**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION** | **Master Docket No. 1:21-cv-00305** |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| **THIS DOCUMENT RELATES TO:** | **JURY TRIAL DEMANDED** |
| **ALL ACTIONS** | |

Plaintiffs Scott Keech and Allen Spradling (collectively "Plaintiffs") allege as follows:

**<u>INTRODUCTION</u>**

1.      The nation's leading operators of outpatient medical centers conspired to restrain competition and reduce compensation for their employees.  Plaintiffs are former employees of SCA (defined below) and bring this suit individually and on behalf of the proposed Class to recover damages and to prevent Defendants from retaining the benefits of their antitrust violations.

2.      The United States Department of Justice ("DOJ") publicly revealed the conspiracy on January 7, 2021, issuing a press release announcing a criminal indictment against Defendants Surgical Care Affiliates, LLC and SCAI Holdings, LLC (described as the successor entity to "Surgical Care Affiliates, Inc.").  *See* Indictment, *United States v. Surgical Care Affiliates, LLC*, No. 3:21cr00011 (N.D. Tex. filed Jan. 5, 2021) ("SCA Indictment" or "DOJ Texas Action").  The DOJ alleges that, by May 2010, Surgical Care Affiliates, LLC and SCAI Holdings, LLC ("SCA") orchestrated a conspiracy in which SCA and "Company A" (identified below as Defendant USPI), and SCA and "Company B" (identified below as Defendant DaVita)

2290838.1

agreed with one another not to solicit or hire the other company's employees without the consent of their current employer.

3.　　The SCA Indictment identifies "Company A" and "Company B" as owners and operators of "outpatient medical care facilities across the United States" and details actions in furtherance of the conspiracy by Individual 1, who "served as SCA's Chief Executive Officer," and Individuals 2 and 3, who served as the CEOs of Company A and Company B, respectively. *Id.* ¶¶ 3, 5, 15.

4.　　Upon information and belief, "Individual 1" is Defendant Andrew Hayek, the former CEO of SCA.[1]

5.　　Upon information and belief, "Company A" refers to Defendants United Surgical Partners International, Inc. and United Surgical Partners Holding Company, Inc. (together, "USPI") and their affiliates and parents, including Defendant Tenet Healthcare Corporation ("Tenet").[2]

6.　　SCA and USPI ostensibly compete horizontally with each other and with the John Doe Defendants to hire and retain employees throughout the United States.  Beginning no later than 2010, however, Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above ("Senior Employees"), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers.  These "no-poach" agreements continued through at least 2017.  The CEOs and other senior executives of each co-conspirator monitored and enforced the agreements.

---

[1] This Complaint uses "[Mr. Hayek]" where the SCA Indictment uses "Individual 1."
[2] This Complaint uses "[USPI]" where the SCA Indictment uses "Company A."

7.     On July 14, 2021, the DOJ revealed a grand jury indictment against Defendants DaVita Inc., formerly known as DaVita Healthcare Partners, Inc., ("DaVita"), and its Chief Executive Officer and Chairman/Co-Chairman of the Board of Directors, Kevin Thiry.  *See United States v. DaVita Inc., et al.*, No. 21-cr-00229-RBJ (D. Colo. July 14, 2021) ("DaVita Indictment" or "DOJ Colorado Action").  The DOJ alleges that beginning at least as early as February 2012 and continuing at least as late as July 2017, DaVita and Thiry entered into a conspiracy with Defendant SCA to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.  DaVita Indictment ¶ 9.  Per the DaVita Indictment, the entity identified as "Company B" in the SCA Indictment is DaVita, and the individual identified in the SCA Indictment as "Individual 3" is Mr. Thiry.[3]

8.     In addition to an agreement between DaVita and SCA, the DaVita Indictment also alleges that, beginning at least as early as April 2017 and continuing at least as late as June 2019, Defendants DaVita and Thiry conspired with an entity identified as "Company B" and its CEO "Individual 3" to suppress competition between them for the services of employees by agreeing that Company B would not solicit DaVita's employees.  (As explained below, the "Company B" and "Individual 3" identified in the DaVita Indictment are not the same as the "Company B" and "Individual 3" identified in the SCA Indictment.)

9.     The conspiracy was not necessary to any legitimate business transaction or lawful collaboration among the companies.  Instead, it was an effective tool to suppress their employees' mobility and compensation, and hence unlawfully reduce the Defendants' costs.

---

[3]  This Complaint uses "[DaVita]" where the SCA Indictment uses "Company B," and "[Thiry]" where the SCA Indictment uses "Individual 3."  No brackets are used where the identity is revealed in the SCA or DaVita Indictment.

10.     The conspiracy accomplished its purpose.  It reduced competition for Defendants' employees and suppressed the compensation of Defendants' employees below competitive levels.  The conspiracy disrupted the efficient allocation of labor that would have resulted if Defendants had competed for, rather than colluded against, current and prospective employees.

11.     Defendants' conspiracy also denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment.  In addition, Defendants' conspiracy eliminated the need for compensation increases to preempt competitive offers and retain employees.  The result, by design, was suppression of broad employee pay structures.

## JURISDICTION AND VENUE

12.     This action arises under section 1 of the Sherman Act (15 U.S.C. § 1) and section 4 of the Clayton Act (15 U.S.C. § 15(a)).  Plaintiffs seek injunctive relief and the recovery of treble damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiffs and members of the Class (defined below) sustained as a result of Defendants' anticompetitive conduct.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. §§ 15 and 26.

13.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the proposed Class Period (defined below), Defendants resided, transacted business, were found, or had agents in this District, and Defendants carried out a substantial portion of the activity that affected interstate trade and commerce in this District.

14.     During the Class Period, Defendants assessed, hired, and retained Senior Employees in a continuous and uninterrupted flow of interstate commerce, including in this

4

District.  Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

15.     This Court has personal jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries: (a) transacted business throughout the United States, including in this District; (b) participated in the assessment, hiring, and retention of Senior Employees throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

16.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Class.  Defendants, directly and through their agents, engaged in activities to limit competition and fix, raise, maintain, and/or stabilize the compensation and terms of employment of their employees in the United States, which unreasonably restrained trade and adversely affected the market for the services of their employees.

## PARTIES

### Plaintiffs

17.     Scott Keech, R.N., M.B.A., was employed by Defendant SCA from approximately 2011 to March 2012 as a Regional Director of Operations and Clinical Services in the San Francisco, California area.  Mr. Keech is a citizen and resident of the State of California.

5

As a Regional Director, Mr. Keech was the senior leader and nurse executive responsible for clinic operations, nursing practice, and the provision of care at outpatient medical centers throughout California.

18.     Allen Spradling is a resident of Hoover, Alabama.  He was employed by Defendant SCA from September 22, 2008 to April 26, 2013, first as a Manager, Program Management Office, and then as a Director, Information Technology.

**SCA Defendants**

19.     Defendant Surgical Care Affiliates, LLC is a company organized and existing under the laws of Delaware with its principal places of business in Birmingham, Alabama and Deerfield, Illinois.  It was the direct operating subsidiary of parent company Surgical Care Affiliates, Inc., which in 2017 merged into Defendant UnitedHealthcare Group Incorporated ("UHG").  Since March 2017, Defendant Surgical Care Affiliates, LLC has been a wholly-owned subsidiary of UHG.  During the relevant period, Surgical Care Affiliates, LLC participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

20.     Defendant SCA Holdings, LLC is a company organized and existing under the laws of Delaware with principal executive offices at UnitedHealth Group Center, 9900 Bren Road East, Minnetonka, Minnesota 55343.  It is a successor in interest to Surgical Care Affiliates, Inc., and an indirect wholly-owned subsidiary of UHG.  During the relevant period, SCA Holdings, LLC participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

21.     Defendant SCAI Holdings, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at 510 Lake Cook Road, Suite 400,

6

Deerfield, Illinois 60015.  SCAI Holdings, LLC is a successor entity to Surgical Care Affiliates, Inc. and a wholly-owned subsidiary of defendant UHG.  During the relevant period, SCAI Holdings, LLC participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

22.     Defendant Andrew Hayek is a natural person and resident of Illinois.  He was Chief Executive Officer and President or Chairman of SCA from 2008 until March 2017.  In mid-2017, OptumHealth, a subsidiary of Defendant UHG, acquired SCA and Mr. Hayek became Chief Executive Officer of OptumHealth.  He served in that capacity until April 2019, when he became Executive Vice President of Optum.  Hayek  participated in, ordered, authorized and assumed a direct role in the illegal conduct alleged.  He knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy as was aware of others who did so as well.  In addition, as a top executive of the company aware of the agreements between competitors and conducting activity consistent with and in furtherance of such agreements, Hayek had a responsible share in the conduct.  In addition, Hayek did so knowing these acts were inherently wrongful.  When engaged in the actions set forth in this complaint, Mr. Hayek was acting on behalf of SCA while engaged in the company's management, direction, or control, or transaction of its business or affairs.  Prior to joining SCA in 2008, Mr. Hayek was the President of Defendant DaVita's VillageHealth division, which provides comprehensive care for patients with chronic kidney disease and end stage renal disease.  During the relevant period, Hayek participated in the conspiracy and committed overt acts in furtherance thereof.

23.     The various SCA entities do and did business as "SCA" and hold themselves out as a single enterprise.  They do not generally distinguish between Surgical Care Affiliates, LLC,

SCA Holdings, LLC, and SCAI Holdings, LLC (or other SCA-related entities) in press releases or on their common website, www.scasurgery.com. Accordingly, this complaint uses "SCA" to mean Surgical Care Affiliates, LLC, SCA Holdings, LLC, SCAI Holdings, LLC, their predecessors and successors, and Andrew Hayek, or any of them.

24. SCA operates more than 230 outpatient medical centers and surgical facilities, employs approximately 10,000 individuals, partners with approximately 8,500 physicians affiliated with its centers, and treats approximately 1 million patients each year. SCA and its affiliates currently operate in 35 states. UHG, SCA's ultimate parent, considers SCA to be a leader in partnering with health plans, medical groups and health systems. SCA's affiliated physicians provide a range of surgical services, including orthopedics, ophthalmology, gastroenterology, pain management, otolaryngology, urology, spine, cardiology and gynecology, as well as other general surgery procedures. SCA's facilities reportedly generate "more than $2 billion in revenue in normal operating times."

**Defendant UHG**

25. Defendant UnitedHealth Group, Incorporated ("UHG") is a company organized and existing under the laws of Delaware, with its principal place of business at 9900 Bren Road East, UnitedHealth Group Center, Minnetonka, Minnesota 55343. During the relevant period, UHG participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

26. In 2017, UHG, through its subsidiaries, acquired SCA for $2.3 billion. Plaintiffs bring this action against UHG for its own actions in furtherance of the conspiracy and as the successor in interest to SCA.

27.     UHG sells products and services through two platforms: UnitedHealthcare, which sells health care insurance coverage and benefits services; and Optum, which provides health services.  Optum includes OptumRx, a pharmacy benefit manager with a network of more than 67,000 community pharmacies; OptumHealth, which sells primary, pediatric, specialty, surgical, urgent care, senior care, and advanced care services through local medical groups and outpatient medical and ambulatory care systems; and OptumInsight, which sells data, analytics, research, consulting, technology, and managed services solutions to hospitals, physicians, health plans, governments, and life sciences companies.  Optum's 2018 calendar year revenues exceeded $100 billion and it has approximately 165,000 employees worldwide.  Optum is reported to be "the fastest growing unit of the largest health insurer in the U.S."

28.     On January 9, 2017, UHG announced that "Optum, a leading health services company and part of UnitedHealth Group … and Surgical Care Affiliates, Inc. …, a leading ambulatory surgery center (ASC) and surgical hospital provider, are combining."  UHG and SCA had entered into a merger agreement two days earlier.

29.     On February 21, 2017, UHG filed a form S-4 with the SEC addressing the transaction.  That submission explained that "in the ordinary course SCA regularly engages in discussions with a variety of other organizations concerning commercial partnering opportunities."  UHG and SCA had discussed a potential merger in November 2015.  At that point, "UnitedHealth Group's senior management began updating the UnitedHealth Group board of directors regarding the status of the proposed commercial arrangements with SCA, as well as SCA's financial and operational performance, on a quarterly basis …."

30.     Among "UnitedHealth Group's Reasons for the Transactions," UHG identified the "experience and strength of SCA's management team."  To that end, UHG disclosed that it

9

would retain the CEO of SCA, Mr. Hayek, who was at that point actively involved in Defendants' conspiracy.

31.     On March 24, 2017, UHG and SCA consummated the transaction, and merged the two entities, including its management, business operations, and ownership of their real and intangible properties.  The merged company was named SCA Holdings, LLC, but it essentially continued SCA's existence and business under a new name.  At the Effective Time of the Merger, David Wichmann became the sole director of the company. David Wichmann is identified on the S-4 as the President of UHG during the period of negotiation with SCA and signed the S-4 as President of UHG.  According to UHG's website, Wichmann became CEO of UHG in 2017 and served until February 2021.

32.     SCA Holdings, LLC's 8-K also explained the management rights of SCA Holdings, LLC.  UHG was to be the Company's sole member.  "Responsibility for the management of the business and affairs of the Company shall be vested in a manager (the 'Manager"), who shall be appointed by the Member.  The initial Manager shall be David S. Wichmann."  The 8-K provides that "[i]t shall be the duty and responsibility of the Manager *solely and exclusively* to manage and control the affairs of the Company.  The Manager may delegate its authorities and responsibilities for management of the business affairs of the Company to third parties, but such delegation shall not relieve the Manager of any of its obligations hereunder."  Any power that officers of SCA Holdings, LLC, such as the CEO, may have are only those delegated to the CEO in writing by the Manager.

33.     The S-4 set forth the operating structure of SCA Holdings after the merger. Among other things, the CEO of SCA, Andrew Hayek, was to serve as CEO of SCA Holdings, LLC after the merger.

34.     On April 15, 2017, Surgical Care Affiliates, Inc. filed with the SEC a Form 15-12B identifying Defendant SCAI Holdings, LLC as its successor in interest.

35.     As a consequence of the merger, UHG assumed and succeeded to all of SCA's liabilities, including for SCA's participation in an unlawful no-poach agreement prior to the acquisition.

### USPI and Tenet Defendants

36.     Defendant United Surgical Partners Holding Company, Inc. is a company organized and existing under the laws of Delaware with its principal place of business at 14201 Dallas Parkway, Dallas, Texas, 75254.  It is a subsidiary of Defendant Tenet Healthcare Corporation.  During the relevant period, USPI participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof

37.     Defendant United Surgical Partners International, Inc. ("USPI") is a company organized and existing under the laws of Delaware with its principal place of business at 14201 Dallas Parkway, Dallas, Texas, 75254.  It is a subsidiary of Defendant Tenet Healthcare Corporation.  USPI "is the largest ambulatory surgery platform in the country" and has over 21,000 employees.  During the relevant period, USPI participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof

38.     Upon information and belief, "Company A" in the SCA Indictment refers to USPI.  For the sake of clarity, this Complaint uses "[USPI]" where the SCA Indictment uses "Company A."

39.     Defendant Tenet Healthcare Corporation ("Tenet") is a public company organized and existing under the laws of Nevada with its principal place of business at 14201 Dallas Parkway, Dallas, Texas 75254.  Through its subsidiaries, partnerships, and joint ventures,

including USPI, Tenet operates 65 hospitals and more than 550 other healthcare facilities, including outpatient medical care and ambulatory surgery centers, surgical hospitals, and other outpatient medical facilities.  During the relevant period, Tenet participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof

40.     On June 16, 2015, Tenet completed a transaction that combined its freestanding ambulatory surgery and imaging center assets with the surgical facility assets of USPI.

41.     In April 2016, Tenet paid $127 million to purchase additional shares of USPI, which increased Tenet's ownership interest from 50.1% to approximately 56.3%.  In July 2017, Tenet paid $716 million for the purchase of additional shares, which increased its ownership interest in USPI to 80.0%.  In April 2018, Tenet paid approximately $630 million for the purchase of an additional 15% ownership interest in USPI, which increased its ownership interest in USPI to 95%.  The acquisition of USPI by Tenet constituted a merger of the two entities in fact and in effect, as USPI essentially continued the same business operations afterwards.

42.     Plaintiffs bring this action against Tenet for its own actions in furtherance of the conspiracy and as the parent company of the USPI entities.

**DaVita Defendants**

43.     Defendant DaVita, Inc. ("DaVita") is a company organized and existing under the laws of Delaware with its principal place of business in Denver, Colorado.  It is sometimes referred to as "The Village" or "DVA."  DaVita owns and operates outpatient medical care facilities around the United States, and employed individuals to operate its business at its headquarters location and at other locations throughout the United States.  Upon information and belief, DaVita is the company identified as "Company B" in the SCA Indictment/DOJ Texas

Action. During the relevant period, DaVita participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof

44.     Defendant Kent Thiry was the CEO of DaVita from 1999 to June 2019. He served as the Chairman of the Board of DaVita from June 2019 to May 2020. Mr. Thiry participated in, ordered, authorized and assumed a direct role in the illegal conduct alleged. He knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy as was aware of others who did so as well. In addition, as a top executive of the company aware of the agreements between competitors and conducting activity consistent with and in furtherance of such agreements, Mr. Thiry had a responsible share in the conduct. He did so knowing these acts were inherently wrongful. When engaged in the actions set forth in this complaint, Mr. Thiry was acting on behalf of DaVita while engaged in the company's management, direction, or control, or transaction of its business or affairs. Upon information and belief, Mr. Thiry is the individual identified as "Individual 3" in the SCA Indictment/DOJ Texas Action.

## Doe Defendants

45.     Upon information and belief, Does 1-20 are persons and entities that participated in the conspiracy between and among SCA, Hayek, UHG, Tenet, USPI, DaVita, Thriy, and other as yet unnamed or unidentified co-conspirators or participants in the conspiracy. Plaintiffs are ignorant of the true names of such Defendants and have named them by fictitious name. They include, at a minimum, "Company B" and "Individual 2," as described in the DOJ Texas Action. During the relevant period, Does 1-20 participated in the conspiracy and, through their executives, managers, employees or agents, committed overt acts in furtherance thereof

46.     Upon information and belief, Defendant Doe 1 is "Company B" as alleged in the DaVita Indictment.  Company B was a company organized and existing under the laws of Delaware with its principal place of business in San Francisco, California.  It was a healthcare company that operated across the United States and employed individuals to operate its business at its headquarters location.  It was a horizontal competitor with DaVita and other participants in the conspiracy with respect to the recruitment and retention of employees.   During the relevant period, Doe 1 participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

47.     Upon information and belief, Defendant Doe 2 is "Individual 3" as alleged in the DaVita Indictment.  Doe 2 served as the CEO of Doe 1," and at all times was acting on behalf of Doe 1 while engaged in the company's management, direction, control, or transaction of its business or affairs.  Doe 2 participated in, ordered, authorized and assumed a direct role in the illegal conduct alleged.  Doe 2 knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy as was aware of others who did so as well. In addition, as a top executive of Doe 1 aware of the agreements between competitors and conducting activity consistent with and in furtherance of such agreements, Doe 2 had a responsible share in the conduct.  In addition, Doe 2 did so knowing these acts were inherently wrongful

### Agents and Co-Conspirators

48.     The anticompetitive and unlawful acts alleged against Defendants in this Complaint were authorized, ordered, or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

14

49.     The Defendants' agents operated under the explicit and apparent authority of their principals.

50.     Each Defendant operated through its subsidiaries, affiliates, and agents.

51.     Each Defendant acted as the principal, agent, or joint venture partner of or for other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint.

52.     Upon information and belief, various companies and individuals not named as defendants in this Complaint participated as co-conspirators in the alleged conspiracy and performed acts and made statements to further the conspiracy.

## FACTUAL ALLEGATIONS

### Defendants' Conspiracy

53.     SCA, USPI, DaVita, Doe 1, and other Doe Defendants operate or operated ambulatory surgery centers, outpatient medical centers, and other healthcare services, and were competitors in the recruitment and retention of employees across the United States.  Over a period spanning at least the years 2010 through 2019, SCA, USPI, DaVita, Doe 1, and other Doe Defendants joined a conspiracy to reduce and limit compensation and mobility of their employees.  In furtherance of the conspiracy, Defendants, and each of them, entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees.  The conspiracy was executed, enforced, and concealed by the companies' most senior executives and managers.  Such no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration among the companies.

15

54. Defendants participated in meetings, conversations, and communications to discuss the solicitation of each other's employees, and agreed during those meetings, conversations, and communications not to solicit each other's employees.

### The Conspiracy Began With SCA and USPI in 2010

55. The conspiracy began at least as early as May 2010, when Mr. Hayek established an agreement with his counterpart at USPI to eliminate competition between the companies for each other's employees. As alleged in the SCA Indictment, on or about May 14, 2010, the CEO of [USPI] emailed certain other [USPI] employees, stating "I had a conversation w [Mr. Hayek] re people and we reached agreement that we would not approach each other's [employees] proactively."

56. Defendants told certain executives, human resources employees, and recruiters to avoid soliciting employees of each other's companies. For example, on or about November 11, 2013, a senior human resources employee at [USPI] told a recruiter the following: "Please do not schedule a call w/ [candidate], thanks. She would have had to apply for the job first. We cannot reach out to SCA folks. Take any SCA folks off the list."

57. On or about November 1, 2013, employees of [USPI] discussed whether to interview a candidate employed by SCA in light of the "verbal agreement with SCA to not poach their folks . . . ." The CEO of [USPI] noted that "[w]e do have that agreement and want to stick by it. If [candidate] indeed did approach us, and is willing to tell [Mr. Hayek] that I'm ok." The senior human resources officer at [USPI] responded: "Yikes, she is not going to want to do that. But I will check."

58. Defendants alerted their co-conspirators when each other's employees were recruited, and policed violations of the conspiracy. For example, on or about December 8, 2015,

16

the CEO of [USPI] told [Mr. Hayek]: "Just wanted to let you know that [recruiting company] is reaching out to a couple of our execs. I'm sure they are not aware of our understanding." [Mr. Hayek] told other SCA executives: "We should continue to flag [USPI] on our 'do not call' list to recruiters - is OK if we get an inbound inquiry and the leader has communicated within [USPI] that they want to leave, but outbound calls should not be occurring."

59.     Defendants refrained from soliciting each other's employees. For example, on or about July 17, 2017, a human resources employee of [USPI], believing a candidate to be employed by SCA, emailed a recruiting coordinator for [USPI] that, although the candidate "look[ed] great" she "can't poach her."

### In 2012, SCA Brings DaVita Into the Conspiracy

60.     The Department of Justice alleges that beginning at least as early as May 2012, DaVita and Mr. Thiry joined the conspiracy through SCA and Mr. Hayek.

61.     For example, on or about October 20, 2014, the CEO of DaVita, Mr. Thiry, emailed [Mr. Hayek] the following: "Someone called me to suggest they reach out to your senior biz dev guy for our corresponding spot. I explained I do not do proactive recruiting into your ranks."

62.     Confirming that DaVita was now part of the conspiracy involving SCA and USPI, on or about October 16, 2015, [Mr. Hayek] emailed an SCA human resources executive: "Putting two companies in italics ([USPI] and [DaVita]) - we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."

63.     Similarly, on or about December 12, 2015, SCA's human resources executive instructed a recruiter to "note that [USPI] and [DaVita] are off limits to SCA."

64.     Consistent with the conspiracy, Defendants told job candidates they needed to inform their current employer to be considered.  For example, on or about April 26, 2016, SCA's human resources executive emailed a candidate from DaVita who was based in Dallas, Texas, that she could not recruit the candidate unless they "have been given explicit permission by their employers that they can be considered for employment with us."

65.     On or about June 13, 2016, an employee of SCA forwarded news of a recruitment, noting that: "I thought there was a gentlemen's agreement between us and DaVita re: poaching talent."  An SCA executive replied: "There is.  Do you mind if I share with [Mr. Hayek], who has most recently addressed this with Kent [DaVita's CEO]."  Mr. Hayek relayed the news to DaVita's CEO, Mr. Thiry, who replied, "Will check it out."  On or about July 10, 2016, Mr. Thiry forwarded the communication from Mr. Hayek to another senior-level DaVita executive, commenting: "Pls put it on our next agenda."

66.     On or about April 7, 2017, [Mr. Hayek] was contacted by a consultant regarding his interest in a candidate employed by DaVita and responded: "In order to pursue [candidate], he would need to have already communicated that he is planning to leave DaVita — that's the relationship that we have with DaVita."  The consultant responded, ". . . I'm glad you arrived at that agreement with KT [Kevin Thiry, DaVita's CEO]."

### In 2017, DaVita Brings Do 1 Into the Conspiracy

67.     Later, DaVita and Mr. Thiry expanded the conspiracy to include Does 1 and 2. As alleged in the DaVita Indictment, on April 16, 2017, Defendant Doe 2 emailed Defendant Thiry that "You also have my commitment we discussed that I'm going to make sure everyone on my team knows to steer clear of anyone at DVA and that I'll come back to you and talk before ever get anywhere near a point that could contemplate someone else."

18

68.     On or around February 22, 2018, Defendant Doe 2 e-mailed Defendant Thiry, stating, "I took our conversations last year to heart around how it felt to you/DVA when [DaVita employee] left—our relationship matters far more to me than any potential addition to our team. Although there have been 4 people that have reached out over the past year to probe about opportunities, I have not pursued those conversations (always being clear that it was about not having a clear need which was accurate to some extent)."

69.     On or around February 22, 2018, Defendant Doe 2 e-mailed Defendant Thiry about a current DaVita employee, stating: "We do happen to have openings in her area and they could be a good fit.  However, I told her that given my relationship with the Village, I would only discuss with her if she told her manager explicitly that she would like to talk to me about a role and that I would talk to you about it before I would discuss with her (I framed it in a positive way about me making sure I'm doing the right thing as someone who cares about the Village and an investor in Village as well."

70.     Consistent with the conspiracy, Defendant Doe 1 refrained from soliciting DaVita employees.  For example, on or about April 20, 2017, Defendant Doe 2 sent a text message to a former colleague for recommendations for customer service employees and, referring to a DaVita-owned pharmacy company, stated "But nobody at Rx today.  Promised Kent [DaVita's CEO]!"  Similarly, on or around July 20, 2017, Defendant Doe 2 sent a text message to a former DaVita employee: "Also please let me know if you think of any great folks (nobody currently at DaVita) that would be worth talking to."

**Effects of No-Poach Conspiracy**

71.     Labor markets are not perfectly competitive.  They are not like commodity markets where market-wide demand and supply tend to determine a single market price.

19

Defendants do not simply pay a "market wage" for a particular employee, as they might pay a "market price" for a pound of silver on a metals exchange. Instead, labor market participants determine prices by interacting with each other. This is particularly true for jobs in which specialized experience or skills are valuable, such as positions in outpatient medical care and other healthcare facilities. Market "frictions" result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) there are a limited number of essentially identical positions from which workers can choose. Such market frictions adversely impact competition in labor markets, and generally provide market power to employers. These market frictions and resulting market power are well-recognized in labor economics.

72.     Defendants' conspiracy injured employees with experience or skills in the outpatient medical care and healthcare industry in part because Defendants are market leaders in their fields. During the Class Period, SCA, USPI, and DaVita were the nation's largest operators of outpatient medical care centers as well as one another's top rivals for labor.

73.     Defendants also are among the largest employers in the outpatient medical care center industry, with a nationwide reach. For example, SCA has over 10,000 employees nationwide, USPI has over 21,000, and DaVita has over 77,000.

74.     The specialized knowledge relevant to work in the outpatient medical care and healthcare industry is subject to not only market frictions, but also high supply-demand pressures. There is high demand for and limited supply of employees with experience or skills relevant to outpatient medical care facilities. Employees within the industry, like those working for the Defendants, are key sources of potential talent to fill these openings.

75. The importance of relevant industry experience to Defendants is reflected in their job postings. For example, in a job posting for a Senior Director of Development in Houston, Texas, SCA emphasizes that "[h]ealthcare industry knowledge is preferred." In a posting for Vice President of Practice Operations in Southern California, SCA notes that qualifications include experience "within a highly professional and successful healthcare services company." For a Director of Operations in Portland, SCA states that "management experience in ASC [Ambulatory Surgery Center] operations or hospital outpatient centers is strongly preferred."

76. Defendants employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire employees. Defendants also receive direct applications from individuals interested in employment opportunities.

77. Soliciting employees from other outpatient medical care and healthcare industry employers is a particularly efficient and effective method of competing for employees. Soliciting involves communicating directly—by phone, email, social and electronic networking, or in person—with competitors' employees who have not applied for a job opening. Such direct solicitation can be done by the soliciting firm's personnel or by outside recruiters. Firms in the outpatient medical care and healthcare industry rely on direct solicitation of employees of other outpatient medical care and healthcare companies because those individuals have specialized experience and may not respond to other methods of recruiting.

78. In a properly functioning and lawfully competitive labor market, outpatient medical care and healthcare industry employers would compete with one another to attract and retain employees for their needs. This competition among employers for those employees would determine the level of compensation. Competition would also improve the employees' ability to negotiate for better salaries and other terms of employment.

79.     In the absence of a prior agreement, companies like Defendants would solicit and hire employees from other companies in the same industry because those employees have training and experience that are lacking in hires from other industries.  Hiring employees from a different industry requires the company to invest significant resources in identifying, assessing, and training those employees, and is particularly unsuitable for senior-level positions.  For these reasons and others, lateral hiring within the outpatient medical care industry is a key form of competition in this industry.  In this case, Defendants prevented that competition through their illegal conspiracy, apparently concluding that the profits to be made by suppressing wages in the labor market outweighed the benefits to be gained from competing with each other in the labor market.

80.     Competition for workers via lateral hiring has a significant impact on compensation in a number of ways.  First, competition facilitates the flow of information about opportunities and compensation.  For example, employees who are solicited, interviewed, or offered a job by a rival employer gain insight into how other companies value their work and experience, and what compensation and benefits their competitors typically pay or are willing to pay to induce them to leave their current employer.  This information is not otherwise readily available to employees, who generally rely on these encounters and word-of-mouth from peers and colleagues for such information.  Employers, on the other hand, often hire private consulting firms to gather information regarding market compensation rates.  In a labor environment where price discovery is already inhibited, no-poach agreements further restrain employees' access to this crucial information by eliminating or reducing the communications that encourage the flow of information.

22

81.     Defendants' conspiracy precluded information about pay and benefits from reaching employees at Defendants' companies.  Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors.  Indeed, empirical economic research confirms that employees who change jobs voluntarily typically have faster wage growth than those who remain in the same job.  These employees also could have shared this information with their co-workers, multiplying the impact of each offer as the information would have spread through social channels.  Among other things, Defendants refrained from informing employees or others who were targets of the conspiracy of the fact of the conspiracy and acted to conceal the fact of the conspiracy by giving pretextual explanations for hiring or compensation decisions, and omitting such decisions were made on the basis of the illegal agreements, not because of market conditions or because of the worth or value of employees.  These acts precluded employees from possessing highly relevant information.

82.     Second, the threat of losing employees to competitors encourages employers to preemptively increase and maintain appropriately high compensation to ensure high morale, productivity, and retention.  Absent appropriate compensation, employees are more likely to seek better compensation elsewhere, be receptive to recruiting by competitors, limit their productivity, and undermine morale.  Once an employee has received an offer from another company, the employer may have to increase compensation to retain that employee, and increase compensation for other employees as well.  In a competitive labor market, such preventive retention measures thus lead to increased compensation for employees.  But in the outpatient medical care industry, Defendants' conspiracy substantially spared them from taking such measures, lowering employee pay.

23

83. Third, because many outpatient medical care and healthcare employees are integrated into teams, some workers who move to different companies may bring others with them. Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for these related workers. Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to move with them.

84. Defendants, like other sophisticated companies, maintained internal compensation systems and developed compensation structures that preserved relatively stable relationships between the pay of their employees. The effect of such systems is that an adjustment to the pay of some employees will lead to adjustments to the pay structure as a whole, affecting the pay of all employees. Distortions to the labor market's competitive process, such as the distortions caused by Defendants' no-poach agreements, suppressed the pay of all employees who shared common pay structures, not just those who proactively sought to work for another outpatient medical care center. Moreover, because the pay rates for jobs within pay structures were tied together, the compensation of all employees was affected by Defendants' no-poach agreements.

85. To maintain productivity and morale and to retain employees, in the absence of a prior agreement, employers such as Defendants would also consider the perceived fairness of their compensation systems. Defendants thus had an incentive to ensure that their employees felt that their compensation was fair based on broad comparisons across job descriptions and titles within the company and as compared to other companies in the industry.

86. What constitutes "fair" is based on comparisons that employees draw between themselves and other employees at their company and in their field. For example, employees

24

generally would not consider it fair for there to be pay differentials for workers doing the same work at the same level at the same company based solely on the fact that some of these employees received an outside solicitation or offer of alternate employment.

87. Fairness concerns often involve both "internal equity" and "external equity." "Internal equity" depends on the extent to which employees perceive pay levels to be fair and objective compared to other employees *within* the same company. "External equity" depends on the perception of the fairness of pay levels compared to similar employees *outside* the company. Defendants' pay structures should have been designed, constructed, and maintained to accomplish both internal and external equity goals, but they were undermined by the illegal agreement.

88. Companies foster both internal and external equity by maintaining formal compensations systems that restrict discretionary pay decisions and focus on more objective criteria such as job descriptions and classifications, wage levels for equivalent jobs in the labor market, pay differentials based on experience and levels of responsibility, and other factors affecting the perceived fairness of the compensation system. In sum, pay systems adjust pay levels across job titles and pools of employees to maintain internal and external equity to better foster good morale and motivate employees across a company's labor force. Because of these systems, the pay of one employee always bears a relationship to the pay of other employees.

89. These pay systems are systematically monitored and adjusted from the top down by senior management, with regular company-wide reviews and assessments.

90. Because of such formal systems, however, Defendants' no-poach agreements would have affected the proposed Class as a whole, and not just individual employees who would have otherwise received job offers from rival companies in the industry.

25

91.     Due to internal and external equity considerations, increasing the pay of one employee in order to retain that employee leads to pay raises not only for those who perform similar work (and thus are within the same pay bands or grades), but also for a wider swath of employees who base their notions of fair compensation on certain degrees of differentials between themselves and those other employees.  Conversely, a no-poach agreement suppresses compensation not only for employees who would have received competitive offers, but for other employees as well.  These systematic effects occur both at the same time, through firm-wide pay adjustments and reviews, and over time, as pay structures adjust to account for internal and external equity.

92.     Defendants' conspiracy restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor markets.  The conspiracy suppressed the compensation of all employees, not just particular individuals who otherwise would have been solicited or sought to change employers.  The effects of eliminating solicitation and lateral hiring, pursuant to agreement, caused widespread impact on Defendants' employees by eliminating or reducing the flow of information and the need for preventive and reactive increases to compensation for the entire Class.

**Effects on Interstate Commerce**

93.     During the relevant time period, Defendants employed members of the Class throughout the United States, including in this judicial district.

94.     Defendants' conspiracy substantially reduced competition for labor in the outpatient medical care and healthcare industry, and suppressed the efficient movement and compensation of outpatient medical care industry employees, harming Plaintiffs and members of the Class.  Because the no-poach agreements enabled Defendants to maintain suppressed

26

compensation levels generally, the harm extended not only to those who sought, or otherwise would have sought to change companies, but also to those who had no intention of seeking other employment.

95.     Thus, Defendants' no-poach agreements and related conduct substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

**Plaintiffs' Claims Are Timely**

96.     Until January 7, 2021, when the DOJ publicly announced the SCA Indictment, Plaintiffs and members of the proposed Class did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaged in secret no-poach agreements.

97.     Defendants did not publicize their no-poach agreements, did not inform job applicants about the conspiracy, and acted in a manner deliberately designed to avoid detection of the conspiracy.  For example, the agreements among the CEOs of SCA, USPI, and DaVita were primarily oral, and deliberately not memorialized in a written agreement or contract, or other writing likely to become widely available.  Knowledge of the agreements was closely held by executives and recruiters of the Defendant companies, who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions, telephone conversations, and private email communications.  None of the relevant communications alleged herein were made public until after release of the Grand Jury's SCA Indictment.

98.     Additionally, rather than disclose their non-solicitation agreements, Defendants devised internal procedures to identify affected applicants, and gave false and pretextual

27

explanations for hiring and compensation decisions that in fact were made pursuant to Defendants' unlawful agreement.

99.     Until recently, Plaintiffs and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were conspiring to restrain competition for the services of their Senior Employees.

100.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, and/or Defendants' fraudulent concealment. Defendants are thus estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

101.    Plaintiffs bring this action individually and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCA Holdings, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holding Company, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries; or (d) from April 1, 2017 through January 5, 2021, for "Company B" (as identified in the DaVita Indictment) or one of its subsidiaries.  The term "skilled positions" will be defined with reference to specific job titles upon Plaintiffs' analysis of discovery materials.  For purposes of the pleadings, "skilled positions" include the titles of Administrator, Group Administrator, Manager, Director, and any equivalent or more senior title at SCA, USPI, DaVita, and Doe 1 and other co-conspirators, as well as any job title for which healthcare experience or skills were valuable.  Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.

28

102.    Plaintiffs reserve the right to amend the Class definition, define subclasses, and expand or narrow the proposed Class based on information obtained in discovery and expert analysis of such information.

103.    There are thousands of members of the Class as described above, the exact number and their identities being known by Defendants, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

104.    The Class is precisely ascertainable from Defendants' records.

105.    Plaintiffs' claims are typical of the claims of the proposed Class as they arise out of the same course of Defendants' conduct and the same legal theories.

106.    Plaintiffs will fairly and adequately represent the interests of the proposed Class and have no conflict with the interests of the proposed Class.

107.    There are numerous questions of law and fact common to each Class member, including, but not limited to:

a.      whether Defendants and their co-conspirators agreed not to solicit or hire each other's employees;

b.      whether such agreements were *per se* violations of the Sherman Act;

c.      whether Defendants have fraudulently concealed their misconduct;

d.      whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for Plaintiffs and the proposed Class;

e.      whether Plaintiffs and the Class suffered antitrust injury as a result of Defendants' agreements;

f.      the type and measure of damages suffered by Plaintiffs and the Class; and

g.      the nature and scope of injunctive relief necessary to restore a competitive market.

108.    During the Class Period, Plaintiffs were employed by SCA at or above the Director level.  Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class.

109.    Plaintiffs are members of the Class, have claims that are typical of the claims of the Class, and will fairly and adequately protect the interests of the Class.  In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

110.    The above-referenced common questions of law and fact predominate over any questions affecting only individual members of the Class.

111.    Defendants have acted on grounds generally applicable to the proposed Class, thereby making final injunctive relief appropriate with respect to the proposed Class as a whole.

112.    A class action is superior to any other means of resolving this litigation.  Separate actions by individual Class members would be inefficient and would create the risk of inconsistent or varying judgments.  There will be no material difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

## (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

113.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

114.    Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in an overarching conspiracy, consisting of unlawful

30

agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's employees, thereby fixing and suppressing Class members' compensation.

115.     Defendants' conspiracy included concerted action and undertakings with the purpose and effect of: (a) fixing Plaintiffs' and the Class's compensation at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for employees.

116.     Defendants' combinations and conspiracy injured Plaintiffs and other members of the Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

117.     Defendants' conduct and agreements are *per se* violations of Section 1 of the Sherman Act.

118.     Defendants' conduct is ongoing, continues to create immediate irreparable harm, and will continue to do so in the future if not enjoined.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class of similarly situated persons, respectfully request that:

a.     The Court certify this lawsuit as a class action under Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, and that Plaintiffs' counsel be appointed as Class counsel for the Class;

b.      The Court declare, adjudge, and/or decree that the conduct alleged herein is *per se*

unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.      Plaintiffs and the Class recover their damages, trebled, and the costs of the suit,

including reasonable attorneys' fees as provided by law;

d.      The Court enter an injunction enjoining Defendants from enforcing the unlawful

conspiracy or entering into similar agreements going forward; and

e.      The Court award such other and further relief as the Court may deem just and

proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, individually and on behalf of

the proposed Class, demand a trial by jury on all issues so triable.

Dated:  August 9, 2021                    Respectfully submitted,

*/s/  Dean M. Harvey*

Dean M. Harvey (*pro hac vice*)
Lin Y. Chan (*pro hac vice*)
Yaman Salahi (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415) 956-1000
dharvey@lchb.com
lchan@lchb.com
ysalahi@lchb.com

Linda P. Nussbaum (*pro hac vice*)
Bart D. Cohen (*pro hac vice* forthcoming)
Marc E. Foto (*pro hac vice* forthcoming)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
mfoto@nussbaumpc.com

Michael L. Roberts
Karen Halbert
ROBERTS LAW FIRM US, PC
1920 McKinney Ave., Suite 700
Dallas, TX 75204
(501) 821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Joseph R. Saveri
Steven N. Williams
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Tel:  (415) 500-6800
Fax:   (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com

*Interim Co-Lead Class Counsel*

33