**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION** | **Master Docket No. 1:21-CV-00305** |
| **THIS DOCUMENT RELATES TO:**<br><br>**ALL ACTIONS** | |

**ANSWER OF DEFENDANTS UNITED SURGICAL PARTNERS HOLDING
COMPANY, INC., UNITED SURGICAL PARTNERS INTERNATIONAL, INC.,
AND TENET HEALTHCARE CORPORATION TO
PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Defendants United Surgical Partners International, Inc. and United Surgical Partners Holding Company, Inc. (together, "USPI") and Defendant Tenet Healthcare Corporation ("Tenet") answer the Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint") as follows:

## INTRODUCTION

1.     The nation's leading operators of outpatient medical centers conspired to restrain competition and reduce compensation for their employees. Plaintiffs are former employees of SCA (defined below) and bring this suit individually and on behalf of the proposed Class to recover damages and to prevent Defendants from retaining the benefits of their antitrust violations.

**ANSWER:**  With respect to the first sentence of Paragraph 1, USPI and Tenet admit that USPI operates outpatient medical centers; admit that, as USPI self-reported to the United States Department of Justice, Antitrust Division ("DOJ"), it entered into an agreement with Surgical

1

Care Affiliates, LLC ("SCA") to avoid actively soliciting each other's employees at the level of administrator or above, absent the knowledge of the employees' existing employer (the "USPI/SCA Agreement"); deny that Tenet was a party to the USPI/SCA Agreement; deny the existence of any conspiracy between USPI or Tenet and the remaining Defendants; and deny the existence of the conspiracy as alleged in the Complaint. With respect to the second sentence of Paragraph 1, USPI and Tenet state they lack knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiffs are former employees of SCA, and on that basis, deny it and admit that Plaintiffs purport to bring this suit individually and on behalf of a proposed Class to recover damages and to prevent Defendants from retaining alleged benefits of alleged antitrust violations.

        2.     The United States Department of Justice ("DOJ") publicly revealed the conspiracy on January 7, 2021, issuing a press release announcing a criminal indictment against Defendants Surgical Care Affiliates, LLC and SCAI Holdings, LLC (described as the successor entity to "Surgical Care Affiliates, Inc."). *See* Indictment, *United States v. Surgical Care Affiliates, LLC*, No. 3:21cr00011 (N.D. Tex. filed Jan. 5, 2021) ("SCA Indictment" or "DOJ Texas Action"). The DOJ alleges that, by May 2010, Surgical Care Affiliates, LLC and SCAI Holdings, LLC ("SCA") orchestrated a conspiracy in which SCA and "Company A" (identified below as Defendant USPI), and SCA and "Company B" (identified below as Defendant DaVita) agreed with one another not to solicit or hire the other company's employees without the consent of their current employer.

      **ANSWER:** With respect to the first sentence of Paragraph 2, USPI and Tenet deny the existence of the conspiracy as alleged in the Complaint and state that the January 7, 2021 DOJ

press release and *United States v. Surgical Care Affiliates, LLC*, No. 3:21-cr-00011 (N.D. Tex. Jan. 5, 2021) (the "SCA Indictment") speak for themselves, and no response is required.

3.      The SCA Indictment identifies "Company A" and "Company B" as owners and operators of "outpatient medical care facilities across the United States" and details actions in furtherance of the conspiracy by Individual 1, who "served as SCA's Chief Executive Officer," and Individuals 2 and 3, who served as the CEOs of Company A and Company B, respectively. *Id.* ¶¶ 3, 5, 15.

**ANSWER:**  USPI and Tenet state that the SCA Indictment speaks for itself, and no response is required.

4.      Upon information and belief, "Individual 1" is Defendant Andrew Hayek, the former CEO of SCA.[1]

**ANSWER:**  USPI and Tenet admit that the "Individual 1" referenced in the SCA Indictment is Defendant Andrew Hyack, the former CEO of SCA.

5.      Upon information and belief, "Company A" refers to Defendants United Surgical Partners International, Inc. and United Surgical Partners Holding Company, Inc. (together, "USPI") and their affiliates and parents, including Defendant Tenet Healthcare Corporation ("Tenet").[2]

**ANSWER:**  USPI and Tenet admit that "Company A" in the SCA Indictment refers to USPI; deny that "Company A" refers to Tenet; and deny the remaining allegations in Paragraph 5.

6.      SCA and USPI ostensibly compete horizontally with each other and with the John Doe Defendants to hire and retain employees throughout the United States.  Beginning

---

[1]  This complaint uses "[Mr. Hayek]" where the SCA Indictment uses "Individual 1."
[2]  This Complaint uses "[USPI]" where the SCA Indictment uses "Company A."

no later than 2010, however, Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above ("Senior Employees"), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers. These "no-poach" agreements continued through at least 2017. The CEOs and other senior executives of each co-conspirator monitored and enforced the agreements.

**ANSWER:** With respect to the first sentence of Paragraph 6, USPI and Tenet admit that SCA and USPI compete to hire and retain employees and state that they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, deny them. With respect to the second and third sentences of Paragraph 6, USPI and Tenet admit that, from May 2010 until October 2017, USPI was a party to the USPI/SCA Agreement; deny that USPI entered into an agreement to avoid competing with SCA for "Senior Employees," who are defined as those at "the director level or above" in the Complaint; deny that Tenet was a party to the USPI/SCA Agreement; deny the existence of any conspiracy between USPI or Tenet and the remaining Defendants; deny the existence of the conspiracy as alleged in the Complaint; and deny the remaining allegations. With respect to the fourth sentence of Paragraph 6, USPI and Tenet admit that USPI's and SCA's then CEOs monitored and enforced the USPI/SCA Agreement; deny the allegations as they relate to Tenet; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations as they relate to the remaining Defendants, and on that basis, deny them.

7.      On July 14, 2021, the DOJ revealed a grand jury indictment against Defendants DaVita Inc., formerly known as DaVita Healthcare Partners, Inc., ("DaVita"), and its Chief Executive Officer and Chairman/Co-Chairman of the Board of Directors, Kevin Thiry. *See*

*United States v. DaVita Inc., et al.,* No. 21-cr-00229-RBJ (D. Colo. July 14, 2021) ("DaVita Indictment" or "DOJ Colorado Action"). The DOJ alleges that beginning at least as early as February 2012 and continuing at least as late as July 2017, DaVita and Thiry entered into a conspiracy with Defendant SCA to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees. DaVita Indictment ¶ 9. Per the DaVita Indictment, the entity identified as "Company B" in the SCA Indictment is DaVita, and the individual identified in the SCA Indictment as "Individual 3" is Mr. Thiry.[3]

**ANSWER:** USPI and Tenet state *United States v. DaVita Inc., et al.*, No. 21-cr-00229-RBJ (D. Colo. July 14, 2021) (the "DaVita Indictment") speaks for itself, and no response is required.

8. In addition to an agreement between DaVita and SCA, the DaVita Indictment also alleges that, beginning at least as early as April 2017 and continuing at least as late as June 2019, Defendants DaVita and Thiry conspired with an entity identified as "Company B" and its CEO "Individual 3" to suppress competition between them for the services of employees by agreeing that Company B would not solicit DaVita's employees. (As explained below, the "Company B" and "Individual 3" identified in the DaVita Indictment are not the same as the "Company B" and "Individual 3" identified in the SCA Indictment.)

**ANSWER:** USPI and Tenet state the DaVita Indictment speaks for itself and no response is required. USPI and Tenet deny that USPI and Tenet had any agreement with DaVita as alleged in the Complaint.

---

[3] This Complaint uses "[DaVita]" where the SCA Indictment uses "Company B," and "[Thiry]" where the SCA Indictment uses "Individual 3." No brackets are used where the identity is revealed in the SCA or DaVita Indictment.

9.     The conspiracy was not necessary to any legitimate business transaction or lawful collaboration among the companies. Instead, it was an effective tool to suppress their employees' mobility and compensation, and hence unlawfully reduce the Defendants' costs.

**ANSWER**:  USPI and Tenet deny the existence of the conspiracy as alleged in the Complaint; state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations as they relate to other Defendants, and on that basis, deny them; and state that the remainder of Paragraph 9 contains legal conclusions to which no response is required.

10.     The conspiracy accomplished its purpose. It reduced competition for Defendants' employees and suppressed the compensation of Defendants' employees below competitive levels. The conspiracy disrupted the efficient allocation of labor that would have resulted if Defendants had competed for, rather than colluded against, current and prospective employees.

**ANSWER**:  USPI and Tenet deny the existence of the conspiracy alleged in the Complaint; deny the remaining allegations to the extent they relate to USPI and Tenet; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations as they relate to other Defendants, and on that basis, deny them.

11.     Defendants' conspiracy also denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment. In addition, Defendants' conspiracy eliminated the need for compensation increases to preempt competitive offers and retain employees. The result, by design, was suppression of broad employee pay structures.

**ANSWER:** USPI and Tenet deny the existence of the conspiracy alleged in the Complaint; deny the remaining allegations as they relate to USPI and Tenet; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations as they relate to other Defendants, and on that basis, deny them.

## JURISDICTION AND VENUE

12.    This action arises under section 1 of the Sherman Act (15 U.S.C. § 1) and section 4 of the Clayton Act (15 U.S.C. § 15(a)). Plaintiffs seek injunctive relief and the recovery of treble damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiffs and members of the Class (defined below) sustained as a result of Defendants' anticompetitive conduct. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. §§ 15 and 26.

**ANSWER:** With respect to the first sentence of Paragraph 12, USPI and Tenet admit that Plaintiffs have alleged a claim that arises under section 1 of the Sherman Act (15 U.S.C. § 1) and section 4 of the Clayton Act (15 U.S.C. § 15(a)).  With respect to the second sentence of Paragraph 12, USPI and Tenet admit that Plaintiffs purport to seek injunctive relief and the recovery of treble damages, costs of suit, and reasonable attorneys' fees for injuries that Plaintiffs allege they and members of the Class they purport to represent sustained.  USPI and Tenet state the third sentence of Paragraph 12 contains legal conclusions to which no response is required.

13.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the proposed Class Period (defined below), Defendants resided, transacted business, were found, or had agents in this District, and Defendants carried out a substantial portion of the activity that affected interstate trade and commerce in this District.

**ANSWER:** USPI and Tenet admit they transacted business in this District and state the remaining allegations in Paragraph 13 are legal conclusions to which no response is required.

14.     During the Class Period, Defendants assessed, hired, and retained Senior Employees in a continuous and uninterrupted flow of interstate commerce, including in this District. Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

**ANSWER:** With respect to the first sentence of Paragraph 14, USPI and Tenet admit that they assessed, hired and retained "Senior Employees," as that term is defined in the Complaint, in this District; state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them; and state that the remaining allegations are legal conclusions to which no response is required. USPI and Tenet state that the second sentence of Paragraph 14 contains legal conclusions to which no response is required.

15.     This Court has personal jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries: (a) transacted business throughout the United States, including in this District; (b) participated in the assessment, hiring, and retention of Senior Employees throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States,

including in this District, and have purposefully availed themselves of the laws of the United

States.

    **ANSWER:**  USPI and Tenet state that the first sentence of Paragraph 15 contains legal

conclusions to which no response is required.  With respect to the second sentence of Paragraph

15, USPI and Tenet admit that they conducted business in various locations throughout the

United States and in this District; state that they lack knowledge or information sufficient to form

a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny

them; and state that the remaining allegation regarding USPI and Tenet is a legal conclusion to

which no response is required.

    16.    By reason of the unlawful activities alleged herein, Defendants

substantially affected commerce throughout the United States, causing injury to Plaintiffs and

members of the Class. Defendants, directly and through their agents, engaged in activities to

limit competition and fix, raise, maintain, and/or stabilize the compensation and terms of

employment of their employees in the United States, which unreasonably restrained trade and

adversely affected the market for the services of their employees.

    **ANSWER:**  USPI and Tenet state that Paragraph 16 contains legal conclusions to which

no response is required.  To the extent a response is required, USPI and Tenet deny the

allegations in Paragraph 16 as to them and state that they lack knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 16 regarding other

Defendants, and on that basis, deny them.

### PARTIES

#### Plaintiffs

    17.    Scott Keech, R.N., M.B.A., was employed by Defendant SCA from

approximately 2011 to March 2012 as a Regional Director of Operations and Clinical Services in

the San Francisco, California area. Mr. Keech is a citizen and resident of the State of California. As a Regional Director, Mr. Keech was the senior leader and nurse executive responsible for clinic operations, nursing practice, and the provision of care at outpatient medical centers throughout California.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, and on that basis, deny them.

18.     Allen Spradling is a resident of Hoover, Alabama. He was employed by Defendant SCA from September 22, 2008 to April 26, 2013, first as a Manager, Program Management Office, and then as a Director, Information Technology.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and on that basis, deny them.

### SCA Defendants

19.     Defendant Surgical Care Affiliates, LLC is a company organized and existing under the laws of Delaware with its principal places of business in Birmingham, Alabama and Deerfield, Illinois. It was the direct operating subsidiary of parent company Surgical Care Affiliates, Inc., which in 2017 merged into Defendant UnitedHealthcare Group Incorporated ("UHG"). Since March 2017, Defendant Surgical Care Affiliates, LLC has been a wholly-owned subsidiary of UHG. During the relevant period, Surgical Care Affiliates, LLC participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and on that basis, deny them.

20.     Defendant SCA Holdings, LLC is a company organized and existing under the laws of Delaware with principal executive offices at UnitedHealth Group Center, 9900

Bren Road East, Minnetonka, Minnesota 55343. It is a successor in interest to Surgical Care

Affiliates, Inc., and an indirect wholly-owned subsidiary of UHG. During the relevant period,

SCA Holdings, LLC participated in the conspiracy and, through its executives, managers,

employees, or agents, committed overt acts in furtherance thereof.

      **ANSWER**: USPI and Tenet lack knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 20, and on that basis, deny them.

      21.      Defendant SCAI Holdings, LLC is a company organized and existing

under the laws of Delaware, with its principal place of business at 510 Lake Cook Road, Suite

400, Deerfield, Illinois 60015. SCAI Holdings, LLC is a successor entity to Surgical Care

Affiliates, Inc. and a wholly-owned subsidiary of defendant UHG. During the relevant period,

SCAI Holdings, LLC participated in the conspiracy and, through its executives, managers,

employees, or agents, committed overt acts in furtherance thereof.

      **ANSWER**: USPI and Tenet lack knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 21, and on that basis, deny them.

      22.      Defendant Andrew Hayek is a natural person and resident of Illinois. He

was Chief Executive Officer and President or Chairman of SCA from 2008 until March 2017. In

mid-2017, OptumHealth, a subsidiary of Defendant UHG, acquired SCA and Mr. Hayek became

Chief Executive Officer of OptumHealth. He served in that capacity until April 2019, when he

became Executive Vice President of Optum. Hayek participated in, ordered, authorized and

assumed a direct role in the illegal conduct alleged. He knew of and participated in

communications with counterparts working on behalf of other participants in the conspiracy as

was aware of others who did so as well. In addition, as a top executive of the company aware of

the agreements between competitors and conducting activity consistent with and in furtherance

of such agreements, Hayek had a responsible share in the conduct. In addition, Hayek did so knowing these acts were inherently wrongful. When engaged in the actions set forth in this complaint, Mr. Hayek was acting on behalf of SCA while engaged in the company's management, direction, or control, or transaction of its business or affairs. Prior to joining SCA in 2008, Mr. Hayek was the President of Defendant DaVita's VillageHealth division, which provides comprehensive care for patients with chronic kidney disease and end stage renal disease. During the relevant period, Hayek participated in the conspiracy and committed overt acts in furtherance thereof.

**ANSWER:** With respect to the first sentence of Paragraph 22, USPI and Tenet admit Defendant Andrew Hayek is a natural person and state that they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegation, and on that basis, deny it. USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second, third, and fourth sentences of Paragraph 22, and on that basis, deny them. With respect to the fifth, sixth, and seventh sentences of Paragraph 22, USPI and Tenet admit that Defendant Andrew Hayek communicated with USPI with respect to the USPI/SCA Agreement and state that they are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, deny them. USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in the seventh, eighth, ninth, and tenth sentences of Paragraph 22, and on that basis, deny them. With respect to the eleventh sentence of Paragraph 22, USPI and Tenet admit that Defendant Andrew Hayek communicated with USPI with respect to the USPI/SCA Agreement and state that they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, deny them.

23.     The various SCA entities do and did business as "SCA" and hold themselves out as a single enterprise. They do not generally distinguish between Surgical Care Affiliates, LLC, SCA Holdings, LLC, and SCAI Holdings, LLC (or other SCA-related entities) in press releases or on their common website, www.scasurgery.com. Accordingly, this complaint uses "SCA" to mean Surgical Care Affiliates, LLC, SCA Holdings, LLC, SCAI Holdings, LLC, their predecessors and successors, and Andrew Hayek, or any of them.

**ANSWER:**  With respect to the first and second sentences of Paragraph 23, USPI and Tenet state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, deny them.  With respect to the third sentence of Paragraph 23, USPI and Tenet admit that Plaintiffs use the term "SCA" as defined in the Complaint.

24.     SCA operates more than 230 outpatient medical centers and surgical facilities, employs approximately 10,000 individuals, partners with approximately 8,500 physicians affiliated with its centers, and treats approximately 1 million patients each year. SCA and its affiliates currently operate in 35 states. UHG, SCA's ultimate parent, considers SCA to be a leader in partnering with health plans, medical groups and health systems. SCA's affiliated physicians provide a range of surgical services, including orthopedics, ophthalmology, gastroenterology, pain management, otolaryngology, urology, spine, cardiology and gynecology, as well as other general surgery procedures. SCA's facilities reportedly generate "more than $2 billion in revenue in normal operating times."

**ANSWER:**  USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, and on that basis, deny them.

### Defendant UHG

25.     Defendant UnitedHealth Group, Incorporated ("UHG") is a company organized and existing under the laws of Delaware, with its principal place of business at 9900

Bren Road East, UnitedHealth Group Center, Minnetonka, Minnesota 55343. During the relevant

period, UHG participated in the conspiracy and, through its executives, managers, employees or

agents, committed overt acts in furtherance thereof.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 25, and on that basis, deny them.

26.     In 2017, UHG, through its subsidiaries, acquired SCA for $2.3 billion.

Plaintiffs bring this action against UHG for its own actions in furtherance of the conspiracy and

as the successor in interest to SCA.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 26, and on that basis, deny them.

27.     UHG sells products and services through two platforms:

UnitedHealthcare, which sells health care insurance coverage and benefits services; and Optum,

which provides health services. Optum includes OptumRx, a pharmacy benefit manager with a

network of more than 67,000 community pharmacies; OptumHealth, which sells primary,

pediatric, specialty, surgical, urgent care, senior care, and advanced care services through local

medical groups and outpatient medical and ambulatory care systems; and OptumInsight, which

sells data, analytics, research, consulting, technology, and managed services solutions to

hospitals, physicians, health plans, governments, and life sciences companies. Optum's 2018

calendar year revenues exceeded $100 billion and it has approximately 165,000 employees

worldwide. Optum is reported to be "the fastest growing unit of the largest health insurer in the

U.S."

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 27, and on that basis, deny them.

28.     On January 9, 2017, UHG announced that "Optum, a leading health services company and part of UnitedHealth Group ... and Surgical Care Affiliates, Inc. ..., a leading ambulatory surgery center (ASC) and surgical hospital provider, are combining." UHG and SCA had entered into a merger agreement two days earlier.

**ANSWER**:  USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, and on that basis, deny them.

29.     On February 21, 2017, UHG filed a form S-4 with the SEC addressing the transaction. That submission explained that "in the ordinary course SCA regularly engages in discussions with a variety of other organizations concerning commercial partnering opportunities." UHG and SCA had discussed a potential merger in November 2015. At that point, "UnitedHealth Group's senior management began updating the UnitedHealth Group board of directors regarding the status of the proposed commercial arrangements with SCA, as well as SCA's financial and operational performance, on a quarterly basis ...."

**ANSWER**:  USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and on that basis, deny them.

30.     Among "UnitedHealth Group's Reasons for the Transactions," UHG identified the "experience and strength of SCA's management team." To that end, UHG disclosed that it would retain the CEO of SCA, Mr. Hayek, who was at that point actively involved in Defendants' conspiracy.

**ANSWER**:  USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and on that basis, deny them.

31.     On March 24, 2017, UHG and SCA consummated the transaction, and merged the two entities, including its management, business operations, and ownership of their

real and intangible properties. The merged company was named SCA Holdings, LLC, but it essentially continued SCA's existence and business under a new name. At the Effective Time of the Merger, David Wichmann became the sole director of the company. David Wichmann is identified on the S-4 as the President of UHG during the period of negotiation with SCA and signed the S-4 as President of UHG. According to UHG's website, Wichmann became CEO of UHG in 2017 and served until February 2021.

**ANSWER**: USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and on that basis, deny them.

32. SCA Holdings, LLC's 8-K also explained the management rights of SCA Holdings, LLC. UHG was to be the Company's sole member. "Responsibility for the management of the business and affairs of the Company shall be vested in a manager (the 'Manager'), who shall be appointed by the Member. The initial Manager shall be David S. Wichmann." The 8-K provides that "[i]t shall be the duty and responsibility of the Manager *solely and exclusively* to manage and control the affairs of the Company. The Manager may delegate its authorities and responsibilities for management of the business affairs of the Company to third parties, but such delegation shall not relieve the Manager of any of its obligations hereunder." Any power that officers of SCA Holdings, LLC, such as the CEO, may have are only those delegated to the CEO in writing by the Manager.

**ANSWER**: USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32, and on that basis, deny them.

33. The S-4 set forth the operating structure of SCA Holdings after the merger. Among other things, the CEO of SCA, Andrew Hayek, was to serve as CEO of SCA Holdings, LLC after the merger.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and on that basis, deny them.

34. On April 15, 2017, Surgical Care Affiliates, Inc. filed with the SEC a Form 1512B identifying Defendant SCAI Holdings, LLC as its successor in interest.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and on that basis, deny them.

35. As a consequence of the merger, UHG assumed and succeeded to all of SCA's liabilities, including for SCA's participation in an unlawful no-poach agreement prior to the acquisition.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and on that basis, deny them.

**USPI and Tenet Defendants**

36. Defendant United Surgical Partners Holding Company, Inc. is a company organized and existing under the laws of Delaware with its principal place of business at 14201 Dallas Parkway, Dallas, Texas, 75254. It is a subsidiary of Defendant Tenet Healthcare Corporation. During the relevant period, USPI participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

**ANSWER:** USPI and Tenet admit the allegations in the first and second sentences of Paragraph 36. With respect to the third sentence of Paragraph 36, USPI and Tenet admit USPI entered into the USPI/SCA Agreement and committed overt acts in furtherance thereof; deny that Tenet was a party to the USPI/SCA Agreement or committed any acts in furtherance thereof; deny the existence of any conspiracy between USPI or Tenet and the remaining Defendants; and deny the existence of the conspiracy alleged in the Complaint.

37.     Defendant United Surgical Partners International, Inc. ("USPI") is a company organized and existing under the laws of Delaware with its principal place of business at 14201 Dallas Parkway, Dallas, Texas, 75254. It is a subsidiary of Defendant Tenet Healthcare Corporation. USPI "is the largest ambulatory surgery platform in the country" and has over 21,000 employees. During the relevant period, USPI participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

**ANSWER:**  USPI and Tenet admit the allegations in the first and third sentences of Paragraph 37.  USPI and Tenet deny the allegations in the second sentence of Paragraph 37. With respect to the fourth sentence of Paragraph 37, USPI and Tenet admit that USPI entered into the USPI/SCA Agreement and committed overt acts in furtherance thereof and deny the existence of the conspiracy alleged in the Complaint.

38.     Upon information and belief, "Company A" in the SCA Indictment refers to USPI. For the sake of clarity, this Complaint uses "[USPI]" where the SCA Indictment uses "Company A."

**ANSWER:**  USPI and Tenet admit the allegations in Paragraph 38.

39.     Defendant Tenet Healthcare Corporation ("Tenet") is a public company organized and existing under the laws of Nevada with its principal place of business at 14201 Dallas Parkway, Dallas, Texas 75254. Through its subsidiaries, partnerships, and joint ventures, including USPI, Tenet operates 65 hospitals and more than 550 other healthcare facilities, including outpatient medical care and ambulatory surgery centers, surgical hospitals, and other outpatient medical facilities. During the relevant period, Tenet participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

**ANSWER:** USPI and Tenet admit the allegations in the first and second sentences of Paragraph 39. USPI and Tenet deny the allegations in the third sentence of Paragraph 39.

40. On June 16, 2015, Tenet completed a transaction that combined its freestanding ambulatory surgery and imaging center assets with the surgical facility assets of USPI.

**ANSWER:** USPI and Tenet admit the allegations in Paragraph 40.

41. In April 2016, Tenet paid $127 million to purchase additional shares of USPI, which increased Tenet's ownership interest from 50.1% to approximately 56.3%. In July 2017, Tenet paid $716 million for the purchase of additional shares, which increased its ownership interest in USPI to 80.0%. In April 2018, Tenet paid approximately $630 million for the purchase of an additional 15% ownership interest in USPI, which increased its ownership interest in USPI to 95%. The acquisition of USPI by Tenet constituted a merger of the two entities in fact and in effect, as USPI essentially continued the same business operations afterwards.

**ANSWER:** USPI and Tenet admit the allegations in the first and second sentences of Paragraph 41. USPI and Tenet deny the allegations in the third sentence of Paragraph 41.

42. Plaintiffs bring this action against Tenet for its own actions in furtherance of the conspiracy and as the parent company of the USPI entities.

**ANSWER:** USPI and Tenet admit that Plaintiffs purport to bring the action against Tenet for its own actions and as the parent company of USPI and deny the remaining allegations.

### DaVita Defendants

43. Defendant DaVita, Inc. ("DaVita") is a company organized and existing under the laws of Delaware with its principal place of business in Denver, Colorado. It is sometimes referred to as "The Village" or "DVA." DaVita owns and operates outpatient medical

care facilities around the United States, and employed individuals to operate its business at its headquarters location and at other locations throughout the United States. Upon information and belief, DaVita is the company identified as "Company B" in the SCA Indictment/DOJ Texas Action. During the relevant period, DaVita participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, and on that basis, deny them.

44. Defendant Kent Thiry was the CEO of DaVita from 1999 to June 2019. He served as the Chairman of the Board of DaVita from June 2019 to May 2020. Mr. Thiry participated in, ordered, authorized and assumed a direct role in the illegal conduct alleged. He knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy as was aware of others who did so as well. In addition, as a top executive of the company aware of the agreements between competitors and conducting activity consistent with and in furtherance of such agreements, Mr. Thiry had a responsible share in the conduct. He did so knowing these acts were inherently wrongful. When engaged in the actions set forth in this complaint, Mr. Thiry was acting on behalf of DaVita while engaged in the company's management, direction, or control, or transaction of its business or affairs. Upon information and belief, Mr. Thiry is the individual identified as "Individual 3" in the SCA Indictment/DOJ Texas Action.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44, and on that basis, deny them.

### Doe Defendants

45. Upon information and belief, Does 1-20 are persons and entities that participated in the conspiracy between and among SCA, Hayek, UHG, Tenet, USPI, DaVita,

Thriy, and other as yet unnamed or unidentified co-conspirators or participants in the conspiracy. Plaintiffs are ignorant of the true names of such Defendants and have named them by fictitious name. They include, at a minimum, "Company B" and "Individual 2," as described in the DOJ Texas Action. During the relevant period, Does 1-20 participated in the conspiracy and, through their executives, managers, employees or agents, committed overt acts in furtherance thereof.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45, and on that basis, deny them.

46. Upon information and belief, Defendant Doe 1 is "Company B" as alleged in the DaVita Indictment. Company B was a company organized and existing under the laws of Delaware with its principal place of business in San Francisco, California. It was a healthcare company that operated across the United States and employed individuals to operate its business at its headquarters location. It was a horizontal competitor with DaVita and other participants in the conspiracy with respect to the recruitment and retention of employees. During the relevant period, Doe 1 participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46, and on that basis, deny them.

47. Upon information and belief, Defendant Doe 2 is "Individual 3" as alleged in the DaVita Indictment. Doe 2 served as the CEO of Doe 1," and at all times was acting on behalf of Doe 1 while engaged in the company's management, direction, control, or transaction of its business or affairs. Doe 2 participated in, ordered, authorized and assumed a direct role in the illegal conduct alleged. Doe 2 knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy as was aware of others who did so as

well. In addition, as a top executive of Doe 1 aware of the agreements between competitors and conducting activity consistent with and in furtherance of such agreements, Doe 2 had a responsible share in the conduct. In addition, Doe 2 did so knowing these acts were inherently wrongful.

**ANSWER**: USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47, and on that basis, deny them.

### Agents and Co-Conspirators

48. The anticompetitive and unlawful acts alleged against Defendants in this Complaint were authorized, ordered, or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

**ANSWER**: Paragraph 48 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet admit that a USPI officer authorized, ordered, or performed the USPI/SCA Agreement while actively engaged in the management, direction, or control of USPI's businesses or affairs and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 regarding other Defendants, and on that basis, deny them.

49. The Defendants' agents operated under the explicit and apparent authority of their principals.

**ANSWER**: Paragraph 49 contains legal conclusions to which no response is required. To the extent that a response is required, USPI and Tenet admit that USPI's agents operated under the explicit and apparent authority of USPI's principals with respect to the USPI/SCA Agreement; deny that any agent took any action alleged in this Complaint under the explicit or apparent authority of Tenet; and state that they lack knowledge or information sufficient to form

a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny

them.

50.　Each Defendant operated through its subsidiaries, affiliates, and agents.

**ANSWER:** USPI and Tenet admit that USPI operated through its subsidiaries, affiliates,

and agents with respect to the USPI/SCA Agreement; deny the allegations as they relate to

Tenet; and state that they lack knowledge or information sufficient to form a belief as to the truth

of the allegations regarding other Defendants, and on that basis, deny them.

51.　Each Defendant acted as the principal, agent, or joint venture partner of or

for other Defendants with respect to the acts, violations, and common course of conduct alleged

in this Complaint.

**ANSWER:** Paragraph 51 contains legal conclusions to which no response is required.

To the extent that a response is required, USPI and Tenet deny that USPI or Tenet acted as the

principal, agent, or joint venture partner of or for other Defendants with respect to the acts and

conduct alleged in the Complaint; deny that any other Defendant acted as the principal, agent, or

joint venture partner of or for USPI or Tenet; and state that they lack knowledge or information

sufficient to form a belief as to the truth of the allegations related to other Defendants, and on

that basis, deny them.

52.　Upon information and belief, various companies and individuals not

named as defendants in this Complaint participated as co-conspirators in the alleged conspiracy

and performed acts and made statements to further the conspiracy.

**ANSWER:** USPI and Tenet deny the existence of the conspiracy alleged in the

Complaint; deny that companies other than USPI and SCA, or individuals other than those

affiliated with USPI and SCA, participated in the USPI/SCA Agreement; and state that they lack

knowledge or information sufficient to form a belief as to the truth of the allegations regarding other companies and individuals, and on that basis, deny them.

## FACTUAL ALLEGATIONS

### Defendants' Conspiracy

53.     SCA, USPI, DaVita, Doe 1, and other Doe Defendants operate or operated ambulatory surgery centers, outpatient medical centers, and other healthcare services, and were competitors in the recruitment and retention of employees across the United States. Over a period spanning at least the years 2010 through 2019, SCA, USPI, DaVita, Doe 1, and other Doe Defendants joined a conspiracy to reduce and limit compensation and mobility of their employees. In furtherance of the conspiracy, Defendants, and each of them, entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees. The conspiracy was executed, enforced, and concealed by the companies' most senior executives and managers. Such no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration among the companies.

**ANSWER:**  With respect to the first sentence of Paragraph 53, USPI and Tenet admit that USPI operates and operated ambulatory surgery centers, outpatient medical centers, and other healthcare service providers, and competed with SCA as well as others in the recruitment and retention of employees across the United States and state they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding others, and on that basis, deny them.  With respect to the second, third and fourth sentences of Paragraph 53, USPI and Tenet deny the existence of the conspiracy alleged in the Complaint; admit that USPI entered into the USPI/SCA Agreement; admit that the USPI/SCA Agreement was in effect between May 2010 and October 2017; admit that USPI senior executives executed and enforced

the USPI/SCA Agreement; deny that Tenet was a party to the USPI/SCA Agreement; deny the existence of any conspiracy between USPI or Tenet and the remaining Defendants; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding others, and on that basis, deny them; and deny the remaining allegations. The fifth sentence of Paragraph 53 contains legal conclusions to which no response is required.

      54.    Defendants participated in meetings, conversations, and communications to discuss the solicitation of each other's employees, and agreed during those meetings, conversations, and communications not to solicit each other's employees.

**ANSWER:** USPI and Tenet admit USPI and SCA entered into the USPI/SCA Agreement; admit that USPI and SCA participated in conversations and communications regarding the USPI/SCA Agreement; deny that Tenet was a party to the USPI/SCA Agreement; deny the existence of any conspiracy between USPI or Tenet and the remaining Defendants; deny that Tenet participated in conversations and communications regarding the USPI/SCA Agreement or any similar agreement; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them.

      55.    The conspiracy began at least as early as May 2010, when Mr. Hayek established an agreement with his counterpart at USPI to eliminate competition between the companies for each other's employees. As alleged in the SCA Indictment, on or about May 14, 2010, the CEO of [USPI] emailed certain other [USPI] employees, stating "I had a conversation w [Mr. Hayek] re people and we reached agreement that we would not approach each other's [employees] proactively."

**ANSWER:** With respect to the first sentence of Paragraph 55, USPI and Tenet admit USPI and SCA entered into the USPI/SCA Agreement; deny that Tenet was a party to the USPI/SCA Agreement; deny the existence of any conspiracy between USPI or Tenet and the remaining Defendants; deny the existence of the conspiracy alleged in the Complaint: and deny the remaining allegations. With respect to the second sentence of Paragraph 55, USPI and Tenet state the SCA Indictment speaks for itself and no answer is required.

56.     Defendants told certain executives, human resources employees, and recruiters to avoid soliciting employees of each other's companies. For example, on or about November 11, 2013, a senior human resources employee at [USPI] told a recruiter the following: "Please do not schedule a call w/ [candidate], thanks. She would have had to apply for the job first. We cannot reach out to SCA folks. Take any SCA folks off the list."

**ANSWER:** With respect to the first sentence of Paragraph 56, USPI and Tenet admit USPI told certain executives, human resources employees, and recruiters to avoid actively soliciting SCA employees at the administrator level and above; deny the allegations as to Tenet; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them. USPI and Tenet admit the allegations in the second sentence of Paragraph 56.

57.     On or about November 1, 2013, employees of [USPI] discussed whether to interview a candidate employed by SCA in light of the "verbal agreement with SCA to not poach their folks . . . ." The CEO of [USPI] noted that "[w]e do have that agreement and want to stick by it. If [candidate] indeed did approach us, and is willing to tell [Mr. Hayek] that I'm ok." The senior human resources officer at [USPI] responded: "Yikes, she is not going to want to do that. But I will check."

**ANSWER:** USPI and Tenet admit the allegations in Paragraph 57.

58. Defendants alerted their co-conspirators when each other's employees were recruited, and policed violations of the conspiracy. For example, on or about December 8, 2015, the CEO of [USPI] told [Mr. Hayek]: "Just wanted to let you know that [recruiting company] is reaching out to a couple of our execs. I'm sure they are not aware of our understanding." [Mr. Hayek] told other SCA executives: "We should continue to flag [USPI] on our 'do not call' list to recruiters - is OK if we get an inbound inquiry and the leader has communicated within [USPI] that they want to leave, but outbound calls should not be occurring."

**ANSWER:** With respect to the first sentence of Paragraph 58, USPI and Tenet admit that USPI alerted SCA when it recruited USPI employees at the administrator level and above; deny the allegations as to Tenet; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them. USPI and Tenet admit the allegations in the second sentence of Paragraph 58. USPI and Tenet state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 58, and on that basis, deny them.

59. Defendants refrained from soliciting each other's employees. For example, on or about July 17, 2017, a human resources employee of [USPI], believing a candidate to be employed by SCA, emailed a recruiting coordinator for [USPI] that, although the candidate "look[ed] great" she "can't poach her."

**ANSWER:** With respect to the first sentence of Paragraph 59, USPI and Tenet admit that USPI refrained from actively soliciting SCA employees at the administrator level and above; deny the allegations as to Tenet; and state that they lack knowledge or information sufficient to

form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny

them.  USPI and Tenet admit the allegations in the second sentence of Paragraph 59.

### In 2012, SCA Brings DaVita into the Conspiracy

60.     The Department of Justice alleges that beginning at least as early as May

2012, DaVita and Mr. Thiry joined the conspiracy through SCA and Mr. Hayek.

**ANSWER:**  USPI and Tenet deny the existence of the conspiracy alleged in the

Complaint; deny that USPI or Tenet entered into any conspiracy with DaVita, Inc. ("DaVita") or

Kent Thiry; state that they lack knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants, and on that basis, deny them; and state that

the DaVita Indictment speaks for itself, and no response is required.

61.     For example, on or about October 20, 2014, the CEO of DaVita, Mr.

Thiry, emailed [Mr. Hayek] the following: "Someone called me to suggest they reach out to your

senior biz dev guy for our corresponding spot. I explained I do not do proactive recruiting into

your ranks."

**ANSWER:**  USPI and Tenet lack knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 61, and on that basis, deny them.

62.     Confirming that DaVita was now part of the conspiracy involving SCA

and USPI, on or about October 16, 2015, [Mr. Hayek] emailed an SCA human resources

executive: "Putting two companies in italics ([USPI] and [DaVita]) - we can recruit junior people

(below Director), but our agreement is that we would only speak with senior executives if they

have told their boss already that they want to leave and are looking."

**ANSWER:**  USPI and Tenet deny the existence of the conspiracy alleged in the

Complaint; deny that USPI or Tenet was part of a conspiracy involving DaVita; and state that

they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, deny them.

63.     Similarly, on or about December 12, 2015, SCA's human resources executive instructed a recruiter to "note that [USPI] and [DaVita] are off limits to SCA."

**ANSWER**:  USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63, and on that basis, deny them.

64.     Consistent with the conspiracy, Defendants told job candidates they needed to inform their current employer to be considered. For example, on or about April 26, 2016, SCA's human resources executive emailed a candidate from DaVita who was based in Dallas, Texas, that she could not recruit the candidate unless they "have been given explicit permission by their employers that they can be considered for employment with us."

**ANSWER**:  USPI and Tenet deny the existence of the conspiracy alleged in the Complaint; admit that USPI told candidates who were employed at the administrator level and above at SCA that they would need to inform SCA to be considered for a position at USPI; deny that Tenet told candidates that they would need to inform their employers to be considered for a position at Tenet; deny that USPI or Tenet was part of a conspiracy involving DaVita; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them.

65.     On or about June 13, 2016, an employee of SCA forwarded news of a recruitment, noting that: "I thought there was a gentlemen's agreement between us and DaVita re: poaching talent." An SCA executive replied: "There is. Do you mind if I share with [Mr. Hayek], who has most recently addressed this with Kent [DaVita's CEO]." Mr. Hayek relayed the news to DaVita's CEO, Mr. Thiry, who replied, "Will check it out." On or about July 10,

2016, Mr. Thiry forwarded the communication from Mr. Hayek to another senior-level DaVita executive, commenting: "Pls put it on our next agenda."

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65, and on that basis, deny them.

66. On or about April 7, 2017, [Mr. Hayek] was contacted by a consultant regarding his interest in a candidate employed by DaVita and responded: "In order to pursue [candidate], he would need to have already communicated that he is planning to leave DaVita — that's the relationship that we have with DaVita." The consultant responded, ". . . I'm glad you arrived at that agreement with KT [Kevin Thiry, DaVita's CEO]."

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66, and on that basis, deny them.

### In 2017, DaVita Brings Doe 1 into the Conspiracy

67. Later, DaVita and Mr. Thiry expanded the conspiracy to include Does 1 and 2. As alleged in the DaVita Indictment, on April 16, 2017, Defendant Doe 2 emailed Defendant Thiry that "You also have my commitment we discussed that I'm going to make sure everyone on my team knows to steer clear of anyone at DVA and that I'll come back to you and talk before ever get anywhere near a point that could contemplate someone else."

**ANSWER:** USPI and Tenet deny the existence of the conspiracy alleged in the Complaint; deny that USPI or Tenet was part of a conspiracy involving DaVita and Does 1 and 2; and state that they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, deny them.

68. On or around February 22, 2018, Defendant Doe 2 e-mailed Defendant Thiry, stating, "I took our conversations last year to heart around how it felt to you/DVA when [DaVita employee] left—our relationship matters far more to me than any potential addition to

our team. Although there have been 4 people that have reached out over the past year to probe about opportunities, **I** have not pursued those conversations (always being clear that it was about not having a clear need which was accurate to some extent)."

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68, and on that basis, deny them.

69. On or around February 22, 2018, Defendant Doe 2 e-mailed Defendant Thiry about a current DaVita employee, stating: "We do happen to have openings in her area and they could be a good fit. However, I told her that given my relationship with the Village, I would only discuss with her if she told her manager explicitly that she would like to talk to me about a role and that I would talk to you about it before I would discuss with her (I framed it in a positive way about me making sure I'm doing the right thing as someone who cares about the Village and an investor in Village as well."

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69, and on that basis, deny them.

70. Consistent with the conspiracy, Defendant Doe 1 refrained from soliciting DaVita employees. For example, on or about April 20, 2017, Defendant Doe 2 sent a text message to a former colleague for recommendations for customer service employees and, referring to a DaVita-owned pharmacy company, stated "But nobody at Rx today. Promised Kent [DaVita's CEO]!" Similarly, on or around July 20, 2017, Defendant Doe 2 sent a text message to a former DaVita employee: "Also please let me know if you think of any great folks (nobody currently at DaVita) that would be worth talking to."

**ANSWER:** USPI and Tenet deny the existence of the conspiracy alleged in the Complaint and state that they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, deny them.

<u>**Effects of No-Poach Conspiracy**</u>

71.     Labor markets are not perfectly competitive. They are not like commodity markets where market-wide demand and supply tend to determine a single market price. Defendants do not simply pay a "market wage" for a particular employee, as they might pay a "market price" for a pound of silver on a metals exchange. Instead, labor market participants determine prices by interacting with each other. This is particularly true for jobs in which specialized experience or skills are valuable, such as positions in outpatient medical care and other healthcare facilities. Market "frictions" result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) there are a limited number of essentially identical positions from which workers can choose. Such market frictions adversely impact competition in labor markets, and generally provide market power to employers. These market frictions and resulting market power are well-recognized in labor economics.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71, and on that basis, deny them.

72.     Defendants' conspiracy injured employees with experience or skills in the outpatient medical care and healthcare industry in part because Defendants are market leaders in their fields. During the Class Period, SCA, USPI, and DaVita were the nation's largest operators of outpatient medical care centers as well as one another's top rivals for labor.

**ANSWER:** With respect to the first sentence of Paragraph 72, USPI and Tenet admit that USPI is a leader in the ambulatory surgery center arena; state that they lack knowledge or

information sufficient to form a belief as to the truth of the allegations about other Defendants, and on that basis, deny them; and deny the remaining allegations. With respect to the second sentence of Paragraph 72, USPI and Tenet admit that, during the "Class Period" defined in the Complaint, USPI was one of the nation's largest operators of outpatient medical care centers; admit that USPI competed with SCA and others for employees; and state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them.

73. Defendants also are among the largest employers in the outpatient medical care center industry, with a nationwide reach. For example, SCA has over 10,000 employees nationwide, USPI has over 21,000, and DaVita has over 77,000.

**ANSWER:** With respect to the first sentence of Paragraph 73, USPI and Tenet admit USPI is among the largest employers in the outpatient medical care center industry, with centers located throughout the nation, and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them. With respect to the second sentence of Paragraph 73, USPI and Tenet admit USPI has over 21,000 employees and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them.

74. The specialized knowledge relevant to work in the outpatient medical care and healthcare industry is subject to not only market frictions, but also high supply-demand pressures. There is high demand for and limited supply of employees with experience or skills relevant to outpatient medical care facilities. Employees within the industry, like those working for the Defendants, are key sources of potential talent to fill these openings.

**ANSWER:** With respect to the first sentence of Paragraph 74, USPI and Tenet admit that specialized knowledge is relevant to some positions in the outpatient medical care and healthcare industry; admit that some such positions are sometimes subject to market frictions and/or supply-demand pressures; and deny the remaining allegations. With respect to the second sentence of Paragraph 74, USPI and Tenet admit that there is sometimes a high demand for and limited supply of employees to fill some positions in outpatient medical care facilities that require experience or specialized skills and deny the remaining allegations. With respect to the third sentence of Paragraph 74, USPI and Tenet admit that employees with experience working in outpatient medical care facilities are one of the key sources of talent for some potential job openings in other outpatient medical care facilities and deny the remaining allegations.

75.     The importance of relevant industry experience to Defendants is reflected in their job postings. For example, in a job posting for a Senior Director of Development in Houston, Texas, SCA emphasizes that "[h]ealthcare industry knowledge is preferred." In a posting for Vice President of Practice Operations in Southern California, SCA notes that qualifications include experience "within a highly professional and successful healthcare services company." For a Director of Operations in Portland, SCA states that "management experience in ASC [Ambulatory Surgery Center] operations or hospital outpatient centers is strongly preferred."

**ANSWER:** USPI and Tenet admit that they sometimes reference the desirability of prior relevant industry experience in some of their job postings; state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them; and deny the remaining allegations. USPI and Tenet

state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 75, and on that basis, deny them.

76.     Defendants employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire employees. Defendants also receive direct applications from individuals interested in employment opportunities.

**ANSWER**:  With respect to the first sentence of Paragraph 76, USPI and Tenet admit USPI and Tenet employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire employees; admit USPI and Tenet sometimes receive direct applications from individuals interested in employment opportunities; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them.

77.     Soliciting employees from other outpatient medical care and healthcare industry employers is a particularly efficient and effective method of competing for employees. Soliciting involves communicating directly—by phone, email, social and electronic networking, or in person—with competitors' employees who have not applied for a job opening. Such direct solicitation can be done by the soliciting firm's personnel or by outside recruiters. Firms in the outpatient medical care and healthcare industry rely on direct solicitation of employees of other outpatient medical care and healthcare companies because those individuals have specialized experience and may not respond to other methods of recruiting.

**ANSWER**:  USPI and Tenet admit that direct solicitation of prospective employees can sometimes be effective for USPI and Tenet; admit that such direct solicitation can be done by USPI or Tenet employees or by outside recruiters; and state that they lack knowledge or

information sufficient to form a belief as to the truth of the allegations regarding others, and on that basis, deny them.

78.     In a properly functioning and lawfully competitive labor market, outpatient medical care and healthcare industry employers would compete with one another to attract and retain employees for their needs. This competition among employers for those employees would determine the level of compensation. Competition would also improve the employees' ability to negotiate for better salaries and other terms of employment.

**ANSWER:**  USPI and Tenet state Paragraph 78 contains legal conclusions to which no response is required.  To the extent a response is required, USPI and Tenet admit that employers in the outpatient medical care and healthcare industry can and do compete with one another to attract and retain employees; admit that competition can impact compensation and other terms of employment; and deny the remaining allegations.

79.     In the absence of a prior agreement, companies like Defendants would solicit and hire employees from other companies in the same industry because those employees have training and experience that are lacking in hires from other industries. Hiring employees from a different industry requires the company to invest significant resources in identifying, assessing, and training those employees, and is particularly unsuitable for senior-level positions. For these reasons and others, lateral hiring within the outpatient medical care industry is a key form of competition in this industry. In this case, Defendants prevented that competition through their illegal conspiracy, apparently concluding that the profits to be made by suppressing wages in the labor market outweighed the benefits to be gained from competing with each other in the labor market.

**ANSWER:** USPI and Tenet deny the allegations in Paragraph 79 as to them and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them.

80. Competition for workers via lateral hiring has a significant impact on compensation in a number of ways. First, competition facilitates the flow of information about opportunities and compensation. For example, employees who are solicited, interviewed, or offered a job by a rival employer gain insight into how other companies value their work and experience, and what compensation and benefits their competitors typically pay or are willing to pay to induce them to leave their current employer. This information is not otherwise readily available to employees, who generally rely on these encounters and word-of-mouth from peers and colleagues for such information. Employers, on the other hand, often hire private consulting firms to gather information regarding market compensation rates. In a labor environment where price discovery is already inhibited, no-poach agreements further restrain employees' access to this crucial information by eliminating or reducing the communications that encourage the flow of information.

**ANSWER:** USPI and Tenet state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80, and on that basis, deny them.

81. Defendants' conspiracy precluded information about pay and benefits from reaching employees at Defendants' companies. Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors. Indeed, empirical economic research confirms that employees who change jobs voluntarily typically have faster wage growth than those who remain in the same job. These employees also could have shared this information with their co-workers, multiplying

the impact of each offer as the information would have spread through social channels. Among other things, Defendants refrained from informing employees or others who were targets of the conspiracy of the fact of the conspiracy and acted to conceal the fact of the conspiracy by giving pretextual explanations for hiring or compensation decisions, and omitting such decisions were made on the basis of the illegal agreements, not because of market conditions or because of the worth or value of employees. These acts precluded employees from possessing highly relevant information.

**ANSWER:**  USPI and Tenet deny the existence of the conspiracy alleged in the Complaint; deny the allegations of Paragraph 81 as they pertain to them; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81 as they relate to others, and on that basis, deny them.

82.     Second, the threat of losing employees to competitors encourages employers to preemptively increase and maintain appropriately high compensation to ensure high morale, productivity, and retention. Absent appropriate compensation, employees are more likely to seek better compensation elsewhere, be receptive to recruiting by competitors, limit their productivity, and undermine morale. Once an employee has received an offer from another company, the employer may have to increase compensation to retain that employee, and increase compensation for other employees as well. In a competitive labor market, such preventive retention measures thus lead to increased compensation for employees. But in the outpatient medical care industry, Defendants' conspiracy substantially spared them from taking such measures, lowering employee pay.

**ANSWER:**  With respect to the first, second, third and fourth sentences of Paragraph 82, USPI and Tenet state that they lack knowledge or information sufficient to form a belief as to the

truth of the allegations, and on that basis, deny them. With respect to the fifth sentence of Paragraph 82, USPI and Tenet deny the existence of the conspiracy alleged in the Complaint; deny that they have not taken measures to ensure appropriate compensation, high morale and retention; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them.

83. Third, because many outpatient medical care and healthcare employees are integrated into teams, some workers who move to different companies may bring others with them. Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for these related workers. Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to move with them.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 83, and on that basis, deny them.

84. Defendants, like other sophisticated companies, maintained internal compensation systems and developed compensation structures that preserved relatively stable relationships between the pay of their employees. The effect of such systems is that an adjustment to the pay of some employees will lead to adjustments to the pay structure as a whole, affecting the pay of all employees. Distortions to the labor market's competitive process, such as the distortions caused by Defendants' no-poach agreements, suppressed the pay of all employees who shared common pay structures, not just those who proactively sought to work for another outpatient medical care center. Moreover, because the pay rates for jobs within pay structures

were tied together, the compensation of all employees was affected by Defendants' no-poach agreements.

**ANSWER:** USPI and Tenet admit that they maintained internal compensation systems; deny the remaining allegations to the extent they pertain to them; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, and on that basis, deny them.

85.     To maintain productivity and morale and to retain employees, in the absence of a prior agreement, employers such as Defendants would also consider the perceived fairness of their compensation systems. Defendants thus had an incentive to ensure that their employees felt that their compensation was fair based on broad comparisons across job descriptions and titles within the company and as compared to other companies in the industry.

**ANSWER:** USPI and Tenet admit that they consider the fairness of their compensation systems and seek to ensure they provide fair compensation to their employees; state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding others, and on that basis, deny them; and deny the remaining allegations.

86.     What constitutes "fair" is based on comparisons that employees draw between themselves and other employees at their company and in their field. For example, employees generally would not consider it fair for there to be pay differentials for workers doing the same work at the same level at the same company based solely on the fact that some of these employees received an outside solicitation or offer of alternate employment.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86, and on that basis, deny them.

87.     Fairness concerns often involve both "internal equity" and "external equity." "Internal equity" depends on the extent to which employees perceive pay levels to be fair and objective compared to other employees *within* the same company. "External equity" depends on the perception of the fairness of pay levels compared to similar employees *outside* the company. Defendants' pay structures should have been designed, constructed, and maintained to accomplish both internal and external equity goals, but they were undermined by the illegal agreement.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87, and on that basis, deny them.

88.     Companies foster both internal and external equity by maintaining formal compensations systems that restrict discretionary pay decisions and focus on more objective criteria such as job descriptions and classifications, wage levels for equivalent jobs in the labor market, pay differentials based on experience and levels of responsibility, and other factors affecting the perceived fairness of the compensation system. In sum, pay systems adjust pay levels across job titles and pools of employees to maintain internal and external equity to better foster good morale and motivate employees across a company's labor force. Because of these systems, the pay of one employee always bears a relationship to the pay of other employees.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88, and on that basis, deny them.

89.     These pay systems are systematically monitored and adjusted from the top down by senior management, with regular company-wide reviews and assessments.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89, and on that basis, deny them.

90. Because of such formal systems, however, Defendants' no-poach agreements would have affected the proposed Class as a whole, and not just individual employees who would have otherwise received job offers from rival companies in the industry.

**ANSWER:** Paragraph 90 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet deny the allegations in Paragraph 90.

91. Due to internal and external equity considerations, increasing the pay of one employee in order to retain that employee leads to pay raises not only for those who perform similar work (and thus are within the same pay bands or grades), but also for a wider swath of employees who base their notions of fair compensation on certain degrees of differentials between themselves and those other employees. Conversely, a no-poach agreement suppresses compensation not only for employees who would have received competitive offers, but for other employees as well. These systematic effects occur both at the same time, through firm-wide pay adjustments and reviews, and over time, as pay structures adjust to account for internal and external equity.

**ANSWER:** USPI and Tenet deny the allegations in Paragraph 91 to the extent they pertain to them and state that they lack knowledge or information sufficient to form a belief as to the allegations of Paragraph 91 as to others, and on that basis, deny them.

92. Defendants' conspiracy restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor markets. The conspiracy suppressed the compensation of all employees, not just particular individuals who otherwise would have been solicited or sought to change employers. The effects of eliminating solicitation and lateral hiring, pursuant to agreement, caused widespread impact

on Defendants' employees by eliminating or reducing the flow of information and the need for
preventive and reactive increases to compensation for the entire Class.

**ANSWER:** Paragraph 92 contains legal conclusions to which no response is required.
To the extent a response is required, USPI and Tenet deny the conspiracy as alleged in the
Complaint; deny the allegations in Paragraph 92 as they relate to them; and state that they lack
knowledge or information sufficient to form a belief as to the truth of the allegations regarding
other Defendants, and on that basis, deny them.

**Effects on Interstate Commerce**

93.     During the relevant time period, Defendants employed members of the
Class throughout the United States, including in this judicial district.

**ANSWER:** USPI and Tenet admit they employed members of the "Class," as defined in
the "Complaint," in locations throughout the United States, including in this judicial district.
USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the
allegations in Paragraph 93 regarding other Defendants, and on that basis, deny them.

94.     Defendants' conspiracy substantially reduced competition for labor in the
outpatient medical care and healthcare industry, and suppressed the efficient movement and
compensation of outpatient medical care industry employees, harming Plaintiffs and members of
the Class. Because the no-poach agreements enabled Defendants to maintain suppressed
compensation levels generally, the harm extended not only to those who sought, or otherwise
would have sought to change companies, but also to those who had no intention of seeking other
employment.

**ANSWER:** Paragraph 94 contains legal conclusions to which no response is required.
To the extent a response is required, USPI and Tenet deny the conspiracy as alleged in the
Complaint; deny the allegations in Paragraph 94 as they relate to them; and state that they lack

knowledge or information sufficient to form a belief as to the truth of the allegations regarding

other Defendants, and on that basis, deny them.

95. Thus, Defendants' no-poach agreements and related conduct substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

**ANSWER:** Paragraph 95 contains legal conclusions to which no response is required. To the extent an answer is required, USPI and Tenet deny the allegations in Paragraph 95.

### Plaintiffs' Claims Are Timely

96. Until January 7, 2021, when the DOJ publicly announced the SCA Indictment, Plaintiffs and members of the proposed Class did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaged in secret no-poach agreements.

**ANSWER:** Paragraph 96 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96, and on that basis, deny them.

97. Defendants did not publicize their no-poach agreements, did not inform job applicants about the conspiracy, and acted in a manner deliberately designed to avoid detection of the conspiracy. For example, the agreements among the CEOs of SCA, USPI, and DaVita were primarily oral, and deliberately not memorialized in a written agreement or contract, or other writing likely to become widely available. Knowledge of the agreements was closely held by executives and recruiters of the Defendant companies, who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions, telephone conversations, and private email communications.

None of the relevant communications alleged herein were made public until after release of the Grand Jury's SCA Indictment.

**ANSWER:** USPI and Tenet deny the allegations in the first sentence of Paragraph 97 to the extent that they pertain to them and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations related to other Defendants, and on that basis, deny them. With respect to the second sentence of Paragraph 97, USPI and Tenet admit that the USPI/SCA Agreement was oral; deny the remaining allegations as they pertain to them; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations related to other Defendants, and on that basis, deny them. USPI and Tenet deny the allegations in the third and fourth sentences of Paragraph 97 as they pertain to them and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations related to other Defendants, and on that basis, deny them.

98. Additionally, rather than disclose their non-solicitation agreements, Defendants devised internal procedures to identify affected applicants, and gave false and pretextual explanations for hiring and compensation decisions that in fact were made pursuant to Defendants' unlawful agreement.

**ANSWER:** USPI and Tenet deny the allegations in Paragraph 98 as they pertain to them and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 as they relate to other Defendants, and on that basis, deny them.

99. Until recently, Plaintiffs and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were conspiring to restrain competition for the services of their Senior Employees.

**ANSWER:** USPI and Tenet lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99, and on that basis, deny them.

100.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, and/or Defendants' fraudulent concealment. Defendants are thus estopped from relying on any statutes of limitations in defense of this action.

**ANSWER:** Paragraph 100 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet deny the allegations in Paragraph 100.

## CLASS ACTION ALLEGATIONS

101.    Plaintiffs bring this action individually and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCA Holdings, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holding Company, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries; or (d) from April 1, 2017 through January 5, 2021, for "Company B" (as identified in the DaVita Indictment) or one of its subsidiaries. The term "skilled positions" will be defined with reference to specific job titles upon Plaintiffs' analysis of discovery materials. For purposes of the pleadings, "skilled positions" include the titles of Administrator, Group Administrator, Manager, Director, and any equivalent or more senior title at SCA, USPI, DaVita, and Doe 1 and other coconspirators, as well as any job title for which healthcare experience or skills were valuable. Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.

**ANSWER:** USPI and Tenet admit that Plaintiffs purport to bring this action on behalf of the "Class" defined in Paragraph 101.

102.     Plaintiffs reserve the right to amend the Class definition, define subclasses, and expand or narrow the proposed Class based on information obtained in discovery and expert analysis of such information.

**ANSWER:**  USPI and Tenet admit that Plaintiffs purport to reserve the right to amend their "Class" definition.

103.     There are thousands of members of the Class as described above, the exact number and their identities being known by Defendants, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

**ANSWER:**  Paragraph 103 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet admit that there are thousands of individuals who would be included in the "Class" defined by Plaintiffs and deny the remaining allegations in Paragraph 103.

104.     The Class is precisely ascertainable from Defendants' records.

**ANSWER:**  Paragraph 104 contains a legal conclusion to which no response is required. To the extent a response is required, USPI and Tenet deny the allegation in Paragraph 104.

105.     Plaintiffs' claims are typical of the claims of the proposed Class as they arise out of the same course of Defendants' conduct and the same legal theories.

**ANSWER:**  Paragraph 105 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet deny the allegations in Paragraph 105.

106.     Plaintiffs will fairly and adequately represent the interests of the proposed Class and have no conflict with the interests of the proposed Class.

**ANSWER:**  Paragraph 106 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet deny the allegations in Paragraph 106.

107.    There are numerous questions of law and fact common to each Class member, including, but not limited to:

a.    whether Defendants and their co-conspirators agreed not to solicit or hire each other's employees;

b.    whether such agreements were per se violations of the Sherman Act;

c.    whether Defendants have fraudulently concealed their misconduct;

d.    whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for Plaintiffs and the proposed Class;

e.    whether Plaintiffs and the Class suffered antitrust injury as a result of Defendants' agreements;

f.    the type and measure of damages suffered by Plaintiffs and the Class; and

g.    the nature and scope of injunctive relief necessary to restore a competitive market.

**ANSWER:**  Paragraph 107 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet deny the allegations in Paragraph 107.

108.    During the Class Period, Plaintiffs were employed by SCA at or above the Director level. Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class.

**ANSWER:**  With respect to the first sentence of Paragraph 108, USPI and Tenet state that they lack knowledge or information sufficient to form a belief as the truth of the allegations, and on that basis, deny them.  USPI and Tenet state that the second sentence of Paragraph 108 contains legal conclusions to which no response is required.  To the extent a response is required, USPI and Tenet deny the allegations in the second sentence of Paragraph 108.

109.     Plaintiffs are members of the Class, have claims that are typical of the claims of the Class, and will fairly and adequately protect the interests of the Class. In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

**ANSWER:**  Paragraph 109 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet state that they lack knowledge or information as to the truth of the allegations in Paragraph 109, and on that basis, deny them.

110.     The above-referenced common questions of law and fact predominate over any questions affecting only individual members of the Class.

**ANSWER:**  Paragraph 110 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet deny the allegations in Paragraph 110.

111.     Defendants have acted on grounds generally applicable to the proposed Class, thereby making final injunctive relief appropriate with respect to the proposed Class as a whole.

**ANSWER:**  Paragraph 111 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet deny the allegations in Paragraph 111 as they pertain to them and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 as they relate to other Defendants, and on that basis, deny them.

112.     A class action is superior to any other means of resolving this litigation. Separate actions by individual Class members would be inefficient and would create the risk of inconsistent or varying judgments. There will be no material difficulty in the management of this action as a class action.

**ANSWER:** Paragraph 112 contains legal conclusions to which no response is required. To the extent a response is required, USPI and Tenet deny the allegations in Paragraph 112.

## FIRST CLAIM FOR RELIEF
## (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

113.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

**ANSWER:** USPI and Tenet repeat their responses to the preceding paragraphs as if fully set forth here.

114.    Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in an overarching conspiracy, consisting of unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's employees, thereby fixing and suppressing Class members' compensation.

**ANSWER:** USPI and Tenet admit that USPI and SCA entered into the USPI/SCA Agreement; deny that Tenet was a party to the USPI/SCA Agreement; deny the existence of any conspiracy between USPI or Tenet and the remaining Defendants; deny the existence of the conspiracy as alleged in the Complaint; deny the remaining allegations of Paragraph 114 as they pertain to them; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114 as they relate to other Defendants, and on that basis, deny them.

115.    Defendants' conspiracy included concerted action and undertakings with the purpose and effect of: (a) fixing Plaintiffs' and the Class's compensation at artificially low

levels; and (b) eliminating, to a substantial degree, competition among Defendants for employees.

**ANSWER:** USPI and Tenet admit that USPI and SCA entered into the USPI/SCA Agreement; deny that Tenet was a party to the USPI/SCA Agreement; deny the existence of any conspiracy between USPI or Tenet and the remaining Defendants; deny the existence of the conspiracy as alleged in the Complaint; deny the remaining allegations of Paragraph 115 as they pertain to them; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 115 as they relate to other Defendants, and on that basis, deny them.

116. Defendants' combinations and conspiracy injured Plaintiffs and other members of the Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

**ANSWER:** USPI and Tenet deny the allegations of Paragraph 116 as they pertain to them and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 116 as they relate to other Defendants, and on that basis, deny them.

117. Defendants' conduct and agreements are *per se* violations of Section 1 of the Sherman Act.

**ANSWER:** USPI and Tenet state that Paragraph 117 contains legal conclusions to which no answer is required; admit that USPI and SCA entered into the USPI/SCA Agreement; deny that Tenet was a party to the USPI/SCA Agreement; deny the existence of any conspiracy between USPI or Tenet and the remaining Defendants; and deny the existence of the conspiracy as alleged in the Complaint; and state that they lack knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 117 as they relate to other Defendants, and on that basis, deny them.

118.    Defendants' conduct is ongoing, continues to create immediate irreparable harm, and will continue to do so in the future if not enjoined.

**ANSWER:**  USPI and Tenet state that Paragraph 118 contains legal conclusions to which no response is required.  To the extent a response is required, USPI and Tenet deny the USPI/SCA Agreement is ongoing; deny that USPI or Tenet is engaged in any similar ongoing conduct; deny the remaining allegations of Paragraph 118 as they pertain to them; and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118 as they relate to other Defendants, and on that basis, deny them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class of similarly situated persons, respectfully request that:

a. The Court certify this lawsuit as a class action under Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, and that Plaintiffs' counsel be appointed as Class counsel for the Class;

b. The Court declare, adjudge, and/or decree that the conduct alleged herein is per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

c. Plaintiffs and the Class recover their damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law;

d. The Court enter an injunction enjoining Defendants from enforcing the unlawful conspiracy or entering into similar agreements going forward; and

e. The Court award such other and further relief as the Court may deem just and proper.

**ANSWER:** USPI and Tenet admit that Plaintiffs request the relief specified herein, individually and on behalf of the "Class" they purport to represent.

## AFFIRMATIVE AND OTHER DEFENSES

As affirmative and other defenses to the averments contained in the Complaint, USPI and Tenet state as follows:

1.      Plaintiffs' claims, and claims of any putative class members, are barred in whole or in part by applicable statutes of limitations.

2.      Plaintiffs' claims, and claims of any putative class members, are barred in whole or in part because Plaintiffs have failed to allege fraud and/or fraudulent concealment with particularity.

3.      Plaintiffs, and any putative class members, lack standing to bring some or all of their claims.

4.      Plaintiffs, and any putative class members, have not suffered harm as a result of any conduct by USPI or Tenet.

5.      Plaintiffs, and any putative class members, have not suffered antitrust injury.

6.      Plaintiffs' claims, and claims of any putative class members, are barred in whole or in part by the failure of Plaintiffs to mitigate, or attempt to mitigate, their damages.

7.      USPI's and Tenet's alleged actions were not the but-for or proximate cause of Plaintiffs' alleged harm, or the alleged harm of any putative class members.

8.      Plaintiffs' claims, and claims of any putative class members, for damages are barred because the alleged damages are speculative and because of the impossibility of ascertaining and allocating those alleged damages.

9.      Plaintiffs' claims, and claims of any putative class members, are barred in whole or in part by the doctrines of waiver, estoppel, and/or laches.

10.      Plaintiffs' claims, and claims of any putative class members, are barred in whole or in part because they cannot be maintained as a class action.

11.      Plaintiffs' claims, and claims of any putative class members, for equitable relief are barred in whole or in part because Plaintiffs have an adequate available remedy at law.

12.      Plaintiffs' claims, and claims of any putative class members, for injunctive relief are barred in whole or in part insofar as Plaintiffs seek to enjoin alleged events that have already transpired without the requisite showing of threatened future harm or continuing harm.

13.     Plaintiffs' claims, and claims of any putative class members, are barred in whole or in part to the extent that Plaintiffs seek damages that are duplicative of damages sought in other actions.

14.     Plaintiffs' claims, and claims of any putative class members, are barred to the extent that they have agreed to arbitration or agreed to a different forum for the resolution of their claims.

15.     Plaintiffs' claims, and claims of any putative class members, are improperly joined within the meaning of Rule 20 of the Federal Rules of Civil Procedure because they did not arise out of the same transaction, occurrence or series of transactions or occurrences and/or do not involve questions of law or fact common to all Defendants.

16.     USPI and Tenet aver that they are entitled to set off any amounts paid to Plaintiffs by any other Defendants who have settled, or do settle, Plaintiffs' claims against them in this matter.

17.     Plaintiffs' claims, and claims of any putative class members, to damages and/or certain remedies are barred in whole or in part to the extent that Plaintiffs have released or waived, under any applicable contract, settlement or otherwise, their rights to those remedies, including, but not limited to, treble damages and attorneys' fees.

18.     Plaintiffs' claims are barred, in whole or in part, to the extent the injuries alleged in the Complaint, the fact and extent of which are expressly denied by USPI and Tenet, were directly and proximately caused by or contributed to by the statements, acts or omissions of Plaintiffs or third persons or entities unaffiliated with USPI and Tenet.

19.     USPI and Tenet presently have insufficient knowledge or information as to whether they may have additional, yet unasserted, affirmative defenses.  USPI and Tenet

therefore reserve the right to assert additional affirmative defenses in the event discovery or further proceedings indicate any additional defense would be appropriate.

DATED: November 17, 2021

Respectfully submitted,

*/s/ Veronica Smith Moyé*
Veronica Smith Moyé (*pro hac vice*)
Andrew LeGrand
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Tel: (214) 698-3320
Fax: (214) 571-2936
VMoye@gibsondunn.com
ALeGrand@gibsondunn.com

Scott Hammond (*pro hac vice* forthcoming)
Kristen Limarzi (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 887-3684
Fax: (202) 530-9582
SHammond@gibsondunn.com
KLimarzi@gibsondunn.com

*Attorneys for Defendants United Surgical Partners Holding Company, Inc., United Surgical Partners International, Inc., and Tenet Healthcare Corporation*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 17th day of November 2021, the foregoing document was filed using the Court's CM/ECF system.  In addition, (1) the filing is available for viewing and downloading via the CM/ECF system, and (2) the CM/ECF system will send notification of this filing to all attorneys of record who have registered for CM/ECF updates.

*/s/ Veronica Smith Moyé*
Veronica Smith Moyé