**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE OUTPATIENT MEDICAL CENTER | ) | Master Docket No. 21-cv-00305 |
| EMPLOYEE ANTITRUST LITIGATION | ) | |
| | ) | Judge Andrea R. Wood |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiffs in these consolidated actions allege that the defendant outpatient medical centers entered into an illegal agreement not to solicit or hire proactively each other's senior employees, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Now, Defendants Surgical Care Affiliates, LLC and SCAI Holdings, LLC (together, "SCA"), UnitedHealth Group Inc. ("UHG"), DaVita, Inc. ("DaVita"), and Kent Thiry (together, with DaVita, "DaVita Defendants") have filed a motion to dismiss the Consolidated Amended Class Action Complaint ("CAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), a motion which Defendant Andrew Hayek joins in part. (Dkt. Nos. 75, 82.) In addition, UHG has filed a separate motion to dismiss (Dkt. No. 77) and DaVita Defendants have submitted a separate supplemental memorandum in support of Defendants' motion to dismiss (Dkt. No. 80). Both UHG's and DaVita Defendants' filings advance arguments for why those parties should be dismissed even if the CAC otherwise survives. (Dkt. Nos. 77, 78.) For the reasons that follow, Defendants' joint motion to dismiss is denied but UHG's separate motion to dismiss is granted.

## BACKGROUND

For the purposes of the motions to dismiss, the Court accepts all well-pleaded facts in the CAC as true and views those facts in the light most favorable to the plaintiffs as the non-moving

parties. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The CAC alleges as follows.

Defendants United Surgical Partners Holding Company, Inc. and United Surgical Partners International, Inc. (together, "USPI"), SCA,[1] DaVita, and Doe 1,[2] operate ambulatory surgery centers, outpatient medical centers, and other healthcare facilities. (CAC ¶ 53, Dkt. No. 57.) Broadly, the CAC alleges that SCA, USPI, DaVita, and Doe 1 are competitors in the recruitment and retention of employees across the United States that, between 2010 and 2019, were involved in a conspiracy to reduce and limit their employees' compensation and mobility. (*Id.*) More specifically, Plaintiffs Scott Keech and Allen Spradling ("Plaintiffs") claim that SCA, USPI, DaVita, and Doe 1 entered into a series of agreements under which they agreed not to solicit or hire each other's employees, particularly senior employees, unless the employee had already informed their existing employer that they were looking for a new job. (*Id.* ¶¶ 6, 7, 53, 64.) The alleged conspiracy also involved Defendants Andrew Hayek and Kent Thiry, the former Chief Executive Officers ("CEO") of SCA and DaVita, respectively; Defendant UHG, the current

---

[1] The SCA entities, together, do business as "SCA" and hold themselves out as a single enterprise. (CAC ¶ 23, Dkt. No. 57.) Prior to March 2017, Surgical Care Affiliates, LLC was a direct operating subsidiary of Surgical Care Affiliates, Inc. (CAC ¶ 19.) In March 2017, Surgical Care Affiliates, Inc. merged with Defendant UHG and, since then, Surgical Care Affiliates, LLC has been a wholly-owned subsidiary of UHG (*Id.*) Similarly, the CAC alleges that SCA Holdings, LLC and SCAI Holdings, LLC are indirect wholly-owned subsidiaries of UHG, and are also successors in interest to Surgical Care Affiliates, Inc. (*Id.* ¶¶ 20–21.) The CAC names both SCA Holdings, LLC and SCAI Holdings, LLC as Defendants and includes both among the entities comprising "SCA." (*Id.* ¶ 23.) However, Defendants note in their motion to dismiss that SCA Holdings, LLC is an unaffiliated third party that has not been served in the case. (Defs.' Mem. in Supp. of Mot. to Dismiss at 1 n.1, Dkt. No. 76.) For present purposes, the Court uses "SCA" to refer to any alleged current or predecessor SCA entity.

[2] Doe 1 refers to a coconspirator identified only as "Company B" in a criminal indictment brought against DaVita Defendants predicated on their involvement in the same antitrust conspiracy as alleged here. *See United States v. DaVita, Inc.*, No. 21-cr-00229-RBJ (D. Colo. July 14, 2021), ECF No. 1.

parent of SCA; Defendant Tenet Healthcare Corp., the current parent of USPI[3]; and multiple unidentified Doe Defendants. (*Id.* ¶¶ 22, 24, 26, 39–42, 44–47.)

The purported conspiracy began at least by May 14, 2010, as evidenced by an email that USPI's CEO sent to certain USPI employees informing them that he and SCA's then-CEO, Hayek, had reached an agreement not to proactively approach each other's employees. (*Id.* ¶ 55.) Consistent with that agreement, USPI's human resources employees told recruiters on multiple occasions to avoid contacting SCA employees, as USPI could not hire SCA employees who had not first informed SCA that they were actively pursuing other opportunities. (*Id.* ¶¶ 56–57, 59.) Further, USPI and SCA would alert each other to potential violations of their agreement. (*Id.* ¶ 58.)

DaVita and SCA reached a similar agreement not to proactively solicit each other's employees by, at the latest, May 2012. (*Id.* ¶¶ 60–61.) Both Hayek and DaVita's CEO, Thiry, understood that neither company was permitted to "do proactive recruiting into [the other's] ranks." (*Id.* ¶ 61.) In October 2015, Hayek sent an email to a human resources executive that revealed SCA had an agreement with both USPI and DaVita. (*Id.* ¶ 62.) Specifically, he claimed that DaVita could "recruit junior people" from USPI and DaVita, "but [SCA's] agreement is that [it] would only speak with senior executives if they have told their boss already that they want to leave and are looking." (*Id.*) Accordingly, in December 2015, an SCA human resources executive instructed a recruiter that USPI and DaVita were "off limits to SCA." (*Id.* ¶ 63.) And in one instance, when SCA was approached by a DaVita employee about employment opportunities, SCA informed the candidate that SCA could not consider them unless they had informed DaVita and received explicit permission that they could be considered for employment with SCA. (*Id.*

---

[3] USPI and Tenet Healthcare Corp. did not join Defendants' motion to dismiss, opting instead to answer the CAC. (Dkt. No. 84.)

¶ 64.) Moreover, on at least one occasion, Hayek alerted Thiry when SCA took some action inconsistent with their agreement. (*Id.* ¶ 65.)

By April 2017, the conspiracy had expanded to include Doe 1. (*Id.* ¶ 67.) In an April 16, 2017 email to Thiry, Doe 1's CEO gave Thiry his commitment that Doe 1 would "steer clear of anyone at" DaVita. (*Id.*) Later, in February 2018, Doe 1's CEO again emailed Thiry informing him that a DaVita employee had inquired about opportunities at Doe 1 but the CEO rebuffed her. (*Id.* ¶ 69.) Doe 1's CEO explained to the prospect that he would only discuss job opportunities if the employee "told her manager explicitly that she would like to talk to [Doe 1] about a role and that [Doe 1's CEO] would talk to [Thiry] about it before [he] would discuss with her." (*Id.*) Consistent with its agreement, Doe 1 regularly refrained from proactively discussing job opportunities with DaVita's current employees. (*Id.* ¶¶ 68–70.)

Defendants' alleged conspiracy only came to light on January 7, 2021, when the U.S. Department of Justice ("DOJ") announced that it had indicted SCA on charges of orchestrating an antitrust conspiracy with USPI and DaVita (both identified pseudonymously in the indictment), in violation of 15 U.S.C. § 1. (CAC ¶¶ 2, 96; *United States v. Surgical Care Affiliates, LLC*, No. 3:21-cr-00011 (N.D. Tex. Jan. 5, 2021).) The charges arose from SCA's agreements with USPI and DaVita not to solicit or hire each other's employees without the consent of the employee's current employer. (CAC ¶ 2.) Later that year, the DOJ announced that it had indicted DaVita and Thiry on antitrust conspiracy charges based on DaVita's agreements with SCA and Doe 1. (CAC ¶¶ 7–8, 46; *United States v. DaVita Inc.*, No. 21-cr-00229-RBJ (D. Colo. July 14, 2021), ECF No. 1.)[4]

---

[4] The criminal case against DaVita Defendants proceeded to a jury trial, which resulted in the jury finding DaVita and Thiry not guilty on all counts. (*DaVita*, No. 21-cr-00229-RBJ (Apr. 15, 2022), ECF No. 262.) Subsequently, the district court entered judgments of acquittal as to both DaVita and Thiry. (*DaVita*, No. 21-cr-00229-RBJ (Apr. 20, 2022), ECF Nos. 266, 267; *see also* Notice of J. of Acquittal, Dkt. No. 127.)

Upon learning of the DOJ's allegations in the SCA and DaVita criminal indictments, Plaintiff brought separate civil actions against Defendants that were ultimately consolidated into a single putative class action before this Court. Plaintiffs are both former senior employees of SCA. (CAC ¶¶ 17–18, 108.) Their CAC sets forth a single civil antitrust conspiracy claim under § 1 of the Sherman Act, 15 U.S.C. § 1, alleging that Defendants entered into an overarching conspiracy to restrict competition for Plaintiffs' and other senior employees' services by agreeing to refrain from proactively soliciting or hiring each other's current employees. (*Id.* ¶¶ 113–18.) According to Plaintiffs, Defendants' agreement constituted a *per se* violation of the Sherman Act. (*Id.* ¶ 117.) As a result of Defendants' conspiracy, Plaintiffs claim that they were deprived of free and fair competition in the market for their services, which, in turn caused the artificial suppression of their compensation. (*Id.* ¶¶ 77–92, 116.)

## DISCUSSION

Defendants move to dismiss the claims against them for lack of standing pursuant to Rule 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6). Under Rule 12(b)(1), a party may make either a factual or facial challenge to a plaintiff's standing. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). A factual challenge occurs where "the complaint is formally sufficient but the contention is that there is *in fact* no subject[-]matter jurisdiction," such that the Court can look beyond the complaint and consider evidence as to whether subject-matter jurisdiction exists. *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (internal quotation marks omitted). But here, Defendants make a facial challenge, which requires "only that the court look to the complaint and see if the plaintiff has sufficiently *alleged* a basis of subject[-]matter

---

Meanwhile, a jury trial in the criminal case against SCA is scheduled for January 9, 2023. (Notice of Trial Continuance, Dkt. No. 111.)

jurisdiction." *Id.* at 443. The same standard used to evaluate facial challenges under Rule 12(b)(1) is used to evaluate motions brought under Rule 12(b)(6). *Silha*, 807 F.3d at 173–74.

To survive a motion under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Defendants argue that the CAC should be dismissed because Plaintiffs lack standing and because they fail to state an antitrust conspiracy claim. To the extent Plaintiffs are able to plead an antitrust conspiracy claim, DaVita Defendants and UHG each advance additional grounds for their dismissal. In particular, DaVita Defendants contend that Plaintiffs lack standing to assert a claim against them and also attack the sufficiency of the allegations concerning their purported agreement with Doe 1. UHG argues that that the CAC's allegations fail to demonstrate it had any involvement in the antitrust conspiracy. The Court first addresses standing before turning to the merits arguments.[5]

## I.    Standing

Defendants contend that Plaintiffs' factual allegations fail to establish Article III standing. Further, they claim that Plaintiffs do not plead that they suffered an antitrust injury proximately caused by Defendants' conduct, a requirement sometimes referred to as "antitrust standing."

---

[5] In addition to the parties' briefs, the DOJ filed a statement of interest responding to certain of the arguments raised in Defendants' motion to dismiss. (Dkt. No. 91.)

## A.    Article III Standing

Standing is an essential component of Article III's limitation of federal courts' judicial power only to cases or controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). There are three elements that constitute the "irreducible constitutional minimum" of standing. *Lujan*, 504 U.S. at 560. A "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (internal quotation marks omitted). Where a plaintiff does not have Article III standing, a federal district court lacks subject-matter jurisdiction to hear his or her claims. *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). Here, Defendants contend that Plaintiffs do not have Article III standing because they have not sufficiently pleaded an injury-in-fact traceable to Defendants' conduct.

A plaintiff establishes an injury in fact by showing that they "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). An injury is particularized when it affects "the plaintiff in a personal and individual way." *Id.* A concrete injury is one that actually exists. *Id.* at 340. Further, standing requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).

Defendants argue that Plaintiffs fail to establish an injury-in-fact because they do not provide specific facts demonstrating that Defendants' conduct actually suppressed their

compensation or caused them to miss out on job opportunities. Moreover, Defendants claim that Plaintiffs offer only speculation as to how any injury suffered by Plaintiffs can be traced to Defendants' non-solicitation agreements. The Court disagrees on both points.

Financial injuries such as lost compensation "are prototypical injuries for the purposes of Article III standing." *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017). Plaintiffs allege that Defendants' conduct injured them and other senior employees "by suppressing their compensation and depriving them of free and fair competition in the market for services." (CAC ¶ 116.) The CAC also includes detailed allegations explaining just how Defendants' non-solicitation agreements caused those alleged injuries. (*Id.* ¶¶ 71–92.) Plaintiffs begin by noting that Defendants are among the largest employers in the outpatient medical care market and compete with each other across the nation for a limited supply of employees possessing the requisite specialized knowledge, experience, and skills to work in the field. (*Id.* ¶¶ 72–75.) Lateral hiring within the outpatient medical services field is a key form of competition in the industry and is particularly beneficial for the hiring of senior employees, as employees of other outpatient medical care providers will come with the necessary training and experience. (*Id.* ¶ 79.) And proactive solicitation is an efficient and effective method for recruiting qualified senior employees. (*Id.* ¶ 77.)

Next, Plaintiffs explain the ways that competition for lateral hires impacts employees' compensation. First, when employees are solicited, interviewed, or offered a job by a rival employer, they gain insight into how other companies value the employee's work experience, which is not readily available from other sources. (*Id.* ¶ 80.) In turn, those employees can use that insight either to negotiate for higher salaries at their existing jobs or to accept a more lucrative opportunity with a different employer. (*Id.* ¶ 81.) But the flow of information between employees

and prospective employers is disrupted by Defendants' agreements not to approach proactively a rival's employees without the rival's prior consent. (*Id.* ¶¶ 80–81.) Second, the mere possibility of losing an employee serves to pressure an employer to increase compensation preemptively to ensure that its employees feel properly valued and loyal. (*Id.* ¶ 82.) Yet by agreeing with each other not to solicit senior employees proactively, Defendants had less reason to fear losing those employees and thus less incentive to take preemptive measures to retain them. (*Id.*) Plaintiffs go on to allege how Defendants' internal compensation systems "preserved relatively stable relationships between the pay of their employees" such that "an adjustment to the pay of some employees will lead to adjustments to the pay structure as a whole, affecting the pay of all employees." (*Id.* ¶ 84.) Thus, where the competitive process for employees is distorted, compensation is suppressed not just for the employees most likely to be solicited by another employer but for all employees. (*Id.* ¶¶ 84–91.)

Stated succinctly, Plaintiffs allege that "Defendants' conspiracy restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor markets," which "suppressed the compensation of all employees, not just particular individuals who otherwise would have been solicited or sought to change employers." (*Id.* ¶ 92.) In that way, as former senior SCA employees, Plaintiffs suffered an injury-in-fact— artificially suppressed compensation—that was fairly traceable to Defendants' non-solicitation agreements. Because Plaintiffs allege that Defendants' restraints on competition operated to reduce the compensation of all senior employees, at this early stage in the proceedings, Plaintiffs are not required to quantify precisely the impact that Defendants' conduct had on their compensation, nor is it necessary for them to allege a specific lost job opportunity. *See Turner v. McDonald's USA, LLC*, No. 19 C 5524, 2020 WL 3044086, at *1 (N.D. Ill. Apr. 24, 2020)

(rejecting Defendants' argument that the plaintiff could not plead an injury-in-fact without alleging that she applied for and was rejected for a job due to Defendants' no-hire policy because it was enough that the plaintiff alleged that "the wages she was actually paid were less than the wages she would have been paid absent the allegedly-unlawful no-hire policy"). And while Defendants assert that Plaintiffs' allegations tracing their injury to Defendants' conduct amounts to a speculative academic exercise, the Court believes that Plaintiffs' causation allegations are supported by "basic principles of economics," which is enough at the pleading stage. *Id.* (finding that the plaintiff had adequately pleaded that her lost wages were fairly traceable to the defendants' no-hire agreement because "if fewer employers compete for the same number of employees, wages will be lower than if a greater number of employers are competing for those employees").

Having found that Plaintiffs have adequately alleged that Defendants' conspiracy caused them to suffer a past injury-in-fact, the Court concludes that Plaintiffs have adequately alleged their standing to seek damages. Yet Defendants assert that even if Defendants' conduct caused Plaintiffs an injury sufficient to confer standing to seek money damages, Plaintiffs face no threat of future harm so as to have standing to pursue injunctive relief. In particular, Defendants emphasize that the CAC expressly alleges that Defendants' conspiracy ended in 2019 and Plaintiffs no longer work for SCA or any other Defendant. (CAC ¶¶ 17–18, 53.) Defendants are correct that a plaintiff's standing to pursue monetary damages does not automatically give that plaintiff standing to also seek injunctive relief. *Freeman v. MAM USA Corp.*, 528 F. Supp. 3d 849, 856 (N.D. Ill. 2021). Rather, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

To establish standing to pursue injunctive relief, a plaintiff "must face a 'real and immediate threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" *Simic*, 851 F.3d 734, 738 (7th Cir. 2017). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). While Plaintiffs no longer work for SCA or any other Defendant, as individuals with extensive experience in the outpatient medical services field, they remain part of the limited supply of individuals qualified to work for Defendants in a senior-level position. (*See* CAC ¶ 74.) Further, the CAC does not definitively establish that no Defendant is part of any active non-solicitation agreement. Rather, the CAC alleges only that the conspiracy "spann[ed] ***at least*** the years 2010 through 2019." (*Id.* ¶ 53 (emphasis added).) Elsewhere, the CAC alleges that "Defendants' conduct is ongoing, continues to create immediate irreparable harm, and will continue to do so in the future if not enjoined." (*Id.* ¶ 118.) Plaintiffs also contend that Defendants did not publicize their non-solicitation agreements and knowledge of them was "closely held," which suggests Plaintiffs need discovery to know if and when the conspiracy terminated. (*Id.* ¶ 97.)

Even if no Defendant is part of a non-solicitation agreement at the moment, it remains possible that they could revive the agreements. *See United States v. Nat'l Ass'n of Realtors*, No. 05 C 5140, 2006 WL 3434263, at *7 (N.D. Ill. Nov. 27, 2006) (noting that a likelihood of the defendant resuming its prior conduct as against the plaintiff can support standing for injunctive relief). And the allegations suggest that Plaintiffs could be harmed by the agreements notwithstanding the fact that they are not currently employed by any Defendant. Given that the agreements are alleged to suppress the compensation of all Defendants' employees and Defendants are among the nation's largest operators of outpatient medical care centers, it is

plausible that Defendants' conspiracy harms or threatens to harm Plaintiffs by reducing the supply of jobs in the outpatient medical services field that fairly compensate employees with Plaintiffs' skill and experience. With a more complete record, Defendants may be able to prove that Plaintiffs do not face an imminent threat of future injury, but there remain questions of fact that preclude the Court from reaching that conclusion based solely on the pleadings. *See Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020) ("As the litigation progresses, the way in which the plaintiff demonstrates standing changes. Initially, a plaintiff may demonstrate standing by clearly pleading allegations that 'plausibly suggest' each element of standing when all reasonable inferences are drawn in the plaintiff's favor." (citation omitted)).

In sum, the Court finds that Plaintiffs have pleaded that they suffered an injury-in-fact that is fairly traceable to Defendants' conspiracy. Moreover, Plaintiffs' allegations plausibly allege a substantial threat of future harm. For these reasons, the Court finds that Plaintiffs have adequately pleaded their Article III standing as to all forms of relief sought in the CAC.

### B.     Proximate Causation

In an antitrust action, "[p]roximate causation is an essential element that plaintiffs must prove in order to succeed on any of their claims." *Supreme Auto Transp., LLC*, 902 F.3d 735, 743 (7th Cir. 2018). "[T]he proximate causation requirement in the past has been termed 'antitrust standing,' even though it has nothing to do with a plaintiff's standing to sue under Article III of the U.S. Constitution . . . ." *Id.* Rather, the term "antitrust standing" simply refers to the various "rules for determining whether the plaintiff is the proper party to bring a private antitrust action." *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1063 (7th Cir. 2019) (internal quotation marks omitted). Describing the term as a "misnomer," *id.*, the Seventh Circuit has recently tended to avoid using it. *See Supreme Auto Transp.*, 903 F.3d at 743 ("We will

. . . eschew the term 'antitrust standing' and speak only of the requirements to bring a case under the particular statutes involved."). Likewise, because "the doctrine of antitrust standing is the equivalent of the common-law tort limitation of proximate cause," *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 927 (7th Cir. 1995), this Court will discuss it in such terms.

To establish proximate causation in an antitrust action, a plaintiff must "demonstrate a direct link between the antitrust violation and the antitrust injury." *Id.* at 927–28 (internal quotation marks omitted). That inquiry "involves a case-by-case analysis of the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 927 (internal quotation marks omitted). Here, Plaintiffs have clearly alleged an antitrust injury, as they allege that Defendants' anticompetitive conduct has restrained competition for qualified outpatient medical services employees and artificially suppressed their compensation. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."); *Turner*, 2020 WL 3044086, at *3 (holding that the plaintiff pleaded an antitrust injury from a no-hire clause because she "alleged injury to competition, namely the injury of depressed prices (wages) to sellers (employees) due to anticompetitive behavior of buyers (employers)"). And Plaintiffs' antitrust injury was linked to Defendants' alleged antitrust violation, as Plaintiffs are former SCA employees and thus directly affected by the suppressed compensation caused by Defendants' conspiracy. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020) ("The general rule is that customers and competitors in the affected market have antitrust standing."); *McGarry & McGarry*, 937 F.3d at 1065 ("We usually presume that competitors and consumers in the

relevant market are the only parties who suffer antitrust injuries and are in a position to efficiently vindicate the antitrust laws."). Thus, the Court concludes that Plaintiffs have satisfied the proximate-causation element of their antitrust conspiracy claim.

## II.   Sherman Act Violation

Because Plaintiffs' antitrust conspiracy claim survives dismissal on standing grounds, the Court next turns to the merits of their claim. Section 1 of the Sherman Act makes illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Because "restraint is the very essence of every contract[,] read literally, § 1 would outlaw the entire body of private contract law." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 687–88 (1978). That, of course, "is not what the statute means." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189 (2010). Rather, "in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean undue restraint." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (internal quotation marks and alteration omitted). Thus, the Supreme Court has "understood § 1 to outlaw only ***unreasonable*** restraints." *Id.* (internal quotation marks omitted). Accordingly, to state a claim under § 1 of the Sherman Act, a plaintiff must allege: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (internal quotation marks omitted). According to Defendants, the CAC must be dismissed because Plaintiffs fail to allege adequately both the existence of an overarching conspiracy between all Defendants and an unreasonable restraint of trade.

### A.    Contract, Combination, or Conspiracy

Despite expressly alleging that Defendants "entered into and engaged in an ***overarching conspiracy***," (CAC ¶ 114 (emphasis added)), Defendants contend that the CAC's allegations demonstrate only the existence of three different bilateral agreements. Defendants argue that because Plaintiffs' predicate their antitrust conspiracy claim on a single, overarching conspiracy that is not supported by their factual allegations, it must be dismissed.[6] In response, Plaintiffs insist that their allegations of Defendants' participation in bilateral agreements is enough to survive dismissal and that the precise contours of the conspiracy can be fleshed out in discovery.

To plead the existence of an antitrust conspiracy, a plaintiff must allege facts showing that "the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Put differently, "the circumstances of the case must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Id.* (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). "While the complaint need not contain detailed 'defendant by defendant' allegations, it must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision to join it." *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) (internal quotation marks omitted). However, § 1 does not reach independent action that happens to have an anticompetitive effect. *Twombly*, 550 U.S. at 553–54; *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 997

---

[6] Hayek joins Defendants' motion to dismiss only as to the argument that Plaintiffs failed to allege a single, overarching conspiracy sufficiently and otherwise takes no position as to Defendants' remaining bases for dismissal. (*See* Def. Hayek's Limited Joinder of Co-Defs.' Mot. to Dismiss, Dkt. No. 82.)

(N.D. Ill. 2011). Factual allegations that are equally consistent with a wide range of lawful, independent business conduct as they are with an anticompetitive agreement are insufficient. *See Twombly*, 550 U.S. at 553–57. At the same time, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). An antitrust conspiracy may be pleaded with either direct evidence of an anticompetitive agreement or circumstantial evidence "from which the existence of such an agreement can be inferred." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018).

Here, there is no dispute that the CAC has sufficiently alleged the following three bilateral agreements: (1) an agreement between SCA and USPI; (2) an agreement between SCA and DaVita; and (3) an agreement between DaVita and Doe 1. Plaintiffs allege direct evidence supporting the existence of each agreement, such as communications in which a Defendant company's CEO expressly acknowledges his company's agreement to refrain from proactively soliciting another participating Defendant's employees or responds to reported violations of one of the relevant agreements. (CAC ¶¶ 56–58, 61–62, 65–70.) However, the CAC does not allege direct evidence of an overarching agreement among all Defendants. Thus, the question is whether the CAC alleges sufficient circumstantial facts from which a single overarching agreement can be inferred.

Insofar as Plaintiffs contend that they can plead a single overarching conspiracy with only allegations of multiple bilateral conspiracies, the Court cannot agree. Rather, multiple bilateral agreements can be evidence of a single conspiracy but only "when the agreements are sufficiently interdependent and made in the context of other plus factors suggesting coordination." *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 252 (D. Mass. 2014). Two of the

primary cases upon which Plaintiffs rely do not hold to the contrary. *See In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 486–93 (W.D. Pa. 2019); *In re High-Tech Emp. Antitrust Litig.*, 856 F Supp. 2d 1103, 1118–22 (N.D. Cal. 2012). In both cases, the respective district courts found that the plaintiffs had pleaded a single conspiracy composed of multiple bilateral agreements. But both cases also turned on the fact that Plaintiffs had "alleged 'something more' from which a reasonable inference" of an overarching conspiracy could be drawn. *Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d at 487; *see also High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1119 (finding an overarching conspiracy based on facts demonstrating that the defendants had "an opportunity to conspire and an opportunity for transfer of the requisite knowledge and intent regarding the bilateral agreements").

Relevant "plus factors" (or "something more") that can bind together allegations of multiple agreements into a single conspiracy include: "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 334 (S.D.N.Y. 2021) (quoting *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)). All three plus factors are alleged in the CAC. Plaintiffs allege that Defendants shared a common motive to conspire, as they were each other's biggest competitors in the high-demand low-supply market for experienced outpatient medical care employees. (CAC ¶¶ 72–74.) Thus, an overarching agreement among Defendants would "place [them] on equal footing with respect to competition for employees from their largest competitors." *Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d at 487–88. Moreover, the bilateral agreements were contrary to their self-interest because outpatient medical services experience is highly valued in Defendants' senior-

level positions and lateral hiring allows Defendants to avoid "invest[ing] significant resources identifying, assessing, and training" employees from other industries. (CAC ¶¶ 75, 79). It is reasonable to infer that Defendants would only "forfeit[] the advantages gained from soliciting and hiring their competitors' employees . . . . in exchange for promises that their top competitors would not solicit or hire each other's employees." *Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d at 488. And the CAC contains several allegations of one Defendant's CEO discussing a non-solicitation agreement with the CEO of the other Defendant party to that agreement. (CAC ¶¶ 58, 61, 65, 67–69.)

Also supporting the existence of a single overarching conspiracy is that the alleged bilateral agreements centered around the parties' substantially similar promise not to solicit each other's senior employees unless the employee had first notified their current employer of their intention to seek a new job. In addition, the agreements were connected by the overlap between Defendants. Specifically, SCA was party to two agreements, one of which was with DaVita, and DaVita subsequently reached the same agreement with Doe 1. *See PharmacyChecker.com*, 530 F. Supp. 3d at 337 ("[A]n alleged series of identical bilateral agreements between a variety of different pairs of defendants, with multiple overlaps, is sufficient to allege a conspiracy."). Finally, Plaintiffs allege that Defendants "did not publicize their . . . agreements, did not inform job applicants about the conspiracy, and acted in a manner deliberately designed to avoid detection of the conspiracy" (CAC ¶ 97), which provides additional support for the existence of a single conspiracy. *See High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1120 ("The fact that all six identical bilateral agreements were reached in secrecy among seven Defendants in a span of two years suggests that those agreements resulted from collusion, and not from coincidence.").

Viewing the CAC as a whole, Plaintiffs allege not only the existence of three bilateral agreements between Defendants but also multiple "plus factors" from which a single overarching conspiracy can be inferred. At the pleading stage, these allegations are sufficient. *Id.* "Whether Plaintiffs can adduce sufficient evidence in discovery to **prove** an overarching conspiracy is a question that is not before the Court today." *Id.* The Court therefore will not dismiss the CAC for failure to sufficiently plead a contract, conspiracy, or combination.

### B. Unreasonable Restraint of Trade

To determine whether a restraint of trade is unreasonable, courts use one of three methods of analysis: *per se*, quick look, and the rule of reason. *Agnew*, 683 F.3d at 335. All three methods "are meant to answer the same question: 'whether or not the challenged restraint enhances competition.'" *Id.* (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780 (1999)). Antitrust claims are usually analyzed under the rule of reason, which requires a plaintiff to show that "an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Id.*; *see also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607 (1972) ("[T]he Court has utilized the 'rule of reason' in evaluating the legality of most restraints alleged to be violative of the Sherman Act . . . ."). However, Plaintiffs assert in the CAC that Defendants' non-solicitation agreements constitute *per se* violations of § 1 of the Sherman Act (CAC ¶ 117)—that their nature and necessary effect are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Nat'l Socy' of Prof'l Eng'rs*, 435 U.S. at 692. Notably, Plaintiffs rely exclusively on the *per se* method and they make no alternative arguments under either the quick look or rule of reason methods in their opposition to the motions to dismiss.

"The *per se* rule is a presumption of unreasonableness based on 'business certainty and litigation efficiency.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)

19

(quoting *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982)). "It represents a 'longstanding judgment that the prohibited practices by their nature have 'a substantial potential for impact on competition.'" *Id.* (quoting *FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 433 (1990)); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects and lack any redeeming virtue." (internal quotation marks and citations omitted)). Under the *per se* rule, "a conclusive presumption" of unreasonableness applies where "experience with [that] particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 344. Thus, when a challenged restraint falls within the subset of agreements that have been found to be *per se* unlawful, a court "may dispense with the rule of reason inquiry." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021).

Only a "small group of restraints" are treated as *per se* unreasonable. *Am. Express*, 138 S. Ct. at 2283. Indeed, "[i]t is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act." *Topco*, 405 U.S. at 607–08. Further, the Supreme Court has "expressed reluctance to adopt *per se* rules with regard to 'restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.'" *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 477, 458–59 (1986)). "Typically only 'horizontal' restraints— restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*." *Am. Express*, 138 S. Ct. at 2283–84 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)). A horizontal agreement to allocate markets among competitors is a type of restraint recognized to be *per se* unlawful. *Leegin*, 551 U.S. at 886. One classic example of a *per se*

unlawful market allocation agreement is where "competitors at the same level of the market structure [agree] to allocate territories in order to minimize competition." *Topco*, 405 U.S. at 608. Any market allocation agreement between competitors may be *per se* unlawful, no matter whether it allocates territories, customers, or products. *United States v. Capitol Serv., Inc.*, 568 F. Supp. 134, 154 (E.D. Wis. 1983); *see also United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1273 (10th Cir. 2018) ("It is undisputed that an agreement to allocate or divide customers between competitors within the same horizontal market, constitutes a per se violation of § 1 of the Sherman Act." (internal quotation marks omitted)).

A horizontal market allocation agreement may escape *per se* treatment, however, if the restraint is "ancillary" rather than "naked." "A restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985). On the other hand, a "naked" restraint is one "in which the restriction on competition is unaccompanied by new production or products." *Id.* at 188. For example:

> If two people meet one day and decide not to compete, the restraint is "naked"; it does nothing but suppress competition. If A hires B as a salesman and passes customer lists to B, then B's reciprocal covenant not to compete with A is "ancillary." At the time A and B strike their bargain, the enterprise (viewed as a whole) expands output and competition by putting B to work. The covenant not to compete means that A may trust B with broader responsibilities, the better to compete against third parties.

*Id.* at 189. To determine whether a restraint is "ancillary" as opposed to "naked," a court must consider "whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment." *Id.* But if the restraint has "no purpose except stifling of competition," it is a "naked" restraint that is *per se* unlawful. *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963).

The Court finds that Plaintiffs have plausibly alleged that the non-solicitation agreements are *per se* unreasonable naked horizontal market allocation agreements. As pleaded, Defendants agreed to divide the market for senior-level outpatient medical care employees by agreeing not to compete for the services of particular employees—namely, those currently employed by another Defendant. It makes no difference that Defendants were dividing employees as opposed to territories, customers, or products. Indeed, courts have found that "[a]ntitrust law does not treat employment markets differently from other markets." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013); *see also Fonseca v. Hewlett-Packard Co.*, No. 19cv1748-GPC-MSB, 2020 WL 6083448, at *9 (S.D. Cal. Feb. 3, 2020) (same); *Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d at 481 (same). Thus, "[a] horizontal agreement not to hire competitors' employees is, in essence, a market division." *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2018 WL 3105955, at *6 (N.D. Ill. June 25, 2018); *see also eBay*, 968 F. Supp. 2d at 1039 ("[A]n agreement among employers that they will not compete against each other for the services of a particular employee or a prospective employee is, in fact, a service division agreement, analogous to a product division agreement." (quoting XII Phillip E. Areeda et al., Antitrust Law ¶ 2013b (3d ed. 2007))).

Moreover, the CAC's allegations contain no suggestion that the non-solicitation agreements were ancillary to some procompetitive business purpose. Rather, as pleaded, the non-solicitation agreements were naked agreements that served only to reduce competition for Defendants' senior employees. That the non-solicitation agreements left Defendants free to compete for non-senior employees or those senior employees who had notified their current employer of their intent to pursue other jobs does not remove them from the ambit of the *per se*

rule. *Blackburn v. Sweeney*, 53 F.3d 825, 827 (7th Cir. 1995) ("To fit under the *per se* rule an agreement need not foreclose all possible avenues of competition.").

To argue against *per se* treatment, Defendants emphasize the novelty of the alleged non-solicitation agreements. In particular, they contend that because courts lack substantial experience with similar agreements, the non-solicitation agreements must be analyzed under the rule of reason. The Court disagrees. That an agreement exactly like Defendants' non-solicitation agreements has not been found to be *per se* unlawful does not preclude the application of the *per se* rule. *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000) ("[T]he fact that the [defendants'] scheme did not fit precisely the characterization of a prototypical *per se* practice does not remove it from *per se* treatment."). In any case, after the motions to dismiss were fully briefed, the district court in the DaVita Defendants' criminal case denied their motion to dismiss the indictment, holding that where "naked non-solicitation agreements or no-hire agreements allocate the market, they are *per se* unreasonable." (Pls.' Notice of Suppl. Authority, Ex. A at 17, Dkt. No. 108-1); *United States v. DaVita Inc.*, No. 1:21-cr-00229-RBJ, 2022 WL 266759, at *8 (D. Colo. Jan. 28, 2022).). Even before the *DaVita* court's ruling, at least one other court had found that a similar agreement not to solicit or hire a competitor's employee stated a plausible *per se* claim. *eBay*, 968 F. Supp. 2d at 1033, 1039–40. Moreover, multiple courts have recognized that naked agreements by employers to refrain from hiring a competitor's employees may be amenable to *per se* treatment. *E.g.*, *Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d at 481–82; *Deslandes*, 2018 WL 3105955, at *6; *High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1122. Finally, the Ninth Circuit recently observed that there is "considerable merit" to the contention

that the "*per se* rule applies to naked non-solicitation agreements." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1110 n.4 (9th Cir. 2021).[7]

Defendants acknowledge the cases finding that non-solicitation or no-poach agreements may be *per se* unlawful but note that in none of those cases did the court definitively decide the issue. Indeed, in *DaVita*, the district court allowed the case to go to trial, which resulted in not guilty verdicts and judgments of acquittal. In several of the other cases, the plaintiff advanced an alternative quick look or rule of reason theory of unlawfulness, and the court simply decided that a determination of the applicable analysis would be made at a later stage. *High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1122 ("[T]he Court need not decide now whether *per se* or rule of reason analysis applies. Indeed, that decision is more appropriate on a motion for summary judgment."); *eBay*, 968 F. Supp. 2d at 1040 ("At this stage in this action, the court simply cannot determine with certainty the nature of the restraint, and by extension, the level of analysis to apply."). In *Deslandes*, the district court only acknowledged that a no-hire agreement ***could*** be *per se* unlawful but found that the restraint at issue there was ancillary and thus subject to rule of reason analysis. 2018 WL 3105955, at *7. And in *Railway Industry Employee No-Poach Antitrust Litigation*, where the plaintiffs relied exclusively on a *per se* theory, the district court found that the plaintiffs sufficiently pleaded a *per se* violation for purposes of Rule 12(b)(6) but noted that the defendants could revisit the "issue if warranted in a motion for summary judgment." 395 F. Supp. 3d at 485.

While Defendants are correct that the cases involving agreements not to solicit or poach a competitors' employees do not make a definitive determination as to the proper analysis, the fact that all those cases accepted that a non-solicitation or no-poach agreement could be a form of

---

[7] Because the challenged non-solicitation agreement in *Aya* was deemed to be ancillary, the Ninth Circuit declined to make a conclusive determination as to the applicable analysis. *Aya*, 9 F.4th at 1110 n.4.

market allocation agreement demonstrates that the agreements fit within an established category of *per se* unlawful restraints.[8] Accordingly, the Court finds that Plaintiffs have adequately alleged that the non-solicitation agreements were naked horizontal market allocation agreements and therefore plead a viable *per se* claim. That Plaintiffs rely exclusively on the *per se* theory does not militate in favor of expediting a decision on the applicable analysis. Rather, because Plaintiffs have a plausible *per se* claim, the question becomes whether the evidence will establish that the non-solicitation agreements do, in fact, nakedly allocate the market for outpatient medical care employees. *See DaVita*, 2022 WL 266759, at *7 ("Where they have been found not to allocate the market or to be ancillary, courts have not found no-hire agreements to be inherently anticompetitive."); *see also Markson v. CRST Int'l, Inc.*, No. 5:17-cv-01261-SB-SP, 2021 WL 1156863, at *4 (C.D. Cal. Feb. 10, 2021) ("The decision of what mode of analysis to apply—per se, rule of reason, or otherwise—is entirely a question of law for the Court, even though the question might involve factual disputes."). Such questions, however, must await development of the record. *See eBay*, 968 F. Supp. 2d at 1039 (explaining that determining whether an agreement is naked or ancillary is a factual inquiry requiring "evidence relating to the agreement's formation and character"). Of course, if the evidence does not support such a claim, Plaintiffs may well find that it is too late for them to pursue an alternative theory of relief.

---

[8] The Sixth Circuit has held that a horizontal agreement between competitors not to solicit business from each other's existing accounts was "plainly a form of customer allocation and, hence, [was] the type of 'naked restraint' which triggers application of the *per se* rule of illegality." *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367, 1372 (6th Cir. 1988). The district court in the *DaVita* criminal case observed that "*Cooperative Theatres* rebuts defendants' arguments that non-solicitation agreements can never properly be subject to per se treatment." *DaVita*, 2022 WL 266759, at *7.

### III.    Sufficiency of Allegations as to DaVita Defendants and UHG

Having found that the CAC states a claim for a *per se* violation of the Sherman Act, the Court moves on to address the individual arguments for dismissal advanced by DaVita Defendants and UHG. DaVita Defendants contend both that Plaintiffs lack standing to assert a claim as to them and that even if Plaintiffs have standing, any claim predicated on DaVita Defendants' agreement with Doe 1 should be dismissed because the CAC does not plausibly allege an unlawful agreement. UHG contends that it must be dismissed because the CAC does not allege its direct involvement in the antitrust conspiracy.

### A.    DaVita Defendants

First, DaVita Defendants contend that Plaintiffs lack standing to assert antitrust claims against them because neither of DaVita's non-solicitation agreements caused Plaintiffs an injury-in-fact. In particular, DaVita Defendants note that both Plaintiffs stopped working for SCA by April 2013, but the earliest evidence of DaVita Defendants' participation in the conspiracy is a May 2014 email. (CAC ¶¶ 17–18, 61.) DaVita Defendants' standing arguments fail. Although the first email evidencing DaVita's non-solicitation agreement with SCA was from May 2014, the CAC expressly alleges that DaVita Defendants joined the conspiracy as early as February 2012, citing the DOJ's indictment in the criminal case. (*Id.* ¶¶ 7, 60.) DaVita asserts that this allegation is conclusory but the Court disagrees, given Plaintiffs' reliance on the indictment. Thus, Plaintiffs have plausibly alleged their standing as to DaVita Defendants.[9]

---

[9] DaVita Defendants also seem to believe that Plaintiffs lack standing to bring a claim based on DaVita's agreement with Doe 1. Yet the CAC contains a single antitrust conspiracy claim; it does not allege a standalone claim based on DaVita's agreement with Doe 1. Thus, the fact that DaVita Defendants plausibly caused Plaintiffs an injury by entering into the conspiracy by way of DaVita's 2012 agreement with SCA ends the standing inquiry as to DaVita Defendants.

Second, DaVita Defendants challenge the sufficiency of the allegations regarding DaVita's non-solicitation agreement with Doe 1. In particular, DaVita Defendants claim that the CAC's allegations do not show a bilateral commitment between DaVita Defendants and Doe 1; only Doe 1 made a commitment not to solicit DaVita's employees but no allegation suggests that Doe 1's commitment was reciprocated. But the Court finds that it can be reasonably inferred from Doe 1's evident agreement not to solicit DaVita's employees that DaVita made a similar commitment to Doe 1. *See In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1209 (N.D. Cal. 2015) ("[I]t is not evident why [the defendant] would refuse to recruit or poach from [its competitor] absent some sort of mutual agreement."). Because Plaintiffs have standing as to DaVita Defendants and there are no deficiencies in the CAC's allegations as to them, the Court rejects DaVita Defendants' individual arguments for dismissal.

### B.     UHG

According to UHG, the CAC contains no facts showing that it had any direct involvement in the non-solicitation agreements. Rather, UHG contends that Plaintiffs improperly seek to hold UHG liable simply by virtue of its acquisition of SCA in 2017.

Normally, a parent company cannot be held liable for the acts of its subsidiaries. *E.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). But there are exceptions to that rule when the parent is directly involved in the subsidiary's wrongful activities or where the conditions for piercing the corporate veil are satisfied. *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 771 (7th Cir. 2007). Plaintiffs contend that UHG was directly involved in the conspiracy because after the merger between UHG and SCA, the two had a complete unity of interest. That argument is derived from the Supreme Court's decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984), which held that "the coordinated activity of a parent and its wholly

owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest." However, *Copperweld* simply concluded that a parent and subsidiary could not conspire with each other for purposes of § 1. *Id.* Courts have declined to extend *Copperweld* to allow § 1 liability for both a parent and its subsidiary "even where there is no evidence that both were involved in the challenged conduct." *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999). Rather, courts continue to find a parent liable only when it was directly involved in the anticompetitive conduct. *E.g.*, *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018).

A parent's direct involvement in its subsidiary's antitrust conspiracy can be shown where the parent directed, controlled, or encouraged its subsidiary's participation in the scheme. *E.g.*, *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009). Plaintiffs argue that UHG's direct involvement is shown by the fact that, after the merger, Hayek remained in his position as SCA's CEO and also served in executive roles with UHG. Because Hayek held dual roles as the CEO of the antitrust violator, SCA, and as an executive of the violator's parent, UHG, Plaintiffs contend that Hayek's knowledge of the conspiracy can be imputed to UHG. The Court is dubious of Plaintiffs' assertion that UHG can be held liable solely based on Hayek's dual positions. Regardless, Plaintiffs' argument mischaracterizes the CAC with respect to Hayek's position at UHG, as the CAC alleges only that Hayek took on an executive position with a different UHG subsidiary rather than UHG itself. (CAC ¶ 22.)

Alternatively, Plaintiffs contend that UHG has successor liability for SCA's conduct because it assumed SCA's liabilities upon the merger, pointing to a provision in the merger

agreement. (Pls.' Opp'n, Ex. B § 2.4, Dkt. No. 87-2)[10]; *see Dore & Assocs. Contracting, Inc. v. Int'l Union of Operating Eng'rs, Loc. Union No. 150*, No. 15 C 6221, 2017 WL 3581159, at *6 (N.D. Ill. Aug. 18, 2017) ("Under the assumption theory of successor liability, a successor is responsible for the obligations of its predecessor if the successor expressly or implicitly bound itself to those obligations."). But that provision does not state that UHG assumed SCA's liabilities; rather, it provides that a separate UHG subsidiary would assume SCA's liabilities. (*Id.*)

Finally, Plaintiffs claim that the CAC alleges facts sufficient to pierce the corporate veil. Because SCA and UHG were both organized in Delaware (CAC ¶¶ 19–21 25), Delaware law governs the veil-piercing inquiry. *On Command Video Corp. v. Roti*, 705 F.3d 267, 272 (7th Cir. 2013). "Persuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace ex rel. Cencom Cable Income Partners II, Inc., LP v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (internal quotation marks omitted). "[B]ecause Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence." *MicroStrategy Inc. v. Acacia Rsch. Corp.*, No. 5735-VCP, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010). In undertaking the veil piercing inquiry, Delaware courts consider: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder." *Id.* (internal quotation marks omitted).

---

[10] Because SCA's merger with UHG is referenced in the CAC and central to Plaintiffs' claim against UHG, the merger agreement is incorporated by reference into the CAC and is properly considered in connection with the motions to dismiss. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

Here, there are no allegations in the CAC that even touch upon those factors. On the contrary, the CAC states that after the merger, the newly formed UHG subsidiary "essentially continued SCA's existence and business under a new name." (CAC ¶¶ 20–21, 31.) Indeed, the CAC does not even contain a conclusory allegation suggesting that UHG and SCA are alter egos. Thus, Plaintiffs fall well short of pleading a basis for piercing the corporate veil to hold UHG liable for SCA's antitrust violations.

In sum, the Court finds that the CAC does not contain sufficient facts to support a plausible inference that UHG was directly involved in the alleged antitrust conspiracy. Nor does it contain any other plausible grounds for nonetheless holding UHG liable for SCA's purported wrongful conduct. For that reason, the Court grants UHG's motion to dismiss.

## CONCLUSION

For the foregoing reasons, Defendants' joint motion to dismiss (Dkt. No. 75) is denied but UHG's separate motion to dismiss (Dkt. No. 77) is granted. The claims against UHG are dismissed from this action. The dismissal is without prejudice to Plaintiffs seeking leave to file an amended complaint that states a viable claim as to UHG, if they believe they can do so consistent with the requirements of Federal Rule of Civil Procedure 11.

ENTERED:

Dated:  September 26, 2022

_____

Andrea R. Wood
United States District Judge