## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 21 C 305 |
| | Magistrate Judge Sunil R. Harjani |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Scott Keech and Allen Spradling, former senior employees of Defendants Surgical Care Affiliates, LLC and SCAI Holdings, LLC (together, "SCA"), bring this antitrust action alleging violation of Section 1 of the Sherman Act, 15 U.S. § 1. The Consolidated Amended Class Action Complaint ("Complaint") [57] alleges that Defendant SCA, along with Defendants United Surgical Partners International, Inc. and United Surgical Partners Holding Company, Inc. (together, "USPI"), DaVita, Inc., Doe 1 and other Doe Defendants who operate or operated ambulatory surgery centers, outpatient medical centers, and other healthcare services, joined a conspiracy to reduce and limit compensation and mobility of their employees. On January 5, 2021, a federal grand jury in the Northern District of Texas returned an indictment against SCA with two counts of conspiring to restrain trade in violation of Section 1 of the Sherman Act. On July 14, 2021, a federal grand jury in the District of Colorado returned an indictment charging DaVita Inc. and its CEO, Kent Thiry, with two counts of conspiring to restrain trade in violation of Section 1 of the Sherman Act. On November 3, 2021, the Colorado grand jury returned a superseding indictment adding a third count. Both the DaVita indictment and the SCA indictment charge a conspiracy between DaVita and SCA not to solicit each other's senior-level employees. Doc. 233 at 2. The *DaVita* case proceeded to trial, and DaVita and Thiry were acquitted. *United States v. DaVita Inc., et al.*, No. 21 CR 229 (D. Colo.). The *SCA* trial has been continued and the parties

are waiting for the Texas court to set a new trial date. *United States v. Surgical Care Affiliates, LLC, et al.*, 21 CR 11 (N.D. Tex.).

In February 2023, this case was referred to the undersigned magistrate judge for discovery supervision. In an effort to resolve the many pending discovery disputes between the parties that have prolonged this litigation, the Court set a deadline for the parties to meet and confer and then file motions to compel on all pending written and document discovery disputes. Fact witness deposition discovery is stayed until further order of the Court. Five motions to compel are now pending. In this opinion, the Court rules on Plaintiffs' Motion to Compel Discovery from Defendant Surgical Care Affiliates, LLC. For the reasons and to the extent set forth below, Plaintiffs' Motion to Compel [217, 218] is granted in part and denied in part.

## DISCUSSION

Plaintiffs' current motion relates to their Second Set of Requests for Production of Documents and seeks to compel eight categories of information relating to: (1) wage-fixing; (2) the exchange of employment-related business information between SCA and other Defendants; (3) all employees, rather than just "senior-level" employees; (4) the time period January 23, 2007 through January 1, 2019; (5) documents given to/seized by the United States Department of Justice ("DOJ"); (6) documents under SCA's control regardless of whether those documents are also in its physical possession; (7) documents returned by Plaintiffs' proposed search terms; and (8) documents from eleven additional custodians. Under Federal Rule of Civil Procedure 26(b), parties are entitled to discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The factors relevant to the proportionality inquiry are "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources,

the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* A "party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as the party understands them." Fed. R. Civ. P. 26(b)(1) Advisory Committee Notes (2015 Amendment). At the same time, a "party claiming undue burden or expense ordinarily has far better information—perhaps the only information—with respect to that part of the determination." *Id.* Finally, when matters are referred to magistrate judges for discovery supervision, they have "extremely broad discretion in controlling discovery." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013). With these discovery standards in mind, the Court addresses each disputed category in turn below.

## A.      Documents Related to Wage-Fixing

Plaintiffs first seek documents related to wage-fixing.[1] SAC opposes producing documents related to wage-fixing, asserting only that the information sought is irrelevant because Plaintiffs' Complaint does not allege that SCA ever agreed to fix anyone's wages. To support this contention, SAC points out that when ruling on Defendants' joint motion to dismiss, the district court held that Plaintiffs adequately alleged market allocation agreements, which is a different claim than price fixing. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2022 WL 4465929, at *10 (N.D. Ill. Sept. 26, 2022). According to SAC, Plaintiffs are therefore only entitled to discovery related to the market allocation agreements they have alleged.

SAC is correct that discovery need not be produced if it is not relevant to a claim or defense alleged in the case. *See* Fed. R. Civ. P. 26(b)(1) Advisory Committee Notes (2000 Amendment) (explaining that the 2000 amendment "signals to the parties that they have no entitlement to

---

[1]      This issue relates to Plaintiffs' Request Nos. 4-8, 10, 13, and 54.

discovery to develop new claims or defenses that are not already identified in the pleadings."). However, a review of the Complaint demonstrates that it does allege that Defendants engaged in wage-fixing.[2]  The Complaint explicitly alleges that "Defendants directly and through their agents, engaged in activities to limit competition and *fix*, raise, maintain, and/or stabilize the *compensation* and terms of employment of their employees[.]" Doc. 57, ¶ 16 (emphasis added).  Further, Plaintiffs allege that "Defendants' conspiracy included concerted action and undertakings with the purpose and effect of: (a) *fixing* Plaintiffs' and the Class's *compensation* at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for employees." *Id*. at ¶ 115 (emphasis added); *see also id.* at ¶ 9 (alleging the conspiracy "was an effective tool to suppress their employees' mobility and compensation."); *id*. at ¶ 53 (alleging "Defendants joined a conspiracy to reduce and limit compensation and mobility of their employees.").[3]  Based on these allegations and solely for purposes of the motion to compel, the Court finds that Plaintiffs' allegations support a theory that Defendants' conspiracy to suppress competition for employees' services could include wage-fixing.

The motion to dismiss proceedings also does not help SAC's position.  In the motions to dismiss, Defendants argued that "Plaintiffs do not allege that Defendants engaged in price fixing, bid rigging, or market allocation." Doc. 76 at 10.  In response, Plaintiffs focused their briefing on whether they adequately alleged that the no-poach agreements were unlawful market allocation

---

[2]    Plaintiffs also argue that documents already produced in this case suggest wage-fixing, but the Complaint controls what discovery is relevant and proportional to this case.

[3]    The Complaint also alleges that the overarching conspiracy to restrict competition for employees' services by agreeing to refrain from proactively soliciting or hiring each other's current employees "caused the artificial suppression of their compensation." *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2022 WL 4465929, at *3; *see also id* at *4-6; Doc. 57, ¶ 114 ("Defendants and their co-conspirators agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's employees, thereby *fixing* and suppressing Class members' *compensation*.") (emphasis added).

agreements. Doc. 86 at 18-27. Thus, the briefing and opinion on the motions to dismiss for failure to state an antitrust conspiracy claim addressed whether Plaintiffs adequately pled market allocation through non-solicitation agreements. The district court concluded that the Complaint "plausibly alleged that the non-solicitation agreements are *per se* unreasonable naked horizontal market allocation agreements." *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2022 WL 4465929, at *10. While the opinion made no mention of wage fixing or price fixing, the district judge did not hold that Plaintiffs' claim under § 1 of the Sherman Act rests solely on the non-solicitation agreements. Nor did the district judge address whether the scope of the alleged conspiracy includes wage-fixing. Consequently, the motion to dismiss opinion does not, one way or the other, settle the issue of whether the Complaint alleges that wage-fixing was part of the conspiracy at issue in this case. Because, at the present time, the scope of the alleged conspiracy includes wage-fixing, the requested documents are relevant to Plaintiffs' claim arising under Section 1 of the Sherman Act. Plaintiffs' motion to compel information related to wage-fixing is therefore granted.

**B.    Documents Regarding the Exchange of Employment-Related Information with Competing Employers**

Plaintiffs' Request No. 54 seeks all documents relating to the exchange of business information between SCA and any competing employer, including but not limited to information "exchanged through trade associations or other industry symposia, concerning labor budgets, wages or planned wage increases, hiring, recruiting, retention, or any other issue related to labor/personnel." Doc. 219-1 at 18. SCA argues only that Plaintiffs have not established that this information is relevant because this is not a wage-fixing case.[4] In turn, Plaintiffs assert that the

---

[4]    SCA also contends that documents responsive to Request No. 54 are not proportional to the needs of the case, but SCA's proportionality objection depends solely on the relevance of the information sought.

requested information is relevant because this case is about a conspiracy among Defendants to restrict competition for labor. Specifically, Plaintiffs explain that exchanges of employment-related information go to the nature and scope of the alleged conspiracy, the nature of the relationships and information exchanges among Defendants, the motive for entering into the conspiracy, and the impact of the collusion on Defendants' employees. As discussed above, Plaintiffs have sufficiently demonstrated that the Complaint's allegations that Defendants conspired to reduce and limit employees' compensation and mobility could include wage-fixing. As such, the Court concludes that Plaintiffs have demonstrated that their request for exchanges of employment-related information seeks information relevant to their claim that Defendants engaged in a conspiracy to restrict competition for labor. Plaintiffs' motion to compel is granted as to Request No. 54.

## C.    Documents Covering All Employees

Plaintiffs next move to compel documents related to all employees, rather than a subset of "senior level" employees. Request Nos. 3, 11, 16-18, 23, 25, 27, 29-30, and 52-53 broadly seek documents about recruitment, hiring, retention, compensation, job categories, and the use of third parties regarding these subjects.[5] SCA objects to producing discovery about any employees other

---

[5]    Specifically, these document requests seek: (1) All documents regarding any understanding, agreement, commitment, contract, or proposal between or among the Defendants and any competitor to restrict former employees' or contractors' solicitation or recruitment of current employees or contractors for work elsewhere (Request No. 3); (2)  All agendas, minutes, notes, or memoranda of any meeting of the board of directors for you or any Co-Conspirators, or any committee thereof relating to how you or any Co-Conspirators recruit, hire, or retain employees, including how employee compensation is determined (Request No. 11); (3) All documents, data, or analyses regarding information you obtained in connection with employee recruiting, hiring, or exit-interviewing, including, without limitation: a. employees' previous employers (or educational institution, where applicable); and b. if the employee left to work for another employer, the identity of that employer, and the reasons why the employee accepted an offer to work with that employer (Request No. 16); (4) All documents and records regarding recruiting efforts, including both successful and failed recruiting attempts (Request No. 17); (5) All documents that refer or relate to the compensation, hiring, recruitment, or retention of employees by you or any competing employer, including steps you or any CoConspirators took to retain employees, such as increasing employee compensation (Request No. 18); (6) All documents concerning any method, formula, policy, practice, or calculation you,

than senior-level employees.[6]   SCA submits that any document requests related to the existence and scope of the alleged agreement not to hire or solicit should be limited to senior-level employees.  For support, SCA again emphasizes the district court's motions to dismiss ruling, which stated that Plaintiffs "allege that the defendant outpatient medical centers entered into an illegal agreement not to solicit or hire proactively each other's senior employees, in violation of § 1 of the Sherman Act." *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2022 WL 4465929, at *1; *see also id.*, at *10 ("As pleaded, Defendants agreed to divide the market for senior-level outpatient medical care employees . . . ."). SCA further contends that the search for and production of documents relating to "all employees" would impose an undue burden on it.

The Court rejects SCA's arguments.  To begin, the district court was not presented with and did not actually decide the question of whether the Complaint alleges that the no-poach agreements part of the conspiracy applies to all employees.  Thus, it is inappropriate to deny production of responsive documents regarding all employees based upon language in the district

---

or any competing employer, used for determining compensation of employees (Request No. 23); (7) All documents regarding how you or any Co-Conspirators determine, update, monitor, or set baseline compensation levels (as opposed to negotiated compensation levels) (Request No. 25); (8) All documents concerning employees' equity-based compensation, both internal and external (Request No. 27); (9) All documents concerning how employees negotiate pay increases (Request No. 29); (10) All documents regarding factors relevant to deciding whether to increase employee pay (Request No. 30); (11) Documents sufficient to identify all job categories, job families, or job titles for people You employed, or whom You attempted to employ, since January 1, 2005 (Request No. 52); (12) Documents sufficient to describe the duties, responsibilities, and pay scales for each job title in which You employed, or attempted to employ, any person since January 1, 2005, including but not limited to job descriptions and job postings for such roles (Request No. 53).

[6]     In addition, Plaintiffs argue that documents relating to "all employees" are relevant to determining the impact and effect of the challenged conspiracy.  The Complaint alleges that Defendants' no-poach agreements suppressed the compensation of all employees, not just employees who would have otherwise received job offers from rival companies in the outpatient medical care center industry. *See* Doc. 57, ¶¶ 10, 11, 84, 90, 92, 94; *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2022 WL 4465929, at *4-6.  On this issue, SCA has agreed to produced structured employee data, including information about the employees' compensation, job titles, and hire and termination dates, for all employees because the request implicated the impact of the alleged agreement.

court's opinion when the plain language of the Complaint refers to all employees. The Complaint also makes clear that the no-poach agreements focused on, but were not limited to, senior-level employees. As the district court's opinion noted, Plaintiffs "claim that SCA, USPI, DaVita, and Doe 1 entered into a series of agreements under which they agreed not to solicit or hire each other's employees, particularly senior employees, unless the employee had already informed their existing employer that they were looking for a new job." *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2022 WL 4465929, at \*1. For example, Paragraph 6 of the Complaint alleges that "[b]eginning no later than 2010 [], Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above ("Senior Employees"), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employees." Doc. 57, ¶ 6. Likewise, Paragraph 53 of the Complaint states: "In furtherance of the conspiracy, Defendants, and each of them, entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees." *Id.* at ¶ 53; *see also id.* at ¶ 1 ("The nation's leading operators of outpatient medical centers conspired to restrain competition and reduce compensation for their employees"); *id.* at ¶ 54 ("Defendants participated in meetings, conversations, and communications to discuss the solicitation of each other's employees, and agreed during those meetings, conversations, and communications not to solicit each other's employees."); *id.* at ¶ 59 ("Defendants refrained from soliciting each other's employees."); *id.* at ¶ 67 ("I'm going to make sure everyone on my team knows to steer clear of anyone at DVA . . . ."); *id.* at ¶ 114 ("Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's employees, thereby fixing and suppressing

8

Class members' compensation."). In short, Plaintiffs' allegations about Defendants' agreements are not limited to senior-level employees.[7]

SCA also asserts that production of responsive documents relating to "all employees," as opposed to only senior-level employees, would impose an undue burden on SCA and be significantly out of proportion to the needs of the case. In reply, Plaintiffs contend that it is actually more burdensome to run search terms and then perform a review that removes documents related to non-senior employees than to run search terms and then produce the documents returned. The Court finds that SCA's claim of undue burden is largely unsupported. SCA's brief states that it employs a wide variety of people, including receptionists, schedulers, nurses, insurance verifiers, finance analysts, radiology technicians, sterile processing clerks, at over 320 different facilities and production of documents related to its entire workforce would be extremely expensive and unduly burdensome. But SCA's supporting declaration states only "SCA's structured data production includes information regarding 37,118 former and current employees, and 803 (approximately 2.2%) of these employees have a job title of Director or above." Doc. 240 at 3, ¶ 13. SCA does not provide any cost or time specifics or estimate the actual burden involved in producing the additional documents sought by Plaintiffs. Moreover, SCA does not address any of the proportionality factors discussed in Rule 26(b)(1). Without greater detail and analysis, SCA's showing is insufficient to establish an undue burden and disproportionality based on that burden. *Human Rights Defense Center v. Jeffreys*, 2022 WL 4386666, at *3 (N.D. Ill. Sept. 22, 2022); *see also* Fed. R. Civ. P. 26(b)(1) Advisory Committee Notes (2015 Amendment) (explaining that the 2015 amendment regarding proportionality was not "intended to permit the opposing party to

---

[7]     Indeed, SCA has agreed not to withhold documents based on the senior-level limitation as to Requests Nos. 4-9, 13, and 54, which seek documents and communications related to the alleged agreement, recognizing that Plaintiffs are entitled to "test whether any alleged agreement was limited to senior employees." Doc. 236 at 6.

refuse discovery simply by making a boilerplate objection that it is not proportional"); *Heraeus Kulzer, GmbH, v. Biomet, Inc.*, 633 F.3d 591, 598 (7th Cir. 2011) ("A specific showing of burden is commonly required by district judges faced with objections to the scope of discovery."). Accordingly, the Court grants Plaintiffs' motion to compel production of documents with respect to "all employees."

### D. Relevant Time Period for Document Searches

The next disputed question involves the relevant time period for SCA's document discovery production. Plaintiffs seek documents from SCA from January 23, 2007 to January 1, 2019. Plaintiff assert that their proposed date range is reasonable because: (1) early-dated documents will likely lead to the discovery of exactly when, how and why the conspiracy was formed; (2) documents after the date which Defendants claim the conspiracy ended will help Plaintiffs confirm when and how, if at all, the conspiracy ended; (3) documents from the full time period requested will help Plaintiffs understand and interpret Defendants' data production, which stretch from 2005 through 2022; and (4) pre- and post- conspiracy documents are relevant to impact and damages, in order to analyze the conspiracy's effect on employee compensation. In response, SCA argues that the Complaint alleges that SCA's involvement in the alleged conspiracy began in May 2010 and ended in July 2017. SCA acknowledges that "Plaintiffs wish to see whether any documents may shed light on how the alleged agreement began and ended and what, if anything, was different before and after the alleged conspiracy." Doc. 236 at 7. SCA suggests that a reasonable time frame for document production is January 2010 through July 2018.

Regarding the start date for document discovery, Plaintiffs and SCA agree that a time-period that pre-dates the beginning of the alleged conspiracy is appropriate. *See IsoNova Technologies LLC v. Ovainnovations, LLC*, 2021 WL 7185073, at *1 (N.D. Iowa Oct. 8, 2021)

("damages in antitrust cases are often calculated by showing the before-and-after effect of a defendant's anticompetitive conduct: thus, a plaintiff is entitled to discovery for some period before the defendant's anticompetitive conduct allegedly began."); *In re Rail Freight Fuel Surcharge Antitrust Litig*. 2009 WL 10703132, at *1 (D.D.C. July 13, 2009) (in antitrust cases, a "plaintiff is ordinarily permitted to discover defendant's activities for a reasonable period of time antedating the earliest possible date of the actionable wrong."). Plaintiffs emphasize that the start date of the alleged conspiracy is uncertain and the Complaint alleges the conspiracy began "no later than 2010." Doc. 57, ¶ 6. In the Court's view, Plaintiffs' requested start date of January 23, 2007 is too broad, while SCA's proposed start date of January 2010 is too narrow to provide Plaintiff with information relevant to when the conspiracy began and the impact of the conspiracy on employee compensation and damages. While it is true that the Complaint does not provide a firm start date of the alleged conspiracy, there must be a start date for discovery and the SCA Indictment and Complaint's earliest specific factual allegation of a conspiracy start date is May 2010. *Id*. at ¶ 55 ("The conspiracy began at least as early as May 2010" with SCA and USPI); *id.* at ¶ 2 (SCA Indictment alleges that "by May 2010," SCA and USPI agreed with one another not to solicit or hire the other company's employees without the consent of their current employer.). The Court finds that the appropriate start date for document discovery in this case is May 1, 2008, two years prior to the earliest specific start date alleged in the Complaint. This is in line with the temporal scope of discovery in other antitrust litigation. *See Jones v. ACE Cheer Co. LLC,* 2022 WL 969720, at *3 (W.D. Tenn. Mar. 30, 2022) (holding plaintiffs' proposed almost three year time period for discovery responsive to a third-party subpoena was too broad but allowing plaintiffs "almost two years of data before the alleged harmed occurred," which was the same time period agreed to for party discovery)*; IsoNova Tech. LLC*, 2021 WL 7185073, at *2 ("two years

prior to the complaint's allegation of the monopoly's beginning [] provides a sufficient before-and-after period for the calculation of damages."); *Kleen Products LLC v. Packaging Corp. of America*, 2013 WL 120240, at *8-9 (N.D. Ill. 2013) (ordering production of conduct documents dating back to January 1, 2003 where plaintiffs alleged in their complaint that price-fixing began in 2005); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2009 WL 10703132, at *1-3 (parties agreed generally to discovery beginning two years and two months before the alleged class period commenced on July 1, 2003 but the court granted a limited exception for discovery back to 2000 for evidence related to whether rate increases in 2003 were aberrational or part of a "historic continuum" as defendants argued in their motion to dismiss). Moreover, SCA has not raised a burden objection to Plaintiffs' requested start date of January 23, 2007. Under these circumstances, a start date of May 1, 2008 will likely provide sufficient information for Plaintiffs to determine when the purported conspiracy was initiated and to compare the competitive conditions when the conspiracy was and was not in effect.

As to the end date for SCA's document discovery, Plaintiffs want SCA to produce responsive documents through January 1, 2019. For its part, SCA states that its involvement in the purported conspiracy ended in July 2017. SCA suggests that July 2018, one year beyond the alleged end date of its involvement, is a reasonable period of time for its document discovery. Although SCA states that its involvement in the alleged conspiracy terminated in July 2017, that statement is counter to Plaintiffs' allegation that Defendants' no-poach agreements "continued through *at least* 2017." Doc. 57, ¶ 6 (emphasis added).[8] But even if the conspiracy had terminated by December 31, 2017, SCA's proposed end date of July 2018 is too limiting to understand the

---

[8] *See also* Doc. 57, ¶ 7 (stating that the DaVita Indictment alleges that "beginning at least as early as February 2012 and continuing *at least as late as* July 2017, DaVita and Thiry entered into a conspiracy with Defendant SCA to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees) (emphasis added).

impact of the conspiracy as well as to determine the amount of damages the employees suffered. The Court finds Plaintiffs' proposed end date of January 1, 2019 is reasonable, and SCA does not argue that it would be overly burdensome to produce responsive documents through January 1, 2019.

Accordingly, Plaintiffs' motion to compel is granted with respect to their request for SCA to produce documents from May 1, 2008 to January 1, 2019 and denied in its remainder.

### E.    Documents Provided to the Department of Justice

Plaintiffs' Request Nos. 1 and 2 seek the documents SCA produced to the DOJ in connection with the DOJ's criminal actions against SCA and DaVita. According to SCA, its DOJ production consisted of 519,204 documents, amounting to 2,223,958 pages. SCA argues that the factual allegations, parties, and scope of the grand jury investigation, and therefore the documents SCA produced to the DOJ, differ from and are broader than Plaintiffs' claims in this case. Specifically, SCA points out that the DOJ's production in the *DaVita* criminal case involved materials related to uncharged conduct, a separate charged conspiracy, and impeachment materials not relevant to and not alleged in the Complaint. *See* Doc. 233 at 7. SCA does not dispute that some of the documents Plaintiffs seek are relevant. Rather, SCA objects that many of the documents in its DOJ production are irrelevant to this case and it would be unduly burdensome to review all 519,204 documents it produced to determine relevance. By way of example, SCA found that many of the documents it produced to the DOJ do not hit on the search terms and custodians currently being negotiated by the parties. From this, SCA argues that the wholesale request for production of all of the DOJ documents encompasses material not relevant to the claims and defenses in this case.

13

Plaintiffs counter that their allegations in this case are broader than the DOJ's investigation, both in terms of the scope of the alleged conspiracy and the elements of Plaintiffs' claims that include common impact and damages to employees, which they claim are issues the DOJ generally does not investigate in any detail. Doc. 260 at 6. According to Plaintiffs, the DOJ's investigation relates to the same misconduct: the DOJ's criminal investigation and Plaintiffs' Complaint both concern Defendants' no-poach agreements and Plaintiffs allege these agreements were part of the same conspiracy. *Id*. at 6-7.

The Court finds that Plaintiffs' request for all documents SCA produced to the DOJ in the criminal actions is "facially overbroad." *In re Broiler Chicken Antitrust Litig.*, 2020 WL 1046784, at *2 (N.D. Ill. Mar. 4, 2020) (Durkin, J.). Courts in this district disfavor "cloned discovery" requests seeking all documents produced or received during other litigation or investigations. *Id*. ("[R]eflexive production of documents previously provided to governmental entities is not appropriate. Rather, documents are discoverable only if they are relevant to a claim or defense in the case." (internal quotation marks omitted)); *Forth v. Walgreen Co.*, 2019 WL 10255628, at *4 (July 20, 2019) (denying plaintiffs' motion to compel all documents defendant produced to the government in a seven-year *qui tam* action) (Finnegan, M.J.); *Oseman-Dean v. Ill. State Police*, 2011 WL 6338834, at *8-9 (N.D. Ill. Dec. 19, 2011) (Brown, M.J.) ("The court agrees with defendants that [requests for documents defendant "sent to any government agency" about sex or gender discrimination or retaliation complaints] are far too broad and overly burdensome, individually and collectively, in relationship to the narrow nature of plaintiff's claims here."); *Perius v. Abbott Labs.*, 2008 WL 3889942, at *5 (N.D. Ill. Aug. 20, 2008) (Brown, M.J.) (granting motion for protective order as to "generalized discovery regarding the DOJ and [internal] investigations" as not relevant to any claims or defenses and noting that "t[o] the extent such

14

evidence would have any 'tangential' relevance," proportionality concerns outweigh permitting such discovery**);** *see also Moore v. Morgan Stanley & Co., Inc.,* 2008 WL 4681942, *2, *5 (N.D. Ill. May 30, 2008) (Keys, M.J.) (holding that "[a] party's requested discovery must be tied to the particular claims at issue in the case" and that "just because the information was produced in another lawsuit . . . does not mean that it should be produced in this lawsuit"); *In re Sulfuric Acid Antitrust Litig.*, 2004 WL 769376, at *6 (N.D. Ill. Apr. 9, 2004) (Schenkier, M.J.) (denying motion to compel production of "[a]ll documents provided to, or received from, any government agency" under Federal Criminal Rule of Procedure 6(e) and noting that "one might wonder how the plaintiffs would show a need for a general request for everything given to the Government, when they have served at least 65 other (presumably) tailored requests seeking information relevant to the claims and defenses in the case.").[9]

---

[9]      Other courts outside this district and this circuit have reached the same conclusion. *Humana Inc. v. Teva Pharms. USA, Inc.*, 2021 WL 8651837, at *1 (M.D. Fla. Oct. 19, 2021) ("Generally, cloned discovery has not been compelled, even absent a showing of undue burden, unless the requesting party shows that all the cloned discovery is relevant."); *Stellato v. Medtronic Minimed, Inc.*, 2021 WL 3134685, at *2–3 (M.D. Fla. Feb. 2, 2021) (plaintiff's request for "much of (if not all)" discovery from another case "arguably captures a host of documents that would have little to no relevance to this case" and the "argument that all discovery is relevant because two cases are 'substantially similar' is simply not enough.); *Midwest Gas Servs., Inc. v. Ind. Gas Co.*, 2000 WL 760700, at *1 (S.D. Ind. Mar. 7, 2000) (in antitrust case, denying motion to compel production of "any and all documents [the defendant] received from or provided to the United States Justice Department from 1995 to the present."); *TravelPass Grp., LLC v. Caesars Ent. Corp.*, 2020 WL 698538, at *6 (E.D. Tex. Jan. 16, 2020) ("Defendants are not entitled to the wholesale reproduction of all of the FTC Documents and Expedia Documents simply because there may be overlap between the issues in those cases and those in this case."); *Goro v. Flowers Foods, Inc.*, 2019 WL 6252499, at *18 (S.D. Cal. Nov. 22, 2019) ("Asking for all documents produced in another matter is not generally proper."); *Arrowpac Inc. v. Sea Star Line, LLC*, 2014 WL 12618327, at *2 (M.D. Fla. Jan. 31, 2014) (finding that "[p]laintiffs have not shown that all of the DOJ materials are relevant" and "[d]efendants should not be required to produce irrelevant documents regardless of any lack of burden to them"); *King Cty. v. Merrill Lynch & Co.*, 2011 WL 3438491, at *3 (W.D. Wash. Aug. 5, 2011) ("Although some portion of documents encompassed by Plaintiffs' request may be relevant, the Court has no method of determining which of those documents are relevant, and which are not. It may very well be that each and every document produced in the government investigations is relevant to Plaintiff's claims. However, Plaintiff must make proper discovery requests, identifying the specific categories of documents sought, in order to obtain them—and each category must be relevant to its claims and defenses."); *Wollam v. Wright Med. Grp., Inc.*, 2011 WL 1899774, at *1-2 (D. Colo. May 18, 2011) ("cloned discovery is not necessarily relevant and discoverable.").

As explained in another case in this Circuit, "'[c]loned discovery' requesting all documents produced or received during other litigation or investigations, is irrelevant and immaterial unless the fact that particular documents were produced or received by a party is relevant to the subject matter of the instant case." *Midwest Gas Servs., Inc*, 2000 WL 760700, at *1. Indeed, "[t]here could be a number of reasons why documents appropriately requested and provided in another case—even if the subject of those cases seem to overlap—would be irrelevant or burdensome to produce in another case." *Goro*, 2019 WL 6252499, at *18. Thus, a party seeking documents produced in another matter ordinarily must "do their own work and request the information they seek directly" and "must make proper requests describing the information in which they are interested." *Midwest Gas,* 2000 WL 760700 at *1.

In contrast, other courts have allowed cloned discovery where the previous litigation or investigation and the present case had "significant factual and legal overlap, with both suits asserting claims under the same [] statute." *Schneider v. Chipotle Mexican Grill, Inc.*, 2017 WL 1101799, at *4 (N.D. Cal. March 24, 2017); *Rumble, Inc. v. Google LLC*, 2023 WL 3751797, at *7-8 (N.D. Cal. May 31, 2023) (granting plaintiff's motion to compel defendant to produce: (1) documents it produced to the DOJ and state Attorneys General because those investigations' allegations had "significant factual and legal overlap" with the allegations made by plaintiff in its antitrust claim and (2) documents produced to a congressional antitrust subcommittee because its "requests and the contents of the Congressional Report tracked similar allegations by plaintiff and [were] relevant to its antitrust claim"); *Costa v. Wright Med. Tech., Inc.*, 2019 WL 108884, at *1–2 (D. Mass. Jan. 4, 2019) (in products liability action, compelling production of cloned discovery from one other case which was "substantially similar because both involve claims stemming from fractures" of the same allegedly defective hip implant component); *Town of Westport v. Monsanto*

*Co.*, 2015 WL 13685105, at *3 (D. Mass. Nov. 5, 2015) ("Materials produced and deposition testimony given in other litigation is generally discoverable upon a showing of substantial similarity between the prior and current actions."); *see also In re Plastics Additives Antitrust Litigation*, 2004 WL 2743591, at *12-13 (E.D. Pa. Nov. 29, 2004) (noting "defendants in antitrust litigation regularly agree through joint discovery schedules to produce documents submitted to the DOJ, grand juries, and other investigatory authorities concerning the basis for the antitrust civil suit" and citing "several cases in which defendants have been compelled to produce documents relating to government investigations.").

!       Ultimately, "the appropriateness of cloned discovery depends upon the circumstances" of each case. *Forth*, 2019 WL 10255628, at *7.  Plaintiffs' request for all documents SCA produced to the DOJ in the criminal actions arguably captures documents that could have no relevance to this case, including materials related to uncharged conduct, a separate charged conspiracy, and certain impeachment materials.  Accordingly, on the current record, the Court cannot conclude that all documents SCA produced to the DOJ are relevant to a party's claim or defense in this lawsuit.  Moreover, Plaintiffs do not contend that the *fact* that SCA produced documents to the DOJ is relevant to their claim.  As a result, Plaintiffs "must make proper requests describing the information in which they are interested" in the SCA production to the DOJ. *Id*., at *4 (quoting *Midwest Gas Servs Inc.*, 2000 WL 760700, at *1).  Here, Plaintiffs' Second Set of Requests for Production of Documents contains 54 separate document requests.  In response, SCA has agreed to produce any documents produced to the DOJ in the SCA criminal case that hit upon the parties' agreed search terms and custodians. Doc. 236 at 8-9.  SCA also represents it will not withhold any documents on the basis that they were produced to DOJ in the SCA criminal case. *Id*. at 8.  Plaintiffs do not address or explain why this is not sufficient to give them relevant information in

proportion to the needs of the case. *See Cap. Ventures Intern. v. J.P. Morgan Mortg. Acquisition Corp.*, 2014 WL 1431124, at *2 (D. Mass. Apr. 14, 2014) ("Defendants have offered to run agreed-upon search terms over their productions to the SEC and New York Attorney General, which should be sufficient to capture materials relevant to the issues in this case. Beyond that arrangement, plaintiff's request for all documents produced in other actions and investigations is denied."). While it is likely that a large portion of documents SCA provided to the DOJ are relevant, Plaintiffs have not established the relevance of *all* documents and thus, the Court need not reach SCA's burden argument. *Forth*, 2019 WL 10255628, at *6 ("Without the predicate showing of relevancy, there is no need for this Court to undertake a balancing of benefit and burden, including an assessment of proportionality.").

## F.  Documents Under SCA's Legal Control

Plaintiffs next request that the Court order SCA to comply with Federal Rule of Civil Procedure 34(a)(1) and produce documents within its legal control. *See* Fed. R. Civ. P. 34(a)(1) (allowing a party to request documents within the responding party's "possession, custody, or control[.]"). In its briefing, SCA does not dispute that it will comply with Rule 34(a)(1) by producing documents under its legal control. SCA represents that "it is not aware of and has not identified any responsive documents related to third parties within its legal control that it is currently withholding from Plaintiffs." Doc. 236 at 9. SCA also states that it will comply with its obligation under the Federal Rules if it discovers third-party documents over which it has legal control. *Id*. at 11. Given SCA's representations, the Court assumes this dispute is resolved and Plaintiffs' motion to compel is denied as moot regarding documents under SCA's legal control. SCA is expected to produce responsive third-party documents over which it has legal control. *See Thermal Design, Inc. v. Am. Soc'y of Heating, Refrig. & Air-Cond. Eng'rs., Inc.*, 755 F.3d 832,

839 (7th Cir. 2014) (quoting *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004) ("On the issue of control, 'the test is whether the party has a legal right to obtain [the evidence].'")).

## G.    Documents Returned by Plaintiffs' Proposed Search Terms and Custodians

¶    Finally, the parties disagree over the appropriate search terms and custodians for SCA's search of its electronically stored information ("ESI"), with Plaintiffs proposing 137 search terms and SCA proposing 32 search terms.  The parties have agreed to twelve custodians, and Plaintiffs seek to add eleven additional custodians, which SCA contends is not proportional to the needs of the case.

Plaintiffs have made a predicate showing that the information they seek is relevant to this litigation.  Specifically, Plaintiffs' charts describe the relevance and non-duplicative nature of their proposed search terms. Docs. 219-19, 267-2.  In support of its contentions, SCA submitted a chart with its objections and proposed modifications to Plaintiffs' proposed search terms. Doc. 240-1.  However, except as noted in the next paragraph, SCA failed to provide any explanation or support for its objections, merely stating in conclusory fashion: (1) "anchor needed because Plaintiffs' search term is untethered to allegations in complaint" or (2) "Plaintiffs' search term is cumulative and duplicative."  Below are illustrative examples from Plaintiffs' reply chart of search terms:

> **Plaintiffs' Proposed Search Term No. 8:** Withdraw* w/2 offer
> **Rationale:** The co-conspirators discussed "withdrawing" offers to employers of competitors to enforce the no-poach agreements. Chan Decl. Ex. 12 at 130:2-22; *id.* Ex. 13 at 479:10-480:6.
> **SCA's Modification to Plaintiffs' Search Term:** (withdraw* or abandon* or terminat* or discontin*) w/10 (DaVita or DVA or "united surgical" or USPI or Tenet)
> **Defendant's Response:** Search Term is Untethered to Allegations in Complaint
> **Plaintiffs' Reply:** <u>No Defendant anchor and no burden.</u> This term should not be anchored by specific reference to Defendants because (1) conspiracy documents may not explicitly name the Defendants and (2) the complaint alleges that the conspiracy involved co-conspirators who were not named as defendants. Additionally, because the conspiracy was secret, it is less likely they would have referred to their co-conspirators by name. Moreover, SCA has failed to substantiate

the burden by providing the hit counts associated with both Plaintiffs' search term and their modification.

**Plaintiffs' Proposed Search Term No. 9:** "cold call*" OR "cold-call* OR coldcall*

**Rationale:** Cold calls are a mechanism by which the co-conspirators' recruiters reach out to potential candidates for employment. Chan Decl. Ex. 12 at 64:9-10. *See also Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 300 (N.D. Cal. 2016) (discussing the effects of cold calling on compensation in a similar antitrust case alleging no poach agreements). This term should not have an anchor to Defendant entity terms because an anchor will not capture all instances relevant to Plaintiffs' allegations.

**SCA's Modification to Plaintiffs' Search Term:** "cold call*" OR cold-call* OR coldcall* w/20 (DaVita or USPI)

**Defendant's Response:** Search Term is Untethered to Allegations in Complaint

**Plaintiffs' Reply:** No Defendant anchor and no burden. This term should not be anchored by specific reference to Defendants because (1) conspiracy documents may not explicitly name the Defendants and (2) the complaint alleges that the conspiracy involved co-conspirators who were not named as defendants. Additionally, because the conspiracy was secret, it is less likely they would have referred to their co-conspirators by name. Moreover, SCA has failed to substantiate the burden by providing the hit counts associated with both Plaintiffs' search term and their modification.

**Plaintiffs' Proposed Search Term No. 19:** Compet* w/10 (agree* OR deal OR guide* OR policy OR understand* OR proactive* OR solicit*)

**Rationale:** Plaintiffs have alleged that Defendants competed to recruit and retain employees. Compl. ¶ 53. As part of the conspiracy, Defendants and co-conspirators avoided soliciting, contacting, or otherwise pursuing each other's employees to reduce competition for labor. Compl. ¶ 56.

**Defendant's Response:** Plaintiffs' proposed term is cumulative and duplicative of other terms, such as SCA's search terms Nos. 3, 6, 14, 15, 16, and 17, and Plaintiffs' search terms Nos. 27, 30, 41, 52, 53, and 83 in this chart. Term is Cumulative and Duplicative

**Plaintiffs' Reply:** Not duplicative and no burden. This term is not duplicative of others that Plaintiffs have proposed. Plaintiffs have developed these search terms based on thorough analysis of USPI's preliminary document production and the DaVita criminal trial transcripts, and based on Plaintiffs' prior experience in similar cases. Harvey Decl. ¶ 4. Alternate terms are required because the conspiracy to suppress employee compensation was described in different ways. Moreover, SCA has failed to substantiate the burden by providing the hit counts associated with the search term or showing that the proposed search term does not generate unique documents.

Doc. 267-2 at 2, 8, 15. As shown by Proposed Search Term Nos. 8 and 9, SCA fails to provide facts which support its proposed modifications or otherwise explain why Plaintiffs' search terms are "untethered to allegations in the complaint" and its proposed modifications are reasonable. Likewise, SCA summarily objects that Plaintiffs' Search Term No. 19 is cumulative and duplicative of other terms, without supporting or explaining how these terms are unreasonably cumulative and duplicative of SCA's search term Nos. 3, 6, 14, 15, 16, 17 and Plaintiffs' search term Nos. 27, 30, 41, 52, 53, and 83. Nor is the cumulative or duplicative nature obvious. By failing to support or explain the basis for its objections and proposed modifications, SCA's objections are insufficient to overcome Plaintiffs' explanations as to why their proposed search terms are relevant and non-duplicative. Accordingly, these two search term objections by SCA are overruled.

In its brief, SCA argues that 131 of Plaintiffs' proposed search terms are overbroad, "untethered to the Complaint," and thus, not proportional to the needs of the case. To support this contention, SCA observes that the Complaint alleges an agreement among Defendants not to solicit each other's senior-level employees. It therefore argues that Plaintiffs' proposal to run certain search terms without anchoring the terms to the relevant senior-level job titles will deliver a large amount of irrelevant documents. *See, e.g.*, Proposed Search Term Nos. 34, 46. SCA further argues that Plaintiffs improperly request search terms about price and wage fixing because Plaintiffs have not alleged a wage-fixing claim. *See* Proposed Search Term Nos. 63, 81. But as the Court has ruled herein, the scope of the alleged conspiracy to suppress competition for employees' services and reduce compensation includes agreements regarding all employees and wage-fixing. The *only* other relevancy example SCA raises in its brief is an objection to a term that refers to a third-party entity that is not named in the Complaint. *See* Proposed Search Term No. 104. However, Plaintiffs

21

have cited testimony from the DaVita criminal trial indicating that DaVita had a no-poach agreement with this third-party entity. Given this, and because Plaintiffs have alleged an overarching conspiracy between and among SCA, Hayek, USPI, DaVita, Thiry and non-Defendant co-conspirators to suppress employee compensation and mobility, Plaintiffs are entitled to information about this third-party entity.[10]

Plaintiffs are also seeking to collect discovery from eleven additional SCA custodians: Walter P. Badham, Ken Bulow, Daniel Conroy, Christy Cronkite, Bill Linder, Roy Georgia, Rick Sharff, Jeff Smith, Leslie Wachsman, David Wichmann, and Caitlin Zulla. SCA argues that documents from Badham, Bulow, Conroy, Linder, Georgia, Smith, and Wachsman are not relevant because Plaintiffs' only explanation of relevance is that these custodian are on documents Plaintiffs claim reflect wage-fixing with USPI and Plaintiffs have not alleged a wage-fixing claim. As previously discussed, Plaintiffs have alleged that the scope of the conspiracy includes wage-fixing. Plaintiffs have also demonstrated that Cronkite, SCA's current Vice President of Human Resources, is likely to have relevant information about the purported conspiracy to suppress employee compensation and recruiting, hiring, and compensation generally because Defendants' human resources departments allegedly played key roles in recruiting employees and complied with and enforced the alleged no-poach agreements. With respect to Sharff, Plaintiffs have

---

[10]      SCA raises a similar relevancy objection to Plaintiffs' Search Terms Nos. 102-03, 105, 106-11, and 121-28. SCA's objection to Search Term No. 102 is overruled because the proposed terms are names of USPI employees who allegedly participated in the conspiracy to suppress employee compensation. The remaining objections are also overruled because Plaintiffs have alleged that non-Defendant co-conspirators participated in the conspiracy to suppress employee compensation. As for Search Term Nos. 115 and 116, SCA argues that these terms are irrelevant because SCA did not work with these entities to recruit SCA employees during the relevant period. In response, Plaintiffs cite testimony from the DaVita criminal trial indicating that SCA was using one of these entities as a recruiter and that Hayek and a recruiter from the other entity discussed the alleged conspiracy to suppress employee wages. As a result, these objections based on relevance are overruled. Regarding SCA's relevancy objection to the term Pirat* (Search Term No. 20), the Court finds that the search term is relevant because the terms "pirating" and "pirate" could be used in reference to poaching a competitor's employee. SCA's objection is thus overruled.

sufficiently explained his relevance to the alleged conduct, including that he worked as an Executive Vice President and General Counsel for SCA, he was a member of SCA's "Cabin Team" which helped develop recruiting target lists, DaVita criminal trial testimony showed that everyone on the Cabin Team was aware of the alleged conspiracy, and Plaintiffs allege that he is on documents that Plaintiffs believe show wage-fixing with USPI. *See* Doc. 267-3 at 7-8. Turning to Wichmann, he was the sole director of SCA in March 2017 and SCA acknowledges that Wichmann advised on corporate governance and high-level strategic company issues. He likely could have been involved in discussions regarding no-poach and other non-compete agreements. With respect to Zulla, she became CEO of SCA in December 2019 and is the current CEO of SCA Health, and thus could likely have knowledge and communications about the alleged conspiracy to suppress employee compensation. Accordingly, the Court concludes that Plaintiffs have sufficiently demonstrated that their proposed eleven additional custodians are relevant to their conspiracy claim. *See* Doc. 219-20, Doc. 267-3.

The Court finds SCA's other arguments in its brief unpersuasive. First, SCA argues that the eleven additional proposed custodians are unreasonably cumulative because Plaintiffs seek to add multiple custodians from within the same departments as already agreed-upon custodians. SCA's claim that the additional custodians are unreasonably cumulative is unsupported by any evidence. SCA has not provided any analysis of the ESI in question or other support for its contention. Second, SCA objects to proposed custodians who exchanged financial data with USPI because it claims these were legitimate exchanges that have nothing to do with the alleged non-solicitation agreement at issue in this case. The Court finds this is not a valid basis for denying Plaintiffs discovery from these custodians because the lawfulness of these exchanges is currently disputed. *See* Doc. 262 at 15. Third, SCA argues that Sharff does not add any unique relevant

23

information and because of his legal role, adds "significant burden" given the volume of privilege material he is likely to have. Doc. 236 at 13. But SCA has not stated that Sharff's *only* role was to provide legal advice or shown that any non-privileged materials would be largely duplicative evidence. Because SCA failed to provide any factual detail about the burden it claims, the Court also cannot find that the burden on SCA to produce non-privileged ESI from Sharff outweighs the potential relevance. Fourth, SCA objects to David Wichmann and Caitlin Zulla because Plaintiffs rely on general descriptions of their role at SCA and have not identified any evidence directly implicating them in the alleged conspiracy. Plaintiffs do not have the benefit of full document production at this juncture, and they have sufficiently articulated how these proposed custodians could lead to relevant information regarding the alleged conspiracy claim.[11] *See* Doc. 267-3. Plaintiffs are therefore entitled to discovery from Wichmann and Zulla to determine if they possess responsive information.

Although SCA does not address or analyze the proportionality factors in its brief, the Court finds that the requested search terms and custodians are proportional to the needs of the case. First, this private antitrust case, which involves Defendant medical centers located nationwide with tens of thousands of employees between them, is a matter of public importance. *In re Diisocyanates Antitrust Litigation*, 2022 WL 17668470, at *13 (W.D. Pa. Oct. 19, 2022) ("the antitrust laws were enacted by Congress to protect the integrity of the markets."). Second, the amount in controversy is significant. Plaintiffs contend that the damages in this case are "likely in the many millions of dollars," and SCA does not contest that valuation. Doc. 262 at 13. Third, SCA maintains access to the ESI Plaintiffs are seeking and the bulk of the information contained in that ESI is not

---

[11]     Plaintiffs have the DaVita criminal trial transcripts, and Defendants have produced limited documents at this early stage of discovery. As of March 24, 2023, apart from the structured employee data, SCA had produced 70 documents, DaVita had produced 24 documents, USPI had produced 7,583 documents, and Hayek and Thiry had produced no documents. Doc. 219, ¶ 3.

available to Plaintiffs through any other avenue. Fourth, both parties appear to have significant resources to prosecute and defend this case. Fifth, Plaintiffs have established that the information sought is relevant to their claim, which indicates that the requested discovery is important to resolving the issues in this case. *See* Docs. 219-19, 219-20, 267-2, 267-3.

Finally, SCA has not demonstrated that implementing Plaintiffs' proposed search terms and custodians would cause it undue burden and expense. SCA states that running Plaintiffs' 137 search terms and SCA's 32 search terms over the twelve agreed custodians yields a hit count of 1,192,580 and 447,521, respectively for a total of 1,640,101 documents. Doc. 236 at 12. SCA represents that a reasonable estimate of the cost to collect, review, and produce this number of documents is over $4.125 million. Doc. 240, ¶ 9. This is a significant expense, but SCA did not explain how it calculated this estimate. Without a specific showing as to how SCA reached this estimate, it is impossible for the Court to understand whether this cost estimate seems reasonable or overstated. Moreover, SCA failed to substantiate its burden by providing hit counts for any of the individual disputed search terms or any of its specific proposed modifications.[12]

To be clear, this is not what the Court ordered when it directed the parties to engage in a final meet and confer session to "crystallize what is in dispute" and "hammer out agreements."[13]

---

[12]    SCA provides only one other hit count and ESI cost estimate which is not relevant to the actual expense imposed here. SCA states that its proposed modifications to Plaintiffs' 137 search terms in addition to SCA's 32 search terms ran over SCA's original seven proposed custodians hit on 328,331 documents and estimates it would cost nearly $1 million to collect, review, and produce 328,331 documents. Doc. 240, ¶¶ 11-12. But SCA has agreed to produce documents from the files of twelve custodians, and SCA does not provide a cost estimate for producing this same information over the twelve agreed custodians. In addition, the Court has rejected SCA's anchors related to senior-level job titles and ruled that wage-fixing conduct is an issue in this case. On this record, it is not clear what it will cost in terms of time and money to exclude these proposed modifications by SCA.

[13]    Nor does SCA's approach comply with its "commit[ment] to cooperate in good faith throughout the matter consistent with the Federal Rules of Civil Procedure." *See* Doc. 71, Stipulated Order Regarding the Production of ESI and Hard Copy Documents, ¶ II.

Doc. 204. When this case was referred for discovery supervision, the undersigned outlined a plan with all the parties to resolve the numerous document discovery disputes that have stalled the progress of this litigation. Docs. 204, 208. As part of that process, the parties were directed to conduct a final meet and confer session and each side was to "provide their best proposal for solving the discovery dispute." Doc. 204. The Court warned the parties that "[s]imply saying 'I want everything' or 'I will produce nothing'" is not sufficient. *Id*. By providing only a single aggregate hit count and a cost estimate which was not explained, SCA has in essence summarily rejected Plaintiffs' requested search terms and inappropriately failed to provide alternate proposals which the Court can assess. *See DeGeer v. Gillis*, 755 F.Supp.2d 909, 929 (N.D. Ill. 2010) ("Selecting search terms and data custodians should be a matter of cooperation and transparency among parties.").

Rather, as part of the meet and confer process and to allow the parties to assess burden, SCA should have provided hit counts for searches run with each of the proposed terms regardless of whether it believed the terms were appropriate. Once preliminary hit counts were obtained, the parties should have collaborated to refine searches terms and address burden concerns. SCA should also have shared hit counts on more restrictive searches to allow Plaintiffs to modify specific search terms and parameters that produced a large number of hits, including potentially numerous irrelevant hits. In addition, the parties could have engaged in sampling to see if search terms were producing responsive documents or excessive irrelevant hits. SCA does not explain why these approaches were not used. SCA has thus failed to substantiate its undue burden objection to Plaintiffs' proposed search terms or heeded this Court's guidance.

Further, SCA has not established an undue burden to producing information from the additional proposed custodians. SCA states that the number of documents and the cost "would

considerably expand if SCA were to include Plaintiffs' additional eleven proposed custodians." Doc. 240, ¶¶ 8, 10. This conclusory statement, without a supported hit count and detailed burden estimate, does not adequately address the final proportionality factor. SCA does not provide any detail regarding the costs involved in producing documents for any of the eleven additional proposed custodians. So again, the Court is unable to evaluate the burden involved in producing each disputed custodians' information. When considering the burdens of discovery, it is SCA's job, as the keeper of the documents, to support its objection that Plaintiffs' proposed custodians are not proportional to the needs of the case. SCA has not met its burden. Because the Court's proportionality analysis weighs in favor of the ESI discovery sought by Plaintiffs, combined with Plaintiffs' demonstration of the relevancy of the information, the motion to compel SCA to implement Plaintiffs' proposed search terms and custodians is granted.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion to Compel Discovery from Defendant Surgical Care Affiliates, LLC [217, 218] is granted in part and denied in part. SCA shall comply with this order within 60 days, but the Court is willing to consider extending this deadline if good cause for such an extension is shown.

**SO ORDERED.**

Dated: June 26, 2023

_____
Sunil R. Harjani
United States Magistrate Judge