**UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION** | **Master Docket No. 1:21-cv-00305** |
| **THIS DOCUMENT RELATES TO:** **ALL ACTIONS** | **JURY TRIAL DEMANDED** |

## THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Scott Keech and Allen Spradling (collectively "Plaintiffs") allege as follows:

## INTRODUCTION

1.      The nation's leading operators of outpatient medical centers conspired to restrain competition and reduce compensation for their employees.  Plaintiffs are former employees of SCA (defined below) and bring this suit individually and on behalf of the proposed Class to recover damages and to prevent Defendants from retaining the benefits of their antitrust violations.

2.      The United States Department of Justice ("DOJ") publicly revealed the conspiracy on January 7, 2021, issuing a press release announcing a criminal indictment against Defendants Surgical Care Affiliates, LLC and SCAI Holdings, LLC (described as the successor entity to "Surgical Care Affiliates, Inc.").  *See* Indictment, *United States v. Surgical Care Affiliates, LLC*, No. 3:21cr00011 (N.D. Tex. filed Jan. 5, 2021) ("SCA Indictment" or "DOJ Texas Action").  The DOJ alleges that, by May 2010, Surgical Care Affiliates, LLC and SCAI Holdings, LLC ("SCA") orchestrated a conspiracy in which SCA and "Company A" (identified

below as Defendant USPI), and SCA and "Company B" (identified below as Defendant DaVita) agreed with one another not to solicit or hire the other company's employees without the consent of their current employer.

3.      The SCA Indictment identified "Company A" and "Company B" as owners and operators of "outpatient medical care facilities across the United States" and details actions in furtherance of the conspiracy by Individual 1, who "served as SCA's Chief Executive Officer," and Individuals 2 and 3, who served as the CEOs of Company A and Company B, respectively. *Id.* ¶¶ 3, 5, 15.

4.      "Individual 1" is Defendant Andrew Hayek, the former CEO of SCA.[1]

5.       "Company A" referred to Defendants United Surgical Partners International, Inc. and United Surgical Partners Holdings, Inc. (together, "USPI") and their affiliates and parents, including Defendant Tenet Healthcare Corporation ("Tenet").[2]

6.      On July 14, 2021, the DOJ revealed a grand jury indictment against Defendants DaVita Inc., formerly known as DaVita Healthcare Partners, Inc., ("DaVita"), and its Chief Executive Officer and Chairman/Co-Chairman of the Board of Directors, Kevin Thiry.  *See United States v. DaVita Inc., et al.*, No. 21-cr-00229-RBJ (D. Colo. July 14, 2021) ("DaVita Indictment" or "DOJ Colorado Action").  The DOJ alleged that beginning at least as early as February 2012 and continuing at least as late as July 2017, DaVita and Thiry entered into a conspiracy with Defendant SCA to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.  DaVita Indictment ¶ 9.  Per the DaVita Indictment, the entity identified as "Company B" in the SCA

---

[1] This Complaint uses "[Mr. Hayek]" where the SCA Indictment uses "Individual 1."
[2] This Complaint uses "[USPI]" where the SCA Indictment uses "Company A."

Indictment is DaVita, and the individual identified in the SCA Indictment as "Individual 3" is Mr. Thiry.[3]

7.      SCA, DaVita and USPI ostensibly compete horizontally with each other and other co-conspirators to hire and retain employees throughout the United States.  Beginning no later than 2008, however, Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above ("Senior Employees"), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers.  These "no-poach" agreements continued through 2021.  The CEOs and other senior executives of each co-conspirator monitored and enforced the agreements.

8.      Defendants also employed collusive exchanges of competitively sensitive information to further their conspiracy to suppress competition between them for employees, and to thereby suppress the compensation of their employees.  ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████ Defendants shared the competitively sensitive information to further the goals of the conspiracy to suppress the compensation of their employees.

9.      The conspiracy was not necessary to any legitimate business transaction, joint venture, or lawful collaboration among the companies.  Instead, it employed effective tools to

---

[3] This Complaint uses "[DaVita]" where the SCA Indictment uses "Company B," and "[Thiry]" where the SCA Indictment uses "Individual 3."  No brackets are used where the identity is revealed in the SCA or DaVita Indictment.

suppress their employees' mobility and compensation, and hence unlawfully reduce the Defendants' costs.

10. The conspiracy accomplished its purpose. It reduced competition for Defendants' employees and suppressed the compensation of Defendants' employees below competitive levels.

11. Defendants' conspiracy also denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment. In addition, Defendants' conspiracy eliminated the need for compensation increases to preempt competitive offers and retain employees. The result, by design, was suppression of broad employee pay structures.

## JURISDICTION AND VENUE

12. This action arises under section 1 of the Sherman Act (15 U.S.C. § 1) and section 4 of the Clayton Act (15 U.S.C. § 15(a)). Plaintiffs seek injunctive relief and the recovery of treble damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiffs and members of the Class (defined below) sustained as a result of Defendants' anticompetitive conduct. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. §§ 15 and 26.

13. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the proposed Class Period (defined below), Defendants resided, transacted business, were found, or had agents in this District, and Defendants carried out a substantial portion of the activity that affected interstate trade and commerce in this District.

14. During the Class Period, Defendants assessed, hired, and retained Senior Employees in a continuous and uninterrupted flow of interstate commerce, including in this

District.  Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

15.     This Court has personal jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries: (a) transacted business throughout the United States, including in this District; (b) participated in the assessment, hiring, and retention of Senior Employees throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

16.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Class.  Defendants, directly and through their agents, engaged in activities to limit competition and fix, raise, maintain, and/or stabilize the compensation and terms of employment of their employees in the United States, which unreasonably restrained trade and adversely affected the market for the services of their employees.

## PARTIES

## I.     PLAINTIFFS

17.     Scott Keech, R.N., M.B.A., was employed by Defendant SCA from approximately 2011 to March 2012 as a Regional Director of Operations and Clinical Services in the San Francisco, California area.  Mr. Keech is a citizen and resident of the State of California.

As a Regional Director, Mr. Keech was the senior leader and nurse executive responsible for clinic operations, nursing practice, and the provision of care at outpatient medical centers throughout California.

18.     Allen Spradling is a resident of Hoover, Alabama.  He was employed by Defendant SCA from September 22, 2008 to April 26, 2013, first as a Manager, Program Management Office, and then as a Director, Information Technology.

## II.     SCA DEFENDANTS

19.     Defendant Surgical Care Affiliates, LLC is a company organized and existing under the laws of Delaware with its principal places of business in Birmingham, Alabama and Deerfield, Illinois.  It was the direct operating subsidiary of parent company Surgical Care Affiliates, Inc., which in 2017 merged into UnitedHealthcare Group Incorporated ("UHG").  Since March 2017, Defendant Surgical Care Affiliates, LLC has been a wholly-owned subsidiary of UHG.  During the relevant period, Surgical Care Affiliates, LLC participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

20.     Defendant SCAI Holdings, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at 510 Lake Cook Road, Suite 400, Deerfield, Illinois 60015.  SCAI Holdings, LLC is a successor entity to Surgical Care Affiliates, Inc. and a wholly-owned subsidiary of UHG.  During the relevant period, SCAI Holdings, LLC participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

21.     Defendant Andrew Hayek is a natural person and resident of Illinois.  He was Chief Executive Officer and President or Chairman of SCA from 2008 until March 2017.  In mid-2017, OptumHealth, a subsidiary of UHG, acquired SCA and Mr. Hayek became Chief

Executive Officer of OptumHealth.  He served in that capacity until April 2019, when he became Executive Vice President of Optum.  Hayek participated in, ordered, authorized and assumed a direct role in the illegal conduct alleged.  He knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy as was aware of others who did so as well.  In addition, as a top executive of the company aware of the agreements between competitors and conducting activity consistent with and in furtherance of such agreements, Hayek had a responsible share in the conduct.  In addition, Hayek did so knowing these acts were inherently wrongful.  When engaged in the actions set forth in this complaint, Mr. Hayek was acting on behalf of SCA while engaged in the company's management, direction, or control, or transaction of its business or affairs.  Prior to joining SCA in 2008, Mr. Hayek was the President of Defendant DaVita's VillageHealth division, which provides comprehensive care for patients with chronic kidney disease and end stage renal disease.  During the relevant period, Hayek participated in the conspiracy and committed overt acts in furtherance thereof.

22.     The various SCA entities do and did business as "SCA" and hold themselves out as a single enterprise.  They do not generally distinguish between Surgical Care Affiliates, LLC and SCAI Holdings, LLC (or other SCA-related entities) in press releases or on their common website, www.scasurgery.com.  Accordingly, this complaint uses "SCA" to mean Surgical Care Affiliates, LLC, SCAI Holdings, LLC, their predecessors and successors, and Andrew Hayek, or any of them.

23.     SCA operates more than 230 outpatient medical centers and surgical facilities, employs approximately 10,000 individuals, partners with approximately 8,500 physicians affiliated with its centers, and treats approximately 1 million patients each year.  SCA and its affiliates currently operate in 35 states.  UHG, SCA's ultimate parent, considers SCA to be a

leader in partnering with health plans, medical groups and health systems. SCA's affiliated physicians provide a range of surgical services, including orthopedics, ophthalmology, gastroenterology, pain management, otolaryngology, urology, spine, cardiology and gynecology, as well as other general surgery procedures. SCA's facilities reportedly generate "more than $2 billion in revenue in normal operating times."

## III.    USPI AND TENET DEFENDANTS

24.    Defendant United Surgical Partners Holdings, Inc. is a company organized and existing under the laws of Delaware with its principal place of business at 14201 Dallas Parkway, Dallas, Texas, 75254. It is a subsidiary of Defendant Tenet Healthcare Corporation. During the relevant period, USPI participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof

25.    Defendant United Surgical Partners International, Inc. ("USPI") is a company organized and existing under the laws of Delaware with its principal place of business at 14201 Dallas Parkway, Dallas, Texas, 75254. It is a subsidiary of Defendant Tenet Healthcare Corporation. USPI "is the largest ambulatory surgery platform in the country" and has over 21,000 employees. During the relevant period, USPI participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof

26.    "Company A" in the SCA Indictment refers to USPI. For the sake of clarity, this Complaint uses "[USPI]" where the SCA Indictment uses "Company A."

27.    Defendant Tenet Healthcare Corporation ("Tenet") is a public company organized and existing under the laws of Nevada with its principal place of business at 14201 Dallas Parkway, Dallas, Texas 75254. Through its subsidiaries, partnerships, and joint ventures, including USPI, Tenet operates 65 hospitals and more than 550 other healthcare facilities, including outpatient medical care and ambulatory surgery centers, surgical hospitals, and other

outpatient medical facilities. During the relevant period, Tenet participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof

28.     On June 16, 2015, Tenet completed a transaction that combined its freestanding ambulatory surgery and imaging center assets with the surgical facility assets of USPI.

29.     In April 2016, Tenet paid $127 million to purchase additional shares of USPI, which increased Tenet's ownership interest from 50.1% to approximately 56.3%. In July 2017, Tenet paid $716 million for the purchase of additional shares, which increased its ownership interest in USPI to 80.0%. In April 2018, Tenet paid approximately $630 million for the purchase of an additional 15% ownership interest in USPI, which increased its ownership interest in USPI to 95%. The acquisition of USPI by Tenet constituted a merger of the two entities in fact and in effect, as USPI essentially continued the same business operations afterwards.

30.     Plaintiffs bring this action against Tenet for its own actions in furtherance of the conspiracy and as the parent company of the USPI entities.

## IV.    **DAVITA DEFENDANTS**

31.     Defendant DaVita, Inc. ("DaVita") is a company organized and existing under the laws of Delaware with its principal place of business in Denver, Colorado. It is sometimes referred to as "The Village" or "DVA." DaVita owns and operates outpatient medical care facilities around the United States, and employed individuals to operate its business at its headquarters location and at other locations throughout the United States. DaVita is the company identified as "Company B" in the SCA Indictment/DOJ Texas Action. During the relevant period, DaVita participated in the conspiracy and, through its executives, managers, employees or agents, committed overt acts in furtherance thereof

32.     Defendant Kent Thiry was the CEO of DaVita from 1999 to June 2019.  He served as the Chairman of the Board of DaVita from June 2019 to May 2020.  Mr. Thiry participated in, ordered, authorized and assumed a direct role in the illegal conduct alleged.  He knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy as was aware of others who did so as well.  In addition, as a top executive of the company aware of the agreements between competitors and conducting activity consistent with and in furtherance of such agreements, Mr. Thiry had a responsible share in the conduct.  He did so knowing these acts were inherently wrongful.  When engaged in the actions set forth in this complaint, Mr. Thiry was acting on behalf of DaVita while engaged in the company's management, direction, or control, or transaction of its business or affairs.  Upon information and belief, Mr. Thiry is the individual identified as "Individual 3" in the SCA Indictment/DOJ Texas Action.

## V.     AGENTS AND CO-CONSPIRATORS

33.     The anticompetitive and unlawful acts alleged against Defendants in this Complaint were authorized, ordered, or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

34.     The Defendants' agents operated under the explicit and apparent authority of their principals.

35.     Each Defendant operated through its subsidiaries, affiliates, and agents.

36.     Each Defendant acted as the principal, agent, or joint venture partner of or for other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint.

37.     Various companies and individuals not named as defendants in this Complaint participated as co-conspirators in the alleged conspiracy and performed acts and made statements to further the conspiracy.

## FACTUAL ALLEGATIONS

## I.    DEFENDANTS' CONSPIRACY

38.     SCA, USPI, and DaVita operate or operated ambulatory surgery centers, outpatient medical centers, and other healthcare services, and were competitors in the recruitment and retention of employees across the United States.  From May 2008 through January 2021, SCA, USPI, and DaVita conspired to reduce and limit compensation and mobility of their employees.  In furtherance of the conspiracy, Defendants, and each of them, (i) entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees, and (ii) exchanged competitively sensitive information to fix and maintain the compensation of their employees. The conspiracy and each component agreement were executed, enforced, and concealed by the companies' most senior executives and managers.  Such no-poach and wage-fixing agreements were not subordinate and collateral to legitimate joint ventures, nor were these unlawful agreements reasonably necessary to achieve a procompetitive objective of a legitimate joint venture.

39.     Defendants participated in meetings, conversations, and communications to discuss the solicitation and compensation of each other's employees, and agreed during those meetings, conversations, and communications not to solicit each other's employees and to suppress the wages of their employees.

## A. In Furtherance of the Conspiracy, SCA and DaVita Agree Not to Poach Each Other's Employees

40.     The conspiracy began at least as early as May 2008, when Hayek left DaVita to become SCA's CEO.  DaVita's senior executives understood that, if any of them left for other companies, Thiry expected they would ensure that their new employer would not recruit DaVita employees.

41.     In July 2008, Thiry became angry when Hayek recruited Michael Rucker, a DaVita Divisional Vice President, to work at DaVita, and accused Hayek of betraying his trust. Thiry demanded that SCA stop recruiting and/or soliciting DaVita employees, and explained that he had "a list of companies I have told my folks we don't recruit senior people from, unless they have first told their employer they are leaving.  It is a potentially nasty thing to start if you do otherwise—because where does it stop?  The best people have the best people, so are we all going to make each other's life's more difficult than they are? . . . do you think we can just sit around and not work hard to change the math of your equation?  And do you think friendships are easy to maintain and develop over the years when you do that?  What world are you living in?  I have competitors where we have basically stopped going after each other's people because it is a lose/lose.  And those do not even have friendships at risk."  Hayek agreed.

42.     In 2011 and 2012, Thiry and Hayek continued to discuss Thiry's demands regarding employee recruiting and hiring.  They further honed the agreement to preclude DaVita and SCA from soliciting or recruiting each other's employees at the director-level and above, unless the employees were already seeking outside employment and had informed their supervisors they wanted to leave.

43.     For example, on or about October 20, 2014, the CEO of DaVita, Mr. Thiry, emailed [Mr. Hayek] the following: "Someone called me to suggest they reach out to your senior

biz dev guy for our corresponding spot.  I explained I do not do proactive recruiting into your ranks."

44.     Confirming that DaVita was part of the conspiracy involving SCA and USPI, on or about October 16, 2015, [Mr. Hayek] emailed an SCA human resources executive: "Putting two companies in italics ([USPI] and [DaVita]) - we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."

45.     Similarly, on or about December 12, 2015, SCA's human resources executive instructed a recruiter to "note that [USPI] and [DaVita] are off limits to SCA."

46.     Consistent with the conspiracy, Defendants told job candidates they needed to inform their current employer to be considered.  For example, on or about April 26, 2016, SCA's human resources executive emailed a candidate from DaVita who was based in Dallas, Texas, that she could not recruit the candidate unless they "have been given explicit permission by their employers that they can be considered for employment with us."

47.     On or about June 13, 2016, an employee of SCA forwarded news of a recruitment, noting that: "I thought there was a gentlemen's agreement between us and DaVita re: poaching talent."  An SCA executive replied: "There is.  Do you mind if I share with [Mr. Hayek], who has most recently addressed this with Kent [DaVita's CEO]."  Mr. Hayek relayed the news to DaVita's CEO, Mr. Thiry, who replied, "Will check it out."  On or about July 10, 2016, Mr. Thiry forwarded the communication from Mr. Hayek to another senior-level DaVita executive, commenting: "Pls put it on our next agenda."

48.     On or about April 7, 2017, [Mr. Hayek] was contacted by a consultant regarding his interest in a candidate employed by DaVita and responded: "In order to pursue [candidate],

13

he would need to have already communicated that he is planning to leave DaVita — that's the relationship that we have with DaVita." The consultant responded, ". . . I'm glad you arrived at that agreement with KT [Kevin Thiry, DaVita's CEO]."

A.    **In Furtherance of the Conspiracy, SCA and USPI Agree Not to Poach Each Other's Employees**

49.    No later than May 2010, Mr. Hayek established a no-poach agreement with his counterpart at USPI to eliminate competition between the companies for each other's employees, by not actively soliciting each other's employees. As alleged in the SCA Indictment, on or about May 14, 2010, the CEO of [USPI] emailed certain other [USPI] employees, stating "I had a conversation w [Mr. Hayek] re people and we reached agreement that we would not approach each other's [employees] proactively."

50.    Defendants told certain executives, human resources employees, and recruiters to avoid soliciting employees of each other's companies. For example, on or about November 11, 2013, a senior human resources employee at [USPI] told a recruiter the following: "Please do not schedule a call w/ [candidate], thanks. She would have had to apply for the job first. We cannot reach out to SCA folks. Take any SCA folks off the list."

51.    On or about November 1, 2013, employees of [USPI] discussed whether to interview a candidate employed by SCA in light of the "verbal agreement with SCA to not poach their folks . . . ." The CEO of [USPI] noted that "[w]e do have that agreement and want to stick by it. If [candidate] indeed did approach us, and is willing to tell [Mr. Hayek] that I'm ok." The senior human resources officer at [USPI] responded: "Yikes, she is not going to want to do that. But I will check."

52.    Defendants alerted their co-conspirators when each other's employees were recruited, and policed violations of the conspiracy. For example, on or about December 8, 2015,

the CEO of [USPI] told [Mr. Hayek]: "Just wanted to let you know that [recruiting company] is reaching out to a couple of our execs. I'm sure they are not aware of our understanding." [Mr. Hayek] told other SCA executives: "We should continue to flag [USPI] on our 'do not call' list to recruiters - is OK if we get an inbound inquiry and the leader has communicated within [USPI] that they want to leave, but outbound calls should not be occurring."

53.     Defendants refrained from soliciting each other's employees. For example, on or about July 17, 2017, a human resources employee of [USPI], believing a candidate to be employed by SCA, emailed a recruiting coordinator for [USPI] that, although the candidate "look[ed] great" she "can't poach her."

**B.      In Furtherance of the Conspiracy, Defendants Exchanged Wage-Fixing Competitively Sensitive Information**

54.     In addition to the no-poach agreements, another tool used by Defendants to effectuate the conspiracy was ███████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████

55.     For example, ████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████



[redacted]

### C.    Effects of the Conspiracy

61.    Labor markets are not perfectly competitive.  They are not like commodity markets where market-wide demand and supply tend to determine a single market price. Defendants do not simply pay a "market wage" for a particular employee, as they might pay a "market price" for a pound of silver on a metals exchange.  Instead, labor market participants determine prices by interacting with each other.  This is particularly true for jobs in which specialized experience or skills are valuable, such as positions in outpatient medical care and other healthcare facilities.  Market "frictions" result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) there are a limited number of essentially identical positions from which workers can choose.  Such market frictions adversely impact competition in labor markets, and generally provide market power to employers.  These market frictions and resulting market power are well-recognized in labor economics.

62.    Defendants' conspiracy injured employees with experience or skills in the outpatient medical care and healthcare industry in part because Defendants are market leaders in

their fields.  During the Class Period, SCA, USPI, and DaVita were the nation's largest operators of outpatient medical care centers as well as one another's top rivals for labor.

63.     Defendants also are among the largest employers in the outpatient medical care center industry, with a nationwide reach.  For example, SCA has over 10,000 employees nationwide, USPI has over 21,000, and DaVita has over 77,000.

64.     The specialized knowledge relevant to work in the outpatient medical care and healthcare industry is subject to not only market frictions, but also high supply-demand pressures.  There is high demand for and limited supply of employees with experience or skills relevant to outpatient medical care facilities.  Employees within the industry, like those working for the Defendants, are key sources of potential talent to fill these openings.

65.     The importance of relevant industry experience to Defendants is reflected in their job postings.  For example, in a job posting for a Senior Director of Development in Houston, Texas, SCA emphasizes that "[h]ealthcare industry knowledge is preferred."  In a posting for Vice President of Practice Operations in Southern California, SCA notes that qualifications include experience "within a highly professional and successful healthcare services company."  For a Director of Operations in Portland, SCA states that "management experience in ASC [Ambulatory Surgery Center] operations or hospital outpatient centers is strongly preferred."

66.     Defendants employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire employees.  Defendants also receive direct applications from individuals interested in employment opportunities.

67.     Soliciting employees from other outpatient medical care and healthcare industry employers is a particularly efficient and effective method of competing for employees.  Soliciting involves communicating directly—by phone, email, social and electronic networking,

or in person—with competitors' employees who have not applied for a job opening. Such direct solicitation can be done by the soliciting firm's personnel or by outside recruiters. Firms in the outpatient medical care and healthcare industry rely on direct solicitation of employees of other outpatient medical care and healthcare companies because those individuals have specialized experience and may not respond to other methods of recruiting.

68. In a properly functioning and lawfully competitive labor market, outpatient medical care and healthcare industry employers would compete with one another to attract and retain employees for their needs. This competition among employers for those employees would determine the level of compensation. Competition would also improve the employees' ability to negotiate for better salaries and other terms of employment.

69. In the absence of a prior agreement, companies like Defendants would solicit and hire employees from other companies in the same industry because those employees have training and experience that are lacking in hires from other industries. Hiring employees from a different industry requires the company to invest significant resources in identifying, assessing, and training those employees, and is particularly unsuitable for senior-level positions. For these reasons and others, lateral hiring within the outpatient medical care industry is a key form of competition in this industry. In this case, Defendants prevented that competition through their illegal conspiracy, apparently concluding that the profits to be made by suppressing wages in the labor market outweighed the benefits to be gained from competing with each other in the labor market.

70. Competition for workers via lateral hiring has a significant impact on compensation in a number of ways. First, competition facilitates the flow of information about opportunities and compensation. For example, employees who are solicited, interviewed, or

19

offered a job by a rival employer gain insight into how other companies value their work and experience, and what compensation and benefits their competitors typically pay or are willing to pay to induce them to leave their current employer.  This information is not otherwise readily available to employees, who generally rely on these encounters and word-of-mouth from peers and colleagues for such information.  Employers, on the other hand, often hire private consulting firms to gather information regarding market compensation rates.  In a labor environment where price discovery is already inhibited, no-poach agreements further restrain employees' access to this crucial information by eliminating or reducing the communications that encourage the flow of information.

71.      Defendants' conspiracy precluded information about pay and benefits from reaching employees at Defendants' companies.  Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors.  Indeed, empirical economic research confirms that employees who change jobs voluntarily typically have faster wage growth than those who remain in the same job.  These employees also could have shared this information with their co-workers, multiplying the impact of each offer as the information would have spread through social channels.  Among other things, Defendants refrained from informing employees or others who were targets of the conspiracy of the fact of the conspiracy and acted to conceal the fact of the conspiracy by giving pretextual explanations for hiring or compensation decisions, and omitting such decisions were made on the basis of the illegal agreements, not because of market conditions or because of the worth or value of employees.  These acts precluded employees from possessing highly relevant information.

72.     Second, the threat of losing employees to competitors encourages employers to preemptively increase and maintain appropriately high compensation to ensure high morale, productivity, and retention.  Absent appropriate compensation, employees are more likely to seek better compensation elsewhere, be receptive to recruiting by competitors, limit their productivity, and undermine morale.  Once an employee has received an offer from another company, the employer may have to increase compensation to retain that employee, and increase compensation for other employees as well.  In a competitive labor market, such preventive retention measures thus lead to increased compensation for employees.  But in the outpatient medical care industry, Defendants' conspiracy substantially spared them from taking such measures, lowering employee pay.

73.     Third, because many outpatient medical care and healthcare employees are integrated into teams, some workers who move to different companies may bring others with them.  Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for these related workers.  Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to move with them.

74.     Defendants, like other sophisticated companies, maintained internal compensation systems and developed compensation structures that preserved relatively stable relationships between the pay of their employees.  The effect of such systems is that an adjustment to the pay of some employees will lead to adjustments to the pay structure as a whole, affecting the pay of all employees.  Distortions to the labor market's competitive process, such as the distortions caused by Defendants' no-poach agreements, suppressed the pay of all employees who shared

common pay structures, not just those who proactively sought to work for another outpatient medical care center.  Moreover, because the pay rates for jobs within pay structures were tied together, the compensation of all employees was affected by Defendants' no-poach agreements.

75.     To maintain productivity and morale and to retain employees, in the absence of a prior agreement, employers such as Defendants would also consider the perceived fairness of their compensation systems.  Defendants thus had an incentive to ensure that their employees felt that their compensation was fair based on broad comparisons across job descriptions and titles within the company and as compared to other companies in the industry.

76.     What constitutes "fair" is based on comparisons that employees draw between themselves and other employees at their company and in their field.  For example, employees generally would not consider it fair for there to be pay differentials for workers doing the same work at the same level at the same company based solely on the fact that some of these employees received an outside solicitation or offer of alternate employment.

77.     Fairness concerns often involve both "internal equity" and "external equity." "Internal equity" depends on the extent to which employees perceive pay levels to be fair and objective compared to other employees *within* the same company.  "External equity" depends on the perception of the fairness of pay levels compared to similar employees *outside* the company. Defendants' pay structures should have been designed, constructed, and maintained to accomplish both internal and external equity goals, but they were undermined by the illegal agreement.

78.     Companies foster both internal and external equity by maintaining formal compensations systems that restrict discretionary pay decisions and focus on more objective criteria such as job descriptions and classifications, wage levels for equivalent jobs in the labor

market, pay differentials based on experience and levels of responsibility, and other factors affecting the perceived fairness of the compensation system. In sum, pay systems adjust pay levels across job titles and pools of employees to maintain internal and external equity to better foster good morale and motivate employees across a company's labor force. Because of these systems, the pay of one employee always bears a relationship to the pay of other employees.

79. These pay systems are systematically monitored and adjusted from the top down by senior management, with regular company-wide reviews and assessments.

80. Because of such formal systems, however, Defendants' no-poach agreements would have affected the proposed Class as a whole, and not just individual employees who would have otherwise received job offers from rival companies in the industry.

81. Due to internal and external equity considerations, increasing the pay of one employee in order to retain that employee leads to pay raises not only for those who perform similar work (and thus are within the same pay bands or grades), but also for a wider swath of employees who base their notions of fair compensation on certain degrees of differentials between themselves and those other employees. Conversely, a no-poach agreement suppresses compensation not only for employees who would have received competitive offers, but for other employees as well. These systematic effects occur both at the same time, through firm-wide pay adjustments and reviews, and over time, as pay structures adjust to account for internal and external equity.

82. Defendants suppressed their employees' pay through another method: exchanging competitively sensitive information including future planned company-wide pay increases. Like the no-poach agreements, these wage-fixing exchanges occurred between Defendants' most senior corporate Officers, the same individuals who set and approve company-wide pay levels.

Defendants used the wage-fixing exchanges to assure each other that they did not need to increase pay levels as much as they otherwise would have, if there were competitive uncertainty about these highly confidential business plans.

83.     Defendants' conspiracy and each component agreement restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor markets.  The conspiracy suppressed the compensation of all employees, not just particular individuals who otherwise would have been solicited or sought to change employers.  The effects of eliminating solicitation and lateral hiring, pursuant to agreement, caused widespread impact on Defendants' employees by eliminating or reducing the flow of information and the need for preventive and reactive increases to compensation for the entire Class.

### D.      Effects on Interstate Commerce

84.     During the relevant time period, Defendants employed members of the Class throughout the United States, including in this judicial district.

85.     Defendants' conspiracy and each component agreement substantially reduced competition for labor in the outpatient medical care and healthcare industry, and suppressed the efficient movement and compensation of outpatient medical care industry employees, harming Plaintiffs and members of the Class.  Because the no-poach agreements and wage-fixing exchanges enabled Defendants to maintain suppressed compensation levels generally, the harm extended not only to those who sought, or otherwise would have sought to change companies, but also to those who had no intention of seeking other employment.

86.     Thus, Defendants' no-poach agreements and wage-fixing exchanges substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

## II.    PLAINTIFFS' CLAIMS ARE TIMELY

87.    Until January 7, 2021, when the DOJ publicly announced the SCA Indictment, Plaintiffs and members of the proposed Class did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaged in secret no-poach agreements and wage-fixing exchanges.

88.    Defendants did not publicize their no-poach agreements or wage-fixing exchanges, did not inform job applicants about the conspiracy, and acted in a manner deliberately designed to avoid detection of the conspiracy.  For example, the agreements among the CEOs of SCA, USPI, and DaVita were primarily oral, and deliberately not memorialized in a written agreement or contract, or other writing likely to become widely available.  Knowledge of the agreements was closely held by executives and recruiters of the Defendant companies, who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions, telephone conversations, and private email communications.  None of the relevant communications alleged herein were made public until after release of the Grand Jury's SCA Indictment.  Defendants' wage-fixing exchanges were not made public until this filing.

89.    Additionally, rather than disclose their non-solicitation agreements and wage-fixing exchanges, Defendants devised internal procedures to identify affected applicants, and gave false and pretextual explanations for hiring and compensation decisions that in fact were made pursuant to Defendants' unlawful agreements.

90.    Until recently, Plaintiffs and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were conspiring to restrain competition for the services of their Senior Employees.

91.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, and/or Defendants' fraudulent concealment. Defendants are thus estopped from relying on any statutes of limitations in defense of this action.

### CLASS ACTION ALLEGATIONS

92.     Plaintiffs bring this action individually and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May  2008 to January 2021 for Surgical Care Affiliates, LLC,  SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 2010 to January 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries.  Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.

93.     Plaintiffs reserve the right to amend the Class definition, define subclasses, and expand or narrow the proposed Class based on information obtained in discovery and expert analysis of such information.

94.     There are thousands of members of the Class as described above, the exact number and their identities being known by Defendants, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

95.     The Class is precisely ascertainable from Defendants' records.

96.     Plaintiffs' claims are typical of the claims of the proposed Class as they arise out of the same course of Defendants' conduct and the same legal theories.

97.     Plaintiffs will fairly and adequately represent the interests of the proposed Class and have no conflict with the interests of the proposed Class.

98. There are numerous questions of law and fact common to each Class member, including, but not limited to:

a. whether Defendants and their co-conspirators entered into no-poach agreements;

b. whether Defendants agreed to fix wages by exchanging competitively sensitive wage and other business information;

c. whether such agreements were *per se* violations of the Sherman Act;

d. whether Defendants have fraudulently concealed their misconduct;

e. whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for Plaintiffs and the proposed Class;

f. whether Plaintiffs and the Class suffered antitrust injury as a result of Defendants' agreements;

g. the type and measure of damages suffered by Plaintiffs and the Class; and

h. the nature and scope of injunctive relief necessary to restore a competitive market.

99. During the Class Period, Plaintiffs were employed by SCA at or above the director level. Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class.

100. Plaintiffs are members of the Class, have claims that are typical of the claims of the Class, and will fairly and adequately protect the interests of the Class. In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

101.     The above-referenced common questions of law and fact predominate over any questions affecting only individual members of the Class.

102.     Defendants have acted on grounds generally applicable to the proposed Class, thereby making final injunctive relief appropriate with respect to the proposed Class as a whole.

103.     A class action is superior to any other means of resolving this litigation. Separate actions by individual Class members would be inefficient and would create the risk of inconsistent or varying judgments. There will be no material difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF
### (*Per Se* Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1)

104.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

105.     Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in an overarching conspiracy, consisting of unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through no-poach agreements, and through exchanging competitively sensitive information, thereby fixing and suppressing Class members' compensation.

106.     Defendants' conspiracy, and each and every component no-poach agreement and wage-fixing exchange, are each *per se* unlawful under Section 1 of the Sherman Act.

107.     Defendants' conspiracy included concerted action and undertakings with the purpose and effect of: (a) fixing Plaintiffs' and the Class's compensation at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for employees.

108.    Defendants' combinations and conspiracy injured Plaintiffs and other members of the Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class of similarly situated persons, respectfully request that:

a.    The Court certify this lawsuit as a class action under Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, and that Plaintiffs' counsel be appointed as Class counsel for the Class;

b.    The Court declare, adjudge, and/or decree that the conduct alleged herein is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.    Plaintiffs and the Class recover their damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law;

d.    The Court enter an injunction enjoining Defendants from enforcing the unlawful conspiracy or entering into similar agreements going forward; and

e.    The Court award such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, individually and on behalf of the proposed Class, demand a trial by jury on all issues so triable.

Dated: October 27, 2024          Respectfully submitted,

*/s/ Dean M. Harvey*

Dean M. Harvey (*pro hac vice*)
Lin Y. Chan (*pro hac vice*)
Sarah D. Zandi (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
dharvey@lchb.com
lchan@lchb.com
szandi@lchb.com

Jessica A. Moldovan (*pro hac vice*)
Emily Harwell (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
jmoldovan@lchb.com
eharwell@lchb.com

Linda P. Nussbaum (*pro hac vice*)
NUSSBAUM LAW GROUP, P.C.
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
(917) 438-9102
lnussbaum@nussbaumpc.com

Michael L. Roberts (*pro hac vice*)
Karen Halbert (*pro hac vice*)
Sarah DeLoach (*pro hac vice*)
Kelly Rinehart (*pro hac vice*)
ROBERTS LAW FIRM US, PC
1920 McKinney Ave., Suite 700
Dallas, TX 75204
Telephone: (501) 821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us
sarahdeloach@robertslawfirm.us
kellyrinehart@robertslawfirm.us

Erich P. Schork (admitted under L.R. 83.10)
ROBERTS LAW FIRM US, PC
P.O. Box 31909
Chicago, IL 60631
Telephone: (708) 497-9068
erichschork@robertslawfirm.us

*Located in Washington State

*Interim Co-Lead Class Counsel*