# **Exhibit 1**

# Lane Declaration

# Redacted

**THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**<u>EXPERT WITNESS REPORT OF DR. EVAN P. STARR</u>**

**TABLE OF CONTENTS**

**Page**

I.      QUALIFICATIONS ................................................................. 1

II.     ASSIGNMENT AND SUMMARY OF CONCLUSIONS ............................................... 3

III.    PRIOR TESTIMONY ................................................................. 7

IV.     BACKGROUND ................................................................. 8

        A.      The Outpatient Medical Center Industry ................................................................. 8

        B.      The Challenged Conduct................................................................. 9

        C.      Parties................................................................. 10

V.      EVALUATING EVIDENCE OF THE CHALLENGED CONDUCT ......................... 14

        A.      Economic Background of the Challenged Conduct............................................. 17

        B.      Defendants Established No-Poach Agreements to Suppress Compensation ....... 30

        C.      Defendants Exchanged CSI to Suppress Labor Market Competition.................. 85

VI.     ECONOMETRIC EVIDENCE OF WAGE SUPPRESSION ......................................... 96

        A.      Standard Econometric Methods To Demonstrate Wage Suppression ................. 97

        B.      Data Summary ................................................................. 100

        C.      Wage Suppression Models................................................................. 102

VII.    COMMON IMPACT ................................................................. 125

        A.      By-Employee-Level Category and Defendant Suppression Model................... 128

        B.      Quantile Regression................................................................. 129

        C.      In-Sample Prediction ................................................................. 131

        D.      Interval In-Sample Prediction................................................................. 135

        E.      Random Coefficient Model................................................................. 142

        F.      Evidence of a Compensation Structure That Would Transmit Wage
                Suppression Across All Class Members................................................................. 144

VIII.   AGGREGATE DAMAGES ................................................................. 162

IX.     MARKET POWER................................................................. 168

X.      CONCLUSIONS................................................................. 170

PROOF OF SERVICE................................................................. 172

APPENDIX A ................................................................. 173

APPENDIX B ................................................................. 193

**TABLE OF CONTENTS**
**(continued)**

**Page**

APPENDIX C ................................................................................................................ 212

APPENDIX D ............................................................................................................... 215

APPENDIX E ................................................................................................................ 227

## I. Qualifications

1. I am Evan P. Starr, a tenured Associate Professor at the University of Maryland's Robert H. Smith School of Business in the Department of Management and Organization. I specialize in performing economic and statistical analyses of labor markets, with a focus on earnings and restrictions on employee mobility. Before I joined the University of Maryland, I was an Assistant Professor at the University of Illinois at Urbana-Champaign, with a joint appointment in the Department of Economics and the School of Labor and Employment Relations.

2. I earned a Ph.D. in Economics from the University of Michigan, an M.A. in Economics from the University of Michigan, and a B.A. from Denison University with majors in Math, Economics, and Spanish. I have taught courses to all levels of students (undergraduate, Masters, M.B.A., and Ph.D.); including a Ph.D. course in labor economics; Ph.D., Masters, and undergraduate courses in applied statistical methods; and M.B.A. and undergraduate courses in strategic management. I have also made presentations to several practitioner audiences, including as part of George Mason University's Continuing Education program for Attorneys General, Practicing Law Institute's Continuing Legal Education Programs, the Illinois Attorneys General Office, and the American Intellectual Property Law Association. My study of restrictions on employee mobility began when I was in graduate school as part of my dissertation, which examined the use of noncompete clauses, and how noncompete policies affect worker wages and on-the-job training, and firm creation, growth, and survival.

3. To date, I have published 18 articles in several leading journals in economics, management, and law, the majority of which focus on mobility restrictions and compensation. These journals include the *Review of Economics and Statistics*, the *Journal of Law and Economics*, the *Journal of Law, Economics, and Organization*, the *Journal of Legal Studies*, the

1

*Journal of Human Resources*, *Management Science*, *Organization Science, Industrial and Labor Relations Review*, and the *Strategic Management Journal*. My research has been cited in major media outlets, including *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *NPR*, *The Financial Times*, *The Economist*, *The Baltimore Sun*, *The New Yorker*, *MIT Sloan Management Review*, and many others. My work is also cited regularly throughout U.S. Treasury and White House reports on restrictive covenants, as well as in policy discussions about noncompete clauses headed by the Federal Trade Commission. Moreover, I served on the Uniform Law Commission's drafting committee for the Uniform Restrictive Employment Agreement Act. In addition, I have written several policy memos regarding mobility restrictions, including no-poach agreements.

4.      I am also an Associate Editor at *Management Science* and an Associate Editor at the *Strategic Management Journal*, two of the leading journals publishing work on organizations. I also regularly review scholarly work as an ad hoc referee for many leading journals in economics and management.[1] I am, or have recently been, a member of the American Economic Association, the Labor and Employment Relations Association, the Academy of Management, the Strategic Management Society, the Society of Labor Economists, the Society for Institutional and Organizational Economics, and the American Law and Economics Association.

---

[1] These include the *American Economic Review: Insights, Management Science*, *Quarterly Journal of Economics*, *American Economic Review*, *Review of Economics and Statistics*, *Organization Science*, *Strategic Management Journal*, *Administrative Science Quarterly*, *Journal of Labor Economics*, *The Journal of Human Resources*, *American Economic Journal: Applied, Industrial and Labor Relations Review*, *Journal of Law, Economics, and Organization*, *Journal of Law and Economics*, *American Law and Economics Review*, *Academy of Management Review*, *Research Policy*, *Strategy Science*, *Strategic Entrepreneurship Journal*, *Journal of Economics and Management Strategy*, *Journal of Business Venturing, Industry and Innovation*, *Information Systems Research*, *Journal of Management Studies*, *European Financial Management Review*, *Advances in Strategic Management*, *Organizational Research Methods*, and *Production and Operations Management*.

3154924.9

5.      A more complete description of my qualifications is included in my curriculum vitae in **Appendix A**.

6.      In connection with this matter, I reviewed and considered materials from this case and from the related criminal investigation *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.), including the Third Consolidated Amended Class Action Complaint (ECF No. 555), depositions, deposition exhibits, trial transcripts, Federal Bureau of Investigation ("FBI") interview reports, and structured compensation data produced by, or compiled from materials produced by Defendants Andrew Hayek ("Hayek"), Kent Thiry ("Thiry"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC (together, "SCA"), DaVita Inc. ("DaVita"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation (together, "USPI") (altogether, "Defendants"). I also evaluated relevant studies from the academic literature. Overall, the information that I considered in forming my opinions include the materials listed in **Appendix B** as well as those cited in this report and any appendices. I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

7.      I am being compensated for my time in this matter at a rate of $990 per hour. My compensation does not depend upon the results of my analysis, any related testimony, or the outcome of this matter.

8.      For purposes of convenience, **Appendix C** provides a list of the names, employers, job titles, and years worked for individuals I reference in my report.

## II.      Assignment and Summary Of Conclusions

9.      I understand that Plaintiffs seek to certify a class of employees who worked in positions at the director-level and above (hereafter "Senior-Level Employees") for one or more of the following: (a) from May 1, 2008, through December 31, 2019, Surgical Care Affiliates,

3

LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, through December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries (hereafter the "Class" or "Class Members").

10.     I further understand that the Plaintiffs allege that Defendants colluded to suppress the compensation of each other's Senior-Level Employees, i.e., their employees at the director-level and above.[2] Specifically, the Plaintiffs challenge two mutually reinforcing methods that Defendants used to suppress Class pay: No-Poach Agreements and Exchanges of Competitively Sensitive Information ("CSI") (together, the "Challenged Conduct"):[3]

11.     Assignment. In my capacity as an applied microeconomist with a focus on labor markets, Counsel for Plaintiffs have asked me to do the following:

a.      *Assess if the Qualitative Evidence is Consistent with Anticompetitive Collusion and Inconsistent with Unilateral Conduct.* I have been asked to review Defendant's internal documents and communications to determine whether the qualitative evidence is consistent with anticompetitive collusion and inconsistent with unilateral conduct;

b.      *Analyze if the Quantitative Evidence is Consistent with Anticompetitive Collusion and Inconsistent with Unilateral Conduct.* I have been asked to analyze Defendant's data, including econometric analysis of Defendants' compensation data, to determine whether the Challenged Conduct is economically and statistically significantly associated with artificially

---

[2] 3rd Am. Class Action Compl., *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305 [hereafter Compl.] ¶¶ 19–32. Senior corporate officers, as well as members of the human resources, recruiting, or legal departments are excluded from the Class. *Id*.
[3] *Id.* ¶ 38.

4

3154924.9

suppressed compensation, beyond what can be explained by competitive factors, and whether this evidence is consistent with anticompetitive collusion and inconsistent with unilateral conduct;

     c.    *Determine Common Impact.* I have been asked to determine whether qualitative and quantitative evidence demonstrates that ███████████████████

██████████████████████████████████████████████████ ;

     d.    *Determine Aggregate Damages.* I have been asked to evaluate whether common methods and evidence can be used to quantify the damages to the Class, if any, caused by the Challenged Conduct;

     e.    *Determine Market Power.* I have been asked to determine whether Defendants have market power over Class Members; and,

     f.    *Assess Common Evidence.* I have been asked to assess whether evidence, data, and analyses common to the Class can be used to assess (a) through (e) above.

12.    <u>Conclusions.</u> As a result of my work to date, the following are my conclusions:

     a.    █████████████████████████████████████

████████████████████████ .

       i.    **No-Poach Agreements**. In Section V.B, I review qualitative evidence which shows that ██████████████████████████████████████

█████████████████████████ . The evidence I have reviewed shows that ██████

████████████████████████████████████████████

████████████████████████████████████████ . The SCA-DaVita and SCA-USPI No-Poach Agreements ███████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

        ii.     **CSI Exchanges.** In Section V.C, I review qualitative evidence which shows ████████████████████████████████████████████. The ████

███████████████████████████████ indicate that (1) ████████████

████████████████████████████████████ and (2) ████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

        b.     ███████████████████████████████████████████████████

████████████████████████ Quantitative evidence regarding the mobility of Class Members between Defendants that I have reviewed shows that ████████████████████████

██████████████████████████████████████████████████████████

████████████ I also conclude based on the ███████████████████████████████

████████████████████████████████████████ Specifically, the Challenged Conduct ████████████████████████████████████████████████

████████████ . This quantitative evidence is ████████████████████████████

████████████████████████

        c.     *The Challenged Conduct* ██████████████████████████████ . In Section VII, I develop a series of econometric tests that I developed from the ████████████ model in Section VI, which shows that Defendants' Conduct, which occurred over a "Conduct Period" defined as ████████████ for DaVita and SCA and ████████████ for USPI,[4] ████████████████████

---

[4] *See* ¶118, *infra.*

6

3154924.9

 Moreover, I conclude based on my analysis of qualitative and quantitative evidence that Defendant firms ███████

███████████████████████████████████████████████

██████████████████████████████████████████████.

      d.      ████████████████████████ *le.* In Section VIII, I compute ████████

████████████████████████████████████ I employ the standard "but-for world" method of calculating damages to calculate that single damages to the Class sum to ████████ over the Conduct Period, which is composed of ████████████████

█████████████████████████████████████████████████

█████████████████████████

      e.      ████████████████████████████. In Section IX, I conclude that the ███████████████████████████████████████████

████████████████████████████. Defendants' Challenged Conduct could not have suppressed Class Member wages if Defendants lacked market power over them.

      f.      *The Evidence is Common to the Class.* All of the evidence, data, and analyses I relied on to reach each of the foregoing conclusions are common to the Class.

## III.    **Prior Testimony**

13.    I have testified as an expert in arbitration proceedings and/or or been deposed in the following cases: *Collier HMA Physician Management, LLC et al., v. NCH Healthcare System Inc., et al.*, No. 2:18-cv-408-SPC-MRM (M.D. Fla.); *Echo Global Logistics Inc. v. Traffic Tech, Inc. and Jack Ford Jr.*; *Jefferies LLC v. Credit Suisse Securities (USA) LLC*; and *The Dufresne Spencer Group, LLC et al. v. Han Nara Enterprises LP et al.*, No. 21-1857 (D. Del.).

14.    Within the last six years, I have also testified on the topic of mobility restrictions in front of the U.S. Senate, the U.S. House of Representatives, at multiple events at the Federal

7

Trade Commission ("FTC"), and the Department of Justice ("DOJ"). I have also presented research on these topics in approximately 100 conferences or university seminars. Additionally, I testified twice in front of the D.C. City Council regarding a noncompete bill and provided testimony to the state legislatures of Massachusetts, Washington, and Connecticut in their deliberations related to restrictive covenants.

## IV. Background

### A. The Outpatient Medical Center Industry

15. Outpatient surgery refers to scheduled surgical services performed on patients who do not remain in the hospital overnight.[5] These procedures may occur in operating hospital suites also used for inpatient suites, hospital suites specifically designated for outpatient care, or procedure rooms within a dedicated outpatient care facility.[6] Ambulatory surgery centers ("ASCs"), or outpatient surgery centers, are facilities that focus on providing same-day surgical care in fields like endoscopy, ophthalmology, orthopedics, pain-treatment, dentistry, and other medical specialties.[7]

16. A wide variety of employees are necessary to keep ASCs and outpatient surgery centers functioning. Physicians, nurses, technicians, registration staff, and operations managers are all required.[8] As with any large company, higher-level management employees located in the corporate headquarters and regional business offices are also required to manage an individual ASC or a region of ASCs and perform a wide variety of administrative functions.

---

[5] *See Outpatient Surgery*, CDC, https://www.cdc.gov/nchs/hus/sources-definitions/outpatient-surgery.htmhttps://www.cdc.gov/nchs/hus/sources-definitions/outpatient-surgery.htm (last updated Jul. 24, 2024).

[6] *Id.*

[7] *What is an ASC?*, AMBULATORY SURGERY CENTER ASSOCIATION, https://www.ascassociation.org/asca/about-ascs/surgery-centers (last visited Jan. 9, 2025).

[8] *Medical Staff and Specialists At Outpatient Centers*, TAG MEDSTAFFING, https://www.tagmedstaffing.com/what-is-a-outpatient-center/ (last visited Jan. 9, 2025).

8

3154924.9

### B.     The Challenged Conduct

17.     In this matter, Plaintiffs allege that Defendants colluded to suppress the pay of each other's Senior-Level Employees, i.e., their employees at the director-level and above.[9]

18.     Plaintiffs allege that DaVita and SCA began colluding at least as early as May 2008, and that USPI and SCA began colluding at least as early as May 2010 (hereafter (the "Class Period").[10]

19.     Plaintiffs allege two mutually reinforcing anticompetitive methods: No-Poach Agreements and Exchanges of CSI (together, the Challenged Conduct):[11]

a.     *No-Poach Agreements.* Plaintiffs allege that SCA and DaVita, and SCA and USPI agreed not to proactively recruit each other's Senior-Level Employees.[12] Further, Defendants agreed not to pursue recruiting, soliciting, hiring, and/or cold calling (i.e. wherein a hiring company proactively calls, emails, or otherwise reaches out through a platform like LinkedIn or Indeed to a passive candidate, i.e., an employee at a competitor firm who has not proactively solicited employment), each other's Senior-Level Employees unless those Senior-Level Employees informed their current employers that they intended to seek employment elsewhere.[13]

---

[9] Compl ¶¶ 19–32. Senior corporate officers, as well as members of the human resources, recruiting, or legal departments are excluded from the Class. *Id.*

[10] *Id.* ¶ 92.

[11] *Id.* ¶ 38.

[12] *Id.* ¶ 7 ("Beginning no later than 2008, however, Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above [i.e., "Senior-Level Employees"], by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers. These 'no-poach' agreements continued through 2021. The CEOs and other senior executives of each co-conspirator monitored and enforced the agreements.").

[13] *Id.* ¶¶ 44, 51.

b.    *CSI Exchanges.* Plaintiffs also allege that SCA and DaVita, and SCA and USPI suppressed Class pay by regularly sharing competitively-sensitive information regarding

██████████████████████████.[14]

20.    Plaintiffs allege the Challenged Conduct "denied [Defendants'] employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment" as well as eliminating "the need for compensation increases to preempt competitive offers and retain employees."[15] Plaintiffs allege that the ultimate effect of the Challenged Conduct was a classwide suppression of employee compensation.[16]

## C.    Parties

### 1.    Plaintiffs and Class Members

21.    The named Plaintiffs in this matter are Scott Keech and Allen Spradling. Keech worked at SCA from approximately February 2009 to March 2012 as a Regional Director of Operations and Clinical Services in the San Francisco, California area.[17] Spradling worked for Surgical Care Affiliates from September 22, 2008 to April 26, 2013 as a Manager in the Program Management Office, and then as a Director of Information Technology.[18]

---

[14] *Id.* ¶ 8.
[15] *Id.* ¶ 11.
[16] *Id.* ¶ 11.
[17] *See* Appendix ("App.") C.
[18] *Id.*

10

3154924.9

22.     Class Members are all Senior-Level Employees holding director-level or above positions, excluding senior officers and those in Defendants' legal, recruiting, and HR departments.[19] The Class is comprised of ███████ Class Members.[20]

### 2.     Defendants

23.     Defendant firms are among "the largest employers in the outpatient medical care center industry, with a nationwide reach,"[21] and the two individual Defendants are their former CEOs and key co-conspirators.

24.     <u>DaVita and Thiry.</u> Defendant DaVita Inc., colloquially referred to by DaVita employees as "The Village" or "DVA," is the largest Defendant in this litigation.

    a.     DaVita "owns and operates outpatient medical care facilities around the United States"[22] and has over 77,000 employees.[23]

    b.     DaVita focuses on kidney care, treating over 200,000 dialysis patients in the US.[24] It is "one of the largest providers of kidney care services in the US" and owns 2,675

---

[19] Compl. ¶ 92.

[20] To calculate the number of unique Class Members, I limit the structured data to the Conduct Period and count the number of unique employee hashed SSNs (a 64-character combination of letters and numbers that are designed to uniquely identify employees across companies, time, and other changes such as job title change) present across all three Defendant companies after removing outlier observations. *See* my workpapers (which include the data and code to replicate the empirical analyses conducted in this report) for details.

[21] Compl. ¶ 63.

[22] *Id.* ¶ 31.

[23] *About Us*, DAVITA REDWOODS, https://www.redwoods.davita.com/about-us (last visited Jan. 2025); *Investors*, DAVITA, https://investors.davita.com/ (last visited Jan. 2025); *Annual Report 2023*, DAVITA (Apr. 26, 2024), https://investors.davita.com/download/DaVita_2023_Annual_Report.pdf.

[24] *About*, DAVITA, https://www.davita.com/about (last visited Jan. 9, 2025).

3154924.9

outpatient dialysis centers in the United States.[25] DaVita also operates 367 centers located in 11 other countries worldwide.[26]

        c.      Formerly comprised of two divisions, DaVita Medical Group (formerly known as DaVita Healthcare Partners) and DaVita KidneyCare, DaVita sold its DaVita Medical Group business to Optum in 2019.[27]

        d.      Thereafter, Defendant Thiry, who was DaVita's CEO from 1999 to 2019, left DaVita, and then-CEO of DaVita KidneyCare Javier Rodriguez took over as CEO for the entire company.[28]

        e.      DaVita is based in Denver, Colorado.[29]

25.    <u>SCA and Hayek.</u> Defendant Surgical Care Affiliates, LLC is another dominant firm in the healthcare space.

        a.      SCA was the direct operating subsidiary of parent company Surgical Care Affiliates, Inc., which in 2017 became a wholly-owned subsidiary of UnitedHealthcare Group Inc., a subsidiary of Optum.[30]

---

[25] *Improving Health, Health Care and Quality of Life*, DAVITA, https://investors.davita.com/ (last visited Jan. 9, 2025).

[26] *Home*, DAVITA INVESTORS, https://www.davita.com/about (last visited Jan. 9, 2025).

[27] *Press Release: Optum completes acquisition of DaVita Medical Group from DaVita*, UNITEDHEALTH GROUP (Jun. 19, 2019) https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html; *Press Release: DaVita Medical Group Acquires Respected Physician Practices in the Orlando Area*, DAVITA NEWSROOM (Jul. 13, 2017), https://newsroom.davita.com/press-releases?item=123281.

[28] *See* App. C.

[29] *Contact Us*, DAVITA, https://www.davita.com/about/contact-us (last visited Jan 14, 2025).

[30] *Press Release: Surgical Care Affiliates (SCA), OptumCare to Combine*, UNITEDHEALTH GROUP (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html.

b. SCAI Holdings, LLC is a successor entity to Surgical Care Affiliates, Inc. and a subsidiary of UnitedHealthcare.[31] These various SCA entities all did business as "SCA" and conducted business as a single enterprise.[32]

c. SCA is comprised of over 320 ambulatory surgery centers.[33] SCA currently operates in 35 states and treats approximately one million patients each year.[34] It further employs 10,000 individuals and partners 9,200 physicians affiliated with its centers.[35]

d. SCA's facilities reportedly generate "more than $2 billion in revenue" annually through its range of surgical services, including orthopedics, ophthalmology, gastroenterology, pain management, otolaryngology, urology, cardiology and gynecology.[36]

e. Hayek was SCA's Chairman and CEO from May 2008 to January 1, 2018. Afterwards, and following a merger between SCA and OptumHealth, Hayek served as OptumHealth's CEO, through March 2019.[37]

f. SCA's main offices are in Birmingham, Alabama and Deerfield, Illinois.[38]

---

[31] SCAI Holdings, Certification and Notice of Termination of Registration (Form 15) (Apr. 3, 2017).

[32] Compl ¶ 22.

[33] *About Us*, SCA HEALTH, https://sca.health/about-us/ (last visited Jan. 9, 2025).

[34] Dan Luu, *How Many Locations Does Surgical Care Affiliates Have?*, NWCC-OR (Aug. 3, 2022), https://www.nwcc-or.com/how-many-locations-does-surgical-care-affiliates-have#:~:text=SCA%20Health%20is%20dedicated%20to,patients%2C%20providers%2C%20and%20community; *About Us*, SCA HEALTH, https://sca.health/about-us/ (last visited Jan. 9, 2025).

[35] *About Us*, SCA HEALTH, https://sca.health/about-us/ (last visited Jan. 9, 2025).

[36] Compl ¶ 23.

[37] *See* App. C; Deposition of Andrew Hayek (Sept. 18, 2024) [hereafter Hayek Dep.] at 35:20–23, 190:2–9.

[38] *See Contact Us*, SCA HEALTH, https://sca.health/about-us/contact/ (last visited Jan. 2025) (Naming Birmingham as the location of Alabama Corporate Headquarters); *SCA Health*, LINKEDIN, https://www.linkedin.com/company/scahealth (last visited Jan. 2025) (Showing SCA being based in Deerfield, Illinois). *See also* Hayek Dep. 197:22–198:6 (█████████████ █████████████████████████████████████████████████████████).

13

26.     USPI. Defendants United Surgical Partners International, Inc. and United Surgical Partners Holdings, Inc. comprise the largest ambulatory surgery company in the country, with more than 535 surgical centers.[39]

a.     USPI is a subsidiary of Defendant Tenet Healthcare Corporation.[40] In June 2015, Tenet merged with USPI.[41]

b.     USPI has over 21,000 employees,[42] including over 6,000 physician partners.[43] It performs over 2 million procedures annually across 37 states.[44]

c.     Bill Wilcox served as USPI's CEO from 2004 to 2018, after which former USPI COO Brett Brodnax replaced him.

d.     USPI's main office is in Dallas, Texas.[45]

## V.     Evaluating Evidence of The Challenged Conduct

27.     In this section, I evaluate the Challenged Conduct from an economic perspective. I first explain how the economic literature views collusion generally, and no-poach agreements and exchanges of CSI specifically. Economic theory clearly establishes that no-poach agreements and exchanges of CSI tend to anticompetitively suppress worker wages and are not in a firm's unilateral self-interest. That is, if the Defendants did engage in a no-poach agreement

---

[39] *Who We Are*, UNITED SURGICAL PARTNERS INT'L, https://uspi.com/about-us/who-we-are/default.aspx (last visited Jan. 9, 2025).

[40] Compl. ¶¶ 24, 28.

[41] *Press Release: Tenet Completes Purchase of USPI from WCAS*, INVESTOR TENET HEALTH (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx.

[42] Compl. ¶ 25.

[43] *Home*, UNITED SURGICAL PARTNERS INT'L, https://uspi.com/home/default.aspx (last visited Jan. 9, 2025).

[44] *Home*, UNITED SURGICAL PARTNERS INT'L, https://uspi.com/home/default.aspx (last visited Jan. 9, 2025).

[45] Compl. ¶ 36. App. E.

14

or exchange CSI, the economic theory would predict that the Class Members who worked for the Defendants would be anticompetitively harmed by this conduct.

28. Armed with this economic background, I then evaluate whether the qualitative and quantitative evidence in this matter is *consistent* with anticompetitive conduct and inconsistent with unilateral conduct. To do this, I first explain how Economists typically use qualitative and quantitative evidence to evaluate the Challenged Conduct, and then proceed to do so using the evidence in this case.

a. Economists consider qualitative evidence when studying economically significant aspects of cartel behavior, and economists frequently bring their expertise to bear in analyzing documentary evidence of communications among cartel members and other qualitative aspects of cartel organization and behavior.[46] For example, economists will consider evidence of communications between horizontal competitors regarding the restriction of competition to aid in assessing what products, services, or inputs may be affected. An economist may also assist in

---

[46] *See, e.g.*, Margaret C. Levenstein & Valerie Y. Suslow, *What Determines Cartel Success?*, 44 J. ECON. LITERATURE 43–95 (2006) [hereafter Levenstein & Suslow (2006)]. Professors Margaret Levenstein and Valerie Suslow review the empirical economic literature studying the determinants of cartel success. They explain that economists recognize that cartels often achieve collusion through the "development of sophisticated and flexible organizations," which they establish "over time as a result of organizational learning." *Id.* at 67. Economists also recognize the "difficulties in observing and quantifying such information [on organizational learning] for a large number of industries." *Id* at 69. For this reason, economic case studies, which focus on a single cartel within a single industry, relying less on large data sets and more on qualitative evidence, "are much more amenable to studying organizational issues[.]" *Id.*

evaluating whether such communications are in a firm's unilateral self-interest, or if the action requires another firm to collude for the action to be beneficial.[47]

b.       Economists also use quantitative evidence by observing whether the period of alleged Conduct is associated with supracompetitive market outcomes. For example, an economist can empirically observe whether rates of employees switching between firms who are parties to a no-poach agreement were diminished when the agreement was in place. Economists can also evaluate whether employee compensation was suppressed during alleged misconduct.

29.      I find that both the qualitative and quantitative evidence is



---

[47] *Prosecuting Cartels without Direct Evidence of Agreement*, ORG. FOR ECON. COOP. & DEV. (Sept. 11, 2006), https://www.oecd.org/content/dam/oecd/en/publications/reports/2006/05/prosecuting-cartels-without-direct-evidence-of-agreement_75732b6f/9640e3d4-en.pdf at 18 ("Economic theories of oligopoly provide several valuable insights for competition law enforcers: They show that acts consistent with unilateral incentives can lead to a different outcome than when firms act collectively, and that oligopoly does not inevitably lead to cooperation and collective action to increase prices. As a result, enforcers and decision makers should carefully examine whether firm conduct can be described as actions in unilateral self-interest absent an agreement to act jointly, or as actions in the collective interest of all competitors. Conduct consistent with unilateral self interest does not constitute good evidence in a circumstantial cartel case.").

3154924.9

### A. Economic Background of the Challenged Conduct

30. In this section I review the economic background of collusion. Collusion among horizontal competitors enables those firms to increase their market power in both product markets (referred to as "Monopoly Power") and input markets (referred to as "Monopsony Power"). I then explain how the two specific forms of collusion at issue here—no-poach agreements and CSI exchanges—would be expected to suppress employee compensation.

### 1. Collusion Gives Firms Monopsony Power

31. Collusion occurs when a group of buyers or sellers coordinate their economic behavior to collectively approximate (or even replicate) the same pricing and associated profits of a monopolist (for sellers) or monopsonist (for buyers).[48]

32. Economists have long recognized that monopolists and monopsonists enjoy greater profits than firms in competitive industries.[49] In the case of a monopsonist, a firm with monopsony power (i.e., buying power) sets the prices at which they will purchase inputs (such as labor) below what would be realized in a competitive market, increasing the monopsonist's own profits at the expense of the employee.

33. Such a position is obviously desirable for a firm, but difficult to obtain because antitrust law impedes a firm from acquiring all of its input market rivals to make itself a true monopsonist.[50]

---

[48] *See generally*, DENNIS W. CARLTON & JEFFERY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION, 122–154 (4th ed. 2005) [hereafter MODERN IO 4TH ED.].

[49] *See* N. GREGORY MANKIW, PRINCIPLES OF MICROECONOMICS, 291–292 (Cengage 8th ed. 2018) [hereafter MANKIW] ("Because these laws give one producer a monopoly, they lead to higher prices than would occur under competition. But by allowing these monopoly producers to charge higher prices and earn higher profits, the laws also encourage some desirable behavior.")

[50] ROBERT C. MARSHALL & LESLIE M. MARX, THE ECONOMICS OF COLLUSION, CARTELS AND BIDDING RINGS, 4 (MIT Press 2012) ("[T]he successful suppression of interfirm rivalry can produce relatively quick improvements in profits . . . [however] there are many circumstances in which collusion is illegal.").

3154924.9

34.     If a group of firms in an industry reach an agreement to not compete with one another for inputs, however, they can achieve monopsony-like prices and profits (supra-competitive outcomes) by collectively behaving like a single buyer of inputs.[51] In the case of a service market for labor, monopsony power is commonly achieved by an agreement not to compete over labor, or to coordinate the price setting of labor below competitive levels among firms that hire similar employees. Such agreements are termed "collusion," and the group of firms with such an agreement is called a "cartel."[52]

### 2.     The Economics of No-Poach Agreements

35.     A no-poach agreement is an agreement between firms to limit or restrict competition for each other's employees.

36.     From an economic perspective, an agreement to suppress competition in an input market (i.e., labor is an input to delivering a product or service) is directly analogous to an agreement to suppress competition in an output market (i.e., a product or services market).

37.     For example, if Defendants had agreed to suppress competition in a product market through a market-allocation agreement (divvying up markets to each firm and agreeing not to compete in markets assigned to another firm),[53] the predicted result would be

---

[51] *Id*. at 7 ("A monopolist internalizes the consequences of decreased output and so achieves enhanced profits. In contrast, when prices increase as a consequence of collusion, each colluding firm has a strong profit incentive not to restrict its own output."). Colluding firms do not need to achieve the optimal monopoly price to enjoy enhanced profits. Any supra-competitive price (that is, prices above what would exist in competition) benefits the firms at the expense of customers.
[52] MANKIW at 339 ("collusion[:] an agreement among firms in a market about quantities to produce or prices to charge"; "cartel[:] a group of firms acting in unison[.]").
[53] *Price Fixing, Bid Rigging, And Market Allocation Schemes*, DOJ (Feb. 2021), https://www.justice.gov/atr/price-fixing-bid-rigging-and-market-allocation-schemes at 3 ("Market division or allocation schemes are agreements in which competitors divide markets among themselves. In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves.").

18

unambiguously anticompetitive, with higher prices (and lower output) than would otherwise prevail.[54] Similarly, if Defendants here agreed to lessen competition for Senior-Level Employees by ceasing solicitations or cold calling for recruitment purposes between them, the predicted result is lower compensation for Senior-Level Employees and less mobility between Defendants.

38.     No-Poach Agreements Yield Monopsony Power. A no-poach agreement is a means of restricting prices in the input market by allowing would-be competitors to behave with more monopsony power.[55] In other words, when firms agree not to compete for labor, they effectively enter into an allocation agreement in the input market for employees, such that employees *artificially* face fewer purchasers for their services.

39.     A no-poach agreement restricts the mobility and bargaining leverage of the employee in three ways: (i) directly by reducing efforts by firms to reach out to other company's employees; (ii) by rebuffing individual efforts to join the other companies covered by the agreements; and (iii) indirectly by reducing the information about outside options available to employees. For example, in a competitive environment, when a firm actively solicits a rival's employee, they impart information to that employee about what the solicitor is willing to pay for

---

[54] S*ee, e.g.*, MANKIW at 339 ("Once a cartel is formed, the market is in effect served by a monopoly and we can apply our analysis from Chapter 15. That is, if Jack and Jill collude, they will agree on the monopoly outcome because that outcome maximizes their total profit. Our two producers produce a total of 60 gallons, which sell at a price of $60 a gallon. Once again, price exceeds marginal cost, and the outcome is socially inefficient.").

[55] *See* Section IX, describing monopsony power; *see also* Alan B. Krueger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, 57 J. HUMAN RESOURCES S324–S348, S332 (2022) [hereafter Krueger & Ashenfelter (2022)] (describing the phenomenon of no-poach agreements as "equivalent to making the group [] a single employer in this labor market[.]").

3154924.9

the employee's services. Even if that employee does not end up switching, this information may be used to negotiate for a higher rate from their current employer.[56]

40.     A recent 2022 report by the U.S. Department of the Treasury on *The State of Labor Market Competition* classified no-poach agreements as a form of "restrictive employment agreement."[57] As shown in **Figure 1** below, other types of restrictive employment agreements include noncompete agreements, non-solicitation agreements, non-recruit agreements, training-repayment agreements, and non-disclosure agreements. A no-poach agreement, like all of the restrictive employment agreements listed in **Figure 1**, limits an employee's outside employment options. The key distinction between no-poach agreements and the other restrictions listed in **Figure 1** is that the no-poach agreement operates between firms, where the workers affected by the no-poach agreement are likely to be unaware of its existence. In contrast, the other types of agreements (noncompete, non-solicit, training repayment, non-disclosure) are all agreed to by the employee.

41.     The fact that workers in general do not choose to enter into a no-poach agreement—but that it then constrains their subsequent job options—suggests that workers will not in general be able to demand compensating differentials in exchange for the subsequent

---

[56] *See* ROGER FISHER & WILLIAM URY, GETTING TO YES, 100 (2nd ed. 1983) [hereafter GETTING TO YES] ("The reason you negotiate is to produce something better than the results you can obtain without negotiating. What are those results? What is that alternative? What is your BATNA—your Best Alternative To a Negotiated Agreement? That is the standard against which any proposed agreement should be measured. That is the only standard which can protect you both from accepting terms that are too unfavorable and from rejecting terms it would be in your interest to accept. . . . If you have not thought carefully about what you will do if you fail to reach an agreement, you are negotiating with your eyes closed.").

[57] *See, e.g., The State of Labor Market Competition,* U.S. DEP'T OF TREASURY (Mar. 7, 2022), https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf at 13.

3154924.9

restrictions on their mobility. Thus, a no-poach agreement, like the other restrictions, "weakens workers' bargaining power and raises hiring costs for other firms."[58]

42.     All else equal, restrictive covenants "lock-in" employees to their employers, which results in lower worker mobility and "a flat or declining wage profile."[59]

**Figure 1: Types of Restrictive Employment Agreements[60]**

| Clause | Description |
| --- | --- |
| Non-compete agreements | Former employee cannot work for a competitor following separation. Typically applies for a certain amount of time, over a certain geographic area, and within a specific industry. |
| Non-solicitation agreements | Employee agrees to not solicit a company's clients or customers for their own benefit, or the benefit of a competitor, after leaving the company. |
| Non-recruitment agreements | Employee or former employee is forbidden from recruiting employers' employees away from employer for a period. |
| Training repayment agreements | Employee must repay the cost of training provided by employer if they leave employment prior to some period. Agreement is typically pro-rated based on length of employment following training. |
| Non-disclosure agreements | Prevents employee or former employee from disclosing information. Meant to protect information that is both confidential and valuable. |
| No-poach agreements | Two or more employers agree to not solicit or hire each other's current or former employees. |

---

[58] *Id.* at 16 ("By design, non-compete agreements limit employees' outside options, which, in turn, weakens workers' bargaining power and raises hiring costs for other firms.").

[59] *Id.* at 16. Note that the economic literature may refer to "wages," "pay," or "compensation." "Wages" tends to specifically refer to the dollar compensation given to employees in exchange for work. "Pay" and "compensation" tend to refer to the total compensation employees receive, which can include non-wage benefits (i.e., healthcare, 401k matching, stock options, etc.) in addition to dollar compensation.

[60] *Id.* at 14.

3154924.9

43.     In economic terms, no-poach agreements give employers monopsony power, meaning they face less competition for workers. The way that monopsony power is often measured in the economic literature is by the "elasticity of labor supply" to the firm. This measure considers how changes in the firm's wages affect the labor supply to the firm. When this value is low, it means that the firm's workers are not sensitive to wage changes at the firm, which allows the firm to mark down their wages relative to how much they produce for the firm.[61] This is perhaps most intuitively understood in dynamic models, where the firm's elasticity of labor supply comes from how likely workers are to quit their jobs if the firm were to reduce their wages.[62] If the firm can lower its wages without losing workers, then it has a low labor supply elasticity and greater monopsony power. That is, when workers cannot or will not leave a job even when wages are lower, the firm can drive down employee compensation relative to the value the employee adds to the firm. Thus, firms can suppress wages below (or further below) competitive levels by engaging in conduct that has the effect of limiting employee mobility and thus dampening their firm's labor supply elasticity.

---

[61] *See, e.g.*, Suresh Naidu et al., *Antitrust Remedies for Labor Market Power*, 132 HARV. L. REV. 536, 557 (2018) (discussing supply curves in a labor context) ("Residual labor supply elasticity is a simple measure of a firm's labor market power. If workers do not quit even if the firm lowers wages significantly (elasticity is low), then the firm enjoys significant market power over the workers. This is the number that antitrust policy focuses on. If the residual labor supply elasticity that a firm faces is high, then the labor market from which a firm draws its workers is competitive, and the firm cannot 'exploit' workers.").

[62] *See, e.g.*, ALAN MANNING, MONOPSONY IN MOTION: IMPERFECT COMPETITION IN LABOR MARKETS, Chapter 4 (2003).

22

3154924.9

### a. Extensive Literature Discusses Harms Caused by No-Poach Agreements

44. There is robust economic literature demonstrating how no-poach agreements suppress labor supply elasticities and affect compensation.[63]

45. For example, economists Dr. Alan Krueger and Dr. Orley Ashenfelter (2022) built no-poach agreements into a dynamic job search model, showing how they dampen the labor supply elasticity faced by an employer by reducing the rate at which workers receive outside job offers, thereby allowing the employer to drive a larger wedge between how much the firm pays the worker and how much revenue the worker produces for the firm.[64] They write, "no-poaching

---

[63] *See, e.g.*, Kevin Caves & Hal Singer, *When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer-Welfare Standard*, 26 GEO. MASON L. REV 395, 410–411 (2019) [hereafter Caves & Singer (2019)]; *see also* Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,* ANTITRUST SOURCE (2015) at 3–4. *See also Justice Department and Federal Trade Commission Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation*, DOJ (Oct. 20, 2016), https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-guidance-human-resource-professionals ("Workers are entitled to the benefits of a competitive market for their services. They are harmed if companies that would ordinarily compete against each other to recruit and retain employees agree to fix wages or other terms of employment or enter into so-called 'no-poaching' agreements by agreeing not to recruit each other's employees."); *see also No More No-Poach: The Antitrust Division Continues to Investigate And Prosecute "No-Poach" And Wage-Fixing Agreements*, DOJ (Apr. 10, 2018), https://web.archive.org/web/20230408175427/https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements ("When companies agree not to hire or recruit one another's employees, they are agreeing not to compete for those employees' labor. The same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services. After all, workers, like consumers, are entitled to the benefits of a competitive market. Robbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment.").

[64] Krueger & Ashenfelter (2022).

agreements increase employer concentration and have the potential for driving a wedge between the value of a worker's marginal product and wage."[65]

46.     In their empirical analysis, Krueger and Ashenfelter examine in detail a series of no-poach agreements within many large franchises. In an addendum to their paper, they later describe how the Washington State Attorney General reached an agreement with the franchises to remove their no-poach agreements.

47.     Two recent papers study how the removal of these no-poach agreements in the franchise context affect compensation. In one study, Callaci et al. (2024) found that the Washington State Attorney General's enforcement campaign against no-poach clauses increased posted annual compensation by 6 percent and increased worker-reported earnings by 4 percent.[66]

48.     In another study by Lafontaine et al. (2024), the removal of no-poach agreements in the chain restaurant industry "caused wages in those chains to rise by about 5% relative to chains that did not have" no-poach agreements.[67] Lafontaine et al. (2024) conclude: "[W]e find strong support for the hypothesis that NPCs increased buyer power, limited workers' labor market opportunities, and suppressed wages."[68]

49.     Perhaps more germane to the present context is a study of the Silicon Valley no-poach case by Gibson (2024). Therein, Gibson examines the effects of the no poach agreements between Silicon Valley tech giants on salary and non-salary compensation. He finds that, as a lower bound, a single no-poach agreement for one year reduced salaries by 5.6 percent.[69] He also

---

[65] *Id.* at S331.

[66] Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings*, REV. ECON. & STATISTICS 1–35, 1 (2024).

[67] Francine Lafontaine, Saattvic Saattvic, & Margaret Slade, *No–Poaching Clauses in Franchise Contracts: Anticompetitive or Efficiency Enhancing*, SSRN (Sept. 9, 2024) at 1.

[68] *Id.* at 35.

[69] Matthew Gibson, *Employer Market Power in Silicon Valley*, UPJOHN RESEARCH (2024) at 3.

3154924.9

finds that a no-poach agreement reduced the probability of a positive stock bonus by 8.3 percentage points and reduced stock bonuses on average by 79.6 percent.[70] Gibson's explanation for the reduction in stock bonuses is that "[a] firm engaged in no-poaching agreements has less need to offer employees incentives to stay[.]"[71] Put differently, stock compensation generally ties the worker to the firm by aligning company performance and individual payouts—but if there is less need to worry about worker retention then there is less need to provide stock compensation.

50.     While no-poach agreements are only one way to suppress labor market competition, the idea that firms can suppress pay by limiting employee outside options has broad support throughout the economics literature.

51.     A prominent early study on labor mobility found that for the first 10 years of a worker's career, the wage gains from changing jobs accounted for one third of their total wage growth.[72] More recently, Caldwell and Danieli (2024) develop a method for estimating individual-level outside options and study how it relates to earnings.[73] They find that a ten percent increase in outside options increases earnings by 1.7 percent.[74] Similarly, researchers studying other restraints on employee mobility have found that they reduce worker pay. For example, both low-wage and high-wage bans on noncompete clauses raise compensation by 2-5

---

[70] *Id.* at 20.

[71] *Id.* at 20.

[72] Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men,* 107 Q. J. ECON. 439–479, 442 (1992) ("Wage gains at job changes average about 10 percent, and account for about one third of total wage growth during the first ten years in the market."). *See also* Serdar Ozkan et al., *Anatomy of Lifetime Earnings Inequality: Heterogeneity in Job-Ladder Risk versus Human Capital*, 1 J. POL. ECON. MACROECONOMICS 506–550, 506 (2023) (The authors studied the effects of job switching on lifetime earnings, finding that job switching is prevalent both among low earners and high earners relative to the median earners, indicating that the nature of job switching is different across earning categories.).

[73] Sydnee Caldwell & Oren Danieli, *Outside Options in the Labour Market*, REV. ECON. STUDIES (2024).

[74] *Id.*

3154924.9

percent on average, including by up to as much as 21 percent for workers with noncompetes.[75]

Similarly, workers with noncompete, non-solicit, and non-disclosure restrictions have 3-7

percent lower earnings on average than workers with only a nondisclosure agreement.[76]

52.     Taken together, this body of research suggests that firms' suppression of worker

mobility, whether via a no-poach agreement, noncompete agreement, or other mechanism that

limits workers' outside options, leads to lower worker compensation. These mechanisms lower

workers' mobility and bargaining power,[77] which translates into lower pay.[78]

---

[75] *See* Michael Lipsitz & Evan Starr, *Low-wage workers and the enforceability of noncompete agreements*, 68(1) MGMT. SCI. 143–170, 143 (2022). *See also* Natarajan Balasubramanian at el., *Locked in? The enforceability of covenants not to compete and the careers of high-tech workers*, 57 J. HUMAN RES. S349–S396, S349 (2022); Takuya Hiraiwa, Michael Lipsitz & Evan Starr, *Do firms value court enforceability of noncompete agreements? A revealed preference approach*, REV. OF ECON. & STATISTICS 1–71 (2024); B. N. Greenwood, B.H. Kobayashi, & E. Starr, *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation*, DONALD G. COSTELLO COLL. OF BUS. AT GEORGE MASON UNIV. RESEARCH PAPER (2024). *See also* Matthew S. Johnson et al., *The labor market effects of legal restrictions on worker mobility*, FEDERAL TRADE COMMISSION 1–77 (2021).

[76] Natarajan Balasubramanian, Evan Starr & Shotaro Yamaguchi, *Employment restrictions on resource transferability and value appropriation from employees*, STRATEGIC MGMT. J. 2519–2547, 2522 (2024).

[77] John M. McAdams, *Non-Compete Agreements: A Review of the Literature*, SSRN 5 (2019) ("In a Nash bargaining model, equilibrium wages will be determined by the bargaining power and outside options of each party to the negotiation. A worker's outside options could include outside wage offers generated from on-the-job search, expected wage offers from job search during unemployment, or non-market activities. A worker with generous outside wage offers, for example, will have greater negotiating leverage and hence will tend to receive higher wages than a worker with less generous offers.").

[78] In classic negotiation theory, a negotiator's "strength" relative to her counterparty is determined by her "Best Alternative To a Negotiated Agreement" or "BATNA." *See, e.g.*, GETTING TO YES at 102–104. As the value of a negotiator's BATNA increases, she can press for more favorable terms from her counterparty. A "strong" negotiator has many attractive outside options should the present negotiation fail, while a "weak" negotiator has a poor or no alternative to the present negotiation—consider a job candidate with five other options versus a candidate with none. Empirical studies on the strength of one's BATNA confirm that having strong alternatives significantly increases the share of value that a negotiator can claim. *See also* Robin L. Pinkley et al., *The Impact of Alternatives to Settlement in Dyadic Negotiation*, 57 ORGANIZATIONAL BEHAV. & HUMAN DECISION PROCESSES, 97–116, 97 (1994).

3154924.9

### b. No-Poach Agreements Can Broadly Suppress Employee Pay

53. Importantly, where there is a single market-clearing wage, a no-poach agreement would tend to have widespread compensation suppression effects across *all* employees, and not just the compensation for employees who would have been poached in a but-for world.

a. This is true because the decision to purchase additional units of a good or service raises the price that must be paid for all units.[79] Just as the market price for a product is determined by the most price-sensitive customers on the product's demand curve, the market price paid to a service provider is determined by the most wage-sensitive input providers on the supply curve.[80] Agreements to lessen competition for employees therefore have the capacity to suppress the compensation paid to employees generally, and not just the wages of those employees whose mobility is directly suppressed by the alleged no-poach agreement. In a dynamic labor market search model, no-poach agreements suppress pay broadly by reducing the rate at which job offers are made. Notably, the rate of job offers can still affect pay even if those

---

[79] ROBERT PINDYCK & DANIEL RUBINFELD, MICROECONOMICS, 384 (9th ed. 2017) ("The decision to buy an extra unit raises the price that must be paid for *all* units, not just the extra one.").

[80] In economic terms, suppression of the market wage affects not just marginal workers, but also inframarginal workers. Similarly, a price-fixing conspiracy causes inflated prices for all buyers, not just marginal customers. *See, e.g.*, DENNIS W. CARLTON & JEFFERY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION (3rd ed. 2000) [hereafter MODERN IO 3RD ED.] at 105–107. *See also* Johnathan Masur & Eric A. Posner, *Horizontal Collusion and Parallel Wage-Setting in Labor Markets*, UNIVERSITY OF CHICAGO LAW SCHOOL CHICAGO UNBOUND, Coase-Sandor Working Paper Series in Law & Econ. No. 941 (2022) at 8–9 (describing how salaries between marginal and inframarginal employees are connected). *See also* Caves & Singer (2019) at 412 (explaining how in an employee context, "do not call lists" to recruit individualized employees results in generalized wage suppression: "top executives at several of the most prominent firms in Silicon Valley, including Adobe, Apple, Intel, and Google, allegedly conspired to restrict recruiting and hiring of technical, creative, and research-and-development employees via so-called 'do not call lists' as a mechanism for suppressing compensation").

3154924.9

job offers are turned down. This is because those job offers can be used as leverage for bargaining for a raise at the current employer. [81]

54.     Further, as discussed in detail below in Section VII.F, there is ample qualitative and quantitative evidence that Defendants' employee compensation is highly correlated due to the presence of Defendants firms' compensation structures. Thus, any dampening of competition for individual Senior-Level Employees could reasonably flow through to affect the compensation paid to all Senior-Level Employees in the Class.

### 3.     The Economics of CSI Exchanges

55.     Economists and antitrust authorities have long recognized that exchanges of CSI among horizontal competitors—or exchanges of information regarding price, quantity, capacity, costs, and specific customers, shared among participants that are actual or potential competitors—can and does help effectuate collusive outcomes.[82]

---

[81] Fabien Postel-Vinay & Jean-Marc Robin, *To match or not to match?: Optimal wage policy with endogenous worker search intensity*, 7 REV. ECON. DYNAMICS 297–300, 297 (2004) (explaining how it may be optimal for an "employer to try to retain the employee by matching the offer. This results in a wage increase for the worker."); *see also* P.F. Cahuc et al., *Wage Bargaining with On-the-job Search: Theory and Evidence*, 74 ECONOMETRICA 323 (2006) (explaining, "We find that between-firm competition matters a lot in the determination of wages.").

[82] The FTC defines competitively sensitive information as "information relating to price, cost, output, customers, or strategic planning." *See* Michael Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (citing *Antitrust Guidelines for Collaborations Among Competitors,* DOJ & FTC (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf [hereafter *Guidelines*]); *see also Guidelines* at 15 ("[T]he sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may

56.     The direct sharing of prices (i.e., what a firm intends to pay or intends to sell at), is the precursor to what economists and antitrust practitioners consider a traditional "naked" price-fixing agreement.[83]

57.     This is the most straightforward type of collusion, whereby "rival sellers in some manner arrive at an understanding as to what price [to charge]," similar to how a monopolist would set its own prices.[84]

58.     In this case, discussed at length below, Plaintiffs allege that Defendants shared CSI on ██████████████████████████████████████████████████ ███████████████ Such a price-fixing agreement has relatively straightforward economic effects: fixing prices for Senior-Level Employee pay reduces the value of searching for and moving to a new job, allowing companies to depress their compensation without suffering mobility losses. ██████████████████████████████████████████ ██████████████████████████████████████████████████

---

increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables."). In a recent case brought by the DOJ against U.S. meat packers accused of CSI exchanges, the DOJ found that the defendants exchanged in "direct exchanges of compensation information" and that "[b]y exchanging large amounts of current and future, disaggregated, and identifiable data, the processors collaborated to accumulate a set of industry compensation information they could use to set their workers' wages and benefits at a nationwide level (for example, to set budgets on plant worker spending across the country) or locally (for example, to determine pay for shoulder cutters in a specific plant)." Complaint, *United States v. Cargill Meat Solutions Corp., et al.*, No. 1:22-cv-01821-ELH (D. Md. Jul. 25, 2022)¶ 110.

[83] *Price Fixing*, FTC, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/price-fixing (last visited Dec. 11, 2024) ("A naked agreement among competitors to fix prices is almost always illegal, whether prices are specified at a minimum, maximum, or within some range. Illegal price fixing occurs whenever two or more competitors agree to take actions to raise, lower, maintain, or stabilize the price of any product or service.").

[84] Levenstein & Suslow (2006) at 45.

29

**B.** ███████████████████████████████████████████████████████

59.     Below, I review the criteria economists use to assess no-poach agreements. I then review whether the evidence meets these criteria. I find that ████████████████████ ████████████████████████████████████

### 1.     Economic Criteria for Assessing No-Poach Agreements

60.     Evidence of a no-poach agreement itself is typically qualitative. Economists and courts recognize that no-poach agreements "may be express or implied, written or oral."[85]

61.     For example, in the no-poach article by Professors Krueger and Ashenfelter described above, the no-poach agreements were formally written within franchise contracts, but the authors imply that the no-poach agreement at issue there also extended *informally* to entities beyond the written agreement.[86]

62.     Similarly, in the antitrust case *In re Animation Workers Antitrust Litigation*, "agreements between [] companies were expressed orally."[87]

63.     In *In re High-Tech Employees Antitrust Litigation*, the Google-Intel agreement took the form of a "handshake 'no recruit'" between executives.[88]

---

[85] Rochelle T. Davis, *Talent Can't Be Allocated: A Labor Economics Justification for No-Poaching Agreement Criminality in Antitrust Litigation*, 12 BROOKLYN J. CORP., FIN. & COM. LAW 279–310, 281 (2018).

[86] Krueger & Ashenfelter (2022) at S331 ("[I]t is apparent that franchise no-poaching agreements increase employer concentration and have the potential for driving a wedge between the value of a worker's marginal product and the wage. From this point of view, franchise agreements have the same anticompetitive effects in labor markets as mergers do in product markets.").

[87] Rochelle T. Davis, *Talent Can't Be Allocated: A Labor Economics Justification for No-Poaching Agreement Criminality in Antitrust Litigation*, 12 BROOKLYN J. CORP., FIN. & COM. LAW 279–310, 281 (2018) at n.10.

[88] *Id.* at 281, n.12.

3154924.9

64.     Implied or oral no-poach agreements are more difficult to detect given there is no paper trail. However, regardless of how they are made, the economic import is in the substance of the no-poach conduct, not its form.

65.     Therefore, qualitative evidence of a no-poach agreement would include any evidence of communication or coordination among horizontal competitors with the intent or effect of reducing competition for each other's employees. Any communications that reference a prohibition on hiring, recruiting, or soliciting a rival's employees constitute direct evidence of a no-poach agreement.

66.     Quantitative evidence of a no-poach agreement would be an attendant decrease in employee mobility between firms with an active no-poach agreement. A generalized suppression of wages during the period of the no-poach agreement would also be consistent with the existence of such an agreement.

67.     In contrast, evidence consistent with unilateral conduct in this instance might be a choice not to hire from a horizontal competitor because it is the company's own best interest, absent any other changes in behavior from other economic actors. For example, a company might not hire from another because they have low quality employees. However, I have seen no evidence consistent with unilateral conduct. Moreover, the direct and repeated communications between Defendants as they relate to beginning and enforcing the No Poach Agreements is inherently inconsistent with unilateral conduct.

        2.      ███████████████████████████████████

68.     Ample qualitative record evidence ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ .[89] Based on the evidence below, the agreement appears ████████████

████████████

69. <u>The DaVita-SCA Agreement's Beginnings.</u>

a. ████████████████

i. The No-Poach Agreement between DaVita and SCA ████████

█████████████████████ .[90] In an ██████ email to Hayek after his departure, Thiry wrote, ████████████

████████████████████████

█████████████████████ [91]

ii. As soon as he started at SCA, ██████████████

█████████████████████ . In a ██████ email to Thiry, Hayek wrote, ████████████████

████████████████████████

████████████████████████

████████████████████████

████ [92]



---

[89] Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 4, 2022) at 22:11–15 (at trial, DaVita told the jury ████████████████████████ ██████████ .

[90] Hayek Dep. at 74:15–21; Ex. PX158 at 455:25–456:3; Ex. PX484 at DVA_OMCEAL_000429388–9.

[91] Ex. PX485 at DVA00006531.

[92] Ex. PX484 at DVA_OMCEAL_000429389.

3154924.9

iii.       Also in ███████, Hayek recruited DaVita's then-Division Vice President ("DVP") Michael Rucker to help run SCA.[93] ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████[94]

iv.       Nevertheless, Rucker ████████████████████████

████████████████.[95] In response, Thiry emailed Hayek to ████████████████

████████████████████████[96]

v.       According to former DaVita COO Dennis Kogod, Thiry also ██████ Hayek, and told him that Rucker's departure could create ████████████ ██████ for DaVita, because Thiry ████████████████████████████

████████████████████████████[97] Indeed, Hayek testified that Thiry

████████████████████████████████████████████████████

████████████████████[98] Thiry emailed Hayek to explain, ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[93] *See id. See also* Deposition of Michael Rucker (Aug. 27, 2024) [hereafter Rucker Dep.] at 55:18–56:12 (Rucker stating that ████████████████████).

[94] Ex. PX305 at DOJCIV-008-00000171. *See also* Rucker Dep. at 59:10–60:3.

[95] Rucker Dep. at 31:25–32:9.

[96] Ex. PX304 at DOJCIV-008-00000301.

[97] Ex. PX485.

[98] Hayek Dep. at 93:7–95:14, 11:4–115:1 and Ex. PX304.

33



[99]

        vi.      The record evidence shows that ██████████████████████

██████████████████████████████ [100] Subsequent email exchanges

between Thiry and Hayek outlined ███████████████████████████████

---

[99] Ex. PX484 at DVA_OMCEAL_000429390.

[100] Deposition of Kent Thiry (Aug. 16, 2024) [hereafter Thiry Dep.] at 86:24–87:20 (Thiry admitted he was ████████████████████████████████████████); *id.* at 145:23–146:7 (Thiry and Hayek were ████████ which Thiry ████████████); Hayek Dep. at 94:8–25 (Hayek agreed that ██████████, stating, ██████████ ████████████████████████████). *See also id.* at 149:21–150:12 ( ██████████████████████████████████████ .

3154924.9



███ [101] Hayek testified at DaVita's criminal trial that he understood Thiry's message to be a warning of a downward spiral of retaliatory recruitment.[102]

    70.    <u>The Terms of the Agreement.</u>

        a.    ███

            i.    According to former DaVita COO Dennis Kogod, the ███

███ [103]

            ii.    Hayek likewise testified that the Agreement was ███.[104]

            iii.    Under the terms of the agreement, DaVita and SCA could ███

███.[105] ███[106]

        b.    ███

---

[101] Ex. PX316 at DVA00019822 ███ . *See also* Hayek Dep. at 103:5–14 (Hayek agreed that he understood ███ ; Ex. PX316 at DVA00019820 ( ███ ).

[102] Ex. PX158 at 468:7–21 (Hayek testified at the criminal trial that he understood Thiry to be threatening "a downward spiral or cycle of, you know, retaliatory acting and then more retaliation [*i.e.*, recruitment of each other's executives].").

[103] Deposition of Dennis Kogod (Sept. 6, 2024) [hereafter Kogod Dep.] at 153:10–154:10.

[104] *See* Hayek Dep. at 168:25–169:9; DOJCIV-007-00000084 at DOJCIV-007-00000084.

[105] Deposition of Michael Staffieri (Apr. 5, 2024) [hereafter Staffieri Dep.] at 35:2–22; Ex. PX313 at DOJCIV-008-00000187.

[106] Ex. PX158 at 473:21–25.



i.      Later, DaVita and SCA ████████████████████

████████████████████ Hayek testified that the ████████████

████████████████████████████████

████████████████████████████████

████████████[107] DaVita COO Michael Staffieri testified that ██████████

████████████████████████████

████████████████████████████

████████████[108] ████████████████████

████████████████████████[109] The agreement

████████████████████████████

████[110]



[107] Ex. PX158 at 475:13–18.

[108] Ex. PX158 at 473:21–25; Staffieri Dep. at 40:17–41:9 (Staffieri testified ██████████████████████████████████████████████████████████); Ex. PX30 at SCA002213759–60 ████████████████████████████████████████████████████ ); Kogod Dep. at 80:3–7 ████████████████████████

[109] Ex. PX13 at DVA_OMCEAL_000397493 (Thiry instructed that ████████████████████████████████████████ ).

[110] Staffieri Dep. at 48:11–22 (Staffieri testified that ████████████████████████████████ .

3154924.9



ii.     Hayek referred to █████████████████████

████████████████████████████████████████████

███████████████████ [111]

iii.    Kogod testified at deposition that he understood ████████

████████████████████████████████████████

████████████████████████████████████████████

██████████ [112]

iv.    Hayek similarly characterized ████████████████

████████████████████████████████████████████

██████ [113]

c.    ██████████████████ The No-Poach Agreement also appears to have

been ████████████████████████████████

---

[111] Ex. PX158 at 476:15–477:2 (describing how ████████████████████████
████████████████████████████. *See also* Hayek Dep. at
262:4–14.
[112] Kogod Dep. at 24:11–19.
[113] Ex. PX158 at 476:9–14. *See also* Hayek Dep. at 179:17–180:5 (Hayek stated that ████
████████████████████████████████████████; Ex. PX483 at
629:16–24 (describing ████████████████
██████████).

i.        For example, Skip Thurman understood, based on his personal experience, that the SCA-DaVita No-Poach Agreement ███████████████████ ████████████████████ [114]

ii.      ███████████████████████████████

███████████████████████████████████

█████████████████████████████ [115]

iii.     Thurman also testified that ███████████████████

███████████████████ [116]

d.     ██████████The SCA-DaVita No-Poach Agreement was ████████

███ :

i.       ████████████████████████████████

████████████ [117] ███████████████████████

█████████████████████████████████████

███████████ [118]

---

[114] Deposition of James "Skip" Thurman (Jun. 17, 2024) [hereafter Thurman Dep.] at 76:14–20 (Thurman believed ████████████████████████████████████████ ). *See also id.* at 127:22–128:6 (Thurman testified that ██████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████. Thiry also ██████████████████████████. Thiry Dep. at 257:16–18. Hayek thought the agreement ██████████████ ████████████████████. *See* Hayek Dep. at 205:22; *see also* Ex. PX458 at 474:5–17 (Hayek testified at trial that █████████████████████████████████████ ███████ ).

[115] Ex. PX305 at DOJCIV-008-00000180.
[116] Thurman Dep. at 76:14–20.
[117] Ex. PX313 at DOJCIV-008-00000188.
[118] Ex. PX313 at DOJCIV-008-00000190–91.

3154924.9

ii.      Neither Hayek nor Thiry believed that ███████████████

████████████████████████████.[119]

iii.     ███████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████████████████████

████████████████████████████████

██████████████████████████████[120]

iv.     ███████████████████████

███████████████████████████████[121]

e.     ███████████████

i.      Both Thiry and Hayek ██████████████

████████████████████[122]

ii.     Former DaVita COO Kogod ████████████████

██████████[123]

---

[119] Hayek Dep. at 296:3–9 ███████████████████████
████████. Thiry Dep. at 176:6–15 █████████████████
████████████████████████████████████████.

[120] DOJCIV-007-00000141 at DOJCIV-007-00000141.

[121] Thurman Dep. at 166:17–167:4 ██████████████████
████████████████████████████████████████
████████████.

[122] Thiry Dep. at 33:11–34:6; Ex. PX158 at 474:24–475:2 (Hayek referred to the agreement as "nationwide" at the DaVita criminal trial); Hayek Dep. at 197:22–198:16 ████████████
████████████.

[123] Kogod Dep. at 54:11–55:3.

3154924.9

iii.    Former SCA Chief Talent Officer Fanning also testified that



71.    ████████████████████████████████████

a.    Some employees testified that they ████████████████

b.    ████████████████████████████████████

c.    Kogod acknowledged at deposition that ████████████████

He testified at the DaVita criminal trial that employees who complied with the tell-your-boss

provision risked financial repercussions: "[W]hat you're saying is, I'm unhappy; I'm leaving;

I've made a decision. So when you think about future consideration for salary increases, your

annual bonus, your performance rating, any stock equity—which was a big piece of DaVita's

---

[124] Deposition of Bridget Fanning (Jul. 17, 2024) [hereafter Fanning Dep.] at 159:12–160:3.
[125] DOJCIV-007-00000141 at DOJCIV-007-00000142–43.
[126] DOJCIV-008-00000431 at DOJCIV-008-00000432–33.
[127] Fanning Dep. at 310:24–311:11.
[128] Kogod Dep. at 43:2–5.

3154924.9

compensation package—that's what people would remember. This person was looking to leave; they're unhappy here; they're going to leave anyway, so we shouldn't give them this next big job; we shouldn't give them the right amount of options. So there was an absolute downside of making that known. That's why most people do confidential searches; they don't want their boss to know."[129]

        d.    ███████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

██████████████████████████ [130]

        e.    SCA Group Vice President of Human Resources Warren Cinnick testified

that he thought ██████████████████████████████████

████████████████████████████████████████████

██████████ [131]

        f.    Rucker similarly testified that when SCA recruited him, ████████

████████████████████████████████████████████

████████████████████ [132] He testified that ██████████████

██████████████████████████████████ [133]

    72.    <u>SCA and DaVita</u> ██████████████████████████. Both SCA and DaVita

████████████████████████████.

        a.    ████████████████████████████.

---

[129] Ex. PX157 at 89:16–90:7.

[130] DOJCIV-007-00000105 at DOJCIV-007-00000107.

[131] Deposition of Warren Cinnick (Nov. 22, 2024) at 29:4–30:9.

[132] PX158 at 392:16–23. *See also* Rucker Dep. at 57:8–20.

[133] Rucker Dep. at 87:8–25.

3154924.9

i.     Top DaVita and SCA executives were ███████████████

████████████████████████████. For example, ███████████

██████████████████████████. When a DaVita recruiter

reached out to an SCA VP regarding an open position at DaVita, ████████████

███████████████████████████████. Hayek

explained at deposition that ████████████████████████.[134]

ii.     Similarly, former SCA CFO Peter Clemens testified ███████

███████████████████████████████████████.

Clemens also testified that ████████████████████████

█████████████████████████.[135]

iii.     According to former DaVita COO Kogod: "████████

███████████████████████████████

███████████████████████████████

██████████████████████████████

██████████████████."[136]

iv.     When competitors violated their No-Poach Agreements with

DaVita, DaVita COO Michael Staffieri "██████████" that he had to "█████████████



---

[134] Ex. PX336 at SCA-DOJ-00158130 ███████

██████████████████████████████████████

██████████████████████████

██████████████████████; *see also* Hayek Dep. at 324:23–325:2 (███

███████████).

[135] Deposition of Peter Clemens (May 2, 2024) [hereafter Clemens Dep.] at 79:23–82:7.

[136] Ex. PX313 at DOJCIV-008-00000188.

42

█████████████████████████████████████████ [137] On one such occasion, Thiry

responded that █████████████████████████████████████

████████████████ [138]

v. As another example, ███████████████████

████████████████████████████████████████████

██████████████████████████████████ [139] ██████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████ [140]

vi. ███████████████████████████████████

██████████████████████ [141] ████████████████████

████ The agreement was █████████████████████████

████████████████████████ [142] These executives were ████████████

---

[137] Staffieri Dep. at 65:9–67:3 (Staffieri testified that ██████████████████
███████████████); Ex. PX3 at DVA_OMCEAL_001354506–7.

[138] Ex. PX4 at DVA01922502; *see also* Ex. PX5 at DVA_OMCEAL_000417583 ████
████████████████████████████████████████████
████████); Ex. PX12 at DVA_OMCEAL_000387563 ████
████████████████████████████████████████████
████████████).

[139] Ex. PX333 at DVA_OMCEAL_000658781.

[140] *Id.*

[141] Staffieri Dep. at 31:19–23 (Staffieri testified that ██████████████████
██████████████████████████████████████.

[142] Staffieri Dep. at 29:4–18 (Staffieri testified that ██████████████████
████████████████████████████████████████████
██████████); *see also* Ex. PX1 at DOJCIV-008-0000062.

43



[REDACTED] [143] In another example, [REDACTED]

[REDACTED], Kogod's first reaction was to ask, [REDACTED]

[REDACTED] [144] Presumably,

[REDACTED]

[REDACTED]

      vii.     Moreover, [REDACTED], a DaVita Senior Group Director of Operations reached out to Fanning, [REDACTED]. Fanning reached out to Hayek [REDACTED] Hayek [REDACTED]

[REDACTED]

[REDACTED] [145]

      b.     *SCA and DaVita* [REDACTED]

      i.     Kogod explained that [REDACTED]

[REDACTED] [146] For example, [REDACTED]

[REDACTED] [147] The firm

[REDACTED]

[REDACTED] [148]

      ii.     Fanning [REDACTED]

[REDACTED] [REDACTED]

---

[143] Kogod Dep. at 69:9–20, 76:4–10, and 108:16–20.
[144] Ex. PX376 at DVA_OMCEAL_000122783.
[145] Ex. PX171 at CA-DOJ-00156929; Hayek Dep. at 318:15–319:4 (Hayek testified that [REDACTED] [REDACTED]).
[146] Kogod Dep. at 53:18–54:10.
[147] *See* Ex. PX275 at DOJ-PROD003-00117878.
[148] *See id.* at DOJ-PROD003-00117892.

3154924.9

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████ [149]

   iii. Similarly, when DaVita Senior Group Director of Operations Andrew Kay ███████████████████████████████████████████████, Fanning responded, ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████ [150]

   iv. Likewise, SCA's former CFO Peter Clemens testified that

██████████████████████████████████████████████████████████

██████ . [151]

  73. <u>The SCA-DaVita No-Poach Agreement</u> ███████████████ . SCA's and DaVita's

██████████████████████████████████████████████████████████

████████████ .

   a. *SCA and DaVita Would* ██████████████████████████████ . But for the No-Poach Agreement, SCA and DaVita ████████████████████████████

████████

---

[149] Ex. PX170 at DOJ-PROD004-00476230.
[150] Ex. PX172 at DOJ-PROD001A-00000001.
[151] Clemens Dep. at 79:23–80:20.

3154924.9

    i.    Fanning acknowledged at deposition that DaVita ███████████

████████████████████ because DaVita ████████████████████████

██████████████████████████ [152]

    ii.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ [153] ███████████████████████████

████████████████████████████████████████████████ [154]

    b.    *The Agreement* █████████████████████

    i.    SCA's former Chief Talent Officer Fanning told the FBI that the

████████████████████████████████████████████████

████████████████████████████ [155] Fanning stated in a later interview

that she ████████████████████████████████████████

████████████████████████████████ [156] Fanning

understood the ████████████████████████████████

---

[152] Fanning Dep. at 33:15–34:18. Fanning ████████████████████████████
████████████████████████. *See* Fanning Dep. at 39:21–40:25. Former
SCA COO Michael Rucker also ████████████████████████████████████.
Rucker Dep. at 71:18–72:12.
[153] Ex. PX555 at DOJCIV-007-00000013 (adding that ███████████████████
████████████████████████████████████████████).
[154] *Id.*
[155] DOJCIV-008-00000431 at DOJCIV-008-00000432–33.
[156] DOJCIV-010-00000110 at DOJCIV-010-00000111.

3154924.9

█████████████████████████████[157] But from the employee perspective, as SCA CFO Leslie Wachsman testified, ████████████████████████████████████████ ███████[158]

    ii.    ████████████████████████████████████

████████████████████████████████████████████████

█████████████████[159] ████████████████████████████████

████████████████[160] and that there were "████████████" as a result of the agreement.[161]

    iii.    Thurman also described working at DaVita as being like "████████" surrounded by "████████████" that ██████████████████

---

[157] *Id.*

[158] Deposition of Leslie Wachsman (May 22, 2024) [hereafter Wachsman Dep.] at 94:12–17.

[159] *See* Ex. PX123 at DOJCIV-007-00000094 (Thurman told the FBI that ████████████████████████████████████ ████████████████"). *See also* Thurman Dep. at 124:2–18 (Thurman testified that the agreements were an ████████████"); SCA001204745 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; Thurman Dep. at 124:20–125:2 (the agreements operated as a "████████████████").

[160] Thurman Dep. at 44:6–25 (Thurman testified that DaVita built an ████████████" wherein employees ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

[161] *Id.* at 76:14–20.

3154924.9

██████████████████ [162] He felt like the ██████████ caused the ███████

████████████████████████ [163] Before he worked for DaVita,

Thurman's █████████████████████████████████████████████

████ [164] But in his ████████████ at DaVita, he ████████████████ [165]

      iv.     DaVita's former Transactions Director Asher similarly said to the

FBI that he ██████████████████████████████████████████████

███████ [166] Prior to joining DaVita, █████████████████████████

████████████████████████████████████████████████████

███████████ [167] Asher stated that during his tenure, ███████████████ at DaVita. [168]

      v.     Moreover, ████████████████████████

████████████████████████████████████████████████████



[162] *Id.* at 37:6–21 ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████ .

[163] *Id.* at 44:6–25 ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████ ).

[164] *Id.* at 45:1–4 ████████████████████████████████████████████

████████████████████████████████████ .

[165] *See* Ex. PX124 at DOJCIV-012-00000133 ████████████████

████████████████████████████ ).

[166] DOJCIV-007-00000141 at DOJCIV-007-00000142–43.

[167] *Id.* at DOJCIV-007-00000141.

[168] *Id.* at DOJCIV-007-0000142–43.

3154924.9

██████████████████████████████████████████████████ [169] He

eventually ████████████████████████████████████████████

████ [170]

    c.    *In Turn, the Agreement* ████████████████████

    i.    Thiry, when broaching ████████████████ highlighted the

███████████████████████████████████████████████ [171]

    ii.    DaVita executives understood that the No-Poach Agreement would

███████████████████ According to Skip Thurman, DaVita ████████████

█████████████████████████████████████████████████████

████████████████ [172] Thurman testified that ███████████████████

████████████████████████████ [173]

    iii.    For instance, when Thurman ███████████████████

████████████████████████████ he was able to ████████████████

---

[169] DOJCIV-007-00000105 at DOJCIV-007-00000106.

[170] *Id.*

[171] Ex. PX316 at DVA00019820 (Thiry writing an email to Hayek ████████████████████████████████████████████████████████████████████████████████████████████ .

[172] Thurman Dep. at 82:23–83:9 (DaVita ████████████████████████████████████████████████ ).

[173] Thurman Dep. at 45:5–20 (Thurman ████████████████████████████████████████████████████████████████████████████████████████████████ ); *id.* at 156:2–10 (████████████████████████████████████████████████████████████ .

3154924.9

[REDACTED] [174] Thurman's [REDACTED] not only indicates that [REDACTED], but also that [REDACTED]. Prior to his [REDACTED], Mr. Thurman had [REDACTED].[175] He testified that [REDACTED],[176] because he had [REDACTED].[177] He said he [REDACTED] [178]

iv.     Thurman testified that [REDACTED]; his reports also told Thurman that they [REDACTED]

---

[174] *Id.* at 156:21–158:3 [REDACTED] ). *See also* Ex. PX124 at DOJCIV-012-000000133.

[175] Thurman Dep. at 21:7–18 [REDACTED] ).

[176] *Id.* at 32:14–18 ( [REDACTED] .

[177] *Id.* at 24:3–18 ( [REDACTED] ; *id.* at 35:23–36:5 [REDACTED] ).

[178] *Id.* at 35:6–12 ( [REDACTED] .

50

[179] Thurman testified that ███████████████

██████████████████ [180] But he claimed that ██████

██████████████████ [181] Thurman stated that there was a culture at

DaVita that they were going to get ███████████████████

██████████████████ [182] Overall, Thurman described a ███████████

████████████████████████████████████

██████ [183] He testified that he felt that ████████████████████

---

[179] *Id.* at 30:20–31:9 (In Thurman's experience, his direct reports were ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ ); *id.*
at 66:6–19 (With respect to one of Thurman's reports, ███████████████

████████████████████████████

████████████ ); *id.* at 70:24–71:6 (another of Thurman's reports was ████

████████ ); *id.* at 173:13–174:3 (multiple members on
Thurman's team ██████████████████████ ).

[180] *Id.* at 31:18–32:5 (Thurman knew both he and his direct reports ████████

████████████████████████████████████

██████████████ .

[181] *Id.* at 273:25–274:10 (With respect to ████████████████████

██████████████████████████████ ).

[182] *Id.* at 32:6–13.

[183] *Id.* at 78:9–19 (The No-Poach Agreements created ████████████████

████████████████████████████████████

████████████ ; *id.* at 78:23–79:4 (Thurman defined ████████

████████████████████████████████████

██████████ ).

51

3154924.9



[184] He claimed that ██████

█████ [185]

      v.     I have also reviewed evidence showing that ██████. For example, ██████

█████ [186] ██

█████



---

[184] *Id.* at 163:12–20 (██████.

[185] *Id.* at 163:21–164:4 ██████.

[186] DOJCIV-007-00000162 at DOJCIV-007-00000162.

[187] *Id.* Interestingly, ██████ *Id.* at DOJCIV-007-00000163.

74. <u>The End of the SCA-DaVita No-Poach Agreement.</u> Qualitative and quantitative evidence suggest that the No-Poach Agreement between SCA and DaVita ended by ███████████████████ .

a. After the SCA-Optum merger, in April 2017 Hayek took over as CEO of Optum Health while remaining the CEO of SCA.[188] The no-poach agreement with Thiry moved with Hayek to Optum: ████████████████████████████████████████ ████████████████████████████████████[189]

b. Moreover, ████████████████████████████████ ██████████████████████████████████████ which was ████ .[190] Former DaVita COO Kogod said the same at deposition.[191]

c. Both Hayek and Thiry, ████████████████████████████ ██████████████████ , stepped down from their respective CEO roles at Optum (SCA's new parent company) and DaVita in 2019.[192] According to Hayek's testimony at the DaVita criminal trial, prior to their departures, Hayek and Thiry ████████████████████████████ ██████████████████████████████████████.[193] Hayek was also not aware of anyone else at DaVita or SCA ██████████████████████████████████ . But when Thiry stopped down from his CEO position in 2019, current COO Staffieri testified that ████████████████████████████████████████████████████████ ████████████████████████████████████[194]

---

[188] Hayek Dep. at 35:20–23.
[189] DOJCIV-008-00000423 at DOJCIV-008-00000424.
[190] Ex. PX305 at DOJCIV-008-00000182; Rucker Dep. at 179:12–23; *see also* App. C.
[191] Kogod Dep. at 55:2–3.
[192] *See* App. C.
[193] Ex. PX158 at 491:7–25.
[194] Staffieri Dep. at 45:11–25.

53

    d.     FBI investigation regarding Defendants' no-poach conduct ███████████ ████████████████████████████. While the FBI began their investigation in ████, based on my review of the record, ███████████████████████████ ████[195] By the time the FBI interviewed Hayek in █████████, Hayek had already stepped down from Optum.[196] The FBI began interviewing DaVita employees in ████████████.[197]

    **3.    The Qualitative Evidence is** ██████████████████ █████████████

75.    In this section, I review qualitative evidence that shows ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

76.    The SCA-USPI Agreement's Beginnings.

    a.    Former SCA CEO Hayek and former USPI CEO Bill Wilcox ████████

████████████████████████████████████[198] USPI's then-CEO Bill Wilcox ("Wilcox") told the FBI that ████████████████████████████████

---

[195] *See, e.g.*, DOJCIV-007-00000131; DOJCIV-010-00000112.

[196] Ex. PX314 at DOJCIV-008-00000230.

[197] Ex. PX257 at DOJCIV-007-00000060.

[198] Ex. PX227 ██████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████
███████); Ex. PX507 at DOJCIV-008-00000269; *see also* Ex. PX89 at
USPI_CIV_000000598 (███████████████████████████████
████████████████████████████████████████████████
████████████); Ex. PX508 at DOJCIV-008-00000222
████████████████████████████████████████████
████████████████████████



██████ [199] Wilcox explained, ████████████████████████████████████

████████████████████████████████████████████████████

████████████ [200] Moreover, at the DaVita criminal trial, Hayek testified that the SCA-USPI

Agreement began ████████████ [201]

     b.     ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ [202]

     c.     From ████ on, ████████████████████████████████ [203]

     d.     The introduction of the no-poach agreement appears to follow the

████████████████████████████████████████████████

████████████████ ████████████████████████

████████████████████████████████████████████████

████████████████ [204]

     e.     ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[199] Ex. PX508 at DOJCIV-008-00000218; *see also* Ex. PX507 at DOJCIV-008-00000269 ████

██████████████████████████████████████ ).

[200] Ex. PX508 at DOJCIV-008-00000218.

[201] Hayek Dep. at 219:13–16.

[202] DOJCIV-007-00000101 at DOJCIV-007-00000102–103.

[203] Ex. PX508 at DOJCIV-008-00000213; Deposition of Bill Wilcox (Sept. 24, 2024) [hereafter Wilcox Dep.] at 129:21–131:2.

[204] Ex. PX507 at DOJCIV-008-00000268; Wilcox Dep. at 93:19–94:3.



██████████████████ [205] Initially, ████████████████████████████

████████████████████ [206] ███████████████████████████ [207] By the time

Wilcox contacted Hayek ████████████████████████████████████████

████████████████████████████████████████████████████

███████ [208]

      f.      According to USPI's former primary internal recruiter Shannon Mosley,

██████████████████████████████████████████ [209]

███████████████████████████████████

███████████████ [210]

      g.      Additionally, ███████████████████████

█████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

████████████████ [211] ████████████████████

███████████████████████████████████████████

---

[205] Ex. PX314 at DOJCIV-008-00000233.

[206] *Id.*

[207] *Id.*

[208] *Id.*

[209] Ex. PX281 at DOJCIV-008-00000041; Deposition of Shannon Mosley (Aug. 13, 2024) [hereafter Mosley Dep.] at 45:15–50:25.

[210] *Id.* at DOJCIV-008-00000042; Mosley Dep. at 45:15–50:25.

[211] DOJCIV-007-00000118 at DOJCIV-007-00000120.

3154924.9



[212]

[213]

h.     Indeed, ████████████████████████████████████████

████████████████████████████████████████████████████

████████ [214]

i.     These ████████████ extended beyond Hayek and Wilcox. For

example, ████████████████████████████████████████████████

████████████████████████████████ [215]

77.     <u>The Terms of the Agreement.</u>

a.     ████████████████████████ The evidence shows that the

SCA-USPI No-Poach Agreement ████████████████████████████

████████

i.     Former USPI CEO Wilcox told the FBI that as he ████████

████████████████████████████████████████████ [216]

Hayek also testified that ████████████████████████████████

████████████████████████████████ [217]

ii.     USPI's current Manager of Talent Acquisition and Onboarding

Shannon McGarry testified that ████████████████████████████ [218]

---

[212] DOJCIV-012-00000056 at DOJCIV-012-00000058–59.
[213] *Id.*
[214] Ex. PX478 at USPI_CIV_000390138.
[215] Ex. PX464 at USPI_CIV_000013967.
[216] Ex. PX508 at DOJCIV-008-00000218; Wilcox Dep. at 136:19–138:3.
[217] Hayek Dep. at 218:15–219:2.
[218] Deposition of Shannon McGarry (Jun. 11, 2024) [hereafter McGarry Dep.] at 73:10–15.

3154924.9

iii.  According to former SCA COO Rucker, ██████████████████████

██████████████████████████████████████████████████████████

████████████████ [219]

iv.  ████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

█████ [220]

b.  ████████████████████████  The SCA-USPI No-Poach Agreement

████████████████████████.

i.  As with the SCA-DaVita Agreement, SCA and USPI employees

████████████████████████████████████████████████████

████████.  Former SCA CEO Hayek testified at the DaVita criminal trial and at deposition that after he and Thiry agreed to implement the "tell-your-boss" provision in the SCA-DaVita No-Poach Agreement, Hayek took that provision and "applied it to the USPI relationship" "for the sake of simplicity."[221]

ii.  Wilcox testified that if ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ [222]



---

[219] Ex. PX305 at DOJCIV-008-00000176.
[220] Ex. PX281 at DOJCIV-008-00000041; Mosley Dep. 45:15–50:25.
[221] Ex. PX483 at 630:19–631:3; Hayek Dep. at 219:20–221:9.
[222] Wilcox Dep. at 137:11–15; Ex. PX508 at DOJCIV-008-00000218 (████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ );

████████████████████████  Wilcox Dep. at 139:2–6.

58



iii.    Moreover, the SCA-USPI No-Poach Agreement ▬

▬▬▬▬▬▬ . ▬▬▬▬▬▬

▬▬▬▬▬▬

▬▬▬▬▬▬[223] As

such, if he ▬▬▬▬▬

▬▬▬▬▬▬

▬▬▬▬▬[224]

iv.    ▬▬▬▬▬

▬▬▬▬▬

▬▬▬▬▬

▬▬▬▬▬

▬▬▬▬▬

▬▬▬▬▬

▬▬▬▬▬

▬▬▬[225]

v.    ▬▬▬▬▬

▬▬▬▬▬

---

[223] Ex. PX88 at DOJCIV-008-00000357 ▬▬▬▬

▬▬▬▬▬

▬▬▬▬ ); Deposition of
Mark Garvin (May 30, 2024) [hereafter Garvin Dep.] at 82:13–83:10 ( ▬▬▬

▬▬ ).

[224] *See* Ex. PX88 at DOJCIV-008-00000358; Garvin Dep. at 158:21–159:11 ( ▬▬

▬▬▬▬ ).

[225] Ex. PX305 at DOJCIV-008-00000176–77.

59



vi. [redacted]

vii. Hayek informed SCA Chief Talent Officer Bridie Fanning about

[redacted] [230]

c. [redacted]. Like the DaVita-SCA No-Poach Agreement, the SCA-USPI No-Poach Agreement [redacted]:

i. Wilcox testified that he assumed the agreement [redacted]

---

[226] Ex. PX281 at DOJCIV-008-00000041; Mosley Dep. at 45:13–50:25.

[227] Ex. PX281 at DOJCIV-008-00000041–42; Mosley Dep. at 45:13–50:25.

[228] Ex. PX219 at DOJCIV-012-00000068–69; Deposition of Jimmy Tanner (Jul. 31, 2024) [hereafter Tanner Dep.] at 32:20–33:13; Tanner Dep. at 45:22–46:19 (Catapult excluded SCA employees from their LinkedIn searches for candidates).

[229] Ex. PX219 at DOJCIV-012-00000069.

[230] Ex. PX159 at SCA-DOJ-00152696.

3154924.9

███████████████████████████████████████████████.[231] Wilcox also told the FBI

that his ████████████████████████████████████████████████████

█████████████████████████████████████████ [232]

      ii.      USPI's then-VP of Talent Acquisition Shannon Mosley understood

the agreement to be █████████████████████████████████████████████

████████████████████████ [233]

      iii.     As noted above, Hayek informed SCA's then-Chief Talent Officer

Bridie Fanning about ████████████████████████████████████████████

████████████████ [234]

      iv.     In an ██████████ email, Hayek instructed that the No-Poach

Agreement █████████████████████████████████████ [235]

      v.     USPI's then-primary internal recruiter Shannon McGarry testified

that ████████████████████████████████████████████████████████████

████████████████████ [236] At the time, McGarry was ██████████████████

---



[231] Wilcox Dep. at 104:15–105:3 (Wilcox stated that the no-poach agreement was ██████
████████████████████████ and that he ████████████████████████████████
████ ); *see also* Ex. PX507 at DOJCIV-008-00000270. ███████████████████████
███████████ *See* Ex. PX508 at DOJCIV-008-00000219.
[232] Ex. PX508 at DOJCIV-008-00000219.
[233] Ex. PX281 at DOJCIV-008-00000042.
[234] Ex. PX159 at SCA-DOJ-00152696.
[235] Ex. PX171.
[236] McGarry Dep. at 65:24–67:20 (McGarry testified that two weeks after she began working at USPI, Mosley ████████████████████████████████████████████████████████████████
████████████████████ or, in other words, ████████████████████████████████████
██████████████████████████████████████████████████████ ); *see also id.*
at 27:23–28:8 (McGarry reported to Mosley). *See also* Mosley Dep. at 47:14–48:18 (the agreement ████████████████████████████████████████████████████████████████████
████████████████████████ .

3154924.9



[237]

d. █████████████████ Like the DaVita-SCA No-Poach Agreement, the SCA-USPI No-Poach Agreement █████████████

i. ████████████████████████

██████████████████[238]

ii. Former SCA Chief Talent Officer Fanning also testified at deposition that the SCA-USPI No-Poach Agreement ██████████████[239]

iii. SCA's former Chief Development Officer Joseph Clark also testified that the Agreement ███████████[240]

e. ████████ SCA and USPI took steps to ████████

██████████████

i. █████████████████

████████████████████████

███████████████████████

████████████████████████

███████████████[241] But he did not

---

[237] McGarry Dep. at 67:21–68:7 (When Mosley handed McGarry ████████████████████████ ██ ).

[238] Ex. PX508 at DOJCIV-008-00000219.
[239] Fanning Dep. at 64:12–65:19, 159:16–160:21.
[240] Deposition of Joseph Clark (Sept. 11, 2024) at 52:22–55:1.
[241] DOJCIV-007-00000118 at DOJCIV-007-00000119.

3154924.9

███████████████████████████████████████████

████████████████████████ [242]

       ii.      ████████████████████████

████████████████████████████████ [243]

78.     ████████████████████████████

    a.     The SCA-USPI No-Poach Agreement included the ███████

███████ [244] Former SCA CEO Hayek had experienced the ████████████

███████ Specifically, Hayek explained to his former boss, DaVita's then-CEO Thiry, that ███

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ [245]

    b.    Multiple employees testified that ██████████████████

████████████████████████████ ███████████████

████████████████████████████████████

████████████████████████████ [246]

---

[242] *Id.* at DOJCIV-007-00000120.
[243] Ex. PX508 at DOJCIV-008-00000218.
[244] Ex. PX507 at DOJCIV-008-0000269 ████████████████████

████████████████████████████████████████

████████████████████████████████████████ .

[245] Ex. PX316 at DVA00019821; Hayek Dep. at 120:2–126:9, 134:2–135:23.
[246] DOJCIV-007-00000070 at DOJCIV-007-00000072.

3154924.9



79. <u>SCA and USPI ███████████</u>. I have reviewed evidence that both SCA and USPI ██████████████████████████.

a. █████████████████████. I have reviewed extensive evidence that ████████████████████████████

███████████████████████████

██

i. ████████████████████

███████████████████████████

---

247 Ex. PX508 at DOJCIV-008-00000220.
248 DOJCIV-010-00000110 at DOJCIV-010-00000111.
249 DOJCIV-008-00000431 at DOJCIV-008-00000432–33.
250 DOJCIV-012-00000094 at DOJCIV-012-00000096.

3154924.9



ii.      Hayek testified that ███████████████████████

████████████████████████████████████████████████

████████████[252] For example, ██████, Hayek emailed Wilcox to confirm that ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████[253]

iii.      Additionally, in a █████████ email, Hayek reminded SCA's

then COO Rucker and then-Chief Talent Officer Fanning that ████████████████

███████████████████████ saying that ████████████████████[254]

Fanning replied, ████████████████████████████████████[255]

iv.      ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████[256]

---

[251] Ex. PX305 at DOJCIV-008-00000177.
[252] Hayek Dep. at 237:2–238:1.
[253] Ex. PX478.
[254] Ex. PX160 at SCA000002866.
[255] *Id.*
[256] DOJCIV-008-00000155 at DOJCIV-008-00000155.

3154924.9



v. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ [257] For example, in a ████████ email with the subject line ████████████

████████████████████████████████ Wilcox alerted

Hayek that ████████████████████████ [258] In response to

this email, Hayek said he would ████████████████████████

████████████████ [259]

vi. ████████████████████████████████

████████████████████████████████████████

████████████████████████████ [260]

vii.    There are also numerous examples in the record evidence of ████

████████████████████████████████████████████

████████████████████████ For example, in an internal USPI ████████

████ email chain ████████████████████████████████, USPI's then-President

Brett Bodnax asked Wilcox, "████████████████████████████████

████████████████████████ "[261] Wilcox responded, "████

---

[257] Ex. PX88 at DOJCIV-008-00000359; Garvin Dep. at 87:14–88:17 (████████████████████
████████).

[258] Ex. PX486 at USPI_CIV_000014009; *see also* Hayek Dep. at 244:10–15, 245:15–23.

[259] Ex. PX487 (Hayek responded to Wilcox, "████████████████████████████████████████

████"); *see also* Hayek Dep. at 247:24–248:17 (Hayek testified that ████████████████████████

████.

[260] Ex. PX508 at DOJCIV-008-00000219.

[261] Ex. PX514.

66

████████████████████████████████████████████ [262] In

████████, Wilcox followed up on the hiring process, letting USPI executives know, ████████

██████████████████████████████████████████████████

████████ [263]

        viii.    USPI's then-primary internal recruiter Shannon McGarry testified

that ██████████████████, USPI's then-VP of Talent Acquisition Mosley ████████

██████████████████████████████████████████████

████ [264] To ██████████████████████, McGarry ████████████████ [265]

████████████████████████████. [266]

        ix.    ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████ [267]

---

[262] *Id.*
[263] Ex. PX515 at USPI_CIV_000018231.
[264] McGarry Dep. at 65:24–67:20 (McGarry testified that ████████████████████
████████████████████████████████████████
████████████████████████████); *see also id.*
at 27:23–28:8 (McGarry reported to Mosley); Ex. PX99 (████████████████████
████████████████). Mosley also testified that she ████████████
████████████████████████████. *See* Mosley
Dep. at 47:14–48:18 (the agreement ████████████████████
████████████████.
[265] Ex. PX99; *see also* Mosley Dep. at 118:6–118:16 (Mosley testified that she told McGarry that
USPI had ████████████████████████████████████
████████).
[266] McGarry Dep. at 68:11–12 (McGarry ████████████████).
[267] Ex. PX281 at DOJCIV-008-00000043; Mosley Dep. at 45:13–50:25.

b. █████████████████████████████ I have also reviewed

evidence that shows SCA and USPI ████████████████████████

██████

i.    Mosley also testified that USPI ████████████████

█████████████[268]████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████[269]█████████████████

████████████████████████████████████[270]

ii.    ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████[271]

███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



---

[268] Mosley Dep. at 97:25–98:7 (Mosley testified that the terms of the agreement ████████████
██████████████████████). *See also* Ex. PX281 at DOJCIV-008-00000045.
[269] DOJCIV-012-00000038 at DOJCIV-012-00000038–39.
[270] *Id.*
[271] DOJCIV-008-00000029 at DOJCIV-008-00000030.

3154924.9



iii. █████████████████████████████████

[272]

v. Likewise, former SCA Chief Talent Officer Fanning █████████

[276]

vi. At SCA, former COO Rucker testified that he █████████

---

[272] Ex. PX281 at DOJCIV-008-00000045; Mosley Dep. at 45:13–50:25.
[273] Ex. PX558 at SS-DOJ-01325 (███████████████████████████████ ██████████████████████████████████████████████ ██████████). Ex. PX555 at DOJCIV-007-00000011. *See also* Ex. PX555 at DOJCIV-007-00000004; DOJCIV-012-00000013 at DOJCIV-012-00000016–18.
[274] Ex. PX555 at DOJCIV-007-00000013.
[275] DOJCIV-007-00000101 at DOJCIV-007-00000102.
[276] Ex. PX162 ███████████████████████████; Ex. PX163 at DOJ-PROD004-00693673.



████████████████████████████████████████ [277] Rucker also testified at deposition that ████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████ [278]

80.    The Agreement ████████████████. As with the SCA-DaVita agreement, the SCA-USPI No-Poach Agreement ████████████████████████████████████████:

a.    *SCA and USPI* ████████████████████████████████████████. But for the SCA-USPI No-Poach Agreement, SCA and USPI ████████████████████████ ████████████:

i.    ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ [279] ████████ ████████████████████████████████████████████████ ████████████████████████████████████████ [280] ████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████████ [281]

ii.    Likewise, in USPI primary internal recruiter McGarry's experience, she ████████████████████████████████████████████

---

[277] Ex. PX305 at DOJCIV-008-00000178.
[278] Rucker Dep. at 103:24–104:18.
[279] Ex. PX281 at DOJCIV-008-00000055; Mosley Dep. at 45:13–50:25.
[280] *Id.* at DOJCIV-008-00000042; Mosley Dep. at 45:13–50:25.
[281] Ex. PX508 at DOJCIV-008-00000220; Wilcox Dep. at 141:18–142:8.

3154924.9

[REDACTED] [282] [REDACTED]

[REDACTED]

[REDACTED] [283] For example, [REDACTED]

[REDACTED]

[REDACTED] [284] McGarry

stated that [REDACTED] [285]

      iii.     Former SCA COO Michael Rucker testified that his understanding

of [REDACTED]

[REDACTED] [286] [REDACTED]

[REDACTED] [287]

[REDACTED]

[REDACTED]

[REDACTED] [288]

      iv.     [REDACTED]

[REDACTED]

---

[282] McGarry Dep. at 76:23–77:6.

[283] McGarry Dep. at 77:13–77:18.

[284] *See* Ex. PX101 at USPI_CIV_000004082. [REDACTED] McGarry Dep. at 93:21–94:9 [REDACTED] ).

[285] *See* Ex. PX101; *see also* McGarry Dep. at 95:1–96:12.

[286] Rucker Dep. at 81:25–84:5.

[287] *Id.* at 87:16–87:25; *see also id.* at 94:18–96:22 [REDACTED] ).

[288] Ex. PX305 at DOJCIV-008-00000176.



[289] In other words, ████

████

   v.  Likewise, ████

████

████ [290]

   b.  *The Agreement Suppressed Employee Mobility and Compensation.*

   i.  An external recruiter for USPI, Jimmy Tanner, testified that Mosley told him that he was not able to recruit from SCA because USPI wanted to avoid situations where there were counteroffers or salaries were consistently raised from competition.[291]

   ii.  ████

████

████ [292] ████

---

[289] Ex. PX555 at DOJCIV-007-00000011–12; Ex. PX162 (Fanning instructed Schultz, "note that USPI and Davita [sic] are off limits to SCA.").

[290] DOJCIV-012-00000056 at DOJCIV-012-00000059.

[291] Tanner Dep. at 40:24–42:6 ("Essentially her reasoning was . . . you create this competition to where they're consistently losing leaders to SCA and vice versa. And then you just kind of get into counteroffers, hiking up salaries, you know, in open positions, . . . is kind of what the gist of it was.").

[292] Ex. PX88 at DOJCIV-008-00000361 ████

████ ); Garvin Dep. at 94:16–22 (confirming his statement to the FBI).



██████████████████████ [293] In Garvin's view, ██████████████████

████████████████████████████████████████████ [294]

iii.　████████████████████

████████████████████████████████████████████

█████████████ [295] ███████████████████████████

████████████████████████████████████████████

███████████████ [296] ████████████████████████ [297]

████████████████████████████████████

████████████████████████████ [298] Garvin also noted that he

---

[293] Garvin Dep. at 96:11–20 (Garvin testified that ████████████████████████████████████████████████████████████████████; *see also* Ex. PX88 at DOJCIV-008-00000361.

[294] Ex. PX88 at DOJCIV-008-00000361 ██████████████████████████████████████; Garvin Dep. at 96:21–97:12 (███████████).

[295] Ex. PX88 at DOJCIV-008-00000358 ██████████████████████████████); Garvin Dep. at 84:24–85:7 (████).

[296] Ex. PX88 at DOJCIV-008-00000358 ██████████████████; Garvin Dep. at 85:6–18 (████████████████████████████████████).

[297] Ex. PX88 at DOJCIV-008-00000358 ██████████████████████████); Garvin Dep. at 86:19–87:13 ████.

[298] Ex. PX88 at DOJCIV-008-00000358.

73



iv. [REDACTED]

[REDACTED] [301]

[REDACTED] [302]

v. [REDACTED]

[REDACTED]

---

[299] *Id.* [REDACTED]

[REDACTED]); Garvin Dep. at 86:12–18 ([REDACTED]).

[300] *Id.* at DOJCIV-008-00000365 ([REDACTED]

[REDACTED]); Garvin Dep. at 124:25–125:17 ([REDACTED]).

[301] DOJCIV-007-00000118 at DOJCIV-007-00000120.

[302] *Id.* at DOJCIV-007-00000121.

74



████████████████████████████████████████████
████████████████████████████████████ [303]

      vi.     Evidence also shows the absence of a no-poach agreement led to

████████████████████████████. Twice, McGarry personally experienced ████████

████████████████████████████████████████████

████████████████████████████ [304] Similarly, current SCA CFO Leslie Wachsman

████████████████████████████████████████████

████████████████████████████ [305] Wachsman agreed at

deposition that ████████████████████████████████

████████████████ [306] Moreover, just before USPI ████████████

████████, USPI discussed ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

      vii.     All told, according to USPI's former VP of Talent Acquisition

Mosley, ████████████████████████████████████████

████████ [307]

---

[303] DOJCIV-008-00000283 at DOJCIV-008-00000283.
[304] McGarry Dep. at 22:1–23:3, 20:1–23, 29:1–10 (McGarry testified that ████████
████████████████████████████████████████████.
[305] Wachsman Dep. at 94:18–95:9 (Wachsman testified that ████████████████
████████████████████████).
[306] Wachsman Dep. at 94:12–17.
[307] Ex. PX281 at DOJCIV-008-00000042; Mosley Dep. at 45:15–50:25.

c. <u>The End of the SCA-USPI No-Poach Agreement</u>. The record evidence suggests that ███████████████████████████████████████████████. While USPI ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████. Moreover, as detailed further in Section V.B.4, ███████████████████████████████████████████████████████ ██████████████████████████████████.

i. ████████████████, USPI's then-SVP, Chief Human Resources & Support Services Officer Sandi Karrmann ██████████████████████████████████ █████████████████████████████████████.[308] But USPI ████████████████████ █████████████████████████████████.[309]

ii. USPI ████████████████████████████████████████████ ██████████████████████████████████, Sandi Karrmann, then USPI's Chief Human Resource Officer, ███████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████[310] The following day, USPI's then-VP of Talent Acquisition

---

[308] USPI_CIV_000000442; Deposition of Sandi Karrmann (Aug. 14, 2024) [hereafter Karrmann Dep.] at 54:12–56:24 (at a meeting with the "███████████████████," Karrmann ████ ███████████████████████████████████████████████████████████████████████ ██████████████████████").
[309] Karrmann Dep. at 59:21–62:10; Mosley Dep. at 41:3–17, 123:15–127:23 (Mosley testified that she recalls that she did not ██████████████████████████████████████████ ███████████████████████; Ex. PX281 at DOJCIV-008-00000053–54 ████████████████████████████████████████████████████████████████████████.
[310] Ex. PX298 at USPI_CIV_000001260.

3154924.9

Mosley ███████████████████████████████████████████

███████████████████████████████████████████ [311]

    iii.    Further, in an ██████████ email chain, Mosley informed USPI's then-primary internal recruiter McGarry that ███████████████████████████

███████████████████████████ [312] McGarry stated that she ██████████

███████████████████████ [313] McGarry was additionally

████████████████████████████████████████████

███████████████████████████ [314] The ██████████, McGarry indicated that

█████████████████████████████ [315]

    iv.    But USPI ████████████████ SCA that the No-Poach

Agreement ██████████ . [316] Former USPI CEO Wilcox testified to the FBI and at deposition that he and Hayek never ███████████████████████ . [317] Wilcox told the FBI that ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ [318]

Further, ██████████████████████████████

████████████████████████████████████████

---



[311] Ex. PX282 at USPI_CIV_000006432; *see also* Ex. PX281 at DOJCIV-008-00000053–54.
[312] Ex. PX103.
[313] McGarry Dep. at 99:2–9 (McGarry testified that ██████████████████████████████ ██████████████████████████████ ).
[314] Ex. PX104 at USPI_CIV_000001842 ██████████████████████████ ██████████████████████████ .
[315] *Id.*; *see also* McGarry Dep. at 101:8–16.
[316] Wilcox Dep. at 112:7–21.
[317] Ex. PX507 at DOJCIV-008-00000276; Wilcox Dep. at 81:24–82:6.
[318] Ex. PX508 at DOJCIV-008-00000223–24.

3154924.9



[redacted][319] Wilcox stepped down as USPI's CEO in 2018, and as Chairman in 2020.

v. Hayek [redacted]

[redacted][320][redacted]

[redacted] When Anthony Kilgore took over as SCA CEO after Hayek stepped down in [redacted]

[redacted]

[redacted][321] Hayek wrote: [redacted]

[redacted][322]

vi. While the SCA-USPI No-Poach Agreement may have [redacted]

[redacted]

[redacted][323]

**4.** [redacted]

81. The qualitative evidence described above suggests that Defendants' conduct [redacted]. I next assess whether the quantitative evidence shows suppression of Senior-Level Employee movement between Defendant firms.

82. To assess whether the No-Poach Agreements suppressed the flow of Senior-Level Employees during the Conduct Period, I utilize the payroll records provided by Defendants,

---

[319] *Id.* at DOJCIV-008-00000224; *see also id.* at DOJCIV-008-00000221.
[320] *See* App. C.
[321] USPI_CIV_000006960.
[322] *Id.*
[323] *See, e.g.*, DOJCIV-007-00000131; DOJCIV-010-00000112.

3154924.9

which includes each employee's unique Social Security number.[324] Because this number is unique to an individual, I am able to track Class Members if they appear in different Defendant's payroll datasets. A complete discussion of the data is provided in Section VI and Appendix E.

83.     As explained in Section V, ██████████████████████████ ████████████ , while ████████████████████████████ ██ . I refer to these pairs of Defendants, "SCA-DaVita" and "SCA-USPI," as "Covered Defendants." Using the payroll data, I develop an indicator for whether each Senior-Level Employee left to work for a "Covered Defendant" in each year. The resulting data, aggregated to the individual-year level, allows me to study movements of Senior-Level Employees between "Covered Defendants" from 2008 to 2021.[325]

84.     **Figure 2** below graphs the Senior-Level Employee flows between Covered Defendants during and after the Conduct Period. The left panel considers the total count of moves between Covered Defendants in a given year, while the right panel examines the percentage of all Senior-Level Employee departures that are moves between Covered Defendants. Between ████████████ during the Conduct Period, the average number of departures between Covered Defendants was ████████ . However, in ████████████ , after the No-Poach Agreements ended, the average number of departures between Covered Defendants



---



[324] ████████████████████████████████████████████████████████

[325] ████████████████████████████████████████████████████████

███████████████████. In terms of the percentage of departures that are moves between Covered Defendants, in the initial years of the Conduct Period the percentage is around ███, then ██████, then ███████████████████████████████████████████, before ██████████████████████████. Both of these patterns suggest that, although mobility between Covered Defendants ████████████████████████████████████████████████, the bilateral flow of Senior-Level Employees slowed ██████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████.



85.     The right panel of **Figure 2**, which measures moves between Covered Defendants as a fraction of all departures, accounts for the fact the employees may be leaving for reasons other than the relaxation of the No-Poach Agreements. For example, I understand that in the

████████████████████████████████████████████████████████████████

3154924.9

██████████████████████████████████████ [326] As part of the Tenet acquisition of USPI, in █████████████████████████████████████████████████

███████████████████████████████████████ [327] ██████, however, Tenet

████████████████████████████████████████████████████████████

████████████████████████████████ [328] This led to litigation against USPI in 2019 and 2020 and the █████████████████████████████████████████████████ [329]

For example, former USPI Market President Alex Bateman testified that ████████████████████

████████████████████████████ [330] Former USPI SVP, Chief Human Resources

---

[326] 2d Am. Class Action Compl., *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.), ECF 101 ¶¶ 25, 47, 110–111, 122; Karrmann Dep. at 12:12–21; Mosley Dep. at 81:14–82:22.

[327] Compl., *Cagle v. United Surgical Partners Int'l, Inc.*, No. 3:20-cv-01681-BN (N.D. Tex.), ECF 1 ¶¶ 23–30; 2d Am. Class Action Compl., *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.), ECF 101 ¶¶ 1–2, 6–7.

[328] 2d Am. Class Action Compl., *Andrews*, ECF 101 ¶ 83; Mem. Op. & Order, *Cagle v. United Surgical Partners Int'l, Inc.*, No. 3:20-cv-01681-BN (N.D. Tex.), ECF 34 at 5.

[329] Garvin Dep. at 9:20–21 (███████████████████████████); Deposition of Andrew Johnston (Sept. 6, 2024) at 32:22–24 (███████████████████); Karrmann Dep. at 35:21–36:1 (███████ ████████████); Deposition of Alex Bateman (Jul. 19, 2024) [hereafter Bateman Dep.] at 30:1–5 (███████████████████); Mosley Dep. at 79:2–10 (Mosley left in 2020); McGarry Dep. at 21:18 (███████████████████████); Deposition of Cindy English (Jun. 12, 2024) [hereafter English Dep.] 21:7 (███████████████); Deposition of Anthony Martin (Jun. 27, 2024) at 15:4–5, 20:7–8 (███████████████████); Compl., *Cagle*, ECF 1 ¶¶ 10, 35, 38 (Cagle was terminated May 9, 2019 and filed a complaint with the Department of Labor on October 31, 2019); 2d Am. Class Action Compl., *Andrews*, ECF 101 ¶¶ 25, 122; Ex. PX185 (██████████████████████); *Jeff Andrews*, LINKEDIN, https://www.linkedin.com/in/jeff-andrews-b7300b8/ (last visited Jan. 2025) (Market President, left in November 2019); *Kelly Barker*, LINKEDIN, https://www.linkedin.com/in/kelly-barker-462332/ (last visited Jan. 2025) (SVP, Controller of U.S. Operations, left in January 2020); *Matt Pate*, LINKEDIN, https://www.linkedin.com/in/matt-pate/ (last visited Jan. 2025) (SVP, left in June 2020); *Daphne Walker*, LINKEDIN, https://www.linkedin.com/in/daphne-walker-a351759a/ (last visited Jan. 2025) (SVP and Chief Legal Officer, left in June 2020); *Philip A. Spencer*, LINKEDIN, https://www.linkedin.com/in/phil-spencer-1547546/ (last visited Jan. 2025) (SVP of Business Development, left in December 2019).

[329] Bateman Dep. at 30:18–31:5.

[330] Bateman Dep. at 30:18–31:5.

3154924.9

82

& Support Services Officer and Tenet/USPI EVP Sandi Karrmann testified that USPI/Tenet

███████████████████████████████████████████████████████.[331] Because my

analysis assesses moves between Covered Defendants as a fraction of all departures from the

company, my analysis accounts for this ███████████.

86.      I confirm that the Conduct Period end date of ████ is appropriate for both the

SCA-DaVita No-Poach Agreement and the USPI-SCA No-Poach Agreement by using a

regression approach. I take the individual-year data and I test how the probability of a move

between each pair of Covered Defendants varies from ████████████████████████

████████████████████████████████████████████████████████

███████████.[332] If ████ is the last year of the No-Poach Agreements, then in ████ we should

observe a statistically significant uptick in the movement of Senior Employees between the

Covered Defendants, and we should see no statistically significant differences in the other years

████████████████████. **Figure 3** below shows exactly this for both sets of No-Poach

Agreements. Relative to ████, in ████ there is a ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

---

[331] Karrmann Dep. at 11:13–20.
[332] Ex. PX299; Ex. PX300.

3154924.9

**Figure 3: Annual Probability of Mobility Between Covered Defendants Relative to 2017**



| Dependent Variable: | [1] 1(Leave for DaVita or SCA) | [2] 1(Leave for USPI or SCA) |
|---|---|---|
| Year = 2008 | | |
| Year = 2009 | | |
| Year = 2010 | | |
| Year = 2011 | | |
| Year = 2012 | | |
| Year = 2013 | | |
| Year = 2014 | | |
| Year = 2015 | | |
| Year = 2016 | | |
| Year = 2017 | | |
| Year = 2018 | | |
| Year = 2019 | | |
| Year = 2020 | | |
| Year = 2021 | | |
| Constant | | |
| Sample | DaVita & SCA | USPI & SCA |
| Observations | | |
| R-squared | | |

*Note:* Robust standard errors in parentheses *** p<0.01, ** p<0.05, * p<0.1

87.     Moreover, to test that the cumulative effect of the No-Poach Agreements

—and that the patterns above are not simply noise or explained by time

trends, I use a standard multivariate regression framework to assess the degree of movement

83

suppression associated with the Conduct Period both overall and for each pair of bilateral No-Poach Agreements.[333]

88.     The results of this analysis are shown in **Figure 4** below. Column (1) examines whether the likelihood that a Class Member left for a Covered Defendant in a given year is lower during the Conduct Period, controlling for year trends. I find that the Conduct Period is associated with a ███████████████████████████████████████ in the probability of movement between Covered Defendants. When expressed in relative terms to the average number of employees who leave each year, this estimate shows movement between Covered Defendants during the Conduct Period ██████████████████ relative to sample average.

89.     Columns (2) and (3) repeat the analysis of Column (1) but do so by looking only at the *bilateral* covered Defendants, as opposed to grouping them together. Column (2) considers the SCA-DaVita No-Poach Agreement, while Column (3) considers the SCA-USPI No-Poach Agreement independently. In both cases, I find that the No-Poach Agreements are associated with a ████████████████████████████████████████████ in movement between Covered Defendants.

---

[333] *See* Section VI for a detailed explanation of this regression framework.

3154924.9

85

**Figure 4: Probability of Mobility Between Covered Defendants**

| Dependent Variable: | [1] 1(Leave for Covered Defendant) | [2] 1(Leave for DaVita or SCA) | [3] 1(Leave for USPI or SCA) |
|---|---|---|---|
| Conduct | | | |
| **% Effect Relative to Sample Mean** | | | |
| Year | | | |
| Sample | All | DaVita & SCA | USPI & SCA |
| Sample Mean of DV | | | |
| Observations | | | |
| R-squared | | | |

*Note:* \*\*\* p<0.01, \*\* p<0.05, \* p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

90.     Taken together, the quantitative evidence presented in this section is ▮▮▮▮ ▮▮▮▮▮▮▮▮ No-Poach Agreement to prevent Class Members from moving between Covered Defendants.

91.     In addition to the previous mobility analysis, the ▮▮▮▮▮▮▮▮▮▮▮ in Section VI also constitute evidence of the effects of the No-Poach Agreements. Those analyses demonstrate that the Conduct Period is associated with ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ in Senior-Level Employee ▮▮▮▮▮.

**C.**     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

92.     I next review the criteria economists use to assess whether CSI Exchanges are indicative of anticompetitive cartel behavior. I then assess whether the information exchanged among the Defendants meets these criteria.

85

3154924.9

## 1. Economic Criteria for Assessing CSI Exchanges

93. The exchange of CSI is often a key component of collusion.[334] In an article published in the *Journal of Economic Literature*, Professors Margaret Levenstein and Valerie Suslow explain that "[i]ndustry associations often engage in the collection and dissemination of information, which may facilitate collusion."[335] Levenstein and Suslow explain that "[c]ollusion in general implies . . . . that the rival sellers in some manner arrive at an understanding as to what price to charge or what outputs to produce, or both."[336] This does not necessarily mean that firms in a cartel explicitly choose a specific price or compensation level, but rather that the cartel pursues a commonly understood goal (lowering input prices below competitive levels) and shares information to achieve that goal.[337] In this case, the exchange of Senior-Level Employee compensation information would give Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees for their services.

94. The DOJ and FTC's *Competitor Collaboration Guidelines* state that the exchange of "competitively sensitive information . . . . may facilitate explicit or tacit collusion."[338] The *Guidelines* highlight that: "[T]he sharing of information relating to price, output, costs, or

---

[334] *See, e.g.*, Levenstein & Suslow (2006). *See also* MODERN IO 4TH ED. at 122–156; Jonathan B. Baker, *The Case for Antitrust Enforcement*, 17 J. ECON. PERSPECTIVES 27–50, 27 (2003). *See also* ADAM SMITH, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS, 105–106 (W. Strahan & T. Cadell, London 1776) ("People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices.").

[335] Levenstein & Suslow (2006) at 69.

[336] *Id.* at 45.

[337] *Id.* at 45 (noting there are often "multiple [price] equilibria" coordinated by a cartel). *See also* Steven G. Lanning, *Costs of Maintaining a Cartel*, 36(2) J. INDUS. ECON. 157, 160 (1987) (describing "allowed pricing variation" within a cartel structure).

[338] *Guidelines* at 6.

3154924.9

strategic planning is more likely to raise competitive concern[.]"[339] The timing of the information being exchanged is also relevant: "[T]he sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information[.]"[340] Finally, the level of aggregation is also important: "[T]he sharing of individual company data is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data."[341]

95.     Further, the *direct and explicit* coordination among rivals to fix prices is anticompetitive and thus direct evidence of anticompetitive conduct. Episodes of direct inter-buyer information exchanges are even more likely to suppress employee compensation. Antitrust authorities appropriately consider "direct inter[firm] communications of current prices on specific transactions to be nearly naked restraints" of trade.[342] These "hard-core cartel agreements" are accordingly per-se illegal under federal antitrust law.[343]

96.     Therefore, qualitative evidence of exchanges of competitively-sensitive wage data would include any evidence of communication or coordination among horizontal competitors

---

[339] *Id.* at 15.

[340] *Id.*

[341] *Id.* at 16.

[342] PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 21113e (4th ed. 2017).

[343] *See* Michael Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (citing *Guidelines* at 3 ("Agreements of a type that always or almost always tends to raise price or to reduce output are per se illegal. The Agencies challenge such agreements, once identified, as per se illegal. Types of agreements that have been held per se illegal include agreements among competitors to fix prices or output, rig bids, or share or divide markets by allocating customers, suppliers, territories, or lines of commerce. The courts conclusively presume such agreements, once identified, to be illegal, without inquiring into their claimed business purposes, anticompetitive harms, procompetitive benefits, or overall competitive effects. The Department of Justice prosecutes participants in hard-core cartel agreements criminally.")).

87

3154924.9

involving employee compensation, particularly if it includes future plans for compensation. Evidence of firms agreeing to match or set compensation at certain levels would be evidence of price-fixing.

97.     Quantitative evidence of CSI exchanges would also include evidence of generalized wage suppression during the period Plaintiffs alleged the CSI exchanges occurred.

98.     In contrast, evidence consistent with unilateral conduct with regards to sharing information might include sharing with a third-party aggregator or the government for benchmarking purposes. I am not aware of an example of how a firm can directly share CSI with a horizontal competitor that is in the company's unilateral self-interest. Moreover, the direct communications between horizontal competitors to agree to share CSI with each other is inherently inconsistent with unilateral conduct.

**2.**     ████████████████████████████

99.     The qualitative record evidence supports the allegation that Defendants SCA and DaVita ███████████████████████████████, and SCA and USPI did the same. The type of CSI shared could be used by Defendants to ███████████████. I review this evidence below.

100.     The SCA-DaVita CSI Exchanges

a.     ████████████████████████████████

████████████████████████████████████

████████████████████████ [344]

_____

[344] Hayek Dep. at 369:11–24 ████████████████████
████████████████████████ .).

88

3154924.9

b.    In ▮▮▮▮▮, Hayek received an email regarding e▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[345] Hayek testified that the ▮▮ information was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[346] Further, Hayek testified that he understood the information was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[347]

c.    

[348]

d.

[349]

e.

[350]

---

[345] Ex. PX490 at HAYEK-000012214–16 (2009 email from Wagner to Hayek listing various raises at companies including DaVita).

[346] Hayek Dep. at 367:17–24.

[347] *Id.* at 369:11–24.

[348] *Id.* at 362:8–363:7.

[349] Deposition of Brian Mathis (Sept. 20, 2024) [hereafter Mathis Dep.] at 53:14–56:20.

[350] Ex. PX491 at OMC_BM_000013355.

3154924.9



f. ██████████████████████████████

████████████████████████████████████████

████████[351] under the ████████████████.[352]

g.     The record evidence does not show that SCA and USPI ever agreed to

████████████████. Note, however, that SCA's current CFO Wachsman did testify that

such data exchanges ████████████████████████████████.[353]

101.    <u>The SCA-USPI CSI Exchanges.</u> The evidence shows that SCA and USPI

████████████████████████████████████████████████

████████████████

a.     The record evidence demonstrates ████████████████ between SCA

and USPI regarding ████████[354] Mathis testified that SCA ████████████████████

████████████.[355]

b.     Around ████, Hayek obtained USPI's ████████████████████

████████████████.[356] SCA and USPI ████████████████.[357]

---

[351] Rucker Dep. at 255:10–256:12.

[352] *Id.* at 234:20–25.

[353] Wachsman Dep. at 177:22–178:4, 232:19–233:1.

[354] *See, e.g.,* Ex. PX489 (a ████████████████████████████
████████). *See also* Hayek Dep. at 353:16–354:2 (Hayek testified that Mathis████████
████████); *id.* at 360:14–361:6 (Hayek also testified that
████████████████.); Ex. PX232 at
USPI_CIV_000021155 (2014 email exchange between USPI and SCA regarding exchanging
wage increase data).

[355] Mathis Dep. at 53:11–56:10.

[356] Ex. PX490 at HAYEK-000012215–16; Hayek Dep. at 366:10–372:22 ████████████████
████████.).

[357] Ex. PX501 at SCA002277742; *see also* Mathis Dep. at 208:18–211:1.

3154924.9



c. In ███████████, USPI's then-CFO Mark Kopser circulated a ███████ ██████████████████████████████████████████████████████████████████.[358] Wilcox confirmed that ████████████████████████████████████████████ ████████████████.[359]

d. Former SCA CFO Peter Clemens testified that he would ████████ ████████████ with Jason Cagle, USPI's former SVP and CFO, ████████████ ██████████.[360] The record shows that Clemens and Cagle ████████████████████ ██████████████████████████████████████████████████████████████ ████████████.[361] Clemens said that SCA ██████████ USPI in ████████████████ ████████████████████████████████████████████████████████ ████████.[362]

e. SCA CFO Leslie Wachsman also testified that SCA ██████████████ ████████████████████████████████████████████.[363]

f. An internal SCA ██████████████████████████████████ ████████ noted that ████████████████████████████████████████████████ ████████████████████████████████████████████[364] The ████ requested that ████ ████████████████████████████████[365]

[358] Ex. PX516 at USPI_CIV_000105175.
[359] Wilcox Dep. at 177:1–10 (Wilcox testified that ████████████████████████████████ ████████████████ ).
[360] Clemens Dep. at 106:10–107:23.
[361] *Id.* at 108:12–109:17, 128:12–132:1.
[362] *Id.* at 188:24–189:7.
[363] Wachsman Dep. at 206:13–19 (████████████████████████████████████ ████████████ )
[364] Ex. PX522 at OMC_BM_000000888.
[365] *Id.*

3154924.9

g.      In at least the years 2011 and 2012, SCA reached out to USPI and DaVita to exchange planned merit adjustments for the upcoming years, which SCA would then incorporate into its labor budget planning.[366]

h.      In a ███████ email exchange, former USPI CFO Mark Kopser contacted Mathis ████████████████████████████████[367]

i.      In ███████████, Mathis and Kosper again ████████████████



████████████[368] ████████████████████████

████████████████████████████████

██ .[369]

j.      For example, in a ████████████ Clemens asked a subordinate to ████ ████████████████████████.[370] In that email chain, Cagle writes to Clemens, ████████████████████████████████

_____

[366] Ex. PX524 at OMC_BM_000013354–55; Mathis Dep. at 53:5–63:5, 66:5–76:12; Ex. PX232 at USPI_CIV_000021155; Ex. PX37 at USPI_CIV_000016100; Deposition of Mark Kopser (Dec. 12, 2024) at 32:3–38:2, 105:5–108:9; Deposition of Jason Cagle (Aug. 6, 2024) at 119:24–120:23; Ex. PX240 at USPI_CIV_000686081 (USPI Cost Reduction Analysis notes that ████ ████████████████████████████ .

[367] *See* Ex. PX523 at OMC_BM_000010778 (████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████ .

[368] Ex. PX489 at OMC_BM_000014759.
[369] *Id.*
[370] Ex. PX33 at SCA002364259–60.

3154924.9

████████████████████████████████████████████████████

████████████████████████ [371]

k.      In another August 2013 email from Brian Mathis to Cagle, Mathis wrote, "One of the things we have shared in the past is plans for the following year wage increases. Have you all started set a number yet that you're planning to budget?" Cagle responded, "Not yet, but probably will nail down the second half of August. We'll remember to share with you when we do."[372]

l.      USPI and SCA also ██████████████████████████████ ████████████████████████████████████ [373] For example, ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ [374] Clemens testified that ████████

██████████████████████████████████████████████████████

███████████████████████████ [375] Similarly, Wachsman testified that ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ [376]

---

[371] *Id.*

[372] Ex. PX37.

[373] *See* Ex. PX63 at SCA000609009 (████████████████████████████████████████████████████████████████████████████████).

[374] Ex. PX59 at SCA002364265.

[375] Clemens Dep. at 135:21–137:11.

[376] Wachsman Dep. at 102:18–103:14, 107:6–10.

93

m. Moreover, in a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ former USPI VP of Financial Operations Cindy English and former SCA Executive VP and General Counsel Rich Sharff ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓ [377] English testified that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓ [378]

n. In ▓▓▓▓▓▓▓, SCA and USPI also ▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓ [379]

o. SCA and USPI also ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ [380]

p. In ▓▓, Mosley prepared an ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ [381]

q. Further, in a ▓▓▓▓▓▓▓▓, former USPI VP of Talent Acquisition Mosley informed Wilcox that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[377] Ex. PX119 at USPI_CIV_000601224–26.
[378] English Dep. at 60:8–10 (English testified that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓); Ex. PX120 at USPI_CIV_000584419–20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[379] Ex. PX138 at USPI_CIV_000122239; Deposition of Brett Brodnax (Sept. 12, 2024) at 42:5–18.
[380] Ex. PX520 at USPI_CIV_000111382 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See also* Wilcox Dep. at 199:10–14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
[381] Ex. PX283 at USPI_CIV_000035856.



[382] Wilcox replied that ███████████

███████████████████ [383]

     r.     SCA and USPI's finance team leaders ██████████

█████████████ [384] Wachsman, described the ASC business as ████████

███████████████████████ [385]

     s.     ███████████████████████

███████████████████ [386]

     t.     The record evidence does not show that SCA and USPI ██████

███████████████████████████

███████████████████████████

███████ [387]

---

[382] Ex. PX239 at USPI_CIV_000046079 ████████████████

████████████ .

[383] *Id.*

[384] *See* Ex. PX60 at SCA001075713–714.

[385] Wachsman Dep. at 202:22–203:9 (█████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████; *id.* at 204:16–21 (█████████████████

████████████████████████████████ ).

[386] *See* Ex. PX235 at USPI_CIV_000110943 █████████

████████████████████ ); Ex. PX135 at USPI_CIV_000016089 ██

███████████████████████████ ;

USPI_CIV_000467624 and USPI_CIV_000411545 (████████

████████████████ ); Wachsman Dep. at 192:19–21 (████████

██████████ ).

[387] Wachsman Dep. at 177:22–178:4, 232:19–233:1.

**3.**

102. If exchanging CSI among Defendants allowed them to ██████████

████████████████████████████████████████████████████████

████████. The ████████ regression I perform next in Section VI demonstrates

that Senior-Level Employee ████████████████████████████. This evidence is

████████████████████████████████████████████████████

██.

## VI. Econometric Evidence of ████████████

103. In this section, I empirically test the hypothesis that, after controlling for other relevant economic factors, Defendants' alleged misconduct during this period economically and statistically significantly suppressed Class Member wages. I use standard econometric techniques and data common to the Class to perform these analyses.

104. I use granular employee-level pay data provided by each of the Defendants to evaluate whether there exists a causal relationship between the Challenged Conduct and Class Members' compensation. The key question this analysis answers is: *What would the compensation of Class Members have been during the Conduct Period had the Challenged Conduct not taken place*? The goal of this section is to develop an appropriate econometric model that estimates the causal effect of the Challenged Conduct.

105. Below, I first explain how a multivariate regression model can be used to isolate the effect of the Challenged Conduct by accounting or "controlling" for other relevant factors that might also cause changes in compensation. I then describe the data and documents produced by each Defendant that I used to perform this analysis. Next, I demonstrate that after controlling for other relevant wage-determining factors, the Challenged Conduct is ████████████

████████████████████████████████████████████. Moreover,

█████████████████████████████████████████████. I then employ a series of robustness checks and alternative models to test the validity of this finding. I conclude by discussing an additional analysis that rules out the possibility that unmeasured, omitted variables from the model are responsible for ██████████████████ and provide a ████████ ██████████████████.

106.     Given that Plaintiffs allege that both elements of the Challenged Conduct (i.e., the No-Poach Agreements and CSI Exchanges) occurred simultaneously, my analysis measures ██████████████████ from the whole of the Challenged Conduct rather than from each individual component. I note that if the fact finder determines that only one element of the Challenged Conduct occurred, then the ██████████████████ revealed by the analyses below must be wholly attributable to the that element of Challenged Conduct.[388]

107.     My analyses below demonstrate that the Challenged Conduct ██████████ ████████████, or when measured at each individual Defendant, by ██████████ ██████████████████████ These findings are robust to a series of alternative models and are statistically and economically significant findings of harm.

### A.     Standard Econometric Methods To Demonstrate Wage Suppression

108.     To estimate the causal effect (if any) of the Challenged Conduct on Class Member compensation, I use a standard "but-for world" economic framework.[389] A "but-for world"

---

[388] Put differently, if one of the elements of the Challenged Conduct is deemed not to ███ ██████████████ (because it did not happen), then the finding of ██████████ below must be due to the other element of the Challenged Conduct.

[389] Theon van Dijk & Frank Verboven, *Quantification of Damages*, in 3 ISSUES IN COMPETITION LAW AND POLICY 2331–2348, 2332 (ABA Section of Antitrust Law 2008) ("The concept underlying most economic damages assessments is that of the 'but-for' world. In the case of a price-fixing agreement, the but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages.").

framework ascribes the causal effect of the Challenged Conduct as the difference between the observed compensation during the Conduct Period and what the compensation would have been during that period in a world "but-for," or absent, the Challenged Conduct.

109. The fundamental challenge of this exercise, as with any causal question, is that we cannot directly observe the counterfactual but-for world: i.e., what compensation *would have been had the Conduct not occurred*. Thus, to generate an estimate of the causal effect of the Challenged Conduct we need to develop a suitable, observable comparison group that plausibly reflects compensation absent the Conduct. A multivariate regression model is a tool that allows an economist to model what Class Members' compensation would have been but-for the Challenged Conduct. When properly constructed, regression models can produce unbiased estimates of the causal effect of the Challenged Conduct on Class Member compensation, given the compensation data provided by the Defendants and other external sources.[390] The use of regression analysis allows an economist to test the "null hypothesis" that the Challenged Conduct did not have an effect on Class Member compensation beyond what can be explained by competitive factors.[391] Indeed, the Federal Judicial Center's *Reference Manual on Scientific Evidence* explains that multiple regression analysis is "a well-accepted scientific

---

[390] *See, e.g.*, JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH, 68 (South-Western 5th ed. 2013) [hereafter WOOLDRIDGE] 68 ("Multiple regression analysis is more amenable to ceteris paribus analysis because it allows us to *explicitly control* for many other factors that simultaneously affect the dependent variable." (emphasis in original)). *See also* Carlos Cinelli et al., *A crash course in good and bad controls*, 53 SOCIOLOGICAL METHODS & RESEARCH 1–30 (2022) [hereafter Cinelli et al. (2022)].
[391] WOOLDRIDGE at 121–123.

methodology."[392] A key advantage of multiple regression analysis is that it "distinguishes among a number of competing factors . . . allowing the court to isolate a key relationship[.]"[393]

110.    Regressions work by making comparisons between observations. For example, a simple regression might compare average annual compensation of Class Members during the Conduct Period to average annual compensation after the Conduct Period. In order for us to believe that this simple comparison estimates the causal effect of the Conduct, we have to believe that annual compensation after the Conduct Period reflects the "but-for" compensation in a world where the Conduct did not happen but everything else remained the same. This simple comparison is unlikely to deliver causal estimates. Suppose, for example, that inflation rose after the Conduct Period, and that Class Members received cost of living adjustments to account for the increased inflation. Then, compensation during the Conduct Period may be lower than the total compensation after the Conduct Period, simply because of the differences in inflation, and not because the Challenged Conduct suppressed compensation. In statistical parlance, we would refer to inflation here as a confounder, which is a variable that, unless properly accounted for, creates bias in our estimate of the effect of the Challenged Conduct. The role of multivariate regression analysis is to control for such confounders and thus isolate the effect of the Challenged Conduct from confounding factors.

---

[392] FED. JUD. CTR., NAT'L RSCH. COUNCIL, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 308 (3rd ed. 2011) [hereafter REFERENCE MANUAL] ("Because multiple regression is a well-accepted scientific methodology, courts have frequently admitted testimony based on multiple regression studies[.]").

[393] Johnathan Baker & Daniel Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique,* 1 AM. LAW & ECON. REV. 386, 388 (1999) ("Empirical methods can help courts identify what happened and why. This can often be accomplished through a multiple regression analysis that distinguishes among a number of competing factors that were correlated with a fact pattern—allowing the court to isolate a key relationship or critical influence using models that describe the statistical relationship between one variable and a number of others.").

3154924.9

### B.      Data Summary

111.      Defendants produced a variety of data, including employee pay data and "teammate" data. The pay data includes



[394]

112.      From the pay data, I calculate the total gross compensation. I use gross compensation because it is available for all three Defendant firms. Total compensation is defined using all available payment sources, including the employee's salary, bonuses, stocks, and all other pay. In robustness checks I consider alternative measures of compensation, such as subtracting out stock payments or looking at hourly compensation.[395]

113.      While SCA and USPI provided pay data on a daily level, DaVita supplied pay data on an annual level. Therefore, to properly compare across Defendants, I aggregate the pay data to an annual level for all three Defendant firms. The pay data also includes the job titles held by the employee when they earned the listed pay amount.

114.      DaVita and SCA also supplied separate data files with teammate data, which

                                                                            USPI supplied the same data within its pay data files. I combine the compensation and teammate data

---

[394] I accept the employee payout to be the dollar value of the stock payments as it is displayed in the pay data.

[395] I understand that the stock amounts present in the pay data include only payments to employees, not unvested stock amounts. While DaVita supplied the unvested amounts, I only consider the realized payments, which are present in the pay data for each Defendant. *See* 2024-12-19 Ltr to S. Zandi re structured data questions from 11-27-24 Ltr (DaVita's response to Plaintiffs' Question 3: . . .

.

100

(where applicable) to match a given employee's location and other personal information with their payment amounts and job title. DaVita supplied job "levels," which identified employees as being Directors, Vice Presidents, and Senior Vice Presidents (among other levels). I use key terms to classify job titles into comparable levels for SCA and USPI.[396] I combined the available data with publicly available sources, such as Federal Reserve Economic Data (FRED) at the Federal Reserve Bank of St. Louis, to obtain variables such as real GDP. A complete description of the Defendant-supplied data used, the publicly available data used, and my data processing work is provided in Appendix E.

115.    I use the resulting data set, at the individual-company-year level as my main dataset. Note that the main dataset for the compensation analysis is limited to employees who worked the full year.[397] The dataset for the mobility analysis I perform in Section V.B.4 is collapsed to the individual-year level and includes employee-years when they worked only part of the year.

116.    Below are the summary statistics for my regression dataset.[398] **Figure 5** includes the mean, standard deviation, maximum, and minimum value of each variable in my regression.

---

[396] I use the "Director," "Vice President," and "Senior Vice President" levels to define Senior-Level Employees (after also removing employees from excluded departments). *See* App. E for details.

[397] Employees are considered to work a partial year if they were hired in a given year other than in January or if they left in a given year other than in December. *See* my workpapers for details.

[398] The data is limited to Senior-Level Employees, with excluded departments removed. The data are also limited to 2005 through 2022. While USPI provided some data in 2023, it did not cover the full year (it only contains payments for January and the beginning of February 2023)). Employees who worked only part of a year (considered a partial year if an employee was hired in a given year other than in January, or if an employee left in a given year other than in December) are excluded. Finally, anomalous data points (such as employees who earned less than minimum wage, employees who worked fewer than 50 hours in the year, employees who worked over 5,000 hours in the year, and employees who worked negative hours or earned negative pay) are excluded from the main compensation analysis, but included in the mobility analysis. *See* my workpapers and App. E for details.

3154924.9

For example, the mean total hours worked per year is ███████, while the hours worked per year vary from ████████████.

**Figure 5: Defendant Regression Data Summary Statistics**

| Variable | Mean | Standard Deviation | Minimum | Maximum |
|---|---|---|---|---|
| *Total Amount* | | | | |
| *Avg. State Mgr. Earnings* | | | | |
| *State Health Expend. PC* | | | | |
| *Covid* | | | | |
| *State GDP PC* | | | | |
| *State Unemployment Rate* | | | | |
| *Census Region Annual CPI* | | | | |
| *Total Hours* | | | | |

*Notes:* The standard deviation measures variation (spread) of data around the average. WOOLDRIDGE at 734–36

### C.  ██████████████  Models

117.    From a conceptual perspective, the ideal comparison would be to compare each individual's compensation during the actual-world Conduct Period to that same individual's counterfactual earnings in a but-for world were the Conduct not to have occurred. Naturally, absent time travel or a crystal ball, it is not possible to observe the counterfactual directly. However, a well-specified empirical model, coupled with variation in the Challenged Conduct, can estimate the causal effect. The broad idea is to mimic the ideal comparison by examining how an individual's total compensation differs during the Conduct Period relative to before it started and after it ended, while adjusting for other relevant factors that might otherwise confound the relationship between the Conduct and total compensation.

118.    Four Components of the Regression Equation. The regression equation has four components: (1) the *dependent* variable, which is the logarithm of total compensation to each worker in a given year; (2) the key *independent* variable, which is an indicator for the Conduct Period; (3) the *control* variables, which collectively control for other factors that may confound

102

3154924.9

the relationship between Conduct and compensation; and (4) an error term that captures residual determinants of earnings. The regression equation is as follows:

$$y_{ict} = \beta_0 + \beta Conduct_{ct} + \lambda X_{ict} + \alpha_{ic} + \epsilon_{ict}$$

I describe each component below:

a.      *First*, the dependent variable of the regression model $y_{ict}$ is the natural logarithm of total compensation of worker $i$ in year $t$ from company $c$. It is standard to use natural logarithms (ln) for compensation in labor economics. This also allows the regression coefficients to be interpreted in (approximate) percentage terms.[399] Note that as a baseline I include in total compensation all compensation provided, including equity compensation.

b.      *Second*, the key variable of interest, $Conduct_{ct}$, measures variation in the Conduct within company $c$ over time $t$. It is an indicator variable equal to zero before the start and after the end of the Conduct for company $c$, and one during the Conduct Period. My review of the evidence in Section V.B and V.C, summarized below, is consistent with a Conduct Period for SCA and DaVita starting ████████████████████████. For USPI and SCA, the evidence is consistent with a Conduct Period of ████████████████████. Given that the data is annualized, the Conduct Period is defined as ████████████ for DaVita and SCA and ████████████ for USPI.

i.      *Conduct Period for DaVita and SCA Challenged Conduct.* The qualitative and quantitative evidence presented in Section V.B and V.C suggests that the No-Poach Agreement between SCA and DaVita began in ████████████████████████. The evidence also indicates that the No-Poach Agreement had ████████████████. The evidence

---

[399] WOOLDRIDGE at 234 ("[W]hen log(y) is the dependent variable in a model, the co-efficient on a dummy variable, when multiplied by 100, is interpreted as the percentage difference in y, holding all other factors fixed.").

3154924.9

presented above related to the SCA and DaVita CSI exchanges similarly ended in ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮. CSI that was exchanged related to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Given the start of the No-Poach

Agreement ▮▮▮▮ the start date of the CSI exchange, and that it ▮▮▮▮▮▮▮▮, I

conclude that the relevant start date of the Challenged Conduct is ▮▮▮▮▮ while the end date

▮▮▮▮▮▮▮▮.

    ii.    *Conduct Period for USPI and SCA Challenged Conduct.* The

qualitative and quantitative evidence presented in Section V.B and V.C suggests that the No-

Poach Agreement between SCA and USPI began in ▮▮▮▮▮▮▮▮▮▮▮▮▮. The

evidence presented above related to the CSI exchanges between SCA and USPI similarly ended

in ▮▮▮ but started sometime in ▮▮▮. Given that the compensation information that was

exchanged related to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Thus, I conclude that the relevant start date of the Challenged Conduct for USPI and SCA is ▮▮▮

▮▮▮▮ while the end date is ▮▮▮▮▮▮▮.

    c.    In the equation above, the approximate percent change in compensation

associated with the Conduct is given by $\beta_1$.[400] If $\beta_1$ is negative, this implies the Conduct is

associated with a reduction in total compensation, holding other factors constant. If the

coefficient has a low p-value (typically lower than 10 percent), then we can reject the null

---

[400] The exact percent change is given by $e^{\beta_1} - 1$. *See, e.g.*, *FAQ*, UCLA STATISTICAL METHODS & DATA ANALYTICS, https://stats.oarc.ucla.edu/other/mult-pkg/faq/general/faqhow-do-i-interpret-a-regression-model-when-some-variables-are-log-transformed/ (last visited Jan. 9, 2025).

3154924.9

hypothesis that there is no relationship between the Conduct and total compensation, and we say that the estimate is statistically significant.

        d.     *Third,* control variables in the model ($X_{ict}$ and $\alpha_{ic}$) account for other factors that might confound the effect of the Conduct on total compensation. By holding these other factors fixed, the regression isolates the impact of the Challenged Conduct on total compensation. Note that, although this is sometimes confused, it is *not* the goal of control variables to maximize how much variance can be explained in the dependent variable. Rather, some controls are "bad controls" and should be excluded because they induce bias or reduce precision, while others are "good controls" because they either reduce bias and/or increase precision.[401] Broadly speaking, good controls are ones that block non-causal pathways (e.g., confounders), leave mediating paths untouched, do not open new spurious pathways (e.g., colliders), and/or increase the precision of the estimate (so long as they do not induce bias).

119.    <u>Two Baseline Control Variables.</u> I select two baseline control variables to mimic the ideal comparison described above:

        a.     *First*, I include *individual fixed effects* to mimic the ideal comparison. Inclusion of individual fixed effects means the regression model compares the same worker during and absent the Conduct Period. As a result, identification of the Conduct coefficient derives only from workers who are present <u>both during and absent</u> (e.g., either before or after) the Conduct. The inclusion of individual fixed effects also ensures that any characteristics that are inherent to an individual (e.g., a superior negotiation ability) do not drive the Conduct

---

[401] *See generally*, NICK HUNTINGTON-KLEIN, THE EFFECT: AN INTRODUCTION TO RESEARCH DESIGN AND CAUSALITY, Chapter 8 (2021). *See also* Cinelli et al. at 1–30, 1–2 (2022).

coefficient.[402] In my later discussion of "bad controls," I describe why I later modify these fixed effects to be individual-by-company fixed effects.[403]

b.  *Second,* because the Conduct effect is identified by comparing the same worker at different points in time (during vs. absent the Conduct), it is natural for individuals to have different earnings at different time periods. To address this, I include a *linear time trend.* This time trend accounts for the natural growth in annual compensation that would have happened over time even absent the Conduct.[404]

120.  <u>Other Control Variables.</u> I next select other control variables to address geographic differences in pay, macro-economic factors, and healthcare-specific factors that might otherwise confound the Conduct estimate. These include:

a.  *Zip Code Fixed Effects*: Class Members who work in different locations could plausibly earn different amounts just because of local pay differences. Indeed, the Defendant firms do seem to ███████████████████████████████████████.[405] For example, if workers move from rural settings to urban settings their compensation may rise. To account for these geographic differences, I account for fixed differences in total compensation that relates to geographic differences by including zip code fixed effects. In other words, this control makes sure that fixed, location-specific differences in pay do not confound the Conduct coefficient.

---

[402] That is, control variables do not contribute to the Conduct coefficient. Rather, the effects of control variables are purged from the Conduct variable and the dependent variable, per the Frisch-Waugh-Lovell theorem.

[403] *See* VI.C, *infra.*

[404] *See, e.g.,* WOOLDRIDGE at 363 ("Many economic time series have a common tendency of growing over time. We must recognize that some series contain a time trend in order to draw causal inference using time series data.").

[405] *See* Section VII.F.1, *infra,* for evidence that companies ████████████████████ ████████

106

b. *The Consumer Price Index at the Census region-year level*: While zip code fixed effects account for fixed regional differences in pay and local prices, regional inflation differences may confound the Conduct estimate if increases in the cost of living are passed on to workers in the form of higher nominal wages. Accordingly, I control for price levels at the most disaggregated level possible (the Census region-year level).

c. *Unemployment Rate and the Real Gross Domestic Product Per Capita at the state-year level*: Prior research suggests that compensation changes along with macroeconomic business cycles.[406] If, in our comparison of the same worker during vs. absent the Conduct, unemployment were to fall or local GDP to rise then this could plausibly confound the Conduct estimate. Accordingly, I control for the natural log of unemployment and the natural log of GDP per capita at the state-year level, which purges from the Conduct estimate any changes in compensation due to changes in the business cycle.

d. *An indicator for the timing of the COVID-19 pandemic*: This binary variable takes the value of one for the years 2020 and 2021, and zero otherwise.[407] The COVID-19 pandemic dramatically altered the supply and demand for labor broadly, as businesses closed

---

[406] On the procyclicality of wages, *see* Gary Solon et al., *Measuring the cyclicality of real wages: how important is composition bias?*, 1 QUARTERLY J. ECON 1 (1994). On the effects of entering the labor market during a recession *see* Hannes Schwandt & Till Von Wachter, *Unlucky cohorts: Estimating the long-term effects of entering the labor market in a recession in large cross-sectional data sets*, 37 J. LABOR ECON. S161 (2019).

[407] Even though the national public health emergency declaration related to the COVID-19 pandemic was not officially declared over in the US until May 2023, *Fact Sheet*, U.S. DEPT. HEALTH & HUMAN SERVS. (May 9, 2023), https://www.hhs.gov/about/news/2023/05/09/fact-sheet-end-of-the-covid-19-public-health-emergency.html, I do not include the year 2022 in the COVID indicator variable because, per a 2022 Johns Hopkins review: "In 2022, COVID-19 illness was less severe and less deadly compared to 2020 and 2021, and no new variant has emerged with the capacity to fuel a major wave of cases." Jackie Powder, *COVID-19 in 2022: A Year-End Wrap-Up*, JOHNS HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH (Dec. 15, 2022), https://web.archive.org/web/20240620113903/https://publichealth.jhu.edu/2022/covid-year-in-review.

107

and workers were laid off in large numbers.[408] It also had specific impacts in medical employment given the physician shortages nationwide and the challenges of working in a medical field during global pandemic.[409] If I did not control for the timing of COVID, the changes in the labor market created by the COVID pandemic might otherwise confound the Conduct estimate.

121. <u>Healthcare-Specific Controls.</u> The next set of controls ensures that trends specific to the healthcare industry do not confound the relationship between the Conduct and total compensation. These healthcare-specific controls include:

a. *Average annual earnings of managers in the healthcare field at the state-year level*: This controls for a baseline level of managerial earnings in the industries represented by the Defendant firms. If earnings in the labor market for managerial work in healthcare changed during vs. before/after the conduct, then Defendants might also have adjusted Class Member earnings even absent the Conduct.[410]

b. *Healthcare services personal consumption expenditure per capita by state-year*: Similar to the macroeconomic controls, the goal of this control variable is to hold fixed consumer spending on healthcare services, which might otherwise drive managerial earnings. For example, if changes in demand for healthcare are passed on to workers then this could affect their total compensation and thus confound the Conduct estimate.

---

[408] *See* Pedro Brinca et al., *Measuring labor supply and demand shocks during COVID-19*, EUROPEAN ECONOMIC REVIEW 1 (2021) ("Most sectors were subject to large negative labor supply and demand shocks in March and April 2020[.]").

[409] Karen Shen et al., *Job flows into and out of health care before and after the COVID-19 Pandemic*, 5 JAMA HEALTH FORUM 1 (2024).

[410] Because the Defendants comprise a small portion of total managers in healthcare, I do not expect the inclusion of this control to materially control for the effects of the Conduct itself. And even if it does, the empirical strategy captures deviations from this earnings of other managers, biasing the Conduct estimate towards zero.

3154924.9

122. Finally, because the data are *annual* compensation data, the workers who work only part of the year or part-time may seem to have low *annual* compensation. In the main sample I have already limited the data to full-year employees, but this does not address those who work only part-time. Thus, if a worker moves to part-time work, then the individuals may appear to have low *annual* earnings simply because they are working fewer hours. Accordingly, I control for the *logarithm of total hours* worker *i* spent working in company *c* in year *t*.

123. <u>Control Variable Considerations.</u> There are two important notes to consider as it relates to the control variables.

a. *First*, in reviewing the regression output, it is important *not* to over-interpret the relationship between the control variables and the dependent variable. This is because, as Hünermund and Luow (2023) point out, "the estimated effect sizes of controls are unlikely to have a causal interpretation themselves . . . This is because even valid controls are possibly endogenous and represent a combination of several different causal mechanisms operating jointly on the outcome, which is hard to interpret[.]"[411] In other words, the empirical specification is designed to interpret only *one* coefficient causally: the Conduct coefficient. Were I trying to estimate the causal effect of one of the control variables, the empirical specification would necessarily change, and it is likely that the coefficient on the control variables would change too.

b. *Second*, it is important to emphasize why some control variables are *omitted* from the regression. Based on the literature and my own editorial experience, the idea that potential control variables should be omitted from a model is not widely known. Indeed, a

---

[411] Paul Hünermund & Beyers Louw, *On the nuisance of control variables in causal regression analysis*, ORGANIZATIONAL RSCH. METHODS 138 (2023).

3154924.9

recent paper by Cinelli, Forney, and Pearl (2022) on good and bad controls notes that it is not uncommon for empirical researchers to "get the impression that adding 'more controls' to a regression model is always better."[412] This is likely because, as they note, "While most of the widely adopted textbooks discuss the problem of omitting 'relevant' variables, they do not provide guidance on deciding which variables are relevant, nor which variables, if included in the regression could induce, or worsen existing biases."[413] Variables that, when included in the regression, induce bias are known as "bad controls." Bad controls operate by closing mediating pathways between the Conduct and compensation, open non-causal pathways, or (assuming they do not increase bias) otherwise reduce precision.

        c.       What does it mean for a variable to "close a mediating pathway" and thus be a bad control? Mediating pathways are the causal pathways that link the independent variable of interest and the outcome but go through a third variable (called a "mediator"). A classic example of why controlling for a mediator (which closes the pathway) induces bias is from the literature on gender discrimination at work.[414] It is often the case that women earn less than men in the same company, and a potential explanation for this finding is that women are discriminated against. In its defense, a company may look within certain job titles and show that the discrepancy in pay between men and women within those jobs is much smaller than it is at the company overall. The problem with this approach, however, is that, while it may be true that there is no gender discrimination in pay *within* an occupation, the discrimination might be operating by preventing women from getting into those jobs in the first place. For example, it is

---

[412] Cinelli et al. (2022) at 2.

[413] *Id.*

[414] *See* the discussion in Section 3.1.5 in SCOTT CUNNINGHAM, CAUSAL INFERENCE: THE MIXTAPE (2021), https://mixtape.scunning.com/03-directed_acyclical_graphs.

3154924.9

well known that women are underrepresented in top management teams. Thus, by looking within a certain occupation, it may not be surprising that you see less evidence of discrimination because by looking in certain occupations we are in fact controlling for the discrimination that we were seeking to find. Put differently, in this example, occupation is a "bad control."

d.     The logic of this example holds in this case as well, where we are interested in how the Conduct affects Total Compensation. There are many causal mediating pathways that link these two variables, and we should *not* in general control for those mediators. For example, as in Lipsitz and Starr (2022) in the case of noncompete clauses, and as supported by the qualitative evidence regarding the No-Poach Agreements, suppose that Conduct prevents workers from getting promotions to higher-paying jobs (because the company doesn't face as much labor market competition for the worker). Then, like in the discrimination example above, the *job* the worker has is an outcome of the Conduct, and lies on a causal pathway between the Conduct and total compensation. As a result, controlling for the job either directly or by limiting the sample to certain jobs induces bias in the estimates by closing off a causal pathway that connects the Conduct and compensation. Thus, several variables that one might think *should* be controlled for are omitted from the main empirical specification. In addition to the worker's job title, I describe several such "bad controls" briefly.

e.     Similar to a worker's job title, it may seem natural to include a worker's *tenure* as a control variable, because workers with longer tenures are also likely to receive higher earnings. However, if one effect of the Conduct is to reduce the likelihood that a worker will leave, and mobility has an effect on compensation, then longer tenure is an *outcome* of the Conduct (a lack of mobility), and thus conditioning on tenure would close the mediating pathway between the Conduct, tenure, and compensation, resulting in biased estimates.

111

f.  One might also conceive that *company performance* should be controlled for, because workers may receive bonuses tied to company performance. However, if the Conduct affects company performance, and company performance affects total compensation, then controlling for company performance closes off this causal pathway between the Conduct and earnings.[415]

g.  In the same vein, given that the Conduct was ███████████████ ███████████████████████████████████████████████████████ ███████████████ —then even which *company* a worker works at is a bad control. For example, if absent the Conduct a worker would have changed employers and received a large raise, then the company a worker works for lies on a pathway between the Conduct and total compensation. Thus, if our goal is to estimate the aggregate of the effect of the Conduct, then we should not limit the data to a single company, and we should not control for a worker's employer because it is a "bad control."

h.  I initially follow the approach of not controlling for a worker's employer for this reason. However, because the ultimate goal of the empirical exercise is to consider whether *all or nearly all* Senior-Level Employees were commonly harmed by the Conduct, I want to ensure that my estimates are not driven *only* by those who move between companies. That is, I want to explicitly estimate harm that occurred even for those who did not change employers. Thus, I violate the "bad control" rules in this instance and in my preferred model I include individual-by-company fixed effects. Because the inclusion of individual-by-company

---

[415] Alternatively, if total compensation is an input to company performance (depending on the measure used) then company performance would be a collider (a collider is a variable that is affected by both the Conduct and total compensation) and should be omitted because conditioning on a collider creates bias. Cinelli et al. (2022) at 3.

fixed effects identifies the Conduct effect by leveraging comparisons of the same individual within the same company, during vs. absent the Conduct, it rules out the possibility that the Conduct effect is driven only by the movers. In the empirical model specified above, $\alpha_{ic}$ are individual-by-company fixed effects for individual $i$ working at company $c$.

124. <u>Clustering in the Standard Errors.</u> While the discussion above relates to control variables and how they might reduce bias in the Conduct estimate, it is also important to emphasize clustering in the standard errors, because it relates to the issue of statistical significance.

a. Because individual earnings are likely to be serially correlated, I cluster the standard errors at the individual level. This allows the error term to be arbitrarily correlated within an individual over time, when estimating the standard error of the coefficient estimate (which is the key input to computing the p-value of that coefficient estimate).

b. However, it also implies that limiting the sample to a few individuals (even if the number of individual-year observations is large), will produce imprecise estimates or even be undefined. This is because, when the intra-class correlation is large (i.e., when one observation within an individual is highly informative of the other observations of that individual), clustering the standard errors by individual limits the *effective* sample size to the number of individuals in the sample (as opposed to the number of individual-year observations).[416]

---

[416] *See, e.g.*, Shersten Killip et al., *What is an intracluster correlation coefficient? Crucial concepts for primary care researchers*, 2 ANNALS OF FAMILY MED. 204–208, 204 (2004). *See*

3154924.9

125.    <u>Defendant-Specific Conduct Variables.</u> Finally, in the empirical models below, I keep the complete dataset in all analyses, rather than limiting the data to a single company. The reason behind this is twofold: First, the pooled model allows for the Conduct coefficients to be identified in part from the same individuals being present in multiple companies, whereas this is not the case when limiting the sample to a single company. This is important because part of the effect of the Conduct is to affect whether workers move across these companies. Second, the pooled model improves identification of the coefficients on the control variables when they are identified based on all of the observations in the data. Nevertheless, in order to estimate a model that includes all Senior-Level Employees while generating Defendant-specific estimates, I modify the main specification to include Defendant-specific Conduct variables. In particular:

a.    *DaVita Conduct$_{ct}$* is an indicator set to 1 if the Class Member works at DaVita between ███████████ , and is set to 0 otherwise.

b.    *SCA Conduct$_{ct}$* is an indicator set to 1 if the Class Member works at SCA between ███████████ , and is set to 0 otherwise.

c.    *USPI Conduct$_{ct}$* is an indicator set to 1 if the Class Member works at USPI between ███████████ , and is set to 0 otherwise.

d.    The estimating equation for the model that ████████████████████ ████████████████████ is the same as above, except that instead of a common Conduct variable it includes a separate conduct variable for each Defendant, for a total of three:

---

*also Intraclass Correlation Coefficient Cheat Sheet*, NIH COLLABORATORY (Mar. 15, 2020), https://dcricollab.dcri.duke.edu/sites/NIHKR/KR/Intraclass_Correlation_Coefficient_Cheat_She et_March_15_2020.pdf ("When this is the case, the data from one member of the cluster provides almost as much information as if all of the members are included. Hence, the effective sample size is closer to the number of clusters as opposed to the entire sample size of study participants.").

114

$$y_{ict} = \beta_0 + \beta_1 DaVitaConduct_{ct} + \beta_2 SCAConduct_{ct} + \beta_3 USPIConduct_{ct}$$

$$+\lambda X_{ict} + \alpha_{ic} + \epsilon_{ict}$$

In this specification $\beta_1$ represents the (approximate) percentage effect of the DaVita Conduct on total compensation, $\beta_2$ represents the (approximate) percentage effect of the SCA Conduct, and $\beta_3$ represents the (approximate) percentage effect of the USPI Conduct.

126.    Below I present the main regression models, iteratively adding control variables to build up to the main specification. I later consider several robustness checks to ensure the stability of these results to various alternative specifications.

### 1.    Aggregate Suppression Model

127.    **Figure 6** reports the results for the sample of Directors and above, building up to the main specification. In a model with only individual fixed effects and a year trend, the regression estimates aggregate ████████████████████████ (Column 1). Including the geographic, macroeconomic, and healthcare controls in Column (2) indicates ███████████ ████████████ Next, adding the natural log of total hours worked as a control results in a ████ ████████████████████████ in Column (3). Finally, including individual-by-company fixed effects (as opposed to individual fixed effects) in Column (4) results in an aggregate ████ ████████████████████████ The R-squared in the final model is 0.856, indicating that the model explains approximately 85.6 percent of the variation in (log) total compensation. The existence of ████████████ as a result of the Conduct is consistent with the existence of the Challenged Conduct, and that the Challenged Conduct is anticompetitive ████████████ ████████████

**Figure 6: Aggregate Effect of Conduct on Earnings for Directors and Above**



| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Conduct | | | | |
| **% Wage Suppression** | | | | |
| Year | | | | |
| Ln(Avg. State Mgr. Earnings) | | | | |
| Ln(State Health Expend. PC) | | | | |
| Covid | | | | |
| Ln(State GDP PC) | | | | |
| Ln(State Unemployment Rate) | | | | |
| Census Region Annual CPI | | | | |
| Ln(Total Hours) | | | | |
| Individual FE | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

128. To visualize the aggregate results presented above, **Figure 7** below presents the unconditional and conditional trends in Ln(Total Compensation) for Senior-Level Employees, using ███ as a reference year. Recall that changes in Ln(Total Compensation) from one year to the next can be interpreted in approximate percentage terms. The unconditional trends reveal a broadly ████████████ in Ln(Total Compensation) over time, though the ████████ ████████████. However, because the unconditional trends do not account for the control variables described above, they do not isolate the effect of the Conduct on Ln(Total Compensation) from other factors that might cause compensation to vary. In contrast, the bottom panel repeats the same analysis but now conditions on the control variables in the fully saturated

116

model (in column 4 of **Figure 6**). In contrast to the top panel, Ln(Total Compensation) indicates more of a U-shaped relationship, where the compensation is ███████████████████████ ████████████████. Perhaps most clearly, following the end of the Conduct in ████ there is a sustained ████████████████████████████████████████████████████████ ███████████████████████████████



## 2. Defendant-Specific Suppression Model

129. **Figure 8** replicates the structure of **Figure 6**, but instead of imposing a common Conduct effect on each Defendant, it allows each Defendant to have its own Conduct effect. The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Directors and above was to █████████████████████████████████████████

3154924.9

118

**Figure 8: Defendant-Specific Effect of Conduct on Earnings for Directors and Above**



| | Dependent Variable: Ln(Total Annual Compensation) | | | |
| --- | --- | --- | --- | --- |
| | [1] | [2] | [3] | [4] |
| DaVita Conduct | | | | |
| **% Wage Suppression** | | | | |
| SCA Conduct | | | | |
| **% Wage Suppression** | | | | |
| USPI Conduct | | | | |
| **% Wage Suppression** | | | | |
| Year | | | | |
| Ln(Avg. State Mgr. Earnings) | | | | |
| Ln(State Health Expend. PC) | | | | |
| Covid | | | | |
| Ln(State GDP PC) | | | | |
| Ln(State Unemployment Rate) | | | | |
| Census Region Annual CPI | | | | |
| Ln(Total Hours) | | | | |
| Individual FE | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 3. Robustness Checks

130. In robustness checks, presented in Appendix D, I consider several other specifications and sample restrictions to ensure the results presented above are robust to deviations from the baseline setup provided above. I summarize these briefly.

119

a.    Given that the economic literature suggests that no-poach agreements can suppress various types of compensation, including salary and stock-based compensation, in **Figure 26** and **Figure 27** I show that the results are robust to using different measures of compensation, including total compensation minus stocks, regular plus other pay, and hourly wages.

b.    In **Figure 28**, I use an alternative approach to estimating the effect of the Conduct called a Poisson regression. Some advocate for using a Poisson regression instead of least squares regression (the regression framework employed previously) because it is better at handling situations when the natural logarithm of the outcome variable is zero.[417] While annual compensation in the main sample does not include zero, I nevertheless confirm that the results are robust to Poisson regressions.

c.    In **Figure 29,** I allow for the fact that Defendants may respond differentially to control variables (e.g., Defendants might give different cost of living adjustments for the same level of inflation). I account for these potential differences by interacting control variables with company-indicators.[418]

d.    Even though they are bad controls, as discussed above, in **Figure 30** I show the results are nevertheless robust to controls for tenure and job title fixed effects.

---

[417] Chen, J. and Roth, J., *Logs with zeros? Some problems and solutions*, QUARTERLY J. ECON.1–22, 1 (2024).

[418] Note that fully interacting company indicators with all controls is equivalent to a subsample approach where we limit the sample to a given firm. Given the need to allow for workers to contribute to the Conduct estimates at multiple firms simultaneously (because part of the effect of the Conduct is to change where people work), I disfavor this particular approach.

120

3154924.9

e.      Some may worry that including the COVID years at all may bias my results. While I include a control for COVID in my main specification, an alternative approach is to drop the COVID years altogether. I do that in **Figure 31** and find consistent results.

f.      The main sample excluded those who worked only part of the year because it then systematically underestimates *annual* earnings. Nevertheless, in **Figure 32** I show that the results are robust, even including employees who work only part of the year.

g.      In the main sample I had excluded certain anomalous observations.[419] In **Figure 33** I include these outlier observations to ensure that the results are robust to including them in the sample.

h.      Because Defendants did not provide a harmonized time frame for their compensation data, some of the point estimates derive from using data from different time periods. **Figure 34** shows that the results are robust to harmonizing the time frame of the data across Defendants (i.e., 2008 to 2022).

i.      Because individual fixed effects rely on comparisons of the same individual during and absent the Conduct, in the main specification there may be Senior-Level Employees who are not contributing to the Conduct estimate. To ensure the results are similar when all Class Members are included, I pursue two approaches. I first show that the results are robust to dropping the individual-by-company fixed effects (**Figure 35**). Second, instead of a fixed effects model, I use a random effects models, which reflects a weighted average of the individual-fixed effects model and the "pooled" model (**Figure 36**).[420]

---

[419] Outliers dropped include observations such as employees who earned less than minimum wage, employees who worked fewer than 50 hours in the year, employees who worked over 5,000 hours in the year, and employees who worked negative hours or earned negative pay. *See* my workpapers for details.

[420] WOOLDRIDGE at 492–496.

121

131.    Across all of these robustness checks, while the estimates vary to some degree (as expected), they are all broadly similar in that the relationship between the Conduct and compensation is ███████████████████████████████████████████ ███████████████████████████████. These robustness checks demonstrate that the ████████████████ found by the model are not an artifact of the specific model I construct and provide additional confidence that the econometric modeling is detecting a ██ ████████████████████.

### 4.    Sensitivity to Unobservable Variables

132.    The multivariate regression models above are designed to compare the same worker in the same company during the Conduct Period to themselves in the same company at a time when the Conduct is not present, while controlling for potential confounding variables that might otherwise create a spurious relationship between the Conduct and compensation. While the model includes many control variables that reduce the likelihood of identifying a spurious relationship, it is not possible to include all such control variables. Thus, a remaining question is whether the estimates above are susceptible to "omitted variable bias," which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation. To assess the potential for unobserved variables to be responsible for the observed relationships above, I deploy an approach designed to not only account for such omitted variables, but also to plausibly provide a lower-bound estimate of the effect of the Challenged Conduct on Class compensation.

133.    The idea behind the analysis is to compare Class Members (Senior-Level Employees, i.e., employees at the Director-level and above) to the next-highest level of workers within each company (Managers). These Managers are excluded from the Class because the documentary evidence suggests that ████████████████████████████████████

3154924.9

████████████████. However, if there are unobserved variables that are responsible for the Conduct effect, but Manager compensation is similarly affected by such unobserved variables, then by taking the difference between Class Member compensation and Manager compensation in a given company-year, we can difference out the effects of those unobserved variables. The downside to this approach is that Managers may also be directly or indirectly affected by the Conduct via intra-firm pay structures (as suggested by the empirical results in Section VII.F). In that case, differencing between Class Members and Managers will provide *a lower bound* estimate of the effect of the Conduct on Senior-Level Employees.

134. To implement this empirical approach, I return to my primary empirical model from **Figure 6**, but now include Managers in the sample. I then add an interaction between the Conduct and whether the worker is a Senior-Level Employee, as well as an indicator for being a Senior-Level Employee. In these models, the coefficient on the Conduct variable reflects the influence of the Conduct on Managers, while the interaction term reflects how the Conduct affects Senior-Level Employee compensation *above and beyond* how the Conduct affected Manager compensation. To further mitigate the possibility of omitted variables, I include in this specification company-by-year fixed effects, which ensures that the Conduct coefficient is being identified by comparing Director and above and Manager compensation *in the same firm-year.*[421] The inclusion of these fixed effects subsumes the main Conduct effect, but not the differential effect for Class Members.

135. **Figure 9** shows the results. Columns (1) and (2) look at the overall Conduct effect, and find that not only is Manager compensation ████████████████ by the Conduct ██

---

[421] Note that this set of fixed effects is not possible to include in the baseline model because it would subsume the Conduct effect, which only varies at the company-year level.

3154924.9

███████████████████████ , but that Class Members are ████████████████████████████

████████ Breaking the results down by Defendant in columns (3) and (4) reveals similar

patterns at play for each Defendant firm. For each company not only are Managers ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ Because Managers appear to be ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████

136.    Taken together, the quantitative analysis I performed in this section finds that the

Challenged Conduct ████████████████████████████████████████████████████████

████████████████████████████ I performed a bevy of robustness checks to ensure that

the final empirical model and results are robust to various alternative specifications and

empirical considerations. Finally, I generate a lower bound estimate of ████████████

████████ which also accounts for the influence of unobserved variables by comparing Senior-

Level Employees to Managers. This evidence suggests that Managers were indeed ████████

████████████████████████████████████████████████████████████████████

████████

124

**Figure 9: Directors Are More Strongly Affected By Conduct Than Managers**

| Baseline Category: Managers | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | Overall | | By Defendant | |
| | [1] | [2] | [3] | [4] |
| Conduct (Managers) | | | | |
| Conduct*1(Directors & Above) | | | | |
| **Lower Bound Suppression %** | | | | |
| DaVita Conduct (Managers) | | | | |
| DaVita Conduct*1(Directors & Above) | | | | |
| **DaVita Lower Bound Suppression %** | | | | |
| SCA Conduct (Managers) | | | | |
| SCA Conduct*1(Directors & Above) | | | | |
| **SCA Lower Bound Suppression %** | | | | |
| USPI Conduct (Managers) | | | | |
| SCA Conduct*1(Directors & Above) | | | | |
| **USPI Lower Bound Suppression %** | | | | |
| 1(Directors & Above) | | | | |
| Healthcare, Macro, Hours | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

## VII. Common Impact

137. In Section VI, I demonstrated that the Challenged Conduct ▮▮▮▮▮▮▮▮ for Class Members at each of the Defendant firms in the aggregate. In this section, I demonstrate that the ▮▮▮▮▮▮▮▮ found above impacted all or nearly all Class Members.

3154924.9

138.     I use <u>six</u> independent and complementary methods to demonstrate that ███

███████████████████████████████████████████████████████████████████████

██████████. The first two approaches extend the regression models developed in Section VI

to analyze logical subgroupings of employees. The next three approaches use common

econometric methods to generate *individual-specific* estimates of harm. The final method

demonstrates █████████████████████████████████████████████████████████████

████████████████████████████████████. I describe each approach briefly.

139.     *First*, I use a similar regression model to those developed in Section VI to

examine the extent of ████████████ for natural subgroupings of Class Members at each firm.

I find that ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████, even though conditioning on the

job level is a "bad control."

140.     *Second*, to avoid the bad control problem from conditioning on specific job levels

in the prior analysis, and to get a better perspective on how the Conduct affects Class Members

at different points in the compensation distribution, I perform *quantile regressions* of employees

at different pay levels. These analyses show how the Conduct affects the compensation of Class

Members at each percentile of the earnings distribution. For example, this analysis reveals that

█████████████████████████████████████████████████████████████████████

██████████. I then repeat this analysis to show that the Conduct ████████████████

██████████████████████████████████████████

141.     *Third*, I use a technique known as "in-sample prediction" to assess whether individual Class Members were able to escape the aggregate suppression resulting from the Challenged Conduct.[422] This approach uses the regression models established in Section VI to predict what each Class Member would have been paid but for the Challenged Conduct, and then compares the but-for compensation to the compensation the Class Member actually received. Using this method and a modified version of it to further account for the possibility of false positives, I show that ██████████████████████████████████████

███████████████████████████████.[423]

142.     *Fourth*, I deploy a "random coefficient model," which uses the same baseline model as in **Figure 6**, but allows estimation of the effect of the Conduct for each individual Class Member. This approach differs from the in-sample prediction approach in that it does not rely on *generalized* harm to predict individual "but-for" compensation. Rather, it uses the same empirical model but directly delivers individual estimates of harm for each individual. This approach estimates that ████████████████████████████████████████████.

143.     *Finally*, I demonstrate using both qualitative and quantitative evidence that

█████████████████████████████████████████████. The existence of ███

█████████████████████████████████████████

---

[422] *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods*, 31 F.4th 651, 672 (9th Cir. 2021) [hereafter *Olean v. Bumble Bee*] ("Finally, Dr. Mangum used the output of the pooled regression model to predict the but-for prices (i.e., what the price of tuna during the conspiracy period would have been without the overcharge caused by the conspiracy), and compared these predicted but-for prices to the actual prices paid by the DPP class.").

[423] Although a few Class Members ████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

3154924.9



[REDACTED] [424]

144.    Taken together, these complementary analyses demonstrate that [REDACTED]

[REDACTED]. These analyses all rely on methods and data common to the Class.

### A.    By-Employee-Level Category and Defendant Suppression Model

145.    I first consider whether [REDACTED] differ between workers at different tiers within the same company. I do so by modifying the main empirical specification to include an interaction between the Conduct variable and an indicator for whether the worker is a Vice President ("VP") or Senior Vice President ("SVP"). The interpretation of the Conduct coefficient in this model is the [REDACTED]

[REDACTED]

[REDACTED]

146.    I show these results in **Figure 10** below. Column 1 reports the overall results for this model, while Column 2 reports the same pooled model but allows the Conduct effect to differ for each Defendant. As before, the results suggest that [REDACTED]

[REDACTED]  In column (1), the estimates suggest that the [REDACTED]

[REDACTED]  The interaction effects reveal that, [REDACTED]

---

[424] The same methodology utilized in *Johnson* was accepted by the court in Order Granting Plaintiffs' Supplemental Motion for Class Certification, *In re High-Tech Employees Antitrust Litigation*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013) ("Plaintiffs noted that Dr. Leamer's approach followed a roadmap widely accepted in antitrust class actions that uses evidence of general price effects plus evidence of a price structure to conclude that common evidence is capable of showing widespread harm to the class.").

3154924.9

████████████████████████████████████ Overall, in column (1), ██████████

█████████████████████████████ In the Defendant-specific regressions, the models

explain at ████████████████████████████████████████. The fact that the

Conduct ██████████████████████████████████████████████████████████

████████████████████

**Figure 10: Aggregate Effect of Conduct on Earnings By Job Level and Defendant**

| Baseline Category: Directors | Dependent Variable: Ln (Total Annual Compensation) | |
| --- | --- | --- |
| | Overall | By Defendant |
| | [1] | [2] |
| Conduct (Directors) | | |
| Conduct*1 (VPs & SVPs) | | |
| DaVita Conduct (Directors) | | |
| DaVita Conduct*1 (VPs & SVPs) | | |
| SCA Conduct (Directors) | | |
| SCA Conduct*1(VPs & SVPs) | | |
| USPI Conduct (Directors) | | |
| USPI Conduct*1(VPs & SVPs) | | |
| 1(VPs & SVPs) | | |
| Healthcare, Macro, Hours | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |

Note: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### B.     Quantile Regression

147.     The regressions above, and those in Section VI reflect the effect of the Conduct

on *average* (log) total compensation of Class Members. The results in Section VII.A above

demonstrate that logical groupings of Class Members were harmed similarly on average, and are consistent with generalized harm across the Class. I next focus not on how ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ but rather on how the Conduct ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ That is, using an identical empirical model, I estimate how the Conduct affected compensation for workers at the 1st percentile of the compensation distribution, the 2nd percentile, up to the 99th percentile. [425] If the Conduct negatively affects compensation at every percentile, this is consistent with common harm.

148. The results of this quantile regression are shown in **Figure 11**. In the model with a common Conduct effect, corresponding to Column 4 of **Figure 6**, I find that ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ (top left panel of **Figure 11**).

149. The remaining three panels of **Figure 11** show the coefficients on the Defendant-specific Conduct variable from the pooled model, corresponding to Column 4 of **Figure 8**. For each Defendant, I find that the Conduct ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[425] In particular, I use the quantile regression approach described in José AF Machado & JMC Santos Silva, *Quantiles via Moments*, 213 J. ECONOMETRICS 145–173 (2019).



### C.  In-Sample Prediction

150.    The prior two analyses assessed workers in logical sub-groups based on title and compensation percentile. I next use three separate approaches to generate estimates of individual-level harm.

151.    The first approach is known as an "in-sample prediction." Having performed a regression analysis that shows compensation suppression, I use the regression equation to predict what each individual in the data ("in sample") would have received absent the Challenged Conduct. Under this method, a Class Member suffers antitrust injury whenever the compensation they actually received during at least one year during the Conduct Period is less than the compensation they would have received absent the Challenged Conduct. This standard form of in-sample prediction allows me to directly compute whether there were any Class Members who were able to consistently escape injury from the Challenged Conduct. Courts have certified

131

numerous classes in antitrust cases where Plaintiffs' economists have used this method to demonstrate common impact.[426]

152.     The main idea behind this method is described in the introductory chapter of the Federal Judicial Center's Reference Manual on Multiple Regression, which illustrates how multiple regression analysis can be used to determine whether individual plaintiffs suffered injury from employment discrimination.[427] Here, I apply the same framework to determine whether individual Class Members suffered injury from the Challenged Conduct. The in-sample prediction method progresses as follows:

153.     **Step 1: Specify a regression model to determine *general* compensation suppression across Class Members.**[428] The coefficient on the Conduct variable represents the

---

[426] *Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, 2:15-cv-01045-RFB-BNW (D. Nev. Aug. 9, 2023). *Olean v. Bumble Bee* at 672 ("Finally, Dr. Mangum used the output of the pooled regression model to predict the but-for prices (i.e., what the price of tuna during the conspiracy period would have been without the overcharge caused by the conspiracy), and compared these predicted but-for prices to the actual prices paid by the DPP class."). *See also In re Air Cargo Shipping Servs. Antitrust Litig.*, No. o6-MD-1775 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014); *In re Capacitors Antitrust Litig.* (No. III), No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018); *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019).

[427] REFERENCE MANUAL at 305, n.4 ("The first step in such a regression analysis is to specify all of the possible 'legitimate' (i.e., nondiscriminatory) factors that are likely to significantly affect the dependent variable and which could account for disparities in the treatment of male and female employees. By identifying those legitimate criteria that affect the decision-making process, *individual plaintiffs* can make predictions about what job or job benefits similarly situated employees should ideally receive, and then can measure the difference between the predicted treatment and the actual treatment of those employees. If there is a disparity between the predicted and actual outcomes for female employees, plaintiffs in a disparate treatment case can argue that the net 'residual' difference represents the unlawful effect of discriminatory animus on the allocation of jobs or job benefits.") (emphasis added).

[428] *Id.* ("The first step in such a regression analysis is to specify all of the possible 'legitimate' (i.e., nondiscriminatory) factors that are likely to significantly affect the dependent variable and which could account for disparities in the treatment of male and female employees.").

132

3154924.9

*general* or aggregate ████████████ to Class Members. If the coefficient is statistically significantly different from zero, proceed to Step 2.

154.    **Step 2: Compute the "but-for" compensation for each individual in the sample.**[429] Using the same regression model, calculate the compensation associated with each individual in each year *but for* the Challenged Conduct. This is done by using standard regression prediction methods after "turning off" the Challenged Conduct by manually setting the Conduct variable to zero. This simulates the compensation but-for the Challenged Conduct to each Class Member, based on the common econometric model.

155.    **Step 3: Compare the actual compensation to the but-for compensation.**[430] The difference between the actual and but-for compensation is the ████████████ for each Class Member each year. Using the regression models developed in Section VI, I empirically demonstrated that Class Members' ████████████████████████████ ████████████████ This completes Step 1. In Step 2, I calculate "but-for" compensation for each year for each Class Member. In Step 3, I then take the difference between the but-for compensation and the actual compensation in each year for each Class Member. I perform this process both using the ████████████████ from column 4 of **Figure 6** and then separately for the ████████████████████ from column 4 of **Figure 8**.

156.    With this process to calculate "but-for" compensation, I then perform three different analyses. First, I calculate the percentage of workers harmed in each year, where a

---

[429] *Id.* ("By identifying those legitimate criteria that affect the decision-making process, *individual plaintiffs* can make predictions about what job or job benefits similarly situated employees should ideally receive, and then can measure the difference between the predicted treatment and the actual treatment of those employees.") (emphasis added).

[430] *Id.* ("If there is a disparity between the predicted and actual outcomes for female employees, plaintiffs in a disparate treatment case can argue that the net 'residual' difference represents the unlawful effect of discriminatory animus on the allocation of jobs or job benefits.").

133

worker is considered harmed in a given year if the but-for compensation is higher than the actual compensation in that year. Second, I calculate the percentage of workers harmed in *any* year. Third, I calculate cumulative compensation across all years an individual is present during the Conduct Period,[431] and examine the proportion of individuals for whom their cumulative earnings but-for the Conduct are higher than their realized, cumulative earnings.

157. The results in **Figure 12** show that, across all Defendants, ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

---

[431] Because the data is at the individual-company-year level, the results for cumulative earnings requires aggregating the compensation for each individual across years during the Conduct Period. Further, because it requires summing compensation in *levels*, the fact that the estimation was in *natural logs* requires using the Duan "smearing" technique to avoid re-transformation bias. Re-transformation bias refers to the fact that we cannot simply exponentiate a prediction for Ln(Total Compensation) to get the prediction in levels. *See* Duan, Naihua, *Smearing estimate: a nonparametric retransformation method*, 78(383) JOURNAL OF THE AMERICAN STATISTICAL ASSOCIATION, 605–610 (1983). *See also* WOOLDRIDGE AT 213 (discussing the "smearing estimate").

**Figure 12: In-Sample Prediction Method**

| | [1] | [2] | [3] | [4] |
|---|---|---|---|---|
| | Annual Wage Suppression % | Percentage Harmed: | | |
| | | In any Year? | In each Year? | Cumulatively? |
| Common Conduct Model | ███ | ███ | ███ | ███ |
| *Defendant-Specific Model* | ███ | ███ | ███ | ███ |
| DaVita | ███ | ███ | ███ | ███ |
| SCA | ███ | ███ | ███ | ███ |
| USPI | ███ | ███ | ███ | ███ |

*Note:* This table reports the results from the in-sample prediction method. Column (1) Provides the wage suppression estimates corresponding to Common Conduct effect and the Defendant-Specific Conduct model provided earlier. Based on the generalized harm in Column (1), Column (2) shows the percentage harmed in each year. Column (3) calculates the percentage of Class Members who had at least one year in which they were harmed by the conduct; that is, at least one year where there earnings under the conduct were lower than what they were predicted to be absent the conduct. Column (4) calculates the cumulative compensation of the Class Member over the time they were employed during the Conduct Period and compares them to the cumulative predicted compensation the Class Member would have received absent the conduct; a Class Member is rated as "harmed" if the cumulative "but for" compensation is higher than the actual received compensation.

### D.      Interval In-Sample Prediction

158.    The results presented in **Figure 12** are based on traditional in-sample prediction that has been accepted by various courts. While traditional in-sample prediction begins with a finding of statistically significant harm from the conduct, critics of this method have written that if the effect of the conduct is truly zero (and therefore not statistically significantly different from zero), then a traditional in-sample prediction approach would generate too many "false positives."[432] I address this criticism below.

---

[432] Michael Kheyfets, *Evolving or Running in Place? Empirical Approaches to "Common Impact" in Antitrust Class* Actions, EDGEWORTH ECONOMICS 74–85, 84–85 (Oct. 23, 2024), https://www.edgewortheconomics.com/assets/htmldocuments/UPDATED_Kheyfets%20PDF%20common%20impact.pdf ("The general response from proponents of these methodologies has been that they are meant to be applied only in periods of anticompetitive conduct—and that applying them to periods where no anticompetitive conduct existed (as a showing of the "false positive" results they generate) is somehow not relevant or appropriate. This argument, however, seems to turn the notion of statistical testing on its head. A reliably designed methodology should not find widespread antitrust impact when tested against a period where there is no anticompetitive conduct. One that does find injury that does not exist should raise red flags about its viability as proof of common impact.").

3154924.9

159.     **Figure 13** illustrates this criticism for a simulated individual with ▮▮▮ of Conduct Period pay data and a statistically significant effect of Conduct of ▮▮▮ .[433] The solid black line is what the regression predicts compensation would be "but for" the Conduct. Traditional in-sample prediction would consider as harmed observations where the actual compensation is below the "but for" predicted compensation, which in this simulation is ▮▮▮

160.     However, critics of the in-sample prediction method point out that *if* the Conduct actually had no effect (the dotted grey line), then the traditional in-sample prediction approach will nevertheless find that approximately half of the observations are "harmed." Because the regression line of best fit runs through the middle of the individual's data points, approximately half of the observations will lie above the line, and half below. In this simulation, we ▮▮▮

---

[433] I simulate ▮▮▮



161.    Critics of in-sample prediction claim that a finding of harm when there is no effect of the Conduct implies a faulty test. I believe this goes too far. The reason is that the in-sample prediction method fundamentally relies on an initial, *statistically significant* finding of harm. So, a critique that argues that in-sample prediction is faulty when there is no effect of the Conduct does not impugn the test because the test is only performed when there is a finding of statistically significant harm.

162.    The problem with the critique is that it dispenses with this ███████████ ███████████████████████  In other words, applying the in-sample prediction test when there is no effect guarantees that findings of harm or no harm are driven purely by statistical noise. This critique loses sight of the fact that the test requires the ██████████████████████ ████████████████████████████████████████████████████████ ██████

3154924.9

163. Even though my main models ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, I nevertheless address this "false positive" critique for when there is no harm. To do so, I bring back the idea of statistical significance to the situation which the Conduct has no effect. I do this by modifying the traditional in-sample prediction approach with a prediction interval.[434] This prediction interval serves two purposes: (1) It sets the false positive rate ($p$) when there is no effect of the Conduct at a particular level of statistical significance level (e.g., *p=10 percent*); and (2) it determines the proportion of observations that are statistically significant harmed in a but-for world given the statistical confidence level of *1-p* (e.g., if the level of statistical significance is 10 percent, then the statistical confidence level is 90 percent.). I term this method "interval in-sample prediction."

164. Below I illustrate the core ideas of this approach with a simulation, and then turn to applying it in this setting. **Figure 14** illustrates the first step of the interval in-sample prediction method, which shows the same data as **Figure 13**. The key is that, relative to **Figure 13**, where 5 observations were classified as harmed if they were below the dashed gray line (which is our best guess about compensation when the Conduct has no effect), we now include a prediction interval around the regression line consistent with no effect and only say that a unit is harmed if it lies below the lower limit of the prediction interval. In this simulation, the size of the

---

[434] Note that I am using the term "prediction interval" precisely and not the term "confidence interval" because they are different in this context, even if they are both intervals. The prediction interval derives from the standard error of the point prediction for a single observation (e.g., for a given individual-year observation). In Stata, it derives from the "predict, stdf" option. In contrast, the term confidence interval is usually used in the context of the predicted mean for a *given set of covariates*. It derives from the Stata command "predict, stdp." As a result, the prediction interval is always larger than the confidence interval. For more details, *see Regress Post Postestimation*, STATA, https://www.stata.com/manuals/rregresspostestimation.pdf (last visited Jan. 9, 2025).

3154924.9

prediction interval yields a *p=10 percent* false positive rate (because one out of 10 observations are categorized as "harmed" when the Conduct has no effect).

165. **Figure 14** illustrates that the key input into the false positive rate is the size of the prediction interval. A larger prediction interval will reduce false positives, while a shorter one will increase false positives. Scientific standards for false positives are typically set at 5 percent or 10 percent. That is, in traditional hypothesis testing, we say that we can reject the null hypothesis of no effect if there is a sufficiently low probability (typically below 10 percent) that we would observe our results or something more extreme if the null hypothesis of no effect were in fact true. In such a case, we say that our results are "statistically significant." I adopt the same thresholds here for setting the size of the prediction intervals.



166. The second step of the method is illustrated in **Figure 15**. As in traditional in-sample prediction, I now create the but-for predictions when the Conduct is "turned off" (the

shifted up black line). I also shift the prediction intervals determined in the first step up by the amount of the estimated harm. I then call an estimate *statistically significantly harmed* with a confidence level of *1-p%* if it lies below the lower limit of the "but for" prediction interval. In the simulation, we can see that all but one data point lie below the lower limit of the prediction interval (in year 10). Thus we would conclude that with a confidence level of ████████ ███████████████████████████████████████████████████████████ .

167.     Lastly, the data may be sensitive to different prediction intervals, depending on the dispersion of compensation in the data. Accordingly, we can vary the length of the prediction interval to target different statistical significance levels and then see how those choices affect the proportion deemed harmed for a given level of statistical confidence.



168.     Next, I apply this interval in-sample approach to the data at hand. In **Figure 16** below, I examine the proportion of individuals that are ███████████████████████████████

█████████████████████████████████████████████████████████████. The top-left panel considers the main model in **Figure 6** with a common Conduct effect, while the other three repeat the same analysis but for the Defendant-specific results in **Figure 8. Figure 17** below summarizes the information from **Figure 16** by showing █████████████████████ ████████████████████████████████████████████ ████████████████████████ Together, the results suggest that ████████████████████ █████████████████████████████████████████. At each Defendant, ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

141

**Figure 17: Interval In-Sample Prediction Results—90 Percent Confidence Level**

| | [1] | [2] | [3] |
|---|---|---|---|
| Model | Annual Wage Suppression % | Confidence Level | Percentage Harmed Cumulatively |
| Common Conduct Model | | | |
| *Defendant-Specific Model* | | | |
| DaVita | | | |
| SCA | | | |
| USPI | | | |

*Note:* This table reports the results from the Interval In-Sample Prediction method for the cumulative compensation of individuals over the Conduct Period.

### E.  Random Coefficient Model

169.  Another critique of traditional in-sample prediction is that it applies the *general* wage suppression estimate to each class member for each year, when individual members may have been harmed to a greater or lesser extent. To address this, I next estimate the effect of the Conduct for each Class Member individually. I expand the regression model to allow the Conduct to have a differential effect on every Senior-Level Employee by using a "Random Coefficient Model." This approach is used by econometricians to understand how a specific variable affects different units in the sample.[435] In contrast to the traditional in-sample prediction model, this approach only estimates a single Conduct effect per individual, and thus is not capable of estimating whether the Conduct harmed an individual *in any year*. In this sense, the Random Coefficient Model is likely more conservative than the traditional in-sample prediction approach.

---

[435] *See* Juan Alcácer et al., *Applying random coefficient models to strategy research: Identifying and exploring firm heterogeneous effects*, 3 STRATEGY SCIENCE 533–553, 533 (2018). *See* also WOOLDRIDGE at 315–17. *See* also Sophia Rabe-Hesketh and Anders Skrondal, *Multilevel and Longitudinal Modeling Using Stata, Volumes I and II, Fourth Edition*, Stata Press (2022) (eBook) at 137–160.

170.    The regression equation is the same as before with one subtle modification: The model not only estimates a common effect from the Conduct $\beta$, but the Random Coefficient Model allows the effect to vary for each individual $i$, such that for each individual I can estimate $\beta_i = \beta + u_i$, where $u_i$ is individual i's deviation from the common effect $\beta$. The regression equation is the largely same as before, except now $\beta$ is replaced with $\beta_i$.[436]

$$y_{ict} = \beta_0 + \beta_i Conduct_{ct} + \lambda X_{icst} + \gamma_c + \alpha_i + \epsilon_{icst}$$

171.    **Figure 18** reports the results from this regression. In particular, it shows both the



Calculating what percentage of these individual Conduct estimates are less than zero reveals the percentage of individuals identified as harmed by this common method. Overall, this approach reveals that ▮▮▮▮▮▮▮▮▮▮ . This includes ▮▮▮▮▮▮▮▮▮▮ . Taken together, this common method provides ▮▮▮ ▮▮▮▮▮▮▮▮▮▮

---

[436] Note: Due to the data structure, we must now use random effects instead of fixed effects. As shown in **Figure 36**, the random effects models deliver very similar estimates to the previously reported fixed effects models. In addition, because the model does not estimate random effects at the individual-by-company level as before (because it is estimating a random coefficient for each individual—not each individual-company combination), to preserve a comparison to previous models I modify the regression to include company fixed effects directly.

3154924.9



**F.** ███████████████████████████████████

172.     Compensation structures tend to arise in firms due to the interrelated concepts of internal and external equity. Compensation structures connect all employee pay within a firm, such that any suppression of wages for one group of employees would tend to suppress the pay of other employees. Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own. Here, the

144

3154924.9

███████████████████████████████████████████████

███████████████████████████████████████████.[437]

173.     Internal equity is the idea that individuals doing comparable work within a firm should receive similar compensation. An article in the *Quarterly Journal of Economics* explains, "a long tradition in economic thought—as well as in psychology, sociology, and organizational behavior—has advanced the notion that individuals also care about their pay relative to that of their co-workers."[438] Because employees value internal equity, employers tend to respond by implementing uniform compensation structures that pay comparable compensation for comparable work. One textbook explains that "[p]ay structure refers to the array of pay rates for different work or skills within a single organization,"[439] and refers to examples of pay structures at companies such as Merrill Lynch and Lockheed Martin.[440] Payroll software companies offer advice to employers on achieving internal equity:

> Internal equity is the comparison of positions within your business
> to ensure fair pay. You must pay employees fairly compared to
> coworkers. Employees must also perceive that they are paid fairly
> compared to their coworkers. Otherwise, they might feel unvalued
> and leave. It is easy for employees to find out how much other
> employees earn via the Internet and word of mouth. If an employee
> works hard but is paid less than her coworkers who do not work as

---

[437] *Olean v. Bumble Bee* at 670 ("After examining the economic structure of the tuna market and the available record evidence concerning the Tuna Suppliers' behavior, Dr. Mangum determined that the packaged tuna market was conducive to price-fixing, given the Tuna Suppliers' dominance in the market, the attendant barriers to entry for competitors, the Tuna Suppliers' use of price lists for their products, and other characteristics of the packaged tuna industry. According to Dr. Mangum, these findings supported a baseline economic theory that the Tuna Suppliers' collusive behavior would affect the DPPs on a class-wide basis.").

[438] Emily Breza et al., *The Morale Effects Of Pay Inequality*, 133 QUARTERLY J. ECON. 611–663, 611 (2018). *See also* GEORGE MILKOVICH, JERRY NEWMAN & BARRY GERHART, COMPENSATION, 72 (11th ed. 2011) [hereafter COMPENSATION] ("Internal alignment, often called *internal equity*, refers to the pay relationships among different jobs/skills/competencies within a single organization." (emphasis in original)).

[439] COMPENSATION at 72.

[440] *Id.* at 72–74.

3154924.9

> hard, she might become upset about her wages. When you adopt a straightforward and honest payment system, your employees will believe that they are being paid fairly and with equality. This boosts company morale and employee loyalty, bringing many benefits in the long run . . . .
>
> To create fair pay, you compare employees who do similar jobs for your company. You should consider the tasks your employees do. *If two employees perform similar tasks, they should earn similar wages.*[441]

174.    The relevant implication is that if employee compensation is driven, in part, by considerations of internal equity, then the firm's ability to suppress wages of a group of employees would also be indirectly felt even by those employees who were not the target of wage suppression.

175.    A related concept is "external equity," wherein employees seek to achieve pay similarities between laborers doing similar jobs at different firms.[442] External equity arises from competition between firms in the relevant labor market.[443] If there is external equity in an industry or job category, increases (or decreases) in wages *within* a firm or group of firms impact

---

[441] *Payroll Blog: Payroll Training, Tips, and News*, PATRIOT SOFTWARE (Jan. 12, 2022), https://www.patriotsoftware.com/payroll/training/blog/what-is-internal-equity/ (emphasis added). *See also* Conrado Tapado, *Does Your Company Have Internal Pay Equity?*, PAYSCALE (Mar. 31, 2009), https://web.archive.org/web/20210508234343/http://www.payscale.com/compensation-today/2009/03/importance-of-internal-pay-equity.

[442] *See, e.g.*, Kent Romanoff et al., *Pay Equity: Internal and External Considerations*, 18 COMP. & BENEFITS REV. 17–25, 17 (1986) ("Companies typically emphasize external equity in the design of their compensation structures. This focus on external equity enables a company to develop compensation structures and programs that are competitive with other companies in appropriate labor markets.").

[443] *Id.*

146

the relevant market price of labor *across* firms competing for the same pool of labor.[444] The relevant implication here is that if Firm A is able to suppress the wages of its own employees, Firm B (which nominally competes with Firm A over labor) can pay its own employees less in the face of reduced wage competition from Firm A.

176.    It is important to point out here that taking external equity into account does not mean that compensation is entirely determined by a larger labor market and that the employer has no monopsony power. It means that a company will, systematically, ensure that employee pay bears some determined relationship to external benchmarks. This systematic concern is itself a powerful compensation structure, linking pay of employees together. For instance, a company may seek to pay its employees at approximately the 75th percentile of some external pay benchmark. But if that company suppresses labor competition through, say, a no-poach agreement with an important labor competitor, the company may instead seek to pay its employees at approximately the 50th percentile of some external pay benchmark. This illustrates both that all pay within a firm would move together, and that paying attention to external equity does not mean that wages are simply set by a larger labor market. Management must consciously choose how to align internal wages with external pay, in light of anticipated labor competition.

177.    Internal and external equity may occur organically or through conscious effort. For internal equity, a firm may have a formal compensation structure that it applies to its

---

[444] Lois Friss, *External Equity and the Free Market Myth*, 7(3) REVIEW OF PUBLIC PERSONNEL ADMINISTRATION 74–91, 76–77 (1987) ("[H]ospitals join employer associations that provide members with benchmark job descriptions, salary surveys, and other price trends . . . [T]he very existence of these programs confirms that hospitals believe their individual actions could have a noticeable effect on nurse wages. Because of this belief, among other reasons, they voluntarily join."). *Id.* at 74 ("Market surveys are routinely conducted by public employers to maintain external equity. Personnel professionals assume that the market survey reflects fair pay resulting from free market forces. Unfortunately, community wages may reflect wage fixing rather than competitive wages.").

147

employees. However, even a firm with no explicit formal compensation structure may nonetheless end up achieving internal equity if the firm's managers value standardization, if employee pay is openly discussed (and unexplained deviations in pay would be viewed as discrimination or favoritism), or if external market forces dictate what pay must be to remain competitive. For external equity, firms may track and benchmark wages across the industry and base pay off of those benchmarks. However, a firm that lacks this market intelligence is still subject to the laws of supply and demand in the labor market, and may end up paying externally equitable wages simply by not having monopsony power over labor.

178. Accordingly, the evidence for both internal and external equity may be qualitative (documents showing a wage structure or tracking competitive wages) or may quantitative (analyses that demonstrate that groups of employee wages are tied together). As explained below, there is substantial documentary evidence indicating that the compensation paid to Class Members followed a compensation structure driven, in part, by considerations of both internal and external equity. In addition, econometric analyses of available wage data show strong support for compensation structures linking Class pay together.



**1.** ██████████████████████████████

179. ██████████████████████████████████████

a. The evidence shows that ████████████████████████
████████████████████████████████████████ For instance, ███████
███████████████████████████████████████████
████████████████████████████████[445]

---

[445] Ex. PX77 at DVA_OMCEAL_001329257.

3154924.9

b. ██████████████████████████

████████████████████████████████

████████

c. For example, █████████████████████

████████████████████████████████

████████████████████████████████

██████████████████[446]

d. The evidence shows that ████████████████

██████████████████████[447]████████████

████████████████████████████████

████████████[448]████████████████

████████████[449]████████████████



---

[446] Ex. PX78 at DVA_OMCEAL_001070929██████████████



[447] Ex. PX84 at DVA_OMCEAL_001321377; Deposition of Colleen Arthur (May 23, 2024) [hereafter Arthur Dep.] at 200:17–201:7.

[448] Arthur Dep. at 108:7–21 (████████████████████████

████████████████ . ████████████████

[449] Arthur Dep. at 109:13–23 (████████████████████

████████████████████████████

).

3154924.9



e. ███████████████████████████████████

████████████████████████████████████████████[451]█

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████[452]██

████████████████████████████████████████████

██████████████████████████████████████[453]

f.     DaVita personnel ██████████████████. For instance, █

████████████████████████████████████████████

████████████████████████████████[454]

g.     ██████████████████████████████

████████████████████████████████████[455]

---

[450] *Id.* at 149:8–19 (████████████████████████████
████████████.

[451] Ex. PX85 at DVA_OMCEAL_001067252 and Arthur Dep. at 208:15–209:3

[452] Ex. PX78 at DVA_OMCEAL_001070929 ███████████████████████

[453] Ex. PX269 at DVA_OMCEAL_000957821 ██████████████
███████████████████████

[454] Arthur Dep. at 203:3–25, 204:14–24 ████████████████████
██████

[455] Ex. PX83 at DVA_OMCEAL_001057524 and Arthur Dep. at 198:8–199:2.

3154924.9

h. ███████████ DaVita's ████████████████████

██████████████████████████████████████████[456]

i. ████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████[457]████████████

██████████████████████████████████████████

████████████.[458]███████████████████████████

████████████████████████████████.[459]████████

██████████████████████████████████,[460]████████

████[461]████████████████████████████████████████

██████████████████████████[462]█████████████████

---

[456] *See* Ex. PX81 at DVA_OMCEAL_001068250 ██████████████████████████████████████
████████████████████████████████████).

[457] Arthur Dep. at 126:19–127:5; *see, e.g.*, Ex. PX75 at DVA_OMCEAL_001321757 (████████████████
████████████████████████████████████).

[458] Ex. PX24 at DVA_OMCEAL_000386711 and Staffieri Dep. at 161:8–23 ████████████████
████████████████████████████████████████
████████████████████████████████████).

[459] Staffieri Dep. at 134:11–16 (██████████████████████████████████████
███████████████████████████); *id.* at 154:4–11 ████████████████████████
████████████████████████████; Ex. PX21 at
DVA_OMCEAL_001339977 ████████████████████████████████████████████
████████████████████████████████████████████
████████; Ex. PX27 at DVA_OMCEAL_001339898 ████████████████████████████████
████████████████████████████████████████████

[460] Staffieri Dep. at 156:1–12.
[461] Ex. PX24 ████████████████████████████████████████████
██████████████████████████████████████████████

[462] Ex. PX84 at DVA_OMCEAL_001321377 and Arthur Dep. at 203:3–25, 204:14–24.



j.    DaVita also ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████ [463]

k.    Finally, the evidence presented Section V.C.2 regarding the ████

█████████████████████ shows that DaVita ███████████████

█████████████████████. The implication of the ██████████ is twofold. First,

it directly indicates that █████████████████████████████

███████████████ Second, the ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

██████████ As a result, the █████████████████████

████████████

180.    ███████████████████████████████████████

a.    SCA ███████████████████████████████

████ Indeed, SCA COO Michael Rucker testified that ██████████████

██████████████████████████.[464] Rucker further testified at deposition that

███████████████████████████████████████████████

███████████████████████ [465]

---

[463] Ex. PX268 at DVA_OMCEAL_001344573 (██████████████████████████████

██████████████████████████████████████).

[464] Ex. PX305 at DOJCIV-008-00000183.

[465] Rucker Dep. at 325:21–326:9.

3154924.9

b. ██████████████████ Internal SCA documents show how they

████████████████████████████████████

c. For example, internal documents show ███████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ [466] SCA also referenced ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ [467]

d. For example, Plaintiff Scott Keech ████████████████████ ████

in January 2012. According to SCA, Keech was "███████████████████████

█████████████████████"[468] SCA stated that he "████████████████████

████████████████████████████████████████"[469]

---

[466] Ex. PX528 at SCA001046573.
[467] *Id.*
[468] Deposition of Scott Keech (Aug. 22, 2024) at 203:1–204:2; Ex. DX64.
[469] *Id.*

153

e.    Within this pay structure,

[redacted].[470]

f.    [redacted]

[redacted].[471]

g.    [redacted]

[redacted] [472]

[redacted]

---

[470] Wachsman Dep. at 117:9–118:5 [redacted]



[471] Wachsman Dep. at 135:6–17 [redacted]

[472] Wachsman Dep. at 130:12–131:16 [redacted]

; Ex. PX53 at SCA000131233.

155

█████████████████████████████████████████████████

███ [473]

    h.     This comports with ████████████████████████████

████████████████████████████████████████ [474] For example, ██████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ [75] The email also

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ [476]

    i.     SCA also ████████████████████████ For example, ████████

███████████████████████████████████████████████████

████ [477] Moreover, former █████████████████████████████

---

[473] Ex. PX54 at SCA000130861

[474] Wachsman Dep. at 248:22–24.

[475] SCA000109831.

[476] *Id.* at SCA000109832.

[477] Ex. PX522 at OCM-BM_000000888, –90.

█████████████████████████████████████████████████████████████

████████ [478]

      j.     █████████ SCA also █████████████████████████

█████████████████ For example, █████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████ [479]

      k.     Finally, the evidence presented in Section V.C.2 show that SCA ██████

█████████████████████████████████ This is ██████████████

██████████████████████████ Moreover, such ██

█████████████████████████████████████████

█████████████████████████████████████████

181.     ███████████████████████████████████████

      a.     Deposition testimony and internal USPI documents demonstrate that ████

███████████████████████████ For example, COO Mark Garvin, who oversaw the hiring and determining of compensation for presidents and regional vice presidents, ████████████████████████████████████████ Garvin explained that █████████████████████████████████████

---

[478] Clemens Dep. at 164:10–165:3.
[479] Ex. PX529 at SCA000065974.

156



In addition, he explained that ███████████████████████████

████████████████████████████ ”[482] Garvin focused on the ██████████

███████████████████████████████████████████████████

███████████████████████ .[483]

     b.     ██████████████████████████████████

████████████████████████████ [484]

     c.     USPI VP of Financial Operations English testified that ████████

███████████████████████████████████████████████ [485] █

██████████████████████████ [486] ███████████████████

█████████████ [487] ████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ [488] English also stated that █

---

[480] Garvin Dep. at 89:22–90:5 (Garvin testified that ████████████████████

██████████████████████████████████████████████████

██████████████████ ; Ex. PX88 at DOJCIV-008-00000360.
[481] Garvin Dep. at 90:6–14.
[482] Garvin Dep. at 93:13–23; Ex. PX88 at DOJCIV-008-00000360.
[483] Garvin Dep. at 93:24–94:9; Ex. PX88 at DOJCIV-008-00000360.
[484] Ex. PX105 at USPI_CIV_000021906 and Ex. PX106 at USPI_CIV_000021907 (███████

██████████████████████████████████████████████

██████████████ .
[485] English Dep. at 27:3–12.
[486] *Id.* at 28:12–13.
[487] *Id.* at 29:7–14.
[488] *Id.* at 35:6–25, 40:14–18; Ex. PX111 (███████████████████████████

████████████████████████████████████████████ ); *see also* Ex. PX112
( ████████████████████████████████████████████████ ).



d.   Finally, the evidence presented in Section V.C.2 show that [REDACTED]

[REDACTED] This is explicit evidence that [REDACTED]

[REDACTED] Moreover, [REDACTED]

[REDACTED]

[REDACTED]

2.   [REDACTED]

182.   The qualitative evidence above demonstrates there [REDACTED]

[REDACTED] I next find that the quantitative evidence is consistent with the [REDACTED]

[REDACTED] I consider two distinct analyses to demonstrate this. *First*, I study

whether earnings are positively correlated across job levels, conditional on a variety of

macroeconomic and healthcare specific controls. That is, if wages for one job level are higher,

---

[489] English Dep. at 48:15–19.
[490] *Id.* at 50:9–51:2; *see also* Ex. PX115 at USPI_CIV_000039752 (a February 2015 email regarding the performance salary adjustment process at USPI).
[491] English Dep. at 51:21–52:13; *see also* Ex. PX118 (an internal 2017 USPI salary planning document listing proposed salary changes for corporate employees).
[492] English Dep. at 51:21–52:13.
[493] Ex. PX109 at USPI_CIV_000810693 [REDACTED]

[REDACTED] ).

3154924.9

then are they also higher in another job level? *Second*, I study whether wages are positively correlated within specific job titles. That is, if a random subset of individuals with the same job title had higher wages, would the other individuals with that same job title also have higher wages? The former analysis suggests that there are equity forces at work across job levels within the firm, while the latter suggests that there are compensation structures within job titles.[494]

    **a.** ████████████████████████████████

183.    To study the extent to which wages co-vary across worker job levels, I take the individual-company-year panel dataset described in Section VI and limit it to Senior-Level Employees. I then define the two job levels studied earlier: whether a worker is a) a Director or b) a Vice President or Senior Vice President. I then calculate the average (effective) hourly wage for each job level in each company in each year (Total Compensation divided by Total Hours worked).[495] To test whether wages for Directors are positively correlated with wages for Vice Presidents and Senior Vice Presidents, I then run the following regressions separately for each company:

$$Ln(Mean\ Director\ Wages_{ct}) = \beta_0 + \beta_1 Ln(Mean\ VP\ and\ SVP\ Wages_{ct}) + \gamma X_{ct} + e$$

184.    Where $X_{ct}$ corresponds to the macroeconomic and healthcare controls described in Section VI.C. If $\beta_1 > 0$ and statistically significant, then wages of VPs and SVPs positively co-move with the wages of Directors within the company, even controlling for macroeconomic and healthcare factors that might otherwise cause them to move together.

---

[494] *Olean v. Bumble Bee* at 671 ("Dr. Mangum first performed a pricing correlation test, which demonstrated that the prices of the Tuna Suppliers' products moved up or down together regardless of product or customer type, and thus supported the proposition that the Tuna Suppliers' collusion had a common, supra-competitive impact on their prices.").

[495] I study effective hourly wage because variation in *annual* compensation depends on how many hours were worked that year. That is, even if effective hourly wages are highly correlated, total compensation may not be if there are discrepancies in how many hours individuals work.

185.    The results are provided in **Figure 19.** For each company, ███████████

███████████████████████████████████████████████████████████████████████

████████████████████████████. Moreover, these ██████████████████████

█████████. Indeed, by themselves, the natural log of the average wages of VPs and SVPs

explains ████████████ of the variation in the natural log of average wages of Directors at DaVita,

████████████████████████████████████████████████████████████. Thus,

████████████████████████████████████████████████████████████████████

████████████████.

**Figure 19: Relationship Between Director and (S)VP Wages**

| | Dependent Variable: Ln(Mean Hourly Rate for Directors) | | |
|---|---|---|---|
| | DaVita | SCA | USPI |
| Ln(Mean Hourly Rate of VPs & SVPs) | | | |
| Ln(Avg. State Mgr. Earnings) | | | |
| Ln(State Health Expend. PC) | | | |
| Covid | | | |
| Ln(State GDP PC) | | | |
| Ln(State Unemployment Rate) | | | |
| Census Region Annual CPI | | | |
| Observations | | | |
| R-squared | | | |



*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

186.    These results are consistent with the █████████████████████████

█████████████████████████████████████████████████. **Figure 37** in the

Appendix reports the reverse analysis, examining how ██████████████████████████

██████████████████████████████████████.

3154924.9

**b.** ██████████████████████████████

187.     A second dimension of compensation structures is to consider whether the wages of workers with the same job title move together. To examine this, I perform a test that relies on the following insight: if there is a compensation structure within a job, then the wages of a random subset of workers within the job will be highly predictive of the wages of the remaining workers with the same job title.

188.     To implement this test, I use a randomized hold-out sample analysis. To illustrate the idea, consider the following example: Suppose that there are 100 Directors in a given company in a given year. I randomly split 50 into group A, and 50 into group B. I then examine whether the average wages of the 50 randomly selected Directors in group A are predictive of the individual wages of the other 50 Directors in group B. If so, then this is strong evidence in favor of a compensation structure.

189.     To implement this test, I take the dataset described in Section VI at the individual-company-year level. Then, I calculate the number of individuals in each job in each company in each year, and I randomly assign half of the individuals in each job in each company in each year to be in a "hold-out sample." With the workers who *are not in the hold-out sample*, I calculate their average hourly wages in their job in that year. I then merge this value into the hold-out sample by job title, company and year. Finally, I regress the natural log of the hourly wages of the individual workers in the hold-out sample against the natural log of the average wages of the randomly selected subset of workers the same job-title, company, and year. I also include the same macroeconomic and healthcare-specific controls as before.

190.     The results are shown in **Figure 20**. For each company, the natural log of the average hourly wages of the random subsample are ████████████████████████ ██████████████████████████. In terms of explanatory power, █

3154924.9

**Figure 20: Within-Job Hourly Rate are Highly Correlated With Hold Out Sample**

| | Dependent Variable: Ln(Mean Hourly Rate for Directors) | | |
| --- | --- | --- | --- |
| | DaVita | SCA | USPI |
| Ln(Hourly Rate of others in same job-year) | | | |
| Ln(Avg. State Mgr. Earnings) | | | |
| Ln(State Health Expend. PC) | | | |
| Covid | | | |
| Ln(State GDP PC) | | | |
| Ln(State Unemployment Rate) | | | |
| Census Region Annual CPI | | | |
| Observations | | | |
| R-squared | | | |

*Note:* \*\*\* p<0.01, \*\* p<0.05, \* p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

## VIII.  Aggregate Damages

191.    In this section, I calculate aggregate damages to Class Members due to the

Challenged Conduct. To do this, I again use the standard but-for world economic framework,

where damages to the class are the difference between total compensation but-for the Challenged

Conduct and total compensation in the real-world with the Challenged Conduct in place.[496] Real-

---

[496] Theon van Dijk & Frank Verboven, *Quantification of Damages*, in 3 ISSUES IN COMPETITION LAW AND POLICY 2331–2348, 2332 (ABA Section of Antitrust Law 2008) ("The concept underlying most economic damages assessments is that of the 'but-for' world. In the case of a price-fixing agreement, the but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages.").

162

world compensation is available in the Defendant's data. I compute total compensation but-for the Challenged Conduct using the wages suppression regressions developed in Section VI.

192.    **Figure 21** shows the results of this analysis. For each Defendant, I first calculate the total number of class members present during the Conduct (Column 1) and the total real-world compensation during the Conduct Period (Column 2).[497] I then take the ███████████ estimate from **Figure 8**, which shows that the Challenged Conduct ████████████████████ ████████████████████████████████████████████████████████. I then calculate what total compensation would have been but-for the Challenged Conduct (Column 4) by multiplying the real-world compensation by $1/(1-P)$, where P is the Defendant-specific wage suppression.[498] Damages are the difference between the but-for and real world compensation (Column 5). With this, single aggregate damages (that is, damages before any potential trebling) are calculated as ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████.

---

[497] Note that because the Conduct began in ████████████████████████████ ████████████████████.

[498] Suppose, for example, that total compensation in the actual world was $100, and that the wage suppression estimate found by the model was as 10 percent. Letting real-world compensation but-for the Conduct be X, we know that $X(1-0.1)=\$100$, where 0.1 is the 10 percent wage suppression. Solving for X gives $X=\$100/(1-0.1)$, such that Total But-For Compensation is $111.11. This example helps us understand that the Total But-For Total Compensation is $1/(1-P)*$Total Compensation Under the Conduct, where P is the wage suppression estimate.

3154924.9

**Figure 21: Aggregate Damages by Defendant**

| Company | Number of Class Members | Total Compensation Under the Conduct ($M) | Wage Suppression Percentages | But-For Total Compensation ($M) | Damages ($M) |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] = [2]/(1-[3]) | [5] = [4] – [2] |
| DaVita SCA USPI | ███ | ███ | ███ | ███ | ███ |

*Note:* Outlier observations (as defined above) are conservatively removed from these damages calculations.

193.    Across all unique Class Members over the ███ Conduct Period, average damages to each Class Member-year comes to ███ [499] **Figure 22** through **Figure 25** show Class Members' total compensation and damages visually by year in total and for each Defendant separately.

---

[499] I calculate these average damages by first determining the number of unique Class Members (excluding outliers) who are present during the Conduct Period. I sum up the total number of years in the Conduct Period for which each Class Member works at a Defendant company. I divide the total single damages ███

164



165



3154924.9

166



3154924.9



## IX.    **Market Power**

194.    Market power is the ability of a firm to restrict output, raise prices, suppress

wages, reduce quality or consumer choice, or inhibit innovation relative to the levels that would

have prevailed under competition.[500] The terms "monopoly power" and "monopsony power" are

---

[500] *See* MODERN IO 3RD ED. at 88–98; *see also* Thomas Krattenmaker et al., *Monopoly Power and Market Power in Antitrust Law*, 76 GEORGETOWN LAW JOURNAL 241–269, 241 (1987); Timothy Brennan, *Bundled Rebates as Exclusion Rather Than Predation*, 4 J. COMPETITION LAW & ECON. 335–374, 335 (2008).

3154924.9

directionally specific variants of the term "market power."[501] A firm or a group of firms has *selling* power or monopoly power if it possesses "the power to control prices or exclude competition" in some relevant output market.[502] Monopsony power or *buying* power[503] is the mirror image of monopoly power on the input side of the market. A firm possesses monopsony power if it wields market power over factors of production, such as labor.[504] The harm to competition from monopsony is directly analogous to the harm from monopoly.

195.    In this matter, Defendants are alleged to have market power, specifically monopsony power, over Class Members. This market power is alleged to have been achieved or increased via the Challenged Conduct.

196.    Market power can be directly established if there is evidence of the ability of firms to suppress wages below competitive levels.[505] In the instant case, ███████████

---

[501] MODERN IO 3RD ED. at 7–8.

[502] *United States v. E. I. du Pont de Nemours & Co.* ("*Cellophane*"), 351 U.S. 377, 391 (1956).

[503] *Horizontal Merger Guidelines*, DOJ & FTC (2010) §1; §12 [hereafter *Merger Guidelines 2010*].

[504] *See, e.g.*, MODERN IO 3RD ED. at 105–107. *See also Merger Guidelines 2010* §1 ("Enhancement of market power by buyers, sometimes called "monopsony power," has adverse effects comparable to enhancement of market power by sellers. The Agencies employ an analogous framework to analyze mergers between rival purchasers that may enhance their market power as buyers.").

[505] *Horizontal Merger Guidelines*, DOJ & FTC (2023) §4.3 ("Direct evidence of the exercise of market power can demonstrate the existence of a relevant market in which that power exists. This evidence can be valuable when assessing the risk that a dominant position may be entrenched, maintained, or extended, since the same evidence identifies market power and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized."); Carl Shapiro, *Antitrust: What Went Wrong and How to Fix It*, 35(3) ANTITRUST L. J. 33–45, 40 (2021) ("IO economists know that the actual economic effects of a practice do not turn on where one draws market boundaries. I have been involved in many antitrust cases where a great deal of time was spent debating arcane details

3154924.9

██████████████████████████████████████████████████████

████████████ Put differently, Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members. ████

████████████████████████████████████████████████

## X. Conclusions

197. Plaintiffs allege that both DaVita and SCA and USPI and SCA engaged in two forms of Challenged Conduct to suppress the pay of their Senior-Level Employees: (1) *No-Poach Agreements* not to proactively recruit each other's Senior-Level Employees; (2) *CSI Exchanges*, which included compensation data. I was tasked with assessing the extent to which the qualitative and quantitative evidence is consistent with anticompetitive collusion, whether all or nearly all members of the Class experienced harm as a result of the Challenged Conduct, and to estimate the amount of that harm (the amount by which Defendants' suppressed Class pay).

198. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

of market definition, distracting from the real economic issues in the case. I shudder to think about how much brain damage among antitrust lawyers and economists has been caused by arguing over market definition."). Aaron S. Edlin & Daniel L. Rubinfeld, *Exclusive or Efficient Pricing? The Big Deal Bundling of Academic Journals*, 72 ANTITRUST L. J. 119, 141 (2004) ("Market definition is only a traditional means to the end of determining whether power over price exists. Power over price is what matters . . . if power can be shown directly, there is no need for market definition: the value of market definition is in cases where power cannot be shown directly and must be inferred from sufficiently high market share in a relevant market."); Daniel A. Crane, *Market Power Without Market Definition*, 90 NOTRE DAME L. REV. 31, 43 (2014) ("Although the market definition/market share paradigm predominates in antitrust analysis, formal doctrine holds that this is merely one of two available routes to proving market power; the other being a "direct" evidence route."); ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS, 229 (7th ed. 2012) (noting that economists and antitrust practitioners have embraced the use of direct evidence of monopoly power in antitrust litigation).

3154924.9

199. Relative to the average annual compensation of a Senior-Level Employee during the Conduct Period, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ ████ ████

\* \* \*

Dated: January 15, 2025        Respectfully submitted,

/s/ _____
Evan P. Starr

171

3154924.9

**PROOF OF SERVICE**

I, Sarah D. Zandi, an attorney, hereby certify that on January 15, 2025, I served a true and correct copy of the foregoing **Expert Witness Report of Dr. Evan P. Starr** by electronic mail upon the following parties and non-parties as set forth below:

| | |
|---|---|
| Kenneth M. Kliebard<br>Staci M. Holthus<br>MORGAN, LEWIS & BOCKIUS LLP<br>110 North Wacker Drive<br>Chicago, IL 60606<br>(312) 324-1000<br>Kenneth.kliebard@morganlewis.com<br>Staci.holthus@morganlewis.com | Jeffrey C. Bank<br>Jordanne Steiner<br>WILSON SONSINI GOODRICH &<br>ROSATI, P.C.<br>1700 K Street NW, Fifth Floor<br>Washington, DC 20006<br>(212) 497-7761<br>jbank@wsgr.com<br>jordanne.miller@wsgr.com |
| Amy B. Manning<br>MCGUIREWOODS LLP<br>77 West Wacker Drive<br>Suite 4400<br>Chicago, IL 60601-7567<br>amanning@mcguirewoods.com | Veronica Moyé<br>KING & SPALDING LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br>(215) 556-2100<br>vmoye@kslaw.com |
| Brian Joseph Smith<br>K&L GATES, LLP<br>70 W. Madison Street<br>Chicago, IL 60602<br>(312) 807-4202<br>brian.j.smith@klgates.com | Molly Moriarty Lane<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Market<br>Spear Street Tower<br>San Francisco, CA 94105-1596<br>(415) 442-1000<br>Molly.lane@morganlewis.com |
| Jeffrey E. Stone<br>Katharine M. O'Connor<br>MCDERMOTT, WILL & EMERY LLP<br>444 West Lake Street, Suite 400<br>Chicago, IL 60605<br>(312) 372-2000<br>jstone@mwe.com<br>koconnor@mwe.com | |

Dated: January 15, 2025          Respectfully submitted,

*/s/ Sarah D. Zandi*
Sarah D. Zandi

172

3154924.9

## APPENDIX A

### Dr. Evan P. Starr

University of Maryland,
Robert H. Smith School of Business
Management and Organization
4512 Van Munching Hall
7621 Mowatt Lane
College Park, Maryland, 20742
estarr@umd.edu

E-mail: estarr@umd.edu
http://evanpstarr.com/http://evanpstarr.com/
Google Scholar Profile

Phone: +1 (301) 405-1054
Citizenship: US

**Employment**

August 2021 –      Associate Professor (with tenure), Robert H. Smith School of Business, Department of Management and Organization, University of Maryland

August 2015 – July 2021      Assistant Professor, Robert H. Smith School of Business, Department of Management and Organization, University of Maryland

August 2014 –      Assistant Professor, School of Labor and Employment
August 2015      Relations and the Department of Economics, University of Illinois at Urbana Champaign

August 2010 – May 2011      Instructor, Department of Strategy and Policy, National University of Singapore Business School

**Education**

2014      *Ph.D.* in Economics, University of Michigan,
2009      *Master of Arts* in Economics, University of Michigan
2007      *Bachelor of Arts* in Mathematics, Economics, Spanish, Denison University (*Summa Cum Laude*)

## Published Manuscripts[*]

1) *Balasubramanian, Natarajan, Evan Starr, and Shotaro Yamaguchi, "Employment Restrictions on Resource Transferability and Value Appropriation from Employees" Forthcoming at *Strategic Management Journal*.

2) *Lipsitz, Michael, Takuya Hiraiwa, and Evan Starr. "Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach" (ungated) Forthcoming at *Review of Economics and Statistics.*

3) Teodorovicz, Thomaz, Prithwiraj Choudhury, and Evan Starr, "Location-Specificity and Geographic Competition for Remote Workers." (ungated) *Organization Science* (2024).

---

[*] Alphabetical by author last name.

3154924.9

4) King, Ben, Martin Ganco, and Evan Starr, "Reconciling Theories on Why Employees of Small Firms Are More Likely to Become Entrepreneurs" (ungated) *Industrial and Corporate Change (*2024) 33(1):194–215.

5) *Prescott, JJ and Evan Starr, "Subjective Beliefs about Contract Enforceability." (ungated) *Journal of Legal Studies.*

6) *Rothstein, Donna and Evan Starr, "Mobility Restrictions, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997." *BLS Monthly Labor Review, June 2022.*

7) *Lipsitz, Michael, and Evan Starr, "Low-Wage Workers and the Enforceability of Non-Compete Agreements." *Management Science* (2022) 68(1):143–170. (ungated)
   • Academy of Management Best Paper Proceedings 2020
   • Finalist, Best Paper Award for the Careers Division of the Academy of Management 2020

8) Starr, Evan, JJ Prescott, and Norman Bishara, "Noncompete Agreements in the US Labor Force." *Journal of Law and Economics* (2021) 64:1 53-84. (ungated)

9) *Balasubramanian, Natarajan, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, and Evan Starr, "Locked In? Noncompete Enforceability and the Careers of High Tech Workers." *Journal of Human Resources* (2020): 1218-9931R1.
   • Academy of Management Best Paper Proceedings 2016 ("Locked In? Noncompete Enforceability and the Mobility and Earnings of High-Tech Workers")
   • Winner, Academy of Management BPS Distinguished Paper Award 2016

10) Starr, Evan and Brent Goldfarb, "Binned Scatterplots: A Simple Tool to Make Research Easier and Better." *Strategic Management Journal* 12 (2020): 2261-2274. (ungated)

11) Starr, Evan, JJ Prescott, and Norman Bishara, "The Behavioral Effects of (Unenforceable) Contracts." *Journal of Law, Economics, and Organization*, (2020) 36(3): 633–687. (ungated)
   • Academy of Management Best Paper Proceedings 2019 ("Noncompetes and Employee Mobility")
   • Winner, Careers Michael Driver Best Applied Paper Award 2019

12) Choudhury, Prithwiraj, Evan Starr, and Rajshree Agarwal, "Machine Learning and Human Capital Complementarities: Experimental Evidence on Bias Mitigation." *Strategic Management Journal*, 8 (2020): 1381-1411. (ungated) (video abstract)
   • Winner, Best Conference Paper Award, Strategic Management Society 2019
   • Winner, Best Interdisciplinary Paper Award, Strategic Human Capital Interest Group at the Strategic Management Society 2019

13) Starr, Evan, Justin Frake, and Rajshree Agarwal. "Mobility Constraint Externalities." *Organization Science*, (2019), 30(5): 961-980. (ungated)

174

3154924.9

14) Starr, Evan, "Consider This: Training, Wages and the Enforceability of Covenants Not to Compete." *ILR Review*, (2019), 72(4): 783–817. (ungated)

15) Starr, Evan, Martin Ganco, and Benjamin Campbell, "Strategic Human Capital Management in the Context of Cross-Industry and Within-Industry Mobility Frictions." *Strategic Management Journal* (2018) 39(8): 2226-2254. (ungated)

16) Starr, Evan, Natarajan Balasubramanian, and Mariko Sakakibara. "Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms." *Management Science*, (2018), 64(2): 552-572. (ungated)
   - Academy of Management Best Paper Proceedings 2014 (1), 13238 ("Enforcing Covenants Not to Compete: The Lifecycle Impact on New Firms")

17) *Bishara, Norman and Evan Starr, "The Incomplete Noncompete Picture." *Lewis & Clark Law Review,* (2016), 20: 497–546.
   - Reprinted in *Employment Law and Intellectual Property Law: Critical Concepts in Intellectual Property Law Series*, Edited by Ann L. Monotti (2018).

18) Prescott, JJ, Norman Bishara, and Evan Starr, "Understanding Noncompetition Agreements: The 2014 Noncompete Survey Project." *Michigan State Law Review,* (2016), 369-464.

**Working Papers**

1) Frake, Justin, Anthony Gibbs, Brent Goldfarb, Takuya Hiraiwa, Evan Starr, and Shotaro Yamaguchi, "From Perfect to Practical: Partial Identification Methods for Causal Inference in Strategic Management Research." *(Minor Revision at Strategic Management Journal)*

2) Greenwood, Brad, Bruce Kobayashi, and Evan Starr, "Can you keep a secret? Banning noncompete clauses does not increase trade secret litigation." (*Revise and Resubmit at Journal of Law, Economics, and Organization*)

3) *Sockin, Jason, Aaron Sojourner, and Evan Starr, "Non-Disclosure Agreements and Externalities from Silence." Updated September, 2022. *(Under Review)*
   - Winner, Strategy Science 2022 Conference Best Paper Award

4) *Adrjan, Pawel, Svenja Gudell, Emily Nix, Allison Shrivastava, Jason Sockin, Evan Starr, "We've Got You Covered: Employer and Employee Responses to Dobbs v. Jackson" *(Under Review)*.

5) *Cowgill, Bo Brandon Frieberg, and Evan Starr, "Clause and Effect: Theory and Field Experimental Evidence on Noncompete Clauses."

6) Pillai, Sandeep, Brent Goldfarb, David Kirsch, Seojin Kim, and Evan Starr, "From Hypothesis Testing Towards Inference to Best Explanation: Testimonial Structure for Abductive Studies in Strategy." (*Under Review*)

175

3154924.9

7) *Kryscynski, David and Evan Starr, "Examining Employment Practice Bundles: When Firms Adopt Value Creation and Value Protection Practices." *(Resting)*

8) Balasubramanian, Natarajan, Mariko Sakakibara, Evan Starr, and Seethalakshmi Ramanathan, "Restricting Physician Noncompete Agreements and Healthcare Access." *(Resting)*

9) Goldfarb, Brent, David Waguespack, and Evan Starr, "Verifying Published Work: The Case of Family Firms and Pollution." *(Resting)*

**Works In Progress**

1) *Balasubramanian, Natarajan, Martin Ganco, Ben King, Evan Starr, and Jake Valentine, "Employment Restrictions, Idea Generation and Entrepreneurship" *(Data analysis stage)*

2) *Kambayashi, Ryo, Evan Starr, and Shotaro Yamaguchi, "Noncompete Agreements in the Japanese Labor Force" *(Data analysis stage)*

3) *Braguinsky, Serguey, Seth Carnahan, Joonkyu Choi, Yuheng Ding, Martin Ganco, Florence Honore, Evan Starr, "Management and Organizational Practices, Business Dynamism, Employee Sorting, and Entrepreneurship" *(Data analysis stage)*

**Book Chapters and Policy Briefs**

1) Noncompete Clauses: A Policymaker's Guide through the Key Questions and Evidence. October 2023. Policy Brief written for the Economic Innovation Group.

2) How Do Broad Non-Disclosure Agreements Affect Labor Markets? With Aaron Sojourner and Jason Sockin, *Upjohn Institute*. November 2022.

3) "Work-From-Anywhere As A Public Policy: Three Lessons from the Tulsa Remote Program." *Brookings Institute 2022*. With Prithwiraj Choudhury and Thomaz Teodorovicz.

4) Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining in Non-Disclosure Agreements, with Rachel Arnow-Richman, Gretchen Carlson, Orly Lobel, Julie Roginsky, and Jodi Short. January 2022. *Day One Project*.

5) Tackling the Dual Economic and Public Health Crises Caused by COVID-19 in Baltimore Early Lessons from the Baltimore Health Corps Pilot, with Dylan Roby, Neil Sehgal, Elle Pope, and Melvin Seale. April 2021. *Rockefeller Foundation.*

6) Are Noncompetes Holding Down Wages? Chapter in *Inequality and the Labor Market: The Case for Greater Competition*. Brookings Institution Press, Edited by Ben Harris and Sharon Block 2021.

176

3154924.9

7) Recent Arguments for Reforming the Law Surrounding Noncompete Agreements, with Mike Lipsitz. Chapter in *Practicing Law Institute Course Handbook* on *Noncompetes and Restrictive Covenants 2020: What Every Lawyer, Human Resources Professional, and Key Strategic Decisionmaker Should Know,* December 2019.

8) The Use, Abuse, and Enforceability of Non-Compete and No-Poach Agreements: A Brief Review of the Theory, Evidence, and Recent Reform Efforts. Policy brief written for Economic Innovation Group, February 2019.

**Popular Press and Other Writing**

1) First Evidence on the Use of Training Repayment Agreements in the US Labor Force, *Promarket.org*, with JJ Prescott and Stewart Schwab. March 27, 2024.

2) Jobs after Dobbs: How Public Support for Female Employees Both Helped and Hurt Some Employers After Roe v. Wade Was Overturned, *Indeed Hiring Lab*, with Pawel Adrjan, Svenja Gudell, Emily Nix, Allison Shrivastava, and Jason Sockin. August, 2023.

3) Comment submitted to the Federal Trade Commission with regards to the proposed noncompete rule, April 2023.

4) Franchise owners are colluding to suppress Minnesota workers' wages, *Minnesota Reformer*, March 2023, with Aaron Sojourner.

5) Companies Say They Need Noncompete Clauses. Here's How We Know That's Not True. *Slate,* March 2023, with Takuya Hiraiwa.

6) Work-from-anywhere as a public policy: 3 findings from the Tulsa Remote program, *Brookings Institute*, September 2022, with Thomaz Teodorovicz and Prithwiraj Choudhury.

7) The Ties that Bind Workers to Firms: No-Poach Agreements, Noncompetes, and Other Ways Firms Create and Exercise Labor Market Power. *Promarket.org.* January 2022.

8) What happens when states limit nondisclosure agreements? Employees start to dish. *Washington Post* October 4, 2021. With Jason Sockin and Aaron Sojourner.

9) Banning Noncompete Agreements Benefits Low-Wage Workers, *Promarket.org* with Mike Lipsitz. October 2019.

10) A new White House proposal targets a hidden culprit holding down Americans' pay, *Vox.com*, October 2016.

**Fellowships and Awards**

1) Smith Teaching Innovation Grant ($6,000), with David Waguespack (Summer 2024)
2) Russel Sage Foundation Grant for $65,000, with Emily Nix and Jason Sockin (October 2023)

177

3) Emerging Fellow at the Smith School (October 2023 to August 2028)
4) Research Grant for $24,000 from sponsor (name withheld due to contract requiring the name of the organization to not be disclosed). September 2023.
5) Russel Sage Foundation Presidential Grant $25,000, with Bo Cowgill (June 2023)
6) Robert H. Smith School of Business External Research Impact Award 2023
7) Allen J. Krowe Excellence in Teaching Award 2022
8) Russel Sage Foundation Presidential Grant $50,000, with Bo Cowgill (October 2020)
9) Rockefeller Foundation Grant $275,000, with Dylan Roby, Neil Sehgal, Melvin Seale (July 2020 to December 2021)
10) Teaching Innovation Grant $12,700 (Summer 2020)
11) Upjohn Institute Early Career Research Award (March 2020)
12) Robert H. Smith School Distinguished Teacher Award (2016, 2019)
    - Top 10% of student evaluations across the Smith School in the previous year
13) University of Maryland Research Communicator Impact Award (May 2017)
    - Given to 3 individuals University-wide
14) Kauffman Grant for $237,937 (Dec 2015 to Dec 2018)
15) SYLFF Fellowship (Winter 2014)
16) Office of the Vice President for Research $15,000 Matching Grant (for Noncompete Survey)
17) Mitre Economics Research Award $5,000 (Spring 2013, Fall 2013, for Noncompete Survey)
18) University of Michigan Rackham Research Award (Summer 2013)
19) University of Michigan Rackham Graduate School Dissertation Fellowship (Winter 2013)
20) University of Michigan Center for Research on Learning and Teaching Preparing Future Faculty Program (May 2012)
21) Michigan Economics Society Outstanding Graduate Student Instructor Award (2009-10)
    - Voted by all University of Michigan Economics undergraduate students
22) Letters of Commendation for Excellent Teaching (Fall 2008, Fall 2009, Winter 2010)
    - Voted top 10 Graduate Student Instructors in Economics at UM
23) University of Michigan Research Grant (Summer 2008, 2009)
24) Denison University President's Medalist (2007): Top Academic Award at University
25) Phi Beta Kappa (Spring 2007)

**Conferences, Keynotes, and Seminar Presentations**

**2025 (planned):** New York University Law School

**2024:** Columbia Business School, University of North Carolina, Eastern Economic Association, University of Toronto, Federalist Society, Economic Innovation Group, UK Competition Authority, Spring American Bar Association Antitrust Meetings, Columbia Law School, Brookings Institute, Non-Market Strategy Conference at Columbia University, Rochester Labor Conference, Strategy and Business Environment Conference at the University of Virginia, Hal White Antitrust Conference, Empirical Contracts Conference at UPenn Law, OECD Noncompete Webinar (Keynote), American Bar Association Debate on the Economics of Non-Compete Agreements, Richmond Association for Business Economics and Virginia Association of Economists, Virginia Commonwealth University, Federal Trade Commission Microeconomics Conference

178

3154924.9

**2023:** American Economic Association, Georgetown University McDonough School of Business, Technology Policy Research Initiative at Boston University, Denison University, University of Utah, Strategy Research Forum, Non-Market Strategy Conference at Columbia University, Empirical Contracts Conference at NYU Law, Strategy and Business Environment Conference at Georgetown University, Bureau of Labor Statistics, Strategic Management Society, Regulatory Transparency Project Webinar on Noncompete Agreements, Economic Policy Institute Virtual Panel, American Bar Association Hot Tub Debate, Economic Innovation Group American Dynamism Series, University of Maryland Smith School Advisory Board, American Antitrust Institute Annual Policy Conference, OECD Webinar on Non-competes (Keynote), Conference on Empirical Legal Studies, People and Organization Conference at Wharton, Australian Treasury and e61 Institute Webinar on Non-compete Clauses (Keynote)

**2022:** LMU Munich, London Business School, Society of Labor Economists, University of Florida Methodological Frontiers Mini-Conference, University of Maryland Snider Center Conversations, Strategic Management Society Methods Program, Google, Academy of Management, Strategic Management Society, SKEMA, Monopsony, Wages and Work Conditions Conference, Duke University, University of Southern California, People & Organizations Conference at Wharton, Department of Justice, American Bar Association Antitrust Fall Forum, Strategy Science, Minneapolis Fed How the Rules of the Labor Market Matter for Workers

**2021:** UT Austin, Society of Labor Economists, Copenhagen Business School, UCLA Anderson, Western Economic Association International, Society for Institutional and Organizational Economics, Academy of Management, Strategic Management Society, Labor and Employment Relations Association, Ludwig Maximilian University of Munich, Navigating Law of Trade Secrets Conference, Practicing Law Institute Conference on Noncompetes and Other Restrictive Covenants, People & Organizations Conference at Wharton, KCON Contracts Conference, NYC Bar Association Trade Secret and Noncompete Forum

**2020:** American Economic Association, Washington University St. Louis, Practicing Law Institute Conference on Noncompetes and Restrictive Covenants 2020, University of Florida (2 Presentations), George Mason University Attorney General Education Program, ESMT Berlin, Boston University School of Law Conference on Technology and Declining Economic Dynamism, George Mason University Scalia Law School, Georgetown Law and Economics Workshop, People and Organizations Conference, Strategic Management Society Conference, Academy of Management, CUNY Baruch Zicklin School of Business, Johns Hopkins Carey School of Business (postponed), London Business School (postponed)

**2019:** American Economic Association, Cornell Law School, Hitotsubashi University, Japanese Cabinet Office, Academy of Management, Darden Global Entrepreneurship and Innovation Research Conference (discussant), Syracuse University Conference on the Changing Nature of Work and Workplaces, Dartmouth Strategy Conference, Strategic Management Society Conference, University of Michigan, University of Maryland Summer Seminar, People and Organizations Conference at Wharton, Federal Trade Commission, University of Maryland Smith School Advisory Board, Bureau of Economic Analysis

179

3154924.9

**2018:** American Intellectual Property Law Association, INSEAD Conference on Innovator Mobility, Labor and Employment Relations Association, University of Minnesota Department of Work and Organizations, Consortium for Competition and Cooperation (participant) at UC Berkeley, Wharton Technology and Innovation Conference, Strategy Research Forum, Unrigging the Labor Market at Harvard Law School, Monopsony in Labor Markets Conference, University of Maryland Summer Seminar, Cornell University, Department of Justice Antitrust Division, Federal Trade Commission Hearings on Competition in the 21st Century, Aspen Institute, Conference on Empirical Legal Studies at the University of Michigan, NBER Summer Institute (participant)

**2017:** Harvard Business School, Clemson University, Utah-BYU Winter Strategy Conference, NYU Economics of Strategy Workshop, SMS Milan, Bureau of Labor Statistics, Dartmouth Strategy Conference, Society of Labor Economists, Industry Studies Association, Strategy Research Forum, DRUID, Western Economic Association International, Strategic Management Society, Frontiers of Entrepreneurial Strategy at Wharton, Consortium for Competitiveness and Cooperation (participant), Harvard Business School WIGE Mini-Conference, People and Organizations Conference at Wharton, University of Maryland Brown-Bag Seminar, Empirical Management Conference at the World Bank, NBER Summer Institute (participant)

**2016:** American Economic Association, University of Maryland Smith Entrepreneurship Research Conference, Society of Labor Economists, American Law and Economics Association at Harvard Law School, Consortium for Competitiveness and Cooperation (participant), Society for Institutional and Organizational Economics at Sciences Po, Strategy Summer Camp at Dartmouth College, Academy of Management, Strategic Management Society, People and Organizations Conference at Wharton, Census Bureau, Duke Strategy Conference, Roundtable for Engineering Entrepreneurship Research (REER) at Georgia Tech, Illinois Attorney General's Office**,** NBER Summer Institute (participant

**2015:** American Economic Association (2 Presentations), University of Delaware, American Law and Economics Association at Columbia University Law School, Industry Studies Association, International Society for New Institutional Economics at Harvard Law School, Society of Labor Economists, Lewis and Clark Fall Forum, Academy of Management, Strategic Management Society, U.S. Department of the Treasury, Roundtable for Engineering Entrepreneurship Research (REER) at Georgia Tech, University of Michigan Law and Economics Seminar

**2014:** IZA Entrepreneurship Conference at the University of Potsdam, The International Society for New Institutional Economics at Duke University, University of Pennsylvania Wharton Mack Institute Conference on Entrepreneurship and Innovation, Census Bureau Center for Economic Studies, Department of Justice Antitrust Division, Federal Trade Commission, Oberlin College, California State University Fullerton, University of Illinois Urbana Champaign, University at Buffalo, University of Maryland Smith School of Business

180

**2011-2013**: Business Econ & Public Policy, Kelley School of Business at Indiana University, Industrial Organization Seminar at the University of Michigan, Zwerdling Labor Seminar at the University of Michigan (2 times), Research Data Center Conference (Census Bureau) at the Atlanta Fed, EconCon at Columbia University, Summer Seminar at the University of Michigan, London Business School Trans-Atlantic Doctoral Conference, Midwestern Economics Association

**Editorial Positions**
Associate Editor, Strategic Management Journal (2021 - )
Associate Editor, Management Science (2019 - )
Editorial Board Member, Strategy Science (2022 - )
Editorial Board Member, Strategic Management Journal (2019 - 2021)

**Refereeing For**
American Economic Review: Insights, Management Science, Quarterly Journal of Economics, American Economic Review, Review of Economics and Statistics, Organization Science, Strategic Management Journal, Administrative Science Quarterly, Journal of Labor Economics, The Journal of Human Resources, American Economic Journal: Applied, Industrial and Labor Relations Review, Journal of Law, Economics, and Organization, Journal of Law and Economics, American Law and Economics Review, Academy of Management Review, Research Policy, Strategy Science, Strategic Entrepreneurship Journal, Journal of Economics and Management Strategy, Journal of Business Venturing, Industry and Innovation, Information Systems Research, Journal of Management Studies, European Financial Management Review, Advances in Strategic Management, Organizational Research Methods, Production and Operations Management, Academy of Management Annual Conference, Strategic Management Society Annual Conference

**Professional Affiliations**

- Strategic Management Society
- Labor and Employment Relations Association
- American Economic Association
- Society of Labor Economists
- Academy of Management
- American Law and Economics Association
- Society for Institutional and Organizational Economics
- Strategy Research Forum

**Teaching**

1) The Best Methods Course Ever, Really (PhD), co-taught with Brent Goldfarb, University of Maryland Smith School of Business (Fall 2017 *4/4*, Fall 2019 *4/4* )
2) Strategic Management (MBA), University of Maryland Smith School of Business (Fall 2019 *3.7/4*, Fall 2020, 3.9/4)

181

3154924.9

3) Strategic Management (Undergrad), University of Maryland Smith School of Business (Spring 2016 *3.81/4*, Spring 2017 *3.16/4*, Fall 2017 *3.52/4*, Spring 2019 *3.7/4*, Fall 2019 *3.8/4*, Fall 2020 *3.7/4*)
4) Quantitative Methods (Masters Level), University of Illinois Urbana Champaign (Spring 2015)
5) Labor Economics II (PhD), University of Illinois Urbana Champaign (Fall 2014)

*Instructor:*

1) International Macroeconomics, National University of Singapore (Winter 2011)
2) Managerial Economics, National University of Singapore (Winter 2011, Fall 2010)
3) Introduction to Macroeconomics, University of Michigan (Summer 2008)

*Graduate Student Instructor:*

1) Applied Microeconometrics (Graduate Level), University of Michigan (Fall 2012)
2) Introduction to Microeconomics, University of Michigan (Winter 2012)
3) Intermediate Macroeconomics, University of Michigan (Winter 2010)
4) Intermediate Microeconomics, University of Michigan (Winter 2009, Fall 2009)
5) Introduction to Macroeconomics, University of Michigan (Fall 2008)
6) Government Regulation of Industry, University of Michigan (Winter 2008)

## Selected Media Coverage

*Interviews:*

1) "Evan Starr | The Noncompete Effect, From CEOs to Sandwich Makers" EMERGE Everywhere Podcast, Financial Health Network, August 7, 2024

2) "Does the FTC Ban Get It Right or Go Too Far? Economists Debate the FTC Non-Compete Rule" *Our Curious Amalgam Podcast, American Bar Association* July 1, 2024.

3) "La Prohibición de los acuerdos do no competencia (NCA) por la FTC", *Contrafactual* June 12, 2024.

4) "No one knows what's in the fine print," *The New Way We Work Podcast* June 3, 2024.

5) "This often-hidden aspect of employment contract costs U.S. employees $300 billion a year", *Fast Company* June 3, 2024.

6) "May Day: The FTC Bans Noncompete Agreements", *WORT 89.9 A Public Affair*, May 1, 2024

7) "Would $10,000 convince you to move to a new city?" *MarketWatch Best New Ideas in Money* podcast, June 1, 2023

8) "She Can't Own Me: Inside the FTC's Proposed Ban on Noncompetes." *UnCommon Law* Podcast, May 31, 2023

9) "Banning Noncompetes is Good, Actually (With Evan Starr)" *Pitchfork Economics*, April 4, 2023

10) "Why Noncompetes Could Soon Be a Non-Thing," *Maryland Today*, March 14, 2023

11) "What an FTC Noncompete Ban Could Mean for Workers and Businesses" *Sloan Management Review*, February 22, 2023

12) "Slingshot Episode 3," *The Slingshot*, February 17, 2023

13) Guest Starr Discusses The Research Behind the FTC's Proposed Noncompete Ban, *Fairly Competing,* February 4th, 2023

14) "What a Ban on Non-compete Agreements Could Mean for American Workers," *The New Yorker*, January 10, 2023

15) "Biden administration may ban 'exploitative practice' of non-compete clauses," *Fox 13 Tampa Bay,* January 6, 2023

16) "More evidence worker noncompete contracts hurt wages," *Scripps National News*, March 2022

17) "Evan Starr on The Economic Benefits of Banning Non-competes," *The Capitol Forum Second Request Podcast,* February 2022

18) "Take the Lead", *Bloomberg Quicktake,* October 2021

19) Interview re: Biden's Executive Order, *Bloomberg Radio,* July 2021

20) Interview with Global Antitrust Institute, June 2020

21) "Gretchen Carlson Urges 2020 Candidates To End NDAs" *Newsy*, February 2020.

22) "How Fair – Or Legal – Are Non-Poaching Agreements?" *Knowledge@Wharton*, July 17, 2018

23) "For American workers, noncompete agreements are pervasive – and might hold down their wages" *NPR Interview on 'Marketplace,'* July 5, 2018.

24) "Employers use non-compete agreements even for low-wage workers." *Baltimore Sun, July 2017.*

3154924.9

25) "Study Finds Many Companies Require Non-Compete Clauses For Low-Wage Workers," *NPR Interview on 'All Things Considered,'* November 7, 2016.

*Selected Mentions:*

26) "WA law restricts noncompete agreements. They keep popping up anyway" *Cascade PBS* November 1, 2024

27) "Can Remote Workers Reverse Brain Drain?" *New York Times, October 16, 2024*

28) "The Last-Minute Curveball for a Big FTC Ban" *The Atlantic, August 28, 2024*

29) "FTC's Noncompete Ban Got Struck Down. What Happens Next?" *Bloomberg,* August 21, 2024

30) "An SAP employee reported a workplace sexual assault. Now she's breaking her NDA" *Business Insider*, June 25, 2024.

31) "The Consequences of Signing Noncompete Agreements among Low-Wage Workers and Those without College Degrees" *Urban Institute WorkRise*, April 30, 2024.

32) "Battles Over Noncompete Clauses Poised to Heat Up in Statehouses" *Bloomberg Law,* April 29, 2024

33) "The Mostly Persuasive Logic Behind the New Ban on Noncompetes" *New York Times,* April 26, 2024.

34) "How the FTC's Noncompete Ban Will Affect Bosses and Workers" *Bloomberg, April 25, 2024*

35) "The FTC is banning noncompete agreements. Did your job search just get easier?" *MarketWatch* April 24, 2024.

36) "F.T.C. Issues Ban on Worker Noncompete Clauses" *New York Times,* April 23, 2024

37) "FTC bans contracts that keep workers from jumping to rival employers" *Washington Post*, April 23, 2024

38) "Ban on Worker Noncompete Agreements Could Spur Job Hopping, Legal Fights" *Barron's*, April 23 2024.

39) "Noncompetes Are Dead—and Tech Workers Are Free to Roam" *Wired*, April 23, 2024

40) "The FTC just banned most noncompetes" *Fast Company*, April 23, 2024

184

41) "Millions of workers are caught in a 'non-compete' trap" *Financial Times, April 18, 2024*.

42) "Biden Scrutiny of Labor Competition Extends to Bank Noncompetes" *Bloomberg Law, March 29, 2024*.

43) "The brewer behind Sam Adams has long kept former employees on a tight leash. Now some are suing to break free." *Boston Globe. March 8, 2024*.

44) "Was Research — on Physicians and Noncompete Agreements — Before Its Time?" *UCLA Anderson Review*, Dec 13, 2023.

45) "Innovation-Killing Noncompete Agreements Are Finally Dying" *Wired Dec 4, 2023*.

46) "What Happens When a Founder Leaves?" *New York Times,* November 20, 2023.

47) "Company-Sponsored, Out-of-State Abortion Benefits a Poor Substitute for State Policies, Research Finds" *Maryland Today,* Aug 11, 2023

48) "Big businesses rally to preserve their right to limit ex-workers' job options," *NBC News,* April 20, 2023

49) "New lawsuit against Tiger Woods could get ugly after breakup with girlfriend: What we know," *USA Today,* March 10, 2023

50) "Noncompete clauses are everywhere, even for dancers and hair stylists" *Washington Post* March 10, 2023

51) "Noncompete Agreements, Come On" *Stuff You Should Know* Podcast, March 7, 2023

52) "US companies mount resistance to proposed ban on non-compete clauses" *Financial Times*, February 9, 2023

53) "Noncompete agreements cost Seattle-area man a new job, lawsuit says" *Seattle Times*, January 30, 2023.

54) "How noncompete agreements harm women and people of color: 'Consequences can be devastating'" *USA Today,* January 19, 2023

55) "Noncompete Ban Holds Out Promise of Better Pay Without Inflation" *Bloomberg*, January 19 2023

56) "The FTC's New Rule Against Noncompetes Could Raise Wages by $300 Billion", *The Nation*, January 18, 2023

57) "In labour markets, the devil is often in the details" *Financial Times*, January 16 2023

58) "The FTC's proposed noncompete ban could be a boon for lower-wage workers" NPR Marketplace January 9, 2023

185

3154924.9

59) "U.S. Moves to Bar Noncompete Agreements in Labor Contracts" *New York Times* Jan. 5, 2023

60) "Why are Fast Food Workers Signing Noncompete Agreements?" *New York Times* Sept 29, 2021

61) "You Deserve a Bigger Paycheck. Here's How You Might Get It." *New York Times* Sept 23, 2021.

62) "Where can I go"? *Chicago Medicine Magazine*, September 2021

63) "Gaming Industry Nondisclosures Become Key Test of #MeToo Laws", *Bloomberg Law*, September 14, 2021

64) "The Noncompete Clause Gets a Closer Look", *Wall Street Journal,* July 21, 2021

65) "Noncompete Agreements Target Janitors as Well as VPs, But Why?" *How Stuff Works,* July 19, 2021

66) "Biden once again bungles a story about low-wage noncompete agreements", *Washington Post,* July 14, 2021

67) "Biden Noncompete Order Risks Legal Disputes Over FTC Overreach", *Bloomberg Law,* July 12, 2021

68) "Biden Moves To Restrict Noncompete Agreements, Saying They're Bad For Workers", *NPR,* July 9, 2021

69) "Employee Noncompete Clause Limits Adopted by Three More States", *Bloomberg Law,* June 29, 2021

70) "An airport executive warns its concessionaires not to steal one another's employees", *Quartz,* June 29, 2021

71) "Number of Americans moving homes hits lowest level in 73 years" *NPR Marketplace, December 16, 2020.*

72) "Noncompete Misconceptions May Be Inhibiting Reform" *Law360.com, December 2019,* by Russell Beck and Erika Hahn.

73) "Half of U.S. businesses make workers sign noncompete agreements" *CBS News, December 2019.*

74) "Resistance to Noncompete Agreements Is a Win for Workers" *Wall Street Journal, May 2019.*

75) "Keep Increasing Pressure Against Noncompetes" *Law360.com, May 2019*, by Eric Posner.

3154924.9

76) "The Freedom to Leave: Curbing Noncompete Agreements to Protect Workers and Support Entrepreneurship," *Center for American Progress*, January 2019.

77) "Cushman v the cleaner: the fight over non-competes," *Financial Times*, October 2018

78) "Efforts to restrict worker mobility are bad for the economy," *Financial Times*, October 2018

79) "WeWork Reaches Settlement on Noncompete Pacts," *Wall Street Journal*, September 2018

80) "The Hidden Reason Why Your Pay Is Stuck in Neutral," *Vice*, July 2018

81) "The Class Struggle According to Donald Trump," *The New York Times,* June 2018.

82) "Lawmakers are trying to curb contracts that make it harder to change jobs," *The Economist*, May 2018

83) "N.J. lawmaker wants to crack down on non-compete clauses," *WHYY NPR*, November 2017

84) "Illinois Wields New Power to Challenge Noncompete Agreements," *New York Times,* Oct 2017

85) "CIOs Likely to Face More Noncompete Disputes," *Wall Street Journal,* August 2017

86) "Work for Us – Or Else: The Rise of Noncompete Contracts," *Governing,* August 2017

87) "Why Janitors Get Noncompete Agreements, Too," *Stateline (Pew),* May 2017

88) "How Noncompete Clauses Keep Workers Locked In," *New York Times,* May 2017

89) "The Rigged Labor Market," Alan Krueger, *Milken Institute Review,* April 2017

90) "To Compete Better, States Are Trying to Curb Noncompete Pacts" *New York Times,* June 2016

91) "Non-Compete Agreements: Analysis of the Usage, Potential Issues, and State Responses", *White House*, May 2016

92) "Leveling the playing field for workers by reforming non-competes," *Brookings Blog*, May 2016

93) "Job hopping helped Silicon Valley thrive. So why do other states restrict it?" *Vox.com*, April, 2016.

94) "The Tyranny of the Noncompete Clause," *Bloomberg View*, April 2016.

95) "Non-compete Contracts: Economic Effects and Policy Implications", *US Department of the Treasury*, March 2016

96) "The Rent-Seeking is Too Damn High," *FiveThirtyEight,* February 2016.

187

97) "Noncompete Agreements Hobble Junior Employees," *The Wall Street Journal*, February 2016.

98) "Hawaii ban on noncompetes leaves out a huge chunk of workers," *Fortune,* July 2015.

99) "New Legislation Targets Non-Compete Agreement for Employees Blocking Wage Growth," *Forbes*, June 2015.

100) "Can the Senate stop low-wage employers from tying up workers with non-competes?" *The Washington Post*, June 2015.

101) "Exclusive: Amazon makes even temporary warehouse workers sign 18-month non-competes," *The Verge*, March 2015.

**Expert Witness Testimony**

1) Collier HMA Physician Management, LLC et al., v. NCH Healthcare System Inc., et al.

2) Echo Global Logistics Inc. v. Traffic Tech, Inc. and Jack Ford Jr.

3) IQVIA Inc. vs. Mansoor Khan and Veeva Systems Inc.

4) Jefferies LLC v. Credit Suisse Securities (USA) LLC

5) The Dufresne Spencer Group, LLC et al. v. Han Nara Enterprises LP et al.

**Policy-Related Work and Testimony**

1) Testified at Maryland Senate Hearing on HB1388 on March 28, 2024.

2) Submitted comment to FTC regarding noncompete rule. April 2023.

3) Testified at Minnesota Hearing on BF999 related to noncompete agreements on February 22, 2022 (here).

4) Presenter at Federal Trade Commission workshop: "Making Competition Work: Promoting Competition in Labor Markets" December 6, 2021.

5) Testified at DC City Council Hearing on B24-256 bill related to noncompetes on July 14, 2021.

6) Testified at Connecticut Labor & Public Employees Committee hearing on SB 906 "An Act Concerning Noncompete Agreements" on March 4, 2021. See my testimony here (from 15:47 to 41:35)

7) Observer, Uniform Law Commission for the "Uniform Restrictive Employment Agreement Act"

188

3154924.9

8) Presented to the Uniform Law Commission committee on the Covenants Not to Compete Act, November 18, 2020.

9) Presented to the National Association of Attorneys General on noncompete agreements on February 10, 2020.

10) Panelist and Presenter at Federal Trade Commission workshop: "Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues" on January 9, 2020. See my testimony here (from 22:30 to 46:10).

11) Testified at District of Columbia Labor & Workforce Development Public Hearing, related to B23-494, Ban on Non-Compete Agreements Amendment Act of 2019, on December 6, 2019. See the full hearing here.

12) Submitted policy memo on noncompetes to National Governor's Association, and National Council on State Legislatures, with Michael Lipsitz, on November 19, 2019.

13) Testified at the US Senate Committee on Small Business and Entrepreneurship Hearing on "Noncompete Agreements and American Workers" on November 14, 2019. See the full hearing here and read my written testimony here.

14) Responded to follow-up questions from Senator Cardin (MD) & Senator Hirono (HI)

15) Testified at the US House of Representatives Judiciary Subcommittee hearings on "Antitrust and Economic Opportunity: Competition in Labor Markets" on October 29, 2019. See my oral testimony here (from 1:28 to 1:33) and read my written testimony here.

16) Panelist at Federal Trade Commission Hearings on Competition and Consumer Protection in the 21st Century, October 16, 2018. Video from 39:00 to 49:33.

17) Met with Federal Trade Commission commissioners Noah Phillips and Rohit Chopra to discuss the use and effects of covenants not to compete, July 2018. Commissioner Chopra later released a statement on covenants not to compete to encourage rulemaking within the FTC.

18) Provided input to CT Senator Chris Murphy's office in crafting the Workforce Mobility Act of 2018.

19) Submitted testimony to the Massachusetts Joint Committee on Labor and Workforce Management and to the Wisconsin Assembly Committee on Jobs and the Economy, October 2017.

20) Organizer and panelist at White House Summit on Employee Non-compete Agreements, October 2016.

21) Provided input to White House Noncompete Report, "Non-Compete Agreements: Analysis of the Usage, Potential Issues, and State Responses," May 2016

3154924.9

22) Provided input to the US Treasury Noncompete Report, "Non-compete Contracts: Economic Effects and Policy Implications," March 2016

23) Provided input to the offices of Senators Murphy regarding the Senate MOVE Act (Mobility and Opportunity for Vulnerable Employees), September 2015.

**Ph.D. Thesis Supervision**

1) Jacob Valentine, ongoing (Committee member)
2) Beril Yacinkaya, ongoing (Committee member)
3) Haifeng Wang at University of Wisconsin, ongoing (Committee Member)
4) Chris Calway, ongoing (Committee member, placed at West Point)
5) Shotaro Yamaguchi, 2024 (Committee member, Placed at University of Wisconsin)
6) Yuheng Ding, 2023 (Committee member, placed at World Bank)
7) Ed Olivares, Economics 2023 (Committee member, placed at US Treasury)
8) Paul Cheung, Economics 2022 (Committee member, placed at University of Texas at Dallas)
9) Audra Wormald, 2022 (Committee member, placed at UNC Chapel Hill)
10) Anthony Gibbs, 2021, (Committee member, placed at George Washington University)
11) Ben King, 2021 (Co-chair, placed at University of Illinois at Urbana Champaign)
12) Cynthia Boruchowicz, Public Policy 2021 (Committee member)
13) Justin Frake, 2018 (Committee member, placed at University of Michigan)
14) Lauren Aydinliyim at Rutgers University, 2018 (Committee member, placed at CUNY Baruch)
15) Daniel Olson, 2016 (Committee member, placed at University of Washington)

**Miscellaneous Information**

1) Coach, Univ. of Michigan Women's Club Water Polo: 48-5 overall record (Winter 2012 & 2010)
   • Finished 2nd (2010) & 4th (2012) at National Championship Tournament

190

## APPENDIX B

## Materials Relied Upon Include the Following:

### I.   PAPERS, BOOKS, AND WEBSITES

Aaron S. Edlin & Daniel L. Rubinfeld, *Exclusive or Efficient Pricing? The Big Deal Bundling of Academic Journals*, 72 Antitrust L. J. 119 (2004)

ABA Section of Antitrust Law, Antitrust Law Developments (7th ed. 2012)

*About Us*, DaVita Redwoods, https://www.redwoods.davita.com/about-us (last visited Jan. 2025)

*About Us*, SCA Health, https://sca.health/about-us/ (last visited Jan. 9, 2025)

*About*, DaVita, https://www.davita.com/about (last visited Jan. 9, 2025)

Adam Smith, An Inquiry into the Nature and Causes of the Wealth of Nations, 105-106 (W. Strahan & T. Cadell, London 1776)

Alan B. Krueger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, 57 J. Human Resources S324–S348 (2022)

Alan Manning, Monopsony in Motion: Imperfect Competition in Labor Markets (2003)

*American Community Survey Information Guide*, United States Census Bureau, https://www.census.gov/programs-surveys/acs/about/information-guide.html (last visited Jan. 2025)

*Annual Report 2023*, DAVITA (Apr. 26, 2024), https://investors.davita.com/download/DaVita_2023_Annual_Report.pdf

B. N. Greenwood, B.H. Kobayashi, & E. Starr, *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation*, Donald G. Costello Coll. Of Bus. At George Mason Univ. Research Paper (2024)

Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings*, Rev. Econ. & Statistics 1–35, 1 (2024)

Carl Shapiro, *Antitrust: What Went Wrong and How to Fix It*, 35(3) Antitrust L. J. 33–45 (2021)

Carlos Cinelli et al., *A crash course in good and bad controls*, 53 Sociological Methods & Research 1-30 (2022)

Chen, J. and Roth, J., *Logs with zeros? Some problems and solutions*, QUARTERLY J. ECON. 1–22 (2024)

Conrado Tapado, *Does Your Company Have Internal Pay Equity?*, Payscale (Mar. 31, 2009), https://web.archive.org/web/20210508234343/http://www.payscale.com/compensation-today/2009/03/importance-of-internal-pay-equity

*Contact Us*, DaVita, https://www.davita.com/about/contact-us (last visited Jan 14, 2025)

*Contact Us*, SCA Health, https://sca.health/about-us/contact/ (last visited Jan. 2025)

Dan Luu, *How Many Locations Does Surgical Care Affiliates Have?*, NWCC-OR (Aug. 3, 2022), https://www.nwcc-or.com/how-many-locations-does-surgical-care-affiliates-have#:~:text=SCA%20Health%20is%20dedicated%20to,patients%2C%20providers%2C%20and%20community

Daniel A. Crane, *Market Power Without Market Definition*, 90 Notre Dame L. Rev. 31 (2014)

*Daphne Walker*, LinkedIn, https://www.linkedin.com/in/daphne-walker-a351759a/ (last visited Jan. 2025)

Dennis W. Carlton & Jeffery M. Perloff, Modern Industrial Organization (3rd ed. 2000)

Dennis W. Carlton & Jeffery M. Perloff, Modern Industrial Organization (4th ed. 2005)

Duan, Naihua, *Smearing estimate: a nonparametric retransformation method*, 78(383) Journal of the American Statistical Association, 605-610 (1983)

Emily Breza et al., *The Morale Effects Of Pay Inequality*, 133 Quarterly J. Econ. 611–663 (2018)

Fabien Postel-Vinay & Jean-Marc Robin, *To match or not to match?: Optimal wage policy with endogenous worker search intensity*, 7 Rev. Econ. Dynamics 297 (2004)

*Fact Sheet*, U.S. Dept. Health & Human Servs. (May 9, 2023), https://www.hhs.gov/about/news/2023/05/09/fact-sheet-end-of-the-covid-19-public-health-emergency.html

*FAQ*, UCLA Statistical Methods & Data Analytics, https://stats.oarc.ucla.edu/other/mult-pkg/faq/general/faqhow-do-i-interpret-a-regression-model-when-some-variables-are-log-transformed/ (last visited Jan. 9, 2025)

Fed. Jud. Ctr., Nat'l Rsch. Council, Reference Manual on Scientific Evidence (3rd ed. 2011)

SCAI Holdings, Certification and Notice of Termination of Registration (Form 15) (Apr. 3, 2017).

Francine Lafontaine, Saattvic Saattvic, & Margaret Slade, *No–Poaching Clauses in Franchise Contracts: Anticompetitive or Efficiency Enhancing*, SSRN (Sept. 9, 2024)

Gary Solon et al., *Measuring the cyclicality of real wages: how important is composition bias?*, 1 Quarterly J. Econ 1 (1994)

George Milkovich, Jerry Newman & Barry Gerhart, Compensation (11th ed. 2011)

Hannes Schwandt & Till Von Wachter, *Unlucky cohorts: Estimating the long-term effects of entering the labor market in a recession in large cross-sectional data sets*, 37 J. Labor Econ. S161 (2019)

*Home*, DaVita Investors, https://www.davita.com/about (last visited Jan. 9, 2025)

*Home*, United Surgical Partners Int'l, https://uspi.com/home/default.aspx (last visited Jan. 9, 2025)

*Improving Health, Health Care and Quality of Life*, DaVita, https://investors.davita.com/ (last visited Jan. 9, 2025)

*Intraclass Correlation Coefficient Cheat Sheet*, NIH Collaboratory (Mar. 15, 2020), https://dcricollab.dcri.duke.edu/sites/NIHKR/KR/Intraclass_Correlation_Coefficient_Cheat_Sheet_March_15_2020.pdf

*Investors*, DaVita, https://investors.davita.com/ (last visited Jan. 2025)

Jackie Powder, *COVID-19 in 2022: A Year-End Wrap-Up*, Johns Hopkins Bloomberg School of Public Health (Dec. 15, 2022), https://web.archive.org/web/20240620113903/https://publichealth.jhu.edu/2022/covid-year-in-review

*Jeff Andrews*, LinkedIn, https://www.linkedin.com/in/jeff-andrews-b7300b8/ (last visited Jan. 2025)

Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach (South-Western 5th ed. 2013)

John M. McAdams, *Non-Compete Agreements: A Review of the Literature*, SSRN 5 (2019)

Johnathan Baker & Daniel Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, 1 Am. Law & Econ. Review. 386 (1999)

Johnathan Masur & Eric A. Posner, *Horizontal Collusion and Parallel Wage-Setting in Labor Markets*, University of Chicago Law School Chicago Unbound, Coase-Sandor Working Paper Series in Law & Econ. No. 941 (2022)

Jonathan B. Baker, *The Case for Antitrust Enforcement*, 17 J. Econ. Perspectives 27 (2003)

José AF Machado & JMC Santos Silva, *Quantiles via Moments*, 213 J. Econometrics 145-173 (2019)

Juan Alcácer et al., *Applying random coefficient models to strategy research: Identifying and exploring firm heterogeneous effects*, 3 Strategy Science 533–553 (2018)

*Justice Department and Federal Trade Commission Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation*, DOJ (Oct. 20, 2016), https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-guidance-human-resource-professionals

Karen Shen et al., *Job flows into and out of health care before and after the COVID-19 Pandemic*, 5 Jama Health Forum 1 (2024)

*Kelly Barker*, LinkedIn, https://www.linkedin.com/in/kelly-barker-462332/ (last visited Jan. 2025)

Kent Romanoff et al., *Pay Equity: Internal and External Considerations*, 18 Comp. & Benefits Rev. 17–25 (1986)

Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases*, Antitrust Source (2015)

Kevin Caves & Hal Singer, *When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer-Welfare Standard*, 26 Geo. Mason L. Rev 395 (2019)

Lois Friss, External Equity and the Free Market Myth, 7(3) REVIEW OF PUBLIC PERSONNEL ADMINISTRATION 74-91 (1987)

Margaret C. Levenstein & Valerie Y. Suslow, *What Determines Cartel Success?*, 44 J. Econ. Literature 43-95 (2006)

*Matt Pate*, LinkedIn, https://www.linkedin.com/in/matt-pate/ (last visited Jan. 2025)

Matthew Gibson, *Employer Market Power in Silicon Valley*, Upjohn Research (2024)

Matthew S. Johnson et al., *The labor market effects of legal restrictions on worker mobility*, Federal Trade Commission 1-77 (2021)

*Medical Staff and Specialists At Outpatient Centers*, Tag Medstaffing, https://www.tagmedstaffing.com/what-is-a-outpatient-center/ (last visited Jan. 9, 2025)

Michael Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable

Michael Kheyfets, *Evolving or Running in Place? Empirical Approaches to "Common Impact" in Antitrust Class Actions*, Edgeworth Economics 74–85 (Oct. 23, 2024), https://www.edgewortheconomics.com/assets/htmldocuments/UPDATED_Kheyfets%20PDF%20common%20impact.pdf

Michael Lipsitz & Evan Starr, *Low-wage workers and the enforceability of noncompete agreements*, 1 Mgmt. Sci. 143-170 (2022)

N. Gregory Mankiw, Principles of Microeconomics (Cengage 8th ed. 2018)

Natarajan Balasubramanian at el., *Locked in? The enforceability of covenants not to compete and the careers of high-tech workers*, 57 J. Human Res. S349–S396, S349 (2022)

Natarajan Balasubramanian, Evan Starr & Shotaro Yamaguchi, *Employment restrictions on resource transferability and value appropriation from employees*, Strategic Mgmt. J. 2519–2547 (2024)

Nick Huntington-Klein, *The Effect: An Introduction to Research Design and Causality*, Chapter 8 (2021)

*No More No-Poach: The Antitrust Division Continues to Investigate And Prosecute "No-Poach" And Wage-Fixing Agreements*, DOJ (Apr. 10, 2018), https://web.archive.org/web/20230408175427/https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements

*Outpatient Surgery*, CDC, https://www.cdc.gov/nchs/hus/sources-definitions/outpatient-surgery.htmhttps://www.cdc.gov/nchs/hus/sources-definitions/outpatient-surgery.htm (last updated July 24, 2024)

P.F. Cahuc et al., *Wage Bargaining with On-the-job Search: Theory and Evidence*, 74 Econometrica 323 (2006)

Paul Hünermund & Beyers Louw, *On the nuisance of control variables in causal regression analysis*, Organizational Rsch. Methods (2023)

*Payroll Blog: Payroll Training, Tips, and News*, Patriot Software (Jan. 12, 2022), https://www.patriotsoftware.com/payroll/training/blog/what-is-internal-equity/

Pedro Brinca et al., *Measuring labor supply and demand shocks during COVID-19*, European Economic Review 1 (2021)

*Philip A. Spencer*, LinkedIn, https://www.linkedin.com/in/phil-spencer-1547546/ (last visited Jan. 2025)

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: an Analysis of Antitrust Principles and their Application (4th ed. 2017)

*Press Release: DaVita Medical Group Acquires Respected Physician Practices in the Orlando Area*, DaVita Newsroom (Jul. 13, 2017), https://newsroom.davita.com/press-releases?item=123281

*Press Release: Optum completes acquisition of DaVita Medical Group from DaVita*, UnitedHealth Group (Jun. 19, 2019) https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html

*Press Release: Surgical Care Affiliates (SCA), OptumCare to Combine*, UnitedHealth Group (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html

*Press Release: Tenet Completes Purchase of USPI from WCAS*, Investor Tenet Health (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx

*Price Fixing, Bid Rigging, And Market Allocation Schemes*, DOJ (Feb. 2021), https://www.justice.gov/atr/price-fixing-bid-rigging-and-market-allocation-schemes

Price Fixing, FTC, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/price-fixing (last visited Dec. 11, 2024)

*Prosecuting Cartels without Direct Evidence of Agreement*, Org. for Econ. Coop. & Dev. (Sept. 11, 2006), https://www.oecd.org/content/dam/oecd/en/publications/reports/2006/05/prosecuting-cartels-without-direct-evidence-of-agreement_75732b6f/9640e3d4-en.pdf

*Regress Post Postestimation*, Stata, https://www.stata.com/manuals/rregresspostestimation.pdf (last visited Jan. 9, 2025)

Robert C. Marshall & Leslie M. Marx, The Economics of Collusion, Cartels and Bidding Rings (2012)

Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 107 Q. J. Econ. 439-479 (1992)

Robert Pindyck & Daniel Rubinfeld, Microeconomics (9th ed. 2017)

Robin L. Pinkley et al., *The Impact of Alternatives to Settlement in Dyadic Negotiation*, 57 Organizational Behav. & Human Decision Processes 97–116 (1994)

Rochelle T. Davis, *Talent Can't Be Allocated: A Labor Economics Justification for No-Poaching Agreement Criminality in Antitrust Litigation*, 12 Brooklyn J. Corp., Fin. & Com. Law 279–310 (2018)

Roger Fisher & William Ury, Getting to Yes (2nd ed. 1983)

*SCA Health*, LinkedIn, https://www.linkedin.com/company/scahealth (last visited Jan. 2025)

Scott Cunningham, Causal Inference: The Mixtape (2021), https://mixtape.scunning.com/03-directed_acyclical_graphs

Serdar Ozkan et al., *Anatomy of Lifetime Earnings Inequality: Heterogeneity in Job-Ladder Risk versus Human Capital*, 1 J. Pol. Econ. Macroeconomics 506–550 (2023)

Shersten Killip et al., *What is an intracluster correlation coefficient? Crucial concepts for primary care researchers*, 2 Annals of Family Med. 204–208 (2004)

Sophia Rabe-Hesketh and Anders Skrondal, *Multilevel and Longitudinal Modeling Using Stata, Volumes I and II, Fourth Edition*, Stata Press (2022)

Steven G. Lanning, *Costs of Maintaining a Cartel*, 36(2) J. Indus. Econ. 157 (1987)

Suresh Naidu et al., *Antitrust Remedies for Labor Market Power*, 132 Harv. L. Rev. 536 (2018)

Sydnee Caldwell & Oren Danieli, *Outside Options in the Labour Market*, Rev. Econ. Studies (2024)

Takuya Hiraiwa, Michael Lipsitz & Evan Starr, *Do firms value court enforceability of noncompete agreements? A revealed preference approach*, Rev. of Econ. & Statistics 1–71 (2024)

*Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform*, Tenet Healthcare (Mar. 23 2015), https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx

*The State of Labor Market Competition*, U.S. Dep't of Treasury (Mar. 7, 2022), https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf

Theon van Dijk & Frank Verboven, *Quantification of Damages*, in 3 Issues in Competition Law and Policy 2331–2348 (ABA Section of Antitrust Law 2008)

Thomas Krattenmaker et al., *Monopoly Power and Market Power in Antitrust Law*, 76 Georgetown Law Journal 241–269 (1987)

Timothy Brennan, *Bundled Rebates as Exclusion Rather Than Predation*, 4 J. Competition Law & Econ. 335–374 (2008)

*What is an ASC?*, Ambulatory Surgery Center Association, https://www.ascassociation.org/asca/about-ascs/surgery-centers (last visited Jan. 9, 2025)

*Who We Are*, United Surgical Partners Int'l, https://uspi.com/about-us/who-we-are/default.aspx (last visited Jan. 9, 2025)

## II. DOCUMENTARY EVIDENCE AND DEPOSITION TRANSCRIPTS AND EXHIBITS

I was provided access to all deposition transcripts and exhibits and all documents produced in the case. The following are among the materials I considered:

**Deposition Transcripts**

Deposition of Alex Bateman (Jul. 19, 2024)

Deposition of Andrew Hayek (Sept. 18, 2024)

Deposition of Andrew Johnston (Sept. 6, 2024)

Deposition of Anthony Martin (Jun. 27, 2024)

Deposition of Bill Wilcox (Sept. 24, 2024)

Deposition of Brett Brodnax (Sept. 12, 2024)

Deposition of Brian Mathis (Sept. 20, 2024)

Deposition of Bridget Fanning (Jul. 17, 2024)

Deposition of Cindy English (Jun. 12, 2024)

Deposition of Colleen Arthur (May 23, 2024)

Deposition of Dennis Kogod (Sept. 6, 2024)

Deposition of James "Skip" Thurman (Jun. 17, 2024)

Deposition of Jason Cagle (Aug. 6, 2024)

Deposition of Jimmy Tanner (Jul. 31, 2024)

Deposition of Joseph Clark (Sept. 11, 2024)

Deposition of Kent Thiry (Aug. 16, 2024)

Deposition of Leslie Wachsman (May 22, 2024)

Deposition of Mark Garvin (May 30, 2024)

Deposition of Mark Kopser (Dec. 12, 2024)

Deposition of Michael Rucker (Aug. 27, 2024)

Deposition of Michael Staffieri (Apr. 5, 2024)

Deposition of Peter Clemens (May 2, 2024)

Deposition of Sandi Karrmann (Aug. 14, 2024)

Deposition of Scott Keech (Aug. 22, 2024)

Deposition of Shannon McGarry (Jun. 11, 2024)

Deposition of Shannon Mosley (Aug. 13, 2024)

Deposition of Warren Cinnick (Nov. 22, 2024)

**<u>Defendants' Structured Data Files</u>**

<u>DaVita</u>
DVA_OMCEAL_000000029–45
DVA_OMCEAL_000000047
DVA_OMCEAL_000902589–91
DVA_OMCEAL_000902592
DVA_OMCEAL_001182111
DVA_OMCEAL_001408544
DVA_OMCEAL_001408550
DVA_OMCEAL_001421632
DVA_OMCEAL_001421634
DVA_OMCEAL_001421733
2022-8-3 Ltr SDZ to DaVita RE Structured Data Questions
2022-8-24 Ltr R Quinto to Pls. RE DaVita 1RFP Structured Data
2022-11-22 Ltr R. Quinto to LYC & SDZ RE DaVita RFP Responses
2023-7-26 - Letter to DaVita re structured data questions
2023-10-5 - DaVita Ltr re structured data
2024-03-27 Ltr to S. Zandi re 2-28-24 Letter
2024-03-27 Ltr to S. Zandi re Structured Data Questions from 2-7-24 Letter
2024-09-30 Ltr to S. Zandi re structured data questions from 7-19-24 Ltr
2024-10-25 Ltr to S. Zandi re 10-1-24 and 7-19-24 Letters
2024-11-07 Ltr to S. Zandi re structured data questions from 7-30-24 Ltr
2024-12-19 Ltr to S. Zandi re structured data questions from 11-27-24 Ltr

<u>SCA</u>
2021 Teammate Roster
2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data
2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions
CheckSumm
CheckSummHE
Check History Hours and Earnings
EEmploy
EJob
SCA Hashed SSNs
SCA - Structured00000005
SCA - Structured00000013
SCA-Structured00000007
SCA-Structured00000009
SCA-Structured00000010

SCA-Structured00000011

SCA-Structured00000012

SCA-Structured00000013

Termed in 2021

2022-1-21 Ltr C. Ventura to Y. Salahi re Structured Data Sample

2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data

2022-4-21 Letter from C. Ventura to L. Chan re 4-20-22 IT Rep Meet & Confer

2022-9-16 Ltr. C. Ventura to S. Zandi RE Structured Data

2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions

2024.08.29 - Letter from J. Wade to S. Zandi re structured data

2024.10.11 - Letter from J. Wade to S. Zandi re structured data

2024-03-13 Letter from T. Rothman to S. Zandi re Response to Plaintiffs' 2-7 Letter

2024-3-6 Ltr T. Rothman to S. Zandi RE Response to Pls' 2-28 Letter

2024-11-13 Ltr J. Wade to S. Zandi RE SCA Structured data


USPI

2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions

2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes

4.19.24 Paygroup location

Exhibit A_Paygroup_Location

Exhibit B_ERNCD Values

USPI_CIV_000021819

USPI_CIV_000659222–33

USPI_CIV_000659234

USPI_CIV_001168726

2022-6-1 Ltr K Limarzi to Plaintiffs Encl USPI Doc Prod Vol004

2022-7-28 - LYC Letter to USPI re structured data questions – LYC

2022-12-2 Ltr K Limarzi to Pls RE USPI Responses & Objs to RFPs

2023.09.26 - K. Limarzi Ltr. re Structured Data Productions

2023-1-25 Ltr K. Limarzi to Plaintiffs RE USPI Responses & Objs to RFPs

2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions

2024.03.27 Ltr from USPI to Plaintiffs re 2.7 Ltr

2024.03.27 Ltr from USPI to Plaintiffs re 2.28 Ltr

2024.04.08 USPI Suppl Ltr to Plaintiffs re 2.7 ltr

2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter

2024.12.12 Ltr to Plaintiffs re Reporting Structure

2024-10-1 Ltr SDZ to USPI re Structured Data Question

2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions

2025.01.06 USPI Resp to Pls 11.22.24 Ltr re Structured Data

2024.11.18 USPI Production - Vol. 27

**Deposition Exhibits (in ascending order by exhibit number)**

Ex. DX64

Ex. PX001, DOJCIV-008-00000059–71

Ex. PX003, DVA_OMCEAL_001354505–06

Ex. PX004, DVA 01922502

Ex. PX005, DVA_OMCEAL_000417583–84

Ex. PX012, DVA_OMCEAL_000387563

Ex. PX013, DVA_OMCEAL_000397493

Ex. PX021, DVA_OMCEAL_001339976–78

Ex. PX024, DVA_OMCEAL_000386711

Ex. PX027, DVA_OMCEAL_001339898–901

Ex. PX030, SCA002213758–62

Ex. PX033, SCA002364259–61

Ex. PX037, USPI_CIV_000016100

Ex. PX053, SCA000131233–34

Ex. PX054, SCA000130861–67

Ex. PX059, SCA002364264–65

Ex. PX060, SCA001075713–15

Ex. PX063, SCA000609009–11

Ex. PX075, DVA_OMCEAL_001321755–59

Ex. PX077, DVA_OMCEAL_001329256–61

Ex. PX078, DVA_OMCEAL_001070924, -28–30

Ex. PX081, DVA_OMCEAL_001068250–52

Ex. PX083, DVA_OMCEAL_001057524–25

Ex. PX084, DVA_OMCEAL_001321377–78

Ex. PX085, DVA_OMCEAL_001067247–81

Ex. PX088, DOJCIV-008-00000353–67

Ex. PX089, USPI_CIV_000000597–600

Ex. PX099, USPI_CIV_000021321

Ex. PX101, USPI_CIV_000004081–82

Ex. PX103, USPI_CIV_000003394

Ex. PX104, USPI_CIV_000001842

Ex. PX105, USPI_CIV_000021906

Ex. PX106, USPI_CIV_000021907–11

Ex. PX109, USPI_CIV_000810693

Ex. PX111, USPI_CIV_000810697

Ex. PX112, USPI_CIV_000810694

Ex. PX115, USPI_CIV_000039752–53

Ex. PX118, USPI_CIV_000022040–66

Ex. PX119, USPI_CIV_000601224–29

Ex. PX120, USPI_CIV_000584419–21

Ex. PX123, DOJCIV-007-00000091–96

Ex. PX124, DOJCIV-012-000000131–37

Ex. PX130, DOJCIV-014-00000009–15

Ex. PX135, USPI_CIV_000016089–92

Ex. PX138, USPI_CIV_000122239

Ex. PX157

Ex. PX158

Ex. PX159, DOJ-PROD001B-00152893–908

Ex. PX160, SCA000002866–68

Ex. PX162, DOJ-PROD004-00725757–58

Ex. PX163, DOJ-PROD004-00693673–74

Ex. PX170, DOJ-PROD004-00476230–31

Ex. PX171, DOJ-PROD001B-00157126–28

Ex. PX172, DOJ-PROD001A-00000001–02

Ex. PX185

Ex. PX219, DOJCIV-012-00000066–69

Ex. PX227, USPI_CIV_000014146

Ex. PX232, USPI_CIV_000021155

Ex. PX235, USPI_CIV_000110943

Ex. PX239, USPI_CIV_000046079

Ex. PX240, USPI_CIV_000686081–92

Ex. PX257, DOJCIV-007-00000060–63

Ex. PX268, DVA_OMCEAL_001344567–82

Ex. PX269, DVA_OMCEAL_000957816–28

Ex. PX275, DOJ-PROD003-00117878–93

Ex. PX281, DOJCIV-008-00000039–55

Ex. PX282, USPI_CIV_000006432

Ex. PX283, USPI_CIV_000035855–56

Ex. PX298, USPI_CIV_000001260–62

Ex. PX299, USPI_CIV_000000447

Ex. PX300, USPI_CIV_000000448–51

Ex. PX304, DOJCIV-008-00000298–303

Ex. PX305, DOJCIV-008-00000170–86

Ex. PX313, DOJCIV-008-00000187–95

Ex. PX314, DOJCIV-008-00000228–43

Ex. PX316, DVA00019820–23

Ex. PX336, SCA-DOJ-00158130–31

Ex. PX376, DVA_OMCEAL_000122783–84

Ex. PX464, USPI_CIV_000013967

Ex. PX478, USPI_CIV_000390138

Ex. PX479, USPI_CIV_000112061

Ex. PX483

Ex. PX484, DVA_OMCEAL_000429386–90

Ex. PX485, DVA00006531

Ex. PX486, USPI_CIV_000014009

Ex. PX487, USPI_CIV_000014006

Ex. PX489, OMC_BM_000014729

Ex. PX490, HAYEK-000012214–16

Ex. PX491, OMC-BM-000013354–56

Ex. PX501, SCA-002277742–44

Ex. PX507, DOJCIV-008-00000266–78

Ex. PX508, DOJCIV-008-00000212–26

Ex. PX514, USPI_CIV_000397215

Ex. PX515, USPI_CIV_000018231

Ex. PX516, USPI_CIV_000105175–77

Ex. PX520, USPI_CIV000111376–82

Ex. PX522, OMC_BM_000000884–95

Ex. PX523, OMC_BM_000010778–79

Ex. PX524, OMC_BM_000013354–56

Ex. PX528, SCA001046573–74

Ex. PX529, SCA000065974–83

Ex. PX555, DOJCIV-007-00000004–15

Ex. PX558, SS-DOJ-01190-367

**Other Evidence Produced by Defendants and Third Parties**

DOJCIV-007-00000070

DOJCIV-007-00000084

DOJCIV-007-00000101

DOJCIV-007-00000105

DOJCIV-007-00000118

DOJCIV-007-00000131

DOJCIV-007-00000141

DOJCIV-007-00000162

DOJCIV-008-00000029

DOJCIV-008-00000155

DOJCIV-008-00000283

DOJCIV-008-00000423

DOJCIV-008-00000431

DOJCIV-010-00000110

DOJCIV-010-00000112

DOJCIV-012-00000013

DOJCIV-012-00000038

DOJCIV-012-00000056

DOJCIV-012-00000094

SCA000109831

SCA001204745

USPI_CIV_000000442

USPI_CIV_000006960

USPI_CIV_000411545

USPI_CIV_000467624

USPI_CIV_001168726

## III. LEGAL DOCUMENTS

2d Am. Class Action Compl., *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.), ECF 101

3rd Am. Class Action Compl., *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

*Antitrust Guidelines for Collaborations Among Competitors*, DOJ & FTC (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf

Compl., *Cagle v.United Surgical Partners Int'l, Inc.*, No. 3:20-cv-01681-BN (N.D. Tex.), ECF 1

Complaint, *United States v. Cargill Meat Solutions Corp., et al.*, No. 1:22-cv-01821-ELH (D. Md. Jul. 25, 2022)

*Cung Le, et al. v. Zuffa*, LLC d/b/a Ultimate Fighting Championship, 2:15-cv-01045-RFB-BNW (D. Nev. Aug. 9, 2023)

*Horizontal Merger Guidelines*, DOJ & FTC (2010)

*Horizontal Merger Guidelines*, DOJ & FTC (2023)

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. o6-MD-1775 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)

*In re Capacitors Antitrust Litig. (No. III)*, No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018)

*In re High-Tech Employees Antitrust Litigation*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013)

*In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019)

Mem. Op. & Order, *Cagle v. United Surgical Partners Int'l*, Inc., No. 3:20-cv-01681-BN (N.D. Tex.), ECF 34

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods*, 31 F.4th 651, 672 (9th Cir. 2021)

Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 4, 2022)

*United States v. E. I. du Pont de Nemours & Co. ("Cellophane")*, 351 U.S. 377, 391 (1956)

**APPENDIX C**

| Employee | Company, Job Title (Years) |
|---|---|
| Colleen Arthur | DaVita, Intern (2013); DaVita, Redwoods Resident (2014–2015); DaVita, Facility Administrator (2015); DaVita, Manager, Compensation & Analytics (2015); DaVita, Director, Compensation & Analytics (2015–2018); DaVita, Senior Director, Compensation & Analytics (2018–2021); DaVita, Senior Director, Recruiting Operations, Strategy & Employment Branding (2021–2022) |
| Scott Asher | DaVita, Director (2010-2014) |
| Alex Bateman | DaVita, Senior Financial Analyst (2005), DaVita, Manager (2006-2008), USPI, Regional VP (2008-2011), USPI, Market President (2011–2020) |
| Tony Blake | DaVita, Director (2006-2009), Vice President (2010-2012) |
| Brett Brodnax | USPI, Executive Vice President ("EVP")/Chief Development Officer ("CDO") (2005–2011); USPI, President (2011–2018); USPI, Chief Executive Officer ("CEO") (2018–Present) |
| Jason Cagle | USPI, Vice President ("VP") (2005–2010); USPI, Senior Vice President ("SVP") (2010–2013); USPI, Chief Financial Officer ("CFO"), (2013–2020) |
| Warren Cinnick | SCA, VP Human Resources ("HR") (2017–2020); SCA, SVP HR (2020); SCA, Group VP ("GVP") HR (2021–2023) |
| Joseph ("Joe") Clark | SCA, EVP & Chief Operating Officer ("COO") (2008); SCA, EVP Development (2008–Present) |
| Peter Clemens | SCA, EVP and CFO (2011–2015), SCA, Senior Advisor (2015–2017) |
| Goran Dragolovic | SCA, SVP Operations (2011–2017) |
| Kristen Neubert DesPalmes | DaVita, Manager (2007-2009), Manager – Corporate (2009-2013), Director (2013), Director Employment Strategy (2013-2017), Senior Director of Employment Strategy (2017–2021).) |
| Cindy English | USPI, VP Financial Operations (2007–2019) |
| Bridie Fanning | SCA, Chief Talent Officer (2014–2016) |
| Mark Garvin | SCA, VP Operations (1992–1996); USPI, COO (2001–2020) |
| Andrew Hayek | DaVita, President (2007); DaVita, VP (2007–2008); SCA, President & CEO (2008–2017); OptumHealth, CEO (2017–2019) |
| Elliott Holder | DaVita, Analyst EX (2013); DaVita, Financial Analyst (2014); DaVita, Senior Financial Analyst (2015–2016); DaVita, Manager, Payor Contacting (2017); DaVita, Senior Manager, Payor Contracting (2018–2021) |
| Andrew ("Andy") Johnston | USPI, RVP Operations (2001-2004), USPI, SVP Development (2004–2007); USPI, SVP/DVP (2007–2014); USPI, COO, East (2014–2018); USPI, CDO (2018–2020); U.S. Renal Care, COO (2020–2021); USPI, Chief Administrative Officer ("CAO") (2023) |
| Sandi Karrmann | USPI, SVP, Chief Human Resources & Support Services Officer (2013–2017); Tenet Healthcare/USPI, EVP, Chief Human Resources Officer (2017–2020) |
| Scott Keech | SCA, Regional Director of Operations & Clinical Services (2009–2012) |
| Dennis Kogod | DaVita, Division President (2006–2010); DaVita, SVP (2008); DaVita, COO (2008–2016); DaVita, COO, HealthCare Partners (2014–2016); DaVita, Advisor to CEO (2016) |
| Mark Kopser | USPI, CFO (2000–2021) |

3154924.9

212

| | |
|---|---|
| Anthony Martin | USPI, Senior Vice President, Corporate Controller and Chief Accounting Officer (1998–2019) |
| Brian Mathis | SCA, VP Strategy (2009–2014); SCA, Group VP Strategy and Payer Engagement (2014–2015); SCA, SVP, Strategy and Payment Innovation (2015–2017); SCA, CDO (2017–2018); OptumCare, CDO (2017–2018); OptumCare, Chief Strategy Officer (2018–2020) |
| Shannon McGarry | USPI, Executive Recruiter (2016–2020); USPI, Manager, Executive Recruitment (2020–2021); USPI, Regional Market Recruiter (2021 – Present) USPI, Manager – Talent Acquisition/Onboarding (2023 – Present) |
| Laura Mildenberger | DaVita, DVP / Chief People Officer, (2005); DaVita, DVP/Regional Vice President ("RVP") (2006–2007); DaVita, SVP (2008); DaVita, Chief People Officer (2008–2016) |
| Shannon Mosley | USPI, Director (2003–2006); USPI, Director (2007); USPI, VP Talent Acquisition (2007–2020) |
| Bill Myers | DaVita, VP Marketing Communications (2016–2018); DaVita, VP, Communications, Marketing & Corporate Social Responsibility (2012–2016); DaVita, VP, Communications and Corporate Social Responsibility (2010–2012); UnitedHealth Group, VP – Government Affairs (2008–2010) |
| Javier Rodriguez | DaVita, SVP (2005–2018); DaVita, DVP (2006); DaVita, VP Value Management Operation (2006); DaVita, President (2008, 2012–2014); DaVita, CEO, Kidney Care (2014-2022) |
| Michael Rucker | DaVita, DVP/RVP (2006–2008); SCA, SVP Operations (2008–2009); SCA, EVP & COO (2009–2017) |
| Jennifer Sandoz | SCA, Director HR (2016–2017); SCA, Senior Director (2017–2020); SCA, VP HR (2021) |
| John Schultz | Russell Reynolds Associates, Consultant (2010–2014); Spencer Stuart, Consultant (2014–2016), Spencer Stuart, Principal (2016–2019); Spencer Stuart, Partner, Private Equity Healthcare Practice Leader (2019–Present) |
| Rich Sharff | SCA, EVP, General Counsel & Secretary (2007–Present); OptumHealth, General Counsel (2017–Present) |
| Allen Spradling | SCA, Project Management Office Director, (2008–2013) |
| Mike Staffieri | DaVita, Director (2005–2006); SVP (2005, 2011, 2013); DaVita, Regional Ops Director (2006–2008); DaVita, Group Director (2008); DaVita, SVP; DaVita, DVP/RVP (2008–2010); DaVita, VP (2010–2011); DaVita COO, Kidney Care (2014-2022); DaVita, COO (2013–2022) |
| Doug Swope | HCA Healthcare, Manager, Executive Recruitment C-Level (1995–1998); HCA Healthcare, Director, HR Executive Recruitment (1998–2008); HCA Healthcare, Senior Director, HR (2008–2011); e+CancerCare (2011–2013); President, Surgical Care Partners (2013–Present) |
| Jimmy Tanner | Aerotek, Recruiter (2009-2013); Catapult Staffing, Director of Recruiting (2013-2016); Catapult Staffing, Vice President of Recruiting & Strategic Accounts (2017-2018); Advantis Medical Staffing, Recruiting Manager (2018-2021); Advantis Medical Staffing, Delivery Manager (2018-2019); Advantis Medical Staffing, Director of Recruiting (2021-2022); Advantis Medical Staffing, Vice President of Recruiting (2022-present). |
| Sean Taylor | DaVita, Senior Director of Business Development (2015–2016) |

| Kent Thiry | DaVita, Chairman and CEO (1999–2019); DaVita, Chairman and CEO, HealthCare Partners Inc. (2014–2020); DaVita, Executive Chairman of the Board of Directors (2019–2021) |
|---|---|
| James "Skip" Thurman | DaVita, Director (2010–2011); DaVita, Senior Director (2011–2013); DaVita, Senior Director, Communications (2014–2017); DaVita, VP (2017–2020) |
| Niels Vernegaard | USPI, COO (2006–2021) |
| Leslie Wachsman | SCA, VP Finance & Investor Relations (2012–2018); SCA, GVP, Finance (2018–2019); SCA, CFO (2019–Present) |
| James Walker | USPI, Director of Technical Accounting (2006–2021); USPI, VP of Corporate Accounting (2011–2019) |
| William ("Bill") Wilcox | USPI, President (2005–2011); USPI, CEO (2011–2018), Chairman (2018–2020); USPI, Consultant (2020–2023) |

3154924.9

214

# APPENDIX D

## Appendix Figures

### Figure 26: Other Measures of Compensation

| | Ln(Regular Plus Other Compensation) | | Ln(Total Compensation Minus Stocks) | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Conduct | | | | |
| % Wage Suppression | | | | |
| DaVita Conduct | | | | |
| % Wage Suppression | | | | |
| SCA Conduct | | | | |
| % Wage Suppression | | | | |
| USPI Conduct | | | | |
| % Wage Suppression | | | | |
| Year Trend | | | | |
| Healthcare, Macro, Hours | | | | |
| Individual-by-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |



*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The two measures of compensation are the natural log of regular pay plus the other category of pay, and the natural logarithm of total pay minus stock compensation.

**Figure 27: Hourly Wages**

| | Dependent Variable: Ln(Hourly Wage) | |
|---|---|---|
| | [1] | [2] |
| Conduct | | |
| **% Wage Suppression** | | |
| DaVita Conduct | | |
| **% Wage Suppression** | | |
| SCA Conduct | | |
| **% Wage Suppression** | | |
| USPI Conduct | | |
| **% Wage Suppression** | | |
| Year Trend | | |
| Healthcare, Macro | | |
| Log-Total Hours | | |
| Individual-by-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |



*Note:* \*\*\* p<0.01, \*\* p<0.05, \* p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The dependent variable is the natural log of hourly wages (total compensation divided by total hours). Note that total hours do not appear as a control variable in this specification, because they are incorporated into the denominator of the dependent variable.

**Figure 28: Poisson Models**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| SCA Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| USPI Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| Year Trend | | | |
| Healthcare, Macro, Hours | | | |
| Log-Total Hours | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The model is estimated using a Poisson regression.

**Figure 29: Control Variables Interacted by Company**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
| --- | --- | --- | --- |
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Note that the macroeconomic, healthcare-specific, and ln(total hours) controls are fully interacted with each company when they are included (e.g., the main effect of each control and the interaction are included).

**Figure 30: Models Controlling for Job Titles and Tenure**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Tenure | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Tenure | | | |
| Observations | | | |
| R-squared | | | |
| Job Title FE | | | |
| Year Trend | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The model includes controls for tenure and for job title fixed effects.

**Figure 31: Drop COVID Years**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| SCA Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| USPI Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample drops the COVID years, 2020 and 2021.

**Figure 32: Include Partial Years Worked**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes workers who worked part of the year.

**Figure 33: Including Outliers**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
| --- | --- | --- | --- |
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes full-year employees, including outliers.

**Figure 34: Harmonizing Data Time-Frame Across Defendants (2008–2022)**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| SCA Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| USPI Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes only years 2008 to 2022.

**Figure 35: No Individual-Company Fixed Effects**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] | [2] |
| *Panel A. Common Conduct Effect* | | |
| Conduct | | |
| **% Wage Suppression** | | |
| *Panel B. Defendant-Specific Conduct* | | |
| DaVita Conduct | | |
| **% Wage Suppression** | | |
| SCA Conduct | | |
| **% Wage Suppression** | | |
| USPI Conduct | | |
| **% Wage Suppression** | | |
| Year Trend | | |
| Healthcare, Macro, Hours | | |
| Individual-by-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. There are no individual-by-company fixed effects in these regressions.

**Figure 36: Random Effects Model**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| Year Trend | | | |
| Individual-by-Company RE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed. The model is estimated with random effects.

226

**Figure 37: Reverse Relationship Between Director and (S)VP Wages**

| | Dependent Variable: Ln(Mean Hourly Rate of VPs & SVPs) | | |
| | DaVita | SCA | USPI |
|---|---|---|---|
| Ln(Mean Hourly Rate of Directors) | | | |
| Ln(Avg. State Mgr. Earnings) | | | |
| Ln(State Health Expend. PC) | | | |
| Covid | | | |
| Ln(State GDP PC) | | | |
| Ln(State Unemployment Rate) | | | |
| Census Region Annual CPI | | | |
| Observations | | | |
| R-squared | | | |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

**APPENDIX E**

**Data Construction**

200.     I relied on several data sources to build my complete dataset, which I used for all econometric analysis. Three data types come from discovery as structured data (one for each Defendant). I supplemented the structured data with publicly available data from several sources, as described below.

**A.     DaVita Data**

201.     ██████████████████████████████████████████████████████

████████████████████████████████████████████

202.     ██████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████

203.     ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████



204.

205.



**B.      SCA Data**

206.

207.

_____

[506] *See*



208.

209.

210.



211. ██████████████████████████████████████████

212. ██████████████████████████████████████████

3154924.9

213. ████████████████████████████████████████████████

**C.    USPI Data**

214. ████████████████████████████████████████████████



215. ██████████████████████████

████████ [507] ██████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████████████████

█████████████████████████████

██████████████████████████████

██████████████████

216. ████████████████████

████████████████████████████████

████████████████████████████████

█████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

--------

[507] ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████



217.

508

_____

508

3154924.9          234



## D.     Publicly Available Data

218.    I use public datasets to acquire the following variables: (1) Per Capita Healthcare Services Spending by State-Year; (2) Real GDP Per Capita by State-Year; (3) CPI by Census Region-Year; (4) Unemployment Rate by State-Year; (5) Annual Medical and Healthcare Manager Earnings in the Defendants' industries; and (6) Minimum Wage Data by State and Year. This data come from Federal Reserve Economic Data (FRED) at the Federal Reserve Bank of St. Louis, the U.S. Department of Commerce's Bureau of Economic Analysis (BEA), the U.S. Bureau of Labor Statistics (BLS), the Department of Labor, and the Census Bureau. I describe each dataset below.

219.    The Per Capita Healthcare Services Spending by State-Year Data comes from FRED. Each state has an individual dataset, which I appended together. The data contain the per capita personal consumption expenditure (PCE) for healthcare services in the given state. Once compiled into one dataset, there are 1,326 observations, with the per capita healthcare services spending for all 50 states and DC between 1997 and 2022.

220.    The Real GDP Per Capita by State-Year Data comes from FRED and BEA. BEA has a real GDP table. FRED has population data by state. I combined the state real GDP data

with the corresponding state population data to calculate the real GDP per capita. Once compiled into one dataset, there are 1,377 observations, with the real GDP per capita for all 50 states and DC between 1997 and 2023.

221.     The Unemployment Rate by State-Year Data comes from the BLS. It contains seasonally adjusted unemployment rates by month and state. I average the rate for each month to estimate an annual rate. The data extends from 2005-2023 for the 50 states and DC.

222.     The CPI by Census Region Data comes from BLS. The Consumer Price Index (CPI) is reported on the census region level (northeast, Midwest, south, and west).[509] I expanded the dataset to include an observation for each state (plus DC and Puerto Rico) and classified the states in their respective regions. The final dataset has 988 observations with the annual CPI for the 50 states and DC and Puerto Rico between 2005 and 2023.

223.     The Minimum Wage Data comes from the U.S. Department of Labor. The publicly available table lists the federal and state-specific minimum wage by year. I classify the effective minimum wage as the higher of the two minimum wages (state and federal). The available data extends through 2022.

224.     The American Community Survey is an annual survey produced by the Census Bureau. I use the harmonized version from IPUMS for the years 2005 to 2022. Per the Census Bureau, it "is a nationwide, continuous survey designed to provide communities with reliable and timely social, economic, housing, and demographic data every year. Since its implementation in 2005, the ACS has been providing a continuous stream of updated

---

[509] I use the census region level because no state level is available. The only less aggregated version, census divisions, is available for 2018–2023. Therefore, to cover the entire payroll dataset period, I can only use the census region level data.

information for states and local areas[.]"[510] With this dataset, I calculate annual earnings of health and medical managers in each state-year in the industries of the Defendants.

## E.     Combining Datasets

225.     I combine the cleaned and annualized files for each Defendant to create my final dataset. After combining the three annual datasets, I cleaned out repeated information (such as matching job titles that appear more than once). I standardize variables to consolidate the descriptions. I remove null values for states and zip codes. I also flag if the overall or current (as of a given year) tenure variables appear to be unreasonable (such as negative tenure values).[511] I remove any blank variables. The resulting dataset with combined annual data has multiple observations per employee, year, and company, because there are still different observations for each time the employee was paid within the year.

226.     I classify the pay types into groups, such as regular pay, overtime, bonuses, and other categories based on the pay type descriptions. This allows me to standardize within and between companies. All unclassified pay types are grouped into "other" pay types. I replace the double counted hours as identified by USPI and DaVita as zero hours worked to avoid double counting. I calculate the total pay by year and pay type for a given employee at a given company. I attribute overall negative annual pay for a given pay type as applying to the previous year, per

---

[510] *American Community Survey Information Guide*, UNITED STATES CENSUS BUREAU, https://www.census.gov/programs-surveys/acs/about/information-guide.html (last visited Jan. 2025).

[511] Defendants informed me that such negative or otherwise unreasonable values are likely the result of data entry errors. *See*, *e.g.*, 2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions (Ejob Question 12 (indicating that values with "ejdatebeg" after "ejdateend" can arise from manual data entry errors).

Defendant instructions.[512] I then sum the total hours and pay amount for a given employee, year, and company. The resulting dataset has one observation per employee, company, and year, with the total pay and hours worked as well as the pay amount and hours associated with the various pay types, included.

227. I create a clean job title with standardized formatting (such as removing commas, correcting typos, etc.) using the final job title each employee held in a given year. This cleaning allows for easier comparison between job titles. However, there are still various job titles that may contain the same responsibilities. Therefore, I use the job levels to inform which employees are considered Senior Employees.

228. I combine the resulting dataset with my various controls from publicly available sources. These controls include healthcare services spending per capita, real GDP per capita, CPI, minimum wage rates, unemployment rates, and ACS health manager data. The controls are assigned at the state-year level, except for CPI, which is only available at the census region-year level. For observations missing a state, I assign the missing value as the average value for the corresponding job title and company. If there are no matching job titles, I assign the missing value as the average value for the corresponding level and company. If there are no populated values at the same level, I assign the missing value as the average value for directors and above at the company.[513]

---

[512]

[513] *See* my workpapers for details.

229.   I next clean the dataset for potential outliers. I make an adjustment ███████



[514] I make

[515] I then flag outliers. I consider an observation to be an outlier if the total or regular hourly pay is below the effective minimum wage, meaning the higher of the relevant state and federal minimum wage in the given year. I also classify very high regular hourly rates as outliers, using a rate of greater than $5,000 per hour as a cutoff.[516] I consider negative total or regular pay or hours worked as outliers. I also flag employees who worked more than 5,000 hours in a year, meaning that they worked over 100 hours per week for 50 weeks, and employees who worked fewer than 50 hours in a year (fewer than one hour a week) while being listed as working the entire year.[517] Using these classification criteria, I identify approximately ███████ [518] I use the resulting dataset to evaluate summary statistics, conduct my econometric analyses, and calculate damages, all as described above.



[517] This assumes two non-working weeks in the year. However, even using 52 weeks, the employee would be working over 96 hours or under 0.96 hours every week.