# Exhibit 3
# Lane Declaration


# Redacted

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

### <u>EXPERT WITNESS REPORT OF DR. BARRY GERHART</u>

**TABLE OF CONTENTS**

**Page**

I.    QUALIFICATIONS ................................................................................ 1

II.   ASSIGNMENT AND SUMMARY OF CONCLUSIONS ................................................ 3

III.  PRIOR TESTIMONY ......................................................................... 8

IV.  FACTUAL AND PROCEDURAL BACKGROUND........................................................ 8

    A.    Defendants. ................................................................................. 8

    B.    U.S. DOJ Criminal Investigation and Trial. ........................................ 11

        1.    USPI Cooperated with the DOJ and Admitted Unlawful No-Poach Conduct. ................................................................................. 11

        2.    Criminal Indictments and Trial. ............................................... 11

    C.    Defendants' Alleged Conspiracy. .................................................... 12

V.   DEFENDANTS ARE INCENTIVIZED TO COLLUDE TO SUPPRESS EMPLOYEE COMPENSATION. ................................................................ 15

    A.    Defendants Are Incentivized to Collude to Keep Senior-Level Employee Turnover and Labor Costs Low. .......................................... 16

        1.    Defendants Care About Their Employee Turnover Rates. ..................... 16

        2.    Defendants Seek to Manage Their Substantial Labor Expenditures. ...... 24

    B.    The Incentives to Collude Are Stronger in a Close-Knit Industry........................ 33

    C.    Collusion Suppresses Compensation Because It Pays to Change Employers. ............................................................................... 35

        1.    In Unrestricted Markets, Departing Employees Experience Pay Growth from Voluntary Job Changes. ................................................. 35

        2.    Incumbent Employees Also Benefit from Unrestricted Job Mobility................................................................................. 41

VI.  DEFENDANTS' COLLUSION WOULD LIKELY HAVE SUPPRESSED EMPLOYEES' COMPENSATION. ......................................................... 49

    A.    In a Normally-Functioning Competitive Market, Defendants Value Recruiting High-Value Passive Candidates for Employment............................ 50

    B.    Defendants' No-Poach Agreements' Cold Calling Restrictions and Tell-Your Boss Provision Decreased Employees' Job Mobility and Bargaining Power. ............................................................................... 63

        1.    Employees Typically Have Limited Access to Labor Market Information. ............................................................................ 65

        2.    Unsurprisingly, Defendants Limited Pay Transparency. ..................... 68

        3.    Absent Defendants' Collusion, Employees Could Acquire Labor Market Information Through Cold Calls and Proactive Recruitment.............................................................................. 69

        4.    Because of Defendants' No-Poach Agreements, Employees Often Never Learned About Higher-Paying Job Opportunities........................ 73

**TABLE OF CONTENTS**

Page

      5.     Defendants' Tell-Your-Boss Provision Further Limited Employee Bargaining Power and Mobility. ............................................................... 79

   C.    Defendants' CSI Exchanges Likely Restricted Labor Market Competition. ........ 91

   D.    Defendants' No-Poach Agreements and CSI Exchanges Harmed Employee Compensation. ...................................................................... 97

   E.    Wage Suppression Can Persist for Years. ......................................................... 102

VII.   DEFENDANTS IMPLEMENTED STRUCTURED COMPENSATION SYSTEMS THAT MAINTAINED INTERNAL AND EXTERNAL EQUITY. .......... 103

   A.    Defendants Employed Highly-Trained and Qualified Compensation Professionals. ................................................................... 105

   B.    Defendants Designed Systematized Compensation Structures. ......................... 113

      1.     Step 1: Assign Internal Value to Jobs. ................................................. 113

      2.     Step 2: Job Evaluation and Benchmarking. ......................................... 116

      3.     Substantial Additional Common Evidence Shows That Defendant Firms Implemented Systematized Compensation Structures. ............... 138

   C.    Defendants' Compensation Systems Sought to Achieve Internal Equity and Pay Fairness. ......................................................................... 148

   D.    Internal Equity and Pay for Performance Are Not Mutually Exclusive. ........... 167

VIII.  A STRUCTURED COMPENSATION SYSTEM WOULD LIKELY LEAD TO CLASS-WIDE COMPENSATION EFFECTS. ........................................................... 177

   A.    Agreements Not to Poach Employees Likely Lead to Cascading Effects Class-Wide. ........................................................................................ 177

   B.    Defendants' CSI Exchanges Would Likely Suppress Employee Compensation Across the Board. ................................................................... 194

IX.    CONCLUSIONS. ............................................................................................... 196

APPENDIX A ......................................................................................................... 203

APPENDIX B .......................................................................................................... 223

APPENDIX C .......................................................................................................... 245

APPENDIX D .......................................................................................................... 249

## I. QUALIFICATIONS

1. I am the Bruce R. Ellig Distinguished Chair of Pay and Organizational Effectiveness at the Wisconsin School of Business, University of Wisconsin-Madison. Previously, I held faculty positions at Cornell University and Vanderbilt University. I have published several books on compensation. These books include two textbooks on human resource management, the preeminent textbook on compensation,[1] a research book on compensation, an edited book on compensation, and a case book (including software) students use to learn to build a structured compensation system. My curriculum vitae in **Appendix A** includes a more complete description of my qualifications. I have taught courses on Compensation Management, Human Resource Management, and Research Methods at all three universities. I have served as department chair at all three universities, and previously served as senior associate dean and interim dean (for 18 months) at the Wisconsin School of Business, as well as interim vice provost and dean of the International Division at the University of Wisconsin-Madison. I received a Ph.D. in Industrial Relations from the University of Wisconsin-Madison and my Bachelor of Science degree in Psychology from Bowling Green State University. I am a Fellow of the American Psychological Association (& Society for Industrial and Organizational Psychology) and of the Academy of Management. Additionally, I am a recipient of three career awards: the Herbert Heneman Jr. Award for Career Achievement from the Human Resources Division of the Academy of Management, the Thomas A. Mahoney Mentoring Award (from the same organization), and the Michael R. Losey Excellence in Human Resource Research Award from the Society for Human Resource Management. My work has covered a variety of fields including compensation design, employee mobility/turnover, and

---

[1] BARRY GERHART, COMPENSATION (14th ed. 2023).

human resource management. My work has been published in a variety of outlets including the *Academy of Management Journal*, *Journal of Applied Psychology*, *Industrial and Labor Relations Review*, and *Personnel Psychology*.

2. In connection with this matter, I reviewed and considered materials from this case and from the related criminal investigation *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.), including the Third Consolidated Amended Class Action Complaint (ECF No. 555), depositions, deposition exhibits, FBI investigation interview reports, DaVita criminal trial transcripts, and salary or market pay range materials produced by or compiled from materials from Defendants Andrew Hayek ("Hayek"), Kent Thiry ("Thiry"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC (together, "SCA"), DaVita Inc. ("DaVita"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation (together, "USPI") (together, "Defendants"). I have also reviewed and drawn on compensation-related literature, as well as survey data collected by WorldatWork, the professional association for those working in compensation management, to describe the workings of formal compensation systems, which are typically found in U.S. companies. Based on documentary evidence and data from the Defendants, their structured compensation systems resemble the compensation systems within most U.S. companies. The information that I considered in forming my opinions include the materials listed in **Appendix B** as well as those cited in this report and the attached **Appendices**. The bases for my opinions are described in this report and any attached exhibits. I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

3.  My compensation for my work in this matter is not contingent upon my findings or the outcome of this litigation. ███████████████████████████ ███

4.  For purposes of convenience, in **Appendix C** I provide the names, employers, job titles, and years worked for all individuals I reference in my report.

## II.    ASSIGNMENT AND SUMMARY OF CONCLUSIONS

5.  I understand that Plaintiffs are seeking certification of a class of employees who worked in positions at the director-level and above (hereafter "Senior-Level Employees") in the United States for one or more of the following:  (a) from May 1, 2008 to December 31, 2019 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, to December 31, 2019 for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008 through December 31, 2019 for DaVita Inc. or one of its subsidiaries (hereafter, "the Class" or "Class Members").

6.  <u>Assignment.</u>  I have been asked by Plaintiffs' counsel to:

a.  Determine whether the evidence common to the Class regarding Defendants' turnover rates and labor costs is consistent with incentives to collude;

b.  Explain whether based on compensation-related theory and literature, collusion that suppresses labor market competition, such as agreements not to poach employees (hereafter, "No-Poach Agreements") or exchanges of Competitive Sensitive Information (i.e., nonpublic company data, including wage data) (hereafter, "CSI Exchanges") is harmful because it does not allow employees to benefit from the ability to move jobs, as long as higher-paying and/or better external opportunities exist;

c. Assess whether evidence common to the Class demonstrates that Defendants' No-Poach Agreements and CSI Exchanges are inconsistent with unilateral conduct and would likely have suppressed employee compensation;

d. Assess what theory and research in the related fields of compensation design, employee turnover, and human resource management show about the effect of No-Poach Agreements and CSI Exchanges on employees' current and future wages;

e. Analyze Defendant firms' pay practices to determine whether Defendants used structured administrative pay systems that seek to maintain internal and external equity; and

f. Determine whether, because of Defendants' systematized pay structures, the effects of restricting Defendants' employees' job mobility and Defendants' CSI Exchanges, as alleged in this case, would likely have cascading effects and suppress the pay of Defendants' employees, including all or nearly all members of the proposed Class.

7. Conclusions. As a result of my work to date and my experience and research in compensation and human resource management, the following are among my conclusions:

a. *Incentives to Collude.* Here, evidence that is common to the Class shows that Defendants were incentivized to collude to suppress labor market competition. Defendants cared about keeping turnover lower and reducing their significant labor costs, as a means to increase Defendant firms' profits and stock value, and which likely inured to the benefit of Defendants' C-Suite executives, who were paid in stock and/or were otherwise financially incentivized to keep costs low.

i. Moreover, I discuss how these incentives are particularly strong where, as here, the industry is small and tight-knit and firms' top executives can develop the relationships that become foundational to the collusion.

-4-

b.      *Harm to Employees.*  Such collusion would be harmful to Defendants' employees because employees benefit when they have uninhibited access to other jobs, i.e., job mobility.  Employees who receive outside employment offers benefit from job mobility by either voluntarily changing employers to obtain substantial compensation increases or by using the outside offers as leverage to negotiate higher compensation in return for remaining with their current employers.  Employees not receiving offers who become aware of coworker offers then receive updated, more accurate information on their own outside pay opportunities, making job searches and job mobility more likely.  Moreover, in competitive labor markets, employers often proactively raise compensation of incumbent employees (i.e., workers currently employed by the employer) to prevent them from being receptive to outside offers and leaving.  Employees accrue these benefits, however, only where higher-paying external job opportunities actually exist and are accessible to employees.

c.      *Ways to Lower Labor Costs.*  To lower their labor costs and increase profits, Defendants could collude with their competitors to restrict their competitors' recruiting activities and their own employees' job mobility.  Defendants could also achieve lower labor costs by fixing wages, thereby keeping the labor market rate low and limiting the number of higher-paying jobs available to employees seeking better jobs.

d.      *Hiring Where No Labor Market Restrictions Exist.*  I explain that in the absence of labor market restrictions, Defendants would solicit, hire, or recruit a broad swath of employees, and particularly high-value passive candidates who did not proactively seek alternative employment.  Likewise, employees would have been free to seek employment at competitor firms on their own initiative.  Solicitation (and self-initiated moves by employees) can and often does increase the compensation of employees who ultimately accept job offers

-5-

elsewhere. Additionally, solicitation can increase the compensation of employees who choose to stay after using outside offers to negotiate higher pay with their current employers.

e. *Effect of No-Poach Agreements on Job Mobility.* I conclude from my review of evidence common to the Class that Defendants' No-Poach Agreements limited employees' job mobility in two ways. First, Defendants agreed not to solicit passive candidates who were not proactively seeking employment. Second, Defendants agreed not to make job offers to either proactive or passive candidates who worked at Defendant firms unless the candidates first informed their current bosses that they were leaving the company and seeking employment elsewhere, which most employees are disinclined to do. Consequently, Defendants' employees often did not receive higher-paying job offers they otherwise would have received and could either accept or use as leverage or data points.

f. *Competitively Sensitive Information Exchanges.* Based on my experience and research in compensation and human resource management, common evidence that Defendants' years-long CSI Exchanges are inconsistent with unilateral conduct and would have harmed employees. No company benefits by unilaterally sharing wage-related data with competing employers. Rather, mutual CSI Exchanges would have enabled Defendants to agree to keep Class pay low and limited the number of higher-paying jobs available to Class Members seeking better opportunities. As such, Defendants could have kept Class Members' pay low without fear of rising turnover rates.

g. *Long-Term Effects.* Such wage suppression resulting from Defendants' anticompetitive No-Poach Agreements and CSI Exchanges would likely persist into the future, as relative compensation and compensation levels often do not change much in the short term.

h.      *Compensation Structure.*  Exacerbating this issue, pay at Defendant firms moved in systematic and structured ways, such that wage suppression as to a subset of employees would have impacted other employees' pay.

i.      Defendant firms had structured compensation systems. Additionally, Defendants cared about maintaining external and internal equity, and equity in general was important to them, regardless of whether they used the foregoing specific terms.

ii.      Defendants utilized compensation components beyond salary, such as bonuses and stock grants and options.  Their compensation systems relied on market surveys to stay current, had clear structures, and deployed market pay lines and grades, among many other features of structured compensation systems.  Ordinarily, firms make upward compensation adjustments in response to market conditions.  But restraints that constrain the employee labor market and suppress compensation (such as No-Poach Agreements and CSI Exchanges) enable firms to benchmark to lower rates, so that upward pay adjustments do not occur.

iii.      With respect to internal equity, Defendants valued treating similarly-situated employees (i.e., employees in similar roles/jobs with similar performance contributions) within their companies similarly.  Thus, in a systematic pay structure, if an employee receives a higher-paying outside offer which they leverage into higher pay at their current company, similarly-situated employees at the current company will expect their own pay to increase to maintain internal equity.  The result is upward pay adjustments.  Those adjustments in that role/job, in turn, will additionally require the company to revisit pay levels for jobs below and above that role/job to maintain what are seen as internally equitable pay differentials.  Again, the result is adjusting pay upward in these jobs.  However, in the absence of

outside offers of higher pay—because of collusion that interferes with typical labor market competition—these upward pay adjustments would not take place.

8. *Effect of No-Poach Agreements and CSI Exchanges on Compensation Given Compensation Structures.* Given the systematized pay structures and compensation design at Defendant firms, anticompetitive No-Poach Agreements and CSI Exchanges interfered with labor market competition broadly. Defendants' No-Poach Agreements and CSI Exchanges suppressed the wages of some Class Members directly and the focus on internal equity embodied in the systematized pay structures and compensation design would additionally limit and otherwise negatively affect the compensation of nearly all employees in the proposed Class. Put plainly, such collusive conduct would suppress compensation levels for those employees who otherwise would have been cold-called or solicited for new positions, as well as for nearly all salaried employees of Defendant firms. Even if Defendants restricted the No-Poach Agreements to individuals and job titles at the top of the salary structure, a No-Poach Agreement's artificial suppression of compensation would have had a cascading effect on other employees.

## III. PRIOR TESTIMONY

9. I have never testified at a deposition or at trial.

## IV. FACTUAL AND PROCEDURAL BACKGROUND

10. In this section I will provide a factual background of all parties in this litigation, the related U.S. Department of Justice ("DOJ") criminal investigation and trial, and Plaintiffs' conspiracy claim.

### A. **Defendants.**

11. <u>DaVita.</u> DaVita is by far the largest Defendant in this action. Formerly comprised of two divisions, DaVita Medical Group ("DMG") (previously called DaVita Healthcare Partners) and DaVita KidneyCare ("DKC"), DaVita sold its DMG business to Optum

in 2019.[2] DaVita is currently one of the leading players in the outpatient medical center industry with thousands of outpatient medical centers nationwide and more than 70,000 employees.[3] Javier Rodriguez serves as DaVita's current Chief Executive Officer ("CEO").[4]

12.    Kent Thiry. Thiry served as DaVita's CEO for two decades, from 1999–2019.[5] After DaVita sold its DMG business to Optum, Rodriguez took over as DaVita's CEO, and Thiry continued to serve as DaVita's Executive Chairman until 2021.[6] A powerful figure, Thiry demanded that many companies led by former DaVita executives, including SCA, not solicit or hire DaVita employees, "███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████"[7]

13.    SCA. SCA is a large firm in the ambulatory surgical center ("ASC") industry. SCA now runs more than 230 outpatient medical centers and ambulatory surgical facilities in 35 states, employs approximately 10,000 workers, and treats approximately 1 million patients

---

[2] Press Release, UnitedHealth Group, Optum completes acquisition of DaVita Medical Group from DaVita (June 19, 2019), https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html; Press Release: DaVita Inc., DaVita Medical Group Acquires Respected Physician Practices in the Orlando Area (July 13, 2017), https://newsroom.davita.com/press-releases?item=123281.

[3] *About Us*, DAVITA REDWOODS, https://www.redwoods.davita.com/about-us (last visited Jan. 13, 2025); *Investors*, DAVITA, https://investors.davita.com/ (last visited Jan. 13, 2025); Annual Report, DAVITA (2023), https://investors.davita.com/download/DaVita_2023_Annual_Report.pdf.

[4] *See* Appendix ("App.") C.

[5] *Id.*

[6] *Id.*

[7] DOJCIV-008-00000090 at DOJCIV-008-00000091 (███████████████████████

██████████████████████████████████████████████████████.

annually.[8]  In the spring of 2017, Optum purchased SCA.[9]  Caitlin Zulla serves as SCA's current CEO.[10]

14.     Andrew Hayek.  Hayek served as SCA's Chairman and CEO from May 2008 to January 1, 2018,[11] and plays a key role in this litigation.  Prior to SCA, Hayek worked for DaVita as a Vice President.[12]  After Optum purchased SCA, in or around April 2017, Hayek took over as OptumHealth's CEO while remaining as SCA's CEO until January 1, 2018, when he stepped down from SCA entirely.[13]  Thereafter, Anthony Kilgore became SCA's CEO.[14]

15.     USPI.  USPI is another dominant firm in the ASC industry.  From 2004 to 2018, Bill Wilcox served as CEO after which Brett Brodnax took over.[15]  USPI operates approximately 461 ambulatory surgical centers and 24 surgical hospitals in 35 states, and employs approximately 22,500 employees.[16]  In 2015, Tenet purchased a controlling share in USPI, and thereafter completed its purchase of USPI in April 2018.[17]

---

[8] Dan Luu, *How Many Locations Does Surgical Care Affiliates Have?*, NWCC-OR (Aug. 3, 2022), https://www.nwcc-or.com/how-many-locations-does-surgical-care-affiliates-have#:~:text=SCA%20Health%20is%20dedicated%20to,patients%2C%20providers%2C%20and%20community; *About Us*, SCAHEALTH, https://sca.health/about-us/ (last visited Jan. 13, 2025).

[9] Press Release, UnitedHealth Group, Surgical Care Affiliates (SCA), OptumCare to Combine (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html.

[10] *See* App. C.

[11] Hayek Dep. at 11:14–13:10, 36:4–37:23.

[12] *See*. App. C.

[13] Press Release, UnitedHealth Group, Surgical Care Affiliates (SCA), OptumCare to Combine (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html; Hayek Dep. at 190:2–9.

[14] Kilgore Dep. at 9:5–6.

[15] *See*. App. C.

[16] Form 10-K, TENET HEALTH CARE CORP. (Dec. 31, 2023), https://s23.q4cdn.com/674051945/files/doc_financials/2023/q4/tenet-10K.pdf.

[17] Press Release, Tenet Health Completes Purchase of USPI from WCAS (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx; Press Release, Tenet Healthcare Corp., Tenet

**B.** **U.S. DOJ Criminal Investigation and Trial.**

**1.** **USPI Cooperated with the DOJ and Admitted Unlawful No-Poach Conduct.**

16. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

████████████[18] I review and rely on many of the FBI's interview reports from this

investigation in my analysis.

**2.** **Criminal Indictments and Trial.**

17. The DOJ brought criminal indictments against SCA, DaVita, and DaVita's former CEO Kent Thiry in early 2021, alleging that they agreed with their competitors to suppress labor competition by refraining from soliciting or hiring each other's employees.[19]

18. In April 2022, the DOJ tried DaVita and Thiry for the alleged conspiracy.[20] Many key co-conspirators testified, including SCA's CEO Hayek and DaVita's former Chief Operating Office ("COO") Dennis Kogod. Although the jury ultimately acquitted DaVita and Thiry, the DOJ presented substantial evidence and testimony that substantiated the presence of a No-Poach Agreement with SCA led by DaVita and Thiry.

19. I review and rely on testimony from the DaVita criminal trial in my analysis.

---

Healthcare Corp. Completes United Surgical Partners Int'l & Aspen Healthcare Transactions (June 16, 2015),
https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm#:~:text=DALLAS%20%E2%80%93%20June%2016%2C%202015%20%E2%80%93,U.S.%20short%2Dstay%20surgery%20platform.

[18] *See, e.g.,* Ex. PX506.

[19] Compl. ¶ 2.

[20] *See, e.g.,* Ex. PX157.

### C.   Defendants' Alleged Conspiracy.

20.    In this section, I discuss Defendants' anticompetitive conduct as background in support of my analysis.

21.    Plaintiffs allege that Defendants unlawfully conspired to suppress competition in the market for Senior-Level Employees in two ways:  (1) SCA and DaVita and SCA and USPI agreed not to cold call, recruit, hire, or otherwise poach each other's Senior-Level Employees (the "No-Poach Agreements");[21] and (2) SCA and DaVita and SCA and USPI engaged in anticompetitive CSI Exchanges.[22]

22.    No-Poach Agreements.  Plaintiffs allege that the Defendants established two No-Poach Agreements as part of their overarching conspiracy to suppress labor market competition:

   a.    *The SCA-DaVita No-Poach Agreement.* ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████.[23] █████████████████████████████████████████

█████████████████████████████████████.[24]  Shortly thereafter, Hayek hired DaVita's then-Division Vice President ("DVP") Michael Rucker to help run SCA.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[21] Compl. ¶¶ 38, 105.

[22] *Id.*

[23] Ex. PX484.

[24] *Id.* at DVA_OMCEAL_000429389.

████████████████████████ [25] As such, according to DaVita's former COO Kogod, "there would be no outreach, no recruiting by either company[.]"[26]

        i.     SCA and DaVita expanded the terms to include a tell-your-boss requirement in 2011 and 2012; they "agreed not to solicit each other's senior executives" unless "the senior executive was already looking at outside jobs and had told their supervisor," before the candidates had job offers in hand.[27] They defined "solicit" as "[t]o call to describe a job opportunity"[28] (the "tell-your-boss" provision). ████████████████████

████████████████████████████████████████████████████

████████ [29] ████████████████████████████ . [30] ████████████████████

██ . [31]

        b.     *The SCA-USPI No-Poach Agreement.* ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[25] Ex. PX484; Ex. PX304 at DOJCIV-008-00000301; *see also* Thiry Dep. at 86:24–87:20 (████████████); *id.* at 145:23–146:7 ████████████████████████████████); Hayek Dep. at 93:7–95:14, 11:4–115:1 and Ex. PX304 (████████████████████████████████████████████████████).

[26] Ex. PX157 at 67:8–69:23.

[27] Ex. PX158 at 473:14–20.

[28] Ex. PX158 at 473:21–25.

[29] *Id.* at 475:7–76:4, 494:16–23; Hayek Dep. at 204:6–9.

[30] Hayek Dep. at 181:2–13; Kogod Dep. at 54:10–24.

[31] Kogod Dep. at 55:2–3; *see also* Ex. PX158 at 491:7–23 (Hayek testified at trial that he and Thiry never told one that they were ending their agreement not to solicit each other's senior-level employees. Hayek was not aware of anyone else at DaVita or SCA telling the other that the agreement was no longer in effect. The agreement was in place until he left.).



After Hayek and former DaVita CEO Thiry agreed to implement the "tell-your-boss" provision in the SCA-DaVita No-Poach Agreement, Hayek took that provision and "applied it to the USPI relationship"[35] ███████████[36] ██████████████████[37] and ███████████████████[38] ██████████

███████████████████[39]

23.     **Defendants' CSI Exchanges.**  Plaintiffs allege and the documents and testimony that I have reviewed about  SCA and DaVita and SCA and USPI's exchange of Competitively Sensitive Information, including wage data, to further suppress the labor market pay rate, provide factual context on which I base my analysis as an expert in the field of Management and Human Resources. ████████████████████

---

[32] Hayek Dep at 219:6–16; Ex. PX483 at 648:3–5.

[33] Ex. PX227; Hayek Dep. at 219:4–16; Ex. PX508 at DOJCIV-008-00000218–219; Wilcox Dep. at 130:8–131:2, 136:19–140:5.

[34] Ex. PX227.

[35] Ex. PX483 at 630:19–631:3.

[36] Hayek Dep. at 219:20–221:9.

[37] *Id.* at 180:14–181:13.

[38] Ex. PX159 at SCA-DOJ-00152696 ████████████████████ ); Mosley Dep. at 17:10–19:18, 48:7–17.

[39] Wilcox Dep. at 112:7–21; *see also* DOJCIV-008-00000345 at DOJCIV-008-00000348 ( ████████████

████████████████████ .



## V. DEFENDANTS ARE INCENTIVIZED TO COLLUDE TO SUPPRESS EMPLOYEE COMPENSATION.

24.     In this section, I will review evidence that, based on my experience and research in compensation and human resource management, is consistent with employers (Defendants) who were incentivized to collude to suppress employee job mobility and compensation. I assess evidence common to the Class showing that Defendants are incentivized to collude because (1) they cared about turnover and wanted to keep it low, and (2) they wanted to manage labor costs, their largest expenditure. Further, I explain that these incentives are particularly powerful where, as here, the industry is small and tight-knit and executives have ample opportunities to develop relationships with their competitors necessary to collude. Finally, I discuss the compensation-related literature and background showing that any collusive conduct will likely suppress employee mobility and compensation, because employees financially benefit from unrestricted job mobility.

---

[40] Rucker Dep. at 254:24–256:12, 260:11–20; Hayek Dep. at 362:18–363:7.

[41] Ex. PX490.

[42] Ex. PX501; *see also* Mathis Dep. at 208:18–211:1.

[43] Mathis Dep. at 41:22–47:19; Hayek Dep. at 362:8–373:1; Wilcox Dep. at 179:2–180:18; Ex. PX490; SCA000862885; OMC_BM_000006875 at OMC_BM_000006875 ("                    ");

USPI_CIV_00010451C8 (                    ).

**A.      Defendants Are Incentivized to Collude to Keep Senior-Level Employee Turnover and Labor Costs Low.**

25.      In this section, I review evidence common to the Class that, based on my experience and research in compensation and human resource management, is consistent with employers (here, Defendants) that are strongly incentivized to collude because they care about and seek to minimize Senior-Level Employee turnover, as high turnover increases labor costs. Further, I review evidence showing that the foregoing matters because labor costs, which are all Defendant firms' largest expenditures, are a key driver of Defendants' performance, and thus an important factor in the compensation of the individual co-conspirators.

26.      The evidence I reviewed included earnings call transcripts, proxy statements and other public financial reporting, deposition testimony, documents produced in this litigation, statements from the FBI investigation interview reports, DaVita criminal trial testimony, and compensation-related literature.

**1.      Defendants Care About Their Employee Turnover Rates.**

27.      Based on my experience and resource, evidence common to the Class shows that all three Defendants cared about employee turnover and retention.

28.      DaVita Wanted to Keep Turnover Low.  DaVita cared about its turnover rates and wanted to retain Senior-Level Employees.

a.      DaVita wanted to keep turnover low in part to increase enterprise productivity (i.e., the amount of resources a firm puts into a task compared to its output, results, profits, etc.).

b.      *Earnings Calls.*  At a 2020 DaVita earnings call, current CEO Javier Rodriguez explained that "higher productivity" corresponds to "lower turnover, lower training

costs, other things related to salary, wage and benefit."[44]  Moreover, during a 2023 earnings call,

Rodriguez connected "elevated turnover" to resulting elevated "training costs."[45]

"[I]mprovement in our training productivity" "will largely depend on successful teammate

retention[.]"[46]

        c.     *Testimony of Steve Priest, Javier Rodriguez, Mike Staffieri, and Robert*

*Chipman.* ███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████ [47] ███████████████████████

█████████████████████████████████████████ [48] ██████████████

████████████████████████████████████████

███████████████████████████████████████████ [49]

Of course, they can only do so in an unrestricted market—which was not the case here, because

Defendants' No-Poach Agreements literally limited mobility and their CSI Exchanges eliminated

better-paying opportunities. ███████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████ [50] ███████████████████████████

---

[44] Ex. PX259 at 6.

[45] Ex. PX260 at 2.

[46] *Id.*; *see also* Ex. PX261 at 2 (lower retention will "drive higher than typical training and onboarding costs").

[47] Priest Dep. at 139:4–16.

[48] Rodriguez Dep. at 133:2–5.

[49] Staffieri Dep. at 139:10–140:2; *see also* Ex. PX1 at DOJCIV-008-0000060 (███████████
█████████████████████████████████████████████ ).

[50] Chipman Dep. at 53:13–24.



d.     *Tracking of Turnover Rates.* Additionally,

e.     *Former CEO Kent Thiry's Emphasis on Low Turnover.*

Below are additional examples of record evidence that Thiry strongly discouraged senior-level departures and took them personally.

---

[51] *Id.* at 54:2–55:2.

[52] Ex. PX19 at DVA_OMCEAL_001399753.

[53] *Id.*

[54] Ex. PX264 at DVA_OMCEAL_001145976.

[55] Thiry Dep. at 98:6–98:24; *see also* Ex. PX1 at DOJCIV-008-00000061 (

; Staffieri Dep. at 25:4–27:9
(                                                                                      ).

i. **Thiry's Testimony:** ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████

███████████████ [56]

ii. **Kogod's Statements to the FBI:** ████████

████████████████████████████

████████████████████████

████ [57] ████████████████████████

████████████ [58] ████████████████

██████ [59]

A. ██████████████████████

████████████████ [60]:



---

[56] Thiry Dep. at 98:6–98:24

[57] DOJCIV-008-00000304 at DOJCIV-008-00000306; *see also id.* at DOJCIV-008-00000307 ████████████████████████████████ ); *id.* ( ████ ).

[58] DOJCIV-008-00000304 at DOJCIV-008-00000313.

[59] DOJCIV-008-00000090 at DOJCIV-008-00000097.

[60] DOJCIV-008-00000304 at DOJCIV-008-00000306.



B. ███████████████ [61]:

iii. **Rodriguez's Testimony:** ███████████████

iv. ███████████████

---

[61] DOJCIV-008-00000090 at DOJCIV-008-00000091.

[62] *Id.* at DOJCIV-008-00000092.

[63] Rodriguez Dep. at 136:3–10.

[64] Ex. PX123 at DOJCIV-007-00000095; *see also* Thurman Dep. at 131:16–132:7 (███████████████).



A. ████████████████████████

████████████████████████████

████████████████████████████

██████ [65]

v. **Mildenberger's Testimony:** ████████████

████████████████████████████

████████████████████ [66].

████████████████████████

████████████

A. ████████████████

████████████████████████████

████████████████████████████

████████ "[67]

vi. **Hayek's Departure and Testimony:** ████████

████████████████████████████

████████████████████████

████████████████████████

██████ [68] ████████████████████

████████████████████████ [69]

---

[65] Ex. PX124 at DOJCIV-012-00000133; Thurman Dep. at 153:5–154:6 (████████████████████████).

[66] Mildenberger Dep. at 166:1–167:31.

[67] *Id.* at 167:4–24.

[68] Ex. PX484.

[69] Ex. PX304 at DOJCIV-008-00000301.

-21-

vii. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[70] Thereafter, according to former DaVita COO Kogod's testimony at the DaVita criminal trial, Thiry and Hayek formally established the SCA-DaVita No-Poach Agreement "[t]o make it more difficult for people to leave . . . and make it impossible for them to go to a company that has a former DaVitan as their leader[.]"[71]

f. The evidence I reviewed demonstrated that it was important to DaVita to "preserve talent."[72]

29. <u>SCA Cared About Turnover.</u> I have also reviewed evidence that SCA cared about and sought to reduce turnover.

a. *Deposition Testimony.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮[73] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[70] Hayek Dep. at 93:7–95:14, 111:4–115:1; *see also* Ex. PX304; *see also* DOJCIV-008-00000090 at DOJCIV-008-00000092 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[71] Ex. PX157 at 134:24–135:4; Kogod Dep. at 57:9–20 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also* DOJCIV-008-00000090 at DOJCIV-008-00000091 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[72] Ex. PX157 at 139:25–140:11.

[73] Rucker Dep. at 154:8–14.

███████████████████████████████████████████████████████████

████████████████████[74]█████████████████████████████████

███████████████████████████████████████████████████████████

██████[75]███████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████[76] This same rationale applies to Defendants' CSI Exchanges, because employees are less likely to quit if there they lack other job opportunities.

        b.    *Documentary Evidence.* ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████[77]:

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

30.    <u>USPI Valued Low Senior-Level Employee Turnover.</u> I have reviewed similar evidence produced by USPI. ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

---

[74] *Id.* at 154:15–24.

[75] Rucker Dep. at 303:2–304:15.

[76] Fanning Dep. at 82:1–15.

[77] Ex. PX562 at SCA001777878.



a. ████████████████████████████████████

█████████████████████████████████[78] ████████████

████████████████████████████████████████████

██████████████████████████[79] ████████████████████

████████████████████████████████[80]

b. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████[81]  USPI could accomplish both tasks by restricting its employees' job mobility and CSI Exchanges to eliminate employees' alternative opportunities.

c. ████████████████████████████████████

███████████████[82]

### 2.    Defendants Seek to Manage Their Substantial Labor Expenditures.

31.    In this section, I review evidence that Defendants' biggest costs are their labor expenditures.  Further, I review evidence common to the Class demonstrating that Defendant firms considered labor costs a measure of performance, and as such their C-suite executives (and key co-conspirators in this litigation) are motivated by bonuses and/or equity grants to keep labor costs as low as possible.

32.    Labor Costs Constitute Defendants' Biggest Expenditure.  Labor costs generally comprise a substantial portion of a firm's total operating costs, and Defendants are no exception.

---

[78] Wilcox Dep. at 99:13–25; Ex. PX507 at DOJCIV-008-00000269.

[79] Wilcox Dep. at 100:1–8; Ex. PX507 at DOJCIV-008-00000269.

[80] *Id.*

[81] Ex. PX98 at DOJCIV-012-00000128; McGarry Dep. at 35:5–37:2.

[82] *See e.g.,* USPI_CIV_000022268.

a.  *DaVita's Labor Costs Are Its Largest Expenditure.*  DaVita's former CEO Thiry and current CEO Rodriguez testified and stated during earnings calls that labor costs comprise an outsize portion of DaVita's costs. ██████████████████████████████ ██████████████████████████████ [83]  Rodriguez similarly has repeatedly told shareholders during DaVita earnings calls that labor costs are a primary driver of DaVita's performance.[84] ████████████████████████████████████████ ████████████████████ [85]

i.  ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ [86]

b.  *SCA's Labor Costs Are Significant.*  ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████ .[87]  ██████████████████████████████████████████████

████████ [88]

---

[83] Thiry Dep. at 109:8–10; *see also* Annual Report at 84, DAVITA (2010), https://filecache.investorroom.com/mr5ir_davita/118/2010%20DVA%20Annual_0.pdf (DaVita reported that its "business is labor intensive").

[84] Ex. PX260; Ex. PX261; Rodriguez Dep. at 44:19–46:8, 47:3–7.

[85] Rodriguez Dep. at 44:19–46:8.

[86] Staffieri Dep. at 128:24–129:15; *see also* Ex. PX259 at 8 (labor was DaVita's largest cost item in 2020).

[87] Rucker Dep. at 252:23–253:8.

[88] Cinnick Dep. at 60:7–8.

c. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████[89]

33.     Defendant Firms Cared About Managing Labor Costs.  In general, any reduction in costs (that does not reduce revenues) results in profit.  Profits drive long-term stock performance.  A company can distribute those profits to multiple places:  (1) to shareholders in the form of dividends; (2) to shareholders in the form of increased equity/stock price appreciation; (3) reinvestment in the business; and/or (4) to executives.

34.     Typically, most executive pay is related to stock performance (i.e., price appreciation plus dividends).

35.     Because labor costs are a large part of a firm's operating costs, firms typically take great care not to raise compensation levels any higher than necessary to increase profits and stock performance, which, in turn, increases executive compensation.  The expectation, however, is that they will do so through legal means.

36.     I have reviewed the following evidence that, based on my experience and research in compensation and human resource management, is consistent with employers (here, Defendant firms) seeking to control labor costs, which could have financially benefited C-suite executives (and others) who were paid primarily in stock and were rewarded for their firms' performance.

---

[89] Wilcox Dep. at 177:1–15.

a. *DaVita.*

i. **Labor Costs Drive DaVita's Profitability.** ██████



[93] The earnings call statements echo Rodriguez's testimony. During a 2019 earnings call DaVita reported to shareholders, "Wage rates are a pressure. We do not get revenue per treatment increases commensurate with our labor costs increases. So labor will always be a headwind relative to margin."[94] During a 2023 earnings call, Rodriguez explained to shareholders, "As we have said in the past, successful labor management requires effectively managing the interplay between wage growth, contract labor and training costs."[95] Rodriguez similarly told shareholders that labor remarkets "remain a key swing factor in our performance" during another earnings call later in 2023.[96]

---

[90] Rodriguez Dep. at 43:5–11; *see also* Ex. PX259 at 8 (Rodriguez told shareholders during a 2020 DaVita earnings call that labor drives productivity).

[91] Rodriguez Dep. at 39:8–10.

[92] *Id.* at 39:8–40:4.

[93] *Id.* at 40:5–23.

[94] Ex. PX262 at 13.

[95] Ex. PX260 at 2 (Rodriguez also told shareholders that "the biggest driver of Q1 outperformance" was labor).

[96] Ex. PX261 at 2.



ii. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮[97] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮[98] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮[99]

iii. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮[100]

iv.     Moreover, companies often replace some of their merit increase budgets with bonuses, because bonuses better help control growth in compensation costs given that they do not become part of base pay (unlike base merit increases). The evidence I have reviewed suggests that DaVita did just that. For instance, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮[101] ▮▮▮▮▮▮▮▮▮▮▮▮

---

[97] Thiry Dep. at 110:13–19.

[98] *Id.*

[99] *Id.* at 124:23–125:18; *see also* Ex. PX309 at 12 ("The bad news is that labor costs more every year[.]").

[100] Priest Dep. at 17:18–25.

[101] Ex. PX77 at DVA_OMCEAL_001329257–58.

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████[102] This

indicates that DaVita sought to control base pay growth.

>        v.        **DaVita Used Profit Sharing to Incentivize Top Executives to**

**Manage Labor Costs.**  The evidence I reviewed shows DaVita's profit sharing/equity

compensation for senior executives incentivized top executives to increase profit, which

depended on keeping labor costs low.  ███████████████████████████████

████████████[103]  ███████████████████████████████████

███████████████████████████████████████████████[104]  ████

██████████████████████████████████[105]  █████████████████████

████████████████████████████████████████████████████

████████████[106]  In its 2012 proxy statement, DaVita reported the compensation it paid to

various C-Suite executives in 2011, including Thiry, Rodriguez, and Kogod.[107]  The vast

majority (71%) of DaVita's executives' compensation was comprised of long-term equity.[108]  In

2011, equity awards ranged from 48–74% of DaVita's named executive officers'

compensation.[109]

---

[102] *Id.* at DVA_OMCEAL_001329257.

[103] Thiry Dep. at 108:7–21.  Note also that Thiry received other forms of pay.  ███████████
████████████████████████████████████  Rodriguez Dep. at
81:18–25.

[104] Terry D. Warfield & John J. Wild, *Accounting recognition and the relevance of earnings as an explanatory variable for returns*, 67 ACCT. REV. 821–842 (Oct. 1992).

[105] Thiry Dep. at 108:22–111:17.

[106] Rodriguez Dep. at 35:24–36:21.

[107] Proxy Statement at 47, DAVITA (2012),
https://filecache.investorroom.com/mr5ir_davita/175/2012%20Proxy%20Statement_2.pdf.

[108] *Id.* at 41.

[109] *Id.* at 42.

b.    *SCA.*

i.    The evidence I reviewed regarding SCA similarly indicates that SCA was concerned about controlling labor costs and incentivized senior executives to do so through profit sharing.

ii.    Equity compensation in the form of company equity grants and bonuses was a significant portion of senior executive compensation and tied to company performance. ███████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████[110]████████████████████████████████ ███████████████████████████████████████████████████ ████████████[111]

iii.    ██████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████[112]

iv.    ██████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████[113]████████ ██████████████████████████████████████████████████

---

[110] SCA000545210 at SCA000545215.

[111] *Id.*

[112] Clemens Dep. at 35:14–25.

[113] Hayek Dep. at 300:2–301:8.



[114]

[115]

     v.      The testimony I reviewed shows that SCA's use of profit sharing as a form of compensation for senior executives incentivized them to control labor costs.

[116]

[117]

[118]

     c.     *USPI.*

     i.      Based on my review of the evidence, USPI, similar to DaVita and SCA, cared about controlling labor costs, its profits were affected by labor costs, and it compensated senior executives in a way that incentivized them to manage labor costs.

---

[114] *Id.* at 74:9–14; Rucker Dep. at 305:3–306:4; Kilgore Dep. at 149:12–150:7.

[115] HAYEK-000011525 at HAYEK-000011540, 44.

[116] Rucker Dep. at 253:18–24.

[117] *Id.* at 303:18–304:15.

[118] *Id.* at 307:02–308:11.



[119]

[120] Wilcox's compensation was tied to USPI profit and labor costs. [...]

[121]

[122]

[123]

ii.

[124]

37. Firms are particularly motivated to reduce labor costs where competitive pressures in the labor market are strong. Thus, if firms in a given labor market can reduce costly employee turnover (discussed below) in some manner other than by increasing pay, such as by enacting anti-competitive No-Poach Agreements and/or via CSI Exchanges, those firms thereby

---

[119] *See, e.g.,* USPI_CIV_000023148 at USPI_CIV_000023148 (stock options granted to Wilcox in 2015 and 2016).

[120] Wilcox Dep. at 26:1–16; 27:4–21, 28:2–21.

[121] *Id.* at 24:8–30:7.

[122] *Id.* at 25:11–16.

[123] *Id.*

[124] *See, e.g.,* USPI_CIV_000150417 at USPI_CIV_000150420; USPI_CIV_000150817.

substantially reduce their labor costs. This activity, of course, embodies an illegal, albeit tempting measure. Such extralegal measures benefit firms at the expense of the labor market's efficiency and employees' income and long-term earning potential.

**B.     The Incentives to Collude Are Stronger in a Close-Knit Industry.**

38.     The foregoing incentives are amplified where there is also common evidence regarding the industry's small size and showing that the major co-conspirators all knew each other and had meaningful personal relationships that could more easily facilitate collusion.

39.     The evidence I have reviewed includes deposition testimony, documents produced in this litigation, and statements from the FBI investigation interview reports. This evidence, based on my experience and research in compensation and human resource management, showed that the industry in this case was close-knit, increasing the likelihood that employers who would otherwise compete for labor might instead collude to avoid such competition.

40.     The evidence I have reviewed in support shows:

a.



[125]

[126]

---

[125] Thiry Dep. at 32:10–33:1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).

[126] *Id.* at 22:5–24:6.

b.

[127] DOJCIV-007-00000084 at DOJCIV-007-00000084; Hayek Dep. at 51:25–52:20 (████ ██████████████████████████████████████████████████████).

[128] Ex. PX305 at DOJCIV-008-00000176; Rucker Dep. at 385:19–388:14 (██████████ ██████████████).

[129] DOJCIV-008-00000345 at DOJCIV-008-00000346.

[130] *Id.* at DOJCIV-008-00000347.

[131] DOJCIV-012-00000056 at DOJCIV-012-00000058.

███████████████████████████████████████████████ [132] ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████ [133]

### C. Collusion Suppresses Compensation Because It Pays to Change Employers.

41.     In this section, I review the literature demonstrating that employees benefit from uninhibited access to job mobility, whereas it can increase employers' labor costs, because employers will have to pay higher compensation to retain employees and/or to replace them.  As such, any anticompetitive restrictions on the labor market that suppress job mobility would likely harm employee compensation.

42.     The evidence I reviewed includes deposition testimony, documents produced in this litigation, statements from the FBI investigation interview reports, and compensation-related literature.

#### 1.     In Unrestricted Markets, Departing Employees Experience Pay Growth from Voluntary Job Changes.

43.     Employees of all kinds undoubtedly benefit from voluntary (employer) job changes.  This is true almost by definition:  Why would someone choose to take a different job if it did not benefit them to do so?

44.     Pay Growth from Job Mobility.  The literature on this topic is extensive and instructs, for example, that one-third of all wage growth individuals experienced during the first ten years of their careers (when the majority of career wage growth occurs) came from changing

---

[132] Ex. PX314 at DOJCIV-008-00000233; Hayek Dep. at 51:25–52:20 (██████████████████ ████████████████████████████████████).

[133] Ex. PX281 at DOJCIV-008-00000041; Mosley Dep. at 50:18–25 (███████████████████ ███████████████████████████).

employers (and the rest came from advancement within the same organization).[134]  Pay growth

from voluntary job changes is larger for those in higher paid jobs (*see* **Figure 1** below).  We also

know that mobility is much more likely to occur within same/similar industries (and

occupations) and that such mobility has a higher payoff (than switching industry or

occupation).[135]  Thus, restrictions on employee mobility within an industry are especially

detrimental to employee pay level and growth.  Finally, it is not just those employees who

change employers that realize a pay increase—incumbent employees do as well.[136]

45.     Importance of Employee Mobility for Labor Markets.  Gerhart and Professor of

Human Resource Management Jie Feng (2021) provide an overview of the importance of

employee mobility to a well-functioning labor market and economy, summarized below:[137]

a.      "Only with adequate mobility can the labor market carry out its major

function of matching, which works to 'allow workers to move to their most productive use.'"[138]

b.      "Workers remain on jobs in which their productivity is revealed to be

relatively high," and "they select themselves out of jobs in which their productivity is evaluated

to be low."[139]

---

[134] For a classic study, *see* Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 108 Q. J. ECON. 439–79 (May 1992).

[135] Eric Parrado, Asena Caner & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007).

[136] Huasheng Gao, Juan Luo & Tilian Tang, *Effects of Managerial Labor Market on Executive Compensation:  Evidence from Job-Hopping*, 59 J. ACCT. & ECON. 203–220 (Apr.–May 2015).

[137] Barry Gerhart & Jie Feng, *The Resource-Based View of the Firm, Human Resources, and Human Capital:  Progress and Prospects*, 47 J. MGMT. 1796–1819 (Jan. 4, 2021).

[138] *Id.* at 1809.

[139] *Id.* (cleaned up) (citation omitted).

c.      Economists Boyan Jovanovic and Robert A. Moffitt estimate that economic output for the U.S. economy would be lower by 6% to 9% if employees "were not able to act on their match information by exercising their option to change jobs."[140]

d.      Likewise, Jovanovic and Moffitt find matching through worker mobility also raises wages by 8.5% to 13%, consistent with the idea that mobility allows "workers to move to their most productive use." (Below I will examine more detailed evidence that worker mobility increases wages and that restrictions on mobility thereby reduce workers' wages.)[141]

e.      Economists Steven J. Davis and John Haltiwanger "point to 'low worker mobility rates' in 'centrally planned economies . . . [that] choke off the productivity-enhancing role of worker sorting.'"[142]

f.      According to economist Niklas Engbom, "reducing workers' ability to find a job that fully utilizes their skills [i.e., reducing mobility] . . . discourage[s] workers from accumulating human capital." In support of this, Engbom relied on panel data from 23 Organisation for Economic Co-operation and Development ("OECD") countries. He found that "life-cycle wage growth and on-the-job training are greater in more fluid labor markets" and that "aggregate productivity is 30 percent lower in the least fluid labor market relative [to the most fluid] primarily due to a lower stock of human capital."[143]

---

[140] *Id.* (cleaned up).

[141] ██████████████████████████████████████████████████ Rucker Dep. at 31:21–32:5.

[142] Barry Gerhart & Jie Feng, *The Resource-Based View of the Firm, Human Resources, and Human Capital: Progress and Prospects*, 47 J. MGMT. 1796–1819 (Jan. 4, 2021) (citing Davis and Haltiwanger 1999: 2778).

[143] Niklas Engbom, *Labor market fluidity and human capital accumulation*, NAT'L BUREAU ECON. RSCH. (No. 29698 Jan. 2022), https://www.nber.org/papers/w29698.

g.      The OECD notes that "[b]arriers to exit, like barriers to entry, 'weaken the market discipline of the competitive process, which . . . can lead to less efficient firms staying in the market' and 'resources (both financial and [human capital] become trapped in existing firms instead of being relocated to their most efficient use.  This can make it more difficult for efficient firms to expand and can crowd out the growth of more innovative firms' and 'can have an adverse impact on economic growth.'"[144]  In other words, employee mobility restrictions run the risk of benefiting less efficient firms, which survive by suppressing wages, at the expense of more efficient firms, which in turn comes at the expense of (i.e., lowers) workers' wages.

46.      Effect of Changing Jobs on Compensation.  **Figure 1** below summarizes key research findings showing a substantial increase in compensation for employees who (voluntarily) change employers.[145]  Additionally, these studies show that percentage pay increases from job changes are greater for higher-paid jobs (e.g., Senior-Level Employees, or jobs at the director-level and above).

---

[144] ORG. FOR ECON. CO-OPERATION & DEV., BARRIERS TO EXIT – BACKGROUND NOTE at 2 (Oct. 23, 2019), https://one.oecd.org/document/DAF/COMP(2019)15/en/pdf.
[145] BARRY GERHART, COMPENSATION 242, EX. 7.16 (14th ed. 2023).

-38-

**Figure 1: The Impact of (Voluntary) Employee Turnover on Subsequent Employee Pay Level[146]**

| Study | Sample | Results |
|---|---|---|
| Groysberg, Healy, & Lin (2020), ILR Review | Global executive search firm placements | 13% increase (in salary plus bonus only) after employer change. (Stock-based compensation, the largest component of executive compensation was not measured.) |
| Bidwell (2015), Organization Science | MBA alumni from a leading U.S. business school | 35% increase in earnings from voluntary employer change within same job function. 4% increase from involuntary employer change. Internal moves (promotion) experienced 34% earnings increase. (Mean of 5.4 years post-MBA work experience. During that time, 87% changed employer at least once; 2.6 moves per person, with 65% being internal, 26% voluntary external, and 9% involuntary external.) |
| Dreher & Cox (2000), Academy of Management Journal | Recent MBA graduates | Pay was 20% higher among those who had changed employers at least once. |
| Keith & McWilliams (1999), ILR Review | National sample of young adults | Pay was 8% to 11% higher for those who voluntarily quit their job relative to those who stayed. Pay was 14% to 18% higher if searched prior to voluntarily quitting. |
| Gomez-Mejia & Balkin (1992), Academy of Management Journal | College and university faculty | Each employer change associated with 25% higher 9-month salary. |
| Topel & Ward (1992), Quarterly Journal of Economics. | National sample of young adults | 10% increase in wage from employer change (first 10 years in labor market; 84% moved). |

47.    When employees accept new, higher-paying job opportunities, they can also later use their compensation at their new employer to return to and leverage higher pay at their

---

[146] BARRY GERHART, COMPENSATION (14th ed. 2023), EXHIBIT 7.16, P. 242.

original employer.

[147]

48.     Additional Job Opportunities for Remaining Employees.  Additionally, when employees change employers, they often recruit their colleagues to leave with them. ▮



[148]

a.     This trend increases the labor market consequences of a single job offer.

49.     Defendants Were Aware of the Effects of Restricting Employee Mobility.  The evidence I reviewed shows that Defendants were aware of this trend, which served as further incentive to collude. ▮

[149]

[150].

[151]

[152].

---

[147] Thurman Dep. at 36:12–37:5.

[148] Ex. PX124 at DOJCIV-012-00000134; Thurman Dep. at 159:8–160:5 (confirming accuracy of statement to the FBI).

[149] Ex. PX316; Ex. PX305 at DOJ-CIV-008-00000171; Rucker Dep. at 385:19–388:14 (▮).

[150] Ex. PX316 at DOJ-PROD001A-00000029.

[151] The "Village" is internal jargon employees used to refer to DaVita.  Thurman Dep. at 145:6–20.

[152] Ex. PX316 at DOJ-PROD001A-00000029; Hayek Dep. at 93:23–95:14.

[REDACTED] [153]

### 2. Incumbent Employees Also Benefit from Unrestricted Job Mobility.

50. The foregoing analysis applies to incumbent employees (i.e., a firm's current employees who remain at the firm) as well as employees who accept positions elsewhere. Where labor markets are competitive, employers often raise wages of current employees to prevent them from leaving. In other words, higher pay constitutes an important tool that employers use to retain remaining employees, and every guide to employee retention emphasizes the need to provide compensation that is competitive with the levels offered elsewhere.[154] Job changes therefore create cascading "spillover" effects, by benefitting those who leave the organization as well as those who remain.[155]

51. For example, a study of executives found "companies dramatically raise pay for their incumbent [i.e., remaining] executives after losing executives" to executive positions at

---

[153] Hayek Dep. at 94:15–25.

[154] *See, e.g.*, Laura Lorber, *How to Retain Employees*, WALL ST. J., Sept. 12, 2008, http://guides.wsj.com/small-business/hiring-and-managing-employees/how-to-retain-employees/. That point is so obvious that the attention has focused on other approaches. *See* Peter Cappelli, *A Market-Driven Approach to Retaining Talent*, 78 HARV. BUS. REV. 103–11 (Jan.– Feb., 2000).

[155] Historically, the "spillover" term was used to describe how unions raised wages at non-union firms because employers there increased wages to buy out interest in unionization. The most common example of spillover effects in contemporary research is with minimum wages pushing up wage rates for higher-paid jobs. *See* DAVID NEUMARK & WILLIAM L. WASCHER, MINIMUM WAGES (2008).

other companies.[156]  And the incumbent executives received a 46% increase in compensation one year later (primarily in the form of stock-related compensation).[157]

52.     Moreover, outside hiring into higher-level jobs is expensive, and outside hires perform worse on average than inside hires (i.e., those who are promoted from within) and have higher turnover than inside hires.  This problem is one more reason why an employer will be reluctant to allow current incumbents of a job or their potential replacements to leave.[158]

53.     Paying higher compensation represents an effective tool in reducing employee turnover.  However, it is also a costly tool, at least compared to the alternative of simply prohibiting employees from moving to what would otherwise be their best alternative job opportunities.  ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████[159]

54.     **Figure 2** below summarizes key research findings on the impact of employee turnover on employee compensation level.  This research shows that a 10% increase in compensation level generally corresponds to lowering employee turnover by 10% to 35%.[160]

---

[156] Huasheng Gao, Juan Luo, & Tilian Tang, *Effects of Managerial Labor Market on Executive Compensation:  Evidence from Job-Hopping*, 59 J. ACCT. & ECON. 203–220 (Apr.–May 2015).

[157] *Id.*

[158] Matthew Bidwell, *Paying more to get less:  The effects of external hiring versus internal mobility*, 56 ADMIN. SCI. Q. 369–407 (Dec. 27, 2011).

[159] Rucker Dep. at 154:25–155:16.

[160] BARRY GERHART, COMPENSATION 241, EX. 7.15 (14th ed. 2023).

**Figure 2: The Impact of Compensation Level on Employee Turnover (Mobility)**[161]

| Study | Sample | Results | Elasticity |
|---|---|---|---|
| Riddell, *Industrial Relations* (2011) | 390 firms in Greater Toronto, 6 occupational groups | A 10% increase in ratio of firm pay to market pay associated with quit rate going from .106 to .095, a 10% reduction | −1.01 |
| Falch, *American Economic Review* (May 2011) | 161 primary and secondary schools in Norway | Schools having teacher "shortage" and located in far north eligible to pay teachers wage premium of 10%. Introduction (also studied its removal) of 10% wage premium associated with quit rate going from .18 to .12, a 35% reduction | −3.50 |
| Siebert & Zubanov, *Academy of Management Journal* (2009) | 325 retail clothing stores in the United Kingdom | A 10% increase in ratio of store wage/county wage associated with separation rate going from .0500 to .0364, a 28% reduction | −2.78 |
| Shaw, Delery, Jenkins, & Gupta, *Academy of Management Journal* (1998) | 227 trucking companies in the United States | Regression coefficient (beta) = −.31 for quits on pay level. A 10% increase in average annual pay level ($34,912 to $38,403) associated with quit rate going from .256 to .200, a 22% reduction | −2.20 |
| Raff & Summers, *Journal of Labor Economics* (1987) | Ford Motor Company in 1914 | Increasing daily wage *100%*, from $2.50 to $5.00, associated with turnover reduction from 370% to 54%, an 85% reduction | −0.85 |

Elasticity = % change in y/% change in x

55. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮[162]

56. As discussed at length below, companies rely on this external market data to choose their pay levels so as to avoid the serious pitfalls of paying too much or too little relative to their competitors. Paying too much for its jobs increases a company's labor costs, which either directly lowers profits or which are passed on to customers as higher prices. Additionally, higher prices reduce the market demand for the company's product or service, which in turn

---

[161] BARRY GERHART, COMPENSATION 241, EX. 7.15 (14th ed. 2023).
[162] *See, e.g.,* Ex. PX85 at DVA_OMCEAL_001067253.

-43-

reduces the company's profits. Paying below market, on the other hand, precludes the company from competing adequately in the labor market to hire and retain sufficient employees, particularly high-quality employees. Paying too little becomes a vicious cycle, because it translates into lower-quality services and/or products, which again works to reduce service demand and thus the price that customers are willing to pay, in turn lowering profits. Accordingly, it is critically important for companies to avoid both overpaying and underpaying their employees in comparison to their competitors. That explains why companies in general, including Defendant firms, place a premium on "pricing" their jobs.

57. However, competitors can avoid these risks, and can also avoid increasing their labor costs, by exchanging information to align their compensation and keep the market rate low. Such collusion would likely reduce each Defendants' labor costs: by gaining assurances from each other that their competitors' labor costs would be lower, each Defendant could lower its own labor costs (including by reducing labor cost growth) without risking (1) the loss of disgruntled employees to rivals or (2) the loss of morale from employees perceiving a lack of external equity with pay offered by comparable employers.

58. Based on my experience and research in compensation and human resource management, the evidence (that is common to the Class) that I have reviewed in this case supports the foregoing principles.

a. *DaVita.* The evidence I have reviewed in this case shows that in some circumstances, turnover increased labor market rates and pressured DaVita to adjust compensation upward to retain employees. The SCA-DaVita No-Poach Agreement was a way to avoid this need to increase compensation to prevent employee turnover.

-44-



i. █████████████████████████

██████████████████████████████ [163]

ii. ███████████████████████

███████████████████████ [164]

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████

iii. ███████████████████████

████████████████████████████████████████

█████████████ [165]

b. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████ [166] ███████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████ [167]

---

[163] Staffieri Dep. at 125:13–21.

[164] Ex. PX551.

[165] Thurman Dep. at 56:8–22.

[166] Staffieri Dep. at 120:23–124:18.

[167] Chipman Dep. at 41:13–42:4.



c. [REDACTED] [168]

d. [REDACTED] [169]

e. [REDACTED] [170] [REDACTED] [171] [REDACTED] [172]

f. [REDACTED] [173] [REDACTED]

---

[168] Hayek Dep. at 79:8–82:9.

[169] DVA_OMCEAL_000942244 at DVA_OMCEAL_000942245.

[170] Thurman Dep. at 20:11–21:15, 22:19–23:7; *see also* Ex. PX124 at DOJCIV-012-00000134 [REDACTED] ); Thurman Dep. at 156:21–157:11 ( [REDACTED] ).

[171] Thurman Dep. at 90:21–24.

[172] Thiry Dep. at 111:13–17.

[173] Ex. PX124 at DOJCIV-012-00000133; Thurman Dep. at 153:5–154:6 ( [REDACTED] ).



[BLACK REDACTION] [174]

       g.     *SCA.*  SCA sometimes increased compensation to address turnover (but note that SCA did not prevent turnover with higher pay as often as it otherwise would have, likely because it benefited from the No-Poach Agreements and CSI Exchanges).



       i.     [BLACK REDACTION]

[BLACK REDACTION] [175] [BLACK REDACTION]

[BLACK REDACTION] [176]

       ii.     [BLACK REDACTION]

[BLACK REDACTION] [177] [BLACK REDACTION]

[BLACK REDACTION] [178] [BLACK REDACTION]

[BLACK REDACTION] [179]

---

[174] *Id.* at DOJCIV-012-00000135; Thurman Dep. at 161:10–162:7 ([BLACK REDACTION]).

[175] Cinnick Dep. at 67:8–10.

[176] *Id.* at 68:7–17.

[177] SCA001123358 (cover email) and SCA001123359 (attachment).

[178] Ex. PX465 at SCA000048816.

[179] BF000048126 at BF000048126–27.

iii. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ [180] Here, SCA did not wait for concrete competitive

threats to manifest, and instead took proactive measures to further reduce turnover risks.

h.    *USPI.*  Similar common evidence at USPI shows that USPI increased

compensation to address turnover, but as above, this happened less frequently than one would

expect in an unrestricted market.



i. ██████████████████████████████ [181]

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████ [182]

ii. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ [183]

██████████████████████████████████████████

██████ [184]

---

[180] Ex. PX465 at SCA000048816.

[181] Wilcox Dep. at 100:14–22.

[182] *Id.* at 99:21–100:13, 132:7–15; Ex. PX507 at DOJCIV-008-00000269; Ex. PX508 at DOJCIV-008-00000213–14.

[183] Ex. PX454.

[184] *Id.*

iii.



iv.

[187] If USPI had had a no-poach agreement with that other company, USPI likely would not have had to give a counteroffer to McGarry because McGarry would never have received the outside job offer in the first place.

## VI. DEFENDANTS' COLLUSION WOULD LIKELY HAVE SUPPRESSED EMPLOYEES' COMPENSATION.

59. In this section, I discuss common evidence of Defendants' typical cold calling recruitment practices regarding high-value passive candidates in an unrestricted labor market. Further, I review evidence that, based on my experience and research in compensation and

---

[185] Ex. PX142.

[186] Ex. PX98 at DOJCIV-012-00000129; McGarry Dep. 35:3–37:2 ▮▮▮▮▮▮▮▮▮▮▮.

[187] *Id.*

human resource management, shows that Defendants' No-Poach Agreements restricted cold calling, which in turn limited job mobility. The Agreements also deprived employees of confidentiality in the hiring process, which created a chilling effect and further suppressed employees' job mobility and bargaining power. Moreover, evidence common to the Class shows that Defendants' CSI Exchanges are likely to have further harmed employees' compensation levels.[188] Finally, I explain that the foregoing wage suppression will likely to persist for years.

**A.** **In a Normally-Functioning Competitive Market, Defendants Value Recruiting High-Value Passive Candidates for Employment.**

60. In this section, I explain why many high-value employees, particularly those with specialized skills, do not proactively seek employment even though they would be very interested in such higher-paying external opportunities. I also review evidence demonstrating that Defendant firms sought such passive candidates with specialized skills, and therefore needed to proactively solicit or recruit those employees. The evidence I review includes compensation-related literature, statements from the FBI investigation interview reports, deposition testimony and exhibits, documents produced in this litigation, and testimony from the DaVita criminal trial.

61. Cold Calling Constitutes a Valuable Recruitment Mechanism. Like many firms, Defendants regularly engaged in proactive recruiting of job candidates.[189] This recruitment practice is colloquially referred to as "cold calling," wherein a hiring company proactively calls,

---

[188] Frank M.H. Neffke, Anne Otto & Antje Weyh, *Inter-industry labor flows*, 142 J. ECON. BEHAV. & ORG. 275, 281 (Oct. 2017). They observe that workers "remain in their 5-digit industry 39 times more often than random." Eric Parrado, Asena Caner & Edward. N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007).

[189] *See, e.g.,* Tae Hon Lee, Barry Gerhart, Ingo Weller & Charlie O. Trevor, *Understanding Voluntary Turnover: Path-Specific Job Satisfaction Effects and The Importance of Unsolicited Job Offers*, 51 ACAD. MGMT. J. 651, 655 (Aug. 2008) ("As Gerhart observed, an individual labor market can change quickly so that although 'a person may perceive ease of movement to be low, an attractive job offer may nevertheless arise that results in turnover.'").

emails, or otherwise reaches out through a platform like LinkedIn or Indeed to a passive candidate, i.e., an employee at a competitor firm who is not actively looking for a new job.

a.        Employees in general are naturally interested in higher-paying alternative job opportunities.  However, to the degree they are unaware of such opportunities, they may be "passive," in that they are less likely to proactively seek alternative employment.  Jobs that come to these passive employees via active recruiting by other employers consequently play a critical role in facilitating high-value employee moves to better and higher-paying jobs at firms who need them.

b.        Employees can incur high search costs from searching for jobs and gathering information about alternative employment options and compensation; it is often time-consuming to identify and assess the suitability of alternative employers.  Moreover, "sometimes . . . employees remain unaware of job opportunities because the constant and daily routine of work, home, and family demands shields that person from alternative possibilities."[190]  Many potential employees, particularly those satisfied in their current roles because they do not yet know about higher-salary opportunities elsewhere, are unlikely to choose to incur those costs. Therefore, cold calling helps employers to reach much larger groups of prospective, passive candidates.  And as discussed herein, many companies believe these passive candidates are particularly valuable.

c.        One study of turnover in a national sample of employees ages 31 to 38 reported that 28% (of which 32% were in professional and managerial occupations) of those who

---

[190] Thomas W. Lee & Terence R. Mitchell, *An Alternative Approach: The Unfolding Model of Voluntary Employee Turnover*, 19 ACAD. MGMT. REV. 51–89 (Jan. 1994).

left their employer to take a job with another employer accepted "unsolicited job offers."[191]  The survey defined such offers as answering "no" to the question, "Were you looking for work elsewhere when you were offered this job?"[192]  Because this number only includes those employees who actually left their current positions, the 28% statistic likely substantially understates the number of employees who actually received a cold call.  It does not include employees who received cold calls and then used their unsolicited job offers to negotiate higher salaries with their current employers, or who simply stayed at their current employers and maintained their salary levels.

d.  More recent evidence suggests that cold calling and other forms of proactive recruitment may play an even larger role than indicated above.  Based on data from the Contingent Worker Supplement Survey (part of the Census Bureau's Current Population Survey), a Federal Reserve Bank of San Francisco study concluded that "more than three-quarters of workers [77.6% based on their Table 1] who switched employers did not report active job search in the previous three months."[193]  Thus, "a majority of people" actually "find jobs without ever reporting actively looking for one."[194]  ***This study "implies that, rather than them finding jobs, the jobs actually find them."***[195]  But if a no-poach agreement restricts proactive recruiting, alternative employers will *not* find passive candidates, resulting in less employee mobility and thereby a reduced likelihood of a mobility-linked wage increase.

---

[191] Tae Heon Lee, Barry Gerhart, Ingo Weller, & Charlie O. Trevor, *Understanding Voluntary Turnover:  Path-Specific Job Satisfaction Effects and The Importance of Unsolicited Job Offers*, 51 ACAD. MGMT. J. 651, 652–53, 659 (Aug. 2008).

[192] *Id.*

[193] Carlos Carrillo-Tudela, Bart Hobijn, Patryk Perkowski & Ludo Visschers, *Majority of Hires Never Report Looking for a Job*, FED. RSRV. BANK OF S.F. ECON. LETTER (Mar. 30, 2015).

[194] *Id.*

[195] *Id.* (emphasis added).

e. The foregoing studies and other literature demonstrate that cold calling passive candidates is widely used in U.S. labor markets as a tool to recruit top talent. It represents an especially useful tool for recruiting and hiring Senior-Level Employees who have highly-sought after specialized skills and industry-specific experience[196] and may tend to respond only to direct solicitation, as here.

f. Much human capital is industry-specific, especially for higher-level/higher-paid employees.[197] Accordingly, the great majority of employee movement is within the same industry. Industry is measured at different levels of specificity. At low specificity are 20 sectors (2-digit) industry categories. At higher specificity are 689 industries (5-digit).[198] The rate of mobility across industries is low, with only about 11% of employees changing sector (2-digit industry) from year to year.[199] That rate is especially low when one considers that the great majority of jobs in the economy are not in any one industry. When adjusting for this fact, employees "remain in their 5-digit industry 39 times more often than random" (i.e., compared to what would be expected if their current industry had no effect on

---

[196] *See, e.g.,* Ex. PX219 at DOJCIV-012-00000066 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ; Tanner Dep. at 32:20–33:13 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

[197] Richard P. Castanias & Constance E. Helfat, *The managerial rents model: Theory and empirical analysis*, 27 J. MGMT. 661–678 (Nov.–Dec. 2001); John K. Mawdsley, & Deepak Somaya, *Employee Mobility and Organizational Outcomes: An Integrative Conceptual Framework and Research Agenda*, 42 J. MGMT. 85–113 (Nov. 19, 2015); Derek Neal, *Industry-specific human capital: Evidence from displaced workers*, 13 J. LAB. ECON. 653–677 (Oct. 1995).

[198] Three sector examples (out of 20 total) are manufacturing, information, finance/insurance, and health care/social assistance. Within these three sectors, there are 176 industries (5-digit) within manufacturing, 24 industries (5-digit) within finance/insurance, and 30 (5-digit) within health care/social assistance. Examples of 5-digit industries within health care/social assistance (Sector 62) include: General Medical and Surgical Hospitals, as well as Other Outpatient Care Centers (which includes HMO Medical Centers, Kidney Dialysis Centers).

[199] Gueorgui Kambourov & Iourii Manovskii, *Rising occupational and industry mobility in the United States: 1968–97*, 49 INT'L ECON. REV. 41–79 (Feb. 2008).

their new destination industry when they switch firms).[200]  Evidence also shows that the strong tendency to move within the same industry is even more pronounced for higher-paid employees.[201]

62.     <u>Defendants' Senior-Level Positions Require Specialized Skills.</u>  Applied here, the common evidence in this case demonstrates that Defendant firms perceived that their senior-level positions required specialized, industry-specific skills and were difficult to fill:

        a.     *DaVita.*

            i.



[202]

            ii.

[203]

            iii.

[204]  Kogod

---

[200] Frank M.H. Neffke, Anne Otto, & Antje Weyh, *Inter-industry labor flows* 142 J. ECON. BEHAV. & ORG. 275–292 (Oct. 2017).

[201] *Id.*; Eric Parrado, Asena Caner, & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007).

[202] Chipman Dep. at 96:21–97:10.

[203] *Id.* at 96:19–97:13.

[204] DOJCIV-008-00000304 at DOJCIV-008-00000306.



       b.     *SCA.*

       i.     At SCA, former Chief Talent Officer Fanning testified at the DaVita criminal trial and at her deposition in this case that it is difficult to find good candidates for business development positions [i.e., employees at the Vice President level and above], who are "in short supply and highly talented. There certainly were not hundreds of them."[207] Fanning explained[208]:

> A lot of executives, especially in these BD [business development] roles are not successful. The failure rate is very much there. And you're trying to avoid risk. Recruiting is all about maximizing the odds of someone being successful. So the more you can recruit somebody from a similar culture or a similar event and pull them in, where the standards are similar, the targets are similar, the demands are similar, you're maximizing your odds all the time that this person is going to be successful.

---

[205] *Id.*

[206] *Id.* at DOJCIV-008-00000308.

[207] Fanning Dep. at 39:10–40:4.

[208] Ex. PX157 at 222:4–25; *see also* Fanning Dep. at 112:22–113:20 ("Finding those people in healthcare, it wasn't—I mean yeah, we got a list of 500 companies on that list or I know—I never did count there—but there aren't a lot of people like that in health care doing business development work . . . oh, and they're highly compensated too. . . . But generally the industry doesn't have a lot of those people, which is why you look in consulting firms and all these other places.").

[REDACTED] [209]

       ii.    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [210]  This internal SCA document underscores the highly specific and specialized qualities SCA looked for in director-level and above candidates.

       c.    *USPI.*

       i.    The pool of talent that USPI recruited from was also very small.

[REDACTED]

[REDACTED]

[REDACTED] [211]

       ii.    [REDACTED]

[REDACTED]

---

[209] *Id.* at 114:12–115:4.

[210] Ex. PX529 at SCA000065982.

[211] Wilcox Dep. at 103:11–19; Ex. PX507 at DOJCIV-008-00000269.



iii.

iv.

---

[212] Ex. PX98 at DOJCIV-012-00000124.

[213] McGarry Dep. at 49:16–50:2, 53:3–54:3; *see also* Mosley Dep. at 58:10–23.

[214] Ex. PX98 at DOJCIV-012-00000128; McGarry Dep. 35:5–37:2.

[215] Mosley Dep. at 108:25–109:14.

[216] DOJCIV-007-00000101 at DOJCIV-007-00000102.

███████████████████████████████████ [217] █████████████████████████

███████████████████████████████████████████████████████ [218]

     v.     Likewise, third-party Catapult recruiter Jimmy Tanner testified that candidates with ASC industry experience were important to USPI and that SCA employees would have been excellent candidates for positions at USPI.[219]

63.    <u>Defendants Needed to Cold Call Senior-Level Employee Candidates.</u>  Substantial evidence shows that Defendants heavily relied on proactive recruiting methods such as cold calling to hire senior-level passive candidates.

     i.     *DaVita.*  The evidence shows that DaVita valued recruiting passive candidates for employees.  Former COO Dennis Kogod testified[220]:

> It was a typical practice for recruiting firms or search firms to reach out to people whether they had expressed an interest or not . . . . [I]t became a worthwhile exercise, part of the recruiter's business model, to identify the candidates regardless of where they're working and make cold calls to see if any of them would consider leaving.

     ii.     ███████████████████████████████████

████████████████████████████████████████████████ [221]

███████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████ [222]

---

[217] *Id.* at DOJCIV-007-00000103.

[218] *Id.*

[219] Tanner Dep. at 34:13–38:15; Ex. PX220.

[220] Ex. PX157 at 64:2–20.

[221] Chipman Dep. at 71:18–72:18.

[222] DOJCIV-008-00000304 at DOJCIV-008-00000306.



iii. ███████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████[223] In

other words, DaVita wanted to have slates of candidates it could proactively contact to fill open

roles.

iv. ██████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████[224] ████████████████

██████████████████████████████████████

█████████████████████████████████████[225]

v.     In **Figure 3** below, DaVita disseminated the graphic below to

demonstrate the benefits of proactive solicitation:

---

[223] Ex. PX254 at DVA_OMCEAL_000036923.

[224] Chipman Dep. at 209:16–211:22.

[225] Ex. PX254 at DVA_OMCEAL_000036922.

**Figure 3**[226]



vi. ████████████████████████████

████████████████████████████████

██████████████████████[227] ████████████████

███████████████████████████████.[228]

vii. ████████████████████████████

██████████████████████████.[229]

---

[226] *Id.* at DVA_OMCEAL_000036929.

[227] Ex. PX255.

[228] *Id.*; Chipman Dep. at 219:17–223:15.

[229] Priest Dep. at 121:13–16.

viii.

b.      *SCA.* I have also reviewed evidence that SCA valued recruiting passive

candidates.

i.      ████████████████████████████████████████

████████████████████████████████████████ [233] As such, "the proactive outreach

of contacting candidates to tell them about opportunities" "is very important."[234] Fanning

testified that proactive recruiting represented one of the most important recruiting methods[235]:

> For executive hires, senior hires, VP and above, *it's how most people will find out about opportunities.* They'll either be referred to recruiters, through their own personal networks, through referrals, people you know. It's . . . not like more junior roles where [there is] advertising and people applying. *Executives generally, especially high-in-demand business development-type executives, which was the bulk of the recruitment I'm talking about, didn't post roles. They don't apply to job advertisements.*

---

[230] Ex. PX253 at DVA_OMCEAL_000012085.

[231] *Id.*

[232] *Id.*

[233] SCA002209521 at 524.

[234] Fanning Dep. at 48:24–49:8.

[235] *Id.* at 49:9–22 (emphasis added).

In Fanning's experience, "the vast majority, and I would say 80, 90 percent" of senior-level positions are filled through the proactive solicitation process.[236] In other words, most of the time, reaching candidates, who will not otherwise proactively solicit new opportunities, requires proactive solicitation.

          ii.      Proactive solicitation was so crucial to SCA's recruitment process that SCA implemented a standardized process for proactively soliciting job candidates[237]:

> [I]t usually starts with a job spec, the responsibilities of the role, what you're expecting somebody to do. . . . You would write a spec that would include [the] kind of culture, the successful traits, the behaviors, the responsibilities of the roles, the key deliverables, the things that generally would make a candidate successful . . . . And then you would say, so based on this is what we're looking for, this is what would be successful, where are we going to find people like that? And then you would make a list of target companies of where you might find people with those skill sets, those cultural attributes and behaviors.

          c.      *USPI.* I also reviewed substantial evidence that USPI valued recruiting passive candidates.

          i.



---

[236] *Id.* at 49:23–50:6.

[237] *Id.* at 47:25–48:23.

[238] Ex. PX98 at DOJCIV-012-00000129.

[239] *Id.*

ii.



iii.

**B.** **Defendants' No-Poach Agreements' Cold Calling Restrictions and Tell-Your Boss Provision Decreased Employees' Job Mobility and Bargaining Power.**

64.     In this section, I explain why proactive solicitation and recruitment of employees, discussed above, which typically benefit employers by connecting them with high-value candidates, also give *employees* increased access to higher-paying job opportunities. Further, I show that restrictions on labor competition decrease employee mobility and thereby deprive employees of those opportunities.

---

[240] Ex. PX98 at DOJCIV-012-00000123.

[241] Mosley Dep. at 90:23–91:7, 92:7–93:18.

[242] Ex. PX280 at DOJCIV-008-00000288.

[243] Ex. PX88 at DOJCIV-008-00000358; Garvin Dep. at 82:13–85:18.

65. I also review common evidence that, based on my experience and research in compensation and human resource management, is consistent with employers who are not competing for labor but instead consistent with Defendant employers' top executives agreeing to implement restrictions on labor competition by (1) agreeing not to actively recruit each other's employees, and (2) requiring candidates to inform their bosses they wanted to pursue external opportunities *before* these candidates had other job offers in hand, which created a chilling effect. This evidence comports with other evidence that executives had the opportunities to collude because of the tight-knit nature of the industry and their longstanding relationships with one another. Finally, I explain that these restrictions would likely have reduced employees' mobility and suppressed their compensation.

66. In this section, the evidence I review includes compensation-related literature, statements from the FBI investigation interview reports, deposition testimony and exhibits, documents produced in this litigation, testimony from the DaVita criminal trial, and federal regulations.

67. At Defendant firms, the logical course of action when a senior-level vacancy occurs would be to: (a) cold call or otherwise proactively recruit qualified Senior-Level Employees at competitor firms; and/or (b) readily entertain proactive applications from such employees. One would consequently expect to see substantial employee mobility between Defendant firms, as well as wage increases across the board. Instead, the No-Poach Agreements effectively suppressed employees' bargaining power and mobility because they cut off key avenues by which employees could obtain better information on alternative employment opportunities, including those with higher wages. That prevented employees from moving to

higher-paying outside opportunities or having the leverage of an outside offer instrumental in negotiating higher pay/better position at their current employer.[244]

68. ███████████████████████████████████████████

███████████████████████████████████████████████████

██[245] ████████████████████████████████████

### 1. Employees Typically Have Limited Access to Labor Market Information.

69. The labor market has long been characterized by imperfect information; searching for better information about the labor market carries with it an associated cost. Such frictions translate into imperfect matches between workers and employers and opportunities for better matches arising in a less than systematic and planned manner.

a. Typically, "[i]n a competitive labor market, a worker is paid their marginal product, possibly adjusted for job amenities. . . . Job search and recruiting, however, are not the frictionless processes that are required for perfect competition. It takes time, resources, and luck for the worker to locate a vacant job and thus for the firm to locate a qualified worker."[246] Further, "[t]urnover plays a major role because workers are seen as acquiring much of their information about match quality only after having actually been in a job for some time (i.e., match is an 'experience good'). The limited amount of information available to firms and workers at the point of hire limits the quality of matches at that point."[247]

---

[244] Barry Gerhart & Sara Rynes, *Determinants and Consequences of Salary Negotiations by Graduating Male and Female MBAs*, 76 J. APPLIED PSYCH. 256–262 (1991).

[245] Fanning Dep. at 79:7–17.

[246] Giuseppe Moscarini & Fabien Postel-Vinay, *The Cyclical Job Ladder*, 10 ANN. REV. ECON. 165–188 (Aug. 2018).

[247] Barry Gerhart & Jie Feng, *The Resource-Based View of the Firm, Human Resources, and Human Capital: Progress and Prospects*, 47 J. MGMT. 1796–1819 (Jan. 4, 2021).

b.    However, the pronounced information asymmetry between employees and employers represents a notable feature of compensation systems in U.S. companies.  In general, employees are less informed about compensation than their employers.  Most U.S. companies share little information with employees regarding how their compensation systems are designed and still less information regarding what other employees are paid.

c.    Further, U.S. companies typically enforce policies that discourage employees from sharing such information if they do possess it.  As Gerhart, compensation expert Ingrid Fulmer, and human resources and industrial relations expert Ji Hyun Kim explain[248]:

> A lack of pay transparency is referred to as pay secrecy.  Historically, in the U.S. private sector, for nonunion employees, there has been little perceived pay transparency in terms of ability to discuss pay with coworkers or ability to access company provided information on pay, with pay secrecy perceptions continuing to be reported in recent years (e.g., 2017–18[)][.]

Avoiding pay transparency can reduce job mobility[249]:

> [A]n organization with known pay inequities may decide to avoid pay transparency. An organization may also avoid transparency to limit worker mobility by limiting their information on pay, making comparisons difficult.  Of course, mobility is a key to workers moving to their most productive job/organization match . . . so while the private return to an organization of pay secrecy may be positive, the effect on individual workers and on society may be negative[.]

d.    Gerhart and human resources management and compensation experts George Milkovich and Jerry Newman summarize data from a WorldatWork survey of compensation professionals.  Only 41% of compensation professionals agreed that employees "know the pay ranges for their [own] pay grade or position" and only 21% agreed that

---

[248] Ingrid Smithy Fulmer, Barry Gerhart & Ji Hyun Kim, *Compensation and Performance:  A Review and Recommendations for the Future*, 76 PERS. PSYCH. 701 (Feb. 27, 2023) (internal citation omitted).

[249] *Id.* (internal citations omitted).

"employees know what the pay ranges are for the grade or the positions immediately above their own."[250]

        e.     In a second WorldatWork survey of compensation professionals, only 15% reported that "information is shared with employees" about "[b]ase salary ranges for all pay grades or jobs," and merely 2% reported that "information is shared with employees" about "[a]ctual pay levels for all employees."

        f.     The results of a third survey, conducted by the Institute for Women's Policy research and which surveyed employees (rather than compensation professionals), found that 66% of private sector respondents report that "discussion of wages and salaries at work" is either "formally prohibited" or "discouraged by managers."[251]

        g.     Indeed, the important role that asymmetric information plays in suppressing pay was a major impetus for recent Executive Order 13665, "Non-retaliation for Disclosure of Compensation Information," which was driven by the belief that more transparency will reduce pay discrimination by shining a light on pay inequities.[252] This Order prohibits federal contractors and subcontractors from "discharging or discriminating in any other way against employees or applicants who inquire about, discuss, or disclose their compensation

---

[250] JERRY NEWMAN, BARRY GERHART, & GEORGE MILKOVICH, COMPENSATION 686, Ex. 18.10 (12th ed. 2016).

[251] *Id.,* Ex. 18.11, p. 687. Note also that not much has changed as of 2023, when WorldatWork reported that according to its 2022 study, "2 in 5 employers don't communicate salary ranges to employees when they aren't required, and 4 out of 5 organizations say a majority of their workers don't understand their compensation philosophy." Tom McMullen & Serra Aladag, *Pay Transparency: A Closer Look at the risks, rewards and Regulations*, WORLDATWORK, INC. (Oct. 19, 2023), https://worldatwork.org/publications/workspan-daily/pay-transparency-a-closer-look-at-the-risks-rewards-and-regulations; *see also* WORLDATWORK, INC., COMPENSATION STRUCTURE POLICIES & PRACTICES (2023), https://worldatwork.org/research/salary-structure-policies-and-practices.

[252] Ingrid Smithy Fulmer, Barry Gerhart, & Ji Hyun Kim, *Compensation and Performance: A Review and Recommendations for the Future*, 76 PERS. PSYCH. 701 (Feb. 27, 2023).

or the compensation of another employee applicant."[253]  The key rationale is that "[s]trictures against revealing compensation can conceal compensation disparities among employees.  This makes it impossible for an employee to know he or she is being underpaid compared to his or her peers."[254]

### 2.     Unsurprisingly, Defendants Limited Pay Transparency.

70.     Although some employees inevitably learn some information about certain other employees' salaries, whether in the form of salary ranges or actual salaries, the results of the surveys summarized earlier show that these employees only acquire this information in spite of their employers.  Employers typically work to ensure both internal and external pay information is *unavailable* to their employees precisely so that they cannot use that data to negotiate pay increases or create bidding wars between competitors, consistent with evidence in this litigation that is common to the Class:

a.     *DaVita.*  In general, DaVita did not want employees having access to pay points. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████ [255]



---

[253] Gov't Contractors, Prohibitions Against Pay Secrecy Policies and Actions, 79 Fed. Reg. 55712-02, 55713 (proposed Sept. 17, 2014) (to be codified at 41 C.F.R. pt 60).
[254] *Id.* at 55714.
[255] DVA_OMCEAL_001188391; *see also, e.g.,* Ex. PX73 at DVA_OMCEAL_001332708 ██████████████ *see also* Thurman Dep. at 28:13–29:11 ████████████████████.

b. *SCA.*

256

c. *USPI.* USPI shared the same goal of avoiding a bidding war for talent.

257.

258

### 3. Absent Defendants' Collusion, Employees Could Acquire Labor Market Information Through Cold Calls and Proactive Recruitment.

71. Due to the foregoing limitations in labor market information available to

employees and the high costs of searching, cold calling and proactive recruiting represent critical

---



[256] Ex. PX484 at DVA_OMCEAL_000429388–89

[257] Ex. PX219 at DOJCIV-012-00000066–67; *see also* Tanner Dep. at 30:9–12 (Tanner confirmed the truthfulness of his statement to FBI).

[258] *Id.* at DOJCIV-012-00000066; *see also* Tanner Dep. at 45:2–21 (because USPI instructed Tanner not to solicit from SCA, he never intentionally tried to go after those candidates); Tanner Dep. at 30:9–12 (confirming accuracy of FBI investigation interview report).

ways workers can supplement their knowledge about the value of their services in a labor market where firms do not have anticompetitive agreements.

72.     <u>Information from Proactive Recruiting Is Valuable.</u>  Proactive recruiting mechanisms like cold calls are particularly valuable sources of information for two major reasons:  the timeliness of the information, and the specificity and relevance of the information to that particular employee.

a.     *Timeliness.*  Proactive recruiting provides an employee information about a job offer and its potential compensation at the exact moment when the information is most actionable—an employer has an opening, and the employee knows they are qualified for the position.  Thus, a cold call informs the recipient as well as any other workers who hears about an existing alternative to their current position.

i.     Proactive recruiting is also timely in that it provides information about the employer's demand for employees at that very moment.  The knowledge that an employer has an active shortage of a certain type of employee increases the candidate's bargaining power vis à vis the potential employer as well as the current employer, because the candidate can use that information and subsequent job offers to negotiate higher compensation.

b.     *Specificity.*  Cold calls are also valuable because they provide information specific to the solicited employee.  In contrast, public information *at best* provides a view of the average market value for an employee with a particular skill set and credentials.  There are many high-performing or otherwise in-demand employees whose service value to their organization is substantially higher than the average for their cohort.[259]  Inside an organization, these employees

---

[259] Michael C. Sturman, Charlie O. Trevor, John W. Boudreau, Barry Gerhart, *Is it Worth it to Win the Talent War? Evaluating the Utility of Performance-Based Pay*, 56 PERS. PSYCH. 997, 1017 n.4 (2003) (providing empirical support for the assumption that the service value of

are generally paid according to a systematized compensation structure (such as those discussed below). However, proactive recruiting offers a unique opportunity for employees who are in particular demand to gain insight into the value they generate for a firm, and thus to capture a greater proportion of that value in their salary negotiations.



i.

[261]

c.    *Public Information Is Inferior.*  By contrast, the information which employees can discover through public sources or through union surveys is not equivalent to that provided by proactive recruiting and ultimately, job offers.  Publicly available information— such as information on job-posting websites, salary websites, or union surveys—is less useful because it has an inherent time lag.  By the time the employee sees the information, the opening may no longer be available.

---

employees whose performance is one standard deviation above average, between 74%-100% more than that of the average employee) (citation omitted).

[260] *See, e.g.,* Kogod Dep. at 53:13–54:10 (

Note that this benefit also accrues to those who are not proactively recruited, who now have the opportunity to learn more about the labor market from those who did.

[261] Thurman Dep. at 155:8–156:16; *see also* Ex. PX124 (same).

d. *Proactive Recruiting Increases Bargaining Power.* Proactive recruiting further increases employees' bargaining power because, in the absence of a no-poach agreement, competing employers would more frequently engage in proactive recruiting hiring of competitors' employees.

e. *Proactive Recruiting Benefits Employees Who Stay.* Due to ongoing concerns about turnover and increased churn among firms' most valuable employees, employers may take proactive measures to increase compensation of incumbent employees. Employee turnover scholars Gerhart, Lee, Weller, and Trevor explain[262]:

> [E]ach organization must decide if it can or should work to preempt raids by other employers (e.g., by proactively adjusting salaries, managing careers/promotion opportunities, etc.). The fact that unsolicited job offer shocks are hard to see in advance perhaps magnifies the importance of such strategies and also raises the question of whether organizations would be well served to develop additional systems that more systematically and proactively seek out information about alternative offers.

i. Thus, the decision to stay at a current employer without an increase in salary would nonetheless benefit the employee who entertained competitor job offers because that employee gained information about alternative job opportunities.

ii. For example, former SCA Chief Talent Officer Fanning testified that solicitation is "valuable to a potential candidate even if they don't take the job," because[263]:

> [I]t tells you if you're known in the market; what reputation you've got in the market; if you're employable; the hey, if you lost your job you could get another one or if you resigned you could get another one. It tells you about your own skill set and your confidence—and if it goes all the way through to compensation or you even get into those conversations, because they don't happen usually until later, although sometimes there might be a ballpark at the beginning . . . you get to

---

[262] Tae Hon Lee, Barry Gerhart, Ingo Weller & Charlie O. Trevor, *Understanding Voluntary Turnover: Path-Specific Job Satisfaction Effects and The Importance of Unsolicited Job Offers*, 51 ACAD. MGMT. J. 651, 667 (Aug. 2008).

[263] Fanning Dep. at 50:7–51:2.

understand a bit more about your job worth [i.e., what your potential compensation could be].

     iii. The likelihood of engaging in salary negotiations with current employers, as well the likelihood of their success, largely depend on employees' ability and motivation to negotiate. Ability is whether a worker has one or more alternative job offers.[264] With zero alternative employers, the employee has no actual leverage. Motivation denotes the degree to which the salary of the alternative job is higher than the employee's current salary. Negotiation is more likely to occur and succeed when both factors are maximized: the employee has the ability because an alternative offer is in hand, and the motivation, because the offer has a higher salary. For example, former SCA Chief Talent Officer Fanning testified that solicited employees can use offers "to negotiate or at least tell their current employer how valuable they are, but I'm staying because I'm really loyal to you."[265] But "if [executives] cannot be solicited by certain companies," those employees "would miss out on the opportunities for that particular firm that wouldn't be proactively recruiting for them."[266]

### 4. Because of Defendants' No-Poach Agreements, Employees Often Never Learned About Higher-Paying Job Opportunities.

73. Here, I have reviewed extensive common evidence to conclude, based on my experience and research in compensation and human resource management, that because of Defendants' No-Poach Agreements, many candidates at Defendant firms never learned about outside opportunities with higher salaries because they never received the necessary phone calls, and their job mobility suffered.

---

[264] Barry Gerhart & Sara Rynes, *Determinants and consequences of salary negotiations by male and female MBA graduates*, 76 J. APPLIED PSYCH. 256 (1991).

[265] Fanning Dep. at 51:15–52:2.

[266] *Id.* at 52:3–17.

74.     <u>DaVita.</u> DaVita stopped actively soliciting SCA employees:

a.     At the DaVita criminal trial, former DaVita COO Kogod testified that as part of the SCA-DaVita No-Poach Agreement, which DaVita executives "discussed openly," "there would be no outreach, no recruiting by either company[.]"[267]



b.     DaVita recruiting documents reflect this agreement. For example, ████ ███████████████████████████████████ ███████████████████████████████ ████████ [271]

---

[267] Ex. PX157 at 67:8–69:23.

[268] DOJCIV-008-00000304 at DOJCIV-008-00000316.

[269] DOJCIV-008-00000090 at DOJCIV-008-00000091.

[270] DOJCIV-008-00000304 at DOJCIV-008-00000307.

[271] Ex. PX275 at DVA00097065.

c.  The fact that DaVita and SCA stopped recruiting from each other is reflected in reports from employees that recruiters stopped recruiting them after they joined DaVita. ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████████ [272]

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████

d.  ███████████████████████████████████████

█████████████████████████████████████ [273] █████████████████

███████████████████████████████████████████████████████████

████████████████ [274] █████████████████████████████████████

████████████████████████████████████████ [275] ███████████

███████████████████████████████████████████████████████████

██████████ [276] ███████████████████████████████████████████

███████████████████████████ [277]

---

[272] DOJCIV-007-00000105 at DOJCIV-007-00000105–06.

[273] Thurman Dep. at 21:1–6; *see also* Ex. PX124 at DOJCIV-012-00000133 (same).

[274] Thurman Dep. at 30:24–9; *see also id.* at 74:15–75:3 ███████████████████████ ████████████████████████████████████████████ Ex. PX124 at DOJCIV-012-00000133 ████ ██████████████████████████████ Thurman Dep. at 30:20–31:9

[275] Thurman Dep. at 30:24–31:9, 74:15–75:3.

[276] Ex. PX124 at DOJCIV-012-00000133; Thurman Dep. at 253:5–254:3 ████████████████ ███████████

[277] Ex. PX126.

e.

75.  <u>SCA.</u>  The evidence I have reviewed shows that SCA stopped cold calling DaVita and USPI employees:

---

278 Thurman Dep. at 36:12–37:2.

279 Fanning Dep. at 52:18–24.

280 DOJCIV-008-00000032 at DOJCIV-008-00000032; Fanning Dep. at 80:12–81:24

(██████████████████████████).

281 Ex. PX484 at DVA_OMCEAL_000429389.

c. █████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

██████████████████[282]███████████████████

██████████████████[283]███████████████████

████████████████████████[284]

d. ████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████[285]

█████████████████████████████[286]███████████

███████████████████████████████████

█████████████████████████████████

███████[287]

e.     Rucker enforced the SCA-DaVita No-Poach Agreement. ████████████

████████████████████████████████████

---

[282] Ex. PX305 at DOJCIV-008-00000176; Rucker Dep. at 385:19–388:14 ████████████
████████████ ).

[283] Ex. PX281 at DOJCIV-00000041; Mosley Dep. at 34:23–35:1 (████████████
██████████████████ ); *see also* Ex. PX314 at
DOJCIV-008-00000233 ███████████████████████
████████████ ).

[284] Ex. PX314 at DOJCIV-008-00000233.

[285] Ex. PX160 at SCA000002866.

[286] *Id.*

[287] Ex. PX305 at DOJCIV-008-00000178; Rucker Dep. at 102:7–22, 385:19–388:14 (████
█████████████████████████████████ ).

██████████████████████████████ [288] ████████████████████████████████

████████████████████████████████████████████████████████████████████

███████ "[289] As a result, SCA and DaVita employees' job mobility suffered: Rucker testified

at trial that his "understanding of the [No-Poach Agreement] was to limit the number of

employees or teammates that moved from DaVita to SCA or from SCA to DaVita."[290]

      76.    USPI. I have reviewed similar evidence of this behavior at USPI, which is

consistent with a determination that USPI colluded with SCA to suppress labor competition:

      a.    ███████████████████████████████

████████████████████████████████████████████████████████████ [291]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ [292]

      b.    ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ [293] ████████████████████████████████

---

[288] Ex. PX333.

[289] Ex. PX335 at DOJ-PROD001A-00000239.

[290] Ex. PX158 at 408:5–16; *see also* Rucker Dep. at 82:16–83:16 (█████████████
████████████████████████████████ ).

[291] Ex. PX508 at DOJCIV-008-00000218; Wilcox Dep. at 136:19–137:22.

[292] Ex. PX508 at DOJCIV-008-00000219; Wilcox Dep. at 138:20–139:1; *see also* Ex. PX98 at
DOJCIV-012-00000124 █████████████████████████████████
████████████████████ .

[293] McGarry Dep. at 65:24–67:20; Ex. PX99.



████████████████████████ [294]

    c.    ██████████████████████████

████████████████████ [295]

### 5. Defendants' Tell-Your-Boss Provision Further Limited Employee Bargaining Power and Mobility.

77. <u>Defendants Implemented a "Tell-Your-Boss" Provision.</u> ██████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████ [296] ████████████████

78. <u>DaVita.</u>

    a.    DaVita's former COO Kogod testified at the DaVita criminal trial about the tell-your-boss requirement: "[I]f a DaVita executive wanted to interview with one of these [co-conspirator] companies, they had to disclose to their boss that they were looking to leave the village and interview outside of the village. And that became one of the requirements before the other company could interview them."[297]

    b.    ██████████████████████████

████████████████████████████████████

---

[294] McGarry Dep. at 74:17–75:5.

[295] Ex. PX216 at USPI_CIV_000010056.

[296] Fanning Dep. at 71:19–24.

[297] Ex. PX157 at 73:7–13.

██████████████████████████████████████████████████████████████ [298] This
included SCA CEO Hayek.

       c.    ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████ [299] ████████████████████████ [300]

    79.    SCA.

       a.    ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ [301]

       b.    ████████████████████████████████████████

████████████████████████████ [302] ████████████████████████████

████████ [303]



---

[298] Staffieri Dep. at 35:2–22.

[299] Rodriguez Dep. at 144:1–11.

[300] *Id.* at 144:12–18.

[301] Fanning Dep. at 71:19–72:10; *see also* Ex. PX171 (██████████████████████████████████ ████████████████████████████████████████████████████ Ex. PX172 (████████████████ ████████).

[302] *See, e.g.,* Ex. PX167; Ex. PX170 (█████████████████████████████████████████████████ ████████████████████████████); *see also* Rucker Dep. at 181:10–182:11 (████████████████ ████).

[303] Rucker Dep. at 162:18–23.

80.   USPI.

a.

[304]

b.   Wilcox's subordinates enforced this restriction.

[305]

81.   <u>The Tell-Your Boss Provision Had a Chilling Effect on Class Members.</u>  The tell-your-boss provision can expose employees to potential risks, such as the possibility that their current employer will react badly (e.g., by firing the employee on the spot or limiting the employee's opportunities for growth going forward).  So ordinarily, before candidates are ready to have that conversation with their bosses, confidentiality is crucial.  This expectation is by no means unusual—

[306]  Herein, I discuss extensive evidence that is common to the Class that demonstrates the tell-your-boss provision likely harmed Defendants firms' employees, and that Class Members were likely paid below market or paid less than they otherwise would have been absent such a provision.

---

[304] Ex. PX508 at DOJCIV-008-00000218; Wilcox Dep. at 136:19–137:22.
[305] Ex. PX216 at USPI_CIV_000010056; *see also* Ex. PX221 
.
[306] Ex. PX316 at DVA0019821.

a. Such a requirement will therefore have a chilling effect and will stop the hiring process in its tracks, because many employees will not want to risk negative reactions from their current employers if they do not have a safe place to land.

b. In turn, such a provision reduces job mobility and exacerbates information asymmetries, because the employees never get far enough in the process to receive job offers. Former SCA COO Rucker, for example, testified that he did not "tell anyone at DaVita about [his] discussions with SCA or Mr. Hayek before [he] had an offer from SCA for employment," because he "thought that having a written offer from SCA represented a certain security and certainty[.]"[307]

c. *DaVita.* I have reviewed substantial evidence that the tell-your-boss requirement had a chilling effect and harmed DaVita employees, by dissuading them from pursuing and accepting better jobs or using their offers as leverage. This evidence is consistent with (successful) collusion and is common to the Class.

i. **DaVita Employees Would Not Want to Tell Their Bosses That They Were Exploring Job Opportunities.** For example, former DaVita COO Kogod testified that people would not want to tell their boss[308]:

> There are a lot of people that just don't want to have that conversation. It's a tough one to have. . . . [F]or the most part, once you make the decision to leave, sitting down with your boss and telling that person you're going to leave makes you somewhat vulnerable. So I think it had a chilling effect with a lot of people.

---

[307] Ex. PX158 at 392:16–23; *see also* Rucker Dep. at 57:21–58:14 ███████ ███████ ).

[308] Ex. PX157 at 73:13–19; DOJCIV-008-00000090 at DOJCIV-008-00000093 (███████ ███████ ███████ ); Kogod Dep. at 45:5–46:14.

███████████████████████████████████████ [309] Even Kogod, who admittedly benefitted from the agreement, thought the "restrictions on notification of one's boss was too much to ask for."[310]

　　　　ii.　　Former DaVita CEO Thiry knew that the tell-your-boss requirement would have this chilling effect. ██████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ [311] ████████

██████████████████████████████████████████████████

████████████ [312].

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

　　　　iii.　　████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ [313]

　　　　iv.　　The chilling effect of the tell-your-boss requirement extended to executives. ████████████████████████████████████

---

[309] DOJCIV-008-00000304 at DOJCIV-008-00000307.

[310] PX157 at 139:25–140:11.

[311] Ex. PX330 at DVA_OMCEAL_000214999.

[312] Ex. PX316 at DVA00019822 (emphasis added).

[313] DOJCIV-007-00000105 at DOJCIV-007-00000107.

████████████████████████████████████████

███████████████████████████████████████ [314]

v.  ██████████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████ [315]

###### vi. The Tell-Your-Boss Requirement Was Meant to Have a Chilling Effect on Job Exploration. ████████████████████████

███████████████████████████████████████

████████████████████ [316].



###### vii. Employees Who Told Their Boss Faced Potential Retribution.

Kogod further testified that DaVita employees were justified in fearing the repercussions if they complied with this provision[317]:

> [W]hat you're saying is, I'm unhappy; I'm leaving; I've made a decision. So when you think about future consideration for salary increases, your annual bonus, your performance rating, any stock equity—which was a big piece of DaVita's compensation package—that's what people would remember. This person was looking to leave; they're unhappy here; they're going to leave anyway, so we shouldn't give them this next big job; we shouldn't give them the right amount of

---

[314] Thurman Dep. at 139:22–140:7.

[315] Ex. PX124 at DOJCIV-012-00000132; Thurman Dep. at 137:16–138:15.

[316] DOJCIV-008-00000090 at DOJCIV-008-00000093 ██████████████ ████████████████████████ (emphasis added).

[317] Ex. PX157 at 89:16–90:7 (emphasis added).

options.  So *there was an absolute downside of making that known.  That's why most people do confidential searches; they don't want their boss to know*.



viii.

ix.      For example, Kogod told the FBI what he witnessed when "longtime DaVita teammate" Jung Lee "expressed an interest in pursuing other opportunities, including outside of the village" [323]:

> *[W]ithin a couple of days there were memos written about him from his two superiors, alleging a variety of kind of behavior leadership issues that were new to me, and I'm sure to others who knew Jung.*  So it was a good example of, I followed the rules, and the response was, people are now writing emails and talking about alleged investigation for excessive alcohol use at company functions.  So I think it's a good example of what it can look like if it backfires on you.

---

[318] DOJCIV-008-00000090 at DOJCIV-008-00000093.

[319] *Id.*

[320] Kogod Dep. at 63:3–22.

[321] DOJCIV-008-00000304 at DOJCIV-008-00000313.

[322] *Id.* at DOJCIV-008-00000315.

[323] Ex. PX157 at 90:8–21 (emphasis added); Kogod Dep. 160:2–14.



[324] However, DaVita foreclosed the range of alternative job opportunities that should have been available to him.

[325] but perhaps also in terms of better later-career opportunities job, which he lost out on.

[326]

x.      Not all, or even most, employees would be so fortunate; nor should employees need such good fortune to advance their careers (and be able to do so only at their current company). This situation comports with Kogod's testimony at trial that the overall effect of telling your boss is negative[327]:

> [I]n some small number of cases, [the tell-your-boss requirement] elevated [the employee], and the employee walked away with a better position, at least for that time. But *more times than not, it shut down conversations, it had a chilling effect,* and it took this opportunity off the table for DaVita employees who didn't want to have it.



[328]

---

[324] Kogod Dep. at 202:14-18; *see also id.* at 160:21–161:1.

[325] *See, e.g.,* Ex. PX124 at DOJCIV-012-00000133 (                                                                                                 ); Thurman Dep. at 24:3–18 (same).

[326] Kogod Dep. at 160:21–161:1                                                           ).

[327] Ex. PX157 at 109:5–14 (emphasis added).

[328] DOJCIV-008-00000304 at DOJCIV-008-00000307.



[329]

[330] "far more times than not."[331]

xi. █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ [332] ████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ [333]

xii. Internal documents and former DaVita VP Hayek's testimony

show that Hayek himself experienced the repercussions of the "tell-your-boss" provision when

---

[329] *Id.* at DOJCIV-008-00000313.

[330] *Id.*; *see also* DOJCIV-008-00000090 at DOJCIV-008-00000093 ███████████

███████████████████████████████████

███████████████████████████████████ ); Kogod Dep. at 48:9–49:13.

[331] Ex. PX157 at 140:12–25; Kogod Dep. at 48:9–49:13.

[332] Ex. PX124 at DOJCIV-012-00000132; Thurman Dep. at 137:20–138:18 (█████████

███████████ ); *see also* DOJCIV-008-00000304 at DOJCIV-008-00000313 █████████

███████████████████████████████████

█████; Priest Dep. at 63:19–64:2 ██████████

███████████ ).

[333] Thurman Dep. at 139:8–21.

he decided to leave DaVita. ███████████████████████████

███████████████████████ 334.



      d.     *SCA.* I have reviewed similar evidence of the chilling effect of the tell-your-boss requirement at SCA.

      i.     ███████████████████



      ii.     ███████████████████

---

[334] Ex. PX316 at DVA00019821 (emphasis added); *see also* Hayek Dep. at 120:2–126:9, 134:2–135:23.

[335] Fanning Dep. at 67:3–69:8.

[336] *Id.* at 69:9–70:5 (emphasis added); *see also id.* at 154:14–155:1 ████

██████████████████████████████████████



337

iii. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

338.

i.     Further, Fanning testified that even absent such a requirement, the hiring process can create risks for the candidate in their current position: if a job candidate receives an offer and uses it to negotiate with their current employer, "that can . . . backfire spectacularly, so you do have to be careful about that."[339] This process therefore becomes even riskier when employees are required to inform their bosses they are seeking employment elsewhere. ▮▮▮▮▮▮▮▮▮▮▮▮▮ 340.

---

[337] *Id.* at 70:6–15; *see also* Ex. PX158 at 385:2–13 (Fanning testified at the DaVita criminal trial that the tell-your-boss provision "means even if I really want to be considered for a job, I can't consider you unless you go and tell your boss. And people don't want to go and tell their boss, I am leaving, and I want to be considered by the other company, because you don't know how your boss is going to react. In a lot of cases, they're going to say, Okay. Bye. And then you're unemployed for six or twelve months until you find another job.").

[338] Cinnick Dep. at 29:4–30:9 (emphasis added).

[339] Fanning Dep. at 51:15–52:2.

[340] *Id.* at 109:18–110:6 (emphasis added).



        e.     *USPI.* I have also reviewed evidence of the tell-your-boss provision's consequences at USPI.

---

[341] *Id.* at 72:4–20; *see also* Ex. PX158 at 385:2–16.

[342] Rucker Dep. at 157:16–158:21.

[343] Ex. PX508 at DOJCIV-008-00000220; Wilcox Dep. at 141:18–142:8.

[344] USPI_CIV_000000457.

[345] Ex. PX281 at DOJCIV-008-00000044 (emphasis added).

████████████████████████████

**C.      Defendants' CSI Exchanges Likely Restricted Labor Market Competition.**

82.      In this section, I review common evidence that, based on my experience and research in compensation and human resource management, Defendants' Competitively Sensitive Information Exchanges would likely lead to Class-wide wage suppression.  Plaintiffs have developed an extensive record of evidence common to the Class to demonstrate that these CSI Exchanges, which Defendants engaged in under the guise of lawful benchmarking, are inconsistent with unilateral conduct and would have harmed employee pay.  This evidence includes statements from the FBI investigation interview reports, deposition testimony and exhibits, and documents produced in this litigation, as follows:

      a.      *Wage Data Exchanges Generally.* ████████████████████

████████████ 346 ████████████████████

---

346 In addition to the wage data exchanges discussed at length in this section, note that the SCA-USPI CSI Exchanges were not limited to compensation information. ████████████
████████████████████
████████████████ Mathis Dep. at 42:20–43:2.
████████ *Id.* at 43:7–21. ████████
████████ (USPI_CIV_000113340; USPI_CIV_000114132);
(USPI_CIV_000021103); ████████ (USPI_CIV_000021181);
████████ (USPI_CIV_000122223; USPI_CIV_000021210);
████████ (USPI_CIV_000021190); ████████
(USPI_CIV_000321269); ████ (USPI_CIV_000001857; USPI_CIV_000002122);
████████ (USPI_CIV_000014178);
████████ (USPI_CIV_000105047);
(USPI_CIV_000016552); ████ (USPI_CIV_000014031;
USPI_CIV_000014062); ████████
(USPI_CIV_000016582); ████████
(USPI_CIV_000015993; USPI_CIV_000015994; SCA000165836; SCA000957620); ████
████████ (USPI_CIV_000472872); ASC facility quality initiatives
(USPI_CIV_000321278); ████████ (USPI_CIV_000006921); ████
████ (USPI_CIV_000016007; USPI_CIV_000016572; USPI_CIV_000016019;

-91-



.[349] In other words, based on my experience and research in compensation and human resource management, these exchanges would have facilitated USPI's and SCA's ability to agree to set their pay rates lower than they otherwise would have.

i.

ii.

[351] As above, based on my experience and research, such exchanges would reduce threats of turnover by lowering the labor market pay rate.

iii.

---

USPI_CIV_000016564; USPI_CIV_000016029; Ex. PX58; USPI_CIV_000016041);
(USPI_CIV_000014031);
(USPI_CIV_000016013; USPI_CIV_000114069); (id.);
(USPI_CIV_000021128; USPI_CIV_000021077);
(SCA001314584);
(USPI_CIV_000000464; USPI_CIV_000000462);
(USPI_CIV_000010321; USPI_CIV_000010971);
(USPI_CIV_000131250; USPI_CIV_000131719);
(SCA001436215); (SCA000681919; SCA000680384);
(USPI_CIV_000010321).

[347] Brodnax Dep. at 42:3–18.
[348] DOJCIV-008-00000345 at DOJCIV-008-00000346.
[349] Id.
[350] Hayek Dep. at 362:18–363:7.
[351] Mathis Dep. at 53:14–56:20.



b.    *2012.*

---

[352] *Id.* at 68:20–71:14.
[353] Ex. PX523 at OMC_BM_000010778.
[354] *Id.* (emphasis added).
[355] Ex. PX234.
[356] *Id.* (emphasis added).



   c. *2013.* In August 2013, Mathis emailed USPI's then-CFO Cagle with the following request: "One of the things we have shared in the past is plans for the following year wage increases. Have you all started [to] set a number yet that you're planning to budget?"[360] Cagle responded, "Not yet, but probably will nail down the second half of August. We'll remember to share with you when we do."[361]

   d. *2014.*



---

[357] Rucker Dep. at 255:10–257:3.
[358] *Id.* at 254:24–255:9.
[359] *Id.* at 260:11–20.
[360] Ex. PX37.
[361] *Id.*
[362] Ex. PX140.
[363] *Id.* (emphasis added).
[364] *Id.*

i. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇ 365.





367 Based on my experience and research in compensation and human resource management, the sharing of this data and subsequent discussion of expenses is consistent with a discussion about expenses that include labor costs.

e. *2015.* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ 368 ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇ 369 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇ 370

---

365 Ex. PX138.

366 Full-time equivalent employees are a unit of measurement used to compare the workload of different employees (i.e., full-time employees vs. part-time employees).

367 *Id.*

368 SCA000862885.

369 *Id.*

370 *Id.*

f. 2018.

███████████████████████████████

███████████████████████████████

████████████ [371]

83. <u>CSI Exchanges Reduce Class Pay.</u> Based on my experience and research in compensation and human resource management, Defendants' CSI Exchanges were likely to lower Class pay for the following reasons:

a. None of the extensive types of data exchanged were published to the public or to the affected employee victims of the suppressed compensation.[372] This suggests that Defendants used the data for nefarious purposes (i.e., to fix wage rates).

b. ████████████████████████

███████████████ [373] Sharing information that links wage data with competitor identities is inconsistent with the behavior of employers who are competing for labor.[374]

c. ████████████████████████

██████ [375] ████████████████████████

---

[371] Ex. PX501 at SCA002277742; Mathis Dep. at 43:19–47:8.
[372] *See* Ex. PX235 ████████████████████
████████████████████████████████
██████████; Ex. PX135 (
████████████████████████; USPI_CIV_000467624
and USPI_CIV_000411546 ████████████████
██████████).
[373] *Id.*
[374] BARRY GERHART, COMPENSATION 268–269 (14th ed. 2023).
[375] *See e.g.,* USPI_CIV_000113333 and USPI_CIV_000113335; Ex. PX497;
USPI_CIV_000962508 and USPI_CIV_000962509 (██████████████
████████████████████████); Ex.
PX138A ████████████████████████
████████).

███████████████████████████████████████████████████████

████████████████████████████████████████████████ [376]

    d.     Based on my review of the evidence, the "overall effect of the information exchange [was] to interfere with competitive prices and artificially hold down wages."[377]

### D. Defendants' No-Poach Agreements and CSI Exchanges Harmed Employee Compensation.

84.     In this section, I review evidence that, based on my experience and research in compensation and human resource management, is consistent with the effects of successful collusion that is common to the Class and inconsistent with the behavior and effects of employers that compete for labor. As expected, Defendant firms benefited from their anticompetitive conduct whereas their employees experienced suppressed job mobility and compensation. The evidence I review includes statements given during FBI interviews, deposition testimony and exhibits, and testimony from the DaVita criminal trial.

85.     DaVita.

    a.     ████████████████████████████████

████████████████████████████████ [378] The No-Poach Agreement was "intended to benefit" DaVita and operated at the expense of "[p]eople wishing to leave DaVita."[379]

    b.     ████████████████████████████████

███████████████████████████████████████████████████████

---

[376] Mathis Dep. at 53:5–63:5, 66:5–76:6; Ex. PX232; Ex. PX37; Kopser Dep. at 32:3–38:2, 105:5–108:9; Cagle Dep. at 119:24–120:23; Ex. PX240 at USPI_CIV_000686081 ███████████

██████████████████████████████████████ ).

[377] BARRY GERHART, COMPENSATION 268–269 (14th ed. 2023).

[378] DOJCIV-008-00000090 at DOJCIV-008-00000098.

[379] Ex. PX157 at 69:24–70:2.



c.

[384] Thurman's assessment is also consistent with CSI Exchanges, because even absent the SCA-DaVita No-Poach Agreement, SCA and DaVita's CSI Exchanges would have kept the labor market rate low and deprived employees of higher-paying opportunities in this way as well.

d.

[385] The lower turnover is to be expected where employees

---

[380] Thurman Dep. at 45:8–46:8.

[381] *Id.*

[382] *Id.* at 78:9–22; *see also* Ex. PX157 at 208:19–21 (Kogod testified that the SCA-DaVita No-Poach Agreement resulted in less opportunities for DaVita employees) and Kogod Dep. at 66:16–67:8 (Kogod confirmed he gave truthful testimony).

[383] *Id.* at 78:20–80:1; *see also* Ex. PX124 at DOJCIV-012-00000134 (

; Thurman Dep. at 154:18–155:7 (
).

[384] Ex. PX124 at DOJCIV-012-00000133.

[385] Thiry Dep. at 109:11–110:19.

could not move and/or had to tell their boss first, and where higher-paying opportunities did not

exist because collusive CSI Exchanges suppressed the labor market rate.

e.


f.

But because of the

No-Poach Agreement, DaVita employees never learned about those opportunities.

86.    SCA.

a.

b.

---

[386] DOJCIV-008-00000090 at DOJCIV-008-00000091.

[387] *Id.* at 33:15–34:18; Ex. PX157 at 221:16–222:3.

[388] Ex. PX331 at DOJCIV-007-00000051; *see also* Rucker Dep. at 155:18–156:10 ).

[389] *Id.* (emphasis added).



Moreover, Rucker's testimony is consistent with an assessment that Defendants' CSI Exchanges further limited employees' options because once Defendants fixed the labor market rate, higher-paying job opportunities simply would not exist.

c.

390

391

87.   USPI.

a.

392

393

---

[390] DOJCIV-008-00000345 at DOJCIV-008-00000349.

[391] *Id.* at DOJCIV-008-00000351.

[392] Ex. PX88 at DOJCIV-008-00000358; Garvin Dep. at 204:6–206:21.

[393] Ex. PX508 at DOJCIV-008-00000213; Wilcox Dep. at 130:8–131:2 ( ).



    b. ███████████████████████████████████

███████████████████████████████████[394]████████

███████████████████████████████████

    c. ███████████████████████████████████

████████████████████████████████

████████████████████████████[395] The

foregoing is likewise consistent with the collusive effects of competitor CSI Exchanges.  As

above, even absent the SCA-USPI No-Poach Agreement, USPI employees could only take

higher-paying external jobs in theory.  The employees would have been able to move companies

in name only, because Defendants' wage-fixing would have suppressed the labor market rate and

higher-paying jobs would not have existed at all.

    d. ████████████████████████████.[396] This

concern is consistent with a determination that USPI's collusive no-poach and wage-fixing

conduct had the intended effect of keeping employee pay rates low.

    e. ███████████████████████████████████

███████████████████████████████

███████████████████████████████████

████████████████████[397] As above, those USPI employees were harmed

because they never learned about opportunities that otherwise would have been available to

them.

---

[394] DOJCIV-008-00000345 at DOJCIV-008-00000349.

[395] Ex. PX88 at DOJCIV-008-00000358; Garvin Dep. at 80:21–81:13, 86:12–18 (███████████
████████████████████).

[396] Ex. PX88 at DOJCIV-008-00000360–61; Garvin Dep. at 93:15–94:9.

[397] Ex. PX555 at DOJCIV-007-0000006.

**E.      Wage Suppression Can Persist for Years.**

88.      In this section, I review compensation-related literature, statements from the FBI investigation interview reports, and deposition testimony and exhibits and explain that the impacts of artificial wage suppression on employee pay can be felt long-term.

89.      Once wages are artificially depressed, they can remain depressed well after the cause of the suppression has ended.  This extended effect occurs because markets adjust over time, but not necessarily quickly.  Moreover, such adjustments will not necessarily remedy the persisting wage trajectory, because losses accumulate over time.

90.      The academic literature widely recognizes this principle.  Gerhart and Milkovich observe that "even a small initial salary disadvantage can take many years to be eliminated."[398] Further, the crowding literature explains that women's occupations have lower wages today because of decades-old restrictions on women in many occupations.  These restrictions created an imbalance between a highly supply of female job candidates and a limited demand for them in most roles other than nurses, teachers, secretaries, and the like.  And the consequences continue to be reflected in lower wages in female-dominant occupations today.[399]

91.      Accordingly, companies, such as Starbucks, Amazon, and Bank of America, recently instructed recruiters not to ask candidates about prior compensation or benefits (i.e.,

---

[398] Barry A. Gerhart & George T. Milkovich, *Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm*, PAY EQUITY: EMPIRICAL INQUIRIES (R. Michael & H. Hartmann, Eds. 1989); Barry Gerhart & Sara Rynes, *Determinants and Consequences of Salary Negotiations by Graduating Male and Female MBAs*, 76 J. APPLIED PSYCH. 256–262 (1991); Armen Alchian, *Information Costs, Pricing, and Resource Unemployment*, 7 ECON. INQUIRY, 109–128 (1969).

[399] BARRY GERHART, COMPENSATION Ch. 17 (14th ed. 2023).  Elaine Sorensen, *The Crowding Hypothesis and Comparable Worth*, 25 J. HUMAN RES. 55–89 (1990); Kimberly Bayard, Judith Hellerstein, David Neumark, & Kenneth Troske, *New evidence on sex segregation and sex differences in wages from matched employee-employer data*, 21 J. LAB. ECON. 887–922 (Oct. 2003).

their "salary history").[400] The logic is that if, as a general matter, women are paid less than men, the salary difference will amplify if subsequent employers rely on salary history to craft job offers. Likewise, approximately twenty states prohibit salary history questions for this reason.[401]

92. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ [402]

## VII. DEFENDANTS IMPLEMENTED STRUCTURED COMPENSATION SYSTEMS THAT MAINTAINED INTERNAL AND EXTERNAL EQUITY.

93. In this section, I describe the process for designing a systematized compensation structure. I assess the evidence demonstrating that Defendants employed compensation professionals trained to implement and maintain systematized compensation structures. I also review evidence showing that this included assigning internal value to jobs, creating salary grades and ranges, benchmarking their internal structures to external data, implementing pay policies, and regularly updating the compensation structure, among other practices.

94. Further, I assess the compensation-related literature and evidence to explain that a fundamental objective of Defendants' structured compensation systems is to achieve equity. External equity means paying similar employees similarly to employees in other companies doing similar work and making similar performance contributions. In the absence of external equity, a company is at greater risk of employee turnover. However, if pay is suppressed in these other companies, achieving external equity will require lower labor costs than in a competitive

---

[400] RAYMOND NOE, JOHN HOLLENBECK, BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCES MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE, 513 (13th ed. 2023).

[401] RAYMOND A. NOE, JOHN R. HOLLENBECK, BARRY GERHART, & PATRICK M. WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE (14th ed. 2024).

[402] DOJCIV-008-00000345 at DOJCIV-008-00000347.

market.  Internal equity means paying employees within the same company similarly to other employees within the same company doing similar work and making similar performance contributions.  Internal equity depends on maintaining certain pay differentials based on job title, level, performance, etc.  Any time these differentials stray from the internal equity objective (e.g., two employees doing similar work and making similar performance contributions are paid very differently), the goal is to correct the outliers so as to avoid undesirable and costly employee reactions to perceived pay inequity.  Finally, I review evidence of Defendants' compensation structures to explain why objectives to pay for performance *and* to maintain internal equity are not mutually exclusive, and rather are compatible.

95.     The role of compensation is to attract candidates to work for the compensation, prevent them from leaving for jobs elsewhere (because turnover is costly), and motivate them to perform their jobs well.  The compensation-related literature describes some of the factors at work here—that employees search for and leave if they find jobs that pay better than their current positions.  In addition, pay fairness concerns affect a range of employee behavior, from motivation to perform jobs to decisions to search for new jobs or leave.

96.     What constitutes "fair" is based on the comparisons that employees make with others doing similar work.  They also care about how they are paid as compared to employees doing similar jobs elsewhere,[403] but as they stay in their current organizations, their comparisons additionally shift to include those with whom they work even if the jobs are not identical.[404]

---

[403] *See, e.g.,* Peter Cappelli & Peter D. Sherer, S*atisfaction, Market Wages, and Labor Relations: An Airline Study*, 27 INDUS. REL. 56–73 (Jan. 1988).  In this study, pay satisfaction depended on the gap between current pay and market averages.

[404] *See, e.g.,* Peter Cappelli & Peter D. Sherer, *The Effect of a Two-Tier Wage Plan on Employee Attitudes*, 43 INDUS. & LABOR REL. REV. 225–44 (Jan. 1990).  New hires who entered a firm under a lower, two-tier pay scale eventually shift their referents from outside the firm to the inside.

Moreover, they care about whether their performance is recognized and rewarded, again typically in a relative context: common sense and academic theory and research dictate that we want to be paid better than others if we believe our performance is better than their performance.

97. The reason employers care that their employees feel that pay is fair is that if pay feels unfair (i.e., if they are paid less than referents), it may stifle productivity or harm retention. This well-documented phenomenon is known in organizational psychology as "equity theory." Fairness, or equity, is based on what we contribute to a job relative to what we get out of it; we compare that ratio to what we see in our referents, and when we believe it is unfair, we try to adjust it.[405]

98. As a result, compensation in such organizations, including in Defendant firms, is organized within a carefully designed system. This system is highly structured and seeks to maintain internal equity and to adapt to market pressures.

### A. Defendants Employed Highly-Trained and Qualified Compensation Professionals.

99. In this section, I explain that compensation professionals are trained to design and implement systematized compensation structures that maintain internal and external equity. I also review evidence that Defendant firms' employed compensation professionals with the requisite education and training to maintain Defendants' systematic compensation structures. Finally, I review evidence regarding WorldatWork as a source of continuing education for compensation professionals.

---

[405] The foundational study relevant here is J. Stacy Adams, *Toward an understanding of inequity*, 67 J. ABNORMAL & SOC. PSYCH. 422–36 (1963). *See also* Charlie O. Trevor, Greg Reilly & Barry Gerhart, *Reconsidering pay dispersion's effect on the performance of interdependent work: Reconciling sorting and pay inequality*, 55 ACAD. MGMT. J. 585–610 (Sept. 8, 2012).

100.     The evidence I reviewed includes deposition testimony and exhibits, documents produced in this litigation, statements from FBI investigation interview reports, and compensation-related literature.

101.     The education and professional standards for workers in the compensation management field in the United States are highly standardized.  Compensation management professionals are trained to design and administer compensation systems that maintain internal and external equity.  One source of this set of practices is compensation textbooks, of which there are essentially two:  *Compensation* by Gerhart (2023) and *Strategic Compensation* by Martocchio (2020).  The first editions of these books were published in 1984 and 1998, respectively.  I am the author of *Compensation* and am familiar with *Strategic Compensation.*  Most compensation professionals who began studying compensation management in college likely learned from one of these two books, which provide similar descriptions of how to design and administer compensation systems.  Working adults pursuing an MBA and similar degrees in part-time programs would also be likely to use these books in a compensation class.

102.     <u>Defendants' Compensation Professionals.</u>  I have reviewed extensive evidence that Defendants were no exception to this trend and employed many highly-educated and credentialed compensation professionals.

a.     *DaVita Employed Highly Trained Compensation Employees.*  DaVita's employees responsible for compensation had extensive education and training in the field.  For example, DaVita employed Laura Mildenberger, Robert Chipman, and Colleen Arthur, who were all heavily involved in human resources functions and highly educated in the area of compensation.

i. Laura Mildenberger served as DaVita's Chief People Officer / Senior Vice President, and VP of Operations.



---

[406] DVA_OMCEAL_000277557 at DVA_OMCEAL_000277557.

[407] *Id.* at DVA_OMCEAL_000277558.

[408] Ex. PX192 at DVA_OMCEAL_000277554.

[409] *Id.* at DVA_OMCEAL_000277554–55.

[410] Chipman Dep. at 70:8–22; Ex. PX248 at RC_OMCEAL_0000062–63.

[411] *Id.*



    iii.  Similarly, Colleen Arthur worked at DaVita as a Senior Director of Recruiting Operations, Strategy & Employment Branding, Senior Director of Compensation, and Director of Compensation.[414]



---

[412] Chipman Dep. at 28:6–29:6; Ex. PX248 at RC_OMCEAL_0000063.

[413] Ex. PX248 at RC_OMCEAL_0000064.

[414] Ex. PX70 at 1–2.

[415] Arthur Dep. at 28:20–29:10.

[416] *Id.* at 29:11–20.

[417] *Id.*; *see also* Ex. PX70 at 1–2.



b.       *SCA Employed Highly-Credentialed Workers to Manage Compensation.*

i.       Similarly, the evidence I have reviewed about SCA shows that Chief Talent Officer Bridie Fanning, who was well educated about personnel management and compensation, ran SCA's human resources team.  Fanning performed SCA's "human resources function, and that consisted of everything you would expect from running a human resources function:  leading the team, paying benefits, recruitment, board responsibilities with regards to the compensation committee, Andrew[] [Hayek's] pay, executive compensation, communications."[422]  She had more than sufficient education and training to carry out these responsibilities.  Fanning received her doctorate in corporate education from the University of Pennsylvania Graduate School of Education, where she jointly studied at the Wharton School.[423] Additionally, Fanning has three master's degrees, in strategic personnel management, corporate education, and business management.[424]  She has worked "in the human resources field for over

---

[418] Arthur Dep. at 29:21–30:21.

[419] *Id.* at 18:16–25; Ex. PX70 at 3.

[420] Arthur Dep. at 21:19–25; Ex. PX70 at 3.

[421] Arthur Dep. at 22:7–23:1.

[422] Fanning Dep. at 28:8–22.

[423] *Id.* at 12:17–13:5.

[424] *Id.* at 13:6–9.

30 years," where she has acquired extensive experience in "recruiting and job replacement work[.]"[425]

        c.      *USPI Relied on Highly-Qualified Human Resources Professionals.*  USPI also employed persons to run compensation and recruiting who were well educated in human resources and compensation.



---

[425] *Id.* at 13:10–18.

[426] Karrmann Dep. at 22:11–23:19; 32:19–34:6; 34:24–35:16, 37:1–48:12.

[427] *Id.* at 29:16–23.

[428] *Id.* at 30:2–31:16.

[429] *Id.*

[430] McGarry Dep. at 23:24–27:12.

███████████████████████████████████████████████████

███████ [431]

103.　<u>WorldatWork Is a Valuable Resource for Compensation Professionals.</u>　Once

compensation professionals enter the workforce, WorldatWork becomes a valuable source of

continuing education.　WorldatWork reports that it has 65,000 members and subscribers

worldwide.[432]

　　　　a.　　*Use by Defendants.*　Defendants' human resources professionals, similar

to human resources professionals from other employers, likely used WorldatWork.　The evidence

I reviewed shows that DaVita and SCA relied upon WorldatWork as a resource.　███████

██████████████████████████████████████████████

███████████████████████████ [433] ██████████████████████

████████████████████ [434] ██████████████████████████

████████████████████████████████████████ [435]

　　　　b.　　*Certification.*　WorldatWork offers a certification for compensation

professionals called the Certified Compensation Professional© (CCP©).[436]　The certification's

coursework emphasizes the design and administration of structured compensation systems.　*See*

**Figure 4** for examples of (CCP©) course content.

---

[431] *Id.* at 37:3–7; Ex. PX98 at DOJCIV-012-00000121.

[432] WORLDATWORK, CERTIFICATION (2025), https://worldatwork.org/certifications.

[433] Ex. PX70; Arthur Dep. at 18:16–25, 22:7–24:5.

[434] Ex. PX19 at DVA_OMCEAL_001399751; Ex. PX201 at DVA_OMCEAL_000944847.

[435] BF00098905.

[436] *Learning Options, Designing and Managing Base Pay Systems*, WORLDATWORK, https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual.

**Figure 4**[437]

**WorldatWork® Total Rewards Association**
**Certified Compensation Professional | (CCP©)**

**Sample Course Titles (3 of the 8 required courses): Designing and Managing Base Pay Systems; Market Pricing and Competitive Pay Analysis; Compensation Analytics and Insights**

**One course in more detail: Designing and Managing Base Pay Systems**

## What You Will Learn:

- Important concepts like compensation philosophy, internal vs. external pay equity, relevant labor markets, benchmark jobs and market-pricing.
- Key steps to build a base pay structure – job analysis, documentation, evaluation and job worth hierarchy.
- Base structure design components like range spread, minimum, midpoint, and maximum, midpoint differentials, range overlap plus methods to adjust and maintain pay structures.
- Determination of individual pay rates, including concepts like new- hire rates, pay differentials, step rate pay progression, merit increases, skill-based pay, promotions, equity adjustments and pay compression.
- Merit pay programs, pay for performance and merit matrix development.
- Pay transparency, communications about pay programs and compensation program audits.

c.    *Compensation Surveys.*  WorldatWork regularly surveys its membership to facilitate benchmarking of compensation practices against other companies.  These surveys provide extensive evidence that U.S. companies implement the types of formalized compensation structures described and taught in the aforementioned widely-used compensation textbooks (Gerhart (2023); Martocchio (2020)) and in the WorldatWork CCP© coursework. WorldatWork survey data show that the typical U.S. company uses systematized compensation

---

[437] WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025), https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual.

structure policies and practices.  Specifically, the typical U.S. company relies on job analyses, job evaluations, market surveys and external market data, market pay lines, salary grades/ranges, midpoint progression (i.e., fixed percentage differentials) between pay grades/ranges, grade/rate ranges, and merit pay increase grids.  Below, I describe these features in detail, as distilled from Gerhart (2023), Martocchio (2020), and WorldatWork.  These sources provide consistent descriptions of American companies' compensation systems.

### B.  Defendants Designed Systematized Compensation Structures.

104.    The design of compensation systems is a two-step process:  (1) create an internal structure to assign relative internal value to jobs and sort jobs into clusters or hierarchies (job groups or families) reflecting the organizational hierarchy and advancement pathways; and (2) benchmark the internal structure to external market data.  I will take both steps in turn.

105.    In this section, I also review evidence including compensation-related literature, deposition testimony and exhibits, documents produced in this litigation, and statements from the FBI investigation interview reports.

### 1.  Step 1:  Assign Internal Value to Jobs.

106.    This step requires developing an internal structure.  A major purpose of an internal structure is to assign relative internal value or worth to jobs.  For example, what is the value of a Vice President of Talent Acquisition relative to a Director?  This relative value can be expressed as a percentage differential.  Companies choose such percentage differentials to support various objectives, e.g., internal equity.  Where competitive market forces operate, the pay differentials that support internal equity often become similar over time to the pay differentials that support external equity (i.e., percentage differentials between jobs found in external market pay surveys) as a shared view within and across organizations on the relative value of jobs develops.

107. <u>Job Analysis.</u> To begin developing an internal structure, human resources professionals first undertake job analysis, which is the "systematic process of collecting information that identifies similarities and differences in the work."[438] In part, this process involves classifying groups in families or groups that that reflect the firm's job professional hierarchy and promotional pathways.

a. Industrial psychologist Dr. Robert J. Harvey notes two important features of job analysis. First, job analysis should describe observable characteristics of jobs. Second, at this point, the analysis should not take into account individual people in those jobs. In other words, the goal is to describe the job, not individuals in the job.[439]

108. <u>Job Content.</u> Specifically, job analysis entails collecting information on job content (e.g., tasks, activities, work demands), characteristics of employees who hold these types of jobs (e.g., technical skills, manual dexterity, leadership), internal relationships (e.g., supervisors, peers), and external relationships (e.g., regulators, customers, suppliers).[440] Henderson (2006) describes a series of questionnaire examples firms use to collect this kind of information in their organizations. O*NET Online—a revision of the U.S. Department of Labor Dictionary of Occupational Titles—is an example of these systems. O*NET includes a set of overarching descriptors: abilities, interests, knowledge, skills (basic), skills (cross-functional), work activities, work context, work styles, and work values.[441]

---

[438] BARRY GERHART, COMPENSATION 109 (14th ed. 2023).

[439] R. J. Harvey, *Job Analysis*, *in* HANDBOOK OF INDUS. & ORG. PSCH. 71–163 (arvin. D. Dunnette & Leatta. M. Hough eds, 1991).

[440] BARRY GERHART, COMPENSATION Ch. 4 (14th ed. 2023); JOSEPH J. MARTOCCIO, STRATEGIC COMPENSATION: A HUMAN RESOURCE MANAGEMENT APPROACH, (10th ed. 2020); KEVIN F HALLOCK, PAY: WHY PEOPLE EARN WHAT THEY EARN AND WHAT YOU CAN DO NOW TO MAKE MORE (2012).

[441] O*NET ONLINE, https://www.onetonline.org/ (last visited Jan. 14, 2025).

109.     Levels of Information.  Job analysis provides information that ranges from specific ("element") to general ("occupation").  Common levels of information are:  element, task, position, job, occupation, and job family.[442]  An element can be as specific/simple as putting a piece of paper in a scanner to scan a document.  A task might be the multiple elements taken together that are necessary for scanning.  A group of tasks performed by one person makes up a position.  Identical positions make up a job at one company.  An occupation is the same job across companies.  A job family is a "group[] of occupations based upon work performed, skills, education, training, and credentials."[443]  For example, software developers and biostatisticians would be occupations that are both part of the computer and mathematical job family.

110.     Job Analysis Output.  The main output of a job analysis is a job description that contains key job characteristics and a job specification that includes key person characteristics necessary to do the job, as illustrated by evidence from Defendant firms:



a.      *DaVita.*

[444]

b.      *SCA.*

[445]

---

[442] BARRY GERHART, COMPENSATION Ch. 4 (14th ed. 2023); JOSEPH J. MARTOCCIO, STRATEGIC COMPENSATION : A HUMAN RESOURCE MANAGEMENT APPROACH (10th ed. 2020).

[443] O*NET ONLINE, https://www.onetonline.org/ (last visited Jan. 14, 2025).

[444] Ex. PX85 at DVA_OMEAL_001067255–56.

[445] SCA002226644 (cover email), SCA002226645 (attachment), and SCA002226646 (attachment).

c.   *USPI.* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[446]

### 2.   Step 2:  Job Evaluation and Benchmarking.

111.   Job evaluation represents the next step in setting up a compensation system or structure.  Job evaluation "is the process of systematically determining the relative worth of jobs to create a job structure for the organization.  The evaluation is based on a combination of job content, skills required, value to the organization, organizational culture, and the external market.  This potential to blend organizational forces and external market forces is both a strength and a challenge of job evaluation[.]"[447]

112.   Compensable Factors.  Prior to benchmarking jobs to external data, companies often identify "compensable factors," i.e., the factors for which the company assigns value, to distinguish the value of different jobs.  For example, compensable factors might include complexity, leadership, responsibility, etc.  The idea is that jobs with more valuable compensable factors should receive higher job evaluations, and in turn, higher pay, because they contribute more value to the company.  However, note that we are not yet focused on pay levels, but rather on differentiating jobs in terms of their relative value to the organization.

a.   Job evaluation can take a variety of specific forms, but the common objective is to order jobs in terms of relative worth.  One form of job evaluation is the point-factor approach.  Using this approach, after each compensable factor for a job is defined, a set of degrees (i.e., levels) for each factor is created.

---

[446] USPI_CIV_000214742 (cover email) and USPI_CIV_000214746 (attachment).
[447] BARRY GERHART, COMPENSATION 144 (14th ed. 2023).

b. For example, **Figure 5** below shows the compensable factor of complexity. Each job is assigned a degree and complexity. The same process is followed to assign degrees on the other compensable factors for each job. The sum of the points across compensable factors for each job indicates its internal value. Percentage differentials in point values for jobs indicate their relative internal value to the company.

**Figure 5: Example of a Compensable Factor (Complexity)[448]**

| Degree | 1st | 2nd | 3rd | 4th | 5th | 6th |
|---|---|---|---|---|---|---|
| Points | 20 | 40 | 60 | 80 | 100 | 120 |

| Degree Definitions for Complexity (of Duties) Compensable Factor | |
|---|---|
| Complexity of duties involves the degree of independent action, the extent to which the duties are standardized, the exercise of judgment, the type of decisions the job requires and the exercise of discretion, resourcefulness, or creative effort in devising methods, procedures, products, scientific applications, etc. | |
| 1st Degree – Little Judgment | Understand and follow simple instructions and use simply technology involving few decisions. |
| 2nd Degree – Some Judgment | Perform repetitive or routine duties working from detailed instructions and under standard procedures. Requires the making of minor decisions. |
| 3rd Degree – Simple Analytical Judgment | Plan and perform diversified duties requiring an extensive knowledge of a particular field, and the use of wide range of procedures. Involves the exercise of judgment in the analysis of facts or conditions regarding individual problems or transactions to determine what action should be taken, within the specifications of standard practice. |
| 4th Degree – Complex Analytical Judgment | Plan and perform a wide variety of duties requiring general knowledge of company policies and procedures applicable within area of responsibilities, and including their application to cases not previously covered. Requires considerable judgment to work independently toward general results, devising methods, modifying or adapting standard procedures to meet different |

---

[448] MIDWEST INDUS. MGMT. ASS'N, MIMA'S GUIDE TO THE EFFECTIVE USE OF ITS JOB EVALUATION PLAN (SHOP) (1974).

| | conditions, making decisions based on precedent and company policies. |
|---|---|
| 5th Degree – Advanced Analytical Judgment | Plan and perform difficult work where only general methods are available.  Involves highly technical or involved projects, presenting new or constantly changing problems.  Requires outstanding judgment and initiative in dealing with complex factors not easily evaluated, also making of decisions for which there is little precedent. |
| 6th Degree – Advanced Judgment and Ingenuity | Plan and perform complex work which involves new or constantly changing problems where there is little accepted method of procedure.  Involves participation in the formulation and carrying out of company policies, objectives and programs for major decisions or functions.  Considerable ingenuity and exceptional judgment required to deal with factors not easily evaluated, interpret results and make decisions carrying a great deal of responsibility.  Direct and coordinate the work of subordinate supervision in order to attain objectives. |

113.    <u>Salary Levels, Ranges, and Grades.</u>  While job evaluation need not be this explicitly quantitative, any form of job evaluation must group and order jobs on the basis of their relative value, as the necessary result of any job evaluation procedure is a set of salary grades/ranges.  I describe ranking ("simply orders job descriptions from highest to lowest based on a global definition of relative value")[449] and classification forms of job evaluation ("a job description is compared to descriptions of existing groupings or classes of jobs to determine which class of job it most aligns with in terms of value").[450] ███████████████████

███████████████████████████████████████[451]

a.    Firms also used fixed percentage pay differentials between jobs at different levels of a grade/range system.  Specifically, survey data indicate that companies used a

---

[449] BARRY GERHART, COMPENSATION 150 (14th ed. 2023).

[450] *Id.* at 151.

[451] SCA002226644 (cover email), SCA002226645 (attachment), SCA002226646 (attachment).

fixed percentage differential between salary midpoints of grades/ranges, referred to as the "midpoint progression."[452] The survey data also show that the most typical midpoint progression for salaried employees is 10–30%. Thus, if a firm increases the pay for grade 1 by 10%, then the firm must also increase the pay for grade 2 by 10% to maintain the chosen midpoint progression policy.

b.     In addition to deciding on salary midpoints, firms also need to set the minimum and maximum pay for each salary grade/range. Range spread is defined as (pay maximum – pay minimum) / pay minimum. Survey data indicate that the typical range spread is 46–59%.[453] A single midpoint progression (i.e., a percentage differential between pay midpoints) typically pertains to all adjacent grades/ranges, from the bottom to the top of a particular structure, with the caveat that they are often somewhat larger at higher pay grades/ranges. The typical practice of using a (single) midpoint progression indicates that companies seek to maintain specific, fixed differentials between different grades/ranges. These fixed differentials can be maintained even as pay level policy choices change.

c.     The most common structures are market-based structures, wherein pay range minimums, maximums (and midpoints) are "anchored" to the 25th, 50th, and 75th percentiles.[454] **Figure 6** below illustrates this point:

---

[452] WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023).

[453] *Id.*

[454] *Id.*; *see also* BARRY GERHART, COMPENSATION 282 (14th ed. 2023) ("Quartiles (25th and 75th percentiles) are often used to set pay ranges.").

**Figure 6**[455]

| Market-Based |
|---|
| • Range spreads of 30% to 80% and midpoint progressions of 10% to 15% growing wider for higher-level jobs |
| • Minimums and maximums are anchored to market data points and encompass the reasonable wage span of the job in the market (i.e., 25th, 50th and 75th percentiles) |

114. <u>Defendants Implemented the Foregoing Principles.</u> The evidence I have reviewed shows that Defendant firms implemented the foregoing principles and created salary grades and ranges and is common to the Class.

  a. *DaVita.* DaVita's pay structures included salary ranges, levels, and structured pay differentials:

   i. **Job Levels.** DaVita had job families/groups, job titles therein, job levels, and salary minimums, midpoints, and maximums. [REDACTED]

[REDACTED][456]

[REDACTED][457]

[REDACTED]

[REDACTED][459]

---

[455] WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023).

[456] Ex. PX74.

[457] Ex. PX75.

[458] Ex. PX83 at DVA_OMCEAL_001057524; *see also* Ex. PX84 at DVA_OMCEAL_001321377 [REDACTED].

[459] Ex. PX85 at DVA_OMCEAL_001067252.

  ii.  **Pay Differentials Based on Market Value.**  DaVita employed standard market-based structures, wherein a firm "anchors" pay range minimums, maximums (and midpoints) to the 25th, 50th, and 75th percentiles.[460] ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████[461]  As such, by ranking or grouping jobs based on their relative value, point factor, ranking, and classification, companies use job evaluation methods as vehicles to create salary grades/ranges. [462]

  iii.  **Salary Ranges Within Similar Jobs.**  DaVita ensured that similar roles were paid within a similar range. ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████[463]  The documentary evidence showed this concept at work with respect to specific employees. █████████████████████████

██████████████████████████████████[464].

███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████ ██ ████████

<hr />

[460] WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023); *see also* BARRY GERHART, COMPENSATION 282 (14th ed. 2023) ("Quartiles (25[th] and 75[th] percentiles) are often used to set pay ranges.").

[461] Chipman Dep. at 34:2–11.

[462] Note that job evaluation is not a process that is conducted each year.  Rather, it is a process that would most likely be conducted as part of developing a set of grades/ranges.  Job evaluation would be used later as needed (e.g., for newly created jobs).

[463] Chipman Dep. at 60:15–24.

[464] Ex. PX27 at DVA_OMCEAL_001339898 (emphasis added).



iv. These salary ranges within similar jobs also applied to bonuses. DaVita established maximum bonus potential for employees. DaVita not only set maximum bonus potential for employees, but checked to make sure the compensation structure was being applied correctly to specific individuals.

v. **Pay Differentials and Ranges Within and Between Job Levels.**

DaVita used fixed percentage pay differentials between jobs.

---

[465] Staffieri Dep. at 143:11–25; *see also* Ex. PX19 at DVA_OMCEAL_001399752.

[466] Ex. PX267 at DVA_OMCEAL_001238631.

[467] *Id.*

[468] Rodriguez Dep. at 83:14–84:6.

████████ [469] ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ [470]

   b.  *SCA.* The evidence shows that SCA used salary ranges, minimums, midpoints, and maximums for its employees. SCA maintained job families/groups, job titles therein, and job levels, and used salary minimums, midpoints, and maximums.

     i.  SCA human resources professionals Bridie Fanning and Warren Cinnick testified to this structure. For example, former SCA Chief Talent Officer Fanning testified that "there were ranges for different levels for different jobs for different markets, geographies."[471] Further, Fanning testified that SCA employed salary ranges based on not just the job, but the type of job within that level. She testified that at SCA[472]:

> [Employees at the Vice President level and above] were paid according to their job. So you might be a VP of technology . . . and your market rate for that specific job might be this kind of range. If you're a VP of HR then you're going to have a different kind of range. If you're a VP of business development you're going to have a different kind of range again. So *it's by job skill set. It's not just by level.*



████████ [473]

     ii.  This pay structure included consideration of merit increases, and SCA applied that compensation to individual merit increase decisions. ███████████████

---

[469] Ex. PX81 at DVA_OMCEAL_001068252.

[470] *Id.* at DVA_OMCEAL_001068251.

[471] Fanning Dep. at 172:13–19.

[472] *Id.* at 173:13–174:1 (emphasis added).

[473] Cinnick Dep. 65:4–18.





iii.    SCA regularly reviewed its salary structure to ensure that it was consistent with the healthcare industry and actively encouraged its managers to follow that structure in making compensation decisions.

c.    *USPI.* Similar to DaVita and SCA, the evidence shows that USPI maintained job structures and pay ranges.

---

[474] Rucker Dep. at 263:5–13.
[475] SCA001363536 at SCA001363537.
[476] Ex. PX34 at SCA000109832 (emphasis added).
[477] *Id.* at SCA000109836.
[478] *Id.* at SCA00109837.

i. ███████████████████████████

████████████████████ 479

ii. ███████████████ 480 ██████████████

███████████████████████ :

**Figure 7**[481]



iii.     USPI applied this overall salary and job structure to individual compensation decisions. ████████████████████████

█████████████████████████████████

████████████████████ 482

---

[479] *See, e.g.,* USPI_CIV_000214742 (cover email) and USPI_CIV_000214746 (████████
████████████).

[480] *See, e.g., id.* at USPI_CIV_000214744–45 (████████████████████
███████████████████████████████████████████
███████████████).

[481] *Id.*

[482] Johnston Dep. at 51:17–24.

iv.     The documentary evidence shows that USPI put these salary

ranges into action for individual compensation decisions. ███████████████

████████████████████████████████████████████████████████

████ 483.



v.     When working with recruiters, USPI human resources

professionals communicated pay ranges as part of the recruiting process. ██████████

████████████████████████████████████████

████████████████████████████████████████

██████ 484 ███████████████████████████

████████████████████████████████████████

███████████████████████████ 485 ████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██ 486 █████████████████████████████████

███████████████████████████████████

███████████████ 487

---

483 Ex. PX455 (emphasis added).

484 Mosley Dep. at 96:18–97:5.

485 *Id.* at 108:16–24.

486 McGarry Dep. at 63:11–17.

487 *Id.* at 64:20–65:7.

115. <u>Defendants Benchmarked Their Internal Pay Structures Against External Pay Data.</u> Next, potential pay levels, salary midpoints, and minimums and maximums are benchmarked against data for equivalent jobs in the labor market. Jobs that are identical across similar employers are referred to as "benchmark" jobs. Benchmark jobs are similar enough in their content to be meaningfully matched across companies. They are important because employees regularly express concerns to their employers about external equity, meaning fairness in how similar jobs at different companies are paid.

a. Surveys of show that employees are very concerned about external equity. For example, a WorldatWork (2011) survey of compensation professionals demonstrated that 28% of employees "frequently" or "constantly" express concern regarding external equity or fairness of base pay amount, and 51% "occasionally" express concern.[488]

b. I have reviewed evidence in this litigation showing that employees at Defendant firms were also concerned about external equity.

c. *DaVita.* Deposition testimony and documents from DaVita show that DaVita employees were concerned about external equity.

i.

[489] and

[490]

---

[488] K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness: Slippery Slope or Manageable Terrain?*, 20 WORLDATWORK J. 50–64 (Fall 2011).

[489] Thurman Dep. at 31:18–32:1.

[490] *Id.* at 32:2–25.



[491]

　　ii.　　DaVita also asked its employees to communicate their concerns about external equity.

[492]

　　d.　　*SCA.* The deposition testimony and documents show that SCA employees were also concerned about external equity.

　　i.　　SCA GVP HR Cinnick testified[493]:



　　ii.

[494]:

---

[491] *Id.*

[492] Ex. PX19 at DVA_OMCEAL_001399749. Note that read the other way around (i.e., 40% of DaVita employees who responded to the survey felt their pay is unfavorable "[i]in comparison with people in similar jobs in other companies") the survey results nonetheless demonstrate that many DaVita employees were concerned about external equity.

[493] Cinnick Dep. at 53:1–19 (emphasis added).

[494] SCA001123358 (cover email) and SCA001123359 (attachment) (emphasis added).



iii. ██████████████████████████

██████████████████████████████████████

████████████████████[495]

      e.     *USPI.* The documentary evidence shows that USPI employees, including senior executives, were also concerned about external equity.

      i.     This employee concern about external equity was raised with USPI executives. ████████████████████████████

████████████████████████████████

████████████████████[496].

██████████████████████████████████████
██████████████

      f.     *Benchmarking.* Given widespread external equity concerns, benchmark jobs can ultimately be used to match a company's internal compensation structure (i.e., the relative value of jobs in terms of job evaluation points assigned) that I have described with the value (as indicated by pay level) assigned by the external market. Put plainly, this matching allows for a direct comparison of internal value and external value for these jobs.[497] It ultimately enables a company to decide how to price jobs (i.e., what pay level is chosen), and wages for

---

[495] Ex. PX530 at SCA001191901.

[496] Ex. PX455 (emphasis added).

[497] The process of deciding on appropriate peer groups to use in benchmarking pay against other companies and finding the right market data and the appropriate survey is described in the literature, including by KEN CARDINAL & BETH FLORIN, HANDBOOK FOR CONDUCTING COMPENSATION & BENEFITS SURVEYS (2012); and by BARRY GERHART, COMPENSATION (14th ed. 2023).

those jobs form the foundation of a pay system.[498]  Over time, in a properly functioning labor market, the internal and external value indicators tend to converge.

> i.      Real-world survey data corroborates widespread use of comparing pay for benchmark jobs.  According to WorldatWork, most companies use market pricing, which means that if they have a benchmark job that matches a benchmark job in the external pay survey, they typically aim to pay their job (on average) the same as the pay in the external market pay survey.[499]

> ii.      For example, if a company's Director job's content etc. match best to a job in the external market pay survey called "Administrator" (actual content match, not title match, is what matters), then the company might well choose to pay Director job at the 50th percentile pay level for Administrator jobs in the external market pay survey.  That might, for example, be $150,000.  The company would group jobs with similar job evaluation rankings and similar pay levels in external market pay surveys into grades/ranges.  The company would then set its midpoint for that range at $150,000 (or slightly higher or lower, depending on the other jobs in that range and what their external market pay levels are).

> iii.      Clearly, and as discussed at length below, if pay levels in the market for any of these benchmark jobs have been artificially depressed, then pay in for these

---

[498] To simplify exposition, I have focused on salaries.  For the average employee, wage and salary income accounts for the majority of compensation.  But there are other components in total compensation, including bonuses, stock, stock options and benefits.  The proportion of compensation that comes from bonuses, stock plans, and individual performance is higher on average at higher job levels (e.g., KEVIN F. HALLOCK, PAY:  WHY PEOPLE EARN WHAT THEY EARN AND WHAT YOU CAN DO NOW TO MAKE MORE, 92 (2012); BARRY GERHART, COMPENSATION 349–50, Exs. 10.2–10.3 (14th ed. 2023).

[499] BARRY GERHART, COMPENSATION 295 (14th ed. 2023).

jobs in a company will also be lower, given that its pay midpoints are chosen to reflect pay levels in the external market.

     iv.  Pay for jobs that cannot be matched well to benchmark jobs is determined based on their job evaluation ranking relative to job evaluation rankings for jobs that can be benchmarked. For example, let's say that the job "Regional Operations Director" cannot be matched, but it has 60 job evaluation points. We know that the "Director" job has been matched and it has a pay midpoint of $150,000 and 80 job evaluation points. Thus, one estimate of what the "Regional Operations Director" level should be is 60/80 x $150,000 = $112,500.[500] Similar interpolation could be done using the ranking and/or classification methods of job evaluation. As a result, artificially depressed external pay levels would also affect non-benchmark jobs, given that non-benchmark jobs are priced based on how many job evaluation points they have relative to benchmark jobs that can be priced directly to the market. The relative value of different jobs is reinforced and maintained by the use of job evaluation as well as by pressures for internal equity, discussed below.

116. <u>Defendants Relied on the Foregoing Benchmarking Practices.</u> I have reviewed extensive evidence of Defendants' benchmarking practices in this litigation. Note that while of course Defendants had to keep pay in some reasonable range with respect to the labor market, their No-Poach Agreements and CSI Exchanges likely enabled them to: (1) pay substantially less than would have been required of them in the absence of these anticompetitive practices;

---

[500] A better, more sophisticated approach is to use regression analysis to regress an external pay survey salary on internal job evaluation points and use the resulting equation as a policy line. By plugging job evaluation points into the equation, one can obtain better estimates of predicted salaries for non-benchmark jobs. *See*, *e.g.,* Chapter 8 of BARRY GERHART, COMPENSATION (14th ed. 2023) and/or chapter 11 of RAYMOND NOE, JOHN HOLLENBECK, J. BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE (13th ed. 2023).

and/or (2) in a large number of individual cases, suppress pay. As discussed above, Defendants' conduct would likely have artificially depressed external pay rates, such that Defendants could safely offer their employees lower compensation than they otherwise would have. Benchmarking against peer companies where pay suppression exists provides a less costly path to achieving external equity.

       a.    *DaVita.* There is abundant evidence common to the Class that DaVita benchmarked its internal pay structures to external market data:



---

501 Rodriguez Dep. at 113:17–23.

502 Chipman Dep. at 79:13–23.

503 Ex. PX73; Arthur Dep. at 108:3–109:9; *see also* Ex. PX268.

504 Ex. PX85 at DVA_OMCEAL_001067252.



       iv.     DaVita's use of benchmarking extended to individual pay decisions for purposes of recruiting.

       b.     *SCA.*  Common evidence shows that SCA also benchmarked its pay to external data:

       i.     Former SCA Chief Talent Officer Fanning testified that SCA used between six and ten surveys to benchmark its pay structures and set compensation, because "it's not smart to use just one."[511]  She explained[512]:

---

[505] Ex. PX268 at DVA_OMCEAL_001344573.

[506] *Id.*

[507] Ex. PX73 at DVA_OMCEAL_001332711.

[508] Ex. PX73 at DVA_OMCEAL_001332708–10.

[509] Chipman Dep. at 100:17–101:5.

[510] *Id.* at 101:6–103:16.

[511] Fanning Dep. at 175:11–16.

[512] *Id.* at 175:17–176:15 (emphasis added).

> *[These surveys were used] to make sure this apple at this company is the same at this apple at this company. . . .* And that information is consolidated and managed through different survey companies like Hewett, Mercer, Willis Towers, Watson, et cetera. . . . And *they will tell you for this kind of job that scores this number of points in these geographies, these are the kind of ranges you would expect at the lower quartile, mid, upper quartiles, and so on.*

ii.



[513]

[514]

iii.    Fanning put further color on how companies apply this data in

practice[515]:

> *You might have a strategy where you decide you only want to pay what you have to keep people and you're going to be 50th percentile.* Total compensation decisions are strategic business decisions that you make, and it's not one-size-fits-all. *You might decide you're going to pay up a quartile for your business development people who bring in the revenue, but you're going to pay lower quartile to X population because they're easily replaced.* Supply and demand. The market forces drive pay forces too.

iv.



[516]

v.    **Job Benchmarking.** The documents also show that SCA utilized

job benchmarking.

---

[513] Rucker Dep. at 262:15–20.

[514] *Id.* at 262:22–263:3.

[515] *Id.* at 266:13–25 (emphasis added).

[516] Cinnick Dep. at 54:12–55:10.



A. ████████████████████████████

████████████████████████████████████████████

████████████████ [517] ███████████████████

████████████████████ [518]

B. ████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████ [519].

C. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████ [520]

D. ████████████████████████████

████████████████████████████████████████████

[517] Ex. PX35.

[518] *Id.*

[519] Ex. PX528 at SCA001046573 (emphasis added).

[520] Ex. PX541 at SCA000331970.

-135-





      c.     *USPI.* The evidence also shows that USPI benchmarked its internal pay practices to external market data:

      i.     The deposition testimony and documents show that USPI regularly used benchmarking to control for external equity.

      ii.     USPI also benchmarked pay against defendants DaVita and SCA.

---

[521] Rucker Dep. at 234:20–25.

[522] Clemens Dep. at 106:10–15.

[523] *Id.* at 106:11–109:17 and 128:20–129:17 (emphasis added).

[524] McGarry Dep. at 108:14–19, 110:3–12.

[525] *Id.* at 108:1–8; *see also* Ex. PX105 (cover email) and Ex. PX106 (attachment) (McGarry forwarded RVP compensation reports to Mosley).

[526] McGarry Dep. at 109:21–110:2.



[527]

[528]

     iii.    USPI employed benchmarking to ensure external equity for compensation, as well as for benefits, including PTO accrual.

[529]

[530]

[531]

[532]

[533].

---

[527] Ex. PX482.

[528] *Id.*

[529] Ex. PX296 at DOJCIV-008-00000389; Karrmann Dep. at 21:20–23:4.

[530] Karrmann Dep. at 23:13–19.

[531] *Id.* at 40:21–41:1.

[532] Ex. PX119 at USPI_CIV_000601228 and Ex. PX120 at USPI_CIV_000584420.

[533] English Dep. at 56:17–57:21 (emphasis added).

### 3. Substantial Additional Common Evidence Shows That Defendant Firms Implemented Systematized Compensation Structures.

117. Overall, additional documentary and deposition evidence that I have reviewed in this case shows that the Defendants implemented the foregoing principles to design structured compensation systems and is common to the Class.

118. <u>DaVita.</u> The following additional evidence demonstrates that DaVita had systematized compensation structures.

a. *DaVita Maintained Systematized Compensation Structures.* DaVita set pay practices for its employees to follow:

i.



[534]

ii. DaVita's formal compensation structures were created and maintained by its Compensation Team.

[535]

[536]

---

[534] Ex. PX83 at DVA_OMCEAL_001057524.

[535] Chipman Dep. at 30:11–13.

[536] *Id.* at 30:3–10.



iii.

b.  *DaVita Enforced Its Centralized Compensation Structure.*

i.  DaVita made sure its managers understood their responsibility to

adhere to its structured compensation systems.

ii.  DaVita also implemented and enforced pay practices with respect

to bonuses.

---

[537] *Id.* at 30:16–23.
[538] *Id.* at 90:5–11.
[539] *Id.* at 90:12–20.
[540] *Id.* at 163:13–20.
[541] *Id.* at 28:4–30:1.
[542] *Id.* at 29:16–30:1.



     iii.    In applying its structured pay practices to bonuses, DaVita took care to ensure it was consistent as to particular employees and that individual pay fit within the overall structured pay system.

543 Ex. PX268 at DVA_OMCEAL_001344575; *see also* Chipman Dep. at 28:4–30:1, 45:4–46:10

████████████████████████████████████████████████ .

544 Ex. PX268 at DVA_OMCEAL_001344575.

545 *Id.*

546 Ex. PX77 at DVA_OMCEAL_001329257–58 (emphasis added).

547 Ex. PX250 at DVA_OMCEAL_000904770.



iv. **Annual Compensation Process.**

v. **Limited Discretion.** This structured annual compensation setting process limited the ability to deviate from set labor budgets.

---

548 *Id.* at DVA_OMCEAL_000904769.

549 *Id.* (emphasis added).

550 Chipman Dep. at 162:16–164:19.

551 *Id.* at 167:16–19.

552 *Id.* at 135:2–11.

553 Staffieri Dep. at 163:1–164:25; Ex. PX25.

554 Chipman Dep. at 135:12–13.

A.     The lack of discretion to set pay also applied to

compensation decisions for new hires. ███████████████████████

███████████████████████████████████████ [555] ███████████████

███████████████████████████████████████████████████

███████████████████████ [556]

vi.     **Recruiting and Hiring.**  Further, DaVita also applied top-down

involvement to recruiting and hiring. ███████████████████████

██████████████████████████████████████████████████

███████████████████████ [557]

119.     SCA.  Similar to DaVita, SCA has produced additional ample evidence of its

formalized compensation structures.

a.     *SCA's Compensation Structure Applied to All Jobs and All Types of Pay.*

The testimony and documents I reviewed illustrate the comprehensiveness of SCA's formalized

compensation structure:

i.     ███████████████████████████████

███████████████████████ [558] ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████ [559]  **Figure 8** below illustrates this structure:

---

[555] Staffieri Dep. at 131:8–19.

[556] *Id.* at 158:15–159:4; Ex. PX23.

[557] DOJCIV-008-00000304 at DOJCIV-008-00000306.

[558] Cinnick Dep. at 65:4–14.

[559] *Id.* at 37:9–38:5.

**Figure 8**[560]



  ii.  SCA documents show that its Compensation Managers maintained

its formal compensation structures.



[562]

[563]

---

[560] SCA000079723 at SCA000079726.

[561] SCA000065816 at SCA000065816.

[562] *Id.*

[563] *Id.*

b. *SCA Systematically Refreshed Compensation.* The testimony and documents I reviewed show that SCA systematized its process for refreshing compensation.

i. Compensation was systematically refreshed annually. Former SCA Chief Talent Officer Fanning testified that SCA had an annual compensation-setting process.[564]



ii.

---

[564] Fanning Dep. at 170:15–19.
[565] SCA000079723 at SCA000079734.
[566] Rucker Dep. at 323:8–20; *see also* SCA000065816 ( ); SCA000093346 ( ); SCA000112688 ( ).
[567] Cinnick Dep. at 39:4–13.
[568] Sandoz Dep. at 36:15–38:10.
[569] Cinnick Dep. at 39:14–18.

████████████████████████████████████████████████

████████████████████████████████ [570]

      c.    *SCA Implemented and Enforced Bonus Practices.* The testimony and documents show that SCA implemented standardized pay practices regarding bonuses:

      i.    ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

██████████ [571]

      ii.    ██████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ [572]

      iii.    ████████████████████████████████

██████████ [573].

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

      iv.    Put simply, bonuses could not be awarded willy-nilly.

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[570] *Id.* at 39:23–40:2; *see also* Clemens Dep. at 144:24–145:4.

[571] Cinnick Dep. at 45:22–48:18.

[572] Rucker Dep. at 319:8–320:24.

[573] Cinnick Dep. at 45:22–47:7 (emphasis added).



574

120.    USPI.

a.    *USPI Used Formal Compensation Structures.*  Additional testimony and USPI documents that I reviewed confirm that USPI utilized formal compensation structures.

i.

575

576

ii.    The mechanics of the process was also formalized and consistent.

577.

---

574 Ex. PX56.

575 Ex. PX297 at USPI_CIV_000058049.

576 *Id.*

577 English Dep. at 26:2–17.

-146-



[578]

iii.     USPI also implemented standardized pay practices with respect to bonuses.  USPI structured its bonus award system to limit discretion. ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████[579]  ███████████████████████████

████████████████████████████

**Figure 9**[580]



---

[578] *Id.* at 26:18–27:2.

[579] USPI_CIV_000901340 at USPI_CIV_000901342.

[580] *Id.* at USPI_CIV_000901341.

b. *USPI Maintained Salary Increase Structures.* USPI also systematized its annual processes for salary increases.

i.



581

ii.

582.

### C. Defendants' Compensation Systems Sought to Achieve Internal Equity and Pay Fairness.

121. In this section, I discuss the literature describing the importance of internal equity and fairness to compensation practices. Additionally, I review evidence that Defendants' formal pay structures sought to maintain internal equity and pay similar employees performing similar work and making similar performance contributions.

122. The evidence I review includes compensation-related literature, deposition testimony and exhibits, and documents produced in this litigation.

---

581 English Dep. at 28:21–29:14, 30:25–31:2.
582 *Id.* at 27:3–28:20.

123.     Internal Equity Principles Are Fundamental to Defendants' Compensation Structures.  According to equity theory, "people compare the ratio of their own outcomes [e.g., pay] to inputs [e.g., performance]" with the same outcomes/inputs ratio of "one or more comparison others. . . .  Perceived equity results if the ratios are very similar.  The ratios can be similar despite differences in pay if performance differences are perceived to exist."[583]

124.     Consider **Figure 10** below, which shows the choice an organization can make between two different pay structures.  In this case, the two pay structures have different pay levels, but identical internal job structures (i.e., identical percentage pay differentials between jobs at different levels in a line of progression).  For example, in each structure, the pay differential between the Advisor Engineer and Lead Engineer is 28%.  But the pay level is lower for all jobs in the left pay structure.  A company choosing the left pay structure would have lower labor costs.  The left (lower) pay structure would be easier to choose if labor market competition was constrained.  A company or companies engaged in collusion could, for example, perhaps achieve the left lower pay level structure, but not have any additional internal equity problems because the internal equity/internal pay differentials between jobs will stay the same.  In contrast, in the absence of collusion, some employees in some jobs would get higher pay at their current company or elsewhere.  Higher pay at their current company would increase the pressure on the current employer on to raise the pay of other employees (i.e., to maintain internal equity).  Higher pay from people moving to higher-paying jobs at other companies would also pressure the company to raise pay to be competitive (i.e., externally equitable to employees) with other companies.

---

[583] BARRY GERHART, COMPENSATION 88 (14th ed. 2023).

**Figure 10: Pay Structure (for Engineering) at Lockheed Martin, under Two Alternative Pay-Level Policies[584]**



**EXHIBIT 3.3** Pay Structure (for Engineering) at Lockheed Martin, under Two Alternative Pay-Level Policies

---

[584] *Id.* at 78.

125.    <u>Literature and Other Evidence Shows That Fairness Is Important to Compensation Considerations.</u>  There is evidence common to the Class in economics and other areas that fairness in wage-setting and consideration of peers is important in compensation matters.[585]

a.    Labor market economist Kevin Hallock opined that "[t]he idea behind equity theory (Adams, 1965) is that workers will be motivated when their perceived inputs (e.g. effort) match their perceived outputs (e.g. pay).  If someone thinks she is being unfairly paid (e.g. others are being paid more for the same perceived effort), she will become uncomfortable and unmotivated."[586]  Similarly, in the absence of perceived equity, employees take actions to restore equity, many of which (e.g., lower performance, turnover, legal action, collective bargaining) employers prefer to avoid.[587]

b.    I also note that the research that discusses how employees judge internal pay equity[588]:

> [A major avenue by which] employees judge the fairness of their pay through comparisons with the compensation paid to others for work related in some fashion to their own. . . .  Employees make multiple pay comparisons to assess the fairness of an internal pay structure.  They compare both with other jobs in the same internal structure and with the pay for their job in the external market (i.e., at competing employers).

c.    Employees regularly express concerns to their employers about equity. For example, 21% of compensation professionals surveyed by WorldatWork (2011) responded

---

[585] *See, e.g.,* David I. Levine, *What do Wages Buy?,* 38 ADMIN. SCI. Q. 462–483 (Sept. 1993); and David Card, Alexandre Mas, Enrico Moretti, & Emmanuel Saez, *Inequality at Work:  The Effect of Peer Salaries on Job Satisfaction*, 102 AM. ECON. REV. 2981–3003 (Oct. 2010).

[586] KEVIN F. HALLOCK, PAY:  WHY PEOPLE EARN WHAT THEY EARN AND WHAT YOU CAN DO NOW TO MAKE MORE 121 (2012).

[587] *Id.*

[588] BARRY GERHART, COMPENSATION 137–38 (14th ed. 2023).

that employees "frequently" or "constantly" "express concerns about the lack of internal equity regarding base pay amount," and 45% of employees do so "occasionally." [589]

        d.      The same survey also asked the compensation professionals "about what influence they believe internal reward equity or fairness has on 'employee engagement,' 'employee motivation,' and 'employee satisfaction.'" More than half of respondents reported that they believe internal equity is "extremely influential" for engagement (56%), motivation (53%), and satisfaction (55%).[590]

        e.      Other evidence also supports the importance of equity to employee satisfaction. I summarize meta-analytic evidence based on 64 studies and 29,754 employee respondents from Williams, McDaniel, and Royal (2011). That analysis reports that employee perception of pay discrepancy (i.e., the difference between an employee's perception of what pay should be and what pay currently is) correlates at a substantial level (corrected $r = -.54$) with pay satisfaction.[591] Theory and research are clear that what employees think their pay should be is influenced strongly by internal equity and external equity comparisons.

        f.      Further, as **Figure 3** demonstrated earlier, employee mobility is higher when pay levels are lower and when employees move voluntarily, their pay increases significantly.

        g.      Moreover, internal equity (in terms of the size of pay differentials between different job levels) is important because it influences employee answers to questions, such as

---

[589] K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness: Slippery Slope or Manageable Terrain?*, 20 WORLDATWORK J. 50–64 (Fall 2011).

[590] *Id.*

[591] BARRY GERHART, COMPENSATION 243 (14th ed. 2023) (citing Margaret L. Williams, Michael A. McDaniel, & Nhung T. Nguyen, *A meta-analysis of the antecedents and consequences of pay level satisfaction*, 91 J. APPLIED PSYCH. 392 (2006)).

"Is taking a 'bigger' job worth it?" and "Is it worth it to invest in further training to get promoted?"

126.    Compensation Professionals Seek to Maintain Internal Equity.  It is therefore unsurprising, based on the foregoing analysis, that compensation professionals devote so much attention to internal equity:  it is a means to positively influence pay satisfaction, engagement, motivation, performance, retention, and employees' willingness to participate in training and take on higher-level positions with greater responsibilities.  Discussed at length above, a firm's failure to attend to these concerns can lead to reduced employee productivity as well as increased employee turnover, both of which can hurt an organization's bottom line.

a.    This step also involves addressing concerns about fairness in pay levels across jobs and job levels that are otherwise similar but differ in the experience levels.  For example, Senior Vice Presidents in an area are paid more than Vice Presidents in that same area.

b.    Finally, compensation structures must address concerns about the structure of pay across different job titles, so as to maintain equity between employees in different jobs who nevertheless have similar relative skills and value to their employer, or who work together on projects.  These employees care about their compensation relative to their professional peers, and pay structures reflect those concerns.  For example, employees in the same organizational units, such as Peoples Services or human resources, care about what others there earn.  Pay systems adjust pay levels to reduce some of the differences in pay that we might otherwise expect in order to create more consistent pay levels where those comparisons matter.  And pay systems also recognize differences in performance across individuals within the same jobs, paying more to those who perform better.

-153-

c.      In fact, creating and maintaining internal equity constitutes one important reason organizations set up formal internal pay structures in the first place, as discussed above. Recall that those structures are typically set up internally, even before adjusting to the external market data.

127.    <u>Defendants Prioritized Internal Equity in Their Compensation Structures.</u>  Indeed, the evidence I have reviewed indicates that Defendant firms sought to maintain internal equity in their formal compensation structures and correct for outliers to restore equity.

a.      *DaVita Maintained Internal Equity.*  Evidence common to the Class demonstrates that DaVita sought to align its compensation practices to align with internal equity principles.

i.      **DaVita Values Internal Equity.**  ███████████



---

[592] Staffieri Dep. at 134:11–16.

[593] Rodriguez Dep. at 72:23–73:13.

[594] Ex. PX249 at DVA_OMCEAL_000906134 (emphasis added); *see also* Ex. PX266.



**B.** ████████████████████████████████

████████████████████████████████████████

████████████████████ [595] ████████████████████

████████████████ [596]

**C.** Internal DaVita documents about specific individuals reflect this commitment to internal equity. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ [597]

**D.** ████████████████████████████████

████████████████████████████████████████

██████ [598] ████████████████████████████

████████████████████████████████████████

██████████

    ii.    **DaVita Paid Attention to Internal Equity When Setting Starting Salaries.** ████████████████████████████████

---

[595] Priest Dep. at 128:24–129:9.

[596] *Id.* at 144:5–16.

[597] Staffieri Dep. at 160:19–161:23; Ex. PX24.

[598] Chipman Dep. at 69:1–17.



A.

B.

---

[599] Priest Dep. at 122:18–23.

[600] *Id.* at 123:9–24; *see also id.* at 128:17–22 ████████████████████████

███████████████████████████████████████████████████

[601] Chipman Dep. at 80:19–23.

[602] Staffieri Dep. at 154:4–11.

[603] Chipman Dep. at 80:24–81:5.

[604] *Id.* at 81:7–9.



**C.**

**D.**

### iii. DaVita Used All Forms of Compensation to Balance Compensation for Similarly-Situated Employees to Ensure Internal Equity.

---

[605] Ex. PX75.

[606] Rodriguez Dep. at 129:14–131:14; Ex. PX272.

[607] Ex. PX272 at DVA_OMCEAL_000957089.

[608] *Id.* at DVA_OMCEAL_000957090.

[609] Ex. PX269 at DVA_OMCEAL_000957821.



A.

B.

---

[610] Ex. PX249 at DVA_OMCEAL_000906134.

[611] Chipman Dep. at 142:11–143:4.

[612] Ex. PX551.

[613] Ex. PX27 at DVA_OMCEAL_001339898.



iv.   **DaVita Monitored Compensation to Ensure Internal Equity.**

[614] Rodriguez Dep. at 59:3–62:1.

[615] *Id.* at 124:13–128:20; Ex. PX271.

[616] Ex. PX252.

[617] *Id.* at DVA_OMCEAL_001187352.

[618] *Id.* at DVA_OMCEAL_001187354.

[619] Staffieri Dep. at 132:13–133:2



---

[620] *Id.* at 132:19–23.
[621] *Id.* at 132:24–133:11.
[622] Ex. PX22.
[623] Chipman Dep. at 34:12–19.



b.    *SCA Wanted to Maintain Internal Equity.*  I have seen similar supporting evidence at SCA that is common to the Class.

i.    **SCA Was Committed to Internal Equity.**



A.

---

[624] *Id.* at 35:24–37:16.

[625] *Id.* at 38:17–24.

[626] *Id.* at 39:2–9.

[627] Rodriguez Dep. at 98:16–99:25 (emphasis added).

[628] *Id.* at 100:1–3.

[629] SCA000079723 at SCA000079726.



As above, these concerns are less paramount where artificial interference, such as No-Poach

Agreements and CSI Exchanges, suppress the labor market rate.

        **B.**      **Moreover, SCA compared pay of employees in different**

**positions to maintain internal equity.**



      ii.      **SCA Checked Employee Compensation to Ensure That It**

**Maintained Internal Equity.**

---

[630] Rucker Dep. at 317:3–24.

[631] *Id.* at 327:18–21.

[632] *Id.* at 325:21–326:9 (emphasis added); *see also* Sandoz Dep. at 85:19–24 ███████.

[633] Ex. PX528 at SCA001046573.

[634] Cinnick Dep. at 74:5–15, 69:15–70:24.



**A.** *SCA Considered Internal Equity Principles When Deciding Starting Salaries.* [636]:

**B.** Internal SCA documents illustrate how this worked for individual salary decisions.

**C.**

---

[635] *Id.* at 71:12–18.

[636] Rucker Dep. at 326:24–327:16.

[637] Ex. PX55 at SCA001204514.

[638] *Id.*

[639] *Id.*

[640] *Id.* at SCA000331971 (emphasis added).

███████████████████████████████████████████
████████████████

        iii.    **SCA Used Different Forms of Compensation to Ensure**

**Internal Equity.** ████████████████████████████

███████████████████████████████████████████

████████████████████████████████[641]████████████

███████████████████████████████████

       A.   ████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████[642]████████████

███████████████████████████████████████████

       B.   ███████████████

███████████████████████████████

███[643].



[641] SCA001363536 at SCA001363537.

[642] Ex. PX34 at SCA000109837.

[643] Ex. PX541 at SCA000331970.



iv.    **SCA Also Sought to Correct Outlier Compensation.** █

644.

A.

645

c.    *USPI Wanted Internally Equitable Compensation Structures.* The evidence also shows that USPI accounted for internal equity in its compensation structure, and is common to the Class.

i.

646

647

---

[644] Ex. PX528 at SCA001046573.
[645] Keech Dep. 203:1–204:2; Ex. DX64.
[646] Karrmann Dep. at 39:25–40:12.
[647] *Id.* at 40:13–20.

███████████████████████████████████████████████

███████████████████████████████████████ [648]

ii.     ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████ [649]

iii.    USPI's pay structures maintained internal equity between

employees doing similar work. ███████████████████████

███████████████ [650].

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ [651]

iv.    USPI sought to maintain internal equity between new hires and

incumbent employees. ██████████████████████████████

███████████████████████████████████████████████████

---

[648] *Id.* at 41:2–14.

[649] Johnston Dep. at 39:21–40:2.

[650] *Id.* at 50:9–20.

[651] *Id.* at 50:21–51:3.

███████████████████████████████████████████████

███████████ 652

v. ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ 653

## D.     Internal Equity and Pay for Performance Are Not Mutually Exclusive.

128.    In this section, I demonstrate that Defendant firms' purported "pay for performance" practices are not incongruous with internal equity principles, and that Defendants did not maximize compensating performance at the expense of pay equity, because equity and equality are not the same.

129.    In this section I also explain how a compensation system that is guided by both pay-for-performance and internal equity principles can still be internally consistent. In fact, it is impossible for a system to maintain internal equity without paying for performance. Paying employees who perform differently equally is clearly inequitable, because pay should be proportional to an employee's contribution to the enterprise.

130.    The evidence I reviewed includes compensation-related literature, deposition testimony and exhibits, and documents produced in this litigation.

131.    To maintain a competitive and well-functioning pay system, it is important that the firm determines how the pay of individual employees within each grade/range will be

---

[652] *Id.* at 40:11–23.
[653] Ex. PX454.

adjusted over time. Regular, planned adjustments happened annually. Survey data indicate that the types of salary adjustments / increases used by a majority of U.S. companies are: (1) promotional increases (96%), which usually involve movement to a higher pay grade/range; (2) merit increases (94%); (3) market adjustments (84%); and (4) internal equity adjustments (69%).[654] Typically, merit increases are awarded each year and depend on employee performance as well as the employee's position in the salary range. This is often defined as the compa-ratio, which is employee salary divided by the salary midpoint for his or her grade/range.[655] Given that organizations typically set their salary grade/range midpoints to match the market, the compa-ratio also then indicates the employee's level of pay as a percentage of market pay.

132. Most organizations use a merit increase grid to calculate employees' merit increases, under which employees with higher performance ratings receive larger merit pay increases and employees with higher compa-ratios receive (given the same performance rating) lower merit pay increases. The compa-ratio is used in this manner to control the growth in salary over time. It is also used to achieve equity, in that companies typically have compa-ratios targets, explicit or implicit, that vary depending in an employee's sustained performance over time. An employee who consistently receives average performance ratings should be at or moving toward a compa-ratio of 1.00 (i.e., 100% of both market pay and the company's own grade/range midpoint pay). By contrast, an organization might have a target compa-ratio of 1.20 (120% of market pay and the company's own grade/range midpoint pay) for an employee with consistently high performance ratings. An employee who is at a compa-ratio that matches their

---

[654] WORLDATWORK, COMPENSATION PROGRAMS AND PRACTICES SURVEY (2016).
[655] *Id*.

target compa-ratio for their performance rating would receive a merit increase that maintains the compa-ratio. For example, with an overall merit budget of 3%, the foregoing employee would receive a 3% increase. However, an employee below their target compa-ratio would receive a larger merit increase, such as 5%, to move them toward the higher salary and compa-ratio. An employee above their compa-ratio would receive a smaller percentage increase, such as 1%, to allow the grade/range midpoint to move to catch up with the employee's salary.

133. The foregoing approach to merit pay increases is designed to pay employees equitably by moving them toward a target pay level that is equitable compared to the pay of similarly-performing employees both internally and externally. Relevant to my earlier assessment, this process also allows the company to ensure that it does not underpay or overpay employees relative to its competitors, and that it can compete effectively in the labor and product/service markets.

134. **Figure 11** (below) exemplifies a merit increase grid that simultaneously incorporates the idea of both pay-for-performance and internal equity. It provides for different compensation increases for equally-performing employees depending on where they are situated in the salary structure (i.e., their compa-ratio) so as to maintain internal equity. In the diagram, the columns represent a worker's position in the pay range (compa-ratio) and the rows indicate a worker's performance rating (1 is the worst and 5 is the best).

**Figure 11**[656]

| RECOMMENDED SALARY INCREASES BY PERFORMANCE RATING AND COMPA-RATIO | | | | Table 12.3 Merit Increase Grid |
|---|---|---|---|---|
| | COMPA-RATIO[a] | | | |
| | 80–90% | 91–110% | 111–120% | |
| Performance rating | | | | |
| Exceeds expectations | 7% | 5% | 3% | |
| Meets expectations | 4 | 3 | 2 | |
| Below expectations | 2 | 0 | 0 | |

[a]Employee salary/midpoint of their salary range.

135.    <u>Defendants' Practices Account For Equity and Performance.</u>  Documents I have reviewed show that Defendants used these practices to determine merit compensation increases to their employees' base salaries.  These practices demonstrate that a company's commitment to pay employees for performance does not conflict with internal equity principles and the continued maintenance of a formal compensation structure.

a.    *DaVita Balanced Internal Equity and Individual Employee Performance.* Common evidence shows that DaVita used various processes to award merit increases throughout the Class Period.

i.    DaVita used the same logic as merit increase grids/compa-ratios.



[656]

---

[656] RAYMOND NOE, JOHN HOLLENBECK, J. BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCE MANAGEMENT:  GAINING A COMPETITIVE ADVANTAGE 538 (13th ed. 2023).
[657] Ex. PX552 at DVA_OMCEAL_000313490 (emphasis added).



[661] As above, this goal of aligning relative employee pay with relative employee performance indicates DaVita's focus on fairness in making its performance-related compensation decisions.

[662] By doing

[658] Rodriguez Dep. at 59:3–23.

[659] *Id.* at 59:24–60:10.

[660] Priest Dep. at 133:21–134:7.

[661] *Id.* at 133:25–135:6 ███████████████████████

[662] Ex. PX268 at DVA_OMCEAL_00134574.

so, DaVita put managers in a situation wherein implementing compa-ratio principles would typically be necessary for them to stay within the overall budgeted percentage increase. Managers would need to assign smaller percentage increases to employees with higher salaries within the salary range in order to assign larger percentage increases to employees with lower (i.e, too low given their performance) salaries within the salary range, where performance was the same. This merit increase pool system is consistent with the goal of moving employees' compensation to a level consistent with their performance, which includes allocating smaller percentage increases to those with higher performances already reflected in higher compensation.

v.



[665] As above, DaVita paid employees for performance subject to the available merit pool, or in other words, subject to the limitations and aims of the overall compensation structure, including moving towards achieving internal and external equity.

---

[663] Ex. PX19 at DVA_OMCEAL_001399752.
[664] *Id.* at DVA_OMCEAL_001399773.
[665] *Id.*

vi.

[666] This approach would enable DaVita to pay its employees equitably by moving their compensation toward a target that is equitable compared to the pay of similarly-performing employees internally.

    b.     *SCA Aligns Pay and Performance.* I have reviewed similar evidence of these processes at SCA that is common to the Class.

i.

[667]

[668]

    ii.     Further, former SCA Chief Talent Officer Fanning testified that SCA deployed "compa-ratios that became [more] sophisticated" during her tenure.[669] Discussed above, such compa-rations are used to achieve equity, by moving employees towards target pay levels that are equitable as compared with the compensation of similarly-performing employees internally. SCA's use of compa-ratios is also evidence that SCA implemented and maintained a broader compensation structure.

---

[666] DVA_OMCEAL_001411518.

[667] SCA000079723 at SCA000079725.

[668] *Id.*

[669] Fanning Dep. at 172:13–19.

iii.



Like DaVita, SCA's performance-related compensation decisions were made within the context of the available merit pool, within the broader compensation structure that SCA designed to achieve internal and external equity.

iv.



---

[670] Cinnick Dep. at 41:11–20.

[671] *Id.* at 41:21–24.

[672] *Id.* at 42:1–14.

Rucker Dep. at 256:2–12.

[673] Rucker Dep. at 255:17–256:1.

-174-

[REDACTED] [674] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [675]

v.    [REDACTED]

[REDACTED] [676].

[REDACTED]

**Figure 12**[677]



    c.    *USPI's Pay Structures Account for Both Equity and Employee*

*Performance.* I have seen similar supporting common evidence produced by USPI.

    i.    [REDACTED]

[REDACTED] [678] Thereafter,

---

[674] Cinnick Dep. at 42:16–24.

[675] Ex. PX34 at SCA000109831.

[676] SCA000078134 at SCA000078134.

[677] SCA000078134

[678] Karrmann Dep. at 45:19–46:16; Ex. PX297.



[679] [redacted] [680] In other words, supervisors did not have unlimited discretion to award increases regardless of how strong an employee's performance was.

ii. [redacted]

[681]

iii. [redacted]

[682] [redacted]

[683] [redacted]

[684]

---

[679] *Id.*

[680] *Id.* at 46:22–47:4.

[681] Johnston Dep. at 44:10–17; Ex. PX454.

[682] Ex. PX115 (cover email) and Ex. PX116 (attachment); *see also* Ex. PX453 at USPI_CIV_000095467 [redacted]

[683] Ex. PX115 at USPI_CIV_00039752.

[684] Ex. PX116; *see also* Ex. PX181 (cover email) and Ex. PX182 (attachment).

iv.

## VIII. A STRUCTURED COMPENSATION SYSTEM WOULD LIKELY LEAD TO CLASS-WIDE COMPENSATION EFFECTS.

### A. Agreements Not to Poach Employees Likely Lead to Cascading Effects Class-Wide.

136. In this section I explain that, as demonstrated above, the No-Poach Agreements likely suppressed Class Members' pay.

137. The evidence I review to aid in my assessment includes statements from the FBI investigation interview reports, deposition testimony and exhibits, and documents produced in this litigation.

138. The most visible mechanism of suppression is in the case of individual employees who were denied the opportunity to be passive recipients of cold calling by other employers, and the higher pay and advancement opportunities those calls would have provided. However, the suppression effects of the No-Poach Agreements go well beyond that, because of the systematic way in which the pay of all employees is connected in companies through their widespread use of standardized principles and practices of employee compensation management. Below, I review evidence showing that Defendants' pay systems were structured in a way that linked the

---

[685] Karrmann Dep. at 47:5–24.
[686] *Id.* at 47:25–48:7.

pay of employees with different job titles and at different job levels, such that the No-Poach Agreements would suppress pay systematically.

139.     A structured pay system of the type I have described here is characterized by purposeful pay differentials between employees meant to maintain internal and external equity. Thus, when upward pressure is put on the compensation of some employees, organizations must adjust others' employees' compensation as well to maintain equity.

140.     This plays out as follows:

a.     Typically, as inflation rises, so does pay across the board; overall rates of increase also reflect resources available to the employer, such as budgetary changes. █

████████████████████████████████████████████████████████

███████████████████████████████████████████ [687] ████████████████

███████████████████████████████████████████████████

████████████ [688]

b.     Notably, although merit increases typically differ according to performance (and often according to current position in range/compa-ratio), they do not typically differ by job or job level.  Thus, a 3% average merit increase in a firm will maintain current pay differentials based on job, job level, and individual performance.

c.     Additionally, shifts in supply and demand within specific labor markets can raise the pay of benchmark jobs, which is reflected in external market pay surveys of competitors.  As discussed above, employers respond by raising the internal pay of those jobs to match external pay to prevent employees in them from feeling underpaid and/or from leaving.

---

[687] Thiry Dep. at 114:17–23 (inflation "was a very important variable").
[688] Clemens Dep. at 150:11–18.

Such increases also spill over to other jobs; higher pay for managers may lead to higher pay for Directors and similarly for Vice Presidents to maintain the necessary pay differentials to achieve equity and/or motivation to advance/be promoted to higher-level jobs.

d.     And as discussed earlier, individual employees may have opportunities to change employers, which may reflect changes in market pay before market survey data does, leading to adjustments of the kind delineated above.

e.     Raising the pay of one employee in order to retain them may lead to pay raises for similar employees, who otherwise recognize that they too could secure higher offers in the outside market and/or feel unfairly treated if their performance contributions are under rewarded relative to peers.  In this way, increases for one employee spill over to increases for another.

141.    Accordingly, given Defendants' formalized pay structures and compensation design and their commitment to maintaining equity and pay fairness, the No-Poach Agreements would have negative, widespread, and systematic effects on Class Members' compensation.

142.    Even if not *every* Class Member would have received a cold call or job offer but for Defendants' conspiracy, the increased wages of each individual employee who *would* have received a cold call or job offer would have a widespread, systematic impact on the salaries of other employees.  This widespread, systemic impact on other employees happens as a function of Defendants' commitment to maintain desired and accepted pay differentials based on jobs, grades/ranges (e.g., the midpoint progressions/differentials described earlier), and employee performance (i.e., internal equity).

143.    An Example of the No-Poach Agreements' Cascading Effects on Defendants' Salary Structures.  For example, even if the No-Poach Agreements were restricted to individuals

-179-

and job titles at the top of the salary structure, a No-Poach Agreement prevents compensation increases that would have had a cascading effect on other employees, in the following ways:

a. *First:* In the absence of a No-Poach Agreement, a current employee (e.g., a Director) at a Defendant firm could have received an unsolicited job offer having higher pay (and potentially higher pay opportunities in later jobs at the new company) than their current job (which provides an incentive to move to the new employer). That Director could then either accept the outside offer or use the outside offer as leverage to negotiate a higher salary at the Defendant firm. However, under a No-Poach Agreement, that higher salary is never offered.

b. *Second:* A second, less visible, but wider and more pervasive suppression effect of a No-Poach Agreement impacts incumbent employees at the same job level who did not receive unsolicited job opportunities. For example, other Directors at the Defendant firm who were not cold called will immediately increase their own pay expectations and require higher pay to feel their pay is fair: their performance contributions relative to those of the Director with the outside offer have not changed, but their relative pay has become lower relative to the Director with the outside offer. Given the emphasis we have seen that firms, including the Defendant firms, put on internal equity, there would then be a focus on increasing the pay of Directors (plural) whose performance contributions are similar to those of the now higher-paid Director due to the outside offer. In a no-poach context, there would not be this internal equity pressure to increase the pay of the other Directors to restore internal equity.

c. *Third:* The next effect is also indirect, but again wide-ranging. Vice Presidents (one level above Directors) who did not receive cold calls notice that their pay is now unfair because the differential between their pay and the pay of Directors has now decreased.

The pressure is now on to increase Vice Presidents' pay to the targeted differential to restore this important element of internal equity.

        d.      *Fourth:*  Other job titles whose functions sometimes overlap with those of Director now notice that the gap between their pay and that of Directors in the same firm has grown, and they demand increases to restore pay fairness.  This compounds the pressure on the firm to maintain internal equity.

        e.      *Fifth:*  When the firm performs its annual system-wide compensation review, it now discovers that Director pay has moved substantially ahead of pay for other job titles whose work overlaps.  Maintaining internal equity requires increasing pay for those job titles as well, and so forth.

        f.      The pressures to raise pay diminish as one gets further removed from the new-hire Director, and the adjustments take time to play out.  But when there are many of these new hire and retention perturbations across a firm, and when they continue year-after-year, the pressures to increase pay system-wide are continuous and substantial.

144.    Further, in competitive labor markets, employers ordinarily do not wait for the ripple effects outlined above to play out and for employees to begin entertaining competitive offers before responding to these threats.  A responsible employer cannot sit back and wait to react to competitive offers from elsewhere, because by that point, it may be too late—the competitive threat has already manifested.  The recruited employee may simply leave without offering the current employer a chance to counter.  Otherwise, the recruited employer may use the offer to negotiate higher compensation in their current role, but may lose morale.  The employee may conclude that the employer was happy to pay less than what the employee was worth, and only offered higher compensation when forced to do so under threat of departure.

Similarly, other employees who hear of an ad-hoc retention increase in response to a competitive threat may also lose morale. Their loyalty was punished, and these employees will learn the lesson that, in order to receive fair pay from the employer, employees must "shop around" at other competing employers.

145. Thus, employers will typically raise compensation systematically to preempt these risks, and to avoid the accompanying morale and retention costs. But by reducing the chance that the firm's own employee could make a move to another employer, the need to proactively increase compensation to fend off cold calling by (would-be) competitors and employee moves to those firms may become much less necessary. That, in turn would have cascading effects, lowering the pay of other employees.

146. Moreover, as discussed above, given the evidence that Defendants benchmark their data to external sources, to the extent that pay is lowered at other firms through anti-competitive conduct, the market data Defendants use for their own structures will be lower. This will cause widespread effects, because Defendants' own pay levels will be lower than they would be in the absence of such conduct.

147. Finally, in top-down salary structures wherein those at the top of a pay scale in a firm help determine the relative gains of those "below" them, restricting the pay of those at the top necessarily affects those below, as here.

148. Defendants' Employees Would Experience Cascading Effects. Defendants' documents indicate that top-down salary structures would cause "across the board" cascading effects, and are evidence common to the Class:

    a.    *DaVita.*



    iii.    DaVita did not apply these increases uniformly—instead, the increases for various job titles were dependent on one another, because DaVita maintained an internal job hierarchy.

---

[689] Ex. PX265.

[690] Staffieri Dep. at 142:1–12.  Note that, as discussed above, the No-Poach Agreements and CSI Exchanges did not absolve DaVita of external equity concerns altogether.  However, with the No-Poach Agreements and CSI Exchanges' likely suppressant effects, DaVita created the conditions by which it could offer less competitive compensation than it otherwise would have.

[691] Ex. PX201 at DVA_OMCEAL_000944848.

[692] Chipman Dep. at 90:25–91:14.

**Figure 13**[693]



iv.     **DaVita Sets Its Compensation Structure From the Top-Down.**

DaVita's formal compensation structures are also set from the top-down and regularly refreshed, such that pay restrictions at the top will cascade to those below:

A.     <u>CEO.</u>  DaVita pay was set through company-wide labor budgeting determined by DaVita's CEO. ████████████████████████████████

---

[693] Ex. PX251 at DVA_OMCEAL_000907141 (████████████████████████

████████ ).

-184-



B.	In addition to setting the labor budget, DaVita's CEO also reviewed compensation decisions.

C.	Board of Directors.	In addition to the CEO, DaVita's Board of Directors oversees certain forms of compensation.

---

[694] Rodriguez Dep. at 62:2–9.

[695] *Id.* at 63:3–6.

[696] *Id.* at 58:17–23.

[697] *Id.* at 59:3–10.

[698] *Id.* at 83:18–24.

[699] *Id.* at 63:17–64:5.

[700] Ex. PX201 at DVA_OMCEAL_000944852.



**D.** <u>Other Executives.</u> Other executives are also involved in setting compensation. ████████████████████

**E.** <u>Annual Compensation Process.</u> ███████████ [706] wherein compensation was reviewed in connection and to ensure alignment with the labor budget. ████████████

---

[701] *See, e.g.,* Ex. PX264 at DVA_OMCEAL_001145991. ███████████ Ex. PX249 at DVA_OMCEAL_000906135.

[702] Chipman Dep. at 84:9–85:15.

[703] Staffieri Dep. at 168:11–169:24.

[704] *Id.* at 129:16–19.

[705] Priest Dep. at 122:12–124:21.

[706] Chipman Dep. at 162:16–164:19.

[707] Ex. PX268 at DVA_OMCEAL_001344574.

[708] Chipman Dep. at 167:16–19.



███████████████████████████████████████████████████████

████████████████████████ [709]

       v.     **Other times, DaVita also sought to lower average starting wages**

company-wide. ████████████████████████████████████

███████████████████ [710] ██████████████████████

███████████████████████████████████████████

███████████████████████████ [711] ███████████████

████████████████████████████████████████

████ [712]

       vi.     **The SCA-DaVita No-Poach Agreement Already Shows**

**Cascading Effects.** ████████████████████████████████

███████████████████████████████████████████

████████████████████████████ [713] ███████████ [714].

██████████████████████████████████████

─────────────────────

[709] Ex. PX552 at DVA_OMCEAL_000313490.

[710] Ex. PX196 at DVA_OMCEAL_001216214.

[711] *Id.* at DVA_OMCEAL_001216215.

[712] *Id.*

[713] Thurman Dep. at 32:14–25.

[714] Ex. PX123 at DOJCIV-007-00000094; *see also* Ex. PX124 at DOJCIV-012-00000136; Thurman Dep. at 127:6–21, 164:5–167:21 ████████████████████ ████ ).

His observation was likely due to the No-Poach Agreements and CSI Exchanges. ████

████████████████████████████████████████████ [715]

A. ██████████████████████████



**Figure 14**[716]



---

[715] Thurman Dep. at 37:6–38:11.

[716] Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854.

b.    *SCA.*

i.    **Salary Range Movements.** ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[717]

ii.    **SCA Uses a Top-Down Compensation Structure.**  There is also extensive evidence that SCA treated compensation-setting as a top-down exercise, such that pay suppression at the top will trickle down to lower-level employees.

A.    SCA's CEO ultimately decided compensation.  ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[718]  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮[719]

B.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[720]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮[721]

C.    Other high-level executives, including SCA's COO, reviewed and set compensation.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[722]:



---

[717] SCA000078353 (cover email) and SCA000078354 (attachment).

[718] Clemens Dep. at 32:1–4.

[719] Ex. PX305 at DOJCCIV-008-00000175; Rucker Dep. at 385:19–388:14 (▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[720] Rucker Dep. at 330:25–332:4.

[721] Sandoz Dep. at 38:7–39:24.

[722] Rucker Dep. at 26:12-27:5, 32:10–33:10, 309:25–310:18.



**D.** ████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████ 726 ████████████████████ 727

**E.** SCA's CFO and Executive VP was involved in setting compensation. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████ 728

---

[723] *Id.* at 310:12–18.
[724] *Id.* at 309:25–310:11.
[725] *Id.* at 34:21–36:7.
[726] *Id.* at 32:10–33:10.
[727] *Id.* at 34:14–16.
[728] Clemens Dep. at 92:4–17.

iii. **SCA's High-Level Compensation Practices Trickled Down to Lower Level Leadership.** The testimony that I reviewed showed the compensation setting processes that SCA's human resources professionals set were disseminated to lower level managers whose pay decisions had to in turn be reviewed and approved by higher level managers.

A.

B. This process also applied to pay increases associated with promotions.

C. Consistent with Cinnick's testimony, former SCA Chief Talent Officer Fanning testified that during the annual compensation-setting process, SCA's

---

[729] Cinnick Dep. at 37:7–15.

[730] *Id.* at 37:16–19.

[731] *Id.* at 62:2–64:12.

[732] *Id.* at 64:13–14.

"compensation committee approved the incentives and pay levels," and "the board would sign off [on] the budget, the amounts for all the [executives], the equity," etc.[733]

        c.     <u>USPI</u>. USPI's salary structure would also lead to cascading effects.

        i.     For example, USPI's salary structure moved altogether. ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████[734]

        ii.     **USPI Refreshed Its Compensation Structures from the Top-Down.** Similar to DaVita and SCA, USPI's formal compensation structures were controlled from the top. ████████████████████████████

██████████████████████████[735]███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████[736]

        A.     <u>USPI's Merit Increase Decision Were Controlled from the Top.</u> The testimony and documents I reviewed also showed that merit increases were controlled

---

[733] Fanning Dep. at 170:25–171:17; *see also* Clemens Dep. at 100:8–11 ███████████████ ████████████████████████).

[734] Karrman Dep. at 38:6–22.

[735] English Dep. at 33:15–34:8; *see also* Johnston Dep. at 37:21–38:16 ██████████ ████████████████████████████████████████████ ████).

[736] Karrman Dep. at 42:21–43:2.

by and required approval from higher-level executives.  Oftentimes, C-level officers had to approve compensation decisions.



B.     As shown in internal USPI documents, Regional Vice Presidents, Market Presidents, Executive and Senior Vice Presidents, and Group Presidents were also sometimes involved in approving compensation decisions.

[737] English Dep. at 40:14–18; *see also* Karrmann Dep. at 37:5–38:2.

[738] Johnston Dep. at 40:24–41:5.

[739] Ex. PX113 (cover email) and Ex. PX112 (attachment to Ex. PX113).

[740] *Id.*

[741] Ex. PX111 (cover email) and Ex. PX112 (attachment).

[742] Ex. PX115 (cover email) and Ex. PX116 (attachment).



iii.

**B.    Defendants' CSI Exchanges Would Likely Suppress Employee Compensation Across the Board.**

149.    As above, in this section I opine that pursuant to common evidence (and based on my experience and research in compensation and human resource management), coordination on compensation for a subset of job titles would likely cascade to the rest of the Class.  Even if the Defendants did not coordinate on compensation for *every* single job title, if they successfully coordinated to suppress the compensation of some positions, that would be spread widely to other employees as well.  Finally, a reduction in the merit increase budget would likely directly reduce the compensation of all of Defendants' employees.

---

[743] *Id.* at USPI_CIV_000039752.

[744] *Id.*

[745] Ex. PX180 at USPI_CIV_000091768.

[746] Ex. PX281 at DOJCIV-008-00000054; Mosley Dep. at 50:18–50 (███████████████ ██████████████████████).

150. The evidence I review in this section includes compensation-related literature.

151. First, note that all employees in companies are typically covered by the same salary merit increase budget and that the sizes of merit increases in percentage terms are usually uniform within a company across jobs and job levels.

152. For example, WorldatWork and other surveys that that collect data on planned and/or actual merit budgets (that have already been implemented) typically do not find any meaningful differences in the size of merit percent awarded to employees in different levels or types of jobs. **Figure 15** (below), from a WorldatWork merit increase budget survey conducted in 2016–2017 (one of the years during the period of interest) illustrates this point.

**Figure 15**[747]

FIGURE 2    **Total Salary Budget Increases, by Employee Category**

Salary Budget Increases (zeros included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 2.9% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% |
| Exempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Officers/Executives | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| All | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |

Salary Budget Increases (zeros not included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Exempt Salaried | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |
| Officers/Executives | 3.1% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% |
| All | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |

---

[747] WORLDATWORK, SALARY BUDGET SURVEY at 20 (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf.

153. Even where Defendants did allocate their merit increase budget differentially across different employees, recall that SCA and USPI used merit pay increase grids and DaVita used merit increase guidelines that incorporated employees' performance ratings to determine how much merit increase each employee would get. The way a merit increase grid works is that any employee with performance above the average, will receive a larger merit pay increase in percentage terms the lower his/her compa-ratio is. The logic is that a high performer should have a compa-ratio of 110 to 120% (or equivalently, be paid at 110 to 120% of midpoint, which is also equivalent to being paid 110 to 120% of the average salary among competitors for that job). (This logic is similar to DaVita's internal equity logic, wherein an important objective was to align individual pay with individual performance and do this consistently across individual employees.) However, all of the merit increases combined must add up to the average merit increase budget. Thus, to reduce the overall merit increase budget while maintaining the relative differentials between employees with different performance ratings and compa-ratios, the majority of individual employees' merit increase would have to be reduced.

## IX. CONCLUSIONS

154. Based on the documents I have considered and my knowledge of labor markets and compensation systems, I have a number of conclusions. These views are expressed in the report and some are summarized here.

155. Defendants were incentivized to collude to suppress labor market competition, because they valued low employee turnover rates and wanted to keep labor costs low. Further, industry conditions facilitated conclusion, given the exclusive and tight-knit nature of Defendants' industry which provided executives with better opportunities to establish their agreements.

156. Collusion that restricts job mobility is harmful because employee mobility is a core tenet of a properly-functioning labor market and economy. It allows workers to move to positions where they are more productive, which in turn increases their wages. Additionally, it benefits incumbent employees, because employers must raise compensation to prevent further turnover. But even absent Defendants No-Poach Agreements, access to job mobility is insufficient if no higher-paying jobs exist because CSI Exchanges in the form of competitor wage data exchanges have suppressed the labor market rate.

157. Common evidence shows that Defendants' No-Poach Agreements and CSI Exchanges would likely have limited employees' job mobility and bargaining power.

a. Foremost, Defendants valued recruiting passive candidates who were not actively seeking employment elsewhere. In the absence of the No-Poach Agreements, Defendants routinely cold called their competitors' employees to recruit them. This practice generally yields higher wages for job candidates, who are offered more compensation to entice them to leave their jobs, and who can use those offers to negotiate higher salaries with their current employers. It also gives employees who receive cold calls more information about the job market, which is frequently shared with employees who were not proactively solicited. Accordingly, restrictions on proactive recruiting clearly would have had impacts on employees among the Defendant firms. Specifically, such restrictions would exacerbate information asymmetries and to depress levels of compensation for those who would have been solicited, as well as for all or nearly all salaried employees of Defendant firms.

b. Defendants' No-Poach Agreements also included an unusual "tell-your-boss" provision that further suppressed employee compensation. Therein, Defendants agreed not to offer jobs to each other's employees unless at an early stage in the hiring process—well before

the candidates received formal job offers—the employees notified their current supervisors that they intended to leave their positions. Inevitably, this provision eliminated confidentiality in the hiring process, and I conclude it would have discouraged employees from pursuing opportunities at Defendant firms, and eliminated opportunities to increase their compensation.

c. The evidence I have reviewed further demonstrates, based on my experience and research in compensation and human resource management, that Defendants CSI Exchanges are inconsistent with the conduct of employers who are competing for labor and would have suppressed Class pay. There is no benefit to a firm if it unilaterally shares, for example, nonpublic wage data. Rather, such exchanges between competitors facilitate anticompetitive collusion to suppress employee pay.

158. Defendant firms' No-Poach Agreements and CSI Exchanges harmed Defendants' employees by suppressing their compensation.

159. Compensation-related theory and literature, which are evidence common to the Class, show that the wage suppression caused by the foregoing conduct is expected to persist for years.

160. The evidence shows that pay moved in Defendant firms in systematic and structured ways. Moreover, I conclude that common evidence shows that Defendant firms implemented and maintained compensation systems that sought to achieve pay equity. Issues of internal and external equity were important to Defendants.

a. Defendants' systematized compensation structures that used market surveys, pay lines, pay grades, and many other typical features of compensation structures. Moreover, Defendants made use of compensation principles beyond salary. These other forms of compensation include components such as bonuses and stock.

b.      Whether or not Defendants used the specific term "internal equity," Defendants' compensation systems valued pay fairness and aimed to pay similar employees similarly, and to correct for outliers to restore equity.

c.      A compensation system that includes pay for performance is not mutually exclusive with one that that takes internal equity into account. Compensation structures that pay for performance can maintain internal equity as a key objective, as here.

161.    Because Defendant firms had systematized pay structures, impacts to these systems cycle on to other employees and their levels of compensation. Defendants' No-Poach Agreements and CSI Exchanges therefore limited and had negative consequences on employee compensation not only for the workers who were directly involved, but also for nearly all employees. Consequently, nearly all salaried employees, including Class Members, would have been paid more but for the challenged conduct.

162.    Although I have not been asked to estimate the magnitude of damages in this case, my knowledge of compensation systems and the materials I considered informs my opinion that No-Poach Agreements, such as the agreements at issue in this case, and exchanges of confidential wage information, such as the CSI Exchanges at issue in this case, will suppress the compensation of all or nearly all members of Plaintiffs' proposed Class, including those with different job titles.

163.    I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

Dated:  January 15, 2025                    Respectfully submitted,

Dr. Barry Gerhart

## <u>PROOF OF SERVICE</u>

I, Sarah D. Zandi, an attorney, hereby certify that on January 15, 2025, I served a true and

correct copy of the foregoing **Expert Witness Report of Dr. Barry Gerhart** by electronic mail

upon the following parties and non-parties as set forth below:

| | |
|---|---|
| Kenneth M. Kliebard<br>Staci M. Holthus<br>MORGAN, LEWIS & BOCKIUS LLP<br>110 North Wacker Drive<br>Chicago, IL 60606<br>(312) 324-1000<br>Kenneth.kliebard@morganlewis.com<br>Staci.holthus@morganlewis.com | Jeffrey C. Bank<br>Jordanne Steiner<br>WILSON SONSINI GOODRICH &<br>ROSATI, P.C.<br>1700 K Street NW, Fifth Floor<br>Washington, DC 20006<br>(212) 497-7761<br>jbank@wsgr.com<br>jordanne.miller@wsgr.com |
| Amy B. Manning<br>MCGUIREWOODS LLP<br>77 West Wacker Drive<br>Suite 4400<br>Chicago, IL 60601-7567<br>amanning@mcguirewoods.com | Veronica Moyé<br>KING & SPALDING LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br>(215) 556-2100<br>vmoye@kslaw.com |
| Brian Joseph Smith<br>K&L GATES, LLP<br>70 W. Madison Street<br>Chicago, IL 60602<br>(312) 807-4202<br>**brian.j.smith@klgates.com** | Molly Moriarty Lane<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Market<br>Spear Street Tower<br>San Francisco, CA 94105-1596<br>(415) 442-1000<br>Molly.lane@morganlewis.com |
| Jeffrey E. Stone<br>Katharine M. O'Connor<br>MCDERMOTT, WILL & EMERY LLP<br>444 West Lake Street, Suite 400<br>Chicago, IL 60605<br>(312) 372-2000<br>jstone@mwe.com<br>**koconnor@mwe.com** | |

Dated: January 15, 2025   Respectfully submitted,

           */s/ Sarah D. Zandi*
           Sarah D. Zandi

## APPENDIX A

## DR. BARRY GERHART CV

**Barry Gerhart**
Bruce R. Ellig Distinguished Chair in Pay and Organizational Effectiveness
Professor of Management & Human Resources
Wisconsin School of Business
University of Wisconsin-Madison
4194 Grainger Hall
975 University Avenue
Madison, WI 53706-1323
barry.gerhart@wisc.edu

## I. EDUCATION

Ph.D.     University of Wisconsin--Madison, 1985
Major:    Industrial Relations (Personnel and Organizational Behavior)
Minors:   Labor Economics, Research Methods/Statistics

B.S.      Bowling Green State University, 1979 Major: Psychology

## II. PROFESSIONAL EXPERIENCE

January 2023 – July 2023. Interim Vice Provost and Dean, International Division, UW-Madison.

February 2018 – July 2019. Interim Albert O. Nicholas Dean, Wisconsin School of Business, University of Wisconsin-Madison.

January 2018. Acting Dean, Wisconsin School of Business, University of Wisconsin-Madison.

July 2017 – January 2018. Senior Associate Dean for Faculty and Research, Wisconsin School of Business, University of Wisconsin-Madison.

Summer 2015. Otto Mønsted Visiting Professor, Copenhagen Business School.

April 2014. Visiting Professor, King's College London, University of London.

August 2008 – July 2012. Chair, Department of Management & Human Resources, Wisconsin School of Business, University of Wisconsin-Madison.

June 2011. Visiting Scientist. Center for Advanced Management Studies, Ludwig-Maximilian-University Munich.

September 2004 – present.  Bruce R. Ellig Distinguished Chair in Pay and Organizational Effectiveness.  School of Business, University of Wisconsin-Madison.

June 2008.  Ludwig Erhard Professor.  Bayreuth University, Germany.

August 2000 – August 2004.  John and Barbara Keller Distinguished Chair of Business, August 2000 – present. Professor of Management & Human Resources, School of Business, University of Wisconsin-Madison.

July 1996 – July 2000.  Professor of Management, Frances Hampton Currey Professor of Organization Studies, and Area Coordinator, Owen Graduate School of Management, Vanderbilt University.

March 1995 - April 1995, October 1995.  Visiting Faculty Member, Faculty of Social Sciences, Charles University, Prague, Czech Republic and Faculty of Management, Comenius University, Bratislava, Slovakia.

August 1992 – August 1995. Chair, Department of Human Resource Studies, School of Industrial and Labor Relations, Cornell University.

August 1985 -- August 1996.  Assistant Professor and Associate Professor (with tenure), Department of Human Resource Studies, School of Industrial and Labor Relations, Cornell University.

## III.    AWARDS & HONORS

### Wisconsin School of Business Awards

Erwin A. Gaumnitz Distinguished Faculty Award for Service, Wisconsin School of Business, University of Wisconsin-Madison, 2017

Erwin A. Gaumnitz Distinguished Faculty Research Award, Wisconsin School of Business, University of Wisconsin-Madison, 2011

### Career Awards

Michael R. Losey Excellence in Human Resource Research Award, Society for Human Resource Management, 2018. ("This award honors lifetime achievement in human resource research.")

Thomas A. Mahoney Mentoring Award, Academy of Management, Human Resources Division, 2018. (Given "to an individual who has distinguished himself/herself in the mentoring of PhD students.")

Fellow, Academy of Management, 2013. (Roughly 1 % of non-emeritus faculty in the Academy of Management are Fellows.)

Herbert Heneman Jr. Award for Career Achievement, Human Resources Division, Academy of Management, 2012. (Roughly 1 % of non-emeritus faculty in the Human Resources Division have received the Heneman Award. The Division has 2200+ non-emeritus, non-student academic members.)

Fellow, American Psychological Association (& Society for Industrial and Organizational Psychology), 2001

**Article/Paper Awards**

International Human Resource Management Scholarly Research Award (best international article), Academy of Management, Human Resources Division, 2015

Outstanding Author Contribution Award, *Research in Personnel and Human Resources Management*, 2010 (best article in that annual volume)

International Human Resource Management Scholarly Research Award (best international article), Academy of Management, Human Resources Division, 2007

Scholarly Achievement Award (best article), Academy of Management, Personnel/Human Resources Division, 1991

Outstanding Paper Award (best paper at meeting), Academy of Management, Personnel/Human Resources Division, 1989

*Runner-up*, *Human Resource Management Review* (*HRMR*) 2019 Scholarly Impact Award for Gerhart, B. & Fang, M. 2014. (This award recognizes the article published in print in *HRMR* during the previous five calendar years that has made the biggest contribution to the field.)

*Finalist*, Scholarly Achievement Award (best article), Human Resources Division, Academy of Management, 2011

**Dissertation Awards (where I was chair of committee)**

Mevan Jayasinghe, First Prize, 2013 Industry Studies Association Dissertation Award Competition.

Anthony Nyberg, Ralph Alexander Best Dissertation Award, 2009, Human Resources Division, Academy of Management.

## IV.   CITATIONS/RESEARCH IMPACT

36,473 (13,032 since 2019) in Google Scholar
h-index = 61 in Google Scholar (as of end of 2023)
https://scholar.google.com/citations?user=q6n8ZHcAAAAJ&hl=en&oi=ao

Top 2% in Research Impact of Scientists Worldwide, Stanford University and Elsevier (as of end of 2022), https://elsevier.digitalcommonsdata.com/datasets/btchxktzyw/6

## V.   TEACHING

Areas: Strategic Human Resources (masters, Ph.D.); Compensation (undergraduate, masters); Research Methods (Ph.D.)

Course Evaluation Scores, Fall 2000—Fall 2022, UW-Madison, Mean = 4.66/5.00, 31 sections. (Scale 1 instructor score used through Fall 2020, then new overall scale score used beginning Fall 2021).

## VI.   PUBLICATIONS

### Articles in Academic Journals/Annual Volumes and Selected Handbook Chapters

Fulmer, I.S., Gerhart, B., & Kim, J.H. (2023). Compensation and Performance: A Review and Recommendations for the Future. Personnel Psychology, 76, 687–718.

Kim, J.H., Gerhart, B., & Fang, M. (2022). Do Financial Incentives Help or Harm Performance in Interesting Tasks? Journal of Applied Psychology, 107, 153–167

Gerhart, B. & Feng, J. (2021). Human Resources and the Resource-Based View. Journal of Management, 47, 1796–1819.

Gerhart, B. (2017). Incentives and Pay for Performance in the Workplace. Advances in Motivation Science, 4, 91–140.

Gerhart, B. & Fang, M. (2017). Competence and Pay for Performance. In A.J. Elliot, C. S. Dweck, & D.S. Yeager (Eds.), Handbook of Competence and Motivation: Theory and Application. Guilford Press: New York. 2nd edition.

Gerhart, B. & Fang, M. (2015). Pay, Intrinsic Motivation, Extrinsic Motivation, Performance, and Creativity in the Workplace:  Revisiting Long-held Beliefs. Annual Review of Organizational Psychology and Organizational Behavior, 2, 489–521.

Rabl, T., Jayasinghe, M., Gerhart, B. &.  Kühlmann, T. A. (2014). Meta-Analysis of Country Differences in the High Performance Work System-Business Performance Relationship: The Roles of National Culture and Managerial Discretion. Journal of Applied Psychology,

99, 1011–1041. [Recipient, 2015 International Human Resource Management Scholarly Research Award, Human Resources Division, Academy of Management]

Gerhart, B. & Fang, M. (2014). Pay for (Individual) Performance: Issues, Claims, Evidence and the Role of Sorting Effects. Human Resource Management Review, 24, 41–52.

Trevor, C.O., Reilly, G, & Gerhart, B. (2012). Reconsidering Pay Dispersion's Effect on the Performance of Interdependent Work: Reconciling Sorting and Pay Inequality. Academy of Management Journal, 55, 585–610.

Gerhart, B. (2012). Construct Validity, Causality, and Policy Recommendations: The Case of High Performance Work Practice Systems. Human Resource Management Review, 22, 157–160.

Fang, M. & Gerhart, B. (2012). Does Pay for Performance Diminish Intrinsic Interest? A Workplace Test Using Cognitive Evaluation Theory and the Attraction-Selection-Attrition Model. International Journal of Human Resource Management, 23, 1176-1196.

Nyberg, A., I. Fulmer, B. Gerhart, & M.A. Carpenter. (2010). Agency Theory Revisited: CEO returns and Shareholder Interest Alignment. Academy of Management Journal, 53, 1029–1049. [Finalist (one of five), Scholarly Achievement Award (best article), Human Resources Division, Academy of Management.]

Gerhart, B. (2009). Does National Culture Constrain Organization Culture and Human Resource Strategy? The Role of Individual Mechanisms and Implications for Employee Selection. Research in Personnel and Human Resources Management, 28, 1–48. [Recipient, Outstanding Author Contribution Award. For best article in that year's volume.]

Gerhart, B., Rynes, S.L., & Fulmer, I.S. (2009). Pay and Performance: Individuals, Groups, and Executives. Academy of Management Annals, 3, 251–315.

Gerhart, B. (2009). How Much Does National Culture Constrain Organization Culture? Management and Organization Review, 5, 244–259.

Lee, T.H., Gerhart, B., Weller, I. & Trevor, C.O. (2008). Understanding voluntary turnover: Path-specific job satisfaction effects and the importance of unsolicited job offers. Academy of Management Journal, 51, 651–671.

Gerhart, B. (2008). Cross-Cultural Management Research: Assumptions, Evidence, and Suggested Directions. International Journal of Cross Cultural Management, 8, 259–274.

Gerhart, B. (2008). Review Essay: The Growth of International Human Resource Management. International Journal of Human Resource Management, 19, 1989–1994.

Rynes, S.L., Gerhart, B., & Parks, L. (2005). Personnel Psychology: Performance Evaluation and Pay-for-Performance. Annual Review of Psychology, 56, 571–600.

Gerhart, B. & Fang, M. (2005). National Culture and Human Resource Management: Assumptions and Evidence. International Journal of Human Resource Management, 16, 975–990. [Recipient, 2007 International Human Resource Management Scholarly Research Award, Human Resources Division, Academy of Management]

Gerhart, B. (2005). Human Resources and Business Performance: Findings, Unanswered Questions, and an Alternative Approach. Management Revue: The International Review of Management Studies, 16, 175–185.

Gerhart, B. (2005). The (Affective) Dispositional Approach to Job Satisfaction: Sorting out the Policy Implications. Journal of Organizational Behavior, 26, 79–97.

Rynes, S.L., Gerhart, B., & Minette, K.A. (2004). The Importance of Pay in Employee Motivation: Discrepancies between What People Do and What They Say. Human Resource Management. 43, 381–394.

Gerhart, B. (2004). Comment on Promise and peril in implementing pay-for performance. Human Resource Management, 43, 29–31.

Fulmer, I.S., Gerhart, B., Scott, K.S. (2003). Are the 100 Best Better? An Empirical Investigation of the Relationship between Being a Great Place to Work and Firm Performance. Personnel Psychology, 56, 965–993.

Sturman, M.C., Trevor, C.O., Boudreau, J.W., & Gerhart, B. (2003). Is It Worth It to Win the Talent War? Evaluating the Utility of Performance-Based Pay. Personnel Psychology, 56, 997–1035.

Wright, P.M., McMahan, G. & Snell, S, & Gerhart, B. (2001). Comparing Line and HR Executives' Perceptions of HR Effectiveness: Services, Roles, and Contributions. Human Resource Management, 40, 111–124.

Wright, P.M., Gardner, T.M., Moynihan, L.M., Park, H.J., Gerhart, B., & Delery, J.E. (2001). Measurement Error in Research on Human Resources and Firm Performance: Additional Data and Suggestions for Future Research. Personnel Psychology, 54, 875-901.

Gerhart, B., Wright, & P.M, McMahan, G.C. (2000). Measurement Error in Research on Human Resources and Firm Performance: Further Evidence and Analysis. Personnel Psychology, 53, 855–872.

Gerhart, B., Wright, P.M, McMahan, G.C., & Snell, S.A. (2000). Measurement

Error in Research on Human Resources and Firm Performance:  How Much Error Is there and How Does it Influence Effect Size Estimates?  Personnel Psychology, 53, 803–834.

Graham, M.E., Hotchkiss, J.L., & Gerhart, B. (2000).  A Fixed-effects Analysis of Starting Pay Differences across Gender.  Eastern Economic Journal, 26, 9–27.

Murray, B. & Gerhart, B. (2000).  Skill-Based Pay and Skill Seeking. Human Resource Management Review, 10, 271–288.

Gerhart, B. (1999).  Human Resource Management and Firm Performance:  Challenges in Making Causal Inferences.  In Patrick Wright et al. (Eds.), Research in Personnel and Human Resources Management, 31–74.

Murray, B.C. & Gerhart, B. (1998).  An Empirical Analysis of a Skill-Based Pay Program and Plant Performance Outcomes.  Academy of Management Journal, 41(1), 68–78.

Trevor, C., Gerhart, B., & Boudreau, J.W. (1997). Voluntary Turnover and Job Performance: Curvilinearity and the Moderating Influences of Salary Growth and Promotions.  Journal of Applied Psychology, 82, 44–61.

Gerhart, B. & Trevor, C. (1996). Employment Stability under Different Managerial Compensation Systems.  Academy of Management Journal, 39, 1692–1712.

Becker, B. & Gerhart, B. (1996).  The Impact of Human Resource Management on Organizational Performance:  Progress and Prospects.  Academy of Management Journal, 39, 779–801.

Gerhart, B., Trevor, C., & Graham, M.  (1996). New Directions in Employee Compensation Research.  In G.R. Ferris (Ed.), Research in Personnel and Human Resources Management, pp. 143–203.

Bretz, R.D., Rynes, S., & Gerhart, B. (1993).  Recruiter Perceptions of Applicant Fit: Implications for Individual Career Preparation and Job Search Behavior.  Journal of Vocational Behavior, 43, 310–327.

Gerhart, B. & Milkovich, G.T. (1992).  Employee Compensation: Research and Practice.  In M.D. Dunnette & L.M. Hough (Eds.), Handbook of Industrial & Organizational Psychology, 2nd Edition, Volume 3.  Palo Alto, CA:  Consulting Psychologists Press, Inc.

Rynes, S., Bretz, R. & Gerhart, B. (1991). The importance of recruitment in job choice:  A different way of looking.  Personnel Psychology, 44, 487–521.

Gerhart, B. & Rynes, S. (1991).  Determinants and Consequences of Salary Negotiations by Graduating Male and Female MBAs.  Journal of Applied Psychology, 76, 256–262.

Milkovich, G.T., Gerhart, B., Hannon, J. (1991). The Effects of Research and Development Intensity on Managerial Compensation in Large Organizations. Journal of High Technology Management Research, 2, 133–150.

Gerhart, B. & El Cheikh, N. (1991). Earnings and Percentage Female: A Longitudinal Study. Industrial Relations, 30, 62–78.

Gerhart, B. & Milkovich, G.T. (1990). Organizational Differences in Managerial Compensation and Financial Performance. Academy of Management Journal, 33, 663–691. [Co-recipient, 1991 Scholarly Achievement Award, Personnel/Human Resources Division, Academy of Management]

Gerhart, B. (1990). The Prediction of Voluntary Turnover Using Tenure, Behavioral Intentions, Job Satisfaction and Area Unemployment Rates. Journal of Applied Psychology, 75, 467–476.

Gerhart, B. (1990). Gender Differences in Current and Starting Salaries: The Role of Performance, College Major, and Job Title. Industrial and Labor Relations Review, 43, 418–433.

Rynes, S. & Gerhart, B. (1990). Interviewer Assessments of Applicant Fit: An Exploratory Investigation. Personnel Psychology, 43, 13–36.

Gerhart, B. (1988). Sources of Variance in Incumbent Perceptions of Job Complexity. Journal of Applied Psychology, 73, 154–162

Haberfeld, Y. and Gerhart, B. (1988). Re-examining Employment Discrimination: An Empirical Test of Forward versus Reverse Regression. Journal of Human Resources, 23, 138–143.

Gerhart, B. (1987). How Important Are Dispositional Variables as Determinants of Job Satisfaction? Implications for Job Design and Other Personnel Programs. Journal of Applied Psychology, 72, 366–373.

Gerhart, B. and Jarley, P. (1987). Comment on Louis Jacobson's A Tale of Employment Decline in Two Cities: How Bad Was the Worst of Times? Industrial and Labor Relations Review, 40, 280–284.

**Chapters (or Contributions) in Edited Books**

Gerhart, B., Trevor, C., & Scott, D. (2023). Merit Pay. In Performance Management Systems: A Global Perspective. Routledge. [update of Gerhart & Trevor, 2008].

Gerhart, B. (2019). Commentary on Larkin and Nyberg and Reilly. In A.J. Nyberg and T.P. Moliterno (Eds.), Handbook of Research on Strategic Human Capital Resources. Edward Elgar Publishing.

Gerhart, B. & Weller, I. (2019). Compensation. In A. Wilkinson et al. (Eds.), Sage Handbook of Human Resource Management. [update of Gerhart, 2009]

Weller, I. & Gerhart, B. (2018). Methodological Challenges for Quantitative Research in Comparative HRM. In C. Brewster, W. Mayrhofer & E. Farndale (Eds.), Handbook of Research in Comparative Human Resource Management, Edward Elgar Publishing. 2nd edition. [update of Weller & Gerhart, 2012]

Gerhart, B. (2013). Research on Human Resources and Effectiveness: Some Methodological Challenges. In Jaap Paauwe, David E Guest, & Patrick M. Wright (Eds.), HRM and Performance: Achievements and challenges, West Sussex, UK: Wiley, pp. 149–171.

Weller, I. & Gerhart, B. (2012). Empirical Research Issues in Comparative HRM. In W. Mayrhofer & C. Brewster (Eds.), Handbook of Research in Comparative Human Resource Management, Edward Elgar Publishing.

Gerhart, B. (2009). Compensation. In A. Wilkinson et al. (Eds.), Sage Handbook of Human Resource Management.

Gerhart, B. (2008). Compensation. In John Storey and Patrick Wright (Eds.), The Routledge Companion to Strategic Human Resource Management. London, U.K.: Routledge.

Gerhart, B. & Trevor, C.O. (2008). Merit Pay. In A. Varma, P.S. Budhwar, & A. DeNisi (Eds.), Performance Management Systems: A Global Perspective. Oxford, U.K.: Routledge.

Gerhart, B. (2008). Compensation and National Culture. In S. Werner & L.R. Gomez-Mejia (Eds.), Global Compensation: Foundations and Perspectives. London, U.K.: Routledge

Gerhart, B. (2007). Modeling Human Resource Management—Performance Linkages. In P. Boxall, J. Purcell, & P. Wright (Eds.), The Oxford Handbook of Human Resource Management. Oxford University Press.

Gerhart, B. (2007). Horizontal and Vertical Fit in Human Resource Systems. C. Ostroff and T. Judge (Eds.), Perspectives on Organizational Fit. SIOP Organizational Frontiers Series. New York: Lawrence Erlbaum Associates, Taylor & Francis Group.

Gerhart, B. (2001). Designing Reward Systems: Balancing Results and Behaviors. In Charles H. Fay (Ed.), The Executive Handbook on Compensation. New York: Free Press.

Gerhart, B. (2000).  Compensation Strategy and Organizational Performance.  In S.L. Rynes & B. Gerhart (Eds.), Compensation in Organizations.  San Francisco:  Jossey-Bass.  Frontiers of Industrial and Organizational Psychology series.

Gerhart, B. (1997).  Managerial Compensation and Gender Issues in Compensation.  In L. Peters, C. Greer, & S. Youngblood (Eds.), The Blackwell Encyclopedic Dictionary of Human Resource Management.  Oxford:  Basil Blackwell Ltd.

Broderick, R. & Gerhart, B. (1996).  Nonwage Compensation.  In D.J.B. Mitchell, D. Lewin, & M.A. Zadi (Eds.), The Human Resource Management Handbook.  JAI Press, pp. 145–173.

Gerhart, B. (1995).  Bonus Payments; Performance-Related Pay; Rewards; Payment Systems.  In N. Nicholson (Ed.), The Blackwell Encyclopedic Dictionary of Organizational Behavior.  Oxford:  Basil Blackwell Ltd, pp. 33, 405–409, 415–417, and 491–492, respectively..

Gerhart, B., Minkoff, H., & Olsen, R. (1995).  Compensation and Reward Systems.  In G.R. Ferris, S.D. Rosen, & D.T. Barnum (Eds.), Handbook of Human Resource Management.  Cambridge, MA:  Blackwell Publishers.

Gerhart, B. & Bretz, R.D. (1994).  Employee Compensation.  In W. Karwowski & G. Salvendy (Eds.), Organization and Management of Advanced Manufacturing.  New York:  John Wiley & Sons.

Gerhart, B., Milkovich, G.T., Murray, B. (1992).  Pay, Performance, and Participation.  In D. Lewin, O. Mitchell, & P. Sherer (Eds.), Research Frontiers in Industrial Relations.  Madison, WI:  Industrial Relations Research Association.

Gerhart, B. & Milkovich, G.T. (1989).  Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm.  In R. Michael & H. Hartmann (Eds.), Pay Equity:  Empirical Inquiries.  Washington, D.C.:  National Academy Press.

**Research Books/Monographs**

Gerhart, B. & Rynes, S.  (2003). Compensation:  Theory, Evidence, and Strategic Implications.  Thousand Oaks, CA:  Sage Publications, Inc., Foundations for Organizational Science series.  [also published in Chinese]

Rynes, S.L. & Gerhart, B. (2000).  Compensation in Organizations.  San Francisco:  Jossey-Bass.  Edited Volume.  Frontiers of Industrial and Organizational Psychology series.

**Textbooks**

Gerhart, B. (2023). Compensation.  New York: McGraw-Hill/Irwin, 14th edition.

Gerhart, B. & Newman, J.M. (2020). <u>Compensation</u>.  New York: McGraw-Hill/Irwin, 13th edition.

Newman, J.M., & Gerhart, B., & Milkovich, G.T. (2017).  <u>Compensation</u>.  New York: McGraw-Hill/Irwin, 12th edition.

Milkovich, G.T., Newman, J.M., & Gerhart, B. (2010, 2014).  <u>Compensation</u>.  New York: McGraw-Hill/Irwin, 10th and 11th editions.

Noe, R.A., Hollenbeck, J.R., Gerhart, B., & Wright, P.M. (2023).  <u>Human Resource Management:  Gaining a Competitive Advantage</u>.  New York:  McGraw-Hill/Irwin. [1st through 13th editions].

Noe, R.A., Hollenbeck, J.R., Gerhart, B., & Wright, P.M.  (2022). Fundamental<u>s of Human Resource Management</u>.  New York:  McGraw-Hill/Irwin. [1st through 9th editions].

Milkovich, G.T. & Gerhart, B. (2013, 2021).  <u>Cases in Compensation</u>. [11e, 11.1e, and 12e editions]. Self-published.

DeCieri, H., Kramar, R. Noe, R.A., Hollenbeck, J.R., Gerhart, B., & Wright, P.M. (2002, 2005, 2008, 2010). <u>Human Resource Management in Australia:  Strategy, People & Performance</u>. New York:  McGraw-Hill/Irwin.

Noe, R.A., Hollenbeck, J.R., Gerhart, B., & Wright, P.M. (1994, 1997).  <u>Readings in Human Resource Management</u>.  Chicago:  Irwin.

*Note: There are additional versions of the textbooks adapted to other countries and/or in other languages, in collaboration with additional co-authors.*

### **Practice-Oriented Journals**

Conroy, S. A., Yoon, Y. J., Bamberger, P. A., Gerhart, B., Gupta, N., Nyberg, A. J., Park, Park, Shaw, & Sturman, M. C. (2016). Past, Present and Future Compensation Research Perspectives. <u>Compensation & Benefits Review</u>, 47(5–6), 207–215.

Ledford, G.E. Jr., Fang, M., & Gerhart, B. (2013).  Negative Effects of Extrinsic Rewards on Intrinsic Motivation:  More Smoke than Fire. <u>World at Work</u> Journal. 22(2), 17–29.

## VII.    PRESENTATIONS AND MEETINGS PAPERS (selected, since 2015)

Gerhart, B. Panelist. Professional Development Workshop. Calibrating Lens of Research in Compensation. Academy of Management, August 2023.

Gerhart, B. Facilitator. Compensation. HR Division Research Roundtable Networking Forum. Academy of Management, August 2023.

[pandemic period]

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. China Europe International Business School (Shanghai), November 2019.

Gerhart, B. Pay for Performance: Separating Fact from Fiction. Zhejiang University, November 2019.

Gerhart, B. Panelist. Strategic Human Capital and Entrepreneurship. Strategic Management Society (extension), Madison, October 19.

Kim, J.H., Gerhart, B., & Fang, M. Do Financial Incentives Help or Harm Performance in Interesting Tasks? Academy of Management. August 2019.

Gerhart, B. [& many others]. HR Research Roundtable. Academy of Management, August 2019.

Gerhart, B. [& many others]. Exploring Tough Research Questions with Compensation Scholars. Academy of Management, August 2019.

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. Nanjing University, May 2019.

Gerhart, B. Pay for Performance: Separating Fact from Fiction. Greater Toronto Area Rewards Association/World at Work, September 2018.

Gerhart, B. [& many others]. HR Research Roundtable. Academy of Management, August 2018.

Fang, M. & Gerhart, B. Does Pay for Performance Help or Harm Performance in Intrinsically Interesting Jobs? 6th European Reward Management Conference. Brussels, December 2017.

Gerhart, B. Pay for Performance, Motivation, Creativity, and Effectiveness: Claims, Evidence, and Future Directions. 6th European Reward Management Conference. Brussels, December 2017.

Gerhart, B. The United States System of Workplace Compensation. Korea Labor Institute, September 2017.

Gerhart [& several others]. Fostering Research and Relationships among Compensation Scholars. Academy of Management, August 2017.

Gerhart, B. Intrinsic Motivation and Pay. 6th Annual Research Symposium of the Centre for Leadership and Innovation, Hong Kong Polytechnic University, March 2017

Gerhart, B. Strategic Human Resource (HR) Perspective on Human Capital (HC) and HC Management Processes and Systems. New Perspectives on Human Capital, LMU Extension Mini-Conference, Strategic Management Society. Munich, Germany. September 2016

Gerhart, B. Strategy Microfoundations and Human Capital (& Human Resources). Strategic Management Society. Berlin, Germany. September 2016.

Conroy, S. A., Yoon, Y. J., Bamberger, P. A., Gerhart, B., Gupta, N., Nyberg, A. J., Park, Park, Shaw, & Sturman, M. C. Past, Present and Future Compensation Research Perspectives. Academy of Management, August 2016.

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. University of Wisconsin-Milwaukee, February 2016.

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. National Taiwan University, December 2015.

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. National Central University, December 2015.

Gerhart, B. Pay for Individual Performance in a Global Economy. Taiwan Semiconductor Manufacturing Company, Hsinchu, Taiwan, December 2015.

Gerhart, B. Does the Effectiveness of Human Resource Management (High Performance Work Systems) Depend on National Culture? Claims and Evidence. Poster Session. Wisconsin Alumni Research Foundation. Poster Session, 2015.

Gerhart, B. Publishing, Impact, and Effect Size in the Field of Management. Copenhagen Business School, July 2015.

Gerhart, B. People Management, National Culture, and Performance: Claims and Evidence. Copenhagen Business School, May 2015.

Gerhart, B. Pay for Individual Performance in a Global Economy. Danish Confederation of Industry (Dansk Industri), Copenhagen, February 2015.

Gerhart, B. Intrinsic Motivation, Incentives, and Performance (in the workplace). Copenhagen Business School, February 2015.

**VIII.   THESIS COMMITTEES (Chaired or co-chaired only)**

<u>**Ph.D.**</u>

<u>University of Wisconsin-Madison</u>

Yerim Sim. (Co-chair, current). The Unexpected Benefits of Delayed Feedback in Creativity: The Role of the Timing of Feedback in Idea Generation.

Kim, Ji Hyun. (2022). An Experimental Examination of Incentive and Sorting Effects of Pay-for-Performance on Creative Performance. Assistant Professor, National University of Singapore.

Feng, Jie (Jasmine). (2015). Organization change, employee attitudes, and turnover:  The role of sorting. Associate Professor, Rutgers University.

Jayasinghe, Mevan. (2013). Labor Codes and Human Resource Strategy in Emerging Economies: Establishment Outcomes and Worker Outcomes.  Recipient, First Prize, 2013 Industry Studies Association Dissertation Award Competition. Associate Professor, Michigan State University.

Nyberg, Anthony. (2008). Performance, Promotions, and Pay.  Recipient, Ralph Alexander Best Dissertation Award, 2009, Human Resources Division, Academy of Management. Professor, University of South Carolina.

Choi, Jang-Ho. (2008). High Performance Work Systems and Performance in Domestic and Overseas Korean-owned Firms. Professor, Sogang University (Korea)

Oh, Kye Taik. (2006). Perceived Management Style, Cultural Adjustment, and Job Attitudes among Korean and non-Korean Employees in Korean-owned Domestic and Foreign Subsidiary Operations:  Nationality and Organization Differences. Director, Center for Wage and Innovation, Korea Labor Institute.

Lee, Tae Heon. (2004). Distinct Voluntary Turnover Paths and Determinants.

<u>Vanderbilt University</u>

Fulmer, Ingrid S. (2003).  Labor Market Influences on Executive Pay Setting. Professor and Dean,  School of Labor and Employment Relations, University of Illinois Urbana-Champaign.

Cornell University

Trevor, Charles O. (1997).  Examining New and Contested Relationships from Traditional Voluntary Turnover Models:  A Multidimensional Approach to Unemployment Rate and Job Market Ease of Movement.  Professor, University of Wisconsin-Madison.

Fang, Meiyu. (1997).  A Study of Work Motivation:  The Influence of Organizational Variables and Individual Characteristics on Work Motivation and Outcomes. Professor, National Central University (Taiwan).

Smith (Hybels), Catherine. (1997). The Effects of Recruitment Practices and Organizational Reputation on Applicant Attraction:  A Multi-Employer Perspective. Director, Leadership in Medicine.

Graham, Mary. (1995). Employee Responses to Pay Policy Changes:  An Organizational Justice Perspective. Professor, Syracuse University.

Takao, Shojiro. (1995). The Multidimensionality of Organizational Commitment:  An Analysis of its Antecedents and Consequences among Japanese Systems Engineers. Associate Professor, Keio University (Japan). Deceased.

Murray, Brian. (1993). Organizational Outcomes of a Skill-Based Pay Program. Professor, University of Dallas.

## **M.S.**

Cornell University

Fang, Meiyu. (1993). The Relative Impact of Country, Job Attributes, and Employee Attributes on Employee Attitudes.

Graham, Mary.  (1993). Starting Salary Differences between Women and Men: Organization-Level Findings and an Analysis of Current Policy Options.

Murray, Brian. (1991). External Competitiveness and Internal Consistency in Compensation: Consequences for Organization Performance.

Smith, Cathy. (1990). Job Search Strategies:  Their Effects on Placement Success.

Chang, Ling-Jiuan (Joann) (1989).  Objective Measures of Alternative Job Opportunities and Voluntary Turnover.

El Cheikh, Nabil. (1988). Earnings and Occupational Characteristics of Men and Women:  A Cross-sectional and Longitudinal Study.

**IX.     SERVICE-UNIVERSITY OF WISCONSIN-MADISON (selected, Wisconsin School of Business unless noted otherwise)**

Interim Vice Provost and Dean, International Division, UW-Madison, January 2022

Academic Planning Committee, International Division, UW-Madison, 2019

Interim Albert O. Nicholas Dean, February 2018–July 2019

Acting Dean, January 2018

Senior Associate Dean for Faculty and Research, July 2017–January 2017

Ad hoc Committee, International Business undergraduate major redesign, 2016–2017

Masters Curriculum Committee, 2015–2016, 2016–2017

Co-Chair, Career Development & Placement Project Team, Full-time MBA review, 2015–2016

Ad hoc Committee, Review (5-year) of Certificates in E-ship and Innovation, 2015–2016

Ad hoc Committee, Review (5-year) of Weinert Center, 2015–2016

Academic Planning Council (consult to Dean on resource allocation) and Subcommittee of Executive Committee (promotion, tenure, salary, and other personnel decisions), School of Business, 2003–2004, 2004–2005, 2005–2006, 2010–2011, 2011–2012, 2012–2013, 2016–2017, 2020–21, 2022–2023 [elected by faculty in all years]

Director, MBA Program in Strategic Human Resource Management, 2003–2004, 2004–2005, 2005–2006, Fall 2006, Fall 2008 (acting director while L. Hunter on sabbatical), Fall 2013, Spring 2014, 2015-2016.

Department Chair, Management & Human Resources, two terms, August 2008–July 2012

Coordinator, Committee to Develop Graduate Certificates in Entrepreneurship and Innovation and Undergraduate Certificate in Entrepreneurship, 2009–2010

Five-Year Review Committee of Dean, School of Business, Spring 2007

Chair, Subcommittee of the Executive Committee, School of Business, 2004–2005

Chair, Ph.D. Committee, Department of Management and Human Resource Studies, School of Business, 2001–2002, 2002–2003, 2003–2004

Ad Hoc MBA Curriculum Committee, School of Business (complete redesign of curriculum to current MBA specialization model), 2002–2003

Executive Committee, Industrial Relations Research Institute

## X. SERVICE-VANDERBILT UNIVERSITY (selected)

Dean Search Committee

Director, Human Resource Steering Committee (monthly lunch meeting of area HR Vice-Presidents)

Area Coordinator/Department Chair, Organization Studies, August 1996–December 1999

Research Committee, Owen School

Chair, Ad Hoc Promotion and Tenure Committees

Chair, Search Committee, Cal Turner Professor of Moral Leadership

## XI. SERVICE-CORNELL UNIVERSITY (selected)

Department Chair, Human Resource Studies, August 1992–July 1995

Policy Board, Center for Advanced Human Resource Studies

Graduate Committee

Chair, Ad Hoc Faculty Search Committees

Chair, Ad Hoc Promotion and Reappointment Committees

University Research Policy Committee

## XII. SERVICE-FIELD

**Editorial Boards:**

Industrial and Labor Relations Review, 1994

Management & Organization Review, 2011 (China, International Association for Chinese Management Research)

German Journal of Human Resource Management, 2017 (Germany)

Journal of International Business Studies, 2017–2022

International Journal of Human Resource Management, 1998–2020 (United Kingdom)

Academy of Management Journal, 1993–1999, 2002–2020

Journal of Applied Psychology, 1994–1996, 2007–2020

Journal of Management & Organization (Australia), 2006–2020

Personnel Psychology, 1996–2018

Journal of World Business, 2012–2017

Human Relations (United Kingdom), 2006–2011

Administrative Science Quarterly, 1999–2000

Ad Hoc Reviewer, numerous journals

**Guest Co-editor**

Special Issue on Human Resources and Organizational Performance, Academy of Management Journal (August 1996 issue)

**Chair, Outside Review Committee**

Department of Labor Studies, Tel Aviv University, January 2011

**Academy of Management Activities:**

Chair, Thomas A. Mahoney Mentoring Award Committee, Academy of Management, Human Resources Division, 2019.

Chair, Thomas A. Mahoney Mentoring Award Committee, Academy of Management, Human Resources Division, 2018.

Member, Herbert Heneman Jr. Award for Career Achievement Committee, Human Resources Division, Academy of Management, 2016, 2017, 2018, 2019

Member, International Human Resource Management Scholarly Research Award Committee, Academy of Management, HR Division, 2008, 2014, 2016

Member, Early Career Achievement Award Committee, Human Resources Division, Academy of Management, 2009, 2013, 2016.

Member, Scholarly Achievement Award Committee, Academy of Management, HR Division, 2014

Member, Ralph Alexander Dissertation Award, Academy of Management, HR Division, 2007, 2014

Chair, Herbert Heneman Jr. Award for Career Achievement Committee, Human Resources Division, Academy of Management, 2013

Member, All-Academy Career Achievement Awards Committee, Academy of Management, 2010

Chair, International Human Resource Management Scholarly Research Award Committee, Academy of Management, HR Division, 2010

Chair, Scholarly Achievement Award Committee, Academy of Management, HR Division, 2003

Chair, Awards Committee, HR Division, Academy of Management, 1997

Past Member, Executive Committee, HR Division, Academy of Management

Speaker, Doctoral Consortium, Academy of Management, HR Division, multiple occasions

Speaker, Junior Faculty Consortium, Academy of Management, HR Division, multiple occasions

## APPENDIX B

## Materials Considered Include the Following:

## I.   PAPERS, BOOKS, AND WEBSITES

## Papers, Books, and Websites

*About Us*, DAVITA REDWOODS, https://www.redwoods.davita.com/about-us (last visited Jan. 14, 2025)

*About Us*, SCAHEALTH, https://sca.health/about-us/

Andrew Hayek, LINKEDIN, https://www.linkedin.com/in/andrewhayek/

Annual Report, DAVITA (2010), https://filecache.investorroom.com/mr5ir_davita/118/2010%20DVA%20Annual_0.pdf

Annual Report, DAVITA (2023), https://investors.davita.com/download/DaVita_2023_Annual_Report.pdf

Armen Alchian, *Information Costs, Pricing, and Resource Unemployment,* 7 ECON. INQUIRY 109–128 (1969)

B. Jovanovic, *Job matching and the theory of turnover*, 87 J. POL. ECON. 972-990 (1979), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr75-0149206320978799

B. Jovanovic & R. Moffitt, *An estimate of a sectoral model of labor mobility*, 98 J. POL. ECON. 827-852 (1990), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr76-0149206320978799

BARRY GERHART, COMPENSATION (14th ed. 2023)

Barry A. Gerhart & George T. Milkovich, *Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm*, PAY EQUITY:  EMPIRICAL INQUIRIES, (R. Michael & H. Hartmann, Eds. 1989)

Barry Gerhart & Jie Feng, *The Resource-Based View of the Firm, Human Resources, and Human Capital: Progress and Prospects*, 47 J. MGMT. 1796–1819 (Jan. 4, 2021), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr85-0149206320978799

BARRY GERHART & SARA L. RYNES. COMPENSATION (2003)

Barry Gerhart & Sara Rynes, *Determinants and Consequences of Salary Negotiations by Graduating Male and Female MBAs*, 76 J. APPLIED PSYCH. 256–262 (1991)

Bill Myers, LINKEDIN, https://www.linkedin.com/in/bill-myers-6b88a12/

Boris Groysberg, Paul Healy & Eric Lin, *Determinants of Gender Differences in Change in Pay among Job-Switching Executives*, CORNELL UNIV. ILR REV. (June 14, 2020)

Brett Brodnax, LINKEDIN, https://www.linkedin.com/in/brett-brodnax-0022301/

Brian Mathis, LINKEDIN, https://www.linkedin.com/in/briantmathis/

Carlos Carrillo-Tudela, Bart Hobijn, Patryk Perkowski, & Ludo Visschers, *Majority of Hires Never Report Looking for a Job*, FED. RSRV. BANK OF S.F. ECON. LETTER (Mar. 30, 2015)

Charlie O. Trevor, Greg Reilly & Barry Gerhart, *Reconsidering pay dispersion's effect on the performance of interdependent work: Reconciling sorting and pay inequality*, 55 ACAD. MGMT. J. 585–610 (Sept. 8, 2012)

Dan Luu, *How Many Locations Does Surgical Care Affiliates Have?*, NWCC-OR (Aug. 3, 2022), https://www.nwcc-or.com/how-many-locations-does-surgical-care-affiliates-have#:~:text=SCA%20Health%20is%20dedicated%20to,patients%2C%20providers%2C%20and%20community

David Card, Alexandre Mas, Enrico Moretti, & Emmanuel Saez, *Inequality at Work: The Effect of Peer Salaries on Job Satisfaction*, 102 AM. ECON. REV. 2981-3003 (Oct. 2010)

David I. Levine, *What do Wages Buy?,* 38 ADMIN. SCI. Q. 462–483 (Sept., 1993)

DAVID NEUMARK & WILLIAM L. WASCHER, MINIMUM WAGES (2008)

Dennis Kogod, LINKEDIN, https://www.linkedin.com/in/dennis-kogod-02110b323/

Derek Neal, *Industry-specific human capital: Evidence from displaced workers*, 13 J. LAB. ECON. 653–677 (Oct. 1995)

Doug Swope, LINKEDIN, https://www.linkedin.com/in/doug-swope-a0178b5/

Dow Scott, Tom McMullen, & Mark Royal, *Reward Fairness: Slippery Slope or Manageable Terrain?,* WORLDATWORK J. (Fourth Quarter 2011)

E. P. Lazear & J. R. Spletzer, *Hiring, churn and the business cycle*, AM. ECON. REV. (2012), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr85-0149206320978799

Elaine Sorensen, *The Crowding Hypothesis and Comparable Worth*, 25 J. HUMAN RES. 55-89 (1990)

Eric Parrado, Asena Caner & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007)

Form 10-K, TENET HEALTH CARE CORP. (Dec. 31, 2023), https://s23.q4cdn.com/674051945/files/doc_financials/2023/q4/tenet-10K.pdf

Frank M.H. Neffke, Anne Otto, & Antje Weyh, *Inter-industry labor flows,* 142 J. ECON. BEHAV. & ORG. 275–292 (Oct. 2017)

George F. Dreher & Taylor H. Cox, Jr., *Labor Market Mobility and Cash Compensation: The Moderating Effects of Race and Gender*, ACAD. MGMT. J. (Oct. 1, 2000)

Giuseppe Moscarini & Fabien Postel-Vinay, *The Cyclical Job Ladder*, 10 ANN. REV. ECON. 165-188 (Aug. 2018)

Government Contractors, Prohibitions Against Pay Secrecy Policies and Actions, 80 Fed. Reg. 54934-01 (Sept. 11. 2015) (41 CFR Part 60-1)

Gov't Contractors, Prohibitions Against Pay Secrecy Policies and Actions, 79 Fed. Reg. 55712-02, 55713 (proposed Sept. 17, 2014) (to be codified at 41 C.F.R. pt 60).

Gueorgui Kambourov & Iourii Manovskii, *Rising occupational and industry mobility in the United States: 1968–97*, 49 INT'L ECON. REV. 41–79 (Feb. 2008)

Huasheng Gao,,Juan Luo, & Tilian Tang, *Effects of Managerial Labor Market on Executive Compensation: Evidence from Job-Hopping*, 59 J. ACCT. & ECON. 203–220 (2015)

Ingrid Smithy Fulmer, Barry Gerhart, & Ji Hyun Kim, *Compensation and Performance: A Review and Recommendations for the Future*, 76 PERS. PSYCH. 687–718 (Feb. 27, 2023)

*Investors*, DAVITA, https://investors.davita.com/ (last visited Jan. 13, 2025)

J. Stacy Adams, *Toward an understanding of inequity*, 67 J. ABNORMAL & SOC. PSYCH. 422–36 (1963)

James "Skip" Thurman, LINKEDIN, https://www.linkedin.com/in/james-skip-thurman-320b69a/

Jennifer Sandoz, LINKEDIN, https://www.linkedin.com/in/jennifer-sandoz-4125071/

JERRY NEWMAN, BARRY GERHART, & GEORGE MILKOVICH COMPENSATION (2010–2013)

JERRY NEWMAN, BARRY GERHART, & GEORGE MILKOVICH, COMPENSATION (12th ed. 2016)

Joe Clark, LINKEDIN, https://www.linkedin.com/in/joe-clark-43726011/

John K. Mawdsley & Deepak Somaya, *Employee Mobility and Organizational Outcomes: An Integrative Conceptual Framework and Research Agenda*, 42 J. MGMT. 85–113 (Nov. 19, 2015)

John Schultz, LINKEDIN, https://www.linkedin.com/in/johnwschultz/

JOSEPH J. MARTOCCIO, STRATEGIC COMPENSATION: A HUMAN RESOURCE MANAGEMENT APPROACH (10th ed. 2020)

K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness: Slippery Slope or Manageable Terrain?*, 20 WorldatWork J. 50–64 (Fall 2011)

KEN CARDINAL & BETH FLORIN, HANDBOOK FOR CONDUCTING COMPENSATION & BENEFITS SURVEYS (2012)

Kent Thiry, LINKEDIN, https://www.linkedin.com/in/kent-thiry-0a996298/

KEVIN F HALLOCK, PAY: WHY PEOPLE EARN WHAT THEY EARN AND WHAT YOU CAN DO NOW TO MAKE MORE (2012)

Kimberly Bayard, Judith Hellerstein, David Neumark,& Kenneth Troske, *New evidence on sex segregation and sex differences in wages from matched employee-employer data*, 21 J. LAB. ECON. 887–922 (Oct. 2003)

Kimberly Kephart, LINKEDIN, https://www.linkedin.com/in/kimkephart/details/experience/

Kristen Keith & Abigail McWilliams, *The Returns to Mobility and Job Search by Gender*, CORNELL UNIV. ILR REVIEW (Apr. 1999)

L. R. Gomez-Mejia & D. B. Balkin, *Determinants of faculty pay: An agency theory perspective*, ACAD. MGMT. J. (1992)

Laura Lorber, *How to Retain Employees*, WALL ST. J., Sept, 12, 2008, http://guides.wsj.com/small-business/hiring-and-managing-employees/how-to-retain-employees

Margaret L. Williams, Michael A. McDaniel & Nhung T. Nguyen, *A meta-analysis of the antecedents and consequences of pay level satisfaction*, 91 J. APPLIED PSYCH. 392 (2006)

Mark Kopser, LINKEDIN, https://www.linkedin.com/in/mark-kopser-a9b06816/

Matthew Bidwell, *Paying more to get less: The effects of external hiring versus internal mobility*, 56 ADMIN. SCI. Q. 369–407 (Dec. 27, 2011)

Matthew Bidwell & Ethan Mollick, *Shifts and Ladders: Comparing the Role of Internal and External Mobility in Managerial Careers*, ORG. SCI. (Oct. 5, 2015)

Michael C. Sturman, Charlie O. Trevor, John W. Boudreau, Barry Gerhart, *Is it Worth it to Win the Talent War? Evaluating the Utility of Performance-Based Pay*, 56 PERS. PSYCH. 997–1035 (2003)

Michael Rucker, LINKEDIN, https://www.linkedin.com/in/michael-rucker-82ba0a1b/

MIDWEST INDUS. MGMT. ASS'N , MIMA'S GUIDE TO THE EFFECTIVE USE OF ITS JOB EVALUATION PLAN (SHOP) (1974)

Niklas Engbom, *Labor market fluidity and human capital accumulation*, NAT'L BUREAU ECON. RSCH. (No. 29698 Jan. 2022), https://www.nber.org/papers/w29698

O*NET ONLINE, https://www.onetonline.org/ (last visited Jan. 14, 2025)

ORG. FOR ECON. CO-OPERATION & DEV., DIRECTORATE FOR FIN. & ENTER. AFFAIRS COMPETITION COMMI., BARRIERS TO EXIT- BACKGROUND NOTE (Oct. 23, 2019), https://one.oecd.org/document/DAF/COMP(2019)15/en/pdf

Peter Cappelli & Peter D. Sherer, S*atisfaction, Market Wages, and Labor Relations: An Airline Study*, 27 INDUS. REL. 56–73 (1988)

Peter Cappelli & Peter D. Sherer, *The Effect of a Two-Tier Wage Plan on Employee Attitudes*, 43 INDUS. & LABOR REL. REV. 225–44 (1990)

Peter Cappelli, *A Market-Driven Approach to Retaining Talent*, 78 HARV. BUS. REV. 103–11 (Jan.–Feb., 2000)

Peter Clemens, LINKEDIN, https://www.linkedin.com/in/peter-j-clemens-iv-a5727520/

Press Release: DaVita Inc., DaVita Medical Group Acquires Respected Physician Practices in the Orlando Area (July 13, 2017), https://newsroom.davita.com/press-releases?item=123281

Press Release, Tenet Health Completes Purchase of USPI from WCAS (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx

Press Release, Tenet Healthcare Corp., Tenet Healthcare Corp. Completes United Surgical Partners Int'l & Aspen Healthcare Transactions (June 16, 2015), https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm#:~:text=DALLAS%20%E2%80%93%20June%2016%2C%202015%20%E2%80%93,U.S.%20short%2Dstay%20surgery%20platform.

Press Release, UnitedHealth Group, Optum completes acquisition of DaVita Medical Group from DaVita (June 19, 2019), https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html

Press Release, UnitedHealth Group, Surgical Care Affiliates (SCA), OptumCare to Combine (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html

Proxy Statement, DAVITA (2012), https://filecache.investorroom.com/mr5ir_davita/175/2012%20Proxy%20Statement_2.pdf

R. J. Harvey, *Job Analysis, in* HANDBOOK OF INDUS. & ORG. PSYCH. 71–163 (Marvin. D. Dunnette & Leatta. M. Hough eds., 1991)

RAYMOND NOE, JOHN HOLLENBECK, BARRY GERHART & PATRICK WRIGHT, FUNDAMENTALS OF HUMAN RESOURCE MANAGEMENT (2022)

RAYMOND A. NOE, JOHN R. HOLLENBECK, BARRY GERHART, & PATRICK M. WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE (14th ed. 2024)

RAYMOND A. NOE, JOHN R. HOLLENBECK, BARRY GERHART, & PATRICK M. WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE. (13th ed. 2023)

Rich Sharff, LINKEDIN, https://www.linkedin.com/in/rich-sharff-27b8abb./

Richard P. Castanias & Constance E. Helfat, *The managerial rents model: Theory and empirical analysis*, 27 J. MGMT. 661–678 (Nov.–Dec. 2001)

Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 108 Q. J. ECON. 439–79 (May 1992)

S. J. DAVIS & J. HALTIWANGER, GROSS JOB FLOWS, HANDBOOK OF LABOR ECONOMICS (1999), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr40-0149206320978799

Sandi Karrmann, LINKEDIN, https://www.linkedin.com/in/sandikarrmann/

Shannon Mosley, LINKEDIN, https://www.linkedin.com/in/shannonmosley/

Tae Hon Lee, Barry Gerhart, Ingo Weller & Charlie O. Trevor, *Understanding Voluntary Turnover: Path-Specific Job Satisfaction Effects and The Importance of Unsolicited Job Offers*, 51 ACAD. MGMT. J. 651, 655 (Aug. 2008)

Terry D. Warfield & John J. Wild, *Accounting recognition and the relevance of earnings as an explanatory variable for returns*, 67 ACCT. REV. 821–842 (Oct. 1992)

Thomas W. Lee & Terence R. Mitchell, *An Alternative Approach: The Unfolding Model of Voluntary Employee Turnover*, 19 ACAD. MGMT. REV. 51–89 (Jan. 1994)

Tom McMullen & Serra Aladag *Pay Transparency:  A Closer Look at the risks, rewards and Regulations*, WORLDATWORK, INC. (Oct. 19, 2023), https://worldatwork.org/publications/workspan-daily/pay-transparency-a-closer-look-at-the-risks-rewards-and-regulations

Warren J. Cinnick, LINKEDIN, https://www.linkedin.com/in/warrencinnick/

WORLDATWORK, https://worldatwork.org/research/compensation-programs-and-practices

WORLDATWORK, CERTIFICATION (2025), https://worldatwork.org/certifications

WORLDATWORK, COMPENSATION PROGRAMS AND PRACTICES SURVEY (2016)

WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023)

WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025), https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual

WORLDATWORK, SALARY BUDGET SURVEY (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf

## II. DEPOSITION TRANSCRIPTS AND EXHIBITS, AND DOCUMENTARY EVIDENCE

I was provided access to all deposition transcripts and exhibits and all documents produced in the case. The following are among the materials I considered:

**Deposition Transcripts (in alphabetical order)**

Deposition of Colleen Arthur, DaVita, May 23, 2024 ("Arthur Dep.")

Deposition of Brett Brodnax, USPI, September 12, 2024 ("Brodnax Dep.")

Deposition of Jason Cagle, USPI, August 6, 2024 ("Cagle Dep.")

Deposition of Robert Chipman, DaVita, August 7, 2024 ("Chipman Dep.")

Deposition of Warren Cinnick, SCA, November 22, 2024 ("Cinnick Dep.")

Deposition of Peter Clemens, SCA, May 2, 2024 ("Clemens Dep.")

Deposition of Cindy English, USPI, June 12, 2024 ("English Dep.")

Deposition of Bridie Fanning, SCA, July 17, 2024 ("Fanning Dep.")

Deposition of Mark Garvin, USPI, May 30, 2024 ("Garvin Dep.")

Deposition of Andrew Hayek, September 18, 2024 ("Hayek Dep.")

Deposition of Andrew Johnston, USPI, September 6, 2024 ("Johnston Dep.")

Deposition of Sandi Karrmann, USPI, August 14, 2024 ("Karrmann Dep.")

Deposition of Scott Keech, Plaintiff, August 22, 2024 ("Keech Dep.")

Deposition of Anthony Kilgore, SCA, October 22, 2024 ("Kilgore Dep.")

Deposition of Dennis Kogod, DaVita, September 6, 2024 ("Kogod Dep.")

Deposition of Mark Kopser, USPI, December 12, 2024 ("Kopser Dep.")

Deposition of Brian Mathis, SCA, September 20, 2024 ("Mathis Dep.")

Deposition of Shannon McGarry, USPI, June 11, 2024 ("McGarry Dep.")

Deposition of Laura Mildenberger, DaVita, July 30, 2024 ("Mildenberger Dep.")

Deposition of Shannon Mosley, USPI, August 13, 2024 ("Mosley Dep.")

Deposition of Steven Priest, DaVita / Third-Party, November 5, 2024 ("Priest Dep.")

Deposition of Javier Rodriguez, DaVita, August 12, 2024 ("Rodriguez Dep.")

Deposition of Michael Rucker, SCA, August 27, 2024 ("Rucker Dep.")

Deposition of Jennifer Sandoz, SCA, September 26, 2024 ("Sandoz Dep.")

Deposition of Michael Staffieri, DaVita, April 5, 2024 ("Staffieri Dep.")

Deposition of Jimmy Tanner, Third Party, July 31, 2024 ("Tanner Dep.")

Deposition of Kent Thiry, August 16, 2024 ("Thiry Dep.")

Deposition of James "Skip" Thurman, DaVita, June 17, 2024 ("Thurman Dep.")

Deposition of William "Bill" Wilcox, USPI, September 24, 2024 ("Wilcox Dep.")

**Deposition Exhibits (in ascending order by exhibit number)**

Exhibit DX6

Exhibit DX64, KEECH_ 000001252

Exhibit DX72

Exhibit PX1, DOJCIV-008-00000059–71.

Exhibit PX19, DVA_OMCEAL_001399746–74

Exhibit PX21, DVA_OMCEAL_001339976–78

Exhibit PX22, DVA_OMCEAL_001079804–05

Exhibit PX24, DVA_OMCEAL_000386711

Exhibit PX25, DVA_OMCEAL_001339745–46

Exhibit PX26, DVA_OMCEAL_000751501–02

Exhibit PX27, DVA_OMCEAL_001339898–901

Exhibit PX34, SCA000109831–37

Exhibit PX37, USPI_CIV_000016100

Exhibit PX50

Exhibit PX55, SCA001204514–15

Exhibit PX56, SCA001239262–63

Exhibit PX70

Exhibit PX71, DVA_OMCEAL_001383294–95 with attachments
DVA_OMCEAL_001383296–307

Exhibit PX73, DVA_OMCEAL_001332708–11

Exhibit PX74, DVA_OMCEAL_001323118–20

Exhibit PX75, DVA_OMCEAL_001321755–59

Exhibit PX77, DVA_OMCEAL_001329256–61

Exhibit PX79, DVA_OMCEAL_001385528-29, with attachment
DVA_OMCEAL_001385530

Exhibit PX81, DVA_OMCEAL_001068250–52

Exhibit PX82, DVA_OMCEAL_001170440–41

Exhibit PX83, DVA_OMCEAL_001057524–25

Exhibit PX84, DVA_OMCEAL_001321377–78.

Exhibit PX85, DVA_OMCEAL_001067247–59

Exhibit PX87

Exhibit PX88, DOJCIV-008-00000353–67

Exhibit PX89, USPI_CIV_000000597–600, with attachment Exhibit PX90,
USPI_CIV_000000601

Exhibit PX97

Exhibit PX98, DOJCIV-012-00000121–29

Exhibit PX108

Exhibit PX109, USPI_CIV_000810693, with attachments Exhibit PX112, USPI_CIV_000810694, Exhibit PX113, USPI_CIV_000810696, and Exhibit PX114, USPI_CIV_000810695

Exhibit PX115, USPI_CIV_000039752–53, with attachment Exhibit PX116, USPI_CIV_000039754

Exhibit PX117, USPI_CIV_000022038, with attachment Exhibit PX118, USPI_CIV_000022040

Exhibit PX123, DOJCIV-007-00000091–96

Exhibit PX124, DOJCIV-012-000000131–37

Exhibit PX126, DOJCIV-014-000000001

Exhibit PX133

Exhibit PX135, USPI_CIV_000016089–92

Exhibit PX138, USPI_CIV_000122239

Exhibit PX140, USPI_CIV_000146394

Exhibit PX142, USPI_CIV_000122072

Exhibit PX166, DOJ-PROD001B-00538908–09

Exhibit PX157

Exhibit PX158

Exhibit PX159, DOJ-PROD001B-00152893–908

Exhibit PX160, SCA000002866–68

Exhibit PX167, DOJ-PROD004-00835491–92

Exhibit PX170, DOJ-PROD004-00476230–31

Exhibit PX171, DOJ-PROD001B-00157126–28

Exhibit PX172, DOJ-PROD001A-00000001–02

Exhibit PX180, USPI_CIV_000091768–69

Exhibit PX181, USPI_CIV_000039752–53, with attachment Exhibit PX182, USPI_CIV_000039754

Exhibit PX183, USPI_CIV_000039819–20

Exhibit PX185

Exhibit PX192, DVA_OMCEAL_000277553–58

Exhibit PX196, DVA_OMCEAL_001216213–16

Exhibit PX201, DVA_OMCEAL_000944847–52

Exhibit PX202, DVA_OMCEAL_001217979–81

Exhibit PX203, DVA_OMCEAL_000944853–54

Exhibit PX216, USPI_CIV_000010048–57

Exhibit PX219, DOJCIV-012-00000066–69

Exhibit PX220, USPI_CIV_000019262–65

Exhibit PX221, USPI_CIV_000017726–27

Exhibit PX227, USPI_CIV_000014146

Exhibit PX234, USPI_CIV_000016522

Exhibit PX235, USPI_CIV_000110943

Exhibit PX240, USPI_CIV_000686081–92

Exhibit PX248, RC_OMCEAL_0000062–64

Exhibit PX249, DVA_OMCEAL_000906132–35

Exhibit PX250, DVA_OMCEAL_000904769–70

Exhibit PX251, DVA_OMCEAL_000907134–52

Exhibit PX252, DVA_OMCEAL_001187352–54

Exhibit PX253, DVA_OMCEAL_000012083–88

Exhibit PX254, DVA_OMCEAL_000036918–35

Exhibit PX255, DVA_OMCEAL_000008843–44

Exhibit PX259

Exhibit PX260

Exhibit PX261

Exhibit PX262

Exhibit PX264, DVA_OMCEAL_001145958, with attachments
DVA_OMCEAL_001145959–006

Exhibit PX265, DVA_OMCEAL_000957201–04, with attachment
DVA_OMCEAL_000957205

Exhibit PX266

Exhibit PX268, DVA_OMCEAL_001344567–82

Exhibit PX267, DVA_OMCEAL_001238631–32

Exhibit PX269, DVA_OMCEAL_000957816, with attachment
DVA_OMCEAL_000957817–28

Exhibit PX270, DVA_OMCEAL_000958748, with attachment
DVA_OMCEAL_000958749–60

Exhibit PX271, DVA_OMCEAL_001144619–20

Exhibit PX272, DVA_OMCEAL_00095708990

Exhibit PX275, DOJ-PROD003-00117878–93

Exhibit PX280, DOJCIV-008-00000284–97

Exhibit PX281, DOJCIV-008-00000039–55

Exhibit PX297, USPI_CIV_000058049–50

Exhibit PX304, DOJCIV-008-00000298–303

Exhibit PX305, DOJCIV-008-00000170

Exhibit PX309

Exhibit PX311, DVA_OMCEAL_001143800-01, with attachment DVA_OMCEAL_001143803–13

Exhibit PX314, DOJCIV-008-00000228–43

Exhibit PX316, DOJCIV-008-00000260–65

Exhibit PX330, DVA_OMCEAL_000214999–21500

Exhibit PX331, DOJCIV-007-00000050–52

Exhibit PX333, DVA_OMCEAL_000658781

Exhibit PX335, DOJ-PROD001A-00000239

Exhibit PX452

Exhibit PX454, USPI_CIV_000058068

Exhibit PX455, USPI_CIV_000027565

Exhibit PX465, SCA000048815–17

Exhibit PX483

Exhibit PX484, DVA_OMCEAL_000429386–90

Exhibit PX490, HAYEK-000012214–16

Exhibit PX497, OMC-BM-000007716

Exhibit PX501, SCA002277742

Exhibit PX506, DOJCIV-005-00000011

Exhibit PX507, DOJCIV-008-00000266–78

Exhibit PX508, DOJCIV-008-00000212–26

Exhibit PX523, OMC_BM_000010778–79

Exhibit PX528, SCA001046573–74

Exhibit PX529, SCA000065974–75, with attachment SCA000065976–84

Exhibit PX530, SCA001191900–01

Exhibit PX531

Exhibit PX537

Exhibit PX541, SCA000331970–73

Exhibit PX546

Exhibit PX551, DVA_OMCEAL_000405110

Exhibit PX552, DVA_OMCEAL_000313489–91

Exhibit PX554

Exhibit PX555, DOJCIV-007-00000007–15

Exhibit PX562, SCA001777877–78

**Other Evidence Produced by Defendants and Third Parties**

BF000048126
BF000095333
BF000098905
DOJCIV-007-00000041–44

-237-

DOJCIV-007-00000069
DOJCIV-007-00000101–103
DOJCIV-007-00000105–07
DOJCIV-008-00000032–33
DOJCIV-008-00000090
DOJCIV-008-00000345
DOJCIV-010-00000117
DOJCIV-012-00000056
DVA_OMCEAL_000277557
DVA_OMCEAL_000942244
DVA_OMCEAL_001188391
DVA_OMCEAL_001411518
EVER13532
HAYEK-000011525
HAYEK-000012301
HAYEK-000012301
OMC_BM_000006875
OMC_BM_000007833
OMC_BM_000009010
OMC_JC_000001411
OC_JC_000001411
SCA000035060
SCA000050575
SCA000051019
SCA000051046
SCA000052830
SCA000065816
SCA000073150
SCA000077243
SCA000077247
SCA000078126
SCA000078134
SCA000078155
SCA000078353
SCA000078354
SCA000079723
SCA000081410
SCA000083983
SCA000093346
SCA000094797
SCA000097183
SCA000098561
SCA000106501

SCA000109496
SCA000111304
SCA000111305
SCA000111311
SCA000111312
SCA000111313
SCA000111314
SCA000111315
SCA000111332
SCA000111335
SCA000111574
SCA000112688
SCA000128582
SCA000128584
SCA000150918
SCA000165836
SCA000363209
SCA000496894
SCA000512099
SCA000512100
SCA000512101
SCA000518874
SCA000528950
SCA000529876
SCA000531068
SCA000539858
SCA000539878
SCA000539880
SCA000539927
SCA000539963
SCA000540080
SCA000540082
SCA000541665
SCA000542598
SCA000542599
SCA000542600
SCA000542742
SCA000542750
SCA000545210
SCA000546011
SCA000546069
SCA000554705
SCA000567838

SCA000571101
SCA000571120
SCA000626812
SCA000662232
SCA000662233
SCA000669368
SCA000669369
SCA000680384
SCA000681919
SCA000836095
SCA000836097
SCA000838370
SCA000838374
SCA000838484
SCA000849033
SCA000861792
SCA000861794
SCA000862885
SCA000870806
SCA000870807
SCA000872849
SCA000872850
SCA000878779
SCA000910975
SCA000957620
SCA000972653
SCA000975231
SCA000975231
SCA000988636
SCA000988976
SCA001060322
SCA001094909
SCA001094914
SCA001095587
SCA001115841
SCA001116610
SCA001123366
SCA001124520
SCA001154146
SCA001154146
SCA001187512
SCA001189759
SCA001192477

SCA001123358 (cover email) and SCA001123359 (attachment).
SCA001204514
SCA001204745
SCA001208498
SCA001210714
SCA001210714
SCA001211596
SCA001211599
SCA001214609
SCA001214610
SCA001215246
SCA001215495
SCA001223273
SCA001225462
SCA001225946
SCA001227036
SCA001228948
SCA001228949
SCA001233178
SCA001235058
SCA001235058
SCA001239994
SCA001239995
SCA001262933
SCA001262937
SCA001266926
SCA001279872
SCA001280924
SCA001280924
SCA001293537
SCA001314584
SCA001363536
SCA001370884
SCA001384336
SCA001436215
SCA001437912
SCA001451596
SCA001453220
SCA001453227
SCA001477484
SCA001487074
SCA001508595
SCA001508596

SCA001519131
SCA001519132
SCA001519137
SCA001519138
SCA001519139
SCA001519952
SCA001519954
SCA001547086
SCA001547088
SCA001589291
SCA001589292
SCA001589332
SCA001589334
SCA001604084
SCA001604085
SCA001613450
SCA001617479
SCA001634127
SCA001634128
SCA001637622
SCA001667523
SCA001667523
SCA001676501
SCA001676501
SCA001754229
SCA001754230
SCA001754231
SCA001757138
SCA001774581
SCA001775416
SCA002100814
SCA002100816
SCA002194370
SCA002209145
SCA002209521
SCA002223610
SCA002226644
SCA002226645
SCA002226646
SCA002268744
SCA002272830
SCA002275090
SCA002283959

SCA002297032
SCA002313664
USPI_CIV_000000457
USPI_CIV_000000462
USPI_CIV_000000464
USPI_CIV_000000601
USPI_CIV_000000652
USPI_CIV_000001857
USPI_CIV_000001881
USPI_CIV_000001885
USPI_CIV_000001886
USPI_CIV_000006921
USPI_CIV_000010321
USPI_CIV_000010971
USPI_CIV_000013866
USPI_CIV_000014031
USPI_CIV_000014062
USPI_CIV_000014178
USPI_CIV_000015993
USPI_CIV_000015994
USPI_CIV_000016013
USPI_CIV_000016019
USPI_CIV_000016029
USPI_CIV_000016031
USPI_CIV_000016041
USPI_CIV_000016552
USPI_CIV_000016564
USPI_CIV_000016582
USPI_CIV_000021077
USPI_CIV_000021103
USPI_CIV_000021128
USPI_CIV_000021181
USPI_CIV_000021190
USPI_CIV_000021210
USPI_CIV_000021991
USPI_CIV_000022268
USPI_CIV_000023148
USPI_CIV_000045294
USPI_CIV_000058049
USPI_CIV_000064524
USPI_CIV_000064780
USPI_CIV_000096518
USPI_CIV_000099553

USPI_CIV_000101136
USPI_CIV_000101137
USPI_CIV_000104518
USPI_CIV_000105047
USPI_CIV_000109590
USPI_CIV_000110162
USPI_CIV_000110943
USPI_CIV_000113340
USPI_CIV_000113396
USPI_CIV_000114069
USPI_CIV_000114132
USPI_CIV_000122223
USPI_CIV_000131250
USPI_CIV_000131719
USPI_CIV_000150417
USPI_CIV_000150817
USPI_CIV_000214742
USPI_CIV_000214746
USPI_CIV_000228756
USPI_CIV_000228762
USPI_CIV_000321269
USPI_CIV_000411546
USPI_CIV_000467624
USPI_CIV_000472872
USPI_CIV_000533945
USPI_CIV_000658451
USPI_CIV_000785652
USPI_CIV_000810134
USPI_CIV_000810694
USPI_CIV_000901340
USPI_CIV_000962508

## III.      LEGAL DOCUMENTS

3rd Am. Class Action Compl. (ECF No. 555), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

**APPENDIX C**

| Employee | Company, Job Title (Years) |
|---|---|
| Colleen Arthur | DaVita, Intern (2013); DaVita, Redwoods Resident (2014–2015); DaVita, Facility Administrator (2015); DaVita, Manager, Compensation & Analytics (2015); DaVita, Director, Compensation & Analytics (2015–2018); DaVita, Senior Director, Compensation & Analytics (2018–2021); DaVita, Senior Director, Recruiting Operations, Strategy & Employment Branding (2021–2022) |
| Brett Brodnax | USPI, Executive Vice President ("EVP")/Chief Development Officer ("CDO") (2005–2011); USPI, President (2011–2018); USPI, Chief Executive Officer ("CEO") (2018–Present) |
| Jason Cagle | USPI, Vice President ("VP") (2005–2010); USPI, Senior Vice President ("SVP") (2010–2013); USPI, Chief Financial Officer ("CFO"), (2013–2020) |
| Robert Chipman | DaVita, People Services Group Director (2011–2012); DaVita, VP of Recruiting and Talent Management (2012–2015) |
| Warren Cinnick | SCA, VP Human Resources ("HR") (2017–2020); SCA, SVP HR (2020); SCA, Group VP ("GVP") HR (2021–2023) |
| Joseph ("Joe") Clark | SCA, EVP & Chief Operating Officer ("COO") (2008); SCA, EVP Development (2008–Present) |
| Peter Clemens | SCA, EVP and CFO (2011–2015), SCA, Senior Advisor (2015–2017) |
| Goran Dragolovic | SCA, SVP Operations (2011–2017) |
| Cindy English | USPI, VP Financial Operations (2007–2019) |
| Bridie Fanning | SCA, Chief Talent Officer (2014–2016) |
| Ray Follett | DaVita, Intern (2005); DaVita, Specialist NE (2006); DaVita, Special Project Consultant (2006); DaVita, Regional Operations ("Ops") Director (2006–2009); DaVita, GVP (2008); DaVita, Group Director (2009–2010); DaVita, DVP/RVP (2010–2012); DaVita, GVP (2012–2022) |
| Mark Garvin | SCA, VP Operations (1992–1996); USPI, COO (2001–2020) |
| Joshua Golomb | DaVita, General Manager-DaVita Rx (2005, 2014–2015); DaVita, Director, Special Projects (2005); DaVita, Senior Manager (2005); DaVita, Director Star Rx (2005–2006); DaVita, Senior Director DaVita Rx (2006); DaVita, Senior Director (2006–2007); DaVita, VP, DaVita Rx (2007–2015); DaVita, CEO, Paladina Health [a DaVita subsidiary] |
| Andrew Hayek | DaVita, President (2007); DaVita, VP (2007–2008); SCA, President & CEO (2008–2017); OptumHealth, CEO (2017–2019) |
| Elliott Holder | DaVita, Analyst EX (2013); DaVita, Financial Analyst (2014); DaVita, Senior Financial Analyst (2015–2016); DaVita, Manager, Payor Contacting (2017); DaVita, Senior Manager, Payor Contracting (2018–2021) |
| Andrew ("Andy") Johnston | USPI, RVP Operations (2001-2004), USPI, SVP Development (2004–2007); USPI, SVP/DVP (2007–2014); USPI, COO, East (2014–2018); |

-245-

| | USPI, CDO (2018–2020); U.S. Renal Care, COO (2020–2021); USPI, Chief Administrative Officer ("CAO") (2023) |
|---|---|
| Sandi Karrmann | USPI, SVP, Chief Human Resources & Support Services Officer (2013–2017); Tenet Healthcare/USPI, EVP, Chief Human Resources Officer (2017–2020) |
| Scott Keech | SCA, Regional Director of Operations & Clinical Services (2009–2012) |
| Kimberly Kephart | Novotus, Senior Recruiter (2010–2016) |
| Anthony Kilgore | SCA, Group VP (2011–2012); SCA, SVP Operations (2013–2016); SCA, Group President (2017); SCA, CEO (2018–2019) |
| Dennis Kogod | DaVita, Division President (2006–2010); DaVita, SVP (2008); DaVita, COO (2008–2016); DaVita, COO, HealthCare Partners (2014–2016); DaVita, Advisor to CEO (2016) |
| Mark Kopser | USPI, CFO (2000–2012) |
| Jung Lee | DaVita, Regional Ops Director (2005); DaVita, Director – Audit and Compliance (2005–2006); DaVita, Director (2006–2008), DaVita, VP (2008–2014); DaVita, Regional Ops Director (2011–2013); DaVita, Division Vice President ("DVP") (2014–2015); DaVita, GVP, New Market CA (2015); DaVita, SVP, HealthCare Partners (2015–2018) |
| Anthony Martin | USPI, Senior Vice President, Corporate Controller and Chief Accounting Officer (1998–2019) |
| Brian Mathis | SCA, VP Strategy (2009–2014); SCA, Group VP Strategy and Payer Engagement (2014–2015); SCA, SVP, Strategy and Payment Innovation (2015–2017); SCA, CDO (2017–2018); OptumCare, CDO (2017–2018); OptumCare, Chief Strategy Officer (2018–2020) |
| Shannon McGarry | USPI, Executive Recruiter (2016–2020); USPI, Manager, Executive Recruitment (2020–2021); USPI, Regional Market Recruiter (2021 – Present) USPI, Manager – Talent Acquisition/Onboarding (2023 – Present) |
| Laura Mildenberger | DaVita, DVP / Chief People Officer, (2005); DaVita, DVP/Regional Vice President ("RVP") (2006–2007); DaVita, SVP (2008); DaVita, Chief People Officer (2008–2016) |
| Shannon Mosley | USPI, Director (2003–2006); USPI, Director (2007); USPI, VP Talent Acquisition (2007–2020) |
| Bill Myers | DaVita, VP Marketing Communications (2016–2018); DaVita, VP, Communications, Marketing & Corporate Social Responsibility (2012–2016); DaVita, VP, Communications and Corporate Social Responsibility (2010–2012); UnitedHealth Group, VP – Government Affairs (2008–2010) |
| Riley Orr | USPI, Intern (2012–2014); USPI, Business Office Manager (2014–2016); USPI, Administrator-in-Training (2015); USPI, Administrator (2015–2017); USPI, Regional Director (2017–2018), USPI, Regional VP – Operations (2018–2020) |
| Steven Priest | DaVita, SVP (2001–2016); DaVita, Chief Wisdom Officer (2014-2016) |

| Julio Quinones | DaVita, Regional Ops Director (2006–2011); DaVita, Redwoods (2006); DaVita, Senior Director (2008, 2013–2015); DaVita, Director (2011–2013); DaVita, Senior Manager (2013); DaVita, Senior Director International (2014); DaVita, Senior Director, Finance (2014–2016); DaVita, Embassy VP (2016–2017); DaVita, VP (2016–2017) |
|---|---|
| Javier Rodriguez | DaVita, SVP (2005–2018); DaVita, DVP (2006); DaVita, VP Value Management Operation (2006); DaVita, President (2008, 2012–2014); DaVita, CEO, Kidney Care (2014-2022) |
| Michael Rucker | DaVita, DVP/RVP (2006–2008); SCA, SVP Operations (2008–2009); SCA, EVP & COO (2009–2017) |
| Jennifer Sandoz | SCA, Director HR (2016–2017); SCA, Senior Director (2017–2020); SCA, VP HR (2021) |
| John Schultz | Russell Reynolds Associates, Consultant (2010–2014); Spencer Stuart, Consultant (2014–2016), Spencer Stuart, Principal (2016–2019); Spencer Stuart, Partner, Private Equity Healthcare Practice Leader (2019–Present) |
| Rich Scharff | SCA, EVP, General Counsel & Secretary (2007–Present); OptumHealth, General Counsel (2017–Present) |
| Allen Spradling | Director, IT Governance and Administration (2008–2013) |
| Mike Staffieri | DaVita, Director (2005–2006); SVP (2005, 2011, 2013); DaVita, Regional Ops Director (2006–2008); DaVita, Group Director (2008); DaVita, SVP; DaVita, DVP/RVP (2008–2010); DaVita, VP (2010–2011); DaVita COO, Kidney Care (2014–2022); DaVita, COO (2013–2022) |
| Doug Swope | HCA Healthcare, Manager, Executive Recruitment C-Level (1995–1998); HCA Healthcare, Director, HR Executive Recruitment (1998–2008); HCA Healthcare, Senior Director, HR (2008–2011); e+CancerCare (2011–2013); President, Surgical Care Partners (2013–Present) |
| Jimmy Tanner | Catapult Staffing, Director of Recruiting (2013–2016); Catapult Physician Staffing, VP of Recruiting & Stragetic Accounts (2017–2018) |
| Kent Thiry | DaVita, Chairman and CEO (1999–2019); DaVita, Chairman and CEO, HealthCarePartners Inc. (2014–2020); DaVita, Executive Chairman of the Board of Directors (2019–2021) |
| James "Skip" Thurman | DaVita, Director (2010–2011); DaVita, Senior Director (2011–2013); DaVita, Senior Director, Communications (2014–2017); DaVita, VP (2017–2020) |
| Sean Taylor | DaVita, Senior Director of Business Development (2015–2016) |
| Niels Vernegaard | USPI, COO (2006–2021) |
| Leslie Wachsman | SCA, VP Finance & Investor Relations (2012–2018); SCA, GVP, Finance (2018–2019); SCA, CFO (2019–Present) |
| William ("Bill") Wilcox | USPI, President (2005–2011); USPI, CEO (2011-2018), Chairman (2018–2020); USPI, Consultant (2020–2023) |

| Kevin Zaideman | SCA, Compensation Senior Manager (2017–2020); SCA, Director of Compensation (2021–2022) |
|---|---|
| Caitlin Zulla | SCA, SVP, Revenue Cycle Operations ("RCO") (2015–2017); SCA, CAO 2017–2018); SCA, CFO and CAO (2018–2019); SCA, CEO (2019–2022) |

-248-

**APPENDIX D**

**FIGURES**

**Figure 1: The Impact of (Voluntary) Employee Turnover on Subsequent Employee Pay Level[748]**

| Study | Sample | Results |
|---|---|---|
| Groysberg, Healy, & Lin (2020), ILR Review | Global executive search firm placements | 13% increase (in salary plus bonus only) after employer change. (Stock-based compensation, the largest component of executive compensation was not measured.) |
| Bidwell (2015), Organization Science | MBA alumni from a leading U.S. business school | 35% increase in earnings from voluntary employer change within same job function. 4% increase from involuntary employer change. <br><br> Internal moves (promotion) experienced 34% earnings increase. (Mean of 5.4 years post-MBA work experience. During that time, 87% changed employer at least once; 2.6 moves per person, with 65% being internal, 26% voluntary external, and 9% involuntary external.) |
| Dreher & Cox (2000), Academy of Management Journal | Recent MBA graduates | Pay was 20% higher among those who had changed employers at least once. |
| Keith & McWilliams (1999), ILR Review | National sample of young adults | Pay was 8% to 11% higher for those who voluntarily quit their job relative to those who stayed. <br><br> Pay was 14% to 18% higher if searched prior to voluntarily quitting. |
| Gomez-Mejia & Balkin (1992), Academy of Management Journal | College and university faculty | Each employer change associated with 25% higher 9-month salary. |
| Topel & Ward (1992), Quarterly Journal of Economics. | National sample of young adults | 10% increase in wage from employer change (first 10 years in labor market; 84% moved). |

---

[748] Barry Gerhart, Compensation 242, Ex. 7.16 (14th ed. 2023).

**Figure 2:  The Impact of Compensation Level on Employee Turnover (Mobility)**[749]

| Study | Sample | Results | Elasticity |
|---|---|---|---|
| Riddell, *Industrial Relations* (2011) | 390 firms in Greater Toronto, 6 occupational groups | A 10% increase in ratio of firm pay to market pay associated with quit rate going from .106 to .095, a 10% reduction | −1.01 |
| Falch, *American Economic Review* (May 2011) | 161 primary and secondary schools in Norway | Schools having teacher "shortage" and located in far north eligible to pay teachers wage premium of 10%. Introduction (also studied its removal) of 10% wage premium associated with quit rate going from .18 to .12, a 35% reduction | −3.50 |
| Siebert & Zubanov, *Academy of Management Journal* (2009) | 325 retail clothing stores in the United Kingdom | A 10% increase in ratio of store wage/county wage associated with separation rate going from .0500 to .0364, a 28% reduction | −2.78 |
| Shaw, Delery, Jenkins, & Gupta, *Academy of Management Journal* (1998) | 227 trucking companies in the United States | Regression coefficient (beta) = −.31 for quits on pay level. A 10% increase in average annual pay level ($34,912 to $38,403) associated with quit rate going from .256 to .200, a 22% reduction | −2.20 |
| Raff & Summers, *Journal of Labor Economics* (1987) | Ford Motor Company in 1914 | Increasing daily wage *100%*, from $2.50 to $5.00, associated with turnover reduction from 370% to 54%, an 85% reduction | −0.85 |

Elasticity = % change in y/% change in x

---

[749] BARRY GERHART, COMPENSATION 241, EX. 7.15 (14th ed. 2023).

-250-

**Figure 3**[750]



---

[750] Ex. PX254 at DVA_OMCEAL_00036929.

**Figure 4**[751]

**WorldatWork® Total Rewards Association**
**Certified Compensation Professional | (CCP©)**

**Sample Course Titles (3 of the 8 required courses): Designing and Managing Base Pay Systems; Market Pricing and Competitive Pay Analysis; Compensation Analytics and Insights**

**One course in more detail: Designing and Managing Base Pay Systems**

## What You Will Learn:

- Important concepts like compensation philosophy, internal vs. external pay equity, relevant labor markets, benchmark jobs and market-pricing.
- Key steps to build a base pay structure – job analysis, documentation, evaluation and job worth hierarchy.
- Base structure design components like range spread, minimum, midpoint, and maximum, midpoint differentials, range overlap plus methods to adjust and maintain pay structures.
- Determination of individual pay rates, including concepts like new- hire rates, pay differentials, step rate pay progression, merit increases, skill-based pay, promotions, equity adjustments and pay compression.
- Merit pay programs, pay for performance and merit matrix development.
- Pay transparency, communications about pay programs and compensation program audits.

---

[751] WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025), https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual.

**Figure 5: Example of a Compensable Factor (Complexity)**[752]

| Degree | 1st | 2nd | 3rd | 4th | 5th | 6th |
|---|---|---|---|---|---|---|
| Points | 20 | 40 | 60 | 80 | 100 | 120 |

| Degree Definitions for Complexity (of Duties) Compensable Factor | |
|---|---|
| Complexity of duties involves the degree of independent action, the extent to which the duties are standardized, the exercise of judgment, the type of decisions the job requires and the exercise of discretion, resourcefulness, or creative effort in devising methods, procedures, products, scientific applications, etc. | |
| 1st Degree – Little Judgment | Understand and follow simple instructions and use simply technology involving few decisions. |
| 2nd Degree – Some Judgment | Perform repetitive or routine duties working from detailed instructions and under standard procedures. Requires the making of minor decisions. |
| 3rd Degree – Simple Analytical Judgment | Plan and perform diversified duties requiring an extensive knowledge of a particular field, and the use of wide range of procedures. Involves the exercise of judgment in the analysis of facts or conditions regarding individual problems or transactions to determine what action should be taken, within the specifications of standard practice. |
| 4th Degree – Complex Analytical Judgment | Plan and perform a wide variety of duties requiring general knowledge of company policies and procedures applicable within area of responsibilities, and including their application to cases not previously covered. Requires considerable judgment to work independently toward general results, devising methods, modifying or adapting standard procedures to meet different conditions, making decisions based on precedent and company policies. |
| 5th Degree – Advanced Analytical Judgment | Plan and perform difficult work where only general methods are available. Involves highly technical or involved projects, presenting new or constantly changing problems. Requires outstanding judgment and initiative in dealing |

[752] MIDWEST INDUS. MGMT. ASS'N, MIMA'S GUIDE TO THE EFFECTIVE USE OF ITS JOB EVALUATION PLAN (SHOP) (1974).

|  | with complex factors not easily evaluated, also making of decisions for which there is little precedent. |
|---|---|
| 6th Degree – Advanced Judgment and Ingenuity | Plan and perform complex work which involves new or constantly changing problems where there is little accepted method of procedure. Involves participation in the formulation and carrying out of company policies, objectives and programs for major decisions or functions. Considerable ingenuity and exceptional judgment required to deal with factors not easily evaluated, interpret results and make decisions carrying a great deal of responsibility. Direct and coordinate the work of subordinate supervision in order to attain objectives. |

**Figure 6[753]**

| Market-Based |
|---|
| • Range spreads of 30% to 80% and midpoint progressions of 10% to 15% growing wider for higher-level jobs |
| • Minimums and maximums are anchored to market data points and encompass the reasonable wage span of the job in the market (i.e., 25th, 50th and 75th percentiles) |

---

[753] WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023).

**Figure 7**[754]



---

[754] USPI_CIV_000214742 (cover email) and USPI_CIV_000214746 (attachment with a sheet delineating each job title's family).

**Figure 8**[755]



---

[755] SCA000079723 at SCA000079726.

**Figure 9**[756]



---

[756] USPI_CIV_000901340 at USPI_CIV_000901341.

**Figure 10:  Pay Structure (for Engineering) at Lockheed Martin, under Two Alternative Pay-Level Policies**[757]



**EXHIBIT 3.3**  Pay Structure (for Engineering) at Lockheed Martin, under Two Alternative Pay-Level Policies

---

[757] BARRY GERHART, COMPENSATION 78 (14th ed. 2023).

**Figure 11**[758]

| RECOMMENDED SALARY INCREASES BY PERFORMANCE RATING AND COMPA-RATIO | | | | Table 12.3 Merit Increase Grid |
|---|---|---|---|---|
| | COMPA-RATIO[a] | | | |
| | 80–90% | 91–110% | 111–120% | |
| **Performance rating** | | | | |
| Exceeds expectations | 7% | 5% | 3% | |
| Meets expectations | 4 | 3 | 2 | |
| Below expectations | 2 | 0 | 0 | |

[a]Employee salary/midpoint of their salary range.

---

[758] RAYMOND NOE, JOHN HOLLENBECK, BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCES MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE 529 (13th ed. 2023).

**Figure 12**[759]



---

[759] SCA000078134.

**Figure 13**[760]



---

[760] Ex. PX251 at DVA_OMCEAL_000907140.

**Figure 14**[761]



---

[761] Ex. PX201 (cover email) and Ex. PX202 (attachment) at DVA_OMCEAL_000944854.

**Figure 15**[762]

FIGURE 2     **Total Salary Budget Increases, by Employee Category**

Salary Budget Increases (zeros included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 2.9% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% |
| Exempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Officers/Executives | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| All | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |

Salary Budget Increases (zeros not included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Exempt Salaried | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |
| Officers/Executives | 3.1% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% |
| All | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |

---

[762] WORLDATWORK, SALARY BUDGET SURVEY at 20 (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf.