# Exhibit 4
# Lane Declaration


# Redacted

**THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 1:21-cv-00305-SRH-YBK |

**UPDATED REBUTTAL EXPERT WITNESS REPORT OF DR. EVAN P. STARR**

3244633.4

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...........................................................................................................1

II. QUALIFICATIONS .......................................................................................................3

III. ASSIGNMENT AND SUMMARY OF CONCLUSIONS ............................................3

IV. PRIOR TESTIMONY ..................................................................................................10

V. BACKGROUND ..........................................................................................................10

VI. EVALUATING EVIDENCE OF THE CHALLENGED CONDUCT ..........................12

    A. Economic Background of the Challenged Conduct............................................12

    B. Defendants Established No-Poach Agreements to Suppress Compensation .......14

        1. The Qualitative Evidence Is Consistent with No-Poach Agreements Between SCA and DaVita and SCA and USPI ...................14

            a. Qualitative Evidence Is Falsifiable and Informative ..................15

            b. Access to Third-Party Information Would Not Defeat a No-Poach Agreement.......................................................................16

            c. Qualitative Evidence on the Timing of the SCA-DaVita and SCA-USPI No-Poach Agreements ..............................................18

        2. The Quantitative Evidence Is Consistent with No-Poach Agreements Between SCA and DaVita and SCA and USPI ...................31

            a. The Evidence Is Consistent with a 2019 End Date......................33

            b. The Evidence Is Consistent with Depressed Bilateral Mobility Between Covered Defendants During the Alleged Conduct Period ............................................................................40

            c. Defendants' Experts' Lightcast Data Are Unreliable, but Still Show That Defendants Are Primary Labor Market Competitors and That the Challenged Conduct Suppressed Hiring and Departures Between Defendants Relative to Other Employers.........................................................................43

            d. COVID Does Not Explain the Mobility Results .........................57

    C. Defendants Exchanged CSI to Suppress Labor Market Competition.................59

        1. The CSI Exchanges Could Have Been Used to Suppress Compensation.......................................................................................60

            a. We Know the Record Evidence Is Not the True Universe of CSI Exchanges..........................................................................60

3244633.4

**TABLE OF CONTENTS**
(continued)

Page

b. The Data Exchanged Are Sufficient to Suppress Wages ............65

c. The No-Poach Agreement Served as an Enforcement Mechanism ................................................................................69

d. Dr. Johnson's Comparison of Changes in Base Salary Are Not Informative of the Wage-Suppressing Effects of CSI Exchanges .........................................................................................71

2. The CSI Exchanges Are Not Consistent with Procompetitive Benchmarking ...........................................................................72

3. The CSI Exchanges Were Regular ...........................................74

VII. ECONOMETRIC EVIDENCE OF WAGE SUPPRESSION ..........................................80

A. Revisions to the Underlying Data .........................................................82

1. Uncontroversial Changes ..........................................................82

2. ██████████████████████████████████████████ .......84

3. Dropping Johnson-Identified Individuals ................................87

4. Revised Data Summary ...........................................................88

B. Primary Wage Suppression Model .......................................................89

1. Aggregate Suppression Model ...................................................89

2. Defendant-Specific Suppression Model .....................................91

3. Robustness Checks ....................................................................92

C. Defendants' Experts' Variant Models ..................................................94

1. Accounting for Equity and Firm Performance ..........................94

2. Wage Suppression Estimates Are Not Sensitive to COVID ........111

3. Time Trend .............................................................................122

4. Standard Errors .......................................................................124

5. Comparability of Benchmark Periods and Class Periods ...........134

6. Start and End Dates ................................................................135

a. Appropriate DaVita-SCA Start and End Dates of the Challenged Conduct .....................................................136

b. Appropriate USPI-SCA Start and End Dates of the Challenged Conduct ......................................................138

3244633.4

**TABLE OF CONTENTS**
**(continued)**

**Page**

c. Sensitivity of the Results to the Start and End Dates of the Challenged Conduct ..................................................................139

7. Pooling Data Is Standard Economic Practice ......................................146

a. Pooling Data Across Defendants Is Appropriate.......................146

b. Throwing Out Pre- or Post-Conduct Data................................151

8. The Conduct Suppressed Starting Wages.............................................156

D. Defendants' Miscellaneous Arguments About My Model Are Meritless .........161

1. It Is Not Necessary to Disentangle the Effects of Defendants' CSI Exchanges and the No-Poach Agreements ............................................161

2. The Mobility Analysis Need Not Be Informative About the Compensation Suppression Estimates....................................................162

3. The Results Are Consistent with Benchmark Estimates of No-Poach Effects from the Academic Literature........................................166

4. Managers Are an Appropriate Benchmark to Gauge the Effects of the Conduct on the Wages of Senior-Level Employees........................172

5. Alleged Model "Unreliability"..............................................................177

6. Dr. Johnson's Base Salary Regressions Are Uninformative About Harm ......................................................................................................180

7. Job Offer and Cold Call Data Is Not Required to Estimate the Effect of the Conduct.............................................................................180

8. The Model Does Account for Individualized Factors ...........................182

9. It Is Inappropriate to Measure Year-Over-Year Differences.................183

10. Graphical, Unconditional Compensation Comparisons to Industry Benchmarks Are Not Capable of Discerning Harm from the Challenged Conduct ..........................................................................184

11. Unconditional Trends in Employment, Hiring, and Departure Rates Are Meaningless.....................................................................................187

VIII. COMMON IMPACT...........................................................................................188

A. By-Employee-Level-Category and Defendant Suppression Model ..................190

B. Quantile Regressions.......................................................................................191

C. In-Sample Prediction.......................................................................................192

D. Interval In-Sample Prediction.........................................................................193

3244633.4

**TABLE OF CONTENTS**
**(continued)**

Page

E.    Random Coefficient Model ..................................................................195

F.    Evidence of a Compensation Structure .............................................195

    1.    Qualitative Record Evidence of Defendant Firms' Compensation Structures ......................................................198

    2.    Quantitative Evidence of a Compensation Structure ............................204

        a.    ██████████ of Dispersion in Compensation is Explained by Four Common Factors ............................................205

        b.    █████████████████ Does Not Change Across Job-Level Wage Regression Results ................................................208

        c.    █████████████ Do Not Disprove a Systematic Pay Structure ................................................................210

        d.    Dr. Saravia's and Dr. Johnson's Non-Randomly Generated Compensation Paths Generate Pre-Determined Relationships ............................................211

        e.    A Common Wage Structure Does Not Require Uniform Changes in Compensation Across Employees .........................214

        f.    Visual Analyses of Employee Pay Does Not Refute the Existence of a Common Wage Structure ..................................220

        g.    Nearly All Workers Are in Jobs with Positive Within-Job Wage Correlations ...................................221

        h.    Dr. Saravia's Criticism of Cascading Effects Misunderstands How the Conduct Affects Wages ....................223

        i.    Dr. McCrary and Dr. Johnson Offer Inapposite Criticisms of My Quantitative Evidence of a Wage Structure ...................225

G.    Dr. McCrary's Subsample Common Impact Analysis......................................226

H.    Dr. McCrary's Theoretical Arguments of Immunized Workers .......................234

    1.    Dr. McCrary's Subgroup 1: Employees in Labor Markets Where Dr. McCrary Claims Defendants Lacked Market Power......................235

    2.    Dr. McCrary's Subgroup 2: So-Called Indirectly Affected Class Members .......................................236

    3.    Dr. McCrary's Subgroup 3: New Hires...............................................238

    4.    Dr. McCrary's Subgroup 4: Employees with Substantial Equity Pay .................................................239

3244633.4

**TABLE OF CONTENTS**
**(continued)**

**Page**

     5.    Dr. McCrary's Subgroups 5 and 6: People Who Would Not Switch Jobs or Engage in Solicitation .......................................................................240

     6.    Dr. McCrary's Subgroup 7: Employees Who Were Already Mobility Impaired .......................................................................................242

IX.    AGGREGATE DAMAGES ........................................................................................243

    A.    The Class Definition Is Objective ...............................................................244

X.    MARKET POWER .....................................................................................................246

    A.    Direct Evidence of Wage Suppression from the Challenged Conduct Shows Market Power .......................................................................248

    B.    Defendants' Experts' Lightcast and Market Share Analyses Do Not Measure Market Power ..................................................................................248

XI.    CONCLUSIONS ........................................................................................................257

APPENDIX A ........................................................................................................................260

APPENDIX B ........................................................................................................................272

APPENDIX C ........................................................................................................................274

3244633.4

## I. **Introduction**

1.      I, Dr. Evan P. Starr, hereby submit the following Updated Rebuttal Expert Witness Report ("Rebuttal"). I previously submitted an interim Rebuttal Expert Report on May 30, 2025 in response to the April 16, 2025 expert reports of Dr. John H. Johnson, IV ("Johnson Report") and Celeste Saravia, Ph.D. ("Saravia Report"), which were submitted by Defendants in response to the initial report I served on January 15, 2025 ("Starr Report").[1] In this Updated Rebuttal Expert Report, I supplement my interim Rebuttal Expert Report to respond to the April 16, 2025 reports of Defendants' Experts Dr. Justin McCrary ("McCrary Report") and Dr. Lauren Stiroh ("Stiroh Report"). Herein, I refer to Dr. Johnson, Dr. McCrary, Dr. Stiroh, and Dr. Saravia collectively as "Defendants' Experts." Given the significant overlapping nature of the four expert reports submitted by Defendants, I have retained references and responses to the Reports of John Johnson and Celeste Saravia contained in my May 30, 2025 Rebuttal Report.[2]

2.      Plaintiffs' Counsel have asked me to comment on all four of Defendants' Experts, testimony and supporting evidence, and in particular to determine whether any of the opinions expressed by Defendants' Experts cause me to change the conclusions reached in my Starr Report. The criticisms of Defendants' Experts do not overturn my initial analyses and opinions. While I accept a limited number of changes to the construction of the underlying dataset that informs my analyses, none of these data changes materially affect the outcome of any analysis.

---

[1] Further, on January 21, 2025, I served an amended version of my initial report to correct non-substantive errors ("Starr Report"). On May 1, 2025, Dr. Saravia served an amended version of her report. On June 26, 2025, Dr. Stiroh served an amended version of her report. Throughout my Rebuttal, I refer to these amended reports. I use the defined terms from my initial report.

[2] My prior responses to Dr. Johnson and Dr. Saravia are integrated into this supplemental report. While this report contains many new analyses to respond to Dr. Stiroh and Dr. McCrary, I supplement my analyses from the interim report in two places. *First,* to address theoretical criticisms raised by Defendants' Experts, I expand my study of first year compensation to include the starting compensation of new hires (Section VII.C.8). *Second*, I include a simulation to prove a theoretical point I made in response to criticisms by Dr. Johnson and Dr. Saravia about my compensation structure analyses (Section VIII.F.2.d).

For completeness, I rerun the analyses from my Starr Report using the updated data.[3] My opinion remains that the Challenged Conduct is consistent with anticompetitive conduct and inconsistent with unilateral conduct, and that common evidence and methods can be used to demonstrate that all or nearly all Class Members were harmed by the Challenged Conduct.

3.      In connection with this matter, I reviewed and relied upon materials from this case and from the related criminal investigation *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.), including the Third Consolidated Amended Class Action Complaint (ECF No. 555), the Johnson Report, the Saravia Report, the McCrary Report, the Stiroh Report, depositions, deposition exhibits, FBI investigation interview reports, DaVita criminal trial transcripts, and documents and structured compensation data produced by, or compiled from materials produced by Defendants Andrew Hayek ("Hayek"), Kent Thiry ("Thiry"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC (together, "SCA"), DaVita Inc. ("DaVita"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation (together, "USPI") (together, "Defendants"). I have also evaluated relevant studies from the academic literature. Overall, the information that I relied upon in forming my opinions include the materials listed in **Appendix A**. The bases for my opinions are described in this report and any attached exhibits. I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

4.      For purposes of convenience, **Appendix B** provides a list of the names, employers, job titles, and years worked for individuals I reference in my Rebuttal.

---

[3] These data changes are discussed in Section VII.A, *infra*.

## II.     Qualifications

5.     My qualifications were set forth in the Starr Report.[4] Subsequent to the submission of my initial report, there is a material change in my qualifications. In addition to publishing a new manuscript on partial identification methods, I recently received notice from the University of Maryland that I will be promoted to Full Professor, starting in the Fall of the 2025 academic year.

## III.     Assignment and Summary of Conclusions

6.     Summary of Defendants' Experts Opinions. There is a considerable amount of overlap among all four of the Defendants' Expert opinions. Broadly, their reports offer three high-level opinions that contrast with my own:

a.     Idiosyncratic Harm: Defendants' Experts do not dispute the factual existence of the record evidence, but claim that the Challenged Conduct would not be expected to harm all Class Members, either due to its alleged sporadic application, lack of mobility effects, or due to the alleged lack of a common wages structure. I do not find any of these arguments compelling. Fundamentally, Defendants' Experts have offered no alternative economic justification for the No-Poach Agreements or CSI Exchanges (other than a brief, easily refutable "benchmarking" justification). Their sole defense appears to rest on the notion that the harms of the Challenged Conduct would not be felt by all Class Members. Yet their evidence that the Defendants' lack standard within-firm wage structures is fundamentally flawed, and, aside from criticisms of the baseline model, Defendants' Experts have offered *zero criticisms* of my Common Impact models which demonstrate that any harms caused by the Challenged Conduct

---

[4] Starr Report ¶¶ 1–5; *id.* Appendix ("App.") A.

would be felt by all or virtually all Class Members.[5] Indeed, even taking on the new analyses proffered by Defendants' Experts, I continue to find Common Impact.

        b.      <u>Regression Model Misspecification:</u> No expert disputes my use of a regression framework. Instead, Defendants' Experts' core criticisms are that my wage regression model, which underpins my opinions on the effect of the Challenged Conduct, is misspecified for a number of reasons. Having considered each criticism in turn and performed a bevy of new robustness checks in response, I am not convinced that any of the modeling criticisms or proposed alterations are correct or appropriate. But, even if I accept each argument at face value, implementing each criticism individually continues to show that the Challenged Conduct is statistically and economically associated with pay suppression to Class Members. Defendants' Experts are only able to extract a finding of "no suppression" from my model by layering on multiple inappropriate alterations to the model simultaneously. The fortitude of my original model to withstand such dramatic changes before it yields a tortured result of "no suppression" is a testament to its robustness, not its fragility.

        c.      <u>No Market Power:</u> Defendants' Experts opine at length that the Challenged Conduct *could not* have harmed Class Members because none of the Defendants,

---

[5] At deposition, Dr. Johnson testified that he did not specifically address the quantile regressions in my report. Deposition of John Johnson, Ph.D. (May 7, 2025) [hereafter Johnson Dep.] at 132:11–19. He does not "have additional opinions on the quantile regression beyond the critiques of the econometrics." *Id.* at 134:6–135:8. Similarly, Dr. Saravia testified that that she does not "separately offer critiques of the quantile regression" because it is "derivative of [the] original regression." Deposition of Celeste Saravia, Ph.D. (May 9, 2025) [hereafter Saravia Dep.] at 122:16–123:3. Dr. Johnson testified that he had no opinions separate from what he wrote in the Johnson Report ¶ 77, n.166 regarding my in-sample prediction and interval in-sample prediction analyses. Johnson Dep. at 135:15–136:8. In her deposition, Dr. Saravia offered no explicit critiques on the validity of my in-sample prediction model. The most direct criticism I received was that she believed compensation is "an individualized issue." Saravia Dep. at 147:22–148:12. Dr. Johnson testified that he did not have any opinions specifically pertaining to my random coefficient model. Johnson Dep. at 137:9–138:9. Dr. Saravia's deposition testimony never raised any criticisms of my random coefficient model. Dr. McCrary also testified that he did not submit an affirmative damages model. Deposition of Justin McCrary (June 12, 2025) [hereafter McCrary Dep.] at 122:14–123:5.

either individually or collectively, have market power in any relevant labor market.[6] Defendants' Experts all attempt to demonstrate that the Defendants all have low market shares and compete with many other employers for labor using third party "Lightcast" data. Notwithstanding several fundamental flaws in the Lightcast data that makes Defendants' Experts' analyses unreliable, I find these arguments and analyses uninformative for assessing whether the Defendants had market power or whether the Challenged Conduct resulted in harm to Class Members. Indeed, Defendants' Experts' Lightcast analyses are fundamentally incapable of shedding light on the extent of market power because they do not study variation in wages.[7] Just like in a hypothetical monopsonist test, variation in wages is the key ingredient to measuring labor supply elasticities and thus market power. Because Defendants' Experts' Lightcast analyses do not incorporate wage variation, their resulting claims about market power amount to mere speculation. In contrast, the labor economics literature recognizes that firms have firm-specific market power over their own employees, both in healthcare and even in otherwise unconcentrated industries.[8] Moreover, the labor economics literature on market power and labor supply elasticities I cited in

---

[6] Johnson Report ¶ 185 (" ██████████████████████████████████ "); *id*. at ¶ 186 (" █████████ '"); Saravia Report ¶ 72 █████████ ); McCrary Report ¶ 68 (" ██████ "); Stiroh Report ¶ 44 (" ██████████████████ ).

[7] McCrary Dep. at 165:11–166:3.

[8] Starr Report ¶ 43 ("In economic terms, no-poach agreements give employers monopsony power, meaning they face less competition for workers. The way that monopsony power is often measured in the economic literature is by the 'elasticity of labor supply' to the firm. This measure considers how changes in the firm's wages affect the labor supply to the firm. When this value is low, it means that the firm's workers are not sensitive to wage changes at the firm, which allows the firm to mark down their wages relative to how much they produce for the firm."). *See also* Alan Manning, *Imperfect Competition in the Labor Market*, 4 HANDBOOK OF LABOR ECONOMICS 973–1041, 974 (2011) ("[I]t has been increasingly recognized that many aspects of labor markets are best analyzed from the perspective that there is some degree of imperfect competition.").

my initial report,[9] which Defendants' Experts completely ignore, is *not conditioned* on any of the firms studied having high market shares in a relevant antitrust market. Indeed, prior evidence on labor supply elasticities in the healthcare context, and on the effects no-poach agreements in more competitive markets, all suggest that Defendants wield market power. Even despite this, the question of whether firms have market power over their employees is best assessed directly, by seeing whether or not they are capable of suppressing wages. One could claim that the Titanic was unsinkable by reviewing its design documents and blueprints, but observing the wreck at the bottom of the ocean would be a more informative method.

7. <u>Assignment:</u> In my capacity as an applied microeconomist with a focus on labor markets, Counsel for Plaintiffs' have asked me to do the following:

a. *Assess if the Qualitative Evidence is Consistent with Anticompetitive Collusion and Inconsistent with Unilateral Conduct.* I have been asked to determine whether Defendants' Experts' opinions have caused me to change my opinion that the qualitative evidence (i.e., Defendants' internal documents and communications) is consistent with anticompetitive collusion and inconsistent with unilateral conduct;

b. *Analyze if the Quantitative Evidence is Consistent with Anticompetitive Collusion and Inconsistent with Unilateral Conduct.* I have been asked to analyze Defendants' Experts' critiques of my analysis of Defendants' data, including econometric analysis of Defendants' compensation data. In particular, I have been asked to determine whether Defendants' Experts have successfully refuted my opinions that the Challenged Conduct (i.e., Defendants' No-Poach Agreements and Competitively Sensitive Information ("CSI")

---

[9] Starr Report ¶¶ 35–58. None of Defendants' Experts dispute my review of the economic literature or otherwise engage with its findings.

Exchanges)[10] is economically and statistically significantly associated with artificially suppressed compensation, beyond what can be explained by competitive factors, and whether this evidence is consistent with anticompetitive collusion and inconsistent with unilateral conduct;

        c.      *Determine Common Impact.* I have been asked to assess whether Defendants' Experts have persuaded me that the qualitative and quantitative evidence does not support my opinion that any wage suppression caused by the Challenged Conduct would commonly impact all or nearly all Class Members;

        d.      *Determine Aggregate Damages.* I have been asked to evaluate whether Defendants' Experts have given me cause to change my testimony that common methods and evidence can be used to quantify the damages to the Class caused by the Challenged Conduct;

        e.      *Determine Market Power.* I have been asked to assess whether Defendants' Experts have put forth sufficient testimony and evidence to refute my opinion that Defendants have market power over Class Members; and

        f.      *Assess Common Evidence.* I have been asked to assess whether Defendants' Experts have successfully demonstrated that evidence, data, and analyses common to the Class cannot be used to assess (a) through (e) above.

    8.    <u>Conclusions.</u> As a result of my work to date, the following are my conclusions:

        a.      *The Qualitative Evidence is Consistent with Anticompetitive Conduct and Inconsistent with Unilateral Conduct.*

        i.      **No-Poach Agreements.** In Section VI.B, I discuss Defendants' Experts' review of the evidence on the No-Poach Agreements in this matter. █████████████

---

[10] Starr Report ¶ 10.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

ii.     **CSI Exchanges.** In Section VI.C, I discuss Defendants' Experts' review of the evidence on CSI Exchanges in this matter. Defendants' Experts argue that the available evidence of CSI Exchanges would be mechanically insufficient to suppress wages. Qualitative evidence shows that this is incorrect. It also shows that the available evidence in the record does not represent the universe of communications between the Defendants. Defendants' Experts also fail to understand how the No-Poach Agreements work in concert with the CSI Exchanges to facilitate compensation suppression. Defendants' Experts also claim that the CSI sharing *could* be procompetitive, but I find that the CSI Exchanges do not fit the criteria set forth by the material they cite.

b.     *The Quantitative Evidence is Consistent with Anticompetitive Conduct and Inconsistent with Unilateral Conduct.* In Section VII, I review every wage regression model criticism made by Defendants' Experts. I explain why the vast majority of these arguments are incorrect in principle or in practice. After accepting certain changes to the underlying regression data (made collectively among all of Defendants' Experts), I then demonstrate that even if I accept each modeling argument at face value, implementing each criticism continues to show that the Challenged Conduct is statistically and economically associated with pay suppression to Class Members. Having re-run my primary models on the revised data, I find that Challenged

Conduct suppressed wages by ███████████, and specifically that the Challenged Conduct suppressed wages by ████████████████████████████████████████.[11]

        c.     *The Challenged Conduct Commonly Impacted Class Members.* In Section VIII, I discuss that none of Defendants' Experts make any criticism of my Common Impact models, which continue to demonstrate that harms from the Challenged Conduct were transmitted to all or virtually all Class Members. I also discuss their arguments against the evidence of a common compensation structure at each of the Defendant firms, finding that their arguments are fundamentally flawed and that the existing evidence is consistent with a wage structure, the existence of which would independently suggest that harms from the Challenged Conduct would flow to all Class Members. Finally, in response to Dr. McCrary, I examine several new analyses he advocated for, which continue to show Common Impact across specialties, seniority and company, and geography.

        d.     *Aggregate Damages Are Calculable.* In Section IX, I discuss how Aggregate Damages are calculable once a finding of harm has been established from the wage regression model. I also refute Dr. McCrary's claims that the criteria for the Class is not objective.

        e.     *Defendants Wield Market Power Over Class Members.* In Section X, I discuss Defendants' Experts' misguided analyses into issues of market definition, mobility, and calculating market shares. These approaches are incapable of estimating the extent of market power, because doing so requires combining wage information with mobility information to estimate labor supply elasticities. Defendants' Experts do not do this. The issues they raise are not relevant to an assessment of harm of the Challenged Conduct given (a) other, direct evidence

---

[11] *See* Figure 6 and Figure 7, *infra.* Initially, these values were ████████████████████████ ████████████████████████. Starr Report ¶ 12(b).

of harm common across workers (including for individuals in labor markets Defendants' Experts consider to be competitive) and (b) the fact that firms are understood to have some degree of firm-specific monopsony power even in unconcentrated industries or when workers move across industries.

    f.  *The Evidence is Common to the Class.* Defendants' Experts argue that individualized inquiry is necessary to identify harm from the Challenged Conduct. I fundamentally disagree because either individualized data is not necessary or because theoretical arguments about the necessity of individualized inquiry are illogical. I conclude that the issues of harm to Class Members turn on classwide evidence and methods. Indeed, all of the evidence, data, and analyses I relied on to reach each of the foregoing conclusions are common to the Class.

## IV. Prior Testimony

9.  I described my prior experience testifying as an expert in arbitration proceedings in my initial report.[12]

10.  Additionally, I produced a report in *Veeva Systems Inc. vs. Medidata Solutions, Inc; Quintiles IMS Inc. (now IQVIA) and Sparta Systems* on April 24, 2025.

## V. Background

11.  <u>Class Definition.</u> As I explained in my initial report, I understand that Plaintiffs are seeking certification of a class of employees who worked in positions at the director-level and above (hereafter "Senior-Level Employees") in the United States for one or more of the following: (a) from May 1, 2008 to December 31, 2019 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010,

---

[12] Starr Report ¶ 13.

to December 31, 2019 for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008 through December 31, 2019 for DaVita Inc. or one of its subsidiaries (hereafter "the Class" or "Class Members").[13]

12.     Challenged Conduct. In my initial background section, I reviewed the Challenged Conduct, and the Defendants. As I described in my initial report, Plaintiffs alleged two "mutually reinforcing methods[:] No-Poach Agreements and Exchanges of Competitively Sensitive Information ('CSI') (together, the Challenged Conduct)."[14]

a.     Defendants' Experts do not raise any objections to my summary of the background, although all four of Defendants' Experts use different language than I used. Dr. Johnson uses the term "alleged mobility restrictions" to refer to the alleged No-Poach Agreements,[15] and the "alleged information sharing" to refer to the alleged CSI Exchanges.[16] And given that USPI admitted to having a No-Poach Agreement with SCA, Dr. Saravia distinguishes between "Alleged, Assessed, Or Admitted" mobility restrictions.[17] And while Dr. Saravia acknowledges that USPI admitted to sharing information with SCA,[18] she uses the term "Alleged or Assessed Information Sharing" to refer to the CSI Exchanges.[19] Dr. Stiroh uses the terms "mobility restriction" and "information exchanges"[20] while Dr. McCrary refers to "information sharing" and "mobility restrictions."[21]

---

[13] Note that Dr. Saravia wrongly provides a prior version of the Class definition in her Report. Saravia Report ¶ 10.
[14] Starr Report ¶ 10.
[15] Johnson Report ¶ 16.
[16] *Id*. ¶ 17.
[17] Saravia Report ¶ 16.
[18] *Id*. ¶ 15.
[19] *Id*. ¶ 16.
[20] Stiroh Report ¶ 20(d)(i) and ¶ 20(e).
[21] McCrary Report ¶ 119 and ¶ 161.

b. In order to keep the language consistent with my initial report, I will continue use the term the "Challenged Conduct" as the combination of the two elements of the alleged conspiracy, which I will continue to refer to as the "No-Poach Agreements" and the "CSI Exchanges."

## VI. Evaluating Evidence of the Challenged Conduct

13. In Section V of my initial report, I provided an overview of how economists see monopsony power, no-poach agreements, CSI exchanges, and how they use qualitative and quantitative evidence to assess the existence of such agreements. I then reviewed the evidence in this case and demonstrated that it was consistent with both a No-Poach Agreement and CSI Exchanges, which is consistent with Plaintiffs' allegations.

14. Broadly, Defendants' Experts do not dispute my framework for assessing the Challenged Conduct nor my evaluation of the evidence. Their main arguments are that the Challenged Conduct would have affected a minority of individuals at the three Defendant firms, that the CSI Exchanges in particular may have procompetitive benefits, and that I selectively considered evidence in forming my opinions. As I explain in detail below, I find these arguments unavailing.

### A. Economic Background of the Challenged Conduct

15. None of Defendants' Experts raise any issues with my discussion of the economics of no-poach agreements, nor my discussion of the empirical literature estimating the harm from no-poach agreements. In fact, nowhere in any report by any of the Defendants' Experts do they even discuss or acknowledge the multiple studies finding that no-poach agreements reduce worker compensation in both the franchise context and in the high-tech

context.[22] I find this surprising, especially with respect to Dr. Johnson and Dr. McCrary, given that both of them have served expert reports in recent no-poach cases.[23] Given the centrality of the literature of no-poach agreements to the present case, as well as Dr. Johnson's and Dr. McCrary's prior expert experience in a no-poach case, I would have expected that at least they would explain how the No-Poach Agreements in this case compare to other no-poach agreements studied in the literature, or why the economic consensus that no-poach agreements tend to suppress pay would not apply in this case. Instead, Dr. Johnson and Dr. McCrary, like the other two Defendant Experts, ignore the academic literature entirely and even offer certain analyses and arguments that directly contradict the prevailing literature.[24]

16. Defendants' Experts do not refute my discussion of monopsony power, or how the economic literature measures whether firms have labor market power to suppress wages (i.e., the labor supply elasticity). This is important, as I will discuss later in Section X when discussing market power, because all of Defendants' Experts' methods to assess market power are incapable

---

[22] There are two references to no-poach studies in the Johnson Report, but neither of the references engage with the actual results of those papers. Dr. Johnson references Lafontaine et al. (2024), but only to mention it uses Lightcast data. Johnson Report n.66 ("Dr. Starr points to academic literature that relies on data tracked by Lightcast[.]"); Francine Lafontaine, Saattvic Saattvic, & Margaret Slade, *No–Poaching Clauses in Franchise Contracts: Anticompetitive or Efficiency Enhancing*, SSRN (Feb. 18, 2025) [hereafter Lafontaine et al. (2025)] (Note both Johnson and I, in the Johnson Report and Starr Report, respectively, cite to a previous draft of this working paper published on Sept. 9, 2024). On this point, it bears noting that Lafontaine et al. (2025) does not use the *resume* data from Lightcast, which is used in both the Johnson and Saravia Reports. Rather, it uses *job posting* data from Lightcast. Note also that Dr. Johnson's Report does not include LaFontaine et al. in its materials relied upon. Dr. Johnson further references the no-poach study by Gibson (2024). However, he only does so to reference that "long-term incentive programs … are commonly used as retention tools by firms." Johnson Report ¶ 94 and n.192; Matthew Gibson, *Employer Market Power in Silicon Valley*, UPJOHN RESEARCH (2024) [hereafter Gibson (2024)]. There are no references to the studies estimating the harms of no-poach agreements on workers in the Saravia Report or the Stiroh Report. Dr. McCrary references only the Gibson (2024) study in n.421, but does not discuss the findings of the study and simply references my own report and deposition testimony.

[23] Dr. Johnson served an expert report in January 2024 specifically in a no-poach case in the Aerospace industry (*Tarah Kye Borozny, et al. vs. RTX Corp., Pratt & Whitney Division, et al*). Johnson Report App. A. Similarly, Dr. McCrary served an expert report in a franchise no-poach case in March 2025 in *Leinani Deslandes and Stephanie Turner v McDonalds USA, LLC*. McCrary Report App. A.

[24] *See, e.g.,* Section VII.C.8 and VII.D.7, *infra*.

of doing so because their methods do not include studying changes in wages and thus do not estimate labor supply elasticities, like in the literature.[25]

17.     Defendants' Experts argue that my analysis of cartel behavior is incomplete because in order for a cartel to exist, it must be able to identify and punish cheaters.[26] Given that my initial report detailed exactly how the No-Poach Agreements were enforced and monitored,[27] I presume that Defendants' Experts are referring to monitoring and enforcing the CSI Exchanges and potential wage fixing. Given this, I address these claims fully in Section VI.C on CSI Exchanges below.

### B.     Defendants Established No-Poach Agreements to Suppress Compensation

#### 1.     The Qualitative Evidence Is Consistent with No-Poach Agreements Between SCA and DaVita and SCA and USPI

18.     Notwithstanding Defendants' Experts claims about the timing of the No-Poach Agreements, which I address later in Section VI.B.1.c and Section VI.B.2.a, none of Defendants' Experts dispute the details of the recruitment restrictions and the tell-your-boss provisions.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████[28]—███████████████████████

████████████████████████████████████████████████████

████████████████████████████████[n.][29]██████████████████

████████████████████████████████████████████

---

[25] *See* Section X, *infra.*

[26] *See* Section VI.C.1.cVI.B.2.c, *infra.*

[27] Starr Report Section V.B.

[28] Johnson Report ¶¶ 4, 55; McCrary Report ¶ 250 ████████████████████████████████ ██████. 

[29] *See* Section VI.B.1.c, *infra.*



[30]

[31]

### a. Qualitative Evidence Is Falsifiable and Informative

19.     Dr. Johnson broadly casts doubt on the informativeness of qualitative evidence because, in his words, "[u]nlike an empirical economic analysis, the conclusions drawn from a narrative based on a review of documents are (i) not falsifiable, (ii) have no known error rate, and (iii) are subject to bias if they fail to assess other contradictory and competing documents."[32] Dr. Johnson's perspective fails to appreciate the value of qualitative evidence for at least three reasons.

a.     First, the record evidence can be informative in its own right. For example, in this case it can help us understand whether the Challenged Conduct fits the characteristics of what no-poach agreements look like in theory.

b.     Second, qualitative evidence can be falsified with other qualitative evidence. For example, if in a deposition somebody says "I did not do X" but the record evidence directly shows them doing X, then we should put less credence in the deposition testimony.

---

[30] *See also* Johnson Dep. at 176:17–25

[31] McCrary Dep. at 121:14–20.

[32] Johnson Report ¶ 57 ("Unlike an empirical economic analysis, the conclusions drawn from a narrative based on a review of documents are (i) not objectively falsifiable, (ii) have no known error rate, and (iii) are subject to bias if they fail to assess other contradictory and competing documents. Dr. Starr's and Dr. Gerhart's presentations of documentary evidence highlight the limitation of simply reviewing documents to assess the impact of the alleged conduct.").

c. Third, we need not pit the qualitative evidence against the quantitative evidence. Rather, the qualitative evidence can help us understand the quantitative evidence, and vice versa, to help better inform our understanding. Indeed, in my academic work, when possible I complement rigorous econometric work with interviews and survey data to help understand what is going on.[33] The same is true in this case. ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████ Similarly, the qualitative evidence alone can indicate when the likely start and end dates of the Challenged Conduct are, and the quantitative analysis can help provide confirmatory evidence. Thus, even when there are certain gaps in our understanding based on the qualitative and quantitative record, when evidence from the qualitative and quantitative data align (as they do here), then we should have more confidence in the results.

**b. Access to Third-Party Information Would Not Defeat a No-Poach Agreement**

20. ██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



---

[33] *See* Thomaz Teodorovicz, Prithwiraj Choudhury, & Evan Starr, *Location-specificity and relocation incentive programs for remote workers*, 36(1) ORGANIZATION SCIENCE 186–212 (2025). *See also* Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do firms value court enforceability of noncompete agreements? A revealed preference approach*, REVIEW OF ECONOMICS AND STATISTICS 1–47 (2024).



21.     This argument ignores the fact that only 14 percent of job postings have salary

ranges, and that the salary ranges are often too broad to be informative.[38] Glassdoor earnings

data may provide some earning information, but Glassdoor did not start posting estimated job

salaries in job postings until 2017.[39] Even here, Glassdoor listings provide broad earnings ranges,

the data may be outdated, and early in the Conspiracy coverage was thin because Glassdoor first

launched in 2008.[40] What individuals could have learned from these outside sources about their

value elsewhere was likely limited. Finally, outside job offers from non-Defendant competitors

will not always be available when an employee wants such information, and may be unlikely to

reflect how much a Defendant would be willing to pay. Thus, these tools are likely to be of

---

[34] Stiroh Report ¶ 81 ████████████████████████████████████████████████████

[35] McCrary Report ¶ 160 ██████████████████████████████████████████████████████████████████████████████████

[36] Stiroh Report ¶ 80 ████████████████████████████████████████████████

[37] Stiroh Report ¶ 79 ██████████████████████████████████████████

[38] *See* Honey Batra, Amanda Michaud, & Simon Mongey, *Online job posts contain very little wage information*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 31984 (2023) [hereafter Batra et al. (2023)] ("First, wage information is rare: only 14% of posts contain any wage information and the minority of these (6%) have a point wage. The majority (8%) a range of wages that are on average wide[.]").

[39] *See Glassdoor Announces Salary Estimates, Find Out What a Job Pays Before Applying,* GLASSDOOR (Feb. 9, 2017), https://www.glassdoor.com/blog/salary-estimates-announcement/ ("Today, Glassdoor announced it has introduced estimated salary ranges in job listings to help people instantly know what they could be paid before applying to a job.").

[40] *See* Catherine Clifford, *Meet the 3 co-founders who built the jobs website that just sold for more than $1 billion,* CNBC (May 9, 2018), https://www.cnbc.com/2018/05/09/meet-founders-of-glassdoor-sold-to-recruit-holdings-for-1-point-2-billion.html ("Barton and Hohman brought on a third former Expedia colleague, Tim Besse, and officially launched glassdoor in 2008.").

limited value, especially as opposed to receiving a real-time job offer or learning what your colleague was offered by a Defendant when they received a solicitation.

**c.**      **Qualitative Evidence on the Timing of the SCA-DaVita and SCA-USPI No-Poach Agreements**

22.      Defendants' Experts raise questions about the start and end dates of the No-Poach Agreements in this case. These questions relate to changes in the dates across different documents, USPI's admitted timing, and deposition testimony. I address these questions in this section as they relate to the qualitative evidence.

23.      All of Defendants' Experts assert that the start and end dates of the Challenged Conduct have differed across the dates in the Complaint, USPI's admitted dates, the DOJ's indictment, and the dates in my initial report,[41] with the implication being that I cherry-picked the dates. These criticisms are misleading. As I explain below, the alleged "inconsistencies" related to the start and end dates highlighted by the Defendants' Experts do not overturn my view that the evidence is most consistent with the start and end dates I was assigned to consider by Counsel.

24.      Moreover, despite raising the fact that different evidence may indicate different dates, none of Defendants' Experts affirmatively state an opinion on the appropriate start and end dates.[42] Given the existing evidence (described below, in Section VI.B.2.a and in Section VII.C.6) and that none of the Defendants' Experts are offering an alternative approach or stake out an affirmative position, I have no basis to substitute my current selection of the start and end dates with an alternative.

---

[41] Johnson Report ¶¶ 4–5; Saravia Report ¶¶ 250–251; McCrary Report ¶ 12; Stiroh Report ¶ 87.

[42] *See, e.g.,* Johnson Dep. at 169:21–173:22; Saravia Dep. at 133:22–134:18; McCrary Dep. at 126:9–19; Stiroh Report ¶¶ 87–88; Deposition of Lauren Stiroh (May 29, 2025) [hereafter Stiroh Dep.] at 142:22–25.

25. <u>DOJ Indictments.</u> The way the timing was described in the DOJ's indictment clearly acknowledged that the exact dates were unknown to the DOJ at the time. Importantly, the dates in the DOJ indictment *encompass* the dates I was asked to review. The most reasonable explanation for the differences in timing reflects the state of the evidence at a given point in time, and nothing more.

a.



[45] In reality, the DOJ indictment related to the SCA-USPI No-Poach Agreement reads: "Beginning *at least as early as* May 2010 and continuing until *at least as late as* October 2017, the exact dates being unknown to the Grand Jury[.]"[46] Similarly, the DOJ indictment for SCA and DaVita reads "Beginning *at least as early as* February 2012 and continuing until *at least as late as* July 2017, the exact dates being unknown to the Grand Jury."[47] The language in the DOJ indictment clearly allows for the timing

---

[43] McCrary Report ¶ 12.

[44] Johnson Report n.383.

[45] Saravia Report ¶ 251. Note that Dr. Saravia inaccurately describes how the end date was selected. I did not "choose" a date. Per my initial report, counsel selected those dates, and my report then considers and validates those dates based on the qualitative and quantitative evidence.

[46] Indictment, *United States v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, No. 3:21-cr-0011-L (N.D. Tex. Jan. 5, 2021) ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017, the exact dates being unknown to the Grand Jury, in part in the Northern District of Texas and elsewhere, SCA and Company A [USPI] entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.").

[47] Indictment, *United States v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, No. 3:21-cr-0011-L (N.D. Tex. Jan. 5, 2021) ¶ 17 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates being unknown to the Grand Jury, in part in the Northern District of Texas and elsewhere, SCA and Company B [DaVita] entered into and engaged in a conspiracy to suppress competition between them for the services for senior-level employees by agreeing not to solicit each other's senior-level employees.").

of the No-Poach Agreements to begin before 2012 and end after 2017. The language is also clear that "the exact dates" are "unknown to the Grand Jury."

26. <u>Plaintiffs' Complaint.</u> As it relates to the way timing was discussed in the Third Amended Complaint, Plaintiffs contend that the SCA-DaVita No-Poach Agreement "began *at least as early as* May 2008," citing to the departure of Hayek and Rucker from DaVita to SCA.[48] The Complaint also describes the beginning of the SCA-USPI No-Poach Agreement as starting "*No later than* May 2010."[49] In identifying these dates, the Complaint cites to specific documentary evidence indicating this timeline. In describing the end of the Class Period as January 2021, the Complaint is clear that the end date was selected based on when the DOJ publicly announced the SCA Indictment: "Until January 7, 2021, when the DOJ publicly announced the SCA Indictment, Plaintiffs and members of the proposed Class did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaged in secret no-poach agreements and wage-fixing exchanges."[50] Thus, the start dates in the Complaint are earlier than the DOJ dates, following the revelation of new information, and the end date is longer, based on the timing in which the DOJ announced its indictment of SCA.

27. <u>Class Definition.</u> Relative to the Complaint, for my initial report, Counsel kept the same initial start dates but shortened the end date from January 2021 to December 31, 2019. My understanding of this change is to align with documentary evidence on when the Challenged Conduct ended, as opposed to when it was publicly revealed by the DOJ. Thus, contrary to the criticisms of Defendants' Experts, the changing of the timing of the Challenged Conduct between the DOJ Indictment, the Complaint, and my initial report does not imply anything

---

[48] 3rd Am. Class Action Compl. (ECF No. 555), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed October 27, 2024 ¶¶ 40–41.
[49] *Id.* ¶ 49.
[50] *Id.* ¶ 87.

except a better grasp of the evidence. Indeed, my review of the qualitative and quantitative

evidence corroborates the start and end dates I was asked to consider.

28. *SCA-DaVita No-Poach Agreement.* ███████████████████████

████████████████████████████████████████████████████████[51]

████████████████████████████████████████████████████████

███[52] I am not persuaded that the evidence weighs in favor of either of these alternative dates.

   a. **Start Date of SCA-DaVita No-Poach Agreement.** ██████████

████████████████████████████████████████████████████████

█████████████████[53] ████████████████████████████████████

████████████████████████████████████████████████████████

████████[54] ████████████████████████████████████████████

███████████████████████████████████

   i. ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████[55] ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[51] Johnson Report ¶ 56 ████████████████████████████████████
███████████████. McCrary Report ¶ 243 ████████████████████████
████████████████████████████████████████████. Stiroh Report ¶
93 ████████████████████████████████████████████████████████
████████████████████████████████████

[52] McCrary Report ¶ 243 ████████████████████████████████████
██████████ Stiroh Report ¶ 93. Johnson Report ¶ 56.

[53] *See, e.g.,* Johnson Report ¶ 56 ███████████████████████████
████████████████████████

[54] Starr Report ¶ 69.

[55] Ex. PX485.



[56] Ex. PX484 at DVA_OMCEAL_000429389.
[57] Deposition of Evan P. Starr, Ph.D. (March 20, 2025) [hereafter Starr Dep. Vol. 2] at 335:11–336:5.
[58] Ex. PX484 at DVA_OMCEAL_000429389.
[59] Deposition of Andrew Hayek (Sep. 18, 2024) [hereafter Hayek Dep.] at 93:7–95:14, 11:4–115:1, and Ex. PX304.
[60] Ex. PX304 at DOJCIV-008-00000301.

3244633.4



v.

vi.

_____

[61] Ex. PX484 at DVA_OMCEAL_000429389.
[62] Johnson Report ¶ 55. McCrary Report ¶ 250.
[63] Ex. PX376 at DVA_OMCEAL_000122784.
[64] *Id*. at DVA_OMCEAL_000122783.
[65] Ex. PX376 at DVA_OMCEAL_000122783.
[66] Johnson Report ¶ 4. McCrary Report ¶ 145



vii. [REDACTED]

[REDACTED] [67]

viii. [REDACTED]

[REDACTED]

[68] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [69]

      b.     **End Date of SCA-DaVita No-Poach Agreement.** Counsel instructed me to consider an end date of 2019, and thus in my initial report I considered whether, among all reasonable end-dates, 2019 is the date with which the qualitative and quantitative evidence is most consistent. [REDACTED]

[REDACTED]

[REDACTED] [70] [REDACTED]

---

[67] Johnson Dep. at 174:20–175:2.

[68] Deposition of Evan P. Starr, Ph.D. (March 19, 2025) [hereafter Starr Dep. Vol. 1] at 242:7–18.

[69] *Id.*

[70] Saravia Report ¶ 251 (" [REDACTED]

[REDACTED]

"). Johnson Report ¶ 56 ( [REDACTED]

[REDACTED]

"). McCrary Report ¶ 243 ("

[REDACTED]

).



[71] Johnson Report ¶ 56; Johnson Dep. at 169:21–170:5; McCrary Report ¶¶ 17, 123; Stiroh Report ¶¶ 87–88; Stiroh Dep. at 142:22–25.

[72] Ex. PX158 at 491:7–25; Hayek Dep. at 190:24–191:7. *See also* Ex. PX507 at DOJCIV-008-00000276; Deposition of William ("Bill") Wilcox (Sep. 24, 2024) [hereafter Wilcox Dep.] at 81:24–82:6; Johnson Dep. at 177:23–178:12.

[73] Johnson Dep. at 175:4–13.

[74] Johnson Report ¶ 56.

[75] Hayek Dep. at 329:14–330:8.

[76] *Id.* at 190:24–191:7.

[77] *Id.* at 191:8–21.

████████ [78] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████ [79]

      iii.     ██████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████

      iv.     ██████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ [80] ██████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[78] Deposition of Anthony Kilgore (Oct. 22, 2024) at 67:11–21.
[79] *Id.* at 173:20–174:8.
[80] *Id.* at 67:11–68:13.

██████████████████████████████████████████████████

███████████████████████████████

v.            ████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████[81] █████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████[82] █████████████████████████

██████████████████████████████████      ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████[83] ███████████████████████████████████

███████████████████████████████████████████████████

███████[84] ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

---

[81] DOJCIV-008-00000423 at -424.

[82] Ex. PX304 at DOJCIV-008-00000300–301.

[83] *See* Starr Report ¶ 74.

[84] Johnson Dep. at 177:23–178:12.

29.  *SCA-USPI No-Poach Agreement.*

a.  **Start Date of SCA-USPI No-Poach Agreement.** ██████████



b.  **End Date of SCA-USPI No-Poach Agreement.** ████████

i.  As a practical matter, because the SCA-USPI No-Poach

Agreement is bilateral, for it to end SCA and USPI would have to *both* stop abiding by it. ██

████████████████████████████████████

████████████████████████ [92] ████████

---

[85] Saravia Report ¶ 250 ("The start of Dr. Starr's assessed conduct period, May 2010, coincides with the start of USPI's Admitted Mobility Restrictions with SCA, as well as the start of the Alleged SCA-USPI Mobility Restrictions.").

[86] Starr Dep. Vol. 2 at 335:11–336:5.

[87] Johnson Report ¶¶ 178–179; Saravia Report ¶ 35, ¶¶ 251–252, McCrary Report ¶ 243.

[88] Johnson Report ¶ 56; Saravia Report ¶ 251; McCrary Report ¶¶ 17, 123; McCrary Dep. at 126:9–19.

[89] Johnson Dep. at 169:21–173:22; Saravia Dep. at 133:22–134:18; McCrary Report ¶¶ 17, 123; McCrary Dep. at 126:9–19.

[90] Starr Report ¶ 80(c).

[91] *Id.*

[92] Ex. PX507 at DOJCIV-008-00000276; Wilcox Dep. at 81:24–82:6.

██████████████████████████████████████████████████████[93] ████████████

████████████████████████████████████████████████████████████████████

███████████████████████████[94]

       ii.   ██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████[95] ████████████████████████████████████

███████████████████████████[96] ████████████████████████

████████████████████████████████████████████████████

████████████

       iii.   ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[93] Ex. PX304 at DOJCIV-008-00000300.
[94] Johnson Dep. at 177:23–178:12.
[95] Ex. PX304 at DOJCIV-008-00000301.
[96] *Id.*



iv. ████████████████████████████████

v. ████████████████████████████████

---

[97] USPI_CIV_000000442; Deposition of Sandi Karrmann (Aug. 14, 2024) at 54:12–56:24.
[98] Deposition of Shannon McGarry (June 11, 2024) at 99:2–9 ████████████████████████████ ████████████████████████████████████ .
[99] Wilcox Dep. at 75:2–80:15.
[100] Ex. PX504.
[101] Wilcox Dep. at 80:16–82:3.
[102] *Id.* at 82:4–15.
[103] *See* Starr Report ¶ 74.

vi.

### 2. The Quantitative Evidence Is Consistent with No-Poach Agreements Between SCA and DaVita and SCA and USPI

30. In my initial report, I described quantitative evidence based on the payroll records provided by Defendants about the extent to which Senior-Level Employees worked for "Covered Defendants."[104] The goal of this analysis was two-fold: ███████████████████████ ███████████████████████████████, I looked for evidence to see if the patterns of Senior-Level Employees working for different Covered Defendants are most consistent with an end date of 2019. Second, I looked to see if there is descriptive evidence that Senior-Level Employees are less likely to work for Covered Defendants during the alleged Conduct Period. Based on this analysis in my initial report, I found that the quantitative evidence was consistent with a 2019 end-date, and that there was evidence consistent with the idea that Senior-Level Employees were less likely to work at different Covered Defendants during the Challenged Conduct.[105]

31. Below I reproduce **Figure 1** and **Figure 2**, representing the same tables and figures as in my initial report which show that the results are unchanged with the revised data

---

[104] *See* Starr Report ¶¶ 81–91.
[105] Starr Report V.B.4.

(explained in Section VII.A). They continue to show a statistically significant uptick in mobility in 2020, and that mobility between Covered Defendants was suppressed during the Conduct.

**Figure 1 [Figure 3 Revised]: Annual Probability of Mobility Between Covered Defendants Relative to 2017**

| Dependent Variable: | [1]<br>1(Leave for DaVita or SCA) | [2]<br>1(Leave for USPI or SCA) |
|---|---|---|
| Year = 2008 | | |
| Year = 2009 | | |
| Year = 2010 | | |
| Year = 2011 | | |
| Year = 2012 | | |
| Year = 2013 | | |
| Year = 2014 | | |
| Year = 2015 | | |
| Year = 2016 | | |
| Year = 2017 | | |
| Year = 2018 | | |
| Year = 2019 | | |
| Year = 2020 | | |
| Year = 2021 | | |
| Constant | | |
| Sample | | |
| Observations | | |
| R-squared | | |

*Note*: Robust standard errors in parentheses *** p<0.01, ** p<0.05, * p<0.1.

**Figure 2 [Figure 4 Revised]: Probability of Mobility Between Covered Defendants**

| | [1] | [2] | [3] |
|---|---|---|---|
| Dependent Variable: | 1(Leave for Covered Defendant) | 1(Leave for DaVita or SCA) | 1(Leave for USPI or SCA) |
| Conduct | | | |
| **% Effect Relative to Sample Mean** | | | |
| Year | | | |
| Sample | | | |
| Sample Mean of DV | | | |
| Observations | | | |
| R-squared | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses. Note the constant term is suppressed.

32. ██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ [106] Some of those criticisms I will deal with in Section X on Market Power. Below I describe their core criticisms as they related to the end date of the Challenged Conduct, and whether mobility between Covered Defendants was lower during the Conduct Period.

**a.    The Evidence Is Consistent with a 2019 End Date**

33.    With regards to the quantitative evidence being consistent with an end-date of 2019, ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[106] Johnson Dep. at 163:20–164:1; McCrary Dep. at 118:14–18.


[107]

[108]

34.     Both claims are inaccurate. First, there was no double counting of an employee. The employee in question was appropriately classified as being paid by both Covered Defendants in consecutive years.[109] Nevertheless, regardless of how the employee is classified, the level of mobility in 2020 is the highest for any year between 2016 and 2020.[110] For DaVita and SCA, the level of mobility in 2020 is nearly twice as large as the second highest year (2018). For USPI and SCA, the level of mobility in 2020 is 29 percent higher than the second highest year.

35.

Recall that Optum bought DaVita Medical Group ("DMG") in 2019, and that Optum bought SCA in 2017.



---

[107] Johnson Report ¶ 59.

[108] Stiroh Report n.132 ("Daniel L. Rubinfeld, 'Reference Guide on Multiple Regression,' in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: The National Academies Press, 2011, p. 320 ('In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%.'"); AMERICAN BAR ASSOCIATION, PROVING ANTITRUST DAMAGES 142 (2017) ("[S]tatistical hypotheses are carried out at conventional levels of 5 percent."); McCrary Report ¶ 201 ("

; Saravia Report n.177 ("

").

[109]

[110] *See* my workpapers.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ To understand how this might influence the mobility patterns observed, and why the mobility between Covered Defendants after 2020 are likely to be under-estimated as a result, consider the following examples.

a.      Suppose that individual A works at SCA in 2019 and would have transitioned to DMG in 2020 after the end of the Conduct Period because of the removal of the SCA-DaVita No-Poach Agreement. Because by 2020, Optum owned DMG, this individual will not be counted as moving to DaVita, even if individual A moved internally between SCA and Optum's newly-owned DMG.

b.      The reverse scenario is also true. Suppose that individual B works at DMG and would have transitioned to SCA in 2020 after the removal of the SCA-DaVita No-Poach Agreement. Because DMG was purchased by Optum, if the individual who would have moved to SCA is now a part of Optum instead, then we would not see the move in the data.

c.      A similar analysis holds even for workers at USPI and DaVita Kidney Care (which was not acquired by Optum). Consider a worker at USPI or DaVita Kidney Care that would have moved to SCA in 2020 due to the removal of the No-Poach Agreement. Now because SCA is owned by Optum, if those individuals join Optum or United Healthcare more broadly, then we would not see those moves in the data.

36.    Thus the acquisition events and ownership structure of SCA and DaVita Medical Group that occur towards the end of the Conduct Period imply that we will systematically undercount moves between SCA and DaVita after the Conduct Period. Another way to make this

point is to note that, due to the various mergers, it is not an apples-to-apples comparison to look at mobility between Covered Defendants after vs. during the Conduct Period. Dr. Stiroh acknowledges this point with regards to the Lightcast Data, but fails to point out how it could manifest in the Defendants' data as well.[111]

37.     Second, Defendants' Experts points about statistical significance are both misguided and are contradicted by the way that statisticians think about "statistical significance" and p-values being less than 5 percent.[112] Indeed, the American Statistical Association position statement on p-values specifically rejects Defendants' Experts proposal of only referring to results with a p-value of less than 5 percent as statistically significant:

> Scientific conclusions and business or policy decisions should *not* be based only on whether a p-value passes a specific threshold. Practices that reduce data analysis or scientific inference to mechanical "bright-line" rules (such as "p < 0.05") for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making. A conclusion does not immediately become "true on one side of the divide and "false" on the other … The widespread use of "statistical significance" (generally interpreted as "p < 0.05") as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process.[113]

a.     Similarly, a 2021 press release in The American Statistician referring to an issue of the journal titled "Statistical Inference in the 21st Century: A World Beyond p<0.05," describes that this journal issue "calls for an end to the practice of using a p-value of less than

---

[111] Stiroh Report n.67.

[112] *See* Johnson Report n.95 ("See*, e.g.,* American Bar Association, Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, 3rd ed., ABA Book Publishing, 2017 ('ABA Proving Antitrust Damages',) p. 142 ('[S]tatistical hypotheses are carried out at conventional levels of 5 percent[.]'); Daniel L. Rubinfeld, 'Reference Guide on Multiple Regression,' *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 320 ('In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at .05 or 5%.').").

[113] Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70(2) THE AMERICAN STATISTICIAN 129–133 (2016).

0.05 as strong evidence against a null hypothesis or a value greater than 0.05 as strong evidence favoring a null hypothesis."[114]

        b.      Defendants' Experts' mistake perhaps results from the fact that standard statistical software (including those used in my report) often defaults to including one, two, or three asterisks on coefficients that have a p-value less than 10 percent, 5 percent, and 1 percent, respectively. And despite the American Statistical Association's recommendations, these are often used as short-hand to refer to results as "statistically significant." However, even while the practice of asterisks as short-hand for indicating ranges of p-values is still used in many journals today, some have dropped this practice altogether due to the problems raised above with specific cutoffs of e.g., 5 percent. For example, the policy of one of the journals at which I am an Associate Editor, the Strategic Management Journal, has a "[r]eporting results of statistical analyses" policy for authors that reads "SMJ no longer accepts papers for publication that report or refer to cutoff levels of statistical significance (p-values). In statistical studies, authors should report either standard errors or exact p-values (without asterisks) or both and should interpret these values appropriately in the text."[115] It continues that authors should not refer to "specific cutoff points."[116]

        c.      Taken together, the consensus of the scientific community firmly rejects Defendants' Experts' outdated claim that only results with a p-value less than 5 percent should

---

[114] *See Editorial Calls Time on 'Statistically Significant' in Research*, AMERICAN STATISTICAL ASSOCIATION, https://www.amstat.org/news-listing/2021/10/08/editorial-calls-time-on-statistically-significant-in-research (last visited June 2025) ("Instead, p-values should be reported as continuous quantities and described in language stating what the value means in the scientific context.").

[115] *See Author Guidelines*, STRATEGIC MANAGEMENT JOURNAL at 6 (updated June 8, 2023), https://onlinelibrary.wiley.com/pb-assets/assets/10970266/SMJ%20Author%20Instructions%2006%2008%2023%20FINAL-1686755077677.pdf.

[116] *Id.*

be referred to as "statistically significant" and it recommends against basing scientific decisions on such thresholds.

38.     With this background on statistical significance, we can now revisit Defendants' Experts' claim that there is "no statistically significant change in the probability of mobility for either Defendant pair in 2020."[117] Recall that for every year from 2016 to 2020, the probability of movement between Covered Defendants is the highest in 2020 for both sets of Covered Defendants, even with the caveats mentioned above related to merger activity suppressing mobility that we may have otherwise observed. For DaVita and SCA, the level of mobility in 2020 is nearly twice as large as the second highest year, and the estimated difference in the level of mobility in relative to 2017 has a p-value of 8.3 percent. For USPI and SCA, the level of mobility in 2020 is 29 percent higher than the second highest year and the estimated difference relative to 2017 has a p-value of 4.2 percent.[118] Moreover, no other year between 2016 and 2019 has a difference in mobility levels with a p-value less than 10 percent relative to 2017.

39.     Given these results and the findings from the qualitative discussion above, if one was to select an end-year to the No-Poach Agreements, 2019 is the only year that one could reasonably select. Picking any other year is inconsistent with both the qualitative evidence and the quantitative evidence.

40.     Defendants' Experts argue my mobility "analysis is sensitive to the specification he selects, finding results that contradict his conclusions when tested using 'base years' other

---

[117] Johnson Report ¶ 59.

[118] These results are robust to how we allocate Heather Way, the individual who Defendants' Experts argue is double counted. When Heather Way is assigned to move in 2020 (which is the first year she is seen being paid by both USPI and SCA) but not in 2021, then the coefficient estimate on 2020 and the corresponding p-value is unchanged relative to the baseline model. When Heather Way is assigned to move in 2021, but not in 2020, then 2020 is still the highest level of mobility between USPI and SCA relative to all years between 2016 and 2017, and the estimated difference in mobility relative to 2017 has a p-value of 7.2 percent.

than 2017."[119] Given this, Defendants' Experts conclude that the evidence is inconsistent with a 2019 end-date of the No-Poach Agreements.[120]

41.    Defendants' Experts points are misguided and misleading, and do not in any way indicate that my mobility analysis is inconsistent with a 2019 end date for the No-Poach Agreements. This is clear for two reasons.

a.    First, one must pick a base year to study changes against. As I reference in my initial report, and as discussed above,[121] Defendants' Experts raise in their rebuttals that 2017 is the only alternative year that could possibly be considered the end-date of both the USPI-SCA and the SCA-DaVita No-Poach Agreements. Thus, the most natural benchmark year is 2017.

b.    Second, the fact that the results do not indicate a "statistically significant" rise in mobility in 2020 when other benchmarks years are considered is a complete red herring. By this logic, Dr. Johnson, Dr. McCrary, and Dr. Stiroh would conclude that the No-Poach Agreements would have never ended because from 2016 onward there is not a statistically significant rise in mobility in any year for all potential benchmark years.[122] Indeed, this critique

---

[119] Johnson Report ¶ 58; McCrary Report ¶ 246 ("Indeed, Exhibit 43 shows that, when I estimate Prof. Starr's year-by-year mobility regression model using 2018 or 2019 as the reference years (instead of 2017), I find no statistically significant differences between inter-Defendant mobility in those years and inter-Defendant mobility in 2020."); Stiroh Report ¶ 73 ("As a matter of econometrics, Dr. Starr could have chosen any base year. If he instead used as the base year any of the 10 years during the alleged conduct period when employee mobility was higher than zero, he would not have found a statistically significant positive coefficient for 2020, eliminating his supposed quantitative support for his decision to analyze a conduct period that ends in 2019.").

[120] Johnson Report ¶ 59 ("This result undermines his conclusion that his mobility regression is consistent with a conspiracy ending in 2019."); Stiroh Report ¶ 72 ("In fact, Dr. Starr's regression analysis provides no robust support for choosing 2019 as the end year for his conduct period.").

[121] *See* Section VI.B.1.c, *supra.*

[122] Dr. Stiroh raises the possibility that if the criteria is a statistically significant increase in mobility then the end dates could have been 2008, 2011, or 2012. Stiroh Report ¶ 72 ("In fact, if the criteria for assessing years in which the alleged agreements did not affect mobility is a statistically significant increase in mobility relative to a year when there were zero movements between SCA and DaVita, then Dr. Starr could equally have concluded that there was no impact of the agreements on mobility in 2008, 2011, or 2012. Each of these years has coefficients with larger magnitudes than the 2020 coefficient that Dr. Starr uses as meaningful economic evidence of the end of the alleged conspiracy period."). This argument is clearly wrong. The qualitative evidence reviewed in Section V.B. is entirely inconsistent with an end-date of the No-Poach Agreements before 2017.

misses the important question: Given that the No-Poach Agreement ended, which year provides the most compelling quantitative evidence of the end of the No-Poach Agreements? As discussed above, among the potential years in which the No-Poach Agreement's plausibly ended (between 2016 and 2020), the highest level of mobility is in 2020 for both SCA-DaVita and SCA-USPI, and it is the only year from 2016 to 2020 that picks up a p-value less than 10 percent for any base year. Given this, and the qualitative evidence described above which also indicate 2019 is the last year of both sets of No-Poach Agreements, it is unreasonable to argue that the evidence is more consistent with an end-date other than 2019.

> **b.** **The Evidence Is Consistent with Depressed Bilateral Mobility Between Covered Defendants During the Alleged Conduct Period**

42. The second analysis I run in this section is to discern if there is descriptive evidence consistent with bilateral mobility between the Covered Defendants being lower than during the Conduct Period. With a simple model that includes a linear trend and an indicator for the Challenged Conduct, I find that mobility is lower for both sets of No-Poach Agreements during versus after/before the Challenged Conduct. I'll note that the goal of this analysis was not to try to estimate the causal effect of the Challenged Conduct on mobility between Covered Defendants.[123] Indeed, doing so is practically impossible because, as described above, the merger activity and data availability makes impossible an apples-to-apples comparison pre- vs. post-2019.

43. Defendants' Experts raise several criticisms of this analysis. Dr. Stiroh argues that because the R-squared of my analysis is small, I have no reason to "conclude that the changes in

---

[123] Starr Report ¶ 88 and ¶ 89 describe these results. Note that I use the term "associated with" and not "caused" (*e.g.*, "I find that the Conduct Period is associated with a statistically significant 0.226 *percentage point* reduction in the probability of movement between Covered Defendants.").

employee mobility … are the result of the alleged conduct."[124] Dr. McCrary makes the same point.[125] This claim is incorrect and is a fundamental misrepresentation of econometrics. First, it is well-known that the level of the R-squared in no way changes the interpretation of a given coefficient estimate. Second, it is also well-known that linear probability models have low R-squared values, because they fit a line to data that is inherently non-linear. This is because the mobility variable only take on values of zero or one. Dr. Stiroh further argues that my inclusion of a time trend in my regression analysis is incorrect because she alleges I have no reason to believe "there would be a trend over time to employee mobility."[126] Dr. Stiroh's removal of the time trend is inappropriate.[127] As Figures 2 and 3 in my initial report show, there is a clear downward trend in mobility between Covered Defendants over time. This is because, based on both the qualitative and quantitative evidence, mobility between Covered Defendants is elevated in the early years of both No-Poach Agreements (in part because mobility events in both cases spurred the instantiation of the No-Poach Agreements) and then falls over time. As a result, it is clearly important to account for the time trend.

---

[124] Stiroh Report ¶ 65 ("With almost none of the variability in employee mobility explained by the model, there is no basis for Dr. Starr to conclude that the changes in employee mobility his model shows are the result of the alleged conduct.").

[125] McCrary Report ¶ 200.

[126] Stiroh Report ¶ 66 ("Dr. Starr does not offer any reason to think that there would be a trend over time to employee mobility, and there is no economic basis to anticipate that there would be one. Without a sound economic justification for what variable is omitted, and why it is appropriate to capture the effect of the omitted variable with a time trend, Dr. Starr has no basis to opine that his results are economically meaningful instead of the result of poor specification.").

[127] Dr. Stiroh also errs in her construction of the mobility patterns in 2022, which affect her estimates in her Figure 12. She claims in n.120, "Thus, it is possible to flag employee movements in 2022 using Dr. Starr's methodology." This is incorrect, as I explained in Starr Report n.325 ("I used Defendants' 2022 data to determine which Class Members left their jobs in 2021. However, because I would need to observe where Class Members worked in 2023 to see if they left for a Covered Defendant in 2022, I cannot assign mobility events to workers in 2022."). Dr. Stiroh fails to appreciate that, while my code measures *same-year* moves in 2022, this does not account for all potential 2022 moves because I cannot capture moves when a worker leaves in 2022 but shows up at a Defendant in 2023. Her error implies she has no basis for the claim that there were "zero employee movements between DaVita and SCA" in 2022. Stiroh Report ¶ 62.

44.     Dr. Stiroh also respecifies my model, adding in control variables for GDP per capita and unemployment rate, noting that "even with Dr. Starr's linear time trend, adding controls for GDP and the unemployment rate results in a conduct effect that is not statistically significantly different from zero."[128] Dr. Stiroh's focus on statistical significance is misplaced and her discussion obscures the fact that the point estimate in this specification is both negative and exactly the same magnitude as the model without these controls.[129] Just because a result is not statistically significant does not mean that the estimate is in fact zero. This is a common fallacy that I address regularly in my PhD econometrics class. In general, economists recognize that there is a difference between economic and statistical significance and that a finding of no statistical significance does not imply that an estimate is not economically significant.[130]

45.     In addition,



[131]

[132]

---

[128] Stiroh Report Figure 13 column (b) and column (e).

[129] *See* ¶ 37, *supra*, discussing statistical significance.

[130] *See* K.D. Hoover & M.V. Siegler, *Sound and fury: McCloskey and significance testing in economics*, 15 JOURNAL OF ECONOMIC METHODOLOGY 1–37,2 (2008) ("To avoid any misapprehension, let us declare at the outset that we accept the main point without qualification: a parameter or other estimated quantity may be statistically significant and, yet, economically unimportant or it may be economically important and statistically insignificant. Our point is the simple one that, while the economic significance of the coefficient does not depend on the statistical significance, our certainty about the accuracy of the measurement surely does.").

[131] Saravia Report App. F ¶ 2 (" ").

[132] Saravia Report App. F Ex. 16, Column (1).

46.

     c.     **Defendants' Experts' Lightcast Data Are Unreliable, but Still Show That Defendants Are Primary Labor Market Competitors and That the Challenged Conduct Suppressed Hiring and Departures Between Defendants Relative to Other Employers**

47.     Defendants' Experts all provide a variety of analyses with "anonymous data from millions of online professional profiles" provided by Lightcast.[135] According to Dr. McCrary, the Lightcast data reflects "job histories for individuals who worked for one of the three Defendants, or in the Outpatient Care Centers industry (NAICS code 6214) to which all three Defendants belong, in 2024 or earlier."[136] Defendants' Experts attempt to use their Lightcast data to support their claim that Defendants were not significant labor competitors in light of competition with other employers. In this section, I first point to several fundamental flaws in the Lightcast Data

---

[133] Saravia Report Ex. 15.

[134] Saravia Report Ex. 16.

[135] *See Social Profile Data,* LIGHTCAST, https://lightcast.io/products/data/overview (last visited June 2025) [hereafter Social Profile Data] ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability."); *see also* Lightcast Data: Basic Overview, available at https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview (last visited June 2025) (describing additional sources).

[136] McCrary Report App. D ¶ 6.

or Defendants' Experts' treatment of it, which make their analyses unreliable. Then, I show that even with the flaws in the Lightcast data, the data nonetheless show that a) Defendants are each others' primary labor market competitors *relative to other potential employers*, and b) that the Challenged Conduct suppressed the extent to which Defendants moved to or departed from each other *relative to other employers*.

48.　*Flaws in the Lightcast Data Make It Unreliable.* There are at least four flaws in the Lightcast data that Defendants' Experts do not address. These flaws make it unclear to what extent any results from the Lightcast data are representative of the experiences of Senior-Level Employees at Defendants, and lead Defendants' Experts to systematically mis-measure an employee's previous and next employer. These flaws arise due to a) the nonrandom nature of the Lightcast sample, b) the omission of an end date for a given job, or an individual otherwise reporting working at a large number of companies simultaneously, c) Defendants' Experts not correcting for variations in the spelling of Defendants' or other companies names, and d) Defendants' Experts asymmetrically treating the Defendants and non-Defendant firm data in terms of the frequency with which they hire and lose employees to each other. I describe each of these in turn.

49.　The first flaw is that the Lightcast data is a nonrandom subsample of Defendants' employees' histories and that there is ultimately no way to verify its accuracy and reliability for representing the experiences of Defendants' Senior-Level Employees.

a.　Because the Lightcast data is allegedly drawn from "online professional profiles," the existence of an individual in the data is predicated on both their having posted their resume somewhere online and posted it in a location that Lightcast was able to find it and scrape it. As a result, the Lightcast data will not capture any individuals at Defendants who did not post

their employment resume online or who posted their resume in a place that Lightcast did not include in their search. The resulting sample is not a random subsample of Defendants' Employees (e.g., Defendants' Employees were not randomly selected to be in the Lightcast data).[137] Since those individuals who are searching for jobs are the most likely to both put their resume online and in prominent places that Lightcast is likely to find, the Lightcast data is likely skewed towards individuals who are more likely to change employers. Further, individuals who do not need to find employment or find new employment through other means besides posting their resume online (e.g., via recruiters or networking), may also be less likely to appear in the Lightcast data or not appear at all. Defendants' Experts offer no analyses to help us understand the extent to which the Lightcast data is reflective of the population of Defendants' Senior-Level Employees.[138]

b. Moreover, because the Lightcast data is "anonymous" there is no way to determine or verify whether the Lightcast data is what Lightcast purports it to be. Lightcast sells the data *after* it has been processed, enriched, and anonymized by Lightcast.[139]As a result, we cannot tie the Lightcast data to Defendant's data by each individual. Thus we have a limited basis to understand the reliability of the Lightcast data and the extent to which the nonrandom

---

[137] McCrary Dep. at 302:10–305:11 (Agreeing that the Lightcast data is from the "universe of resumes" found by Lightcast and not a random sample).

[138] The only reference to the representativeness of the Lightcast data is from Dr. Stiroh, who appears to acknowledge that the data are at least not representative for medical directors, though she presents no analysis to support this claim, and she does not otherwise compare the representativeness of the Lightcast data to Defendants' Data. Stiroh Report n.67.

[139] Lightcast states on its website that it "enriches" the data using "machine learning algorithms," among other things. *See Lightcast Data: Basic Overview*, Lightcast, https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview (last visited June 2025).

nature of the Lightcast data biases any conclusions made by Defendants' Experts based on that data.[140]

50.     In a series of analyses, Defendants' Experts limit the Lightcast data to "Defendants' employees in class positions"[141] and consider both the prior employer before being hired by a Defendant and the subsequent employer.[142] These data are self-reported, and so the reliability of the data rests on both completeness and accuracy of the data, as well as proper data handling by Lightcast, and then by Defendants' Experts.[143] Below I provide several examples that involve either typos, omissions, or improper handling of multiple job holdings, which cause Defendants' Experts to systematically overcount the number of "competitors" that Defendants compete with. Despite these obvious errors in the data or data processing, Defendants' Experts do not attempt to evaluate the potential extent of this shortcoming or even acknowledge that the issue exists. Moreover, quantifying the full scope of these errors in the Lightcast data is impossible because there is no ground truth to rely upon. Nevertheless, the examples below are indicative of the types of problems in the Lightcast data which Defendants' Experts ignore.

a.     One individual is listed as going to nine different companies from DaVita, because each of those nine jobs was started after the individual started at DaVita and there was

---

[140] I note that Defendants' Experts do reference academic studies that use Lightcast data. *See e.g.,* McCrary Report n. 311. But these studies do not examine Lightcast's resume data that Defendants' Experts use. Rather, they use Lightcast's job posting data.

[141] McCrary App. C Ex. 1 ("The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer is the indicated firm. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions.").

[142] McCrary Report App. C Ex. 1 ("Previous or Next Employer"). Stiroh Report Figure 1 ("Immediate Prior Employer to DaVita") and Figure 3 ("Immediate Next Employer of DaVita"). Saravia Report Ex. 10 ("Companies that USPI hires Senior Employees from and loses them to"). Johnson Report Ex. ¶ 36 ("The Lightcast data shows that all three Defendants compete with a broad set of different employers[.]").

[143] *See* Social Profile Data ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of *how workers describe their own experience*. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability.") (emphasis added).

no official end date to the individual's time at DaVita.[144] The same individual's overlapping time period of jobs prior to joining DaVita causes Dr. McCrary to count three companies as being a "previous employer" of DaVita.[145] Thus, this single individual's lack of an end date in their DaVita job and the overlapping time period of their other jobs causes Dr. McCrary to list twelve different companies as the previous or next employer to Davita for this single individual. Without any way to check who this individual is, or what their actual employment experiences are, we are left with no basis to address this obvious overcounting.

b.      Another individual in the Lightcast data who reported working at DaVita as a Medical Director from May 2013 to January 2015 had six immediately previous employers according to Dr. McCrary. According to the Lightcast data, this individual was working at DaVita, Air Methods, Superior Ambulance Service, Emsrx, Imaging Advantage, and Engage Healthcare Marketing simultaneously in May 2013.[146] Without any way to check who this individual is, or what their actual employment experiences are, we are left with no basis to address this obvious overcounting.

c.      Another individual was counted by Dr. McCrary as leaving nine different companies to become a Vice President of Marketing and Communications at SCA in January

---

[144] *See* my workpapers for details. The nine listed "next employer" companies are Abbott Laboratories, Amgen, Paragonrx International, Renal Advantage, Belmont University, Meharry Medical College, Accretive Health, Corizon Health, and the State of Tennessee.

[145] *See* my workpapers for details. The individual is listed as having worked at Baptist Hospital Nashville as a Physician from January 1996 to July 2015, at Gambro as a Medical Director from January 1997 to January 2003 (prior to Gambro being acquired by DaVita in 2005), and at Signature Nephrology Group Pc as a Vice President/Practice Leader from October 2002 to January 2013. This individual began at DaVita as a Medical Director in January 2003 and did not list an end date for that position. Dr. McCrary then counts each of these three companies (Baptist Hospital Nashville, Gambro, and Signature Nephrology Group Pc) as having an employee leave the company for a Defendant.

[146] *See* my workpapers for details. This individual reported working at Air Methods as a Medical Director from February 2004 to January 2017, at Superior Ambulance Service as a Medical Director starting in December 2004 with no end date, at Emsrx as a Chief Medical Officer from August 2010 to December 2016, at Scan as a Medical Director from October 2011 to May 2013, at Imaging Advantage as an Executive Vice President of Operations from May 2012 to August 2013, and at Engage Healthcare Marketing as a Chief Executive Officer from August 2012 to December 2016.

2022. The individual listed only two of the nine jobs as ending in January 2022, the Executive Director at Orthocarolina Foundation and the Vice President of Talent Management at OrthoCarolina. (Note that OrthoCarolina and Orthocarolina Foundation are treated as two separate employers according to Dr. McCrary, even though they clearly share a common name; I discuss this limitation in more detail below.) The other seven jobs presumably all continued into the individual's tenure at SCA. These jobs include Instructor at Skillpop, Member of the Board of Advisers at Noda Brewing Company, Founding Member at Pink Mentor Network, Member of the Board of Directors at Launch Tower Health, Board of Directors and Chairs at 7th Street Public Market, Corporate Educator at University of North Carolina, and Founding Member at Ondeck. An individual could certainly be affiliated with a number of organizations as a member of the board of directors or as a founding member. However, to count each of these as a distinct "competitor" from a given company to SCA seems misleading, given that the individual continued to hold six of these nine jobs the entire time they were employed at SCA and five of the jobs beyond their time at SCA.[147]

51.    These examples illustrate how Defendants' Experts overcount the number of moves to a given company from a Defendant or from a Defendant to a given company. This overcounting stems from the self-reported nature of the data. It cannot be corrected within the data processing itself.

52.    A third issue with the Lightcast data relates to how Defendants' Experts process it. For example, Dr. McCrary describes an analysis of the "previous" and "next" employers of

---

[147] *See* my workpapers for details. The individual indicated that they left SCA in June 2023. They listed leaving Launch Tower Health in June 2023 as well. They listed leaving Pink Mentor Network in December 2023, Noda Brewing Company in February 2024. They did not list any end date for their positions at Skillpop, 7th Street Public Market, or the University of North Carolina. Presumably this employee continued these six jobs throughout their tenure at SCA, yet Dr. McCrary counts these each as moves from the listed companies to SCA.

Defendants' Senior-Level Employees.[148] Because the data are self-reported, there are discrepancies in how the Defendant's company names are written, and Dr. McCrary does not account for the fact that company names, including Defendants' names, are written differently throughout the data. This leads both to an overcounting of previous and next employers, and mismeasures whether a given individual worked at a Defendant, thus also mismeasuring who is a previous or next employer to a Defendant. I provide a few examples of this mismeasurement from the data for each Defendant and from other cFompanies that appear as distinct in the data when in fact they are the same:

      a.     For DaVita, I found 11 entities with DaVita in the name which were not counted as being "DaVita" entities by Dr. McCrary. These include, for example, "Davita Intergrated Kidney Care" [sic] and "Applachian Davita Dialysis Center" [sic], and "Davita's Redwoods Leadership Development Program" [sic].[149]

      b.     For SCA, I found three entities that were clearly working for SCA but were not counted as such. These include an individual who worked for "SCA Health," an individual who worked at "Grossmont Surgery Center, Surgical Care Affiliates," and an individual who worked at "Center For Minimally Invasive Surgery, Affiliate Of Surgical Care Affiliates."[150]

      c.     For USPI, I found eight entities that were clearly USPI but were not counted as such. These include, for example, individuals working at "United Surgical Partners

---

[148] *See, e.g.,* McCrary Report Ex. 2.

[149] DaVita's Redwoods Program is a "Leadership Development Program" that includes "summer internship and full-time" opportunities for undergraduate and MBA students. *See* DaVita Redwoods Program, DAVITA, https://www.redwoods.davita.com/ (last visited June 2025). *See* my workpapers for details.

[150] The Center for Minimally Invasive Surgery advertises SCA Health prominently on its website. *See Center for Minimally Invasive Surgery*, CENTER FOR MINIMALLY INVASIVE SURGERY, https://cmisurgery.com/ (last visited June 2025). *See* my workpapers for details.

International Memorial Herman Surgery Center Katy," "Uspi - St. Joseph's Outpatient Surgery Center", and "Uspi Baylor Scott & White Surgical Hospital At Sherman."[151]

d.      In total, Dr. McCrary mischaracterizes 22 "companies" as being separate from Defendants when in fact they are Defendant entities. This mischaracterization leads to a mechanical overcounting of the number of prior and next employers. This is because each of these companies is listed as a separate next or previous employer, when in fact they are wrongly mischaracterized as different companies (e.g., "SCA Health" is not a competitor with SCA). This mischaracterization also then misses who exactly was the previous and next employer for Defendants. For example, if an individual is tracked as moving from "SCA Health" to SCA, then SCA Health is counted as the previous employer to SCA, when in fact the previous employer to SCA should be the employer previous to "SCA Health." But because "SCA Health" was not counted as being an SCA entity, this is not tracked in Dr. McCrary's processing of the data. Because this data processing error for Defendants can be corrected, I do so in my analysis of the Lightcast data below.[152]

e.      The possibility that company names are not consistent across individuals also systematically inflates the number of Non-Defendant previous and next employers. Like Defendants, there are many companies that appear as separate entities in the data, but are in fact the same entity. I provide several examples below:

i.      For example, "Aetna," "Aetna Northeast Region," and "Aetna/Schaller Anderson" are three different versions that are all Aetna.

---

[151] *See* my workpapers for details.
[152] I additionally correct for acquisitions that Dr. McCrary did not include in his "Acquisitions" Excel. *See* my workpapers for details.

ii. Similarly, "Baylor Medical Center At Garland," "Baylor Medical Center At Grapevine," "Baylor Medical Center At Uptown," "Baylor Scott & White Health," "Baylor Scott & White Surgical Hospital," "Baylor Scott And White Quality Alliance," "Baylor Surgical Hospital At Las Colinas," and "Baylor Surgicare" are eight iterations of Baylor University Medical Center, which is a part of Baylor Scott & White Health.[153]

iii. Similarly "Gambro," "Gambro / Cobe Laboratories," "Gambro Dialysis Clinic," "Gambro Healtcare" [sic], "Gambro Health Care," and "Gambro Healthcare USA" are all treated as different employers.

iv. While these are a few obvious examples, the Lightcast data is replete with these errors. And because every typo, or every different writing of a given employer is treated as a completely different entity, Defendants' Experts systematically overcount the number of companies that Defendants hire from and to whom Defendants lose employees. Quantifying the exact scope of this problem is, unfortunately, impossible. This is because in the data itself there are too many instances in which we cannot tell if companies with similar names are in fact distinct. For example, "Surgery Center," "Surgery Center Consulting Services," "Surgery Center Management Services," "Surgery Center Of Central Nj," "Surgery Center Of Naples," "Surgery Center Of Peoria," and "Surgery Center Partners" are all listed in the data. However, there is no way to determine if these seven employers are in fact the same entity or different entities.

53. Finally, Defendants' Experts perform an analysis comparing the extent to which Defendants hire from and lose employees to each other, versus the extent to which Non-

---

[153] *See Baylor University Medical Center, part of Baylor Scott & White Health,* BAYLOR SCOTT & WHITE HEALTH, https://www.bswhealth.com/locations/hospital/dallas (last visited June 2025). ("Baylor University Medical Center, part of Baylor Scott & White Health, is a nationally recognized, faith-based, academic medical center providing quaternary care to Dallas, the Southwest region and patients seeking specialized care from around the world.").

Defendant Employers hire from and lose employees to Defendants.[154] The process by which Defendants' Experts count previous or next employers systematically disadvantages Defendants, because Defendants can only be the previous or next employer of the two other Defendants, while Non-Defendants can be the previous or next employer for all three Defendants. As a result, holding hiring levels constant, a comparison of the number of times a given employer is a previous or next employer of Defendants' employees artificially suppresses Defendants' position relative to Non-Defendants.

a.      To observe this, consider the following example. Suppose that in 2010, each of Company A, SCA, DaVita, and USPI all lose three employees, with one employee going to each of the other three companies (e.g., Company A's three departing employees go to SCA, DaVita, and USPI while SCA's three departing employees go to Company A, DaVita, and USPI). If we were to follow Dr. McCrary's approach to counting the instances in which Company A was a previous or next employer of Defendants in 2010, we would find that the answer is six (Company A lost three individuals to Defendants and hired three individuals from Defendants). If we were to perform the same analysis for each of the Defendants, Dr. McCrary's analysis would count only four instances in which a Defendant was the previous or next employer of other Defendants' employees (i.e., SCA lost three employees, two of which went to Defendants, and hired three employees, two of which came from Defendants). Because six is more than four, Dr. McCrary's analysis would make it seem like Company A is a bigger competitor with Defendants than Defendants are with each other, even though all four companies lost and hired the same number of employees from each other.

---

[154] *See, e.g.,* McCrary Report App. C Ex. 1.

b. The mechanical inflation of Non-Defendants relative to Defendants in terms of their relative frequency of being the previous or next employer occurs because Non-Defendants can be the previous or next employer for three Defendants, while Defendants can only be the previous or next employer for two Defendants. Thus, a natural solution to this problem is to treat Defendants and Non-Defendants symmetrically by calculating the average number of instances in which a given employer is a previous or next employer of a Defendant on a *per Defendant basis*. Thus for Non-Defendants, we would divide the total count of instances in which they were previous or next employer of a Defendants' employee by three, while for Defendants we would divide by two. Absent this, any ranking approach that compares Defendants to Non-Defendants is conservative in that Defendants will be ranked artificially lower than Non-Defendants.

54. These errors in the Lightcast data and Defendants' Experts' handling of the Lightcast data make their analyses wholly unreliable. Defendants' Experts want to use this analysis to claim that, e.g., "Defendant Firms Are Not Dominant Prior and Next Employers for Proposed Class Members."[155] But, due to these errors in the Lightcast data, the results from their analyses systematically overcount the number of prior and next employers, inaccurately capture moves to and from Defendants, and systematically inflate the extent to which Non-Defendants are competitors over Defendants. Moreover, because we possess no ground truth as to what individuals' career trajectories were, and we cannot track them down using other methods because their data is "anonymous," we cannot universally correct for these errors. As a result, Defendants' Experts' conclusions from the Lightcast data are evidently unreliable.

---

[155] McCrary Report Ex. 1.

55.     *Lightcast Data show Defendants are Primary Labor Market Competitors*. Even if I were to grant that the Lightcast Data is reliable, which I do not due to the errors mentioned above, the data nevertheless reveals that Defendants are primary labor market competitors.

56.     To study what the Lightcast data reveals about the extent to which Defendants are primary labor market competitors with each other, I replicate the approach of Appendix C Exhibit 1 provided by Dr. McCrary, which ranks employers by the number of times they were the previous or next employer of a worker employed by a Defendant. As described above, if a worker moves from Company A to a Defendant and then leaves for Company B, then this worker's experience would mean that a Defendant hired from Company A and that the worker left for Company B. The analysis done by Dr. McCrary aggregates these patterns for all Senior-Level Employees employed by Defendants, counting the instances in which Company A, Company B, and all other such companies appear as the previous or next employer (however their names were written in the Lightcast data and however their start and end dates were or were not recorded).

57.     I depart from Dr. McCrary's analysis in three ways.

        a.      First, Dr. McCrary's analysis inexplicably covers the entire time period of the Lightcast data, from 1979 to 2024.[156] This is especially perplexing because, as Dr. McCrary recognizes earlier in his report, "SCA was founded in mid-2007."[157] Because SCA is part of both sets of bilateral No-Poach Agreements (and CSI Exchanges), including data before 2008 biases any results towards finding no departures to or hiring by SCA. Note that each of the Defendants' Experts who include pre-2008 data in their Lightcast analyses suffer from the same bias, making

---

[156] McCrary Report App. C Ex. 1 ("The analysis includes all unique moves to or from a Defendant that took place during or before 2024[.]").
[157] McCrary Report Ex. 39 ("SCA employees are not reflected in the data until 2008 because SCA was founded in mid-2007.").

it appear that Defendants are less common employers of each others' employees than they are.[158]

Thus, I begin by excluding moves to or from Defendants that happened before 2008.

      b.      Second, I also fix four errors in Dr. McCrary's analysis in Appendix C Exhibit 1 where, as highlighted above, (1) he does not account for variations in Defendants' names, (2) he does not account for certain acquisition events, (3) he arbitrarily breaks ties based on alphabetical ordering, and (4) his ranking code does not account for the full number of companies ranked above a given company. Note that I am unable to fix the fundamental flaws related to typos, company names written in different ways, multiple job holding, and a lack of an end date described above.

      c.      Third, as described above, because Dr. McCrary treats Defendants and Non-Defendants asymmetrically in his counting, it artificially inflates the extent to which Non-Defendants are perceived to be competitors. I initially replicate Dr. McCrary's approach because it is conservative. However, I also adjust his analysis to put Defendants and Non-Defendants on equal footing, by making the counts of instances in which a given employer is a previous or next employer on a *per Defendant* basis (i.e., dividing total counts by three for Non-Defendants, and by two for Defendants).

58.      With these data, and subject to caveats about its reliability highlighted above, I calculate in each year how frequently each Defendant appears as a previous or next employer of other Defendants' employees *relative to other potential employers*. The resulting data describes where each Defendant *ranks* in each year based on the number of times they were the previous or next employer of Defendants' employees among other potential employers in that year. Note that a rank of one for a given Defendant in a given year implies that that Defendant was the most

---

[158] This includes McCrary Exs. 1–5, McCrary Report App. C Exs. 1–4, Stiroh Exs. 4–5, and Saravia Report Exs. 8–10 and 12.

common prior or subsequent employer of the other Defendants' employees in that year. The year-by-year results are plotted in **Figure 44** in Appendix C.

59.     This analysis clearly indicates that Defendants are all primary labor market competitors, and in some years the top labor market competitor. A nice summary statistic is the highest rank each Defendant achieved between 2008 and 2024. Using Dr. McCrary's conservative ranking approach, both USPI and SCA were the most frequent previous or next employer of the other Defendants' employees in at least one year, while DaVita's highest annual rank was fifth. If we adjust the ranks to reflect counts on a *per Defendant* basis, as described above, then DaVita's highest annual rank achieved between 2008 and 2024 is two. Thus, even with McCrary's conservative counting and the flaws in the Lightcast data, Defendants are all "top 5" labor market competitors and "top 2" competitors on a per Defendant basis.[159]

60.     *Lightcast Data show Defendants are less likely to be Primary Labor Market Competitors during versus after the Conduct Period.* The results in **Figure 44** show that Defendants were highly ranked as competitors after the Challenged Conduct ended, from 2020 to 2024. Using Dr. McCrary's conservative ranking approach, from 2020 to 2024 SCA's rank was 3rd, USPIs was 4th, and DaVita's was 11th.[160] However, in the years before the Challenged Conduct ended, the Defendants were ranked much lower. From 2013 to 2019 both USPI's and SCA's rank as a previous or next employer of the other Defendants' Employees was 45th, while

---

[159] Note that this analysis includes moves between DaVita and USPI, which follows what Dr. McCrary did. I agree with Dr. McCrary that including all three Defendants as a baseline is useful because, as a result of the Challenged Conduct (in totality), moves between DaVita and USPI may have been affected even though there is no direct No-Poach between DaVita and USPI. Nevertheless, removing those moves from the analysis does not change the results. For example, under Dr. McCrary's conservative ranking, the highest rank for each Defendant is still one for SCA, fifth for DaVita, and second for USPI. Repeating this analysis using the per Defendant ranking (and adjusting the per Defendant calculations for the fact that we are now not counting moves between DaVita and USPI), the highest rank for SCA, DaVita, and USPI is all one. *See* my workpapers.
[160] *See* my workpapers.

DaVita's rank was 89th.[161] Using the per Defendant rank measure I find similar results.[162] I also find similar results when I exclude moves between DaVita and USPI.[163] This analysis confirms that, while Defendant's Employees do move to other employers, this is in part driven by the Challenged Conduct itself because the Challenged Conduct suppressed the extent to which Defendants hired from each other relative to other employers.

61. Finally, while Defendants' Experts posit many explanations for the mobility results documented in Section VI.B.2.b, including macroeconomic effects and changes in overall mobility levels,[164] this Lightcast analysis confirms that those ideas do not have merit. While those variables might affect *levels* of mobility, Defendants' Experts do not explain why those variables would make it more likely for Defendants to appear as more frequent next or previous employers relative to other employers after the Challenged Conduct ends relative to during the Challenged Conduct.

### d. COVID Does Not Explain the Mobility Results

62. Defendants' Experts point out that the ending of the mobility analysis in 2021 coincides with the COVID pandemic.[165] Dr. McCrary argues that the mobility results are susceptible to controls from the Job Openings and Labor Turnover Survey (JOLTS) for the

---

[161] *See* my workpapers.
[162] On per Defendant basis, from 2020 to 2024 SCA ranked 2nd, USPI ranked 3rd, and DaVita ranked 6th. From 2013 to 2019, on a per Defendant basis, SCA and USPI ranked 25th, while DaVita ranked 47th. *See* my workpapers.
[163] *See* my workpapers.
[164] Stiroh Report ¶ 68 ("Figure 13 shows the sensitivity of Dr. Starr's regression model of employee mobility to his unjustified inclusion of a time trend and his omission of standard labor supply and demand conditions"); Saravia Report ¶ 132 ("Dr. Starr's mobility regression can be modified to account for the overall increase in departures from USPI and SCA in 2020. To do so, I estimate his regression, including a control for the departure rate of Senior Employees each year.").
[165] McCrary Report ¶ 202 ("This means his mobility regression model may confound the effects of the alleged conduct with the effects of the COVID-19 pandemic."); Stiroh Report ¶ 67 ("Dr. Starr's employee mobility analysis failed to control for the underlying labor supply and demand conditions that affect employee mobility, including the COVID-19 pandemic and its impact on labor markets[.]").

3244633.4                                    57

pandemic.[166] I dispute how Dr. McCrary treats the pandemic due to the inclusion of highly collinear, national-level control variables (see the discussion in Section VII.C.2). Nevertheless, in this section I show that COVID is not responsible for the mobility results. This is clear for two reasons that emerge from the prior analysis which ranked employers based on the extent to which they are the previous or next employer of Defendants' Senior-Level Employees.

63.     First, after the Conduct Period, while the *level* of hiring and departures in 2020 and 2021 might generally be affected by the pandemic, Defendants' Experts posit no reason that the pandemic alone would change *where* Defendants' Senior-Level Employees are hired from or go to. The fact that (using Dr. McCrary's conservative ranking method), SCA, DaVita, and USPI move from the 45th (USPI and SCA) and 89th (DaVita) most frequent previous or next employers of Defendants' employees during the middle and end of the Conduct Period to the 3rd (SCA), 4th (USPI), and 11th (DaVita) most frequent previous or next employers after the Challenged Conduct ends cannot be explained by a pandemic that might broadly change mobility levels.

64.     Second, the best way to study whether the COVID pandemic is responsible for the results is to gather more information on hires and departures *after the pandemic*. ███████ ████████████████████████████████████████████████████████████████████████ ████████████████████████ However, the Lightcast data includes data post-pandemic. Repeating the conservative ranks analysis for the time period 2022 to 2024 reveals that USPI is the 3rd most common previous or next employer, SCA is the 12th, and DaVita is the 15th. On a per Defendant basis over this time period, USPI is ranked 3rd, SCA is ranked 4th, and DaVita is

---

[166] McCrary Report 202 ("Consistent with this, his results are sensitive to adding even basic controls for the effect of the COVID-19 pandemic on labor markets and employee mobility, as shown in Exhibit 28. Specifically, I assess how controlling for the healthcare job openings, quits, and layoffs and discharges rates from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey affects Prof. Starr's results.").

ranked 7th.[167] Thus, it is clear that even after the pandemic, movement between the three Defendants was relatively higher than it was during the middle and end of the Challenged Conduct before the pandemic started.

### C.      Defendants Exchanged CSI to Suppress Labor Market Competition

65.      In my initial report, I described the economic criteria for evaluating exchanges of competitively sensitive information (CSI), and then reviewed qualitative, documentary evidence on the nature of the CSI Exchanges in this case. ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████ I concluded that this evidence is consistent with anticompetitive conduct and inconsistent with unilateral conduct. ████████████████████

██████████████████████████████████████████████████

█████████████████████████[168]

66.      █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████ Below I describe and respond to each of these arguments.

---

[167] *See* my workpapers. If instead we limited the sample to 2023 and 2024, then Dr. McCrary's conservative ranking approach shows that SCA and DaVita are the 16th most frequent previous or next employer, while USPI is the 3rd. The per Defendant approach suggests that SCA and DaVita are the 8th most frequent previous or next employer over this time period, while USPI is still the 3rd. The mergers between DaVita Medical Group and Optum in 2019, and Optum and SCA in 2017 may also affect how these companies are ranked after the 2019.

[168] ████████████████████████████████████████████

████████████████████

**1.** **The CSI Exchanges Could Have Been Used to Suppress Compensation**

67.



[169] ███████████████████████████████████████

████████████████████████████████[170]█████████████████

█████████[171]█████████████████████████████[172]█████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████[173]█

████████████████████████████████████████████████

████████████████████████ [174] None of these points have merit.

**a.** **We Know the Record Evidence Is Not the True Universe of CSI Exchanges**

68. My review of the record evidence is limited to what is obtained in discovery and through deposition testimony. Accordingly, it is all we have, but we do not observe all

---

[169] Johnson Report ¶ 111 █████████████████████████████████████████████████████████████████████████████████████████████

[170] *Id.* ¶ 103.
[171] *Id.* ¶ 120 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; *see also id.* ¶¶ 98–127.
[172] Saravia Report ¶¶ 133–167 ████████████████████████████████████████████████████████████████████████████ McCrary Report ¶¶ 147–183; Stiroh Report ¶¶ 107–117.
[173] Johnson Report ¶¶ 99, 121–123; Saravia Report ¶ 155; McCrary Report ¶¶ 147–148, 174; Stiroh Report ¶¶ 110–111.
[174] Johnson Report ¶ 101, 106, 111; Saravia Report ¶¶ 142–143, 146–147; McCrary Report ¶¶ 151, 163; Stiroh Report ¶ 112 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

communications between Defendants. Defendants' Experts all incorrectly treat the record evidence we do have as if it includes every communication that occurred in reality.[175] This is almost certainly not the case. For example, I have reviewed evidence that gives me reason to believe that SCA, which exchanged CSI with both DaVita and USPI, did not produce all of its relevant internal communications. For example:

    a.    USPI provided e-mails between USPI and SCA which SCA did not provide.[176]

    b.  



[177]

[178]

[179]

[180]

---

[175] *See* Johnson Report ¶¶ 98–127; Saravia Report ¶¶ 133–167; McCrary Report ¶¶ 147–183; Stiroh Report ¶¶ 107–117.

[176] Plaintiffs' Mot. to Compel SCA to Perform Supp. ESI Search (ECF 419), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305 (June 11, 2024) at 1.

[177] I understand from counsel that the documents produced by Mr. Mathis bear the Bates Stamp prefix "OMC_BM_".

[178] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[179] *See* Ex. PX489 at OMC_BM_000014759

[180] Ex. PX523 at OMC_BM_000010778 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).



c. ███████████████████████████████████████████

███████████ [181]

d. ███████████████████████████████████

███████████████ had flimsy corporate retention policies.

i. ████████████████████████████

███████ [182] ███████████████████████████████

████████████████████ [183] ███████████████████

███████████████████████████████████ [184] █

██████████████████████████████████████

███████████████████████████████████ [185]

███████████████████████████████████

██████████ [186]

ii. █████████████████████████████████

████████████████████████████████████████

██████████████ [187] ████████████████████████

███████████████████████████████████

████████████ [188] ████████████████████████

---

[181] Ex. PX314 at DOJCIV-008-00000236.
[182] Deposition of Brian Rasco (Nov. 26, 2024) [hereafter Rasco Dep.] at 108:12–20.
[183] *Id*. at 72:7–16; Ex. PX566.
[184] Rasco Dep.at 72:4–73:2.
[185] *Id*. at 73:3–10, 74:5–16.
[186] *Id*. at 73:21–74:4.
[187] *Id*. at 111:16–112:13 ("██████████████████████████████████
██").
[188] *Id.* at 115:17–116:5; *id.* at 118:17–119:8.



[89]

   iii. ████████████████████████████

████████████████████████████ [190] ████████████

████████████████████████████████████

████████████████████████████████ [191]

   iv. We therefore cannot know if there is more evidence that SCA did not produce as it relates to either USPI or DaVita.

  69. ████████████████████████████████ [192]



   a. ████████████████████████████

████████████████████████████████████

████ [193]

   i. After SCA's then-CEO Hayek poached DaVita's then-DVP Rucker to become a top SCA executive, DaVita's then-CEO Thiry asked DaVita's then-SVP

---

[189] *Id.* at 77:24–79:22.

[190] *Id.* at 123:4–124:15.

[191] *Id.* at 138:18–139:20.

[192] *See, e.g.,* Deposition of Cindy English (June 12, 2024) at 60:8–10 (████████████████████████ ████████████████ ); Ex. PX120 at USPI_CIV_000584419–20 ████████████████████████ ████████████████████████████████ .).

[193] *See, e.g.,* Starr Report ¶ 70(d)(i) (citing Ex. PX313 at DOJCIV-008-00000188, -190–191 ████████ ████████████████████████████████████ ).



ii.

70.

71. Given all of these reasons, it is highly likely that the full record of CSI Exchanges can never be fully discovered.

[194] [195] [196] [197]

[194] OMCEAL_000385858.
[195] Id.
[196] Deposition of Joshua Golomb (Aug. 28, 2024) at 171:2–172:1.
[197] Starr Report ¶ 70(d), ¶ 77(e).
[198] Starr Report V.C. and VII.F.
[199] Saravia Report ¶ 155 (" ").
[200] Saravia Report App. E.

3244633.4    64



### b. The Data Exchanged Are Sufficient to Suppress Wages

72. Defendants' Experts posit that I provide no argument for how Defendants could have used information to set pay across many different jobs, with different types of compensation.[205] The implication of these arguments is that Defendants would have required in-depth communication and granular data exchanges to set the individual wages of over 6,300 employees with heterogeneous titles, backgrounds, geographies, etc. ████████████

████████████████████████████████████████████

████████████████████████████████████

a. Drs. Levenstein and Suslow write that "[c]ollusion in general implies … that the rival sellers in some manner arrive at an **understanding** as to what price to charge or

---

[201] Ex. PX283 at USPI_CIV_000035856 ████████████████████████████████████
████████████████████████████ .
[202] Saravia Report ¶ 163.
[203] Ex. PX119 at USPI_CIV_000601224–26.
[204] Saravia Report n.245.
[205] Johnson Report ¶¶ 98, 100, 102–106, 113, 118, 123; Saravia Report ¶¶ 154, 156, 160 n.236, 165–168; McCrary Report ¶¶ 148, 150–151, 154–155, 157, 162, 170–171, 175, 177, 181–182; Stiroh Report ¶¶ 107–112.

what outputs to produce, or both."[206] In this case, the *understanding* of what price to charge

could be as simple as a reduction in year-over-year wage increases or bonus payments, which is

a single figure ██████████████████████



---

[206] Margaret Levenstein & Valerie Suslow, *What Determines Cartel Success?*, 44(1) JOURNAL OF ECONOMIC LITERATURE 43–95, 45 (2006) [hereafter Levenstein & Suslow (2006)] ("'Collusion in general implies … that the rival sellers in some manner arrive at an understanding as to what price to charge or what outputs to produce, or both.' Producers form cartels with the goal of limiting competition to increase profits. By restricting output and increasing price, ideally to the price a monopolist would set, profits are jointly maximized. Upon its creation, a cartel immediately faces three key problems: coordination, cheating, and entry. Firms must be able to coordinate on an equilibrium-in a situation in which there are often multiple equilibria-which increases prices and allocates reduced out- put among member firms. The equilibrium must increase profits to cartel members as a group and provide a mechanism for distributing those profits 'fairly' to member firms. The cartel must develop an incentive compatible structure—a combination of monitoring, rewards, and punishments—to prevent cheating by members. The cartel must also prevent entry by outsiders. In a dynamic economy, the solution to all these problems will change over time, so successful cartels must develop an organizational structure that allows them to solve these problems continuously.") (emphasis added).

[207] Johnson Report ¶¶ 98, 100, 102–106, 112–123; Saravia Report ¶¶ 154, 156–168; McCrary Report ¶¶ 148, 150–152, 154–155, 157, 162, 170–171, 175–177, 181–182; Stiroh Report ¶ 112.

[208] Stiroh Report ¶ 112 ████████████████████████

[209] McCrary Dep. at 42:21–43:5.

[210] McCrary Report ¶ 168 ████████████████

*id.* ¶¶ 177–183.

[211] Saravia Report ¶ 59 ████████████████



c.

73.

More generally, if SCA knows ahead of time what salary and bonus a given worker receives over at DaVita or USPI, they can choose to match it.[216] If they know how much merit raises are going

---

[212] Saravia Report ¶ 158 ("███████████████████████████████████ ████████████").

[213] *See* Section VIII.F, *infra.*

[214] Deposition of Michael Rucker (Aug. 27, 2024) [hereafter Rucker Dep.] at 277:10–16.

[215] *Id.* at 278:12–17.

[216] Deposition of Leslie Wachsman (May 22, 2024) [hereafter Wachsman Dep.] at 249:1–22 ("████████ █████████████████████████████████████████████████████████")

to happen at DaVita or USPI, they can choose to match it. Now the companies need not match exactly to suppress wages, or fix wages for each and every job title, but as long as the information shared results in lower compensation than would have otherwise been paid without that information, then the CSI Exchanges will result in reduced compensation.

a. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ [217] ████████████████████████

█████████████████████████████████ [218] █████████████████████

███████████████████████████████████████████████████████

█████████████████████████ [219] █████████████████████████████

████████████████████████████████████████████████████████████ [220]

74. Moreover, as I argued in my initial report, issues of internal equity in compensation setting have the potential to magnify the effects of such CSI Exchange to affect many more workers. ███████████████████████████████████████████



████████ . *See also* Starr Dep. Vol. 1 at 45:16–21 ████████████████████

████████████████████████████████████████ .

[217] Kopser Dep. at 32:3–38:2, 105:5–108:9 ██████████████████████

████████████████████████ ; Cagle Dep. at 119:24–120:23 ( ████████

███████ ).

[218] Wachsman Dep. at 196:3–7 and 249:1–23.

[219] Mathis Dep. at 87:10–91:11 and 99:11–24.

[220] Clemens Dep. at 135:21–137:11.

 [221] ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ This

mechanism can also manifest as it relates to merit raises, base pay, or other forms of

compensation that were shared. As a result, it is easy to see how the CSI Exchanges could not

only facilitate wage suppression but also how it would be commonly felt across Class Members.

75. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████ [222] This is false. As reviewed

in Section VIII, I developed a variety of econometric tests and showed that all or nearly all Class

Members were harmed by the Challenged Conduct. Finally, I was not tasked with determining

whether Defendants engaged in wage-fixing, which I understand is a task for the jury.

### c. <u>The No-Poach Agreement Served as an Enforcement Mechanism</u>

76. Defendants' Experts emphasize that wage-fixing cartels need a method to monitor

and punish cheaters.[223] For example, Dr. Saravia writes, "The ability to punish is fundamental to

---

[221] Wachsman Dep. at 117:10–118:5 (████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

[222] Johnson Report ¶ 113.
[223] Johnson Report ¶ 101, 105–106, 111 ("[T]hree major tasks that must be performed if a buyer cartel is to be successful [are] agreement, implementation, and monitoring. They also highlight two significant obstacles to

the sustainability of a cartel because each individual participant in a cartel will always have an incentive to deviate."[224] Dr. Johnson further argues that I did not provide any analysis "to assess whether the economic conditions to facilitate a successful wage-fixing cartel exist in this case, nor how the information sharing they cite would overcome these obstacles."[225] Accordingly, in Dr. Johnson's view, the CSI Exchanges could not have supported a wage-fixing cartel.[226]

77.     I do not dispute the criteria that Defendants' Experts have described as it relates to the sustainability of a cartel, which is consistent with my understanding of the economic literature related to cartels.[227] However, Defendants' Experts seem to have forgotten that the Challenged Conduct includes a No-Poach Agreement, and the existence and enforcement of this No-Poach Agreement, which I discussed in detail in my initial report,[228] naturally mitigates "an incentive to deviate" when it comes to wage-fixing.[229] In this sense, Defendants' Experts fail to consider the totality of the Challenged Conduct and what it means for the efficacy of the CSI Exchanges in suppressing compensation.

a.      To understand how the No-Poach Agreements mitigate the need to monitor and punish cheaters, consider the following example. Suppose that DaVita decides that

---

maintaining a cartel—restricting entry and limiting cheating."); Saravia Report ¶¶ 142–143, 146–147; McCrary Report ¶¶ 151, 163, 183 ("Assuming then that Defendants would have cheated on any agreement they reached to fix salary pay because they could earn more profits by doing so, the effects of the alleged information sharing would vary across proposed class members and would require individualized inquiry to quantify. This is because the importance of non-salary pay components varied across proposed class members and the degree to which Defendants would have been able to offset any suppression in salary pay with an increase in non-salary pay therefore varied across proposed class members."); Stiroh Report ¶ 112 ("Moreover, according to economic theory, collusive agreements cannot be sustained without monitoring and enforcement mechanisms, but Plaintiffs and their experts do not describe any monitoring or enforcement mechanisms that DaVita and SCA could have used or establish that DaVita and SCA employed any such mechanisms.").

[224] Saravia Report ¶ 143.
[225] Johnson Report ¶ 101.
[226] Id. ¶ 111 ("Neither Dr. Starr nor Dr. Gerhart provide any explanation for how the Defendants could limit deviations from the alleged cartel (i.e., cheating), particularly in light of the types of information allegedly shared.").
[227] Levenstein & Suslow (2006).
[228] Starr Report Section V.B.
[229] Saravia Report ¶ 143.

it is not going to raise compensation next year, and that it shares this information with SCA. Knowing that DaVita is not going to raise compensation next year, SCA could choose to raise compensation of their workers by more next year, making SCA jobs relatively more enticing to DaVita employees. This reflects SCA's "incentive to deviate" and it arises because paying workers more than what DaVita is paying might give SCA a chance to hire away DaVita's workers. Defendants' Experts effectively argue that if there is no way to detect and punish such deviations, then the wage-fixing cartel cannot be sustained. However, it is easy to see that if SCA cannot so easily hire DaVita's workers away because of the No-Poach Agreement between SCA and DaVita—which is actively monitored and enforced—then SCA has no incentive to deviate and pay higher compensation. As a result, SCA may well choose to match DaVita and keep compensation the same or otherwise pay less than they would have.

b.      In this direct sense, we should not think of the CSI Exchanges and the No-Poach Agreements as independent pieces of the Challenged Conduct. Rather, precisely by mitigating the competitive value from paying higher compensation, they reinforce each other to give firms more incentive to suppress compensation. Thus, I reject Defendants' Experts' claims that the CSI Exchanges could not have facilitated wage suppression.

d.      **Dr. Johnson's Comparison of Changes in Base Salary Are Not Informative of the Wage-Suppressing Effects of CSI Exchanges**

78.      In Exhibit 19 and 20, Dr. Johnson shows the distribution of changes in base salary in 2009 and 2013 at each level across DaVita, SCA, and USPI. The basis for this analysis is apparently to examine if Defendants have similar raises, potentially as a result of the CSI Exchanges. ████████████████████████████████████████████



79. There are several flaws with this analysis.

   a.

   b.

## 2. The CSI Exchanges Are Not Consistent with Procompetitive Benchmarking

80.

---

[230] Johnson Report ¶ 117.
[231] *Id.* ¶ 115 ("

).
[232] *See* Johnson Report Ex. 19.



[233] [234] [235] To support their

contention that the information exchanges can lead to increased wages, they point to a study by

Cullen et al. (2024), which finds that benchmarking reduces dispersion in salaries, reduces

salaries (but not statistically significantly) for high-skill jobs but raises salaries for low-skill jobs,

leading to a null average effect.[236] In essence, Dr. Saravia, Dr. McCrary, and Dr. Stiroh argue

that benchmarking can raise worker salaries (even though estimates for high-skill workers in the

study is in fact negative and the average effect is not statistically significantly different from

zero, with p-values from 0.119 to 0.288).

81.     Aside from misrepresenting this study's findings, the foregoing narrative fails to

acknowledge that the CSI Exchanges in fact are *not* benchmarking as discussed in the paper. For

example, the first paragraph in Cullen et al. (2024) reads:

> While U.S. legislation, in an effort to hinder collusive practices,
> prohibits employers from sharing compensation information with
> each other, employers are still allowed to acquire and use more
> aggregated data provided by third parties. This practice of using
> market pay data to identify typical market salaries for an internal
> position is known as salary benchmarking.[237]

---

[233] Saravia Report ¶¶ 141, 145; McCrary Report ¶¶ 148, 152–160; Stiroh Report ¶¶ 107, 113–117.

[234] Saravia Report ¶ 145.

[235] McCrary Report ¶ 153 ("Economists recognize that information sharing can support competition as there are 'legitimate efficiency reasons for industry members to exchange information,' including 'monitor[ing] their own efficiency better' by comparing their costs to other firms."); Stiroh Report ¶ 113 ("However, economic literature and theory recognize that information sharing and benchmarking across firms can have procompetitive benefits and can be in a firm's unilateral self-interest.").

[236] Zoe B. Cullen, Shengwu Li, & Ricardo Perez-Truglia, *What's My Employee Worth? The Effects of Salary Benchmarking*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 30570 (Aug. 2024) [hereafter Cullen et al. (2024)] Section 4, n.45 ("More precisely, the average salary drops by 2.9% and 1.6%, depending on the control group used, but these effects are statistically insignificant (p-values of 0.119 and 0.288, respectively). These results are reported in Appendix F.1.").

[237] *Id.* at 1.

Thus, by Cullen et al.'s definition, the CSI Exchanges in this case are in fact *not benchmarking*

because they do not reflect "aggregated data provided by third parties."



### 3. The CSI Exchanges Were Regular

82.

This claim is without merit.

83.

---

238 *See, e.g.,* Deposition of Bridget A. Fanning, Ph.D. (Jul. 14, 2024) at 175:17–176:1

239 Saravia Dep. at 175:15–20 ("

").

240 Johnson Report ¶ 99 ("

); McCrary Report ¶ 169

*id.* ¶¶ 149, 151, 162, 165, 171, 177.



a. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

b.      Likewise, I submitted evidence in my opening report showing that in August 2014, SCA's then-GVP Mathis asked USPI's then-CFO Jason Cagle if USPI was "willing to swap wage increase budgets as we have in the past?"[244] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[245]

c. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[246]

---

[241] Ex. PX501 at SCA002277742.
[242] Ex. PX36 at SCA000540406–07.
[243] *Id.* at SCA000540405.
[244] Ex. PX232.
[245] McCrary Dep. at 177:14–180:11.
[246] Wachsman Dep. at 177:22–178:4, 232:19–233:1.



i.

[247]

None of Defendants' Experts provided contrary evidence.

ii.

A.

[248]

B.

[249]

d.

84.

[250]

[247] Starr Report ¶¶ 76(d)–(i).
[248] USPI_CIV_000007019; SCA001395985 (appointment entry).
[249] USPI_CIV_000290705.
[250] Ex. PX490 at HAYEK-000012214–16 (
).



[251] Hayek Dep. at 369:11–19 ███████████████████████████████████

███████████████ ).

[252] *Id.* at 362:25–363:7.

[253] *Id.* at 363:9–14.

[254] Deposition of Brian Mathis (Sep. 20, 2024) at 54:16–24.

[255] Rucker Dep. at 256:13–257:3.

3244633.4

77

d.

<hr />

[256] *Id.* at 268:16–20.
[257] *Id.* at 270:8–13.
[258] *Id.* at 272:7–14.
[259] *Id.* at 272:15–273:11.
[260] *Id.* at 275:3–11.
[261] Ex. PX340 at SCA000540065. *See also* Rucker Dep. at 286:15–20.



██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [262]

      iii.    ███████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████. [263]

     e.    ██████████████████████████████████████████

██████████████████████████████████

      i.    ██████████████████████████████████████

█████████████████████████ [264] Defendants' Experts did not attempt to submit contrary evidence.

      ii.    ██████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████ [265]

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████ [266] ███████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████ [267]

     f.    ██████████████████████████████████████████

██████████████████████████████████████████████████████████████████

---

[262] Ex. PX340 at SCA000540065. *See also* Rucker Dep. at 292:18–24.

[263] Rucker Dep. at 275:18–276:1.

[264] *See* Starr Report ¶ 69(a)(v) (citing Ex. PX484 at DVA_OMCEAL_000429390); *id.* ¶ 69(a)(ii) (citing Ex. PX484 at DVA_OMCEAL_000429389); *id.* ¶ 69(a)(vi) n.100 (citing Thiry Dep. at 145:23–146:7).

[265] SCA000484064 (████████████████████████████████████████); SCA000484054 (████████████ ██████████████).

[266] SCA000160352; SCA000629524 (███████████████████████████████████████ ████████████).

[267] SCA000630035.



## VII. Econometric Evidence of Wage Suppression

85.     In my initial report, I empirically tested the hypothesis that, after controlling for other relevant economic factors, Defendants' alleged misconduct during this period economically and statistically significantly suppressed Class Member wages.[270] Using granular employee-level pay data provided by each of the Defendants and a multivariate regression model, I demonstrated that the Challenged Conduct is economically and statistically significantly associated with suppressed pay for Class Members.[271] I then demonstrated that my primary model[272] was robust to a series of robustness checks.[273]

86.     Defendants' Experts offer opinions and perform their own variations of my regression model. Their arguments, broadly, are that when my primary regression model is altered to include additional or replacement variables, the results of the model show lower wage suppression. I note that few specifications offered by Defendants' Experts *overturn* the finding of

---

[268] Wachsman Dep. at 177:22–178:4, 232:19–233:1.

[269] ████████████████████████████████████████

[270] Starr Report Section VII.

[271] Starr Report ¶ 107 ( ████████████████████████████████████████ ).

[272] I consider the Defendant-Specific model in Section VI.C.2 (Figure 8) of the Starr Report to be my primary econometric model, as that is what I used to calculate Aggregate Damages.

[273] Starr Report Section VI.C.4.

economically and statistically significant harm caused by the Challenged Conduct.[274] Moreover, Dr. Johnson did not "affirmatively provide a regression analysis of [his] own" and neither did Dr. McCrary.[275]

87.     Below, I first review Defendants' Experts' changes to the underlying dataset for these regression models. While some of these changes are meritless, I accept that four changes to the underlying data are legitimate. I also identify and rectify dataset construction errors by Defendants' Experts. Having revised the underlying dataset, I next re-run my primary regression model on the revised data and demonstrate that these changes make essentially no difference to the regression results. Starting from this revised primary model as a baseline, I then review each of the Defendants' Experts proposed alterations to my model. Because there is significant overlap between Defendants' Experts' arguments, I consolidate the various attacks on my model by concept.

88.     Having reviewed all of the arguments, my opinion remains that my primary regression model (applied on the revised data), is the most empirically valid model. This model shows that the Challenged Conduct suppressed wages by ████████████, or when measured at each individual Defendant, ████████████████████████████████████████ ██████ reject the Defendants' Experts' proposed variations to my model. As I explain in detail below, these modeling changes either lack econometric merit or are not grounded in the facts of the case.

---

[274] Dr. Saravia presents results that are not statistically significant in her Exs. 31, 32, and 33. Dr. Johnson presents results that are positive and statistically significant in his Exs. 21, 28, and 33, and results that are not statistically significant in his Exs. 24 and 29.
[275] Johnson Dep. at 119:21–25. McCrary Dep. at 122:14–123:5.

## A. Revisions to the Underlying Data

89.     In Section VI of my initial report, I described how I used a variety of datasets produced by the three Defendants to assemble a dataset that formed the underlying data for my econometric wage regressions.[276] Because the datasets produced by each Defendant had a different structure, after cleaning and processing this data, I aggregated the data so that each row or observation represented an individual at a particular company in a given year. Defendants' Experts do not take issue with this methodology.

90.     However, Defendants' Experts contend that I made several errors in processing the underlying data.[277] Some of these observations are legitimate, and the fix is uncontroversial. I make the appropriate change to the underlying data in this report. Other observations are true, but the Defendants' Experts' remedy is either (a) correct in principle but coded erroneously or (b) incorrect or problematic in principle. I discuss all of the relevant changes to the underlying data below, and then use this revised regression dataset for the remainder of my report.

### 1. Uncontroversial Changes

91.     There are a number of uncontroversial changes made by the Defendants' Experts that I either accept outright, or accept with minor modification to fix an error in their proposed remedy. These changes include:

---

[276] Starr Report ¶¶ 111–116, Figure 5.
[277] *See generally* Saravia Report App. C ¶ 5.

a.    Using more (allegedly) up-to-date DaVita data to classify workers than the original files I received in discovery.[278]

b.    Excluding more observations corresponding to certain job titles or departments that my original data processing code did not catch.[279]

c.    Incorporating hours data for certain employees at USPI from 2018–2021, whose data on hours was missing in the primary USPI data;[280]

d.

[81]

92.    Note that in reviewing the updated data provided by Dr. Saravia and Dr. McCrary, there are also clear errors in their data construction as it relates to classifying job levels.[282] In my analysis below I correct these errors in keeping with Dr. Saravia's and Dr. McCrary's stated intent.

---

[278] Johnson Report ¶ 137 ("Finally, Dr. Starr does not utilize all available DaVita Teammate data, which includes relevant information on employee jobs, for example."). I will note that Defendants' Experts do not explain why the updated DaVita data is more complete than the prior version that I used. They simply assert it. *See* Saravia Report App. C ¶ 5 ("Dr. Starr relied on the following DaVita Teammate Data files for his analysis: DVA_OMCEAL_000902592. However, DaVita subsequently produced a similar, but more complete and up-to-date, DaVita Teammate Data file: DVA_OMCEAL_001421635."). DaVita similarly provided no explanation for why the new but almost entirely duplicative data was updated and improved relative to what they previously provided. Accordingly, it is not obvious that the new data provided should be used, but ultimately this choice matters little in the ultimate analysis. *See also* Saravia Report App. C ¶ 5.

[279] Johnson Report ¶ 138 ("Dr. Starr makes an error in applying his own methodology for identifying non-relevant 'members of the human resources, recruiting, [and] legal departments' in the Defendants' data, which entails running keyword searches."). *See also* Saravia Report App. C ¶ 5.

[280] Johnson Report ¶ 137 [REDACTED], Dr. Starr does not include available data on total hours worked and excludes these employee-years from his regression analysis."); Saravia Report App. C ¶ 5.

[281] Johnson Report ¶ 137 (" [REDACTED] ; Saravia Report App. C ¶ 5.

[282] [REDACTED]

**2.** ███████████████████████████████████

93.  ███████████████████████████████████

███████████████████████████████████[283]███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

94.  █████████████████████████████████

███████████████████████████████████████

███[284]█████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████

95.  █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

[283] Johson Report ¶ 136 (" ███████████████████████████████████████ █████████████████████████████████████ ████████████████.").

[284] Saravia Workpapers at Workpaper 5.



96.

97.

[285] Johnson Report ¶ 136 (

).
[286] See Section VII.C.2, infra.

98. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████[287] **Figure 3** below

compares my original baseline model using the revised dataset (with no USPI hour control) with

the McCrary/Saravia approach, the Johnson Approach, and my preferred approach.

| Figure 3: ███████ Modeling Approaches | | | | |
|---|---|---|---|---|
| **Dependent Variable: Ln(Total Annual Compensation)** | | | | |
| | [1]<br>Original<br>Model | [2]<br>Saravia/McCrary<br>Approach | [3]<br>Johnson<br>Approach | [4]<br>Revised<br>Model |
| DaVita Conduct | | | | |
| **% Wage Suppression** | | | | |
| SCA Conduct | | | | |
| **% Wage Suppression** | | | | |
| USPI Conduct | | | | |
| **% Wage Suppression** | | | | |
| Ln(Total Hours) | | | | |
| Ln(Total Hours-Saravia) | | | | |
| Ln(Total Hours-Johnson) | | | | |
| USPI Low Hours Control | | | | |
| Baseline Model Controls | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. This data is inclusive of the dropped Dr. Johnson Individuals discussed in the next section. Note that the observation counts

---

[287] Johnson Report ¶ 139 ("████████████████████████████████████

████████████████████████████████████████████████████

██████ ).

change between the regression as the handling of outliers (which are dropped from the regression analysis) is dependent on how hours are measured.

### 3. Dropping Johnson-Identified Individuals

99. Dr. Johnson identifies a few individuals in the regression data who either

██████████████████████████████████████████████████████████

██████ Dr. Johnson argues these individuals should be dropped from the regression data as

there is ██████████████████████████████████████████████████

██████████ [288] None of Defendants' other Experts argue that these individuals should be

dropped from the sample.

100. While these Senior-Level Employees (below the C-Suite) ████████████

█████████████████████████████████████████████████. These

individuals ████████████████████████████████████████████████

██████████ Moreover, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

101. Regardless, out of an abundance of caution I remove these identified individuals

from the data entirely. As shown in **Figure 4** below, comparing my baseline regression from

**Figure 7** (on the revised dataset) with or without these employees ████████████████

████████████████████. Based on the regression output, ████████████████████

████████████████████████████████████████████████████

████████

---

[288] Johnson Report ¶ 183 ("████████████████████████████████████████████
████████████████████████████████ ).

**Figure 4: Dropping Johnson-Identified Individuals**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] Individuals Included | [2] Individuals Dropped |
| DaVita Conduct | | |
| **% Wage Suppression** | | |
| SCA Conduct | | |
| **% Wage Suppression** | | |
| USPI Conduct | | |
| **% Wage Suppression** | | |
| Baseline Model Controls | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Column [1] includes the Johnson-Identified Individuals, while they are dropped in column [2].

### 4. Revised Data Summary

102. Having incorporated all of the changes discussed above, I recalculate the summary statistics for my main wage regression dataset.[289] As before, each observation represents an individual at the company-year level. **Figure 5** includes the mean, standard deviation, maximum, and minimum value of each variable in my regression. For example, the mean total hours worked per year is ▮▮▮▮▮, while the hours worked per year vary from ▮▮▮

---

[289]  *See* my workpapers and App. C, *infra*, for details.

███████. Similarly, ████████████ of the observations in the data have a "USPI Low Hours Control" set to one.

**Figure 5 [Figure 5 Revised]: Defendant Regression Data Summary Statistics**

| Variable | Mean | Standard Deviation | Minimum | Maximum |
|---|---|---|---|---|
| Total Amount | | | | |
| Avg. State Mgr. Earnings | | | | |
| State Health Expend. PC | | | | |
| Covid | | | | |
| State GDP PC | | | | |
| State Unemployment Rate | | | | |
| Census Region Annual CPI | | | | |
| Total Hours | | | | |
| USPI Low Hours Control | | | | |

*Note*: The standard deviation measures variation (spread) of data around the average. Wooldridge (2013) at 734–36

## B. Primary Wage Suppression Model

103. Having incorporated all of the changes discussed above in Section VII.A, I next demonstrate that ██████████████████████████████████████████ ████████████

### 1. Aggregate Suppression Model

104. **Figure 6** below is a replication of Figure 6 from my initial report with the revised regression data. As before, **Figure 6** below shows the aggregate wage suppression regression model, building up to the main specification.[290] In a model with only individual fixed effects and a year trend, the regression estimates ████████████████████████████████ █████████████████████████████ Including the geographic, macroeconomic, and healthcare controls in Column (2) indicates ███████████████████████████████████ ██████████ Next, adding the natural log of total hours worked as a control results in ██████

---

[290] Starr Report Figure 6, ¶¶ 127–128.



Finally, including individual-by-company fixed effects (as opposed to individual fixed effects) in Column (4) results in

**Figure 6 [Figure 6 Revised]: Aggregate Effect of Conduct on Earnings for Directors and Above**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Conduct | | | | |
| **% Wage Suppression** | | | | |
| Year | | | | |
| Ln(Avg. State Mgr. Earnings) | | | | |
| Ln(State Health Expend. PC) | | | | |
| Covid | | | | |
| Ln(State GDP PC) | | | | |
| Ln(State Unemployment Rate) | | | | |
| Census Region Annual CPI | | | | |
| Ln(Total Hours) | | | | |
| USPI Low Hours Control | | | | |
| Individual FE | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 2. Defendant-Specific Suppression Model

105.    **Figure 7** is a replication of Figure 8 from my initial report with the revised regression data. As before, instead of imposing a common Conduct effect on each Defendant, it allows each Defendant to have its own Conduct effect. The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Senior-Level Employees was to ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

**Figure 7 [Figure 8 Revised]: Defendant-Specific Effect of Conduct on Earnings for Directors and Above**



| | Dependent Variable: Ln(Total Annual Compensation) | | | |
| --- | --- | --- | --- | --- |
| | [1] | [2] | [3] | [4] |
| DaVita Conduct | | | | |
| **% Wage Suppression** | | | | |
| SCA Conduct | | | | |
| **% Wage Suppression** | | | | |
| USPI Conduct | | | | |
| **% Wage Suppression** | | | | |
| Year | | | | |
| Ln(Avg. State Mgr. Earnings) | | | | |
| Ln(State Health Expend. PC) | | | | |
| Covid | | | | |
| Ln(State GDP PC) | | | | |
| Ln(State Unemployment Rate) | | | | |
| Census Region Annual CPI | | | | |
| Ln(Total Hours) | | | | |
| USPI Low Hours Control | | | | |
| Individual FE | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note*: \*\*\* p<0.01, \*\* p<0.05, \* p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 3. Robustness Checks

106. In **Appendix C**, I perform the same robustness checks as performed in Section VI.C.3 of my initial report. All of the robustness checks continue to show that the relationship

between the Conduct and compensation is ██████████████████████████████

██████████████████████████████████████████████████████ [291]

107.    I note that Dr. McCrary criticizes my main model because it ████████

███████████████████████████████████████████████ [292]

a.    Dr. McCrary's criticism is wholly unwarranted for two reasons. First, as described in my initial report, it is standard practice to use fixed effects to parse out the cleanest comparison, which results in some variation not being used to identify the Conduct effect.[293] Second, Dr. McCrary provides an inaccurate and misleading characterization of my initial report, in which I recognized the fact that not all Senior-Level Employees were contributing to the Conduct effect estimate, and I took two different approaches to ensure that I find similar results when I use a less restrictive fixed effects structure that allow for all Senior-Level Employees to contribute to the Conduct effect estimate.[294] One extreme approach I took is to remove the individual by company fixed effects altogether, which even here (**Figure 58** in Appendix C) I find ████████████████████████████████████████████████████████ A more reasonable approach, however, and as I described in my initial report, is to use random

---

[291] Note that in **Figure 53** there was a coding error in the earlier version of that table. Rather than control for an individual's tenure in each year, the prior table controlled for the total number of years an individual worked at the Defendant. The revised table controls for an individual's tenure in each year, though the results are quantitatively and qualitatively similar. I also note that in **Figure 54**, where I dropped the COVID years entirely, I incidentally dropped the years 2019 and 2020 in my initial report, instead of years 2020 and 2021. I have corrected this and the results are unchanged.

[292] McCrary Report ¶ 247 ████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████ ).

[293] Starr Report ¶ 119(a) ("*First*, I include *individual fixed effects* to mimic the ideal comparison. Inclusion of individual fixed effects means the regression model compares the same worker during and absent the Conduct Period. As a result, identification of the Conduct coefficient derives only from workers who are present both during and absent (e.g., either before or after) the Conduct.").

[294] Starr Report ¶ 130(i) ("Because individual fixed effects rely on comparisons of the same individual during and absent the Conduct, in the main specification there may be Senior-Level Employees who are not contributing to the Conduct estimate. To ensure the results are similar when all Class Members are included, I pursue two approaches.").

effects instead of fixed effects. This is because random effects leverage all of the data from Senior-Level Employees to estimate the Conduct effect and are the primary alternative to fixed effects (as opposed to dropping them altogether). I did this in my main report, which I report in **Figure 59** in Appendix C, and, as before, ███████████████████████████████ ████████████████████████████ Nowhere in Dr. McCrary's report does he acknowledge this analysis or how it undercuts his unwarranted criticisms. Moreover, neither Dr. McCrary nor any of Defendants' other experts offer any criticisms of this approach.

### C. Defendants' Experts' Variant Models

108. Defendants' Experts allege that I make a number of other mistakes related to data processing. In this section I review and respond to those claims.

#### 1. Accounting for Equity and Firm Performance

109. Defendants' Experts argue that there is an important "timing issue" as it relates to equity payments because equity grants are often made well before they are received by workers. Dr. Johnson argues that the lack of accounting for this timing issue biases my estimates, as well as the lack of accounting for how the value of those grants change over time.[295] Dr. McCrary and Dr. Stiroh make the same point about needing to account for the value of equity at the time of the equity grant, rather than measuring what equity income workers receive.[296]

---

[295] Dr. Johnson also misrepresents my deposition testimony about how I think about this timing issue, writing in n.363 that I assumed "that employees (and firms) place *no value* on unvested equity." My deposition testimony that the value of a stock grant was "entirely zero before the vesting period" is clear and accurate. Starr Dep. Vol. 2 369:5–6. Before a stock grant vests, it is not income for a worker. This does not mean that the worker does not value it; but it means that that value comes entirely from their expectation of the likelihood that they will stay until it vests.

[296] McCrary Report ¶ 222 ("Prof. Starr does not properly handle equity pay in the data. When constructing the outcome variable that he uses in his pay regression model, Prof. Starr measures equity pay not in the year that it is issued, but in the year that it vests, or is exercised or sold by, the employee."); Stiroh Report ¶ 97 ("Specifically, Dr. Starr included the value of stock options in an employee's total compensation in the year the employee decided to exercise the options rather than in the year DaVita elected to grant the stock option to them.").

110.    I reject both Defendants' Experts' points. As I will explain, my approach of measuring stock payments when they vest, are exercised, or are otherwise counted as income, as opposed to when they are granted, is consistent with how the IRS assesses income, SEC disclosure rules, and, perhaps more importantly, is exactly what one should care about if we care about estimating the effect of firm conduct on *worker-experienced* harm. Moreover, as I will discuss below, ██████████████████████████████████████████████ ████████████ such that firm or stock performance is an outcome of the Conduct and thus should *not* be controlled for as the baseline. Finally, I will show using a simulation that the fact that some equity might be granted during the Conduct but received afterwards either leads to no bias in my estimates or results in conservative estimates.

111.    I will begin with the argument that I need to account for this timing issue of when stock grants are made versus when they are received as income for workers. Defendants' Experts argue that my approach "contradicts how the Defendants calculated expected values for stock grants and options prior to vesting."[297] I understand that Defendants need to determine how much stock to grant in a given year and what a vesting schedule might be. But the value of the equity grant at the grant date is not necessarily what the worker receives, and, so long as there is a vesting schedule, the worker does not receive any income on that grant date.

a.    Take a simple example to illustrate: Suppose that a worker receives an equity grant of 100 shares with a fair market value of $500 in 2010, which vests if the worker stays until 2014. Per Defendants' Experts' claims, I should account for the timing of the stock grant by giving the worker the fair market value of the grant ($500) in 2010. This is clearly

---

[297] Johnson Report n.363; Stiroh Report ¶ 97 ("As a result of these decisions, Dr. Starr's equity compensation measure does not reflect DaVita's compensation decisions, which are the focus of this matter."); McCrary Report ¶ 222 ("That means that when Prof. Starr measures equity pay, he is measuring something other than the employer's choice of how to set equity pay.").

wrong because in 2010 the worker experiences no change in their actual income. If the worker leaves in 2010, 2011, 2012, or 2013, then the equity would not vest and they would receive $0. In this situation, Defendants' Experts approach would give the worker $500 in 2010, when the realized value of the equity to the worker is $0. As a result, Defendants' Experts approach would both misallocate earnings to years when it did not occur, and overstate realized earnings.

b.  Only if the worker stays until 2014 does the worker receive the 100 shares, which, if the price stayed the same, would be worth $500 in *realized* income. But even in this case, the realized income from the worker's perspective happens in 2014, not 2010. Indeed, as described below, this is also when the stock grants are taxed as income by the IRS. Note that it is also possible that the price did not stay the same between the grant and vesting date, such that when the worker realizes the stock equity, the price of the stock may have gone up or down (e.g., as a result of the Challenged Conduct), resulting again in differences in realized stock compensation relative the initial grant amount. For example, if the stock price tanked to $0, then the realized value of the equity grant from 2010 is $0 in 2014. In this situation, as before, Defendants' Experts approach would give the worker $500 more dollars than they earned, and would give it to them in a year that they did not earn it. This simple example illustrates that if we care about what workers are compensated and in which years they receive that compensation—which is the whole point of the wage-suppression exercise—then in general we should *not* be shifting compensation from worker equity grants to a time period when they did not receive them as income.

112.  The examples above are fictitious, but represent the real experiences of many Senior Employees. Below I document several examples in this case of stock grants that did not

reflect actual, realized compensation, as well as how Dr. McCrary's and Dr. Stiroh's calculations correspond to the realized compensation.



a.

.[298]

[299]

[300]

b.

[301]

.[302]

---

[298] *See* McCrary Report ¶ 142 (

).

[299] Note that

[300] *See* my workpapers for details.

[301] Note that

[302]



d.　　These examples highlight how Dr. McCrary's and Dr. Stiroh's data

manipulations to account for equity compensation at the time of the equity grant do *not* reflect

the equity compensation workers realized. But these examples also do not do justice to the sheer

---

[303] *See* my workpapers for details.

[304] Note that ███████████████████████████████████████████████████
████████████████████████████████████████

[305] Specifically, ███████████████████████████████████████████████
███████████████████████████████████████████████████

[306] *See* my workpapers for details.

number of observations in which Dr. McCrary and Dr. Stiroh wrongly adjust compensation.

Cumulatively, ███████████████████████████████████████████



███████████████████████████████████████████████████

███████. [307] █████████████████████████████████████████

███████████████████████████████████████████

113.    Treating equity income when it is received, as opposed to when it is granted, is consistent with how government agencies treat equity grants for the purposes of taxation and disclosure of executive compensation.

a.    An article by Itzkowitz (2025) called "Taxes on Equity" summarizes how the IRS taxes equity. He writes, "[w]hen you vest restricted stock, it triggers ordinary income tax on the fair market value (FMV) of the shares on the vesting date. This income tax is due by the filing of your tax return for the related calendar year."[308] Thus, the IRS taxes restricted stock units based on what the worker *receives*, including the fair market value of the shares *on the vesting date* (not the grant date). With regards to non-qualifying stock options, he writes "[i]f you're exercising NSOs, you will have to pay income tax on the difference, or spread, between the exercise price and the fair market value (FMV) of the shares at the time of exercise."[309] As in the case of Restricted Stock Units, the IRS taxes the difference between the value of the equity and the strike price *at the time of vesting or exercise*.

---

[307] *See* my workpapers for details.
[308] Eitan Itzkowitz, *Taxes on Equity*, CARTA (Apr. 1, 2025), https://carta.com/learn/equity/equity-taxes/.
[309] *Id.*

b.     The issue of what executives are *actually paid* as it relates to equity is also the subject of a new SEC disclosure rule.[310] In January 2022, with the goal of making "it easier for shareholders to assess a public company's decision-making with respect to its executive compensation policies" the SEC finalized a disclosure rule that implemented the "pay versus performance" disclosure requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.[311] A summary of the new disclosure rule notes that "[i]n particular, the new rule will require companies to quantify and describe (in both tabular and narrative format) the relationship between compensation *actually paid* to executives and company financial performance across multiple metrics."[312] Precisely because various long-term equity or similar grants may not reflect actual compensation, the new SEC disclosure emphasizes the importance of understanding what executives are actually paid.

114.    Similarly, the fact that worker harm arises from what workers receive versus what they were promised is evident in ████████████████████████████, which led to a separate lawsuit.[313] As I described in my initial report, ████████████████████████ ████████████████████████████████████ [314] ████████████

---

[310] Academic studies have also grappled with how to measure equity pay for executives, and highlighted how important it is for understanding whether executive pay reflects firm performance. *See, e.g.,* Anthony J. Nyberg, Ingrid Smithey Fulmer, Barry Gerhart, & Mason A. Carpenter, *Agency theory revisited: CEO return and shareholder interest alignment*, 53(5) ACADEMY OF MANAGEMENT JOURNAL 1029–1049 (2010); Brian J. Hall & Jeffrey B. Liebman, *Are CEOs really paid like bureaucrats?*, 113(3) QUARTERLY JOURNAL OF ECONOMICS 653–691 (1998).

[311] *See SEC Adopts Pay Versus Performance Disclosure Rules*, U.S. SECURITIES AND EXCHANGE COMMISSION (Aug. 25, 2022), https://www.sec.gov/newsroom/press-releases/2022-149.

[312] Eric W. Wilfers et al., *SEC's New Pay Versus Performance Disclosure Rule: Important Things To Know*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (Oct. 28, 2022), https://corpgov.law.harvard.edu/2022/10/28/secs-new-pay-versus-performance-disclosure-rule-important-things-to-know/.

[313] 2nd Am. Class Action Compl. (ECF 101), *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.) ¶ 2–3.

[314] Starr Report ¶ 85.



██████████████ ,[315] ██████████████████████████ ,[316] ███████████ .[317]

115.    Taken together, it is clear that what we should care about when studying whether firm conduct reduces compensation for workers is in fact what workers receive in compensation. Defendants' Experts are fundamentally confused on this point.

a.    Dr. Johnson writes: "For the question at issue—whether or not Defendants suppressed compensation for proposed Class Members—one would need to compare the pay decisions Defendants actually made to those they would have made but-for the alleged conduct *during* the proposed Class Period."[318] The first part of this statement is correct: the question at issue is indeed whether or not Defendants suppressed compensation for proposed Class Members. But the second part of the sentence is misleading because Dr. Johnson has now switched from describing "compensation for proposed class members" in the first part of the sentence to "pay decisions Defendants actually made" in the second. This is highly misleading

---

[315] Deposition of Mark Garvin (May 30, 2024) at 146:16–147:20 ( ████████████████████████ ████████████████████████████████████████████████ ").

[316] Alex Bateman indicates ███████████████████████████████████████ Deposition of Alex Bateman (Jul. 19, 2024) at 30:6–31:5 ( █████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ").

[317] Deposition of Shannon Mosley (Aug. 13, 2024) at 81:2–82:22 ( █████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ ").

[318] Johnson Report ¶ 167.

because in the context of stock grants, as explained above, "pay decisions" do not necessarily reflect "compensation received." If the second part of his sentence was consistent with the first, it would have read "one would need to compare the **compensation class members actually received** to what they would have received but-for the alleged conduct during the proposed class period." And that is exactly what I do.

> b.      Dr. McCrary's and Dr. Stiroh's confusion is the same. Dr. McCrary writes: "That means that when Prof. Starr measures equity pay, he is measuring something other than the employer's choice of how to set equity pay."[319] Similarly, Dr. Stiroh writes "As a result of these decisions, Dr. Starr's equity compensation measure does not reflect DaVita's compensation decisions, which are the focus of this matter." Dr. McCrary and Dr. Stiroh are wrong. The goal of this analysis is to understand whether the Challenged Conduct affected *what workers actually receive*. If instead I were to focus on company pay decisions when those pay decisions do not reflect what workers actually received, then I would not be studying whether workers were harmed, because the definition of harm is lower *realized* compensation, not the extent of unrealized promises.

116.    Even if I were to accept Defendants' Experts' claims that we should count as income the value of equity at the time it is granted, which I firmly reject, then we must decide on how to value those grants. Here, Defendants' Experts themselves do not agree on how to do this. Dr. Johnson does not even attempt to measure the equity at the grant date, while Dr. Stiroh and Dr. McCrary take different approaches overall and for different Defendants. I describe these briefly.

---

[319] McCrary Report ¶ 222.

a.



117.    Clearly the extent to which Dr. McCrary and Dr. Stiroh are altering the actual compensation received by Senior-Level Employees is extreme, and I reiterate my objections to their approach. However, even if I take their approaches at face value and re-run my primary wage suppression models, as shown in **Figure 8**, █████████████████████████████

---

[320] McCrary Report ¶ 233 ██████████████████████████████████████████████████
█████████████████████████████████████████ .").
[321] *Id.* ¶ 233.
[322] *Id.* ¶ 233.
[323] *Id.* n.435.
[324] *See* my workpapers for details.
[325] Stiroh Report ¶ 98 ("████████████████████████████████████████████████
██████████████████████████████████████████ ).
[326] *See* my workpapers for details.



**Figure 8: Equity Accounting Methods**

| | Dependent Variable: Ln(Total Annual Compensation) Stiroh Equity Method | | Dependent Variable: Ln(Total Annual Compensation) McCrary Equity Method | | Dependent Variable: Ln(Total Annual Compensation) McCrary Equity Method, No USPI/SCA Subtraction | |
|---|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] | [6] |
| Conduct | | | | | | |
| **% Wage Suppression** | | | | | | |
| DaVita Conduct | | | | | | |
| **% Wage Suppression** | | | | | | |
| SCA Conduct | | | | | | |
| **% Wage Suppression** | | | | | | |
| USPI Conduct | | | | | | |
| **% Wage Suppression** | | | | | | |
| Baseline Model Controls | | | | | | |
| Individual-Company FE | | | | | | |
| Location FE | | | | | | |
| Observations | | | | | | |
| R-squared | | | | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

118. Defendants' Experts also argue that without accounting for equity at the time of grant that my estimates are susceptible to changes in the value of stock performance or that my

estimates may be biased by grants made during the Conduct Period that pay out afterwards.[327] I respond to these two concerns in turn.

      a.     First, the fact that stock prices might change the value of equity grants is part of a broader argument that Dr. Johnson makes, where he believes that firm performance (whether measured as a stock price or otherwise) should be included in the model because my causal reasoning that firm performance is a "bad control" is insufficient to exclude it from my analysis.[328]

      i.     Dr. Johnson does not seem to understand what bad controls are, and why firm performance, including stock price, is a bad control and should not be controlled

---

[327] Johnson Report ¶ 166 ("[N]or do his models account for changes in the value of these grants over time due to factors outside of Defendants' compensation setting process, for example, changes in stock prices over multiple years which can impact both the value of the payment itself and the employee's behavior (e.g., if they decide to 'exercise' vested stock options on a certain date because of gains in the underlying stock price[.])"); *id*. ¶ 157 ("As these exhibits indicate, the level of variable compensation that employees received would depend not only on the compensation practices of a given Defendant but also on the performance of the firm itself in that year, which Dr. Starr does not account for in his regression analysis."). Dr. Johnson also reports examples of when individuals receive grants at one date but stock compensation at another. Johnson Report ¶ 168 (When should one value stock options?); *id*. ¶ 169 ████████████████████████████████████████ ")"; *id*. ¶ 170 ( ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ "); McCrary Report ¶ 223 ("To illustrate why it is problematic that Prof. Starr does not use equity at the time it was issued in his pay regression, consider that, by doing so, he inappropriately assigns equity pay that was issued during the Class Period to after the Class Period. For example, if an SCA or a USPI employee was issued equity pay during the Class Period, but that equity pay did not vest, or the employee did not choose to sell their stocks or exercise their stock options, until after the Class Period, then that would elevate Prof. Starr's pay measure in the post period relative to the Class Period, and bias his pay regression model in favor of finding a pay suppression effect.").

[328] Johnson Report ¶ 154 ("Dr. Starr understates the problem that occurs when a relevant variable is excluded from a 'wage suppression' model such as the one he proposes. When a regression omits a critical factor, such as firm financial performance, it suffers from what is known as 'omitted variable bias.' … Simply speculating that a given variable is a 'bad' control is not a justification for its exclusion."). *See also* Starr Dep. Vol. 2 at 339:21–342:3 ("I think that we should be leery of overinterpreting regression models that include many, many bad control variables," which "can actually increase bias in your estimates.").

for as a default. I do not dispute that firm performance likely drives compensation, but that does not mean it should be included as a control variable in the regression. The problem is that the Challenged Conduct also affects firm performance, making firm performance a mediator variable on the causal pathway between the Challenged Conduct and compensation. So, if we wish to understand the effect of the Challenged Conduct on compensation, then we should not in general control for mediators, as I explained in my initial report.[329]

ii. Dr. Johnson argues that "Simply speculating that a given variable is a 'bad; control is not a justification for its exclusion."[330] I am not "simply speculating." Rather, Dr. Johnson ignores direct evidence that the Challenged Conduct was designed to improve firm performance. As I described in my initial report, ███████████████████ ████████████████████████████████████[331]████████████████████████ ███████████████████████████████████████████████████████████"[332] Thus, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████[333]

---

[329] *See* Starr Report ¶ 123(b) ("*Second*, it is important to emphasize why some control variables are *omitted* from the regression."). *See also* Carlos Cinelli, Andrew Forney, & Judea Peral, *A crash course in good and bad controls*, 53 SOCIOLOGICAL METHODS & RESEARCH 1–30 (2022) [hereafter Cinelli et al. (2022)].

[330] Johnson Report ¶ 154.

[331] Ex. PX316 at DVA00019820 ██████████████████████████████████████ ██████████████████████████████████████

[332] Ex. PX304 at DOJCIV-008-00000300.

[333] Clemens Dep. 135:21–137:11.

        iii.      To drive the point home, note that no study on the effects of no-poach agreements takes Dr. Johnson's perspective when it comes to controlling for firm performance. This is true across both the franchise and the high-tech no-poach studies.[334]

        iv.      Thus, for the aforementioned reasons, I reject Dr. Johnson's arguments that I should adjust for firm performance or stock prices in my base model.

        v.      Even if we were to accept Dr. Johnson's claim that we should control for company performance, which I do not, including stock prices or firm performance in the model ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In **Figure 9** below I control for stock prices and in **Figure 10** I control for DaVita performance as measured by Dr. Johnson.[335] Even with these firm performance controls, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

[334] Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings*, REVIEW OF ECONOMICS AND STATISTICS 1–35, 1 (2024) [hereafter Callaci et al. (2024)]; Lafontaine et al. (2025); Gibson (2024).

[335] Johnson Report ¶ 175 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

**Figure 9: Controlling for Stock Prices**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] | [2] |
| Conduct | | |
| **% Wage Suppression** | | |
| DaVita Conduct | | |
| **% Wage Suppression** | | |
| SCA Conduct | | |
| **% Wage Suppression** | | |
| USPI Conduct | | |
| **% Wage Suppression** | | |
| End of Year Stock Pirce | | |
| Baseline Model Controls | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |



*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

**Figure 10: Controlling for DaVita Performance (Dr. Jonhson's DaVita Subsample)**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| DaVita Conduct | | | | |
| **% Wage Suppression** | | | | |
| 3-Year Growth Rate of Dialysis Adjusted OI For 2015-2020 U.S. Dialysis Employees | | | | |
| 3-Year Growth Rate of Dialysis Adjusted OI Before G&A Expenses For 2015-2020 U.S. Dialysis Employees | | | | |
| 2015-2020 U.S. Dialysis Employees Indicator | | | | |
| End of Year Stock Price | | | | |
| Baseline Model Controls | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |



*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

  b.  Second, Defendants' Experts point out that if one considers the fact that equity is granted during the Conduct Period, but then paid out during the post-Conduct Period, that it could bias the results.[336] This claim is a red herring for two reasons.

  i.  First, Dr. Johnson points out that some stock grants are made during the Conduct Period but paid out after it.[337] Yet the same is true before the Conduct Period as well, when, e.g., DaVita makes grants before 2008 but then it pays out during the Conduct Period. For example, if DaVita provides a stock grant worth $10,000 in 2007, and it pays out during the Conduct Period (assuming that it vests), then this increases Conduct Period

---

[336] McCrary Report ¶ 223.

[337] Johnson Report ¶ 72 ("The timing issue I illustrate above, where Dr. Starr misattributes stock earnings to the post-period for compensation decision *during* the proposed class period, is pervasive."). Dr. Johnson makes a similar point about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Johnson Report ¶ 155.

compensation. However, if DaVita also provides a similar stock grant worth $10,000 in 2018 and it pays out after the Conduct Period, then this will increase post-Conduct compensation. On net, as long as equity grants are unaffected by the Conduct, they will cancel each other out and not lead to any bias in the estimates.

           ii.      Second, if instead the Challenged Conduct systematically suppresses the amount of equity granted, as found in Gibson (2024), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ then the delay between a stock grant and its realization will only make my estimates *conservative*. To see this, consider the same $10,000 grant scenario as above, but instead of assuming that the stock grant from during the Conduct Period was $10,000, assume that the Challenged Conduct reduced it to $5,000, but that it still paid out after the Conduct Period (assuming the worker stays until it vests). In this case, as a result of these changes, post-Conduct equity compensation would be $5,000 (halved due to when it was issued during the Conduct Period), while during Conduct Period compensation would still be $10,000 (intact because it was issued before the Conduct Period). As a result, the regression model will see that equity compensation would appear to be $5,000 lower in the post-Conduct Period relative to the during Conduct Period. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, this timing issue related to equity compensation only makes my Conduct estimate conservative. This is a basic spillover problem where the Conduct period is made more "clean" by the "clean" period, and the "clean" period is made less "clean" by the Conduct Period. However, such spillovers simply reduce the difference between the two periods, leading to either no bias or conservative estimates.

iii. To illustrate that my theoretical arguments above are accurate, I develop a simulation.[338] In the simulation I compare situations when the equity is all received within the same period versus when equity grants are received in a subsequent period. As I argued above, the simulation shows that,

 The simulation also shows that

.

### 2. Wage Suppression Estimates Are Not Sensitive to COVID

119. Defendants' Experts argue that I have not appropriately addressed COVID in my empirical model. In my initial empirical model I included an indicator variable for the timing of the COVID pandemic (2020 and 2021). Defendants' Experts offer alternative ways to account for COVID, though Dr. Saravia does not have an opinion on the "correct" way to do it.[339] Dr. Stiroh, Dr. McCrary, and Dr. Saravia suggest that effects of the COVID-19 pandemic continued until 2022.[340] Dr. McCrary and Dr. Saravia then addressed COVID-19 by including three binary variables indicating 2020, 2021, and 2022.[341] Dr. McCrary also includes three national variables

---

[338] *See* my workpapers.

[339] I note that Dr. Saravia testified that she did not have an opinion "as to what the correct model to account for COVID would be[.]" Saravia Dep. at 202:16–21. She did not "actually do analysis to model the effect of the 2020 COVID on employees instead of simply sticking in a dummy." Saravia Dep. at 199:20–200:12.

[340] Saravia Report ¶ 260 ("Effects of the pandemic persisted in the ASC industry in particular. During the pandemic and for some time after, Americans deferred elective healthcare procedures, including many of the kind of surgeries performed at ASCs. This eventually caused a dramatic rise in demand for elective procedures. Patients who had put off their healthcare needs during the pandemic caused a backlog of demand that extended into 2021 and 2022 and even beyond."); McCrary Report ¶ 221 ("These patterns also align with Prof. Gerhart's deposition testimony, where he indicated the job openings rate swung "wildly" during the COVID-19 pandemic and that the impacts of COVID-19 in labor markets continued into 2022 and beyond."); Stiroh Report ¶ 103 ("However, the COVID-19 pandemic continued to affect labor markets through at least 2022. While labor demand recovered in 2021, labor supply was slower to recover, leading labor markets to be historically tight in 2021 and 2022.").

[341] Saravia Report ¶ 262 ("A more flexible way to control for the effect of the pandemic on wages would be to allow its effect to persist, and perhaps differ, into 2022. To allow for the persistence of effects from the pandemic—but also for the possibility that effects had ended by 2022—I estimated Dr. Starr's model adding a separate COVID pandemic indicator for 2022.").

3244633.4

from the Job Openings and Labor Turnover Survey ("JOLTS").[342] In contrast, Dr. Stiroh

modifies my compensation regression to limit the COVID-19 control to only the year 2020[343]

and adds a control variable for the average annual unfilled job openings in a state-year (across all

industries) from the JOLTS Survey. Dr. Johnson also raises questions about handling the

COVID-19 pandemic but does not provide an assessment of how to address it.[344]

120.    Dr. Saravia also argues that my comparison of Directors and Above to Managers

does not properly account for COVID-19 because "Differencing manager and Senior-Level

Employee pay will not remove any bias caused by the COVID pandemic if the pandemic

affected manager and Senior-Level Employee compensation differently, and it will not correct

for a misspecification of the conduct period."

121.    In this section I respond to these critiques. As evidenced by Dr. Saravia's

admission and the multitude of approaches Defendants' Experts took to address sensitivity to the

COVID pandemic, there is no single, obvious way to address potential biases from COVID.

Indeed, the only way to fully address COVID is to collect more data after COVID ended. I

---

[342] McCrary Report ¶ 202 ("Specifically, I assess how controlling for the healthcare job openings, quits, and layoffs and discharges rates from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey affects Prof. Starr's results.").

[343] Stiroh Report ¶ 104.

[344] Johnson Report ¶ 149 ("Dr. Starr purports to account for this 'dramatic' change by including a dummy variable for 2020 and 2021. However, the sensitivity of his analysis to the use of this benchmark period can be seen from the results of Dr. Starr's own 'robustness checks.'").

anticipated this potential issue and requested data extending into 2023 from Defendants for exactly this reason.[345] Defendants declined to provide more post-COVID data.[346]

122.    Nevertheless, as Defendants' Experts' own analyses show, and as my analyses below fully document, the COVID pandemic does not drive my results. Even though I dispute how Defendants' Experts treat COVID, regardless of how I incorporate their suggestions to address COVID, I find ███████████████████████████████████████████████████.

123.    To address how different approaches to handling COVID influence the wage suppression estimates, I begin by focusing on potential ways to handle the year fixed effects. These analyses are in general more flexible than Defendant's other approaches using JOLTS variables because they purge from the model variation in compensation coming from post-2019. In my benchmark model, I include one fixed effect for 2020 and 2021, because in 2022 vaccines were widely available and there was no new threatening variant. Alternative approaches include having a fixed effect for both 2020 and 2021 (as opposed to one fixed effect for both years), and adding a fixed effect for 2022, which Defendants' Experts advocate. I incorporate these suggestions in **Figure 11**, which shows that ████████████████████████████████████

---

[345] In February 2024, Plaintiffs requested that SCA and DaVita produce structured data for 2022 and 2023, and that USPI produce structured data for the remainder of 2023. *See* 2024-2-7 Ltr SDZ to DaVita RE Structured Data Questions ("Plaintiffs request that DaVita produce structured data matching the data fields produced to date for the calendar years 2022 and 2023."); 2024-2-7 Ltr SDZ to SCA RE Structured Data Questions ("Plaintiffs request that SCA produce structured data matching the data fields produced to date for the calendar years 2022 and 2023."); 2024-2-7 Ltr SDZ to USPI RE Structured Data Questions ("Plaintiffs request that USPI produce structured data matching the data fields produced to date for the calendar year 2023."). *See also* 2024-2-20 E-mail SDZ to DaVita RE Structured Data Questions; 2024-2-20 E-mail SDZ to SCA RE Structured Data Questions; 2024-2-20 E-mail SDZ to USPI RE Structured Data Questions (e-mails from Plaintiffs requesting an update on the data requests).

[346] All three Defendants declined to produce 2023 data. DaVita and SCA declined to produce 2022 data. *See* 2024-3-13 Ltr T. Rothman to S. Zandi RE Response to Plaintiffs' 2-7 Letter; 2024-3-27 Ltr J Barrett to SDZ RE USPI Structured Data 2.7 Ltr; 2024-3-27 Ltr M Lane to SDZ RE DaVita 2022-23 Structured Data. Thereafter, in May 2024 SCA and DaVita agreed only to match USPI and produce 2022 data. *See* 2024-4-3 Ltr SDZ to Ds RE Structured Data ("Plaintiffs propose the following compromise to avoid motion practice. … DaVita and SCA would produce class data for 2022, which is what USPI has already done."); 2024-5-29 Email SDZ to DaVita & SCA RE 2022 Structured Data ("Defendants DaVita and SCA agree to join USPI in producing 2022 structured data[.]").



347

## Figure 11: Alternative Controls for COVID

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| DaVita Conduct | | | | |
| **% Wage Suppression** | | | | |
| SCA Conduct | | | | |
| **% Wage Suppression** | | | | |
| USPI Conduct | | | | |
| **% Wage Suppression** | | | | |
| Covid (2020–2021) | | | | |
| Year 2020 Dummy | | | | |
| Year 2021 Dummy | | | | |
| Year 2022 Dummy | | | | |
| Baseline Model Controls | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |



*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

---

[347] Dr. Saravia also acknowledges that my analysis comparing Senior Employees to Managers addresses COVID. This is because, in that analysis, I compared how the difference between Senior Employee and Manager compensation in a given company-year changes as a result of the Conduct. Naturally, because this comparison is done within a company-year, it at least partially if not fully accounts for COVID and all other omitted variables that similarly affect manager and Senior Employee pay in any given year for each company. Dr. Saravia pushes back on the idea that this differencing approach fully accounts for COVID because "Differencing manager and Senior Employee pay will not remove any bias caused by the COVID pandemic if the pandemic affected manager and Senior Employee compensation differently[.]" *See* Saravia Report ¶ 278. While Dr. Saravia posits this conditional, ███████████████████████████████████████████████████ Nevertheless, in **Figure 26** I show that the Senior-Level Employee versus manager differentials are robust to controlling for fixed effects for each year in the post-Conduct period.

124.     As an alternative approach to handling COVID, Dr. McCrary and Dr. Stiroh relax the post-Conduct year fixed effects and instead control for various measures of COVID coming from the Job Openings and Labor Turnover Survey (JOLTS). Dr. Stiroh inexplicably controls for only a fixed effect in 2020 and average state unfilled job openings data across all industries.[348] Dr. McCrary drops the post-Conduct year fixed effects altogether and instead controls for three JOLTS variables at the national level, "job openings, quits, and layoffs and discharges rates in the health care and social assistance industry."[349]

125.     Dr. Stiroh and Dr. McCrary offer no justification for why controlling for national or cross-industry JOLTS measures are preferable to controlling for fixed effects for the initial years of the pandemic. Indeed, using fixed effects is a more complete approach to washing out the variation driven by COVID. Moreover, the coarse JOLTS measures cannot by their nature pick up local, industry-specific effects of the pandemic. In addition, the JOLTS measures used by Defendants' Experts are highly correlated: The health-industry-specific job openings variable, the health-industry specific job quits variable, and the state average job openings variable are all correlated at or above 0.949.[350] Yet this high degree of multicollinearity goes unmentioned by Dr. McCrary. The resulting feature of multicollinearity is that it can make results highly unstable.[351] Accordingly, I fundamentally disagree that Dr. McCrary's model which includes JOLTS is appropriately specified. Similarly, Dr. Stiroh's approach of controlling only for 2020 and then adding a JOLTS job openings variable is highly selective. She offers no justification for

---

[348] Stiroh Report Figure 22.
[349] McCrary Report Ex. 40.
[350] *See* my workpapers for details.
[351] *See* Arturs Kalnins, *Multicollinearity: How common factors cause Type 1 errors in multivariate regression*, 39 STRATEGIC MANAGEMENT JOURNAL 2362–2385 (2018).

why we should only include a year fixed effect for 2020 and not 2021, when clearly the effects of the pandemic continued into 2021, as I described in my initial report.[352]

126.    Despite my disagreement with both Dr. Stiroh's and Dr. McCrary's analysis, I perform two analyses, both of which suggest that █████████████████████████████████

███████████████████████████████████████████████████████████████████

127.    First, note that Defendants' Experts JOLTS variables cover either *all industries* at the state-year level (Stiroh) or cover *national* patterns in the healthcare industry as a whole. These are coarse controls, especially given that I am already controlling for local unemployment rates and GDP. If these JOLTS measures corresponding to the COVID pandemic are going to account for how earnings of Senior-Level Employees at the three Defendants change, then because COVID is a national shock, we should observe that that the earnings of managers in the healthcare industry also changed when these measures changed due to COVID. **Figure 12** plots how average manager earnings in healthcare change over time, relative to 2017, alongside Defendants' Experts JOLTS measures of COVID. The graph shows clearly that while layoffs spike and recover relatively quickly in 2020 and 2021, the quit rate and job opening rates are elevated in 2021 and 2022. However, despite these changes, note that average healthcare manager earnings, as shown in the red-line, do not change in any visible way from 2020 to 2022. Rather, healthcare manager earnings continue along its pre-2020 trend. Dr. Saravia even acknowledges that ███████████████████████████████████

---

[352] Starr Report n.407 ("[P]er a 2022 Johns Hopkins review: 'In 2022, COVID-19 illness was less severe and less deadly compared to 2020 and 2021, and no new variant has emerged with the capacity to fuel a major wave of cases.'").

 [REDACTED]³⁵³ This [REDACTED]

[REDACTED]

**Figure 12: Comparison of COVID Controls to HealthCare Manager Earnings**



128. To put a finer point on it, in **Figure 13** I convert **Figure 12** above into a regression and show that, [REDACTED]



---

³⁵³ Saravia Report n.138 ( [REDACTED] ).

**Figure 13: Dr. McCrary and Dr. Stroh's Covid Measures are Not Significantly Correlated with Healthcare Manager Earnings**

| | Dependent Variable: Ln(Medical Healthcare Manager Earnings) | | | | | |
|---|---|---|---|---|---|---|
| | [1] All Years No Controls | [2] All Years Stiroh Controls | [3] All Years McCrary Controls | [4] Post 2013 No Controls | [5] Post 2013 Stiroh Controls | [6] Post 2013 McCrary Controls |
| Year | | | | | | |
| JOLTS: Healthcare Layoff Rates | | | | | | |
| JOLTS: Healthcare Job Opening Rates | | | | | | |
| JOLTS: Healthcare Job Quit Rates | | | | | | |
| State Average Job Openings | | | | | | |
| Observations | | | | | | |
| R-squared | | | | | | |

*Note*: \*\*\* p<0.01, \*\* p<0.05, \* p<0.1. Robust standard errors in parentheses, clustered by individual.

129. These findings are perhaps not surprising, as the measures used by Defendants' Experts are very coarse. Dr. McCrary's variables cover the entire healthcare industry across the whole United States—only a tiny fraction of which is populated by managers and Senior-Level Employees. Dr. Stiroh, in contrast, uses a JOLTS variable that is at the state-level but aggregated across *all industries*, of which healthcare is only a fraction. If these coarse variables are unlikely to affect average compensation for managers in healthcare, it strains credulity that they would

███████████████████████████████████████████. More likely, and if

anything, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████ —like how ice cream sales and shark attacks move together, even though ice cream sales do not cause shark attacks.[354]

130.    Thus, it is not clear why any of these JOLTS measures would have a causal effect on Senior-Level employee wages. COVID was certainly a disruption to the economy at large and pressured the medical industry specifically, but it is not clear how COVID would lead to higher or lower wages. Although the Defendants' Experts claim that there may be omitted variable bias in my model to justify the inclusion of their JOLTS measures,[355] econometric textbooks explicitly warn against this practice of throwing in "the kitchen sink" to identify omitted variable bias:[356]

> At first glance a strategy of 'throwing in everything but the kitchen sink as regressors' seems to be a good way of avoiding bias. This creates what is sometimes referred to as the 'kitchen sink' dilemma—omitted variables, and the bias they cause, will be avoided, but the irrelevant variables that will inevitably be present will cause high variances. There is no easy way out of this dilemma.

131.    Dr. McCrary and Dr. Stiroh do not follow these best practices. They have introduced a number of highly collinear control variables without clarity on why those specific coarse variables are the appropriate control variables, and why they better than alternative fixed effects approaches. Indeed, whatever arguments Defendants' Experts have for a specific control variable their myriad approaches suggest that at baseline they disagree about which ones should be in the model. Given this "kitchen sink" approach, the lack of a relationship with manager compensation, and the lack clarity on why a specific set of control variables is better than others,

---

[354] *See* Eric Siegel, *Why eating ice cream is linked to shark attacks*, BIG THINK, https://bigthink.com/the-present/correlation-causation/ (last visited June 2025). ("According to the data, ice cream consumption is linked to shark attacks. How the why? Well, maybe eating ice cream makes you taste better? So, you consume the ice cream and the shark consumes you. But the more accepted sharksplanation is that it's seasonal. It just so happens that, when it's warmer, more people are eating ice cream and also more people are swimming in the ocean. That is to say that there's no causal relationship, in either direction—neither of these things causes the other, even indirectly.").
[355] McCrary Report ¶ 202.
[356] PETER KENNEDY, A GUIDE TO ECONOMETRICS 94 (Blackwell Publishing 6th ed. 2008) (emphasis in original).

the myriad approaches Defendants' took to address COVID at best introduce noise into the regression model, and at worst mask the true effect of the Challenged Conduct by introducing spurious correlations in the data.

132.    Even though I dispute how Defendants' Experts treat COVID, incorporating all possible variants of their suggestions ████████████████████████████████. In **Figure 14** below, I perform a complete analysis of all potential approaches to handling year fixed effects as raised by Defendants' Experts, and all potential approaches to Defendants' Experts JOLTS variables. ███████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████

**Figure 14: Regression Models Using All Proposed COVID Controls**



*Note*: This figure shows every potential combination of handling COVID based on Defendants' Experts' approaches.

133.    As **Figure 14** reveals,

███████████████████████████████████████████████████████

████████████████████████████ Given these results, as well as the fact that benchmark manager compensation does not respond to COVID, I see no reason to diverge from my initial approach to handling COVID as a baseline.

### 3. Time Trend

134. Dr. McCrary argues that I have improperly included a time trend, because there are other covariates in the model to address trends and because the time trend is forced to have the same effect before and after the Class Period.[357] Dr. Johnson also argues that the time trend is included inappropriately in my model.[358] He then drops the time trend from the analysis and finds that the results change somewhat.[359] Below I describe why dropping the time trend is inappropriate, show that the results are robust to dropping it, and show that the results are also robust to allowing for the time trend to change during the Conduct Period, as Dr. McCrary suggests.

135. **Figure 15** documents that ██████████████████████████████

████████████████████████████████████████████████

     a. Dr. McCrary and Dr. Johnson choosing to drop the time trend is inconsistent with standard econometrics approaches, as well as the academic literature on no-

---

[357] McCrary Report ¶ 238 ("His inclusion of the linear time trend is unsupported because, although he claims he includes it to account 'for the natural growth in annual compensation that would have happened over time even absent the Conduct' for individual workers, he already includes three other variables in his pay regression model that serve that purpose: wages for a benchmark group of health and medical manager, gross domestic product (GDP) per capita, and the consumer price index (CPI) in each year.").

[358] Johnson Report ¶ 146 ("Specifically, Dr. Starr includes a linear time trend to purportedly account 'for the natural growth in annual compensation that would have happened over time even absent the Conduct.' Dr. Starr does not address what 'natural growth' in compensation this linear time trend accounts for that are not accounted for by his other controls. Dr. Starr offers no additional explanation for including his linear time-trend beyond the 'natural growth in annual compensation,' despite already including CPI as a control, which he purports accounts for increases over time (i.e., employees may receive 'cost of living adjustments to account for the increased inflation.')").

[359] Johnson Report Ex. 24.

poach agreements. As I referenced in my initial report, Dr. Wooldridge notes on page 363 in his econometrics textbook that "Many economic time series have a common tendency of growing over time. We must recognize that some series contain a time trend in order to draw causal inference using time series data."[360] Because compensation is likely to grow over time for a variety of reasons, including those not controlled for in the baseline regression, including a time trend in general is an appropriate methodological choice. Where possible, such as in the director versus managers approach, when I drop the year trend and include year fixed effects, I find

███████████████ [361]

        b.     In addition, the academic literature on no-poach agreements estimates models either using year-fixed effects, as I am able to do in the manager vs. director model, or using time trends.[362] None of the studies in the academic literature drop time trends altogether like Dr. Johnson and Dr. McCrary.

        c.     Dr. McCrary raises another concern that the time trend is required to have the same relationship to compensation both during and absent the Conduct.[363] To address this criticism, I re-run my main analysis, but instead allow the trend to differ based on the Conduct Period. The results in **Figure 15**, ███████████████ If anything, my current approach is conservative relative to an interacted trend approach.

---

[360] *See, e.g.,* JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH 363 (South-Western 5th ed. 2013) [hereafter Wooldridge (2013)].

[361] *See* Figure 44.

[362] *See* LaFontaine et al. (2025) at 21 ("This is similar to the approach used, for example, in (Clark, Horstmann, and Houde, 2024), who evaluate the effects of cartel formation and breakdown on prices by including a cartel membership dummy variable interacted with a time trend. Using time period fixed effects interacted with the treatment variable, as we do, is somewhat more general."). *See also* Gibson (2024) at 13 ("The parameters $\beta_{jt}$ control for arbitrary job-year time trends, $\gamma_{lt}$ for arbitrary location-year time trends.").

[363] McCrary Report ¶ 238 ("It is also econometrically incorrect because the linear time trend is forced to have the same effect throughout the Class Period and periods outside the Class Period, even though his 'before-and-after' pay regression model design relies on variation over time to isolate the effect of the alleged conduct. In other words, although a foundational assumption of his pay regression model is that he can utilize differences over time to isolate the impact the alleged conduct had on pay, he is himself constraining factors in his model related to time to remain the same across the non-Class Period and Class Period years.").

**Figure 15: Alternative Trend Controls**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
| --- | --- | --- | --- |
| | [1] No Trend | [2] Common Trend | [3] Interacted Trend |
| *Panel A. Common Conduct Effect* Conduct | | | |
| **% Wage Suppression** | | | |
| *Panel B. Defendant-Specific Conduct* DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Individual-Company FE | | | |
| Location FE | | | |
| Observations | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 4.    Standard Errors

136.    Dr. McCrary also argues that I have improperly clustered the standard errors, though none of the other three Defendants' Experts raise this issue.[364] In my report I described why I originally clustered the standard errors by individual.[365] Dr. McCray proposes to cluster standard errors by each individual employee, as well as the Defendant by year level. Dr. McCrary's argument, even if it were correct, would make no practical difference if implemented at face value. The clustering of the standard errors does not affect what the estimate of the

---

[364] McCrary Report ¶ 238 ("I correct Prof. Starr's standard errors by properly clustering at both the individual level, as well as at the Defendant and year level.").

[365] Starr Report ¶ 124(a) ("Because individual earnings are likely to be serially correlated, I cluster the standard errors at the individual level.").

coefficient is, only whether that coefficient might be statistically significant. Thus, the key result of any such modifications to how the standard errors are clustered is what they do to the p-value of any estimates, not to the estimates themselves. As I will explain below, Dr. McCrary's clustering approach is inconsistent with the econometric literature on standard error estimation. However, even if I incorporate Dr. McCrary's approach, ████████████████████████ ████████████████████████

137. Before I proceed, I note that standard error estimation is a relatively complicated topic. Thus, to set the stage I provide a brief, conceptual description of what standard errors are, how they relate to the estimation of p-values, and why clustering the standard errors is important in this case.

a. Standard errors reflect the variability of an estimate based on repeatedly sampling from the population. Imagine we could repeatedly draw 10,000 independent random samples of the same size from our population of interest, and then run the same regression 10,000 times (once on each sample) and capture 10,000 estimates for our coefficient of interest. The resulting distribution of 10,000 regression coefficient estimates is known as a "sampling distribution" because it shows how the distribution of a sample statistic (a regression coefficient estimate) varies across repeated samples.[366] The *standard error* of the regression coefficient estimate is *the standard deviation* (e.g., a measure of variability) of the sampling distribution (which reflects the 10,000 regression estimates).[367] If the regression estimate changes

---

[366] Technically, the sampling distribution would show the distribution of a sample statistic across *all possible samples* of the same size within the population. I use 10,000 samples in this example for expositional purposes. *See* generally Wooldridge (2013) at 93–94 (Describing the calculation of the variance of a regression coefficient based on the sampling distribution) and at 760–767 (Describing the sampling variance of estimators and asymptotic properties of estimators).

[367] Note that the standard deviation of a sample of $N$ values of a variable $x$ (with each value denoted $x_i$, where $i$ goes from 1 to N), is given by $Standard\ Deviation(x) = \sqrt{\sum_{i=1}^{N} \frac{(x_i - \bar{x})^2}{N-1}}$, where $\bar{x}$ is the average value of $x_i$.

considerably from sample to sample, then the standard error will be large. Conversely, if the regression estimate changes little from sample to sample, then the standard error will be small. I illustrate this idea graphically in **Figure 16** below, which shows the sampling distribution of 10,000 independent regression estimates from 10,000 repeated samples from a given population.[368] I repeat this for both a high standard error (spread out sampling distribution) and a low standard error (narrow sampling distribution).

**Figure 16: Sampling Distribution of Coefficient Estimates Compared to the True Coefficient Value**



b.      With this conceptual understanding of a sampling distribution and the associated standard error, we can now think about p-values. P-values are calculated by comparing the coefficient estimate we observe in a single sample to the sampling distribution we

---

[368] Note, I assume that the regression model is well-specified such that the sampling distribution of the regression coefficient estimate is centered on the population value. This means that the regression coefficient estimate is unbiased in expectation.

would get in repeated samples *if the true coefficient was zero.* The p-value is the percentage of observations from a "zero effect" sampling distribution that are (by random chance) greater than our sample estimate.[369] The p-value is shown graphically in **Figure 17**, where it is the proportion of observations above our sample estimate (the shaded portion underneath the probability density, above the sample estimate of 0.5). If the p-value is 5 percent, this means that in 5 percent of the 10,000 independent random samples we would find a regression coefficient estimate greater than our sample estimate when the true effect is zero.[370]

**Figure 17: Sampling Distribution of Coefficient Estimates When The True Effect is Zero Compared to the Sample Coefficient**



---

[369] This is for a "one-tailed" p-value. For a "two-tailed" p-value, it is the percentage of observations in the sampling distribution that are greater *in absolute value* than the estimate in our sample. *See* Wooldridge (2013) at 128.
[370] Wooldridge (2013) at 785 describes p-values as follows: "The *p*-value in this example has another useful interpretation: it is the probability that we observe a value of $T$ as large as 1.52 when the null hypothesis is true. If the null hypothesis is true, we would observe a value of $T$ as large as 1.52 due to chance only 6.5% of the time. Whether this is small enough to reject $H_0$ depends on our tolerance for a Type I error."

c.      Holding the estimate from the sample fixed, **Figure 17** makes clear that if the variation in the sampling distribution consistent with no effect is narrow (i.e., the standard error is small), then there will be fewer observations in the sampling distribution that are above our sample estimate, leading to a low p-value (the shaded area under the dark probability density). If in contrast the sampling distribution consistent with no effect is wide (high standard error), then the p-value will be higher (the red shaded portion). Thus, holding all else equal, larger standard errors lead to larger p-values.

d.      In reality, we usually cannot sample data from the population more than once, let alone 10,000 times. That means we cannot know what the true standard error or p-value of a coefficient is. To generate *an estimate of the standard error* of a regression coefficient based on our single sample, a researcher must make several assumptions about how the error terms, which reflect *all unobserved* factors (things not in the regression) that affect the dependent variable (employee compensation in this case), are related to each other across observations in the dataset.[371] The validity of the standard error estimate hinges on the extent to which these assumptions are true.[372] I describe three sets of assumptions.

i.      **I.I.D. Standard Errors:** The researcher assumes that (i) the sampling distribution of the estimate is approximately normally distributed,[373] (ii) the error terms

---

[371] *See* Wooldridge (2013) at 99–101 (Describing estimation of standard errors and how those estimates are biased if our assumption of homoskedasticity is wrong).

[372] I will note that there is a debate about the value of even estimating standard errors and the usefulness of p-values when you have the full population of data. *See, e.g.,* Hoover and Siegler (2008), at 4 ("In general, she leaves the strong impression that tests of statistical significance have next to no place in economics for a variety of reasons. Tests are appropriate only when the data are a proper sample and not when they constitute the whole population.").

[373] This is known as the "Central Limit Theorem." Wooldridge (2013) at 790 ("The central limit theorem implies that, in large samples, the sampling distribution of most estimators is approximately normal"). Technically, when performing actual tests the distribution is known as a "T-distribution," which has slightly fatter tails than the normal distribution. Wooldridge (2013) at 122.

are independent across observations (meaning the error in one observation is not related to the error in another observation), and (iii) the error terms have constant variance (homoskedasticity).

ii.      **Robust Standard Errors**: The researcher relaxes assumption (iii), allowing the error variance to differ across observations. Wooldridge (2013) describes this as a situation in which "the variance of the unobserved factors changes across different segments of the population[.]"[374] However, it is still assumed that observations error terms are independent from one another.

iii.      **Clustered Standard Errors**: The researcher relaxes both assumption (ii) and (iii).[375] Clustering allows for correlation of errors within some defined "cluster" (e.g., an employee's error terms are correlated over time), but assumes independence between clusters (e.g., errors between employees are independent). I clustered the standard errors by employee in my initial report. There is a long literature on how to estimate standard errors and "cluster robust" inference.[376]

138.    To illustrate why clustering standard errors can be important, and why I cluster standard errors by individual, consider the XKCD comic below:

---

[374] Wooldridge (2013) at 268.

[375] Wooldridge (2013) at 483 ("The general approach to obtaining fully robust standard errors and test statistics in the context of panel data is known as clustering, and ideas have been borrowed from the cluster sampling literature. The idea is that each cross-sectional unit is defined as a cluster of observations over time, and arbitrary correlation—serial correlation—and changing variances are allowed within each cluster.").

[376] *See, e.g.,* A. Colin Cameron & Douglas L. Miller, *A Practitioner's Guide to Cluster-Robust Inference*, 50(2) JOURNAL OF HUMAN RESOURCES 317–372 (2015).

**Figure 18: XKCD Comic on Clustered Standard Errors**



*Source: Slope Hypothesis Testing, XKCD, https://xkcd.com/2533/ (last visited June 2025).*

With only three observations from three students, the comic shows that there is a positive but statistically insignificant (p-value=0.58) relationship between scream loudness and exam grade. To try to increase the statistical significance of the estimate, the researchers get each student to scream two more times, such that we now have three observations for each student, even though the newly added observations replicate the first observation for each student. Re-running the analysis on the nine observation dataset (three nearly identical observations for each student), the p-value falls to 3.7 percent, and the researcher asks "Are you sure we're doing slope hypothesis testing right?" The problem evinced by the comic is that the observations (and their associated error terms) are not independent within students. As a result, unless we account for the within-student correlation by clustering the standard errors by student, we will estimate the wrong standard error and thus the wrong p-value.

139.     Dr. McCrary's argument is that standard errors should be clustered by both employee *and* Defendant-by-year. This is taking clustering too far. One well-known study in this literature by Bertrand, Duflo, and Mullainathan (2004) specifically examines and rejects Dr.

McCrary's suggestion to cluster the standard errors by Defendant-year combination.[377] The Bertrand et al. (2004) study examines data at the state-year level (as opposed to the individual-company-year level as in this case) and seeks to study when "fake laws" are identified as having a statistically significant effect (even though they are fake and should have no effect), based on how the standard errors are clustered. The basic idea of their study follows these two steps.

      a.      First, they ignore any actual laws that are passed by states and instead assume that random states passed laws at random times ("fake laws"). Due to this randomness, when Bertrand et al. (2004) run a regression estimating the effect of the fake state law, the estimate should be close zero. The authors then re-randomize the laws and re-run their same regression a large number of times, effectively deriving a sampling distribution consistent with no effect.[378] Given that the laws have no effect, the authors argue that "If OLS were to provide consistent standard errors, we would expect to reject the null hypothesis of no effect roughly 5 percent of the time."[379] Put differently, across all the iterations where state laws are randomized and the regressions are re-run, the coefficient estimates should have a p-value of 5 percent or less approximately 5 percent of the time.[380]

      b.      Second, Bertrand et al. (2004) cluster the standard errors at different levels to understand which level of standard error clustering hits the correct 5 percent mark. When Bertrand et al. (2004) cluster their standard errors at the state-year level, they find that the results appear statistically significant 44 percent of the time, which is clearly much higher than the 5

---

[377] *See* Marianne Bertrand, Esther Duflo, & Mullainathan Sendhil, *How much should we trust differences-in-differences estimates?*,119 QUARTERLY JOURNAL OF ECONOMICS 249–275, 250 (2004) ("We assume away biases in estimating the intervention's effect and instead focus on issues relating to the standard error of the estimate.").

[378] Bertrand et al. (2004) at 256 ("[W]e can repeat this exercise a large number of times, each time drawing new laws at random.").

[379] Bertrand et al. at 256.

[380] Bertrand et al. (2004) at 251 ("Since these laws are fictitious, a significant "effect" at the 5 percent level should be found roughly 5% of the time.").

percent of time they should have found if the standard errors were properly clustered. Bertrand et al. (2004) highlight that clustering at the state-year level in this case results in the wrong standard error estimation because clustering at the state-year assumes the error terms are independent across state-years, when in fact they are not.[381] This is the same problem as in the XKCD comic, where the observations and error terms were not independent within an individual. The standard guidance since this study, including in the Abadie et al. (2023) paper Dr. McCrary references, is to *not* cluster at the state-year when studying state policies.[382]

140.    While the Bertrand et al. (2004) study is looking at state policies, their guidance applies to this case, where we are looking at firm conduct. Rather than having data at the state-year level, the data in this case is at the individual-company-year level. Thus, taking the guidance of Bertrand et al. (2004) to this data means that we should avoid doing exactly what Dr. McCrary did, cluster the standard errors at the company-by-year level. Notably, and perhaps not surprisingly in light of this discussion, none of the other three of Defendants' Experts raised Dr. McCrary's point about clustering standard errors.

141.    Even if Dr. McCrary's approach were valid, which it is not, ███████████

███████████    As shown in **Figure 19**, ███████████

███████████████████████████████████

---

[381] *Id*. at 258 ("In row 2 we allow for an arbitrary correlation of the error terms at the state-year level. We still find a very high (44 percent) rejection rate.").

[382] Alberto Abadie, Susan Athey, Guido W. Imbens, & Jeffrey M. Wooldridge, *When should you adjust standard errors for clustering?*, 138 QUARTERLY JOURNAL OF ECONOMICS 1–35 (2023). In particular, Abadie et al. (2023) do not even consider clustering at the state-year level when studying the effect of living in a state with a high degree of collegiate experience. *Id.* at 8 ("We report the ordinary least squares (OLS) estimate, as well as robust and cluster standard errors. Since the late 1980s, it has been common practice to report cluster standard errors in settings where the regressors are constant in a cluster. Clustering at the *state level* makes a substantial difference relative to using robust standard errors, with the cluster standard errors approximately 26 times larger than the robust standard errors."). The guidance in Abadie et al. (2023) may be interpreted to suggest clustering by company, but doing so implies only three clusters, in which case, per Cameron and Miller (2015) at 2, "test statistics based on the cluster-robust standard errors over-reject and confidence intervals are too narrow."

**Figure 19: Alternative Clustered Standard Errors**

| | [1]<br>Cluster by ID | [2]<br>Cluster by ID | [3]<br>Twoway Cluster by ID & Company-Year | [4]<br>Twoway Cluster by ID & Company-Year |
|---|---|---|---|---|
| | Dependent Variable: Ln(Total Annual Compensation) | | | |
| Conduct | | | | |
| **% Wage Suppression** | | | | |
| DaVita Conduct | | | | |
| **% Wage Suppression** | | | | |
| SCA Conduct | | | | |
| **% Wage Suppression** | | | | |
| USPI Conduct | | | | |
| **% Wage Suppression** | | | | |
| Year | | | | |
| Ln(Avg. State Mgr. Earnings) | | | | |
| Ln(State Health Expend. PC) | | | | |
| Covid | | | | |
| Ln(State GDP PC) | | | | |
| Ln(State Unemployment Rate) | | | | |
| Census Region Annual CPI | | | | |
| Ln(Total Hours) | | | | |
| USPI Low Hours Control | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. P-values in parentheses. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Columns [1] and [2] are clustered by individual, and Columns [3] and [4] are two-way clustered by individual and company-year.

**5.** **Comparability of Benchmark Periods and Class Periods**

142.    Dr. Johnson finds evidence that the control variables included in my model "do not have the same relationships with compensation in the benchmark and alleged misconduct periods."[383] Based on this analysis, he concludes that my wage suppression model is not reliable.[384]

143.    As I discuss in depth in Section VII.C.7, the results of the Chow test Dr. Johnson performs to reach his conclusion is incapable of indicating the reliability of the model or diagnosing any bias in the estimate of wage suppression. Indeed, just because a given control variable's coefficient differs between certain time periods does not mean that the aggregate estimate of the Conduct is inaccurate. As I discussed in my initial report, we should not give too much credence to the interpretation of coefficients on control variables.

144.    More importantly, if Dr. Johnson had continued in his analysis to understand how the Challenged Conduct might change when the controls are allowed to vary with the Conduct, he would have found that his conclusions are unwarranted, and that if anything, my baseline estimates are conservative relative to the analysis proposed by his results. I perform the same analysis that Dr. Johnson proposes (but does not perform himself), allowing the effect of each of his control variables in his Exhibit 25 to differ during versus absent the Challenged Conduct. I then calculate the marginal effect of the Challenged Conduct, both overall and by Defendant, as shown in **Figure 20**. The results are ███████████████████████████████ ████████████████ .

---

[383] Johnson Report Ex. 25 and ¶ 151.
[384] Johnson Report ¶ 151 ("These results provide further evidence that Dr. Starr's 'wage suppression' model has not reliably captured the relevant non-conspiratorial economic factors that affected total compensation for relevant employees.").

**Figure 20: Interacted Conduct and Control Regressions**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] Common Controls | [2] Interacted Controls |
| *Panel A. Common Conduct Effect* | | |
| Conduct | | |
| **% Wage Suppression** | | |
| *Panel B. Defendant-Specific Conduct* | | |
| DaVita Conduct | | |
| **% Wage Suppression** | | |
| SCA Conduct | | |
| **% Wage Suppression** | | |
| USPI Conduct | | |
| **% Wage Suppression** | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |

*Note*: \*\*\* p<0.01, \*\* p<0.05, \* p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 6.      Start and End Dates

145.    Defendants' Experts make two arguments related to the start and end dates of the Challenged Conduct. First, although they do not have an opinion on the appropriate dates of the Challenged Conduct,[385] they raise questions about the appropriate start and end dates. Second, Defendants' Experts make various adjustments to the baseline empirical model to argue that the

---

[385] *See* n.42, *supra.*

results are sensitive to different start and end dates of the Challenged Conduct.[386] I take these two sets of arguments in turn.

146.     The Challenged Conduct is comprised of two sets of bilateral agreements, one between DaVita and SCA, and one between SCA and USPI. Within each of these agreements the Challenged Conduct includes two reinforcing methods to suppress Class pay: No-Poach Agreements and CSI Exchanges. Thus, to think about the appropriate start and end dates of the Challenged Conduct for each bilateral agreement, we must consider the start and end dates of each subcomponent of that agreement.

### a.     Appropriate DaVita-SCA Start and End Dates of the Challenged Conduct

147.     In my initial report, Counsel asked me to consider a start date for the DaVita-SCA Challenged Conduct of May 1, 2008 and an end date of December 31, 2019.[387] My initial report reviewed qualitative and quantitative evidence that ████████████████████████████

████.[388] Claims made by Defendants' Experts about alternative start and end dates are

---

[386] Johnson Report ¶ 56 ("Both experts also ignore evidence contradicting Plaintiffs' assertions regarding the start dates of the agreements. … In addition, both experts ignore other evidence contradicting Plaintiffs' assertions about the end dates of the agreements."); Saravia Report ¶ 251 ("By contrast, ████████████████████████████████████████████████████████████████████████████████ ; Stiroh Report ¶ 86 ("In this section, I show that Dr. Starr's conduct effect is highly sensitive to changes in the start and end dates he uses for the alleged conduct period, such that if the finder of fact were to determine a different conduct period than that evaluated by Dr. Starr, his model would offer no support for a finding of impact, injury or market power for DaVita's Senior-Level employees."); McCrary Report ¶ 242 ("Importantly, Prof. Starr's pay regression model also shows ████████ ████████")

[387] Starr Report ¶ 9 ("I understand that Plaintiffs seek to certify a class of employees who worked in positions at the director-level and above (hereafter 'Senior-Level Employees') for one or more of the following: (a) from May 1, 2008, through December 31, 2019, Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, through December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries (hereafter the 'Class' or 'Class Members').").

[388] Starr Report ¶ 118(b)(i) ("Conduct Period for DaVita and SCA Challenged Conduct.").

unpersuasive, and I stand by initial conclusion that ███████████████████████████

███████████████████████████████

148.    *Start and End Dates of the DaVita-SCA No-Poach Agreements.* In Section

VI.B.1.c above, I reviewed Defendants' Experts claims that ███████████████████████

████████████████████████████████  I also reviewed ██

███████████████████████  in the DOJ indictment, ████████████████████

████  Finally, I reviewed the quantitative evidence in Section VI.B.2 in light of Defendants'

Experts Criticisms.

149.    As I described in Section VI.B.1.c, the record evidence ████████████████

████████████████████████████████████████  And, among all

possible end dates of the DaVita-SCA No-Poach Agreement, as described in Section VI.B.1.c

and Section VI.B.2, ████████████████████████████████████

████████████████████████

150.    *Start and End Dates of the DaVita-SCA CSI Exchanges.* In Section VI.C , I

reviewed the CSI Exchanges between DaVita and SCA. The direct documentary evidence

████████████████████████████████████████████

However, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████  Indeed, ████████████████

████████████████████████████████████████████

████

151. *Start and End Dates of the DaVita-SCA Challenged Conduct.* Taken together, the evidence ███████████████████████████████████████████████████████████

████████████████████████████████████████████

### b. Appropriate USPI-SCA Start and End Dates of the Challenged Conduct

152. In my initial report, Counsel asked me to consider a start date for the USPI-SCA Challenged Conduct of May 1, 2010 and an end date of December 31, 2019.[389] My initial report reviewed qualitative and quantitative evidence that ██████████████████████████

███[390] Defendants' Experts ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Based on my review of the qualitative and quantitative record, I find Defendants' Experts ██████████████████

████████████████████████████████████████████████████████

██████

153. *Start and End Dates of the USPI-SCA No-Poach Agreements.* In Section VI.B.1.c above, I reviewed Defendants' Experts claims that ███████████████████████

██████████████████ I also reviewed ████████████████ in the DOJ indictment, ████████████████████████ Finally, I reviewed the quantitative evidence in Section VI.B.2 in light of Defendants' Experts' criticisms.

---

[389] Starr Report ¶ 9 ("I understand that Plaintiffs seek to certify a class of employees who worked in positions at the director-level and above (hereafter 'Senior-Level Employees') for one or more of the following: (a) from May 1, 2008, through December 31, 2019, Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, through December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries (hereafter the 'Class' or 'Class Members').").

[390] Starr Report ¶ 118(b)(ii) ("Conduct Period for DaVita and SCA Challenged Conduct.").

154. Among all possible end dates of the USPI-SCA No-Poach Agreement, as described in Section VI.B.1.c and Section VI.B.2, ██████████████████████████

██████████████████████████████████████████

155. *Start and End Dates of the USPI-SCA CSI Exchanges.* In Section VI.B.2.c, I review the CSI Exchanges between USPI and SCA. The evidence suggests that ██████

████████████████████████████████████████████████

██████████████████████████████████████████████████

156. *Start and End Dates of the USPI-SCA Challenged Conduct.* Taken together, ████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████ I address that possibility in

the empirical analyses below.



### c. Sensitivity of the Results to the Start and End Dates of the Challenged Conduct

157. Defendants' Experts argue that the results are sensitive to the start and end dates of the Challenged Conduct. In this section, I describe the various approaches Defendants' Experts took to address the potential sensitivity of the results to the start and end dates of the Challenged Conduct. I then respond to each of those criticisms.

158. Defendants' Experts report a variety of analyses to suggest that the results are sensitive to the start and end dates. Dr. Johnson and Dr. McCrary run my wage suppression model varying the dates of the Challenged Conduct according to dates drawn from the SCA and DaVita Indictments, the Second Amended Complaint, and the Third Amended Complaint.[391] Dr.

---

[391] Johnson Report Ex. 33. McCrary Report Ex. 42.

Stiroh limits the data to DaVita only and estimates a model for every start date and end date.[392]

Despite evidence that ████████████████████████████████,[393] ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████[394] In each case, Defendants' Experts point out that

the estimated Conduct effect varies when different start and end dates are adjusted.

159.    To begin, it is important to emphasize that the results *should* be sensitive to the

start and end dates of the Challenged Conduct. To the extent that dates are included in the

Conduct variable when the Challenged Conduct was in fact not present, the results should

change. Or, conversely, to the extent that dates that are excluded from the Conduct variable when

the Challenged Conduct was in fact present, then again changes in the start and end date should

change the results. Thus, the fact that the results change when Defendants' Experts alter the

Conduct date is not informative about the effects of the Challenged Conduct or the integrity of

the model. Indeed, something would likely be *wrong* with the model if the results did not change

when the Conduct dates are changed. Rather, the key question is what are the appropriate start

and end dates of the Challenged Conduct? To that, ████████████████████████████

Therefore, these variations on the model only serve to demonstrate that the model is working as

intended—as you change the inputs, the outputs change. My review of the qualitative and

quantitative evidence suggests that ████████████████████████████████████



---

[392] Stiroh Report Figures 17–19. ████████████████████████████████████
████████████████ Stiroh Report ¶ 91 ████████████████████████████████
████████████████████████████████████████████████████
████████████████████.

[393] *See* Ex. PX501 at SCA002277742 ████████████████████████████████████
████████████████████████.

[394] Saravia Report Ex. 31.

███████████████████████████████████████████████████████

██████████████████████████████████████████████

160.     Nevertheless, below I offer several specific robustness checks to show how robust the results are to different potential start and end dates. I focus my attention on the places where there is documentary evidence in the record that could possibly suggest different start and end dates. Because the DOJ Indictments and the initial Complaints were clearly based on an incomplete understanding of the documentary evidence at the time they were written, I do not replicate analyses with those dates.

161.     As I explained in my initial report,[395] and as I further detail in my response on pooling the data below, in general I reject limiting the sample to one firm to estimate damages, as in Dr. Johnson's, Dr. Stiroh's, and Dr. Saravia's Reports. There are many reasons for this, which I elaborate on in Section VII.C.7. The core issues are that a) subsampling by Defendant is equivalent to including many bad controls in the model, introducing bias relative to a pooled regression, and b) because the Challenged Conduct involved ████████████████████ ██████████████████████████████████████████████ , then we should allow the data from all the companies to inform the damages estimate, and not force them to be fully independent of each other.

162.     The first point of contention across Defendants' Experts is that ████████████ ████████████████████████████████████████████ Defendants' Experts ██████████



---

[395] Starr Report ¶ 123(g) ("Thus, if our goal is to estimate the aggregate of the effect of the Conduct, then we should not limit the data to a single company[.]").

██████████████████████████████████████████████████████████

██████████████████████████████████████ [396] ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

The result, shown in **Figure 21**, shows that ███████████████████████████████

██████████████████████████████████████████████████████

████████████

---

[396] Saravia Report Ex. 31.

**Figure 21: 2018 and 2019 "Grey Period" Controls**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] | [2] |
| Conduct | | |
| **% Wage Suppression** | | |
| DaVita Conduct | | |
| **% Wage Suppression** | | |
| SCA Conduct | | |
| **% Wage Suppression** | | |
| USPI Conduct | | |
| **% Wage Suppression** | | |
| 2018 Control | | |
| 2019 Control | | |
| Baseline Model Controls | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

163.    Dr. Stiroh raises the point that ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████[397]

I disagree with the logic of Dr. Stiroh's claim. The record evidence suggests that ███████

████████████████████████████████████████████████████████



---

[397] Stiroh Report ¶ 91 ("In addition, it is implausible that the alleged conduct would have impacted DaVita compensation starting in January 2008 at all for several reasons. ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ .



Nevertheless, ███████████████████, in **Figure 22,** I repeat my main wage regression, but I include a dummy variable for 2008, such that the Conduct estimate is not driven by data in 2008. Doing this, I find that ████████████████████████████████████

███████

**Figure 22: 2008 "Grey Period" Control**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] | [2] |
| Conduct | ████ | ████ |
| **% Wage Suppression** | | |
| DaVita Conduct | | |
| **% Wage Suppression** | | |
| SCA Conduct | | |
| **% Wage Suppression** | | |
| USPI Conduct | | |
| **% Wage Suppression** | | |
| 2008 Control | | |
| Baseline Model Controls | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

164.    Finally, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████, I expand USPI's start date to 2009 and re-run my baseline model. **Figure 23** shows that ████████████████████████████

████████



**Figure 23: USPI Start Date in 2009**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] | [2] |
| Conduct | | |
| | | |
| **% Wage Suppression** | | |
| DaVita Conduct | | |
| | | |
| **% Wage Suppression** | | |
| | | |
| SCA Conduct | | |
| | | |
| **% Wage Suppression** | | |
| | | |
| USPI Conduct | | |
| | | |
| **% Wage Suppression** | | |
| | | |
| Baseline Model Controls | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |

*Note*: \*\*\* p<0.01, \*\* p<0.05, \* p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

165.    Taken together, the quantitative and qualitative evidence suggests that my initial report used the proper start and end dates. But even across all other potentially reasonable start and end dates, my model delivers similar estimates. Accordingly, I view Defendants' Experts claims about the sensitivity of the results as they relate to the start and end date of the Conduct as meritless.

### 7. Pooling Data Is Standard Economic Practice

166. Defendants' Experts make a variety of arguments around pooling the data, i.e. running a regression model on all Defendants' data, as opposed to three separate regression models, one per Defendant. Dr. Saravia argues that I inappropriately pool data across Defendants, and her work mostly focuses on a USPI subsample.[398] Dr. Johnson, Dr. Stiroh, and Dr. McCrary similarly consider a DaVita or other company-based subsample for some of their analyses.[399] Dr. Saravia, Dr. Johnson, and Dr. Stiroh also raise questions about pooling the periods before and after the Challenged Conduct.[400] I respond to these criticisms in turn.

### a. Pooling Data Across Defendants Is Appropriate

167. Defendants' Experts argue that I have inappropriately pooled the data across Defendants, and that I have ignored statistical tests to validate the assumptions of my model.[401] Dr. Saravia, for example, argues that her Chow test indicates that a pooled model is inappropriate, and that I should have looked at subsamples of specific companies, as she does.[402]

---

[398] Saravia Report Section 8.2.2 ("Dr. Starr inappropriately pools data across Defendants[.]").

[399] Johnson Report Exs. 28 and 29. Stiroh Report Figures 17–22. McCrary Report Exs. 46–48.

[400] Saravia Report Section 8.2.5 ("Excluding post-admitted-conduct period data from Dr. Starr's Regression[.]"); Johnson Report Ex. 25 and ¶ 148 ("Dr. Starr's model assumes that, with the exception of the alleged conduct, economic conditions—measured by the controls he includes in his model—affected compensation in the same way in both the benchmark and proposed conduct periods."). Stiroh Report Figure 21 and ¶ 102 ("Figure 21 displays the results of Dr. Starr's regression specification run as two separate 'before-during' and 'during-after' regressions.")

[401] Saravia Report ¶¶ 245–246. *See also* Saravia Report Ex. 30, which documents how the estimates change using a subsample approach.

[402] Saravia Report n.366 ("I performed a Chow test on Dr. Starr's before/during/after model that permits the conduct effects to vary across Defendants, testing the restriction that the effects of the other covariates (other than the conduct dummy) are equal across Defendants. The Chow test rejects this restriction above the 99% confidence level."). I note that Dr. Saravia also challenges the Senior Employee vs. Manager differentials with a similar logic. Saravia Report ¶ 277 ("As with his before/during/after regressions, Dr. Starr pools data from the three Defendants to estimate his difference-in-differences regressions, and, as I show in section 8.2, the restriction that his covariates affect compensation in the same way for each Defendant is rejected by the data. When Dr. Starr's difference-in-differences models are estimated on data for USPI only, his conduct effect estimates change."). For the reasons described in this section, I also reject this characterization.

168.      As I explained in my initial report, I considered the pooled data as my primary specification, and argue against limiting the data to a single company for two reasons.[403] First, pooling the data helps to identify the control variables when they are based on all of the observations in the data. Second, because part of the Challenged Conduct is to affect whether workers move across Defendants, limiting the sample to a single Defendant is effectively controlling for a bad control, which induces bias in the Conduct estimate.[404] In a pooled model, however, the Conduct coefficient is allowed to be identified in part by the presence of the same individual in multiple companies; but this is not possible in a single firm subsample. As Drs. Singer and Caves put it, "performing separate regressions excludes, ex ante, any and all variation in prices from one buyer to the next, even though such variation is likely to inform the price-formation process."[405] Thus, when Dr. Saravia ███████████████████████████ ██████████████████████████, she ignores how doing so induces bias in the estimates.

---

[403] Starr Report ¶ 125 ("I keep the complete dataset in all analyses, rather than limiting the data to a single company. The reason behind this is twofold: First, the pooled model allows for the Conduct coefficients to be identified in part from the same individuals being present in multiple companies, whereas this is not the case when limiting the sample to a single company. This is important because part of the effect of the Conduct is to affect whether workers move across these companies. Second, the pooled model improves identification of the coefficients on the control variables when they are identified based on all of the observations in the data.").

[404] Starr Report ¶ 123(g) ("In the same vein, ███████████████████████████████████████ ███████████████████████████████████████████████████████████—then even which *company* a worker works at is a bad control. For example, if absent the Conduct a worker would have changed employers and received a large raise, then the company a worker works for lies on a pathway between the Conduct and total compensation. Thus, if our goal is to estimate the aggregate of the effect of the Conduct, then we should not limit the data to a single company, and we should not control for a worker's employer because it is a 'bad control.'"). Note that I later describe why I include individual by company fixed effects, though in some models those controls are not included (*e.g.*, the random coefficient model).

[405] Kevin Caves & Hal Singer, *Econometric Tests for Analyzing Common Impact*, 26 LAW AND ECONOMICS OF CLASS ACTIONS 135–160, 154 (2014) ("In particular, performing separate regressions excludes, ex ante, any and all variation in prices from one buyer to the next, even though such variation is likely to inform the price-formation process. In contrast, estimating a common regression model preserves degrees of freedom by pooling data across a large number of buyers allowing the expert to evaluate the degree of uniformity in the price-setting process through statistical tests … Performing only individualized regressions, as suggested by the CPP, simply imposes a separate pass-through parameter $\gamma_i$ for each customer ex ante, while ignoring the cross-buyer variation that is available to test the validity of this assumption.").

169.    The statistical tests Defendants' Experts use to determine whether the actual analysis should be pooled or subsampled are of no value. The Chow test Dr. Saravia performs is a "joint test" that compares whether all of coefficients on the *control variables* are different across different companies.[406] There are several important reasons that this test is uninformative in this case, and that the proposed remedy of subsampling is likely to induce bias. First, as I emphasized in my initial report, and consistent with the advice in Hünermund & Louw (2025), "it is important *not* to over-interpret the relationship between the control variables and the dependent variable."[407] However, this is exactly what the Chow test does. Rather, the focus of the analysis should be squarely on properly identifying the Conduct coefficient and closing backdoors by controlling for confounders and not inducing bias via bad controls.[408] Second, because subsampling on a mediator (in this case, which company a worker joins) is effectively controlling for many bad control variables (because it is the same as allowing company indicators to be interacted with each control variable), then subsampling could create more bias in the estimate of the Conduct effect than a pooled model without those bad controls. For these reasons, the results of the Chow Test is generally not informative of whether the appropriate model is pooled or subsampled.

a.    To show that when the Chow Test produces a statistically significant test result that the appropriate conclusion is *not* necessarily to subsample on a bad control, in my workpapers I design a simulation to demonstrate that the Chow Test will lead to biased results. In the simulation, the Conduct variable impacts a mediator variable, and that mediator variable

---

[406] Dr. McCrary's similarly performs Chow tests (McCrary Report ¶ 260 "For each of the exhibits, I perform a standard statistical test, which is known as a "Chow test," to assess whether, from a statistical perspective, it is appropriate to pool the data across the corresponding subgroups when estimating the alleged conduct effect.").
[407] Starr Report ¶ 123(a). *See also* Paul Hünermund & Beyers Louw, *On the Nuisance of Control Variables in Causal Regression Analysis*, 28(1) ORGANIZATIONAL RESEARCH METHODS 138–151 (2025).
[408] Cinelli et al. (2022).

also relates to the dependent variable based on the level of another control variable. When the Chow test is applied to this simulated data it uncovers a statistically significant effect, but subsequently sub-sampling based on the results of the Chow Test result in more biased estimates than a pooled model. In particular, the simulation demonstrates that the regression model's estimate is unbiased when the data are pooled, but returns a biased estimate when the Chow Test results suggest that we subsample on the mediator (a bad control). The rationale behind the simulation is exactly as I laid out above: the fact that other control variables differ for different levels of a bad control variable does not mean that the pooled model is biased, and it does not mean that a subsample analysis will be less biased than the pooled model.[409]

   b.  I am not the only one to reach this conclusion. Indeed, Finkelstein[410] notes that:

> A Chow test that shows no statistically significant difference in coefficients is good evidence that aggregation does not create serious bias, but a contrary finding does not necessarily mean that a regression based on combined data must be rejected. Since a Chow test is of the statistical significance of the difference in all the coefficients in two models, a statistically significant finding will appear if any pair of coefficients is sufficiently different.[411]

  170. Nonetheless, even if one were to accept Dr. Saravia's (and other Defendants' Experts') premise that the data should not be pooled, which I do not, then we can run subsample

---

[409] *See* my workpapers.

[410] MICHAEL O. FINKELSTEIN, BASIC CONCEPTS OF PROBABILITY AND STATISTICS IN THE LAW 119 (Springer 1st ed. 2009).

[411] The court in *Chen-Oster v. Goldman Sachs* addressed this issue in some detail. *See Chen-Oster v. Goldman, Sachs & Co.*, 114 F.Supp.3d 110, 122–123 (S.D.N.Y. 2015) ("There are also sound statistical reasons for being cautious about using the Chow test alone to reject a model. In effect, the Chow test measures whether the coefficients of all variables in separate regressions are the same. Thus, an analysis could fail the Chow test even if the coefficient for the variable of interest was identical in each regression on disaggregated data, if the coefficients for other variables were dissimilar. … More importantly, an analysis could fail the Chow test where the coefficient for the variable of interest varies in magnitude but not in the direction of impact. For instance, if being female is always negatively associated with compensation, even if not always to the same magnitude, it may be appropriate to utilize a unitary model notwithstanding failure to satisfy the Chow test.").

models. Doing so in **Figure 24** ███████████████████████████████████

███████████

**Figure 24: Unpooled Models**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| | Pooled | Davita Only | SCA Only | USPI Only |
| DaVita Conduct | | | | |
| **% Wage Suppression** | | | | |
| SCA Conduct | | | | |
| **% Wage Suppression** | | | | |
| USPI Conduct | | | | |
| **% Wage Suppression** | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note*: \*\*\* $p<0.01$, \*\* $p<0.05$, \* $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

171.    Dr. Saravia later argues that ██████████████████████████

████████████████████████████████████████[412] She argues, like before, that my

prior analysis reflects an inappropriate pooling of the data.[413] These conclusions lack merit for

two reasons. For the same reasons raised above, results of the Chow test are not informative of

whether a subsample analysis is preferred, and can exacerbate bias when conditioning on a bad

control—as is the case here. When I run the pooled model, as shown in **Figure 48** in Appendix

---

[412] Saravia Ex. 35.

[413] Saravia Report ¶ 277 ("As with his before/during/after regressions, Dr. Starr pools data from the three Defendants to estimate his difference-in-differences regressions, and, as I show in section 8.2, the restriction that his covariates affect compensation in the same way for each Defendant is rejected by the data.").



C, ███████████████████████████████████████████

████████████ [414]

### b.      Throwing Out Pre- or Post-Conduct Data

172.     Defendants' Experts perform analyses ███████████████████████

████████████████.[415] For example, Dr. Stiroh argues that ████████████████

████████████████████████████████████████████████ Dr.

Saravia argues that █████████████████████████████████████████

█████████████████████████████████████████ [416] In

response, Dr. Saravia argues that, █████████████████████████████████

To clarify, Dr. Saravia ███████████████████████████████████████

██████████████████████████████

173.     As a practical matter, Dr. Saravia's approach is generally not feasible for all

Defendants because ██████████████████████████ Thus, it is impossible to incorporate

this suggestion in a subsample analysis for each Defendant. Moreover, given my analysis in

---

[414] In addition, in Column 2 of Dr. Saravia's Ex. 35, ████████████████████████

███████████████████████████████████████████████████████

███████████████████████

[415] Stiroh Report ¶ 102 (████████████████████████████████████████

████████████████████████████████████████████████

█████████████████ ; Saravia Report ¶ 263.

[416] Saravia Report ¶ 263 ("███████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████ .

[417] Saravia Report ¶ 264.

Section VII.C.2 showing that ████████████████████████████████████████, in general I do not view Dr. Saravia's suggestion as necessary or appropriate.

174.    Nevertheless, to consider whether the results are robust to using either benchmark period, I use a pooled sample approach where, rather than ignoring relevant data, I use indicator variables for either the before-Conduct Period or the after-Conduct Period to ensure that only certain benchmark periods are driving the Conduct effect. This is consistent with how Defendants' Experts handled the COVID pandemic when they included fixed effects for 2022.[418] The results, shown below in **Figure 25**, indicate that, █████████████████████ ████████████████████████████████████████████████████ ███████████████████████[419]

---

[418] *See* Section VII.C.2, *supra.*
[419] Note also that ██████████████████████████████████████ ████████████████████████

**Figure 25: Before or After Benchmark Models**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Conduct | | | | |
| **% Wage Suppression** | | | | |
| DaVita Conduct | | | | |
| **% Wage Suppression** | | | | |
| SCA Conduct | | | | |
| **% Wage Suppression** | | | | |
| USPI Conduct | | | | |
| **% Wage Suppression** | | | | |
| 2005 Control | | | | |
| 2006 Control | | | | |
| 2007 Control | | | | |
| 2008 USPI Control | | | | |
| 2009 USPI Control | | | | |
| 2020 Control | | | | |
| 2021 Control | | | | |
| 2022 Control | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |



*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Note also that

175. Dr. Saravia also

.[420]

While I dispute her analysis, as I describe below, I note that

176. As I discussed in VII.C.7.a, I prefer to keep the pooled sample, and as noted above, I prefer to control for the post-Conduct Period as opposed to throwing out the data entirely. Doing so and re-running Dr. Saravia's model with post-Conduct indicators in **Figure 26** reveals that

[420] Saravia Report Ex. 36.

**Figure 26: Managers Vs. Senior-Level Employees With Post Conduct Period Controls**

| Baseline Category: Managers | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | Overall | By Defendant |
| | [1] | [2] |
| Conduct (Managers) | | |
| Conduct*1(Directors & Above) | | |
| **Lower Bound Suppression %** | | |
| DaVita Conduct (Managers) | | |
| DaVita Conduct*1(Directors & Above) | | |
| **DaVita Lower Bound Suppression %** | | |
| SCA Conduct (Managers) | | |
| SCA Conduct*1(Directors & Above) | | |
| **SCA Lower Bound Suppression %** | | |
| USPI Conduct (Managers) | | |
| SCA Conduct*1(Directors & Above) | | |
| **USPI Lower Bound Suppression %** | | |
| 1(Directors & Above) | | |
| 2020 Control | | |
| 2021 Control | | |
| 2022 Control | | |
| Healthcare, Macro, Hours | | |
| USPI Low Hours Control | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 8. The Conduct Suppressed Starting Wages

177. Defendants' Experts posit that because the three Defendants compete in the labor market with a variety of different non-conspiratorial competitors, Defendants would have had to pay competitive wages to attract new workers, implying that Defendants could not have suppressed initial wages.[421] This is a theory-based argument—none of Defendants' Experts perform any analysis to examine whether starting wages are suppressed—and this argument is inconsistent with how labor economists understand labor market competition, inconsistent with the literature on no-poach agreements and noncompete clauses, and inconsistent with the qualitative evidence ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Moreover, a direct empirical analysis of new hires at each of the Defendants shows that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

178. Dr. Johnson and Dr. Saravia acknowledge that labor markets generally do not have a single market clearing wage, and that "perfect competition is a theoretical construct."[422] Rather, modern labor economists view the labor market in terms of search and matching frictions, where identical workers being competed over by identical firms can end up being paid starkly different amounts due to the matching process of job offers reaching certain workers and not others.[423] The result is that the labor market generally resembles a job ladder, where identical

---

[421] Johnson Report ¶ 92; Saravia Report ¶ 77, ¶¶ 197–201; McCrary Report ¶ 121 ("Thus, as above, pay for new hires would have to be competitive.").

[422] Johnson Dep. at 42:2–5, 267:11–16 ("There is no single market clearing pay rate. That's a fallacy that wouldn't exist in a matching market like a labor or labor markets."). *See also id.* at 187:1–6 ("I don't think there's any market that's perfectly competitive in the pure theoretical sense. There's no market with infinite competitors, there's no market with perfect knowledge. It's a theoretical abstraction."); Saravia Dep. at 75:4–76:8 ("[E]mployees receive different wages.").

[423] *See* ALAN MANNING, MONOPSONY IN MOTION: IMPERFECT COMPETITION IN LABOR MARKETS (Princeton University Press 2003) [hereafter Manning (2003)]. Likewise, Dr. Saravia testified at deposition that "of course there are frictions in labor markets." Saravia Dep. at 83:22–84:17. Dr. McCrary also agreed with economist Alan Manning that "'there are important frictions in the labour market[.]'" McCrary Dep. at 81:14–82:11 (discussing Ex. PX597 (Manning 2003) at 1) ("[T]he idea that there are frictions in labor markets, the same way that there are frictions in every market should be uncontroversial.").

workers are not paid the same, with some workers earning more due to having been able to climb the job ladder while other workers are left behind even though they may be otherwise identical.[424] Thus, as a practical matter, when Defendants are hiring, they *do not* need to pay a "competitive wage" because there is no single "competitive wage" to offer. Rather, they must only find a worker for whom their present wage offer is better than the worker's current wage (holding other amenities etc., constant). Thus, even from a theoretical perspective, the possibility that outside competition for workers makes it impossible for Defendants to suppress starting wages is wrong. Indeed, as discussed further in Section X, mobility restrictions result in monopsony power even over starting wages, and the average firm in the healthcare industry generally has significant market power, with the average firm being able to mark down compensation to just 56 percent of productivity.[425]

179. To underscore these points, the academic literature on noncompete clauses and no-poach agreements, which none of Defendants' Experts review or discuss, finds that they reduce *starting* wages. For example, LaFontaine et al. (2025) studies the removal of no-poach agreements among restaurant chains, finding that that removal of the no-poach agreements increased *wages posted in job ads* by 5 percent, with no detectable differences between workers and managers. They attribute the fact that the removal of the no-poach agreement increased

---

[424] *See* Kenneth Burdett & Dale T. Mortensen, *Wage Differentials, Employer Size, and Unemployment*, 39(2) INTERNATIONAL ECONOMIC REVIEW 257–273 (1998) [hereafter Burdett & Mortensen (1998)]. *See also* Starr Dep. Vol. 1 at 147:16–148:19 ("[I]t's not as if everybody is paying the exact same thing all at once … In reality there is [] differential pay across companies for the same jobs.").

[425] Douglas A. Webber, *Firm market power and the earnings distribution*, 35 LABOUR ECONOMICS 123–134, 133 (2015) [hereafter Webber (2015)] (Table 7, average firm-level labor supply elasticity in Healthcare and Social Assistance is 0.78, indicating a markdown of 44%).

posted wages to "reduction in frictions and barriers to labor mobility."[426] Because the wage changes observed here are in posted job ads, they matter most for workers starting their job. Similarly, Callaci et al. (2024) study a broader set of industries and find that the removal of franchise no-poach agreements increased *posted* annual earnings by 6 percent and worker-reported earnings by 4 percent.[427] Thus, these findings suggest that the removal of no-poach agreements caused firms to advertise 5–6 percent higher compensation to prospective workers.

180.     It is important to note that while posted wages are likely to indicate what a new worker will earn, there may nevertheless be a discrepancy between the posted wage and the actual starting wage. While the no-poach studies above do not have evidence on *received* starting compensation, the literature on noncompete agreements provides such estimates. In Balasubramanian et al. (2022), my coauthors and I study how starting compensation changes after Hawaii banned noncompete clauses for high-tech workers.[428] We find that the Hawaii ban on noncompetes for high-tech workers increased new-hire monthly earnings by 4.2 percent.[429] Using a different empirical strategy leveraging both within-state and cross-state variation covering the universe of workers in the US, we also find that noncompete enforceability lowers *starting* quarterly compensation for tech workers.[430] This is consistent with Dr. McCrary's

---

[426] Lafontaine et al. (2025) at 1 ("We find robust evidence that the legal cases, proposed legislation, and negative attention surrounding NPCs, which led many chains to remove such clauses from their contracts, caused wages in those chains to rise by about 5% relative to chains that did not have NPCs. We show that … low wage workers suffer losses that are as large as the losses of their managers. We attribute these effects to a reduction in frictions and barriers to labor mobility.").

[427] Callaci et al. (2024) ("Implementing a staggered difference-in-differences research design using Burning Glass Technologies job vacancies and Glassdoor salary reports from numerous industries, we estimate a 6% increase in posted annual earnings from the job vacancy data and a 4% increase in worker-reported earnings.").

[428] Natarajan Balasubramanian et al., *Locked in? The enforceability of covenants not to compete and the careers of high-tech workers*, 57(S) JOURNAL OF HUMAN RESOURCES S349–S396 (2022).

[429] *Id*. at 3 ("In our preferred specifications, we find that Hawaii's 2015 CNC [covenants not to compete] ban increased new-hire monthly earnings by 4.2%[.]").

[430] *Id*. at 20 ("Column 1 of Table 4 presents results on the initial start of job spell wage (this specification naturally excludes initial wage fixed effects)—consistent with the results for new hire wages for Hawaii, we find that initial wages are lower in states with higher [covenants not to compete] enforceability[.]").

testimony that "competition benefits sellers in general and input markets [i.e., labor markets][,]"[431] and such benefits can include compensation increases.[432]

181.    While this prior academic scholarship suggests that no-poach agreements and noncompete clauses can reduce starting compensation, it would be preferable to have confirmatory evidence that the Challenged Conduct had similar effects in this case. In my initial report, I reviewed qualitative evidence from each Defendant which indicates that ███████

████████████████████████████████████████████████████████████████████

████████[433] If the Challenged Conduct suppressed the pay of incumbent employees at Defendants, and that suppressed pay is used to help set starting pay for new Senior Employee, then starting pay for Senior Employees may also be suppressed.

182.    To provide quantitative evidence that this is the case, I pursue two similar analyses. First, I take my main regression model and I allow the effect of the Challenged Conduct to vary with an employee's tenure. To do this, I include tenure as a control variable in the regression and interact it with the Conduct variable. I then recenter the employee's tenure on one, so that the interpretation of the Conduct coefficient is for employees with a tenure of one year.[434] Second, as a robustness check, I look at only an employee's first full year in the data as a Senior Employee. I re-run the same model with the first-year data, interacting tenure with the Conduct. In this specification, note that because first-year compensation cannot vary within

---

[431] McCrary Dep. at 48:13–50:2 ("[I]s it right [that] the competition benefits workers in the way of they are selling their labor services? Does competition for those labor services benefit them? Then the answer is yes.").
[432] *Id.* at 50:3–13.
[433] Starr Report VII.F.
[434] I performed a similar analysis in the context of noncompete clauses. *See* Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72(4) ILR REVIEW 783–817, 802 (2019) ("Table 7 examine how noncompete enforceability is differentially related to training and wages by tenure[.]).

individual-company, I cannot include individual-by-fixed effects.[435] I note, as I did initially in my report, that we should be somewhat careful in interpreting the exact numbers in these tables because tenure is an outcome of the Conduct, and thus a bad control. Nevertheless, in both approaches, the results in **Figure 27** indicate that ███████████████████████

█████████████████████████████████████

███████ Thus, I reject Defendants' Experts' arguments that external competition prevents the Challenged Conduct from suppressing compensation for newly hired workers.

---

[435] Starr Report ¶ 123(e) ("Similar to a worker's job title, it may seem natural to include a worker's tenure as a control variable, because workers with longer tenures are also likely to receive higher earnings. However, if one effect of the Conduct is to reduce the likelihood that a worker will leave, and mobility has an effect on compensation, then longer tenure is an outcome of the Conduct (a lack of mobility), and thus conditioning on tenure would close the mediating pathway between the Conduct, tenure, and compensation, resulting in biased estimates.").

**Figure 27: The Conduct Suppresses Starting Compensation**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| | First Year in Data | First Year in Data | All Data | All Data |
| Conduct | | | | |
| **% Wage Suppression For Tenure = 1** | | | | |
| DaVita Conduct | | | | |
| **% Wage Suppression For Tenure = 1** | | | | |
| SCA Conduct | | | | |
| **% Wage Suppression For Tenure = 1** | | | | |
| USPI Conduct | | | | |
| **% Wage Suppression For Tenure = 1** | | | | |
| Tenure | | | | |
| Conduct*Tenure | | | | |
| DaVita Conduct*Tenure | | | | |
| SCA Conduct*Tenure | | | | |
| USPI Conduct*Tenure | | | | |
| Baseline Model Controls | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The Tenure variable is centered at 1, such that the interpretation of the Conduct main effect is for those with Tenure of 1.

## D.     Defendants' Miscellaneous Arguments About My Model Are Meritless

### 1.     It Is Not Necessary to Disentangle the Effects of Defendants' CSI Exchanges and the No-Poach Agreements

183.     Dr. Johnson argues that my model is unable to disentangle the effects of the CSI Exchanges and the No-Poach Agreement.[436] That is not necessary, nor was it my assignment.

My assignment was to estimate the aggregate harm as a result of the Challenged Conduct, and

then to assess whether, using common methods or evidence, that all or nearly all members of the proposed Class were harmed as a result of the Challenged Conduct. Thus my empirical work was designed to estimate wage suppression resulting from the Challenged Conduct, not to estimate wage suppression resulting from each specific component of the Challenged Conduct.

184.    Indeed, "there are several pieces to this misconduct, several subparts; and the wage regressions stand on their own such that … if a fact finder was to come along or a jury was to say, well, we have determined that the [N]o-[P]oach [A]greements didn't happen, if they're right about that, then that means that … the wage estimates that I come up with are due to the other remaining pieces … of the conduct."[437]

### 2.    The Mobility Analysis Need Not Be Informative About the Compensation Suppression Estimates

185.    One set of criticisms raised by Defendants' Experts is that the changes in observed movement patterns between Covered Defendants related to the No-Poach Agreement cannot explain ███████████████████████ For example, Dr. Johnson claims disbelief that my finding of ████████████████████████████████████████████ ████████[438] Similarly, Dr. Stiroh argues that ████████████████████████ ████████████████████████[439] ████████████████████████████████[440]

---

[437] Starr Dep. Vol. 1 at 204:19–205:4.
[438] Johnson Report ¶ 30 ("That is, Dr. Starr purports to find that ████████████████ ███████████████████████████████████████████████████████████████████████ . *See also* Johnson Report ¶ 92 ("Neither Dr. Starr nor Dr. Gerhart has ██████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████).
[439] Starr Report Figure 4.
[440] Stiroh Report ¶ 64. *See also* Stiroh Report ¶ 84 ("Dr. Starr's preferred estimate of compensation suppression implies that ████████████████████████████████████████████████████ ████    The implausibility of Dr. Starr's results reinforce that his regression analysis of compensation is critically flawed.").

Dr. Saravia makes the same point.[441] These arguments are unfounded and irrelevant for several reasons.

a.      First, the goal of this analysis was not to identify a causal effect of mobility levels in a but-for world without the Challenged Conduct. The goals were explicitly descriptive and not causal.[442] ███████████████████████████████████████████

███████████████████████████████████████████████ And, perhaps more importantly, movement between Covered Defendants need not change at all for the observed wage suppression to occur. This is because (a) there are also the alleged CSI Exchanges that operated in tandem with the No-Poach Agreements, and (b) No-Poach Agreements can reduce compensation by reducing the rate of job offers, bargaining power, and information flow even when actual movement is entirely unaffected. And even if there is movement, that does not mean that the Challenged Conduct did not suppress compensation. For example, even if a worker received a job offer from a Covered Defendant and moved, the tell-your-boss provision of the No-Poach Agreement may have nevertheless stunted the counter offer process (because the Defendant knew the worker was going to leave regardless), resulting in lower compensation even with a job move between Covered Defendants.

---

[441] Saravia Report ¶ 121 (" ███████████████████████████████████████████ ). Dr. Saravia misrepresents the findings of Figure 4 in my report, ███████████████ Starr Report ¶ 89, Figure 4. ███████████████████████████

██████████ This is wrong. ██████████████████████ Further, Dr. Saravia misreports the likelihood that ██████████████████ See Saravia Report ¶ 122 ██████████ .

[442] Dr. Stiroh mischaracterizes the goals of my analysis when she writes "Dr. Starr seeks to establish that mobility was suppressed during the conduct period by applying a regression analysis that purports to control for other underlying economic factors." Stiroh Report ¶ 64.

b.      As I discussed in my overview, a rich literature in economics highlights how the offer and counteroffer process can result in compensation increases even when no movement occurs.[443] Thus, conversely, by reducing solicitations and job offers as a result of the No-Poach Agreements (as well as concomitant information flows), the lack of an offer and counteroffer process results in lower compensation. Defendants' Experts ignore this economic literature. As a result, regardless of what the movement analysis shows, it was not meant to be interpreted causally, and the results are not necessarily determinative of any wage-suppression.

c.      The fact that



Indeed, as I discussed in my initial report, in my baseline econometric specification, the possibility of only mobile workers driving the wage estimates is in fact foreclosed upon by the inclusion of individual by company fixed effects.[444]

186.    Thus, Defendants' Experts' claims that

is incapable of explaining the wage effects is meritless. Their narrow focus on movement obscures the fact that the No-Poach Agreement suppressed opportunities. Their claims fail to take into account the full suite of mechanisms that could generate wage

---

[443] Starr Report ¶ 53(a) ("In a dynamic labor market search model, no-poach agreements suppress pay broadly by reducing the rate at which job offers are made. Notably, the rate of job offers can still affect pay even if those job offers are turned down. This is because those job offers can be used as leverage for bargaining for a raise at the current employer."). *See also* Starr Report n.81, which references studies that consider wage bargaining and on the job search, and in particular counteroffering that results in wage increases without workers changing employers. Those studies are: Fabien Postel-Vinay & Jean-Marc Robin, *To match or not to match?: Optimal wage policy with endogenous worker search intensity*, 7 REVIEW OF ECONOMIC DYNAMICS 297–300, 297 (2004) and Pierre Cahuc, Fabien Postel-Vinay & Jean-Marc Robin, *Wage Bargaining with On-the-job Search: Theory and Evidence*, 74(2) ECONOMETRICA 323–364 (2006).

[444] Starr Report ¶ 123(h) ("Because the inclusion of individual-by-company fixed effects identifies the Conduct effect by leveraging comparisons of the same individual within the same company, during vs. absent the Conduct, it rules out the possibility that the Conduct effect is driven only by the movers.").

suppression as a result of the Challenged Conduct, and reflects their lack of understanding that the identifying variation in the baseline wage suppression model identifies wage suppression by comparing individuals within the same company both during and absent the Challenged Conduct.

a.    Defendants' Experts also argue that the time trends in the mobility analysis and compensation results do not follow the same timing.[445] Defendants' Experts again mischaracterize my report by claiming that I assumed that the wage effects were driven entirely by any mobility effects.[446] As the prior discussion makes clear, there are several mechanisms by which the Challenge Conduct can affect compensation, with or without actual mobility changing. Thus, I reject their characterizations of my assumptions and their criticisms that the wage trends and the mobility trends must follow the same patterns. I will note however, that Defendants' Experts do not point out contrary evidence to their view, ████████████████████████████

████████████████████████████

187.    While the discussion above relates to movements between Covered Defendants, Dr. Johnson performs a turnover analysis that looks broadly at separations from Defendants. He runs the same mobility regression model in my initial report and finds that ████████████████

---

[445] Stiroh Report ¶ 91 ("[A]ssuming, as Plaintiffs' experts do, that the mechanism for compensation suppression was suppression of Senior-Level employee mobility, then the fact that Dr. Starr finds that employee mobility was 'elevated in the early years of the Conduct Period' suggests that compensation would not have been suppressed during those years."). Dr. McCrary makes a similar point that the time trends in compensation suppression do not exhibit in his view the appropriate pattern. McCrary Report ¶ 251 ("When I compare Exhibit 44 to the description above of how the alleged conduct changed over time according to Plaintiffs and their experts, I find that the patterns in Figure 7 are not in alignment with what would be expected based on their claims."). This argument is meaningless too because the time trends in wage suppression may well depend on how many solicitations were made, how precisely Defendants incorporated information from the CSI exchanges, the propagation of initial negative wage shocks from the Challenged Conduct. In general, there's no reason they should follow a particular type of pattern, except to suppress compensation in each year.

[446] Stiroh Report ¶ 91 ("[A]ssuming, as Plaintiffs' experts do, that the mechanism for compensation suppression was suppression of Senior-Level employee mobility, then the fact that Dr. Starr finds that ████████████████ ████████████████████████ suggests that compensation would not have been suppressed during those years.").



[REDACTED] [447] Dr. Johnson concludes that [REDACTED]

a. Dr. Johnson's analysis in no way undermines my movement analysis between Covered Defendants, and neither does it undermine the wage suppression estimates. To begin, Dr. Johnson misleadingly references my analysis as "suppressing movement" broadly, when my analysis was targeted only at [REDACTED] [REDACTED] His strategic mis-representation of my analysis leads to the illusion that the results are inconsistent, but there is no inherent inconsistency between the two results. [REDACTED] For example, [REDACTED] fact, this is exactly what I find in my analysis of Defendant's Lightcast data in Section VI.B.2.c. Thus, the turnover analysis performed by Dr. Johnson is not inconsistent with my mobility analysis between Covered Defendants, and whatever the results of his analysis are, they do not influence the wage suppression estimates.

### 3. The Results Are Consistent with Benchmark Estimates of No-Poach Effects from the Academic Literature

188. Defendants' Experts argue that my results are implausible based on inappropriate benchmarks. Rather than compare to the most natural benchmarks in the literature—the

---

[447] Johnson Report Ex. 7 and ¶ 16.

estimated harm of no-poach agreements—they chose other, uninformative benchmarks. Dr. Saravia argues that ██████████████████████████████████████████████████ ████████████[448] Dr. Johnson argues my estimates are implausible when compared to an outside options estimate derived from representative German data.[449] And Dr. McCrary argues my estimates are too large relative to general labor supply elasticities.[450] I discuss these in turn.

189. Dr. Saravia argues that the compensation increase from switchers "provides an indication of the offers that Senior Employees could have leveraged for compensation increases." ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████[451] Because the average switcher does not earn more by switching, she argues that my estimates of harm are implausibly large.[452]

a. Dr. Saravia's analysis is meritless and uninformative for at least three reasons. First, Dr. Saravia's comparison presumes that mobility is the only reason for any wage

---

[448] Saravia Report ¶ 281 ("████████████████████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████").

[449] Johnson Report ¶ 141 ("While Dr. Starr claims that there is 'broad support throughout the economic literature' for the 'idea that firms can suppress pay by limiting employee outside options,' the inconsistency of Dr. Starr's estimate with the literature he cites further indicates the unreliability of his regression model. For example, the Caldwell and Danieli paper which Dr. Starr describes as having 'develop[ed] a method for estimating individual-level outside options and stud[ied] how it relates to earnings' finds that a 10 percent increase in outside options increases earnings by only 1.7 percent.").

[450] McCrary Report ¶ 211 ("For example, a textbook that Prof. Starr relies upon in his own report estimates that a 1% decrease in wages should be expected to increase departures by between 0.5% and 0.9% - which would mean that, ██████████████████████████████████████████████████████ ██████████████████████").

[451] Saravia Report ¶ 281. I also note that Dr. Saravia's finding that ██████████████████████ ████████████ the academic literature, which tends to find that wages rise when workers move jobs. *See, e.g.,* Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 107 QUARTERLY JOURNAL OF ECONOMICS 439–479, 442 (1992) ("Wage gains at job changes average about 10 percent, and account for about one third of total wage growth during the first ten years in the market."). Her analysis ███████████████████ ███████████████████████████████████████████████

[452] Saravia Report ¶ 281.

suppression in this case. As I discussed above, this is not true; compensation can change regardless of how people move and what compensation they earn when they do switch. Indeed, my estimates are specifically not driven by the switchers. Second, because in her analysis ███████████████████, then any amount of harm would be deemed implausible by her standards.[453] Third, and most importantly, nowhere in her Report does Dr. Saravia reference any of the evidence on the extent to which no-poach agreements harm workers—even though it is cited and discussed in my initial report. These are clearly the most relevant benchmarks, and my estimates are clearly in line with them. As I described in my initial report, two studies estimate that the franchise no-poach agreements reduced posted compensation by 4–6 percent, and realized compensation by 4 percent.[454] And a study of the Silicon Valley no-poach case finds that a single no-poach agreement for one year reduced *salaries* by 5.6 percent, reduced the probability of a positive stock bonus by 8.3 *percentage points*, and reduced stock bonuses on average by 79.6 percent.[455] In turn, ████████████████████████████ ████████████████████[456] ███████████████████████████[457] ████████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[453] Indeed, Dr. Saravia does not explore the reason for the "switch." Many factors can motivate an employee's decision to "switch." Switching can be voluntary or involuntary. An employee may switch to another firm to take a position that offers a lower initial pay but greater opportunity for advancement. This outcome would not appear as an increase in pay in the short-term period that forms the sole basis for Dr. Saravia's analysis. Relatedly, for the comparison that Dr. Saravia makes to carry any meaning, the reason for the switch matters. If a company terminates a position or a particular line of business, employees in that division may need to quickly find alternative employment. Such a necessity would limit the matching process that occurs between a worker and a firm, resulting in a suboptimal outcome where the worker takes a disfavored position out of necessity rather than because of an ideal match between the worker's skills and the firm's needs. Dr. Saravia's mechanical analysis of switching ignores such realities.

[454] Callaci et al. (2024) at 1. Lafontaine et al. (2025).

[455] Gibson (2024).

[456] *See* Figure 49, *infra*.

[457] *See* Figure 6, *supra*.

███████████████████████████████████████████████████████

████████████

190.    Dr. Johnson misrepresents the literature when benchmarking my estimates.[458] Instead of benchmarking my estimates to those from the actual literature on no-poach agreements—indeed nowhere in his paper does he even discuss the estimates of harm from no-poach agreements in the economics literature—he instead tries to benchmark my estimates against a study by Caldwell and Danieli that develops an outside options index using German data to show that workers with reduced outside options have lower wages.[459] █████████████

██████████████████████████████████████████████████

████████████████████████████[460]

a.    Dr. Johnson's comparisons and claims that my estimates are inflated are meritless for several reasons. First, Dr. Johnson's choice to benchmark my estimates against Caldwell and Danieli is a clear attempt to mislead because (a) those estimates of harm do not come from no-poach agreements but rather by comparing people who have different outside options because they live in different parts of the country, and (b) those estimates derive from a broad sample of German workers from 1993–2014.

---

[458] Johnson Report ¶ 141 ("While Dr. Starr claims that there is 'broad support throughout the economic literature' for the 'idea that firms can suppress pay by limiting employee outside options,' the inconsistency of Dr. Starr's estimate with the literature he cites further indicates the unreliability of his regression model. For example, the Caldwell and Danieli paper which Dr. Starr describes as having 'develop[ed] a method for estimating individual-level outside options and stud[ied] how it relates to earnings' finds that a 10 percent increase in outside options increases earnings by only 1.7 percent.").

[459] Johnson Report Ex. 23.

[460] Johnson Report ¶ 142 ("█████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

████████").

       i.      Even if we believe that this benchmark is reasonable, which we should not, Dr. Johnson's attempts to claim that the change in outside options is driven only by the mobility effect is wrong. As I discussed above, wage suppression can result even without any mobility effects, and the wage suppression effects I estimated are specifically not due to the changes in mobility.

       ii.      More importantly, measured against the most natural benchmarks in the literature—estimates of the harm to workers as a result of no-poach agreements—my estimates are reasonable and ███████████████████. For example, as I cited in my initial report, Matt Gibson's study of the Silicon Valley no-poach agreements finds that "On average, the no-poaching agreements reduced salaries at colluding firms by 5.6 percent."[461] ████████████

████████████████████████████████████████████████.[462]

Similarly, when considering stock-based compensation, Gibson finds that the no-poach agreements reduced the probability of a positive stock bonus and the amount of that stock bonus.[463] While Gibson does not provide an overall compensation (i.e., including equity compensation) estimate to directly benchmark against, ████████████████████



████[464]

---

[461] Gibson (2024) at 3.

[462] *See* Figure 49, *infra*.

[463] Gibson (2024) at 20 ("The estimated effect of the no-poaching agreements on the probability of a positive stock bonus is -8.3 percentage points. Conditional on a positive stock bonus, the amount declines by 65 percent (105 log points).").

[464] *See* Figure 6, *supra*.

191.    Finally, Dr. McCrary argues



[465]

[466]

[467] Dr. McCrary's claims and analysis are misleading and misguided for several reasons.

a.      First, Dr. McCrary's analysis does not reflect any actual tests of how turnover changed, and he does not put forward an actual model to establish how turnover would have changed but for the Challenged Conduct. His speculative conclusions are based only on his eyeballing of unconditional trends. Given the extent to which he criticizes my wage suppression and mobility models for omitting certain variables, applying his own standards to this analysis suggests that we should not treat his conclusion as credible.

b.      Second, as explained in Section X, Dr. McCrary should not be extrapolating any estimates based on quit elasticities from the broad population. Healthcare is a labor market with a particularly low labor supply elasticity and particularly high market power, with the average firm possessing enough labor market power to mark down compensation by 44 percent.[468] This implies that for the average healthcare firm, even if wages change, the labor supply response is not generally strong. Thus, and notwithstanding the fact that Dr. McCrary didn't put forth a regression model to establish but-for turnover rates, the reason for Dr. McCrary's conclusion that █████████████████████████████████ ██████████████████████ could in fact reflect that Defendants do possess significant market

---

[465] McCrary Report ¶ 211 and n.401.
[466] McCrary Report ¶ 211.
[467] McCrary Report ¶ 211 and Ex. 33.
[468] Webber (2015) at Table 7.

power, like other firms in healthcare.[469] Dr. McCrary could have used standard approaches in labor economics to estimate a labor supply elasticity for each Defendant and thus come up with a proper extrapolation in this case. He did not.[470] As a result, his benchmarking and extrapolation exercise from broad estimates in the population is without merit.

      i.     To further drive this point home, note that Dr. McCrary's extrapolation pulls from Table 4.7 in Manning (2003), and he cherry picks the labor quit elasticities he considers (from -0.5 to -0.9[471]) when in fact the table indicates quit elasticities as low as -0.15 and -0.21. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

      c.     Third, Dr. McCrary could have benchmarked my estimates to those in the literature related to how no-poach agreements affect compensation, given that No-Poach Agreements are one prong of the Challenged Conduct. However, at no point in his 310-page report did Dr. McCrary even discuss the results of that literature.[472] Had he done so, it would have revealed, as discussed above and in my initial report, that my estimates are directly in line with this literature.

      **4.     Managers Are an Appropriate Benchmark to Gauge the Effects of the Conduct on the Wages of Senior-Level Employees**

192.     In my initial report, I tested the estimates that I obtained from my before-during-after regression models by comparing Class Members to the next-highest level of workers within

---

[469] McCrary Report ¶ 211.
[470] McCrary Dep. at 151:21–23 (testifying that he did not "calculate demand or supply elasticities for labor[.]").
[471] McCrary Report n.401.
[472] The only point at which Dr. McCrary mentions one such paper is in n.421, where he quotes from my report regarding the Gibson (2024) no-poach Silicon Valley paper, but does not engage with the actual findings of that paper.

each company, i.e., Managers.[473] ████████████████████████████████

████████████████████████████████████████ [474] For this reason, I explained that

differencing between Class Members and Managers will provide a lower bound estimate of the

effect of the Challenged Conduct on Senior-Level Employees.[475]

193.    In Figure 9 of my initial report, I implemented this empirical approach by (1)

including managers in my primary empirical model, (2) adding a dummy variable that identified

the Senior-Level Employees, and (3) including an interaction term between the Senior-Level

Employee dummy and the Conduct term. The latter interaction term aims to recover a lower

bound of causal effect of the Challenged Conduct on Senior-Level Employee wages. I also

included company-by-year fixed effects to ensure that the process of identifying the Conduct

effect compares compensation in Senior-Level Employee positions versus Manager positions

within the same firm-year combination.

194.    Both Dr. McCrary and Dr. Saravia argue that my Senior-Level-Employee analysis

is unreliable. They contend that my analysis is a "difference-in-differences" analysis and that the

above method can only recover a causal effect if two conditions are met: "manager compensation

must have followed the same path as Senior Employee compensation over time, relative to

observed and unobserved factors, but for the assessed conduct; and (2) manager compensation

must not have been affected by the conduct."[476] Both Dr. Saravia and Dr. McCrary criticize my

---

[473] Starr Report ¶ 133.
[474] *Id.* ¶¶ 172–193. *See also* Starr Dep. Vol. 2 at 320:5–16 (" ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ ").
[475] Starr Report ¶ 133.
[476] Saravia Report ¶ 270.

model on the basis that the first condition "likely does not hold[.]"[477] To demonstrate this, in Dr.

Saravia's Exhibit 34, ███████████████████████████████████████████

█████████████████████████████████████████[478] Dr.

McCrary makes the same point.[479] As a result Dr. Saravia concludes that this ██████████

███████████████████████████████████████████

██████████████████████████████ "[480] Dr. McCrary similar concludes "█████████

███████████████████ "[481]

195.    I do not dispute that these two assumptions are key to delivering a causal estimate

to a difference-in-differences analysis, among others. However, as a preliminary matter, I did not

use the language of "difference[-]in[-]differences" in my report, and I disputed it during my

deposition.[482] There are two reasons for this: First, as I described in my initial report, ████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████ This complicates the

[477] Saravia Report ¶ 271; McCrary Report ¶ 228.
[478] Saravia Report Ex. 34.
[479] McCrary Report Ex. 39 and ¶ 228 ( ████████████████████████

███████████████████████████████████████████

████████████████████████████ ).
[480] Saravia Report ¶ 274.
[481] McCrary Report ¶ 228.
[482] Starr Dep. Vol 2. at 321:14–322:3.

set of assumptions required to believe a difference-in-differences estimate is causal.[483] In light of

this, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

196.     Despite this, I still believe that managers are an appropriate benchmark for

Senior-Level Employees. Dr. Saravia's and Dr. McCrary's analysis comparing average trends in

compensation for managers and Senior-Level Employees before the Challenged Conduct began

is not generally how economists study the parallel trends assumption. The standard approach to

examining the parallel trends assumption is not to plot unconditional averages, but rather to

report an event-study graph that shows how the *conditional* difference between Senior-Level

Employee and manager compensation changes year over year relative to some benchmark

year.[484] Then, if the differences between managers and Senior-Level Employee compensation are

similar during untreated periods, that gives confidence that manager compensation does trend

similarly with Senior Employee compensation.

197.     I do this analysis in **Figure 28** below. ███████████████████████



---

[483] *See* Clément De Chaisemartin & Xavier d'Haultfoeuille, *Difference-in-differences estimators of intertemporal treatment effects*, REVIEW OF ECONOMICS AND STATISTICS 1–45 (2024).
[484] SCOTT CUNNINGHAM, CAUSAL INFERENCE: THE MIXTAPE (Yale University Press 2021) at Chapter 9 ("We now discuss the obligatory test for any DD design—the event study.").



[485]

**Figure 28: Difference in Ln(Total Compensation) Between Directors and Above and Managers Relative to 2021**



198.    The important point of the event-study is the post-Conduct years 2020 through

2022, ████████████████████████████████████████████████████████████

---

485 *See* Gibson (2024) at Figure 2.

███████████████████████████████ Both Dr. McCrary and Dr. Saravia ignore this evidence. Instead, they plot unconditional averages and calculate whether the pre-2008 period trends are parallel. However, such an analysis is fraught because, as both Dr. McCrary and Dr. Saravia emphasize, ████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████ Thus, a much more natural benchmark to assess whether managers are a suitable comparison to Senior Employees is after the Challenged Conduct ends, when neither of those issues are present. ███████████████████████████████ ████████████████████████████████████████

199.    Despite the comparability of managers and Senior Employees, I do not expect that this approach will deliver causal estimates. ██████████████████████████ ████████████████████████████████████████████████ ██████████

### 5.    Alleged Model "Unreliability"

200.    Dr. Johnson claims that my empirical wage suppression model is unreliable because ████████████████████████████████████████████ ██████████████████████████████████████████ Dr. Stiroh makes the same point.[486]

201.    Defendants' Experts analysis of my robustness checks is misguided and misleading. For example, Dr. Johnson misdescribes results as █████████████████████

---

[486] Stiroh Report ¶ 83 ("████████████████████████████████████████ ████████████████████████████████.").



,[487] and

. This is clearly wrong, as the American Statistical Society pointed out—the magnitude of an estimate and exactly what the p-value of that estimate are completely different things. There is no reason that in general a regression cannot report an economically meaningful point estimate but a p-value above 0.1.

202.    Both Dr. Johnson and Dr. Stiroh also seek to mislead about the robustness of the results by picking the most extreme estimates from models that are clearly not the primary model because they suffer from an obvious flaw. For example, Dr. Johnson compares models without individual fixed effects—which, as I described in my initial report, are critical for comparing the same individual to themselves during versus absent the Challenged Conduct—to a specification that throws out a significant amount of data from a benchmark period.[488] Similarly,

.[489] As I discussed, there is a reason that all the models in the robustness checks section are *not* the preferred model, because they suffer from different types of deficiencies. The fact that my model withstands these extreme alterations is a testament to its robustness, not its fragility.

---

[487] Johnson Report ¶ 145 (

).

*Id.* (

").

[488] Starr Report ¶ 119.
[489] *Id.* ¶ 83.

203.  Dr. Johnson also misrepresents the nature of the control variables I use in my regression, claiming that I am alleging that my model ████████████████████████

████████████████████████████████████████████████████████."[490]

a.  As I discussed at length in my initial report, the goal of a causal empirical analysis is *not* to control for all relevant factors that determine compensation.[491] Rather, as I explained and as is consistent with standard, modern econometrics, one has to be judicious in considering control variables and sampling decisions because the inclusion of "bad controls" can result in biased estimates.

b.  Second, at no point did I claim that I controlled for all relevant factors "that determine compensation", as Dr. Johnson claims. Rather, I omitted certain factors precisely because including them would cause bias, and I included other controls variables explicitly to close backdoors and reduce bias. I then perform a variety of analyses to rule out that other unobservable variables are not biasing my results.[492] Defendants' Experts do not identify any other control variables that either should be in the regression model (e.g., firm performance should not be in the regression model) or overturn my original estimates (e.g., inappropriate JOLTS controls).

---

[490] Johnson Report ¶ 128 ("████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████ ).
[491] Starr Report ¶ 123.
[492] Starr Report Section VI.C.4 ("Sensitivity to Unobservable Variables").

**6.** **Dr. Johnson's Base Salary Regressions Are Uninformative About Harm**

204. Dr. Johnson ███████████████████████████████████

████████████████████████████████████████████████.[493] Dr.

Johnson concludes that my wage suppression model is therefore unreliable.

205. Dr. Johnson's analysis ignores the fact that what matters for worker harm is not base salary, but total compensation. Total compensation includes not only base salary but also bonuses, equity, and other forms of compensation. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Thus, Dr.

Johnson's claim about model reliability lack merit, and his cherry picking of one particular type of compensation obscures the broader scope of potential compensation and worker harm.

**7.** **Job Offer and Cold Call Data Is Not Required to Estimate the Effect of the Conduct**

206. Dr. Johnson argues that to study the effects of the Challenged Conduct we must consider job offers received. He writes[494]

> To properly study the direct effects of the alleged mobility restrictions, one has to consider not only an alleged offer not received, but also whether that offer would have made any difference given the other job opportunities available to that employee. That is, "it is necessary to study whether, but for the alleged conduct, an employee would receive an additional job opportunity that was "accessible to" that employee and "higher-paying" than any other job offer they received in the actual world.

---

[493] Johnson Report Ex. 28.
[494] Johnson Report ¶ 51.

Dr. Johnson makes a similar point about cold calls, which can convey timely information about workers and their specific value to specific employers, beyond what can generally be found from publicly available salary ranges.[495] Dr. McCrary makes the same point.[496]

207.     Dr. Johnson's and Dr. McCrary's critique that we should measure job offers (or cold calls) is misguided, inconsistent with the academic literature, and only displays their lack of understanding of bad control variables.

208.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████  To understand why this is wrong, and why data on cold calls and job offers are not needed to estimate the causal effect of the Challenged Conduct, we need to revisit the discussion from my initial report about controlling for mediators.[497] Mediating variables are those that lie on a causal pathway between the Challenged Conduct and compensation. Based on Dr. Johnson and Dr. McCrary's logic, ███████████████████████████████████

███████████████████████████████████████████████████. As I described in my initial report, if we control for a mediator variable, like job offers, then we induce bias in our overall estimate because we close that causal pathway and prevent it from contributing to the overall Conduct estimate. Thus in general we should *not* control for job offers, cold calls, or any

---

[495] Johnson Report n.111 ("Plaintiffs' experts also suggest that cold calls (absent an outside job offer) provide employees information on the 'market value' of their labor (Starr Report, ¶73(c), footnote 173). Similarly, Plaintiffs' experts have done no analysis to show that relevant employees had access to meaningfully different market information due to the alleged conduct."). On the lack of availability of pay information from external employers, *see* Batra et al. (2023) at abstract ("First, wage information is rare: only 14% of posts contain any wage information and the minority of these (6%) have a point wage. The majority (8%) a range of wages that are on average wide[.]").

[496] McCrary Report ¶ 67 ████████████████████████████████████████

████████████████████████████████████████████████████████

████████.

[497] Starr Report ¶ 123(c) ("What does it mean for a variable to 'close a mediating pathway' and thus be a bad control? Mediating pathways are the causal pathways that link the independent variable of interest and the outcome but go through a third variable (called a 'mediator').").

other mediating variable. Indeed, we specifically *do not* need data on job offers or cold calls to identify the effect of the Challenged Conduct

209.    The academic literature similarly rejects Dr. Johnson's and Dr. McCrary's claims. None of the studies estimating the causal effects of no-poach agreements or noncompete clauses rely on data from job offers or cold calls.[498] Neither Dr. Johnson nor Dr. McCrary seem to be aware of this because they do not review any of this relevant literature.

### 8.    The Model Does Account for Individualized Factors

210.    Dr. McCrary critiques my regression model that derives aggregate estimates of the effect of the Challenged Conduct because, in his view, the "regression model does not account for numerous individualized" factors including employee skills and preferences, the existence of noncompete clauses, and other similar factors.[499] I reject this criticism for three reasons.

a.    First, as discussed above, it is obvious that I do not need to measure certain individualized factors, such as job offers or subsequent negotiations, as described above in Section VII.D.7. This is because those characteristics are an outcome of the Challenged Conduct, and thus we do not want to control for them.

b.    Second, the baseline empirical model does account for individualized factors via the use of individual by company fixed effects. As described in my initial report in Section VI.C, the baseline empirical model compares individuals *to themselves* both during and absent the Challenged Conduct. Thus, any fixed individual-specific skills, individual-specific preferences, individual-specific constraints, are all accounted for in the empirical model.

---

[498] *See* Starr Report Section V.
[499] McCrary Report ¶ 240.

c.　　Third, if Dr. McCrary is concerned that there may be differences in the effect of the Challenged Conduct across individuals, as described in the Common Impact section of my initial report, and as fully detailed below in Section VIII, ███████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████ .

### 9.　　It Is Inappropriate to Measure Year-Over-Year Differences

211.　　Dr. McCrary argues that the dependent variable and control variables should be measured in year-over-year differences.[500] This suggestion is inappropriate and inconsistent with the literature on mobility constraints. In that literature, as reviewed in my initial report, all of the research focuses primarily on the levels of pay. This is because, as is the case here, the goal is generally to understand to what extent mobility constraints reduce compensation—not necessarily the extent to which they reduce compensation *growth*. Moreover, as I explain later in Section VIII.F.2.e, focusing on the *growth* of wages, rather than wages themselves, can inadvertently mask the reality of the data. Thus, I reject this argument.

---

[500] McCrary Report n.438 ████████████████████████████████████████ ████████████████████████████████████████████ *See* Workpaper 26. Studies in the economics literature have concluded that earnings are best modelled in terms of first differences. *See* Costas Meghir and Luigi Pistaferri, *Earnings, Consumption, and Life Cycle Choices*, *in* HANDBOOK OF LABOR ECONOMICS 773–854, 813 (Orley Ashenfelter & David Card eds. Vol. 4B 2011) ("Following these two papers are two of the most important works in this literature, namely Macurdy (1982) and Abowd and Card (1989) … They both conclude that the best representation of earnings is a unit root in levels and MA(2) in first differences."). Note that Nobel Prize-winning labor economist David Card was Dr. McCrary's advisor. McCrary Dep. at 91:10–25.

**10.** **Graphical, Unconditional Compensation Comparisons to Industry Benchmarks Are Not Capable of Discerning Harm from the Challenged Conduct**

212. Dr. McCrary and Dr. Stiroh both compare Defendants' compensation to my benchmark group of medical and health services managers in the health care and social assistance industry.[501] Dr. Stiroh also compares DaVita compensation to three other benchmarks.[502] ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [503]

a. Dr. McCrary's and Dr. Stiroh's analyses related to benchmarks are not informative about the extent to which the Challenged Conduct suppressed compensation for three reasons. First, as a general matter, these analyses are unconditional and do not incorporate any other control variables. Thus, they are susceptible to omitted variable bias and should not generally be interpreted to reflect but-for relationships.

---

[501] McCrary Report Ex. 29; Stiroh Report Figure 11.

[502] *See* Stiroh Report Figure 9 and Figure 10. These three benchmarks are (1) the OEWS 3-Digit Industry Benchmark, which is the average salary of management employees in the ambulatory health care services industry excluding executives, compensation and benefits managers, and HR managers, as calculated from the United States Bureau of Labor Statistics' Occupational Employment and Wages Series (Stiroh Report n.101); (2) the Top 5 NAICS Benchmark, which is according to Dr. Stiroh is the "average annual salary of management employees in the top five industries from which DaVita hired employees or to which it lost employees during the alleged conduct period, according to my analysis of the Lightcast data" (Stiroh Report ¶ 51); and (3) The QWI Industry Benchmark is the mean compensation excluding equity of workers with at least a bachelor's degree (Stiroh Report n.106).

[503] Stiroh Report ¶ 55 ( ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ ); McCrary Report ¶ 208 ████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ ).

b. Second, Dr. Stiroh's and Dr. McCrary's benchmark analyses are also purely graphical, and Defendants' Experts do not perform any tests to see if compensation was suppressed relative to the benchmarks.

c. Third, █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

**Figure 29: Including Other Benchmarks**

| | Dependent Variable: Ln(Total Annual Compensation) | | | | | |
|---|---|---|---|---|---|---|
| | [1] QWI Industry Benchmark | [2] QWI Industry Benchmark | [3] OEWS 3-Digit Industry Benchmark | [4] OEWS 3-Digit Industry Benchmark | [5] Top 5 NAICS Benchmark | [6] Top 5 NAICS Benchmark |
| Conduct | | | | | | |
| **% Wage Suppression** | | | | | | |
| DaVita Conduct | | | | | | |
| **% Wage Suppression** | | | | | | |
| SCA Conduct | | | | | | |
| **% Wage Suppression** | | | | | | |
| USPI Conduct | | | | | | |
| **% Wage Suppression** | | | | | | |
| QWI Industry Benchmark | | | | | | |
| OEWS 3-Digit Industry Benchmark | | | | | | |
| Top 5 NAICS Benchmark | | | | | | |
| Individual-Company FE | | | | | | |
| Location FE | | | | | | |
| Observations | | | | | | |
| R-squared | | | | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

3244633.4

186

**11.  Unconditional Trends in Employment, Hiring, and Departure Rates Are Meaningless**

213.  Dr. Stiroh argues broadly that ███████████████████████████ ████████████████████████████████████████[505] Dr. McCrary makes the same argument about employment, hiring rates, and turnover rates.[506] Dr. Johnson argues that "to facilitate a successful monopsony cartel, firms must implement 'a restriction' on their purchases (i.e., the amount of labor to employ) and 'the group must decide on how much each participant will curtail its purchases.'"[507] He then argues that I provided "no assessment of whether, or to what extent, the Defendants restricted demand for proposed class member labor, " ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[508]

214.  The observation that certain metrics changed in absolute terms reveals nothing about what those metrics might have been in the but-for world. While Defendants' Experts criticize my econometric model for not considering certain control variables, ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████



[504] Stiroh Report ¶ 47 (████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ").
[505] Stiroh Report ¶ 50 (████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████ ").
[506] McCrary Report Exs. 21, 22, and 33.
[507] Johnson Report ¶ 107.
[508] *Id.*



215.    In addition, Dr. Johnson's claims that I did not assess whether Defendants

restricted demand for Class Member labor are misleading. I did analyze moves between Covered

Defendants ████████████████████████████████████████████

██████████████[509] My analysis of Defendants' Experts own Lightcast data, described in Section

VI.B.2.c above, reaches the same conclusion.

## VIII.    Common Impact

216.    In my initial report, I used <u>six</u> independent and complementary methods to

demonstrate ████████████████████████████████████████

█████████████████████████████[510] Aside from the criticisms about my baseline model,

Defendants' Experts offer zero criticisms of the empirical models ████████████████████

█████████████████████████████████████.[511] Defendants' Experts do mischaracterize

my analysis, however. For example, Dr. Johnson posits that I do "not consider the possibility that

any subset of employees within the class could be in different relevant labor markets, and fails to

assess any geographic constraints that would limit or expand competition for some proposed

class members."[512] Dr. McCrary makes a similar criticism, including alleging that my analysis

---

[509] Starr Report Section V.B.
[510] Starr Report Section VIII.
[511] *See* n.5, *supra.*
[512] Johnson Report ¶ 12.

estimates a "single effect."[513] Both criticisms are wrong and reflect a fundamental misunderstanding of the analyses I performed in the Common Impact section. The empirical analyses in this section, particularly the in-sample prediction methods and the random coefficient models, use common methods and data to generate an estimate of harm *for every individual*, regardless of any specific geographic constraints, relevant labor markets, or even individual preferences, skills, or circumstances.

217.    Defendants' Experts only substantive arguments ███████████████████ ██████████████████████████████████████. Neither Dr. Johnson nor Dr. Saravia dispute that wage structures are a real economic phenomenon. None of Defendants' Experts challenge the concept of internal equity on a theoretical level, nor do they contend that wage compression would not exist.[514] (Nor can they, as these are well understood phenomena among economists.) Instead, Defendants' Experts' arguments in this section boil down to claims ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████

218.    Before proceeding to address their arguments on the merits of a compensation structure, I reproduce all of the figures in my initial report below using the revised data. All of

[513] McCrary Report ¶ 25 ("████████████████████████████████████████████████████ ████████████████████████████████████"); *id.* ¶ 240 ("Further, Prof. Starr's pay regression model does not account for numerous individualized factors I discussed earlier including what the skills and preferences, and in turn the relevant labor market, are for each employee; whether Defendants had market power sufficient to suppress pay for a given individual; the role that individualized negotiations, performance, or managerial discretion played in determining each employee's pay; and whether the mobility of some proposed class members was limited regardless of the alleged conduct (e.g., non-compete agreements or unvested equity)."); *id.* ¶ 249 ("Finally, in addition to the methodological flaws discussed above, Prof. Starr's primary pay regression model (███████████████████ ████████████████████████ suffers from another specification problem: it simply estimates a single effect across all forms of conduct and throughout the Class Period, despite the fact that Plaintiffs allege multiple forms of conduct that varied in nature (mobility restrictions versus information sharing), varied in terms of which Defendants and which proposed class members were involved, and varied in terms of when the conduct occurred.").
[514] *See, e.g.,* McCrary Report ¶ 70 ("I do not dispute that Defendants consider internal equity to some degree[.]").

these Common Impact methods █████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████

### A.    <u>By-Employee-Level-Category and Defendant Suppression Model</u>

219.    **Figure 30** below recreates Figure 10 from my initial report, ███████████

███████████████████████████████████████████████████████████████. The

results below are not materially different from the results in my initial report, and continue to

show ███████████████████████████████████████████████████████████

████████████████████████████████.

**Figure 30 [Figure 10 Revised]: Aggregate Effect of Conduct on Earnings By Job Level and Defendant**

| Baseline Category: Directors | Dependent Variable: Ln (Total Annual Compensation) | |
| --- | --- | --- |
| | Overall | By Defendant |
| | [1] | [2] |
| Conduct (Directors) | | |
| Conduct*1 (VPs & SVPs) | | |
| DaVita Conduct (Directors) | | |
| DaVita Conduct*1 (VPs & SVPs) | | |
| SCA Conduct (Directors) | | |
| SCA Conduct*1(VPs & SVPs) | | |
| USPI Conduct (Directors) | | |
| USPI Conduct*1(VPs & SVPs) | | |
| 1(VPs & SVPs) | | |
| Healthcare, Macro, Hours | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |



*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

## B.    Quantile Regressions

220.    **Figure 31** below recreates Figure 11 from my initial report, which examined how the Challenged Conduct affected compensation at every percentile of the earnings distribution.[515]

As before,

---

[515]

**Figure 31 [Figure 11 Revised]: Quantile Regressions**



### C. In-Sample Prediction

221.    **Figure 32** below recreates Figure 12 from my initial report, which is the traditional method of in-sample prediction for estimating harm to individual Class Members following a regression model. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

**Figure 32 [Figure 12 Revised]: In-Sample Prediction Method**

| | [1] | [2] | [3] | [4] |
|---|---|---|---|---|
| | Annual Wage Suppression % | Percentage Harmed: | | |
| | | In any Year? | In each Year? | Cumulatively? |
| Common Conduct Model | | | | |
| *Defendant-Specific Model* DaVita SCA USPI | | | | |



### D.  Interval In-Sample Prediction

222.  **Figure 33** and **Figure 34** recreate Figure 16 and Figure 17 from my initial report, which report the harm to Class Members using the interval in-sample prediction approach. ▮

**Figure 33 [Figure 16 Revised]: Interval In-Sample Prediction Results— Rates of Statistically Significant Harm At Each Confidence Level**



**Figure 34 [Figure 17 Revised]: Interval In-Sample Prediction Results—**  [516]

| Model | [1] Annual Wage Suppression % | [2] Confidence Level | [3] Percentage Harmed Cumulatively |
|---|---|---|---|
| Common Conduct Model | | | |
| *Defendant-Specific Model* | | | |
| DaVita | | | |
| SCA | | | |
| USPI | | | |

*Note*: This table reports the results from the Interval In-Sample Prediction method for the cumulative compensation of individuals over the Conduct Period.

---

[516] ███████████████████████████████████████████████████████████████████████████. Starr Report ¶ 168 ████████████████████████████████████████████████

████████ ).

### E.        Random Coefficient Model

223.        **Figure 35** below recreates Figure 18 from my initial report, which used a Random

Coefficient Model to allow the Conduct to have a differential effect on every Senior-Level

Employee. <span style="background:black">███████████████████████████████████████</span>

<span style="background:black">███████████████████████████████████████████</span>

<span style="background:black">████████████████████████████</span>

**Figure 35 [Figure 18 Revised]: Results from the Random Coefficient Model**



### F.        Evidence of a Compensation Structure

224.        In this section, I reviewed the basics of compensation structures, before turning to

qualitative and quantitative evidence in this case.[517] My discussion emphasized issues of internal

equity, which refers to the idea that workers doing similar work and performing similarly would

---

[517] Starr Report Section VII.F.

be paid similarly. I discussed how, due to internal equity concerns "employers tend to respond by implementing uniform compensation structures that pay comparable compensation for comparable work."[518] I also discussed issues of external equity, which refers to pay similarities between workers doing similar jobs at different firms. I described how companies balance internal and external equity, and that by taking external equity into account it "does not mean that compensation is entirely determined by a larger labor market and that the employer has no monopsony power."[519] The cumulation of these ideas suggests that, as I wrote in my initial Report, "if employee compensation is driven, in part, by considerations of internal equity, then the firm's ability to suppress wages of a group of employees would also be indirectly felt even by those employees who were not the target of wage suppression."[520]

225.    Before turning to the qualitative and quantitative evidence in this case, I first consider Defendants' Experts' common claim that that wage structures also put upward pressure on wages when new employees are hired because new employees "would have to be paid a competitive rate."[521] I agree with Defendants' Experts that wage structures can propagate harm or benefits across the workforce, but I disagree with their claim that the external market will necessarily put upward pressure on compensation that would propagate throughout the firm.

---

[518] Starr Report ¶ 173.
[519] Id. ¶ 176.
[520] Id. ¶ 174.
[521] Johnson Report ¶¶ 92–93 ("Taking Dr. Starr's and Dr. Gerhart's description of the Defendants' purported 'wage structures' at face value, ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████. Saravia Report ¶ 198 (██████████████████████████████████████████████ ████").

226. As I discussed in Section VII.C.8, Defendants' Experts rely on an outdated notion that the external labor market is competitive, and that companies must offer a single competitive wage. Labor economists have long debunked this myth. The canonical job search and matching models reveal that identical workers searching for jobs at identical firms can wind up receiving dramatically different compensation, simply by din of which job offers one receives and thus where they fall on the job ladder.[522] The resulting frictions in the labor market give companies some degree of market power, and in the context of Healthcare, recent estimates suggest that the average firm has the power to suppress compensation by 44 percent, such that workers earn only 56 percent of their productivity.[523] Thus, the economic consensus disputes the broad assumption on which Defendants' Experts rely that the external labor market is generally competitive. Perhaps most directly, as shown in Section VII.C.8, while Defendants' Experts assume that starting compensation must be competitive and thus unaffected by the Challenged Conduct, ██ ████████████████████████████████████████████████. The academic literature finds that posted wages and starting wages are reduced as a result of no-poach agreements and noncompete clauses, ████████████████████████████████ ███████████████████████████████[524]

227. Thus, these analyses suggest that Defendants' Experts arguments that an outside competitive market is likely to result in upward pressure on compensation are meritless. Rather, Defendants do have power to suppress even starting compensation, and thus the wage structures and concerns about internal equity do help maintain suppressed compensation among Class Members across the Defendants.

---

[522] *See* Burdett & Mortensen (1998). *See also* Manning (2003).
[523] Webber (2015) at 133 (Table 7, average firm-level labor supply elasticity in Healthcare and Social Assistance is 0.78, indicating a markdown of 44%).
[524] *See* Figure 27, *supra*.

1. **Qualitative Record Evidence of Defendant Firms' Compensation Structures**

228. In this section, I reviewed documentary evidence from each Defendant about how they set pay. This review considered documentary evidence and deposition testimony of how pay was set, and in particular regarding issues of external benchmarking and internal equity. It described a variety of pay setting practices related to how internal equity affects compensation for new hires and compensation adjustments. █████████████████████████████

████████████████████████████████

229. Defendants' Experts dispute my characterization of the evidence. █████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████[525]████████████████████████████████

████████████████████████████████[526] Dr. Saravia and Dr. McCrary make the same points.[527] Dr. McCrary argues that pay is "highly individualized" and posits five reasons,

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████[528]

230. █████████████████████████████████████████

████████████████

---

[525] Johnson Report ¶ 68 referencing DVA_OMCEAL_001329256 at -9257.
[526] *Id.* referencing SCA001669270 at slide 3.
[527] Saravia Report ¶ 207; McCrary Report ¶ 104.
[528] McCrary Report ¶ 72.

a. Indeed, the qualitative evidence Defendants' Experts ███████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ [529]

b. Further, at deposition, Dr. Johnson testified that ███████████

██████████████████████████████████████████████████████

████████████████████ [530]

c. Dr. Saravia's description of █████████████████████

█████████████ [531] █████████████████████████████████

██████████████████████████████████████████████████████

███████ [532] ████████████████████████████████ [533] █████████

██████████████████████████████████████████████████████

████████████████ . [534] ███████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ [535] ███████████████████████████

██████████████████████████████████████████████████████



---

[529] Starr Report ¶¶ 179–181.
[530] Johnson Dep. at 159:4–15.
[531] Saravia Report ¶¶ 57–69.
[532] *Id.* ¶ 61.
[533] *Id.* ¶ 59 (" ████████████████████████████████████████

████████████████████████████████████████████ ).
[534] *Id.* ¶ 64 ████████████████████████████████████

████████████████████████████████████████████████████

████████████

[535] *Id.* ¶ 208.



231. Similarly Dr. McCrary's "five facts" which in his view ███████ ███████████████████████████████████ ignorant of the fact that all compensation decisions, even when part of negotiation decisions with an individual, are made within the context of internal equity and centralized control and guidance.[537] I describe how these ideas manifest in regards to each of Dr. McCrary's five reasons below.

a. Dr. McCrary first argues ██████████████ ██████[538]█████████████████████████████ ██████████████████████████████████ ██████[539]████████████████████████████ ████████████████████████████████ ██████████████████████████████████ ██████████████████████████[540]██████████ ███████████████████████████████

[536] Saravia Report n.328.
[537] McCrary Report ¶ 72.
[538] *Id.* ¶ 73 ("████████████████████████ ████████████████████████ ████████").
[539] Note that one argument that Dr. McCrary makes in this section is that ████████████████████ ████████████████████████████" McCrary Report ¶ 74. Workers being paid according to their performance is perfectly in line with a compensation structure where workers receive similar pay for similar performance.
[540] Starr Report Section VII.F.1.

3244633.4                                        200

███████████████████████████████████ A company may be willing to grant an individual's request precisely because it falls right within where others are already being paid. Or, even if a company grants an extraordinary pay increase, this inevitably creates internal equity issues in subsequent years. ████████████████████████████

████████████████████████

      b.     Dr. McCrary next argues that "████████████████████████

██████████████████████████████"[541] ████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

██████████████████████████████

      c.     ███████████████████████████████

██████████████████████████████████████[542]█

█████████████████████████████████[543]█

█████████████████████████████████████

████████████████████████████████████

[541] McCrary Report ¶ 76.
[542] Id. ¶ 77.
[543] Id.



d.      The fourth argument that Dr. McCrary makes is that ███████

████████████████████████████████████████████████████████████████

███████████████████████[546]█████████████████████████████████████

███████████████████████████████████████████[547] However, just

because the company is taking into account external equity does not mean that internal equity

doesn't matter. Indeed, as I wrote in my initial report, "taking external equity into account

does not mean that compensation is *entirely* determined by a larger labor market and that the

employer has no monopsony power."[548]

e.      Finally, Dr. McCrary points out that ███████████████

███████████████████████[549]████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████[550] The fact that compensation types

---

[544] McCrary Report ¶ 82.
[545] *See* Webber (2015) (Table 7, average firm-level labor supply elasticity in Healthcare and Social Assistance is 0.78, indicating a markdown of 44%.). *See* Section IX.A, *infra.*
[546] McCrary Report ¶ 83.
[547] Starr Report ¶ 175 ("A related concept is 'external equity,' wherein employees seek to achieve pay similarities between laborers doing similar jobs at different firms.")
[548] Starr Report ¶ 176.
[549] McCrary Report ¶ 84.
[550] *Id.* ¶ 85 and Ex. 11.

can vary, or that they differ for different types of workers, is not generally inconsistent with a

pay structure. Internal equity requires similar compensation for similar work.

232.



233.    Dr. McCrary also claims I provided no evidence that compensation structures

govern equity pay, which can be a significant portion of an employee's total compensation.[552]



a.

b.

---

[551] *Id.* ¶ 87.
[552] McCrary Report ¶ 105.
[553] USPI_CIV_000242381.
[554] USPI_CIV_000624407.



## 2.   Quantitative Evidence of a Compensation Structure

234.    In this section, I developed two analyses to help shed light on the existence of a compensation structure: whether compensation was positively correlated within a company across job levels, and whether compensation was positively correlated within a job across individuals. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[555] USPI_CIV_000026885. *See also* USPI_CIV_000243441 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ). ▮▮▮▮▮▮▮▮▮▮▮▮

[556] USPI_CIV_000167345 ▮▮▮▮▮▮▮▮▮▮ . *See also* USPI_CIV_000514831 ▮▮▮▮ .

[557] USPI_CIV_000624407.

[558] USPI_CIV_000401250.

235. Given the updates to the data as discussed above, I have re-run those models and found that the results are unchanged (**Figure 46, Figure 47,** and **Figure 60** in Appendix C).[559] ▮

████████████████████████████████████████████████████████

    a.    I note that Dr. McCrary repeats my within-job-level analysis but takes a slightly different approach with regards to the hold out sample. I replicate his results with my revised data, and find consistent results with my initial analysis.[560]

236. Defendants' Experts offer several criticisms of my analyses. I address each of these below. As my response below fully documents, Defendants' Experts' analyses, "basic corrections,"[561] and arguments are flawed, incomplete, and misleading. ███████████

████████████████████████████████████████

    a.    ████████ **of Dispersion in Compensation is Explained by Four Common Factors**

237. ████████████████████████████████████████████████

████████████████████████[562]███████████████████████████

████████████████████████████████████████████████

---

[559] Note that in order to calculate hourly wages in the comparison of (S)VP and Director compensation I need to impute hours for those who were identified as low measured earnings for USPI. I avoided this in the primary wage regressions above by using an indicator variable, but given here that I am aggregating the data beyond the individual level I need to impute these hours. I use Dr. Johnson's approach for this imputation because it is significantly less likely to create measurement error relative to Dr. Saravia's. This is because, as discussed in Section VII.A.2, Dr. Saravia's approach imputed nearly everyone's hours ███████████████████████████

[560] In particular, ██████████████████████████████████████████
████████████████████ (McCrary ¶ 101 ████████████████████████
████████████████████████████████████████████████
████████. ████████████████████████████████████
████████████████████████████. *See* my workpapers.
[561] McCrary Report ¶ 70 ████████████████████████████████████
████████████████████████████████.
[562] Johnson Report Exs. 11 and 12; Saravia Report Ex. 20. McCrary Report Exs. 15–18.



238. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

In general, dispersion in compensation arises naturally from wage structures because, as discussed in my initial report, companies pay workers differently based on their different roles and contributions to the organization.[565] None of Defendants' Experts put forth an economic analysis that seeks to quantify what amount of variation in compensation is due to individualized versus common factors.[566] ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████[567] ██████████████████████████████████████

██████████████████████████████

239. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[563] Johnson Report ¶ 70 (███████████████████████████████████

████████████████████████████████████████████

██████████ ); Saravia Report ¶ 210

██████████████████████████ ); McCrary Report ¶ 98

████████████████ ).
[564] Saravia Report ¶ 221
████████████████
[565] Starr Report Section VII.F.
[566] See, e.g., Saravia Dep. at 147:22–148:12.
[567] Saravia Dep. at 146:7–19.



240. ███████████████████████████████████████████

241. ████████████████████████████████████████████

████████████████████████████████████████████ I consider two

studies that study the same company. In Gerhart and Milkovich (1989), the authors study a large

---

[568] ████████████████████████████████████████████
████████████████████████████████████████

[569] Starr Dep. Vol. 2 at 320:5–16.

fortune 500 company and highlight how the firm has highly structured pay.[570] Analyzing that company's compensation, Gerhart (1990) runs regressions similar to those I ran above, seeking to explain variation in log compensation as a function of human capital, college major, tenure, job title, job performance ratings, education, and experience.[571] Even though he has even more variables than I do (e.g., college major and performance ratings), when he runs his regressions he finds that he gets a 68 percent R-squared for men, and 66 percent for women.[572] Given that we know that this company had a systematic pay structure, ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ [573]

**Figure 36: R-Squared Value by Defendant and Job Level**



| | R-Squared | | | |
|---|---|---|---|---|
| | All | Davita | SCA | USPI |
| **All Employees** | | | | |
| **Directors** | | | | |
| **Vice Presidents** | | | | |

    b.    ██████████████████ **Does Not Change Across Job-Level Wage Regression Results**

242. Based on the idea that maintaining internal equity across the company implies in part that compensation should move together even across groups, I studied whether increases in

---

[570] Barry A. Gerhart & George T. Milkovich, *Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm*, *in* 23 PAY EQUITY: EMPIRICAL INQUIRIES (R. Michael, H. Hartmann, & B. O'Farrell Eds. 1989).
[571] Barry A. Gerhart, *Gender differences in current and starting salaries: The role of performance, college major, and job title*, 43(4) ILR REVIEW 418–433 (1990) [hereafter Gerhart (1990)] at Table 2.
[572] *Id.* at Table 2.
[573] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *See* my workpapers.

compensation in one job level are associated with increases in compensation in another job level within the same firm. ██████████████████████████

██████████████████████[574]

243.  ████████████████████████████████████

██████████████████████████████████████

████████.[575]

       a.      Both Dr. McCrary's and Dr. Saravia's analysis is flawed. ████████

██████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████

---

[574] Starr Report Figure 19.
[575] McCrary Report ¶ 102 ("████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ ").

**c.** ███████████████ **Do Not Disprove a Systematic Pay Structure**

244.

245.     Defendants' Experts fundamentally misunderstand what a pay structure is or how it works. ███████████████████████████ consider one of the most common wage structures in the United States: the General Schedule (GS) pay scale used for civilian federal employees.[579] The GS consists of fifteen grades, each of which has ten steps, for a total of 150 positions. **Figure 37** below provides the 2025 GS pay scale.[580] Note that, despite the systematic nature of this pay structure, overlap exists between grades. For example, Grade 6, Step 8 offers higher pay ($55,448) than Grade 8, Step 1 ($55,328). Likewise, Grade 3, Step 10 offers higher pay ($41,744) than Grade 5, Step 2 ($41,676). One would be hard pressed to argue that the General Schedule does not represent a systematic compensation structure, despite general overlap between grades.

---

[576] Saravia Report ¶ 174. Saravia Report ¶ 172 ("███████████████████████████ █████████████.").
[577] Johnson Report ¶ 76.
[578] McCrary Report ¶ 98.
[579] *General Schedule*, U.S. OFFICE OF PERSONAL MANAGEMENT, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited June 2025) ("The General Schedule (GS) classification and pay system covers the majority of civilian white-collar Federal employees (about 1.5 million worldwide) in professional, technical, administrative, and clerical positions. GS classification standards, qualifications, pay structure, and related human resources policies (e.g., general staffing and pay administration policies) are administered by the U.S. Office of Personnel Management (OPM) on a Governmentwide basis.").
[580] *Pay & Leave*, U.S. OFFICE OF PERSONAL MANAGEMENT, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/25Tables/html/RUS.aspx (last visited June 2025).

**Figure 37: General Services Pay Scales, 2025**

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $26,175 | $27,053 | $27,922 | $28,790 | $29,658 | $30,166 | $31,028 | $31,895 | $31,930 | $32,742 |
| 2 | $29,431 | $30,131 | $31,106 | $31,930 | $32,289 | $33,238 | $34,187 | $35,137 | $36,086 | $37,035 |
| 3 | $32,114 | $33,184 | $34,254 | $35,324 | $36,394 | $37,464 | $38,534 | $39,604 | $40,674 | $41,744 |
| 4 | $36,049 | $37,251 | $38,453 | $39,655 | $40,857 | $42,060 | $43,262 | $44,464 | $45,666 | $46,868 |
| 5 | $40,332 | $41,676 | $43,020 | $44,363 | $45,707 | $47,051 | $48,395 | $49,739 | $51,083 | $52,426 |
| 6 | $44,959 | $46,458 | $47,956 | $49,454 | $50,953 | $52,451 | $53,949 | $55,448 | $56,946 | $58,445 |
| 7 | $49,960 | $51,626 | $53,292 | $54,957 | $56,623 | $58,289 | $59,955 | $61,620 | $63,286 | $64,952 |
| 8 | $55,328 | $57,173 | $59,018 | $60,863 | $62,708 | $64,553 | $66,398 | $68,242 | $70,087 | $71,932 |
| 9 | $61,111 | $63,148 | $65,185 | $67,222 | $69,259 | $71,295 | $73,332 | $75,369 | $77,406 | $79,443 |
| 10 | $67,297 | $69,539 | $71,782 | $74,025 | $76,268 | $78,511 | $80,754 | $82,997 | $85,240 | $87,482 |
| 11 | $73,939 | $76,403 | $78,867 | $81,331 | $83,795 | $86,259 | $88,723 | $91,187 | $93,652 | $96,116 |
| 12 | $88,621 | $91,576 | $94,531 | $97,485 | $100,440 | $103,394 | $106,349 | $109,304 | $112,258 | $115,213 |
| 13 | $105,383 | $108,896 | $112,409 | $115,922 | $119,435 | $122,948 | $126,461 | $129,974 | $133,487 | $137,000 |
| 14 | $124,531 | $128,682 | $132,833 | $136,984 | $141,135 | $145,286 | $149,436 | $153,587 | $157,738 | $161,889 |
| 15 | $146,481 | $151,363 | $156,246 | $161,128 | $166,011 | $170,894 | $175,776 | $180,659 | $185,541 | $190,424 |

*Source*: *Pay & Leave*, U.S. OFFICE OF PERSONAL MANAGEMENT, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/25Tables/html/RUS.aspx (last visited June 2025)

246.    The same overlap appears in Federal Wage System (FWS), which "is a uniform pay-setting system that covers Federal appropriated fund and nonappropriated fund blue-collar employees who are paid by the hour."[581] As with the GS, rates overlap between grades. For example, Grade 9, step 5 FWS employee in the Dallas-Ft. Worth area receives $34.77 per hour in 2025, while a Grade 12, Step 1 employee in the same area receives only $34.36.[582] Such overlaps do not overcome the existence of a common wage structure.

**d.     Dr. Saravia's and Dr. Johnson's Non-Randomly Generated Compensation Paths Generate Pre-Determined Relationships**

247.



---

[581] *Federal Wage System*, U.S. OFFICE OF PERSONNEL MANAGEMENT, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/#url=Overview (last visited June 2025) ("The system's goal is to make sure that Federal trade, craft, and laboring employees within a local wage area who perform the same duties receive the same rate of pay.").

[582] *Federal Wage System Regular and Special Production Facilitating Wage Rate Schedules for the Dallas-Fort Worth, Texas (DFW) Wage* Area, DEFENSE CIVILIAN PERSONNEL ADVISORY SERVICE (Jan. 2, 2025), https://wageandsalary.dcpas.osd.mil/Content/AF%20Schedules/survey-sch/131/131R-02Jan2025.pdf.

248.

249.

---

[583] Saravia Report ¶ 225.

250. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████[584]████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

251. ███████████████████████████████████████

█████████████████████████,[585]



---

[584] Note, I chose 5,001 instead of 5,000 because with 5,001 iterations the median is an observation in the data when the number of iterations is odd, but it is not when the number of iterations is even.
[585] Johnson Report ¶ 87.

252.

[586]

### e. A Common Wage Structure Does Not Require Uniform Changes in Compensation Across Employees

253. In my initial report I describe internal equity as "comparable compensation for comparable work."[587] Defendants' Experts appear to misunderstand this fundamental idea.

---

[586] *Id.* n.176.

[587] Starr Report ¶ 173 ("Because employees value internal equity, employers tend to respond by implementing uniform compensation structures that pay comparable compensation for comparable work.").

Rather, Dr. Johnson argues that the relevant question is not whether compensation *levels* move together, but whether "*changes* in compensation for one employee related to *changes* in compensation for the other employees?"[588] Dr. Saravia's analyses similarly reflect the mistaken impression that non-uniform changes in compensation among workers across time implies the absence of a common wage structure.[589] Dr. McCrary makes the same claim.[590] Dr. McCrary even goes so far as to argue that he is "correcting" my analysis when he changes the dependent variable to "year-over-year wage changes."[591]

254.    These ideas are misguided, and changing the dependent variable to "changes" in wages is certainly not a "correction" to my original analysis. A wage structure can accommodate differential movements in wages among employees.

.[592] As a result, and as I demonstrate below, I reject Defendants' Experts' claims. Nevertheless, even if one assumes that this argument has merit (which it does not), both Dr. McCrary and Dr. Johnson's analysis ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[588] Johnson Report ¶ 82 and Ex. 16. Dr. Saravia also studies year-over-year changes and argues that "▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Saravia Report ¶ 178 and Ex. 21. Dr. McCrary ¶ 92 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ McCrary Report Exs. 12–14.

[589] Saravia Report ¶ 172 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *id.* ¶ 178 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Saravia Ex. 22.

[590] McCrary Report ¶ 92 ("The first prediction of a rigid pay structure is that shorter-run changes in pay should be similar across workers.").

[591] McCrary Report ¶ 102 ("▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉").

[592] Starr Report Section VII.F.1.

███████████████████████████████████████ [593] ██████████████████████

████████████████████████████████████████

255. A common wage structure does not mean that if a single employee receives a pay raise for, *inter alia*, exceptional performance, all other employees in her level must also receive such an increase at the same time. Rather, some employees may receive pay increases one year, creating internal pressures related to internal equity that may drive differential pay changes in the subsequent years. Conversely, as I explained in my initial report, such a wage structure would allow a *broad negative shock* to employee compensation to impact all employees whose pay depends on the pay of other similarly situated employees—though the timing with which it happens need not be the same for all employees.

256. To begin to show that changes in compensation are not sufficient for identifying a compensation structure, note that a time series contains two components: a trend and a periodic component. The trend refers to systematic changes that occur over time after removing period-to-period differences. The periodic component refers to differences in the series across periods. For example, we might expect ice cream sales to have both a trend and periodic component: (1) an upward trend over time as population increases, new flavors are created, etc., and (2) a periodic component that captures seasonality, such as increased sales during the summer season each year. Now consider Dr. Johnson's approach of "first differencing." First differences effectively removes the trend component, looking only at period-to-period changes. In doing so, it requires any relationships between two first-differenced series to occur *in the same period*. As a result, first-differencing does not capture any long-term evidence of a wage structure. Dr. Johnson's

---

[593] Johnson Report Ex. 16 (████████████████████████████████████████████).

first differencing analysis requires any relationship to occur in the short term (same year) only.

This requirement is both unnecessary and inconsistent with a wage structure.

257. ██████████████████████████████████████[594]███████

██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

258. ██████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

---

[594] Johnson Report ¶ 79.

259.    I note that Dr. McCrary attempts a similar modification to my analysis as Dr. Johnson, likewise focusing on first differences or year-to-year changes.[595] As a result, Dr. McCrary's opinions suffer from the flaws that apply to Dr. Johnson's approach. ███████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████

**Figure 38: Example of Alternative Raises Being Negatively Correlated**

| Year | Employee 1 | Employee 2 |
|------|-----------|-----------|



█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[595] McCrary Report Ex. 12 ("███████████████████████████████████████████████").



260.

261.

[596]

[597]

---

[596] Johnson Report Ex. 16.
[597] Arthur S. Goldberger, A Course in Econometrics (Harvard University Press 1991).

f.  **Visual Analyses of Employee Pay Does Not Refute the Existence of a Common Wage Structure**

262.



---

[598] Saravia Report ¶¶ 165–167; McCrary Report ¶¶ 92–95.

[599] McCrary Report Ex. 13 and Ex. 14. I note that Dr. McCrary's titles on these figures are misleading. The title for Ex. 13 is "█████████████████████████████████████████████████████████." But this title is not accurate because Ex. 13, as made clear in the exhibit notes, studies ███████████ ███████████████████████████████████ The same critique is true of Ex. 14.

[600] McCrary Report Ex. 19 and Ex. 20.

[601] Saravia Dep. at 138:19–24.

[602] *Id.* at 139:6–9.

263.

264. Consider, for example, professional sports. The NBA uses a collectively-bargained compensation structure. Nevertheless, not all NBA players' salaries move in concert. While most players may increase over time, some suffer pay decreases, either willingly or involuntarily. These realities do not obviate the existence of a structure that would permit a wage shock (e.g., increased revenue subject to sharing) to propagate across all or nearly all Class Members.

> **g.** **Nearly All Workers Are in Jobs with Positive Within-Job Wage Correlations**

265.

---

603 Saravia Report ¶ 221.
604 Saravia Report ¶ 227.
605 *Id*. Ex. 29.

266.     Dr. Saravia's analysis is misleading for several reasons. First, Dr. Saravia misses that my approach is a summary of what is happening for the *average* worker. Instead, she looks to point towards job titles with few observations as proof that there is a lack of correlation. ▮

▮▮▮▮▮[606]▮▮▮▮▮

▮▮▮▮▮

267.     Second, while the randomized hold-out sample approach I developed works well when samples are large, as in my initial analysis, doing the randomized hold out-sample only one time when the sample is small, as in jobs with just a handful of workers, can result in skewed outcomes depending on where outliers are classified.

268.     To address both points, I replicate Dr. Saravia's analysis across all three Defendants. To ensure that the results are not driven by a particular randomization, I re-randomize the hold-out sample 25 different times and take the average across the 25 iterations.

▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮[607]▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮

---

[606] *Id.*

[607] *See* my workpapers for details. The results presented in the text are weighted to describe the experience of the typical worker. If instead we weighted all job titles the same, regardless of how many workers are in them, ▮ ▮▮▮▮▮

### h. Dr. Saravia's Criticism of Cascading Effects Misunderstands How the Conduct Affects Wages

269. Dr. Saravia contends that switchers' compensation patterns contradict the theory of indirect harm, namely that when some employees switch to other firms, their current employer must not only raise their pay in response but also raise the pay for workers generally. She claims that, ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████ [608]

270. Dr. Saravia's analysis seems to belie her misunderstanding of compensation structures and the mechanisms through which the Challenged Conduct could have affected wages. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ [609] ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

271. Similarly, in her analysis of compensation patterns when a worker leaves USPI for SCA, she argues that █████████████████████████████████████████████

---

[608] Saravia Report ¶ 290.

[609] *Id.* ¶ 285 ("Based on Dr. Gerhart's and Dr. Starr's theory of indirect harm, new hires' compensation levels would be high relative to incumbent USPI employees with the same job title, which they assert, would compel USPI to increase compensation of other Senior Employees in similar positions[.]"); *id.* ¶ 77 ("If Senior Employees have many employment options beyond Defendants, they will be free to move to these options in response to suppressed compensation. Likewise, employees of non-Defendant competitors hired by Defendants could demand competitive compensation.").

███████████████████████████████████████ [610] ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████ [611] As in the prior analysis, Dr. Saravia's analysis is not based on any objective statistical test. Rather her conclusions are based on her eyeballing where a black dot lies within a sea of blue dots and how those blue dots may have vertically shifted. This is guesswork. Based on an ocular examination, even her own conclusions seem meritless—indeed, for several switchers it does seem that the distribution of workers at USPI move similarly with the individual who just joined SCA.[612]

272. Despite emphasizing the importance of control variables in her Report, Dr. Saravia's analysis in her Exhibits 38 and 39 compares compensation before and after a switch without controlling for any other variables. ████████████████████████████████ ███████████████████████████████████████████████████ As I have explained in my initial report and reiterated above, my compensation analysis controls for relevant factors that could have confounded the effects of the Challenged Conduct and impeded recovery of any attendant causal effect. She does not do the same.

273. Finally, this test is an extreme and unlikely reflection of how the Challenged Conduct is likely to affect compensation. It doesn't account for how the CSI Exchanges might have suppressed compensation, and it does not address the impact of solicitations when somebody does not move.

---

[610] Saravia Report ¶ 289 ████████████████████████████████████████████
████████████████████████████████

[611] *Id.*
[612] This includes IDs 107425, 137423, 255844.

i. **Dr. McCrary and Dr. Johnson Offer Inapposite Criticisms of My Quantitative Evidence of a Wage Structure**

274. Dr. McCrary argues that my between-job analysis "simply reflects that similar market forces affect labor markets where Directors, VPs, and SVPs participate."[613] He similarly argues that my within-job analysis ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████[614] Dr. McCrary's claims fail to consider that the control variables in the model include related macroeconomic and healthcare specific factors, including benchmark compensation. █████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████ Indeed, Dr. McCrary has pointed to no unobserved variables that overturn my results.

275. Dr. Johnson argues that my quantitative analysis ████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████[615] He later raises some other possible explanation for why my results could exist, e.g., the Reflection Problem, but does nothing to investigate whether such an explanation is plausible, let alone incorporate it into my model to observe its results. Such purely hypothetical rebuttals reflect the *argumentum ad ignorantiam* informal logical fallacy. In other words, Dr. Johnson implies that, because I have not ruled out the possibility that his factors could overturn my results, then they

---

[613] McCrary Report ¶ 100.
[614] McCrary Report ¶ 100.
[615] Johnson Report ¶ 78. Dr. Johnson further critiques Dr. Gerhart for making similar claims. *See id.* ¶ 73 ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████).

must do so. Not only does he not show this to be the case, he does not even identify what factors he claims I omitted.

276.



Defendants' Experts' arguments that the qualitative and quantitative evidence is inconsistent with a wage structure is unsupported.

### G. Dr. McCrary's Subsample Common Impact Analysis

277. In Section 6 of Dr. McCrary's report, he takes his flawed regression model and performs a variety of "subsample analyses"

.[616] However, Dr. McCrary analyzes sub*groups* by sub*sampling* the regression data, meaning that he runs a regression model on only small portion of the full data (a "subsample" approach), rather than using the full data by allowing the Conduct to vary by subgroup a (a "pooled data" approach). In particular, he cuts up the data by employee specialty,[617] by Defendant and seniority level,[618] by state,[619] and by year[620]

---

[616] McCrary Report Section 6.
[617] McCrary Report Ex. 46.
[618] *Id.* Ex. 47.
[619] *Id.* Ex. 48.
[620] *Id.* Ex. 49.

and then re-runs his regression model on these chopped up datasets. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ [21]

278.    While assessing if the effect of the Challenged Conduct varied for different groups is a legitimate inquiry, as I myself studied in Section VIII.A through VIII.E, Dr. McCrary's approach to the task is not. There are at least three serious flaws with his subgroup analyses ████████████████████████████████████████████████████

████████

    a.    First, Dr. McCrary uses his flawed regression models as the baseline. As I discussed at length in Section VII.C, Dr. McCrary's regression models are fundamentally flawed because of how he treats equity compensation and COVID. As a reminder, Dr. McCrary drops all *realized* stock income entirely from SCA and USPI. For DaVita, Dr. McCrary ignores *realized* stock income entirely, even though individuals have to pay tax on it, and instead reallocates equity income to when it is granted, regardless of whether the worker received it (or received a different amount). With regards to COVID, Dr. McCrary's preferred approach is to control for highly multicollinear JOLTS variables, which is known to create instability in estimates. I reject both of these modifications.

    b.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[621] *Id.* ¶ 253.



c.      Third, Dr. McCrary presents his analyses in a misleading manner because his exhibits give primacy to statistical significance over the direction and economic magnitude of the estimates. This is seen clearly in each of Dr. McCrary's Exhibits 46–49, ████████████ ████████████████████████████████████████████████████████████ █████ ████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████

---

[622] PETER KENNEDY, A GUIDE TO ECONOMETRICS 19 (Blackwell Publishing 6th ed. 2008) ("The sampling distribution of most estimators changes as the sample size changes. The sample mean statistic, for example, has a sampling distribution that is centered over the population mean but whose variance becomes smaller as the sample size becomes larger. In many cases it happens that a biased estimator becomes less and less biased as the sample size becomes larger and larger - as the sample size becomes larger its sampling distribution changes, such that the mean of its sampling distribution shifts closer to the true value of the parameter being estimated."). *See also* ROBERT PINDYCK & DANIEL RUBINFELD, ECONOMETRIC MODELS AND ECONOMIC FORECASTS 43–44 (Irwin/McGraw-Hill 1998).

[623] McCrary Report ¶ 260 ("For each of the exhibits, I perform a standard statistical test, which is known as a 'Chow test,' to assess whether, from a statistical perspective, it is appropriate to pool the data across the corresponding subgroups when estimating the alleged conduct effect.").

[624] McCrary Report Exs. 46–49.

[625] Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70(2) THE AMERICAN STATISTICIAN 129–133 (2016). *See also* Section VI.B.2.a.37, *supra*.

██████████████████████████████████████████████████████████

████████████████████████████████ This approach is particularly misleading when paired with his decision to use subsamples, rather than pooled models. By slicing the data so thin (many regressions have fewer than 200 observations), Dr. McCrary practically guarantees that some estimates will be statistically insignificant, which he can then sweep under the rug using his presentation style which ignores economic significance.

279.     In the remainder of this section, I replicate Dr. McCrary's analysis, keeping Dr. McCrary's identified subgroups the same, but I correct his regression by making three changes. *First,* I use my main empirical specification (which properly accounts for *realized* stock income and uses a COVID dummy for 2020 and 2021). *Second,* I use a pooled regression model that allows the effect of the Challenged Conduct to differ according to the group identified by Dr. McCrary, rather than throwing out all of the non-subgroup data. This distinction is critical: A pooled model offers superior statistical power over a subsample approach, because it allows all of the data to contribute to a more accurate estimate of the effect of the Challenged Conduct. Even data from observations outside of the subgroup contribute to the estimation of the Challenged Conduct on a subgroup, because all of the explanatory variables are interrelated, and accurately estimating the effect of the Challenged Conduct depends on accurately estimating the effect of other control variables in the model.[626] *Third,* I appropriately report the results as clearly as possible, rather than focusing only on statistical significance like Dr. McCrary. I present the point estimate for each subgroup and the corresponding 95 percent confidence interval. To account for the fact that some groups have few observations, I label the variables so

---

[626] *See, e.g.,* Wooldridge (2013) at 807–809 (demonstrating that, in multiple regression analysis, regression coefficients are simultaneously calculated using all data in the regression model).

it is clear how many observations are in each group, and I weight the scatterplot by the number of observations, so the larger the dot then the more individuals in that group.

280.    I first present the results according to employee specialty, which are shown in **Figure 39**. In the figure, the point estimate of the effect of the Conduct is given by the blue dot (the size of which reflects the number of individuals reflected in that group), and the 95 percent confidence interval on that estimate around each estimate is provided as a red bar. When this red bar does not include zero, that means that the p-value on the estimate is less than 0.05.

**Figure 39: Regression Analysis by Employee Specialty**



281. **Figure 40** repeats the same analysis according to Dr. McCrary's measure of employee seniority, which varies by both the job level and Defendant. **Figure 40** shows the estimates of the effect of the Challenged Conduct from a pooled model on each seniority-Defendant group.

**Figure 40: Regression Analysis by Employee Seniority**



282.    **Figure 41** performs a similar analysis by state. Mirroring Dr. McCrary, I do not report states with fewer than 50 observations. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████

**Figure 41: Regression Analysis by Employee State**



283. Finally, Dr. McCrary reports estimates by year. As opposed to using the full pre- and post-period as the baseline, his analysis uses only 2007 as a base year.[627] He provides no basis or explanation for why he chose 2007 as the appropriate base year. I replicate his analysis, but rather than use 2007 as a base year, I use all years where the Conduct is not present as the baseline. The results of this analysis are shown in **Figure 42**. ███████████████

████████████████████████████████████

███████████████████████████████████

████████████████.[628] ███████████████████████

███████████████████████████████

---

[627] McCrary Report Ex. 49 ("Estimates reflect the effect of the indicated year on pay relative to 2007[.]").
[628] *See* my workpapers.

**Figure 42: Regression Analysis Year**



284. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## H. Dr. McCrary's Theoretical Arguments of Immunized Workers

285. In Section 3 of his report, Dr. McCrary posits a series of arguments that there are

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[629] Dr. McCrary's arguments in this section are entirely

speculative. Dr. McCrary offers no empirical evidence ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[629] McCrary Report ¶ 107 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



286. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

### 1. Dr. McCrary's Subgroup 1: Employees in Labor Markets Where Dr. McCrary Claims Defendants Lacked Market Power

287. In Section 3.1 of his report, Dr. McCrary ████████████████████

████████████████████████████████████████████

██████████████[630] ████████████████████████████

████████████████████████████████████████████

████████████,[631] ████████████████████████████

████████████████████.[632]

288. ████████████████████████████████████████

████████████████ The ability to suppress compensation below competitive levels is the definition of market power. Therefore, the relevant question is whether Defendants have market power over *all* workers, or if there are subgroups of workers with either countervailing market power or where the Defendants' market power is somehow absent.

---

[630] McCrary Report ¶ 112.

[631] *Id.* ¶ 109 ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████ ).

[632] *Id.* ¶ 110 ████████████████████████████████
████████████████████████████████████████████
████████████████ ).

289.   There is no evidence of this. Dr. McCrary specifically suggests that Defendants could not suppress compensation for workers in Accounting, Tax, and Treasury jobs. █████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

290.   While I defer a full discussion of market power to Section X, I note that Dr. McCrary does not present any estimates of labor market power. The Lightcast analysis he performs is fundamentally not capable of measuring whether Defendants have market power.

████████████████████████████████████████████

████████████████████████████████[633]

### 2.   Dr. McCrary's Subgroup 2: So-Called Indirectly Affected Class Members

291.   In Section 3.2 of Dr. McCrary's report, ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████[634] For example, Dr. McCrary highlights the truism that



---

[633] *See* Section X, *infra.*

[634] McCrary Report ¶ 19 ("[I]t would not be possible to reliably measure any impact or harm using common evidence given the unique context of this case including among other things the diversity of proposed class members, the many and varied job options available to them, and the individualized nature of compensation for Defendants' senior-level employees such as proposed class members."); McCrary Report ¶ 107 ("[I]ndividualized inquiry would be necessary to identify proposed class members in each of these groups of unharmed class members."); McCrary Report ¶ 146 ("It is not possible using evidence common to the proposed class to identify which individuals would not or could not have been impacted by the alleged conduct for the above reasons, nor is it possible to reliably quantify harm for proposed class members who were harmed by the alleged conduct (if any). Rather, individualized inquiry would be necessary given the wide array of complexities discussed throughout this section.").

individuals are unique, with idiosyncratic skills and specific outside employment options,[635] or that in the absence of the No-Poach Agreement not every Class Member would receive solicitations.[636] None of these arguments convince me that individualized inquiry is required to determine harm from the Challenged Conduct.



a.

b.

c.     *Finally*, as I discussed in Section VIII.F, Dr. McCrary's conclusion about pay structure is fundamentally unsupported.

---

[635] *Id.* ¶ 111 ("[E]ach individual's relevant outside employment options, and thus relevant labor market, depend on individualized factors like skills, experience, location, and preferences.").

[636] *Id.* ¶ 20 ("Individualized inquiry into the suitable employment options for a given individual would be necessary to assess who is and is not harmed.").

██████████████████████████████████████████████████████████

███████████████████████████████████

      d.    ██████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████[637]

### 3.    Dr. McCrary's Subgroup 3: New Hires

292.    ████████████████████████████████████████████

██████████████████[638] ███████████████████████████████

████████████████████████████████████████████

█████████████████████[639] ██████████████████████████

██████████████████████████████████████████

███████████████████████████████

      a.    Dr. McCrary's claim that new hire pay is not suppressed by the Challenged Conduct is inconsistent with the academic literature and with the empirical evidence in this case. As I discussed in Section VII.C.8, the academic literature on no-poach and noncompete agreements find that they reduce starting wages. █████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

---

[637] Saravia Report ¶¶ 104–132.
[638] McCrary Report Section 3.3.
[639] McCrary Report ¶ 116.



█████████ Accordingly, Dr. Johnson's, Dr. Saravia's, and Dr. Stiroh's similar objections do not cause me to change my opinion.[641]

293. ████████████████████████████████████████

████████████████████████████[642]████████████

████████████████████████████████████████

████████████████

#### 4. Dr. McCrary's Subgroup 4: Employees with Substantial Equity Pay

294. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████[643]████████

████████[644]████████████████████████████████

████████████████████████

---

[640] *See* Manning (2003).
[641] Johnson Report ¶ 43; Saravia Report ¶ 77 n.135; Stiroh Report ¶ 49.
[642] McCrary Report ¶ 128 ████████████████████████
████████████████████████████████████████
████████████████████████
[643] *Id.* ¶ 129.
[644] *Id.* ¶ 129 ████████████████████████████████
████████████████████████████████████████
████████

a. ████████████████████████████████████████████

████ Gibson (2024) finds that, in the high-tech no-poach case, the no-poach agreements reduced the probability of a stock bonus and the bonus amount, such that those who received equity were harmed in party by receiving less equity.

b. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

c. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████[645]

295. Moreover, Dr. McCrary's meritless argument here is further illustration of why, contrary to Defendants' Experts, it is important to focus on total compensation, and to assess—as I do—the impact of the Challenged Conduct on total realized compensation.

**5. Dr. McCrary's Subgroups 5 and 6: People Who Would Not Switch Jobs or Engage in Solicitation**

296. In Sections 3.5 and 3.6 of his report, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████.[646] I group these claims as they are essentially identically describing an employee

---

[645] Johnson Report ¶ 97.
[646] McCrary Report ¶ 130 ████████████████████████████████
████████████████████ ). ████████
████████████ Saravia Report ¶¶ 106–107).

that would not entertain an alternative employment option. ██████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████.[647] Dr. McCrary's claims are meritless.

      a.     First, as described fully in Section VIII.F, Dr. McCrary's criticisms of my

wage structure analyses are entirely unpersuasive. ███████████████████████████

█████████████████████████████████████████████████████████████████████████

      b.     Second, because an individual would not consider employment at SCA

does not mean that they would not learn from a solicitation or use that solicitation to raise their

wages. And even those who would not engage with a solicitation still learn about demand for

their services, or may learn about wages paid elsewhere (through either their or another's

outreach). █████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████[648]████████████████████████.

      c.     ███████████████████████████████████████████████████

█████████████████████████████████████████.

      d.     Finally, the random coefficient model and in-sample prediction analyses

described in Sections VIII.C, VIII.D, VIII.E allow for *individual* estimates of harm from the

Challenged Conduct, ████████████████████████████████████████████████████

██████████████████

---

[647] *Id.* ¶ 132 (" ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████").

[648] Saravia Report ¶¶ 104–132.

**6. Dr. McCrary's Subgroup 7: Employees Who Were Already Mobility Impaired**

297.

298. The idea that other factors may have dampened harm from the No-Poach Agreements because certain individuals may be less likely to move to a Covered Defendant does not necessarily imply that the Challenged Conduct overall did not still harm workers. Indeed, in the high-tech no-poach case, where noncompetes, equity, and external recruitment are common, the no-poach agreements alone still facilitated wage suppression.[650] Dr. McCrary offers no discussion of why we would expect the answer to be any different in this case.

---

[649] *Id.* ¶ 135 ("███████████████████████████████████████████████████████████████.")

[650] Gibson (2024).

████████████████████████.[651] Notably, none of Defendants' Experts criticize these methods or their ability to estimate harm from the Challenged Conduct.

## IX.  Aggregate Damages

299.  Defendants' Experts do not criticize my method for calculating Aggregate Damages in my initial report. Nor does any expert put forward an affirmative damages analysis.[652]

300.  Given the Class Members I identified, I recalculate damages based on the same standard but-for world economic framework used in my initial report, using the revised dataset and regression results from **Figure 7** above. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████[653]

---

[651] Johnson Report ¶¶ 95–96.

[652] Dr. Johnson testified at deposition that █████████████████████████████████████ ██████████████ Johnson Dep. at 123:12–19. ████████████████████ . McCrary Dep. at 122:14–123:5.

[653] I calculate these average damages by first determining the number of unique Class Members (excluding outliers) who are present during the Conduct Period. I sum up the total number of years in the Conduct Period for which each Class Member works at a Defendant company. ███████████████████████████████ ████████████████████████████████████

**Figure 43 [Figure 21 Revised]: Aggregate Damages by Defendant**

| | [1] | [2] | [3] | [4] = [2]/(1-[3]) | [5] = [4] - [2] |
|---|---|---|---|---|---|
| Company | Number of Class Members | Total Compensation Under the Conduct ($M) | Wage Suppression Percentages | But-For Total Compensation ($M) | Damages ($M) |
| DaVita | ██████ | ██████ | ██████ | ██████ | ██████ |
| SCA | ██████ | ██████ | ██████ | ██████ | ██████ |
| USPI | ██████ | ██████ | ██████ | ██████ | ██████ |

*Note*: Outlier observations (as defined above) are conservatively removed from these damages calculations.

## A.      The Class Definition Is Objective

301.     The only potential criticism as it relates to how to calculate Aggregate Damages is by Dr. McCrary, who argues that the criteria for being in the proposed Class are "not objective."[654] Dr. McCrary proposes three sets of criteria to identify directors and above and concludes that the method I used to identify director and above positions is "arbitrary and subjective."[655] Dr. McCrary first argues that director and above jobs could be classified by job responsibilities, with inquiry needing to determine whether jobs are more "complex" than director jobs.[656] His second approach is to consider internal hierarchies, which he acknowledges DaVita already provides.[657] Third, he suggests that directors and above could be distinguished by pay.[658] I disagree with Dr. McCrary's claims and assessment, for several reasons.

302.     First, the "Directors and Above" language is the language that Defendants themselves used. ████████████████████████████████████

████████████████████████████████ [659] ██████████████████████

---

[654] McCrary Report Section 8 ("Plaintiffs Criteria For the Proposed Class Are Not Objective").
[655] McCrary Report ¶ 268.
[656] *Id.* ¶ 269.
[657] *Id.* ¶ 270.
[658] *Id.* ¶ 272.
[659] Ex. PX159 at SCA-DOJ-00152696 (emphasis added).



303.     Second, for DaVita, it is clear who is a Director and above, because they provided

such data. For SCA and USPI, the job titles are clearly labeled Director, VP, or SVP, or make it

clear that the job title is above Director (e.g., President, Executive).[664] For the few jobs that had

some ambiguity (e.g., CEOs), I asked for clarification from Defendants ███████████████

██████████████████████████████████████████████.[665] Dr. McCrary

specifically asks how I determined that "administrators" at SCA and USPI are in the category of

directors or above.[666] This question is surprising, given that USPI specifically confirmed that

Administrators were subject to the Agreement, and SCA clarified the Administrator

---

[660] Ex. PX304 at DOJCIV-008-00000302.
[661] Hayek Dep. at 317:13–21.
[662] Answer of Defendants United Surgical Partners International and Tenet Healthcare Corporation to Third Consolidated Amended Class Action Complaint (ECF No. 568), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed December 20, 2024 ¶ 50 ("USPI and Tenet admit USPI told certain executives, human resources employees, and recruiters to avoid actively soliciting SCA employees at the administrator level and above[.]").
[663] Ex. PX304 at DOJCIV-008-00000298.
[664] *See* McCrary Report App. E Ex. 1 for a list of job titles in the Class from USPI.
[665] Ex. PX304 at DOJCIV-008-00000302.
[666] McCrary Report ¶ 273 ("[Dr. Starr] includes 'administrator' job titles at USPI and SCA as class-relevant jobs, but how did he decide that administrators at SCA and at USPI are director level and above employees?").

responsibilities, making it clear that the job was above director level.[667]

304.    More broadly, if anything, the Class is too narrowly construed.

## X.    Market Power

305.    In my initial report I described how economists assess whether a firm has labor market power. In the literature on no-poach agreements, evidence that the no-poach agreements reduce compensation constitutes direct evidence of market power. For example, in the context of franchise no-poach clauses, LaFontaine et al. (2025) "find strong support for the hypothesis that NPCs [no-poach agreements] suppressed wages, an effect that suggests that they increased buyer

---

[667] *See* 2024-08-29 Ltr J. Wade to S. Zandi RE Structured Data ("SCA assigns the job title 'CEO' to the employee who leads an individual ambulatory surgical center or surgical hospital. SCA previously assigned the job title 'Administrator' for employees performing this role. The data reflect both job titles for this role, in both ambulatory surgical centers and surgical hospitals."). USPI also admitted that "it had an agreement with Surgical Care Affiliates … to avoid actively soliciting each other's employees at the level of administrator or above[.]" Answer of Defendants United Surgical Partners International and Tenet Healthcare Corporation to Third Consolidated Amended Class Action Complaint (ECF No. 568), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed December 20, 2024 ¶ 1. *See also* 2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions (in which USPI defines Administrators as being subject to the no-poach agreements. I use this list as a basis for the minimum of which positions were affected by the agreements.). USPI's internal recruiter Shannon McGarry similarly testified that she was given a "list of companies that [she] was not to actively solicit for [] CEO and administrator positions." *See* Deposition of Shannon McGarry (June 11, 2024) at 65:24–67:20.

*See also* Ex. PX159 at SCA-DOJ-00152696.

market power and limited workers' labor market opportunities."[668] Similarly, Gibson (2024) concludes in his study of Silicon Valley no-poach agreements that "On average the no-poaching agreements reduced salaries at colluding firms by 5.6 percent, consistent with considerable employer market power." ███████████████████████████

███████████████████████████████████████████

██████████████████████████████

306.     Aside from this direct evidence, I also described in Section V.A of my initial report how economists otherwise measure labor market power: by estimating the firm-specific labor supply elasticity. The labor supply elasticity summarizes how sensitive the firm's labor supply is to changes in the firm's wage. It mimics the hypothetical monopsonist test by studying how drops in compensation affect whether workers leave the firm. In a perfectly competitive market, a small drop in wages would result in no workers being willing to work for the firm, resulting in an infinite labor supply elasticity. If instead the labor supply elasticity is close to zero, then this suggests that the firm's supply of labor changes little when the firm cuts wages, thus giving the firm power to reduce wages below productivity. Given an estimate of the firm's labor supply elasticity, economists convert them into wage markdowns: i.e., what portion of worker productivity workers receive as compensation.

307.     Defendants' Experts do not object to the idea that a finding that the Challenged Conduct reduced compensation would constitute direct evidence of market power. Defendants' Experts also do not object to my discussion of how labor economists have estimated firm-level market power via labor supply elasticities.

---

[668] Lafontaine et al. (2025) at 35.

A. **Direct Evidence of Wage Suppression from the Challenged Conduct Shows Market Power**

308.

309.

B. **Defendants' Experts' Lightcast and Market Share Analyses Do Not Measure Market Power**

310. Defendants' Experts also argue that I did not define a "relevant antitrust labor market" and that in any such market Defendants do not have market power to sustain suppressed compensation.[670] To make this argument, they rely on Lightcast data, which purpotedly

---

[669] Johnson Report ¶ 184 ("

.

*See* Johnson Dep. at 196:9–15.

[670] Johnson Report ¶¶ 26–49, 143–144, 184–188; *id.* ¶ 185 ("First, Dr. Starr does not assess the competition Defendants face for the labor of relevant employees. A relevant antitrust labor market represents the area of effective competition within which a set of firms actively compete for the services of worker."); Saravia Report ¶¶ 21–23, 42, 70–103; McCrary Report ¶¶ 29–68, 107–112; *id.* ¶ 34 (

"); Stiroh Report ¶¶ 22–45; *id.* ¶ 26 ("

).

aggregates "anonymous data from millions of online professional profiles"[671] and aggregate market data on the Defendants' industry to calculate what portion of industry employment is derived from Defendants' employees.[672] With the Lightcast data, Defendants' Experts attempt to document where Defendants hire from and where workers go when they leave Defendants.[673] Defendants' Experts conclude from these analyses that Defendants do not hold a substantial share of employees in the market, and that Defendants compete with many different types of companies, including from different industries.[674] From these analyses, Defendants' Experts uniformly conclude that Defendants do not have market power.[675]

311.    Setting aside the flaws in the Lightcast data that lead them to systematically overcount the number of competitors, as I discussed in Section VI.B.2.c, Defendants' Experts' claims that Defendants lack market power are meritless. Not only do their claims reflect an ignorance of the modern labor economics literature, but the analyses that form the basis for their claims cannot, by construction, support a definitive characterization about the extent to which Defendants have labor market power.

---

[671] *Id.*; *see also Overview*, LIGHTCAST, https://lightcast.io/products/data/overview (last visited June 2025). The Lightcast website also states that its profile data comes from many other sources, including "publicly available information on the web, third-party resume databases and job boards, the recruiting industry, opt-in data from employers and applicant tracking systems, sales and marketing CRM databases, and various consumer/identity databases." *See* Lightcast Data: Basic Overview, available at https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview (last visited June 2025).

[672] Johnson Report ¶ 47 ("Plaintiffs' experts also do not assess the Defendants' share of employment within the industries that they suggest are relevant."); Johnson Report Ex. 8; Stiroh Report Figure 7; McCrary Dep. at 146:23–149:19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.).

[673] *See, e.g.,* Saravia Report Exs. 8, 9, 10, and 12. *See also* Johnson Report Exs. 4 and 5, Stiroh Report Figures 1–6, and McCrary Report Exs. 1–5.

[674] Johnson Report ¶ 48 and Ex. 8; Stiroh Report Figure 7 and ¶ 44 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[675] Saravia Report ¶ 78 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

a. As a preliminary matter, Defendants' Experts' claims about the necessity of defining a relevant antitrust market to determine market power are misguided.[676] None of the studies examining whether no-poach agreements or noncompete agreements suppress compensation define a relevant labor market or count the number of unique employers a firm's workers are hired from or leave to. Instead, like I do here, they are focused on identifying the causal effect of such Conduct on compensation, which does not require defining a market, studying market shares or mobility patterns. Thus, as a general matter, Defendants' Experts' proclamations about the need to define a relevant labor market are misplaced and unnecessary.

b. Defendants' Experts claim that I failed to analyze the outside employment options for Senior-Level Employees beyond the Defendants.[677] I did not do so because 1) I was not asked to do so,[678] and because 2) analyzing outside employment options is *not necessary* to establish that the Defendants collectively wield market power over Class Members.[679] ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

312. More broadly, Defendants' Experts' market share and Lightcast analyses belie their misunderstanding of how labor markets work and the modern labor economics literature. As reviewed in Section V.A. of my initial report, modern labor economists understand that labor

---

[676] Johnson Report ¶¶ 27 n.47, 47; Saravia Report ¶¶ 76, 152–153; McCrary Report ¶¶ 33, 335; Stiroh Report ¶¶ 27–29.

[677] Johnson Report ¶¶ 26–49, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 32, 52–59, 107–112; Stiroh Report ¶¶ 22–45.

[678] Starr Report ¶ 11.

[679] *Id*. ¶ 196 ("Market power can be directly established if there is evidence of the ability of firms to suppress wages below competitive levels. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮").

markets are frictional.[680] Just because an individual is able to move from Firm A to Firm B does not mean that Firm B is willing to make an offer to every worker at Firm A, or that Firm A is willing to make an offer to every worker from Firm B. As Dr. McCrary testified, "it's hard to think of any two workers as being exactly alike and interchangeable, particularly for proposed class members."[681] This core idea has important implications for Defendants' Experts' conclusions as it relates to their employment share and Lightcast analyses.

313. ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████[682] This is an illusion. The fact that a firm employs only a small fraction of a market does not mean that the firm does not have market power. In fact, in some search and matching models, a smaller share of the market is indicative of higher monopsony power.[683] This is because the firms that optimally choose to pay low wages end up extracting more value from each worker, but they lose workers more frequently than the higher paying firms, and so they end up staying small. A recent discussion on how these "concentration" measures relate to market power by Jha et al. (2025) echoes these ideas:[684]

> Although concentration measures like HHI are widely used, theoretical considerations suggest important limitations. In Burdett and Mortensen (1998), for example, an increase in the job offer rate—a sign of greater competition—can lead to higher concentration, as larger or more productive firms attract and retain a disproportionate share of workers. Similarly, in markets characterized by monopsonistic competition, firms may be atomistic and hold small market shares, yet still possess significant wage-

---

[680] Starr Report Section V.A.
[681] McCrary Dep. at 74:19–23.
[682] Stiroh Report ¶ 43 ████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████ ").
[683] *See* Burdett & Mortensen (1998).
[684] Priyaranjan Jha, Jyotsana Kala, David Neumark, & Antonio Rodriguez-Lopez, *City Size, Monopsony, and the Employment Effects of Minimum Wages*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 30570 (May 2025) [hereafter Jha et al. (2025)] at 1.

setting power (e.g., Jha and Rodriguez-Lopez, 2021). In these cases, HHI fails to accurately capture the degree of monopsony power. Finally, a market with many establishments could still be monopsonistic if workers rarely move, while a concentrated market may not always imply high monopsony power if workers can easily switch jobs.

314. The economics literature also emphasizes that employment shares are misleading because they do not indicate the amount of *opportunities* in the market available to workers. In standard search and matching models, when no firm hires, the equilibrium outcome is monopsony—even in the presence of many potential competitors.[685] The Jha et al. (2025) quote above emphasizes this when they write that "a market with many establishments could still be monopsonistic if workers rarely move."[686] This finding is known as the Diamond Paradox, and recent research highlights how mobility restrictions push labor markets towards monopsony even when there are many competitors.[687] The literature on concentration in labor markets has acknowledged that what matters for studying market power are opportunities, not employment shares. And when using vacancies to measure opportunities, they find that many labor markets are in fact concentrated.[688]



[689]

---

[685] Manning (2003). *See also* McCrary Dep. at 47:5–48:12 ("If there is a single firm which is the buyer of goods for which there are not substitutes," Dr. McCray agrees "that monopsonist [is] a price setter[.]").

[686] Jha et al. (2025) at 1.

[687] *See* Axel Gottfries & Gregor Jarosch, *Dynamic Monopsony with Large Firms and Noncompetes*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 31965 (2023) at 2 ("When some firms introduce noncompetes this reduces competition along the job ladder and spills over to all other firms in the market. In the limit where all firms can offer noncompetes, the Diamond (1971) equilibrium reappears, and wages collapse. This shows that the widespread adoption of noncompetes can sharply hurt workers by undermining labor market competition.").

[688] *See* José Azar, Ioana Marinescu, & Marshall Steinbaum, *Labor market concentration*, 57(S) JOURNAL OF HUMAN RESOURCES S167–S199 (2022).

[689] *See* Arindrajit Dube, Jeff Jacobs, Suresh Naidu, & Siddharth Suri, *Monopsony in Online Labor Markets*, 2(1) AMERICAN ECONOMIC REVIEW: INSIGHTS 33–46 (2020).

315. The idea that labor markets are frictional also has implications for what we can learn from the Lightcast analyses Defendants' Experts perform. Defendants' Experts contend that by hiring from different industries and different employers that Defendants could not possibly suppress compensation.[690] However, Defendants' Experts once again ignore the fact that labor markets reflect a search and matching process, not a spot market where employers are simultaneously and continuously submitting bids for workers. As before, a key insight is that because a worker leaves Firm A and joins Firm B, that does not mean that Firm A is willing to make an offer to all of Firm B's employees, that Firm A's workers would take them, or vice versa. Indeed, it's possible that Firm B only had one vacancy and does not make any other offers to Firm A. As before, what matters for the extent of market power is the rate of job offers, not the number or type of moves. Indeed, whatever the extent of those moves, it need not prevent companies from suppressing even starting compensation. Evidence that no-poach agreements and noncompete clauses suppress starting compensation, including in this case, was reviewed in Section VII.C.8. This section highlights that fast-food no-poach agreements and high tech noncompete clauses, and the Challenged Conduct in this case suppressed *starting compensation*. This evidence directly contradicts and invalidates Defendants' Experts' many claims that the external competition would prevent the Challenged Conduct from suppressing pay.

316. ███████████████████████████████████████████

████████████████████████████████████████████████

██████████[691] Based on their Lightcast data analyses, Defendants' Experts conclude that

---

[690] Johnson Report ¶¶ 37–43; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 115–128; Stiroh Report ¶¶ 22–55.
[691] Johnson Report ¶ 26; McCrary Report ¶¶ 20, 34–36 & n.38, 42–59, 111. *See also,* McCrary Report Section 2.1.2 ("Proposed Class Members Participate in Different Labor Markets with Widely Varying Employment Options, Including Many Non-Defendant, and Even Non-Healthcare, Firms") and Section 2.1.3 ("Proposed Class Members Have Widely Varying Skills and Preferences").

Defendants "Lack Market Power Sufficient to Suppress Pay for Many or Most (if Not All) Proposed Class Members."[692] I do not dispute the broad idea that individuals might differ in the types of jobs they would consider, or where geographically they would consider working, such that the scope of the outside labor market options might differ across different employees. But the fact that labor market options might be different for different workers does not imply that Defendants do not have market power and it does not imply that the Challenged Conduct did not suppress compensation. Rather, the evidence in Section VIII broadly, and Section VIII.G specifically, fully rebuts Dr. Johnson's and Dr. McCrary's arguments. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ .

317.    Finally, and in general, Defendants' Experts' Lightcast analysis is not capable of measuring whether Defendants have market power. This is because labor market power is about how sensitive labor supply is to changes in the wage. If wages were to go down, as in a hypothetical monopsonist test, then how much would labor supply fall? Defendants' Experts' Lightcast analyses—measuring labor market employment shares and mobility patterns—cannot answer this question, because their analyses do not even incorporate any variation in wages, and they do not estimate the Defendants' labor-supply elasticities. They may show mobility patterns, but they do not estimate how those mobility patterns are sensitive to the firm's wage. Without

---

[692] McCrary Report Section 2.1.4.

this, Defendants' Experts' Lightcast analyses are fundamentally incapable of showing that Defendants have no labor market power.[693] All they can do is speculate.

318. Moreover, Defendants' Experts do acknowledge that Defendants do have some degree of market power.[694] Indeed, any conclusion otherwise is illogical in light of existing evidence on the effects of no-poach and noncompete agreements in more competitive labor markets and evidence estimating labor supply elasticities precisely in the healthcare setting.

a. If prior studies find that no-poach agreements in the fast-food and franchise chain context give firms additional labor market power, or that no-poach agreements give firms additional labor market power over high-tech workers, then why would we think that the answer would be any different in the context of Senior-Level Employees in the Outpatient Medical Services context? Defendants' Experts do not even review or discuss this prior literature on no-poach agreements, let alone provide any guidance as to why we would expect the

---

[693] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ McCrary Dep. at 150:23–151:11. I disagree that Dr. McCrary's analysis of Lightcast data is reflective of the hypothetical monopsonist test. The hypothetical monopsonist test begins with a "small but significant and nontransitory" reduction in wages. *See e.g.*, Suresh Naidu et al*., Antitrust Remedies for Labor Market Power,* 132 HARV. L. REV. 536, 557 (2018) *("*To determine market definition, we can use, by analogy to the "hypothetical monopolist test" used in product market analysis, a hypothetical monopsonist test. Under this test, the analyst asks whether a single monopsonist — in this case, a single hypothetical firm that employs all specialists who live in this town (rather than the actual four firms, acting independently) — could reduce wages by a "small but significant and non-transitory" amount, what we call the small but significant and non-transitory decrease in wages (SSNDW) test.*").* Yet, Dr. McCrary testified that he did not review compensation data from Defendants, either on its own or as part of his Lightcast analysis (McCrary Dep. at 165:11–166:3). Because Dr. McCrary's Lightcast analyses, just like the other Defendants' Lightcast analyses, do not examine changes in wages, none of their Lightcast analyses are consistent with a hypothetical monopsonist test. Indeed, in their reports none of Defendants' Experts characterize their Lightcast analyses as reflecting a Hypothetical Monopsonist Test. ███████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ cCrary Dep. at 64:12–65:12.).

[694] Johnson Report ¶ 27; Johnson Dep. at 190:17–23 █████████████████ ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ), 267:11–16; Saravia Report ¶ 38 n.36; Saravia Dep. at 82:22–84:17; McCrary Report ¶¶ 53–59, 145; McCrary Dep. at 74:19–23; Stiroh Report ¶ 38 ██████████████████████████████████████████████ ).

Outpatient Medical Services industry to behave differently. If anything, the labor market for fast-food employees is likely to be even more competitive than the much thinner market for Senior-Level Employees in Outpatient Medical Care industry. Yet even for fast-food workers, no-poach agreement suppress compensation. Thus, whatever the results of Defendants' Experts' Lightcast analysis, they are insufficient to make claims about market power.

b.      Similarly, Defendants' Experts argue that because individuals leave Defendants for jobs in different industries that Defendants cannot have market power.[695] This argument is without merit and is clearly rebutted by the academic literature.

.[696] Indeed, when hiring, Defendants often specifically asked candidates how many years of healthcare experience they had.[697] Thus, healthcare-specific experience and expertise is clearly valued, and many departing Senior Employees do stay in the healthcare field. Second, the academic literature shows that the fact that workers move between industries is generally insufficient to claim that mobility constraints do not give firms market power. For example, in Lipsitz and Starr (2021) we show that low-wage workers are the most likely to switch industries when they change jobs.[698]

---

[695] Johnson Report ¶¶ 27–49, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 37–68, 107–112, 196, 198; Stiroh Report ¶¶ 22–45.

[696] Saravia Report Ex. 9. Note that this table is misleading because it groups together all non-healthcare industries instead of breaking them out. Even with this, Saravia Report Ex. 9 shows that nearly the same number of workers depart to Healthcare specifically as they do to all other non-Healthcare industries (setting aside the unclassified industry category).

[697] USPI_CIV_000422931 at -936 (The bottom of page six of an employment application for a USPI VP Development job asks "How many years of healthcare experience do you have?").

[698] *See* Michael Lipsitz & Evan Starr, *Low-wage workers and the enforceability of noncompete agreements*, 68(1) MANAGEMENT SCIENCE 143–170, 143 (2022) at Figure 1.

██████████████████████████████████████████████. Indeed, that is precisely what I find even in the Accounting, Tax, and Treasury specialty, which per Dr. McCrary is the most likely specialty to come from or go to a different industry.[699]

     c.     Prior literature already provides some estimates of labor market power in the healthcare industry. Webber (2015) estimates firm-level labor supply elasticities according to each industry, and finds that the average healthcare services company faces a labor supply elasticity of just 0.78. A labor supply elasticity of 0.78 implies that the typical healthcare employer enjoys a substantial degree of labor maker power, with workers earning just 56 percent of their productivity, for a markdown of 44 percent. A 44 percent markdown reflects substantial market power, and is indeed the second-highest level of market power across all industries.[700]

     d.     To rebut my claim that Defendants do wield labor market power, Defendants' Experts could have followed the academic literature and estimated labor supply elasticities for Senior-Level Employees. They did not do so. Instead, they offer speculative claims unmoored from a modern understanding of labor markets.

## XI.    Conclusions

319.    Having reviewed the Reports and workpapers of Defendants' Experts, I am not persuaded to alter any conclusion in my initial report. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[699] McCrary Report Ex. 5.
[700] Webber (2015) Table 7 (only Administrative Support has a lower elasticity of labor supply than Healthcare and Social Assistance at 0.72).

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

320.     ███████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████

\*     \*     \*

Dated: June 30, 2025                    Respectfully submitted,

_Evan P. Starr_

Evan P. Starr

**PROOF OF SERVICE**

I, Sarah D. Zandi, an attorney, hereby certify that on June 30, 2025, I served a true and

correct copy of the foregoing **Updated Rebuttal Expert Witness Report of Dr. Evan P. Starr**

by electronic mail upon the following parties as set forth below:

| | |
|---|---|
| Kenneth M. Kliebard<br>Staci M. Holthus<br>MORGAN, LEWIS & BOCKIUS LLP<br>110 North Wacker Drive<br>Chicago, IL 60606<br>(312) 324-1000<br>Kenneth.kliebard@morganlewis.com<br>Staci.holthus@morganlewis.com | Jeffrey C. Bank<br>Brian J. Smith<br>Jordanne Steiner<br>WILSON SONSINI GOODRICH &<br>ROSATI, P.C.<br>1700 K Street NW, Fifth Floor<br>Washington, DC 20006<br>(212) 497-7761<br>jbank@wsgr.com<br>brian.smith@wsgr.com<br>jordanne.miller@wsgr.com |
| Amy B. Manning<br>MCGUIREWOODS LLP<br>77 West Wacker Drive<br>Suite 4400<br>Chicago, IL 60601-7567<br>amanning@mcguirewoods.com | Veronica Moyé<br>KING & SPALDING LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br>(215) 556-2100<br>vmoye@kslaw.com |
| Jeffrey E. Stone<br>Katharine M. O'Connor<br>MCDERMOTT, WILL & EMERY LLP<br>444 West Lake Street, Suite 400<br>Chicago, IL 60605<br>(312) 372-2000<br>jstone@mwe.com<br>**koconnor@mwe.com** | Molly Moriarty Lane<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Market<br>Spear Street Tower<br>San Francisco, CA 94105-1596<br>(415) 442-1000<br>Molly.lane@morganlewis.com |

Dated: June 30, 2025          Respectfully submitted,

*/s/ Sarah D. Zandi*
Sarah D. Zandi

3244633.4          259

## APPENDIX A

## Materials Relied Upon Include the Following:

### I.   PAPERS, BOOKS, AND WEBSITES

A. Colin Cameron & Douglas L. Miller, *A Practitioner's Guide to Cluster-Robust Inference*, 50(2) Journal of Human Resources 317–372 (2015)

Alan Manning, *Imperfect Competition in the Labor Market*, Handbook of Labor Economics 973–1041 (2011)

Alan Manning, Monopsony in motion: Imperfect Competition in Labor Markets (Princeton University Press 2003)

Alberto Abadie, Susan Athey, Guido W. Imbens, & Jeffrey M. Wooldridge, *When should you adjust standard errors for clustering?*, 138 Quarterly Journal of Economics 1–35 (2023)

American Bar Association, Proving Antitrust Damages (2017)

Anthony J. Nyberg, Ingrid Smithey Fulmer, Barry Gerhart, & Mason A. Carpenter, *Agency theory revisited: CEO return and shareholder interest alignment*, 53(5) Academy of Management Journal 1029–1049 (2010)

Arindrajit Dube, Jeff Jacobs, Suresh Naidu, & Siddharth Suri, *Monopsony in Online Labor Markets*, 2(1) American Economic Review: Insights 33–46 (2020)

Arthur S. Goldberger, A Course in Econometrics (Harvard University Press 1991)

Arturs Kalnins, *Multicollinearity: How common factors cause Type 1 errors in multivariate regression*, 39 Strategic Management Journal 2362–2385 (2018)

*Author Guidelines*, Strategic Management Journal (updated June 8, 2023), https://onlinelibrary.wiley.com/pb-assets/assets/10970266/SMJ%20Author%20Instructions%2006%2008%2023%20FINAL-1686755077677.pdf

Axel Gottfries & Gregor Jarosch, *Dynamic Monopsony with Large Firms and Noncompetes*, National Bureau of Economic Research, Working Paper No. 31965 (2023)

Barry A. Gerhart & George T. Milkovich, *Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm*, *in* 23 Pay Equity: Empirical Inquiries (R. Michael, H. Hartmann, & B. O'Farrell Eds. 1989)

Barry Gerhart, *Gender differences in current and starting salaries: The role of performance, college major, and job title*, 4(43) ILR Review 418–433 (1990)

*Baylor University Medical Center, part of Baylor Scott & White Health*, Baylor Scott & White Health, https://www.bswhealth.com/locations/hospital/dallas (last visited June 2025)

Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings*, Review of Economics and Statistics 1–35 (2024)

Brian J. Hall and Jeffrey B. Liebman, *Are CEOs really paid like bureaucrats?*, 113(3) Quarterly Journal of Economics 653–691 (1998)

Carlos Cinelli et al., *A crash course in good and bad controls*, 53 Sociological Methods & Research 1–30 (2022)

Catherine Clifford, *Meet the 3 co-founders who built the jobs website that just sold for more than $1 billion*, CNBC (May 9, 2018), https://www.cnbc.com/2018/05/09/meet-founders-of-glassdoor-sold-to-recruit-holdings-for-1-point-2-billion.html

*Center for Minimally Invasive Surgery*, Center for Minimally Invasive Surgery, https://cmisurgery.com/ (last visited June 2025)

Clément De Chaisemartin & Xavier d'Haultfoeuille, *Difference-in-differences estimators of intertemporal treatment effects*, Review of Economics and Statistics 1–45 (2024)

Costas Meghir and Luigi Pistaferri, *Earnings, Consumption, and Life Cycle Choices*, *in* Handbook of Labor Economics 773–854, 813 (Orley Ashenfelter & David Card eds. Vol. 4B 2011)

*DaVita Redwoods Program*, DaVita, https://www.redwoods.davita.com/ (last visited June 2025)

Douglas A. Webber, *Firm market power and the earnings distribution*, 35 Labour Economics 123–134 (2015)

*Editorial Calls Time on 'Statistically Significant' in Research*, American Statistical Association, https://www.amstat.org/news-listing/2021/10/08/editorial-calls-time-on-statistically-significant-in-research (last visited June 2025)

Eitan Itzkowitz, *Taxes on Equity*, Carta (Apr. 1, 2025), https://carta.com/learn/equity/equity-taxes/

Eric Siegel, *Why eating ice cream is linked to shark attacks*, Big Think, https://bigthink.com/the-present/correlation-causation/ (last visited June 2025)

Eric W. Wilfers et al., *SEC's New Pay Versus Performance Disclosure Rule: Important Things To Know*, Harvard Law School Forum on Corporate Governance (Oct. 28, 2022), https://corpgov.law.harvard.edu/2022/10/28/secs-new-pay-versus-performance-disclosure-rule-important-things-to-know/

Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72(4) ILR Review 783–817 (2019)

Fabien Postel-Vinay & Jean-Marc Robin, *To match or not to match?: Optimal wage policy with endogenous worker search intensity*, 7 Review of Economic Dynamics 297–300 (2004)

*Federal Wage System Regular and Special Production Facilitating Wage Rate Schedules for the Dallas-Fort Worth, Texas (DFW) Wage Area*, Defense Civilian Personnel Advisory Service (Jan. 2, 2025), https://wageandsalary.dcpas.osd.mil/Content/AF%20Schedules/survey-sch/131/131R-02Jan2025.pdf

*Federal Wage System*, U.S. Office of Personnel Management, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/#url=Overview (last visited June 2025)

Francine Lafontaine, Saattvic Saattvic, & Margaret Slade, *No–Poaching Clauses in Franchise Contracts: Anticompetitive or Efficiency Enhancing*, SSRN (Feb. 18, 2025)

*General Schedule*, U.S. Office of Personal Management, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited June 2025)

*Glassdoor Announces Salary Estimates, Find Out What a Job Pays Before Applying*, Glassdoor (Feb. 9, 2017), https://www.glassdoor.com/blog/salary-estimates-announcement/

Honey Batra, Amanda Michaud, & Simon Mongey, *Online job posts contain very little wage information*, National Bureau of Economic Research, Working Paper No. 31984 (2023)

Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach (South-Western 5th ed. 2013)

José Azar, Ioana Marinescu, & Marshall Steinbaum, *Labor market concentration*, 57(S) Journal of Human Resources S167–S199 (2022)

Kenneth Burdett & Dale T. Mortensen, *Wage Differentials, Employer Size, and Unemployment*, 39(2) International Economic Review 257–273 (1998)

Kevin Caves & Hal Singer, *Econometric Tests for Analyzing Common Impact*, 26 Law and Economics of Class Actions 135–160 (2014)

*Lightcast Data: Basic Overview, Lightcast, https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview (last visited June 2025).*

Margaret Levenstein & Valerie Suslow, *What Determines Cartel Success?*, 44(1) Journal of Economic Literature 43–95 (2006)

Marianne Bertrand, Esther Duflo, & Mullainathan Sendhil, *How much should we trust differences-in-differences estimates?*, 119 Quarterly Journal of Economics 249–275 (2004)

Matthew Gibson, *Employer Market Power in Silicon Valley*, Upjohn Research (2024)

Michael Lipsitz & Evan Starr, *Low-wage workers and the enforceability of noncompete agreements*, 68(1) Management Science 143–170 (2022)

Michael O. Finkelstein, Basic Concepts of Probability and Statistics in the Law (Springer 1st ed. 2009)

Natarajan Balasubramanian et al., *Locked in? The enforceability of covenants not to compete and the careers of high-tech workers*, 57(S) Journal of Human Resources S349–S396 (2022)

*North American Industry Classification System, Year 2022*, United States Census Bureau, https://www.census.gov/naics/?input=621&year=2022&details=621 (last visited June 2025)

*North American Industry Classification System, Year 2022, Details 6214 Code*, United States Census Bureau, https://www.census.gov/naics/?input=6214&year=2022&details=6214 (last visited June 2025)

*Overview*, Lightcast, https://lightcast.io/products/data/overview (last visited June 2025)

Paul Hünermund & Beyers Louw, *On the Nuisance of Control Variables in Causal Regression Analysis*, 28(1) Organizational Research Methods 138–151 (2025)

*Pay & Leave*, U.S. Office of Personal Management, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/25Tables/html/RUS.aspx (last visited June 2025)

Peter Kennedy, A Guide to Econometrics (Blackwell Publishing 6th ed. 2008)

Pierre Cahuc, Fabien Postel-Vinay, & Jean-Marc Robin, *Wage Bargaining with On-the-job Search: Theory and Evidence*, 74(2) Econometrica 323–364 (2006)

Priyaranjan Jha, Jyotsana Kala, David Neumark, & Antonio Rodriguez-Lopez, *City Size, Monopsony, and the Employment Effects of Minimum Wages,* National Bureau Of Economic Research, Working Paper No. 30570 (May 2025)

Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 107 Quarterly Journal of Economics 439–479 (1992)

Robert Pindyck & Daniel Rubinfeld, Econometric Models and Economic Forecasts (Irwin McGraw-Hill 1998).

Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70(2) The American Statistician 129–133 (2016)

Scott Cunningham, Causal Inference: the Mixtape (Yale University Press 2021)

*SEC Adopts Pay Versus Performance Disclosure Rules*, U.S. Securities and Exchange Commission (Aug. 25, 2022), https://www.sec.gov/newsroom/press-releases/2022-149

*Slope Hypothesis Testing*, XKCD, *https://xkcd.com/2533/* (last visited June 2025).

*Social Profile Data*, Lightcast, https://lightcast.io/products/data/overview (last visited June 2025)

Suresh Naidu et al*., Antitrust Remedies for Labor Market Power,* 132 Harv. L. Rev. 536 (2018)

Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do firms value court enforceability of noncompete agreements? A revealed preference approach*, Review of Economics and Statistics 1–47 (2024)

Thomaz Teodorovicz, Prithwiraj Choudhury, & Evan Starr, *Location-specificity and relocation incentive programs for remote workers*, 36(1) Organization Science 186–212 (2025)

Zoe B. Cullen, Shengwu Li, & Ricardo Perez-Truglia, *What's My Employee Worth? The Effects of Salary Benchmarking*, National Bureau of Economic Research, Working Paper No. 30570 (Aug. 2024)

## II.  EXPERT REPORTS, DEPOSITION TRANSCRIPTS AND EXHIBITS, AND DOCUMENTARY EVIDENCE

I was provided access to all Expert Reports, deposition transcripts and exhibits, and all documents produced in the case. The following are among the materials I relied upon:

**Expert Reports (in alphabetical order)**

Expert Report of Celeste Saravia, Ph.D. (Apr. 16, 2025)

3244633.4                                              264

Expert Report of Dr. John H. Johnson, IV (Apr. 16, 2025)

Expert Report of Justin McCrary, Ph.D. (Apr. 16, 2025)

Expert Report of Lauren J. Stiroh, Ph.D. (Apr. 16, 2025)

Expert Witness Report of Dr. Barry Gerhart (Jan. 15, 2025)

Expert Witness Report of Dr. Evan P. Starr (Jan. 15, 2025)

**Deposition Transcripts (in alphabetical order)**

30(b)(6) Deposition of Surgical Care Affiliates, LLC, By and Through its Corporate Designee, Brian Rasco (Nov. 26, 2024)

Deposition of Alex Bateman (Jul. 19, 2024)

Deposition of Andrew Patrick Hayek (Sept. 18, 2024)

Deposition of Anthony Kilgore (Oct. 22, 2024)

Deposition of Bill Wilcox (Sept. 24, 2024)

Deposition of Brian Mathis (Sept. 20, 2024)

Deposition of Bridget A. Fanning, Ph.D. (Jul. 14, 2024)

Deposition of Celeste Saravia, Ph.D. (May 9, 2025)

Deposition of Cindy English (June 12, 2024)

Deposition of Evan P. Starr, Ph.D., Vol. 1 (Mar. 19, 2025)

Deposition of Evan P. Starr, Ph.D., Vol. 2 (Mar. 20, 2025)

Deposition of John Johnson, Ph.D. (May 7, 2025)

Deposition of Joshua Golomb (Aug. 28, 2024)

Deposition of Justin McCrary (June 12, 2025)

Deposition of Lauren Stiroh (May 29, 2025)

Deposition of Leslie Wachsman (May 22, 2024)

Deposition of Mark Garvin (May 30, 2024)

Deposition of Michael Rucker (Aug. 27, 2024)

Deposition of Sandi Karrmann (Aug. 14, 2024)

Deposition of Shannon McGarry (June 11, 2024)

Deposition of Shannon Mosley (Aug. 13, 2024)


**Defendants' Structured Data Files**

DaVita
DVA_OMCEAL_000000029–47
DVA_OMCEAL_000000047
DVA_OMCEAL_000902589–91
DVA_OMCEAL_000902592
DVA_OMCEAL_001182111
DVA_OMCEAL_001408533
DVA_OMCEAL_001408536
DVA_OMCEAL_001408539
DVA_OMCEAL_001408542–44
DVA_OMCEAL_001408547
DVA_OMCEAL_001408550
DVA_OMCEAL_001408829
DVA_OMCEAL_001421632–35
DVA_OMCEAL_001421640DVA_OMCEAL_001421733
2022-8-3 Ltr SDZ to DaVita RE Structured Data Questions
2022-8-24 Ltr R Quinto to Pls. RE DaVita 1RFP Structured Data
2022-11-22 Ltr R. Quinto to LYC & SDZ RE DaVita RFP Responses
2023-7-26 - Letter to DaVita re structured data questions
2023-10-5 - DaVita Ltr re structured data
2024-03-27 Ltr to S. Zandi re 2-28-24 Letter
2024-03-27 Ltr to S. Zandi re Structured Data Questions from 2-7-24 Letter
2024-09-30 Ltr to S. Zandi re structured data questions from 7-19-24 Ltr
2024-10-25 Ltr to S. Zandi re 10-1-24 and 7-19-24 Letters
2024-11-07 Ltr to S. Zandi re structured data questions from 7-30-24 Ltr
2024-12-19 Ltr to S. Zandi re structured data questions from 11-27-24 Ltr

SCA
2021 Teammate Roster


3244633.4                                              266

2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data

2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions

CheckSumm

CheckSummHE

Check History Hours and Earnings

EEmploy

EJob

SCA Hashed SSNs

SCA - Structured00000005

SCA - Structured00000013

SCA-Structured00000007

SCA-Structured00000009

SCA-Structured00000010

SCA-Structured00000011

SCA-Structured00000012

Teammate Roster Point In TimeTermed in 2021

2022-1-21 Ltr C. Ventura to Y. Salahi re Structured Data Sample

2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data

2022-4-21 Letter from C. Ventura to L. Chan re 4-20-22 IT Rep Meet & Confer

2022-9-16 Ltr. C. Ventura to S. Zandi RE Structured Data

2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions

2024.08.29 - Letter from J. Wade to S. Zandi re structured data

2024.10.11 - Letter from J. Wade to S. Zandi re structured data

2024-03-13 Letter from T. Rothman to S. Zandi re Response to Plaintiffs' 2-7 Letter

2024-3-6 Ltr T. Rothman to S. Zandi RE Response to Pls' 2-28 Letter

2024-11-13 Ltr J. Wade to S. Zandi RE SCA Structured data

USPI

2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions

2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes

4.19.24 Paygroup location

Exhibit A_Paygroup_Location

Exhibit B_ERNCD Values

USPI_CIV_000021819

USPI_CIV_000422931

USPI_CIV_000659222–33

USPI_CIV_000659234

USPI_CIV_001168726

2022-6-1 Ltr K Limarzi to Plaintiffs Encl USPI Doc Prod Vol004

2022-7-28 - LYC Letter to USPI re structured data questions – LYC

2022-12-2 Ltr K Limarzi to Pls RE USPI Responses & Objs to RFPs

2023.09.26 - K. Limarzi Ltr. re Structured Data Productions

2023-1-25 Ltr K. Limarzi to Plaintiffs RE USPI Responses & Objs to RFPs

2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions

2024.03.27 Ltr from USPI to Plaintiffs re 2.7 Ltr

2024.03.27 Ltr from USPI to Plaintiffs re 2.28 Ltr

2024.04.08 USPI Suppl Ltr to Plaintiffs re 2.7 ltr

2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter

2024.12.12 Ltr to Plaintiffs re Reporting Structure

2024-10-1 Ltr SDZ to USPI re Structured Data Question

2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions

2025.01.06 USPI Resp to Pls 11.22.24 Ltr re Structured Data

2024.11.18 USPI Production - Vol. 27

**Deposition Exhibits (in ascending order by exhibit number)**

DOJCIV-008-00000423

DVA_OMCEAL_000385858

DVA_OMCEAL_001329256

Ex. PX36

Ex. PX119

Ex. PX120

Ex. PX158

Ex. PX159

Ex. PX232

Ex. PX283

Ex. PX304

Ex. PX305

Ex. PX313

Ex. PX314

Ex. PX316

Ex. PX340

3244633.4                                      268

**Deposition Exhibits (in ascending order by exhibit number)**

Ex. PX376

Ex. PX484

Ex. PX485

Ex. PX489

Ex. PX490

Ex. PX501

Ex. PX507

Ex. PX523

Ex. PX566

Ex. PX597

SCA000160352

SCA000484054

SCA000629524

SCA000630035

SCA001395985

SCA001669270

USPI_CIV_000000442

USPI_CIV_000007019

USPI_CIV_000026885

USPI_CIV_000167345

USPI_CIV_000242381

**Deposition Exhibits (in ascending order by exhibit number)**

USPI_CIV_000243441

USPI_CIV_000290705

USPI_CIV_000401250

USPI_CIV_000422931

USPI_CIV_000514831

USPI_CIV_000624407

## III. LEGAL DOCUMENTS

2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions

2024-2-7 Ltr SDZ to DaVita RE Structured Data Questions

2024-2-7 Ltr SDZ to SCA RE Structured Data Questions

2024-2-7 Ltr SDZ to USPI RE Structured Data Questions

2024-2-20 Email SDZ to DaVita RE Structured Data Questions

2024-2-20 Email SDZ to SCA RE Structured Data Questions

2024-2-20 Email SDZ to USPI RE Structured Data Questions

2024-3-13 Ltr T. Rothman to S. Zandi RE Response to Plaintiffs' 2-7 Letter

2024-3-27 Ltr J Barrett to SDZ RE USPI Structured Data 2.7 Ltr

2024-3-27 Ltr M Lane to SDZ RE DaVita 2022-23 Structured Data

2024-4-3 Ltr SDZ to Ds RE Structured Data

2024-5-29 Email SDZ to DaVita & SCA RE 2022 Structured Data

2024-08-29 Ltr J. Wade to S. Zandi RE Structured Data

Answer of Defendants United Surgical Partners International and Tenet Healthcare Corporation to Third Consolidated Amended Class Action Complaint (ECF No. 568), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed December 20, 2024

2nd Am. Class Action Compl. (ECF 101), *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.)

3rd Am. Class Action Compl. (ECF No. 555), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed October 27, 2024

*Chen-Oster v. Goldman, Sachs & Co.*, No. 1:10-cv-6950 (S.D.N.Y. Mar. 10, 2015)

Indictment, *United States v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, No. 3:21-cr-0011-L (N.D. Tex. Jan. 5, 2021)

Plaintiffs' Mot. to Compel SCA to Perform Supp. ESI Search, Dkt. No. 419

**APPENDIX B**

| Employee | Company, Job Title (Years) |
|---|---|
| Jeff Andrews | USPI, Administrator (2005–2008), Regional VP (2009–2010), Market President (2010–2020) |
| Alex Bateman | DaVita, Senior Financial Analyst, Mergers and Acquisitions (2005); DaVita, Manager (2008); USPI, Regional Vice President ("VP") (2008–2010); USPI, Market President (2011–2020) |
| Tony Blake | DaVita, Director (2006–2009), Vice President (2010–2012) |
| Jason Cagle | USPI, VP (2005–2010); USPI, Senior Vice President ("SVP") (2010–2013); USPI, Chief Financial Officer ("CFO"), (2013–2020) |
| Peter Clemens | SCA, EVP and CFO (2011–2015), SCA, Senior Advisor (2015–2017) |
| Cindy English | USPI, VP Financial Operations (2007–2019) |
| Bridie Fanning | SCA, Chief Talent Officer (2014–2016) |
| Mark Gildea | DaVita, SVP of Operations (2005–2015) |
| Joshua Golomb | DaVita, General Manager-DaVita Rx (2005, 2014–2015); DaVita, Director, Special Projects (2005); DaVita, Senior Manager (2005); DaVita, Director Star Rx (2005–2006); DaVita, Senior Director DaVita Rx (2006); DaVita, Senior Director (2006–2007); DaVita, VP, DaVita Rx (2007–2015); DaVita, CEO, Paladina Health [a DaVita subsidiary] |
| Andrew Hayek | DaVita, President (2007); DaVita, VP (2007–2008); SCA, President & CEO (2008–2017); OptumHealth, CEO (2017–2019) |
| Sandi Karrmann | USPI, SVP, Chief Human Resources & Support Services Officer (2013–2017); Tenet Healthcare/USPI, EVP, Chief Human Resources Officer (2017–2020) |
| Anthony Kilgore | SCA, Group VP (2011–2012); SCA, SVP Operations (2013–2016); SCA, Group President (2017); SCA, CEO (2018–2019) |
| Dennis Kogod | DaVita, Division President (2006–2010); DaVita, SVP (2008); DaVita, COO (2008–2016); DaVita, COO, HealthCare Partners (2014–2016); DaVita, Advisor to CEO (2016) |
| Brian Mathis | SCA, VP Strategy (2009–2014); SCA, Group VP Strategy and Payer Engagement (2014–2015); SCA, SVP, Strategy and Payment Innovation (2015–2017); SCA, CDO (2017–2018); OptumCare, CDO (2017–2018); OptumCare, Chief Strategy Officer (2018–2020) |
| Laura Mildenberger | DaVita, DVP / Chief People Officer, (2005); DaVita, DVP/Regional Vice President ("RVP") (2006–2007); DaVita, SVP (2008); DaVita, Chief People Officer (2008–2016) |
| Shannon Mosley | USPI, Director (2003–2006); USPI, Director (2007); USPI, VP Talent Acquisition (2007–2020) |
| Brian Rasco | SCA, Director of IT Security (2021–Present) |
| Javier Rodriguez | DaVita, SVP (2005–2018); DaVita, DVP (2006); DaVita, VP Value Management Operation (2006); DaVita, President (2008, 2012–2014); DaVita, CEO, Kidney Care (2014–2022) |
| Michael Rucker | DaVita, DVP/RVP (2006–2008); SCA, SVP Operations (2008–2009); SCA, EVP & COO (2009–2017) |

| Employee | Company, Job Title (Years) |
|---|---|
| Rich Sharff | SCA, EVP, General Counsel & Secretary (2007–Present); OptumHealth, General Counsel (2017–Present) |
| Kent Thiry | DaVita, Chairman and CEO (1999–2019); DaVita, Chairman and CEO, HealthCarePartners Inc. (2014–2020); DaVita, Executive Chairman of the Board of Directors (2019–2021) |
| Leslie Wachsman | SCA, VP Finance & Investor Relations (2012–2018); SCA, GVP, Finance (2018–2019); SCA, CFO (2019–Present) |
| Heather Way | SCA, CEO (2019–2021); USPI, Administrator (2020–2022) |
| William ("Bill") Wilcox | USPI, President (2005–2011); USPI, CEO (2011–2018), Chairman (2018–2020); USPI, Consultant (2020–2023) |
| Kevin Zaideman | SCA, Compensation Senior Manager (2017–2020); SCA, Director of Compensation (2021–2022) |

**APPENDIX C**

**REBUTTAL REPORT FIGURES**

**Figure 44: The Challenged Conduct Reduced the Extent to Which Defendants Hire From Each Other Relative to Other Employers**



*Note*: Corrected Lightcast Data. The graph show for each year how each Defendant ranked among all other labor market competitors in the Lightcast Data in terms of the number of times a Defendant hired from or lost employees to the other Defendants in a given year. These ranks are not adjusted to be on a *per Defendant* basis.

3244633.4

**Figure 45: Dr. Saravia's Nonrandom Compensation Paths Generate Predetermined Relationships**



hourly compensation from 5,001 iterations of Dr. Saravia's toy simulation. In the dashed gray line I keep her asymmetric raises, and in the black line I repeat her analysis but make the raises symmetric around zero. The vertical lines are the median of each distribution.

**Figure 46 [Figure 19 Revised]: Relationship Between Director and (S)VP Wages**

| | Dependent Variable: Ln(Mean Hourly Rate for Directors) | | |
|---|---|---|---|
| | DaVita | SCA | USPI |
| Ln(Mean Hourly Rate of VPs & SVPs) | | | |
| Ln(Avg. State Mgr. Earnings) | | | |
| Ln(State Health Expend. PC) | | | |
| Covid | | | |
| Ln(State GDP PC) | | | |
| Ln(State Unemployment Rate) | | | |
| Census Region Annual CPI | | | |
| Observations | | | |
| R-squared | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses. Note the constant term is suppressed.

276

**Figure 47 [Figure 20 Revised]: Within-Job Hourly Rate are Highly Correlated With Hold Out Sample**

| | Dependent Variable: Ln(Mean Hourly Rate) | | |
|---|---|---|---|
| | DaVita | SCA | USPI |
| Ln(Hourly Rate of others in same job-year) | | | |
| Ln(Avg. State Mgr. Earnings) | | | |
| Ln(State Health Expend. PC) | | | |
| Covid | | | |
| Ln(State GDP PC) | | | |
| Ln(State Unemployment Rate) | | | |
| Census Region Annual CPI | | | |
| Observations | | | |
| R-squared | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

**Figure 48 [Figure 9 Revised]: Senior-Level Employees Are More Strongly Affected By Conduct Than Managers**

| *Baseline Category: Managers* | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | Overall | | By Defendant | |
| | [1] | [2] | [3] | [4] |
| Conduct (Managers) | | | | |
| Conduct*1(Directors & Above) | | | | |
| **Lower Bound Suppression %** | | | | |
| DaVita Conduct (Managers) | | | | |
| DaVita Conduct*1(Directors & Above) | | | | |
| **DaVita Lower Bound Suppression %** | | | | |
| SCA Conduct (Managers) | | | | |
| SCA Conduct*1(Directors & Above) | | | | |
| **SCA Lower Bound Suppression %** | | | | |
| USPI Conduct (Managers) | | | | |
| SCA Conduct*1(Directors & Above) | | | | |
| **USPI Lower Bound Suppression %** | | | | |
| 1(Directors & Above) | | | | |
| Healthcare, Macro, Hours | | | | |
| USPI Low Hours Control | | | | |
| Individual-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |



*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

**Figure 49 [Figure 26 Revised]: Other Measures of Compensation**



| | Ln(Regular Plus Other Compensation) | | Ln(Total Compensation Minus Stocks) | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Conduct | | | | |
| **% Wage Suppression** | | | | |
| DaVita Conduct | | | | |
| **% Wage Suppression** | | | | |
| SCA Conduct | | | | |
| **% Wage Suppression** | | | | |
| USPI Conduct | | | | |
| **% Wage Suppression** | | | | |
| Year Trend | | | | |
| USPI Low Hours Control | | | | |
| Healthcare, Macro, Hours | | | | |
| Individual-by-Company FE | | | | |
| Location FE | | | | |
| Observations | | | | |
| R-squared | | | | |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The two measures of compensation are the natural log of regular pay plus the other category of pay, and the natural logarithm of total pay minus stock compensation.

**Figure 50 [Figure 27 Revised]: Hourly Wages**

| | Dependent Variable: Ln(Hourly Wage) | |
|---|---|---|
| | [1] | [2] |
| Conduct | | |
| **% Wage Suppression** | | |
| DaVita Conduct | | |
| **% Wage Suppression** | | |
| SCA Conduct | | |
| **% Wage Suppression** | | |
| USPI Conduct | | |
| **% Wage Suppression** | | |
| Year Trend | | |
| USPI Low Hours Control | | |
| Healthcare, Macro | | |
| Log-Total Hours | | |
| Individual-by-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |



*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The dependent variable is the natural log of hourly wages (total compensation divided by total hours). Note that total hours do not appear as a control variable in this specification, because they are incorporated into the denominator of the dependent variable.

**Figure 51 [Figure 28 Revised]: Poisson Models**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Year Trend | | | |
| USPI Low Hours Control | | | |
| Healthcare, Macro, Hours | | | |
| Log-Total Hours | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |



*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The model is estimated using a Poisson regression. As I explained at deposition, a Poisson regression "is better at accounting for zeros and can be more efficient, and I show the results are robust when using a Poisson regression." Starr Dep. Vol. 2 at 312:7–17.

**Figure 52 [Figure 29 Revised]: Control Variables Interacted by Company**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
| --- | --- | --- | --- |
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| USPI Low Hours Control | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |



*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Note that the macroeconomic, healthcare-specific, and ln(total hours) controls are fully interacted with each company when they are included (e.g., the main effect of each control and the interaction are included).

**Figure 53 [Figure 30 Revised]: Models Controlling for Job Titles and Tenure**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| Tenure | | | |
| | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| SCA Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| USPI Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| Tenure | | | |
| | | | |
| Observations | | | |
| R-squared | | | |
| Job Title FE | | | |
| USPI Low Hours Control | | | |
| Year Trend | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The model includes controls for tenure and for job title fixed effects.

**Figure 54 [Figure 31 Revised]: Drop COVID Years**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| SCA Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| | | | |
| USPI Conduct | | | |
| | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| USPI Low Hours Control | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample drops the COVID years, 2020 and 2021.

**Figure 55 [Figure 32 Revised]: Include Partial Years Worked**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Cond* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| USPI Low Hours Control | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |



*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes workers who worked part of the year.

**Figure 56 [Revised 33 Revised]: Including Outliers**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| USPI Low Hours Control | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |



*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes full-year employees, including outliers.

**Figure 57 [Figure 34 Revised]: Harmonizing Data Time-Frame Across Defendants (2008–2022)**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
| --- | --- | --- | --- |
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| R-squared | | | |
| Year Trend | | | |
| USPI Low Hours Control | | | |
| Individual-by-Company FE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |



*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes only years 2008 to 2022.

**Figure 58 [Figure 35 Revised]: No Individual-Company Fixed Effects**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] | [2] |
| *Panel A. Common Conduct Effect* | | |
| Conduct | | |
| **% Wage Suppression** | | |
| *Panel B. Defendant-Specific Conduct* | | |
| DaVita Conduct | | |
| **% Wage Suppression** | | |
| SCA Conduct | | |
| **% Wage Suppression** | | |
| USPI Conduct | | |
| **% Wage Suppression** | | |
| Year Trend | | |
| USPI Low Hours Control | | |
| Healthcare, Macro, Hours | | |
| Individual-by-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. There are no individual-by-company fixed effects in these regressions.

**Figure 59 [Figure 36 Revised]: Random Effects Model**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | |
| **% Wage Suppression** | | | |
| SCA Conduct | | | |
| **% Wage Suppression** | | | |
| USPI Conduct | | | |
| **% Wage Suppression** | | | |
| Observations | | | |
| Year Trend | | | |
| USPI Low Hours Control | | | |
| Individual-by-Company RE | | | |
| Location FE | | | |
| Healthcare, Macro | | | |
| Log-Total Hours | | | |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed. The model is estimated with random effects.

**Figure 60 [Figure 37 Revised]: Reverse Relationship Between Director and (S)VP Wages**



*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.