# Exhibit 5

# Lane Declaration

# Redacted

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**<u>UPDATED REBUTTAL EXPERT WITNESS REPORT OF DR. BARRY GERHART</u>**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................................. 1

II. ASSIGNMENT AND SUMMARY OF CONCLUSIONS ............................................. 2

III. FACTUAL AND CASE BACKGROUND ................................................................. 13

    A. Outpatient Medical Center Industry.................................................. 14

    B. Defendants' Alleged Conspiracy. ....................................................... 14

IV. DEFENDANTS HAD INCENTIVES AND OPPORTUNITIES TO COLLUDE
TO SUPPRESS EMPLOYEE COMPENSATION. ...................................................... 27

    A. Defendants Are Incentivized to Collude to Keep Senior-Level Employee
Turnover and Labor Costs Low. ........................................................ 28

        1. Defendants Care About Their Employee Turnover Rates. ...................... 29

        2. Defendants Seek to Manage Their Substantial Labor Expenditures. ...... 33

    B. A Close-Knit Industry Increases Incentives and Opportunities to Collude. ......... 39

    C. Collusion Robs Employees of Pay Growth from Voluntary Job Changes
and Unrestricted Job Mobility. ......................................................... 41

        1. In Unrestricted Markets, Departing Employees Experience Pay
Growth from Voluntary Job Changes. ................................................. 41

        2. Incumbent Employees Also Benefit from Unrestricted Job
Mobility.............................................................................................. 45

V. DEFENDANTS' COLLUSION WOULD LIKELY HAVE HARMED
EMPLOYEES' COMPENSATION. ....................................................................... 47

    A. In an Unrestricted Labor Market, Defendants Highly Value Recruiting
Passive Candidates with Specialized Skills. ....................................... 48

    B. The No-Poach Agreements' Cold Calling Restrictions and Tell-Your Boss
Provision Decreased Employees' Job Mobility and Bargaining Power. ............. 64

        1. Senior-Level Employees Typically Have Limited Access to Labor
Market Information.............................................................................. 65

        2. Defendants Limited Pay Transparency.................................................. 67

        3. Absent Defendants' Collusion, Employees Could Acquire Labor
Market Information Through Cold Calls and Proactive
Recruitment........................................................................................ 69

        4. Because of the No-Poach Agreements, Employees Often Never
Learned About Higher-Paying Job Opportunities at Defendant
Firms. ................................................................................................ 74

        5. Defendants' Tell-Your-Boss Provision Further Limited Employee
Bargaining Power and Mobility............................................................ 86

        6. Defendants Have Market Power. .......................................................... 92

    C. Defendants' CSI Exchanges Likely Restricted Labor Market Competition...... 121

    D. Defendants' No-Poach Agreements and CSI Exchanges Harmed
Employee Compensation. ................................................................ 134

**TABLE OF CONTENTS**

Page

      1.    Defendants' No-Poach Agreements Harmed Class Member Pay.......... 138

      2.    Defendants' CSI Exchanges Harmed Employee Compensation. .......... 142

  E.    Wage Suppression Can Persist for Years............................................................ 153

VI.    DEFENDANTS MAINTAINED STRUCTURED COMPENSATION SYSTEMS THAT SOUGHT TO ACHIEVE INTERNAL EQUITY AND EXTERNAL EQUITY............................................................................................................... 153

  A.    Defendants' Highly-Trained and Qualified Compensation Professionals Established and Maintained Structured Compensation Systems. ...................... 154

  B.    Defendants Designed Systematized Compensation Structures......................... 156

      1.    Step 1: Defendants Assigned Internal Value to Jobs. ........................... 159

      2.    Step 2: Defendants Undertook Job Evaluation and Benchmarking...... 161

      3.    Substantial Additional Common Evidence Shows That Defendant Firms Used Systematized Compensation Structures. ........................... 173

  C.    Defendants' Compensation Systems Sought to Achieve Internal Equity and Pay Fairness. ........................................................................................... 185

  D.    Internal Equity and Pay for Performance Are Not Mutually Exclusive. ........... 194

VII.    DEFENDANTS' CONDUCT LIKELY HAD CLASS-WIDE COMPENSATION EFFECTS VIA THEIR STRUCTURED COMPENSATION SYSTEMS. ................... 199

  A.    Defendants' No-Poach Agreements Likely Lead to Cascading Compensation Effects Class-Wide. .................................................................. 199

  B.    Defendants' CSI Exchanges Would Likely Broadly Suppress Employee Compensation. .................................................................................................. 230

VIII.    CONCLUSIONS............................................................................................... 238

APPENDIX A ......................................................................................................... 246

APPENDIX B ......................................................................................................... 258

APPENDIX C ......................................................................................................... 261

APPENDIX D ......................................................................................................... 271

## I.     **INTRODUCTION**

1.     I, Dr. Barry Gerhart, hereby submit the following Updated Rebuttal Expert Witness Report ("Rebuttal"), in response to the April 16, 2025 Expert Reports submitted by Dr. John H. Johnson, IV ("Johnson Report"), Celeste Saravia, Ph.D. ("Saravia Report"), Justin McCrary, Ph.D., ("McCrary Report"), and Dr. Lauren Stiroh ("Stiroh Report").[1] On May 30, 2025, I submitted my Rebuttal to the Johnson and Saravia Reports. I hereby update my Rebuttal to include rebuttal to the McCrary and Stiroh Reports. My qualifications were set forth in my January 15, 2025 report.[2]

2.     I have been asked by Plaintiffs to comment on the Johnson, Saravia, McCrary, and Stiroh Reports, and in particular to determine whether any of the opinions expressed by Defendants' Experts cause me to change the conclusions reached in my report. They do not.

3.     In connection with this matter, I reviewed materials from this case and from the related criminal investigation *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.), including the Johnson Report, the Saravia Report, the McCrary Report, the Stiroh Report, the Third Consolidated Amended Class Action Complaint (ECF No. 555), depositions, deposition exhibits, FBI investigation interview reports, DaVita criminal trial transcripts, and documents including salary or market pay range materials produced by or compiled from materials from Defendants Andrew Hayek ("Hayek"), Kent Thiry ("Thiry"), Surgical Care Affiliates, LLC and

---

[1] Herein, I refer to Dr. Johnson, Dr. Saravia, Dr. McCrary, and Dr. Stiroh collectively as "Defendants' Experts." Note that all Defendants retained Dr. McCrary (McCrary Report ¶ 16), whereas only DaVita, SCA, Hayek, and Thiry retained Dr. Johnson (Johnson Report ¶ 1), only USPI and Tenet retained Dr. Saravia (Saravia Report ¶ 4), and only DaVita and Thiry retained Dr. Stiroh (Stiroh Report ¶ 4).

[2] On May 1, 2025, Dr. Saravia served an amended version of her report. On February 11, 2025, I served an amended version of my opening report to correct non-substantive errors. Throughout my Rebuttal, I refer to these amended reports.

SCAI Holdings, LLC (together, "SCA"), DaVita Inc. ("DaVita"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation (together, "USPI") (together, "Defendants"). I have also reviewed and drawn on compensation-related and economics literature, as well as survey data collected by WorldatWork, the professional association for those working in compensation management, to describe the structured compensation typically utilized by U.S. companies. The information that I relied upon in forming my opinions include the materials listed in **Appendix A** as well as those cited in this report and the attached **Appendices**. The bases for my opinions are described in this Rebuttal, any attached exhibits, and my workpapers. I reserve the right to supplement my Rebuttal in view of any new material or information provided to me after the date of this Rebuttal.

4.      For purposes of convenience, in **Appendix B,** I provide the names, employers, job titles, and years worked for all individuals I reference in my report.

## II.      ASSIGNMENT AND SUMMARY OF CONCLUSIONS

5.      Below, I explain Defendants' Experts' objections to my opinions. I also explain the conclusions I have drawn as a result of my review of Defendants' Experts' Reports and testimony, my work to date, and my experience and research in compensation and human resource management.

6.      <u>Background of Anticompetitive Conduct.</u> Foremost, I am not persuaded by Defendants' Experts' critiques of the background I provided regarding Defendants' anticompetitive conduct in support of my analysis. I ███████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████. ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████. ████████████████████████████████████████████████████

-2-

-3-

███████████████. I also have no cause my opinions regarding Defendants' exchanges of competitively sensitive information ("CSI Exchanges").

7. Incentives to Collude. Defendants' Experts have not persuaded me to change my assessment that evidence common to the Class shows that Defendants were incentivized to collude to suppress labor market competition. I have no reason to change my opinions that Defendants sought to keep turnover low and reduce their substantial labor expenditures in order to (1) increase Defendant firms' profits and stock values, and, relatedly, (2) increase the compensation of Defendants' C-Suite executives, who were paid in stock and/or were otherwise financially incentivized to keep costs low. Indeed, ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ Moreover, employment growth (and the added upward pressure that would put on pay levels) at Defendant firms would have further incentivized collusion.

8. Harm to Employees. Defendants' Experts have also not put forth testimony or evidence sufficient to cause me to change my opinion that such collusion would have harmed Defendants' employees because employees benefit when they have uninhibited access to other jobs, i.e., job mobility.

9. Defendants' Experts do not contradict my opinion that employees who receive outside employment offers benefit from job mobility by (1) voluntarily changing employers to obtain substantial compensation increases or (2) using the outside offers as leverage to negotiate higher compensation in return for remaining with their current employers. Not all outside job offers result in moves, but almost all likely result in a pay increase, either from moving or

negotiating a counteroffer with higher pay to stay. Thus, moves are a relevant, but incomplete indicator of employee opportunities for mobility and pay increases.

10. Moreover, Defendants' Experts do not contest the testimony and other evidence I cite about employees who do not receive outside job offers: those employees become aware of coworker offers then receive updated, more accurate information on their own outside pay opportunities (and their assessment of external equity), making job searches and job mobility (and thus upward pressure on pay) more likely. Defendants' Experts also do not refute my opinion that when employees use outside offers to negotiate higher pay at their current employer, that will disrupt internal equity and require pay adjustments for other employees.

11. Further, Defendants' Experts do not refute my opinion that in competitive (i.e., unrestricted) labor markets, employers often proactively raise compensation of incumbent employees (i.e., workers currently employed by the employer) to prevent turnover. I also have not changed my view that employees accrue these benefits, however, only when employees' access to these higher-paying external job opportunities is not restricted.

12. <u>Ways to Lower Labor Costs.</u> Defendants' Experts have not persuaded me to change my opinion that, to lower labor costs and increase profits, Defendants could collude with their labor market competitors to restrict their competitors' recruiting activities and their own employees' job mobility. Moreover, I have not changed my opinion that Defendants could also achieve lower labor costs by sharing competitively sensitive information, including wage information, to fix wages, thereby keeping the labor market rate low and limiting the number of higher-paying jobs available to employees seeking better jobs.

13. <u>Hiring Where No Labor Market Restrictions Exist.</u> Defendants' Experts have not rebutted my opinion or provided supporting evidence sufficient to cause me to change my

opinions about hiring in the absence of Defendants' labor market restrictions. Specifically, I opined that in the absence of labor market restrictions, Defendants would have solicited, hired, or recruited a broad swath of employees from each other, and particularly high-value passive candidates with specialized skills who did not proactively seek alternative employment. Likewise, I have no cause to change my opinion that employees would have been free to seek employment at competitor firms on their own initiative. Accordingly, in the absence of no-poach agreements, Defendants expected to lose valuable employees to each other and anticipated that they would have to increase pay to prevent turnover. Once the losses began, the risk would be that they snowball due to turnover contagion, as other employees follow (e.g., former DaVita Division Vice President ("DVP") Michael Rucker left DaVita followed SCA CEO Andrew Hayek to help run SCA as Chief Operating Officer ("COO")). Thus, they decided to obstruct the turnover by restricting Class Members' mobility. Defendants' Experts do not contest my opinion that solicitation (and self-initiated moves by employees) can and often does increase the compensation of employees who ultimately accept job offers elsewhere. They also do not object to my opinion that, additionally, solicitation can increase the compensation of employees who choose to stay after using outside offers to negotiate higher pay with their current employers.

14. <u>Effect of No-Poach Agreements on Job Mobility.</u> Defendants' Experts contend that, contrary to my assessment, Defendants' No-Poach Agreements would have caused harm to only a limited number of employees because of competition from non-Defendant employers.[3] Dr. Johnson also asserts that I improperly neglected to consider evidence contrary to the factual background I provided regarding the SCA-DaVita No-Poach Agreement.[4] █████████

---

[3] Johnson Report ¶ 3; Saravia Report ¶¶ 21(2), 22–25; McCrary Report ¶¶ 19, 21, 24(a); Stiroh Report ¶¶ 19, 20(a)–20(c).
[4] Johnson Report ¶ 4.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████[5]████████████████████████████████████████████

████████████████[6] Moreover, Dr. McCrary asserts that Defendants' conduct would not have had a common impact given Class Members' diversity and the variety of job opportunities available to them.[7] In response, I explain that Defendants' Experts have not given me cause to change my opinion that evidence common to the Class shows that Defendants' No-Poach Agreements limited employees' job mobility.

15.     Effect of Defendants' Recruiting Restrictions. Further, Defendants' Experts do not contest my opinion that the evidence is consistent with Defendants agreeing not to solicit passive candidates who were not proactively seeking employment. Second, Defendants' Experts do not contradict my opinion about the existence of a tell-your-boss restriction. I found that, based on my analysis of common evidence, Defendants agreed not to make job offers to either proactive or passive candidates who worked at Defendant firms. The exception was if the candidates first informed their current bosses that they were seeking employment elsewhere before the candidates had received external job offers, which most employees are disinclined to do. Consequently, Defendants' employees often did not receive higher-paying job offers they otherwise would have received and could either have accepted or used as leverage or data points.

---

[5] *Id.* ¶ 4.

[6] McCrary Report ¶¶ 17, 173; Stiroh Report ¶¶ 20(d)(i), 87.

[7] McCrary Report ¶¶ 19, 20(a), 21 ("Identifying exactly which proposed class members" would have been harmed by Defendants' conduct "would require individualized inquiry[.]"), 22, 23(c) ("[I]mpact stemming from the alleged information sharing would not be common[,]" because of "variation across proposed class members in labor market opportunities . . . performance, which years of the Class Period they were employed by Defendants, and their compensation mix[.]").

16.     Negative Impact on Class Members.  Defendants' Experts do not convince me that Defendants' conduct was harmless because Class Members had job opportunities at Non-Defendant firms.  As a threshold matter, Class Members would have valued opportunities at Defendant firms.  Given Defendants' employment growth, we would expect to see an increase in the number of Class Members switching to Defendant firms in an unrestricted market, but we did not.  Moreover, I am also not swayed by Defendants' Experts' contentions regarding Class Members' employment opportunities at non-Defendant firms.  Given frictions in the labor market and that finding a match between an employer and employee is challenging, unsolicited offers are valuable.  Defendants' Experts cannot show that non-Defendant job opportunities were as valuable as opportunities that Class Members would have received from Defendants in an unrestricted market.  Moreover, this critique does not capture the cascading harm to employees of their peers not receiving outside offers.  Foremost, such employees would never have received information about outside offers from their peers who had received unsolicited offers.  Second, there would not have been upward pressure on the pay of those who did not receive outside offers, due to the internal equity pressures created by their peers using their outside offers to negotiate higher pay to stay.

17.     Defendants' Labor Market Power.  Finally, Defendants' Experts claim that my opinions are flawed because I failed to show that Defendants had sufficient market power to suppress employee compensation.[8] ███████████████████████████████

███████████████████████████████████████████████████

████████████████████[9]  Further, Dr. McCrary and Dr. Stiroh argue that, because I cannot

---

[8] Johnson Report ¶ 2; Saravia Report ¶¶ 21(1), 22–25; McCrary Report ¶ 20(a); Stiroh Report ¶¶ 19–20(a).
[9] Johnson Report ¶ 48.

show that Defendants have sufficient market power to suppress pay for all or nearly all Class Members, I cannot show that Defendants' conduct would commonly impact Class Members (and an individualized inquiry is necessary to assess each individual employee's employment options).[10] In response, I explain that Defendants' Experts' assertions that Defendants lacked sufficient market power to harm employee mobility and pay is incorrect and unsupported by compensation-related and economic theory and literature.

18. <u>Competitively Sensitive Information Exchanges.</u> Defendants' Experts claim that my opinion that Defendants' Exchanges of Competitively Sensitive Information ("CSI Exchanges") would likely have facilitated wage suppression is unsupported by the record evidence and the economic literature.[11] Relatedly, Defendants' Experts claim that economic conditions would have precluded any CSI Exchanges from suppressing compensation.[12] But Defendants' Experts have not convinced me to change my assessment that the common evidence showed that Defendants' years-long CSI Exchanges are inconsistent with unilateral conduct and would have harmed employees. Indeed, it would be quite a coincidence for the same companies to engage in both No-Poach Agreements and CSI Exchanges.

19. Though Dr. Saravia, Dr. McCrary, and Dr. Stiroh object that data exchanges can be legal and procompetitive in some circumstances, they have not put forth convincing testimony

---

[10] McCrary Report ¶¶ 20(a), 21(a), 23(c) ("[I]mpact stemming from the alleged information sharing would not be common[,]" in part because of "variation across proposed class members in labor market opportunities (and thus whether Defendants would have market power)[.]"); Stiroh Report ¶ 38 ▮▮▮▮▮▮▮▮

[11] Johnson Report ¶¶ 6–8; Saravia Report ¶¶ 21(3), 27–29; McCrary Report ¶¶ 19, 23; Stiroh Report ¶¶ 20(a)–(c), 20(e).

[12] Johnson Report ¶ 7; Saravia Report ¶ 21(3); McCrary Report ¶ 23; Stiroh Report ¶ 20(a)(iii).

or evidence that contradicts my opinion that no company benefits by unilaterally sharing wage-related data directly with competing employers.

20.     Defendants' Experts have also not convinced me that the evidence I have provided is insufficient to support my opinion that Defendants' CSI Exchanges could have facilitated wage suppression.  It is still my opinion that, based on the evidence I have reviewed, Defendants' mutual CSI Exchanges would have enabled them to agree to keep Class pay lower than it would have been otherwise and limit the number of higher-paying jobs available to Class Members seeking better opportunities, without fear of rising turnover rates.  Further, Defendant firms' CEOs control their respective budgets, which are set in light of retention risks and turnover concerns.  These same CEOs eliminated competitive threats in the labor market through their No-Poach Agreements, and shared compensation-related information through their CSI Exchanges, which allowed them to set lower labor budgets, including lower merit increase budgets, than they would have in a competitive market.  Accordingly, this misconduct would directly cause Class-wide compensation suppression, in addition to the direct effects experienced by employees who did not receive job offers because of Defendants' No-Poach Agreements, and the consequent cascading effects on Defendants' systematic pay structures and Senior-Level Employees' pay.

21.     Long-Term Effects.  Defendants' Experts have not refuted my opinion that such wage suppression resulting from Defendants' anticompetitive No-Poach Agreements and CSI Exchanges would accumulate and likely persist into the future, as suppressed compensation levels are unlikely to fully recover immediately.

22.     Systematic Compensation Structures.  Dr. Johnson, Dr. Saravia, and Dr. McCrary also contend that my opinion that Defendant firms had systematic and structured pay systems

-9-

with a focus on internal equity and external equity (such that the effects of the No-Poach Agreements and CSI Exchanges would have cascading effects on other employees' pay) is unsupported by the evidence.[13] I maintain my opinion that Defendant firms had structured compensation systems. Additionally, Defendants' Experts have given me no cause to change my testimony that Defendants cared about maintaining internal equity and external equity, and equity in general was important to them, regardless of whether they used the foregoing specific terms. I disagree with Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's opinions that Defendant firms lacked pay structures because pay was individualized, randomized, or provided for entirely discretionary pay decisions, none of which are supported by the evidence.[14]

23.     Defendants' Experts do not disagree that Defendants utilized compensation components beyond salary, such as bonuses and stock grants and options. Further, Defendants' Experts have not undermined my opinion that Defendant firms' compensation systems (1) relied on market surveys to stay current, (2) had clear structures, and (3) deployed market pay lines and grades. Their Reports also do not undermine my opinion that the foregoing features are among many other features of their structured compensation systems. Moreover, Dr. Johnson, Dr. Saravia, and Dr. McCrary agree that ordinarily, firms make upward compensation adjustments in response to market conditions. But they do not convince me to change my opinion that restraints that constrain the employee labor market and suppress compensation (such as No-Poach Agreements and CSI Exchanges) enable firms to benchmark to lower rates, so that upward pay adjustments do not occur or are smaller.

---

[13] Johnson Report ¶¶ 6–8; Saravia Report ¶¶ 21(4), 30–32; McCrary Report ¶¶ 20(b), 21(b), 23(c), 26.

[14] Johnson Report ¶ 6; Saravia Report ¶¶ 21(4), 30–32; McCrary Report ¶¶ 19, 20(b).

24.     Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's opinions that Defendant firms' pay structures did not seek to maintain internal equity are unavailing. I have not changed my opinion that Defendants valued treating similarly-situated employees (i.e., employees in similar roles/jobs with similar performance contributions) within their companies similarly. I also have no cause to change my assessment that accordingly, in their systematic pay structures, if an employee receives a higher-paying outside offer which they leverage into higher pay at their current company, similarly-situated employees at the current company will expect their own pay to increase to maintain internal equity. As the evidence shows, the result is upward pay adjustments. Further, I maintain that those adjustments in that role/job, in turn, will additionally require the company to revisit pay levels for jobs below and above that role/job to maintain what are seen as internally equitable pay differentials. Again, the result is adjusting pay upward in these jobs. I also have no cause to change my view that, in the absence of outside offers of higher pay—because of collusion that interferes with typical labor market competition—these upward pay adjustments would not take place.

25.     <u>Cascading Effects of No-Poach Agreements and CSI Exchanges and Common Impact on Compensation Given Compensation Structures.</u> ██████████████

███████████████████████████████████████

███████████████████████████████████████

██ [15] ███████████████████████████████████

██████████████████████████████████████ [16]

Defendants' Experts have not given my cause to draw a different conclusion.

---

[15] Johnson Report ¶ 6; Saravia Report ¶¶ 21(2), 21(4); McCrary Report ¶¶ 19, 20(b), 23(c).
[16] Gerhart Dep. at 105:10–19.

26. Dr. Johnson, Dr. Saravia, and Dr. McCrary do not persuade me that Defendants did not maintain systematized pay structures and compensation design, such that Defendants' anticompetitive No-Poach Agreements and CSI Exchanges could not interfere with labor market competition broadly.

27. Defendants' Experts also do not persuasively refute my opinion about wage suppression as to all or nearly all Class Members. Based on my experience, the compensation research, and my analysis of the record evidence, Defendants' No-Poach Agreements and CSI Exchanges suppressed the wages of some Class Members directly. But those are not the only ones who were harmed. Given Defendants' commitment to internal equity and systematized pay structures, their No-Poach Agreements and CSI Exchanges would likely cause cascading effects and suppress the compensation of all or nearly all employees in the proposed Class. Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's objections that such collusive conduct would not suppress compensation levels for those employees who otherwise would have been cold-called or solicited for new positions are meritless and inconsistent with the research and my experience. I have no cause to change my opinion that even if Defendants restricted the No-Poach Agreements to individuals and job titles at the top of the salary structure, a No-Poach Agreement's artificial suppression of compensation would have had a cascading effect on other employees.

28. <u>Common Evidence and Methods.</u> Finally, Dr. McCrary contends that I have failed to set forth a reliable methodology, based on information common to the Class, that can be used to assess whether Defendants' No-Poach Agreements and CSI Exchanges would harm all or nearly Class Members.[17] I disagree, for the same reasons discussed above. Moreover, all of the

---

[17] McCrary Report ¶ 19.

materials on which I relied to reach each of the foregoing conclusions, including Defendants'

Experts' Reports, documents produced by Defendants and third parties, materials from the

DaVita criminal case, the compensation-related and economics literature, and survey data

collected by WorldatWork, are common to the Class.

**III.    FACTUAL AND CASE BACKGROUND**

29.    In this section, I respond to the overviews Defendants' Experts provided

regarding the litigation, outpatient medical center industry, Defendants' No-Poach Agreements,

and Defendants' CSI Exchanges.[18]  I also clarify certain aspects of the factual background I

provided in my report regarding Plaintiffs' conspiracy claim.[19]

30.    Class Definition.  Whereas Dr. Johnson and Dr. McCrary provided the correct

Class definition,[20] Dr. Saravia incorrectly relies on an earlier version of the Complaint in stating

the Class definition.[21]  Similarly, Dr. Stiroh incorrectly contends that I address a different time

period than the Class Period alleged in the Complaint.[22]  I have been informed that Plaintiffs'

counsel have since narrowed the Class definition.  For clarity, below I re-state the Class

definition provided by Plaintiffs' counsel for my report[23]:

> [Employees] who worked in positions at the director-level and above [hereafter
> "Senior-Level Employees"] in the United States for one or more of the following:
> (a) from May 1, 2008 to December 31, 2019 for Surgical Care Affiliates, LLC,
> SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers;
> (b) from May 1, 2010, to December 31, 2019 for United Surgical Partners Holdings,
> Inc., United Partners International, Inc., or one of their subsidiary outpatient
> medical care centers; or (c) from May 1, 2008 through December 31, 2019 for

---

[18] Saravia Report ¶¶ 10–13, 37–52; Johnson Report ¶¶ 16–23, 98; McCrary Report ¶¶ 13, 17, 136, 145, 243, 250; Stiroh Report ¶ 13.

[19] Gerhart Report ¶¶ 10–23.

[20] Johnson Report ¶ 18; McCrary Report ¶ 12.

[21] Saravia Report ¶ 10.

[22] Stiroh Report ¶¶ 13–14, 16, 91.

[23] Gerhart Report ¶ 5; Compl ¶ 92.

DaVita Inc. or one of its subsidiaries (hereafter, "the Class" or "Class Members"). Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.[24]

### A.    Outpatient Medical Center Industry.

31.    In my report, I explained that DaVita, SCA, and USPI are all leading players in the outpatient medical center industry.[25]  Specifically, as Dr. Johnson explains, all three fall within the 5-digit NAICS industry code 62149 - Other Outpatient Care Centers.[26]  I provided evidence that DaVita runs thousands of outpatient medical centers in the United States, and employs more than 70,000 workers.[27]  Further, SCA operates more than 230 outpatient medical centers and ambulatory surgical centers in 35 states, with more than 10,000 workers.[28]  Likewise, USPI runs more than 461 ambulatory surgical centers and 24 surgical hospitals nationwide and employs more than 22,500 workers.[29]

### B.    Defendants' Alleged Conspiracy.

32.    Overarching Conspiracy.  Dr. Saravia, Dr. McCrary, and Dr. Stiroh opine that I do not describe an overarching conspiracy, and instead have analyzed two separate bilateral agreements.[30]  Their characterizations are misleading.

---

[24] Dr. Johnson contends that I failed to address "why employees would take part in a conspiracy to suppress their own compensation."  Johnson Report ¶ 183.  On the contrary, I am informed that is precisely why Plaintiffs' counsel excluded these employees from the Class.

[25] Gerhart Report ¶¶ 11, 13, 15.

[26] Johnson Report ¶ 48 n.104.

[27] Gerhart Report ¶ 11.

[28] *Id.* ¶ 13.

[29] *Id.* ¶ 15.

[30] Saravia Report ¶ 11; McCrary Report ¶¶ 13, 250; Stiroh Report ¶ 13.  Note that Dr. Johnson did not opine as to whether Defendants' conduct was part of an overarching conspiracy.  Johnson Dep. at 180:10–181:8.  Further, Dr. Stiroh did not opine as to "whether DaVita understood that it was entering into a broader agreement than just with SCA[.]"  Stiroh Dep. at 170:2–10.

-14-

33.    As I explained in my report, Plaintiffs allege that Defendants SCA and DaVita and SCA and USPI established two No-Poach Agreements as part of their overarching conspiracy to suppress competition and thus wages in the labor market.[31] I understand that Plaintiffs allege that the SCA-DaVita and SCA-USPI CSI Exchanges also facilitated Defendants' overarching anticompetitive conspiracy.[32]

34.    Further, at deposition, I testified that my report includes evidence showing "that the mobility of employees at these three companies was restricted, and then my focus is on what would be the consequences. . . for the [C]lass."[33]

35.    However, I do not have an opinion as to whether Defendants' conduct constitutes an overarching conspiracy. I understand that may be a question for the jury to answer at trial. Plaintiffs' counsel did not ask me to provide an opinion, and I have not done so.[34]

36.    <u>No-Poach Agreements.</u> ███████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████[35] Plaintiffs allege that SCA and DaVita and SCA and USPI formed two No-Poach Agreements in furtherance of their conspiracy to suppress Senior-Level Employee labor market competition.[36] Below, I clarify my prior testimony and correct certain of Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's descriptions of the No-Poach Agreements, and explain that my prior opinions have not changed.

---

[31] Gerhart Report ¶ 21.

[32] Compl. ¶¶ 38, 105.

[33] Gerhart Dep. at 102:8–19.

[34] *Id.* at 301:24–302:14.

[35] Gerhart Report ¶ 16 (citing Exhibit ("Ex.") PX506).

[36] *Id.* ¶ 22.

37. *Nomenclature.* Nomenclature is important here, and Dr. Saravia and Dr. McCrary muddy the waters with imprecise language.

38. **Non-Solicitation Agreements.** At times, Dr. Saravia and Dr. McCrary incorrectly refer to Defendants' No-Poach Agreements as "non-solicitation agreements."[37] "Non-solicitation agreements" typically refer to a very different kind of employment restriction, wherein the "[e]mployee agrees to not solicit a company's clients or customers for their own benefit, or the benefit of a competitor, after leaving the company."[38] In contrast, Defendants' Senior-Level Employees were not a party to their employers' alleged agreements with each other not to solicit, recruit, and/or hire from each other.[39] Note that "non-solicitation agreements" also refer to "contractual hiring and recruitment limitations agreed to by external search firms used by Defendants," wherein the external search firms "agree to not recruit and hire *from* firms for which they recruit."[40] These provisions are contractualized, typically time-bound, and for the most part prevent the search firms from recruiting a specific subset of employees, in exchange for obtaining the recruiting contract.[41]

39. **No-Hire Agreements.** Similarly, Dr. McCrary objects that I have failed to sufficiently show that the evidence is consistent with "no-hire agreements" (i.e., agreements that prevent hiring between employers altogether) between Defendant firms.[42] His objection is irrelevant, because Plaintiffs allege that Defendants established No-Poach Agreements, which

---

[37] *See, e.g.,* Saravia Report ¶ 12; McCrary Report ¶¶ 13, 250.

[38] U.S. DEPT. OF TREASURY, THE STATE OF LABOR MARKET COMPETITION 13 (Mar. 7, 2022), https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf.

[39] Compl. ¶¶ 87–90.

[40] McCrary Report ¶ 140 (emphasis omitted).

[41] *Id.* & ns.262–272.

[42] McCrary Report ¶ 13.

typically restrict various activities beyond simply hiring, such as solicitation.[43]  For example, Plaintiffs allege that SCA and DaVita and SCA and USPI agreed to restrict labor market competition in a number of ways, including by refraining from cold calling, recruiting, hiring, or poaching each other's Senior-Level Employees.[44]  Further, that these No-Poach Agreements included an identical "tell-your-boss" provision (discussed below) does not undermine my testimony.[45]  As I explained in my report, this provision would likely have created a chilling effect that suppressed Class Member mobility between Defendant firms, if it did not prevent it altogether.[46]

40.     **Non-Compete Agreements.**  Non-compete agreements are another type of labor market restriction.  According to Dr. McCrary, "Non-compete agreements are agreements between an employee and an employer that restrict an individual from seeking employment with certain competing firms (for example those in a defined geographic scope or those explicitly listed or described) for some period of time."[47]  Crucially, "[n]on-compete agreements are negotiated:  to the extent that individuals did not view non-compete agreements as favorable when considering their employment contract, they could negotiate for additional compensation or employment terms."[48]

41.     *The Tell-Your-Boss Provision.*  In my report, I analyzed documentary evidence demonstrating that both No-Poach Agreements included a "tell-your-boss" requirement.[49]

---

[43] LABOR MARKET COMPETITION, *supra* note 38, at 13–14.

[44] Gerhart Report ¶ 21 (citing Compl. ¶¶ 38, 105).

[45] McCrary Report ¶ 13.

[46] Gerhart Report ¶ 81.

[47] McCrary Report ¶ 136.

[48] *Id.*; *see also* LABOR MARKET COMPETITION, *supra* note 38, at 15.

[49] Gerhart Report ¶¶ 77–81.

-18-

Accordingly, SCA and DaVita and SCA and USPI "agreed not to solicit each other's senior executives" unless "the senior executive was already looking at outside jobs and had told their supervisor," before the candidates had job offers in hand.[50]



42. [redacted]

[redacted][51] [redacted]

[redacted][52]

43. [redacted]

[redacted]

[redacted]

[redacted][53] First, recall that Plaintiffs allege and I have opined that, based on the evidence I have reviewed, [redacted]

[redacted][54] Moreover, and as I explain at length below, to clarify, [redacted]

[redacted]

[redacted][55]

---

[50] *Id.* ¶¶ 22(a)(i), 22(b) (citing Ex. PX158 at 473:14–20; Hayek Dep. at 219:20–221:9).

[51] Saravia Report ¶ 6 (emphasis added).

[52] Gerhart Report ¶ 77; *see also* McCrary Report ¶ 250.

[53] McCrary Report ¶¶ 13, 250.

[54] Gerhart Report ¶¶ 22(a), 22(b).

[55] *Id.* ¶ 22(a)(i).

44.    Finally, Dr. Johnson, Dr. Saravia, and Dr. McCrary do not dispute that Defendants' No-Poach Agreements included a "tell-your-boss" provision.[56] As such, my opinions regarding this provision have not changed.

45.    *The SCA-DaVita No-Poach Agreement.* In my report, I submitted evidence demonstrating that SCA and DaVita established their No-Poach Agreement as early as May 2008, when Andrew Hayek left his DaVita VP role to be SCA's CEO.[57] The agreement derived from Hayek's extensive relationship with DaVita's then-CEO Kent Thiry, who demanded that Hayek stop soliciting DaVita employees after Hayek successfully recruited DaVita's then-DVP Michael Rucker to help run SCA as COO.[58] The agreement applied to Director-level employees and above, had a nationwide geographical scope, and as I explain below, continued through 2019.[59]

46.    **Scope.** With respect to the SCA-DaVita No-Poach Agreement, Dr. Johnson and Dr. McCrary contend that I failed to consider evidence showing that the agreement initially applied only to employees at the VP-level and above, and only later expanded to include Directors.[60] This critique has not caused me to change any of my opinions, which I clarify below.

---

[56] Johnson Dep. at 178:13–179:5; Saravia Report ¶ 14; McCrary Report ¶ 17.
[57] Gerhart Report ¶ 22(a).
[58] *Id.*
[59] *Id.* ¶ 22(a)(i).
[60] Johnson Report ¶¶ 4, 55–63; McCrary Report ¶ 145.

47.  SCA and DaVita did not perfectly execute their No-Poach Agreement. ███

████████████████████████████████████████████████

██████████████████████████████ [61]

48.  ███████████████████████████████████████████

███████████████████████████████████ [62]  But

based on my review of the evidence, which Dr. Johnson neglects to assess, the Agreement's

terms were not narrowly invoked, and in the early years, the evidence indicates that SCA and

DaVita did not limit the restrictions to employees at the VP-level and above. ████

████████████████████████████████████████████████

███████████████████████████████████ [63]

████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████ [64] ████████████

████████████████████████████████████████████

████████████████████████████████████████████



---

[61] *See, e.g.*, Ex. PX313 at DOJCIV-008-00000188–91 (████████████████████████████████

███████████████████████████████████████████████████;

Hayek Dep. at 296:3–9 ████████████████

████████████████ Thiry Dep. at 176:6–15 ████████

████ ); *see also* Saravia Report ¶ 14 (██████████████████

██████████████████████ ).

████████ McCrary Dep. at 136:9–14.

[62] Johnson Report ¶ 55.

[63] Gerhart Report ¶ 22(a) (citing Ex. PX484 at DVA_OMCEAL_000429389).

[64] *Id.* ¶ 75(e) (citing Ex. PX333).



50. Further, however the precise terms of the SCA-DaVita No-Poach Agreement may have evolved over time, my opinion that a No-Poach Agreement preventing compensation increases would have had a cascading effect on other employees remains unchanged.[68] Accordingly, even if the No-Poach Agreements were restricted for a time to employees at the VP-level and above, Defendants' systematic salary structures would cause the pay suppression to cascade to other employees, such as those at the Director-level.[69] This cascading pay suppression is a consequence of both (1) internal equity with its focus on appropriate pay differentials based on role and performance contributions, and (2) the fact that, in the absence of

---

[65] *Id.* (citing Ex. PX335 at DOJ-PROD001A-00000239).

[66] Ex. PX376 at DVA_OMCEAL_000122784.

[67] *Id.* at DVA_OMCEAL_000122783–84 (emphasis added).

[68] Gerhart Report ¶ 143.

[69] *Id.* ¶ 148.

No-Poach Agreements, Directors would glean important information about their own likely external higher-paying alternative employment opportunities based on observing the higher-paying external employment opportunities that VPs would likely have received. Further, if a Senior-Level Employee does leave, they often recruit those they know (a form of turnover contagion, which I define below) from their former employer, and Director-level employees would be obvious recruiting targets.

51. **Agreement Start and End Dates.** In my report, ███████████████

████████████████████████████████████████

███[70] Dr. Johnson contends that I ignore contradictory evidence,[71] and Dr. McCrary and Dr. Stiroh opine that the evidence suggests other time periods,[72] but their contentions are unavailing.

52. *Start Date.* ████████████████████████



_____

[70] *Id.* ¶ 22(a).

[71] Johnson Report ¶ 56.

[72] Stiroh Report ¶ 87; McCrary Report ¶¶ 17, 73.

[73] Johnson Report ¶ 56; Johnson Dep. at 169:21–170:5; McCrary Report ¶¶ 17, 243; McCrary Dep. at 126:9–19 (████████████████████████████████); Stiroh Report ¶¶ 87–88 ████████████████████████████; Stiroh Dep. at 142:22–25.

[74] *See, e.g.,* Gerhart Report ¶¶ 22(a), 28(e)(vi) (████████████████████████████████████████████), 75(b) ██ ); *see also* Johnson Dep. at 170:7–14 (████████████████████████████).

-22-



[76] Dr. Stiroh also states that the DaVita indictment "alleged a conduct period from February 1, 2012 to July 31, 2017." [77] This is incorrect. Rather, the indictment alleged misconduct "[b]eginning at least as early as February 2012 and continuing until at least as late as July 2017, th*e exact dates being unknown to the Grand Jury*[.]" [78]

53. *End Date.*

---

[75] Stiroh Report ¶ 91; Gerhart Report ¶ 22(a) (citing Ex. PX484 at DVA_OMCEAL_000429389).

[76] Ex. PX376.

[77] Stiroh Report ¶ 44, n.88.

[78] Superseding Indictment ¶ 9, *United States v. DaVita Inc.*, No. 21-cr-00229-RBJ (D. Colo. Nov. 3, 2021) (emphasis added).

[79] Gerhart Report ¶ 75(e).

[80] Johnson Report ¶ 56; Johnson Dep. at 169:21–170:5; McCrary Report ¶¶ 17, 243; Stiroh Report ¶¶ 87–88; Stiroh Dep. at 142:22–25.



54.     *The SCA-USPI No-Poach Agreement.*

[84] Dr. Johnson and Dr. Saravia have not objected to the

foregoing opinions.[85]

---

[81] Gerhart Report ¶ 22(a)(i) n.31.

[82] *Id.*; Hayek Dep. at 190:12–191:7 (

.

[83] Johnson Report ¶ 38; Stiroh Report ¶ 41; McCrary Report ¶ 211 & Ex. 33.

[84] Gerhart Report ¶ 22(b).

[85] Johnson Dep. at 169:21–170:14; Saravia Dep. at 133:23–137:3.

[86] I am not convinced. As such, my conclusions remain largely the same. ■

55.     <u>CSI Exchanges.</u>  In my report, I explained that, pursuant to Plaintiffs' allegations and my review of the documents and testimony, SCA and DaVita and SCA and USPI exchanged competitively sensitive information, including wage data, to further suppress labor competition and, consequently, pay rates.[87]  Moreover, I found that the evidence showed that ███████████ ███████████████████████████████████████████████████████ ██████████████████████████[88]  I did not assess whether the CSI Exchanges had an end date.  Defendants' Experts have not provided evidence or testimony that has caused me to reconsider the background I provided in my report regarding Defendants' CSI Exchanges.[89]  I therefore have no cause to change my testimony.

56.     <u>Qualitative Analysis Is a Reliable and Robust Methodology.</u>  Defendants' Experts opine that my opinions are deficient because I do not conduct any empirical analysis of the conduct.[90]  I disagree.  My opinion regarding Defendants' anticompetitive conduct is well-founded because it applies my expertise and knowledge of the relevant literature, including

---

[86] McCrary Report ¶¶ 17, 243; McCrary Dep. at 126:9–19.

[87] Gerhart Report ¶ 23.

[88] *Id.* ¶ 23.

[89] McCrary Report ¶ 17 ("I do not express an opinion about whether the alleged conduct," including the CSI Exchanges, "occurred."); *see also* McCrary Dep. at 118:14–18.

[90] *See, e.g.,* Johnson Report ¶¶ 57, 91 n.189, 100; Saravia Report ¶¶ 75, 182 (critiquing my assessments as "not falsifiable"); McCrary Report ¶¶ 15, 82, 99 (remarking, "Prof. Gerhart presents no quantitative evidence of the pay structure he claims exists in his report[.]"), 106, 186; Stiroh Report ¶ 17 ("Dr. Gerhart does not provide any quantitative analysis of compensation data at DaVita or any other Defendant to support his opinions.").

theory and empirical evidence, as well as practice, to a qualitative analysis of the record evidence.

57.     Foremost, Plaintiffs' counsel limited my task to a qualitative assessment of the evidence and theory and research in the fields of compensation design, employee turnover, and human resource management.[91]  I was not tasked with conducting quantitative analysis in this matter, which is a task that I understand Plaintiffs' expert Dr. Evan Starr performs.  Both qualitative and quantitative assessments support antitrust impact in this litigation.

58.     To explain and make sense of what we observe (empirical observations/data), we need theory.  Theory explains why we observe empirical relationships between variables (e.g., how and why employees react to their pay being inconsistent with internal equity and/or external equity) and the conditions (e.g., they are more likely to react when they or another employee receive an unsolicited outside job offer) under which that relationship is likely smaller or larger. Theory is informed by empirical research done broadly across different contexts, not just by the empirical analysis done in a single case.  As such, if empirical analysis in a single case yields results inconsistent with theory, we can look more closely to understand why.  In some cases, we will see that the empirical analysis in that single case is inconsistent with theory (which is based on broader evidence) because of the manner in which the analysis was conducted.

59.     As I explained in my opening report and at deposition, in forming my opinions in this matter, I relied on my extensive academic and research experience in the fields of compensation design, employee mobility/turnover, and human resource management.[92]  That

---

[91] Gerhart Report ¶ 6.
[92] *See* Gerhart Dep. at 29:9–21.

experience includes my work publishing thirty-plus peer-reviewed articles on these subjects,[93] two textbooks on human resource management, the world's foremost textbook on compensation,[94] a research book on compensation, and a case book (which includes software to help simulate an organizational setting) students use to build a structured compensation system.[95] I then applied my decades of knowledge and my compensation-related expertise to my review and assessment of materials from this case and from the related criminal investigation *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.). That material included the Third Consolidated Amended Class Action Complaint (ECF No. 555), depositions, deposition exhibits, FBI investigation interview reports, DaVita criminal trial transcripts, and salary or market pay range materials produced by or compiled from materials from all Defendants.[96] With respect to my opinions that Defendants have structured compensation systems typical of most American companies' compensation systems, I also relied on (1) peer-reviewed compensation-related literature grounded in substantial theory and evidence, and (2) survey data on typical company compensation management practices from WorldatWork.[97] The foregoing constitutes a firm foundation for my assessment.

## IV. DEFENDANTS HAD INCENTIVES AND OPPORTUNITIES TO COLLUDE TO SUPPRESS EMPLOYEE COMPENSATION.

60. Based on my review of the evidence in this litigation and my expertise in compensation and human resource management, my opinion is that Defendant firms were

---

[93] Gerhart Report, Appendix ("App.") A. In contrast, Dr. Johnson, a career expert witness (*see* Johnson Dep. at 63:19–23; Johnson Report, App. A at 1) has only published three peer-reviewed articles. *See* Johnson Dep. at 20:12–22:19; Johnson Report, App. A at 7.

[94] BARRY GERHART, COMPENSATION (14th ed. 2023).

[95] Gerhart Report ¶ 1.

[96] *Id.* ¶ 2.

[97] *Id.*

incentivized to collude to limit employee job mobility and pay and had the opportunities to do so.[98]  Specifically, I opined that Defendants' motives to collude included:  (1) the need to keep turnover low; and (2) the need to manage large labor costs.[99]  Moreover, these incentives were powerful and Defendants had an opportunity to act on them because of the small and close-knit nature of the industry.[100]  Finally, I applied the compensation-related literature and theory to explain that, because employees financially benefit from unrestricted labor markets, Defendants' collusive conduct would likely suppress employees' mobility and compensation.[101]

61.     Below, I explain that Defendants' Experts have not given me cause to change the foregoing opinions.

**A.     Defendants Are Incentivized to Collude to Keep Senior-Level Employee Turnover and Labor Costs Low.**

62.     I have testified that, based on my experience and research in the compensation and human resource management fields, common evidence is consistent with Defendants' strong incentives to collude to minimize Senior-Level Employee turnover because high turnover yields increased labor costs.[102]  As Dr. McCrary explains, if a firm sets pay too low, "the worker may leave and the firm will incur costs to find a new employee and train them.  The firm would have been better off to pay more[.]"[103]

63.     █████████████████████████████████████

████████████████████████████████████████████

---

[98] *Id.* ¶ 24.

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.* ¶¶ 25–37.

[103] McCrary Report ¶ 158.

-28-

████████████████████████████████████████████████████████

████████ [104]  In this section, I explain that my opinions are unchanged by Defendants'

Experts' Reports because they did not submit contrary evidence or otherwise sufficiently counter

my opinion.

### 1.    Defendants Care About Their Employee Turnover Rates.

64.    I testified that based on my experience and research, common evidence shows

that DaVita, SCA, and USPI cared about employee turnover and retention.[105]    ████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ [106]

65.    For example, I explain in my textbook that "[c]ompensation strategy, HR [human

resource] strategy, and business strategy ultimately seek to decrease costs or increase revenues,

relative to competitors."[107]   Moreover, "[s]uccess in recruiting and retention will depend on

competitive compensation."[108]   As such, "[n]ot acting quickly enough or not setting

compensation at a sufficiently competitive level means losing out on employees who choose to

work elsewhere and thus losing out on profits and sales."[109]

66.    Below, I explain that Defendants' Experts have not put forth testimony or

evidence that has caused me to change my opinions.

---

[104] Gerhart Report ¶ 25.

[105] *Id.* ¶¶ 27–30.

[106] McCrary Report ¶ 143.

[107] GERHART, *supra* note 94, at 48.

[108] *Id.* at xv.

[109] *Id.*

67. <u>DaVita Valued Low Senior-Level Employee Turnover.</u> My opinion that DaVita cared about its turnover rates and sought to retain Senior-Level Employees is unchanged by Dr. Johnson, Dr. McCrary, and Dr. Stiroh.[110] Whereas Dr. Johnson and Dr. Stiroh did not address my opinion,[111] Dr. McCrary provided additional evidence that supports my opinion.

████████████████████████████████████████████████████████

████████████████████████████████████████████[112]

████████████████████████████████████████████████████████

████████████████████████████████[113]

68. <u>SCA Valued Low Senior-Level Employee Turnover.</u> In my opinion, the record evidence shows that SCA cared about and sought to reduce Senior-Level Employee turnover.[114] Dr. Johnson and Dr. Saravia did not address my opinion or provide contrary evidence to persuade me otherwise.[115] ████████████████████████████████

████████████████████[116] ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████[117]

████████████████████████████[118] I therefore maintain my opinion.

---

[110] Gerhart Report ¶ 28.

[111] Johnson Dep. at 141:15–21.

[112] McCrary Report ¶ 66 & n.126.

[113] *Id.* ¶ 83 (citing Staffieri Dep. at 120:23–121:18).

[114] Gerhart Report ¶ 29.

[115] Johnson Dep. at 141:15–21; Saravia Dep. at 123:16–124:1.

[116] McCrary Report ¶ 66 & n.126.

[117] *Id.* ¶ 83 (citing SCA000091011).

[118] *Id.* ¶ 143 & n.276 (citing SCA000545210 at SCA000545215 ████████████

████████████████████████████████████████████████████████

69.     <u>USPI Valued Low Senior-Level Employee Turnover.</u>  Again, based on my review of the evidence and my experience and research in compensation and human resource management, USPI tried to minimize employee turnover.[119]

70.     Examples from the Saravia and McCrary Reports actually *support* my opinion that USPI made efforts to reduce turnover.



[120] [121] [122] [123] Note, however, that USPI likely did so less often than it would have in an unrestricted market.

71.     [124]

[125]

---

).

[119] Gerhart Report ¶ 30.
[120] Saravia Report ¶¶ 58, 63.
[121] *Id.* ¶ 67.
[122] *Id.* ¶ 192.
[123] McCrary Report ¶ 142 & n.275.
[124] Saravia Dep. at 123:16–124:1.
[125] *Id.*

72.  [126]

[127] As such my opinion is unchanged.

73. <u>Turnover Rates and JOLTS Data.</u> Further, Dr. Johnson and Dr. McCrary provided additional evidence in *support* of my opinion that DaVita, SCA, and USPI wanted to keep Senior-Level Employee turnover low.

74.

[128] This turnover is ▮ compared to national data from the U.S. Bureau of Labor Statistics, Job Openings and Labor Turnover Survey (JOLTS) data on the industry during the Class Period.[129]

[130]

a. According to national JOLTS data, the employee quit rate, economy-wide (total nonfarm) increased from 16.1% in 2009 to 27.8% in 2019, an increase of 11.7 percentage points or an increase of a factor of 1.73 (27.8/16.1).[131] The narrowest industry classification

---

[126] McCrary Report ¶ 66 & n.126.

[127] *Id.* ¶ 83 (citing USPI_CIV_000401250 at USPI_CIV_000401250).

[128] Johnson Report ¶¶ 45, 109.

[129] *Data Tool, Job Openings and Labor Turnover Survey*, U.S. BUREAU OF LABOR STATISTICS, https://data.bls.gov/multi-screen?survey=jt (last visited June 26, 2025).

[130] McCrary Report ¶ 211 & Ex. 33.

[131] *Job Openings and Labor Turnover Survey*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/jlt/ (last visited June 26, 2025).

using the JOLTS data is the 2-digit NAICS level. Looking at the most detailed industry level (2-digit) data available, NAICS 62, the Health Care and Social Assistance industry, we see that the employee quit rate in this industry increased from 16.0% in 2009 to 24.0% in 2019, or by a factor of 1.50x. Given the 1.73x factor increase in the economy-wide quit rate and the 1.50x increase in the Health Care and Social Assistance industry quit rate, one might have expected a similar large increase in the quit rates at the Defendants. ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████ [132] █████████████████████

███████████████████████████████████

███████████████

75.      Employment Growth.  The substantial growth in the number of Senior-Level Employees (discussed below) and the even greater growth in employee hires necessary in the face of, not only employment growth, but also the need to replace employees due to turnover, would likely have resulted in increasing labor costs and reinforced Defendants' concern with controlling labor costs.  No-Poach Agreements and coordination on pay increases would be ways to reduce competition in the labor market as a means to control labor costs.

### 2.      Defendants Seek to Manage Their Substantial Labor Expenditures.

76.      In this section, I explain that Defendants' Experts have failed to change my opinion about their C-suite executives' concern with labor costs.  Based on my review of the

---

[132] Johnson Report ¶¶ 45, 109. ████████████████████

███████████████████████████████████

        *Id.* ¶ 45 n.97.

common evidence, I found that (1) ███████████████████████████████████ and

(2) Defendants used labor costs as a performance measure. Consequently, their C-suite

executives (and key co-conspirators in this litigation) are motivated by bonuses and/or equity

grants to keep these costs low.[133]

77. █████████████████████████████████████████████

████████ Below, I explain that Defendants' Experts do not refute my conclusion that like

with most organizations,[134] ███████████████████████████████

███████[135]

78. *DaVita.* █████████████████████████████████

████████████████████████████████████[136] ██████

███████████████████████████████████████

█████████████████████████████[137] My opinions therefore

remain the same.

79. *SCA.* █████████████████████████████████

████ Dr. Johnson, Dr. Saravia, and Dr. McCrary did not rebut my opinion.[138] My opinions

have therefore not changed.

80. *USPI.* ████████████████████████████████

█████████████████████[139] so my opinion has not changed.

---

[133] Gerhart Report ¶ 31.

[134] GERHART, *supra* note 94, at 58 ("Compensation is often a company's largest controllable expense.").

[135] Gerhart Report ¶ 32.

[136] *Id.* ¶ 32(a).

[137] Johnson Dep. at 161:3–8.

[138] *Id.* at 161:3–8; Saravia Dep. at 124:3–6.

[139] Gerhart Report ¶ 32(c); Saravia Dep. at 124:3–6.

81. <u>Defendant Firms Cared About Managing Labor Costs.</u>  I opined that labor costs typically constitute an organization's largest expense.[140]  Because lower labor costs generally translate into higher profits and increased executive compensation, firms are usually careful not to raise pay levels higher than necessary—though of course, they are expected to manage these costs legally.  As I noted in my opening report, Defendants had incentives to collude to reduce their labor costs and increase the stock price[141]:

> Defendants cared about keeping turnover lower and reducing their significant labor costs, as a means to increase Defendant firms' profits and stock value, and which likely inured to the benefit of Defendants' C-Suite executives, who were paid in stock and/or were otherwise financially incentivized to keep costs low.

82.  I write in my compensation textbook that "compensation is a powerful tool that has major consequences for the success or failure of an organization."[142]  "Other things being equal, the higher the pay level, the higher the labor costs[,]" and "the higher the pay level relative to what competitors pay, the greater the relative costs to provide similar products or services."[143]  As the McCrary Report elaborates, using what appears to be agency theory logic[144]:

> Equity compensation is particularly common for more senior level positions.  From an economic perspective, ideal employee compensation reflects employee performance.  From this perspective, equity compensation is anomalous:  people dislike risk, and rewarding an employee with equity compensation saddles them with risk.  The economics literature describes, however, that for some employees sufficiently high in the organization, equity compensation is expected, because the value of aligning firm incentives and employee incentives outweighs the inefficiency of giving employees the risk they dislike.

Dr. McCrary helpfully explains in a footnote, "'[P]erhaps the most important justification for equity-based pay is to generate incentives.  This explanation is likely to apply . . . among very

---

[140] Gerhart Report ¶¶ 33–36.

[141] *Id.* ¶ 7(a).

[142] GERHART, *supra* note 94, at xvi.

[143] *Id.* at 212.

[144] McCrary Report ¶ 78.

high-level managers at large firms.  These employees can have an important impact on the firm's value[.]"[145]

83.  [146]:

For example, employers may instead choose to engage in more nefarious efforts to "alter the structure of their own work relationships to lower their labor costs and undercut competition at the expense of workers."[147]

84. The 2022 U.S. Department of Treasury paper "The State of Labor Market Competition" (which Dr. Johnson and Dr. Stiroh cite[148]) explains, "A labor market monopsonist leverages their position to pay their workers less than the competitive rate for a given job.  In a perfectly competitive market, each worker earns the market value of what they contribute to production[.]"[149]  According to Dr. Johnson, perfect competition "assumes perfect resource

---

[145] *Id.* ¶ 78 n.167 (citing Edward P. Lazear & Paul Oyer, *Personnel Economics, in* THE HANDBOOK OF ORGANIZATIONAL ECONOMICS 502 (Robert Gibbons & John Roberts eds., 2013)); *see also* McCrary Report ¶ 87 n.184 (citing George-Levi Gayle & Robert A. Miller, *Has Moral Hazard Become a More Important Factor in Managerial Compensation?*, 99 AMERICAN ECONOMIC REVIEW 1740–1769, 1740 (2009) ("Executive compensation is tied [] to various indicates of managerial effort, such as the firm's performance.")).

[146] Gerhart Dep. at 59:18–60:17.

[147] LABOR MARKET COMPETITION, *supra* note 38, at ii.

[148] *See, e.g.,* Johnson Report ¶ 27 n.47; Stiroh Report ¶ 24 n.43.

[149] LABOR MARKET COMPETITION, *supra* note 38, 3–4.

mobility."[150]  As explained in the Treasury paper, however, "A labor-market monopsonist instead sets its compensation below" the market value of what its workers contribute, "which reduces its cost of production and therefore raises profits."[151]

85.     Below, I explain that here, there is no evidence to suggest that Defendants are any less focused on controlling labor costs than any other large employer in the United States.[152]

█████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████ [153]

86.     *DaVita.*  I opine that DaVita cared about managing its labor costs, █████████████

██████████████████████████████████████████████████████████████████

████████████████ [154]

87.     The Johnson Report references evidence that in fact supports my opinion regarding DaVita.  ████████████████████████████████████████████████████████

█████████████████ [155]  ██████████████████████████████████████████████████

█████████████████████████████████████████████ [156]  █████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████  It would also

---

[150] Johnson Dep. at 186:3–25.

[151] LABOR MARKET COMPETITION, *supra* note 38, at 3–4.

[152] The U.S. Census Bureau defines a large employer as having 500 or more employees. Christopher Goetz & Martha Stinson, *The Business Dynamics Statistics:  Describing the Evolution of the U.S. Economy from 1978-2019*, U.S. CENSUS BUREAU (Oct. 2021), https://www2.census.gov/ces/wp/2021/CES-WP-21-33.pdf.

[153] Gerhart Report ¶¶ 33–36.

[154] *Id.* ¶ 36 (a).

[155] Johnson Report ¶ 173 & Ex. 32.

[156] *Id.* ¶ 175; *see also id.* ¶ 173 & Ex. 32.

reduce the likelihood that Senior-Level employees receiving lower stock-related compensation would quit to join another Defendant.

88.     The McCrary Report also contains additional supporting evidence showing that DaVita cared about managing its labor costs.



[157]

89.     Otherwise, Dr. Johnson, Dr. McCrary, and Dr. Stiroh have not provided any testimony or evidence to show that DaVita made no effort to manage its labor expenses.[158]  As such, my opinion is unchanged.

90.     *SCA.*  I also explained in my report that SCA was similarly concerned about controlling labor costs and used profit sharing to induce senior executives to promote this goal.[159]  As above, Dr. Johnson ignored my analysis, and likewise Dr. Saravia did not address my opinion or submit contrary evidence regarding my assessment of SCA's labor cost control measures.[160]

[161]  My opinion has therefore not changed.

---

[157] McCrary Report ¶ 77 (citing Staffieri Dep. at 150:7–152:1).

[158] *See* Johnson Dep. at 141:22–142:8.

[159] Gerhart Report ¶ 36(b); *see also* Johnson Dep. at 141:22–142:8.

[160] Gerhart Report ¶ 36(b).

[161] McCrary Report ¶ 85 n.179 (citing Fanning Dep. at 169:5–13).

91. *USPI.* In my opinion, the evidence demonstrates that USPI's labor costs were a significant part of its costs and its executives took care not to raise them higher than necessary.[162]

92.



This testimony supports my own.

93. Dr. Saravia and Dr. McCrary did not otherwise refute my analysis, such that I have no cause to change my opinion.

### B. A Close-Knit Industry Increases Incentives and Opportunities to Collude.

94. In my report, I opine that Defendants had stronger incentives to collude because their industry's small size provided opportunities for the major co-conspirators to develop collaborative relationships that in turn became opportunities to facilitate collusion.[165]

95. Indeed, both the Johnson and Saravia Reports contain evidence that further supports my assessment that the industry was close-knit. ▮▮▮▮▮▮▮▮

---

[162] Gerhart Report ¶ 36(c).
[163] Saravia Dep. at 72:8–16.
[164] *Id.* at 73:18–74:11.
[165] Gerhart Report ¶¶ 38–40; Gerhart Dep. at 71:6–15.

████████████████████████████████████████████████████ [166] But

Defendants' connections go back even further. DaVita, formerly Total Renal Care Holdings, Inc., was founded in 1979 as Medical Ambulatory Care, Inc., as a subsidiary of National Medical Enterprises, Inc., now Tenet, to own and operate Tenet's dialysis services.[167] USPI is now owned by Tenet.[168]

96.     The close-knit nature of the industry corresponds with the record evidence. █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ [169]

97.     Further, even after former SCA CEO Hayek became the Optum CEO in 2017, his close relationships with Thiry and former USPI CEOs Bill Wilcox and Brett Brodnax continued.

████████████████████████████████████████████████████████████

████████████████████████████████████████ [170] ████

████████████████████████████████████████ [171] ████

---

[166] Johnson Report ¶¶ 20–21 & n.27; Saravia Report ¶ 49; McCrary Report ¶ 84 n.175; Stiroh Report ¶¶ 9–10.

[167] Total Renal Care Holdings, Inc., Form 10K at 39 (Oct. 8, 1999), http://pdf.secdatabase.com/409/0000898430-99-003846.pdf.

[168] Gerhart Report ¶ 15 (citing Press Release, Tenet Health Completes Purchase of USPI from WCAS (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx; Press Release, Tenet Healthcare Corp., Tenet Healthcare Corp. Completes United Surgical Partners Int'l & Aspen Healthcare Transactions (June 16, 2015), https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm#:~:text=DALLAS%20%E2%80%93%20June%2016%2C%202015%20%E2%80%93,U.S.%20short%2Dstay%20surgery%20platform); *see also* McCrary Report ¶ 84 n.175; Stiroh Report ¶ 11.

[169] Cagle Dep. at 62:4–8.

[170] SCA000153859.

[171] USPI_CIV_000007019 (████████████████████████████); SCA001395985 (██████████████████); SCA000412504 (████████████████████).

██████████████████████████████████████████████

████████████[172]

98.     Defendants' Experts did not otherwise address my opinion that Defendants had the opportunities to act on their incentives to collude to suppress competition with each other for labor.  As such, my opinions in my report regarding the foregoing have not changed.

### C.     Collusion Robs Employees of Pay Growth from Voluntary Job Changes and Unrestricted Job Mobility.

99.     I opine that, based on my review of the literature, employees benefit from uninhibited opportunities for job mobility, which includes unsolicited outside offers as well as actual employer moves/changes.  Again, the key inquiry is about opportunities/offers and not just actual moves.[173]  Uninhibited job mobility, which includes both job offers and actual moves to another employer, can increase employers' labor costs because employers will have to increase compensation in response to outside offers and/or the threat of outside offers to retain and/or replace employees.[174]  My opinion that any anticompetitive labor market restrictions that suppress opportunities for job mobility would likely harm employee pay is unchanged by Defendants' Expert Reports.

### 1.     In Unrestricted Markets, Departing Employees Experience Pay Growth from Voluntary Job Changes.

100.    In my report, I opined that all types of employees benefit from voluntary job changes.[175]  Below, I explain that Defendants' Experts have not rebutted my opinion.

---

[172] SCA000630035.

[173] Gerhart Report ¶¶ 41–58; *see also* Johnson Dep. at 226:2–22 ████████████████████

████████████████████████████████ ).

[174] Gerhart Report ¶¶ 41–58.

[175] *Id.* ¶¶ 43–49.

101.    _Pay Growth from Job Mobility._  In my report, I explained that according to the extensive literature on the topic, which is evidence common to the Class, employees (and in particular senior employees) experience substantial pay growth when they voluntarily change employers or use offers to negotiate higher pay at their current employers.[176]  Dr. McCrary agrees:  "[C]ompetition benefits sellers in general and input markets,"[177] including by increasing employees' compensation in the labor market.[178]  In turn, mobility restrictions will suppress employee pay level and growth and will also harm incumbent employees who would have otherwise benefited from indirect compensation effects and/or new opportunities themselves (discussed below).[179]  Note that my distinction between direct and indirect effects is not meant to be a distinction in any legal sense.[180]  Rather, I am explaining additional ways mobility restrictions will suppress employee pay.  These indirect effects, or cascading effects, as I refer to them, are no less important or real than direct pay effects, as Dr. McCrary contends.[181]

102.    Here, it is worth reiterating a study of executives that I cited in my opening report, which reported that "companies dramatically raise pay for their incumbent [i.e., remaining] executives after losing executives" to executive positions at other companies.[182]  The study also reported that the incumbent executives received a 46% increase in compensation one year later (chiefly as stock-related compensation).[183]

---

[176] _Id._ ¶ 44.

[177] McCrary Dep. at 48:20–49:6.

[178] _Id._ at 49:7–50:13.

[179] Gerhart Report ¶ 44.

[180] _See_ Johnson Report ¶ 6; Saravia Report ¶ 169.

[181] McCrary Report ¶¶ 113–114.

[182] Gerhart Report ¶ 51 (citing Huasheng Gao, Juan Luo, & Tilian Tang, _Effects of Managerial Labor Market on Executive Compensation:  Evidence from Job-Hopping_, 59 J. ACCT. & ECON. 203–220 (Apr.–May 2015)).

[183] _Id._

103.    Defendants' Experts did not rebut or otherwise address this testimony.  As such, my opinions are unchanged.

104.    <u>Importance of Employee Mobility for Labor Markets.</u>  I also previously provided an overview showing that employee mobility and mobility opportunities are crucial to a well-functioning labor market and economy.[184]  As above, Defendants' Experts did not address or provide evidence to refute my opinion, and as such my opinions have not changed.

105.    <u>Effects of Changing Jobs on Compensation.</u>  My opinion is that much research shows a substantial increase in compensation for employees who voluntarily change employers, particularly for higher-paid jobs.[185]  Since Defendants' Experts have not addressed this testimony, I have not changed my opinion.

106.    <u>Additional Job Opportunities for Remaining Employees.</u>  I opined that employees who accept new job opportunities often recruit their colleagues to leave with them, which increases the consequences of a single job offer.[186]  Defendants' Experts object that only employees who would have received cold calls in the absence of the No-Poach Agreements would have been "directly" affected.[187]  That viewpoint is reductive.

107.    Their opinion is contradicted, for instance, by human resource management professors Jie Feng, Junchao (Jason) Li, Su Chen, and Alex L. Rubenstein (2024).  They define "group turnover" as "'employee departures that occur within *groups*,' including 'teams, work groups, or departments, which are often nested within a single organization and/or location'

---

[184] Gerhart Report ¶ 45.

[185] *Id.* ¶ 46.

[186] *Id.* ¶ 48.

[187] Johnson Report ¶ 51; Saravia Report ¶ 108; McCrary Report ¶ 21; Stiroh Report ¶ 56.

(Hausknecht & Trevor, 2011, p. 353, emphasis ours)[.]"[188]  The concept of "turnover contagion"

explains that "the notion of a collective withdrawal spiral, even if due to distinct individual

causes, is common among groups to the extent that members (and leaders) often appreciably

influence each other's expectations at work and subsequently, each other's attitudes and

behaviors, ultimately triggering sequential or concerted departures[.]"[189]  Further, because co-

workers know each other's performance and values better than anyone, they are in the very

advantageous position of knowing which employees are the most valuable targets.

108.



.[190]

[191]  This reaction is precisely an example of

what Feng, Li, Chen, and Rubenstein (2024) deem "group turnover development" that[192]:

> operates via a self-reinforcing dynamic, in which departure-initiator(s)' thoughts of
> leaving or their actual departure (i.e., a turnover spark) can prompt other members
> (i.e., early onboarders) to leave, thereby establishing a psychosocial context for
> quitting that further begets other responders (or perhaps even the entire group) to
> exit, often within a short time interval (or even simultaneously[]).

109.    As the Hayek-Rucker departures demonstrated, the loss of one employee could

lead to more employee losses in a short timeframe, which would thereby reduce productivity and

---

[188] Jie Feng, Junchao (Jason) Li, Su Chen & Alex L. Rubenstein, *From a Spark to a Sweeping Fire:  An Integrative Conceptual Review of Group Turnover and a Theoretical Exploration of Its Development*, 109 J. OF APPLIED PSYCH. 13–38, at 13 (2024).

[189] *Id.* at 13–14.

[190] Gerhart Report ¶ 49.

[191] *Id.*

[192] Feng et al., *supra* note 188 at 14.

increase training and labor costs.[193]  Such losses are especially serious when those departing were likely on the path to be high impact future top leaders (as in the case of Hayek and Rucker).

110.    Additional evidence in the Stiroh Report bears this out.  Dr. Stiroh's Figure 1 shows that Bain & Company was one of the top three employers DaVita most frequently hired from during the Class Period.[194] ███████████████████████████████████████

███████████████████████████████████████████████████████████

██████[195]

111.    Relevant here, according to Feng, Li, Chen, and Rubenstein (2024), the foregoing dynamic of a loss leading to more employee losses has even greater consequences where "highly regarded, influential members" leave because "their departures should have a stronger effect on remaining members."[196]  Thiry and Hayek watched this principle play out in real time.

112.    Defendants Were Aware of Effects of Mobility Restrictions.  In my report, I opined that I reviewed evidence consistent with Defendants' awareness of this trend, which compounded their incentives to collude.[197]  Defendants' Experts have not put forth any rebuttal testimony or evidence to cause me to change my opinion.

### 2.    Incumbent Employees Also Benefit from Unrestricted Job Mobility.

113.    ████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████[198] ████████████████████████████████████████████████

---

[193] *See, e.g.,* Gerhart Report ¶ 28.

[194] Stiroh Report ¶ 33 & Figure 1.

[195] Thiry Dep. at 34:14–16.

[196] Feng et al., *supra* note 188 at 27–28.

[197] Gerhart Report ¶ 49.

[198] Saravia Report ¶¶ 104–132.

████████████████████████████████████████ [199] But as I explained in part above, the indirect harms are no less pernicious. In my report, I explained the principles underlying my analysis that employees' compensation benefits from voluntary job changes in the absence of mobility restrictions also apply to incumbent employees (i.e., a firm's current employees who remain at the firm).

114. Put simply, employers can use higher pay to incentivize remaining employees to stay at the firm, and often need to do so in response to turnover, either in a proactive manner to head off outside offers and employees' receptiveness to them or to retain an employee with an outside offer.[200]

115. ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ [201]

116. I also applied my experience and research in compensation and human resource management to my review of evidence common to the Class in this litigation and found further support for these principles.[202]

117. Defendants' Experts did not address the foregoing testimony and did not put forth evidence to rebut my assessment. Accordingly, I have not changed my opinions.

118. The Connection Between Turnover and Incumbent Compensation at DaVita. In my opinion, pursuant to common evidence, at times, turnover increased market rates for compensation, which in turn put pressure on DaVita to initiate upward compensation

---

[199] McCrary Report ¶¶ 113–114 & n.230.
[200] Gerhart Report ¶¶ 50–57.
[201] Gerhart Dep. at 134:3–25.
[202] Gerhart Report ¶ 58.

adjustments to improve retention.[203]  As such, DaVita and SCA could use their No-Poach

Agreement to limit turnover and reduce the need for upward pay adjustments.[204]  Dr. Johnson,

Dr. McCrary, and Dr. Stiroh have not persuaded me to change my opinion.

119.    <u>SCA Increased Compensation in Response to Turnover.</u>  As above, Dr. Johnson

and Dr. McCrary have not provided any reason for me to change my view that, based on my

review of common evidence, SCA sometimes offered more pay to prevent further turnover (but

likely would have needed to raise pay more so, in the absence of the No-Poach Agreements and

CSI Exchanges).[205]  My opinions are therefore unchanged.

120.    <u>USPI Used Pay Adjustments to Address Turnover.</u>  Again, Dr. Saravia and Dr.

McCrary did not address my opinion or the evidence I submitted showing that USPI increased

compensation to address turnover (though this happened less frequently due to labor market

restrictions),[206] so I maintain my opinions.

## V.    DEFENDANTS' COLLUSION WOULD LIKELY HAVE HARMED EMPLOYEES' COMPENSATION.

121.    In my report, I assessed evidence common to the Class documenting that in a

normal (i.e., unrestricted) labor market, Defendant firms regularly cold called high-value, passive

candidates for employment.[207]  I also applied my experience and research in compensation and

human resource management to my analysis of common evidence showing that Defendants' No-

Poach Agreements restricted cold calling and limited employees' confidentiality in the hiring

process, which in turn suppressed Senior-Level Employees' job mobility and bargaining

---

[203] *Id.* ¶ 58(a).

[204] *Id.*

[205] *Id.* ¶ 58(g).

[206] *Id.* ¶ 58(h).

[207] *Id.* ¶ 59.

power.[208]  Additionally, I examined common evidence and determined that Defendants' No-Poach Agreements likely harmed Class Members' compensation, and opined that such wage suppression will likely persist for years.[209]  Based on my review of the evidence and my expertise in compensation and human resource management, Dr. Johnson and Dr. Saravia have not put forth any compelling rebuttal testimony or evidence sufficient to persuade me to change any of the foregoing opinions.

122.     According to the 2022 U.S. Department of Treasury paper, No-Poach Agreements and CSI Exchanges are part of a[210]:

> [R]ange of practices that firms use to restrain competition for workers, most clearly to lower wages and benefits, but also potentially to negatively impact job characteristics beyond just compensation.  Firms can engage in tacit collusion by sharing wage information for different occupations, conspiring to fix wages, [and/or] adopting no-poach agreements where firms agree not to hire other firms' workers[.]

### A.     In an Unrestricted Labor Market, Defendants Highly Value Recruiting Passive Candidates with Specialized Skills.

123.     In my opinion, high-value employees with specialized skills, such as Class Members, often do not proactively search for alternative employment opportunities, despite their likely interest.[211]  But Defendant firms intently sought this category of employees, known as passive candidates, and as such needed to engage in proactive recruitment measures to hire these workers.[212]  In this section, I explain that based on my review of the compensation-related literature, my expertise in compensation and human resource management, and the quantitative

---

[208] *Id.*

[209] Gerhart Report ¶ 59.

[210] LABOR MARKET COMPETITION, *supra* note 38, at i.

[211] Gerhart Report ¶ 60.

[212] *Id.*

and qualitative evidence in this litigation, Defendants' Experts have not provided any testimony or contrary evidence that has caused me to change the foregoing opinions.

124.    Cold Calling Constitutes a Valuable Recruiting Mechanism.  I previously provided an overview of the compensation-related literature, which is evidence common to the Class, to explain that cold calling is a valuable recruiting mechanism that benefits both passive employees and employers, and is broadly used in U.S. labor markets to recruit valuable talent with specialized skills.[213]

125.    For example, human resource management professors Feng, Li, Chen, and Rubenstein (2024) explain that "alternative job offers usually come in unsolicited from the competing organization rather than from group members' individual proactive search efforts (Groysberg & Abrahams, 2006)."[214]

126.    Similarly, in my opening report,[215] I described a Federal Reserve Bank of San Francisco study.  That study concluded that "more than three-quarters of workers who switched employers did not report an active job search in the previous three months," and thus the study observed that "a majority of people" actually "find jobs without ever reporting actively looking for one."[216]

127.    Defendants' Experts declined to persuade me otherwise.[217]  As such, my opinion is unchanged.

---

[213] *Id.* ¶ 61.

[214] Feng et al., *supra* note 188 at 21.

[215] Gerhart Report ¶ 61.

[216] Carlos Carrillo-Tudela, Bart Hobijn, Patryk Perkowski & Ludo Visschers, *Majority of Hires Never Report Looking for a Job*, FED. RSRV. BANK OF S.F. ECON. LETTER (Mar. 30, 2015).

[217] *See* Saravia Dep. at 129:22–130:12.

128.    <u>Class Members Possess Specialized, Industry-Specific Skills.</u>  I testified that common evidence shows that Defendant firms perceived that they required Senior-Level Employees with specialized, industry-specific skills, who were often difficult to find.[218]

███████████████████████████████████████████████████████████████

███████[219]  Below I explain that Defendants' Experts have not given me cause to change my opinions.

129.    *Skill Variety.*  ██████████████████████████████████

████████████████████████████████████████████████████████

███████████.[220]  This is not inconsistent with my opinions.  Regardless, lost opportunities to work at Defendant firms would have been especially good matches, requiring little search effort and greatly reduced risk/uncertainty, and would have resulted in substantially higher pay for Class Members at their current Defendant employer or at their new Defendant employer.  The opportunities would have also resulted in substantially higher pay for other employees connected to them because Defendant companies were committed to internal equity and a structured compensation system.  Further, it is important to note that there were no exemptions for particular skill areas in these agreements.[221]  In other words, the agreements stipulated no recruiting from *any* Director-level or above job.  The agreements did not, for example, prohibit recruiting at the Director-level and above, except for business development or except for finance or except for information technology, and so forth.  Again, it was a prohibition that applied to *all* Director-level and above positions.

---

[218] Gerhart Report ¶ 62.

[219] McCrary Dep. at 156:2–10.

[220] Saravia Report ¶¶ 56, 102–103; McCrary Report ¶¶ 41, 45, 53–57, 107–112; Stiroh Report ¶¶ 32–40.

[221] Gerhart Report ¶¶ 22(a)(i), 22(b).

130.    *DaVita.*  I have not changed my assessment that DaVita sought to hire difficult-to-find Senior-Level Employees with specialized skills.[222]

131.

[223]  However, they do not explain whether these new hires had consulting experience in the healthcare industry and/or for DaVita specifically.  But based on my decades of experience in the compensation and human resource management fields, they likely did.

132.    **2014 DaVita Communication re VP Role.**



133.

---

[222] *Id.* ¶ 62(a).

[223] Johnson Report ¶¶ 39–41; McCrary Report ¶¶ 41, 43; Stiroh Report ¶¶ 33–34, Figure 1.

[224] DVA_OMCEAL_000010256 at DVA_OMCEAL_000010258.

[225] *Id.*

[226] DVA_OMCEAL_000413696 at DVA_OMCEAL_000413696.

███████████████████████████ [227] Dr. McCrary cites to Boyink's LinkedIn page, wherein Boyink represents that he has "a strong background in Healthcare Consulting primarily focused on provider and system improvement driving effective and efficient care delivery in the US, UK, and Developing Markets. My goal is to improve care and efficiency, in developed and developing markets, through new delivery models and capabilities."[228] Further, prior to joining DaVita, Boyink earned a dual Masters in Public Health in Hospital Administration and MBA at the University of Michigan, where he participated in the Michigan Healthcare Executives Student Association and the Healthcare and Life Sciences Club.[229] ███████████████████████████████████████

██████████████████████████████████████████████████████ [230]

Highmark is a healthcare insurer,[231] which would suggest that Boyink and his former McKinsey mentor worked in healthcare consulting at McKinsey.

134. **Consideration of Other Non-Defendant Candidates.** ██████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ [232] As I explain above, that certain of Defendants' Senior-Level Employees possess skills that transfer to

---

[227] McCrary Report ¶ 41 (citing Andrew Boyink, LINKEDIN https://www.linkedin.com/in/andrewboyink).

[228] Andrew Boyink, LINKEDIN, https://www.linkedin.com/in/andrewboyink (last visited June 26, 2025).

[229] *Id.*

[230] DVA_OMCEAL_001144622 at DVA_OMCEAL_001144622.

[231] HIGHMARK, https://www.highmark.com/ (last visited June 26, 2025).

[232] McCrary Report ¶ 45 (citing DVA_OMCEAL_000011812 at DVA_OMCEAL_000011815; DVA_OMCEAL_000538771 at DVA_OMCEAL_000538801; DVA_OMCEAL_000760685 at DVA_OMCEAL_000760687); Stiroh Report ¶¶ 39–40.

some degree to other industries is not surprising.  The point, though, is that there is no guarantee that those jobs would be as good of matches for those employees, and Dr. McCrary and Dr. Stiroh makes no attempt to demonstrate as much.

135.

136.    Moreover, the Stiroh Report includes evidence that undermines her opinion and supports mine.

---

233 *Id.* ¶ 39 (citing Staffieri Dep. at 118:5–120:8).

234 *Id.* ¶ 39 (citing DVA_OMCEAL_000124754).

235 DVA_OMCEAL_000124754 at DVA_OMCEAL_000124754–55.

236 Stiroh Report ¶ 40 (citing DVA_OMCEAL_001294850 at DVA_OMCEAL_001294852; DVA_OMCEAL_001296753).



137.

138.     Finally, Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not opine as to whether the evidence shows that DaVita placed value on recruiting passive candidates for employment.[240] As such, I find that I do not have cause to change my opinion that DaVita needed to proactively recruit employees with specialized skills to fill its open senior-level positions.

---

[237] DVA_OMCEAL_001296753 at DVA_OMCEAL_001296754. *See also* McCrary Report ¶ 55 (citing DVA_OMCEAL_001317525–27 (

; DVA_OMCEAL_001313820 at DVA_OMCEAL_001313821

)).

[238] Gerhart Report ¶ 62(a)(iii)

).

[239] Gerhart Report ¶ 74(b) (citing Ex. PX275 at DVA00097065 (

)).

[240] Johnson Dep. at 147:18–150:15.

139.    *SCA.*  My opinion that SCA sought candidates from a finite talent pool and in ordinary circumstances would have proactively recruited DaVita and USPI employees is also unchanged by Defendants' Expert Reports.[241]

140.    **SCA Valued DaVita Candidates.**  Dr. Johnson and Dr. Stiroh did not submit persuasive testimony or other qualitative evidence to show that SCA did not value DaVita candidates.[242] ██████████████████████████████████████████

███████████████████████████████████████████████████

████[243]  I am unconvinced.

141.    Dr. Johnson, along with Dr. McCrary and Dr. Stiroh, failed to address the evidence I analyzed showing that, had former SCA CEO Hayek and former DaVita CEO Thiry *not* established the SCA-DaVita No-Poach Agreement, SCA would have pursued DaVita employees.[244]

142.    Similarly, Dr. Johnson, Dr. McCrary, and Dr. Stiroh ignore the evidence I analyzed demonstrating that SCA considered DaVita employees "qualified" to work at SCA.[245] The foregoing is consistent with former SCA COO Rucker's testimony at trial that the goal of

---

[241] Gerhart Report ¶ 62(b).

[242] Johnson Dep. at 147:18–150:15; Johnson Report ¶¶ 39–42.

[243] McCrary Report ¶ 52.

[244] Gerhart Report ¶¶ 75(b) (citing Ex. PX484 at DVA_OMCEAL_000429389 (████████████████████████████████

████████████████████████ ), 75(e) (citing Ex. PX333 ████████████████████

████ ).

[245] *Id.* ¶ 75(e) (citing Ex. PX335 at DOJ-PROD001A-00000239 ████████████████████

█████████████ .

the SCA-DaVita No-Poach Agreement was precisely "to limit the number of employees or teammates that moved" between SCA and DaVita, which would otherwise have been higher.[246]

143.

[247]

[248] I am not persuaded. For one thing, the irony is palpable here, given that SCA's longtime CEO, Hayek, was himself a former DaVita VP, who recruited DaVita's then-DVP Rucker to be SCA's COO, a role which Rucker occupied for nearly a decade.[249] In fact, former SCA Chief Talent Officer Bridie Fanning made this exact point in her testimony at the DaVita criminal trial (which directly contradicts her deposition testimony) when she told the court that she would "have expected movement in the absence of" the SCA-DaVita No-Poach Agreement.[250] She explained that many "of the culture practices and talent practices from DaVita were at SCA," because Hayek and Rucker "brought them with them. So culturally, the demands, the targets, the expectations were very similar."[251] Fanning elaborated that Hayek and Rucker "both came from DaVita to SCA and were wildly successful at SCA."[252]

---

[246] *Id.* (citing Ex. PX158 at 408:5–16; Rucker Dep. at 82:16–83:16 (Rucker confirmed at his deposition that his prior testimony was truthful)).

[247] McCrary Report ¶ 145.

[248] *Id.* ¶ 52 (citing SCA000838956; SCA000163727; Clark Dep. at 145:15–22).

[249] Gerhart Report ¶ 49.

[250] Ex. PX157 at 228:25–229:10.

[251] *Id.* at 229:11–16.

[252] *Id.*; *see also* Fanning Dep. at 33:11–22 (DaVita would "have been one of the top places [Fanning] would have looked for talent.").



[253] In other words, the fact of the agreement by itself would be less damning if SCA could make it look like it was uninterested in DaVita employees even in an unrestricted market.

144.    **Metcalf's Testimony About Industry Experience is Unreliable.**

[254]

[255]

[256]

145.    **Saravia and McCrary Ignore Qualitative Evidence.**  Dr. Saravia and Dr. McCrary also do not rebut the qualitative evidence I analyzed that SCA would have recruited from USPI in an unrestricted labor market.  Whereas Dr. Saravia ignores the evidence altogether,

[257]  I am unconvinced.

---

[253] SCA000163727.

[254] Saravia Report ¶ 103; Metcalf Dep. at 27:1–9; McCrary Report ¶ 46; Stiroh Report ¶ 39.

[255] Metcalf Dep. at 43:23–44:7.

[256] Ex. PX304 at DOJCIV-008-00000301.

[257] McCrary Report ¶ 52.

146.	First,

[258] This instruction implies that SCA would otherwise have recruited USPI employees.

147.	████████████████████████████████████

████████████████████████████████████ [259] (Note that this indicates most employer switches are likely attributable to cheating on the SCA-USPI No-Poach Agreement.  Moreover, and as discussed herein, SCA hired USPI employees at a much lower rate than it likely would have absent the No-Poach Agreement).

148.	The fact that SCA and USPI established their No-Poach Agreement makes it clear that they believed their employees would be very interested in job opportunities at the other Defendants and that, in the absence of such an agreement, they expected to lose valuable employees to each other and/or have to increase pay to prevent that from happening.  Once such losses started, the risk would be that the losses snowball due to turnover contagion.  Thus, they decided to nip it in the bud early by restricting Class Members' mobility.

149.	**McCrary's Record Evidence Does Not Support His Views.**  Further, the qualitative evidence Dr. McCrary put forth to rebut my opinion is unconvincing.

150.	████████████████████████████████████

████████████████████████████████████

[260] It is, of course, impractical for any organization of any size to recruit and hire all of its

---

[258] Gerhart Report ¶ 75(e) (citing Ex. PX305 at DOJCIV-008-00000178; Rucker Dep. at 102:7–22, 385:19–388:14).
[259] Saravia Report ¶ 86.
[260] McCrary Report ¶ 45 (citing Fanning Dep. at 112:22–113:20).

employees from one or two other organizations. That SCA recruited candidates from other organizations is not surprising, but does not change the fact that SCA did not recruit from the other Defendant firms.

151.



[261] *Id.* ¶ 41.

[262] SCA001551238 (cover email) and SCA001551239 (attachment) (Kruger resume).

[263] *Id.*

[264] *Id.*

[265] *Id.*

[266] *Id.*



152. ████████████████████████████████████████

████████████████████████████████████████

████████████ [268] This evidence is unconvincing for the same reasons discussed above with respect to DaVita. Moreover, the documents Dr. McCrary cite undermine his testimony and support my own. ████████████████████████████████

████████████████████████████████████████ [269]

███████████████████████████████████

█████████████████████████████████████ [270] ██

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████ [271] ████████████████████████████

███████████████████████████████

█████████ [272] █████████████████████████

██████████████████████████████████

██████████████████████████████████

---

[267] *Id.*

[268] McCrary Report ¶ 45 (citing SCA000003962 at SCA000003962; SCA002270032).

[269] SCA000003962 (cover email) and SCA000003963 at SCA000003965 (attachment).

[270] SCA000003963 at SCA000003966–67.

[271] *Id.* at SCA000003967.

[272] *Id.* at SCA00003967–69.



154. As such, my opinion that, according to the qualitative evidence, SCA required niche candidates for its Director-level and above positions remains unchanged.

155. *USPI.* I opine that USPI valued a small pool of employees with a specialized skillset, which often derived from industry experience;[276] Dr. Saravia and Dr. McCrary say USPI did not.[277] I am unconvinced.

156. I am not swayed by Dr. Saravia's and Dr. McCrary's contentions that I failed to account for qualitative evidence regarding the broader pool of employees from which USPI recruits.[278]

---

[273] *Id.* at SCA000003970.

[274] SCA002270032 at SCA00227032.

[275] McCrary Report ¶ 45 (citing SCA002270032 at SCA002270032–34). *See also* McCrary Report ¶ 55 (citing SCA000128921 (                    ).

[276] Gerhart Report ¶ 62(c).

[277] Saravia Report ¶¶ 53–56, 102–103, 110–116; McCrary Report ¶ 41.

[278] Saravia Report ¶¶ 102–103; McCrary Report ¶¶ 41, 45.

-62-

███████████████████████████████████████████████ [279] ██████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████ [280]

157.     First, in all likelihood, USPI's new hires from consulting firms typically had

healthcare consulting experience, and/or consulted for USPI specifically. ████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████ [281] ██████████████████████

█████████████████████████████████████████████████████████████████

██ [282]

158.     ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████ [283] ██████████████████████████████

█████████████████████████████████████████████████████████████████

[279] Saravia Report ¶ 56.

[280] McCrary Report ¶ 41.

[281] USPI_CIV_000449339 at USPI_CIV_000449340.

[282] *Id.* at USPI_CIV_000449339.

[283] McCrary Report ¶ 41 (citing Stephanie A. Phillips, LINKEDIN, https://www.linkedin.com/in/stephanie-a-phillips-651913).

██████████████████████████████ [284] As such, I am not persuaded to change my view.

159.    That USPI at times recruited from a broader pool of employers does not change the fact that USPI *did* value employees with industry experience, including SCA employees. ██

███████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ [285] ████████

███████████████████████████████████████████████

██ [286]

160.    Moreover, Dr. Saravia and Dr. McCrary do not address the multiple examples I provided wherein USPI employees issued mandates not to recruit from SCA, implying that SCA employees would otherwise have been acceptable candidates in an unrestricted market.[287] Further, additional evidence supports my assessment. ████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

---

[284] USPI_CIV_000115447 at USPI_CIV_000115447–48 (d████████████████████████
████████████). *See also* McCrary Report ¶ 55 (citing USPI_CIV_000457557
████████████████████████
██████████).

[285] Ex. PX88 at DOJCIV-008-00000354.

[286] McCrary Report ¶ 45 (citing Garvin Dep. at 195:15–196:2 ████████
█████████████████████████████████████████████
███████████████████████████████
███)).

[287] Gerhart Report ¶¶ 62(c), 76(b) (citing McGarry Dep. at 65:24–67:20, 74:17–75:5; Ex. PX99), 76(c) (citing Ex. PX216 at USPI_CIV_000010056).

[blackout]<sup>288</sup> My

opinions are therefore unchanged.

**B.      The No-Poach Agreements' Cold Calling Restrictions and Tell-Your Boss Provision Decreased Employees' Job Mobility and Bargaining Power.**

161.    In my report, I opined that, based on my experience in compensation and human resource management and the related literature and theory, employers generally benefit from proactively soliciting and recruiting workers because these mechanisms connect them with high-value candidates.[289]  Moreover, proactive solicitation and recruiting also benefits employees by facilitating their increased access to higher-paying job opportunities.[290]  Consequently, restrictions on employee mobility deprives employees of those opportunities.[291]

162.    I therefore concluded that, based on my expertise and research experience, common evidence in this litigation is consistent with Defendant firms' top executives colluding to restrict labor competition in two key ways.[292]  Defendants:  (1) agreed not to proactively recruit each other's workers; and (2) agreed to require candidates currently employed at each other's firms to inform their supervisors that they wanted to pursue external opportunities before those candidates had job offers in hand, which created a widespread chilling effect.[293]  Taken together, in my opinion, these restrictions would likely have reduced Senior-Level Employees' mobility and suppressed their compensation.[294]

---

[288] Ex. PX101 at USPI_CIV_000004081 (cover email) (emphasis added) and Ex. PX102 (attachment) ([blackout]).
[289] Gerhart Report ¶¶ 64, 66.
[290] *Id.*
[291] *Id.*
[292] *Id.* ¶¶ 65–66.
[293] *Id.*
[294] *Id.*

163. Below, I explain that Defendants' Experts have not put forth rebuttal testimony or evidence that has changed my foregoing opinions.

### 1. Senior-Level Employees Typically Have Limited Access to Labor Market Information.

164. I previously opined that, based on my expertise in compensation and human resource management, relevant literature and theory, and WorldatWork and Institute for Women's Policy surveys of compensation professionals and employees, the labor market is characterized by frictions that impede employees' access to better job opportunities.[295] The foregoing evidence is common to the Class.

165. "A friction is any factor that makes job searches or switches more difficult than the theoretical idea of switching" employers.[296] Such frictions include information asymmetry between employees and employers and high costs of proactive job searches, which make it difficult, if not impossible, for employees to know they are underpaid.[297] Non-compete agreements, which Dr. McCrary opines restricted certain Class Members' mobility,[298] also "introduce frictions into the labor market, weaken workers' bargaining positions, and reduce competition over wages[.]"[299]

166. In contrast with consumers in the product market, "it is typically impossible for workers to learn the compensation associated with every potential employment opportunity."[300] The situation for employers is different. As the 2022 U.S. Treasury paper stated[301]:

---

[295] *Id.* ¶ 69.

[296] LABOR MARKET COMPETITION, *supra* note 38, at 5–6.

[297] Gerhart Report ¶ 69.

[298] McCrary Report ¶ 137.

[299] LABOR MARKET COMPETITION, *supra* note 38, at 15.

[300] *Id.* at 6.

[301] *Id.* at 34.

> [Employers, on the other hand] often have more information regarding workers' outside options than the workers. Many employers have access to non-public compensation surveys, giving them a better understanding of the wage distribution for a given occupation and geography. Even when information is publicly available, HR departments of firms are in a better position to use the data than the typical workers—HR departments have institutional knowledge and a stronger incentive to know where vacancies are posted than a time-constrained worker.

As such, it is unsurprising that alternatively, increased information transparency can increase competition to employees' benefit, according to Dr. McCrary.[302]

167.	Employers' actions will often exacerbate this asymmetry. For example, employers usually delay wage and benefit negotiations with higher-level employees until "the final stage of the hiring process."[303]

168.	These amplified frictions harm employee outcomes because, as the 2022 U.S. Treasury paper explains, "[i]f workers underestimate the wages paid by similar employers, then they will be less likely to actively search for a new employer. For workers, acquiring information about outside options is often more costly than for firms."[304] Taken together, "[l]ack of pay transparency from firms' use of salary history, pay secrecy, and punitive practices against workers sharing pay information" all help employers "restrain[] competition."[305] As such, "the ultimate way of finding out what your opportunities are is to get a concrete, specific opportunity," which usually "come[s] without looking."[306]

169.	Defendants' Experts declined to rebut the foregoing analysis and opinions. Rather, Dr. Johnson testified that he "would be surprised if you could say across all employees,

---

[302] McCrary Report ¶¶ 153, 158.

[303] LABOR MARKET COMPETITION, *supra* note 38, at 6.

[304] *Id.* at 7.

[305] *Id.* at i.

[306] Gerhart Dep. at 125:11–126:2.

they had perfect information."[307]  Likewise, Dr. Saravia agreed that "in general, employees don't have perfect information about alternative job opportunities."[308]  Dr. McCrary also points out that according to the economics literature, which is evidence common to the Class, higher-paid employees learn less (than those with lower pay) about their own individual alternative pay opportunities from generally available information,  which yields an additional friction in the labor market.[309]  Dr. Stiroh impliedly agrees pursuant to her assertion that "[e]conomic literature suggests that increased transparency among producers can lead to more competitive outcomes. In fact, perfect information, for both consumers and producers, is an underlying assumption of a perfectly competitive market."[310]  If even the employer cannot readily look up the labor market rate for a job, the employee will have even less of a chance of accessing the relevant information.

170.    I therefore have not changed my opinion that, according to compensation-related literature and theory, firms typically have more information about labor markets than employees and prohibit or discourage employees from sharing what information they do have, which can reinforce pay suppression.[311]

### 2.    Defendants Limited Pay Transparency.

171.    Defendants Obscured Pay Data.  Based on my review of the evidence, Defendants' conduct accords with typical employer practices in the United States.  Defendants sought to limit their employees' access to pay information, as a means to limit internal equity

---

[307] Johnson Dep. at 151:17–152:16.

[308] Saravia Dep. at 130:14–21.

[309] McCrary Report ¶ 65.

[310] Stiroh Report ¶ 114.

[311] Gerhart Report ¶ 69.

and external equity pay comparisons by employees.[312]  Defendants' Experts did not refute this part of my report.  My opinions are unchanged.

172.  *DaVita.*  In my report, I explained that the common evidence I analyzed showed that DaVita sought to limit its employees' access to pay data for jobs other than their own.[313]  Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not rebut my assessment.  Accordingly, I have not changed my opinion.

173.  *SCA.*  Based on my review of common evidence, SCA sought to limit its employees' access to compensation information.[314]  Dr. Johnson, Dr. Saravia, and Dr. McCrary did not address my opinion that SCA sought to avoid bidding wars, which are often provoked when employees acquire access to labor market information.[315]  As such, my assessment is unchanged.

174.  *USPI.*  In my report, I put forth common evidence to show that USPI shared SCA's same goal of avoiding a bidding war that would have put upward pressure on salary levels.[316]  While Dr. McCrary ignored this testimony, at deposition, ███████████████[317]  As such, my testimony is unchanged.

---

[312] *Id.* ¶ 70.
[313] Gerhart Report ¶ 70(a); Johnson Dep. at 152:17–153:22 ████████████████████████████ ).
[314] Gerhart Report ¶ 70(b).
[315] Johnson Dep. at 152:17–153:22
[316] Gerhart Report ¶ 70(c).
[317] Saravia Dep. at 131:6–132:4.

**3.      Absent Defendants' Collusion, Employees Could Acquire Labor Market Information Through Cold Calls and Proactive Recruitment.**

175.    Based on my experience and research in the fields of compensation and human resource management, compensation-related literature and theory, and evidence in this litigation, which is common to the Class, in unrestricted labor markets, cold calls and proactive recruitment are valuable mechanisms by which employees can overcome labor market frictions and access more accurate wage information.[318] Defendants' Experts have not identified any testimony or evidence sufficient to change my view.

176.    <u>Federal Reserve Study.</u> As discussed, in my original report, I described a Federal Reserve Bank of San Francisco study, which concluded that "a majority of people" actually "find jobs without ever reporting actively looking for one."[319] In other words, unsolicited job offers dominate actual employer changes. This Federal Reserve study concluded that "rather than them [employees] finding jobs, the jobs actually find them[,]"[320] ██████████████████████████ █████████████████████████████████ [321] Defendants' Senior-Level Employees were no different.

177.    <u>Documentary Evidence.</u> ███████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ [322] ██████████████

---

[318] Gerhart Report ¶¶ 71–72.

[319] Carrillo-Tudela, *supra* note 216.

[320] *Id.*

[321] Gerhart Dep. at 98:12–99:4.

[322] Ex. PX88 at DOJCIV-008-00000354.

███████████████████████████████████████████

███████████████████████████████████████ [323]

178.    Theoretical Alternatives vs. Real Matches.  There are, of course, many jobs out there that are theoretical alternatives.  However, there is a big gap between a generically available job and an available job that matches the employee's needs, abilities, and preferences and provides enough beyond the current job for the employee to incur the cost of changing jobs.  In the absence of an unsolicited offer, the employee either never receives an offer (because they are not searching) or they search, but then face the large search costs inherent in finding, pursuing, and evaluating many low-percentage alternative job opportunities.

179.    Tendency to Remain in the Same Industry.  As I discussed in my opening report, research has concluded that employees "remain in their 5-digit industry 39 times more often than random" (i.e., compared to what would be expected if their current industry had no effect on their new destination industry when they switch firms).[324]  Further, I cited evidence showing that the strong tendency to move within the same industry is even more pronounced for higher-paid employees.[325]  This research is directly relevant to this case because all three Defendants fall within the same 5-digit industry, NAICS 62149, Other Outpatient Care Centers.

180.    Turnover Contagion.  Additionally, this information is valuable even for employees who do not receive cold calls.  The social network connected Defendants' employees.  Turnover contagion operates in such cases and works like this: "[A] coworker's search for job alternatives or actual quitting can spread, through a process of social contagion, to affect another

---

[323] *Id.*

[324] Gerhart Report ¶ 61(f) (citing Frank M.H. Neffke, Anne Otto, & Antje Weyh, *Inter-industry labor flows*, 142 J. ECON. BEHAV. & ORG. 275–292 (Oct. 2017)).

[325] *Id.* (citing Eric Parrado, Asena Caner, & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007)).

employee's quitting behavior. Like the contagion of illness, the process involves the transmission of something from one individual to another."[326] Turnover contagion operates with particular force when more employees pursue alternative employment[327]:

> Given that high levels of risk and uncertainty often characterize job transition, . . . we expect employees to look to others in evaluating whether to seek alternative employment. When a number of coworkers are looking for other jobs, it may increase the salience and perceived viability of leaving for a focal employee.

181. Similarly, recall that Feng, Li, Chen, and Rubenstein (2024) describe how "one or a few" employee departures can result in "igniting a turnover spark" that spreads to a group of employees, "ultimately resulting in a sweeping group turnover fire."[328]

182. <u>DaVita Executives Were Likely Aware of Turnover Contagion.</u> ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[329]

If Thiry had not taken these steps, it seems likely that Hayek and Rucker would have looked to DaVita for more of their former co-workers whom they knew and whose capabilities they knew to help SCA going forward. In turn, these former DaVita co-workers would have had concrete job opportunities at SCA. Those opportunities would have come through cold calls, and these opportunities would be seen as less risky and less uncertain given that Hayek and Rucker knew

---

[326] W. Felps, T.R. Mitchell, D.R. Hekman, T.W. Lee, B.C. Holtom & W.S. Harman, *Turnover contagion: How coworkers' job embeddedness and job search behaviors influence quitting*, 52 ACADEMY OF MGMT. J. 545–561, at 546 (2009).

[327] *Id.* at 547.

[328] *See* Feng et al., *supra* note 188 at 23. This "turnover 'spark'" consists of one or a few departure-initiators' turnover decisions or their actual exits. *Id.* In turn, this spark can prompt a set of early onboarders to also quit, which then builds an increasingly salient psychosocial context for leaving that permeates the group to fuel further departures. *Id.*

[329] *See* Gerhart Report ¶ 49.

them, as well as the fact that they knew both SCA and DaVita and thus that these candidates would fit at SCA. Once this process of turnover contagion begins, it can snowball. If that had been allowed to unfold in this case, it could have resulted in a well-beaten path from DaVita to SCA. Making matters worse, Thiry knew that Hayek and Rucker were uniquely capable of identifying and targeting DaVita's best talent.[330]

183. ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████[331]

184. <u>Johnson/McCrary/Stiroh Arguments.</u> As such, I am not persuaded by Dr. Johnson's, Dr. McCrary's, and Dr. Stiroh's objections that I have not shown that employees acquire uniquely valuable information from competing employers' proactive recruiting mechanisms where they also had access to public sources of market data.[332] I am also not persuaded by Dr. McCrary's objection that not all employees necessarily acquire pay information even when they receive cold calls.[333] Based on my expertise and experience in the compensation and human resource management fields, general labor market information (e.g., the unemployment rate) has nowhere near the utility of proactive recruiting. By definition, general and/or public labor market information such as "job alerts" from "internet resource[s]"[334] cannot capture the number and/or quality of opportunities for a particular employee as well as a

---

[330] *See, e.g.,* Ex. PX316 at DOJ-PROD001A-00000029.

[331] *Id.* ¶ 48 (citing Ex. PX124 at DOJCIV-012-00000134; Thurman Dep. at 159:8–160:5 (confirming accuracy of statement to the FBI)).

[332] Johnson Report ¶ 51 n.111; McCrary Report ¶ 145; Stiroh Report ¶¶ 57, 76–77, 80–81.

[333] McCrary Report ¶ 132 ("[E]ven many individuals who would engage by answering the phone or reviewing a message sent to them may not get to the point of learning what the job is paying.").

[334] Stiroh Report ¶ 81.

cold call, which is why unsolicited offers are so important.[335] Moreover, "job alerts" from internet resources have far less applicability or relevance to any individual passive candidate than a targeted search that has invested in identifying a specific individual passive candidate deemed to be a likely good match to the position. At that point, which is essentially the starting point for the passive candidate, the two parties can establish relatively quickly what the parameters of the offer would be (including a narrower salary range than what would ordinarily be posted in a more cast-a-wide-net sort of posting, such as in Figure 15 in the Stiroh Report[336]) and whether there is mutual interest and a match. At this point also the candidate has the option to use the outside opportunity as leverage for a higher pay counteroffer from their current employer.

185. Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not address the remainder of my opinions and evidence on this subject.[337] Further, at deposition, Dr. Saravia confirmed that she had not opined as to whether proactive recruiting efforts would not provide better information to Senior-Level Employees.[338] As such, my opinion that cold calls and proactive recruiting

---

[335] *See* Gerhart Dep. at 118:12–119:13 ("

"); *see also id.* at 122:2–24

). Additionally, Dr. Stiroh cites to evidence that Plaintiff Scott Keech received information about job opportunities from LinkedIn to support her argument that "considerable information about job openings and salaries became increasingly available from public sources during the alleged conduct period." Stiroh Report ¶ 81 n.163.

*See* Keech Dep. at 57:8–60:2

).



[336] Stiroh Report ¶ 80 & Figure 15.
[337] Johnson Dep. at 155:17–22.
[338] Saravia Dep. at 132:5–10.

uniquely benefit employees because they provide timely, actionable, and specific information that is superior to public information, and increase employees' bargaining power and wages remains unchanged.[339]

### 4. Because of the No-Poach Agreements, Employees Often Never Learned About Higher-Paying Job Opportunities at Defendant Firms.

186. I opined that, based on my review of extensive common evidence and my experience in compensation and resource management, Defendants' No-Poach Agreements successfully stalled proactive recruiting, prevented many candidates at Defendant firms from learning about higher-paying outside opportunities, and suppressed Class Members' mobility.[340] Defendants' Experts have failed to submit convincing rebuttal testimony or evidence that undermines my assessment. As such, I have not changed my opinions.

187. Class Members Would Have Valued Employment Opportunities at Defendant Firms Regardless of Non-Defendant Opportunities. Defendants' Experts opine that my analysis is deficient because I fail to consider that Class Members had plenty of job opportunities at non-Defendant firms, such that I inflate the harm Defendants' mobility restrictions inflicted on the Class.[341] However, based on the evidence and my expertise and research in the compensation and human resource management fields, Defendants' Experts' opinions are unpersuasive.

188. It is unsurprising that there are job opportunities beyond the three Defendant firms and that Defendants' employees sometimes possess skills that are transferable to employment at non-Defendant employers within and outside the healthcare industry.[342] Nonetheless,

---

[339] Gerhart Report ¶ 72.

[340] *Id.* ¶¶ 73–76.

[341] Johnson Report ¶¶ 27–49; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 52–59, 107–112; Stiroh Report ¶¶ 32, 36–42.

[342] McCrary Report ¶¶ 52–59, 109.

Defendants' employees were denied what was likely a substantial number of alternative opportunities, which did not come around every day. For example, as Dr. McCrary explains, "Economic literature discusses how workers with highly specialized skills may consider employment options in a national or even global geography because, in any narrower geography, the number of employers who can utilize their skills may be too small for them to find a good employment match."[343]

189. Moreover, it is unclear to what labor markets Dr. McCrary refers when he argues that "proposed class members who participate in labor markets where Defendants do not have labor market power could not have been harmed by the alleged market," and Dr. McCrary makes no attempt to explain.[344]

190. *SCA and DaVita Employees.* In my report, I explained that DaVita and SCA employees were interested in opportunities at the other firm.



[345] [346] Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not address this anecdote, which supports my view that DaVita employees would have appreciated and benefited from job opportunities at SCA.

---

[343] McCrary Report ¶ 47 (citing Kathleen O'Toole, *Enrico Moretti: The Geography of Jobs*, INSIGHTS BY STANFORD BUSINESS (June 10, 2013), available at https://www.gsb.stanford.edu/insights/enrico-moretti-geography-jobs ("If you are in a very highly specialized position, you want to be in a labor market where there are a lot of employers looking for workers, and a lot of workers looking for employers.")).

[344] McCrary Report ¶ 21(a).

[345] Gerhart Report ¶ 75(b) (citing Ex. PX484 at DVA_OMCEAL_000429389).

[346] *Id.*

191.     Similarly, Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not address the

qualitative evidence I analyzed regarding former DaVita Senior Director of Business

Development Sean Taylor.



The foregoing demonstrates DaVita employees' interest in job opportunities at SCA, yet Dr.

Johnson does not account for any of this evidence in his testimony.

192.     Dr. Johnson's, Dr. McCrary's, and Dr. Stiroh's analyses of the data are also

unconvincing and *support* my opinion that SCA and DaVita employees wanted to work at the

other company because, according to the data, some employees got around the No-Poach

Agreement and switched between SCA and DaVita.[350]

193.



[351]  Foremost, Dr. Johnson and

---

[347] *Id.* ¶ 74(c) (citing DOJCIV-007-00000105 at DOJCIV-007-00000105–06).

[348] *Id.* ¶ 79(a) n.301 (citing Ex. PX171 at DOJ-PROD001B-00157126).

[349] *Id.* (citing Ex. PX172).

[350] Johnson Report ¶¶ 37–38; McCrary Report ¶¶ 187, 189; Stiroh Report ¶ 41 n.84; *see also* Stiroh Report ¶ 62, Figure 12.

[351] Johnson Report ¶ 38; Stiroh Report ¶ 41.

Dr. Stiroh also fail to consider that the during-and-after conduct periods are not an apples-to-apples comparison. By the time the conduct ended, Optum had acquired both SCA and DaVita Medical Group. As such, SCA acquired an entire DaVita division's worth of co-workers through the Optum merger.[352] ████████████████████████████████████████████[353] Accordingly, fewer external DaVita positions would have been available to SCA employees post-merger, and DaVita would have had fewer employees seeking new job opportunities.

194. *SCA and USPI Employees.* In my report, I opined that the evidence showed that that SCA and USPI employees were interested in job opportunities at the other firm.

195.

████████████████████████████████████████[354] Fanning's testimony shows that USPI employees were interested in positions with SCA.

196. ████████████████████████████████

████████████████████████████[355] ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████[356] As such, I have no cause to change my opinion.

---

[352] Johnson Report ¶¶ 20–21 & n.27; Saravia Report ¶ 49.

[353] *See* Johnson Report, App. E at 2, Ex. E-2.

[354] Gerhart Report ¶ 79(a) (citing Fanning Dep. at 71:19–72:10).

[355] Saravia Dep. at 81:4–82:5.

[356] Saravia Report ¶¶ 80–90; McCrary Report ¶¶ 187, 190.

197.    <u>Defendants Ceased Proactively Soliciting Each Other's Employees.</u>  In my report, I analyzed substantial qualitative evidence showing that Defendant firms complied with the No-Poach Agreements' prohibition on proactive solicitation and that the Agreements negatively impacted employees' compensation.[357]  Defendants' Experts do not provide any cause for me to change my opinion.

198.    *DaVita.*  In my opinion, based on the common evidence I have reviewed, DaVita stopped actively soliciting SCA employees, which blocked SCA workers from learning about opportunities at DaVita.[358]  Dr. Johnson and Dr. Stiroh do not rebut my assessment of this evidence. ████████████████████████████████████████████

████████████████████████████████████████████

██████████████[359] but ultimately does not "express any opinion about whether the alleged conduct in fact occurred."[360]  As I explain below, Dr. McCrary's argument is unavailing, because he wrongly focus on moves between Defendants, as opposed to job offers.  As such, I have not changed my opinion.

199.    *SCA.*  In my view, based on the common evidence I reviewed, SCA stopped calling DaVita and USPI employees to disrupt their competitor's employees' knowledge about external opportunities.[361]  Dr. Johnson did not rebut my analysis of this evidence.  Moreover, Dr. Saravia testified that she has no opinion as to whether the qualitative evidence is consistent with a No-Poach Agreement between SCA and USPI.[362]

---

[357] Gerhart Report ¶¶ 73–76.

[358] *Id.* ¶ 74.

[359] McCrary Report ¶ 190.

[360] McCrary Dep. at 118:14–18.

[361] *Id.* ¶¶ 74(d)–(e), 75.

[362] Saravia Dep. at 133:23–137:3.

200. ████████████████████████████████████████████

████████████████████████████████████[363] I disagree that this weakens my analysis. Even lawful, publicly-known policies in an organization are not executed with 100 percent success. When a policy is decidedly not public and is not written down to avoid detection, as here (discussed below), perfect enforcement will be a challenge. This is especially true when external recruiters are used as there is the goal of adhering to the no-poach agreement, but ideally without telling recruiters more than necessary. Despite these challenges, it is clear that the Defendants vigorously monitored each other and that enforcement was by and large very effective.[364] Dr. McCrary also ignores the substantial evidence I provided regarding the Agreements' robust enforcement mechanisms.[365] ██████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████[366] As such, my opinions are unchanged.

201. *USPI.* As above, Dr. Saravia did not object to my assessment that based on the evidence I reviewed, USPI colluded with SCA to suppress labor market competition,[367] and she likewise testified that she has no opinion regarding the foregoing qualitative evidence.[368] Similarly, Dr. McCrary does not have an opinion as to whether this collusion occurred.[369] Further, pursuant to my analysis below, I am not persuaded by his objection that there is

---

[363] McCrary Report ¶ 145.
[364] *See* Gerhart Report ¶¶ 73–76.
[365] *Id.* ¶ 75.
[366] McCrary Dep. at 118:14–18.
[367] Gerhart Report ¶ 76.
[368] Saravia Dep. at 133:23–137:3.
[369] McCrary Dep. at 118:14–18.

insufficient evidence to show that Defendants ceased to proactively solicit each other's employees.[370] I therefore have no cause to modify my opinion.

202. _Employment Growth and Turnover and Hiring Rates._ Moreover, Defendants' Experts incorrectly focus exclusively on data regarding moves between Defendants to show that Defendants' No-Poach Agreements did not impact employee movement, whereas the real concern is job offers (unsolicited or otherwise).[371] Below, I explain that Defendant firms experienced employment growth during the Class Period. But in the context of an unrestricted labor market, this trend would be inconsistent with the ongoing small number of inter-Defendant moves.

203. _Growing Employment Numbers._ Relevant to the inquiry is "the degree to which employees would move between these companies in a competitive, unrestricted labor market."[372]



---

[370] McCrary Report ¶ 190.

[371] Johnson Report ¶¶ 38, 44–46; Saravia Report ¶¶ 104–132; McCrary Report ¶¶ 38, 185–198; Stiroh Report ¶¶ 56–75.

[372] Gerhart Dep. at 49:22–50:19.

[373] Johnson Report, App. C at 1, Ex. C-1; _id._ ¶ 48, Ex. 8 (█████████████████ █████████████████████████). _See also_ Stiroh Report ¶ 44, Figure 7 (Figure 7 is nearly identical to Exhibit 8 in the Johnson Report).

[374] McCrary Report ¶ 122, Exs. 21–22.



The left panel of Figure 2 of the Starr Report shows that did not happen.[376]

204.    We also know that Hires = Employment Growth + Employee Turnover.  Thus, Hires > Employment Growth.

205.

---

[375] Stiroh Report ¶ 8, ¶ 44 n.90, ¶¶ 46–48, Ex. 8.

[376] Starr Report ¶ 84, Figure 2.  Note that on January 21, 2025, Dr. Starr served an amended version of his opening report.  Here and throughout my Rebuttal, I refer to this amended report.

[377] Johnson Report ¶ 38, Ex. 5.

[378] *Id.*

[379] Johnson Report, App. E at 1, Ex. E-1 (Dr. Johnson here uses data from the U.S. Bureau of Labor Statistics, Occupational and Wage Statistics survey to estimate employment in NAICS 62149, Other Outpatient Care Centers.).



206.

This disparity is consistent with Defendants' market power, which would have enabled them to hire fewer employees than they would have in a competitive environment.[383]

207. <u>Defendants Experienced Less Than Expected Turnover.</u>

---

[380] Starr Report ¶ 84, Figure 2.

[381] *See* McCrary Report ¶¶ 37–40 & Exs. 1–3.

[382] Stiroh Report ¶¶ 60–64, Figure 12; *see also id.* ¶ 41 n.84

[383] LABOR MARKET COMPETITION, *supra* note 38, at 26.

[384] Johnson Report ¶ 38, Ex. 5.



208.

The likely explanation is that moves between Defendants were very effectively prevented by the No-Poach Agreements.

209.     The "turnover contagion" phenomenon discussed above would again have played a role here, as departing colleagues would likely have encouraged their colleagues to join them at their new organizations.[389]

390.

---

[385] Starr Report ¶ 84, Figure 2.

[386] McCrary Report ¶ 122, Exs. 21–22.

[387] Stiroh Report ¶ 91 (citing Starr Dep., Vol. II, 336:6–337:12).

[388] *Id.* ¶ 62 & Figure 12.

[389] Feng et al., *supra* note 188 at 21 (explaining that "alternative job offers usually come in unsolicited from the competing organization rather than from group members' individual proactive search efforts (Groysberg & Abrahams, 2006)").

[390] Gerhart Report ¶ 49 (citing Ex. PX316 at DOJ-PROD001A-00000029).



210.    The personal contacts between former co-workers (e.g., between Hayek and Rucker and their former DaVita co-workers) would have diminished with each passing year, especially with the amount of employee turnover and hiring at DaVita and the suppressed movement between SCA and DaVita.  After roughly ten years, the personal connections and experiences with former colleagues and the ability that provided to tap into the (top) talent known to them at DaVita would have been largely gone.

211.

[391]

[392]

212.    Impact of Long-Term Incentives on Mobility.

[393]

213.    Unvested stock-related compensation can inhibit movement.  However, any such inhibition is not limited to moves from one Defendant to another.  In addition, if an employee is pessimistic about future stock price performance, this pessimism will reduce the degree to which

[391] Johnson Report ¶¶ 37–38.
[392] *Id.* ¶ 38, Ex. 5.
[393] *Id.* ¶¶ 94–97; McCrary Report ¶¶ 107, 135.

unvested stock-related compensation will inhibit movement. No doubt, former SCA CEO Hayek and former SCA COO Rucker left DaVita despite possessing substantial unvested stock-related compensation.

214.

215. <u>Increases in Stock Prices Would Not Have Created a Net Benefit for Class Members.</u> Dr. Johnson and Dr. McCrary also argue that I did not account for potential increases in stock prices, which would limit the impact of the No-Poach Agreements.[396] I am not persuaded.

216.

---

[394] Johnson Report ¶¶ 95–96.

[395] McCrary Report ¶ 135 (emphasis added).

[396] Johnson Report ¶ 97; McCrary Report ¶¶ 107, 129.

[397] Gerhart Dep. at 75:11–76:21.

[398] *Id.* at 76:22–77:9.

██████████████████████████████████████████████████████████[399] As

such, my opinion is unchanged.

### 5. Defendants' Tell-Your-Boss Provision Further Limited Employee Bargaining Power and Mobility.

217. I explained in my report that common evidence shows that both No-Poach Agreements incorporated the same tell-your-boss provision.[400] This type of provision would have served to strongly discourage both proactive and passive Defendant employees from job offers they could have used to acquire higher pay (by changing employers or by negotiating higher pay to stay) or as valuable information on their external value, unless those candidates informed their bosses that they were leaving and pursuing external opportunities—before they had offers in hand.[401] It should come as no surprise that, as I explained in my report, this requirement had a chilling effect because telling their boss can expose employees to many risks, such as retaliation from their current employers.[402] Defendants' Experts have not provided any testimony or evidence sufficient to cause me to reconsider the foregoing opinions.

218. Defendants Implemented a "Tell-Your-Boss" Provision. I have no cause to change my assessment that the common evidence shows that Defendants' No-Poach Agreements included an identical tell-your-boss provision.[403]

219. *DaVita.* In my report, I explained that SCA and DaVita expanded the terms of their No-Poach Agreement in 2011 and 2012 to include the tell-your-boss provision.[404] █

---

[399] *Id.*

[400] Gerhart Report ¶¶ 77–81.

[401] *Id.*

[402] *Id.* ¶ 81.

[403] *Id.* ¶¶ 77–80.

[404] *Id.* ¶ 22(a)(i).



I disagree.

220.     To clarify, the SCA-DaVita No-Poach Agreement always included an informal version of the "tell-your-boss" provision.  The documentary evidence shows that former DaVita CEO Thiry considered the provision a standard business practice, a consideration for which Dr. Johnson does not account.



221.

---

[405] Johnson Report ¶ 55.

[406] McCrary Report ¶ 251.

[407] Ex. PX484 at DVA_OMCEAL_000429389.

[408] *Id.*



222.    Dr. Johnson, Dr. McCrary, and Dr. Stiroh do not otherwise rebut my opinion that common evidence shows that DaVita and SCA implemented a tell-your-boss provision in their No-Poach Agreement.  Indeed, Dr. McCrary testified that he does not have any opinion as to whether any of the alleged conduct occurred.[411]  As such, my opinion remains the same.

223.    *SCA.* ███████████████████████████████████████████

███████████████████████████████████████████████

████████[412] ████████████████████████████████████

████████████████████████████[413]  Neither claim holds water.

224.    The evidence shows that SCA enforced this provision even without a specific request to do so. ██████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████[414] ████████████████████████████

██████████████████████████████████████████

████████████████████████████[415]  In other words,

---

[409] Ex. PX376 at DVA_OMCEAL_000122784.

[410] Gerhart Report ¶ 22(a)(i).

[411] McCrary Dep. at 118:14–18.

[412] Gerhart Report ¶ 79; Johnson Report ¶ 55.

[413] McCrary Report ¶ 251.

[414] Ex. PX484 at DVA_OMCEAL_000429387.

[415] *Id.*

Hayek decided not to hire a candidate who had not widely shared their plans to leave with DaVita.

225.     Moreover, former SCA Chief Talent Officer Fanning testified that the provision "impact[ed] a candidate's ability to proactively be considered or respond to opportunities at DaVita or USPI" "[o]r [to] get solicit[ed] in the first place[.]"[416]

226.     **Johnson/Saravia/McCrary Do Not Rebut My Opinions re the Tell-Your-Boss Requirement.**  Dr. Johnson does not otherwise object to my opinions that SCA enforced the tell-your-boss provision against DaVita employees.[417]  Likewise, Dr. Saravia did not respond to my opinions that SCA enforced the tell-your-boss provision against USPI employees, so my opinions are unchanged.  Dr. McCrary also has no opinion as to whether the conduct occurred.[418]  I therefore have no cause to change my opinion.

227.     *USPI.*  In my report, I submitted evidence consistent with USPI's enforcement of the tell-your-boss provision against SCA employees.[419]  Dr. Saravia does not rebut this evidence.  Dr. McCrary testified at deposition that he has no opinion as to whether USPI enforced the provision against SCA employees.[420]  ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████ [421]

---

[416] Fanning Dep. at 305:14–25.

[417] Gerhart Report ¶ 79.

[418] McCrary Dep. at 118:14–18.

[419] Gerhart Report ¶ 80.

[420] McCrary Dep. at 118:14–18.

[421] McCrary Report ¶ 251.

228. To clarify, the SCA-USPI No-Poach Agreement always included a version of the "tell-your-boss" provision.

Accordingly, I have no reason to modify my opinions.

229. The Tell-Your-Boss Provision Had a Chilling Effect on Class Members. In my report, I opined that pursuant to common evidence, before employees receive offers, they generally value confidentiality in their job-seeking processes to avoid potential retaliation or negative reactions from their current employers.[423] I then testified that, in my assessment of common evidence in this litigation, Defendants' No-Poach Agreements' tell-your-boss provision likely created a chilling effect and ultimately suppressed employee pay.[424]

230.

---

[422] Gerhart Report ¶ 80 (citing Ex. PX508 at DOJCIV-008-00000218; Wilcox Dep. at 136:19–137:22).

[423] Id. ¶ 81.

[424] Id.



231. Moreover, I submitted evidence showing that former DaVita COO Kogod made

the same point[427]:

> There are a lot of people that just don't want to have that conversation. It's a tough one to have. . . . [F]or the most part, once you make the decision to leave, sitting down with your boss and telling that person you're going to leave makes you somewhat vulnerable. So I think it had a chilling effect with a lot of people.

███████████████████████████████████████████[428] Even

Kogod, who admittedly benefitted from the agreement, thought the "restrictions on notification

of one's boss was too much to ask for."[429]

232. ███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████[430] Obviously, if the only way to be considered for a job at

another Defendant was to adhere to the tell-your-boss provision, some employees would decide

to take on the risk of notifying their supervisors. (That is another indication of the high interest

---

[427] Ex. PX88 at DOJCIV-008-00000355.

[426] *Id.* at DOJCIV-008-00000357.

[427] Gerhart Report ¶ 81(c)(i) (citing Ex. PX157 at 73:13–19; DOJCIV-008-00000090 at DOJCIV-008-00000093 ████████████████████████████████████
████████████████████ Kogod Dep. at 45:5–46:14).

[428] Gerhart Report ¶ 81(c)(i) (citing DOJCIV-008-00000304 at DOJCIV-008-00000307).

[429] *Id.* ¶ 81(c)(i) (citing Ex. PX157 at 139:25–140:11).

[430] McCrary Report ¶ 145.

Defendants' employees had in alternative job opportunities at other Defendants.) ██████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████[431] Thus, there is agreement that the tell-your-boss provision had a serious chilling effect causing many Class Members to not to take the risk necessary to consider alternative job opportunities at other Defendant companies. As a result, these employees had to forego the pay increase that would have come from either moving to another Defendant or from using an outside offer from another Defendant as leverage to increase their pay at their current Defendant company. ████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████

233. Defendants' Experts did not otherwise put forth testimony to rebut my views regarding the chilling effect the tell-your-boss requirement had on Class Members, which I therefore have no cause to change.

### 6. Defendants Have Market Power.

234. In my expert opinion, Defendants' No-Poach Agreements would likely have decreased Class Members' job mobility and suppressed their pay.[432] Defendants' Experts attempt to argue that the evidence does not show that Defendant firms have the market power

---

[431] Gerhart Report ¶ 81(c)(x) (citing DOJCIV-008-00000304 at DOJCIV-008-00000307).
[432] *Id.* ¶¶ 84–87.

necessary for the No-Poach Agreements to harm Class Members' compensation.[433]  Below, I explain that their testimony does not comport with the compensation-related literature, basic labor economics, or with the evidence consistent with Defendants' exercise of monopsony power, which is common to the Class.  Further, Defendants' Experts do not persuade me that I should have defined a relevant labor market for Defendants' employees,[434] and Dr. McCrary and Dr. Stiroh also do not persuade me that individualized inquiry would be necessary to define a labor market for each Class Member.[435]  Moreover, none convince me that non-Defendant labor market competition undermines my view that Defendants' No-Poach Agreements would likely harm all or nearly all employees.[436]  Defendants obviously recruited and hired employees from non-Defendant firms.[437]  But again, their attempts to argue that this fact renders my opinion deficient are not convincing, and accordingly do not cause me to change my opinions.

235.    Background.  Monopsony power in the labor market is "a firm's power to reduce the compensation it pays to its workers, paying less than an equivalent job would, in a hypothetical perfectly competitive market.  Market power allows a firm to decrease its compensation without losing its entire workforce[.]"[438]  "Sources of this market power include natural labor market frictions, employer concentration, and anti-competitive labor market

---

[433] Johnson Report ¶¶ 26–49, 143–144, 184–188; Saravia Report ¶¶ 21–23, 42, 70–103; McCrary Report ¶¶ 29–68, 107–112; Stiroh Report ¶¶ 22–45.

[434] Johnson Report ¶¶ 27 n.47, 47; Saravia Report ¶¶ 76, 152–153; McCrary Report ¶¶ 33, 335; Stiroh Report ¶¶ 27–29.

[435] McCrary Report ¶¶ 32, 107–108; Stiroh Report ¶ 38.

[436] Johnson Report ¶¶ 26–36, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 32, 107–112; Stiroh Report ¶¶ 22–45.

[437] Johnson Report ¶¶ 37–43, 143–144; Saravia Report ¶¶ 70–103; McCrary Report ¶ 32; Stiroh Report ¶ 31.

[438] LABOR MARKET COMPETITION, *supra* note 38, at 3; *see also* McCrary Dep. at 38:21–39:7 (Dr. McCrary agreed that "monopsony power is power with respect to the purchase of goods[.]").

practices."[439] According to Nobel Prize-winning economist David Card (and Dr. McCrary's former advisor[440]), "many—or even most—firms have some wage-setting power."[441] This concept is consistent with the U.S. Department of Treasury's assessment "that the American labor market is characterized by high levels of employer power."[442] In turn, "[e]mployers exploit this market power by holding wages and certain non-wage benefits beneath their competitive level."[443]

236. <u>Outpatient Medical Center Industry.</u> Dr. Johnson and Dr. Saravia argue that the outpatient medical center industry (referred to by Dr. Johnson as the "Other Outpatient Care Center industry" and by Dr. Saravia and Dr. Stiroh as the "outpatient care center" industry) is large. ████████████████████████████████████████████[444] These arguments are meant to lay the groundwork for their opinion that Defendants do not have the requisite market power to suppress employee compensation.[445] ████████████████

████████████████████████████████████████

████████████[446] This description is incorrect.

237. ████████████████████████████████████████

████████████████████████████████████████

---

[439] LABOR MARKET COMPETITION, *supra* note 38, at 1.

[440] McCrary Dep. at 91:10–15).

[441] LABOR MARKET COMPETITION, *supra* note 38, at i (cleaned up).

[442] *Id.* at 1.

[443] *Id.*

[444] Johnson Report ¶ 48.

[445] *Id.* ¶¶ 27–49; Saravia Report ¶¶ 70–103 (though note Dr. Saravia concedes that she does not consider the outpatient medical center industry "the relevant labor market for analyzing the issues in the case").

[446] Stiroh Report ¶¶ 31, 43–45.

238.     Moreover, each Defendant's share of facilities within the industry is not the relevant inquiry where Plaintiffs have alleged that Defendants suppressed competition in the labor market.



---

[447] Johnson Report ¶ 48; Saravia Report ¶ 42; Stiroh Report ¶¶ 31, 43–45.  At deposition, Dr. McCrary testified that he had not calculated each Defendant's market share.  McCrary Dep. at 146:23–148:2.

[448] Johnson Report ¶ 48.

[449] *Id.* ¶ 48.

[450] Stiroh Report ¶¶ 43–45, Figure 7.

[451] *Id.* ¶ 62, Figure 12.

[452] *Id.* ¶ 44, Figure 7.

██████████████████████████████████████ [453]  This again suggests the effectiveness of the No-Poach Agreements in preventing employee movement between them.

239.     Defendants' substantial share of employment undermines the suggestion that Defendant firms comprise a small share of the outpatient medical center industry.  In an unrestricted market, ███████████████████████████████████████████ ███████████████████████████████████████ , we would expect that Defendants would have hired much more from each other.

240.     *Labor Markets Are Characterized by Monopsonistic Competition*.  Finally, "pure monopsony," which "describes a market with a single buyer[,]" "is clearly an inappropriate descriptor for American labor markets.  A more realistic model of labor markets in the United States is that of monopsonistic competition."[454]  Defining a labor market as monopsonistic does not require there to be only one or a small number of potential alternative employers, but rather more broadly "applies to labor markets that have many employers in them."[455]  In the latter framework, "a firm may be *neither large nor dominant* in its market but still exercise market power."[456]  Given this, the size of Defendants' industry share is that much more significant.

241.     <u>Frictions Within the Labor Market Exacerbate Market Power.</u>  Moreover, explained at length above, employees have imperfect information about external labor market alternative opportunities.  Thus, the process of finding a better match in the labor market is far more complex than in the product market, which forces workers to invest extensive time and

---

[453] *See* Johnson Report ¶ 38, Ex. 5; Saravia Report ¶ 80, Ex. 6, ¶ 111, Ex. 11; McCrary Report ¶ 198, Ex. 27; Stiroh Report ¶ 62, Figure 12.

[454] LABOR MARKET COMPETITION, *supra* note 38, at 4–5.

[455] RONALD G. EHRENBERG & ROBERT S. SMITH, MODERN LABOR ECONOMICS:  THEORY AND PUBLIC POLICY 132 (11th ed. 2012).

[456] LABOR MARKET COMPETITION, *supra* note 38, at 6.

resources to seek out such a match.[457] These frictions facilitate Defendants' ability to grow their labor market power.

242. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████[458] Dr. Johnson, Dr. McCrary, and Dr. Stiroh make similar objections.[459] My response is that yes, pay is obviously very important. However, as I explain below, the two-way matching process, imperfect information, and labor market frictions generally mean it is costly for employees and employers to determine how well they match more broadly and, with respect to pay specifically, what pay it would take for both to make a match.

243. <u>My Opinions Do Not Depend on Defining a Relevant Labor Market.</u> Defendants' Experts contend that to demonstrate that Defendants had sufficient market power to suppress Class pay, I must define a relevant labor market or assess Defendant firms' share of employment within relevant industries.[460] I disagree. Foremost, I was not asked to perform such an analysis, which is unnecessary to my opinion that the No-Poach Agreements would likely harm employee pay.[461] Moreover, Defendants' Experts also did not define the scope of the relevant labor market, or sufficiently explain why it would be necessary to do so.[462] Accordingly, my opinions have not changed.

---

[457] *Id.* at 4.

[458] Saravia Report ¶ 77.

[459] Johnson Report ¶¶ 27–49, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 37–68, 107–112, 196, 198; Stiroh Report ¶¶ 25–44.

[460] Johnson Report ¶¶ 27 n.47, 47; Saravia Report ¶¶ 73–76; McCrary Report ¶¶ 33, 35, 111; Stiroh Report ¶¶ 27–30.

[461] Gerhart Report ¶ 6.

[462] Johnson Dep. at 198:19–199:4; Saravia Dep. at 94:9–13; Saravia Report ¶ 38 n.36 ("My description of the OCC [outpatient care center] industry does not imply that I view the OCC industry as the relevant labor market for analyzing the issues in this case."); McCrary Report ¶ 37 n.45 ("I am not offering an affirmative opinion on the outer boundary of the relevant

244.     Competition from Non-Defendant Firms Does Not Change My Assessment.  It comes as no surprise that non-Defendants competed to hire Defendants' employees. Nevertheless, Defendants' Experts contend that Class Members' employment opportunities at non-Defendant firms constrained Defendants' ability to suppress compensation.[463]  It is obvious that some of Defendants' employees left for jobs at alternative employers.  But it does not change my assessment that evidence common to the Class shows that regardless, Defendants' No-Poach Agreements restricted labor market competition.

245.



246.

antitrust market."); McCrary Dep. at 153:19–23; Stiroh Report ¶ 43 ("My analysis of shares among these employers should not be interpreted as an affirmative opinion that I am endorsing . . . [a] relevant antitrust market for this matter.").

[463] Johnson Report ¶¶ 27–49, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 37–68, 107–112, 196, 198; Stiroh Report ¶¶ 22–45.

[464] Johnson Report ¶ 33, Ex. 4.

[465] *Id*. ¶ 34.

[466] Johnson Dep. at 218:13–18.



247. Dr. McCrary is in accord.

248.

---

[467] Saravia Report ¶¶ 70–103.

[468] *Id.* ¶ 77.

[469] McCrary Report ¶ 37. Note that if we accept his claims that Class Members and employers had individualized preferences and other frictions, we would expect to see Class Members with far fewer potential matches than implied by his assessment of the Lightcast data.

[470] *Id.* ¶ 38 (emphasis omitted).

[471] McCrary Report ¶¶ 43–45.

[472] Stiroh Report ¶¶ 31–45.

████████████████████████████████████████ [473] ██████████

█████████████████████████████████████████████████████

██████████ [474]

249. There are two primary issues with Defendants' Experts determinations that, because of employment opportunities at non-Defendant employers, the No-Poach Agreements did not greatly harm Class Members' employment options.

250. *Not all Job Opportunities Are Created Equal.* First, Defendants' Experts wrongly assume all employment opportunities are equally valuable. This assumption is a fatal error.

██████████████████████████████████████████████████

███████████████████████████████

251. ██████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████ [475] There is almost always *some* alternative external job alternative. For example, when employees are laid off, they often find other jobs, but the pay is typically much lower. As such, although Defendant Class Members moved to non-Defendants, one cannot assume that non-Defendant employment options are as well paid or attractive to Class Members as job opportunities with Defendants.

252. In fact, many job opportunities will be less attractive to employees. Again, there are always alternative job opportunities, but it does not follow that depriving employees of what were likely very attractive and low risk alternative job opportunities is then defensible. This point carries particular force pursuant to evidence discussed in my report and above that in

---

[473] *Id.* ¶ 41 n.84.
[474] *Id.* ¶ 27.
[475] Saravia Dep. at 80:12–81:3.

unrestricted markets, more senior and highly-paid employees tend to move employers within the same industry.[476]  If employees would have had access to these opportunities, there would likely have been more employee moves, higher pay for them (at either their new or current employer), and higher pay for other employees due to the internal equity norm and the focus on internal equity in a structured compensation system as found at Defendants.  Access to such opportunities would have additionally provided other incumbent employees with valuable information on external equity and their own external opportunities.  For these same reasons, I am not swayed by Dr. Stiroh's contention that there could not have been any "reduction in information flowing from mobility."[477]

253.    Defendants' Expert Reports do not submit any data to test this assumption either way. ████████████████████████████████████

████████████████████████████████████████████████

██████████████████ [478] ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ [479] .

254.    Finally, Dr. McCrary concedes that not all employment opportunities are equally good. ████████████████████████████████████████

---

[476] Gerhart Report ¶ 61(f) (citing Eric Parrado, Asena Caner, & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007)).

[477] Stiroh Report ¶¶ 76–79, 82 (██████████████████████████████

████████████████████████████████████████ .

[478] Johnson Dep. at 90:15–20, 233:6–17; Saravia Dep. at 110:14–112:22.

[479] Johnson Dep. at 201:23–202:19; Saravia Dep. at 78:24–81:3.

█████████████████████████████████████████████

██████████████████████████████████████████████ [480]

255.   *Frictions / Switching Costs.*  Second, compensation and economics-related theory and literature, which is evidence common to the Class, demonstrates that labor markets operate differently from product markets.[481]

256.   **Everyone Agrees That Labor Markets Operate Differently.**  Though Dr. Johnson, Dr. McCrary, and Dr. Saravia make some suggestions that labor and product markets are very similar, it is widely recognized (including by Defendants' Experts) that labor markets are unique in key respects.[482]  One key difference is that there is typically no going single price (pay rate) for similar employees and which is much more complex because it is a two-sided matching market with frictions and one where it is, at a minimum, costly (if not infeasible) to accurately assess the match of a new job without experiencing it.[483]

257.   Dr. Johnson concedes that labor markets are matching markets, and require far more specific information than is generically available, which underscores the key role unsolicited offers play throughout workers' careers.[484]  As Dr. Johnson acknowledges, "Competition within labor markets functions differently than competition in product markets as labor markets are 'matching markets' where the employer and the job applicant must 'match' in

---

[480] McCrary Report ¶ 48.

[481] *See* Gerhart Dep. at 47:21–48:6 ("[T]he product market is different than the labor market.").

[482] Johnson Report ¶¶ 36–43, 143–144; Saravia Report ¶ 76 & n.132; McCrary Dep. at 162:15–164:23.  Further, Dr. Saravia testifies about "the cartel" and its ability in "raising the market price." Saravia Report ¶¶ 70–71.

[483] B. Jovanovic, *Job matching and the theory of turnover*, 87 J. OF POLITICAL ECONOMY 972–990, 973 (1979).

[484] Johnson Report ¶ 27; Johnson Dep. at 267:11–16 ██████████████████████████████████

███████████████████████████████████████████████████████.

their preferences."[485]  He contrasts that with "a product market," where "the customer decides to purchase a product from a specific vendor and pays a specific price for the product."[486]  He states, "In labor markets, depending on the jobs at issue, both employees and employers may have a range of choices for potential matches across firms, industries, and geographic locations."[487]  Similarly, Dr. Saravia acknowledges that "labor markets are not the same as industries or even product markets."[488]  "[O]f course there are frictions in labor markets. . . . they're switching costs.  It's more costly than switching from Diet Coke to Diet Pepsi."[489]



[490]

[491]

[492]  Moreover, he testified that he "can't really imagine anyone who" disagrees with the principle that there are frictions in the labor market.[493]

---

[485] Johnson Report ¶ 27.

[486] *Id.*

[487] *Id.*

[488] Saravia Report ¶ 38 n.36.

[489] Saravia Dep. at 82:22–84:17.

[490] *Id.* at 75:4–76:8 (

).

[491] McCrary Report ¶¶ 53–59, 145.

[492] McCrary Dep. at 74:19–23.

[493] McCrary Dep. at 79:17–82:11 ("[T]he idea that there are frictions in labor markets, the same way that there are frictons in every market should be uncontroversial.").

258.    In other words, the labor market is much more complicated than the product market when it comes to finding a better match and thus requires a major time investment to seek that better match.  Thus, any implication that a large number of potential homogeneous employers and homogeneous employees are interchangeable or close substitutes for each other with all employers paying a single going rate in a competitive market without significant elements of monopsony does not reflect the current understanding of how labor markets work.  And it certainly does not explain why the Defendants felt it was necessary to restrict mobility of their employees as to other Defendants if Dr. Johnson, Dr. Saravia, and Dr. McCrary are correct.

259.    ███████████████████████████████████████████████████████████████████████████ [494]  Their admissions reinforce the fact that there is no single going market pay rate for a job.  In other words, "it is possible for firms offering the same employment to offer different wages—a key characteristic of monopsony models."[495]

260.    ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████ [496] ████████████████████████████████████████ ██████████████████████████, because frictions are the basis of market power.

261.    **Jobs Are Experience Goods.**  It is difficult and perhaps even unlikely that one can determine the other attributes of a job to assess the match without actually working at that

---

[494] Johnson Report ¶¶ 68, 71–73; Saravia Report ¶¶ 186–187, 190–193; McCrary Report ¶¶ 30 ("[M]any individualized factors influence proposed class members' pay."), 60–68, 71, 84, 96.
[495] LABOR MARKET COMPETITION, *supra* note 38, at 6.
[496] McCrary Report ¶ 107; Stiroh Report ¶ 38. ████████████████████████████████ ████████████████████  McCrary Dep. at 74:19–23.

alternative job. In his seminal work on job matching and turnover, economist Boyan Jovanovic conceptualizes a job as an "experience good," which means "the only way to determine the quality of a particular match is to form the match and 'experience it'."[497] Thus, as noted in my opening report[498]:

> Employees can incur high search costs from searching for jobs and gathering information about alternative employment options and compensation; it is often time-consuming to identify and assess the suitability of alternative employers. Moreover, "sometimes . . . employees remain unaware of job opportunities because the constant and daily routine of work, home, and family demands shields that person from alternative possibilities." Many potential employees, particularly those satisfied in their current roles because they do not yet know about higher-salary opportunities elsewhere, are unlikely to choose to incur those costs.

262. **Compensation Information Is Difficult to Acquire.** For employees, even obtaining information on the pay of alternative jobs is no simple matter. One reason is because there is no one correct data point employees can look for. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[499] Moreover, the first pay transparency law (in California) was not adopted until 2018.[500] Even such laws only require posting of a pay range for a job. It does not tell a prospective employee what pay they would receive or what they could negotiate. That would

---

[497] B. Jovanovic, *Job matching and the theory of turnover*, 87 J. OF POLITICAL ECONOMY 972–990, 973 (1979). As I documented in my original report, employees who voluntarily change employers, especially higher-level employees, receive a substantial pay increase on average from such changes. Gerhart Report ¶ 46 & Figure 1. In addition to pay, employees may seek to estimate how well an alternative job matches on other dimensions such as the nature of the work (interest, challenge), learning/development opportunities, relations with supervisor and coworker, and so forth. These are generally seen as key reasons why a job is an "experience good" (i.e., determining the match before actually working on the job may not be possible).

[498] Gerhart Report ¶ 61.

[499] Johnson Dep. at 267:11–16.

[500] Jennifer Lu, *How much do others make for the same job? Here's where employers are required by law to share salary ranges when hiring*, CNBC.COM (Jan. 12, 2022).

take an investment of time and this investment would be necessary for each potential alternative job.

263. **Matching Is Challenging.** As such, finding a match in the labor market is a unique challenge. All told, the frictions (or relatedly, switching costs) include the inability of employees to access or be able to meaningfully utilize complete information on the scope of potential alternative jobs available. They would also have difficulty determining which of these would actually prove to be a better job than what they have and whether it is worth the risk/uncertain payoff to switch jobs. Employers face a similar challenge in finding and identifying potential employees and their likely value. Combined, "workers find it costly to change employers and . . . firms find it costly to hire or fire workers."[501] Mobility thus brings with it "high levels of risk and uncertainty" and one way employees can reduce that is "to look to others in evaluating whether to seek alternative employment."[502] When others with whom you have worked move to a new employer and are satisfied with their new employer match, "it may increase the salience and perceived viability of leaving for a focal employee."[503]

264. **The Two-Sided Nature of Labor Markets Exacerbates the Negative Effects of Employer Collusion.** This costly and imperfect worker mobility "has profound theoretical implications."[504] Under such frictions/costs, rather than the labor supply curve to an employer being horizontal as in a perfectly competitive market, the supply curve to an employer becomes upward sloping. Defining a labor market as monopsonistic "rests only" on this assumption of an upward-sloping supply curve. It does not rest on there being only a limited number of potential

---

[501] EHRENBERG, *supra* note 455, at 128.
[502] Felps, *supra* note 326, at 546.
[503] *Id.* at 547.
[504] *Id.*

alternative employers, but rather "applies to labor markets that have many employers in them."[505]  The two-sided matching nature of labor markets (acknowledged by Dr. Johnson[506]) with distinct preferences on both sides comes into play here to make for thinner markets in terms of viable employee-employer matches.  "The set of workers one firm prefers may be small, and the set of workers that prefer that firm is even smaller.  This 'differentiation-squared' may exacerbate market power in labor markets relative to product markets."[507]  Under such conditions, collusion on the part of employers to take themselves out of competition with one another for employees can have major negative consequences for employees.

265.    **Frictions Decrease in Competitive Labor Markets.**  In contrast, when employees have unfettered access to unsolicited job offers, the search costs are minimized for the employee and the employer has already likely invested in information that allows it to identify the employee as a likely strong match.  To the extent the employee already has personal relationships with employees at the new prospective employer (e.g., as a previous co-worker—peer, supervisor, direct report, etc.), that relationship is likely to increase the employee's assessment of the potential match and reduce the risk and uncertainty of moving to the new employer.

266.    **The Benefits of Unsolicited Offers Extend Beyond Actual Job Movement.**  Of course, an external unsolicited offer does not necessarily require the employee to move in order to benefit.  █████████████████████████████████████████████

---

[505] EHRENBERG, *supra* note 455, at 132.

[506] "Competition within labor markets functions differently than competition in product markets as labor markets are 'matching markets' where the employer and the job applicant must 'match' in their preferences."  Johnson Report ¶ 27.

[507] S. Naidu & E.A. Posner, *Labor Monopsony and the Limits of the Law*, 57 J. OF HUMAN RESOURCES S284–S323 (2022).

████████████████████████████████████████ [508] Additionally, benefits do not accrue only to the employee receiving the outside offer. As I described in my opening report, a structured compensation system, which I documented existed at Defendant firms, has the objective of internal equity.[509] I also reviewed evidence documenting that the Defendants sought to achieve internal equity and external equity.[510] Internal equity has two parts: (1) similar pay for employees in similar jobs/roles with similar performance contributions; and (2) maintaining certain pay differentials based on job title, job level, performance, etc. Internal equity includes maintaining certain pay differentials between Directors, VPs, and SVPs. Thus, outside offers that lead to higher pay (at the new or current employer) affect the pay of other employees given that internal equity is the norm and expectation among employees (pay commensurate with contribution) and the goal of the structured compensation system. As I have noted, outside offers also provide new and highly relevant information on external equity not only to those receiving the offers, but to others as well.

267. **The Heterogeneity of Labor Market Matching Does Not Negate Harm to Employees from Collusion.** Dr. Johnson and Dr. McCrary focused on the individualized nature of employee job markets. ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████ [511] ██████████████████████████

---

[508] McCrary Report ¶¶ 66–68, 72–73.

[509] Gerhart Report ¶¶ 121–135.

[510] *Id.* ¶¶ 127–135.

[511] Johnson Report ¶ 26 (citing Gerhart Dep. at 119:14–120:6); *see also* McCrary Report ¶¶ 34–36 & n.38.



[512] I am not persuaded.

268.  *Labor Markets Involve Two-Way Matching.*  As Dr. Johnson, Dr. McCrary, and I agree, the labor market involves a complex two-way matching process.

[513]

As I explain above, the fact that employees are not homogeneous means that, when an expert identifies what they deem to be a feasible set of alternative jobs/employers, those alternatives may or may not be a good match for an individual employee.

269.  *Collusion Harms Despite Heterogeneity.*  However, it hardly follows from that fact that if employers collude to reduce the number of alternative jobs/employers in that supposed feasible set that the collusion would somehow produce no harm to employees because they are not homogeneous.

[514] It is not possible to argue that collusion has no harmful effect simply because the harmful effect would be smaller for some, larger for others, depending on their individual characteristics.

---

[512] McCrary Report ¶ 29; *see also id.* ¶¶ 42–59, 111.
[513] McCrary Dep. at 156:17–23; *see also* Johnson Report ¶ 27.
[514] Johnson Report ¶ 48.



515

270.

516

To my knowledge, there is no disagreement that average pay level varies by job and that external benchmarking of pay is done by job. At the same time, there are stable relationships/differentials between the pay levels of jobs, both inside organizations and in the organizations included in the external pay surveys/benchmarking. For example, the percentage difference in base pay between a Director-level job and a VP-level job would not be expected to vary much year to year, either internally or in the pay survey/benchmarking data. That is because changes over time in base pay levels for different jobs are significantly correlated and pay levels of jobs mostly move similarly. In other words, the forces that influence pay level tend to broadly influence the pay level of different jobs similarly. I discuss the interrelated nature of pay levels of different jobs more fully below.

271. *Intraclass Differences Do Not Negate Impact.*



517

---

515 Gerhart Dep. at 119:14–121:24

516 McCrary Report ¶ 36.
517 *Id.* ¶ 42.

[REDACTED] [518] That is not surprising. [REDACTED]



[REDACTED] [519] Again, this is not surprising. What we know is that while employee moves are much more likely to be within-industry, not that all employee moves are within-industry. Although it is difficult to know precise percentages based on Exhibit 5, we can make a few observations. [REDACTED] [520] [REDACTED] [521] [REDACTED]

[REDACTED] To put that in context, in 2015, 13 percent of all employment was in the Healthcare and Social Assistance Industry.[522] Thus, we again see the importance of within-industry employee movement. However, the expected level of within-industry moves between the Defendants did not happen during the conduct period, despite the employment growth and large number of external hires by Defendants during that time period.

---

[518] *Id.* ¶ 43, Ex. 4.

[519] *Id.* ¶ 44, Ex. 5.

[520] *Id.*

[521] *Id.*

[522] *Data Retrieval: Employment, Hours, and Earnings (CES)*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/webapps/legacy/cesbtab1.htm (last visited June 26, 2025).

272.    Moreover, I am not moved by Dr. McCrary's explanation that Class Members' employment options varied based on geography.[523]  Dr. McCrary cites my textbook, *Compensation*, to say that employment options tend to be more national for higher-level jobs like those at issue in this litigation, and more local for lower-level jobs.  That is correct.  However, Dr. McCrary seems to infer that this means Defendants' employees have what he deems to be sufficient alternative employment opportunities such that being foreclosed from employment opportunities at other Defendants is not a problem.  As I have made clear throughout this Rebuttal, I do not agree with that argument, and Dr. McCrary does not provide any basis for it.

273.    *The Argument That Assessing Harm Requires Modeling Employee's Additional Job Opportunities Is Misguided.*  Dr. Johnson also argues[524]:

> [T]o assess if an employee was harmed "directly" by the alleged mobility restrictions, Plaintiffs' experts would have to model the additional job opportunities that would have been available to that employee absent the alleged mobility restrictions and determine if these were "higher-paying external job opportunities" than the opportunities available to that employee in the actual world[.]



[525]  In response, I provide additional context to explain why the foregoing does not undermine my opinion.

---

[523] McCrary Report ¶¶ 47–51, 58–59.
[524] Johnson Report ¶ 52.
[525] McCrary Report ¶¶ 53–59, 134–145.

274.    First, I documented in my report that unsolicited job offers play a dominant role in employee mobility.[526]  The Federal Reserve Bank of San Francisco reported that "more than three-quarters of workers [77.6% based on their Table 1] who switched employers did not report active job search in the previous three months."  The report concluded that "a majority of people" in fact "find jobs without ever reporting actively looking for one," and "rather than them [workers] finding jobs, the jobs actually find them."[527]  No explanation has been provided for why that would not likewise be the case for employees of DaVita, SCA, and USPI.

275.    Second, I documented in Figure 1 in my report that employees receive a substantial pay increase when they voluntarily change employers, especially higher-level employees.[528]  Again, there is no reason to expect something different for DaVita, SCA, and USPI Senior-Level Employees.  Of course, not every employee who receives an outside offer must move to increase their pay.  As we have noted, they can also use that outside offer to negotiate higher pay at their current employer.

276.    Apparently, the inference Dr. Johnson and Dr. McCrary want to make here is that nobody should worry about the harm to Defendants' employees who were deprived of employment opportunities at the other Defendants,[529] all of whom are within the same 5-digit

---

[526] Gerhart Report ¶¶ 61, 71–72.

[527] *Id.* ¶ 61(d) (citing Carrillo-Tudela, *supra* note 216).

[528] *Id.* ¶ 46, Figure 1.

[529] ███████████████████████████████████████████████████████████████████████████

Johnson Report ¶ 40; McCrary Report ¶ 41.  But Keech and Spradling proceeded to sign up as Named Plaintiffs to sue Defendants for colluding to restrict their job mobility.  This would strongly suggest that they feel harmed by Defendants' conduct, and that though they took positions at non-Defendant firms, these positions were not their first choices.  Indeed, Spradling testified that if DaVita had offered him a job while he was at SCA, he would have been interested in that opportunity.  Spradling Dep. at 289:12–18.

NAICS industry Other Outpatient Care Centers.[530]  We have seen that employer changes within 5-digit industries are much, much more likely than moves outside of a 5-digit industry.  That increased movement within 5-digit industries is likely because that 5-digit industry is where employees find the best matching and most desired jobs for themselves, given that much human capital is industry-specific, especially for higher-level/higher-paid employees.[531]  ███████

███████████████████████████████████████████████████████████████

██████ [532]  There is substantial evidence that Defendants believed each other's employees would be good matches, as discussed above and as demonstrated by the fact that that Defendants established their No-Poach Agreements in anticipation (one presumes) of likely increased employee movement between them.  Thus, the low number of moves between Defendants can be interpreted instead as a result of restrictions on their movements.

277.    *Removing Industry-Specific Opportunities Has an Impact.*  ███████████

██████████████████████████████████████████ [533]  Kaiser Permanente is in the same 5-digit industry (NAICS 62149, Other Outpatient Care Centers) as the Defendants.[534]

---

[530] Johnson Report ¶ 48 n.104.

[531] Gerhart Report ¶ 61(f) (citing Richard P. Castanias & Constance E. Helfat, *The managerial rents model:  Theory and empirical analysis*, 27 J. MGMT. 661–678 (Nov.–Dec. 2001); John K. Mawdsley, & Deepak Somaya, *Employee Mobility and Organizational Outcomes:  An Integrative Conceptual Framework and Research Agenda*, 42 J. MGMT. 85–113 (Nov. 19, 2015); Derek Neal, *Industry-specific human capital:  Evidence from displaced workers*, 13 J. LAB. ECON. 653–677 (Oct. 1995)).

[532] Johnson Report ¶ 48.

[533] *Id.* ¶¶ 36, 39, 42.

[534] *Profile Page*, NAICS (July 1, 2022), https://www.naics.com/company-profile-page/?co=16124; Code Description, NAICS, https://www.naics.com/naics-code-description/?code=62149 (last visited June 26, 2025).

-114-

In 2016, Kaiser Permanente had 192,607 employees.[535]



It is also interesting to note that Kaiser Permanente operates in only 9 states.[537] In contrast, for example, SCA and USPI each operate in 35 states.[538]

[539]

278.    Further, as noted earlier, given the growth in the number of Class Members at the Defendants, one would have expected commensurate growth in the number of employee moves between Defendants.  We did not see that.  That lack of commensurate growth in employee movement exists despite the potential for turnover contagion due to the personal connections between Defendants,[540] which would have ordinarily been expected to further increase moves between Defendants during the conduct period.  This disconnect between expected growth in mobility between Defendants and the actual (lack of) growth in mobility is compelling and,

---

[535] *Number of Kaiser Permanente Employees from 2007-2023*, STATISTA, https://www.statista.com/statistics/403098/kaiser-permanente-employee-numbers/ (last visited June 26, 2025).

[536] Johnson Report, App. E at 1, Ex. E-1.

[537] *Our Company*, KAISER PERMANENTE, https://about.kaiserpermanente.org/who-we-are/fast-facts (last visited June 26, 2025).

[538] Gerhart Report ¶¶ 13–15.

[539] McCrary Report ¶ 145.

[540] *See, e.g.,* Gerhart Report ¶¶ 38–40.

combined with the qualitative evidence I have provided, points to the impact of the No-Poach

Agreements.

279.



280. I am also not persuaded to change my opinion by Dr. McCrary's argument that

individualized inquiry would be necessary to quantify harm.

---

541 McCrary Report ¶¶ 136–141.

542 McCrary Report ¶ 126, n.261 (citing Tanner Dep. at 56:3–57:24 (third-party Catapult recruiter Jimmy Tanner testified that such non-solicitation agreements are "common in the industry"); Schultz Dep. at 11710–119:8 ████████████████████████████████████ . *See also* LABOR MARKET COMPETITION, *supra* note 38, at 1 ("[A] recent paper estimates that one-in-five workers is currently subject to non-compete agreements and double that number report having been bound by a non-compete agreement in the past.").

543 McCrary Report ¶ 136 n.252.

544 *Id.* ¶ 141.

-116-

███████ [545] ████████████████████████

███████████████████ [546] and as such are evidence common to the Class.

281.    Finally, my assessment of Defendants' market power undermines Dr. McCrary's contention that the harm would be individualized.  While it is true that Defendants' conduct may harm some Class Members more than others, it strains credulity to argue that market power does not reduce valuable outside employment opportunities for all or nearly all Class Members.  As such, my testimony is unchanged.

282.    **Actual Alternate Job Offers Are Not the Only Harm Flowing from Collusion.** Lastly here, it bears repeating that it is not only that mobility is restricted.  Where there is a No-Poach Agreement, unsolicited offers do not happen.  An offer can result in a move.  However, just as important, it can result in negotiation of a counter-offer of higher compensation to stay. Thus, the harm to the Class is not fully captured by the reduction in employee mobility between the Defendants.  Further, it is not just the employees who do not receive offers and thus do not receive higher compensation by either moving to the other employer or negotiating a counteroffer to remain.  Another uncaptured form of harm is to the employees who would not have received outside offers, but who would have benefited from their peers receiving outside offers.  These benefits would accrue by virtue of the importance of internal equity comparisons among employees, which are also reflected in the design of structured compensation systems, which are found at the Defendants.  These outside offers also provide uniquely valuable information to other employees on how externally equitable their pay is and on potential higher

---

[545] *Id.* ¶ 141 n.273 (citing Chipman Dep. at 98:5–13 (██████████████
███████████████ ); Sandoz Dep. at 27 (███████████
████ )); *see also id.* ████████████████████████
[546] *Id.* ¶ 141.

paying external opportunities for them. ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ [547]

283.    *Empirical Analysis.*  Dr. Johnson and Dr. Saravia object that my opinions are unfounded because I did not perform a quantitative analysis of Defendant Senior-Level Employee departures to non-Defendant firms.[548]  In my opinion, such an analysis is unnecessary and does not change my opinion.  In fact, Dr. Johnson and Dr. Saravia's focus on quantitative analysis misses the point:  the issue is not whether Class Members would have been paid more elsewhere.  Instead, the issue is what Class Members would have been paid in a labor market where competition was not artificially and significantly constrained by the actions of Defendants.

284.    Defendants' Hiring from Non-Defendant Companies Does Not Undercut My Opinions.  Defendants' Experts opine that I neglected to consider data showing that Defendants hired many employees from non-Defendant companies during the Class Period, which contradicts my conclusions.[549]  Defendants' Expert Reports have not caused me to change my opinion that the No-Poach Agreements would likely harm all or nearly all Senior-Level Employees.[550]

---

[547] McCrary Report ¶¶ 107, 130–144.

[548] Johnson Report ¶ 33; Saravia Report ¶ 75.

[549] Johnson Report ¶¶ 37–43; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 115–128; Stiroh Report ¶¶ 22–55.

[550] Gerhart Report ¶¶ 84–87.

-118-

285.    *Benchmarking Spreads Artificial Pay Suppression to Other Firms.*



[551]

[552]  I disagree.

286.    First, this argument assumes that it is easy for employees to generate offers and to maximize their own pay.  As discussed above, in realty, it is much harder for employees to do these things.

287.    

[553]  This benchmarking would play out as mutually-reinforcing pay suppression.  Competitors who benchmarked against Defendants' artificially-depressed pay rates would be able to safely lower their own pay rates.[554]  Moreover[555]:



288.    In other words, competitor benchmarking practices would permit Defendant firms to suppress pay rates market-wide, and not merely firm-wide.    

---

[551] Johnson Report ¶¶ 42–43, 92–93; Saravia Report ¶¶ 194–196, 285; McCrary Report ¶¶ 33 & n.35, 107–112, 115–128; Stiroh Report ¶¶ 41, 46.

[552] Johnson Report ¶¶ 92–93; McCrary Report ¶¶ 263–267.

[553] Gerhart Report ¶ 115.

[554] *Id.* ¶ 115(f)(iii).

[555] *Id.* ¶ 146.



[556]

[557] These effects would then cascade via Defendants' wage structures, discussed below.

289. 

[558] But it is entirely possible that Defendants' employee counts would have grown *more* if Defendants' conduct had not suppressed pay during the Class Period, and Dr. McCrary does not put forth any evidence to the contrary.

290.    *Not All Companies Are Created Equal.*  Moreover, Defendants' Experts did not submit any evidence that Defendants considered non-Defendant organizations equally attractive sources of recruits.  Their quantitative analyses of Lightcast data regarding Defendants' hiring practices therefore do not change my assessment that Defendants' conduct would have harmed

---

[556] Johnson Report ¶¶ 42–43, 92–93; Saravia Report ¶¶ 194–196.
[557] McCrary Report ¶¶ 266–267.
[558] *Id.* ¶ 122, Ex. 21.

all or nearly all Class Members.[559]  Moreover, their critique that I did not perform a quantitative analysis of my own likewise falls flat.[560]

### C.     Defendants' CSI Exchanges Likely Restricted Labor Market Competition.

291.    In my report, I applied my review of common evidence and my experience and research in compensation and human resource management to determine that Defendants' Exchanges of Competitively Sensitively Information would likely cause Class-wide pay suppression.[561]  I then provided an overview of the evidence demonstrating that, though Defendants concealed this conduct as legal benchmarking, such CSI Exchanges are inconsistent with unilateral conduct and would have harmed Class Member pay.[562]  Below, I assess Defendants' Experts' testimony and determine that they have not convinced me to alter my opinions.[563]

292.    *CSI Exchanges Generally.*  I previously provided an overview of Defendants' years-long CSI Exchanges as background in support of my assessment that this conduct is consistent with collusion and would reduce employee pay.[564]  Defendants' Experts' objections to my analysis miss the mark.

293.    *Specific Position Data.*  ████████████████████████████

████████████████████████████████████

---

[559] Johnson Report ¶¶ 37–43; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 37–58; Stiroh Report ¶¶ 32–35, 37–42.

[560] Johnson Report ¶ 43; Saravia Report ¶ 75; McCrary Report ¶ 35; Stiroh Report ¶ 20(a)(i).

[561] Gerhart Report ¶ 82.

[562] *Id.* ¶ 82.

[563] Johnson Report ¶¶ 98–127; Saravia Report ¶¶ 133–167; McCrary Report ¶¶ 147–183; Stiroh Report ¶¶ 107–117.

[564] Compl. ¶ 92.



294. ████████████████████████████████████████

███████████████████████████████ [572] To clarify, I understand Plaintiffs are not seeking damages on behalf of employees in Defendants' legal and compliance departments. ████████

---

[565] Johnson Report ¶ 98 (citing Ex. PX523).

[566] Ex. PX523 at OMC_BM_000010778.

[567] *Id.*

[568] Johnson Report ¶ 99 n.212 (citing Ex. PX234).

[569] Saravia Report ¶ 161.

[570] McCrary Report ¶¶ 168, 174.

[571] Saravia Report ¶ 161.

[572] McCrary Report ¶¶ 168 n.336 (███████████████████████████████████████ ███████████████████████████████████████ ), 174.

████████████████████████████████████████████. Moreover,

pursuant to my analysis that Defendants' wage structures would cause cascading pay effects,

wage exchanges as to non-Class Members would still impact Class Member pay.

295. *Regular Practice.* ████████████████████████████████

████████████████████████████[573] and though I did not form an opinion as to an

end date, I noted that Plaintiffs' counsel are seeking to certify a Class of employees who worked

for DaVita and SCA until December 31, 2019.[574] ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████[575] ███████████████████████

████████████████████████████████████

████████████████████[576] I disagree.

296. The foregoing argument is problematic because of persisting effects of pay

suppression that I explained in my report[577]:

> [T]he issue is that, even in some subset of the years, if you were able to suppress
> compensation, that that effect would likely persist for some time into the future . . .
> [and] suppression in any year, even one year, could have persisting effects such that
> pay would be lower into the future.

297. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

---

[573] Gerhart Report ¶ 23.

[574] *Id.* ¶ 5.

[575] Johnson Report ¶¶ 99 (citing Hayek Dep. at 362:8–363:7), 96.

[576] McCrary Report ¶¶ 149, 151, 162, 165, 169, 171, 177.

[577] Gerhart Dep. at 174:19–175:11.



[578] This evidence undermines the argument that these data exchanges were not a regular practice throughout the Class Period.

298.

299. *Limited Evidence Is Unsurprising.*

---

[578] Gerhart Report ¶ 82(f) (citing Ex. PX501 at SCA002277742; Mathis Dep. at 43:19–47:8).

[579] McCrary Report ¶ 167.

[580] Johnson Report ¶ 99; McCrary Report ¶ 168.

[581] Gerhart Report ¶ 83(c) (citing Mathis Dep. at 53:5–63:5, 66:5–76:6; Ex. PX232; Ex. PX37; Kopser Dep. at 32:3–38:2, 105:5–108:9; Cagle Dep. at 119:24–120:23; Ex. PX240 at USPI_CIV_000686081).

[582] Johnson Report ¶¶ 99, 121–123; Saravia Report ¶ 155; McCrary Report ¶¶ 147–148, 174; Stiroh Report ¶¶ 110–111.



[redacted] [583] [redacted]

[redacted] [584) [redacted]

[redacted] [585 [redacted]

[redacted] [586] But the fact that Defendants have not produced extensive evidence of these exchanges is unsurprising and consistent with my assessment of the conspiracy, given that generally, collusion is a secretive matter. [redacted] [587]

300. Secrecy was a concern and a goal. [redacted]

[redacted] [588 [redacted]

[redacted] [589.]

[redacted] [o]

---

[583] Johnson Report ¶¶ 99, 121–123; McCrary Report ¶¶ 147–148, 168, 172; Stiroh Report ¶¶ 110–112.

[584] McCrary Dep. at 169:23–170:20; *see also* Rucker Dep. at 260:11–20 (former SCA COO Rucker testified that when he obtained merit pool information from SCA and USPI, it was a mutual exchange).

[585] Johnson Report ¶ 123; McCrary Report ¶¶ 173–174.

[586] McCrary Report ¶ 169.

[587] *See, e.g.,* DVA_OMCEAL_000385858 [redacted] ).

[588] Kogod Dep. at 80:12–86:9; Ex. PX157 at 83:2–24 (Kogod's testimony at the DaVita criminal trial); Ex. PX313 at DOJCIV-008-00000190–191 [redacted] ).

[589] Kogod Dep. at 80:12–81:6.



301. [redacted][590]

[redacted][591]

[redacted]

[redacted]

[redacted][592]

302.     Moreover, it is my understanding that, during the fact discovery period, Plaintiffs' counsel became concerned that SCA had destroyed relevant documents pertaining to the CSI Exchanges. For example, whereas USPI produced certain documents documenting exchanges of propriety wage information, SCA never produced those same emails.[593] The fact of these missing documents corroborates my opinion that colluding parties generally make efforts to conceal their unlawful conduct. I have assessed the evidence that I know exists. Defendants' Experts have not convinced me that there is no other evidence that once existed, but now does not. Moreover, Dr. McCrary testified that he is not "offering any opinion" about whether "the agreements that are alleged in this case [were] in writing or oral[.]"[594]

303. [redacted]

[redacted]

---

[590] *Id.* at 81:7–10.

[591] Ex. PX313 at DOJCIV-008-00000190.

[592] Golomb Dep. at 41:18–42:17; *see also* Ex. PX313 at DOJCIV-008-00000191 [redacted]

[redacted].

[593] Pls.' Mot. to Compel SCA to Perform Supp. ESI Search (ECF. No. 419) at 1.

[594] McCrary Dep. at 136:9–14.

███████████████████████████████████████████████████████

███████████████████████████████████████[595] This is

hardly convincing. As such, my opinions are unchanged.

304. <u>CSI Exchanges Would Likely Successfully Reduce Class Pay.</u> In my report, I

testified that, based on my experience and review of the evidence, Defendants' CSI Exchanges

were likely to suppress Class pay.[596] ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████[597] Below, I demonstrate why the foregoing rebuttals are

unpersuasive, not well-founded, misinterpret the evidence, and do not change my opinions.

305. *Market Power.* Defendants' Experts argue that I have failed to demonstrate that

Defendants had monopsony power, such that their CSI Exchanges would not have harmed

employees' job and pay outcomes.[598] Their arguments fall flat.

306. Discussed at length above, Defendants do exert monopsony power in their

employee labor market, as many employers do.[599] In fact, according to economist David Card, a

"widespread lack of competition has become the consensus view in economics."[600]

---

[595] *See* Stiroh Report ¶¶ 110–111.

[596] Gerhart Report ¶ 83.

[597] Johnson Report ¶¶ 100–127; Saravia Report ¶¶ 138–167; McCrary Report ¶¶ 147–183; Stiroh Report ¶¶ 11–45, 107–117.

[598] Johnson Report ¶¶ 109–110; Saravia Report ¶¶ 70–103, 140, 144; McCrary Report ¶¶ 107–112, 151, 177–178; Stiroh Report ¶¶ 11–45.

[599] LABOR MARKET COMPETITION, *supra* note 38, at 1.

[600] *Id.* at 2.

307. Defendants' Experts' testimony regarding labor competition from non-Defendant employers for Defendant employees and evidence that Defendants hired non-Defendant employees therefore does not undermine my assessment.

308. *Single Price.* Dr. Johnson and Dr. Saravia argue that unless the product that is the subject of the collusion is homogeneous (i.e., the product has "a single price to fix"), the cartel cannot fix the price.[601] In their view, this crucial criteria is unmet here, where Defendants employ many different types of employees, and compensation includes various components.[602] This premise is wrong as a matter of economics and is otherwise illogical.

309. **No Single Price for Labor.** Dr. Johnson's and Dr. Saravia's analyses here wrongly treat product markets and labor markets as indistinguishable. As discussed above, the widely-accepted economics literature instructs, and Dr. Johnson and Dr. Saravia agree, that these markets are very different.[603] While there is often a single product price, there is generally not a single price for labor, as the 2022 U.S. Department of Treasury report explains[604]: "[L]abor markets are very different than some product markets, like commodity markets, where the product is relatively homogeneous, and buyers are usually indifferent to who is selling and vice-versa. In the labor market, both buyers (firms) and sellers (workers) take great interest in their counterpart's characteristics."

---

[601] Johnson Report ¶¶ 102–105; Saravia Report ¶¶ 165–167.
[602] *Id.*
[603] Johnson Report ¶ 27; Saravia Dep. at 75:4–76:8.
[604] LABOR MARKET COMPETITION, *supra* note 38, at 3.

-128-



310. **Variable Compensation.** ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ [606]  Their analyses are inconsistent

with the economics.

311. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ [607]

312.     Finally, these arguments defy common sense.  If employees and jobs comprise

one large homogeneous market where jobs/employers and employees are perfect substitutes for

each other, then Defendants would have exchanged CSI with non-Defendant employers,

including those Defendants' Experts identified as Defendants' competitors.  Unsurprisingly,

Defendants' Experts do not try to make this point and also do not try to explain this

inconsistency.  As such, I have no cause to change my opinions.

313.     *Long-Lasting Coordination Mechanism.* ████████████████



████████████████ [608] ████████████████████████████████

---

[605] McCrary Report ¶ 64 & n.122 (citing Fanning Dep. at 176:16–177:1).

[606] Johnson Report ¶¶ 104–105; Saravia Report ¶¶ 165–167; McCrary Report ¶¶ 151, 155, 175, 177, 181–182; Stiroh Report ¶ 112.

[607] McCrary Report ¶ 182.

[608] Johnson Report ¶ 106; Saravia Report ¶¶ 166–167.



[609] [redacted]

[610] I disagree.

314. [redacted] [611] ( [redacted] )[612] [redacted]

315. The foregoing is also consistent with evidence I analyzed in my report showing that labor market pay stayed relatively flat over the Class Period. [redacted]

---

[609] *Id.*; McCrary Report ¶¶ 162, 164, 179.

[610] Saravia Report ¶¶ 166–167; McCrary Report ¶¶ 162, 169; McCrary Report, Ex. 24; Stiroh Report ¶ 109.

[611] Saravia Report ¶ 159 and McCrary Report ¶ 170 (citing Ex. PX489).

[612] McCrary Report ¶ 77 (citing USPI_CIV_000121836 at USPI_CIV_000121836).

███████████████████████████████████████[613] As such, the evidence is consistent with Defendants' ability to coordinate compensation over an extended period of time.

316.    **Effects in Product Market.**  Finally, Dr. Johnson objects that I failed to account for the complexity of the alleged conspiracy because I did not address the impact Defendants' collusion would have on the product market.[614]  His testimony is deficient and unconvincing.

317.    Dr. Johnson ignores my opinions explaining that Defendants are incentivized to collude in part because of the relationship between the labor and product/services market.[615] Previously, I explained that companies must avoid paying its employees too much, which will increase their labor costs and either directly suppress profits, or which are passed on to customers as higher prices.[616]  In turn, higher prices reduce market demand, which in turn reduces profits.[617]  Paying too little is also problematic due to lowered employee quality, which in turn yields lower-quality services and/or products, which thereby reduces market demand, the price customers are willing to pay, and company profits.[618]  But if competitors can collude to suppress labor market competition without risking turnover or loss of employee morale from perceived external inequity, Defendants can reduce their labor costs without consequences to the product/services market.[619]

318.    Moreover, Dr. Johnson's statement is true only in a perfectly competitive market, which does not exist here.

---

[613] Gerhart Report ¶ 92 (citing DOJCIV-008-00000345 at DOJCIV-008-00000347).

[614] Johnson Report ¶ 108.

[615] Gerhart Report ¶¶ 56–57.

[616] *Id.* ¶ 56.

[617] *Id.*

[618] *Id.*

[619] *Id.* ¶ 57.

319.    <u>Non-Defendant Employers and Employees.</u>  Defendants' Experts argue that I wrongly ignored non-Defendant employers' competition for Defendants' employees.[620]  Dr. Johnson, Dr. Saravia, and Dr. McCrary also contend that I failed to explain how Defendants could have prevented other employers from bidding up compensation, which would have put upward pressure on Defendants' pay structures and offset downward pressure from the CSI Exchanges.[621]  I am unconvinced.

320.    In their arguments, Dr. Johnson and Dr. Saravia seem to have forgotten their own acknowledgements that labor markets do not operate as product markets.[622]  Thus, both note that there are frictions and costs to changing employers.  Dr. Johnson suggests this is especially true in the short run (an undefined number of years).[623]

321.    I noted earlier that frictions include limits of information on what actual alternative jobs are available externally, how much they would improve on what they have in their current job, and the risk/uncertainty of making a move to find out, the only way to know for sure.  Combined with the fact that there is no discernible single market pay rate[624] and that Defendants had market power (which need not affect all potential employers),[625] it becomes difficult to envision an immediate mass exodus of Defendants' employees to alternative

---

[620] Johnson Report ¶¶ 109–110; Saravia Report ¶¶ 70–103, 144; McCrary Report ¶¶ 121–128, 263–267; Stiroh Report ¶¶ 107, 112.

[621] Johnson Report ¶¶ 109–110; Saravia Report ¶¶ 70–103, 144; McCrary Report ¶¶ 121–128, 263–267.

[622] Johnson Report ¶ 27; Saravia Dep. at 83:22–84:17.

[623] Johnson Dep. at 190:9–191:6.

[624] *Id.* at 267:11–16.

[625] *See also* LABOR MARKET COMPETITION, *supra* note 38, at 3 ("To illustrate the contrast between competition and market power, consider this question:  If an employer cut their wages by 5 percent, what fraction of their workers would quit?  In a perfectly competitive market, all workers would leave.  Yet, we know that is not true in practice—indicating that many employers have some degree of market power.").

employers (and certainly not to Defendant co-conspirators) in response to lower annual merit increase budgets. However, these lower annual merit increase budgets would certainly have saved the Defendants a substantial amount in labor costs, especially as the savings accumulate over time.

322. Otherwise, for the same reasons as explained above, evidence of non-Defendant employer competition and Defendants' need to hire non-Defendant employees is not inconsistent with my opinions.

323. <u>Defendants Had a Mechanism to Prevent Cheating.</u> Defendants' Experts further contend that my analysis is deficient because I did not adequately show that Defendants had a mechanism to monitor and enforce their wage-fixing agreement and prevent cheating.[626] This contention is inaccurate and does not change my opinion.

324.

[628] Accordingly, Defendants' key co-conspirators already had open channels of communications that could be used to enforce a wage-fixing agreement. Moreover,

---

[626] Johnson Report ¶¶ 101, 106, 111; Saravia Report ¶¶ 142–143, 146–147; McCrary Report ¶¶ 151, 163; Stiroh Report ¶ 112.

[627] Gerhart Report ¶¶ 12 (citing Ex. DOJCIV-008-00000090 at DOJCIV-008-00000091 (█████ █████████████████████████████████ )), 22(a) n.25 (citing Thiry Dep. at 145:23–146:7; Hayek Dep. at 93:7–95:14, 11:4–115:1 and Ex. PX304), 73–76.

[628] Saravia Report ¶ 14.

this assessment is consistent with evidence I provided in my report regarding the incestuous nature of the industry and the CEOs' close personal relationships and regular interactions.[629] Defendants' Experts ignore this evidence.

325. Moreover, Defendants' Experts fail to account for the fact that there would be no benefit to cheating on wage-fixing agreements where Defendants also maintained No-Poach Agreements which suppressed labor market competition, and which obviously mitigate incentives to cheat on the wage-fixing. ███████████████████████████

████████████████████████████████████████████████████████████

███████████████████████[630] As such, I have no cause to change my opinion.

**D. Defendants' No-Poach Agreements and CSI Exchanges Harmed Employee Compensation.**

326. In my report, I explained that based on my experience and research in the compensation and human resource management spaces, my opinion is that the common evidence I analyzed regarding Defendants' collusion is consistent with harm to Class Members' compensation.[631]

327. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████[632]███████████████████████████████████

---

[629] Gerhart Report ¶ 40.

[630] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████ McCrary Report ¶ 183. It is not clear how paying more would increase profits, and Dr. McCrary does not attempt to explain.

[631] Gerhart Report ¶¶ 84–87.

[632] Johnson Report ¶ 107.

-134-



[633] Their testimony does not compel me to change my own.

328. ██████████████████████████████████████████

███████████████████████████████████████████████████

██ .[634] ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ [635] ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████ [636] In, response, I note

that: Labor cost = Labor cost per employee x Number of employees.

329. Most businesses welcome an increase in product demand and find it necessary, all else equal, to hire more employees to do so. However, labor costs can be controlled somewhat by keeping labor cost per employee (average pay) as low as possible, conditional on having enough sufficiently qualified employees. That is more achievable to the degree competition for employees from other companies is restricted. Another avenue for employers seeking to keep labor costs low is to lower their employee hiring standards.

---

[633] Stiroh Report ¶¶ 46–48, Figure 8.
[634] Johnson Report ¶ 107.
[635] *Id.* ¶ 107;
[636] Stiroh Report ¶ 47.

-135-

330.    It is possible that Defendants would have expanded Senior-Level Employment more than they did if pay had not been suppressed.



331.

[637] *Id.* ¶ 75, Ex. 13.
[638] Johnson Report, App. E, Ex. E-1.
[639] *Id.* ¶ 75, Ex. 13.
[640] Stiroh Report ¶ 53, Figure 10.

332.

[641] One explanation for this trend is the presence of labor market frictions. In other words, DaVita's market power would have enabled it to deviate from "market pay." Another explanation is that DaVita may have lowered its hiring standards.

333.

---

[641] *Id.* ¶¶ 50–55, Figures 9–11.

. *See, e.g.,* Johnson Report ¶¶ 74–76; Saravia Report ¶¶ 183–185; McCrary Report ¶¶ 79–80, 84–87.

[642] Stiroh Report ¶ 52, Figure 9.

[643] *Id.* ¶ 53, Figure 10.



334. Below, I explain that Defendants' Experts fail to persuade me that Defendants'
No-Poach Agreements and CSI Exchanges did not suppress Senior-Level Employees'
Compensation.

### 1. Defendants' No-Poach Agreements Harmed Class Member Pay.

335.

---

644 ██████████████████████████████████████████
██████
Stiroh Report ¶ 51. Note that in 2007, the only occupational category containing
"executives" is the "Chief Executives" category. In 2019, there are two occupational categories
containing "executives": "Chief Executives" and "Top Executives" (which has roughly eight
times as many employees/observations). I removed "Chief Executives" from both years. *See* my
workpapers.

645 Stiroh Report ¶¶ 50–55, Figures 9–11.

646 Johnson Report ¶¶ 51–54.

██████████████████████████████████████████████ [647] Below, I explain how the foregoing is an example of ignoring overwhelming evidence on how labor markets work and providing no real reason to expect labor markets for Defendants to work differently.

336. <u>Tracking Cold Calls Is a Red Herring.</u> ████████████████

███████████████████████████████████████████████████████

██████████████████████████████ [648] To the extent Defendants did collect this data, it is my understanding that they did not produce it to Plaintiffs. ████████████████████

████████████████ [649] ███████████████████████████████████

███████████████████████████████ [650]

337. Additionally, I am not persuaded that such an analysis would change my opinion.

███████████████████████████████████████████████████████

█████████████████████████████████ [651].



---

[647] Stiroh Report ¶ 77 n.149.

[648] *See* Johnson Dep. at 90:15–20 (████████████████████████████████████████████████████████).

[649] *Id.* at 233:6–17.

[650] Saravia Dep. at 122:11–15; Stiroh Dep. at 118:6–12 ████████████████████████████████████).

[651] Gerhart Dep. at 137:12–138:17.

338. ██████████████████████████████████████████████████

████████████ [652]

339. <u>Even One Missed Opportunity Can Have a Profound Impact.</u> Second, Dr. Johnson's and Dr. Stiroh's critiques improperly devalue the potential impact of just one missed job opportunity on an employee's compensation.

340. For example, discussed at length above, not all job opportunities will be equally good matches for the employee. ████████████████████████████

███████████ [653].

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

341. ████████████████████████████████████████████████

███████████████ [654] is misleading. Rather, given the frictions inherent to the job search process, "[a] worker will sometimes prefer to accept a job with a discounted wage than to continue a job search that may not yield a better alternative quickly or at all."[655]

342. Further, I have repeatedly explained that most employee movement occurs in response to unsolicited opportunities. As I have noted, such offers to passive job seekers provide important new information on alternative employment opportunities, including those with higher wages, which is of great value, given what we have seen is the cost and difficulty of obtaining such information, especially information specific to that individual employee's potential match

---

[652] *Id.* at 55:1–4.

[653] Gerhart Dep. at 116:22–117:14.

[654] Johnson Dep. at 202:13–14.

[655] LABOR MARKET COMPETITION, *supra* note 38, at 5.

and with which employer. Recipients of such offers have often been screened by the prospective new employer and the recipient and prospective employer may even know each other (e.g., as in the case of SCA CEO Hayek recruiting SCA COO Rucker from DaVita). This prior knowledge or information reduces the risk/uncertainty of a potential move to a new, typically higher paying job for the employee. It also typically gives the employee an option to negotiate higher pay at their current employer. The outside offer will typically have cascading effects on the pay of other employees through internal equity and/or external equity (because of what it may tell other employees about their potential value externally).

343.    I have described the Federal Reserve Bank of San Francisco study, which concluded that "more than three-quarters of workers who switched employers did not report active job search in the previous three months." This finding lead the authors to observe that "a majority of people" actually "find jobs without ever reporting actively looking for one."[656] ■



657.

344.    █████████████████████████

658

---

[656] Carrillo-Tudela, *supra* note 216.
[657] Gerhart Dep. at 53:5–54:6.
[658] McCrary Report ¶¶ 71, 74.

345.    I also reviewed evidence in Figure 1 in my report showing the substantial average increase in pay to those voluntarily changing employers, especially higher level employees as the Class Members are.[659] ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ [660]

346.    Of course, unsolicited outside offers do not necessarily come in often or regularly. Many employers think about their own careers and how one opportunity appeared and had a major impact by providing access to that job and/or to other future opportunities/jobs.  Thus, if an employee is denied even one such offer, it can have major consequences for them (and as we have seen, for other employees).

347.    Finally, Defendants' Experts do not refute the substantial qualitative evidence I provided in my report that is consistent with Class Members receiving fewer cold calls during the Class Period and thereby experiencing suppressed compensation.  As such, I have no cause to change my opinions.

### 2.    Defendants' CSI Exchanges Harmed Employee Compensation.

348.    Defendants' Experts claim I neglected to show how Defendants could have weaponized their CSI Exchanges to lower Class pay, and thus that this conduct did not harm Class Members' pay.[661]  None has convinced me that the CSI Exchanges are consistent with unilateral conduct or that its impact on compensation would likely have been benign.

---

[659] Gerhart Report ¶ 46, Figure 1.

[660] Johnson Report ¶ 54.

[661] Johnson Report ¶¶ 111–113, 118; Saravia Report ¶ 157 n.228 (Dr. Saravia also incorrectly asserts that I "backed away" from my opinion that these exchanges would have enabled Defendants to fix compensation levels.); McCrary Report ¶¶ 161–176; Stiroh Report ¶¶ 107–117.

349.   <u>CSI Exchanges Are Inconsistent with Unilateral Interest.</u>



[666] Their testimony is misleading and obscures the harm likely incurred by competitor exchanges of propriety business information.

350.   *CSI Exchanges of Compensation Data Differ from Normal Salary Surveys.* As explained in my opening report and at deposition, Defendants' sharing of compensation information bears little resemblance to legal salary surveys that purportedly promote efficiency.[667]

---

[662] Saravia Report ¶¶ 141, 145.

[663] *Id.* ¶ 145.

[664] McCrary Report ¶¶ 148, 152–160.

[665] *Id.* ¶¶ 155, 171.

[666] Stiroh Report ¶¶ 107, 113–117.

[667] Gerhart Report ¶ 83(b); Gerhart Dep. at 145:10–146:2 ███████████ *see also* McCrary Report ¶ 153.

351.

[668]

[669] These criteria are clearly unmet with respect to Defendants' exchange of compensation data, and, ███████████████████████████████████████████████████████████████████ [670]

352. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████ [671] ███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ [672] █████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ [673] █

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ [674] Absent the

CSI Exchanges, Defendants could only make educated guesses about each other's compensation-related decisions; with them, Defendants could be certain. Moreover, the foregoing begs the question: if Defendants already had access to largely similar information, why engage in the CSI

---

[668] Ex. PX85 at DVA_OMCEAL_001067253.

[669] *Id.*

[670] Gerhart Dep. at 146:23–147:9.

[671] Johnson Dep. at 247:13–25.

[672] *Id.* at 248:1–15.

[673] Stiroh Dep. at 162:19–163:17.

[674] McCrary Report ¶ 160.

Exchanges at all? That they did would tend to imply some additional benefit to directly sharing de-anonymized, forward-looking data directly with competitors.

353. Dr. McCrary's and Dr. Stiroh's attempts to characterize Defendants' CSI Exchanges as pay transparency efforts, let alone required by law, are futile.[675] Pay transparency, discussed above, refers to *employees'* access to labor market data, and not to one competitors' access to another competitors' CSI.[676] ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████[677] ██████████████████████████

████████████████████████████████████████

████████████████████████████[678]

354. *Nonpublic Data.* In my report, I opined that "[n]one of the extensive types of data exchanged [by Defendants] were published to the public or to the affected employee victims of the suppressed compensation. This suggests that Defendants used the data for nefarious purposes (i.e., to fix wage rates)."[679] ████████████████████

████████████████████████████████████████

███████████████████████████[680] I disagree.

---

[675] McCrary Report ¶¶ 158–159; McCrary Dep. at 196:5–198:12 (████████████████████ ████████████████████████████████ ; Stiroh Report ¶¶ 113–117.
[676] *See* Gerhart Report ¶ 83(a).
[677] McCrary Report ¶ 171.
[678] Stiroh Dep. at 161:21–162:11.
[679] Gerhart Report ¶ 83(a).
[680] *Id.* ¶ 23 (citing Ex. PX490).

355. [684] As such, Dr. Stiroh's analysis is wrong and has not given me cause to change my own.

356. *Defendants Were Aware That Their CSI Exchanges Were Anticompetitive.* Further, Defendants' Experts ignore evidence that Defendants were aware of the anticompetitive implications of these exchanges.

357. ███████████████████████████████████████[685] which generally involve "looking at compensation for all employees across the organization and identifying a percentage increase to be applied."[686]

---

[681] Stiroh Report ¶ 109 (citing DaVita, *Notice of Annual Meeting of Stockholders* 21 (June 15, 2009).

[682] Ex. PX490.

[683] *Id.* at HAYEK_000012214.

[684] *Id.*

[685] Ponds Dep. at 27:25–28:8.

[686] Gerhart Report ¶¶ 119(b)(ii) (citing Sandoz Dep. at 36:15–38:10 ███████████████████ , 118(b)(iv)

358.

[687] Fanning testified that she had a strong reaction to Rucker's request, and "very diplomatically told him yeah, that ain't happening . . . . It's not lawful. I'm not doing this shit . . . . You don't do this. And I would never do it."[688]

[689] She testified that in her experience, "competitors don't share their future data," and that third-party pay surveys are "the lawful professional way to share information between these companies, and I'm making it clear that I ain't doing anything that ain't right"[690]

[691]

359.

---

(citing Chipman Dep. at 167:16–19 (DaVita implemented annual company-wide merit increase budgets)), 120(b)(ii) (citing English Dep. at 27:3–28:20 (USPI recommended merit salary increases based on performance and budget)).

[687] Ex. PX36 at SCA000540406–07.

[688] Fanning Dep. at 177:20–183:11.

[689] Ex. PX36 at SCA000540407.

[690] Fanning Dep. at 182:25–183:11.

[691] *See, e.g.,* Gerhart Report ¶ 75(d) (citing Ex. PX160 at SCA000002866 ( ).



360.    Moreover, Defendants' own compliance policies prohibited them from sharing

such information.

---

[692] Clemens Dep. at 174:1–3.

[693] *Id.* at 179:21–180:21.

[694] Ex. PX49 at DVA_OMCEAL_000285349.  I have not seen any evidence wherein DaVita's legal counsel instructed its employees to share CSI with SCA.

[695] Ex. PX337 at SCA002021398.

[696] *Id.* at SCA002021398, SCA002021402.



361.    The foregoing furt█ supports my opinion that these exchanges were inconsistent with unilateral conduct.

362.    <u>Defendants Used the CSI Data They Received.</u>  Though I was not tasked with performing an empirical analysis,[699] I did provide ample qualitative evidence of Defendants' exchanges of granular overhead expense data to set their annual merit increases and facilitate cost reduction efforts.[700]



363.    ██████████████████████████████████████████████

██████████████████████████████████████████[703]

██████████████ I said the complete opposite. █████████████

███████████████████████████████████████

---

[697] USPI_CIV_000433011 (cover email) and USPI_CIV_000433030 (attachment) at USPI_CIV_000433032.

[698] *Id.*

[699] Gerhart Report ¶ 6.

[700] *Id.* ¶ 83.

[701] Johnson Report ¶¶ 112–123; Saravia Report ¶¶ 156–161; McCrary Report ¶¶ 148, 152; Stiroh Report ¶ 112.

[702] McCrary Report ¶¶ 148, 152; Stiroh Report ¶ 112.

[703] Stiroh Report ¶ 112 (citing Gerhart Report ¶ 83).



by the evidence.

This effect is borne out

704

705

706

707

708

709 .710

364.

_____

704 Gerhart Report ¶ 83(c).

705 Gerhart Report ¶ 83(d) (citing GERHART, *supra* note 94, at 268–269).

706 Ex. PX36 at SCA000540410.

707 *Id.*

708 *Id.*; Fanning Dep. at 185:13–18, 186:2–4.

709 Ex. PX36 at SCA000540406.

710 *Id.* at SCA000540405.



I disagree.

---

711 Gerhart Report ¶ 83 (c) (citing Mathis Dep. at 53:5–63:5, 66:5–76:6; Ex. PX232; Ex. PX37; Kopser Dep. at 32:3–38:2, 105:5–108:9; Cagle Dep. at 119:24–120:23; Ex. PX240 at USPI_CIV_000686081).

712 Johnson Report ¶¶ 125–126; Saravia Report ¶ 157; McCrary Report ¶¶ 164, 166–167.

713 McCrary Report ¶ 167 (citing Gerhart Report ¶ 83).

714 Gerhart Dep. 183:6–19.

715 *Id.* at 185:5–23.

716 *Id.* at 184:2–185:1.

717 Note that G&A expenses and overhead costs are both terms used to describe expenses. "Selling, general, and administrative expense" (i.e., G&A expense) is an actual line typically

368.

[718]

[719]

369. Accordingly, such exchanges between Defendants were certainly granular enough to harm employee compensation. I am therefore not persuaded to change my opinion.

370. <u>Exchanges of General Business Information and Other Non-Compensation Data.</u> In my opening report, I provided evidence showing that SCA and USPI regularly exchanged many kinds of proprietary business information, apart from wage data.[720]

[721] These arguments fall flat.

---

appearing in annual reports (the income statement). *See Overheads*, CFI https://corporatefinanceinstitute.com/resources/accounting/overheads/ (last visited June 26, 2025).

[718] Gerhart Report ¶ 23 (citing Rucker Dep. at 254:24–256:12, 260:11–20; Hayek Dep. at 362:18–363:7; OMC_BM_000006875

)); *see also* Ex. PX518 (

; Saravia Report ¶ 145 n.204; McCrary Report ¶ 156.

[719] *See* Gerhart Report ¶ 83(c) n.375 (

); McCrary Report ¶ 156.

[720] *See, e.g.,* Gerhart Report ¶ 82(a) n.346.

[721] Johnson Report ¶¶ 124–127; Saravia Report ¶¶ 154–155, 157, 163; McCrary Report ¶¶ 164–165.

371.    Obviously, sharing information about payor mix comparisons or case volume, for example, would not by itself enable Defendants to fix wages.  To clarify, I provided this evidence to illustrate that Defendants shared vast amounts of information above and beyond the compensation and overhead cost data.  ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████[722]  This is relevant to my assessment that they behaved far more like co-conspirators than competitors.  This conclusion is reinforced by the fact that these same Defendants entered into No-Poach Agreements in tandem.

372.    It also bears repeating that regardless, Defendants primarily exchanged nonpublic information.[723]

### E.    Wage Suppression Can Persist for Years.

373.    In my report, I opined that, once wages are artificially suppressed, they can remain at depressed levels long after the anticompetitive restraint is limited, because markets do not necessarily adjust quickly.[724]  Defendants' Experts do not rebut my analysis.  As such, my opinions are unchanged.

## VI.    DEFENDANTS MAINTAINED STRUCTURED COMPENSATION SYSTEMS THAT SOUGHT TO ACHIEVE INTERNAL EQUITY AND EXTERNAL EQUITY.

374.    In my report, I opined that, based on my expertise and review of the evidence, Defendant firms used compensation professionals to carry out their pay strategies and maintain

---

[722] Gerhart Dep. at 157:17–158:6.

[723] *See* Gerhart Report ¶¶ 82–83.

[724] *Id.* ¶¶ 88–92.

their pay structures.[725]  I then provided a step-by-step process for designing a systematized compensation structure.[726]  Further, I opined that a fundamental goal of Defendants' pay strategies is to achieve internal equity and external equity.[727]  Finally, I explained that internal equity and pay-for-performance policies are not mutually exclusive concepts, and that, in fact, paying for performance promotes internal equity.[728]  Defendants' Experts' rebuttal opinions fail to address many of my opinions, and, to the extent they respond, those responses run counter to the qualitative evidence and widely-accepted compensation-related literature.  As such, I have no cause to change my opinion.

### A. Defendants' Highly-Trained and Qualified Compensation Professionals Established and Maintained Structured Compensation Systems.

375.    Based on my experience and research in the compensation and human resource management fields, compensation professionals receive standardized training to implement structured pay systems that are geared towards achieving internal equity and external equity.[729]  Moreover, I analyzed the evidence in this litigation and opined that Defendants employed this exact group of highly-educated professionals to effectuate their pay systems.[730]  Finally, I explained that WorldatWork is a valuable reference source for these professionals when they enter the workforce.[731]

376.    Below, I explain that Defendants' Experts make no efforts to refute the foregoing opinions.  In fact, Dr. Johnson agreed that Defendants "employ compensation professionals

---

[725] *Id.* ¶¶ 99–103.
[726] *Id.* ¶¶ 104–120.
[727] *Id.* ¶¶ 121–127.
[728] *Id.* ¶¶ 128–135.
[729] *Id.* ¶¶ 99–103.
[730] *Id.* ¶ 102.
[731] *Id.* ¶ 103.

whose job it was, at least in part, to assist the company in setting pay rates of its employees."[732] Further, Dr. McCrary declined to opine as to whether Defendant firms maintained pay structures, and testified only that it "might be true, in some of the instances, it might not be true at all" that each Defendant firm "had HR departments and other job functions that were responsible for determining pay to employees[.]"[733]

377. <u>Defendants' Compensation Professionals.</u>  I have not changed my view that Defendants employed highly-educated and credentialed compensation professionals.[734]

378. *DaVita.*  I opined that DaVita employees responsible for maintaining its compensation structures were well-trained and well-educated.[735]  Apart from the testimony discussed above, Dr. Johnson, Dr. McCrary, and Dr. Stiroh do not submit contrary evidence to respond to my opinion that DaVita employed compensation professionals with extensive training and experience to maintain its compensation structures.[736]  Moreover, Dr. Saravia testified that she did not opine about whether DaVita "employed highly trained compensation specialists[,]" but that she knew Defendants "employed HR professionals."[737]  As such, my opinion is unchanged.

379. *SCA.*  As above, I opined that SCA's HR professionals responsible for compensation had extensive education and training in human resource management and compensation.[738]  As above, Dr. Johnson and Dr. McCrary do not put forth evidence contrary to

---

[732] Johnson Dep. at 156:9–13.

[733] McCrary Dep. at 361:21–362:24, 364:20–365:12.

[734] Gerhart Report ¶ 102.

[735] *Id.* ¶ 102(a).

[736] Johnson Dep. at 155:23–156:8; McCrary Dep. at 361:21–362:24, 364:20–365:12.

[737] Saravia Dep. at 132:11–14.

[738] Gerhart Report ¶ 102(b).

the evidence I analyzed showing that SCA hired highly-credentialed employees to manage its compensation structure.[739] Likewise, Dr. Saravia does not submit any testimony or evidence contrary to my assessment that SCA's compensation professionals had extensive training.[740] Accordingly, I have not changed my opinions.

380. *USPI.* Finally, I testified that like DaVita and SCA, USPI employed workers with comprehensive human resource and compensation training to maintain its systematic pay structures.[741] As above, Dr. Saravia and Dr. McCrary do not rebut my assessment that USPI relied on highly-qualified human resources professionals to administer its structured pay systems.[742]

381. WorldatWork Is a Valuable Resource for Compensation Professionals. I stated that WorldatWork is a valuable resource for professional compensation and human resource employees, and that Defendants' compensation employees regularly consulted WorldatWork resources.[743] Defendants' Experts decline to address my opinion, and I therefore have no cause to change my own.

## B. Defendants Designed Systematized Compensation Structures.

382. In my report, I provided an overview of the two-step process to design structured compensation systems.[744] I then determined that the evidence showed that Defendants applied the principles of internal and external equity foundational to this design process in designing and

---

[739] Johnson Dep. at 155:23–156:8; McCrary Dep. at 361:21–362:24, 364:20–365:12.

[740] Saravia Dep. at 132:11–14.

[741] Gerhart Report ¶ 102(c).

[742] Saravia Dep. at 132:11–22; McCrary Dep. at 361:21–362:24, 364:20–365:12.

[743] Gerhart Report ¶ 103.

[744] *Id.* ¶¶ 104–120.

maintaining their own structured compensation systems.[745]  Below, I correct Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's attempts to redefine systematic pay structures that cause wage suppression to have cascading effects on employees as "rigid" structures incapable of transmitting impact across subsets of employees.[746]  I also explain that they and Dr. Stiroh have not provided compelling testimony or evidence to refute my assessment of Defendants' pay structures.[747]

383.    Dr. Johnson, Dr. Saravia, and Dr. McCrary argue that my (purported) opinion that Defendants had "rigid" pay structures, which would have transmitted the effects of Defendants' anticompetitive conduct Class-wide (discussed below), is unsupported by the evidence.[748]



---

[745] *Id.*

[746] Johnson Report ¶¶ 6, 43, 68, 74; Saravia Report ¶¶ 30–31, 186; McCrary Report ¶¶ 30, 69–106.

[747] Johnson Report ¶¶ 64–97; Saravia Report ¶¶ 168–196; McCrary Report ¶¶ 30, 69–106.

[748] Johnson Report ¶¶ 6, 43, 68, 74; Saravia Report ¶¶ 30–31, 186; McCrary Report ¶¶ 30, 69–106.

[749] Johnson Report ¶¶ 64–97; Saravia Report ¶¶ 165–196; McCrary Report ¶¶ 30, 69–106.

[750] McCrary Report ¶ 87.

751

Each of the features he identifies as problematic are, to the contrary, typical of structured compensation systems. Moreover, Dr. McCrary's testimony that he does not have an opinion about whether each company maintained a pay structure appears at odds with his testimony that Defendant firms lacked pay structures capable of transmitting harm Class-wide.[752] It is unclear how he could have an opinion on one topic but not the other, and Dr. McCrary does not explain how he distinguishes between the two.

384. In structured compensation systems, there are generally substantial differences (differentials) between average salary and total direct compensation according to job level. If an employee wants to maximize the likelihood of high pay, the employee would obviously choose to be a VP rather than a Director, or an SVP rather than a VP. The idea that all VPs would be paid more than all Directors would only be possible to the degree within-job pay variance was eliminated by a compensation system that did not allow Director and VP pay to vary as a function of individual performance contributions. Taken to the extreme, that would require all Directors to be paid the same, all VPs the same, and all SVPs the same. That homogeneity

---

[751] *Id.* Note that Dr. McCrary relies on a paper by management scholars Matt Bloom and John G. Michel in support of this proposition. *Id.* at n.185 (citing Matt Bloom & John G. Michel, *The Relationships among Organizational Context, Pay Dispersion, and Managerial Turnover*, 45 THE ACADEMY OF MANAGEMENT JOURNAL 33–42, 34 (2002)). However, there is no data in this source regarding employee performance (and its role in determining pay), either relative or absolute, and this paper in fact supports my assessment. Bloom and Michel explain that according to "a large body of research," "the distribution of rewards within an organization is fundamental to employee attitudes and behaviors such as job-related satisfactions, organizational commitment and withdrawal, and job performance (Folger & Cropanzano, 1998; Greenberg, 1990)." *Id.* at 33. "This evidence indicates people care more about how their rewards compare to those of relevant others than about the absolute amount of rewards they receive because reward distributions signal an individual's relative performance proficiency and her or his organizational value and status." *Id.* In other words, they agree that the comparison of pay and performance contributions—what I call "internal equity"—is what matters.
[752] McCrary Dep. at 361:21–362:24.

would effectively eliminate the within-job variation in pay and the overlap in pay of Directors and VPs about which Dr. Johnson and Dr. McCrary are so concerned, as I explain below. However, that is not how a structured compensation system works. (All Directors paid the same would instead be more akin to how blue-collar workers covered by a union-negotiated contract would be paid.) A structured compensation system ensures that *on average*, VPs are paid more than Directors, but that there is significant variation in how much Directors and VPs are paid (based on performance contributions) and thus there will be some overlap in pay of the two jobs. That will be more true to the degree bonus and equity compensation are used to pay for performance. Of course, these are also very structured—indeed often formulaic.

385.    Below, I correct Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's misrepresentations regarding my opinion, and then explain why their rebuttals are inconsistent with the evidence and compensation-related theory and do not cause me to change my opinions. I also explain that Dr. Stiroh has declined to rebut this testimony altogether.

### 1.    Step 1:  Defendants Assigned Internal Value to Jobs.

386.    I testified that according to the compensation-related literature, this first step requires an organization to create an internal pay structure, which primarily involves assigning internal value or worth to jobs.[753] The internal value is frequently expressed as a percentage differential, and companies choose percentage differentials with different strategies and goals in mind, e.g., to promote internal equity.[754] Over time, in a competitive labor market the internal equity-promoting pay differentials begin to approximate the external equity-promoting pay differentials (i.e., percentage differentials between jobs found in external market pay surveys),

---

[753] Gerhart Report ¶¶ 106–110.
[754] *Id.*

and are consistent internally and across organizations.[755] Defendants' Experts have not provided any testimony or evidence sufficient to persuade me to change my opinion.

387. <u>Job Analysis.</u> Job analysis is the first step in developing an internal pay structure, and I explained the systematic process by which organizations collect information to establish similarities and differences in different kinds of work.[756] Defendants' Experts have not addressed this opinion or given me cause to change it.

388. <u>Job Content.</u> Further, I opined that, to perform job analysis, compensation and human resource professionals must collect information about a job's tasks, activities, and work demands, as well as the required characteristics of employees in those roles, and the job's internal and external relationships.[757] As above, Defendants' Experts do not address my views on the subject.

389. <u>Levels of Information.</u> Moreover, I testified that the job analysis process provides both high-level and specific information, such as elements, tasks, positions, jobs, occupations, and job families.[758] Again, Defendants' Experts made no effort to put forth contrary evidence or testimony.

390. <u>Job Analysis Output.</u> I opined that the primary purpose of job analysis is to put out a job description that sets forth key roles and person characteristics, and I reviewed Defendant firms' evidence in support of my assessment.[759]

---

[755] *Id.*

[756] *Id.* ¶ 107.

[757] *Id.* ¶ 108.

[758] *Id.* ¶ 109.

[759] *Id.* ¶ 110.

391.    Dr. Johnson did not submit evidence contrary to the evidence of DaVita's and SCA's job mapping assessments, which demonstrates that DaVita and SCA utilized job analysis practices.[760]  Dr. Saravia also does not object that the internal USPI spreadsheet I provided showing USPI used "Job Description" sheets is inconsistent with my description of the job analysis output.[761]  Likewise, Dr. Stiroh ignores my assessment altogether.

392.    Dr. McCrary claims that I have not addressed or explained how to use common evidence to set "objective criteria for determining which jobs are senior to the director-level."[762] Foremost, I was not tasked with identifying director-level and above jobs at Defendant firms,[763] which is a task that I understand Dr. Starr performs.  Moreover, Dr. McCrary's contention that I "endorsed" job analysis at my deposition, such that Dr. Starr's approach for identifying job titles to include in the Class is "flawed," mischaracterizes my testimony.[764]  I did not endorse any one approach over another; instead, I made the point, as Dr. McCrary notes, that job titles alone are not sufficient for matching internal jobs to external pay survey jobs because job titles do not necessarily mean the same thing in different companies.[765]  But of course, they can mean the same thing—one clearly needs to take care in establishing they do.  As such, my opinion is unchanged.

### 2.    Step 2:  Defendants Undertook Job Evaluation and Benchmarking.

393.    I then opined that the second step in the pay structure design process is to undertake job evaluation, which is a systematic determination of jobs' relative worth to create a

---

[760] *Id.* ¶ 110(a)–(b).

[761] *Id.* ¶ 110(c).

[762] McCrary Report ¶ 272.

[763] *See* Gerhart Report ¶ 6.

[764] McCrary Report ¶¶ 269, 273 (citing Gerhart Dep. at 44:5–45:6).

[765] *Id.*

job structure.[766]  Below, I explain that Defendants' Experts have not persuaded me to change any of my opinions explaining this process or my opinion that Defendants implemented these organizing principles.

394.    Compensable Factors.  I explained that companies will often identify "compensable factors" (i.e., the factors for which the company assigns value), to distinguish an individual job's value.[767]  A job with more high-value compensable factors should correspondingly receive higher pay, because that job yields higher value for the company. Defendants' Experts do not address the foregoing opinions, so I have no cause to change them.

395.    Salary Levels, Ranges, and Grades.  Moreover, I opined that, however a company chooses to perform job evaluation, the process must involve grouping and ordering jobs by relative value, and will always produce a set of salary grades/ranges, however informal or unstructured.  Defendants' Experts do not provide any testimony or contrary evidence to rebut my analysis.  Accordingly my opinion is unchanged.

396.    Defendants Implemented Salary Levels, Ranges, and Grades.  I thereafter found that the evidence I analyzed is consistent with Defendant firms' implementation of the foregoing principles to create salary grades and ranges.[768]

397.    A structured compensation system uses pay ranges with minimums, midpoints, and maximums.[769]  How formalized these are is not the key factor.  Rather, it is whether the company takes steps to, on average, pay SVPs more than VPs, and pay VPs more than Directors. It is also about whether the pay of most Directors, for example, falls within a range.  Contrary to

---

[766] Gerhart Report ¶¶ 111–116.

[767] *Id.* ¶ 112.

[768] *Id.* ¶ 114.

[769] *Id.* ¶ 113(b).

Dr. McCrary's objections,[770] variation within a range is by design in a structured compensation system to allow different pay for the same role or same level role based on performance contributions. In other words, another indicator of a structured compensation system is whether the company considers and compares the pay and performance contributions of employees in a job like Director to those of others and takes steps to ensure pay is consistent with contributions (internal equity).[771] In a structured compensation system, some employees will have base pay below the minimum or above the maximum of their salary range. Indeed, these are common enough in structured compensation to have names. Below-minimum base pay is a "green circle rate" and above-maximum base pay is a "red circle rate."[772]

398. Dr. Johnson, Dr. Saravia, and Dr. McCrary disagree with my analysis of the evidence and claim that Defendants did *not* implement salary grades, levels, or ranges.[773] I analyzed their arguments and found that they are not supported by the evidence or by the compensation-related theory and literature.

399. *DaVita.* I testified that, based on my experience and the evidence, DaVita's pay structures clearly incorporated salary ranges, levels, and structured pay differentials.[774] Below, I explain that Dr. Johnson, Dr. McCrary, and Dr. Stiroh have not given me cause to revise this testimony.

400. ██████████████████████████████████████████████

████████████████████████████████████████████████████

---

[770] McCrary Report ¶ 96.

[771] Gerhart Report ¶ 94.

[772] GERHART, *supra* note 94, at Chapter 18.

[773] Johnson Report ¶¶ 6, 68–69, 74–75; Saravia Report ¶¶ 179–182; McCrary Report ¶ 71.

[774] Gerhart Report ¶ 114(a).



401.    The best evidence of a company's pay structure is evidence of what the company actually did, and not just what it says it does. [redacted]

[redacted] [780] none of which Dr. Johnson takes into account.

---

[775] Johnson Report ¶ 68 and McCrary Report ¶ 104 (citing Ex. PX77 at DVA_OMCEAL_001329257).

[776] McCrary Report ¶ 104.

[777] DVA_OMCEAL_001068058 at DVA_OMCEAL_001068059.

[778] *Id.*

[779] DVA_OMCEAL_001329840 (cover email), DVA_OMCEAL_001329841 (attachment, *see* "Pay Ranges" sheet) and DVA_OMCEAL_001329842 (attachment). *See also* DVA_OMCEAL_001385318 (cover email) and DVA_OMCEAL_001385327 (attachment).

[780] Gerhart Report ¶¶ 114(a), 127(a).

402.    Further, Dr. Johnson objects that I did not assess whether "pay differentials" would apply to total compensation.[781]  In the typical structured compensation system, the rate ranges apply to salary/base pay.  There is no minimum or maximum as such for "variable pay" (bonus, equity) as these are tools to even more strongly differentiate pay to recognize differences in employee performance.  In other words, bonus and equity are part of how a structured compensation system recognizes differences in performance contributions.  However, it continues to be the case that higher job levels have more opportunity for higher bonus and equity pay, consistent with the nature of a structured compensation system where salary is higher at higher job levels.  It is also the case that bonus payouts are to a large extent as structured as it gets given the typical use of a formula with predetermined performance metrics and payout schedules (often expressed as a percentage of salary) to determine bonus payouts.  Here, DaVita's compensation process further shows that DaVita's pay system is structured, given evidence discussed above that rate ranges did apply to bonuses and equity grants.  Accordingly, my opinion is unchanged.

403.    *SCA.*  In my opinion, the common evidence shows that SCA likewise maintained a pay structure with salary ranges, job families, job titles, job levels, and salary minimums, midpoints, and maximums.[782]  Dr. Johnson and Dr. McCrary put forth various pieces of evidence, including SCA internal documents, email exchanges, and deposition testimony to attempt to rebut my opinion that SCA used salary grades, levels, and ranges.[783]  But I remain unconvinced.

---

[781] Johnson Report ¶¶ 74–76.

[782] Gerhart Report ¶ 114(b).

[783] Johnson Report ¶ 68 & n.150; McCrary Report ¶¶ 103–104.

404.

[784]

[785]

[786] But pay ranges do not need to be formal to be structured and systematic, as long as the firm acts like such a range exists, which SCA did.

405. Further, taken together, these documents show that SCA previously focused on maintaining a systematic pay structure (albeit one that still included pay ranges), and then turned to formalizing that structure, and this variation over time further supports my opinion. This is consistent with my statement in my compensation textbook that "[p]ay levels at firms [with structured compensation systems] are not completely static. They also can adjust over time to changing market conditions and/or business strategies."[787] As such, Dr. Johnson and Dr. McCrary have not given me reason to change my opinions.

---

[784] Johnson Report ¶ 68 n.150 and McCrary Report ¶ 104 (citing SCA000098450–51).
[785] McCrary Report ¶ 104.
[786] Johnson Report ¶ 68 & n.150 (citing SCA001669270).
[787] GERHART, *supra* note 94, at 211.

406.     Additionally, the evidence Dr. Johnson and Dr. McCrary rely on as the basis of their testimony actually weakens their argument and strengthens mine. ████



407. ████

████ [789] Job levels based on title are a feature of systematic pay structure.

408.     *USPI.* Similarly, Dr. Saravia's and Dr. McCrary's assessments that USPI did not use salary ranges that would transmit harm broadly has no basis in widely-accepted

---

[788] Johnson Report ¶ 68 n.150 and McCrary Report ¶ 103 n.206 (citing Zaideman Dep. at 52:14–53:18).

[789] Johnson Report ¶ 68 n.150 and McCrary Report ¶ 104 n.212 (citing Wachsman Dep. at 118:8–119:14).

compensation-related literature, or in the evidence.[790]  Again, it is important to look at what the

company *does*, and not merely what it *says* it does.



409.

791

792

410.

793

411.

794

412.

---

[790] Saravia Report ¶¶ 32, 181–182, 185; McCrary Report ¶¶ 103–104.

[791] McCrary Report ¶ 104.

[792] Saravia Report ¶¶ 181–82.

[793] *Id.* ¶ 185.

[794] *Id.* ¶ 174, Ex. 20.

413.    In its 2019 survey, WorldatWork found that the typical range spread is 70% to 80% for the executive level.[795]  WorldatWork survey participants have highly structured compensation systems. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

414.    <u>Defendants Benchmarked Their Internal Pay Structures Against External Pay Data.</u>  I testified that the next step in creating a structured compensation system is benchmarking potential pay levels and salary midpoints, minimums, and maximums against external data for equivalent jobs in the labor market.[796]  "Benchmark" jobs share enough similar content to be matched against similar employers.[797]  This step is important because at every company, employees share their concerns about external equity with their employers (i.e., pay fairness across similar jobs at different companies).[798]  Below, I explain that Defendants' Experts do not refute my assessment of the evidence showing that Defendants' employees valued external

---

[795] GERHART, *supra* note 94, at 290, Exhibit 8.20.
[796] Gerhart Report ¶ 115.
[797] *Id.*
[798] *Id.*

-169-

equity, or my analysis of the evidence in support of my opinion that Defendants' administrative pay systems implemented fundamental benchmarking principles.[799]

415.    *Defendants' Employees Care About External Equity.*  Based on my experience and research in the compensation and human resource management fields, the evidence demonstrates that Defendants' employees were not unique, and like most other employees in the United States, had concerns about external equity and pay fairness.[800]  Defendants' Experts do not attempt to rebut my opinion, so I have no cause to change it.

416.    *Benchmarking.*  I testified that according to my compensation-related expertise and the compensation-related literature and theory, to manage employees' widespread concerns about external equity, organizations can use benchmark jobs to match their internal pay structures with pay values assigned by the external market.[801]  In other words, a firm can use benchmarking for many jobs to directly compare a job's internal value with its external value (e.g., the 25th, 50th, and 75th percentile values), and thereafter price its own jobs.[802]  This process forms the basis of a systematic pay structure.[803]

417.    Dr. Johnson and Dr. Stiroh do not address the overview I provide regarding the relationship between benchmarking and external equity.  Dr. Saravia likewise does not rebut my opinion that benchmarking facilitates a firm's structured pay system's ability to achieve external equity. █████████████████████████████████████████

---

[799] *Id.* ¶¶ 115–116.

[800] *Id.* ¶ 115(a)–(e).  Note that though "employees are very interested in knowing how their compensation compares to the market[,]" "[a] separate question is how good is the information they have on that," which I discuss above.  Gerhart Dep. at 124:20–125:10.

[801] Gerhart Report ¶ 115(f).

[802] *Id.*

[803] *Id.*



[804]

[805]

[806] I therefore have no cause to change my views.

418.    *DaVita Relied on the Foregoing Benchmarking Practices.*  I testified that DaVita produced an overwhelming amount of common evidence that DaVita benchmarked its internal pay against external market data.[807]  Notably, [REDACTED] ,[808] which further substantiates my opinion. Otherwise, Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not submit any evidence that refutes my opinion regarding DaVita's benchmarking practices.  As such, my opinion is unchanged.

419.    *SCA Implemented Typical Benchmarking Practices.*  Similarly, I determined that based on my review of the common evidence, SCA also benchmarked its compensation to external pay data.[809]

[810]

---

[804] Saravia Report ¶ 145.

[805] McCrary Report ¶ 63.

[806] *Id.* ¶ 158.

[807] Gerhart Report ¶ 116(a).

[808] Johnson Report ¶¶ 89–91 [REDACTED] ); McCrary Report ¶¶ 60–64 [REDACTED] ).

[809] Gerhart Report ¶ 116(b).

[810] Johnson Report ¶¶ 89–91.



[811] ███

███

███

███

███ [812] Accordingly, my opinion is unchanged.

420. *USPI Benchmarked Its Pay Structures.* I testified that USPI used benchmarking to achieve external equity.[813] ███

███

███

███

███ [814] ███

███

███ [815] ███

███

███

---

[811] Saravia Report ¶ 145 n.204 (citing Mathis Dep. at 51:21–52:2; Rucker Dep. at 261:24–263:24).

[812] McCrary Report ¶ 63 (citing SCA001280928).

[813] Gerhart Report ¶ 116(c).

[814] Saravia Report ¶ 63.

[815] *Id.* ¶ 189 & nn.286, 289; *see also id.* ¶ 145 & n.204 (citing Martin Dep. at 92–93 ███ ).

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████ [816] This is dispositive and

consistent with my opinion.

### 3. Substantial Additional Common Evidence Shows That Defendant Firms Used Systematized Compensation Structures.

421. Moreover, I explained that I reviewed extensive additional documentary and deposition testimony common to the Class in support of my opinion that Defendant firms had structured and systematic compensation practices.[817] Below, I explain that Dr. Johnson, Dr. Saravia, and Dr. McCrary cannot credibly argue otherwise, particularly where their Reports cite to additional evidence that undermines their arguments and bolsters mine. I also explain that Dr. Stiroh ignored my analysis entirely.

422. Figure 15 in my opening report (below) shows that employers use the same percentage salary budget increase for different job levels. Using the same increase year after year contributes to average pay at different levels moving in lockstep over time.

---

[816] McCrary Report ¶ 63 (citing USPI_CIV_000021897 at USPI_CIV_000021898; USPI_CIV_000021899 at USPI_CIV_000021899; Karrmann Dep. at 40:21–41:1).

[817] Gerhart Report ¶¶ 117–120.

**Gerhart Report, Figure 15**[818]

FIGURE 2    **Total Salary Budget Increases, by Employee Category**

Salary Budget Increases (zeros included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 2.9% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% |
| Exempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Officers/Executives | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| All | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |

Salary Budget Increases (zeros not included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Exempt Salaried | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |
| Officers/Executives | 3.1% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% |
| All | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |

423.    When using actual compensation data, things are complicated by the fact that there are hires and departures, as well as promotions (and perhaps a few demotions) from year to year.  Therefore, actual compensation at different levels will not appear to move in as tight of a lockstep.  However, the presence of such "complications" actually provides an opportunity to see how structured the compensation system is.  If, despite the churn of individual employees over time, pay at different levels continues to move in tandem, that would be evidence that compensation is so systematized and structured that it can be seen even when the population of employees changes substantially.

---

[818] Gerhart Report ¶ 152, Figure 15 (citing WORLDATWORK, SALARY BUDGET SURVEY at 20 (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf).

424.

[819] [820] As such, there were clearly a great many departures as well. It would be compelling evidence of the existence of a structured pay system if pay at different levels moved together at different levels despite the huge change in who the employers are.

425. In **Figure 1** (below), there are plots of how base pay at the three job levels (SVP, VP, and Director) moved across 15 years for each of the three Defendants and simple descriptive statistics (correlations) showing how those movements are interrelated.

**Figure 1**[821]



---

[819] Johnson Report ¶ 38, Ex. 5.
[820] *Id.* ¶ 48, Ex. 8; *id.*, App. C., Ex. C-1.
[821] *See* my workpapers.



426. ██████████████████████████████████████████████████████

████████████████████████████████████████████

427. ██████████████████████████████

428. ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████



429.     <u>Defendants' Pay Structures.</u>  I opined that common evidence I have reviewed shows that Defendants created and maintained structured pay systems.[822]

430.     *DaVita.*  I submitted substantial evidence to provide additional support for my opinion that DaVita maintained systematized pay structures.[823]  Below, I explain that Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not provide any contrary evidence and therefore have not convinced me to change my views.

431.     ████████████████████████████████████████

████████████████████████████████████████

████████████ [824] ████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████ .[825]  There are two problems with this argument.

---

[822] Gerhart Report ¶¶ 117–120.

[823] *Id.* ¶ 118.

[824] Johnson Report ¶ 68 (citing DVA_OMCEAL_001329257).

[825] McCrary Report ¶¶ 73 (citing Rodriguez Dep. at 58:5–23, 84:7–14 ████████████

████████████████████████); Priest Dep. at 142:1–25), 74–76.

432.     First, the argument ignores the documentary record in my report showing that DaVita limited discretion in compensation decisions. ████████████████



---

[826] Gerhart Report ¶ 118(a)(b)(iv) (citing Chipman Dep. at 135:2–13; Staffieri Dep. at 163:1–164:25; Ex. PX25).

[827] *Id.* ¶ 118(a)(b)(iv)(A) (citing Staffieri Dep. at 131:8–19, 158:15–159:4; Ex. PX23).

[828] McCrary Report ¶ 77 (citing Ex. PX19 at DVA_OMCEAL_001399774 (███████████████ ██████████████████████████ )).

[829] Gerhart Report ¶ 134, Figure 11 (citing RAYMOND NOE, JOHN HOLLENBECK, J. BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE 538 (13th ed. 2023)).

[830] McCrary Report ¶ 77 (DVA_OMCEAL_001344570 at DVA_OMCEAL_001344575).

[831] *Id.*

[832] *Id.* ¶ 76 (citing Staffieri Dep. at 150:7–152:1).

433. Further, Dr. Johnson admitted that he was not offering the opinion that there are no "rules or principles" that Defendants use to actually determine pay for their employees,[833] nor was he offering the opinion that "employee pay levels were set in a random and unstructured fashion[.]"[834]

434. Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not otherwise rebut my assessment of the evidence showing that DaVita implemented and maintained systematic pay structures. Accordingly, my opinion is unchanged.

435. *SCA Used Compensation Structures*. I similarly opined that SCA systematized its pay practices.[835] Below, I confirm that Dr. Johnson and Dr. McCrary have not given me cause to change my opinion.

436. Dr. Johnson and Dr. McCrary appear to argue that SCA did not have a systematic pay structure (i.e., a pay structure capable of transmitting impacts Class-wide) in place.[836] Not only would this be unfathomable in a company of its size, it's also unsupported by the evidence.

437.

---

[833] Johnson Dep. at 258:6–25.

[834] *Id.* at 259:12–260:5.

[835] *Id.* ¶ 118(b).

[836] Johnson Report ¶ 68; McCrary Report ¶¶ 72–87.

[837] Johnson Report ¶ 68 n.150 and McCrary Report ¶ 104 (citing Zaideman Dep. at 54:22–56:5); *see also* McCrary Report ¶ 76.



438. ████████████████████████████████████

439.     As at DaVita, SCA's compensation professionals maintained its systematic

compensation structures. ████████████████████████████

---

[838] Gerhart Report ¶ 119.

[839] McCrary Report ¶ 77 (citing Cinnick Dep. at 46:3–11; Sandoz Dep. at 54:17–55:2).

[840] Ponds Dep. at 24:10–16.

[841] *Id.* at 24:17–25:1.

[842] *Id.* at 25:2–14.

[843] *Id.* at 28:9–15.

[844] *Id.* at 27:4–11. *See also* McCrary Report ¶ 76 n.154 (citing Fanning Dep. at 169:19–170:12 ("Very few people have absolute authority" to set pay at SCA.)).



[845] McCrary Report ¶ 143 & n.276 (citing SCA000545210 at SCA000545215 ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ )).

[846] *Id.* ¶ 104.

[847] *Id.* ¶ 76 (citing SCA000075527 at SCA000075527).

[848] Gerhart Report ¶ 134, Figure 11 (citing NOE ET AL., *supra* note 829, at 538).

[849] McCrary Report ¶¶ 73–76.

[850] Gerhart Report ¶ 119(a) (citing Cinnick Dep. at 65:4–14 ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ )).

██████████████████████████████████████████████████████████

███████████████████████████ [851] ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ [852] As such, my opinion is unchanged.

443.    *USPI Used Systematic Compensation Structures*.  I have also provided ample documentary and deposition testimony confirming that USPI's administrative pay structure was systematic.[853]  Below, I explain that Dr. Saravia and Dr. McCrary have not convinced me to modify my opinions, and in fact succeeded in doing the opposite.  Indeed, at a minimum, Dr. Saravia agrees that USPI had a compensation system.[854]

444.    **Compensation Components.**  Dr. Saravia and Dr. McCrary agree that USPI used base salary, bonus pay (including annual and one-off bonuses), deferred compensation, and equity to pay its employees.[855]  According to **Figure 2** (below) from my compensation textbook, the foregoing are typical compensation components:

---

[851] SCA000523268 (cover email) and SCA000523273 (attachment).

[852] SCA000523268 at SCA000523269.

[853] Gerhart Report ¶ 118(b).

[854] Saravia Report ¶ 69.

[855] *Id.* ¶¶ 57–69; McCrary Report ¶¶ 78, 142 & n.275.  *See also* GERHART, *supra* note 94, at 14–15 (explaining that compensation returns "include pay received directly as cash (e.g., base, merit, incentives, cost-of-living adjustments)[.]").

**Figure 2: Total Returns for Work**[856]



445. **Annual Compensation Process**. Further, the Saravia Report supports my determination that USPI systematized its pay system.[857]

446.



[858]

[859] This corroborates the evidence I provided to show that USPI had systematic pay practices.

---

[856] GERHART, *supra* note 94, at 15, Exhibit 1.5.

[857] *See, e.g.,* Saravia Report ¶¶ 57–69.

[858] *Id.* ¶ 59.

[859] *Id.* ¶ 158.

447.

[860]

[861]

448. **Limited Discretion**. Dr. Saravia's and Dr. McCrary's argument that I failed to consider evidence showing that pay at USPI was individualized is contradicted by the evidence, and is not supported by compensation-related literature and theory.[862]

449.

[863]

450.

[864]

As I explain above, it is normal that managers exercise a degree of discretion in setting pay. Generally, companies permit managers to exercise judgment in a manner consistent with their organization's pay strategy, and their judgment is subject to approval.

.[865]

451. Additional support can be found in the Saravia Report.

[866].

---

[860] *Id.* ¶ 60.

[861] *Id.* ¶ 61.

[862] *Id.* ¶¶ 190–193; McCrary Report ¶¶ 69–87.

[863] Saravia Report ¶¶ 61–62, 191.

[864] *Id.* ¶¶ 190–193; McCrary Report ¶¶ 73–76.

[865] *See, e.g.,* Gerhart Report ¶¶ 120(a)(iii) (citing USPI_CIV_000901340), 135(c)(ii) (citing Karrmann Dep. at 45:19–47:4; Ex. PX297).

[866] Saravia Report ¶ 61; McCrary Report ¶ 73.



452. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ [867] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ [868] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ It also seems likely that few supervisors would request a lower payout than generated by the formula.

## C. Defendants' Compensation Systems Sought to Achieve Internal Equity and Pay Fairness.

453. I testified that according to the compensation-related literature, internal equity and fairness are core tenets of organizational compensation processes.[869] I also explained that the evidence is consistent to show that Defendant firms had structured pay systems to maintain internal equity. Below, I explain that Defendants' Experts have failed to convince me to change my opinion.

454. According to Dr. Saravia, I define internal equity as such[870]:

1. Pay within a job level should be similar and pay across job levels should be differentiated. 2. When one or some Senior Employees' compensation increases (or decreases), other Senior Employees' compensation should also reflect similar

---

[867] Saravia Report ¶ 62.

[868] *Id.*

[869] Gerhart Report ¶¶ 121–126.

[870] Saravia Report ¶ 172.

-185-

changes to maintain the compensation structure. 3. Compensation paths should be similar across Senior Employees over the course of their career at USPI.

455. Similarly, according to Dr. McCrary, I "discuss the concepts of 'internal equity,' the idea that individuals doing similar work within a firm should receive similar pay."[871]

456. Their language is ambiguous and misrepresents my views. For clarity, my report stated[872]:

> Internal equity means paying employees within the same company similarly to other employees within the same company doing similar work and making similar performance contributions. Internal equity depends on maintaining certain pay differentials based on job title, level, performance, etc. Any time these differentials stray from the internal equity objective (e.g., two employees doing similar work and making similar performance contributions are paid very differently), the goal is to correct the outliers so as to avoid undesirable and costly employee reactions to perceived pay inequity.

457. Dr. Saravia omits my emphasis on performance contributions. Internal equity has no meaning if one ignores performance contributions in determining an individual's pay. She also omits my documentation of a structured compensation system as being characterized by pay ranges.[873] Pay ranges exist to differentiate the pay of employees at the same level, within the same pay range, based on their different performance contributions. Thus, internal equity and pay ranges go hand in hand. By ignoring the fundamental role of pay ranges to allow pay

---

[871] McCrary Report ¶ 70.

[872] Gerhart Report ¶ 94.

[873] *Id.* ¶ 113. There, I gave the standard definition of range spread: (pay maximum – pay minimum)/pay minimum. I then noted: "Survey data indicate that the typical range spread is 46–59%" and in my Figure 6, showed that range spread of up to 80% was used. *Id.* ¶ 113(b) (citing WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023)). Likewise, above I cite survey evidence that a 70% to 80% range spread is typical at a higher level.

variation based on performance contributions, to support internal equity, Dr. Saravia implies that employees in a structured compensation system are all paid the same (including over time), regardless of their performance. That is not accurate and is, in fact, very contrary to the design of a typical structured compensation system. Dr. McCrary recognizes that Defendants pay individuals differently based on differences in individual performance, but also seems to (mistakenly) believe that is inconsistent with a structured compensation system.[874] Again, nothing is farther from the truth. Internal equity is defined as paying different employees in a similar role differently based on their individual performance differences.

458. Pay growth over time for those who stay with the same company is higher with promotions. Promotions, in turn, are based on individual performance. That is another mechanism by which a structured compensation system results in differentiated pay over time for different performance at the individual level.[875]

459. ███████████████████████████████████████

███████████████████ He opines[876]:



---

[874] McCrary Report ¶ 77 ███████████████████

████████████████████████████████████████████

███████ (emphasis omitted).

[875] GERHART, *supra* note 94, at 350–351.

[876] McCrary Report ¶ 100.

███████████████████████ [877] Market benchmark data is used to set pay levels in systematic compensation structures, as at Defendant firms.

460. <u>Internal Equity Principles Are Fundamental to Systematic Pay Structures.</u> In my report, I provided an overview of equity theory.[878] Dr. Johnson and Dr. McCrary did not attempt to refute my opinion explaining internal equity principles. Moreover, both freely admit that external equity is a legitimate concept.[879] Why would external equity be legitimate, but internal equity is not? Dr. Johnson and Dr. McCrary cannot square this circle, and they do not try. Similarly, Dr. Saravia and Dr. Stiroh ignore my analysis of equity theory's role in pay structures. As such, I have no cause to change my opinion.

461. <u>Literature and Other Evidence Demonstrates the Importance of Fairness in Compensation-Setting.</u> Moreover, I opined that common evidence in economics and other disciplines establish that pay fairness is an important consideration in compensation matters.[880] Defendants' Experts did not put forth any testimony or evidence contrary to my assessment that according to economics and compensation-related literature, compensation professionals aim to achieve internal equity in their organizations' pay structures, because it is important to employees. As such, my opinion is unchanged.

462. <u>Compensation Professionals Seek to Maintain Internal Equity.</u> I also explained that, pursuant to the foregoing, compensation professionals expend a lot of time and energy to achieve internal equity in their companies' pay structures.[881] If they fail to address internal

---

[877] *Id.*

[878] Gerhart Report ¶¶ 123–124.

[879] Johnson Report ¶ 88 (discussing the "well understood [] econometrics and statistics literature on 'peer effects.'"); McCrary Report ¶¶ 60–64.

[880] Gerhart Report ¶ 125.

[881] *Id.* ¶ 126.

equity concerns or disruptions, employee productivity will likely drop and turnover will increase.[882] Defendants' Experts did not rebut my analysis explaining that compensation professionals must address concerns about fairness in pay levels across jobs and job levels, as well as across different job titles. I therefore have not changed my assessment.

463. <u>Defendants Prioritized Internal Equity in Their Compensation Structures.</u> Next, I explained that, based on my experience in the compensation-related and human resource management fields, the evidence shows that Defendant firms sought to achieve internal equity in their systematic pay structures.[883]

464. Individualized pay determinations are not inconsistent with pay structures geared towards maintaining internal equity. The definition I gave of internal equity, as reflected in a structured compensation system in my opening report, was companies "treating similarly-situated employees (i.e., employees in similar roles/jobs with similar performance contributions) within their companies similarly."[884] Of course, then individuals making different performance contributions would be paid differently and each company has a highly structured process in place to accomplish that (through merit increases, short-term incentives, long-term incentives), as well as practices in place to monitor that these highly structured processes (i.e., paying for performance) are being used and to flag exceptions, which are scrutinized. The fundamental rationale for why companies have salary ranges is exactly because it allows them to "individualize" pay based on different performance contributions made by those in the same job level and/or same job title. Supervisors (and often others) are asked to provide input into merit pay decisions by providing performance ratings. (No one in the compensation-related field

---

[882] *Id.*

[883] *Id.* ¶ 127.

[884] *Id.* ¶ 7(h)(iii).

disagrees that part of being a manager is to make judgments.) Short-term incentive payments typically have a major formulaic component and long-term incentive decisions are made at the highest levels of the organization, presumably in a systematic manner.

465.    For example, Dr. McCrary argues[885]:

> ████████████████████████████████████████████████
> ████████████████████████████████████████████████
> ████████████████████████████████████████ For example, Named
> Plaintiff Allen Spradling testified that it was "probable" that SCA considered
> matching job offers made to IT employees by competing firms during his tenure at
> SCA, as IT skills were "very in demand and transferable" during this period.

This anecdote does not make the point Dr. McCrary thinks it does. If IT is an in-demand field in the labor market, then the combination of internal and external equity forces will place *broad pressure* on IT employees' pay.

466.    Below, I explain that while Dr. Stiroh did not attempt to refute my assessment, Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's efforts to rebut my opinion are unconvincing, and their arguments that I inaccurately describe the role of internal equity in Defendants' pay systems lack foundation in the evidence and in the compensation-related literature. I also explain that variable compensation and internal equity principles are consistent with one another.

467.    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[885] McCrary Report ¶ 83 (citing Spradling Dep. at 123:12–125:24).

[BLACK REDACTION BAR]

[BLACK REDACTION][886] Case in point.[887]

468. *DaVita Maintained Internal Equity.* I testified that common evidence is consistent to show DaVita aligned its compensation policies and practices with internal equity principles.[888] Dr. Johnson and Dr. Stiroh did not put forth any evidence or testimony contrary to my assessment that DaVita's systematic pay structures were grounded in internal equity considerations.[889] Additionally, Dr. Saravia testified at deposition that she does not "have an opinion on whether DaVita used compensation structures to maintain internal and external equity[.]"[890] Dr. McCrary also does not dispute that DaVita's compensation structures accounted for internal equity, but argues that pay was highly individualized.[891] The argument that individual employees must be paid the same in a structured compensation system is simply wrong. The only circumstance where pay truly lacks any individualization in a company is in the traditional union context. As such I have no cause to change my opinion.

469. *SCA Maintained Internal Equity.* I opined that SCA produced extensive common evidence documenting its systematic pay structures.[892] Discussed above, Dr. Johnson appears to make the inconceivable argument that SCA did not have a pay system altogether. Otherwise,

---

[886] *Id.* ¶ 70.

[887] Johnson Report ¶ 78. [BLACK REDACTION]

[BLACK REDACTION] Saravia Report ¶ 176, Ex. 21; ¶ 185. [BLACK REDACTION]

[BLACK REDACTION] McCrary Report ¶¶ 30, 90–98, Exs. 12–14.

[888] Gerhart Report ¶ 127(a).

[889] *See* Johnson Dep. at 158:8–12.

[890] Saravia Dep. at 64:14–19.

[891] McCrary Report ¶¶ 70–71.

[892] Gerhart Report ¶ 119.

Johnson did not refute my analysis explaining that SCA sought to maintain internal equity.[893]

Moreover, Dr. Saravia testified at deposition that she does not "have an opinion on whether SCA used compensation structures to maintain internal and external equity[.]"[894] Dr. McCrary also does not disclaim that SCA sought to maintain internal equity, but does object that internal equity and the degree to which SCA permitted individualized pay are inconsistent.[895] As above, this is inaccurate.

470. *USPI Maintained Internal Equity.* I opined that based on my experience and review of testimony and USPI documents, USPI maintained a systematic compensation structure.[896]

471. **All Pay Structures Allow for Individualization.**

[897] As noted, above, that pay differs based on individual performance is a core principle of a structured compensation system. That is far different from pay differences having no rhyme or reason or core principles. As such, for the same reasons as above, this argument is wrong and does not cause me to change my own opinion.

472. This is borne out by evidence introduced in the Saravia Report, which supports my view that Dr. Saravia and Dr. McCrary overstate the extent to which USPI's pay structures

---

[893] *See* Johnson Dep. at 158:8–12.
[894] Saravia Dep. at 64:8–13.
[895] McCrary Report ¶¶ 70–71.
[896] Gerhart Report ¶ 120.
[897] Saravia Report ¶¶ 30–31, 172–193; McCrary Report ¶¶ 72–87.

provide for rampant principle-free pay individualization.  As I discuss above, USPI limited

managers' discretion to set pay, though of course there will always be a degree of discretion in

any systematic pay structure.  But even Dr. Saravia agrees that pay decisions required higher-

level approval.



899

473.

900  It is unclear what the issue is here, because this is

how internal equity works.901

474.    **Taking Account of Market-Based Salaries Is Not Inconsistent with Internal**

**Equity.**

902

Dr. Saravia appears not to understand the interplay between internal and external equity.

475.    Internal equity cannot be achieved without taking full account of external equity /

the market.  The idea that internal equity and external equity give very different indications of

---

898 Saravia Report ¶ 59 (citing Ex. PX88 at DOJCIV-008-00000359; English Dep. at 40:10–18; Ex. PX111 at USPI_CIV_000810697).

899 *Id.* (citing USPI_CIV_000147704 at USPI_CIV_000147704).

900 *Id.* ¶ 189.

901 *Id.*

902 *Id.*

what to pay jobs is not correct.  Most organizations price jobs based on external equity (i.e.,

consistent with firms they choose outside as comparisons).  The difference between a Director

and a VP in a comparable company should not typically be much different from the internal

differences, lest the firm risk overpaying or underpaying its employees.

476.    However, the firm must also evaluate internal equity because, as I explained in

my opening report[903]:

> [A major avenue by which] employees judge the fairness of their pay through comparisons with the compensation paid to others for work related in some fashion to their own. . . .  Employees make multiple pay comparisons to assess the fairness of an internal pay structure.  They compare both with other jobs in the same internal structure and with the pay for their job in the external market (i.e., at competing employers).

477.    The primary difference between internal equity and external equity is that the

former involves not only job-to-job pay comparisons, but also person-to-person comparisons

(which are more possible given that everyone is employed by the same company and is evaluated

with the same general system and by the same general people).  Internal equity is most likely to

deviate from external equity to the degree there are certain occupations/jobs that are especially

critical to successfully executing a specific company's strategy.  Accordingly, Dr. Saravia and

Dr. McCrary have not convinced me to change my opinion.

### D.    Internal Equity and Pay for Performance Are Not Mutually Exclusive.

478.    I opined that internal equity and "pay for performance" policies are not

incongruous, because paying employees who perform differently in proportion to their

contributions to the organization is equitable.[904]  Indeed, paying employees equally despite their

different performance contributions is inequitable, and it can hardly be the case that some

---

[903] Gerhart Report ¶ 125(b) (citing GERHART, *supra* note 94, at 137–138).
[904] *Id.* ¶¶ 128–134.

companies prefer to hire worse performers and pay them more. I also opined that Defendants'
documents show that Defendants' pay-for-performance practices were consistent with their
commitments to achieving internally equitable systematic pay structures.[905]

479. Dr. McCrary provides a hypothetical example wherein "Defendants used job-specific pay ranges or grades to set pay," and[906] :

> [A] top performer attempts to negotiate pay higher than what the pay range or grade to which they are assigned based on their job title and annual performance rating would allow (i.e., because there are individualized components of their performance that cannot be captured by an annual performance rating, but that Defendants and competing performers value). The employer suspects the top performer could seek employment elsewhere and command a higher salary. The employer must then decide whether to respond to these latent competitive forces by granting the requested pay increase, or to prioritize internal equity by not agreeing to the pay increase. If the top performer avails herself of outside options, then the employer prioritizing internal equity risks losing the top performer to another firm.

To respond, context is important here because the purpose of the pay maximum is not only to
promote internal equity—it is also there as a cost control tool. There is typically a limit to how
much value someone can create in a job, and thus there is a logic to how much a firm may wish
to pay someone in a job. Firms typically prefer to pay significantly more when that employee is
promoted to a higher-level job where they can have a greater impact on the firm's performance.
Moreover, if employees are regularly receiving external pay offers with salaries beyond the
firm's pay range or grade maximums, that sends an important message to the firm that it must
consider raising the pay structure altogether, or consider widening the pay ranges (if justified by
substantially large differences in performance). All told, internal equity requires paying
employees equitably, which is different than paying them equally.

---

[905] *Id.* ¶ 135.
[906] McCrary Report ¶ 81.

480. Below, I explain that Defendants' Experts have not convinced me to change my views.

481. <u>Defendants Achieve Equity by Paying for Performance.</u> I opined that Defendants' compensation structures sought to maintain internal equity and to pay for performance.[907]

482. *DaVita's Practices Account for Equity and Performance.* I opined that common evidence supports my opinion that DaVita used various practices to award employees merit increases during the Class Period.[908]

---

[907] Gerhart Report ¶ 135.
[908] *Id.* ¶ 135(a).
[909] McCrary Report ¶ 77 (citing DVA_OMCEAL_001322030 at DVA_OMCEAL_001322034).
[910] *Id.* (citing Arthur Dep. at 52:5–19 ⬛⬛⬛ )); *see also id.* ¶ 180 & n.361 ⬛⬛⬛ ).

-196-

██████████████████████████████████████████████████ [911] Accordingly,

my opinion is unchanged.

483.  *SCA's Practices Account for Internal Equity and Performance.*  I also opined that

SCA used similar processes to align pay and performance in its compensation structures.[912] ██

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ [913] ████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

██ [914] ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ [915] ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ [916]  As such, I

have not changed my opinions.

---

[911] *Id.* ¶ 74 (citing DVA_OMCEAL_001059650 at DVA_OMCEAL_001059652).

[912] Gerhart Report ¶ 135(b).

[913] McCrary Report ¶ 77 (SCA001159728 at SCA001159729).

[914] *Id.* (citing Cinnick Dep. at 46).

[915] *Id.* (citing Sandoz Dep. at 54–55); *see also id.* ¶ 180 (citing SCA001125179 at SCA001125180 ████████████████████████████████████████ ████████████ .

[916] *Id.* ¶ 74 (citing SCA000000198 at SCA000000200).

484.     *USPI's Practices Account for Equity and Performance.*  I testified that, like DaVita and SCA, USPI produced similar common evidence documenting internally equitable pay-for-performance practices.[917]  Below, I explain that the Saravia and McCrary Reports contain additional evidence that provides further support for my opinion, and that Dr. Saravia and Dr. McCrary have not otherwise persuaded me that my opinion is incorrect.

485.
[918]  This argument is again predicated on a basic misunderstanding of how internal equity works.
[919]
[920]

486.     As I have testified, accounting for performance in pay-setting is part and parcel with internal equity.  It would be far more inequitable to pay employees in similar roles similarly if those employees performed dissimilarly.  Moreover, as I explained in my opening report, USPI's managers did not evaluate employee performance without any guidance or oversight.

---

[917] Gerhart Report ¶ 135(c).
[918] Saravia Report ¶ 189.
[919] McCrary Report ¶ 77.
[920] *Id.* ¶ 180 (citing USPI_CIV_000099574).



[921] The McCrary Report provides additional support. [redacted]

[922] [redacted]

[923]

[924] These are examples of USPI taking action to promote internal equity.

487.    Dr. Saravia and Dr. McCrary do not contest the other testimony or evidence I submitted to show that USPI baked both internal equity and pay-for-performance considerations into its pay structures.  As such, I have no cause to change my opinion.

## VII.    DEFENDANTS' CONDUCT LIKELY HAD CLASS-WIDE COMPENSATION EFFECTS VIA THEIR STRUCTURED COMPENSATION SYSTEMS.

### A.    Defendants' No-Poach Agreements Likely Lead to Cascading Compensation Effects Class-Wide.

488.    I opined that Defendants' No-Poach Agreements likely suppress Class Members' compensation.[925]  Below, I explain that Defendants' Experts' Reports do not rebut my opinion

---

[921] Gerhart Report ¶¶ 135(c)(iii) (citing Ex. PX115 (cover email) and Ex. PX116 (attachment); Ex. PX453 at USPI_CIV_000095467 [redacted] ), 135(c)(iv) (citing Karrmann Dep. at 47:5–48:7).

[922] McCrary Report ¶ 77 n.165 (citing USPI_CIV_000037627 at USPI_CIV_000037627).

[923] Id.

[924] Id. ¶ 74 (citing USPI_CIV_000499023 at USPI_CIV_000499023).

[925] Gerhart Report ¶¶ 136–148.

that the No-Poach Agreements would have cascading effects on Defendants' systematic salary structures.[926] I also explain that Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's analyses that Defendants' purported external equity concerns would limit the No-Poach Agreements' pay suppression effect are not relevant.[927]

489. <u>Cascading Effects to "All" vs. "Nearly All" Employees.</u> Dr. Johnson, Dr. Saravia, and Dr. McCrary dispute that Defendants had structured pay systems that would yield cascading effects to all or nearly all Class Members' compensation.[928] Below, I explain why their critiques are unconvincing and unsupported by the evidence and compensation-related literature and theory.

490. In my opening report, I cited a Federal Reserve study finding that 77% of employees changing employers do so in response to an unsolicited outside offer and my Figure 1 summarized research documenting that employees receive a substantial pay increase when they voluntarily change employers, especially higher-level employees.[929] Of course, one does not have to change employers to *increase* pay. One can instead use the offer as leverage to negotiate a higher salary at one's current employer. Thus, there are more offers than employer changes/moves. This means that any implication that harm to Class Members can be fully captured by estimating how many more employer changes/moves would have been made in the absence of restrictions is incorrect. I also opined that the employee receiving the outside offer is

---

[926] Johnson Report ¶¶ 50–97; Saravia Report ¶¶ 104–132, 168–196, 283–291; McCrary Report ¶¶ 88–108; Stiroh Report ¶¶ 82–106.

[927] Johnson Report ¶¶ 65, 89–93; Saravia Report ¶¶ 194–196.

[928] Johnson Report ¶¶ 50–97; Saravia Report ¶¶ 21, 24–25, 104–132, 168–196, 283–291; McCrary Report ¶¶ 88–108.

[929] Gerhart Report ¶ 61(d) (citing Carrillo-Tudela, *supra* note 216).

not the only employee to benefit from higher pay, and I explained the logic of how over time, cascading effects would result in higher pay for other employees.[930]

491.  Dr. Johnson, Dr. Saravia, and Dr. McCrary describe my logic as requiring that a change in one employee's compensation due to an outside job offer—or even a "cold-call"—lead to rapid adjustments of a similar magnitude for all or nearly all employees' compensation.[931] The Stiroh Report makes the similar argument that in order for outside job offers to change compensation for all or nearly all employees, compensation information would have to "be transmitted throughout the organization."[932]  Of course, I never argued that one outside offer or cold call would rapidly increase the compensation of "all employees" as Defendants' Experts claim, though "[i]t's possible that one offer could have a cascading effect," though of course "more offers would have a bigger cascading effect."[933]  In any event, one employee receiving an outside offer during the conduct period is hardly realistic.  One doubts that the Defendants would have gone to the trouble and risk of colluding to establish No-Poach Agreements if they believed outside offers in the absence of such agreements would be so rare.  If such agreements served to prevent a substantial number of unsolicited outside offers that Defendants' employees would have otherwise received, it would have had a major impact, including via cascading effects.

492.  Dr. Stiroh argues that "Plaintiffs' alleged mechanisms by which impact from the conduct would purportedly flow to all Senior-Level employees at DaVita would have taken time to impact compensation, if they did so at all.  Dr. Gerhart acknowledges that adjustments to

---

[930] *Id.* ¶¶ 50–51, 143(c)–(f), 157(a); *see also* Gerhart Dep. at 37:7–22 ███████████████ ███████████████ ).

[931] Johnson Report ¶ 64; Saravia Report ¶ 168; McCrary Report ¶¶ 87, 89.

[932] Stiroh Report ¶ 82.

[933] Gerhart Dep. at 217:7–24.

-201-

compensation 'take time to play out.'"[934] This analysis is incomplete. Smaller merit increases would account for some, but not all of the harmful effect of the conduct on pay. The cessation of cold calls from other Defendants and with that the lack of external salary offers and external salary information and the consequent reduced upward pressure on pay levels would also account for the harmful effect on pay. Some of these harmful effects would be immediate, in response to these cold calls stopping. Some harmful cascading effects could take somewhat longer as the cascading effects that would have otherwise occurred over time no longer occurred.

493. Base pay adjustments are made in reference to job titles/levels and pay ranges. Recall that I testified that the logic of merit increase grids grants smaller pay increases to employees with higher compa-ratios, which is employee salary divided by the salary midpoint for the employee's grade/range.[935] If a company adjusts salary midpoints upward to compete externally, that adjustment will diminish the compa-ratio for all employees.[936] Based on the logic of a typical merit grid, such an adjustment would likewise move many employees into a grid "cell" where they would receive a larger merit increase. In other words, such an adjustment will cause cascading effects to compensation that transmit across job titles/levels, and across the Class.[937]

494. However, the foregoing does not necessarily mean that "from one year to the next, different employees' pay would trend in the same direction (either increasing for all employees or decreasing for all employees)," as Dr. McCrary asserts.[938] Indeed, this would *not*

---

[934] Stiroh Report ¶ 91 (citing Gerhart Report ¶ 143).
[935] Gerhart Report ¶¶ 131–133.
[936] *Id.*
[937] *Id.*
[938] McCrary Report ¶ 90.

be consistent with a structured compensation system, where pay for performance is a fundamental component. As noted above, one aspect of pay for performance is that merit increases are higher for high performers in a role on average than for low performers in that role. Equal merit increases (equal changes in base pay) are not consistent with the standard merit increase grid or with structured compensation systems. Bonuses are often even more closely tied to performance. Indeed, bonus payout size is often based on a predetermined formula specifying higher bonus payouts as a function of higher performance on metrics. Again, there is no expectation of equal bonuses (except when performance on metrics is equal).[939]

495. It also does not follow that "when observed over a longer time horizon, employees' pay profiles would move together over time."[940] Over time, employee differences in performance not only result in different merit increases and bonuses, they also result in some employees getting promoted more often than other employees, which is a major explanation for differences in salary growth/changes over time. Again, this is a fundamental feature of structured compensation systems. In his Exhibits 13 and 14, Dr. McCrary shows that different employees have different pay growth over time.[941] That is exactly what is expected under a structured compensation system, given its emphasis on pay for performance and the fact that employees do not have equal performance and that their performance can vary over time. As noted earlier, surveys by WorldatWork of its members, which use structured compensation systems, show, contrary to Dr. McCrary's claim, that narrow observed pay ranges are *not* part of a structured compensation system.[942] (As noted, such narrow pay ranges are more likely to be

---

[939] *Id.* ¶ 92, Ex. 12.
[940] *Id.* ¶¶ 90, 93 (emphasis omitted).
[941] *Id.* ¶¶ 93–84 & Exs. 13–14.
[942] *Id.* ¶ 96.

found in a traditional blue collar union setting, not among professional and managerial employees.)

496. <u>How Cascading Effects Work.</u> **Figure 3** below provides a hypothetical example of how cascading effects would work using just a small subsample of four employees (two Directors, one VP, and two SVPs) to simplify things.

**Figure 3**

| Employee | Job Title/Level | Pre-Offer | | | | Post-Offer (immediate) | | | | | Post-Offer (near term) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Salary | Performance | Salary/ Performance | Salary/ Performance Differential versus Row Below | Job Title/Level | Salary | Performance | Salary/ Performance | Salary/ Performance Differential versus Row Below | Job Title/Level | Salary | Performance | Salary/ Performance | Salary/ Performance Differential versus Row Below |
| 1 | SVP A | 160 | 4 | 40 | 1.33 | SVP A | 160 | 4 | 40 | 1.33 | SVP A | 207.0 | 4 | 51.8 | 1.33 |
| 2 | VP A | 120 | 4 | 30 | 1.20 | VP A | 120 | 4 | 30 | 0.92 | VP A | 155.5 | 4 | 38.9 | 1.20 |
| 3 | Director A | 100 | 4 | 25 | 1.00 | Director A | 130 | 4 | 32.5 | 1.30 | Director A | 130 | 4 | 32.5 | 1.00 |
| 4 | Director B | 125 | 5 | 25 | | Director B | 125 | 5 | 25 | | Director B | 162.5 | 5 | 32.5 | |
| | | | | | | | | | | | | | | | |
| | Salary Total Cost | 505 | | | | | 535 | | | | | 655 | | | |

497. In practice, there would be many employees in each role and many unsolicited outside job offers coming in (in the absence of restrictions) throughout the company. Internal equity, as I described in my original report, is fundamental to employee compensation management.[943] First, equity theory tells us that employees compare their pay to the pay of others, including peers, as well as those in higher and lower level jobs. Employees do not expect to be paid the same. They do, however, expect their pay to be in line with their performance/contributions to the success of the company. A structured compensation system strives for this same goal, by paying jobs that are more important to the success of the business more (e.g., VPs earn more on average than Directors) and by paying employees with higher performance more than employees with lower performance.

---

[943] Gerhart Report ¶¶ 121–135.

498.     To capture this internal equity, **Figure 3** above is a hypothetical scenario that shows the ratio of salary/performance and how that ratio compares across employees ("Salary/Performance Differential versus Row Below").  Director A and Director B report to VP A, and VP A reports to SVP A.  Pre-offer, Director A and Director B have different salaries, but their ratios of salary/performance are equal.  Thus, internal equity between them exists.  Then, Director A receives an unsolicited outside offer for $130,000 ("130") versus a current $100,000 ("100") salary.  Director A has now learned their external market value (and that external equity of their pay is in doubt).  Director A does not move.  Rather, Director A negotiates an increase of $30,000 in salary to match the external $130,000 offer.  Internal equity with respect to Director B no longer exists because Director A has lower performance, but (now) a higher salary compared to Director B.  In this scenario, Director B is likely to be very dissatisfied due to a perception of a lack of internal equity (and with the realization that external equity is lower than realized).

499.     *Impact on Director B.*  Director B has at least a few courses of action.  First, Director B can begin an active job search.  After all, Director B has now learned from Director A's offer that there may be jobs in the external market that pay more than Director B's current $125,000.  Indeed, if Director A, whose performance is lower than that of Director B's, can earn $130,000, then Director B might anticipate an external offer well above $130,000.  Second, Director B can tell the company that if Director A, with lower performance, now makes $130,000, it would only be appropriate for Director B's salary to be raised to beyond $130,000.  If the company does not increase Director B's salary, then Director B may leave (turnover) due to dissatisfaction with internal equity, but also with external equity.  The company then will need to promote someone into Director B's job (resulting in a salary increase for the person promoted,

which this person would likely not have received in a restricted market) or conduct an external search, which is not only costly, but will likely require hiring someone (if of equal performance/contribution level to Director B) in at a salary higher than what Director B was earning. As such, the company may decide to increase Director B's salary. To restore the previous ratio of salary/performance would require a new salary of $162,500 for Director B.

500. *Impact on VP A.* Another cascading effect comes because now VP A has a smaller pay differential compared to Director A and to Director B if Director B is given a salary increase and stays. VP A expects there to be an appropriate payoff to being a Vice President rather than a Director. Further, VP A now also has better external market salary information thanks to Director B's outside offers (an impact which is further reinforced if the company decided to increase Director B's salary rather than do an external search). To restore the previous relationship between VP A's salary and that of the Directors would require increasing VP A's salary to $155,500. The final effect in this example is that SVP A's salary is now less different than that of VP A. To restore the previous situation would require an increase to $207,000 for SVP A. Thus, in the post-offer (near term) stage, we see that the salary for these four employees has increased from a total of $505,000 to $655,000, a 30% increase.

501. Of course, in the absence of Defendants' mobility restrictions, there would be many (more) unsolicited outside offers throughout the companies, providing the impetus for disruption of internal equity (which means salary is proportionate to performance/contribution), resulting in salary increases for those receiving offers, as well as for those not receiving offers (either by having their salaries adjusted upwards internally or searching/leaving for higher paying external jobs).

502.    *Turnover Contagion.*  The scenario could also play out with any of Director A, Director B, VP A, or SVP A changing employers after the impetus of the outside offer to Director A.  Should that happen, the possibility of turnover contagion comes into play.  If others at my current company move for higher pay to another company and I learn from them, who are uniquely positioned to compare both my current employer and my prospective employer, that they are happy with their move(s), then I see less risk/uncertainty and will likely focus more on the upside of making such a move myself.  Especially when these alternative employers are growing and hiring, one employee leaving can easily turn into many following that employee.  With unsolicited outside offers coming into many employees throughout a company, the potential for turnover contagion can grow rapidly.  This large-scale turnover risk (or, alternatively, higher labor costs required to head off such turnover) would provide an incentive to implement no-poach agreements, especially with what would be deemed especially attractive alternative employers to one's employees.

503.    At deposition, Dr. Johnson testified to the cascading effects scenario I provide as "preposterous."[944]  It is unclear why.  Employees place a strong value on pay that is equitable based on internal and external equity comparisons and react when they perceive it is not.  That is why internal equity and external equity are a major focus and key objectives for companies (including the Defendants) in managing employee compensation.  In my original report, my

---

[944] Johnson Dep. at 231:16–232:13.

Figure 4 included courses from WorldatWork, the leading association of compensation professionals.[945]  Prominent were internal equity, external equity, and pay structure design.[946]

504.    The foregoing analysis also dismantles Dr. McCrary's argument that Defendants' No-Poach Agreements would not affect (1) Class Members employed by USPI and DaVita who were uninterested in employment opportunities at SCA, (2) Class Members who did not engage with proactive solicitation, and (3) Class Members whose employment options were restricted because of non-compete agreements, unvested equity, and/or Defendants' non-solicitation agreements with third-party recruiters.[947]  In the study cited by Dr. McCrary, Bloom and Michel argue[948]:

> A large body of research indicates that the distribution of rewards within an organization is fundamental to employee attitudes and behaviors . . . .  This evidence indicates people care more about how their rewards compare to those of relevant others than about the absolute amount of rewards they receive[.]

In other words, consistent with equity theory, employees compare the ratio of their pay to their performance contributions to the corresponding ratio of other employees they deem to be relevant comparisons.  Their attitudes and behaviors will be more negative if they think their pay

---

[945] Gerhart Report ¶ 103(b), Figure 4 (citing WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025), https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual).  *See also id.* ¶ 115(a) (citing K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness:  Slippery Slope or Manageable Terrain?*, 20 WORLDATWORK J. 50–64 (Fall 2011)) ("Surveys [] show that employees are very concerned about external equity.  For example, a WorldatWork (2011) survey of compensation professionals demonstrated that 28% of employees 'frequently' or 'constantly express concern regarding external equity or fairness of base pay amount, and 51% "occasionally" express concern."). Moreover, at least 14 states have passed pay disclosure laws since 2018, to make it easier for employees to assess pay equity.  *See* Lu, *supra* note 500.

[946] Gerhart Report ¶ 103(b), Figure 4 (citing WORLDATWORK, *supra* note 945).

[947] McCrary Report ¶¶ 107, 130–144.

[948] Bloom & Michel, *supra* note 751 at 33.

in not equitable based on this comparison. Again, this is why the design and execution of compensation systems focuses so much on equity.

505. <u>Top-Down Salary Structures Would Cause Cascading Effects.</u> Below, I explain that Defendants' Experts have not convinced me to change my view that Defendants implemented top-down salary structures that would cause "across the board" cascading effects.[949] In such structures, employees at the top of a pay scale in a firm play a role in determining the relative gains of those "below them," such that restricting the pay of those at the top will necessarily affect the pay of those below, as here.[950]

506. *DaVita.* Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not address my opinion that common evidence shows that DaVita had top-down salary structures that would cause "across the board" cascading compensation effects.[951] As such, my opinions are unchanged.

507. *SCA.* As above, because Dr. Johnson and Dr. McCrary did not address my opinion that based on my review of evidence common to the Class, SCA had top-down salary structures that would cause the No-Poach Agreements to have widespread effects,[952] my opinions have not changed.

508. *USPI.* Dr. Saravia and Dr. McCrary failed to refute my opinion that USPI set its compensation structures from the top down.[953] Moreover, Dr. Saravia provided additional evidence common to the Class that USPI's top-down pay structures would have cascading effects on Defendant's Senior-Level Employees' pay.

---

[949] Gerhart Report ¶ 148.

[950] *Id.* ¶ 147.

[951] *Id.* ¶ 148(a).

[952] *Id.* ¶ 148(b)(ii).

[953] *Id.* ¶ 148(c)(ii).

509.



Moreover, managing pay centrally and managing pay from the top-down are two different things. As such, Dr. Saravia's contention is not inconsistent with my opinion that USPI set its compensation from the top-down, which is also borne out by evidence that Dr. Saravia produced.

510.

---

954 Saravia Report ¶ 59 (citing Karrmann Dep. at 43:8–19).

955 *Id.* (citing Ex. PX88 at DOJCIV-008-00000359; English Dep. at 27:24–28:4, 52:2–17; Karrmann Dep. at 38:6–19; Ex. PX11 at USPI_CIV_000810697; USPI_CIV_000650633 at USPI_CIV_000650635–36; USPI_CIV_000689431).

956 *Id.* (citing Ex. PX88 at DOJCIV-08-00000359; English Dep. at 40:10–18; Ex. PX111 at USPI_CIV_000810697).

957 *Id.* ¶ 61 (citing Ex. PX88 at DOJ-CIV-008-00000360; USPI_CIV_000056611 at USPI_CIV_000056612, 615, 620, 622–823; USPI_CIV_000037627 at USPI_CIV000037627; USPI_CIV_000034853; USPI_CIV_000023134 at  USPI_CIV_000023140–41).

███████████████████████████████████████

███████████████████████████████████████

███████ [958]

511.    <u>Variable Compensation and Pay Differentials</u>.  Dr. Johnson, Dr. Saravia, and Dr. McCrary argue that my opinion regarding cascading effects is unsupported because many proposed Class Members received variable compensation.[959]  Dr. McCrary also asserts that I failed to explain how compensation other than salary, and in particular equity pay, "would be linked across proposed class members."[960]  Below, I explain that these arguments are inconsistent with the compensation-related literature and with the evidence I reviewed.

512.    A 2022 WorldatWork survey reported that in 2019, 87% of companies determined their competitive position using base salary, 8% used total cash compensation, and the remaining companies used some other approach.[961]  That means the primary focus is on salary midpoints that align with market pay levels and pay minimums and maximums that align with lower and higher levels in the market (one approach is to use the 25th and 75th percentiles, respectively).[962]  As such, a major focus on base pay makes sense.  Unlike variable pay, base pay provides certainty in compensation-based income.  Indeed, on a risk-adjusted basis, a dollar of uncertain variable pay is worth less than a dollar of certain base salary pay.  (█████████████

---

[958] *Id.* ¶ 64 (citing USPI_CIV_000336973 at USPI_CIV_000336973; USPI_CIV_000022791 at USPI_CIV_000022805; USPI_CIV_000041645 at USPI_CIV_000041656; USPI_CIV_000890968 at USPI_CIV_000890973; USPI_CIV_000039709 at USPI_CIV_000039709; USPI_CIV_000121836 at USPI_CIV_000121836, 839; USPI_CIV_000467447 at USPI_CIV_000467458–60).

[959] Johnson Report ¶¶ 74–76; Saravia Report ¶¶ 183–185; McCrary Report ¶¶ 79–80, 84–87.

[960] McCrary Report ¶ 105.

[961] COMPENSATION STRUCTURE POLICIES & PRACTICES, *supra* note 873.

[962] GERHART, *supra* note 94, at 290.



[963] A structured compensation system does not have as a goal to use the salary structure to limit variable pay such as short-term and long-term incentives. Rather, as the evidence has borne out, it determines short-term and long-term incentive payouts to its employees using a highly structured approach that relies on formulas using predetermined performance metrics and payout schedules.

513. ███████████████████████████████████████████ [964]

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████ This is not surprising—performance-based bonus and equity payments are more likely to comprise significant portions of pay for higher level jobs such as top executives.

514. ███████████████████████████████ [965] PTO is a benefit that is ordinarily treated separately from direct pay. "Other" also includes benefits (e.g., "holiday") that are ordinarily treated separately. ███████████████████

███████████████████████████████████████████

███████████████████████ [966] ███████████████

---

[963] Johnson Report ¶¶ 155–157.
[964] Saravia Report ¶ 68, Ex. 5.
[965] McCrary Report ¶¶ 84–85, Ex. 11.
[966] There is insufficient detail (percentage represented by each category in each bar) in Dr. Johnson's Exhibit 11 to allow a similar adjustment to be made.

██████████████████████████████████████████████████

██████

515.  ████████████████████████████████████████████

█████████████████████████████████████████████[967] The answer
is that, yes, there are multiple components to pay and the more of these components that are
suppressed and the more each is suppressed, the more overall pay will be suppressed. I never
argued that suppression of merit budgets alone would account for the total amount of pay
suppression. However, it is part of the suppression.

516.  In my report, I provided other evidence that the Defendants were focused on
internal equity in setting bonuses and issuing equity, which would cause compensation impacts
to have cascading effects.[968]  Moreover, at higher-job levels, like Senior-Level Employee
positons at Defendant firms, **Figures 4** and **5** below show that it is standard practice for
companies using structured compensation systems to have bonus (short-term incentive) and
equity (long-term incentive) payouts that add significantly to base pay, just as we see here.
Bonus and equity payouts are determined in a systematic manner at companies generally and at
Defendants specifically, which deflates Dr. McCrary's argument that I failed to show how
Defendants' pay structures governed equity pay.[969]  Note also that the more compensation is

---

[967] Stiroh Report ¶ 112 & n.236.
[968] *See, e.g.,* Gerhart Report ¶¶ 127(a)(i)(A) (citing Ex. PX249 at DVA_OMCEAL_000906134
████████████████, 127(a)(iii)(A) (citing Ex. PX551 ████
█████████████████████████), 127(b)(ii) (citing Cinnick Dep. at
74:5–15, 69:15–70:24 ████████████████████████)), 120(a)(iii) (citing
USPI_CIV_000901340 at USPI_CIV_000901341 (████████████████████
████████████████)).
[969] McCrary Report ¶ 105.

comprised of bonus and equity pay, the more the harm will be common to Class Members, given the impact of business performance on payouts.

**Figure 4:  Estimated Short-Term Incentive/Variable (Bonus) Pay as a Percentage of Salary and Performance Basis, by Employee Group[970]**

| Employee Group | Percentage of Organizations Where Eligible | Bonus/Variable Pay as a Percentage of Salary (Target) | | Performance Basis for Bonus Payout | | |
|---|---|---|---|---|---|---|
| | (A) | In Organizations Using Such Plans (B) | All Organizations (A x B) | Corporate | Division/Business Unit | Individual |
| Officers/executives | 99% | 49% | 49% | 62% | 19% | 19% |
| Exempt, salaried | 99 | 15 | 15 | 48 | 28 | 26 |
| Nonexempt, salaried | 48 | 6 | 3 | 44 | 29 | 26 |
| Nonexempt, hourly nonunion | 54 | 5 | 3 | 40 | 32 | 27 |

**Figure 5:  Allocation and Use of Long-Term Incentive Plans[971]**

| Employee Group | Median Percentage of Long-Term Incentive Grants Allocated |
|---|---|
| CEO | 13% |
| Officers/executives (excluding CEO) | 50 % |
| Exempt, salaried | 25 % |
| Nonexempt, salaried | 0% |
| Nonexempt, hourly nonunion | 0% |
| | **Practices/Use** |
| Percentage of organizations using long-term incentive | 91 % |
| Number of long-term incentive plans used | |
| One plan | 18% |
| More than one plan | 82% |

---

[970] GERHART, *supra* note 94, at 349, Exhibit 10.2.

[971] *Id.* at p. 350, Exhibit 10.3.

-214-

517. *Bonus and Equity Payments at DaVita.* █████████████████

██████████████████████████████████████████████████████████

███ 972 ████████████████████████████████████████████████████

████████████████████████████ 973.



518. ████████████████████████████████████████████

██████████████████████████████████████████████████████████

████ 974.

_____

519. *Bonus and Equity Payments at SCA.* In my report, I explained that SCA

accounted for bonuses in its pay structure.975 ████████████████████████

██████████████████████████████████████████████

████ 976.

██████████████████████████████████████████████

_____

972 Stiroh Report ¶ 113.

973 Gerhart Report ¶ 127(a)(iii)(B) (citing Ex. PX27 at DVA_OMCEAL_001339898).

974 *Id.* ¶¶ 127(a)(iii)(A) (citing Ex. PX551), 127(a)(i)(A) (citing Ex. PX249 at DVA_OMCEAL_000906134 ███████████████████████████████████████████████████ ).

975 *Id.* ¶ 127(b)(ii).

976 *Id.* (citing Cinnick Dep. at 74:5–15, 69:15–70:24).



520.

521.    *Bonus and Equity Payments at USPI.* Further, I previously explained that the Saravia Report provides evidence that at USPI, bonus potential varied systematically with job level,[980] which is very consistent with a structured compensation system and a focus on internal equity. [981]



---

[977] *Id.* ¶ 127(b)(ii) (citing Cinnick Dep. at 71:12–18).

[978] *Id.* ¶ 127(b)(i)(A) (citing Rucker Dep. at 325:21–326:9).

[979] McCrary Report ¶ 142 (citing SCA000545210 at SCA000545226).

[980] Saravia Report ¶ 61.

[981] USPI_CIV_000964138 at USPI_CIV_000964138; *see also* USPI_CIV_000901340 (2015 internal evaluation of USPI's compensation plan).

522.   Additional evidence illustrates how bonus payments fit into USPI's pay structure.



525.   *Pay Levels.* Dr. Johnson, Dr. Saravia, and Dr. McCrary allege that the so-called

"wide distribution of compensation" for employees within Defendant firms' job levels and job

---

[982] USPI_CIV_000070529 (cover email) and USPI_CIV_000070534 (attachment) at USPI_CIV_000070534–35.

[983] *Id.*

[984] USPI_CIV_000964138 at USPI_CIV_000964138.

[985] *See, e.g.,* USPI_CIV_000059623 at USPI_CIV_000059623.

[986] USPI_CIV_000026885.

[987] *Id.* at USPI_CIV_000026886.

titles would prevent Defendants' conduct from causing cascading compensation effects.[988] Below, I explain why their arguments are unsound. Moreover, the only way to avoid overlap is to eliminate pay ranges at each level.

526. First, Dr. Johnson, Dr. Saravia, and Dr. McCrary fail to understand that structured compensation systems use pay levels and salary ranges. Different job titles at different levels are paid differently on average and everyone in a job title does not need to be paid the same, and there is no expectation that this will occur. Further, "wide" is relative, and it is unclear what is being compared.

527. Regardless, the differences are intentional: salary ranges exist for the very purpose of ensuring variation in pay within a job, specifically as a function of performance contribution. Recall that equity requires paying employees in line with their contributions to the firm. If Employee A contributes much more to the organization than Employee B, but Employee B's pay is suddenly too close to Employee A's, Employee A will perceive this as inequitable.

528. As I discussed, according to my compensation textbook and the 2019 WorldatWork survey, the typical range spread (i.e., the salary range maximum/salary range minimum – 1) for executives is 70% to 80%, and between 50 and 60% for other salaried employees.[989] This explains in part Dr. McCrary's assertion that benchmarking may "play[] a bigger role in compensation for low-skill positions than high-skill positions."[990]

529. The purpose of the range is to recognize differences in performance contributions by different employees within the same pay range and/or job title. The maximum/minimum

---

[988] Johnson Report ¶¶ 71–73; Saravia Report ¶¶ 186–187; McCrary Report ¶¶ 90, 96–90, Exs. 15–18.

[989] GERHART, *supra* note 94, at 290, Exhibit 8.20.

[990] McCrary Report ¶ 65.

pertain to the salary range, and not to the lowest-paid and highest-paid employees in the range or title.

530.    Dr. McCrary again erroneously claims that in a structured compensation system, all employees within a role are paid similarly.[991]  As I have noted, only employees with similar performance contributions would be expected to be paid similarly.  (Dr. McCrary, of course, does not measure or include any measures of performance in his analysis.)  ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████[992]  One simple question here:  Does Dr. McCrary feel that a current Vice President at a Defendant company would be indifferent to being demoted to the Director level because the pay is not really different at the two levels?  Of course not.  As I explained above, the only way to completely eliminate overlap in pay between adjacent job levels would be to pay everyone at a particular job level the same or nearly the same.  That, of course, would be inconsistent with the principle of equity (different pay based for different performance contributions), which is fundamental to structured compensation systems.  That is why overlap, as I noted previously, is a standard feature of structured compensation systems.

531.    **Quantitative Assessments Regarding Pay Differentials Are Unnecessary.**  Dr. Johnson also contends that I neglected to conduct any quantitative assessments regarding Defendants' pay differentials.[993]  Similarly, Dr. McCrary remarks that I neglected to provide any

---

[991] *Id.* ¶¶ 96, 98, Ex. 15.
[992] McCrary Report ¶ 96.
[993] Johnson Report ¶ 74.

quantitative evidence of the pay structure I opine exists at each Defendant firm.[994]  Their

critiques are ineffective.

532.  An empirical analysis of Defendants' pay differentials is not needed because the

vast majority of large companies use salary to define ranges, not total (direct) compensation

(salary, bonus, equity).  Salary ranges at the Defendants, whether formalized or not, are

systematic, and are similar from year to year.  No salary range is defined as the difference

between the lowest and highest salary or between the lowest and highest total direct

compensation for a job.  The within-level variation (technically, this is the range, not the

variance) and across-level overlap from following such an approach will look much larger as it is

a function of the most extreme observations.  It is also the case that the range of total direct pay

will be larger because in a typical structured compensation system, it is standard practice for

Senior-Level Employees to receive a significant share of total direct compensation in the form of

equity and bonus.  With respect to salary, contrary to how Dr. Johnson, Dr. Saravia, and Dr.

McCrary approach the matter, it is typical for the minimum salary to be set, for example, at the

25th percentile in the external market (however that is defined and estimated) and the maximum

at the 75th percentile (as opposed to, for example, the 5th and 95th percentile).  When using

actual compensation data, things are complicated by the fact that there are hires and departures,

as well as promotions (and perhaps a few demotions) from year to year.  Therefore, actual

compensation at different levels will not appear to move in as tight of a lockstep.

533.  Recall also that typically, merit increase percentages are almost always identical

for different job levels, which indicates an organization's intent to maintain current base pay

differentials between levels.

---

[994] McCrary Report ¶¶ 99, 106.

534.    Throughout this Rebuttal, I have provided some basic analyses to demonstrate that the Defendants did use structured compensation systems that aligned with the foregoing principles and maintained systematic and consistent difference in pay levels across job levels over time.  Accordingly, I am not persuaded to change my views.

535.    <u>Overlapping Pay Ranges Are Consistent with Structured Compensation Systems.</u> Dr. Johnson, Dr. Saravia, and Dr. McCrary argue that Defendants' job levels overlap, such that the harm would not spread.[995]  This is incorrect.  Range overlap, as seen in Exhibit 20 in the Saravia Report is a design characteristic of structured compensation systems.[996]

536.    There will of course be overlap in pay across adjacent levels in a structured compensation system.  Overlap is actually a feature of systematic compensation structures, and the only way to eliminate overlap is to greatly reduce the range spread, discussed above, which would throttle the firm's ability to pay for performance at the same level and/or within the same job.  For example, consider **Figure 6** (below), which shows different options for salary grade/range overlap in a structured compensation system:

**Figure 6:  Range Overlap**[997]



---

[995] Johnson Report ¶¶ 75–76; Saravia Report ¶¶ 186, 188; McCrary Report ¶¶ 30, 71, 96–98.
[996] Saravia Report ¶ 174, Ex. 20.
[997] GERHART, *supra* note 94, at 291, Exhibit 8.21.

Notice that in the example above, there is no option shown with zero overlap.

537.    Here, a Director performing at a very high level can be paid more in base salary than a newly-hired VP whose performance may not yet be to expectations given that she just started her job.  If that VP performs at a high level, she will get a large merit increase soon due not only to her performance but also due to the use of a compa-ratio in a standard merit increase grid.[998]

538.    Moreover, the example I provided in my opening report explicitly explains how effects cascade.[999]  I hypothesized that a current employee (e.g., a Director) at a Defendant firm received a cold call resulting in an offer of an external job with higher pay.[1000]  There were three jobs in the example, representing three different salary ranges (low to high):  Director, VP, and SVP, and these are in a reporting relationship.  That Director (Director A) can accept the offer, or can use the offer as leverage to negotiate higher pay in the current role.[1001]  In the example, a second Director (Director B) learns of the offer and of Director A's new higher salary (either at the current employer as a result of leveraging the offer or as a result of moving to the new employer).  Director B, the vice president, and senior vice president all gain new information about alternative external job and pay opportunities and perhaps Director A's new employer now is seen as a more concrete possibility.  If Director A leaves, others may follow, possibly to that employer.  If they stay, they may raise their pay expectations at their current employer due either to the new information on external equity of lack thereof.  If Director A and others stay, each will make comparisons between their pay and their performance contributions and those of

---

[998] Gerhart Report ¶ 132.

[999] *Id.* ¶ 143.

[1000] *Id.* ¶ 143(a).

[1001] *Id.*

Director A.  Upon doing so, they may feel a lack of internal equity and seek pay increases.[1002] As this same chain of events takes place throughout the firm, it creates upward pressure on pay and labor costs.  That upward pressure is lower to the degree outside offers have been restricted due to No-Poach Agreements.

539.  Employees working in different job groups or functions also compare their pay and performance contributions.  The Zhang et al. study of the effects of between-group pay dispersion explains[1003]:

> Employees are likely to compare their pay against that of others in different job groups, especially when those others belong to a shared, larger unit (e.g., division, organization) and frequently interact toward a common goal . . . .  Such frequent work interactions under a shared collective goal render colleagues working in other job groups both relevant and proximal, increasing the likelihood that such colleagues will be selected as social comparison referents.

540.  ████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████[1004] █

███████████████████████████[1005].



---

[1002] *Id.* ¶ 125(d) (citing Dow et al., *supra* note 945 (A WorldatWork survey "asked [] compensation professionals about what influence they believe internal reward equity or fairness has on employee engagement, employee motivation, and employee satisfaction.  More than half of respondents reported that they believe internal equity is 'extremely influential' for engagement (56%), motivation (53%), and satisfaction (55%).") (cleaned up)).
[1003] Z. Zhang et al., *The effects of between-group pay dispersion*, 66 ACADEMY OF MGMT. J. 1860–1895, 1862 (2023).
[1004] McCrary Report ¶ 98.
[1005] *Id.* & Ex. 15.

It would be very interesting to see Dr. McCrary put his (novel) view of how people react to pay decreases in action. He again fails to recognize that equity is not about pay alone, it is instead about how one's pay compares to one's performance contributions and how fair they believe that ratio is when they compare the pay others receive for their performance contributions. Two people paid the same, but with different performance contributions, will be perceived as inequitable by the higher performer. Likewise, in Dr. McCrary's example, the VP receiving the pay cut will very likely perceive a strong sense of inequity if others with similar performance contributions do not receive such a pay cut and would be expected to seek a way to restore equity, which could include considering other jobs.

541.

[1006] And he, Dr. Saravia, and Dr. Stiroh decline to rebut the foregoing analysis. Accordingly, I have no cause to change my opinion.

542. <u>External Equity Constraints Do Not Preclude Pay Suppression.</u> Defendants' Experts also argue that my opinion that Defendants sought to achieve external equity is inconsistent with my opinion that Defendants' No-Poach Agreements would have suppressed pay Class-wide.[1007] Their opinions rest on a fundamental misunderstanding of how

---

[1006] Johnson Dep. at 269:18–23.
[1007] Johnson Report ¶¶ 65, 89–93; Saravia Report ¶¶ 194–196; McCrary Report ¶¶ 64–68

80

Stiroh Report ¶¶ 46–49.

organizations, and in particular Defendants, incorporate external equity principles into their compensation structures, which is evidence common to the Class.[1008]

543. First, external equity is not a total check on labor market restrictions because of the labor market fictions that advantage employers and disadvantage employees that I articulated above. Because employees do not have perfect information about job opportunities (what they are, how well they match, what the pay would be), they do not have unfettered mobility or ease of movement even in unrestricted labor markets. Indeed, as the U.S. Department of Treasury report points out, "monopsony does not imply a complete absence of market forces."[1009]

544. Moreover, despite the fact that Dr. Johnson, Dr. Saravia, and Dr. McCrary mischaracterize my opinion, it is not the pay strategy of Defendants, or indeed of any company, to exclusively rely on the market to dictate pay. Even if a company wished to do that, it would first have to figure out what market pay is, which is hard to do when there is no single going market rate of pay. Further, not all jobs can be matched directly to comparable jobs in external market pay surveys. In such cases, a company will compare the internal value of the job with jobs that can be matched and pay the unmatched job in proportion to its value relative to the matched jobs. In other words, internal equity in this case helps bring external equity inside. Finally, a company may decide that certain jobs are more critical to successful execution of its strategy and pay such jobs more, consistent with the internal equity focus on paying more for greater contributions. Thus, although internal equity and external equity generally largely

---

[1008] ███████████████████████████████ McCrary Report ¶ 68.

[1009] *See also* LABOR MARKET COMPETITION, *supra* note 38, at 3.

coincide, external equity alone does not fully explain pay levels, even if figuring out market pay was as easy as in simple economics models.

545.     Additionally, Dr. Johnson agrees:  at deposition, he testified that he had "not offered the opinion that the entirety of class pay levels were determined by external benchmarking."[1010]

546.     Further, as I explain in my textbook[1011]:

> [P]eople love to talk about 'the market rate' as if a single rate exists for any job, with the implication that organizations are constrained to pay that same rate to their own employees in that job.  Nevertheless, [**Figure 7** below] instead shows that organizations can and do vary in how closely they match the 'going rate.'  There is no single 'going mix' of pay forms, either.  [**Figure 7**] compares the pay fix for the same job (software marketing manager) at two companies in the same geographic area.  Both companies offer about the same total compensation.  Yet the percentages allocated to base, bonuses, benefits, and options are very different.

[1012]

---

[1010] Johnson Dep. at 246:9–25.

[1011] GERHART, *supra* note 94, at 217–218.

[1012] Gerhart Dep. at 56:1–9; Johnson Report ¶ 43; Saravia Report ¶ 77 n.135; McCrary Report ¶ 120 n.235; Stiroh Report ¶ 49.

**Figure 7:  Two Companies:  Same Total Compensation, Different Mixes**[1013]





547.    As my compensation textbook and **Figure 8** below explain[1014]:

[T]he factors that affect decisions on pay level and pay mix include (1) competition in the labor market for people with various skills; (2) competition in the product and service markets, which affects the financial condition of the organization; and (3) characteristics unique to each organization and its employees, such as its

---

[1013] GERHART, *supra* note 94, at 219, Exhibit 7.4.

[1014] *Id.*

business strategy, technology, and the productivity and experience of its workforce. These factors act in concert to influence pay-level and pay-mix decisions.

**Figure 8: What Shapes External Competitiveness?**[1015]



548. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ [1016]

████████████████████████████████████████████████████████

████████████████████

549. Consider also that there is substantial variation in pay across employers within an industry, calling into question whether all of the employers in an industry are actually competing for the same employees. For example, in 2010, in the NAICS industry Outpatient Care Centers,

---

[1015] *Id.* at 220, Exhibit 7.5.

[1016] Gerhart Report ¶ 148(a)(vi)(A), Figure 14 (citing Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854).

Management Occupations (621400), the 25th-percentile annual pay was $60,840, the 50th-percentile (median) was $79,940, and the 75th-percentile pay was $107,890.[1017]  Either these are major differences in pay level that do not prevent firms from competing in labor markets for the same employees, or firms within this industry are not all comparable and are thus competing for some subset of employees within this industry.  If the latter is true, it is incorrect to treat these firms as equally viable employment options.  In other words, there are fewer employers in competition for Defendants' employees than might have been inferred.

550.    Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's testimony is also inconsistent with their opinions regarding variations in Defendants' pay levels, discussed below.[1018]  If there is variation, each company will have significant discretion in choosing whether to pay at, above, or below market for a particular job, which is exactly how it played out. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [1019] ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ [1020]

---

[1017] *Occupational Employment and Job Statistics*, U.S. BUREAU LABOR OF LABOR STATISTICS, https://www.bls.gov/oes/tables.htm (last visited June 26, 2025).  In addition, although the 75th percentile is not available for the occupation of "Chief Executives," the median pay is $142,370. That is obviously much lower than the pay for CEOs at the Defendants, and using chief executives has the advantage of using one single well-defined occupation.  This comparison again points to many employers in the industry not actually being in competition with the Defendants for employees.

[1018] Johnson Report ¶¶ 71–73; Saravia Report ¶¶ 186–187; McCrary Report ¶¶ 60–62, Exs. 8–10.

[1019] Johnson Report ¶ 71, Ex. 11; *id.* ¶ 72, Ex. 12.

[1020] McCrary Report ¶¶ 80–82.

### B.  Defendants' CSI Exchanges Would Likely Broadly Suppress Employee Compensation.

551.  I opined that, pursuant to common evidence and based on my experience and research in compensation and human resource management, Defendants' coordination on pay for a subset of job titles would likely cascade to all or nearly all Class Members.[1021]  As such, Defendants did not need to coordinate on compensation for all Senior-Level Employee job titles, as long as they successfully colluded to suppress compensation for some positions because those suppressive effects would be spread widely to other Senior-Level Employees.[1022]  I also opined that if the collusion successfully reduced Defendant firms' merit increase budgets, all of Defendants' employees would experience reduced pay.[1023]

552.  Moreover, I opined that Defendants' CSI Exchanges of merit increase budgets were likely to reduce Class pay because a salary merit increase budget typically applies to all employees in a company, and the merit increases sizes in percentage terms are usually uniform across jobs and job levels intra-company.[1024]  Defendants' Experts contend that it is my opinion that Defendants' CSI Exchanges would "likely" have impacted compensation, but I have not sufficiently demonstrated that this conduct *could* suppress pay, let alone shown that it actually *did* suppress pay Class-wide.[1025]  Moreover, they represent that I did not provide any empirical assessment of the CSI Exchanges' impact on employee pay to suggest that my analysis is inadequate.[1026]  Below, I explain why their critiques have not convinced me to change my views.

---

[1021] Gerhart Report ¶¶ 149–153.

[1022] *Id.*

[1023] *Id.*

[1024] *Id.*¶ 83(c).

[1025] Johnson Report ¶¶ 98, 100, 106, 113, 118, 123; Saravia Report ¶¶ 154, 156, 160 n.236, 168; McCrary Report ¶¶ 148, 150, 154, 157, 162, 170–171, 176; Stiroh Report ¶¶ 107–112.

[1026] Johnson Report ¶ 118; Saravia Report ¶ 160 n.236.

553.     The Scope of My Assignment.  First, recall that Plaintiffs' counsel did not task me with performing a quantitative analysis of the impact of Defendants' CSI Exchanges on Senior-Level Employees' compensation.[1027]

554.     Common Evidence.



555.     Dr. Johnson Ignored My Clarification.

[1030]  If the Defendants can collaborate to increase their average pay level less than it would have been raised in the absence of collusion, then all would realize lower labor costs than they would have otherwise.  This would directly impact all or nearly all Class Members' pay.

556.     Suppression of Average Pay Suppresses Pay of All or Nearly All Jobs, Contrary to McCrary/Stiroh's Claims.  The foregoing also renders irrelevant Dr. McCrary's arguments

---

[1027] Gerhart Report ¶ 6.

[1028] Gerhart Dep. at 39:17–40:10.

[1029] Johnson Report ¶ 111 (citing Gerhart Dep. at 163:7–17).

[1030] Gerhart Dep. at 163:7–164:4.

that CSI Exchanges of aggregate merit increase budgets "would not be sufficient to enable firms to coordinate on pay for specific jobs or proposed class members,"[1031] and that "it is unclear how [exchanges of] information for groups of employees that were largely not proposed class members (such as facility or field employees) would have affected proposed class members."[1032] It likewise refutes Dr. Stiroh's assertion that I have failed to "explain how exchanging information about company-level merit increases could be used to fix wages across hundreds of job titles in different states for employees in the broad labor markets in which DaVita and SCA competed with hundreds of other employers for talent."[1033]

557.   Evaluating Plausibility Requires Understanding the Compensation Package. █

███████████████████████████████████████

███████████████████████████

███████ [1034]  First, even suppressing merit increases by 1 percentage point would add up to sizeable suppression over time.  For example, a 2 percent pay increase each year would result in 22 percent higher pay after 10 years, whereas a 3 percent pay increase each year would result in 41 percent higher pay after 10 years, a difference of 19 percentage points.  In other words, with a salary of $100,000 at the beginning, after 10 years, it would mean a salary of $122,000 (with a 2 percent increase each year) versus $141,000 (with a 3 percent increase each year).[1035]  Further, in this scenario, there is a salary shortfall in each of the 10 years from receiving 2 percent rather than 3 percent.  Summing those shortfalls from each year adds up to a $62,908 year shortfall

---

[1031] McCrary Report ¶ 170.
[1032] *Id.* ¶ 170.
[1033] Stiroh Report ¶¶ 107–112.
[1034] McCrary Report ¶ 171.
[1035] The salary at a future point is:  $(\text{Salary}_{time0} \times \text{annual increase percent})^{\text{Number of Years}}$.

total, which is roughly 60 percent of the $100,000 salary at the beginning of the 10 year period.[1036] Second, merit increases are one major component of pay (and labor cost) growth over time, but not the only component. For example, pay growth also comes from making counteroffers of higher pay in an effort to retain those who have received outside offers. When those receiving outside offers obtain higher pay, either by receiving a counteroffer or by leaving, this has cascading effects on the pay of others (as I have described) that goes beyond the costs of the annual merit increase program. Further, labor cost growth is also a function of changes in bonus and stock compensation over time. Thus, reducing merit increase budgets is one key part of a strategy to reduce labor costs over time. There are, of course, other parts of such a strategy. However, organizations are especially concerned about controlling base pay growth because it is a fixed labor costs. Variable pay (e.g., bonus plans) payouts, in contrast, are one-time payments that do not become fixed labor costs and thus such payouts can automatically decline when business performance declines (in contrast to base pay costs).

558.    Johnson/McCrary's Requirement That Merit Increases Across Relevant Employees Mirror Each Other Rests on a False Premise.



[1037]

[1038] It is not clear why either test is relevant. First, as described in

---

[1036] *See* my workpapers.
[1037] Johnson Report ¶¶ 113–117.
[1038] McCrary Report ¶¶ 151 ( ), 170 n.344

), 177, 180.

my opening report, it is standard practice to not set similar merit increases across employees.[1039] In fact, in a structured compensation system, it is exactly the opposite. In this vein, in Figure 11 in my report, I provided an example of a merit increase grid, which I reproduce below for convenience.[1040] Obviously, it shows different (higher) merit increases for higher performing employees. (It also provides higher merit increases for high performing employees with lower current pay/lower compa-ratio.)

### Gerhart Report, Figure 11[1041]

| RECOMMENDED SALARY INCREASES BY PERFORMANCE RATING AND COMPA-RATIO | | | Table 12.3 Merit Increase Grid |
|---|---|---|---|
| | COMPA-RATIO* | | |
| | 80–90% | 91–110% | 111–120% |
| Performance rating | | | |
| Exceeds expectations | 7% | 5% | 3% |
| Meets expectations | 4 | 3 | 2 |
| Below expectations | 2 | 0 | 0 |

*Employee salary/midpoint of their salary range.

559. Moreover, I provided an example of this kind of standard merit increase grid being used at SCA in Figure 12 in my report, also reproduced here for convenience:

### Gerhart Report, Figure 12[1042]

---

[1039] Gerhart Report ¶¶ 131–134.

[1040] *Id.* ¶ 134, Figure 11 (citing NOE ET AL., *supra* note 829, at 538).

[1041] *Id.*

[1042] *Id.* ¶ 135(b)(v), Figure 12 (citing SCA000078134).

560.    Additionally, whatever variation in merit increases that does or does not exist within a Defendant or across a Defendant is irrelevant for assessing whether pay was suppressed for the Class, and Dr. Johnson and Dr. McCrary do not persuade me otherwise.  What is relevant is the overall merit increase budget, which determines the overall level of employees' base pay growth going forward. ██████████████████████████████████████████████████

████████████████████████████████████████ [1043] ████████████████████

████████████████████████████████████████ Therefore, DaVita was able to save a substantial amount of compensation cost each year and these savings accumulated over time.

---

[1043] *Id.* ¶ 148(a)(vi)(A), Figure 14 (citing Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854). ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████ McCrary Report ¶ 160; Stiroh Report ¶ 46.

**Gerhart Report, Figure 14**[1044]



561. <span style="color:black">████████████████████████████████████</span>

<span style="color:black">█████████████████████████</span>[1045] Apparently, the idea would be that, if there were an

equal number of class members and non-class members, for example, that class members could

get an average 6% increase and non-class members would get an average 0% increase. This

certainly is possible. It is, however, very unlikely, and Defendants' Experts cite no evidence to

show that it occurred at the Defendant firms. As I have already documented using survey

evidence, organizations give nearly equal merit increases on average to different employee

---

[1044] Gerhart Report ¶ 148(a)(vi)(A), Figure 14 (citing Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854).
[1045] McCrary Report ¶ 170, n.344.

groups, whether executives, non-executive exempt employees, or hourly. Dr. McCrary provides

no evidence that the Defendants are any different. ██████████████████████████

███████████████████████████████████████████████████████████

███████████████████████ [1046] Of course, I have also documented using survey

evidence that firms do not give equal pay (merit) increases to employees. What I have

documented using survey evidence is that firms give the same average pay increase to different

employee groups, but that, within each group, they give different size pay increases to different

employees based on differences in their performance.

562.    Dr. Johnson, Dr. Saravia, and Dr. McCrary also claim that my analysis is

unsupported because I failed to account for employees who were ineligible for merit

increases.[1047] They are incorrect. In fact, my analysis does account for ineligible employees,

because my analysis is predicated on the logic of a typical merit increase grid/compa-ratio,

discussed above. These principles typically provide for little or no merit increases for low

performers. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ [1048]

563.    Defendants' Experts do not otherwise refute my analysis. Accordingly, I am not

persuaded to change my opinion.

564.    Exchanges of Pay Data for Specific Jobs. Dr. Johnson, Dr. Saravia, and Dr.

McCrary also contend that I do not explain how exchanging compensation data for a few specific

---

[1046] *Id.* (citing Gerhart Report ¶ 151).
[1047] Johnson Report ¶ 114 n.249; Saravia Report ¶ 191; McCrary Report ¶ 180.
[1048] Gerhart Dep. at 167:2–15.

job titles would likely restrict pay for all or nearly all Class Members.[1049]  My response is two-fold.  First, as I have explained above, Defendants implemented structured wage systems that seek to achieve internal and external equity.  Accordingly, exchanging data for some job titles would have cascading pay effects on other employees.  Moreover, Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's arguments discount the bulk of my opinion on this subject, discussed above, explaining that Defendants' CSI Exchanges of merit increase budgets, which are broadly applicable to Defendants' employees, would cause cascading Class-wide pay suppression effects.

## VIII.  CONCLUSIONS

565.    Based on my review of Defendants' Experts' Reports and testimony, the common evidence I have relied on, and my knowledge of labor markets and compensation systems, I have a number of conclusions.  These views are expressed throughout this Rebuttal and some are summarized here.

566.    Defendants' Incentives to Collude.  Defendants' Experts have not rebutted my opinion that based on my compensation-related literature and evidence common to the Class, Defendants were incentivized to collude to suppress labor market competition because they valued low employee turnover rates and wanted to keep labor costs low.  Further, they do not contest my opinions that industry conditions facilitated collusion, given the exclusive and tight-knit nature of Defendants' industry, which provided executives with better opportunities to establish their agreements.  As such, I have no cause to change my opinions.

567.    Mobility Suppression Harms Employees.  Defendants' Experts have not persuaded me to change my opinion that common evidence shows that Defendants' No-Poach

---

[1049] Johnson Report ¶¶ 121–123; Saravia Report ¶ 161; McCrary Report ¶ 162.

Agreements and CSI Exchanges would likely have limited employees' job mobility and bargaining power.

568. *Benefits of Mobility.* Defendants' Experts do not refute my opinion that collusion that restricts job mobility is harmful because employee mobility is a core tenet of a properly-functioning labor market and economy. It allows workers to move to positions where they are more productive, which in turn increases their wages. Additionally, it benefits incumbent employees because employers must raise compensation to prevent further turnover. Defendants' Experts also have not given me cause to change my testimony that, even absent Defendants No-Poach Agreements, access to job opportunities is insufficient because CSI Exchanges in the form of competitor wage data exchanges have suppressed pay rates.

569. *Importance of Cold Calling.* Foremost, Defendants' Experts do not contest that Defendants valued recruiting passive candidates who were not actively seeking employment elsewhere. In the absence of the No-Poach Agreements, Defendants routinely cold called their competitors' employees to recruit them. This practice generally yields higher wages for job candidates, who are offered more compensation to entice them to leave their jobs, and who can use those offers to negotiate higher salaries with their current employers. It also gives employees who receive cold calls more information about the job market, which is frequently shared with employees who were not proactively solicited. Defendants' Experts have therefore not convinced me that, accordingly, restrictions on proactive recruiting would not impact employees among the Defendant firms. Specifically, I have no cause to change my opinion that such restrictions would exacerbate information asymmetries and to depress levels of compensation for those who would have been solicited, as well as for all or nearly all salaried employees of Defendant firms.

570.    *Chilling Effect of the Tell-Your-Boss Requirement.*  Defendants' Experts do not contest that Defendants' No-Poach Agreements also included a "tell-your-boss" provision that further suppressed employee compensation.  Defendants agreed not to offer jobs to each other's employees unless at an early stage in the hiring process—well before the candidates received formal job offers—the employees notified their current supervisors that they intended to leave their positions.  Defendants' Experts also do not contest that, inevitably, this provision eliminated confidentiality in the hiring process, and I conclude it would have discouraged employees from pursuing opportunities at Defendant firms, and eliminated opportunities to increase their compensation.  As such, my opinions are unchanged.

571.    <u>Competitively Sensitive Information Exchanges.</u>  Defendants' Experts also have not given me cause to change my opinion that the common evidence I have reviewed demonstrates, based on my experience and research in compensation and human resource management, that Defendants' CSI Exchanges are inconsistent with the conduct of labor market competitors, and would have suppressed Class pay.  There is no benefit to a firm if it unilaterally shares, for example, nonpublic wage data.  Defendants' CSI Exchanges are inconsistent with lawful data surveys conducted by third-parties.  Moreover, Defendants' Experts have not convinced me that the data exchanged would not facilitate collusion to suppress employee pay.  As such, I have not changed my opinion that Defendants' exchanges would facilitate anticompetitive collusion to suppress employee pay.

572.    Moreover, Defendant firms' CEOs control their respective budgets, which are set to reduce employee turnover and promote retention.  The CEOs simultaneously eliminated competitive threats in the labor market by establishing No-Poach Agreements, and shared compensation-related information through their CSI Exchanges, which allowed them to set lower

labor budgets, including lower merit increase budgets, than they would have in a competitive market. This misconduct would likely have directly impacted all or nearly all Class Members.

573. Market Power. Further, Defendants' Experts also do not successfully rebut my opinion that based on my experience in compensation and human resource management and my review of evidence common to the Class, Defendant firms had sufficient labor market power, such that their No-Poach Agreements and CSI Exchanges harmed Defendants' employees by suppressing their compensation.

574. Moreover, that Class Members had job opportunities at non-Defendant firms is unavailing. The common evidence tells us that Class Members would have valued opportunities at Defendant firms. Moreover, I am also not swayed by Defendants' Experts' contentions regarding Class Members' employment opportunities at non-Defendant firms. Given frictions in the labor market and that finding a match between an employer and employee is challenging, unsolicited offers are valuable. Defendants' Experts cannot show that non-Defendant job opportunities were as valuable as opportunities that Class Members would have received from Defendants in an unrestricted market. Further, based on the common evidence, given ███

███████████████████████████████████████████████████

further that Defendants' employment grew substantially during the period, we would expect to see more Class Members and a growing number of Class Members switch to Defendant firms in an unrestricted market, but we did not. We would have expected turnover contagion (e.g., Rucker following Hayek from DaVita to SCA could have been just the start of DaVita's losses to SCA) to contribute to this growth in movement, but the No-Poach Agreements nipped this in the bud. Moreover, Defendants' Experts' critiques do not account for harm to employees who never received information about outside offers from their peers who had received unsolicited offers.

-241-

575.     Long-Term Effects.  Similarly, Defendants' Experts do not contest that compensation-related theory and literature, which are evidence common to the Class, show that the wage suppression caused by the foregoing conduct is expected to accumulate and persist for years.

576.     Compensation Structures.  I also have no cause to change my opinion that the common evidence shows that pay moved in Defendant firms in systematic and structured ways. Moreover, Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's opinions that pay at Defendants was individualized and discretionary does not undermine my conclusion that common evidence shows that Defendant firms implemented and maintained compensation systems that sought to achieve internal equity and external equity.  Achieving internal equity requires that individual pay differ based on individual differences in performance.  I am not convinced by Defendants' Experts that issues of internal equity and external equity were unimportant to Defendants.  As such, I have not changed my testimony.

577.     *Typical Features and Compensation Components.*  Defendants' Experts have not rebutted my opinion that according to common evidence, Defendants' systematized compensation structures used market surveys, pay lines, pay grades, and many other typical features of compensation structures.  Moreover, as we all agree, Defendants made use of compensation principles beyond salary, such as bonuses and stock.

578.     *Internal Equity.*  I maintain that whether or not Defendants used the specific term "internal equity," Defendants' compensation systems valued pay fairness and thus aimed to pay similar employees (i.e., those with similar roles and performance contributions) similarly, to pay dissimilar employees dissimilarly, and to correct for outliers inconsistent with fairness to restore equity.  A degree of individualization and managerial judgment in pay decisions, based on

-242-

achieving the closely related principles of pay for performance and internal equity, are standard in structured pay systems.

579.    *Paying for Performance.*  Defendants' Experts fail to demonstrate that a compensation system that includes pay for performance and a compensation system that takes internal equity into account are mutually exclusive.  Compensation structures that pay for performance do so to achieve and maintain internal equity, a key objective for companies in general, as we saw it was for the Defendants.  As such, my testimony is unchanged.

580.    Cascading Effects on Class Members' Compensation and Common Impact. Defendants' Experts also have not given me cause to change my opinion that because Defendant firms had systematized pay structures, impacts to these systems cascade to other employees and their levels of compensation.  I maintain that Defendants' No-Poach Agreements and CSI Exchanges therefore limited and had negative consequences on employee compensation not only for the workers who were directly involved, but also for nearly all employees.  Consequently, I have not changed my opinion that all of nearly all Class Members would have been paid more but for the challenged conduct.  Defendants' goals of achieving external equity in their pay systems would not prevent this pay suppression.

581.    Although I have not been asked to estimate the magnitude of damages in this case, my knowledge of compensation systems and the materials I have relied on inform my opinion that No-Poach Agreements, such as the agreements at issue in this case, and exchanges of confidential information, such as the CSI Exchanges at issue in this case, will suppress the compensation of all or nearly all members of Plaintiffs' proposed Class, including those with different job titles.

582.    Common Evidence and Methods.  I conclude that evidence common to the Class, including Defendants' Experts' Reports, documents produced by Defendants and third parties, materials from the DaVita criminal case, the compensation-related and economics literature, and survey data collected by WorldatWork, can be used to conclude that Defendants' No-Poach Agreements and CSI Exchanges would harm all or nearly Class Members.

583.    I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

Dated:  June 30, 2025              Respectfully submitted,

*Barry Gerhart*

Dr. Barry Gerhart

**PROOF OF SERVICE**

I, Sarah D. Zandi, an attorney, hereby certify that on June 30, 2025, I served a true and

correct copy of the foregoing **Updated Rebuttal Expert Witness Report of Dr. Barry Gerhart**

by electronic mail upon the following parties as set forth below:

| | |
|---|---|
| Kenneth M. Kliebard<br>Staci M. Holthus<br>MORGAN, LEWIS & BOCKIUS LLP<br>110 North Wacker Drive<br>Chicago, IL 60606<br>(312) 324-1000<br>Kenneth.kliebard@morganlewis.com<br>Staci.holthus@morganlewis.com | Jeffrey C. Bank<br>Brian J. Smith<br>Jordanne Steiner<br>WILSON SONSINI GOODRICH &<br>ROSATI, P.C.<br>1700 K Street NW, Fifth Floor<br>Washington, DC 20006<br>(212) 497-7761<br>jbank@wsgr.com<br>brian.smith@wsgr.com<br>jordanne.miller@wsgr.com |
| Amy B. Manning<br>MCGUIREWOODS LLP<br>77 West Wacker Drive<br>Suite 4400<br>Chicago, IL 60601-7567<br>amanning@mcguirewoods.com | Veronica Moyé<br>KING & SPALDING LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br>(215) 556-2100<br>vmoye@kslaw.com |
| Jeffrey E. Stone<br>MCDERMOTT, WILL & EMERY LLP<br>444 West Lake Street, Suite 400<br>Chicago, IL 60605<br>(312) 372-2000<br>jstone@mwe.com | Molly Moriarty Lane<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Market<br>Spear Street Tower<br>San Francisco, CA 94105-1596<br>(415) 442-1000<br>Molly.lane@morganlewis.com |

Dated: June 30, 2025          Respectfully submitted,

/s/ Sarah D. Zandi
Sarah D. Zandi

## APPENDIX A

## Materials Relied Upon Include the Following:

### I. PAPERS, BOOKS, AND WEBSITES

### Papers, Books, and Websites

Andrew Boyink, LINKEDIN, https://www.linkedin.com/in/andrewboyink

Andrew Hayek, LINKEDIN, https://www.linkedin.com/in/andrewhayek/

BARRY GERHART, COMPENSATION (14th ed. 2023)

B. Jovanovic, *Job matching and the theory of turnover*, 87 J. OF POLITICAL ECONOMY 972–990, 973 (1979)

Brandon Ponds, LINKEDIN, https://www.linkedin.com/in/brandon-ponds-8a6a297/

Brett Brodnax, LINKEDIN, https://www.linkedin.com/in/brett-brodnax-6488a029b/

Brian Mathis, LINKEDIN, https://www.linkedin.com/in/briantmathis/

Carlos Carrillo-Tudela, Bart Hobijn, Patryk Perkowski & Ludo Visschers, *Majority of Hires Never Report Looking for a Job*, FED. RSRV. BANK OF S.F. ECON. LETTER (Mar. 30, 2015)

Christopher Goetz & Martha Stinson, *The Business Dynamics Statistics: Describing the Evolution of the U.S. Economy from 1978-2019*, U.S. CENSUS BUREAU (Oct. 2021), https://www2.census.gov/ces/wp/2021/CES-WP-21-33.pdf

*Code Description*, NAICS, https://www.naics.com/naics-code-description/?code=62149 (last visited June 26, 2025)

*Data Retrieval: Employment, Hours, and Earnings (CES)*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/webapps/legacy/cesbtab1.htm (last visited June 26, 2025)

*Data Tool, Job Openings and Labor Turnover Survey*, U.S. BUREAU OF LABOR STATISTICS, https://data.bls.gov/multi-screen?survey=jt (last visited June 26, 2025)

DaVita, *Notice of Annual Meeting of Stockholders* (June 15, 2009)

Dennis Kogod, LINKEDIN, https://www.linkedin.com/in/dennis-kogod-02110b323/

-246-

Derek Neal, *Industry-specific human capital: Evidence from displaced workers*, 13 J. LAB. ECON. 653–677 (Oct. 1995)

Doug Swope, LINKEDIN, https://www.linkedin.com/in/doug-swope-a0178b5/

Edward P. Lazear & Paul Oyer, *Personnel Economics*, *in* THE HANDBOOK OF ORGANIZATIONAL ECONOMICS 502 (Robert Gibbons & John Roberts eds., 2013)

Eric Parrado, Asena Caner, & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007)

Frank M.H. Neffke, Anne Otto, & Antje Weyh, *Inter-industry labor flows*, 142 J. ECON. BEHAV. & ORG. 275–292 (Oct. 2017)

George-Levi Gayle & Robert A. Miller, *Has Moral Hazard Become a More Important Factor in Managerial Compensation?*, 99 AMERICAN ECONOMIC REVIEW 1740–1769, 1740 (2009)

HIGHMARK, https://www.highmark.com/ (last visited June 26, 2025)

Huasheng Gao, Juan Luo, & Tilian Tang, *Effects of Managerial Labor Market on Executive Compensation: Evidence from Job-Hopping*, 59 J. ACCT. & ECON. 203–220 (Apr.–May 2015)

James "Skip" Thurman, LINKEDIN, https://www.linkedin.com/in/james-skip-thurman-320b69a/

Jennifer Lu, *How much do others make for the same job? Here's where employers are required by law to share salary ranges when hiring*, CNBC.COM (Jan. 12, 2022)

Jennifer Sandoz, LINKEDIN, https://www.linkedin.com/in/jennifer-sandoz-4125071/

Jie Feng, Junchao (Jason) Li, Su Chen & Alex L. Rubenstein, *From a Spark to a Sweeping Fire: An Integrative Conceptual Review of Group Turnover and a Theoretical Exploration of Its Development*, 109 J. OF APPLIED PSYCH. 13–38 (2024)

*Job Openings and Labor Turnover Survey*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/jlt/ (last visited June 26, 2025)

Joe Clark, LINKEDIN, https://www.linkedin.com/in/joe-clark-43726011/

John K. Mawdsley, & Deepak Somaya, *Employee Mobility and Organizational Outcomes: An Integrative Conceptual Framework and Research Agenda*, 42 J. MGMT. 85–113 (Nov. 19, 2015)

Kathleen O'Toole, *Enrico Moretti: The Geography of Jobs*, INSIGHTS BY STANFORD BUSINESS (June 10, 2013), available at https://www.gsb.stanford.edu/insights/enrico-moretti-geography-jobs

Kent Thiry, LINKEDIN, https://www.linkedin.com/in/kent-thiry-0a996298/

K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness: Slippery Slope or Manageable Terrain?*, 20 WORLDATWORK J. 50–64 (Fall 2011)

Matt Bloom & John G. Michel, *The Relationships among Organizational Context, Pay Dispersion, and Managerial Turnover*, 45 THE ACADEMY OF MANAGEMENT JOURNAL 33–42, 34 (2002)

Michael Rucker, LINKEDIN, https://www.linkedin.com/in/michael-rucker-82ba0a1b/

*Number of Kaiser Permanente Employees from 2007-2023*, STATISTA, https://www.statista.com/statistics/403098/kaiser-permanente-employee-numbers/ (last visited June 26, 2025)

*Occupational Employment and Job Statistics*, U.S. BUREAU LABOR OF LABOR STATISTICS, https://www.bls.gov/oes/tables.htm (last visited June 26, 2025)

*Our Company*, KAISER PERMANENTE, https://about.kaiserpermanente.org/who-we-are/fast-facts (last visited May 28, 2025)

*Overheads*, CFI, https://corporatefinanceinstitute.com/resources/accounting/overheads/ (last visited June 26, 2025)

Peter Clemens, LINKEDIN, https://www.linkedin.com/in/peter-j-clemens-iv-a5727520/

Press Release, Tenet Health Completes Purchase of USPI from WCAS (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx

Press Release, Tenet Healthcare Corp., Tenet Healthcare Corp. Completes United Surgical Partners Int'l & Aspen Healthcare Transactions (June 16, 2015), https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm#:~:text=DALLAS%20%E2%80%93%20June%2016%2C%202015%20%E2%80%93,U.S.%20short%2Dstay%20surgery%20platform

*Profile Page*, NAICS (July 1, 2022), https://www.naics.com/company-profile-page/?co=16124

RAYMOND A. NOE, JOHN R. HOLLENBECK, BARRY GERHART, & PATRICK M. WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE. (13th ed. 2023)

Richard P. Castanias & Constance E. Helfat, *The managerial rents model: Theory and empirical analysis*, 27 J. MGMT. 661–678 (Nov.–Dec. 2001)

RONALD G. EHRENBERG & ROBERT S. SMITH, MODERN LABOR ECONOMICS: THEORY AND PUBLIC POLICY 128 (11th ed. 2012)

S. Naidu & E.A. Posner, *Labor Monopsony and the Limits of the Law*, 57 J. OF HUMAN RESOURCES S284–S323 (2022)

Sandi Karrmann, LINKEDIN, https://www.linkedin.com/in/sandikarrmann/

Stephanie A. Phillips, LINKEDIN, https://www.linkedin.com/in/stephanie-a-phillips-651913

Total Renal Care Holdings, Inc., Form 10K at 39 (Oct. 8, 1999), http://pdf.secdatabase.com/409/0000898430-99-003846.pdf

U.S. DEPT. OF TREASURY, THE STATE OF LABOR MARKET COMPETITION (Mar. 7, 2022), https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf

Warren J. Cinnick, LINKEDIN, https://www.linkedin.com/in/warrencinnick/

W. Felps, T.R. Mitchell, D.R. Hekman, T.W. Lee, B.C. Holtom & W.S. Harman, *Turnover contagion: How coworkers' job embeddedness and job search behaviors influence quitting*, 52 ACADEMY OF MGMT. J. 545–561 (2009)

WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (June 2023)

WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025), https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual

WORLDATWORK, SALARY BUDGET SURVEY (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf

Z. Zhang et al., *The effects of between-group pay dispersion*, 66 ACADEMY OF MGMT. J. 1860–1895 (2023)

## II.  EXPERT REPORTS, DEPOSITION TRANSCRIPTS AND EXHIBITS, AND DOCUMENTARY EVIDENCE

I was provided access to all expert reports, deposition transcripts and exhibits, and all documents produced in the case.  The following are among the materials I relied upon:

**Expert Reports (in alphabetical order)**

Expert Witness Report of Dr. Barry Gerhart ("Gerhart Report")

Expert Report of Dr. John H. Johnson, IV ("Johnson Report")

Expert Witness Report of Justin McCrary, Ph.D. ("McCrary Report")

Expert Report of Celeste Saravia, Ph.D. ("Saravia Report")

Expert Witness Report of Dr. Evan P. Starr ("Starr Report")

Expert Witness Report of Lauren J. Stiroh, Ph.D. ("Stiroh Report")

**Deposition Transcripts (in alphabetical order)**

30(b)(6) Deposition of Surgical Care Affiliates, LLC, By and Through its Corporate Designee, Brandon Ponds, November 26, 2024 ("Ponds Dep.")

Deposition of Colleen Arthur, DaVita, May 23, 2024 ("Arthur Dep.")

Deposition of Jason Cagle, USPI, August 6, 2024 ("Cagle Dep.")

Deposition of Robert Chipman, DaVita, August 7, 2024 ("Chipman Dep.")

Deposition of Joseph T. Clark, SCA, September 11, 2024 ("Clark Dep.")

Deposition of Warren Cinnick, SCA, November 22, 2024 ("Cinnick Dep.")

Deposition of Peter Clemens, SCA, May 2, 2024 ("Clemens Dep.")

Deposition of Cindy English, USPI, June 12, 2024 ("English Dep.")

Deposition of Bridie Fanning, SCA, July 17, 2024 ("Fanning Dep.")

Deposition of Mark Garvin, USPI, May 30, 2024 ("Garvin Dep.")

Deposition of Barry Gerhart, Ph.D., Expert, March 5, 2025 ("Gerhart Dep.")

Deposition of Joshua Golomb, DaVita / Third Party, August 28, 2024 ("Golomb Dep.")

Deposition of Andrew Hayek, September 18, 2024 ("Hayek Dep.")

Deposition of John Johnson, Ph.D., Expert, May 7, 2025 ("Johnson Dep.")

Deposition of Sandi Karrmann, USPI, August 14, 2024 ("Karrmann Dep.")

Deposition of Scott Keech, Plaintiff, August 22, 2024 ("Keech Dep.")

Deposition of Dennis Kogod, DaVita, September 6, 2024 ("Kogod Dep.")

Deposition of Mark Kopser, USPI, December 12, 2024 ("Kopser Dep.")

Deposition of Anthony Martin, USPI, June 27, 2024 ("Martin Dep.")

Deposition of Brian Mathis, SCA, September 20, 2024 ("Mathis Dep.")

Deposition of Dr. Justin McCrary, Expert, June 12, 2025 ("McCrary Dep.")

Deposition of Shannon McGarry, USPI, June 11, 2024 ("McGarry Dep.")

Deposition of Clare Metcalf, Third Party, August 14, 2024 ("Metcalf Dep.")

Deposition of Steven Priest, DaVita / Third-Party, November 5, 2024 ("Priest Dep.")

Deposition of Javier Rodriguez, DaVita, August 12, 2024 ("Rodriguez Dep.")

Deposition of Michael Rucker, SCA, August 27, 2024 ("Rucker Dep.")

Deposition of Jennifer Sandoz, SCA, September 26, 2024 ("Sandoz Dep.")

Deposition of Celeste Saravia, Ph.D., Expert, May 9, 2025 ("Saravia Dep.")

Deposition of John Schultz, November 19, 2024 ("Schultz Dep.")

Deposition of Allen Spradling, Plaintiff, July 18, 2024 ("Spradling Dep.")

Deposition of Michael Staffieri, DaVita, April 5, 2024 ("Staffieri Dep.")

Deposition of Evan P. Starr, Ph.D., Vol. II, Expert, March 20, 2025 ("Starr Dep., Vol. II")

Deposition of Lauren Stiroh, Expert, May 29, 2025 ("Stiroh Dep.")

Deposition of Jimmy Tanner, Third Party, July 31, 2024 ("Tanner Dep.")

Deposition of Kent Thiry, August 16, 2024 ("Thiry Dep.")

Deposition of James "Skip" Thurman, DaVita, June 17, 2024 ("Thurman Dep.")

Deposition of Leslie Wachsman, SCA, May 22, 2024 ("Wachsman Dep.")

Deposition of William "Bill" Wilcox, USPI, September 24, 2024 ("Wilcox Dep.")

Deposition of Kevin Zaideman, SCA, December 18, 2024 ("Zaideman Dep.")

**Deposition Exhibits (in ascending order by exhibit number)**

Exhibit PX11, DVA_OMCEAL_000402427–28

Exhibit PX19, DVA_OMCEAL_001399746–74

Exhibit PX23, DVA_OMCEAL_001079804–05

Exhibit PX25, DVA_OMCEAL_001339745–46

Exhibit PX27, DVA_OMCEAL_001339898–901

Exhibit PX36, SCA000540405–11

Exhibit PX37, USPI_CIV_000016100

Exhibit PX49, DVA_OMCEAL_000285328–62

Exhibit PX50

Exhibit PX70

Exhibit PX77, DVA_OMCEAL_001329256–61

Exhibit PX85, DVA_OMCEAL_001067247–81

Exhibit PX87

Exhibit PX88, DOJCIV-008-00000353–67

Exhibit PX97

Exhibit PX99, USPI_CIV_000021321

Exhibit PX101 (cover email), USPI_CIV_000004082–83, and Exhibit PX102 (attachment), USPI_CIV_000004090–91

Exhibit PX108

Exhibit PX111, USPI_CIV_000810697

Exhibit PX115 (cover email), USPI_CIV_000039752–53, and Exhibit PX116 (attachment), USPI_CIV_000039754

Exhibit PX124, DOJCIV-012-000000131–37

Exhibit PX133

Exhibit PX157

Exhibit PX158

Exhibit PX160, SCA000002866

Exhibit PX171, DOJ-PROD001B-00157126–28

Exhibit PX172, DOJ-PROD001A-00000001–02

Exhibit PX201 (cover email), DVA_OMCEAL_000944847–52 and Exhibit PX203 (attachment), DVA_OMCEAL_000944853–54

Exhibit PX216, USPI_CIV_000010048–57

Exhibit PX232, USPI_CIV_000021155

Exhibit PX234, USPI_CIV_000016522

Exhibit PX240, USPI_CIV_000686081–92

Exhibit PX249, DVA_OMCEAL_000906132–35

Exhibit PX275, DOJ-PROD003-00117878–93

Exhibit PX297, USPI_CIV_000058049–50

Exhibit PX304, DOJCIV-008-00000298–303

Exhibit PX305, DOJCIV-008-00000170

Exhibit PX313, DOJCIV-008-00000187–95

Exhibit PX316, DOJ-PROD001A-00000029–32

Exhibit PX333, DVA_OMCEAL_000658781

Exhibit PX335, DOJ-PROD001A-00000239

Exhibit PX337, SCA002021140–413

Exhibit PX376, DVA_OMCEAL_000122783–84

Exhibit PX453, USPI_CIV_000095467–68

Exhibit PX484, DVA_OMCEAL_000429386–90

Exhibit PX489, OMC_BM_000014729

Exhibit PX490, HAYEK-000012214–16

Exhibit PX501, SCA002277742–44

Exhibit PX506

Exhibit PX508, DOJCIV-008-00000212–26

Exhibit PX518, USPI_CIV_000104518

Exhibit PX523, OMC_BM_000010778–79

Exhibit PX537

Exhibit PX546

Exhibit PX551, DVA_OMCEAL_000405110

-254-

**Other Evidence Produced by Defendants and Third Parties**

DVA_OMCEAL_000010256
DVA_OMCEAL_000011812
DVA_OMCEAL_000124754
DVA_OMCEAL_000385858
DVA_OMCEAL_000413696
DVA_OMCEAL_000538771
DVA_OMCEAL_000760685
DVA_OMCEAL_001059650
DVA_OMCEAL_001068058
DVA_OMCEAL_001144622
DVA_OMCEAL_001294850
DVA_OMCEAL_001296753
DVA_OMCEAL_001313820
DVA_OMCEAL_001317525
DVA_OMCEAL_001322030
DVA_OMCEAL_001329257
DVA_OMCEAL_001329840 (cover email), DVA_OMCEAL_001329841 (attachment), and
DVA_OMCEAL_001329842 (attachment)
DVA_OMCEAL_001344570
DVA_OMCEAL_001385318 (cover email) and DVA_OMCEAL_001385327
DOJCIV-007-00000105
DOJCIV-008-00000090
DOJCIV-008-00000304
DOJCIV-008-00000345
OMC_BM_000006875
SCA000000198
SCA000003962 (cover email) and SCA000003963 (attachment)
SCA000075527
SCA000078134
SCA000091011
SCA000098450
SCA000128921
SCA000153859
SCA000163727
SCA000412504
SCA000523268 (cover email) and SCA000523273 (attachment)
SCA000545210
SCA000630035
SCA000838956
SCA001125179
SCA001159728

SCA001280928
SCA001395985
SCA001551238 (cover email) and SCA001551239 (attachment)
SCA001669270
SCA002270032
USPI_CIV_000021897
USPI_CIV_000021899
USPI_CIV_000022791
USPI_CIV_000023134
USPI_CIV_000026885
USPI_CIV_000034853
USPI_CIV_000037627
USPI_CIV_000039709
USPI_CIV_000041645
USPI_CIV_000056611
USPI_CIV_000059623
USPI_CIV_000070529 (cover email) and USPI_CIV_000070534 (attachment)
USPI_CIV_000007019
USPI_CIV_000099574
USPI_CIV_000115447
USPI_CIV_000121836
USPI_CIV_000147704
USPI_CIV_000336973
USPI_CIV_000401250
USPI_CIV_000433011 (cover email) and USPI_CIV_000433030 (attachment)
USPI_CIV_000449339
USPI_CIV_000457557
USPI_CIV_000467447
USPI_CIV_000499023
USPI_CIV_000650633
USPI_CIV_000689431
USPI_CIV_000890968
USPI_CIV_000901340
USPI_CIV_000962508
USPI_CIV_000962509
USPI_CIV_000964138

**Data**

14_Final Defendant Stack (produced by Dr. Johnson)

"Figure 9, 10, 11" output file (produced by Dr. Stiroh and located within her workpapers at Figures\Figure 9, 10, 11\Figure)

-257-

## III. LEGAL DOCUMENTS

3rd Am. Class Action Compl. (ECF No. 555), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

Pls.' Mot. to Compel SCA to Perform Supp. ESI Search (ECF. No. 419), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

Superseding Indictment, *United States v. DaVita Inc.*, Case No. 21-cr-00229-RBJ (D. Colo. Nov. 3, 2021)

USPI and Tenet's Answer to the Third Amended Complaint (ECF No. 569), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

**APPENDIX B**

| Employee | Company, Job Title (Years) |
|---|---|
| Colleen Arthur | DaVita, Intern (2013); DaVita, Redwoods Resident (2014–2015); DaVita, Facility Administrator (2015); DaVita, Manager, Compensation & Analytics (2015); DaVita, Director, Compensation & Analytics (2015–2018); DaVita, Senior Director, Compensation & Analytics (2018–2021); DaVita, Senior Director, Recruiting Operations, Strategy & Employment Branding (2021–2022) |
| Andrew Boyink | DaVita, National Director of Strategy & Operations for Hospital Services (2015–2017); DaVita, Senior Director of Strategy & Operations, Hospital Services (2017–2021); DaVita, Vice President ("VP"), Hospital Services Group (2021–Present) |
| Brett Brodnax | USPI, Executive Vice President ("EVP")/Chief Development Officer ("CDO") (2005–2011); USPI, President (2011–2018); USPI, Chief Executive Officer ("CEO") (2018–Present) |
| Jason Cagle | USPI, VP (2005–2010); USPI, Senior Vice President ("SVP") (2010–2013); USPI, Chief Financial Officer ("CFO"), (2013–2020) |
| Warren Cinnick | SCA, VP Human Resources ("HR") (2017–2020); SCA, SVP HR (2020); SCA, Group VP ("GVP") HR (2021–2023) |
| Joseph ("Joe") Clark | SCA, EVP & Chief Operating Officer ("COO") (2008); SCA, EVP Development (2008–Present) |
| Peter Clemens | SCA, EVP and CFO (2011–2015), SCA, Senior Advisor (2015–2017) |
| Bridie Fanning | SCA, Chief Talent Officer (2014–2016) |
| Mark Garvin | SCA, VP Operations (1992–1996); USPI, COO (2001–2020) |
| Mark Gildea | DaVita, SVP of Operations (2005–2015) |
| Joshua Golomb | DaVita, General Manager-DaVita Rx (2005, 2014–2015); DaVita, Director, Special Projects (2005); DaVita, Senior Manager (2005); DaVita, Director Star Rx (2005–2006); DaVita, Senior Director DaVita Rx (2006); DaVita, Senior Director (2006–2007); DaVita, VP, DaVita Rx (2007–2015); DaVita, CEO, Paladina Health [a DaVita subsidiary] |
| Andrew Hayek | DaVita, President (2007); DaVita, VP (2007–2008); SCA, President & CEO (2008–2017); OptumHealth, CEO (2017–2019) |
| Sandi Karrmann | USPI, SVP, Chief Human Resources & Support Services Officer (2013–2017); Tenet Healthcare/USPI, EVP, Chief Human Resources Officer (2017–2020) |
| Scott Keech | SCA, Regional Director of Operations & Clinical Services (2009–2012) |
| Anthony Kilgore | SCA, GVP (2011–2012); SCA, SVP Operations (2013–2016); SCA, Group President (2017); SCA, CEO (2018–2019) |
| Dennis Kogod | DaVita, Division President (2006–2010); DaVita, SVP (2008); DaVita, COO (2008–2016); DaVita, COO, HealthCare Partners (2014–2016); DaVita, Advisor to CEO (2016) |
| Anthony Martin | USPI, SVP, Corporate Controller and Chief Accounting Officer (1998–2019) |

-258-

| Brian Mathis | SCA, VP Strategy (2009–2014); SCA, GVP, Strategy and Payer Engagement (2014–2015); SCA, SVP, Strategy and Payment Innovation (2015–2017); SCA, CDO (2017–2018); OptumCare, CDO (2017–2018); OptumCare, Chief Strategy Officer (2018–2020) |
|---|---|
| Shannon McGarry | USPI, Executive Recruiter (2016–2020); USPI, Manager, Executive Recruitment (2020–2021); USPI, Regional Market Recruiter (2021 – Present) USPI, Manager – Talent Acquisition/Onboarding (2023 – Present) |
| Shannon Mosley | USPI, Director (2003–2006); USPI, Director (2007); USPI, VP Talent Acquisition (2007–2020) |
| Stephanie A. Phillips | USPI, VP, Procurement (2010–2021) |
| Brandon Ponds | SCA, Financial Analyst (2012–2015); SCA, Manager of Financial Planning and Analysis (2015–2017); SCA, Director, Financial Operations (2017–2019); SCA, Director, Payroll and HR Measurement (2019–2021); SCA, Senior Director, Payroll, HRIS and HR Analytics (2021–2022); SCA, Senior Director, Compensation, Payroll, D&I, Service Delivery, HR Technology and HR Analytics (2022–2023); SCA, VP, HR Service Delivery (2023–Present) |
| Steven Priest | DaVita, SVP (2001–2016); DaVita, Chief Wisdom Officer (2014-2016) |
| Javier Rodriguez | DaVita, SVP (2005–2018); DaVita, DVP (2006); DaVita, VP Value Management Operation (2006); DaVita, President (2008, 2012–2014); DaVita, CEO, Kidney Care (2014–2022) |
| Michael Rucker | DaVita, DVP/RVP (2006–2008); SCA, SVP Operations (2008–2009); SCA, EVP & COO (2009–2017) |
| Jennifer Sandoz | SCA, Director HR (2016–2017); SCA, Senior Director (2017–2020); SCA, VP HR (2021) |
| Allen Spradling | Director, IT Governance and Administration (2008–2013) |
| Doug Swope | HCA Healthcare, Manager, Executive Recruitment C-Level (1995–1998); HCA Healthcare, Director, HR Executive Recruitment (1998–2008); HCA Healthcare, Senior Director, HR (2008–2011); e+CancerCare (2011–2013); President, Surgical Care Partners (2013–Present) |
| Jimmy Tanner | Catapult Staffing, Director of Recruiting (2013–2016); Catapult Physician Staffing, VP of Recruiting & Strategic Accounts (2017–2018) |
| Kent Thiry | DaVita, Chairman and CEO (1999–2019); DaVita, Chairman and CEO, HealthCare Partners Inc. (2014–2020); DaVita, Executive Chairman of the Board of Directors (2019–2021) |
| James "Skip" Thurman | DaVita, Director (2010–2011); DaVita, Senior Director (2011–2013); DaVita, Senior Director, Communications (2014–2017); DaVita, VP (2017–2020) |
| Sean Taylor | DaVita, Senior Director of Business Development (2015–2016) |
| Leslie Wachsman | SCA, VP Finance & Investor Relations (2012–2018); SCA, GVP, Finance (2018–2019); SCA, CFO (2019–Present) |

| | |
|---|---|
| William ("Bill") Wilcox | USPI, President (2005–2011); USPI, CEO (2011-2018), Chairman (2018–2020); USPI, Consultant (2020–2023) |
| Kevin Zaideman | SCA, Compensation Senior Manager (2017–2020); SCA, Director of Compensation (2021–2022) |

## APPENDIX C

## REBUTTAL REPORT FIGURES

**Figure 1**[1050]



---

[1050] *See* my workpapers.

-263-



**Figure 2:  Total Returns for Work**[1051]



[1051] BARRY GERHART, COMPENSATION 15, Exhibit 1.5 (14th ed. 2023).

**Figure 3**

| | | Pre-Offer | | | | | Post-Offer (immediate) | | | | | Post-Offer (near term) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee | Job Title/Level | Salary | Performance | Salary/ Performance | Salary/ Performance Differential versus Row Below | Job Title/Level | Salary | Performance | Salary/ Performance | Salary/ Performance Differential versus Row Below | Job Title/Level | Salary | Performance | Salary/ Performance | Salary/ Performance Differential versus Row Below |
| 1 | SVP A | 160 | 4 | 40 | 1.33 | SVP A | 160 | 4 | 40 | 1.33 | SVP A | 207.0 | 4 | 51.8 | 1.33 |
| 2 | VP A | 120 | 4 | 30 | 1.20 | VP A | 120 | 4 | 30 | 0.92 | VP A | 155.5 | 4 | 38.9 | 1.20 |
| 3 | Director A | 100 | 4 | 25 | 1.00 | Director A | 130 | 4 | 32.5 | 1.30 | Director A | 130 | 4 | 32.5 | 1.00 |
| 4 | Director B | 125 | 5 | 25 | | Director B | 125 | 5 | 25 | | Director B | 162.5 | 5 | 32.5 | |
| | | | | | | | | | | | | | | | |
| | Salary Total Cost | 505 | | | | | 535 | | | | | 655 | | | |

**Figure 4: Estimated Short-Term Incentive/Variable (Bonus) Pay as a Percentage of Salary and Performance Basis, by Employee Group**[1052]

| Employee Group | Percentage of Organizations Where Eligible | Bonus/Variable Pay as a Percentage of Salary (Target) | | Performance Basis for Bonus Payout | | |
|---|---|---|---|---|---|---|
| | (A) | In Organizations Using Such Plans (B) | All Organizations (A x B) | Corporate | Division/Business Unit | Individual |
| Officers/executives | 99% | 49% | 49% | 62% | 19% | 19% |
| Exempt, salaried | 99 | 15 | 15 | 48 | 28 | 26 |
| Nonexempt, salaried | 48 | 6 | 3 | 44 | 29 | 26 |
| Nonexempt, hourly nonunion | 54 | 5 | 3 | 40 | 32 | 27 |

---

[1052] BARRY GERHART, COMPENSATION 349, Exhibit 10.2 (14th ed. 2023).

-266-

**Figure 5:  Allocation and Use of Long-Term Incentive Plans**[1053]

| Employee Group | Median Percentage of Long-Term Incentive Grants Allocated |
|---|---|
| CEO | 13% |
| Officers/executives (excluding CEO) | 50 % |
| Exempt, salaried | 25 % |
| Nonexempt, salaried | 0% |
| Nonexempt, hourly nonunion | 0% |
| | **Practices/Use** |
| Percentage of organizations using long-term incentive | 91 % |
| Number of long-term incentive plans used | |
| One plan | 18% |
| More than one plan | 82% |

---

[1053] BARRY GERHART, COMPENSATION 350, Exhibit 10.3 (14th ed. 2023).

**Figure 6:  Range Overlap**[1054]



---

[1054] BARRY GERHART, COMPENSATION 291, Exhibit 8.21 (14th ed. 2023).

**Figure 7:  Two Companies:  Same Total Compensation, Different Mixes**[1055]







---

[1055] BARRY GERHART, COMPENSATION 219, Exhibit 7.4 (14th ed. 2023).

**Figure 8:  What Shapes External Competitiveness?**[1056]

---

[1056] BARRY GERHART, COMPENSATION 220, Exhibit 7.5 (14th ed. 2023).

## APPENDIX D

## GERHART REPORT FIGURES

**Gerhart Report, Figure 11**[1057]

| RECOMMENDED SALARY INCREASES BY PERFORMANCE RATING AND COMPA-RATIO | | | | Table 12.3 Merit Increase Grid |
|---|---|---|---|---|
| | COMPA-RATIO[a] | | | |
| | 80–90% | 91–110% | 111–120% | |
| Performance rating | | | | |
| Exceeds expectations | 7% | 5% | 3% | |
| Meets expectations | 4 | 3 | 2 | |
| Below expectations | 2 | 0 | 0 | |

[a]Employee salary/midpoint of their salary range.

---

[1057] Gerhart Report ¶ 134, Figure 11 (citing RAYMOND NOE, JOHN HOLLENBECK, J. BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE 538 (13th ed. 2023)).

**Gerhart Report, Figure 12**[1058]



_____

[1058] Gerhart Report ¶ 135(b)(v), Figure 12 (citing SCA000078134)

-274-

**Gerhart Report, Figure 14**[1059]



---

[1059] Gerhart Report ¶ 148(a)(vi)(A), Figure 14 (citing Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854).

**Gerhart Report, Figure 15[1060]**

**FIGURE 2**  **Total Salary Budget Increases, by Employee Category**

Salary Budget Increases (zeros included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 2.9% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% |
| Exempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Officers/Executives | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| All | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |

Salary Budget Increases (zeros not included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Exempt Salaried | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |
| Officers/Executives | 3.1% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% |
| All | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |

---

[1060] Gerhart Report ¶ 152, Figure 15 (citing WORLDATWORK, SALARY BUDGET SURVEY at 20 (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf).