# Exhibit 6
Lane Declaration


Redacted

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In Re Outpatient Medical Center Employee Antitrust Litigation | Case No. 1:21-cv-00305 <br><br> **HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL/EXPERTS ONLY** |

# EXPERT REPORT OF JUSTIN MCCRARY, PH.D.

## April 16, 2025

# Table of contents

**1. Introduction** ...............................................................................................................................**5**

1.1. Qualifications ......................................................................................................................5

1.2. Allegations and Summary of Opposing Expert Opinions ......................................................6

1.3. Assignment .......................................................................................................................13

1.4. Summary of Opinions .......................................................................................................14

**2. The Alleged Conduct, Assuming it Occurred, Would Not Have Had a Common Impact on Proposed Class Members** ........................................................................................................................ **24**

2.1. Plaintiffs' Experts Have Not Explained How Impact Could Possibly Be Common Given That Proposed Class Members Participate in Different Labor Markets with Varying Competitive Circumstances and Many Non-Defendant Employers.........................................................................................................................25

2.1.1. Plaintiffs' Experts Do Not Properly Analyze the Relevant Labor Markets or Market Power for Proposed Class Members ..................................................................................................26

2.1.2. Proposed Class Members Participate in Different Labor Markets with Widely Varying Employment Options, Including Many Non-Defendant, and Even Non-Healthcare, Firms.....................29

2.1.3. Proposed Class Members Have Widely Varying Skills and Preferences.........................45

2.1.4. Defendants Face Varying Competitive Pressures When Setting Compensation, and Lack Market Power Sufficient to Suppress Pay for Many or Most (if Not All) Proposed Class Members.....................53

2.2. Plaintiffs' Experts Have Not Demonstrated that Proposed Class Members Not Directly Affected by the Challenged Conduct Would Be Indirectly Affected Through a Rigid Pay Structure.............................61

2.2.1. Evidence Indicates that Proposed Class Members' Pay is Highly Individualized and That Defendants Did Not Have Rigid Pay Structures Through Which Changes in Pay for One Group of Proposed Class Members Would Be Transmitted to All (or Nearly All) Other Proposed Class Members .............................64

2.2.2. Empirical Analysis is Inconsistent with Plaintiffs' Claimed Rigid Pay Structures and Consistent with Proposed Class Members' Pay Being Individualized.......................................................81

2.2.3. Plaintiffs' Experts Fail to Properly Consider Qualitative Evidence That is Inconsistent with Defendants Having Rigid Pay Structures Or Job-Specific Pay Ranges and Grades for Class Positions Throughout the Class Period ..............................................................................................................100

**3. Many Proposed Class Members Could Not, Or Would Not, Be Harmed by The Alleged Conduct, And It Is Not Possible to Reliably Measure Harm Using Common Evidence** ..............................................**106**

3.1. Proposed Class Members Who Participate in Labor Markets Where Defendants Do Not Have Market Power Could Not Have Been Harmed by the Alleged Conduct.......................................................... 108

***3.2. Plaintiffs Have Not Demonstrated that Proposed Class Members Not Directly Impacted by the Alleged Conduct Would Be Harmed, And Many (If Not All) Would Not Be*** .....................................110

3.3. Pay for Proposed Class Members Newly Hired from Somewhere Other than Defendant Firms Could Not Have Been Harmed by Alleged Conduct, At Least Initially, and Possibly Ever..........................................111

3.4. Any Proposed Class Members Whose Alleged Pay Suppression Was Entirely Offset by Increases in Equity Would Not Have Been Harmed by the Alleged Conduct ......................................................................120

3.5. Proposed Class Members Employed by DaVita and USPI Who Would Not Consider Employment Options at SCA Could Not be Directly Harmed by the Alleged Mobility Restrictions..................................................................... 121

3.6. Any Proposed Class Members Who Would Not Engage with Any Solicitation Outreach Could Not be Directly Harmed by the Alleged Mobility Restrictions.......................................................................................................... 121

3.7. Proposed Class Members Whose Mobility Between Defendants Was Already Restricted Would Not Have Been Directly Harmed by the Alleged Mobility Restrictions in Some Cases, and in Other Cases Would Have Been Less Harmed ...............................................................................................................................................................122

3.8. Common Evidence Cannot Be Used to Reliably Quantify the Extent of Harm for Proposed Class Members (If Any) Who Were Impacted by the Alleged Conduct For Several Other Reasons .............................................................132

**4. The Compensation Information Allegedly Shared Between Defendants Could Have Had Procompetitive Effects, Was Not Sufficient to Coordinate on Pay, And Even If It Were, Would Not Have Had Common Impact ...................................................................................................................................................................................136**

4.1. The Alleged Information Sharing between Defendants Cannot be Assumed to be Anticompetitive and Could Have Procompetitive Effects..........................................................................................................................................138

4.2. The Information Allegedly Shared by Defendants Would Not be Sufficient to Suppress Pay, Even by Plaintiffs' Experts' Own Standards................................................................................................................................................145

4.3. The Impact of the Alleged Information Sharing on Proposed Class Members' Pay Would Not be Common......158

4.3.1. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Due to Their Varied Employment Opportunities, and the Varied Competition that is Implied for Their Labor..........................159

4.3.2. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Who Worked for Defendants at Different Times ...................................................................................................................159

4.3.3. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Based on Performance ...............................................................................................................................................................160

4.3.4. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Based on their Compensation Mix.............................................................................................................................................. 161

**5. Prof. Starr Has Not Developed a Reliable Methodology to Assess Impact and Damages Stemming from the Challenged Conduct.............................................................................................................................................................164**

5.1. Empirical Evidence Does Not Show a Reduction in Mobility Between Defendants During the Class Period ......164

5.1.1. Prof. Starr's Own Empirical Analysis Does Not Demonstrate that Mobility Was Lower During the Class Period ..........................................................................................................................................................................166

5.1.2. Prof. Starr's Mobility Regression Analysis is Fundamentally Flawed and Unreliable.....................................172

5.2. Prof. Starr Has Not Developed a Reliable Methodology to Estimate Whether, and by How Much, Proposed Class Members' Pay Changed Due to the Alleged Conduct................................................................................................ 175

5.2.1. Prof. Starr's Findings are Factually Implausible and Inconsistent with the Reality of How Proposed Class Members' Pay and Turnover Rates Evolved Before, During, and After the Class Period .........................................176

5.2.2. Prof. Starr's Pay Regression Model Suffers from Methodological Flaws and His Estimated Effect Cannot Be Interpreted as the Change in Proposed Class Members' Pay Caused by the Alleged Conduct .................................184

5.2.3. The Alleged Suppression of Pay Measured by Prof. Starr's Pay Regression Model Disappears Once Certain Obvious Flaws are Corrected.....................................................................................................................................202

5.2.4. Prof. Starr's Pay Regression Model is Highly Sensitive to the Class Period Dates Selected by Plaintiffs, Which Have Changed Over Time................................................................................................................................210

5.2.5. Prof. Starr's Pay Regression Model Extrapolates a Conduct Estimate Based on a Subset of Proposed Class Members ........................................................................................................................................................... 215

5.3. Prof. Starr's Pay Regression Model is Not Properly Linked to the Alleged Conduct, as it Assumes a Single Effect Across Numerous Forms of Conduct That Varied in Nature and Timing ........................................................................ 216

**6. Prof. Starr's Pay Regression Model Does Not Demonstrate Common Impact During the Class Period, Nor Does It Even Measure the Effect of the Alleged Conduct on Pay Using All or Nearly All Proposed Class Members ........................................................................................................................................................... 222**

**7. Pay Structures Capable of Generating Classwide Impact, As Plaintiffs' Experts Contend, Would Also Generate Upward Pressure on Pay for All or Nearly All Proposed Class Members ................................................ 230**

**8. Plaintiffs' Criteria for the Proposed Class are Not Objective ........................................................................................ 232**

Highly Confidential – Outside Counsel/Experts Only

# 1. INTRODUCTION

## *1.1. Qualifications*

1. I am an economist with expertise in labor economics, antitrust, corporations, law and economics, economic modeling, and statistical methods, among other subjects. I hold an A.B. in Public Policy from Princeton University (1996) and a Ph.D. in Economics from the University of California, Berkeley ("Berkeley") (2003). I currently hold the position of Paul J. Evanson Prof. at the Law School at Columbia University ("Columbia"), and previously held academic positions at the University of Michigan ("Michigan") (2003–2007) and Berkeley (2008–2019). Over the course of my academic career, I have taught courses on labor economics, antitrust, corporations, law and economics, and statistics to undergraduates, M.B.A., J.D., L.L.M., and Ph.D. students.

2. From September 2009 until July 2014, I co-directed the Law and Economics Program at Berkeley Law. From 2017 to 2019, I was a member of the Board of Directors of the American Law and Economics Association. I currently serve on the Board of Editors of the *Journal of Law and Economics*.

3. While at Berkeley, I served as the Founding Director of the Social Sciences Data Laboratory ("D-Lab") from June 2014 to June 2017. At D-Lab, I lectured on and advised graduate students and faculty regarding high performance computing, statistical software, and statistical techniques.

4. I have been a Faculty Research Associate of the National Bureau of Economic Research ("NBER") since 2012. I was first asked to join the NBER in 2006 as a Faculty Research Fellow, and I co-directed the NBER Economics of Crime Working Group from 2008 to 2019. The NBER is the preeminent professional association of economists in the world, with over 1,800 members worldwide.

5. My research spans a diverse range of topics, including labor economics, antitrust, econometric and statistical methodology, and other topics. I have published papers in leading journals within economics, such as the *American Economic Review*, the *Review of Economics and Statistics*, the *Journal of Economic Literature*, and the *Journal of Econometrics*. Over the years, my research has been supported by Michigan, Berkeley, Columbia, the MacArthur Foundation, the NBER, the National Institutes of Health, the National Science Foundation, the Arnold Foundation, and the Robert Wood Johnson Foundation.

6. I regularly review articles for the leading peer-reviewed journals within economics, including *Econometrica*, the *American Economic Review*, the *Quarterly Journal of Economics*, the *Journal of Political Economy*, the *Review of Economic Studies*, the *Journal of Econometrics*, the *Review of Economics and Statistics*, and the *American Law and Economics Review*. Peer review specifically focuses on assessing whether submitted manuscripts are employing methodologies that are consistent with academic standards.

7. ███████████████████████████████████████████████████████ ███████████████████. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter. A copy of my curriculum vitae, including my previous testimony, is included as Appendix A. A list of the materials I have relied upon in forming my opinions is included as Appendix B.

### 1.2. Allegations and Summary of Opposing Expert Opinions

8. Plaintiffs allege that at different points in time between May 2008 and January 2021, DaVita Inc. ("DaVita"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC ("SCA"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation ("USPI") (collectively "Defendants") conspired to "reduce and limit compensation and mobility of their employees."[1] Specifically, Plaintiffs claim that Defendants "entered into agreements to avoid competing for employees, particularly those at the director level or above ('Senior Employees'), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers."[2] Plaintiffs challenge two forms of conduct: (1) alleged "no-poach agreements," and (2) alleged collusive "exchange[s] [of] competitively

---

[1] Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024 ("Third Amended Complaint"), ¶ 38, ¶ 92 ("All natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 2010 to January 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries. Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.").

[2] Third Amended Complaint, ¶ 7.

sensitive information" ("CSI").[3] Plaintiffs claim that the alleged information exchanges were used in addition to the alleged mobility restrictions to suppress compensation and "assure each [Defendant] that they did not need to increase pay levels as much as they otherwise would have[.]"[4] In this report, I will refer to both forms of conduct collectively as the "alleged conduct" or the "challenged conduct," to the alleged conduct concerning the no poach agreements specifically as the "alleged mobility restrictions" or "challenged mobility restrictions," and to the conduct concerning the alleged exchanges of competitively sensitive information as the "alleged information sharing" or "challenged information sharing."

9. Plaintiffs claim that the alleged mobility restrictions impacted all proposed class members, not just those who were allegedly not solicited or hired as a result of the alleged mobility restrictions, because of Defendants' "formal compensation systems" that allegedly spread pay suppression for some proposed class members to all or nearly all other proposed class members.[5]

10. Plaintiffs allege that the challenged conduct had the effect of restricting competition and lowering pay for proposed class members.[6] Plaintiffs allege that it did so by denying proposed class members "access to job opportunities," "restrict[ing] their mobility," "depriv[ing] them of significant information that they would have used to negotiate for better compensation and terms of employment," and "eliminat[ing] the need for compensation increases to preempt competitive offers and retain employees."[7] Plaintiffs allege they are seeking to certify a class comprised of all DaVita, SCA, and USPI employees in the United States with job positions at the director-level and above, excluding senior corporate officers and employees in human resources, recruiting, and legal departments (hereafter referred to as "Senior Employees" or "proposed

---

[3] Third Amended Complaint, ¶ 38 ("In furtherance of the conspiracy, Defendants, and each of them, (i) entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees, and (ii) exchanged competitively sensitive information to fix and maintain the compensation of their employees.").

[4] Third Amended Complaint, ¶ 82.

[5] Third Amended Complaint, ¶¶ 74, 78, 80 ("Because of such formal systems, however, Defendants' no-poach agreements would have affected the proposed Class as a whole, and not just individual employees who would have otherwise received job offers from rival companies in the industry.").

[6] Third Amended Complaint, ¶ 105 ("Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through no-poach agreements, and through exchanging competitively sensitive information, thereby fixing and suppressing Class members' compensation.").

[7] Third Amended Complaint, ¶ 11.

class members") who worked at SCA or DaVita from May 2008 to January 2021, and at USPI from May 2010 to January 2021.[8]

11. Plaintiffs have disclosed two experts: Prof. Evan Starr, a labor economist, and Prof. Barry Gerhart, who studies industrial relations.[9]

12. Plaintiffs' experts analyzed a purported "Class Period" that varies by Defendant: for SCA and DaVita, it is May 1, 2008 to December 31, 2019, but for USPI, it is May 1, 2010 through December 31, 2019.[10] This Class Period departs from what was alleged in the Third Amended Complaint (the operative complaint in this matter): there, Plaintiffs defined a class period of May 2008 to January 2021 for SCA and DaVita, and May 2010 to January 2021 for USPI.[11] It also differs from what was alleged in the criminal indictments against SCA and DaVita. The indictment against SCA alleged that the agreement between SCA and USPI was in place from May 2010 to October 2017. The indictments against SCA and DaVita both alleged that the agreement between SCA and DaVita occurred from February 2012 to July 2017.[12] Finally, the periods alleged

---

[8] Third Amended Complaint, ¶ 92 ("All natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 2010 to January 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries. Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.").

[9] Amended Expert Witness Report of Dr. Evan P. Starr, January 21, 2025, and Backup Materials ("Starr Report"), ¶ 1 ("I specialize in performing economic and statistical analyses of labor markets, with a focus on earnings and restrictions on employee mobility."); Amended Expert Witness Report of Dr. Barry Gerhart, February 11, 2025, and Backup Materials ("Gerhart Report"), ¶ 1 ("I have taught courses on Compensation Management, Human Resource Management, and Research Methods at all three universities [...] I received a Ph.D. in Industrial Relations from the University of Wisconsin-Madison[.]").

[10] Starr Report, ¶ 9 ("I understand that Plaintiffs seek to certify a class of employees who worked in positions at the director-level and above (hereafter 'Senior-Level Employees') for one or more of the following: (a) from May 1, 2008, through December 31, 2019, Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, through December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries ('hereafter the 'Class' or 'Class Members')"); Gerhart Report, ¶ 5 ("I understand that Plaintiffs are seeking certification of a class of employees who worked in positions at the director-level and above (hereafter 'Senior-Level Employees') in the United States for one or more of the following: (a) from May 1, 2008 to December 31, 2019 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, to December 31, 2019 for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008 through December 31, 2019 for DaVita Inc. or one of its subsidiaries (hereafter, 'the Class' or 'Class Members').").

[11] Third Amended Complaint, ¶ 92.

[12] Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC,* January 5, 2021 ("Indictment of SCA"), ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017, the exact dates being unknown to the Grand Jury, in part in the Northern District of Texas and elsewhere, SCA and Company A [USPI] entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees."), ¶ 17 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates being unknown to the Grand Jury, in part in the Northern District of Texas and elsewhere, SCA

by Plaintiffs also differ from those Plaintiffs alleged in the Consolidated Amended Class Complaint and the Second Amended Complaint: there, Plaintiffs defined a class period of May 1, 2010 to January 5, 2021 for SCA and USPI, and February 1, 2012 through January 5, 2021 for DaVita.[13]

13. Besides the class period at issue, there are also at least two other instances where Plaintiffs' allegations in their pleadings or to the court and in Plaintiffs' experts' assertions are not in alignment.

- First, although Plaintiffs claim a conspiracy between DaVita, SCA, and USPI, nowhere in the Third Amended Complaint do Plaintiffs allege facts supporting any alleged mobility restrictions or alleged information sharing between DaVita and USPI.[14] Plaintiffs' expert reports and testimony also do not discuss any evidence of mobility restrictions or information sharing between DaVita and USPI. Prof. Starr claimed during his deposition that DaVita was "a partner" to the alleged mobility restrictions and information sharing with SCA, but not with USPI.[15] He presents no qualitative evidence in his report of

and Company B [DaVita] entered into and engaged in a conspiracy to suppress competition between them for the services for senior-level employees by agreeing not to solicit each other's senior-level employees."); Indictment, *United States of America v. DaVita Inc. and Kent Thiry,* November 3, 2021, ¶ 9 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates being unknown to the Grand Jury, in part in the District of Colorado and elsewhere, DAVITA and THIRY entered into and engaged in a conspiracy with SCA to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.").

[13] Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, August 9, 2021 ("Consolidated Amended Class Complaint"), ¶ 101 ("All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCA Holdings, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holding Company, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries"); Second Consolidated Amended Class Action Complaint, In Re Outpatient Medical Center Employee Antitrust Litigation, June 6, 2023 ("Second Amended Complaint"), ¶ 101 ("All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries").

[14] For instance, while the Third Amended Complaint broadly alleges a global 'overarching conspiracy', it elsewhere more specifically alleges two bilateral agreements. Specifically, it claims that (1) SCA and DaVita and (2) SCA and USPI agreed not to poach each other's employees without making any such claim between USPI and DaVita. See Third Amended Complaint, ¶ 7, ¶ 105, p. 12 ("In Furtherance of the Conspiracy, SCA and DaVita Agree Not to Poach Each Other's Employees"), p. 14 ("In Furtherance of the Conspiracy, SCA and USPI Agree Not to Poach Each Other's Employees").

[15] Deposition of Evan P. Starr, Ph.D. (Expert), March 19, 2025 ("Starr Deposition, Volume I"), p. 38 ("Q. And you were not asked to assess whether the evidence is consistent or inconsistent with anticompetitive conduct with regard to any solicitation agreement between USPI and DaVita; correct? A. That's correct. [...] Q. And you're not offering an opinion that there was such an agreement; is that correct? A. As written here, I have no opinion on the existence or nonexistence of an agreement between DaVita and USPI."), p. 216 ("████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████

any agreement or information sharing  between DaVita and USPI, and in fact excludes moves between DaVita and USPI when analyzing mobility between Defendants.[16] Prof. Gerhart similarly discusses no evidence related to any agreement or information sharing between DaVita and USPI.[17] That is, Plaintiffs' experts only assert evidence regarding alleged dyadic agreements between SCA and DaVita, on the one hand, and SCA and UPSI, on the other hand. Plaintiffs' experts do not assert any evidence regarding an alleged overarching agreement.

- Second, while the Third Amended Complaint alleges a no hire agreement in addition to a no solicit agreement, Prof. Starr and Prof. Gerhart's reports and deposition testimony taken together do not support a no hire agreement.[18] Specifically, in his summary of conclusions, Prof. Starr describes the alleged mobility restrictions between SCA and DaVita, and SCA and USPI, as agreements ███████ ██████████████████████████████████████████████ ██████████████████████████████ (emphasis added).[19] Then when discussing the challenged conduct in Section IV.B of his report, he says ████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████ ██████████████████████████████████ ███████████████████████████ █████████████████████ (emphasis added).[20] He also explains that the "tell-your-boss" provision whereby employees allegedly had to

---

[16] Starr Report, ¶ 83 ("████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████"). This is consistent with Starr Report, Figure 3, which does not analyze mobility between DaVita and USPI. See Starr Report, Figure 3.

[17] Gerhart Report, ¶ 22 ("Plaintiffs allege that the Defendants established two No-Poach Agreements as part of their overarching conspiracy to suppress labor market competition: a. The SCA-DaVita No-Poach Agreement [...] The SCA-USPI No-Poach Agreement.").

[18] Third Amended Complaint, ¶ 7 ("Beginning no later than 2008, however, Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above ('Senior Employees'), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers."), ¶ 39 ("Defendants participated in meetings, conversations, and communications to discuss the solicitation and compensation of each other's employees, and agreed during those meetings, conversations, and communications not to solicit each other's employees and to suppress the wages of their employees.").

[19] Starr Report, ¶ 12.

[20] Starr Report, ¶ 19.

inform their current employer they intended to seek employment elsewhere (before the recruiting and hiring process would be completed) was added "later" for both the SCA-DaVita and SCA-USPI alleged mobility restrictions.[21] Prof. Starr further testified in his deposition that he does not have an opinion as to the exact contours of the alleged mobility restrictions (e.g., whether they prevented hiring), but he explained that it is his understanding that the "tell-your-boss" provision further "dampened" (but did not necessarily prevent) mobility between Defendants.[22] Similarly, Prof. Gerhart testified in his deposition that the "tell your boss" provision did not prevent hiring (and therefore was weaker than a no hire agreement), and claimed in his report that the "tell your boss" provision was added to the alleged mobility restrictions in 2011 or 2012.[23] Thus, although Plaintiffs allege a no solicit and no hire agreement, Plaintiffs' experts appear to assert that there were no solicit agreements initially (from May 2008 until approximately 2011 or 2012), and then when the "tell-your-boss" provision was adopted, the agreements became more restrictive.

14. Prof. Starr opines that his analysis demonstrates ███████████ ████████████████████████████████████████████ ██████████████████████████[24] Prof. Starr also opines that █████ ████████████████████████████████████████████



---

[21] Starr Report, ¶ 70 ("███████████████████████████████ █████████"), ¶ 77 ███████████████████████████████████ ██████████████████████████████████████████████ █████████████████████████""").

[22] Starr Deposition, Volume I, p. 54 ███████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████""").

[23] Deposition of Barry Gerhart, Ph.D. (Expert), March 5, 2025 ("Gerhart Deposition"), pp. 96–100 ("████████████ ███████████████████████████"); Gerhart Report, ¶ 22 ███████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████""").

[24] Starr Report, ¶ 12 ████████████████████████████████ ██████████████████████████████████████████████ ███████.



.[25] Additionally, based on his pay regression model findings, Prof. Starr opines that Defendants had market power over proposed class members.[26]

15. For his part, Prof. Gerhart opines that Defendants ████████████ ████████████████████████████[27]████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████[28]████████████████████ ████████████████████████████████[29]████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████[30] As he testified in his deposition, Prof. Gerhart's opinions are supported only by qualitative evidence and academic literature, as opposed to any quantitative analysis of Defendants' compensation data.[31]



[25] Starr Report, ¶ 12 ("████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████").

[26] Starr Report, ¶¶ 12, 196.

[27] Gerhart Report, ¶ 7 ("████████████████████████████████ ████████████████████████████████████████").

[28] Gerhart Deposition, pp. 33–34 ("████████████████████████ ████████████████████████████.").

[29] Gerhart Report, ¶ 82 ("████████████████████████████████ ████████████████████████████████").

[30] Gerhart Report, ¶ 8 ("████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████").

[31] Gerhart Deposition, p. 208 ("████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████").

### 1.3. Assignment

16. Counsel for Defendants have asked me to evaluate the analysis and opinions in Prof. Starr and Prof. Gerhart's expert reports and address the following questions:

   a. Assuming the alleged conduct occurred, would it be expected to have had a common impact on proposed class members? Have Plaintiffs' experts Prof. Starr and Prof. Gerhart demonstrated that it would?

   b. Have Plaintiffs' experts sufficiently analyzed the alleged conduct in the context of:

      i. the labor markets in which proposed class members participate?

      ii. whether Defendants had market power sufficient to suppress pay for proposed class members in any such claimed antitrust labor market?

      iii. the way in which Defendants set compensation, including whether Defendants pay was structured in such a way that any impact from the alleged conduct would have been spread or could be measured classwide?

   c. Are there groups of proposed class members who, from an economic perspective, could not or would not be harmed by the alleged conduct? Can common evidence be used to determine whether a given proposed class member was impacted, and by how much he or she was harmed?

   d. Have Plaintiffs' experts demonstrated that the alleged information sharing was anticompetitive and part of an agreement to coordinate on pay, that the information shared would be sufficient to effectuate successful coordination on pay, or that any impact from the alleged information sharing, assuming it occurred, would be common to proposed class members?

Highly Confidential – Outside Counsel/Experts Only

e. Have Plaintiffs' experts proposed a reliable methodology based on common evidence that measures the impact *caused by* the alleged conduct, appropriately accounting for the various forms of alleged conduct?

i. Does Prof. Starr's pay regression model demonstrate that pay was suppressed for proposed class members, on average? Does it further demonstrate that pay was suppressed classwide?

f. Finally, have Plaintiffs provided a class definition that is clear and based on objective criteria, such that proposed class members may be identified using common evidence?

17. I do not express an opinion about whether the alleged conduct (both the alleged mobility restrictions and the alleged information sharing) occurred. Rather, my analysis focuses on whether the alleged conduct, assuming it occurred, had an economic impact on proposed class members, and whether that impact was experienced classwide and can be reliably assessed using common evidence. Further, my analysis relies on the Class Period that Plaintiffs' experts analyzed in their reports (which extends through December 31, 2019), unless otherwise specified.

18. In forming my opinions, I have relied on several sources of information, including deposition testimony in this matter; documents produced by Plaintiffs, Defendants, and third parties in this matter; documents produced in *United States of America v. DaVita Inc. and Kent Thiry*; employment and compensation data produced by Defendants; publicly available data on employment and compensation; and proprietary data on employment histories for healthcare employees.

### 1.4. Summary of Opinions

19. I understand that at this phase of the litigation, the Court needs to determine whether Plaintiffs have put forward a reliable methodology, based on information common to the class, that can be used to assess whether the challenged conduct caused harm to, and impacted, all or nearly all of the proposed class members. It is my opinion that Plaintiffs' experts have failed to do so. My own analysis indicates that any impact caused by the challenged conduct would not have been common, and, moreover, that it would not be

Highly Confidential – Outside Counsel/Experts Only

possible to reliably measure any impact or harm using common evidence given the unique context of this case including among other things the diversity of proposed class members, the many and varied job options available to them, and the individualized nature of compensation for Defendants' senior-level employees such as proposed class members. In addition, I find that Plaintiffs have failed to demonstrate that the challenged conduct suppressed pay on average, let alone classwide. I detail my findings further below.

20. First, Plaintiffs' claims are at odds with how labor market competition, and compensation decisions, for proposed class members actually occur. Once I properly account for the reality of how Defendants compete for labor and set compensation, I find that the alleged conduct, assuming it occurred, would not have had a common impact on proposed class members (**Section 2**).

a. Plaintiffs and their experts assume that Defendants had market power sufficient to suppress pay for proposed class members. This assumption ignores a basic fact: proposed class members have widely varying skills, job titles, employment preferences, and outside employment options that include many non-Defendant, and even of course non-healthcare-related, firms. Using proprietary data, which shows prior and next employers for individuals employed by Defendants in class positions, I find that Defendants face extensive competition from non-Defendant firms for proposed class members' labor: non-Defendant firms are the prior or next employers for more than 98% of moves to or from a Defendant. This aligns with Prof. Starr's own analysis using produced data, which shows that at least ████ of departures from Defendants on an annual basis did not involve a move between USPI and SCA, or between SCA and DaVita. This also aligns with qualitative evidence, which shows that Defendants recruited and hired proposed class members from many firms besides Defendants. Together, these results are incompatible with Plaintiff's contention that the three Defendants have labor market power sufficient to suppress pay for all or nearly all proposed class members, and mean that any effect of the alleged conduct on pay would not be common. Individualized inquiry into the suitable employment options for a given individual would be necessary to assess who is and is not harmed. Despite the need for individualized inquiry, it is evident that, for many or most (if not all) proposed class members, Defendants did not have market power sufficient to

suppress pay, given the abundance of alternative employers besides Defendants that I observe in my analysis of employment histories (**Section 2.1**).

b. Further, Plaintiffs and their experts unreasonably assume that proposed class members who were not directly affected by the alleged conduct were nonetheless indirectly affected through a rigid pay structure that supposedly links together pay for each of the proposed class members. This assumption is problematic because it ignores the reality of how Defendants set compensation. Qualitative evidence shows that the Defendants engaged in individualized negotiations and considered individualized factors when setting pay. Quantitative evidence shows that, consistent with proposed class members pay being individualized, and inconsistent with rigid pay structures, (1) there is wide variation in pay across proposed class members, even among those at the same seniority level (e.g., Administrator, Director, Vice President, etc.), (2) there is substantial overlap in the observed pay ranges for adjacent seniority levels, and (3) proposed class members' pay does not generally move together over time. Moreover, Plaintiffs' experts' qualitative and quantitative evidence, which they purport shows that Defendants had rigid pay structures, fails to do so. Prof. Starr's quantitative evidence does not speak to whether Defendants had rigid pay structures sufficient to generate classwide impact, and generates results inconsistent with Plaintiffs' claimed rigid pay structures once basic corrections are made. Prof. Starr and Prof. Gerhart additionally fail to properly consider qualitative evidence showing that Defendants did not have job-specific pay ranges and grades for class positions throughout the Class Period (**Section 2.2**).

21. Second, from an economic perspective, there are several groups of proposed class members who could not or would not have been harmed by the alleged conduct. Identifying exactly which proposed class members belong to each of these groups would require individualized inquiry (**Section 3**). These groups of proposed class members include the following:

a. First, proposed class members who participate in labor markets where Defendants do not have labor market power could not have been harmed by the alleged conduct. This is because without market

power, Defendants would not be able to suppress pay. Evidence of extensive competition from non-Defendant employers for proposed class members' labor demonstrates that Defendants would not have had market power sufficient to suppress pay for many or most (if not all) proposed class members (**Section 3.1**).

b. Second, proposed class members who were not directly affected by the alleged conduct could only have been indirectly harmed through Plaintiffs' claimed rigid pay structures. However, quantitative and qualitative evidence militate against the existence of a rigid pay structure capable of classwide harm. As a result, Plaintiffs and their experts have not shown that all or nearly all individuals not directly affected by the alleged conduct would be harmed indirectly, and many (if not all) would not be (**Section 3.2**).

c. Third, proposed class members who were newly hired during the Class Period from a non-Defendant firm (or after graduating from school or returning to work after time off) could not be harmed by the alleged conduct, at least initially, and possibly ever. Compensation for new hires is set competitively at the time of hire (because Defendants and non-Defendant firms alike could compete for such workers), and it would take time for new hires' pay to be impacted by the conduct. Plaintiffs' experts have provided no methodology for identifying when newly hired individuals would transition from no harm at hire to the claimed harms later on, if ever. ███████████████████████████ ████████████████. Pay suppression for new hires would be unlikely to occur through pay cuts as economics teaches that it is rare for nominal wages to fall. The other option would be to suppress new hires' pay by withholding or reducing pay increases year after year, but this is not plausible given substantial pay increases experienced by new hires during Class Period years: the median new hire experienced annual pay increases which averaged ██% during the Class Period. Similarly, individuals who were employed by Defendants at the start of the Class Period but who had short tenures could not be harmed, at least initially, and possibly ever. Like new hires, those individuals' pay would be competitive at the start of the Class Period (since it was set prior to the onset of any alleged conduct) and would take time to be affected (if ever). I

roughly approximate the share of proposed class members who could not be harmed by the alleged conduct for these reasons by computing ████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████ (**Section 3.3**).

d. Fourth, any proposed class members whose compensation was highly skewed toward equity pay, and who held a large amount of equity from Defendant firms, could have been unharmed, or possibly even benefited, from the alleged conduct. As Prof. Gerhart explains, proposed class members with substantial equity may have benefited from any alleged scheme to suppress pay because, under Plaintiffs' theory, it would have made their equity more valuable than it would have been absent the alleged conduct (**Section 3.4**).

e. Fifth, proposed class members employed by DaVita or USPI who would not consider employment with SCA, for example due to location considerations, could not have been directly harmed by the alleged mobility restrictions given that Plaintiffs' experts have presented no evidence of mobility restrictions between DaVita and USPI (**Section 3.5**).

f. Sixth, proposed class members who would not engage with solicitation outreach (for example because they would not consider changing jobs) could not be directly harmed by the alleged mobility restrictions (**Section 3.6**).

g. Seventh, proposed class members whose inter-Defendant mobility was already restricted for other reasons could not be directly harmed by the alleged mobility restrictions, at least in some cases. Reasons proposed class members' inter-Defendant mobility may have already been restricted include (1) having a non-compete agreement which prevented movement to at least some other Defendant firms, which was common among senior-level employees at SCA and USPI; (2)

contractual recruiting and hiring limitations agreed to by external recruiting firms used by Defendants; and (3) having substantial unvested equity (**Section 3.7**).

22. I also discuss several additional reasons why it is not possible to use evidence common to the proposed class to reliably quantify harm (if any) (**Section 3.8**).

23. Third, Plaintiffs' experts have not established that the information allegedly shared by Defendants was shared for anticompetitive reasons, and it could have increased compensation for proposed class members rather than enabled pay suppression. The information allegedly shared by Defendants was also insufficient to support coordination on pay throughout the Class Period even assuming that was the goal, and would not have had a common impact on proposed class members pay even assuming it was used anticompetitively and was sufficient to support coordination on pay (**Section 4**).

    a. Plaintiffs' experts have no evidence that information was shared for purposes of coordinating on pay, and admit as much. From an economic perspective, compensation-related information can be used by firms to improve their compensation offers and enhance competition, just as much as it could be used to collude. It is therefore possible the information sharing had procompetitive effects, i.e., improved pay for at least some proposed class members, and Plaintiffs' experts have failed to consider or address this possibility (**Section 4.1**).

    b. Plaintiffs' experts have also failed to establish that the information sharing was sufficient to support a conspiracy to suppress pay throughout the Class Period. Much of the evidence Plaintiffs' experts point to does not concern actual sharing of information, or is not related to compensation. Their evidence of compensation-related information sharing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ demonstrates that the information sharing did not occur regularly (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) and thus was insufficient to sustain a conspiracy to coordinate on pay over a Class Period spanning 10 to 12 years depending on the Defendant. It was also aggregate in nature

for each firm (i.e., for the entire firm or for broad groups of employees at the firm). For example, it would not even allow for the calculation of average pay for individuals in a particular job. Indeed, this information does not even meet Prof. Starr's own criteria stated in his report regarding the types of information that when shared can lead to anticompetitive outcomes due to its aggregated nature, and lack of information about specific salaries (**Section 4.2**).

   c.   Even assuming for the sake of argument that the alleged information sharing was undertaken with a goal of suppressing pay, and that the information shared was sufficient to support a conspiracy to suppress pay, impact stemming from the alleged information sharing would not be common. There are several reasons for this, including variation across proposed class members in labor market opportunities (and thus whether Defendants would have market power), performance, which years of the Class Period they were employed by Defendants, and their compensation mix (i.e., what share of their total compensation came from salary versus bonus versus equity versus other types of pay) (**Section 4.3**).

24. Fourth, Prof. Starr has not developed a reliable methodology to measure impact and damages stemming from the alleged conduct (**Section 5**).

   a.   Although Plaintiffs, Prof. Starr, and Prof. Gerhart all assert that mobility would be suppressed by the alleged conduct, Prof. Starr's own analysis examining the inter-Defendant mobility of proposed class members does not demonstrate that mobility was suppressed throughout the Class Period, or that mobility was statistically significantly lower during the Class Period as compared to before and after the Class Period. This fact alone is critical: a reduction in mobility underpins Plaintiffs' theory of harm with regard to the alleged mobility restrictions, and Plaintiffs have no evidence that mobility was impacted by the alleged conduct. A far more significant takeaway from Prof. Starr's mobility analysis is that it shows that



, a fact that is consistent with Defendants facing extensive competition from non-Defendant firms

for proposed class members' labor throughout the Class Period (**Section 5.1**).

b.  When I compare proposed class members' pay to pay for a benchmark group of medical and health services managers in the health care and social assistance industry (one that Prof. Starr incorporates in his own pay regression analysis), I find proposed class members' pay trended similarly to, or even grew at a faster rate than, the benchmark group during most years before, during, and after the Class Period, a pattern that is wholly inconsistent with Prof. Starr's finding that ███████████████████████████ ██████. This inconsistency is not surprising, as Prof. Starr has not identified a reliable methodology that measures impact caused by the alleged conduct. The fact that Prof. Starr's pay regression model fails as a matter of causation is evidenced by issues with Prof. Starr's "before-after" methodology that are raised in the economics literature. Moreover, Prof. Starr's pay regression model does not even demonstrate ████████████████████ ████████████████████████████████ ████████████████████████ ████████████████████████. His pay regression model also does not demonstrate an average reduction in pay when I consider alternative class period dates (which is notable, since these dates have changed considerably over time since the initial filing of Plaintiffs' Consolidated Amended Class Complaint, and the dates that Prof. Starr analyzes are not even consistent with the Third Amended Complaint). Additionally, as Prof. Starr himself admits in his report, ████████████████████ ████████████████████████████ and Prof. Starr provides no explanation for why the resulting conduct estimate can be extrapolated to reliably estimate damages for the remaining proposed class members who constitute more than half of the proposed class (**Section 5.2**).

c.  Further, Prof. Starr's pay regression model is not sufficiently linked to the alleged conduct because, despite the fact that Plaintiffs themselves allege at least two forms of conduct (mobility restrictions and information sharing) that applied differentially across Defendants (there is no allegation of mobility restrictions or

information sharing between USPI and DaVita), that Plaintiffs' experts opine

(**Section 5.3**).

25. Fifth, Prof. Starr's pay regression model does not demonstrate a common reduction in pay during the Class Period for the proposed class (**Section 6**). He purports to estimate the effect of the alleged conduct on average in his pay regression analysis but, by focusing on averages, he conceals variation within the proposed class, ignoring the diversity of jobs and skills among proposed class members. When I correct Prof. Starr's pay regression model for certain obvious flaws (basic errors he made when processing the data, his treatment of equity pay, and his treatment of the COVID-19 pandemic) and estimate the model separately for key subgroups within the class (e.g., by seniority level and Defendant, by state, by job specialty group, or by year), ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. These patterns are entirely inconsistent with common impact. I additionally show that Prof. Starr's other analyses allegedly demonstrating that proposed class members were commonly impacted are driven by his flawed pay regression model, and that once such flaws are corrected, those results no longer show that most proposed class members were impacted using Prof. Starr's model.

26. Sixth, a rigid pay structure capable of generating classwide downward pressure on pay, as Plaintiffs allege, would also generate classwide upward pressure on pay, potentially insulating proposed class members from any harm (**Section 7**). Even if one were to take Plaintiffs' claim that Defendants had a rigid pay structure sufficient to generate classwide harm at face value, under such a pay structure both decreases and increases in pay for one proposed class member should impact pay for all (or nearly all) other proposed class members. This, in turn, would mean that there would have been upward pressure on the pay structure due to employees newly hired from somewhere other than a Defendant firm, whose pay is set competitively, or from proposed class

members who had non-Defendant employment options, and who negotiated pay increases due to outside offers. Given that more than half of proposed class members were newly hired during the Class Period, and that Defendants compete with many non-Defendant firms for proposed class members' labor, this upward pressure would be considerable, and could offset any downward pressure resulting from the alleged conduct either partially or completely. Prof. Starr's damages estimates do not account for this, nor has he explained how he could.

27. Seventh, and finally, proposed class members cannot be identified based on clear, objective criteria using common evidence. It is subjective and unclear what constitutes a "director-level and above" employee and there are multiple ways to think about it. For example, whether someone is above the director level could be argued to depend on pay, or on skills and tasks associated with the job, or on a defined company hierarchy, and these different ways of thinking about it would lead to different decisions about which proposed class members (and associated jobs) are in Plaintiffs' proposed class. Moreover, there are no objective criteria to identify proposed class members in excluded groups (e.g., legal or HR "departments") based on common evidence. Consistent with this, Prof. Starr's method for identifying class positions is not based on objective criteria and contains employees who facially should not be included within Plaintiffs' definition of the class (**Section 8**).

## 2. THE ALLEGED CONDUCT, ASSUMING IT OCCURRED, WOULD NOT HAVE HAD A COMMON IMPACT ON PROPOSED CLASS MEMBERS

28. Plaintiffs' experts claim that the challenged conduct commonly impacted proposed class members by suppressing compensation of members of the proposed class.[32] They claim this occurred for two reasons. First, they claim that some proposed class members were directly impacted by the alleged conduct (for example because they did not receive solicitation outreach or compensation information that they otherwise would have or because information about pay was shared between Defendants), and that this enabled Defendants to suppress pay for such individuals. Second, they claim that proposed class members not directly affected by the alleged conduct would also be indirectly impacted through a pay structure that spreads changes in pay for some proposed class members to all or nearly all other proposed class members. (Throughout this report, for ease of exposition, I will refer to such a pay structure as "rigid.") Embedded in these claims are significant assumptions about how labor market competition and compensation for proposed class members work, which are at odds with quantitative and qualitative evidence regarding how Defendants compete for labor and set compensation.

29. First, Plaintiffs' experts assume that the alleged conduct would have enabled Defendants to suppress compensation for proposed class members.[33] For example, they assume that if a proposed class member were prevented from moving between Defendant firms, or from receiving information about what Defendants were paying, this would enable Defendants to pay that individual an amount that is not competitive. However, as the evidence I present in Section 2.1 demonstrates, the degree to which labor market competition would have been impacted by the alleged conduct – and, in turn, the degree to which Defendants would have had market power and been able to lower compensation for proposed class members – differs based on a proposed class

---



[32] Starr Report, ¶ 12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ ); Gerhart Report, ¶ 162 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ .

[33] Starr Report, ¶ 198 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ; Gerhart Report, ¶ 158 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ See Starr Report, ¶ 174 ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ .

member's outside employment options, which varied widely across proposed class members. This contradicts Plaintiffs' and Plaintiffs' experts' claims of common impact. Further, given the abundance of outside employment options for members of the proposed class besides Defendants, it is evident that Defendants did not have market power sufficient to be able to lower compensation for many or most (if not all) proposed class members.

30. Second, Plaintiffs' experts assume that the alleged conduct would have suppressed pay for proposed class members who were not directly affected by the alleged conduct because such individuals were indirectly impacted through a rigid pay structure, that would cause any pay suppression experienced by some proposed class members to spread to all or nearly all proposed class members.[34] However, as the evidence I present in Section 2.2 demonstrates, a rigid pay structure is not supported. Rather, evidence reveals several facts that are inconsistent with rigid pay structures. First, many individualized factors influence proposed class members' pay. Second, proposed class members' pay varies widely among those at the same seniority level, and there is substantial overlap in the observed pay ranges for adjacent seniority levels. Third, proposed class members' pay does not move together over time. These facts completely undermine Plaintiffs' claims that any impact from the alleged conduct would be common to the class. Moreover, these facts are not surprising given record evidence, which Plaintiffs' experts fail to properly consider, indicating that Defendants did not have job-specific pay ranges and grades for class positions throughout the Class Period.

### *2.1. Plaintiffs' Experts Have Not Explained How Impact Could Possibly Be Common Given That Proposed Class Members Participate in Different Labor Markets with Varying Competitive Circumstances and Many Non-Defendant Employers*

31. Plaintiffs' experts ignore the reality of labor market competition for proposed class members – specifically, that Defendants employ many different types of proposed class members who hold different jobs, have different job

---

[34] Plaintiffs' experts purport to demonstrate the existence of Defendants' rigid pay structures through their review of the qualitative and quantitative evidence in this matter. However, as I will explain in Section 2.2 and Section 6, the evidence is inconsistent with rigid pay structures (either on its face, or once key flaws are corrected), which means that Plaintiffs' experts unreasonably assume that Defendants had rigid pay structures in place despite the lack of evidence that this was the case. See Starr Report, ¶ 12 ███████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ ; Gerhart Report, ¶ 7 ███████████████████ ████████████████████████████████████████████████████████████████████ ████ .

titles, have different seniority levels, have different skills, have different outside employment opportunities, and therefore participate in different labor markets where they are subject to different competitive pressures relevant for determining compensation. These competitive pressures vary widely across proposed class members and are inconsistent with the notion that Defendants would have had market power sufficient to suppress pay for proposed class members classwide. This means that neither the alleged mobility restrictions nor the alleged information sharing would have common impact.

32. To start, in Section 2.1.1, I explain that Plaintiffs' experts do not properly analyze the relevant labor markets in which proposed class members participate, nor do they properly assess whether Defendants had market power sufficient to suppress pay in those labor markets. Then, unlike Plaintiffs' experts, I analyze the record and economic evidence regarding labor market competition for proposed class members. In Section 2.1.2, my analysis shows that proposed class members participate in different labor markets with varying outside employment options. In Section 2.1.3, I explain the economic basis for this variation: outside employment options depend on skills and preferences, and these vary a great deal from person to person and thus among proposed class members. Finally, in Section 2.1.4, I explain that proposed class members' outside employment options affect whether Defendants have market power sufficient to suppress proposed class members' pay through the alleged conduct. If there are many non-Defendant employment options for proposed class members in a certain position, then Defendants could not suppress pay for that position below what other non-Defendant firms were offering, while still being able to retain and recruit enough employees to fill Defendants' available jobs. Individualized inquiry is necessary to determine whether Defendants had market power in the labor market for a given proposed class member, and thus whether that employee could potentially be harmed by the alleged conduct assuming it occurred, although the abundance of alternative employers besides Defendants makes it clear that Defendants did not have market power sufficient to suppress pay for many or most (if not all) proposed class members.

### 2.1.1. Plaintiffs' Experts Do Not Properly Analyze the Relevant Labor Markets or Market Power for Proposed Class Members

33. As an initial matter, Plaintiffs' experts do not properly account for proposed class members' many (and varied) employment opportunities with non-Defendant firms when analyzing labor market competition for proposed class members. Consideration of proposed class members' employment

opportunities is critical because broad competition from numerous firms that are not alleged to be part of a conspiracy constrains the ability of the conspirators to suppress pay – Defendants must pay competitive wages when faced with broad competition, or they will struggle to hire and retain workers.[35] Neither expert engages in an analysis of market definition that includes understanding the alternative employment opportunities for proposed class members. Both Prof. Starr and Prof. Gerhart reach various conclusions in their reports that assume Defendants have market power sufficient to suppress pay. However, neither does any analysis of any market to support the claim that Defendants have market power or to outline the boundary of the market being proposed.

34. Prof. Starr's opinion on this topic is limited to the assertion that Defendants have "market power over Class Members."[36] In his deposition, he clarified that he did not make any attempt to analyze the relevant labor market for proposed class members.[37] Prof. Starr's assertion reflects a misunderstanding of market power, which requires showing that Defendants had the ability to suppress compensation in a claimed relevant antitrust market. I disagree with Prof. Starr's conclusion. As I explain below, proposed class members had far too many labor market options for suppression of compensation to be plausible and his empirical analyses do not support his claim. However, the issue here is more fundamental: Prof. Starr is claiming market power, but does not address the question of "in what market?" The analyses I present below show that it is implausible that there is a single relevant antitrust labor market for the proposed class, or that in each of the relevant antitrust labor markets that do exist, Defendants had market power sufficient to suppress pay. Indeed, labor

---

[35] Prof. Gerhart acknowledges this basic economic fact in his report and textbook. See Gerhart Report, ¶ 50 ("Where labor markets are competitive, employers often raise wages of current employees to prevent them from leaving. In other words, higher pay constitutes an important tool that employers use to retain remaining employees, and every guide to employee retention emphasizes the need to provide compensation that is competitive with the levels offered elsewhere."), ¶ 56 ("Paying below market, on the other hand, precludes the company from competing adequately in the labor market to hire and retain sufficient employees, particularly high-quality employees."); Barry Gerhart, Jerry Newman and George Milkovich, *Compensation ISE*, (McGraw-Hill Education, 2022) ("Gerhart (2022)"), p. 243 ("A policy of paying below-market rates may hinder a firm's ability to attract potential employees.").

[36] Starr Report, ¶ 12 ("I conclude that the evidence includes direct proof of market power, such that Defendants wielded substantial market power over Class Members.").

[37] Starr Deposition, Volume I, p. 139 ("Q. Okay. So you'd need data on where the departing employees went to, to determine who the relevant, competitors in the relevant labor market are; right? [...] A. Yes, that's right. Q. Okay. And you haven't examined or tried to determine whether such data's available? [...] A. I wasn't asked to, to examine where every departing worker went to, and I did not do that."), p. 155 ("In this context I wasn't asked to study the relevant labor market and define the precise contours of the labor market.").

market definition for proposed class members can itself be an individualized question, as Prof. Gerhart explained in his deposition.[38]

35. For his part, Prof. Gerhart claims in his report that, according to Plaintiffs, ███████████████████████████████████████████████████████ ██████████████████████ (emphasis added),[39] though he notably reached the opposite conclusion during his deposition when he claimed that, rather than a single labor market for proposed class members, labor markets are in fact individualized.[40] However, like Prof. Starr, Prof. Gerhart does not conduct any analysis of labor market definition. Prof. Gerhart also does not opine on labor market power, although he assumes Defendants had market power when he concludes that the alleged conduct (both the alleged mobility restrictions and the alleged information sharing) would likely lead to suppressed pay classwide.[41]

36. Neither expert considers whether different types of proposed class members may have faced different competitive conditions.[42] For example, while Prof. Starr acknowledges that Defendants account for only a "small portion" of employment for medical and health services managers in the health care and social assistance industry (a group that Prof. Starr considers in his own pay regression analysis) and that proposed class members' compensation may be affected by the average wage level for healthcare managers, he does not discuss non-Defendant employers of healthcare managers at all when evaluating whether Defendants have market power sufficient to suppress proposed class

---

[38] Gerhart Deposition, p. 119 ("A. Well, I'll try not to do this too much; but I'm kind of thinking of an article that I wrote, I think, in 1990, where I think I said something about 'each person almost has their own individual market for opportunities.'"). See also Barry Gerhart, "Voluntary Turnover and Alternative Job Opportunities," *Journal of Applied Psychology*, 75(5), 1990, pp. 467–476 ("Gerhart (1990)") at pp. 467–468 ("Finally, although general labor-market conditions influence the probability of an employee's receiving an alternative job offer, the 'specific mix of skills and experiences of the person in question' are at least equally important (Hulin et al., 1985, p. 239). At the extreme, one could think of a separate labor market existing for each person. Thus, although general labor-market conditions should influence perceived ease of movement, the magnitude of the relation is limited to the extent that perceived ease of movement also reflects idiosyncratic differences in individual labor markets stemming from variations in skills, abilities, experience, and so on.").

[39] Gerhart Report, ¶ 21. Prof. Gerhart also refers to "the labor market" or "the labor market rate" throughout his report. See, e.g., Gerhart Report, ¶ 7 ("████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ █████████.").

[40] Footnote 38.

[41] Gerhart Report, p. 177███████████████████████████████████████████████████████████, p. 194███████████████████████████████████████████████████████████.

[42] The only "direct evidence" that Plaintiffs' experts offer to support their claim that Defendants had market power sufficient to suppress Senior Employees' compensation is Prof. Starr's pay regression analysis. See Starr Report, Section IX. However, as I explain in Sections 5 and 6 below, Prof. Starr's pay regression analysis does not demonstrate any impact on proposed class members' pay once obvious flaws are corrected and is not sufficient evidence to reliably conclude that Defendants had market power over proposed class members.

members' compensation.[43] Similarly, Prof. Gerhart discusses a single "market for Senior-Level Employees," but he does not explain how this reconciles with the extensive evidence he describes in his report that Defendants engaged in external pay benchmarking *at the job level,* that Defendants' selection of the appropriate firms against which to benchmark pay depended on the tasks associated with a specific job, or that according to his own admission in his deposition, labor markets for proposed class members are individualized.[44]

*2.1.2. Proposed Class Members Participate in Different Labor Markets with Widely Varying Employment Options, Including Many Non-Defendant, and Even Non-Healthcare, Firms*

37. A basic fact that Plaintiffs' experts fail to account for is that proposed class members are qualified for, and consider, many jobs with employers besides Defendants before, during, and after the proposed Class Period. Below, I describe a set of empirical analyses using a sample of resume data for proposed class members, as well as additional analyses based on record evidence and academic literature, which show that proposed class members participate in different labor markets with widely varying outside employment options. These analyses demonstrate that, in general, Defendants face substantial labor market competition from non-Defendant firms for proposed class members. As I explain in Section 2.1.4, that means that Defendants would not have market power sufficient to suppress proposed class members' pay classwide. When employees come to an employer from a set of firms "A" and leave the employer to a set of firms "B," the firms in "A" and "B" pose obvious employers that should be considered, and likely included, in any claimed relevant antitrust market.[45] In fact, Prof. Gerhart acknowledges in his deposition that the key information for defining the scope of a labor market is "where people come from and where they go to,"[46] and Prof. Starr similarly acknowledges in his



[43] Starr Report, ¶ 121 ███████████████████████████████
███████████████████████████████████████████████████████
████████████, footnote 410 ███████████████████████████████,
Section IX.
[44] Gerhart Report, ¶ 21 ██████████████████████████████████
████████████████████████ (emphasis added)), ¶ 115 ████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████ ; Footnote 38.
[45] I am not offering an affirmative opinion on the outer boundary of the relevant antitrust market.
[46] Gerhart Deposition, p. 47 ████████████████████████████████
███████████████████████████████████████████████████████

deposition that if a proposed class member was hired from or departed for another employer, then that employer is a "relevant competitor[] in the relevant labor market" for that employee.[47]

38. When competing for proposed class members' labor, Defendants must consider a wide range of non-Defendant employers, whose efforts to attract and retain proposed class members would be unaffected by the alleged conduct. Exhibit 1 summarizes the firms that Defendants' employees working in class positions arrive from when they are hired by a Defendant ("prior employers"), and the firms they join after working for a Defendant ("next employers"), using data on the moves to and from a Defendant based on a sample of resumes collected from career websites by the proprietary data provider Lightcast ("Lightcast Data"). Exhibit 1 shows an important result that is entirely inconsistent with Plaintiffs' allegation that Defendants engaged in a successful conspiracy to suppress proposed class members' pay: **Defendants are not the dominant previous or next employers for Defendants' employees working in class positions in the Lightcast Data**: 2,640 non-Defendant firms are the previous employer for 98.9% of moves, while the three Defendants account for the remaining 1.1%. Similarly, 2,429 non-Defendant firms are the next employer for 98.8% of moves, while the three Defendants account for the remaining 1.2%. Looking at prior and next employers together, no single non-Defendant firm accounts for more than 1.3% of moves, and Defendants collectively only account for 1.2% of moves.[48] As I discuss in Section 5.1, these statistics align with Prof. Starr's own results based on Defendants' structured data, which show that ██████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████

---

██████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████).

[47] Starr Deposition, Volume I, pp. 132–133 ("████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████ p. 147 ████████████████████████████
██████████████████████████

[48] See Workpaper 1. In Appendix C, I provide a list of the most common previous and next employers for moves to and from Defendants and ranks them based on the percentage of moves that the employer accounts for.

Highly Confidential – Outside Counsel/Experts Only

***EXHIBIT 1***
***Defendant Firms Are Not Dominant Prior and Next Employers for Proposed Class Members***



Source: Lightcast Data

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer is another Defendant versus a non-Defendant firm. The exhibit also lists the number of unique non-Defendant firms that Defendants' employees move to and from. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. In Exhibit 3, I show that the results are similar when I restrict to moves that took place before, during, or after the Class Period. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

39. Exhibit 2 shows a similar result. Exhibit 2 identifies the 40 most common prior and next employers for proposed class members in the Lightcast Data (where, as noted above, even the "most common" employer in this exhibit accounts for only 1.3% of moves to or from prior and next employers in the sample). Exhibit 2 shows that proposed class members in the Lightcast Data worked for a wide range of non-Defendant employers just before or after working for Defendants. These non-Defendant employers include other firms in the outpatient care centers industry (e.g., Fresenius), the industry to which all three Defendants belong according to the standard industry classification system used by federal agencies.[49] Non-Defendant employers also include

---

[49] Industries do not necessarily align with relevant product markets or labor markets for several reasons discussed throughout this section. I use the industry classification provided in the Lightcast Data, which is the North American Industry Classification System (NAICS), to determine the industry that each employer belongs to. In the case of firms that operate in multiple lines of business, the industry codes native to the Lightcast Data reflect only one line of business. To assess whether my results are driven by Lightcast's determination of industry codes, I run my analyses that rely on industry categorizations with an alternative set of industry codes provided by the NAICS Association. The pattern of results does not substantively change. See U.S. Census Bureau, "North American Industry Classification System: Introduction to NAICS," December 20, 2024, available at https://www.census.gov/naics/, accessed on April 2, 2025 ("The North American Industry Classification System

healthcare-related employers outside of the outpatient care centers industry (e.g., Kaiser Permanente), and employers that are not healthcare related (e.g., Amazon, Target, McKinsey, Bain & Company, Guidehouse, Regions Financial). This makes sense because, while a worker's alternative employers might bear some relation to what industry their current employer is in, they also depend on the worker's skills and preferences.[50] This includes to what extent the individual is open to opportunities in another industry, and to what extent the individual's skills are well suited to employment in another industry. Notably, Defendants are also typically not among the most highly ranked previous and next employers.[51]

---

(NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy."); NAICS Association, "NAICS Code Description 6214 – Outpatient Care Centers," available at https://www.naics.com/naics-code-description/?code=6214, accessed on April 3, 2025.

[50] The economics literature has found that employment opportunities for senior-level employees have expanded over the last several decades, as computers and other technological changes have increased the demand for educated workers with skills such as solving complex problems and managing other employees. As computers and other technological changes have become increasingly integral to firms' day-to-day operations, senior-level employees with these skills have had a broader set of employment options across a wider set of firms available to them. See David H. Autor, Frank Levy and Richard J. Murnane, "The Skill Content of Recent Technological Change: An Empirical Exploration," *The Quarterly Journal of Economics*, 118(4), 2003, pp. 1279–1333 at p. 1279; Luis Garicano and Esteban Rossi-Hansberg, "Organization and Inequality in a Knowledge Economy," *The Quarterly Journal of Economics*, 121(4), 2006, pp. 1383–1435 at p. 1385; Erik Brynjolffson and Andrew McAfee, *The Second Machine Age*, (New York, NY: W. W. Norton & Company, 2014) at pp. 4–5.

[51] Appendix C.

*EXHIBIT 2*
**Proposed Class Members' Outside Options Extend Beyond Defendants, Beyond the Outpatient Care Centers Industry, and Even Beyond Healthcare-Related Industries**



Source: Lightcast Data

Note: The exhibit shows the 40 most common previous and next employers for Defendants' employees in the Lightcast Data aggregated across Defendants. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

40. These patterns are consistent before, during, and after the Class Period. Even if I only consider employee moves *before or after* the Class Period, Defendants are also not the dominant previous or next employers. As shown in Exhibit 3, Defendants never account for more than 2.1% of the moves to or from prior and next employers before, during, and after the Class Period. Exhibit 3 also shows that Defendants do not account for a large share of the moves to or from prior and next employers for any one specific Defendant: Defendants are the previous and next employer for 0.4% of moves for DaVita employees, 3.7% of moves for SCA employees, and 2.0% of moves for USPI employees.[52]

---

[52] Workpaper 2 presents the results in Exhibit 3, separately for previous employers and for next employers.

***EXHIBIT 3***
***Defendants Were Not a Dominant Previous or Next Employer Before, During, or After the Class Period or For Any One Defendant***



Source: Lightcast Data

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer is another Defendant versus a non-Defendant firm, separately by time period or Defendant. I restrict to moves that took place before, during, or after the Class Period. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

41. To further demonstrate that Defendants compete with many non-Defendant firms for proposed class members, I next describe a set of illustrative examples where proposed class members moved to or from a non-Defendant employer during the Class Period:

- Named Plaintiff Allen Spradling had no healthcare experience and worked for Teksystems (a business and technology services firm) immediately before joining SCA as a Project Management Office Director in 2008, and for Bank of America (a financial services firm) immediately after departing from SCA in 2013.[53] Spradling testified

[53] Deposition of Allen Spradling (Named Plaintiff), July 18, 2024 ("Spradling (Named Plaintiff) Deposition"), p. 57 ("Q [...] [T]hat resume that was attached, that was your resume at this point in time before you got your position at SCA; correct? A I think that's a true statement, yes. Q [...] And at this point in time, you had never worked for a company in the health care industry; correct? A Correct. Q You had no prior health care experience;

that he has "a broader range of employment opportunities" available to him and that his IT skills are "very in demand and transferable."[54]

- Named Plaintiff Scott Keech worked for Kaiser Permanente (a healthcare provider) immediately after departing from SCA as a Regional Director of Clinical Operations in March 2012.[55] Keech testified that he believed his leadership skills were "transferable to industries outside of healthcare."[56]

- Proposed class member Stephanie A. Phillips, a VP of Procurement at USPI during the Class Period, worked at Avaya (a cloud-based software computing firm) immediately before joining USPI, and at Mars Veterinary Health (a veterinary care firm) immediately after leaving USPI.[57]

- Proposed class member Naomi Kruger, a Director of Strategy and Payor Engagement at SCA during the Class Period, is currently a VP of Strategy and Payor Engagement at SCA and worked at Navigant, a

---

correct? [...] A Correct. Q You had no specialized experience or skills that were particular to the health care industry; correct? [...] A Correct."), pp. 66–67 ("Q And this is your letter to Rachel Frerman resigning from TEKSystems; is that correct? A Correct. Q And you say your resignation will be effective September 19th, 2008; correct? A Yes, I'm sure that's correct. [...] You say, I was presented with a unique opportunity to start up a PMO for a relatively new company which spun out of the HealthSouth [...] specialization activities about a year ago. Do you see that? A I do. Q That is referring to your opportunity with SCA; correct? A It is."), p. 134 ("Q Okay. You ultimately left SCA to -- and went to Bank of America; correct? A. Correct."); TekSystems, "IT and Business Services," available at https://www.teksystems.com/en/it-and-business-services, accessed on April 2, 2025; Bank of America, "Our Company," available at https://about.bankofamerica.com/en/our-company, accessed on April 2, 2025.

[54] Spradling (Named Plaintiff) Deposition, pp. 59–60 ("Q. So you were conveying in this letter that you're qualified in both of how you describe it technology and nontechnology initiatives; correct? A. [...] Correct. Q. And did those different skill sets mean that you had a broader range of employment opportunities available to you? A. Well, I was certainly promoting that I did. Q. But you believe that to be true; right? A. I did, and I do."), pp. 123–124 ("A. It is highly possible that during my tenure at SCA – not possible, probable that someone had an offer from another company and SCA considered matching it. Almost guaranteed that happened. Just don't ask me for specifics because I have none. Q. Sure. Sure. And why are you so confident that that's something that would have happened? [...] A. The – the IT skill set is very in demand and transferable, so in general IT resources are constantly reassessing their value to the market, so to speak, and as a result of that, opportunities present themselves.").

[55] Third Amended Complaint, ¶ 17 ("Scott Keech, R.N., M.B.A., was employed by Defendant SCA from approximately 2011 to March 2012 as a Regional Director of Operations and Clinical Services in the San Francisco, California area."); Deposition of Scott Keech (Named Plaintiff), August 22, 2024 ("Keech (Named Plaintiff) Deposition"), p. 218 ("Q. Equally exciting to be leaving SCA and -- rejoining Kaiser? A. Yes. Absolutely."); Kaiser Permanente, "What is Kaiser Permanente," available at https://healthy.kaiserpermanente.org/learn/what-is-kaiser-permanente, accessed on April 13, 2025.

[56] Keech (Named Plaintiff) Deposition, p. 168 ("Q. Do you believe that the skills you've learned in the operations side of the business, the various companies that you've worked for, would translate to other industries easily today? [...] A. I think leadership skills are transferrable. Q. And do you believe that the leadership skills you've learned as a result of the various roles you've held over the years would be transferable to industries outside of healthcare? A. Yes.").

[57] LinkedIn, "Stephanie A. Phillips," available at https://www.linkedin.com/in/stephanie-a-phillips-651913, accessed on February 26, 2025. See also Avaya, "What We Do: Avaya Empowers CX Innovation Without Disrupting Your Business," available at https://www.avaya.com/en/, accessed on April 2, 2025; Mars Veterinary Health, "Who We Are," available at https://marsveterinary.com/who-we-are/, accessed on April 2, 2025.

specialized global professional services firm, immediately before joining SCA.[58]

- Proposed class member Andrew Boyink, a National Director of Strategy & Operations for Hospital Services at DaVita during the Class Period, worked at McKinsey, a management consulting company, immediately before joining DaVita.[59]

42. Not only does any claimed relevant antitrust labor market include many non-Defendants, but there is also variation among proposed class members in which non-Defendant firms would be alternative employers. Some proposed class members have many non-Defendant alternative employers, whereas others may have fewer. As a proxy for variation amongst proposed class members, I grouped proposed class members into various specialty areas based on Defendants' departments and job titles. If there were one claimed relevant antitrust labor market, then prior and next employers would be similar across specialty areas. I constructed these specialty areas by manually reviewing and grouping department and job titles in Defendants' data that relate to a similar subject matter. These specialty areas include the following (among others):

- **Marketing and Communications** (which includes departments such as "Communications" and "Marketing PR-Strategy Operations" and job titles such as "Director, Communications" and "Sr Director, Marketing")
- **Accounting, Tax, and Treasury** (which includes departments such as "Tax Department" and "Facility Accounting" and job titles such as "Senior Director, Accounting" and "Director, Tax")
- **Information Technology** (which includes departments such as "IT-Management" and "IT-Enterprise Architecture" and job titles such as "Director, Applications Development" and "VP, Information Technology")
- **Clinical and Research** (which includes departments such as "Clinical-PC" and "Nursing Administration" and job titles such as "Regional VP - Imaging" and "Director, Clinical Services")

---

[58] LinkedIn, "Naomi Kruger," available at https://www.linkedin.com/in/naomi-kruger-74986420/, accessed on February 26, 2025. See also Navigant, "Guidehouse," available at https://www.navigant.com/, accessed on April 2, 2025.

[59] LinkedIn, "Andrew Boyink," available at https://www.linkedin.com/in/andrewboyink/, accessed on April 10, 2025. See also McKinsey, "McKinsey & Company About Us," available at https://www.mckinsey.com/about-us/overview, accessed on April 15, 2025.

- **Business Office Administration and Management** (which includes departments such as "Administration" and "Regional Office" and job titles such as "Administrator" and "Regional Operations Director (ROD)")

43. Exhibit 4 demonstrates that the most common prior and next employers for proposed class members (according to the Lightcast Data) vary by specialty area.[60] For each specialty area, the exhibit shows five of the most common previous and next employers (although, as before, no employer is very common).[61] For some specialty areas, such as Clinical and Research, the employers consist of firms within the outpatient care centers and healthcare-related industries (e.g., Fresenius, HCA Healthcare, Optum, and Kaiser Permanente), whereas for other specialty areas, such as Accounting, Tax, and Treasury, several of the employers are outside of healthcare-related industries altogether (e.g., Ernst & Young and Deloitte). The employer names in Exhibit 4 are shaded according to how frequently they appear among the top five prior and next employers across specialty areas (darker shading indicates the employer is a top previous or next employer for many specialty areas). Few employers show up as a top previous and next employer for many specialty areas. In contrast, most employers are a top previous and next employer for very few specialty areas: USPI is only among the top previous and next employers for one specialty area (Business Office Administration and Management specialty area), as are other non-Defendant employers including Cigna and Accenture (Information Technology specialty area), Amazon (Operations specialty area), Express Scripts and AstraZeneca (Pharmacy Management specialty area), and TransUnion (Finance specialty area). DaVita is not among the most frequent previous and next employers for any of the specialty areas.

---

[60] As the Lightcast Data does not contain data on the departments individuals work in, the specialty areas in the Lightcast Data are constructed only using job title.

[61] If more than five employers would be considered among the five most common prior and next employers for a given specialty area due to ties, the employers listed in the exhibit are randomly selected from among the top prior and next employers for each specialty area. See Workpaper 3 for a list of the top 20 previous and next employers for each specialty area.

Highly Confidential – Outside Counsel/Experts Only

**EXHIBIT 4**
**Proposed Class Members Have Varying Outside Employment Opportunities Depending on Their Specialty Area: Top 5 Prior and Next Employers by Specialty Area**

**Pharmacy Management**

| |
|---|
| CVS Health |
| AstraZeneca |
| Express Scripts |
| Pacific Pulmonary Services |
| Target |

**Clinical and Research**

| |
|---|
| HCA Healthcare |
| Fresenius |
| Kaiser Permanente |
| U.S. Renal Care Inc. |
| Optum |

**Physician Relations and Management**

| |
|---|
| Caremore Medical Group |
| Fresenius |
| Idaho Health Data Exchanges |
| Optum |
| Rldatix |

**Operations**

| |
|---|
| Fresenius |
| HCA Healthcare |
| Amazon |
| SCA |
| CVS Health |

**Business Office Admin and Management**

| |
|---|
| HCA Healthcare |
| USPI |
| SCA |
| Encompass Health |
| Fresenius |

**Business Dev, Sales, Strategy, and Planning**

| |
|---|
| McKinsey |
| Bain & Company |
| HCA Healthcare |
| Fresenius |
| UnitedHealth Group |

**Marketing and Communications**

| |
|---|
| UnitedHealth Group |
| Aetna |
| Carlisle/Carré Comms, LLC |
| McKesson |
| Mgma |

**Finance**

| |
|---|
| Encompass Health |
| HCA Healthcare |
| Humana |
| MedAssets |
| TransUnion |

**Accounting, Tax, and Treasury**

| |
|---|
| Ernst & Young |
| Deloitte |
| U.S. Renal Care Inc. |
| F5 |
| Penske Automotive Group |

**Information Technology**

| |
|---|
| Kaiser Permanente |
| McKesson |
| UnitedHealth Group |
| Accenture |
| Cigna |

**Other**

| |
|---|
| Fresenius |
| HCA Healthcare |
| U.S. Renal Care Inc. |
| Bain & Company |
| SCA |

**Number of Specialty Areas** | 1 | 2 | 3 | 4–5 | 6–8

Source: Lightcast Data

Note: The exhibit lists five of the most common previous and next employers by specialty area. If more than five employers would be considered among the top five prior and next employers for a given specialty area due to ties, the employers listed are randomly selected from among the top prior and next employers for each specialty area. Employer names are shaded according to how often the employer shows up among the five most common previous and next employers across specialty areas. Lighter shading indicates that the employer shows up as a top previous or next employer for few specialty areas, and darker shading indicates the employer shows up as a top previous or next employer for several specialty areas. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

44. Exhibit 5 further illustrates that proposed class members come from and go to employers in different industries, including industries outside of the outpatient care centers industry to which all three Defendants belong. It shows, for Defendants' employees in class positions in the Lightcast Data, the percentage of moves to or from an employer that is: (1) a Defendant (blue shading); (2) a firm in the outpatient care centers industry (orange shading); (3) a firm outside of the outpatient care centers industry, but in a healthcare-

related industry (pink shading); (4) a firm outside of the healthcare-related industry (yellow shading); or (5) a firm whose industry could not be classified in the data (green shading), separately for each specialty area.[62] The percentage of moves to or from an employer outside of the outpatient care centers industry but in a healthcare-related industry (shown in pink) varies substantially across specialty areas, ranging from 10% for moves in or out of Accounting, Tax, and Treasury jobs, to 34% for moves in or out of Finance jobs, to 50% for moves in or out of Pharmacy Management jobs. The variation in the percentage of moves to or from an employer outside of a healthcare-related industry altogether (shown in yellow) is even larger, ranging from 16% for moves in or out of Pharmacy Management jobs to 50% for moves in or out of Information Technology jobs, to 63% for moves in or out of Accounting, Tax, and Treasury jobs. Indeed, Named Plaintiff Allen Spradling, who worked at Teksystems (a business and technology services firm in the computer programming services industry) immediately prior to joining SCA, and at Bank of America (a financial services firm in the financial transactions processing industry) after leaving SCA, would contribute to this latter category (moves to or from an employer outside of a healthcare-related industry) for the Information Technology specialty area if he were to appear in the Lightcast Data.[63] Exhibit 5 also shows that Defendants (shown in blue) are a tiny share of prior and next employers across all specialty areas.

---

[62] In Appendix C, I reproduce the analysis presented in Exhibit 5 with an alternative set of industry codes provided by the NAICS Association. This analysis shows that the pattern of results is broadly the same. I also summarize the industries that Defendants' employees in the Lightcast Data come from and go to separately by Defendant using the industry codes native to the Lightcast Data and industry codes provided by the NAICS Association, respectively.

[63] Resume of Allen M. Spradling (Named Plaintiff), SPRAD000014–15 at SPRAD000014.

Highly Confidential – Outside Counsel/Experts Only

***EXHIBIT 5***

***The Industries Proposed Class Members Come From and Go To Vary by Specialty Area, and Few Proposed Class Members Come From or Go To Defendants***



Source: Lightcast Data

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer belongs to the indicated industry grouping. The results are shown separately by specialty area. "Outpatient Care Centers" is defined by NAICS codes beginning with 6214. "Healthcare Related (non-OCC)" includes NAICS codes related to healthcare that I identified based on a review of the industries for the top 50 most common previous and next employers for Defendants' employees in the Lightcast Data. "Other Industries" contains all remaining classified industries. "Unclassified Industry and Non-Defendant" includes firms that were not assigned NAICS codes in the Lightcast Data. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendant employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

45. The patterns shown in Exhibit 4 and Exhibit 5 align with business documents and depositions, which show that Defendants recruited proposed class members from many different types of non-Defendant employers. For example, ███████████████████████████████████

███████████████████████████████

███████████████ 64 █████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████

---



64 Deposition of Bridget A. Fanning. Ph.D. (SCA), July 17, 2024 ("Fanning (SCA) Deposition"), pp. 112–113 ("███████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████").

████████████████████████████████████████████████████ [65] An internal document ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ [66] Similarly, at USPI, Mark Garvin testified ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ [67] An internal email chain ████████████

███████████████████████████████████████████

████████████████████████████████████████████████ [68] Further, at DaVita, email exchanges between DaVita and external recruiting firms conducting candidate searches on DaVita's behalf ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ [69]

---

[65] Email chain from Leslie Wachsman (SCA) to Caitlin Covey (SCA), "RE: Sr DFO Epic," June 6, 2014, SCA002270032–35 at SCA002270032–34 ("████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████ ").

[66] Email chain from Gina Thomas (Cielo) to Tony Kilgore (SCA) and Laura Shively (SCA), "RE: Regional Vice President – RSM," with attachment, April 1, 2015, SCA000003962–70 at SCA000003962 ("████████████████ ███████████████████████████████ "); Attachment to Email from Gina Thomas (Cielo) to Tony Kilgore (SCA) and Laura Shively (SCA) about SCA's Regional Vice President Search with Cielo, "Assignment Brief: Regional Vice President – Dallas, Texas," March 30, 2015, SCA000003963–70 at SCA000003967–69 ("████████████████████████████████████████████ ").

[67] Deposition of Mark Garvin (USPI), May 30, 2024 ("Garvin (USPI) Deposition"), pp. 195–196 ████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████ ").

[68] Email chain from Shannon McGarry (USPI) to Shannon Mosley (USPI), "RE: RVP Dallas candidates," March 21, 2018, USPI_CIV_000142589–90 at USPI_CIV_000142589–90 ("████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████ ").

[69] Email chain from Rob Chipman (DaVita) to Brian Schaffer (DaVita), "FW: DaVita GVP Status Report," with attachments, October 23, 2013, DVA_OMCEAL_000011812–22 at DVA_OMCEAL_000011815; Email chain from Darin DeWitt (Caldwell Partners) to Vijay Kotte, "FW: HCP SVP BD 04 08 15," with attachments, April 8, 2015, DVA_OMCEAL_000538771–803 at DVA_OMCEAL_000538801; Email chain from Kelsey Landahl

46. Deposition testimony also shows that, consistent with Exhibit 4 and Exhibit 5, the employers from whom Defendants recruited candidates for class positions varied depending on the employee's specialty area. In particular,



[70]

47. The set of outside employment options, and in turn the degree to which Defendants compete with non-Defendant firms for proposed class members, can also vary across proposed class members based on geography. The relevant employment options may be limited to a local or regional geography for some proposed class members but span a national geography for others. Prof. Gerhart seems to agree, as is apparent based on the following excerpt from his textbook, *Compensation*:

> "[Q]ualifications interact with geography to define the scope of relevant labor markets. As the importance and the complexity of qualifications increase, the geographic limits also increase. Competition tends to be national or international for managerial and professional skills […] but local or regional for clerical and production skills. However, these generalizations do not always hold true. In areas with high concentration of scientists, engineers, and managers (e.g., Boston or San Jose/Silicon Valley), the primary market comparison may be regional, with national data used only secondarily."[71]

48. Economic literature discusses how workers with highly specialized skills may consider employment options in a national or even global geography because, in any narrower geography, the number of employers who can utilize their skills may be too small for them to find a good employment match.[72] For instance, economist David Wildasin explained that "the chance of a highly

---

(Heidrick) to Mike Staffieri (DaVita), "H&S Update Call," with attachments, September 12, 2016, DVA_OMCEAL_000760685–699 at DVA_OMCEAL_000760687.

[70] Deposition of Clare Metcalf (Russell Reynolds), August 14, 2024 ("Metcalf (Russell Reynolds) Deposition"), pp. 43–44 (" ").

[71] Gerhart (2022), p. 264.

[72] Kathleen O'Toole, "Enrico Moretti: The Geography of Jobs," *Insights by Stanford Business*, June 10, 2013, available at https://www.gsb.stanford.edu/insights/enrico-moretti-geography-jobs, accessed on April 2, 2025 ("If you are in a very highly specialized position, you want to be in a labor market where there are a lot of employers looking for workers, and a lot of workers looking for employers.").

specialized worker finding a good employment match within the local labor market is [...] reduced, and it would not be surprising, therefore, to find such workers and firms searching in more than one local market; in some cases, indeed, workers and employers may search over an entire country or over the entire world in order to find the best employment match."[73] Consistent with this idea, economist Abigail Wozniak also found that changes in state labor demand affect where college graduates decide to locate post-graduation "several times" more than they affect where high school graduates decide to locate.[74]

49. These findings from the economics literature align with evidence in the record showing that the geographic scope of Defendants' recruitment efforts varied by role. Jimmy Tanner, an external recruiter for USPI involved in recruiting for proposed class member roles, testified that this was "100 percent" the case.[75] ██████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███[76] while ████████████████████████████████

████████████████████████████████████████████

██████████████████████████[77]

---

[73] David E. Wildasin, "Labor-Market Integration, Investment in Risky Human Capital, and Fiscal Competition," *American Economic Review*, 90 (1), 2000, pp. 73–95 at p. 73.

[74] Abigail Wozniak, "Are College Graduates More Responsive to Distance Labor Market Opportunities?" *Journal of Human Resources*, 45(4), 2010, pp. 944–970 at p. 944 ("I find effects of changes in state labor demand on college graduate location choice that are several times greater than for high school graduates.").

[75] Deposition of Jimmy Tanner (Catapult Staffing), July 31, 2024 ("Tanner (Catapult Staffing) Deposition"), p. 61 ("Could the different roles that you would be recruiting for also have maybe a different geographic scope? A. 100 percent."), pp. 59–60 ("Q. So you mentioned, you know, administrators. I believe you also mentioned partnership liaison and clinical positions; is that right? A. Yeah. So on the partnership liaison side they had like a liaison, which is like a lower level, they had a manager, and they had like a VP level. Those were all sales positions. And the – on the clinical side, they would do like an OR director or like a, maybe a director of nursing. And then there was the administrator role. And then there was a business office manager role which kind of reported in to [sic] the administrator. And then above the administrator was like a regional vice president or like a – and there was – I think there was a market president role too. I don't think we ever did a search for a market president though. Q. Okay. But all of those other roles that you just mentioned could have been roles that you all were hired to fill? A. Yes.").

[76] Metcalf (Russell Reynolds) Deposition, p. 36 ("███████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██.").

[77] Deposition of Kristen DesPalmes (DaVita), May 21, 2024, pp. 36–37 ("████████████████████████████ ███████████████████████████████████████████████████████████████"), Exhibit 41 ("DaVita Senior Director, Employment Strategy February 2007 - July 2021 (14 years 6 months)").

50. Further, internal documents also show that the set of candidates considered by Defendants for specific roles varied in geographic scope. An internal email chain ██████████████████████████████████████████████████ ████████████████████████████████████████████████[78] However, searches for other positions were local in scope. An internal e-mail chain ███████████████████████████████████ ████████████████████████████████████████[79] In an internal email chain ███████ ████████████████████████████████████████████████████ ████████████████████████[80] Similarly, recruiter Jimmy Tanner testified that USPI sometimes requested that he focus his recruiting efforts on candidates within specific geographic locations.[81]

51. In addition to the fact that the set of outside employment options for proposed class members can vary based on geography, it is also notable that many proposed class members participate in a labor market that is national in scope. Proposed class members who participate in a national labor market have many alternative employment options besides Defendants. This is illustrated by data from the Bureau of Labor Statistics showing that proposed class members who worked at Defendant firms in 2019 accounted for only 0.8% of national employment in 2019 (the last year of the Class Period) among the relatively-narrow group of medical and health services managers in the health care and

---

[78] Email chain from Shannon McGarry (USPI) to Shannon Mosley (USPI), "RE: RVP Dallas candidates," March 21, 2018, USPI_CIV_000142589–90 at USPI_CIV_000142589–90 ("████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████"); HCA Midwest Health: Surgicenter of Johnson County, "About Surgicenter of Johnson County: Welcome to Surgicenter of Johnson County," available at https://surgicenterjc.com/, accessed on April 2, 2025 ("The Surgicenter of Johnson County is an accredited, freestanding outpatient surgery center in Overland Park, Kansas"); Department of Children & Family Services, "About Us: Franklin Foundation Hospital," available at https://www.dcfs.louisiana.gov/directory/office/9047, accessed on April 2, 2025.

[79] Email chain from Aaron Cho (SCA) to Leslie Wachsman (SCA), "RE: Open Finance Roles," September 25, 2015, SCA001437481–82 at SCA001437481 ("██████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████").

[80] Email chain from Shannon McGarry (USPI) to John Snyders (USPI), "RE: Medplex - Administrator Search," with attachments, October 2, 2018, USPI_CIV_000764198–99 at USPI_CIV_000764198, ("████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████").

[81] Tanner (Catapult Staffing) Deposition, p. 18 ("Q. And do you recall that – if USPI ever instructed you to create a pipeline of candidates for certain areas or certain geographic locations? A. Yeah, we did a couple. I know in markets where I think they had either issues with just general staffing or maybe a growth sector, where they anticipated some openings coming available. They would say – we would – I don't recall exactly what our fee was, it wasn't crazy, but they just wanted a pipeline of like, hey, start looking in the Chicago market, we may have some needs there.").

social assistance industry (the benchmark group of employees that Prof. Starr analyzes in his pay regression model).[82]

52. Finally, the set of outside employment options may differ for proposed class members who work for different Defendants. Depending on the job, one Defendant is not necessarily an outside employment option for employees at another Defendant (e.g., due to differences in the size of these firms, or in what these firms do). In an internal email exchange ██████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████ [83] In another internal email exchange ██████████████████████████████████████████████ ████████████████████████████████ [84] Similarly, ████ ██████████████████████████████████████████████ ██████████████████████████████ [85] Further, ████ ██████████████████████████████████████████ ██████████████████████████████████████ [86] Additionally, ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████ [87]

*2.1.3. Proposed Class Members Have Widely Varying Skills and Preferences*

53. The exact set of outside employment options available to each proposed class member, and in turn the labor market in which each proposed class

---

[82] Workpaper 4.

[83] Email from Andrew Hayek (SCA) to Joe Clark (SCA) and Michael Rucker (SCA), "Re: Marsha Dodd," December 2, 2014, SCA000838956 ████████████████████████████ ████████████████████████████████████████

[84] Email from Andrew Hayek (SCA) to Brian Mathis (SCA) and Tim Buono (SCA), "Re: DaVita 'No Fly Zone'," July 3, 2017, SCA000163727.

[85] Deposition of Joseph T. Clark (SCA), September 11, 2024, p. 145 ████████████████████ ██████████████████████████████████████████████████ ████████

[86] Deposition of Anthony Kilgore (SCA), October 22, 2024 ("Kilgore (SCA) Deposition"), p. 43 ████████ ████████████████████████████████████████████████ ████████████████████████████ .

[87] Fanning (SCA) Deposition, pp. 114–115 ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ .

member participates, depends on their skills and preferences, which vary across the proposed class. For example, if many workers who are qualified to fill a certain job have skills that are valuable to firms outside of the healthcare sector (e.g., a proposed class member with a background in accounting), then Defendants must compete with a broad set of healthcare and non-healthcare employers for these workers.[88] Indeed, Prof. Gerhart agreed during his deposition that different individuals have different employment options depending on their skills and preferences, and that the set of employment options for each worker can extend beyond the product market where their firm operates (i.e., beyond healthcare for proposed class members).[89] However, if many of the same workers have a strong preference not to relocate (e.g., a proposed class member whose children are enrolled in school), and there are enough of these to workers to fill all of the available jobs in a particular area, then Defendants only need to compete with the employers in that area for these workers. Further, the preferences proposed class members have over the desirability of jobs in other industries or occupations will also impact the set of employers with which Defendants must compete for a proposed class member's labor.

54. Seniority is one dimension of a proposed class member's skills, and I use available data to examine variation across proposed class members in seniority. Exhibit 6 shows ███████████████████████████████████████████ ██████████████████████[90] ███████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████████████ ████████

---

[88] See, e.g., Fanning (SCA) Deposition, p. 262 ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ .

[89] Gerhart Deposition, p. 48 ("Q. Is it true that different individuals have different employment options based on their skills, their preferences, geographic mobility, things like that? [...] A. Generally speaking, yes."), pp. 47–48 ("Q. So labor markets include not only companies that a firm competes with in the products or services market, but also other companies outside of that market that may also have employees with the right skills? A. Yeah. Yeah. [...] So the product market is different than the labor market. They don't have to be different but they can be different.").

[90] I group job titles for class positions into five seniority levels based on Prof. Starr's three class-relevant seniority levels ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

**EXHIBIT 6**
**Proposed Class Members Have Varying Seniority Levels and, In Turn, Varying Skills**



Number of Proposed Class Members

Source: Corrected Starr Data
Note: This exhibit shows

55. Further evidence of proposed class members' varying skills are the different job requirements associated with the specialty areas in which they work. Exhibit 7 reports the number of proposed class members who worked in each of the specialty areas (such as Clinical and Research, Business Development, Sales, Strategy, and Planning, and Information Technology) that I analyzed in Section 2.1.2. The educational, skill, and experience requirements can differ across these specialty areas, as illustrated in the following examples from Defendants' job descriptions and online job postings:

- The job description for

[91]

---

[91] "DaVita Job Description, Sr. Director, Clinical Services," DaVita, November 2018, DVA_OMCEAL_001297898–900 at DVA_OMCEAL_0012978898–899.

Highly Confidential – Outside Counsel/Experts Only

- The job description for ███████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████[92]

- The job description for ██████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████
  ████████████████████████[93]

- The job description for ████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████[94]

---

[92] "SCA Position Description for Director Financial Operations/DFO," SCA, September 27, 2007, SCA000128921.

[93] "DaVita Position Description, Senior Director, Information Technology," DaVita, January 2014, DVA_OMCEAL_001317525–27.

[94] Email from Shelly Campbell (USPI) to Shannon Mosley (USPI), "FW: Director of Operations Finance," August 20, 2014, USPI_CIV_000457557–60 at USPI_CIV_000457557.

***EXHIBIT 7***
***Proposed Class Members Work in Different Specialty Areas that Require Varying Educational Backgrounds and Skills***



Source: Corrected Starr Data
Note: This exhibit shows █████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████

56. Seniority level and specialty area may serve as proxies for skills, but case evidence shows that skill requirements vary among proposed class members even at the same seniority level in the same specialty area. █████████████
█████████████████████████████████████████████
███████████████████████████████████[95]█████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████[96]███████████████████████
█████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████[97]

---

[95] Workpaper 5.

[96] "DaVita Position Description, IT – Product Management," DaVita, Undated, DVA_OMCEAL_001313820–23 at DVA_OMCEAL_001313820–21 ("████████████████████████████████████████████████████████████████
████████████████████").

[97] "DaVita Position Description, Director, Project Management," DaVita, September 2012, DVA_OMCEAL_001313824–27 at DVA_OMCEAL_001313824–25 ████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████").

Similarly [98]

57. Named Plaintiffs Allen Spradling, whose background is in project management and IT, and Scott Keech, whose background is in nursing and clinical operations, illustrate the wide variation in skills among proposed class members. Allen Spradling worked for SCA as a "Manager, Program Management Office" and an "IT Director" from 2009 to 2013 where, according to his resume, he was responsible for "[directing] all activities within IT that involved application development, projects, project discipline, product quality, vendor management, strategic planning, and contract resources."[99] He was employed in project management and IT roles outside of the healthcare industry immediately before and after working for SCA.[100] He holds a bachelor's degree in law and society, as well as multiple certifications in information technology and project management.[101] In contrast, Scott Keech worked for SCA as a "Regional Director of Operations & Clinical Services" from 2011 (when the firm he worked for, Surgery Center Partners, was acquired by SCA) to March 2012 where, according to his resume, he was responsible for "clinic operations, nursing practice, and the provision of care at ambulatory

---

[98] "SCA Position Description for Director, IT Security & Technology Compliance," SCA, February 20, 2009, SCA001773262 at SCA001773262, ("███████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████); "SCA Position Description for Systems Integration Director," SCA, November 1, 2011, SCA001200665–66 at SCA001200665–66 ("██████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████").

[99] Resume of Allen M. Spradling (Named Plaintiff), SPRAD000014–15 at SPRAD000014 ("SURGICAL CARE AFFILIATES […] IT Director, July 2010 – April 2013 […] Directed all activities within IT that involved application development, projects, project discipline, product quality, vendor management, strategic planning, and contract resources.").

[100] Resume of Allen M. Spradling (Named Plaintiff), SPRAD000014–15 at SPRAD000014 ("TekSystems – Birmingham, AL[,] May 2008–April 2009[,] Senior Project Manager […] Assigned to Compass Bank Project Management Office (PMO) fulltime and responsible for the planning and implementation of projects for the Financial Risk Management Group. […] Bank of America – Birmingham, AL, May 2013–May 2019[,] Senior Vice President, Senior Services Delivery Manager, ATM […] Led initiatives to replace legacy software distribution tool (Tivoli) with SCCM and to replace legacy SNMP monitoring tool (Gasper) with ESQ.").

[101] Resume of Allen M. Spradling (Named Plaintiff), SPRAD000014–15 at SPRAD000015 ("Education & Credentials[:] Bachelor of Science (BS), Law and Society, Concentration in Economics[.] Florida State University – Tallahassee, FL[.] Project Management Professional (PMP)[.] Certified Scrum Master (CSM)[.] SAFe 4 Agilist (SA)[.] SAFe 4 Product Owner/Production Manager (PO/PM)[.] Microsoft Certified Professional (MCP)[.] Certified NetWare Administrator (CNA)[.]").

Highly Confidential – Outside Counsel/Experts Only

surgery centers (ASCs) throughout California and Texas."[102] He was employed in other clinical operations roles in the healthcare industry immediately before and after working for SCA.[103] He holds a post-graduate degree in nursing, as well as an MBA.[104]

58. In addition to varying skills, proposed class members also have varied preferences that are often correlated with the specific requirements of their jobs. Defendants' job descriptions and online job postings show that some jobs require travel.[105] Such jobs would be more attractive to workers who are willing to travel for work. This would have included Allen Spradling in May 2019, who testified that he was open to "traveling to other areas as needed" while searching for work at that time.[106] Conversely, other jobs require in-person attendance.[107] Such jobs would be unattractive to workers who are unwilling to

---

[102] Keech (Named Plaintiff) Deposition, pp. 125–126 ("You say at the top that in February 2009 you went to work for Surgery Center Partners; correct? A. [...] Yes. Q. And you were in the role of regional director of clinical operations; correct? A. Correct. Q. And you were in that role for the entire duration of your stay at Surgery Center Partners; correct? A. It's a little tricky. There was a takeover of Surgery Center Partners by SCA"); Exhibit 72 at p. 3 ("Surgical Care Affiliates[.] Regional Director of Operations & Clinical Services[.] February 2009 - March 2012 [...] responsible for clinic operations, nursing practice, and the provision of care at ambulatory surgery centers (ASCs) throughout California and Texas"); Email chain from Scott Keech (Named Plaintiff) to Shannon Kelly (Kaiser Permanente), "Re: Application," February 21, 2012, KEECH_000000339 ("[M]y current employers is SCA (they bought my company in mid December.").

[103] Keech (Named Plaintiff) Deposition, Exhibit 72 at pp. 2–3 ("Presidio Surgery Center[.] Administrator[.] July 2007 - February 2009 (1 year 8 months)[.] Provided executive leadership and direction to a team of clinical, operations, and front office managers at this six room, multi-specialty, ambulatory surgery center. [...] Kaiser Permanente[.] Area Continuum Administrator[.] April 2012 - August 2015 (3 years 5 months). [...] Responsible for all areas of continuing care operations").

[104] Keech (Named Plaintiff) Deposition, Exhibit 72 at p. 4 ("Education[.] University of Toronto - Rotman School of Management[.] Master of Business Administration, Business Administration and Management, General[.] (2002 - 2004)[.] Henry Ford Hospital/U of Michigan[.] RN, Nursing[.] (1994 - 1996).").

[105] For example, SCA specifies that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" for its "Director, Acquisition Due Diligence" position. Similarly, DaVita specifies that travel is required "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" See "SCA Position Description for Director, Acquisition Due Diligence," SCA, July 23, 2009, SCA001613450; "DaVita Job Description, Vice President – VillageHealth Clinical Operations," DaVita, November 2009, DVA_OMCEAL_001296546–49 at DVA_OMCEAL_001296546–47; "DaVita Job Description, Director – Acquisition Integration," DaVita, July 2008, DVA_OMCEAL_001294747–50 at DVA_OMCEAL_001294747–48; United Surgical Partners International, "USPI Regional Vice President, Operations II – New Jersey," 2025, available at https://careers.uspi.com/job/lakewood/uspi-regional-vice-president-operations-ii-new-jersey/26425/78736071152, accessed on April 6, 2025.

[106] Spradling (Named Plaintiff) Deposition, p. 209 ("At that time, were you open to relocating to other areas? A. No, I was open to being a remote employee and traveling to other areas as needed.").

[107] For example, DaVita specifies that a Senior Director of Finance role "will be based out of Denver, Colorado" and require travel only "10%" of the time, and that a Director of Corporate Strategy role is "required" to be based out of Denver. See DaVita, "Senior Director, Finance Job in 2000 16th Street, Denver, CO 80202 | Leadership & Supervisor Jobs at DaVita," March 26, 2025, available at https://careers.davita.com/job/R0397738/Senior-Director-Finance, accessed on April 8, 2025; DaVita, "Director, Corporate Strategy Job in 2000 16th Street, Denver, CO 80202 | Leadership & Supervisor Jobs at DaVita," February 13, 2025, available at https://careers.davita.com/job/R0378916/Director-Corporate-Strategy, accessed on April 8, 2025. Some positions, including Hospital Administrator and CEO positions require in-person attendance because they involve the day-to-day management of specific facilities. Other positions require in-person visits to several facilities and require that candidates reside nearby. See, e.g., SCA, "CEO - Gladiolus Surgery Center in Ft Myers,

commute or relocate to the assigned office location. ███████████

████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

█████████████████ ⁰⁸ Similarly, other examples in the record show that proposed class members switched jobs or turned down job offers with Defendants during the Class Period because they preferred a shorter commute,[109] or less work-related travel.[110]

59. Importantly, these preferences can also change over time. Scott Keech testified that he actively sought to relocate to California from Michigan during a job search in 1999. Soon after arrival in California, he commuted daily almost 50 miles each way from San Francisco to Santa Clara.[111] Ultimately, however, he



Florida | SCA Health," available at https://careers.sca.health/jobs/38935?lang=en-us, accessed on April 8, 2025 ("Locations: Ft Myers, Florida Facility: Gladiolus Surgery Center [...] Accountable for executing the growth strategy, direct P&L responsibility and overall goal execution of one SCAH facility. [...] Serves as on-site personnel director and ensures fair and prompt resolution of teammate complaints, grievances and operating proble [sic]"); USPI, "Surgery Center Administrator at USPI," available at https://careers.uspi.com/job/ventura/surgery-center-administrator/35934/77706296208, accessed on April 8, 2025 ("Ventura Endoscopy Center (11841) [...] Responsibilities and Expectations [...] The daily operation of the facility"); USPI, "Director of Business Office at USPI," available at https://careers.uspi.com/job/dakota-dunes/director-of-business-office/35934/78354660944, accessed on April 8, 2025 ("This position is responsible for the direct supervision of the business office staff."); SCA, "Director Operations in United States | SCA Health," available at https://careers.sca.health/jobs/39469?lang=en-us, accessed on April 8, 2025 ("This role requires travel to facilities within the Indianapolis, Indiana market. We are open to candidates residing within a two-hour commute of the region.").

[108] Spradling (Named Plaintiff) Deposition, pp. 164–165 ("[D]id the reason for not wanting to relocate even initially or for the delay in relocation have to do with your children being in school? [...] Yes."), p. 196 ("[My wife] wouldn't consider going south. Q. And why was that? A. Just comfort desire with climate, that kind of thing. [...] [P]ersonal preference."); Keech (Named Plaintiff) Deposition, p. 44 ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████), pp. 185–186 ("██████████████████

██████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████), pp. 186–187 ████████

████████████████████████████████████████████████

███).

[109] "Exit Interview Questionnaire of Wayne C. Jones," USPI, October 12, 2016, USPI_CIV_000239009–12 at USPI_CIV_000239010 ("Name & Phone #: Wayne C. Jones Dept./Facility Name: Broward Specialty Surgical Center Title: Administrator"), USPI_CIV_000239009 ("████████████████████████

████████████████████").

[110] Email chain from Rich Sharff (SCA) to Michael Rucker (SCA), "RE: Confidential – ████████/USPI," January 7, 2014, SCA000227468–70 at SCA000227468–69 ████████████████████

████████████████████████████████████████████████

███").

[111] Google Maps, "Santa Clara, California to San Francisco, California," available at https://www.google.com/maps/dir/santa+clara/san+francisco/, accessed on April 2, 2025.

Highly Confidential – Outside Counsel/Experts Only

acquired a job at Presidio Surgery Center in San Francisco and the experience made him averse to commuting.[112] Similarly, Allen Spradling testified that he was unwilling to move to another city at one point while his children were in school.[113] However, during his tenure at a previous employer, he moved almost 500 miles between offices in Montgomery, AL and Lexington, KY.[114]

*2.1.4. Defendants Face Varying Competitive Pressures When Setting Compensation, and Lack Market Power Sufficient to Suppress Pay for Many or Most (if Not All) Proposed Class Members*

60. In order for the challenged conduct to suppress competition and pay for all or nearly all proposed class members, it must be the case that Defendants have sufficient market power to restrict labor competition for each of the many different jobs that proposed class members hold. However, as the data and record evidence I have already discussed in this section establish, proposed class members' pay is subject to different competitive pressures that vary depending on their alternative employers. The alternative employers for a worker depend in turn on that worker's skills and preferences and are thus individualized.

61. In what follows, I explain how Defendants take these varying competitive pressures into account when setting proposed class members' pay. This occurs in at least two different ways. First, as I explain below, Defendants benchmark proposed class members' pay against what competing employers are offering to workers in similar jobs. This might be thought of as job-based variation in

---

[112] Keech (Named Plaintiff) Deposition, p. 44 ("



"), pp. 157–158 ("

"").

[113] Spradling (Named Plaintiff) Deposition, pp. 164–165 ("Q. Okay. And what was the reason that you weren't able to relocate immediately? A. Well, there was never a requirement to relocate immediately. They were fine with me working remotely. I just had to have a definite ending to that remote engagement, and I think it was three years. But during my three years, my personal circumstances changed which caused me not to be able to relocate to Charlotte. Q. Was – did the reason for not wanting to relocate even initially or for the delay in relocation have to do with your children being in school? [...] A. Yes.").

[114] Spradling (Named Plaintiff) Deposition, pp. 34–35 ("Q. Why did you leave your role at ASD? A. So I started in Montgomery as the branch manager. Then I moved to Kentucky and started a new branch there, and during that spin-up of that new branch, I was contacted by a friend at Regions to come work at Regions. Q. When you were a branch manager, you act – you had relocated to Kentucky? A. Yes. Correct. Q. Where in Kentucky? A. Lexington."); Google Maps, "Montgomery, Alabama to Lexington, Kentucky," available at https://www.google.com/maps/dir/Montgomery+alabama/lexington+kentucky/, accessed on April 2, 2025.

competitive pressures. Second, as I show in Section 2.2, there is also person-based variation in competitive pressures. Compensation for proposed class members can vary based on several individualized factors including pay negotiations, managerial discretion, individual performance, the supply and demand for workers' highly specific skills, and the proportion of compensation that different types of pay that depend on different factors (including individual-specific factors) comprise. I am aware of no information common to the proposed class that would allow all of the above factors to be accounted for.

62. I begin by describing preliminary evidence that is consistent with competitive pressures varying across proposed class members at both the job and person level, as the above discussion explained is the case. Exhibit 8, Exhibit 9, and Exhibit 10 show that average pay for proposed class members *differs across jobs in different categories* – and specifically, by seniority level, by specialty area, and by geography.[115] Further, Exhibit 8, Exhibit 9, and Exhibit 10 also indicate that there is a wide range of pay *within each of these categories*, which is consistent with the individualized nature of proposed class members' outside employment options due to their varied skills and preferences.

---

[115] I present exhibits similar to Exhibit 8, separately for each of the three Defendants, in Appendix C.

*EXHIBIT 8*

*Differences in Pay Across Seniority Levels Reflect Varying Competitive Pressures*



**Source: Corrected Starr Data**

**Note: This exhibit shows** ███████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████

***EXHIBIT 9***
***Differences in Pay Across Specialty Areas Reflect Varying Competitive Pressures***



Source: Corrected Starr Data

Note: This exhibit shows

**EXHIBIT 10**
**Differences in Pay Across States Reflect Varying Competitive Pressures**



Source: Corrected Starr Data
Note: This exhibit shows ███████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████.

Highly Confidential – Outside Counsel/Experts Only

63. Turning back to the two types of variation in competitive pressures that Defendants consider when setting pay, record evidence shows that Defendants consider job-based variation in competitive pressures when setting proposed class members' pay, in part by relying on external market data and industry surveys that are *specific to a job*. These kinds of benchmarking efforts are common in labor markets to determine whether pay for a job generally aligns with what competitors are offering for workers in similar jobs.[116] There are numerous examples of Defendants benchmarking pay against the competition in this way during the Class Period, using information collected from a variety of sources (e.g., external market data from CareerBuilder and PayScale; industry surveys from Mercer). For example, ████████



████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████[117] Similarly, ████████████
████████████████████████████████████████
████████████████████████[118] ████████████
████████████████████████████████████████
████████████████████[119] Additionally, an internal presentation
████████████████████████████████████████
████████████████████████████████████████
████████████████████████[120] Indeed, Prof. Starr and

Prof. Gerhart cite this evidence extensively in their own reports.[121]

---

[116] Zoe Cullen, Shengwu Li and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," *National Bureau of Economic Research,* 2024 ("Cullen, Li, Perez-Truglia (2024)"), p. 1 ("[I]n our survey of Human Resources (HR) managers, 87.6% report using salary benchmarks to set pay.").

[117] "PwC Executive Total Cash Compensation Assessment," SCA, January 2012, SCA001280928–79. See also "SCA Benchmark – GVP Development," SCA, Undated, SCA001669826.

[118] Email chain from Mark Garvin (USPI) to Sandi Karrmann (USPI) and Andy Johnston (USPI), "RE: PayScale Information – RVP Nationwide," with attachments, February 8, 2017, USPI_CIV_000021897–98 at USPI_CIV_000021898; "PayScale Market Report: Regional Vice President (RVP), Operations," USPI, February 3, 2017, USPI_CIV_000021899–904 at USPI_CIV_000021899. See also Email chain from Sandi Karrmann (USPI) to Andy Johnston (USPI) et al., "FW: RVP Compensation Reports - Career Builder," February 7, 2017, USPI_CIV_000021906; "Talent Compensation Report," CareerBuilder, February 7, 2017, USPI_CIV_000021907–11 at USPI_CIV_000021907.

[119] Deposition of Sandi Karrmann (USPI), August 14, 2024 ("Karrmann (USPI) Deposition"), pp. 40–41 ("████████
████████████████████████████████████████
████████████████████████").

[120] "Village Vitality Murphy Update," DaVita, September 2012, DVA_OMCEAL_001360570–622 at DVA_OMCEAL_001360573.

[121] Gerhart Report, ¶ 116 ("████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Highly Confidential – Outside Counsel/Experts Only

64. Further, even though external pay benchmarking plays an important role in Defendants' pay decisions for proposed class members, Defendants set pay in an individualized manner that accounts for person-level variation in competitive pressures.[122] For example, in her deposition, Bridie Fanning

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████ [123]

65. This aligns with findings from the economics literature. For example, a 2024 study by economists Zoe Cullen, Shengwu Li, and Ricardo Perez-Truglia concludes that salary benchmarking plays a bigger role in compensation for low-skill positions than high-skill positions.[124] In particular, in an empirical analysis those authors conduct, while the median market salary may serve as a "starting point" for setting pay for high-skilled positions, employers tend to



████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████████████████ "); Starr
Report, ¶ 179 ("█████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████ "), ¶ 181 ("████████████████
████████████████████████████████████ ").
[122] Bridie Fanning testified that, in addition to external market data, ████████████
███████████████████████████████████████████████. I will
discuss these individualized factors further in Section 2.2. See Fanning (SCA) Deposition, pp. 176–177 ████
████████████████████████████████████████████████████████
████████████████████████████████████████████████ See also
Deposition of Robert Chipman (DaVita), August 7, 2024 ("Chipman (DaVita) Deposition"), pp. 82–83 ████
████████████████████████████████████████████████████
████████████████████████████████████.
[123] Fanning (SCA) Deposition, pp. 176–177.
[124] Cullen, Li, Perez-Truglia (2024), p. 3 ("According to anecdotal accounts from interviews with compensation managers, salary benchmarking may play a more prominent role for low-skill positions. Intuitively, employers see candidates for a low-skill position as 'interchangeable' (Adler, 2020), so they want to identify the market rate and offer that amount to all candidates. In contrast, in high-skill positions, employers may supplement salary benchmarks with additional information tailored to each specific candidates, such as salary expectations and outside offers."), p. 27 ("Low-skill candidates are given take-it-or-leave-it offers, and the candidate's efforts to ask for more are not only rejected, but are even considered inappropriate (Adler, 2020). On the other hand, in high-skill positions, there can be large differences in quality from one candidate to another. HR professionals emphasize the importance of tailoring offers to specific candidates (Adler, 2020). The firm may still look up and use the salary benchmark as a starting point, but there are other factors that can come into play, such as the line manager's opinion of the candidate, the candidate's own salary history, outside offers, and salary expectations. Consistent with this view, survey data suggest that, relative to low-skill candidates, high-skill candidates are substantially more likely to engage in salary negotiations (Hall and Krueger, 2012).").

Highly Confidential – Outside Counsel/Experts Only

"tailor the offer to the individual candidates" by paying attention to individualized factors such as outside offers.[125]

66. Indeed, consistent with this, and as I discuss in Section 2.2, record evidence shows that proposed class members leveraged outside job offers from non-Defendant employers to negotiate pay increases with Defendants on a case-by-case basis during the Class Period. Had Defendants tried to suppress these proposed class members' pay below what other firms were offering, these workers could have simply accepted their competing job offer. Further, as I will also discuss in Section 2.2, record evidence also shows that Defendants issued retention bonuses to proposed class members whose skills were in high demand from competing employers.[126] These are the kinds of competitive constraints that render implausible Prof. Starr's assertion that the Defendants have "market power over Class Members" in an undefined relevant antitrust labor market.[127]

---

[125] Cullen, Li, Perez-Truglia (2024), p. 29 ("In high-skill roles, although the median market salary may serve as a starting point, other factors often become more significant as employers tailor the offer to the individual candidate. Another way to view this is that benchmarks are less informative for high-skill positions. In low-skill positions, candidates are seen as interchangeable, so the firm only needs to determine the median pay and offer that to every candidate. For high-skill positions, however, the information on the median pay may fall short of ideal. For example, rather than a single benchmark for "software developer," a firm might prefer two distinct benchmarks: one for "below-average software developer" and another for "above-average software developer," to be used depending on the perceived quality of the candidate").

[126] Email from Jason Strauss (SCA) to Jeff Fields (SCA) and Leslie Wachsman (SCA), "RE: Notable Forecasting Items Northern California – Retention Agreements," July 22, 2014, SCA000091011 ███████████████████
████████████████████████████████████████████████████████████; Email chain from Bill Wilcox (USPI) to Brett Brodnax (USPI), "Re: David Lewis Draft Offer Letter and Compensation Plan," November 15, 2014, USPI_CIV_000401250–54 at USPI_CIV_000401250 ████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████; Deposition of Michael D. Staffieri (DaVita), April 5, 2024 ("Staffieri (DaVita) Deposition"), pp. 120–121 ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████; Email from Paul Slavin (USPI) to Mark Corcoran (USPI) et al., "RE: Retention Review Recommendations," July 10, 2018, USPI_CIV_000064623–27 at USPI_CIV_000064623 ████████████████████████████
████████████; Email from Mark Corcoran (USPI) to Sandi Karrmann (USPI) et al., "Retention Plan for my team," July 3, 2018, USPI_CIV_000064628 ███████████████████████████████████████████
████████████████; Email chain from Carolyn Campbell (USPI) to Rachelle Pitts (USPI) et al., "Re: ████████ - Foundation Interim VP- IT," March 23, 2017, USPI_CIV_000235807 ████████████████████
████████████████████████████████ Email from Rachelle Pitts (USPI) to Corey Ridgway (USPI) et al., "RE: Saginaw Staff Retention," August 15, 2018, USPI_CIV_000563699–700 at USPI_CIV_000563699 ████████████████████████████████████████████████████████████████████████
████████████████████████████████.

[127] Starr Report, ¶ 196.

67. The varying job-level and person-level competitive pressures that Defendants consider when setting pay for proposed class members, and the fact that proposed class members leverage outside job offers from non-Defendant firms to negotiate pay increases with Defendants on a case-by-case basis, mean that individualized inquiry would be necessary to evaluate whether pay could have been suppressed due to the alleged conduct for any proposed class member, let alone all or nearly all proposed class members. For example, to understand whether Defendants had market power sufficient to suppress pay for a certain job, it would be necessary to understand not only what other firms Defendants compete with for that type of labor, but also what other jobs individuals in that role consider when conducting a job search. Similarly, it would be necessary to understand which proposed class members leveraged outside offers to negotiate their pay. Individualized inquiry would be required to determine the answer to these key questions.

68. Despite the need for individualized inquiry, it is evident that, for many or most (if not all) proposed class members, Defendants did not have market power sufficient to suppress pay, given the abundance of alternative employers besides Defendants that I observe in my analysis of employment histories for members of the proposed class. Moreover, in the event that it was determined Defendants did have market power with respect to some set of proposed class members (which Plaintiffs have not demonstrated), individualized inquiry would also be necessary to quantify harm (if any), given the varying competitive pressures that Defendants face when setting pay for proposed class members. I am not aware of any information common to the proposed class that would allow Plaintiffs to address these complex individualized considerations.

### 2.2. Plaintiffs' Experts Have Not Demonstrated that Proposed Class Members Not Directly Affected by the Challenged Conduct Would Be Indirectly Affected Through a Rigid Pay Structure

69. Plaintiffs' experts assert that, due to Defendants having rigid pay structures that link together pay for each of the proposed class members, proposed class members not directly impacted by the alleged conduct also experienced suppressed pay as a result of the alleged conduct.[128] Prof. Starr concludes that,

███████████████████████████████████████████████████████

████████████████████████████████████

---

[128] Starr Report, ¶ 172 ████████████████████████████████████████████████████████████████████████████████████████████; Gerhart Report, ¶ 7 ████████████████████████████████████████████████████████████████████.



”[129] Similarly, Prof. Gerhart opines that ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ [130] In order for this to be true, it would need to be the case that Defendants' pay structures were sufficiently rigid that changes in pay for some proposed class members would lead to changes in pay for all or nearly all other proposed class members. Plaintiffs' experts have not established that such a rigid pay structure exists for any of the Defendants, let alone all three (as would be required to support Prof. Starr's damages model).

70. In support of their claimed rigid pay structures, Prof. Starr and Prof. Gerhart discuss the concepts of "internal equity," the idea that individuals doing similar work within a firm should receive similar pay, and "external equity," the idea that workers doing similar work at different firms should have pay that is similar. They then assume that because Defendants at times considered both internal equity and external equity, they had rigid pay structures in place that linked together pay for each of the proposed class members. They further purport to demonstrate that Defendants did, in fact, have rigid pay structures in place through their review of qualitative and quantitative evidence.[131] As an initial matter, I do not dispute that Defendants consider internal equity to some degree and are constrained by market forces (i.e., the fact that employers' decisions about how much to pay their workers are constrained by what other employers who compete for the same worker's pay) when setting pay, nor that Defendants have one or more processes for thinking

---

[129] Starr Report, ¶ 172.
[130] Gerhart Report, ¶ 161. See also Gerhart Deposition, p. 288 ("



"), p. 230 ("

").
[131] Starr Report, ¶¶ 172–175 ("

"); Gerhart Report, ¶ 94 ("

").

about and setting compensation. However, in this section I show that case evidence casts doubt on Defendants' purported reliance on internal equity and market forces as a basis for assuming rigid pay structures, and I further dispute the claim that the qualitative or quantitative evidence in this matter is consistent with the existence of a rigid pay structure whereby any pay suppression or changes in pay for some proposed class members would spread to all or nearly all other proposed class members. I also show that, while Plaintiffs' experts put forward flawed qualitative and quantitative evidence to support their claimed rigid pay structures, the quantitative analyses are uninformative and generate results that are inconsistent with the claimed rigid pay structures once basic corrections are made, and their review of the qualitative evidence does not properly account for business documents and testimony showing that Defendants did not have job-specific pay ranges or grades for class positions throughout the Class Period.

71. In the first part of this section, I discuss evidence demonstrating that proposed class members' pay is determined in a highly individualized, and highly negotiated, manner rather than according to rigid pay structures (Section 2.2.1). In the second part, I turn to a discussion of quantitative evidence, which shows that there is wide variation in pay for proposed class members at the same seniority level, that there is substantial overlap in the observed pay ranges for adjacent seniority levels (i.e., observed pay ranges are not highly differentiated across seniority levels); and that proposed class members' pay does not move together over time. Further, I show that Prof. Starr's quantitative analyses, once corrected for basic errors, also show no evidence consistent with rigid pay structures. Each of these points militates against the existence of rigid pay structures (Section 2.2.2). In the final part of this section, I explain that these findings are not surprising, given record evidence showing that Defendants did not have job-specific pay ranges and grades for class positions throughout the Class Period (Section 2.2.3). Both Prof. Starr and Prof. Gerhart fail to properly consider the evidence from this section. Ultimately, the facts and arguments summarized above lead me to conclude that, even assuming the alleged conduct occurred and impacted some proposed class members, impact from the alleged conduct would not be common across proposed class members.

*2.2.1. Evidence Indicates that Proposed Class Members' Pay is Highly Individualized and That Defendants Did Not Have Rigid Pay Structures Through Which Changes in Pay for One Group of Proposed Class Members Would Be Transmitted to All (or Nearly All) Other Proposed Class Members*

72. Plaintiffs' experts assume that proposed class members' pay was set through rigid pay structures capable of spreading harm classwide. However, this assumption ignores at least five basic facts about the setting of proposed class members' pay. First, Defendants engage in individualized negotiations with proposed class members to determine their pay. Second, Defendants rely in part on managerial discretion to determine proposed class members' pay, which means that many different decentralized decision makers are involved in making pay decisions. Third, Defendants condition a portion of proposed class members' pay on their individual performance. Fourth, Defendants adjust proposed class members' pay to account for differences in the supply and demand for their highly specific skills. Fifth, Defendants offer many different types of pay, and the proportion of total compensation that each type of pay represents can vary substantially across workers. **These five facts highlight the individualized nature of proposed class members' pay.** In such a context, it is not plausible that proposed class members' pay would move together over time in accordance with the rigid pay structure that Plaintiffs' experts assert. In the absence of a rigid pay structure, any effect of the alleged conduct on pay would not be common.

73. The first reason that proposed class members' pay is individualized is that **Defendants often engage in individualized pay negotiations with proposed class members, resulting in individualized differences in pay across the proposed class**. ████████████████



████████████████████████████████████████

████████████████████████ 132 ████████████████████

---

132 Fanning (SCA) Deposition, p. 35 ("████████████████████████████████
████████████████████████"), pp. 171–172 ("████████████████████
████████████████████████████████████████████████████
████████████████████████████████████"). See also Email chain from Warren Cinnick (SCA) to Jason Strauss (SCA), "RE: CONFIDENTIAL – Title and Compensation Recommendation – ████████████," with attachments, September 20, 2018, SCA000523268–72 at SCA000523270 ██████████████████████████
████████████; Email chain from Andy Johnston (USPI) to Sandi Karrmann (USPI), "RE: Fwd: LDP," December 5, 2013, USPI_CIV_000473082–83 at USPI_CIV_000473083 ("████████████████
████████████████████████████████████"); "Offer of Employment Letter to ████████ for Vice-President, Development," USPI, Undated, USPI_CIV_000026215–216 at USPI_CIV_000026215 ("████████████████████████████████████████"); Email



████████████ [134] Further, Prof. Gerhart acknowledges in his report that Defendants negotiate pay with proposed class members (citing testimony from

███████████████████████████████████

████████████████████), and similarly testified during his deposition that he was aware of examples where Defendants' employees used outside job offers to negotiate higher pay.[135]

74. There are various ways that proposed class members leverage their individual circumstances (their "bargaining position") to obtain better terms from Defendants during these negotiations. For example:

- **Some individuals leverage employment offers or expressed interest from competing firms to negotiate better terms**

chain from Shannon Mosley (USPI) to Mark Garvin (USPI) et al., ███████████ Offer Letter 09 26 14.docx – please approve," September 26, 2014, USPI_CIV_000244825 ("████████████████████████████████ ████████████"); Letter from Mark Garvin (USPI) to ███████████, 2014, USPI_CIV_000036006 ("███████████████████ █████████████").

[133] Garvin (USPI) Deposition, p. 90 ("█████████████████████████████████ ████████████████████████████████████ ████████████████████████"); Deposition of Anthony Martin (USPI), June 27, 2024 ("Martin (USPI) Deposition"), p. 59 ("██████████████████████████████ █████████████████").

[134] Deposition of Steven Priest (DaVita), November 5, 2024 ("Priest (DaVita) Deposition"), p. 142 ("██████████ ███████████████████████████████████ ██████████████████████"'); Deposition of Javier Rodriguez (DaVita), August 12, 2024 ("Rodriguez (DaVita) Deposition"), p. 59 ("█████████████████ ███████████████████████████████████ ██████████████████████████"), p. 84 ("███████████████ █████████████████████").

[135] Gerhart Report, ¶ 72 ("███████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ██████████"'); Gerhart Deposition, pp. 133–134 ("████████████████ ███████████"). Note that, despite Prof. Gerhart's admission, and despite the evidence discussed above which shows that individualized negotiations were common among proposed class members, Prof. Starr claimed in his deposition that "wages ██████████████████████████████. See Starr Deposition, Volume I, p. 268.

**with Defendants.** For example,

- **Some individuals – in particular, candidates who are employed by another firm at the time that they apply for a**

---

[136] Email chain from Jennifer Sandoz (SCA) to Melissa Hayes (SCA) and Rita Benavides (SCA), "RE: *EXTERNAL* SCA Offer Letter/Director, Financial Operations," August 1, 2016, SCA000100643–46 at SCA000100643–46,

[137] Email chain from Tim Buono (SCA) to Christian Ellison (SCA) and Brian Mathis (SCA), "RE: Personnel –Need feedback this afternoon, if at all possible," April 7, 2017, SCA001129757–58 at SCA001129758 ███████

[138] Email chain from Alex Bateman (USPI) to Andy Johnston (USPI), "RE: Admin merit increase," February 6, 2015, USPI_CIV_000336479 ("███████").

[139] Email chain from Leah Cerkvenik (USPI) to Shannon Mosley (USPI) and Teresa Danna (USPI), "RE: ███ offer information," December 26, 2013, USPI_CIV_000192177–78 at USPI_CIV_000192178, ("███ "); "Confidential Assessment for ███," December 17, 2013, USPI_CIV_000376500–06 at USPI_CIV_00376500 ("███").

[140] Priest (DaVita) Deposition, p. 142 ("███").

**job with one of the Defendants – leverage their current employer's compensation package to negotiate better terms with Defendants.** In one such instance, ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████[141] In another instance, ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████[142] Additionally, ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████[143]

- **Some existing employees leverage their strong performance to negotiate better terms with Defendants**. Named Plaintiff ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████[144] Similarly,

████████████████████████████████████████████

---

[141] Email chain from Faisal Rashid (DaVita) to Colleen Arthur (DaVita), "RE: Davita Offer and Next Steps," January 20, 2016, DVA_OMCEAL_001382483–86 at DVA_OMCEAL_001382483–85 ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ .

[142] Email from Shannon McGarry (USPI) to Marc Steen (USPI), "RE: USPI Employment Offer," February 14, 2018, USPI_CIV_000030396–99 at USPI_CIV_000030396–97 ("████████████

████████████████████████████████████████████████

████████████████████"); Letter from Marc Steen (USPI) to Julianne Christy, February 8, 2018, USPI_CIV_000274099 ("████████████████████████████████

████████████████").

[143] Email chain from Peter Blach (USPI) to Shannon Mosley (USPI), "RE: FW: Todd interview with Andy," June 4, 2014, USPI_CIV_000452281–283 at USPI_CIV_000452281; "Offer of Employment Letter to Robert 'Todd' Greene for Administrator at Franklin Surgery Center," USPI, 2014, USPI_CIV_000295492 ("████████████████

███████").

[144] "SCA Personnel Action Form – Allen Spradling," SCA, October 23, 2009, SCA000000198–200 at SCA000000200 ████████████████████████████████████

████████████████████████████████ . See also Email chain from Andrew Hayek (SCA) to Joe Clark (SCA) and Michael Rucker (SCA), "RE: Followup-this morning," August 7, 2015, SCA001284417–18 at SCA001284417 ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ .



<sup>145</sup> Another

<sup>146</sup>

<sup>147</sup>

75. The above discussion underscores that pay negotiations are common among proposed class members. There is likely also variation in whether proposed class members choose to negotiate in the first place, and how successful such negotiations would be. For example, a 2020 study by economists Christine Exley, Muriel Niederle, and Lise Vesterlund found that, in a series of laboratory experiments, women tended to "self-select" into pay negotiations if doing so was expected to result in gains for them financially, and avoid pay negotiations if doing so was expected to result in losses.[148] They also found that women with higher negotiating ability were more likely to engage in pay negotiations in the first place and tended to achieve higher returns when they did engage in pay negotiations.[149] Similarly,

---

[145] Email chain from Teresa Danna (USPI) to Cindy English (USPI), "RE: FW: Message from, KMBT_C454," with attachments, January 15, 2014, USPI_CIV_000499023–24 at USPI_CIV_000499023 ("

").

[146] Email chain from Peter Blach (USPI) to Sandi Karrmann (USPI) and Shannon Mosley (USPI), "RE: Donita stock question," February 28, 2018, USPI_CIV_000272179–182 at USPI_CIV_000272181

").

[147] Email chain from Arthur Colleen (DaVita) to Gary Main (DaVita), "RE:                    ," with attachments, January 27, 2016, DVA_OMCEAL_001059650–52 at DVA_OMCEAL_001059652 ("

").

[148] Christine L. Exley, Muriel Niederle, and Lise Vesterlund, "Knowing When to Ask: The Cost of Leaning In," *Journal of Political Economy,* 128(3), 2020, pp. 816–854 ("Exley, Niederle and Vesterlund (2020)") at pp. 818–819 ("When women choose to enter negotiations in the Choice treatment, they largely gain from doing so. [...] [W]e find, from the counterfactual of women always negotiating, that there are no gains from increased negotiations. When given a choice, women already enter negotiation opportunities that result in gains. They only avoid negotiation opportunities that would have resulted in losses. [...] When comparing the financial outcomes from 'self-selected' negotiations that workers choose to enter in the Choice treatment to those from 'non-self-selected' negotiations in the Always treatment, it is clear that women know when to ask and men are not more adept at knowing when to ask than women are.").

[149] Exley, Niederle and Vesterlund (2020), p. 841 ("While female workers with higher [bargaining] ability measures are significantly more likely to enter negotiations [...], male workers with higher [bargaining] ability measures are not [...] [T]hese [bargaining] ability measures are correlated with higher average profits [...] These results therefore suggest that men are not more likely, and if anything appear less likely than women, to positive select on [bargaining] ability.").



████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████[150]

76. Above, I discussed the *first* reason that proposed class members' pay is individualized: pay is negotiated differently from one proposed class member to another. Next, I turn to the *second* reason that proposed class members' pay is highly individualized: **the specific decision makers involved in determining pay vary across proposed class members.** Differences across proposed class members in terms of who decides on their pay lead to another layer of individualized inquiry. Two otherwise-similar employees assigned to different decision makers would potentially see different pay based on differences across decision makers. In discussing the first reason for individualized pay, I cited a number of examples in the record where decision makers negotiated pay with proposed class members. These decision makers additionally exercise pay-setting discretion by assigning merit pay increases or bonuses to the employees they oversee. My review of record evidence reveals this pattern for each Defendant:

- At SCA, ████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████[151]
  Similarly, ████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████[152] In
  fact, in his deposition testimony, ████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████



---

[150] Deposition of Kent Thiry (DaVita), August 16, 2024 ("Thiry (DaVita) Deposition"), p. 257 ████████████████████
████████████████████████████ ").

[151] Email from Kevin Zaiderman (SCA) to Suzanne Rogers (SCA), "Comp Analysis," with attachments, February 8, 2018, SCA000075527–28 at SCA000075527, ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████.

[152] "SCA Compensation Committee Meeting," March 6, 2012, SCA000641812 at p. 10.

███████████████████████████ [153] More generally,
██████████████████████████████████
██████████████████████████████
███████████████████████████████████
██████████████████████████████ [154]

- Similarly, at USPI, ████████████████████████
████████████████████████████████████
██████████████████████████████████ [155] In line with these
examples, ██████████████████████████████
████████████████████████████████
███████████ [156]

---

[153] Deposition of Michael Rucker (SCA), August 27, 2024 ("Rucker (SCA) Deposition"), pp. 344–345 ████
████████████████████████████████████
██████████████████████████████████
███████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████ "). See also Deposition of Brian Mathis (SCA), September 20, 2024 ("Mathis (SCA) Deposition"),
p. 247 ("████████████████████████████
███████████████████████ ").

[154] Fanning (SCA) Deposition, pp. 169–170 ████████████████████
███████████████████████████████████
█████████████████████ .

[155] Email chain from Mark McCormick (USPI) to Teresa Danna (USPI), "RE: Corporate Salary Increases - Nov
2014_████████████ (Due by Mon 10/20)," with attachment, October 20, 2014, USPI_CIV_000689431 ("█
████████████ "); Email chain from Alex Bateman (USPI) to Cindy English (USPI), "RE: PLEASE RESPOND:
Administrator Increase Questions Ellinger & Bray – JOHNSTONBATEMAN," February 2, 2015,
USPI_CIV_000650633–36 at USPI_CIV_000650634 ("████████████████████
█████████████████████████ ").

[156] Karrmann (USPI) Deposition", pp. 43–44 ("████████████████████
████████████████████████████████████
███████ "), pp. 45–47 ("██████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████████████████
████████████ "). See also Email chain from Mark Kopser (USPI) to Cindy English (USPI), "Re: Salary
Adjustment Considerations – Wilcox (Nov 2010)," October 21, 2010, USPI_CIV_000147704–706 at
USPI_CIV_000147704 ("████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████ "); Email from Cindy English (USPI) to Jonathan Bond (USPI), "Administrator Salary Considerations

- Further, at DaVita, ███████████████████████



157

159

160

---

– BOND – Nov 2012," October 11, 2012, USPI_CIV_000810697; "Year End Performance Review Process," USPI, December 2014, USPI_CIV_000056611–43 at USPI_CIV_000056620; Email chain from Mark Garvin (USPI) to John Wellik (USPI), "Preliminary bonus calculations – Garvin," February 23, 2013, USPI_CIV_000045232–33 at USPI_CIV_000045232; Email chain from Alex Bateman (USPI) to Cindy English (USPI)., "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Johnston-Bateman (Due by Friday, February 6, 2015)," February 6, 2015, USPI_CIV_000039752–53 at USPI_CIV_000039752; "Base Salary – Proposed Increases Effective 3/1/15 – Alpha by EVP/SVP," USPI, January 1, 2015, USPI_CIV_000039754; Email chain from John Wellik (USPI) to Andy Johnston (USPI), "Re: Preliminary bonus calculations – Johnston – 2/27," March 6, 2013, USPI_CIV_000040585–87 at USPI_CIV_000040586; Email chain from Andy Johnston (USPI) to Teresa Danna (USPI), "Re: Administrator Salary Considerations – JOHNSTON – Danna – Nov 2012," October 19, 2012, USPI_CIV_000044404–405 at USPI_CIV_000044404; Email chain from Mark Garvin (USPI) to Peggy Wellmann (USPI) et al., "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Garvin-Wellman (Due by Friday, February 6, 2015)," February 9, 2015, USPI_CIV_000045211–12 at USPI_CIV_000045211.

[157] "Palmer Meeting," October 10, 2011, DVA_OMCEAL_001399746–74 at DVA_OMCEAL_001399774 ███████████████████████████████████████████████████████████████████████████████████████ .

[158] "Compensation Risk Assessment – Part 2: Broad-Based Employee Programs," April 17, 2018, DVA_OMCEAL_001344570–82 at DVA_OMCEAL_001344575 █████████████████████████████████████████████████████████ .

[159] Deposition of Colleen Arthur (DaVita), May 23, 2024 ("Arthur (DaVita) Deposition"), pp. 39–40 ████████████████████████████████████████████ .

[160] Staffieri (DaVita) Deposition, pp. 150–152 ████████████████████████████████████████████████████████████████ .

77. A third reason that proposed class members' pay is highly individualized is that **Defendants condition many components of proposed class members' pay on individual performance, resulting in additional variation in compensation across the proposed class**. Individual performance plays a central role in Defendants' pay decisions. For example, ██



██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████ [161] Similarly, ████████████
██████████████████████████████████████████
███████████████████████ [162] Further, ██████████████
██████████████████████████████████████████
████████████ [163] ████████████████████████
██████████████████████████████████████████
████████████ [164] Both ██████████████████████
██████████████████████████████████████
████████████████████████████████████ [165]

___

[161] Email chain from Colleen Arthur (DaVita) to Carley St. Clair (DaVita), "RE: Comp FAQs talking pts," with attachments, July 10, 2018, DVA_OMCEAL_001322030–34 at DVA_OMCEAL_001322034.

[162] "SCA 2016 Total Compensation," SCA, March 2016, SCA001159728–48 at SCA001159729.

[163] Arthur (DaVita) Deposition, p. 52 ███████████████████████████████████████ ██████████ ").

[164] Deposition of Warren Joseph Cinnick (SCA), November 22, 2024 ("Cinnick (SCA) Deposition"), p. 46 ("███ ████████████████████████████████████████████ ██████████████████████████████ "). See also Kilgore (SCA) Deposition, pp. 102–103 ("████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████ ").

[165] Karrmann (USPI) Deposition, p. 39 ("██████████████████████████ ██████████████████████████████████████████ ████████████████ "); Deposition of Jennifer Sandoz, Volume I (SCA), September 26, 2024 ("Sandoz (SCA) Deposition, Volume I"), pp. 54–55 ████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████ ."). ██████████████ See "USPI Performance Management Strategy," USPI, USPI_CIV_000037627–29 at USPI_CIV_000037627 ("██████████████████████████████ ████████████████████████████████████ "); "Brett Brodnax Personal Objectives," USPI, January 2009, USPI_CIV_000034853–54 at  USPI_CIV_000034853 ("███████████████████ ████████ "). ██████████████████████████████████████ See Memo from Bill Wilcox (USPI) to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041648 ("████████████████████████

78. A special example of Defendants' pay-for-performance strategy that is particularly relevant for proposed class members involves equity compensation (i.e., compensation awarded in the form of stock shares or stock options). Equity compensation is particularly common for more senior level positions.[166] From an economic perspective, ideal employee compensation reflects employee performance. From this perspective, equity compensation is anomalous: people dislike risk, and rewarding an employee with equity compensation saddles them with risk. The economics literature describes, however, that for some employees sufficiently high in the organization, equity compensation is expected, because the value of aligning firm incentives and employee incentives outweighs the inefficiency of giving employees risk they dislike.[167]

79. Defendants' pay-for-performance approach is also consistent with broader trends documented in the economics literature. A 2007 study by Edward Lazear and Katherine Shaw concluded that pay has become more variable across U.S. workers over time, in part because firms have shifted toward a pay-██

---

█████████████████████ "); "Minutes: USPI Holding Company, Inc. Compensation Committee Meeting," USPI, March 8, 2017, USPI_CIV_000023134–45 at USPI_CIV_000023144–145; "Unanimous Written Consent of the Compensation Committee of the Board of Directors," USPI, February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467450. See also "2015 Bonus Plan Regional Vice President," USPI, 2015, USPI_CIV_000152743 ████████████████████ ); "Tenet HR Committee USPI Compensation Overview," USPI, November 4, 2015, USPI_CIV_000024185 at p. 2 ████████████████ ███████ ; "USPI Group Holdings, Inc. 2007 Equity Incentive Plan," USPI, 2007, USPI_CIV_000336973–85 at USPI_CIV_000336974 ████████████ ██████████████████████ ██████ ; "Resolutions of Compensation Committee of USPI Holding Company, Inc.," USPI, November 13, 2016," USPI_CIV_000068808–21 at USPI_CIV_000068815 ████████ ███████████████████████ █████████████████████ . See Memo from Bill Wilcox to Option and Compensation Committee, "Request for Approval," June 25, 2013, USPI_CIV_000121836–40 at USPI_CIV_000121836 (" ████████████████████████ "); "Minutes: United Surgical Partners International, Inc. Compensation Committee Meeting," USPI, May 3, 2011, USPI_CIV_000890968–76 at USPI_CIV_00890971.

[166] I demonstrate that this is the case later in this section. See e.g., Exhibit 11.

[167] See e.g. Edward P. Lazear and Paul Oyer, "Personnel Economics," *The Handbook of Organizational Economics*, ed. Robert Gibbons and John Roberts (Princeton, N.J.: Princeton University Press, 2013), pp. 479–519 at p. 502 ("[P]erhaps the most important justification for equity-based pay is to generate incentives. This explanation is likely to apply in small firms or among very high-level managers at large firms. These employees can have an important impact on the firm's value, and the incentive effects of ownership can outweigh the inefficiency in asking these employees to bear the risk of factors beyond their control that affect firm value."). The economics literature has also found that deferred compensation could "may induce a worker to perform at a higher level of effort." Equity pay is one such form of deferred compensation. See Edward Lazear, "Why Is There Mandatory Retirement?" *Journal of Political Economy*, 87(6), 1973, pp. 1261–1284 at p. 1264.

performance approach (which generates larger differences in pay between high and low performers).[168]

80. Before proceeding, it is important to note that Prof. Gerhart claims in his report that a "pay-for-performance" strategy is *not inconsistent* with internal equity, and in turn is not inconsistent with Plaintiffs' claimed rigid pay structures. He argues that performance is simply another factor (similar to job title or years of experience) that Defendants can condition on within their structured compensation systems.[169] However, this, too, is individualized: a "pay-for-performance" strategy creates a tension between internal equity and market forces that Defendants are likely to resolve differently from one another, or differently for different workers.

81. To make this more concrete, consider a hypothetical example. Suppose I accept Prof. Gerhart's claim that, as part of their rigid pay structures, Defendants used job-specific pay ranges or grades to set pay (even though, as I show in Section 2.2.3, evidence in this matter indicates that Defendants did not have job-specific pay ranges or grades for class positions throughout the Class Period).[170] Further suppose a top performer attempts to negotiate pay higher than what the pay range or grade to which they are assigned based on their job title and annual performance rating would allow (i.e., because there are individualized components of their performance that cannot be captured by an annual performance rating, but that Defendants and competing employers value). The employer suspects the top performer could seek employment elsewhere and command a higher salary. The employer must then decide whether to respond to those latent competitive forces by granting the requested pay increase, or to prioritize internal equity by not agreeing to the pay increase. If the top performer avails herself of outside options, then the employer prioritizing internal equity risks losing the top performer to another firm.

---

[168] Edward P. Lazear and Kathryn L. Shaw, "Personnel Economics: The Economist's View of Human Resources," *Journal of Economic Perspectives*, 21(4), 2007, pp. 91–114 at p. 92 ("The rising variance of pay across individuals surely reflects changing demand for skills, but also is likely to reflect changes in human resource practices. Compensation has shifted towards pay-for-performance. The proportion of employees' pay that comes from bonuses rather than from base salary has increased. [...] [T]he share of large firms that have more than 20 percent of their workforce working with some form of individual incentives, like a performance bonus, has grown from 38 percent to 67 percent. The percent of firms using any form of 'gain-sharing' or group-based incentives has grown from 26 percent to 53 percent.").

[169] Gerhart Report, Section VII.D, ¶ 135 ("Internal Equity and Pay for Performance Are Not Mutually Exclusive. [...] Defendants' Practices Account For Equity and Performance.").

[170] Gerhart Report, ¶ 114 ("███████████████████████████████████████ ███████████████████████████████████████████ ").

82. Turning from this hypothetical to the Defendants in this matter, it is not clear why faced with such a choice, the three Defendant firms would make the same decision as each other. Similarly, it is not clear why any one Defendant faced with such a choice for one employee would make the same decision for another employee. These considerations undercut the idea that a rigid pay structure based on internal equity considerations is tenable. Market forces would persistently chip away at such a structure in ways that are inherently individualized, as high performers seek outside options or, in negotiation with their incumbent firm, point to their ability to do so.

83. A fourth reason pay for proposed class members is highly individualized is that **Defendants make adjustments to proposed class members' pay based on differences in skills, and in the demand for those skills, across workers**. For example, Named Plaintiff Allen Spradling testified that it was "probable" that SCA considered matching job offers made to IT employees by competing firms during his tenure at SCA, as IT skills were "very in demand and transferable" during this period.[171] ████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████[172] ██████████████████████████
██████████████████████████████████████
██████████████████████████████
████████████[173] ████████████████████████

[171] Spradling (Named Plaintiff) Deposition, pp. 123–125 ("It is highly possible that during my tenure at SCA – not possible, probable that someone had an offer from another company and SCA considered matching it. Almost guaranteed that happened [...] Q. Sure, sure. And why are you so confident that that's something that would have happened? [...] A. The – the IT skill set is very in demand and transferable, so in general IT resources are constantly reassessing their value to the market, so to speak, and as a result of that, opportunities present themselves.").

[172] Email from Jason Strauss (SCA) to Jeff Fields (SCA) and Leslie Wachsman (SCA), "RE: Notable Forecasting Items Northern California – Retention Agreements," July 22, 2014, SCA000091011, ████████████████ ██████████████████████████████████████ ████████████████████████████████ ; Email from Peter Clemens (SCA) to Julie Smith (SCA) et al., "RE: Retention Pay," January 29, 2015, SCA001117010–13 at SCA001117010 ("████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████").

[173] Email chain from Bill Wilcox (USPI) to Brett Brodnax (USPI), "Re: ████████ Draft Offer Letter and Compensation Plan," November 15, 2014, USPI_CIV_000401250–54 at USPI_CIV_000401250 ("████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████"). See also Memo from Bill Wilcox (USPI) to



84. Finally, a fifth reason pay is individualized for proposed class members is that **Defendants offer many different types of pay that depend on different factors, and the proportion of total compensation that each type of pay represents can vary substantially across workers.** Exhibit 11 demonstrates the variation in the types of pay that feed into total compensation across proposed class members, focusing on DaVita only. SCA and USPI are excluded from the analysis because structured data on equity pay at the time of issuance is only available for DaVita.[175] While there is some data on equity pay at SCA and USPI, it does not reflect the value of equity at the time it is issued by Defendants to employees as part of a total compensation package.[176] Rather it reflects equity when it vests, or is exercised or sold by,

---

Arie Burke (USPI), July 16, 2014, USPI_CIV_000044881–83 at USPI_CIV_000044881 ("

"), USPI_CIV_000044883 ("⬛⬛⬛").

[174] Staffieri (DaVita) Deposition, pp. 120–121 ("⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛ ").

[175] The available data on equity pay for SCA and USPI comes from payroll records. Payroll records reflect income that is reportable for tax purposes (i.e., income that must be reported on an employee's W-2 tax form) and that appears on an employee's paycheck. Restricted stock units, stock grants, and stock options become taxable income at the time of vesting, or at the time of sale or exercise by the employee, depending on the type of equity. See Turbotax, "How to Report RSUs or Stock Grants on Your Tax Return," February 18, 2025, available at https://turbotax.intuit.com/tax-tips/investments-and-taxes/how-to-report-rsus-or-stock-grants-on-your-tax-return/L55yZieu0, accessed on April 11, 2025; Fidelity Investments, "How equity compensation and stock purchase plans are taxed," available at https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/fidelity/equity-compensation-tax-treatment-guidelines.pdf,accessed on April 11, 2025; Intuit Quickbooks, "Payroll records: What are they and why do you need them?," January 22, 2020, available at https://quickbooks.intuit.com/r/payroll/payroll-records/, accessed on April 11, 2025.

[176] DaVita has been a publicly-held company since their initial public offering in 1995. SCA was founded in 2007 as a privately-held company, but later became publicly-held following their initial public offering in 2013. They were acquired by Optum (part of UnitedHealth), a publicly-held company, in 2017. USPI was a publicly-held company from their initial public offering in 2001 to 2007, at which point they were purchased by a private equity firm and became privately-held. They were later acquired by Tenet, a publicly-listed company, in 2018. See Total Renal Care Holdings, Inc., SEC Form 10-K for period ended December 31, 1998, filed on October 8, 1999, p. 40 ("We raised additional capital to fund the continuation of our growth strategy through an initial public offering, or IPO, in October 1995"); "Total Renal Care Holdings, Inc. Announces Legal Name Change to DaVita Inc.," DaVita, October 9, 2000, available at https://investors.davita.com/2000-10-04-Total-Renal-Care-Holdings-Inc-Announces-Legal-Name-Change-to-DaVita-Inc, accessed on April 10, 2025; Reuters, "HealthSouth to Sell Surgery Unit for $945 Mln," August 9, 2007, available at https://www.reuters.com/article/business/healthsouth-to-sell-surgery-unit-for-945-mln-idUSN26342795/ , accessed on April 15, 2025; GlobeNewsWire, "Surgical Care Affiliated Announces Closing of its Initial Public

---

Highly Confidential – Outside Counsel/Experts Only

proposed class members which conflates employer conduct (with respect to compensation setting) with vesting schedules, employee behavior, and changes in the market value of the equity more generally. Exhibit 11, focusing on DaVita, shows ████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

███████████████████████████████

Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares," November 4, 2013, available at https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-to-Purchase-Additional-Shares.html, accessed on April 10, 2025; GlobeNewsWire, "Surgical Care Affiliates (SCA), OptumCare to Combine," January 9, 2017, available at https://www.globenewswire.com/news-release/2017/01/09/904294/28633/en/Surgical-Care-Affiliates-SCA-OptumCare-to-Combine.html, accessed on April 10, 2025; "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," *CNBC,* January 8, 2007, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 10, 2025; United Surgical Partners International, Inc., SEC Form Schedule 14A, 2007, p. 15 ("USPI's initial public offering was in 2001"); Tenet Health, "Tenet Completes Purchase of USPI from WCAS," April 26, 2018, available at https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx, accessed on April 10, 2025.

***EXHIBIT 11***
***DaVita Proposed Class Members' Compensation Mix Varies by Seniority Level***



Source: Corrected Starr Data
Note: The exhibit shows ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████ This exhibit reflects DaVita only, since information on equity pay at the time of issuance is only available for DaVita.

85. While I cannot perform the same analysis for SCA and USPI, the available qualitative and quantitative evidence indicates that similar patterns hold for both Defendants.

- For SCA, ████████████████████████████


---

177 "Total Rewards Statement for 2016," March 8, 2016, BF000233732; "Total Rewards Statement for 2015," August 8, 2015, SCA001478736.



[178] These data align with ███████████████████████████████████████ [179]

- For USPI, ███████████████████████████████ [180] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [181]

86. Further, internal emails during the Class Period demonstrate variation across proposed class members in pay composition as a result of pay negotiations. These internal emails show that while some negotiations related to salaries, others involved signing bonuses, equity compensation, tuition reimbursement, and relocation packages.[182]

---

[178] Workpaper 6.

[179] Fanning (SCA) Deposition, p. 169 ("██████████████████████████████████████ ██████████████████" SCA, March 2016, SCA001159728–48 at SCA001159734 ("████████████ ████████████████████████████████").

[180] ██████████████████████████████████████████████████████████████ . See Email chain from Alex Jenkins (USPI) to Andy Johnston (USPI), "FW: Grant of Stock Options," USPI_CIV_000337004–7005; Email from Alex Jenkins (USPI) to Paula Baldwin (USPI) et al., "Stock Option Grant & Agreement Dated July 14, 2017 (Paula Baldwin)," USPI_CIV_000231289–90; Email chain from Jeffrey Andrews (USPI) to broncojeff16@gmail.com, "FW: Grant of Stock Options," September 19, 2016, USPI_CIV_000701723–24; Email from Alex Jenkins (USPI) to Kelly Barker (USPI), "Stock Option Grant & Agreement Dated July 14, 2017 (Kelly Barker)," July 19, 2017, USPI_CIV_000314724–25.

[181] Workpaper 7.

[182] Email chain from Joe Clark (SCA) to Bridie Fanning (SCA) et al., "RE: 16 02 17–Drekhoff recap," February 20, 2016, SCA000900508–10 at SCA000900509 ████████████████████████████████████ ██████████████████████████████████████████████████████████████████

87. The discussion of these five basic facts above highlights the individualized nature of Defendants' pay-setting processes. These facts mean that contrary to Plaintiffs' experts' claims regarding rigid pay structures, a decrease in pay for some employees *does not necessarily imply* a similar decrease in pay for all other employees. Aside from these five basic facts, the idea of pay being set based on rigid pay structures is especially implausible in light of the high-level nature of the employees in the proposed class. Numerous studies in economics have shown that pay dispersion is largest among high-level employees with more years of education and experience,[183] in part due to variation in individual and firm level factors among these employees, such as the amount of on-the-job training they receive; their firm's size and performance; and their negotiating ability.[184] Further, because managerial performance is difficult to observe and



██████████████████████; Email chain from Warren Cinnick (SCA) to Jennifer Sandoz (SCA), "RE: Craig's final offer," February 6, 2018, SCA000532931–33 at SCA000532931–33 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████); Email chain from Tim Buono (SCA) to Christian Ellison (SCA) and Brian Mathis (SCA), "RE: Personnel –Need feedback this afternoon, if at all possible," April 7, 2017, SCA001129757–58 at SCA001129758, ██████████████████████████████████████████████████████████████████████████

██████████████████████; Staffieri (DaVita) Deposition, p. 121 ("████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

██████████████████████); Email chain from Faisal Rashid (DaVita) to Colleen Arthur (DaVita), "RE: Davita Offer and Next Steps," January 20, 2016, DVA_ OMCEAL_001382483–86 at DVA_ OMCEAL_001382483, ("████████████████████████████████████████████████ ████████████████████████████████████████████"); Email chain from Bill Wilcox (USPI) to Brett Brodnax (USPI), "Re: ████████ Draft Offer Letter and Compensation Plan," November 15, 2014, USPI_CIV_000401250–54 at USPI_CIV_000401251, ("████████████████████████████████ ████████████████████████████████████████████████"); Email chain from Shannon Mosley (USPI) to Andy Johnston (USPI), "RE: ████████ Offer Ltr 01142014.docx.," January 14, 2014, USPI_CIV_000338903–04 at USPI_CIV_000338903, ("████████████████████████ ████████████████████████████████████████████████"); Email chain from Brett Brodnax (USPI) to Sandi Karrmann (USPI), "RE: ████████ Offer Letter 4 2016," April 19, 2016, USPI_CIV_000900796–801 at USPI_CIV_000900801 ("██████████████████████████████████ ████████████████████████████████████████████████").

[183] Thomas Lemieux, "Increasing Residual Wage Inequality: Composition Effects, Noisy Data, or Rising Demand for Skill?," *American Economic Review,* 96(3), 2006, pp. 461–498 ("Lemieux (2006)") at p. 462 ("Wage dispersion among narrowly defined groups of workers is substantially larger for older and more educated workers than for younger and less-educated work[ers]."), p. 465 ("There is pervasive evidence of heteroskedasticity in wages, however. For example, Mincer (1974) and more recently Chay and Lee (2000) show that the variance of wages generally grows with both education and labor market experience.").

[184] Lemieux (2006), p. 466 ("In particular, Mincer (1974) argues that wage dispersion increases as a function of experience (past the overtaking point) because of differential investments in on-the-job training (OJT). In other words, inequality in the distribution of unobserved skills (OJT) increases with experience."); George-Levi Gayle and Robert A. Miller, "Has Moral Hazard Become a More Important Factor in Managerial Compensation?," *American Economic Review*, 99(5), 2009, pp. 1740–1769 at p. 1740 ("[T]he market for managers has become more differentiated, increasing the premium paid to managers of large versus small firms. [...] Executive compensation is tied instead to various indicators of managerial effort, such as the firm's performance."); Exley, Niederle and Vesterlund (2020), p. 841 ("While female workers with higher [bargaining] ability measures are significantly more likely to enter negotiations [...], male workers with higher [bargaining] ability measures are not [...] [T]hese [bargaining] ability measures are correlated with higher average profits [...] These results therefore suggest that men are not more likely, and if anything appear less likely than women, to positive select on [bargaining] ability.").

monitor, the economics literature has found that firms often pay high-level employees in accordance with their relative performance (rather than according to absolute performance standards), which leads to a wider range of pay among employees in similar jobs.[185]

*2.2.2. Empirical Analysis is Inconsistent with Plaintiffs' Claimed Rigid Pay Structures and Consistent with Proposed Class Members' Pay Being Individualized*

88. I next turn to a discussion of the empirical implications of rigid pay structures and describe tests I conducted to assess whether Defendants' compensation is consistent with rigid pay structures. These tests demonstrate that pay is highly individualized. I also show that Prof. Starr's empirical analyses that he claims are evidence of rigid pay structures are uninformative. Making simple corrections to Prof. Starr's methodology to better align the tests with what Prof. Starr purports to be testing belies rigid pay structures.

*a) Empirical Analysis is Inconsistent with Defendants Setting Pay Based on Rigid Pay Structures*

89. As an initial matter, Plaintiffs' experts assert that Defendants set pay according to rigid pay structures. As a result, they claim the alleged conduct generates "cascading" effects on proposed class members' pay, primarily through two mechanisms:[186]

- **First, Plaintiffs' experts claim that any pay suppression for a worker or group of workers at a particular seniority level would spread to all other workers at that same seniority level.** Prof. Gerhart provides the following example in his report to show how this supposedly works: in the absence of the alleged conduct, a current Director could have negotiated a higher salary

---

[185] Matt Bloom and John G. Michel, "The Relationships among Organizational Context, Pay Dispersion, and Managerial Turnover," *The Academy of Management Journal*, 45(1), 2002, pp. 33–42 at p. 34 ("Tournament theory also alludes to context, in, for example, the assertion that 'it is the amount of uncertainty that determines the wage spread' (Lazear, 1995: 31)"), p. 35 ("Uncertain environments make it increasingly difficult to assess managerial performance in absolute terms both because of monitoring difficulties and because managerial actions cannot be prescribed a priori (Lambert et al., 1993). More dispersed pay structures are posited to be appropriate under such circumstances because they rely on relative, not absolute, performance standards, which reduces the monitoring burden (Lazear, 1995)."); Edward P. Lazear and Sherwin Rosen, "Rank-Order Tournaments as Optimum Labor Contracts," *Journal of Political Economy*, 89(5), 1981, pp. 841–864 at p. 848 ("Salesmen, whose output level is easily observed, typically are paid by piece rates, whereas corporate executives, whose output is more difficult to observe, engage in contests.").

[186] Gerhart Report, ¶ 8 (" .").

after receiving an unsolicited job offer with higher pay, which means that "████████████████████████████████████ ████████████████████████████████████ ████████████████████████," and in turn means that "████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████"[187] Assuming the alleged conduct did occur, Prof. Gerhart opines this would work in reverse, and the lack of an increase in pay for the Director who did not receive the unsolicited job offer as a result of the alleged conduct would in turn lead to a lack of an increase in pay for all other Directors.[188]

- **Second, Plaintiffs' experts claim that any pay suppression for workers at one seniority level would spread to workers at all other seniority levels.** Extending his previous example, Prof. Gerhart claims that this supposedly works as follows: in the absence of the alleged conduct, any increase in pay for Directors means that "████████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████" which means that ████████████████████████ ████████████████████████████████ ████████████████████████████[189] Assuming the alleged conduct did occur, Prof. Gerhart opines this would once again work in reverse, and the lack of an increase in pay for Directors would in turn lead to a lack of an increase in pay for Vice Presidents.[190]

---

[187] Gerhart Report, ¶ 143. See also Starr Report, ¶¶ 173–174 ("████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████████████").

[188] Gerhart Report, ¶ 143 ("In a no-poach context, there would not be this internal equity pressure to increase the pay of the other Directors to restore internal equity.").

[189] Gerhart Report, ¶ 143. See also Starr Report, ¶ 172 ██████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████").

[190] Gerhart Report, ¶ 143.

90. If Plaintiffs' experts were correct that Defendants had rigid pay structures that would spread any pay suppression classwide in the manner they claim, I would expect to observe three key patterns in Defendants' structured data:

- **First, it should be the case that, from one year to the next, different employees' pay would trend in the same direction (either increasing for all employees or decreasing for all employees).** This is evident from Prof. Gerhart's example above, which purports to show that when pay goes up for one Director, it should go up for other Directors as well as for proposed class members at other seniority levels.

- **Second, it should be the case that, when observed over a longer time horizon, employees' pay profiles would move together over time.** Again, this is evident from Prof. Gerhart's example, if one considers that the same scenario could play out multiple times throughout the Class Period.

- **Third, observed pay ranges within a seniority level should be narrow (meaning that employees in the same seniority level would receive similar pay), and observed pay ranges across seniority levels should be differentiated and have minimal overlap.** In Prof. Gerhart's example, if this were not the case and observed pay ranges were very wide with substantial overlap, then there would be no reason for pay of other Directors to adjust, or for pay of proposed class members at other seniority levels to adjust, in response to a change for a single Director since the ranges and differentials could be maintained without adjusting pay for others.

91. In what follows, I show that none of these three key patterns hold under scrutiny. I note that when I refer to "observed pay ranges" in this subsection, I am referring to the observed range in actual pay corresponding to the 5th and 95th percentiles of the pay distribution for a given group, not to the job-specific pay ranges or grades that Prof. Gerhart claims Defendants used to set pay, and which I show in Section 2.2.3 are inconsistent with record evidence.

92. The first prediction of a rigid pay structure is that shorter-run changes in pay should be similar across workers. My analysis gives no indication that, on a year-over-year basis, pay changed similarly across proposed class members. Exhibit 12 plots █████████████████████████████████



████████████████████████████████████████████ Exhibit 12 shows that, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ 191

**EXHIBIT 12**
**Year-Over-Year Changes in Pay Vary Across Proposed Class Members**



Source: Corrected Starr Data
Note: The exhibit shows ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

93. The second prediction of a rigid pay structure is that longer-run changes in pay should be similar across workers. My analysis gives no indication that proposed class members' pay changed similarly over a longer time horizon. Exhibit 13 █████████████████████████████████

██████████████████████████████████████████████

██████████████ Exhibit 13 ████████████████████████

████████████████████████████████████

---

191 Workpaper 8.

Highly Confidential – Outside Counsel/Experts Only



*EXHIBIT 13*
*Pay of Randomly Selected Proposed Class Members Does Not "Move Together" Over Time*



Source: Corrected Starr Data
Note: The exhibit shows █████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

94. I also perform a similar analysis as the one in Exhibit 13 ████████████████
██████████████████████████████████████ These analyses are included in Appendix C. As just one example of the additional analyses I perform, Exhibit 14 shows ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

Highly Confidential – Outside Counsel/Experts Only

**EXHIBIT 14**
**Pay of Randomly Selected Directors Does Not "Move Together" Over Time**



Source: Corrected Starr Data
Note: The exhibit shows the ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

95. The results in Exhibit 12, Exhibit 13, and Exhibit 14 indicate that a change in pay for one proposed class member would not be expected to result in a change in pay for all other proposed class members. Pay simply does not move similarly for different proposed class members. These patterns are inconsistent with rigid pay structures, and instead show that pay is individualized.

96. The third prediction of a rigid pay structure is narrow observed pay ranges for proposed class members at the same seniority level (e.g., Administrator and Hospital CEO, Director, Senior Director, or Vice President) and differentiation in observed pay ranges for adjacent seniority levels. My analysis shows that ██

████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████

████████████████████████████

Highly Confidential – Outside Counsel/Experts Only

████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████ Exhibit 15 ████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ These patterns do not align with Prof. Gerhart's deposition testimony that █████████████
████████████████████████████████████
████████████████████████[192] They also do not align with Prof. Gerhart's statements in his report regarding differentiation in pay across seniority levels – i.e., the need ████████████████████
████████████████████████████████████████
██████[193] Further, these analysis █████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████
████████████████████████████████████████████
███████████████████████████[194] For example, Exhibit 16, Exhibit 17, and Exhibit 18 show that ████████████████████
██████

97. These wide observed pay ranges within a level mean that, even if pay for proposed class members at one seniority level changed, there is no clear reason that pay for other proposed class members at that same level would need to change to maintain "internal equity" within a level. As an illustrative example using Exhibit 15, a ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[192] Gerhart Deposition, p. 214. See also Gerhart Report, ¶ 126 ("████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████").
[193] Gerhart Report, ¶ 140.
[194] Workpaper 9.

[REDACTED]

[REDACTED]

98. The wide observed pay ranges within a level, and substantial overlap in observed pay ranges for adjacent seniority levels, additionally mean that changes in pay at one level would not necessitate changes in pay at other levels. As an illustrative example using Exhibit 15, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED][195] In sum, given the wide observed pay ranges for a given seniority level, and large overlap in observed pay ranges for different seniority levels, illustrated in Exhibit 15 through Exhibit 18, Plaintiffs' experts' claims that concerns about internal equity would result in a rigid pay structure sufficient to spread impact from the alleged conduct classwide are not supported.

---

[195] Gerhart Report, ¶ 143.

**EXHIBIT 15**
**There is Wide Variation in Compensation Within a Specific Seniority Level, and Substantial Overlap in the Observed Compensation Ranges for Adjacent Seniority Levels (Defendants, 2008–2019)**



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay without equity for proposed class members of the indicated seniority level. Pay in each year is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at USPI between 2010-2019 and SCA and DaVita between 2008-2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay without equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median.

Highly Confidential – Outside Counsel/Experts Only

*EXHIBIT 16*

***There is Wide Variation in Compensation Within a Specific Seniority Level, and Substantial Overlap in the Observed Compensation Ranges for Adjacent Seniority Levels (DaVita, 2016)***



Source: Corrected Starr Data

Note: This exhibit shows the annualized total compensation without equity for proposed class members of the indicated seniority level. The exhibit includes employee-year observations for proposed class members who were employed at DaVita in 2016, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total compensation without equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median. I observe similar patterns when I consider Class Period years besides 2016. See Workpaper 9.

Highly Confidential – Outside Counsel/Experts Only

**EXHIBIT 17**

***There is Wide Variation in Compensation Within a Specific Seniority Level, and Substantial Overlap in the Observed Compensation Ranges for Adjacent Seniority Levels (SCA, 2016)***



Source: Corrected Starr Data

Note: This exhibit shows the annualized total compensation without equity for proposed class members of the indicated seniority level. The exhibit includes employee-year observations for proposed class members who were employed at SCA in 2016, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total compensation without equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median. I observe similar patterns when I consider Class Period years besides 2016. See Workpaper 9.

Highly Confidential – Outside Counsel/Experts Only

**EXHIBIT 18**
**There is Wide Variation in Compensation Within a Specific Seniority Level, and Substantial Overlap in the Observed Compensation Ranges for Adjacent Seniority Levels (USPI, 2016)**



Source: Corrected Starr Data

Note: This exhibit shows the annualized total compensation without equity for proposed class members of the indicated seniority level. The exhibit includes employee-year observations for proposed class members who were employed at USPI in 2016, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total compensation without equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median. I observe similar patterns when I consider Class Period years besides 2016. See Workpaper 9.

### b) Prof. Starr's Quantitative Evidence of Plaintiffs' Claimed Rigid Pay Structures is Flawed

99. While Prof. Gerhart presents no quantitative evidence of the pay structure he claims exists in his report, Prof. Starr puts forward two flawed empirical analyses to purportedly test for the presence of rigid pay structures. First, he puts forward an empirical analysis that claims to test whether "███████████

███████████████████████████████████████

███████████.[196] For this analysis, Prof. Starr ████████████████████████████

███████████████████████████████████████

---

[196] Starr Report, p. 159 ("████████████████████████"), ¶ 183 ("████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████"), Figure 19.

Highly Confidential – Outside Counsel/Experts Only

██████████████████████████████████████. Second, he puts forward an analysis that claims to test whether "███████████████████████" ██████ ████████████████████████████████████.[197] For this analysis, Prof. Starr ████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████. In the discussion below, I first explain why Prof. Starr's empirical analyses are uninformative for understanding whether proposed class members' pay moves together over time in accordance with rigid pay structures. I then show that making simple corrections to Prof. Starr's methodology generates results that are inconsistent with Plaintiffs' claimed rigid pay structures.

100. As an initial matter, Prof. Starr's ██████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

---

[197] Starr Report, p. 161 ("████████████████████████████████"), ¶¶ 187–189 ("████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████"), Figure 20. Although Prof. Starr provides an example in his report that seems to indicate he is relying on seniority levels (e.g., Director) to define the "job levels" he uses for this analysis, he actually relies on much more granular job titles (e.g., Director of Finance) in practice. See Starr Report, ¶ 188 ("████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████"), Backup Materials.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████ [198] At root, when Prof. Starr observes ███████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████ However, this fails to account for alternative explanations that could generate the same patterns.

101. Moreover, if I correct key flaws in Prof. Starr's ███████████████████████

████████████████████████████████████████████

█████████████████████ In Exhibit 19 and Exhibit 20, ████████████████████

████████████████████████████████████ (Exhibit 19) █████████████████

████████ (Exhibit 20)

- I correct for several basic errors that Prof. Starr made when processing Defendant's structured data (which I will return to in Section 5.2), including Prof. Starr's ████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

  ██████████████████

- I then make two additional adjustments, on top of correcting Prof. Starr's data processing errors.[199] *First*, ████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

---

[198] Prof. Starr's within-job analysis suffers from the "reflection problem," a term coined by economist Charles Manski to refer to the problem "that arises when a researcher observing the distribution of behavior in a population tries to infer whether the average behavior in some group influences the behavior of the individuals that comprise the group." See Charles F. Manski, "Identification of Endogenous Social Effects: The Reflection Problem," *The Review of Economic Studies,* 60(3), 1993, pp. 531–542 at p. 531. As a simple illustrative example of how the reflection problem works ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

[199] ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████



200 *Second,*

201

---

200 [REDACTED] See A. C. Harvey, "On Comparing Regression Models in Levels and First Differences," *International Economic Review*, 21(3), 1980, pp. 707–720 at p. 707 ("It has long been recognized that regressions involving economic variables in levels can be misleading. A high value of $R^2$ is often obtained even when there is no underlying causal relationship between the dependent and explanatory variables. [...] Spurious correlations are less likely to occur with variables in first differences, and this has lead some researchers to adopt first difference formulations automatically.").

201 For the between-job analysis, Prof. Starr compares two averages, the average pay of Directors and the average pay of VPs and SVPs. This approach captures firm-wide pay correlations between levels, but does not quantify the impact of a change in one or a few proposed class members' wages on the wages of all or nearly all other proposed class members. For the within-job analysis, Prof. Starr compares a proposed class members' compensation to the average compensation of other proposed class members with the same job title. While this approach does use individual level data as the outcome variable in the regression, in cases where a job title encompasses many proposed class members, the outcome (or "dependent" variable) is equal to the average wage for a large group of proposed class members, which muddies the ability of the analysis to measure how changes in one person's pay affects the pay of all or nearly all others within the same role. See, Starr Report, Backup Materials.



102. As I explain below, making these corrections ███████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████████████████:[202]

- When I correct for Prof. Starr's ████████████████████ ██████████████████████████████ ████████████████████████████████ ████████████████████████████████ ███████████████████████████████████[203] Exhibit 19 shows that, ██████████ █████████████████████████████ █████████████████████████████████ █████████████████████████ ████████████████████████████████ █████████████████████████████████████ ████████████████████████████ ████████████████████████ ██████████████████████████████[204] ████████████████████████.

- When I additionally correct █████████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████ as shown in Exhibit

---

[202] Prof. Starr estimates his between-job and within-job analyses in two ways: first, without including any control variables in his regression model, and second, including control variables in his regression model. My analyses focus on Prof. Starr's results without control variables, as these are the results that he relies upon when he interprets the R-squared values that his analyses generate. Prof. Starr's estimated coefficients are similar in his models with and without controls. See Starr Report, Figure 19, Figure 20.

[203] Appendix D.

[204] Starr Report, p. 159.

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

███████████████████████████████

██████

- My corrected results also show that, ████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████[205]████████████████
████████████████████████████████████
████████████████████████████████
█████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████

---

[205] The R-squared values in Exhibit 19 and Exhibit 20 reflect ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. See Jeffrey M. Wooldridge, *Introductory Econometrics*, (Mason, OH: South-Western Cengage Learning, 2009) ("Wooldridge (2009)"), p. 40 ("$R^2$ is the ratio of the explained variation compared to the total variation; thus, it is interpreted as *the fraction of the sample variation in y that is explained by x.*" (emphasis in original)).

**EXHIBIT 19**
*Correcting Flaws in Prof. Starr's Between-Job Analysis Shows That Changes in Hourly Wages of Vice Presidents and Senior Vice Presidents are Not Positively Correlated with Changes in Hourly Wages of Directors*



Source: Starr Data; Corrected Starr Data

Note: This exhibit shows the results of Prof. Starr's between-job analysis from Figure 19 in his report, after correcting for certain flaws. For Starr's Model with Starr Data and Starr's Model with Corrected Starr Data, the exhibit reports the regression coefficient and the 95% confidence interval in the top panel, and the R-squared in the bottom panel (blue and orange bars). For the Adjusted Starr Model with Corrected Data, the exhibit reports the median regression coefficient and 95% confidence interval in the top panel, and the median R-squared estimate and the 95% confidence interval in the bottom panel, based on 5,000 resamplings (pink bars). Starr's Model with Starr Data and Starr's Model with Corrected Data analyze hourly wages based on total compensation, whereas Adjusted Starr Model with Corrected Starr Data analyzes hourly wages based on total compensation with adjusted equity. Total compensation with adjusted equity reflects equity at time of issuance for DaVita, but removes equity pay altogether for SCA and USPI.

Highly Confidential – Outside Counsel/Experts Only

***EXHIBIT 20***
***Correcting Flaws in Prof. Starr's Within-Job Analysis Shows That There is Not a Strong Positive Correlation Between Changes in Hourly Wages for Some Individuals in a Given Job Title and Other Individuals in That Same Job Title***

Regression Coefficient



Starr's Model, Starr Data | Starr's Model, Corrected Starr Data | Adjusted Starr Model, Corrected Starr Data

R-Squared



Starr's Model, Starr Data | Starr's Model, Corrected Starr Data | Adjusted Starr Model, Corrected Starr Data

Source: Starr Data; Corrected Starr Data
Note: This exhibit shows the results of Prof. Starr's within-job analysis from Figure 19 in his report, after correcting for certain flaws. For Starr's Model with Starr Data and Starr's Model with Corrected Starr Data, the exhibit reports the regression coefficient and the 95% confidence interval in the top panel, and the R-squared in the bottom panel (blue and orange bars). For the Adjusted Starr Model with Corrected Data, the exhibit reports the median regression coefficient and 95% confidence interval in the top panel, and the median R-squared estimate and 95% confidence interval in the bottom panel, based on 5,000 resamplings (pink bars). Starr's Model with Starr Data and Starr's Model with Corrected Data analyze hourly wages based on total compensation, whereas Adjusted Starr Model wth Corrected Starr Data analyzes hourly wages based on total compensation with adjusted equity. Total compensation with adjusted equity reflects equity at time of issuance for DaVita, but removes equity pay altogether for SCA and USPI.

Highly Confidential – Outside Counsel/Experts Only

*2.2.3. Plaintiffs' Experts Fail to Properly Consider Qualitative Evidence That is Inconsistent with Defendants Having Rigid Pay Structures Or Job-Specific Pay Ranges and Grades for Class Positions Throughout the Class Period*

103. Besides Prof. Starr's quantitative analysis, Prof. Starr and Prof. Gerhart both present qualitative analyses of Plaintiff's claimed pay structures. However, these analyses are flawed because they ignore evidence that Defendants did not have job-specific pay ranges and grades for class positions (let alone rigid pay structures) throughout the Class Period, they ignore forms of pay that comprised a large share of compensation for many proposed class members, and because qualitative analyses alone cannot demonstrate that Defendants had rigid pay structures.

104. In their qualitative analyses, Plaintiffs' experts ignore qualitative record evidence that undercuts the existence of any job-specific pay ranges and grades that applied to class positions throughout the Class Period.[206] This evidence is not surprising, considering that the quantitative analyses I performed above in Section 2.2.2 shows that there were wide observed ranges of pay for individuals at the same level, significant overlap in observed pay ranges across levels, and that pay for proposed class members did not generally move together over time.

- **SCA did not use job-specific salary ranges or grades throughout the Class Period.**

---

[206] In his deposition, SCA's Kevin Zaideman ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See Deposition of Kevin Zaideman (SCA), December 18, 2024 ("Zaideman (SCA) Deposition"), pp. 52–53 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"), p. 54 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").



207 Email from Brooke Jackson (SCA) to Bridie Fanning (SCA), October 30, 2014, SCA000111304 ███████████
█████████████████████████████████████ "); Email chain from Bridie Fanning (SCA) to
Jennifer Sandoz (SCA) and Becky Johnson (SCA), "FW: Survey Data," February 2, 2016, SCA000100169−72 at
SCA000100169 ("█████████████████████████████████████████████████████████
████████"); Email from Brooke Jackson (SCA) to Bridie Fanning (SCA), "Updated Salary Ranges," with
attachment, November 20, 2014, SCA000078353 ████████████████████████████████");
Email chain from Warren Cinnick (SCA) to Karri Hermanson (United Health Group), "SCA – Pay Equity for
NIEs: Mercer Questions and Answers," with attachment, July 25, 2018, SCA001198974−77 at SCA001198974
("████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████"); Reuters, "HealthSouth to Sell Surgery Unit for $945 Mln," August 9, 2007, available at
https://www.reuters.com/article/business/healthsouth-to-sell-surgery-unit-for-945-mln-idUSN26342795/ ,
accessed on April 15, 2025.

208 Email chain from Jennifer Simmons (SCA) to Becky Johnson (SCA) and Erin Soreano (SCA), "RE: Table or
Range Matrix?," January 30, 2017, SCA000106045−47 at SCA000106046 ██████████████████████
████████████████████████████████████████████████ "); Email chain from Jennifer Sandoz
(SCA) to Jennifer Sandoz (SCA), "FW: Update List for 1:1," February 20, 2017, SCA001186824−25 at
SCA001186824 ████████████████████████████████████████████████████████
████████████████████████████████████████ "); Email chain from Suzanne Rogers (SCA) to
Jennifer Simmons (SCA) et al., "RE: PAF/PRF," May 15, 2017, SCA001185620−32 at SCA001185620 ("███
████████████████████████████████████████████████████████████████
████████████████ "), SCA001185622 ██████████████████████████████████████
████████████████████████████████████████████████████████████████ ").

209 Email chain from Chip Zahn (SCA) to Tony Kilgore (SCA), "FW: Pay range visibility – system on which this
appears," March 9, 2018, SCA000098450−52 at SCA000098451; "Compensation Framework Alignment and
Validation," September 2020, SCA001669270 at p. 3.

210 Cinnick (SCA) Deposition, pp. 8−9 ("████████████████████████████████████████
████████████████ "), pp. 153−154 ("████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████ ").

Highly Confidential – Outside Counsel/Experts Only



- **USPI did not use job-specific salary ranges or grades throughout the Class Period.** ███████████████████

---

[211] Zaideman (SCA) Deposition, p. 52 ("███████████████████████████████████████████████████████████████████████"), pp. 54–56 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

[212] Deposition of Leslie Wachsman (SCA), May 22, 2024, p. 119 ("████████████████████████████████████████████████████████████"). See also Deposition of Jennifer Simmons-Duggan (SCA), p. 46 ("████████████████████████████████████████████████").

[213] Email chain from Sandi Karrmann (USPI) to Shannon Mosley (USPI), "Fwd: USPI HRD – C. Hodges," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337 ("██████████████████████████████████████████████").

[214] Email chain from Peggy Wellman (USPI) to Mary Leachy (Saint Joseph) and Jeremy Zoch, "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 ██ ██████████████████████████████"); Email chain from Andy Johnston (USPI) to Vanessa Smith (USPI), "RE: Administrator Prorated Salary Increases – March 1, 2015 – JOHNSTON-SMITH (Due by 01/26/15)," January 21, 2015, USPI_CIV_000095479–80 at USPI_CIV_000095479 ("███████████████████████████████████████████████").



- **DaVita did not use job-specific salary ranges or grades for class positions throughout the Class Period.** ███████████

[215] "Department Blueprint," February 9, 2016, USPI_CIV_000242488.

[216] Karrmann (USPI) Deposition, p. 32 ("████████████████████████████████ ████████████████████████████████████"), pp. 35–36 ("████ ████████████████████████████████████████"), p. 39 ("████ ████████████████████████████████"). See also Deposition of Andrew Johnston (USPI), September 6, 2024 ("Johnston (USPI) Deposition"), p. 51 ("█████████████████████ ████████████████████████████████").

[217] "Compensation Risk Assessment – Part 2: Broad-Based Employee Programs," April 17, 2018, DVA_OMCEAL_001344570–82 at DVA_OMCEAL_001344573.

[218] Email from Colleen Arthur (DaVita) to Christine Moore (DaVita), "FW: DVA Compensation Structures," March 30, 2018, DVA_OMCEAL_001329256–61 at DVA_OMCEAL_001329257.

[219] Staffieri (DaVita) Deposition, p. 150 ████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████.

[220] Arthur (DaVita) Deposition, pp. 78–79 ("██████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████"), p. 112 ("█████████████████ █████████████████████████).

Highly Confidential – Outside Counsel/Experts Only

███████████████████████████████████████████████████████████████
████████████████████████ [221]

105. Plaintiffs' experts' qualitative evidence is also flawed because it ignores forms of pay that constituted a sizable share of compensation for most senior proposed class members, such as equity pay. For example, key documents that Prof. Gerhart and Prof. Starr rely upon in their reports as evidence that Defendants designed and implemented structured compensation systems focus on salaries and bonuses, but do not discuss how the claimed structured compensation systems governed equity pay.[222] This is notable because Prof. Starr includes all types of compensation (including equity) in his pay regression model and damages estimates, and yet Plaintiffs' experts have not explained



███████████████████████████████████████ ”), p. 112 (“██████████████████████████████████
████████████████████████ ”), p. 119 █████████████████████████████████████████████████████
█████████████████████████████████████████████████████ , p. 176-180 (“███████████████████████████
██████████████████ ”).

[221] Chipman (DaVita) Deposition, p. 61 (“█████████████████████████████████████████████
████████████████████████████ ).

[222] Prof. Gerhart claims that “███████████████████████████████████████████████████ ” See Gerhart Report, p. 113, Section VII.B. He then presents evidence that “██████████████████████████████████
████████████████████████████ . See Gerhart Report, ¶ 114. However, the documentary evidence he cites in that discussion focuses primarily on salaries and bonuses, and does not discuss how the claimed structured compensation systems govern equity pay. See, e.g., Email chain from Mike Staffieri (DaVita) to Tad Stahel (DaVita), “Re: Keith increase,” December 17, 2014, DVA_OMCEAL_001339898–901; Email chain from Bridie Fanning (SCA) to Leslie Wachsman (SCA), “FW: Merit and Performance Review Process Updates,” January 7, 2015, SCA000109831–37; “Untitled Spreadsheet,” USPI, October 23, 2018, USPI_CIV_000214746, Tab “Compensation Ranges”; Email from Andy Johnston (USPI) to Bill Wilcox (USPI), “Vanessa,” July 18, 2014, USPI_CIV_000027565 . Further, while Prof. Gerhart later claims that “████
██████████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████████████
████████████████████ . See Gerhart Report, ¶ 119, Figure 8; “Surgical Care Affiliates Total Compensation Philosophy,” SCA, Undated, SCA000079723–41 at SCA000079725, SCA000079728 (“██████████████████████████████████
██████████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████ ” (emphasis added)).
Similarly, Prof. Starr claims that Defendants███████████████████████████████████████████████████
█████████████████████ ” See Starr Report, ¶¶ 179–181. However, the documentary evidence he cites focuses on salaries and bonuses, and does not discuss how the claimed structured compensation systems govern equity pay. See, e.g., Email chain from Colleen Arthur (DaVita) to Kenny Gardner (DaVita), “Internal Promotions | Comp Request,” May 23, 2018, DVA_OMCEAL_001057524–25; Email chain from Jennifer Sandoz (SCA) to Ajay Chokshi (SCA), “FW: Brian Tees comp / weekly update,” with attachment, February 13, 2017, SCA000065974–84; Email chain from Alex Bateman (USPI) to Cindy English (USPI), “RE: Proposals for VP & Above March 1, 2015 Salary Increases - Johnston-Bateman (Due by Friday, February 6, 2015),” February 6, 2015, USPI_CIV_000039752–53.

why or how compensation other than salary would be linked across proposed class members.[223]

106. Finally, qualitative evidence alone is not sufficient to demonstrate Plaintiffs' claimed rigid pay structures. While it might demonstrate that Defendants at times considered internal equity and market forces, it is ultimately an empirical question whether in practice Defendants had rigid pay structures that would spread any harm from the alleged conduct classwide. In order to demonstrate that Defendants set pay according to rigid pay structures, Prof. Starr and Prof. Gerhart would need to perform a credible empirical analysis aimed at answering the relevant question (whether Defendants had pay structures that were sufficiently rigid that changes in pay for some proposed class members necessarily led to changes in pay for all other proposed class members), not a qualitative analysis. However, Prof. Gerhart agreed in his deposition that he did no quantitative analysis of pay structures, and as I previously showed in this section, Prof. Starr's empirical analyses are fatally flawed.[224]

---

[223] Starr Report, ¶ 112 ("Total compensation is defined using all available payment sources, including the employee's salary, bonuses, stocks, and all other pay.), ¶ 115 ("I use the resulting data set, at the individual-company-year level as my main dataset.").

[224] Gerhart Deposition, p. 288 ("Q. Because you didn't perform any quantitative work in this case, is it fair to say that your report contains your opinions on what could have happened and not on what did happen? [...] A. I think my report is framed as 'the likely impact.'").

### 3. MANY PROPOSED CLASS MEMBERS COULD NOT, OR WOULD NOT, BE HARMED BY THE ALLEGED CONDUCT, AND IT IS NOT POSSIBLE TO RELIABLY MEASURE HARM USING COMMON EVIDENCE

107. In Section 2, I discussed how Plaintiffs' conclusion that impact would be common to the class relies on unsupported and incorrect assumptions. Rather, I find that, for the varied labor markets in which proposed class members participated, extensive competition from non-Defendant firms for proposed class members' labor and lack of rigid pay structures together mean that proposed class members would not be commonly impacted by the alleged conduct. In this section, I turn to a discussion of groups of proposed class members who could not, or would not, be harmed by the alleged conduct, assuming it occurred. I discuss how individualized inquiry would be necessary to identify proposed class members in each of these groups of unharmed class members. I next summarize these ideas:

- First, related to my discussion in Section 2.1, proposed class members who participated in labor markets where Defendants did not jointly possess labor market power could not have been harmed by the alleged conduct (Section 3.1).
- Second, related to my discussion in Section 2.2, many proposed class members would not have been affected directly by the alleged conduct and thus could only have been harmed indirectly through Plaintiffs' claimed rigid pay structures. However, empirical and qualitative evidence is inconsistent with rigid pay structures through which changes in pay for one group of proposed class members would spread to all (or nearly all) other proposed class members. As a result, Plaintiffs and their experts have not demonstrated that individuals not directly affected by the alleged conduct would be harmed indirectly, and many (if not all) would not be (Section 3.2).
- Third, proposed class members who were newly hired during the Class Period from a non-Defendant firm (or after graduating from school or returning to work after time off) could not be harmed by the alleged conduct, at least initially, and possibly ever. Compensation for new hires is set competitively at the time of hire (since Defendants and non-Defendant firms alike could compete for such workers) and it would take time for new hires' pay to be impacted by the conduct. Plaintiffs' experts have provided no methodology for identifying when newly hired individuals would transition from no harm at hire to the claimed harms later on, if ever. Similarly, individuals who were

employed by Defendants at the start of the Class Period but who had short tenures could not be harmed, at least initially, and possibly ever. Like new hires, their pay would be competitive at the start of the Class Period (since it was set prior to the onset of any alleged conduct) and would take time to be affected, and Plaintiffs' experts have provided no methodology for identifying when harm would start to occur, if ever (Section 3.3).

- Fourth, any proposed class members whose compensation was skewed toward equity pay, and who held a large amount of equity from Defendant firms, could have been unharmed, or possibly even benefited from the alleged conduct (Section 3.4).

- Fifth, any proposed class members employed by USPI and DaVita who would not consider employment options at SCA could not be directly harmed by the alleged mobility restrictions because Plaintiffs and their experts have presented no evidence of mobility restrictions or information sharing between DaVita and USPI (Section 3.5).

- Sixth, proposed class members who would not engage with any solicitation directed toward them (for example because they would not consider changing employers) could not have been directly harmed by the alleged mobility restrictions (Section 3.6).

- Seventh, proposed class members whose inter-Defendant mobility was already restricted for reasons other than the alleged mobility restrictions, for example due to non-compete agreements or unvested equity fall into two categories: (1) those who could not have been directly harmed by the alleged mobility restrictions and (2) those who could have been directly harmed to a degree, but where the fact of that harm could only be determined through individualized inquiry (Section 3.7).[225]

108. In all of the cases discussed above, it is not possible using common evidence to identify which individuals could not, or would not, have been impacted by the alleged conduct. The category where quantification is most nearly possible is proposed class members newly hired from non-Defendants with short tenure, and proposed class members employed by Defendants at the onset of the Class Period with short tenure: ███████████████████

---

[225] Individuals in the fifth, sixth, and seventh group could arguably still be impacted through Plaintiffs' alleged information sharing, but as I will discuss in Section 4, the information allegedly shared could have been used to compete, and would have been insufficient to coordinate on pay, even by Prof. Starr's own standards. As such, the individuals in the fifth, sixth, and seventh groups would be a subset of the second group I discussed above, those who could only be affected indirectly through Plaintiffs' unsupported rigid pay structure.

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████[226] Plaintiffs may claim that such individuals would over time become affected by the challenged conduct; however, it is not clear at what point in time these proposed class members' pay would begin to be suppressed below competitive levels under Plaintiffs' theory, and Plaintiffs' experts have provided no method to determine this. Moreover, although it is not possible to quantify precisely, the analyses I presented in Section 2.1 showing the abundance of non-Defendant firms competing for proposed class members' labor indicates that many or most (if not all) proposed class members could not be harmed by the alleged conduct due to Defendants lack of market power. Finally, in Section 3.8, I discuss several additional reasons why it is not possible to use evidence common to the proposed class to reliably quantify harm (if any).

### 3.1. Proposed Class Members Who Participate in Labor Markets Where Defendants Do Not Have Market Power Could Not Have Been Harmed by the Alleged Conduct

109. The alleged conduct could not have harmed proposed class members who participate in labor markets where Defendants do not have market power sufficient to suppress pay. In Section 2.1, I explained that Defendants do not have market power sufficient to suppress pay for many or most (if not all), proposed class members, and thus the alleged conduct could not have harmed many or most proposed class members for this reason. Proposed class members have many (and varied) employment options besides Defendants, including in the healthcare industry generally, and outside of the healthcare industry altogether. Employment options outside of the healthcare industry may be particularly likely for some proposed members of the class, such as those in certain specialty areas including Accounting, Tax, and Treasury jobs, but may also be likely for proposed class members generally.[227] By definition, all proposed class members are employed in a managerial capacity, and labor demand for supervision of other workers exists throughout the economy.[228]

110. Since proposed class members have many employment options outside of the Defendants, had compensation been suppressed below what non-Defendant competitors were offering, Defendants would have struggled to retain and hire

---

[226] See Workpaper 10.

[227] Exhibit 5.

[228] Footnote 50.

workers. Plaintiffs have not presented, nor have I seen, evidence indicating that Defendants struggled to retain and hire workers, either generally, or particularly, during the Class Period. Moreover, in Section 3.3, I present an empirical analysis of Defendants' hiring rates and employment counts over time which suggests that they did not.

111. Given the individualized nature of proposed class members' employment options, although it is theoretically possible that a proposed class member might exist for whom the only employment options are DaVita, SCA, or USPI, such a person could only be identified after conducting an individualized inquiry, and Plaintiffs' experts have not demonstrated that any such individual exists. Nor have Plaintiffs' experts demonstrated that any such individual was harmed or that the amount of any possible harm could be determined without an individualized inquiry. As I discussed in Section 2.1, each individual's relevant outside employment options, and thus relevant labor market, depend on individualized factors like skills, experience, location, and preferences among other considerations. The analysis I presented there shows extensive competition from non-Defendant employers for proposed class members' labor (e.g., see Exhibit 1 and Exhibit 2). Neither Prof. Starr nor Prof. Gerhart has put forward *any* analysis of market power in a claimed relevant antitrust market, and Prof. Starr seems unfamiliar with the idea of a relevant antitrust market.[229] While I can conceive of a person who would fail to consider any employment options outside of their employer due to various idiosyncratic reasons, it is not self-evident to me that there are any persons at Defendant "A," say, who would consider employment at Defendants "B" and "C" and not simultaneously be willing to consider employment at the many other possible employers I discussed in Section 2.1. To uncover whether any such person exists and who they might be—the only members of the proposed class for whom harm is possible—would require individualized inquiry. Available evidence on this question is limited to the analysis I have presented, and it points to the conclusion that most, if not all, proposed class members are unharmed.

---

[229] Starr Deposition, Volume I, p. 153 ("Q Are you familiar with the antitrust concept of a relevant market? A Vaguely."), pp. 154–155 ("Q And those -- those guidelines provide in particular tools for assessing the scope of what the guidelines call and what the case law calls a relevant market. Are you familiar with that? [...] A. I'm -- I'm somewhat familiar with that. Q You haven't attempted to define a relevant market in this case, have you? A Well, when it comes to thinking about market power, my -- my reading and my understanding of those -- those documents is that there are several ways to demonstrate market power, and in the merger context, it can be hard to demonstrate market power because the merger hasn't happened. And so there are several ways in that context to think about whether, you know, whether companies might have market power, and that would require defining a relevant market.").

112. A separate but important point is that **for proposed class members where Defendants did not have market power, neither the alleged mobility restrictions nor the alleged information sharing could suppress pay**. Additionally, a lack of market power corresponds to a lack of harm regardless of whether Plaintiffs allege individuals were harmed directly (due to not being solicited) or indirectly through a rigid pay structure. Therefore, **proposed class members where Defendants did not have market power could not be harmed by the alleged conduct directly, or indirectly through a rigid pay structure.**

### 3.2. Plaintiffs Have Not Demonstrated that Proposed Class Members Not Directly Impacted by the Alleged Conduct Would Be Harmed, And Many (If Not All) Would Not Be

113. Plaintiffs and their experts claim that individuals not directly affected by the alleged conduct would be harmed indirectly through a rigid pay structure that spreads harm classwide. However, as I discussed in Section 2.2, empirical and qualitative evidence does not support the existence of a rigid pay structure, but rather indicates that individualized factors were important in compensation setting. In particular, case evidence shows that proposed class members' pay (1) depends on individualized considerations, (2) varies widely between individuals even when they occupy the same seniority level at the same firm, and (3) does not move together over time. As a result, Plaintiffs and their experts have not demonstrated that proposed class members not directly affected by the alleged conduct would be harmed indirectly, and many (if not all) would not be.

114. Just above, I discussed how many or most (if not all) proposed class members, including those who were allegedly harmed only indirectly, could not be harmed because Defendants did not have market power. This is one reason for my conclusion that many (if not all) proposed class members not directly affected by the alleged conduct would not be harmed. However, even setting this aside and allowing for the possibility that Defendants had market power over proposed class members in some cases, my analysis of Defendants' pay data and proposed class members' pay changes over time suggests that many who were allegedly harmed only indirectly would not be harmed. Neither Plaintiffs nor their experts have offered any method based on common evidence that, even assuming the alleged conduct took place and harmed some proposed

class members directly, would allow them to identify which proposed class members (if any) were harmed indirectly.[230]

### 3.3. Pay for Proposed Class Members Newly Hired from Somewhere Other than Defendant Firms Could Not Have Been Harmed by Alleged Conduct, At Least Initially, and Possibly Ever

115. Competition from numerous non-Defendant firms for proposed class members' labor implies that pay for any proposed class members hired by Defendants during the Class Period from somewhere other than a Defendant firm would have to be competitive at the time of hire. This could include being hired from a non-Defendant firm, from outside the labor market, or after finishing a degree, for example an MBA. It is therefore not at all evident how these newly hired proposed class members could be harmed, or at what point that harm would start, if ever. Plaintiffs' experts have done nothing to address this gap in their logic.

116. Consider a proposed class member who is newly hired by a Defendant during the Class Period who was either previously not employed or previously employed by a non-Defendant firm. Compensation for such a person would be competitive, otherwise they would not have accepted the offer and would not have been a new hire. This gives two puzzles for Plaintiffs and their experts. First, how could such a person have been harmed? Second, since at the moment

---



[230] Moreover, they have not even offered a methodology that would allow them to identify which proposed class members were and were not directly affected. Speaking to this point, even Plaintiffs and their experts concede that there are many proposed class members who could only have been harmed indirectly through the pay structure. Third Amended Complaint, ¶ 74 ("Distortions to the labor market's competitive process, such as the distortions caused by Defendants' no-poach agreements, suppressed the pay of all employees who shared common pay structures, not just those who proactively sought to work for another outpatient medical care center. Moreover, because the pay rates for jobs within pay structures were tied together, the compensation of all employees was affected by Defendants' no-poach agreements."); Starr Report, ¶ 172 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Gerhart Report, ¶ 138 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Gerhart Deposition, pp. 38–39 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, p. 203 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

of their hire they could not have been harmed, if the theory is that they were eventually harmed, when did that begin?

117. Prof. Starr's primary pay regression model assumes a common impact for all proposed class members and thus contains two immediate contradictions in this regard that parallel the puzzles posed above.[231] First, proposed class members hired during the Class Period could not have been harmed at the time of hire, but are assumed by Prof. Starr to have the same effects as all proposed class members. This is an immediate contradiction. Second, if harm across proposed class members is common, does that mean proposed class members newly hired during the Class Period are never harmed throughout their tenure at a Defendant firm? Or are they initially unharmed and they transition to being harmed at some point? And if the latter, how long does it take before they are harmed?[232]

118. Let me now reiterate why pay for new hires is competitive, at least initially. I first describe why it would be competitive even assuming both existence and effects of the alleged mobility restrictions. Then I do the same for the alleged information sharing.

119. First, I turn to alleged mobility restrictions and assume both existence and effects. The alleged mobility restrictions would not have restricted Defendants' ability to compete for workers not employed by Defendants. Defendants, as well as other labor market competitors, would have been free to compete for these proposed class members' labor at the time they were being recruited or considered for a position. Plaintiffs allege and Plaintiffs' experts assert no agreement between any Defendants not to compete with each other for workers not employed by Defendants. Moreover, as I discussed in Section 2.1, Defendants competed with many non-Defendant employers for proposed class members' labor. It is contrary to basic case facts to assert that there are no non-Defendant employment options for proposed class members. Thus, if pay for new hires were not set competitively, those proposed class members would

---

[231] Prof. Starr may argue that his pay regression model does not treat new hires as harmed at the time of hire because he only focuses his analysis on employees with full-year compensation. See Starr Deposition, Volume I, p. 258. However, his pay regression model does include new hires that I approximate could not have been harmed because they are within their first two years of employment with Defendants, and more importantly, Prof. Starr's damages calculations include the compensation for new hires for all years in which they were employed by Defendants, including the partial years he excludes from his pay regression analysis sample.

[232] Prof. Starr's ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████

simply choose better options.[233] That pay for new hires would need to be set competitively is consistent with deposition testimony ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████[234]

120. Prof. Gerhart acknowledges that pay for individuals newly hired by Defendants would have to be set competitively in both his expert report and his deposition testimony.[235] Prof. Starr when asked in his deposition whether pay for new hires is competitive at first seems to respond that there is no such thing as competitive compensation,[236] but ultimately agrees with the obvious—a worker would only "climb the job ladder" by moving to a Defendant (or indeed any firm) if it were their best option.[237]

---

[233] I note that the compensation that is paid for a position is determined by the options and decisions of the marginal worker (i.e., the last worker hired who has the highest reservation wage). This means that even if there were some proposed class members with no non-Defendant employment options who might accept below market pay, pay for new hires would still be set competitively, because such workers would not be the marginal worker relevant for determining compensation.

[234] Johnston (USPI) Deposition, pp. 40–41 ("█████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████"). See also Deposition of Peter Clemens (SCA), May 2, 2024 ("Clemens (SCA) Deposition"), p. 144 ("██████████████ ███████████████████████████████████████████").

[235] Gerhart Report, ¶ 56 ("Paying below market, on the other hand, precludes the company from competing adequately in the labor market to hire and retain sufficient employees, particularly high-quality employees."), ¶ 143 ("But when there are many of these new hire and retention perturbations across a firm, and when they continue year-after-year, the pressures to increase pay system-wide are continuous and substantial."); Gerhart Deposition, p. 56 ("██████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████").

[236] Starr Deposition, Volume I, pp. 253–254 ("████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████"). This testimony appears to conflate two ideas. The first concept is that of a competitive compensation package, which is a package that emerges from competition between competing employers. Prof. Starr agrees that that type of package is what would persuade new hires to join the firm. See Starr Deposition, Volume I, p. 254 ██████████████████████████████████████ ██████████████████████████████████████████. See Starr Deposition, Volume I, p. 253 ("████████████████████████████████████████████████████ ████████████████████████").

[237] Starr Deposition, Volume I, pp. 254–255 ("██████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████"), p. 255 ("██████████████ ██████████████████████████████████████████████████████████████████████ ████████████████").

121. Second, I turn to the alleged information sharing and assume both existence and effects. Plaintiffs do not allege that non-Defendant firms were part of the alleged information sharing. As above, if Defendants attempted to set pay for new hires from non-Defendant firms below what other labor market competitors were offering, individuals who had the option of a job with a higher-paying, non-Defendant firm would choose the higher-paying job. Thus, as above, pay for new hires would have to be competitive.

122. Regardless of whether we are talking about the alleged mobility restrictions or the alleged information sharing, Plaintiffs' experts might try to argue that pay for proposed class members newly hired during the Class Period is not set competitively. I do not find such a claim credible. If that claim were made, it would imply that Defendants would have struggled to fill positions and maintain adequate staffing. Empirical evidence in this case points to the opposite conclusion. Exhibit 21 below shows that Defendants' employee counts grew substantially during the Class Period. (███████████████████ ███████████████████████████████████ ███████████████████████████████) Additionally, Exhibit 22 below shows that hiring rates for Defendant were similar during the Class Period, as compared to periods before or after the Class Period.

Highly Confidential – Outside Counsel/Experts Only

*EXHIBIT 21*
*Defendants' Employee Counts Grew Over Time, and Throughout the Class Period*



Source: Corrected Starr Data

Note: The exhibit shows the total number of employees for each Defendant in each year.

**EXHIBIT 22**
**Defendants' Hiring Rates Were Stable Before, During, and After the Class Period**



Source: Corrected Starr Data
Note: The exhibit plots the hiring rate for each Defendant in each year. The hiring rate is calculated as the total number of new hires divided by the total number of employees in class positions at each Defendant in each year. Employees are considered to be a new hire at a Defendant in the first year they appear in the firm's data in a class position, and were not employed by the Defendant in the previous year. The exhibit omits the first year of data available for each Defendant. ███████████████████



123. Using Defendants' data, I identify proposed class members who were hired by Defendants from somewhere other than another Defendant firm during the Class Period, and thus could not have been harmed by the alleged conduct at least initially, and possibly ever. ████████████████████
████████[238] Both Named Plaintiffs were newly hired (or acquired) from non-Defendant firms: Scott Keech previously worked at Surgery Center Partners

---

[238] See Workpaper 10. ██████████████



before his employment at SCA in December 2011 (when Surgery Center Partners was acquired by SCA),[239] and Allen Spradling previously worked at TekSystems before being hired by SCA in the fall of 2008.[240]

124. Plaintiffs may claim that such individuals would over time become affected by the challenged conduct: either directly through the alleged mobility restrictions or the alleged information sharing, or indirectly through the alleged pay structures. However, it is not clear at what point in time proposed class members' pay would begin to be suppressed below competitive levels under Plaintiffs' theory. The average length of employment for proposed class members newly hired during the Class Period was short: 2.8 years.[241] This means that for many newly hired proposed class members, any impact from the alleged conduct had little time to accrue. Additionally, all three Defendants typically implemented pay changes annually,[242] as Prof. Starr and Prof. Gerhart agree.[243] That suggests newly hired individuals would generally not be harmed

---

[239] Keech (Named Plaintiff) Deposition, pp. 125–126 ("You say at the top that in February 2009 you went to work for Surgery Center Partners; correct? A. [...] Yes. Q. And you were in the role of regional director of clinical operations; correct? A. Correct. Q. And you were in that role for the entire duration of your stay at Surgery Center Partners; correct? A. It's a little tricky. There was a takeover of Surgery Center Partners by SCA"); Email chain from Scott Keech (Named Plaintiff) to Shannon Kelly (Kaiser Permanente), "Re: Application," February 21, 2012, KEECH_000000339 ("[M]y current employers is SCA (they bought my company in mid December.").

[240] Spradling (Named Plaintiff) Deposition, DX006, pp. 49–50 (Q. "Understood. Understood. Okay. So you left TEKSystems in – oh, well, let's see. This says April 2009, but actually – but let – let's put a pin in the date. Correct? A. Correct. Q. Okay. Why did you leave? A. I was contacted by a mutual friend about an opportunity at SCA."), pp. 76–77 ("Q. You started with SCA in September of 2008; is that Correct? I'm assuming it would have been – A. Sorry. Can I go back to my resume? Q. Yeah. Sure. A. (Witness reviews document.) Well, yeah, the date of the letter is September 9th, and that's the date I accepted, and I assume it says – does it have a start date in this letter? I don't know if it does or not. I don't think it does. Q. Fair to say that you started – that you accepted this job and started within a month or so after this letter; correct? A. Correct.").

[241] Workpaper 13.

[242] Karrmann (USPI) Deposition, pp. 45–46 (""); Deposition of Cindy English, Volume I (USPI), June 12, 2024, p. 28 ("");; Sandoz (SCA) Deposition, Volume I, pp. 40–41 ("

"); Priest (DaVita) Deposition, p. 133 ("

").

[243] Starr Deposition, Volume I, p. 259 ("

"); Gerhart Report, ¶ 148 ("

"), ¶ 127 ("

for at least their first year. Economic theory and research also indicate that compensation is "sticky" or, put another way, that there is downward wage rigidity, which means that wages rarely fall, at least in nominal terms.[244] This further implies that any impact on the pay of proposed class members would not be immediate, and would most likely occur through reduced or withheld pay raises over several years, rather than through pay cuts. This explanation, however, is not at all plausible given facts in this case which show that newly hired proposed class members experienced substantial annual pay increases during Class Period years. ████████████████████████████████

████████████████████████████[245]

125. In addition, proposed class members could only be harmed if they remained at Defendant firms, but new hires, who are less attached to their new employer initially, would be prone to consider alternative employment options if their pay was not competitive, which they could likely find relatively easily by leveraging connections in the labor market made in their recent job search.[246] Moreover, even if it were the case that the pay of newly hired individuals did

---

████ ").

[244] Bruce Fallick, Daniel Villar, and William Wascher, "Downward Nominal Wage Rigidity in the United States in times of Economic Distress and Low Inflation," *Labour Economics*, 78, 2022, pp. 1–12 at p. 3 ("As is the case with many earlier studies, we find a significant amount of downward nominal wage rigidity in the United States at a 12-month horizon, both in terms of the proportion of wage changes that were actually constrained by downward nominal wage rigidity and in the proportion potentially subject to such rigidity should the notional wage change fall below zero.."); George A. Akerlof, William T. Dickens, George L. Perry, Robert J. Gordon and N. Gregory Mankiw, "The Macroeconomics of Low Inflation," *Brookings Papers on Economic Activity*, 1996, pp. 1–76 at p. 5 ("Our own reading of the evidence, and the fundamental assumption of the model that we develop below, is that nominal wages are downward rigid, except when firms are under extreme duress. [...] We present a range of evidence demonstrating that downward rigidity is an important feature of wage behavior [...]."). Firms may also "insure" workers by not adjusting wages downwards when faced with a negative shock. See, e.g., Luigi Guiso, Luigi Pistaferri and Fabiano Schivardi, "Insurance within the Firm," *Journal of Political Economy*, (2005), pp 1054–1087 at p. 1054 ("We allow for both temporary and permanent shocks to output and find that firms absorb temporary fluctuations fully but insure workers against permanent shocks only partially."). Other research, based on interviews of business people, labor leaders, business consultants, and counselors of unemployed people during a recession in the early 1990s found that "employers were reluctant to cut pay because they believed doing so would hurt employee morale, leading to lower productivity and current or future difficulties with hiring and retention." See Truman F. Bewley, "Why Not Cut Pay?" European Economic review, 42, 1998, pp. 459–490" at p. 459; Truman F. Bewley, "A Depressed Labor Market as Explained by Participant," American Economics Review, 85(2), 1995, pp. 250–254 "at p. 252 ("However, the main causes of downward wage rigidity have to do with employers' belief that other motivators are necessary, which are best thought of as having to do with generosity.").

[245] I first compute the year over year percent change in pay for new hires in each Class Period year. I then take the average of these pay changes over all Class Period years for each individual. Finally, I take the median of these individual level averages. See Workpaper 14.

[246] Henry S. Farber, "Mobility and Stability: The Dynamics of Job Change in Labor Markets," in *Handbook of Labor Economics*, Volume 3, ed. O. Ashenfelter and D. Card (Amsterdam, Netherlands: Elsevier Science B.V., 1999), pp. 2439–2483 at p. 2440 ("Three central facts describe inter-firm worker mobility in modern labor markets: (1) long-term employment relationships are common; (2) most new jobs end early; and (3) the probability of a job ending declines with tenure.").

begin to be affected after the first year, it would not turn on like a light switch ███████████████████████████████████████████████.

126. Plaintiffs' experts have done nothing to demonstrate that they have a method for reliably determining when suppressed pay for newly hired proposed class members would start, nor the degree to which pay suppression for such individuals would vary over time. Thus, it is not possible to identify which individuals who were newly hired were and were not harmed, nor is it possible to reliably quantify harm for any who were using common evidence.

127. Although individualized inquiry would be necessary to quantify precisely the share of proposed class members who could not be harmed because they were newly hired during the Class Period, to roughly approximate a group of newly hired proposed class members who could not be harmed, I estimate the share of proposed class members newly hired during the Class Period who remained with the firm for two years or less. I find ████████████████████ ███████████████████████.[247] It is my view that this is likely an underestimate of the share of proposed class members who were not harmed because they were newly hired during the Class Period (and therefore had competitive pay at the time of hire).

128. As a final point, and relatedly, proposed class members who were employed by one of the Defendants at the onset of the Class Period and left shortly after the onset of the Class Period would not have been harmed by the alleged conduct. As with the new hires with short tenure, pay would be competitive initially for such individuals (since it was set before the onset of the conduct), and it is not clear at what time (if ever) pay suppression due to the alleged conduct would occur. As I discussed above, pay changes were typically implemented annually by all three Defendants, and downward nominal pay adjustments are rare. ████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████

[247] Workpaper 10 also presents ████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████████████████████████████████████████ ███████████████████████████████████



██████.[248] Additionally, ████████████████████
████████████████████████████████████████
████████████████████████[249] Pay for these individuals would also be competitive at the onset of the Class Period, and Plaintiffs and their experts have provided no methodology to determine when, if ever, they would start to incur harm.

### 3.4. Any Proposed Class Members Whose Alleged Pay Suppression Was Entirely Offset by Increases in Equity Would Not Have Been Harmed by the Alleged Conduct

129. Prof. Gerhart asserts in his report that the alleged conduct would have benefited Defendants' stockholders by reducing each firm's compensation-related costs, and in turn, boosting their profits and the firm's long-run stock performance.[250] However, he fails to consider that, as the evidence that I discuss in Section 2.2.1 shows, **equity pay is an important source of compensation for proposed class members.** This was especially the case at the highest levels such as SVP, and may be more important for some proposed class members than others. For DaVita, this is illustrated in Exhibit 11, ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████ This means that, by Prof. Gerhart's own reasoning, individuals for whom a large share of their total compensation was equity pay, and who held a large amount of equity, could have been less harmed, unharmed, or possibly even benefited, from the alleged conduct. For these employees, even if their non-equity pay was suppressed as a result of the alleged conduct, that loss could have been (at least partially) offset as a result of

---

[248] Workpaper 10. ████████████████████████████████
████████████████████████████████████████████
████████████████████████

[249] Workpaper 10.
[250] Gerhart Report, ¶¶ 33, 36 ("████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████").

the gain in the value of their equity. Individualized inquiry would be necessary to identify which proposed class members belong to this group. I am not aware of any information common to the class that would allow for the identification of such individuals. Therefore, I cannot confirm based on evidence common to the class that they did exist, but neither can Plaintiffs and their experts demonstrate that they did not.

### 3.5. Proposed Class Members Employed by DaVita and USPI Who Would Not Consider Employment Options at SCA Could Not be Directly Harmed by the Alleged Mobility Restrictions

130. Plaintiffs' experts have provided no evidence that there was any agreement to restrict mobility between USPI and DaVita. As such, individuals employed by USPI and DaVita could only have been directly affected by the alleged mobility restrictions to the extent that they would have considered opportunities with SCA. Given this, any proposed class members employed by DaVita or USPI who would not have considered employment options at SCA (for example due to location considerations) could not have been directly harmed by the alleged mobility restrictions. Plaintiffs may claim such individuals could still be harmed by the alleged mobility restrictions indirectly through a rigid pay structure, but I have addressed this possibility in Section 3.2 where I concluded that Plaintiffs' experts have not demonstrated this would be the case, and many (if not all) would not be.

131. Additionally, individualized inquiry would be necessary to learn which proposed class members employed by DaVita and USPI would not have considered employment options at SCA. Therefore, I cannot confirm that such individuals did exist, but neither can Plaintiffs confirm that they did not.

### 3.6. Any Proposed Class Members Who Would Not Engage with Any Solicitation Outreach Could Not be Directly Harmed by the Alleged Mobility Restrictions

132. The alleged mobility restrictions would not directly affect any individuals who would not engage with any solicitation or outreach directed at them. This might occur, for example, because they have no interest in changing jobs or do not learn any useful information from the solicitation. Such individuals could not be directly impacted by the alleged mobility restrictions because they would not review any solicitation outreach, or answer the phone, let alone negotiate their wages at their current employer or move to a new employer as a result of the solicitation. Moreover, even many individuals who would engage by

answering the phone or reviewing a message sent to them may not get to the point of learning what the job is paying. Plaintiffs may claim such individuals could still be harmed by the alleged mobility restrictions indirectly through a rigid pay structure, but I have addressed this possibility in Section 3.2 where I concluded that Plaintiffs' experts have not demonstrated this would be the case, and many (if not all) would not be.

133. I am not aware of any information common to the class that would allow for the identification of individuals who would not engage with solicitation and outreach, nor attempt to negotiate higher wages or consider changing employers as a result of solicitation and outreach they received. Therefore, I cannot confirm based on evidence common to the class that they did exist, but neither can Plaintiffs and their experts demonstrate that they did not.

### 3.7. Proposed Class Members Whose Mobility Between Defendants Was Already Restricted Would Not Have Been Directly Harmed by the Alleged Mobility Restrictions in Some Cases, and in Other Cases Would Have Been Less Harmed

134. Proposed class members whose inter-Defendant mobility was already restricted regardless of the alleged mobility restrictions either could not have been directly harmed by the alleged mobility restrictions or would have been less directly harmed by the mobility restrictions than individuals who did not already have any inter-Defendant mobility restrictions. Plaintiffs may claim such individuals would still be harmed by the alleged mobility restrictions indirectly through a rigid pay structure, but I have addressed this possibility in Section 3.2 where I concluded that Plaintiffs' experts have not demonstrated this would be the case, and many (if not all) would not be.

135. There are at least three ways in which proposed class members' mobility between Defendants may have already been restricted for reasons other than the alleged conduct. First, many proposed class members agreed to non-compete agreements with their employers which likely prevented them from moving to another firm in the same industry or perhaps geography, including at least one other Defendant, for some period.[251] Second, hiring and recruitment limitations placed on external search firms used by Defendants would also have limited the inter-Defendant mobility of some proposed class members, potentially dulling or negating any impact of the alleged mobility restrictions.

---

[251] Because non-compete agreements would vary from individual to individual, it is hard to say definitively what mobility restrictions such employees would have agreed to. See below for available record evidence on the scope of non-compete agreements.

Finally, proposed class members faced with losing substantial equity pay that was not yet vested may also have self-restricted themselves from moving (to another Defendant firm or anywhere else) to avoid losing unvested equity. Similarly, proposed class members who expected to receive equity awards may have also self-restricted themselves from moving. Individualized inquiry would be necessary to identify proposed class members who could not have been directly harmed by the alleged mobility restrictions due to their mobility between Defendants already being restricted. I now discuss in more detail each of the ways in which proposed class members inter-Defendant mobility could have been limited regardless of the alleged conduct.

136. **Lawful non-compete agreements would have limited the mobility of proposed class members, dulling, or potentially negating, any impact of the alleged mobility restrictions**.[252] Non-compete agreements are agreements between an employee and an employer that restrict an individual from seeking employment with certain competing firms (for example those in a defined geographic scope or those explicitly listed or described) for some period of time.[253] The purpose of such agreements is to protect a firm's trade secrets, customer relationships, or other confidential information, as well as to encourage employees and employers to make relationship-specific investments.[254] Non-compete agreements are negotiated:

---

[252] I have no view as to the enforceability of the non-competes that were relevant for proposed class members. For remainder of report, when I discuss non-compete agreements, I mean lawful non-compete agreements.

[253] U.S. Government Accountability Office, "Noncompete Agreements: Use Is Widespread to Protect Business' Stated Interests, Restricts Job Mobility and May Affect Wages," May 11, 2023, available at https://www.gao.gov/products/gao-23-103785 at p. 3 ("In general, noncompete agreements (NCAs) are contracts between a worker and an employer in which the worker, upon departure from employment, agrees to not join a competing employer in a similar position or launch a competing business, generally for a specified period. NCAs are generally bound by (1) time—a period restricting certain types of related employment (e.g., 1 year); (2) geography—a defined territorial area in which the employee is restricted from working; and (3) scope—a prohibition limiting the nature of the work in which an employee can engage.").

[254] Absent a non-compete agreement, firms and workers may be less likely to make relationship-specific investments for fear of separation. See U.S Government Accountability Office, "Noncompete Agreements: Use Is Widespread to Protect Business' Stated Interests, Restricts Job Mobility and May Affect Wages, May 11, 2023, available at https://www.gao.gov/products/gao-23-103785 at p. 1 ("For example, the use of noncompete agreements may enhance economic efficiency by incentivizing firms to invest in worker training and other types of human capital."), p. 13 ("Firms can use NCAs to protect their business interests, such as keeping sensitive or confidential information from falling into the hands of an employer's competitors or ensuring an employer's workforce remains in place."). In the context of physicians, non-competes prevent physicians from taking patients with them to another practice in the same geographic market. See Kurt Lavetti, Carol Simon and William D. White, "The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians," *Journal of Human Resources*, 55 (3), 2020, pp. 1025–1067 at pp. 1027–1028 ("By preventing physicians from taking patients with them to another practice in the same geographic market, NCAs [non-compete agreements] have the effect of converting patient relationships, which would otherwise be general human capital that increases productivity at many firms, into firm-specific capital by making the patient relationships worthless to the physician outside of the practice that imposes the NCA. [...] Without extracting a payment for general human capital investments made by the firm, and without individual physicians making direct investments in recruiting patients, general human capital investments may be inefficiently low due to investment holdup problems. By converting general capital into firm-specific capital, NCAs offer firms a mechanism to overcome this investment holdup, leading firms to increase their investments in patient relationships.").

to the extent that employees did not view non-compete agreements as favorable when considering their employment contract, they could negotiate for additional compensation or employment terms.[255] Prof. Starr agrees that non-competes can have private and social benefits and that workers can negotiate on other employment terms when agreeing to a non-compete.[256]

137. Record evidence indicates that, during the Class Period, █████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████[257] ████████████████████████
████████████████████████████████████████████████



---

[255] Individuals who have non-competes can negotiate higher starting pay to compensate for any loss they perceive from the non-compete agreement (so long as they know about the non-compete). Indeed, a recent report from the Government Accountability Office found that executives that signed non-compete agreements received additional financial compensation upon signing non-compete agreements. See, U. S. Government Accountability Office, "Noncompete Agreements: Use is Widespread to Protect Business' Stated Interests, Restrict Job Mobility, and May Affect Wages," May 11, 2023, available at https://www.gao.gov/products/gao-23-103785 at p. 20 ("Similar to the employers that responded to our survey, stakeholders told us that executives or senior management more typically received additional financial compensation from employers for signing NCAs.").

[256] In his academic research, Prof. Starr notes that one positive benefit of noncompete agreements is that individuals who sign noncompetes can effectively negotiate over the terms of the contract so that "her expected future utility is no lower than it would be without the noncompete." See, Norman D. Bishara and Evan Starr, "The Incomplete Noncompete Picture," *Lewis & Clark Law Review*, 20(2), 2016, pp. 497–546 at p. 505 ("Despite the potential cost of noncompetes for individuals and regions, the use and enforcement of noncompetes may also provide both private and social benefits. For instance, proponents of private contracting argue that individuals who sign noncompetes will effectively negotiate over the terms of the contract, so that when an employee agrees to a noncompete, her expected future utility is no lower than it would be without the noncompete. Other socially positive spillovers of noncompetes include increases in innovation and employee training, which may be derived from the protection noncompetes offer for trade secrets and employer good will.").

[257] Record evidence suggests ████████████████████████████████████. See "Memo to Andrew Hayek (SCA) and Suzanne Watson (Chartwell Partners) from William H. Wilcox (USPI), May 2010, USPI_CIV_000714194–95 at USPI_CIV_000714194 ("████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████"). █████████████████
████████████████████████████████████████████
██████████████████. See "SCA Severance Pay Plan Effective December 18, 2008," SCA002220548–52 at SCA002220549 ("████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████"); "Amendment to the SCA Severance Pay Plan Effective January 1, 2011," SCA002220553–54 at SCA002220553 ("████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████"); "SCA Compensation Committee Meeting," February 8, 2011, SCA000640388–509 at SCA000640453 ("████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████").



138. For example, it would be important to understand whether proposed class members employed by SCA who were subject to non-compete agreements preventing movement to USPI, but not to DaVita, would have considered opportunities at DaVita, which operated in a different industry from USPI and SCA, and therefore might not have been within the ambit of non-competes signed by USPI and SCA employees.[259] If a proposed class member employed by SCA who agreed to a non-compete restricting movement to USPI would not have considered opportunities at DaVita, then they could not have been directly impacted by the alleged mobility restrictions because the alleged mobility restrictions would not have prevented any movement that was not already prevented by the non-compete the employee agreed to. If they would have considered DaVita opportunities, then it is still theoretically possible the alleged mobility restrictions directly impacted them, but harm (if any) would be diminished by the existence of the non-compete, and common evidence would be insufficient to identify or quantify harm.[260]

---



[258] See, e.g., "Offer of Employment for a Regional Vice-President of Anesthesia Operations," January 25, 2013, USPI_CIV_000036736–37 at USPI_CIV_000036736 ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████ "); "Offer of Employment for a Director of Business Development," March 14, 2014, USPI_CIV_000446798–99 at USPI_CIV_000446798; "Offer of Employment for a Regional Director, Business Development for the San Antonio marketplace," September 8, 2014, USPI_CIV_000752863–64 at USPI_CIV_000752863; "Offer of Employment Letter for Director of Perioperative Clinical Services," November 13, 2013, SCA000549141–48 at SCA000549145 ("███████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████"); "Offer of Employment Letter for Senior Vice President," July 23, 2015, SCA000844623–24 at SCA000844623 ("███ █████████████████████████████████████████████████████ ").

[259] Although all three Defendants operate in the four digit "Outpatient Care Centers industry" (NAICS code 6214), USPI and SCA operate in the six digit "Freestanding Ambulatory Surgical and Emergency Centers" industry (NAICs code 621493), and DaVita operates in the six digit "Kidney Dialysis Centers" industry (NAICS code 621492). See my backup materials.

[260] To the extent there was variation over time in whether an individual had such a non-compete, or would consider employment at DaVita, that would also be relevant to quantifying harm accurately and would require individualized inquiry to determine.

139. For proposed class members employed by USPI who were subject to non-compete agreements preventing movement to SCA, but not to DaVita, the situation is less complicated. Such individuals could not be directly harmed by the alleged mobility restrictions regardless of whether they would consider employment opportunities at DaVita because Plaintiffs' experts have alleged no mobility restrictions between USPI and DaVita. Individualized inquiry would still be necessary in this case however to confirm that the individual at USPI had a non-compete that prevented movement to SCA throughout his/her employment with USPI during the Class Period.

140. Besides non-compete restrictions in many proposed class members' employment contracts, **contractual hiring and recruitment limitations agreed to by external search firms used by Defendants, and which are standard in the professional recruiting firm industry,[261] would also have limited the mobility of proposed class members, potentially dulling or negating any impact of the alleged mobility restrictions**. External search firms learn sensitive information when recruiting on a firm's behalf (e.g., via interviews or in-depth interactions with the firm's employees). That sensitive information may include information about company culture, compensation practices, performance and caliber of individual employees, the organizational chart, and company strategy.[262] It also

---

[261] Tanner (Catapult Staffing) Deposition, p. 57 ("Was it your understanding that these sort of contractual nonsolicits were common in the industry? A. Yes, I think from a client perspective, yes. In our contracts. Q. Would those sort of nonsolicit clauses also have been in your contracts while you were working at Catapult? A. Yes, I would imagine I think it's standard staffing agreement language with most of our clients."); Deposition of John Schultz (Russell Reynolds and Spencer Stuart), November 19, 2024 ("Schultz (Russell Reynolds and Spencer Stuart) Deposition"), pp. 117–119 ("



"); Deposition of Michael Loiacano, June 28, 2024 ("Loiacano (Heidrick) Deposition"), pp. 46–47 ("

").

[262] Fanning (SCA) Deposition, pp. 205–207 ("

includes forging relationships with key employees.[263] In order to prevent external search firms from using this information to subsequently recruit workers from that same firm, external search firms often agree to not recruit and hire *from* firms for which they recruit.[264] ████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████.[265]

141. To the extent that Defendants worked with the same external search firms during the Class Period, the hiring and recruiting of Defendants' employees

---

████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████").

[263] Schultz (Russell Reynolds and Spencer Stuart) Deposition, p. 118 ("████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ██████████").

[264] Metcalf (Russell Reynolds) Deposition, pp. 85–88 ("████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████").

[265] Loiacano (Heidrick) Deposition, pp. 45–47 ("███████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████").

may have been limited as a result of the limitations placed on third party recruiters. ███████████████████████████████████████████ ███████████████████████████████████,[266] ████████████████████████ ███████████████████████████████.[267] Record evidence includes examples of limitations placed on third party recruiters that would have limited mobility between Defendants:

- Bridie Fanning testified that, ██████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████[268]

- ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████

---

[266] According to deposition testimony of Robert Chipman, █████████████████████████ █████████████████████████████████████████████████. See Chipman (DaVita) Deposition, pp. 98–99 ("████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. ████████████████ ████████████████████. See "Heidrick and Struggles Confidential Progress Report –Senior Vice President, West," SCA, December 4, 2015, SCA000001836–47; "Caldwell Partners Report Confidential Candidate Report – Senior Director, Managed Care," SCA, June 2014, SCA000393815–25; "Assignment Status Report – Regional Vice President from Russell Reynolds to SCA," April 20, 2015, SCA0000002891–908; E-mail from Spencer Stuart to Bridie Fanning and Joe Clark at SCA, "*EXTERNAL* FW: Update: GVP, Development Discussion Materials," July 19, 2016, SCA000071259–65 at SCA000071260–65.

[267] See, e.g., "Catapult Staffing Service Order for an Administrator Position," February 13, 2018, USPI_CIV_000001791; See also Email from Megan Fox (Catapult Staffing) to Shannon Mosley (USPI) and Shannon McGarry (USPI), RE: [External] Catapult Weekly Recruiting Updates, February 16, 2018, USPI_CIV_000001734–35 at USPI_000001734 ("█████████████████████████████."). The deposition testimony of Jimmy Tanner, an external recruiter at Catapult Staffing, suggests that Catapult staffing worked with both SCA and USPI. See Tanner (Catapult Staffing) Deposition, p. 15 ("Q. Now, at Catapult did you do work for USPI – if I say USPI, do you know what that means? A. Yes, I do. And yes. Q. And did you do work for USPI during your time at Catapult? A. I did."); Shannon McGarry (USPI) Deposition, pp. 83–84 ("███████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ █████████████████████████████████.").

[268] Fanning (SCA) Deposition, pp. 30–32 ("██████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.").



As a result, in some instances the limitations that external search firms working for Defendants placed on whom they could recruit from included co-Defendants.[272] Moreover, as Defendants' use of recruiting firms varied (e.g., over the Class Period or by job position),[273] individualized inquiry would be

[269] "Caldwell Partners Engagement Letter for SCA Senior Director of Managed Care Search," April 16, 2014, SCA000841643–47 at SCA000841645–46 ("███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████").

[270] "Chartwell Partners Engagement Letter for SCA Vice President (or Senior Vice President) Search," March 15, 2011, DOJCIV-009-00000032–37 at DOJCIV-009-00000035 ("████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████; "Master Services Agreement between Catapult Staffing and USPI," July 7, 2013, USPI_CIV_000432243–54 at USPI_CIV_000432248–49 ("████████████████████████████████████ ██████████████████████████████████████████████████████").

[271] "Caldwell Partners Engagement Letter for DaVita Vice President, Practice Affiliations," December 7, 2011, DVA_OMCEAL_000289410–15 at DVA_OMCEAL_000289413.

[272] See, e.g., Fanning (SCA) Deposition, pp. 207–208 ("████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████"); Metcalf (Russell Reynolds) Deposition, pp. 87–88 ("████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████").

[273] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████. See, Chipman (DaVita) Deposition, pp. 99–100 ("████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████"), p. 98 ("████████████████████

necessary to reliably quantify harm because it would be important to understand for which proposed class members the recruitment and hiring limitations imposed by external search firms would have restricted mobility between Defendants thus rendering the alleged mobility restrictions partially or entirely irrelevant.

142. **The mobility of proposed class members was also potentially limited because some proposed class members would have had substantial equity pay that had not yet vested**. As I explained in Section 2.2.1, proposed class members received equity compensation, and the share of an employees' compensation composed of equity typically increased with seniority. Proposed class members were often granted equity pay or other incentives such as signing bonuses that vest over time. ███████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████ [274] As another example, ████████████

████████████████████████████████████████

███████ [275] ████████████████████████████████

---

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ ). ██████
See Sandoz (SCA) Deposition, Volume I, p. 27 (" █████████████████████

████████████████████████████████████████████

█████████████████████████████████████ "). ████████

████████████████████████████ See Deposition of Shannon McGarry (USPI), June 11, 2024, pp. 78–79 (" █████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ "); Deposition of Shannon Mosley (USPI), August 13, 2024 ("Mosley (USPI) Deposition"), p. 92 ████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███ ").

[274] "DaVita Employment Agreement for ██████████," DaVita, November 14, 2011, DVA_OMCEAL_001090817–29 at DVA_OMCEAL_001090818. See also "DaVita Employment Agreement for ██████████," DaVita, Undated, DVA_OMCEAL_000296081–088 at DVA_OMCEAL_000296082.

[275] "USPI Employment Offer Letter for Regional Vice President, ██████████," USPI, 2013, USPI_CIV_000301109–10 at USPI_CIV_000301109. See also "USPI Employment Offer Letter for Director of Acquisitions, ██████████," September 3, 2013, USPI_CIV_000035655; "USPI Employment Offer Letter for Regional Vice President of the Phoenix region, ██████████," USPI, May 9, 2014, USPI_CIV_000055047–48 at USPI_CIV_000055047; "USPI Employment Offer Letter for Regional Vice President of the Phoenix region,


[276] Senior employees like those employed by Defendants would likely take into account their unvested equity with their current employer when considering alternative employment opportunities.[277]

143. As a result, employees with substantial unvested equity pay may not have had any desire to leave for a competitor – if they did leave, they would lose out on a significant portion of their equity compensation. An individual faced with losing substantial equity upon leaving would likely only choose to leave in the event that a competing employer was willing to compensate them for the equity pay that they would have to give up. Indeed, compensation such as equity or signing bonuses that vests over time is a common tool employers use to increase retention, as was recognized by Defendants themselves.[278] Academic literature shows that deferred vesting of stock and option grants leads to reduced employee mobility.[279] Understanding to what extent proposed class

---

Wade Burgess," August 25, 2014, USPI_CIV_000040029; "USPI Employment Offer Letter for Regional Vice President of Operations, December 5, 2008, USPI_CIV_000037954; "Stock Option Agreement," July 14, 2017, USPI_CIV_000022791–811 at USPI_CIV_000022794; "Minutes – USPI Holding Company, Inc. Option and Compensation Committee Meeting," October 19, 2017, USPI_CIV_000023128–133 at USPI_CIV_000023130; Email chain between Andy Johnston (USPI) and Andrea Fann (USPI), "Re: stock option agreement," March, 23, 2015, USPI_CIV_000039709–10 at USPI_CIV_000039709; "July 2016 USPI Equity Grants," USPI_CIV_000024141; "Re: Equity Plan and Deferred Comp Plan Amendments," USPI_CIV_000038254–55 at USPI_CIV_000038254 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ "). ████████████████████████████████████████████████████ . See "United Surgical Partners International, Inc. Deferred Compensation Plan," USPI_CIV_000227267 at pp. 8, 12; "Minutes – USPI Holding Company, Inc. Compensation Committee Minutes," February 14, 2018, USPI_CIV_000620051–67 at USPI_CIV_000620063 ("████████████████████████████████████████████████████████████ ."); Email chain between Daniel Cancelmi (Tenet) and Sandi Karrmann (USPI), "Re: USPI Deferred Compensation Plan," December 26, 2018, USPI_CIV_000212779–80 at USPI_CIV_000212779; "Tenet/USPI Deferred Compensation High Level Plan Comparison," April 1, 2016, USPI_CIV_000026240 ("████████████████████████████████████████████████████ ██████████ .").

[276] "Total Rewards Statement for 2016," March 8, 2016, BF000233732. See also "SCA Compensation Committee Meeting," SCA, March 4, 2015, SCA000545210–245 at SCA000545217. See also "Compensation Committee Meeting," SCA, March 6, 2013, SCA001279742–825 at SCA001279747 ("████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ").

[277] To the extent that prospective employers would compensate a candidate for unvested equity they would lose if they were to change jobs, the above arguments would not apply in these specific instances.

[278] See, e.g., Email chain between Peter Clemens (SCA) and Michael Rucker (SCA), "RE: equity grant," July 16, 2014, SCA00004815–17 at SCA00004816 ("████████████████████████████████ ██████████████████ ").

[279] Academic research has found that following the issuance of broad-based employee stock options ("BBSO") employee turnover decreases but then increases again once the options vest. See, e.g., Serdar Aldatmaz, Paige

---

members had unvested equity pay (or were expecting to receive equity awards) such that they would not have engaged with solicitation outreach or proactively searched for employment elsewhere, and therefore could not have been directly harmed by the alleged mobility restrictions, would require individualized inquiry. Moreover, quantifying any harm would also require individualized inquiry in part to understand how proposed class members viewed their unvested equity pay, and in part because there could be variation over time for the same individual with respect to whether they had substantial unvested equity, and whether it prevented them from engaging with solicitation outreach or considering other employment opportunities.

144. I also note that individualized inquiry would be necessary to determine the extent to which the above mobility restrictions interacted with one another. For example, if a proposed class member from SCA had a non-compete agreement preventing his movement to USPI throughout the Class Period, and also had unvested equity awards such that he self-restricted from engaging with solicitation outreach, or otherwise searching for jobs, with DaVita during the Class Period, he could not be directly harmed by the alleged mobility restrictions. To the extent these things only occurred in some years during the Class Period, harm would be diminished and would not be able to be quantified using common evidence.

### 3.8. Common Evidence Cannot Be Used to Reliably Quantify the Extent of Harm for Proposed Class Members (If Any) Who Were Impacted by the Alleged Conduct For Several Other Reasons

145. There are several additional reasons that any potential harm due to the alleged conduct would be individualized and could not be quantified based on common evidence. For example:

---

Ouimet, and Edward D. Van Wesep, "The Option to Quit: The Effect of Employee Stock Options on Turnover," *Journal of Financial Economics*, 127(1), 2018, pp. 136–51 at p. 137 ("We exploit a large panel of establishment-level data to show that turnover is reduced following the granting of BBSOs and that the relation appears causal. We show that this reduction in turnover is largely temporary. After the options vest, turnover increases by an amount comparable in magnitude to the prior reduction. As such, BBSO grants appear to be delaying, as opposed to preventing, turnover. The increase in turnover once the options vest suggests that the mechanism through which BBSO grants reduce turnover is associated with anticipation of a deferred compensation award as opposed to a permanent increase in loyalty toward the firm following the granting of stock-based compensation."). See also Steven Balsam, Richard Gifford, and Sungsoo Kim, "The Effect of Stock Option Grants on Voluntary Turnover," *Review of Accounting and Finance*, 6(1), 2007, pp. 5–14 at p. 5 ("The objective of this research is to examine the effect of a broad-based option program on voluntary employee turnover. Design/methodology/approach – The paper examines the effect of a broad-based stock option program in a Fortune 100 company during the 1990s and uses logistical analysis. [...] The paper finds that voluntary turnover is lower during the periods in which the option cannot be exercised, i.e., the vesting period.").

- The alleged mobility restrictions may not have been enforced consistently. For example, record evidence includes instances in which the employees at external search firms recruiting on behalf of Defendants appeared unaware of the alleged mobility restrictions.[280] Bridie Fanning from SCA testified ███████████████████ ███████████████████████████████████.[281] Michael Rucker testified that ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████.[282] Andrew Hayek testified that ███████████████████████████████████ ███████████████████████████ ███████████████████.[283]



- There could be proposed class members who did tell their boss of their intent to move and were thereafter considered for employment at other Defendants, and such individuals would be affected by the alleged conduct differently than those who did not or would not tell their boss of an intent to move.[284]

---

[280] For example, ██████████████████████████████████████ ██████████████████████████████████████████. See Email chain from Nate Haines (Russell Reynolds) to Bridie Fanning (SCA), "RE: DaVita and USPI," February 3, 2016, SCA000550887 ("██████████████████████████████████████████ ██████████████████████████████.").

[281] Fanning (SCA) Deposition, p. 231 ("████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ██████████████████████████").

[282] Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 6, 2022), Testimony of Michael Rucker (SCA), pp. 419–420 ("A. Yes. Q. Okay. You'll see that you told Bridie Fanning that you spoke to Andrew Hayek, 'and we landed on a more strict interpretation of the spirit of the understanding previously arrived at.' Do you see that language? A. Yes, I do. Q. This is in May of 2015; right? A. Yes. Q. Is it fair to say that up until this time and at various points during the existence of the gentlemen's agreement, that precise parameters and terms of it ebbed and flowed now and again? A. Yes. Q. And that ebb and flow happened depending on what was going on between SCA and DaVita at a given time? A. Yes. [...] Q. So you talked about the spirit of the understanding. Is it fair to say that the spirit of the understanding as you understood it was that, generally speaking, when it came to SCA and DaVita recruiting from each other, they would be sensitive about the way they did it? A. Yes."). See also email chain from Michael Rucker (SCA) to Bridie Fanning (SCA), "RE: dva candidate," May 21, 2015, SCA000861824 ("███████████████████████████████ ████████████████.").

[283] Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 6, 2022), Testimony of Andrew Hayek (SCA), p. 474 ("Q. And initially, what level of employees were off limits under your agreement? A. Vice presidents and above. Q. And did you interact with Mr. Thiry about this agreement over the course of the subsequent years? A. Yes, we did. Q. And did your understanding of the scope of the agreement get refined through those course of dealings with Mr. Thiry? A. Yes, it did. Q. So focusing on the level of employee, did that get refined? A. Yes. We ultimately expanded to include the director level, which is a role that became a bit more common in SCA, as we grew over the years.").

[284] It is unclear at what time candidates had to tell their bosses of their intentions. Prof. Starr ████████████ ████████████████████████████████████████.

- There could be proposed class members who learned any information about compensation or opportunities that they would have learned through the solicitation or hiring process from other sources. For example, proposed class members could learn such information from online job postings or via informal discussions with other Defendant employees, both of which were not restricted by the alleged mobility restrictions.[285]

- There could be proposed class members for whom there were relevant employment opportunities with one Defendant but not the other two. For example, there could be proposed class members with strong location preferences working for one Defendant in an isolated location where no other Defendant firms have a presence who would not consider alternatives with the other two Defendant firms due to location. For example, among the Defendants, only DaVita had facilities in West Virginia.[286]

- There could be proposed class members whom Defendants would not have hired in the absence of the alleged mobility restrictions for reasons unrelated to the alleged mobility restrictions. For example, this might be the case because such individuals were viewed as unqualified. In Section 2.1.2, I explained that, according to record evidence, proposed class members who work for one Defendant may not be a good fit for another Defendant. █████████████

---

████████████████████████████████████████████ ” (i.e., before a job offer). See Starr Report, ¶ 70, footnotes 107–108. Record evidence also includes examples in which candidates (from SCA) accepted the position (with USPI) before telling her boss. See, e.g., Email chain from Shannon Mosley (USPI) to Bill Wilcox (USPI) and Sandi Karrmann (USPI), "RE: Terri Seidel – STL RVP Offer," January 7, 2014, USPI_CIV_000021255–56 at USPI_CIV_000021255 ("██████████████████████████████ ████████████████████ ").

[285] See, e.g., Spradling (Named Plaintiff) Deposition, p. 46 ("Q: And—and how are you primarily going about finding jobs? A: Although I don't recall that specific time in my life with great detail, the generic answer would be LinkedIn, job boards, headhunters, many—many local consulting firms."), p. 50 ("Q: Okay. Why did you leave [TEKSystems]? A: I was contacted by a mutual friend about an opportunity at SCA."), pp. 124–125 ("A: The—the IT skill set is very in demand and transferable, so in general IT resources are constantly reassessing their value to the market, so to speak, and as a result of that, opportunities present themselves. [...] Q: And is it the case that employees would look outside the company in order to get a sense of what their market rate was? A: Yes, my experience is that happens all the time. Q: And did you personally do that during the course of your time at SCA? A: I don't recall. Q: What about during the course of your career? A: Oh, without a doubt, yes. Q: And it's your – it's been your experience that that is very common, correct? A: Yeah, within the IT field, correct."), pp. 162–163 ("Q: So you were seeking $150,000 in compensation at Bank of America; correct? A: Correct. Q: What was your basis for seeking that? A: It was a promotional opportunity over what I was making at SCA. Q: And what was the basis for requesting that increase over what you were making at SCA? A: Well, I felt like I had a feeling for the market value of someone with my years of experience and education and certifications was worth.").

[286] Workpaper 15.

██████████████████████████████████████████
████████████████████████████████████ [287]

146. In sum, the degree to which the alleged conduct would have harmed proposed class members would vary greatly across proposed class members, and many proposed class members including newly hired individuals with short tenures, and individuals over which Defendants did not have market power sufficient to suppress pay, could not have been harmed. It is not possible using evidence common to the proposed class to identify which individuals would not or could not have been impacted by the alleged conduct for the above reasons, nor is it possible to reliably quantify harm for proposed class members who were harmed by the alleged conduct (if any). Rather, individualized inquiry would be necessary given the wide array of complexities discussed throughout this section.

---

[287] Fanning (SCA) Deposition, pp. 114–115 ("████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████ ").

Highly Confidential – Outside Counsel/Experts Only

**4. THE COMPENSATION INFORMATION ALLEGEDLY SHARED BETWEEN DEFENDANTS COULD HAVE HAD PROCOMPETITIVE EFFECTS, WAS NOT SUFFICIENT TO COORDINATE ON PAY, AND EVEN IF IT WERE, WOULD NOT HAVE HAD COMMON IMPACT**

147. Plaintiffs and their experts claim that, in addition to the alleged mobility restrictions, Defendants shared competitively sensitive information (referred to as "CSI Exchanges" by Prof. Starr and Prof. Gerhart) in order to further the goals of the conspiracy to suppress the compensation of their employees.[288] Plaintiffs' experts further claim that the alleged information sharing likely caused classwide impact.[289] I disagree. Before I lay out in greater detail the reasons behind that disagreement, let me first summarize four high level points.

148. First, **sharing compensation information is not equivalent to an agreement or conspiracy to suppress pay**. Plaintiffs and their experts have not presented evidence that Defendants agreed to use any information they shared to suppress pay, nor have they presented any evidence that Defendants lowered compensation (individual pay or the merit budget overall) in response to shared information. At most, the evidence Plaintiffs' experts rely on is, in the words of Prof. Starr, "█████████████████████████ ██████████████████████████████████████████████."[290] This is important because the types of information discussed by Plaintiffs' experts can be used by firms to enhance, rather than suppress, competition. I discuss the potential for information sharing to have procompetitive effects, and Plaintiffs' experts' lack of evidence that compensation-related information was shared for anticompetitive purposes or was used to suppress pay, in more detail in Section 4.1.

149. Second, even assuming Defendants did share information in the ways alleged, contrary to the assumptions of both Prof. Starr and Prof. Gerhart, **the information allegedly shared would not be sufficient to suppress pay**. Prof. Starr claims that the information allegedly shared would "██

---

[288] Third Amended Complaint, ¶ 8 ("Defendants shared the competitively sensitive information to further the goals of the conspiracy to suppress the compensation of their employees."); Starr Report, ¶ 102 ("█████████ █████████████████████████████████████████████"); Gerhart Report, ¶ 157 ("███████████████████████████████████████████████ ██████████").

[289] Starr Report, ¶ 12; Gerhart Report, ¶ 82, p. 194.

[290] Starr Report, ¶ 96 █████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.").

████████████████████████████████████████████████████
████████████████████████████████ ”[291] however, the compensation-related information allegedly shared was generally aggregate in nature for each firm (i.e., for the entire firm or for broad groups of employees at the firm), and the cadence of the information sharing was irregular. I discuss this in more detail in Section 4.2.

150. Third, **Plaintiffs have not presented any credible evidence that the alleged information sharing suppressed pay for proposed class members**. First, as I will discuss in Section 5, Prof. Starr's pay regression model is severely flawed and does not measure changes in pay that occurred because of the alleged conduct. Once key flaws are corrected, Prof. Starr's pay regression model demonstrates no evidence that pay was suppressed for proposed class members. Second, Prof. Starr himself admits that his pay regression model cannot distinguish between effects of the alleged information sharing and effects of the alleged mobility restrictions.[292]

151. Finally, even for the sake of argument, assuming Defendants did share information with an understanding that it would be used to suppress pay, and that the compensation-related information sharing could somehow be used to coordinate on pay, **impact from the alleged information sharing would not have been common**. There are at least five reasons for this: (1) competition from non-Defendant employers would have prevented Defendants from suppressing pay for many or most (if not all) proposed class members; (2) the irregular nature of the alleged information sharing means that some proposed class members were employed by Defendants only in years in which no information was shared; (3) the alleged information sharing concerned salary pay but proposed class members earn substantial non-salary pay (e.g., bonuses and equity), and Defendants would have had an incentive to cheat on an agreement to coordinate on pay that was focused only on salary by adjusting other types of non-salary pay; and (4) the sharing of merit pay budgets at the firm level (or for broad groups of employees within the firm) would differentially impact high and low performers. In Section 4.3, I discuss in more detail the reasons impact would not be common to the proposed class.

---

[291] Starr Report, ¶ 93 (" ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████ ").

[292] Starr Report, ¶ 106 (" ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████ ").

### *4.1. The Alleged Information Sharing between Defendants Cannot be Assumed to be Anticompetitive and Could Have Procompetitive Effects*

152. Both Plaintiffs' experts assume that the alleged information sharing is anticompetitive. Prof. Gerhart concludes that "███████████ █████████████████████████████████████████████████ ██████████████████████████████████"[293] For his part, Prof. Starr states that the alleged information sharing is "██████████ ██████████████████████████████████"[294] Neither expert has provided any evidence that Defendants shared information for the purpose of suppressing pay, or that the alleged information sharing had anticompetitive effects. From an economic perspective, it is not evident that the information sharing Defendants engaged in would be anticompetitive and lead to suppressed pay. Indeed, academic literature and economic theory suggest when firms gain more information about compensation in the industry, it can enhance competition and raise pay levels.

153. Prof. Starr's conclusion that the alleged information sharing was "███████████████████████████████████████ ███████" is not supported by his own analysis and claims.[295] His analysis of the alleged information sharing leads him to conclude only that information sharing may facilitate coordination on pay because it is "█████████████████ ███████."[296] This is a one-sided account; the full story is this: from an economic perspective, gaining information about what other firms in the industry are paying can just as readily lead to pay increases as pay decreases. Economists recognize that information sharing can support competition as there are "legitimate efficiency reasons for industry members to exchange information," including "monitor[ing] their own efficiency better" by comparing their costs to other firms.[297] Academic research has also found that

---

[293] Gerhart Report, ¶ 7.

[294] Starr Report, ¶ 12.

[295] Starr Report, ¶ 12.

[296] Starr Report, ¶ 93 ("█████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████").

[297] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, (Essex, England: Pearson Education Limited, 2015) ("Carlton and Perloff (2015)"), p. 405 ("Information exchanges between firms can facilitate cartels or promote efficiency…. There may also be legitimate efficiency reasons for industry members to exchange information. When a centralized market does not exist, disseminating price information can improve efficiency […]. Moreover, firms can monitor their own efficiency better if they can compare their costs to those of other firms.").

information sharing can increase competition: as one example, economists developed a theoretical model to analyze the effects of a law that mandated meat packers publicly report transaction data (including average prices paid to feeders by meat packers) and found that increased information transparency increased competition between buyers and benefited feeders.[298]

154. Prof. Starr relies on academic literature and agency guidelines to argue that information sharing is anticompetitive, but these sources themselves indicate that information sharing may facilitate collusion or coordination on prices, not that information sharing necessarily implies collusion or coordination on prices.[299] Putting that aside, Prof. Starr himself seems to concede that information sharing *may* lead to wage suppression, not that it necessarily does. For example, when describing the effects of the alleged information sharing, Prof. Starr states that it "could" or "might have" allowed Defendants to suppress compensation, not that it did.[300] Similar to Prof. Starr,

---

[298] The authors analyze the effects of the 1999 Livestock Mandatory Price Reporting Act (MPRA) which required meat packers to publicly report transaction data that includes average prices paid to feeders by meat packers. See Christopher N. Boyer and B. Wade Brorsen, "Changes in Beef Packers' Market Power after the Livestock Mandatory Price Reporting Act: An Agent-Based Auction," *American Journal of Agricultural Economics*, 95(4), 2013, pp. 859–876 at p. 873 ("The agent-based common-value auction models show that reducing the noisy signal of the buyers and/or the seller can reduce market power by increasing competition between buyers. By strictly reducing the seller's noisy signal, the seller imposes a higher reserve price that more accurately reflects their salvage value, which results in the seller's expected revenue per item increasing. By strictly reducing the buyers' noisy signal, competition between the buyers increases, which increases the seller's expected revenue per item. Finally, reducing both the noisy signal of the buyers and the seller increases the seller's expected revenue per item due to increased competition between the buyers. This finding indicates that providing information to packers and/or feeders through the MPRA is beneficial to feeders. By giving packers more information, the feeder benefits primarily from an increase in competition between the packers; by giving the feeder more information, the feeder benefits primarily from setting a more accurate reserve price.").

[299] Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?," *Journal of Economic Literature*, 44 (1), 2006, pp. 43–95 ("Levenstein and Suslow (2006)") at p. 69 ("[i]ndustry associations often engage in the collection and dissemination of information, which may facilitate collusion"); U.S. Department of Justice and Federal Trade Commission, "Antitrust Guidelines for Collaborations Among Competitors," April 2000, available at https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf, accessed on April 8, 2025, p.15 ("[T]he sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables."); Michael Bloom, "Competition Matters: Information Exchange: Be Reasonable," *Federal Trade Commission*, December 11, 2014, available at https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable, accessed on April 3, 2025 ("[b]ut when competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws … The bottom line is this: even competitors can exchange information when the purpose and likely effect of the exchange is to make the participants more effective competitors.").

[300] See, Starr Report, ¶ 58 ███████████████████████████████
██████████████"), ¶ 170 ("████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████").



Prof. Gerhart only opines that the alleged information sharing "likely" suppressed compensation.[301]

155. Additionally, contrary to what Prof. Starr claims, the alleged information sharing is not of the type that Prof. Starr describes as raising anticompetitive concerns.[302] He argues that for information sharing to support collusion, it need not be the case that "firms in a cartel explicitly choose a specific price or compensation level," but rather "that the cartel pursues a commonly understood goal (lowering input prices below competitive levels) and shares information to achieve that goal."[303] This itself is an oblique statement. However, taking it at face value, Prof. Starr has not provided any evidence that Defendants shared information in support of a "commonly understood goal" to suppress pay. For that matter, neither have Plaintiffs or Prof. Gerhart, a point that Prof. Gerhart concedes in his deposition.[304] All that said, however, Prof. Starr seems to understand that the information sharing of the type alleged here is not inherently anticompetitive. He notes that, "evidence of communication or coordination among horizontal competitors involving employee compensation," is qualitative evidence of information sharing whereas evidence of "price-fixing" would be "[e]vidence of firms agreeing to match or set compensation at



---

[301] Gerhart Deposition, p. 146 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); Gerhart Report, Section VIII.B, p. 194 ("█████████████████████████████████████████████████████"), ¶ 83 ("███████████████████████████████████████████████████████████████████████████████████████████████").

[302] Starr Report, ¶ 29 ("████████████████████████████████████████████████████████████████████").

[303] Starr Report, ¶ 93. See also Levenstein and Suslow (2006), p. 45 ("'Collusion in general implies [...] that the rival sellers in some manner arrive at an understanding as to what price to charge or what outputs to produce, or both.'").

[304] In his deposition, Prof. Gerhart stated that he does not have evidence that there is a ██████████████" that "████████" less was part of the information exchange. See, Gerhart Deposition, pp. 153–155 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████). ████████████████████████████████████████████████████████████ See Deposition of Andrew Patrick Hayek (SCA), September 18, 2024 ("Hayek (SCA) Deposition"), p. 382 ("██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

certain levels."[305] Thus, according to Prof. Starr's own standard, the evidence Plaintiffs have presented is only evidence of information sharing, not evidence of Defendants agreeing to collude on compensation.

156. Above, I noted that from an economic perspective, information sharing can just as readily trigger competition and higher pay as it could support collusion. What does case evidence show about the likely effects of information sharing here? In this matter, case evidence I have reviewed is consistent with the idea that information sharing was used to compete. Defendants' employees testified that they would have used any merit pool information shared to help them compete more effectively. For example, ███████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

████████████████[306] Similarly, ████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████[307]

157. Prof. Starr and Prof. Gerhart have not established that the outcome of the alleged information sharing by Defendants would have been anticompetitive, as opposed to having no effect, or having procompetitive effects. To the extent Prof. Starr claims his pay regression estimates confirm that the information sharing was anticompetitive (which he appears to do),[308] he himself admits that

[305] Starr Report, ¶ 96████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████.").
[306] Mathis (SCA) Deposition, pp. 51–52 ("███████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████").
[307] Rucker (SCA) Deposition, pp. 295–296 ("██████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████").
[308] Starr Report, ¶ 102 ("██████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████
████████████████████").

his pay regression model is not able to distinguish between any effect of the alleged mobility restrictions and the information sharing, and as I will discuss in more detail in Section 5, his pay regression model is severely flawed, and once obvious flaws are corrected, it shows no evidence that proposed class members' pay was suppressed during the Class Period. Perhaps more to the point, relying on his flawed pay regression model, Prof. Starr inappropriately reaches conclusions that are the opposite of what basic market facts show.

158. Academic literature also demonstrates that employers having better information about what competitors are paying can benefit employees by raising compensation. For example, a recent academic paper analyzing the impact of salary benchmarking on employee pay uses economic theory to predict that "in equilibrium, salary benchmarking can intensify competition and raise salaries."[309] The intuition behind this (based on the model the authors present) is that without information about what other competitors are paying, the firm has to guess at where to set pay and risks setting pay too low. In this case, the worker may leave and the firm will incur costs to find a new employee and train them. The firm would have been better off to pay more and would do so had it had more information about the value of the worker to other firms. The same authors also analyzed national payroll data and found that the impact of benchmarking on pay varies across employees: it had a positive impact on the pay for some employees but no statistically significant impact on the pay for others.[310]

159. In another study, the authors found that a 2021 Colorado law requiring online job postings to include information about the expected salary of the position led to an increase in both posted and actual salaries, and in particular, found that the results are consistent with employers raising wages in response

---

[309] Cullen, Li, Perez-Truglia (2024), pp. 4–5 ("Motivated by the evidence, we propose a simple model with firms that are uncertain about the salary distribution. ... Suppose that one of the firms covertly gains access to a salary benchmark, learning the population distribution of wages, and hence learning the threshold wage needed to hire a worker"), pp. 6-7 ("However, a 2021 executive order mandates that agencies must also consider the procompetitive effects of benchmarks ... Our model provides a formal analysis of these procompetitive effects; it suggests that, in equilibrium, salary benchmarking can intensify competition and raise salaries."). The authors analyze national payroll data for 20 million workers and approximately 650,000 organizations to study firms that gain access to a tool that reveals aggregate data on market salaries for each job title to set pay ("salary benchmarking").

[310] Cullen, Li, Perez-Truglia (2024) at pp. 30–31 ("Given that the effects of benchmarking on salary dispersion are largely concentrated in low-skill positions, we can explore this same heterogeneity for salary levels. Figure 6 reproduces the results from Figure 5, but for the subsample of low-skill positions. The evidence points to a modest increase in average salary. ... By comparison, in high-skill positions, there is no evidence of significant effects on the salary level.").

to new information about their competitor's wages.[311] Empirical academic studies have also found that the impact of sharing of information about pay can be positive, negative, or zero depending on what the information suggests about the worker's current compensation in relation to the information.[312] In sum, the economics literature indicates that information sharing could increase, decrease or have no impact on compensation, and the effect could vary across members of the proposed class.

160. Besides not demonstrating that the alleged information sharing was anticompetitive or made for the purpose of coordinating on pay, Plaintiffs and their experts have also not demonstrated that the claimed information sharing was the unique way in which the Defendants could access the information that was allegedly shared, or if Defendants learned anything new from the limited compensation-related information that was shared. First, very similar information may have been available from other sources. For example, █████

███████████████████████████████████████

---

[311] David Arnold, Simon Quach and Bledi Taska, "The Impact of Pay Transparency in Job Postings on the Labor Market," 2024, at p. 18. The author use data from Lightcast to estimate the impact of the law on pay transparency in postings, job vacancy data to study the impacts on various aspects of the job posting, including expected salary, job requirements, and the volume of postings, and data actual on earnings from Glassdoor and the Quarterly Census of Employment and Wages (QCEW) to study the impact of the policy on realized wages. They find that posted salaries increased across all firms, including among firms that were already fully transparent before the policy. The authors find that the occupations that experienced a larger increase in transparency are also the occupations that experienced a larger increase in wages, which the authors argue is consistent with the policy having general equilibrium effects and that always-transparent firms are responding to broader increases in transparency at the market level.

[312] A recent academic article studies pay among academics in the U.S. and finds that pay transparency reduces gender-based pay inequality because (1) females are relatively more likely to be underpaid than their male peers and (2) pay transparency has the effect of granting pay increases to those who are underpaid. As a result, the authors find that the impact of pay transparency on female academics was statistically significantly larger than the effects on the pay of male employees. See Tomasz Obloj and Todd Zenger, "The Influence of Pay Transparency on (Gender) Inequity, Inequality and the Performance Basis of Pay," *Nature Human Behavior*, 6, 2022, pp. 646–655 at pp. 653, 648, Table 1. See also Michael Baker, Yosh Halberstam, Kory Kroft, Alexandre Mas and Derek Messacar, "Pay Transparency and the Gender Gap," *American Economic Journal: Applied Economics*, 15(2), 2023, pp. 157–183 at p. 159 ("We find that, on average, transparency laws significantly reduced the gender salary gap. Across our specifications for the reference group, we find that they led to a statistically significant 1.2–2 percentage point reduction in the gender gap."). In their analysis of payroll data for 20 million workers and approximately 650,000 organizations, Cullen, Li, Perez-Truglia (2024) found that in response to accessing salary benchmarking data, employers adjust pay depending on how an employee's pay compares to the information. See Cullen, Li, Perez-Truglia (2024) at p. 2 ("We find that after a firm is exposed to the benchmark information in a position, it sets salaries that are closer to the median salary benchmark. On the one hand, firms that would otherwise have paid more than the median benchmark reduce salaries toward the median (for the sake of brevity, we refer to this as 'compression from above'). On the other hand, firms that would otherwise have paid less than the median benchmark increase salaries toward the median (`compression from below')."). In another study of a 2010 California mandate that required municipal salaries to be posted online, the author found that disclosure led to an approximately 7 percent decreases in average compensation among top managers, and that the impacts varied across cities depending on the average level of compensation in the city prior to the reform, which the author argues is consistent with an "aversion to large salaries." See Alexandre Mas, "Does Transparency Lead to Pay Compression," *Journal of Policial Economy*, 125(5), 2017, pp. 1683–1721 at p. 1685 ("Wage cuts were substantially larger in cities where compensation was initially higher, particularly cities where the city managers were paid more than $200,000 annually prior to disclosure (the mean salary was $193,000 in 2009). There was no relative decline in the 50th, 75th, and 90th percentiles of the city wage distributions, on average, implying that reductions at the top of the wage distribution reflect pay compression.").

█████████████████████████████████████████████

█████████████████████████████ [313] In another instance, █████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ [314] More generally, as I discussed in Section 2.1, Defendants often benchmarked pay against various other surveys. Second, the information shared may have provided little incremental information. As an example, to the extent Defendants set their salary and merit increase budget based on inflation (████████████████ ██████████████████),[315] or pay in the healthcare industry (████████████ ██████████████████),[316] the limited pay increase budget information shared would not have revealed much, if any, additional information. Indeed, an analysis of publicly available data shows ██████████████████ ██████████████████████████████████████████████████

████████████████████████████████████ [317] ██████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ [318] Additionally,



---

[313] Email chain from Sue Seme (SCA) to Cabin Team (SCA) and Brian Mathis (SCA), "RE: Updated: Cabin Team Materials," with attachment, January 14, 2011, OMC_BM_000000884–95 at OMC_BM_000000888 ("• ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████).

[314] "Village Vitality Murphy Update," DaVita, September 2012, DVA_OMCEAL_001360570–622 at DVA_OMCEAL_001360573.

[315] Deposition of Mark Kopser, Volume I (USPI), December 12, 2024 ("Kopser (USPI) Deposition"), pp. 86–87 ("██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████), pp. 108–109 ("██████████████████████████████████████████████████████████████ █████████████████████████████").

[316] Gerhart Report, ¶ 114 ("██████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████"), ¶ 148 ("█████████████████████████████████████ ███████████████████████").

[317] Workpaper 16.

[318] █████████████████████████████████████████████████████████████ ████████████████████████ See Email from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729 ("████████████████████ █████████████████████); Email chain from Sue Seme (SCA) to Cabin Team (SCA) and Brian Mathis (SCA), "RE: Updated: Cabin Team Materials," with attachment, January 14, 2011, OMC_BM_000000884–95 at OMC_BM_000000888 ████████████████████████████████████████████; HAYEK-000012214–16 at Hayek-000012214 ("2009 Hayek Merit Pay Notes") ("████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████)



████[320] To the extent the information shared was essentially the same as what was already available elsewhere, it would not have had any impact on proposed class members' pay.

### 4.2. The Information Allegedly Shared by Defendants Would Not be Sufficient to Suppress Pay, Even by Plaintiffs' Experts' Own Standards

161. Having discussed how Plaintiffs' experts have presented no evidence to demonstrate that Defendants shared information with a goal of suppressing pay, and that from an economic perspective information sharing can have procompetitive effects, let me now turn to a consideration of the likely effects of the alleged information sharing at issue here. In this subsection, I show that the information allegedly shared would not have been sufficient to coordinate on pay for proposed class members.

162. Plaintiffs allege and Plaintiffs' experts assert that Defendants shared competitively sensitive information, including compensation-related information in the form of planned merit increase budgets, that allowed them to coordinate on pay and thereby suppress the pay of their employees.[321]



---

[319] Workpaper 17.

[320] Gerhart Report, Figure 15, ¶ 103 ████████████████████████████
████████████████████████████████████████████████████████
████████).

[321] Starr Report, ¶ 12 ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████); Third Amended Complaint, ¶ 8 ("Defendants also employed collusive exchanges of competitively sensitive information to further their conspiracy to suppress competition between them for employees, and to thereby suppress the compensation of their employees. ████████████████████████████████
████████████████████████████████████████████████████████

████████ Defendants shared the competitively sensitive information to further the goals of the conspiracy to suppress the compensation of their employees"); Gerhart Report, ¶ 23 ("████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████").

However, the evidence of alleged information sharing that Plaintiffs' experts point to demonstrates that the information was either not compensation-related or not shared regularly, and that when compensation-related information was shared, it was sometimes backwards-looking and generally aggregate in nature for each firm (i.e., for the entire firm or for broad groups of employees at the firm), such that it could not be used to identify even the average total compensation, or average salary for individuals with a particular job title, let alone for an individual.

163. From an economic perspective, it is widely recognized that maintaining an agreement to coordinate on prices requires the ability to monitor prices and punish cartel members who deviate from the agreed-upon prices. This is because each cartel member has a strong economic incentive to cheat on the cartel; cheating increases their individual profits if undetected.[322] As a result, agreements to coordinate on prices in industries with complex pricing arrangements are understood to be difficult to sustain because they require detailed monitoring of many different prices to prevent cheating.[323] For these

---

[322] See Carlton and Perloff (2015), p. 160 ("Cartel agreements are easier to enforce if detecting violations is easy. Four factors aid in the detection of cheating: - There are few firms in the market -- Prices do not fluctuate independently -- Prices are widely known -- All cartel members sell identical products at the same point in the distribution chain."), p. 164 ("Unless a cartel can detect violations of its price-fixing agreement and prevent reoccurrences, member firms engage in secret price cutting (or output expansions) that destroys the cartel."), pp. 177–178 ("Cartels fail due to cheating by member firms or by competition from firms outside the cartel. Individual firms have an incentive to cheat on a cartel agreement because they can make higher profits by increasing output or undercutting the cartel's price. A cartel can maintain its agreement only if cheating can be detected and adequately punished.").

[323] Carlton and Perloff (2015), p. 160 ("Cartel agreements are easier to enforce if detecting violations is easy. Four factors aid in the detection of cheating: - There are few firms in the market -- Prices do not fluctuate independently -- Prices are widely known -- All cartel members sell identical products at the same point in the distribution chain."), p. 161 ("If a market has frequent shifts in demand, input costs, or other factors, prices in the market have to adjust often. In that case, cheating on a cartel arrangement may be difficult to detect because it cannot be distinguished easily from other factors that cause price fluctuations. Cheating is easier if prices are known."); Louis Kaplow and Carl Shapiro, "Antitrust," in *Handbook of Law and Economics*, Volume 2, p. 1103 ("Economists have long recognized that there exist certain prerequisites to successful collusion. [...] The key elements are (1) reaching consensus: some understanding must be reached among the otherwise-competing firms regarding what conduct is permitted under the terms of the collusive agreement, such as the prices that the firms will charge; (2) detection: some reliable means must exist by which departures from the agreement can be detected; and (3) punishment: some credible mechanism must be established by which such departures are punished if and when they are detected. Specifically, the prospect of detection and punishment must be sufficient to deter individual firms' proclivity to cheat on the agreement, typically by cutting prices in the short-term, hoping to reap greater profits through a higher market share, at the expense of the other firms, before they can respond. Related to the need to reach an agreement is the problem of (4) inclusion: a means of inducing participation by a sufficiently large number of incumbent suppliers so that competition from non-participants does not undermine the profitability of the collusive agreement. Lastly and relatedly, the incumbent firms must be protected by (5) entry barriers: there must not be so much competition from quickly arriving new entrants so as to undermine the effectiveness of collusion.") Economic theory suggests it is harder to sustain a conspiracy to fix pay when colluding firms have to coordinate on and monitor more than a single price. See Carlton and Perloff (2015), p. 159 ("Firms have more difficulty agreeing on relative prices when each firm's product has different qualities or properties. Each time a product is modified, a new relative price must be established. It is easier for a cartel to spot cheating when all it has to examine is a single price. It is relatively difficult to detect price cutting that is achieved by an increase in quality; a firm could increase its quality and hold its price constant if it wanted to increase sales without explicitly violating the pricing agreement.").

reasons, the information sharing necessary to support a successful conspiracy to coordinate on pay across all of the jobs and employees in the proposed class (and prevent unraveling due to cheating by conspiracy participants) would need to be very detailed. For example, it would likely need to include data on every component of pay (salary, bonus, equity, etc.) shared in regular intervals (say, monthly or yearly), and disaggregated by job title, and possibly by department, location and years of experience (to the extent pay varies by department, location or by years of experience within a particular job title).

164. My review of Prof. Starr's and Prof. Gerhart's reports, and the evidence cited within them, indicates that Plaintiffs' experts have presented no evidence that information sharing occurred between DaVita and USPI. Moreover, the types of information allegedly shared between SCA and DaVita, and separately between SCA and USPI, did not take the form that would be expected to support a successful conspiracy to fix pay (described above). Some of the evidence Plaintiffs point to is merely discussion of potential information sharing, rather than actual sharing. The evidence Plaintiffs' experts present concerning actual, as opposed to potential, information sharing falls into three categories: (1) information that was not compensation related at all, (2) information concerning overhead costs where compensation costs were an input but were inseparable from other costs, and (3) information related to compensation such as retrospective or prospective merit pay increase budgets.

165. Of these three types of information, the only type shared with any regularity between either pair of Defendants (based on the evidence presented by Plaintiffs' experts) was within the first category – information that was not compensation related at all. ██████████████████████████████
████████████████████████████████████████████[324]
████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████

[324] Gerhart Report, footnote 346 ("████████████████████████████████
████████████████████████████████████████"). For an example of the case volume data, see email chain from James Walker (USPI) to Brian Mathis (SCA) and Jason Cagle (USPI), "RE: Oct volume," with attachment, November 10, 2014, USPI_CIV_000021165; "October Cases – Final," USPI, November 10, 2014, USPI_CIV_000021166. Prof. Starr does not mention case volume exchanges in his report.

Highly Confidential – Outside Counsel/Experts Only



█████████████████████████████████”[325] Prof. Starr similarly stated in his deposition that "█████████████████████████████" in case volume information.[326] █████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████.[327]

166. With respect to the second type of information (information concerning overhead costs where compensation costs were an input but were inseparable from other costs), ██████████████████████████████████

████████████████████████████████[328] The data were at a highly aggregated level (e.g., "████

████████████████████").[329] ██████████████████████████████

████████████████████████████████

█████,[330] ████████████████████████████████e

---

[325] Gerhart Deposition, pp. 160–161 ("███████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████") In his report, Prof. Gerhart also seems to concede that case volume information was not compensation information. See Gerhart Report, footnote 346 ("████████████████████████

██████████████████████████████████

████████████████████████████").

[326] Deposition of Evan P. Starr, Ph.D., Volume II, March 20, 2025 ("Starr Deposition, Volume II"), pp. 465–466.

[327] See, e.g., Email chain from Megan Farabaugh (USPI) to Jason Cagle (USPI) et al., "RE: SCA Payor Mix – Week 13," with attachment, April 5, 2013, USPI_CIV_000016019–20 at USPI_CIV_000016019 ("█████████████

██████████████████████"); "Year over Year Weekly Case Counts Payor Mix Percentage," USPI, January 14, 2025, USPI_CIV_000016020; Gerhart Report, footnote 346; "Kopser (USPI) Deposition", p. 88 ("█████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████").

[328] See, e.g., ██████████████████████████████████

███████████████████████ 15. See "Expense Comparison of USPI and SCA," USPI, January 11, 2015, USPI_CIV_000962509; "Overhead Comparison of USPI and SCA," USPI, December 16, 2013, USPI_CIV_000113335; Gerhart Report, footnote 375. See also Starr Report at ¶ 101 ("████████████████████████████████

████████████████████████").

[329] Martin (USPI) Deposition, p. 63 ("████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████").

[330] Starr Report, ¶ 101 ("█████████████████████████████████

███████████████████████████.").

███████████████████████████████████████████████████

██████████.[331] While these data were sometimes department specific, they were not broken down into separate categories such as labor costs or rent costs within the department, nor did they contain compensation information for specific individuals nor even sufficient information to calculate the average salary for proposed class members within a given department.[332]

167. Prof. Gerhart states that the overhead expense data has "granularity" that is "significant," but does not state in what sense or what kind of information would not be "granular" or would have a granularity that would not be "significant."[333] In the interest of being concrete rather than vague, I provide an example of the overhead cost data shared in Exhibit 23. Such information could not facilitate coordination on pay between USPI and SCA. Furthermore, USPI's and SCA's ability to use this information to coordinate on pay was further hindered because according to Defendants' employees, these data were not easily comparable between USPI and SCA due to differences between USPI and SCA in the classification of departments and expenses.[334]



[331] Mathis (SCA) Deposition, p. 136 ("████████████████████████████ ██████████████████████████████████████████████████ ██████"); Kopser (USPI) Deposition, pp. 87–88 ██████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████"). 

[332] Martin (USPI) Deposition, pp. 135–136 ("██████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████"). 

[333] Gerhart Report, ¶ 83 ("████████████████████████████████████████"). 

[334] Kopser (USPI) Deposition, p. 34 ("██████████████████████████ ██████████████████████████████████████████████████ ██████"); Email from Brian Mathis (SCA) to Jason Cagle (USPI), "Re: SCA Department Comparison.xlsx," with attachments, December 31, 2014, USPI_CIV_000021178 ("████████████████████ ████████████████"); Clemens (SCA) Deposition, pp. 137– 138 ("██████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████").

**EXHIBIT 23**
**Example of Overhead Expense Data Shared Between USPI and SCA**



Source: "Expense Comparison of USPI and SCA," USPI, January 11, 2015, USPI_CIV_000962509
Note: This exhibit provides an example of the corporate overhead information shared between USPI and SCA.

168. The evidence Plaintiffs' experts point to that does concern the sharing of compensation-related information, and thus falls within the third type,



[335] Even where the evidence does support information being shared, I have seen no explanation for how aggregate information of this type could be used to facilitate coordination on pay for proposed class members, and I find it implausible it could be used in such a manner. (I also discuss in more detail later in this section two instances Plaintiffs' experts point to concerning SCA and USPI (but not SCA and DaVita) sharing compensation information for individual employees. This evidence is extremely limited, and at least one of the two instances does not pertain to class positions.[336])

169. First, Plaintiffs' evidence does not support that these wage increase budgets were shared regularly throughout the Class Period. ▮

---

[335] See, e.g., a discussion of a potential exchange cited by both Prof. Starr and Prof. Gerhart. See email chain from Brian Mathis (SCA) to Jason Cagle (USPI), "RE: Wage Increase Budgets," August 20, 2014, USPI_CIV_000021155 ("[Brian Mathis (SCA):] Are you all willing to swap wage increase budgets as we have in the past? [Jason Cagle (USPI):] Sure. We're just heading into budgets. When were you hoping to see it? I may be a few weeks out."); Gerhart Report footnote 376; Starr Report footnote 366.

[336] The first instance does not pertain to a class position: ▮▮▮▮▮ See email chain from Rich Sharff (SCA) to Jason Cagle (USPI), "RE: comp," May 30, 2012, USPI_CIV_000016522. The second instance may pertain to a class position for USPI but may pertain to a position in an excluded department for SCA. ▮▮▮▮▮ . See email chain from Mark Kopser (USPI) to Brian Mathis (SCA), "RE: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–79 at OMC_BM_000010778 ▮▮▮▮▮ "). The only other compensation-related information Plaintiffs' expert alleged was shared between USPI and SCA (but not between SCA and DaVita) included the sharing of SCA's firmwide PTO policy. See email chain from Cindy English (USPI) to Rich Sharff (SCA), "RE: Contacts as SCA Baylor and Tenet for PTO Policy and Accrual Inquiry?," August 25, 2014, USPI_CIV_000601224–29.

████████████████████████████.337 Evidence of such ad hoc information sharing in a few years during a Class Period spanning 12 years (2008–2019) does not strike me as "regular." The depositions Plaintiffs' experts point to on this topic also indicate that the information was not shared regularly throughout the Class Period (e.g., stating it was "not a regular practice," or that it only occurred in "some years" or "a year or two.").338

---

337 Plaintiffs' experts only provide evidence of a few ad hoc instances in which Defendants shared information about merit pay increase budgets. First, ████████████████████████████████████ ████████████████████████████████████. See 2009 Hayek Merit Pay Notes, HAYEK-000012214–16 at HAYEK-000012216. In his deposition, Andrew Hayek testified ████ ████████████████████████████████████████████████████████████ ████████████████. See Hayek (SCA) Deposition, pp. 367–369. ██████████████ ████████████████████████████████████████████████████████████ ██████████████████████. See email chain from Laura Mildenberger (DaVita) to Kent Thiry (DaVita) et al., "CALL MATERIALS," January 28, 2009, DVA OMCEAL 001181143–65 at DVA_OMCEAL_001181148 ("████████████████████████████████████ ████████████████████"); Email chain from Village Communications to Village Communications (DaVita et al., "Correction: Focal Merit Increase Process — Opening Mar. 9," March 6, 2009, DVA_OMCEAL_001096793–809 at DVA_OMCEAL_001096801 ("█████ ████████████████████████████████████████████████████████████ ████████████████████"), DVA_OMCEAL_001096808 ("████████████████ ████████████████████████████████████████████████████████████ ██████████████"). ████████████████████████████████████████████ ████████████████████████████████████████████████████████████. See DaVita, "Notice of Annual Meeting of Stockholders," June 15, 2009, available at https://filecache.investorroom.com/mr5ir_davita/185/DaVita_Proxy09_Final_2.pdf at p. 21 ██████████ ████████████████████████████████████████████████████████████ ████████████████████████). Second, Prof. Starr cites to an SCA document ██████████ ████████████████. See email chain from Sue Seme (SCA) to Cabin Team (SCA) and Brian Mathis (SCA), "RE: Updated: Cabin Team Materials," with attachment, January 14, 2011, OMC_BM_000000884–95 at OMC_BM_000000888 ("████████████████████████████████████████████ ████████████████."). Third, ████████████████████████████████ ████████████████. See email chain from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729 ████████████████████████ ██████████████████████.

338 Hayek (SCA) Deposition, pp. 362–363 ("████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████"); Mathis (SCA) Deposition, pp. 53–54 ("████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████"); Rucker Deposition, pp. 254–260 ("████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████").

170. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ [339] ████████████████████████████████

██████████████████████████████████████ [340] As the exhibit illustrates,

███████████████████████████████████████████████

████████████████████████████████████ Information at this level of aggregation would not be sufficient to enable firms to coordinate on pay for specific jobs or proposed class members.[341] In some cases, the information was more disaggregated but in no case was the wage increase budget information



████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ ), pp. 342–343 ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ ). See also Kopser (USPI) Deposition, p. 88 ("███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ ").

[339] The aggregate nature of these data was affirmed in deposition by Defendants' employees. See Mathis (SCA) Deposition, pp. 69–70 ("██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ "); Hayek Deposition, p. 367 ██████████████████

██████████████████████████████████████████████ ").

[340] See, e.g., Email from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729 █████████████████████████████████

██████████████████ .

[341] ██████████████████████████████████████████████

████████████████████████████████████████ Kopser (USPI) Deposition, pp. 86–87 ("████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ "). See also, Clemens (SCA) Deposition, p. 189 ("████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ ").

Highly Confidential – Outside Counsel/Experts Only

disaggregated to the level of an individual or a specific job title or location.[342] Additionally, it is unclear how information for groups of employees that were largely not proposed class members (such as facility or field employees) would have affected proposed class members.[343] Moreover, it is unclear how budgets for large pools of employees that included both individuals within and outside of the proposed class, such as firm level budgets, would be distributed across employees and how they would affect proposed class members, if at all. [344]



[342] ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████ . See 2009 Hayek Merit Pay Notes, HAYEK-000012214–16 at Hayek-000012216 (“███████████████████████████████████████ ███████████████████”).

[343] 2009 Hayek Merit Pay Notes, HAYEK-000012214–16 at Hayek-000012214–16 (“███████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████”); Email chain from Sue Seme (SCA) to Cabin Team (SCA) and Brian Mathis (SCA), “RE: Updated: Cabin Team Materials,” with attachment, January 14, 2011, OMC_BM_000000884–95 at OMC_BM_000000888 ███████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████ ███████████████”).

[344] It is worth noting that any impact on the compensation of individual employees could be borne entirely by *non-class* members, and it could still be the case that “a██████████████████████████████████████ ███████████████████████████████ ” See Gerhart Report, ¶ 153. Prof. Gerhart may claim that ███████████ ███████████████████████████████████████████████████████████████ ████████████, however, as I explain in Section 4.3.3, actual pay increases for Defendants' employees could, and did, vary widely from the budgeted percentage based on employee performance and other factors. See Gerhart Report, ¶ 151.

Highly Confidential – Outside Counsel/Experts Only

***EXHIBIT 24***
***Example of Merit Pay Increase Budget Shared Between SCA and USPI***



Source: Email from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729

171. Taking a step back, suppose for the sake of argument that there was a conspiracy. Irregular information sharing of highly aggregated information, between two of the three alleged conspirators, would not be sufficient to support it, and would be expected to result in little to no effect on pay — ███

████████████████████████

████████████████████████

████████████████████████ ,345 ████████

████████████████████████

████████████████████ I therefore do not interpret the isolated episodes of information sharing alleged as having anything to do with collusion—certainly not collusion that could have an effect on compensation such as those claimed by Prof. Starr. A much more obvious interpretation of the information sharing alleged is that it would orient a firm as to where it was relative to its competitors, which can have procompetitive effects on pay.

---

345 Email from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729████████████████████

████████████

Highly Confidential – Outside Counsel/Experts Only

172. The pay increase budget pool information discussed by Plaintiffs' experts does not even meet Prof. Starr's own criteria stated in his report regarding the types of information that, when shared, can lead to anticompetitive outcomes because it did not involve the "direct sharing of prices (i.e., what a firm intends to pay or intends to sell at,"[346] or the "direct inter[firm] communications of current prices on specific transactions,"[347] and did not "give Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees for their services,"[348] as Prof. Starr claims, let alone enable Defendants to effectively suppress pay.[349]

173. Prof. Gerhart argues that even if the information shared was only sufficient to coordinate pay for some positions, that would be sufficient to "█████████ ███████████████"[350] ████████████████████████ ███████████████████████████████ But the evidence Prof. Starr and Prof. Gerhart have presented does not demonstrate that it would even be possible for Defendants to have coordinated on pay for even a single job throughout the Class Period.



[346] Starr Report, ¶ 56 ("The direct sharing of prices (i.e., what a firm intends to pay or intends to sell at), is the precursor to what economists and antitrust practitioners consider a traditional "'naked' price-fixing agreement.").

[347] Starr Report, ¶ 95 ("████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████"). In this context, the sharing of "████████████████████████" would be analogous to the sharing of wages for specific employees. As I explained above, ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████

[348] Starr Report, ¶ 93 ("████████████████████████████████ ████████████████████████████████████").

[349] This is consistent with academic literature that Prof. Starr cites, which notes that Antitrust enforcers object to agreements among rivals to exchange price information *if* doing so would facilitate the reaching of consensus on a collusive price, which in this case it would not. See Jonathan B. Baker, "The Case for Antitrust Enforcement," *Journal of Economic Perspectives*, 17(4), 2003, pp. 27–50 at p. 30 ("Antitrust enforcers also address the cartel threat indirectly. Antitrust law objects to agreements to engage in practices that likely facilitate collusion or appear to have led to higher prices, even without proof that the firms agreed on price. These may include, for example, agreements among rivals to exchange price and output information, if doing so would facilitate the reaching of consensus on a collusive price or help deter cheating by making price cutting transparent.").

[350] Gerhart Report, ¶ 149 ("████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████").

174. Specifically, for SCA and DaVita, I have seen no instance in which compensation information for individual employees or job titles was shared. For SCA and USPI, I have seen two instances in which SCA and USPI shared compensation information for individual employees or job titles. Only one of these may pertain to a class position. The other concerned compensation for an individual not in the proposed class.[351] That is, the high water mark of information sharing Plaintiffs point to is one instance at one point in time of one pair of Defendants allegedly sharing a specific salary for a single position that may or may not be in the class. This would not be sufficient to allow coordination on pay generally and ███████████████████████████ ████████████████████████. Prof. Starr states that the information sharing was sufficient for the Defendants to "████████████████████████ █████████████████████████████████████████████ ██████"[352] This strains credulity, and I disagree.

175. Information on the overall pay increase budget percentage, which pertains only to salary compensation, would also not support effective coordination on pay because it only contains information on salaries, not bonuses, equity grants, or other types of pay received by proposed class members as part of their total compensation package. As I will explain in more detail in Section 4.3, a conspiracy to fix one piece of a price (in this case base salary) is unlikely to be successful as firms participating in the conspiracy will have an incentive to cheat by adjusting on other dimensions of price (in this case equity or bonus pay).[353]



[351] ████████████████████████████████████████████████████████ ██████████████████████████████████████████ See email chain from Rich Sharff (SCA) to Jason Cagle (USPI), "RE: comp," May 30, 2012, USPI_CIV_000016522. ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ See email chain from Mark Kopser (USPI) to Brian Mathis (SCA), "RE: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–79 at OMC_BM_000010778 ████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████.").

[352] Starr Report, ¶ 93 ███████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████.

[353] Even if it were the case that the merit pool information shared pertained to more than just salary compensation, it would still not contain information pertinent to *all* aspects of total compensation including bonuses and/or equity pay, and Defendants could still easily defect and adjust these dimensions of pay. While Prof. Gerhart seems to suggest in his deposition testimony that the merit pool information shared pertained to

176. Finally, as I mentioned above, and as I will discuss in detail in Section 5, Plaintiffs have not presented any credible evidence that the alleged information sharing suppressed pay for proposed class members. Prof. Starr's pay regression model is severely flawed and shows no evidence that pay was suppressed for proposed class members once obvious flaws are corrected. Moreover, by his own admission, it cannot distinguish between effects of the alleged information sharing and effects of the alleged mobility restrictions so could not possibly be used to demonstrate that the alleged information sharing specifically had an effect on pay.[354]

### *4.3. The Impact of the Alleged Information Sharing on Proposed Class Members' Pay Would Not be Common*

177. Even assuming for the sake of argument that compensation-related information was shared between Defendant firms with an intent to use the information to coordinate on pay, and that Defendants somehow were able to use irregular, aggregated information to suppress pay for some proposed class members, the impact of the information sharing would not be common, and common evidence would not be sufficient to quantify harm for any proposed class members who were impacted. There are several reasons why: (1) the varied competition faced by Defendants for proposed class members' labor; (2) the irregular nature of the information sharing which occurred predominantly in the early part of the Class Period according to the evidence Plaintiffs' experts presented; (3) the varied impacts that the alleged information sharing concerning merit pay increase budgets would have on low and high performers; and (4) the fact that the alleged information sharing pertained only to salary information, not other aspects of total compensation like bonuses and equity, and that Defendants would have had an economic incentive to cheat on an agreement to coordinate on pay (assuming there was one) but that their ability to do so would have varied with proposed class members' compensation mix. In this section, I discuss each of these reasons in turn.

---

more than just salary compensation, he does not explain whether he considers the merit pool information shared to pertain to *all* aspects of compensation and indeed concedes that it would not inform equity compensation. See Gerhart Deposition, pp. 169–171.

[354] Starr Report, ¶ 106 ("Given that Plaintiffs allege that both elements of the Challenged Conduct (i.e., the No-Poach Agreements and CSI Exchanges) occurred simultaneously, my analysis measures suppressed compensation from the whole of the Challenged Conduct rather than from each individual component.").

*4.3.1. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Due to Their Varied Employment Opportunities, and the Varied Competition that is Implied for Their Labor*

178. First, the alleged information sharing would not have a common impact because, as I discussed in Section 2.1, proposed class members' labor market opportunities vary widely, and therefore, any impact of a conspiracy to suppress pay would also vary across proposed class members based on the extent of those other labor market opportunities. Neither Prof. Starr nor Prof. Gerhart conduct any analysis of labor market competition. [355] Neither expert considered whether Defendants would have faced varied competitive conditions for different types of proposed class members. Therefore, just as with the alleged mobility restrictions, neither expert can credibly conclude that the alleged information sharing suppressed pay.[356] My analysis in Section 2 demonstrates that, in fact, Defendants could not have had market power sufficient to suppress pay for many or most (if not all) proposed class members given extensive competition from non-Defendant employers for proposed class members' labor. Given this, individualized inquiry would be necessary to determine for which, if any, proposed class members Defendants did have market power sufficient to suppress pay.

*4.3.2. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Who Worked for Defendants at Different Times*

179. Second, the alleged information sharing would not have had a common impact because some proposed class members only worked for Defendants during time periods when there is no evidence of information being shared. As I discussed in Section 4.2, the evidence Plaintiffs' experts discuss pertaining to

---

[355] Starr Deposition, Volume I, pp. 155–156 ("Q. You haven't attempted to define a relevant market in this case, have you? A. [...] In this context I wasn't asked to study the relevant labor market and define the precise contours of the labor market. I wasn't asked to figure out exactly which companies every worker was going -- every worker was going to or coming from. [...] Q. Okay. It was a very long answer. My question was simple. You have not attempted to, nor have you defined a relevant market in this case; is that correct? [...] A I wasn't asked to define a relevant market, and I did not define a relevant market."); Gerhart Deposition, pp. 51–52 ("Q. [... D]o you have an understanding of the market that plaintiffs are alleging in this case? [...] A. think I would go back to what I said before, that you'd want to look at the degree to which companies people move between if there's a competitive, unrestricted market. Q. Did you look at those things related to the defendants in this case? [...] A. Yeah, I don't know that I had information; but, no, I didn't look at it in detail. [...] Q. Are you offering an opinion about the scope of the relevant labor market as it relates to the defendants in this case? A. My focus was on the movement between these three companies, I think, primarily, in this case. Q. Okay. But you're -- you are not asserting that these three companies, in and of themselves, are in a relevant labor market; correct? [...] A. I don't think I asserted that.").

[356] Prof. Starr asserts that Defendants have "market power over Class Members," a claim that is based on his alleged evidence of pay suppression, and Prof. Gerhart asserts that "Plaintiffs allege that Defendants unlawfully conspired to suppress competition in the market for Senior-Level Employees." See Starr Report, ¶ 196; Gerhart Report, ¶ 21.

compensation-related information does not support that information was shared regularly. Their evidence from contemporaneous business documents regarding merit pay increase budgets only includes a few instances, all prior to 2013.[357] Proposed class members who only worked for Defendants outside of these years, and in particular those who only worked for Defendants in the latter portion of the Class Period, could not have been affected by the alleged information sharing in those earlier years. Using Defendants' data, I estimate that ███████████████████████████████████████████████████ ███████████, and thus could not have been harmed by any information sharing that occurred in 2013 and earlier.[358]

### 4.3.3. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Based on Performance

180. Third, the alleged information sharing would not have a common impact because much of the information that was allegedly shared between Defendants concerned merit pay increase budgets for the entire firm, or for broad groups of employees within the firm, where the amount of increase individuals received was conditioned on their performance. As I discussed in Section 2.2, Defendants use "pay for performance" strategies when setting many types of pay (and in particular, when determining merit pay increases) that aims to ensure that high performers are better compensated than low performers. Low performers whose performance is sufficiently poor that they receive no merit pay increase whatsoever could not have been affected by the alleged information sharing related to merit pay increases because they would have been ineligible to receive a merit pay increase of any amount regardless of whether the alleged information sharing took place. For example, ███████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████[359]███████████████████████████████████████████████

---

[357] As I explained in Section 4.2, Plaintiffs' experts only provide evidence of a few instances from contemporaneous business documents in which a Defendant shared a merit pay increase budget or had another Defendant's merit pay increase budget, which occurred in 2009, 2011, and 2012. Plaintiffs' experts also cite to deposition testimony from Michael Rucker (SCA) ███████████████████████████████████████ ███████████████████████████████. See footnote 337 and 338.

[358] Workpaper 18.

[359] See email chain from Peter Clemens (SCA) to Chris Jennings (SCA) and Lynn Howard (SCA), "RE: Compensation Adjustments for Support Services Teammates,", February 21, 2013, SCA001125179–82 at SCA001125180 ("███████████████████████████████████████████████ ███████████████████████."). In his deposition testimony, Allen Spradling affirmed that these guidelines specified the process by which to determine annual merit increases based on performance ratings. See Spradling (Named Plaintiff) Deposition, pp. 93–94 ("Q: And this chart is suggesting that depending on performance --or, actually, why don't you tell me what this chart is saying. A: Yeah. Exactly like you were saying,

██████████████████████████████████████████████████████

██████████ [360] ████████████████████████████████████████

███████████████████████████████████

██████████ [361] The deposition testimony of Defendants' employees and case evidence affirms that salary increases could and did vary widely from the budgeted percentage due to performance.[362]

### 4.3.4. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Based on their Compensation Mix

181. Fourth, the alleged information sharing would not have a common impact because the compensation-related information allegedly shared pertained to

---

that these are guidelines for raters to try and follow based upon the rating they have given to direct reports. If they were middle-of-the-road performance --i.e., meets standards --1 to 2 percent. If less performance, less money. If more performance, more money.").

[360] "2014/2015 Merit Guidelines," USPI, USPI_CIV_000099574.

[361] ████████████████████████████████████████████████████████████████████████████████. See Email from David Maughan (DaVita) to Jeff Rieb (DaVita), "FW: Communication to RODs/DVPs," January 7, 2014, DVA_OMCEAL_001150350–51 at DVA_OMCEAL_001150350 ("████████████████████████████████████████████████████████████████████████████████" (emphasis in original)); Email chain from Jeremy Eaves (DaVita) to Philipp Stephanus (DaVita) et al., "████████████████████████████████████████████████████," with attachment, March, 18, 2011, DVA_OMCEAL_001358600–02 at DVA_OMCEAL_001358600 ("████████████████████████████████████████████████████████████████" (emphasis in original)); Email from Cynthia Baxter (DaVita) to People Services Directors (DaVita), ██████████████████████, March 2, 2013, DVA_OMCEAL_000906132–35 at DVA_OMCEAL_000906134 ("████████████████████████████████████████████████"); "Palmer Meeting," October 10, 2011, DVA_OMCEAL_001399746–74 at DVA_OMCEAL_001399774 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.").

[362] See, e.g., Clemens (SCA) Deposition, p. 147 ████████████████████████████████████████████████████████████████████████████████████████"); Mathis (SCA) Deposition, p. 247 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); Kopser (USPI) Deposition, pp. 86–87 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

salaries, not other important aspects of proposed class members' compensation such as equity grants and bonuses. From an economic perspective, any agreement to suppress one component of compensation would invite backsliding (i.e., cheating on the agreement) for other components of compensation. This would be expected to have larger effects for some proposed class members than others due to variation across proposed class members in the types of compensation (e.g., equity, bonuses, etc.) they would usually receive.[363]

182. The broader point that it is unsustainable to collude on one component of compensation is supported by the economic literature generally.[364] When firms cannot compete in one way, they adapt and find other ways to compete. For example, in regulated markets in which firms are price constrained, including commercial banking and air transportation, firms compete on factors other than price.[365] Similarly, academic literature has also shown that firms change their behavior strategically in the face of regulation or taxes.[366] The same phenomenon holds in labor markets. For instance, when wages were frozen during World War II, but health insurance coverage was not included, firms competed by offering private health insurance.[367] This is consistent with

---

[363] See Section 2.2.1.

[364] Economic theory suggests it is harder to sustain a conspiracy to fix pay when colluding firms have to coordinate on and monitor more than a single price. See Carlton and Perloff (2015) , p. 159 ("It is easier for a cartel to spot cheating when all it has to examine is a single price. It is relatively difficult to detect price cutting that is achieved by an increase in quality; a firm could increase its quality and hold its price constant if it wanted to increase sales without explicitly violating the pricing agreement.").

[365] See, e.g., George W. Douglas and James C. Miller III, "Quality Competition, Industry Equilibrium, and Efficiency in the Price-Constrained Airline Market," *The American Economic Review*, 64(4), (Sep. 1974), pp. 657–669 at p. 657 ("There are many examples of such regulated markets […] which, although price constrained, reach an equilibrium through vigorous non price competition […] Examples include commercial banking, stock brokerage, real estate brokerage, motor trucking, taxicab service, and, of particular interest here, air transportation.").

[366] See, e.g., Justin Marion and Erich Muehlegger, "Measuring Illegal Activity and the Effects of Regulatory Innovation: Tax Evasion and the Dyeing of Untaxed Diesel," *Journal of Political Economy,* 116(4), (Aug. 2008) pp. 633–666 at p. 633 ("This article examines tax evasion in the diesel fuel market. Diesel fuel used for on-road purposes is taxed, while other uses are untaxed, creating an incentive for firms and individuals to evade on-road diesel taxes by purchasing untaxed diesel fuel and then using it for on-road use.").

[367] The U.S. stands alone among wealthy nations in having private provision of health care by employers; avoidance of WWII price controls is generally thought to be the origin story of this unique institutional arrangement. See, e.g., David Blumenthal "Employer-Sponsored Health Insurance in the United States — Origins and Implications," The New England Journal of Medicine Health Policy Report, July 6, 2006, pp. 82–88 at p. 83 ("The resultant private insurance industry was therefore ready to sell insurance to employers when the opportunity to do so emerged during World War II. This opportunity arose because, to control inflation in the overheated wartime economy, the federal government in 1942 limited employers' freedom to raise wages and thus to compete on the basis of pay for scarce workers."); Paul Fronstin, "Testimony to the House Committee on Education and the Workforce on behalf of the Employee Benefit Research Institute," *Employee Benefit Research Institute*, September 10, 2024, p. 2, available at https://edworkforce.house.gov/uploadedfiles/9.10.24_help_hearing_on_erisa_anniversary_fronstin_testimony.pdf, accessed on April 8, 2025 ("It was during World War II that employers began to offer more formal health coverage. Because the National War Labor Board (NWLB) froze wages, employers sought ways to get around the wage controls to attract scarce workers (Helms 2008).") See also Richard E. Schumann "Compensation from

employers adjusting other components of compensation (e.g., bonuses or equity pay) to attract or retain employees in the case that a conspiracy to fix pay only applies to a specific component of compensation such as salary. Such adjustments would be especially likely for firms where a high share of pay is skewed towards bonuses and equity, which as I explained in Section 2.2, was the case for the three Defendants.

183. Assuming then that Defendants would have cheated on any agreement they reached to fix salary pay because they could earn more profits by doing so, the effects of the alleged information sharing would vary across proposed class members and would require individualized inquiry to quantify. This is because the importance of non-salary pay components varied across proposed class members and the degree to which Defendants would have been able to offset any suppression in salary pay with an increase in non-salary pay therefore varied across proposed class members. To illustrate, consider an individual with a large share of equity pay, whose equity pay was adjusted by their employer to fully offset any salary suppression. At the same time, consider another individual not eligible for equity pay whose salary was suppressed as a result of the information sharing, but who did not receive an offsetting increase in equity pay since he was not eligible. In the first case, the individual would not be harmed by the alleged conduct, but in the second case, the individual would be, illustrating the complexity and need for individualized inquiry in order to determine which (if any) proposed class members would be harmed, and by how much.

---

World War II through the Great Society," *Bureau of Labor Statistics Compensation and Working Conditions Fall*, January 30, 2003, p. 1, available at https://www.bls.gov/opub/mlr/cwc/compensation-from-world-war-ii-through-the-great-society.pdf, accessed on April 8, 2025 ("As a result of wage restrictions, employers who needed to attract labor resorted to a growing range of fringe benefits, such as pensions, medical insurance, and paid holidays and vacations. These benefits were considered non-inflationary, as they were paid in cash and, thus, did not violate the wage ceiling. Additionally, payments for overtime afforded extra income to workers, without violating the limits on hourly wage payments.") See also Sherwin Rosen "Does the Composition of Pay Matter," in *Employee Benefits and Labor Markets in Canada and the United States*, (Kalamazoo, MI: W.E. Upjohn Institute, 2000), pp. 13–30 at p. 17 ("There is a natural tendency toward 'wage drift' in those circumstances [during periods of wage controls]: using wage and price controls to suppress inflation gives strong incentives for workers and employers to look for ways to increase worker incomes exempt from regulation. Provision of company-owned housing to employees often was used for this purpose in Europe and in the post World War II era.").

**5. PROF. STARR HAS NOT DEVELOPED A RELIABLE METHODOLOGY TO ASSESS IMPACT AND DAMAGES STEMMING FROM THE CHALLENGED CONDUCT**

184. Prof. Starr's pay regression model is not reliable for the purposes of establishing impact or damages because it does not measure changes in pay that were caused by the challenged conduct. In this section, I explain this point in some detail.

185. First, in Section 5.1, I explain that, even though a decline in mobility of proposed class members between Defendants is critical to Plaintiffs' theory of harm, and even though Plaintiffs and their experts claim mobility would be reduced by the alleged conduct, neither expert demonstrates that mobility was restricted during the Class Period. This fact alone is strong evidence that Prof. Starr's pay regression model does not measure how proposed class members' pay changed because of the alleged conduct. Second, in Section 5.2, I provide an overview of Prof. Starr's pay regression model (upon which he bases his claimed finding of common impact and his damages estimates) and discuss additional reasons that his model does not measure a change in pay caused by the challenged conduct. I show that Prof. Starr's pay regression model suffers from methodological flaws and, as a result, is incapable of reliably estimating the change in pay caused by the alleged conduct. When I correct these flaws and fix basic errors that Prof. Starr made when processing the data, I find no evidence of pay suppression or damages. I also find no evidence of pay suppression or damages when I make slight modifications to the class period start and end dates. Finally, in Section 5.3, I explain why the single effect Prof. Starr estimates in his pay regression model is not sufficiently linked to the varied conduct Plaintiffs allege.

### 5.1. *Empirical Evidence Does Not Show a Reduction in Mobility Between Defendants During the Class Period*

186. Plaintiffs and their experts, Prof. Starr and Prof. Gerhart, claim that a key mechanism by which the challenged conduct suppressed pay is that proposed class members were unable (or less able) to move between Defendants as a result of the alleged mobility restrictions.[368] Specifically, Prof. Gerhart claims

---

[368] Third Amended Complaint, ¶ 11 ("Defendants' conspiracy [...] denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment. In addition, Defendants' conspiracy eliminated the need for compensation increases to preempt competitive offers and retain employees."), ¶ 71 ("Defendants' conspiracy precluded information about pay and benefits from reaching employees at Defendants' companies. Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors.").

that the alleged mobility restrictions "restricted cold calling, which in turn limited job mobility,"[369] and harmed employees who would otherwise "benefit when they have uninhibited access to other jobs, i.e., job mobility."[370] However, Prof. Gerhart presents no empirical analysis of how mobility between Defendants during the Class Period compared to mobility between Defendants prior to or after the Class Period.[371] He merely cites academic literature and qualitative record evidence, and concludes that the alleged mobility restrictions "███████████████████████████████████████ ████████████████"[372] Similarly, Prof. Starr claims that no poach agreements as a general matter "lower workers' mobility and bargaining power, which translates into lower pay," and that the alleged mobility restrictions in particular "███████████████████████████████████████ ████████████████████████"[373] While Prof. Starr does present an empirical analysis that attempts to analyze mobility during the Class Period as compared to after the Class Period, his analysis does not exhibit the patterns that he claims it does, and has several fatal flaws that render it unreliable.

187. In this subsection, I discuss Prof. Starr's flawed mobility analysis. In Section 5.1.1, I show that, at face value, his own analysis does not support his conclusion that the alleged conduct reduced mobility. ████████████████ ████████████████████████████████████



---

[369] Gerhart Report, ¶ 59 ("████████████████████████████████ ██████████████████████"). See also Gerhart Deposition, pp. 136–137 ("████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████").

[370] Gerhart Report, ¶ 7 ("████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ ").

[371] Gerhart Deposition, p. 113 (████████████████████████████ ████████████████████████████████████████████ ████████████████████████).

[372] Gerhart Report, ¶¶ 64–65 ("████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████").

[373] Starr Report, ¶¶ 52, 73, 80.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████.[374] In my opinion, a far more significant takeaway from Prof. Starr's mobility analysis is that it shows that movement between covered Defendants ████████████████████████████████████ total departures per year before, during, and after the Class Period, a fact that is consistent with Defendants facing extensive competition from non-Defendant firms for proposed class members' services throughout the Class Period.

188. In Section 5.1.2, I turn to the flaws in Prof. Starr's mobility regression model, which he claims shows a statistically significant reduction in mobility between Defendants during the Class Period as compared to the years outside of the Class Period. I show that Prof. Starr's mobility regression model is fatally flawed and unreliable, as it omits most of the factors that drive mobility, includes an inappropriate time trend, and fails to account for the effects of the COVID-19 pandemic on labor markets, even though Prof. Starr acknowledges the effects of the pandemic and the lockdown period on compensation.

*5.1.1. Prof. Starr's Own Empirical Analysis Does Not Demonstrate that Mobility Was Lower During the Class Period*

189. Prof. Starr puts forward two opinions regarding mobility: that there is quantitative evidence of reduced mobility during the Class Period, and that this reduction in mobility led to a classwide reduction in pay. Yet Prof. Starr's own empirical analyses of mobility—in Figures 2 and 3 of his report—do not support his opinions.

190. First, Prof. Starr's empirical analysis shows that **proposed class members continued to move between Defendants throughout the Class Period**. This is apparent from the fact that, according to the left panel of Prof. Starr's Figure 2 (reproduced in Exhibit 25 below), the number of moves between covered Defendants is greater than zero during each year of the Class Period. Thus, while Prof. Starr and Prof. Gerhart present qualitative evidence which they claim shows that selected individuals did not move during the Class Period as a result of the alleged mobility restrictions, this evidence at best

---

[374] Starr Report, ¶ 83 ("███████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████").

shows that mobility was restricted (or was believed to be restricted) in certain instances, rather than on a classwide basis.[375]

***EXHIBIT 25***
***Figure 2 in Prof. Starr's Report***



**Figure 2: Director and Above Mobility Events Between Covered Defendants**

Source: Starr Report, Figure 2

Note: This exhibit contains a reproduction of Figure 2 in Prof. Starr's report. I obtain similar results if I re-estimate Figure 2 after correcting basic errors that Prof. Starr made when processing Defendants' structured data. See Workpaper 19.

191. Second, Prof. Starr's empirical analysis shows **no reduction in mobility for the first part of the Class Period.** The right panel of Prof. Starr's Figure 2 (reproduced in Exhibit 25 above) shows that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It also shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Prof. Starr himself acknowledges these patterns, noting that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[376]



---

[375] Starr Report, ¶ 81 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Section V.B; Gerhart Report, Section VI.B.

[376] Starr Report, ¶ 84.

Highly Confidential – Outside Counsel/Experts Only

192. Relatedly, Prof. Starr's Figure 3 purports to calculate the annual probability of mobility between covered Defendants relative to 2017, based on a regression analysis conducted by Prof. Starr. Prof. Starr's Figure 3 shows that,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ [377] ███

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

193. To the extent that Prof. Starr is claiming that mobility was suppressed during the latter years (2014–2019) of the Class Period, any increase in mobility that he attributes to the end of Class Period (and the alleged conduct) is small. The left panel of Prof. Starr's Figure 2 (reproduced in Exhibit 25 above) shows that, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ [378] ██████████████████

████████████████████████████████████████████████

███████████████████████████████████ At the risk of stating the obvious, the pandemic and associated lockdown was one of the most serious labor supply and labor demand disruptions in many decades, with complex effects on the labor market.[379] Prof. Starr cannot be confident in interpreting this economically insignificant difference as being due to alleged mobility restrictions between some of the Defendants, when the transition out of the Class Period coincides with the pandemic and lockdown. Prof. Starr acknowledges that the pandemic period is not a reliable reference period when

---

[377] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ See Starr Report, Figure 3.

[378] ████████████████████████████████████████████████████

██████████████████ See Exhibit 25.

[379] U.S Bureau of Labor Statistics, "Empirical evidence for the Great Resignation," *Monthly Labor Review*, November 2022, available at https://www.bls.gov/opub/mlr/2022/article/empirical-evidence-for-the-great-resignation.htm, accessed on April 16, 2025 ("[C]ompared with the dot-com recession of 2001 and the 2007–09 Great Recession, the pandemic produced unique quits rates, and this finding holds across U.S. census regions. [...] The article empirically confirms the "Great Resignation" phenomenon, which is characterized by record job quitting during the pandemic[.]"); U.S. Bureau of Labor Statistics, "Labor Market Dynamics during the COVID-19 Pandemic," *Commissioner's Corner,* November 15, 2022, available at https://www.bls.gov/blog/2022/labor-market-dynamics-during-the-covid-19-pandemic.htm, accessed on April 16, 2025 ("The U.S. labor market experienced a period of unprecedented volatility during the COVID-19 pandemic."). See also Section 5.2.2.

he discusses his pay regression model, noting that █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████[380] Prof. Gerhart similarly testified

in his deposition that there were ████████████████████ in the job turnover

rate and the unemployment rate during the COVID-19 pandemic.[381] And yet

Prof. Starr fails to address COVID at all in his mobility analysis despite his and

Prof. Gerhart's recognition of its relevance.

194. Moreover, even if the "slowdown" in mobility in the latter part of the Class

Period were attributable to the alleged conduct (which, as I explained above,

Prof. Starr's analysis does not show), there would be no evidence of injury for

the first part of the Class Period. In that case, many proposed class members

would have been uninjured; ████████████████████████████████

██████████████████████████████████[382]

195. Besides not showing that mobility fell during the Class Period, **Prof.
Starr's mobility patterns are also inconsistent with his pay
suppression estimates**, suggesting that whatever his pay regression model is

estimating, it is not the effect of the alleged conduct. If the alleged mobility

restrictions suppressed pay by restricting mobility, then the timing of the

mobility reduction should match the timing of the pay reduction. In fact, the

patterns are reversed: ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████[383]

196. Finally, **Prof. Starr's own calculations also demonstrate that
proposed class members had a wide range of outside employment
options beyond Defendants**. The right panel in Prof. Starr's Figure 2

(reproduced in Exhibit 25 above) shows ████████████████████████████

███████████████████████████████████████ Using Prof. Starr's own calculation

in his Figure 2, Exhibit 26 then shows that, ████████████████████████████

---

[380] Starr Report, ¶ 120.

[381] Gerhart Deposition, pp. 56–57 ("████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████").

[382] Workpaper 18.

[383] Starr Report, Figure 7.

██████████████████████████████████████████████████████

As Prof. Starr testified in his deposition, these departures include departures to a non-covered Defendant.[384] Prof. Starr's measure of the rate at which departing employees left for anywhere besides covered Defendants thus reinforces my estimates from Section 2.1 indicating that the vast majority of departures are for employers outside of the Defendants. Additionally, it is inconsistent with Prof. Starr's opinion that ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████[385]

197. Additionally, there was also no marked change during versus outside of the Class Period in terms of whether departing employees were more or less likely to move between covered Defendants: the two years with the highest share of departures involving moves between covered Defendants, 2010 and 2012, are *within the Class Period*. Plaintiffs' allegations would suggest the opposite should be true – i.e., the years with the highest share of departures involving moves between covered Defendants should fall outside the Class Period.

198. Finally, Exhibit 27 shows ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████. Like the results in Exhibit 26, these results ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████

---

[384] Starr Deposition, Volume I, pp. 136–137 ("████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████).

[385] Starr Report, Figure 6, ¶ 136 ("████████████████████████████████████ ████████████████████████████████████████████").

*EXHIBIT 26*
*Moves Between Covered Defendants Account for a Small Share of Total Departures for Proposed Class Members, and There is No Noticeable Change During versus Outside of the Class Period*



Source: Corrected Starr Data
Note: This exhibit shows the percent of total departures of proposed class members from Defendants that are versus are not moves between covered Defendants by year. This exhibit uses the same methodology as the right panel in Prof. Starr's Figure 2 to identify departures and moves between covered Defendants. Following Prof. Starr's methodology, departures are identified based on an employee's last year in the data at a particular Defendant, and moves between covered Defendants are identified based on whether an employee appears in the data at both DaVita and SCA, or at both USPI and SCA, within the same year or in successive years.

**EXHIBIT 27**
**There Was No Marked Decrease in Departures for Proposed Class Members as a Percentage of Total Employment During the Class Period**



Source: Corrected Starr Data

Note: This exhibit shows the total number of departures of proposed class members from Defendants that are versus are not moves between covered Defendants as a percent of total employment of proposed class members by year. This exhibit uses the same methodology as the right panel in Prof. Starr's Figure 2 to identify departures and moves between covered Defendants. Following Prof. Starr's methodology, departures are identified based on an employee's last year in the data in a class position, and moves between covered Defendants are identified based on individuals who appear in multiple firms' data in the same or adjacent calendar years in class positions. This exhibit uses the same methodology as Prof. Starr's Figure 3 to calculate total employment. Following Prof. Starr's methodology, total employment is calculated based on the total number of employees in class positions who appear in the data for at least part of the year. The increase in departures as a percent of total employment in 2018 reflects, at least in part, the departure of HealthCare Partners employees from DaVita's structured data upon sale of that division. See Workpaper 11. The increase in departures as a percent of total employment in 2021 reflects, at least in part, the fact that the Tenet payroll data only records pay through 2021, such that certain USPI employees stop appearing in USPI's structured data beginning in 2022.

### 5.1.2. Prof. Starr's Mobility Regression Analysis is Fundamentally Flawed and Unreliable

199. Prof. Starr also puts forward a mobility regression model that purports to estimate the average difference in mobility rates between the Class Period and a post-conduct period of 2020–2021. He estimates this mobility regression model for the covered Defendants combined, as well as separately for DaVita-SCA and SCA-USPI.[386] This model is fundamentally flawed and unreliable.

200. First, the mobility regression model does a poor job explaining the mobility patterns in the data: ████████████████████

████████████████████████████████████████

[386] Starr Report, Figure 4.

[REDACTED]

[387] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [388] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

201. Second, Prof. Starr misleadingly interprets the results of his mobility regression. He claims in his report, based on these results, that "[REDACTED]

[REDACTED]

[REDACTED]"

(emphasis added).[389] However, this statement is only true if Prof. Starr's results are evaluated using a [REDACTED]

[REDACTED] [390] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

202. Finally, Prof. Starr's mobility regression model does nothing to account for the effects of the COVID-19 pandemic. [REDACTED]

[REDACTED]

[REDACTED]

---

[387] Starr Report, Figure 4; Wooldridge (2009), p. 40 ("$R^2$ is the ratio of the explained variation compared to the total variation; thus, it is interpreted as the fraction of the sample variation in y that is explained by x.").

[388] A. Colin Cameron and Pravin K. Trivedi, *Microeconometrics: Methods and Applications*, (New York: Cambridge University Press, 2005), p. 7 ("[M]icrodata may be quite noisy. At the individual level many (idiosyncratic) factors may play a large role in determining responses. Often these cannot be observed, leading one to treat them under the heading of a random component, which can be a very large part of observed variation.").

[389] Starr Report, ¶ 89.

[390] Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80(4), 1980, pp. 702–736 at p. 717 ("Significance levels of five percent and one percent are generally used by statisticians in testing hypotheses. That is, given a significance level of five percent (or one percent for a stricter researcher) it is safe to assume that the true coefficient is not zero and that therefore the variable being tested has some effect on the dependent variable in question."). ABA Antitrust Section: American Bar Association, "Econometrics and Regression Analysis" in *Proving Antitrust Damages: Legal and Economic Issues,* Third Edition (Chicago: ABA Publishing, 2017), p. 142 ("[S]tatistical hypotheses are carried out at conventional levels of 5 percent, occasionally at 1 percent or 10 percent.").

Highly Confidential – Outside Counsel/Experts Only

████████████████████████████████████████████████████████████
█████████████████████████████████████████ Consistent with
this, his results are sensitive to adding even basic controls for the effect of the
COVID-19 pandemic on labor markets and employee mobility, as shown in
Exhibit 28. Specifically, I assess █████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████ As I show in
Section 5.2.2, these rates changed dramatically during the COVID-19 pandemic.
I find that, after correcting for several basic errors that Prof. Starr made when
processing the data which I discuss further in Section 5.2.3 and Appendix D
(second row), when I add these controls to Prof. Starr's mobility regression
model, there is no statistically significant difference in mobility during the Class
Period, whether looking at the combined model or the USPI-SCA and DaVita-
SCA specific models (third row).[391]

**EXHIBIT 28**
***Prof. Starr's Mobility Regression Model is Highly Sensitive to Alternative Time Trend***
***Assumptions and Controlling for the COVID-19 Pandemic***

| Model Specification | Estimated Change in Mobility Rate During Conduct Period, Between: | | |
| --- | --- | --- | --- |
| | Either Pair of Covered Defendants | DaVita and SCA | USPI and SCA |
| [1] Starr's Model | ███████████ | ███████████ | ███████████ |
| [2] Correct Data Processing Errors | ███████████ | ███████████ | ███████████ |
| [3] JOLTS Healthcare Openings, Quits, and Layoffs and Disacharges Rates + Correct Data Processing Errors | ███████████ | ███████████ | ███████████ |

Source: Starr Data; Corrected Starr Data; Bureau of Labor Statistics JOLTS Data

Note: This exhibit reports the conduct estimate for each of the indicated mobility regression models. The first model (row 1) includes a binary variable for the conduct period and a linear year trend, and is identical to the mobility regression that Prof. Starr estimates in Figure 4 of his report. The second model (row 2) corrects data processing errors in Prof. Starr's data. The third model (row 3) adds controls for healthcare job openings, quits, and layoffs and discharges rates from the Bureau of Labor Statistics Job Openings and Labor Turnover Survey ("JOLTS") Data. Standard errors in parentheses; * indicates statistical significance at at least the 5% level.

203. In the context of his pay regression model, Prof. Starr has acknowledged
the importance of accounting for the effect of the pandemic, noting that "████████

---

[391] As I explain further in Section 5.2.2, job openings, quits, and layoffs and discharges rates in the health care and social assistance industry fluctuated during the COVID-19 pandemic relative to their pre-pandemic levels.

Highly Confidential – Outside Counsel/Experts Only

██████████████████████████████████████████████████

███████████████████████████████████████████████"[392] His failure to control for these effects in his mobility regression by his own admission renders his mobility regression findings completely uninformative for the purposes of understanding whether the alleged conduct had any impact on mobility. The sensitivity of his mobility regression to including even basic controls for the labor market effects of the COVID-19 pandemic further demonstrates the unreliability of his results.

### 5.2. Prof. Starr Has Not Developed a Reliable Methodology to Estimate Whether, and by How Much, Proposed Class Members' Pay Changed Due to the Alleged Conduct

204. In Section 5.1, I showed that mobility of proposed class members did not fall during the Class Period. This shows that whatever Prof. Starr's pay regression model is measuring, it is not the effect of the alleged conduct on pay. However, there are several additional pieces of evidence that indicate Prof. Starr's pay regression model does not reliably measure the effect of the alleged conduct on proposed class members' pay.

205. In this subsection, I describe these additional pieces of evidence in greater detail. In Section 5.2.1, I show that the flawed regression Prof. Starr uses ██ ████████████████████████████████████████████████

████████████. Prof. Starr's pay regression model is a "before-and-after" model, the logic of which would be a comparison of pay during the Class Period to that outside the Class Period. Thus Prof. Starr is saying ████████████████ ███████████████████████████████████████████████

██████████████████████████. Examining the actual data, as opposed to regression modeling, shows nothing surprising about pay during the Class Period. In particular, ███████████████████████████████████████ ████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████. The actual data do not follow the logic of Prof. Starr's claims. The evolution of total pay at the Defendants over time is, in a word, unremarkable: it tracks Prof. Starr's compensation benchmark. Moreover, proposed class members left Defendants at a similar rate before, during, and after the Class Period. ████████████████████████████████████ ██████████████████████████████████████

---

[392] Starr Report, ¶ 120.

████████████████████████████████████████

████████. In Section 5.2.2, I show that Prof. Starr's pay regression suffers from several methodological flaws, including misspecification and omitted variable bias. As a result, his pay regression does not reliably measure whether or by how much the alleged conduct impacted proposed class members' pay. In Section 5.2.3, I show that once I address certain obvious flaws in Prof. Starr's pay regression, I find there is no effect of the alleged conduct on pay. In Section 5.2.4, I show that Prof. Starr's pay regression results are also highly sensitive to changes in the start and end dates that are used to define the Class Period.[393] Finally, in Section 5.2.5, I explain that, as Prof. Starr himself admits in his report, only a subset of proposed class members contribute to the estimation of the conduct effect in his pay regression model. Prof. Starr provides no explanation for why the resulting conduct estimate can be extrapolated to reliably estimate damages for the remaining proposed class members.

*5.2.1. Prof. Starr's Findings are Factually Implausible and Inconsistent with the Reality of How Proposed Class Members' Pay and Turnover Rates Evolved Before, During, and After the Class Period*

206. Prof. Starr estimates a "before-and-after" pay regression model in his report. He explains that his pay regression model examines "how an individual's total compensation differs during the Conduct Period relative to before it started and after it ended," adjusting for his proposed regression controls.[394] He then uses the average reduction in pay for each Defendant estimated by his regression to calculate the damages that, according to him, are attributable to the alleged conduct.[395] However, as I explain in this section, Prof. Starr's claimed findings from his pay regression model – and in particular, his claimed findings that, due to the alleged conduct, pay was suppressed by

████████████████████████████████████████

---

[393] Since Plaintiffs have changed the Class Period dates multiple times since filing their Consolidated Amended Class Action Complaint, this point may be particularly relevant.

[394] Starr Report, ¶ 117 ("The broad idea is to mimic the ideal comparison by examining how an individual's total compensation differs during the Conduct Period relative to before it started and after it ended, while adjusting for other relevant factors that might otherwise confound the relationship between the Conduct and total compensation."); Theon van Dijk and Frank Verboven, "Quantification of Damages," in *3 Issues in Competition Law and Policy*, (ABA Section of Antitrust Law, 2008), pp. 2331–2348 ("Van Dijk and Verboven (2008)") at p. 2335 ("In [the before-and-after method] the prices that prevailed before and after the collusive period are used to estimate the prices that would have emerged during the collusive period had the collusion not taken place. [...] The before-and-after approach is usually implemented within a multiple regression framework in which one estimates the price over the entire period (conspiracy and benchmark period) and includes an [indicator] (or 'dummy') variable that is equal to one during the conspiracy period and zero otherwise.").

[395] Starr Report, ¶ 192 ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ ").

██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████[396] I also explain in this section that his claimed pay regression findings would imply the Defendants should have faced unusual retention problems during the Class Period, when the basic data on separations show nothing of the sort.

207. I next turn to my first basic check of the plausibility of Prof. Starr's claim that proposed class members' pay was suppressed during the Class Period. I compare proposed class members' pay to that of Prof. Starr's compensation benchmark group. The benchmark group Prof. Starr chose consists of medical and health services managers in the health care and social assistance industry who appear in the American Community Survey ("ACS") data.[397] My analysis shows that proposed class members' pay tracks that of the benchmark group before, during, and after the Class Period. This basic finding is inconsistent with Prof. Starr's pay suppression claims. It is simply not accurate that pay is relatively low during the Class Period.

208. Exhibit 29 shows average pay by year for proposed class members at each Defendant, as compared to the same benchmark group that Prof. Starr uses in his pay regression analysis. To ensure an "apples-to-apples" comparison, this analysis excludes any equity pay earned by proposed class members, since the ACS data does not reflect equity pay.[398] Exhibit 29 demonstrates three key



[396] Starr Report, ¶ 127 (" ██████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████ ").

[397] Starr Report, ¶ 121 (" ███████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████ "), Appendix E, ¶ 224 ("The American Community Survey is an annual survey produced by the Census Bureau. [...] With this dataset, I calculate annual earnings of health and medical managers in each state-year in the industries of the Defendants."); Centers for Disease Control, "About the Data: American Community Survey," May 15, 2024, available at https://www.cdc.gov/vision-health-data/data-sources/american-community-survey.html, accessed on February 23, 2025 ("ACS is an annual, nationally representative household survey that collects and produces information on demographic, social, economic, and housing characteristics of the U.S. population."). Prof. Starr explains in his report that he "[does] not expect" this benchmark group to be materially affected by the alleged conduct, since Defendants account for a small portion of managers in healthcare. See Starr Report, footnote 410 (" ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████ ").

[398] ACS data are self-reported. Respondents are asked to report "Wages, salary, commissions, bonuses, or tips from all jobs. *Report amount before deductions for taxes, bonds, dues, or other items.*" See IPUMS USA, "INCWAGE: Wage and Salary Income," available at https://usa.ipums.org/usa-

patterns, none of which align with Prof. Starr's claim that pay was suppressed during the Class Period:

- **During the Class Period, average pay for proposed class members grew at a rate similar to Prof. Starr's compensation benchmark.** Exhibit 29 shows that ██████████ ████████████████████████████████████████ ██████████████████████████ ████████████████████████

- **Average pay for proposed class members did not sharply decrease at the beginning of the Class Period when the alleged conduct began.** Exhibit 29 shows that ████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████ ██████████████████████████████ ████████████████████████████████████ ██████████████████████ ████████████████████████████████████ ████[399])

- **Average pay for proposed class members did not sharply increase at the end of the Class Period when the alleged conduct ended.** Exhibit 29 shows that ████████████ ████████████████████████████████████████ ██████████████████████████████ ██████████████████████████████████ ██████████████████████████

---

action/variables/INCWAGE#questionnaire_text_section, accessed on February 23, 2025. On its face, this question does not include equity awards.

[399] Section 1.2; Appendix D.

**EXHIBIT 29**
**Proposed Class Members' Compensation Evolved Similarly Over Time to Prof. Starr's Benchmark Group During the Class Period**



Source: Corrected Starr Data

Note: This exhibit shows average annualized total compensation without equity for proposed class members who were included in Prof. Starr's regression analysis (which only considered full-year employees) by year and Defendant (solid lines). This exhibit also shows average annualized compensation for medical and health services managers in the health care and social assistance industry from the American Community Survey ("ACS") by year (dashed line). The vertical lines indicate the start and end dates of the Class Period. The USPI data series ends in 2021 because the Tenet Payroll Data is only available through 2021. The SCA data series begins in 2008 because SCA was founded in mid-2007.

209. The patterns in Exhibit 29 also indicate ███████████████████████████████ ██████████████████████████████████████████████ ████████████. This is the opposite of what Plaintiffs' claims would predict. To start, it is apparent from Exhibit 29 that ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████

Highly Confidential – Outside Counsel/Experts Only

███████████████████████████████████████████

██████████████████████████████████████[400]

210. Further, Exhibit 30, Exhibit 31, and Exhibit 32 show █████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████ Exhibit 30, Exhibit 31, and
Exhibit 32 build on Exhibit 29 and show ████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ These exhibits demonstrate that according to
Prof. Starr's model, average pay for proposed class members but-for the alleged
conduct would have increased dramatically whether compared to actual
average pay or average pay for the benchmark group. A gap in pay of this size
would require substantial market power on the part of Defendants, which is not
supported by my analysis of the Lightcast Data in Section 2. It would also imply
significant retention problems at the Defendants during the Class Period, which
as I show below is not borne out in the data.

---

[400] Workpaper 20.

*EXHIBIT 30*
*Prof. Starr's* ▮▮▮ *Pay Suppression Estimate Implies That Pay for Proposed Class Employed by DaVita Would Have Increased Dramatically During the Class Period, Which is Unreasonable*



Source: Corrected Starr Data

Note: This exhibit shows actual average annualized total compensation without equity for proposed class members who were included in Prof. Starr's regression analysis by year, as well as but-for average annualized total compensation without equity which is calculated assuming that I accept Prof. Starr's opinion that but-for the alleged conduct, pay would have been ▮▮▮ higher. This exhibit also shows average annualized compensation for medical and health services managers in the health care and social assistance industry from the American Community Survey ("ACS") by year (dashed line), weighted by state-year observations of proposed class members. The vertical lines indicate the start and end dates of the Class Period.

Highly Confidential – Outside Counsel/Experts Only

**EXHIBIT 31**
**Prof. Starr's ▮ Pay Suppression Estimate Implies That Pay for Proposed Class Members Employed by SCA Would Have Increased Dramatically During the Class Period, Which is Unreasonable**



Source: Corrected Starr Data

Note: This exhibit shows actual average annualized total compensation without equity for proposed class members who were included in Prof. Starr's regression analysis by year, as well as but-for average annualized total compensation without equity which is calculated assuming that I accept Prof. Starr's opinion that but-for the alleged conduct, pay would have been ▮ higher. This exhibit also shows average annualized compensation for medical and health services managers in the health care and social assistance industry from the American Community Survey ("ACS") by year (dashed line), weighted by state-year observations of proposed class members. The vertical lines indicate the start and end dates of the Class Period. The SCA data series begins in 2008 because SCA was founded in mid-2007.

Highly Confidential – Outside Counsel/Experts Only

**EXHIBIT 32**
***Prof. Starr's ███ Pay Suppression Estimate Implies That Pay for Proposed Class Employed by USPI Would Have Increased Dramatically During the Class Period, Which is Unreasonable***



Source: Corrected Starr Data

Note: This exhibit shows actual average annualized total compensation without equity for proposed class members who were included in Prof. Starr's regression analysis by year, as well as but-for average annualized total compensation without equity which is calculated assuming that I accept Prof. Starr's opinion that but-for the alleged conduct, pay would have been ███ higher. This exhibit also shows average annualized compensation for medical and health services managers in the health care and social assistance industry from the American Community Survey ("ACS") by year (dashed line), weighted by state-year observations of proposed class members. The vertical lines indicate the start and end dates of the Class Period. The USPI data series ends in 2021 because the Tenet Payroll Data is only available through 2021.

211. I turn now to my other basic check of the plausibility of Prof. Starr's claim that proposed class members' pay was suppressed during the Class Period. Exhibit 33 ████████████



**EXHIBIT 33**

***Defendants' Departure Rates Were Generally Stable Over Time, Including During the Class Period***



Source: Corrected Starr Data

Note: This exhibit plots the departure rate for each Defendant by year. The departure rate is calculated as the total number of departures divided by the total number of proposed class members at each Defendant in each year. Employees are considered to have departed from a Defendant in the last year they appear in the Defendant's structured data in a class position. USPI employees who appear in the Tenet Payroll Data are excluded from the departure rate calculation in 2021 as there is no Tenet Payroll Data available in 2022. The SCA data series begins in 2008 because SCA was founded in mid-2007.

### 5.2.2. Prof. Starr's Pay Regression Model Suffers from Methodological Flaws and His Estimated Effect Cannot Be Interpreted as the Change in Proposed Class Members' Pay Caused by the Alleged Conduct

212. In the previous subsection, I performed two basic checks of the plausibility of Prof. Starr's finding that pay was suppressed during the Class Period. These

---

[401] Alan Manning, "The Elasticity of the Labor Supply Curve to an Individual Firm," in *Monopsony in Motion*, (Princeton University Press, 2003), pp. 102–103 ("[C]onsider the wage elasticity for all separations [...] They range from -0.5 for the NLSY to -0.9 for the PSID.").

[402] Workpaper 11.

Highly Confidential – Outside Counsel/Experts Only

checks show the implausibility of Prof. Starr's claims. How can Prof. Starr's pay regression lead him to conclusions so at odds with what basic case evidence shows? The answer is that Prof. Starr's pay regression model is flawed to the point of being unreliable and misleading. The pay regression model is misspecified and the pay suppression he estimates could be driven by factors that vary over time and are unrelated to the alleged conduct. As a result, and as I explain further below, the estimated effects from Prof. Starr's pay regression model cannot be interpreted as reliable measures of whether, or by how much, pay for proposed class members changed because of the alleged conduct.

a) *Prof. Starr's Pay Regression Model is Not Properly Specified, and Therefore Generates Unreliable Results*

213. As I discussed in Section 5.2.1, Prof. Starr estimates a "before-and-after" pay regression model that he ultimately uses to calculate damages. However, as I explain below, his pay regression model is susceptible to bias (and therefore unreliable) because it is not properly specified, meaning that the assumptions and modeling choices he makes are neither supported by evidence nor reasonable.

214. As an initial matter, there are at least two conditions that would need to be satisfied for Prof. Starr's pay regression to be properly specified, and therefore capable of reliably estimating the change in pay caused by the alleged conduct:[403]

- **It would have to be the case that Prof. Starr made reasonable and evidence-based choices when specifying the pay regression model**, such as by controlling for the factors that affect pay in a way that reflects economic reality, and by selecting an outcome variable that is appropriate to address the question at

---

[403] Prof. Starr agrees in his report that a "well-specified empirical model" is necessary to identify the change in pay caused by the alleged conduct (i.e., the causal effect of the alleged conduct). See Starr Report, ¶ 117 ("However, a well-specified empirical model, coupled with variation in the Challenged Conduct, can estimate the causal effect."). See also Wooldridge (2009), p. 300 ("In the special case that the omitted variable is a function of an explanatory variable in the model, the model suffers from functional form misspecification."), pp. 300–301 ("A multiple regression model suffers from functional form misspecification when it does not properly account for the relationship between the dependent and the observed explanatory variables. For example, if hourly wage is determined by $\log(wage) = \beta_0 + \beta_1 \, educ + \beta_2 \, exper + \beta_3 \, exper^2 + u$, but we omit the squared experience term, $exper^2$, then we are committing a functional form misspecification. [...] Omitting functions of independent variables is not the only way that a model can suffer from misspecified functional form. For example, if [...] we use *wage* rather than $\log(wage)$ as the dependent variable, then we will not obtain unbiased or consistent estimators of the partial effects. [...] Misspecifying the functional form of a model can certainly have serious consequences.").

Highly Confidential – Outside Counsel/Experts Only

hand.[404] The *Reference Guide on Multiple Regression* explains this issue as follows: "Failure to develop the proper theory, failure to choose the appropriate variables, or failure to choose the correct form of the model can substantially bias the statistical results – that is, create a systematic tendency for an estimate to be too high or too low."[405] Prof. Starr's pay regression falls into exactly this category of a biased statistical result.

- **It would have to be the case that Prof. Starr's pay regression does not suffer from omitted variable bias, meaning that he controlled for all time-varying factors unrelated to the alleged conduct that affect pay when specifying the pay regression model**. If these factors are not properly controlled for, a "before-and-after" regression may suffer from a problem that economists refer to as "omitted variable bias."[406] Prof. Starr agrees that omitted variable bias is a concern for his pay regression model in his own report, explaining that omitted variables, unless properly controlled for, can "create[] bias in our estimate of the effect of the Challenged Conduct," such that "an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation."[407]

---

[404] Daniel L. Rubinfeld, "Reference Guide on Multiple Regression" in *Reference Guide on Scientific Evidence*, (Washington, D.C.: The National Academies Press, 2011), pp. 307–357 at pp. 312–313 ("Rubinfeld (2011)") ("The variable to be explained, the dependent variable, should be the appropriate variable for analyzing the question at issue. Suppose, for example, that pay discrimination among hourly workers is a concern. One choice for the dependent variable is the hourly wage rate of the employees; another choice is the annual salary. The distinction is important, because annual salary differences may in part result from differences in hours worked. If the number of hours worked is the product of worker preferences and not discrimination, the hourly wage is a good choice. If the number of hours worked is related to the alleged discrimination, annual salary is the more appropriate dependent variable to choose."), p. 316 ("Choosing the proper set of variables to be included in the multiple regression model does not complete the modeling exercise. The expert must also choose the proper form of the regression model.").

[405] Rubinfeld (2011), p. 312.

[406] Van Dijk and Verboven (2008), p. 2335 ("The before-and-after approach is usually implemented within a multiple regression framework in which one estimates the price over the entire period (conspiracy and benchmark period) and includes an indicator (or 'dummy') variable that is equal to one during the conspiracy period and zero otherwise. The estimated coefficient associated with this dummy variable then measures the amount of the price overcharge. For this interpretation to be valid, however, control variables that account for other factors that affect prices must be included, particularly if there is [a] chance that these factors are correlated with the conspiracy period. Failure to include such controls may result in an inference of significant damages when in fact prices simply reflect changes in competitive market conditions.").

[407] Starr Report, ¶ 110 ("Suppose, for example, that inflation rose after the Conduct Period, and that Class Members received cost of living adjustments to account for the increased inflation. Then, compensation during the Conduct Period may be lower than the total compensation after the Conduct Period, simply because of the differences in inflation, and not because the Challenged Conduct suppressed compensation. In statistical parlance, we would refer to inflation here as a confounder, which is a variable that, unless properly accounted for, creates bias in our estimate of the effect of the Challenged Conduct."), ¶ 132 ("While the model includes many control variables that reduce the likelihood of identifying a spurious relationship, it is not possible to include all such control variables. Thus, a remaining question is whether the estimates above are susceptible to 'omitted variable bias,' which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation.").

215. These conditions are unlikely to be satisfied in this setting, which means that Prof. Starr's unsupported assumptions and modeling choices are likely to drive his results.

216. A particularly important issue for Prof. Starr's pay regression model is the COVID-19 pandemic and associated lockdown. The time during and after the pandemic and associated lockdown was a period of nearly unprecedented labor market disruption. The time period that Prof. Starr analyzes in his pay regression analysis, 2005 to 2022, overlaps with the COVID-19 pandemic, which began in March 2020, and which the World Health Organization did not officially declare over (as a public health emergency) until May 2023.[408] As previously noted in Section 5.1, Prof. Starr acknowledges in his report that the COVID-19 pandemic "dramatically altered" the supply and demand for labor generally, and for healthcare labor specifically, and thus that it is important for him to account for it in his pay regression. Prof. Starr claims to do so by including a binary variable for the years 2020 and 2021 in his pay regression model.[409] However, as I demonstrate below, the assumptions he makes when modeling the impact that the COVID-19 pandemic had on proposed class members' pay – *i.e.,* that the labor market effects of the pandemic were the same in the years 2020 and 2021, and that these effects ended by 2022 – are unreasonable, given the economic reality of how the pandemic affected labor markets.[410]

217. In 2020, the labor market effects of the COVID-19 pandemic differed from those in later years. Exhibit 34 shows the layoffs and discharges rate in the health care and social assistance industry (which includes Defendants) between January 2015 and January 2025. The data underlying these exhibits come from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey

---

[408] Centers for Disease Control, "CDC Museum COVID-19 Timeline," July 8, 2024, available at https://www.cdc.gov/museum/timeline/covid19.html, accessed on February 23, 2025 ("March 11, 2020: After more than 118,000 cases in 114 countries and 4,291 deaths, the WHO declares COVID-19 a pandemic."); United Nations, "WHO Chief Declares End to COVID-19 as a Global Health Emergency," May 5, 2023, available at https://news.un.org/en/story/2023/05/1136367, accessed on February 23, 2025 ("The head of the UN World Health Organization (WHO) has declared 'with great hope' an end to COVID-19 as a public health emergency, stressing that it does not mean the disease is no longer a global threat.").

[409] Starr Report, ¶ 120 ("An indicator for the timing of the COVID-19 pandemic: This binary variable takes the value of one for the years 2020 and 2021, and zero otherwise. The COVID-19 pandemic dramatically altered the supply and demand for labor broadly, as businesses closed and workers were laid off in large numbers. It also had specific impacts in medical employment given the physician shortages nationwide and the challenges of working in a medical field during [a] global pandemic. If I did not control for the timing of COVID, the changes in the labor market created by the COVID pandemic might otherwise confound the Conduct estimate.").

[410] Starr Report, footnote 407 ("I do not include the year 2022 in the COVID indicator variable because, per a 2022 Johns Hopkins review: 'In 2022, COVID-19 illness was less severe and less deadly compared to 2020 and 2021, and no new variant has emerged with the capacity to fuel a major wave of cases.'").

("JOLTS"), which generates monthly estimates of job openings, voluntary quits, and involuntary layoffs and discharges in the U.S.[411] Exhibit 34 shows that, at the onset of the COVID-19 pandemic in March and April 2020, the rate of involuntary layoffs and discharges spiked to historically high levels, but returned to the pre-pandemic average level by May of the same year. As I will show further below, while layoffs and discharges returned to typical levels quickly, labor market disruption—in particular, long-term openings and compensation pressures due to unfilled positions—persisted for quite some time.

*EXHIBIT 34*
***Layoffs and Discharges Rate in the Health Care and Social Assistance Industry by Month, January 2015 to January 2025***



Source: Bureau of Labor Statistics JOLTS Data

Note: This exhibit shows the seasonally-adjusted layoffs and discharges rate in the health care and social assistance industry by month, as measured by the Bureau of Labor Statistics JOLTS Data. The layoffs and discharges rate is calculated by dividing the number of involuntary separations initiated by the employer by total employment. See Bureau of Labor Statistics, "Help & Tutorials: Job Openings and Labor Turnover Survey," January 21, 2022, available at https://www.bls.gov/help/one_screen/JT.htm#select-select-rate-and-or-level.

218. Another important difference between 2020 and subsequent years during the COVID-19 pandemic is that, unlike in subsequent years, the COVID-19 vaccine was not yet available for most of 2020, and only became available to

---

[411] U.S Bureau of Labor Statistics, "Job Openings and Labor Turnover Survey," available at https://www.bls.gov/jlt/, *JOLTS Home*, accessed on April 2, 2025 ("The Job Openings and Labor Turnover Survey (JOLTS) program of the Bureau of Labor Statistics (BLS) produces monthly and annual estimates of job openings, hires, and separations for the nation. The JOLTS program also produces monthly state estimates for all 50 states and the District of Columbia at the total nonfarm industry level.").

some workers beginning in December 2020 (with over 50% of adults receiving a first dose by May 2021).[412] The introduction of the COVID-19 vaccine, along with the spike in the layoffs and discharges rate in 2020 shown in Exhibit 34, helps explain the patterns I see in Exhibit 35. Exhibit 35 shows the number of people in the U.S. who were unable to work at some point during the previous four weeks because their employer closed or lost business due to the COVID-19 pandemic according to the Bureau of Labor Statistics' monthly Current Population Survey, which collects data on the U.S. labor force.[413] This number was as high as 49.8 million in May 2020 (which reflects data extending as far back as April 2020, due to the backward-looking nature of the survey), but decreased to 7.9 million by May 2021, and decreased further to 2.5 million by March 2022 (the last month for which data is available).[414]

---

[412] U.S. Food and Drug Administration, "FDA Approves First COVID-19 Vaccine," August 23, 2021, available at https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine, accessed on February 27, 2025 ("Since Dec. 11, 2020, the Pfizer-BioNTech COVID-19 Vaccine has been available under EUA in individuals 16 years of age and older, and the authorization was expanded to include those 12 through 15 years of age on May 10, 2021."); Centers for Disease Control, "COVID-19 Vaccination Coverage Among Adults — United States, December 14, 2020–May 22, 2021," June 25, 2021, available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7025e1.htm, accessed on February 27, 2025 ("By May 22, 2021, 57.0% of U.S. adults aged ≥18 years had received ≥1 vaccine dose. [...] High vaccination coverage among all age groups is important for decreasing COVID-19 cases, hospitalizations, and deaths...").

[413] U.S Bureau of Labor Statistics, "2.5 Million Unable to Work in March 2022 Because Employer Closed or Lost Business Due to COVID-19," *The Economics Daily*, April 6, 2022, available at https://www.bls.gov/opub/ted/2022/2-5-million-unable-to-work-in-march-2022-because-employer-closed-or-lost-business-due-to-covid-19.htm, accessed on April 2, 2025 ("These data are from the Current Population Survey and are not seasonally adjusted."); Bureau of Labor Statistics, "Labor Force Statistics from the Current Population Survey," available at https://www.bls.gov/cps/, accessed on April 6, 2025 ("The Current Population Survey (CPS) provides a wealth of information on the nation's labor force including data on the employed, unemployed, and those not in the labor force.").

[414] U.S Bureau of Labor Statistics, "2.5 Million Unable to Work in March 2022 Because Employer Closed or Lost Business Due to COVID-19," *The Economics Daily*, April 6, 2022, available at https://www.bls.gov/opub/ted/2022/2-5-million-unable-to-work-in-march-2022-because-employer-closed-or-lost-business-due-to-covid-19.htm, accessed on April 2, 2025.

*EXHIBIT 35*
***People Unable to Work At Some Point in the Last Four Weeks Because Their Employer Closed or Lost Business Due to COVID-19, May 2020 to March 2022***



Source: Bureau of Labor Statistics Current Population Survey

Note: This exhibit shows the number of individuals (in millions) who were unable to work at some point in the last four weeks because their employer closed or lost business due to COVID-19 by month, according to the Bureau of Labor Statistics Current Population Survey. See Bureau of Labor Statistics, "2.5 Million unable to work in March 2022 because employer closed or lost Business due to COVID-19," *The Economics Daily*, April 6, 2022, available at https://www.bls.gov/opub/ted/2022/2-5-million-unable-to-work-in-march-2022-because-employer-closed-or-lost-business-due-to-covid-19.htm.

219. The labor market effects of the COVID-19 pandemic extended through at least 2022, the last year in Prof. Starr's pay regression sample. Multiple pieces of evidence make this clear. Exhibit 36 shows the job openings rate for the health care and social assistance industry between January 2015 and January 2025, and Exhibit 37 shows the rate of voluntary quits for the health care and social assistance industry between January 2015 and January 2025. Like Exhibit 34, these exhibits reflect data from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey. These exhibits show that the job openings rate and the quits rate followed a similar pattern after the onset of the COVID-19 pandemic in March 2020: each data series steadily increased beginning in March 2020 and extending through late 2021 or early 2022, and

remained elevated through the end of 2022, and beyond, relative to pre-pandemic levels. Both series were still elevated relative to pre-pandemic norms through some or all of 2024. The patterns in these exhibits reflect the "Great Resignation" in 2021 and 2022, during which the number of workers quitting their jobs to seek new employment opportunities or leave the labor force altogether, and the number of unfilled job openings, reached historic highs.[415] These patterns also align with Prof. Gerhart's deposition testimony, where he indicated the job openings rate swung "wildly" during the COVID-19 pandemic and that the impacts of COVID-19 in labor markets continued into 2022 and beyond.[416]

220. Prof. Starr ignores this evidence, and instead treats pay in 2020 and 2021 as similarly affected by the COVID-19 pandemic, and treats pay in 2022 (the last year in his pay regression sample) as unaffected by the COVID-19 pandemic. In doing so, he misspecifies his pay regression model, which means that the labor market effects of the COVID-19 pandemic likely bias his results.

---

[415] Hubert Janicki, "From Great Resignation to Great Reshuffling: How the COVID-19 Pandemic Prompted More People to Change Jobs," *U.S Census Bureau*, May 13, 2024, available at https://www.census.gov/library/stories/2024/05/great-reshuffling.html, accessed on March 22, 2025 ("An unprecedented number of U.S. workers quit their jobs in 2021 and 2022, the first full two years of the COVID-19 pandemic — a phenomenon dubbed the Great Resignation."); U.S Bureau of Labor Statistics, "Empirical evidence for the Great Resignation," *Monthly Labor Review*, November 2022, available at https://www.bls.gov/opub/mlr/2022/article/empirical-evidence-for-the-great-resignation.htm, accessed on April 16, 2025 ("A major observation associated with the COVID-19 pandemic is the 'Great Resignation' phenomenon, which has received significant attention. This phenomenon [...] involves record rates of job quitting during the pandemic. As noted by one author, return-to-office mandates, attractive job offers from competing employers, and revelations about better work–life balance have motivated a 'record-breaking departure from jobs in a shockingly small window of time.'").

[416] Gerhart Deposition, pp. 56–57 ("Q. Would you agree that the COVID-19 pandemic impacted labor markets? [...] A. Yes. Q. How so? A. Well, there were some pretty wild swings in the job opening rate, the unemployment rate. So the unemployment rate was historically low before the pandemic, then of course it shot up. And then, actually, during the pandemic, there were some companies which were -- were doing quite well, you know, like Amazon. And so, in the labor market, there's always parts that do better and some that don't do as well; but, yes, the pandemic had an effect."), p. 58 ("Q. Would you agree that, to some extent, the impacts of COVID-19 in labor markets continued into 2022 and even after that? [...] A. Yes, I think there were some lasting impacts.").

**EXHIBIT 36**
**Job Openings Rate in the Health Care and Social Assistance Industry by Month, January 2015 to January 2025**



Source: Bureau of Labor Statistics JOLTS Data

Note: This exhibit shows the seasonally-adjusted job openings rate in the health care and social assistance industry by month, as measured by the Bureau of Labor Statistics JOLTS Data. The job openings rate is calculated by dividing the number of job openings by the sum of total employment and job openings. See Bureau of Labor Statistics, "Help & Tutorials: Job Openings and Labor Turnover Survey," January 21, 2022, available at https://www.bls.gov/help/one_screen/JT.htm#select-select-rate-and-or-level.

***EXHIBIT 37***
***Quits Rate in the Health Care and Social Assistance Industry by Month, January 2015 to January 2025***



Source: Bureau of Labor Statistics JOLTS Data

Note: This exhibit shows the seasonally-adjusted quits rate in the health care and social assistance industry by month, as measured by the Bureau of Labor Statistics JOLTS Data. The quits rate is computed by dividing the number of employees who left voluntarily (excluding retirements or transfers) divided by total employment. See Bureau of Labor Statistics, "Help & Tutorials: Job Openings and Labor Turnover Survey," January 21, 2022, available at https://www.bls.gov/help/one_screen/JT.htm#select-select-rate-and-or-level.

221. As a final note, Prof. Starr's failure to account for the fact that the COVID-19 pandemic extended into 2022 is particularly problematic given that, because his binary variable for COVID-19 absorbs any variation in pay from the years 2020 and 2021, his pay regression model identifies the effect of the alleged conduct on pay by comparing a relatively small number of years outside of the Class Period (███████████████████████;[417] ████████████████████ ██████████████████████████) to years during the Class Period ████████ ██████████████████████████).[418] As a result, ███████████ ██████████████████████████████████████████████████████

---

[417] In his pay regression, Prof. Starr ████████████████████████████████ ████████████████████████████████████████. See Appendix D.

[418] Prof. Starr's conduct estimate is not identified using the years 2020 or 2021 because he separately controls for those years in his binary variable for COVID-19. Starr Deposition, Volume II, pp. 405–406 ("█████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████").

Highly Confidential – Outside Counsel/Experts Only



[REDACTED] [419]

222. In addition, Prof. Starr does not properly handle equity pay in the data. When constructing the outcome variable that he uses in his pay regression model, Prof. Starr measures equity pay not in the year that it is issued, but in the year that it vests, or is exercised or sold by, the employee.[420] That means that when Prof. Starr measures equity pay, he is measuring something other than the employer's choice of how to set equity pay. Rather, what he is measuring reflects factors unrelated to the alleged conduct such as vesting schedules, changes in the market value of equity, and employee choices as to when to sell stocks or exercise stock options. By doing so, he distorts the patterns in pay over time, which contributes to his pay regression model finding an effect from the alleged conduct when there is none.

223. Conceptually, when equity was issued is what matters for measuring how the alleged conduct affected Defendants' compensation decisions. Prof. Starr himself appears to agree (although he said otherwise in his deposition), as in his report he cites to, and discusses results from, a paper studying the High-Tech no poach matter, which includes discussion of how firms could stop issuing equity to employees during the conspiracy period if they no longer feel it is needed as a tool to retain employees.[421] To illustrate why it is problematic

---

[419] Workpaper 21.

[420] Starr Deposition, Volume II, p. 364 ("[REDACTED]"); Starr Report, footnote 395 ("[REDACTED]").

[421] Starr Report, ¶ 49 ("[REDACTED]"); Starr Deposition, Volume II, p. 366 ("[REDACTED]"), pp. 371–373 ("[REDACTED]



that Prof. Starr does not use equity at the time it was issued in his pay regression, consider that, by doing so, he inappropriately assigns equity pay that was issued during the Class Period to after the Class Period. For example, if an SCA or a USPI employee was issued equity pay during the Class Period, but that equity pay did not vest, or the employee did not choose to sell their stocks or exercise their stock options, until after the Class Period, then that would elevate Prof. Starr's pay measure in the post period relative to the Class Period, and bias his pay regression model in favor of finding a pay suppression effect.

224. A basic empirical test illustrates how Prof. Starr's improper handling of equity pay biases his results. ███████████████████████████████



225. Prof. Starr does not perform basic quantitative and qualitative analyses to rule out the possibility that his modeling choices and assumptions, including omitted variables, are driving his results. Take, for example, his market power analysis (or lack thereof). Prof. Starr does not perform any analysis of market power. He merely claims that his pay regression is, by itself, evidence that Defendants have market power.[423] However, a reference source on

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████ ).

[422] Workpaper 22.

[423] Starr Report, ¶ 196 ███████████████████████████
███████████████████████████████████████
██████████ .

econometrics published by the American Bar Association highlights the limitations of using a pay regression alone to analyze market power, in part due to concerns that pay regressions may generate unreliable results if not properly specified. This source explains that "[i]f prices increase during the affected period for reasons unrelated to market power, the 'Before-and-After' analysis can lead to the spurious conclusion that market power has increased."[424] Further, when I properly consider data and documents relevant to understanding whether Defendants have market power in the relevant labor markets where proposed class members participate (Section 2.1), find that in many or most (if not all) cases, Defendants would not have had market power sufficient to suppress compensation for proposed class members. Prof. Starr does not consider or engage with those data or documents, even though they reflect an on-the-ground reality that contradicts the extreme results of Prof. Starr's pay regression model. That contradiction, and Prof. Starr's failure to engage with it, suggest that a misspecified model built upon unreasonable modeling choices and faulty assumptions is driving Prof. Starr's pay regression results, and that it does not provide a reliable estimate of how much pay changed as a result of the alleged conduct.

226. Take, for another example, the results from Prof. Starr's pay regression when I allow the conduct estimate to vary across years (similar to Figure 7 in Prof. Starr's report). The results are shown in Exhibit 38. A key difference between Prof. Starr's Figure 7 and Exhibit 38 is that I measure the conduct estimate *relative to 2007* (the year before the Class Period began) in Exhibit 38, whereas Prof. Starr measured the conduct estimate *relative to 2017* in his Figure 7. As a result, using my approach, the results have a more straightforward interpretation than what Prof. Starr presented in his report: a positive conduct estimate for any year during the Class Period would indicate that pay was *higher* during that year compared to 2007 (the last year before the

---

[424] ABA Antitrust Section: American Bar Association, "Applying Econometrics to Address Class Certification," in *Econometrics: Legal, Practical and Technical Issues*, (Chicago: ABA Publishing, 2014), p. 350 ("Evidence contained in documents and statements by fact witnesses that relates to the determination of whether the defendants exercise market power can also be important in class certification disputes, since the ability to sustain prices above competitive levels is essential to the effectiveness of the conspiracy."); ABA Antitrust Section: American Bar Association, "Applying Econometrics to Assess Market Definition and Market Power," in Econometrics: Legal, Practical and Technical Issues, (Chicago: ABA Publishing, 2014), p. 254 ("The obvious limitation of the simple "Before-and-After" analysis is that it cannot control for other market factors that influence price. If prices increase during the affected period for reasons unrelated to market power, the "Before-and-After" analysis can lead to the spurious conclusion that market power has increased."), p. 256 ("There are two common concerns with the [difference-in-differences] model. First, if the model cannot reliably account for all important factors that influence price, then the estimated link between the price increase and market power is questionable. Second, the model assumes that the relationships between price and the relevant supply and demand factors are the same during the affected period and the unaffected period. If this assumption is untrue because the conduct at issue has impacted the relationships between price and key supply and demand factors, then the model's results can become unreliable.").

SCA and DaVita Class Period begins and three years prior to the USPI Class Period beginning), whereas a negative conduct estimate would indicate that pay was *lower* during that year compared to 2007. A second difference between Prof. Starr's Figure 7 and Exhibit 38 is that I also correct the basic errors that Prof. Starr made when processing the data.[425] Exhibit 38 shows that, according to Prof. Starr's pay regression, ███████████████████████ ██████████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████ ████████████████████████. It is also inconsistent with common impact throughout the Class Period since there is no evidence that pay was suppressed relative to 2007 for 10 of the 12 years during the Class Period. This again suggests that model misspecification and omitted variable bias underlies Prof. Starr's pay regression results.

---

[425] Appendix D.

**EXHIBIT 38**
**The By-Year Estimates from Prof. Starr's Pay Regression Do Not Align with Plaintiffs' Allegations**



Source: Corrected Starr Data
Note: This exhibit shows the yearly conduct estimates from Prof. Starr's Figure 7, after correcting basic errors that Prof. Starr made when processing Defendants' structured data. The estimates are calculated relative to 2007, the year before the Class Period began. Error bars represent the 95% confidence interval.

### b) *Prof. Starr's Alternative Difference-in-Difference Pay Regression Model, is Similarly Flawed and Unreliable*

227. Prof. Starr agrees that model misspecification, and in particular omitted variable bias, is a concern for his "before-and-after" pay regression model.[426] He claims to address this concern when he estimates a "difference-in-differences" pay regression model that uses managers who work for Defendants as a control group. However, as I explain below, his "difference-in-differences" pay regression model is flawed and unreliable.

---

[426] Prof. Starr acknowledges that the estimates of his pay regression model may be susceptible to "omitted variable bias" and estimates a "difference-in-differences" pay regression model as a regression sensitivity to address this concern. See Starr Report, ¶ 132 ("Thus, a remaining question is whether the estimates above are susceptible to 'omitted variable bias,' which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation. To assess the potential for unobserved variables to be responsible for the observed relationships above, I deploy an approach designed to not only account for such omitted variables, but also to plausibly provide a lower-bound estimate of the effect of the Challenged Conduct on Class Compensation.").

228. The reliability of a difference-in-differences regression model hinges on choosing an appropriate control group – and the one Prof. Starr has selected, managers who work for Defendants, is not defensible. Prof. Starr's difference-in-differences pay regression model can only generate reliable results if, absent the alleged conduct, pay would have trended similarly over time for proposed class members and managers.[427] This assumption must hold in order for a difference-in-differences regression model to generate reliable results. Economists refer to this as the "parallel trends assumption."[428] However, as I show in Exhibit 39 below, the parallel trends assumption is not supported by the evidence. Exhibit 39 shows average pay for proposed class members, as compared to average pay for managers, from 2005 through 2022 (the years included in Prof. Starr's pay regression sample), using the exact measure of total compensation that Prof. Starr relies on for his pay regression analyses.[429] What is clear from the exhibit is that, even before the Class Period began, managers' pay did not follow the same trend over time as proposed class members' pay. ████████████████████ ███████████████████████████████████ ████████████████████████ This pattern means that the parallel trends assumption is not appropriate in this setting, and that managers are not a defensible control group for proposed class members in the context of Prof. Starr's difference-in-differences regression.

---

[427] Starr Report, ¶ 133 ("███████████████████████████ ████████████████████████████████ ████████████████████ " (emphasis added)); ABA Antitrust Section: American Bar Association, "Specifying and Estimating an Appropriate Econometric Model," in *Econometrics: Legal, Practical and Technical Issues*, Second Edition, (Chicago: ABA Publishing, 2014), pp. 65–88 at p. 73 ("The difference-in-differences model has limitations. The model essentially assumes that, but for the alleged activity, changes in prices between the relevant and benchmark markets over time would be identical. If the benchmark market is not appropriately chosen or if there are reasons other than the alleged activity as to why the relevant market would experience a unique change relative to the benchmark, the results would need careful interpretation.").

[428] The standard way to test this assumption is by using what is known as the "parallel pre-trends" test – i.e., evaluate whether, before the alleged conduct began, the difference in pay between managers and proposed class members was constant across years (meaning that the two time series tracked each other over time). See Jonathan Roth, Pedro H.C Sant'Anna, Alyssa Bilinski and John Poe, "What's Trending in Difference-in-Differences? A Synthesis of The Recent Econometrics Literature," Journal of Econometrics, 235, 2023, pp. 2218–2244 at p. 2219 ("However, even if one conditions on observable covariates, there are often concerns that the necessary parallel trends assumption may be violated due to time-varying unobserved confounding factors. It is therefore common practice to test for pre-treatment differences in trends ('pre-trends') as a test of the plausibility of the (conditional) parallel trends assumption."). I find that Prof. Starr's difference-in-differences pay regression fails this test, and therefore is unlikely to solve the problems with bias in his primary specification. See Workpaper 23.

[429] I explained above in this section that Prof. Starr's total compensation variable is flawed for the purposes of his pay regression analysis, as it measures equity at the time of vesting, sale, or exercise by the employee rather than at the time of issuance by Defendants. However, because Prof. Starr relies upon this total compensation variable when estimating his difference-in-differences pay regression, this is the appropriate variable to use for evaluating the validity of the parallel trends assumption.

Highly Confidential – Outside Counsel/Experts Only

229. These results are not surprising, considering that managers differ from proposed class members along a number of dimensions, including their seniority level, their job responsibilities, their skills and qualifications, and the types of compensation they earn.[430] Importantly, while equity pay accounts for a large share of total compensation for many proposed class members, it is less important for managers (███████████████████████████████████████ ███████████████████████████████████████████).[431] This means that time-varying factors that affect the value of equity pay in Prof. Starr's total compensation measure but that are unrelated to the alleged conduct will tend to disproportionately affect proposed class members compared to managers. For example, changes in stock prices for Defendants, or changes in employees' expectations about the stock market (and attendant changes in the timing of their decisions of when to sell their equity), disproportionately affect pay for proposed class members compared to managers.

---

[430] In fact, Prof. Gerhart refers to his own publication in the context of job analysis, which is used by human resources professionals to classify roles within a firm, pointing to the fact that jobs vary in these dimensions. See Gerhart Report, ¶ 108 ("███████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████") Prof. Gerhart also highlights the special skills needed for executive level positions. See Gerhart Report, ¶ 62 ("███████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████").

[431] Workpaper 24. See also Fanning (SCA) Deposition, p. 169 ("██████████████ █████████████"); "SCA 2016 Total Compensation," SCA, March 2016, SCA001159728–48 at SCA001159734 ("████████████████████████████████████████████").

**EXHIBIT 39**
*Managers' Pay Trended Differently Over Time Than Proposed Class Members' Pay According to Prof. Starr's Total Compensation Variable, Even Before the Class Period Began*



Source: Corrected Starr Data

Note: This exhibit plots Prof. Starr's annual total compensation data series (the same data series that he uses to estimate the difference-in-differences pay regressions in his report) for proposed class members and managers, after correcting basic data errors that Prof. Starr made when processing Defendants' structured data. SCA employees are not reflected in the data until 2008 because SCA was founded in mid-2007.

230. As a final consideration, even if one were to set aside the flaws in Prof. Starr's difference-in-differences analysis described above, the conduct estimates Prof. Starr obtains from his difference-in-differences pay regression model ███████████████████████████████████ ████████████████████████████) are *much smaller in magnitude* than what he obtains from his "before-and-after" pay regression model ████████████████ ███████████████████████████████████████████ ████████████).[432]

---

[432] Starr Report, ¶ 127 ("███████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████), ¶ 129 ("███████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████"), ¶ 135 ("█████████████ ████████████████████████████████████████ ████████████████████████████████████

Highly Confidential – Outside Counsel/Experts Only

*5.2.3. The Alleged Suppression of Pay Measured by Prof. Starr's Pay Regression Model Disappears Once Certain Obvious Flaws are Corrected*

231. Having shown that Prof. Starr's pay regression model suffers from methodological flaws, such that it does not measure changes in proposed class members' pay caused by the alleged conduct, I next show that, once certain obvious flaws in his pay regression model are corrected, his claim that the alleged conduct suppressed pay on average (and that Defendants had market power) no longer holds.

232. First, Prof. Starr committed several basic errors when preparing Defendants' data for analysis that inflate his estimate of the conduct effect. These errors include: inappropriately measuring hours worked for USPI employees in the before and after periods, but not the during period; using outdated and less-complete data to identify DaVita employees' job titles, departments, and locations; inappropriately omitting equity compensation for SCA entirely prior to 2021, but including it for 2021–2022, which distorts the "before versus after" comparison that he makes in his pay regression analysis; and inappropriately failing to exclude DaVita and USPI employees in certain departments.[433] I describe these errors in detail in Appendix D. **When I correct these data processing errors, while making no other changes to his data or analysis, I find** ███████████████████████ ████████████████████████████████. **This is shown in Model 2 of Exhibit 40.**[434]

233. Second, as I explained in Section 5.2.2, Prof. Starr does not properly define the outcome variable in his regression analysis. In particular, by measuring equity compensation at the time it vests, or is sold or exercised by, the employee, rather than at the time of issuance, he misspecifies the timing of when compensation is granted by each Defendant, which is relevant for understanding whether compensation offered by Defendants was higher or

---

███████████████████████████████████████████
████████████████████████████████████████
███").

[433] Appendix D.

[434] I evaluate statistical significance at the conventional 5% significance level. See Franklin M. Fisher, "Multiple Regression in Legal Proceedings," Columbia Law Review, 80(4), 1980, pp. 702-736 at p. 717 ("Significance levels of five percent and one percent are generally used by statisticians in testing hypotheses. That is, given a significance level of five percent (or one percent for a stricter researcher) it is safe to assume that the true coefficient is not zero and that therefore the variable being tested has some effect on the dependent variable in question [...] The significance level tells us only the probability of obtaining the measured coefficient value if the true value is zero; it does not give the probability that the coefficient's true value is zero, nor does subtracting the significance level from one hundred percent give the probability that the hypothesis is not true.").

lower at various points in time, and, in particular, during versus outside of the Class Period.[435] I correct this issue by ███████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████[436] **When I adjust Prof. Starr's outcome variable so that it does not improperly measure equity compensation in addition to the other data corrections described above, I find that** ████████████████████████████ ██████████████. **This is shown in Model 3 of Exhibit 40.**

234. Third, as I explained in Section 5.2.2, Prof. Starr does not properly account for the effect of the COVID-19 pandemic in his regression analysis. In particular, by including a single binary variable for 2020 and 2021 in his pay regression model, he incorrectly assumes that the COVID-19 pandemic has the same effect on proposed class members' pay in 2020 and 2021, and he ignores that the labor market effects of the COVID-19 pandemic extended into 2022. To account for the labor market effects of the COVID-19 pandemic, ██████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ As I discussed in Section 5.1.2, these rates reflect the extent to which labor markets have excess supply (i.e., are

---

[435] ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████ See Email from Louis Efron (DaVita) to Colleen Arthur (DaVita), "FW: fyi," with attachments, March 30, 2018, DVA_OMCEAL_000994610–16 at DVA_OMCEAL_000994613–14 ("███████████████████████ ██████████████████"); Letter from Ken Thiry et al. (DaVita) to Scott Eposito (DaVita), March 2010, DVA_OMCEAL_000946317–20 at DVA_OMCEAL_000946318 ("████████████████████████████ ██████████████████████").

[436] I also ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████ See Email from Louis Efron (DaVita) to Colleen Arthur (DaVita), "FW: fyi," with attachments, March 30, 2018, DVA_OMCEAL_000994610–16 at DVA_OMCEAL_000994613 ("███████████████████████ █████"); "Summary: 2015 Long Term Incentive Program (LTIP) Awards," DaVita, 2015, DVA_OMCEAL_001062957–61 at DVA_OMCEAL_001062961 ("████████████████████████ ████████████████████████").

slack) or excess demand (i.e., are tight), which affects firms' expectations about likelihood of turnover and pay decisions.[437] Further, as I discussed in Section 5.2.1, the job openings rate fluctuated between 2020, 2021, and 2022, as firms created new jobs, and job openings remained unfilled, at historical rates. Similarly, the layoffs and discharges rate and the quits rate fluctuated between 2020, 2021, and 2022, as firms initially laid off workers in March and April 2020, and workers subsequently departed from existing jobs during the "Great Resignation," at historical rates. **When I correct Prof. Starr's treatment of the COVID-19 pandemic in his pay regression model, in addition to the corrections described above, I find that** ███████████████████ ████████████████████████████████. **That is, Prof. Starr's pay regression model incorporating these corrections shows no evidence of pay suppression. This is shown in Model 4 of Exhibit 40.**[438]

235. Additionally, if I were to alternatively estimate Model 4 of Exhibit 40, but include Prof. Starr's flawed measure of equity pay for USPI and SCA (instead of omitting equity pay for these two firms altogether), I similarly find that Prof. Starr's pay regression model shows no evidence of pay suppression (███ ██████████████████████████████████).[439]

---

[437] Sebastian Heise, Jeremy Pearce, and Jacob Weber, "Wage Growth and Labor Market Tightness," *FRB of New York Staff Report No. 1128*, March 2025, available at https://ssrn.com/abstract=4980503, accessed on April 11, 2025, pp. 1–45 at p. 26 ("Amongst a broad range of measures of labor market tightness, quits and vacancies per effective searcher are independently the most strongly correlated with wage growth—both in the aggregate time series and in within-industry panel regressions.").

[438] ████████████████████████████████████████████████████████████████ ████████████████████. See Workpaper 25. ████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████. See Workpaper 26. Studies in the economics literature have concluded that earnings are best modelled in terms of first differences. See Costas Meghir and Luigi Pistaferri, "Earnings, Consumption, and Life Cycle Choices," *Handbook of Labor Economics,* 4b, p. 813 ("Following these two papers are two of the most important works in this literature, namely Macurdy (1982) and Abowd and Card (1989) [...] They both conclude that the best representation of earnings is a unit root in levels and MA(2) in first differences.").

[439] Workpaper 27.

***EXHIBIT 40***
***The Aggregate Conduct Effect Estimated by Prof. Starr's Pay Regression Shows No Evidence of Pay Suppression Once I Correct Certain Obvious Flaws in His Model***



Source: Starr Data; Corrected Starr Data

Note: This exhibit shows the conduct estimate for each of the indicated pay regression models. Each successive model is cumulative in terms of the corrections it incorporates. The Bureau of Labor Statistics Job Openings and Labor Turnover ("JOLTS") Data consist of the job openings, quits, and layoffs and discharges rates in the health care and social assistance industry. Error bars represent the 95% confidence interval.

236. The corrections for the obvious flaws in Prof. Starr's pay regression, shown in Model 4 of Exhibit 40, when applied to Prof. Starr's damages pay regression model (which allows the effect of the alleged conduct on pay to vary by Defendant), also lead to statistically insignificant conduct estimates for each Defendant. This is shown in Exhibit 41. In other words, neither the aggregate conduct estimate, nor the by-Defendant conduct estimates that Prof. Starr uses to calculate damages, show any evidence that the alleged conduct suppressed pay during the Class Period, once three obvious flaws in his pay regression model – the basic errors that he makes when processing the structured data, his use of a flawed and mistimed measure of equity pay, and his failure to properly account for the effect of the COVID-19 pandemic on labor markets – are corrected.

**EXHIBIT 41**

**The By-Defendant Conduct Effect Estimated by Prof. Starr's Pay Regression Shows No Evidence of Pay Suppression for Each of the Three Defendants Once I Correct Certain Obvious Flaws in His Model**



Source: Corrected Starr Data

Note: This exhibit shows the conduct estimate from Prof. Starr's pay regression by Defendant, after correcting the obvious flaws shown in Model 4 of Exhibit 40. Error bars represent the 95% confidence interval.

237. Prof. Starr also estimates a number of regression sensitivities in his report, where he purports to show that his pay regression results do not substantively change if he makes small changes to his model or to the underlying data. The results from these sensitivities are reflected in Figure 10 and Appendix D of Prof. Starr's report. I find that, similar to his aggregate and damages pay regression models, once I correct the obvious flaws in Prof. Starr's pay regression model that I described above, the regression sensitivities in Figure 10 and Appendix D of Prof. Starr's report no longer show any evidence that the alleged conduct reduced proposed class members' pay during the Class Period.[440]

---

[440] Workpaper 28. As I explained in Section 5.2.2, Prof. Starr's difference-in-differences pay regression is fundamentally flawed and does not produce reliable results due to its reliance on an inappropriate benchmark group.

Highly Confidential – Outside Counsel/Experts Only

238. Furthermore, Prof. Starr's alleged conduct effect also disappears if I make other corrections to his pay regression model besides those that I considered above. I describe these alternative corrections below:

- First,

---

[441] Starr Report, ¶ 119 ████████████████████████████████████████ ████████████████████████████████████████ ), ¶ 120 ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ , ¶ 121 ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████ .

[442] Douglas L. Miller, "An Introductory Guide to Event Study Models," Journal of Economic Perspectives, 37(2), 2023, pp. 203–230 at p. 220 ("These considerations lead to guidelines for researchers who are controlling for trends. First, don't let post-event parameter restrictions influence your estimated trends, unless you are highly confident that the treatment effects are not trending in that range. Otherwise, your control for trends may be picking up part of the trending treatment event. [...] Finally, if we are working with a timing-based data structure, controlling for trends has potential to create surprising and severe problems. Adding linear trend controls (and the required additional parameter restriction) can induce quadratic trends into our estimated event study coefficients. This arises from a subtle way in which the event dummies are collinear with the other variables in the model (as illustrated in online Appendix F.2). The key lesson is to be extra cautious about the combination of trend controls and a timing-based data structure.").

- Second,

- Third,

<hr />

[443] ABA Antitrust Section: American Bar Association, "Appendix and Glossary," in *Econometrics: Legal, Practical and Technical Issues*, Second Edition, (Chicago: ABA Publishing, 2014), pp. 371–421 at p. 382 ("In regression analysis, the standard error of a regression coefficient measures the dispersion of the estimated coefficient around its (true) mean. The coefficient estimate will vary from sample to sample; the standard error of the coefficient indicates how much that estimate is likely to vary from sample to sample. Small standard errors imply that estimates are likely to be similar across samples, while large standard errors imply greater variation across samples and hence less reliable results.").

[444] Starr Report, ¶ 124, ("[I]t is also important to emphasize clustering in the standard errors, because it relates to the issue of statistical significance. Because individual earnings are likely to be serially correlated, I cluster the standard errors at the individual level. This allows the error term to be arbitrarily correlated within an individual over time, when estimating the standard error of the coefficient estimate (which is the key input to computing the p-value of that coefficient estimate).").



239. When I estimate Prof. Starr's pay regression model after incorporating each of these three corrections, along with correcting Prof. Starr's data processing errors but making no additional changes to the model, Prof. Starr's pay regression model shows **no** evidence of pay suppression (███████ ████████████████████████████████). I continue to find no evidence of pay suppression if I ████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████[446]

240. Further, Prof. Starr's pay regression model does not account for numerous individualized factors I discussed earlier including what the skills and preferences, and in turn the relevant labor market, are for each employee; whether Defendants had market power sufficient to suppress pay for a given individual; the role that individualized negotiations, performance, or managerial discretion played in determining each employee's pay; and whether the mobility of some proposed class members was limited regardless of the alleged conduct (e.g., non-compete agreements or unvested equity). Because

---

[445] For additional details on Plaintiffs' allegations that the alleged conduct varied across Defendants and over time, see Section 5.3. See also Alberto Abadie, Susan Athey, Guido Imbens, and Jeffrey Wooldridge, "When Should You Adjust Standard Errors for Clustering?," *The Quarterly Journal of Economics*, 138(1) 2023, pp. 1–35 at p. 33 ("With clustered assignment, one should cluster the standard errors at the level of assignment Under partially clustered assignment, adding group-level fixed effects to this regression allows for group-specific linear trends in the underlying potential outcomes series but does not change the answer to the question whether one needs to adjust for clustering. […] If sampling is not clustered, standard errors should be clustered at the treatment assignment level because the estimand of interest depends on potential outcomes and the sampling of potential outcomes is determined only by the assignment mechanism. When the fraction of sampled clusters is non-negligible and there is variation in average treatment effects across clusters, conventional clustered standard errors may be off").

[446] Workpaper 29. ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████

 See Workpaper 30.

these factors affect the potential impact of the alleged conduct, Prof. Starr's pay regression model cannot reliably measure whether there is harm or the quantum of damage.

241. Finally, as I demonstrated above, Prof. Starr's pay regression model shows no effect of the alleged conduct on pay after I correct obvious flaws, which corresponds to $0 in damages for the entire proposed class as a result of the alleged conduct.

*5.2.4. Prof. Starr's Pay Regression Model is Highly Sensitive to the Class Period Dates Selected by Plaintiffs, Which Have Changed Over Time*

242. Importantly, Prof. Starr's pay regression model also shows no effect on proposed class members' pay if I make slight modifications to the class period's start and end dates. I understand that Plaintiffs have changed their selected class period dates multiple times (and, indeed, Prof. Starr uses a different set of class period dates than what Plaintiffs alleged in their operative complaint, moving the end date of the class period from 2021 to 2019).

243. As background, Plaintiffs have considered a number of different class periods since the DaVita and SCA criminal indictments were issued, and since they filed their original complaint:

- Initially, the SCA indictment alleged a conduct period of May 1, 2010 to October 31, 2017 for the USPI-SCA agreement, and both the SCA and DaVita indictments alleged a conduct period of February 1, 2012 to July 31, 2017 for the DaVita-SCA agreement.[447]
- Next, in their Consolidated Amended Class Action Complaint and their Second Amended Complaint, Plaintiffs specified a class period of May 1, 2010 to January 5, 2021 for SCA and USPI, and February 1, 2012 to January 5, 2021 for DaVita.[448]

---

[447] Indictment of SCA, ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017"); Indictment, *United States of America vs. DaVita Inc. and Kent Thiry,* November 3, 2021, ¶ 9 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017").

[448] Consolidated Amended Class Complaint, ¶ 101 ("All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCA Holdings, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holding Company, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries"); Second Amended Complaint, ¶ 101 ("All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holdings,

- Subsequently, in their Third Amended Complaint, Plaintiffs specified a revised class period of May 2008 to January 2021 for SCA and DaVita, but continued to specify a class period of May 2010 to January 2021 for USPI.[449]

- Prof. Starr considers a class period of May 1, 2008 to December 31, 2019 for SCA and DaVita, and May 1, 2010 to December 31, 2019 for USPI.[450]

- Finally, I understand that there is evidence suggesting the possibility of other alternative class periods. ███████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████ [452] ██████████████

██████████████████████ [453] █████████

███████████████████████████████

████████████████████████████

---

Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries").

[449] Third Amended Complaint, ¶ 92 ("All natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 2010 to January 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries.").

[450] Section 1.2.

[451] Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 7, 2022), Testimony of Andrew Hayek (SCA), p. 535 ("Q. And it's in 2012, around February, that you described entering into this understanding or agreement with Mr. Thiry about how solicitations would be conducted; right? A. Yes. The agreement was approximately around January of 2012."); see also Hayek (SCA) Deposition, p. 165 ("████████████████████████ ████████████████████████████████████ ████████████████████████████").

[452] Hayek (SCA) Deposition, p. 190 ("████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████").

[453] Email from Shannon McGarry (USPI) to Shannon Mosley (USPI), "RE: SCA," October 24, 2017, USPI_CIV_000003394 ("████████████████████████████ ████████"); Email from Shannon Mosley (USPI) to Megan Fox (Catapult Healthcare) et al., "SCA," October 23, 2017, USPI_CIV_000006432 ("███████████████████████ ████████████"); Mosley (USPI) Deposition, pp. 126–127 ("████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████").

See also Deposition of Bill Wilcox (USPI), September 24, 2024 ("Wilcox (USPI) Deposition"), p. 233 ("████ ████████████████████████████████████ ████████████████████████████████████ ████████").

██████████████████████████████████████████████
████████████████████[454]

- I do not express an opinion about which dates are the correct dates. I only note these alternatives to illustrate the point that there appears to be a legitimate question in this case about when the correct class period may be.

244. Exhibit 42 shows how the results from Prof. Starr's pay regression model change if, instead of using the dates specified in Prof. Starr's report to define the Class Period, I use the dates from the SCA and DaVita indictments, or the dates from Plaintiffs' prior complaints. For the purposes Exhibit 42, I correct the basic data processing errors that Prof. Starr made when constructing his data sample. I described these errors, and the corrections that I implement, in Section 5.2.3 and Appendix D. ███████████████████████████
████████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████

[454] Kilgore (SCA) Deposition, pp. 56–60 ("███████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████"), pp. 67–68 ("███████
███████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████").

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ In other words, while the earliest set of available dates for the alleged conduct resulted in a positive conduct estimate (the opposite of what Plaintiffs' theory of harm predicts), each subsequent revision to the class period dates resulted in an increasingly negative conduct estimate.

---

**EXHIBIT 42**
*The Results from Prof. Starr's Pay Regression Are Highly Sensitive to the Class Period Dates and Moved from Positive and Significant to Negative and Significant Over Time*



Source: Corrected Starr Data

Note: This exhibit shows the conduct estimate from Prof. Starr's pay regression, under different class period dates. Error bars represent the 95% confidence interval.

---

245. The above results show that Prof. Starr's pay regression results are highly sensitive to the class period dates. Relatedly, Prof. Starr's own empirical analysis attempting to justify a class period end date of 2019 fails to do so. Prof. Starr estimates a year-by-year mobility regression model, which estimates whether inter-Defendant mobility changed between 2017 and each other year from 2008 to 2021, to "████████████████████████ ████████████"[455] But, Prof. Starr's year-by-year mobility regression model

---

[455] Starr Report, ¶ 86.

answers an irrelevant question: whether inter-Defendant mobility in 2017 (a single year of the Class Period) was statistically significantly different from what it was in 2020 (a single year of the post-conduct period). As Prof. Starr himself explains,



[456] This is a non-sequitur: if Prof. Starr believes that the agreements were equally binding in 2018 and 2019 (and he has no assertion to the contrary), he has no reason to focus his statistical test on 2017. Moreover, it is unclear why the timing of an internal USPI memo has any bearing on the alleged agreement between DaVita and SCA.

246. Indeed, Exhibit 43 shows that, when I estimate Prof. Starr's year-by-year mobility regression model using 2018 or 2019 as the reference years (instead of 2017), I find no statistically significant differences between inter-Defendant mobility in those years and inter-Defendant mobility in 2020. In other words, Prof. Starr's decision to use 2017 as a reference year is a clear case of cherry-picking, at odds with standard scientific practice.[457] Further, these results mean that, if I apply Prof. Starr's own reasoning, his empirical analysis shows that a class period end date of 2019 is inappropriate.

---

[456] Starr Report, ¶ 86.

[457] See, e.g., David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, (Washington, D.C.: The National Academies Press, 2011), pp. 213–302 at p. 233 ("Finally, there is the issue of which numbers to compare. Researchers sometimes choose among alternative comparisons. It may be worthwhile to ask why they chose the one they did. Would another comparison give a different view? A government agency, for example, may want to compare the amount of service now being given with that of earlier years—but what earlier year should be the baseline? If the first year of operation is used, a large percentage increase should be expected because of startup problems. If last year is used as the base, was it also part of the trend, or was it an unusually poor year? If the base year is not representative of other years, the percentage may not portray the trend fairly. No single question can be formulated to detect such distortions, but it may help to ask for the numbers from which the percentages were obtained; asking about the base can also be helpful.").

**EXHIBIT 43**
**Prof. Starr's Year-by-Year Mobility Regression Shows No Statistical Change in Inter-Defendant Mobility Between 2018 and 2020 or Between 2019 and 2020**



| Base Year | Estimated Percentage Point Change in Mobility Rate Between Base Year and 2020 | |
|---|---|---|
| | Davita/SCA | USPI/SCA |
| 2017 | | |
| 2018 | | |
| 2019 | | |

Source: Corrected Starr Data
Note: This exhibit reports the estimated coefficient on the 2020 year indicator variable in Prof. Starr's year-by-year mobility regression model (Starr Report, Figure 3), where the model is estimated using the indicated base year. Prof. Starr uses 2017 as his base year. Robust standard errors in parentheses; * indicates statistical significance at at least the 5% level.

### 5.2.5. Prof. Starr's Pay Regression Model Extrapolates a Conduct Estimate Based on a Subset of Proposed Class Members

247. Finally, another limitation of Prof. Starr's pay regression model is that he only identifies the effect of the alleged conduct on pay using a subset of proposed class members, but he extrapolates the resulting conduct estimate to calculate damages for the entire proposed class. Prof. Starr admits that this is the case in his own report, noting that, because he includes individual-company fixed effects in his pay regression model, and



"[458] Indeed, I find that

.[459]

.[460] In other words, by Prof. Starr's own admission, more than half of proposed class members do not contribute to his estimate for the

---

[458] Starr Report, ¶ 130.
[459] Workpaper 31.
[460] Workpaper 11.



248. ████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████[461]

### *5.3. Prof. Starr's Pay Regression Model is Not Properly Linked to the Alleged Conduct, as it Assumes a Single Effect Across Numerous Forms of Conduct That Varied in Nature and Timing*

249. Finally, in addition to the methodological flaws discussed above, Prof. Starr's primary pay regression model (█████████████████████ ███████████████████) suffers from another specification problem: it simply estimates a single effect across all forms of conduct and throughout the Class Period, despite the fact that Plaintiffs allege multiple forms of conduct that varied in nature (mobility restrictions versus information sharing), varied in terms of which Defendants and which proposed class members were involved, and varied in terms of when the conduct occurred. Once Prof. Starr's results are broken down to account for the variation in the nature and timing of the alleged conduct, the patterns generated by his pay regression are inconsistent with the patterns that would be expected based on Plaintiffs' allegations, illustrating the disconnect between his modeling of the alleged conduct and how Plaintiffs claim the alleged conduct actually worked.

250. There are several key dimensions along which Plaintiffs and their experts claim that the alleged conduct varied. I describe each of these key dimensions in the discussion that follows.

---

[461] Starr Report, Figure 35 ("████████████████████ ████████"); Starr Report, Figure 8 ("██████████████████████ ████████████████").

- **Plaintiffs allege and Plaintiffs' experts claim that proposed class members at SCA were subject to two sets of bilateral conduct, whereas proposed class members at USPI and DaVita were subject to only one set of bilateral conduct.** Plaintiffs allege an overarching conspiracy in the Third Amended Complaint, and Prof. Starr's pay regression aligns with this interpretation.[462] However, elsewhere in their expert reports and in the Third Amended Complaint, they acknowledge that the alleged conduct at issue is at most bilateral alleged mobility restrictions and information sharing between two pairs of Defendants (USPI/SCA and DaVita/SCA), and nothing at all between one pair of Defendants (USPI/DaVita). Thus, according to Plaintiffs and their experts, proposed class members at SCA were affected by bilateral conduct between USPI/SCA *and* SCA/DaVita, whereas proposed class members at DaVita and USPI were subject to only one type of bilateral conduct between *either* SCA/DaVita *or* USPI/SCA.

- **Plaintiffs allege and Plaintiffs' experts claim that the alleged mobility restrictions and the alleged information sharing went into effect at different points in time.** Specifically, they claim that the alleged information sharing between SCA/DaVita and USPI/SCA began in 2009, after the alleged SCA/DaVita mobility restrictions began in 2008, but before the alleged SCA/USPI mobility restrictions began in 2010.[463] Thus, according to Plaintiffs' allegations, beginning in 2008, proposed class members at SCA and DaVita were newly subject to the alleged SCA/DaVita mobility restrictions; beginning in 2009, proposed class members at all three Defendants were newly (and for proposed class members at SCA and DaVita, additionally) subject to the alleged mobility restrictions between SCA/DaVita and USPI/SCA; and beginning in 2010, proposed class members at SCA and USPI were

---

[462] Third Amended Complaint, ¶ 105 ("Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in an overarching conspiracy, consisting of unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. 1."); Starr Report, ¶ 106 ("Given that Plaintiffs allege that both elements of the Challenged Conduct (i.e., the No-Poach Agreements and CSI Exchanges) occurred simultaneously, my analysis measures suppressed compensation from the whole of the Challenged Conduct rather than from each individual component.").

[463] Starr Report, ¶ 69 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"), 76 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮"), 100−101 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). While Prof. Gerhart agrees with Prof. Starr that the alleged information sharing between SCA and DaVita began "▮▮▮▮▮▮▮▮▮▮," he claims that the alleged information sharing between SCA and USPI began earlier, in "▮▮▮▮▮▮▮." See Gerhart Report, ¶ 23.

newly (and additionally) subject to the alleged USPI/SCA mobility restrictions. Prof. Starr himself admits that his pay regression model is not able to distinguish between the effects of the alleged mobility restrictions and the alleged information sharing, instead claiming that "██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████"[464]

- **Plaintiffs' experts assert that the alleged mobility restrictions began as non-solicitation agreements, but later became more restrictive when Defendants adopted a "tell your boss" requirement.**[465] Specifically, Plaintiffs' experts claim that the SCA/DaVita and USPI/SCA mobility restrictions began as no-solicitation agreements in 2008 and 2010, respectively (which prevented the Defendant firms participating in each bilateral agreement from "cold-calling" each other's Senior Employees), but later became more restrictive when Defendants adopted a "tell your boss" requirement (which required proposed class members to notify their boss before the recruiting and hiring process would be completed even in cases where candidates were not solicited but proactively applied).[466] Thus, according to Plaintiffs' experts' claims, beginning in 2008, proposed class members at SCA and DaVita were

---



[464] Starr Report, ¶ 106; Starr Deposition, Volume I, pp. 108–110 ("██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████.").

[465] Plaintiffs refer to the "tell your boss" requirement in their operative complaint, noting that: "on or about October 16, 2015, [Mr. Hayek] emailed an SCA human resources executive: 'Putting two companies in italics ([USPI] and [DaVita]) - we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking.'" Third Amended Complaint, ¶ 44.

[466] Gerhart Report, ¶ 22 ("██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████"); Starr Report, ¶ 70 ("██████████████████ ████████████████"), ¶ 77 ("██████████████████████████ ████████████████████████████████████████████████████ ██████████").

newly subject to a SCA/DaVita no-solicitation agreement; beginning in 2010, proposed class members at SCA and USPI were newly (and for proposed class members at SCA, additionally) subject to a USPI/SCA no-solicitation agreement; and later, proposed class members at all three Defendants, who were already subject to one or both of the two no-solicitation agreements, were newly (and additionally) subject to the "tell your boss" requirement.

251. Once Prof. Starr's pay regression model is adjusted to allow the effect of the alleged conduct to vary across years or across Defendants, the resulting patterns are inconsistent with Plaintiffs' allegations.[467] This is demonstrated in Exhibit 44 and Exhibit 45 below. Exhibit 44 shows Figure 7 from Prof. Starr's report, where Prof. Starr reports the estimated conduct effects from his pay regression model when he allows the effect of the alleged conduct to vary across years. When I compare Exhibit 44 to the description above of how the alleged conduct changed over time according to Plaintiffs and their experts, I find that the patterns in Figure 7 are not in alignment with what would be expected based on their claims. In particular, Prof. Starr's Figure 7 does not show the effect of the alleged conduct becoming *more negative* over time even though, as I explained above, Plaintiffs alleged and Plaintiffs' experts claim that the alleged conduct strengthened over time as the alleged mobility restrictions and information sharing took effect in a staggered fashion, and as the alleged mobility restrictions allegedly became more restrictive with the addition of the "tell your boss" requirement. To the contrary, Prof. Starr's Figure 7 shows the effect of the alleged conduct becoming less negative over time during the Class Period.

---

[467] I obtain similar results if I generate Exhibit 44 and Exhibit 45 after correcting the basic errors that Prof. Starr made when processing the data. See Workpaper 32; Workpaper 33; Appendix D.

**EXHIBIT 44**
**The Patterns in Figure 7 from Prof. Starr's Report Do Not Align with Plaintiffs' Allegations**
**Regarding the Scope, Nature, and Timing of the Alleged Conduct**



Conditional Trends in Ln(Total Compensation)

Source: Starr Report, Figure 7
Note: This exhibit contains a reproduction of Figure 7 in Prof. Starr's report.

252. Exhibit 45 shows the estimated conduct effects from Prof. Starr's pay regression (taken directly from Figure 8 in his report) when Prof. Starr allows the effect of the alleged conduct to vary across Defendants. When I compare Exhibit 45 to my description above of how the alleged conduct differed across Defendants according to Plaintiffs and their experts, I find that the by-Defendant conduct estimates from Figure 8 in Prof. Starr's report are not in alignment with what I would expect based on Plaintiffs' allegations and Prof. Starr's claims. Prof. Starr's estimates do not show that the alleged conduct effect is larger for SCA than for DaVita or USPI even though, as I explained above, proposed class members at SCA were allegedly subject to two sets of bilateral conduct (USPI/SCA and DaVita/SCA), whereas proposed class members at USPI and DaVita were allegedly subject to only one.

Highly Confidential – Outside Counsel/Experts Only

**EXHIBIT 45**
***The By-Defendant Conduct Estimates from Figure 8 in Prof. Starr's Report Do Not Align with Plaintiffs' Allegations Regarding the Scope, Nature, and Timing of the Alleged Conduct***



Source: Starr Report, Figure 8

Note: This exhibit contains a reproduction of the by-Defendant estimates from Model (4) in Prof. Starr's Figure 8. Error bars represent the 95% confidence interval.

**6. PROF. STARR'S PAY REGRESSION MODEL DOES NOT DEMONSTRATE COMMON IMPACT DURING THE CLASS PERIOD, NOR DOES IT EVEN MEASURE THE EFFECT OF THE ALLEGED CONDUCT ON PAY USING ALL OR NEARLY ALL PROPOSED CLASS MEMBERS**

253. Prof. Starr purports to estimate the effect of the alleged conduct on average in his pay regression analysis, either for all three Defendants in aggregate (in his aggregate pay regression model) or separately by Defendant (in his damages pay regression model).[468] But, by focusing on averages, he conceals variation within the class, ignoring the diversity of jobs and skills among proposed class members. When I correct Prof. Starr's pay regression model for the obvious flaws that I discussed in Section 5.2.3 – i.e., correcting the basic errors he makes when processing the structured data; adjusting equity compensation so that it does not improperly measure the value of equity at the time that it vests, is exercised or sold; and reasonably controlling for the effect of the COVID-19 pandemic on labor markets using the healthcare job openings rate, quits rate, and layoffs and discharges rate – and estimate the model separately for key subgroups within the class, I find substantial variation in the alleged pay suppression across subgroups. These patterns are inconsistent with Plaintiffs' common impact allegations.

254. After I fix these obvious flaws, Prof. Starr's regression finds varying effects of the alleged conduct *across specialty areas* (Exhibit 46). The results indicate that all specialty areas are either not affected at all or are positively and statistically significantly affected (Business Development, Sales, Strategy, and Planning; Operations; and Physician Relations and Management).

---

[468] Starr Report, p. 115 ("Aggregate Suppression Model"), p. 117 ("Defendant-Specific Suppression Model"), Figure 6, Figure 8, ¶ 136 ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████ .

**EXHIBIT 46**
**Prof. Starr's Pay Regression Model, After Correcting Obvious Flaws, Finds That the Effect of the Alleged Conduct Varies Across Specialty Areas**

| Specialty | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| Accounting, Tax, and Treasury | | | |
| Business Development, Sales, Strategy, and Planning | | | |
| Business Office Administration and Management | | | |
| Clinical and Research | | | |
| Finance | | | |
| Information Technology | | | |
| Marketing and Communications | | | |
| Operations | | | |
| Other | | | |
| Pharmacy Management | | | |
| Physician Relations and Management | | | |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by specialty area. I correct the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Statistical significance is determined at the 5% level.

255. Similarly, Exhibit 47 shows the results when I fix the same obvious flaws and estimate Prof. Starr's pay regression model separately by Defendant and seniority level. The results indicate that the results vary *across Defendant-seniority level pairs*, and that all Defendant-seniority level pairs are either not affected (e.g., SCA and USPI Administrators) or positively and statistically significantly affected (e.g., DaVita and SCA Directors).

**EXHIBIT 47**
**Prof. Starr's Pay Regression Model, After Correcting For Obvious Flaws, Finds That the Effect of the Alleged Conduct Varies Across Defendants and Seniority Levels**

| Seniority Level | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| SCA: Administrator | | | |
| USPI: Administrator | | | |
| DaVita: Director | | | |
| SCA: Director | | | |
| USPI: Director | | | |
| DaVita: Senior Director | | | |
| SCA: Senior Director | | | |
| USPI: Senior Director | | | |
| DaVita: Vice President | | | |
| SCA: Vice President | | | |
| USPI: Vice President | | | |
| DaVita: Senior Vice President | | | |
| SCA: Senior Vice President | | | |
| USPI: Senior Vice President | | | |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by Defendant and seniority level. I correct the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Statistical significance is determined at the 5% level.

256. The idea that the effect of the alleged conduct may differ across job-related subgroups, such as those shown in Exhibit 46 and Exhibit 47, is consistent with the discussion in Section 2.1. There, I explained that there are substantial differences in proposed class members' outside employment options depending on their skills and preferences, and that for many or most (if not all) proposed class members, Defendants did not have market power sufficient to suppress proposed class members' pay. The results in Exhibit 46 and Exhibit 47, which indicate that all specialty area and Defendant-seniority level subgroups are either not affected at all or are positively and statistically significantly affected, align with that conclusion.

257. Further, after I fix the same obvious flaws, Prof. Starr's pay regression model also demonstrates varying effects *across states*, as shown in Exhibit 48 below. The results indicate that one state is positively affected (Texas), while all others are not affected at all (e.g., Oklahoma). Again, the idea that the effect of the alleged conduct may differ across geographic areas is not surprising, as it is aligns with my discussion in Section 2.1, where I explained that the relevant labor market can be narrower in geography for some jobs than it is for others, and that for many or most (if not all) proposed class members, Defendants did not have market power sufficient to suppress proposed class members' pay. The

results in Exhibit 48, which show that all states are either not affected or positively affected, are consistent with that conclusion.

**EXHIBIT 48**
***Prof. Starr's Pay Regression Model, After Correcting For Obvious Flaws, Finds That the Effect of the Alleged Conduct Varies Across States***

| State | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| AL | | | |
| AZ | | | |
| CA | | | |
| CO | | | |
| CT | | | |
| FL | | | |
| GA | | | |
| IA | | | |
| ID | | | |
| IL | | | |
| IN | | | |
| KY | | | |
| LA | | | |
| MA | | | |
| MD | | | |
| MI | | | |
| MN | | | |
| MO | | | |
| NC | | | |
| NE | | | |
| NJ | | | |
| NM | | | |
| NV | | | |
| NY | | | |
| OH | | | |
| OK | | | |
| OR | | | |
| PA | | | |
| SC | | | |
| TN | | | |
| TX | | | |
| VA | | | |
| WA | | | |
| WI | | | |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by state. I correct the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Statistical significance is determined at the 5% level. States with fewer than 50 observations do not appear in the exhibit (this removes 17 states from the analysis).

258. Finally, after I fix the same obvious flaws, Prof. Starr's pay regression model finds varying effects of the conduct *across years*. Notably, the results

indicate that the effect of the alleged conduct is statistically insignificant or statistically significant and positive during every year of the Class Period, the opposite of what Plaintiffs' theory of harm predicts.

**EXHIBIT 49**
**Prof. Starr's Pay Regression Model, After Correcting for Obvious Flaws, Finds Varying Patterns in Pay Across Class Period Years**



| Year | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| 2008 | | | |
| 2009 | | | |
| 2010 | | | |
| 2011 | | | |
| 2012 | | | |
| 2013 | | | |
| 2014 | | | |
| 2015 | | | |
| 2016 | | | |
| 2017 | | | |
| 2018 | | | |
| 2019 | | | |

Source: Corrected Starr Data
Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by year. I correct the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Statistical significance is determined at the 5% level. Estimates reflect the effect of the indicated year on pay relative to 2007.

259. I also find substantial variation in the alleged pay suppression across subgroups when I only correct the basic errors Prof. Starr made when processing the structured data, but otherwise make no other changes to his pay regression. The results are shown in Appendix C.

260. For each of the exhibits, I perform a standard statistical test, which is known as a "Chow test," to assess whether, from a statistical perspective, it is appropriate to pool the data across the corresponding subgroups when estimating the alleged conduct effect.[469] I find that the Chow test supports using separate subgroup regressions to estimate the effect of the alleged conduct, and

---

[469] ABA Antitrust Section: American Bar Association, "Applying Econometrics to Address Class Certification," in *Econometrics: Legal, Practical and Technical Issues*, Second Edition, (Chicago: ABA Publishing, 2014), pp. 341–370 at p. 358 ("Standard statistical tests can be applied to test the stability of coefficients among subgroups of customers, products, time, geographies or other subsamples, and to determine whether it is appropriate to pool potential subgroups when estimating the average effect of the alleged conspiracy. For example, a Chow test can be implemented to determine whether the effect of an alleged conspiracy should be estimated separately for two or more potential subgroups of customers, products, or periods.").

does not support Prof. Starr's aggregate pay regression model which estimates a single conduct effect for all proposed class members.[470]

261. Moreover, Prof. Starr performs a number of empirical analyses, reflected in Figures 11, 12, and 16-18 of his report, which he claims "████████████████ ████████████████████████████████████████████████████."[471] However, these empirical analyses suffer from the same flaws as his main pay regression model.  Consistent with the above results, I find that once I correct his additional analyses for the obvious flaws that I discussed in Section 5.2.3 – ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ – none of his results hold or provide evidence that is consistent with common impact. These results are shown in Exhibit 50, Exhibit 51, and Appendix C.

262. As one example, Prof. Starr purports to show in Figure 16 of his report that "████████████████████████████████████████████████████ ████████████████████████████████" according to his pay regression analysis.[472] However, Exhibit 50 shows that, if I correct obvious flaws in Prof. Starr's pay regression model, this result no longer holds: ██████████████████████ ████████████████████████████████████████████████ ████████████████████. As a second example, Prof. Starr purports to show in Figure 18 of his report that "████████████████████████████████████ ██████████" according to his random coefficient regression analysis.[473] However, Exhibit 51 shows the results of Prof. Starr's random coefficient regression analysis after I correct obvious flaws with his pay regression model. Rather than showing evidence of common impact, the results instead indicate ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. The corrected versions of Prof. Starr's other analyses, which also do not support a conclusion of common impact for all or nearly all proposed class members, can be seen in Appendix C.

---

[470] Workpaper 34.

[471] Starr Report, ¶ 137.

[472] Starr Report, ¶ 168.

[473] Starr Report, ¶ 148.

**EXHIBIT 50**
**Prof. Starr's Interval In-Sample Prediction Analysis, After Correcting for Obvious Flaws,**
**Shows No Evidence of Common Impact**



Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's interval in-sample prediction analysis (Prof. Starr's Figure 16), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. The intersection of the dotted and solid lines in each panel represents the percentage of proposed class members potentially harmed at the 95% significance level.

Highly Confidential – Outside Counsel/Experts Only

***EXHIBIT 51***
***Prof. Starr's Random Coefficient Model Analysis, After Correcting for Obvious Flaws, Shows No Evidence of Common Impact***



Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's random coefficient model regression analysis (Prof. Starr's Figure 18), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. The blue curve shows the distribution of conduct estimates for proposed class members, jointly and then separately by Defendant. The red dashed line represents the average conduct estimate for each panel. The percentage of proposed class members potentially harmed by the conduct is reported under each panel.

**7. PAY STRUCTURES CAPABLE OF GENERATING CLASSWIDE IMPACT, AS PLAINTIFFS' EXPERTS CONTEND, WOULD ALSO GENERATE UPWARD PRESSURE ON PAY FOR ALL OR NEARLY ALL PROPOSED CLASS MEMBERS**

263. As I explained in Section 2.2, the claim that Defendants set pay according to rigid pay structures can be refuted by both record evidence and an analysis of Defendants' data. Despite this evidence, in this section, I explain that if one were to accept Plaintiffs' claim that Defendants had rigid pay structures sufficient to generate classwide harm, such pay structures would also generate *upward* pressure on compensation for all or nearly all proposed class members, a fact that Plaintiffs' experts fail to address or account for. This upward pressure could insulate against any downward pressure purportedly caused by the alleged conduct.

264. Under Plaintiffs' claimed rigid pay structures that Defendants purportedly used to set compensation for proposed class members, both decreases *and increases* in pay for one proposed class member should impact the pay for all other proposed class members. Plaintiffs claim that through Defendants' purported pay structures, any decreases in wages for workers directly affected by the alleged conduct would place downward pressure on the pay structures, leading to decreased wages for all other proposed class members. But that is only half the story, and they ignore the other half. Evidence suggests that if Defendants had the pay structures that Plaintiffs claim, there would have been upward pressure on the pay structure due to employees newly hired from somewhere other than a Defendant firm. This could include individuals hired from a non-Defendant firm or individuals first entering or re-entering the labor force (for example after a maternity leave or after completing a professional degree).

265. As I discussed in Section 2, Defendants were free to compete for new hires regardless of the alleged mobility restrictions, and also faced competition for these workers from other non-Defendant employers. Competition for these new hires would lead to competitive pay, which, under Plaintiffs' alleged pay structures, would put upward pressure on the wages of their equally qualified peers whose pay was allegedly suppressed. These wage adjustments would then put upward pressure throughout Defendant firms' entire pay structures as according to Plaintiffs "adjustment to the pay of some employees will lead to adjustments to the pay structure as a whole, affecting the pay of all

employees."[474] This upward pressure could potentially entirely offset, or at a minimum insulate against, any downward pressure on compensation stemming from the alleged mobility restrictions (as well as the alleged information sharing).

266. New hires from non-Defendant firms are just one group of individuals that would place upward pressure on pay through Defendants' purported pay structures. As I explained in Section 2.1, many or most (if not all) proposed class members had non-Defendant employment options, as well as employment options outside of the outpatient care center industry, and even healthcare-related industries. If Defendants were to lower compensation for these proposed class members, competition stemming from these individuals' outside employment options would apply upward pressure to the pay of Defendants' workers because they could use information on competing offers to negotiate higher pay at their existing jobs or else accept superior offers from non-Defendant competitors. As I showed in Section 2.2, there are many examples in the record where proposed class members engaged in exactly this type of pay negotiation with Defendants, leveraging competing offers they had received in order to obtain pay raises.

267. Plaintiffs and their experts have failed to present any evidence or analysis that the pay structures they claim existed would not be prone to upward pressure from groups of proposed class members for which Defendants compete, or to explain how they could account for these complexities in their quantification of harm based on common evidence. Instead, Prof. Starr's conclusions regarding common impact and the effect of the alleged conduct on proposed class members' pay ignore these issues entirely, leading to conclusions that, even under Plaintiffs' assumed pay structures, are inadequate and overstated. Given that more than half of proposed class members were newly hired during the Class Period, and that Defendants compete with many non-Defendant firms for proposed class members' labor, this upward pressure would be considerable, and could offset any downward pressure resulting from the alleged conduct either partially or completely.

---

[474] Third Amended Complaint, ¶ 74.

**8. PLAINTIFFS' CRITERIA FOR THE PROPOSED CLASS ARE NOT OBJECTIVE**

268. Plaintiffs claim that the proposed class consists of employees who worked for Defendants "in positions at the director-level and above."[475] By itself, this characterization is not sufficiently objective as to be implementable based on common evidence. In this section, I explain that there are at least three alternative criteria that could conceivably be used to identify director-level and above positions in an objective manner. For each of these alternative criteria, implementing them would require evidence that is not common to the proposed class. I then explain why the method Prof. Starr used to identify director-level and above positions (which differs from any of these three methods) is arbitrary and subjective.

269. One set of criteria for identifying director-level and above positions is based on an analysis of job responsibilities. Prof. Gerhart endorsed this approach during his deposition, testifying that job responsibilities (and not job titles alone) should be used to identify director-level and above positions, as "different companies may use the same title differently or use different titles for the same thing."[476] Under this approach, it would first be necessary to explain what job responsibilities constitute a "director" level job, and then any job considered to be more complex than a job handled by a director could be considered to be above the director level. However, analyzing job responsibilities for ███████████████████████████████████ ██████████████████████████████████ during the Class Period to understand what constitutes a director and which jobs were above director level in terms of complexity and job responsibilities is a subjective and time-intensive process.[477] Indeed, in the textbook he authored, Prof. Gerhart describes the process of "job analysis," which he defines as "the systematic process of collecting information that identifies similarities and differences in the work" across jobs. He explains

---

[475] Third Amended Complaint, ¶ 92.

[476] Gerhart Deposition, pp. 44–45 ("

See "SCA Position Description, Director, Accounting Operations," SCA, September 25, 2017, SCA000608681–82 at SCA000608681; "SCA Position Description, Director, Revenue Management," SCA, Undated, SCA001153473–74 at SCA001153473–74; "SCA Position Description, Director of Development," SCA, April 1, 2015, SCA000568874–75 at SCA000568874–75.

[477] Workpaper 5.

that this process typically involves using document review, interviews, and work site visits to collect data on a wide range of job and employee characteristics, such as the tasks, activities, performance criteria, and working conditions associated with each job, as well as the technical knowledge and skills that the employees in each job possess.[478] In other words, the process of determining job responsibilities through job analysis requires a detailed review of information about jobs and employees that is not common to the proposed class, and one which Plaintiffs' experts did not undertake.

270. A second set of criteria for identifying director-level and above positions is based on internal company hierarchies, as delineated in documents or perhaps data fields, that explicitly state where jobs sit relative to directors in that hierarchy. For DaVita, the produced data include a field identifying a hierarchy of management "levels" to which each job belongs, one of which is labeled "Director."[479] However, for SCA and USPI, the produced data contain no such field, and as a result, there are many job titles for which it isn't clear what level the job title falls under, even within a given year during the Class Period, let alone across all years of the Class Period. As one example, ███████████ █████████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████████████ ██████[480] This is shown in Exhibit 52 below. █████████████████ █████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ ██████████████████████████████████████ ██████████████████

---

[478] Gerhart (2022), pp. 109–112.

[479] See, e.g., YTD-2016 TM Earnings by Management Level.xlsx, DVA_OMCEAL_000000041, Column F.

[480] 2016 USPI Internal Organization Chart, "Organization Chart," July 2016, USPI_CIV_000000190–227 at USPI_CIV_000000222.

**EXHIBIT 52**
**2016 Internal Organization Chart for IT Systems & Solutions Roles at USPI**



Source: USPI_CIV_000000190–227 at USPI_CIV_000000222.
Note: This exhibit shows the internal organization chart for IT Systems & Solutions roles at USPI in 2016. See 2016 USPI Internal
Organization Chart, "Organization Chart," July 2016, USPI_CIV_000000190–227 at USPI_CIV_000000222.

271. Further, as an additional source of complexity, even if one were able to identify director-level and above positions within a given Defendant, when comparing across all three Defendants, a given individual may be more junior to all directors within her own firm, but at the same level as or relatively more senior than a director at another co-Defendant. For example, the ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████[481] However, as discussed above, and as shown in Exhibit 52, ████████ ████████████████████████████████████████████████ ████████████████████████████████████████ Resolving these ambiguities regarding the relative seniority of positions across different

---

[481] YTD-2016 TM Earnings by Management Level.xlsx, DVA_OMCEAL_000000041, Column F.

Highly Confidential – Outside Counsel/Experts Only

Defendants in an objective manner requires additional evidence (e.g., regarding job responsibilities) that is not common to the proposed class.

272. A third set of criteria for identifying director-level and above positions is based on measuring pay for a given job and comparing that to pay for directors. This approach requires a number of subjective choices about which "director" group to use for the comparison – e.g., would the reference point be the average pay across directors or instead the pay of the lowest-paid director, and should comparisons only be made within firms or across all Defendant firms? For example, ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████[482] ██████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████ Developing objective criteria for determining which jobs are senior to the director-level in this and similar situations requires additional evidence beyond pay (e.g., on job responsibilities or internal company hierarchies), may not be possible using common evidence produced in this matter, and certainly isn't something that Plaintiffs' experts have addressed or explained.

273. Prof. Starr does not use any of the approaches described above to identify director-level and above positions in his report. His approach involves (a) relying on the management level field in the produced data for DaVita, and (b) performing keyword searches for certain phrases, such as "director" or "vice president" or "administrator," in employees' job titles for USPI and SCA.[483] This approach, which relies on job titles for two of the three Defendants, is flawed because, as Prof. Gerhart testified in his deposition, "different companies may use the same title differently or use different titles for the same thing."[484] Further, it is unclear what objective criteria Prof. Starr applied to identify the relevant search terms that he used to identify proposed class members for USPI and SCA. For example, he includes "administrator" job titles at USPI and SCA as class-relevant jobs, but how did he decide that administrators at SCA and at USPI are director level and above employees?[485]  The answer to this question is

---

[482] Workpaper 35.

[483] Starr Report, Backup Materials.

[484] Gerhart Deposition, p. 44.

[485] ████████████████████████████████████████████ ████████████████████████████████████████████

unclear, considering that, as noted above, individuals with "Administrator" job titles are often paid less than individuals with "Director" job titles.[486]

274. Finally, apart from the difficulties in identifying "director-level or above" positions, another complication when identifying proposed class members is how to identify the positions that Plaintiffs have carved out of the proposed class – i.e., "senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants."[487] As the examples below illustrate, ambiguities in how to identify these two groups of employees underscore the lack of objective criteria that can be used to identify proposed class members based on common evidence alone:

- **"Senior Corporate Officers":** For DaVita, Prof. Starr identifies "senior corporate officers" as those employees for whom the management level field in DaVita's produced data is equal to "Senior Officers." However, for SCA and USPI, Prof. Starr assumes that certain employees with terms such as "chief" or "president" in their job titles (other than "vice president") should be treated as a "senior corporate officer."[488] It is not obvious why "senior corporate officers" should not extend beyond the job titles he selects. For example, at USPI, internal organization charts from July 2016 indicate that, in addition to individuals with "chief" or "president" in their job titles, certain VPs (i.e., individuals in the "SVP, Strategy" and "SVP, Physician Strategy Group & Ortholink" roles) also reported directly to the CEO.[489] Likewise, while Prof. Starr excludes some titles with "chief" from the class, he continues to include others. For example, he does not exclude a "chief tech gastroenterology" at SCA from his proposed class, but he does not explain this decision that deviates from his proposed rule.

---

. See Letter from Julia B. Bates (King & Spalding) to Sarah D. Zandi (Lieff Cabraser Heimann & Bernstein), "Re: In re Outpatient Medical Center Employee Antitrust Litig., N.D. Ill. 1:21-cv-000305," December 12, 2024.

[486] I understand that USPI has provided a list of job titles that they consider to be "subject to USPI's no-poach agreements." This list differs from the job titles that are included in Plaintiffs' proposed class according to Prof. Starr's analyses. See Appendix E; Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph Saveri (Joseph Saveri Law Firm Inc.) et al., "Re: In Re Outpatient Medical Center Antitrust Litigation, Case No 1:21-cv-00305," May 14, 2023.

[487] Third Amended Complaint, ¶ 92.

[488] Starr Report, Backup Materials.

[489] 2016 USPI Internal Organization Chart, "Organization Chart," July 2016, USPI_CIV_000000190–227 at USPI_CIV_000000191.

- **"Personnel in the Human Resources, Recruiting, and Legal Departments":** For all three Defendants, Prof. Starr assumes that anyone with the keywords "human resources," "legal," "recruit," "benefit," or other similar terms in their job titles or department names should be excluded from the class.[490] But it appears that Prof. Starr's keywords were too limited. For example, for DaVita, Prof. Starr does not exclude departments such as "People Insights and Analytics," "LAB-People Services," "TM [Teammate] Relations", "HRIS [Human Resources Information Systems]," "Talent Management," and "Compensation and Analytics" from the proposed class, even though he does exclude other, similar departments whose titles contain the terms he selected for his keyword searches (e.g., "human resources").[491]

_____

Justin McCrary

---

[490] Starr Report, Backup Materials.

[491] Starr Report, Backup Materials.

## APPENDIX A: CV and Prior Testimony For Justin McCrary, Ph.D.

# Justin McCrary

Columbia Law
521 Jerome Greene Hall
New York, NY 10027

Email: justin.mccrary@gmail.com
Homepage: https://www.law.columbia.edu/faculty/justin-mccrary

## Current Academic Appointments

**Columbia University**
2018– Paul J. Evanson Professor of Law
2018– Fellow, Program in the Law and Economics of Capital Markets

**National Bureau of Economic Research**
2012– Faculty Research Associate

## Past Academic Appointments

**National Bureau of Economic Research**
2008–19 Co-director, Crime Working Group
2006–12 Faculty Research Fellow

**University of California, Berkeley**
2014–17 Director, Social Sciences Data Laboratory (D-Lab)
2010–18 Professor of Law
2008–10 Assistant Professor of Law

**Columbia University**
Fall 2017 Samuel Rubin Visiting Professor of Law

**University of Michigan**
2003–07 Assistant Professor, Gerald R. Ford School of Public Policy, and
Assistant Professor, Department of Economics (courtesy)

## Government and Public Service

*Journal of Law and Economics*
2024– Member, Board of Editors

**Rosalyn Yalow Charter School**
2023– Member, Board of Directors
2024– Member, Finance Committee

**California Law Revision Commission**
2023–24 Consultant, Study of Antitrust Law

**Committee on National Statistics**
2022 Reviewer, National Academies of Sciences, Engineering, and Medicine

**Securities and Exchange Commission**
2022– Signatory, Intergovernmental Personnel Agreement

**European Central Bank (Banco de España)**
2013–14 Economist

**Equal Employment Opportunity Commission**
2000–16 Signatory, Intergovernmental Personnel Agreement

**California Department of Justice**
2011–12 Consultant

**Federal Reserve Bank of New York**
1996–98 Assistant Economist

## Education

Ph.D. Economics, University of California, Berkeley, 2003

A.B. Public Policy, Princeton University, 1996

## Languages

English (native); German (fluent); Spanish (elementary/intermediate)

## Hobbies

Chess, Squash, Classical guitar

## Testimony Experience

*State of California, ex rel.., Edelweiss Fund, LLC, v JP Morgan Chase Bank, et al.*
Superior Court of the State of California

> VRDO case
>
> Testimony regarding market definition, market power, and competitive effects
>
> Retained through the joint defense group
>
> Reply report filed on April 11, 2025
>
> Affirmative report filed on March 14, 2025

*In re: Bank of America California Unemployment Benefits Litigation*
District Court of the Southern District of California

> Case alleging slow payment of covid checks
>
> Testimony regarding the unemployment insurance program literature and the time value of money
>
> Retained through Bank of America
>
> Report filed on April 4, 2025

*Leinani Deslandes and Stephanie Turner v McDonald's USA, LLC*
U.S. District Court for the Northern District of Illinois (Eastern Division)

> Putative class action antitrust labor case
>
> Testimony regarding franchising and vertical restraints, procompetitive benefits of vertical restraints, incentives, monopsony theory, general versus specific human capital, and salary structure models
>
> Retained through McDonald's USA, LLC
>
> Affirmative report on remand filed on March 28, 2025
>
> Deposed on May 10, 2021 (via video)
>
> Class certification report filed on April 15, 2021

*The Collection LLC v Porsche Cars North America*
Circuit Court of the 11th Judicial Circuit, Miami-Dade County

> Antitrust case
>
> Testimony regarding local market demand and a new proposed Porsche dealership
>
> Retained through Porsche
>
> Deposed on March 27, 2025
>
> Report filed on February 3, 2025

*In re Cattle and Beef Antitrust Litigation*
U.S. District Court for the District of Minnesota

    Antitrust case

    Testimony regarding liability, class certification, regression methodology, and exchange and direct and indirect seller claimed damages

    Retained through the joint defense group

    Deposed on March 19 and 20, 2025

    Class certification report filed on January 24, 2025

*Glencore Glencore Grain v Louis Dreyfus Company*
United State District Court of the Northern District of Illinois

    Antitrust commodities market case

    Testimony regarding market definition, market power, and competitive effects

    Retained through Louis Dreyfus Company

    Report filed on March 14, 2025

*MLRN LLC v U.S. Bank National Association*
Supreme Court of the State of New York

    Mortgage-backed securities case (servicing)

    Testimony regarding sampling and statistical methods

    Retained through U.S. Bank

    Deposed on March 14, 2025

    Report filed on February 14, 2025

*Entri LLC v GoDaddy.com LLC*
U.S. District Court for the Eastern District of Virginia

    Antitrust case

    Testimony regarding market definition, market power, competitive effects, tying, procompetitive rationale of vertical integration, and damages

    Retained through GoDaddy

    Report filed on January 27, 2025

*Target v Visa; 7-Eleven v Visa*
U.S. District Court for the Southern District of New York

    Antitrust case

    Testimony regarding liability, two-sided markets, market power, and credit and debit card payment systems

    Retained through Mastercard

    Deposed on December 19, 2024

    Report filed on October 1, 2024

*Rivera and Romero v Amazon Web Services*
District Court of the Western District of Washington

    Putative class action alleging violations of the Illinois Biometric Information Privacy Act

    Testimony regarding harm and damages

    Retained through AWS

    Report filed on December 13, 2024

*Noe Rosales, et al. v Valve Corporation*
American Arbitration Association

Antitrust case

Testimony regarding market definition, market power, and competitive effects in video game distribution

Retained through Valve

Testified at arbitration hearing on December 6 and 9, 2024

*Federal Trade Commission, et al. v The Kroger Company and Albertsons Companies, Inc.*
United States District Court for the District of Oregon

§13(b) merger case

Testimony regarding labor market definition (product and geographic), market power, merger effects, and bargaining theory

Retained through Kroger

Trial testimony on September 12, 2024

Deposed on July 18, 2024

Report filed on July 1, 2024

*Favell et al. v University of Southern California*
United States District Court of the Central District of California

Putative class action alleging tuition overpayment

Testimony regarding damages methodologies and conjoint analysis

Retained through USC

Deposed on September 2, 2024

Report filed on August 22, 2024

*IKB International S.A. in Liquidation and IKB Deutsche Industriebank AG v U.S. Bank N.A.*
Supreme Court of the State of New York, County of New York

Mortgage-backed securities case (servicing)

Testimony regarding sampling and statistical methods

Retained through U.S. Bank

Deposed on July 23, 2024

Report filed on June 28, 2024

*Attorney General for the Commonwealth of Massachusetts v Uber Technologies, Inc. and Lyft, Inc.*
Superior Court of the Commonwealth of Massachusetts for the County of Suffolk

Alleged misclassification of employees as independent contractors

Testimony regarding two-sided markets and platform companies

Retained through Uber Technologies, Inc.

Trial testimony on May 31, 2024

Deposed on January 27, 2024 (via video)

Report filed on October 13, 2023

APPENDIX A

*IKB International S.A. in Liquidation and IKB Deutsche Industriebank AG v Morgan Stanley, et al.*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case (servicing)

    Testimony regarding sampling and statistical methods

    Retained through Morgan Stanley

    Deposed on May 15, 2024

    Report filed on September 30, 2022

*State of New York ex rel., Edelweiss Fund, LLC v JP Morgan Chase & Co., et al.*
Supreme Court of State of New York, County of New York

    *Qui tam* action alleging collusion and/or coordination on the part of remarketing agents and thus municipal government overpayment for variable rate demand obligation (VRDO) interest rates

    Testimony regarding cartel theory, economic incentives, market power, barriers to entry, and random versus selected samples and bootstrap methodologies

    Retained through the joint defense group

    Deposed on May 2, 2024

    Report filed on March 15, 2024

*Mayor and City Council of Baltimore v Purdue Pharma L.P., et al.*
Circuit Court for Baltimore City

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, abatement plan, damages

    Retained through Janssen

    Deposed on April 26, 2024

    Report filed on February 23, 2024

*Chuba Hubbard et al. v NCAA et al.*
United States District Court for the Northern District of California

    Putative class action antitrust labor case

    Testimony regarding damages methodologies and causation

    Retained through NCAA

    Deposed on April 15, 2024

    Report filed on March 27, 2024

*Lisa Barkel-Williams, et al. v Auto Club Group and Auto Club Services*
United States District Court for the Eastern District of Michigan

    Unjust enrichment putative class action in the insurance industry

    Testimony regarding damages methodologies and causation

    Retained through Auto Club Group and Auto Club Services

    Report filed on March 22, 2024

*Palm Beach Tanning, Inc., et al., v Sunless, Inc.*
United States District Court for the Northern District of Ohio

    Intellectual property and antitrust dispute

    Testimony regarding antitrust economics and damages methodologies

    Retained through Sunless

    Deposed on February 21, 2024

    Report filed on January 16, 2024

*Richard Dennis, Michael Glass, and Port 22, LLC v The Andersons, Inc. and Cargill, Inc.*
United States District Court for the Northern District of Illinois, Eastern Division

    Putative class action antitrust finance case (wheat market)

    Testimony regarding antitrust economics and damages methodologies, causation, inferential statistics, and commodities markets (physical, futures, options)

    Retained through The Andersons and Cargill

    Deposed on January 26, 2024

    Report filed on December 20, 2023

*The Collection v Holman North Miami and Porsche Cars North America*
State of Florida, Division of Administrative Hearing

    Proposed new car dealership case

    Testimony regarding local market demand and a new proposed Porsche dealership

    Retained through Porsche Cars North America

    Deposed on January 17, 2024 (via video)

    Deposed on January 11, 2024

    Reply report filed on December 22, 2023

    Report filed on November 11, 2023

*Paul Orshan, et al. v Apple Inc.*
United States District Court for the Northern District of California

    Putative class action consumer products liability case

    Testimony regarding the law and economics of damages

    Retained through Apple, Inc.

    Deposed on January 9, 2024

    Deposed on June 8, 2022 (via video)

    Report filed on May 17, 2022

*Campbell v Uber Technologies, Inc. and Lyft, Inc.*
Superior Court of the Commonwealth of Massachusetts for the County of Suffolk

    Alleged misclassification of employees as independent contractors

    Testimony regarding two-sided markets and platform companies

    Retained through Uber Technologies, Inc.

    Report filed on October 13, 2023

*Erica Frasco v Flo Health, Inc., Google, LLC, Facebook, Inc., AppsFlyer, Inc., and Flurry, Inc.*
United States District Court for the Northern District of California

    Putative class action data breach and privacy case

    Testimony regarding liability and damages

    Retained through Flurry, Inc.

    Deposition on August 24, 2023 (via video)

    Report filed on June 27, 2023

*The DCH Health Care Authority v Purdue Pharma L.P.; Fort Payne Hospital Corporation v McKesson Corporation*
Circuit Court for Conecuh County, Alabama

Prescription opioid medication litigation

Testimony regarding causation, economics of crime, regression methodology

Retained through the Janssen Defendants

Supplemental Disclosure filed on July 5, 2023

Expert Disclosure filed on July 3, 2023

*PennyMac Loan Services, LLC v Black Knight Servicing Technologies, LLC; Black Knight, Inc.*
American Arbitration Association

Intellectual property and antitrust dispute

Testimony regarding damages

Retained through Black Knight

Testified at arbitration hearing on May 18, 2023

Deposition on December 8, 2022

Report filed on October 25, 2022

*State of Illinois ex rel., Edelweiss Fund, LLC v JP Morgan Chase & Co., et al.*
Circuit Court of Cook County, Illinois, County Department, Law Division

*Qui tam* action alleging collusion and/or coordination on the part of remarketing agents and thus municipal government overpayment for variable rate demand obligation (VRDO) interest rates

Testimony regarding cartel theory, economic incentives, market power, barriers to entry, and random versus selected samples and bootstrap methodologies

Retained through the joint defense group

Deposed on April 5, 2023

Report filed on February 6, 2023

*National Fair Housing Alliance et al. v Deutsche Bank National Trust, as Trustee; Deutsche Bank Trust Company Americas, as Trustee; Ocwen Loan Servicing, LLC; and Altisource Solutions, Inc.*
United States District Court for the Northern District of Illinois, Eastern Division

Housing maintenance discrimination

Testimony regarding causation, economics of housing market

Retained through Deutsche Bank, Ocwen, and Altisource

Deposed on March 31, 2023 (via video)

Declaration filed on February 28, 2023

Report filed on February 21, 2023

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*
United States District Court for the Eastern District of New York

Antitrust case

Testimony regarding liability, two-sided markets, market power, and credit and debit card payment systems

Retained through Mastercard

Deposed on March 24, 2023

Reply Report filed on January 13, 2023

Report filed on September 30, 2022

*In re University of San Diego Tuition and Fees COVID-19 Refund Litigation*
United States District Court for the Southern District of California

    Putative class action alleging tuition overpayment

    Testimony regarding damages methodologies, conjoint analyses, and hedonic regression

    Retained through the University of San Diego

    Rebuttal report filed on February 20, 2023

    Affirmative report filed on February 6, 2023

*Palmer, Piroumian, Cox, and Franchitt v Cognizant Technology Solutions Corporation and Cognizant Technology Solutions U.S. Corporation*
United States District Court for the Central District of California

    Putative class action employment discrimination case

    Testimony regarding regression and statistical methodologies, the Yule-Simpson paradox and omitted variable bias, causation, personnel economics, self-selection, the economics of immigration, and damages methodologies

    Retained through Cognizant

    Deposed on January 23, 2023 (via video)

    Deposed on July 5, 2022 (via video)

    Report filed on June 10, 2022

*In re: Broiler Chicken Grower Antitrust Litigation Haff Poultry, Inc., et al. v Tyson Foods, Inc., et al.*
United States District Court for the Eastern District of Oklahoma

    Putative class action antitrust monopsony case

    Testimony regarding information sharing, no-poach allegations, causation, and damages estimation

    Retained through Pilgrim's and Sanderson

    Deposition on December 22, 2022

    Report filed on November 18, 2022

*Twitter v Musk*
Delaware Chancery Court

    Acquisition dispute

    Testimony regarding statistical sampling and extrapolation, inferential statistics, and data science

    Retained through Twitter

    Report filed on October 2, 2022

*Walter Peters v Apple Inc.*
Superior Court for the State of California, County of Los Angeles

    Putative class action consumer products liability case

    Testimony regarding event study methodology, extent of unharmed class members, and statistics

    Retained through Apple, Inc.

    Deposed on September 2, 2022 (via video)

    Report filed on July 26, 2022

*Appellant The Mount Sinai Hospital's OMHA Appeal (No. 3-7103567206)*
Centers for Medicare and Medicaid Services

    Centers for Medicare and Medicaid Services investigation

    Testimony regarding statistics and damages estimation

    Retained through Mt. Sinai

    Testified before administrative law judge on August 30, 2022 (via audio)

    Report filed on July 18, 2018

*National Fair Housing Alliance et al. v Bank of America, National Association; Bank of America Corp.; and Safeguard Properties Management*
United States District Court for the District of Maryland

    Housing maintenance discrimination

    Testimony regarding causation, economics of housing market

    Retained through Bank of America

    Supplemental declaration filed on August 31, 2022

    Deposed on February 28, 2022 (via video)

    Supplemental report filed on February 14, 2022

    Report filed on November 5, 2021

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*
U.S. District Court for the Southern District of New York

    Putative class action antitrust case

    Testimony regarding liability, heterogeneity, trader communications, sampling, and regression

    Retained through Credit Suisse

    Declaration filed on August 26, 2022

    Deposed on July 30, 2020 (via video)

    Merits report filed on March 12, 2020

    Deposed on January 17, 2019

    Class certification report filed on October 25, 2018

*Raef Lawson v Grubhub Holdings Inc. and Grubhub Inc.*
United States District Court for the Northern District of California, San Francisco Division

    Alleged misclassification of employees as independent contractors

    Testimony regarding two-sided markets and platform companies

    Retained through Grubhub

    Report filed on June 15, 2022

*Jessica Robinson, Stacey Jennings, and Priscilla McGowan v Jackson Hewitt, Inc. and Tax Services of America, Inc.*
United States District Court for the District of New Jersey

    Putative class action antitrust labor case

    Testimony regarding the economics of franchising, general and specific human capital, and intrabrand restraints

    Retained through Jackson Hewitt

    Deposed on June 1, 2022

    Report filed on April 25, 2022

*City and County of San Francisco and the People of the State of California v Purdue Pharma L.P., et al.*
United States District Court for the Northern District of California

   Prescription opioid medication litigation

   Testimony regarding causation, economics of crime, regression methodology

   Retained through Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., and Endo International plc

   Deposed on January 10, 2022 (via video)

   Report filed on December 2, 2021

*State of Florida v Purdue Pharma L.P. et al.*
Circuit Court of the Sixth Judicial Circuit in and for Pasco County, West Pasco Division, New Port Richey, Florida

   Prescription opioid medication litigation

   Testimony regarding causation, economics of crime, regression methodology

   Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

   Deposed on December 13, 2021 (via video)

   Report filed on September 17, 2021

*Sarah J. Hunter and David N. Youtz v Booz Allen Hamilton Holding Corporation*
U.S. District Court for the Southern District of Ohio (Eastern Division)

   Putative class action antitrust labor case

   Testimony regarding heterogeneity of impact, incentives, contracting, damages models, and salary structure models

   Retained through Booz Allen, Mission Essential Personnel, and CACI International

   Live testimony in class certification hearing on October 22, 2021

   Deposed on August 6, 2021 (via video)

   Rebuttal merits report filed on July 15, 2021

   Affirmative merits report filed on June 3, 2021

   Deposed on April 12, 2021 (via video)

   Class certification report filed on March 12, 2021

*County of Bexar v Purdue Pharma L.P. et al.*
*(and In re Texas Opioid Litigation)*
District Court, 224th Judicial District, Dallas County, Texas
(and District Court, 152nd Judicial District, Harris County, Texas)

   Prescription opioid medication litigation

   Testimony regarding causation, economics of crime, regression methodology

   Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

   Report filed on September 21, 2021

*County of Dallas v Purdue Pharma L.P. et al.*
*(and In re Texas Opioid Litigation)*
District Court, 116th Judicial District, Dallas County, Texas
(and District Court, 152nd Judicial District, Harris County, Texas)

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, regression methodology

    Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

    Deposed on September 20, 2021 (via video)

    Report filed on July 30, 2021

*Iowa Public Employees' Retirement System, et al. v Bank of America Corporation, et al.*
U.S. District Court for the Southern District of New York

    Putative class action antitrust group boycott case

    Testimony regarding the stock lending market and heterogeneity of impact

    Retained through Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS

    Deposed on September 3, 2021 (via video)

    Reply report filed on November 22, 2021

    Class certification report filed on June 29, 2021

*The State of Alabama v Purdue Pharma L.P. et al.*
Circuit Court for Montgomery County, Alabama

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, regression methodology

    Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

    Deposed on August 10, 2021 (via video)

    Report filed on July 29, 2021

*The People of the State of California v Purdue Pharma L.P. et al.*
Superior Court of the State of California, County of Orange

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, regression methodology

    Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

    Trial testimony July 20-21, 2021 (via video)

    Deposed on February 8, 2021 (via video)

    Reply report filed on January 21, 2021

    Affirmative report filed on November 13, 2020

*Eric Stevens, et al. v Ford Motor Company*
U.S. District Court for the Southern District of Texas

    Putative class action consumer products liability case

    Testimony regarding the car market and damages methodologies

    Retained through Ford Motor Company

    Deposed on June 24, 2021

    Report filed on May 17, 2021

*Kaloma Cardwell v Davis Polk and Wardwell LLP, et al.*
U.S. District Court for the Southern District of New York

  Employment discrimination case

  Testimony regarding the labor market for high skilled workers and damages models

  Retained through Davis Polk and Wardwell

  Report filed on June 15, 2021

*Jamie Postpichal, Sarah Waters, and Ursula Freitas v Cricket Wireless, LLC*
U.S. District Court for the Northern District of California (San Francisco Division)

  Putative class action false advertising case

  Testimony regarding heterogeneity of impact, damages estimation, consumer preferences

  Retained through Cricket Wireless

  Deposed on April 16, 2021 (via video)

  Report filed on April 5, 2021

*Phoenix Light SF Limited, et al. and Commerzbank AG v HSBC Bank USA, N.A.*
U.S. District Court for the Southern District of New York

  Mortgage-backed securities case (servicing)

  Testimony regarding matching estimators, statistics, sampling, damages

  Retained through HSBC

  Report filed on September 14, 2020

*State of New Mexico v Honda Motor Company, et al.*
State of New Mexico, County of Santa Fe, First Judicial District Court

  Putative class action consumer products liability case

  Testimony regarding the car market and damages methodologies

  Retained through Ford Motor Company

  Report filed on September 8, 2020

*Donald Conrad et al. v Jimmy John's Franchise, LLC, et al.*
U.S. District Court for the Southern District of Illinois

  Putative class action antitrust labor case

  Testimony regarding liability, damages, heterogeneity, horizontal versus vertical relationships, franchise arrangements, internal labor markets, monopsony theory, and general versus specific human capital training

  Deposed on August 14, 2020 (via video)

  Retained through Jimmy John's Franchise, LLC and Jimmy John's Enterprises, LLC

  Report filed on July 1, 2020

*People of the State of California v Uber Technologies, Inc., Lyft, Inc., and Does 1-50*
Superior Court of the State of California, County of San Francisco

  Alleged misclassification of employees as independent contractors

  Testimony regarding two-sided markets and platform companies

  Retained through Uber Technologies, Inc.

  Report filed on July 24, 2020

*Alex Morgan, et al. v United States Soccer Federation, Inc.*
U.S. District Court for the Central District of California, Western Division

Putative class action sex discrimination case

Testimony regarding law and economics, labor economics, and damages methodologies

Retained through United States Soccer Federation

Deposed on April 9, 2020 (via video)

Rebuttal report filed on March 6, 2020

Affirmative report filed on February 4, 2020

*Barry Staubus, et al. v Purdue Pharma, L.P.*
Circuit Court for Sullivan County at Kingsport, Tennessee

Prescription opioid medication litigation

Testimony regarding causation, economics of crime, regression methodology

Retained through Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

Deposed on April 7, 2020 (via video)

Report filed on March 20, 2020

*John Capriole v Uber Technologies, Inc. and Dara Khosrowshahi*
U.S. District Court for the Northern District of California

Putative class action regarding independent contractor versus employee

Testimony regarding two-sided markets, economics of market-wide shocks, matching technologies, cost implications of reclassification, and capital-labor tradeoffs

Retained through Uber Technologies, Inc.

Report filed on April 6, 2020

*Spencer Verhines v Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

Putative class action regarding independent contractor versus employee

Testimony regarding two-sided markets, economics of market-wide shocks, matching technologies, cost implications of reclassification, and capital-labor tradeoffs

Retained through Uber Technologies, Inc.

Report filed on March 25, 2020

*Rescap Liquidating Trust v Primary Residential Mortgage, Inc.*
U.S. District Court for the District of Minnesota

Mortgage-backed securities case (bankruptcy)

Testimony regarding sampling, damages, and statistical concepts

Retained through Primary Residential Mortgage, Inc.

Bench trial testimony on March 12-13, 2020 (via video)

Deposed on October 23, 2019

Supplemental report filed on August 23, 2019

Report filed on August 9, 2019

*County of Suffolk v Purdue Pharma LP, et al.; County of Nassau v Purdue Pharma LP, et al.; and The People of the State of New York v Purdue Pharma LP, et al.*
Supreme Court of the State of New York, County of Suffolk

Prescription opioid medication litigation

Testimony regarding causation, economics of crime, regression methodology

Retained through Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

Deposed on February 25, 2020

Report filed on February 3, 2020


*Government of the United States Virgin Islands v Toyota Motor Corporation, et al.*
Superior Court of the Virgin Islands, Division of St. Thomas and St. John

Putative class action consumer products liability case

Testimony regarding the car market and damages methodologies

Retained through Ford Motor Company

Deposed on February 14, 2020

Report filed on January 31, 2020


*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*
U.S. District Court for the Eastern District of New York

Antitrust case

Testimony regarding liability, two-sided markets, market power, and credit and debit card payment systems

Retained through Mastercard, Bank of America, Barclays, Capital One, Citibank, Fifth Third, First National Bank of Omaha, HSBC, JPMorgan Chase, PNC, SunTrust, Texas Independent Bancshares, and Wells Fargo

Deposed on January 14, 2020

Report filed on June 10, 2019


*Olson, Perez, Postmates, and Uber v State of California*
U.S. District Court for the Central District of California

U.S. constitutional objection to California adoption of Assembly Bill 5

Testimony regarding two-sided markets and flexible work arrangements

Retained through Postmates and Uber

Declaration filed on January 8, 2020


*Phoenix Light SF Limited, et al. vs. Wells Fargo Bank*
U.S. District Court for the Southern District of New York

Mortgage-backed securities case (servicing)

Testimony regarding matching and other statistical methodologies

Retained through Wells Fargo Bank

Deposed on October 4, 2019

Report filed on July 25, 2019

*Jacob Beaty and Jessica Beaty vs. Ford Motor Company*
U.S. District Court for the Western District of Washington

Putative class action consumer products liability case

Testimony regarding conjoint analysis and heterogeneity

Retained through Ford Motor Company

Deposed on June 25, 2019

Class certification report filed on May 24, 2019

*Shamrell v Apple Inc.*
Superior Court of the State of California, County of San Diego

Putative class action regarding products liability, Unfair Competition Law and Consumers Legal Remedies Act

Testimony regarding heterogeneity across putative class members, failure rate methodologies, econometrics, and data science

Retained through Apple, Inc.

Deposed on June 6, 2019

Supplemental class certification report filed on October 17, 2018

Class certification report filed on March 29, 2017

Report filed on February 1, 2017

*Cuyahoga County v Purdue Pharma LP, et al. and Summit County v Purdue Pharma LP, et al.*
U.S. District Court of the Northern District of Ohio

Prescription opioid medication litigation

Testimony regarding causation, drug use, economics of crime, regression methodology

Retained through Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

Deposed on May 31, 2019

Report filed on May 10, 2019

*Lerman v Apple Inc.*
U.S. District Court for the Eastern District of New York

Putative class action consumer products liability case

Testimony regarding heterogeneity across putative class members, the nature of products, and conjoint analysis

Retained through Apple, Inc.

Deposed on May 29, 2019

Report filed on April 3, 2019

*Financial Guaranty Insurance Company v Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc.*
Supreme Court of the State of New York, County of New York

Mortgage-backed securities case

Testimony regarding sampling and statistical methods

Retained through Morgan Stanley

Deposed on May 15, 2019

Report filed on October 19, 2018

*Rebuttal Testimony of Powerex Corp re: BPA Southern Intertie Hourly Rate*
U.S. Department of Energy, Bonneville Power Administration

Administrative proceeding concerning the rates for transmission of electricity

Testimony regarding regression methodology

Retained through Powerex Corp.

Testimony before the Hearing Officer on April 23, 2019

Report filed on March 28, 2019

*Financial Guaranty Insurance Company v Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Holdings LLC, Morgan Stanley & Co. LLC, as successor to Morgan Stanley & Co. Inc., Morgan Stanley, and Saxon Mortgage Services, Inc.*
Supreme Court of the State of New York, County of New York

Mortgage-backed securities case

Testimony regarding sampling and statistical methods

Retained through Morgan Stanley

Deposed on January 8, 2019

Report filed on August 7, 2018

*Trinidad Lopez v Liberty Mutual Insurance Company*
U.S. District Court for the Central District of California

Wage and hour case after class certification

Testimony regarding damages and statistics

Retained through Liberty Mutual

Report filed on December 21, 2018

*Samsung Electronics Co., Ltd., v Kuroda Electric Co., Ltd., Sakai Display Products Corporation and Sharp Corporation*
International Chamber of Commerce

Contractual dispute regarding supply of television panels

Testimony regarding economic theory, data science, statistics

Retained through Samsung Electronics Co.

Testified at arbitration hearing on December 20, 2018

Report filed on September 28, 2018

*In re: Part 60 RMBS Put-Back Litigation*
Supreme Court of the State of New York, County of New York

Mortgage-backed securities case

Testimony regarding sampling and statistical methods

Retained through Morgan Stanley Mortgage Capital Holdings LLC

Deposed on November 27, 2018

Report filed on June 22, 2018

Highly Confidential - Outside Counsel/Experts Only

APPENDIX A

*In Re: RFC and ResCap Liquidating Trust Litigation*
U.S. District Court for the District of Minnesota and
U.S. Bankruptcy Court for the Southern District of New York

   Mortgage-backed securities case (bankruptcy)

   Testimony regarding sampling, damages, and statistical concepts

   Retained through Advanced Financial Services, BMO Harris Bank, Cadence Bank, Colonial Savings, CTX Mortgage, Decision One, First Guaranty, Freedom Mortgage, Home Loan Center, HSBC Mortgage, Impac Funding, PNC, Provident, Standard Pacific, Synovus, and Universal American

   Testified at jury trial on November 1, 2018 (Minnesota; Home Loan Center)

   Final rebuttal report filed on June 14, 2018

   Deposed on April 24, 2018

   Rebuttal report to supplemental disclosure filed on February 26, 2018

   Report filed on October 27, 2017


*Residential Funding Company v Universal American Mortgage Co.*
U.S. District Court for the District of Minnesota

   Mortgage-backed securities case (bankruptcy)

   Testimony regarding sampling and statistical methods

   Retained through Universal American Mortgage Co.

   Report filed on August 30, 2018


*In re Gateway Plaza Residents Litigation*
Supreme Court of the State of New York, County of New York

   Putative class action regarding warranty of habitability

   Testimony regarding electricity usage, individual preferences and choices, and heterogeneity across putative class members; large scale data analysis

   Retained through Gateway Plaza

   Supplemental class certification and rebuttal report filed on August 8, 2018

   Class certification report filed on September 18, 2017


*United States of America v SavaSeniorCare*
U.S. District Court for the Middle District of Tennessee

   False Claims Act case

   Testimony regarding sampling and statistical methods

   Retained through SavaSeniorCare

   Report filed on August 6, 2018


*Latoya Brown et al. v Madison County, Mississippi*
U.S. District Court for the Southern District of Mississippi

   Putative class action alleging violations of § 1983 and the Fourth and Fourteenth Amendments

   Testimony regarding regression methodologies, measurement error, and data science

   Retained through Latoya Brown et al.

   Report filed on July 2, 2018

APPENDIX A

*Martin Dulberg et al. v Uber Technologies, Inc. and Rasier, LLC*
U.S. District Court for the Northern District of California

  Putative class action alleging breach of contract

  Testimony regarding heterogeneity in damages across putative class members

  Retained through Uber Technologies, Inc.

  Supplemental report filed on June 28, 2018

  Affirmative report filed on January 11, 2018

*Tri-City, LLC; Endor Car and Driver, LLC; Zehn-NY, LLC; Zwei-NY, LLC; Abatar, LLC; and Flatiron Transit, LLC v New York Taxi and Limousine Commission and Meera Joshi*
Supreme Court of the State of New York, County of New York

  Article 78 proceeding challenging an administrative ruling

  Testimony regarding mismatch between accessibility regulation and accessibility demand

  Retained through plaintiffs

  Supplemental report filed on May 18, 2018

  Affirmative report filed on April 13, 2018

*Federal Home Loan Bank of Boston, v Ally Financial, Inc., et al.*
Superior Court of the State of Massachusetts, Business Litigation Session, Suffolk County

  Mortgage-backed securities case

  Testimony regarding sampling and statistical methods

  Retained through Morgan Stanley

  Report filed on May 17, 2018

*Cheryl Phipps and Shawn Gibbons v Wal-Mart Stores, Inc.*
U.S. District Court for the Middle District of Tennessee

  Putative class action alleging sex discrimination

  Testimony regarding the decentralized nature of Walmart's internal labor market and concomitant hetero-geneity across proposed class members in pay and promotion outcomes

  Retained through Walmart

  Deposed on April 30, 2018

  Report filed on April 20, 2018

*People of the State of California v Morgan Stanley & Co.*
Superior Court of the State of California, County of San Francisco

  Mortgage-backed securities case

  Testimony regarding sampling and statistical methods

  Retained through Morgan Stanley & Co.

  Deposed on February 9, 2018

  Report filed on January 25, 2018

*Tony Dickey and Paul Parmer et al. v Advanced Micro Devices, Inc.*
U.S. District Court for the Northern District of California

  Putative class action alleging false advertising

  Testimony regarding availability of information regarding and market for computer chips and heterogeneity across putative class members

  Retained through Advanced Micro Devices

  Report filed on January 26, 2018

APPENDIX A

*Federal Home Loan Bank of Chicago v Banc of America Funding Corporation, et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

> Mortgage-backed securities case

> Testimony regarding sampling, regression, and statistical methods

> Retained through Morgan Stanley

> Deposed on December 14, 2017

> Report filed on August 21, 2017

*In re Lehman Brothers Holdings, Inc., et al., Debtors*
U.S. Bankruptcy Court for the Southern District of New York

> Mortgage-backed securities case

> Testimony regarding sampling, resampling methods for inference, and statistical methods

> Retained through Lehman Brothers Holdings, Inc.

> Deposed on October 9, 2017

> Report filed on August 28, 2017

*Deutsche Bank National Trust Company v Morgan Stanley Mortgage Capital Holdings LLC*
U.S. District Court for the Southern District of New York

> Mortgage-backed securities case

> Testimony regarding sampling and statistical methods

> Retained through Morgan Stanley Mortgage Capital Holdings LLC

> Deposed on March 27, 2017

> Report filed on December 16, 2016

*Rosen v Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

> Putative class action regarding false advertising

> Testimony regarding economics of safety

> Retained through Uber Technologies, Inc.

> Deposed on February 3, 2017

> Report filed on January 13, 2017

> Affirmative report filed on December 2, 2016

*Blackrock Allocation Target Shares: Series S Portfolio, et al. v Wells Fargo Bank, N.A.; Royal Park Investments SA/NV v Wells Fargo Bank, N.A., as Trustee; National Credit Union Administration Board, et al. v Wells Fargo Bank, N.A.; Phoenix Light SF Limited, et al. v Wells Fargo Bank, N.A.; and Commerzbank AG v Wells Fargo Bank, N.A.*
U.S. District Court for the Southern District of New York

> Mortgage-backed securities case

> Testimony regarding sampling and statistical methods

> Retained through Wells Fargo Bank

> Report filed on January 18, 2017

Highly Confidential - Outside Counsel/Experts Only

APPENDIX A

*LA Taxi Cooperative, Inc. et al. v Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

  False advertising case

  Testimony regarding economics of safety

  Retained through Uber Technologies, Inc.

  Report filed on January 13, 2017

  Affirmative report filed on November 18, 2016

*State of Illinois v Hitachi Ltd., et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

  Antitrust price-fixing case

  Testimony regarding liability and damages

  Retained through Hitachi Ltd.

  Report filed on November 11, 2016

*In re: City of San Bernardino, California, Debtor*
U.S. Bankruptcy Court, Central District of California, Riverside Division

  Municipal bankruptcy case

  Testimony regarding economics, econometrics, rare risks and the value of a statistical life

  Retained through the City of San Bernardino

  Report filed on October 3, 2016

*U.S. Bank National Association v Morgan Stanley Mortgage Capital Holdings LLC*
Supreme Court of the State of New York, County of New York

  Mortgage-backed securities case

  Testimony regarding sampling and statistical methods

  Retained through Morgan Stanley Mortgage Capital Holdings LLC

  Deposed on September 10, 2016

  Report filed on June 17, 2016

*National Credit Union Administration Board v RBS Securities, Inc.*
U.S. District Court for the Central District of California &
U.S. District Court for the District of Kansas

  Mortgage-backed securities case

  Testimony regarding sampling and statistical methods

  Retained through RBS Securities

  Deposed on January 28, 2016

  Report filed on October 16, 2015

*Temple-Inland, Inc., v Thomas Cook, et al.*
U.S. District Court for the District of Delaware

  Escheat law case

  Testimony regarding sampling, statistical methods, and economic theory

  Retained through the State of Delaware

  Deposed on November 24, 2015

  Report filed on October 23, 2015

APPENDIX A

*National Consumer Protection Service v Farmacias Cruz Verde S.A. et al.*
Honorable Civil Court of Santiago (Chile)

> Putative class action antitrust case

> Testimony regarding damages methodologies

> Retained through Salcobrand

> Report filed on November 14, 2015

*Douglas O'Connor, et al. v Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

> Putative class action regarding independent contractor versus employee

> Testimony regarding heterogeneity in alleged damages across putative class members, potential for class conflict

> Retained through Uber Technologies, Inc.

> Report filed on October 27, 2015

> Report filed on July 7, 2015

*Students for Fair Admissions, Inc. v President and Fellows of Harvard College*
U.S. District Court for the District of Massachusetts

> Discovery dispute in affirmative action case

> Testimony regarding necessary inputs into statistical methodologies

> Retained through Harvard College

> Report filed on July 30, 2015

*Securities and Exchange Commission v James V Mazzo and David L. Parker*
U.S. District Court for the Central District of California

> Civil insider trading suit

> Testimony regarding probability theory and statistics

> Retained through James V. Mazzo and David L. Parker

> Deposed on May 13, 2015

> Report filed on March 13, 2015

*In re: City of Stockton, California, Debtor*
U.S. Bankruptcy Court, Eastern District of California

> Municipal bankruptcy suit

> Testimony regarding economic theory, labor economics, and econometrics

> Retained through the City of Stockton

> Deposed on March 13, 2013

> Report filed on February 15, 2013

*In the Matter of Act 111 Interest Arbitration Between Commonwealth of Pennsylvania and Pennsylvania State Troopers Association*

> Hearings on wage setting

> Testimony regarding rare risks and the value of a statistical life

> Retained through the Pennsylvania State Troopers Association

> Testified at arbitration hearing on December 4, 2012

> Report filed on December 4, 2012

## Scholarship on Competition

Accounting for the Employee-Employer Relationship in Antitrust Analysis (with Bryan Ricchetti)
*Antitrust Magazine Online*, June 2023

Measuring Benchmark Damages in Antitrust Litigation (with Daniel L. Rubinfeld)
*Journal of Econometric Methods*, Volume 3, January 2014

## Scholarship on Finance

A Fractional Solution to a Stock Market Mystery (with Robert P. Bartlett and Maureen O'Hara)
Working Paper, July 2022

Tiny Trades, Big Questions: Fractional Shares (with Robert P. Bartlett and Maureen O'Hara)
*Journal of Financial Economics*, Forthcoming

The Market Inside the Market: Odd-Lot Quotes (with Robert P. Bartlett and Maureen O'Hara)
*Review of Financial Studies*, Forthcoming

Subsidizing Liquidity with Wider Ticks: Evidence from the Tick Size Pilot Study Timestamps (with Robert P. Bartlett)
*Journal of Empirical Legal Studies*, Volume 17, Issue 2, June 2020

Dark Trading at the Midpoint: Pricing Rules, Order Flow, and Price Discovery (with Robert P. Bartlett)
*Journal of Law, Finance, and Accounting*, Volume 4, Issue 2, 2019

How Rigged Are Stock Markets?: Evidence from Microsecond Timestamps (with Robert P. Bartlett)
*Journal of Financial Markets*, Volume 45, September 2019

Shall We Haggle in Pennies at the Speed of Light or in Nickels in the Dark?: How Minimum Price Variation Regulates High Frequency Trading and Dark Liquidity (with Robert P. Bartlett)
Working Paper, 2015

## Scholarship on Sampling, Statistics, and Econometrics

What To Do If You Can't Use '1.96' Confidence Intervals for IV (with David S. Lee, Marcelo Moreira, Jack Porter, and Luther Yap)
Working paper, 2024

Robust Conditional Wald Inference for Over-Identified IV (with David S. Lee, Marcelo Moreira, Jack Porter, and Luther Yap)
Working paper, 2023

Valid *t*-Ratio Inference for IV (with David S. Lee, Marcelo Moreira, and Jack Porter)
*American Economic Review*, Volume 112, Number 10, October 2022

A Practical Proactive Proposal for Dealing with Attrition: Alternative Approaches and an Empirical Example (with John DiNardo, Jordan Matsudaira, and Lisa Sanbonmatsu)
*Journal of Labor Economics*, Volume 39, Number S2, April 2021

Conservative Tests Under Satisficing Models of Publication Bias (with Garret Christensen and Daniele Fanelli)
*PLOS One*, Volume 11, Number 2, February 22, 2016

New Evidence on the Finite Sample Properties of Propensity Score Matching and Reweighting Estimators (with Matias Busso and John DiNardo)
*Review of Economics and Statistics*, Volume 96, Number 5, December 2014

Incomes in South Africa Since the Fall of Apartheid (with Murray Leibbrandt and James Levinsohn)
*Journal of Globalization and Development*, Volume 1, Issue 1, January 2010

Manipulation of the Running Variable in the Regression Discontinuity Design: A Density Test
*Journal of Econometrics*, Volume 142, Issue 2, February 2008

## Scholarship on Risk and Crime

The Impact of the Coronavirus Lockdown on Domestic Violence (with Sarath Sanga)
*American Law and Economics Review*, Volume 23, Issue 1, Spring 2021

Why We Need Police (with Deepak Premkumar)
Chapter 3 in *The Cambridge Handbook of Policing in the United States*, Tamara Rice Lave and Eric Jr. Miller, eds., Cambridge University Press, June 2019

Are U.S. Cities Underpoliced? Theory and Evidence (with Aaron Chalfin)
*Review of Economics and Statistics*, Volume 100, Issue 1, March 2018, 167–186

Criminal Deterrence: A Review of the Literature (with Aaron Chalfin)
*Journal of Economic Literature*, Volume 55, Number 1, March 2017, 5–48 (lead article)

The Deterrence Effect of Prison: Dynamic Theory and Evidence (with David S. Lee)
*Advances in Econometrics*, Volume 38, 2017, editors Matias D. Cattaneo and Juan Carlos Escanciano
2018 Emerald Literati Award, Outstanding Author Contribution

Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process: An Empirical Inquiry (with Tamara Lave)
*Brooklyn Law Review*, Volume 78, Summer 2013, Number 4, 1391–1439

General Equilibrium Effects of Prison on Crime: Evidence From International Comparisons (with Sarath Sanga)
*Cato Papers on Public Policy*, Volume 2, 2012

*Controlling Crime: Strategies and Tradeoffs* (co-edited with Phil Cook and Jens Ludwig), Chicago: University of Chicago Press, 2011.

## Scholarship on Labor Economics

Unmarked? Criminal Record Clearing and Employment Outcomes (with Jeffrey Selbin (lead author) and Joshua Epstein)
*Journal of Criminal Law and Criminology*, Volume 108, Number 1, 2017 (lead article)

The Effect of Female Education on Fertility and Infant Health: Evidence from School Entry Laws Using Exact Date of Birth (with Heather Royer)
*American Economic Review*, Volume 101, Number 1, February 2011

Comment on "Free to Punish? The American Dream and the Harsh Treatment of Criminals", by Rafael di Tella and Juan Dubra
*Cato Papers on Public Policy*, Volume 1, 2011

Dynamic Perspectives on Crime
in *Handbook of the Economics of Crime*, Chapter 4, Edward Elgar, 2010

The Effect of Court-Ordered Hiring Quotas on the Composition and Quality of Police
*American Economic Review*, Volume 97, Number 1, March 2007

Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Comment
*American Economic Review*, Volume 92, Number 4, September 2002

## Scholarship on Intellectual Property

A Reconsideration of Copyright's Term (with Kristelia A. Garcia)
*Alabama Law Review*, Volume 71, Issue 2, 2019

Copyright and Economic Viability: Evidence from the Music Industry (with Kristelia A. Garcia and James Hicks)
*Journal of Empirical Legal Studies*, Volume 17, Issue 4, December 2020

## Scholarship on Monetary Policy

Following Germany's Lead: Using International Monetary Linkages to Estimate the Effect of Monetary Policy on the Economy (with Julian di Giovanni and Till von Wachter)
> *Review of Economics and Statistics*, Volume 91, Number 2, May 2009

## Other Scholarship

The Ph.D. Rises in American Law Schools, 1960-2011: What Does It Mean for Legal Education? (with Joy Milligan and James Phillips)
> *Journal of Legal Education*, Volume 65, Number 543, Spring 2016

## Referee

*Econometrica*

*American Economic Review*

*Quarterly Journal of Economics*

*Journal of Political Economy*

*Review of Economic Studies*

*Journal of Econometrics*

*Journal of Economic Literature*

*Review of Economics and Statistics*

*Journal of the American Statistical Association*

*American Economic Journal*

*Advances in Econometrics*

*American Law and Economics Review*

*International Law and Economics Review*

*Journal of Labor Economics*

*Journal of Econometric Methods*

*Industrial and Labor Relations Review*

*Journal of Law and Economics*

*Journal of Empirical Legal Studies*

*Journal of Urban Economics*

*Journal of Quantitative Criminology*

*American Political Science Review*

*American Sociological Review*

*Stanford Law Review*

*Yale Law Journal*

*Columbia Law Review*

## Other Activities

2023–    Member, Board of Directors, WayRay AG

2019–21  Member, Board of Directors, Plectica, LLC

2017–19  Member, Board of Directors, American Law and Economics Association

2007–19  Co-Director (with Phil Cook and Jens Ludwig), *Crime Working Group*, National Bureau of Economic Research

2009–14  Co-Director, *Law and Economics Program*, University of California, Berkeley

## Courses Taught

### *Columbia*

2023-24  L6293: Antitrust and Trade Regulation (Fall); L8856: Antitrust at Trial (Fall); L6916: Litigation, Economics, and Statistics (Spring); L6231: Corporations (Spring)

2022-23  L6293: Antitrust and Trade Regulation (Spring); L6916: Litigation, Economics, and Statistics (Spring)

2021-22  L6231: Corporations (Fall); L6916: Litigation, Economics, and Statistics (Fall); L6293: Antitrust and Trade Regulation (Spring)

2020-21  L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2019-20  L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall)

2018-19  L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2017-18  L6231: Corporations (Fall)

### *Berkeley*

2016-17  Law 244.4: Litigation and Statistics (Fall); Law 216: Law and Economics Workshop (Fall); Law 218.6: Law and Economics of Discrimination (Fall)

2015-16  Law 250: Business Associations (Fall); Law 244.4: Litigation and Statistics (Fall); Letters and Science 39D: Race, Policing, and Data Science (Fall)

2014-15  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer)

2013-14  Law 250S: Business Associations (Summer)

2012-13  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall)

2011-12  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall); Law 251.31: Introduction to Law, Economics, and Business (Spring); Legal Studies 145: Law and Economics I (undergraduate)

2010-11  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 216: Law and Economics Workshop (Fall and Spring); Legal Studies 145: Law and Economics I (undergraduate); Law 209.6: Topic in Quantitative Methods (JSP); Econ 250C: Labor Economics (graduate, shared course with 209.6)

2009–10  Law 216: Law and Economics Workshop (Fall and Spring); Law 209.32: Quantitative Methods II (JSP)

2008–09  Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP); Law 209.32: Quantitative Methods II (JSP)

2007–08  Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP)

*Michigan*

Introduction to Quantitative Methods (policy), First Econometrics Field Course (economics), Advanced Economic Theory (policy)

# Grants and Fellowships

2007–2010 NIH, Constructive Proposals for Dealing With Attrition (with John DiNardo)

2009 Committee on Research, Junior Faculty Research Grant, UC Berkeley

2006–2009 NIH, The Effect of Female Education on Fertility and Infant Health (with Heather Royer, Grant # R03 HD051713)

2006–2011 NSF, New Instrumental Variables Estimates of the Effects of Schooling and Military Service: Empirical Strategies Using Non-Public-Use Data (with Josh Angrist and Stacey Chen)

2005 RWJ Foundation Health and Society Scholars Program, Small Grant Program

2004 Rackham Interdisciplinary Grant, University of Michigan

2004 CLOSUP Grant, University of Michigan

2004 National Poverty Center Grant, University of Michigan

2002–2003 Chancellor's Dissertation Year Fellowship, UC Berkeley

# Presentations

2023–2024 Columbia University, Department of Economics; Columbia University, School of Law

2022–2023 Northwestern University, School of Law

2018–2019 Columbia University, School of Law; Conference on Empirical Legal Studies, University of Michigan

2017–2018 Columbia University, School of Law; Georgetown University, School of Law

2016–2017 George Mason University, School of Law; University of Michigan, Economics Department (Summer, Fall); Equities Leaders Summit; University of Zürich, Department of Economics; ETH (Swiss Federal Institute of Technology) Zürich, Law and Economics; Northwestern University, School of Law; Duke University, School of Law; Duke University, Information Initiative

2015–2016 Goldman Sachs; University of California, Berkeley, School of Law; University of Virginia, School of Law; University of California, Irvine; Equal Employment Opportunity Commission; National Bureau of Economic Research, Summer Institute

2014–2015 Duke University; Federal Reserve Bank of New York; Equal Employment Opportunity Commission (EEO-DataNet); American Law and Economics Association (discussant); New York University (NYU / Penn Law and Finance Conference); National Bureau of Economic Research, Summer Institute (discussant)

2013–2014 University of Southern California, School of Law; London School of Economics; Bank of Spain; CEMFI; Carlos III; University of Zaragoza; University of Rotterdam; University of Maastricht; University of Götenborg

2012–2013 University of California, Los Angeles, School of Law

2011–2012 University of Oregon, Department of Economics; University of British Columbia, Department of Economics; Brown University, Department of Economics; University of Rochester, Department of Economics; Cato Institute; National Bureau of Economic Research, Summer Institute; Harvard Law School

2010–2011 Northwestern, School of Law; University of Wisconsin, Department of Economics; Brookings Institution; Cato Institute

APPENDIX A

2009–2010  University of Chicago, School of Law; Cornell University, School of Law and Department of Economics; University of Michigan, School of Law and Department of Economics; University of Virginia, School of Law, Olin Conference

2008–2009  University of California, Los Angeles, School of Law; University of Arizona, School of Law and Department of Economics; Stanford University, School of Law and Department of Economics; University of Miami, Department of Economics

2007–2008  Northwestern University, School of Law; University of Michigan, Department of Economics; National Bureau of Economic Research, Summer Institute; Florida State University

*Prior to 2007–2008, presentations are at departments of economics, unless otherwise noted*

2006–2007  University of Michigan, Program in Survey Methodology; Public Policy Institute of California; Brown University

2005–2006  University of Michigan; University of California, Irvine; University of California, Santa Barbara; University of California, Santa Cruz; California State University, Long Beach; University of Western Ontario; University of Toronto; University of Illinois, Chicago; University of Chicago, Graduate School of Business; APPAM; University of Florida; University of California, Berkeley, School of Law; Princeton University; RAND; Hebrew University (conference in honor of Reuben Gronau); Stanford University, University of Wisconsin, Madison; Northwestern University; Crime and Economics Summer Workshop, University of Maryland

2004–2005  Federal Reserve Bank of Chicago; University of Illinois, Urbana-Champaign; University of Michigan, William Davidson Institute; University of Maryland; Urban Institute; American Economics Association Meetings; City University of New York Health Economics Seminar; University of Wisconsin, Madison; Stanford University; University of California, Davis; University of California, Berkeley, Labor Lunch; NBER Summer Institute, Education/Labor Studies

2003–2004  University of Michigan; APPAM; NBER Labor Studies Meeting (Fall); Massachusetts Institute of Technology; Harvard University, Kennedy School; University of California, Los Angeles; University of California, San Diego; Columbia University; University of California, Berkeley; NBER Summer Institute, Monetary Policy; NBER Summer Institute, Labor Studies

2002–2003  University of California, San Diego; University of California, Los Angeles; RAND Institute; University of Chicago, Graduate School of Business; University of Chicago, Harris School of Public Policy; University of Michigan, Ford School of Public Policy; Columbia University; Dartmouth College; Federal Reserve Bank of New York; Boston University

Last updated: April 14, 2025

Highly Confidential - Outside Counsel/Experts Only

**APPENDIX B: Documents Relied Upon**

# Documents Relied Upon

## Academic Articles

- A. C. Harvey, "On Comparing Regression Models in Levels and First Differences," *International Economic Review*, 21(3), 1980, pp. 707–720

- Abigail Wozniak, "Are College Graduates More Responsive to Distance Labor Market Opportunities?" *Journal of Human Resources*, 45(4), 2010, pp. 944–970

- Alberto Abadie, Susan Athey, Guido Imbens, and Jeffrey Wooldridge, "When Should You Adjust Standard Errors for Clustering?" *The Quarterly Journal of Economics*, 138(1), 2023, pp. 1–35

- Alexandre Mas, "Does Transparency Lead to Pay Compression," *Journal of Political Economy*, 125(5), 2017, pp. 1683–1721

- Barry Gerhart, "Voluntary Turnover and Alternative Job Opportunities," *Journal of Applied Psychology*, 75(5), 1990, pp. 467–476

- Bruce Fallick, Daniel Villar, and William Wascher, "Downward Nominal Wage Rigidity in the United States in Times of Economic Distress and Low Inflation," *Labour Economics*, 78, 2022, pp. 1–12

- Charles F. Manski, "Identification of Endogenous Social Effects: The Reflection Problem," *The Review of Economic Studies,* 60(3), 1993, pp. 531–542

- Christine L. Exley, Muriel Niederle, and Lise Vesterlund, "Knowing When to Ask: The Cost of Leaning In," *Journal of Political Economy*, 128(3), 2020, pp. 816–854

- Christopher N. Boyer and B. Wade Brorsen, "Changes in Beef Packers' Market Power After the Livestock Mandatory Price Reporting Act: An Agent-Based Auction," *American Journal of Agricultural Economics*, 95(4), 2013, pp. 859–876

- David Arnold, Simon Quach and Bledi Taska, "The Impact of Pay Transparency in Job Postings on the Labor Market," 2024

- David Blumenthal "Employer-Sponsored Health Insurance in the United States — Origins and Implications," *The New England Journal of Medicine Health Policy*, 355(1), 2006, pp. 82–88

- David E. Wildasin, "Labor-Market Integration, Investment in Risky Human Capital, and Fiscal Competition," *American Economic Review*, 90(1), 2000, pp. 73–95

- David H. Autor, Frank Levy and Richard J. Murnane, "The Skill Content of Recent Technological Change: An Empirical Exploration," *The Quarterly Journal of Economics*, 118(4), 2003, pp. 1279–1333

- Douglas L. Miller, "An Introductory Guide to Event Study Models," *Journal of Economic Perspectives*, 37(2), 2023, pp. 203–230

- Edward Lazear, "Why Is There Mandatory Retirement?" *Journal of Political Economy*, 87(6), 1973, pp. 1261–1284

- Edward P. Lazear and Kathryn L. Shaw, "Personnel Economics: The Economist's View of Human Resources," *Journal of Economic Perspectives*, 21(4), 2007, pp. 91–114

- Edward P. Lazear and Sherwin Rosen, "Rank-Order Tournaments as Optimum Labor Contracts," *Journal of Political Economy*, 89(5), 1981, pp. 841–864

- Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80(4), 1980, pp. 702–736

- George A. Akerlof, William T. Dickens, George L. Perry, Robert J. Gordon and N. Gregory Mankiw, "The Macroeconomics of Low Inflation," *Brookings Papers on Economic Activity*, 1996, pp. 1–76

- George W. Douglas and James C. Miller III, "Quality Competition, Industry Equilibrium, and Efficiency in the Price-Constrained Airline Market," *American Economic Review*, 64(4), 1974, pp. 657–669

- George-Levi Gayle and Robert A. Miller, "Has Moral Hazard Become a More Important Factor in Managerial Compensation," *American Economic Review*, 99(5), 2009, pp. 1740–1769

- Jonathan B. Baker, "The Case for Antitrust Enforcement," *Journal of Economic Perspectives*, 17(4), 2003, pp. 27–50

- Jonathan Roth, Pedro H.C Sant'Anna, Alyssa Bilinski and John Poe, "What's Trending in Difference-in-Differences? A Synthesis of The Recent Econometrics Literature," *Journal of Econometrics,* 235, 2023, pp. 2218–2244

- Justin Marion and Erich Muehlegger, "Measuring Illegal Activity and the Effects of Regulatory Innovation: Tax Evasion and the Dyeing of Untaxed Diesel," *Journal of Political Economy*, 116(4), 2008, pp. 633–666

- Kurt Lavetti, Carol Simon and William D. White, "The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians," *Journal of Human Resources*, 55(3), 2020, pp. 1025–1067

APPENDIX B

- Luigi Guiso, Luigi Pistaferri and Fabiano Schivardi, "Insurance Within the Firm," *Journal of Political Economy*, (2005), pp 1054–1087

- Luis Garicano and Esteban Rossi-Hansberg, "Organization and Inequality in a Knowledge Economy," *The Quarterly Journal of Economics*, 121(4), 2006, pp. 1383–1435

- Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature*, 44 (1), 2006, pp. 43–95

- Matt Bloom and John G. Michel, "The Relationships Among Organizational Context, Pay Dispersion, and Managerial Turnover," *The Academy of Management Journal*, 45(1), 2002, pp. 33–42

- Michael Baker, Yosh Halberstam, Kory Kroft, Alexandre Mas and Derek Messacar, "Pay Transparency and the Gender Gap," *American Economic Journal: Applied Economics*, 15(2), 2023, pp. 157–183

- Norman D. Bishara and Evar Starr, "The Incomplete Noncompete Picture," *Lewis & Clark Law Review*, 20(2), 2016, pp. 497–546

- Serdar Aldatmaz, Paige Ouimet, and Edward D. Van Wesep, "The Option to Quit: The Effect of Employee Stock Options on Turnover," *Journal of Financial Economics*, 127(1), 2018, pp. 136–151

- Steven Balsam, Richard Gifford, and Sungsoo Kim, "The Effect of Stock Option Grants on Voluntary Turnover," *Review of Accounting and Finance*, 6(1), 2007, pp. 5–14

- Thomas Lemieux, "Increasing Residual Wage Inequality: Composition Effects, Noisy Data, or Rising Demand for Skill?" *American Economic Review*, 96(3), 2006, pp. 461–498

- Tomasz Obloj and Todd Zenger, "The Influence of Pay Transparency on (Gender) Inequity, Inequality and the Performance Basis of Pay," *Nature Human Behavior*, 6, 2022, pp. 646–655

- Truman F. Bewley, "A Depressed Labor Market as Explained by Participant," *American Economics Review*, 85(2), 1995, pp. 250–254

- Truman F. Bewley, "Why Not Cut Pay?" *European Economic review*, 42, 1998, pp. 459–490

- Zoe B. Cullen, Shengwu Li and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," *National Bureau of Economic Research,* 2024

**Bates Stamped Documents**

- BF000233732
- DOJCIV-009-00000032–37
- DVA_OMCEAL_000000041
- DVA_OMCEAL_000011812–22
- DVA_OMCEAL_000289410–15
- DVA_OMCEAL_000296081–088
- DVA_OMCEAL_000538771–803
- DVA_OMCEAL_000760685–699
- DVA_OMCEAL_000906132–35
- DVA_OMCEAL_000946317–20
- DVA_OMCEAL_000994610–16
- DVA_OMCEAL_001057524–25
- DVA_OMCEAL_001059650–52
- DVA_OMCEAL_001062957–61
- DVA_OMCEAL_001090817–29
- DVA_OMCEAL_001096793–809
- DVA_OMCEAL_001150350–51
- DVA_OMCEAL_001181143–65
- DVA_OMCEAL_001294747–50
- DVA_OMCEAL_001296546–49
- DVA_OMCEAL_001297898–900
- DVA_OMCEAL_001313820–23
- DVA_OMCEAL_001313824–27
- DVA_OMCEAL_001317525–27
- DVA_OMCEAL_001322030–34
- DVA_OMCEAL_001329256–61
- DVA_OMCEAL_001339898–901
- DVA_OMCEAL_001344570–82
- DVA_OMCEAL_001358600–02
- DVA_OMCEAL_001360570–622
- DVA_OMCEAL_001382483–86
- DVA_OMCEAL_001399746–74
- HAYEK-000012214–16
- KEECH_000000339
- OMC_BM_000000884–95
- OMC_BM_000010778–79
- OMC_BM_000014729
- SCA000000198–200
- SCA000001836–47
- SCA000002891–908
- SCA000003962
- SCA000003963–70
- SCA00004815–17
- SCA000065974–84
- SCA000071259–65
- SCA000075527–28
- SCA000078353
- SCA000079723–41
- SCA000091011
- SCA000098450–52
- SCA000100169–72
- SCA000100643–46

Highly Confidential - Outside Counsel/Experts Only

- SCA000106045–47
- SCA000109831–37
- SCA000111304
- SCA000128921
- SCA000163727
- SCA000227468–70
- SCA000393815–25
- SCA000523268–72
- SCA000532931–33
- SCA000545210–245
- SCA000549141–48
- SCA000550887
- SCA000568874–75
- SCA000608681–82
- SCA000640388–509
- SCA000641812
- SCA000838956
- SCA000841643–47
- SCA000844623–24
- SCA000861824
- SCA000900508–10
- SCA001117010–13
- SCA001125179–82
- SCA001129757–58
- SCA001153473–74
- SCA001159728–48
- SCA001185620–32
- SCA001186824–25

- SCA001198974–77
- SCA001200665–66
- SCA001279742–825
- SCA001280928–79
- SCA001284417–18
- SCA001437481–82
- SCA001478736
- SCA001613450
- SCA001669270
- SCA001669826
- SCA001773262
- SCA002220548–52
- SCA002220553–54
- SCA002270032–35
- SPRAD000014–15
- USPI_ CIV_000239009–12
- USPI_CIV_000000190–227
- USPI_CIV_000001734–35
- USPI_CIV_000001791
- USPI_CIV_000003394
- USPI_CIV_000006432
- USPI_CIV_000016019–20
- USPI_CIV_000016522
- USPI_CIV_000021155
- USPI_CIV_000021165
- USPI_CIV_000021166
- USPI_CIV_000021178
- USPI_CIV_000021255

Highly Confidential - Outside Counsel/Experts Only

- USPI_CIV_000021897–98
- USPI_CIV_000021899–904
- USPI_CIV_000021906
- USPI_CIV_000021907
- USPI_CIV_000022791–811
- USPI_CIV_000023128–133
- USPI_CIV_000023134–45
- USPI_CIV_000024141
- USPI_CIV_000024185
- USPI_CIV_000026215–216
- USPI_CIV_000026240
- USPI_CIV_000027565
- USPI_CIV_000030396–99
- USPI_CIV_000034853–54
- USPI_CIV_000035655
- USPI_CIV_000036006
- USPI_CIV_000036736–37
- USPI_CIV_000037627–29
- USPI_CIV_000037954
- USPI_CIV_000038254–55
- USPI_CIV_000039709–10
- USPI_CIV_000039752–53
- USPI_CIV_000039754
- USPI_CIV_000040029
- USPI_CIV_000040585–87
- USPI_CIV_000041645–56
- USPI_CIV_000044404–405
- USPI_CIV_000044881–83

- USPI_CIV_000045211–12
- USPI_CIV_000045232–33
- USPI_CIV_000055047–48
- USPI_CIV_000056611–43
- USPI_CIV_000064623–27
- USPI_CIV_000064628
- USPI_CIV_000068808–21
- USPI_CIV_000095479–80
- USPI_CIV_000099574
- USPI_CIV_000113335
- USPI_CIV_000121836–40
- USPI_CIV_000142589–90
- USPI_CIV_000147704–706
- USPI_CIV_000152743
- USPI_CIV_000192177–78
- USPI_CIV_000212779–80
- USPI_CIV_000214746
- USPI_CIV_000227267
- USPI_CIV_000231289
- USPI_CIV_000235807
- USPI_CIV_000242488
- USPI_CIV_000244825
- USPI_CIV_000272179–182
- USPI_CIV_000274099
- USPI_CIV_000295492
- USPI_CIV_000301109–10
- USPI_CIV_000314724
- USPI_CIV_000336479

- USPI_CIV_000336973–85
- USPI_CIV_000337004
- USPI_CIV_000338903–04
- USPI_CIV_000376500–06
- USPI_CIV_000401250–54
- USPI_CIV_000432243–54
- USPI_CIV_000441337–39
- USPI_CIV_000446798–99
- USPI_CIV_000452281–283
- USPI_CIV_000457557–60
- USPI_CIV_000467447–60
- USPI_CIV_000473082–83
- USPI_CIV_000499023–24
- USPI_CIV_000563699–700

- USPI_CIV_000601224–29
- USPI_CIV_000620051–67
- USPI_CIV_000650633–36
- USPI_CIV_000689431
- USPI_CIV_000701723
- USPI_CIV_000714194–95
- USPI_CIV_000752863–64
- USPI_CIV_000755571–72
- USPI_CIV_000764198–99
- USPI_CIV_000810697
- USPI_CIV_000890968–76
- USPI_CIV_000900796–801
- USPI_CIV_000962509

## Books

- A. Colin Cameron and Pravin K. Trivedi, *Microeconometrics: Methods and Applications*, (New York, NY: Cambridge University Press, 2005)

- ABA Antitrust Section: American Bar Association, *Econometrics: Legal, Practical and Technical Issues*, Second Edition (Chicago: ABA Publishing, 2014)

- ABA Antitrust Section: American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition (Chicago: ABA Publishing, 2017)

- Alan Manning, "The Elasticity of the Labor Supply Curve to an Individual Firm," in *Monopsony in Motion,* (Princeton University Press, 2003), pp. 80–114

- Barry Gerhart, Jerry Newman and George Milkovich, *Compensation ISE*, (McGraw-Hill Education, 2022)

- Daniel Rubinfeld, "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, (Washington, D.C.: The National Academies Press, 2011), pp. 305–357

Highly Confidential - Outside Counsel/Experts Only

APPENDIX B

- David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, (Washington, D.C.: The National Academies Press, 2011), pp. 213–302

- Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, (Essex, England: Pearson Education Limited, 2015)

- Edward P. Lazear and Paul Oyer, "Personnel Economics," in *The Handbook of Organizational Economics*, ed. Robert Gibbons and John Roberts (Princeton, N.J: Princeton University Press, 2013), pp. 479–519

- Erik Brynjolffson and Andrew McAfee, *The Second Machine Age*, (New York, NY: W. W. Norton & Company, 2014)

- Henry S. Farber, "Mobility and Stability: The Dynamics of Job Change in Labor Markets," in *Handbook of Labor Economics*, Volume 3, ed. O. Ashenfelter and D. Card (Amsterdam, Netherlands: Elsevier Science B.V., 1999), pp. 2439–2483

- Jeffrey M. Wooldridge, *Introductory Econometrics*, (Mason, OH: South-Western Cengage Learning, 2009)

- Louis Kaplow and Carl Shapiro, "Antitrust," in *Handbook of Law and Economics*, Volume 2, pp. 1077–1225

- Sherwin Rosen, "Does the Composition of Pay Matter," in *Employee Benefits and Labor Markets in Canada and the United States*, (Kalamazoo, MI: W.E. Upjohn Institute, 2000), pp. 13–30

- Theon van Dijk and Frank Verboven, "Quantification of Damages," in *3 Issues in Competition Law and Policy*, (ABA Section of Antitrust Law, 2008), pp. 2331–2348

**Data**

- Bureau of Labor Statistics Job Openings and Labor Turnover Survey Data

- DaVita Equity Grant Data
    - DVA_OMCEAL_001408533
    - DVA_OMCEAL_001408536
    - DVA_OMCEAL_001408539
    - DVA_OMCEAL_001408542–43
    - DVA_OMCEAL_001408547

- DaVita Payroll Data

APPENDIX B

- - o DVA_OMCEAL_000000029–45
    - o DVA_OMCEAL_000902589–91
    - o DVA_OMCEAL_001182111
    - o DVA_OMCEAL_001408544
  - DaVita Teammate Data
    - o DVA_OMCEAL_001421632–35
  - Hashed SSN Data
    - o "Highly Confidential - Outside Counsel Experts Only_SCA Hashed SSNs.xlsx"
    - o "SCA - Structured00000005.xlsx"
    - o "SCA - Structured00000013.xlsx"
    - o "SCA-Structured00000012_Highly Confidential–Outside Counsel Experts Only.xlsx"
    - o DVA_OMCEAL_000000047
    - o DVA_OMCEAL_001408550
    - o DVA_OMCEAL_001421640
    - o DVA_OMCEAL_001421733
  - Lightcast Data
  - NAICS Association Data
  - Prof. Starr's Data
  - SCA Payroll Data
    - o "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data.xlsx"
    - o "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions.xlsx"
    - o "CheckSumm_Highly Confidential-Outside Counsel, Experts Only"
    - o "CheckSummHE_ Highly Confidential-Outside Counsel, Experts Only.csv"
    - o "Eemploy_ Highly Confidential-Outside Counsel, Experts Only.csv"
    - o "Ejob_ Highly Confidential-Outside Counsel, Experts Only.csv"

APPENDIX B

- - "Highly Confidential - Outside Counsel Experts Only_Check History Hours and Earnings.xlsx"

  - "Highly Confidential - Outside Counsel Experts Only_Teammate Roster Point In Time.xlsx"

  - "Highly Confidential - Outside Counsel Experts Only_Termed in 2021.xlsx"

  - "SCA-Structured00000007_Highly Confidential–Outside Counsel Experts Only.xlsx"

  - "SCA-Structured00000009_Highly Confidential–Outside Counsel Experts Only.xlsx"

  - "SCA-Structured00000010_Highly Confidential–Outside Counsel Experts Only.xlsx"

  - "SCA-Structured00000011_Highly Confidential–Outside Counsel Experts Only.xlsx"

- Tenet Payroll Data

  - USPI_CIV_000659234

  - USPI_CIV_001168726

- USPI Payroll Data

  - "2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions.xlsx"

  - "2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes.xlsx"

  - "4.19.24 Paygroup location.xlsx"

  - "Exhibit A_Paygroup_Location.xlsx"

  - "Exhibit B_ERNCD Values.xlsx"

  - USPI_CIV_000021819

  - USPI_CIV_00065922–33

## Depositions

- Deposition of Allen Spradling (Named Plaintiff), July 18, 2024

- Deposition of Andrew Johnston (USPI), September 6, 2024

- Deposition of Andrew Patrick Hayek (SCA), September 18, 2024

- Deposition of Anthony Kilgore (SCA), October 22, 2024
- Deposition of Anthony Martin (USPI), June 27, 2024
- Deposition of Barry Gerhart, Ph.D., March 5, 2025
- Deposition of Bill Wilcox (USPI), September 24, 2024
- Deposition of Brian Todd Mathis (SCA), September 20, 2024
- Deposition of Bridget A. Fanning. Ph.D. (SCA), July 17, 2024
- Deposition of Cindy English, Volume I (USPI), June 12, 2024
- Deposition of Clare Metcalf (Russell Reynolds), August 14, 2024
- Deposition of Colleen Arthur (DaVita), May 23, 2024
- Deposition of Evan P. Starr, Ph.D., Volume I, March 19, 2025
- Deposition of Evan P. Starr, Ph.D., Volume II, March 20, 2025
- Deposition of Javier Rodriguez (DaVita), August 12, 2024
- Deposition of Jennifer Sandoz, Volume I (SCA), September 26, 2024
- Deposition of Jennifer Simmons-Duggan (SCA), October 25, 2024
- Deposition of Jimmy Tanner (Catapult Staffing), July 31, 2024
- Deposition of John Schultz (Russell Reynolds and Spencer Stuart), November 19, 2024
- Deposition of Joseph T. Clark (SCA), September 11, 2024
- Deposition of Kent Thiry (DaVita), August 16, 2024
- Deposition of Kevin Zaideman (SCA), December 18, 2024
- Deposition of Kristen DesPalmes (DaVita), May 21, 2024
- Deposition of Leslie Wachsman (SCA), May 22, 2024
- Deposition of Mark Garvin (USPI), May 30, 2024
- Deposition of Mark Kopser, Volume I (USPI), December 12, 2024
- Deposition of Michael D. Staffieri (DaVita), April 5, 2024
- Deposition of Michael Loiacano (Heidrick), June 28, 2024
- Deposition of Michael Rucker (SCA), August 27, 2024
- Deposition of Peter Clemens (SCA), May 2, 2024
- Deposition of Robert Chipman (DaVita), August 7, 2024

- Deposition of Sandi Karrmann (USPI), August 14, 2024

- Deposition of Scott Keech (Named Plaintiff), August 22, 2024

- Deposition of Shannon McGarry (USPI), June 11, 2024

- Deposition of Shannon Mosley (USPI), August 13, 2024

- Deposition of Steven Priest (DaVita), November 5, 2024

- Deposition of Warren Joseph Cinnick (SCA), November 22, 2024

## Expert Reports and Backup Materials

- Amended Expert Witness Report of Dr. Barry S. Gerhart, February 11, 2025, and Backup Materials

- Amended Expert Witness Report of Dr. Evan P. Starr, January 21, 2025, and Backup Materials

## Industry Reports

- Paul Fronstin, "Testimony to the House Committee on Education and The Workforce on behalf of the Employee Benefit Research Institute," *Employee Benefit Research Institute*, September 10, 2024, available at https://edworkforce.house.gov/uploadedfiles/9.10.24_help_hearing_on_eris a_anniversary_fronstin_testimony.pdf

- Sebastian Heise, Jeremy Pearce, and Jacob Weber, "Wage Growth and Labor Market Tightness," *FRB of New York Staff Report No. 1128*, March 2025, available at https://ssrn.com/abstract=4980503, accessed on April 11, 2025, pp. 1–45

- U.S Government Accountability Office, "Noncompete Agreements: Use Is Widespread to Protect Business' Stated Interests, Restricts Job Mobility and May Affect Wages," May 11, 2023, available at https://www.gao.gov/products/gao-23-103785

## Legal Documents

- Consolidated Amended Class Action Complain, *In Re Outpatient Medical Center Employee Antitrust Litigation*, August 9, 2021

- Indictment, *United States of America v. DaVita Inc. and Kent Thiry*, November 3, 2021

- Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings*, LLC, January 5, 2021

APPENDIX B

- Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024

- Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, June 6, 2023

- Trial Tr., *United States v. DaVita,* No. 21-cr-00229-RBJ (D. Colo. Apr. 6, 2022)

- Trial Tr., United States v. DaVita, No. 21-cr-00229-RBJ (D. Colo. Apr. 7, 2022)

## Letters

- Letter from Julia B. Bates (King & Spalding) to Sarah D. Zandi (Lieff Cabraser Heimann & Bernstein), "Re: In re Outpatient Medical Center Employee Antitrust Litig., N.D. Ill. 1:21-cv-000305," December 12, 2024

- Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph Saveri (Joseph Saveri Law Firm Inc.) et al., "Re: In Re Outpatient Medical Center Antitrust Litigation, Case No 1:21-cv-00305," May 14, 2023

## Public Press and other Web Content

- "Total Renal Care Holdings, Inc. Announces Legal Name Change to DaVita Inc.," DaVita*,* October 9, 2000, available at https://investors.davita.com/2000-10-04-Total-Renal-Care-Holdings-Inc-Announces-Legal-Name-Change-to-DaVita-Inc, accessed on April 10, 2025

- Avaya, "What We Do: Avaya Empowers CX Innovation Without Disrupting Your Business," available at https://www.avaya.com/en/, accessed on April 2, 2025

- Bank of America, "Our Company," available at https://about.bankofamerica.com/en/our-company, accessed on April 2, 2025

- Centers for Disease Control, "About the Data: American Community Survey," May 15, 2024, available at https://www.cdc.gov/vision-health-data/data-sources/american-community-survey.html, accessed on February 23, 2025

- Centers for Disease Control, "CDC Museum COVID-19 Timeline," July 8, 2024, available at https://www.cdc.gov/museum/timeline/covid19.html, accessed on February 23, 2025

- Centers for Disease Control, "COVID-19 Vaccination Coverage Among Adults — United States, December 14, 2020–May 22, 2021," June 25, 2021, available

at https://www.cdc.gov/mmwr/volumes/70/wr/mm7025e1.htm, accessed on February 27, 2025

- CNBC, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," *CNBC,* January 8, 2007, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 10, 2025

- DaVita, "DaVita Closes Gambro Healthcare Acquisition," Oct. 5, 2005, available at https://investors.davita.com/2005-10-05-DaVita-Closes-Gambro-Healthcare-Acquisition, accessed on April 15, 2025

- DaVita, "Director, Corporate Strategy Job in 2000 16th Street, Denver, CO 80202 | Leadership & Supervisor Jobs at DaVita," February 13, 2025, available at https://careers.davita.com/job/R0378916/Director-Corporate-Strategy, accessed on April 8, 2025

- DaVita, "Notice of Annual Meeting of Stockholders," June 15, 2009, available at https://filecache.investorroom.com/mr5ir_davita/185/DaVita_Proxy09_Final_2.pdf, accessed on April 16, 2025

- DaVita, "Senior Director, Finance Job in 2000 16th Street, Denver, CO 80202 | Leadership & Supervisor Jobs at DaVita," March 26, 2025, available at https://careers.davita.com/job/R0397738/Senior-Director-Finance, accessed on April 8, 2025

- Department of Children & Family Services, "About Us: Franklin Foundation Hospital," available at https://www.dcfs.louisiana.gov/directory/office/9047, accessed on April 2, 2025

- Fidelity Investments, "How Equity Compensation and Stock Purchase Plans Are Taxed," available at https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/fidelity/equity-compensation-tax-treatment-guidelines.pdf, accessed on April 11, 2025

- GlobeNewsWire, "Surgical Care Affiliated Announces Closing of its Initial Public Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares," November 4, 2013, available at https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-to-Purchase-Additional-Shares.html, accessed on April 10, 2015

- GlobeNewsWire, "Surgical Care Affiliates (SCA), OptumCare to Combine," January 9, 2017, available at https://www.globenewswire.com/news-

release/2017/01/09/904294/28633/en/Surgical-Care-Affiliates-SCA-OptumCare-to-Combine.html, accessed on April 10, 2025

- Google Maps, "Montgomery, Alabama to Lexington, Kentucky," available at https://www.google.com/maps/dir/Montgomery+alabama/lexington+kentucky/, accessed on April 2, 2025

- Google Maps, "Santa Clara, California to San Francisco, California," available at https://www.google.com/maps/dir/santa+clara/san+francisco/, accessed on April 2, 2025

- HCA Midwest Health: Surgicenter of Johnson County, "About Surgicenter of Johnson County: Welcome to Surgency of Johnson County," available at https://surgicenterjc.com/, accessed on April 2, 2025

- Hubert Janicki, "From Great Resignation to Great Reshuffling: How the COVID-19 Pandemic Prompted More People to Change Jobs," *U.S. Census Bureau*, May 13, 2024, available at https://www.census.gov/library/stories/2024/05/great-reshuffling.html, accessed on March 22, 2025

- Intuit Quickbooks, "Payroll Records: What Are They and Why Do You Need Them?" January 22, 2020, available at https://quickbooks.intuit.com/r/payroll/payroll-records/, accessed on April 11, 2025

- IPUMS USA, "INCWAGE: Wage and Salary Income," available at https://usa.ipums.org/usa-action/variables/INCWAGE#questionnaire_text_section, accessed on February 23, 2025

- Kaiser Permanente, "What is Kaiser Permanente," available at https://healthy.kaiserpermanente.org/learn/what-is-kaiser-permanente, accessed on April 13, 2025

- Kathleen O'Toole, "Enrico Moretti: The Geography of Jobs," *Insights by Stanford Business,* June 10, 2013, available at https://www.gsb.stanford.edu/insights/enrico-moretti-geography-jobs, accessed on April 2, 2025

- Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 12, 2025

- LinkedIn, "Andrew Boyink," available at https://www.linkedin.com/in/andrewboyink/, accessed on April 10, 2025

- LinkedIn, "Naomi Kruger," available at https://www.linkedin.com/in/naomi-kruger-74986420/, accessed on February 26, 2025

- LinkedIn, "Stephanie A. Phillips," available at https://www.linkedin.com/in/stephanie-a-phillips-651913, accessed on February 26, 2025

- Mars Veterinary Health, "Who We Are," available at https://marsveterinary.com/who-we-are/, accessed on April 2, 2025

- McKinsey, "McKinsey & Company About us," available at https://www.mckinsey.com/about-us/overview, accessed on April 15, 2025

- Michael Bloom, "Competition Matters: Information Exchange: Be Reasonable," *Federal Trade Commission*, December 11, 2014, https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable, accessed on April 3, 2025

- NAICS Association, "NAICS Code Description 6214 – Outpatient Care Centers," available at https://www.naics.com/naics-code-description/?code=6214, accessed on April 3, 2025

- Navigant, "Guidehouse," available at https://www.navigant.com/, accessed on April 2, 2025

- Reuters, "HealthSouth to Sell Surgery Unit for $945 Mln," August 9, 2007, available at https://www.reuters.com/article/business/healthsouth-to-sell-surgery-unit-for-945-mln-idUSN26342795/, accessed on April 15, 2025

- Richard E. Schumann, "Compensation from World War II Through the Great Society," *U.S Bureau of Labor Statistics: Compensation and Working Conditions*, January 30, 2003, available at https://www.bls.gov/opub/mlr/cwc/compensation-from-world-war-ii-through-the-great-society.pdf, accessed on April 16, 2025

- SCA, "CEO - Gladiolus Surgery Center in Ft Myers, Florida | SCA Health," available at https://careers.sca.health/jobs/38935?lang=en-us, accessed on April 8, 2025

- SCA, "Director Operations in United States | SCA Health," available at https://careers.sca.health/jobs/39469?lang=en-us, accessed on April 8, 2025

- TekSystems, "IT and Business Services," available at https://www.teksystems.com/en/it-and-business-services, accessed on April 2, 2025

- Tenet Health, "Tenet Completes Purchase of USPI from WCAS," April 26, 2018, available at https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx, accessed on April 10, 2025

- Turbotax, "How to Report RSUs or Stock Grants on Your Tax Return," February 18, 2025, available at https://turbotax.intuit.com/tax-tips/investments-and-taxes/how-to-report-rsus-or-stock-grants-on-your-tax-return/L55yZieu0, accessed on April 11, 2025

- U.S Bureau of Labor Statistics, "2.5 Million Unable to Work in March 2022 Because Employer Closed or Lost Business Due to COVID-19," *The Economics Daily*, April 6, 2022, available at https://www.bls.gov/opub/ted/2022/2-5-million-unable-to-work-in-march-2022-because-employer-closed-or-lost-business-due-to-covid-19.htm, accessed on April 2, 2025

- U.S Bureau of Labor Statistics, "Empirical Evidence for the Great Resignation," *Monthly Labor Review,* November 2022, available at https://www.bls.gov/opub/mlr/2022/article/empirical-evidence-for-the-great-resignation.htm, accessed on April 16, 2025

- U.S Bureau of Labor Statistics, "Help & Tutorials: Job Openings and Labor Turnover Survey," January 21, 2022, available at https://www.bls.gov/help/one_screen/JT.htm#select-select-rate-and-or-level, accessed on April 16, 2025

- U.S Bureau of Labor Statistics, "Job Openings and Labor Turnover Survey, available at https://www.bls.gov/jlt/, *JOLTS Home*, accessed on April 2, 2025

- U.S Bureau of Labor Statistics, "Labor Force Statistics from the Current Population Survey," available at https://www.bls.gov/cps/, accessed on April 6, 2025

- U.S Census Bureau, "North American Industry Classification System: Introduction to NAICS," December 20, 2024, available at https://www.census.gov/naics/, accessed on April 2, 2025

- U.S. Bureau of Labor Statistics, "Labor Market Dynamics during the COVID-19 Pandemic," *Commisioner's Corner,* November 15, 2022, available at https://www.bls.gov/blog/2022/labor-market-dynamics-during-the-covid-19-pandemic.htm, accessed on April 16, 2025

- U.S. Department of Justice and Federal Trade Commission, "Antitrust Guidelines for Collaborations Among Competitors, April 2000, available at https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf, accessed on April 8, 2025

- U.S. Food and Drug Administration, "FDA Approves First COVID-19 Vaccine," August 23, 2021, available at https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine, accessed on February 27, 2025

APPENDIX B

- United Nations, "WHO Chief Declares End to COVID-19 as a Global Health Emergency," May 5, 2023, available at https://news.un.org/en/story/2023/05/1136367, accessed on February 23, 2025

- United Surgical Partners International, "USPI Regional Vice President, Operations II – New Jersey," 2025, available at https://careers.uspi.com/job/lakewood/uspi-regional-vice-president-operations-ii-new-jersey/26425/78736071152, accessed on April 6, 2025

- USPI, "Director of Business Office at USPI," available at https://careers.uspi.com/job/dakota-dunes/director-of-business-office/35934/78354660944, accessed on April 8, 2025

- USPI, "Surgery Center Administrator at USPI," available at https://careers.uspi.com/job/ventura/surgery-center-administrator/35934/77706296208, accessed on April 8, 2025

**SEC Filings**

- United Surgical Partners International, Inc., SEC Form Schedule 14A, 2007
- Total Renal Care Holdings, Inc., SEC Form 10-K for period ended December 31, 1998, filed on October 8, 1999

**Note: In addition to the documents on this list, I relied on all documents cited in my report to form my opinions.**

# APPENDIX C: Supplemental Exhibits

---

*EXHIBIT 1*
*Proposed Class Members' Employment Opportunities Extend Beyond Defendants, Beyond the Outpatient Care Centers Industry, and Beyond Healthcare-Related Industries*

| | Previous or Next Employer | Number of Moves | Share of Moves |
|---|---|---|---|
| 1 | Fresenius | 97 | 1.27% |
| 2 | HCA Healthcare | 81 | 1.06% |
| 3 | UnitedHealth Group | 48 | 0.63% |
| 4 | Kaiser Permanente | 44 | 0.58% |
| 5 | McKinsey | 41 | 0.54% |
| 6 | Encompass Health | 40 | 0.52% |
| 7 | Surgical Care Affiliates | 39 | 0.51% |
| 8 | United States Renal Care Incorporated | 39 | 0.51% |
| 9 | CVS Health | 35 | 0.46% |
| 10 | Optum | 35 | 0.46% |
| 11 | Bain & Company | 31 | 0.41% |
| 12 | Deloitte | 27 | 0.35% |
| 13 | United Surgical Partners International | 27 | 0.35% |
| 14 | Amazon | 25 | 0.33% |
| 15 | Baylor Scott & White Health | 25 | 0.33% |
| 16 | DaVita | 24 | 0.31% |
| 17 | Envision Physician Services | 23 | 0.30% |
| 18 | Target | 23 | 0.30% |
| 19 | Tenet Healthcare | 23 | 0.30% |
| 20 | Intermountain Health | 22 | 0.29% |
| 21 | McKesson | 21 | 0.27% |
| 22 | CommonSpirit Health | 20 | 0.26% |
| 23 | Aetna | 19 | 0.25% |
| 24 | Apria Healthcare | 19 | 0.25% |
| 25 | Humana | 19 | 0.25% |
| 26 | AMSURG | 18 | 0.24% |
| 27 | Cigna | 18 | 0.24% |
| 28 | Satellite Healthcare Wellbound | 17 | 0.22% |
| 29 | Sound Physicians | 17 | 0.22% |
| 30 | Abbott Laboratories | 16 | 0.21% |
| 31 | Elevance Health | 16 | 0.21% |
| 32 | Memorial Hermann | 16 | 0.21% |
| 33 | Molina Healthcare | 16 | 0.21% |
| 34 | Surgery Partners | 16 | 0.21% |
| 35 | University of California | 16 | 0.21% |
| | *4,515 more companies* | *6,626* | *86.7%* |

Source: Lightcast Data

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer is the indicated firm. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

Highly Confidential - Outside Counsel/Experts Only

APPENDIX C

---

***EXHIBIT 2***

***The Industries Proposed Class Members Come From and Go To Vary by Specialty Area, and Few Proposed Class Members Come From or Go To Defendants (NAICS Association Industry Codes)***



Source: Lightcast Data; NAICS Association

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer belongs to the indicated industry grouping. The results are shown separately by specialty area. "Outpatient Care Centers" is defined by NAICS codes beginning with 6214. "Healthcare Related (non-OCC)" includes NAICS codes related to healthcare that I identified based on a review of the industries for the top 50 most common previous and next employers for Defendants' employees in the Lightcast Data. "Other Industries" contains all remaining classified industries. "Unclassified Industry and Non-Defendant" includes firms that were not assigned NAICS codes by the NAICS Association. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendant employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

Highly Confidential - Outside Counsel/Experts Only

APPENDIX C

---

*EXHIBIT 3*

***The Industries that Proposed Class Members Come From and Go To Overall and By Defendant (Lightcast Industry Codes)***



Source: Lightcast Data

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer belongs to the indicated industry grouping. The results are shown separately by Defendant. "Outpatient Care Centers" is defined by NAICS codes beginning with 6214. "Healthcare Related (non-OCC)" includes NAICS codes related to healthcare that I identified based on a review of the industries for the top 50 most common previous and next employers for Defendants' employees in the Lightcast Data. "Other Industries" contains all remaining classified industries. "Unclassified Industry and Non-Defendant" includes firms that were not assigned NAICS codes in the Lightcast Data. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendant employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

*EXHIBIT 4*
*The Industries that Proposed Class Members Come From and Go To Overall and By Defendant (NAICS Association Industry Codes)*



Source: Lightcast Data; NAICS Association.

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer belongs to the indicated industry grouping. The results are shown separately by Defendant. "Outpatient Care Centers" is defined by NAICS codes beginning with 6214. "Healthcare Related (non-OCC)" includes NAICS codes related to healthcare that I identified based on a review of the industries for the top 50 most common previous and next employers for Defendants' employees in the Lightcast Data. "Other Industries" contains all remaining classified industries. "Unclassified Industry and Non-Defendant" includes firms that were not assigned NAICS codes by the NAICS Association. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendant employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

Highly Confidential - Outside Counsel/Experts Only

APPENDIX C

---

*EXHIBIT 5*
*There is Wide Variation in Compensation Within a Specific Seniority Level at DaVita, and*
*Substantial Overlap in the Observed Compensation Ranges for Different Seniority Levels*
*(Total Pay with Adjusted Equity)*



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay with adjusted equity for proposed class members of the indicated seniority level. Pay is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at DaVita between 2008-2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay with adjusted equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median.

APPENDIX C

---

***EXHIBIT 6***

***There is Wide Variation in Compensation Within a Specific Seniority Level at SCA, and Substantial Overlap in the Observed Compensation Ranges for Different Seniority Levels (Total Pay with Adjusted Equity)***



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay with adjusted equity for proposed class members of the indicated seniority level. Pay is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at SCA between 2008-2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay with adjusted equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median.

---

**EXHIBIT 7**

***There is Wide Variation in Compensation Within a Specific Seniority Level at USPI, and Substantial Overlap in the Observed Compensation Ranges for Different Seniority Levels (Total Pay with Adjusted Equity)***



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay with adjusted equity for proposed class members of the indicated seniority level. Pay is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at USPI between 2010-2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay with adjusted equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median.

APPENDIX C

---

*EXHIBIT 8*
*Pay of Proposed Class Members at DaVita Does Not "Move Together" Over Time (Total Pay with Adjusted Equity)*



**Source:** Corrected Starr Data

Note:



**EXHIBIT 9**
**Pay of Proposed Class Members at SCA Does Not "Move Together" Over Time (Total Pay without Equity)**



Source: Corrected Starr Data

Note:

**EXHIBIT 10**
**Pay of Proposed Class Members at USPI Does Not "Move Together" Over Time (Total Pay without Equity)**



Percent Change in Pay

Seniority Level — Administrator and Hospital CEO — Director — Vice President — Senior Vice President

Source: Corrected Starr Data
Note:

Highly Confidential - Outside Counsel/Experts Only

Page 10

APPENDIX C

**EXHIBIT 11**
**Pay for Administrators and Hospital CEOs at Defendants Does Not "Move Together" Over Time (Total Pay without Equity)**



Source: Corrected Starr Data

Note:

**EXHIBIT 12**

**Pay for Senior Directors at Defendants Does Not "Move Together" Over Time (Total Pay without Equity)**



Source: Corrected Starr Data

Note:

### EXHIBIT 13
**Pay for Vice Presidents at Defendants Does Not "Move Together" Over Time (Total Pay without Equity)**



Source: Corrected Starr Data

Note:

Highly Confidential - Outside Counsel/Experts Only

### EXHIBIT 14
### Pay for Senior Vice Presidents at Defendants Does Not "Move Together" Over Time (Total Pay without Equity)



Percent Change in Pay

Seniority Level — Senior Vice President

Source: Corrected Starr Data

Note: [redacted]

### EXHIBIT 15
### Prof. Starr's Pay Regression Model, Without Any Corrections, Finds That the Effect of the Alleged Conduct Varies Across Specialty Areas

| Specialty | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| Accounting, Tax, and Treasury | | | |
| Business Development, Sales, Strategy, and Planning | | | |
| Business Office Administration and Management | | | |
| Clinical and Research | | | |
| Finance | | | |
| Information Technology | | | |
| Marketing and Communications | | | |
| Operations | | | |
| Other | | | |
| Pharmacy Management | | | |
| Physician Relations and Management | | | |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by specialty area. Statistical significance is determined at the 5% level.

APPENDIX C

---

*EXHIBIT 16*
**Prof. Starr's Pay Regression Model, Without Any Corrections, Finds That the Effect of the Alleged Conduct Varies Across Defendants and Seniority Levels**

| Seniority Level | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| SCA: Administrator | | | |
| USPI: Administrator | | | |
| DaVita: Director | | | |
| SCA: Director | | | |
| USPI: Director | | | |
| DaVita: Senior Director | | | |
| SCA: Senior Director | | | |
| USPI: Senior Director | | | |
| DaVita: Vice President | | | |
| SCA: Vice President | | | |
| USPI: Vice President | | | |
| DaVita: Senior Vice President | | | |
| SCA: Senior Vice President | | | |
| USPI: Senior Vice President | | | |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by Defendant and seniority level. Statistical significance is determined at the 5% level.

---

Highly Confidential – Outside Counsel/Experts Only

APPENDIX C

*EXHIBIT 17*
*Prof. Starr's Pay Regression Model, Without Any Corrections, Finds That the Effect of the Alleged Conduct Varies Across States*

| State | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| AL | | | |
| AZ | | | |
| CA | | | |
| CO | | | |
| CT | | | |
| FL | | | |
| GA | | | |
| IA | | | |
| ID | | | |
| IL | | | |
| IN | | | |
| KY | | | |
| LA | | | |
| MA | | | |
| MD | | | |
| MI | | | |
| MN | | | |
| MO | | | |
| NC | | | |
| NE | | | |
| NJ | | | |
| NM | | | |
| NV | | | |
| NY | | | |
| OH | | | |
| OK | | | |
| OR | | | |
| PA | | | |
| SC | | | |
| TN | | | |
| TX | | | |
| VA | | | |
| WA | | | |
| WI | | | |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by state. Statistical significance is determined at the 5% level. States with fewer than 50 observations do not appear in the chart (this removes 17 states from the analysis).

**EXHIBIT 18**
**Prof. Starr's Pay Regression Model, Without Any Corrections, Finds That the Effect of the Alleged Conduct Varies Across Years**



| Year | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| 2008 | | | |
| 2009 | | | |
| 2010 | | | |
| 2011 | | | |
| 2012 | | | |
| 2013 | | | |
| 2014 | | | |
| 2015 | | | |
| 2016 | | | |
| 2017 | | | |
| 2018 | | | |
| 2019 | | | |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by year. Statistical significance is determined at the 5% level. Estimates reflect the effect of the indicated year on pay relative to 2007.

Highly Confidential – Outside Counsel/Experts Only

APPENDIX C

---

**EXHIBIT 19**
**Prof. Starr's Quantile Regression Model, After Correcting for Obvious Flaws, Shows No Evidence of Common Impact**



Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's quantile regression analysis (Prof. Starr's Figure 11), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. █████████████████

---

**EXHIBIT 20**
*Prof. Starr's Figure 12, After Correcting for Obvious Flaws, Shows No Evidence of Common Impact*

| | [1]<br>Annual Wage<br>Suppression % | [2]<br>In any Year? | [3]<br>Percentage Harmed:<br>In each Year? | [4]<br>Cumulatively? |
|---|---|---|---|---|
| Common Conduct Model | | | | |
| *Defendant-Specific Model* | | | | |
| DaVita | | | | |
| SCA | | | | |
| USPI | | | | |

Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's in sample prediction analysis (Prof. Starr's Figure 12), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40



**EXHIBIT 21**
*Prof. Starr's Figure 17, After Correcting for Obvious Flaws, Shows No Evidence of Common Impact*

| | [1]<br>Annual Wage<br>Suppression % | [2]<br>Confidence Level | [3]<br>Percentage Harmed<br>Cumulatively |
|---|---|---|---|
| Common Conduct Model | | | |
| *Defendant-Specific Model* | | | |
| DaVita | | | |
| SCA | | | |
| USPI | | | |

Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's interval in-sample prediction analysis (Prof. Starr's Figure 17), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40.



Highly Confidential – Outside Counsel/Experts Only

# APPENDIX D: Data Appendix

1. DaVita produced the following data in this matter:

- **DaVita Payroll Data.** ███████████████████
  ██████████████████████████[1]███████████
  ████████████████████████████████
  ████████████████████████████████████
  ██████████████████████████████████[2]█
  ████████████████████████████████
  ██████████████████████

- **DaVita Teammate Data.** ████████████████
  ██████████████████████[3]████████
  ████████████████████████████████████
  ████████████████████████████████████
  ██████████████████████████████████████
  ████████████████████████████████████
  ██████████████████████

- **DaVita Equity Grant Data.** ██████████████
  ██████████████████████[4]████████
  ████████████████████████████████
  ██████████████████████████████████
  ████████████████████████

2. SCA produced the following data in this matter:

- **SCA Payroll Data.** ███████████████████████
  ████████████████████████████████████
  ████████████████████[5]██████████████

---

[1] DVA_OMCEAL_000000029–45; DVA_OMCEAL_000902589–91; DVA_OMCEAL_001408544; DVA_OMCEAL_001182111.

[2] The job title and seniority level (as assigned by DaVita) fields are available in some, but not all, of the DaVita Payroll Data files.

[3] DVA_OMCEAL_001421635; DVA_OMCEAL_001421632–34.

[4] DVA_OMCEAL_001408533, DVA_OMCEAL_001408536, DVA_OMCEAL_001408539, DVA_OMCEAL_001408542, DVA_OMCEAL_001408543, DVA_OMCEAL_001408547.

[5] "Highly Confidential - Outside Counsel Experts Only_Check History Hours and Earnings.xlsx"; "Highly Confidential - Outside Counsel Experts Only_Termed in 2021.xlsx"; "Highly Confidential - Outside Counsel Experts Only_Teammate Roster Point In Time.xlsx"; "SCA-Structured00000007_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000009_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000010_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000011_Highly Confidential–Outside Counsel Experts Only.xlsx"; "CheckSumm_Highly Confidential-Outside Counsel, Experts Only"; "CheckSummHE_ Highly Confidential-Outside Counsel, Experts Only.csv"; "Eemploy_ Highly Confidential-Outside Counsel, Experts Only.csv"; "Ejob_ Highly Confidential-

███████████████████████████████████████████████

███ ████████████████████████████████

████████████████████████████

3. USPI produced the following data in this matter:

- **USPI Payroll Data.** ███████████████████████
  ████████████████████████████ [6] ██████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████

- **Tenet Payroll Data.** ████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████ [7] ████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████████
  ██████████████████████████████

4. Additionally, all three Defendants generated the following data specifically for use in this matter:

- **Hashed SSN Data.** ██████████████████████████
  ██████████████████████████████████████
  ████████████████████ [8] ████████████████████

---

Outside Counsel, Experts Only.csv"; "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data.xlsx"; "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions.xlsx".

[6] USPI_CIV_000021819; USPI_CIV_00065922–33; "2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions.xlsx"; "Exhibit A_Paygroup_Location.xlsx"; "Exhibit B_ERNCD Values.xlsx"; "4.19.24 Paygroup location.xlsx"; "2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes.xlsx".

[7] USPI_CIV_000659234; USPI_CIV_001168726.

[8] DaVita produced several datasets containing hashed SSNs for employees who appear in their structured data. See DVA_OMCEAL_000000047; DVA_OMCEAL_001408550; DVA_OMCEAL_001421733; DVA_OMCEAL_001421640. SCA similarly produced several datasets containing hashed SSNs for employees who appear in their structured data. See "Highly Confidential - Outside Counsel Experts Only_SCA Hashed SSNs.xlsx"; "SCA - Structured00000005.xlsx"; "SCA-Structured00000012_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA - Structured00000013.xlsx". USPI generated hashed SSNs and appended them to USPI_CIV_00065922–33 and USPI_CIV_000659234.

APPENDIX D

███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████
█████████████

5. Prof. Starr constructed a dataset that combined several of the datasets described above with various publicly available datasets. However, he made several basic errors when constructing this dataset. I corrected these errors, and I rely on the corrected dataset throughout my report to assess the validity of Prof. Starr and Prof. Gerhart's conclusions:

- **Prof. Starr's Data.** ██████████████████
  ████████████████████████████
  ████████████████████████████████
  █████████████████████████████████
  ███████████████████████████
  ████████████████████████████████
  █████████████████████████
  ████████████████████████████
  ██████████████████████████████
  ███████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████
  ██████████████████████████████████
  ████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████
  ██████████████████████████████████
  █ ████████████████████████████████
  ████████████████████

- **Prof. Starr's Corrected Data.** Prof. Starr made four basic errors when processing the various datasets that he used to construct his

panel dataset, which I corrected. ██████████████

████████████████████████████████████

████████████████████████████████████

██████████████████[9]████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████.[10]███████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████[11]████████████████████

████████████████████████.[12]████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



[9] ████████████████████████████████████████████████████████████████████ See Workpaper 37.

[10] ████████████████████████████████████████████████ See Workpaper 38; Workpaper 39.

[11] ██████████████████████████████████. See Workpaper 40.

[12] ████████████████████████████████████████████████████████████████████

Highly Confidential - Outside Counsel/Experts Only

██████████████████████████████████████
████████████████████████ [13]

6. I also rely on proprietary data from Lightcast and publicly available data from other sources to perform certain analyses in my report:

- **Lightcast Data.** Lightcast is a proprietary data provider that has constructed a structured database of job histories based on resumes posted to online resume websites.[14] The Lightcast Data that I analyze in my report reflects job histories for individuals who worked for one of the three Defendants, or in the Outpatient Care Centers industry (NAICS code 6214) to which all three Defendants belong, in 2024 or earlier. The Lightcast Data record company name, occupation, industry, start date, and end date at the individual-job level.

- **NAICS Association Data.** NAICS Association provides data on industry codes from Dun & Bradstreet, a provider of business data and analytics. NAICS Association provides industry codes for a specified list of companies by matching the companies to entities in the Dun & Bradstreet database based on the company's name and other characteristics (e.g., location) where available.

- **Bureau of Labor Statistics Job Openings and Labor Turnover Survey ("JOLTS") Data.** The Bureau of Labor Statistics JOLTS Data report monthly estimates of job openings, voluntary quits, and involuntary layoffs and discharges based on a survey of establishments in the U.S.[15] These estimates are available by industry.

[13]

[14] Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 12, 2025 ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability.").

[15] U.S Bureau of Labor Statistics, "Job Openings and Labor Turnover Survey," available at https://www.bls.gov/jlt/, *JOLTS Home*, accessed on April 2, 2025 ("The Job Openings and Labor Turnover Survey (JOLTS) program of the Bureau of Labor Statistics (BLS) produces monthly and annual estimates of job openings, hires, and separations for the nation. The JOLTS program also produces monthly state estimates for all 50 states and the District of Columbia at the total nonfarm industry level.").

## Considers to Be Subject to the Alleged Mobility Restrictions

---

*EXHIBIT 1*
*Job Titles Included in Prof. Starr's Definition of the Class*



**Job Title**

APPENDIX E

**Job Title**



APPENDIX E

**Job Title**



Source: Starr Data
Note: This exhibit shows all USPI job titles included in the proposed class according to Prof. Starr.

Highly Confidential – Outside Counsel/Experts Only

APPENDIX E

*EXHIBIT 2*
*Job Titles Subject to USPI's Admitted Non-Solicitation Agreement with SCA*



| Job Title | Subject to Agreement? |
|---|---|

Source: Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.) et al., "In re Outpatient Medical Center Employee Antitrust Litigation, Case No. 1:21-cv-00305," May 14, 2023

Highly Confidential – Outside Counsel/Experts Only