# Exhibit 7

# Lane Declaration

# Redacted

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| In Re Outpatient Medical Center Employee Antitrust Litigation | Case No. 1:21-cv-00305<br><br>**HIGHLY CONFIDENTIAL**<br><br>**OUTSIDE COUNSEL/EXPERTS ONLY** |

**EXPERT REPORT OF CELESTE SARAVIA, PH.D.**

April 16, 2025

*Highly Confidential - Outside Counsel/Experts Only*

**Table of Contents**

1. Qualifications, case background, and assignment ...........................................5

1.1. Qualifications..........................................................................................5

1.2. Allegations in Plaintiffs' Third Amended Complaint ...............................6

1.2.1. Alleged Three-Party Mobility Restrictions.......................................6

1.2.2. Alleged Three-Party Information Sharing ........................................6

1.2.3. Alleged Two-Party Mobility Restrictions..........................................7

1.2.4. Alleged Two-Party Information Sharing ...........................................7

1.2.5. Alleged Class...................................................................................7

1.3. Experts' Assessed Bilateral Conspiracies ..............................................8

1.4. USPI's Admitted Conduct......................................................................9

1.5. Assignment...........................................................................................10

2. Summary of opinions ...................................................................................11

3. Background on Defendants and the industries in which they operate ..........17

3.1. Overview of outpatient care centers and ambulatory surgery centers ..... 18

3.2. Background on the Defendants............................................................. 21

3.2.1. USPI............................................................................................... 21

3.2.2. SCA................................................................................................23

3.2.3. DaVita............................................................................................24

3.3. Background on USPI Senior Employees ................................................25

3.4. Overview of compensation for USPI Senior Employees.........................29

4. The economic evidence does not support a conclusion that USPI individually or in combination with SCA and DaVita has the market power to suppress wages................. 37

4.1. Overview of Dr. Starr's and Dr. Gerhart's market power opinions.........................38

4.2. Defendants' collective market power and ability to suppress Senior Employee compensation is constrained by competition from non-Defendants...........................40

4.2.1. ██████████████████████████████████████ ██████████████████████████████████████ .........................41

4.2.2. ██████████████████████████████████████ ███████████████████████████████ ...................................45

5. The Alleged, Assessed, and Admitted Mobility Restrictions could have directly impacted the employment options of, at most, a limited number of Senior Employees. 51

5.1. Overview of the potential impacts of a non-solicitation agreement ......................52

5.2. Economic evidence indicates that the ████████████████████████ ███████████████████████████████████ ██████████████████ ................................................................53

5.2.1. Even outside the Alleged, Assessed, or Admitted Mobility Restrictions, ███ ████████████████████████████████ ..........................53

5.2.2. USPI Senior Employees' job opportunities beyond Defendants are extensive and varied.................................................................................. 57

5.3. Dr. Starr's analysis indicates that the Experts' Assessed SCA-USPI Mobility Restrictions could have directly impacted a limited number of Senior Employees ....58

5.3.1. Dr. Starr's analysis indicates that the Experts' Assessed SCA-USPI Mobility Restrictions had a minimal effect on mobility ......................................59

5.4. Dr. Starr's analysis of switchers is flawed and overstates the direct impact of the Experts' Assessed SCA-USPI Mobility Restrictions ...................................... 61

6. Plaintiffs' experts fail to present reliable economic evidence to support the conclusion that the Alleged or Assessed Information Sharing restricted labor market competition or suppressed compensation, and ignore evidence that is inconsistent with such a conclusion ..................................................................64

6.1. Overview of the economic theory of collusion and Plaintiffs' experts' analysis .... 67

6.1.1. Overview of economic conditions that are required for collusion to have an effect on market outcomes......................................................... 67

6.1.2. Neither Dr. Starr nor Dr. Gerhart conducts an analysis of whether the economic conditions for collusion to affect market outcomes hold ........................68

6.2. The economic evidence reviewed by Dr. Starr and Dr. Gerhart does not support a conclusion that the Experts' Assessed SCA-USPI Information Sharing or the Alleged SCA-USPI Information Sharing suppressed compensation or restricted labor market competition.................................................................70

6.2.1. Overview of Experts' Assessed SCA-USPI Information Sharing......................71

6.2.2. Plaintiffs' experts have not shown how the alleged information sharing they identify provides a mechanism to monitor and suppress compensation ................ 73

6.2.3. Plaintiffs', Dr. Starr's, and Dr. Gerhart's assertions that the Experts' Assessed SCA-USPI Information Sharing was sufficiently detailed to facilitate collusion ignore the complexity of Defendants' compensation packages.................78

7. Economic evidence does not support Plaintiffs' experts' claims that internal and external equity would have resulted in the Alleged, Assessed, or Admitted Mobility Restrictions ████████████████████████████████ 81

7.1. ████████████████████████████████████
████████████████████████████████████
██████████████████████ ........................................83

7.2. Dr. Gerhart offers flawed logic and analyses to support his assertion that concerns of internal and external equity would have resulted in the Experts'
████████████████████████████████████
████████████ ........................................89

7.2.1. Overview of Dr. Gerhart's claims related to internal and external equity.......89

7.2.2. Dr. Gerhart's review of USPI documents does not support his opinion that the Experts' Assessed SCA-USPI Mobility Restrictions would have a widespread impact on the compensation of USPI Senior Employees........................................ 91

7.2.3. Dr. Gerhart's claims about "external equity" contradict his claim that the Experts' Assessed SCA-USPI Mobility Restrictions would have affected all Senior Employees ........................................98

7.3. Dr. Starr offers flawed analyses to support his assertion that the Experts' Assessed SCA-USPI Mobility Restrictions would have indirectly suppressed the compensation of USPI Senior Employees.................................99

7.3.1. Overview of Dr. Starr's claims and analysis related to internal and external equity........................................99

7.3.2. Dr. Starr's empirical analysis does not support the claim that internal equity would have resulted in all or nearly all USPI Senior Employees' wages being suppressed........................................ 103

8. Dr. Starr offers flawed empirical analyses to support his opinions on wage suppression and to calculate damages.................................113

8.1. Overview of regression models and identification of causal effects .....................115

8.2. Dr. Starr's before/during/after model .................................117

8.2.1. Errors in Dr. Starr's data affect his results .................................118

8.2.2. Dr. Starr inappropriately pools data across Defendants .............................118

8.2.3. Dr. Starr's results are driven by the end-date he selects for the Experts' Assessed SCA-USPI Conduct period ........................................................................ 120

8.2.4. Dr. Starr's results are affected by his treatment of the COVID pandemic ... 124

8.2.5. Excluding post-admitted-conduct period data from Dr. Starr's regression ..127

8.3. Dr. Starr's difference-in-differences model ......................................................... 129

8.3.1. Manager compensation is not a suitable benchmark for Senior Employee compensation ................................................................................................................131

8.3.2. Dr. Starr inappropriately pools data across Defendants ............................. 133

8.3.3. Dr. Starr's results are driven by his inclusion of COVID period data and his choice of the end-date for the Experts' Assessed SCA-USPI Conduct ................... 134

8.4. Dr. Starr's estimate of the effect of the Experts' Assessed USPI-SCA Conduct is implausibly high ................................................................................................... 135

8.4.1. Dr. Starr's estimate of the effect of the Experts' Assessed SCA-USPI Conduct is implausible compared to changes in compensation for switchers ..................... 135

8.4.2. Even if Dr. Gerhart's and Dr. Starr's assertions about a purported compensation structure were accurate, evidence contradicts their claims of cascading effects ................................................................................................................137

# 1. Qualifications, case background, and assignment

*1.1. Qualifications*

1. My name is Celeste C. Saravia. I am an economist with expertise in industrial organization, which is the study of markets and how firms compete. I received my Ph.D. in Economics from the University of California, Berkeley, in 2004. While studying at the University of California, Berkeley, I was a research assistant at the University of California Energy Institute. Since receiving my Ph.D., I have worked at Cornerstone Research as a consultant. In this role, I have used my expertise in industrial organization to study economic issues related to competition. In addition, I have held the position of lecturer at University of California, Berkeley, where I taught Industrial Organization and Public Policy and Natural Resource Economics. I have experience assessing competition issues across a wide range of industries, including energy, pharmaceuticals, medical devices, information technology, payment systems, aviation, telecommunications, and media distribution.

2. I have published on competition issues in energy markets in one of the leading economics journals, the *American Economic Review*, and I have contributed to multiple books and treatises on competition issues for the American Bar Association. I contributed to the market definition chapter in the Seventh Edition of *Antitrust Law Developments* and to *The Indirect Purchaser Litigation Handbook* and *Antitrust Law and Economics of Product Distribution*. I have previously served as a Vice Chair of the Pricing Conduct and Distribution and Franchising Committees of the American Bar Association's Antitrust Section.

3. I have testified on competition issues in depositions, trials, and in arbitration. I have been qualified by U.S. district courts to testify on competition issues on multiple occasions.[1] I have provided testimony in antitrust cases involving a wide range of allegations, including cases involving allegations of price fixing and other coordinated conduct, and a wide range of industries, including pharmaceutical products. A complete copy of my CV, including a list of prior testimony, is attached to this report as Appendix A.

4. I have been retained to provide expert testimony on behalf of Defendants United Surgical Partners Holdings, Inc., United Surgical Partners International, Inc. (collectively "USPI") and Tenet Healthcare Corporation ("Tenet"). The other corporate Defendants in the case are Surgical Care

---

[1] I have testified at trial on competition issues in the following cases: *Tevra Brands, LLC v. Bayer Healthcare LLC, et al.*; *In re HIV Antitrust Litigation*; *Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars v. Ningbo Sunny Electronic Co. Ltd.*; and *J&M Distributing Inc. v. Hearth & Home Technologies Inc. and Magnotti and Sons, Inc. d/b/a The Fireplace and the Patio Place.*

Affiliates, LLC, and SCAI Holdings, LLC (collectively "SCA") and DaVita Inc. ("DaVita").[2] I refer to USPI, Tenet, SCA, and DaVita collectively as "Defendants."

### 1.2. Allegations in Plaintiffs' Third Amended Complaint

5. In their Third Amended Complaint ("Complaint"), dated November 14, 2024, Plaintiffs allege both three-party mobility restrictions and three-party information sharing, as well as two separate bilateral mobility restrictions and two separate sets of bilateral information sharing.

### 1.2.1. Alleged Three-Party Mobility Restrictions

6. With respect to the alleged three-party conspiracy, Plaintiffs contend: "[b]eginning no later than 2008 … Defendants … entered into agreements to avoid competing for employees, particularly those at the director level or above ('Senior Employees'), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers. These 'no-poach' agreements continued through 2021."[3] The Complaint also alleges that these agreements included a provision preventing the parties from considering unsolicited job applications from each other's employees unless the employee notified their current employer (i.e., the "Tell Your Boss" provision). I refer to these allegations as the "Alleged Three-Party Mobility Restrictions."[4]

### 1.2.2. Alleged Three-Party Information Sharing

7. Plaintiffs also allege "[f]rom May 2008 through January 2021, SCA, USPI, and DaVita conspired to reduce and limit compensation and mobility of their employees" and "[i]n furtherance of the conspiracy, Defendants … exchanged competitively sensitive information to fix and maintain the compensation of their employees."[5] Plaintiffs allege that Defendants' sharing of competitively sensitive information ("CSI") allowed them "█████████████████████████████████████████████████████

---

[2] The non-corporate defendants are Andrew Hayek (former CEO of SCA) and Kevin Thiry (former CEO of DaVita). See Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, November 14, 2024 ("Complaint"), ¶¶ 21, 32.

[3] Complaint, ¶ 7.

[4] Complaint, ¶ 46 ("Consistent with the conspiracy, Defendants told job candidates they needed to inform their current employer to be considered. For example, on or about April 26, 2016, SCA's human resources executive emailed a candidate from DaVita who was based in Dallas, Texas, that she could not recruit the candidate unless they 'have been given explicit permission by their employers that they can be considered for employment with us.'").

[5] Complaint, ¶ 38.

████████████████████████"[6] I refer to the three-party information sharing alleged in the complaint as the "Alleged Three-Party Information Sharing."[7] and I refer to the three-party conspiracy alleged in the Complaint as the "Alleged Three-Party Conspiracy."

### 1.2.3. Alleged Two-Party Mobility Restrictions

8.  Plaintiffs also allege "SCA and DaVita Agree[d] Not to Poach Each Other's Employees" and this "conspiracy began at least as early as May 2008" (the "Alleged SCA-DaVita Mobility Restrictions").[8] And plaintiffs allege "SCA and USPI Agree[d] Not to Poach Each Other's Employees" and that this agreement began "[n]o later than May 2010" (the "Alleged SCA-USPI Mobility Restrictions").[9] In this report, I refer collectively to the Alleged Three-Party Mobility Restrictions and Alleged SCA-USPI Mobility Restrictions as the "Alleged USPI Mobility Restrictions."

### 1.2.4. Alleged Two-Party Information Sharing

9.  Plaintiffs' Complaint also alleges information sharing between SCA and DaVita, and information sharing between SCA and USPI. The alleged information sharing between SCA and USPI is referred to herein as the "Alleged SCA-USPI Information Sharing."[10] Plaintiffs contend the Alleged SCA-USPI Information Sharing "████████████████████████ ████████████████████████."[11] (In this report, I refer collectively to the Alleged Three-Party Information Sharing and Alleged SCA-USPI Information Sharing as the "Alleged USPI Information Sharing," and the Alleged USPI Mobility Restrictions and Alleged USPI Information Sharing are collectively referred to as the "Alleged USPI Conduct").

### 1.2.5. Alleged Class

10. Plaintiffs purport to represent a class defined as:

> [a]ll natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for [SCA]; (b) from May 2010 to January

---

[6] Complaint, ¶ 54.

[7] Complaint, ¶ 38.

[8] Complaint, ¶ 40.

[9] Complaint, ¶ 49.

[10] Complaint, ¶¶ 54–60.

[11] Complaint, ¶ 54.

2021, for [USPI]; or (c) from May 2008 to January 2021, for [DaVita].[12]

### 1.3. Experts' Assessed Bilateral Conspiracies

11. Plaintiffs retained two economic experts, Dr. Evan P. Starr and Dr. Barry S. Gerhart, who each filed a report on January 15, 2025.[13] Plaintiffs' experts do not describe or analyze the Alleged Three-Party Mobility Restrictions or the Alleged Three-Party Information Sharing. Instead, Plaintiffs' experts describe and analyze two separate mobility restrictions and two separate bilateral pathways for information sharing.

12. With respect to alleged mobility restrictions, Plaintiffs' experts describe and analyze two separate alleged non-solicitation agreements spanning different durations than those alleged in the Complaint—one between SCA and DaVita, claimed to be in effect from 2008 to 2019, and a separate agreement between SCA and USPI from 2010 to 2019 ("Experts' Assessed SCA-USPI Mobility Restrictions").[14] Plaintiffs' experts do not describe or analyze any alleged agreement between USPI and DaVita concerning mobility restrictions. For both sets of bilateral non-solicitation agreements, Plaintiffs' experts describe provisions ██████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ████████[15]

13. With respect to alleged information sharing, Plaintiffs' experts describe and analyze two separate alleged bilateral pathways for information sharing, beginning as early as 2009 and continuing through 2019.[16] Plaintiffs' experts allege SCA and DaVita shared information ("Experts' Assessed SCA-DaVita Information Sharing"), and separately allege SCA and USPI

---

[12] Complaint, ¶ 92.

[13] On January 21, 2025, Dr. Starr served an amended version of his report. On February 11, 2025, Dr. Gerhart served an amended version of his report. Throughout my report I refer to these amended reports.



[14] See also Deposition of Evan P. Starr, March 19–20, 2025 ("Starr Deposition"), p. 37 ███████████████ █████████████████████████████████████████████ ██████████████████████ ). Dr. Starr testified that █████████████ ███████████████████████. See Starr Deposition, pp. 36–37 █████████ ████████████████████"), 38 ("█████████████████████████████ ████████████████").

[15] Expert Witness Report of Dr. Evan P. Starr, January 21, 2025 ("Starr Report"), ¶ 77.b ("██████████ █████████████████████████████████████████████ ████████████████████████████████); Expert Witness Report of Dr. Barry Gerhart, February 11, 2025 ("Gerhart Report"), ¶ 22.b██████ █████████████████████████████████████████████ ██████████████████████).

[16] Starr Report, ¶¶ 118.b.i████████████████████████████████████ █████████████████ 118.b.ii███████████████████████████ ██████████████████████████████

shared information ("Experts' Assessed SCA-USPI Information Sharing") that could have been used to ███████████████████.[17] Plaintiffs' experts do not describe or analyze any alleged information sharing between USPI and DaVita.[18] Collectively, I refer to Experts' Assessed SCA-USPI Mobility Restrictions and Experts' Assessed SCA-USPI Information Sharing as "Experts' Assessed SCA-USPI Conduct."

### 1.4. USPI's Admitted Conduct

14. USPI admits that it had an agreement with SCA "to avoid actively soliciting each other's employees at the level of administrator or above, absent the knowledge of the employee's existing employer, that was effective from May 2010 until October 2017."[19] USPI admitted that the "agreement was oral[.]"[20] USPI admitted that it "told certain executives, human resources employees, and recruiters to avoid actively soliciting SCA employees at the administrator level and above[.]"[21] USPI admitted that "USPI's and SCA's then CEOs [Bill Wilcox and Andrew Hayek] monitored and enforced the USPI/SCA Agreement,"[22] that Mr. Hayek "communicated with USPI with respect to" the agreement,[23] and that "USPI senior executives executed and enforced" the agreement.[24] USPI also admitted that it "told candidates who were employed at the administrator level and above at SCA that they would need to inform SCA to be considered for a position at USPI" (i.e., the Tell Your Boss provision).[25] I refer to USPI's admitted mobility restrictions with SCA as "USPI's Admitted Mobility Restrictions with SCA".

---

[17] Starr Report, ¶ 19.b ("Plaintiffs also allege that SCA and DaVita, and SCA and USPI suppressed Class pay by regularly sharing ███████████████████████.").; Gerhart Report, ¶ 21 ("Plaintiffs allege that Defendants unlawfully conspired to ███████████████████████ ████████████████████████████████████████ ██████████████████).

[18] See, e.g., Starr Deposition, pp. 36–37 ████████████████████████████████ ███"), 38 ████████████████████████████████████████████").

[19] Answer of Defendants United Surgical Partners Holdings, Inc., United Surgical Partners International, Inc., and Tenet Healthcare Corporation to Plaintiffs' Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, December 20, 2024 ("USPI and Tenet's Answer to the Third Amended Complaint"), ¶ 1. USPI also reported evidence of potential bilateral agreements with the following ASC companies: ████████████████████████████. See Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "*In re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305," June 1, 2023 at p. 4. Neither the Complaint nor Dr. Starr focus on these other agreements.

[20] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 88.

[21] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 50.

[22] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 7.

[23] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 21.

[24] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 38.

[25] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 46.

15. While USPI admits to sharing "business information" with SCA, USPI denies that the purpose of sharing this information was to suppress USPI's employees' pay.[26]

16. In this report, I refer collectively to the Alleged USPI Mobility Restrictions, Experts' Assessed SCA-USPI Mobility Restrictions, and USPI's Admitted Mobility Restrictions with SCA as the "Alleged, Assessed, or Admitted Mobility Restrictions." Similarly, I refer collectively to the Alleged USPI Information Sharing and the Experts' Assessed SCA-USPI Information Sharing as the "Alleged or Assessed Information Sharing." I also refer collectively to the Alleged USPI Conduct, the Experts' Assessed SCA-USPI Conduct, and USPI's Admitted Mobility Restrictions with SCA as the "Alleged, Assessed, or Admitted Conduct."

## 1.5. Assignment

17. I was asked by counsel representing USPI and Tenet to review and respond to the expert reports of Plaintiffs' experts, Dr. Starr and Dr. Gerhart, and to assess the economic analyses contained in those reports relating to various allegations about USPI's conduct. In particular, I have been asked to:

- Assess whether the available evidence and data support a conclusion that USPI, collectively with SCA, would have had market power sufficient to suppress the compensation of all or nearly all USPI Senior Employees by engaging in the Alleged, Assessed, or Admitted Conduct;
- Assess whether the economic evidence and analyses presented in Dr. Starr's and Dr. Gerhart's expert reports support Plaintiffs' allegations that the Alleged USPI Conduct suppressed the compensation of all or nearly all USPI Senior Employees;
- Assess whether the economic evidence and analyses presented in Dr. Starr's and Dr. Gerhart's expert reports support their conclusion that the Experts' Assessed SCA-USPI Conduct suppressed the compensation of all or nearly all USPI Senior Employees;
- Assess whether the economic analyses presented in Dr. Starr's and Dr. Gerhart's expert reports support a conclusion that USPI's Admitted

---

[26] USPI and Tenet's Answer to the Third Amended Complaint, p. 6 ("With respect to the third sentence of Paragraph 8, USPI and Tenet admit that there were occasions on which USPI shared business information with SCA. … USPI and Tenet deny the fourth sentence of Paragraph 8." The fourth sentence of Paragraph 8 states "████████████████████████████████████████████████████ ████████"). See also USPI and Tenet's Answer to the Third Amended Complaint, p. 41 ("USPI and Tenet deny the allegations in Paragraph 82 as they relate to them[.]" Paragraph 82 states: "Defendants suppress their employees' pay through another method: exchanging competitively sensitive information including future planned company-wide pay increases. Like the no-poach agreements, these wage-fixing exchanges occurred between Defendants' most senior corporate Officers, the same individuals who set an approve company-wide pay levels. Defendants used the wage-fixing exchanges to assure each other that they did not need to increase pay levels as much as they otherwise would have, if there were competitive uncertainty about those highly confidential business plans.").

Mobility Restrictions with SCA suppressed the compensation of all or nearly all USPI Senior Employees;

- Assess whether Dr. Starr's empirical analysis reliably estimates the impact and damages, if any, from the Experts' Assessed SCA-USPI Conduct, and whether his analysis supports a conclusion of compensation suppression from the Alleged USPI Conduct or USPI's Admitted Mobility Restrictions with SCA.

18. Cornerstone Research is being compensated at my standard billing rate of $1,200 per hour for my work. I have been assisted in this matter by staff at Cornerstone Research, who worked under my direction. Neither my compensation in this matter nor the compensation that Cornerstone Research receives is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

19. In performing my analyses and forming my opinions, I have relied upon the materials cited in this report, including documents and data produced in this litigation as well as publicly available documents and data. A full list of the documents I relied upon in forming my opinions is in Appendix B.

20. I reserve the right to supplement or modify my opinions, if warranted, as additional information or documents are made available to me. In addition, I reserve the right to prepare additional supporting materials such as summaries, graphical exhibits, charts, demonstratives, animations, enlargements, or other enhancements, including for hearings and trial.

## 2. Summary of opinions

21. I have reviewed Plaintiffs' allegations from the Complaint, USPI's Answer to the Complaint, Dr. Starr's and Dr. Gerhart's expert reports as well as record documents and testimony. My overall opinions are as follows:

   1. The economic evidence does not support a conclusion that USPI in combination with SCA or in combination with SCA and DaVita had the requisite market power to suppress the compensation of all or nearly all USPI Senior Employees.
   2. An analysis of the Alleged, Assessed, and Admitted Mobility Restrictions demonstrates that each could have directly affected, at most, a small number of USPI Senior Employees.
   3. Plaintiffs' experts do not analyze any information sharing between DaVita and USPI, and their analysis of the Experts' Assessed SCA-USPI Information Sharing fails to identify reliable economic evidence to support their conclusion that such conduct restricted labor market competition or facilitated the suppression of compensation for all or nearly all USPI Senior Employees. Plaintiffs' experts also fail to identify

reliable economic evidence to support a conclusion that the Alleged SCA-USPI Information Sharing restricted labor market competition or facilitated the suppression of compensation for all or nearly all USPI Senior Employees.

4. Economic evidence does not support Plaintiffs' experts' claims that USPI maintains a compensation structure that would have resulted in the Alleged, Assessed, or Admitted Conduct suppressing the compensation of all or nearly all USPI Senior Employees.

5. Dr. Starr's empirical analysis of the effect or impact of the Experts' Assessed SCA-USPI Conduct on compensation is flawed. Moreover, his empirical analyses do not support the conclusion that the Alleged USPI Conduct, the Experts' Assessed USPI Conduct, or USPI's Admitted Mobility Restrictions with SCA suppressed compensation.

22. In **Section 4**, I review record evidence related to labor market mobility to determine if USPI, collectively with SCA and/or DaVita, possesses the labor market monopsony power required to suppress the compensation of Senior Employees. In the absence of market power, if USPI attempted to suppress compensation, it would lose Senior Employees to its other labor market competitors. **I find that the economic evidence does not support a conclusion that** ███████████████████████████████ ███████████████████████████████████ ████████████████████

23. My conclusion is based on a review of Defendants' internal compensation records and third-party employee mobility data. I find that, during the years outside the Alleged, Assessed, or Admitted Conduct periods, SCA and DaVita account for less than ██████ of USPI Senior Employee arrivals or departures, and ██████████████████████ ████████████████████████████. Based on this analysis, I conclude that ██████████████████ ████████████████████████████████ ███████████████████████████████ ███████████████████████████ ██████████████████████.

24. In **Section 5**, I analyze the potential direct impact of the Alleged, Assessed, and Admitted Mobility Restrictions between SCA and USPI or among Defendants. Plaintiffs allege that some USPI Senior Employees were directly harmed by the Alleged Three-Party Mobility Restrictions. Plaintiffs' experts claim some USPI employees were directly harmed by the Experts' Assessed SCA-USPI Mobility Restrictions. Plaintiffs and Plaintiffs' experts claim that these restrictions prevented SCA (and DaVita) from soliciting USPI Senior Employees who could have either accepted a new position with SCA (or DaVita) or used the solicitation as leverage to

increase their compensation at USPI. I review the frequency of ███████ ███████████████████████████ ███████████████████ I also review Dr. Starr's impact analysis of the Experts' Assessed SCA-USPI Mobility Restrictions. **I conclude that** ███ ████████████████████████████████████████ ████████████████████████████████████ ████████████

25. My conclusion is based on economic evidence showing that ████ ████████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████████████ ████████████████████████

26. I then review Dr. Starr's impact analysis of the Experts' Assessed SCA-USPI Mobility Restrictions. His results, unmodified, indicate that there would have been ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████[27]

27. In **Section 6**, I review the evidence that Dr. Starr and Dr. Gerhart highlight in support of their claim that the economic evidence is consistent with Defendants' sharing information that could be used to suppress compensation.[28] I find that neither Dr. Starr nor Dr. Gerhart provides any analysis of alleged information sharing between USPI and DaVita in support of the Alleged Three-Party Information Sharing. **I conclude that Plaintiffs' experts fail to present reliable economic evidence that the Experts' Assessed SCA-USPI Information Sharing restricted labor market competition, or suppressed compensation**.

28. Economic theory outlines a set of conditions needed for collusion (e.g., compensation suppression or price fixing) to arise and be profitable. Dr. Gerhart and Dr. Starr opine that the economic evidence is consistent with Defendants' sharing information to facilitate a conspiracy to suppress

---

[27] The total number of departures from USPI during the conduct period was ████ See Section 5 below for details of this calculation.

[28] Starr Report, ¶ 29 (" ████████████████████████████████████████████ ████████████████ "); Gerhart Report, ¶ 7.f ("Based on my experience and research in compensation and human resource management, common evidence that ████████████████████████ are inconsistent with unilateral conduct and would have harmed employees. No company benefits by unilaterally sharing ████████████ with competing employers. Rather, mutual CSI Exchanges would have enabled Defendants to agree to keep Class pay low and limited the number of higher-paying jobs available to Class Members seeking better opportunities. As such, Defendants could have kept Class Members' pay low without fear of rising turnover rates.").

compensation.[29] Yet, neither Dr. Gerhart nor Dr. Starr assesses whether the necessary conditions for collusion hold. Moreover, the economic evidence indicates that certain conditions that are necessary for collusion do not hold.

29. Plaintiffs' experts provide characteristics of information sharing that they claim reduce competition and suppress compensation. They then review and identify communication documents that they claim demonstrate that ███████████████████████████████████████ ████████████████[30] Yet, neither expert explains how the different communications they have identified support their opinion or fit into an *economic* analysis of collusion. Applying Plaintiffs' experts' supposed criteria for assessing the likely impact of information sharing to the communications they identified calls into question their assertion that the information exchanged in each or any communication suppressed compensation. Moreover, Dr. Starr and Dr. Gerhart ignore qualitative and quantitative economic evidence that is inconsistent with the Alleged or Assessed Information Sharing suppressing compensation.

30. In **Section 7**, I review the evidence that Dr. Starr and Dr. Gerhart highlight to describe a compensation structure they claim USPI maintained. Both experts claim that the ████████████████ ████████████████████████████████████████████ ██████████████████████████████ ████████████████████████████ Therefore, Plaintiffs' experts conclude that ██████████████████ ████████████████████████████ ████████████████████ **I conclude that economic evidence does not support Plaintiffs' experts' claims that** ████████████████ ████████████████████████████ ████████████████████████████████████ ████████████████████ I base my conclusion on the following analyses and opinions.

31. I review USPI's compensation records and find that ████████████████ ████████████████████████████ ██████████████████████ ████████

---

[29] Gerhart Report, ¶ 82.a ("[B]ased on my experience and research in compensation and human resource management, ████████████████████████████████████████ ████████████████████████████." ); Starr Report, ¶ 29 ("I find that both the qualitative and quantitative evidence is consistent with the alleged anticompetitive collusion and inconsistent with competition. ... ████████ ██████████████████████████████████████████████.").
[30] Starr Report, ¶ 99. See also Gerhart Report, ¶ 82.



- ███████████████████████████████████████████
  ███████████████████████████████████
  ██████████████████████████[31]
- ██████████████████████████████████████
  ████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ████████████████████████[32]
- ████████████████████████████████████████
  ██████████████████████████████████
  █████████████████████████████
  ███████.[33]
- ████████████████████████████████████████
  █████████████████[34]

32. Dr. Gerhart relies on an internal USPI document describing ████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ The document Dr. Gerhart identifies does not support his conclusion. Rather, the ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████. I find that the existence of these documents does not support Dr. Gerhart's conclusion that ████████████████████████████████████ ████████████████████████████████████████ ████████████████.

33. Dr. Starr offers a quantitative analysis to support his compensation structure opinions. Dr. Starr claims that USPI Senior Employee compensation is correlated across jobs and within jobs. I find that Dr. Starr's compensation dataset includes an error that inflates his measure of compensation, particularly in 2005 and 2006, causing him to overstate the correlation in compensation across jobs. Once the data are corrected, Dr. Starr's methodology finds that compensation is not correlated between jobs. Furthermore, I find that the results from his *within*-job correlation analysis are driven by differences in average pay *across* jobs and not from within-job correlation in pay. I modify his analysis to isolate the within-job correlation in compensation by applying Dr. Starr's methodology to a single job title at a time. I find that correlation within any given job Dr.

---

[31] See Exhibit 20.

[32] See Exhibit 20.

[33] See Exhibit 21.

[34] See Exhibit 19.

Starr analyzes is much smaller than his overall results, and negative in some instances.

34. Finally, in **Section 8**, I review Dr. Starr's analysis of wage suppression resulting from the Experts' Assessed SCA-USPI Conduct and damages calculations. Upon review of these regressions, I conclude that Dr. Starr offers flawed empirical analyses to support his opinions on wage suppression and to calculate damages. Dr. Starr estimates two types of compensation regressions. First, ███████████████████████
█████████████████████████████████████████
██████████████████████████████████
█████████████████████████████
███████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████
█████████████████████████

35. I show that Dr. Starr's main specification, which provides the basis for his damages calculation, overstates the effect of the Experts' Assessed SCA-USPI Conduct for several reasons.

- First, Dr. Starr's regression data contain the same data processing error highlighted above that affects hours worked, as well as some other technical errors. Applying Dr. Starr's regression methodology to corrected data for Defendants results in an effect ██████████████
  █████████████████████████████████████

- Second, his main specification pools data across Defendants and imposes that the effects of the factors he accounts for are exactly the same across all Defendants. I perform a statistical test for whether the factors affect all Defendants the same and find they do not. I estimate Dr. Starr's regression on USPI's compensation data alone and find an ███████████████████████████████████
  ████████████████████████████████████████
  ███████████████████████[35]

- Third, Dr. Starr cites documents that demonstrate █████████████
  █████████████████████████████████████████
  ██████████████████████████████████████████████
  ████████████████████████████████████████████
  █████████████████████████████████████████████ If Dr. Starr's regression was identifying the effect of the Experts' Assessed

---

[35] This sensitivity is shown in Dr. Starr's Appendix Figure 29.

SCA-USPI Conduct, it should find an attenuated effect during these years. Yet, when I re-estimate Dr. Starr's regression allowing for different effects during the periods ███████████████████████ ████████████████████████████████. That is, according to Dr. Starr's analysis, ████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ █████████████████████████

- Fourth, Dr. Starr recognizes that the COVID-19 pandemic, which began coincidentally with the end of the Experts' Assessed SCA-USPI Conduct period, impacted labor markets, and that therefore he needs to control for it in his regression. He does this in a very restrictive way, assuming that the pandemic had a constant impact on compensation for 2020 and 2021, and that its impact vanished in 2022. Research shows that the pandemic's impact on labor markets was varied and persistent. When I modify Dr. Starr's regression to allow for the effect of the pandemic to persist into 2022—possibly at a reduced level—his model finds that Experts' Assessed SCA-USPI Conduct had no significant effect.

- Last, given disagreement over when the conduct at issue ended and uncertainty about how to control for effects of the pandemic, I test whether Dr. Starr's results are being driven by his choices on both of these issues by estimating his model excluding data from 2018 thereafter. This methodology allows me to be agnostic about whether 2018–2019 are inside or outside the conduct period, and agnostic about whether the impact of the pandemic continued into 2022. When I estimate Dr. Starr's model this way, I find no statistically significant effect.

36. My finding that Dr. Starr ████████████████████████ █████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████ ████████████████████████████


## 3. Background on Defendants and the industries in which they operate

37. In this section, I provide an overview of facts that will serve as building blocks in my analysis of Plaintiffs' claims and in my analysis of Plaintiffs' experts' reports. I focus on the following topics.

38. First, I provide a brief overview of the outpatient care center ("OCC") industry—the industry in which Defendants' businesses operate.[36] In this overview, I provide information on the number and variety of employers included in this industry and the industry's growth over the relevant time period. Second, I provide a brief overview of each Defendant's business and the types of facilities each Defendant operates. Third, I provide an overview of the positions held by Senior Employees at USPI and the types of skills and backgrounds of the employees that fill those positions. This overview demonstrates that Senior Employees at USPI hold positions that require different skill sets and convey different responsibilities. Last, I provide an overview of the different types of compensation USPI offers, and the varied, complex processes used by USPI to set compensation levels for Senior Employees.

### 3.1. Overview of outpatient care centers and ambulatory surgery centers

39. Defendants' businesses all fall within the OCC industry. OCCs are facilities that exclusively provide outpatient health services that are administered without an overnight stay.[37]

40. OCCs generally specialize in terms of the types of care they provide, and include facilities as diverse as Family Planning Centers, which include birth control clinics and fertility clinics,[38] Outpatient Mental Health and

---

[36] My description of the OCC industry does not imply that I view the OCC industry as the relevant labor market for analyzing the issues in this case. To the contrary, labor markets are not the same as industries or even product markets. Moreover, as I describe in Section 4, USPI Senior Employees can and do move employers outside the OCC industry. See, e.g., Samuel Dodini, Michael Lovenheim, Kjell Salvanes, and Alexander Willen, "Monopsony, Job Tasks and Labour Market Concentration," *The Economic Journal*, 134(661), 2024, pp. 1914–1949 at p. 1914 ("However, workers move across occupations and industries, and failing to account for these outside options can make labour demand appear more concentrated.").

[37] Definitive Healthcare, "Outpatient care: What is Outpatient Care?" available at https://www.definitivehc.com/resources/glossary/outpatient-care, accessed on February 25, 2025 ("Outpatient care refers to any healthcare consultation, procedure, treatment, or other service that is administered without an overnight stay at a hospital or medical facility.").

[38] Rachel K. Jones, Candace Gibson, and Jesse Philbin, "The Number of Brick-and-Mortar Abortion Clinics Drops, as US Abortion Rate Rises: New Data Underscore the Need for Policies that Support Providers," *Guttmacher*, June 2024, available at https://www.guttmacher.org/report/abortion-clinics-united-states-2020-2024, accessed on February 25, 2025 ("The nationwide 5% decline in brick-and-mortar abortion clinics took the number of such facilities from 807 in 2020 to 765 in March 2024 (Table 1)."); Blooming Eve, "Find a Fertility Clinic Near You," available at https://www.bloomingeve.com/, accessed on February 25, 2025 ("> 450 fertility centers in the US for you to choose from"); Blooming Eve, "All Fertility Clinics in the USA," available at https://www.bloomingeve.com/clinics, accessed on February 25, 2025 ("All fertility clinics in the USA").

Substance Abuse Centers,[39] and Kidney Dialysis Centers,[40] among others.[41] Ambulatory Surgical Centers ("ASCs") are specialized OCCs focused on providing same-day surgical care.[42] ASC facilities generally specialize in terms of the types of surgeries they provide.

41.  OCCs have grown substantially within the U.S. healthcare sector as part of a shift to outpatient care. This shift has been enabled by medical innovations such as minimally invasive surgeries, by payors' preference for lower-cost care, and by the increasing adoption of outpatient care by health systems.[43] This growth is demonstrated by an 80 percent increase in OCC employment between 2009 and 2023 and a more than doubling of revenue over the same period.[44]

---

[39] These facilities can offer different treatment approaches to different groups of patients. See, e.g., Substance Abuse and Mental Health Services Administration, "2020 National Mental Health Services Survey," available at https://www.samhsa.gov/data/system/files/media-quick-stats/nmhss-us20.pdf ("Treatment approaches, by number and percent … Age groups served, by number and percent … Dedicated or exclusively designed programs or groups, by number and percent"). See also the SAMHSA National Directory of Mental Health Treatment Facilities, which tracks facilities by type and treatments, available at https://www.samhsa.gov/data/sites/default/files/reports/rpt34657/National_Directory_MH_facilities_2021.pdf, accessed on April 14, 2025. See also KFF, "Number of Mental Health Treatment Facilities, By Type of Care," 2022, available at https://www.kff.org/other/state-indicator/number-of-mental-health-treatment-facilities-by-type-of-care/, accessed on April 14, 2025.

[40] The National Forum of ESRD Networks, "National ESRD Census Data," September 30, 2024, available at https://esrdnetworks.org/resources-news/national-esrd-census-data/, accessed on February 25, 2025 ("The 18 ESRD Networks serve 7,563 dialysis centers and 224 transplant centers in the United States and its territories.").

[41] Office of Management and Budget, "North American Industry Classification System," 2022, available at https://www.census.gov/naics/reference_files_tools/2022_NAICS_Manual.pdf ("621410 Family Planning Centers … 621420 Outpatient Mental Health and Substance Abuse Centers … 621492 Kidney Dialysis Centers … 621493 Freestanding Ambulatory Surgical and Emergency Centers").

[42] Ambulatory Surgery Center Association, "What is an ASC?," available at https://www.ascassociation.org/asca/about-ascs/surgery-centers, accessed on February 25, 2025 ("Ambulatory surgery centers, or ASCs, are modern healthcare facilities focused on providing same-day surgical care, including diagnostic and preventive procedures."); CMS.gov, "State Operations Manual," July 21, 2023, available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/som107ap_l_ambulatory.pdf, 416.2 ("Ambulatory surgical center or ASC means any distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following an admission.").

[43] Deloitte, "Growth in Outpatient Care," available at https://www2.deloitte.com/content/dam/insights/us/articles/4170_Outpatient-growth-patterns/DI_Patterns-of-outpatient-growth.pdf, p. 2 ("Clinical innovation, patient preferences, and financial incentives are tilting the balance in favor of outpatient settings for hospital services. Aggregate hospital revenue from outpatient services grew from 30 percent in 1995 to 47 percent in 2016. Some of this change is driven by patient preference and clinical and technological advances such as minimally invasive surgical procedures and new anesthesia techniques that reduce complications and allow patients to return home sooner. Financial incentives have likely played a role as well. Health plans and government program payment policies support providing services in lower-cost care settings, including outpatient facilities. Health systems have also been acquiring or partnering with physicians and physician practices, further driving up the volume of services performed in outpatient settings."); Kimberly Steele, "Healthcare Industry Embraces Shift to Outpatient Care Sites," *JLL*, April 11, 2024, available at https://www.us.jll.com/en/newsroom/healthcare-industry-embraces-shift-to-outpatient-care-sites, accessed on February 25, 2025 ("Demographic trends, consumer preferences, technology and reimbursement changes are continuing to steer the shift toward outpatient care, in turn driving demand for medical outpatient buildings.").

[44] Federal Reserve Bank of St. Louis, "Employment for Health Care and Social Assistance: Outpatient Care Centers (NAICS 6214) in the United States," available at https://fred.stlouisfed.org/series/IPURN6214W200000000, accessed on April 14, 2025; Federal Reserve Bank of St. Louis, "Total Revenue for Outpatient Care Centers, All Establishments," available at https://fred.stlouisfed.org/series/REV6214ALLEST144QNSA#0, accessed on April 14, 2025.

42. Exhibit 1 shows the growth of employment in OCCs and ASCs between 2008 and 2022 based on data from the U.S. Bureau of Labor Statistics. Over this period, the number of people employed in OCCs has grown substantially, and ASCs have grown even faster. ASCs accounted for 14 percent of OCC employment in 2008, and their share grew to 17 percent in 2022.

*Exhibit 1*
*ASC and OCC employment, 2008–2022*



Source: U.S. Bureau of Labor Statistics

Note: OCCs are identified using the North American Industry Classification System ("NAICS") code 6214 ("Outpatient care centers") and ASCs are identified by NAICS 621493 ("Freestanding ambulatory surgical and emergency centers"). Employment counts are calculated as annual averages and do not include workers at government-owned facilities.

43. The OCC industry is comprised of many participants beyond Defendants, and combined, USPI, SCA, and DaVita account for a small share of facilities in the industry. Exhibit 2 shows the number of OCC facilities in the U.S. versus the number operated by Defendants over time. Defendants' share of U.S. facilities, and in particular the share of USPI and SCA combined, is small.

*Highly Confidential - Outside Counsel/Experts Only*

*Exhibit 2*

*Number of OCC facilities in the U.S., and number operated by USPI, SCA, and DaVita, 2008–2022*



Source: U.S. Bureau of Labor Statistics; Dr. Starr Compensation Regression Data

Note: OCCs are identified using the NAICS code 6214 ("Outpatient care centers"). U.S. overall counts of establishments come from the U.S. Bureau of Labor Statistics. These data are calculated as annual averages and do not include government-owned facilities. Defendants' yearly count of establishments represents the distinct number of employment locations by name for each Defendant in each year in Dr. Starr's regression data.

### 3.2. Background on the Defendants

44. The corporate Defendants in this matter are USPI, SCA, and DaVita. USPI and SCA both operate ASC facilities. DaVita primarily operates dialysis centers, which are part of a broader OCC industry. In the remainder of this section, I provide background on each of the Defendants.

### 3.2.1. USPI

45. Founded in 1998, USPI currently owns and operates 518 ASCs and 25 surgical hospitals across 37 states.[45] USPI partners with both local

---

[45] Tenet Healthcare Corporation, SEC Form 10-K for period ended December 31, 2024, filed on February 18, 2025 ("Tenet 2024 10-K"), p. 4 ("At December 31, 2024, USPI held indirect ownership interests in 518 ASCs and 25 surgical hospitals in 37 states."); United Surgical Partners International, "About Us: Who We Are," available at https://uspi.com/about-us/who-we-are/default.aspx, accessed on April 1, 2025 ("USPI was founded in 1998").

physicians and health systems in ownership of its surgical facilities,[46] and operates these facilities through management services contracts.[47] USPI facilities offer a range of procedures but focus on ophthalmology, gastroenterology, and orthopedics.[48]

46. USPI completed an initial public offering in 2001,[49] and was acquired by private equity firm Welsh Carson in 2007.[50] In 2015, USPI merged with Tenet in a deal that gave Tenet majority control of the company.[51] By 2018, Tenet had completed its buyout of Welsh Carson and had 95 percent control of USPI.[52] In December 2021, USPI acquired SCD, which operated 86 ASCs.[53]

---

[46] United Surgical Partners International, "About Us: Who We Are," available at https://uspi.com/about-us/who-we-are/default.aspx, accessed on April 1, 2025 ("We care for communities of all sizes through strategic joint venture partnerships with more than 50 health systems and thousands of physicians. … We also have a proven track record of successful two-way partnerships between USPI and local physicians."); United Surgical Partners International, "Partners: For Physicians," available at https://uspi.com/partners/for-physicians/default.aspx, accessed on April 1, 2025 ("We have two models in which physician partners can participate: Two-way partnerships, wherein physicians have joint ownership in surgical facilities with USPI. Three-way partnerships, wherein physicians have joint ownership in surgical facilities together with USPI and another health system"). USPI owns approximately 30 percent of its ASCs outright. See Deposition of Sandi Karrmann (USPI), August 14, 2024 ("Karrmann Deposition"), PX 296 at DOJCIV-008-00000390 ("████████████████████████████████████████ ███████████████").

[47] Tenet 2024 10-K, p. 54 ("USPI operates its surgical facilities in partnership with local physicians and, in many of these facilities, a health system partner. In most cases, we hold ownership interests in the facilities and operate them through separate legal entities. USPI operates facilities on a day-to-day basis through management services contracts. … Our role as an owner and day-to-day manager provides us with significant influence over the operations of each facility.").

[48] Tenet, "Tenet and USPI to Acquire SurgCenter Development and Establish Long-Term Development Partnership," November 8, 2021, available at https://investor.tenethealth.com/press-releases/press-release-details/2021/Tenet-and-USPI-to-Acquire-SurgCenter-Development-and-Establish-Long-Term-Development-Partnership/default.aspx, accessed on April 1, 2025 ("The case mix of the centers has an attractive distribution among several service lines where USPI has demonstrated expertise, including approximately 80 percent in musculoskeletal care, such as total joint and spine procedures. This complements a robust service offering within USPI's broader platform in the areas of gastroenterology, ophthalmology, ENT, general surgery and other specialized procedures."); Francesca Mathewes, "USPI vs. AmSurg vs. SCA Health: 10 Key Comparisons to Know in 2024," *Becker's: ASC Review*, August 9, 2024, available at https://www.beckersasc.com/asc-news/uspi-vs-amsurg-vs-sca-health-10-key-comparisons-to-know-in-2024.html, accessed on April 1, 2025 ("USPI invests primarily in orthopedics and other specialties such as ophthalmology and gastroenterology."); Tenet 2024 10-K, p. 4 ("USPI's facilities offer a range of procedures and service lines, including, among other specialties: orthopedics, total joint replacement, and spinal and other musculoskeletal procedures; gastroenterology; pain management; otolaryngology (ear, nose and throat); ophthalmology; and urology.").

[49] Luisa Beltran, "IPO Market Starts Off Fresh," *CNN Money*, June 2, 2001, available at https://money.cnn.com/2001/06/02/deals/sat_ipos/, accessed on April 1, 2025.

[50] CNBC, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," August 5, 2010, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 1, 2025.

[51] Tenet Health, "Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx, accessed on April 1, 2025.

[52] WCAS, "Tenet Completes Purchase of USPI from WCAS," April 26, 2018, available at https://wcas.com/news/tenet-completes-purchase-of-uspi-from-wcas/, accessed on April 1, 2025.

[53] Tenet Health, "Tenet and USPI Complete Transaction to Acquire SCD," December 22, 2021, available at https://investor.tenethealth.com/press-releases/press-release-details/2021/Tenet-and-USPI-Complete-Transaction-to-Acquire-SCD/default.aspx, accessed on April 1, 2025.

*Highly Confidential - Outside Counsel/Experts Only*

47.  USPI accounts for a small share of the ASC industry in the U.S. Exhibit 3 shows the number of ASC facilities in the U.S. for each year from 2008 to 2022, along with the number of facilities operated by USPI. In 2022, USPI operated 424 facilities out of 8,576 ASC facilities in the U.S. overall, or less than 5 percent of the U.S. total.[54]

*Exhibit 3*
*Number of ASC facilities in the U.S., and number operated by USPI and SCA, 2008–2022*



Source: U.S. Bureau of Labor Statistics; Dr. Starr Compensation Regression Data

Note: ASCs are identified using the NAICS code 621493 ("Freestanding ambulatory surgical and emergency centers"). U.S. overall counts of establishments come from the U.S. Bureau of Labor Statistics. These data are calculated as annual averages and do not include government-owned facilities. Defendants' yearly count of establishments represents the distinct number of employment locations by name for each Defendant in each year in Dr. Starr's regression data.

### 3.2.2. SCA

48.  SCA owns and operates more than 320 ASCs across 35 states.[55] SCA operates both single- and multi-specialty facilities covering many

---

[54] Workpaper 1.

[55] SCA Health, "Supporting Physician Specialists in Many Aspects of Patient Care," available at https://sca.health/about-us/, accessed on February 25, 2025 ("320+ surgical facilities … Industry-leading core ASC business delivers high-quality, lower cost care with exceptional patient and physician satisfaction scores."); SCA Health, "Patient Commitment: We Put Patients First," available at https://sca.health/patient-commitment/, accessed on April 1, 2025; Claire Wallace, "SCA Health Grows to 320+ Surgical Facilities," *Becker's: ASC Review*, August 31, 2022, available at https://www.beckersasc.com/asc-transactions-and-valuation-issues/sca-health-adds-almost-100-new-surgical-facilities-in-2022.html, accessed on April 1, 2025 ("SCA now has over 320 surgical facilities, up from 230 last year. In addition, while they used to serve 8,000 physicians across 35 states, they now serve 9,200.").

specialties, with an emphasis on orthopedics and spinal surgery.[56] About half of SCA's facilities are operated with local physician partners and half are operated with hospital system partners.[57]

49. SCA was acquired by Optum, a health services company that is owned by UnitedHealth Group, in 2017.[58]

50. SCA accounts for a small share of the ASC industry in the U.S. In 2022, SCA accounted for 201 out of 8,576 ASC facilities in the U.S., or roughly 2 percent of facilities.[59] The two Defendant ASC operators' networks combined account for a small share of facilities. Exhibit 3 above shows that in each year from 2008 to 2022, USPI and SCA together accounted for less than 10 percent of ASCs in the U.S.

### 3.2.3. DaVita

51. DaVita is in the broader OCC industry. It owns and operates 2,657 outpatient dialysis centers in 46 states and provides hospital inpatient dialysis services at over 750 hospitals,[60] and it also provides home-based dialysis services.[61] While DaVita owns many of its outpatient centers outright, a minority are owned and operated as joint ventures with partners ranging from physicians and health systems to management services organizations. DaVita usually holds a controlling interest in these centers.[62]

---

[56] Francesca Mathewes, "USPI vs. AmSurg vs. SCA Health: 10 Key Comparisons to Know in 2024," *Becker's: ASC Review*, August 9, 2024, available at https://www.beckersasc.com/asc-news/uspi-vs-amsurg-vs-sca-health-10-key-comparisons-to-know-in-2024.html, accessed on April 1, 2025 ("It focuses on orthopedics and spine."); SCA Health, "Build Your Career at SCA Health," available at https://careers.sca.health/, accessed on April 8, 2025 ("We provide a wide range of care to patients[.]").

[57] SCA Health, "Committed to Excellent Patient Care," available at https://sca.health/partnering-with-sca/physicians/#, accessed on April 1, 2025 ("Surgery center partnership"); SCA Health, "Partnering with Hospital Systems," available at https://sca.health/partnering-with-sca/hospital-systems/#, accessed on April 1, 2025 ("Professional ASC leadership, including managed care contracting, group purchasing, and management and operating systems ... ~50% of SCA Health facilities have a hospital system partner that allows for unique understanding of joint venture structures and local community relationships").

[58] UnitedHealth Group, "Surgical Care Affiliates (SCA), OptumCare to Combine," January 9, 2017, available at https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html, accessed on April 1, 2025.

[59] Workpaper 1.

[60] DaVita Inc., SEC Form 10-K for period ended December 31, 2024, filed on February 13, 2025 ("DaVita 2024 10-K"), p. 3 ("Our U.S. dialysis business is a leading provider of kidney dialysis services for patients suffering from ESKD. As of December 31, 2024, we provided dialysis, administrative and related laboratory services in the U.S. through a network of 2,657 outpatient dialysis centers in 46 states and the District of Columbia, serving a total of approximately 200,800 patients. We also have contracts to provide hospital inpatient dialysis services in approximately 760 hospitals throughout the U.S.").

[61] DaVita 2024 10-K, p. 5 ("Many of our outpatient dialysis centers offer certain support services for dialysis patients who prefer and are able to perform either HHD or peritoneal dialysis in their homes. Home-based hemodialysis support services consist of providing equipment and supplies, training, patient monitoring, on-call support services and follow-up assistance. Registered nurses train patients and their families or other caregivers to perform either HHD or peritoneal dialysis.").

[62] DaVita 2024 10-K, p. 8 ("We own and operate certain of our dialysis centers through entities that are structured as joint ventures. We generally hold controlling interests in these joint ventures, with nephrologists, hospitals, management services organizations, and/or other healthcare providers holding minority equity interests. ... For the

52. DaVita has been a standalone public company since 1995, when it operated as Total Renal Care.[63] It changed its name to DaVita in 2000.[64] In 2005, it acquired Gambro Healthcare for $3 billion in a deal that added 565 dialysis centers to its operations.[65]

### 3.3. Background on USPI Senior Employees

53. Plaintiffs claim that Defendants conspired to suppress competition for Senior Employees, which they define as employees "at the director level and above."[66] Senior Employees include employees in a variety of roles that require different skills and experience, from nursing certifications to business degrees, experience with health insurance billing or information technology, or experience in a surgical setting. As I explain below, any assessment of the effect of the Alleged, Assessed, or Admitted Conduct on USPI's Senior Employees requires an understanding of the employment options available to USPI Senior Employees. In this section, I describe examples of the jobs held by USPI Senior Employees.

54. Exhibit 4 below summarizes USPI job descriptions for nine common Senior Employee job titles in Dr. Starr's class data: ███████████████████ ███████████████████████████████ ███████████████████████████████ ████████████████ Each of these jobs requires a different combination of education and certifications, skills, and experience.[67]

---

[63] Total Renal Care Holdings Inc., SEC Form 10-Q for the quarterly period ended March 31, 1996, filed on March 15, 1996, p. 13 ("On November 3, 1995, the Company completed its initial public offering[.]").

[64] DaVita, "Total Renal Care Holdings, Inc. Announces Legal Name Change to DaVita Inc.," October 4, 2000, available at https://investors.davita.com/2000-10-04-Total-Renal-Care-Holdings-Inc-Announces-Legal-Name-Change-to-DaVita-Inc, accessed on April 1, 2025.

[65] DaVita, "DaVita to Acquire Gambro Healthcare, a Renal Dialysis Services Company," December 7, 2004, available at https://investors.davita.com/2004-12-07-DaVita-to-Acquire-Gambro-Healthcare-a-Renal-Dialysis-Services-Company, accessed on April 1, 2025.

[66] Complaint, ¶ 7 ("Beginning no later than 2008, however, Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above ('Senior Employees'), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers.").

[67] USPI provided a letter to Plaintiffs containing the set of job titles that were subject to USPI's Admitted Mobility Restrictions with SCA. See Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C.), and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "*In re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305," May 14, 2023. Dr. Starr identified a set of job titles listed in USPI's compensation records that he considers part of the putative class. I present both lists of job titles in Appendix D. Exhibit 4 presents examples from the list of job titles Dr. Starr considers as part of the putative class and which may not be job titles that USPI admitted were subject to USPI's Admitted Mobility Restrictions with SCA.

The footnote beginning on the previous page continues: year ended December 31, 2024, revenues from joint ventures in which we have a controlling interest represented approximately 30% of our U.S. dialysis revenues.").

***Exhibit 4***
***Education, skill, and experience requirements for a selection of USPI class jobs***

| Education and Certification | Skills and Specialties | Experience |
| --- | --- | --- |



Source: ███████████████████████ (USPI_CIV_000258918; USPI_CIV_000255672; USPI_CIV_000035153; https://www.indeed.com/viewjob?jk=fe790283b33ab633&from=shareddesktop; https://www.indeed.com/viewjob?jk=58a75b27e4092221&from=shareddesktop; https://careers.uspi.com/job/monroe/clinical-director/35934/79380146160); ███████████████ (USPI_CIV_000537576; https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-75Di1200318061401/); ██████████████████ (https://www.wayup.com/i-j-Director-of-Clinical-Operations-United-Surgical-Partners-International-Inc-USPI-482563639121828/; https://careers.uspi.com/job/dallas/uspi-director-clinical-operations-up-to-75-travel/26425/79499040448; https://careers.uspi.com/job/nashville/uspi-director-of-clinical-operations-hybrid-must-live-in-tn-up-to-75-travel/26425/78599147200); ██████████████ (USPI_CIV_000006204; USPI_CIV_000336360; USPI_CIV_000198551; USPI_CIV_000056074); ████████████ (USPI_CIV_000336074; USPI_CIV_000574241; https://www.indeed.com/viewjob?jk=bc655b0f0fe331fc&from=shareddesktop); ███████████ (USPI_CIV_000776176; USPI_CIV_000484217; USPI_CIV_000557348; USPI_CIV_000031207; USPI_CIV_000188238; USPI_CIV_000301659; https://www.indeed.com/viewjob?jk=46a9059ad76901ba&from=shareddesktop; https://www.indeed.com/viewjob?jk=c078d8f7008bf116&from=shareddesktop); ███ (USPI_CIV_000241755; USPI_CIV_000250682; https://www.indeed.com/viewjob?jk=8c181807c183eabc&from=shareddesktop; https://www.indeed.com/viewjob?jk=1046d2fc27cbf644&from=shareddesktop); █████████████ (USPI_CIV_000188238; USPI_CIV_000239249; USPI_CIV_000261743; https://www.indeed.com/viewjob?jk=80dba394c619badf&from=shareddesktop); █████████ (USPI_CIV_000889891; USPI_CIV_000713042; USPI_CIV_000035359; https://www.tealhq.com/job/uspi-market-president-i-midwest_d9052397-8ff0-420a-93ae-52f1189ff5d0)

Note: Table summarizes key required or preferred educational background and certifications, skills and specialties, and experiences for nine Senior Employee job titles. Job titles in this table reflect some of the largest titles by total compensation appearing in Dr. Starr's class data, except for ██████████████████████████████████████. This summary relies on job postings and/or resumes for each job title.

55. Some Senior Employee positions in the putative class as identified by Dr. Starr, such as █████████████████████████████████████████████████████████, but these jobs differ in the required skills or experience.[68] Of the positions for ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[69] Some of these jobs prefer both a █████████████████████████████████████████.[70]

---

[68] USPI Job Description, "Clinical Director/Director of Nursing at the Center for Ambulatory Surgical Treatment," Undated, USPI_CIV_000035153 at USPI_CIV_000035153 ("Current license as a Registered Nurse (for the state of CA)"); Indeed, "Crown Point Surgery Center: Clinical Director," available at https://www.indeed.com/viewjob?jk=fe790283b33ab633&from=shareddesktop, accessed on February 3, 2025 ("Current license as a CO Registered Nurse."); Indeed, "Baylor Scott & White Surgicare Centennial: Director of Nursing Outpatient Surgery," available at https://www.indeed.com/viewjob?jk=58a75b27e4092221&from=shareddesktop, accessed on February 3, 2025 ("RN License in the State"); WayUp, "USPI: FSH Director of Surgical Services," available at https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-751200318061401/, accessed on February 4, 2025 ("Current California Registered Nursing License.").

[69] WayUp, "USPI: FSH Director of Surgical Services," available at https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-751200318061401/, accessed on February 4, 2025 ("Five (5) years of experience in surgical nursing."); WayUp, "USPI: Director of Clinical Operations," available at https://www.wayup.com/i-j-Director-of-Clinical-Operations-United-Surgical-Partners-International-Inc-USPI-482563639121828/, accessed on February 4, 2025 ("Minimum of five (5) years' experience in Medical/Surgical or Intensive Care nursing."); Indeed, "Crown Point Surgery Center: Clinical Director," available at https://www.indeed.com/viewjob?jk=fe790283b33ab633&from=shareddesktop, accessed on February 3, 2025 ("At least two years supervisory experience in the outpatient surgery area."); WayUp, "USPI: FSH Director of Surgical Services," available at https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-751200318061401/, accessed on February 4, 2025 ("Two (2) years of nursing management experience preferred.").

[70] WayUp, "USPI: Director of Clinical Operations," available at https://www.wayup.com/i-j-Director-of-Clinical-Operations-United-Surgical-Partners-International-Inc-USPI-482563639121828/, accessed on February 4, 2025 ("Graduate of professional school of nursing, BSN required … Master's degree preferred, applicable to area of expertise … Current, active Texas RN License"); Indeed, "USPI: Surgery Center Administrator," available at

While the Senior Employee roles for Registered Nurses require different combinations of skills and experience, and therefore differ from each other, they are not unique to the OCC industry. As I show in detail below, USPI competes for workers in each of these roles with different types of employers, ███████████████████████████████████ ████████████████████████████ .

56. Other positions held by Senior Employees, such as ███████████████ ,[71] ████████████████████████████████████████████████████ ████████████████████ [72] Some of these jobs call for ██████████████████ ████████████████████ .[73] Some do not require ████████████████ ████████████████ , but they do require different sets of skills such as ██████ ███████████████████████████████████ .[74] As I show in detail below, USPI hires workers for these roles from and loses workers to businesses ████████████████████████████████████████ ██████████████████████████████████████

---

https://www.indeed.com/viewjob?jk=c078d8f7008bf116&from=shareddesktop, accessed on February 3, 2025 ("Nursing or Master's degree preferred.").

[71] There are distinct job titles requiring different educational backgrounds and skills even within directors of finance. In addition to the director of finance position discussed in this section, documents and Dr. Starr's class data identify a separate director of operations finance position, which requires a master's degree in a quantitative or technical field as well as knowledge and ability in business intelligence and financial analysis. See email chain from Shelly Campbell to Shannon Mosley, "FW: Director of Operations Finance," August 20, 2014, USPI_CIV_000457557–60 at USPI_CIV_000457557 ("Director Business Intelligence & Financial Analysis will create business intelligence solutions/reports and provide information and analytical consulting in support of financial, strategic and quality initiatives. ... Requires a Masters degree in Computer Science, Information Technology, Finance, Accounting or related field ... Minimum of 5 years related business intelligence experience including data design, data quality, and reporting/visualization[.]").

[72] USPI Job Description, "Director at TOPS Surgical Specialty Hospital," Undated, USPI_CIV_000056074–75 at USPI_CIV_000056075 ("Masters degree in Business Administration, Accounting or Health Care Administration preferred."); Indeed, "USPI: Regional Director," available at https://www.indeed.com/viewjob?jk=bc655b0f0fe331fc&from=shareddesktop, accessed on February 3, 2025 ("Master's degree in business administration or healthcare administration preferred."); Indeed, "USPI: Chief Executive Officer – Fresno Surgical Hospital," available at https://www.indeed.com/viewjob?jk=1046d2fc27cbf644&from=shareddesktop, accessed on April 8, 2025 ("A Master's degree is strongly preferred."); "Resume of Thanh T. Tran, FACHE," Undated, USPI_CIV_000241755–57; "Resume of Dan Smith, MBA," Undated, USPI_CIV_000250682–84; Indeed, "USPI: Regional Vice President, Operations I–Mid–Atlantic (MD/PA/NJ/DE)," available at https://www.indeed.com/viewjob?jk=80dba394c619badf&from=shareddesktop, accessed on February 3, 2025 ("Prefer Master's degree in Business Administration or Healthcare Administration; equivalent experience considered").

[73] Indeed, "USPI: Regional Vice President, Operations I–Mid–Atlantic (MD/PA/NJ/DE)," available at https://www.indeed.com/viewjob?jk=80dba394c619badf&from=shareddesktop, accessed on February 3, 2025 ("Must have OR Operations experience").

[74] USPI Job Description, "Director at TOPS Surgical Specialty Hospital," Undated, USPI_CIV_000056074–75 at USPI_CIV_000056075 ("Minimum 5 years in a hospital financial management capacity. Bachelors degree in Accounting required."); Indeed, "USPI: Regional Director," available at https://www.indeed.com/viewjob?jk=bc655b0f0fe331fc&from=shareddesktop, accessed on February 3, 2025 ("Minimum five years' experience with exposure to healthcare business development & operations, finance and business consulting required.").

*3.4. Overview of compensation for USPI Senior Employees*

57. To analyze whether compensation outcomes are consistent with the allegations that Defendants colluded to suppress Senior Employee compensation, it is important to understand the components of compensation that USPI offered. In this section, I review documentary evidence showing the complex ways that compensation for USPI employees was determined.

58. USPI provided a variety of forms of compensation to Senior Employees.



[75] USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 2 ("████████████████").

[76] USPI_CIV_000338903–04 at USPI_CIV_000338903, ("████████████████████████████████ ████████████████████████████████████████████████ ████████").

[77] "Federal Bureau of Investigation Interview of ████████████████," July 28, 2020, DOJCIV-008-00000353– 67 at DOJCIV-008-00000359 ("████████████████████████████ ████████████████████."); Deposition of Cindy English (USPI), Volume I, June 12, 2024 ("English Deposition"), p. 52 ("████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████").

[78] Karrmann Deposition, p. 38 ██████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████); English Deposition, pp. 27– 28 ("████████████████████████████████████████████████ ████████████████████████████").

[79] English Deposition, p. 27 ("████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████"); Email from Cindy English to Jonathan Bond, "RE: Administrator Salary Considerations – BOND – Nov 2012," October 11, 2012, with attachment, USPI_CIV_000810697 at USPI_CIV_000810697 ("████████████████████████").



.80

.82

.83

); Email chain from Alex Bateman to Cindy English, "RE: PLEASE RESPOND: Administrator Increase Questions Ellinger & Bray – JOHNSTON– BATEMAN," February 2, 2015, USPI_CIV_000650633–36 at USPI_CIV_000650635–636 ("

                                ); Email chain from Mark McCormick to Teresa Danna, "RE: Corporate Salary Increases - Nov 2014_Garvin_Danna (Due by Mon 10/20)," with attachment, October 20, 2014, USPI_CIV_000689431

Karrmann Deposition, pp. 43–44 ("

                                                                            .

[80] "Federal Bureau of Investigation Interview of                                ," July 28, 2020, DOJCIV-008-00000353– 67 at DOJCIV-008-00000359 ("

                                                                            ); English Deposition, p. 40 ("

                                "); Email from Cindy English to Jonathan Bond, "RE: Administrator Salary Considerations – BOND – Nov 2012," October 11, 2012, with attachment, USPI_CIV_000810697 at USPI_CIV_000810697 ("

                ).

[81] Email chain from Mark Kopser to Cindy English, "RE: Salary Adjustment Considerations - Wilcox (Nov 2010)," October 21, 2010, USPI_CIV_000147704–06 at USPI_CIV_000147704 ("

                                                                            .

[82] Email chain from Teresa Danna to Cindy English, "RE: FW: Message from, KMBT_C454," with attachments, January 15, 2014, USPI_CIV_000499023–24 at USPI_CIV_000499023

                                                                            ); Karrmann Deposition, p. 73

[83] Karrmann Deposition, p. 43 ("

                                                                            ").



84 Karrmann Deposition, p. 43.

85 "Federal Bureau of Investigation Interview of ███████████████," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000359 ("███████████████████████████████████████████████████████████████████.").

86 USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041645; Email chain from Mark Garvin to John Wellik, "RE: Preliminary bonus calculations – Garvin," with attachment, USPI_CIV_000045232–33 at 232 ("████████████████████████████████████████████████████").

87 English Deposition, pp. 46–47 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

88 "Federal Bureau of Investigation Interview of ███████████████," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000360 ("████████████████████████████████████████████████████████████").

89 USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 4.████████████████████████████████████ See USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041648; USPI, "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467450.

90 USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 4; Email chain from Doug Esho to Andy Johnston and Mark Garvin, "RE: New Bonus Plans," February 22, 2017, USPI_CIV_000025214–17 at USPI_CIV_000025215████████████████████████████████████████████████).

91 USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 4.



[92] USPI presentation, "Year End Performance Review Process: Manager Training," December 2014, USPI_CIV_000056611–43 at 612, 615, 620; USPI, "USPI Performance Management Strategy," Undated, USPI_CIV_000037627–29 at USPI_CIV_000037627 ("███████████████████████████████████████ ███████████████████████████████████").

[93] See, e.g., Brett Brodnax, "2009 Personal Objectives," January 2009, USPI_CIV_000034853–54.

[94] USPI presentation, "Year End Performance Review Process: Manager Training," December 2014, USPI_CIV_000056611–43 at USPI_CIV_000056622–623; USPI, "Compensation Committee Meeting," March 8, 2017, USPI_CIV_000023134–45 at USPI_CIV_000023140–141.

[95] "Federal Bureau of Investigation Interview of ████████████████," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000360 ("████████████████████████████████████████ ████████████████████████████████████.").

[96] English Deposition, pp. 47–48 ("████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████").

[97] Email chain from Mark Garvin to John Wellik, "RE: Preliminary bonus calculations – Garvin," with attachment, USPI_CIV_000045232–33 at USPI_CIV_000045232 ("████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████"); Email chain from John Wellik to Andy Johnston, "RE: Preliminary bonus calculations - Johnston - 2/27," with attachment, March 6, 2013, USPI_CIV_000040585–87 at USPI_CIV_000040586 ("████████████████████████████ ████████████████████████████████████████████████████ ████████████████"), 585 ("████████████████████████████████ ████████████████████████████████████"").

[98] Email chain from Paul Slavin to Sandi Karrman, "RE: Patrick (updated)," March 13, 2018, USPI_CIV_000534606–09 at USPI_CIV_000534609 ("████████████████████████████ ████████████████"), 607 ("████████████████████████ ████████████"); Email chain from Carolyn Campbell to Rachelle Pitts et al., "RE: Kevin Turner – Foundation Interim VP- IT," with attachments, March 23, 2017, USPI_CIV_000235807 at USPI_CIV_000235807 ("████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████").

64. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████ [99] ████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████ [100] ██████████████████████

████████████████████████████████████████████

████████████ [101]

65. █████████████████████████████████████████████

███████████████████████████████████████████████████████

---

███████████████████████████████████████████████████████████████████████ ); Email chain from Rachelle Pitts to Corey Ridgway and Melissa Nelson, "RE: Saginaw Staff Retention," with attachment, August 15, 2018, USPI_CIV_000563699–700 at USPI_CIV_000563699 ("███████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ); Email chain from Paul Slavin to Mark Corcoran and Sandi Karrmann, "RE: Retention Review Recommendations," July 10, 2018, USPI_CIV_000064623–27 at 000064627 ("███████████████████████████ ███████████████ "), 625 ("██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ███████████████████████████████████ "), 623 ("███████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ "); Email from Mark Corcoran to Sandi Karrmann, "RE: Retention Plan for my team," July 3, 2018, USPI_CIV_000064628 at USPI_CIV_000064628 ("████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ ).

[99] USPI Group Holdings, Inc., "2007 Equity Incentive Plan," April 22, 2008, USPI_CIV_000336973–85; USPI, "████████████████████████████████████████████████," July 14, 2017, USPI_CIV_000022791–811 at USPI_CIV_000022805.

[100] USPI Group Holdings, Inc., "2007 Equity Incentive Plan," April 22, 2008, USPI_CIV_000336973–85 at USPI_CIV_000336973 ("███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████ "); USPI, "Stock Option Agreement between USPI Holding Company, Inc. and Aric Burke," July 14, 2017, USPI_CIV_000022791–811 at USPI_CIV_000022805 ("██████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████ ").

[101] USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041656; USPI, "Compensation Committee Meeting," May 3 and May 31, 2011, USPI_CIV_000890968–76 at USPI_CIV_000890973; Email chain from Andrea Fann to Andy Johnston, "RE: stock option agreement," March 23, 2015, USPI_CIV_000039709–10 at USPI_CIV_000039709 ("███████████████ ███████████████████████████████████████████████████████████ "); USPI Office Memo from Bill Wilcox to Option and Compensation Committee, "Request for Approval," June 25, 2013, USPI_CIV_000121836–40 at USPI_CIV_000121836 ("█████████████████████████████████████ ███████████████████████████████████ "), 839; USPI Group Holdings, Inc., "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467458–460.



66. ███████████████████████████████

---

[102] Email chain from Mark Garvin to Teresa Danna, "█████████████████████████████ ███████████████," with attachments, July 24, 2013, USPI_CIV_000758762–65 at USPI_CIV_000758764 ("████████████████████████████████████████████████████████████████████"); Email chain from Andrea Fann to Andy Johnston, "RE: stock option agreement," March 23, 2015, USPI_CIV_000039709–10 at USPI_CIV_000039709 ("█████████████████████████████████ ████████████████████████████████████████████████"); USPI, "█████████████ ████████████████████████████████" July 14, 2017, USPI_CIV_000022791–811 at USPI_CIV_000022805 ("██████████████████████████████████████████████████████ ████████████████████████████████████████████████").

[103] USPI Group Holdings, Inc., "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467458 ("RSA"); USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041650 ██████████████████████████████████████ ████████████████████████████████████████████████████").

[104] USPI Group Holdings, Inc., "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467458; USPI_CIV_000024141.xlsx.

[105] See, e.g., "Offer of Employment Letter to Steven Palmer for Director of Acquisitions," September 3, 2013, USPI_CIV_000035655 ("████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████; ████████████████████████████████████," USPI, August 25, 2014, USPI_CIV_000040029███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████); "████████ ████████████████████████████████," USPI, May 9, 2014, USPI_CIV_000055047–48 at USPI_CIV_000055047 ("████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████); "████████████████████ ████████████████," USPI, Undated, USPI_CIV_000301109–10 at USPI_CIV_000301109 ("████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████).

[106] USPI Office Memo from Bill Wilcox to Option and Compensation Committee, "Request for Approval," June 25, 2013, USPI_CIV_000121836–40 at USPI_CIV_000121836 ("████████████████████████████████████ ████████████████████████████████████████████████████████████").



67.

---

[107] USPI, "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467458–460.

[108] USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 5 ("███████████████████████████████████████████").

[109] USPI_CIV_000026240.xlsx, Tab "DC Tenet vs USPI Compare," ("████████████████████████████████████████████████████████████████████"); USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 3; USPI presentation, "United Surgical Partners International, Inc. Deferred Compensation Plan," November 2011, USPI_CIV_000227267, p. 12 ("████████████████████████████████████████████"); USPI_CIV_000026240.xlsx, Tab "DC Compare-Key Item Summary," ("████████████████████████████████████████").

[110] USPI presentation, "United Surgical Partners International, Inc. Deferred Compensation Plan," November 2011, USPI_CIV_000227267, p. 12 ("████████████████████████████████████"); USPI_CIV_000026240.xlsx, Tab "DC Compare-Key Item Summary," ("████████████████████████████████████████████████"); USPI Office Memo from Sandi Karrmann to USPI Option & Comp Committee, "Equity Plan and Deferred Comp Plan Amendments," Undated, USPI_CIV_000038254–55 at USPI_CIV_000038255 ("████████████████████████████████████████████████████"). ███████████████████████████████████████ See email chain from ████████████ to Sandi Karrmann, "RE: USPI Deferred Compensation Plan Effective 12/31/18 - Change in Vesting from 5 Year Cliff to 5 Years of Service," December 26, 2018, USPI_CIV_000212779–80 at USPI_CIV_000212779 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); USPI Holding Company, Inc., "Compensation Committee Minutes," February 14, 2018, USPI_CIV_000620051–67 at USPI_CIV_000620063 ("████████████████████████████████████████████████████████████████████████████████████████████████").

[111] USPI Office Memo from Sandi Karrmann to USPI Option & Comp Committee, "RE: Equity Plan and Deferred Compensation Plan Amendments," September 7, 2017, USPI_CIV_000038258–59 at USPI_CIV_000038259 ("████████████████████████████████████████████████████████████████████████").

[112] USPI, "Job Offer as Regional Vice President of Operation," December 5, 2008, USPI_CIV_000037954 at USPI_CIV_000037954 ("██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").



68. Exhibit 5 summarizes the types of compensation Defendants pay their Senior Employees and the share of total compensation over the period 2008 to 2022 accounted for by each type. ███████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████

---

*Exhibit 5*
**Components of compensation for Senior Employees, 2008–2022**



Source: Dr. Starr Corrected Compensation Regression Data

Note: Total compensation is deflated according to each year's Consumer Price Index ("CPI"), standardized to 2019 U.S. dollars. The "Other" category includes compensation types labeled as additional, commission, debt forgiveness, education, holiday, jury, leave, on call, other, overtime, retro, settlement, severance, shift, shift differential, and sick.

---

69. The above discussion details a complex, multifaceted, and discretionary compensation system that USPI used to attract, retain, and award Senior Employees, including █████████████████████████████████ ████████████████████████

## 4. The economic evidence does not support a conclusion that USPI individually or in combination with SCA and DaVita has the market power to suppress wages

70. A buyer has market power if its decision on how much to buy affects the market price.[113] The extent to which a buyer or collection of buyers has market power, meaning the ability to suppress the market price, will depend upon whether sellers have the option of selling to other buyers that are willing to purchase at the competitive price. Similarly, an employer's ability to suppress wages is limited by workers' ability to find similarly attractive jobs at other employers. If employees have many other employment options, they will be free to move to these options in response to receiving sub-competitive wages from their employer. The outside options are one of the competitive checks that erodes an employer's market power and limits its ability to suppress wages.

71. For any alleged collusive conduct to have an anticompetitive effect, the alleged conspirators must collectively have market power. As Dr. Starr states in his report, "Defendants' Challenged Conduct could not have suppressed Class Member wages if Defendants lacked market power over them."[114] Further, as noted by Carlton and Perloff (2015), an economics textbook cited by Dr. Starr, "[i]f the cartel controls only a small share of the relevant market, which includes all close substitutes, firms not in the cartel undercut the cartel and prevent it from raising the market price[.]"[115] In the current context, if Senior Employees have many employment options beyond Defendants, then Defendants' ability to suppress Senior Employees' compensation will be constrained by competition from these alternative employment options. Thus, the question of whether Defendants collectively have market power is central to any analysis of the Alleged, Assessed, or Admitted Conduct.

---

[113] B. Douglas Bernheim and Michael D. Whinston, *Microeconomics* (New York, NY: McGraw-Hill Irwin, 2008), p. 648 ("Market power isn't limited to the sellers of a product; it also can be held by … buyers. In some circumstances, however, there may be only a few buyers of a product. In an extreme case, called a monopsony market, there is just one buyer, called a monopsonist. In these circumstances, buyers may not need to take the price of a good as given. Rather, they can lower the price they pay, at least if they are willing to reduce the quantity that they purchase.").

[114] Starr Report, ¶ 12.ii.e. See also Starr Deposition, p. 158 ("Q[.] Okay. You would agree that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them; correct? A[.] If -- Yes. I would agree with my own statement here.").

[115] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition (Essex, England: Pearson Education Limited, 2015) ("Carlton and Perloff (2015)"), p. 155 ("Entry by nonmember firms or close substitutes produced in other industries prevents a cartel from raising price. If the cartel controls only a small share of the relevant market, which includes all close substitutes, firms not in the cartel undercut the cartel and prevent it from raising the market price; that is, the demand curve facing the cartel is relatively elastic. Even if all firms initially in a market form a cartel and raise the price, the higher price may induce enough new firms to enter that the cartel is unable to keep the price high in the long run."). Because the cartel alleged here is operated on the input market, rather than the standard case of a cartel over output, the effect of the cartel would be to decrease prices (i.e., compensation), but the restraint on the cartel's impact caused by other firms is the same.

72. Dr. Starr opines that Defendants have market power.[116] As I demonstrate in this section, the economic evidence does not support Dr. Starr's assertion of market power. Instead, there is clear evidence that USPI and SCA's (or all Defendants') collective labor market power is limited by the many employment options available to their employees beyond Defendants.

*4.1. Overview of Dr. Starr's and Dr. Gerhart's market power opinions*

73. Dr. Starr states that he was asked "to determine whether Defendants have market power over Class Members[.]"[117] He states that "[m]arket power can be directly established if there is evidence of the ability of firms to suppress wages below competitive levels."[118] He then argues that the "evidence of wage suppression" that he finds through his wage suppression regression analysis demonstrates that Defendants have market power.[119] That is,  [120] In Section 8, I demonstrate that Dr. Starr's compensation suppression analysis is fundamentally flawed, showing he has no reliable basis for his market power opinion.[121]

74. Dr. Starr argues that "███████████████████████ ████████"[122] "████████████████████████ ████████"[123] and "████████████████████████████ ████████████████"[124] However, Dr. Starr testified that ██████████ ███████████████████████████████"[125] Dr. Starr does not assess the extent to which these Defendants recruited from each other outside or during the allegedly collusive period. Moreover, he does not assess the extent to which Defendants were each other's "most relevant"

---

[116] Starr Report, ¶ 12.ii.e ("Defendants Wield Market Power over Class Members."); Starr Deposition, pp. 159–160 ("Whether that is a reflection of an increase in market power because they are now shielded from competition as a result of the no-poach agreements or whether it's because … the sharing of information has made alternative companies less attractive because people will earn similar amounts across companies, those two things have suppressed compensation. It's an interpretation issue of whether that is an increase in market power or whether it is a reflection of them exerting market power that they possibly have. I don't -- I don't distinguish between those interpretations in my report, and sitting here today, I don't think I have an opinion on exactly which is going on.").

[117] Starr Report, ¶ 11.e.

[118] Starr Report, ¶ 196.

[119] Starr Report, ¶ 196.

[120] Starr Deposition, p. 266 ("████████████████████████████████ ████████████████████████████████████████████████ ████████████").

[121] Dr. Starr's analysis of the "qualitative evidence of an agreement" assumes that Defendants have market power, but he has failed to demonstrate that this is the case.

[122] Starr Report, ¶ 181.d.

[123] Starr Report, ¶ 179.k.

[124] Starr Report, ¶ 180.k.

[125] Starr Deposition, p. 43.

competitors for any Senior Employees.[126] He also does not assess the extent to which Defendants competed with non-Defendants for labor.[127] Instead, he bases his conclusion that ███████████████████████████████ ████████████████████████████████████████[128] Consequently, even if his statements were correct, they would not rule out the possibility that Defendants unilaterally and collectively lack market power over Senior Employees because they are constrained by non-Defendant employers.

75. Similarly, Dr. Gerhart fails to provide any quantitative evidence or analysis of market power. In fact, Dr. Gerhart testified ███████████████ ███████████████████████████████████████████.[129]

76. While both Dr. Starr and Dr. Gerhart recognize that Defendants' relevant labor market competitors would include non-Defendant companies from which Defendants recruit employees or to which they lose employees, neither expert has done any analysis to identify these companies.[130] Critically, neither Dr. Starr nor Dr. Gerhart analyzes the extent to which Senior Employees have employment options beyond the Defendants.[131] Both experts also fail to analyze whether Defendants recruit employees from non-Defendant firms or to assess the extent to which Defendants' former employees elected to move to non-Defendant employers.[132] Neither

---

[126] Starr Deposition, p. 130 ("I wasn't asked to do any analysis on which employers are the most relevant. I was asked to study the extent to which the qualitative and quantitative evidence in this case is consistent with anticompetitive conduct[.]").

[127] Starr Deposition, p. 132 ("Q[.] There is data that would allow you to determine what job they took and which employer; correct? A[.] I wasn't asked [] to look into that. There may be data that you could use [] to assess that, but it wasn't one of my assignments."), 139 ("I wasn't asked to, to examine where every departing worker went to, and I did not do that."), 150 ("It wasn't asked of me to look at everywhere that DaVita, SCA and USPI are hiring for director and above, and it wasn't asked of me to look at where every director level and above employee or class member went to if they left.").

[128] Starr Report, ¶ 180.k ("Finally, the evidence presented in Section V.C.2 show that ███████████████ ████████████████████████████ ).

[129] Deposition of Barry Gerhart, March 5, 2025 ("Gerhart Deposition"), pp. 285–286 ("Q. [] And, again, I'd just want to confirm: You did not perform any empirical or quantitative analysis to support your opinions in this case; correct?... [A.] That is correct.").

[130] Starr Deposition, pp. 133

); Gerhart Deposition, p. 52

[131] Starr Deposition, p. 130 ("I wasn't asked to do any analysis on which employers are the most relevant."); Gerhart Deposition, pp. 285–286: ("[Q.] And, again, I'd just want to confirm: You did not perform any empirical or quantitative analysis to support your opinions in this case; correct?... [A.] That is correct.").

[132] Louis Kaplow and Carl Shapiro, "Antitrust," in *Handbook of Law and Economics*, Volume 2, ed. A. Mitchell Polinsky and Steven Shavell (Elsevier B.V., 2007), pp. 1090-1091 ("Kaplow and Shapiro (2007)"), p. 1090–1091 ("In antitrust analysis, both by agencies (notably, in examining prospective horizontal mergers) and by the courts, the

expert has conducted any of the types of analyses necessary to assess the competitive constraints that Defendants face.[133]

*4.2. Defendants' collective market power and ability to suppress Senior Employee compensation is constrained by competition from non-Defendants*

77. As I describe above, USPI and SCA's (or Defendants' collective) ability to suppress the compensation of their Senior Employees is limited by those employees' ability to find similarly attractive positions at employers beyond Defendants. If Senior Employees have many employment options beyond Defendants, they will be free to move to these options in response to suppressed compensation.[134] Likewise, employees of non-Defendant competitors hired by Defendants could demand competitive compensation.[135] Because of this, the share of Defendants' employee hires and departures that is accounted for by inter-Defendant moves outside the Alleged, Assessed, and Admitted Conduct periods provides an indication of Defendants' combined market power.

78. In this section, I use Defendants' compensation records to identify the frequency and share of Senior Employee transitions between USPI and SCA and between USPI and DaVita (Section 4.2.1.). Then I analyze data from Lightcast, a labor market analytics company, to identify the employers that Defendants compete with for Senior Employees (Section 4.2.2.). I find that ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████ .

---

dominant method of gauging the extent of market power involves defining a so-called relevant market and examining the share of a firm or group of firms in that market. In defining product markets, the focus is on which products are sufficiently good demand substitutes for the product in question to be deemed in the same market.") While labor markets are markets for inputs rather than products, the principle of identifying a set of close substitutes is the same. Despite acknowledging that the "degree to which employees move to and from non-defendants as well" would be "of interest" when thinking about the labor market, Dr. Gerhart does not look at the degree to which individuals move between companies in this case. See Gerhart Deposition pp. 50–51. Dr. Starr likewise does not perform a "relevant market analysis" and was not asked to look into data that would show the movement of Senior Employees to non-Defendant firms. See Starr Deposition, pp. 131–132.

[133] Dr. Gerhart does not perform any of these analyses despite acknowledging that "any company that you lose employees to or you get employees from is … part of the analysis" when defining a labor market. See Gerhart Deposition, p. 52. See also Starr Deposition, p. 131 ("I wasn't asked to do any analysis on which employers are the most relevant.").

[134] Dr. Gerhart testified that "to the extent you pay below market, there's more of a chance somebody's going to go elsewhere." Gerhart Deposition, p. 56.

[135] Dr. Gerhart agrees that when "defendants hired employees from non-defendant firms," those employees' compensation would be "within sight of what the competitive rate would be." Gerhart Deposition, p. 56.

*4.2.1.* ██████████████████████████████████████████████████████
███████████████████████████████████████

79. I begin my analysis of Defendants' market power by reviewing ████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████.[136]

80. Exhibit 6 shows my analysis of Senior Employee turnover at USPI over time. The second column of Exhibit 6 shows total turnover of Senior Employees at USPI, defined as the sum of new hires and departures, for each year from 2006 through 2021. The third column shows the number of Senior Employee hires from and departures to SCA, and the fourth column shows the percentage of hires from and departures to SCA. The exercise is repeated with respect to DaVita in the fifth and sixth columns. For example, ████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████

---

[136] For the purpose of my analysis, I use a corrected version of Dr. Starr's data. I identify technical errors in Dr. Starr's work that relate to the way his code assigns jobs to Senior Employees and the way he determines each employee's hours worked. My analysis uses a version of Dr. Starr's data that has been corrected for these clear errors. An overview of Dr. Starr's data errors and the corrected data is provided in Appendix C. To identify Senior Employees who switch between USPI and other Defendants, I follow Dr. Starr's methodology, except that I remove a switcher who Dr. Starr double-counts. Except where otherwise stated, I use my corrected version of Dr. Starr's compensation data for analyses of switching behavior by Senior Employees among the Defendants.

*Exhibit 6*
**USPI's Senior Employee turnover accounted for by Defendants, 2006–2021**

| | | Total Turnover | Hires From and Departures To | | | |
| | | | SCA | | DaVita | |
| Year | | | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|
| 1. 2006 | | | | | | |
| 2. 2007 | | | | | | |
| 3. 2008 | | | | | | |
| 4. 2009 | | | | | | |
| 5. 2010 | | | | | | |
| 6. 2011 | | | | | | |
| 7. 2012 | | | | | | |
| 8. 2013 | | | | | | |
| 9. 2014 | | | | | | |
| 10. 2015 | | | | | | |
| 11. 2016 | | | | | | |
| 12. 2017 | | | | | | |
| 13. 2018 | | | | | | |
| 14. 2019 | | | | | | |
| 15. 2020 | | | | | | |
| 16. 2021 | | | | | | |
| 17. Outside of the Alleged Three-Party Mobility Restrictions: 2021 | | | | | | |
| 18. Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2008–2009 and 2020–2021 | | | | | | |
| 19. Outside of USPI's Admitted Mobility Restrictions with SCA: 2008–2009 and 2018–2021 | | | | | | |
| 20. During USPI's Admitted Mobility Restrictions with SCA: 2010–2017 | | | | | | |

Source: Dr. Starr Corrected Compensation Data

Note: Senior Employee departures and arrivals are identified using the date of the employee's first and last paychecks. Inter-Defendant switches are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch.

81. For the purpose of analyzing market power, ███████████████

████████████████████████████████████████████
██████████████████████.[137]

82. **The Alleged Three-Party Mobility Restrictions** ████████████
███████████. With the data provided for this matter, I am able to identify Senior Employee job mobility among USPI, SCA, and DaVita ██████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
████████████████████████████[138]████
██████████████████████████████

83. **Experts' Assessed SCA-USPI Mobility Restrictions** ████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████.[139]

84. **USPI's Admitted Mobility Restrictions with SCA** ████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████

---

[137] The compensation data do not identify where a Senior Employee who leaves the data departs to. As a result, some of the departures may represent terminations or retirements rather than a departure to a new employer. Similarly, some of the arrivals may not be hires from other firms (e.g., recent graduates). Given that the purported class consists of senior-level employees, it is unlikely that a large share of new hires came from outside the workforce (such as straight from college). However, even if a large proportion of turnover is movements into and out of the labor force, rather than switches to other non-Defendant employers, ████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████

[138] Because the COVID pandemic affected labor market dynamics, I also review the same patterns restricting to years prior to the pandemic, when data are available. I do not have data on inter-Defendant switching outside both the Alleged Three-Party Mobility Restrictions and the years in which labor markets for healthcare workers may have been affected by the pandemic.

[139] Outside both the Experts' Assessed SCA-USPI Mobility Restrictions period and prior to the COVID pandemic, ████
████████████████████████████████████
███████████████

████████████████████████████████████████████████████████████
███████████████████████████████████████████[140]

85. Regardless of whether the Alleged, Assessed, or Admitted Mobility Restrictions period is considered, ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

86. Furthermore, during the Alleged, Assessed, and Admitted Mobility Restrictions, ██████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████

87. Exhibit 7 below illustrates the mobility displayed in Exhibit 6. Each pie chart represents Senior Employee switching during different time periods. Within each pie chart, ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

88. The first pie chart depicts mobility ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

89. The second pie chart depicts mobility ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ██████████████

90. The third pie chart depicts mobility ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

---

[140] Outside both the USPI's Admitted Mobility Restrictions with SCA time period and prior to the COVID pandemic, ███████████████████████████████████████████████████████ ███████████████████████████████████

91. As these charts show, in any formulation of the mobility restriction conduct period, ███████████

██████████████████████

██████████████████████

██████████████████████

██████████████████████

██████████████████████

███████████████

---

*Exhibit 7*
*Share of USPI Senior Employee turnover accounted for by Defendant and by non-Defendant employers, outside the Alleged, Assessed, and Admitted Conduct periods*

| Outside of the Alleged Three-Party Mobility Restrictions: | Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: | Outside of USPI's Admitted Mobility Restrictions with SCA: |
| --- | --- | --- |



Source: Dr. Starr Corrected Compensation Data
Note: Senior Employee departures and arrivals are identified using the date of the employee's first and last paychecks. Inter-Defendant switches are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch.

---

4.2.2. ████████████████████████

████████████████████

92. In this section, I analyze a publicly available dataset on workers collected by Lightcast. Lightcast pulls information from online professional profiles to create a dataset tracking individuals' careers over time.[141] Lightcast data is commonly used by academic researchers to study labor market issues and underpins numerous peer-reviewed articles in leading economics

---

[141] Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 1, 2025 ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles").

journals.[142] I use a sample of Lightcast data covering resume information for any individual in its data who ever reported employment in the OCC industry—including, specifically, any who reported working for USPI, SCA, or DaVita. For each individual, the data include career information that would be reported on a resume: job titles, employers, and start and end dates of employment over time. These data allow me to track and analyze the career paths of a sample of USPI Senior Employees, including their previous and next jobs, employers, and industries. While the data are limited to people who post resume information online, unlike Defendants' payroll data, the Lightcast data allows me to see where Senior Employees arrive from or leave for, even when the source or destination firm is not a Defendant.

93. By analyzing employee transitions prior to the Alleged, Assessed, and Admitted Mobility Restrictions, I can observe the sources of competitive constraints that USPI faces absent any mobility restrictions. In his deposition, Dr. Starr endorsed this approach for identifying labor market competitors, testifying that ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ [143]

94. My analysis of the employee transitions captured in the Lightcast data demonstrates that USPI competes for workers with hundreds of non-Defendant employers, including employers both within and outside the ASC or OCC industries.[144] Exhibit 8, below, provides a breakdown of the employers that USPI either lost Senior Employees to or hired Senior Employees from. The analysis is limited to include data from outside each of the Alleged, Assessed, and Admitted Mobility Restrictions time periods.

95. Each column of Exhibit 8 shows a breakdown of USPI's Senior Employee turnover outside a different formulation of the mobility restrictions.[145] Each row of the table describes a different category of employers and shows the share of USPI Senior Employee turnover accounted for by employers in

---

[142] Lightcast, "Academic Research Using Lightcast Data," available at https://lightcast.io/resources/new-academic-research, accessed on April 16, 2025 ("Researchers frequently analyze Lightcast data to inform their own insights across a wide range of disciplines. This comprehensive list includes reports authored by Lightcast (entirely or in part) as well as other releases where Lightcast data was employed from 2021-Present. … Academic Research … *Journal of Human Resources … Labour Economics … Journal of Labor Economics … American Economic Review … American Economic Journal: Macroeconomics*).

[143] Starr Deposition, p. 133.

[144] Outside the Alleged Three-Party Mobility Restrictions period, the Experts' Assessed SCA-USPI Mobility Restrictions period, and USPI's Admitted Mobility Restrictions with SCA, there were 304, 395, and 511 non-Defendant firms that hired employees from or lost employees to USPI, respectively. See Workpaper 2. This result is also consistent with USPI testimony ████████████████████████. See, e.g., Deposition of Mark Garvin (USPI), May 30, 2024 ("Garvin Deposition"), pp. 195–196 ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████.

[145] Because the COVID pandemic affected labor market dynamics, I also review the same patterns restricting to years prior to the pandemic. These patterns are consistent with Exhibit 8. See Workpaper 10.

that category. The categories of employers are mutually exclusive so that, within a column, the shares of turnover across categories sum to 100 percent.[146]

96. **Outside the Alleged Three-Party Mobility Restrictions period, employers in other industries accounted for the majority of Senior Employee turnover at USPI**. Under any formulation of the mobility restrictions, there were no restrictions on employee mobility between Defendants, prior to ▅▅▅ and after ▅▅▅. Column 2 of Exhibit 8 below shows that in this period, despite mobility within the ASC or OCC industries being unconstrained, other industries accounted for a large share of USPI's turnover. During this period, 18.9 percent of USPI's Senior Employees switched to and from General Medical and Surgical Hospitals, and 17.2 percent switched to and from Offices of Physicians—neither of which are OCCs.[147] Almost three-quarters of USPI turnover was accounted for by firms that are not even in the OCC industry.[148]

97. **Outside the Experts' Assessed SCA-USPI Mobility Restrictions period, employers in other industries accounted for the majority of Senior Employee turnover at USPI**. The Experts' Assessed SCA-USPI Mobility Restrictions began in ▅▅▅ and ended in ▅▅▅. Outside this period, 19.0 percent of USPI's turnover was accounted for by General Medical and Surgical Hospitals, and 15.6 percent was accounted for by Offices of Physicians. Neither of these are ASCs. Over three-quarters of USPI turnover was accounted for by firms that are not even in the ASC industry.[149]

98. **Outside USPI's Admitted Mobility Restrictions with SCA, employers in other industries accounted for the majority of Senior Employee turnover at USPI**. USPI's Admitted Mobility Restrictions with SCA began in ▅▅▅ and ended in ▅▅▅. Outside this period, 17.7 percent of USPI's turnover was accounted for by General Medical and Surgical Hospitals, and 15.7 percent was accounted for by Offices of Physicians. Neither of these are ASCs. Over three-quarters of USPI turnover was accounted for by firms that are not even in the ASC industry.[150]

---

[146] The employer categories listed in the table are based on the industry codes Lightcast assigned to the employers that people who worked for USPI reported switching from or to. Lightcast used the NAICS to categorize employers.

[147] Note that a portion of the employers that USPI employees switched from or to were not categorized into industries in the data, and therefore, these shares may understate the true amount of mobility accounted for by hospitals and physicians' offices.

[148] The sum of the shares in rows 1, 2, 3, and 4 of Column 2 (24.7, 12.1, 18.9, 17.2) is 72.9 percent.

[149] The sum of the shares in rows 1, 2, 3, 4, and 5 of Column 3 (25.5, 12.7, 19.0, 15.6, 3.7) is 76.5 percent.

[150] The sum of the shares in rows 1, 2, 3, 4, and 5 (26.5, 13.2, 17.7, 15.7, 3.2) is 76.4 percent.

*Exhibit 8*
**Share of USPI Senior Employee turnover outside the Alleged, Assessed, and Admitted Mobility Restrictions periods, by industry**

| | Share of Turnover | | |
|---|---|---|---|
| Industry of Previous or Next Employer | Outside of the Alleged Three-Party Mobility Restrictions: ▬▬ | Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: ▬▬ | Outside of USPI's Admitted Mobility Restrictions with SCA: ▬▬ |
| 1. Classified Industries – excluding Healthcare Providers | 24.7% | 25.5% | 26.5% |
| 2. Healthcare Providers – excluding Hospitals, Offices of Physicians, and OCCs | 12.1% | 12.7% | 13.2% |
| 3. General Medical and Surgical Hospitals | 18.9% | 19.0% | 17.7% |
| 4. Offices of Physicians | 17.2% | 15.6% | 15.7% |
| 5. Outpatient Care Centers – excluding ASCs | 3.8% | 3.7% | 3.3% |
| 6. Ambulatory Surgical Centers | 4.5% | 4.8% | 4.4% |
| 7. Unclassified Industries | 18.7% | 18.6% | 19.2% |

Source: Lightcast; NAICS Association

Note: This table includes all reported previous and next employers for Senior Employees who started at and/or left USPI between January 1, 2005 and May 1, 2024, excluding the Alleged, Assessed, or Admitted Mobility Restrictions. For each employee, I identify previous and next employers for each class-relevant stint (i.e., each period of time in a class-relevant position at USPI). For a given stint, previous employer(s) are identified based on the most recent completed job before the start of the stint, as well as any ongoing job that began before the start of the stint. Next employer(s) are identified based on the first job starting after the end of the stint, as well as any other job that started during the stint. Ambulatory Surgical Centers are identified using the six-digit NAICS code 621493. Outpatient Care Centers are identified using four-digit NAICS code 6214. General Medical and Surgical Hospitals are identified using the four-digit NAICS code 6221. Offices of Physicians are identified using the four-digit NAICS code 6211. An analysis using Lightcast's own industry categories, rather than ones from NAICS Association, is provided in Workpaper 13.

99.     Exhibit 9 below is similar to Exhibit 8 above but shows a breakdown of Senior Employee turnover for all three Defendants combined.[151] Columns 2, 3, and 4 show a breakdown of Defendants' combined turnover outside the Alleged, Assessed, and Admitted Conduct periods, respectively. Each row of the table describes a different category of employers and shows the share of Defendants' Senior Employee turnover that is accounted for by that category of employers. Column 2 shows that, outside the Alleged Three-Party Mobility Restrictions period, 75 percent of Defendants' turnover was accounted for by firms outside the OCC industry (Rows 1–4). Columns 3 and 4 show that the same is true of the period outside the Experts' Assessed SCA-USPI Mobility Restrictions and USPI's Admitted Mobility Restrictions with SCA.

---

[151] Because the COVID pandemic affected labor market dynamics, I also review the same patterns restricting to years prior to the pandemic. These patterns are consistent with Exhibit 9. See Workpaper 11.

*Exhibit 9*
**Share of Defendants' Senior Employee turnover outside the Alleged, Assessed, and Admitted Mobility Restrictions period, by industry**

| | Share of Turnover | | |
| --- | --- | --- | --- |
| **Industry of Previous or Next Employer** | **Outside of the Alleged Three-Party Mobility Restrictions:** ▮▮▮ | **Outside of the Experts' Assessed SCA-USPI Mobility Restrictions:** ▮▮▮ | **Outside of USPI's Admitted Mobility Restrictions with SCA:** ▮▮▮ |
| 1. Classified Industries – excluding Healthcare Providers | 39.7% | 40.9% | 42.6% |
| 2. Healthcare Providers – excluding Hospitals, Offices of Physicians, and OCCs | 12.8% | 12.1% | 12.2% |
| 3. General Medical and Surgical Hospitals | 10.9% | 10.4% | 10.1% |
| 4. Offices of Physicians | 11.6% | 11.0% | 10.8% |
| 5. Outpatient Care Centers – excluding ASCs | 4.3% | 4.7% | 4.2% |
| 6. Ambulatory Surgical Centers | 2.3% | 2.2% | 2.0% |
| 7. Unclassified Industries | 18.4% | 18.7% | 18.2% |

Source: Lightcast; NAICS Association

Note: This table includes all reported previous and next employers for Senior Employees who started at and/or left a Defendant firm between January 1, 2005 and May 1, 2024, excluding the Alleged, Assessed, and Admitted Conduct periods. For each employee, I identify previous and next employers for each class-relevant stint (i.e., each period of time in a class-relevant position at a Defendant). For a given stint, previous employer(s) are identified based on the most recent completed job before the start of the stint, as well as any ongoing job that began before the start of the stint. Next employer(s) are identified based on the first job starting after the end of the stint, as well as any other job that started during the stint. Ambulatory Surgical Centers are identified using the NAICS code 621493. Outpatient Care Centers are identified using NAICS code 6214. General Medical and Surgical Hospitals are identified using the four-digit NAICS code 6221. Offices of Physicians are identified using the four-digit NAICS code 6211. An analysis using Lightcast's own industry categories, rather than ones from NAICS Association, is provided in Workpaper 14.

100. Based on the information on employee transitions shown in Exhibit 9, a substantial share of USPI Senior Employees' job options is with employers outside the OCC industry. Furthermore, as I show in Section 3.2, Defendants account for only a small share of establishments, and a small share of employment, in the OCC industry overall. Even if Defendants comprised a majority of the OCC industry, which they do not (as shown in Exhibit 2), they would still face substantial competition for workers from employers outside the industry.

101. At a more granular level, looking at employee transitions by specific employer, the Lightcast data show that USPI Senior Employees switch to and from jobs with many different employers. Exhibit 10 below lists examples of employers that USPI hires Senior Employees from and loses them to—that is, employers it competes with for workers. These include hospitals such as CommonSpirit Health or Memorial Hermann and specialty healthcare providers such as Solis Mammography, but also firms and institutions beyond healthcare providers including McKinsey and Abbot Labs.

102. Dr. Starr testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████ [152] Even if it were true that the healthcare industry contains the best employment options for all of Defendants' Senior Employees—including those in specialties like IT or finance—Exhibit 10 demonstrates that the employment opportunities in the healthcare industry extend far beyond Defendants and even beyond OCCs.[153]

*Exhibit 10*
*Companies that USPI hires Senior Employees from and loses them to*



Source: Lightcast

Note: In the graphic above, the companies named on the left are examples of the immediate previous employers of Senior Employees who joined USPI between January 1, 2005 and May 1, 2024. The companies named on the right are examples of the immediate next employers of Senior Employees who left USPI during the same period.

103. Case documents and deposition testimony further support the conclusion that ███████████████████████████████████████ ████████████████████████.[154] █████████████████████████

---

[152] Starr Deposition, pp. 129–130 █████████████████████ ████████████████████████████████████.").

[153] Dr. Gerhart agreed in his deposition that Defendants ████████████████" to an extent. See Gerhart Deposition, p. 73.

[154] For examples of USPI considering applications from non-Defendant competitors, see email chain from Shannon McGarry to Shannon Mosley, "RE: RVP Dallas candidates," March 21, 2018, USPI_CIV_000142589–90 ("████████ ████████████████████████████████████████████ ████████████████████████████ █████████████████████).



████████████████████████████████████.[155]
███████████████████████████████████
████████████████████████████████████
██████████████████████████████
████████████████████████████████████
████████████████”[156]

### 5. The Alleged, Assessed, and Admitted Mobility Restrictions could have directly impacted the employment options of, at most, a limited number of Senior Employees

104. Dr. Starr posits that the mechanism by which the Experts' Assessed SCA-USPI Mobility Restrictions could suppress workers' compensation is by suppressing their mobility, stating:

> Taken together, this body of research suggests that firms' suppression of worker mobility, whether via a no-poach agreement, noncompete agreement, or other mechanism that limits workers' outside options, leads to lower worker compensation.[157]

105. In this section, I explain that according to this mechanism the direct impact of the Alleged, Assessed, or Admitted Mobility Restrictions would therefore have been limited to the employees who lost a relevant outside option for employment.[158]

---

[155] Deposition of Clare Metcalf (Russell Reynolds), August 14, 2024, pp. 43–44 ("██████████████████
███████████████████████████████████████████████████
████████████████████████").

[156] Garvin Deposition, pp. 195–196 ("█████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
████████████████████").

[157] Starr Report, ¶ 52. Dr. Starr testified that █████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████, but he has not quantitatively analyzed any mechanisms other than a reduction in mobility. See Starr Deposition, p. 204.

[158] This conforms with Dr. Gerhart's characterization of ██████████████████. See Gerhart Deposition, p. 199 ("███████████████████████████████████████████████████████████
████████████████████████").

*5.1. Overview of the potential impacts of a non-solicitation agreement*

106. For a non-solicitation agreement to preclude a specific employee from receiving a higher level of compensation, either at the employee's current employer or at the co-party to the non-solicitation agreement, the following conditions would have to hold:

1. Absent the non-solicitation agreement, the co-party to the non-solicitation agreement would have solicited the employee.
2. The solicited employee would have considered the solicitation.
3. The co-party would have given the employee an offer but for the non-solicitation agreement.
4. The offer would have conveyed a higher compensation than the employee's current compensation.
5. The employee would have either accepted the offer or used the offer to obtain better compensation at the employee's current employer.
6. The employee did not receive an offer from a third-party employer that conveyed an equal or higher increase in compensation than the co-party's offer.

107. For the Tell Your Boss provision of the Alleged, Assessed, and Admitted Mobility Restrictions to preclude a specific employee from receiving a higher level of compensation, either at the employee's current employer or at the co-party to the non-solicitation agreement, the following conditions would have to hold:

1. The employee applied to the co-party for a position.[159]
2. The co-party told the employee about the Tell Your Boss provision.
3. The employee either elected not to tell their boss and the co-party refused to consider the application, or the employee told their boss and their boss convinced the employee to stay.
4. If the recruiting process had continued, the employee would have received an offer from the co-party.
5. The offer would have conveyed a higher compensation than the employee's current compensation.
6. The employee would have either accepted the offer or used the offer to obtain better compensation at their current employer.
7. The employee did not receive an offer from a third-party employer that they could use to obtain the same increase in compensation than the co-party's offer.

---

[159] Dr. Starr testified that the "tell-your-boss provision is about curtailing competition when it is the employee who reached out first." Starr Deposition, p. 83.

*5.2. Economic evidence indicates that the Alleged, Assessed, and Admitted Mobility Restrictions* ██████████████████████████████████████████
██████████████████████

108. According to Plaintiffs' theory of harm, employees can use a job offer from another company to increase their compensation (assuming the offer has better terms than their current position) by either accepting the offer or using the offer to negotiate better compensation at their current job.[160] Therefore, the way in which a non-solicitation agreement could directly harm an employee is by preventing a job offer they would have received but for the non-solicitation agreement.[161] The Tell Your Boss provision is similar in that, according to Plaintiffs' experts, the way in which it could directly harm an employee is by preventing a job offer they would have received but for the non-solicitation agreement.[162]

109. The number of USPI Senior Employees who might have been directly harmed by not receiving an offer from SCA or DaVita is determined in part by the share of all job opportunities for USPI Senior Employees that is represented by SCA or DaVita. In this section, I analyze evidence based on

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

*5.2.1. Even outside the Alleged, Assessed, or Admitted Mobility Restrictions,* ████
████████████████████████████████████

110. I start reviewing ██████████████████████████████████ by analyzing ████████████████████████████████████. As I describe above in Section 4.2, ████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████

---

[160] Complaint, ¶ 11 ("Defendants' conspiracy also denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment.").

[161] Complaint, ¶ 80 ("Defendants' no-poach agreements would have affected the proposed Class as a whole, and not just individual employees who would have otherwise received job offers from rival companies in the industry.").

[162] Gerhart Report, ¶ 77 ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ ").

██████████████████████████████████████████████

████████████████████[163]

111. Exhibit 11 summarizes ██████████████████████

████████████████████████.[164] ██████████████████

██████████████████████████████████████████████

█████████████████████



[163] ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

See "Current HR Priorities," April 18, 2017, SCA000072712; SCA00147I584.xlsx; USPI_CIV_000053367.xlsx.

[164] This table differs from Exhibit 6 in that it only looks at ███████████████████████████.

**Exhibit 11**

**Total USPI Senior Employee departures and the number departing to SCA and DaVita, 2006–2021**

| Year | Total Departures | Departures To | | | |
|---|---|---|---|---|---|
| | | SCA | | DaVita | |
| | | Number | Percent | Number | Percent |
| 1. 2006 | | | | | |
| 2. 2007 | | | | | |
| 3. 2008 | | | | | |
| 4. 2009 | | | | | |
| 5. 2010 | | | | | |
| 6. 2011 | | | | | |
| 7. 2012 | | | | | |
| 8. 2013 | | | | | |
| 9. 2014 | | | | | |
| 10. 2015 | | | | | |
| 11. 2016 | | | | | |
| 12. 2017 | | | | | |
| 13. 2018 | | | | | |
| 14. 2019 | | | | | |
| 15. 2020 | | | | | |
| 16. 2021 | | | | | |
| 17. Outside of the Alleged Three-Party Mobility Restrictions: 2021 | | | | | |
| 18. Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2008–2009 and 2020–2021 | | | | | |
| 19. Outside of USPI's Admitted Mobility Restrictions with SCA: 2008–2009 and 2018–2021 | | | | | |
| 20. During USPI's Admitted Mobility Restrictions with SCA: 2010–2017 | | | | | |

Source: Dr. Starr Corrected Compensation Data

Note: Senior Employee departures are identified using the date of the employee's last paycheck. Inter-Defendant switches are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch.

112. For the purpose of analyzing the potential direct effects of the Alleged, Assessed, or Admitted Mobility Restrictions, I follow the same strategy I use for assessing market power and focus my attention on years outside the Alleged, Assessed, or Admitted Conduct periods. Analyzing employee departures outside the Alleged, Assessed, or Admitted Conduct periods allows me to assess the importance of SCA and DaVita as employment options for USPI Senior Employees absent any claim of collusion and to assess the number of Senior Employees who may have been directly affected by the Alleged, Assessed, or Admitted Conduct.

113. **Alleged Three-Party Mobility Restrictions** ██████████
    ████████████. With the data provided for this matter, I can identify
    Senior Employee mobility between USPI and both DaVita and SCA from

    ████████████████████████████████████████████████████
    ████████████████████████████████████.[165] ████████████
    ██████████████████████████████████
    ████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████
    ██████████████████████████████

114. **Experts' Assessed SCA-USPI Mobility Restrictions** ████████
    ████████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████████
    ████████████████████████████████████████
    ██████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████.[166]

115. **USPI's Admitted Mobility Restrictions with SCA** ████████████
    ████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████████.[167]

116. The final row of Exhibit 11 ████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████

---

[165] ██████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

[166] ████████████████████████████████████████████████████████
████████████████████████████████

[167] ██████████████████████████████████████████████████████
████████████████████████████

████████████████████████████████████

███████████████████

### 5.2.2. USPI Senior Employees' job opportunities beyond Defendants are extensive and varied

117. Above, I review departures from USPI and analyze how many of those employees transferred to other Defendants. In this section, I analyze where USPI Senior Employees departed to when it was not another Defendant. As I describe in Section 4.2.2 above, the Lightcast data allow me to identify where some of these Senior Employees depart for, even when they do not end up at another Defendant.

118. In Section 4.2.2, I use Lightcast data to identify the types of employers that USPI competes with for Senior employees by looking at the industries from which it hires workers and to which it loses them. In this section, I narrow my focus to the employers to which USPI Senior Employees depart. The results of this analysis are shown in Exhibit 12.[168] Even when there were no Alleged, Assessed, or Admitted Mobility Restrictions on USPI's Senior Employees, the majority of employees found their preferred outside option for employment with firms outside the ASC and OCC industries.

---

[168] Because the COVID-19 pandemic affected labor market dynamics, I also review the same patterns restricting to years prior to the pandemic. These patterns are consistent with Exhibit 12. See Workpaper 12.

*Exhibit 12*
**Share of USPI Senior Employee departures outside the Alleged, Assessed and Admitted Conduct periods, by industry**

| | | Share of Departures | | |
|---|---|---|---|---|
| **Industry of Next Employer** | | **Outside of the Alleged Three-Party Mobility Restrictions:** ███ | **Outside of the Experts' Assessed SCA-USPI Mobility Restrictions:** ███ | **Outside of USPI's Admitted Mobility Restrictions with SCA:** ███ |
| 1. | Classified Industries – excluding Healthcare Providers | 21.2% | 22.6% | 24.3% |
| 2. | Healthcare Providers – excluding Hospitals, Offices of Physicians, and OCCs | 12.4% | 11.1% | 12.3% |
| 3. | General Medical and Surgical Hospitals | 18.2% | 17.1% | 15.4% |
| 4. | Offices of Physicians | 22.4% | 19.4% | 17.9% |
| 5. | Outpatient Care Centers – excluding ASCs | 3.5% | 4.4% | 3.4% |
| 6. | Ambulatory Surgical Centers | 2.9% | 4.0% | 3.9% |
| 7. | Unclassified Industries | 19.4% | 21.4% | 22.9% |

Source: Lightcast; NAICS Association

Note: This table includes all reported next employer for Senior Employees who left USPI between January 1, 2005 and May 1, 2024, excluding the Alleged, Assessed, or Admitted Conduct periods. For each employee, I identify next employers for each class-relevant stint (i.e., each period of time in a class-relevant position at USPI). Next employer(s) are identified based on the first job starting after the end of the stint, as well as any other job that started during the stint. Ambulatory Surgical Centers are identified using the six-digit NAICS code 621493. Outpatient Care Centers are identified using four-digit NAICS code 6214. General Medical and Surgical Hospitals are identified using the four-digit NAICS code 6221. Offices of Physicians are identified using the four-digit NAICS code 6211. An analysis using Lightcast's own industry categories, rather than ones from NAICS Association, is provided in Workpaper 15.

### 5.3. Dr. Starr's analysis indicates that the Experts' Assessed SCA-USPI Mobility Restrictions could have directly impacted a limited number of Senior Employees

119. As I explain above, the question of whether the Experts' Assessed SCA-USPI Mobility Restrictions affected the mobility of Senior Employees is a crucial one for Plaintiffs because a reduction in job offers received, and a reduction in mobility, is the mechanism their experts describe by which the mobility restrictions could have affected compensation.[169] The question of whether the Experts' Assessed SCA-USPI Mobility Restrictions impacted compensation hinges on whether it affected job offers and mobility.

120.

---

[169] Neither of Plaintiffs' experts provide any explanation of how the business information Defendants shared could have been used to suppress compensation. I discuss this issue in detail in Section 6 below.

[170] Starr Report, ¶ 82.

*5.3.1. Dr. Starr's analysis indicates that* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



121. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

122. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [171] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[171] Starr Report, Figure 4, p. 85.

[172] 449 x 0.0017 = 0.76.

*Exhibit 13*
**Additional USPI Senior Employees that would have switched to SCA but for the Experts'
Assessed SCA-USPI Mobility Restrictions according to Dr. Starr's mobility model**

| Year | Number of Senior Employees | Number of Senior Employee Departures | Additional But-For Senior Employee Departures to SCA According to Dr. Starr |
|---|---|---|---|
| 2010 | | | |
| 2011 | | | |
| 2012 | | | |
| 2013 | | | |
| 2014 | | | |
| 2015 | | | |
| 2016 | | | |
| 2017 | | | |
| 2018 | | | |
| 2019 | | | |
| **Total** | | | |

Source: Dr. Starr Compensation Data

Note: This table shows the total number of USPI Senior Employees per year (in column 2), the total USPI Senior Employee departures (in column 3), and the additional number of USPI Senior Employees who would have switched to SCA but for the Experts' Assessed SCA-USPI Mobility Restrictions, according to Dr. Starr's mobility regression. Additional But-For Senior Employee Departures to SCA According to Dr. Starr are calculated by multipliying Dr. Starr's Figure 4 USPI-SCA regression coefficient ■ ) by the total number of USPI Senior Employees each year. The total Number of Senior Employees (in the Total row) denotes the number of unique Senior Employees working at USPI during the Experts' Assessed SCA-USPI Mobility Restrictions period.

123. I repeat the exercise in Exhibit 14 for SCA. ▮

124. ▮

*Exhibit 14*

**Additional SCA Senior Employees that would have switched to USPI but for the Experts' Assessed SCA-USPI Mobility Restrictions according to Dr. Starr's mobility model**



| Year | Number of Senior Employees | Number of Senior Employee Departures | Additional But-For Senior Employee Departures to USPI According to Dr. Starr |
|---|---|---|---|
| 2010 | | | |
| 2011 | | | |
| 2012 | | | |
| 2013 | | | |
| 2014 | | | |
| 2015 | | | |
| 2016 | | | |
| 2017 | | | |
| 2018 | | | |
| 2019 | | | |
| **Total** | | | |

Source: Dr. Starr Compensation Data

Note: This table shows the total number of SCA Senior Employees per year (in column 2), the total SCA Senior Employee departures (in column 3), and the additional number of SCA Senior Employees who would have switched to USPI but for the Experts' Assessed SCA-USPI Mobility Restrictions, according to Dr. Starr's mobility regression. Additional But-For Senior Employee Departures to USPI According to Dr. Starr are calculated by multipliying Dr. Starr's Figure 4 USPI-SCA regression coefficient (███████) by the total number of SCA Senior Employees each year. The total Number of Senior Employees (in the Total row) denotes the number of unique Senior Employees working at SCA during the Experts' Assessed SCA-USPI Mobility Restrictions period

### 5.4. Dr. Starr's analysis of switchers is flawed and overstates the direct impact of the Experts' Assessed SCA-USPI Mobility Restrictions

125. As I discuss above, Dr. Starr's methodology, as implemented, demonstrates that ████████████████████████████████ ███████████████████████████. In this section, I highlight a flaw in that methodology that causes him to overstate that limited impact.

126. Based on his mobility regression, Dr. Starr estimates that ████████████

[173] Starr Report, Figure 4, p. 85. Note that, despite relying on this regression for his opinions regarding reductions in mobility, Dr. Starr testified that ████████████████████████████████████ █████████" Starr Deposition, p. 223.

127. As I show in Exhibit 11 above, ███████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████

128. Dr. Starr recognizes that ████████████████████████ ███████████████████████████████████ ██████████████████████████████████[174] For example, he notes that ███████████████████████████ ████████████████████████.[175] ██████████████████ ███████████████████████████████ ███████████████████████████████████ ████████████████████████████

129. In this section, I modify Dr. Starr's Senior Employee mobility regression to control for changes in the overall rate of employee departures. ████████ ███████████████████████████████ ███████████████████████████████ ███████████████

130. In Exhibit 15, I review ███████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████ ██████████████████████████ ████████████████████████

---

[174] Starr Report, ¶ 85.

[175] Starr Report, ¶ 85 ("For example, I understand that in the ███████████████████████████████ ████████████████████████████████).

*Exhibit 15*
**Share of USPI and SCA Senior Employees that depart increased in 2020**

**Percent of Senior Employees**



Source: Dr. Starr Compensation Data
Note: Senior Employee departures are identified using Dr. Starr's mobility methodology applied to Dr. Starr's class.

131. Dr. Starr's mobility regression does not account for ███████████████

███████████████████

███████████████████

███████████████████

132. Dr. Starr's mobility regression can be modified to account for ██████████
███████████████████. To do so, I estimate his regression, including a control for the departure rate of Senior Employees each year. I also make a correction to one of the ████ observations in Dr. Starr's regression data.[176] Exhibit 16 displays the results from these modifications to Dr. Starr's regression. Column 1 displays the results of Dr. Starr's mobility regression for USPI and SCA.[177] Column 2 shows the results of his regression correcting for the double-counted switcher. In

---

[176] Dr. Starr flags ██████████ (████████) as a switcher between USPI and SCA in both ████ and ████. From a review of the relevant paycheck data, ████████ appears to have switched from SCA to USPI in ██████████.

[177] See Starr Report, Figure 4, Column 3, p. 85. Note that the effect of the conduct found in Dr. Starr's Figure 4, Column 3 (████████), is not significant at a conventional level of statistical significance used by economists, the 5 percent level (i.e., the 95 percent confidence interval). See, e.g., American Bar Association, "Econometrics and Regression Analysis," in *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition (ABA Book Publishing, 2017), pp. 123–208 ("American Bar Association (2017)") at p. 142 ("Ideally the economist would choose the level of the [hypothesis] test to balance the costs of falsely rejecting a true hypothesis with the costs of failing to reject a false hypothesis. However, such an analysis is rarely carried out. Instead, statistical hypotheses are carried out at conventional levels of 5 percent, occasionally at 1 percent or 10 percent. These choices for the level of the test should be understood as conventions and not necessarily grounded in any careful balancing between the kinds of errors that can occur in practice.").

Column 3, I introduce a control variable for the rate of Senior Employee departures from USPI and SCA in each year. ███████████ ████████████████████████████████ ████████████████████████████████ ██████████ .[178]

***Exhibit 16***
***Senior Employees who depart USPI or SCA*** █████████████████████ ███████████████████



|  | Figure 4: Model 3 | | |
|  | (1) | (2) | (3) |
|  | Starr's Regression | Double-Switcher Correction | Double-Switcher Correction Control for Departures |
| Conduct | | | |
| % Effect Relative to Sample Mean | | | |
| Year | | | |
| % of USPI-SCA Employees Departing | | | |
| Sample | | | |
| Sample Mean of DV | | | |
| Observations | | | |
| R-squared | | | |

Source: Dr. Starr's Compensation Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Percentage of Senior Employees Departing is calculated annually by dividing the number of USPI and SCA departures by the total number of USPI and SCA Senior Employees.

## 6. Plaintiffs' experts fail to present reliable economic evidence to support the conclusion that the Alleged or Assessed Information Sharing restricted labor market competition or suppressed compensation, and ignore evidence that is inconsistent with such a conclusion

133. Plaintiffs allege that, as part of Defendants' overarching conspiracy, Defendants "employed collusive exchanges of competitively sensitive information to further their conspiracy to suppress competition between them for employees, and to thereby suppress the compensation of their

---

[178] When I estimate Dr. Starr's mobility regression on data for the corrected class, ████████████████ ████████████████████████████████████████ ██████████████████████ See Workpaper 8.

employees."[179] The Alleged Three-Party Information Sharing started "no later than ████," and continued "through at least ████."[180]

134. As discussed in Section 1.2, Dr. Starr and Dr. Gerhart do not address the Alleged Three-Party Information Sharing among Defendants. Neither Dr. Starr nor Dr. Gerhart presents any evidence of information sharing between DaVita and USPI, and therefore neither presents evidence supporting the Alleged Three-Party Information Sharing.[181] Rather, with respect to USPI, they analyze the Experts' Assessed SCA-USPI Information Sharing, which they claim allowed USPI to suppress compensation. Dr. Starr takes the position that "████████████████████ ████████ [.]"[182]

135. Both Dr. Gerhart and Dr. Starr opine that ████████████████ ████████████████████████████ ████████████████████████ Dr. Gerhart argues that "████████████████████ ████████████████████████ ████████████████████████ ████████████████"[183] Dr. Gerhart concludes "Defendants' CSI Exchanges Likely Restricted Labor Market Competition."[184]

136.  Dr. Starr argues that "[t]he exchange of CSI is often a key component of collusion."[185] He further argues that "[i]n this case, ████████████ ████████████████ ████████████████ ████████"[186] Finally, he claims that "the direct communications between horizontal competitors to agree to share CSI with each other is inherently inconsistent with unilateral conduct"[187] and that Defendants in this case

---

[179] Complaint, ¶ 8.

[180] Complaint, ¶¶ 8, 59.

[181] Starr Deposition, p. 44 ████████████████████████ ████████████"); Gerhart Deposition, p. 196 ("████████████ ████████████████████ ████████████████").

[182] Starr Report, ¶ 118.b.ii.

[183] Gerhart Report, ¶ 82.

[184] Gerhart Report, Section VI.C. See also Gerhart Deposition, p. 34 ("████████████ ████████████████████ ████████████████").

[185] Starr Report, ¶ 93.

[186] Starr Report, ¶ 93.

[187] Starr Report, ¶ 98.

███████████████████████████████████████.[188] Dr. Starr concludes that "███████████████

████████████████████████████████████████."[189]

137. Thus, both experts opine that the ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████.[190] Yet, as I demonstrate in this section, neither expert has conducted the type of analysis that is needed to conclude that SCA and USPI's ████████████████████████████████

████████████████████████████████████████

Moreover, they ignore evidence that is inconsistent with such a conclusion.

138. In this section, I first provide an overview of the economic theory of collusion, including the conditions that are necessary for collusion to occur and have an effect on market prices. I demonstrate that neither Dr. Gerhart nor Dr. Starr assesses whether all the necessary conditions hold in the current matter in Section 6.1. In Section 6.2, I turn to the analysis of information sharing that Dr. Gerhart and Dr. Starr provide. I show that neither Dr. Gerhart's nor Dr. Starr's analysis supports their conclusion that the information shared is of the type that could be used to support collusion or that it could be used to restrict competition for labor or suppress compensation, and that Plaintiffs' experts ignore economic evidence that is inconsistent with the alleged compensation suppression agreement. Specifically, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

---

[188] Starr Report, ¶ 99 ("The qualitative record evidence supports the allegation that ███████████

████████████████████████████████████████.").

[189] Starr Report, Section V.C.

[190] Gerhart Report, ¶ 7.f ("████████████████████████████████████████

████████████████████████████████████████████████████"); Starr Report, ¶ 29 ("I find that both the qualitative and quantitative evidence is consistent with the alleged anticompetitive collusion and inconsistent with competition. … ████████████████████████████████████

████████████████████."); Starr Deposition, p. 109 ("███████████████████████████

████████████████████████████████████████████████

████████████████████.").

*6.1. Overview of the economic theory of collusion and Plaintiffs' experts' analysis*

*6.1.1. Overview of economic conditions that are required for collusion to have an effect on market outcomes*

139. In antitrust economics, "collusion" generally refers to conduct that is coordinated between firms to derive supra-competitive profits.[191] The coordinated conduct could take the form of fixing prices, allocating the market, or some other form of agreed-upon conduct. When assessing whether the economic evidence is consistent with a claim of collusion, such as any alleged conspiracy to suppress compensation, an economist can assess whether the conditions that are needed for collusion to be profitable and to affect market outcomes are present and whether market outcomes are consistent with the allegations of collusion (e.g., are the observed changes in compensation consistent with the allegations of collusion).

140. Economic theory outlines a set of conditions needed for collusion (e.g., compensation suppression or price fixing) to arise and be profitable and affect market outcomes. These conditions are as follows. First, the members of the cartel need to collectively have meaningful market power for the collusion to be successful.[192] In the absence of meaningful market power, the members of the cartel will have limited ability to influence market outcomes.[193]

141. Second, participants in the cartel must behave in ways that are not in their unilateral incentives or individually rational. This means that they would not engage in the conduct but for the cartel.[194] For example, in a cartel to

---

[191] Louis Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, N.J.: Princeton University Press, 2010), p. 315 ("Collusion occurs when firms in an industry coordinate to maximize (or at least increase) joint industry profits as opposed to individual profits. In standard models of oligopolistic competition, firms maximize their own profits and ignore the consequence of their actions on competitor's profitability. As a result of this fundamental horizontal externality, whereby a firm takes actions (e.g., increases output or cuts prices) without any consideration of the negative impact on its competitors' profits, total industry profits are not maximized and firms will end up producing more and at lower prices than if they were active together in a concerted fashion. Thus economic theory argues that selfish actions by individual firms are (i) ultimately self-defeating and (ii) ultimately generate great benefits for consumers in the form of lower prices and higher output.").

[192] Jeffrey M. Perloff, "Cartels," *Journal of Industrial Organization Education,* 1(1), 2006, pp. 1–12 ("Perloff (2006)") at p. 3 ("Economists have identified many conditions for cartels to form, last, and be profitable. Here, we review some of the major ones. First, the cartel can significantly raise prices. Second, the cartel controls most of the market (makes most of the sales)."); Kaplow and Shapiro (2007), p. 1103 ("Economists have long recognized that there exist certain prerequisites to successful collusion. ... The key elements are ... inclusion: a means of inducing participation by a sufficiently large number of incumbent suppliers so that competition from non-participants does not undermine the profitability of the collusive agreement.").

[193] Kaplow and Shapiro (2007), p. 1115 ("If the firms have little collective market power, so they collectively face rather elastic demand for their products, their incentive to collude is correspondingly low.").

[194] Carlton and Perloff (2015), pp. 148–149 ("Why doesn't each competitive firm reduce its own output below the competitive level? At the competitive equilibrium each competitive firm sets its marginal revenue equal to it marginal cost and has no incentive to further lower its output. If it were to reduce its output by one unit, it would lose profits because the marginal revenue on the last unit produced (the price) would exceed its marginal cost. Thus, each competitive firm is maximizing its profits at the competitive output. ... If all firms cut back by, say, 10 percent, the market price definitely rises; however, if only one firm cuts back by 10 percent, the effect on price is so small that it is

suppress compensation, if only one firm suppressed the compensation of its employees below the competitive level, then that firm's employees would likely switch to other firms that were offering competitive compensation, implying that the first firm's decision to suppress compensation would not be profitable or individually rational.

142. Third, there must be a mechanism that can detect whether any member of the cartel has deviated from the agreed-upon conduct.[195] The ability to detect cheating is critical because each member of a cartel has an incentive to cheat or defect because doing so would increase its profits. In the absence of an ability to detect cheating, a collusive agreement is not sustainable.

143. Fourth, collusive agreements need a mechanism to punish any firm that deviates or cheats on the agreement.[196] The ability to punish is fundamental to the sustainability of a cartel because each individual participant in a cartel will always have an incentive to deviate.

### 6.1.2. Neither Dr. Starr nor Dr. Gerhart conducts an analysis of whether the economic conditions for collusion to affect market outcomes hold

144. Neither Dr. Starr nor Dr. Gerhart conducts an analysis of whether each of the conditions above holds. With respect to the first condition, as described in Section 4, Dr. Gerhart does not demonstrate that Defendants have market power to suppress compensation.[197] Dr. Starr claims that the results

---

hardly measurable. Each competitive firm decides that it doesn't pay to reduce its output significantly because its gain is less than its cost. If it reduces its output by one unit, its gain is the trivial amount by which price rises times the units it produces, whereas its loss is the price it would have received for this last unit. A competitive firm ignores the good it does other firms by reducing its output and increasing the market price; it places no value on the gains of other firms. This gain by others is an externality. Working cooperatively, the cartel members gain from the output reductions of each firm.").

[195] Perloff (2006), p. 3 ("Economists have identified many conditions for cartels to form, last, and be profitable. Here, we review some of the major ones. … The cartel has mechanisms that allow it to detect and prevent cheating[.]"); Kaplow and Shapiro (2007), p. 1103 ("Economists have long recognized that there exist certain prerequisites to successful collusion. … The key elements are … (2) detection: some reliable means must exist by which departures from the agreement can be detected[.]").

[196] Kaplow and Shapiro (2007), p. 1103 ("Economists have long recognized that there exist certain prerequisites to successful collusion. … The key elements are … punishment: some credible mechanism must be established by which such departures are punished if and when they are detected. Specifically, the prospect of detection and punishment must be sufficient to deter individual firms' proclivity to cheat on the agreement, typically by cutting prices in the short-term, hoping to reap greater profits through a higher market share at the expense of the other firms, before they can respond."); George J. Stigler, "A Theory of Oligopoly," *The Journal of Political Economy*, 72(1), 1964, pp. 44–61 at p. 46 ("Enforcement consists basically of detecting significant deviations from the agreed-upon prices. Once detected, the deviations will tend to disappear because they are no longer secret and will be matched by fellow conspirators if they are not withdrawn."); W. Kip Viscusi, Joseph E. Harrington, Jr., and David E. M. Sappington, *Economics of Regulation and Antitrust*, Fifth Edition (Cambridge, MA: The MIT Press, 2018), p. 143 ("If we go back to the theory of collusion, what made it stable for firms to produce low quantities or charge high prices was that any cheating by a firm would be immediately punished. That threat of low future profits serves to discipline cartel members.").

[197] Dr. Gerhart restricts his analysis to █████████████████████████████████████████ ██████████████████████████████████████ Gerhart Deposition, p. 52. He is not opining ████████████

from his compensation regression ███████████████████████
███████████████████████████████████████████████
███████████,[198] but as I demonstrate in Section 8, his regressions do not separately identify such an impact. Moreover, the economic evidence I present in Section 4 demonstrates that ████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
███████████

145. With respect to the second condition, Dr. Starr and Dr. Gerhart simply assert that the exchange of information was necessarily against each Defendant's unilateral interest.[199] Yet, economic literature recognizes that firms can have an incentive to share information with competitors absent a conspiracy. This literature recognizes that sharing information with competitors is not inherently anticompetitive. Rather, a building block for economic models of competitive markets is that market participants know the prices of the good or service in question (e.g., wages in a labor market).[200] Information sharing that disseminates price information can improve market efficiency and competition, especially when a centralized market does not exist, as is often the case in labor markets.[201] Companies regularly consider information about their competitors' compensation for Senior Employees as part of benchmarking analyses.[202] Academic literature indicates that sharing aggregate compensation information can increase competition.[203] ████████████████████████████

---

████████████████████████. See Gerhart Deposition, pp. 70–73. Dr. Starr testified that ████████████
████████████████████████████" Starr Deposition, p. 155.

[198] Starr Report, ¶ 196 ("Market power can be directly established if there is evidence of the ability of firms to suppress wages below competitive levels. In the instant case, ████████████████████████████████
██████████████████████.").

[199] Starr Report, ¶ 98 ████████████████████████████
████████████████████); Gerhart Report, ¶ 82 ██████████████
███████████████████████████████

[200] Jeffrey M. Perloff, *Microeconomics*, 7th Edition (Boston, MA: Pearson Education Inc., 2015), p. 222 ("Perfectly competitive markets have five characteristics … 3. All market participants have full information about price").

[201] Carlton and Perloff (2015), p. 405 ("There may also be legitimate efficiency reasons for industry members to exchange information. When a centralized market does not exist, disseminating price information can improve efficiency. … Moreover, firms can monitor their own efficiency better if they can compare their costs to those of other firms.").

[202] Zoe B. Cullen, Shengwu Li, and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," NBER Working Paper 30570, August 2024 (Cullen, Li, and Perez-Truglia (2024)"), p. 9, ("[T]he use of salary benchmarking is widespread: of the 2,085 respondents who participate in setting salaries, 87.6% report using salary benchmarks.").

[203] Cullen, Li, and Perez-Truglia (2024), p. 40 ("[S]alary benchmarks can lead to higher pay, as resolving uncertainty prompts firms near the hiring margin to compete more fiercely with one another.").

██████████████████████████████████████████████████████
████████.[204]

146. With respect to the third condition, both experts suggest ███████████
████████████████████████████████████████████
████████.[205] Yet, they fail to show that the exchanged information was sufficiently detailed and timely to provide a mechanism for coordination and monitoring. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████

147. Finally, neither expert articulates any punishment mechanism, even as Dr. Starr acknowledges that "████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████."[206]

*6.2. The economic evidence reviewed by Dr. Starr and Dr. Gerhart does not support a conclusion that the Experts' Assessed SCA-USPI Information Sharing or the Alleged SCA-USPI Information Sharing suppressed compensation or restricted labor market competition*

148. Plaintiffs claim that USPI shared compensation information with SCA and DaVita in order to suppress compensation.[207] Plaintiffs further claim that

---

[204] Deposition of Brian Todd Mathis (SCA), September 20, 2024 ("Mathis Deposition"), pp. 51–52 ███████████
████████████). See also Deposition of Michael Rucker (SCA), August 27, 2024, pp. 261–263 (████████
████████████████████████████████████████████████
████████"). See also Deposition of Anthony Martin (USPI), June 27, 2024 ("Martin Deposition"), pp. 92–93
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████

[205] Gerhart Report, ¶ 149 ("█████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████); Starr Report, ¶ 12.a.ii ("████████████████
████████████████████████████████████████.").

[206] Starr Report, ¶¶ 80.c.iv–v. ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████

[207] Complaint, ¶ 8 ("Defendants shared the competitively sensitive information to further the goals of the conspiracy to suppress the compensation of their employees.").

Defendants used the compensation information shared to implement and enforce their conspiracy to suppress compensation.[208] Neither Dr. Starr nor Dr. Gerhart provides any evidence of information sharing that were, or could have been, used to facilitate compensation suppression, as Plaintiffs' experts claim.

149. In this section, I review the Experts' Assessed SCA-USPI Information Sharing. Plaintiffs' experts highlight what they identify as examples of information sharing between SCA and USPI and claim that the information shared could be used to suppress employee compensation. However, they fail to explain how the specific instances of information sharing between USPI and SCA could have been used to suppress compensation. Moreover, Plaintiffs' experts do not provide any analysis to support Plaintiffs' allegation that the information sharing was conducted in support of the Alleged Three-Party Conspiracy and ignore evidence that the information sharing they identify would not be adequate for monitoring and enforcing an agreement to suppress compensation.

### 6.2.1. Overview of Experts' Assessed SCA-USPI Information Sharing

150. As described in the last section, neither of Plaintiffs' experts analyzes whether the conditions for a conspiracy hold in the Experts' Assessed SCA-USPI Information Sharing. Instead, both experts support their conclusions that the alleged exchange of information was inconsistent with unilateral conduct (and consistent with collusion) by separately reviewing the Experts' Assessed SCA-DaVita Information Sharing and the Experts' Assessed SCA-USPI Information Sharing.[209] Both experts identify the types of information they allege SCA and USPI (and SCA and DaVita) shared. Then they claim the information allegedly shared was inconsistent with unilateral conduct and consistent with the types of data that could be used to suppress compensation.[210]

151. Dr. Gerhart lists three reasons the identified information sharing was likely to lower Senior Employees' pay. First, he states that ▮▮▮▮▮▮▮▮▮▮▮▮

---

[208] Complaint, ¶ 60 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[209] Starr Report, ¶ 101 ("The evidence shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."); Gerhart Report, ¶ 82 ("I review common evidence that, based on my experience and research in compensation and human resource management, ▮▮▮▮▮▮▮▮▮▮▮▮.").

[210] Starr Report, ¶ 101; See also Gerhart Report, ¶ 82 ("I review common evidence that, based on my experience and research in compensation and human resource management, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.."); Starr Report, ¶ 12.a.ii ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").



152. Dr. Starr outlines what he claims are economic criteria for assessing information sharing.[215] Specifically, he states that ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ ████████████"[216] ████████████████████████████████████████████ ████████████████████████████████████████[217] ████████████ ████████████████████████████████████████.[218] ████████████████████████████████████████████ ████████████.[219]

153. Collectively Dr. Gerhart and Dr. Starr's framework for analyzing information sharing includes identifying instances when Defendants shared data that were ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████.[220] Dr. Gerhart and Dr. Starr claim to apply their framework to the Experts' Assessed SCA-USPI Information Sharing and conclude that the Experts' Assessed SCA-USPI Information Sharing is consistent with collusion. Yet, they fail to explain how the information that is included in the Experts' Assessed SCA-USPI Information Sharing is ████████████████████████████

---

[211] Gerhart Report, ¶ 83.a ("████████████████████████████████████████ ████████████████████████████.").

[212] Gerhart Report, ¶ 83.a.

[213] Gerhart Report, ¶ 83.b ("████████████████████████████████████████████ ████████████").

[214] Gerhart Report, ¶ 83.c.

[215] See Starr Report, ¶¶ 93–96.

[216] Starr Report, ¶ 96.

[217] Starr Report, ¶ 93.

[218] Starr Report, ¶ 94 ("████████████████████████████████████████").

[219] Starr Report, ¶ 96 ("████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████.").

[220] See Starr Report, ¶¶ 93 ████████████████████████████████████████████ ████"), 96 ████████████████████████████████████████ See also Gerhart Report, ¶ 83.c ("████████████████████████████████████████").

█████████████████████████████████████████████
███████████████████████████████. That is, they have failed to
describe how they have applied their own framework to the examples of the
Experts' Assessed SCA-USPI Information Sharing they have identified.
Moreover, many of the identified examples of the Experts' Assessed SCA-
USPI Information Sharing do not involve ████████████████████████
████████████████████

*6.2.2. Plaintiffs' experts have not shown how the alleged information sharing they identify provides a mechanism to monitor and suppress compensation*

154. Dr. Starr and Dr. Gerhart identify specific documents that they claim demonstrate that Defendants shared "[t]he type of CSI [… that] could be used by Defendants to suppress employee wages."[221] Both experts identify a

████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

██████████ The examples of information sharing they provide would be difficult, if not impossible, to leverage for a compensation suppression agreement for several reasons.

155. First, Dr. Starr and Dr. Gerhart identify █████████████████████
██████████████████████████████████.[222] ████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████[223] ██████████████
█████████████████████████████████████████████████
██████████████████[224] ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

156. █████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████

---

██ Starr Report, ¶ 99. *See also* Gerhart Report, ¶ 82 ("████████████████████████████████████████████
████████████████████████").

[222] See Starr Report, ¶ 101. *See also* Gerhart Report, ¶¶ 23, 87.

[223] Gerhart Report, Footnote 43 ("USPI_CIV_00010451C8 [*sic*] (████████████████████████████████
████████████████████████).");  Email chain from Jarod Moss to Bill Wilcox et al., "RE: Untitled," July 13, 2011, USPI_CIV_000104518.

[224] Starr Report, ¶ 101.p.



157. For example, ███████████████████████

███████████████████████ [225] ███████████████████████

███████████████████████ .[226] ███████████████████████

███████████████████████ .[228]

---

[225] Gerhart Report, ¶ 83.c.

[226] ███████████████████████ Gerhart Deposition, pp. 183, 186. ███████████ . See Starr Deposition, p. 469.

[227] Deposition of Mark Kopser (USPI), December 12, 2024 ("Kopser Deposition"), pp. 34–35 ███████████████████████ ). See also email from Brian Mathis to Jason Cagle, "Re: SCA Department Comparison.xlsx," with attachments, December 31, 2014, USPI_CIV_000021178 ("███████████████████████"); Deposition of Peter Clemens (SCA), May 2, 2024, ("Clemens Deposition"), p. 137–138 ███████████████████████ ").

[228] In deposition, both experts ███████████████████████ See, e.g., Gerhart Deposition, pp. 184–186 ("███████████████████████") See also Starr Deposition, p. 469 ("███████████████████████

***Exhibit 17***



Source: USPI_CIV_00962509

158. Third, some examples of the information sharing highlighted by Plaintiffs' experts are ███████████████████████ ██████████████████████████████ ████████████████████[229]████████ ██████████████████████████████ ██████████.[230]██████████████████ ██████████████████████████████ ██████████████████████████ ████████████.[232]

159. For example, Dr. Starr cites ██████████████ ██████████████████████████████ █████████████████████████[233]███ ██████████████████████████████ ████████.[234]██████████████████ ██████████████████████████████ █████████████████████

160. Furthermore, ████████████████████ ██████████████████████████████ ████████████[235]██████████████████

---

[229] Mathis Deposition, p. 245.

[230] Mathis Deposition, p. 245. See also Kopser Deposition, pp. 51–53.

[231] Deposition of Andrew Johnston (USPI), September 6, 2024 ("Johnston Deposition"), p. 39 ("██████████ ██████████████████████████████ ████████████); Clemens Deposition, p. 147 ████████ ██████████████████████████████ ██████████.")

[232] Johnston Deposition, p. 44 ("██████████████████ ██████████████████████████████ ████████████████████████████; Clemens Deposition, p. 147 ██████████████████████████████ ██████████████████████").

[233] Starr Report, ¶ 101.i ████████████████████ ██████████████████████████████ ██████████████████); Email chain from Brian Mathis to Lynn Howard, et al., "Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729.

[234] Dr. Starr does not cite any other communications in which USPI provided budgeted wage increases to SCA. See, e.g., Starr Report, ¶ 101.k (citing USPI_CIV_000016100, in which no information was exchanged). Other documents cited by Plaintiffs' experts show only requests for merit pool budget information, not actual information sharing. See, e.g., email chain from Brian Mathis to Jason Cagle, "Re: Wage Increase Budgets," August 20, 2014, USPI_CIV_000021155 ("Are you all willing to swap wage increase budgets as we have in the past?").

[235] Dr. Starr acknowledged this in his deposition. See Starr Deposition, p. 458 ("██████████████ ██████████████████████████████ ██████████████████████████████ ██████████████████")

███████████████████████████████████████████████████████████
████████████████████████████.[236]

161. Fourth, Dr. Gerhart points to only two shared documents that contain

██████████████████████████████████████.[237] ████████████████████

██████████████████████████████████████████████████████████

████████████[238] ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████"[239] ███████████████████████████████

█████████████████████████████.[240] ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████[241]

162. Fifth, the information was often ███████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████.[242]

163. Sixth, Plaintiffs' experts rely on ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████.[243] ████████████████████████

---

[236] █████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████ See Gerhart Deposition, pp. 172–173.

[237] Email chain from Mark Kopser to Brian Mathis, "Re: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–9; Email chain from Rich Sharff to Jason Cagle, "RE: comp," May 30, 2012, USPI_CIV_000016522.

[238] Email chain from Mark Kopser to Brian Mathis, "Re: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–9.

[239] Email chain from Rich Sharff to Jason Cagle, "RE: comp," May 30, 2012, USPI_CIV_000016522; Gerhart Report, ¶ 82.b.i. Asked whether ████████████████████████████████████████████████████████████
███████████████████████████████████████████████████."  Gerhart Deposition, pp. 180–181.

[240] Complaint, ¶ 92 ("Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.").

[241] The salary and bonus information for one of the potential Senior Employees, VP of SCA's audit department is represented as current while the salary and bonus information for the other potential Senior Employees discussed in the email, a director, is described as being from "a few years ago." As I explain above, Dr. Gerhart has not shown how SCA and USPI could have used compensation information for as few employees to effectuate a conspiracy to suppress compensation. Furthermore, even if Defendants successfully conspired to suppress these few employees' wages, neither of Plaintiffs' experts shows that Defendants had a wage structure that would have spread the impact to all or nearly all Senior Employees.

[242] Starr Report, Footnote 373 ("See Ex. PX63 at SCA000609009 (█████████████████████████████
██████████████████████████████).").

[243] Starr Report, ¶ 101.m ("█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████."); Gerhart Report, ¶ 116.c.iii ███████████
██████████████████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████").

█████████████████████████████████████████████████████.[244] ██████

████████████████████████████████████████████████████████,[245] ██████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████.[246] ████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████.[247]

164. Seventh, some information shared between USPI and SCA was already available publicly. For example, Dr. Gerhart discusses ██████████████████ ████████████████████████████████████████"[248] ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

████████████.[250]

### 6.2.3. Plaintiffs', Dr. Starr's, and Dr. Gerhart's assertions that the Experts' Assessed SCA-USPI Information Sharing was sufficiently detailed to facilitate collusion ignore the complexity of Defendants' compensation packages

165. In addition to failing to identify how the Experts' Assessed SCA-USPI Information Sharing could have supported a collusive agreement to suppress compensation, Dr. Starr and Dr. Gerhart fail to analyze how Defendants' different compensation components would complicate any alleged conspiracy to suppress compensation. Economic research finds that markets where transactions are complex or customized are less susceptible to collusion,[251] and here, ████████████████████████████████████████

---

[244] Starr Deposition, p. 475 ████████████████████████████████████████████████ ███████████████████████████████████████

[245] Gerhart Report, footnote 346. However, Dr. Gerhart acknowledges that case volume information is not "compensation information." Gerhart Report, footnote 346 ("In addition to the ████████████████ discussed at length in this section, note that the SCA-USPI CSI Exchanges were not limited to compensation information. ████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████). See also Email chain from Jason Cagle to Brian Mathis, "RE: USPI February 2013 Final.xls," April 5, 2013, USPI_CIV_000016573–74 at USPI_CIV_000016573 ("████████████████████████████████████ CA."); Email chain from James Walker to Brian Mathis and Jason Cagle, "RE: Oct volume," with attachment, November 10, 2014, USPI_CIV_000021165 ██████████████████ ██████████").

[246] Starr Deposition, p. 466.

[247] Gerhart Report, Footnote 346. See, e.g., Email chain from Megan Farabaugh to Jason Cagle et al., "RE: SCA Payor Mix – Week 13," April 5, 2013, USPI_CIV_000016019 ("████████████████████████████ ██████████"); USPI_CIV_000016020.xlsx ("█████████████████████████████████████████").

[248] Gerhart Report, Footnote 346.

[249] Deposition of Jason Cagle (USPI), August 6, 2024, pp. 37 ("█████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████."), 53 ("███████████████████████████████████████████████████████████████████.").

[250] Gerhart Report, Footnote 346; Kopser Deposition, p. 81 ██████████████████████████████████).

[251] Louis Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, N.J.: Princeton University Press, 2010), p. 320 ("A market with complex transactions or with customized transactions will be less susceptible to firms being able to find a mutually acceptable understanding of what it means to tacitly



252

---

**Exhibit 18**

**Components of compensation for Senior Employees differed across Defendants, 2008–2022**



Source: Dr. Starr Corrected Compensation Regression Data

Note: Total compensation is deflated according to each year's CPI, standardized to 2019 U.S. dollars. The "Other" category includes compensation types labeled as additional, commission, debt forgiveness, education, holiday, jury, leave, on call, other, overtime, retro, settlement, severance, shift, shift differential, and sick.

166. Plaintiffs' experts' claims that aggregate spending data ███████████ could be used to maintain a conspiracy to suppress compensation are inconsistent with the evidence on the variability in compensation changes

---

collude. Similarly, a market with very diverse products such as different brands and different versions of a particular product will be more difficult to coordinate. Since complexity makes agreements about what it would mean to collude difficult to achieve, sometimes we see firms adopting practices that 'simplify their prices for consumers' or harmonize the conditions for a transaction.").

252 Email chain from Mark Kopser to Brian Mathis, "Re: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–9 at OMC_BM_000010778 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████ "); Email chain from Rich Sharff to Jason Cagle, "RE: comp," May 30, 2012, USPI_CIV_000016522 ███████████████████████████ ").

of USPI employees over time. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

*Exhibit 19*

████████████████████████████



Source: Dr. Starr Corrected Compensation Regression Data

Note: ████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████

167. Dr. Starr and Dr. Gerhart highlight instances of alleged information sharing involving USPI that they claim could have been used by USPI to suppress compensation.[253] However, neither expert explains how the

---

[253] Starr Report, ¶¶ 99 ("The qualitative record evidence supports the allegation that Defendants SCA and DaVita shared ████████████████ with one another, and SCA and USPI did the same. ████████████████ ████████████████"), 102 ("The evidence is consistent with ████████████████

*Highly Confidential - Outside Counsel/Experts Only*

specific alleged information shared could have been used to maintain a compensation suppression agreement. A review of the Experts' Assessed SCA-USPI Information Sharing reveals that much of the information sharing highlighted by Dr. Starr and Dr. Gerhart is not the forward looking, granular, compensation data specific to Senior Employees that Dr. Starr and Dr. Gerhart argue could be used to maintain a compensation suppression agreement between USPI and SCA. Neither expert explains how the Experts' Assessed SCA-USPI Information Sharing could have been used to suppress the compensation of Senior Employees, given the complex and non-systematic way that compensation is set and evolves. Furthermore, neither expert provides any evidence of information sharing between USPI and DaVita.

## 7. Economic evidence does not support Plaintiffs' experts' claims that internal and external equity would have resulted in the Alleged, Assessed, or Admitted Mobility Restrictions

████████████████████████████████████████
██████████

168. Both Dr. Starr and Dr. Gerhart claim that the Experts' Assessed SCA-USPI Mobility Restrictions harmed all or nearly all USPI Senior Employees. They make this claim even though Dr. Starr's own analysis, reviewed in Section 5.3.1, ████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████[254]████████ ████████████████████████████████████████ ███████████████████████████[255] In this section, I demonstrate that neither Dr. Starr nor Dr. Gerhart has a reliable basis for claiming that USPI's supposed compensation structure would

---

████████████████████████████ "); Gerhart Report, ¶ 82.a████████████████ ██████████████████████

[254] According to Dr. Starr, ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████

[255] Starr Report, Section VII.F ("Just as a rising tide would lift all boats, ████████████████████████ ████████████████████████ "); Gerhart Report, Section VIII.A████████████ ████████████████████ ]").

transmit any direct harm suffered by a limited number of Senior Employees to all or nearly all USPI Senior Employees.[256]

169. Dr. Gerhart describes the direct mechanism for harm from a non-solicitation agreement and indirect pathways by which the harm can cascade to other employees through a compensation structure as follows:

- *Direct*: But for the alleged mobility restrictions, ██████████ ████████████████████████████████████████████ ████████████████████████.[257]

- *Indirect effect on other Senior Employees with the same job*: ████ ████████████████████████████████████████ ████████████████████████████████████████[258]

- *Indirect effect on other Senior Employees in different jobs*: ████ ████████████████████████████████████████ ████████████████████████████████████████ ██████.[259]

170. As a result of these indirect effects, Plaintiffs' experts conclude that all or nearly all Senior Employees are harmed because those directly affected did not receive an increase in their compensation.

---

[256] Neither expert provides an estimate of the impact, if any, of the Experts' Assessed SCA-USPI Information Sharing on compensation nor do they even analyze whether the Experts' Assessed SCA-USPI Information Sharing had any effect on compensation. With respect to Dr. Gerhart, he affirms that ████████████████████████ ████████████████████████████ See Gerhart Deposition, p. 147. With respect to Dr. Starr, he claims that ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ See Starr Report, ¶ 106. As I describe in Section 8, Dr. Starr's wage suppression regressions are flawed and incapable of separating the effect, if any, of either the Experts' Assessed SCA-USPI Information Sharing or Experts' Assessed SCA-USPI Mobility Restrictions from other market factors. ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████

[257] Gerhart Report, ¶ 143.a ("████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████").

[258] Gerhart Report, ¶ 143.b.

[259] Gerhart Report, ¶ 143.c ("██████████████████████████████████ ████████████████████████████████████████████████████████ ██████"). Also, according to Dr. Gerhart, ████████████████████████ ████████████ See, e.g., Gerhart Report, ¶¶ 143.d–e ("████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████").

171. I begin in Section 7.1 by ███████████████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████ ████████. Next, in Section 7.2, I review and respond to Dr. Gerhart's claims related to internal and external equity and his assertion that USPI's compensation system would lead to cascading effects across Senior Employees. Then in Section 7.3 I turn to Dr. Starr's qualitative and quantitative assessment of USPI's compensation. I show that ████████ ████████████████████████████████ ████████████████████████████ ██████████████████████████████ ██████████████████████████ ████████████████████████ ██████████████████████████████ ████████████████

*7.1.* ████████████████████████████████████ ████████████████████████

172. Plaintiffs' experts claim that Defendants implemented structured compensation systems that maintained internal equity. They claim this internal equity would result in the direct harm allegedly suffered by a limited number of USPI Senior Employees flowing through to all or nearly all USPI Senior Employees. Plaintiffs' experts' description of USPI's alleged compensation structure implies the following should be observed in USPI's compensation data:

1. Pay within a job level should be similar and pay across job levels should be differentiated.[260]
2. When one or some Senior Employees' compensation increases (or decreases), other Senior Employees' compensation should also reflect similar changes to maintain the compensation structure.[261]

---

[260] Gerhart Report, ¶ 94 ("Internal equity means paying employees within the same company similar to other employees within the same company doing similar work and making similar performance contributions. Internal equity depends on maintaining certain pay differentials based on job title, level, performance, etc.").

[261] Starr Report, ¶ 172 ("Compensation structures connect all employee pay within a firm, such that any suppression of wages for one group of employees would tend to suppress the pay of other employees."). See also Starr Deposition, pp. 453–454 ("████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ ████████████████████████████████████ ████████████).

3. Compensation paths should be similar across Senior Employees over the course of their career at USPI.[262]

173. In this section, I review

174.

---

[262] Starr Report, ¶ 172 ("Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own.").

[263] Starr Report, ¶ 216 ("                                                                                                                                                        .").

[264] Exhibit 20 shows distributions of real annualized total compensation for 2017. Graphs showing the distributions for other years and other measures of pay are provided in a workpaper. See Workpaper 3.

**Exhibit 20**
**Pay within job categories varies and pay is not differentiated across job levels, 2017**



Source: Dr. Starr Corrected Compensation Regression Data
Note: The chart displays ██████████████████████████████████████████████
████████████████████████████████████ .

175. Next, I review ████████████████████████


176. According to Dr. Starr, a set of employees were harmed because they were not solicited by SCA due to the alleged mobility restrictions. He claims that,

---

[265] Starr Report, ¶¶ 172 ("Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own."), 190 ("These findings are strongly consistent with the existence of a pay structure within jobs."), 186 ("These results are consistent with the qualitative evidence that there is a compensation structure within the firm that aligns wages across job levels.").

[266] Graphs showing compensation changes for USPI Senior Employees for other years are provided in Workpaper 4.



*Highly Confidential - Outside Counsel/Experts Only*

*Exhibit 21*
*Compensation of individual USPI Senior Employees changed differentially, 2016–2017*



Source: Dr. Starr Corrected Compensation Regression Data

Note: ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████

177. ███████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
██ ░267░ ██████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

**Exhibit 22**

█████████████████████████████████████████████████████████████



Source: Dr. Starr Corrected Compensation Regression Data

Note: █████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████

178. ███████████████████████████████████████████
████████████████████████████████████████████

---

[267] █████████████████████████████████████████████████ is provided in Section 6.2.3, Exhibit 19.

███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████

*7.2. Dr. Gerhart offers flawed logic and analyses to support his assertion that concerns of internal and external equity would have resulted in the Experts'*
███████████████████████████████████████████████
██████████████████

*7.2.1. Overview of Dr. Gerhart's claims related to internal and external equity*

179. Dr. Gerhart claims that ████████████████████████████████ ████████████████████████."[268] Dr. Gerhart describes a two-step process by which ████████████████████████████.

- Step 1 is assigning internal relative value to jobs, which according to Dr. Gerhart, can be expressed as a percentage differential between jobs.[269]
- Step 2 is job evaluation, which Dr. Gerhart describes as "the process of systematically determining the relative worth of jobs to create a job structure for the organization."[270] He describes firms setting the minimum and maximum pay for each salary grade at this step.[271]

180.

---

[268] Gerhart Report, ¶ 98.

[269] Gerhart Report, ¶ 106 ("Step 1: Assign Internal Value to Jobs. … This relative value can be expressed as a percentage differential.").

[270] Gerhart Report, ¶ 111.

[271] Gerhart Report, ¶ 113.b ("In addition to deciding on salary midpoints, firms also need to set the minimum and maximum pay for each salary grade/range.").

[272] Gerhart Report, ¶ 110.c ("████████████████████████████████ ████████████████████████████████████").

[273] See Appendix D.



181. ███████████████████████████████████

██████████████████████████████

████████████████████████████████

███████████████████████████████████

█████████████████████████████████

███████████████████████████████.[274] ████████

████████████████████████████████

██████████████████████████████████

███████████████████████████████████

███████████████████████████.[275]

182. ████████████████████████████████

█████████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████[276] ████████████████████████████

█████████████████████████████████

███████████████████████████████████

██████████████████████████████████

█████████████████████████████

████████████████████████████████

███████████████████████████████████

█████████████████████████████████

███████████████████████████████████

███████████████████████████████

██████████[277]

---

[274] Gerhart Report, ¶ 114.c.iii ("For instance, ████████████████████████████████ ███████████████████████████████████████ ████████████").

[275] Gerhart Report, ¶ 114.c.v ████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████"").

[276] Gerhart Report, Section VII.

[277] Falsifiability, or the notion that a scientific statement must be one that is falsifiable, is a central concept in the scientific method. In seminal writing on the philosophy of science, Karl Popper concludes, "In so far as a scientific statement speaks about reality, it must be falsifiable: and in so far as it is not falsifiable, it does not speak about reality." See Karl Popper, *The Logic of Scientific Discovery*, (New York, NY: Routledge Classics, 2005), p. 316.

*Highly Confidential - Outside Counsel/Experts Only*

*7.2.2. Dr. Gerhart's review of USPI documents does not support his opinion that the Experts' Assessed SCA-USPI Mobility Restrictions would have a widespread impact on the compensation of USPI Senior Employees*

183. As I describe at the start of this section, Dr. Gerhart claims that ███ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████ ██████████.[278] Dr. Gerhart describes internal equity as "paying employees within the same company similarly to other employees within the same company doing similar work and making similar performance contributions. Internal equity depends on maintaining certain pay differentials based on job title, level, performance, etc."[279] In this section, I examine Dr. Gerhart's review of USPI's alleged pay structure. I show that it does not support his opinion that the alleged mobility restrictions would have widespread impact on the compensation of USPI Senior Employes.



---

[278] Gerhart Report, ¶¶ 141 ("███████████████████████████████████████ ███████████████████████████████████████████ ████████████"), 161 ("██████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████").

[279] Gerhart Report, ¶ 94.

[280] Gerhart Report, ¶ 114.c, Figure 7.



[black redaction bar] [black redaction bar] 281 [black redaction bar]

[black redaction bars]

---

■ See, e.g., Email chain from Alex Bateman to Andy Johnston, "RE: Admin merit increase," February 6, 2015, USPI_CIV_000336479 ("[redacted]."); Email chain from Teresa Danna to Cindy English, "RE: FW: Message from, KMBT_C454," with attachments, January 15, 2014, USPI_CIV_000499023–24 at USPI_CIV_000499023 ("[redacted]"); "Michael Bass Initial Offer," Undated, USPI_CIV_000036746–49 at USPI_CIV_000036748 ("[redacted]").

***Exhibit 23***
***Example salary ranges at USPI, Gerhart Report, Figure 7***



Source: Gerhart Report, Figure 7

Note: Dr. Gerhart cites USPI_CIV_000214742, which is an email from Shannon Mosley in August 2018 ██████████████████ ███████████████████████. He also cites USPI_CIV_000214746, which is an Excel file containing the above information.

186. ████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
███████████████████

187.

188.

189.

---

[282] In response to ███████ ████████████ of USPI replied, "██████████████████████████ █████" See email chain from Sandi Karrmann to Shannon Mosley, "Fwd: USPI HRD – ████████," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337.

[283] Starr Report, ¶ 129 ("The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Directors and above was to reduce total compensation by … ██████████ at USPI[.]").

[284] Note that for the "CMO" position, the average wage is listed as being equivalent to the maximum wage. However, employees in this position are not a part of the alleged class. See Appendix D.

[285] See Appendix D.



.286

,287

.288

289

.290

190. Dr. Gerhart also fails to address documents

.291 For

---

286 USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 2; Email chain from Peggy Wellman to Mary Leahy et al., "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 ).

287 I explain my analysis of USPI's compensation data for evidence that it adheres to salary ranges in Section 7.

288 Karrmann Deposition, p. 39 ). See also, Johnston Deposition, p. 51 ); Email chain from Sandi Karrmann to Shannon Mosley, "Fwd: USPI HRD – C. Hodges," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337 (" "); Email chain from Peggy Wellman to Mary Leahy et al., "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 (" "); Email chain from Monica Cintado to Brett Brodnax et al., "RE: Phone Interview with -VP Development candidate/Nashville (Resume Attached)," April 3, 2013, USPI_CIV_000047956–58 at USPI_CIV_000047957 ).

289 Karrmann Deposition, p. 39 (" "); Karrmann Deposition, PX 296 at DOJCIV-008-00000389 ).

290 Karrmann Deposition, pp. 39–40 (" ), 41–42 (" ).

291 See email chain from Leah Cerkvenik to Shannon Mosley and Teresa Danna, "RE: offer information," December 26, 2013, USPI_CIV_000192177–78 at USPI_CIV_000192178 ("

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████"292 █████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████

191. Dr. Gerhart further fails to consider evidence that suggests pay was individualized. For example, ██████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

████████ 293 ███████████████████████████████████
███████████████████████████████████████████████████████████
████████████.294 ██████████████████████████████████████
███████████████████████████████████████████

---

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████); United
Surgical Partners International, "Confidential Assessment For █████████: Administrator Candidate for United
Surgical Partners," December 17, 2013, USPI_CIV_000376500–506 at USPI_CIV_000376500 ("██████████
████████████████████████"); Email chain from Cindy English to Sherri Reinert and Paula
Baldwin, " RE: FW: █████████, Administrator candidate," July 20, 2016, USPI_CIV_000626729–30 at
USPI_CIV_000626729 ("████████████████████████████████████████████████
██████████████████████████████")"); Email chain from Shannon McGarry to Marc Steen
and Shannon Mosley, "RE: USPI Employment Offer," February 14, 2018, USPI_CIV_000030396–399 at
USPI_CIV_000030396–97 ("████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████"); "Offer of
Employment Letter to █████████ for Administrator at Baylor Surgicare," USPI, February 8, 2018,
USPI_CIV_000274099 at USPI_CIV_000274099 ████████████████████████████████
██████████████████████████████."). See also email chain from Sandi Karrmann to
Shannon Mosley, "Fwd: USPI HRD – █████████," November 27, 2013, USPI_CIV_000441337–39 at
USPI_CIV_000441337. In response to a candidate requesting additional PTO, Sandi Karrmann of USPI responded,
████████████████████████████████████████████████████████████
██████████████████████ and followed up with Shannon Mosely to revise the offer letter accordingly. See also
USPI_CIV_000047956–58, an internal USPI email chain about ████████████████████████
████████████████████████████████████████████████████████

292 Email chain from Alex Bateman to Andy Johnston, "RE: Admin merit increase," February 6, 2015,
USPI_CIV_000336479.

293 "Federal Bureau of Investigation of █████████████," July 28, 2020, DOJCIV-008-00000353–67 at
DOJCIV-008-00000362–363 ████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████

294 Email chain from Alex Bateman to Cindy English, "RE: PLEASE RESPOND: Administrator Increase Questions
█████████████████████████," February 2, 2015, USPI_CIV_000650633–36 at USPI_CIV_000650634
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████



192. Dr. Gerhart also fails to explain how USPI's use of equity compensation, which could be individualized, is consistent with his claims of internal equity that would result in harm to all or nearly all Senior Employees. ████

---

[295] Email chain from Teresa Danna to Cindy English, "RE: FW: Message from, KMBT_C454," with attachments, January 15, 2014, USPI_CIV_000499023–24 at USPI_CIV_000499023 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

[296] "Federal Bureau of Investigation of ████████████," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000359–360 ("██████████████████████████████████████").

[297] Gerhart Deposition, p. 168 ████████████████████████████████████████████████

[298] USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041656 ("████████████████████████████").

[299] USPI Office Memo from Bill Wilcox to Option and Compensation Committee, "RE: Request for Approval," June 25, 2013, USPI_CIV_000121836–40 at USPI_CIV_000121839 ("██████████████████████████████").

[300] See USPI, "Resolutions of Compensation Committee of USPI Holding Company, Inc.," November 13, 2016, USPI_CIV_000068808–21 at USPI_CIV_000068818.

[301] USPI Office Memo from Bill Wilcox to Aric Burke, July 16, 2014, USPI_CIV_000044881–83 at USPI_CIV_000044881 ("██████████████████████████████████████), USPI_CIV_000044883 ("████████████████████████████████████████"").

*Highly Confidential - Outside Counsel/Experts Only*

██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████ [302] ████████████
██████████████████████████████████████████████
████████.[303]

193. These examples demonstrate ████████████████████████
██████████████████████████████████████████████
████████.[304]

*7.2.3. Dr. Gerhart's claims about "external equity" contradict his claim that the Experts' Assessed SCA-USPI Mobility Restrictions would have affected all Senior Employees*

194.██████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████ According to Dr. Gerhart, "[e]xternal equity means paying similar employees similarly to employees in other companies doing similar work and making similar performance contributions."[305] ████████████████████████████
████████████████████████████████████████ Dr. Gerhart states, "[i]n the absence of external equity, a company is at greater risk of employee turnover. However, if pay is suppressed in these other companies, achieving external equity will require lower labor costs than in a competitive market."[306]

---

[302] Email chain from Paul Slavin to Sandi Karrman, "RE: Patrick (updated)," March 13, 2018, USPI_CIV_000534606–09 at USPI_CIV_000534609 ("████████████████████████████ ████████████████████████████████), USPI_CIV_000534607 ████████████ ████████████████████.").

[303] Email chain from Bill Wilcox to Brett Brodnax, "Re: ████████ Draft Offer Letter and Compensation Plan," November 15, 2014, USPI_CIV_000401250–54 at USPI_CIV_000401253 ("████████████████████ ████████████████████████████████."), USPI_CIV_000401252 (████████████████████████ ████████████."), USPI_CIV_000401251 ████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████.").

[304] Garvin Deposition, p. 90 ("████████████████████████████████ ██████████████████████████████████████████ ████████████████████). See also email chain from Peter Blach to Sandi Karrmann and Shannon Mosley, "RE: ████ stock question," February 28, 2018, USPI_CIV_000272179–82 at USPI_CIV_000272181 ████████████ ████████████████████████?); Email chain from Brett Brodnax to Sandi Karrman, "Re: ████████ Offer Letter 4 2016.docx," April 19, 2016, USPI_CIV_000900796–801 at USPI_CIV_000900801 ████████████████████████████████ ████████████████████████████████████████; Offer of Employment Letter to ████████ for Vice-President, Development, undated, USPI_CIV_000026215–16 ("████ ████████████████████████████████.").

[305] Gerhart Report, ¶ 94.

[306] Gerhart Report, ¶ 94.

195. Dr. Gerhart's claims of external equity, along with observed labor mobility, are inconsistent with Plaintiffs' allegations that USPI was able to maintain sub-competitive compensation. If SCA and USPI (or all three Defendants) agreed to reduce compensation below competitive rates, as alleged by Plaintiffs, USPI's compensation would violate external equity. In Sections 4 and 5 above, I review labor mobility of Senior Employees at USPI and find that ██████████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████████ ██████████████████████████████████████████ █████████████████

196. ████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████ ███████████

### 7.3. Dr. Starr offers flawed analyses to support his assertion that the Experts' Assessed SCA-USPI Mobility Restrictions would have indirectly suppressed the compensation of USPI Senior Employees

### 7.3.1. Overview of Dr. Starr's claims and analysis related to internal and external equity

197. Dr. Starr makes claims similar to Dr. Gerhart regarding internal and external equity. Specifically, Dr. Starr states "[c]ompensation structures connect all employee pay within a firm, such that any suppression of wages for one group of employees would tend to suppress the pay of other employees. … █████████████████████████████████ █████████████████████████████████████ ████████████████████████████████████"[307]

---

[307] Starr Report, ¶ 172.

198. Dr. Starr begins by reviewing qualitative evidence. He asserts that this qualitative evidence demonstrates that ██████████████████ ██████████████████ Yet, Dr. Starr fails to recognize that ██████████████████ ██████████████████ ██████████████████.[308]

199. First, Dr. Starr highlights testimony from USPI's then COO, ████ ████.[309] ██████████████████ ██████████████████ ██████████████████ ██████████████████ ████ 310 ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ████

200. Second, Dr. Starr points out that ██████████████████ ██████████████████.[311] ██████████████████ ██████████████████ ██████████████████ ██████████████████

---

[308] Note that Dr. Starr ignores evidence contrary to his opinions that indicates USPI did not follow a strict compensation structure. See, e.g., Email chain from Peggy Wellman to Mary Leahy and Jeremy Zoch, "RE: FW: Human Resources Questions for St. Joseph's," with attachments, March 21, 2015, Email chain from Peggy Wellman to Mary Leahy et al., "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 ("██████████████████ ██████████████████"); Email chain from Julie Manning to Natalie Buncher and Shannon Mosley, "RE: Pay scale grid for surgery scheduler w/ other duties assigned," September 20, 2017, USPI_CIV_000033030–31 at USPI_CIV_000033031 ("██████████████████."); Email chain from Sandi Karrmann to Shannon Mosley, "Fwd: USPI HRD – C. Hodges," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337 ("██████████████████ ██████████████████)."); Karrmann Deposition, p. 39 ("██████ ██████").

[309] Starr Report, ¶ 181.a ("██████████████████ ██████████████████ ██████████").

[310] Garvin Deposition, p. 93.

[311] Starr Report, ¶ 181.b ("██████████████████ ██████████████").

*Highly Confidential - Outside Counsel/Experts Only*

███████████████████████████████████████████████████
████████████████████████████.[312]

201. Dr. Starr claims that a firm taking external equity into account does not mean that compensation is entirely determined by a larger labor market or that it lacked monopsony power. He provides an example that "a company may seek to pay its employees at approximately the 75th percentile of some external pay benchmark. But if that company suppresses labor competition through, say, a non-solicitation agreement with an important labor competitor, the company may instead seek to pay its employees at the 50th percentile of some external pay benchmark. This illustrates both that all pay within a firm would move together, and that paying attention to external equity does not mean that wages were simply set by a larger labor market."[313] Yet, suppose the benchmark compensation range shifted upward. To maintain external equity, Defendants would have to match pay increases or face attrition of their employees, which is a competitive compensation setting process. That is, Dr. Starr has failed to explain how mobility restrictions between two firms could successfully reduce their employees' compensation in the face of labor market competition from other firms included in the benchmark.

202. Third, Dr. Starr references testimony from USPI's then VP of Financial Operations, ██████████.[314] ██████████████████████████████



---

[312] See also email chain from Mark Garvin to Sandi Karrmann and Andy Johnston, "PayScale Information – RVP Nationwide," with attachments, February 8, 2017, USPI_CIV_000021897–98 at USPI_CIV_000021898 ("████████ ████████████████████████████████"); "PayScale Market Report: Regional Vice President (RVP), Operations," February 3, 2017, USPI_CIV_000021899–904 at USPI_CIV_000021900 ████ ██████████████████████████"); Email chain from Shannon Mosley to Sandi Karrmann and Crystal Hodges, "RE: Salary Surveys," February 11, 2014, USPI_CIV_000057810–11 at USPI_CIV_000057810 ████████████████ ████").

[313] Starr Report, ¶ 176.

[314] Starr Report, ¶ 181.c ("████████████████████████████████████ ███████████████████████████.").

[315] English Deposition, pp. 29 ███████████████████████████████ ██████████████████████████████████████████████), 48 ("████ ███████████████████████████████████████████████).

[316] English Deposition, p. 52 ("██████████████████████████████████ ████████████████████████").

.[317]

203. Finally, Dr. Starr points to

[318]

.[319]

204. Furthermore, Dr. Starr ignores

.[320]

---

[317] Starr Report, ¶ 181.c ("In 2015, the default increase for VP and above was ▮▮▮▮▮. In 2012, the proposed increase for everyone below the VP level was ▮▮▮▮▮.").

[317] See, e.g., Email chain from Greg Miller to Michael Stroup, "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Brodnax – ▮▮▮▮▮ (Due by Friday, February 6, 2015)," February 2, 2015, USPI_CIV_000964185–86 at USPI_CIV_000964185 (▮▮▮▮▮

▮▮▮▮▮; Email chain from Teresa Danna to Andy Johnston, "RE: Administrator Salary Considerations – JOHNSTON – ▮▮▮▮▮ – Nov 2012," October 19, 2012, USPI_CIV_000044404–05 at USPI_CIV_000044404 ▮▮▮▮▮

▮▮▮▮▮); Email chain from Mark Garvin to Peggy Wellman and Cindy English, "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Garvin-▮▮▮▮▮ (Due by Friday, February 6, 2015)," with attachment, February 9, 2015, USPI_CIV_000045211–12 at USPI_CIV_000045211 (▮▮▮▮▮

▮▮▮▮▮).

[318] Starr Report, ¶ 181.d.

[319] Starr Deposition, p. 45 ▮▮▮▮▮

▮▮▮▮▮.

[320] See, e.g., Email chain from Sandi Karrmann to Shannon Mosley, "Fwd: USPI HRD – ▮▮▮▮▮," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337 ("▮▮▮▮▮

▮▮▮▮▮"); Email chain from Julie Manning to Natalie Buncher and Shannon Mosley, "RE: Pay scale grid for surgery scheduler w/ other duties assigned," September 20, 2017, USPI_CIV_000033030–31 at USPI_CIV_000033031 ("▮▮▮▮▮"); Email chain from Peggy Wellman to Mary Leahy et al., "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 ("▮▮▮▮▮

▮▮▮▮▮"); Email chain from Andy Johnston to Vanessa Smith, "RE: Administrator Prorated Salary Increases – March 1, 2015 – JOHNSTON-▮▮▮▮▮ (Due by 01/26/15)," January 21, 2015, USPI_CIV_000095479–80 at USPI_CIV_000095479 ▮▮▮▮▮

▮▮▮▮▮); Email chain from Monica Cintado to



*7.3.2. Dr. Starr's empirical analysis does not support the claim that internal equity would have resulted in all or nearly all USPI Senior Employees' wages being suppressed*

205. After reviewing documents and testimony that Dr. Starr claims demonstrate that USPI maintained a compensation structure, he analyzes historical USPI compensation data in an attempt to detect a compensation structure. In this section, I review Dr. Starr's analysis of USPI's compensation data and show that his analysis does not support Plaintiffs' Experts' claim that any direct harm of the Alleged, Assessed, or Admitted Mobility Restrictions would have been transmitted to all or nearly all USPI Senior Employees.

206. In Section 3.4 above, I review the ███████████████████ ██████████████████████████ █████████████████████████ ████████████████

207. ███████████████████████ ███████[321]███████████████ ████████████████████████ ████████████[322]█████████ ████████████████████████ ██████████████████████ ████████[323]███████████████ █████████[324]██████████████ █████████████████████ ████████[325]████████████ ███████████████████.[326]



---

Brett Brodnax et al., "RE: Phone Interview with ████████-VP Development candidate/Nashville (Resume Attached)," April 3, 2013, USPI_CIV_000047956–58 at USPI_CIV_000047957 ████████████████████ ████████████████████████████████████████████ ███████████████████████

[321] Karrmann Deposition, pp. 38–39.

[322] See, e.g., Deposition of Shannon Mosley (USPI), August 13, 2024, p. 94 ██████████████████████ ████████████████████████████████████████ ████████████████

[323] Karrmann Deposition, p. 42.

[324] Karrmann Deposition, p. 44.

[325] Email chain from Alex Bateman to Cindy English, "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Johnston-████████ (Due by Friday, February 6, 2015)," with attachment, February 6, 2015, USPI_CIV_000039752–53 at USPI_CIV_000039752 ████████████████████████████████████████ █████████████████████████████████████████████████; Email chain from Mark Kopser to Cindy English, "RE: Salary Adjustment Considerations - Wilcox (Nov 2010)," October 21, 2010, USPI_CIV_000147704–06 at USPI_CIV_000147704 ████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████.

[326] Karrmann Deposition, p. 46.

208. ███████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████ [327] █████
██████████████████████████████████████████
████████████████████████ [328]

209. ██████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████ [329] █████████
████████████████████████████ [330] █████████
█████████████████████████ [331]

210. ████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
██████████████████

211. Dr. Starr conducts two separate empirical analyses that he claims demonstrate USPI did maintain a compensation structure despite ████ ██████████████████████████████

212. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████

---

[327] Martin Deposition, p. 56.

[328] English Deposition, pp. 47–48 ("████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████").

[329] USPI Group Holdings, Inc., "2007 Equity Incentive Plan," July 15, 2014, USPI_CIV_000337006–011 at USPI_CIV_000337006; USPI, "Stock Option Agreement between USPI Holding Company, Inc. and Sandi Karrmann," November 18, 2016, USPI_CIV_000233594–614 at USPI_CIV_000233608.

[330] USPI, "Option and Compensation Committee Meeting," October 19, 2017, USPI_CIV_000023128–33 at USPI_CIV_000023130 ("████████████████████████████████████████").

[331] See, e.g., USPI, "Option and Compensation Committee Meeting," October 19, 2017, USPI_CIV_000023128–33 at USPI_CIV_000023130 ("████████████████████████████████████████████ █████████████████████████████").



[332]

[333]

213. [334]

[335]

214. Dr. Starr's across-job and within-job compensation analyses suffer from several flaws, causing him to overstate the relationship of pay within and across job levels. First, Dr. Starr's results are driven, in part, by data errors in USPI's compensation data. [336]

[337]

---

[332] Starr Report, Figure 19, p. 160.

[333] Starr Report, ¶ 186.

[334] Starr Report, Figure 20.

[335] Starr Report, ¶ 190.

[336] See Starr Report, Figures 19 and 20.

[337]

215.

*Exhibit 24*
*Correcting Dr. Starr's hourly pay measure*



Source: Dr. Starr Compensation Regression Data with Corrected Hours

Note: Dr. Starr Compensation Regression Data contain errors in assigning hours worked to employees. I have corrected these errors in this chart. Dashed lines represent Dr. Starr's measure of the mean hourly rate using his hours worked calculation, while solid lines represent the corrected version of this field.

216.

_____

███████████████████████████████████, a fact that Dr. Starr did not account for at all when processing the data. See Workpaper 5.

[338] ███████████████████████████████████████████████

███████████████████████



217. [redacted][339]

218. [redacted][340]

219. [redacted]

---

[339] Starr Report, ¶ 185. The R-squared measure of a regression indicates the portion of variation in the dependent variable (in this case, Mean Hourly Rate of Manager pay) that can be explained by the set of independent variables (in this case, Mean Hourly Rate of VPs & SVPs). See, e.g., Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, Fourth Edition (Mason, OH: South-Western Cengage Learning, 2009) ("Wooldridge (2009)"), p. 40, italics in original ("$R^2$ is the ratio of the explained variation compared to the total variation; thus, it is interpreted as the *fraction of the sample variation in y that is explained by x*.").

[340] The R-squared in the second regression, with additional controls, remains relatively high because the other variables explain a large portion of the variation in mean manager wages.

*Highly Confidential - Outside Counsel/Experts Only*

**Exhibit 25**
**Dr. Starr's across-job compensation correlation analysis, correcting employee hours**



| | Dr. Starr's Figure 19 | | Dr. Starr's Figure 19 Corrected Hours Adding Back in Zero Hour Employees | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| Ln(Mean Hourly Rate of VPs & SVPs) | | | | |
| Covid | | | | |
| Ln(State GDP PC) | | | | |
| Ln(State Unemployment Rate) | | | | |
| Census Region Annual CPI | | | | |
| Ln(Avg. State Mgr. Earnings) | | | | |
| Ln(State Health Expend. PC) | | | | |
| Observations | | | | |
| R-Squared | | | | |

Source: Dr. Starr Compensation Regression Data with Corrected Hours

Note: The first two columns show replications of Dr. Starr's Figure 19 results for USPI. The last two columns show Dr. Starr's Figure 19 results for USPI after correcting his error in assigning hours and including employees who he mistakenly treated as having zero hours worked in his regression analysis.

220. Second, both of Dr. Starr's analyses rely on comparing averages, either to another average or to individual compensation. In both instances, he is collapsing the variation in compensation that he claims is correlated.



221.

[341]

---

[341] Starr Report, ¶ 178 ("[E]conometric analyses of available wage data show strong support for compensation structures linking Class pay together.").

*Highly Confidential - Outside Counsel/Experts Only*



**Exhibit 26**
**Dr. Starr collapses variation in compensation**



Source: Dr. Starr Compensation Regression Data with Corrected Hours
Note:

222. Third,



223. To demonstrate this issue, I estimate Dr. Starr's regression on hypothetical, randomly generated compensation paths that, by design, do not follow the patterns of a compensation structure as described by Dr. Starr.[342] I generate these data by initiating two separate wage series at an annual rate of $100,000 for hypothetical managers and $150,000 for hypothetical VPs and SVPs. Then, in each year, I randomly assign a change to each series, independent of one another, of between a 25 percent decrease and a 50 percent increase. The results of the randomly generated data are plotted in the top panel in Exhibit 27. The bottom panel of Exhibit 27 displays the random year-over-year changes used to generate the hypothetical compensation paths displayed in the top panel. The two compensation paths follow very different year-over-year growth patterns, in many years moving in the opposite direction.

***Exhibit 27***
***Hypothetical randomly generated compensation***



Source: Hypothetical Compensation Data

Note: Hypothetical data set 2005 annual compensation to $100,000 (directors) or $150,000 (VPs and SVPs). For subsequent years, compensation in each category is calculated by applying a separate, randomly generated change between -25 percent and +50 percent. Average annual hourly wage is calculated by dividing total annual compensation by 2,080 hours (assuming 40 hours worked per week, for 52 weeks).

---

[342] Starr Report, ¶ 182 ("The qualitative evidence above demonstrates there exist compensations structures at Defendant firms. I next find that the quantitative evidence is consistent with the existence of these compensation structures.").

224. Then I take the hypothetical compensation paths that are not dependent on or influenced by the other and I estimate Dr. Starr's across-job regression. Exhibit 28 displays the results. In the first column, I estimate a regression of the hypothetical manager compensation on hypothetical VP and SVP compensation, analogous to Dr. Starr's across-job correlation regressions.[343] Even though the data series are randomly generated and independent of one another, the R-squared of this regression is 0.788 and the correlation coefficient is 0.678 and statistically significant. Both of these estimates exceed the corresponding results from Dr. Starr's reported DaVita regression and Dr. Starr's USPI regression, after correcting the hours variable.[344] The second column estimates the same regression, controlling for a time trend. The results of this regression are very similar to the first.

225. This exercise demonstrates that a high R-squared or a coefficient significantly higher than zero resulting from a regression like Dr. Starr's across-job correlation regression is not sufficient to conclude that manager and VP and SVP pay are dependent on one another in a way that would translate alleged harm across job levels or across the firm.

*Exhibit 28*
***Dr. Starr's regression detects a compensation structure where there is no structure***

|  | Dr. Starr's Figure 19 with Synthetic Wages | |
|---|---|---|
|  | **(1)** **Baseline** | **(2)** **Add Time Trend** |
| Ln(Mean Hourly Rate of VPs and SVPs) | 0.678*** | 0.649*** |
|  | (0.102) | (0.210) |
| Year |  | 0.00339 |
|  |  | (0.0176) |
| Constant | 1.360** | -5.316 |
|  | (0.563) | (34.44) |
| Observations | 18 | 18 |
| R-squared | 0.788 | 0.788 |

Source: Hypothetical Compensation Data

Note: I apply Dr. Starr's Figure 19 regression without controls to the hypothetical wage data presented in Exhibit 27 above. In the second column, I include an annual time trend in the regression.

226. Fourth, his within-job compensation structure regression pools directors in different job titles when he attempts to measure the correlation of compensation within job titles. Dr. Starr describes the exercise as follows:[345]

---

[343] See Starr Report, Figure 19.

[344] See Exhibit 25.

[345] Starr Report, ¶ 188.

To implement this test, I use a randomized hold-out sample analysis. To illustrate the idea, consider the following example: Suppose that there are 100 Directors in a given company in a given year. I randomly split 50 into group A, and 50 into group B. I then examine whether the average wages of the 50 randomly selected Directors in group A are predictive of the individual wages of the other 50 Directors in group B. If so, then this is strong evidence in favor of a compensation structure.

227. However,

228. To illustrate the flaw,

229.

230.

---

[346] Starr Report, ¶ 190.

*Exhibit 29*
*Compensation is not correlated within job title according to Dr. Starr's regression methodology*

| | Job Title | Log Mean Hourly Rate | Standard Error | R-Squared | Observations |
|---|---|---|---|---|---|
| | | | Dr. Starr's Figure 20 | | |
| 1. | Administrator | | | | |
| 2. | Chief Executive Officer | | | | |
| 3. | Clinical Director | | | | |
| 4. | Director | | | | |
| 5. | Director Of Finance | | | | |
| 6. | Director Of Nursing | | | | |
| 7. | Imaging Administrator | | | | |
| 8. | Market President | | | | |
| 9. | Partnership Vp | | | | |
| 10. | Regional Administrator FT | | | | |
| 11. | Regional Director | | | | |
| 12. | Regional VP | | | | |
| 13. | Regional VP - Ops II | | | | |
| 14. | Senior Director | | | | |
| 15. | Senior VP | | | | |
| 16. | VP | | | | |

Source: Dr. Starr Compensation Regression Data
Note: This analysis runs Dr. Starr's Figure 20 regression separately for each job title. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

231. Dr. Starr claims that USPI maintained a rigid pay structure that would transmit alleged harm to specific individuals indirectly to the remaining Senior Employees. However, as I have shown above, his analyses are flawed and overstate the relationship between pay across jobs and within jobs. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## 8. Dr. Starr offers flawed empirical analyses to support his opinions on wage suppression and to calculate damages

232. Dr. Starr presents a set of empirical analyses of Senior Employee compensation that he claims provides estimates of the effect of the Experts'

Assessed SCA-USPI Conduct on Senior Employee compensation.[347] Dr. Starr's analysis does not separately identify effects, if any, of the Experts' Assessed SCA-USPI Mobility Restrictions from effects, if any, of the Experts' Assessed SCA-USPI Information Sharing.[348] He relies on these analyses as quantitative support for (1) his opinion that Defendants have substantial market power over Senior Employees,[349] (2) his opinion that the assessed conduct harmed all or nearly all Senior Employees,[350] and (3) his estimate of the amount by which the assessed conduct harmed all or nearly all Senior Employees.[351] In this section, I address the regression models on which Dr. Starr bases these conclusions. I begin by describing Dr. Starr's regression techniques and show that neither of his methods provides estimates of harm that identify the effect of the Experts' Assessed SCA-USPI Conduct. The estimates he presents are therefore not reliable for determining whether the Experts' Assessed SCA-USPI Conduct affected compensation, for measuring by how much, or for showing that Defendants had the requisite market power to suppress wages. Additionally, he does not analyze nor provide support for a conclusion of compensation suppression resulting from the Alleged USPI Conduct or USPI's Admitted Mobility Restrictions with SCA.[352]

233. In addition to the error that Dr. Starr makes in calculating hours worked, which I describe in Section 7, there are other errors in Dr. Starr's regression data construction. For example,



---

[347] As I describe in Section 2, Dr. Starr's description of the conduct alleged in this case differs from the description of the conduct alleged in the Complaint. In this section, I review Dr. Starr's analysis of the effect of the alleged conduct under his interpretation—that is, his analysis of the effect of Experts' Assessed SCA-USPI Conduct. For simplicity, throughout this section, I refer to the alleged conduct under Dr. Starr's interpretation as the "assessed conduct."

[348] Starr Report, ¶ 106 ("Given that Plaintiffs allege that both elements of the Challenged Conduct (i.e., the No-Poach Agreements and CSI Exchanges) occurred simultaneously, my analysis measures suppressed compensation from the whole of the Challenged Conduct rather than from each individual component.").

[349] Starr Report, ¶ 196 ("In the instant case, ███████████████████████████████████████ ██████████████████████████████████████████████").

[350] Starr Report, ¶ 12.c ("In Section VII, I develop a series of econometric tests that I developed from the wage suppression model in Section VI, which shows that ████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████").

[351] Starr Report, ¶ 12.d ("In Section VIII, I compute aggregate damages to the Class as a whole using classwide methods and data. I employ the standard "but-for world" method of calculating damages to calculate that ████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████ ██████████████████████").

[352] On May 14, 2023, ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████ See Appendix D; Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "In re Outpatient Medical Center Employee Antitrust Litigation, Case No. 1:21-cv-00305," May 14, 2023.

███████████████████████████████████████.[353] I
provide a more detailed description of the errors and the corrections that I
implement in Appendix C. In the sections that follow, I use a version of Dr.
Starr's data with my corrections.[354]

*8.1. Overview of regression models and identification of causal effects*

234. Dr. Starr uses two types of regression models to estimate the effect of the
assessed conduct on Senior Employee compensation. The first is a
before/during/after regression, which compares Senior Employees'
compensation during the assessed conduct period to their compensation
before and after it. The second is a difference-in-differences regression,
which uses changes in manager compensation as a benchmark for how
Senior Employee compensation would have changed during the assessed
conduct period. Dr. Starr claims these regression models allow him to
isolate or separately identify the effect of the assessed conduct from other
factors that affect compensation.

235. A regression model can identify the effect of a treatment on an outcome
when the treatment is as good as randomly assigned. For example, suppose
I wanted to identify the effect of schooling (the treatment) on annual
earnings (the outcome), a perennial question in applied economics. The
effect I want to measure is how much a person's earnings would change, on
average, if we could "either change their schooling in a perfectly controlled
environment or change their schooling randomly."[355] The key assumption
that allows a regression model to identify this effect is that other factors
that affect earnings and may be correlated with education are "known and
observed[.]"[356]

236. A before/after analysis (or variants of it) can identify the effect of a
treatment on the outcome when everything that affects the outcome, other
than the treatment, either remains unchanged or is accounted for with an
adequate control variable. Continuing the education and earnings example,
suppose a teacher earned more the year after obtaining a master's degree.
A before/after analysis would quantify the increase in the teacher's
earnings upon receiving the master's degree. So long as nothing else
changed, one could attribute the earnings increase to the additional
education. However, if the city passed a new budget at the same time,
increasing the pay of all teachers, the before/after regression would need to
account for the effect of the budget on the teacher's pay in order to

---

[353] Starr Deposition, pp. 119–120.

[354] I do not claim to have identified, let alone corrected, all of the errors in Dr. Starr's compensation data.

[355] Joshua Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics*, (Princeton, NJ: Princeton University Press, 2009) ("Angrist and Pischke (2009)"), p. 53.

[356] Angrist and Pischke (2009), p. 53.

separately identify the effect of the additional education on pay. Without controlling for the budget change, the regression would overstate the effect of the additional education on the teacher's pay by including the effect of the budget change. The overestimate of the effect of interest due to changes in unobserved factors is known as "omitted variables bias."[357]

237. When there are unobserved factors that affect the outcome variable, other regression techniques may be needed to account for them. One such technique is a difference-in-differences regression; difference-in-differences regressions identify the effect of a treatment by comparing changes in the treated group before and after treatment to changes in a "benchmark" group that is affected by the unobserved factors in the same way but was not "treated." In the schooling example above, the earnings of other teachers in the district who did not get master's degrees could be used as a benchmark; by accounting for changes to these teachers' pay, the regression would control for changes that may have been caused by unobserved factors common to all teachers, such as the increase in school funding. A difference-in-differences regression would quantify the incremental increase in pay for the teacher who earned the master's degree relative to the increase in pay of the other teachers. Provided other teachers' pay evolved in the same way the teacher of interest's pay would have evolved absent the additional schooling, this would yield an unbiased estimate of the effect of the master's degree on that employee's earnings.

238. One can attribute the difference-in-differences estimate to the effect of earning a master's degree provided that the change in pay for other teachers in the district represents the increase in pay that the teacher of interest would have received absent the master's degree. However, if the teacher of interest also started teaching summer courses for additional pay, the difference-in-differences regression would need to account for the increased hours worked in order to separately identify the effect of the degree on the teacher's earnings. Without controlling for hours worked, the difference-in-differences regression would overstate the effect of the degree on the teacher's annual earnings by including the effect of increased hours. In other words, the resulting estimate would still suffer from omitted variables bias.

239. This example helps show why, when one is trying to estimate the effect of a "treatment," it is necessary to start with an understanding of relevant economic factors and to tailor the model to account for them. Neither the before/after model nor the difference-in-differences model is inherently

---

[357] Wooldridge (2009), p. 842 ("Omitted Variable Bias: The bias that arises in the OLS estimators when a relevant variable is omitted from the regression."); See also Angrist and Pischke (2009), p. 59 ("The omitted variables bias (OVB) formula describes the relationship between regression estimates in models with different sets of control variables. This important formula is often motivated by the notion that a longer regression—one with controls, such as (3.2.9)—has a causal interpretation, while a shorter regression does not. The coefficients on the variables included in the shorter regression are therefore said to be biased.").

*Highly Confidential - Outside Counsel/Experts Only*

able to show causality or to separately identify the magnitude of a treatment's effect.

240. In the following sections, I describe Dr. Starr's regression models in detail and explain how he uses them to estimate the purported effect of the assessed conduct. I then describe the flaws in his models that make his estimates of the impact of the assessed conduct on USPI's Senior Employees unreliable.

### 8.2. Dr. Starr's before/during/after model

241. Dr. Starr's first regression model—exemplified in his Figure 6—is based on a comparison of



242. Dr. Starr estimates his before/during/after regression model on pooled data from all three Defendants. He estimates that Senior Employee compensation across all Defendants was, on average, █████████████ ████ during the assessed conduct period than outside of it, depending on the factors he accounts for.[360] Dr. Starr then estimates an alternative specification—exemplified in his Figure 8—where he uses pooled data but



. In this specification, he estimates that

█████.[361]

█████████.[362]

---

[358] ████████████████████████████████████████████
████████. See Starr Report, ¶ 12.c ("███████████████████████████
████████████").

[359] Dr. Starr's control factors include average wages for workers in management positions in the healthcare industry in the employee's state, personal consumption expenditures for healthcare in the employee's state, state-level GDP per capita, the unemployment rate in the employee's state, the CPI for the employee's census region, and the year. Dr. Starr adds employee-level fixed effects and a single indicator variable for all years in the alleged conduct period.

[360] Starr Report, Figure 6, p. 116.

[361] Starr Report, Figure 8, p. 119.

[362] Starr Report, Figure 21, p. 164.

243. In the remainder of this section, I describe flaws in Dr. Starr's before/during/after regression model that render his results unreliable.

### 8.2.1. Errors in Dr. Starr's data affect his results

244. As a first step in assessing Dr. Starr's analysis, I check whether the data errors that I have identified and corrected affect his results. Exhibit 30 below shows that they do. The first column of Exhibit 30 shows the results Dr. Starr presents in Figure 6 of his report, based on his uncorrected data, and the second column shows the results that obtain when corrected data are used. Dr. Starr's estimate of the effect of the assessed conduct on Senior Employee pay at USPI falls from ███████████████████ when the corrections discussed above are made to his regression data.

### 8.2.2. Dr. Starr inappropriately pools data across Defendants

245. In estimating his regressions, Dr. Starr pools data from all three Defendants. Dr. Starr's regression accounts for changes in economic conditions through control variables that include the number of hours the Senior Employee worked in a year, state-level healthcare manager earnings, GDP, and CPI indicators as well as national macroeconomic controls including an indicator for the COVID-19 pandemic.[363] He also includes individual fixed effects.[364] In some regression specifications, Dr. Starr estimates a single average effect of the assessed conduct across all Defendants (e.g., Starr Report, Figure 6), and in other specifications he estimates conduct effects that vary by Defendant (e.g., Starr Report, Figure 8). However, in all the before/during/after regressions in the body of his report, he assumes that the changes in the control variables affect Senior Employees of all Defendants in the same way. Dr. Starr does not conduct statistical tests to determine if in fact changes in control variables affect Defendants' Senior Employees in the same way, although such tests exist. As I show below, this untested assumption affects Dr. Starr's conclusions and damage calculations.

246. Academic economics literature has developed standard statistical tests to assess the validity of an assumption such as Dr. Starr's that the control

---

[363] The variables Dr. Starr includes in his before/during/after regression to control for other factors that affect compensation and are not caused by the alleged conduct are a linear time trend, the annual Consumer Price Index (CPI) in the employee's Census Region, the unemployment rate and real Gross Domestic Product (GDP) per capita in the employee's state, average annual earnings of managers in the healthcare field in the employee's state, the Personal Consumption Expenditure on healthcare services per capita in the employee's state, an indicator for the employee's ZIP Code, the log of their total hours worked, the year, and a single indicator variable for the years 2020 and 2021, meant to account for the effect of the COVID pandemic on compensation in those two years. See Starr Report, pp. 106–109.

[364] Starr Report, ¶ 119.a ("I include individual fixed effects to mimic the ideal comparison. Inclusion of individual fixed effects means the regression model compares the same worker during and absent the Conduct Period.").

variables he selected affect all three Defendants' Senior Employees in the same way.[365] I implement one such test on Dr. Starr's regression, and the test rejects Dr. Starr's assumption that the control variables he selected affect all three Defendants' Senior Employees in the same way.[366] This result indicates that Dr. Starr's primary regression model that he uses to calculate alleged damages is mis-specified and, as I show below, yields misleading results.

247. In the appendix to his report, Dr. Starr ██████████████████



248. ██████████████████

_____

[365] I use a statistical test applied to regression coefficients called the Chow test. The Chow test assesses whether the "same relationship holds for two different groups of economic units," in this case, whether Dr. Starr's controls affect USPI, SCA, and DaVita in the same way. See, e.g., Gregory C. Chow, "Tests of Equality Between Sets of Coefficients in Two Linear Regressions," *Econometrica*, 28(3), 1960, pp. 591–605 at p. 591 ("When a linear regression is used to represent an economic relationship, the question often arises as to whether the relationship remains stable in two periods of time, or whether the same relationship holds for two different groups of economic units. Is the consumption pattern of the American people today the same as it was before World War II? Do the firms in the steel industry and the firms in the chemical industry have similar dividend policies? Statistically these questions can be answered by testing whether two sets of observations can be regarded as belonging to the same regression model.").

[366] I performed a Chow test on Dr. Starr's before/during/after model that permits the conduct effects to vary across Defendants, testing the restriction that the effects of the other covariates (other than the conduct dummy) are equal across Defendants. ██████████████████. See Workpaper 6.

[367] See Starr Report, Figure 29, p. 218.

[368] See Starr Report, Figures 8, 29, pp. 119, 218.

[369] A fully interacted regression model, which permits different regression coefficients on all regressors for each Defendant, yields mathematically identical results to what one would obtain estimating separate regressions for each Defendant. For simplicity, therefore, I estimate regressions on data for USPI alone. Note that Exhibit 30 does not report the coefficient estimates for all of Dr. Starr's controls; for a more complete set of parameter estimates from these regressions, Workpaper 18.

[370] See Starr Report, Figure 29, p. 218.

**Exhibit 30**
*Dr. Starr's before/during/after regression model estimated on data for USPI only*



| | (1) Figure 6: Model 4 Uncorrected Data All Defendants | (2) Figure 6: Model 4 Corrected Data All Defendants | (3) Figure 29: Model 3 Uncorrected Data All Defendants | (4) Figure 29: Model 3 Corrected Data All Defendants | (5) Figure 6: Model 4 Corrected Data USPI Only |
|---|---|---|---|---|---|
| Conduct | | | | | |
| % Wage Suppression | | | | | |
| USPI Conduct | | | | | |
| % Wage Suppression | | | | | |
| Year | | | | | |
| Ln(Total Hours) | | | | | |
| Ln(Corrected Total Hours) | | | | | |
| Defendant-Specific Conduct Effects | | | | | |
| Healthcare and Macro Controls | | | | | |
| Individual-by-Company FE | | | | | |
| Location FE | | | | | |
| Observations | | | | | |
| R-squared | | | | | |

Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 6 and Figure 29 models are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's Figure 29 regression is a sensitivity of the regression in Figure 6 where he allows many of the estimated coefficients to vary by Defendant. Dr. Starr's regression data contain errors in assigning hours worked, job title, location, and department to employees. Column 1 uses uncorrected versions of these fields while columns 2, 3, and 4 use corrected versions.

### 8.2.3. Dr. Starr's results are driven by the end-date he selects for the Experts' Assessed SCA-USPI Conduct period

249. Dr. Starr's before/during/after regression compares compensation of Senior Employees during the assessed conduct period to their compensation outside the period. To make this comparison, Dr. Starr must first define the time period over which the conduct took place. He defines the conduct period based on instructions from counsel but opines that the evidence is "consistent with those dates."[371]

---

[371] Starr Deposition, pp. 69 ██████████████████████████████

250. The start of Dr. Starr's assessed conduct period, May 2010, coincides with the start of USPI's Admitted Mobility Restrictions with SCA,[372] as well as the start of the Alleged SCA-USPI Mobility Restrictions.[373]

251. By contrast, for the end of his assessed conduct period, he chooses a date (2019) that does not align with either the allegations (2021),[374] the admission (2017),[375] or the DOJ's indictment (again, 2017).[376] ██████



████████████████████████████████████████[377]
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████[378]

252. ████████████████████████████████████████



████████████████████████████████████████
████████████████████████[79]█████████████████
████████████████████[380] Dr. Starr states, ███████████████

---

[372] Starr Report, ¶ 76.a ("████████████████████ ████████████████████"); USPI and Tenet's Answer to the Third Amended Complaint, ¶ 7 ("USPI and Tenet admit that, from May 2010 until October 2017, USPI was a party to the USPI/SCA Agreement").

[373] Complaint, ¶ 49 ("No later than May 2010, Mr. Hayek established a no-poach agreement with his counterpart at USPI to eliminate competition between the companies for each other's employees, by not actively soliciting each other's employees."). Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, January 5, 2021 ("SCA Indictment"), ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017 ... SCA and [USPI] entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.").

[374] Complaint, ¶ 38 ("From May 2008 through January 2021, SCA, USPI, and DaVita conspired to reduce and limit compensation and mobility of their employees.").

[375] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 7 ("USPI and Tenet admit that, from May 2010 until October 2017, USPI was a party to the USPI/SCA Agreement").

[376] SCA Indictment, ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017 ... SCA and [USPI] entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.").

[377] See Starr Report, ¶¶ 80.c.ii–80.c.iii ("████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████").

[378] See, e.g., email thread from Shannon McGarry to Shannon Mosley, "RE: SCA," October 24, 2017, USPI_CIV_000003394 ("████████████████████████████ ████████████████████"); Email from Shannon Mosley to Megan Fox and Miles Freeman, "SCA," October 23, 2017, USPI_CIV_000006432 ("████████████████████ ████████████████████████████████████████ ████████").

[379] Starr Report, ¶ 80.c.ii.

[380] Dr. Starr claims that a regression of switching probabilities on year dummies provides evidence that the alleged conduct ended in 2019, but, for several reasons, it does not. First, if the Alleged Three-Party Mobility Restrictions had a meaningful effect on mobility between USPI and SCA, whether a year is within or outside of the conduct period should explain some of the differences in mobility over time. ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████



253. Even assuming that Dr. Starr was correct, and ███████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

This hypothesis provides a test for whether Dr. Starr's regression model is identifying the effect of the assessed conduct on pay, or whether his conduct coefficient reflects other, unrelated changes over time that are not controlled for in the model.

254. I modified Dr. Starr's regression to allow for a decreased effect of the assessed conduct ██████████████████████████████

---



255. The results of this modification are shown in Exhibit 31 below.

256.

*Highly Confidential - Outside Counsel/Experts Only*

*Exhibit 31*
*Dr. Starr's before/during/after regression model allowing for a differential conduct effect in 2018–2019*



| | Figure 6: Model 4 | | |
| --- | --- | --- | --- |
| | (1) Constant Conduct Effect | (2) Differential Conduct Effect | (3) Constant Conduct Effect |
| Conduct 2010–2019 | | | |
| % Wage Suppression | | | |
| Conduct 2018–2019 | | | |
| % Wage Suppression | | | |
| Conduct 2010–2017 | | | |
| % Wage Suppression | | | |
| Year | | | |
| Ln(Corrected Total Hours) | | | |
| Healthcare and Macro Controls | | | |
| Individual-Company FE | | | |
| Location FE | | | |
| Observations | | | |
| R-squared | | | |

Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Regression results using Dr. Starr's Figure 6 model 4 on USPI employees are shown. Dr. Starr's regression data contain errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

### 8.2.4. Dr. Starr's results are affected by his treatment of the COVID pandemic

257. The COVID pandemic also complicates Dr. Starr's before/during/after model because the start of the pandemic coincides with the end of his alleged conduct period. As I describe above, when there is an unmeasured factor affecting pay that covaries with the conduct period—as the pandemic does here—the regression will yield a biased estimate of the conduct period effect. Dr. Starr correctly notes that "[i]f [he] did not control for the timing of COVID, the changes in the labor market created by the COVID pandemic might otherwise confound the Conduct estimate."[387] Dr. Starr controls for the COVID pandemic in a very rigid way, allowing for it to have just a single, constant impact on compensation for 2020 and 2021.

258. In the U.S., the COVID pandemic began in early 2020,[388] and according to a growing body of research, its effects on the economy—and the labor

---

[387] Starr Report, ¶ 120.d.

[388] Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," July 8, 2024, available at https://www.cdc.gov/museum/timeline/covid19.html, accessed on April 3, 2025 ("January 20, 2020[:] CDC reports the first laboratory-confirmed case of the 2019 Novel Coronavirus in the U.S. from samples taken on January 18").

market in particular—were both varied and persistent. The pandemic affected employment and compensation, but the effects varied by region, industry, and job level.[389]

259. Economic impacts also varied over time. As the pandemic continued, some workers continued to lose income but some began receiving stimulus payments and Federal Pandemic Unemployment Benefits.[390] While it is true that the COVID mortality rate waned in 2022,[391] the economic effects of the pandemic on the labor market and the healthcare industry persisted. For example, the labor force participation rate fell by a record-breaking amount early in the pandemic, but rather than recovering quickly, it remained well below pre-pandemic levels into 2022.[392] The pandemic also gave rise to an increased rate of job quits in a phenomenon known as the "Great Resignation,"[393] and the quit rate notched its highest recorded level in March 2022,[394] after December 2021, when Dr. Starr stops controlling for any pandemic-related effects in his regression.[395]

---

[389] See, e.g., Sarah Albert, Andrew Foerster, and Pierre-Daniel G. Sarte, "Employment Effects of COVID-19 Across States, Sectors," *FRBSF Economic Letter*, November 22, 2021, available at https://www.frbsf.org/wp-content/uploads/el2021-32.pdf, accessed April 15, 2025 ("The COVID-19 pandemic led to dramatic declines in employment in both goods-producing and service-providing sectors, and the recovery in employment has continued but is still incomplete. Job dynamics in each sector have differed. Likewise, states have experienced widely dissimilar trajectories in both employment losses and in the recovery."); Sang Yoon Lee, Minsung Park, and Yongseok Shin, "Hit Harder, Recover Slower? Unequal Employment Effects of the COVID-19 Shock," *Federal Reserve Bank of St. Louis Review*, 103(4), 2021, pp. 367–383 at p. 367 ("The destructive economic impact of the COVID-19 pandemic was distributed unequally across the population."). See also Thomas J. Bollyky, et al., "Assessing COVID-19 Pandemic Policies and Behaviours and Their Economic and Educational Trade-Offs Across US States from Jan 1, 2020, to July 31, 2022: An Observational Analysis," *The Lancet*, 401, 2023, pp. 1341–1360 at p. 1352 ("As with cumulative infection and death rates, there was a great deal of variation across the USA regarding relative decline in state GDP [and the] state employment rate[.]"). Dr. Gerhart agreed ███████████████████████████████████████████████ ████████ Gerhart Deposition, pp. 56–57.

[390] Thesia I. Garner, Adam Safir, and Jake Schild, "Receipt and Use of Stimulus Payments in the Time of the Covid-19 Pandemic," *Beyond the Numbers: Prices & Spending*, 9(10), 2020 ("Of the 48 percent of respondents reporting a loss of income since March 13, [2022,] the majority (81 percent) reported using their stimulus payment mostly for expenses, as opposed to paying off debt or adding to savings, as might be expected. The resources they used to meet their spending needs were more diverse than those not reporting a loss of income.").

[391] See, e.g., Centers for Disease Control and Prevention, "COVID Data Tracker," available at https://covid.cdc.gov/COVID-DATA-TRACKER/#trends_weeklydeaths_testpositivity_00, accessed on April 1, 2025.

[392] Miguel Faria-e-Castro and Samuel Jordan-Wood, "Pandemic Labor Force Participation and Net Worth Fluctuations," *Federal Reserve Bank of St. Louis Review*, 106(1), 2024, pp. 40–58 at p. 40 ("The US labor force participation rate (LFPR) experienced a record drop during the early pandemic. While it has since recovered to 62.2 percent as of December 2022, it was still 1.41 percentage points below its pre-pandemic peak.").

[393] See, e.g., Vincent Amanor-Boadu, "Empirical Evidence for the 'Great Resignation'," *U.S. Bureau of Labor Statistics: Monthly Labor Review,* November 2022, available at https://doi.org/10.21916/mlr.2022.29, accessed on April 16, 2025.

[394] U.S. Bureau of Labor Statistics, "Job Openings and Labor Turnover – March 2022," May 3, 2022, available at https://www.bls.gov/news.release/archives/jolts_05032022.pdf, accessed on April 15, 2025, ("In March [2022], the number of quits edged up to a series high of 4.5 million"). See also the quits rate for total nonfarm payrolls, generally (Federal Reserve Bank of St. Louis, "Quits: Total Nonfarm," available at https://fred.stlouisfed.org/series/JTSQUR, accessed on April 15, 2025), and for the healthcare and social assistance industry, specifically (Federal Reserve Bank of St. Louis, "Quits: Health Care and Social Assistance," available at https://fred.stlouisfed.org/series/JTS6200QUL, accessed on April 15, 2025).

[395] Dr. Gerhart also testified ████████████████████████ ███████████████████ See Gerhart Deposition, p. 58 ████████████████████████

260. Effects of the pandemic persisted in the ASC industry in particular. During the pandemic and for some time after, Americans deferred elective healthcare procedures, including many of the kind of surgeries performed at ASCs. This eventually caused a dramatic rise in demand for elective procedures.[396] Patients who had put off their healthcare needs during the pandemic caused a backlog of demand that extended into 2021 and 2022 and even beyond.[397]

261. Dr. Starr assumes that the pandemic had a constant effect on Senior Employee pay through 2020 and 2021 and that the effect went to zero in 2022. He justifies this choice by stating, "I do not include the year 2022 in the COVID indicator variable because, per a 2022 Johns Hopkins review: 'In 2022, COVID-19 illness was less severe and less deadly compared to 2020 and 2021, and no new variant has emerged with the capacity to fuel a major wave of cases.'"[398] However, Dr. Starr performed no analysis to determine, and has no opinion regarding, when labor markets recovered from the effects of the pandemic.[399]

262. A more flexible way to control for the effect of the pandemic on wages would be to allow its effect to persist, and perhaps differ, into 2022. To allow for the persistence of effects from the pandemic—but also for the possibility that effects had ended by 2022—I estimated Dr. Starr's model adding a separate COVID pandemic indicator for 2022. The results are shown in Exhibit 32. When Dr. Starr's assumption that the effect of the pandemic on compensation was zero in 2022 is relaxed, his estimate of the effect of the assessed conduct on pay ███████████████████████ ████████████████████████████████ ██████████████████████████████. Dr. Starr would assume that this reflects changes due to the end of the conduct, but

---

████████████████████████████████████████████
██████).

[396] For example, there was an estimated backlog of 1 million elective orthopedic surgeries in the U.S. by mid-2022. See Amit Jain, Punya Jain, and Shruti Aggarwal, "SARS-CoV-2 Impact on Elective Orthopaedic Surgery: Implications for Post-Pandemic Recovery," *The Journal of Bone and Joint Surgery*, 102(13), 2020, pp. e68(1)–e68(5). For another, there was an estimated backlog of 1.1 to 1.6 million elective cataract procedures in the U.S. by mid-2022. See Shruti Aggarwal, Punya Jain, and Amit Jain, "COVID-19 and Cataract Surgery Backlog in Medicare Beneficiaries," *Journal of Cataract & Refractive Surgery*, 46(11), 2020, pp. 1530–1533.

[397] Sriparna Roy and Bhanvi Satija, "US Hospitals See Post Pandemic Catch-up Behind Insurer Healthcare Costs," *Reuters*, February 13, 2024, available at https://www.reuters.com/world/us/us-hospitals-see-post-pandemic-catch-up-behind-insurer-healthcare-costs-2024-02-13/, accessed on April 9, 2025 ("Americans are catching up on healthcare missed during the COVID-19 pandemic, a trend driven by heart procedures and outpatient orthopedic surgeries that likely won't soon slow, according to interviews with three hospital officials in major U.S. cities, but other factors may also be at play. ... Officials from three hospitals - Providence health system headquartered in Renton, Washington, and Boston's Brigham and Women's Hospital and Tufts Medical Center - said the post pandemic 'catch-up' trend is occurring across age groups. ... Several also said the pandemic may have accelerated the shift to outpatient and offsite surgeries.").

[398] Starr Report, Footnote 407.

[399] Starr Deposition, pp. 396 ("I don't have an opinion on exactly the timing of when the labor market recovered from [] the pandemic."), 399 ("I have not done an analysis of exactly how the labor markets have -- the timing of which [] they were corrected. I've not done that.").

it may reflect persistent effects of and policy responses to the pandemic.

███████████████████████████████████████████████

---

**Exhibit 32**
*Dr. Starr's before/during/after regression model allowing the effect of the COVID-19 pandemic to continue into 2022 – Dr. Starr's Assessed Conduct period (2010–2019)*



| | Figure 6: Model 4 | |
| --- | --- | --- |
| | (1) | (2) |
| | 2020–2021 Covid Dummy | 2020–2021 Covid Dummy And 2022 Covid Dummy |
| **Conduct** | | |
| **% Wage Suppression** | | |
| 2020–2021 Covid Dummy | | |
| 2022 Covid Dummy | | |
| Year | | |
| Ln(Corrected Total Hours) | | |
| Healthcare and Macro Controls | | |
| Individual-Company FE | | |
| Location FE | | |
| Observations | | |
| R-squared | | |

Source: Dr. Starr Corrected Compensation Regression Data
Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 6 model 4 on USPI employees are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's regression data contains errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

---

### 8.2.5. Excluding post-admitted-conduct period data from Dr. Starr's regression

263. As I explain above, whether 2018, 2019, or 2020 belong in the conduct period or outside of it is in dispute, and the answer matters. It is also clear that how one controls for the effects of the COVID pandemic on compensation matters. As I show in Exhibit 32, ██████████████████

██████████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

264. By contrast, Plaintiffs' experts do not dispute that the start date of USPI's conduct is 2010. Therefore, it may be preferable to run Dr. Starr's regression on the "before" and "during" data only. As I explain above, comparing "before" and "during" data is a standard way to estimate the effect of a treatment on an outcome when "after" treatment period data are unavailable or are contaminated by other factors for which one cannot control. Moreover, if Dr. Starr's regression adequately controls for factors that affect USPI wages and that change over time (i.e., if his regression model is capable of identifying the effect of the assessed conduct), then a before/during regression using only the pre-period as a benchmark would yield an unbiased estimate of the true parameters of the model, and therefore of the effect of the assessed conduct.[400]

265.

266.

[400] American Bar Association (2017), pp. 183–184 ("Sometimes data might exist on several unaffected periods. For example, data may exist not only for the before period, but also for an after period. With more than one unaffected period, the question arises as to whether one should combine the two unaffected periods and, if not, then which of the two unaffected periods should be compared to the affected period. In general, the before and after periods should be combined, if appropriate, since that will result in a larger sample and more precise estimates. However, it is appropriate to combine the periods only if the model is stable across them. Although there are many ways that one might assess whether the model prediction model is stable across the two time periods (e.g., testing all or some of the coefficients for equality), the most informative test is likely to test whether a prediction model estimated using only the before period would yield the same overcharge estimates as a prediction model estimated using only the after period. If such equivalence of the before and after models cannot clearly be established, attempting to combine the before and after period to predict the path of prices 'in the middle' (during the alleged anticompetitive act) is inadvisable, as prediction are likely to be unreliable."). See also Wooldridge (2009), pp. 99 ("In section 3.3. we derived the bias induced by leaving out a relevant variable when the true model contains two explanatory variables."), 100 ("The case where $\beta_2 \neq 0$ is more difficult. Leaving $x_2$ out of the model results in a biased estimator of $\beta_1$. Traditionally, econometricians have suggested comparing the likely size of the bias due to omitting $x_2$ with the reduction in the variance—summarized in the size of $R_1^2$ —to decide whether $x_2$ should be included. However, when $\beta_2 \neq 0$, there are two favorable reasons for including $x_2$ in the model. The most important of these is that any bias in $\tilde{\beta}_1$ does not shrink as the sample size grows; in fact, the bias does not necessarily follow any pattern. Therefore, we can usefully think of the bias as being roughly the same for any sample size. On the other hand, Var($\tilde{\beta}_1$) and Var($\hat{\beta}_1$) both shrink to zero as $n$ gets large, which means that the multicollinearity induced by adding $x_2$ becomes less important as the sample size grows. In large samples, we would prefer $\hat{\beta}_1$.").

*Exhibit 33*
*Dr. Starr's before/during/after regression model on "before" and "during" data only*



Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 6 model 4 on USPI employees are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's regression data contains errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

### 8.3. Dr. Starr's difference-in-differences model

267. As I describe in the opening to this section, regressions do not inherently show causality or yield unbiased estimates of causal effects. For Dr. Starr's regression results to represent an unbiased estimate of the effect of the assessed conduct on compensation, his control variables must account for factors not caused by the assessed conduct that are correlated with the conduct period and affect Senior Employee compensation. If important factors are omitted, then Dr. Starr's estimate will reflect a combination of the effect of the assessed conduct and the effect of the omitted factors—in other words it will suffer from omitted variables bias. Dr. Starr describes his difference-in-differences regression model as a way to "assess" this bias.[401]

268. Because Dr. Starr's regression attempts to explain movements in compensation over an 18-year period—during which there were many changes in the economy overall and the healthcare industry in particular—

---

[401] Starr Report, ¶ 132 ("To assess the potential for unobserved variables to be responsible for the observed relationships above, I deploy [a difference-in-differences] approach designed to not only account for such omitted variables, but also to plausibly provide a lower-bound estimate of the effect of the Challenged Conduct on Class compensation.").

it is likely that there are many factors that affect compensation.[402] For example, Dr. Starr's regression period includes the "Great Recession," the COVID pandemic, the "Great Resignation," and changes to government policy regarding coverage for procedures performed at ASCs.[403] It also includes the dates USPI went private (2007)[404] and was purchased by Tenet (2015).[405]

269. To "assess the potential" that his results are biased by omitted factors,[406] Dr. Starr estimates a difference-in-differences style regression model, exemplified in his Figure 9. As explained in the opening to this section, difference-in-differences models provide a way to account for factors that affect pay but are not directly included in the model by comparing the changes in compensation for a "treated" population with changes for a benchmark—another group that was similarly affected by the omitted factors but were not "treated." As a benchmark for Senior Employees, Dr. Starr uses managers, who were not targets of the Alleged USPI Conduct,[407] and his difference-in-differences model estimates the amount by which compensation for Senior Employees diverged from that for managers during the assessed conduct period, conditional on his control variables.

270. █████████████████████████████████████████████



---

[402] █████████████████████████████████████████████
Dr. Starr includes the entire ███████, 18-year time period in most of his compensation regressions.

[403] Anna L. Goldman, Michael K. Paasche-Orlow, and Frederick Thurston Drake, "Affordable Care Act Medicaid Expansion and Access to Outpatient Surgical Care" *JAMA Surgery*, 155(11), 2020, pp. 1066–1067 ("Medicaid expansion through the Affordable Care Act (ACA) has provided insurance coverage to approximately 10 million low-income Americans since it was implemented in January 2014. To date, 36 states and the District of Columbia have opted to expand their Medicaid coverage. The ACA has been a boon for surgical care in Medicaid expansion states.").

[404] CNBC, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," August 5, 2010, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 1, 2025.

[405] Tenet Health, "Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx, accessed on April 1, 2025.

[406] Starr Report, ¶ 132 ("[A] remaining question is whether the estimates above are susceptible to 'omitted variable bias,' which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation. To assess the potential for unobserved variables to be responsible for the observed relationships above, I deploy an approach designed to not only account for such omitted variables, but also to plausibly provide a lower-bound estimate of the effect of the Challenged Conduct on Class compensation.").

[407] Of the managers identified by Dr. Starr, ████████████████████████████
████████████████████████. See Workpaper 17. See also, e.g., Karrmann Deposition, pp. 42–43 ("██████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████").



271. Dr. Starr recognizes the second condition when he notes ████████ ████████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████[408]██ ████████████████████████████████ ████████████████████████████ ████████████████████████████ ██████████████████████████ ████████████████████

*8.3.1. Manager compensation is not a suitable benchmark for Senior Employee compensation*

272. Dr. Starr's regression only provides an unbiased estimate of the effect, or upper and lower bound estimates, under the assumption that unobserved factors correlated with the assessed conduct affect manager and Senior Employee compensation in the same way. Dr. Starr assumes this holds, but he performs no analysis to support it. If Senior Employee compensation would have evolved differently over time than manager compensation even but for the assessed conduct, and the factors that cause this divergence are not accounted for in the regression, the differential conduct effect Dr. Starr estimates here will still be biased; it will still include the effect of unaccounted-for factors described above.

273. While the assumption that unobserved factors affect manager and Senior Employee compensation the same way is not testable, the assumption that manager compensation and Senior Employee compensation trended similarly over time outside the conduct period—that they were following "parallel trends"—is testable. ████████████████ ████████████████████████████ ████████████████████████████ ██████[409]████████████████████ ████████████████████████████ ████████████████████████

---

[408] Starr Report, ¶ 133. Note that if one assumes the conduct does not affect managers, then Dr. Starr's difference-in-differences regression may control for omitted variables bias. Under this assumption, his results would show that indeed the *conduct effect estimated by his before/during/after model is biased*. If instead, Dr. Starr assumes that managers may have been affected, and that the effect would have been to lower their pay, then even if assumption one holds, his difference-in-differences model provides a biased estimate of the conduct effect.

[409] See Workpaper 7.



████ Without this assumption, any divergence in manager and Senior Employee compensation cannot be attributed to the assessed conduct.

274. ████████████████████████████████

**Exhibit 34**
**Total compensation for managers and Senior Employees at USPI**



Source: Dr. Starr Compensation Regression Data
Note: The averages of total compensation are shown for ████████████ and above in Dr. Starr's Figure 9 regression sample.

275. Dr. Starr estimates two types of difference-in-differences models. ████

*Highly Confidential - Outside Counsel/Experts Only*

██████████████████████████████████████████████████
███████████████████████████████████

276. ██████████████████████████████████████
████████████████████, Dr. Starr's difference-in-differences analysis
would still suffer from some of the same flaws as his before/during/after
analysis. I show how each of the relevant problems affects his analysis in
the sections below.

### 8.3.2. Dr. Starr inappropriately pools data across Defendants

277. As with his before/during/after regressions, Dr. Starr pools data from the
three Defendants to estimate his difference-in-differences regressions, and,
as I show in section 8.2, the restriction that his covariates affect
compensation in the same way for each Defendant is rejected by the data.

████████████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
█████

**Exhibit 35**
**Dr. Starr's difference-in-differences regression model using only USPI data**



Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 9 models 3 and 4 are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's regression data contain errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

### 8.3.3. Dr. Starr's results are driven by his inclusion of COVID period data and his choice of the end-date for the Experts' Assessed SCA-USPI Conduct

278. The results from Dr. Starr's difference-in-differences regression models are affected by the same problems with the post-assessed-conduct period data I described above for his before/during/after regression. ▮▮▮▮▮▮▮▮

**Exhibit 36**
**Dr. Starr's difference-in-differences regression model on "before" and "during" data only**

| | (1)<br>Figure 9: Model 3<br>No Year Dummies<br>2005–2017 | (2)<br>Figure 9: Model 4<br>With Year Dummies<br>2005–2017 |
|---|---|---|
| Conduct USPI (Managers) | | |
| Conduct USPI*1(Directors & Above) | | |
| **Lower Bound Suppression %** | | |
| 1(Directors & Above) | | |
| Year | | |
| Ln(Corrected Total Hours) | | |
| Healthcare and Macro Controls | | |
| Individual-Company FE | | |
| Location FE | | |
| Company-Year FE | | |
| Observations | | |
| R-squared | | |

Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 9 models 3 and 4 are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's regression data contain errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

### 8.4. Dr. Starr's estimate of the effect of the Experts' Assessed SCA-USPI Conduct is implausibly high

279. Based on his regressions, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

### 8.4.1. Dr. Starr's estimate of the effect of the Experts' Assessed SCA-USPI Conduct is implausible compared to changes in compensation for switchers

280. According to Dr. Starr, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



281. Using USPI's and SCA's compensation data, I analyze the compensation of

---

[410] Starr Report, ¶ 53.a ("In a dynamic labor market search model, no-poach agreements suppress pay broadly by reducing the rate at which job offers are made. Notably, the rate of job offers can still affect pay even if those job offers are turned down. This is because those job offers can be used as leverage for bargaining for a raise at the current employer.").

[411] Starr Report, ¶ 178 ("[T]here is ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████ ").

[412] Starr Report, ¶ 53.a ("Notably, ████████████████████████████████████████████████████ ██████████████████████████████████████████████ ").

[413] In order to accurately compare compensation for switchers, ████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████ .

[414] ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. See Workpaper 9.

[415] Starr Report, ¶ 129 ("The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Directors and above was to ████████████████████████████████████████████ ").

**Exhibit 37**

**Percentage change in annualized compensation for Senior Employees who switched between USPI and SCA outside the Experts' Assessed SCA-USPI Mobility Restrictions or from SCA to USPI in** █████████



Percent change in compensation

Source: Dr. Starr Corrected Compensation Regression Data

Note: Switches between USPI and SCA are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. I include all switches, regardless of direction, that occur in ██████████ ████ as well as switches from ██████████████ . Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch. Percent change is calculated using the employee's annualized compensation in the switch year at the firm they depart and their annualized compensation in the following year at the firm they join. Total annualized compensation adjusted for work hours is deflated according to the CPI, standardized to 2019 U.S. dollars.

282.

### 8.4.2. Even if Dr. Gerhart's and Dr. Starr's assertions about a purported compensation structure were accurate, evidence contradicts their claims of cascading effects

283. As I explain in Section 7.1 above, Dr. Gerhart's report provides the following example to describe the indirect pathway by which direct harm to Senior Employees who would have received offers but for the assessed conduct cascades to other employees: After a director uses an unsolicited job offer to negotiate higher pay, the employer would then raise pay for all

directors, because the other directors would "require higher pay to feel their pay is fair[.]"[416]

284. In this section, I analyze the ███████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

285. ████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████
██████[417] ██████████████████████████████████████████
████████████████████████████████████████████████

286. Exhibit 38 below shows the results of this analysis. ██████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
██████

287. Contrary to Dr. Gerhart's and Dr. Starr's assertion, ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

---

[416] Gerhart Report, ¶ 143.b.

[417] Gerhart Report, ¶ 143.b; Starr Report, ¶ 178 ("[T]here is substantial documentary evidence indicating ███████████████████████████████████████████████████████████████████████████ In addition, econometric analyses of █████████████████████████████████████████████ █████████████████████████████████████████.").

*Exhibit 38*
**Distribution of compensation at USPI before and after the arrival of a new hire from SCA**



Source: Dr. Starr Corrected Compensation Data

Note: Switches between USPI and SCA are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch. ██████████████████████████████████████████████ The observations in each distribution pairing are determined by the switcher's job title in the year after they join USPI. For each pairing, the left-most distribution shows compensation in the switch year and the right-most distribution shows compensation in the following year. Total annualized compensation adjusted for work hours deflated according to each year's CPI, standardized to 2019 U.S. dollars.

288. Next, I consider ██████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████ 418

289. Exhibit 39 below shows the results of this analysis. ██████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████

---

418 Gerhart Report, ¶ 143.b.

██████████████████████████████████████████
██████████████████

### Exhibit 39
### Distribution of compensation at USPI before and after the departure of a switcher to SCA



Source: Dr. Starr Corrected Compensation Data

Note: Switches between USPI and SCA are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch. ██████████████████████████████████████████ ████████████████████████████████████. The observations in each distribution pairing are determined by the switcher's job title in the year after they join SCA. For each pairing, the left-most distribution shows compensation in the switch year and the right-most distribution shows compensation in the following year. Total annualized compensation adjusted for work hours deflated according to each year's CPI, standardized to 2019 U.S. dollars. I drop observations from two administrators with total annualized compensation greater than $400,000 in 2008–2010.

290. Dr. Starr estimates that ████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████
██████████████████████████████████
████████████████████████████████
██████████████████████████████
████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
██████████

291. ████████████████████████████████
████████████████████████████████
██████████████████████████████████
██████████████████████████████████

[REDACTED]



_____

Celeste Saravia, Ph.D.

April 16, 2025

**APPENDIX A**

# CELESTE SARAVIA, PH.D.
## Vice President

**Cornerstone Research**
Two Embarcadero Center, 20th Floor • San Francisco, CA 94111
415.229.8116 • fax 415.229.8199
csaravia@cornerstone.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1998–2004 | **University of California, Berkeley** | Berkeley, California |
| | *Ph.D. in Economics, 2004* | |

| | | |
|---|---|---|
| 1994–1998 | **Northwestern University** | Evanston, Illinois |
| | *B.A. in Mathematics, 1998* | |

## PROFESSIONAL EXPERIENCE

**2004-Present    Cornerstone Research**                            San Francisco, California
*Vice President and Co-Head of Antitrust Practice*

- Extensive experience across class certification, liability, and damages both as lead consulting expert and as the testifying expert, with a particular focus on civil litigation antitrust matters.

- Experience across multiple industries, including semiconductors, telecommunications, retail, franchising and distribution, consumer high-tech products, financial services, payment services, life sciences, health insurance, healthcare, and energy.

**2023-2025    University of California, Berkeley**                            Berkeley, California
*Lecturer*

- Instructor for undergraduate Industrial Organization and Natural Resource Economics.

**2000–2004    University of California Energy Institute**                            Berkeley, California
*Research Assistant*

- Developed and implemented models for econometric analysis of the efficiency of the California electricity market. Maintained and updated large electricity databases.

**2002    Analysis Group**                            San Francisco, California
*Summer Associate*

- Developed analytical models for an economic consulting project.

**1999–2000    University of California, Berkeley**                            Berkeley, California
*Teaching Assistant*

- Instructed sections for Graduate Micro Economics and Introduction to Economics

## OTHER PROFESSIONAL ACTIVITIES
2017–2023    *Vice Chair, ABA Pricing Conduct Committee, Section of Antitrust Law*
2014–2017    *Vice Chair, ABA Franchising and Distribution Committee, Section of Antitrust Law*

**APPENDIX A**

## HONORS AND AWARDS

- Selected by 2016, 2017, 2019, 2020 and 2023 Who's Who Legal: Consulting Experts as a leading economic consulting and competition economist.

- Received a Best Antitrust Business Article award in the concerted practices category in 2016 for the publication, "Analyzing Incentives and Liability in 'Hub-and-Spoke' Conspiracies," with C. Falls, published by the American Bar Association Section of Antitrust Law, *Distribution and Franchising Committee Newsletter*.

## REPRESENTATIVE CONSULTING EXPERIENCE

### Representative antitrust and competition civil litigation consulting experience

- *State of Colorado et al. v Google LLC* Analyzed claims that Google's search results page has the effect of throttling web traffic to specialized vertical search providers (e.g., Yelp, Expedia, Hotels.com, AirBnB, Angie's List).

- *Alleged collusion in a financial services product.* Assessed liability issues in matters alleging a horizontal conspiracy among market makers in a financial asset.

- *FTC v. Qualcomm* and other matters involving Qualcomm. Analyzed claims that Qualcomm's business practices relating to its licensing of patents and its selling of cellular modem chips were anticompetitive.

- *Garber, et al. v. Office of the Commissioner of Baseball, et al.; Laumann, et al. v. National Hockey League, et al.* Analyzed liability and class certification issues in multiple cases challenging exclusive broadcast territories.

- *Universal Surveillance Corporation v. Checkpoint Systems, Inc.* Analyzed damages issues in a case involving allegations of anticompetitive bundling.

- *Cathode Ray Tube (CRT) Antitrust Litigation* Analyzed liability and damages issues in multiple cases involving allegations of a horizontal conspiracy.

- *Alleged Collusion in the Processing of a Renewable Natural Resource* Assessed liability, damages, and class certification issues in direct class actions in matters alleging horizontal conspiracy to suppress production of a renewable natural resource.

- *Alleged Monopoly and Foreclosure in Home Recreation Industry* Assessed claims of attempted monopoly and foreclosure by large distributor of home recreation products against class of retailers. Developed statistical model of damages to measure alleged impact of challenged conduct and class certification.

- *Alleged No-Poach matters* Analyzed class certification in alleged no-poach agreements. Analyzed complex datasets that track individual employees' compensation, performance, promotion, hiring, firing, and mobility across firms.

- *Competitive effects of franchising agreements* Analyzed the pro-competitive benefits of franchising agreements in a lawsuit challenging specific clauses of franchise agreements as anticompetitive.

**APPENDIX A**

- *In re Flash Memory Antitrust Litigation.* Assessed class certification issues in direct and indirect class actions.

- *American Express Travel Related Services Company Inc. v. Visa USA Inc. et al.* Analyzed competitive effects of Visa U.S.A. and MasterCard's rule, barring member banks from issuing Amex or Discover cards.

- *Rambus v. Micron et al.* Analyzed liability issues in case alleging that large semiconductor firms implemented a group boycott that was alleged to have the effect of artificially restricting industry support for a new product.

- *Thales Avionics Inc. v. Matsushita Avionics Systems Corporation.* Analyzed claims that Panasonic Avionics Corporation, formerly Matsushita Avionics Systems Corporation, had engaged in predatory pricing with respect to in-flight entertainment systems.

- *Alleged Predatory Pricing in Generic Pharmaceutical* Analyzed claims that a manufacturer of a generic drug engaged in predatory pricing.

- *Alleged Anticompetitive Reverse Payment* Assessed class certification issues in a direct and indirect class action involving allegations of an anticompetitive reverse payment.

- Arbitration examining the competitive effects of the terms imposed on signatories to the 1998 Master Settlement Agreement on subsequent market structure in the cigarette industry. Supported Peter Reiss and Timothy Bresnahan on behalf of Philip Morris.

**Representative merger consulting experience**

- *China International Marine Containers/Maersk Container Industry* Retained by the DOJ to investigate competitive effects. Merger abandoned.

- *U.S. v. Sabre/Farelogix*, 2019–2020. Supported Aviv Nevo in expert reports as expert witness for the DOJ.

- *FTC v. Sysco/US Foods Merger* Analyzed potential economic impacts of a proposed merger.

- *Applied Materials Inc./Tokyo Electron Ltd.* Supported DOJ in evaluating the proposed merger. Merger was abandoned.

- *Thoratec/Heartware* Supported the FTC in evaluating the proposed merger. Merger abandoned after FTC authorized a preliminary injunction.

- Assessed the competitive effects of a proposed merger of two electricity firms.

**EXPERT TESTIMONY**

- *National ATM Council, Inc., et al. v. Visa Inc., et al.* United States District Court, District of Columbia. Filed expert report (2024)

- *Dow Chemical Canada ULC and Dow Europe GmbH v. Nova Chemicals Corp.* Court of King's Bench of Alberta, Calgary. Filed expert report, gave deposition testimony, and testified at trial (2024)

- *In re: Amitiza Antitrust Litigation.* United States District Court, District of Massachusetts. Filed expert reports and gave deposition testimony (2024)

**APPENDIX A**

- *Tevra Brands, LLC v. Bayer Healthcare LLC, et al.* United States District Court, Northern District of California San Jose Division. Filed expert report, gave deposition testimony (2023), and testified at jury trial (2024)

- *The State Of Connecticut, et al. v. Sandoz, INC., et al.* United States District Court, District of Connecticut. Filed expert report and gave deposition testimony (2024)

- *In re: Qualcomm Incorporated Securities Litigation.* United States District Court, Southern District of California. Filed expert report (2023) and gave deposition testimony (2024)

- *In re: Broiler Chicken Grower Antitrust Litigation Haff Poultry, Inc., al, v. Tyson Foods, Inc., et al.* United States District Court Eastern District of Oklahoma. Filed expert report (2022) and gave deposition testimony (2023)

- *In re HIV Antitrust Litigation.* United States District Court, Northern District of California San Francisco Division. Filed expert report, gave deposition testimony (2022), and testified at jury trial (2023)

- *O.E.M. Glass Network, Inc. et al v. Mygrant Glass Company, Inc. et al.* United States District Court for the Eastern District of New York. Filed expert report (2021) and gave deposition testimony (2022)

- *B & R Supermarket, Inc., et al. v. Visa, Inc., et al.* U.S. District Court, Eastern District of New York. Filed expert report and gave deposition testimony (2021)

- *eBay v. Amazon et al.* American Arbitration Association. Filed expert report (2020), gave deposition testimony (2020), and arbitration testimony (2020)

- *All-Tag Corp. v. Checkpoint Systems, Inc.* U.S. District Court, Southern District of Florida. Filed expert report (2019) and gave deposition testimony (2019)

- *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation.* U.S. District Court, Eastern District of New York. Filed expert reports (2019) and gave deposition testimony (2019)

- *Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars v. Ningbo Sunny Electronic Co. Ltd.* U.S. District Court, Northern District of California. Filed expert report (2019), gave deposition testimony (2019), and testified at jury trial (2019)

- *Fresenius Kabi v Par Sterile Products, LLC and Par Pharmaceuticals Companies, Inc.* U.S. District Court, District of New Jersey. Filed expert report (2019) and gave deposition testimony (2019)

- *Inline Packaging, LLC v. Graphic Packaging International, Inc.* U.S. District Court, District of Minnesota. Filed expert report (2017) and gave deposition testimony (2018)

- *In RE: Dental Supplies Antitrust Litigation,* U.S. District Court, Eastern District of New York. Filed expert report (2017) and gave deposition testimony (2018)

- *The Rack LLC, v. Westfield LLC, Westfield Promenade LLC.* Superior Court, State of California for the County of Los Angeles. Gave deposition testimony (2017)

- *J&M Distributing Inc. v. Hearth & Home Technologies Inc. and Magnotti and Sons, Inc. d/b/a The Fireplace and the Patio Place.* U.S. District Court, District of Minnesota. Filed expert report (2014) and testified at jury trial (2015)

- *The Morning Star Packing Company, et al. v. SK Foods, L.P., et al.* U.S. District Court, Eastern District of California. Filed expert report (2015) and gave deposition testimony (2015)

**PUBLICATIONS**

**APPENDIX A**

- "Most-Favored Entry Clauses in Drug-Patent Litigation Settlements: A Reply to Drake and McGuire (2022)" with A. Elzinga and P. Kovacheva, *The Antitrust Source*, December 2023

- "Comments on the Potential Implications of the Draft FTC-DOJ Merger Guideline 4 for the U.S. Pharmaceutical Industry," with Sarah Abraham, John Asker, Avigail Kifer, Margaret Kyle, and Ariel Pakes, September 18, 2023, available at https://www.regulations.gov/comment/FTC-2023-0043-1505

- "Necessity as the Mother of Invention? Streamlining the Evaluation of Competitor Collaborations" with I. Simmons, G. Bashour, and A. Klein, *Antitrust Magazine*, Vol.34, No 3, Summer 2020

- **"**Bright Line**"** Apple v. Pepper Invites Further Economic Analysis**,** with T. Kumler, *Competition Policy International*, July 2019

- "Tying Law and Policy," (contributor) Antitrust Law and Economics of Product Distribution Second Edition, 2016

- "Class Certification under Rule 23," (contributor) *ABA Indirect Purchaser Litigation Handbook,* 2016.

- "Analyzing Incentives and Liability in 'Hub-and-Spoke' Conspiracies," with C. Falls, *Distribution: The Newsletter of the Distribution and Franchising Committee,* Vol 19, No. 1, April 2015

- "Relevant Markets," (contributor) *ABA Antitrust Law Developments (Seventh),* Vol. 1, Chapter 6, March 2012

- "Horizontal Merger Guidelines and Market Definition in Monopolization Cases," with E. Bruegmann and N. Soboleva, *Global Competition Review: The Antitrust Review of the Americas*, 2011

- "Standards for Assessing Bundled Discounts," with V. Howell, *Global Competition Review: The Antitrust Review of the Americas* (special issue), 2009

- "Vertical Arrangements, Market Structure, and Competition: An Analysis of Restructured U.S. Electricity Markets," with J. Bushnell and E. Mansur, *American Economic Review,* Volume 98, Issue 1, March 2008, pages 237-266

## PRESENTATIONS

- Panel presentation, "Hatching a Procompetitive Settlement" American Bar Association, Webinar, September 2024

- Panel presentation, "Can Bots collude? Cartels in the age of artificial intelligence" Global Competition Review Live: Cartels, Washington, D.C., May 2024

- Panel presentation, "Big Data and Evolving Views of Market Definition and Power" Antitrust in the Financial Sector Summit, New York, NY, September 2023

- Panel presentation, "Transatlantic Antitrust Class Actions" Fordham University, 49th Annual Antitrust Conference, New York, NY, September 2022

- Panel presentation, "Certifiable? Navigating Class Actions Today" American Bar Association 70th Antitrust Law Spring Meeting, April 2022

- Panel presentation, "12[th] Summit on Biosimilars & Innovator Biologics" American Conference Institute, June 2021

- Panel presentation, "Big Tech Trial Juror Study" American Bar Association Antitrust Law Section, May 2021

**APPENDIX A**

- Panel presentation, "Fundamentals—Economics" American Bar Association 69th Antitrust Law Virtual Spring Meeting, March 2021

- Panel presentation "Women in Lead Roles: First Chairs and Expert Witnesses" American Bar Association Antitrust Law Section, February 2021

- Panel presentation, "Tech Enforcement and Digital Competition Challenges" Antitrust TX, October 2020

- Panel presentation, "Economic Analysis in Antitrust, Consumer and Securities Class Actions" The Chicago Bar Association Webinar, May 2020

- Moderated Panel presentation, "Antitrust Counseling on Competitor Collaborations and Price Gouging during COVID-19" American Bar Association Section of Antitrust Law teleconference, April 2020

- Panel presentation, "FTC vs. Qualcomm and Other Recent Antitrust Developments in High Tech and Life Sciences" 20th Annual Berkeley-Stanford Advanced Patent Law Institute: Silicon Valley, East Palo Alto, CA, December 2019

- Panel presentation, "Legal Standards for Class Certification and Regression Analysis" The Economics of Class Certification, San Francisco, CA November 2019

- Panel presentation, "A Deep Dive into Spokeo: Including a Discussion of the Use of Experts and Statistical Sampling at Class Certification in light of Spokeo and Tyson," Bridgeport Continuing Education 2017 Class Action Litigation Conference, San Francisco CA, September 2017

- Panel presentation, "Proof Agreements, Incentives and Liabilities in Hub-and-Spoke Antitrust Conspiracies: A 2017 Update," The Knowledge Group Teleconference, May 2017

- Panel presentation, "Clarifying Liability in Hub-and-Spoke Conspiracies," 64th American Bar Association Section of Antitrust Law Spring Meeting, Washington D.C., April 2016

- Panel presentation, "Trial Practice Fundamentals: Working with Your Expert," American Bar Association Webinar, May 2015

- Panel presentation, "Downloading the Future: Media Mergers and Content Distribution," 63rd American Bar Association Section of Antitrust Law Spring Meeting, April 2015

- Panel presentation, "Analyzing Conspiracies with Both Vertical & Horizontal Elements," American Bar Association Teleconference, January 2015

- Expert in mock trial focusing on pay-for-delay to teach State and Federal court judges, "Antitrust Law & Economics Institute for Judges," American Bar Association/George Mason University School of Law Judicial Education Program, October 2014

**APPENDIX B**

# Documents Relied Upon

## Academic Articles

- Amit Jain, Punya Jain, and Shruti Aggarwal, "SARS-CoV-2 Impact on Elective Orthopaedic Surgery: Implications for Post-Pandemic Recovery," *The Journal of Bone and Joint Surgery*, 102(13), 2020, pp. e68(1)–e68(5)

- Anna L. Goldman, Michael K. Paasche-Orlow, and Frederick Thurston Drake, "Affordable Care Act Medicaid Expansion and Access to Outpatient Surgical Care" *JAMA Surgery*, 155(11), 2020, pp. 1066–1067

- George J. Stigler, "A Theory of Oligopoly," *The Journal of Political Economy*, 72(1), 1964, pp. 44–61

- Gregory C. Chow, "Tests of Equality Between Sets of Coefficients in Two Linear Regressions," *Econometrica*, 28(3), 1960, pp. 591–605

- Jeffrey M. Perloff, "Cartels," *Journal of Industrial Organization Education*, 1(1), 2006, pp. 1–12

- Miguel Faria-e-Castro and Samuel Jordan-Wood, "Pandemic Labor Force Participation and Net Worth Fluctuations," *Federal Reserve Bank of St. Louis Review*, 106(1), 2024, pp. 40–58

- Samuel Dodini, Michael Lovenheim, Kjell Salvanes, and Alexander Willen, "Monopsony, Job Tasks, and Labor Market Concentration," *The Economic Journal*, 134(661), 2024, pp. 1914–1949

- Sang Yoon Lee, Minsung Park, and Yongseok Shin, "Hit Harder, Recover Slower? Unequal Employment Effects of the COVID-19 Shock," *Federal Reserve Bank of St. Louis Review*, 103(4), 2021, pp. 367–383

- Shruti Aggarwal, Punya Jain, and Amit Jain, "COVID-19 and Cataract Surgery Backlog in Medicare Beneficiaries," *Journal of Cataract & Refractive Surgery*, 46(11), 2020, pp. 1530–1533

- Thesia I. Garner, Adam Safir, and Jake Schild, "Receipt and Use of Stimulus Payments in the Time of the Covid-19 Pandemic," *Beyond the Numbers: Prices & Spending*, 9(10), 2020

- Thomas J. Bollyky, et al., "Assessing COVID-19 Pandemic Policies and Behaviours and Their Economic and Educational Trade-Offs Across US States from Jan 1, 2020, to July 31, 2022: An Observational Analysis," *The Lancet*, 401, 2023, pp. 1341–1360

**APPENDIX B**

- Zoe B. Cullen, Shengwu Li, and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," *NBER Working Paper Series* 30570, October 2022, Revised August 2024, pp. 1–53

## Bates Stamped Documents

- DOJCIV-008-00000353–67
- DOJCIV-008-00000387–96
- DOJCIV-008-00000390
- Hayek-000012214–16
- OMC_BM_000000884–95
- OMC_BM_000006875
- OMC_BM_000007716
- OMC_BM_000010778–9
- OMC_BM_000013354–56
- OMC_BM_000014729
- SCA000072712
- SCA000609009–11
- SCA000862885
- SCA001075713–5
- SCA001471584.xlsx
- SCA002277742–44
- SCA002364259–63
- SCA002364264–65
- USPI_CIV_000003394
- USPI_CIV_000006432
- USPI_CIV_000016019
- USPI_CIV_000016020.xlsx
- USPI_CIV_000016089–92
- USPI_CIV_000016100
- USPI_CIV_000016522

- USPI_CIV_000016573–74
- USPI_CIV_000021155
- USPI_CIV_000021165
- USPI_CIV_000021178
- USPI_CIV_000021897–98
- USPI_CIV_000021899–904
- USPI_CIV_000022791–811
- USPI_CIV_000023128–33
- USPI_CIV_000023134–45
- USPI_CIV_000024141.xlsx
- USPI_CIV_000024185
- USPI_CIV_000025214–17
- USPI_CIV_000026215–16
- USPI_CIV_000026240.xlsx
- USPI_CIV_000030396–99
- USPI_CIV_000033030–31
- USPI_CIV_000034853–54
- USPI_CIV_000035153
- USPI_CIV_000035655
- USPI_CIV_000035855
- USPI_CIV_000036746–49
- USPI_CIV_000037627–29
- USPI_CIV_000037954
- USPI_CIV_000038254–55
- USPI_CIV_000038258–59

**APPENDIX B**

- USPI_CIV_000039709–10
- USPI_CIV_000039752–53
- USPI_CIV_000040029
- USPI_CIV_000040585–87
- USPI_CIV_000041645–56
- USPI_CIV_000044404–05
- USPI_CIV_000044881–83
- USPI_CIV_000045211–12
- USPI_CIV_000045232–33
- USPI_CIV_000046079
- USPI_CIV_000047956–58
- USPI_CIV_000053367.xlsx
- USPI_CIV_000055047–48
- USPI_CIV_000056074–75
- USPI_CIV_000056611–43
- USPI_CIV_000057810–11
- USPI_CIV_000064623–27
- USPI_CIV_000064628
- USPI_CIV_000068808–21
- USPI_CIV_000095479–80
- USPI_CIV_000110943
- USPI_CIV_000111376–82
- USPI_CIV_000113333
- USPI_CIV_000113335
- USPI_CIV_000122239
- USPI_CIV_000122240
- USPI_CIV_000146394
- USPI_CIV_000212779–80

- USPI_CIV_000233594–614
- USPI_CIV_000337006–011
- USPI_CIV_000584419–21
- USPI_CIV_000601224–29
- USPI_CIV_000620051–67
- USPI_CIV_000626729–30
- USPI_CIV_000686081–92
- USPI_CIV_000962508
- USPI_CIV_000962509
- USPI_CIV_000104518
- USPI_CIV_000105175–77
- USPI_CIV_000121836–40
- USPI_CIV_000142589–90
- USPI_CIV_000147704–06
- USPI_CIV_000192177–78
- USPI_CIV_000214742–45
- USPI_CIV_000214746.xlsx
- USPI_CIV_000227267
- USPI_CIV_000235807
- USPI_CIV_000241755–57
- USPI_CIV_000250682–84
- USPI_CIV_000272179–82
- USPI_CIV_000274099
- USPI_CIV_000301109–10
- USPI_CIV_000336479
- USPI_CIV_000336973–85
- USPI_CIV_000338903
- USPI_CIV_000376500–06

**APPENDIX B**

- USPI_CIV_000401250–54
- USPI_CIV_000441337–39
- USPI_CIV_000457557–60
- USPI_CIV_000467447–60
- USPI_CIV_000499023–24
- USPI_CIV_000534606–09
- USPI_CIV_000563699–700
- USPI_CIV_000650633–36

- USPI_CIV_000689431
- USPI_CIV_000755571–72
- USPI_CIV_000758762–65
- USPI_CIV_000810697
- USPI_CIV_000890968–76
- USPI_CIV_000900796–801
- USPI_CIV_000964185–86
- USPI_CIV_00890968–76

**Books**

- American Bar Association, "Econometrics and Regression Analysis," in *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition (ABA Book Publishing, 2017), pp. 123–208

- Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition (Essex, England: Pearson Education Limited, 2015)

- B. Douglas Bernheim and Michael D. Whinston, *Microeconomics* (New York, NY: McGraw-Hill Irwin, 2008)

- Jeffrey M. Perloff, *Microeconomics*, 7th Edition (Boston, MA: Pearson Education Inc., 2015)

- Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, Fourth Edition (Mason, OH: South-Western Cengage Learning, 2009)

- Joshua Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics*, (Princeton, NJ: Princeton University Press, 2009)

- Karl Popper, *The Logic of Scientific Discovery*, (New York, NY: Routledge Classics, 2005)

- Louis Kaplow and Carl Shapiro, "Antitrust," in *Handbook of Law and Economics*, Volume 2, ed. A. Mitchell Polinsky and Steven Shavell (Elsevier B.V., 2007), pp. 1073–1225

- Louis Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, N.J.: Princeton University Press, 2010)

- W. Kip Viscusi, Joseph E. Harrington, Jr. and David E. M. Sappington, *Economics of Regulation and Antitrust*, Fifth Edition (Cambridge, MA: The MIT Press, 2018)

**APPENDIX B**

**Data**

- "4.19.24 Paygroup location.xlsx"

- "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data.xlsx"

- "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions.xlsx"

- "2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions.xlsx"

- "2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes.xlsx."

- "CheckSumm_Highly Confidential-Outside Counsel, Experts Only"

- "CheckSummHE_ Highly Confidential-Outside Counsel, Experts Only.csv"

- "Eemploy_ Highly Confidential-Outside Counsel, Experts Only.csv"

- "Ejob_ Highly Confidential-Outside Counsel, Experts Only.csv"

- "Exhibit A_Paygroup_Location.xlsx"

- "Exhibit B_ERNCD Values.xlsx"

- "Highly Confidential - Outside Counsel Experts Only_Check History Hours and Earnings.xlsx"

- "Highly Confidential - Outside Counsel Experts Only_SCA Hashed SSNs.xlsx"

- "Highly Confidential - Outside Counsel Experts Only_Teammate Roster Point in Time.xlsx"

- "Highly Confidential - Outside Counsel Experts Only_Termed in 2021.xlsx"

- "SCA - Structured00000005.xlsx"

- "SCA - Structured00000013.xlsx"

- "SCA-Structured00000007_Highly Confidential–Outside Counsel Experts Only.xlsx"

- "SCA-Structured00000009_Highly Confidential–Outside Counsel Experts Only.xlsx"

- "SCA-Structured00000010_Highly Confidential–Outside Counsel Experts Only.xlsx"

- "SCA-Structured00000011_Highly Confidential–Outside Counsel Experts Only.xlsx"

**APPENDIX B**

- "SCA-Structured00000012_Highly Confidential–Outside Counsel Experts Only.xlsx"
- DVA_OMCEAL_000000029–45
- DVA_OMCEAL_000000047
- DVA_OMCEAL_000902589–91
- DVA_OMCEAL_001182111
- DVA_OMCEAL_001408533
- DVA_OMCEAL_001408536
- DVA_OMCEAL_001408539
- DVA_OMCEAL_001408542
- DVA_OMCEAL_001408543
- DVA_OMCEAL_001408544
- DVA_OMCEAL_001408547
- DVA_OMCEAL_001408550
- DVA_OMCEAL_001421632–34
- DVA_OMCEAL_001421635
- DVA_OMCEAL_001421640
- DVA_OMCEAL_001421733
- USPI_CIV_000021819
- USPI_CIV_00065922–34
- USPI_CIV_000659234
- USPI_CIV_001168726

**Depositions**

- Deposition of Peter Clemens (SCA), May 2, 2024
- Deposition of Mark Garvin (USPI), May 30, 2024
- Deposition of Cindy English (USPI), Volume I, June 12, 2024
- Deposition of Anthony Martin (USPI), June 27, 2024
- Deposition of Jason Cagle (USPI), August 6, 2024

- Deposition of Shannon Mosley (USPI), August 13, 2024

- Deposition of Clare Metcalf (Russell Reynolds), August 14, 2024

- Deposition of Sandi Karrmann (USPI), August 14, 2024

- Deposition of Michael Rucker (SCA), August 27, 2024

- Deposition of Andrew Johnston (USPI), September 6, 2024

- Deposition of Andrew P. Hayek (SCA), September 18, 2024

- Deposition of Brian Todd Mathis (SCA), September 20, 2024

- Deposition of Anthony Kilgore (SCA), October 22, 2024

- Deposition of Mark Kopser (USPI), Volume I, December 12, 2024

- Deposition of Barry Gerhart, March 5, 2025

- Deposition of Evan P. Starr, March 19, 2025

- Deposition of Evan P. Starr, Volume 2, March 20, 2025

## Expert Reports

- Amended Expert Witness Report of Dr. Barry Gerhart, February 11, 2025

- Amended Expert Witness Report of Dr. Evan P. Starr, January 21, 2025

## Legal Documents

- Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, January 5, 2021

- Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024

- Answer of Defendants United Surgical Partners Holdings, Inc., United Surgical Partners International, Inc., and Tenet Healthcare Corporation to Plaintiffs' Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, December 20, 2024

## Letters

- Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser

Heimann & Bernstein, LLP), "*In re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305," May 14, 2023

- Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "*In re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305," June 1, 2023

## Press Releases

- Tenet Health, "Tenet and USPI Complete Transaction to Acquire SCD," December 22, 2021, available at https://investor.tenethealth.com/press-releases/press-release-details/2021/Tenet-and-USPI-Complete-Transaction-to-Acquire-SCD/default.aspx, accessed on April 1, 2025

- Tenet Health, "Tenet and USPI to Acquire SurgCenter Development and Establish Long-Term Development Partnership," November 8, 2021, available at https://investor.tenethealth.com/press-releases/press-release-details/2021/Tenet-and-USPI-to-Acquire-SurgCenter-Development-and-Establish-Long-Term-Development-Partnership/default.aspx, accessed on April 1, 2025

- Tenet Health, "Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx, accessed on April 1, 2025

- United Health Group, "Surgical Care Affiliates (SCA), OptumCare to Combine," January 9, 2017, available at https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html, accessed on April 1, 2025

## SEC Filings

- Total Renal Care Holdings, Inc., SEC Form 10-Q for the quarterly period ended March 31, 1996, filed on March 15, 1996

- DaVita Inc., SEC Form 10-K for period ended December 31, 2024, filed on February 13, 2025

- Tenet Healthcare Corporation, SEC Form 10-K for period ended December 31, 2024, filed on February 18, 2025

**APPENDIX B**

## Websites

- Ambulatory Surgery Center Association, "What is an ASC," available at https://www.ascassociation.org/asca/about-ascs/surgery-centers, accessed on February 25, 2025

- Blooming Eve, "All Fertility Clinics in the USA," available at https://www.bloomingeve.com/clinics, accessed on February 25, 2025

- Blooming Eve, "Find a Fertility Clinic Near You," available at https://www.bloomingeve.com, accessed on February 25, 2025

- Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," July 8, 2024, available at https://www.cdc.gov/museum/timeline/covid19.html, accessed on April 3, 2025

- Centers for Disease Control and Prevention, "COVID Data Tracker," available at https://covid.cdc.gov/COVID-DATA-TRACKER/#trends_weeklydeaths_testpositivity_00, accessed on April 1, 2025

- Claire Wallace, "SCA Health Grows to 320+ Surgical Facilities," *Becker's: ASC Review*, August 31, 2022, available at https://www.beckersasc.com/asc-transactions-and-valuation-issues/sca-health-adds-almost-100-new-surgical-facilities-in-2022.html, accessed on April 1, 2025

- CMS.gov, "State Operations Manual," July 21, 2023, available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/som107ap_l_ambulatory.pdf

- CNBC, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," August 5, 2010, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 1, 2025

- DaVita, "DaVita to Acquire Gambro Healthcare, a Renal Dialysis Services Company," December 7, 2004, available at https://investors.davita.com/2004-12-07-DaVita-to-Acquire-Gambro-Healthcare-a-Renal-Dialysis-Services-Company, accessed on April 1, 2025

- DaVita, "Total Renal Care Holdings, Inc. Announces Legal Name Change to DaVita Inc.," October 4, 2000, available at https://investors.davita.com/2000-10-04-Total-Renal-Care-Holdings-Inc-Announces-Legal-Name-Change-to-DaVita-Inc, accessed on April 1, 2025

**APPENDIX B**

- Definitive Healthcare, "Outpatient care: What is Outpatient Care?" available at https://www.definitivehc.com/resources/glossary/outpatient-care, accessed on February 25, 2025

- Deloitte, "Growth in Outpatient Care," available at https://www2.deloitte.com/content/dam/insights/us/articles/4170_Outpatient-growth-patterns/DI_Patterns-of-outpatient-growth.pdf

- Federal Reserve Bank of St. Louis, "Employment for Health Care and Social Assistance: Outpatient Care Centers (NAICS 6214) in the United States," available at https://fred.stlouisfed.org/series/IPURN6214W200000000, accessed on April 14, 2025

- Federal Reserve Bank of St. Louis, "Quits: Health Care and Social Assistance," available at https://fred.stlouisfed.org/series/JTS6200QUL, accessed on April 15, 2025

- Federal Reserve Bank of St. Louis, "Quits: Total Nonfarm," available at https://fred.stlouisfed.org/series/JTSQUR, accessed on April 15, 2025

- Federal Reserve Bank of St. Louis, "Total Revenue for Outpatient Care Centers, All Establishments," available at https://fred.stlouisfed.org/series/REV6214ALLEST144QNSA#0, accessed on April 14, 2025

- Francesca Mathewes, "USPI vs. AmSurg vs. SCA Health: 10 Key Comparisons to Know in 2024," *Becker's: ASC Review*, August 9, 2024, available at https://www.beckersasc.com/asc-news/uspi-vs-amsurg-vs-sca-health-10-key-comparisons-to-know-in-2024.html, accessed on April 1, 2025

- Indeed, "Crown Point Surgery Center: Clinical Director," available at https://www.indeed.com/viewjob?jk=fe790283b33ab633&from=shareddesktop, accessed on February 3, 2025

- Indeed, "USPI: Chief Executive Officer – Fresno Surgical Hospital," available at https://www.indeed.com/viewjob?jk=1046d2fc27cbf644&from=shareddesktop, accessed on April 8, 2025

- Indeed, "Baylor Scott & White Surgicare Centennial: Director of Nursing Outpatient Surgery," available at https://www.indeed.com/viewjob?jk=58a75b27e4092221&from=shareddesktop, accessed on February 3, 2025

- Indeed, "USPI: Regional Director," available at https://www.indeed.com/viewjob?jk=bc655b0f0fe331fc&from=shareddesktop, accessed on February 3, 2025

**APPENDIX B**

- Indeed, "Surgery Center Administrator - Merrillville, IN," available at https://www.indeed.com/viewjob?jk=46a9059ad76901ba&from=shareddesk top, accessed on February 3, 2025

- Indeed, "USPI Chief Executive Officer - Baylor Scott & White Las Colinas - Irving, TX 75064," available at https://www.indeed.com/viewjob?jk=8c181807c183eabc&from=shareddeskt op, accessed on February 3, 2025

- Indeed, "USPI: Regional Vice President, Operations I–Mid–Atlantic (MD/PA/NJ/DE)," available at https://www.indeed.com/viewjob?jk=80dba394c619badf&from=shareddeskt op, accessed on February 3, 2025

- Indeed, "USPI: Surgery Center Administrator," available at https://www.indeed.com/viewjob?jk=c078d8f7008bf116&from=shareddeskt op, accessed on February 3, 2025

- KFF, "Number of Mental Health Treatment Facilities, By Type of Care," 2022, available at https://www.kff.org/other/state-indicator/number-of-mental-health-treatment-facilities-by-type-of-care, accessed on April 14, 2025

- Kimberly Steele, "Healthcare Industry Embraces Shift to Outpatient Care Sites," *JLL*, April 11, 2024, available at https://www.us.jll.com/en/newsroom/healthcare-industry-embraces-shift-to-outpatient-care-sites, accessed on February 25, 2025

- Lightcast, "Academic Research Using Lightcast Data," available at https://lightcast.io/resources/new-academic-research, accessed on April 16, 2025

- Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 1, 2025

- Luisa Beltran, "IPO Market Starts Off Fresh," *CNN Money*, June 2, 2001, available at https://money.cnn.com/2001/06/02/deals/sat_ipos, accessed on April 1, 2025

- Office of Management and Budget, "North American Industry Classification System," 2022, available at https://www.census.gov/naics/reference_files_tools/2022_NAICS_Manual.pdf

- Rachel K. Jones, Candace Gibson and Jesse Philbin, "The Number of Brick-and-Mortar Abortion Clinics Drops, as US Abortion Rate Rises: new Data Underscore the Need for Policies that Support Providers," *Guttmacher*, June 2024, available at https://www.guttmacher.org/report/abortion-clinics-united-states-2020-2024, accessed on February 25, 2025

**APPENDIX B**

- Sarah Albert, Andrew Foerster, and Pierre-Daniel G. Sarte, "Employment Effects of COVID-19 Across States, Sectors," *FRBSF Economic Letter*, November 22, 2021, available at https://www.frbsf.org/wp-content/uploads/el2021-32.pdf, accessed April 15, 2025

- SCA Health, "Build Your Career at SCA Health," available at https://careers.sca.health, accessed on April 8, 2025

- SCA Health, "Committed to Excellent Patient Care," available at https://sca.health/partnering-with-sca/physicians, accessed on April 1, 2025

- SCA Health, "Partnering with Hospital Systems," available at https://sca.health/partnering-with-sca/hospital-systems, accessed on April 1, 2025

- SCA Health, "Patient Commitment: We Put Patients First," https://sca.health/patient-commitment, accessed on April 1, 2025

- SCA Health, "Supporting Physician Specialists in Many Aspects of Patient Care," available at https://sca.health/about-us, accessed on February 25, 2025

- Sriparna Roy and Bhanvi Satija, "US Hospitals See Post Pandemic Catch-up Behind Insurer Healthcare Costs," *Reuters*, February 13, 2024, available at https://www.reuters.com/world/us/us-hospitals-see-post-pandemic-catch-up-behind-insurer-healthcare-costs-2024-02-13, accessed on April 9, 2025

- Substance Abuse and Mental Health Services Administration, "2020 National Mental Health Services Survey," available at https://www.samhsa.gov/data/system/files/media-quick-stats/nmhss-us20.pdf

- Substance Abuse and Mental Health Services Administration, "National Directory of Mental Health Treatment Facilities," April 2021, available at https://www.samhsa.gov/data/sites/default/files/reports/rpt34657/National_Directory_MH_facilities_2021.pdf

- Teal Labs, Inc., "USPI Market President I Midwest @ United Surgical Partners International," available at https://www.tealhq.com/job/uspimarket-president-i-midwest_d9052397-8ff0-420a-93ae-52f1189ff5d0, accessed on April 1, 2025

- The National Forum of ESRD Networks, "National ESRD Census Data," September 30, 2024, available at https://esrdnetworks.org/resources-news/national-esrd-census-data, accessed on February 25, 2025

- U.S. Bureau of Labor Statistics, "CES Overview," February 7, 2025, available at https://www.bls.gov/web/empsit/cesprog.htm, accessed on April 15, 2025

**APPENDIX B**

- U.S. Bureau of Labor Statistics, "Job Openings and Labor Turnover – March 2022," May 3, 2022, available at https://www.bls.gov/news.release/archives/jolts_05032022.pdf, accessed on April 16, 2025

- U.S. Bureau of Labor Statistics, "QCEW Overview," March 14, 2025, available at https://www.bls.gov/cew/overview.htm, accessed on April 16, 2025

- United Surgical Partners International, "About Us: Who We Are," available at https://uspi.com/about-us/who-we-are/default.aspx, accessed on April 1, 2025

- United Surgical Partners International, "Clinical Director at USPI," available at https://careers.uspi.com/job/monroe/clinical-director/35934/79380146160, accessed on March 31, 2025

- United Surgical Partners International, "Partners: For Physicians," available at https://uspi.com/partners/for-physicians/default.aspx, accessed on April 1, 2025

- United Surgical Partners International, "USPI Director, Clinical Operations (up to 75% travel) at USPI," available at https://careers.uspi.com/job/dallas/uspi-director-clinical-operations-up-to-75-travel/26425/79499040448, accessed on March 31, 2025

- United Surgical Partners International, "USPI Director of Clinical Operations (Hybrid, must live in TN) - up to 75% travel at USPI," available at https://careers.uspi.com/job/nashville/uspi-director-of-clinical-operations-hybrid-must-live-in-tn-up-to-75-travel/26425/78599147200, accessed on March 31, 2025

- Vincent Amanor-Boadu, "Empirical Evidence for the 'Great Resignation'," *U.S. Bureau of Labor Statistics: Monthly Labor Review*, November 2022, available at https://doi.org/10.21916/mlr.2022.29, accessed on April 16, 2025

- WayUp, "USPI: FSH Director of Surgical Services," available at https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-751200318061401, accessed on February 4, 2025

- WayUp, "USPI: Director of Clinical Operations," available at https://www.wayup.com/i-j-Director-of-Clinical-Operations-United-Surgical-Partners-International-Inc-USPI-482563639121828, accessed on February 4, 2025

- WCAS, "Tenet Completes Purchase of USPI from WCAS," April 26, 2018, available at https://wcas.com/news/tenet-completes-purchase-of-uspi-from-wcas, accessed on April 1, 2025

**APPENDIX B**

**Note: In addition to the documents on this list, I relied on all documents cited in my report to form my opinions.**

**APPENDIX C**

*Data Appendix*

1. USPI produced the following data in this matter:

- **USPI Payroll Data.** ███████████████████████
███████████████████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████████████
██████████

- **Tenet Payroll Data.** █████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████"█████████████████████████
████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████
████████████████████████████████

2. SCA produced the following data in this matter:

- **SCA Payroll Data.** ██████████████████████████
███████████████████████████████████████████
████████████████████████[3]███████████████████
███████████████████████████████████████████

---

[1] USPI_CIV_000021819; USPI_CIV_00065922–33; "2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions.xlsx"; "Exhibit A_Paygroup_Location.xlsx"; "Exhibit B_ERNCD Values.xlsx"; "4.19.24 Paygroup location.xlsx"; "2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes.xlsx".

[2] USPI_CIV_000659234; USPI_CIV_001168726.

[3] "Highly Confidential - Outside Counsel Experts Only_Check History Hours and Earnings.xlsx"; "Highly Confidential - Outside Counsel Experts Only_Termed in 2021.xlsx"; "Highly Confidential - Outside Counsel Experts Only_Teammate Roster Point In Time.xlsx"; "SCA-Structured00000007_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000009_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000010_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000011_Highly Confidential–Outside Counsel Experts Only.xlsx"; "CheckSumm_Highly Confidential-Outside Counsel, Experts Only"; "CheckSummHE_ Highly Confidential-Outside Counsel, Experts Only.csv"; "Eemploy_ Highly Confidential-Outside Counsel, Experts Only.csv"; "Ejob_ Highly Confidential-Outside Counsel, Experts Only.csv"; "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data.xlsx"; "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs'Plaintiffs' Structured Data Questions.xlsx".

**APPENDIX C**

███████████████████████████████████████████████████████████
███████████████████████████████

3. DaVita produced the following data in this matter:

- **DaVita Payroll Data.** ████████████████████████████
████████████████████████████████[4]██████████████████
██████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████[5]██
████████████████████████████████████████
███████████████████████████████████

- **DaVita Teammate Data.** █████████████████████████
█████████████████████████████████[6]██████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

- **DaVita Equity Grant Data.** ██████████████████████████
███████████████████████████████[7]██████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

4. Additionally, all three Defendants generated the following data specifically for use in this matter:

- **Hashed SSN Data.** ██████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████[8]████████████████████████████

---

[4] DVA_OMCEAL_000000029–45; DVA_OMCEAL_000902589–91; DVA_OMCEAL_001408544; DVA_OMCEAL_001182111.

[5] ████████████████████████████████████████████████████████
██████████████

[6] DVA_OMCEAL_001421635; DVA_OMCEAL_001421632–34.

[7] DVA_OMCEAL_001408533; DVA_OMCEAL_001408536; DVA_OMCEAL_001408539; DVA_OMCEAL_001408542; DVA_OMCEAL_001408543; DVA_OMCEAL_001408547.

[8] █████████████████████████████████████████████████████████
See DVA_OMCEAL_000000047; DVA_OMCEAL_001408550; DVA_OMCEAL_001421733; DVA_OMCEAL_001421640.██████████████████████. See "Highly Confidential - Outside Counsel Experts Only_SCA Hashed



**APPENDIX C**

5. Dr. Starr constructed a dataset that combined several of the datasets described above with various publicly available datasets. However, he made several basic errors when constructing this dataset. I corrected these errors, and I rely on the corrected dataset throughout my report to assess the validity of Dr. Starr and Dr. Gerhart's conclusions:

- **Dr. Starr's Data.** Dr. Starr constructed a panel dataset at the employee-year-company level. This dataset combined certain variables from the DaVita Payroll Data, DaVita Teammate Data, SCA Payroll Data, USPI Payroll Data, Tenet Payroll Data, and Hashed SSN Data. This dataset also included selected variables from publicly available data sources, including average wage and income earnings for medical and health services managers in the health care and social assistance industry by state and year from the American Community Survey ("ACS") Data; per-capita healthcare services spending by state and year from Federal Reserve Economic Data ("FRED"); per-capita real GDP by state and year from FRED and the U.S. Bureau of Economic Analysis ("BEA"); consumer price index by Census Region, and unemployment rate by state and year, from the U.S. Bureau of Labor Statistics ("BLS"); and minimum wage by state and year from the U.S. Department of Labor. Dr. Starr relies on the

SSNs.xlsx"; "SCA - Structured00000005.xlsx"; "SCA-Structured00000012_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA - Structured00000013.xlsx". USPI generated hashed SSNs and appended them to USPI_CIV_00065922–33 and USPI_CIV_000659234.

**APPENDIX C**

- **Dr. Starr's Corrected Data.** Dr. Starr made four basic errors when processing the various datasets that he used to construct his panel dataset, which I corrected. First, ████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████[9] ███████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████ Second, Dr. Starr relied on ███████████ ███████████████████████████████████████████ █████████[10] █████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████ Third, ████████████████████████████████████████ █████████████[11] ████████████████████████████ ██████████████████████████ Fourth, ████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████ For example, ████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████

---

[9] ██████████████████████████████████████████████████████████, a fact that Dr. Starr did not account for at all when processing the data. See Workpaper 5. ███████████████████████████████████████████████ ███████████████████████████████████. See Workpaper 19.

[10] ██████████████████████████████████████████████████████████████ ████████████. See Workpaper 20; Workpaper 21.

[11] ████████████████████████████████████████. See Workpaper 22.

██████████████████████████████████████

█████████████████████████████████████[12]

6. I also rely on proprietary data from Lightcast and publicly available data from other sources to perform certain analyses in my report:

- **Lightcast Data.** Lightcast is a proprietary data provider that has constructed a structured database of job histories based on resumes posted to online resume websites.[13] The Lightcast Data that I analyze in my report reflects job histories for individuals who worked for one of the three Defendants, or in the Outpatient Care Centers industry (NAICS code 6214) to which all three Defendants belong, in 2024 or earlier. The Lightcast Data record company name, occupation, industry, start date, and end date at the individual-job level.

- **NAICS Association Data.** NAICS Association provides data on industry codes from Dun & Bradstreet, a provider of business data and analytics. NAICS Association provides industry codes for a specified list of companies by matching the companies to entities in the Dun & Bradstreet database based on the company's name and other characteristics (e.g., location) where available.

- **Bureau of Labor Statistics Data.** The Bureau's Quarterly Census of Employment and Wages program collects and publishes national counts of annual average private-sector establishments by NAICS industry.[14] The Bureau also provides national estimates of annual average private-sector employment by NAICS industry from the Current Employment Statistics program.[15]

---

[12] Dr. Starr also made one additional error that affects a small number of observations in the data. He improperly included USPI's ████████, USPI's ████████████, and SCA's ████████████ in the proposed class during certain years when they served as ██████████████████ respectively, but excluded them for other years. I corrected this error by excluding observations for both during all years when they served as CEO.

[13] Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 12, 2025 ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability.").

[14] U.S. Bureau of Labor Statistics, "QCEW Overview," available at https://www.bls.gov/cew/overview.htm, accessed on April 16, 2025 ("QCEW produces a comprehensive tabulation of data on the number of establishments, monthly employment and quarterly wages for workers covered by State unemployment insurance (UI) laws and Federal workers covered by the Unemployment Compensation for Federal Employees (UCFE) program. ... At the national level, the QCEW program publishes establishment, employment and wage data for nearly every NAICS industry.").

[15] U.S. Bureau of Labor Statistics, "CES Overview," available at https://www.bls.gov/web/empsit/cesprog.htm, accessed on April 16, 2025 ("The Current Employment Statistics (CES) program is a monthly survey conducted by the Bureau of Labor Statistics. The survey provides employment, hours, and earnings estimates based on payroll records of business establishments. ... CES data are classified according to the 2022 North American Industry Classification System (NAICS).").

APPENDIX D

## Job Titles Included in
## Dr. Starr's Definition of the Class

| Job Title |
|-----------|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

**APPENDIX D**

**Job Title**



**APPENDIX D**

| Job Title | |
|---|---|
|  | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Source: Dr. Starr Compensation Build

Note: List includes all USPI job titles included in Dr. Starr's director and above class.

**APPENDIX D**

## Job Titles Subject to
## USPI's Admitted Non-Solicitation Agreement with SCA

| Job Title | Subject to Agreement? |
|---|---|



Source: Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts ( Roberts Law Firm), Linda P. Nussbaum (Naussbum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "In re Outpatient Medical Center Employee Antitrust Litigation, Case No. 1:21-cv-00305," May 14, 2023

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX E**

# Experts' Assessed Information Sharing between SCA and USPI

## USPI & SCA (2009–2018)

| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 1. | 12/20/2009 |  | Gerhart | No |
| 2. | 12/22/2009 | | Gerhart | No |
| 3. | 2/12/2010 | Internal USPI emails with "GA cost comparison SCA versus USPI": <br>- Compares total cost and "cost per center" across 3 departments <br>- Most recent response: "Impressive. Can we get anything at facility level, ie staffing?" | Starr | Yes |
| 4. | 6/16/2010 | | Both | Yes |
| 5. | 1/14/2011 | | Starr | Yes |

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX E**

| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 6. | 7/13/2011 | ████████ | Gerhart | No |
| 7. | 5/2/2012 | ████████ | Both | Yes |
| 8. | 5/30/2012 | ████████ | Gerhart | Yes |
| 9. | 9/9/2012 | ████████ | Starr | No |
| 10. | 10/21/2012 | ████████ | Starr | Yes |

*Highly Confidential - Outside Counsel/Experts Only*

# APPENDIX E

| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 11. | 7/31/2013 |  | Both | Yes |
| 12. | 8/9/2013 | SCA: "One of the things we have shared in the past is plans for the following year wage increases. Have you all started [to] set a number yet that you're planning to budget?"<br>USPI: "Not yet … We'll remember to share with you when we do." | Both | No |
| 13. | 12/16/2013 | | Gerhart | Yes |
| 14. | 8/20/2014 | SCA: "Are you all willing to swap wage increase budgets as we have in the past?"<br>USPI: "Sure. We're just heading into budgets … I may be a few weeks out." | Both | No |

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX E**



| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 15. | 8/25/2014 | | Both | Yes |
| 16. | 12/19/2014 | | Both | Yes |
| 17. | 2015 | | Starr | No |
| 18. | 1/11/2015 | | Both | Yes |

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX E**



| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 19. | 2/18/2015 | | Starr | No |
| 20. | 3/3/2015 | | Starr | No |
| 21. | 4/1/2015 | | Gerhart | No |
| 22. | 5/28/2015 | | Starr | Yes |

**APPENDIX E**



| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 23. | 6/3/2015 | | Gerhart | Yes |
| 24. | 9/19/2017 | | Both | No |
| 25. | 9/21/2017 | | Starr | Yes |
| 26. | 5/12/2018 | | Both | Yes |

Source: Gerhart Report; Starr Report; Produced Documents

Note: Documents covered, ordered by row number, include: 1. (OMC_BM_000006875); 2. (Mathis Deposition, Ex. PX497 [OMC_BM_0000007716]); 3. (Wilcox Deposition, Ex. PX516 [USPI_CIV_000105175–7]); 4. (Hayek Deposition, Ex. PX490 [Hayek-000012214–6]); 5. (Wilcox Deposition, Ex. PX522 [OMC_BM_000000884–95]); 6. (USPI_CIV_000104518); 7. (Wilcox Deposition, Ex. PX523 [OMC_BM_000010778–9]); 8. (Cagle Deposition, Ex. PX234 [USPI_CIV_000016522]); 9. (Mathis Deposition, Ex. PX491 [OMC_BM_000013354–6]); 10. (Hayek Deposition, Ex. PX489 [OMC_BM_000014729]); 11. (Clemens Deposition, Ex. PX33 [SCA002364259–63], Wachsman Deposition, Ex. PX59 [SCA002364264–5], and Martin Deposition, Ex. PX135 [USPI_CIV_000016089–92]); 12. (Clemens Deposition, Ex. PX37 [USPI_CIV_000016100]); 13. (USPI_CIV_000113333 and USPI_CIV_000113335); 14. (Cagle Deposition, Ex. PX232 [USPI_CIV_0000021155]); 15. (Martin Deposition, Ex. PX140 [USPI_CIV_000146394], English Deposition, Ex. PX120 [USPI_CIV_000584419–21], and English Deposition, Ex. PX119 [USPI_CIV_000601224–9]); 16. (Martin Deposition, Ex. PX138 [USPI_CIV_000122239] and Martin Deposition, Ex. PX 138A [USPI_CIV_000122240]); 17. (Mosley Deposition, Ex. PX283 [USPI_CIV_000035855–6]); 18. (Cagle Deposition, Ex. PX235 [USPI_CIV_000110943]); 19. (Cagle Deposition, Ex. PX239 [USPI_CIV_000046079]); 20. (Wachsman Deposition, Ex. PX60 [SCA001075713–5]); 21. (SCA000862885); 22. (Wilcox Deposition, Ex. PX520 [USPI_CIV_000111376–82]); 23. (USPI_CIV_000962508 and USPI_CIV_000962509); 24. (Cagle Deposition, Ex. PX240 [USPI_CIV_000686081–92]); 25. (SCA000609009–11); 26. (Mathis Deposition, Ex. PX501 [SCA002277742–4]). Date shown is the latest date given on the document or across the set of documents, if applicable.

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX F**

## *Correction of Dr. Starr's processing of USPI departures*

1.  Throughout my report, I present several analyses that rely on a version of Dr. Starr's compensation dataset in which I corrected several data processing errors.[1] Since filing my report, I have identified an additional error in Dr. Starr's processing of the compensation data that causes him to overcount departures from USPI. In this Appendix, I describe the error and my correction to it. I then reproduce the analyses from my report that use Dr. Starr's process for identifying departures as an input. After correcting Dr. Starr's compensation data for this additional error, the analyses presented in this appendix provide qualitatively similar results to those presented in the report I submitted on April 16, 2025, and all my opinions contained in my report are unaffected.

2.  The additional data processing error in Dr. Starr's compensation dataset stems from his processing of USPI's Tenet Payroll Data. ████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████

3.  Some of the analyses in Sections 4 and 5 of my report rely on the departure information in Dr. Starr's compensation dataset, which is affected by ██ ████████████████████████████████████████████ ████████[2]████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ██████[3]████████████████████████████████ ████████████████████████████████████ ████████████████████████

---

[1] See the Data Appendix (Appendix C).

[2] Exhibits 6, 7, 11, 15, and 16 of my report require the identification of departing employees, and therefore are affected by Dr. Starr's mistake.

[3] I retain all eleven inter-Defendant switchers identified by Dr. Starr in my analysis. Note that, because I cannot observe whether other USPI employees in the Tenet Payroll Data left for non-Defendant employees, to the extent any did depart USPI, I am overstating the share of inter-Defendant switching in 2021.

**APPENDIX F**

4.  Appendix F Exhibit 6 below is a sensitivity of Exhibit 6 in my report that corrects for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. See paragraphs 80 through 86 of my report for a description of this analysis. The description and qualitative conclusions presented in the body of my report also apply to this sensitivity.

*Appendix F Exhibit 6*
***USPI's Senior Employee turnover accounted for by Defendants, 2006–2021 – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data***

| | | Hires From and Departures To | | | |
| | | SCA | | DaVita | |
| Year | Total Turnover | Number | Percent | Number | Percent |
|---|---|---|---|---|---|
| 1. 2006 | | | | | |
| 2. 2007 | | | | | |
| 3. 2008 | | | | | |
| 4. 2009 | | | | | |
| 5. 2010 | | | | | |
| 6. 2011 | | | | | |
| 7. 2012 | | | | | |
| 8. 2013 | | | | | |
| 9. 2014 | | | | | |
| 10. 2015 | | | | | |
| 11. 2016 | | | | | |
| 12. 2017 | | | | | |
| 13. 2018 | | | | | |
| 14. 2019 | | | | | |
| 15. 2020 | | | | | |
| 16. 2021 | | | | | |
| 17. **Outside of the Alleged Three-Party Mobility Restrictions: 2021** | | | | | |
| 18. **Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2008–2009 and 2020–2021** | | | | | |
| 19. **Outside of USPI's Admitted Mobility Restrictions with SCA: 2008–2009 and 2018–2021** | | | | | |
| 20. **During USPI's Admitted Mobility Restrictions with SCA: 2010–2017** | | | | | |

Source: Dr. Starr Corrected Compensation Data

Note: ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████

**APPENDIX F**

5. Appendix F Exhibit 7 below is a sensitivity of Exhibit 7 in my report that corrects for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. See paragraphs 87 through 91 of my report for a description of this analysis. The description and qualitative conclusions presented in the body of my report also apply to this sensitivity.

---

*Appendix F Exhibit 7*
*Share of USPI Senior Employee turnover accounted for by Defendant and by non-Defendant employers, outside the Alleged, Assessed, and Admitted Conduct periods – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data*

| Outside of the Alleged Three-Party Mobility Restrictions: 2021 | Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2008–2009 and 2020–2021 | Outside of USPI's Admitted Mobility Restrictions with SCA: 2008–2009 and 2018–2021 |
|---|---|---|



Source: Dr. Starr Corrected Compensation Data

Note: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX F**

6.  Appendix F Exhibit 11 below is a sensitivity of Exhibit 11 in my report that corrects for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. See paragraphs 110 through 116 of my report for a description of this analysis. The description and qualitative conclusions presented in the body of my report also apply to this sensitivity.

*Appendix F Exhibit 11*
*Total USPI Senior Employee departures and the number departing to SCA and DaVita, 2006–2021 – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data*

| Year | Total Departures | SCA Number | SCA Percent | DaVita Number | DaVita Percent |
|---|---|---|---|---|---|
| 1. 2006 | | | | | |
| 2. 2007 | | | | | |
| 3. 2008 | | | | | |
| 4. 2009 | | | | | |
| 5. 2010 | | | | | |
| 6. 2011 | | | | | |
| 7. 2012 | | | | | |
| 8. 2013 | | | | | |
| 9. 2014 | | | | | |
| 10. 2015 | | | | | |
| 11. 2016 | | | | | |
| 12. 2017 | | | | | |
| 13. 2018 | | | | | |
| 14. 2019 | | | | | |
| 15. 2020 | | | | | |
| 16. 2021 | | | | | |
| 17. Outside of the Alleged Three-Party Mobility Restrictions: 2021 | | | | | |
| 18. Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2008–2009 and 2020–2021 | | | | | |
| 19. Outside of USPI's Admitted Mobility Restrictions with SCA: 2008–2009 and 2018–2021 | | | | | |
| 20. During USPI's Admitted Mobility Restrictions with SCA: 2010–2017 | | | | | |

Source: Dr. Starr Corrected Compensation Data

Note: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX F**

7. Appendix F Exhibit 15 below is a sensitivity of Exhibit 15 in my report that corrects for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. See paragraphs 127 and 130 of my report for a description of this analysis. The description and qualitative conclusions presented in the body of my report also apply to this sensitivity.

---

*Appendix F Exhibit 15*
*Share of USPI and SCA Senior Employees that depart increased in 2020 – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data*



Source: Dr. Starr Compensation Data
Note: Senior Employee departures are identified using Dr. Starr's mobility methodology applied to Dr. Starr's class. I drop observations from the 2021 Tenet Payroll Data.

**APPENDIX F**

8.   Columns 1, 2, and 3 of Appendix F Exhibit 16 below show a sensitivity of the regressions in Exhibit 16 of my report on data that are corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. As a robustness check, I also estimate the regression in Column 3, where I control for the rate of USPI departures, excluding data from 2021 altogether. Column 4 below shows the results from this regression. Columns 3 and 4 below show that the conclusions from my analysis remain unchanged after either of these corrections: ████████████

████████████████████████████████████████████

████████████████████████

---

*Appendix F Exhibit 16*
*Senior Employees who depart USPI or SCA are not less likely to arrive at the other firm during the Experts' Assessed SCA-USPI Conduct period – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data*



| | Figure 4: Model 3 | | | |
| | (1) | (2) | (3) | (4) |
| | Starr's Regression Correcting Departures | Double-Switcher Correction Correcting Departures | Double-Switcher Correction Control for Departures Correcting Departures | Double-Switcher Correction Control for Departures Drop 2021 |
|---|---|---|---|---|
| Conduct | | | | |
| % Effect Relative to Sample Mean | | | | |
| Year | | | | |
| % of USPI-SCA Employees Departing | | | | |
| Sample | | | | |
| Sample Mean of DV | | | | |
| Observations | | | | |
| R-squared | | | | |

Source: Dr. Starr's Compensation Data

Note: Robust standard errors in parentheses. *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Percentage of Senior Employees Departing is calculated annually by dividing the number of USPI and SCA departures by the total number of USPI and SCA Senior Employees. These regressions are all estimated on data that exclude all 2021 Tenet Payroll Data observations except for the ones Dr. Starr flags as switchers from SCA. Column 1 shows Dr. Starr's regression; Column 2 shows Dr. Starr's regression on data that additionally exclude the double-counted switcher; Column 3 adds a control for the corrected average departure rate at USPI and SCA; Column 4 is the same regression as Column 3 but excludes data for 2021 altogether.