# Exhibit 8
# Lane Declaration


# Redacted

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | MASTER DOCKET NO. 1:21-CV-00305 |

EXPERT REPORT OF DR. JOHN H. JOHNSON, IV

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ..............................................................................................1

II.     QUALIFICATIONS.....................................................................................................8

III.    SUMMARY OF ALLEGATIONS, PROPOSED CLASS, AND ASSIGNMENT ....................................9
        A. Summary of Plaintiffs' Allegations........................................................................ 9
        B. Proposed Class Definition .................................................................................. 10
        C. Assignment ...................................................................................................... 10

IV.     BACKGROUND ON THE DEFENDANTS AND THE PROPOSED CLASS ......................................11
        A. Defendants....................................................................................................... 11
        B. Proposed Class Members ................................................................................... 13

V.      DR. STARR AND DR. GERHART IGNORE COMPETITION FOR EMPLOYEES WITHIN THE
        PROPOSED CLASS FROM ALL NON-DEFENDANT EMPLOYERS............................................16
        A. Economic Evidence of All Departures of Relevant Employees from the Defendants
           Illustrates the Competitive Constraints Faced by Defendants....................................... 19
        B. Plaintiffs' Experts Fail to Assess Evidence on Hiring Practices by the Defendants that
           Contradict Their Conclusions that Defendants Had the Ability to Suppress Mobility and
           Compensation for All Proposed Class Members ....................................................... 27
        C. Dr. Starr's Analysis of "Limited Mobility" is Flawed and Fails to Consider Evidence on
           Overall Turnover Rates that Contradict His Opinions ................................................ 33
        D. Defendants' Share of Total Employment is Small Even Within the Industries Dr. Gerhart
           Identifies as Potentially Relevant ........................................................................ 37

VI.     DR. STARR'S AND DR. GERHART'S THEORY OF ANTITRUST IMPACT FROM THE
        ALLEGED MOBILITY RESTRICTIONS IS UNSUPPORTED BY ECONOMIC ANALYSIS .............40
        A. Summary of Plaintiffs' Experts' Theory of Harm Due to the Alleged Mobility
           Restrictions.................................................................................................... 40
        B. Plaintiffs' Experts' Narrative of the Alleged Mobility Restrictions Ignores Contrary
           Evidence and is Not Supported by Empirical Analysis............................................... 42
        C. Plaintiffs' Theory of a "Wage Structure" and Purported "Cascading" Effects of the
           Alleged Conduct is Not Supported by the Available Data or Dr. Starr's Analysis.................... 49
           1. Summary of Plaintiffs' Experts' Theory of "Cascading" Effects Due to the
              Defendants' Purported Use of "Wage Structures"............................................... 49
           2. Compensation Data for Relevant Employees Contradicts Dr. Gerhart's and Dr. Starr's
              Conclusion of "Cascading Effects".............................................................. 51
           3. Dr. Starr's "Quantitative Evidence of a Compensation Structure" is Flawed and Does
              not Support his Conclusion that the Purported "Wage Suppression" would "Transmit"
              Across Proposed Class Members.................................................................. 59
        D. Dr. Starr and Dr. Gerhart Ignore Other Factors that Would Limit the Impact (If Any) of
           the Alleged Conduct.......................................................................................... 66

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

1. Plaintiffs' Experts Acknowledge that the Defendants Benchmarked Compensation to Non-Defendant Firms But Do Not Account for How This May Limit the Impact of the Alleged Conduct on Compensation Received by Relevant Employees ................................. 66

2. Plaintiffs' Experts' Own Description of the Purported "Wage Structures" at Defendant Firms Suggest these Practices Would Limit the Impact of the Alleged Conduct on Compensation.................................................................................................................... 69

3. Defendants Utilized Long-Term Incentives to Retain High Performing Employees, Which Would Limit the Impact of the Alleged Mobility Restrictions................................. 69

VII. DR. STARR'S AND DR. GERHART'S OPINIONS ON THE ALLEGED INFORMATION SHARING DO NOT ADDRESS PLAINTIFFS' WAGE FIXING ALLEGATION AND ARE NOT SUPPORTED BY ECONOMIC ANALYSIS OR THE EVIDENCE THEY PRESENT..........................71

A. Summary of the Alleged Information Sharing Evidence Presented by Plaintiffs' Experts......... 71

B. Dr. Starr and Dr. Gerhart Fail to Assess Whether the Alleged Information Sharing or the Economic Conditions in the Markets at Issue Could Facilitate a Successful "Wage Fixing" Conspiracy ............................................................................................................... 75

   1. Dr. Starr and Dr. Gerhart Do Not Assess How the Co-Defendants Could Successfully Coordinate to Form a Wage Fixing Cartel.............................................................. 75

   2. Dr. Starr and Dr. Gerhart Do Not Address How the Defendants Would Limit Competition for Employment of Proposed Class Members from Other Employers ............. 79

   3. Dr. Starr and Dr. Gerhart Do Not Assess How the Alleged Information Sharing Would Prevent Cheating on the Alleged Wage Fixing Conspiracy..................................... 81

C. Dr. Starr and Dr. Gerhart Do Not Offer a Reliable Link Between the Alleged Information Sharing and Antitrust Impact ................................................................................... 81

   1. Plaintiffs' Experts' Speculative Link Between the Alleged Sharing of Merit Budget Information and Purported "Wage Suppression" Is Not Supported by Any Economic Analysis.................................................................................................................... 82

   2. Plaintiffs' Experts Offer No Reliable Link Between the Alleged Information Sharing for a Limited Number of Individual Jobs and "Suppressed Compensation" Across Proposed Class Members .......................................................................................... 88

   3. Plaintiffs' Experts Offer No Mechanism Through Which Sharing General Business Information Would Lead to "Suppressed Compensation" Across Proposed Class Members............................................................................................................... 89

VIII. DR. STARR'S "WAGE SUPPRESSION" REGRESSION MODEL IS UNRELIABLE AND CANNOT SHOW ANTITRUST IMPACT OR BE USED TO CALCULATE DAMAGES FROM THE ALLEGED CONDUCT ...............................................................................................91

A. Summary of Dr. Starr's "Wage Suppression" Regression Model............................................. 93

B. Dr. Starr's Incorrect Treatment of Defendants' Data Impacts the Results of his "Wage Suppression" Regression Model ....................................................................................... 96

C. Indicators of the Unreliability of Dr. Starr's "Wage Suppression" Regression Model.............. 99

   1. The Results of Dr. Starr's Regression Model Are Inconsistent with His Own Analysis of the Alleged Conduct and the Academic Literature He Cites............................................ 99

   2. The Results of Dr. Starr's "Wage Suppression" Regression Are Sensitive to the Specification and Included Sample ..................................................................................... 103

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

3. Dr. Starr's "Wage Suppression" Regression is Based on the Flawed Assumption that Relevant Factors Would Affect Compensation in the Same Way in His Benchmark and Proposed Conduct Periods ................................................................ 106

D. Dr. Starr's "Wage Suppression" Regression Produces Biased Results as His Model Does Not Account for the Factors that Determine the Levels of Variable Pay Received by Relevant Employees ............................................................................................. 109

    1. Relevant Employees Received Multiple Types of Compensation, All of Which Dr. Starr Includes in His "Wage Suppression" Regression Model ............................................ 111

    2. Empirical Testing Shows that Dr. Starr's "Wage Suppression" Regression Cannot Establish Impact for Base Salary ...................................................................... 115

    3. The Failure to Include Firm Specific Performance Controls in Dr. Starr's "Wage Suppression" Regression Renders His Analysis Unreliable ................................. 117

    4. Dr. Starr's "Wage Suppression" Regression Model Cannot Account for the Variation in Timing for Long-Term Incentive Payments .................................................... 120

IX.    DR. STARR'S DAMAGES CALCULATION IS UNRELIABLE AND IS BASED ENTIRELY ON HIS UNRELIABLE "WAGE SUPPRESSION" REGRESSION MODEL ..................................... 127

A. Dr. Starr's Damages Calculation Depends on the Defined Class Period ................................. 128

B. Dr. Starr's Damages Calculation Depends on His Identification of Relevant Employees ........ 132

X.    DR. STARR'S CONCLUSION THAT "DEFENDANTS WIELD MARKET POWER" IGNORES WELL-ESTABLISHED METHODS USED BY ECONOMISTS TO ASSESS MARKET POWER AND IS REFUTED BY AVAILABLE EVIDENCE .................................................................... 133

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

## I.   EXECUTIVE SUMMARY

1.      I have been asked by counsel for Defendants DaVita Inc. ("DaVita"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC (collectively "SCA"), Andrew Hayek, and Kent Thiry to provide an assessment of the merits and damages issues addressed in the expert reports of Dr. Evan Starr and Dr. Barry Gerhart in the *In Re Outpatient Medical Center Employee Antitrust Litigation*.[1]  Plaintiffs allege that the Defendants DaVita, SCA, and United Surgical Partners International ("USPI") (i) "entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees," and (ii) "exchanged competitively sensitive information to fix and maintain the compensation of their employees."[2]  Plaintiffs' experts describe and analyze separate bilateral agreements, between DaVita and SCA and between SCA and USPI.

2.      Plaintiffs' experts' assessments of antitrust injury and damages ignore a foundational feature of the labor markets at issue here—the Defendants are only three of hundreds of employers who compete for the labor of the more than 6,300 proposed class members, who held a variety of different jobs at the Defendants, requiring a variety of different skills and qualifications.  Dr. Starr and Dr. Gerhart myopically focus their analyses entirely on competition for the proposed class members between either DaVita and SCA or between SCA and USPI.  The economic evidence, including the documents and data Plaintiffs' experts reference in their reports, refute this simplistic conception of labor market competition limited to only the Defendants.

- Over ■ percent of employees who left a Defendant moved to options outside of the other "Covered Defendants" both during and outside of the proposed class period.

- During the proposed class period, over 3,000 relevant employees were hired by one of the Defendants from sources outside of the other "Covered Defendants" (■ percent of all hires during the relevant period), including from numerous competing employers.

- Individual job history data from Lightcast (which collects individuals' online resumé profiles from career websites) shows that proposed class members moved to numerous

---

[1] Expert Witness Report of Dr. Evan P. Starr, January 15, 2025, Notice of Errata Regarding the Expert Report of Dr. Evan P. Starr, January 21, 2025, and Starr Deposition Exhibit DX83 (Errata dated March 19, 2025) ("Starr Report"); Expert Witness Report of Dr. Barry Gerhart, January 15, 2025, and Notice of Errata Regarding the Expert Report of Dr. Barry Gerhart, February 11, 2025 ("Gerhart Report").

[2] Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024 ("Complaint"), ¶38.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

firms outside of the Defendants, including other firms in the outpatient care industry, the broader healthcare industry, and outside of the healthcare industry altogether.

- The Defendants' share of total employment in the industries Plaintiffs' experts describe as potentially relevant is small—Defendants account for less than ▆ percent of employment in the Healthcare sector and only approximately ▆ percent even when looking at the smaller Other Outpatient Care Centers industry, both of which would not account for competition between the Defendants and firms beyond the healthcare sector.

3.      Based on his analyses limited only to the Defendants, Dr. Starr concludes that "the quantitative evidence" of mobility rates between (i) DaVita and SCA or (ii) SCA and USPI are "strongly consistent with a No-Poach Agreement to prevent Class Members from moving" between Defendants subject to one of the agreements.[3]  However, these mobility analyses simply show that very few employees moved between DaVita and SCA or between SCA and USPI either outside of the proposed class period or during the alleged conduct.  Applying his own simple comparison of averages separately for the two pairs of Defendants involved in the alleged bilateral mobility restrictions, I find (i) *no* additional hires per year absent the alleged conduct between DaVita and SCA and (ii) two additional hires per year absent the alleged conduct between SCA and USPI (out of the hundreds of employees the Defendants hire into relevant positions each year).  Further, these analyses are plagued by several conceptual issues:

- Dr. Starr presents no analysis controlling for any other factor that could affect mobility rates between the proposed class period and the benchmark period (other than a simple time-trend that he has not provided an economic rationale to include).

- He relies on an unconventional (and more relaxed) standard of statistical significance to overcome the problem that his analyses find changes in mobility rates that are no different than random chance occurrence.

- By focusing his analysis on only movements between the "Covered Defendants," Dr. Starr ignores the vast majority of mobility events for relevant employees.

Simply applying Dr. Starr's own mobility analysis to overall turnover rates (departures to any destination, including Defendants and non-Defendants) shows *no* consistent pattern of suppressed mobility across the Defendants.  Indeed, the results for DaVita show a statistically significant *increase* in mobility during the alleged conduct relative to the benchmark period.

---

[3] Starr Report, ¶90.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

4.       Both Dr. Starr and Dr. Gerhart rely on anecdotal evidence of the alleged mobility restrictions between DaVita and SCA and separately between SCA and USPI.  But, in their subjective assessments of documents they simply ignore evidence counter to their stylized narrative of the non-solicitation and "tell your boss" provisions of the alleged bilateral mobility restrictions.  Both experts ignore:

- Changes in which Defendants' employees were covered by the alleged agreements over time, instead assuming that all members of the class (both Directors and VPs/SVPs) were the focus of the alleged conduct for the full proposed class period.

- Evidence that contradicts the assumed start and end dates of the alleged mobility restrictions.

5.       Dr. Starr's own empirical analysis of the purported start and end dates of the conspiracy illustrates the fundamental flaws in his and Dr. Gerhart's subjective interpretation of the documentary evidence.  His results are based on a small number of employee moves in any given year, rendering them highly sensitive to:

- The inclusion of one individual who was mistakenly double counted in his data set;

- The arbitrary selection of 2017 as a "base year," for his analysis; and

- His reliance on an unconventional (and more relaxed) standard of statistical significance.

I demonstrate that the results of this simple regression are not consistent with the start and end dates Dr. Starr assumes.  Further, his results cannot support his conclusion as they are driven by his selection of a base year—with the resulting start and end dates of the alleged conspiracy depending upon which year he arbitrarily chooses to treat as the base year in the regression.

6.       Plaintiffs' experts theorize that employees not "directly" affected by the alleged mobility restrictions—those who would not have received additional cold calls or external offers in the but-for world—are still "indirectly" affected through "cascading effects."  However, their theory of "wage structures" is not supported by the available evidence or Dr. Starr's analysis.  For example, internal documents cited by Dr. Starr and Dr. Gerhart describe the ███████████████████████
███████████████████████████████.[4]  Similarly, an internal SCA presentation notes that, ████
████████████████████████████████████████████████

---

[4] DVA_OMCEAL_001329256–9261, at 9257.

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

██████[5] Further, the empirical evidence based on actual compensation paid by the Defendants is also not consistent with Plaintiffs' experts' theory of a rigid "wage structure":

- Data on actual compensation paid to Directors shows wide variation in pay both within a single Defendant and across Defendants. For example, using Dr. Starr's calculated "hourly rate," ██████████████████████████████████████████████████████ ███████████████████████████████████████████████[6]

- Actual compensation paid to Vice Presidents also show wide variation in pay both within a single Defendant and across Defendants. For example, ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████

- Actual compensation information also is inconsistent with Plaintiffs' experts' contention of a rigid "wage structure" between jobs and the use of "fixed percentage pay differentials" by the Defendants. Available data shows that ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

- Dr. Starr's only quantitative support for this purported "wage structure" are correlations of average compensation series. Showing that compensation is "correlated" does not inform the question of whether all, some, or none of the relevant employees were paid less *due to* the alleged conduct. Further, Dr. Starr's analysis (i) does not find a consistent pattern across Defendants when applied to the more relevant measure, changes in compensation over time, and (ii) finds the same result of a supposed "wage structure" when applied to compensation that moves randomly for different employees. Each of these results demonstrates the unreliability of Dr. Starr's analysis.

- Dr. Starr and Dr. Gerhart also fail to assess other factors that would undermine any alleged antitrust conspiracy and/or limit the impact of the alleged conspiracy, including the

---

[5] SCA001669270, at slide 3.

[6] Dr. Starr calculates the "hourly rate" as total compensation divided by the number of hours worked in a year to compare employees that may have worked different number of hours within the same year. Proposed class members are senior level employees that received substantial total compensation. Based on Dr. Starr's own analysis, ██████████████████████████████████████████████████████ ██████████ (Starr Report, Figure 5).

4

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Defendants' benchmarking practices, consistent hiring of employees from non-Defendants during the proposed class period, and the use of long-term incentives to retain employees.

7.      Dr. Starr and Dr. Gerhart also offer unsupported opinions about the use of alleged information sharing to facilitate a wage fixing conspiracy.  Despite citing economic literature that explains the obstacles to a successful cartel are "coordination, cheating, and entry,"[7] Dr. Starr provides no assessment of the feasibility of the alleged wage fixing conspiracy given the conditions in this industry. He provides no explanation for how any alleged wage fixing cartel could:

- Set compensation for 6,300 proposed class members with different educational backgrounds, working in different functional areas, with different skillsets and employment backgrounds, employed in different geographic areas, across a 12-year period in the face of competition from hundreds of firms outside the Defendants.

- Be monitored or enforced in light of the large percentage of compensation that is paid in the form of bonuses and long-term incentives.  Plaintiffs' experts provide no explanation for how the information sharing they cite could be used to "fix" variable compensation levels.

- Restrict demand for the employees at issue both in the face of substantial growth in employment at the Defendants as well as the significant number of non-Defendants who were hiring employees.

- Utilize the limited instances of information sharing cited by Plaintiffs' experts (merit budget increases in a small number of years early in the proposed class period, information on three individual jobs, and general business information) to "fix" the compensation of relevant employees, let alone the thousands of proposed class members.

8.      The empirical evidence is inconsistent with a wage fixing conspiracy using the information allegedly shared.  Plaintiffs' experts present no analysis to show that any of the alleged information sharing resulted in changes in pay for any individual employee of a Defendant or the aggregate merit budgets used by the Defendants—a conclusion that is not supported by the available evidence.  An analysis of the distribution of actual merit increases at each Defendant shows wide variation in merit increases (i) across Defendants, (ii) for different employees at the same Defendant, and (iii) over time. When applied only to base salary, which is the portion of compensation that would be impacted directly

---

[7] Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature*, Vol. 44, No. 1, 2006 ("Levenstein and Suslow (2006)"), pp. 42–95, p. 45.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

by merit budgets, Dr. Starr's own regression model shows no statistically significant suppression in compensation in the aggregate or across two of the three Defendants.

9.      Dr. Starr puts forward a regression model, which he asserts can "empirically test" if the alleged conduct "economically and statistically significantly suppressed Class Member wages."[8]  Dr. Starr claims that this model accounts for all relevant factors aside from the alleged conduct that determine compensation for all 6,300 proposed class members, and that by "controlling for other relevant economic factors," his model can identify the effect of the alleged conduct by comparing total compensation before and after the proposed class period to total compensation during the proposed class period.[9]  Dr. Starr's regression model, from which he estimates a ▆▆▆▆▆▆ "wage suppression" in aggregate due to the challenged conduct for the three corporate Defendants, is plagued by several errors which render it unreliable:

- Dr. Starr makes several errors in his underlying data construction.  He overstates the total compensation per hour of USPI employees, omits relevant data for certain employees, and includes non-relevant employees in human resources, recruiting, and legal departments that should be excluded from the class under his own methodology to identify proposed class members.  Simply correcting these data errors reduces Dr. Starr's damages estimate by over ▆▆▆▆▆▆▆▆▆ or nearly ▆▆▆▆▆▆

- The results of Dr. Starr's own "robustness checks" and my additional testing show the sensitivity of his model to different regression model specifications.

- Statistical testing disproves the fundamental assumption of Dr. Starr's model that with the exception of the alleged conduct, economic factors affected compensation in the same way in both the benchmark and proposed class periods.

- After correcting Dr. Starr's data errors, his own model no longer finds statistically significant aggregate "wage suppression" (or Defendant-specific "wage suppression" for two of the three Defendants) for base salary.

- Dr. Starr's regression attempts to model all forms of compensation (base salary, bonus, and long-term incentives) in a single model without accounting for changes in firm performance that impact variable compensation levels.  As my testing shows, Dr. Starr's "wage suppression" model fails to find statistically significant "wage suppression" when firm-

---

[8] Starr Report, ¶103.

[9] Starr Report, ¶105.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

specific performance measures for certain types of variable compensation are included in his model.

- Moreover, by including equity payments (rather than grants) in his regression, Dr. Starr (i) incorrectly attributes stock payments granted prior to the alleged conduct to his damages, and (ii) incorrectly ignores that the vast majority (more than ███████████████) of proposed class members' stock payments after the conduct period were granted during the conduct period.

10. The unreliable nature of Dr. Starr's regression is also highlighted by the unrealistic magnitudes of his estimated "wage suppression" relative to his own analysis of mobility rates. Dr. Starr cites an academic paper by Caldwell and Danieli, which finds that a 10 percent increase in outside employment options increases earnings by only 1.7 percent. In this case, Dr. Starr's regression model would suggest proposed class members were underpaid by an average of █████████ in *every* year of the proposed class period. Based on the academic literature he cites a "wage suppression" effect of this magnitude would imply that the available outside employment options decreased by *approximately* ██ *percent*. However, Dr. Starr's own mobility analysis suggests, at most, a change in mobility rates of only █ percent due to the alleged conduct.

11. Dr. Starr's calculation of damages is based entirely on his flawed "wage suppression" regression model, which, as discussed above, cannot be used to reliably estimate "wage suppression" or calculate damages for the proposed class. Further, the results of Dr. Starr's "wage suppression" regression (and damages analysis) vary significantly depending on the definition of the proposed class period. When I apply his model to different alleged conduct periods, I find his model generates vastly different damages estimates—including *no damages*. When applied to the alleged conduct dates Dr. Starr assumes—which are contradicted by available evidence—his analysis finds the largest damages estimate across all of the previously alleged conduct periods. Dr. Starr's damages calculation is also elevated by his inclusion of senior executives at the Defendants, which he testified are excluded from the proposed class.

12. Finally, Dr. Starr offers an unsupported opinion on the existence of market power by the Defendants. He reaches this conclusion based entirely on the results of his unreliable compensation regression model. Dr. Starr conducts no analysis of any relevant antitrust labor market and ignores the well-established methods that antitrust economists regularly use to assess market power and market definition. He performs no assessment of any qualitative evidence, conducts no "Hypothetical Monopsonist Test," does not analyze employment options outside the Defendants, does not consider the

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

possibility that any subset of employees within the class could be in different relevant labor markets, and fails to assess any geographic constraints that would limit or expand competition for some proposed class members.

## II.     QUALIFICATIONS

13.     My name is John H. Johnson, IV.  I am the CEO of Edgeworth Economics, L.L.C. ("Edgeworth").  Edgeworth is a consulting firm that provides clients with objective expert economic and financial analysis for complex litigation and public policy debates.  Edgeworth's experts work in a wide range of areas, including labor and employment, antitrust, data management, class certification, and intellectual property.  I am also an Adjunct Professor at the Georgetown University McCourt School of Public Policy and am a member of the Board of Directors of the National Archives Foundation.

14.     I am an economist specializing in economic and statistical analysis of antitrust and labor and employment issues.  I received my B.A. *magna cum laude* with highest distinction in Economics from the University of Rochester and my Ph.D. in Economics from the Massachusetts Institute of Technology ("MIT").  My areas of specialization at MIT were econometrics—the application of statistics to economics—and labor economics.  During my career as a professional economist, I have provided economic analysis in a wide range of litigation matters involving antitrust, labor and employment, consumer protection, damages, and statistics.  Prior to my employment as an economic consultant, I was an Assistant Professor of Economics and Labor and Industrial Relations at the University of Illinois at Urbana-Champaign.  In my various teaching roles, I have taught courses in labor economics and statistics, among other topics.  I continue to teach as an Adjunct Professor at Georgetown University's McCourt School of Public Policy, including a course on *Antitrust and Public Policy.*

15.     I have testified at trial, at evidentiary hearings, and by deposition, and provided consulting on a wide range of antitrust matters related to class certification, liability, and damages as well as in antitrust cases involving claims both of coordinated behavior and monopolization.  I have written numerous papers and given many talks on topics related to class certification, scientific standards in litigation, appropriate use of econometrics in litigation, and antitrust damages and was previously an Editor of the *Antitrust Law Journal*.  I have been accepted as an expert in Economics, Econometrics, and Statistics in Federal District Courts.  My curriculum vitae, which includes a list of my previous antitrust (and other) expert testimony in the last four years and publications, is attached as **Appendix A** to this report.[10]

---

[10] Edgeworth is compensated for my work and the work of my team relating to this litigation based on hourly rates.  My rate is ▮▮▮▮ per hour.  Payment for Edgeworth's services is not contingent upon my opinions or the outcome of this litigation.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

III.     SUMMARY OF ALLEGATIONS, PROPOSED CLASS, AND ASSIGNMENT

A.   Summary of Plaintiffs' Allegations

16.     Plaintiffs allege that "SCA, USPI, and DaVita conspired to reduce and limit compensation and mobility of their employees."[11]  Plaintiffs allege that the Defendants "entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees."[12]  Plaintiffs' experts describe two bilateral agreements, (i) between DaVita and SCA and separately (ii) between SCA and USPI,[13] which I refer to as the alleged mobility restrictions throughout my report.  Specifically, Plaintiffs allege that:

- Beginning in May 2008, DaVita and SCA agreed not to solicit each other's employees.[14] Plaintiffs further allege that Kent Thiry of DaVita and Andrew Hayek of SCA "further honed" the agreement "to preclude DaVita and SCA from soliciting or recruiting each other's employees at the director-level and above, unless the employees were already seeking outside employment and had informed their supervisors they wanted to leave."[15]

- "No later than May 2010, Mr. Hayek [of SCA] established a no-poach agreement with his counterpart at USPI to eliminate competition between the companies for each other's employees, by not actively soliciting each other's employees."[16]

17.     Plaintiffs further allege that the Defendants "exchanged competitively sensitive information" (what Plaintiffs' experts refer to as "CSI") to "fix and maintain the compensation of their employees."[17] Specifically, Plaintiffs allege that beginning ██████████████████████████ ████████████████████████████████████████ as well as ████████████████████ ████████████████████████████████████████████████ ████████████████████[18]  Both of Plaintiffs' experts describe alleged information sharing between (i)

---

[11] Complaint, ¶38.

[12] Complaint, ¶38.  "Senior Employees" are defined by Plaintiffs as employees at the Director level or above (Complaint, ¶7)

[13] Plaintiffs' experts do not assess any alleged mobility restrictions between DaVita and USPI.  See Deposition of Evan P. Starr, Ph.D., March 19, 2025 & March 20, 2025 ("Starr Deposition") 38:3–8; Deposition of Barry Gerhart, Ph.D., March 5, 2025 ("Gerhart Deposition") 196:5–198:12

[14] Complaint, ¶40.

[15] Complaint, ¶¶41–42.

[16] Complaint, ¶49.

[17] Complaint, ¶38.

[18] Complaint, ¶8.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

DaVita and SCA and separately (ii) between SCA and USPI,[19] which I refer to as the alleged information sharing throughout my report.

### B. Proposed Class Definition

18.     As Plaintiffs' experts describe, the proposed class includes "employees who worked in positions at the director-level and above […] in the United States for one or more of the following: (a) from May 1, 2008, to December 31, 2019, Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, to December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries."[20]  I understand that the period in which the conduct at issue has been alleged to have occurred has changed over time.[21]  Throughout my report, I refer to the conduct period assessed by Plaintiffs' experts as the proposed class period.

### C. Assignment

19.     I have been asked by counsel for DaVita, SCA, Andrew Hayek, and Kent Thiry to provide an assessment of the expert reports submitted by Dr. Evan Starr and Dr. Barry Gerhart in this case. Specifically, I have been asked to assess the methods presented by Dr. Starr and Dr. Gerhart with respect to their opinions on antitrust liability, antitrust impact, and the calculation of class-wide damages.[22]  In the course of preparing this report, I conducted an economic analysis of the industry at issue.  As part of my analysis, I reviewed deposition testimony, documents in the litigation record, as well as publicly available information.  I also conducted various analyses of data produced in this litigation—including data regarding relevant employees' base and variable compensation.  Additionally, I reviewed the expert reports of Dr. Starr and Dr. Gerhart, as well as the materials supporting their reports, and their deposition testimony.  I have been assisted in this matter by staff of Edgeworth, who

---

[19] See Section VII.A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   (Starr Deposition 38:3–8; Gerhart Deposition 196:5–198:12).

[20] Starr Report, ¶9; Gerhart Report, ¶5.

   Excluded from the class are "senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants" (Complaint, ¶92).

[21] For example, in their Third Amended Complaint, Plaintiffs allege that the "'no-poach' agreements continued through 2021" (Complaint, ¶7).

[22] My analyses and opinions may also be relevant for an assessment of Dr. Starr's and Dr. Gerhart's class certification opinions.  As I describe below, Plaintiffs' experts have not offered a reliable methodology to show liability, class-wide impact, or class-wide damages.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

worked under my direction.  A list of materials which I relied upon to develop my opinions is attached in **Appendix B** to this report.[23]

## IV.    BACKGROUND ON THE DEFENDANTS AND THE PROPOSED CLASS

### A.  Defendants

20.    DaVita currently specializes in kidney dialysis care and is headquartered in Denver, Colorado.[24] As of 2022, DaVita "provided dialysis and administrative services in the U.S. through a network of 2,724 outpatient dialysis centers."[25]  In 2012, DaVita acquired HealthCare Partners, renamed to DaVita Medical Group ("DMG") in 2016, which operated medical groups and affiliated physician networks.[26] DaVita sold DMG in 2019.[27]  Kent Thiry is the former Chairman and CEO of DaVita, a title he held between 1999 and 2019.[28]

21.    SCA is an Ambulatory Surgery Centers ("ASCs") management company headquartered in Birmingham, Alabama that currently operates outpatient surgical facilities in multiple states.[29]  SCA facilities offer surgical services across spinal, total joint replacement, gynecology, cardiovascular, orthopedic, and other specialties.[30]  The company was created in 2007 and was privately held until its

---

[23] I understand that I was provided access to the entire record as of the time of this report's writing.  If additional information is provided to me in this litigation, I will analyze it and consider it as part of my opinions and supplement this report as appropriate.

[24] DaVita Inc. 10-K, 2022 Annual Report, p. 2.  DaVita relocated its headquarters from El Segundo, CA in 2010 (DaVita, "DaVita Announces New Corporate Headquarters in Denver, Colorado," May 27, 2009, https://investors.davita.com/2009-05-27-DaVita-Announces-New-Corporate-Headquarters-in-Denver-Colorado. See also, Starr Report, ¶24(b) ("Davita focuses on kidney care").

[25] DaVita Inc. 10-K, 2022 Annual Report, p. 4.

[26] DaVita Inc. 10-K, 2012 Annual Report, p. 2; DaVita Inc. 10-K, 2016 Annual Report, p. 2.

[27] UnitedHealth Group, "Optum completes acquisition of DaVita Medical Group from DaVita," June 19, 2019, https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html.

[28] Deposition of Kent Thiry, August 16, 2024 ("Thiry Deposition") 9:23–24; DaVita, "DaVita Announces CEO Succession," April 29, 2019, https://investors.davita.com/ 2019-04-29-DaVita-Announces-CEO-Succession.

[29] SCA Health, "About Us," https://sca.health/about-us/; SCA Health, "Contact Us," https://sca.health/about-us/contact/.  SCA was headquartered in Deerfield, IL from at least 2013 to 2017, but most of SCA's relevant employees were located in Alabama during those years.

[30] SCA Health, "Build Your Career at SCA Health," https://careers.sca.health/.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

initial public offering in 2013.[31]  In 2017, SCA was acquired by Optum, a subsidiary of UnitedHealth.[32]
Andrew Hayek was the Chairman and CEO of SCA from 2008 until 2017 when he became the CEO of
OptumHealth, a title he held until 2019.[33]

22.     USPI currently operates ASCs and surgical hospitals in multiple states and is headquartered in
Dallas, Texas.[34]  USPI's service lines include orthopedics, spine, pain management, gastrointestinal,
ophthalmology, urology, and other specialized outpatient services.[35]  USPI was a publicly traded
company until 2007, when private equity firm Welsh, Carson, Anderson, and Stowe acquired USPI.[36]
USPI was later acquired by Tenet Healthcare Corporation.[37]

23.     The Defendants DaVita, SCA, and USPI are three of many companies that provide different
types of outpatient care services within the healthcare industry in the United States.[38]  Outpatient care
refers to any healthcare consultation, procedure, treatment, or other service that is administered without
an overnight stay at a hospital or medical facility.[39]  Outpatient care centers can include dialysis centers
that provide kidney care, ASCs where surgical procedures are performed, along with other types of

---

[31] SCA001258153–8251, at 8167–8168; Global News Wire, "Surgical Care Affiliates Announces Closing of Its
Initial Public Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares,"
November 4, 2013, https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-
Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-
to-Purchase-Additional-Shares.html.

[32] Reuters, "UnitedHealth to buy Surgical Care Affiliates in $2.3 billion deal," January 9, 2017,
https://www.reuters.com/article/world/americas/unitedhealth-to-buy-surgical-care-affiliates-in-23-billion-deal-
idUSKBN14T15C/.

[33] Hayek Deposition, 11:2–12:20.  Prior to working at SCA, Mr. Hayek served as President of VillageHealth at
DaVita from 2007 to 2008 (Deposition of Andrew Patrick Hayek, September 18, 2024 ("Hayek Deposition")
38:11–20).

[34] USPI, Homepage, https://uspi.com/home/default.aspx; USPI, "Contact Us," https://uspi.com/contact-
us/default.aspx.

[35] USPI, "Who We Are," https://uspi.com/about-us/who-we-are/.

[36] United Surgical Partners International, Inc. 10-K, 2009 Annual Report, p. 4; Reuters, "United Surgical to Be
Acquired for $1.4 Billion in Private Equity Deal," January 8, 2007, https://www.cnbc.com/2007/01/08/united-
surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html.

[37] Tenet Healthcare Corporation gained majority ownership of USPI in 2015 and completed its acquisition in 2018
(see Tenet Health, "Tenet Healthcare Corporation Completes United Surgical Partners International and Aspen
Healthcare Transactions," June 16, 2015, retrieved from
https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm; Tenet Health,
"Tenet Completes Purchase of USPI from WCAS," April 16, 2018, https://investor.tenethealth.com/press-
releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx).

[38] See, e.g., NAICS Association, "NAICS Code Description," https://www.naics.com/naics-code-
description/?code=6214 (listing more than 70,000 "US Business Entities" operating Outpatient Care Centers).

[39] See, e.g., Definitive Healthcare, "Outpatient Care," https://www.definitivehc.com/resources/glossary/outpatient-
care.

12

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

medical facilities.[40]  Total employment of nursing, administrative, managerial, executive, and other personnel in the outpatient care industry has grown over the relevant period.  Per the Bureau of Labor Statistics ("BLS"), around 600,000 individuals were employed in the Outpatient Care Center industry in 2008, growing to slightly over 1 million in 2019 (and around 1.1 million in 2022).[41]  Similarly, employment within the broader Healthcare and Social Assistance sector grew substantially from around 16 million in 2008 to 20.4 million in 2019 (and around 20.6 million in 2022).[42]

### B.  Proposed Class Members

24.    Dr. Starr opines that the proposed class includes 6,308 putative members "holding director-level or above positions."[43]  These "director-level or above" positions include multiple job levels (e.g., Directors, Vice Presidents, Senior Vice Presidents) as well as a variety of job functions, across different departments.  Dr. Starr's data shows that proposed class members are heterogeneous, holding hundreds of different jobs (such as Director, Real Estate and Vice President of Finance).  For example,[44]

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████
  █████████████████

- ████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████

---

[40] Definitive Healthcare, "Outpatient clinics are in!," https://www.definitivehc.com/blog/outpatient-clinics-are-in.

[41] U.S. Bureau of Labor Statistics, "Employment for Health Care and Social Assistance: Outpatient Care Centers (NAICS 6214) in the United States [IPURN6214W200000000]," retrieved from FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/IPURN6214W200000000.

[42] U.S. Bureau of Labor Statistics, "All Employees, Health Care and Social Assistance [CEU656200000]," retrieved from FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/CEU6562000001.

[43] Starr Report, ¶22.  See **Appendix C-1** for a summary of proposed class members by year.

[44] Note that the job title tracked in the Defendants' data is frequently populated with generic titles such as "Director" or "Vice President."  The counts of unique job titles would not account for the differences in job responsibilities and qualifications for a "Director" in the finance department and another "Director" in the IT department, for example.

████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

- ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████

25.     These different jobs held by the proposed class members had a wide variety of different responsibilities and required different skills or previous experiences.  I show examples of job descriptions for Director level jobs, as identified by Dr. Starr in **Exhibit 1**.  As this exhibit shows, Director level jobs have a variety of different responsibilities and require different qualifications.  For example,

- The "Director, Real Estate" position at DaVita is responsible for ██████████████
██████████████████████████████████████████████████████
███████████████████████████████████

- The "Director, IT Governance and Administration" position at SCA is responsible for
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

14

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 1**
**EXAMPLES OF JOB DESCRIPTIONS FOR RELEVANT POSITIONS**
**DIRECTOR LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Construction Management at DaVita | | |
| IT at SCA | | |

Note: See **Appendix C-2** for additional examples.

Sources: DVA_OMCEAL_001302342–2343; SCA000073150–3151.

26.     Similarly, the responsibilities differ between Vice President positions, examples of which I show in **Exhibit 2**. ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████ These jobs also require different qualifications, with the VP in the finance department requiring a finance or business-related degree and six years of experience in business and/or accounts receivable management, while the "Vice President of Development" requires experience in leading direct and indirect teams of at least 5 people across multiple internal and external stakeholders.

15

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 2**
**EXAMPLES OF JOB DESCRIPTIONS FOR RELEVANT POSITIONS**
**VICE PRESIDENT LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Finance at DaVita | | |
| Development at SCA | | |

Note: See **Appendix C-3** for additional examples.

Sources: DVA_OMCEAL_001318066–8068; SCA000058911–8916.

As I describe in more detail below, the competition for an individual employee's labor will depend on their own background, location, and which job opportunities that employee is qualified for (and would be interested in). Dr. Gerhart described this dynamic when he testified that, "each person almost has their own individual market for opportunities."[45] Available information shows that Defendants compete with hundreds of non-Defendant firms across a variety of industries for the labor of relevant employees.

## V. DR. STARR AND DR. GERHART IGNORE COMPETITION FOR EMPLOYEES WITHIN THE PROPOSED CLASS FROM ALL NON-DEFENDANT EMPLOYERS

27. Economists characterize competitive conditions for labor services based on the supply side (workers) and the demand side (employers). To understand how the two sides interact with each other

---

[45] Gerhart Deposition, 119:14–120:6.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

and determine the degree of competition for labor, economists focus on supply-side substitution, i.e., employees' ability and willingness to substitute away from their current employer (such as a Defendant) to another employer (such as a different Defendant or a non-Defendant).[46] Competition within labor markets functions differently than competition in product markets as labor markets are "matching markets" where the employer and the job applicant must "match" in their preferences.[47] In a product market, the customer decides to purchase a product from a specific vendor and pays a specific price for the product. In labor markets, depending on the jobs at issue, both employees and employers may have a range of choices for potential matches across firms, industries, and geographic locations.[48] Once a match is found, the employer and employee then potentially negotiate the terms of compensation, including base salary, variable compensation, long-term equity and cash incentives, as well as benefits.

28.     In assessing antitrust liability, impact, and damages, Dr. Starr and Dr. Gerhart myopically ignore competition for the 6,300 proposed class members from any employers outside of DaVita, SCA, and USPI. Dr. Starr and Dr. Gerhart do not properly account for (or in many cases, consider at all):

- Available data on employee departures, which shows that during and outside the proposed class period more than 95 percent of employees who left one of the Defendants moved to options outside of the other Defendants as well as data on employee hiring, which shows that during the proposed class period over 3,000 relevant employees joined a Defendant from numerous competing non-Defendants. The existence of outside employment options for proposed class members demonstrates that any conclusions based solely on inter-Defendant mobility are incomplete, failing to capture competition from competitors outside the alleged conspiracy.

---

[46] See American Bar Association, Section of Antitrust Law, *Market Power Handbook: Competition Law and Economic Foundations*, 2nd ed., ABA Book Publishing, 2012, pp. 52–54. See also, U.S. Department of Justice and the Federal Trade Commission, "2023 Merger Guidelines," December 18, 2023 ("2023 Merger Guidelines"), §4.3(B).

[47] As I explain in Section X, the concept of a "relevant labor market" has a specific meaning in antitrust economics. It represents the boundaries of effective competition within which a set of firms actively compete for the services of workers. See U.S. Department of Justice, "Public Workshop on Competition in Labor Markets," September 23, 2019, comments by Dr. Patrick Greenlee and Dr. Kevin Murphy. See also, U.S. Department of Treasury, *The State of Labor Market Competition*, March 7, 2022, https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf.

[48] As the Department of Justice ("DOJ") and Federal Trade Commission ("FTC") Merger Guidelines explain, "[d]epending on the occupation, alternative job opportunities might include the same occupation with alternative employers, or alternative occupation" (2023 Merger Guidelines, §4.3.D.8).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Available documents and data show class members moving to numerous firms other than the Defendants. These include firms in the ASC and Outpatient Care Center industries, the broader healthcare industry, and outside of the healthcare industry altogether.

- Statistical evidence on overall turnover rates for relevant employee departures directly rebuts Dr. Starr's conclusion that Defendants restricted employee mobility during the proposed class period.

- When focusing on the healthcare sector (which Dr. Gerhart appears to identify as a potentially relevant industry), Defendants' share of total employment in the healthcare industry is less than 1 percent. Even when looking at the smaller Other Outpatient Care Center industry Dr. Gerhart points to, Defendants' share of total employment is still only approximately 17 percent. These shares of total employment also do not account for the fact that the Defendants compete for labor with firms beyond the healthcare sector, which would further constrain their ability to suppress compensation.

The fact that the Defendants' share of employment in the industries that Plaintiffs' own experts identify is small indicates that the labor market competition from non-Defendants would be meaningful. Economic theory and the antitrust literature predict that the continued competition with a large number of firms (to which proposed class members continued to move) would restrict Defendants' ability to suppress wages below competitive levels, contradicting Dr. Starr's assertion that the Defendants suppressed compensation for all relevant employees by ▮▮▮▮▮ on aggregate over the span of an almost twelve-year proposed class period.[49] As Dr. Starr states, "Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members."[50]

---

[49] For example, a textbook cited by Dr. Starr describes that monopsony power depends on the number of buyers ("When the number of buyers is very large, no single buyer can have much influence over price"), the labor supply elasticity (i.e., a measure of workers' willingness to supply labor in the face of a wage reduction), and the interaction among buyers (Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 8th ed., Pearson, 2013 ("Pindyck and Rubinfeld"), pp. 386–387).

Dr. Starr does not account for these factors because he does not study the nature of competition for relevant employees from firms outside of the three Defendants.

[50] Starr Report, ¶196.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**A. Economic Evidence of All Departures of Relevant Employees from the Defendants Illustrates the Competitive Constraints Faced by Defendants**

29.     Dr. Starr focuses his quantitative analysis of mobility entirely on moves between "Covered Defendants" (i.e., SCA and DaVita and separately between SCA and USPI).[51]  That is, out of the hundreds of relevant employees moving from and to the Defendants each year, Dr. Starr only studies a small number of moves between "Covered Defendants" to support his claim that ███████████ ████████████████████████████████████████████████████████████████████ ██████████[52]  Dr. Starr summarizes the moves between "Covered Defendants" in his Figure 2.[53] As Dr. Starr's analysis shows, few employees moved between "Covered Defendants" both outside and during the proposed class period.  Moreover, some employees moved between "Covered Defendants" both outside of and during the proposed class period, despite the alleged mobility restrictions.

30.     Despite testifying that ███████████████████████████████████ Dr. Starr presents all employee moves between "Covered Defendants" together in his Figure 2.[54]  Based on his Figure 2, which I replicate in the first panel of **Exhibit 3** below, Dr. Starr calculates the average number of "departures between Covered Defendants" for 2010–2019 and compares this to the average for 2020–2021, claiming to find "markedly" different rates between periods.[55]  This "markedly" different rate of hiring between the Defendants outside of the alleged conduct is a difference of ██ employees, on average, per year.[56]  That is, Dr. Starr purports to find that the Defendants, in aggregate, "suppressed wages" for all proposed class members by ████████████ by foreclosing ██ additional moves

---

[51] Dr. Starr presents three analyses of "mobility events" between Defendants subject to one of the agreements: (i) a simple chart of "mobility events," (Figure 2) (ii) a regression analysis that Dr. Starr purports to use to "confirm that the Conduct Period end date of 2019 is appropriate" for both agreements (Figure 3), and (iii) a separate regression analysis "to test that the cumulative effect of the No-Poach Agreements was to suppress movement." (Figure 4) (Starr Report, ¶¶81–90).  I address his regression analyses in his Figure 3 and 4 in Sections VI.B and V.C, respectively.

[52] Starr Report, ¶12(b).

[53] See Starr Report, Figure 2, which counts ██ mobility events between "Covered Defendants."  Dr. Starr double counts the move of the employee ████████████ counting her move from SCA to USPI in both 2020 and 2021. ████████ termination date at SCA was January 22, 2021, and she was hired at USPI on January 25, 2021. After correcting this double counting, Dr. Starr's Figure 2 contains ██ total mobility events.

[54] Starr Deposition 102:6–103:4.

[55] Starr Report, ¶84.

For the purposes of his analysis, Dr. Starr does not account for *when* in the year an employee moved between Defendants.  For example, Dr. Starr includes the move of employee ████████████ from SCA to USPI in 2010 as "during" the alleged conduct for the purposes of his comparison.  However, ████████ ended her employment at SCA on January 31, 2010 and was hired by USPI on February 1, 2010—*before* the start of the alleged conduct between these Defendants in May 2010.

[56] Starr Report, ¶84.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

between the two pairs of "Covered Defendants" each year out of the approximately ▮ employees, on average, that departed one of the Defendants each year during the proposed class period—almost ▮ times more than the difference in moves Dr. Starr purports to find. Further, as this exhibit shows, there is variation in the number of moves year-to-year, including outside of the proposed class period. For example, in 2020 there were ▮ moves between DaVita and SCA compared to ▮ moves in 2021. Dr. Starr does not assess *why* there would be more moves in some years and not others separate and apart from the alleged mobility restrictions (e.g., changes in available job opportunities over time).

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

**EXHIBIT 3**
**DR. STARR'S FIGURE 2**
**NUMBER OF DEPARTURES THAT ARE MOVES BETWEEN COVERED DEFENDANTS**
**2008 – 2021**



Notes: All three charts above exclude the double counted move of Heather Way in 2020, included in Dr. Starr's Figure 2. Dr. Starr's benchmark periods are highlighted in grey on each chart.

Source: Starr turnover.

21

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

31.     Dr. Starr's choice to present together all moves between either pair of "Covered Defendants" obscures the different patterns of employee movements between the different "Covered Defendant" pairs. In **Exhibit 3**, I also show the same data graphed separately for employees that moved between (i) DaVita and SCA (in the middle panel) and (ii) between SCA and USPI (in the last panel). When split apart to show the employees impacted by the specific alleged bilateral mobility restrictions, Dr. Starr's own analysis no longer shows any change in the rates of moves between DaVita and SCA during and after the end of the alleged conduct. Dr. Starr's simplistic approach of comparing averages for numbers of the employees moving between "Covered Defendants" finds that, for DaVita and SCA, on average, more employees moved between these Defendants *during* the alleged conduct than outside of it (an average of ■ moves per year during the proposed class period compared to ■ after). That is, one of Dr. Starr's own quantitative analyses in fact contradicts his own conclusion that "Defendants' Conduct artificially suppressed the bilateral mobility of Senior-Level Employees between SCA and DaVita."[57]

32.     For employees moving between SCA and USPI, Dr. Starr's simplistic comparison of averages would suggest that, on average, ■ fewer employees moved during the alleged conduct than in his benchmark periods before and after it (an average of ■ moves per year during the proposed class period compared to ■ outside the proposed class period). That is, even for employee moves between SCA and USPI, which drive the "markedly" different rate of movement Dr. Starr purports to find, his own analysis would suggest that only ■ additional employees would have moved each year absent the alleged conduct.[58]

33.     Departures to destinations other than a "Covered Defendant," including to employment opportunities at non-Defendant competitors, exceed ■ percent of total departures in each year of Dr. Starr's analysis—including the years during the alleged mobility restrictions and those outside of it.[59] In **Exhibit 4**, I compare the departures to "Covered Defendants" in Dr. Starr's analysis to all other departures.[60] The vast majority of all departures by proposed class members (highlighted in light blue in

---

[57] Starr Report, ¶12(b).

[58] Starr Report, ¶84.

[59] At his deposition, Dr. Starr argued that ████████████████████████████████████ ████████████████████████████████████████████ (Starr Deposition, 136:19–137:10). According to BLS data on labor force flows, during the proposed class period, on average, only 4.1 percent of all employees in the U.S. became unemployed or exited the labor market each month. (U.S. Bureau of Labor Statistics, "Employment Level (LNU02000000), Labor Force Flows Employed to Unemployed (LNU07400000), and Labor Force Flows Employed to Not in Labor Force (LNU07800000)," retrieved from https://fred.stlouisfed.org/graph/?id=LNU02000000,LNU07400000,LNU07800000,#).

[60] I identify "departures" in this analysis based on the termination dates tracked in the Defendants' structured data. In his Figure 2 analysis, Dr. Starr considers a relevant employee to have departed a Defendant in a given year if

(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

the pie charts) was not to one of the other "Covered Defendants," both during and outside of the proposed class period.  For example,

- The top panel of this exhibit shows moves between DaVita and SCA, which account for less than ▮ percent (▮ percent) of all departures during the proposed class period and even less after the proposed class period.  As discussed above, Dr. Starr's own comparison would suggest no additional moves between DaVita and SCA during the proposed class period absent the alleged mobility restrictions.

- The bottom panel of this exhibit shows moves between SCA and USPI, which account for approximately ▮ percent of all employee departures during the proposed class period compared to approximately ▮ percent prior to the proposed class period and ▮ percent after.  Dr. Starr's analysis would suggest ▮ additional moves each year, on average, between SCA and USPI during the proposed class period absent the alleged mobility restrictions ▮ percent of all class period departures in the but-for world).

Even though movements to other employment opportunities far exceeded movements to "Covered Defendants" during and outside the proposed class period, Dr. Starr and Dr. Gerhart offer no analysis of competition from non-Defendants to support their conclusion of restricted employee mobility.  Plaintiffs' experts thus do not assess the competitive constraints non-Defendants placed on Defendants' ability to allegedly suppress compensation below competitive levels.

---

they do not appear in a relevant position in the next year's data.  This leads to two issues.  First, Dr. Starr's analysis in Figure 2 considers employees as leaving the company if they move from a position he classifies as class-relevant in one year to a position he classifies as non-relevant in the next year.  Second, Dr. Starr's classification of departures (i.e., employees who are in this year's, but not in next year's data) considers nearly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in 2021 as departures.  ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (see 2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter).

I see the same results when I apply Dr. Starr's methodology for identifying departures—the overwhelming majority of relevant employee departed to destinations other than the "Covered Defendants" before, during and after the proposed class period.  See **Appendix D-1** for the same set of pie charts comparing moves between "Covered Defendants" to all other departures, using Dr. Starr's methodology (corrected for the two issues mentioned above).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 4**
**MOVES BETWEEN "COVERED DEFENDANTS"**
**COMPARED TO ALL DEPARTURES**

**DAVITA AND SCA**



Notes: For the purposes of this exhibit, I adopt Dr. Starr's convention in his mobility analyses and consider all of 2008 as part of the proposed class period he studies for DaVita and SCA as well as all of 2010 for the proposed class period he studies for SCA and USPI. Departures are identified by termination records. This chart does not include DMG employees that left in 2019 when DaVita sold DMG or USPI employees with a termination date on December 31, 2019 that transfer to the Tenet payroll.

Source: Starr turnover (Corrected Data).

34. The Named Plaintiffs and employee-specific examples cited by Dr. Starr and Dr. Gerhart further highlight the broad employment opportunities proposed class members availed themselves of when they departed from the Defendants.

24

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- After leaving SCA, Named Plaintiff Allen Spradling returned to the financial services industry (where he worked prior to SCA) as a project manager for Bank of America's IT group, testifying that the skills he gained at SCA and prior employers made him qualified for a job at Bank of America.[61]

- [62] [63] [64]

- Former DaVita Vice President of Marketing Communications Bill Myers, who was discussed in both Plaintiffs' expert reports, "began interviewing for a position" and left DaVita to work for telecommunications company Liberty Global.[65]

35.     To examine the broader set of companies that relevant employees moved to after working at one of the Defendants, I use individual job history data from Lightcast, which collects individuals' online resumé profiles from career websites.[66]  The dataset I analyzed contains employees' job titles and

---

[61] Deposition of Allen Spradling, July 18, 2024 ("Spradling Deposition") 135:1–2; 161:12–19.  See also, Spradling Deposition, 124:10–14 ("…the IT skill set is very in demand and transferrable.").

[62] Deposition of Scott Keech, August 22, 2024 ("Keech Deposition") 172:15–173:12; 191:7–192:10; Keech Deposition, Exhibit 0056 (KEECH_000000806–0808) (email chain).

[63] Keech Deposition, Exhibit 0048 (KEECH_000001104–1106) (▮▮▮▮▮▮▮▮▮▮▮); Keech Deposition, Exhibit 0050 (KEECH_000000332–0333) (▮▮▮▮▮▮▮▮▮▮▮); Keech Deposition, Exhibit 0041B (KEECH_000000317–0324) ▮▮▮▮▮▮▮▮▮▮▮.

[64] Keech Deposition, 195:10-17; Keech Deposition, Exhibit 0072 (LinkedIn Profile).

[65] Gerhart Report, ¶81(v); Starr Report, footnote 174; LinkedIn, "Bill Myers," https://www.linkedin.com/in/bill-myers-6b88a12/.

[66] See Lightcast, "Overview," https://lightcast.io/products/data/overview ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability.")  Dr. Starr points to academic literature that relies on data tracked by Lightcast (see, for example, Francine Lafontaine, and Saattvic, Margaret Slade, "No–Poaching Clauses in Franchise Contracts, Anticompetitive or Efficiency Enhancing?" cited in Starr Report, ¶48).

The Lightcast data I use for my analysis includes anyone who reported employment at companies in the Outpatient Care Industry (i.e., all companies Lightcast matched to the NAICS 6214 Industry Classification), which includes individuals that reported working for DaVita, SCA, or USPI.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

company names with the corresponding employment start and end dates. I matched the job titles in the Lightcast data to the set of relevant job titles included in Dr. Starr's analysis and examined the set of different companies relevant employees worked at after being employed at one of the Defendants. The Lightcast data thus allows me to observe where at least a subset of the companies' employees worked for immediately after departing from relevant positions at the Defendants.[67] The Defendants acknowledged the wide range of firms they compete with for labor. As Bridie Fanning (SCA) testified, "[t]here were hundreds of places that people [from SCA] could go and work."[68]

36.    The Lightcast data shows that all three Defendants compete with a broad set of different employers (inside and outside of the healthcare industry) for the labor of relevant employees. For example,

- For DaVita, the Lightcast data records departures to approximately 1,000 different companies,[69] including to dialysis competitor Fresenius, other healthcare companies such as Kaiser Permanente, and companies with large footprints outside of healthcare such as retailers Amazon and Walmart.

- For SCA, the Lightcast data records departures to over 250 different companies, including outpatient care companies such as Covenant Physician Partners, other healthcare companies such as Sutter Health, and companies primarily operating outside of healthcare such as BMO (a commercial bank) and Dell Technologies (a computer manufacturer).

---

[67] Because the Lightcast data is limited to employees with online resumes, the set of companies observed in the Lightcast data is likely a subset of all the companies' relevant employees worked for after their employment in relevant positions at Defendants.

[68] Deposition of Bridget A. Fanning, Ph.D., July 17, 2024 ("Fanning Deposition",) 303:20–304:13. See also, Deposition of Mark Garvin, May 30, 2024 ("Garvin Deposition",) 195:14–196:2

. See also Deposition of Dennis Kogod, September 6, 2024 ("Kogod Deposition",) 179:9–20
).

[69] I identify unique companies as tracked by the field *company_name*, which captures the standardized company name associated with a job (see Lightcast, "US PROFILES (PSEUDONYMIZED) JOBS," https://docs.lightcast.dev/data-shares/us-profiles-pseudonymized-jobs.)

I limit my analysis of the Lightcast data to begin in 2005 for DaVita and USPI, and in 2007 for SCA. I do not include moves between relevant employees and firms that acquired one of the Defendants as external moves, specifically moves from SCA to Optum and UnitedHealth Group starting in 2017 and moves from USPI to Tenet starting in 2015 (see footnotes 32 and 37, *supra*).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- For USPI, the Lightcast data records departures to over 200 different companies, including outpatient care companies such as US Renal Care, other healthcare companies such as HCA Healthcare, and companies primarily operating outside of healthcare such as McKinsey (a management consulting company).

That is, the available Lightcast data shows hundreds of outside competitors hiring proposed class members, which would limit Defendants' ability to restrict mobility and lower proposed class members' compensation below competitive levels.

### B. Plaintiffs' Experts Fail to Assess Evidence on Hiring Practices by the Defendants that Contradict Their Conclusions that Defendants Had the Ability to Suppress Mobility and Compensation for All Proposed Class Members

37. Dr. Gerhart testified that it would be of interest to ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████.[70] Similarly, Dr. Starr testified that ███████████ ████████████████████████████████████████████████████████ ███████████████████.[71] However, Dr. Starr only studies "departures that are moves between Covered Defendants" and does not assess the *hiring* practices at the Defendants.[72] Hiring by the Defendants from non-Defendant companies is another indication of the wide range of competitive labor market options for the proposed class members, as well as competitive constraints on the Defendants.[73]

38. In **Exhibit 5**, I summarize the number of all external hires from non-Defendant firms into relevant positions (in the light blue areas) before, during, and after the proposed class period compared to the employee moves between "Covered Defendants" identified by Dr. Starr (in the grey areas).[74] As

---

[70] Gerhart Deposition, 51:5–15, 52:8–21.

[71] Starr Deposition p. 147:4–15
). See also, Starr Deposition, 139:6–11 ("

"); Starr Deposition, pp. 132:21–133:13 ("

")."

[72] Starr Report, ¶84.

[73] See Starr Report, Section V.B. and Gerhart Report, Section VI.B.

[74] I identify the timing of hirings based on the hire dates. I see the same results when I identify hires as those employees who are in this year's but not in last year's payroll data (analogue to Dr. Starr's methodology of identifying departures)—the overwhelming majority of external hires into relevant senior roles at Defendants
(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

this exhibit shows, the Defendants did not hire a large number of employees from "Covered Defendants" even outside the alleged conduct periods.  In addition, there were thousands of external hires from outside of the Defendants into relevant positions during the proposed class period—approximately 98 percent of hiring during the relevant period was from outside the "Covered Defendants."[75]  For example,



---

were from other sources and not from "Covered Defendants" before, during and after the proposed class period. See **Appendix D-2**.

[75] As I show in **Exhibit 18** below, each of the Defendants' employment *increased* during the relevant period (between 60 and 190 percent for relevant job levels).  Given the thousands of employees hired by the Defendants during this period, it is not possible that Defendants could have only hired employees from other "Covered Defendants.  For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 5**
**EXTERNAL HIRES INTO RELEVANT EMPLOYEE POSITIONS**
**BY DEFENDANT AND TIME PERIOD**

A. ITA



Notes: Hires are identified based on hiring date. The grey-shaded areas contain the 70 mobility events (i.e., moves between "Covered Defendants") from Dr. Starr's Figure 2.

Source: Starr turnover (Corrected Data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

39.     The hiring experiences of the Named Plaintiffs themselves highlight the opportunities for proposed class members to "match with" and potentially be hired from different employers.

- Prior to joining SCA, Mr. Spradling worked in the financial services, technology services, and law enforcement industries in various IT and project management roles and considered multiple industries when looking for jobs.[76] Mr. Spradling had no healthcare experience before he went to SCA and the job he applied to at SCA was not a job for which healthcare experience or skills were necessary.[77] Mr. Spradling considered employment opportunities across multiple industries because IT "[p]roject management arguably is project management regardless of the industry."[78]

- [79]

[80]

Moreover, the two Named Plaintiffs highlight the different outside opportunities available to the relevant employees who held a variety of positions at the Defendants. Mr. Spradling, an IT Director at SCA, was hired by SCA from Teksystems (a business and technology services company) and was hired by Bank of America (a financial institution) after working at SCA.[81] In contrast,

---

[76] Spradling Deposition, Exhibit DX005 (Sprad000014–0015).

[77] Spradling Deposition, 44:12–45:22, 65:16–65:21.

[78] Spradling Deposition, 44:12–45:22.

[79] Keech Deposition, Exhibit 42B (KEECH_000001419–1422).

[80] Keech Deposition, 106:13–16, 116:22–117:3, 168:14–168:20.

[81] Spradling Deposition, Exhibit DX005 (Sprad000014–0015); TEKsystems, "Who We Are", https://www.teksystems.com/en/who-we-are; Bank of America, "Our Company," https://about.bankofamerica.com/en/our-company.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

██████████████████████████████[82] Plaintiffs' experts have not assessed how the outside opportunities would vary across these two employees or the thousands of proposed class members.

40.    As the experience of the Named Plaintiffs exemplifies, Defendants recruited from a large and diverse set of companies, both within and outside of the healthcare industry.  Recruiting presentations list a large number of target companies within various industries.[83]  For example, an attachment to an email from SCA's Chief Talent Officer Bridie Fanning from October 2015 contains a ████████████ ████████████████████████████[84]  The list contains hundreds of companies from different industries, including:[85]



- ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████

- ██████████████████████████████████████.[86]

Other documents also show that SCA recruited Vice Presidents from a range of companies, targeting employees in healthcare-related companies as well as companies with large footprints outside of healthcare.  For example, ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████.[87]

---

[82] Keech Deposition, Exhibit DX0041 (KEECH_000000320–0322); Presidio Surgery Center, "About Us," https://presidiosurgery.com/about-us/; Keech Deposition, 111:16–113:16, Exhibit 0072 (Mr. Keech's LinkedIn Profile).

[83] Conversely, because such target companies employ talent with potentially matching skillsets to a Defendants' job position, these companies may also constitute potential destinations for Defendants' current employees. Thus, these target companies are in potential continuous competition with Defendants for the labor of proposed class members.

[84] SCA000287698.

[85] SCA000287699.

[86] See also, SCA000663768, █████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ )

[87] SCA000002890–2932, at 2932. ████████████████████████ ████████████████████████████████████████████████ (SCA000065727).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

41.    DaVita documents also discuss competition for employees with the broader healthcare industry (and not just the outpatient care or dialysis care industries) and companies outside of healthcare.



- ████████████████████████████████████████████████████
  ██████████████████████████████████████████████
  ████████████████████████████.[88]

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████
  ██████████████[89]

42.    As these examples demonstrate, (i) Defendants competed for hires with a large set of different firms, and (ii) the available outside opportunities for proposed class members extended beyond the Defendants.  I also use the Lightcast data to examine the set of companies and industries from which Defendants hired relevant employees.  The Lightcast data similarly shows the Defendants hiring employees from a variety of different companies into relevant positions.[90]

- For DaVita, the Lightcast data records relevant hires from over 900 different companies, including from dialysis competitor Fresenius, other healthcare companies such as Kaiser Permanente, and companies with large footprints outside of healthcare such as Amazon, Deloitte (an advisory and consulting firm) or Target (a department store).

- For SCA, the Lightcast data records relevant hires from over 350 different companies, including outpatient care company Select Medical, other healthcare companies such as Banner Health, and companies primarily operating outside of healthcare such as Goldman Sachs (an investment bank and broker) and FedEx (a courier).

- For USPI, the Lightcast data records relevant hires from over 250 different companies, including outpatient care companies such as US Renal Care, other healthcare companies such as HCA Healthcare, and companies primarily operating outside of healthcare such as Deloitte (an advisory and consulting firm) and Johnson & Johnson (a pharmaceutical company).

---

[88] DVA_OMCEAL_000906018.

[89] DVA_OMCEAL_000010422.

[90] I limit this analysis to individuals hired directly into relevant roles (i.e., Director level or above).

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

43.     Competition with hundreds of companies is inconsistent with Plaintiffs' experts' opinions on the impact of the alleged bilateral conduct between the Defendants.  As the Lightcast data shows, proposed class members chose to join Defendants from a large number of non-Defendant firms.  While Plaintiffs' experts do not assess any competition with non-Defendants for new hires, Dr. Gerhart testified that the compensation Defendants provided to these new hires "would probably have to be within sight of what the competitive rate would be," otherwise they would have joined a competing firm or remained at their current employer rather than agreeing to work for a Defendant.[91]  Plaintiffs' experts have not assessed how the Defendants would be able to suppress compensation for these employees given the competition Defendants faced from the variety of non-Defendant firms they hired relevant employees from.  Moreover, Plaintiffs' experts claim that the Defendants had "wage structures" such that the purported "wage suppression" would impact all employees—if such "wage structures" were rigid (as Plaintiffs' experts claim), compensation across employees would equally have to *increase* in response to newly hired employees paid competitive rates.

### C.  Dr. Starr's Analysis of "Limited Mobility" is Flawed and Fails to Consider Evidence on Overall Turnover Rates that Contradict His Opinions

44.     Dr. Starr concludes that "the quantitative evidence" of mobility rates he presents "is strongly consistent with a No-Poach Agreement to prevent Class Members from moving between Covered Defendants."[92]  To support this conclusion, Dr. Starr points to a regression analysis he purports to use "to test that the cumulative effect of the No-Poach Agreements was to suppress movement" in his Figure 4.[93]  However, the only factor Dr. Starr accounts for in his mobility analysis is a time trend.  That is, Dr. Starr assumes that no other factors (e.g., greater overall mobility rates as part of the "great resignation" after the COVID-19 pandemic) would impact the rate in which employees' mobility between "Covered Defendants" changed across his period of analysis.[94]  As with his other "quantitative" analyses I describe above, this regression analysis simply shows that very few employees moved

---

[91] Gerhart Deposition, 56:1–15.

[92] Starr Report, ¶90.

[93] Starr Report, ¶87, Figure 4.  I note that while both Dr. Starr and Dr. Gerhart point to the importance of solicitations or "cold calls," nether attempt to quantify the additional number of solicitations or "cold calls" that would have occurred in the absence of the non-solicitation agreements (Gerhart Deposition, 117:24–118:3; Starr Deposition, 177:6–178:3).  Instead, Dr. Starr focuses his analysis on "movement" between Defendants (Starr Deposition, 176:8–177:5).  That is, Plaintiffs' experts have not shown that the alleged conduct in fact had any significant impact on the number of solicitations or "cold calls" to class members.

[94] As Dr. Starr testified, the great resignation "referred to sort of an increased propensity for workers to leave their employer for other companies" (Starr Deposition, 399:22–401:1).  See also, U.S. Bureau of Labor Statistics, "The 'Great Resignation' in perspective," July 2022, https://www.bls.gov/opub/mlr/2022/article/the-great-resignation-in-perspective.htm.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

between DaVita and SCA or between SCA and USPI both outside of the proposed class period and during the alleged conduct.  In fact, the results he presents for the individual agreements are not statistically significant at conventional levels.[95]

45.    By focusing his analysis on only movements between the "Covered Defendants," Dr. Starr ignores the majority of mobility events for relevant employees.  In fact, Plaintiffs' experts' conclusions that employee mobility was restricted by the bilateral agreements is inconsistent with Defendants' overall turnover rates.  In **Exhibit 6** below, I display the annual turnover rates at the Defendants, calculated as the percentage of all relevant employees who leave one of the Defendants for any destination in a given year.[96]  As this exhibit shows, there is no consistent pattern indicating a systematic reduction in mobility during the alleged proposed class periods.  ███████████████

████████████████████████████████████████████████████████

██████████████[97]

---

[95] Starr Report, Figure 4 columns [2] and [3].

Throughout his report, Dr. Starr refers to results as "statistically significant" using the more relaxed standard of a 10 percent level of statistical significance.  However, the conventional level to determine statistical significance is 5 percent.  See, e.g., American Bar Association, Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, 3rd ed., ABA Book Publishing, 2017 ("ABA Proving Antitrust Damages",) p. 142 ("[S]tatistical hypotheses are carried out at conventional levels of 5 percent");  Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 320 ("In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at .05 or 5%.").

[96] To analyze overall turnover rates, I use the actual termination records provided in the Defendants' structured data.  Termination records for all employees are available through at least December 2022.  I consider a relevant employee to be terminated in a given year if I observe a corresponding termination record for this employee in the same year.

I do not include USPI employees which transitioned to Tenet Payroll data as terminated.  These employees have a termination record on December 31, 2019, but appear with regular hours in the Tenet payroll data during 2020 (see *2023.09.26 - K. Limarzi Ltr. re Structured Data Productions*, point 8).

[97] I note that the increase in turnover rates for USPI (in the purple line) after the proposed class period coincides with changes in the equity valuation for USPI's 2015 Employee Stock Equity Plan, which Dr. Starr acknowledged led to departures of senior USPI employees (see Starr Report, ¶85).  **Appendix D-3** shows similar patterns in overall turnover rates using Dr. Starr's methodology (i.e., considering employees as terminated in this year if they do not appear in next year's payroll data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 6**
**OVERALL TURNOVER RATE FOR RELEVANT EMPLOYEES**
**BY DEFENDANT**
**2006 – 2022**



Notes: Turnover rates are calculated as the percentage of relevant employees at each Defendant who were terminated each year.  This chart does not show DMG employees that left in 2019 when DaVita sold DMG or USPI employees with a termination date of December 31, 2019 that transfer to the Tenet payroll.

Turnover rates for DaVita and USPI are not shown for 2005 where very few terminations are identified (█ ████████████████████).  Vertical lines indicate the start and end of the proposed class periods.

Source: Starr turnover (Corrected Data).

46.     Dr. Starr does not assess the overall turnover rates at the Defendants.  However, one can apply Dr. Starr's own regression model, which he states can be used to test if "the cumulative effect of the No-Poach Agreements was to suppress movement" to overall turnover rates.[98]  I present the results of this test in **Exhibit 7** below, using Dr. Starr's regression to assess if the overall turnover rates (i.e., whether

---

[98] Starr Report, ¶87.  He reports the results of this test in his Figure 4.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

employees stayed at the respective Defendant or left the company to any destination) were "suppressed" during the proposed class period.[99]

- There was a statistically significant *increase* in turnover at DaVita during the proposed class period and

- No statistically significant change in turnover at SCA during the same period.

The lack of a statistically significant decline in turnover at SCA and DaVita during the proposed class period is inconsistent with Dr. Starr's finding "that the cumulative effect of the No-Poach Agreements was to suppress movement."[100]

---

[99] I note that the "Conduct" estimates of overall turnover rates in this analysis are not consistent across Defendants. This is not indicative of (i) systematically *lower* turnover rates due to the alleged mobility restrictions in the proposed class period or (ii) systematically *higher* turnover rates during the proposed class period that one might expect if compensation for relevant employees was suppressed by ▮▮▮▮▮▮▮ in aggregate.

See **Appendix D** for additional versions of this analysis, (i) using Dr. Starr's methodology to identify departures in any given year as those employees who are not in next year's payroll data (see **Appendix D-4**), and (ii) including Dr. Starr's "macroeconomic and healthcare" controls (see **Appendix D-5**). I find that there is no statistically significant change in overall turnover at SCA and DaVita and similarly find that overall turnover rates of relevant senior employees did not systematically change during the proposed class period.

[100] Starr Report, ¶87.

I note that the increase in turnover rates for USPI after the proposed class period coincides with changes in the equity valuation for USPI's 2015 Employee Stock Equity Plan, which Dr. Starr acknowledged led to departures of senior USPI employees (see Starr Report, ¶85).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 7**
**DR. STARR'S FIGURE 4 PROBABILITY OF MOBILITY**
**APPLIED TO OVERALL TURNOVER**

| Statistic | Overall Turnover (Departures to any Destination) | | |
| --- | --- | --- | --- |
| | DaVita | SCA | USPI |
| [a] | [b] | [c] | [d] |
| Conduct | | | |
| Time-trend | | | |
| Observations | | | |
| Departures | | | |
| R-squared | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

### D. Defendants' Share of Total Employment is Small Even Within the Industries Dr. Gerhart Identifies as Potentially Relevant

47.     At various points, Dr. Gerhart (and Dr. Starr in his discussion of the Defendants' businesses) contends that Defendants have "large," "leading," or "dominant" footprints.[101]  However, neither of Plaintiffs' experts define the relevant labor market(s) for proposed class members in order to assess these claims.  Plaintiffs' experts also do not assess the Defendants' share of employment within the industries that they suggest are relevant.  For example, Dr. Gerhart argues that "the great majority of employee movement is within the same industry," pointing to (i) the relevant "sector" for employees (identified by the 2-digit industry code assigned to firms by the U.S. Census Bureau) as well as (ii) more

---

[101] Gerhart Report, ¶11 ("DaVita is currently one of the leading players in the outpatient medical center industry"); ¶13 ("SCA is a large firm in the ambulatory surgical center ('ASC') industry"); ¶15 ("USPI is another dominant firm in the ASC industry"); ¶87(a) (                                                                                                                        ).

Starr Report, ¶25 (SCA is "another dominant firm in the healthcare space"); Starr Report, ¶26 (USPI "comprise the largest ambulatory surgery company in the country").

As a general matter, the magnitude of a firm's share in the (output) services market need not imply the same magnitude of a firm's share in the labor (input) market (see, for example, U.S. Department of Justice, "Public Workshop on Competition in Labor Markets," September 23, 2019, comments by Dr. Patrick Greenlee and Dr. Kevin Murphy, p. 19).

granular industries (specifically, he points to industries identified by 5-digit industry codes).[102] The Defendants are within the Healthcare and Social Assistance sector, which includes outpatient care centers as well as hospitals, offices of physicians, and skilled nursing facilities.[103]

48.    I analyzed publicly available data from the BLS on both the Healthcare sector (the 2-digit NAICS 62 sector) and the more granular Other Outpatient Care Centers industry (the 5-digit NAICS 62149 industry), which Plaintiffs' experts suggest may be relevant.[104] The BLS data shows that Defendants' shares of total employment in the Healthcare sector and in the Other Outpatient Care Centers industry are not "dominant." In **Exhibit 8** below, I compare the Defendants' total U.S. employment to industry-wide employment for 2016.[105]

- As shown in the left panel below, ███████████████████████████████ ███████████████████████████. That is, as Dr. Starr describes in his report, the Defendants comprise a "small portion" of total managerial employment in the Healthcare sector.[106]

- ███████████████████████████████████████████████████████████ ███████████████████████████████████████████

---

[102] Gerhart Report, ¶61(f). The North American Industry Classification System ("NAICS") classifies business into a hierarchical structure of 2-digit to 6-digit codes, with additional digits conveying increasing levels of specificity (U.S. Census Bureau, "Economic Census: NAICS Codes & Understanding Industry Classification Systems," February 12, 2024, https://www.census.gov/programs-surveys/economic-census/year/2022/guidance/understanding-naics.html).

Similarly, Dr. Starr testified that relevant employees had ███████████████████████████ and the ███████ ███████████████████████████████████████ (Starr Deposition, 128:8–23).

[103] The Healthcare sector is associated with the 2-digit NAICS 62. See, U.S. Bureau of Labor Statistics, "Industries at a Glance: Health Care and Social Assistance: NAICS 62," https://www.bls.gov/iag/tgs/iag62.htm.

[104] Gerhart Report, ¶61(f).

The 5-digit NAICS 62149 code classifiers outpatient care centers "except family planning centers and outpatient mental health and substance abuse." Per the NAICS classification, Defendants do not operate in the same 6-digit code. NAICS classifies DaVita into Sector 621492 "Kidney Dialysis Centers" while USPI and SCA are classified into Sector 621493 "Freestanding Ambulatory Surgical and Emergency Centers" (see NAICS Association, "NAICS Code Description," https://www.naics.com/naics-code-description/?code=6214).

[105] I use 2016 here because Defendants' combined share of total employment in the Other Outpatient Care Centers industry was highest in 2016.

[106] Starr Report, footnote 410 ("Defendants comprise a small portion of total managers in healthcare").

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 8**
**DEFENDANTS' SHARE OF TOTAL U.S. EMPLOYMENT**
**2016**



Note: **Appendix E-1** shows the counts of employees at the Defendants relative to the Healthcare sector (NAICS 62) and Other Outpatient Care Centers industry (NAICS 62149) for each year.

Sources: Starr turnover (Corrected Data); BLS OEWS Data on industry employment.

I find similar results when I look at the number of facilities operated by the Defendants compared to the overall number of facilities within the same sector and industry. ██████████████████ ███████████████████████████████████ ████████████████████████████████████ ████████████████████████[107]

49.     As with my analysis in the previous sections, both of these shares are indicative of the numerous opportunities for relevant employees outside of the Defendants. These outside opportunities would constrain the impact, if any, of the alleged conduct on compensation for relevant employees as the Defendants compete for their labor with hundreds of other firms—inside the Outpatient Care Center industry, Healthcare sector, and beyond. Plaintiffs' experts do not account for any of these outside opportunities in their assessment of the alleged conduct—even for companies within the sectors and industries they point to as potentially relevant. In fact, the Defendants account for a small share of employment within these industries. Neither of the Plaintiffs' experts have assessed how the

---

[107] See **Appendix E-2** for a summary of these shares by year.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Defendants could suppress compensation ███████████████████ for relevant employees given the competition they face from outside employers.

## VI. DR. STARR'S AND DR. GERHART'S THEORY OF ANTITRUST IMPACT FROM THE ALLEGED MOBILITY RESTRICTIONS IS UNSUPPORTED BY ECONOMIC ANALYSIS

### A. Summary of Plaintiffs' Experts' Theory of Harm Due to the Alleged Mobility Restrictions

50.     Plaintiffs' experts reference two agreements, which they refer to as "no-poach" agreements, between (i) DaVita and SCA and (ii) between SCA and USPI.  According to Plaintiffs' experts, SCA and DaVita, and separately SCA and USPI, agreed "not to pursue recruiting, soliciting, hiring, and/or cold calling […] each other's Senior-Level Employees unless those Senior-Level Employees informed their current employers that they intended to seek employment elsewhere," which Plaintiffs' experts refer to as a "tell your boss" provision.[108]  An economic assessment of the impact to the proposed class must account for the scope of these agreements (e.g., the employees impacted, the time periods covered).  However, Plaintiffs' experts ignore evidence contrary to their conclusion that these agreements would suppress compensation for all relevant employees for the full proposed class period.

51.     As Plaintiffs' experts describe, only some employees—those who would have received cold calls absent the alleged conduct—would be "directly" affected by the alleged mobility restrictions.[109]  Plaintiffs' experts' theory of harm implies that these employees would "benefit when they have uninhibited access to other jobs, i.e., job mobility" and can either (i) "voluntarily chang[e] employers to obtain substantial compensation increases" or (ii) leverage outside offers to "negotiate higher compensation" with their current employer.[110]  To properly study the direct effects of the alleged mobility restrictions, one has to consider not only an alleged offer not received, but also whether that offer would have made any difference given the other job opportunities available to that employee.[111]

---

[108] Starr Report, ¶19(a).  See also, Starr Report, ¶12; Starr Report ¶70(b); Gerhart Report, ¶21.

[109] Gerhart Report, ¶8; Gerhart Deposition, 199:18–25; Starr Report, ¶39.

[110] Gerhart Report, ¶7(b).  See also, Starr Report, ¶52 ("These mechanisms," such as no-poach agreements, "lower workers' mobility and bargaining power, which translates to lower pay.")

[111] Plaintiffs' experts also suggest that cold calls (absent an outside job offer) provide employees information on the "market value" of their labor (Starr Report, ¶73(c), footnote 173).  Similarly, Plaintiffs' experts have done no analysis to show that relevant employees had access to meaningfully different market information due to the alleged conduct.

Plaintiffs' experts do not assess what "market" information was available to employees apart from cold calls.  For example, named Plaintiff Allen Spradling testified that IT professionals "are constantly reassessing their value in the market." Spradling Deposition, 124:10–125:24 ("A: The—the IT skill set is very in demand and transferable, so in general IT resources are constantly reassessing their value to the market, so to speak, and as a

(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

That is, it is necessary to study whether, but for the alleged conduct, an employee would receive an additional job opportunity that was "accessible to" that employee and "higher-paying" than any other job offer they received in the actual world.[112]

52.　Neither Dr. Starr nor Dr. Gerhart attempt to quantify the number of cold calls or external job offers that would have existed in the but-for world, let alone for any of the individual ▮▮▮ proposed class members.[113]  As Dr. Gerhart testified, "each person almost has their own individual market for opportunities."[114]  Given this, to assess if an employee was harmed "directly" by the alleged mobility restrictions, Plaintiffs' experts would have to model the additional job opportunities that would have been available to that employee absent the alleged mobility restrictions and determine if these were "higher-paying external job opportunities" than the opportunities available to that employee in the actual world—which are not limited to the Defendants themselves, but all other non-Defendant employers.  However, neither of Plaintiffs' experts conduct any analysis of non-Defendant employment opportunities.

53.　In addition, Plaintiffs' experts theorize that employees not "directly" affected by the alleged mobility restrictions—those who would not have received additional external offers or cold calls in the but-for world—are still "indirectly" affected.[115]  To support their claims, Plaintiffs' experts point to the use of purported "wage structures" at the Defendant firms.  Specifically, Dr. Starr argues that "the existence of compensation structures within Defendant firms would mean that any wage suppressing

---

result of that, opportunities present themselves. […] Q: And is it the case that employees would look outside the company in order to get a sense of what their market rate was? A: Yes, my experience is that happens all the time. Q: And did you personally do that during the course of your time at SCA? A: I don't recall.  Q: What about during the course of your career? A: Oh, without a doubt, yes. Q: And it's your – it's been your experience that that is very common, correct?  A: Yeah, within the IT field, correct.").  Mr. Spradling received job alerts via email from sites such as Indeed and Neuvoo with information on available job opportunities, including posted salary information for some jobs (see, e.g., Sprad005529; Sprad002185).  Dr. Gerhart opines that he "reviewed evidence in this litigation showing that employees at Defendant firms were also concerned about external equity," citing information on relevant employees being aware of the "market level" for their individual position (Gerhart Report, ¶115(b)–(e)).

[112] As Dr. Gerhart describes, "[e]mployees accrue" the benefits of job mobility "only where higher-paying external job opportunities actually exist and are accessible to employees (Gerhart Report, ¶7(b)).  That is, to be harmed by the alleged mobility restrictions, an employee would have had to receive "higher-paying external job opportunities" absent the alleged conduct that they did not have in the actual world.  In order for this outside opportunity to be available to the employee, it would have to be one that the employee was qualified for and desired to switch to (or could credibly use to negotiate a higher salary from their current employer).

[113] For example, Dr. Gerhart testified that he had "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Gerhart Deposition, 135:23–136:10, 143:16–18).

[114] Gerhart Deposition, 119:14–24.

[115] Gerhart Deposition, 202:13–202:21; Starr Report, ¶39.  See also, Starr Deposition, 433:22–434:3.

effects of the Challenged Conduct would be broadly transmitted across the Class."[116]  Similarly, Dr. Gerhart concludes, without conducting any analysis, that "agreements not to poach employees likely lead to cascading effects class-wide" due to "Defendants' formalized pay structures and compensation design and their commitment to maintaining equity and pay fairness."[117]

54.     Ultimately, the question of impact to the proposed class is an empirical question.  While Plaintiffs' experts argue that the alleged mobility restrictions would impact all employees, both those "directly" impacted by the conduct and purportedly "indirectly" impacted, they offer no analysis able to assess the but-for external job opportunities for employees "directly" targeted to determine if they were in fact impacted by the alleged conduct.  Dr. Gerhart testified that he performed no empirical analysis.[118] Further, as I describe below, available compensation information—and Dr. Starr's own analysis—does not support the Plaintiffs' experts' conclusion that employees would be "indirectly" affected by the alleged conduct due to "cascading effects."

### B. Plaintiffs' Experts' Narrative of the Alleged Mobility Restrictions Ignores Contrary Evidence and is Not Supported by Empirical Analysis

55.     An understanding of the nature of the conduct at issue is important to develop both sound economic theories and empirical testing to assess antitrust liability, impact, and damages.  Both Dr. Starr and Dr. Gerhart present anecdotal documentary evidence of the alleged mobility restrictions.[119]

---

[116] Starr Report, ¶172.  Similarly, Dr. Starr claims that "where there is a single market-clearing wage, a no-poach agreement would tend to have widespread compensation suppression effects across *all* employees, and not just the compensation for employees who would have been poached in a but-for world" (Starr Report, ¶53).  Dr. Starr has offered no evidence that there was a "single market-clearing wage." In fact, relevant employees worked in a variety of jobs (see Section IV.B) and were paid a variety of salaries (see Section VI.C.2).

[117] Gerhart Report, Section VIII.A, ¶141.  Dr. Gerhart also argues that employees "not receiving offers who become aware of coworker offers then receive updated, more accurate information on their own outside pay opportunities, making job searches and job mobility more likely" (Gerhart Report, ¶7(b)).  Like Plaintiffs' experts' theory of "direct" effects, the impact of this additional potential information would depend on the available opportunities for an individual employee.

[118] Gerhart Deposition, 282:23–288:23.

[119] See, e.g., Starr Report, Sections V.B.2, V.B.3, and V.C.2 and Gerhart Report, Section VI.B and VI.C.

Dr. Gerhart presents no analysis of the impact of these agreements, testifying that his opinion is limited to "▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Gerhart Deposition, 103:24–104:19).

Dr. Starr concludes not only that the documents he presents are "consistent with anticompetitive collusion and inconsistent with unilateral conduct" but also that these documents can be used to *show* antitrust impact (Starr Report, ¶11).  For example, Dr. Starr claims based on his review of documents that (i) the alleged "no-poach restrictions harmed [proposed class members] by limiting their mobility and suppressing their compensation" and (ii) the "tell-your-boss provision" of the alleged mobility restrictions "created a chilling effect" (Starr Report, ¶¶71, 73, 78, 80).

(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

But, in their subjective assessments of documents—and Dr. Starr's "wage suppression" regression—they simply ignore evidence counter to their stylized narrative of the non-solicitation and "tell your boss" provisions of the alleged mobility restrictions. Dr. Starr and Dr. Gerhart conclude that the alleged mobility restrictions would suppress compensation for all proposed class members at (i) DaVita and SCA between May 2008 and December 2019 and (ii) USPI between May 2010 and December 2019 but fail to address how changes in the agreements over time, including changes to agreement provisions and jobs covered, would affect the proposed class. For example,

-  [120]

- As Dr. Starr notes, after DaVita and SCA first agreed to the alleged mobility restrictions, ███████████████████████████████████████████ ████████[21]

56.     Both experts also ignore evidence contradicting Plaintiffs' assertions regarding the start dates of the agreements. For example, Andrew Hayek (SCA) testified t███████████████████ ██████████████████ █████[122] Further, Dr. Starr and Dr. Gerhart fail to assess whether their conclusions change based on direct evidence they present on the end dates for the alleged mobility restrictions. As Dr. Starr states, ████████████████████████████████ ████████████████████████[123] In addition, both experts ignore other evidence contradicting Plaintiffs' assertions about the end dates of the agreements. For example, Andrew Hayek (SCA) and

---

Economists have no specialized expertise to determine intent. As Nobel Laureate George Stigler stated, even in the face of a written anticompetitive agreement and meetings between competitors: "A reasonable man, and often even an economist, would say that the documents seemed to present a conclusive proof of collusive behavior. The economist, however, would have no professional basis for reaching such a conclusion: he has no special skill in reading documents and relating them to actual behavior" (George J. Stigler, "What Does an Economist Know?" *Journal of Legal Education*, Vol. 33, No. 2, 1983, p. 311).

While Dr. Starr claims that "economists frequently bring their expertise to bear in analyzing documentary evidence of communications among cartel members," the only authority he cites is a paper which discusses economic case studies, not the review of documents (Starr Report, ¶28, footnote 46). This paper does not present a scientific approach to use economics to assess evidence of communications, nor does it support the idea that his subjective review is scientific, replicable, has a known error rate, or can be falsified.

[120] Hayek Deposition, 203:20–204:9.

[121] Starr Report, ¶70(b).

[122] Hayek Deposition, 165:21–166:24.

[123] Dr. Starr cites ████████████████████████████████ ████████████████████████████████████ (Starr Report, ¶80(c), footnote 311, citing USPI_CIV_000006432 (Exhibit PX282)).

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

Anthoy Kilgore (SCA) testified that the alleged mobility restrictions between SCA and DaVita as well as between SCA and USPI ███████████████████████████████████████ ██████████ █████[124]

57.     Unlike an empirical economic analysis, the conclusions drawn from a narrative based on a review of documents are (i) not objectively falsifiable, (ii) have no known error rate, and (iii) are subject to bias if they fail to assess other contradictory and competing documents.  Dr. Starr's and Dr. Gerhart's presentations of documentary evidence highlight the limitation of simply reviewing documents to assess the impact of the alleged conduct.  Both of Plaintiffs' experts exclude contradictory and competing documents from their discussion of the alleged mobility restrictions.

58.     In fact, the empirical analysis Dr. Starr presents fails to support his subjective conclusions based on his documentary narrative.[125]  Dr. Starr purports to "confirm that the Conduct Period end date of 2019 is appropriate" for the alleged mobility restrictions "using a regression approach," which he presents in his Figure 3.[126]  Specifically, Dr. Starr "test[s] how the probability of a move between each pair of Covered Defendants varies from 2008 to 2021, relative to 2017."[127]  That is, Dr. Starr tests if the probability of a move between "Covered Defendants" in a given year was different than the probability of a move in 2017.  Because there are so few employee moves between "Covered Defendants" during his period of analysis, Dr. Starr relies on limited variation in his outcome variable.  For example, the "uptick" in 2020 Dr. Starr purportedly finds is an increase of only five employee moves (out of the over 1,500 employees in the proposed class at SCA and USPI).[128]  Given this limited variation, Dr. Starr's analysis is sensitive to the specification he selects, finding results that contradict his conclusions when tested using "base years" other than 2017.

---

[124] Hayek Deposition, 328:17–330:8.  See also, Hayek Deposition, 189:23–190:22.  Mr. Hayek's successor as CEO at SCA, Anthony Kilgore, testified that ████████████████████████ (Deposition of Anthony Kilgore, October 22, 2024 ("Kilgore Deposition",) 67:11–68:13 ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ )).

[125] Dr. Gerhart presents no empirical analysis at all, testifying ████████████████████ ████████████████████  See, e.g., Gerhart Deposition, 107:21–108:4, 139:16–21, 143:16–21, and 249:10–14.

[126] Starr Report, ¶86.  See also, Starr Deposition, 333:7–334:9.

[127] Starr Report, ¶86.

[128] See **Exhibit 3** (████████████████████████████████████ ████████████████████ ).

44

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

59. The sensitivity of Dr. Starr's analysis can be seen first by simply applying his own test after correcting his double counting of one employee who moved between SCA and USPI and correctly accounting for statistical significance.[129] As I discuss above, Dr. Starr refers to results as "statistically significant" at the 10 percent level. However, the conventional level to determine if results are statistical significance is 5 percent.[130] While Dr. Starr argues that if "2019 is the last year of the No-Poach Agreements, then in 2020 we should observe a statistically significant uptick in the movement of Senior Employees between the Covered Defendants," this is not the pattern I find.[131] Instead, I find no statistically significant change in the probability of mobility for either Defendant pair in 2020 when using the conventional threshold for statistical significance of 5 percent. This result undermines his conclusion that his mobility regression is consistent with a conspiracy ending in 2019.[132]

60. Further, the results of Dr. Starr's analysis are sensitive to his selection of 2017 as the "base year"—i.e., the year in which "probability of mobility" for other years are compared to. For example, based on Dr. Starr's analysis no employees moved between DaVita and SCA in 2014, 2017, and 2021. Dr. Starr's choice of 2017 as a base year means that every other year for DaVita and SCA is compared against a year with a ▪ percent probability of a move between these two Defendants. By selecting a year with ▪ moves between DaVita and SCA as his reference year, Dr. Starr increases the likelihood of finding a statistically significant increase in mobility (as the probability of a move in that year would be compared to the ▪ percent probability in 2017). In selecting 2017 as the "base year" for his analysis, Dr. Starr points out that this was when "USPI appears to have stopped enforcing the agreement" between itself and SCA.[133] Dr. Starr does not discuss why this "base year" would be relevant for an assessment of the agreement between DaVita and SCA nor why he selects this year if his contention is that the alleged mobility restrictions between SCA and USPI continued (at least on SCA's side) through 2019.[134]

61. To show this, I take his own analysis using different "base years," applying the same double counting correction I reference above. **Exhibit 9** shows the result of this test for the employee moves

---

[129] As I describe above, Dr. Starr double counts a move of one employee across 2020 and 2021, which I remove from my analysis in this section (see footnote 53, *supra*).

[130] See footnote 95, *supra*.

[131] Starr Report, ¶86.

[132] Dr. Starr's analysis only finds a statistically significant change in the probability of moves (relative to 2017) between DaVita and SCA in 2011, during the conduct period (see **Exhibit 9**). For SCA and USPI, Dr. Starr's analysis finds a statistically significant increase in the probability of mobility (relative to 2017) in 2010, the start of the alleged conduct for SCA and USPI, and in 2021, a year after the proposed class period (see **Exhibit 10**).

[133] Starr Report, ¶¶80(c), 86.

[134] Starr Report, ¶80(c).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

between DaVita and SCA and **Exhibit 10** shows the result of this test for the employee moves between SCA and USPI.  In both exhibits, each column shows the results of Dr. Starr's analysis applied to a different base year.  For example, the first column in **Exhibit 9** shows the probability of mobility between DaVita and SCA (i.e., how likely is it for an employee to move between these Defendants) relative to 2008.  When applied to this base year, Dr. Starr's analysis shows no statistically significant change in mobility across years.  That is, Dr. Starr's analysis would suggest that the probability of an employee move between DaVita and SCA is not statistically different in any year compared to 2008.  Dr. Starr's test finds the same results when applied to different base years with the same number of moves.  For example, Dr. Starr's analysis finds the same results in base years 2014, 2017, and 2021—this is because there are no moves between DaVita and SCA in these years.  That is, the results of Dr. Starr's analysis are entirely dependent on the base year he selects—finding different patterns when applied to different base years.

62.     As these results show, for DaVita and SCA, Dr. Starr's analysis does not find "a statistically significant uptick in the movement" in 2020 for relevant employes with any base year.[135]  For SCA and USPI, Dr. Starr's analysis only finds this pattern if his analysis is applied to the "base years" 2009 or 2011—when there are no moves between SCA and USPI.[136]  That is, Dr. Starr only finds the relationship he expects when he compares the probability of moving to a year with a ▮ percent probability of movement between these Defendants.  In short, the results of Dr. Starr's analysis are tied to the base year he selects and do not support his conclusion that he can "confirm" the end date of the alleged mobility restrictions.

---

[135] Even using Dr. Starr's less rigorous 10 percent level of statistical significance, his analysis only finds an "uptick in the movement" in 2020 for DaVita and SCA employes for base years 2014, 2017, and 2021.

[136] Similarly, using Dr. Starr's less rigorous 10 percent level of statistical significance, his analysis only finds an "uptick in the movement" in 2020 for SCA and USPI employes for base years 2009, 2011, 2016, and 2017.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 9**
**STARR FIGURE 3**
**ANNUAL PROBABILITY OF MOBILITY BETWEEN DAVITA AND SCA**
**RELATIVE TO DIFFERENT BASE YEARS**

| | | | | | | | Base Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Statistic | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [j] | [k] | [l] | [m] | [n] | [o] |
| Year=2008 | | | | | | | | | | | | | | |
| Year=2009 | | | | | | | | | | | | | | |
| Year=2010 | | | | | | | | | | | | | | |
| Year=2011 | | | | | | | | | | | | | | |
| Year=2012 | | | | | | | | | | | | | | |
| Year=2013 | | | | | | | | | | | | | | |
| Year=2014 | | | | | | | | | | | | | | |
| Year=2015 | | | | | | | | | | | | | | |
| Year=2016 | | | | | | | | | | | | | | |
| Year=2017 | | | | | | | | | | | | | | |
| Year=2018 | | | | | | | | | | | | | | |
| Year=2019 | | | | | | | | | | | | | | |
| Year=2020 | | | | | | | | | | | | | | |
| Year=2021 | | | | | | | | | | | | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *.  Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey.  Positive and statistically significant results are shown in blue.

Source: Starr turnover.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 10**
**STARR FIGURE 3**
**ANNUAL PROBABILITY OF MOBILITY BETWEEN SCA AND USPI**
**RELATIVE TO DIFFERENT BASE YEARS**

| Statistic | Base Year | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [j] | [k] | [l] | [m] | [n] | [o] |
| Year=2008 | | | | | | | | | | | | | | |
| Year=2009 | | | | | | | | | | | | | | |
| Year=2010 | | | | | | | | | | | | | | |
| Year=2011 | | | | | | | | | | | | | | |
| Year=2012 | | | | | | | | | | | | | | |
| Year=2013 | | | | | | | | | | | | | | |
| Year=2014 | | | | | | | | | | | | | | |
| Year=2015 | | | | | | | | | | | | | | |
| Year=2016 | | | | | | | | | | | | | | |
| Year=2017 | | | | | | | | | | | | | | |
| Year=2018 | | | | | | | | | | | | | | |
| Year=2019 | | | | | | | | | | | | | | |
| Year=2020 | | | | | | | | | | | | | | |
| Year=2021 | | | | | | | | | | | | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Positive and statistically significant results are shown in blue. I remove the employee Dr. Starr "double counts" as a move in both 2020 and 2021 (see footnote 53, *supra*).

Source: Starr turnover.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

63.     Both of Plaintiffs' experts fail to consider information contrary to their own narrative description of the alleged mobility restrictions.  They also do not assess how the changes in the agreements would impact the proposed class.  Further, the analysis that Dr. Starr puts forward to purportedly measure the effect of the alleged conduct on mobility rates is based on a small number of moves between the "Covered Defendants," and does not support his conclusion that the alleged mobility restrictions ended in 2019 for both pairs of Defendants.

### C. Plaintiffs' Theory of a "Wage Structure" and Purported "Cascading" Effects of the Alleged Conduct is Not Supported by the Available Data or Dr. Starr's Analysis

#### 1. Summary of Plaintiffs' Experts' Theory of "Cascading" Effects Due to the Defendants' Purported Use of "Wage Structures"

64.     Dr. Starr and Dr. Gerhart both point to two elements of the purported "wage structures" at Defendant firms—internal equity and external equity.  Dr. Starr defines internal equity as "the idea that individuals doing comparable work within a firm should receive similar compensation."[137]  Dr. Starr argues that the "relevant implication is that if employee compensation is driven, in part, by considerations of internal equity, the firm's ability to suppress compensation of a group of employees would also be indirectly felt even by those employees who were not the target of wage suppression."[138]  Both Dr. Starr's and Dr. Gerhart's conclusion that "internal equity" would lead to "cascading effects" are predicated on the flawed assumptions that a change in one employee's compensation due to an outside job offer—or even a "cold-call"—would lead to rapid adjustments of a similar magnitude for *all* employees' compensation.[139]  The actual compensation information for relevant employees contradicts Plaintiffs' experts' conclusion that a compensation increase for one employee immediately results in compensation increases for other employees.

65.     Secondly, Plaintiffs' experts point to external equity, which Dr. Starr describes as employers seeking "to achieve pay similarities between laborers doing similar jobs at different firms."[140]  As Dr.

---

[137] Starr Report, ¶173.  See also, Gerhart Report, ¶94.

[138] Starr Report, ¶174.

[139] For example, Dr. Starr's "wage suppression" regression and correlation analyses both assume that the impact of the alleged conduct would be instantaneous (i.e., Dr. Starr (i) calculates the same "wage suppression" for every year in the proposed class period, beginning with the first year of the alleged conduct and (ii) calculates contemporaneous correlations across job levels and within job titles) (see Starr Report, Figures 6, 8, and 19).

Similarly, Dr. Gerhart argues that a Director receiving a higher paying job offer would result in "other Directors at the Defendant firm who were not cold called will *immediately* increase their own pay expectations and require higher pay to feel their pay is fair" (Gerhart Report, ¶143, emphasis added).

[140] Starr Report, ¶175.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Gerhart describes, in "the absence of external equity, a company is at greater risk of employee turnover."[141]  That is, if a firm does not set competitive compensation, they are likely to lose employees to other firms that do.  Dr. Gerhart argues that "if pay is suppressed in these other companies, achieving external equity will require lower labor costs than in a competitive market."[142]  This conclusion—that the alleged conduct would impact all employees despite "external equity" constraints—is predicated on the flawed premise that the Defendants are the only firms proposed class members could move to.[143]  Plaintiffs' experts present no assessment of the hundreds of other firms competing for labor from relevant employees which may constrain the ability of the Defendants to "suppress wages."  Neither Dr. Starr nor Dr. Gerhart have presented any analysis to suggest that compensation was "suppressed in these other companies" where relevant employees could move.

66.     Dr. Gerhart presents what he describes as an "example of the no-poach agreements' cascading effects."  In his example,[144]

- A Director does not receive "an unsolicited job offer having higher pay […] than their current job" due to the alleged conduct.

- Due to this offer the Director would have received absent the alleged conduct, "other Directors at the Defendant firm who were not cold called will *immediately* increase their own pay expectations and require higher pay to feel their pay is fair."

- Next, Vice Presidents "who did not receive cold calls notice that their pay is now unfair because the differential between their pay and the pay of Directors has now decreased," which leads to "pressure" to "increase Vice Presidents' pay to the targeted differential."

- Further, "[o]ther job titles whose functions sometimes overlap with those of Director now notice that the gap between their pay and that of Directors in the same firm has grown, and they demand increases to restore pay fairness."

- Finally, when "the firm performs its annual system-wide compensation review, it now discovers that Director pay has moved substantially ahead of pay for other job titles whose

---

[141] Gerhart Report, ¶94.

[142] Gerhart Report, ¶94.

[143] As I discuss in Section VI.D, Defendants also benchmarked their pay to a variety of compensation surveys, which include information from non-Defendant firms.

[144] Gerhart Report, ¶143, emphasis added.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

work overlaps," and "[m]aintaining internal equity requires increasing pay for those job titles as well."

67.     Dr. Gerhart assumes that an additional job offer for a Director would move compensation for all Directors, irrespective of the type of work they were doing.  For example, by Dr. Gerhart's theory, if Named Plaintiff Allen Spradling, who worked as a Director of IT in Birmingham, AL,[145] received another job offer, all other Directors—not just those in SCA's IT department but also those in the Finance, Marketing, Development, and other departments—would *immediately* demand higher compensation (including base salary as well as bonus and equity), irrespective of their job responsibilities, performance, outside job opportunities, or location.  Dr. Gerhart further assumes that this additional job offer for a Director would move compensation for all Vice Presidents and all "[o]ther job titles whose functions sometimes overlap with those of Director."  That is, Dr. Gerhart's theory would suggest *all* employees would demand higher compensation due to a single additional job offer— contrary to his own argument that "the pressures to raise pay diminish as one gets further removed from the new-hire Director, and the adjustments take time to play out."[146]  Dr. Starr similarly posits that "[c]ompensation structures connect all employee pay within a firm, such that any suppression of wages for one group of employees would tend to suppress the pay of other employees."[147]

### 2. Compensation Data for Relevant Employees Contradicts Dr. Gerhart's and Dr. Starr's Conclusion of "Cascading Effects"

68.     To support their conclusion that "formalized pay structures" would "lead to cascading effects class-wide,"[148] Plaintiffs' experts review documents they claim describe Defendants' compensation policies.  However, several documents Dr. Starr and Dr. Gerhart cite in support of their conclusion of rigid "wage structures" do not support their conclusions.  For example, Dr. Starr cites a March 2018 internal DaVita document, which describes the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ used by DaVita in determining compensation, such as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and that DaVita did not ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[149]  Similarly, an internal SCA

---

[145] Spradling Deposition, 201:1–24; Spradling Deposition, Exhibit DX005 (Sprad000014–0015).

[146] Gerhart Report, ¶143.

   Dr. Gerhart testified that the pay adjustments ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Gerhart Deposition, 223:11–17).

[147] Starr Report, ¶172.

[148] Gerhart Report, Section VIII.A, ¶141.

[149] DVA_OMCEAL_001329256–9261, at 9257.

51

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

presentation notes that, as of September 2020, SCA did not ███████████████████████
████████████████████████████.[150] Ultimately, Dr. Starr and Dr. Gerhart's conclusions regarding the purported "cascading effects" on compensation for relevant employees is an empirical issue.

69.     In fact, data reflecting the actual compensation received by relevant employees does not follow Plaintiffs' experts' description of the purported "cascading effects" of the alleged conduct. Dr. Gerhart testified that "internal equity is the key to causing cascading effects," and that "internal equity is reflected in the focus on paying people systematically […] based on their role and their performance" as well as a firms' "accepted or desired differentials" between different job levels.[151] However, Dr. Gerhart does not conduct any empirical analysis to assess how (if at all) these two considerations of "internal equity" impacted compensation for relevant employees. While Dr. Starr presents two correlation analyses to purportedly "demonstrate that groups of employee wages are tied together," as I describe below, his analyses do not support Plaintiffs' experts' theory of "cascading effects."[152]

---

[150] SCA001669270, at slide 3. ████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
████████████████████████████ (see slides 4–5).

See also, SCA000098450–8452, at 8450–8451 ███████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████; Deposition of Leslie Wachsman, May 22, 2024 ("Wachsman Deposition",) 118:8–119:14 (████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████); Deposition of Kevin Zaideman, December 18, 2024 ("Zaideman Deposition",) 54:22–56:5 ("███████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
█████████████████████); Zaideman Deposition, 52:14–53:18 ████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████ ██████ ███ ███
██████████████████████")

[151] Gerhart Deposition, 250:17–24.

[152] Starr Report, ¶178.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

### a. Compensation Data Contradicts Plaintiffs' Experts' Conclusion of Consistent Compensation Changes Within Job Levels

70. The first step of Plaintiffs' experts' "cascading effects" theory is that the Defendants would adjust compensation for employees in jobs "similar" to the employee that received an additional job offer. For example, Dr. Starr argues that "[c]ompensation structures connect all employee pay within a firm" as pay for employees is "in part, set with reference to the pay of those employees whose jobs are most similar to their own."[153] As Dr. Gerhart asserts in his example mentioned above, due to the additional offer a Director receives absent the alleged conduct, "other Directors at the Defendant firm who were not cold called will *immediately* increase their own pay expectations and require higher pay to feel their pay is fair."[154] That is, Plaintiffs' experts' theory of "cascading effects" assumes that the compensation for all Directors (or all Vice Presidents) are connected, such that a change on one Director's (or Vice President's) compensation will immediately cause consistent changes in the compensation of all Directors (or all Vice Presidents).

71. However, the Defendants' compensation data shows that employees within each of these job levels (as identified by Dr. Starr) have wide variation in compensation both within a single Defendant and across Defendants. **Exhibit 11** shows Dr. Starr's calculated hourly rate (i.e., total compensation divided by the number of hours worked by the employee in that year) for jobs he identifies as being in the Director level in 2017.[155] Dr. Starr calculates the hourly rate to compare employees that may have worked different number of hours within the same year.[156] In this exhibit, each dot represents the hourly rate for an individual employee at one of the Defendants. The vertical black bars show the median hourly rate for that Defendant. As this exhibit shows, each Defendants paid a variety of compensation for "similar" employees. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[157] This exhibit also shows that the compensation for these different job levels was not consistent Defendant by Defendant. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[153] Starr Report, ¶172.

[154] Gerhart Report, ¶143, emphasis added.

[155] I select 2017 as an illustration in this exhibit, but I see similar variation across all years. See **Appendix F** for the distribution in hourly rates by Defendant and job level in each year from 2005 to 2022.

[156] Proposed class member are senior level employees that received substantial total compensation. ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ (Starr Report, Figure 5).

[157] In this section, I report the ranges between the 1st percentile and 99th percentile of compensation.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



**EXHIBIT 11**
**HOURLY RATE FOR DIRECTORS**
**BY DEFENDANT**
**2017**

Notes: The vertical black bar on each distribution indicates the median hourly rate. Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours. Employees with compensation below the 1st percentile or above the 99th percentile for each Defendant are not shown in this exhibit.

Source: Starr turnover (Corrected Data).

72.     I find an even wider variation in compensation for employees that Dr. Starr has identified as being within the Vice President level. In **Exhibit 12,** I present a similar analysis of the distribution in compensation for these employees as I present above for the Director level. ▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



**EXHIBIT 12**
**HOURLY RATE FOR VICE PRESIDENTS**
**BY DEFENDANT**
**2017**



Notes: The vertical black bar on each distribution indicates the median hourly rate. Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours. Employees with compensation below the 1st percentile are not shown in this exhibit. ████████████████ ████████████ are not shown.

Source: Starr turnover (Corrected Data).

73.     The first step in Dr. Gerhart's theory is that a single employee receiving one job offer or cold call in the but-for world would result in an adjustment of expectations across all employees in that same job level—irrespective of what job those employees held or where their compensation fell within the wide distribution of compensation for employees within their job level. The range of compensation for Directors and Vice Presidents—hundreds of dollars per hour—illustrates how unrealistic the predicate of his "cascading effects" theory is. For example, Dr. Gerhart's theory implies that an employee making near the top of the range (████████████████████████████████) would immediately change their expectations in response to an offer a different employee receives near the bottom of the range (██████████████████████████████). Moreover, given this wide range, there is no reason to assume that the Defendants would have adjusted their purported "wage

55

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

structure" due to an increase in compensation for one (or several) employees as their compensation would likely remain within this wide range.

### b. Compensation Data Contradicts Plaintiffs' Experts' Conclusion of Consistent "Pay Differentials" Between Job Levels

74.     The second step of Plaintiffs' experts' "cascading effects" theory is that the Defendants maintained rigid "differentials" between different jobs such that compensation changes within one group of employees would lead to compensation changes for other groups.  For example, Dr. Gerhart argues that the "widespread, systematic impact on other employees happens as a function of Defendants' commitment to maintain desired and accepted pay differentials based on jobs, grades/ranges […] and employee performance."[158]  While Dr. Gerhart claims that Defendants "used fixed percentage pay differentials between jobs at different levels of a grade/range system" based on general compensation practices he cites, he does no empirical analysis to determine if this is true for the compensation of relevant employees.[159]  As I describe below, relevant employees received a large portion of their total compensation in the form of variable compensation (i.e., bonus and equity compensation).  Dr. Gerhart's general discussion of "pay differentials" is focused on salary ranges, and he does not assess if his assumed "pay differentials" would apply to total compensation.

75.     In fact, the data underlying Dr. Starr's correlation analysis across job levels contradicts the theory of fixed "pay differentials."[160]  **Exhibit 13** and **Exhibit 14** show the average hourly rate for Directors and VPs/SVPs at DaVita and SCA, respectively.[161]  In these exhibits,

- The dark blue portion of each bar shows the average hourly rate (as calculated by Dr. Starr as total compensation divided by the number of hours worked by the employee in that year) for Directors.

- The light blue portion of each bar shows the difference in average rates between Directors and VPs/SVPs, such that the total height of each bar shows the average rate of VPs/SVPs in that year.

- For each year, I label the percentage difference between the hourly rate for Directors and VPs/SVPs.  For example, ██████████████████████████████

---

[158] Gerhart Report, ¶142.

[159] Gerhart Report, ¶113(a).

[160] Starr Report, Figure 19.

[161] See **Appendix G-1** for a similar chart for USPI.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



As these exhibits show, the differentials between different job levels are not "fixed"—ranging between ███████████████████████████ and between ███████████████████ during the proposed class period.

**EXHIBIT 13**
**DIFFERENCE BETWEEN AVERAGE HOURLY RATE**
**DIRECTORS AND VPs/SVPs**
**DAVITA**
**2005 – 2022**



Note: Vertical lines indicate the start and end of the proposed class period.

Source: Starr turnover (Corrected Data).

57

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 14**
**DIFFERENCE BETWEEN AVERAGE HOURLY RATE**
**DIRECTORS AND VPS/SVPS**
**SCA**
**2005 – 2022**



Note: Vertical lines indicate the start and end of the proposed class period.

Source: Starr turnover (Corrected Data).

76.      This wide range of differentials contradicts Dr. Gerhart's assumption of how effects would "cascade" across job levels.  To the extent Defendants adjusted compensation for one job level and not others (through, for example, offering different bonus amounts), there is no reason to assume, as Plaintiffs' experts have, that changes in compensation for one group of employees would necessarily lead to changes in compensation for other groups of employees.  Dr. Gerhart assumes that if the pay for a Director is increased, (i) Vice Presidents will "notice that their pay is now unfair because the differential between their pay and the pay of Directors has now decreased and (ii) this will lead to "pressure" to "increase Vice Presidents' pay to the targeted differential."[162]  However, as **Exhibit 11** and **Exhibit 12** above show, there is substantial overlap in the distribution of compensation between

---

[162] Gerhart Report, ¶143

58

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Directors and Vice Presidents.  For example, ███████████████████████████████████ ███████████████████████████████████████████████████████████████ Given this overlap, there is no reason to assume that Vice Presidents will "notice that their pay is now unfair." Moreover, Dr. Gerhart's "cascading effects" theory hinges on the maintenance of a fixed ratio (e.g., Vice Presidents always make 10 percent more than Directors).  But, as the empirical analysis demonstrates, there is no fixed differential and the underlying mechanism that Dr. Gerhart alleges creates the "cascading effects" does not exist for the positions at issue.

### 3. Dr. Starr's "Quantitative Evidence of a Compensation Structure" is Flawed and Does not Support his Conclusion that the Purported "Wage Suppression" would "Transmit" Across Proposed Class Members

77.      While Dr. Gerhart presents no analysis to support his theory of "cascading effects," Dr. Starr presents two correlation analyses that he states are "consistent with the existence" of "compensation structures" at the Defendant firms.[163]  First, Dr. Starr purports to "study whether earnings are positively correlated across job levels, conditional on a variety of macroeconomic and healthcare specific controls."[164]  Second, Dr. Starr purports to "study whether wages are positively correlated within specific job titles."[165]  Dr. Starr argues that because these two correlation analyses purport to show that compensation is correlated (i) "across job levels" and (ii) "within specific job titles," this is "strong support for compensation structures linking Class pay together."[166]

78.      However, Dr. Starr's analysis cannot determine *why* the average compensation series he studies move together, i.e., whether a change in compensation for one job is the reason for any part of any movement in compensation for other jobs.  In fact, compensation across jobs (particularly when

---

[163] Starr Report, ¶182.  I note that neither of these analyses address the issue of external equity as each looks at wages only within a single Defendant.

[164] Starr Report, ¶182.

[165] Starr Report, ¶182.

[166] Starr Report, ¶178.  In addition to his discussion of "compensation structures" and correlation analysis, Dr. Starr presents what he describes as "independent and complimentary methods" to demonstrate that "the generalized wage suppression" he purports to find with his "wage suppression" regression model "would harm all or nearly all Class Members" (Starr Report, ¶138).  Each of these proposed "methods" is based on his flawed "wage suppression" regression model and suffers from the same flaws described in Section VIII.

Further, the results of Dr. Starr's own "complimentary methods" do not support his conclusion on their face.  For example, Dr. Starr presents what he refers to as "Interval In-Sample Predictions" in his Figure 16 and reports that "more than ███ percent of Senior-Level Employees are statistically significantly harmed" (Starr Report, ¶168).  However, when I apply this same analysis to Dr. Starr's corrected data (see Section VIII.B) and apply the conventional level of █ percent to determine statistical significance, but make no other corrections, I find that Dr. Starr's "Interval In-Sample Predictions" suggest only approximately ███ of relevant employees might have been impacted by the alleged conduct.

averaged together) can be correlated whether all, some, or none of compensation moves in relationship to a purported "wage structure." Thus, the correlation that Dr. Starr finds for average time series is unsurprising; all it indicates is that compensation generally moved together between 2005 and 2022 after accounting for the limited set of macroeconomic and healthcare factors that Dr. Starr includes in some of his analyses.[167]

79.     I construct a simple illustration limited to base salary to show why the finding of two series to be highly correlated has no probative value for the assessment of impact to any individual proposed class members, much less to the proposed class as a whole. The construction of my illustration is as follows:

- There are two employees within the same firm who start in the same job in 2015, one of which has a starting salary of $85,000 (Employee 1) and the other of which has a starting salary of $80,000 (Employee 2).

- Both of these employees receive an average merit increase of 2 percent each year.

- In 2019, Employee 1 receives an outside job offer, which she leverages to negotiate a 15 percent increase in her base salary that year.

80.     According to Dr. Starr's theory, the existence of "compensation structures" within the Defendant firms would cause Employee 2 to similarly receive a similar 15 percent increase in his base salary. However, whether or not Employee 2 receives this increase in his base salary, the pay for Employee 1 and Employee 2 will be correlated. **Exhibit 15** graphically represents this illustration, with the blue line showing the base salary of Employee 1 and the orange line showing the base salary of Employee 2. In the first panel, I show the effect that would be seen if Dr. Starr's assumed "wage structure" existed, where Employee 2 receives a similar pay increase as Employee 1. In the second panel, I show the same two employees, but now Employee 2 only receives an average merit increase of 2 percent each year.

---

[167] Starr Report, ¶184. The analyses Dr. Starr puts forward cover 2005 through 2022 for DaVita and USPI and 2008 through 2022 for SCA. In some of his analyses, Dr. Starr includes the same "macroeconomic and healthcare factors" that he includes in his "wage suppression" regression.

These factors do not account for any firm-specific factors (such as financial or stock market performance) that would drive compensation of employees in the same direction. For example, in 2007, when USPI went private, ████████████████████████████████████ Similarly, as I explain below, many DaVita employees ███████████████████████████ due to the firm's performance.

Dr. Starr's analysis would attribute these events to a spurious correlation between average compensation of Directors and VPs/SVPs because he does not account for any firm-specific factors which impacted compensation of many employees in a given year.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 15**
**ILLUSTRATION OF HIGHLY CORRELATED BASE SALARY SERIES**

| WITH "CASCADING EFFECTS" | WITHOUT "CASCADING EFFECTS" |



81.     The correlation between the base salary for these two employees in the second panel is *0.96*. That is, even absent a comparable pay increase for Employee 2 (after the job offer received by Employee 1), these two series are highly correlated. By Dr. Starr's logic, both of these panels would indicate the existence of a "compensation structure." However, only the first panel is consistent with impact to employees not directly impacted by the alleged mobility restrictions. Given that Dr. Starr's "wage structure" analyses cannot show *why* pay is correlated across jobs, they are not probative of the question at issue—whether or if a change in an individual's compensation due to an additional job offer (or cold call) causes all other compensation to increase.[168]

82.     In discussing his correlation analysis across job levels, Dr. Starr argues that the relevant question is "if wages for one job level are higher, then are they also higher in another job level?"[169] As an initial point, Dr. Starr's analysis across job levels tests if *average* compensation for all Directors is correlated with *average* compensation for all Vice Presidents and Senior Vice Presidents. As I show above, compensation levels varied significantly even for employees within the same job level. Rather

---

[168] For some of his correlation analyses, Dr. Starr includes additional variables that he claims control "for macroeconomic and healthcare factors that might otherwise cause [wages] to move together" (Starr Report, ¶184). However, if Dr. Starr is not controlling for all factors that might result in wages "moving together," his analysis will still find a correlation absent his contention of a "wage structure." As I discuss in detail in Section VIII.D, Dr. Starr's additional controls do not include any control for firm performance, which would impact employees' compensation over time.

[169] Starr Report, ¶182.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

than testing if two aggregate series generally move together, the more relevant question is: are the *changes* in compensation for one employee related to the *changes* in compensation for other employees? As the hypothetical example above shows, two series can be correlated even if the *change* in pay is not similar. Moreover, by Dr. Gerhart's contention, Defendants' focus on "internal equity" including "accepted or desired differentials" between different job levels is "key" to the effects "cascading" across proposed class members.[170] This "fixed" differential would imply that the changes in compensation move in tandem across levels (i.e., finding a correlation close to 1).

83.     To test this more relevant question (i.e., whether the changes in compensation for one employee are related to the changes in compensation for other employees), I apply Dr. Starr's correlation analysis to the changes in average compensation for each job level (i.e., the difference between the average compensation in that job level in the current year and the prior year, also referred to as a "first difference"). That is, I test whether Dr. Starr's analysis finds a statistically significant relationship—and the size of this relationship (which would need to be close to 1 to support Plaintiffs' experts' arguments of "cascading effects") —between the year-over-year changes in average pay for Directors and the year-over-year changes in average pay for VPs/SVPs. **Exhibit 16** shows the results of this test, applying the same data corrections described in Section VIII.B.

---

[170] Gerhart Deposition, 250:17–24.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

**EXHIBIT 16**
**DR. STARR'S FIGURE 19: RELATIONSHIP BETWEEN DIRECTOR AND VP/SVP WAGES**
**ON CORRECTED DATA**
**APPLIED TO YEAR-OVER-YEAR CHANGES**

| | Dependent Variable: *First Difference of* Ln(Mean Hourly Rate for Directors) | | |
|---|---|---|---|
| | DaVita | SCA | USPI |
| *First Difference of* Ln(Mean Hourly Rate of VPs & SVPs) | | | |
| *First Difference of* Ln(Avg. State Mgr. Earnings) | | | |
| *First Difference of* Ln(State Health Expend. PC) | | | |
| *First Difference of* Covid | | | |
| *First Difference of* Ln(State GDP PC) | | | |
| *First Difference of* Ln(State Unemployment Rate) | | | |
| *First Difference of* Census Region Annual CPI | | | |
| Constant | | | |
| Observations | | | |
| R-squared | | | |

Notes: * indicates results that are statistically significant at the conventional 5 percent level. Results of Dr. Starr's variable of interest that are not statistically significant are shown in yellow. Dr. Starr notes that "the constant term is suppressed" for his analysis; however, the analysis does include a constant term, although it is not shown in his Figure 19.

See **Appendix H-1** for this same test on Dr. Starr's Figure 37, which studies the opposite relationship (i.e., how pay for directors relates to pay for VPs/SVPs).

Source: Starr turnover (Corrected Data).

84.     As this exhibit shows, when applied to the *changes* in compensation, Dr. Starr's correlation analysis across job levels does not find a statistically significant relationship between job levels at SCA or USPI, after accounting for the other factors that Dr. Starr argues would result in compensation moving together.[171] That is, his own analysis does not show that "there are equity forces at work across job levels" within two of the three Defendants.[172] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[171] Starr Report, ¶184.

[172] Starr Report, ¶182.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

85.    Dr. Starr also purports to assess "whether the wages of workers with the same job title move together" by testing whether the average compensation of a subset of employees within a job title is correlated with individual employees' compensation in that same job title.[173]  Specifically, Dr. Starr calculates whether the average hourly rate of a random 50 percent sample within a given job title-year combination is correlated with the individual hourly rates for the remaining 50 percent of employees in that same job title and year (in his "hold-out sample").[174]  Dr. Starr argues that the findings of his purported test ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████.[175]

86.    However, Dr. Starr's test has no bearing on whether there is a "wage structure" such that the alleged conduct would have "cascading effects."  That is, Dr. Starr's analysis cannot answer the question at issue: would a positive wage shock to an employee that received an additional job offer in the but-for world "cascade" to others in the same job who did not?  Instead, Dr. Starr's analysis merely confirms that relevant employees worked in numerous different jobs at the Defendants, with different average wage levels (and considerable variation in pay around these averages).

87.    In fact, Dr. Starr's test would find the same relationship—that the average hourly rate for employees in one job title is correlated with the hourly rate of individuals within that same job title—even if the compensation levels for workers with the same job title do *not* move together.  To illustrate this, I perform a "placebo test," which I present in **Exhibit 17** below.  For this test, I replicate Dr. Starr's "hold-out sample test" with only one modification: I replace the actual wages for any worker who remained in the same job with a completely *independent* and *random* wage change between –5 and +10 percent.  This "placebo test" thus ensures by definition that wages of workers with the same job title do *not* move together.  For every Defendant, Dr. Starr's method would still find a statistically significant

---

[173] Starr Report, ¶187.

[174] Starr Report, ¶¶187–188.  ("To implement this test, I use a randomized hold-out sample analysis.  To illustrate the idea, consider the following example: Suppose that there are 100 Directors in a given company in a given year.  I randomly split 50 into group A, and 50 into group B.  I then examine whether the average wages of the 50 randomly selected Directors in group A are predictive of the individual wages of the other 50 Directors in group B.  If so, then this is strong evidence in favor of a compensation structure.")

[175] Starr Report, ¶190.  Starr Deposition, 424:22–430:1.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"almost one for one" relationship with the individual compensation of those in the hold-out set—even if compensation moved randomly and independently from each other.[176]

**EXHIBIT 17**
**DR. STARR'S FIGURE 20: WITHIN-JOB HOURLY RATE CORRELATION**
**ON CORRECTED DATA**
**PLACEBO TEST WITH RANDOM COMPENSATION CHANGES**



| | Dependent Variable: Ln(Hourly Rate) | | |
|---|---|---|---|
| | DaVita | SCA | USPI |
| Ln(Average Placebo Hourly Rate of Others in Same Job-Year) | | | |
| Ln(Avg. State Mgr. Earnings) | | | |
| Ln(State Health Expend. PC) | | | |
| Covid | | | |
| Ln(State GPD PC) | | | |
| Ln(State Unemployment Rate) | | | |
| Census Region Annual CPI | | | |
| Constant | | | |
| Observations | | | |
| R-squared | | | |

Notes: * indicates results that are statistically significant at the conventional 5 percent level. While Dr. Starr notes that "the constant term is suppressed" for his analysis, the analysis does include a constant term, which is not reported.

This analysis uses the same employees and starting compensation as Dr. Starr's Figure 20, but randomly replace the actual compensation for any worker who remained in the same job title with an independent and random compensation change drawn from a [–5, +10 percent] uniform distribution.

Source: Starr turnover (Corrected Data).

88.     The reflexive property generating the "almost one for one" co-movement between individual wages and the (approximated) average wages among their peer group is well understood in the

---

[176] In my backup materials, I show the results of 1,000 repetitions of this placebo test—each time with different "hold-out samples" and different random and independent wage changes for employees remaining in the same job. A meaningful statistical test should falsely reject that "wages of workers in the same job title do not move together" only around 5 percent of the time. Dr. Starr's test, however, rejects this true null hypothesis 100 percent of the time.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

econometrics and statistics literature on "peer effects."[177] As labor economist and Nobel Prize laureate Joshua Angrist describes in a textbook on this topic, "any shock common to the group […] creates spurious peer effects."[178] In Dr. Starr's application, any shocks *common* to a job title-year group (such as the firm's or the group's performance, group-specific merit budgeting decisions and/or job-specific benchmarking adjustments) will create the spurious illusion of "cascading" peer effects extending to employees in the same job. To address the relevant question at issue—whether an *uncommon* positive wage shock for a few employees would "cascade" to all others in the same job—Dr. Starr's test would need to properly account for the effects of all *common* shocks. Dr. Starr has not done that.

### D. Dr. Starr and Dr. Gerhart Ignore Other Factors that Would Limit the Impact (If Any) of the Alleged Conduct

#### 1. Plaintiffs' Experts Acknowledge that the Defendants Benchmarked Compensation to Non-Defendant Firms But Do Not Account for How This May Limit the Impact of the Alleged Conduct on Compensation Received by Relevant Employees

89. Dr. Gerhart argues that companies benchmark their compensation to external sources in order to "match a company's internal compensation structure […] with the value (as indicated by pay level) assigned by the external market."[179] Dr. Starr similarly argues that the Defendants sought to maintain "external equity."[180] While Dr. Starr argues the "relevant implication" of external equity in the context of "wage suppression" (i.e., "if Firm A is able to suppress the wages of its own employees, Firm B (which nominally competes with Firm A over labor) can pay its own employes less"), the same forces

---

[177] If one regressed the individual hourly rates on an average estimated over the *same* set of individuals (and not over a 50 percent sample of "others"), the regression would mechanically guarantee a *perfect* "one for one" relationship. This is known as the "reflection problem." See Charles F. Manski, "Economic Analysis of Social Interactions," *Journal of Economic Perspectives*, Vol. 14, No.3, 2000, p. 128 (describing that average "behavior in the group is itself determined by the behavior of group members. Hence, data on outcomes do not reveal whether group behavior actually affects individual behavior, or group behavior is simply the aggregation of individual behaviors. This *reflection problem* is similar to the problem of interpreting the (almost) simultaneous movements of a person and his reflection in a mirror. Does the mirror image cause the person's movements or reflect them?")

Dr. Starr's estimate of the average hourly rate within a job is estimated over a 50 percent sample and thus not perfectly identical to the exact group average. However, as long as the 50 percent sample is large enough, it will provide a good approximation of the exact group average (by the law of large numbers – the same law that guarantees that if one throws a coin often enough, one will eventually get 50 percent heads and 50 percent tails.) Therefore, Dr. Starr's estimator also moves closer to the mechanical "reflexive one-for-one" relationship simply because of sample size (and not because "wages of workers with the same job title move together").

[178] Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion*, 1st ed., Princeton University Press, 2009, p. 146; Joshua D. Angrist, "The Perils of Peer Effects," *Labour Economics*, Vol. 30, 2014, p. 101.

[179] Gerhart Report, ¶115(f). See also, Starr Report, ¶¶175–176.

[180] Starr Report, ¶¶179–181.

would apply to wage increases as well.[181]  In the face of competition from a wide range of companies, the "relevant implication" for Defendants would be the opposite of Dr. Starr's contention.  That is, if Firm A competes with Firm 1 through Firm 100 for employees, it would not be able to "suppress wages" unless many of its 100 competitors did the same (or risk losing employees to their labor market competitors).  Similarly, if Defendants benchmark compensation against the external market, which includes a variety of non-Defendant firms, this may undermine or limit the impact of the alleged conduct on compensation for relevant employees.

90.      Plaintiffs' experts reference "abundant evidence" that DaVita, SCA, and USPI benchmarked their pay to external market data.[182]  As shown by the evidence cited by Dr. Starr and Dr. Gerhart, the Defendants used a variety of different surveys to benchmark compensation for relevant jobs.  For example,



- ███████████████████████████████████████████████████████
  ███████████████████████████████████.[183] ████████████████████
  ███████████████████████████████████████████████
  ███████████████████████████████████████████████
  ██████████████████████████████████████████
  ████████████████████[184]

- Available evidence also shows that SCA benchmarked its pay to external market data. Former SCA Talent Officer Bridie Fanning testified that ████████████████████ ████████████████████████████████████████████████ ████████████████████.[185]  Dr. Gerhart cites similar statements from other SCA executives

---

[181] Starr Report, ¶175.

[182] Gerhart Report, ¶116(a).  See also, Gerhart Report, ¶116(b)–(c), Starr Report, ¶¶179–181.

[183] Gerhart Report, ¶116(a), citing Rodriguez Deposition, 113:17–23; Chipman Deposition, 79:13–23; Arthur Deposition, 108:3–109:9.

DaVita benchmarked compensation against a variety of different types of companies in several industries.  For example, ██████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████ (DVA_OMCEAL_001386589–6626, at 6589).

[184] Deposition of Colleen Arthur, May 23, 2024 ("Arthur Deposition",) 107:24–110:1; DVA_OMCEAL_001332708–2711 (Exhibit PX73), at 2708–2710; DVA_OMCEAL_001344567–4582 (Exhibit PX268), at 4573.  See also, Gerhart Report, ¶116(a); Starr Report, ¶179(d), (j).  Towers Watson and Willis Group merged in 2016 to become Willis Towers Watson (WTW, "Our History," https://www.wtwco.com/en-us/about-us/our-history)

[185] Fanning Deposition, 175:11-16.  See also, Gerhart Report, ¶116(b); Starr Report, ¶180(c), (i).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

involved in compensation decision making, including former COO Michael Rucker who testified that SCA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[186]

- Similarly, USPI regularly relied on external benchmarking to set employees' pay. For example, former USPI internal recruiter Shannon McGarry testified that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮.[187] Like DaVita and SCA, USPI also relied on a variety of third-party services including Ambulatory Surgery Center Association and Mercer to benchmark pay.[188]

91. Despite acknowledging the importance of "external equity," benchmarking, and salary surveys for setting compensation, neither Dr. Starr nor Dr. Gerhart consider how benchmarking would undermine the broader compensation effects of any alleged conduct.[189] Given that the Defendants regularly benchmarked compensation to external labor market data, including a wide range of non-Defendant firms, such benchmarking could have applied upward pressure on any purported "wage structure" within each of the Defendant firms, potentially reducing the impact of the alleged conduct. Ultimately, the relevant question is if Defendants were able to suppress compensation without losing employees to their competitors. Dr. Starr and Dr. Gerhart have not explained how Defendants could suppress compensation below competitive levels when relevant employees could move to hundreds of

---

[186] Gerhart Report, ¶116(b); Deposition of Michael Rucker, August 27, 2024 ("Rucker Deposition"), 262:15–20. The 2017 compensation analysis Dr. Gerhart cites reveals that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ (Gerhart Report, ¶116(b); SCA001046573–6574 (Exhibit PX528), at 6573).

[187] Deposition of Shannon McGarry, June 11, 2024 ("McGarry Deposition",) 108:14–19, 110:3–12. See Gerhart Report, ¶116(c).

[188] Gerhart Report, ¶116(c). See also, Starr Report, ¶181(b).

[189] Gerhart Report, ¶115(f); Starr Report, ¶175.

While Dr. Gerhart claims that "if pay levels in the market for any of these benchmark jobs have been artificially depressed, then pay [for] these jobs in a company will also be lower," he has performed no analysis of the benchmark levels for any relevant job nor has he described how the Defendants could "artificially depress" benchmark data across the variety of surveys utilized and across the companies included within these surveys (Gerhart Report, ¶115(f)). As I discuss above, the evidence that Dr. Gerhart cites indicates that that Defendants benchmarked to a broad set of labor market competitors—not just one another.

Similarly, Dr. Starr argues that "a company may seek to pay its employees at approximately the 75th percentile of some external pay benchmark" but switch to benchmarking to "approximately the 50th percentile of some external pay benchmark" if "that company is suppressing labor competition" (Starr Report, ¶176). Dr. Starr fails to provide any evidence that the Defendants in this case changed their external benchmarking practices over time due to the alleged conduct.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

other firms that competed with the Defendants for their labor and that the Defendants benchmark themselves against.

### 2. Plaintiffs' Experts' Own Description of the Purported "Wage Structures" at Defendant Firms Suggest these Practices Would Limit the Impact of the Alleged Conduct on Compensation

92. Taking Dr. Starr's and Dr. Gerhart's description of the Defendants' purported "wage structures" at face value, the continued addition of new employees would put *upward* pressure on compensation. According to Plaintiffs' experts, Defendants' purported "wage structures" imply that any "wage suppression" would impact all employees. If that were the case, compensation across employees would also have to *increase* in response to newly hired employees paid competitive rates (i.e., joining the Defendants at higher compensation levels compared to current employees' compensation that was allegedly "suppressed"). Neither Dr. Starr nor Dr. Gerhart has described how an additional six employees failing to move between the Defendants each year would suppress compensation for all proposed class members while the Defendants hiring hundreds of employees each year would not have the opposite effect on compensation due to these same forces.

93. Dr. Gerhart acknowledged that "when there are many […] new hire and retention perturbations across a firm, and when they continue year-after-year, the pressure to increase pay system-wide are continuous and substantial."[190] As I show above, the Defendants regularly hired from non-Defendant firms. If compensation was not suppressed at these non-Defendant firms, based on Plaintiffs' experts' own theory, these newly hired employees would have to be paid a competitive rate, creating "pressure to increase" pay. Dr. Gerhart acknowledged that compensation for these new hires "would probably have to be within sight of what the competitive rate would be," otherwise they would have joined a competing firm.[191] If these new employees were paid "within sight of what the competitive rate would be" as the Plaintiffs' experts theorize, then current employees would be as well by Plaintiffs' experts' own "cascading effects" theory.

### 3. Defendants Utilized Long-Term Incentives to Retain High Performing Employees, Which Would Limit the Impact of the Alleged Mobility Restrictions

94. An academic article referenced by Dr. Starr discusses how long-term incentive programs— where employees must remain at the firm to receive the compensation they were granted in previous

---

[190] Gerhart Report, ¶143.

[191] Gerhart Deposition, 56:1–21.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

years—are commonly used as retention tools by firms.[192] One reason why employees would be incentivized to remain at their current employers is to receive any unvested compensation they have been granted but not yet received. The Defendants themselves describe their long-term incentive programs as an effort ███████████████████████████████████████[193]

95.     Dr. Starr and Dr. Gerhart do not address how unvested compensation would potentially limit the mobility of the proposed class (separate and apart from the alleged conduct) given that these are senior level employees who received a large part of their compensation in long-term incentives.[194] For example, █████████████████████████████████████,[195] and the value of these grants could be substantial relative to other types of compensation employees received:

- Proposed class member Richard Kemball-Cook was █████████████████████ ███████████████████████████████ ███████████████████████████ ██.[196]

- █████████████████████████████████████████ The value of Mr. Kemball-Cooks' unvested options appreciated to around ██████ █████████████████████████████████████ ████

96.     Similarly, ██████████████████████████████.[197] SCA tracked the value of unvested equity in compensation statements provided to employees. For example, ████████ ███████████████████████████████████ █████████████████████████████████████ ████████████████████████████████████ ████.[198] Dr. Starr and Dr. Gerhart do not consider that employees like Mr. Kemball-Cook and Mr.

---

[192] Matthew Gibson, "Employer Market Power in Silicon Valley," *W. E. Upjohn Institute Working Papers*, 2024.

[193] SCA000048815-8817, at 8816 (Exhibit PX465).

[194] See **Exhibit 26** and **Exhibit 27**.

[195] DVA_OMCEAL_001332734–2774, at 2760; DVA_OMCEAL_000711693–1695.

[196] I calculate the unvested value of options based on the "Black-Scholes-Merton" valuation model DaVita uses in its SEC 10-K financial filings (see, e.g., DaVita Inc. 10-K, 2010 Annual Report, p. 106). See also, Gerhart Deposition, 78:18–24 ("one of the common methods [to value option grants] is the Black-Scholes method").

[197] See, e.g., SCA002246316; See also, SCA000465129 and SCA001159728–9748 at 9741.

[198] BF000222637.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Buono would be incentivized not to depart from DaVita or SCA while their granted equity compensation is not yet vested.

97.     In addition, Plaintiffs' experts do not discuss how potential increases in stock prices—which Dr. Gerhart claims incentivized the alleged collusion—would improve the position of the proposed class members, a large portion of whose compensation was comprised of equity.[199]  By their own contention, the value of these forms of compensation would be *higher* for proposed class members due to the alleged conduct.  The opposite would also hold.  The value of equity as well as long-term cash incentives and bonuses were contingent on Defendants' financial performance.[200]  Plaintiffs' experts do not address that in their purported but-for world, (i) financial performance may have fallen in the face of a ▮▮▮▮▮▮ (or more) increase in  compensation for relevant employees (as suggested by Dr. Starr's flawed regression model), such that (ii) recipients of long-term equity or cash incentives (or bonuses) would have received less in the but-for world.[201]  Ultimately, Dr. Starr and Dr. Gerhart fail to assess other factors that would undermine any alleged antitrust conspiracy and/or limit the impact of the alleged conspiracy.

## VII.    DR. STARR'S AND DR. GERHART'S OPINIONS ON THE ALLEGED INFORMATION SHARING DO NOT ADDRESS PLAINTIFFS' WAGE FIXING ALLEGATION AND ARE NOT SUPPORTED BY ECONOMIC ANALYSIS OR THE EVIDENCE THEY PRESENT

### A.    Summary of the Alleged Information Sharing Evidence Presented by Plaintiffs' Experts

98.     In addition to the alleged mobility restrictions, Plaintiffs allege that the Defendants ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮"[202]  Dr. Starr testified that he was not offering an "opinion on whether the Defendants coordinated pay levels."[203]  However, Dr. Starr claims that the alleged information sharing included what Defendants "would pay their employes" and speculates that it "would have allowed them

---

[199] Gerhart Report, ¶7(a).  See DVA_OMCEAL_000926457–6460 (▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[200] See ¶155, *infra* for a discussion of Defendants' variable pay programs.  See also, for example, SCA001497129– 7179, at 7150–7154 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[201] I note that Dr. Starr's regression model omits any financial performance measures, and thus also cannot account for any feedback effects between compensation and financial performance.

[202] Complaint, ¶54.

[203] Starr Deposition, 47:1–7.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

to fix Senior-level Employee pay."[204]  Similarly, Dr. Gerhart testified that he was offering the opinion that ███████████████████████████████████████████████████ ████████████████████████.[205]  In support of their conclusion, Plaintiffs' experts reference specific examples of alleged bilateral information sharing between (i) DaVita and SCA or (ii) SCA and USPI.[206] These examples are limited to:

- DaVita or SCA ██████████████████████████████████ ████████████████████████████ ███[207] and SCA or USPI ██████████ ████████████████████████████████ ███[208] ████ ████████████████████████████████ ████████████████████████████.[209]  For example, Plaintiffs' experts point to ████████████████████████████████████████

---

[204] Starr Report, ¶58.  See also, Starr Report, ¶179(k) (███████████████████████████ ██████████████████████████████████████ ); ¶180(k) (████ ████████████████████████████████████████████████████ ████████████████████████████; ¶181(d) ████████ ████████████████████████████████████████████ ████████████████████████████ ).

[205] Gerhart Deposition, 146:11–147:18.

[206] Gerhart Report, ¶¶82–83; Starr Report, ¶¶100–101.

[207] See, e.g., HAYEK-000012214–2216 (Exhibit PX490) and Rucker Deposition, 256:13–257:3, 294:5–17, 342:17–343:11, 353:5–355:14 (████████████████████████████████ ████████████████████████████ ).

████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████ (Hayek Deposition, 366:20–368:14).  DaVita's public Proxy Statement in June 2009 includes similar information as this document, including that the DaVita "Compensation Committee elected not to award merit increases to base salary in 2009 to our named executive officers and other members of management across the company" (DaVita, "Notice of Annual Meeting of Stockholders," June 3, 2009, https://filecache.investorroom.com/mr5ir_davita/185/ DaVita_Proxy09_Final_2.pdf., p. 21).

[208] See, e.g., HAYEK-000012214–2216 (Exhibit PX490); OMC_BM_000014729 (Exhibit PX525); USPI_CIV_000021155 (Exhibit PX232).

[209] ████████████████████████████████████████████████████ ██████████████████████████████████ (Mathis Deposition, 69:18–70:11).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

███████████████████████████████████████████████

████████████████████████████████ [210]

- ████████████████████████████████████████████ ███
████████████████████████████████████

████████████████████████████████████

███████████████████████████████. [212]

- SCA and USPI sharing general business information during the relevant period such as case volume data and aggregate overhead cost information. For example, ███████████

████████████████████████████████████████████████

████████████████████. [213] ███████████████████████████████

████████████████████████████████████

99.    Although the evidence they present about merit budget information and compensation information for a few individual jobs is limited to discrete conversations in specific years in the early portion of the proposed class period, Dr. Starr and Dr. Gerhart assume, without support, that this alleged information sharing continued for the full relevant period. [214]  For example, Dr. Starr concludes that

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████." [215]  However, Dr. Starr omitted the next sentence of Mr. Hayek's testimony where he stated that this ███████████████████████████ of times and was ███████████████. [216]

---

[210] OMC_BM_000014729 (Exhibit PX525).  Mr. Mathis testified that ███████████████████████ ████████████████████████████ (Deposition of Brian Todd Mathis, September 20, 2024 ("Mathis Deposition",) 53:14–54:3, 55:7–56:20).

In addition to merit budgets, Plaintiffs' experts also point to ████████████████████████████ ████████████████ (USPI_CIV_000601224–1229 (Exhibit PX119)).

[211] OMC_BM_000010778–0779 (Exhibit PX523).

[212] USPI_CIV_000046079 (Exhibit PX239).

Dr. Gerhart also points to a ████████████████████████████████████████████ ████████████████████████████████████ (USPI_CIV_000016522 (Exhibit PX234)).  My understanding is that employees within the legal departments at the Defendants are outside of the proposed class (Complaint, ¶92).

[213] SCA002364259–4261 (Exhibit PX033).

[214] ████████████████████████████████████████████████ ████████████████████████ (Complaint, ¶¶54–60).

[215] Starr Report, ¶100; Hayek Deposition, 362:8–363:7.

[216] Hayek Deposition, 362:8–363:7.

(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Dr. Starr simply assumes the absence of an agreement "to stop exchanging wage data" is proof that the alleged information sharing continued.[217]  As I discuss above, the conclusions drawn from simply reviewing documents—and not conducting any empirical analysis—are not consistent with sound scientific practice or economic analysis.

100.     Neither Dr. Starr nor Dr. Gerhart present any empirical analysis to assess the effect specifically of the alleged information sharing.  Dr. Starr points to the results of his "wage suppression" regression—which estimates an *average* effect across the entire time period and cannot parse out the effects (if any) on compensation of the alleged information sharing from the other challenged conduct.[218]  That is, he provides no empirical analysis to test whether the specific alleged information sharing example he cites had an effect on compensation for any proposed class member or if sharing this information at specific points in time had different impacts on compensation during the proposed class period.  Further, Dr. Gerhart testified that he conducted no empirical analysis and simply offered an opinion on the "likely" effects of the alleged information sharing on the proposed class.[219]  While Plaintiffs allege that the Defendants "███████████████" through the alleged information sharing,[220] neither Dr. Starr nor Dr. Gerhart assess or even explain how the information allegedly shared—inconsistently across the 12-year proposed class period—could form the basis of an understanding as to what compensation to pay or the amount of hiring to suppress.

---

Dr. Starr also cites testimony from Brian Mathis (SCA), who testified that he ███████████████ ████████████████████████████████████████████ ██████████████████████ (Mathis Deposition, 54:16–24).

[217] Starr Report, ¶¶100–101. ████████████████████████████████████████ ██████████████████████████████████████████████

(SCA) (Starr Report, ¶¶100–101 and footnotes 353, 387).  However, her testimony specifically references the exchange of ██████████████ between SCA and USPI, not "wage data" or ████████████████████ ██████ (Wachsman Deposition, at 177:22–178:19, 232:19–233:1).

See also, Starr Deposition, 94:10–23, 96:13–97:7, 462:1–465:10, 501:12–503:16.

[218] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (Starr Report, ¶102). ████████████████████████████████████████████████ ████████████████████████████████████████ (Starr Report, ¶106).

[219] Gerhart Deposition, 34:6–22, 285:24–286:4.

[220] Complaint, ¶54.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

### B. Dr. Starr and Dr. Gerhart Fail to Assess Whether the Alleged Information Sharing or the Economic Conditions in the Markets at Issue Could Facilitate a Successful "Wage Fixing" Conspiracy

101.    Dr. Starr asserts that "the exchange of CSI is often a key component of collusion," citing a paper by Dr. Margaret Levenstein and Dr. Valerie Suslow from the *Journal of Economic Literature*.[221] In this article, Dr. Levenstein and Dr. Suslow describe three key problems economists recognize as an obstacle to any successful cartel: coordination, entry (i.e., competition from firms outside of the cartel), and cheating.[222] Dr. Roger Blair and Dr. Jeffrey Harrison provide a similar framework for assessing monopsony cartel behavior, which is alleged in this case.[223] They describe the "three major tasks that must be performed if a buyer cartel is to be successful" as agreement, implementation, and monitoring.[224] They also highlight two significant obstacles to maintaining a cartel—restricting entry and limiting cheating. Neither Dr. Starr nor Dr. Gerhart provides any analysis to assess whether the economic conditions to facilitate a successful wage fixing cartel exist in this case, nor how the information sharing they cite would overcome these obstacles.

### 1. Dr. Starr and Dr. Gerhart Do Not Assess How the Co-Defendants Could Successfully Coordinate to Form a Wage Fixing Cartel

102.    A successful wage fixing cartel requires "some mutually satisfactory agreement on a host of issues" with respect to base salary, other forms of compensation, demand for labor, and other terms and conditions  of employment.[225] Dr. Starr and Dr. Gerhart are silent about how the Defendants' alleged information sharing could result in coordination of base salary (and other forms of compensation) paid to thousands of proposed class members, or how the Defendants would suppress their demand for labor collectively to reduce compensation. To successfully form a wage fixing cartel, the Defendants would

---

[221] Starr Report, ¶93, citing Levenstein and Suslow (2006).

[222] Levenstein and Suslow (2006), pp. 45–46.

[223] Roger D. Blair and Jeffrey L. Harrison, *Monopsony in Law and Economics*, 1st ed., Cambridge University Press, 2010 ("Blair and Harrison (2010)").

As Dr. Starr describes, "a firm with monopsony power (i.e., buying power) sets the prices at which they will purchase inputs (such as labor) below what would be realized in a competitive market, increasing the monopsonist's own profits at the expense of the employee" (Starr Report, ¶32).

[224] Blair and Harrison (2010), p. 50–51.

[225] Blair and Harrison (2010), p. 50–51. Dr. Levenstein and Dr. Suslow describe the analog to monopsony in a traditional price fixing conspiracy where firms must determine "what prices to charge" and "what level of output to produce" (Levenstein and Suslow (2006), p. 45).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

need a mechanism to coordinate and agree on the compensation paid to and the demand for over ▮▮ proposed class members:[226]

- With a wide range of educational backgrounds and specific credentials;

- Working in different departments, including Operations, Business Development, Corporate Strategy, Payor Contracting, Communications, Government Affairs, Clinical Services, IT, and Finance;

- Employed in different geographic locations;

- Across an approximately 12-year time period, and

- Who could be hired away by hundreds of competing non-Defendant employers.

103.    Economists recognize that certain conditions facilitate collusion amongst buyers, including when a product is "homogeneous" with a "single price to fix."[227]  On the other hand, "product heterogeneity requires a complex price schedule that maintains equilibrium price differentials" which "undermines the stability of the cartel."[228]  Dr. Levenstein and Dr. Suslow explain that, "[f]irms must be able to coordinate on an equilibrium—in a situation in which there are often multiple equilibria—which increases prices [suppresses wages] and allocates reduced output [employment] among member firms."[229]  The types of employees at issue in this case—highly skilled workers employed across a range of jobs, in different functions, geographic locations, and with different levels of education and skills are clearly heterogeneous, and there is no single prevailing wage for all proposed class members.[230]  Dr. Starr and Dr. Gerhart offer no explanation for how the alleged wage fixing cartel could effectively set compensation for this diverse set of employees.

104.    The ability of Defendants to form an agreement to "fix" compensation is further complicated as base salary is not the only element of compensation.  Many of the proposed class members—Directors, Vice Presidents, and Senior Vice Presidents—receive bonus and equity compensation.  For example, during the proposed class period, variable compensation (e.g., bonus and equity payments) accounts for:

---

[226] See Sections IV and X for additional detail on the variety of proposed class members backgrounds, jobs, and geographic locations.

[227] Blair and Harrison (2010), p. 50.

[228] Blair and Harrison (2010), p. 50.

[229] Levenstein and Suslow (2006), p. 45.

[230] See **Exhibit 11** and **Exhibit 12**, *supra*.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



- ███████████████████████████████ for relevant DaVita employees,

- ███████████████████████████ for SCA employees, and

- ███████████████████████████ for relevant USPI employees.

105.    Any agreement between the Defendants to fix compensation would necessarily have to limit not only base salary levels, but these other bonus and equity components.  Otherwise, the agreement would not be sustainable.  If any given employee's compensation could be simply adjusted with respect to variable compensation, each co-conspirator would have the incentive to undermine an agreement with additional variable compensation.[231]  Neither Dr. Starr nor Dr. Gerhart provide any explanation of (or analysis of) how the examples of alleged information sharing they cite could be used to fix variable compensation levels.  Plaintiffs' experts do not address how Defendants would be able to allegedly coordinate variable compensation in the face of the different compensation plans utilized by the Defendants.[232]

106.    Another obstacle to the formation of the alleged wage fixing agreement is the length of time over which the conspiracy is alleged to have been maintained.  Plaintiffs' experts assess a period that spans May 2008 through December 2019—an almost 12-year period.  Dr. Levenstein and Dr. Suslow explain that in "a dynamic economy, the solution to all these problems"—coordination, entry, and cheating—"will change over time, so successful cartels must develop an organizational structure that allows them to solve these problems continuously."[233]  However, Plaintiffs' experts point to a few discrete events of alleged merit budget information sharing, limited to the early portion of the period they studied.  Neither offer a mechanism by which the Defendants could coordinate compensation in the years where no compensation information was allegedly shared.  In addition, during the course of the proposed class period, there were several changes at the organizations, specifically with respect to equity compensation, which would only further complicate any effort to fix compensation.  For

---

[231] See, e.g., Levenstein and Suslow (2006), p. 45–46 ("A cartel must somehow escape from the Prisoners' Dilemma: by raising price above marginal cost, the cartel creates an incentive for each producer to cheat.  Each firm would like to lower its price, increase its output and market share, and thereby increase its profits").  Similarly, employers would have the incentive to *increase* compensation to attract additional employees away from other members of the cartel.  See also, Pindyck and Rubinfeld, p. 478 ("Unlike our prisoners in the prisoners' dilemma, cartel members can talk to each other to formalize an agreement.  This does not mean, however, that agreeing is easy […] Furthermore, each member of the cartel will be tempted to "cheat" by lowering its price slightly to capture a larger market share than it was allotted").

[232] As I describe in Section VIII, the Defendants had a variety of bonus and long-term incentive plans.  Plaintiffs' experts offer no assessment of *how* Defendants would be able to "coordinate" compensation levels across these different programs, which were tied to that Defendants' own performance.

[233] Levenstein and Suslow (2006), p. 45.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

example, after SCA went public in 2013, it introduced a new long-term incentive plan.[234]  In addition, USPI was acquired by Tenet in 2015.[235]  As I describe above, Dr. Gerhart conducted no empirical analysis to assess the impact of the alleged information sharing, and Dr. Starr's "wage suppression" regression does not attempt to account for these differences in corporate structures—or variable compensation plans—over time.

107.     Further, to facilitate a successful monopsony cartel, firms must implement "a restriction" on their purchases (i.e., the amount of labor to employ) and "the group must decide on how much each participant will curtail its purchases."[236]  Dr. Starr and Dr. Gerhart provide no assessment of whether, or to what extent, the Defendants restricted demand for proposed class member labor as a means to facilitate a wage fixing conspiracy.  In fact, during the relevant period, all three companies expanded employment within the jobs allegedly targeted by the wage fixing conspiracy—the opposite of what one would expect if they were "suppressing" wages.  **Exhibit 18** shows the change in the number of employees overall, and in relevant class positions, over the proposed class period.  As this exhibit shows, the number of Directors (as identified by Dr. Starr) more than *doubled* at each of the Defendants between 2008 and 2019.  Neither Dr. Starr nor Dr. Gerhart explain how an effective cartel could fix compensation in the face of such employment growth, nor do they present any analysis of the but-for employment growth that was allegedly suppressed to maintain the conspiracy.

---

[234] Surgical Care Affiliates, Inc. 10-K, 2014 Annual Report, p. 81; Global News Wire, "Surgical Care Affiliates Announces Closing of Its Initial Public Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares," November 4, 2013, https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-to-Purchase-Additional-Shares.html; SCA000552095–2113.

[235] Tenet Health, "Tenet Healthcare Corporation Completes United Surgical Partners International and Aspen Healthcare Transactions," June 16, 2015, retrieved from https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm.

As Dr. Starr describes, around this acquisition, "key employees of USPI were offered participation in the 2015 Employee Stock Equity Plan," that Tenet revalued in 2018, "resulting in a significant drop in the value of the stock options" (Starr Report, ¶85).

[236] Blair and Harrison (2010), p. 51.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 18**
**GROWTH IN DEFENDANT EMPLOYMENT**
**2008 COMPARED TO 2019**

| | Count of Employees | | Percentage |
| Defendant | 2008 | 2019 | Change |
| [a] | [b] | [c] | [d] |

**DaVita**

**SCA**

**USPI**

Notes: Counts of Directors and VPs/SVPs are based on Dr. Starr's assignment of job levels at each of the Defendants and follow Dr. Starr's method for identifying proposed class members.

Source: Starr turnover.

108.    Moreover, any successful conspiracy to fix compensation and reduce employment is also necessarily more complex because changes in a key input—employee labor—will have consequences for the output market(s)—the goods or services that are being produced by the Defendants.  Yet both of Plaintiffs' experts simply assume that any reduction in compensation (resulting from a coordinated reduction in demand for skilled labor at issue) would have no corresponding effects on the Defendants' ability to offer the services they provide or the profits they earn as a result.

## 2. Dr. Starr and Dr. Gerhart Do Not Address How the Defendants Would Limit Competition for Employment of Proposed Class Members from Other Employers

109.    By ignoring competition for employees outside of the Defendants, Dr. Starr and Dr. Gerhart overlook that a successful wage fixing agreement requires a mechanism to prevent other employers (what Dr. Levenstein and Dr. Suslow describe as "outsiders") from bidding up the compensation of Defendants' employees.[237]  As I describe above, the Defendants do not control a large share of the employment opportunities for the ▮▮▮ proposed class members.  A wage fixing conspiracy cannot artificially depress compensation if other competitors outside the cartel would simply offer higher

---

[237] Levenstein and Suslow (2006), p. 45.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

compensation. The economic analysis suggests significant competition for proposed class members from non-Defendant employers:

- Defendants account for a small portion of total employment within the industries Dr. Gerhart's points to as potentially relevant—accounting for less than ▮ percent of the employment within the Healthcare sector and approximately ▮ percent of the employment within the outpatient care industry (see Section V.D);

- Defendants benchmark compensation against a range of other employers across different industries, including outside the healthcare industry, as potential competitors for labor (see Section VI.D.1);

- Relevant employees are located across numerous geographical areas, each of which has different economic conditions. The set of competitors with whom the Defendants compete for labor potentially varies across geographic locations at least for some employees (see Section X); and

- Annual turnover at DaVita, SCA, and USPI was ▮▮▮▮▮▮▮▮▮▮, on average, depending on the Defendant. Both during and outside the proposed class period, a large majority (over ▮ percent) of senior employees who left a Defendant did not go to a Defendant covered by the alleged mobility restrictions (see Section V.A).

110.    Defendants' data shows that the Defendants regularly hired employees from non-Defendant firms. Dr. Starr and Dr. Gerhart do not address how the Defendants were able to compete with non-Defendants for labor while simultaneously supporting a wage fixing conspiracy. For example, Dr. Gerhart acknowledged that employees hired from non-Defendant firms "would probably have to be [paid] within sight of what the competitive rate would be."[238] Given the need to pay newly hired employees "within sight" of a competitive rate, Plaintiffs' experts do not explain how the Defendants were able to suppress compensation by up to ▮▮▮▮▮▮.[239]

---

[238] Gerhart Deposition, 56:1–21.

[239] Given that Dr. Starr does not separately estimate the purported "wage suppression" due to the alleged information sharing from that of the alleged mobility restrictions (Starr Report, ¶106), it is not clear what portion of this estimated "wage suppression" is due to the alleged information sharing.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

### 3. Dr. Starr and Dr. Gerhart Do Not Assess How the Alleged Information Sharing Would Prevent Cheating on the Alleged Wage Fixing Conspiracy

111. Neither Dr. Starr nor Dr. Gerhart provide any explanation for how the Defendants could limit deviations from the alleged cartel (i.e., cheating), particularly in light of the types of information allegedly shared. As Dr. Levenstein and Dr. Suslow describe, a "cartel must develop an incentive compatible structure—a combination of monitoring, rewards, and punishments—to prevent cheating by members."[240] Plaintiffs' experts do not describe any mechanism by which the Defendants monitored, rewarded, or punished each other in support of a wage fixing conspiracy. As I describe below, aside from limited examples of information for specific jobs, Plaintiffs' experts do not point to any alleged information sharing of compensation levels for relevant jobs—let alone all relevant jobs over a 12-year period. For example, with respect to the merit budgets, ███████████████████████████ ████████████████████████████████████████████████[241] Without information on a co-Defendants' actual compensation levels, it is unclear how a Defendant would be able to monitor the behavior of co-Defendants to ensure compliance with a wage fixing conspiracy (or punish them for any deviation). Moreover, Plaintiffs' experts do not point to any evidence of Defendants confirming that another Defendant set compensation at an agreed upon level—or punishing them for cheating.

### C. Dr. Starr and Dr. Gerhart Do Not Offer a Reliable Link Between the Alleged Information Sharing and Antitrust Impact

112. In their assessment of the alleged information sharing, Plaintiffs' experts point to three general categories of information that was allegedly shared, which they characterize as containing "pay data."[242] Dr. Starr claims that "the exchange of Senior-Level Employee compensation information would give Defendants sufficient information to arrive at a general understanding between Defendants of what price to pay Senior-Level Employees for their services"[243] without describing how the information shared was sufficient to the determine the "price" to pay any proposed class member, let alone the over ████ proposed class members. Similarly, Dr. Gerhart claims that "based on [his] experience and research in compensation and human resource management, Defendants' CSI Exchanges were likely to lower Class

---

[240] Levenstein and Suslow (2006), p. 45.

[241] Gerhart Deposition, 163:7–17.

[242] Starr Report, ¶99; Gerhart Report, ¶82.

[243] Starr Report, ¶93.

81

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

pay,"[244] without describing *how* the specific information shared could be used to "lower Class pay," and without conducting any analysis to show that any alleged information sharing *did impact* any proposed class members' compensation. As I discuss below, for each type of alleged information sharing, Plaintiffs' experts do not offer a reliable link between the actual information shared and purported "lower Class pay."

### 1. Plaintiffs' Experts' Speculative Link Between the Alleged Sharing of Merit Budget Information and Purported "Wage Suppression" Is Not Supported by Any Economic Analysis

113.    Absent any analysis, Dr. Starr speculates that "[i]f exchanging CSI among Defendants allowed them to agree on a (lower) pay increase for Senior-Level Employees, this would quantitatively manifest in lower pay in subsequent years."[245] However, simply speculating about what would happen *if* the alleged information sharing "allowed" Defendants "to agree on a (lower) pay increase" on base salaries is not sufficient to show impact to the proposed class. Plaintiffs' experts have not provided any analysis of actual compensation increases nor attempted to estimate compensation increases "but-for" the alleged information sharing. Put simply, Plaintiffs' experts have done no analysis to show that the alleged information sharing impacted the compensation provided by any of the Defendants to proposed class members.[246] Further, neither of Plaintiffs' experts discuss how alleged bilateral sharing of merit budget information between SCA and DaVita and separately between SCA and USPI would "allow" the Defendants to collectively "agree" to a specific compensation increase.

114.    While Dr. Gerhart makes several general statements about how firms "typically" treat merit budgets,[247] neither he nor Dr. Starr assess how the Defendants set their merit budgets during the relevant

---

[244] Gerhart Report, ¶83. He draws this conclusion based his assessment that (i) the information shared was not public, which "suggests that Defendants used the data for nefarious purposes (i.e., to fix wage rates)," (ii) the information shared was not anonymized, and (iii) "the granularity of the overhead expense data exchanged was significant."

[245] Starr Report, ¶102. Similarly, absent any analysis, Dr. Gerhart argues that "coordination on compensation for a subset of job titles would likely cascade to the rest of the Class" and that "a reduction in the merit increase budget would likely directly reduce the compensation of all of Defendants' employees" (Gerhart Report, ¶149).

[246] Starr Report, ¶102, 106, footnote 388; Starr Deposition, 424:3–9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Gerhart Deposition, 147:10–24, 172:20–173:6, 176:4–12.

[247] For example, Gerhart Report ¶151, emphasis added ("all employees in companies are *typically* covered by the same salary merit increase budget and that the sizes of merit increases in percentage terms are usually uniform within a company across jobs and job levels […] WorldatWork and other surveys that that collect data on planned and/or actual merit budgets (that have already been implemented) *typically* do not find any meaningful differences in the size of merit percent awarded to employees in different levels or types of jobs").

period.  For example, Dr. Starr cites a March 2018 internal DaVita document, which indicates that at the

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████[248]████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████[249]

115.    Defendants' own data can be used to test if Defendants set similar merit increases across relevant employees (and each other) in the same year.  For example, in **Exhibit 19** and **Exhibit 20**, I show the distribution of the year-over-year change in base salary for employees that remain in the same job title across both years (e.g., the percent change in base salary for employees in the job "Director, Real Estate" that were also in the job "Director, Real Estate" in the previous year).  In these exhibits, I present the results for 2009, the first year of the alleged information sharing according to Dr. Starr, and 2013, one of the last years for which Plaintiffs' experts present evidence of sharing or discussions of sharing merit budget information.[250]  I see similar variation across all years.[251]

---

[248] Starr Report ¶179, citing to DVA_OMCEAL_001329256–9261, at 9257.

[249] In addition, employees with low performance ratings were typically not eligible for merit increases (see DVA_OMCEAL_001358600–8602 ████████████████████████████████████████");  DVA_OMCEAL_001150350–0351 ("██████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████ "); SCA000132458 ("████████████████████████████████ ██████████████████████████████████████████████████".)

[250] See ¶98, *supra*.

[251] See **Appendix I-1** for my analysis of base salary changes across all years.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 19**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2009**



| Job Level and Defendant [a] |
| --- |
| **Directors** |
| DaVita |
| SCA |
| USPI |
| **VPs & SVPs** |
| DaVita |
| SCA |
| USPI |

Note: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. Negative pay changes are not shown in this exhibit. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

116. As this exhibit shows, the Defendants did not apply uniform merit increases across all of their employees. Moreover, the Defendants do not have similar distributions of merit increases, even for employees within the same job level. For example,

- Each of the Defendants distributed pay increases differently across employees in different job levels (as identified by Dr. Starr), which is inconsistent with Plaintiffs' experts' claim that a single, overall merit budget could be used to "coordinate" base salary.

- Over ▇ of DaVita Directors received an increase of ▇▇▇▇▇▇▇▇▇, while over ▇ percent of SCA Directors received an increase of ▇▇▇▇▇▇▇.

- One ▇▇▇ of DaVita Vice President and Senior Vice Presidents received ▇▇▇▇▇ ▇▇▇▇, while ▇▇▇▇ of SCA Vice Presidents received ▇▇▇▇▇▇

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 20**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2013**

| Job Level and Defendant [a] | | |
|---|---|---|
| **Directors** | | |
| DaVita | | |
| SCA | | |
| USPI | | |
| **VPs & SVPs** | | |
| DaVita | | |
| SCA | | |
| USPI | | |

Note: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. Negative pay changes are not shown in this exhibit. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

117. I see similar results in 2013, where the Defendants did not apply uniform merit increases across all of their employees nor did the Defendants have similar distributions of merit increases, even within the same job level. For example,

- Almost ▮ percent of SCA's Directors received an increase ▮▮▮▮▮▮▮, while approximately ▮ percent of DaVita Directors received an increase of less ▮▮▮▮.

- DaVita Vice President and Senior Vice Presidents received a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, while ▮▮▮▮▮ SCA Vice President and Senior Vice Presidents received ▮▮▮▮▮▮▮.

- Moreover, the pattern of merit increases in 2013 is not consistent with those in 2009 (as shown in **Exhibit 19**).

118. Plaintiffs' experts have not conducted any analysis to show that Defendants adjusted their planned merit increase budgets after the alleged information sharing, nor have they provided any assessment of how (if at all) the merit budgets Defendants ultimately used differed from what they would have been absent the alleged information sharing. Both Dr. Starr and Dr. Gerhart acknowledge that the Defendants use compensation surveys to benchmark their compensation (including merit

85

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

increases) against a variety of different firms.[252] As Brian Mathis testified, SCA ███████████████████ ██████████████████████████████████████████ when setting merit budgets.[253] In addition, Defendants also discussed using publicly available information to set merit budgets.[254] Plaintiffs' experts have not shown (or tried to show) that the merit budgets Defendants ultimately used were lower due to the alleged information sharing, given Defendants reliance on these multiple sources of information.

119.     Further, Dr. Starr's own analysis does not support his conclusion that the alleged sharing of merit budget information in certain years suppressed compensation.  In **Exhibit 21**, I show the results of Dr. Starr's own "wage suppression" regression on base salary (i.e., the portion of compensation that changes based on merit budgets), applying the corrections to his data that I describe in detail in Section VIII.B but making no other changes.  In this exhibit, the first column shows the aggregate results of Dr. Starr's "wage suppression" regression (as he reports in his Figure 6) applied to base salary.  ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

That is, Dr. Starr's own "wage suppression" regression fails to find that base salaries were suppressed overall or for two of the three Defendants.

---

[252] Dr. Gerhart acknowledges that the Defendants (and other companies) benchmark against third party companies "to avoid the serious pitfalls of paying too much or too little relative to their competitors" (Gerhart Report, ¶56).

██████████████████████████████████████████████████████
████████████████████████████████ (Starr Report, ¶179).  Dr. Starr does not assess how (if at all) these purported benchmarks were used by the Defendants.  Nor does he assess if these purported benchmarks were lower or higher (or similar) to other external benchmarks used by the Defendants.

[253] Mathis Deposition, 75:10–76:6.

[254] ██████████████████████████████████████████████████████
██████████████████████████ (Gerhart Report, ¶140(a), citing Thiry Deposition, 114:17–23 and Clemens Deposition, 150:11–18).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 21**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**
**BASE SALARY**



| Statistic | Aggregate Model | Defendant-Specific Model |
|---|---|---|
| [a] | [b] | [c] |
| Pooled Conduct **% Wage Suppression** | | |
| DaVita Conduct **% Wage Suppression** | | |
| SCA Conduct **% Wage Suppression** | | |
| USPI Conduct **% Wage Suppression** | | |
| Observations Included Employees R-squared | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Negative and statistically significant results are shown in gray. Not statistically significant or positive and statistically significant results are shown in yellow.

This test includes compensation Dr. Starr identifies as "regular pay" and "other compensation" (see Starr Report, Figure 26), excluding DaVita long-term cash incentive payments. See Section VIII.D.2 for a more detailed discussion of this test).

Source: Starr turnover (Corrected Data).

120.    Neither Dr. Starr nor Dr. Gerhart provide more than speculation to link the alleged sharing of merit budget information in specific years to "suppressed compensation." Compensation for proposed class members includes not just base salary but bonus and equity payments, which were substantial.[255] Plaintiffs' experts fail to explain how information on the aggregate merit budget for base salary would impact the levels of variable compensation—compensation included within Dr. Starr's "wage suppression" regression—or how this information sharing would "allow" Defendants to "agree" to

---

[255] See Section VIII.D.1.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

lower variable compensation levels.[256]  Further, Plaintiffs' experts also do not discuss how Defendants would have been able to monitor what merit budget their co-Defendants ultimately used.  Dr. Starr claims that the alleged information sharing would allow Defendants "to set compensation below competitive levels with the knowledge that their rivals would do the same" without describing *how* the Defendants would have this knowledge (or providing any evidence of a mechanism to monitor the alleged conspiracy).[257]  As I show above, Dr. Starr's own "wage suppression" analysis does not find any negative and significant effect on base salary from the alleged conduct for two of the three Defendants.

### 2. Plaintiffs' Experts Offer No Reliable Link Between the Alleged Information Sharing for a Limited Number of Individual Jobs and "Suppressed Compensation" Across Proposed Class Members

121.    In their discussions of the alleged information sharing, Plaintiffs' experts have not shown evidence that the Defendants shared compensation information systematically for relevant jobs.  Instead, Dr. Starr and Dr. Gerhart only point to information sharing between SCA and USPI for an ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ in 2012[258] and discussions between SCA and USPI of potentially sharing information on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in 2015.[259] Neither of Plaintiffs' experts explain how these specific examples they cite for individual jobs, at specific points in time, in certain geographic areas would facilitate a conspiracy to "lower Class pay" for more than ▮▮▮ employees over the proposed almost 12-year conduct period.[260]

122.    For example, Dr. Starr points to a February 2015 internal USPI email in which Shannon Mosley requests that Bill Wilcox ask SCA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[261] After reviewing additional related internal email communications, Mr. Wilcox testified that he ▮▮▮▮▮

---



[256] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Gerhart Deposition, 170:1–17).

[257] Starr Report, ¶58.

[258] OMC_BM_000010778–0779 (Exhibit PX523).

[259] USPI_CIV_000046079 (Exhibit PX239).

   Dr. Gerhart also points to a May 2012 email in which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (USPI_CIV_000016522 (Exhibit PX234)).  My understanding is that employees within the legal departments at the Defendants are outside of the proposed class (Complaint, ¶92).

[260] Dr. Gerhart testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ (Gerhart Deposition, 180:19–181:2).

[261] USPI_CIV_000046079 (Exhibit PX239).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



as USPI ████████████████

████████"[262] That is, neither of Plaintiffs' experts point to any compensation information actually being shared between SCA and USPI for these jobs. In addition, for the ███████████ position discussed in 2012, ████████████████████████████████████

████████████████████████████████████[263] Plaintiffs' experts do not offer a reliable link between the sharing of (or discussion of sharing) compensation information between SCA and USPI for a few specific jobs at specific points in time and "suppressed wages" for all proposed class members over an almost-12-year conduct period.

123.    Neither Dr. Starr nor Dr. Gerhart point to any alleged information sharing related to individual jobs between DaVita and SCA.[264] Nor do Plaintiffs' experts discuss how SCA and USPI potentially sharing compensation information for these selected jobs would affect compensation for DaVita employees. Even for SCA and USPI employees, Plaintiffs' experts offer only a speculative mechanism through which information for a small number of individual jobs at specific points in time—starting in 2012—would lead to suppressed compensation across all relevant employees for the full proposed class period. For example, while Dr. Gerhart speculates that "even if the Defendants did not coordinate on compensation for *every* single job title, if they successfully coordinated to suppress the compensation of some positions, that would be spread widely to other employees as well,"[265] he does not actually assess if this happened.[266] As I discuss in Section V.C, Dr. Gerhart's theory of "cascading effects" is not supported by the available evidence.

### 3. Plaintiffs' Experts Offer No Mechanism Through Which Sharing General Business Information Would Lead to "Suppressed Compensation" Across Proposed Class Members

124.    In support of their conclusions that the alleged information sharing "suppressed compensation," Plaintiffs' experts cite examples of general business information shared between SCA and USPI such as case volume data and aggregate overhead cost information. Neither expert provides a reliable link between this information and the alleged "wage suppression." For example, to support his claim that

---

[262] Deposition of Bill Wilcox, September 24, 2024 ("Wilcox Deposition",) 237:19–239:18.

[263] OMC_BM_000010778–0779 (Exhibit PX523).

[264] See, Starr Report, ¶101 and Gerhart Report, ¶82.

[265] Gerhart Report, ¶149.

[266] ████████████████████████████████████

████████████████████████████████████

███████████████████████ (Gerhart Deposition, 205:12–18).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"these exchanges would have facilitated USPI's and SCA's ability to agree to set their pay rates lower than they otherwise would have," ████████████████████████████████████ ████████████[267] ████████████████████████████████████████████████████ ████████████████████████████████████[268]  Dr. Gerhart does not describe how case volume information would allow SCA or USPI to "set their pay rates" nor how this information would allow either to set pay "lower than they otherwise would have."[269]

125. ████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████[270] ██████████████ ████████████████████████████████████████████████[271]  Dr. Starr offers no mechanism through which SCA could use this overall ratio to determine the pay for any job (or group of jobs) at USPI in order to "fix" compensation.

126. ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████[272] ████████████████████████████████ ████████████████████████████████████████  Dr. Starr argues that this "non-public corporate overhead cost data […] would include Senior-Level Employee

---

[267] Gerhart Report, ¶82 citing Brodnax Deposition, 42:3–18.

[268] Deposition of Brett Brodnax, September 12, 2024 ("Brodnax Deposition",) 42:3–18, 183:1–10.

[269] ████████████████████████████████████████████████████████ ██████ (Gerhart Deposition, 160:15–23).

[270] SCA000609009–9011 (Exhibit PX063).

[271] Starr Report, ¶101, citing SCA000609009–9011 (Exhibit PX063), at 9011.

[272] USPI_CIV_000111376–1382 (Exhibit PX520), at 1381–1382.

████████████████████████████████████████████████████████ ████████████████████████████████ (Gerhart Report, ¶82(d), citing USPI_CIV_000122239 (Exhibit PX138). ██████████████████████████████ (see USPI_CIV_000122240).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

compensation."[273] While total overhead costs may include compensation for relevant jobs, these costs are aggregated across both wage information and *all* other general and administrative costs.[274] Dr. Starr does not describe how SCA or USPI would determine the pay for any individual job or group of jobs in the, for example, "Accounting" department (or any other department) based on these aggregate costs.

127. As with the sharing of (or discussions of sharing) compensation information for select individual jobs, neither Dr. Starr nor Dr. Gerhart points to any sharing of general business information between DaVita and SCA.[275] Plaintiffs' experts do not discuss how SCA and USPI sharing the aggregate business information cited would affect compensation for DaVita employees. Plaintiffs' experts' conclusion that the general business information shared could be used by SCA and USPI to "fix" compensation for relevant employees is not supported simply because this information was aggregate not just across different jobs but also across compensation as well as other costs. With each type of information shared, neither Dr. Starr nor Dr. Gerhart offer a reliable link between the alleged information sharing and suppressed compensation or antitrust impact to the proposed class—nor do they offer a mechanism by which the Defendants would be able to monitor or enforce any wage fixing conspiracy.

## VIII. DR. STARR'S "WAGE SUPPRESSION" REGRESSION MODEL IS UNRELIABLE AND CANNOT SHOW ANTITRUST IMPACT OR BE USED TO CALCULATE DAMAGES FROM THE ALLEGED CONDUCT

128. Dr. Starr puts forward a regression model, which he claims can "empirically test" if the alleged conduct "economically and statistically significantly suppressed Class Member wages."[276] Dr. Starr claims that this model accounts for all relevant factors aside from the alleged conduct that determine

---

[273] Starr Report, ¶101. Similarly, Dr. Gerhart argues that "the sharing of this data and subsequent discussion of expenses is consistent with a discussion about expenses that include labor costs" (Gerhart Report, ¶82(d)).

In his discussion of the alleged information sharing, Dr. Starr points out that "it was beneficial for SCA to manage overhead cost growth," and that "SCA tries to manage labor costs as a percent of revenue" (Starr Report, ¶101). Dr. Gerhart acknowledged that this would be true for all firms, testifying that ███████████ ███████████████████████████████████████████████████████ (Gerhart Deposition, 66:1–16).

[274] Deposition of Mark Kopser Vol. I, December 12, 2024 ("Kopser Deposition",) 87:21–88:6 ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████") 

[275] See, Gerhart Report, ¶¶82–83; Starr Report, ¶100.

[276] Starr Report, ¶103.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

compensation for all ▮▮▮ proposed class members, and that by "controlling for other relevant economic factors," his model can identify the effect of the alleged conduct by comparing total compensation before and after the proposed class period to total compensation during the proposed class period.[277] Dr. Starr's regression model attributes any change in total compensation in the proposed class period that is "unexplained" by the specific economic factors included in the models to the alleged conspiracy, i.e., the estimated "wage suppression" reflects the portions of total compensation unexplained by the other factors in his model.

129.     As Dr. Starr himself states, a "multivariate regression model is a tool."[278] Simply "running a regression" and generating results does not mean that a proposed model is reliable or that the results yield a relevant answer to any particular question. Whether or not a particular regression model is relevant for studying a particular question, and whether the answer it provides is reliable, is a matter of how the model is constructed and implemented. As one economic treatise notes, "a set of regression estimates are only as good as the underlying assumptions used to build and estimate the model."[279] Dr. Starr similarly states that "regression models can produce unbiased estimates of the causal effect" of the alleged conduct "*[w]hen properly constructed*."[280] It is the role of an economist to conduct empirical testing to ascertain if the model is, in fact, properly constructed and can isolate the effects of the alleged conduct from all other factors that impact compensation.[281]

130.     When assessing the results of a regression model, it is important to keep in mind two elements of regression analysis. First, the selection of economic factors is critical to a model's ability to distinguish between lawful and unlawful drivers of compensation. A regression model does not "know" whether all relevant lawful factors have been accounted for—it is simply comparing average total compensation in the benchmark periods to average total compensation in the proposed class period, accounting for whichever factors the economist has chosen to include. If the economist has omitted relevant factors that affect compensation over time—e.g., firm performance that determines the level of variable compensation employees receive—the model will not be able to separately identify the effect of

---

[277] Starr Report, ¶117.

[278] Starr Report, ¶109.

[279] Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010 ("Davis and Garces"), p. 79.

[280] Starr Report, ¶109, emphasis added.

[281] See, e.g., ABA Proving Antitrust Damages, p. 163, emphasis in original ("[F]rom an economic and statistical point of view, it is important to test whether a regression model is misspecified in order to avoid drawing incorrect or unreliable conclusions").

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

the alleged conduct.[282]  That is, although the model can mechanically find differences in average compensation between the periods of analysis—controlling for the included factors—it does not "know" whether the reasons for those differences are due to the alleged conduct or these omitted factors.

131.     Second, a regression like the model offered by Dr. Starr is "probabilistic"—meaning that it calculates the likelihood of the effect they find occurring due to random chance (as opposed to the effect being attributable to the underlying variable of interest).[283]  A standard practice in economic research is that if the identified result would occur by chance only 5 percent (or less) of the time, that result is deemed to be "statistically significant."[284]  It is important that a regression model is defined to properly calculate this likelihood of chance occurrence because "[a] finding that the estimated impact is not statistically different than zero would be consistent with a lack of causation and zero damages."[285]  As I discuss below, Dr. Starr's "wage suppression" regression model cannot reliably distinguish the effect of the alleged conduct from all other economic factors.  As it cannot isolate the effect of the alleged conduct, Dr. Starr's analysis cannot show antitrust impact and cannot be used to calculate damages caused by the alleged conduct.

### A.  Summary of Dr. Starr's "Wage Suppression" Regression Model

132.     Dr. Starr presents a regression model purportedly to "evaluate whether there exists a causal relationship between the Challenged Conduct and Class Members' compensation."[286]  Specifically, Dr. Starr purports to estimate the effect of the alleged conduct on what he describes as employees' "total compensation," which includes base salary, bonuses, and long-term incentive pay such as equity

---

[282] See, e.g., Daniel L. Rubinfeld, "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy*, ABA Section of Antitrust Law, 2008, p. 738.  ("[F]ailure to include an important major explanatory variable that accounts for factors that differ between the period of alleged wrongdoing and other time periods can cause the measured effect of the dummy variable of interest to be biased, which in turn could lead to an invalid conclusion on liability.  In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis.")

[283] See, e.g., American Bar Association, Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, 2nd ed., ABA Book Publishing, 2014 ("ABA Econometrics (2014)"), p. 6, emphasis added.  ("Statistical hypothesis testing involves stating a 'null hypothesis' and then asking whether a statistical result is consistent with what would be expected if the null hypothesis were true.  If the statistical result is sufficiently inconsistent with the null hypothesis […], the null hypothesis is said to be 'rejected' and the statistical result is said to be 'statistically significant.'  If the statistical result is not sufficiently inconsistent with the null hypothesis, the null hypothesis is 'not rejected' and the statistical result is said to be 'not statistically significant.' […] Consider an econometric study of the overcharge imposed by an alleged cartel.  In such a study, a *natural null hypothesis to test is that the overcharge was zero*.  Such a null hypothesis accords with the Plaintiffs having the burden of proof with regard to damages.")

[284] See footnote 130, *supra*.

[285] ABA Econometrics (2014), p. 309.

[286] Starr Report, ¶104.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

payments.[287] Dr. Starr purports to "isolate" the effect of the alleged conduct on total compensation for relevant employees "by accounting or 'controlling' for other relevant factors that might also cause changes in compensation."[288] These "other relevant factors" included in Dr. Starr's analysis are:[289]

- Indicator variables, each of which is intended to capture any difference unexplained by the other factors in the model between average total compensation between the "benchmark" periods and the alleged "conspiracy" period, which differ for each Defendant:

  - The indicator for DaVita employees compares average total compensation from 2005–2007 and 2020–2022 to average total compensation between 2008 and 2019 (i.e., the alleged conduct period for "DaVita and SCA Challenged Conduct").

  - The indicator for SCA employees compares average total compensation from 2020–2022 to average total compensation between 2008 and 2019.[290]

  - The indicator for USPI employees compares average total compensation from 2005–2009 and 2020–2022 to average total compensation between 2010 and 2019 (i.e., the alleged conduct period for "USPI and SCA Challenged Conduct").

- "Baseline" control variables that include (i) individual "fixed effects" to account for "any characteristics that are inherent to an individual (e.g., a superior negotiation ability)" that do not change over time and (ii) a linear time trend purportedly to account "for the natural growth in annual compensation that would have happened over time even absent the Conduct."

- "Other" control variables "to address geographic differences in pay" and "macro-economic factors," specifically (i) ZIP Code "fixed effects," (ii) the Consumer Price Index ("CPI") by Census region, (iii) unemployment rate by state, (iv) real GDP per capita by state, and (v)

---

[287] Starr Report, ¶112. For long-term incentive pay, Dr. Starr relies on *payments* data rather than grant data. That is, Dr. Starr includes long-term incentive pay in his analysis in the year in which it is paid out (and the value at which it is paid out) rather than when the compensation decision was actually made and the compensation was granted by the Defendants (see Starr Report, footnote 395).

[288] Starr Report, ¶105.

[289] Starr Report, ¶118–122.

[290] The SCA data begins in 2008. Because of this, Dr. Starr's analysis does not include a pre-period benchmark for SCA and only compares the compensation of SCA employees during the proposed class period to the period after.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

> an indicator for the COVID-19 pandemic, which "takes the value of one for the years 2020 and 2021, and zero otherwise."[291]

- "Healthcare-Specific" control variables, including "average annual earnings of managers in the healthcare field" by state and "healthcare services personal consumption expenditure per capita" by state.

- Total hours for each employee to account for part-time employees who "may appear to have low *annual* earnings simply because they are working fewer hours."

133. Using this model, Dr. Starr estimates that the alleged conduct—the alleged mobility restrictions and the alleged information sharing together—"suppressed wages by ▮▮▮▮▮▮▮▮▮▮."[292] Dr. Starr also uses this model to estimate the effect of the alleged conduct separately at each Defendant, purporting to find compensation was suppressed "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮" which Dr. Starr describes as "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[293] Dr. Starr also presents what he describes as "a series of robustness checks and alternative models to test the validity" of his results.[294]

134. The construction of Dr. Starr's regression makes specific assumptions. First, as Dr. Starr acknowledges, his "wage suppression" regression model only purports to measure "suppressed compensation from the whole of the Challenged Conduct rather than from each individual component part" over the full 12-year conduct period he studies.[295] Dr. Starr argues that this single model can reliably measure "suppressed wages" irrespective of what the actual challenged conduct is, stating that "if one of the elements of the Challenged Conduct is deemed not to have suppressed wages (because it did not happen), then the finding of suppressed wages" he presents "must be due the other element of the Challenged Conduct."[296] That is, Dr. Starr asserts that his model can correctly estimate the effect of

---

[291] As Dr. Starr describes, the "COVID-19 pandemic dramatically altered the supply and demand for labor broadly" and "had specific impacts in medical employment" (Starr Report, ¶120).

[292] Starr Report, ¶107.

[293] Starr Report, ¶¶105, 107. Dr. Starr estimates Defendant-specific effects of the conduct with a single model. That is, in his "preferred" specification, Dr. Starr assumes that the effect of each control variable is identical across Defendants. As Dr. Starr describes, "Defendants may respond differentially to control variables (e.g., Defendants might give different cost of living adjustments for the same level of inflation)," which he purports to test in his Figure 29 (Starr Report, ¶130).

[294] Starr Report, ¶105.

[295] Starr Report, ¶106.

[296] Starr Report, footnote 388.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

the alleged conduct if it includes the alleged mobility restrictions (which changed over time[297]), the alleged information sharing (which were not consistent across time or Defendants[298]), or some combination of both. However, this conclusion is entirely based on his own say so.

135. Second, Dr. Starr's model assumes that all relevant factors that impact total compensation for all ▮▮▮▮ proposed class members are accounted for. The relevant question for whether Dr. Starr's model is reliable—and not mis-specified—is whether it has captured the complexity of how total compensation (as defined by Dr. Starr) is determined in a way that would allow the model to isolate the effect on compensation due to the alleged conduct. Dr. Starr's choice to model total compensation for all three Defendants in a single regression means that this model also assumes that those included factors have the *same* impact on compensation within his benchmark periods and the conduct periods for all three Defendants. If this assumption does not hold, Dr. Starr's model cannot reliably capture the relevant factors that impact total compensation in a way that would allow it to isolate the effect of the alleged conduct.

### B. Dr. Starr's Incorrect Treatment of Defendants' Data Impacts the Results of his "Wage Suppression" Regression Model

136. Dr. Starr commits several errors in his treatment of Defendants' data, which impact the results of his "wage suppression" regression and calculation of damages. First, Dr. Starr overestimates the total compensation per hour for USPI employees in the early portion of his relevant period as he makes no adjustment for relevant employee-years that have missing hours information, predominantly in 2005 and 2006.[299] This data error results in an overstatement of the per-hour earnings in Dr. Starr's benchmark period, which biases Dr. Starr's regression towards finding a larger "wage suppression" during the proposed class period. To correct Dr. Starr's data error, I identify employee pay records for full time

---

[297] See Section VI.B. As Dr. Starr testified, his ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Starr Deposition, 103:23–105:5).

[298] See Section VII.C.

[299] For example, in Dr. Starr's data, USPI employee Evelyn Miller had regular earnings of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See 2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter* ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

employees where the pay type is coded as "regular" with positive total earnings and zero hours worked and adjust the hours worked to be equal to 40 hours per week.[300]

137.     Second, Dr. Starr omits relevant data for certain employees, which I integrate into his data.  For USPI employees in 2018–2021, Dr. Starr does not include available data on total hours worked and excludes these employee-years from his regression analysis.[301]  In addition, while Dr. Starr includes equity payments made to SCA employees in 2021 and 2022, .[302]  Finally, Dr. Starr does not utilize all available DaVita Teammate data, which includes relevant information on employee jobs, for example.[303]

138.     Third, Dr. Starr makes an error in applying his own methodology for identifying non-relevant "members of the human resources, recruiting, [and] legal departments" in the Defendants' data, which entails running keyword searches.[304]  Specifically, Dr. Starr includes employees such as those in the "LEGAL - Commercial Litigation" in his regression analysis.  Dr. Starr does not consider that department names and job titles could have different capitalizations of keyword terms he searches for.[305]

---

[300] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[301] Pay information for USPI employees in Tenet files from 2018 to 2021 was produced in two files, one annual and one at the paycheck level (*USPI_CIV_000659234.xlsx* (annual file), *USPI_CIV_001168726.xlsx* (paycheck-level)).  Dr. Starr relies only on the annual file, which does not include total hours, instead of also using the paycheck-level data, which does include information on hours worked.

These records are also missing ZIP Code information (another control in Dr. Starr's "wage suppression" regression).  I categorize records with missing ZIP Code information into a "Missing" category.

[302] Starr Deposition, 380:13–383:2.

[303] Dr. Starr also relies on incomplete Teammate data for DaVita.  I modify Dr. Starr's data to use the updated Teammate data (*DVA_OMCEAL_001421635*) that accounts for time-variant employee information.  I also use an additional job code dictionary produced by DaVita (*DVA_OMCEAL_001421634*).

[304] Starr Report, footnote 2; Complaint, ¶92.

[305] For example, Dr. Starr searches DaVita department names and job titles for the term "legal," which does not identify departments such as "LEGAL - Commercial Litigation" and "Legal – Privacy" departments, both of which he includes in his analysis.  Because Dr. Starr only searches for a limited number of terms, he includes additional job titles that appear to be related to Legal or HR functions such as "dir hr" for SCA and "Director, Corporate Counsel" for DaVita (see Dr. Starr's turnover).

I also exclude Andrew Hayek, whom Dr. Starr includes as a Vice President in his analysis between 2015 and 2017 when Mr. Hayek was the CEO of SCA (or CEO of SCA and OptumHealth).  Dr. Starr testified that Mr. Hayek should have been excluded as a "senior officer" when he worked at SCA (Starr Deposition, 383:10–385:16).

97

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

When I adjust Dr. Starr's analysis to take this into account, I exclude approximately 1,600 employee-years from his analysis.

139.     After correcting Dr. Starr's data errors, I re-run his "wage suppression" regression, which he reports in Figures 6 and 8 of his report with no additional changes.  In **Exhibit 22**, I show the results of this analysis.  As the exhibit shows, Dr. Starr's aggregate "wage suppression" estimate drops from ███ ████████████████ Similarly, all of Dr. Starr's Defendant-specific results also decline when I fix his data errors.  After making these data corrections—and with no other changes to his model—Dr. Starr's damages estimate declines ███████████████████████████████████████.  I apply these same corrections to all of my testing of Dr. Starr's regression model.

98

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 22**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**

| Statistic | Dr. Starr's Aggregate Model | | Dr. Starr's Defendant-Specific Model | |
| --- | --- | --- | --- | --- |
| | Figure 6 | Corrected | Figure 8 | Corrected |
| [a] | [b] | [c] | [d] | [e] |



| Statistic | | | | |
| --- | --- | --- | --- | --- |
| Pooled Conduct **% Wage Suppression** | | | | |
| DaVita Conduct **% Wage Suppression** | | | | |
| SCA Conduct **% Wage Suppression** | | | | |
| USPI Conduct **% Wage Suppression** | | | | |
| Observations Included Employees R-squared | | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. See **Appendix J-1** for the results of Dr. Starr's analysis where I exclude USPI records with missing regular hours.

Source: Starr Report, Figure 6 column [4] and Figure 8 column [4]; Starr turnover (Corrected Data).

### C. Indicators of the Unreliability of Dr. Starr's "Wage Suppression" Regression Model

#### 1. The Results of Dr. Starr's Regression Model Are Inconsistent with His Own Analysis of the Alleged Conduct and the Academic Literature He Cites

140. The unreliable nature of Dr. Starr's results can be shown by simply comparing the magnitudes of his estimated "wage suppression" relative to his own analysis and the academic literature he cites. For example, Dr. Starr purports to find that the compensation of DaVita employees was suppressed by ▮▮▮▮▮ due to (i) the alleged mobility restrictions and (ii) the alleged information sharing between DaVita and SCA.[306] However,

---

[306] Starr Report, Figure 8. As Dr. Starr acknowledges, his "wage suppression" regression model only purports to measure "suppressed compensation from the whole of the Challenged Conduct rather than from each individual component part" (Starr Report, ¶106).

- Dr. Starr's own mobility analysis shows ███████ in mobility for DaVita employees during the period of the alleged mobility restrictions;[307] and

- ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████ ████ [308]

That is, Dr. Starr' purports to find that total compensation for all ████ DaVita employees in the proposed class was lower by ████████, on average, over the 12-year proposed class period due to ██████████████████████████████████████.[309] Dr. Starr has provided no analysis to assess if any of the Defendants ever ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████

141. As the DaVita results highlight, Dr. Starr's "wage suppression" regression finds significantly larger "wage suppression" than his own analysis of the alleged conduct would suggest. While Dr. Starr claims that there is "broad support throughout the economic literature" for the "idea that firms can suppress pay by limiting employee outside options," the inconsistency of Dr. Starr's estimate with the literature he cites further indicates the unreliability of his regression model.[310] For example, the Caldwell and Danieli paper which Dr. Starr describes as having "develop[ed] a method for estimating individual-level outside options and stud[ied] how it relates to earnings" finds that a 10 percent increase in outside options increases earnings by only 1.7 percent.[311]

142. As shown in **Exhibit 23,** this estimate from the literature implies that, due to the alleged mobility restrictions, the available outside employment options would be expected to decrease by

---

[307] See Section V.A. Dr. Starr testified that ██████████████████████████████████████ ██████████████████████████████████████████████ ██████████ (Starr Deposition, 203:10–204:1). However, Dr. Starr presents no quantitative analysis of ████ ██████ if these were suppressed during the proposed class periods, or if the addition (if any) job offers available in the but-for world would have actually led to higher compensation.

[308] See Section VII.C.

[309] Starr Report, Figure 21.

[310] Starr Report, ¶50.

[311] Starr Report, ¶50, citing Sydnee Caldwell and Oren Danieli, "Outside Options in the Labor Market," *The Review of Economic Studies*, Vol. 91, Issue 6, 2024, pp. 3286–3315 ("Caldwell and Danieli (2024)"), pp. 3308–3309.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

*approximately* ▮ *percent* to reach the magnitude of Dr. Starr's estimated ▮▮▮▮▮ "wage suppression" across Defendants. Put in context, this decrease is significantly larger than Dr. Starr's own finding that the alleged conduct changed employee mobility rates by, at most, only ▮ percent (▮▮ additional moves between the "Covered Defendants" each year out of the approximately ▮▮ employees, on average, that departed one of the Defendants each year during the proposed class period).[312] In addition, even if the alleged conduct totally prevented mobility between the Defendants, it would nonetheless be implausible to assume that proposed class members' outside employment options decreased by ▮ percent given the hundreds of other non-Defendant employment options available to proposed class members—with proposed class members moving to non-Defendant firms ▮ percent of the time even outside the proposed class period.

---

[312] Per Caldwell and Danieli's estimate of the relationship of outside options and pay, a ▮ percent reduction in outside options would be associated with ▮▮▮▮▮▮▮▮▮▮, far below the ▮▮▮▮ "wage suppression" Dr. Starr purports to find in his regression analysis.

This ▮ percent reduction in "movements" is reflective of the reduction in "outside options" in the broader sense, unless recruiting efforts between "Covered Defendants" (e.g., cold calls) in the but-for world would have been *less* effective in eliciting movements. Neither Dr. Starr nor Dr. Gerhart quantify the amount of cold calls lost due to the alleged conduct. As a percentage of all cold calls, the purported reduction in cold calls during the proposed class period would be equivalent to the percent reduction in movements (or lower), unless the "Covered Defendants" in the proposed but-for world class period would have required more cold calls than outside the proposed class period to convince employees to move between them.

101

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 23**
**IMPLIED REDUCTION IN OUTSIDE OPTIONS**
**BASED ON DR. STARR'S AGGREGATE "WAGE SUPPRESSION"**
**AND ELASTICITY ESTIMATED BY CALDWELL AND DANIELI**



**Outside Options**
**(Indexed to 100 for Options in Dr. Starr's But-For World)**

— Compensation Relationship with Outside Options

Notes: The orange line shows the "constant elasticity" Dr. Starr cites from Caldwell and Danieli. ███████

████████████████████████████████████████████████████████

████████████████████████████████████

Sources: Starr Report; Figure 6; Caldwell and Danieli (2024), pp. 3308–3309.

143. While Dr. Starr's mobility analysis studies only observed moves between the Defendants, the outside options, or an employee's "Option Set," as described by the literature Dr. Starr cites, represents the employee's probability of working in jobs with certain characteristics and the distribution of such jobs in the economy.[313] These outside options could include similar occupations that exist within the same industry, but could also, for example, include similar jobs in different industries based on an individual's skills, education, and commuting preferences, and vary by regional availability of jobs.[314] Dr. Starr claims that these economic studies provide broad support for his findings of mobility and wage

---

[313] *Id,* at pp. 3294–3298.

[314] *Id,* at 3286, 3293, Figure 3.

102

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

suppression even though he has not attempted to study changes in "outside options" available to proposed class members—instead focusing only on the limited set of potential outside employment options that were available to an employee at one of the other "Covered Defendants."

144. As I show above, in 2016, Defendants' employees represented less than ▮ percent of all employment in the Healthcare sector. Even if this industry reflected the available "outside options" for relevant employees, as Dr. Gerhart argues, the change in outside options due to the alleged conduct would be significantly lower than the change implied by Dr. Starr's estimated "wage suppression"—not even accounting for the available options outside of the Healthcare sector.[315] For example, absent the alleged conduct, assuming the potentially available "outside options" for employees at DaVita would change from (i) excluding all other relevant job positions at SCA to, (ii) including these job positions, (i.e., each employee at DaVita could perfectly substitute for every position at SCA), their outside options would increase only marginally relative to existing Healthcare sector employment options.[316] That is, while Plaintiffs allege that during the conduct period relevant DaVita employees could not move to SCA, they potentially could have moved to over 650,000 Manager positions in the Healthcare sector. If *all* SCA positions hypothetically became available to those DaVita employees, the total "outside options" available to DaVita employees would increase by only ▮▮▮ percent in the Healthcare sector—or even less if outside employment options beyond the Healthcare sector were included as well.

### 2. The Results of Dr. Starr's "Wage Suppression" Regression Are Sensitive to the Specification and Included Sample

145. In addition to the results of his "preferred model," Dr. Starr presents what he refers to as "robustness checks," in which he "consider[s] several other specifications and sample restrictions to

---

[315] Relevant employees may also seek employment outside of the healthcare industry. For example, named Plaintiff Allen Spradling moved to the financial services industry, working for Bank of America after working at SCA (Spradling Deposition, 134:15–17).

[316] In 2016, DaVita had over ▮▮▮▮▮▮▮ in "Manager or above" positions (as defined by Dr. Starr), while SCA had approximately ▮▮▮▮▮▮▮, which represents ▮▮ percent of the ▮▮▮▮ employees in Manager positions in the Healthcare sector in 2016. I note this comparison makes the following assumptions:

(i) taking Plaintiffs' allegations at face value, there is a national class of employees who are willing to broadly substitute across firms and geographic regions (i.e., willing to accept employment at another firm in another location).

(ii) that external jobs across the industry are comparable to ones in which the employees held at Defendants. For example, Dr. Starr testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ (Starr Deposition, 128:8–130:4).

(iii) that all employees at DaVita are perfectly substitutable for all jobs at SCA. However, SCA may not in reality be willing to hire some (or all) of DaVita's employees due to other reasons, such as skills, performance, experience, or other factors affecting the "match" of the employment contract.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"ensure the results" in his Figure 6 and Figure 8 "are robust to deviations from the baseline setup."[317] Rather than show the robustness of his analysis, the results of Dr. Starr's "robustness checks" show significant variation in the estimated effect of the alleged conduct, highlighting the instability of Dr. Starr's model. For example, after applying the data corrections I describe above, Dr. Starr's "robustness checks" find that for his models of total compensation:[318]

- The DaVita specific "wage suppression" was not statistically different from ▮ (in his Figure 35 specification, excluding individual-company fixed effects) or as high as ▮▮▮▮▮▮ (in his Figure 34 specification, harmonizing time periods across Defendants); and

- The SCA specific "wage suppression" was not statistically different from ▮ (in his Figure 35 specification, excluding individual-company fixed effects) or as high as ▮▮▮▮ (in his Figure 29 specification, including control variables interacted by Defendant).

Dr. Starr argues that the results he presents are "all broadly similar in that the relationship between the Conduct and compensation is negative, statistically significant, and similarly sized."[319] After correcting Dr. Starr's data treatment, his model in fact does not find a statistically significant relationship in each of his robustness checks nor are the estimates "similarly sized," contradicting his claim that his results are "robust."[320] These different estimates of "wage suppression" have a significant impact on Dr. Starr's calculation of damages, estimating:

- Between ▮▮▮▮▮▮▮▮▮▮ in damages for DaVita; and

- Between ▮▮▮▮▮▮▮▮▮▮ in damages for SCA.

146. Further, the results of Dr. Starr's model are sensitive to the inclusion of the specific "baseline" controls he selects for his model (and does not test as part of his "robustness checks"). Specifically, Dr. Starr includes a linear time trend to purportedly account "for the natural growth in annual compensation that would have happened over time even absent the Conduct."[321] Dr. Starr does not address what "natural growth" in compensation this linear time trend accounts for that are not accounted for by his other controls. Dr. Starr offers no additional explanation for including his linear time-trend beyond the

---

[317] Starr Report, ¶130.

[318] See my workpapers for the results of all Dr. Starr's "robustness checks" applying the data corrections I describe above.

[319] Starr Report, ¶131.

[320] Starr Report, ¶131.

[321] Starr Report, ¶119(b).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"natural growth in annual compensation," despite already including CPI as a control, which he purports accounts for increases ov r time (i. ., employ es ay rece ve "c st of liv ng adjustme ts to acco nt or he increa ed inflation.")[322]

147.    In **Exhib t 24** I res nt the es lts of Dr. tarr' "wage suppr ssion" reg ession mak ng two c ang s: (i) cor ect ng t e data e rors I d scrib ab ve a d (ii) r mov ng the tim -tr nd Dr Starr i cl des in his odel When I mak th se two adjus men s, Dr. tarr's ag regate e ti ate o "wage suppr ssion" d cli es o ███████, and his Defendant specific sti at s are o longer stat stically si nif can f r SCA or U PI. These esul s— s w ll s his own " obustness ch cks —show the s ns tiv ty of D . Starr's egres io mo el to the in lusion o specif c control variable .[32] Whil Dr. S arr rgu s that he results e pr sen s are not n rti act of t e spe ific model [he] con tru t[s]," he testing he himse f presents cont adict th s claim nd shows th s nsi ivity o h s r sults to the pe ification he selects.[24] Addition l dju tment t his mo e to ex lude a ingle co trol va iab e ( hat he ha n t provid d an econ mi rationa e to in lude fu ther show t e s nsitivity nd unrel abl nature o his resul s.

---

[322] Starr por , 110

[323] A th American B r Assoc ation ( ABA") Pro ing Ant trust Da ages tr atise stat s, "[R es lts sh ul be este to ake sure t ey are robust to reas na le han es in the et of control varia les—includ ng reasonab e alterna ive ar ables u ed to c pture si ilar econ mic on epts, such s al er ative ost or de nd con rols Mod ls that yiel re ults t at are hi hl sensitive to part cu ar choices f explana ory a iabl s have a h gh likel hood of ei g affected by speci ica ion rror a d thus sh uld ge erally not e re ied upo (ABA Pro ing Anti ru t Dam ges p. 1 4).

[324] Starr Report, ¶131.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 24**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**
**EXCLUDING HIS LINEAR TIME-TREND**

| Statistic | Dr. Starr's Aggregate Model | | Dr. Starr's Defendant-Specific Model | |
|---|---|---|---|---|
| | Figure 6 Corrected | Excluding Time Trend | Figure 8 Corrected | Excluding Time Trend |
| [a] | | | | |



Pooled Conduct
  **% Wage Suppression**

DaVita Conduct
  **% Wage Suppression**

SCA Conduct
  **% Wage Suppression**

USPI Conduct
  **% Wage Suppression**

Observations
Included Employees
R-squared

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

### 3. Dr. Starr's "Wage Suppression" Regression is Based on the Flawed Assumption that Relevant Factors Would Affect Compensation in the Same Way in His Benchmark and Proposed Conduct Periods

148.    As I describe above, regression models like Dr. Starr's are predicated on two key assumptions. One is that they have appropriately captured the factors affecting compensation for relevant employees and can thus distinguish the effects of the alleged conduct from the effects of these factors. The second fundamental assumption in Dr. Starr's model is that the benchmark periods he selects can be used to model compensation "but for" the alleged conduct. Specifically, Dr. Starr's model assumes that, with the exception of the alleged conduct, economic conditions—measured by the controls he includes in his model—affected compensation in the same way in both the benchmark and proposed conduct periods. For example, the model assumes that the unemployment rate and inflation affected relevant employees'

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

total compensation (including variable pay like equity payments) in the same way in the benchmark periods as in the alleged conduct period. If this assumption does not hold then a comparison between these periods cannot isolate the effect of the alleged conduct since the difference would not reflect solely the effect of the alleged conduct but also other differences between the periods.

149.     Dr. Starr has two benchmark periods, 2005–2007 for DaVita and USPI (but not SCA) and 2020–2022 for all three Defendants. This later benchmark period includes the COVID-19 pandemic, which, as Dr. Starr describes, "dramatically altered the supply and demand for labor broadly" and "had specific impacts in medical employment."[325] Dr. Starr purports to account for this "dramatic" change by including a dummy variable for 2020 and 2021.[326] However, the sensitivity of his analysis to the use of this benchmark period can be seen from the results of Dr. Starr's own "robustness checks." Dr. Starr presents the results of his model "harmonizing" the time periods across Defendants, i.e., excluding his early benchmark period in his Figure 34. Relying on only the later benchmark period increases his estimate of "wage suppression" substantially for DaVita and SCA.[327] That is, Dr. Starr's results are sensitive to the specific benchmark period he relies on—increasing significantly for two out of the three Defendants when relying entirely on his later benchmark period.

150.     The assumption of comparability between the benchmark and proposed class periods is testable with standard econometric tools. I conduct this test by undoing the assumption of Dr. Starr's model and allowing within his model for the possibility that total compensation was *not* affected identically by economic factors in the benchmark and conduct periods. If Dr. Starr's assumption holds, the test will identify no difference between the separately estimated economic relationships. If it does not hold, the test will reject this assumption.[328] The results of these tests are summarized in **Exhibit 25** below.

---

[325] Starr Report, ¶120.

[326] Due to Dr. Starr's inclusion of this dummy variable for 2020 and 2021, Dr. Starr's later benchmark period is effectively limited to 2022 only.

Dr. Starr also includes a "robustness check" where he purports to exclude these years from his analysis. I note that Dr. Starr describes his Figure 31 as "[dropping] COVID years," but he in fact excludes 2019 and 2020 from the analysis presented in his report.

[327] Specifically, after correcting Dr. Starr's data treatment, the wage suppression estimates from his preferred model (Starr Report, Figure 8) change from ▮▮▮▮▮▮▮▮ for DaVita, from ▮▮▮▮▮▮▮▮ for SCA, and from ▮▮▮▮▮▮ for USPI after excluding the early benchmark period (see Starr Report, Figure 34).

[328] I conduct Chow tests to determine whether the coefficients of the control variables differ across periods.

See ABA Proving Antitrust Damages, pp. 164–166. ("Another potential misspecification is caused by imposing incorrect restrictions on the coefficients of the regression model—that is, by forcing the coefficients to take incorrect values. Forcing incorrect values on some coefficients can bias other coefficients. […] The existence of bias resulting from the imposition of incorrect restrictions can be econometrically tested using standard procedures often used by economists. […] A standard method for detecting changes in model parameters is the

(continued on next page . . .)

107

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 25**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**
**DIFFERENCES IN THE ESTIMATED EFFECTS OF DR. STARR'S CONTROLS**
**ACROSS BENCHMARK AND ALLEGED CONDUCT PERIODS**

| Statistic | Statistically Significant Differences Between Combined Benchmark and Class Period |
|---|---|
| [a] | [b] |
| Time-trend | |
| Log of Avg. State Mgr. Earnings | |
| Log of State Health Expend. PC | |
| Log of State GDP per Capita | |
| Log of State Unemployment Rate | |
| Census Region Annual CPI | |
| Log of Total Hours | |

Notes: Statistical significance is estimated at conventional levels of 5 percent. A joint F-test rejects that the controls are jointly equal across the two benchmark periods and the conduct period in his model. I cannot test differences in Dr. Starr's COVID-19 control separately as it only exists in his benchmark periods.

Source: Starr turnover (Corrected Data).

As this exhibit shows, the estimated coefficients for healthcare services personal consumption expenditure per capita, GDP per capita, unemployment rate, CPI, and total hours are statistically significantly different between Dr. Starr's combined benchmark periods and the proposed class period.

151.    As this analysis shows, the factors Dr. Starr includes in his model do not have the same relationships with compensation in the benchmark and alleged misconduct periods, undermining the fundamental assumption on which his model is based—i.e., that the three periods are the same, other than the existence of the alleged conduct in the middle period. These results provide further evidence

Chow test. The Chow test is more accurately described as a testing principle than a single test, and it describes methods to test if all the coefficients in the model have changed between two periods (or subgroups of the observations), or if some specific subset of parameters has changed, or if some particularly important combination of parameters (or function of the parameters) has changed.")

See also, Jeffrey Wooldridge, *Introductory Econometrics*, 5th ed., Cengage Learning, 2013, p. 453 ("The Chow test – which is simply an F test – can be used to determine whether a multiple regression function differs across two groups"); Damodar N. Gujarati, *Basic Econometrics*, 2nd ed., McGraw-Hill, 1988, p. 443 ("One of the popular methods of testing for differences between two (or more) regressions is the Chow test"); ABA Econometrics (2014), p. 358 ("Standard statistical tests can be applied to test the stability of coefficients among subgroups of customers, products, time, geographies, or other subsamples, and to determine whether it is appropriate to pool potential subgroups when estimating the average effect of the alleged conspiracy. For example, a Chow test can be implemented to determine whether the effect of an alleged conspiracy should be estimated separately for two or more potential subgroups of customers, products or periods").

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

that Dr. Starr's "wage suppression" model has not reliably captured the relevant non-conspiratorial economic factors that affected total compensation for relevant employees.

**D. Dr. Starr's "Wage Suppression" Regression Produces Biased Results as His Model Does Not Account for the Factors that Determine the Levels of Variable Pay Received by Relevant Employees**

152. As Dr. Starr describes, "a multivariate regression model can be used to isolate the effect of the Challenged Conduct by accounting or 'controlling' for other relevant factors that might also cause changes in compensation."[329] If, however, Dr. Starr does not correctly account for "other relevant factors that might also cause changes in compensation" in his model, it will not be able to reliably estimate the effect of the alleged conduct. Dr. Starr himself points to this issue, stating that estimates can be "susceptible to 'omitted variable bias,' which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation."[330] That is, if a relevant factor is excluded from Dr. Starr's "wage suppression" model, any difference in total compensation during the conduct period due to this omitted factor would be attributed to his average "wage suppression" effect.

153. Dr. Starr's "wage suppression" model includes a limited set of controls, which Dr. Starr argues can account for all relevant factors that impact total compensation for all proposed class members. However, Dr. Starr's own Figure 5 shows the wide range in total compensation received by employees included within his "wage suppression" regression. As his table shows, Dr. Starr includes employees that have total annual compensation of less than $3,000 as well as employees making more than $14.8 million. That is, Dr. Starr purports to account for all relevant factors that impact compensation for both a USPI Clinical Director in Arizona (███████████████) and a DaVita Senior Vice President in Colorado (█████████████████████████████████████████████████████ ██████) in a single model. This second employee was a Senior Vice President at DaVita between 2012 and 2022 and received compensation (as calculated by Dr. Starr) of between ████████████████ ██████ per year during this period. This wide variation in compensation year-over-year for a single employee in the same job is due to the large portion of his compensation that was variable (e.g., bonus

---

[329] Starr Report, ¶105.

[330] Starr Report, ¶132.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

and long-term incentives), which was determined, in part, by the performance of his employer DaVita—a factor that Dr. Starr omits from his analysis.[331]

154.    In his discussion of his regression analysis, Dr. Starr acknowledges that one might "conceive that *company performance* should be controlled for, because workers may receive bonuses tied to company performance."[332]  Dr. Starr argues that this is a "bad" control because "controlling for company performance" would "close off" a "causal pathway" between the alleged conduct and total compensation "if the Conduct affects company performance."[333]  Dr. Starr understates the problem that occurs when a relevant variable is excluded from a "wage suppression" model such as the one he proposes.  When a regression omits a critical factor, such as firm financial performance, it suffers from what is known as "omitted variable bias."[334]  As an ABA antitrust treatise explains, omitted variable bias is a form of model mis-specification and can lead to "misinterpretation of estimated results" and results that are "biased and unreliable."[335]  Omitted factors are particularly problematic in a model like Dr. Starr's, because the underlying assumption of the model is that it has accounted for all relevant factors other than the alleged conspiracy.[336]  In other words, if the analyst fails to include all relevant economic factors in his model, what he calls "wage suppression" is likely to be conflated with other legal, contemporaneous economic factors that determine compensation.[337]  Simply speculating that a given variable is a "bad" control is not a justification for its exclusion.  Dr. Starr provides nothing more than speculation to support his claim that the alleged conduct would affect firm performance, stating

---

[331] For example, a 2017 SCA ███████████████████████ presentation notes that ████████
██████████████████████████████████████████████████████████████████
███████ (SCA001543663, at slide 7).  Similarly, DaVita's ████████████████████████
████████████████████████████████ which usually are provided ████████████
████████ DaVita also awarded bonuses ████████████████████████████████
████████████████████████████ See DVA_OMCEAL_000906132–6135.

[332] Starr Report, ¶123(f), emphasis in original.

[333] Starr Report, ¶123(c), (f).

[334] More specifically, omitted variable bias occurs when a model does not control for variables that are expected to (a) influence the dependent variable in the regression (in this case, compensation) and (b) also be correlated with the explanatory variable(s) of interest (in this case, Dr. Starr's "Conduct" period indicator).

[335] ABA Proving Antitrust Damages, pp. 148, 164.

[336] Starr Report, ¶117

[337] The ABA antitrust treatise also explains that "omitted variable bias can be tested by identifying and including in the regression model additional explanatory variables […].  If these additional explanatory variables turn out to be statistically significant, and the coefficient estimates on the previously included explanatory variables change substantially when the additional variables are added, then the regression model that omitted the additional explanatory variables likely is misspecified and its results are biased and unreliable" (ABA Proving Antitrust Damages, p. 164).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

only that total compensation may be "an input to company performance (depending on the measure used)."[338] While Dr. Starr presents a series of sensitivity analyses that he describes as "robustness checks," which include adding additional control variables, some of which he describes as "bad controls," he does not perform a similar test to include any measure of firm performance—even measures of firm performance that do not include compensation for relevant employees.[339]

### 1. Relevant Employees Received Multiple Types of Compensation, All of Which Dr. Starr Includes in His "Wage Suppression" Regression Model

155. Relevant employees received multiple types of compensation, including multiple types of variable compensation (i.e., bonus and equity payments). For example,



---

[338] Starr Report, footnote 415.

[339] Starr Report, ¶130. Dr. Starr purports to "assess the potential for unobserved variables to be responsible for the observed relationships" by comparing the compensation over time of relevant Director and VP level employees to that of managers (below Director level). The key assumption of this type of analysis is that "[m]anager compensation is similarly affected" by the "unobserved variables that are responsible for the Conduct effect" (Starr Report, ¶133). Dr. Starr has not described why he assumes firm performance (which impacts variable compensation paid to proposed class members at higher rates than managers) or any other factor would impact both managers and relevant employees "similarly."

Due to its construction, Dr. Starr's model will attribute any changes in total compensation between the benchmark and conduct period that is not accounted for by his limited controls to the estimated "wage suppression." To the extent that the change in total compensation comes from variable compensation, which proposed class members receive more of than managers, Dr. Starr's analysis comparing compensation between these two groups would still attribute this difference to his estimated "wage suppression." See, e.g., SCA000073564–3571, at 3567.

[340]  (DVA_OMCEAL_001329256–9261, at 9258; DVA_OMCEAL_000294731–4747, at 4738).

[341] DVA_OMCEAL_000926457–6467 at 6460; DVA_OMCEAL_000297363–7368 at 7364.

[342] DVA_OMCEAL_001329256–9261, at 9257–9258.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



156.     To show how these different types of compensation vary over time, I show Dr. Starr's calculation of total compensation for proposed class members at DaVita and SCA, broken out by pay type in **Exhibit 26** and **Exhibit 27**. These charts show the average amount of each type of compensation that employees of each Defendant received in each year. During the proposed class period, variable compensation (e.g., bonus, cash long-term incentives, and equity payments) accounts for between ████████████ of total compensation for relevant DaVita employees, depending on the year, and between ████████████ of total compensation for SCA employees over this same period.[346]

---

[343] SCA001159728–9748 at 9733.

[344] SCA001159728–9748 at 9734.

[345] SCA001159728–9748 at 9731, 9740.

[346] See **Appendix K-1** for a similar analysis for USPI. Variable compensation accounts for between ████████ ████ of annual total compensation for relevant USPI employees during the proposed class period.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 26**
**AVERAGE ANNUAL TOTAL COMPENSATION**
**BY COMPENSATION TYPE**
**DAVITA**
**2005 – 2022**



Notes: The total compensation in this analysis is the compensation that Dr. Starr describes as "Class Compensation" in his Figure 23. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr.

Dr. Starr speculates that the "drop" in total compensation he identifies in his Figure 23 in 2019 is due to the sale of DaVita Medical Group (Starr Report, Figure 23 notes). However, as this analysis shows, there is also a decline in compensation *per employee* due to changes in variable compensation levels.

Source: Starr turnover (Corrected data).

113

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 27**
**AVERAGE ANNUAL TOTAL COMPENSATION**
**BY COMPENSATION TYPE**
**SCA**
**2005 – 2022**



Notes: The total compensation in this analysis is the compensation that Dr. Starr describes as "Class Compensation" in his Figure 24. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr.

Source: Starr turnover (Corrected data).

157. These exhibits further show that not only the amount of variable compensation, but also the type of variable compensation employees received changed over time. For example,

- [347]

[348]

---

[347] DVA_OMCEAL_000972302; DVA_OMCEAL_001329256–9261, at 9258.

[348] DVA_OMCEAL_001402387–2433, at 2398–2399; DVA_OMCEAL_001329256–9261, at 9258.

114

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



- ████████████████████████████████████████████████████.[349]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████ [350]

As these exhibits indicate, the level of variable compensation that employees received would depend not only on the compensation practices of a given Defendant but also on the performance of the firm itself in that year, which Dr. Starr does not account for in his regression analysis.

### 2. Empirical Testing Shows that Dr. Starr's "Wage Suppression" Regression Cannot Establish Impact for Base Salary

158.    As I describe above, Dr. Starr's model does not find statistically significant "wage suppression" on base salary after correcting his data errors.  Dr. Starr acknowledges that testing his model on "different measures of compensation" is an important test to assess the "robustness" of his model.  In his Figure 26, Dr. Starr presents the results of this test to "show that the results are robust to using different measures of compensation."[351]  First, Dr. Starr purports to test the effect of the alleged conduct on "regular plus other pay."[352]  Without discussion, Dr. Starr includes DaVita's Cash LTI payments in his measure of "regular pay." ████████████████████████████████████████████

████████████████████████████████

159.    In **Exhibit 28** I present the results of Dr. Starr's Figure 26 analysis making two changes but otherwise making no corrections to Dr. Starr's model: (i) adjusting Dr. Starr's incorrect data treatment as I describe above (in Section VIII.B) and (ii) excluding DaVita Cash LTI payments from his measure of "regular pay."  As this exhibit shows, Dr. Starr's own regression does not find "suppression" of base salary overall.  Further, Dr. Starr's regression—making no other corrections—does not find "suppression" for base salary for DaVita and USPI individually and finds that the effect for SCA would be only ███████ (down from the ███████ Dr. Starr reports in his Figure 26).  In fact, Dr. Starr's model would suggest that the alleged conduct *increased* base salary for DaVita employees.[353]  As I

---

[349] See, e.g., SCA 2013 10-K, p. 102.

[350] SCA000465129, at slide 11.  In addition, after SCA was acquired by Optum, a subsidiary of UnitedHealth, █ ███████████████████████████████████████ (SCA001037832–7833).

[351] Starr Report, ¶130(a).

[352] Starr Report, ¶130(a).

[353] Although Dr. Starr estimates separate effects for each of the Defendants, he runs a single pooled model, which assumes that his included control variables have the same effect on compensation across Defendants.  That is, a change in DaVita specific data (i.e., the exclusion of their Cash LTI from Dr. Starr' analysis) would impact results for the other Defendants as well.

describe in the previous sections, Dr. Starr's "wage suppression" regression is unreliable. That is, the purported finding of "suppression" on base salary for SCA in this test is not consistent with Dr. Starr's own "robustness check" that finds no statistically significant "wage suppression" on total compensation in his Figure 35 specification, excluding individual-company fixed effects.[354]

**EXHIBIT 28**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**BASE SALARY**
**CORRECTED DATA**

| Statistic | Dr. Starr's Aggregate Model | | Dr. Starr's Defendant-Specific Model | |
| | Figure 26 [1] Corrected | Excluding DaVita Cash LTI | Figure 26 [2] Corrected | Excluding DaVita Cash LTI |
| [a] | [b] | [c] | [d] | [e] |
| Pooled Conduct **% Wage Suppression** | | | | |
| DaVita Conduct **% Wage Suppression** | | | | |
| SCA Conduct **% Wage Suppression** | | | | |
| USPI Conduct **% Wage Suppression** | | | | |
| Observations Included Employees R-squared | | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

This test includes compensation Dr. Starr identifies as "regular pay" and "other compensation" (see Starr Report, Figure 26), excluding DaVita long-term cash incentive payments.

Source: Starr turnover (Corrected Data).

---

[354] See Section VIII.C.2, *supra*.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

160.     As the results of my test shows, Dr. Starr's analysis is not "robust to using different measures of compensation" as he claims.[355]  In fact, Dr. Starr's analysis does not show any effect of the alleged conduct across Defendants on base salary.  That is, the "wage suppression" Dr. Starr purports to find is driven by employees' variable compensation.  As I describe below, Dr. Starr's model does not account for firm performance, a key factor in determining the levels of variable compensation for relevant employees.  After correcting for this error, Dr. Starr's "wage suppression" model fails to find statistically significant "wage suppression" when firm-specific performance measures for certain types of variable compensation are included in his model.

### 3.     The Failure to Include Firm Specific Performance Controls in Dr. Starr's "Wage Suppression" Regression Renders His Analysis Unreliable

161.     Dr. Starr's model cannot account for differences in the value of variable compensation such as long-term incentive payments included within his measure of total compensation as his model does not attempt to control for changes in firm specific performance over time.  That is, Dr. Starr's model does not know if a change in variable compensation between his conduct and benchmark periods is due to changing firm performance over time or due to the alleged conduct.  By not accounting for firm performance, Dr. Starr's model assumes any difference in compensation payments between these periods is due to the alleged conduct and attributes it to his estimate of "wage suppression."

162.     To illustrate the issue of Dr. Starr's omission of firm performance controls I assess the value of Cash LTI payments for DaVita.



---

[355] Starr Report, ¶130.

[356] DVA_OMCEAL_000944057–4061, at 4060. ████████████████████████████████
████████████████████████████████████████████████
(DVA_OMCEAL_001329256–9261, at 9259; DVA_OMCEAL_000939090–9103, at 9090).  DMG employees only appear in the data during the conduct period and do not contribute to the "wage suppression" estimate in Dr. Starr's "preferred" model (Starr Report, ¶130, "Because individual fixed effects rely on comparisons of the same individual during and absent the Conduct, in the main specification there may be Senior-Level Employees who are not contributing to the Conduct estimate").

[357] DVA_OMCEAL_000297363–7368 at 7364.

[358] On average, DaVita employees received Cash LTI payments of $237 in 2019 compared to over $46,000 in 2020.  From 2015 to 2018, the relevant period determining Cash LTI payouts for 2019, DaVita's U.S. Dialysis and Lab Adjusted Operating Income declined from $1.76 billion to $1.68 billion.  In 2019, Adjusted Operating

(continued on next page . . .)

117

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

163. █████████████████████████████████████████████

██████████████████████████████████████████[359] █████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████[360] In **Exhibit 29,** I show how Dr. Starr's results are affected by the omission of the relevant firm performance measures that determined the value of these Cash LTI payments for DaVita employees. For this test, I apply Dr. Starr's model to total compensation less stock payments (i.e., base salary, bonus payments, and Cash LTI payments) for DaVita specifically. The first column in the exhibit shows the results of Dr. Starr's model making no other changes. In the second column I include two additional controls: (i) an indicator for DaVita U.S. Dialysis employees in 2015–2020 (i.e., the employees who were potentially eligible for Cash LTI payments) and, for these employees and years, (ii) the three-year growth rate of DaVita's U.S. Dialysis Adjusted Operating Income. As the results of this exhibit show, when I include these additional controls to account for how Cash LTI payments changed over time, Dr. Starr's model no longer finds a statistically significant "wage suppression" for DaVita employees.

---

Income increased again to $1.93 billion, leading to larger payouts in 2020 (DaVita Inc. 10-K, 2017 Annual Report, p. 79; DaVita Inc. 10-K, 2018 Annual Report, p. 79; DaVita Inc. 10-K, 2019 Annual Report, p. 57).

[359] DVA_OMCEAL_000926457–6467 at 6460; DVA_OMCEAL_000683921–3930 at 3930.

[360] See, for example, ██████████████████████████████████████████ ██████████████████ (DVA_OMCEAL_000929239–9248, at 9239, 9248). DaVita's 2018 U.S. Dialysis operating income was $1.68 Billion (DaVita Inc. 10-K, 2018 Annual Report, p. 79).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 29**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION LIMITED TO DAVITA**
**ON CORRECTED DATA**
**TOTAL COMPENSATION LESS STOCK PAYMENTS**
**INCLUDING DAVITA SPECIFIC FIRM PERFORMANCE CONTROLS**

| Statistic | Dr. Starr's Model | Including Adjusted OI 2015-2020 | Including Adjusted OI Before G&A 2015-2020 |
|---|---|---|---|
| [a] | [b] | [c] | [d] |
| DaVita Conduct | | | |
|   **% Wage Suppression** | | | |
| | | | |
| 2015-2020 U.S. Dialysis Employees Indicator | | | |
| | | | |
| 3-Year Growth Rate of Dialysis Adjusted OI | | | |
|   For 2015-2020 U.S. Dialysis Employees | | | |
| 3-Year Growth Rate of Dialysis Adjusted OI Before G&A Expens | | | |
|   For 2015-2020 U.S. Dialysis Employees | | | |
| | | | |
| Observations | | | |
| Included Employees | | | |
| R-squared | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

164.   Dr. Starr argues that "controlling for company performance" would be a "bad control" as total compensation may be "an input to company performance (depending on the measure used)."[361] Although Dr. Starr has done no analysis to show that the alleged conduct in fact impacted any measure of firm performance, to address this concern I include an additional test in **Exhibit 29** above. In the last column of this exhibit, I adjust the control for DaVita's U.S. Dialysis Adjusted Operating Income to now exclude general and administrative expenses, which include the labor costs of relevant employees.[362] That is, by making this adjustment, I ensure that the changes in operating income I measure are not due to changes in the cost of labor for the relevant employees. With this adjustment, I

---

[361] Starr Report, ¶123(f), footnote 415.

[362] See DaVita Inc. 10-K, 2018 Annual Report, p. 81.

119

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

continue to find that Dr. Starr's model no longer finds a statistically significant "wage suppression" for DaVita employees.

165.    While this test illustrates the impact of omitted firm performance controls for a specific type of variable compensation offered by one of the Defendants, this issue permeates Dr. Starr's analysis across all three Defendants.  All three Defendants offered variable compensation to relevant employees, which were, at least in part, determined by that firm's own performance.  Dr. Starr makes no attempt to model changes in compensation due to any of these firm specific factors—which would vary by Defendant, the different types of variable compensation, and time as the example of DaVita's cash LTI program I describe above shows.  This omission impacts all of the models Dr. Starr has put forward including variable compensation.

### 4. Dr. Starr's "Wage Suppression" Regression Model Cannot Account for the Variation in Timing for Long-Term Incentive Payments

166.    Dr. Starr's inclusion of long-term incentive *payments* (rather than grants) introduces a timing issue into his regression analysis, which Dr. Starr does not account for.  Dr. Starr's "stock compensation" measure is associated with the wrong year because he only looks at the payments, which can occur years after when Defendants made and implemented their compensation decisions for proposed class members.  This timing issue biases Dr. Starr's total compensation regression results, which include these equity payments.  In all of his models including "stock compensation," Dr. Starr does not account for this timing issue nor do his models account for changes in the value of these grants over time due to factors outside of Defendants' compensation setting process, for example, changes in stock prices over multiple years which can impact both the value of the payment itself and the employee's behavior (e.g., if they decide to "exercise" vested stock options on a certain date because of gains in the underlying stock price).[363]

167.    Because Dr. Starr analyzes only long-term incentive payments, the "stock compensation" Dr. Starr includes in his regression is measured in the year an employee received vested RSUs or unilaterally chose to exercise their vested stock options.[364]  This employee decision happens after the

---

[363]  ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ (Starr Deposition, 368:7–369:8).

Dr. Starr's assertion contradicts how the Defendants calculated expected values for stock grants and options prior to vesting.  For example, DaVita's 2013 10-K accounted for "$134.7 million in total estimated but unrecognized long-term incentive compensation for LTIP awards outstanding, including $89.4 million for nonvested stock-based awards under [their] equity compensation and stock purchase plans" (DaVita Inc. 10-K, 2013 Annual Report, p. 98).

[364] Stock options include non-qualified stock options ("NQs") and Stock Appreciation Rights ("SARs").

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

company's decision to grant stock compensation, often by several years. For the question at issue—whether or not Defendants suppressed compensation for proposed class members—one would need to compare the pay decisions Defendants actually made to those they would have made but-for the alleged conduct *during* the proposed class period. However, Dr. Starr's model of total compensation including these long-term incentives conflates this comparison by (i) attributing lower "stock compensation" in the early proposed class period to the conduct, when that compensation was granted *before* the proposed class period, and (ii) misattributing higher "stock compensation" after the proposed class period to after the end of the conduct, when that compensation was granted *during* the proposed class period.

168.     For Dr. Starr's "stock compensation" measure, there is a difference of multiple months (and usually a difference of multiple years) between the following events:

- First, the time at which equity was *granted* to an employee (i.e., stock grants). That is, the time at which the company made a compensation decision. This reflects the company's choice regarding the given employee's equity compensation.

- Second, the time at which an employee either received vested RSUs or *chose* to exercise their right to vested options (i.e., stock earnings).[365] This is the measure included in Dr. Starr's regression analysis. The value and timing of these earnings would depend not only on the initial grant decision made by the firm but the associated vesting schedule, changes in the underlying stock price, and the individual employee's choice.

Dr. Starr does not account for any of these other factors, including stock price changes over time, which can explain some of the fluctuations in his total compensation measure over time, or an employee's decision (not) to exercise their vested options in a given year.

169.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████[366]████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[365] In most instances, if an employee leaves the company before equity vests, he or she will forfeit the right to the underlying stock. For this reason, stock grants are a "retention" tool (see Starr Report, ¶49).

[366] ████████████████████████████████████████

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



**EXHIBIT 30**
**EXAMPLE OF THE EXERCISE OF STOCK OPTIONS**
**BY DAVITA PROPOSED CLASS MEMBER KENNETH LEIDNER**
**JANUARY 1, 2006 – DECEMBER 31, 2009**



Notes: Grant ID DVA11390.

Source: DaVita Grant Recap Data (DVA_OMCEAL_001408533, DVA_OMCEAL_001408536, DVA_OMCEAL_001408539, DVA_OMCEAL_001408542, DVA_OMCEAL_001408543, DVA_OMCEAL_001408547); Investing.com, "DaVita Healthcare Partners Inc.," https://www.investing.com/equities/davita-inc.

170.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

[367]

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 31**
**EXAMPLE OF THE EXERCISE OF STOCK OPTIONS**
**BY PROPOSED CLASS MEMBER BRYAN GREGORY**
**JANUARY 1, 2018 – DECEMBER 31, 2022**



Notes: Grant ID DVA16431.

Source: DaVita Grant Recap Data (DVA_OMCEAL_001408533, DVA_OMCEAL_001408536, DVA_OMCEAL_001408539, DVA_OMCEAL_001408542, DVA_OMCEAL_001408543, DVA_OMCEAL_001408547); Investing.com, "DaVita Healthcare Partners Inc.," https://www.investing.com/equities/davita-inc.

171.    Dr. Starr's regression on total compensation also misattributes stock compensation for proposed class members that worked at SCA granted *during* the proposed class period to earnings *after* the proposed class period. [368]

---

[368] SCA002246316 (Grant ID OP917047).

124

███████████████████████████████████████████████████[369] ████████████
█████████████████████████████████████████████████████████████████
████████████████████████████████████████████████.[370]

172. The timing issue I illustrate above, where Dr. Starr misattributes stock earnings to the post-period for compensation decision *during* the proposed class period, is pervasive. ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

173. Dr. Starr's erroneous use of stock earnings measured at the time of payment biases his regression towards finding larger wage suppression effects because the returns on DaVita's stock price were smaller during the proposed class period. Because Dr. Starr does not attempt to control for these differences in firm performance over time, his estimate of the effect of the conduct captures not only the purported difference between the actual and but-for compensation of employees, but also the comparatively lower returns on DaVita's stock price during the proposed class period. This issue is demonstrated in **Exhibit 32** which shows the average stock earnings of relevant DaVita employees (in the light blue bars) and the average Cash LTI earnings (in the darker blue bars). The percentage return on DaVita's stock price over a three-year period is shown in the red line.[371] For example, this line shows that as of Q1 of 2022, DaVita's stock had increased 103 percent over Q1 of 2019.[372]

---

[369] SCA000108278–8279, at 8278. ████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

[370] Starr turnover. The payment associated with Mr. Brown's grant is identified by the "Document No." RSU7047." From March 2017 to March 2021, UnitedHealth's stock price appreciated from $168 to $357 (stock prices from Investing.com, ticker symbol "UNH").

[371] ████████████████████████████████████████████████████████████
█████████████████████████████████ (DVA_OMCEAL_001332734–2774, at 2760). The average time between grant and exercise for stock payments to DaVita class members is ████████.

[372] I show the three-year return on DaVita's stock price in **Exhibit 32** because the average time between grants and payments for proposed DaVita class members' equity was 3.3 years.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 32**
**RELEVANT DAVITA EMPLOYEES**
**ANNUAL AVERAGE STOCK AND LONG-TERM CASH INCENTIVE PAYMENTS**
**COMPARED TO DAVITA STOCK PRICE RETURNS**



Notes: The "Return on DVA Stock over 3 Years" measures the percentage return between the average DaVita Stock Price in Q1 of this year and the average in Q1 three years ago. Vertical lines indicate the start and end of the proposed class period.

Sources: Starr turnover (Corrected Data); Investing.com, "DaVita Healthcare Partners Inc.," https://www.investing.com/equities/davita-inc.

174.    As this exhibit shows, stock and long-term cash incentive earnings are correlated with the stock price return over multiple years:[373]

-

---

[373] Note that the blue bars (stock and Cash LTI payments) as well as the red line (the return on DVA Stock over three years) in **Exhibit 32** follow a similar pattern.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



175. DaVita's stock price returns increased again after the proposed class period, corresponding with higher stock earnings of proposed class members in and after 2020, as they profited from the stock grants DaVita distributed during the proposed class period. That is, Dr. Starr both misattributes (i) the lower earnings of proposed class members in the proposed class period due to lower stock price returns to the effect of the alleged conduct, and (ii) the higher earnings of proposed class members in the post-period to the end of the alleged conspiracy period, even though proposed class members in this period gained from stock grants received *during* the proposed class period.

176. As the testing in this section shows, Dr. Starr's "wage suppression" model (i) fails to find "wage suppression" on base salary, (ii) fails to find "wage suppression" on certain types of variable compensation when firm specific performance measures are included in his model, and (iii) uses long-term incentive payment data that creates a timing issue within his model, which renders any estimate of purported "wage suppression" on long-term incentive compensation unreliable. Put simply, Dr. Starr's "wage suppression" model cannot reliably model relevant employees' total compensation and cannot be used show antitrust impact or be used to calculate damages from the alleged conduct.

## IX. DR. STARR'S DAMAGES CALCULATION IS UNRELIABLE AND IS BASED ENTIRELY ON HIS UNRELIABLE "WAGE SUPPRESSION" REGRESSION MODEL

177. Dr. Starr's calculation of damages is entirely based on his flawed "wage suppression" regression model, which, as I describe above, cannot be used to reliably calculate damages for the proposed class. For example, after making only the data corrections I describe above in Section VIII.B, Dr. Starr's damages estimate declines by approximately ███████. Further, Dr. Starr's "wage suppression" regression suffers from several fundamental flaws:

- The results of Dr. Starr's own "robustness checks" and my additional testing show the sensitivity of his model to different regression model specifications.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Statistical testing disproves the fundamental assumption of Dr. Starr's model that with the exception of the alleged conduct, economic factors affected compensation in the same way in both the benchmark and proposed class periods.

- After correcting Dr. Starr's data errors, his own model no longer finds statistically significant "wage suppression" for all Defendants for base salary.

- Dr. Starr's regression model does not account for changes in firm performance that impacts variable compensation levels. As my testing shows, Dr. Starr's "wage suppression" model fails to find "wage suppression" when firm specific performance measures are included in his model.

- Moreover, by including equity payments (rather than grants) in his regression, Dr. Starr (i) incorrectly attributes stock payments granted prior to the alleged conduct to his damages, and (ii) incorrectly ignores proposed class members' stock payments after the conduct period that were granted during the conduct period.

Taken together, Dr. Starr's "wage suppression" regression cannot reliably estimate the effect of the alleged conduct (either in total or separately for the alleged mobility restrictions or the alleged information sharing) and therefore cannot be used to estimate damages to the proposed class caused by the alleged conduct. Below, I discuss other reasons why Dr. Starr's damages calculations are unreliable.

### A. Dr. Starr's Damages Calculation Depends on the Defined Class Period

178. The period in which the conduct at issue has been alleged has changed over time. While Dr. Starr and Dr. Gerhart assess the period from May 1, 2008 to December 31, 2019 for DaVita and SCA employees and the period from May 1, 2010 to December 31, 2019 for USPI employees,[374] previously the conduct was alleged to have taken place over different periods:

- In the Third Amended Complaint (the operative complaint), Plaintiffs alleged a proposed class period of May 2008 to January 2021 for DaVita and SCA and May 2010 to January 2021 for USPI.[375]

---

[374] Starr Report, ¶9; Gerhart Report, ¶5.

[375] Complaint, ¶92.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Previously, in the Second Amended Complaint, Plaintiffs alleged a proposed class period of May 1, 2010 to January 5, 2021 for SCA and USPI and May 1, 2010 to January 5, 2021 for DaVita.[376]

- The now-dismissed indictments against SCA and DaVita alleged a conduct period of May 2010 to October 2017 for SCA and USPI and February 2012 to July 2017 for DaVita.[377]

179.    Dr. Starr offered the opinion that the qualitative evidence he reviewed was ███████████ ██████████████████████████████████[378]  However, as I describe above in Sections VI.B and VII.A, Plaintiffs' experts ignore evidence counter to their assumed start and end date of the alleged conduct.  For example,



[379]



[380]

[381]

---

[376] Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, June 6, 2023, ¶101.  Plaintiffs allege the same proposed class period in their Consolidated Amended Class Complaint (see Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, August 9, 2021, ¶101).

[377] Indictment, *United States v. Surgical Care Affiliates, LLC* (N.D. Tex.), January 5, 2021, ¶9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017" SCA and USPI "entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees"), ¶17 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017" SCA and DaVita "entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees"); Indictment, *United States v. DaVita Inc., et al.* (D. Colo.), July 14, 2021, ¶9 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017" DaVita and Kent Thiry "entered into and engaged in a conspiracy with SCA to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees."). See also, Complaint, ¶¶2–6.

[378] For example, Starr Deposition, 59:2–60:8, 69:17–70:1 (███████████████████████████████████ ████████████████████████ ); 68:19–69:9, 73:1–15 (█████████████████████████████████ ███████████████ ).

[379] Hayek Deposition, 165:21–166:24.

[380] Starr Report, ¶80, footnote 311.

[381] Hayek Deposition, 189:23–190:22, 328:17–330:8; Kilgore Deposition, 67:11–68:13.

129

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

- ███████████████████████████████████████████████████
  ███████████████████████████████████████████████████
  ███████████████████████████████████████

███████████████████████████████████████████████████████

████████████████[382] ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

180.     When I test the results of Dr. Starr's "wage suppression" model applied to the different periods in which the conduct at issue has been alleged, I find substantially different results.  That is, the volume of damages Dr. Starr calculates depends on the proposed class period he assesses, which is not "consistent" with the available evidence.  I summarize the results of this test in **Exhibit 33**.  In the first column, I show the results of Dr. Starr's analysis on corrected data.  In the subsequent columns, I show the results of Dr. Starr's analysis applied to the alleged conduct period according to the (i) Third Amended Complaint, (ii) Second Amended Complaint, and (iii) DOJ indictments.[383]

---

[382] Starr Deposition, 241:13–242:6.  See also, Starr Report, ¶118.

[383] The following dates are used to define the "Conduct" indicator:

- Column [b] 2008-2019 (DaVita), 2008-2019 (SCA), 2010-2019 (USPI).
- Column [c] 2008-2020 (DaVita), 2008-2020 (SCA), 2010-2020 (USPI).
- Column [d] 2012-2020 (DaVita), 2010-2020 (SCA), 2010-2020 (USPI).
- Column [e] 2012-2017 (DaVita), 2010-2017 (SCA), 2010-2017 (USPI).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 33**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION AND DAMAGES CALCULATION**
**ON CORRECTED DATA**
**APPLIED TO DIFFERENT CLASS PERIODS**



| Statistic | Dr. Starr's Period of Analysis | Third Amended Complaint | Second Amended Complaint | DOJ Indictments |
|---|---|---|---|---|
| [a] | [b] | [c] | [d] | [e] |
| Pooled Conduct **% Wage Suppression** | | | | |
| DaVita Conduct **% Wage Suppression** | | | | |
| SCA Conduct **% Wage Suppression** | | | | |
| USPI Conduct **% Wage Suppression** | | | | |
| Observations Included Employees R-squared | | | | |
| **Total Damages (Millions)** | | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

I follow Dr. Starr's method for calculating damages in partial years by prorating the total compensation for relevant employees in that year based on the number of months included in the alleged conduct period.

Source: Starr turnover (Corrected Data).

181. As this exhibit shows, when I apply Dr. Starr's own "wage suppression" model to the different periods the conduct has been alleged to span, I find a wide range of estimated damages—from ▮ if the dates in the Second Amended Complaint are used to almost ▮▮▮▮ for the dates Dr. Starr uses for his analysis. I note that Dr. Starr's analysis applied to the time period outlined in the Third Amended Complaint estimates damages approximately ▮▮▮▮ lower than for the period he studies, even though the period alleged by Plaintiffs in the operative Complaint is *longer* than the period Dr. Starr studies. That is, the results of Dr. Starr's "wage suppression" regression (and damages analysis) vary significantly depending on the definition of the proposed class period. When applied to the dates Dr.

131

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Starr studies—which are contradicted by evidence Dr. Starr ignored—his analysis finds the largest damages across all of these potential proposed class periods definitions.[384]

### B. Dr. Starr's Damages Calculation Depends on His Identification of Relevant Employees

182.     Dr. Starr testified that senior officers, which he defined as "C-suite" employees, were excluded from the proposed class as ████████████████████████████████████████ ██████████████████████[385]  However, Dr. Starr includes a number of these "C-suite" employees in his analysis (and damages calculation).  For example, Dr. Starr includes the CEOs of two of the Defendants in his damages calculation (Andrew Hayek and Anthony Kilgore of SCA, William Wilcox and Brett Brodnax of USPI) *when they held* the title CEO—calculating a total of ██████████ in damages for these individuals.  ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████[386] Dr. Starr includes these employees in his calculation of damages to the proposed class.

183.     Further, both of Plaintiffs' experts cite examples of other senior employees (not within the "C-suite") discussing the alleged conduct.  That is, Plaintiffs' experts' documentary narrative would suggest that certain proposed class members were aware of the agreements and also perpetuated the alleged conduct.  For example, Dr. Starr calculates: [387]

- ████████████████████████████████████████████████████████████████ ██████████████████████████.[388]

---

[384] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ (Starr Deposition, 96:7–12).

[385] Starr Deposition, 118:12–18, 119:16–120:4.

[386] Starr Deposition, 119:16–120:4.

[387] Damages are calculated using Dr. Starr's turnover for his Figure 8.

[388] According to Dr. Starr, ████████████████████████████████████████████ (Starr Report, ¶72(a), footnote 139, citing DVA_OMCEAL_000658781 (Exhibit PX333)).  According to Dr. Starr, ████████████████████████████████████████████ (Starr Report, ¶100(a), (b), (f), citing Hayek Deposition at 369:11–24, Rucker Deposition at 234:20–25, 255:10–256:21).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

-

[389]

- 

[390]

Dr. Starr and Dr. Gerhart do not address why employees would take part in a conspiracy to suppress their own compensation. It is illogical that individuals would have acted to suppress their own pay, yet that is exactly what Dr. Starr assumes. Dr. Starr does not provide a methodology for identifying employees that "would have been in the know about" the alleged conduct "and part of the enforcement mechanisms" nor does he exclude these employees from his calculation of damages.

## X. DR. STARR'S CONCLUSION THAT "DEFENDANTS WIELD MARKET POWER" IGNORES WELL-ESTABLISHED METHODS USED BY ECONOMISTS TO ASSESS MARKET POWER AND IS REFUTED BY AVAILABLE EVIDENCE

184. Dr. Starr concludes that the "evidence of wage suppression" he purports to find with his regression model standing alone "demonstrates that Defendants wield market power over Class Members."[391] Monopsony power (i.e., market power for buyers) in labor markets is defined as a firm's ability to pay compensation below the level "that would prevail in a competitive market" for a sustained period of time.[392] As Dr. Starr argues, "Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members."[393] As a threshold matter, given that the only evidence Dr. Starr uses to support his conclusion that "Defendants wield market power" is his wage suppression regression, all of the flaws that render his "wage suppression" model unreliable undermine its use as "direct proof of Defendants' market power."[394]

185. Dr. Starr fails to consider any of the other types of analytical methods or approaches economists use to support a conclusion of monopsony power in labor markets. First, Dr. Starr does not assess the

---

[389] (Starr Report, ¶100(d), citing Mathis Deposition at 53:14–56:20). (Starr Report, ¶101(h), (i), citing OMC_BM_000010778 (Exhibit PX523) and OMC_BM_000014759 (Exhibit PX489)).

[390] According to Dr. Starr, (Starr Report, ¶77(e), citing DOJCIV-007-00000118).

[391] Starr Report, ¶196.

[392] Pindyck and Rubinfeld, p. 382.

[393] Starr Report, ¶196.

[394] Starr Report, ¶196. (Starr Deposition, 266:5–267:19).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

competition Defendants face for the labor of relevant employees. A relevant antitrust labor market represents the area of effective competition within which a set of firms actively compete for the services of workers. As the DOJ and FTC Merger Guidelines state:[395]

> "When defining a market for labor the Agencies will consider the job opportunities available to workers who supply a relevant type of labor service, where worker choice among jobs or between geographic areas is the analog of consumer choices among products and regions when defining a product market."

Dr. Starr presents no such assessment of the "job opportunities available to workers" either in terms of the types of jobs available to that worker at rival employers or their geographic location. An economist can apply a series of (qualitative and/or quantitative) tools to analyze worker substitution possibilities that may constrain the ability of firms to suppress wages.[396] Other than simply pointing to the results of his flawed regression analysis, Dr. Starr fails to apply any of the other analytical tools and methods used by economists to determine the scope of competition for employees.

186.   Dr. Starr further does not address that these other types of evidence contradict his conclusion with respect to Defendants' "market power." For example, Dr. Starr ignores the "practical indicia" of the scope of labor market competition for relevant employees.[397] Dr. Starr fails to provide a meaningful economic explanation for how the Defendants could exert market power to suppress wages by ███, in aggregate, given that:

- Both of Plaintiffs' experts agree that the other firms that relevant employees move to or come from would be ███████████████ for the Defendants.[398] As I describe in detail in Section V, the Defendants' data, data tracked by Lightcast, and available evidence such as Defendants' recruiting lists indicate competition with numerous non-Defendant firms—none of which Dr. Starr assesses.

---

[395] 2023 Merger Guidelines, §4.3.

[396] 2023 Merger Guidelines, §4.3. For example, Dr. Starr does not define a relevant labor market nor does he use any of the tools economists would use to do so such as the "Hypothetical Monopsonist Test," which is a framework used to analyze whether a single hypothetical employer (monopsonist) could profitably reduce compensation below competitive levels by a small but significant and non-transitory amount (typically 5–10 percent) without losing too many workers (2023 Merger Guidelines, §4.3(A)).

[397] As the Merger Guidelines describe, a "relevant market can be identified from evidence on observed market characteristics ('practical indicia'), such as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors" (2023 Merger Guidelines, §4.3).

[398] Starr Deposition, 147:4–15 ("███████████████ ███████████████ ███████████████"). See also, Gerhart Deposition, 51:5–15, 52:8–21.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Plaintiffs' experts do not assess indirect evidence, such as labor market shares and barriers to entry (for potentially competing employers), to determine whether market power is likely.[399] Dr. Starr provides no explanation for how the Defendants could exert market power given their relatively small share of employment in just the Other Outpatient Care Centers industry (approximately ▉ percent) and the Healthcare sector (less than ▉ percent)—which would not account for competing employers outside of the healthcare sector.[400]

187. Further, competition for relevant employees may vary by geographic area depending on the job and preferences of individual employees.[401] As the Merger Guidelines state, "[g]eographic market definition may involve considering workers' willingness or ability to commute."[402] Dr. Starr simply assumes all employees would be within the same national geographic market without addressing the substantial geographic dispersion of Defendants' operations.[403] As Dr. Starr acknowledges, the Defendants' "regional business offices and corporate headquarters" are located in different states, which may impact compensation levels across relevant employees.[404] However, Dr. Starr does not assess how labor market competition might vary for these employees across geographies.[405] For example, in 2017,

---

[399] See Pindyck and Rubinfeld, p. 387 ("When the number of buyers is very large, no single buyer can have much influence over price").

See also, Jonathan Baker, *Market Definition: An Analytical Overview,* Antitrust Law Journal, Vol. 74, No. 1, 2007, p. 130. (Information on market participants "is commonly used, among other things, to compute statistics about the size distribution of firms, usually in the form of market shares, from which inferences about market power and likely anticompetitive effect may be made"); Davis and Garces, pp. 191–2 ("However, market shares can be a misleading proxy for what we are actually trying to measure: substitution patterns between goods").

[400] As I noted above, these calculations are based on Dr. Gerhart's selected industry codes. I do not agree that either of these industries represents the relevant antitrust labor market.

[401] For example, the named Plaintiffs testified that they were unwilling to relocate at certain points in time due to geographic preference or family constraints. See, e.g., Spradling Deposition, 196:4–14 ("[My wife] wouldn't consider going south. Q. And why was that? A. Just comfort desire with climate, that kind of thing"); Keech Deposition, 186:22–187:3 ("▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉").

[402] 2023 Merger Guidelines, §4.3.

[403] In **Appendix L-1**, I summarize relevant employees' geographic locations across time.

[404] Starr Report, ¶16, Section IV.C.2 ("DaVita is based in Denver, Colorado. […] SCA's main offices are in Birmingham, Alabama and Deerfield, Illinois. […] USPI's main office is in Dallas, Texas."), ¶120(a) ("the Defendant firms do seem to take into account geography when determining compensation").

[405] In addition, Dr. Starr does not test whether his assumed "wage structure" mechanism implies that any wage suppression in one region (due to the alleged lack of offers from another "Covered Defendant") would lead to "indirect" impact (through compensation adjustments "cascading" across employees) across regions.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

████████████ of proposed USPI class members were located in Texas (in/or around USPI's Dallas headquarters), while less than ████████ of proposed SCA class members worked in Texas at the same time.[406]  As Brian Mathis (SCA) testified, for ██████████████████████████████████████ while SCA was ██████████████████████████████████████████████ ██████████████████████████[407]  Dr. Starr does not test if his conclusion would hold to the extent Defendants recruit for specific roles within a given geographic region (or employees prefer to remain within that geographic region).

188.    In summary, Dr. Starr's conclusion of monopsony power does not hold.  Contrary to available evidence, Plaintiffs' experts do not assess the outside options available to relevant employees nor do they assess how competition for relevant employees varied by geography.  Dr. Starr's conclusion that "Defendants wield market power over class members" is refuted by the quantitative evidence on mobility and outside competition for proposed class members' labor (see Section V), entirely based on a flawed wage suppression model (see Section VIII), and unsupported by antitrust methods economists use to assess labor markets and monopsony power.

---

[406] Constraints due to moving costs and individual-specific geographical preferences may also apply to geographic distances between Defendants' operations *within* states, particularly large ones such as Texas or California.

[407] Mathis Deposition, 122:13–17.  The departure rates in Section V above are consistent with Mr. Mathis' observations and demonstrate that movements between SCA and USPI amounted to only a small fraction of hirings and departures at either Defendant.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Dated this April 16, 2025 in Washington, DC.

_____

Dr. John H. Johnson, IV

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

## Appendix A.    DR. JOHNSON CV

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



1111 19th Street NW
Washington, DC 20036
+1 202 559 4388
jjohnson@edgewortheconomics.com

April 2025

# John H. Johnson IV

### EDUCATION

Massachusetts Institute of Technology
PhD, Economics, 1999

University of Rochester
BA, *magna cum laude* with Highest Distinction in Economics, 1995
Phi Beta Kappa

### CURRENT EMPLOYMENT

Edgeworth Economics, Washington, DC
Chief Executive Officer, Partner, September 2009-present

McCourt School of Public Policy, Georgetown University, Washington, DC
Adjunct Professor, Fall 2022

### EMPLOYMENT HISTORY

Edgeworth Economics, Washington, DC
President, September 2009-December 2018

Georgetown University, Washington, DC
Affiliated Professor, Georgetown Public Policy Institute, 2008-2011

Criterion Economics, LLC, Washington, DC
President, March 2009-September 2009

NERA Economic Consulting, Washington, DC
Vice President, 2005-2009
Senior Consultant, 2003-2005
Consultant, 2001-2003

University of Illinois at Urbana-Champaign, Champaign, IL
Assistant Professor of Economics and of Labor & Industrial Relations, 1999-2001

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

## A PPOINTMENTS

District of Columbia Board on Professional Responsibility
Hearing Committee Member, April 2023-present

National Archives Foundation
Board of Directors, March 2018-present

Appleseed Pro Bono Network
Board of Directors, June 2011-December 2018
Chair, Board of Directors, March 2016-March 2018
Chair-Elect, February 2015-February 2016
Chair of Nominating Committee, February 2013-January 2015

Antitrust Law Journal
Associate Editor, June 2011-May 2013
Assistant Editor, June 2010-May 2011

Hawaii Appleseed Center for Law and Economic Justice
Board of Directors, February 2013-January 2016

American Bar Association Antitrust Agriculture and Food Committee
Vice Chairman, June 2013-July 2014

## T EACHING EXPERIENCE

Georgetown University/McCourt School of Public Policy Courses
- o Antitrust and Public Policy
- o Masters in Public Policy: Thesis Research Seminar
- o The Law and Economics of Labor Discrimination Public Policy

University of Illinois at Urbana-Champaign Courses
- o Labor Problems
- o Women in the Labor Market
- o Graduate Labor Economics

LinkedIn Learning
- o Data Analytics for Business Professionals

## A WARDS AND HONORS

Good Apple Award, Appleseed Foundation, September 2021
Finalist, Entrepreneur of the Year, Mid-Atlantic Region, Ernst & Young, 2017
Pro Bono Innovator Award, Appleseed Pro Bono Network, 2012
Pro Bono Practice Award Recipient, Akin Gump Strauss Hauer and Feld, 2012
Finalist, Competition Economist of the Year, Global Competition Review, 2012
"Top Young Competition Economist," Global Competition Review, 2012

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

## MEMBERSHIPS

Society of Human Resources Management
American Association for Public Opinion Research
American Economic Association
American Statistical Association
American Bar Association
- o Labor and Employment Section
- o Antitrust Section

Canadian Bar Association
International Association of Privacy Professionals
National Association of Forensic Economists
Society of Labor Economists

## TESTIMONY AND EXPERT REPORTS
## PRIOR FOUR YEARS

*Pamela Wimbish and Patricia Onken v. IBM, Inc.,* United States District Court, Southern District of New York.
Case No. 23 CV 08327
Expert Report, March 14, 2025.

*Giang Bui vs. Cargill Incorporated, Cargill Meat Solutions Corporation, Cargill Limited, JBS USA Food Company, Swift Beef Company, JBS Packerland Inc., JBS Canada ULC, Tyson Foods, Inc., Tyson Fresh Meats, Inc., and National Beef Packing Company, LLC.* Supreme Court of British Columbia.
File No. S221365
Affidavit, March 13, 2024.
Deposition, October 11, 2024.

*Xockets Inc. v. Nvidia Corporation, Microsoft Corporation, and RPX Corporation,* United States District Court for the Western District of Texas, Waco Division.
Case No. 6:24-CV-00453-LS
Declaration, October 9, 2024.

*In the Matter of the Arbitration Between National Football League Players Association v. National Football League*
Expert Report, January 19, 2024.
Deposition, March 8, 2024.
Expert Report, April 19, 2024.
Declaration, June 14, 2024.
Deposition, July 19, 2024.
Trial Testimony, August 6, 2024.

*In re: Generic Pharmaceuticals Pricing Antitrust Litigation,* United States District Court for the Eastern District of Pennsylvania
Case No. 2:16-MD-02724
In re: Clomipramine Cases, DPP Case: 16-CM-27241
Clomipramine Expert Report, February 2, 2024.
Deposition, April 24, 2024.
Reply Report, June 17, 2024.

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

*In re: Generic Pharmaceuticals Pricing Antitrust Litigation,* United States District Court for the Eastern District of Pennsylvania
    Case No. 2:16-MD-02724
    In re: Clobetasol Cases, DPP Case: 16-CB-27241
    Clobetasol Expert Report, February 2, 2024.
    Deposition, April 24, 2024.
    Reply Report, June 17, 2024.
.
*In re: EpiPen Direct Purchaser Litigation*, United States District Court District of Minnesota
    Case No. 20-CV-00827-ECT-JFD
    Expert Report, June 1, 2023.
    Reply Report, July 5, 2023.
    Deposition, October 25, 2023.
    Expert Report, April 12, 2024.

*Jennifer Nosalek, Randy Hirschorn and Tracey Hirschorn, individually and on behalf of all others similarly situated, v. MLS Property Information Network, Inc., Anywhere Real Estate Inc. (f/k/a Realogy Holdings Corp.), Century 21 Real estate LLC, Coldwell Banker Real Estate LLC, Sotheby's International Realty Affiliates LLC, Better Homes and Gardens Real Estate LLC, Era Franchise Systems LLC, HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, RE/MAX LLC, Polzler & Schneider Holdings Corporation, Integra Enterprises Corporation, RE/MAX of New England Inc., RE/MAX Integrated Regions, LLC, and Keller Williams Realty, INC.,* United States District Court for The District of Massachusetts.
    Case No. 1:20-cv-12244-PBS
    Declaration with M. Kheyfets, March 26, 2024.

*The Icon at Panorama, LLC v. Southwest Regional Council of Carpenters, et al.,* United States District Court Central District of California,
    Case No. 2:19-cv-00181
    Expert Report, February 13, 2024.
    Deposition, March 18, 2024.

*State of Washington v. Tyson Foods, Inc. et al.,* State of Washington King County Superior Court.
    Case No. 21-2-14174-5 SEA.
    Expert Report, February 1, 2024.
    Deposition, March 14, 2024.

*Tarah Kye Borozny, et al. vs. RTX Corporation, Pratt & Whitney Division, et al.,* United States District Court, District of Connecticut
    Case No. 3:21-cv-1657 (SVN)
    Expert Report, January 29, 2024.
    Deposition, February 29, 2024.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

*In re: Broiler Chicken Antitrust Litigation,* United States District Court for the Northern District of Illinois, Eastern Division
>Case No. 1:16-cv-08637
>Expert Report, January 22, 2021.
>Deposition, March 23-24, 2021.
>Supplemental Expert Report, May 20, 2021.
>Expert Report, February 21, 2022.
>Evidentiary Hearing, May 11, 2022.
>Deposition, June 30 – July 1, 2022.
>Supplemental Expert Report, August 11, 2023.
>Supplemental Expert Report, October 2, 2023.
>Supplemental Expert Report, February 2, 2024.
>Supplemental Expert Report, June 7, 2024.

*In re: Rail Freight Surcharge Antitrust Litigation (No. II),* United States District Court for the District of Columbia.
>MDL Docket No. 2925, Misc. No. 20-8 (BAH)
>*Environmental Protection & Improvement Company LLC v. Union Pacific Railroad Company, et al.,*
>Case No. 1:22-cv-02587.
>Expert Report, December 13, 2023.

*In re: Rail Freight Surcharge Antitrust Litigation (No. II),* United States District Court for the District of Columbia.
>MDL Docket No. 2925, Misc. No. 20-8 (BAH).
>Expert Report*, August 15, 2023.*
>Deposition, November 8, 2023.

*In re: Surescripts Antitrust Litigation*, United States District Court for the Northern District of Illinois
>Case No. 1:19-cv-06627
>Expert Report, September 14, 2023.
>Deposition, October 12, 2023.

*Laronda Rasmussen, et al. vs. The Walt Disney Company,* Superior Court of the State of California, County of Los Angeles
>Case No. 19STCV10974
>Expert Report, September 8, 2023.
>Deposition, October 2, 2023.

*In re: Watkins Incorporated v. McCormick & Company, Incorporated.,* United States District Court of Minnesota.
>Case No. 15-cv-2688 (DSD/BRT).
>Expert Report, January 7, 2021.
>Deposition, February 3, 2021.
>Trial Testimony, August 28, 2023.

*In re: Folgers Coffee Marketing Litigation, United States District Court for the Western District of Missouri, Central Division*
>Case No: 21-2984-MD-C-BP
>Expert Report, December 9, 2022.
>Deposition, January 31, 2023.
>Declaration, July 17, 2023.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

*Nicholas Marcus Thompson, Jennifer Phillips, Michelle Herbert, Kathy Samuel, Wagna Celidon, Duane Guy Guerra, Stuart Philp, Shalane Rooney, Daniel Malcolm, Alain Babineau, Bernadeth Betchi, Carol Sip, Monica Agard and Marcia Banfield Smith vs. His Majesty The King.* Canada Federal Court.
     File No. T-1458-20
     Affidavit, September 30, 2022.
     Affidavit, February 28,2023.
     Deposition, July 14, 2023.

*In re: Caustic Soda Antitrust Litigation, United States District Court for the Western District Of New York*
     Case No: 1:19-cv-00385-EAW-MJR
     Expert Report, June 27, 2022.
     Deposition, July 29, 2022.
     Sur-reply Expert Report, December 27, 2022.
     Deposition, January 23, 2023.
     Evidentiary Hearing, June 5-6, 2023.
     Declaration, October 17, 2024.

*In re: Distribution of Cable Royalty Funds, Before the Copyright Royalty Judges, Washington, DC*
     Consolidated Docket Number 16-CRB-0009 CD (2014-17)
     Expert Report, July 1, 2022.
     Rebuttal Testimony, November 2, 2022.
     Hearing Testimony, March 21-23, 2023.

*In re: Caustic Soda Antitrust Litigation, Relates to Indirect Purchaser Action, United States District Court for the Western District Of New York*
     Case No: 1:10-cv-00385-EAW-MJR
     Expert Report, November 28, 2022.
     Deposition, January 11, 2023.

*Nicholas Marcus Thompson, Jennifer Phillips, Michelle Herbert, Kathy Samuel, Wagna Celidon, Duane Guy Guerra, Stuart Philp, Shalane Rooney, Daniel Malcolm, Alain Babineau, Bernadeth Betchi, Carol Sip, Monica Agard and Marcia Banfield Smith vs. Her Majesty The Queen.* Canada Federal Court.
     File No. T-1458-20
     Affidavit, September 7, 2022.

*Steves and Sons, Inc., v. JELD-WEN, Inc.,* United States District Court for the Eastern District of Virginia, Richmond Division
     Case No. 3:16-cv-00545-REP
     Declaration, March 21, 2022.
     Declaration, June 9, 2022.
     Declaration, July 8, 2022.

*International Construction Products LLC, v. Caterpillar Inc., Komatsu America Corp., Associated Auction Services, LLC d/b/a Cat Auction Services*, United States District Court for the District of Delaware.
     Case No.: 15-108-RGA.
     Expert Report, November 15, 2021.
     Deposition, December 8, 2021.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

*In re: Rail Freight Surcharge Antitrust Litigation (MDL-I),* United States District Court for the District of Columbia.
> Case No. 1:07-mc-00489.
> Expert Report, January 22, 2013.
> Deposition, May 31, 2013.
> Supplemental Expert Report, April 15, 2021.
> Deposition, November 16, 2021.

*Pamela La Fosse, et al. v. Sanderson Farms*, United States District Court for the Northern District of California
> Case No. 19-cv-06570-RS (N.D. Cal. Jul. 2, 2020)
> Expert Report, September 17, 2021.
> Deposition, October 15, 2021.

*In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices, And Antitrust Litigation,* United States District Court for the District of Kansas.
> Civil Action No. 2:17-md-02785-DDC-TJJ (MDL. No.: 2785)
> Expert Report, March 18, 2019.
> Deposition, April 10, 2019.
> Declaration, May 21, 2019.
> Declaration, May 21, 2019.
> Hearing Testimony, June 11, 2019.
> Damages Report, December 23, 2019.
> Deposition, January 28, 2020.
> Declaration, July 14, 2020.
> Declaration, September 2, 2021.


P U B L I C A T I O N S
P R I O R   T E N   Y E A R S

B O O K S

Everydata: The Misinformation Hidden in the Little Data You Consume Every Day
> Bibliomotion, Inc., with Mike Gluck, New York, NY, 2016.


A R T I C L E S

"The Evolution of DOJ's Views on No-Poach Litigation."
> *Antitrust Magazine,* Vol.36, No. 3. with James Mutchnik and Charles Fields, Summer 2022.

"Are Pandemic Sellers Actually Violating Price-Gouging Laws?"
> *Law 360* with G. Korenko and M. Milner, April 3, 2020.

"Turning Daubert on Its Head: Efforts to Ban Hypothesis Testing in Antitrust Class Actions"
> *Antitrust Magazine*, Vol. 30, No. 2, with Laila Haider and Gregory Leonard, Spring 2016.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

### KEYNOTE AND BOOK PRESENTATIONS

Everydata: The Misinformation Hidden in the Little Data in your Everyday Life

- University of South Carolina, February 2018
- Consumer Electronics Show, January 2017
- Chief Legal Counsel Association, October 2016
- TEDx Buffalo, October 2016
- Busboys and Poets, July 2016
- Huntington Book Review, July 2016
- O2 Labs, June 2016
- Latham & Watkins, June 2016
- Piper Marbury Institute, June 2016
- Vinson & Elkins, June 2016
- Government Acquire Conference, June 2016
- TJ-STAR Research Symposium, Thomas Jefferson High School, June 2016
- 1919 Investment Club, May 2016
- Sagamore Institute, May 2016
- Ball State Town and Gown Speaker Series, May 2016
- Ice Miller, May 2016
- Inside Self Storage World Exposition, April 2016
- Securities and Exchange Commission University, April 2016
- Arkansas Literary Festival, April 2016
- Central High School, Little Rock, Arkansas, April 2016
- University of Illinois College of Business, April 2016
- University of Michigan School of Law, March 2016

### ACADEMIC AND CONSULTING PRESENTATIONS
### PRIOR TEN YEARS

"Keeping Secrets Amidst Increased Employee Mobility"
American Bar Association Spring Meetings, April 2025

"Algorithmic Pricing in Antitrust"
Venable, March 2025.
Axinn, April 2025.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"Antitrust Class Actions 101"
>Jenner Block, October 2024
>Freshfields, December 2024

"Economics of MLS: Assessing Value and Competition" (with M. Kheyfets).
>CMLS 2023 Conference, Championing MLS, New Orleans, LA.  October 5, 2023

"Value of MLS"
>cMLS Legal Summit, July 2023.

"Economic Outlook Roundtable"
>cMLS Bring it to the Table Conference, April 2023.

"Does Economics Matter in Criminal Antitrust Cases?
>ABA Antitrust Spring Meetings, March 2023.

"Moving Economic Thinking: Minority Rights and Competition"
>Kirkland Antitrust & Competition Institute, March 2023.

"Introduction to Economic Consulting"
>MIT Labor Economics Lunch, April 2022.

"Recent Trends and Strategies in HR Analytics."
>Law Firm HR Roundtable. October 2021.

"Economics of Class Certification"
>Weil, July 2021, with Michael Kheyfets and David Colino

"HR Analytics in Uncertain Times: Using Data to Guide Your Path Forward"
>Human Capital Institute.  Webcast Series. June 2020 with Chuck Fields

"Apples and Economics: Is Illinois Brick Obsolete?"
>American Bar Association, April 2020

"HR Data Analytics: Introductory Course"
>Latham and Watkins, November 2019, with Chuck Fields

"Reverse Payment Settlements: Explaining 'Large and Unexplained.'"
>American Bar Association, April 2018.

"Data Analytics for Business Professionals"
>LinkedIn Learning, January 2018.

"Economic Analysis of Antitrust Class Actions"
>McMillan, with Matt Milner and Sophie Meadows, June 2017.

"Working with Experts in Litigation"
>Kirkland & Ellis, September 2016.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix B.     MATERIALS RELIED UPON**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

## MATERIALS RELIED UPON

\* I incorporate by reference all materials in the turnover productions from Dr. Starr and Dr. Gerhart.

### Court Filings

Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, August 9, 2021.

Indictment, *United States v. DaVita Inc., et al.* (D. Colo.), July 14, 2021.

Indictment, *United States v. Surgical Care Affiliates, LLC* (N.D. Tex.), January 5, 2021.

Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, June 6, 2023.

Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024.

### Expert Reports

Expert Witness Report of Dr. Barry Gerhart, January 15, 2025.

Expert Witness Report of Dr. Evan P. Starr, January 15, 2025.

Notice of Errata Regarding the Expert Report of Dr. Barry Gerhart, February 11, 2025.

Notice of Errata Regarding the Expert Report of Dr. Evan P. Starr, January 21, 2025.

Starr Deposition Exhibit DX83 (Errata dated March 19, 2025).

### Data

*Bates Numbered Files:*

| | |
|---|---|
| BF000222637 | DVA_OMCEAL_001408547 |
| DVA_OMCEAL_001408533 | DVA_OMCEAL_001408829 |
| DVA_OMCEAL_001408536 | DVA_OMCEAL_001421631 |
| DVA_OMCEAL_001408539 | DVA_OMCEAL_001421634 |
| DVA_OMCEAL_001408542 | DVA_OMCEAL_001421635 |
| DVA_OMCEAL_001408543 | SCA002246316 |

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

SCA-Structured0000001                    USPI_CIV_000659234

SCA-Structured00000010                   USPI_CIV_001168726

USPI_CIV_000122240

*Data Letters:*

2023.09.26 - K. Limarzi Ltr. re Structured Data Productions.

2023-10-05 - Letter from M. Lane to S. Zandi.

2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter.

2024.11.18 USPI Production - Vol. 27.

*Lightcast:*

2024-10-23T162506_0_0_0.csv              2024-10-23T162506_2_0_0.csv

2024-10-23T162506_0_1_0.csv              2024-10-23T162506_2_1_0.csv

2024-10-23T162506_0_2_0.csv              2024-10-23T162506_2_2_0.csv

2024-10-23T162506_0_3_0.csv              2024-10-23T162506_2_3_0.csv

2024-10-23T162506_0_4_0.csv              2024-10-23T162506_2_4_0.csv

2024-10-23T162506_0_5_0.csv              2024-10-23T162506_2_5_0.csv

2024-10-23T162506_0_6_0.csv              2024-10-23T162506_2_6_0.csv

2024-10-23T162506_0_7_0.csv              2024-10-23T162506_2_7_0.csv

2024-10-23T162506_1_0_0.csv              2024-10-23T162506_3_0_0.csv

2024-10-23T162506_1_1_0.csv              2024-10-23T162506_3_1_0.csv

2024-10-23T162506_1_2_0.csv              2024-10-23T162506_3_2_0.csv

2024-10-23T162506_1_3_0.csv              2024-10-23T162506_3_3_0.csv

2024-10-23T162506_1_4_0.csv              2024-10-23T162506_3_4_0.csv

2024-10-23T162506_1_5_0.csv              2024-10-23T162506_3_5_0.csv

2024-10-23T162506_1_6_0.csv              2024-10-23T162506_3_6_0.csv

2024-10-23T162506_1_7_0.csv              2024-10-23T162506_3_7_0.csv

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

*SCA:*

Structured00000002 (*Teammate Roster Point In Time.xlsx, Termed in 2021.xlsx*)

*U.S. Bureau of Labor Statistics:*

| | |
|---|---|
| natsector_M2008_dl.xls | natsector_M2018_dl.xlsx |
| natsector_M2009_dl.xls | natsector_M2019_dl.xlsx |
| natsector_M2010_dl.xls | natsector_M2020_dl.xlsx |
| natsector_M2011_dl.xls | natsector_M2021_dl.xlsx |
| natsector_M2012_dl.xls | natsector_M2022_dl.xlsx |
| natsector_M2013_dl.xls | natsector_M2023_dl.xlsx |
| natsector_M2014_dl.xlsx | natsector_may2004_dl.xls |
| natsector_M2015_dl.xlsx | natsector_may2005_dl.xls |
| natsector_M2016_dl.xlsx | natsector_may2006_dl.xls |
| natsector_M2017_dl.xlsx | natsector_may2007_dl.xls |

*Other:*

Investing.com, "DaVita HealthCare Partners Inc (DVA)," https://www.investing.com/equities/davita-inc.

U.S. Bureau of Labor Statistics, "Series ID: CEU6562149001," https://data.bls.gov/dataViewer/view/timeseries/CEU6562149001.

U.S. Bureau of Labor Statistics, "Occupational Employment and Wage Statistics," https://www.bls.gov/oes/tables.htm.

U.S. Census Bureau Country Business Patterns Data, https://www.census.gov/programs-surveys/cbp/data/datasets.html?text-list-cc4db501b6%3Atab=all#text-list-cc4db501b6.

**Testimony Transcripts**

Deposition of Allen Spradling, July 18, 2024.

Deposition of Andrew Patrick Hayek, September 18, 2024.

Deposition of Anthony Kilgore, October 22, 2024.

Deposition of Barry Gerhart, Ph.D., March 5, 2025.

Deposition of Bill Wilcox, September 24, 2024.

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Deposition of Brett Brodnax, September 12, 2024.

Deposition of Brian Todd Mathis, September 20, 2024.

Deposition of Bridget A. Fanning, Ph.D., July 17, 2024.

Deposition of Colleen Arthur, May 23, 2024.

Deposition of Dennis Kogod, September 6, 2024.

Deposition of Evan P. Starr, Ph.D., March 19, 2025 & March 20, 2025.

Deposition of Kent Thiry, August 16, 2024.

Deposition of Kevin Zaideman, December 18, 2024.

Deposition of Leslie Wachsman, May 22, 2024.

Deposition of Mark Garvin, May 30, 2024.

Deposition of Mark Kopser Vol. I, December 12, 2024.

Deposition of Michael Rucker, August 27, 2024.

Deposition of Robert Chipman, August 7, 2024.

Deposition of Scott Keech, August 22, 2024.

Deposition of Shannon McGarry, June 11, 2024.


**Bates Numbered Documents**

| | |
|---|---|
| DVA_OMCEAL_000010422–0428 | DVA_OMCEAL_000939090–9103 |
| DVA_OMCEAL_000294731–4747 | DVA_OMCEAL_000944057–4061 |
| DVA_OMCEAL_000297363–7368 | DVA_OMCEAL_000972302 |
| DVA_OMCEAL_000683921–3930 | DVA_OMCEAL_001150350–0351 |
| DVA_OMCEAL_000711693–1695 | DVA_OMCEAL_001300788–0792 |
| DVA_OMCEAL_000906018–6026 | DVA_OMCEAL_001302342–2343 |
| DVA_OMCEAL_000906132–6135 | DVA_OMCEAL_001302757–2758 |
| DVA_OMCEAL_000926457–6467 | DVA_OMCEAL_001311454–1456 |
| DVA_OMCEAL_000929239–9248 | DVA_OMCEAL_001311499–1500 |

4

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

| | |
|---|---|
| DVA_OMCEAL_001313626–3618 | SCA000073564–3572 |
| DVA_OMCEAL_001318066–8068 | SCA000098450–8452 |
| DVA_OMCEAL_001313954–3958 | SCA000108278–8279 |
| DVA_OMCEAL_001329256–9261 | SCA000132458 |
| DVA_OMCEAL_001332708–2711 | SCA000287698 |
| DVA_OMCEAL_001332734–2774 | SCA000287699 |
| DVA_OMCEAL_001344567–4582 | SCA000465129 |
| DVA_OMCEAL_001358600–8602 | SCA000552095–2113 |
| DVA_OMCEAL_001386589–6626 | SCA000555897–5900 |
| DVA_OMCEAL_001402387–2433 | SCA000568874–8875 |
| HAYEK-000012214–2216 | SCA000609009–9011 |
| KEECH_000000317–0324 | SCA000663768–3770 |
| KEECH_000000806–0808 | SCA000989200–9202 |
| KEECH_000000320–0322 | SCA001037832–7833 |
| KEECH_000000332–0333 | SCA001046573–6574 |
| KEECH_000001104–1106 | SCA001102036–2037 |
| KEECH_000001419–1422 | SCA001159728–9748 |
| OMC_BM_000000884–0895 | SCA001258153–8251 |
| OMC_BM_000010778–0779 | SCA001497129–7179 |
| OMC_BM_000014729 | SCA001543663 |
| SCA000002890–2932 | SCA001669270 |
| SCA000015897–5901 | SCA001893511–3515 |
| SCA000048815–8817 | SCA002364259–4261 |
| SCA000058911–8916 | Sprad000014–0015 |
| SCA000065727 | Sprad002185 |
| SCA000073150–3151 | Sprad005529 |

5

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

USPI_CIV_000016522

USPI_CIV_000021155

USPI_CIV_000046079

USPI_CIV_000111376–1382

USPI_CIV_000169100–9102

USPI_CIV_000190519–0524

USPI_CIV_000198546–8549

USPI_CIV_000210543–0545

USPI_CIV_000601224–1229

USPI_CIV_000974608–4610

USPI_CIV_000974615–4617

**Articles, Books, and Additional Sources**

American Bar Association, Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, 2nd ed., ABA Book Publishing, 2014.

American Bar Association, Section of Antitrust Law, *Market Power Handbook: Competition Law and Economic Foundations*, 2nd ed., ABA Book Publishing, 2012.

American Bar Association, Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, 3rd ed., ABA Book Publishing, 2017.

Charles F. Manski, "Economic Analysis of Social Interactions," *Journal of Economic Perspectives*, Vol. 14, No.3, 2000.

Damodar N. Gujarati, *Basic Econometrics*, 2nd ed., McGraw-Hill, 1988.

Daniel L. Rubinfeld, "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy*, ABA Section of Antitrust Law, 2008.

Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011.

Davita, "Proxy Statement,' June 03, 2009, https://filecache.investorroom.com/mr5ir_davita/185/DaVita_Proxy09_Final_2.pdf.

DaVita Inc. 10-K, 2005 Annual Report.

DaVita Inc. 10-K, 2006 Annual Report.

DaVita Inc. 10-K, 2007 Annual Report.

6

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

DaVita Inc. 10-K, 2008 Annual Report.

DaVita Inc. 10-K, 2009 Annual Report.

DaVita Inc. 10-K, 2010 Annual Report.

DaVita Inc. 10-K, 2011 Annual Report.

DaVita Inc. 10-K, 2012 Annual Report.

DaVita Inc. 10-K, 2013 Annual Report.

DaVita Inc. 10-K, 2014 Annual Report.

DaVita Inc. 10-K, 2015 Annual Report.

DaVita Inc. 10-K, 2016 Annual Report.

DaVita Inc. 10-K, 2017 Annual Report.

DaVita Inc. 10-K, 2018 Annual Report.

DaVita Inc. 10-K, 2019 Annual Report.

DaVita Inc. 10-K, 2020 Annual Report.

DaVita Inc. 10-K, 2021 Annual Report.

DaVita Inc. 10-K, 2022 Annual Report.

George J. Stigler, "What Does an Economist Know?" *Journal of Legal Education*, Vol. 33, No. 2, 1983.

Jeffrey Wooldridge, *Introductory Econometrics*, 5th ed., Cengage Learning, 2013.

Jonathan Baker, "Market Definition: An Analytical Overview," *Antitrust Law Journal*, Vol. 74, No. 1, 2007.

Joshua D. Angrist, "The Perils of Peer Effects," *Labour Economics*, Vol. 30, 2014.

Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion*, 1st ed., Princeton University Press, 2009.

Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature*, Vol. 44, No. 1, 2006.

Matthew Gibson, "Employer Market Power in Silicon Valley," *W. E. Upjohn Institute Working Papers*, 2024.

Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010.

Robert S. Pindyck and Daniel Rubinfeld, *Microeconomics*, 8th ed., Pearson, 2013.

Roger D. Blair and Jeffrey L. Harrison, *Monopsony in Law and Economics*, 1st ed., Cambridge University Press, 2010.

Surgical Care Affiliates, Inc. 10-K, 2013 Annual Report.

Surgical Care Affiliates, Inc. 10-K, 2014 Annual Report.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Sydnee Caldwell and Oren Danieli, "Outside Options in the Labor Market," *The Review of Economic Studies*, Vol. 91, Issue 6, 2024.

United Surgical Partners International. Inc. 10-K, 2009 Annual Report.

U.S. Department of Justice, "Public Workshop on Competition in Labor Markets," September 23, 2019, comments by Dr. Patrick Greenlee and Dr. Kevin Murphy.

U.S. Department of Justice and the Federal Trade Commission, "2023 Merger Guidelines," December 18, 2023.

U.S. Department of Treasury, *The State of Labor Market Competition*, March 7, 2022, https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf.


**Websites**

Bank of America, "Our Company," https://about.bankofamerica.com/en/our-company.

DaVita, "DaVita Announces New Corporate Headquarters in Denver, Colorado," May 27, 2009, https://investors.davita.com/2009-05-27-DaVita-Announces-New-Corporate-Headquarters-in-Denver-Colorado.

DaVita, "DaVita Announces CEO Succession," April 29, 2019, https://investors.davita.com/ 2019-04-29-DaVita-Announces-CEO-Succession.

Definitive Healthcare, "Outpatient Care," https://www.definitivehc.com/resources/glossary/outpatient-care.

Definitive Healthcare, "Outpatient clinics are in!", https://www.definitivehc.com/blog/outpatient-clinics-are-in.

Global News Wire, "Surgical Care Affiliates Announces Closing of Its Initial Public Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares," November 4, 2013, https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-to-Purchase-Additional-Shares.html.

Lightcast, "Overview," https://lightcast.io/products/data/overview.

Lightcast, "US PROFILES (PSEUDONYMIZED) JOBS," https://docs.lightcast.dev/data-shares/us-profiles-pseudonymized-jobs.

LinkedIn, "Bill Myers," https://www.linkedin.com/in/bill-myers-6b88a12/.

NAICS Association, "NAICS Code Description," https://www.naics.com/naics-code-description/?code=6214.

Presidio Surgery Center, "About Us," https://presidiosurgery.com/about-us/.

Reuters, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," January 8, 2007, https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Reuters, "UnitedHealth to buy Surgical Care Affiliates in $2.3 billion deal," January 9, 2017, https://www.reuters.com/article/world/americas/unitedhealth-to-buy-surgical-care-affiliates-in-23-billion-deal-idUSKBN14T15C/.

SCA Health, "About Us," https://sca.health/about-us/.

SCA Health, "Build Your Career at SCA Health," https://careers.sca.health/.

SCA Health, "Contact Us," https://sca.health/about-us/contact/.

TEKsystems, "Who We Are", https://www.teksystems.com/en/who-we-are.

Tenet Health, "Tenet Completes Purchase of USPI from WCAS," April 16, 2018, https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx.

Tenet Health, "Tenet Healthcare Corporation Completes United Surgical Partners International and Aspen Healthcare Transactions," June 16, 2015, retrieved from https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm.

U.S. Bureau of Labor Statistics, "All Employees, Health Care and Social Assistance [CEU656200000]," retrieved from FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/CEU6562000001.

U.S. Bureau of Labor Statistics, "Employment for Health Care and Social Assistance: Outpatient Care Centers (NAICS 6214) in the United States [IPURN6214W200000000]," retrieved from FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/IPURN6214W200000000.

U.S. Bureau of Labor Statistics, "Employment Level (LNU02000000), Labor Force Flows Employed to Unemployed (LNU07400000), and Labor Force Flows Employed to Not in Labor Force (LNU07800000)," retrieved from https://fred.stlouisfed.org/graph/?id=LNU02000000,LNU07400000,LNU07800000,#).

U.S. Bureau of Labor Statistics, "Industries at a Glance: Health Care and Social Assistance: NAICS 62," https://www.bls.gov/iag/tgs/iag62.htm.

U.S. Bureau of Labor Statistics, "The 'Great Resignation' in perspective," July 2022, https://www.bls.gov/opub/mlr/2022/article/the-great-resignation-in-perspective.htm.

U.S. Census Bureau, "Economic Census: NAICS Codes & Understanding Industry Classification Systems," February 12, 2024, https://www.census.gov/programs-surveys/economic-census/year/2022/guidance/understanding-naics.html.

UnitedHealth Group, "Optum completes acquisition of DaVita Medical Group from DaVita," June 19, 2019, https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html.

USPI, "Contact Us," https://uspi.com/contact-us/default.aspx.

USPI, Homepage, https://uspi.com/home/default.aspx.

USPI, "Who We Are," https://uspi.com/about-us/who-we-are/.

WTW, "Our History," https://www.wtwco.com/en-us/about-us/our-history.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix C.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-1**
**COUNT OF CLASS MEMBERS**
**BY DEFENDANT**

| Year | DaVita | SCA | USPI |
|------|--------|-----|------|
| [a] | [b] | [c] | [d] |
| 2008 | | | |
| 2009 | | | |
| 2010 | | | |
| 2011 | | | |
| 2012 | | | |
| 2013 | | | |
| 2014 | | | |
| 2015 | | | |
| 2016 | | | |
| 2017 | | | |
| 2018 | | | |
| 2019 | | | |

Notes: Counts of class members based on Dr. Starr's assignment of job levels at each of the Defendants.
Excludes employees that departed DaVita and SCA prior to May 2008 and May 2010 for USPI.

Source: Starr turnover.

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-2**
**EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS**
**DIRECTOR LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
| --- | --- | --- |
| IT at DaVita | | |
| Quality Management Department at SCA | | |
| Finance at USPI | | |

Sources: DVA_OMCEAL_001313954–3958, SCA001893511–3515; USPI_CIV_000198546–8549.

2

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-2 (CONTINUED)**
**EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS**
**DIRECTOR LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Operations Group at DaVita | | |
| Development at SCA | | |
| IT at USPI | | |

Sources: DVA_OMCEAL_001300788–0792, SCA000568874–8875, USPI_CIV_000190519–0524.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-2 (CONTINUED)**
**EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS**
**DIRECTOR LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Commercial Integrated Care Analytics at DaVita | | |
| Finance and Accounting (SOX) at SCA | | |
| Business Development at USPI | | |

Sources: DVA_OMCEAL_001311499–1500, SCA000989200–9202, USPI_CIV_000974608–4610.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-3**
**EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS**
**VICE PRESIDENT/SENIOR VICE PRESIDENT LEVEL**

| Department and Defendant | Job Responsibilities | Job Qualifications |
|---|---|---|
| [a] | [b] | [c] |
| Operations at DaVita | | |
| Diligence and Integration at SCA | | |
| Business Development at USPI | | |



Sources: DVA_OMCEAL_001311454–1456, SCA001102036–2037, USPI_CIV_000974615–4617.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-3 (CONTINUED)**
**EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS**
**VICE PRESIDENT/SENIOR VICE PRESIDENT LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Physician Experience at DaVita | | |
| Operations at SCA | | |
| Sales at USPI | | |

Sources: DVA_OMCEAL_001313626–3618, SCA000555897–5900, USPI_CIV_000169100–9102.

6

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

**EXHIBIT C-3 (CONTINUED)**
**EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS**
**VICE PRESIDENT/SENIOR VICE PRESIDENT LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Kidney Care Management Team at DaVita | | |
| Executive Team at SCA | | |
| Operations at USPI | | |

Sources: DVA_OMCEAL_001302757–2758, SCA000015897–5901, USPI_CIV_000210543–0545.

7

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix D.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT D-1**
**MOVES BETWEEN "COVERED DEFENDANTS"**
**COMPARED TO ALL DEPARTURES**
**USING DR. STARR'S METHODOLOGY**
**DAVITA AND SCA**



Notes: For the purposes of this exhibit, I adopt Dr. Starr's convention in his mobility analyses and consider all of 2008 as part of the proposed class period for DaVita and SCA as well as all of 2010 for the proposed class period for SCA and USPI.

A departure is identified if the given employee is in this year's, but not in next year's payroll data. This chart does not include DMG employees that left in 2019 when DaVita sold DMG as well as USPI/Tenet records in 2021 due to data truncation (see footnote 60).

Source: Starr turnover (Corrected Data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT D-2**
**EXTERNAL HIRES INTO RELEVANT EMPLOYEE POSITIONS**
**BY DEFENDANT AND TIME PERIOD**
**USING DR. STARR'S METHODOLOGY**



Notes: Identifies hires using first appearance in the data or employment gaps of one year or more. Grey-shaded areas indicate the 70 moves between "Covered Defendants" from Dr. Starr's Figure 2.

Source: Starr turnover (Corrected Data).

2

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT D-3**
**OVERALL TURNOVER RATE FOR RELEVANT EMPLOYEES**
**BY DEFENDANT**
**USING DR. STARR'S METHODOLOGY**
**2006 – 2022**



Notes: Turnover rates are calculated as the percentage of relevant employees at each Defendant who were terminated each year (i.e., under Dr. Starr's methodology the percentage of relevant employees in this year's, but not in next year's payroll data). This chart does not include DMG employees that left in 2019 when DaVita sold DMG as well as USPI/Tenet records in 2021 due to data truncation (see footnote 60).

Turnover rates for DaVita and USPI are not shown for 2005 where very few terminations are identified (27 for DaVita and 1 for USPI). Vertical lines indicate the start and end of the proposed class periods.

Source: Starr turnover (Corrected Data).

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT D-4**
**DR. STARR'S FIGURE 4 PROBABILITY OF MOBILITY**
**APPLIED TO OVERALL TURNOVER**
**USING DR. STARR'S METHODOLOGY**

| Statistic | Overall Turnover (Departures to any Destination) | | |
| --- | --- | --- | --- |
| | DaVita | SCA | USPI |
| [a] | [b] | [c] | [d] |
| Conduct | | | |
| Time-trend | | | |
| Observations | | | |
| Departures | | | |
| R-squared | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

4

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT D-5**
**DR. STARR'S FIGURE 4 PROBABILITY OF MOBILITY**
**APPLIED TO OVERALL TURNOVER RATES**
**INCLUDING DR. STARR'S MACROECONOMIC AND HEALTHCARE CONTROLS**

| Statistic | DaVita | SCA | USPI |
|---|---|---|---|
| [a] | [b] | [c] | [d] |
| Conduct | | | |
| Time-trend | | | |
| Log of Avg. State Mgr. Earnings | | | |
| Log of State Health Expend. PC | | | |
| Covid | | | |
| Log of State GDP per Capita | | | |
| Log of State Unemployment Rate | | | |
| Census Region Annual CPI | | | |
| Observations | | | |
| Departures | | | |
| R-squared | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

5

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix E.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT E-1**
**DEFENDANTS' SHARE OF TOTAL U.S. EMPLOYMENT**
**2008 – 2022**

| | Defendants | | | | Total Employment | | Percent of Total Employment Held by Defendants | |
| | | | | | Healthcare and Social Assistance (NAICS 62) | Other Outpatient Care Centers (NAICS 62149) | Healthcare and Social Assistance (NAICS 62) | Other Outpatient Care Centers (NAICS 62149) |
| Year | DaVita | SCA | USPI | Total | | | | |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2008 | | | | | | | | |
| 2009 | | | | | | | | |
| 2010 | | | | | | | | |
| 2011 | | | | | | | | |
| 2012 | | | | | | | | |
| 2013 | | | | | | | | |
| 2014 | | | | | | | | |
| 2015 | | | | | | | | |
| 2016 | | | | | | | | |
| 2017 | | | | | | | | |
| 2018 | | | | | | | | |
| 2019 | | | | | | | | |
| 2020 | | | | | | | | |
| 2021 | | | | | | | | |
| 2022 | | | | | | | | |

Source: Starr turnover (Corrected Data); BLS OEWS Data on industry employment.

1

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

**EXHIBIT E-2**
**DEFENDANTS' SHARE OF TOTAL U.S. FACILITIES**
**2008 – 2022**

| | Defendants | | | | Total Facilities | | Percent of Total Facilities Operated by Defendants | |
| | | | | | Healthcare and Social Assistance (NAICS 62) | Other Outpatient Care Centers (NAICS 62149) | Healthcare and Social Assistance (NAICS 62) | Other Outpatient Care Centers (NAICS 62149) |
| Year | DaVita | SCA | USPI | Total | | | | |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2008 | | | | | | | | |
| 2009 | | | | | | | | |
| 2010 | | | | | | | | |
| 2011 | | | | | | | | |
| 2012 | | | | | | | | |
| 2013 | | | | | | | | |
| 2014 | | | | | | | | |
| 2015 | | | | | | | | |
| 2016 | | | | | | | | |
| 2017 | | | | | | | | |
| 2018 | | | | | | | | |
| 2019 | | | | | | | | |
| 2020 | | | | | | | | |
| 2021 | | | | | | | | |
| 2022 | | | | | | | | |

Note: Facilitie

Source: Starr turnover (Corrected Data); U.S. Census Bureau Country Business Patterns Data.

2

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix F.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-1**
**HOURLY RATE FOR DIRECTORS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
| | | | | 1st | 25th | Median | 75th | 99th |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2005 | DaVita SCA USPI | | | | | | | |
| 2006 | DaVita SCA USPI | | | | | | | |
| 2007 | DaVita SCA USPI | | | | | | | |
| 2008 | DaVita SCA USPI | | | | | | | |
| 2009 | DaVita SCA USPI | | | | | | | |
| 2010 | DaVita SCA USPI | | | | | | | |
| 2011 | DaVita SCA USPI | | | | | | | |
| 2012 | DaVita SCA USPI | | | | | | | |
| 2013 | DaVita SCA USPI | | | | | | | |
| 2014 | DaVita SCA USPI | | | | | | | |
| 2015 | DaVita SCA USPI | | | | | | | |
| 2016 | DaVita SCA USPI | | | | | | | |
| 2017 | DaVita SCA USPI | | | | | | | |
| 2018 | DaVita SCA USPI | | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-1 (CONTINUED)**
**HOURLY RATE FOR DIRECTORS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
| | | | | 1st | 25th | Median | 75th | 99th |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2019 | DaVita SCA USPI | | | | | | | |
| 2020 | DaVita SCA USPI | | | | | | | |
| 2021 | DaVita SCA USPI | | | | | | | |
| 2022 | DaVita SCA USPI | | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

2

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-2**
**HOURLY RATE FOR VICE PRESIDENTS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | 1st | 25th | Median | 75th | 99th |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2005 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2006 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2007 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2008 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2009 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2010 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2011 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2012 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2013 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2014 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2015 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2016 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2017 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2018 | DaVita<br>SCA<br>USPI | | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-2 (CONTINUED)**
**HOURLY RATE FOR VICE PRESIDENTS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
| | | | | 1st | 25th | Median | 75th | 99th |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2019 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2020 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2021 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2022 | DaVita<br>SCA<br>USPI | | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

4

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-3**
**HOURLY RATE FOR SENIOR VICE PRESIDENTS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
| | | | | 1st | 25th | Median | 75th | 99th |
|------|---------|-----------|------|-----|------|--------|------|------|
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2005 | DaVita SCA USPI | | | | | | | |
| 2006 | DaVita SCA USPI | | | | | | | |
| 2007 | DaVita SCA USPI | | | | | | | |
| 2008 | DaVita SCA USPI | | | | | | | |
| 2009 | DaVita SCA USPI | | | | | | | |
| 2010 | DaVita SCA USPI | | | | | | | |
| 2011 | DaVita SCA USPI | | | | | | | |
| 2012 | DaVita SCA USPI | | | | | | | |
| 2013 | DaVita SCA USPI | | | | | | | |
| 2014 | DaVita SCA USPI | | | | | | | |
| 2015 | DaVita SCA USPI | | | | | | | |
| 2016 | DaVita SCA USPI | | | | | | | |
| 2017 | DaVita SCA USPI | | | | | | | |
| 2018 | DaVita SCA USPI | | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

5

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-3 (CONTINUED)**
**HOURLY RATE FOR SENIOR VICE PRESIDENTS**
**BY DEFENDANT**
**2005 – 2022**

| | | | | | Percentiles | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Company | Employees | Mean | 1st | 25th | Median | 75th | 99th |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2019 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2020 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2021 | DaVita<br>SCA<br>USPI | | | | | | | |
| 2022 | DaVita<br>SCA<br>USPI | | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

6

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix G.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT G-1**
**DIFFERENCE BETWEEN AVERAGE HOURLY RATE**
**DIRECTORS AND VPS/SVPS**
**USPI**
**2005 – 2022**



Note: Vertical lines indicate the start and end of the proposed class period.

Source: Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix H.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT H-1**
**DR. STARR'S FIGURE 37: REVERSE RELATIONSHIP BETWEEN DIRECTOR AND VP/SVP WAGES ON CORRECTED DATA APPLIED TO YEAR-OVER-YEAR CHANGES**

| | Dependent Variable: First Difference of Ln(Mean Hourly Rate of VPs & SVPs) | | |
|---|---|---|---|
| | DaVita | SCA | USPI |
| First Difference of *Ln(Mean Hourly Rate of Directors)* | | | |
| First Difference of *Ln(Avg. State Mgr. Earnings)* | | | |
| First Difference of *Ln(State Health Expend. PC)* | | | |
| First Difference of *Covid* | | | |
| First Difference of *Ln(State GDP PC)* | | | |
| First Difference of *Ln(State Unemployment Rate)* | | | |
| First Difference of *Census Region Annual CPI* | | | |
| Constant | | | |
| Observations | | | |
| R-squared | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variable of interest that are not statistically significant are shown in yellow. Dr. Starr notes that "the constant term is suppressed" for his analysis; however, the analysis does include a constant term, although it is not shown in his Figure 37.

Source: Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix I.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT I-1**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2009 – 2022**

| Job Level and Defendant [a] | No Salary Change | Percent Change in Base Salary | | | | | | | Other Salary Changes |
|---|---|---|---|---|---|---|---|---|---|
| | | Less than 1.0% | Between 1.0 and 1.9% | Between 2.0 and 2.9% | Between 3.0 and 4.9% | Between 5.0 and 7.9% | Between 8.0 and 11.9% | 12% or Greater | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |

Notes: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT I-1 (CONTINUED)**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2009 – 2022**

| Job Level and Defendant | No Salary Change | Percent Change in Base Salary | | | | | | | Other Salary Changes |
|---|---|---|---|---|---|---|---|---|---|
| | | Less than 1.0% | Between 1.0 and 1.9% | Between 2.0 and 2.9% | Between 3.0 and 4.9% | Between 5.0 and 7.9% | Between 8.0 and 11.9% | 12% or Greater | |
| [a] | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |

Notes: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. I note that the majority of job titles for DaVita employees change between 2013 and 2014 (DaVita changed its payroll system between 2013 and 2014, see 2.b in *2023-10-05 - Letter from M. Lane to S. Zandi*). These employees are not included in this analysis. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

2

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT I-1 (CONTINUED)**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2009 – 2022**

| Job Level and Defendant [a] | No Salary Change | Percent Change in Base Salary | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Less than 1.0% | Between 1.0 and 1.9% | Between 2.0 and 2.9% | Between 3.0 and 4.9% | Between 5.0 and 7.9% | Between 8.0 and 11.9% | 12% or Greater | Other Salary Changes |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |

Notes: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix J.**

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

**EXHIBIT J-1**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**
**EXCLUDING USPI RECORDS WITH MISSING REGULAR HOURS**

| Statistic | Dr. Starr's Aggregate Model | | Dr. Starr's Defendant-Specific Model | |
|---|---|---|---|---|
| | Figure 6 | Corrected Excl. USPI Records Missing Regular Hours | Figure 8 | Corrected Excl. USPI Records Missing Regular Hours |
| [a] | | | | |
| Pooled Conduct **% Wage Suppression** | | | | |
| DaVita Conduct **% Wage Suppression** | | | | |
| SCA Conduct **% Wage Suppression** | | | | |
| USPI Conduct **% Wage Suppression** | | | | |
| Observations | | | | |
| Included Employees | | | | |
| R-squared | | | | |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Negative and statistically significant results are shown in grey. USPI records with missing regular hours are excluded.

Sources: Starr Report, Figure 6 column [4] and Figure 8 column [4]; Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix K.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT K-1**
**AVERAGE ANNUAL TOTAL COMPENSATION**
**BY COMPENSATION TYPE**
**USPI**
**2005 – 2022**



Notes: The total compensation in this analysis is the compensation that Dr. Starr describes as "Class Compensation" in his Figure 25. The annual Tenet data (*USPI_CIV_000659234.xlsx*), which includes additional off-cycle bonuses, does not differentiate between variable compensation types. Following Dr. Starr's classification, these are included within "All Other Compensation" (see *2024.11.18 USPI Production - Vol. 27.pdf*).

Sources: Starr turnover (Corrected Data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix L.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT L-1**
**GEOGRAPHIC DISPERSION OF RELEVANT EMPLOYEES**
**TOP 5 STATES**



| State and Defendant | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [a] | | | | | | | | | | | | | | | |
| **Colorado (DaVita HQ)** | | | | | | | | | | | | | | | |
| DaVita | | | | | | | | | | | | | | | |
| SCA | | | | | | | | | | | | | | | |
| USPI | | | | | | | | | | | | | | | |
| **Alabama (SCA HQ)** | | | | | | | | | | | | | | | |
| DaVita | | | | | | | | | | | | | | | |
| SCA | | | | | | | | | | | | | | | |
| USPI | | | | | | | | | | | | | | | |
| **Texas (USPI HQ)** | | | | | | | | | | | | | | | |
| DaVita | | | | | | | | | | | | | | | |
| SCA | | | | | | | | | | | | | | | |
| USPI | | | | | | | | | | | | | | | |
| **California (DaVita former HQ)** | | | | | | | | | | | | | | | |
| DaVita | | | | | | | | | | | | | | | |
| SCA | | | | | | | | | | | | | | | |
| USPI | | | | | | | | | | | | | | | |
| **Florida** | | | | | | | | | | | | | | | |
| DaVita | | | | | | | | | | | | | | | |
| SCA | | | | | | | | | | | | | | | |
| USPI | | | | | | | | | | | | | | | |
| **All Other States** | | | | | | | | | | | | | | | |
| DaVita | | | | | | | | | | | | | | | |
| SCA | | | | | | | | | | | | | | | |
| USPI | | | | | | | | | | | | | | | |

Source: Starr turnover (Corrected Data).

1