# Exhibit 10

# Lane Declaration

# Redacted

Highly Confidential
Outside Counsel/Experts Only

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
| --- | --- |
| *IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION* | Case No. 1:21-cv-00305-SRH-YBK |

# CORRECTED EXPERT REPORT OF LAUREN J. STIROH, PH.D.

## June 26, 2025

Highly Confidential
Outside Counsel/Experts Only

# Contents

I.     **Introduction** .................................................................. **1**

     A. Qualifications ...............................................................1

     B. Assignment .................................................................1

     C. Materials Relied Upon ....................................................2

     D. Nature of the Case .........................................................2

        1.   Overview of Defendants .............................................2

        2.   Summary of Plaintiffs' Allegations ...............................4

        3.   Summary of Plaintiffs' Experts' Opinions ......................5

     E. Summary of Opinions .....................................................6

II.    **Impact Is Economically Implausible Given the Competitive Realities Faced by DaVita and SCA** ....................................... **11**

     A. Market Power Is Necessary for Firmwide Suppression of Compensation ...................11

     B. Plaintiffs and Their Experts Do Not Assess or Acknowledge the Extent of Competition for Senior-Level Employees .................................................................13

     C. DaVita Competes for Employees with Many Employers Across Many Industries .....14

        1.   DaVita Competed with a Broad Set of Employers in Multiple Industries ...........15

        2.   DaVita and SCA Represented a Small Share of One Another's Hires .................23

        3.   DaVita and SCA Represent a Small Share of Employment in the Industries that Competed for DaVita Senior-Level Employees ..........................24

III.   **Economic Evidence Is Consistent with Competitive Behavior and Outcomes** ..................................................... **26**

     A. DaVita's Significant Employment Growth Is Consistent with Competitive Outcomes ....................26

     B. DaVita's Compensation Grew at a Competitive Rate ................................29

IV.   **Economic Evidence Is Inconsistent with Plaintiffs' Mechanisms of Harm** ............................................................. **33**

     A. There Was No Reduction in Employee Mobility ......................................34

        1.   Dr. Starr's Analysis of Employee Mobility is Flawed and Estimates a Reduction in Employee Mobility Between DaVita and SCA When There Was None ..........................35

        2.   Dr. Starr Fails to Establish a Meaningful Increase in Employee Mobility after 2019 ..........................41

     B. It Is Implausible That There Would Have Been Any Meaningful Reduction in Information Available To Senior-Level Employees ..........................43

Highly Confidential
Outside Counsel/Experts Only

**V. Dr. Starr's Compensation Regressions Estimate Firmwide Conduct Effects Where There Are None............................................. 48**

A. Dr. Starr's Model Yields No Firmwide Conduct Effect for Potentially Relevant Alternative Conduct Periods........................................................................49

B. Dr. Starr Uses a Flawed Measure of Equity Compensation and Made Errors in Constructing His Data........................................................................56

C. Dr. Starr's Regressions Are Not Robust to Alternative Specifications ......................58

D. Dr. Starr's Robustness Checks Are Not Informative....................................................63

**VI. Plaintiffs Fail to Establish the Alleged Information Exchanges Supported Wage-Fixing and Fail to Consider that Information Exchanges Can Be Procompetitive ........................................................ 64**

A. Plaintiffs Fail to Establish that the Alleged Information Exchanges Could Have Supported Wage-Fixing........................................................................64

B. Economic Research Demonstrates that Firms Have Unilateral Incentives to Exchange Compensation-Related Information and Benchmark Compensation ........66

Highly Confidential
Outside Counsel/Experts Only

## I.   Introduction

### A. Qualifications

1.   My name is Lauren J. Stiroh.  I am an economist and a Senior Managing Director at NERA.  NERA was founded in 1961 and provides research and analysis in the field of applied microeconomics, including the economics of competition, regulation, and finance.  A substantial portion of my work, as well as NERA's consulting work, includes class certification, liability matters, and the determination of economic damages.

2.   I have provided economic consulting services and testimony in a substantial number of antitrust cases and in connection with liability, damages, and class certification issues.  I have testified at trial and in deposition regarding a variety of business practices.  These include, for example, abuse of monopsony power, labor disputes, commercial disputes, business interference, breach of contract, allegations of monopolization, price predation, tie-ins, price discrimination, abuse of market power, and patent infringement.  I have experience with antitrust damages and class certification issues in a range of industries including labor, health insurance, medical devices, pharmaceuticals, biotechnology, real estate, café franchises, futures trading exchange services, advertising and promotion, sports, industrial chemicals, automotive services, consumer products, agricultural products, and semiconductors.

3.   I received my Ph.D. in economics from Harvard University in 1996.  Prior to that, I completed my B.A. in economics from the University of Western Ontario in 1990, and my M.A. from the University of British Columbia in 1991.  My curriculum vitae, which includes a list of my prior expert testimony, is appended to this report as **Exhibit 1**. NERA is being compensated for my time at a rate of $1,250 per hour.  Neither NERA's compensation, nor my compensation, depends on the outcome of this litigation.

### B. Assignment

4.   I have been asked by counsel for DaVita Inc. ("DaVita") and Kent Thiry to evaluate Plaintiffs' claims that alleged agreements between DaVita and Surgical Care Affiliates, LLC and SCAI Holdings, LLC (collectively "SCA") restricting the movement of employees between them and the alleged exchange of "competitively sensitive information" ("CSI ") between DaVita and SCA, as set out in the Complaint, resulted in substantial reductions in compensation for all of DaVita's Senior-Level employees from 2008 through 2019.[1]  Specifically, I have been asked to evaluate and comment on the disclosed opinions, methodologies, analyses, and conclusions of the experts retained by

---

[1]   Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, November 14, 2024 ("Complaint").  I use the term "Senior-Level employees" to mean the same group of people to whom Dr. Starr refers as "Class Members."

Highly Confidential
Outside Counsel/Experts Only

and testifying for Plaintiffs, Dr. Barry S. Gerhart and Dr. Evan P. Starr, dated January 15, 2025,[2] that pertain to DaVita.

## C. Materials Relied Upon

5.  In preparing this report, I, and economists working under my direction, have reviewed Plaintiffs' experts' reports, documents and data referenced therein, the Complaint, documents, deposition transcripts, testimony provided in connection with this case and in *United States of America v. DaVita Inc., Kent Thiry*, proprietary data, and publicly available information. The opinions expressed in this report are based on my review of this information, my training and experience as an economist, and the application of economic analysis to the information that I have reviewed. A list of the sources of information and materials I relied upon in forming my opinions is presented in **Exhibit 2**.

6.  I may use the materials that I have identified, as well as other information that has been or may be produced during the course of this case, to support my testimony at any relevant hearing or trial. In addition, I may use demonstrative materials (*e.g.*, tables and charts) based on this information and my analyses to support that testimony.

## D. Nature of the Case

### 1. Overview of Defendants

7.  The Corporate Defendants include DaVita, SCA, and USPI. For the remainder of this report, I use the term "Defendants" to refer to the Corporate Defendants.

8.  Headquartered in Denver, Colorado, DaVita is a provider of kidney care services, operating 2,675 outpatient dialysis centers across 46 states.[3] DaVita cares for more than 200,000 dialysis patients in the United States and employs approximately 55,000 individuals in the United States.[4] DaVita expanded its global workforce from 32,500 employees in 2008 to approximately 70,000 by 2023, representing employment growth of approximately 115 percent.[5] Kent Thiry served as DaVita's CEO from 1999 until May 31, 2019, when he was succeeded by Javier Rodriguez.[6]

---

[2]  Expert Witness Report of Dr. Barry S. Gerhart, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, January 15, 2025 as amended ("Gerhart Report"); Expert Witness Report of Dr. Evan P. Starr, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, January 15, 2025 as amended ("Starr Report").

[3]  DaVita also operates outpatient dialysis centers in the District of Columbia. DaVita is sometimes referred to as "The Village" or "DVA." DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, pp. 2-3.

[4]  "About," *DaVita Website*, available at https://www.davita.com/about.

[5]  DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, p. 22; DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2008, p. 18.

[6]  "DaVita Announces CEO Succession," *DaVita Investors Website*, April 29, 2019, available at https://investors.davita.com/2019-04-29-DaVita-Announces-CEO-Succession.

Highly Confidential
Outside Counsel/Experts Only

9. In October 2005, DaVita acquired Gambro Healthcare U.S., adding approximately 520 dialysis centers to its portfolio.[7] In November 2012, DaVita acquired HealthCare Partners ("HCP"), "one of the nation's largest operators of medical groups and physician networks."[8] HCP, later known as DaVita Medical Group, was subsequently acquired by Optum in June 2019.[9]

10. SCA is an ambulatory surgery center management company, operating around 320 surgical facilities in 35 states and employing around 11,000 individuals.[10] Andrew Hayek served as SCA's CEO from 2008 through 2017.[11] In January 2017, Optum acquired SCA, and Mr. Hayek became CEO of OptumHealth in April.[12]

11. United Surgical Partners International, Inc. and United States Surgical Partners Holdings, Inc. ("USPI") is an "ambulatory surgery platform" founded in 1998.[13] Headquartered in Dallas, Texas, USPI operates approximately 535 surgical facilities across over 37 states.[14] USPI employs roughly 20,000 individuals.[15] In March 2015, Tenet Healthcare Corporation ("Tenet") purchased 50.1 percent of USPI, and Tenet increased its ownership stake to 95 percent in April 2018.[16]

---

[7] "DaVita Closes Gambro Healthcare Acquisition," *DaVita Investors Website*, October 5, 2005, available at https://investors.davita.com/2005-10-05-DaVita-Closes-Gambro-Healthcare-Acquisition.

[8] "DaVita and HealthCare Partners Finalize Merger," *Davita Investors Website*, November 1, 2012, available at https://investors.davita.com/2012-11-1-DaVita-and-HealthCare-Partners-Finalize-Merger.

[9] "History & Culture," *DaVita Website*, available at https://www.davita.com/about/history-and-culture; "Optum completes acquisition of DaVita Medical Group from DaVita," *United Health Group Website*, June 19, 2019, available at https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html.

[10] "About Us," *SCA Health Website*, available at https://sca.health/about-us/; "SCA Health grows to 320+ surgical facilities (Becker's)," *Harlee Medical Website*, available at https://www.harleemedical.com/sca-health-grows-to-320-surgical-facilities-beckers/; Complaint, ¶ 2.

[11] Before joining SCA, Mr. Hayek was President of DaVita's VillageHealth division. Complaint, ¶ 21.

[12] SCA has been a wholly-owned subsidiary of UnitedHealth Group since 2017. "Surgical Care Affiliates (SCA), OptumCare to Combine," *UnitedHealth Group Website*, January 9, 2017, available at https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html; Susan Morse, "UnitedHealth Group shuffles executive management, names new Optum leaders," *Healthcare Finance News Website*, April 24, 2017, available at https://www.healthcarefinancenews.com/news/unitedhealth-group-shuffles-executive-management-names-new-optum-leaders.

[13] "Who We Are," *USPI Website*, available at https://uspi.com/about-us/who-we-are/default.aspx; Complaint, ¶ 5.

[14] "Who We Are," *USPI Website*, available at https://uspi.com/about-us/who-we-are/default.aspx; "Contact Us," *USPI Website*, available at https://uspi.com/contact-us/default.aspx; "Home," *USPI Website*, available at https://uspi.com/home/default.aspx.

[15] "Home," *USPI Website*, available at https://uspi.com/home/default.aspx.

[16] "Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," *Tenet Health Investor Website*, March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx; "Tenet Completes Purchase of USPI from WCAS," *Tenet Health Investor Website*, April 26, 2018, available at https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx.

Highly Confidential
Outside Counsel/Experts Only

### 2. Summary of Plaintiffs' Allegations

12.     Plaintiffs allege that DaVita, SCA, and USPI "conspired to restrain competition and reduce compensation for their employees."[17]  Plaintiffs allege that Defendants "agreed with one another not to solicit or hire the other company's employees without the consent of their current employer."[18]  They argue that Defendants "entered into agreements to avoid competing for employees, particularly those at the director level or above …, by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers."[19]

13.     Plaintiffs claim that DaVita and SCA agreed not to solicit one another's Senior-Level employees beginning in May 2008, when Mr. Hayek "left DaVita to become SCA's CEO," that the agreement was expanded at some later date to include a requirement that SCA and DaVita would not solicit and recruit one another's Senior-Level employees unless the employee first told "their boss" that they were considering other employment options, and that the agreement continued through 2021.[20]  Plaintiffs also claim that in May 2010, "Mr. Hayek established a no-poach agreement with his counterpart at USPI to eliminate competition between the companies for each other's employees, by not actively soliciting each other's employees."[21]  Although Plaintiffs allege that DaVita, SCA and USPI "entered into and engaged in an overarching conspiracy," Plaintiffs' Complaint does not allege any specific agreement or connection alleged between DaVita and USPI; and Plaintiffs' experts do not purport to analyze any agreement or connection between DaVita and USPI.[22]

14.     In addition to these alleged agreements, Plaintiffs allege that DaVita and SCA and SCA and USPI "fix[ed] wages directly by regularly exchanging competitively sensitive wage and other business information among each other."[23]  Plaintiffs claim that this information included "confidential plans for future company-wide pay increases."[24]  According to Plaintiffs, these information exchanges occurred "from at least as early as 2009 and continued through at least 2017."[25]

---

[17]   Complaint, ¶ 1.

[18]   Complaint, ¶ 2.

[19]   Complaint, ¶ 7.  Plaintiffs refer to the alleged agreement to refrain from soliciting or hiring each other's Senior Level employees without the knowledge or consent of the employee's existing employer as a "no-poach" agreement.

[20]   Complaint, ¶¶ 7, 40, 42.  The Department of Justice's indictment of DaVita and Kent Thiry specified that the mobility restriction began "at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates being unknown to the Grand Jury[.] …"  Indictment, *United States of America v. DaVita Inc., Kent Thiry*, Case No. 21-cr-00229-RBJ, United States District Court, District of Colorado, November 3, 2021 ("DaVita-Thiry Indictment"), p. 2.

[21]   Complaint, ¶ 49.

[22]   Complaint, ¶¶ 105.

[23]   Complaint, ¶ 54.  The Complaint further alleges, "Defendants also exchanged other competitively sensitive information, including specific employee salaries, general and administrative expenses, forecasts, and forecasted sales volumes."  Support for these allegations appears to be limited to communications between SCA and USPI.  Complaint, ¶¶ 8, 59.

[24]   Complaint, ¶ 54.

[25]   Complaint, ¶ 54.

Highly Confidential
Outside Counsel/Experts Only

15.     Plaintiffs argue that the alleged conduct impacted compensation by "reduc[ing] competition for Defendants' employees and suppress[ing] the compensation of Defendants' employees below competitive levels."[26]  Further, they claim that the alleged conduct "denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment."[27]  Plaintiffs claim that Defendants "maintained internal compensation systems and developed compensation structures" such that "the compensation of all [Senior-Level] employees was affected by Defendants' no-poach agreements."[28]

16.     I understand that, according to the Complaint, the putative Class in this matter includes "[a]ll natural persons who worked in positions at the director-level and above in the United States" at Defendant firms.[29]  The Complaint alleges a Class Period from "May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries."[30]  Plaintiffs' experts address a different time period.  Dr. Starr states, "[t]he qualitative and quantitative evidence … suggests that the no-poach agreement between SCA and DaVita began in May 1, 2008 and ended in 2019;" and in his quantitative analysis, he analyzes a conduct period beginning January 2008 and ending December 2019.[31]  Dr. Gerhart addresses the same alleged conduct period as Dr. Starr.[32]  In the remainder of this report, I use the term "alleged conduct period" to refer to the period from January 2008 through December 2019.

### 3.  Summary of Plaintiffs' Experts' Opinions

17.     Dr. Gerhart states that he was retained by Plaintiffs to assess whether "evidence common to the Class regarding turnover rates and labor costs is consistent with incentives to collude," whether such collusion is harmful, whether such collusion is consistent with unilateral conduct, and whether "Defendants used structured administrative pay systems" such that the alleged conduct "would likely have cascading effects and suppress the pay of Defendants' employees."[33]  Dr. Gerhart opines that the alleged conduct restricted cold-

---

[26]     Complaint, ¶ 10.

[27]     Complaint, ¶ 11.

[28]     Complaint, ¶ 74.

[29]     Complaint, ¶ 92.  The full class definition includes, "[a]ll natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 2010 to January 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries.  Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants."  I refer to these members of the proposed Class as "Senior-Level employees."

[30]     Complaint, ¶ 92.

[31]     Starr Report, ¶ 118.  Dr. Starr accounts for the starting date of May 1, 2008 when prorating his damages calculation for 2008.  *See* Starr Report, footnote 497.

[32]     Gerhart Report, ¶ 5.

[33]     Gerhart Report, ¶ 6.  In addition, Dr. Gerhart was retained by Plaintiffs to "[a]ssess what theory and research in the related fields of compensation design, employee turnover, and human resource management show about the effect of No-Poach Agreements and CSI Exchanges on employees' current and future wages."

Highly Confidential
Outside Counsel/Experts Only

calling and created a "chilling effect," suppressing compensation because "employees benefit when they have uninhibited access to other jobs."[34] In addition, Dr. Gerhart opines that "pay at Defendant firms moved in systematic and structured ways, such that wage suppression as to a subset of employees would have impacted other employees' pay."[35] Dr. Gerhart does not provide any quantitative analysis of compensation data at DaVita or any other Defendant to support his opinions.

18. Dr. Starr opines that "the evidence regarding Defendants' No-Poach Agreements is consistent with anticompetitive conduct and inconsistent with unilateral conduct."[36] He provides quantitative analysis of "employee mobility" and "wage suppression." From his employee mobility analysis, Dr. Starr opines that there was a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[37] From his compensation regression analysis, Dr. Starr opines that the conduct ▮▮▮▮▮▮▮▮▮▮▮▮[38] He asserts that this purported impact ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[39] Thus, according to Dr. Starr's analysis, but-for the alleged conduct, approximately ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ during the alleged conduct period.[40]

### E. Summary of Opinions

19. DaVita hired Senior-Level employees from hundreds of different companies in addition to SCA; and its Senior-Level employees that left DaVita were hired by hundreds of different employers in addition to SCA. DaVita competed for Senior-Level employee talent with all of those other employers—and thousands of other potential employers—

---

[34] Gerhart Report, ¶¶ 7, 59.

[35] Gerhart Report, ¶ 7.

[36] Starr Report, ¶ 12.

[37] Starr Report, ¶ 88, Figure 4 (emphasis in original). By percentage point reduction, Dr. Starr refers to a difference between two percentages. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[38] Starr Report, ¶ 198, Figure 6.

[39] Starr Report, ¶ 107, Figure 8.

[40]  Starr Report, ¶ 192, Figure 21.

See **Figure 12**, column (d)

Highly Confidential
Outside Counsel/Experts Only

during the alleged conduct period; and DaVita's compensation for Senior-Level employees was necessarily influenced by competition from that broad pool of actual and potential alternative employers. It is economically implausible that the compensation of all or nearly all of DaVita's Senior-Level employees was materially suppressed due to agreements between DaVita and SCA given the many other competitive alternatives available to DaVita's Senior Level employees. Dr. Starr's claim that the compensation of all of DaVita's Senior-Level employees was suppressed by ███████████████ ███████████████████ does not make economic sense given the broad set of competing alternative employers available to DaVita's Senior-Level employees. DaVita would not have been able to continue hiring Senior Level employees throughout the alleged conduct period if its compensation was ███████ below competitive levels, nor would it have been able to retain its Senior-Level employees if it paid ███████ less than "market" compensation given the many different alternatives available to DaVita's Senior-Level employees███████████████████████████████████ ███████████████████████████████. Dr. Starr's quantitative analyses of employee mobility and compensation suffer from critical flaws, which cause his models to estimate large degrees of purported compensation suppression (which Dr. Starr refers to as "conduct effects" (a term I adopt)) where there are none.

20. Based on my analysis to date, I have reached the following opinions:

   a. *It is economically implausible that compensation for all of DaVita's Senior-Level employees was meaningfully impacted by agreements with SCA given the many different competitive alternatives available to DaVita's Senior-Level employees in addition to SCA and DaVita's history of successfully competing for and attracting Senior-Level employees.*

      i. Plaintiffs did not make any attempt to evaluate the extent of competition for Senior-Level employees or otherwise assess the competitive realities faced by DaVita and SCA to hire and retain Senior-Level employees. Nor did they meaningfully assess whether DaVita and SCA had market power over the compensation of their Senior-Level employees or whether the alleged agreements between DaVita and SCA meaningfully increased any such purported market power. Because market power is a prerequisite for the compensation of DaVita's Senior-Level employees to be impacted, this is a fatal omission on the part of Plaintiffs and their experts.

      ii. Dr. Starr's compensation regressions are not a substitute for a proper assessment of market power. His compensation regression model is flawed and his purported results are unreliable and overturned once certain of his errors are corrected.

      iii. Resume data from Lightcast show that DaVita participated in broad labor markets for its Senior-Level employees, competing with at least 1,000 employers spanning more than 100 industries. DaVita successfully attracted talent in these markets and grew substantially in terms of overall employment during the alleged conduct period. ████████████

7

Highly Confidential
Outside Counsel/Experts Only



These market outcomes would not be feasible if DaVita did not offer competitive compensation during the alleged conduct period.

iv. DaVita and SCA represented a small share of employment opportunities in the set of industries from which DaVita most commonly recruited Senior-Level employees and to which it most commonly lost Senior-Level employees, as well as in the two industries that Plaintiffs reference in their Complaint (and Plaintiffs' experts reference in their reports): the healthcare industry and the outpatient medical center industry.

v.

vi. It is implausible that a mobility restriction and/or information exchange between employers with very little hiring overlap in various industries where Defendants successfully competed with hundreds of other employers and grew rapidly would lead to any impact on compensation, ████████████████████████████████████ even if Defendants entered into and upheld the alleged agreements exactly as characterized by Plaintiffs. And it is economically implausible that an agreement restricting the mobility of Senior-Level employees between DaVita and SCA would immediately reduce the compensation of all DaVita's Senior-Level employees in any magnitude similar to that asserted by Dr. Starr.

b. *The economic evidence is consistent with competitive behavior and outcomes.*

i. Plaintiffs have not shown that DaVita and SCA decreased employment in order to suppress wages ████████████████████████ ████████████████ Plaintiffs do not offer any explanation for how DaVita could have attracted so many new employees from a wide variety of sources if it did not offer competitive compensation.

ii. My analysis shows that compensation for DaVita's Senior-Level employees ████████████████████████████████████████

8

Highly Confidential
Outside Counsel/Experts Only

c. *The economic evidence is inconsistent with Plaintiffs' mechanisms of harm. There was no reduction in employee mobility, and, even if a reduction of mobility of the magnitude measured by Dr. Starr had occurred, Plaintiffs have not established, nor is it plausible, that there was a meaningful reduction in employee access to information.*

   i. Dr. Starr's analysis of employee mobility is unreliable and correcting certain flaws in his analysis shows ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ during the alleged conduct period.

      1. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ correcting certain flaws in Dr. Starr's empirical approach overturns his finding that the alleged conduct reduced mobility between DaVita and SCA.

      2. Dr. Starr's analysis that purports to show that the alleged conduct ended in 2019 is flawed and, if anything, shows that there was no unusual increase in Senior-Level employee mobility between DaVita and SCA after 2019.

   ii. An economically meaningful reduction in information about competitive alternative compensation is implausible, because DaVita recruited hundreds of employees from a wide variety of sources other than SCA, its Senior-Level employees left for hundreds of other employers other than SCA during the alleged conduct period, and Dr. Starr's analysis, though flawed and overstated, implies that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

      1. DaVita employees had access to information through many sources, most importantly through the substantial recruiting of DaVita Senior-Level employees by employers outside of the alleged conspiracy between the Defendant firms.

      2. DaVita employees also had access to public sources of information, like Glassdoor and PayScale, and could obtain information by engaging in job search activities.

d. *Dr. Starr's compensation regression finds impact where there is none.*

   i. Dr. Starr's model yields no firmwide conduct effect for potentially relevant alternative conduct periods. For example, if the finder of fact were to determine tha ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Highly Confidential
Outside Counsel/Experts Only



ii. Dr. Starr makes errors in preparing his data and uses an inappropriate measure of equity compensation for DaVita that reflects stock market performance and employee decisions regarding the timing of stock option exercises rather than DaVita's compensation decisions. Just correcting these errors substantially reduces the conduct effect Dr. Starr's model estimates for DaVita.

iii. Dr. Starr's model does not adequately control for differences in market conditions that changed across the conduct and non-conduct periods, including major labor market shocks, and this failure affects his conclusions that there was any firmwide impact of the conduct at issue. Adding improved controls for labor supply and demand conditions overturns Dr. Starr's conduct effect for DaVita.

e. *The nature and frequency of the alleged information exchanges between DaVita and SCA would not economically allow DaVita and SCA to use such exchanges to "fix" compensation for DaVita's Senior-Level employees, and Dr. Starr is not correct that employers have no unilateral, non-conspiratorial incentive to engage in such exchanges.*

i. Plaintiffs have not established that the alleged information exchanges between DaVita and SCA supported any fixing of wages or compensation of Senior-Level employees.



1.

2.

ii. Contrary to Plaintiffs' experts' claims, employers have non-conspiratorial incentives to exchange general information of the type that is alleged to

Highly Confidential
Outside Counsel/Experts Only

have been shared ███████████████ Compensation benchmarking has procompetitive benefits and can lead to increased compensation.

21. These opinions are based on my review and analysis of information made available to me to date and are expressed from the perspective of an economist addressing questions of antitrust economics. I reserve the right to update my opinions should additional information become available to me.

## II. Impact Is Economically Implausible Given the Competitive Realities Faced by DaVita and SCA

22. As a matter of economics, an agreement between DaVita and SCA that restricted the mobility of Senior-Level employees between them and/or an exchange of compensation information between DaVita and SCA could meaningfully impact DaVita's Senior-Level employees' compensation *only* if DaVita and SCA collectively had market power over the compensation of those employees and if the alleged agreements meaningfully allowed them to exercise market power that they could not exercise individually. However, Plaintiffs and their experts made no attempt to assess market power or otherwise consider the extent of competition for Senior-Level employees and the competitive realities faced by DaVita and SCA with regard to DaVita's Senior-Level employees. In this section, I show that DaVita and SCA competed for employees with many employers in many industries. ███████████████████████████████████████████

23. These facts make it implausible that the alleged conduct would lead to firmwide impact on compensation, much less ███████████ impact Dr. Starr estimates for DaVita employees. This is the case even if Defendants carried out the alleged agreement and information exchanges as alleged by Plaintiffs.

### A. Market Power Is Necessary for Firmwide Suppression of Compensation

24. In product markets, market power is defined as "the ability of a firm or a group of firms within a relevant market profitably to raise prices above the competitive level for a sustained period of time."[42] In labor markets, market power is analogously the "firm's power to reduce the compensation it pays to its workers, paying less than an equivalent job would, in a hypothetical perfectly competitive market."[43] Dr. Starr agrees that market power is "the ability of a firm to restrict output, raise prices, suppress wages, reduce

---

[41] Complaint, ¶ 62.

[42] ABA Section of Antitrust Law, *Econometrics: Legal, Practical and Technical Issues*, 2nd Edition (American Bar Association, 2014) ("ABA Handbook on Econometrics (2014)"), p. 14.

[43] US Department of the Treasury, "The State of Labor Market Competition," March 7, 2022, p. 3.

Highly Confidential
Outside Counsel/Experts Only

quality or consumer choice, or inhibit innovation relative to the levels that would have prevailed under competition."[44]

25. Thus, employers must have market power over the compensation of Senior-Level employees in order to suppress compensation below competitive levels.[45] Without market power, suppression is not profitable because employers offering compensation below competitive levels not only lose employees to firms offering competitive compensation but are also unable to attract new hires to replace lost workers and support growth.[46] In other words, competition from employers in the labor market constrains Defendants' ability to suppress compensation. Dr. Starr agrees that market power is a prerequisite for suppression of compensation. He states that "Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members."[47]

26. In the Complaint, Plaintiffs allege that "[m]arket 'frictions' result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) there are a limited number of essentially identical positions from which workers can choose. Such market frictions adversely impact competition in labor markets, and generally provide market power to employers."[48] However, Plaintiffs' experts have not shown any of these alleged frictions to be meaningful or demonstrated that the alleged conduct led to an increase in market power on the part of DaVita and SCA through market frictions or any other means. Indeed, as discussed further below, ███████████████████████████████████████████████████████████████████████████ notwithstanding such alleged market frictions.[49] These market facts demonstrate that "market frictions" are either not present or not sufficient to prevent employees moving between jobs, including to DaVita and are therefore not sufficient to bestow market

---

[44] Starr Report, ¶ 194.

[45] For a discussion of market power in product markets *see, e.g.,* Frank H. Easterbrook, "Limits of Antitrust," *Texas Law Review* 63:1 (August 1984), p. 20 ("Firms that lack power cannot injure competition no matter how hard they try."); Mark R. Patterson, "The Market Power Requirement in Antitrust Rule of Reason Cases: A Rhetorical History," *San Diego Law Review* 37:1 (2000), p. 2 ("Without market power, a seller cannot impose anticompetitive terms and therefore need not be kept in check by antitrust laws.")

[46] US Department of the Treasury, "The State of Labor Market Competition," March 7, 2022, p. 3 ("Monopsony's counterpart is perfect competition, an economic model in which both workers and firms take wages as given—meaning they cannot raise or lower the prevailing wage. Under perfect competition, the residual labor supply curve (or firm-specific labor supply curve) is flat, meaning each firm can hire whatever amount of labor it wants but only at the market wage.")

[47] Starr Report, ¶ 196. *See also* Deposition of Evan Starr, Ph.D., Vol I, March 19, 2025 ("Starr Deposition, Vol. I"), 268:22-269:10 ("Q. Would you agree that defendants would not have been able to suppress class member wages if the challenged conduct did not generate market power over class members? ... A. I think we've talked about this previously. ... My opinion is that the, the defendants had market power. Otherwise the alleged misconduct would not have suppressed wages.")

[48] Complaint, ¶ 61.

[49] ██████████████████████████ An employee is considered a Senior-Level new hire if they appear with positive regular hours worked as a Senior-Level employee in DaVita's structured data in a particular year but do not appear at all in the immediately prior year. Employees that worked at DaVita as a part of the HCP acquisition are not included in these counts. *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

Highly Confidential
Outside Counsel/Experts Only

power to DaVita, when DaVita's growth depends on it being able to attract hundreds of new Senior-Level employees every year.

## B. Plaintiffs and Their Experts Do Not Assess or Acknowledge the Extent of Competition for Senior-Level Employees

27. Even though competition from employers outside of the alleged agreement limits firms' ability to suppress compensation, neither Plaintiffs nor their experts make any attempt to evaluate labor market competition or assess Defendants' market share in any relevant labor markets.[50] This subsection summarizes Plaintiffs' and their experts' limited statements and economic evidence regarding relevant labor markets and Defendants' market power.[51]

28. Plaintiffs' Complaint is unclear as to what labor market Plaintiffs assert to be at issue, if any. The Complaint alleges that "SCA, USPI, and DaVita were the nation's largest operators of outpatient medical care centers as well as one another's top rivals for labor."[52] Elsewhere in the Complaint, however, Plaintiffs also reference the broader healthcare industry in addition to outpatient medical care centers: "[i]n a properly functioning and lawfully competitive labor market, outpatient medical care and healthcare industry employers would compete with one another to attract and retain employees for their needs."[53]

29. Plaintiffs' experts also do not seek to define the scope of any labor market in which DaVita competed for any Senior-Level employees. Dr. Starr testified that he does not "have any opinions on exactly the contours of the labor market in this case."[54] Dr. Starr admitted that the relevant labor markets would include the many other employers that DaVita employees went to and from, but he did not do any analysis of who these relevant employers were.[55] Dr. Gerhart also did not define a relevant labor market and similarly

---

[50] The American Bar Association notes that calculating market shares is the first step in identifying market power, stating "[t]he simplest and most common measure of market power is market share." Neither Plaintiffs nor their experts address the geographic market. For purposes of this report, I evaluate market power assuming the relevant geographic market is at least national. ABA Handbook on Econometrics (2014), pp. 241-242. *See also* U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023, p. 49 ("As discussed above, the Agencies may use evidence about market shares and market concentration as part of their analysis. These structural measures can provide insight into the market power of firms as well as into the extent to which they compete.")

[51] I understand that when Plaintiffs have alleged a *per se* violation, as I understand is the case here, the court may not require an analysis of relevant markets for purposes of determining liability. However, as an economic matter, it is inappropriate to evaluate impact from a purported competitive restraint without considering whether the model yields economically rational results. To make that determination, an economist needs to consider whether the firms that are alleged to have engaged in conduct that affected market outcomes have sufficient market power to accomplish the price changes predicted by their models.

[52] Complaint, ¶ 62.

[53] Complaint, ¶¶ 68-69. The Complaint also states, "companies like Defendants would solicit and hire employees from other companies in the same industry because those employees have training and experience that are lacking in hires from other industries."

[54] Starr Deposition, Vol. I, 43:11-19.

[55] Starr Deposition, Vol. I, 132:21-133:13, 147:4-15.

Highly Confidential
Outside Counsel/Experts Only

admitted that "any company that you lose employees to or you get employees from" would be relevant in a market definition analysis.[56]

30. Plaintiffs and their experts also fail to establish that Defendants possessed market power over the compensation of Senior-Level employees during the alleged conduct period, or that the alleged agreements meaningfully allowed them to exercise market power over Senior-Level employees that they could not exercise individually. Employment shares are one indicator of the competitive circumstances faced by DaVita and SCA for Senior-Level employees. Plaintiffs do not discuss or provide employment shares, yet they claim that Defendants "are among the largest employers in the outpatient medical care center industry."[57] Dr. Gerhart makes no explicit reference to market power in his report and does not provide any economic evidence regarding Defendants' market power or otherwise assess the competitive circumstances faced by Defendants. The only economic evidence Dr. Starr purports to provide regarding market power is his compensation regression analysis, which he claims "directly demonstrates that Defendants wield market power over Class Members."[58] However, Dr. Starr's compensation regression analysis is critically flawed, as I describe in **Section V**. Thus, Plaintiffs' only economic evidence regarding market power is unreliable, and, as I explain below, they have failed to recognize that DaVita and SCA faced substantial competition for Senior-Level employees that would constrain any purported firmwide impact of any agreement between only those two firms concerning the mobility of Senior-Level employees between them or the information exchange alleged to be competitively sensitive.

## C. DaVita Competes for Employees with Many Employers Across Many Industries

31. Using proprietary resume data from Lightcast, I have assessed the number and identity of employers with which DaVita competes for Senior-Level employees.[59] My analysis shows that DaVita hired Senior-Level employees from, and lost Senior-Level employees to, hundreds of employers in many industries, demonstrating that DaVita competes for Senior-Level employees with many different employers in addition to SCA. My analysis shows that this was true before, during and after the alleged conduct period. Using Dr. Starr's data, I show that SCA represented only ▮▮▮▮▮▮▮ of the labor pool from which DaVita recruits. Using publicly available data, I calculate DaVita and SCA's employment share in the industries of the employers with which DaVita commonly

---

[56] In his deposition, Dr. Gerhart agreed that he did not offer an opinion regarding the scope of the relevant labor market, stating "[m]y focus was on the movement between these three companies, I think, primarily, in this case." Deposition of Barry Gerhart, Ph.D., March 5, 2025 ("Gerhart Deposition"), 52:3-21.

[57] Complaint, ¶ 63.

[58] Starr Report, ¶ 196.

[59] Lightcast is a labor market analytics company that collects and disseminates labor market data. The resume data I use from Lightcast, which Lightcast refers to as the "profile database," is "built from individual profiles of over 120 million workers in the United States." These data are "gathered from publicly available information on the web, third-party resume databases and job boards, the recruiting industry, opt-in data from employers and applicant tracking systems, sales and marketing CRM databases, and various consumer/identity databases." "Lightcast Data: Basic Overview," *Lightcast Website*, available at https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview; "Profiles Methodology," *Lightcast Website*, archived February 27, 2025, at the Wayback Machine, available at https://web.archive.org/web/20250227153835/https://kb.lightcast.io/en/articles/6957504-profiles-methodology.

Highly Confidential
Outside Counsel/Experts Only

competes, as well as in two industries referenced in Plaintiffs' Complaint: the healthcare industry and the outpatient medical center industry. I show that DaVita and SCA had a small share of employment in all of these industries.

### 1. DaVita Competed with a Broad Set of Employers in Multiple Industries

32. I evaluate DaVita's share of employment in the industries in which it competes using data from Lightcast. These data include resume profile information for individuals who listed a Senior-Level position at DaVita in their profile.[60] These data permit me to observe the job histories of DaVita Senior-Level employees, including their employer immediately before and after their employment at DaVita. In addition, Lightcast has categorized each employer in the dataset according to their North American Industry Classification System ("NAICS") six-digit industry code.[61]

33. **Figure 1** summarizes the top 15 immediate prior employers in the profiles of DaVita Senior-Level employees in the Lightcast data from 2008 to 2019. The figure shows that DaVita recruited Senior-Level employees from over 900 different organizations in more than 100 industries. The top prior employer was Fresenius, a leading provider of dialysis services with around 3,700 locations that is outside of the alleged conspiracy.[62] While it is the most frequently noted prior employer, Fresenius was the prior employer for only 2.5 percent of DaVita Senior-Level employees in the Lightcast data. The employers accounting for the next two largest fractions of DaVita's Senior-Level employees were McKinsey and Bain & Company, both global management consulting companies, indicating that DaVita draws from a broad and fragmented, rather than narrow and concentrated, labor market. McKinsey was the prior employer for 1.7 percent of DaVita's Senior-Level employees, while Bain & Company was the prior employer for 1.4 percent of DaVita's Senior-Level employees in the Lightcast data. **Figure 1** also shows that DaVita's Senior-Level employees came from a wide range of different industries outside of outpatient medical centers or the healthcare industry. The top 15 employers belonged to industries including Management, Scientific, and Technical Consulting Services, Insurance Carriers, and Department Stores.

---

[60] The Lightcast data used in these analyses include observations for individuals who indicated: (i) ever having worked in a job classified by Lightcast in the 4-digit NAICS code 6214, which represents outpatient medical centers; (ii) ever having worked at DaVita, SCA, or USPI; or (iii) ever having worked at a set of specific Defendant facilities provided to Lightcast. Criterion (iii) was included to account for the fact that some individuals could have listed a specific facility where they worked instead of the company name, *e.g.*, "Burbank Dialysis" instead of "DaVita."

[61] According to the U.S. Census Bureau, the NAICS was developed "as the standard for use by Federal statistical agencies in classifying business establishments for the collection, tabulation, presentation, and analysis of statistical data describing the U.S. economy." In particular, "NAICS is a 2- through 6-digit hierarchical classification system, offering five levels of detail. Each digit in the code is part of a series of progressively narrower categories, and the more digits in the code signify greater classification detail. The first two digits designate the economic sector, the third digit designates the subsector, the fourth digit designates the industry group, the fifth digit designates the NAICS industry, and the sixth digit designates the national industry." "North American Industry Classification System – Frequently Asked Questions (FAQs)," *U.S. Census Bureau Website*, available at https://www.census.gov/naics/.

[62] "Facts & Figures," *Fresenius Medical Care Website*, available at https://freseniusmedicalcare.com/en/investors/equity-story/facts-and-figures/.

Highly Confidential
Outside Counsel/Experts Only

**Figure 1: Immediate Prior Employers of DaVita Senior-Level Employees by Frequency, 2008-2019[63]**

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | ---(Count)--- | -(Percent)- |
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 35 | 2.5 % |
| McKinsey | Management, Scientific, and Technical Consulting Services | 24 | 1.7 |
| Bain & Company | Management, Scientific, and Technical Consulting Services | 20 | 1.4 |
| UnitedHealth Group | Insurance Carriers | 19 | 1.3 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 16 | 1.1 |
| Target | Department Stores | 15 | 1.1 |
| Deloitte | Management, Scientific, and Technical Consulting Services | 15 | 1.1 |
| McKesson | Drugs and Druggists' Sundries Merchant Wholesalers | 13 | 0.9 |
| Intermountain Health | General Medical and Surgical Hospitals | 9 | 0.6 |
| Accenture | Computer Systems Design and Related Services | 9 | 0.6 |
| United States Army | National Security and International Affairs | 8 | 0.6 |
| Optum | Insurance Carriers | 8 | 0.6 |
| Amgen | Pharmaceutical and Medicine Manufacturing | 8 | 0.6 |
| Abbott Laboratories | Medical Equipment and Supplies Manufacturing | 8 | 0.6 |
| HCA Healthcare | General Medical and Surgical Hospitals | 7 | 0.5 |
| Other Companies (935) | Other Industries (133) | 1,208 | 85.0 |
| | Total | 1,422 | 100 % |

34.     **Figure 2** summarizes the most common prior industries for DaVita's Senior-Level employees as reflected in the Lightcast data. Outpatient Care Centers represent a small fraction of prior employers, with only 6.5 percent of DaVita Senior-Level employees listing prior employers in this industry. The healthcare industry, including "General Medical and Surgical Hospitals," "Offices of Physicians," "Outpatient Care Centers," and "Other Ambulatory Health Care Services" was the prior employer for 27.8 percent of DaVita's Senior-Level employees.[64] Non-healthcare employers accounted for a substantial 72.2 percent of prior employers for DaVita's Senior-Level employees.

---

[63]    In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: "director," "vp," or "vice president." I exclude employees with titles related to HR, recruiting, or legal functions and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data. Companies are identified using the variable "company_name," if available, or "company_raw" otherwise. While it is possible that some SCA employees appear as Optum employees or United Health Group ("UHG") employees in the Lightcast data after SCA was acquired in 2017, ██████████████████████████████████████████ ██████████████████████████ Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

[64]    The listed industries are denoted by NAICS 4-digit codes 6221, 6211, 6214, and 6219, respectively. All NAICS 4-digit industries that begin with "62" other than industries that begin with "624," which represents the "Social Assistance" industry, are included in this percentage.

16

Highly Confidential
Outside Counsel/Experts Only

**Figure 2: Industries of Immediate Prior Employers of DaVita Senior-Level Employees by Frequency, 2008-2019[65]**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | ---(Count)--- | -(Percent)- |
| (a) | (b) | (c) | (d) |
| 5416 | Management, Scientific, and Technical Consulting Services | 106 | 9.8 % |
| 6221 | General Medical and Surgical Hospitals | 95 | 8.8 |
| 6214 | Outpatient Care Centers | 70 | 6.5 |
| 6211 | Offices of Physicians | 63 | 5.8 |
| 5241 | Insurance Carriers | 51 | 4.7 |
| 3254 | Pharmaceutical and Medicine Manufacturing | 43 | 4.0 |
| 6113 | Colleges, Universities, and Professional Schools | 38 | 3.5 |
| 5415 | Computer Systems Design and Related Services | 27 | 2.5 |
| 6219 | Other Ambulatory Health Care Services | 24 | 2.2 |
| 4242 | Drugs and Druggists' Sundries Merchant Wholesalers | 22 | 2.0 |
| 5221 | Depository Credit Intermediation | 19 | 1.8 |
| 3391 | Medical Equipment and Supplies Manufacturing | 19 | 1.8 |
| 5242 | Agencies, Brokerages, and Other Insurance Related Activities | 18 | 1.7 |
| 4522 | Department Stores | 17 | 1.6 |
| 5412 | Accounting, Tax Preparation, Bookkeeping, and Payroll Services | 15 | 1.4 |
| | Other Industries (129) | 458 | 42.2 |
| | **Total** | **1,085** | **100 %** |
| | **Healthcare Industries (12)** | **302** | **27.8** |
| | **Non-Healthcare Industries (132)** | **783** | **72.2** |

35.     **Figure 3** summarizes the top 15 immediate subsequent employers in the profiles of DaVita Senior-Level employees from 2008 to 2019. The figure shows that DaVita Senior-Level employees departed for 973 companies across 123 industries during the alleged conduct period. The most common subsequent employer was again Fresenius. Only two percent of DaVita Senior-Level employees left DaVita for Fresenius, and the next largest subsequent employers were United States Renal Care Incorporated and Optum. SCA appears fifth on this list, but SCA was the subsequent employer for less than one percent of the departing DaVita Senior-Level employees according to Dr. Starr's data.[66] And, as discussed in **Section IV.A**, below, there was no reduction in employee mobility between DaVita and SCA in the alleged conduct period.

---

[65]     "Healthcare Industries" are identified as 4-digit NAICS industries that begin with "62," other than NAICS industries that begin with "624," which represent the "Social Assistance" industry. "Non-Healthcare Industries" include all 4-digit NAICS industries that do not begin with "62," in addition to those that begin with "624." Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

[66]     *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

17

Highly Confidential
Outside Counsel/Experts Only

### Figure 3: Immediate Next Employer of DaVita Senior-Level Employees by Frequency, 2008-2019[67]

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees ---(Count)--- | -(Percent)- |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 26 | 2.0 % |
| United States Renal Care Incorporated | Outpatient Care Centers | 19 | 1.4 |
| Optum | Insurance Carriers | 14 | 1.1 |
| Sound Physicians | Offices of Physicians | 13 | 1.0 |
| Surgical Care Affiliates | Outpatient Care Centers | 12 | 0.9 |
| UnitedHealth Group | Insurance Carriers | 11 | 0.8 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 9 | 0.7 |
| HCA Healthcare | General Medical and Surgical Hospitals | 9 | 0.7 |
| National Veterinary Associates | Other Professional, Scientific, and Technical Services | 8 | 0.6 |
| Envision Physician Services | Offices of Physicians | 8 | 0.6 |
| Scan | Insurance Carriers | 7 | 0.5 |
| American Dental Partners | Offices of Dentists | 7 | 0.5 |
| Satellite Healthcare Wellbound | Outpatient Care Centers | 6 | 0.5 |
| Radiology Partners | Other Ambulatory Health Care Services | 6 | 0.5 |
| Northstar Anesthesia, P.A. | Offices of Other Health Practitioners | 6 | 0.5 |
| Other Companies (958) | Other Industries (115) | 1,166 | 87.9 |
| **Total** | | **1,327** | **100 %** |

36.     **Figure 4** summarizes the most common industries in which DaVita's Senior-Level employees worked after departing DaVita, according to the Lightcast data. It shows that DaVita Senior-Level employees departed for companies in a range of industries, with more than half departing to employers in non-healthcare industries: 41.6 percent of DaVita Senior-Level employees departed for employers in the healthcare industry and 58.4 percent of DaVita's Senior-Level employees departed for employers in non-healthcare industries.

---

[67]  In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: "director," "vp," or "vice president." I exclude employees with titles related to HR, recruiting, or legal functions and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data. Companies are identified using the variable "company_name," if available, or "company_raw" otherwise. I identify next employers for Senior-Level employees with an end date at DaVita between 2008 and 2019. Employees who worked within the Healthcare Partners or DaVita Medical Group branch of DaVita and thereafter moved to Optum in 2019 are excluded as these may represent departures related to the divestiture of DaVita Medical Group. Companies "Sound Physicians" and "Caremore Health" were not assigned a NAICS industry in the Lightcast data. Their NAICS industries were manually determined based on data from Factiva. Note that Optum is a subsidiary of UnitedHealth Group (UHG), so while it is possible that some SCA employees appear as Optum employees or UHG employees in the Lightcast data after SCA was acquired in 2017, ███████████████████████████████████████████ ███████████████ **Exhibit 3** displays the immediate next employer of DaVita Senior-Level employees by frequency from 2008 to 2016. Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967; "Sound Inpatient Physicians, Inc.," *Dow Jones Factiva*, accessed April 16, 2025; "Caremore Health Medical Partners Pc.," *Dow Jones Factiva*, accessed April 16, 2025.

Highly Confidential
Outside Counsel/Experts Only

**Figure 4: Industries of Immediate Next Employers of DaVita Senior-Level Employees by Frequency, 2008-2019[68]**

| 4-Digit NAICS | Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | ---(Count)--- | --(Percent)-- |
| (a) | (b) | (c) | (d) |
| 6214 | Outpatient Care Centers | 93 | 10.3 % |
| 6211 | Offices of Physicians | 78 | 8.7 |
| 6221 | General Medical and Surgical Hospitals | 75 | 8.3 |
| 5241 | Insurance Carriers | 58 | 6.5 |
| 5416 | Management, Scientific, and Technical Consulting Services | 33 | 3.7 |
| 6219 | Other Ambulatory Health Care Services | 28 | 3.1 |
| 6213 | Offices of Other Health Practitioners | 26 | 2.9 |
| 5419 | Other Professional, Scientific, and Technical Services | 25 | 2.8 |
| 5415 | Computer Systems Design and Related Services | 24 | 2.7 |
| 6113 | Colleges, Universities, and Professional Schools | 19 | 2.1 |
| 6216 | Home Health Care Services | 19 | 2.1 |
| 5242 | Agencies, Brokerages, and Other Insurance Related Activities | 18 | 2.0 |
| 6212 | Offices of Dentists | 17 | 1.9 |
| 6215 | Medical and Diagnostic Laboratories | 16 | 1.8 |
| 5412 | Accounting, Tax Preparation, Bookkeeping, and Payroll Services | 14 | 1.6 |
| | Other Industries (108) | 356 | 39.6 |
| | **Total** | **899** | **100 %** |
| | **Healthcare Industries (13)** | **374** | **41.6** |
| | **Non-Healthcare Industries (110)** | **525** | **58.4** |

37.     The results are similar if I instead look at the immediate prior and next employers before the alleged conduct period from 2005 to 2007 or after the alleged conduct period from 2020 to 2022, as shown in **Exhibits 4** to **7**. While the set of employers and industries changes slightly over time, the conclusion that DaVita competes for employees with a broad set of employers in multiple industries, including outside of outpatient medical centers and even the healthcare industry, is true irrespective of the period under analysis.

38.     Lightcast data also show that the considerable competition DaVita faced for employees differed across departments and job titles, which reflects the heterogeneous positions within the proposed class. For example, **Figure 5** shows the top five subsequent and prior industries for DaVita Senior-Level employees in finance jobs. **Figure 6** shows the top five subsequent and prior industries for DaVita Senior-Level employees in information technology ("IT") jobs. The top prior industry for finance employees was Management, Scientific, and Technical Consulting Services, the top next industry was Offices of Physicians, and the healthcare industry accounted for only 22 percent of

---

[68]     Employees who worked within the Healthcare Partners or DaVita Medical Group branch of DaVita and thereafter moved to Optum in 2019 are excluded as these may represent departures related to the divestiture of DaVita Medical Group. Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

Highly Confidential
Outside Counsel/Experts Only

subsequent employers, suggesting that the skills of DaVita employees in finance jobs are marketable beyond the outpatient medical centers industry or the broader healthcare industry. For IT employees the top five next industries include four non-healthcare industries, and the top next industry for IT employees was Management, Scientific, and Technical Consulting Services. These results show that DaVita competed with many employers across many industries for IT and Finance employees. They also show that the industries DaVita competed with differed across jobs, a fact that is inconsistent with firmwide impact.

**Figure 5: Top Five Industries of Immediate Prior and Next Employers of DaVita Senior-Level Employees in Finance Jobs, 2008-2019[69]**

**Top 5 Previous Industries for Finance Employees**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | (Count) | -(Percent)- |
| (a) | (b) | (c) | (d) |
| 5416 | Management, Scientific, and Technical Consulting Services | 7 | 9.7 % |
| 5241 | Insurance Carriers | 7 | 9.7 |
| 6211 | Offices of Physicians | 5 | 6.9 |
| 5221 | Depository Credit Intermediation | 5 | 6.9 |
| 3391 | Medical Equipment and Supplies Manufacturing | 3 | 4.2 |
| | Other Industries (35) | 45 | 62.5 |
| | **Total** | **72** | **100 %** |
| | **Healthcare Industries (5)** | **12** | **16.7** |
| | **Non-Healthcare Industries (35)** | **60** | **83.3** |

**Top 5 Next Industries for Finance Employees**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | (Count) | -(Percent)- |
| (a) | (b) | (c) | (d) |
| 6211 | Offices of Physicians | 4 | 8.0 % |
| 5412 | Accounting, Tax Preparation, Bookkeeping, and Payroll Services | 3 | 6.0 |
| 5241 | Insurance Carriers | 3 | 6.0 |
| 4885 | Freight Transportation Arrangement | 2 | 4.0 |
| 5416 | Management, Scientific, and Technical Consulting Services | 2 | 4.0 |
| | Other Industries (28) | 36 | 72.0 |
| | **Total** | **50** | **100 %** |
| | **Healthcare Industries (6)** | **11** | **22.0** |
| | **Non-Healthcare Industries (27)** | **39** | **78.0** |

---

[69] Senior-Level employees are identified as holding finance jobs if they have titles that contain a set of finance-related keywords. Employees who worked within the Healthcare Partners or DaVita Medical Group branch of DaVita and thereafter moved to Optum in 2019 are excluded from next industry counts as these may represent departures related to the

Highly Confidential
Outside Counsel/Experts Only

**Figure 6: Top Five Industries of Immediate Prior and Next Employers of DaVita Senior-Level Employees in Information Technology Jobs, 2008-2019[70]**

**Top 5 Previous Industries for IT Employees**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | (Count) | -(Percent)- |
| (a) | (b) | (c) | (d) |
| 6221 | General Medical and Surgical Hospitals | 6 | 9.5 % |
| 5241 | Insurance Carriers | 4 | 6.3 |
| 5415 | Computer Systems Design and Related Services | 4 | 6.3 |
| 5242 | Agencies, Brokerages, and Other Insurance Related Activities | 3 | 4.8 |
| 3391 | Medical Equipment and Supplies Manufacturing | 3 | 4.8 |
| | Other Industries (31) | 43 | 68.3 |
| | **Total** | **63** | **100 %** |
| | **Healthcare Industries (6)** | **14** | **22.2** |
| | **Non-Healthcare Industries (30)** | **49** | **77.8** |

**Top 5 Next Industries for IT Employees**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | (Count) | -(Percent)- |
| (a) | (b) | (c) | (d) |
| 5416 | Management, Scientific, and Technical Consulting Services | 4 | 7.7 % |
| 5415 | Computer Systems Design and Related Services | 4 | 7.7 |
| 6221 | General Medical and Surgical Hospitals | 4 | 7.7 |
| 5419 | Other Professional, Scientific, and Technical Services | 3 | 5.8 |
| 5112 | Software Publishers | 3 | 5.8 |
| | Other Industries (28) | 34 | 65.4 |
| | **Total** | **52** | **100 %** |
| | **Healthcare Industries (7)** | **13** | **25.0** |
| | **Non-Healthcare Industries (26)** | **39** | **75.0** |

39. Consistent with the Lightcast data, documents and testimony in the record also show that DaVita and SCA recruited from and lost Senior-Level employees to a broad set of employers across numerous industries. For example, SCA's former Chief of Talent, Dr. Bridget Fanning, testified that ███████████████████████████
███████████████████████████████████████████████████████

---

divestiture of DaVita Medical Group. Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

[70] Senior-Level employees are identified as holding information technology jobs if they have titles that contain a set of IT-related keywords. Employees who worked within the Healthcare Partners or DaVita Medical Group branch of DaVita and thereafter moved to Optum in 2019 are excluded from next industry counts as these may represent departures related to the divestiture of DaVita Medical Group. Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

Highly Confidential
Outside Counsel/Experts Only



[1] She also testified that ""[72] DaVita COO Mike Staffieri testified that [73] Dennis Kogod, DaVita's former Chief Operating Officer agreed that [74] Executive recruiter John Schultz, who worked with DaVita to recruit Senior-Level employees, estimated that [75] In 2013, DaVita [6] Similarly, in 2013 DaVita also [7] Documents also show that [78]

40. I reviewed DaVita's job descriptions for Senior-Level employee roles and found that they also reflect the broad scope of industries from which DaVita sought to recruit employees.



[9]

---

[71] Deposition of Bridget Fanning, former Chief Talent Officer, SCA, July 17, 2024 ("Fanning Deposition"), 303:11-304:13.

[72] Fanning Deposition, 31:17-32:5, 32:20-33:1.

[73] Deposition of Michael Staffieri, Chief Operating Officer, DaVita, April 5, 2024 ("Staffieri Deposition"), 118:14-120:8.

[74] Deposition of Dennis Kogod, former Chief Operating Officer, DaVita, September 6, 2024 ("Kogod Deposition"), 179:9-20

[75] Deposition of John Schultz, Executive Recruiter, Spencer Stuart, November 19, 2024, 114:14-115:9.

[76] Email from Samantha Carey (CTPartners) to Dennis Kogod (DaVita), Subject: Update on Ops Searches, February 19, 2013, DVA_OMCEAL_000124754-755.

[77] Email from Rob Chipman (DaVita) to Brian Schaffer (DaVita), Subject: FW: DaVita GVP Status Report, October 23, 2013, DVA_OMCEAL_000011812-822 at 815-817, 820. Email from Darin DeWitt (Caldwell Partners) to Robert Chipman (DaVita), Subject: Need some data for Monday..., October 10, 2014, DVA_OMCEAL_000017255-278 at 257, 263, 271-273.

[78] Email from Erica Rockenback (DaVita) to Stephanee Roessing (DaVita), et al., Subject: FW: DaVita Alumni in C-suite, November 19, 2017, DVA_OMCEAL_000041688-689.

[79]

Highly Confidential
Outside Counsel/Experts Only



██████████████████████████ [80] ██████████████████████████ In summary, Lightcast data as well as documents and testimony in the record indicate that DaVita competes with many employers and that the labor markets in which it competes are not restricted to outpatient medical centers or even the healthcare industry.

## 2. DaVita and SCA Represented a Small Share of One Another's Hires

41.    Plaintiffs allege that Defendants were "one another's top rivals for labor."[81] This allegation is not supported by any analysis of labor market data in Plaintiffs' experts' reports. In fact, Plaintiffs' assertion is refuted by the economic evidence, which shows that SCA and DaVita are not important sources of Senior-Level talent for one another. ████████████████████████████████████████████ [82] ████████████████████████████████████████ [83] Plaintiffs' experts offer no economic theory to explain how DaVita was able to compete successfully for the employees it recruited during the alleged conduct period who came from firms other than SCA, if it was offering compensation that was ████████████████████████ [84] Indeed, such an outcome is economically implausible.

42.    DaVita grew substantially during the alleged conduct period, ████████████████████ ████████████████████████████████████ [85] DaVita would not

---

[80] ██████████████████████████████████████████████████████, August 2016, DVA_OMCEAL_001297448-450 at 450.

[81] Complaint, ¶ 62.

[82] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[83] Dr. Starr's methodology to flag movements between DaVita and SCA is used to identify the number of people that moved between SCA and DaVita in a particular year. I determine whether each movement flagged by Dr. Starr was from DaVita to SCA or from SCA to DaVita based on observing whether the employee appeared first in DaVita data and then SCA data or vice-versa. *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[84] ████████████████████████████████████████████████████████ *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[85] ████████████████████████████████████████ *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

Highly Confidential
Outside Counsel/Experts Only

have been able to support this growth if it had been suppressing compensation below competitive levels.

### 3. DaVita and SCA Represent a Small Share of Employment in the Industries that Competed for DaVita Senior-Level Employees

43. In this section, I evaluate DaVita and SCA's share of employment 1) among the top five NAICS 4-digit industries from which DaVita hired employees or to which it lost employees, 2) within the healthcare industry, and 3) among outpatient medical centers.[86] My analysis of shares among these employers should not be interpreted as an affirmative opinion that I am endorsing any of these possibilities as the relevant antitrust market for this matter. Rather, I am demonstrating that however one might try to define appropriate relevant labor markets, so long as they include the companies with which DaVita actually competes for Senior-Level employees, DaVita and SCA's combined share of employment is too small to support an inference of market power. In fact, each of the share calculations below excludes many employers with which DaVita competed for Senior-Level labor.

44. **Figure 7** displays DaVita's share of employment of managers and above in the top five NAICS 4-digit industries described above, in the healthcare industry, and in the outpatient medical center industry.[87] The figure shows that ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ These employment shares suggest that DaVita and SCA competed with many alternative employers for talent. Even in the narrowest industry mentioned in the Complaint, DaVita and SCA's combined share ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████[88] There is no economic basis to infer that SCA and DaVita would be able to gain monopsony power, suppress competition for workers, limit employee mobility, dampen "labor supply elasticities," suppress employee compensation, or "effectuate collusive outcomes" with employment shares of this level.[89] It is clear from this economic evidence that DaVita and SCA represented a small share of employment among the many alternative

---

[86] To evaluate employment in the "healthcare industry," I focus on NAICS industry sector 62, which is the "Healthcare and Social Services" sector, and I exclude NAICS 624, which is the "Social Assistance" industry.

[87] Publicly-available data do not allow a precise comparison of wage levels in the categories that Plaintiffs have included in the purported class. For purposes of this analysis, I include "Managers" and above, rather than "Directors" and above.

[88] Deposition of Evan Starr, Ph.D., Vol. II, March 20, 2025 ("Starr Deposition, Vol. II"), 333:3-335:10 ████████████ ██████████████████████████████████████████████████████████████████████ ███████) *See also* Starr Report, ¶ 100. The indictment alleged a conduct period from February 1, 2012 to July 31, 2017 for DaVita. DaVita-Thiry Indictment, ¶ 9.

[89] *See* Starr Report, ¶¶ 29, 43-44, 55.

Highly Confidential
Outside Counsel/Experts Only

employers that the data show were competing or DaVita Senior-Level employees, and are thus unlikely to have been able profitably to suppress wages to all Senior-Level employees while continuing to attract new employees and grow their labor bases.[90]

**Figure 7: DaVita and SCA's Share of Employment for Different Industry Segments Competing for DaVita Senior-Level Employees[91]**

| Year | DaVita and SCA Managers and Up | Top 5 Previous and Next NAICS 4-digit Industries | | Healthcare Companies | | Outpatient Medical Centers | |
|---|---|---|---|---|---|---|---|
| | -------(Count)------- | ------(Count)------ | --(Percent)- | -------(Count)------ | --(Percent)- | -----(Count)---- | --(Percent)-- |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) |
| | | | 100*(b)/(c) | | 100*(b)/(e) | | 100*(b)/(g) |
| 2008 | | | | | | | |
| 2009 | | | | | | | |
| 2010 | | | | | | | |
| 2011 | | | | | | | |
| 2012 | | | | | | | |
| 2013 | | | | | | | |
| 2014 | | | | | | | |
| 2015 | | | | | | | |
| 2016 | | | | | | | |
| 2017 | | | | | | | |
| 2018 | | | | | | | |
| 2019 | | | | | | | |
| 2020 | | | | | | | |
| 2021 | | | | | | | |
| 2022 | | | | | | | |
| **Total** | | | | | | | |

45.     Dr. Starr infers market power among Defendants solely because he estimates that compensation was suppressed for the three Defendants during the conduct period.[92]  His inference of market power is wholly inconsistent with the market outcomes and economic data described in this section.  It is, however, consistent with his estimates being the

---

[90]     *See* **Figure 8**. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* **Exhibit 8**.

[91]     This table presents employment shares of DaVita and SCA managers and above in three industry groups: (i) Outpatient Medical Centers, identified as NAICS Code "6214", (ii) Healthcare Companies, identified at the 2-digit NAICS code level as "62" excluding non-healthcare companies which are identified as "624" at the 3-digit NAICS code level, and (iii) the top five NAICS 4-digit industries DaVita senior employees come from and leave to (*see* **Figure 2** and **Figure 4**).  For all three industry groups, only counts for employees at the most detailed level of Management Occupations are included (identified as those occupations for which the Occupation Code starts with "11" and OCC Group is either "detailed" or missing) with the exception of those occupations that pertain to executive, HR, legal, and recruiting job titles (such as "Chief Executives", "Human Resources Managers", "Compensation and Benefits Mangers", and "Top Executives").  Managers and up are identified when variable "final_level_year" is equal to "Manager," "Director," "Vice President," or "Senior Vice President." Only observations with positive hours worked are included.  "Occupational Employment and Wage Statistics," *US Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/tables.htm; Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[92]     Starr Report, ¶ 196 ("In the instant case, the evidence of wage suppression found in Section VI directly demonstrates that Defendants wield market power over Class Members.")

Highly Confidential
Outside Counsel/Experts Only

result of econometric flaws rather than any purported anticompetitive conduct, which I show to be the case in **Section V**.

## III. Economic Evidence Is Consistent with Competitive Behavior and Outcomes

46. As noted above, during the alleged conduct period, DaVita hired Senior-Level employees from more than 1,000 companies that are not alleged to be part of the purported conspiracy. The fact that DaVita ███████████████████████████████████████ ████████ and accomplished substantial growth through hiring during the alleged conduct period is economic evidence that DaVita's compensation offers were competitive. It is implausible as an economic matter that DaVita would be able to accomplish that growth if it offered compensation that was substantially below competitive levels. In fact, ███████████████████████████████████████████ ████████████████████████████████████████ This economic evidence is consistent with DaVita offering competitive compensation and inconsistent with Dr. Starr's claim ████████████████████████████████████████ ████████████████████████████████

### A. DaVita's Significant Employment Growth Is Consistent with Competitive Outcomes

47. Dr. Starr opines that the agreements gave Defendants "monopsony" power over their Senior-Level employees.[93] According to monopsony models, suppressing compensation requires a reduction in employment.[94] There is no economic evidence of reduced employment of Senior-Level employees by DaVita during the conduct period, which is inconsistent with Dr. Starr's assertion that Defendants' alleged conduct meaningfully suppressed employee mobility or compensation. If the alleged conduct suppressed employee compensation, then Defendant firms would be unable to compete for new employees. Further, employees would depart for roles at non-Defendant firms offering competitive compensation. Plaintiffs and their experts fail to demonstrate that employment levels decreased at DaVita compared to what they otherwise would have been, nor do they address the implications of the fact that DaVita grew substantially during the purported conduct period.

48. **Figure 8** shows the growth in DaVita's Senior-Level employees during the alleged conduct period.[95] ████████████████████████████████████████

---

[93] Starr Report, ¶ 34.

[94] Joan Robinson, who is credited with the first monopsony model, noted with respect to monopsony models, "[i]n every case the amount of employment under monopoly will be less than under competition." Joan Robinson, *The Economics of Imperfect Competition* (2nd Edition) (London: Macmillan, 1976), p. 269. *See also* Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics* (7th Edition) (Upper Saddle River, NJ: Pearson, 2009), pp. 376. *See also* Eric Posner, "You Deserve a Bigger Paycheck. Here's How You Might Get It.," *New York Times Website*, September 23, 2021, available at https://www.nytimes.com/2021/09/23/opinion/antitrust-workers-employers.html ("Companies that use their market power to suppress wages do something similar: They hire fewer workers, and this leads to unemployment and low growth as well.")

[95] This chart excludes Senior-Level employees that joined DaVita as part of the HCP acquisition in 2012. ████████ ████████████████████████████

Highly Confidential
Outside Counsel/Experts Only

[6] **Exhibit 8** shows that SCA also experienced considerable growth during the alleged conduct period, [redacted]

---

Consideration of these employees does not change my opinions, but I have excluded them from **Figure 8** to focus on the hiring that DaVita achieved outside of acquisitions. "DaVita and HealthCare Partners Finalize Merger," *Davita Investors Website*, November 1, 2012, available at https://investors.davita.com/2012-11-1-DaVita-and-HealthCare-Partners-Finalize-Merger.

[96] For this calculation, the data are restricted to only those employee-years with positive regular hours worked. A new Senior-Level employee at a DaVita in a particular year is defined as someone who appears in its data as a Senior-Level employee in a particular year but not in its data for any position in the immediately prior year. Employees that worked at DaVita as part of the HCP acquisition are not included in these counts. *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[97] For this calculation, the data are restricted to only those employee-years with positive regular hours worked. A new Senior-Level employee at a SCA in a particular year is defined as someone who appears in its data as a Senior-Level employee in a particular year but not in its data for any position in the immediately prior year.

27

Highly Confidential
Outside Counsel/Experts Only

**Figure 8: Number of DaVita Senior-Level Employees[98]**



49. DaVita's Senior-Level employment grew at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[99] This is not consistent with DaVita underpaying Senior-Level employees on a broad scale. The mere fact that DaVita was able to attract additional employees is economic evidence that the compensation offer was competitive. Dr. Gerhart agreed that growth would require competitive compensation, when he testified that new hire compensation "would probably have to be within sight of what the competitive rate would be."[100]

---

[98] Only observations with positive hours worked are included. Bars in gray indicate years outside the alleged conduct period. Although DaVita acquired HCP in 2012, HCP employees do not appear in DaVita's data until 2016, when they appear all at once. Therefore, employees that joined DaVita as a part of the HCP acquisition are not included. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[99] *See* **Figure 8**.

[100] Gerhart Deposition, 56:1-9.

Highly Confidential
Outside Counsel/Experts Only

## B. DaVita's Compensation Grew at a Competitive Rate

50. Not only was DaVita's compensation consistent with competitive offerings during the alleged conduct period (as demonstrated by DaVita's ability to attract hundreds of Senior-Level employees), but ███████████████████████████████ ███████████████████████████████████████████████████████████, indicating that DaVita did not underpay Senior-Level employees once it attracted them to the firm.

51. **Figure 9** displays



52. **Figure 9** shows that DaVit██████████████████████████

---

[101]  *See* "Occupational Employment and Wage Statistics," *US Bureau of Labor Statistics Website*, available at https://www.bls.gov/oes/ ("The Occupational Employment and Wage Statistics (OEWS) program produces employment and wage estimates annually for approximately 830 occupations. These estimates are available for the nation as a whole, for individual states, and for metropolitan and nonmetropolitan areas; national occupational estimates for specific industries are also available.") *See* also "Occupational Employment and Wage Statistics Frequently Asked Questions," *U.S. Bureau of Labor Statistics OEWS FAQs Website*, available at https://www.bls.gov/oes/oes_ques.htm. The OEWS wage data include "straight-time, gross pay, exclusive of premium pay." The components include base rates, commissions, cost-of-living allowances, deadheading pay, guaranteed pay, hazard pay, incentive pay, longevity pay, over-the-road pay (mileage), piece rates, portal-to-portal rates, production bonuses, and tips. The OEWS wage data does not include attendance bonuses, back pay, clothing allowances, discount, draw, holiday bonus, holiday premium pay, jury duty pay, meal and lodging payments, merchandise discounts, non-production bonuses, on-call pay, overtime pay, prerequisites, profit-sharing payments, relocation allowances, severance pay, shift differentials, stock bonuses, tool/equipment allowances, tuition repayment, uniform allowance, weekend premium pay, and year-end bonuses.

[102]  The top five industries are listed in **Figure 2** and **Figure 4** and discussed in **Section II.C.1**.

Highly Confidential
Outside Counsel/Experts Only

[103]



53. **Figure 10** displays

---

[103] Included are Senior-Level DaVita employees, excluding observations identified as partial-year observations or outliers. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")); "Occupational Employment and Wage Statistics," *US Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/tables.htm; Lightcast Profile Data.

Highly Confidential
Outside Counsel/Experts Only

**Figure 10: Growth in Average DaVita Senior-Level Salary Relative to Benchmarks, Indexed to 2007[104]**



54.    **Figures 9** and **10** above compare DaVita's salaries for Senior-Level employees with benchmark salaries. **Figure 11**, below, compares the growth rate of total compensation excluding equity at DaVita with two benchmarks.[105]  Total compensation including equity is not available in any publicly available and nationally representative data, but total compensation excluding equity is available in the Census Bureau's Quarterly Workforce Indicators (QWI) and in the American Community Survey (ACS).  The "QWI Industry Benchmark" is the mean compensation excluding equity of workers with at least a bachelor's degree.  It is based on QWI data for the 3-digit ambulatory health care services industry.[106]  The benchmark labeled "Dr. Starr Healthcare Manager Earnings"

---

[104]    DaVita salaries and wage benchmarks are indexed to 2007.  Included are Senior-Level DaVita employees, excluding observations identified as partial-year observations or outliers.  Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")); "Occupational Employment and Wage Statistics," *US Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/tables.htm; Lightcast Profile Data.

[105]    Dr. Starr filters DaVita compensation into 20 different pay types, such as regular pay, bonus pay, stock pay, commission pay, and paid time off.  The measure of compensation in **Figure 11** is the sum of all pay types minus stock pay.  Starr turnover materials ("05_2_Build All Pay Dataset.do").

[106]    "Quarterly Workforce Indicators (QWI)," *U.S. Census Bureau QWI Website*, available at https://ledextract.ces.census.gov/qwi/all ("The Quarterly Workforce Indicators (QWI) are a set of economic indicators including employment, job creation, earnings, and other measures of employment flows.  The QWI are reported based on detailed firm characteristics (geography, industry, age, size) and worker demographics information (sex, age, education, race, ethnicity) and are available tabulated to national, state, metropolitan/micropolitan areas, county, and Workforce Investment Board (WIB) areas.").  John M. Abowd, *et al*., "The LEHD Infrastructure Files and the Creation of the Quarterly Workforce Indicators," *U.S. Census Bureau, Longitudinal Employer-Household Dynamics Program* (2005), available at

31

Highly Confidential
Outside Counsel/Experts Only

reflects cash compensation and is Dr. Starr's own data series of the mean state-level compensation of healthcare managers in Defendants' industries in the ACS.[107] The figure shows that



---

https://lehd.ces.census.gov/doc/technical_paper/tp-2006-01.pdf, Appendix A, p. 81 ("The QWI system measures the average earnings of full-quarter employees by summing the earnings on the UI [Unemployment Insurance] wage records of all individuals at a given employer who have full-quarter status in a given quarter then dividing by the number of full-quarter employees."); "Wage Records Program [Technical Notes]," *U.S. Bureau of Labor Statistics Website*, available at https://www.bls.gov/wrp/technical-notes.htm ("All wage records contain an employee's total wages for the quarter … total wages are defined as all compensation received by an employee, including salaries, hourly pay, piecework pay, bonuses, commissions, vacation and sick leave pay, severance pay, the cash value of meals and lodging, and tips and other gratuities. Generally, total wages exclude employer contributions for old-age, survivors, and disability insurance; health insurance; UI; workers' compensation; and private pension and welfare funds. However, employee contributions for the same purposes are included, as is money withheld for income taxes, union dues, and so forth, even though they are deducted from the workers' gross pay. However, definitions of total wages can vary slightly by state. For example, in some states, employer contributions to certain deferred compensation plans, such as 401(k) plans, are included in total wages.")

[107] Dr. Starr uses this as a control variable in his compensation regression analysis and describes the data in Appendix E of his report. Starr Report, ¶ 121, Appendix E, pp. 236-237. Dr. Starr uses the variable 'incwage' from the ACS to construct his healthcare manager earnings benchmark, which includes "wages, salaries, commissions, cash bonuses, tips, and other money income received from an employer. Payments-in-kind or reimbursements for business expenses are not included." *See* "INCWAGE," *IPUMS USA Website*, available at https://usa.ipums.org/usa-action/variables/INCWAGE/#description_section.

[108] Total growth over the alleged conduct period compares compensation in 2019 to compensation in 2007 for all series.

Highly Confidential
Outside Counsel/Experts Only

**Figure 11: Growth in Average DaVita Senior-Level Total Compensation Excluding Equity Relative to Benchmarks, Indexed to 2007** [109]



55.                      and do not support Plaintiffs' contention that compensation at DaVita was anticompetitively suppressed for more than a decade as a result of an agreement that affected a very small part of the labor pool in which DaVita competes for Senior-Level employees.

## IV.    Economic Evidence Is Inconsistent with Plaintiffs' Mechanisms of Harm

56.     Plaintiffs claim that the alleged agreements between DaVita and SCA suppressed compensation by purportedly restricting employee mobility between SCA and DaVita.[110] They claim that a reduction in employee movements between DaVita and SCA directly impacted employees who would have moved but for the alleged conduct by denying them "faster wage growth."[111] They also claim that the reduction in employee mobility could impact even employees who would not have moved regardless of the alleged conduct,

---

[109]   DaVita compensation and benchmarks are indexed to 2007. Both benchmarks are at the state level and aggregated to the national level, weighted by the share of DaVita Senior-Level employees employed in each state in a given year. Included are Senior-Level DaVita employees, excluding observations identified as partial-year observations or outliers. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")); "Quarterly Workforce Indicators (QWI)," *US Census Bureau QWI Website*, available at https://ledextract.ces.census.gov/qwi/all.

[110]   Complaint, ¶ 11.

[111]   Complaint, ¶ 71.

Highly Confidential
Outside Counsel/Experts Only

because "the threat of losing employees to competitors encourages employers to preemptively increase and maintain appropriately high compensation."[112] Plaintiffs also claim that the alleged agreements reduced employees' information regarding compensation and that "employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors."[113]

57. In this section, I show that the economic evidence is inconsistent with the mechanisms of harm put forth by Plaintiffs and their experts. I show that Dr. Starr's analysis of employee mobility is critically flawed and that there was, in fact, no reduction in employee mobility between DaVita and SCA during the alleged conduct period. I also explain that it is implausible that there was any reduction in information available to employees, given that there was no decrease in employee mobility and given the many alternative sources of timely and specific information that were available to DaVita employees during the alleged conduct period. It is therefore economically implausible that the alleged mechanisms of harm served to suppress compensation.

Without a reduction in employee mobility or a meaningful reduction in access to information and wage discovery, there is no basis to assume that any reduction in compensation levels occurred as a result of the alleged agreements. The conclusions in this section are consistent with the observation above that ████████████████ ████████████████████████████

## A. There Was No Reduction in Employee Mobility

58. Plaintiffs and their experts claim that the alleged agreements between DaVita and SCA suppressed compensation by reducing employee mobility. Dr. Starr writes, "if Defendants here agreed to lessen competition for Senior-Level Employees by ceasing solicitations or cold calling for recruitment purposes between them, the predicted result is lower compensation for Senior-Level Employees and less mobility between Defendants."[114] Dr. Gerhart writes that employees "undoubtedly benefit from voluntary (employer) job changes."[115] He argues that employee mobility benefits employees who stay, claiming that "concerns about turnover" may lead employers to "take proactive measures to increase compensation of incumbent employees."[116]

59. In this section, I evaluate Dr. Starr's analyses of employee mobility. I show that there are critical flaws in Dr. Starr's quantitative analysis purporting to show that fewer employees moved between DaVita and SCA during the alleged conduct period than would have occurred but for the alleged agreements. Dr. Starr's analysis has no statistical validity and what he reports as meaningful results are neither meaningful nor robust.

---

[112] Complaint, ¶ 72.

[113] Complaint, ¶ 71.

[114] Starr Report, ¶ 37.

[115] Gerhart Report, ¶ 43.

[116] Gerhart Report, ¶ 72.

Highly Confidential
Outside Counsel/Experts Only

1. **Dr. Starr's Analysis of Employee Mobility is Flawed and Estimates a Reduction in Employee Mobility Between DaVita and SCA When There Was None**

60. In his report, Dr. Starr purports to assess "whether the quantitative evidence shows suppression of Senior-Level Employee movement between Defendant Firms."[117] However, Dr. Starr's "quantitative evidence" is critically flawed. His analysis is incapable of demonstrating any meaningful decrease in employee mobility between DaVita and SCA during the alleged conduct period.

61.

62.

---

[117] Starr Report, ¶ 81.

[118] Starr Report, ¶ 84.

[119] *See* **Exhibits 9** and **10** for charts of these data similar to the left and right panels Dr. Starr's Figure 2, but showing only movements between SCA and DaVita.

[120]

Highly Confidential
Outside Counsel/Experts Only



121

**Figure 12: Employee Movements Between DaVita and SCA Based on Dr. Starr's Data[122]**

| Year | Senior-Level Employees | Total Departures | DaVita-SCA Departures | DaVita-SCA Departures, Percentage of Employees | DaVita-SCA Departures, Percentage of Departures |
|---|---|---|---|---|---|
| (a) | | | | | |
| 2008 | | | | | |
| 2009 | | | | | |
| 2010 | | | | | |
| 2011 | | | | | |
| 2012 | | | | | |
| 2013 | | | | | |
| 2014 | | | | | |
| 2015 | | | | | |
| 2016 | | | | | |
| 2017 | | | | | |
| 2018 | | | | | |
| 2019 | | | | | |
| 2020 | | | | | |
| 2021 | | | | | |
| 2022 | | | | | |
| 2008-2019 Total | | | | | |
| 2020-2021 Total | | | | | |
| 2020-2022 Total | | | | | |



63.

---

121 

122

Highly Confidential
Outside Counsel/Experts Only



64.   Dr. Starr seeks to establish that mobility was suppressed during the conduct period by applying a regression analysis that purports to control for other underlying economic factors.



[25] However, Dr. Starr's mobility regression analysis is deeply flawed.

65.   As an initial matter,



_____

[123]   Starr Report, ¶ 89, Figure 4, Column 2.

[124]   Starr Report, ¶ 89.

[125]   Starr Report, Figure 4.

[126]   R-squared is a statistical measure of the proportion of the variance in the dependent variable that is explained by all of the independent variables in the model. James H. Stock and Mark W. Watson, *Introduction to Econometrics* (4th Edition) (New York, NY: Pearson, 2019), p. 111; Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* (7th Edition) (Boston, MA: Cengage, 2020), p. 35; ABA Handbook on Econometrics (2014), p. 100.

[127]   James H. Stock and Mark W. Watson, *Introduction to Econometrics* (4th Edition) (New York, NY: Pearson, 2019), pp. 111, 113-114; Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* (7th Edition) (Boston, MA: Cengage, 2020), p. 35 ("A value of $R^2$ that is nearly equal to zero indicates a poor fit of the OLS line: very little of the variation in $y_i$ is captured by the variation in the $\hat{y}_i$ (which all lie on the OLS regression line.")

[128]   Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: The National Academies Press, 2011), p. 314 ("Failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect

Highly Confidential
Outside Counsel/Experts Only

66.     Moreover, the result that Dr. Starr purports to obtain is a product of flaws in his regression specification rather than an economically or statistically meaningful reduction in mobility.  Dr. Starr's sole control variable in his regression is a linear time trend in his regression and his negative conduct effect is influenced by the inclusion of this variable.  A time trend is sometimes included in time series regressions to capture the effects of things that are changing over time that cannot easily be controlled for directly, such as technological progress or improvements in efficiency.  Dr. Starr does not offer any reason to think that there would be a trend over time to employee mobility, and there is no economic basis to anticipate that there would be one.[129]  Without a sound economic justification for what variable is omitted, and why it is appropriate to capture the effect of the omitted variable with a time trend, Dr. Starr has no basis to opine that his results are economically meaningful instead of the result of poor specification.

67.     In addition, Dr. Starr's employee mobility analysis failed to control for the underlying labor supply and demand conditions that affect employee mobility, including the COVID-19 pandemic and its impact on labor markets, and other macroeconomic variables that he included in his analysis of compensation but not mobility.[130]  That is, Dr. Starr did not include controls for GDP per capita or the unemployment rate, which have been shown to be related to turnover and which he included in his compensation regressions.[131]  Addressing these flaws overturns Dr. Starr's purported finding of a suppression in labor mobility between DaVita and SCA during the conduct period.

68.     **Figure 13** shows the sensitivity of Dr. Starr's regression model of employee mobility to his unjustified inclusion of a time trend and his omission of standard labor supply and demand conditions:

   - Column (b) reproduces Dr. Starr's original result from his Figure 4, Column 2.  It is notable that even in Dr. Starr's original result, the conduct coefficient is statistically significant at the ten percent level but not at the five percent level,

---

that actually is caused by the excluded variable.  In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis.")

[129]   Starr Report, ¶¶ 87-88; Starr Deposition, Vol. I, 224:6-230:24.  Dr. Starr testified as to the reasons why he has used a linear trend rather than individual year indicator variables, stating, "Typically in the analysis that I've been running I would, I would include a year trend if including year fixed effects would mean that I cannot estimate my coefficient of interest because it's perfectly co-linear."  Later in his deposition, he stated "So given that there is a clear trend in the data, I wanted to capture that.  I estimated it year by year in figure 3.  In figure 4 I estimate it this way."  However, (as I show in **Section IV.A.2**) Dr. Starr's year-by-year estimates displayed in his Figure 3 do not show a "clear trend" in the data.  Moreover, Dr. Starr did not seek to understand what was driving the purported trend, or whether the "trend" is in fact economic evidence directly contradicting the purported restriction in mobility.

[130]   Lucy Bayly, "Unemployment rate soars to 14.7 percent, highest level since the Great Depression," *NBC News Website*, May 8, 2020, available at https://www.nbcnews.com/business/economy/u-s-economy-shed-record-20-5-million-jobs-last-n1202696.

[131]   The macroeconomic controls I include are Dr. Starr's ln(GDP Per Capita) and ln(Unemployment Rate) measures from his compensation regressions.  Economic literature shows that turnover rates are related to macroeconomic conditions.  *See, e.g.*, Michael J. Pries and Richard Rogerson, "Declining Worker Turnover: The Role of Short Duration Employment Spells," *National Bureau of Economic Research* Working Paper 26019 (June 2019); Steven J. Davis, *et al.*, "The Establishment-Level Behavior of Vacancies and Hiring," *National Bureau of Economic Research* Working Paper 16265 (August 2010); Henry R. Hyatt and James R. Spletzer, "The Recent Decline in Employment Dynamics," *IZA Journal of Labor Economics* 2:5 (September 2013).

Highly Confidential
Outside Counsel/Experts Only

which is generally considered the conventional cut-off for statistical significance.[132]

- Column (c) shows that the conduct effect is not statistically significant (at either the five or ten percent level) when I do not include a linear time trend in Dr. Starr's regression model.[133] This shows that the conduct effect Dr. Starr estimates arises due to his unjustified and unwarranted inclusion of a linear trend.

- In column (d) I add macroeconomic controls without a time trend and show that results are similar to column (c). That is, there is no longer any finding of a conduct effect in this specification.

- In column (e) I include Dr. Starr's time trend, but now also include macroeconomic controls. Column (e) shows that, even with Dr. Starr's linear time trend, adding controls for GDP and the unemployment rate results in a conduct effect that is not statistically significantly different from zero.

---

[132] Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: The National Academies Press, 2011), p. 320 ("In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%."); ABA Proving Antitrust Damages (2017), p. 142 ("[S]tatistical hypotheses are carried out at conventional levels of 5 percent.")

[133] The coefficient on the conduct indicator in the regression with no time trend and no controls returns the difference in the average mobility rate in the alleged conduct period minus the average mobility rate in the after-period. ▮▮▮▮▮

Highly Confidential
Outside Counsel/Experts Only

**Figure 13: Sensitivity Results of Dr. Starr's Employee Mobility Regressions[134]**



| Variable | Original Model | No Time Trend | Add Controls No Time Trend | Add Controls |
|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) |

Dependent Variable: Indicator for Movements Between SCA/DaVita

Conduct

**% Effect Relative to Sample Mean**

Year

Ln(GDP Per Capita)

Ln(Unemployment Rate)

**Sample Time Range**
**Sample Mean of DV**
**Observations**
**R-squared**

69. My analysis shows that Dr. Starr's purported economic evidence of reduced employee mobility is unreliable. Even if any meaning could be attached to a purported finding in a regression that fails to explain 99.9 percent of the variable being studied, my analysis shows that Dr. Starr's supposed finding of a reduction in mobility is overturned when his model is adjusted to include even the most basic of standard economic controls. Dr. Starr writes that "[q]uantitative evidence of a no-poach agreement would be an attendant decrease in employee mobility between firms with an active no-poach agreement."[135] However, as demonstrated, Dr. Starr's purported quantitative evidence of an "attendant decrease in employee mobility" between DaVita and SCA is unreliable and such an effect is non-existent once certain flaws in his analysis are corrected.[136] Both common sense appraisal of mobility numbers and appropriate statistical methods reveal no decrease in employee mobility between DaVita and SCA during the alleged conduct period. This means that reduction in employee mobility cannot have been a mechanism for meaningful compensation suppression. Plaintiffs' experts' claims that the alleged conduct deprived individual employees of the wage growth associated with changing employers are thus unsupported. In addition, Plaintiffs' experts' claims regarding broad

---

[134] Significance values are as follows: *** p < 0.01, ** p < 0.05, * p < 0.1. Robust standard errors are in parentheses. Starr turnover materials ("DaVita USPI SCA Complete Data with Outliers.dta").

[135] Starr Report, ¶ 66.

[136] Starr Report, ¶ 66.

Highly Confidential
Outside Counsel/Experts Only

impact resulting from alleged measures to prevent attrition are unsupported, since there is no econometric evidence that mobility would have been higher in the but-for world.

### 2. Dr. Starr Fails to Establish a Meaningful Increase in Employee Mobility after 2019

70.   Dr. Starr provides one additional regression analysis of employee mobility. In his Figure 3, he presents the results of a regression analysis to confirm "that the Conduct Period end date of 2019 is appropriate for both the SCA-DaVita No-Poach Agreement and the USPI-SCA No-Poach Agreement."[137] As I show below, Dr. Starr's conclusions from his Figure 3 are unsound, and his analysis is flawed and misleading.

71.   Dr. Starr's Figure 3 displays the coefficients on individual year indicators from a regression of a measure of employee mobility between DaVita and SCA (and SCA and USPI) for each year between 2008 and 2021. Dr. Starr writes that "[i]f 2019 is the last year of the No-Poach Agreements, then in 2020 we should observe a statistically significant uptick in the movement of Senior Employees between the Covered Defendants," and ███████████████████████████ [138] ████████████████████████████████████████████████████████████████████████████████████ [139]

72.   In fact, Dr. Starr's regression analysis provides no robust support for choosing 2019 as the end year for his conduct period. ████████████████████████████████████████████████ [140] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[137]   Starr Report, ¶ 86.

[138]   Starr Report, ¶ 86. Here again, Dr. Starr assesses statistical significance at the 10 percent level instead of at the 5 percent level. His analysis finds ████████████████████████████████████████ ██████████████████

[139]   Starr Report, ¶ 86.

[140]   ████████████████████████████████████████████████████████ Starr Report, Figure 3.

Highly Confidential
Outside Counsel/Experts Only

73.   Dr. Starr's analysis is also misleading because his purported finding of ███ ███████████ is predicated on the base year he selected. When including fixed effects (like Dr. Starr's year indicators) in a regression, the econometrician has to leave out one of the fixed effects, with the result that the coefficients on the other fixed effects are interpreted relative to the category that was left out. Dr. Starr elected to make 2017 the base year in his analysis so the coefficients on his individual year indicator variables are interpreted relative to 2017, ████████████████████████ ████████ [141] As a matter of econometrics, Dr. Starr could have chosen any base year. If he instead used as the base year any of the 10 years during the █████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ [43]

74.   Column (c) of **Figure 14**, below, displays the coefficients on the 2020 year indicator that result from running Dr. Starr's conduct end-date regression with alternative base years. ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████

---

[141] ████████████████████████████████████████████ *See* **Figure 12**.

[142]   *See* **Figure 14**.

[143]   *See* footnote 121.

Highly Confidential
Outside Counsel/Experts Only

### Figure 14: Annual Number of Movements and Probability of Mobility Between DaVita and SCA in 2020 Relative to Alternative Base Years[144]



| Base Year | Number of Movements | Conduct Coefficient For 2020 |
|---|---|---|
| | ----(Count)---- | -------(Estimates)------- |
| (a) | (b) | (c) |
| 2008 | | |
| 2009 | | |
| 2010 | | |
| 2011 | | |
| 2012 | | |
| 2013 | | |
| 2014 | | |
| 2015 | | |
| 2016 | | |
| 2017 | | |
| 2018 | | |
| 2019 | | |

75.    As demonstrated, Dr. Starr's own employee mobility data show ███ As I show below in **Section V.A**, Dr. Starr's opinion about the date on which impact from the agreement ended materially affects his purported finding of compensation suppression.

### B. It Is Implausible That There Would Have Been Any Meaningful Reduction in Information Available To Senior-Level Employees

76.    Plaintiffs claim that the alleged agreement "deprived [employees] of significant information that they would have used to negotiate for better compensation and terms of employment."[145]  Dr. Starr states that the alleged agreements affected mobility and

---

144    Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$.  Starr turnover materials ("DaVita USPI SCA Complete Data with Outliers.dta").  For completeness, **Exhibit 11** displays the coefficients that result from running Dr. Starr's conduct end-date regression for all possible alternative base years.  The results confirm that the sign and significance of the coefficients on the year indicators are sensitive to the chosen base year.

145    Complaint, ¶ 11.

Highly Confidential
Outside Counsel/Experts Only

bargaining leverage "indirectly by reducing the information about outside options available to employees."[146] Dr. Gerhart claims that the alleged agreements suppressed bargaining power "because they cut off key avenues by which employees could obtain better information on alternative employment opportunities, including those with higher wages."[147] Ultimately, Dr. Gerhart claims that this mechanism of harm indirectly transmitted impact to "all or nearly all salaried employees of Defendant firms."[148]

77.     In this section, I explain that it is implausible that there was any meaningful reduction in information available to Senior-Level employees during the alleged conduct period, given that there was no decrease in mobility between DaVita and SCA during the alleged conduct period and given the many alternative sources of timely and specific information that were available to DaVita employees during the alleged conduct period.[149] I also explain that, had there been a mechanism for information regarding job opportunities to spread rapidly through the DaVita organization, as Plaintiffs allege, recruiting activities by employers outside of the alleged agreement, which vastly outnumbered the recruiting activities from SCA, could have ensured that all DaVita Senior Level employees were compensated at competitive levels, regardless of any agreements between DaVita and SCA.[150]

78.     As a preliminary matter, since I have shown ███████████████████████ ████████████████████████████████████████████ there can be no reduction in information flowing from mobility, for example, through employees observing the job moves and compensation outcomes of colleagues. Moreover, █████ ████████████████████████████████████████████ it is unlikely that the alleged conduct would have meaningfully impacted employee information flow. That is because DaVita employees had access to other timely and specific information regarding compensation and job opportunities during the alleged conduct period and there is no reason to believe that the information flow from SCA that was purportedly suppressed was any different from the information that flowed from the multiple other sources unaffected by the alleged agreement. In other words, if DaVita's compensation for its Senior-Level employees was below market levels, those employees would have found out about that suppression from outreach by, or information provided by, the hundreds of other alternative employers who competed for DaVita Senior-Level employees.[151]

---

[146]  Starr Report, ¶ 39.

[147]  Gerhart Report, ¶ 67.

[148]  Gerhart Report, ¶ 157.

[149]  Plaintiffs also fail to establish that information from cold calls and other recruiting efforts would in fact, have been transmitted throughout DaVita. Plaintiffs' experts offer no method of measuring the supposed reduction in cold-calling, and do not quantify its impact.

[150]  ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

[151]  See **Figure 1** and **Figure 3**.

Highly Confidential
Outside Counsel/Experts Only

79.     One such source of information to DaVita employees was information from the departure of employees to employers other than SCA.  To the extent that employee departures are informative to incumbent employees, this would have been an important source of information, because many DaVita employees departed to many employers over the alleged conduct period.[152]  Specifically, 1,402 DaVita Senior-Level employees departed for 1,020 different employers during the alleged conduct period, and SCA was the destination for less than 1 percent of those departures.[153]  Information about compensation or other conditions of employment from other competitive alternatives would have been timely and specific, as it related to the real-time employment prospects of DaVita employees.  Plaintiffs' experts themselves point to documents and testimony indicating that offers from outside of the alleged conspiracy were important sources of information for DaVita employees.  For example, Dr. Gerhart notes that ███████████████

████████████████████████████████████████████

███████████████[154]

80.     DaVita employees also had access to public sources of information on compensation and employment opportunities through companies like Glassdoor and Indeed.  Glassdoor is an online forum and job board where visitors can post compensation and other information pertaining to their own jobs and search and view information posted by others.[155]  Indeed is an online job board that aggregates job listings and allows visitors to explore compensation through its "Find salaries" tool.[156]  To demonstrate the type of information available to DaVita employes on these sites, **Figure 15** displays the results of two searches for Director jobs at SCA Health (the company's name after it became a division of Optum) on Glassdoor.  The left panel displays the first page of results that Glassdoor returns from a search of job openings for "SCA Health Director."  This search returned results for 23 Director jobs, all of which included estimated salary ranges provided by the employer.  The right panel displays the results of searching user submitted salaries on Glassdoor using the same search term.[157]  It shows that users submitted 736 SCA salaries, including 15 for Directors.[158]  Similarly, **Figure 16** shows some of the first results that Indeed returns for a search of job postings for "Director" jobs at SCA.  This search returned results for 25 Director jobs, all of which included salary ranges.

---

152   *See* **Section II.C**.

153   *See* **Figure 3**.

154   Gerhart Report, ¶ 58.

155   "About Us," *Glassdoor Website*, available at https://www.glassdoor.com/about.

156   "About Indeed," *Indeed Website*, available at https://www.indeed.com/about; "Salaries," *Indeed Website*, available at https://www.indeed.com/career/salaries?from=gnav-homepage.

157   Glassdoor users input their actual income and have the option of having it displayed on Glassdoor as a range.  "Adding a Salary," *Glassdoor Website*, October 24, 2024, available at https://help.glassdoor.com/s/article/Adding-a-salary?language=en_US.

158   The pay for SCA Director jobs reported by Glassdoor users ranged from $164,000 to $244,000, and the total salary range for SCA Director employer job postings was $137,000 to $200,000.

45

Highly Confidential
Outside Counsel/Experts Only

**Figure 15: SCA Director Search Results from Glassdoor**[159]

| Job Openings Search | Compensation Information Search |
|---|---|





---

[159] "SCA Health Director Jobs," *Glassdoor Website*, March 21, 2025, available at https://www.glassdoor.com/Jobs/SCA-Health-Director-Jobs-EI_IE221678.0,10_KO11,19.htm; "SCA Health Director Salaries," *Glassdoor Website*, available at https://www.glassdoor.com/Salary/SCA-Health-Director-Salaries-E221678_D_KO11,19.htm.

Highly Confidential
Outside Counsel/Experts Only

**Figure 16: SCA Director Job Openings Search Results from Indeed[160]**



81.     While these searches were conducted at the time of the writing of this report, it is indicative of the type of information that was available over large parts of the alleged conduct period. Salary information has been available on Glassdoor since at least June 2008. [161] Job listings have been available since 2004 on Indeed and since at least June

---

[160]   "SCA Health director Jobs," *Indeed Website*, March 28, 2025, available at https://www.indeed.com/cmp/Sca-Health-1/jobs?q=director&l=#cmp-skip-header-desktop.

[161]   Company reviews and salary information have been available on Glassdoor since at least June 2008. Job listings have been available on Glassdoor since at least June 2010. "About Us," *Glassdoor Website*, available at https://www.glassdoor.com/about/; Erick Schonfeld, "At Glassdoor, Find Out How Much People Really Make at Google,

Highly Confidential
Outside Counsel/Experts Only

2010 on Glassdoor. [162]  In addition, documents in the record show that one of the class representatives received job alerts for various DaVita jobs from another internet resource, LinkedIn.[163]  All told, considerable information about job openings and salaries became increasingly available from public sources during the alleged conduct period.  Job postings and salary surveys were a potentially important source of information for job searchers as well as for employees who were not looking to change jobs.

82.    Finally, to support Dr. Gerhart's conclusion that a reduction of information would have led all or nearly all putative Class Members to be impacted by the alleged conduct, it would have to be the case that compensation information transmitted to one employee through an active solicitation would be transmitted throughout the organization.  However, if there were a mechanism that led compensation information to spread through the DaVita organization, then recruiting activities by the many employers outside of the alleged agreement would also impact compensation throughout the organization.  In this scenario, cold calls or hiring activity by outside employers would cause information regarding competitive compensation to be broadly transmitted through the organization.

## V.    Dr. Starr's Compensation Regressions Estimate Firmwide Conduct Effects Where There Are None

83.    Dr. Starr's estimates of the effect of the alleged conduct on the compensation of DaVita employees vary greatly across his regression models, from a purported compensation suppression of ███████████████████████████████[164]  As I describe below, Dr. Starr made errors in constructing his data, and his empirical methodology is critically flawed.  The wide variation in his estimates reflects these flaws, and the general unreliability of his results.[165]  The flaws in Dr. Starr's data and models

---

Microsoft, Yahoo, and Everywhere Else.," *TechCrunch Website*, June 10, 2008, available at https://techcrunch.com/2008/06/10/at-glassdoor-find-out-how-much-people-really-make-at-google-microsoft-yahoo-and-everywhere-else/; JP Mangalindan, "How Glassdoor became the No. 2 jobs site in the US," *Yahoo Finance Website*, February 26, 2018, available at https://finance.yahoo.com/news/glassdoor-became-no-2-jobs-site-us-222246364.html.

[162]    Indeed began offering job postings in 2004 and added a feature allowing job seekers to search for jobs by salary in 2008. "About Indeed," *Indeed Website*, available at https://www.indeed.com/about; "Salaries," *Indeed Website*, available at https://www.indeed.com/career/salaries?from=gnav-homepage; "Indeed Celebrates 20 Years of Helping People Get Jobs," *Business Wire Website*, November 19, 2024, available at https://www.businesswire.com/news/home/20241116622469/en/Indeed-Celebrates-20-Years-of-Helping-People-Get-Jobs; "Indeed.com Launches Job Search by Salary," *Indeed Website*, April 15, 2008, available at https://www.indeed.com/press/releases/indeed-launches-job-search-by-salary.

[163]    Scott Keech is a Named Plaintiff in this matter who "was employed by Defendant SCA from approximately 2011 to March 2012 as a Regional Director of Operations and Clinical Services in the San Francisco, California area."  Complaint, ¶ 17. *See, e.g.*, Your job alert for United States, February 22, 2022, KEECH_000002092-093; Your job alert for United States, January 19, 2022, KEECH_000002656-057; Your saved job at On Time Talen Solutions is still available, January 15, 2022, KEECH_000002714-015; Your job alert for Manhattan, New York, United States, January 19, 2022, KEECH_000002658-059; Your job alert for Manhattan, New York, United States, March 1, 2022, KEECH_000003499-500; Your saved job at Premise Health is still available, December 31, 2021, KEECH_000002910-911; Your saved job at DaVita Kidney Care is still available, December 28, 2021, KEECH_000002954-955.  While these documents are dated after the alleged conduct period, they are indicative of the sources of information that were available during the alleged conduct period.

[164]    Starr Report, Appendix D.

[165]    A model's reliability "depends on both the quality of data available and how well the models control for relevant supply and demand factors."  ABA Handbook on Econometrics (2014), pp. 262-263.

Highly Confidential
Outside Counsel/Experts Only

lead Dr. Starr's models not only to estimate widely varying conduct effects but to estimate statistically significant conduct effects where there are none.

84. Dr. Starr's preferred estimate of compensation suppression implies ███████ ██████████████████████████████████████████████ ███████████████████ The implausibility of Dr. Starr's results reinforce that his regression analysis of compensation is critically flawed.

85. In this section, I describe the flaws in Dr. Starr's models and show how they lead to bias in his estimated conduct effects. Correcting these flaws overturns Dr. Starr's purported results and finding of compensation suppression for all DaVita Senior-Level employees. Dr. Starr relies on his compensation regressions as the sole economic evidence regarding the impact of the alleged conduct as well as regarding Defendants' market power over the compensation of Senior-Level employees.[166] The economic evidence in this section which overturns Dr. Starr's compensation regression models, therefore overturns Dr. Starr's conclusions regarding both market power and impact.

## A. Dr. Starr's Model Yields No Firmwide Conduct Effect for Potentially Relevant Alternative Conduct Periods

86. Dr. Starr elected to use a conduct period for DaVita beginning in 2008 and ending in 2019 for reasons that are unsupported by his statistical analysis.[167] In this section, I show that Dr. Starr's conduct effect is highly sensitive to changes in the start and end dates he uses for the alleged conduct period, such that if the finder of fact were to determine a different conduct period than that evaluated by Dr. Starr, his model would offer no support for a finding of impact, injury or market power for DaVita's Senior-Level employees.

87. This sensitivity of Dr. Starr's purported finding of compensation suppression to changes in the start and end dates is notable because the Department of Justice and Plaintiffs have alleged several different conduct and class periods over time:

- **DOJ Indictments:** In the DOJ's indictments of DaVita and SCA, the DOJ alleged that the DaVita-SCA agreement began "at least as early as" February 1, 2012, and lasted "at least" until July 31, 2017.[168]

- **Consolidated Amended Class Action Complaint & Second Consolidated Amended Class Action Complaint:** In Plaintiffs' Consolidated Amended Class Action Complaint and their Second Consolidated Amended Class Action

---

[166] Starr Report, ¶ 196.

[167] I understand that Plaintiffs' Complaint alleges a class period for DaVita starting in May 2008 and going through January 2021. Complaint, ¶ 92. *See* **Section IV.A** for a discussion of Dr. Starr's quantitative analysis purportedly confirming that the alleged conduct ended in 2019.

[168] DaVita-Thiry Indictment, ¶ 9; Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, Case No. 3:21-cr-00011-L, United States District Court for the Northern District of Texas, Dallas Division, January 5, 2021, ¶ 17.

Highly Confidential
Outside Counsel/Experts Only

Complaint, Plaintiffs alleged class periods of February 1, 2012 to January 5, 2021, for DaVita, and May 1, 2010, to January 5, 2021, for SCA.[169]

- **Third Consolidated Amended Class Action Complaint:** In Plaintiffs' Third Consolidated Amended Class Action Complaint, Plaintiffs shifted again, alleging a class period of May 2008 to January 2021 for both DaVita and SCA.[170]

- **Testimony Suggesting Other Conduct Periods:** ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [73]

- **Dr. Starr's Report:** Dr. Starr's report does not use any of the periods referenced in the Complaints, the DOJ indictments or ███████████████████. Instead, it considers a conduct period of January 1, 2008, to December 31, 2019, for DaVita and SCA.[174] Dr. Starr did not investigate whether his model showed any evidence of compensation suppression in any of the periods alleged in the Complaints or the DOJ indictment or the period ███████████████ ███████████████████

88.  I do not offer an opinion about which conduct or class period is correct. I note these inconsistent allegations and conflicting testimony because, as explained below, the results of Dr. Starr's regression are highly sensitive to, and in fact depend critically on, the dates used for the alleged conduct period.

89.  Dr. Starr's compensation regression utilizes data on the annual compensation of DaVita employees from 2005 to 2022. His dependent variables are the natural log of various compensation measures, such as total compensation, total compensation excluding equity, regular pay plus "other pay," and the hourly wage.[175] Dr. Starr regresses his dependent variables on conduct indicators (either pooled for all three corporate

---

[169]  Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, August 9, 2021, ¶ 101; Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, June 6, 2023, ¶ 101.

[170]  Complaint, ¶ 92.

[171]  Transcript of Proceedings before the Honorable R. Brooke Jackson, Day 4, *United States of America v. DaVita Inc., Kent Thiry*, Case No. 21-cr-00229-RBJ, United States District Court for the District of Colorado, April 7, 2022, 535:7-11. *See also* Deposition of Andrew Hayek, former Chief Executive Officer, SCA, September 18, 2024 ("Hayek Deposition"), 165:21-23.

[172]  Hayek Deposition, 189:22-190:9.

[173]  Deposition of Anthony Kilgore, former CEO, SCA, October 22, 2024, 56:19-58:17, 67:11-68:13.

[174]  Starr Report, ¶ 118. Dr. Starr accounts for the starting date of May 1, 2008 when prorating his damages calculation for 2008. *See* Starr Report, footnote 497.

[175]  Starr Report, ¶¶ 118; 130.

Highly Confidential
Outside Counsel/Experts Only

Defendants, or for DaVita, SCA and USPI separately), and various controls. His controls include a linear time trend, a COVID indicator (equal to one for 2020 and 2021 and zero for all other years), and state- or region-level controls for "geographic differences in pay, macro-economic factors, and healthcare-specific factors," including the average wages of managers in the healthcare industry, health expenditures per capita, GDP per capita, the unemployment rate, and Consumer Price Index.[176] In some specifications, Dr. Starr also controls for the natural log of total hours worked and the work location.[177] In many of his models, he includes either individual or individual-company fixed-effects.[178]

90.     Dr. Starr concludes based on his analysis ███████████████████████████████████████ ██████████[179] I have tested the sensitivity of this purported conduct effect to alternative conduct periods. I have determined that Dr. Starr's result is highly sensitive to even small changes in the start and end dates of the alleged conduct period, and that Dr. Starr's estimated impact is overturned when examining many different potential conduct periods.

91.     Plaintiffs allege a class period beginning in May 2008, when Mr. Hayek left DaVita to become the CEO of SCA and ending in January 2021, when the DOJ announced its indictment of SCA.[180] In his regression analysis, Dr. Starr chose to begin the conduct period in January 2008 and end the conduct period in 2019. As I show in **Section IV.A**, Dr. Starr's flawed statistical analysis does not support an end date in 2019. In addition, it is implausible that the alleged conduct would have impacted DaVita compensation starting in January 2008 at all for several reasons. ████████████████████████████ ███████████████████████████████████████████[181]████████████████████████████ █████████[82]████████████████████████████████████████████████████████████████ ███████████████████████████ Dr. Gerhart acknowledges that

---

[176]   Starr Report, ¶¶ 119-121.

[177]   *See, e.g.*, Starr Report, Figure 6, Figure 8, ¶ 122.

[178]   *See, e.g.*, Starr Report, Figure 6, Figure 8, Figure 9, Figure 10.

[179]   Starr Report, ¶ 129 and Figure 8, column (4).

[180]   Complaint, ¶¶ 21, 92.

[181]   Email from Laura Mildenberger (DaVita) to Kent Thiry (DaVita), *et al.*, Subject: CALL MATERIALS, January 28, 2009, DVA_OMCEAL_001181143-165 at 145; Village Communications (DaVita) to Village Communications (DaVita), *et al.*, March 17, 2011, DVA_OMCEAL_001096182-198 at 192; Email from Lana Natali (DaVita) to Guy Seay (DaVita), *et al.*, January 15, 2014, DVA_OMCEAL_001153790-813 at 796; Email from Colleen Arthur (DaVita) to Danielle Reveal (DaVita), *et al.*, January 18, 2016, DVA_OMCEAL_001061165-190 at 169

[182]   Arthur Deposition, 133:9-12 ████████████████████████████████████████ ████████████████ Email from Laura Mildenberger (DaVita) to Kent Thiry (DaVita), *et al.*, Subject: CALL MATERIALS, January 28, 2009, DVA_OMCEAL_001181143-165 at 145; Village Communications (DaVita) to Village Communications (DaVita), *et al.*, March 17, 2011, DVA_OMCEAL_001096182-198 at 192; Email from Lana Natali (DaVita) to Guy Seay (DaVita), *et al.*, January 15, 2014, DVA_OMCEAL_001153790-813 at 796; Email from Colleen Arthur (DaVita) to Danielle Reveal (DaVita), *et al.*, January 18, 2016, DVA_OMCEAL_001061165-190 at 169.

Highly Confidential
Outside Counsel/Experts Only

adjustments to compensation "take time to play out."[183]  It also would have taken time for the alleged agreement ███████████████████████████ to be implemented throughout DaVita and SCA.  Dr. Starr himself stated that "in the early stages of the instantiation of these no-poach agreements, these are large companies and recruitment is being done by internal workers who may or may not be aware the moment that Mr. Hayek or Mr. Wilcox or Mr. Thiry decided to implement these agreements."[184]  Third, assuming, as Plaintiffs' experts do, that the mechanism for compensation suppression was suppression of Senior-Level employee mobility, then the fact that Dr. Starr finds that employee mobility was "elevated in the early years of the Conduct Period" suggests that compensation would not have been suppressed during those years.[185]  For these reasons, the "Conduct Period" in Dr. Starr's compensation suppression regression is not tied to the period or periods in which the challenged conduct would, as an economic matter, even be able to affect compensation.  Adjusting the Conduct Period to make it more aligned with the allegations in the Complaint demonstrates the flaws in Dr. Starr's analysis.

92.    **Figure 17** displays the results of Dr. Starr's compensation regression model for DaVita with alternative conduct periods. ███████████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

---

[183]   Gerhart Report, ¶ 143.

[184]   Starr Deposition, Vol. II, 336:6-337:12.

[185]   Starr Report, ¶ 84.

Highly Confidential
Outside Counsel/Experts Only

**Figure 17: Dr. Starr's Compensation Regression for Alternative Conduct Start and End Dates[186]**



| Variable | Dependent Variable: Ln(Total Annual Compensation) | | | | |
|---|---|---|---|---|---|
| | 2008-2019 | 2009-2019 | 2009-2020 | 2010-2019 | 2010-2020 |
| | ----------(Estimates)---------- | | | | |
| (a) | (b) | (c) | (d) | (e) | (f) |
| DaVita Conduct | | | | | |
| % Effect | | | | | |
| Year | | | | | |
| Ln(Avg. State Mgr. Earnings) | | | | | |
| Ln(State Health Expend. PC) | | | | | |
| Covid | | | | | |
| Ln(State GDP PC) | | | | | |
| Ln(State Unemployment Rate) | | | | | |
| Census Region Annual CPI | | | | | |
| Ln(Total Hours) | | | | | |
| Observations | | | | | |
| Adjusted R-squared | | | | | |
| Employee FE | | | | | |
| Location FE | | | | | |

93.     Dr. Starr's model also fails to establish compensation suppression for other conduct periods that the finder of fact may find relevant. [187]

---

[186]  Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$.  Standard errors, clustered by employee, are in parentheses.  Column (b) displays the results of Dr. Starr's Figure 6, column (3) restricted to DaVita employees only. Columns (c) through (f) display these same results with different alleged conduct periods.  Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta).

[187]  Hayek Deposition, 35:14-23, 165:21-23; 190:10-22.

Highly Confidential
Outside Counsel/Experts Only



[88]

## Figure 18: Dr. Starr's Compensation Regression for Alternative Conduct Periods[189]

| Variable | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | 2012-2017 | 2013-2017 | 2010-2017 |
| | -----------------(Estimates)----------------- | | |
| **(a)** | | | |
| DaVita Conduct | | | |
| % Effect | | | |
| Year | | | |
| Ln(Avg. State Mgr. Earnings) | | | |
| Ln(State Health Expend. PC) | | | |
| Covid | | | |
| Ln(State GDP PC) | | | |
| Ln(State Unemployment Rate) | | | |
| Census Region Annual CPI | | | |
| Ln(Total Hours) | | | |
| **Observations** | | | |
| **Adjusted R-squared** | | | |
| Employee FE | | | |
| Location FE | | | |

94. Documents in the record suggest other relevant periods for investigation. For example, Dr. Starr's model does not allow him to separately measure the impact of the alleged

---

[188] I understand that the exchange of information was alleged to have begun in 2009, and that Dr. Starr stated that 2010 is the earliest year that the alleged information exchange could have had an effect. *See* Starr Report, ¶ 118.

[189] Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. Standard errors, clustered by employee, are in parentheses. Columns (b), (c), and (d) display the results of Dr. Starr's Figure 6, column (3) model restricted to DaVita employees only for different alleged conduct periods. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta).

54

Highly Confidential
Outside Counsel/Experts Only

exchange of information and the alleged agreement.[190]  However, if the finder of fact is interested in examining the alleged period of the information exchanges using Dr. Starr's model, I understand that the earliest documentary support about information exchanges is



95.

Starr Deposition, Vol. I, 84:18-85:24, 88:16-89:8.

[191] Starr Deposition, Vol. II, 333:3-335:10

*See also* Starr Report, ¶ 118.

[192]

Highly Confidential
Outside Counsel/Experts Only

**Figure 19: DaVita Compensation Regression Results: Dr. Starr's Conduct Effect by Start and End Year of Alleged Conduct[193]**



96. These results show that Dr. Starr's conduct effect is highly sensitive to the start and end dates he uses for the alleged conduct period.[194] If the Court or the finder of fact were to determine a different conduct period than that evaluated by Dr. Starr, Dr. Starr's model would offer no support for a robust and reliable finding of impact, injury or market power for many conduct periods that the Court may find applicable.

## B. Dr. Starr Uses a Flawed Measure of Equity Compensation and Made Errors in Constructing His Data

97. Dr. Starr made several errors in constructing his data. He failed to use updated employee data produced by DaVita on October 11, 2024. As a result, his data included inaccurate job title, manager level, and department information for ███ Senior-Level employee-year



56

Highly Confidential
Outside Counsel/Experts Only

observations.[195] Dr. Starr's data construction also failed to exclude ▬ employee-year observations corresponding to the legal and HR departments at DaVita that I understand are not part of the purported Class.[196] In addition to these errors, Dr. Starr used a conceptually flawed measure of equity compensation to construct the total compensation measure he used in his compensation regressions. Specifically, Dr. Starr included the value of stock options in an employee's total compensation in the year the employee decided to exercise the options rather than in the year DaVita elected to grant the stock option to them.[197] That is, Dr. Starr valued stock options based on the exercise price at the exercise date rather than using the expected value of the equity grant at the time it was granted. As a result of these decisions, Dr. Starr's equity compensation measure does not reflect DaVita's compensation decisions, which are the focus of this matter. Instead, his equity compensation measure reflects factors outside of DaVita's control, including stock market returns and the investment decisions of individual employees.

98. There are well-established methods, based on principles of economics and finance, for valuing equity compensation at the time of the grant.[198] DaVita reports the value of its total equity grants in its 10-K filing each year.[199] I have constructed a value of equity compensation at the grant date using the "weighted-average fair value" of grants from DaVita's 10-K in the year of the grant.[200] I have also corrected Dr. Starr's total compensation measure by removing any component of pay associated with stock options exercises from his measure and adding the corrected value of equity grants to his measure in the year they were granted.

99. **Figure 20** displays the results of Dr. Starr's regression specification from column (3) of his Figure 6, with Dr. Starr's original data and with Dr. Starr's data corrected for errors, including the errors in identifying class members and in his measure of the value of equity compensation. Both models are exactly as specified by Dr. Starr but limited to DaVita employees only. The figure shows that Dr. Starr's data errors are consequential

---



[196] Dr. Starr excludes departments in a case-sensitive manner, which fails to properly exclude ▬ Senior-Level employee-year observations that work in HR and legal departments based on their department classification or job title.

[197] *See* Starr turnover materials; DaVita Stock Option Exercise Data; DaVita Stock Options Grants Data.

[198] *See, e.g.,* Fischer Black and Myron Scholes, "The Pricing of Options and Corporate Liabilities," *The Journal of Political Economy* 81:3 (May-June 1973), pp. 637-654.

[199] The value of stock appreciation rights and stock units granted are available for each year, *e.g.,* DaVita stock appreciation rights granted in 2016 were valued at $13.74 per share, and stock units were valued at $70.99 per share in the year which they were granted. DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2016, p. F-36.

[200] According to an annual filing from DaVita, "the Company has estimated the grant-date fair value of stock-settled stock appreciation rights using the Black-Scholes-Merton valuation model and stock-settled stock unit awards at intrinsic value on the date of the grant." This annual filing also describes the assumptions regarding the term of the awards, the expected volatility, the expected dividend yield, and the risk-free interest rate. DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2016, pp. F-36-F-37.

Highly Confidential
Outside Counsel/Experts Only

for his results.  Column (b) displays the results of running Dr. Starr's model on Dr. Starr's original data for DaVita only.  The conduct effect for Dr. Starr's model when applied only to DaVita's data is ███████████ [201]  Column (c) displays the results of running Dr. Starr's model on Dr. Starr's data corrected for errors.  The conduct effect based on the corrected data is ███████████████

**Figure 20: Dr. Starr's Compensation Regression for DaVita Corrected for Data Errors[202]**



| Variable | Dr. Starr's Original Data | Corrected Data |
| --- | --- | --- |
| | ------------------(Estimates)------------------ | |
| **(a)** | | |
| DaVita Conduct | | |
| **% Effect** | | |
| Year | | |
| Ln(Avg. State Mgr. Earnings) | | |
| Ln(State Health Expend. PC) | | |
| Covid | | |
| Ln(State GDP PC) | | |
| Ln(State Unemployment Rate) | | |
| Census Region Annual CPI | | |
| Ln(Total Hours) | | |
| **Observations** | | |
| **Adjusted R-squared** | | |
| Employee FE | | |
| Location FE | | |

## C. Dr. Starr's Regressions Are Not Robust to Alternative Specifications

100.	I have shown that Dr. Starr's conduct effects are sensitive to the start- and end-dates he elects to use as the conduct period in his regressions as well as to the data errors in his

[201] ███████████████████████████

[202]	Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$.  Standard errors, clustered by employee, are in parentheses.  Column (b) uses Dr. Starr's data to recreate Figure 6 column (3) from Dr. Starr's expert report, excluding SCA

Highly Confidential
Outside Counsel/Experts Only

underlying analysis. In this subsection, I show that Dr. Starr's model does not adequately control for underlying labor supply and demand factors that changed across the conduct and non-conduct periods, including major labor market shocks. Adding improved controls for labor supply and demand conditions ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

101.  Dr. Starr's "before-during-after" regressions compare compensation during the alleged conduct period with compensation in a before-period from 2005 to 2007 and in an after-period from 2020 to 2022. If Dr. Starr's regression specification adequately controls for underlying labor supply and demand conditions that changed across the period, dropping the after-period to run a "before-during" regression should lead to the same conclusion as dropping the before-period to run a "during-after" comparison.[203] In this subsection, I conduct this experiment and show that Dr. Starr's "before-during" regression produces substantially different results from his "during-after" regression.

102.  **Figure 21** displays the results of Dr. Starr's regression specification run as two separate "before-during" and "during-after" regressions. The results show that Dr. Starr's results are highly sensitive to the time frame of the analysis. ████████████████████



and USPI observations. Column (c) is the same as column (b) but corrects Dr. Starr's data as described above. Starr Report, Figure 6; Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")); DaVita Annual Reports 2005-2022.

[203]  Discussing before-during-after models, one ABA textbook states "it is appropriate to combine the [before and after] periods only if the model is stable across them. Although there are many ways that one might assess whether the model [] is stable across the two time periods … the most informative test is likely to test whether a prediction model estimated using only the before period would yield the same overcharge estimates as a prediction model estimated using only the after period. If such equivalence of the before and after models cannot clearly be established, attempting to combine the before and after period … is inadvisable, as predictions are likely to be unreliable." ABA Proving Antitrust Damages (2017), pp. 183-184.

[204]  Gerhart Report, ¶ 7 ("[s]uch wage suppression resulting from Defendants' anticompetitive No-Poach Agreements and CSI Exchanges would likely persist into the future, as relative compensation and compensation levels often do not change much in the short term.")

Highly Confidential
Outside Counsel/Experts Only

**Figure 21: Dr. Starr's Compensation Regression for DaVita Based on Before-During and During-After Analyses[205]**



| Variable | Model with Controls Before-During | Model with Controls During-After |
|---|---|---|
| | **Dependent Variable: Ln(Total Annual Compensation)** | |
| | -------------------------------(Estimates)------------------------------- | |
| **(a)** | **(b)** | **(c)** |
| DaVita Conduct | | |
| **% Effect** | | |
| Year | | |
| Ln(Avg. State Mgr. Earnings) | | |
| Ln(State Health Expend. PC) | | |
| Ln(State GDP PC) | | |
| Ln(State Unemployment Rate) | | |
| Census Region Annual CPI | | |
| Ln(Total Hours) | | |
| Covid | | |
| **Observations** | | |
| **Adjusted R-squared** | | |
| Employee FE | | |
| Location FE | | |

103.    One of the factors potentially confounding the results is the COVID-19 pandemic and its impact on labor markets.  The COVID-19 pandemic was the largest labor market shock

---

[205] Significance values are as follows: *** p < 0.01, ** p < 0.05, * p < 0.1.  Standard errors, clustered by employee, are in parentheses.  Columns (b) and (c) use the specification reported in Dr. Starr's Figure 6 column (3).  Column (b) limits to observations between 2005 and 2019, and column (c) limits to observations between 2008 and 2022.  Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta"))

Highly Confidential
Outside Counsel/Experts Only

since the Great Depression.[206]  During 2020, the pandemic caused a large decrease in labor force participation and an increase in unemployment rates.[207]  Economists have found, and government statistics reflect, that excess slack in labor markets was largely gone by the end of 2020.[208]  However, the COVID-19 pandemic continued to affect labor markets through at least 2022.  While labor demand recovered in 2021, labor supply was slower to recover, leading labor markets to be historically tight in 2021 and 2022.[209]  By July 2021, the unfilled job opening rate, a key indicator of labor market tightness, was at its highest level since the inception of the data series twenty years prior, and this rate continued to increase during 2022.[210]  In April 2021, a record four million people quit their jobs, part of what became known as "The Big Quit" or "The Great Resignation."[211]  Importantly, economists have also concluded that the labor market situation during 2021 and 2022 was even tighter than the unemployment rate suggested, suggesting that Dr.

---

[206]  Lucy Bayly, "Unemployment rate soars to 14.7 percent, highest level since the Great Depression," *NBC News Website*, May 8, 2020, available at https://www.nbcnews.com/business/economy/u-s-economy-shed-record-20-5-million-jobs-last-n1202696.

[207]  U.S. private sector employment fell by 21 percent from February to April 2020, and the US unemployment rate spiked to 14.7 percent in April 2020.  Alexander Bartik, *et al.*, "Measuring the Labor Market at the Onset of the COVID-19 Crisis," *National Bureau of Economic Research* Working Paper 27613 (July 2020), p. 1; Tomaz Cajner, *et al.*, "The U.S. Labor Market during the Beginning of the Pandemic Recession," *National Bureau of Economic Research* Working Paper 27159 (May 2020), p. 1; Sumedha Gupta, *et al.*, "Effects of social distancing policy on labor market outcomes," *Contemporary Economic Policy* 41:1 (September 2022), p. 169.

[208]  Robert E. Hall and Marianna Kudlyak, "The unemployed with jobs and without jobs," *Labour Economics* 79 (August 2022), p. 2  ("[J]ob-finding rate for the jobless unemployed fell in April 2020 but bounced back later.  In November 2020, the job-finding rate among the jobless unemployed was at the level similar to the average rates in 2015 and 2016, when total unemployment was 5.3% and 4.9%, respectively.")

[209]  Labor supply was abnormally low during 2021 due to a decrease in labor force participation rates relative to the historical trend.  Labor demand was unexpectedly high due to the quick economic recovery and government programs like the CARES Act, which increased consumer demand for goods and services.  Robert E. Hall and Marianna Kudlyak, "The unemployed with jobs and without jobs," *Labour Economics* 79 (August 2022), pp. 2, 4-6.  In addition to labor force participation, the desired number of working hours decreased during this period as well.  *See* R. Jason Faberman, *et al.*, "Has the Willingness to Work Fallen during the Covid Pandemic?," *Labour Economics* 79 (September 2022), p. 9.  "Labor Force Participation Rate [CIVPART]," Federal Reserve Economic Data, *Federal Reserve Bank of St. Louis Website*, April 4, 2025, available at https://fred.stlouisfed.org/series/CIVPART.  In April 2021, a record four million people quit their jobs, part of what became known as "The Big Quit" or "The Great Resignation."  Lisa Curtis, "Why The Big Quit Is Happening And Why Every Boss Should Embrace It," *Forbes Website*, June 30, 2021, available at https://www.forbes.com/sites/lisacurtis/2021/06/30/why-the-big-quit-is-happening-and-why-every-boss-should-embrace-it/.  Robin Brooks and Ben Harris, "The US recovery from COVID-19 in international comparison," *The Brookings Institution Website*, October 17, 2024, available at https://www.brookings.edu/articles/the-us-recovery-from-covid-19-in-international-comparison/; Scott Fulford, "The post-pandemic economy," *Princeton University Press Website*, May 22, 2024, available at https://press.princeton.edu/ideas/the-post-pandemic-economy; Alyssa Flowers and Andrew Van Dam, "The most unusual job market in modern American history, explained," *The Washington Post Website*, December 29, 2021, available at https://www.washingtonpost.com/business/2021/12/29/job-market-2021/.

[210]  Louise Sheiner, *et al.*, "The US labor market post-COVID: What's changed, and what hasn't? *The Brookings Institution Website*, March 22, 2024, available at https://www.brookings.edu/articles/the-us-labor-market-post-covid-whats-changed-and-what-hasnt/; "Job Openings and Labor Turnover - July 2021,"*U.S. Bureau of Labor Statistics Website,* September 8, 2021, available at https://www.bls.gov/news.release/archives/jolts_09082021.pdf; "Job Openings and Labor Turnover Survey : History," *U.S. Bureau of Labor Statistics Website*, March 29, 2024, available at https://www.bls.gov/opub/hom/jlt/history.htm.

[211]  Lisa Curtis, "Why The Big Quit Is Happening And Why Every Boss Should Embrace It," *Forbes Website*, June 30, 2021, available at https://www.forbes.com/sites/lisacurtis/2021/06/30/why-the-big-quit-is-happening-and-why-every-boss-should-embrace-it/.

Highly Confidential
Outside Counsel/Experts Only

Starr's unemployment rate control is an inadequate control for labor market conditions during this period.[212]

104.  Dr. Starr includes a COVID-19 control equal to one in 2020 and 2021 in his regression model and zero in every other year.[213]  This control does not have a statistically significant coefficient when included in the model, likely because it reflects the average effect of the slack 2020 labor market and the tight 2021 labor market.  Accordingly, it does not adequately control for the labor market situation in either year.  It also does not control for the unusual labor market situation during 2022.  Dr. Starr also controls for the state unemployment rate.  However, economists have found that, during the period following COVID the unemployment rate failed to capture the labor market situation to the extent it had previously.[214]  Economists have suggested that additional controls are necessary for this period.[215]

105.  **Figure 22** displays the results of Dr. Starr's compensation regression for DaVita with alternative and economically meaningful controls.  Column (b) again displays Dr. Starr's original model using Dr. Starr's data corrected for errors.  In column (c) I correct Dr. Starr's COVID-19 control.  When I replace Dr. Starr's COVID-19 control with an indicator for 2020 only, ███████████████████████████████████████  In column (d), I add a control for the state-level rate of unfilled job openings from the U.S. Bureau of Labor Statistics Job Openings and Labor Force Turnover Survey ("JOLTS").  The unfilled job openings rate has a statistically significant positive coefficient when included in the model, reflecting that difficulty filling positions puts upward pressure on

---

[212]  During 2022, vacancy rates and quit rates corresponded to a degree of labor market tightness previously associated with sub-2 percent unemployment rates.  Alex Domash, Lawrence H. Summers, "How Tight Are U.S. Labor Markets," *National Bureau of Economic Research* Working Paper 29739 (February 2022), pp. 1-2.  Louise Sheiner, *et al.*, "The US labor market post-COVID: What's changed, and what hasn't? *The Brookings Institution Website*, March 22, 2024, available at https://www.brookings.edu/articles/the-us-labor-market-post-covid-whats-changed-and-what-hasnt/.

[213]  Starr Report, ¶ 120.

[214]  Alex Domash, Lawrence H. Summers, "How Tight Are U.S. Labor Markets," *National Bureau of Economic Research* Working Paper 29739 (February 2022), p. 2 ("Historically, measures of slack on the supply-side, like the unemployment rate and the prime-age (25-54) nonemployment rate, have moved in tandem with measures of slack on the demand-side, such as the job vacancy rate and the quits rate, meaning that different indicators gave broadly corroborative signals of labor market tightness. Since the beginning of the Covid-19 pandemic, however, the supply-side indicators and the demand-side indicators have diverged significantly. While the unemployment rate and prime-age nonemployment rate remain elevated at late-2017 levels and imply modest degrees of slack, the job vacancy rate and quits rate have surged to series highs and imply a very tight labor market.").  *See also* Louise Sheiner, *et al.*, "The U.S. Labor Market Post-Covid: What's Changed, and What Hasn't?," *The Brookings Institution Website*, March 22, 2024, available at https://www.brookings.edu/wp-content/uploads/2024/03/U.S.-Labor-Market-post-COVID.pdf, p. 2 ("Before 2019, the unemployment rate was widely regarded to be an adequate measure of labor market slack, largely because it closely tracked other measures of slack like the ratio of vacancies to unemployed workers (V/U) and quit rates, measures that that Bureau of Labor Statistics reports in its monthly Job Openings and Labor Turnover Survey.  Many economists are no longer confident about the adequacy of the unemployment rate as the only important measure. Although unemployment in 2023 was at about the same level as it was in 2019, other measures of slack suggested that the labor market was much tighter.")

[215]  During 2022, vacancy rates and quit rates corresponded to a degree of labor market tightness previously associated with sub-2 percent unemployment rates.  Alex Domash, Lawrence H. Summers, "How Tight Are U.S. Labor Markets," *National Bureau of Economic Research* Working Paper 29739 (February 2022), pp. 1-2.  Louise Sheiner, *et al.*, "The U.S. Labor Market Post-Covid: What's Changed, and What Hasn't?," *The Brookings Institution Website*, March 22, 2024, available at https://www.brookings.edu/wp-content/uploads/2024/03/U.S.-Labor-Market-post-COVID.pdf, p. 2.

Highly Confidential
Outside Counsel/Experts Only

compensation. With the addition of this variable ███████████████████████████
████████████████████████████

### Figure 22: Dr. Starr's Compensation Regression for DaVita with Labor Market Controls[216]



| Variable | Baseline Model | 2020 Covid Dummy | 2020 Covid Dummy Unfilled Job Opening |
|---|---|---|---|
| | | (Estimates) | |
| (a) | (b) | (c) | (d) |
| DaVita Conduct | | | |
| % Effect | | | |
| Year | | | |
| Ln(Avg. State Mgr. Earnings) | | | |
| Ln(State Health Expend. PC) | | | |
| Ln(State GDP PC) | | | |
| Ln(State Unemployment Rate) | | | |
| Census Region Annual CPI | | | |
| Ln(Total Hours) | | | |
| Covid (2020 and 2021) | | | |
| Covid (2020 Only) | | | |
| Avg. Annual Unfilled Job Openin | | | |
| **Observations** | | | |
| **Adjusted R-Squared** | | | |
| Employee FE | | | |
| Location FE | | | |

## D. Dr. Starr's Robustness Checks Are Not Informative

106. In his Appendix D, Dr. Starr provides the results of a number of compensation regressions that he refers to as robustness checks.[217] He opines, "[t]hese robustness

---

[216] Significance values are as follows: *** p < 0.01, ** p < 0.05, * p < 0.1. Standard errors, clustered by employee, are in parentheses. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta"))

[217] Starr Report, ¶ 130.

Highly Confidential
Outside Counsel/Experts Only

checks demonstrate that the wage suppressing effects found by the model are not an artifact of the specific model I construct and provide additional confidence that the econometric modeling is detecting a true suppression of employee wages."[218]  However, Dr. Starr's robustness tests suffer from the same flaws as his other compensation regressions.  They rely on flawed data, they assume a conduct period from 2008 to 2019, and they fail to adequately control for underlying supply and demand conditions.  Accordingly, they do not provide any "additional confidence" regarding Dr. Starr's analysis or conclusions.

## VI. Plaintiffs Fail to Establish the Alleged Information Exchanges Supported Wage-Fixing and Fail to Consider that Information Exchanges Can Be Procompetitive

107.  Even if DaVita and SCA had ████████████████████████████████ which Plaintiffs do not establish, Plaintiffs and their experts do not explain how ████████ ████████████████████████████ could be used to fix wages across hundreds of job titles in different states for employees in the broad labor markets in which DaVita and SCA competed with hundreds of other employers for talent.  Plaintiffs' experts rely on their (false) claim that there is no unilateral reason to exchange compensation information to suggest that the alleged information exchanges were anticompetitive.[219]  This claim is in conflict with economic literature that establishes unilateral incentives to engage in information exchange and compensation benchmarking.

### A. Plaintiffs Fail to Establish that the Alleged Information Exchanges Could Have Supported Wage-Fixing



108.  ████████████████████████████████████████████████████ [220] However, the documents and information that Dr. Starr cites show ████████████████████ ████████████████████████ nd I am not aware of any documents or testimony showing that DaVita and SCA reached an agreement to suppress, set, or fix wages.

109.  ████████████████████████████████████████████████████ [221] Plaintiffs mischaracterize this information exchange as pertaining to future wage increases ████████████████████ ████████████████████████████████████████████████████

---

[218]  Starr Report, ¶ 131.

[219]  Starr Report, ¶¶ 93-98; Gerhart Report, ¶ 157.

[220]  Complaint, ¶ 54.

[221]  Complaint, ¶ 55.

Highly Confidential
Outside Counsel/Experts Only

█████ [222] ███████████████████████████████ In advance of DaVita's June 2009 shareholders meeting, DaVita released a public proxy statement stating, "the Compensation Committee elected not to award merit increases to base salary in 2009 to our named executive officers and other members of management across the company."[223]

110.



111.



---

[222] Andrew Hayek Notes, July 6, 2009, HAYEK-000012214-216 at 214. ████████████████████

[223] DaVita, "Notice of Annual Meeting of Stockholders," June 15, 2009, p. 21.

[224] Complaint, ¶ 56.

[225] Starr Report, ¶ 101.

[226] Email from Brian Mathis (SCA) to Lynn Howard (SCA), Subject: Re: Merit Information, September 9, 2012, OMC_BM_000013354-356 at 355.

[227] Deposition of Brian Todd Mathis, former Chief Development Officer, SCA, September 20, 2024 ("Mathis Deposition"), 83:21-23.

[228] Starr Report, ¶ 100.

[229] Hayek Deposition, 362:25-363:7.

[230] Starr Report, ¶ 100.

[231] Mathis Deposition, 54:1-15.

[232] Starr Report, ¶ 100.

Highly Confidential
Outside Counsel/Experts Only

[REDACTED] [233]

112. [REDACTED] I am not aware of any documents or testimony suggesting that DaVita and SCA reached any agreement to fix wages, or altered their compensation plans to the detriment of Senior-Level employees as a result of having received information from each other [REDACTED] In his report, Dr. Starr writes that "[e]vidence of firms agreeing to match or set compensation at certain levels would be evidence of price-fixing."[234] However, neither Dr. Starr nor Dr. Gerhart cite any "evidence" of such an agreement. Plaintiffs and their experts do not explain how exchanging information about [REDACTED] could be used to fix wages across hundreds of job titles in different states for employees in broad labor markets in which DaVita and SCA did not have market power. Moreover, they have not explained how "price-fixing" would be possible [REDACTED] [235] Bonus and equity compensation was an important part of Senior-Level employees' compensation packages.[236] In fact, Dr. Gerhart suggests that granular data (in contrast to information about firmwide increases) is preferable for supporting such an agreement.[237] Moreover, according to economic theory, collusive agreements cannot be sustained without monitoring and enforcement mechanisms, but Plaintiffs and their experts do not describe any monitoring or enforcement mechanisms that DaVita and SCA could have used or establish that DaVita and SCA employed any such mechanisms.[238]

## B. Economic Research Demonstrates that Firms Have Unilateral Incentives to Exchange Compensation-Related Information and Benchmark Compensation

113. Dr. Starr writes that he is "not aware of an example of how a firm can directly share CSI with a horizontal competitor that is in the company's unilateral self-interest."[239] Similarly, Dr. Gerhart writes "[n]o company benefits by unilaterally sharing wage-related data with competing employers."[240] Further, Dr. Gerhart opines that "Defendants' years-long CSI Exchanges are inconsistent with unilateral conduct and would have harmed

---

[233] Deposition of Michael Rucker, former Chief Operating Officer, SCA, August 27, 2024 ("Rucker Deposition"), 256:13-257:3, 270:8-272:6, 275:13-277:2, 289:25-290:13, 294:5-19, 339:1-340:17, 341:21-342:3, 343:12-345:25, 346:1-18, 383:10-16.

[234] Starr Report, ¶ 96.

[235] Rucker Deposition, 255:17-256:12.

[236] [REDACTED]

[237] Gerhart Report, ¶ 83.

[238] Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature* 44 (March 2006), p. 45.

[239] Starr Report, ¶ 98.

[240] Gerhart Report, ¶ 7.

Highly Confidential
Outside Counsel/Experts Only

employees."[241]  However, economic literature and theory recognize that information sharing and benchmarking across firms can have procompetitive benefits and can be in a firm's unilateral self-interest.

114.    Economic theory teaches that it is economically rational and in each producer's unilateral best interest to observe, study, and respond to business and pricing decisions made by competitors.[242]  Economic literature suggests that increased transparency among producers can lead to more competitive outcomes.[243]  In fact, perfect information, for both consumers and producers, is an underlying assumption of a perfectly competitive market.[244]

115.    Information sharing can help companies make informed production and pricing decisions, particularly in industry settings with uncertainty.  Under certain market conditions, an individual firm has non-collusive incentives to share information with rivals.[245]  These incentives arise because information exchange allows individual firms to share the benefit of private, idiosyncratic information to gain an understanding of market shocks that they are relatively less informed about.  This exchange can lead to higher expected consumer surplus since information exchange enables market prices to better reflect market information.[246]

116.    Empirical economic research confirms that information sharing serves non-collusive purposes and often results in consumer welfare gains.  For example, in a study of the airline industry, Armantier and Richard (2003) show that information sharing leads to a higher likelihood of active markets, an increased number of flights, and increased expected consumer welfare in a majority (61 percent) of markets, and minor decreases in

---

[241]   Gerhart Report, ¶ 7.

[242]   David Besanko and Ronald R. Braeutigam, Microeconomics (4th Edition) (Hoboken, NJ: John Wiley & Sons, Inc., 2011), pp. 533-536 (where each firm's output is a "best" or profit-maximizing response to the other firm's output), pp. 541-542 (where each firm chooses a profit-maximizing price, given the price set by the other firm).

[243]   William Novshek and Lynda Thoman, "Information disaggregation and incentives for non-collusive information sharing," *Economic Letters* 61:3 (1998) ("Novshek and Thoman (1998)"), pp. 327-328 ("Information sharing among firms in an industry may lead to better decision making, and thus provide positive benefits to both firms and society. … We show that in a specific robust example of such a model, firms have a non-collusive incentive to share disaggregated information. Furthermore, sharing disaggregated information increases consumers' surplus and the total surplus."); Xavier Vives, "Private information, strategic behavior, and efficiency in Cournot markets," *RAND Journal of Economics* 33:3 (2002) ("Vives (2002)"), p. 373 ("[I]nformation sharing on costs (or demand) is good for welfare with Cournot competition independent of whether uncertainty is of the private or common-value variety.")

[244]   Libby Rittenberg and Timothy Tregarthen, Principles of Microeconomics (1st Edition) (Boston, MA: FlatWorld Knowledge, 2009), pp. 465, 468-469 ("Perfect competition is a model of the market … it assumes that buyers and sellers have complete information about market conditions. … We assume that all sellers have complete information about prices, technology, and all other knowledge relevant to the operation of the market. … We assume also that buyers know the prices offered by every seller.")  *See also* Patrick M. Emerson, *Intermediate Microeconomics* (1st Edition) (Corvallis, OR: Oregon State University, 2019), p. 296 (describing that in perfect competition there is an "implicit assumption" that "buyers and sellers have full information, meaning that they know the prices charged by every firm.")

[245]   Novshek and Thoman (1998), pp. 327-328.  The authors highlight asymmetric demand shocks as an example of a market condition wherein firms have non-collusive incentives to share information.

[246]   Novshek and Thoman (1998), pp. 331-332.

Highly Confidential
Outside Counsel/Experts Only

aggregated expected welfare (3.6 percent).[247]  In a study of the automotive industry, Doyle and Snyder (1999) find that automakers' information exchange is consistent with firms using information to mitigate demand uncertainty.[248]

117.  There is also economic literature particular to labor markets regarding the benefits of salary benchmarking.  First, surveys have shown that the use of benchmarking services is common in many industries, with the majority of employers reporting that they engage in salary benchmarking.[249]  A recent empirical paper evaluating the impact of using salary benchmark information on compensation found that benchmarking reduced variation in compensation across employees and did not decrease average compensation.  Moreover, for some employees, benchmarking increased average compensation and employee retention.[250]  This research shows that, even if there were an exchange of information as Plaintiffs allege, it would not be expected to lead to a decrease in average compensation across employees.  The regression analyses I presented above that fixed certain flaws in Dr. Starr's analysis confirm that no such decrease in average compensation across employees occurred at DaVita.[251]


Signed this 26th of June, 2025:


_____

Lauren J. Stiroh

---

[247]  Olivier Armantier and Oliver Richard, "Exchanges of Cost Information in the Airline Industry," *RAND Journal of Economics* 34:3 (2003), pp. 471-473.

[248]  Maura P. Doyle and Christopher M. Snyder, "Information Sharing and Competition in the Motor Vehicle Industry," *Journal of Political Economy* 107:6 (1999), pp. 1329, 1338-1339.

[249]  According to one study, 87.6 percent of HR managers report using salary benchmarks for setting pay.  *See* Zoe B. Cullen, *et al.*, "What's My Employee Worth?  The Effects of Salary Benchmarking," *National Bureau of Economic Research* Working Paper 30570 (October 2022), p. 9.

[250]  *See* Zoe B. Cullen, *et al.*, "What's My Employee Worth?  The Effects of Salary Benchmarking," *National Bureau of Economic Research* Working Paper 30570 (October 2022), pp. 28-31.

[251]  *See* **Section V**.



**N NERA**

**Exhibit 1**



## Lauren Stiroh
### Senior Managing Director

NERA
360 Hamilton Avenue
10th Floor
White Plains, New York 10601
914 448 4143
lauren.stiroh@nera.com

## Overview

Dr. Stiroh specializes in the economics of antitrust, intellectual property, and commercial damages. She has conducted research, prepared expert reports, and testified in court on a variety of issues arising from antitrust allegations such as monopolization, exclusionary conduct, tying, vertical restrictions, price fixing, predatory pricing, price discrimination, and abuse of standard setting. Dr. Stiroh has analyzed the competitive effects of mergers, acquisitions, and joint ventures. She has also written expert reports and consulted on matters related to assessing impact and damages in class action litigation. She has performed or critiqued damage calculations in more than a dozen industrial settings.

Dr. Stiroh has also written and testified on the subject of intellectual property value and valuation. She has assessed and critiqued damages from patent, copyright, and trademark infringement in industries including semiconductors, biotechnology, pharmaceuticals, medical devices, and consumer products. Dr. Stiroh is co-editor and contributing author of *Economic Approaches to Intellectual Property Policy, Litigation and Management*, published in 2005.

Dr. Stiroh holds a Ph.D. in Economics from Harvard University, an M.A. in Economics from the University of British Columbia, and a B.A. in Economics from the University of Western Ontario.

## Education

**Harvard University** 1996
Ph.D., Economics

**University British Columbia** 1991
M.A., Economics

**University Western Ontario** 1990
B.A., Economics

## Honors and Professional Activities

Member, American Bar Association.

Member, American Economic Association.

YWCA-NYC Academy of Women Leaders, Class of 2010.

Derek Bok Teaching Award, 1996.

Harvard University Scholarship 1991-1994.

**Exhibit 1**

Social Sciences and Humanities Research Council of Canada Fellowship 1991-1994.

University Graduate Fellowship (University of British Columbia) 1990-1991.

Huron College Corporation Scholarship (University of Western Ontario) 1987-1989.

## Professional Experience

**NERA Economic Consulting**                                            1996-present

2021- Senior Managing Director/Managing Director

2016-2021 Chair, Global Antitrust and Competition Practice

2005-2016 Managing Director/Senior Vice President

2002-2005 Vice President

1999-2002 Senior Consultant

1996-1999 Senior Analyst

**Universidad del Desarrollo Social**                                   1994

*Consultant.* Prepared two studies for the National Planning Department concerning the effect of the trade liberalization in Colombia on the distribution of income.

**Harvard University**                                                  1994-1996

*Research Assistant.* Research Assistant for Professor Dale Jorgenson. Estimated human capital and national income accounts.

**Harvard University**                                                  1993-1996

*Teaching Fellow in Economics.* Taught principles of economics, the introductory and core course in economics at Harvard College.

## Expert Testimony and Reports (2021-2025)

### In Re: Cattle and Beef Antitrust Litigation

- Deposition testimony, on behalf of Defendants, Cargill Meat Solutions Corporation et al., in connection with *Olean Wholesale Grocery Cooperative, Inc., et al. v. Cargill Meat Solutions Corporation et al.* March 19, 2025.

- Expert Report, on behalf of Defendants, Cargill Meat Solutions Corporation et al., in connection with *Olean Wholesale Grocery Cooperative, Inc., et al. v. Cargill Meat Solutions Corporation et al.* January 24, 2025.

### Henry, et al., v. Brown University, et al.

- Deposition testimony, on behalf of Defendants, Brown University, et al., in connection with *Henry, et al., v. Brown University, et al.* November 12, 2024.

- Expert Report, on behalf of Defendants, Brown University, et al., in connection with *Henry, et al., v. Brown University, et al.* August 7, 2024.

**Exhibit 1**

### *In Re: Turkey Antitrust Litigation*

- Testimony on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., October 10, 2024.

- Declaration on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., January 26, 2024.

- Deposition testimony, on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., August 15, 2023.

- Rebuttal Declaration and Expert Report, on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., May 31, 2023.

- Declaration and Expert Report, on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., February 14, 2023.

### *In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*

- Testimony, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, September 10, 2024.

- Deposition testimony, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, August 9, 2023.

- Expert Report, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, June 28, 2023.

- Deposition testimony, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, March 25, 2022.

- Expert Report, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, January 12, 2022.

### *The State of Connecticut, et al. v. Sandoz, Inc., et al.*

- Deposition testimony, on behalf of Defendant, Mylan Pharmaceuticals, Inc., in connection with *The State of Connecticut, et al., v. Sandoz, Inc., et al.* June 26, 2024.

- Expert Report, on behalf of Defendant, Mylan Pharmaceuticals, Inc., in connection with *The State of Connecticut, et al., v. Sandoz, Inc., et al.* April 26, 2024.

**Exhibit 1**

### In Re: Pork Antitrust Litigation

- Surrebuttal Expert report, on behalf of Defendants, Clemens Food Group, LLC, et al., in connection with *In Re: Pork Antitrust Litigation*, June 7, 2024.

- Deposition testimony, on behalf of Defendants, Clemens Food Group, LLC, et al., in connection with *In Re: Pork Antitrust Litigation*, March 8, 2024.

- Expert Report, on behalf of Defendants, Clemens Food Group, LLC, et al., in connection with *In Re: Pork Antitrust Litigation*, December 11, 2023.

### State of Washington v. Tyson Foods, et al.

- Declaration, on behalf of Defendant, Wayne Farms, LLC, in connection with *State of Washington v. Tyson Foods, et al.*, May 8, 2024.

- Deposition testimony, on behalf of Defendant, Wayne Farms, LLC, in connection with *State of Washington v. Tyson Foods, et al.*, March 13, 2024.

- Expert Report, on behalf of Defendant, Wayne Farms, LLC, in connection with *State of Washington v. Tyson Foods, et al.*, February 1, 2024.

### Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.

- Deposition testimony, on behalf of Defendant, Amgen, Inc., in connection with *Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.* May 7, 2024.

- Expert Report, on behalf of Defendant, Amgen, Inc., in connection with *Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.* March 29, 2024.

### Cabot Microelectronics Corporation v. DuPont de Nemours, Inc., et al.

- Expert Report, on behalf of Cabot Microelectronics Corporation, in connection with *Cabot Microelectronics Corporation v. DuPont de Nemours, Inc., et al.* April 19, 2024.

- Deposition testimony, on behalf of Cabot Microelectronics Corporation, in connection with *Cabot Microelectronics Corporation v. DuPont de Nemours, Inc., et al.* June 5, 2024.

### In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation

- Declaration, on behalf of Defendants, NHK Spring Co., Ltd., and TDK Corporation in connection with *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*, January 30, 2024.

- Testimony, on behalf of Defendants, NHK Spring Co., Ltd., and TDK Corporation in connection with *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*, December 12, 2023.

- Deposition testimony, on behalf of Defendants, NHK Spring Co., Ltd., and TDK Corporation in connection with *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*, February 15-16, 2023.

- Expert Report, on behalf of Defendants, NHK Spring Co., Ltd., and TDK Corporation in connection with In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation, December 22, 2022.

**Exhibit 1**

### *Apple, Inc. v. Masimo Corporation and Sound United, LLC*

- Deposition testimony, on behalf of Apple, Inc., in connection with *Apple, Inc. v. Masimo Corporation and Sound United, LLC*, January 25, 2024.

- Expert Reply Report, on behalf of Apple, Inc., in connection with *Apple, Inc. v. Masimo Corporation and Sound United, LLC*, January 5, 2024.

- Expert Rebuttal Report, on behalf of Apple, Inc., in connection with *Apple, Inc. v. Masimo Corporation and Sound United, LLC*, December 15, 2023.

- Expert Report, on behalf of Apple, Inc., in connection with *Apple, Inc. v. Masimo Corporation and Sound United, LLC*, November 22, 2023.

### *Tremor Video, Inc. v. Alphonso, Inc., n/k/a LG Ads, LG Electronics, Inc., LG Electronics U.S.A., Inc.*

- Affidavit, on behalf of Defendants, Alphonso, Inc., and LG Electronics, Inc., in connection with *Tremor Video, Inc. v. Alphonso, Inc., n/k/a LG Ads, LG Electronics, Inc., LG Electronics U.S.A., Inc.*, September 26, 2023.

- Expert Rebuttal Report, on behalf of Defendants, Alphonso, Inc., and LG Electronics, Inc., in connection with *Tremor Video, Inc. v. Alphonso, Inc., n/k/a LG Ads, LG Electronics, Inc., LG Electronics U.S.A., Inc.*, February 24, 2023.

- Expert Report, on behalf of Defendants, Alphonso, Inc., and LG Electronics, Inc.; in connection with *Tremor Video, Inc. v. Alphonso, Inc. n/k/a LG Ads, LG Electronics, Inc., LC Electronics U.S.A., Inc.*, February 3, 2023.

### *Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc.*

- Deposition testimony, on behalf of Defendants, The National Association of Realtors, et al., in connection with Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc., July 18, 2023.

- Expert Report, on behalf of Defendants, The National Association of Realtors, et al., in connection with Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc., June 1, 2023.

- Expert Report, on behalf of Defendants, The National Association of Realtors, et al., in connection with Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc., May 31, 2022.

**Exhibit 1**

### In Re: Broiler Chicken Antitrust Litigation

- Deposition testimony, on behalf of Defendant, Wayne Farms, LLC in connection with *In Re: Broiler Chicken Antitrust Litigation,* June 28, 2023.

- Declaration and Expert Report, on behalf of Defendant, Wayne Farms, LLC in connection with *In Re: Broiler Chicken Antitrust Litigation,* February 21, 2022.

### AliveCor, Inc., v. Apple, Inc.

- Deposition testimony, on behalf of Defendant, Apple, Inc., in connection with *AliveCor, Inc., v. Apple, Inc.,* June 14, 2023.

- Expert Rebuttal Report, on behalf of Defendant, Apple, Inc., in connection with *AliveCor, Inc., v. Apple, Inc.,* May 22, 2023.

- Deposition testimony, on behalf of Defendant, Apple, Inc., in connection with *AliveCor, Inc., v. Apple, Inc.,* May 18, 2023.

- Expert Report, on behalf of Defendant, Apple, Inc., in connection with *AliveCor, Inc., v. Apple, Inc.,* March 23, 2023.

### Simon and Simon, PC d/b/a City Smiles; and VIP Dental Spas, et al., v. Align Technology, Inc., and Misty Snow, et al., v. Align Technology, Inc.

- Deposition testimony, on behalf of Defendants, Align Technology, Inc., in connection with Simon and Simon, PC d/b/a City Smiles; and VIP Dental Spas, et al., v. Align Technology, Inc., and Misty Snow, et al., v. Align Technology, Inc., June 7, 2023.

- Expert Report, on behalf of Defendants, Align Technology, Inc., in connection with Simon and Simon, PC d/b/a City Smiles; and VIP Dental Spas, et al., v. Align Technology, Inc., and Misty Snow, et al., v. Align Technology, Inc., May 5, 2023.

### David Toms, et al., v. State Farm Life Insurance Company

- Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *David Toms, et al., v. State Farm Life Insurance Company,* August 23, 2022.

- Second Declaration and Expert Report on behalf of Defendant, State Farm Life Insurance Company in connection with *David Toms, et al., v. State Farm Life Insurance Company,* August 1, 2022.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *David Toms, et al., v. State Farm Life Insurance Company,* April 15, 2022.

### Earl L. McClure, et al., v. State Farm Life Insurance Company

- Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* June 23, 2022.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* April 8, 2022.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* December 9, 2021.

**Exhibit 1**

### *Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc.*

- Testimony, on behalf of Defendants, The National Association of Realtors, et al., in the United States District Court for the Western District of Missouri, Western Division in connection with *Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc.*, April 18, 2022.

- Expert Report and Declaration, on behalf of Defendants, The National Association of Realtors, et al., in connection with Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc., November 12, 2021, and January 28, 2022.

- Deposition testimony, on behalf of Defendants, The National Association of Realtors, et al., in connection with Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC Re/Max, LLC, and Keller Williams Realty, Inc., January 17, 2022.

### *Chandra B. Singh, et al., v. State Farm Life Insurance Company*

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Chandra B. Singh, et al., v. State Farm Life Insurance Company,* March 11, 2022.

### *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company*

- Declaration, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* February 25, 2022.

- Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* December 22, 2021.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* December 3, 2021.

### *William T. Whitman, et al., v. State Farm Life Insurance Company*

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *William T. Whitman, et al., v. State Farm Life Insurance Company,* March 29, 2021, and February 15, 2022.

### *John E. Jaunich, et al., v. State Farm Life Insurance Company*

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *John E. Jaunich, et al., v. State Farm Life Insurance Company,* December 13, 2021.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *John E. Jaunich, et al., v. State Farm Life Insurance Company,* August 5, 2021.

**Exhibit 1**

### *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company*

- Supplemental Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* September 23, 2021.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* December 21, 2020.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* February 3, 2020.

### *Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC*

- Deposition testimony, on behalf of Defendants, SAP SE, SAP America, Inc., and SAP Labs, LLC in connection with *Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC,* August 9, 2021.

- Expert Report, on behalf of Defendants, SAP SE, SAP America, Inc., and SAP Labs, LLC in connection with Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC, June 2, 2021.

### *Anna Gonzalez and Ronald K Page, et al., v. State Farm Life Insurance Company*

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Anna Gonzalez and Ronald K. Page, et al., v. State Farm Life Insurance Company,* August 9, 2021.

### *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*

- Deposition testimony, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* March 25, 2021.

- Expert Reply Report, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* February 1, 2021.

- Expert Report, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* August 28, 2020.

### *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.*

- Deposition testimony, on behalf of Defendant, QVC, Inc., in connection with *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.,* March 2, 2021.

- Expert Report, on behalf of Defendant, QVC, Inc., in connection with *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.,* January 25, 2021.

**Exhibit 1**

## Publications (2015-2025)

"Checking in on PeaceHealth: Providing Some Clearer Guidance to Bundling Sellers," co-authored with David Reichenberg, Cozen O'Connor, *The Antitrust Source,* American Bar Association, Volume 19, Issue 2, October 2019.

"Sports, Student-Athletes, and Antitrust," *Ass'n: The Newsletter of the Trade, Sports, & Professional Associations Committee*, American Bar Association, Section of Antitrust Law, Summer 2018.

"Demonstrating Faulty Predictions in Class Certification Analysis," co-authored with Christine Siegwarth Meyer and Claire (Chunying) Xie, NERA Economic Consulting, American Bar Association, Section of Antitrust Law, *Antitrust Magazine*, Vol. 30, No. 2, Spring 2016.

## Presentations and Speeches

Panelist, "Antitrust and Labor Markets" presented by the *George Mason Law Review, 26th Annual Antitrust Symposium,* February 24, 2023.

Presenter, "Investigating Trends in the Foal Crop," on behalf of the Jockey Club, 70th Round Table Conference on Matters Pertaining to Racing, August 14, 2022.

Panelist, "Proving Market Power in Unilateral Conduct Cases," presented by the *ABA Section of Antitrust Law, Unilateral Conduct Committee*, June 30, 2020.

Panelist, "A View of Class Actions from Both Sides of the Atlantic," presented by *Monckton Chambers and NERA Economic Consulting Summer Webinar Series: Competition Law in the UK and EU*, June 25, 2020.

Panelist, "Honest Broker or Advocate: Effective Expert Testimony," presented by the *Antitrust Magazine and Economics Committee, Our Curious Amalgam Podcast Release,* April 29, 2020.

Panelist, "Algorithms, Textual Analysis, and Collusion," presented at New York University, School of Law, New York, New York, January 31, 2020.

Panelist, "Wage the Battle to Win the War: Expert Challenges at Class Certification," presented at McDermott, Will & Emery, Chicago, Illinois, September 24, 2019.

Panelist, "College Sports – Beyond Pay," presented by *The Trade, Sports, and Professional Associations Committee of the American Bar Association's Section of Antitrust Law,* American Bar Association Spring Meeting, Washington, DC, April 11, 2018.

Panelist, "The Nexus between Competition and Innovation," presented by *GCR Live: Women in Antitrust*, Washington, DC, November 9, 2017.

Panelist, "2015 Canadian Bar Association Roundtable: IP and Competition Law," presented by *The Economics and Law Committee of the CBA National Competition Law Section, Borden Ladner Gervais, LLP*, Toronto, ON, June 22, 2015.

April 2025

**Exhibit 2**

Highly Confidential
Outside Counsel/Experts Only

## Materials Relied Upon by Lauren J. Stiroh, Ph.D.

### Court Filings

Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, November 14, 2024

Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, June 6, 2023

Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, August 9, 2021

Indictment, *United States of America v. DaVita Inc., Kent Thiry*, Case No. 21-cr-00229-RBJ, United States District Court, District of Colorado, November 3, 2021

Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, Case No. 3:21-cr-00011-L, United States District Court for the Northern District of Texas, Dallas Division, January 5, 2021

### Expert Reports and Accompanying Backup

Expert Witness Report of Dr. Barry S. Gerhart, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, January 15, 2025

Expert Witness Report of Dr. Evan P. Starr, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, January 15, 2025

### Depositions and Accompanying Exhibits

*In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division:

Deposition of Colleen Arthur, former Senior Director of Recruiting Operations, Strategy, and Employment Branding, DaVita, May 23, 2024

Deposition of Bridget Fanning, former Chief Talent Officer, SCA, July 17, 2024

Deposition of Barry Gerhart, Ph.D., March 5, 2025

Deposition of Andrew Hayek, former Chief Executive Officer, SCA, September 18, 2024

**Exhibit 2**                                                                     Highly Confidential
                                                                         Outside Counsel/Experts Only

Deposition of Anthony Kilgore, former CEO, SCA, October 22, 2024

Deposition of Dennis Kogod, former Chief Operating Officer, DaVita, September 6, 2024

Deposition of Brian Todd Mathis, former Chief Development Officer, SCA, September 20, 2024

Deposition of Michael Rucker, former Chief Operating Officer, SCA, August 27, 2024

Deposition of John Schultz, Executive Recruiter, Spencer Stuart, November 19, 2024

Deposition of Michael Staffieri, Chief Operating Officer, DaVita, April 5, 2024

Deposition of Evan Starr, Ph.D., March 19–20, 2025

**Trial Transcript**

Transcript of Proceedings before the Honorable R. Brooke Jackson, Day 4, *United States of America v. DaVita Inc., Kent Thiry*, Case No. 21-cr-00229-RBJ, United States District Court for the District of Colorado, April 7, 2022

**Data**

Lightcast Profile Data

Starr turnover materials

**Bates Stamped Data**

2022-2023 DaVita Teammate Data

DVA_OMCEAL_001408829

DaVita Stock Options Exercise Data

DVA_OMCEAL_001408532

DVA_OMCEAL_001408535

DVA_OMCEAL_001408538

DVA_OMCEAL_001408540

DVA_OMCEAL_001408545

DVA_OMCEAL_001408549

DaVita Stock Options Grants Data

DVA_OMCEAL_001408533

DVA_OMCEAL_001408536

**Exhibit 2**

DVA_OMCEAL_001408539

DVA_OMCEAL_001408542

DVA_OMCEAL_001408543

DVA_OMCEAL_001408547

**Bates Stamped Documents**

DVA_OMCEAL_000011812-822

DVA_OMCEAL_000017255-278

DVA_OMCEAL_000041688-689

DVA_OMCEAL_000124754-755

DVA_OMCEAL_001061165-190

DVA_OMCEAL_001096182-198

DVA_OMCEAL_001153790-813

DVA_OMCEAL_001181143-165

DVA_OMCEAL_001294850-853

DVA_OMCEAL_001296753-754

DVA_OMCEAL_001297448-450

HAYEK-000012214-216

KEECH_000002092-093

KEECH_000002656-057

KEECH_000002658-059

KEECH_000002714-015

KEECH_000002910-911

KEECH_000002954-955

KEECH_000003499-500

OMC_BM_000013354-356

**SEC Filings and Other Investor Information**

DaVita Annual Reports 2005–2022

3

**Exhibit 2**                                                          Highly Confidential
                                                                                    Outside Counsel/Experts Only


DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2023

DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2016

DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2008

DaVita, "Notice of Annual Meeting of Stockholders," June 15, 2009


## Academic Literature

ABA Section of Antitrust Law, *Econometrics: Legal, Practical and Technical Issues*, 2nd Edition (American Bar Association, 2014)

ABA Section of Antitrust Law, *Proving Antitrust Damages*, 3rd Edition (American Bar Association, 2017)

Abowd, John M., Bryce E. Stephens, Lars Vilhuber, Fredrik Andersson, Kevin L. McKinney, Marc Roemer, and Simon Woodcock, "The LEHD Infrastructure Files and the Creation of the Quarterly Workforce Indicators," U.S. Census Bureau, Longitudinal Employer-Household Dynamics Program Technical Paper No. TP-2006-01 (2005), available at https://lehd.ces.census.gov/doc/technical_paper/tp-2006-01.pdf

Armantier, Olivier and Oliver Richard, "Exchanges of Cost Information in the Airline Industry," *RAND Journal of Economics* 34:3 (2003)

Bartik, Alexander, Marianne Bertrand, Feng Lin, Jesse Rothstein, and Matt Unrath, "Measuring the Labor Market at the Onset of the COVID-19 Crisis," *National Bureau of Economic Research* Working Paper 27613 (July 2020)

Besanko, David and Braeutigam, R. Ronald, *Microeconomics*, 4th Edition (Hoboken, NJ: John Wiley & Sons, Inc., 2011)

Black, Fischer and Myron Scholes, "The Pricing of Options and Corporate Liabilities," *The Journal of Political Economy* 81:3 (May-June 1973)

Cajner, Tomaz, Leland D. Crane, Ryan A. Decker, John Grigsby, Adrian Hamins-Puertolas, Erik Hurst, Christopher Kurz, and Ahu Yildirmaz, "The U.S. Labor Market during the Beginning of the Pandemic Recession," *National Bureau of Economic Research* Working Paper 27159 (May 2020)

Cullen, Zoe B., Shengwu Li, and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," *National Bureau of Economic Research* Working Paper 30570 (October 2022)

Davis, Steven J., R. Jason Faberman, and John C. Haltiwanger, "The Establishment-Level Behavior of Vacancies and Hiring," *National Bureau of Economic Research* Working Paper 16265 (August 2010)

Domash, Alex and Lawrence H. Summers, "How Tight Are U.S. Labor Markets?" *National Bureau of Economic Research* Working Paper 29739 (February 2022)

**Exhibit 2**
Highly Confidential
Outside Counsel/Experts Only

Doyle, Maura P. and Christopher M. Snyder, "Information Sharing and Competition in the Motor Vehicle Industry," *Journal of Political Economy* 107:6 (1999)

Easterbrook, Frank H., "Limits of Antitrust," *Texas Law Review* 63:1 (August 1984)

Emerson, Patrick M., *Intermediate Microeconomics*, 1st Edition (Corvallis, OR: Oregon State University, 2019)

Faberman, R. Jason, Andreas I. Mueller, and Ayşegül Şahin, "Has the Willingness to Work Fallen during the Covid Pandemic?" *Labour Economics* 79 (September 2022)

Gupta, Sumedha, Laura Montenovo, Thuy Nguyen, Felipe Lozano-Rojas, Ian Schmutte, Kosali Simon, Bruce A. Weinberg, and Coady Wing, "Effects of social distancing policy on labor market outcomes," *Contemporary Economic Policy* 41:1 (September 2022)

Hall, Robert E. and Marianna Kudlyak, "The unemployed with jobs and without jobs," *Labour Economics* 79 (August 2022)

Hyatt, Henry R. and James R. Spletzer, "The Recent Decline in Employment Dynamics" *IZA Journal of Labor Economics* 2:5 (September 2013)

Levenstein, Margaret C. and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature* 44 (March 2006)

Novshek, William and Lynda Thoman, "Information disaggregation and incentives for non-collusive information sharing," *Economics Letters* 61:3 (1998)

Patterson, Mark R., "The Market Power Requirement in Antitrust Rule of Reason Cases: A Rhetorical History," *San Diego Law Review* 37:1 (2000)

Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics*, 7th Edition (Upper Saddle River, N.J.: Pearson, 2009)

Posner, Eric, "You Deserve a Bigger Paycheck.  Here's How You Might Get It.," *New York Times Website*, September 23, 2021, available at https://www.nytimes.com/2021/09/23/opinion/antitrust-workers-employers.html, accessed April 16, 2025

Pries, Michael J. and Richard Rogerson, "Declining Worker Turnover: The Role of Short Duration Employment Spells," *National Bureau of Economic Research* Working Paper 26019 (June 2019)

Rittenberg, Libby and Timothy Tregarthen, *Principles of Microeconomics*, 1st Edition (Boston, MA: FlatWorld Knowledge, 2009)

Robinson, Joan, *The Economics of Imperfect Competition*, 2nd Edition (London: Macmillan, 1976)

Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, 3rd Edition (Washington, DC: The National Academies Press, 2011)

Stock, James H. and Mark W. Watson, *Introduction to Econometrics*, 4th Edition (New York: Pearson, 2019)

**Exhibit 2**                                                      Highly Confidential
                                                         Outside Counsel/Experts Only

Vives, Xavier, "Private information, strategic behavior, and efficiency in Cournot markets," *RAND Journal of Economics* 33:3 (2002)

Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, 7th Edition (Boston, MA: Cengage, 2020)


**Publicly Available Information**

"About," *DaVita Website*, available at https://www.davita.com/about, accessed March 28, 2025

"About Indeed," *Indeed Website*, available at https://www.indeed.com/about, accessed March 28, 2025

"About Us," *Glassdoor Website*, available at https://www.glassdoor.com/about/, accessed March 28, 2025

"About Us," *SCA Health Website*, available at https://sca.health/about-us/, accessed March 28, 2025

"Adding a Salary," *Glassdoor Website*, October 24, 2024, available at https://help.glassdoor.com/s/article/Adding-a-salary?language=en_US, accessed April 14, 2025

Bayly, Lucy, "Unemployment rate soars to 14.7 percent, highest level since the Great Depression," *NBC News Website*, May 8, 2020, available at https://www.nbcnews.com/business/economy/u-s-economy-shed-record-20-5-million-jobs-last-n1202696, accessed April 9, 2025

Brooks, Robin and Ben Harris, "The US recovery from COVID-19 in international comparison," *The Brookings Institution Website*, October 17, 2024, available at https://www.brookings.edu/articles/the-us-recovery-from-covid-19-in-international-comparison/, accessed April 14, 2025

"Caremore Health Medical Partners Pc.," *Dow Jones Factiva*, available at https://global.factiva.com/cof/default.aspx?NAPC=K, accessed April 16, 2025

"Contact Us," *USPI Website*, available at https://uspi.com/contact-us/default.aspx, accessed March 28, 2025

Curtis, Lisa, "Why the Big Quit Is Happening and Why Every Boss Should Embrace It," *Forbes Website*, June 30, 2021, available at https://www.forbes.com/sites/lisacurtis/2021/06/30/why-the-big-quit-is-happening-and-why-every-boss-should-embrace-it/, accessed April 14, 2025

"DaVita and HealthCare Partners Finalize Merger," *Davita Investors Website*, November 1, 2012, available at https://investors.davita.com/2012-11-1-DaVita-and-HealthCare-Partners-Finalize-Merger, accessed March 28, 2025

"DaVita Announces CEO Succession," *DaVita Investors Website*, April 29, 2019, available at https://investors.davita.com/2019-04-29-DaVita-Announces-CEO-Succession, accessed April 1, 2025

"DaVita Closes Gambro Healthcare Acquisition," *DaVita Investors Website*, October 5, 2005, available at https://investors.davita.com/2005-10-05-DaVita-Closes-Gambro-Healthcare-Acquisition, accessed March 28, 2025

**Exhibit 2**                                                                                      Highly Confidential
Outside Counsel/Experts Only

Dow Jones, Company Snapshots, *Factiva Website*, available at
    https://global.factiva.com/cof/default.aspx?NAPC=K

"Facts & Figures," *Fresenius Medical Care Website*, available at
    https://freseniusmedicalcare.com/en/investors/equity-story/facts-and-figures/, accessed March 28,
    2025

Flowers, Alyssa and Andrew Van Dam, "The most unusual job market in modern American history,
    explained," *The Washington Post Website*, December 29, 2021, available at
    https://www.washingtonpost.com/business/2021/12/29/job-market-2021/, accessed April 10, 2025

Fulford, Scott, "The post-pandemic economy," *Princeton University Press Website*, May 22, 2024,
    available at https://press.princeton.edu/ideas/the-post-pandemic-economy, accessed April 16, 2025

"History & Culture," *DaVita Website*, available at https://www.davita.com/about/history-and-culture,
    accessed March 28, 2025

"Home," *USPI Website*, available at https://uspi.com/home/default.aspx, accessed March 28, 2025

"INCWAGE," *IPUMS USA Website*, available at https://usa.ipums.org/usa-
    action/variables/INCWAGE/#description_section, accessed April 16, 2025

"Indeed Celebrates 20 Years of Helping People Get Jobs," *Business Wire Website*, November 19,
    2024, available at https://www.businesswire.com/news/home/20241116622469/en/Indeed-
    Celebrates-20-Years-of-Helping-People-Get-Jobs, accessed March 31, 2025

"Indeed.com Launches Job Search by Salary," *Indeed Website*, April 15, 2008, available at
    https://www.indeed.com/press/releases/indeed-launches-job-search-by-salary, accessed March 31,
    2025

"Job Openings and Labor Turnover - July 2021," *U.S. Bureau of Labor Statistics*, September 8, 2021,
    available at https://www.bls.gov/news.release/archives/jolts_09082021.pdf, accessed March 31, 2025

"Job Openings and Labor Turnover Survey : History," *U.S. Bureau of Labor Statistics*, March 29,
    2024, available at https://www.bls.gov/opub/hom/jlt/history.htm, accessed April 16, 2025

"Labor Force Participation Rate [CIVPART]," Federal Reserve Economic Data, *Federal Reserve Bank
    of St. Louis Website*, April 4, 2025, available at https://fred.stlouisfed.org/series/CIVPART, accessed
    April 16, 2025

"Lightcast Data: Basic Overview," *Lightcast Website*, available at
    https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview, accessed March 28, 2025

Mangalindan, JP, "How Glassdoor became the No. 2 jobs site in the US," *Yahoo Finance Website*,
    February 26, 2018, available at https://finance.yahoo.com/news/glassdoor-became-no-2-jobs-site-us-
    222246364.html, accessed March 31, 2025

Morse, Susan, "UnitedHealth Group shuffles executive management, names new Optum leaders,"
    *Healthcare Finance News Website*, April 24, 2017, available at
    https://www.healthcarefinancenews.com/news/unitedhealth-group-shuffles-executive-management-
    names-new-optum-leaders, accessed April 2, 2025

7

**Exhibit 2**

Highly Confidential
Outside Counsel/Experts Only

"North American Industry Classification System," *US Census Bureau Website*, available at https://www.census.gov/naics/?48967, accessed April 16, 2025

"North American Industry Classification System – Frequently Asked Questions (FAQs)," *U.S. Census Bureau Website*, available at https://www.census.gov/naics/, accessed March 29, 2025

"Optum completes acquisition of DaVita Medical Group from DaVita," *United Health Group Website*, June 19, 2019, available at https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html, accessed March 28, 2025

"Profiles Methodology," *Lightcast Website*, archived February 27, 2025, at the Wayback Machine, available at https://web.archive.org/web/20250227153835/https://kb.lightcast.io/en/articles/6957504-profiles-methodology, accessed April 8, 2025

"Salaries," *Indeed Website*, available at https://www.indeed.com/career/salaries?from=gnav-homepage, accessed March 26, 2025

"SCA Health Director Jobs," *Glassdoor Website*, March 21, 2025, available at https://www.glassdoor.com/Jobs/SCA-Health-Director-Jobs-EI_IE221678.0,10_KO11,19.htm, accessed April 10, 2025

"SCA Health Director Salaries," *Glassdoor Website*, available at https://www.glassdoor.com/Salary/SCA-Health-Director-Salaries-E221678_D_KO11,19.htm, accessed April 10, 2025

"SCA Health grows to 320+ surgical facilities (Becker's)," *Harlee Medical Website*, available at https://www.harleemedical.com/sca-health-grows-to-320-surgical-facilities-beckers/, accessed March 28, 2025

Schonfeld, Erick, "At Glassdoor, Find Out How Much People Really Make at Google, Microsoft, Yahoo, and Everywhere Else," *TechCrunch Website*, June 10, 2008, available at https://techcrunch.com/2008/06/10/at-glassdoor-find-out-how-much-people-really-make-at-google-microsoft-yahoo-and-everywhere-else/, accessed March 31, 2025

Sheiner, Louise, David Wessel, and Elijah Asdourian, "The U.S. Labor Market Post-Covid: What's Changed, and What Hasn't?," *The Brookings Institution Website*, March 2024, available at https://www.brookings.edu/articles/the-us-labor-market-post-covid-whats-changed-and-what-hasnt, accessed March 31, 2025

"Sound Inpatient Physicians, Inc.," *Dow Jones Factiva*, available at https://global.factiva.com/cof/default.aspx?NAPC=K, accessed April 16, 2025

"Surgical Care Affiliates (SCA), OptumCare to Combine," *UnitedHealth Group Website*, January 9, 2017, available at https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html, accessed March 28, 2025

"Tenet Completes Purchase of USPI from WCAS," *Tenet Health Investor Website*, April 26, 2018, available at https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx, accessed March 28, 2025

**Exhibit 2**                                                                    Highly Confidential
Outside Counsel/Experts Only

"Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," *Tenet Health Investor Website*, March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx, accessed April 2, 2025

U.S. Bureau of Labor Statistics, "Occupational Employment and Wage Statistics," *U.S. Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/tables.htm, accessed April 1, 2025

U.S. Bureau of Labor Statistics, "Occupational Employment and Wage Statistics Frequently Asked Questions," *U.S. Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/oes_ques.htm, accessed April 16, 2025

U.S. Census Bureau, "Quarterly Workforce Indicators (QWI)," *U.S. Census Bureau QWI Website*, available at https://ledextract.ces.census.gov/qwi/all, accessed April 1, 2025

U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023, available at www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf

U.S. Department of the Treasury, "The State of Labor Market Competition," March 7, 2022, available at https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf, accessed March 28, 2025

"Wage Records Program [Technical Notes]," *U.S. Bureau of Labor Statistics Website*, available at https://www.bls.gov/wrp/technical-notes.htm, accessed April 16, 2025

"Who We Are," *USPI Website*, available at https://uspi.com/about-us/who-we-are/default.aspx, accessed March 28, 2025

Highly Confidential
Outside Counsel/Experts Only

## Corrected Exhibit 3: Immediate Next Employers of DaVita Senior-Level Employees by Frequency

### 2008-2016

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees | |
| --- | --- | --- | --- |
| | | -(Count)- | -(Percent)- |
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 26 | 3.2 % |
| United States Renal Care Incorporated | Outpatient Care Centers | 17 | 2.1 |
| Surgical Care Affiliates | Outpatient Care Centers | 11 | 1.3 |
| Sound Physicians | Offices of Physicians | 9 | 1.1 |
| HCA Healthcare | General Medical and Surgical Hospitals | 7 | 0.9 |
| UnitedHealth Group | Insurance Carriers | 6 | 0.7 |
| Northstar Anesthesia, P.A. | Offices of Other Health Practitioners | 6 | 0.7 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 6 | 0.7 |
| Humana | Insurance Carriers | 6 | 0.7 |
| ScionHealth | General Medical and Surgical Hospitals | 5 | 0.6 |
| Molina Healthcare | Agencies, Brokerages, and Other Insurance Related Activities | 5 | 0.6 |
| Envision Physician Services | Offices of Physicians | 5 | 0.6 |
| Aetna | Insurance Carriers | 5 | 0.6 |
| Radiology Partners | Medical and Diagnostic Laboratories | 4 | 0.5 |
| Integramed Fertility | n/a | 4 | 0.5 |
| Other Companies (608) | Other Industries (95) | 695 | 85.1 |
| **Total** | | **817** | **100 %** |

Notes: In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify next employers for Senior-Level employees with an end date at DaVita between 2008 and 2016.

The NAICS code for Sound Physicians was identified using Factiva.

Sources: Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website* , available at https://www.census.gov/naics/?48967.

"Sound Inpatient Physicians Inc.," *Dow Jones Factiva* , Accessed April 16, 2025.

Highly Confidential
Outside Counsel/Experts Only

## Corrected Exhibit 4: Immediate Prior Employers of DaVita Senior-Level Employees by Frequency

### 2005-2007

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees -(Count)- | Senior-Level Employees -(Percent)- |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Gambro Healthcare USA | Outpatient Care Centers | 17 | 7.5 % |
| Gambro | Other Miscellaneous Manufacturing | 7 | 3.1 |
| Accenture | Computer Systems Design and Related Services | 4 | 1.8 |
| UnitedHealth Group | Insurance Carriers | 3 | 1.3 |
| United States Navy | National Security and International Affairs | 3 | 1.3 |
| United States Congress | Executive, Legislative, and Other General Government Support | 3 | 1.3 |
| Renal Care Group | Outpatient Care Centers | 3 | 1.3 |
| Nabi Biopharmaceuticals | Pharmaceutical and Medicine Manufacturing | 3 | 1.3 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 3 | 1.3 |
| HCA Healthcare | General Medical and Surgical Hospitals | 3 | 1.3 |
| Fresenius | Outpatient Care Centers | 3 | 1.3 |
| United States Air Force | National Security and International Affairs | 2 | 0.9 |
| Unisource Worldwide | Paper and Paper Product Merchant Wholesalers | 2 | 0.9 |
| US Oncology Network | Outpatient Care Centers | 2 | 0.9 |
| Target | Department Stores | 2 | 0.9 |
| Other Companies (157) | Other Industries (47) | 168 | 73.7 |
| **Total** | | **228** | **100 %** |

Notes: In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify prior employers for Senior-Level employees with a start date at DaVita between 2005 and 2007.

Sources: Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website* , available at https://www.census.gov/naics/?48967.

NERA
Page 1 of 1

Highly Confidential
Outside Counsel/Experts Only

**Corrected Exhibit 5: Immediate Next Employers of DaVita Senior-Level Employees
by Frequency**

**2005-2007**

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees -(Count)- | -(Percent)- |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 6 | 5.4 % |
| Liberty Dialysis | Outpatient Care Centers | 4 | 3.6 |
| Apria Healthcare | Commercial and Industrial Machinery and Equipment Rental and Leasing | 3 | 2.7 |
| The Little Clinic | Offices of Other Health Practitioners | 2 | 1.8 |
| Tenet Healthcare | General Medical and Surgical Hospitals | 2 | 1.8 |
| Sinai Health System | General Medical and Surgical Hospitals | 2 | 1.8 |
| Pennsylvania State University | Colleges, Universities, and Professional Schools | 2 | 1.8 |
| Ochsner Health | Offices of Physicians | 2 | 1.8 |
| Oakwood Agency | Elementary and Secondary Schools | 2 | 1.8 |
| Nationwide Laboratory Services | Architectural, Engineering, and Related Services | 2 | 1.8 |
| Millennium Pharmacy Systems | Agencies, Brokerages, and Other Insurance Related Activities | 2 | 1.8 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 2 | 1.8 |
| Hamilton Healthcare | General Medical and Surgical Hospitals | 2 | 1.8 |
| Gwa Group Limited | Clay Product and Refractory Manufacturing | 2 | 1.8 |
| Cms Health Systems, Inc. | Home Health Care Services | 2 | 1.8 |
| Other Companies (74) | Other Industries (19) | 75 | 67.0 |
| **Total** | | **112** | **100 %** |

Notes: In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify next employers for Senior-Level employees with an end date at DaVita between 2005 and 2007.

NAICS codes from companies that were not assigned one by Lightcast are identified using Factiva.

Sources: Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website*, available at https://www.census.gov/naics/?48967.

"Hamilton Health Care System Inc," *Dow Jones Factiva*, Accessed April 16, 2025.

"GWA Group Ltd.," *Dow Jones Factiva*, Accessed April 16, 2025.

"Cms Health Care Inc," *Dow Jones Factiva*, Accessed April 16, 2025.

Highly Confidential
Outside Counsel/Experts Only

## Corrected Exhibit 6: Immediate Prior Employers of DaVita Senior-Level Employees
## by Frequency

### 2020-2022

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees (Count) | (Percent) |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 7 | 1.9 % |
| Amazon | Electronic Shopping and Mail-Order Houses | 7 | 1.9 |
| Target | Department Stores | 5 | 1.4 |
| HCA Healthcare | General Medical and Surgical Hospitals | 5 | 1.4 |
| Nephrology Practice Solutions | Outpatient Care Centers | 4 | 1.1 |
| McKinsey | Management, Scientific, and Technical Consulting Services | 4 | 1.1 |
| Deloitte | Management, Scientific, and Technical Consulting Services | 4 | 1.1 |
| CVS Health | Health and Personal Care Stores | 4 | 1.1 |
| Bain & Company | Management, Scientific, and Technical Consulting Services | 4 | 1.1 |
| Mercy Health | Offices of Physicians | 3 | 0.8 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 3 | 0.8 |
| Dish | Cable and Other Subscription Programming | 3 | 0.8 |
| Cigna | Agencies, Brokerages, and Other Insurance Related Activities | 3 | 0.8 |
| University of Tennessee | Colleges, Universities, and Professional Schools | 2 | 0.5 |
| Surgical Care Affiliates | Outpatient Care Centers | 2 | 0.5 |
| Other Companies (281) | Other Industries (66) | 309 | 83.7 |
| **Total** | | **369** | **100 %** |

Notes:  In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify prior employers for Senior-Level employees with a start date at DaVita between 2020 and 2022.

Nephrology Practice Solutions is an independent subsidiary of DaVita Inc. and was thus assigned the same NAICS code as DaVita, i.e., 6214.

SCA is tied for 15th place with 29 companies that were prior employers for 2 Senior-Level DaVita hires during the period.  This exhibit has been manually re-sorted so that SCA is shown in the table.

Sources:  Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website* , available at https://www.census.gov/naics/?48967.

"Nephrology Practice Solutions Names New Chief Medical Officer," DaVita Investors Website, May 28, 2020, available at https://investors.davita.com/2020-05-28-Nephrology-Practice-Solutions-Names-New-Chief-Medical-Officer.

Highly Confidential
Outside Counsel/Experts Only

**Corrected Exhibit 7: Immediate Next Employers of DaVita Senior-Level Employees by Frequency**

**2020-2022**

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees (Count) | Senior-Level Employees (Percent) |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Optum | Insurance Carriers | 25 | 6.0 % |
| CVS Health | Health and Personal Care Stores | 8 | 1.9 |
| WelbeHealth | Home Health Care Services | 6 | 1.4 |
| Amazon | Electronic Shopping and Mail-Order Houses | 5 | 1.2 |
| Radiology Partners | Medical and Diagnostic Laboratories | 4 | 1.0 |
| ChenMed | Offices of Physicians | 4 | 1.0 |
| Us Anesthesia Partners | Office Administrative Services | 3 | 0.7 |
| UnitedHealth Group | Insurance Carriers | 3 | 0.7 |
| United States Renal Care Incorporated | Outpatient Care Centers | 3 | 0.7 |
| Satellite Healthcare Wellbound | Outpatient Care Centers | 3 | 0.7 |
| Salesforce | Software Publishers | 3 | 0.7 |
| National Veterinary Associates | Other Professional, Scientific, and Technical Services | 3 | 0.7 |
| LifeStance Health | Offices of Physicians | 3 | 0.7 |
| Cityblock Health | Offices of Physicians | 3 | 0.7 |
| Virta Health | Home Health Care Services | 2 | 0.5 |
| Other Companies (303) | Other Industries (59) | 336 | 81.2 |
| **Total** | | **414** | **100 %** |

Notes: In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify next employers for Senior-Level employees with an end date at DaVita between 2020 and 2022.

NAICS codes from companies that were not assigned one by Lightcast are identified using Factiva.

Sources: Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website*, available at https://www.census.gov/naics/?48967.

"Welbe Health Llc," *Dow Jones Factiva*, Accessed April 16, 2025.

"Satellite Healthcare Inc.," *Dow Jones Factiva*, Accessed April 16, 2025.

Highly Confidential
Outside Counsel/Experts Only



**Exhibit 8: Number of SCA Senior Level Employees**

Notes:

Source: Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with NERA corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

Highly Confidential
Outside Counsel/Experts Only

**Exhibit 9: Counts of Departures between DaVita and SCA**



Note:      Grey line indicates the end of the alleged conduct period.

Source:    Starr turnover materials ("DaVita USPI SCA Complete Data with Outliers.dta")

Highly Confidential
Outside Counsel/Experts Only

**Exhibit 10: Departures between DaVita and SCA, Percentages of Total Departures**



Note:     Grey line indicates the end of the alleged conduct period.

Source:     Starr turnover materials ("DaVita USPI SCA Complete Data with Outliers.dta")

Highly Confidential
Outside Counsel/Experts Only

## Exhibit 11: Coefficients from Dr. Starr's Figure 3 Regression
## With Alternative Base Years

**Dependent Variable: Indicator for Movements Between SCA/DaVita**

| Coefficient Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Base Year<br>2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| :--- | :---: | :---: | :---: | :---: | :---: | :---: | :---: | :---: | :---: | :---: | :---: | :---: | :---: |
| | | | | | | | (Estimates) | | | | | | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) | (n) |
| 2008 | | | | | | | | | | | | | |
| 2009 | | | | | | | | | | | | | |
| 2010 | | | | | | | | | | | | | |
| 2011 | | | | | | | | | | | | | |
| 2012 | | | | | | | | | | | | | |
| 2013 | | | | | | | | | | | | | |
| 2014 | | | | | | | | | | | | | |
| 2015 | | | | | | | | | | | | | |
| 2016 | | | | | | | | | | | | | |
| 2017 | | | | | | | | | | | | | |
| 2018 | | | | | | | | | | | | | |
| 2019 | | | | | | | | | | | | | |
| **2020** | | | | | | | | | | | | | |
| 2021 | | | | | | | | | | | | | |

Notes: Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$.

Source: Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta).

NERA
Page 1 of 1

Highly Confidential
Outside Counsel/Experts Only

**Exhibit 12: DaVita and SCA Compensation Regression Results**
**Dr. Starr's Conduct Effect by Start and End Year of Alleged Conduct**



Source:     Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta).