# **Exhibit 11**

# Lane Declaration

# Redacted

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL

CENTER EMPLOYEE ANTITRUST

LITIGATION | Docket No. 1:21-cv-00305

_____|

CONFIDENTIAL - UNDER PROTECTIVE ORDER

VIDEO DEPOSITION OF BARRY GERHART, Ph.D.

WEDNESDAY, MARCH 5, 2025

SAN FRANCISCO, CALIFORNIA

Reported by:   Marilynn Hoover, RPR

California CSR No. 8841

Barry Gerhart, Ph. D. Confidential
March 05, 2025

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the video deposition of BARRY GERHART, Ph.D., was taken before Marilynn Hoover, California CSR No. 8841; on Wednesday, March 5, 2025, at 9:09 a.m.; located at 275 Battery Street, 29th Floor, in San Francisco, California.

ON BEHALF OF PLAINTIFFS:

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

BY MS. LIN Y. CHAN, ESQ.

MR. DEAN M. HARVEY, ESQ.

MS. SARAH D. ZANDI, ESQ.

275 Battery Street, 29th Floor

San Francisco, California 94111-3339

Telephone:  415-956-1000

E-mail:  LChan@lchb.com

DHarvey@lchb.com

SZandi@lchb.com

NUSSBAUM LAW GROUP

BY MS. SUSAN R. SCHWAIGER, ESQ.

1133 Avenue of the Americas, 31st Floor

New York, New York 10036

Telephone:  917-224-7088

E-mail:  SSchwaiger@nussbaumpc.com

Barry Gerhart, Ph. D. Confidential
March 05, 2025

ON BEHALF OF UNITED SURGICAL PARTNERS HOLDINGS

INC., UNITED SURGICAL PARTNERS INTERNATIONAL INC.,

AND TENET HEALTHCARE CORPORATION:

   KING & SPALDING, LLP

   BY MS. JULIA BARRETT BATES, ESQ.

   500 West 2nd Street, Suite 1800

   Austin, Texas 78701

   Telephone:  512-457-2053

   E-mail:  JBates@kslaw.com


   KING & SPALDING, LLP

   BY MS. DIANA LIU, ESQ.

   50 California Street, Suite 3300

   San Francisco, California 94111

   Telephone:  415-318-1203

   E-mail:  DLiu@kslaw.com


   KING & SPALDING, LLP

   BY MR. CONNOR BREWER, ESQ.

   1401 Lawrence Street, Suite 1900

   Denver, Colorado 80202

   Telephone:  713-751-3254

   E-mail:  CBrewer@kslaw.com

Barry Gerhart, Ph. D. Confidential
March 05, 2025

KING & SPALDING, LLP

BY MS. JULIANNE LEE DURAN, ESQ.

1700 Pennsylvania Avenue N.W., Suite 900

Washington, D.C. 20006

Telephone:  202-626-9625

E-mail:  JDuran@kslaw.com


KING & SPALDING, LLP

BY MS. VERONICA MOYE, ESQ.

2601 Olive Street, Suite 2300

Dallas, Texas 75201

Telephone:  214-764-4418

E-mail:  VMoye@kslaw.com


ON BEHALF OF DEFENDANT DAVITA INC.:

MORGAN LEWIS & BOCKIUS, LLP

BY MR. KENNETH M. KLIEBARD, ESQ.

    MR. JASON L. CHRESTIONSON, ESQ.

110 North Wacker Drive

Chicago, Illinois 60606

Telephone:  312-324-1774

E-mail:  Kenneth.Kliebard@morganlewis.com

        Jason.Chrestionson@morganlewis.com

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MORGAN LEWIS & BOCKIUS, LLP

BY MS. MOLLY MORIARTY LANE, ESQ.

One Market Street, Spear Street Tower

San Francisco, California 94105-1596

Telephone:  415-442-1000

E-mail:  Molly.Lane@morganlewis.com


MORGAN LEWIS & BOCKIUS, LLP

BY MR. NATHAN T. SHAPIRO, ESQ.

101 Park Avenue

New York, New York 10178

Telephone:  212-309-6796

E-mail:  Nathan.Shapiro@morganlewis.com


ON BEHALF OF DEFENDANTS SURGICAL CARE

AFFILIATES LLC AND SCAI HOLDINGS LLC:

McGUIRE WOODS, LLP

BY MS. SARAH ZIELINSKI, ESQ.

     MS. AMY B. MANNING, ESQ.

77 West Wacker Drive, Suite 4100

Chicago, Illinois 60601-7567

Telephone:  312-849-8288; 312-750-8904

E-mail:  SZielinski@mcguirewoods.com

          AManning@mcguirewoods.com

Barry Gerhart, Ph. D. Confidential
March 05, 2025

McGUIRE WOODS, LLP

BY MR. ANDREW E. TALBOT, ESQ.

800 East Canal Street

Richmond, Virginia 23219

Telephone:  804-775-1622

E-mail:  ATalbot@mcguirewoods.com


ON BEHALF OF ANDREW HAYEK:

WILSON SONSINI GOODRICH & ROSATI, P.C.

BY MS. JORDANNE M. STEINER, ESQ.

1700 K Street N.W., Fifth Floor

Washington, D.C. 20006

Telephone:  212-497-7761

Email:  Jordanne.Miller@wsgr.com


ON BEHALF OF KENT THIRY:

McDERMOTT WILL & EMERY, LLP

BY MS. KATHARINE O'CONNOR, ESQ.

444 West Lake Street

Chicago, Illinois 60606

Telephone:  312-984-3627

E-mail:  KOConnor@mwe.com

Barry Gerhart, Ph. D. Confidential
March 05, 2025

ALSO PRESENT:  Daniel Stroud, videographer

Michael Cheung, exhibit technician

Sara Champion, Cornerstone Research

Melissa Lou, DaVita in-house counsel

Peter Shakow, Optum in-house counsel

Wendy Petropoulos, Cornerstone Research

Joseph Ammer, Edgeworth Economics

Barry Gerhart, Ph. D. Confidential
March 05, 2025

EXAMINATION INDEX

PAGE

Examination by Ms. Zielinski                    12

Examination by Ms. Bates                        257

Examination by Mr. Kliebard                     273

*   *   *

EXHIBIT INDEX

EXHIBIT NO.    DESCRIPTION                       PAGE

Exhibit DX78   Expert witness report of

               Dr. Barry Gerhart                 18

Exhibit DX79   Notice of errata regarding the

               expert report of Dr. Barry Gerhart   19

Exhibit DX80   Expert witness report of

               Dr. Barry Gerhart                 19

Exhibit DX81   Expert witness report of

               Dr. Barry Gerhart                 21

WEDNESDAY, MARCH 5, 2025; SAN FRANCISCO, CALIFORNIA

THE VIDEOGRAPHER:  Good morning, ladies and gentlemen.

We're on video record.  The time is 9:09 a.m.  Today's date is March 5th, 2025.

This marks the beginning of video 1, volume 1, in the deposition of Barry Gerhart, Ph.D., in the case In Re Outpatient Medical Center Employee Antitrust Litigation, appearing before the United States District Court, Northern District of Illinois, Eastern Division; case number 1:21-cv-00305.

We're located today at 275 Battery Street, San Francisco, California.

Would all counsel in the room please identify themselves for the record.

MS. ZIELINSKI:  Sarah Zielinski from McGuire Woods, for SCA.

MR. TALBOT:  Andrew Talbot from McGuire Woods, on behalf of SCA.

MS. CHAMPION:  Sarah Champion, an economist with Cornerstone Research, on behalf of defendants.

MS. MANNING:  Amy Manning, McGuire Woods, on behalf of SCA.

MR. KLIEBARD:  Good morning, counsel and Professor Gerhart.  I am Ken Kliebard.  I am with

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Morgan Lewis, representing DaVita.

MS. BATES:  Julia Bates with King & Spalding, representing USPI and Tenet.

MS. LIU:  Diana Liu from King & Spalding, representing USPI and Tenet.

MR. BREWER:  Connor Brewer from King & Spalding, representing USPI and Tenet.

MS. LOU:  Melissa Lou, in-house counsel with DaVita.

MS. LANE:  Molly Lane with Morgan Lewis, on behalf of DaVita Inc.

MR. HARVEY:  Dean Harvey of Lieff Cabraser, for the plaintiffs.

MS. ZANDI:  Sarah Zandi of Lieff Cabraser, for the plaintiffs.

MS. CHAN:  Lin Chan, Lieff Cabraser, for the plaintiffs.

THE VIDEOGRAPHER:  Would those on Zoom please identify themselves for the record.

MS. DURAN:  Julianne Duran, King & Spalding, for USPI and Tenet.

MS. MOYE:  Veronica Moyé, King & Spalding, for USPI and Tenet.

MR. SHAPIRO:  Nathan Shapiro, Morgan Lewis & Bockius, on behalf of DaVita Inc.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MR. CHRESTIONSON:  Jason Chrestionson, Morgan Lewis & Bockius, on behalf of DaVita Inc.

MS. STEINER:  Jordanne Steiner, Wilson Sonsini Goodrich & Rosati, on behalf of Andrew Hayek.

MR. AMMER:  Joseph Ammer with Edgeworth Economics.

MS. SCHWAIGER:  Susan Schwaiger from Nussbaum Law Group, for the plaintiffs.

MR. SHAKOW:  Peter Shakow, in-house counsel at Optum SCA.

MS. PETROPOULOS:  Wendy Petropoulos with Cornerstone Research.

THE VIDEOGRAPHER:  Okay.  You may swear in the witness.

THE STENOGRAPHIC REPORTER:  Good morning.

My name is Marilynn Hoover.  I am a California certified shorthand reporter and my license number is 8841.

Thank you.

                        --o0o--

            BARRY GERHART, Ph.D.,
called as a witness, being duly sworn on oath, was examined and did testify as follows:

                        --o0o--

Barry Gerhart, Ph. D. Confidential
March 05, 2025

                    EXAMINATION

BY MS. ZIELINSKI:

     Q.   Good morning, Dr. Gerhart.

     A.   Good morning.

     Q.   We met off the record.  I'm Sarah Zielinski

for the SCA defendants.

          Could you please state your full name for

the record.

     A.   Barry Gerhart.

     Q.   And this is the first time you've had your

deposition taken; is that right?

     A.   Correct.

     Q.   Have you ever before provided testimony

under oath?

     A.   No.

     Q.   But you understand that your testimony today

is under oath; correct?

     A.   Yes.

     Q.   And you understand that you must answer my

questions truthfully and honestly?

     A.   Yes.

     Q.   And is there any reason that you could not

give your complete and honest testimony today?

     A.   Not that I can think of.

     Q.   Okay.  Great.  So, before we get started,

Barry Gerhart, Ph. D. Confidential
March 05, 2025

let's cover a few ground rules that you may have also covered with your counsel.

As I'm sure you're aware, I'll be asking questions, and your role is to answer those questions.

Do you understand that?

A.   I understand.

Q.   And as the court reporter asked, we're -- we'll do our best not to talk over each other; so please let me finish my question before you start your answer.

Does that sound good?

A.   Yes.

Q.   Okay.  And, also, to get a clear record, you'll need to answer questions verbally instead of shaking your head.

Does that sound okay?

A.   Yes.

Q.   Okay.  Thanks.  If you need to take a break at any time, let me know.  One thing I ask is, if there's a question pending, we just wrap up that question and get an answer to it before we take a break.

Does that work?

A.   Yes.

Q.   Okay.  And if you do not understand any of

Barry Gerhart, Ph. D. Confidential
March 05, 2025

the questions I ask, just ask me to rephrase them.  If you respond, we'll assume that you understood the question.

Does that work?

A.   Yes.

Q.   Okay.  You were retained as an expert witness by plaintiffs' counsel in this matter; correct?

A.   Correct.

Q.   Is this the first time you've ever been hired as an expert witness in a litigation matter?

A.   I think it's the second time.

Q.   Okay.  What was the prior matter?

A.   In the animation -- animators case.

Q.   Okay.  Did you submit a report in that case?

A.   Yes.

Q.   And what -- sort of as a general matter, what sort of things were you opining about in that case?

MS. CHAN:  Objection.  Vague.

You may answer.

THE WITNESS:  My recollection is it was about the effects of a no-poach agreement.

Q.   BY MS. ZIELINSKI:  Okay.  Turning to this matter:  How much time have you spent thus far working

Barry Gerhart, Ph. D. Confidential
March 05, 2025

on this matter?

A.   How many hours?

Q.   Yes.

A.   At least 50.  A little over 50.

Q.   Okay.  Is anyone supporting you in the work you're doing on this case?

MS. CHAN:  I'm going to object and instruct you not to answer to the extent that your answer would reveal attorney expert communications or work product; but, outside of that, you can answer.

THE WITNESS:  The only people I've communicated with are part of the firm, the law firm.

Q.   BY MS. ZIELINSKI:  Okay.  So no other -- no other team members supporting you, other than the legal team?

A.   No.

Q.   Okay.  Are you familiar with Dr. Evan Starr?

A.   I know of Evan Starr, yes.

Q.   All right.  How is it that you're familiar with him?

A.   I assigned some of his research on a syllabus I use for a doctoral level course on human resources.

Q.   Okay.  Have you ever communicated with Dr. Starr related to this case?

not relied upon.

Q. BY MS. ZIELINSKI: Are you taking your counsel's instruction?

A. Yes.

Q. All right. Let's turn to page 1 of your report where it talks about your qualifications.

Do you see that?

A. Yes, I do.

Q. You say at the bottom of page 1 that your work focuses on compensation design, employee mobility, turnover, and human resources management; right?

A. Yes.

Q. In the course of your work, have you ever studied those issues for healthcare companies?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: So I've done work using data sets that cover the whole economy, that would not exclude healthcare, and, I think, as we'll probably get into later, those organizations like World at Work which -- which provide a certification called the certified compensation professional. And people from all industries go to take courses at World at Work. So I think, for what -- I'll just -- I'll stop there for now.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  So you've generally encountered data related to healthcare companies.

Have you actually studied those issues for healthcare companies?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.  Asked and answered.

THE WITNESS:  As I said, I've studied companies economy-wide, and that would have included healthcare companies.

Q.   BY MS. ZIELINSKI:  Do you consider yourself to be an economist?

A.   No.

MS. CHAN:  Objection.  Vague and ambiguous.

Sorry.  You may answer.

THE WITNESS:  No.

Q.   BY MS. ZIELINSKI:  Okay.  Your expertise does not include antitrust economics; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  I'd say that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  All right.  Let's flip to page 7 of your report -- or, I'm sorry, page 4 of your report, paragraph 7.  And I'm referring to paragraphs 7 and 8, which is on pages 4 through 8.

Paragraphs 7 and 8 list the opinions that

you've reached in this matter, correct, to date?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Those are my conclusions.

Q.   BY MS. ZIELINSKI:  Looking at paragraph 7, right after the word "conclusions," it says that your conclusions are based on your experience and research in compensation in human resources management; correct?

A.   Yes, that's what it says.

Q.   You're not offering any opinions based on any other expertise beyond what's listed there; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I'm not sure what -- what -- Do you have something specific in mind?

Q.   BY MS. ZIELINSKI:  Based on economics or antitrust experience.  You're not basing your opinions on expertise in either of those areas; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  Yeah, so I would not refer to myself as an economist.  Part of compensation is being pretty -- it involves a lot of labor economics, and I -- I have some knowledge of labor economics.

Q.   BY MS. ZIELINSKI:  Do you have any degrees

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Do you see that?

A.   I know it's there, but where exactly are we looking?

Q.   7(A).

A.   Yeah.

Q.   After the italicized "incentives to collude."

A.   Yeah.

Q.   It's that first sentence.

A.   I see it.

Q.   You're offering -- So you're offering the opinion that defendants -- Well, strike that.

You're not offering an opinion on whether defendants actually did collude; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah, I didn't see that as part of my charge, but I can speak to what incentives there would be to collude.

Q.   BY MS. ZIELINSKI:  Okay.  So it's your opinion that defendants were incentivized to collude, but not that they actually -- but you've not actually opined that they actually did collude; correct?

A.   I have not opined -- There's --

MS. CHAN:  Objection.  Vague and ambiguous.

You can answer.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS:  Yeah, there's -- there's evidence in the report that would be relevant to that.

Q.   BY MS. ZIELINSKI:  So where you're talking about -- where your report talks about collusion, you're talking about evidence that you reviewed as opposed to an opinion you're offering regarding the conduct; is that correct?

A.   Yeah.

MS. CHAN:  Objection.

THE WITNESS:  Yes.

MS. CHAN:  Vague and ambiguous.

THE WITNESS:  My focus is on what the consequences would be of collusion.

Q.   BY MS. ZIELINSKI:  And not whether they -- not whether they did it or not; correct?

A.   That's not my --

MS. CHAN:  Objection.  Vague and ambiguous.

You can answer.

THE WITNESS:  That's not my focus.

Q.   BY MS. ZIELINSKI:  And, similarly, you -- you're not offering an opinion about whether the defendants entered into an agreement to fix wages; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS:  Yeah, again, I would say my focus is on the consequences of such actions.

Q.   BY MS. ZIELINSKI:  Okay.  So you're not offering an opinion on that; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  I'm -- I'm not.

Q.   BY MS. ZIELINSKI:  Okay.  Let's flip to the table of contents of your report.

Starting with Roman numeral 5, these -- these are the headings -- I guess a preliminary question:  These are the headings of the -- that are used throughout your report; correct?

A.   Yes.

Q.   So all of these correspond to opinions or conclusions that you've reached in your report; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I would say yes.

Q.   BY MS. ZIELINSKI:  Okay.  Looking at Roman numeral 6, it says:  "Defendants' collusion would likely have suppressed employees' compensation."

Do you see that?

A.   Yes.

Q.   Are you offering an opinion that defendants'

Barry Gerhart, Ph. D. Confidential
March 05, 2025

alleged conduct actually suppressed employees'

compensation or is just -- or likely would?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  Likely.

Q.   BY MS. ZIELINSKI:  And so you're not -- And

is that true -- Let me go to a couple other opinions.

That's also true for heading 6(C),

defendants' CSI exchanges likely restricted labor

market compensation; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Sorry.  What -- What is your

question there?

Q.   BY MS. ZIELINSKI:  Do you see that?

A.   I see it, yes.

Q.   You are opining -- You are not opining that

defendants' CSI exchanges in fact restricted labor

market competition; you are opining that they likely

restricted labor market competition.  Correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Well, I am concluding they

likely restricted labor market competition.

Q.   BY MS. ZIELINSKI:  And, similarly, for the

heading for section 7 -- or, I'm sorry, not seven --

eight, it says:  "A structured compensation system

Barry Gerhart, Ph. D. Confidential
March 05, 2025

You agree with that; correct?

MS. CHAN: Objection. Vague and ambiguous. Compound. Misstates the report.

You may answer.

THE WITNESS: Yeah, actually, I'd have to think about that some more, I think.

I think I would go with, at a minimum, nearly all. I think the effect would be pretty pervasive.

Q. BY MS. ZIELINSKI: So you disagree with what you wrote here in your report?

A. No, I don't disagree.

MS. CHAN: Objection. Misstates his testimony. Argumentative. Compound. Vague and ambiguous.

Q. BY MS. ZIELINSKI: Okay. So you do agree with what you wrote in your report?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: That -- Are we talking about nearly all employees?

Q. BY MS. ZIELINSKI: No. I'm talking about the "some." I'll get to the "nearly all."

A. Oh, okay. So where are we?

Q. "Defendants" -- It's the second sentence in eight: "Defendants' no-poach agreements and CSI

exchanges suppressed the wages of some class members directly."

A.    Yes.

Q.    You agree with that?

A.    Yes.

Q.    Okay.  All right.  So the remainder of class members who you say were affected would have been affected indirectly; correct?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  Yeah, it wouldn't -- it wouldn't seem as direct.  It would be -- Given the nature of a system where -- where pay is -- of different people and titles is closely interrelated, that would be the so-called indirect effect or less direct effect.

Q.    BY MS. ZIELINSKI:  Okay.  Now let's look to the next part, where it says that the compensation of nearly all employees of the proposed class would be affected.

Do you see that?

A.    Um-hum.  Yes.

Q.    So you can see that not all class members were affected, when you say "nearly all"; correct?

MS. CHAN:  Objection.  Mischaracterizes the

report.  Vague and ambiguous.  Compound.

THE WITNESS:  Yeah, I -- I think the effect would be pervasive.  "Nearly all" is what the report says, which is maybe as good as any way to describe it.  If anything, I would -- You know, there's a -- there's -- For instance, there's an overall merit increase budget that the companies use; and if that is suppressed and that's what's applied as the overall budget in each company, that's going to have a very pervasive effect, just as an example.

Q.   BY MS. ZIELINSKI:  Yep.

"Nearly all" isn't "all."  You agree with that; correct?

A.   Well --

MS. CHAN:  Objection.  Vague and ambiguous. Misstates his testimony.

THE WITNESS:  I agree "nearly all" is not "all."

MS. ZIELINSKI:  Okay.

THE WITNESS:  I am not sure if "nearly all" is the best term, but that's what's in the report and that's what I'm happy with for now.

Q.   BY MS. ZIELINSKI:  Okay.  All right.  Let's go to paragraph 5 of your report, which is on page 3.

You provide here your understanding of the

Barry Gerhart, Ph. D. Confidential
March 05, 2025

companies' interests to restrict the labor market by using no-poach and by sharing competitively sensitive information.

So I think there's a logic here to why that would -- an explanation for why they would engage in those behaviors.

Q.   BY MS. ZIELINSKI:  So is the answer to my question no?

MS. CHAN:  Objection.  Misstates prior testimony.  Asked and answered.

THE WITNESS:  Yeah, that's the best answer I think I can give.

Q.   BY MS. ZIELINSKI:  Okay.  I asked -- This started by me asking what experience you have in determining whether businesses are incentivized to collude.

I heard you explain your theory, but I didn't hear the answer to your question on what experience you have in that area.

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah, I took my task as to why would -- what would explain companies engaging in these behaviors.

Q.   BY MS. ZIELINSKI:  Okay.  So you don't have prior experience on that?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN:  Objection.  Argumentative.
Misstates prior testimony.  Vague and ambiguous.

THE WITNESS:  Yeah, I don't have -- I don't have anything further to add.

Q.   BY MS. ZIELINSKI:  Okay.  Let's look at 7(A).  And you say that one of the reasons that you believe defendants were incentivized to collude is because defendants cared about keeping turnover lower; correct?

A.   Yes, because turnover is costly.

Q.   Don't all organizations care about keeping turnover low?

MS. CHAN:  Objection.  Calls for speculation.  Vague and ambiguous.

THE WITNESS:  I think, in general, organizations prefer lower turnover to higher turnover.

Q.   BY MS. ZIELINSKI:  So you'd agree, then, that all organizations care about keeping turnover low?

MS. CHAN:  Objection.  Misstates prior testimony.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  I would say, in general, that's true.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  Would you agree that keeping turnover low is even more important for senior-level positions?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  Yes, I would say, generally, that would be true.

Q.   BY MS. ZIELINSKI:  How do you determine whether an -- Would you agree that -- I'm sorry. Strike that.

Would you agree that not all businesses that care about keeping turnover low are engaged in collusion?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yes, I would.

Q.   BY MS. ZIELINSKI:  So what's the test for determining whether an organization cares enough about keeping turnover low such that it gives them an incentive to collude?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  Yeah, I -- I don't have a precise answer for a standard; but, again, my focus was on explaining why a company would consider engaging in these kind of behaviors.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  And did you conduct any quantitative analysis of the defendants' actual turnover rates?

A.   I didn't --

MS. CHAN:  Objection.  Vague and ambiguous.

You can answer.

THE WITNESS:  No.

Q.   BY MS. ZIELINSKI:  And you didn't analyze how those rates -- turnover rates compared to other employers; correct?

A.   That's --

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  That's correct.

Q.   BY MS. ZIELINSKI:  Okay.  Going back to 7(A) again, you say that the other reason that you conclude that defendants were incentivized to collude is because they cared about reducing their significant labor costs; correct?

A.   Yes.

Q.   Labor costs generally comprise a substantial portion of a firm's total operating costs; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  It varies by industry, depending, for instance, on how capital-intensive versus labor-intensive the work is.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  But would you agree that labor costs generally comprise a substantial portion of a firm -- of a firm's total operating costs?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  I think, generally, that's true; but there is -- there are significant differences between industries.

Q.   BY MS. ZIELINSKI:  Would you agree that all organizations care about managing labor costs?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  Yeah, I think all organizations care about controlling all kinds of costs; but if labor is your primary cost, then will likely care more.

Q.   BY MS. ZIELINSKI:  Well, what -- And you would agree that not all businesses that care about managing labor costs are engaged in collusion; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  To my knowledge, that's correct.

Q.   BY MS. ZIELINSKI:  So what's the test for determining whether an organization cares enough about

Barry Gerhart, Ph. D. Confidential
March 05, 2025

reducing labor costs such that it gives them an incentive to collude?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: I think the more costly the turnover is, the more likely it would be that they would engage in things like no-poach agreements and ensuring of competitively sensitive information.

Q. BY MS. ZIELINSKI: You would agree that not all companies with high turnover costs are engaged in collusion; correct?

MS. CHAN: Objection. Vague and ambiguous. Calls for speculation.

THE WITNESS: I -- Yeah, I would agree with that.

Q. BY MS. ZIELINSKI: Did you do any quantitative analysis of defendants' actual labor costs?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: I did see some labor cost numbers; and I know that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

Q. BY MS. ZIELINSKI: Did you analyze how defendants' labor costs compared to other employers?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: No, not specifically in this report.

Q. BY MS. ZIELINSKI: So you've not conducted any analysis to differentiate defendants from other companies who care about lower -- lowering turnover and managing labor costs; correct?

MS. CHAN: Objection. Misstates prior testimony and his report. Vague and ambiguous. Compound.

THE WITNESS: I don't think it's addressed explicitly in the report.

Q. BY MS. ZIELINSKI: Then how can you conclude that defendants here are any more likely to collude than any other company?

MS. CHAN: Objection. Vague and ambiguous. Compound.

THE WITNESS: Yeah, I think probably the -- it's based on my own knowledge of what labor costs are. And, as I mentioned before, they do vary across industry, depending on how labor capital-intensive and -- This is more of a -- This has many labor-intensive aspects; and so, in this particular -- in these particular companies, labor cost is the single largest operating cost. That's not true of all companies.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  But you agree that not all companies that have labor costs as their single largest operating cost are engaged in collusion; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  It is --

MS. CHAN:  Calls for speculation.

THE WITNESS:  It is not a deterministic relationship.  In other words, it doesn't always happen when labor costs are high.  I would agree with that.  It's just more likely.

Q.   BY MS. ZIELINSKI:  But you haven't done an analysis to conclude that defendants here are any more likely to collude than other companies where labor costs -- than other companies that have significant labor costs; correct?

MS. CHAN:  Objection.  Misstates prior testimony and the report.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  Yeah, I don't -- there's no explicit analysis; again, it would just -- it would be based on knowledge of what labor costs are in different companies and also ███████████████████

████████████████████████████████████

████████████████████████████████████

Barry Gerhart, Ph. D. Confidential
March 05, 2025

████████████████████████████████████████████████

████████████████████████

Q.   BY MS. ZIELINSKI:  Moving back to paragraph 7:  You have -- Under A, you have a little I and you say that "these incentives are particularly strong, whereas here the industry is small and tight-knit."

Do you see that?

A.   Um-hum.  Yes.

Q.   What is -- Sorry.  What industry are you referring to there?

A.   I think the focus here is on the three firms that we're talking about; and they have pretty close connections, is what that paragraph is trying to get at.

Q.   Okay.  So you are opining that the industry is limited to these three defendants?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  No.  There's other evidence in the report about going beyond the three defendants, and ██████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████  And then, of course, in the three firms, we know, for instance,

Barry Gerhart, Ph. D. Confidential
March 05, 2025

that there was movement from DaVita to SCA.

And so I think the focus is on those kind of tight-knit connections. Those are the ones most explicitly laid out in the report, and there's other connections as well.

Q. When you use the term "industry," are you using a different concept than labor market?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: Yeah, it's -- it's -- it's a bit vague there, but I think the focus was on -- I think it's on employee movement primarily and just the way that their interpersonal connections might have provided an opportunity -- maybe "incentive" isn't the best word; maybe it's an opportunity -- along with an incentive to take action to restrict movement.

Q. BY MS. ZIELINSKI: I'm not sure I understood the answer.

So are you saying that industry, the word "industry," does mean the same thing as labor market?

MS. CHAN: Objection. Misstates the testimony. Vague and ambiguous.

THE WITNESS: I think, generally, industry would probably correspond a little more closely to the product market, but --

MS. ZIELINSKI: Okay.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS: -- in this case, would also include, to use a general term, healthcare companies. So that's the product market but also talking about the labor market activity, the movement between -- of people between these companies.

Q. BY MS. ZIELINSKI: So the -- So the industry -- You mentioned the industry being healthcare companies; correct?

MS. CHAN: Objection. Vague and ambiguous. Misstates testimony.

THE WITNESS: Yeah, that's at a very general level. I mean, obviously, within an industry, there's -- there's certain parts where -- where companies compete more closely in the product market but also in the labor market.

Q. BY MS. ZIELINSKI: When you were characterizing the industry as "small and close-knit," were you characterizing the relationship between the three defendants or relationships within a broader industry?

A. I think probably some of both, but a lot of the focus here is on the three defendants.

Q. And is the broader industry healthcare companies?

MS. CHAN: Objection. Vague and ambiguous.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS:  I mean, that would be broad enough to include all three.

Q.   BY MS. ZIELINSKI:  And what's the basis for asserting that an industry comprised of healthcare companies is small or close-knit?

MS. CHAN:  Objection.  Vague and ambiguous. Misstates prior testimony.

THE WITNESS:  Yeah, I think the focus here is on -- as you said, I think, on the three defendants.

Q.   BY MS. ZIELINSKI:  Okay.  So you're not opining about the industry as a whole; you're just focused on the three defendants when you describe this?

A.   Well, I mean, some of both, I think.  As I noted, some people in their testimony did opine on a broader industry, but most of the focus of the report is on the three defendants.

Q.   And you agree that the three defendants compete in a broader industry; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  I'm sure that's true to an extent; and I was focused on the competition between them, to a large extent.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  All right.  Let's --
still focusing on seven -- back up to 7(A).

          After you talk about defendants caring about
keeping turnover low and caring about reducing their
labor costs, you say:  "This was a means to increase
defendant firms' profits and stock value and which
likely inured to the benefit of defendant C suite
executives who are paid in stock."

          Do you see that?

     A.   I do.

     Q.   Under -- So under your theory, employees of
defendants who receive stock compensation would have
benefited from the alleged conduct; correct?

          MS. CHAN:  Objection.  Vague and ambiguous.
Compound.  Misstates the report.

          THE WITNESS:  The logic -- which I don't
think is unique -- again, is you want to increase
revenues and reduce costs.  Labor cost is a big part
of cost here.  So if you reduce labor cost, it leads
to hire profits over time.  That correlates with stock
values, shareholder return.  Executives, especially as
you go up to higher levels, are paid increasingly
based on profits and stock returns.

     Q.   BY MS. ZIELINSKI:  So you agree that
defendants -- employees of defendants who receive

Barry Gerhart, Ph. D. Confidential
March 05, 2025

that people benefited, again, because they -- they may have done significantly better in the absence of the no-poach and the sharing of competitively sensitive information.  And they may have done better if they would have gotten an outside offer, which they could have either leveraged or taken, which could have had higher compensation.

So I -- I don't really -- I don't agree that -- it's not clear to me that people benefited.

Q.   BY MS. ZIELINSKI:  Well, it says right here that -- that the keeping turnover lower --

(Reporter request.)

Q.   BY MS. ZIELINSKI:  It says here that keeping turnover lower and reducing their significant labor costs, you know, then it goes on to say, inured to the benefit of defendant C-suite executives; correct?

MS. CHAN:  Objection.  Argumentative. Compound.

THE WITNESS:  They -- They do better if they can control labor costs, yes.

Q.   BY MS. ZIELINSKI:  Okay.  So you agree that people who were paid in stock did benefit from the alleged conduct?

A.   It depends --

MS. CHAN:  Objection.  Argumentative.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS:  Yeah.

MS. CHAN:  Asked and answered.  Vague and ambiguous.  Compound.

THE WITNESS:  I would -- I would say they could have benefited more.

MS. ZIELINSKI:  Okay.

THE WITNESS:  And they lost some -- they could have lost some benefit because of the restriction on the labor market.

Q.   BY MS. ZIELINSKI:  The measure of an employee's compensation at a given point in time includes salary, bonus, grants of equity; correct?

A.   For higher-level --

MS. CHAN:  Objection.  Calls for speculation.  Compound.

THE WITNESS:  For higher-level employees, um-hum.

Q.   BY MS. ZIELINSKI:  How -- How are grants of equity valued for the purposes of determining someone's compensation?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  One of the common methods is the Black-Scholes method.

Q.   BY MS. ZIELINSKI:  I guess what I mean is:

Barry Gerhart, Ph. D. Confidential
March 05, 2025

When --

A.   For options.  Sorry.  Did you ask me about grants?

Q.   Yes.

A.   Oh, grants?  Okay.  Go ahead.

Q.   Yeah.  So how are grants of equity valued as a measure of compensation?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  I mean, I think the greater challenge is valuing options.

MS. ZIELINSKI:  Okay.

THE WITNESS:  I'm not sure what you're getting at with grants.

Q.   BY MS. ZIELINSKI:  Yeah.  So what's the appropriate point in time to value that equity grant? Is it -- Is it -- So is it the full grant of the equity?  Is it after the equity is vested?  Is it after the person sells their shares?  What -- Which piece of that is considered compensation?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.  Calls for speculation.

THE WITNESS:  Well, clearly, it matters when it vests, and there may be certain requirements that have to be met for it to vest, where you actually have

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN:  You said -- Oh, I see.

Q.   BY MS. ZIELINSKI:  Our favorite page of the report, no.

The last sentence of B, which is what we -- we looked at 7(B) before -- the last sentence of that paragraph says:  "Employees accrue these benefits, however, only where higher-paying external job opportunities actually exist and are accessible to employees."

Do you see that?

A.   Yes.

Q.   And then look at paragraph 7(H)(iii) which is on page 7.

Okay.  At the very bottom of that page 7 and going to the top of the next, it says:  "However, in the absence of outside offers of higher pay, because of collusion that interferes with typical labor market competition, these upward pay adjustments would not take place."

Do you see that?  It's --

A.   Sorry.  Where?

Q.   It's at the -- It's at the very bottom of seven, like the very last line, and it starts with "however."  Page 7.

A.   Yeah.  Which line is it?

Q.    The very last one.

A.    Oh, okay.  So it's the beginning of the sentence.  Sorry.  Got it.

Q.    That's okay.

A.    Okay.  "However, in the absence."  Yeah.

Q.    "However, in the absence of outside offers of higher pay, because of collusion that interferes with labor market competition, these upward pay adjustments would not take place."

A.    I see it.

Q.    Is it your understanding that the alleged conduct by defendants eliminated higher-paying job opportunities available to class members?

MS. CHAN:  Objection.  Vague and ambiguous.  Compound.

THE WITNESS:  Higher-paying job opportunities where?

Q.    BY MS. ZIELINSKI:  At non-defendant firms, as a general matter.

A.    At non --

MS. CHAN:  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  So is your question:  Would it have been possible for employees to move to non-defendant firms?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. ZIELINSKI:  Yes.

THE WITNESS:  Yes, it would be possible.

Q.   BY MS. ZIELINSKI:  And to receive higher-paying jobs at non-defendant firms as well?

A.   Yes.

MS. CHAN:  Objection.  Calls for speculation.

THE WITNESS:  Yes.

Q.   BY MS. ZIELINSKI:  Okay.  So the conduct did not eliminate higher-paying job opportunities available to class members; correct?

MS. CHAN:  Objection.  Misstates prior testimony.  Vague and ambiguous.  Compound.  Calls for speculation.

THE WITNESS:  Yeah.  The issue, again, is that there would be fewer such job opportunities because of the restrictions put in place.

Q.   BY MS. ZIELINSKI:  And, again, you haven't quantified what -- how many fewer you believe there to be; correct?

MS. CHAN:  Sorry.  Let me just -- Okay.

THE WITNESS:  No, I haven't quantified it.

Q.   BY MS. ZIELINSKI:  And you don't even know if it in fact is the case that there were fewer opportunities; correct?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN: Objection. Misstates prior testimony. Compound. Vague and ambiguous.

THE WITNESS: I don't have -- I didn't quantify it as a -- As I said, again, if you restrict the amount of proactive recruiting that can be done; we know proactive recruiting -- again, the Federal Reserve study concludes that over 75 percent of job switchers are proactively recruited. And, again, as I said earlier, it's not necessarily that you have a lot of good outside offers rolling in; so even missing out on one outside offer that would have been a great offer is a negative outcome for the employees that miss out on those. And then, as the report says, that negative effect can cascade, will typically cascade, through -- through a system.

Q. BY MS. ZIELINSKI: But, again, you haven't shown that there were in fact fewer offers; correct?

A. I did not.

MS. CHAN: Objection. Vague and ambiguous. Misstates prior testimony.

THE WITNESS: I did not quantify it.

MS. ZIELINSKI: Can we take a break?

THE VIDEOGRAPHER: We're off the record. The time is 1:32 p.m.

(Recess.)

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE VIDEOGRAPHER:  We're back on the record. The time is 1:58 p.m.

This marks the beginning of video 4, volume 1, in the continuing deposition of Barry Gerhart, Ph.D.

Q.   BY MS. ZIELINSKI:  Dr. Gerhart, just to make sure I understand some of the opinions we talked about earlier:  You are not offering an opinion that the defendants actually did agree to fix wages; correct?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for a legal conclusion.  Calls for speculation.

THE WITNESS:  My main focus would be on the likely consequences of sharing competitively sensitive information.

Q.   BY MS. ZIELINSKI:  So that's a no; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I think it would be:  No, I'm not trying to make a legal determination.

Q.   BY MS. ZIELINSKI:  Well -- Well, and you're also just not offering an expert opinion?

A.   I'm not offering -- yeah.

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah.

Q.   BY MS. ZIELINSKI:  Yes, you're not offering -- Just to make sure the record's clear --

Barry Gerhart, Ph. D. Confidential
March 05, 2025

pay-related information was not what I would expect to see.

Q. BY MS. ZIELINSKI: And you just described recommended ways in which companies obtain information.

Where do those recommendations come from?

A. Certainly part of it is just observing the kinds of surveys companies typically rely on, which would fit what I just described as the more typical approach.

Q. So it's your -- So based on your -- Strike that.

Going back to the question I asked before: My understanding of the opinions that you are offering in this case, based on your previous testimony, was that information -- the alleged information sharing likely would lead -- likely would suppress compensation, not that it actually did.

Am I understanding that correctly?

A. Yes.

MS. ZIELINSKI: Okay.

(Reporter request.)

Q. BY MS. ZIELINSKI: Because you're not offering an opinion on whether the alleged information sharing actually lowered class pay, you're also not

offering an opinion on whether the information sharing actually had anti-competitive impact; correct?

MS. CHAN:  Objection.  Misstates prior testimony.  Vague and ambiguous.

THE WITNESS:  My opinion would be --

MS. CHAN:  Compound.  Sorry.

THE WITNESS:  Yeah.  My opinion would be that I do not see how it would help foster competition in the labor market.

Q.   BY MS. ZIELINSKI:  Okay.  But you're not offering an opinion that the information sharing actually had an anti-competitive impact; correct?

MS. CHAN:  Objection.  Misstates prior testimony.  Asked and answered.  Vague and ambiguous. Compound.

THE WITNESS:  I -- I think, as you said before, I would say it had a likely impact, but I don't have it quantified.

Q.   BY MS. ZIELINSKI:  Okay.  And just to -- just to clarify that last piece that you said:  It's true that you performed no quantitative analysis of the effects or likely effects of the alleged information exchanges; correct?

A.   Correct.

Q.   Okay.  Let's go to page 194 of your report.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

It's paragraph 149.

All right. And that -- Are you there?

A. Yes, I am.

Q. On page 194?

A. Yes.

Q. Okay. Paragraph 149 says: "As above in this section, I opine that, pursuant to common evidence" -- and I'm going to skip down after the parentheses -- "that coordination on compensation for a subset of job titles would likely cascade to the rest of the class even if defendants did not coordinate on compensation for every single job title. If they successfully coordinated to suppress the compensation of some positions, that would spread widely to other employees as well."

Do you see that?

A. I see it.

Q. Are you offering an opinion on which subset of jobs defendants coordinated compensation for?

MS. CHAN: Objection. Vague and ambiguous. Compound.

THE WITNESS: No, not a subset of the class.

Q. BY MS. ZIELINSKI: Okay. So you don't have -- you do not have an opinion on which subset of jobs that you're referring to, that's being referred to in

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS:  Yeah, that's -- I'd actually have to think through that.

So if there was one year where wages were suppressed, then, as I said, I think those effects could be lasting.

And then I'd have to think through, well, would -- if the -- if the same amount of suppression took place the following year, would it be additive or not?  And I would just have to have more time to think through that.

Q.   BY MS. ZIELINSKI:  ████████████████████████
████████████████████████████████████████████████
████████████████████████████

MS. CHAN:  Objection.  Incomplete hypothetical.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  Yeah, I would go back to:  One year could have a lasting effect on suppressing wages.  And, I mean, on the face of it, it seems logical that, if it was done in more years, it would have a bigger effect; but I'd kind of have to, as I've said, think about are those effects additive each year or is there some other relationship between the years?  So that's about -- that's what I can offer at this point.

Q.   BY MS. ZIELINSKI:  So the number of times

Barry Gerhart, Ph. D. Confidential
March 05, 2025

that information -- merit pool information was exchanged between a company would be relevant to the degree of -- the likely degree of compensation suppression; is that right?

MS. CHAN: Objection. Vague and ambiguous. Incomplete hypothetical. Calls for speculation.

THE WITNESS: Possibly. Again, I'd have -- I'd have to think through it; but, yeah, possibly.

Q. BY MS. ZIELINSKI: And if there were fewer exchanges of information, you'd expect to see less of an impact; is that right?

MS. CHAN: Objection. Incomplete hypothetical. Calls for speculation. Vague and ambiguous.

THE WITNESS: Yeah, again, I'd have to think through it; but possibly.

Q. BY MS. ZIELINSKI: Did you -- Let me say it this way: It's correct that you've not formed an opinion as to ███████████████████████████████

███████████████████████████████████████████

████████████████

A. ██████████████████████████████████████

████████████████████████████████████

████████████████

███████████████████████████████████████████

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:

Q.   BY MS. ZIELINSKI:  Okay.  And if there's not -- If you haven't written any examples or identified any examples of sharing wage information between USPI and DaVita in your report, then we can conclude you did not see such evidence; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

And I'm going to instruct the witness not to answer to the extent that this question is asking for attorney/expert privileged protected communications and work product; but if you can answer outside of that, go ahead.

THE WITNESS:  Yeah.  What I -- What I can say is:  If it's not in the report, then I didn't rely on it.  I wouldn't -- There's always the possibility of realizing that there's something out there relevant that was not included.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.    BY MS. ZIELINSKI:  Okay.  Would it impact your opinions if at trial it were proven that USPI and DaVita did not exchange compensation-related information?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for a legal conclusion.  Calls for speculation.

THE WITNESS:  So, again, my -- my charge is to gauge what the likely consequences are of exchange of information.  I don't think it's my main charge is to establish whether there was exchange that wouldn't be acceptable from a legal standpoint; so, again, I'm focusing on the consequences where there were exchanges.

Q.    BY MS. ZIELINSKI:  But would -- But if it were proven that USPI and DaVita did not exchange compensation-related information, would that change your opinion about the consequences?  Would it change your opinions about the likelihood of suppressing compensation?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for a legal conclusion.  Incomplete hypothetical.

THE WITNESS:  Yeah, I -- Well, I would be interested to see such evidence, but I'd have to see what it was exactly to know.

not fair.

And, as I think we saw, there's quite a bit of testimony that the companies placed a high value on making sure -- whatever term they used, it was basically internal equity -- they talked about pay being appropriate, pay being fair, pay being equitable.  So that's -- I would start with that element, the internal equity within a similar role.

And then you mentioned -- I'm sorry.  I think you mentioned different pay levels and -- You didn't mention different pay levels?  I thought you did.

Q.   BY MS. ZIELINSKI:  Oh, I see job levels.

A.   Okay.  So different job levels, which would be different pay levels.

And one place to start would be if you look at -- World at Work does a couple pay surveys regularly about how people -- how companies design their pay systems, and one of the parameters they -- they survey is midpoint progression, which is the percentage difference between, say, a pay grade midpoint and the pay grade midpoint at the next level, the pay grade midpoint below that, and they -- they -- they have targets that they -- that they try to adhere to on what the differentials in pay are between pay

Barry Gerhart, Ph. D. Confidential
March 05, 2025

levels.

So, to the extent they're doing that, if at one pay level somebody uses an outside offer to leverage higher pay and that affects the pay of other people in that role and pay level, then to maintain the differential between that level and the next level, the next level would have to go up.  And if you're -- if you're -- if somebody's reporting to you and their pay is getting closer to yours, you may not believe that is fair.

So that would be another aspect of internal equity, and I'll just -- I'll pause there for now.

Q.   BY MS. ZIELINSKI:  And this -- this cascading effect that you just described, those are the class members who you say were indirectly affected by the alleged conduct; is that correct?

MS. CHAN:  Objection.  Compound.  Vague and ambiguous.  Calls for a legal conclusion.

THE WITNESS:  I think that's the word I used, and, again, with caveats that "indirect" doesn't mean less important.

Q.   BY MS. ZIELINSKI:  Sure.  And you agree -- you would agree with me that the vast majority of the proposed class members are going to fall into that indirect bucket as opposed to the direct bucket?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN: Objection. Vague and ambiguous. Compound.

Q. BY MS. ZIELINSKI: I'll rephrase my question.

You would agree with me that the vast majority of the proposed class members are going to fall into that indirect bucket; correct?

MS. CHAN: Objection. Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS: Well, that's an interesting question. I guess it would depend on how many people would have gotten cold-called and gotten outside offers. And so if it was a larger percentage of people, then the direct effects would be -- would get bigger; and then the indirect effects, I guess, would also be expected to be bigger because there'd be even more pressure for wages to rise.

So, yeah, it's -- I -- it's possible that -- that most people could have the so-called indirect effects, but it's not -- I don't know that it's necessarily true.

Q. BY MS. ZIELINSKI: Okay. You haven't conducted an analysis to determine that one way or the other; correct?

MS. CHAN: Objection. Vague and ambiguous.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS:  Yeah, I have not quantified that.

Q.   BY MS. ZIELINSKI:  Let's turn to page 182.

And you conclude here that defendants' employees would experience cascading effects.

Do you see that?

A.   Where on 182?  Oh, down at the bottom?

Q.   Oh, I'm sorry.  Yep.

A.   Yep.

Q.   Okay.  And in the paragraphs that follow, you describe your methodology for arriving at this conclusion; correct?

MS. CHAN:  So I'm going to just object that there are many pages of paragraphs that follow; so this is compound, and perhaps the witness should have the opportunity to review those paragraphs.

Q.   BY MS. ZIELINSKI:  Well, actually, let me just refer you to the rest of 148.

You say, after the heading, that "defendants' documents indicate that top-down salary structures would cause across-the-board cascading effects."

Correct?

A.   That's what -- That's the way I read it, yes.

Q.   Okay.  And, in order to determine -- to reach your opinion that there would be cascading effects, you base that opinion on defendants' documents; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  The opinion is based on how compensation systems work in the vast majority of companies.  And then I think we have testimony consistent with that, especially around things like -- or, for example, around things like internal equity being a focus in these companies.

Q.   BY MS. ZIELINSKI:  You didn't conduct any empirical analysis of defendants' employees' pay to determine whether there were such cascading effects; correct?

MS. CHAN:  Vague and ambiguous.

THE WITNESS:  I think that's correct, I did not quantify it.

Q.   BY MS. ZIELINSKI:  You're -- You're aware that data reflecting defendants' employees' pay was produced in this case; correct?

MS. CHAN:  Hold on.  I'm going to instruct the witness not to answer to the extent that this question is asking about attorney/expert communications or work product upon which the expert

Barry Gerhart, Ph. D. Confidential
March 05, 2025

did not rely.

Apart from that, you can answer.

THE WITNESS:  Yeah, I didn't rely on those data.

Q.   BY MS. ZIELINSKI:  If that data was produced in this case, you could have performed an analysis to confirm whether these cascading effects that you talk about in fact existed within defendants' pay structures; correct?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  Are you asking me if I would be -- I'm not sure what you mean.  Like if I --

Q.   BY MS. ZIELINSKI:  The point -- Sorry.

A.   Go ahead.  Yeah.

Q.   The point is that I'm asking whether, based on data, the opinions -- the opinions you formed about the cascading effects within defendants' pay systems could have been confirmed?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  Those -- I mean, if the right data were available, that could be relevant, yes.

Q.   BY MS. ZIELINSKI:  Okay.  It can be verified whether or not defendants indeed had pay structures

that led to cascading effects, if you had their pay data; correct?

MS. CHAN: Objection. Misstates prior testimony. Compound. Vague and ambiguous.

THE WITNESS: So I guess I would go back to that if you don't -- if you're not able to observe what the pay structures were without the alleged agreement and sharing of information, you have some challenges in doing a study, but the quantitative data should provide some information.

Q. BY MS. ZIELINSKI: Well, isn't this opinion that you're offering irrespective of the alleged conduct?

MS. CHAN: Objection. Misstates prior testimony.

Q. BY MS. ZIELINSKI: In other words --

(Cross talk.)

MS. ZIELINSKI: I'm sorry.

THE WITNESS: Oh, I see.

Q. BY MS. ZIELINSKI: In other words, your opinion here is with respect to the rigidity of the pay structure?

You're not opining that the pay structure has changed --

A. Yeah.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.    -- as a result of the conduct; correct?

MS. CHAN:  Objection.  Misstates prior testimony.  Vague and ambiguous.  Compound.

THE WITNESS:  I think if it's -- I wouldn't call it rigid; but if there's a systematic pay structure, then I would expect cascading effects.

Q.  BY MS. ZIELINSKI:  And whether or not a compensation structure causes cascading effects can be verified by analyzing actual pay data; correct?

MS. CHAN:  Objection.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  It would -- It seems like it could be relevant.

Q.  BY MS. ZIELINSKI:  But -- But you didn't conduct that analysis; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I did not.

Q.  BY MS. ZIELINSKI:  So just so I understand what you would expect to see if a -- with a -- in a compensation structure that has cascading effects, I want to understand what you'd expect to see in -- Sorry.  Scratch that.  So let me say it a different way.

Is it your opinion that, because of defendants' compensation systems, you'd expect to see

Barry Gerhart, Ph. D. Confidential
March 05, 2025

that changes for pay in one seniority level of employees in the job hierarchy would cause changes in pay for other employees at a different seniority level in the job hierarchy?

A.    That's --

MS. CHAN:  Objection.  Vague and ambiguous. You may answer.

THE WITNESS:  That's one effect in a systematic pay system.

Q.    BY MS. ZIELINSKI:  Okay.  Is it your opinion that, because of defendants' compensation systems, you'd expect to see that a change in pay for employees in one job category would also likely cause changes in pay for employees in another job category?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I'd have to know more about the categories; but it's -- yes, that is also -- that's another effect.

Q.    BY MS. ZIELINSKI:  Okay.  How much overlap must there be between the jobs of the first employee whose pay was impacted and the job titles of other employees in order to also see an impact?

MS. CHAN:  Objection.  Compound.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  So in the case of -- So

Barry Gerhart, Ph. D. Confidential
March 05, 2025

possible that class members who negotiated their pay were able to negotiate a salary that would have offset or been uneffected by the alleged suppression of compensation; correct?

MS. CHAN:  Objection.  Misstates prior testimony.  Asked and answered.  Vague and ambiguous. Compound.

THE WITNESS:  I believe the effect would be negative for the class of not -- of not having full opportunity to get outside offers from everywhere.

Q.   BY MS. ZIELINSKI:  But you would agree with me that it's possible that there were some class members who were not harmed; correct?

MS. CHAN:  Objection.  Asked and answered. Misstates prior testimony.  Vague and ambiguous. Compound.  And calls for a legal conclusion.

THE WITNESS:  Again, I'm -- I'm focused on the class, and I just don't see any advantage.  And I see a disadvantage to all members of the class if they're restricted from getting offers that they would have otherwise received.

MS. ZIELINSKI:  Okay.

MS. CHAN:  Oh, sorry.  Sorry.  Before you ask the question, I just wanted to note that we've been going for over an hour; so, whenever you're

ready, it would be great to take a break.

MS. ZIELINSKI: Okay. I want to get through just one more topic before we take a break.

Q. BY MS. ZIELINSKI: All right. Let's turn to page 103.

So I want to talk about the features that are necessary to have a structured compensation system that would likely cause class-wide impact.

So, I guess, before we refer to the language in your report: What -- What are those features?

A. I would say that you make pay decisions in a systematic way, and a big part of that is internal equity, which, again, is one -- one component of it is that people in a similar role, similar performance, would get paid similarly.

And I think we talked about the other parts of a systematic compensation system. I mean, the key is that people's pay, even not in that same role that I was talking about, same role, same performance, pay of employees is linked in other ways such that, in a system, when one part of the system changes, it cascades to have other effects in the system.

And there's other things that I have in the report about the merit increase budget and how that typically applies the same to different employees,

Barry Gerhart, Ph. D. Confidential
March 05, 2025

different levels, different roles, and so forth, so...

And managing, auditing, looking to make sure there's

as few exceptions as possible to internal equity,

again, which is -- seems to be embraced as an

important goal in these companies, like in most

companies.

Q.   BY MS. ZIELINSKI:  Okay.  And let's look at

paragraph 93 and the second sentence.

It says:  "I also review evidence showing

that this included assigning internal value to jobs,

creating salary grades and ranges, benchmarking

internal structures to external data, implementing pay

policies, and regular updating the compensation

structure, among other practices."

Do you see that?

A.   I see it.

MS. CHAN:  And, for clarity, that's the

third sentence.

MS. ZIELINSKI:  Thank you.

Q.   BY MS. ZIELINSKI:  Are these features that

you claim are necessary to make a compensation system

structured?

MS. CHAN:  Objection.  Compound.  Misstates

the testimony.

You can answer.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS:  I think what I would say is these are sufficient but not necessary.

Q.   BY MS. ZIELINSKI:  Are any of these features necessary?

A.   I think assigning an internal value to jobs is necessary.

Q.   Okay.

A.   Part of it comes down to how formalized it is, but it doesn't need to be formalized.  So if you are -- You can have a formalized -- formalized grades and ranges, but the same purpose is served by if you're -- if, when you decide what to pay an individual, you ask for data on what the pay of other people is and that, and you ask for the 25th percentile and the 75th percentile of pay in that role.  And so it could be served in a variety of ways, but it gets you to the same place.

The benchmarking, I think, has -- has to be done in some way.  It's sort of hard to function without knowing how your pay and labor costs compare to the companies that -- that you choose to compare yourself to.

And regularly updating the compensation structure, that involves -- that could involve a number of things.  One is the merit increase budget,

Barry Gerhart, Ph. D. Confidential
March 05, 2025

which leads to changes in the level of the compensation structure.

So that's -- those are my thoughts on that, on 93.

Q.  BY MS. ZIELINSKI:  Okay.  So what -- when we talk about creating a job structure, would you agree with me that, in order to have a compensation structure, there needs to be more than just grouping into job families with job descriptions; correct?

MS. CHAN:  Objection.  Compound.  Vague and ambiguous.  Incomplete hypothetical.

THE WITNESS:  Well, you need to -- as one step, you need to group together work that's -- that requires -- that's a similar role and have a general -- a general decision about what you're going to pay that role, and then you differentiate within that based on performance contributions.

Q.  BY MS. ZIELINSKI:  And the jobs also need to be ordered in terms of worth with salary ranges; correct?

MS. CHAN:  Objection.  Compound.  Vague and ambiguous.  Incomplete hypothetical.

THE WITNESS:  Well, they need to be ordered in some way.  They can be ordered in different ways. So, I mean, a CEO gets paid more than the COO, who

Barry Gerhart, Ph. D. Confidential
March 05, 2025

STATE OF CALIFORNIA      )
                         )  SS.
COUNTY OF SAN FRANCISCO )

     I, MARILYNN HOOVER, CSR No. 8841 for the State of California, do hereby certify:

     That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

     That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced by me to typewritten form; and that the same is a true, correct, and complete transcript of the said proceedings.

     Before completion of the deposition, review of the transcript [ ] was [X] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed shall be appended hereto.

     I further certify that I am not interested in the outcome of the action.

     Witness my hand this 8th day of March 2025.


_____

Marilynn Hoover, RPR

California CSR No. 8841

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL

CENTER EMPLOYEE ANTITRUST

LITIGATION                    Docket No. 1:21-cv-00305

_____|

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

VIDEO-RECORDED REBUTTAL DEPOSITION OF

BARRY GERHART, Ph.D., VOLUME II

THURSDAY, JULY 10, 2025

SAN FRANCISCO, CALIFORNIA

Reported by:   Marilynn Hoover, RPR

California CSR No. 8841

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the video deposition of BARRY GERHART, Ph.D., was taken before Marilynn Hoover, California CSR No. 8841; on Thursday, July 10, 2025, at 9:04 a.m.; located at 275 Battery Street, 29th Floor, in San Francisco, California.

                    APPEARANCES

ON BEHALF OF PLAINTIFFS:

    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

    BY MS. SARAH D. ZANDI, ESQ.

    275 Battery Street, 29th Floor

    San Francisco, California 94111-3339

    Telephone:  415-956-1000

    E-mail:  SZandi@lchb.com


    JOSEPH SAVERI LAW FIRM, LLP

    BY MR. JOSEPH RICHARD SAVERI, ESQ.

       MR. DAVID SEIDEL, ESQ.

    601 California Street, Suite 1505

    San Francisco, California 94108

    Telephone:  415-500-6800

    E-mail:  JSaveri@saverilawfirm.com

             DSeidel@saverilawfirm.com

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

ON BEHALF OF UNITED SURGICAL PARTNERS HOLDINGS

INC., UNITED SURGICAL PARTNERS INTERNATIONAL INC.,

AND TENET HEALTHCARE CORPORATION:

    KING & SPALDING, LLP

    BY MR. CONNOR BREWER, ESQ.

    1401 Lawrence Street, Suite 1900

    Denver, Colorado 80202

    Telephone:  713-751-3254

    E-mail:  CBrewer@kslaw.com


    KING & SPALDING, LLP

    BY MS. DIANA LIU, ESQ.

       MR. MATTHEW H. DAWSON, ESQ.

    50 California Street, Suite 3300

    San Francisco, California 94111

    Telephone:  415-318-1203

    E-mail:  DLiu@kslaw.com

             MDawson@kslaw.com


    KING & SPALDING, LLP

    BY MS. VERONICA MOYE, ESQ.

    2601 Olive Street, Suite 2300

    Dallas, Texas 75201

    Telephone:  214-764-4418

    E-mail:  VMoye@kslaw.com

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

ON BEHALF OF DEFENDANT DAVITA INC.:

MORGAN LEWIS & BOCKIUS, LLP

BY MR. KENNETH M. KLIEBARD, ESQ.

MR. JASON L. CHRESTIONSON, ESQ.

110 North Wacker Drive

Chicago, Illinois 60606

Telephone: 312-324-1774

E-mail: Kenneth.Kliebard@morganlewis.com

Jason.Chrestionson@morganlewis.com


MORGAN LEWIS & BOCKIUS, LLP

BY MS. MOLLY MORIARTY LANE, ESQ.

One Market Street, Spear Street Tower

San Francisco, California 94105-1596

Telephone: 415-442-1000

E-mail: Molly.Lane@morganlewis.com


MORGAN LEWIS & BOCKIUS, LLP

BY MR. NATHAN T. SHAPIRO, ESQ.

101 Park Avenue

New York, New York 10178

Telephone: 212-309-6796

E-mail: Nathan.Shapiro@morganlewis.com

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

MORGAN LEWIS & BOCKIUS, LLP

BY MR. J. CLAYTON EVERETT JR., ESQ.

1111 Pennsylvania Avenue N.W.

Washington, D.C. 20004

Telephone:  202-739-5860

E-mail:  Clay.Everett@morganlewis.com


ON BEHALF OF DEFENDANTS SURGICAL CARE

AFFILIATES LLC AND SCAI HOLDINGS LLC:

McGUIRE WOODS, LLP

BY MS. SARAH ZIELINSKI, ESQ.

     MS. AMY B. MANNING, ESQ.

77 West Wacker Drive, Suite 4100

Chicago, Illinois 60601-7567

Telephone:  312-849-8288; 312-750-8904

E-mail:  SZielinski@mcguirewoods.com

          AManning@mcguirewoods.com


McGUIRE WOODS, LLP

BY MR. JOSHUA D. WADE, ESQ.

800 East Canal Street

Richmond, Virginia 23219

Telephone:  804-775-1622

E-mail:  JWade@mcguirewoods.com

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

ON BEHALF OF ANDREW HAYEK:

   WILSON SONSINI GOODRICH & ROSATI, P.C.

   BY MS. JORDANNE M. STEINER, ESQ.

   1700 K Street N.W., Fifth Floor

   Washington, D.C. 20006

   Telephone:  212-497-7761

   Email:  JSteiner@wsgr.com


ON BEHALF OF KENT THIRY:

   McDERMOTT WILL & EMERY, LLP

   BY MS. CHELSEA MOUNAYER, ESQ.

   444 West Lake Street

   Chicago, Illinois 60606

   Telephone:  312-984-2165

   E-mail:  KMounayer@mwe.com


ALSO PRESENT:  Daniel Stroud, videographer

               Zach Czerenda, concierge

               Michele Carter,  Cornerstone Research

               Wendy Petropoulos, Cornerstone Research

               Sebastian Macek, Cornerstone Research

               Melissa Lou, DaVita in-house counsel

               Andrew Mohraz, DaVita in-house counsel

               Peter Shakow, Optum in-house counsel

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

EXAMINATION INDEX

                                                       PAGE

Examination by Ms. Zielinski                           316

Examination by Mr. Kliebard                            524

Examination by Mr. Seidel                              534

                            *   *   *

EXHIBIT INDEX

EXHIBIT NO.     DESCRIPTION                            PAGE

Exhibit DX84    Rebuttal expert witness report

                of Dr. Barry Gerhart                   318

Exhibit DX85    Updated rebuttal expert witness

                report of Dr. Barry Gerhart            322

Exhibit DX86    The State of the Labor Market

                Competition                            346

Exhibit DX87    Article:  Inter-industry labor flows   397

Exhibit DX88    Expert report of Justin McCrary,

                Ph.D. (highly confidential, outside

                counsel/experts only)                  404

Exhibit DX89    Determinants of gender differences

                in change in pay among job-switching

                executives                             443

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

```
               EXHIBITS PREVIOUSLY MARKED

EXHIBIT NO.     DESCRIPTION                          PAGE

Exhibit PX36    E-mail string (confidential); Bates

                numbers SCA000540405 to 000540411     530

Exhibit DX81    Expert witness report of Dr. Barry

                Gerhart                               442
```

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

THURSDAY, JULY 10, 2025; SAN FRANCISCO, CALIFORNIA

THE VIDEOGRAPHER: Good morning, ladies and gentlemen. We're on video record.

The time is 9:04 a.m. Today's date is July 10th, 2025.

This marks the beginning of video 1, volume 2, in the continuing deposition of Barry Gerhart, Ph.D., in the case In Re Outpatient Medical Center, et al., appearing before the United States District Court for the Northern District of Illinois, Eastern Division; case number 1:21-cv-00305.

We're located in person today at 275 Battery Street, San Francisco, California.

Would all counsel in the room please identify themselves for the record.

MR. SEIDEL: Good morning. David Seidel with the Joseph Saveri Law Firm, on behalf of the plaintiffs.

MS. ZANDI: Sarah Zandi, Lieff Cabraser Heimann & Bernstein, on behalf of plaintiffs.

MR. SAVERI: Joseph Saveri on behalf of the plaintiffs.

MS. ZIELINSKI: Sarah Zielinski, McGuire Woods, on behalf of the SCA defendants.

MR. WADE: Joshua Wade, also of McGuire

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

Woods, for the SCA defendants.

MS. CARTER: Michele Carter, Cornerstone Research, on behalf of defendants.

MR. DAWSON: Matthew Dawson, King & Spalding, on behalf of USPI.

MS. LIU: Diana Liu, also King & Spalding, on behalf of the defendants.

MR. KLIEBARD: Good morning. Ken Kliebard, Morgan Lewis, on behalf of DaVita.

MS. LANE: Molly Lane, appearing on behalf of DaVita, from Morgan Lewis.

MS. LOU: Melissa Lou, in-house counsel for DaVita.

THE VIDEOGRAPHER: And would those joining by Zoom please identify themselves for the record.

MS. MOYE: Good morning. Veronica Moye, King & Spalding, for USPI.

MS. MANNING: Good morning. Amy Manning, McGuire Woods, for SCA.

MS. MOUNAYER: Good morning. Chelsea Mounayer, McDermott Will & Emery, for defendant Thiry.

MS. STEINER: Good morning. Jordanne Steiner, Wilson Sonsini Goodrich & Rosati, for defendant Andrew Hayek.

MR. SHAPIRO: Good morning. Nathan Shapiro,

Morgan Lewis, on behalf of DaVita.

MR. CHRESTIONSON:  Good morning.  Jason Chrestionson, Morgan Lewis, also on behalf of DaVita.

MR. MOHRAZ:  Andrew Mohraz with DaVita.

MR. BREWER:  Connor Brewer, King & Spalding, USPI.

MS. PETROPOULOS:  Wendy Petropoulos, Cornerstone Research.

THE VIDEOGRAPHER:  Go for it.

MR. SAVERI:  Is that everybody?

THE STENOGRAPHIC REPORTER:  Yes, to my knowledge, that's everyone.

MR. SAVERI:  Thank you.

THE VIDEOGRAPHER:  You may swear in the witness.

THE STENOGRAPHIC REPORTER:  Good morning.

My name is Marilynn Hoover.  I am a California certified shorthand reporter and my license number is 8841.  Thank you.

--o0o--

BARRY GERHART, Ph.D., called as a witness, being duly sworn on oath by the stenographic reporter, was examined and did testify as follows:

--o0o--

you what's been marked Exhibit 84.

And is that a true and correct copy of the report that you submitted on May 30th, 2025?

And if you need to look at the...

A.   So this is --

THE CONCIERGE:   Which tab is this?

MR. WADE:   This is tab 2.

THE WITNESS:   This is the second rebuttal submission, the third.

Q.   BY MS. ZIELINSKI:   Actually, this would -- this should be the first rebuttal submission from May 30th, 2025.   And if you want to look at the date --

A.   Oh, okay.

Q.   -- of this, you can refer to page 179?

A.   I believe it is as you described it.

Q.   Okay.   And did you personally draft that report?

A.   It's my report.   Everything in the report is there at my direction.

Q.   Okay.   And did you personally draft it, or did you have assistance drafting it?

A.   I think just what I said:   Everything in here has been at my direction.   It's my report.   I stand by it.

Q. How much time did you spend working on your report?

A. I haven't separated my time out by different tasks. I just try to keep a running total.

Q. Okay. What's your running total thus far for this matter?

A. I don't know what it is exactly. I know for sure it's well over a hundred hours, but I'm not sure beyond that.

Q. Okay. So, since the last time you were deposed -- or during your last deposition, you've said that you had spent 50 hours working on this matter, as of that point in time.

A. Yeah.

Q. Do you recall that?

A. That sounds about right.

Q. Okay. And as of right now, you've spent at least an additional 50 hours working on this matter; is that correct?

A. Yes.

Q. Okay. Can you -- And are you -- are you able to be any more specific than an additional 50 hours?

A. No. Like I said, I just try to of course track my time.

Q.    Okay.

A.    Yeah.

Q.    Did anyone assist you in drafting that report, defendants' Exhibit 84?

A.    It's my report and everything in here is at my direction.

Q.    Did you have a team of people reporting to you, to assist you with your report?

A.    A team of people reporting to me?  No.

Q.    Okay.  Other than attorneys involved in this case, you didn't have any assistance with the report; correct?

A.    I didn't work with anybody but counsel.

Q.    Okay.  Got it.

A.    Well, there was some data that I looked at; but I asked counsel how I could get the data, and they connected me to -- I think it's Econ One.  That's all I can think of.

Q.    Okay.  And who -- what is Econ One?

A.    I don't honestly know.  I just -- I -- I guess they do some work to provide data.  They're good with spreadsheets.  So I needed a spreadsheet with some data, to do some simple arithmetic.

Q.    And what data -- what data was compiled by Econ One?

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.   So I don't -- There's -- There's a figure with plotting; I think it's mean salary over time, by company and by director.  And so they gave me the mean salaries.

Q.   Okay.

A.   They also gave me -- I was trying to look at one of the charts from one of the defense experts and probably, I think, Saravia.  And I couldn't quite tell what the numbers were from the chart.  So they also got the numbers underlying her chart, that they provided to me.

Q.   And was Econ One retained by you or by your counsel?

MR. SEIDEL:  I'm going to caution the witness:  You can answer the question to the extent you can without divulging any communications with us or with -- or with them.

THE WITNESS:  I didn't know about them.  I just asked how I could get the data I just described, and they connected me to Econ One.

MS. ZIELINSKI:  Okay.  All right.  Can I have defendants' Exhibit 85.

(Exhibit DX85 marked.)

Q.   BY MS. ZIELINSKI:  All right.  I am handing you what has been marked defendants' Exhibit 85, and

my question is:  Is that a true and correct copy of the rebuttal report that you submitted on June 30th, 2025?

THE CONCIERGE:  Is that tab 3.

MR. WADE:  Yes, this is tab 3.

THE WITNESS:  Yes, it looks like it is.

Q.   BY MS. ZIELINSKI:  Okay.  And did you personally draft -- did you personally draft this report?

A.   It's my report.  Everything in it is at my direction.

Q.   How much time did you personally spend working on this report?

A.   I don't know.

Q.   Okay.  Fair to say that the time that you spent working on this report is part of the additional 50 hours that you testified to before?

A.   Well, actually, I don't think I said 50 hours.  I just said my total time so far is over a hundred.

I'm sorry.  What was the question again?

Q.   The -- Right.  And, but you also testified that, as of the last deposition, you had spent 50 hours.

A.   Um-hum.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

Q.   Correct?

MR. SEIDEL:  Objection.  Mischaracterizes.

THE WITNESS:  Yes.  Last time, I think that's right.  I think that I estimated I'd spent at least 50, and now I'm pretty sure I've spent at least -- I've spent at least a hundred.  I don't know beyond that.

Q.   BY MS. ZIELINSKI:  Okay.  And the time that you spent working on defendants' Exhibit 85, your June 30th, 2025, rebuttal report, is included in that estimate of over a hundred hours; correct?

A.   Yes.

Q.   Same questions as before:  Did anyone -- Setting aside counsel, did anyone assist you in drafting this report?

A.   No.

Q.   Okay.  And did you -- You reviewed and approved this report before it was submitted?

A.   It's my report.

Q.   That's a yes?

A.   Yes.

Q.   Okay.  And are the three reports submitted a complete statement of your opinions in this case?

A.   Yes.  That's my intent, yes.

Q.   Okay.  As you sit here right now, there

isn't any opinion that you intend to offer that's not included in one of these reports; correct?

A.   I believe that's correct; but, as I read and think about things, I obviously come up with different ways of looking at something, so -- but my intent was to be as complete in the report as possible.

Q.   Okay.  And, as you sit here today, there are no changes that you'd like to make to any of your reports or appendices; correct?

A.   Nothing substantive.  I may have come across a few small word errors or something like that --

Q.   Okay.

A.   -- but I don't think -- nothing substantive, that I could think of.

Q.   Okay.  Any specific changes that come to mind?

A.   Not right now, no.

Q.   Okay.  Let's turn to paragraph 1 of the June 30th rebuttal report, defendants' Exhibit 60 -- I'm sorry -- 85.

A.   Paragraph 1.

Q.   Yes.  In that first paragraph, it's the last sentence -- or, I'm sorry, it's the second to last sentence -- you say -- you characterized the June 30th report as an update to your prior rebuttal

report.

Do you see that?

A.    Yes, I see it.

Q.    What do you mean by "an update"?

A.    I think just adding responses to the other two defense experts.

Q.    Okay.  Neither of the two reports we just entered into evidence have an updated résumé for you.

Is it fair to say that your résumé remains the same as what you submitted in your January 2025 report?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I don't -- I don't think there have been any substantive changes.

Q.    BY MS. ZIELINSKI:  Okay.  If there's no --
If there's no updated résumé in your May 30th and June 30th reports, then should take it that your January 2025 résumé that you submitted is your most up-to-date résumé; correct?

A.    Yeah, I think so.  I might have another publication or two.  Maybe one.  Can't really think of much else that would have changed.

MS. ZIELINSKI:  Okay.

MR. KLIEBARD:  Sorry.  I'm getting a couple of e-mails from people on Zoom that they can't hear

you.  I don't know if you can slide your -- maybe your microphone up.

THE WITNESS:  Yep.

THE VIDEOGRAPHER:  That's not -- They're not connected.

MR. KLIEBARD:  Oh, it's a different microphone?

THE VIDEOGRAPHER:  Yes.  It's probably the system here.

MS. ZANDI:  Maybe if you'd just speak up a little bit.

THE WITNESS:  Yep.

MS. ZIELINSKI:  Okay.

THE WITNESS:  Please feel free to remind me.

MR. KLIEBARD:  Thank you.

Q.   BY MS. ZIELINSKI:  Have you had your deposition taken -- Other than the last deposition, have you had your deposition taken any other times?

A.   No.

Q.   Okay.  And the last time -- in your last deposition, you stated that you provided an expert report in the animators case.

Besides that case and this case, have you been hired as an expert witness in any other matters?

A.   Those are the only reports that I've ever

provided.

Q.   Okay.  Are there other matters where you've been retained but not provided reports?

A.   Yes, but it never got much past a preliminary stage.  Yeah.

Q.   And was that -- were those retentions since the last deposition or prior to that?

A.   Prior.

Q.   Okay.  During your last deposition, we discussed the expertise you were relying on to form your opinions in this case.

Do you recall that?

A.   No.

MR. SEIDEL:  Hold on a second.  Hold on a second.

THE WITNESS:  Uh-huh.  Yeah.

MR. SEIDEL:  Objection to form.  Go ahead.

THE WITNESS:  I'm not sure what you mean.

MS. ZIELINSKI:  Okay.

THE WITNESS:  And I don't recall the conversation exactly.

MS. ZIELINSKI:  Sure.

THE WITNESS:  Yeah.

Q.   BY MS. ZIELINSKI:  In your initial report in this case, you indicated that the expertise you were

relying on to form your opinions in this case was your expertise in compensation and human resources management.

Do you recall that?

A.   That sounds right.

Q.   Okay.

A.   Yeah.

Q.   And the question is:  You're not relying on any additional expertise, beyond compensation in human resources management, to form the opinions in either of those rebuttal reports; correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  That's how I would describe my main areas of expertise.

Q.   BY MS. ZIELINSKI:  Okay.  There's no other expertise, that we didn't talk about in your prior deposition, that you're relying on for the opinions in these supplemental reports; correct?

A.   Yeah, I think that's probably correct.  It's just a little hard for me to answer -- because I have some knowledge of some other areas; but, again, my primary expertise would be in the areas you described.

Q.   Okay.  And what I'm asking about is the expertise that you are relying on to form your opinions in this case.

And the question is whether you are relying on any expertise beyond the expertise in compensation and human resources management that we discussed at your last deposition.

MR. SEIDEL:  Objection to form.

THE WITNESS:  Again, I would -- I would say those are my primary areas of expertise.

Q.   BY MS. ZIELINSKI:  Okay.  And you're not intending to offer any legal opinions in any of your reports; correct?

A.   That's correct.

Q.   Okay.  When you were deposed on March 5th, you indicated that you had reviewed the report that Dr. Starr submitted in January of this year; is that correct?

A.   That's correct.

Q.   Okay.  Did you rely on any of Dr. Starr's opinions from his January report when forming the opinions in either of your rebuttal reports?

A.    I don't remember explicitly using anything from his report.  I know we -- there's -- I talked about a figure from his report where he looks at -- I think it's moves during different points in time between defendants, and that's mostly because the defendant experts brought that up a lot.  So that, I

guess, we relied on.

Is that a sufficient answer?  I mean, that's an example of something that was relied on, I guess.

Q.   Can you think of anything else from Dr. Starr's report that you relied on?

A.   Not -- Not at the moment, I can't.

Q.   Have you reviewed -- Or are you aware that Dr. Starr also submitted rebuttal reports in this case?

A.   I think I'm aware.  If I'm not aware, I would assume he would need to, yeah.

Q.   Okay.  Have you reviewed either of his rebuttal reports?

A.   I have not.

Q.   Did any of Dr. Starr's opinions in his January report cause you to change any of your opinions?

A.   As far as I can remember, no.

Q.   Did reviewing his reports cause you to add to any of your opinions?

MR. SEIDEL:  Objection to form, and mischaracterizes.

THE WITNESS:  As far as I -- I mean, I don't think so; but, anytime I read something, it's possible I find something interesting and go -- like if there

report; correct?

MR. SEIDEL:  Hold on a second.

THE WITNESS:  Yeah.  Yeah.  Yeah.

MR. SEIDEL:  Objection to the form.

THE WITNESS:  Yeah, I believe that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  Meaning that statements made throughout your report, supporting these opinions, are still -- are not intended to augment the opinions beyond what likely happened; correct?

A.   I think that's correct.

Q.   Previously, you testified that you were not offering an opinion on whether defendants actually did collude.

Do you remember that?

MR. SEIDEL:  Objection to form.

THE WITNESS:  That sounds right.

Q.   BY MS. ZIELINSKI:  Okay.  And, likewise, you still are not offering an opinion that defendants actually did collude; correct?

A.   I think that's right.  Obviously, there's evidence in the report that would be relevant; but, yeah, I'm not -- that's not my -- I don't think it's my assignment to offer an opinion on that.  I think my

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

assignment is to say what the likely consequences would be.

Q.   Okay.  And so if -- throughout your report, if you're referencing the defendants' agreements, it's your intention to describe your view of evidence as opposed to offering an opinion that defendants in fact entered into an agreement; is that correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  That sounds correct.

Q.   BY MS. ZIELINSKI:  Okay.  And you also testified in your prior deposition that you were not offering an opinion that defendants entered into an agreement, or agreements, to fix wages.

Do you recall that?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I -- I think that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  And that's also true with your supplemental reports:  You are also not offering an opinion that the defendants agreed to fix wages; correct?

A.   I think that's correct.

Q.   Okay.  So, again, in your report, if you are referring to defendants having an alleged wage-fixing agreement, you are describing your view of evidence as opposed to offering an opinion that the defendants

entered into a wage-fixing agreement; correct?

A.    Correct.

MR. SEIDEL:  Object to --

THE WITNESS:  Oh.

MR. SEIDEL:  Objection to form.

No worries.  Go ahead.

THE WITNESS:  Correct.

Q.    BY MS. ZIELINSKI:  You are not offering an opinion that defendants engaged in an overarching conspiracy among all three defendants; correct?

A.    I'm offering no opinion on that.

Q.    Okay.  And you're also not offering any opinion that evidence is consistent with defendants engaging in an overarching conspiracy; correct?

A.    I think that's correct.

Q.    Okay.  You understand that plaintiffs here have alleged that there was an overarching conspiracy among all three defendants?

MR. SEIDEL:  Objection to form.

THE WITNESS:  Yes.

Q.    BY MS. ZIELINSKI:  Okay.  But it's your understanding that whether defendants' conduct constitutes an overarching conspiracy is a question for the jury to answer at trial; right?

MR. SEIDEL:  Objection.  Calls for a legal

conclusion.

THE WITNESS:  Well, as far as I understand, yes.

Q.  BY MS. ZIELINSKI:  Okay.  And since it's a question for the jury to answer at trial, it's not your role as an expert witness to answer that question on their behalf; correct?

MR. SEIDEL:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  I -- I think that's correct.

Q.  BY MS. ZIELINSKI:  Okay.  Let's turn to page 92 of that report.

And here, heading 6 above paragraph 234, you offer the opinion that defendants have market power; correct?

A.  Yes.

Q.  And you did not offer that opinion in your initial report; correct?

A.  I think that's probably correct.

Q.  So that's a new opinion that you're offering in rebuttal; correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  It's -- It's a new term, yes; and, beyond that, I'm not sure how I would describe it.  But, yeah, I don't think we -- I don't think the

term "market power" was in the first one.

Q.   BY MS. ZIELINSKI:  Do you agree that defendants could not have suppressed the compensation of proposed class members without market power?

A.   I'd have to think about that, but -- I think market power is pretty fundamental, but I'd have to think through that.

Q.   Okay.  So you don't have an opinion one way or the other as to whether defendants could have suppressed compensation of proposed class members without market power?

A.   So market power, one aspect of it is employees don't respond to changes in wages, for example, with turnover, as strongly.  So I think, probably, yes -- Oh, sorry.  I actually forgot your question.

But given if employees don't respond to changes in wages as strongly as might have been expected in the past, then that would generally give employers more leeway in where they set their wage.

Q.   Okay.  Let me ask my question again.

Do you agree that defendants could not have suppressed the compensation of proposed class members without market power?

A.   I think that's probably correct.

Q.   Okay.  What analysis did you conduct that measures the market power of defendants?

A.   I'm not -- Do you mean -- Well, what -- what do you mean by "analysis"?

Q.   Well, let me -- I guess we'll start with an empirical analysis.

You didn't conduct any empirical analysis showing that defendants had market power; correct?

A.   No.  I don't think I did anything that would speak to that quantitatively, yes.

Q.   Okay.  You did not, for example, conduct a hypothetical monopsonist test?

A.   No, I don't believe I did.

Q.   Okay.  You did not define a relevant labor market or markets?

A.   No, I did not.

Q.   Okay.  And you didn't calculate defendants' market shares; correct?

A.   Which market share do you refer to?

Q.   In the market where you claim they have market power.

MR. SEIDEL:  Objection to form.

THE WITNESS:  Yeah, I guess I'll say I didn't.  There's probably some things I did that are relevant, but I think -- I didn't calculate some

measure of market power explicitly.  I think that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  All right.

So, aside from empirical testing to establish market power, did you conduct any other analysis to measure the defendants' market power?

A.   I don't think directly, no.

Q.   Okay.  You claim that you did not need to define a relevant market to demonstrate market power; correct?

A.   I don't know if I explicitly said that or not, but I -- so I'm not actually sure.

Q.   Okay.  But, regardless, you've not specified what market the -- the market in which the defendants -- the market or markets in which the defendants supposedly had market power; correct?

A.   I don't think there's any explicit definition.  Correct.

Q.   Okay.  And you've not analyzed whether defendants had market power in each of the labor markets in which proposed class members participated; correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I think that's correct.  Yeah.

Q.   BY MS. ZIELINSKI:  Do you have an

understanding of the purpose of defining a relevant market in antitrust cases?

A.    I do not have much knowledge at all of antitrust.

Q.    Okay.  Do you understand that a relevant market is defined by identifying alternatives?

A.    Again, I don't have any expertise in antitrust.

Q.    Okay.  If you don't have expertise in antitrust, how is it that you are able to offer the opinion that defendants have market power from an antitrust perspective?

MR. SEIDEL:  Objection to form.

Objection to the extent it calls for a legal conclusion.

THE WITNESS:  Yeah.  So when I use the term "market power," it's more on the labor side; and that relates to work I've done, over many years, on human resources and compensation, and studying how much variation there is in wages across employers and that sort of thing.

So when I said before that I didn't use the term "market power" before, I feel like I've studied related issues over time but I just -- that wasn't a term that I -- that I used.  There wasn't much reason

for me to use it; but it is helpful to me, now that I'm using it, to have an understanding of how wages vary across employers.

Q.   BY MS. ZIELINSKI:  So, throughout your report, when you use the term "market power," you are not using that term in the sense of antitrust economics but in the sense of labor markets; correct?

MR. SEIDEL:  Object -- I'm sorry.

Objection to form.  Vague.

And object to the extent it calls for a legal conclusion.

THE WITNESS:  Yes.  And I believe I defined it in the report, that -- basically, in the context of employment, defining "market power" as -- I think manning does this -- in terms of the elasticity; so, in other words, how much does something like turnover respond to an increase or decrease in wages.  And, again, if the elasticity isn't as strong as under a standard neoclassical model, then kind of standard labor economics textbooks define that as market power.

Q.   BY MS. ZIELINSKI:  So setting aside antitrust economics, when you assess labor markets, one of the things that is considered is alternative employment opportunities; correct?

MR. SEIDEL:  Objection to form.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

on the five-digit, was -- made sense for some purposes.

Q.    Would you still -- So hold on.

So even if it were determined that defendants had less than 1 percent share of employment in the relevant market, would you still offer the opinion that they have market power?

MR. SEIDEL:  Objection to form.

Objection to the extent it calls for a legal conclusion.  Vague.

THE WITNESS:  So, again, the definition of "market power" I'm using is kind of, I think, standard in the labor econ literature; and that is, changes in wages don't lead to as much of a response in employee turnover; and, given that, that gives you some latitude on how high or low to set your wage as an employer.

Q.    BY MS. ZIELINSKI:  So I don't know if you are agreeing, that if you're answering -- whether you're answering yes or no to my question, so I want to pose it again.

Even if it were determined that defendants had less than 1 percent share of employment in the relevant market, would you still offer the opinion that they have market power?

MR. SEIDEL:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  So, yes.

MS. ZIELINSKI:  This is a good time to take a break.

MR. SEIDEL:  Sounds great.

MS. ZIELINSKI:  Okay.  We'll go off the record.

THE VIDEOGRAPHER:  We're off the record. The time is 10:14 a.m.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:32 a.m.

This marks the beginning of video 2, volume 2, in the continuing deposition of Barry Gerhart, Ph.D.

Q.   BY MS. ZIELINSKI:  Dr. Gerhart, I'm going to start by asking you a question to clarify some testimony you gave previously.

So, before the break, earlier today, I asked you:  "Aside from empirical testing to establish market power, did you conduct any other analysis to measure the defendants' market power?"

And you answered:  "I don't think, directly, no."

Do you recall that?

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.    Yes.

Q.    Okay.  And my question is:  Was there any analysis, whether direct or indirect, done to measure the defendants' market power?

A.    Yeah, I guess the answer is probably no.  I was just, I guess, not wanting -- I was just trying to think through what I did and how direct or indirect, if either.

So I think the answer is that a lot of my market power discussion is based on the current literature in mostly labor economics about what market power is and how much there is in the -- in the U.S.

Q.    Okay.  So, setting aside that literature, you did not conduct any analysis to measure the defendants' market power; correct?

A.    I think that's -- that's correct.  Obviously, some of the -- Not some.  The allegations about, for instance, no-poach would be relevant to market power, just like noncompetes would be, but...

Q.    But you did not conduct any analysis to measure the defendants' market power; correct?

A.    No, I don't think so.  Yeah, I think that's right.

Q.    Okay.  All right.  Let's look at paragraph 235 of your report, which is at page 94.

And in that paragraph, you include a quote from David Card, that "many or even most firms have some wage-setting power."

Do you see that?

A.   I see it.

Q.   And is it your understanding that Professor Card is saying that almost every employer has some degree of wage-setting power over their employees?

A.   That's the way I read it.

Q.   And that's because of labor market frictions; is that correct?

A.   Yeah, labor market friction is a major factor in market power.

Q.   And labor market frictions are things like imperfect information and job search costs, things like that; correct?

A.   And two-way matching, which one of the defense experts, one or more, spent some time on. But, yeah, I think that's very relevant.

Q.   Okay.  And those frictions exist in almost every labor market; is that right?

A.   That sounds right.  Yeah, I think that's probably right.

Q.   Okay.  Well, is it right or...

A.   I -- I --

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

Q.    BY MS. ZIELINSKI:  Okay.  Well, let's focus on the "well paid" portion.

A.    Okay.

Q.    You can't assume that non-defendant employment options are less well paid than opportunities with the defendants; correct?

A.    Well, it would depend on a number of things. If in fact defendants were able to suppress wages, then, you know, that's one issue.  But I guess, absent that, would the pay be higher at other defendant companies than what they could get elsewhere?  I think it would be higher if they're a better match and are more productive at the other defendant companies, again, within that five-digit industry.

And, again, presumably, the people -- the reason people are more likely to move within their five-digit industry is they get better jobs for them. And at least some of that would logically be that the pay is better in those jobs; that's why they move to them.

So, yeah, I mean, "match" -- match is about moving to where you're most productive; and where you're more productive, on average, your pay will be higher than if you took a job where you're -- where you're less productive.  So I think it probably does

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

make sense that moves within that five-digit industry,

in general -- not always; in general -- would be

associated with higher pay.

Q.   You didn't do any analysis to show that

opportunities at defendants would have been

higher-paying for class members than opportunities at

non-defendant firms; correct?

A.   No, I don't think I did.

Q.   Okay.  And you didn't do any analysis to

show that opportunities at defendants would have been

more attractive for all class members than

opportunities at non-defendant firms; correct?

A.   Did you say "all"?

Q.   Yes.

A.   No, I did not.

Q.   Does it change your answer if I didn't say

"all"?

A.   Well --

MR. SEIDEL:  Object -- Hold on.

THE WITNESS:  Oh, sorry.

MR. SEIDEL:  That's okay.  No worries.

Objection to form.

Go ahead.

THE WITNESS:  Yeah, it's just -- I mean, it

would -- I'd have to think about it a bit more, yeah.

Q.   BY MS. ZIELINSKI:  Okay.  And you didn't do any analysis to show that opportunities at defendants would have been more attractive for class members than opportunities at non-defendant firms; correct?

A.   I didn't do a quant -- No, I didn't quantify that.

Q.   Okay.  All right.  Let's turn to a page -- oh, wait; let's see -- paragraph 222 on page 114.

Wait.  No.  I think it's 276.  I think it's 276, sorry, page 114.

MR. SEIDEL:  Paragraph 276?

MS. ZIELINSKI:  Yeah.

THE WITNESS:  Okay.  Well, 276 starts on 113?

MS. ZIELINSKI:  Yep.

THE WITNESS:  Okay.

MS. ZIELINSKI:  And then we'll look to --

THE WITNESS:  Yeah.

MS. ZIELINSKI:  -- the top of 114.

THE WITNESS:  Yes.

Q.   BY MS. ZIELINSKI:  Okay.  All right.

At the top line there, the first full sentence, you say:  "We have seen that employer changes within five-digit industries are much, much more likely than moves outside of a five-digit

exchanges, there wasn't any end date that we gave, so...

Q. BY MS. ZIELINSKI: Okay. But what -- what I'm getting at here is that the fact that departures were stable during the class period can't tell you that defendants' alleged conduct was suppressing turnover; correct?

A. Well, I think, if turnover was going up generally, that the -- the JOLTS is not a perfect comparison, but it's the best comparison we could get, and I think one or -- I think at least one of the experts used JOLTS, but perhaps my memory is not correct. If turnover was going up more broadly and it didn't go up at the defendants, then that would suggest market power; that there's some -- some reason that it's not going up. So I -- that's how I would read it.

Q. Okay. But, again, you did not conduct an analysis of the defendants' turnover as compared to during the conduct versus before and after the conduct; correct?

A. I think that's right.

Q. Okay.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.    Yeah.

Q.    Let's go to paragraph 48, which is on page 20.

Okay.  I'm looking about three lines down in paragraph 48.  It says:  "Based on my review of the evidence."

Do you see that?

A.    I see it.

Q.    Okay.  It says:  "Based on my review of the evidence which Dr. Johnson neglects to assess, the agreements terms were not narrowly invoked; and, in the early years, the evidence indicates that SCA and DaVita did not limit their restrictions to employees at the VP level and above."

Do you see that?

A.    I see it.

Q.    So here you are indicating -- you are saying that the evidence in this case indicates that SCA and DaVita did not limit the restrictions to employees at the VP and level above for a period time at the beginning of the class period; correct?

A.    That looks to be correct.

Q.    You also say at the beginning of paragraph 48 that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

██████████████████; correct?

A.   Yes.

████████████████████████████████████████████

████████████████████████████████████████

████████████████████

████████████████████████

Q.   Why did you discount that testimony?

A.   There was other evidence, which there was -- where people were talking about the agreement, and there was nothing ruling out directors.  That's one aspect of it.  And I -- I mean, I don't know what other reasons -- what -- what might have caused Hayek to recall that, but it seemed like there was other evidence that it wasn't limited to VP and above.

Q.   Did you not find Hayek's testimony to be credible?

A.   I don't have enough experience with testimony to know what's credible; but ████████████

████████████████████████████████████████

████████████████████████

Q.   So, on balance, you looked at the evidence that you cited in these paragraphs, and you determined which evidence was more persuasive; correct?

A.   I suppose.  I mean, it's probably something for the jury to decide, I guess, is my understanding.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

(Sotto voce remarks.)

Q.   BY MS. ZIELINSKI:  All right.  You also -- So you said that -- When you said it was something for the jury to decide, what were you referring to?

A.   The scope of the agreement.

Q.   Okay.  So when you are describing evidence in your report, you are not offering any opinions about what that evidence means?

A.   Oh, I think the intent is to offer evidence and just try to take away from it the best interpretation.  And, in this case, I think it's offering evidence that it wasn't necessarily limited to vice presidents and above.

Q.   Isn't it the jury's role to look at the evidence and take away the best interpretation?

MR. SEIDEL:  Objection.  Calls for a legal conclusion.

THE WITNESS:  That's -- That's my understanding, yeah.

Q.   BY MS. ZIELINSKI:  Okay.  You say in paragraph 47 that "SCA and DaVita did not perfectly execute their no-poach agreement."

Do you see that?

A.   I see it.

Q.   Okay.  What do you mean, "did not perfectly

execute"?

A. That would mean that some employees moved between them, despite the no-poach agreement.

Q. So, at times, the agreement was enforced differently; correct?

A. That's -- That's the way it would seem. I don't think any -- there was a lot of agreement -- well, just even public policies that are not enforced with a hundred percent success, so...

Q. Sometimes -- At some points in time, the agreement was enforced more strictly; and other times, it was enforced less strictly. Correct?

A. I don't know if it's at certain times and other times. I mean, all I think we can say is that some hires occurred despite them seeming to be inconsistent with the no-poach.

Q. Okay. Would you agree that the impact of the agreements would change, depending on how strictly the agreements were enforced at the time?

A. I think, anytime something is executed better, it has more of an impact.

(Sotto voce remarks.)

Q. BY MS. ZIELINSKI: Let's go to paragraph 52, page 22.

A. Yes.

Q. Okay. Are you offering an opinion on when the alleged no-poach agreement started and ended?

A. I'm offering evidence that -- The no-poach or...

Q. The no-poach, yes.

A. I'm providing evidence that seems relevant.

Q. Okay. So you're not offering an opinion about the alleged -- the start date or the end date of the alleged no-poach agreement; correct?

A. I'm offering evidence that I -- that I think is relevant to when it started.

Q. Okay. So this paragraph 51, 52, 53, is just a description of evidence as opposed to offering your opinions about certain end date; correct?

A. Well, it's certainly offering evidence. And I think, if called on to say when the best guess is as to the start date, then you can see what -- what we -- what -- what the opinion is.

Q. So you are offering an opinion about the start date? I'm just -- I'm not trying to be tricky.

A. Yeah.

Q. I'm just trying to understand what the scope of your opinions is.

A. So I suggest a start date based on what I looked at, but I'm not -- I'm not trying to take the

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

place of the jury.



Q.   So you made a determination about which evidence was more compelling and persuasive; correct?

A.   I found that very, very relevant, I guess,

is what I would say, yes.

Q.   And then same with paragraph 53:  Do you see that, about the end date?

A.   Yes, I do.



Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025



Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025



Q.   What expertise do you have to interpret evidence and weigh inconsistencies regarding the timing and scope of a conspiracy?

A.   I don't have any special expertise.

Q.   Okay.  Have you investigated conspiracies in your work as a compensation academic?

A.   I'm sorry.  I have to think just for a second.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

Nothing obvious jumps out to me, but I'm just -- No, I don't recall anything right now.

MS. ZIELINSKI:  Okay.

(Exhibit DX81 previously marked.)

Q.  BY MS. ZIELINSKI:  All right.  Dr. Gerhart, I am handing you what's been previously marked as defendants' Exhibit 81.

This is the report that you issued in January 2025, as corrected --

A.  The original.

Q.  -- by errata in February.

A.  The original report?

Q.  Correct.

A.  Okay.

MS. ZIELINSKI:  Correct.

MS. ZANDI:  This is January.  One second.

(Pause.)

MS. ZIELINSKI:  All right.

(Sotto voce remarks.)

THE CONCIERGE:  Is there a corresponding tab with this one?

MR. WADE:  Yes.  I'm sorry.

THE CONCIERGE:  Is this tab 1?

MR. WADE:  Yes, thank you.

THE CONCIERGE:  All right.  Thank you.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

is not fair, then employers are concerned that will cause problems with having their employees engaged to do the kind of things they need to do to execute the strategy.

Q. Is there a quantitative test I can run to determine whether compensation is structured?

A. I mean, I think there's probably some data that would be relevant to that. I mean, some of my past research has looked at the relationship between pay, individual pay, and performance; so that would be -- that would be one way to look at it.

Q. Your opinion in this case is that defendants' conduct as a result of their compensation structure likely caused cascading effects across the pay of class members; correct?

A. That's correct.

Q. Is there a test I can run, a quantitative test, to determine whether those -- there is -- there are in fact cascading effects across a compensation structure?

A. I'd have to think about that. It's -- I mean, I think where I'm -- my frame of reference is that there's just decades of research and practice where the focus is on equity and how important it is in managing employees. So if somebody who's in the

same job and has similar performance to me is getting paid more than me, that -- that often results in outcomes that employers wish to avoid.

So if you look at World at Work, which is the leading compensation professional association, you know, they -- they put a heavy focus on internal equity and external equity as part of how you use a structured compensation system.  My textbook of course does the same thing.

Q.    So the test that you are advancing for whether a company has a compensation structure that causes cascading effects is purely qualitative; correct?

A.    I think we have research on how -- how employees compare their pay to others; that they do it very regularly, that it effects their behavior.  But in terms of the specific situation of the defendants, I do not quantify that effect.

Q.    So the test that you advocated a moment ago for determining when a company's compensation structure is sufficient to cause cascading effects is essentially just a list of characteristics that you would look for in a compensation structure; correct?

A.    I think that's about right, yes.

Q.    Okay.  Will you -- Would you agree with me

that some employers' compensation systems are more structured than others?

A.   I'm sure there's some variance, yes.

Q.   Okay.

A.   Yeah.

Q.   So the degree of structure in a compensation system is not binary; it exists on a spectrum. Correct?

A.   I think so -- although I think it's probably a bit hard to compete successfully, over time, if you don't make people's pay decisions in a systematic manner.  People do kind of care about their pay, so that's why it gets so much attention.

Q.   Do you -- Do you think it is -- In your view, do you believe that nearly all companies have compensation structures that would lead to cascading effects in pay?

A.   I think private-sector companies, except maybe for ones that are very small, tend to have structured compensation systems.

Q.   Okay.  So not public-sector companies?

A.   They have -- They have -- They have their own structure, but that's not really -- that's not quite the same as in the private sector.  It'd be structured -- For instance, individual differences in

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

pay would sometimes be more a function of something like seniority rather than individual performance.

Q. Okay. So you think all companies, except for ones -- all private-sector companies, except for ones that are very small, would have structured compensation systems that would cause cascading effects; correct?

MR. SEIDEL: Objection to form. Misstates testimony.

THE WITNESS: All or, I would say, virtually all.

Q. BY MS. ZIELINSKI: Okay. And, in fact, you say in your report that it would be unfathomable for a company the size of SCA not to have a compensation structure capable of causing cascading effects; correct?

A. Did I use the word "unfathomable"?

Q. Yeah. Let's go to page 179, paragraph 436.

A. 436? Oh, I did use the word. Oh, okay. Well, I mean, it is -- I would be very surprised to have a company like SCA without significant structure in how they decide people's compensation.

Q. And if we look at pages 150 -- starting at 159 to 163, are these the -- is it your opinion, for a

pay structure -- a pay system to produce cascading effects, it must have all the characteristics described in paragraphs 386 to 398 of this report?

A.   So, in my compensation book, I talk about how different firms might have different degrees of formalization.  And so some of this, like job analysis, there's a -- when you talk about job analysis, you can talk about using a particular job analysis method, and that quantifies things and is very data heavy.

But you can also accomplish -- I mean, the reason you're doing that to some extent in compensation is you need to match your jobs to survey jobs.  So whether you use the formal job analysis or not, you do need to analyze the content of the job and figure out how well it matches the survey job.  And the consulting companies can help do that; sometimes they have tools to do that.

So it doesn't have to be done in exactly this way for it to be systematic, but this would be kind of the most detailed description of how to do it. And a lot of firms that have structured compensation systems.  If you go look, for instance, at World at Work surveys, they don't probably spend a lot of time in any given year doing job analysis, or

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

certainly not a formal job analysis; but it's very critical to do something equivalent to that, that gives you the same output.

Q.    You said a moment ago that the degree of structure in a system, in a compensation system, exists on a spectrum.

So how would you distinguish between a company that has a compensation system that produces cascading effects and one that does not produce cascading effects?

A.    So I think structured compensation -- structured or system -- systematic/systematized compensation means you have principles and you apply them consistently, and that's how you achieve fairness and equity.  And the degree of formalization can vary; but, for instance, if people regularly ask, "Well, what are the other people in that job getting paid, and what's their performance, and what are they getting paid now?" that's a structured compensation system.

Q.    So a company could have a structured compensation system on paper but not consistently execute on the principles behind that system, and it wouldn't have produced cascading effects; correct?

MR. SEIDEL:  Objection to form, and vague.

THE WITNESS:  It's on paper, but they don't use it.

Q.   BY MS. ZIELINSKI:  You testified a moment ago that, in order to determine the difference between a compensation system that produces cascading effects and one that does not, the key is whether the company consistently enforces the principles behind the system; correct?

A.   Yes.

Q.   Okay.  And so my question is, then:  It's possible that there is a company that has some of these characteristics that you describe in paragraphs 386 through 398 but does not consistently follow through on those principles, such that it does not cause cascading effects; correct?

A.   Almost anything is at least somewhat possible, but if you -- Again, people care, obviously, deeply about their pay and whether it's fair and how it compares to others; and so that puts a pretty serious limit on how far you can stray from deciding people's compensation in a systematic and structured manner.

Q.   And, again, it's your view that virtually every company has a compensation system that causes cascading effects; correct?

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

Do you see that?

A.   Yes.

Q.   So you're not offering -- I just want to make sure I understand:  It's fair to say that you're not offering an opinion that defendants had rigid wage structures?

A.   I'm not -- I don't remember using the word "rigid."

Q.   Okay.  That -- That is not your opinion, that defendants have a rigid pay structure; correct?

A.   No.  No, it's not.

Q.   Okay.

A.   They have a structured pay system.

Q.   Okay.  Let's go to paragraph 491 on 201.

All right.  In this paragraph, you criticize defendants' experts as characterizing your opinion as requiring that a change in pay for one employee would lead to changes for all, or nearly all, of their employees' compensation; right?

A.   That looks to be correct.

Q.   Okay.  So you are not offering an opinion, then, that defendants' pay systems are so structured that a change in one employee's compensation due to an outside job offer would lead to rapid adjustments of a similar magnitude for all, or nearly all, employees'

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

compensation; correct?

A.   I think that's correct.

Q.   Okay.  So if I'm understanding your opinion correctly, then, it's not that one employee is enough to lead to these cascading effects that you are describing; there must be compensation -- suppression of compensation for some subset of employees before these cascading effects occur.  Correct?

A.   The cascading effects would logically be larger, the more employees who are getting, for instance, unsolicited outside offers.

Q.   And I want to focus specifically on cascading effects for all, or nearly all, class members.

A.   Yes.

Q.   So, in order to cause cascading effects in the pay of all, or nearly all, class members, how big of a subset of employees whose wages are directly suppressed -- how many employees does that need to be in order to impact all, or nearly all, class members' compensation?

A.   It's -- I'm not sure it's possible to come up with a precise number.

I'd just go back to the other outpatient care industry, which, I think, again, it was

Dr. Johnson said one in six jobs in that industry at the defendants.

So if from time to time -- Well, I don't know if it would be one in six. I mean, one in six would certainly be a lot of outside offers. It wouldn't have to be that high. Again, I can't give you a number. In a big organization, one person getting an outside offer would not have an effect; but, in a big organization, there would be a lot more than one person getting cold calls and outside offers when that -- such calls are not restricted.

Q. Okay. And I take it, when you say one is not enough, you'd also agree that two or three or four or five is also not enough; correct?

A. I don't know where you would draw the line; but, the more coming in, the more effect it would have, yes.

Q. Right. Yeah. Yeah, I understand you to be saying that it's difficult to draw the line; but, again, we're -- we're talking about this subset that you're talking about. We're talking about, you know, more than just, you know, a dozen or so employees. Correct?

MR. SEIDEL: Objection to form.

THE WITNESS: I don't know. I don't know

where to draw the line; but I would expect that, in ordinary circumstances, it would be -- there would be more than a dozen getting such outside offers, so... But I don't have it at my fingertips what the number would be right now.

But we -- you know, I'll go back to the Federal Reserve study that I cite regularly, which finds that over three quarters of people who have changed jobs did so without actively searching for a job. So that -- they -- they were -- they were passive candidates. And then more than that would have gotten outside offers, because not everybody takes an outside offer.

Q. BY MS. ZIELINSKI: If 25 percent of class members were directly affected by the defendants' conduct and their wages were suppressed, would it be your opinion that that is sufficient to cause cascading effects across the class?

A. Again, I don't know where to draw the number. One in four employees getting outside offers seems like a goodly number that would have a substantial effect.

Q. Okay. But any lower than that, you cannot determine where to draw the line of how many employees would need to be directly affected in order to cause

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

cascading effects; correct?

A.   At this moment, I don't -- I wouldn't be able to draw the line.

Q.   Let's go to paragraph 495 of your report, which is on page 203.

Let's see.  Okay.  It's about halfway through the paragraph.  It says -- It's referring to Dr. McCrary.  It says:  "In his Exhibits 13 and 14."

Do you see where I'm at?

A.   I see it.

Q.   Okay.  "In his" -- It says:  "In his Exhibits 13 and 14, Dr. McCrary shows that different employees have different pay growth over time.  That is exactly what is expected under a structured compensation, given its emphasis on pay for performance and the fact that employees do not have equal performance and their performance can vary over time."

Do you see that?

A.   I see it.

Q.   You're not offering any analysis disagreeing with Dr. McCrary's opinion that different employees have different pay growth over time; correct?

A.   I agree that different employees have different pay growth over time.

A.    Generally speaking, there's -- there would have to be other factors; but I'm -- I'm having a little trouble thinking of what those factors would be.  Again, the ones that come to mind are the factors we want to avoid coming into play.

In a traditional labor union setting, there would be some differences in employee pay growth over time; but it would be based on seniority, primarily.

Q.    Let's go to the next page, 204, and figure 3, which is --

A.    Yes.

Q.    -- in paragraph 496.

A.    Yes.

Q.    Okay.  You present here a hypothetical scenario to illustrate your theory of cascading effects.

A.    Yes.

Q.    Correct?

A.    Yes.

Q.    Okay.  So, in your hypothetical, director A and director B have different salaries but their ratios of salary and performance are equal.

A.    Yes.

Q.    And then you say that director A receives an unsolicited outside offer and negotiates an increase

based on that outside offer; correct?

A.   Yes.

Q.   Okay.  So, as the first step -- we're going to go through the steps here.

So, as the first step in your cascading effects hypothetical, you say that director B is likely to be very dissatisfied due to a perception of a lack of internal equity and with the realization that external equity is lower than realized; correct?

A.   That sounds right.

Q.   Okay.  And you say that, based on that dissatisfaction, director B can take -- take several steps in response; correct?

A.   Yes.  Yes.

Q.   So, for your theory of cascading effects to work, director B must know of director A's existing salary relative to their own salary; correct?

A.   Yes.  I mean, this is a very small example; so, in real life, there'd be other people besides director A --

Q.   Sure.

A.   -- getting an outside offer.

So employers do try to prevent employees from discussing their wages, but that's -- that's a policy where enforcement isn't all that successful a

lot of the time.

So, yes, it would -- the cascading effect is more likely to the extent that there's knowledge of the difference in pay, yes.

Q.   What does the evidence that you've reviewed in this case indicate that defendants here were successful in -- or whether the employees of defendants had knowledge of their co-workers wages?

A.   No.

MR. SEIDEL:  Hold on a second.

THE WITNESS:  Oh, I'm sorry.  I'm sorry.

MR. SEIDEL:  No problem.

Objection to form.  Unclear.

THE WITNESS:  I don't recall seeing evidence on how much employees talked to each other in these companies about pay.

Q.   BY MS. ZIELINSKI:  Okay.  But, again, going back to your hypothetical:  For this theory of cascading effects to work, director B does have to know director A's salary relative to their own; correct?

A.   Yes, I think that's probably true.

Q.   Okay.  And director B must also know the value of director A's external job offer and then the renegotiated salary; correct?

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.    Yes.

Q.    Okay.  And --

A.    And if I may...

Q.    Um-hum.

A.    I think, in the case of an external offer, if you know that there's an offer, you can make a pretty good guess, if the person stays, that their -- their pay increased.  So I do think people do talk, but there's other ways to infer that; and if it's a good outside offer, people don't usually keep it much of a secret.  So there's various mechanisms by which people can compare themselves.

Q.    And, but did you see evidence of those discussions happening among class members in this case?

A.    I didn't.  But there's so much evidence from so many sources, that that's kind of human nature.  But, no, I don't -- I don't have any evidence specific to these companies, at least that I can think of right now.

Q.    And, in your hypothetical, would director B know this information about director A's external job offer instantaneously?

A.    They could know very quickly.

Q.    You would agree that if, hypothetically,

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

director B does not know how much he's paid relative to director A, then there wouldn't be any effect on -- this cascading effect wouldn't work; correct?

A. Yeah, it seems like it would be less strong. But, again, you can make a comparison and make an inference even if you don't know the exact dollar number. But employees often do find out the dollar number.

Q. And what evidence are you basing that on, that employees often do find out the dollar number?

A. Well, I think one piece of evidence is employers trying very hard to keep employees from -- from talking. So that seems like that wouldn't be a focus if it didn't happen that employees shared information.

Q. Do you believe that, in the U.S. private sector, there is little perceived pay transparency in terms of the ability to discuss pay with co-workers?

MR. SEIDEL: Objection to form.

THE WITNESS: I do, especially at the time of class period.

MS. ZIELINSKI: Okay.

THE WITNESS: Let me be clear: So there's employer policies aimed at preventing pay transparency in general, but that doesn't necessarily work very

well.

Q.    BY MS. ZIELINSKI:  But, again, you saw no evidence of that in this case; correct?

A.    I don't have any evidence, that I can think of, on these particular defendants and their employees.

Q.    Okay.  Going back to your hypothetical:  For this theory of cascading effects to work, director B also must know director A's performance relative to his or her own; correct?

A.    Yes.

Q.    Okay.  And how would director B gather that information?

A.    I think people often have an idea of who's doing well and how they compare to other people in their jobs.

Q.    And does this assume that director A and director B work closely together such that they would be aware of each other's performance?

A.    That would, I think, facilitate it; but it depends on what you mean by "work closely."  I mean, there's different ways to work closely:  You can be in proximity; you could be working on projects or initiatives together.  And, again, there's -- there's different avenues to get information in an

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

organization.

Q.   Well, you certainly wouldn't expect that every director in a company would have visibility into every other director's performance; correct?

A.   Not every other director.

Q.   Okay.  So they would have to work in some sort of close enough proximity to have that understanding; correct?

A.   They'd have to have some opportunity to get that understanding, yes.

Q.   And how closely would two directors have to work together in order to gain that sort of understanding?

A.   Hmm.  I think that's probably hard to come up with a simple rule; but, again, I would just go back to it.  I think it's fairly common for people to have an understanding of who's doing well and who's contributing the most.

Q.   You would also agree with me that you would not expect every director in a company to have visibility into what every other -- into what other directors were paid; correct?

A.   That, I think, would be unusual.  I think there's some companies which post their salaries, but I wouldn't say that's typical.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

Q.   Okay.  So when this director A received this outside job offer, you would not expect that every other director in the company would have visibility into director A's salary or new salary as a result of the job offer; correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I would say not usually, but companies have -- it's hard to grasp all -- all the ways people interact and communicate and exchange information, so...  But, yeah, there's certain things that would make it more likely, I agree.

Q.   BY MS. ZIELINSKI:  Okay.  And, but not every -- not every director would have visibility into that information; correct?

A.   I would say not typically.

Q.   Correct.  Okay.

All right.  So then step 2 of your hypothetical, you say that now VP A -- we're in paragraph 500 now, if you'd like to look at it.

A.   Oh.

Q.   You say that "now VP A has a smaller pay differential compared to director A, and VP A expects there to be an appropriate payoff to being a vice president rather than a director"; correct?

A.   Correct.

Q.   And so you then suggest that, under this cascading effects hypothetical, that VP A's salary will be increased; correct?

A.   There'd be pressure to increase it, yes.

Q.   Okay.  So, for your theory to work, must the VP know director A's existing salary relative to their own?

A.   That would certainly facilitate it, and I think that would be pretty common.

Q.   Why do you say that?

A.   If it's somebody reporting to you.

Q.   Okay.  So in this -- in this hypothetical you gave, we're talking about a direct report; correct?

A.   I think that's what I had in mind.

Q.   Okay.

A.   Yeah.  I don't know that it would be limited; because, if you're at a higher level, you may also know what other directors are paid; but, certainly, you would usually know if somebody's reporting to you what their pay is.

MR. SEIDEL:  Sarah, we've been going over an hour.  Can you let us know when is a good stopping point.  I'm not asking for a break now.

MS. ZIELINSKI:  Yeah.

an offer is -- that an opportunity is attractive does not -- according to your theory of how impact spreads across the class in this case, does not provide enough information; correct?

MR. SEIDEL:  Objection to the form.

THE WITNESS:  Sorry.  Knowing the offer is attractive...

Q.   BY MS. ZIELINSKI:  As we said before, what the individual needs to know in order to cause class-wide impact is the amount of the offer; correct?

MR. SEIDEL:  Objection to the form.

THE WITNESS:  I mean, that would maximize the impact, I think; but, again, if a really good company with a -- especially a position which is a move up, but it doesn't have to be a move up, is contacting you, you may not even need a salary offer to negotiate with your current employer.

Q.   BY MS. ZIELINSKI:  Do you say anything like that in any of your reports in this case?

A.   I'm not sure I do.  But just sitting here, thinking about how things work, that's -- that is something that came to mind.

Q.   And is that an opinion you're offering in this case?

A.   That you don't necessarily need a specific

salary offer to negotiate with your current employer?

Yes.

Q.    What's the basis for that?

A.    Well, the only thing I can say for sure at the moment would be personal experience for -- over the years, seeing people do that.

Q.    Have you seen any evidence in this case that class members used the mere existence of a cold call from another company to negotiate higher compensation?

MR. SEIDEL:  Objection.  Misstates prior testimony.

THE WITNESS:  I'm not thinking of a specific example right now.

Q.    BY MS. ZIELINSKI:  You've not conducted an analysis in this case of how many fewer job offers class members received as a result of the alleged conduct; correct?

A.    That's correct.

Q.    And you've also not conducted an analysis of how many fewer job cold calls class members received because of the alleged conduct; correct?

A.    That's correct.

Q.    Let's go to paragraph 405 of your report on page 166.

In paragraph 405 you quote from your

textbook the following sentence: "Pay levels at firms" -- let's see -- "with structured compensation systems are not completely static. They also can adjust over time to changing market conditions and/or business strategies."

Do you see that?

A. I see it.

Q. Would you agree that the evidence in this case shows that there was variation over time in the defendants' pay structures?

A. The main thing I could think of -- I'm not sure I'll get the numbers right -- I think it was -- ah, shoot -- during one of -- around one of the acquisitions, the number of senior VPs dropped pretty dramatically -- I'm forgetting now whether it was USPI or SCA -- and their pay dropped, but... So that -- that would be an example of a major change in business strategy.

So that that's not a big surprise. That's the most -- That's the one that comes to mind most immediately.

Q. When you reviewed evidence in this case about the characteristics of defendants' pay structures, did you see evidence that those structures varied over time?

formalization, which I don't see as being a good example of what change in market conditions or business strategies would cause.

Q.   In that sentence in paragraph 405, when you say "this variation over time," are you referring to SCA's pay structure?

A.   Sorry.  I lost -- Where is the "variation over time"?

Q.   It's in the third line.

(Sotto voce reading.)

THE WITNESS:  Oh, okay.  "This variation over time supports my" -- I'm being a little vague there about what my opinion is.  I -- I think -- I -- I mean, I think my opinion, the opinion I meant to express there, was that they used structured compensation, and that -- but it became more formalized, maybe became more formalized over time.  Again, I thought it was pretty formalized at one point.

Q.   BY MS. ZIELINSKI:  And my question is just simply whether, in that sentence, when you say "this variation over time" --

A.   Yeah.

Q.   -- if you're referring to SCA's pay structure.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.   Oh, I'm sorry.  Yes, I must be.

Q.   Okay.

A.   Yeah.

Q.   Okay.  We're going to pull out your May 30th report, which should be in that stack as defendants' Exhibit 84.  It should be marked.

A.   Okay.  I have it.

Q.   Okay.  Let's go to page --

THE CONCIERGE:  Is this an existing tab?

MS. ZIELINSKI:  Yes.  This is Exhibit 84.

THE CONCIERGE:  The one from earlier?

MS. ZIELINSKI:  Yes.

MR. WADE:  This was tab 2 from earlier?

THE CONCIERGE:  Okay.  Okay.  Thank you.

Q.   BY MS. ZIELINSKI:  We're going to page 133, paragraph 370.

A.   Okay.  Which?  Oh, this is the first installment, I'll say, of the rebuttal?

Q.   Correct.

A.   Oh, okay.

Q.   Yeah.

A.   Okay.  I thought it was the original.

Q.   No, no.  Yeah, first installment.

A.   Okay.

Q.   Page 133, paragraph 370.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.   Yes.

Q.   Okay.  You say:

So this is what I was talking about before:  I looked, for instance -- I think it was a memo from 2005, sent to people to help them in setting pay for people who report to them, which included information on range penetration.

So you can't have -- you can't have range penetration without having a range with a midpoint. So this is why I just found -- I just found this hard

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

to square with that memo.  And then later, I think he says -- I don't know, maybe it's in here.  Well, maybe it's not in here.  But I remember reading him saying, I think, that they had pay ranges but they hadn't been kept up to date.

Well, that's -- that's a little different. I mean, if you -- if you do something and you just don't manage it well, that's -- that's not -- you don't have it.  So I just -- That's the background for why I put it this way, I guess.

Q.   So this is another instance where you weighed evidence and selected the evidence that you believed to be more credible; correct?

A.    I just thought the evidence was -- was very relevant.  Again, I don't know how you can have range penetration without a range, and I think that was 2015.  So I just -- it didn't make sense to me.

Q.    Sorry.  ████████████████████████
████████████████████████████████████████████
████████████████████
████████████████████████████████████████████
██████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

STATE OF CALIFORNIA        )
                           )  SS.
COUNTY OF SAN FRANCISCO )

    I, MARILYNN HOOVER, CSR No. 8841 for the State of

California, do hereby certify:

    That prior to being examined, the witness named

in the foregoing deposition was duly sworn to testify

the truth, the whole truth, and nothing but the truth;

    That said deposition was taken down by me in

shorthand at the time and place therein named, and

thereafter reduced by me to typewritten form; and that

the same is a true, correct, and complete transcript

of the said proceedings.

    Before completion of the deposition, review of

the transcript [ ] was [X] was not requested.  If

requested, any changes made by the deponent (and

provided to the reporter) during the period allowed

shall be appended hereto.

    I further certify that I am not interested in the

outcome of the action.

    Witness my hand this 14th day of July 2025.

                        _____

                        Marilynn Hoover, RPR

                        California CSR No. 8841

| Page | Line | Correction | Reason for Change |
|------|------|------------|-------------------|
| | | See attached chart for corrections | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Witness Signature

Date

*Barry Gerhart*

SARA J BROWN
NOTARY PUBLIC
STATE OF WISCONSIN

Subscribed and sworn to before me this _____ day of _____ 20___

Notary Public, Dane Co., State of Wis.

My commission expires ___8/17/2027___

I, _Barry Gerhart_, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page(s), and that I am signing this before a Notary Public.

_Barry Gerhart_

STATE OF _WI_

COUNTY OF _Dane_

Before me, _Sara J Brown_, on this day personally appeared _Barry Gerhart_, known to me, or proved to me under oath or through _WI DL_, _____ (description of identity card or other document), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _3_ day of _April_, 20_25_.

SARA J BROWN
NOTARY PUBLIC
STATE OF WISCONSIN

_Sara J Brown_
NOTARY PUBLIC IN AND FOR THE
STATE OF _WI_

My Commission Expires: _8/17/2027_

**Errata for Expert Deposition of Dr. Barry Gerhart**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
March 5, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 1 | 37 | 19–21 | "Yeah, I think the term 'directly' there is meant 'the most easily seen,' maybe." | "Yeah, I think the term 'directly' there is meant to mean 'the most easily seen,' maybe." | Clarification |
| 2 | 51 | 12–15 | "I think I would go back to what I said before, that you'd want to look at the degree to which which companies people move between if there's a competitive, unrestricted market." | "I think I would go back to what I said before, that you'd want to look at the degree to which companies people move between if there's a competitive, unrestricted market." | Delete repeated word for clarification |
| 3 | 74 | 19–20 | "So if you reduce labor cost, it leads to hire profits over time." | "So if you reduce labor costs, it leads to higher profits over time." | Typographic error |
| 4 | 78 | 16–17 | "For higher-level employees, um-hum." | "For higher-level employees, yes." | Clarification |
| 5 | 114–15 | 114:23– 115:2 | "No quantitative analysis bringing to bear knowledge of how these processes work and what the consequences of restricting mobility are and how—how mobility can lead to higher pay for employees or opportunities for mobility." | "No quantitative analysis. My focus was on bringing to bear knowledge of how these processes work and what the consequences of restricting mobility are and how—how mobility can lead to higher pay for employees or opportunities for mobility." | Typographic error; clarification |
| 6 | 118 | 10–11 | "Yeah. As I said, even missing one cold call could be very consequential." | "As I said, even missing one cold call could be very consequential." | Clarification |
| 7 | 129 | 4 | "Um-hum." | "Yes." | Clarification |
| 8 | 130 | 10 | "Um-hum." | "Yes." | Clarification |
| 9 | 131 | 20–22 | ██████████ | ██████████ | To conform the record to the facts; clarification |

1

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 10 | 137 | 1–3 | "For instance, the CEO and COO of SCA moving from DaVita." | "For instance, the future CEO and COO of SCA moving from DaVita." | To conform the record to the facts; clarification |
| 11 | 138 | 2–3 | "So your—So if I'm understanding . . ." | "So you're—So if I'm understanding . . ." | Typographic error |
| 12 | 164 | 17–20 | "And I think it's typically—once the percentage is set, then how it's allocated internally would typically be based on internal equity kinds of principles and internal equity principles." | "And I think it's typically—once the percentage is set, then how it's allocated internally would typically be based on internal equity kinds of principles and clearly stated internal equity." | Clarification |
| 13 | 190 | 10–13 | "And I think I also mentioned that your merit increase budget could also be influenced by your growth and how much hiring you have to do, because labor is a drive demand . . ." | "And I think I also mentioned that your merit increase budget could also be influenced by your growth and how much hiring you have to do, because labor is a derived demand . . ." | Typographic error |
| 14 | 197 | 9–11 | "I don't think it's my main charge is to establish whether there was exchange that wouldn't be acceptable from a legal standpoint . . ." | "I don't think my main charge is to establish whether there was exchange that wouldn't be acceptable from a legal standpoint . . ." | Clarification |
| 15 | 210 | 7–10 | "And then I think we talked about adjacent job levels would be affected if pay is going up in the job level below or above, and then it could relate to job levels not immediately adjacent." | "And then I think we talked about how adjacent job levels would be affected if pay is going up in the job level below or above, and then it could relate to job levels not immediately adjacent." | Clarification |
| 16 | 215 | 11–14 | "Well, I would think, the more outside offers there are, the more pressure it would put on the system and that there would be system-like cascading effects." | "Well, I would think, the more outside offers there are, the more pressure it would put on the system and that there would be system-wide cascading effects." | Typographic error |
| 17 | 224 | 19–22 | "'Restraints that can strain the employee labor market | "'Restraints that constrain the employee | Typographic error; to |

2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | and suppress compensation, such as no-poach agreements and CSI exchanges, enable firms to benchmark to lower rates so that upward pay adjustments do not occur.'" | labor market and suppress compensation, such as no-poach agreements and CSI exchanges, enable firms to benchmark to lower rates so that upward pay adjustments do not occur.'" | conform the record to the facts |
| 18 | 228–29 | 228:25–29:4 | "But it's certainly possible that class members who negotiated their pay were able to negotiate a salary that would have offset or been uneffected by the alleged suppression of compensation; correct?" | "But it's certainly possible that class members who negotiated their pay were able to negotiate a salary that would have offset or been unaffected by the alleged suppression of compensation; correct?" | Typographic error |
| 19 | 272 | 22–23 | "Well, that was my intention, yes." | "It was my intention to include everything I relied on for my opinions about USPI's compensation practices in the report." | Clarification |
| 20 | 283 | 15–16 | "Empirical Research Issues and Comparative HRM" | "Empirical Research Issues in Comparative HRM" | Typographic error; to conform the record to the facts |
| 21 | 289 | 7–8 | "I was looking at things common to the class employees across the companies." | "I was looking at things common to the class member employees across the companies." | Clarification |
| 22 | 290 | 13–17 | | | Typographic error |
| 23 | 293 | 9–11 | " . . . then you can assume that there would be more offers and that less offers | " . . . then you can assume that there would be more offers | Typographic error |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | for employees of those two companies to move to the other company?" | and not less offers for employees of those two companies to move to the other company?" | |
| 24 | 294 | 10–13 | "I see it as if there's specially good offers coming in and they're coming from the defendant companies, then that would be pretty critical to know." | "I see it as if there's especially good offers coming in and they're coming from the defendant companies, then that would be pretty critical to know." | Typographic error |

4

| Page | Line | Correction | Reason for Change |
|------|------|------------|-------------------|
| | | See attached chart for corrections | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Barry Gerhart
_____     08/21/2025
Witness Signature                                                                    Date

I, _**Barry Gerhart**_, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page(s), and that I am signing this before a Notary Public.

_Barry Gerhart_

STATE OF ____WI____

COUNTY OF____Dane____

Before me, ___August 21, 2025___, on this day personally appeared___Barry Gerhart___, known to me, or proved to me under oath or through_Driver Lic._ (description of identity card or other document), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the __21__ day of _August_ , 20_25_.

___(signature)___

NOTARY PUBLIC IN AND FOR THE
STATE OF____Wisconsin.____

My Commission Expires: __11/6/2027.__

**Errata for Expert Deposition of Dr. Barry Gerhart, Vol. II**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
July 10, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 1. | 319 | 1 | "Exhibit 84." | "defendants' Exhibit 84." | Clarification |
| 2. | 323 | 25 | "Um-hum." | "Yes." | Clarification |
| 3. | 327 | 22 | "the animators case." | "the Animators case." | Typographic error |
| 4. | 329 | 9–10 | "beyond compensation in human resources management" | "beyond compensation and human resources management" | Typographic error |
| 5. | 338 | 19 | "I think that's probably correct." | "My initial report does show that defendant firms had market power during the Conduct Period, given the presence of various labor market frictions, and given my determination that the no-poach conduct and CSI Exchanges would likely have suppressed pay Class-wide" | Clarification; to conform the record to the facts |
| 6. | 340 | 9–10 | "I don't think I did anything that would speak to that quantitatively, yes." | "I don't think I did anything that would speak to that quantitatively." | Clarification |
| 7. | 342 | 3–4 | "I do not have much knowledge at all of antitrust." | "I do not have much knowledge at all of antitrust law." | Clarification |
| 8. | 343 | 15 | "manning" | "Manning" | Typographic error |
| 9. | 353 | 22 | "the other outpatient care centers industry." | "the Other Outpatient Care Centers industry." | To conform the record to the facts |
| 10. | 357 | 3–4 | "the other outpatient care centers industry;" | "the Other Outpatient Care Centers industry;" | To conform the record to the facts |
| 11. | 358 | 5–6 | "the other outpatient care centers" | "the Other Outpatient Care Centers industry" | To conform the record to the facts |

1

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 12. | 358 | 11 | "the other outpatient care center industry," | "the Other Outpatient Care Centers industry," | To conform the record to the facts |
| 13. | 358 | 17–18 | "there's evidence in the report" | "there's evidence in the rebuttal report" | Clarification |
| 14. | 359 | 4 | "of the report" | "of the rebuttal report" | Clarification |
| 15. | 359 | 25 | "the other outpatient care industry" | "the Other Outpatient Care Centers industry" | To conform the record to the facts |
| 16. | 361 | 1 | "the five-digit" | "the five-digit industry code" | Clarification; to conform the record to the facts |
| 17. | 363 | 5 | "Yeah, I guess the answer is probably no." | "I did not perform any quantitative analysis to measure the defendants' market power." | Clarification; to conform the record to the facts |
| 18. | 363 | 16 | "I think that's—that's correct." | "That is partially correct." | Clarification; to conform the record to the facts |
| 19. | 363 | 22–23 | "No, I don't think so. Yeah, I think that's right." | "I did not perform any quantitative analysis to measure the defendants' market power. I did assess defendants' experts' testimony and determine that based on my review of the evidence and my knowledge of the compensation-related literature and basic labor economics, their testimony did not convince me that the evidence is inconsistent to show that defendants had the market power necessary to harm all or nearly all class | Clarification; to conform the record to the facts |

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | | members' compensation." | |
| 20. | 365 | 16–17 | "the three defendants" | "the three defendant firms" | Clarification; to conform the record to the facts |
| 21. | 366 | 12 | "there's less information" | "there's less of an information deficit" | Clarification |
| 22. | 367 | 16 | "the three defendants," | "the three defendant firms," | Clarification; to conform the record to the facts |
| 23. | 369 | 23 | "in antitrust" | "in antitrust law" | Clarification |
| 24. | 371 | 4–5 | "like a no-poach" | "like a no-poach agreement" | Clarification |
| 25. | 371 | 5–8 | "And I guess part of that is trying to think about what would have happened without such a no-poach versus what happened with such an alleged no-poach." | "And I guess part of that is trying to think about what would have happened without such a no-poach agreement versus what happened with such an alleged no-poach agreement." | Clarification |
| 26. | 374 | 2 | "a successful no-poach" | "a successful no-poach agreement" | Clarification |
| 27. | 375 | 17 | "like no-poach." | "like a no-poach agreement" | Clarification |
| 28. | 377 | 20–22 | "What the report says is that the defendants seem like they would be very good matches that defendant employees" | "The report and rebuttal show that defendants seem like they would be very good matches for other defendants' employees" | Clarification; to conform the record to the facts |
| 29. | 381 | 4–5 | "Yeah, I don't think I would necessarily say that." | "No, that is not my opinion." | Clarification |
| 30. | 383 | 11 | "Yes." | "It's possible." | Clarification |
| 31. | 388 | 9–10 | "Sure, some things will vary by individuals, yes. A lot of things vary by individuals." | "Sure, some preferences will vary by individuals." | Clarification; to conform the record to the facts |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 32. | 389 | 12–13 | "same five-digit industry" | "same five-digit industry code" | Clarification; to conform the record to the facts |
| 33. | 389 | 25 | "Yeah, it's hard to know." | "I would need more information." | Clarification |
| 34. | 390 | 22 | "same five-digit industry" | "same five-digit industry code" | Clarification; to conform the record to the facts |
| 35. | 391 | 7 | "within their five-digit" | "within their five-digit industry" | Clarification; to conform the record to the facts |
| 36. | 391 | 11 | "within their five-digit" | "within their five-digit industry" | Clarification; to conform the record to the facts |
| 37. | 394 | 5–6 | "I didn't do a quant—No, I didn't quantify that. | "No, I didn't quantify that, but I did perform a qualitative analysis of the evidence, which was consistent to show that defendants' employees would have valued opportunities at other defendant firms." | Clarification; to conform the record to the facts |
| 38. | 397 | 3–4 | "Let's mark this as defendants 87." | "Let's mark this as defendants' Exhibit 87." | Typographic error |
| 39. | 398 | 21 | "other outpatient care centers industry;" | "Other Outpatient Care Centers industry;" | To conform the record to the facts |
| 40. | 400 | 9–10 | "But I think the other thing on the post-conduct is," | "But I think the other thing on the post-conduct period is," | Clarification |
| 41. | 400 | 16 | "the pre-conduct and conduct and post-conduct" | "the pre-conduct and conduct and post-conduct periods" | Clarification |
| 42. | 403 | 18–19 | "'healthcare-related non-OCC industries'" | "'Healthcare Related (non-OCC) industries'" | To conform the record to the facts |

4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 43. | 403 | 20 | "'outpatient care centers.'" | "'Outpatient Care Centers.'" | To conform the record to the facts |
| 44. | 403 | 25 | "'healthcare and social assistance.'" | "'Healthcare and Social Assistance.'" | To conform the record to the facts |
| 45. | 405 | 4–7 | "So he—I think 'healthcare-related' must be code 62, and 'outpatient care centers' looks like it's 6214.  So it's not 'other outpatient care centers'; it's broader." | "So he—I think 'Healthcare Related' must be code 62, and 'Outpatient Care Centers' looks like it's 6214.  So it's not 'Other Outpatient Care Centers'; it's broader." | To conform the record to the facts |
| 46. | 405 | 15–16 | "within the two-digit healthcare industry" | "within the two-digit Healthcare and Social Assistance industry" | To conform the record to the facts |
| 47. | 406 | 12–14 | "Four-digit would be outpatient care centers.  And then within outpatient care centers, there's a lot of different types." | "Four-digit would be Outpatient Care Centers.  And then within Outpatient Care Centers, there's a lot of different types." | To conform the record to the facts |
| 48. | 406 | 20–21 | "for outpatient care centers?" | "for Outpatient Care Centers?" | To conform the record to the facts |
| 49. | 407 | 1 | "'other outpatient care center'" | "'Other Outpatient Care Center'" | To conform the record to the facts |
| 50. | 407 | 2 | "outpatient care center" | "'Outpatient Care Center'" | To conform the record to the facts |
| 51. | 407 | 24 | "within the five-digit outpatient care center industry" | "within the five-digit Other Outpatient Care Centers industry" | To conform the record to the facts |
| 52. | 411 | 20–21 | "Yeah, I'd have to—I think that's what I—I think what I meant to say is if" | "My opinion is that if" | Clarification |
| 53. | 413 | 6 | " the 'other outpatient care centers'" | " the 'Other Outpatient Care Centers'" | To conform the record to the facts |
| 54. | 419 | 9 | "the pre-conduct;" | "the pre-conduct period;" | Clarification |

5

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 55. | 421 | 19 | "the pre-conduct and the conduct period" | "the pre-conduct period and the conduct period" | Clarification |
| 56. | 425 | 20–21 | "lower-level employees And senior-level employees" | "lower-level employees and senior-level employees" | Typographic error |
| 57. | 438–439 | 438:25– 439:1 | "I found that very, very relevant, I guess, is what I would say, yes." | "I found that very, very relevant, I guess, is what I would say, yes. I provided a factual background of Plaintiffs' conspiracy claim in support of my analysis, and determined that the evidence was consistent to show certain start and end dates." | Clarification; to conform the record to the facts |
| 58. | 439 | 22 | "Doesn't seem to be consistent with that, no." | "Doesn't seem to be consistent with that, no, ██████████████" | Clarification; to conform the record to the facts |
| 59. | 441 | 10 | "I think that's correct." | "██████████████" | Clarification; to conform the record to the facts |
| 60. | 450 | 19–21 | "Well, I think the no-poach would give them a less incentive to not adhere to the wage-fixing." | "Well, I think the no-poach agreements would give them less incentive to not adhere to the wage-fixing agreements." | Clarification; typographic error |
| 61. | 452 | 9 | "increase composition" | "increase compensation" | Typographic error; clarification |
| 62. | 454 | 17–19 | "No, and I'm not—I'm not intending to offer a | "No, and I'm not intending to offer a | Clarification; to conform |

6

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | legal opinion. It's more of a lay-person impression." | legal opinion. I submitted this evidence in my rebuttal report to respond to defendants' experts' argument that I provided insufficient evidence regarding the CSI Exchanges in my opening report. Accordingly, as I explain in my rebuttal report, defendants' experts' argument does not give me cause to change my assessment in my opening report." | the record to the facts |
| 63. | 454 | 22–23 | "That—That part is—I think that's right, yeah." | "I am not offering an expert opinion about typical actions of colluding parties to conceal their conduct. I submitted this evidence as support for my finding in my rebuttal report that defendants' experts had not persuaded me that my expert opinions in my opening report regarding the CSI exchange were unsupported." | Clarification; to conform the record to the facts |
| 64. | 466 | 16 | "that it effects their behavior" | "that it affects their behavior" | Typographic error |
| 65. | 467 | 12–13 | "People do kind of care about their pay, so that's why it gets so much attention." | "People do care about their pay, so that's why it gets so much attention." | Clarification |
| 66. | 475 | 3–4 | "I think this is from World at Work—World at Work survey" | "I think this is from World at Work—a World at Work survey" | Clarification |

7

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 67. | 476 | 11 | "No.  No, it's not." | "My opinion is that Defendant firms had systematic pay structures." | Clarification |
| 68. | 484 | 8 | "co-workers wages?" | "co-workers' wages?" | Typographic error |
| 69. | 486–487 | 486:23–481:1 | "Let me be clear:  So there's employer policies aimed at preventing pay transparency in general, but that doesn't necessarily work very well." | "Let me be clear:  So there's employer policies aimed at preventing pay transparency in general, but that doesn't necessarily work very well to prevent employees from discussing their pay with each other." | Clarification |
| 70. | 491 | 23 | "directors salaries" | "directors' salaries" | Typographic error |
| 71. | 498 | 16–18 | "this analysis does not tell us whether base pay for individual class members move together over time; correct?" | "this analysis does not tell us whether base pay for individual class members moves together over time; correct?" | Typographic error |
| 72. | 498 | 22 | "So that's why I'm not using individual." | "So that's why I'm not using individual pay." | Clarification; to conform the record to the facts |
| 73. | 505 | 5–6 | "Hmm.  Yeah, again, I look at evidence that I think is relevant." | "Again, I look at evidence that I think is relevant, rather than at hypotheticals." | Clarification |
| 74. | 506 | 14 | "That sounds right." | "My opinion about likely impact to class members in this case partially depends upon information about job opportunities being conveyed to the recipient of a cold call. Information received by recipients of cold calls is not the | Clarification; to conform the record to the facts |

8

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | only pathway of impact." | |
| 75. | 509 | 4–6 | "Well, the only thing I can say for sure at the moment would be personal experience for— over the years, seeing people do that." | "The basis for my opinion that you don't necessarily need a specific salary offer to negotiate with your current employer is based on my expertise in compensation and human resource management. It is also based on evidence in my reports showing that defendants responded to even the threat of outside offers to retain employees." | Clarification; to conform the record to the facts |
| 76. | 512 | 11–12 | "'They can also adjust over time to changing.'" | "'They can also adjust over time to changing market conditions and/or business strategies.'" | To conform the record to the facts |
| 77. | 513 | 2–3 | "example of what change in market conditions or business strategies would cause." | "example of what changes in market conditions or business strategies would cause." | Typographic error |
| 78. | 514 | 10 | "Yes. This is Exhibit 84." | "Yes. This is defendants' Exhibit 84." | To conform the record to the facts |
| 79. | 515 | 16–18 | "I think, probably, if I rewrote it, I would say—I might say I'm not accurate; but it didn't seem—" | "My opinion is that based on my experience in compensation and human resource management and my review of the evidence, I do not think that Zaideman's testimony that SCA entirely lacked a compensation | Clarification; to conform the record to the facts |

9

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | framework before 2021 was accurate." | |
| 80. | 528 | 6–7 | "I'm not sure there's a way to do it very precisely." | "My rebuttal report describes why I would have expected much higher mobility of the Class Members between Defendants, absent the restrictions." | Clarification |
| 81. | 528 | 24 | "Yes." | "I prepared a rebuttal report that was served May 30 and then I updated that rebuttal report for June 30." | Clarification; to conform the record to the facts |

10