# **Exhibit 12**

# Lane Declaration

# Redacted

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - x

IN RE:  OUTPATIENT MEDICAL :

CENTER EMPLOYEE ANTITRUST  : Master Docket No.

LITIGATION                 : 1:21-cv-00305-SRH-YBK

- - - - - - - - - - - - - - x


HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER


Videotaped Deposition of

EVAN P. STARR, Ph.D.


Baltimore, Maryland

Wednesday, March 19, 2025

9:24 a.m.


Job No. 577303

Pages:  1 - 271

Reported by:  Janet A. Hamilton, RDR

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025          2

Videotaped Deposition of EVAN P. STARR, Ph.D., held at the office of:

Kramon & Graham, P.A.

750 East Pratt Street

Suite 1100

Baltimore, Maryland  21202-3201

410.752.6030

Pursuant to Notice, before Janet A. Hamilton, Registered Diplomate Reporter and Notary Public in and for the State of Maryland.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                          3

                    A P P E A R A N C E S

     ON BEHALF OF THE PLAINTIFFS:

          DEAN M. HARVEY, ESQUIRE

          SARAH D. ZANDI, ESQUIRE

          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

          275 Battery Street, 29th Floor

          San Francisco, California  94111-3339

          415.956.1000

     -And-   EMILY HARWELL, ESQUIRE (via Zoom)

          250 Hudson Street, 8th Floor

          New York, New York  10013

          212.355.9500


     ON BEHALF OF DEFENDANT DaVITA, INC.:

          MORGAN LEWIS & BOCKIUS LLP

          J. CLAYTON EVERETT, JR., ESQUIRE

          1111 Pennsylvania Avenue, NW

          Washington, DC  20004-2541

          202.739.3000

     -And-   NATHAN T. SHAPIRO, ESQUIRE

          101 Park Avenue

          New York, New York  10178-0060

          212.309.6000

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                4

A P P E A R A N C E S   C O N T I N U E D


-And-    KENNETH M. KLIEBARD, ESQUIRE

         110 North Wacker Drive

         Chicago, Illinois  60606

         312.324.1000


-And-    MOLLY MORIARTY LANE, ESQUIRE (via Zoom)

         One Market, Spear Street Tower

         28th Floor

         San Francisco, California  94105-1596

         415.442.1333


-And-    JOHN C. DODDS, ESQUIRE

         2222 Market Street

         Philadelphia, Pennsylvania  19103-3007

         215.963.5000

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025                5

A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF DEFENDANTS UNITED SURGICAL PARTNERS

HOLDINGS, INC., UNITED SURGICAL PARTNERS

INTERNATIONAL, INC., and TENET HEALTHCARE

CORPORATION:

        KING & SPALDING LLP

        EMILY NEWTON, ESQUIRE (pro hac vice)

        LAUREN SMITH, ESQUIRE

        JACOB (JAY) PAOLILLO, ESQUIRE (via Zoom)

        1180 Peachtree Street, NE

        Suite 1600

        Atlanta, Georgia   30309

        404.572.2745


-And-   VERONICA MOYÉ, ESQUIRE (pro hac vice)

        1185 Avenue of the Americas

        34th Floor

        New York, New York   10036

        212.556.2100

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025                    6

A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF DEFENDANTS SURGICAL CARE

AFFILIATES, LLC and SCAI HOLDINGS LLC:

     McGUIREWOODS LLP

     SARAH A. ZIELINSKI, ESQUIRE

     AMY B. MANNING, ESQUIRE

     77 West Wacker Drive

     Suite 4100

     Chicago, Illinois  60601-1818

     312.849.8100

-And-   JOSHUA D. WADE, ESQUIRE

     Gateway Plaza

     800 East Canal Street

     Richmond, Virginia  23219-3916

     804.775.1000


ON BEHALF OF DEFENDANT ANDREW HAYEK:

     WILSON SONSINI GOODRICH & ROSATI, P.C.

     JORDANNE M. STEINER, ESQUIRE (pro hac vice)

     1700 K Street, NW, Fifth Floor

     Washington, DC  20006

     202.920.8703

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANT KENT THIRY:

      McDERMOTT WILL & EMERY LLP

      DANIEL R. CAMPBELL, ESQUIRE (via Zoom)

      KATHARINE M. O'CONNOR, ESQUIRE (via Zoom)

      444 West Lake Street

      Suite 400

      Chicago, Illinois  60605

      312.372.2000


ALSO PRESENT:

      ANDREW MOHRAZ, ESQ., Associate General

         Counsel, DaVita, Inc.

      ADAM NUDELMAN, Videographer

      SOPHIE MEADOWS, Edgeworth Economics

      ERIN JOHNSON, Ph.D., NERA

      WENDY L. PETROPOULOS, Ph.D.

         Cornerstone Research

      MICHELE CARTER, Cornerstone Research

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                                    8

C O N T E N T S

EXAMINATION OF EVAN P. STARR, Ph.D.            PAGE

   By Mr. Everett                                12

E X H I B I T S

          (Attached to the transcript)

STARR DEPOSITION

Exhibit DX 82    Expert Report of

                 Dr. Evan P. Starr

Exhibit DX 83    List of corrections to

                 Report of Dr. Evan P. Starr

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    9

THE VIDEOGRAPHER: This is media unit number 1 in the videotaped deposition of Evan Starr in the matter of In Re: Outpatient Medical Center Employee Antitrust Litigation in the US District Court for the District, Northern District of Illinois, Eastern Division, Case Number 1:21-cv-00305. Today's date is March 19, 2025. Time on the record is 9:24 a.m. Videographer today is Adam Nudelman representing US Legal.

Would all attorneys present please identify themselves, state whom they represent, beginning with the party noticing the proceeding.

MR. EVERETT: Good morning. This is Clay Everett from Morgan Lewis & Bockius on behalf of DaVita.

MR. SHAPIRO: Nathan Shapiro, Morgan Lewis & Bockius on behalf of DaVita.

MR. KLIEBARD: Good morning. Ken Kliebard from Morgan Lewis & Bockius --

THE REPORTER: I can't hear you, sir.

MR. KLIEBARD: Oh, sorry. Ken Kliebard, K-L-I-E-B-A-R-D, also with Morgan Lewis & Bockius, on behalf of DaVita.

MS. CARTER: Michele Carter, Cornerstone

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    10

Research for defendants.

MS. MOYE:  Veronica Moyé, that's M-O-Y-É, King & Spalding, for USPI and Tenet.

MS. NEWTON:  Emily Newton also from King & Spalding for the Tenet and USPI defendants.

MS. MANNING:  Amy Manning of McGuireWoods for SCA.

MS. ZIELINSKI:  Sarah Zielinski of McGuireWoods for SCA.

MS. ZANDI:  Sarah Zandi, Lieff Cabraser Heimann & Bernstein for plaintiffs.

MR. HARVEY:  Dean Harvey of Lieff Cabraser for the plaintiffs.

MR. WADE:  Joshua Wade of McGuireWoods for SCA.

MR. DODDS:  Jack Dodds from Morgan Lewis for DaVita.

MR. MOHRAZ:  Andrew Mohraz, M-O-H-R-A-Z, in-house counsel for DaVita.

MS. STEINER:  Jordanne Steiner from Wilson Sonsini Goodrich & Rosati on behalf of defendant Andrew Hayek.

MS. SMITH:  Lauren Smith with King & Spalding on behalf of USPI.

MR. HARVEY:  Could those attending remotely also state their appearance, please.

If we can hear them.

THE VIDEOGRAPHER:  Has anyone checked to see if --

MS. ZANDI:  I think we might have muted them.  The screen is showing -- I'll let you look.

THE VIDEOGRAPHER:  Repeat it.  Would the Zoom participants repeat the intros.

MR. HARVEY:  Zoom folks?  Yeah.

MR. CAMPBELL:  Sure.  You've got Dan Campbell from McDermott Will & Emery on behalf of defendant Kent Thiry.

MS. O'CONNOR:  Kate O'Connor from McDermott Will & Emery on behalf of Kent Thiry.

MS. LANE:  Molly Lane from Morgan Lewis & Bockius on behalf of DaVita.

MS. JOHNSON:  Erin Johnson from NERA -- that's N-E-R-A -- on behalf of DaVita.

MS. PETROPOULOS:  Wendy Petropoulos, Cornerstone.

MS. MEADOWS:  Sophie Meadows from Edgeworth Economics.

MR. PAOLILLO:  Jay --

| | |
|---|---|
| | 09:26:19 |
| | 09:26:20 |
| | 09:26:25 |
| | 09:26:31 |
| | 09:26:36 |
| | 09:26:39 |
| | 09:27:10 |
| | 09:27:14 |
| | 09:27:23 |
| | 09:27:25 |
| | 09:27:26 |
| | 09:27:31 |
| | 09:27:32 |
| | 09:27:34 |
| | 09:27:37 |
| | 09:27:38 |
| | 09:27:44 |
| | 09:27:46 |
| | 09:27:50 |
| | 09:27:52 |
| | 09:27:54 |
| | 09:27:57 |
| | 09:28:02 |

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025          12

THE REPORTER:  I'm sorry.  Say that again, please.          09:28:02  09:28:03

MR. PAOLILLO:  Jay, J-A-Y, Paolillo, P-A-O-L-I-L-L-O, from King & Spalding for USPI and Tenet.          09:28:06  09:28:09

MS. HARWELL:  Emily Harwell from Lieff Cabraser for the plaintiffs.          09:28:18  09:28:21

MR. HARVEY:  Anyone else?  Okay.          09:28:28

THE VIDEOGRAPHER:  Court reporter today, Jan Hamilton, also with US Legal, will now administer the oath.  You can proceed.          09:28:31  09:28:33  09:28:35

P R O C E E D I N G S

-----

EVAN P. STARR, Ph.D.,
a witness herein, being duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT DAVITA, INC.          09:28:50
BY MR. EVERETT:          09:28:50

Q  Good morning, Dr. Starr.  So I'm Clay Everett, as I've just announced, representing DaVita.          09:28:51  09:28:53  09:28:56

We haven't met before, have we?          09:28:56

A  Not to my knowledge.          09:28:58

Q  You've had your deposition taken in the          09:29:00

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    14

Q  All right.  Dr. Starr, you understand that you're testifying as an expert witness in this case?

A  I understand that, yes.

Q  And that you are offering opinion testimony in this case?

A  Yes.

Q  Okay.  And do you understand what opinion testimony is?

A  To the extent --

MR. HARVEY:  Objection.  Calls for legal conclusion.

A  To the extent that's a -- that's a legal term, I'm not sure exactly what the legal term is.

Q  You are -- but you are offering opinions within the scope of your expertise; is that correct?

A  That's right.  I was asked by counsel to develop opinions on several matters in this case, and that's -- that's what I've done in my report.

Q  How many hours have you spent working on this matter?

A  I can't recall the exact number, but several hundred.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                          15

Q   When did you start work?                                    09:30:58

A   I was retained, I believe, in the middle                   09:31:01
of 2023.                                                        09:31:05

Q   And -- and you started work shortly                        09:31:09
thereafter?                                                     09:31:12

A   That's right.                                               09:31:12

Q   And you said you've spent several hundred                  09:31:15
hours.  Can you give me any more specificity on                09:31:17
that?  More than 200 hours?                                     09:31:22

A   Probably more than 200 hours.                              09:31:25

Q   More than 300?                                             09:31:27

A   I'm not sure.                                              09:31:30

Q   Who's retained you in this case?                           09:31:33

A   To the best of my knowledge, counsel has                   09:31:38
retained me.                                                    09:31:41

Q   Of the 2 to 300 hours that you've spent on                09:31:43
this matter, what portion of that were spent                   09:31:47
preparing the report that you've -- that you've                09:31:51
offered into evidence in this case?                            09:31:55

A   The vast majority of the hours that I've                   09:31:58
spent working have been towards this report.                   09:32:01

Q   Have you provided expert testimony in the                 09:32:08
past?                                                          09:32:12

    MR. HARVEY:  Objection.  Vague.                            09:32:14

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    16

A   I have provided expert testimony in a few cases prior to this.

Q   How many cases?

A   I believe it's four or five.  I'd have to go look exactly what I -- what I wrote in my report.

Q   Those are disclosed in your report?

A   They are, yes.

Q   So we'll go through those.  Have you ever in another case besides this case provided expert testimony on damages issues?

A   There's one case that is related that I provided testimony related to damages although it has a very different flavor.

Q   In what way were the -- was the flavor different?

A   In this prior case it was a -- the case was about physicians moving from one hospital to another, and I was asked to examine the patients that would lose access to their physicians as a result of noncompete agreements being enforced. And so the damages there were to the patients who would lose their physicians, and so it was not a compensation case.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    17

Q   Are any of the other cases in which you've provided expert testimony in the past antitrust cases?

A   To the extent that you can classify issues related to noncompete agreements antitrust, then yes.  I'm not sure if that is a legal -- the implicated competition issues related to noncompetes.  So I don't know if those are employment or antitrust based on how you would classify them, but given that antitrust authorities are interested in those issues, my sense is that somebody could plausibly classify them as an antitrust issue.

Q   So you provided expert testimony in other cases relating to the effect of noncompetes; is that correct?

A   That's right.

Q   What are noncompetes?

A   Noncompetes are clauses in employment contracts that prohibit a departing worker from joining or starting a competing company typically within a specified time limit after they leave and sometimes within a geographic radius as well.

Q   So they're -- they're agreements between

conclusion.

A  My understanding, based on reading that report and the conversations with the attorneys, is that the judge did not want to go down that line of inquiry and, and so threw out that, the, the line of inquiry that my report was relevant to, and therefore excluded my report.

My understanding is that had nothing to do with the quality of the report or any of the methods or analysis that I did.

Q  Have you ever had a judge disagree with your expert opinions in an opinion from the judge?

A  Not to my knowledge.

Q  Has your testimony in other cases always been on behalf of a plaintiff in the case?

A  In my mind I don't think about the plaintiff/defendant distinction.  I, I am -- I think I was retained and provided a report in the case where I was on the side of the defendants.

Q  In which case was that?

A  This was a case -- I'd have to look at the exact name of the case, but it was a Han Nara case that's referenced in my report.

Q  And what was at issue in that case?

A    At issue in that -- well, so I was asked in that case to, to provide a rebuttal report from a statistics expert; and so I was retained as a statistics expert to discuss sampling procedures that were done in that case.

Q    Your -- well, let's finish this out.

So you've been deposed before; correct?

A    Correct.

Q    How many times?

A    I believe it's a handful of times.  I think five, maybe more, maybe less.  I can't remember exactly, but.

Q    In each of the cases that are disclosed in your expert report where you provided expert testimony in the past, were you deposed in each of those cases?

A    I was deposed in all of them except for one; and in that one I testified live in a, in the arbitral hearing.

Q    Okay.  And so that anticipates to some extent my, my next question.  So it sounds like you've testified at least once in an arbitral hearing; is that correct?

A    That's right.

Q   Have you ever otherwise testified live in court?

A   I presume testimony in front of the US Senate and the US House would not count as testifying live in court.  This is different testimony.  Yes.  So I think if you're asking have I testified live in court, aside from that one arbitration case, then I think the answer is no.

Q   You served an expert report in this matter on January 15th, 2025; is that correct?

A   I believe that was right.

Q   And then you made some corrections to that expert report; is that correct?

A   That's correct.

Q   And served a revised report that incorporated those corrections; correct?

A   That's right.

Q   What were the circumstances that led you to preparing the corrected report?

MR. HARVEY:  Let me just caution the witness not to reveal the content of any communications you had with plaintiffs' counsel or with other consulting or testifying experts.

A   Can you repeat the question?

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    22

Q   What were the circumstances that led you to serve the corrected expert report?

A   As I was rereading the report after we submitted it, I noticed several formatting problems that were unexpected and, and changed, and I wanted to correct those; and so that's -- and then in rereading the report there were several small substantive changes that, that I thought, as someone who cares about the quality of their work, I wanted to make sure that those small substantive changes were -- nonsubstantive changes were corrected.

Q   Are you working with any consulting firm, economic consulting firm or other consulting firm, in relation to the work that you performed in this case?

A   I had a team that was operating under my direction, but I'm not employed by a consulting firm.

Q   What's the name of the firm?

A   Econ One.

Q   And who on that team worked with you?

A   Augustus Urschel and Madeleine Bowe.

Q   So let's -- let's mark now your corrected

evidence that you believed was inconsistent with

any of those opinions; correct?

    A  I would.  I would. ███████████████

████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

██████████████████████████████

    Q  Okay.  And -- and so when there was

evidence that was inconsistent with any of the

opinions based on the qualitative evidence that

are described in section V.B of the report, you

considered that inconsistent evidence and then

offer an opinion about whether the inconsistent

evidence is more -- more convincing or credible

than the consistent evidence?

       MR. HARVEY:  Objection to form.

    A  I'm sorry.  Maybe you can restate the

question.  I was getting confused with all the

what is consistent and inconsistent.

Q  So you offer various opinions in section V.B of your report concerning whether the evidence that you reviewed and that you rely upon is consistent with the existence of various agreements, the timing of those agreements and the scope of those agreements; correct?

A  I would say in section 5 we -- there's even more detail than you described regarding the enforcement of those agreements, how they were communicated, the various examples of how they were used in practice, et cetera.  So there's much more than you just described in this section.

Q  And you didn't limit your review to evidence that was consistent with those conclusions; correct?

MR. HARVEY:  Objection.  Asked and answered.

A  I did not.

Q  You -- you considered inconsistent evidence as well; correct?

MR. HARVEY:  Objection.  Asked and answered.

A  I did.

Q  And with regard to evidence that was

inconsistent, you determined in your opinion that the, that evidence should not be, shouldn't change your opinion that the evidence is consistent with the existence of those agreements; is that correct?

MR. HARVEY: Objection to form.

A Let me try to answer your question. In this case there is a lot of qualitative evidence, and I reviewed the qualitative evidence to assess whether the alleged conduct was consistent with anticompetitive collusion.

And so in furtherance of that, I studied the qualitative evidence that was consistent and inconsistent; and at the end of the day, there was an ultimate question of was the -- is the -- is the qualitative evidence consistent with anticompetitive conduct, weighing all of that evidence together.

And my answer is that the evidence, the qualitative evidence is consistent with anticompetitive conduct.

Q Got it. So in this section of your report, after weighing that consistent and inconsistent evidence, you offer your opinion on

that, that ultimate question; correct?

MR. HARVEY:  Objection to form.

A  I offer that opinion, I offer the opinion that the qualitative evidence is inconsistent with competitive conduct and consistent with anticompetitive collusion in this section; but it also comprises -- I was also asked to look at the quantitative evidence as well.

This section, section V.B, is describing the qualitative evidence as it relates to the no-poach agreements.

Q  And we'll get to your quantitative analysis as well; but again, just focusing on this section V.B which relates to the qualitative evidence concerning what you're describing as bilateral no-poach agreements, you weighed the consistent and inconsistent evidence and then rendered your opinion about whether the, the -- on the ultimate question about whether the evidence is, in fact, more consistent with the parameters of those agreements; correct?

MR. HARVEY:  Objection.  Vague.  Objection to form.

A  I think -- I think I've answered your

question already.  I can try to summarize what, again, I think is an answer, which is that I reviewed the qualitative evidence as it relates to the bilateral no-poach agreements between SCA and DaVita and SCA and USPI; and I was asked to form an opinion about whether that evidence is consistent with anticompetitive conduct.

And in reviewing that evidence, I did not ignore inconsistent evidence, and I considered both evidence that would be inconsistent and consistent, and then in rendering my opinion I ultimately came to the conclusion that the qualitative evidence was consistent with anticompetitive conduct.

Q  Okay.  After weighing the consistent and inconsistent evidence?

I'm sorry.  You have to answer audibly.

A  Oh yes.

Q  Thanks.  Okay.

So let's focus again back on the SCA and DaVita, what you're calling no-poach agreements.

Do you offer opinions about whether the qualitative evidence shows that there were changes or modifications to that agreement or those

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025                    81

agreements over time?

    Q   Okay.  And is the tell-your-boss provision in your mind a material modification of the underlying agreement?

       MR. HARVEY:  Objection.  Vague.

    A   The -- the question you asked is, is it a material modification.  What do you mean by "material"?

    Q   Economically material.

    A   That sounds like an empirical question at the end of the day.  Are you asking me if I have an opinion on the effect of the tell-your-boss provision on its own?

    Q   Well, let me -- let me just take what you first said.  So you believe that that's an empirical question; is that correct?

    A   I was just trying to interpret the question that you were asking me.

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025                    129

What do you mean by that?                                    13:15:05

A  I mean, the places where their skill set                13:15:07
and their experience would most easily transfer.            13:15:10

Q  So it would include all the employers for               13:15:15
particular employees where their skill sets would           13:15:20
most easily transfer; is that right?                        13:15:24

A  Yeah, let me clarify.  And when I say                    13:15:26
easily, I mean that their -- their productivity             13:15:30
would not fall off because they have to learn, for          13:15:35
example, how a new industry operates, right, that           13:15:38
their knowledge of how to do their job is largely           13:15:41
similar at the other location.                              13:15:46

Q  And those -- depending on those skills,                 13:15:51
there might be different relevant labor markets             13:15:54
for different individuals; correct?                         13:15:58

MR. HARVEY:  Objection to form.                             13:16:01

A  When you say different labor markets, like              13:16:04
what do you mean?                                            13:16:07

Q  I mean just what you were talking about                 13:16:08
before when you -- when you describe what a                 13:16:10
relevant labor market is.                                   13:16:13

A  Right.  So I think what I'm trying to say               13:16:15
is that we are in the healthcare context, and to            13:16:17
the extent these individuals could go and use               13:16:21

their skills and knowledge most productively
without a big drop-off in their productivity, it
would be in the healthcare context in a similar
job.

Q And the -- the potential employers for
someone in an IT department might be different
than those with finance skills, for instance; is
that correct?

A I think I would just reiterate my answer
that if I am an individual who has expertise in
IT, in the healthcare industry, in the ASE
industry in particular, that the most relevant
labor market competitors are those who are working
in that same context.

Q And you haven't done any analysis to
determine who the most relevant employers are for
different class members, have you?

MR. HARVEY: Objection to form.

A I wasn't asked to do any analysis on which
employers are the most relevant. I was asked to
study the extent to which the qualitative and
quantitative evidence in this case is consistent
with anticompetitive conduct and to quantify the
harms done to the workers as a result of that

13:16:24
13:16:27
13:16:31
13:16:33
13:16:34
13:16:41
13:16:44
13:16:52
13:16:52
13:16:55
13:16:58
13:17:03
13:17:06
13:17:09
13:17:15
13:17:18
13:17:22
13:17:25
13:17:27
13:17:31
13:17:35
13:17:40
13:17:42
13:17:45

conduct using common methods and evidence.

Q Yeah. So you haven't done a relevant market analysis; correct?

A I wasn't asked --

MR. HARVEY: Objection to form.

A Let me repeat what I just said. I wasn't asked to do a relevant market analysis, however you're referring to that, and I did not do one.

Q A clear indication of who -- which employers might be able to employ individuals with readily transferrable skills is the employer from which an employee was hired.

Is that fair?

MR. HARVEY: Objection to form.

A I'm sorry. I found the question confusing. Could you restate it?

Q Sure. So there are lots of people that during the conduct period at issue in this case moved from other employers to, for instance, DaVita or SCA or USPI; correct?

MR. HARVEY: Objection to form.

A Among -- among the class members, during the window of data that we have, which again is approximately 2008, which is the start of the SCA

data up until 2022, we do see senior-level employees moving between SCA and USPI and SCA and DaVita.

Q  And from other employers as well; correct?

A  In the data that's provided, we only have payroll records -- sorry.  We have a lot of data from only these three companies.  So if I see an individual in the data, let's say, at SCA and they move to DaVita within the time period for which I have data, I can observe that move.  If they moved to another company outside of the three companies for which I have access to the data, I don't know what kind of job they took.

Q  There is data that would allow you to determine what job they took and which employer; correct?

MR. HARVEY:  Objection to form.

A  I wasn't asked to -- to look into that. There may be data that you could use to -- to assess that, but it wasn't one of my assignments.

Q  But you'd agree with me that if -- and you focused on departure so let's focus on departures first.

You would agree with me, would you not,

included in the -- in the class definition; is that right?

MR. HARVEY: Objection to form.

A  We don't know exactly where these individuals are going or if they're going anywhere. They could again be sitting out or unemployed, so I don't have a, a number of the other, the number of other companies that they went to in 2008, for example.

Q  Right. And I'll get back to that question; but my question is a little bit different, which is that the -- there may be different sets of competitors in the labor markets for different employees that are included within the class definition; is that right?

MR. HARVEY: Objection to form.

A  I think I gave the answer that I gave because we don't know where they went. So a competitor in this case is a company, and it's possible that this year the company hired in IT and next year the company is going to hire in finance.

And so it could very well be that we have the same company hiring for both of those types of

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                                    139

jobs.  Could be in this year, could be in another year; and what we would need, I think, to answer your question is the different employers that these individuals went to, if they went anywhere after they left.

Q   Okay.  So you'd need data on where the departing employees went to, to determine who the relevant, competitors in the relevant labor market are; right?

MR. HARVEY:  Objection to form.

A   Yes, that's right.

Q   Okay.  And you haven't examined or tried to determine whether such data's available?

MR. HARVEY:  Objection to form.

A   I wasn't asked to, to examine where every departing worker went to, and I did not do that.

Q   Your previous answers were suggesting you thought that or would expect that the moves were generally with other healthcare companies; is that right?

MR. HARVEY:  Objection to form.

A   I believe my testimony was that to the extent this individual's primary experience and expertise is in IT and healthcare or in finance

and healthcare, that they would be most well situated to be equally productive in similarly situated companies in the healthcare space.

Q   And do you know how many similarly situated companies in healthcare space there are?

A   Sitting here today I don't, I don't know.

Q   Order of magnitude?

A   I don't know.

Q   Certainly thousands; right?

MR. HARVEY:  Objection to form.

A   I don't know.

Q   No idea?

A   I don't know.

Q   Okay.  You at some point in your report refer to the defendants as among the largest in the outpatient medical care industry.

Does that sound familiar?

A   I'd have to go back and double check my language; but that is my -- that's consistent with my recollection.

Q   And how many entities are there in outpatient medical care industry?

MR. HARVEY:  Objection.  Vague.

A   What do you mean by "entities"?

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025                    155

A   I'm -- I'm somewhat familiar with that.

Q   You haven't attempted to define a relevant market in this case, have you?

A   Well, when it comes to thinking about market power, my -- my reading and my understanding of those -- those documents is that there are several ways to demonstrate market power, and in the merger context, it can be hard to demonstrate market power because the merger hasn't happened.  And so there are several ways in that context to think about whether, you know, whether companies might have market power, and that would require defining a relevant market.

In this context I wasn't asked to study the relevant labor market and define the precise contours of the labor market.  I wasn't asked to figure out exactly which companies every worker was going -- every worker was going to or coming from.  I was asked to assess the harm done to the workers as a result of the alleged conduct, whether that conduct -- the evidence, qualitative and quantitative, was consistent with anticompetitive harm.

My understanding of this literature and

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

156

these documents is that you can establish market power through a market definition exercise, or you can establish it directly. And as I talk about later in my report, the evidence that I uncover from the wage suppression models constitute direct evidence of market power.

Q  Okay. It was a very long answer. My question was simple. You have not attempted to, nor have you defined a relevant market in this case; is that correct?

MR. HARVEY: Objection. Argumentative. Asked and answered.

A  I wasn't asked to define a relevant market, and I did not define a relevant market.

Did you want to go back to the --

Q  I'll get back to that in a minute. So my next question for you, sir, is whether you agree that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them.

Would you agree with that?

MR. HARVEY: Object to form.

A  Sorry. A lot of --

MR. HARVEY: Objection to form.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

157

A   There were a lot of negatives in there. Could you restate the question?

Q   Yep.  Would you agree that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them?

MR. HARVEY:  Objection to form.

A   I think -- I think the -- the question that you're asking is let's imagine a world in which the defendants had no market power.  They had no power to set wages.

In that world is it possible that the conduct could have suppressed wages?  Is that your question?

Q   If you want to look, I'm actually reading from your report.

A   Okay.

Q   So my question is whether you agree with what you wrote, which is that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them?

MR. HARVEY:  Counsel, could you please identify where you're reading?

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025

181

more disaggregated compensation data.  So to

harmonize it, we aggregated it all to the

individual employee company level.

So I would -- I would now have a dataset

where I observe individual A at DaVita in 2010.

The defendants didn't give, harmonize time frames

of the data.  SCA only gave data that started in

2008.  USPI and DaVita had data that started a

little bit earlier, and so we call this an

unbalanced panel in econometrics.

And so what the model does is it has to

define for each company when does the conduct

period start and stop, and so that's defined --

the conduct overall is defined.  So this is at,

remember, the individual company level, and the

conduct varies at the -- sorry -- the individual

company year level, and the conduct varies at the

company year level, based on the record evidence

that I analyzed previously.

And so for workers that are employed at

this time period -- they may have been employed for a year or two; they don't necessarily have to be employed over the whole time frame -- that this is the aggregate effect on their compensation during the conduct period was about ██████████ percent across each of the three defendants.

Q So just at the last part I just want to make sure I understand. So the ████████████, is that at ██████████ suppression on an individual per year or over the entire time the individual's included in that class?

A Thank you for that clarification.

This is per year, and this is for the typical class member regardless of which company you are at, because later we're going to disaggregate between companies.

Q Okay. But at least in terms of this model, this is across all three companies; correct?

A That's right.

Q Okay. And I -- it was in your description -- thank you very much for that, by the way -- in your description of how you put together the model, but the data was harmonized at

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

183

the individual company year level; correct? — 14:44:55

A  That's right. — 14:44:58

Q  And so, and that's based in part on the fact that DaVita's compensation data was at the annual level of aggregation? — 14:44:59 / 14:45:02 / 14:45:07

A  That's right. — 14:45:09

Q  Okay.  And then the other variables that you included in your model as control variables, did you also harmonize those to the annual level? — 14:45:10 / 14:45:15 / 14:45:21

A  Yes.  As, as described in the control variables, I think I have approximately ten, ten control variables; and so it depends on which control variable that you're talking about, for example. — 14:45:26 / 14:45:29 / 14:45:31 / 14:45:35

Some of them have natural variation across time.  So, for example, the state unemployment rate can vary from year to year, and so that is a state year variable. — 14:45:38 / 14:45:41 / 14:45:43 / 14:45:47

State GDP per capita, that also can vary across time and state as well.  State healthcare expenditures per capita, again, that changes year to year.  Averager -- average manager earnings in that state in the industries by the defendants, that also changes year to year. — 14:45:50 / 14:45:54 / 14:45:58 / 14:46:01 / 14:46:07 / 14:46:09

Q   And -- and the evidence that you rely on for that opinion are your regressions; is that correct?

A   I believe the -- if I could just turn to the right page.  So I've been asked to determine whether defendants have market power over class members, and based on my wage suppression estimates, I suggest that companies did suppress or they -- all or nearly all class members experienced wage suppression as a result of the alleged misconduct and -- and if we had a perfectly competitive market, then it would -- I do not expect that we would have -- that the conduct would have had these effects.

Q   And -- and so that's what you're comparing it against is a perfectly competitive market?

A   But we have to think about the term market power and what's it mean here, and the typical benchmark in economics classes is to think about it in a perfectly competitive market.  And it's long been alleged that labor markets are perfectly competitive.  That claim, I think, has been debunked several times.

I do think that here if -- if the

companies didn't have some power, market power
over setting wages, then they would not have been
able to suppress class member compensation as a
result of the conduct.

Q  Okay.  So in terms of your opinions about
the market power of the defendants over labor that
are reflected in, I think, section 9 of your
report, those are based on your wage suppression
regressions; correct?

A  Right.  I was asked to assess market power
and the existence of market power, and as I talk
about in section 9, there's generally two ways to
assess market power.  One is using an indirect
test, which is, again, more common, as we
discussed, when you cannot test directly whether
there is evidence of market power.  And so what I
did is a direct test of market power by examining
whether or not the alleged conduct suppressed
compensation for all or nearly all members, and
that constitutes direct evidence of market power.

Q  And -- and that evidence, again, just to
be clear is your wage suppression regressions?

A  Certainly the wage suppression
regressions, and I'd have to think about the

extent to which it's consistent with the other

analyses.  The mobility analysis also seems

relevant for the market power though I think the

primary evidence is the -- the compensation

analyses.

Q  Okay.  So at least the primary evidence is

the compensation analysis; is that correct?

A  And I'm saying analyses here just because

there's many.

Q  And the analyses that you're referring to

are the regressions about wage suppression in

various forms; correct?

A  They are, and I would also include in

there potentially the wage structure regressions

as well.

Q  Okay.  And is that reflected in section 9

of your report?

A  The -- the compensation structure

regressions are in part 7(F).

Q  But is your reliance on the compensation

structure regressions a support for your opinions

regarding market power reflected in your report in

the section that addresses market power?

A  Well, I think to the extent that we

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    271

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Janet A. Hamilton, Registered Diplomate Reporter and Notary Public before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that review was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of March, 2025.

Registered Diplomate Reporter

My commission expires

March 31, 2028

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - x

IN RE:  OUTPATIENT MEDICAL :

CENTER EMPLOYEE ANTITRUST  : Master Docket No.

LITIGATION                 : 1:21-cv-00305-SRH-YBK

- - - - - - - - - - - - - - x


HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER


Videotaped Deposition of

EVAN P. STARR, Ph.D.

VOLUME 2

Baltimore, Maryland

Thursday, March 20, 2025

9:18 a.m.

Job No. 577304

Pages:  272 - 522

Reported by:  Janet A. Hamilton, RDR

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025                              273

          Videotaped Deposition of EVAN P. STARR,

Ph.D., held at the office of:




          Kramon & Graham, P.A.

          750 East Pratt Street

          Suite 1100

          Baltimore, Maryland  21202-3201

          410.752.6030









          Pursuant to Notice, before Janet A.

Hamilton, Registered Diplomate Reporter and Notary

Public in and for the State of Maryland.

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025
274

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

DEAN M. HARVEY, ESQUIRE

SARAH D. ZANDI, ESQUIRE

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

275 Battery Street, 29th Floor

San Francisco, California  94111-3339

415.956.1000


ON BEHALF OF DEFENDANT DaVITA, INC.:

MORGAN LEWIS & BOCKIUS LLP

J. CLAYTON EVERETT, JR., ESQUIRE

1111 Pennsylvania Avenue, NW

Washington, DC  20004-2541

202.739.3000

-And-   NATHAN T. SHAPIRO, ESQUIRE

101 Park Avenue

New York, New York  10178-0060

212.309.6000

(Appearances continued on next page)

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025                    275

A P P E A R A N C E S   C O N T I N U E D

-And-    KENNETH M. KLIEBARD, ESQUIRE

         110 North Wacker Drive

         Chicago, Illinois  60606

         312.324.1000


-And-    MOLLY MORIARTY LANE, ESQUIRE (via Zoom)

         One Market, Spear Street Tower

         28th Floor

         San Francisco, California  94105-1596

         415.442.1333


-And-    JOHN C. DODDS, ESQUIRE

         2222 Market Street

         Philadelphia, Pennsylvania  19103-3007

         215.963.5000

(Appearances continued on next page)

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025                                    276

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANTS UNITED SURGICAL PARTNERS

HOLDINGS, INC., UNITED SURGICAL PARTNERS

INTERNATIONAL, INC., and TENET HEALTHCARE

CORPORATION:

        KING & SPALDING LLP

        EMILY NEWTON, ESQUIRE (pro hac vice)

        LAUREN SMITH, ESQUIRE

        1180 Peachtree Street, NE

        Suite 1600

        Atlanta, Georgia  30309

        404.572.2745


-And-   VERONICA MOYÉ, ESQUIRE (pro hac vice)

        1185 Avenue of the Americas

        34th Floor

        New York, New York  10036

        212.556.2100


(Appearances continued on next page)

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025                    277

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANTS SURGICAL CARE

AFFILIATES, LLC and SCAI HOLDINGS LLC:

 McGUIREWOODS LLP

 SARAH A. ZIELINSKI, ESQUIRE

 AMY B. MANNING, ESQUIRE

 77 West Wacker Drive

 Suite 4100

 Chicago, Illinois  60601-1818

 312.849.8100

-And- JOSHUA D. WADE, ESQUIRE

 Gateway Plaza

 800 East Canal Street

 Richmond, Virginia  23219-3916

 804.775.1000

ON BEHALF OF DEFENDANT ANDREW HAYEK:

 WILSON SONSINI GOODRICH & ROSATI, P.C.

 JORDANNE M. STEINER, ESQUIRE (pro hac vice)

 1700 K Street, NW, Fifth Floor

 Washington, DC  20006

 202.920.8703

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANT KENT THIRY:

McDERMOTT WILL & EMERY LLP

DANIEL R. CAMPBELL, ESQUIRE (via Zoom)

KATHARINE M. O'CONNOR, ESQUIRE (via Zoom)

444 West Lake Street

Suite 400

Chicago, Illinois  60605

312.372.2000

ALSO PRESENT:

ANDREW MOHRAZ, ESQ., Associate General

Counsel, DaVita, Inc.

ADAM VAUGHN, Videographer

WENDY L. PETROPOULOS, Ph.D.

Cornerstone Research

MICHELE CARTER, Cornerstone Research

C O N T E N T S

EXAMINATION OF EVAN P. STARR, Ph.D.      PAGE

By Mr. Everett      282

By Ms. Newton      445

By Ms. Zielinski      476

E X H I B I T S

(None marked)

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025

THE VIDEOGRAPHER: We are on the record at 9:18 a.m. Audio and video recording will continue to take place. All parties agree to go off record. Please note the microphones are sensitive and may pick up whispering and private conversations.

This is the recorded proceeding of Dr. Evan P. Starr taken by counsel in the matter of Outpatient Medical Center Employee Antitrust Litigation. This proceeding is taking place at Kramon & Graham, P.A., 750 East Pratt Street, Suite 1100, Baltimore, Maryland 21202. My name is Adam Vaughn, and I am the videographer on behalf of US Legal Support located at 11625 North Chase Drive, Suite 900, Houston, Texas, 77060.

I am not related to any party in this action nor am I financially interested in the outcome. The court reporter is Jan Hamilton on behalf of US Legal Support. Counsel will state their appearances for the record, after which the court reporter will enter the statement for the proceeding into the record and swear in the witness.

MR. EVERETT: This is Clay Everett from

| | |
|---|---|
| 09:18:09 | |
| 09:18:12 | |
| 09:18:17 | |
| 09:18:20 | |
| 09:18:23 | |
| 09:18:27 | |
| 09:18:27 | |
| 09:18:32 | |
| 09:18:39 | |
| 09:18:44 | |
| 09:18:52 | |
| 09:18:57 | |
| 09:19:03 | |
| 09:19:06 | |
| 09:19:11 | |
| 09:19:16 | |
| 09:19:18 | |
| 09:19:20 | |
| 09:19:23 | |
| 09:19:25 | |
| 09:19:28 | |
| 09:19:31 | |
| 09:19:32 | |
| 09:19:34 | |

Morgan Lewis for DaVita.

MR. SHAPIRO:  Nathan Shapiro, Morgan Lewis, for DaVita.

MR. KLIEBARD:  Good morning.  Ken Kliebard of Morgan Lewis, also on behalf of DaVita.

MS. CARTER:  Michele Carter, Cornerstone Research, for defendants.

MS. MOYÉ:  Veronica Moyé, King & Spalding, USPI and Tenet.

MS. NEWTON:  Emily Newton, King & Spalding, also for Tenet and USPI.

MS. MANNING:  Amy Manning, McGuireWoods, SCA.

MS. ZIELINSKI:  Sarah Zielinski, McGuireWoods, SCA.

MS. ZANDI:  Sarah Zandi, Lieff Cabraser Heimann & Bernstein for plaintiffs.

MR. HARVEY:  Dean Harvey, Lieff Cabraser for plaintiffs.

MR. WADE:  Joshua Wade, McGuireWoods for SCA.

MR. DODDS:  Jack Dodds, Morgan Lewis for DaVita.

MR. MOHRAZ:  Andrew Mohraz for DaVita.

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025                                    282

MS. STEINER:  Jordanne Steiner, Wilson Sonsini Goodrich & Rosati for Andrew Hayek.

MS. SMITH:  Lauren Smith, King & Spalding, for USPI and Tenet.

MR. HARVEY:  And the Zoom?

P R O C E E D I N G S

-----

EVAN P. STARR, Ph.D.,

a witness herein, being duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT DAVITA

MR. EVERETT:

Q  All right.  Good morning, Dr. Starr.

A  Good morning.

Q  Just I wanted to follow up real briefly on one thing from yesterday.  Yesterday you testified that in one of your academic papers you utilized a regression that incorporated a linear time trend.

Do you recall that?

A  Yes.

Q  Which -- which paper is that?

A  If I could look in my CV, I can give you the title.

Q  And while you're looking for it, just to

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025

365

uncertain is how long they are staying, and so if we want to talk about expected values, an individual might have a subjective probability that they will make it to a year, whatever the vesting period is, and they might have their own subjective value of what that equity grant is worth at a particular point in time; but in terms of what's in their bank account, what actually transfers on the day that stock award is made, my understanding is that it is a, it is a promise to pay at some future date based on certain conditions. There's no dollars exchanged on that day.

Q Right. And I understand that the -- in terms of the realized value for unvested stock options, that would be zero; is that right?

A As long as the unvested stock options -- and I don't want to complicate the hypothetical, but some bonuses -- sometimes stock options might come with a cash bonus, so to the extent we're only talking about stock options with a vesting period of a given time, my understanding is that when the stock option award is made, that it would come in general with no -- no actual dollars being

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025                           366

transferred, just a promise to pay at a future point in time based on the conditions laid out in the award.

Q But there would be an expected value of the stock at the time it is issued; is that correct?

MR. HARVEY: Objection. Asked and answered.

A I would say the expected value in each year before the vesting period ends is zero, and then after the vesting period ends, it's certain, whatever that -- whatever the stock award says. And so it's really a matter of -- of timing, and so up until the worker hits that vesting period, it's worth zero to them. And then any subjective beliefs they have about their future probabilities of mobility, which may or may not be right, they might form an expectation of how much that particular stock award might be worth, but it's not worth anything in realized earnings until that future date in time.

Q And -- and do you -- do you know how as an accounting matter unvested stock options are valued?

MR. HARVEY: Objection to form.

A I'm not an accountant, and I -- I -- I can't -- sitting here today, I can't say I know how defendants valued stock options in this case. We use the value of realized earnings that they provided to us.

Q And do you know if as -- in terms of reporting and accounting for, say -- say, financial reporting, whether stock options need to be valued at the time of issuance?

MR. HARVEY: Objection to form.

A My understanding is that an award of a given number of stock options has a value and is tied to the resale of those stocks at any given time. If you have ten shares of a stock and you'd like to sell them, then you sell them at the -- at the going rate, and that rate could change over time.

Exactly how accountants pick that rate, if it's the rate at a -- the start or the expected rate at the time of vesting or something different, I'm not exactly sure how they do that, and I don't know how they did it in this case. We used the realized earnings that defendants shared

with us.

Q   But your testimony is that as an economic matter the expected value of stock options is zero until they are vested; is that right?

MR. HARVEY:  Objection.  Misstates prior testimony.

A   The expectation that individuals have is entirely conditional on how long they expect to stay.  So the expected value -- so if you -- if I look at a stock, an award that vests in -- I'll give myself more time -- two years, what is my expected award if I stay one year?  Zero.

What is my expected award if I stay 1.5 years?  Zero.

What is my expected award if I stay 1.8 years?  Zero.

What is my expected award if I stay 1.9 years?  Zero.

What is my expected award if I stay 1.99 years?  Zero.

What is my expected award as soon as I cross that threshold?  It's whatever the value of the award is as laid out in the particulars of that contract.

And so my testimony is that there might be a forward-looking expectation which relates to the individuals' subjective probability of how long they are going to stay, but the expected value of that award depends on -- it's zero -- it's entirely zero before the vesting period, and then it's exactly what's awarded in it at the time they cross that threshold.

Q  And from the perspective of the employer who is paying compensation, you would take into account their expectations about the likelihood of vesting?

MR. HARVEY:  Objection to form.

A  As a practical matter, when companies are issuing stock compensation, my understanding is that part of the goal of stock compensation is that when the company does well, the worker does well, and when you have a vesting period of a certain number of years, it acts potentially as an incentive mechanism to keep the worker around such that they have a particular incentive to stay, a higher incentive to stay to reach a given period of time.

And I just want to cite from Gibson here

because I thought he put this very nicely for why he looked at stock compensation differently than salary compensation, and Gibson writes here in his -- in his article that his explanation for the reduction in stock bonuses arising from the no-poach agreement is that "a firm engaged in no-poaching agreements has less need to offer employees incentives to stay."

And so that's -- that's his justification for why he includes equity compensation. So I can imagine that when companies are choosing to use equity compensation, they're -- they're doing it in part to try to help keep workers to stick around, and so they have a subjective belief not only about how long those workers might stay without the equity compensation but maybe that their belief updates if they were to provide equity compensation.

Q But -- but in the case of individuals who received equity compensation before the conduct period, that would not have been affected by the conduct; correct?

MR. HARVEY: Objection. Asked and answered.

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025                                        437

employee compensation?  Would that in your opinion transmit across all class members?

     MR. HARVEY:  Objection to form.

  A  What do you mean by a narrow shock?

  Q  I guess the opposite of what you mean by a broad shock.

     MR. HARVEY:  Objection to form.

  A  So I think that the -- at issue in this case are -- is the alleged misconduct which is agreements not to poach each others' workers, which consists of a direct prohibition on solicitation and the tell-your-boss provision and separately the CS -- the CSI exchanges.  And so I'm not sure it's worth talking about narrow shocks to an individual worker or not when the -- the conduct at issue in this case is clearly not narrow.

    The evidence is -- let me be clear.  The evidence is consistent with the agreements at issue in this case not being narrow.  The -- it's possible at the same time -- and let me play with your hypothetical for just a moment -- that if the right worker is seen as a -- as a benchmark in a certain job and that worker is able to leave, for

example, that that puts -- that gives information

and competitive pressure for other workers.

I'll just give you one example that comes

Q   Is that something you've tested?

A   What I've looked at in this case, as we've

talked about several times, and forgive me if I

sound like a broken record here, is whether the

evidence in this case is consistent with

anticompetitive conduct, whether I can quantify the harms from the conduct, whether all or nearly all class members are harmed using common methods and evidence, and -- and that -- that's what I've done.

And so I haven't tested whether a single job mobility event or a single event of any kind, aside from what I was asked to do, I haven't looked at those individual events and tried to assess what impacts they have.

Q   Is -- if there was a positive shock to compensation, would that also tend to filter through and impact every employee among the senior employees of defendants?

A   So I'll just return, I think, to the example that we started with here, which is probably the easiest to understand, which is that if -- you imagine a world in which the defendants are sharing their raise information. And, again, just to give a purely hypothetical, suppose that SCA is thinking about raises of 4 percent and then they learn that DaVita and USPI are giving 2 percent raises. If they then give everyone a raise of 2 percent instead of 4 percent, that's

broadly felt.  If instead they were to go from 2 percent to 4 percent, again, that would be broadly felt.

Q  So you gave the example before of Skip Thurman.  Have you looked to see whether others who worked in a similar role as Mr. Thurman or Mr. Myers who Mr. Thurman was referring to got raises when -- when the information that you were talking about became available?

A  Yeah.  I'd love to talk about the common impact section in my report where we use a variety of methods to estimate whether all or nearly all members of the class were harmed, and so that would include Skip Thurman and -- and the others, subject to the caveat that they were in the director and above jobs.

Q  But -- but I think the example that you gave was that Mr. Thurman became aware of some other employee getting an offer with -- for substantially more compensation than he or -- or perhaps others in a similar role were being paid.

Did that positive shock result in an increase in pay for Mr. Thurman or others?

A  So my understanding of part of the Skip

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025                                    522

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

   I, Janet A. Hamilton, Registered Diplomate Reporter and Notary Public before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that review was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

   IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of March, 2025.

Janet A. Hamilton

Registered Diplomate Reporter

My commission expires

February 4, 2028

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

------------------------------- Master Docket No.

IN RE OUTPATIENT MEDICAL CENTER   1:21-cv-00305-SRH-YBK

EMPLOYEE ANTITRUST LITIGATION,

----------------------------------

Baltimore, Maryland

Tuesday, July 15, 2025

*** HIGHLY CONFIDENTIAL ***

Deposition of EVAN P. STARR, Ph.D., VOL. III, a witness herein, called for examination by counsel for the Defendant DaVita, in the above-entitled matter, pursuant to notice, the witness being duly sworn by Barbara J. Moore, a Notary Public in and for the State of Maryland, taken at the offices of KRAMON & GRAHAM, P.A., 750 E. Pratt Street, Baltimore, Maryland, at, and the proceedings being taken down by Stenotype by BARBARA MOORE, CRR, RMR, and transcribed under her direction.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

APPEARANCES:


              On Behalf of the Plaintiff:

                     DEAN M. HARVEY, ESQ. (pro hac vice)
                     LIN Y. CHAN, ESQ. (pro hac vice)
                     YAMAN SALAHI, ESQ. (pro hac vice)
                     LIEFF CABRASER HEIMANN & BERNSTEIN,
                     LLP
                     275 Battery Street, 29th Floor
                     San Francisco, CA 94111-3339
                     dharvey@lchb.com


               On Behalf of the Defendant DaVita,
               Inc.:
                     J. CLAYTON EVERETT, ESQ.
                     NATHAN T. SHAPIRO, ESQ.
                     KENNETH M. KLIEBARD, ESQ.
                     MORGAN LEWIS, LLP
                     1111 Pennsylvania Avenue, NW
                     Washington, D.C.   20004


                     SARA CHAMPION, ESQ.
                     CORNERSTONE RESEARCH
                     2001 K St NW, Suite 800
                     Washington, DC 20006


              On Behalf of SCA Defendants:

                     SARAH A. ZIELINSKI, ESQ.
                     ANDREW E. TALBOT, ESQ.
                     AMY B. MANNING, ESQ. (Via Zoom)
                     PETER SHAKOW, ESQ. (Via Zoom)
                     McGUIRE WOODS, LLP
                     77 W Wacker Drive, # 4100
                     Chicago, IL 60601

APPEARANCES (Continued):

On Behalf of Defendants Tenet and USPI:

EMILY SHOEMAKER NEWTON, ESQ.

LAUREN SMITH, ESQ.

VERONICA MOYÉ, ESQ.

KING & SPALDING, LLP

1180 Peachtree Street, NE

Suite 1600

Atlanta, GA 30309

Videographer:  Adam Nudelman

                         TABLE OF CONTENTS

WITNESS                                                   PAGE

EVAN P. STARR, Ph.D.

BY ATTORNEY EVERETT                                        528

BY ATTORNEY ZIELINSKI                                     788


                           EXHIBITS

EXHIBIT          DESCRIPTION                     PAGE

EX DX 90    Updated expert witness report        563

EX DX 91    Errata                               563

EX DX 92    May 30 rebuttal report               564

EX DX 93    LinkedIn download                    566

EX DX 94    Lafontaine paper                     613

EX DX 95    Collaci paper                        633

EX DX 96    Gibson paper                         640

P R O C E E D I N G S

THE VIDEOGRAPHER:  This is media Unit No. 1 in the videotaped deposition of Dr. Evan Starr in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation, Case No. 1:21-cv-00305.

Today's date is July 15, 2025. Time on the record 9:16 a.m.  This video deposition is taking place in Baltimore, Maryland.

Would all attorneys present please identify themselves, state whom they represent, beginning with the party that noticed this proceeding.

ATTORNEY EVERETT:  Good morning, Clay Everett for Morgan Lewis for DaVita.

(Attorneys stated their appearances for the record.)

ATTORNEY EVERETT:  I assume that the Zoom notices could be noted in the report; is that correct?

THE VIDEOGRAPHER: Adam Nudelman, also with U.S. Legal. We'll now administer the oath and we can proceed.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EVAN P. STARR, having been called as a witness on behalf of the Plaintiff and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY

ATTORNEY EVERETT:

BY ATTORNEY EVERETT:

Q.    Good morning, Dr. Starr.

A.    Good morning.

Q.    You wouldn't disagree, would you, that the employers that hired Defendants' senior-level employees are competitors for those employees?

ATTORNEY HARVEY: Objection to form.

THE WITNESS: Can you state the question again.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

they've traditionally been separate.

Q. Have you ever taught industrial organization?

A. I have. I've taught managerial economics, and I've taught intramicro and intermediate micro, and I taught antitrust courses in graduate school as well.

Q. So I guess turning back to these naturally occurring sources of monopsony power, those exist in labor markets regardless of any, say, no-poach agreement; right?

A. There are naturally existing frictions that exist independent of firm conduct and independent of firm behavior.

Q. And for the three defendants here, do you have the opinion that each of them had some monopsony power by virtue of these types of naturally occurring frictions?

A. So when I think about whether the companies and the defendants in this case have market power, I think we can look to the economic literature, which has some estimates of the typical

firm market power in the healthcare industry.

And when you look across industries, healthcare has the most market power relative to just -- to -- sorry.  Healthcare has the second most market power, according to some estimates.

And so as a default, I would expect that they have market power and a significant degree of market power.  I'm not relying on that for my opinion that the defendants had market power.  I'm primarily relying on my wage regression that the documents -- that defendants had market power.  But I think it would be expected that they would, given the prior literature.

Q.    Okay.  And they would have had any of that naturally occurring monopsony power bothboth before, during and after the conduct at issue?

A.    There would be some naturally occurring market power.  I imagine that they would have had that both before and during and after the conduct, and their behavior may have also either extended their market power or it may have -- they

may have actualized their market power in ways that they weren't during the after period or before period.

Q.    And have you done any analysis to determine whether the naturally occurring monopsony power that defendants may have had that arose from things such as frictions varied over time?

A.    Your question is have I studied whether the other sources of market power have varied over time in addition to -- so we should talk about, I guess -- I'm not sure where you're going.  I haven't done a separate analysis that identifies market power arising from naturally occurring frictions versus firm conduct.

The empirical model that I estimate is designed to take into account a variety of other issues and identify the effect of the conduct itself.

So I'm confident in that, but I haven't done a separate analysis that would say search all matching frictions that were naturally occurring would have been higher here or there.

And so the goal is purely on causal identification.  Whatever the relevant contours of the labor market are for a given individual is immaterial once you've estimated the appropriate causal effect.

Just to give an example of how that works in this case, if you recall, my empirical model compares the same workers to themselves.  And so presumably that same worker is in a similar labor market or has similar preferences and skills as they did at different points in time.

And so when you have that sort of comparison that's driving your estimate, the labor market for that individual is already held sort of constant, and in that sense it's not necessary to think about all the potential moves and where everybody goes to.

BY ATTORNEY EVERETT:

Q.    Again, just to be clear, you have not attempted to define even the rough contours of any labor market in this case; correct?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  As I just testified, my task was not to identify the rough contours of the labor market.  It was to identify the harm done to the employees as a result of the challenged conduct, among other assignments.

And so that was what I did, and what I did is consistent with the literature.  If you study the no-poach agreements that have been studied in the literature, for example, and the High Tech case and in the franchise cases, none of those studies do an analysis that examines the rough contours of the labor market, as you put it.  That's because you don't need to do that when the goal

is to estimate the harm of the conduct.

So my analysis is consistent with the literature, and it's consistent with the other research that I've done on identifying the harms from mobility restrictions.

BY ATTORNEY EVERETT:

Q.    And the literature that you're referring to on no-poach agreements is four papers. Is that right?

A.    Well, so I would include, you know, if you want to think about the literature mobility restrictions more broadly, there are limited instances of no-poach agreements in the literature. There's a handful of papers, but the literature on non-compete agreements is much larger.

And so I think in totality I don't think many of them take the perspective that Defendants' experts do hear that you have to study and count the exact number of employers that people go to.

Q.    So I guess putting aside the non-compete literature, which I acknowledge you've

record.)

THE VIDEOGRAPHER:  We're back on the record at 16:27.

EXAMINATION BY

ATTORNEY ZIELINSKI:

Q.    Dr. Starr, nice to see you again. I'm Sarah Zielinski, an attorney for SCA.

First let's go to your report, Defendant's Exhibit 90, and I'm on page 62.  And this is Paragraph 68D.

A.    Okay.

Q.    And that paragraph says, ████

████████████████████████████████████

████████████████████████████████████

flimsy corporate retention policies."

Do you see that?

A.    Yes.

Q.    Are you offering an opinion in this case that SCA had flimsy corporate retention policies?

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████

Q.     So is that an opinion that you're offering in this case?

A.     I'm just trying to describe the evidence ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Q.     Okay.  And what I'm trying to understand is whether this paragraph is just a descriptive, you know, something that you're doing to characterize evidence that you saw or whether that's an opinion that you are offering in this case.

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  Let me back up.  So

we're talking about this section which is in response to Defendant's experts here claiming that the record evidence is insufficient to support wage fixing or support wage fixing or support wage suppression as it relates to only the CSI exchanges.

So I'm responding to that by saying A, I think that the evidence that we do have is already sufficient to suppress compensation just from the CSI exchanges.

And then here what I'm talking about, in this section I'm talking about the evidence that we may not have because we don't observe it. So there's lots of pieces of that evidence. Some of it is coming from the fact that emails were supplied by individuals and not the companies themselves because of subpoenas.

Some of it is coming from the fact

Evan P. Starr Volume III Highly Confidential
July 15, 2025

harmed by the challenged conduct.

BY ATTORNEY ZIELINSKI:

Q.     Did you do a comparison of facility CEOs or administrators to their job responsibilities to the job responsibilities of director, director and above at SCA?

A.     Well, it says here that the CEOs are the leader of the surgical hospitals, and so they are the ones who are in charge of the hospital, so their responsibilities would include overall running of the hospital.

And so that was a very large responsibility.  And so we assume that they were in the director and above category.

ATTORNEY ZIELINSKI:  Nothing further from SCA.

ATTORNEY HARVEY:  I think I don't have anything, but why don't we take a second just to double-check.

THE VIDEOGRAPHER:  Off the record at 16:53.

(Recess taken from 4:53 p.m.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

to 4:55 p.m.)

THE VIDEOGRAPHER: We're back on the record at 16:55.

ATTORNEY ZIELINSKI: While we were on a break, Plaintiff's counsel indicated that a question that he had previously instructed the witness not to answer that we can now reask and have the witness answer.

BY ATTORNEY ZIELINSKI:

Q. So the question was -- so the answer to my question is that you don't have any expertise in analyzing retention policies; correct?

A. So I think that the -- your question is do I have expertise in analyzing corporate retention policies. My expertise is in economics, labor economics and understanding competitive conduct and how that affects workers. So the issue here that we're talking about is one of evidence that I would normally be looking for in a case like this where the goal is to understand what communications took place that would be consistent

with anti-competitive conduct and inconsistent with unilateral conduct.

And so I'd be looking for communications that would indicate individuals sharing specific instances of price information, asking for prices, future price changes. I would be interested in what they're doing beyond normal benchmarking.

And so that's an expertise that economists bring to these cases is reconciling the qualitative evidence with theory about what cartel behavior would look like. And so the issue of retention policies comes into play because that determines the scope of the record evidence that we can see.

And so the extent to which SCA has retention policies which facilitates emails and communications not being shared is relevant to that discussion because it limits therefore what we can see.

And so the fact that some practices were made to keep information unknown is also relevant because economists understand that cartel behavior is likely to be secretive, and so even the types of

STATE OF MARYLAND:                              SS

    I, Barbara Moore, a Registered Court Reporter of the State of Maryland, do hereby certify that these proceedings took place before me at the time and place herein set out, and the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

    I further certify that I am not of counsel to any of the parties, nor an employee of counsel nor related to any of the parties, nor in any way interested in the outcome of this action.

_____

BARBARA MOORE, CRR, RMR

_____

My Commission Expires:

February 8, 2026



Dean M. Harvey, Esquire
Lieff Cabraser Heimann & Bernstein, LLP. (San Francisco)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339


Re: Deposition of **Evan P. Starr, Ph.D.**
    Date: 3/19/2025
    Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:


Dear Sir/Madam,

Attached please find the above-referenced deposition transcript. If applicable, signature is required within 30 days from the date of receipt of this letter.

In accordance with the disposition of signature at the deposition or the pertinent jurisdictional rules, the deponent should follow these instructions to complete the Errata Sheet:

(1) Read the transcript and indicate any corrections or changes in ink on the enclosed Errata Sheet. Please include page and line numbers. If more space is needed for corrections, please use a blank sheet of paper. If no corrections or changes are necessary, please indicate "no corrections" or "no changes" on the Errata Sheet.

(2) Sign and date the Errata Sheet and Acknowledgement of Deponent/Affiant pages.

(3) Please return the executed Errata Sheet and Acknowledgement pages to the address indicated below, submit via fax (888-503-3767) or email (transcripts@planetdepos.com).

A copy of this letter and the returned signature pages, if any, will be distributed to counsel.


Sincerely,


Production Department
Planet Depos, LLC
451 Hungerford Drive
Suite 400
Rockville, Maryland 20850


No. 577303

No. 577303

Re:    Deposition of **Evan P. Starr, Ph.D.**
       Date: 3/19/2025
       Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
       Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
|      |      | See attached chart for corrections. |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |

April 19, 2025

_____
(Date)

_____
(Signature)

No. 577303

Re:  Deposition of **Evan P. Starr, Ph.D.**
Date: 3/19/2025
Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
Return to: transcripts@planetdepos.com

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

April 19, 2025
_____
(Date)

_____
(Signature)

No. 577303

Re:   Deposition of **Evan P. Starr, Ph.D.**
       Date: 3/19/2025
       Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
       Return to: transcripts@planetdepos.com

```
                ACKNOWLEDGMENT OF DEPONENT


     I, Evan P. Starr, Ph.D., do hereby

acknowledge that I have read and examined the

foregoing testimony, and the same is a true, correct

and complete transcription of the testimony given by

me and any corrections appear on the attached Errata

sheet signed by me.


  April 19, 2025      _____

_____

      (Date)                    (Signature)
```

**Errata for Volume 1 of the Expert Deposition of Evan P. Starr, Ph.D.**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
March 19, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 1 | 22 | 8 | "several small substantive changes" | "several small nonsubstantive changes" | Clarification |
| 2 | 23 | 7 | "Defendants' Exhibit 2" | "Defendants' Exhibit 82" | Clarification; to conform the transcript to the record |
| 3 | 40 | 5 | "You're not offering opinion about what the" | "You're not offering any opinion about what the" | Clarification |
| 4 | 41 | 9 | "romanette 2 in 12(a)" | "romanette ii in 12(a)" | Typographic error |
| 5 | 44 | 9–10 | "DaVita USPI exchange" | "DaVita-USPI exchange" | Typographic error |
| 6 | 46 | 24 | "Mm-hmm." | "Yes." | Clarification |
| 7 | 55 | 12 | "section V.B, 5.B, I review the evidence." | "section V.B, I review the evidence." | Clarification; to conform the testimony to the record |
| 8 | 57 | 5 | "subsection 5(b)ii of your report;" | "subsection V(B)ii of your report;" | Clarification; to conform the transcript to the record |
| 9 | 57 | 19 | "section 5(b)ii of your report;" | "section V(B)ii of your report;" | Clarification; to conform the transcript to the record |
| 10 | 58 | 19 | "the DaVita-SCA agreements beginnings" | "the DaVita-SCA agreement's beginnings" | Typographic error |
| 11 | 61 | 1–2 | "consistent with an anticompetitive conduct." | "consistent with anticompetitive conduct." | Clarification |
| 12 | 61 | 6-8 | "The evidence that I reviewed in part A is that suggests, yes, that there is a proactive recruitment restriction." | "The evidence that I reviewed in part A suggests, yes, that there is a proactive recruitment restriction." | Clarification |
| 13 | 62 | 15 | "section paragraph 70, sections (A)1, 2 and 3." | "paragraph 70, sections (A)i, ii and iii." | Clarification; to conform the testimony to the record |
| 14 | 63 | 14 | "no-poach agreements" | "no-poach agreement" | Clarification; to conform the |

1

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | | | testimony to the record |
| 15 | 63 | 16 | "SCA and DaVita agreements," | "SCA and DaVita's agreement," | Clarification; to conform the transcript to the record |
| 16 | 66 | 14 | "agreements" | "agreement" | Clarification; to conform the testimony to the record |
| 17 | 69 | 1 | "SCA DaVita agreement" | "SCA-DaVita agreement" | Typographic error |
| 18 | 74 | 14 | "SCA and USPI agreements" | "SCA and USPI agreement" | Clarification; to conform the transcript to the record |
| 19 | 74 | 20 | "page 78.6." | "page 78, point vi." | Typographic error; to conform the testimony to the record |
| 20 | 77 | 7 | "section 5" | "section V" | Typographic error; to conform the testimony to the record |
| 21 | 80 | 18 | "Oh yes." | "Oh. Yes." | Typographic error; clarification |
| 22 | 80 | 21 | "no-poach agreements" | "no-poach agreement" | Clarification; to conform the testimony to the record |
| 23 | 81 | 13 | "material modification." | "material modification?" | Typographic error |
| 24 | 85 | 22–23 | "the effects of all the subcomponents of the alleged misconduct" | "the effects of each subcomponent of the alleged misconduct" | Clarification; to conform the testimony to the record |
| 25 | 86 | 21 | "start middle of 2008" | "starts middle of 2008" | Typographic error |
| 26 | 90 | 13–14 | "sharing at CSI; correct?" | "sharing of CSI; correct?" | Typographic error; to conform the transcript to the record |
| 27 | 93 | 1 | "(Witness nodded.)" | "Yes." | Clarification |
| 28 | 96 | 9–11 | "and so this suggests that around 2009 the Hayek | "and so this suggests that around 2009 Hayek | Clarification |

2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | obtained planned wage increase from USPI," | obtained planned wage increase from USPI," | |
| 29 | 111 | 8–9 | "So that the class in this case" | "So the class in this case" | Clarification; potentially a typographic error |
| 30 | 114 | 5–6 | "and the senior—senior-senior executives" | "and the senior corporate officers" | Clarification; to conform the testimony to the record |
| 31 | 116 | 21 | "section 5" | "section V" | Typographic error |
| 32 | 120 | 15–17 | "And so how did you identify who were in the legal recruiting and HR departments?" | "And so how did you identify who were in the legal, recruiting, and HR departments?" | Typographic error; to conform the transcript to the record |
| 33 | 120 | 21–23 | "And at least it was your intent in the, in the data build to exclude everyone in the legal recruiting and HR departments;" | "And at least it was your intent in the data build to exclude everyone in the legal, recruiting, and HR departments;" | Typographic error; to conform the transcript to the record |
| 34 | 121 | 10–12 | "but so was the intention to exclude anyone from the legal recruiting and HR departments" | "but so was the intention to exclude anyone from the legal, recruiting, and HR departments" | Typographic error; to conform the transcript to the record |
| 35 | 121 | 21–22 | "And that would include anyone in the legal recruiting and HR departments?" | "And that would include anyone in the legal, recruiting, and HR departments?" | Typographic error; to conform the transcript to the record |
| 36 | 122 | 5–6 | "and that was to exclude everyone from the legal recruiting and HR departments;" | "and that was to exclude everyone from the legal, recruiting, and HR departments;" | Typographic error; to conform the transcript to the record |
| 37 | 122 | 12–13 | "Excluding those in legal recruiting and HR." | "Excluding those in legal, recruiting, and HR." | Typographic error; to conform the transcript to the record |
| 38 | 122 | 14–15 | "And if someone in the legal recruiting or HR departments was actually included" | "And if someone in the legal, recruiting, or HR departments was actually included" | Typographic error; to conform the transcript to the record |

3

3217488.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 39 | 130 | 11 | "in the healthcare industry, in the ASE" | "in the healthcare industry, in the ASC" | Typographic error |
| 40 | 154 | 3–7 | "The Horizontal Merger Guidelines are what the DOJ and FTC released as it relates to their thinking on competition is used related to horizontal competitors engaging in M&A and anticompetitive conduct." | "The Horizontal Merger Guidelines are what the DOJ and FTC released as it relates to their thinking on competition with respect to horizontal competitors engaging in M&A and anticompetitive conduct." | Clarification |
| 41 | 158 | 1 | "paragraph 12(E)" | "paragraph 12(e)" | Typographic error; to conform the transcript to the record |
| 42 | 171 | 6 | "Burdette and Mortenson" | "Burdett and Mortensen" | Typographic error |
| 43 | 177 | 18-19 | "just don't go after these workers that appears in the report as well." | "'just don't go after these workers' that appears in the report as well." | Clarification |
| 44 | 180 | 5-6 | "the conduct, reduced compensation and aggregate by ▓" | "the conduct reduced compensation in aggregate by ▓" | Clarification |
| 45 | 187 | 21 | "what would conduct have been" | "what would compensation have been" | Clarification |
| 46 | 193 | 7 | "To look at each year's again, we'd have to" | "To look at each year, again, we'd have to" | Clarification |
| 47 | 212 | 20 | "he has estimates that executives were harmed" | "he estimates that executives were harmed" | Clarification |
| 48 | 214 | 19 | "section 5" | "section V" | Typographic error; to conform the testimony to the record |
| 49 | 251 | 24 | "specific significant estimate" | "statistically significant estimate" | Typographic error |
| 50 | 267 | 16 | "section 9" | "section IX" | Typographic error; to conform the transcript to the record |
| 51 | 267 | 19 | "part 7(F)" | "part VII(F)" | Typographic error; to |

4

5

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
|   |         |         |               |           | conform the testimony to the record |

3217488.4



Dean M. Harvey, Esquire
Lieff Cabraser Heimann & Bernstein, LLP. (San Francisco)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339

Re: Deposition of **Evan P. Starr, Ph.D., Volume 2**
    Date: 3/20/2025
    Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:

Dear Sir/Madam,

Attached please find the above-referenced deposition transcript. If applicable, signature is required within 30 days from the date of receipt of this letter.

In accordance with the disposition of signature at the deposition or the pertinent jurisdictional rules, the deponent should follow these instructions to complete the Errata Sheet:

(1) Read the transcript and indicate any corrections or changes in ink on the enclosed Errata Sheet. Please include page and line numbers. If more space is needed for corrections, please use a blank sheet of paper. If no corrections or changes are necessary, please indicate "no corrections" or "no changes" on the Errata Sheet.

(2) Sign and date the Errata Sheet and Acknowledgement of Deponent/Affiant pages.

(3) Please return the executed Errata Sheet and Acknowledgement pages to the address indicated below, submit via fax (888-503-3767) or email (transcripts@planetdepos.com).

A copy of this letter and the returned signature pages, if any, will be distributed to counsel.

Sincerely,

Production Department
Planet Depos, LLC
451 Hungerford Drive
Suite 400
Rockville, Maryland 20850

No. 577304

No. 577304

Re:     Deposition of **Evan P. Starr, Ph.D., Volume 2**
        Date: 3/20/2025
        Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
        Return to: transcripts@planetdepos.com

| **Page** | **Line** | **Correction/Change and Reason** |
|---|---|---|
| | | See attached chart for corrections. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

April 19, 2025

_____        _____
        (Date)                                (Signature)

No. 577304

Re:     Deposition of **Evan P. Starr, Ph.D., Volume 2**
        Date: 3/20/2025
        Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
        Return to: transcripts@planetdepos.com

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

April 19, 2025

_____        _____

           (Date)                                    (Signature)

No. 577304

Re:     Deposition of **Evan P. Starr, Ph.D., Volume 2**
        Date: 3/20/2025
        Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
        Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Evan P. Starr, Ph.D., Volume 2, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

April 19, 2025

(Date)                          (Signature)

**Errata for Expert Deposition of Evan P. Starr, Ph.D., Volume 2**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
March 20, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 1 | 285 | 2–3 | "'Low Wage Workers and the Enforceability of Noncompete Agreements,'" | "'Low-Wage Workers and the Enforceability of Non-Compete Agreements,'" | Typographic error; to conform the testimony to the record |
| 2 | 289 | 8–10 | "'Locked in Noncompete Enforceability in the Careers of High Tech Workers'" | "'Locked In? Noncompete Enforceability and the Careers of High Tech Workers'" | Typographic error; to conform the testimony to the record |
| 3 | 289 | 13–15 | "'Do Firms Value Court Enforceability of Noncompete Agreements: A Revealed Preference Approach,'" | "'Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach,'" | Typographic error; to conform the testimony to the record |
| 4 | 298 | 16–18 | "'Employment Restrictions on Resource Transferability and a Value Appropriation From Employees';" | "'Employment Restrictions on Resource Transferability and Value Appropriation From Employees';" | Typographic error; to conform the testimony to the record |
| 5 | 315 | 23-24 | "They're all specifically significant" | "They're all statistically significant" | Typographic error |
| 6 | 317 | 21-23 | "done in section IV because it does get to the time trend issue here. So in section IV I recognize that," | "done in section VI because it does get to the time trend issue here. So in section VI, I recognize that," | Typographic error |
| 7 | 319 | 1 | "We're going to connect directors" | "We're going to compare directors" | Typographic error |
| 8 | 336 | 9–10 | "for leave USPI or SCA" | "for 'Leave for USPI or SCA'" | Clarification; to conform the transcript to the record |
| 9 | 349 | 13 | "but invested at some later point" | "but it vested at some later point" | Typographic error; clarification |
| 10 | 378 | 10 | "we use what the companies' provided with us." | "we use what the companies provided us with." | Clarification |
| 11 | 387 | 7 | "Mm-hmm." | "Yes." | Clarification |
| 12 | 392 | 24 | "paragraph 120(D)." | "paragraph 120(d)." | Typographic error; to |

1

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | | | conform the testimony to the record |
| 13 | 393 | 11 | "paragraph D" | "paragraph (d)" | Typographic error; to conform the testimony to the record |
| 14 | 397 | 1 | "emergency declaration from the US wasn't until May" | "emergency declaration from the US declaring the pandemic over wasn't until May" | Clarification; to conform the testimony to the record |
| 15 | 405 | 2 | "all class members was harmed." | "all class members were harmed." | Typographic error |
| 16 | 406 | 8–9 | "Frischwaugh-Lovell theorem" | "Frisch-Waugh-Lovell theorem" | Typographic error |
| 17 | 406 | 11 | "The Frischwaugh-Lovell theorem." | "The Frisch-Waugh-Lovell theorem." | Typographic error |
| 18 | 408 | 3 | "effect between directors above and managers" | "effect between directors and above and managers" | Clarification |
| 19 | 414 | 22 | "paragraph 12(C)" | "paragraph 12(c)" | Typographic error; to conform the transcript to the record |
| 20 | 414 | 24 | "12(C) you said?" | "12(c) you said?" | Typographic error; to conform the testimony to the record |
| 21 | 415 | 6 | "12(C)," | "12(c)," | Typographic error; to conform the transcript to the record |
| 22 | 415 | 16 | "paragraph 12(C)" | "paragraph 12(c)" | Typographic error; to conform the transcript to the record |
| 23 | 416 | 9 | "section 12(C)" | "section 12(c)" | Typographic error; to conform the testimony to the record |
| 24 | 417 | 8 | "the harm to all or nearly all members" | "the harm to all or nearly all class members" | Clarification |

2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 25 | 417 | 23 | "all or nearly all members were harmed" | "all or nearly all class members were harmed" | Clarification |
| 26 | 418 | 2 | "why all or nearly all members" | "why all or nearly all class members" | Clarification |
| 27 | 418 | 22–23 | "section VII.F.ii" | "section VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 28 | 419 | 15 | "subsection VII.F.i." | "subsection VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 29 | 421 | 2 | "subsection VII.F.i." | "subsection VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 30 | 421 | 7–8 | "section VII—7.1" | "section VII.F.1" | Clarification; to conform the testimony to the record |
| 31 | 421 | 15 | "section VII.F.i" | "section VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 32 | 421 | 17 | "section VII.F.i" | "section VII.F.1" | Typographic error; clarification; to conform the testimony to the record |
| 33 | 424 | 13-14 | "the compensation structures being the same across dependents is not necessary" | "the compensation structures being the same across defendants is not necessary" | Clarification |
| 34 | 442 | 11 | "all or nearly all members were" | "all or nearly all class members were" | Clarification |
| 35 | 443-444 | 22-1 | "the qualitative evidence shows that for the compensation generally at these companies is set with" | "the qualitative evidence shows that the compensation generally at these companies is set with reference to a" | Clarification |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | reference to a compensation structure." | compensation structure." | |
| 36 | 448 | 1–2 | "paragraph 101(A)." | "paragraph 101(a)." | Typographic error; to conform the transcript to the record |
| 37 | 448 | 7 | "101(B)" | "101(b)" | Typographic error; to conform the transcript to the record |
| 38 | 448 | 10 | "101(F)" | "101(f)" | Typographic error; to conform the transcript to the record |
| 39 | 448 | 13 | "101(G)" | "101(g)" | Typographic error; to conform the transcript to the record |
| 40 | 448 | 16 | "101(I)" | "101(i)" | Typographic error; to conform the transcript to the record |
| 41 | 448 | 19 | "101(K)" | "101(k)" | Typographic error; to conform the transcript to the record |
| 42 | 448 | 22 | "101(K)" | "101(k)" | Typographic error; to conform the transcript to the record |
| 43 | 459 | 12 | "paragraph 101(G)." | "paragraph 101(g)." | Typographic error; to conform the transcript to the record |
| 44 | 459 | 16 | "paragraph 101(G)" | "paragraph 101(g)" | Typographic error; to conform the transcript to the record |
| 45 | 460 | 12–13 | "I wrote 'in'" | "I wrote, 'In'" | Typographic error; to |

4

3218799.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | | | conform the testimony to the record |
| 46 | 460 | 20 | "paragraph 101(K)" | "paragraph 101(k)" | Typographic error; to conform the transcript to the record |
| 47 | 461 | 9 | "paragraph K" | "paragraph k" | Typographic error; to conform the testimony to the record |
| 48 | 466 | 14 | "paragraph 101(C)" | "paragraph 101(c)" | Typographic error; to conform the transcript to the record |
| 49 | 466 | 21 | "101(J)" | "101(j)" | Typographic error; to conform the transcript to the record |
| 50 | 467 | 4 | "paragraph 101(N)," | "paragraph 101(n)," | Typographic error; to conform the transcript to the record |
| 51 | 467 | 7 | "paragraph 101(O)." | "paragraph 101(o)." | Typographic error; to conform the transcript to the record |
| 52 | 467 | 18 | "101(L)." | "101(l)." | Typographic error; to conform the transcript to the record |
| 53 | 468 | 7–8 | "In paragraph 101(C), you can flip to paragraph C," | "In paragraph 101(c), you can flip to paragraph c," | Typographic error; to conform the transcript to the record |
| 54 | 473 | 17 | "101(M)." | "101(m)." | Typographic error; to conform the transcript to the record |

5

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 55 | 477 | 21–22 | "paragraph E," | "paragraph e," | Typographic error; to conform the testimony to the record |
| 56 | 477 | 23 | "paragraph E" | "paragraph e" | Typographic error; to conform the testimony to the record |
| 57 | 478 | 1 | "on an all-for-one plan such that everyone at the" | "on an 'all-for-one' plan, such that everyone at the" | Typographic error; to conform the testimony to the record |
| 58 | 478 | 3 | "department and company performance" | "'department and company performance'" | Typographic error; to conform the testimony to the record |
| 59 | 478 | 11 | "paragraph E" | "paragraph e" | Typographic error; to conform the testimony to the record |
| 60 | 499 | 20 | "top down policy" | "top-down policy" | Typographic error |
| 61 | 511 | 3 | "VP of human resources" | "VP of Human Resources" | Typographic error; to conform the testimony to the record |
| 62 | 511 | 5–6 | "chief talent officer" | "Chief Talent Officer" | Typographic error; to conform the testimony to the record |
| 63 | 511 | 7–8 | "SVP of chief human resources and support" | "SVP, Chief Human Resources and Support Services Officer" | Typographic error; clarification; to conform the testimony to the record |
| 64 | 521 | 1 | "broadly across the workers at d companies." | "broadly across the workers at different companies." | Typographic error |

6

ACKNOWLEDGMENT OF DEPONENT

I, EVAN P. STARR, Ph.D., do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

September 3, 2025          _____

        DATE                    EVAN P. STARR, Ph.D.

Subscribed and sworn to

before me on this_____ day

of _____, _____.


_____

        Notary Public

```
                          *** ERRATA SHEET ***

     NAME OF CASE: IN RE OUTPATIENT
     DATE OF DEPOSITION:  July 15, 2025
     NAME OF WITNESS: EVAN P. STARR, Ph.D.
     PAGE  LINE  FROM          TO          REASON
     _____|_____|_____|_____|Please see attached chart

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____

     _____|_____|_____|_____|_____


                         _____
     Subscribed and sworn before me
     this____day of_____,20__.
     _____        _____
     (Notary Public)             My Commission Expires:
```

**Errata for Volume III of the Expert Deposition of Evan P. Starr, Ph.D.**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
July 15, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 1. | 526 | 14 | "Collaci paper" | "Callaci paper" | Typographic error |
| 2. | 528 | 6–7 | "the Plaintiff" | "the Plaintiffs" | Clarification; to conform the record to the facts |
| 3. | 529 | 20 | "or DaVita hired from another company," | "or DaVita hired them from another company," | Clarification |
| 4. | 530 | 6–7 | "reveal preference" | "revealed preference" | Typographic error |
| 5. | 530 | 15 | "typically confused" | "typically introduced in" | Typographic error |
| 6. | 530 | 16 | "workers" | "consumers" | Clarification |
| 7. | 530 | 17–18 | "they reveal those preferences based on what you choose" | "they reveal their preferences based on what they choose" | Typographic error |
| 8. | 531 | 10–11 | "Their choices can be used to ranks." | "Their choices can be used as ranks." | Typographic error |
| 9. | 531 | 22 | "approving every single" | "recruiting every single" | Typographic error |
| 10. | 532 | 4-5 | "But certainly many workers are making advanced options. They're also all" | "But certainly many workers are, if they have options," | Typographic error |
| 11. | 533 | 3 | "then a weighted labor" | "then creates a weighted labor" | Typographic error |
| 12. | 533 | 13-14 | "I can't think of a recent paper" | "I can think of a recent paper" | Typographic error |
| 13. | 533 | 15–16 | "I have to be specific about exactly what paperwork we're talking about." | "I have to be specific about exactly what paper we're talking about." | Typographic error |
| 14. | 533 | 16-17 | "about. I've done this" | "about. In the work I've done that is" | Typographic error |
| 15. | 533 | 20–21 | "really trying just to identify at the causal effect of a non-compete clause" | "really trying just to identify the causal effect of a non-compete clause" | Typographic error |
| 16. | 534 | 21 | "those positions." | "those decisions." | Typographic error |
| 17. | 535 | 2 | "two workers" | "two companies" | Clarification |
| 18. | 535 | 4–5 | "and then one of the companies that announces this policy." | "and then one of the companies announces this policy." | Typographic error |

1

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 19. | 535 | 6–8 | "And so—and so the question is who do you identify which company's workers are indifferent between." | "And so the question is how do you identify which companies workers are indifferent between." | Typographic error; clarification |
| 20. | 535 | 11 | "job search section" | "job search session" | Typographic error |
| 21. | 537 | 9 | "simultaneous job succession" | "simultaneous job search session" | Typographic error |
| 22. | 537 | 13 | "clicked on in examining" | "clicked on and is examining" | Clarification |
| 23. | 538 | 9–11 | "Indeed will tell you, you know, how many percentage will land jobs from searching Indeed" | "Indeed will tell you, you know, what percentage will land jobs from searching on Indeed" | Clarification |
| 24. | 538 | 19 | "what was the pitch" | "but that was the pitch" | Typographic error |
| 25. | 539 | 6–7 | "on potential employers job postings?" | "on potential employers' job postings?" | Typographic error |
| 26. | 541 | 2 | "the data" | "the Indeed data" | Typographic error |
| 27. | 541 | 19 | "cooperative" | "coauthorship" | Typographic error |
| 28. | 541 | 22 | "from Indeed and their chief" | "from Indeed, including their chief" | Typographic error; clarification |
| 29. | 542 | 7–9 | "they were the ones who initially did the initial jobs because it was their internal data." | "they were the ones who initially did the initial draws because it was their internal data." | Typographic error; clarification |
| 30. | 542–543 | 542:21–543:5 | "And so what we're doing is we're taking two companies that work as kind of indifferent between, and then the ideal experiment is to say okay, one of these companies announces this policy, what happens on worker interest on Indeed, as a result, or what happens to workers on Glassdoor?" | "And so what we're doing is we're taking two companies that workers are kind of indifferent between, and then the ideal experiment is to say okay, one of these companies announces this policy, what happens to worker interest on Indeed, as a result, or what happens to worker reviews on Glassdoor?" | Typographic error; clarification |
| 31. | 543 | 9 | "this click." | "this click one." | Typographic error |
| 32. | 544 | 1 | "self-report" | "have to report" | Typographic error |
| 33. | 544 | 10 | "That I'm running." | "Surveys that I'm running." | Clarification |

2

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 34. | 545 | 13–14 | "I've used survey data collected by myself by governments." | "I've used survey data collected by myself and by governments." | Clarification |
| 35. | 546 | 5 | "and phase a" | "and it's a" | Typographic error |
| 36. | 546 | 11–13 | "so we thought we kind of use this to study whether firms valued the ability enforce noncompetes." | "so we thought we could use this to study whether firms valued the ability to enforce noncompetes." | Clarification |
| 37. | 546 | 14 | "So they did those papers very simple." | "So the idea of the paper is very simple." | Typographic error; clarification |
| 38. | 546 | 20 | "As far as if they have to leave there" | "And so the idea of the paper is that firms don't have to leave their pay there" | Typographic error |
| 39. | 547 | 4–5 | "So we would see small mass at 100,000 in 2020 and after than before." | "So we would see excess mass at 100,000 or just above in 2020 and after relative to before 2020." | Typographic error; clarification |
| 40. | 547 | 18 | "it would have made that decide harder to pass" | "it would have made that design harder to pass" | Typographic error |
| 41. | 549 | 18 | "what we –" | "what we purchased from them –" | Typographic error; clarification |
| 42. | 552 | 1–2 | "So based on my understanding of defendant expert reports," | "So based on my understanding of defendants' experts' reports," | Typographic error; to conform the record to the facts |
| 43. | 553 | 4 | "And so I think that's fundamental." | "And so I think that's a fundamental problem." | Clarification |
| 44. | 554 | 4–5 | "And so this happening in that data set." | "And so this is happening in that data set." | Typographic error |
| 45. | 554 | 12–13 | "Defendants' experts didn't study how represented it was" | "Defendants' experts didn't study how representative it was" | Typographic error |
| 46. | 555 | 15–16 | "I want to make sure I didn't hear you." | I want to make sure I didn't mishear you." | Typographic error |
| 47. | 556 | 2–3 | "and I think this is right that we eventually figured out that to get the hash SSNs correct, yes." | "and I think this is right that we eventually figured out that to get the hashed SSNs correct across Defendants, yes." | Typographic error; clarification |
| 48. | 556–557 | 556:22–557:1 | "I think the earliest one was 1979 was in the data." | "I think the earliest one was 1979 in the data." | Clarification |
| 49. | 558 | 7–8 | "If I put on LinkedIn, I don't know if they scraped in LinkedIn." | "If I put the profile on LinkedIn, I don't know if they scraped LinkedIn." | Typographic error; clarification |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 50. | 558 | 10-11 | "I have no way to figure out what websites –" | "I have no way to figure out which websites they are pulling from – " | Typographic error |
| 51. | 560 | 4-7 | "So if you have a DaVita SCA or USPI employee you don't have the information online, I don't know how Lightcast would have got it." | "So if you have a DaVita, SCA, or USPI employee where you don't have their resume online, I don't know how Lightcast would have gotten it." | Typographic error; clarification |
| 52. | 561 | 8–9 | "I should say my reaction I was just responding to Defendants," | "I should say my first reaction is that I was just responding to Defendants' experts" | Clarification |
| 53. | 562 | 8–9 | "Alan Spradling" | "Allen Spradling" | Typographic error; to conform the record to the facts |
| 54. | 562 | 13 | "Alan Spradling" | "Allen Spradling" | Typographic error; to conform the record to the facts |
| 55. | 562 | 20 | "eight employees in the Lightcast data" | "employees in the Lightcast data" | Typographic error; clarification |
| 56. | 563 | 15–16 | "the errata that was served yesterday this report" | "the errata that was served yesterday to this report" | Typographic error; clarification |
| 57. | 565 | 17 | "Paragronrx" | "ParagonRX" | Typographic error; to conform the record to the facts |
| 58. | 565 | 19–20 | "Corizon Health in the state of Tennessee?" | "Corizon Health, and the state of Tennessee?" | Typographic error; to conform the record to the facts |
| 59. | 571 | 12 | "I couldn't tell you if I" | "I could tell you if I" | Clarification |
| 60. | 572 | 3-5 | "I think my critique was that there are employees that were written down that were clearly defendants." | "I think my critique was that there are employers that were written down that were clearly defendants." | Typographic error; clarification; to conform the record to the facts |

4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 61. | 572 | 5-8 | "It was either written in the USSCA or the USPI or DaVita something or other that was measured as something other than DaVita or USPI or some other defendants." | "It was either written SCA, USPI or DaVita or something or other that was measured as something other than DaVita or USPI or SCA by Defendants' Experts." | Typographic error; clarification |
| 62. | 572 | 10–11 | "you can determine how many in which the employees moved between Defendants" | "you can determine how many and which of the employees moved between Defendants" | Typographic error; clarification |
| 63. | 573 | 1 | "Yes, I would say it's small." | "Yes, I would say it's small--" | Clarification |
| 64. | 573 | 16-19 | "I don't know whether the Lightcast data represents what fraction of that 90 percent the Lightcast data could even possibly represent" | "I don't know whether the Lightcast data is representative, what fraction of that 95 percent the Lightcast data could even possibly represent," | Clarification |
| 65. | 575 | 8–9 | "recognizing that Kaiser Permanente are the same company," | "recognizing that Kaiser and Kaiser Permanente are the same company," | Typographic error; to conform the record to the facts |
| 66. | 577 | 19 | "keeping track of them" | "keeping track of that" | Typographic error |
| 67. | 580 | 1 | "Paragronrx" | "ParagonRx" | Typographic error; to conform the record to the facts |
| 68. | 582 | 2 | "It was a busy month." | "Yes. It was a busy month." | Clarification |
| 69. | 582 | 7–10 | "In total, you know, 300 sounds high for this 92, and I'd have to go back and look at my records.  It could have been, I don't know, another hundred, something like that. It was a lot of work." | "In total, you know, 300 sounds high for DX-92, and I'd have to go back and look at my records. It could have been, I don't know, another hundred for DX-90, something like that.  It was a lot of work." | Typographic error; clarification; to conform the record to the facts |
| 70. | 582 | 13-14 | "I work with the same assistants that I worked on in the initial report." | "I worked with the same assistants that I worked with on the initial report." | Typographic error |
| 71. | 582 | 16 | "Augustus Herschel and Madeline Bow." | "Augustus Urschel and Madeleine Bowe." | Typographic error |

5

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 72. | 585 | 19–21 | "I'm just referencing the academic literature on firm specific ^^monopsony power." | "I'm just referencing the academic literature on firm-specific monopsony power." | Typographic error |
| 73. | 586 | 5–6 | "There is many sources of monopsony power." | "There are many sources of monopsony power." | Typographic error |
| 74. | 586 | 19 | "acquired in the labor market" | "squared in the labor market" | Typographic error |
| 75. | 586 | 19–21 | "So there's many soures of monopsony power. There's manpower induced by the companies themselves." | "So there are many sources of monopsony power, some natural, some induced by the companies themselves." | Typographic error; clarification |
| 76. | 587 | 8-9 | "one of the kind of matching friction to the others as" | "one of the kind of natural frictions, I am sure there are others as" | Typographic error; clarification |
| 77. | 588 | 14 | "there's a one mining company" | "there's one mining company and they employee everybody" | Typographic error; clarification |
| 78. | 588 | 17 | "Monopsony is" | "Monopsony power is" | Typographic error |
| 79. | 589 | 3–4 | "but in nearly all context I imagine that's true." | "but in nearly all contexts I imagine that's true." | Typographic error; clarification |
| 80. | 589 | 5–6 | "So in nearly all context for labor markets," | "So in nearly all contexts for labor markets," | Typographic error; clarification |
| 81. | 589 | 14–15 | "They find that in the gig worker marketplace, workers have monopsony power." | "They find that in the gig worker marketplace, companies have monopsony power." | Clarification |
| 82. | 589 | 22 | "The modern economics, the elaborate" | "The modern economics, the labor" | Typographic error |
| 83. | 591 | 5 | "intramicro" | "intro to micro" | Typographic error; clarification |
| 84. | 592 | 16 | "bothboth" | "both" | Typographic error; clarification |
| 85. | 593 | 20-21 | "search all matching frictions" | "search and matching frictions" | Typographic error; clarification |
| 86. | 595 | 6–7 | "I said 'extended,' I believe where I used the word 'actualized,'" | "I said 'extended,' and I believe I also used the word 'actualized,'" | Typographic error; clarification |

6

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 87. | 596 | 10 | "listing letter" | "existing literature" | Typographic error; clarification |
| 88. | 599 | 14–17 | "you go on to say that the way that monopsony power is often measured in the economic literature by the elasticity of labor supplied to the firm; correct?" | "you go on to say that the way that monopsony power is often measured in the economic literature is by the elasticity of labor supplied to the firm; correct?" | Clarification; to conform the record to the facts |
| 89. | 601 | 5 | "maximize" | "actualize" | Typographic error |
| 90. | 601 | 11-12 | "I have many analysis here" | "I have many analyses here" | Typographic error |
| 91. | 602 | 15–16 | "I took the industry organization class in graduate school." | "I took the industrial organization class in graduate school." | Typographic error; clarification |
| 92. | 604 | 12 | "high-tech no-poach case" | "High-Tech No-Poach case" | Typographic error; to conform the record to the facts |
| 93. | 606 | 14 | "can contribute. There's" | "can contribute if there's" | Typographic error |
| 94. | 607 | 14 | "case when I signed," | "case, one of my assignments," | Typographic error |
| 95. | 609 | 17–18 | "the High Tech case" | "the High-Tech case" | Typographic error; to conform the record to the facts |
| 96. | 610 | 18-19 | "the perspective that Defendants' experts do hear that you have to" | "the perspective that Defendants' experts do here that you have to" | Typographic error |
| 97. | 611-612 | 611:22-612:1 | "That's four papers." | "It's a handful of papers and if" | Typographic error |
| 98. | 612 | 13 | "Collaci" | "Callaci" | Typographic error; to conform the record to the facts |
| 99. | 613 | 4 | "Collaci," | "Callaci," | Typographic error; to conform the record to the facts |

7

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 100. | 615 | 6–10 | "I imagine that in this case we have, you know, equity is like DaVita especially, I don't imagine that the fast food workers are getting equity compensation." | "I imagine that in this case we have, you know, equity is used at DaVita especially. I don't imagine that the fast food workers are getting equity compensation." | Typographic error; clarification |
| 101. | 616 | 13–15 | "Some of them I believe Lafontaine will look at managers differently from other workers in this context," | "Some of them, I believe--Lafontaine will look at different types of workers. For example, they look at managers differently from other workers in this context," | Clarification |
| 102. | 616 | 21 | "buy us their estimates" | "bias their estimates" | Typographic error |
| 103. | 620 | 3–6 | "I do not think this is a cross-sectional.  This has longitudinal elements as well.  It's not a purely cross-sectional empirical design." | "I do not think this is a cross-sectional design.  This has longitudinal elements as well.  It's not a purely cross-sectional empirical design." | Clarification |
| 104. | 620 | 21-22 | "I think Lafontaine caused a long difference in differences" | "I think Lafontaine called this a long difference in differences" | Typographic error |
| 105. | 621 | 13–14 | "they could have been salaries." | "they could have been paid salaries." | Clarification |
| 106. | 621 | 14–16 | "been salaries. You know, they talk to us in the abstract and tell me later about that, you know," | "been salaried. You know, they talk at least here in the abstract, and study later that, you know," | Typographic error |
| 107. | 624 | 8 | "more apples to apples." | "more apples to apples comparison." | Typographic error |
| 108. | 624 | 17 | "I believe –" | "I believe you said –" | Typographic error |
| 109. | 626 | 9 | "Collaci" | "Callaci" | Typographic error; to conform the record to the facts |
| 110. | 628 | 12 | ██ percent" | ██ percentage points" | Clarification |

8

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 111. | 629 | 2–6 | "Based on my understanding of the way that Defendants processed the data and what they provided to us that the stock data was provided to us based on the value on which the employee received it." | "Based on my understanding of the way that Defendants processed the data and what they provided to us that the stock data was provided to us based on the value at which the employee received it." | Clarification |
| 112. | 629 | 16 | "figure our" | "figure out" | Typographic error |
| 113. | 630 | 4–5 | "█ divided by █ is less than █ | "█ divided by █ is less than █" | Typographic error |
| 114. | 632 | 2 | "is that data is using from" | "is that data is coming from" | Typographic error |
| 115. | 635 | 8–10 | "Gibson is focused on the high tech no-poach case, which are relatively high-earning workers," | "Gibson is focused on the High-Tech No-Poach case, which involved relatively high-earning workers," | Typographic error; clarification; to conform the record to the facts |
| 116. | 635 | 13 | "low-income workers like in the Gibson case" | "more low-income workers than in the Gibson case" | Typographic error |
| 117. | 639 | 13–14 | "who were not paid to equity" | "who were not paid with equity" | Typographic error |
| 118. | 640 | 21 | "high tech workers" | "high-tech workers" | Typographic error |
| 119. | 641 | 5 | "Ebay," | "eBay," | Typographic error; to conform the record to the facts |
| 120. | 641 | 18–19 | "I'll tell you I know Google and all these companies, obviously it has lots of places," | "I'll tell you, I mean I know Google and all these companies have offices in lots of places," | Typographic error |
| 121. | 641 | 22 | "bay area" | "Bay Area" | Typographic error |
| 122. | 642 | 6 | "Bay area" | "Bay Area" | Typographic error |
| 123. | 644 | 7 | "San Francisco Bay area" | "San Francisco Bay Area" | Typographic error |

9

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 124. | 644 | 13 | "San Francisco Bay area" | "San Francisco Bay Area" | Typographic error |
| 125. | 647 | 3–6 | "So in figure 41 of my updated report on page 243, I look at the effect of the conduct according to the state in which the—is reported in the data." | "So in figure 41 of my updated report on page 243, I look at the effect of the conduct according to the state in which the individual is reported to work in the data." | Clarification |
| 126. | 648 | 18 | "high tech industry" | "high-tech industry" | Typographic error; to conform the record to the facts |
| 127. | 649 | 6 | "San Francisco Bay area" | "San Francisco Bay Area" | Typographic error |
| 128. | 650 | 14 | "in the high tech no-poach case," | "in the High-Tech No-Poach case," | Typographic error; to conform the record to the facts |
| 129. | 652 | 2–3 | "depending on whether the workers is in the Bay area versus elsewhere." | "depending on whether the workers are in the Bay Area versus elsewhere." | Typographic error; clarification |
| 130. | 653 | 9–13 | "And I think that it's important to emphasize that the labor market here is generally natural." | "And I think it's important to emphasize that the labor market here is generally national." | Typographic error |
| 131. | 653 | 18 | "differ. For" | "differ for" | Typographic error |
| 132. | 654 | 6 | "direct solicitations," | "direct solicitations and include the tell your boss provision," | Typographic error |
| 133. | 654 | 9 | "information, specific jobs," | "information, including for specific jobs," | Typographic error |
| 134. | 654 | 12 | "against geographic areas on" | "across geographic units depending on" | Typographic error |
| 135. | 655 | 8 | "references" | "preferences" | Typographic error |
| 136. | 655 | 21 | "broadly a national" | "broadly consider a national" | Clarification |
| 137. | 659 | 17–18 | "It's not like these are one-off." | "It's not like these are one-offs." | Clarification |

10

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 138. | 661 | 2 | "Dr. McCray's" | "Dr. McCrary's" | Typographic error |
| 139. | 662 | 4 | "Dr. McCray" | "Dr. McCrary" | Typographic error |
| 140. | 662 | 8 | "SCA DaVita" | "SCA, DaVita, and USPI" | Typographic error; clarification |
| 141. | 662 | 9 | "lost three people." | "lost three people, one each to SCA, DaVita, and USPI." | Clarification |
| 142. | 663 | 3–7 | "And if you did this for SCA and DaVita and USPI, they would have two defendants employers so you would divide their numbers by two and you would get back to a number of two, and you would find that these are the same on a per defendant basis." | "And if you did this for SCA and DaVita and USPI, they would have two defendants' employers they could hire from so you would divide their numbers by two and you would get back to a number of two, and you would find that these are the same on a per defendant basis." | Clarification |
| 143. | 666 | 9–10 | "we only have really conduct period data for SCA." | "we only really have conduct period data for SCA." | Clarification |
| 144. | 666 | 22 | "Dr. McCray's" | "Dr. McCrary's" | Typographic error |
| 145. | 671 | 3 | "top five competitor" | "top five competitors" | Typographic error |
| 146. | 671 | 13 | "same number" | "same rank" | Clarification |
| 147. | 677 | 7-11 | "if USPI is not losing a lot of workers in those years and not doing a lot of hiring, then it would be surprising that that rank would not be high." | "if USPI is not losing a lot of workers in those years and not doing a lot of hiring, then it would not be surprising that that rank would not be high." | Clarification |
| 148. | 679 | 7-10 | "lots of companies that didn't hire or have workers leave two defendants in a given year." | "lots of companies that didn't hire or have workers leave to defendants in a given year." | Typographic error |

11

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 149. | 679 | 21–22 | "They should be included in the zero if we were going this thing correctly." | "They should be included in the zero if we were doing this thing correctly." | Typographic error |
| 150. | 682 | 14–18 | "I believe in this section what I'm responding is to Defendants' experts across their reports, want to try to say that the mobility patterns alone are responsible for the wage suppression efforts that I get." | "I believe in this section I'm responding to Defendants' experts' arguments across their reports that the mobility patterns alone are responsible for the wage suppression effects that I get." | Typographic error; clarification |
| 151. | 683 | 4 | "move, in fact" | "move. In fact" | Clarification |
| 152. | 683 | 17 | "company effects" | "company fixed effects" | Typographic error |
| 153. | 684 | 11 | "Defendants' experts claims that" | "Defendants' experts' claims that" | Typographic error |
| 154. | 684 | 22 | "in this case" | "in this case the conduct" | Typographic error |
| 155. | 686 | 10 | "question of whom reached out to whom" | "question of who reached out to whom" | Clarification |
| 156. | 687 | 13 | "analysis" | "empirical analysis" | Clarification |
| 157. | 687 | 17 | "cause of the conduct" | "causal effect of the conduct" | Typographic error |
| 158. | 688 | 14 | "I believe it's on page 16, 17, and 18." | "I believe it's on pages 16, 17, and 18." | Clarification |
| 159. | 688 | 16 | "Stiroh saying" | "Dr. Stiroh saying" | Typographic error |
| 160. | 689 | 1-2 | "Honig Bastrom, co-authored" | "Honey Batra and co-authors" | Typographic error |
| 161. | 689 | 14-15 | "offers from Defendants and non-defendants" | "offers from non-defendants" | Clarification |

12

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 162. | 690–691 | 690:20–691:4 | "You're asking me have I examined what's available from—and job offers from non-defendant employers in this case? And how that might relate to what job offers would have came from Defendants, is that what you're saying?" | "You're asking me have I examined what's available from job offers from non-defendant employers in this case? And how that might relate to what job offers would have contained from Defendants, is that what you're saying?" | Typographic error; clarification |
| 163. | 693 | 18–19 | "They are switching costs to jobs, yes." | "There are switching costs to jobs, yes." | Typographic error |
| 164. | 695 | 15 | "labor is an experience" | "labor is an experience good" | Typographic error |
| 165. | 697 | 5 | "But I think" | "But the modal situation I think" | Typographic error |
| 166. | 700 | 2 | "different style" | "differenced out" | Typographic error |
| 167. | 701 | 1 | "different in" | "differenced out in" | Typographic error |
| 168. | 701 | 3–5 | "So I also want to know what percent of Defendants' employees are remote work at any given point in time." | "So I also want to know what percentage of Defendants' employees are working remotely at any given point in time." | Clarification |
| 169. | 701 | 19–21 | "And then to examine the robustness to looking at different cuts of that data to ensure sure that we get similar results either way." | "And then to examine the robustness, looking at different cuts of that data to ensure that we get similar results either way." | Clarification |
| 170. | 702 | 15 | "versus after" | "versus absent" | Typographic error |
| 171. | 703 | 18 | "empirical regression" | "empirical question is" | Typographic error |
| 172. | 704 | 7 | "differences," | "difference is" | Typographic error |
| 173. | 704 | 17 | "defendants' experts claims" | "defendants' experts' claims" | Typographic error |

13

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 174. | 707 | 10 | "bothboth" | "both" | Typographic error |
| 175. | 712 | 3–8 | "The issue is that you have—you have pay on both sides, so you have—you have some being granted before during the pay factor and the same during versus after. The question is what do you get, the regression is looking at all of that variation." | "The issue is that you have—you have pay on both sides, so you have—you have some stock equity being granted before that pays out during and the same during versus after. The question is what do you get—the regression is looking at all of that variation." | Clarification |
| 176. | 714 | 15 | "together of what" | "pulling out or what" | Typographic error; clarification |
| 177. | 715 | 8 | "biometrics" | "econometrics" | Typographic error |
| 178. | 715 | 11 | "utilize" | "residualize out" | Typographic error |
| 179. | 717 | 6 | "some of them don't do it all together." | "some of them don't do it altogether." | Typographic error |
| 180. | 717 | 16 | "Dr. Seravia," | "Dr. Saravia," | Typographic error |
| 181. | 718 | 7–8 | "Dr. McCrary and Dr. Stiroh's attempt to do it," | "Dr. McCrary's and Dr. Stiroh's attempts to do it," | Clarification |
| 182. | 718 | 9 | "Johnson's attempt to do it" | "Johnson's doesn't even attempt to do it" | Typographic error |
| 183. | 719 | 5 | "2007" | "2011" | Typographic error |
| 184. | 719 | 15–16 | "he actually never received at no point in time." | "he actually never received at any point in time." | Clarification |
| 185. | 720 | 6 | "offering" | "altering" | Typographic error |
| 186. | 721 | 20–21 | "that this are the appropriate models to run" | "that these are the appropriate models to run" | Typographic error |

14

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 187. | 723 | 7 | "stock price" | "strike price" | Typographic error |
| 188. | 723 | 20 | "see here" | "see the disconnect here" | Typographic error |
| 189. | 726 | 6-7 | "establish what Defendants have been paid but for the conduct." | "establish what Defendants' employees would have been paid but for the conduct." | Clarification |
| 190. | 726 | 10 | "reports" | "results" | Typographic error |
| 191. | 727 | 16 | "time" | "harm" | Typographic error |
| 192. | 727 | 17 | "tax policy" | "tax policy is" | Typographic error |
| 193. | 728 | 6 | "if the conduct still is suppressed" | "if the compensation is suppressed by then conduct" | Clarification |
| 194. | 729 | 1–2 | "the no-poach agreement" | "the no-poach agreements" | Clarification |
| 195. | 729 | 6–8 | "The no-poach agreement is my understanding that was between DaVita and SCA and then SCA and USPI." | "My understanding is that the no-poach agreements were between DaVita and SCA and then SCA and USPI." | Clarification |
| 196. | 729 | 9 | "recruiting and hiring" | "recruiting and hiring from other companies" | Typographic error |
| 197. | 729 | 18 | "I'm not sure" | "I'm not sure to the extent" | Typographic error |
| 198. | 730 | 8 | "Give me a second." | "Let me give an example." | Typographic error |
| 199. | 732 | 15–16 | "with reference to" | "relative to" | Typographic error |
| 200. | 736 | 15 | "a new analysis" | "a new hire analysis" | Clarification |
| 201. | 738 | 3-5 | "more broadly restrictions can affect even studying" | "mobility restrictions can affect even starting" | Typographic error |

15

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 202. | 738 | 12–13 | "post-Bell and" | "post-Bellum" | Typographic error; clarification |
| 203. | 739 | 21 | "suppressed" | "increased" | Clarification |
| 204. | 740 | 2–3 | "he doesn't review best literature." | "he doesn't review this literature." | Clarification |
| 205. | 740 | 17–20 | "If you review the compensations that are made in this case and you consider now pay is set at these companies" | "If you review the compensation decisions that are made in this case and you consider how pay is set at these companies" | Typographic error; clarification |
| 206. | 741 | 10–12 | "Look, the academic literature this is inconsistent with Dr. McCrary," | "Look, the academic literature is inconsistent with Dr. McCrary," | Clarification |
| 207. | 742 | 9–10 | "I did a separate analysis how long in the first year in the data" | "I did a separate analysis looking only at the first year in the data" | Typographic error; clarification |
| 208. | 744 | 9 | "incumbent higher pay" | "incumbent pay" | Clarification |
| 209. | 744 | 16 | "Column 1 and 2" | "Columns 1 and 2" | Clarification |
| 210. | 745 | 6 | "may have" | "only has" | Typographic error |
| 211. | 745 | 17 | "partial data" | "partial data in 2007" | Typographic error |
| 212. | 746 | 13–14 | "the first year, was 2025" | "the first year, was 2005" | Typographic error |
| 213. | 746 | 17–19 | "in the 2025 data that is a senior-level employee in your analysis, the year 2025 is the first year" | "in the 2005 data that is a senior-level employee in your analysis, the year 2005 is the first year" | Typographic error |
| 214. | 747 | 14 | "efficient" | "coefficient" | Clarification |
| 215. | 748 | 15 | "10" | "tenure" | Typographic error |
| 216. | 748 | 20 | "effect for tenure" | "effect of conduct for tenure" | Typographic error |

16

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 217. | 751 | 9–10 | "they were a manager maybe before years and now they just got promoted." | "they were a manager maybe for years and now they just got promoted." | Typographic error |
| 218. | 751 | 11 | "first in the" | "first full year in the" | Typographic error |
| 219. | 755 | 12 | "Mortinson" | "Mortensen" | Typographic error |
| 220. | 755 | 13 | "economical" | "canonical" | Typographic error |
| 221. | 757 | 14–15 | "So in a pure monopsony, you converge two." | "So in a pure monopsony, you converge to -- " | Typographic error |
| 222. | 757 | 22 | "ladder" | "labor" | Typographic error |
| 223. | 758 | 14 | "hiring an elastic" | "highly inelastic" | Typographic error |
| 224. | 758 | 15 | "So it's a type" | "So to tie it back" | Typographic error |
| 225. | 765 | 8 | "overtime" | "over time" | Typographic error |
| 226. | 773 | 10 | "discussing pulling" | "discussing gathering merit pool" | Typographic error |
| 227. | 773 | 18 | "Peter Clemons" | "Peter Clemens" | Typographic error |
| 228. | 774 | 10 | "emergency" | "internal" | Typographic error |
| 229. | 778 | 7 | "Ken Thiry" | "Kent Thiry" | Typographic error |
| 230. | 778 | 18–19 | "And Bridie Fanning in his deposition" | "And Bridie Fanning in her deposition" | Typographic error |
| 231. | 780 | 20 | "Ken Thiri well. Ken Thiri has" | "Kent Thiry well. Kent Thiry has" | Typographic error |
| 232. | 786 | 11 | "quantitative" | "qualitative" | Typographic error |

17

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 233. | 788 | 8–9 | "Defendant's Exhibit 90," | "Defendants' Exhibit 90," | Typographic error |
| 234. | 788 | 14 | "Brian Rasko" | "Brian Rasco" | Typographic error |
| 235. | 790 | 2 | "Defendant's experts" | "Defendants' experts" | Typographic error |
| 236. | 792 | 14 | "bilateral" | "unilateral" | Typographic error |
| 237. | 792 | 16 | "And then analyze the qualitative evidence" | "And then analyze the quantitative evidence" | Typographic error |
| 238. | 792 | 19 | "bilateral" | "unilateral" | Typographic error |
| 239. | 793 | 8 | "consistent" | "inconsistent" | Typographic error |
| 240. | 794 | 7–8 | "which is to assess access that the qualitative evidence is" | "which is to assess that the qualitative evidence is" | Typographic error |
| 241. | 794 | 12–13 | "My opinion is in that qualitative evidence is consistent with" | "My opinion is that qualitative evidence is consistent with" | Typographic error |
| 242. | 796 | 2 | "consistent" | "inconsistent" | Typographic error |
| 243. | 796 | 16–17 | "The evidence that I saw in the initial report of all this CSI exchanges" | "The evidence that I saw in the initial report of all these CSI exchanges" | Typographic error |
| 244. | 797 | 6 | "things about" | "thinking about" | Typographic error |
| 245. | 797 | 10–11 | "what we don't observe as relevant because" | "what we don't observe is relevant because" | Typographic error |
| 246. | 802 | 2 | "Brian Rasko." | "Brian Rasco." | Typographic error |
| 247. | 802 | 19 | "Brian Rasko;" | "Brian Rasco;" | Typographic error |
| 248. | 804 | 15 | "relevant amount of documents" | "relevant documents" | Typographic error |

18

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 249. | 806 | 19 | "in the" | "and the" | Typographic error |
| 250. | 809 | 2 | "difference" | "differencing" | Typographic error |
| 251. | 811 | 18–19 | "and saw how many CEOs and how many CEOs there were at SCA." | "and saw how many CEOs there were at SCA." | Typographic error |
| 252. | 816 | 18 | "Brian Rasko," | "Brian Rasco," | Typographic error |

19