# Exhibit 17
# Lane Declaration

521

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cr-00229-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

1. DAVITA INC., and
2. KENT THIRY,

    Defendants.
_____

**REPORTER'S TRANSCRIPT**
TRIAL TO JURY – DAY FOUR
_____

        Proceedings before the HONORABLE R. BROOKE JACKSON,

Senior Judge, United States District Court for the District of

Colorado, continuing at 8:59 a.m., on the 7th day of April,

2022, in Courtroom A902, United States Courthouse, Denver,

Colorado.

                THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
            Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

**A P P E A R A N C E S**

MEGAN S. LEWIS, WILLIAM JEFFERSON VIGEN, SARA MICHELLE CLINGAN and ANTHONY WILLIAM MARIANO, Attorneys at Law, U.S. Department of Justice, Antitrust Division, Washington Criminal II Section, 450 5th Street N.W., Washington, DC, 20530, appearing for the Government.

JOHN C. DODDS, Attorney at Law, Morgan Lewis & Bockius LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103, appearing for Defendant DaVita.

JOHN F. WALSH, III, Attorney at Law, WilmerHale LLP, 1225 17th Street, Suite 2600, Denver, Colorado, 80220, appearing for Defendant DaVita.

THOMAS MELSHEIMER, Attorney at Law, Winston & Strawn LLP, 2121 North Pearl Street, 9th Floor, Dallas, Texas, 75201, appearing for Defendant Thiry.

JUANITA ROSE BROOKS, Attorney at Law, Fish & Richardson, 12860 El Camino Real, Suite 400, San Diego, California, 92130, appearing for Defendant Thiry.

*   *   *   *   *

**P R O C E E D I N G S**

(In open court at 8:59 a.m.)

THE COURT:  Good morning.  We have a juror that is running late.  Do you have anything to discuss before we bring the jurors in?

MS. LEWIS:  We have two pretrial matters, Your Honor.

THE COURT:  I thought you probably would.  Okay.

MS. LEWIS:  Thank you, Your Honor.  So the first one, we just wanted to place on the record that we don't intend to have any witness do an in-court identification of Mr. Thiry in front of the jurors, because the parties have agreed that identity is not an issue in this case.  So we just wanted to

Andrew Hayek – Cross

are a number of things that are unique.

Q.  You yourself worked at DaVita for a little over a year; is that right?

A.  Yes.  About 15 months.

Q.  You learned something about being a CEO from Mr. Kent Thiry; didn't you, sir?

A.  Yes.  I learned a number of things from Mr. Thiry and from DaVita broadly.

Q.  You have your own style; correct?

A.  Yes.  We all have our own styles.  I'm, you know, from a town in Iowa and was raised a certain way.  And, you know, that affects who you are and how you communicate.  We all have our styles.

Q.  You learned certain things from Mr. Thiry that you adopted, and then you had your own ideas about the kind of CEO you wanted to be.  Do I have that about right?

A.  Yes, that's right.  And I think I've learned from each person I've worked for and people you work with.  You learn -- you learn from people you work with.

Q.  A CEO, it's important that they have their own identity, their own style that they're comfortable with; is that fair?

A.  I do.  I think if you're not authentic to who you are, it's not effective.

Q.  You left DaVita in 2008 to be your own kind of CEO; is that right?

Andrew Hayek - Cross

A.  Yes.  I aspired to be a CEO and lead a team, and we very much try to do it our way, which was partly my way, but also the rest of the team's style.

Q.  Shortly after you left DaVita to go to work for SCA, you recruited Mr. Michael Rucker from DaVita to come work with you at SCA; true?

A.  True.

Q.  Mr. Rucker was a divisional vice president at DaVita, and then he left to become I believe the chief operating officer at SCA.  Do I have that right?

A.  We initially hired Michael to be a senior vice president of operations, but Michael and I both knew that he would have a really good shot at becoming chief operating officer.  And that happened about a year later.

Q.  You testified yesterday, sir, that when you hired -- recruited and hired Mr. Rucker from DaVita, Mr. Thiry was unhappy with that; fair?

A.  Yes, he was unhappy.

Q.  And he actually asked you, Andrew, can you stop hiring people?  It's bothering me.

A.  Yes.  He was upset and didn't like it at all.

Q.  But you didn't stop hiring people; right?

A.  That's correct.  We hired a number of more -- of other senior executives.

Q.  You didn't make any kind of agreement with Mr. Thiry in

Andrew Hayek - Cross

2008 to stop hiring people; right?

A. No. I would explain with the hiring of Mr. Rucker and others that I wasn't bad-mouthing DaVita, I wasn't trying to do anything untoward. So I would explain it, but didn't develop an agreement.

Q. On your direct examination yesterday, you talked about one of the challenges that a company faces when they're losing people is this reputational challenge, that people might say, oh, people are leaving there, must be a bad place to work. Is that what you were talking about?

A. Yes. When someone leaves, it raises questions, especially of very senior executives. Why are they leaving? Is there something wrong here? You know, is there something I should be thinking about?

Q. So you may not have agreed with it exactly, but you understood where Mr. Thiry was coming from; right?

A. In terms of the damage or harm from losing someone, sir?

Q. Yes, sir.

A. Yes. I think it's true in a company; it's true on a sports team; it's -- when you lose someone from your team, it creates difficulties.

Q. You don't like losing your best players to another team; right?

A. I think that's true.

Q. So SCA actually continued to hire, by my count, eight

531

Andrew Hayek – Cross

different DaVita employees, most of whom were senior level, in 2008, in 2009, in 2010, and 2011; do I have that about right?

A.   I don't know the number, but it's -- it sounds directionally correct.  I would say several.

Q.   You knew each time you hired someone that it was at least possible that Mr. Thiry might be frustrated with you; right?

A.   I expected it.  Yes.

Q.   And as I said, you told the ladies and gentlemen of the jury, you to some extent understood that; right?

A.   Yes.  I could relate.  I don't think it's unusual.

Q.   From working a year or so in a very senior position at DaVita, you had insights, I think you told us, into the people at DaVita, their skills, that someone outside of DaVita might not have; right?

A.   Yes.  I -- I knew the team at DaVita -- not all of the team, but I knew a number of members of the team -- they knew me.  So I knew a lot about DaVita, and I had relationships and some level of trust.

Q.   My additional point, though, is sir, that was information that other people outside of DaVita might not know; true?

A.   Yes, that is true.  That came from having worked there.

Q.   You didn't just know who the really good people were.  Fair to say, you also knew maybe who to stay away from; right?

A.   Yes.  I had my own view of who was really, really good and would be a good fit for SCA and people who might still be good

532

Andrew Hayek - Cross

but not the right fit for SCA.

Q. And when you say someone is not the right fit for SCA, that's not any kind of a criticism of them personally. That's just, they might be right for one job at one company, but might not be right for SCA; fair?

A. I think that is fair. SCA is a surgery center company, and we had a slightly different way of operating. And so a person could be very good at DaVita but not the type of person that would be the best fit at SCA.

Q. I want to talk a little bit about the people you did hire from DaVita, sir. I show that in 2009, SCA hired someone named Kelli Ruiz, who was a director at DaVita that SCA hired to become vice president of operations. Does that ring a bell?

A. It does. I remember Kelli.

Q. In 2009, SCA hired a gentleman named Richard Rice. He was a regional operations director at DaVita who became an administrator at SCA. Does that sound right?

A. I remember the name. I didn't know Rich -- Mr. Rice personally.

Q. In 2010, SCA hired a woman named Helen Como, who was regional operations director at DaVita and hired to be SCA's vice president of group operations. Does that sound about right?

A. Yes. I remember Ms. Como.

Q. In 2010, SCA also hired Tom Gill, a vice president at

533

Andrew Hayek – Cross

DaVita, who SCA hired to also be a vice president.  Does that sound right?

*A.*  It does.  I remember him.

*Q.*  In 2010, again, SCA hired Ajay Chokshi, a senior director of strategy and special projects at DaVita, who SCA hired to be a group president.  Does that sound right?

*A.*  It does.  Mr. Chokshi joined, I believe, in a strategy role.  And he ultimately became a senior vice president -- group president, running one of our regions.

*Q.*  In 2011 is it your recollection that SCA hired a man named Ben Jacobs, who was director of mergers and acquisitions, who left DaVita to become vice president of development at SCA? Does that sound right?

*A.*  Yes.  I remember Mr. Jacobs.  He became one of our listing of people on our development and acquisitions team.

*Q.*  And, in fact -- I don't want to bring up a bad memory, sir -- but, in fact, that hiring of Mr. Jacobs so upset an executive at DaVita, a man named Tom Usilton, that he actually declined a dinner invitation from you at around that time; right?

*A.*  Yes.  I recall -- Mr. Usilton ran all of development at DaVita, so that's an important relationship for us to do business with DaVita.  And I believe I reached out about having a meal or reconnecting, and Mr. Usilton declined to talk to me.

*Q.*  He was polite about it; right?

Andrew Hayek - Cross

*A.* He was pretty direct about it.

*Q.* He was direct about it, but you understood in a sense where he was coming from; right?

*A.* My personal style is not to be quite that direct.  But in terms of, you know, feeling hurt when you lose somebody on your team, I think that's something that everybody who leads a team identifies with.

*Q.* Mr. Usilton didn't have that Midwestern equanimity that you're showing us; right, sir?

*A.* He had a different style, and he was upset.

*Q.* After Mr. Jacobs was hired, SCA hired a person named Terry Forsyth.  Do you remember that?

*A.* Yes.  I remember Mr. Forsyth.

*Q.* Is that -- is that Mr. Forsyth or Ms. Forsyth?

*A.* Mister.

*Q.* So Mr. Forsyth was a regional operations director at DaVita, who in 2011 became VP of operations at SCA.  Does that sound right?

*A.* Yes, sir.

*Q.* Also in 2011, SCA hired Ms. Surber, Kris Gorman Surber, a group healthcare administrator, who was hired by SCA to become CEO of one of its Connecticut clinics.  Does that ring a bell?

*A.* I remember her as Ms. Gorman.  And, yes, she ran one of our surgery centers.  So we'd call that role an administrator, or we would sometimes call that the CEO of the surgery center.

Andrew Hayek - Cross

Q.   You had hired so many people between 2008 and 2012 that in one email, Mr. Thiry sent you in January of 2012 -- I think the ladies and gentlemen of the jury have seen -- he said, "The lore within the village is that you are quite the aggressor." Right?

A.   That's correct.

Q.   And it's in 2012, around February, that you described entering into this understanding or agreement with Mr. Thiry about how solicitations would be conducted; right?

A.   Yes.   The agreement was approximately around January of 2012.

Q.   Now, I just want to take you back to 2012 and try to get your mindset.   Is it fair to say, sir, that by 2012, you had hired about all of the DaVita people that you wanted to hire at that point; true?

A.   At the time, and -- I remember discussing with Mr. Rucker and others that, you know, we had hired more people from DaVita than anywhere else and that there was a risk that SCA would just become known as DaVita part two.   And it was important to us to have our own culture and our own identity and do things our own way.   And so that was something that we thought about and we talked about, is the risks of having more senior executives from DaVita.

Q.   That was the independent thought that you had on your own about what was the best decision for SCA going forward; true?

Andrew Hayek - Cross

*A.* Independent meaning something I thought and Mr. Rucker thought or --

*Q.* Yes, sir. Independent, it was within SCA, in your decision, in your evaluation, not anyone else's?

*A.* Yes, that was our own thoughts. My own thoughts, and thoughts expressed by some members of my team.

*Q.* That made sense to you; right?

*A.* It did. Because having so many people from one place just raises questions. And is it a carbon copy? Are you just copying somebody else?

*Q.* Well, so let's talk about that for a second. So fair to say, there were some good things about DaVita that you wanted to have at SCA; right?

*A.* There were a number of things that were very good, that I learned from DaVita and that we used. And then there was some things we did our own way. Yes.

*Q.* I think what you just said, and I want to make sure I understand it, you didn't want to be just a little DaVita or carbon copy of DaVita. You wanted to be your own independent identity, where you and the others there could frame, build, and develop the culture of SCA the way you wanted; does that sound right?

*A.* It does. We borrowed some things from DaVita's culture that we thought were really good, and we deliberately decided to do things differently in other areas, and it was ours. We

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 25th day of April, 2022.

_____

Therese Lindblom,CSR,RMR,CRR