**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE OUTPATIENT MEDICAL CENTER
EMPLOYEE ANTITRUST LITIGATION

Master Docket No.: 1:21-cv-00305-SRH-YBK

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT**
**OPINIONS OF DR. EVAN STARR AND DR. BARRY GERHART**

**[REDACTED]**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT .................................................................................................. 4

     A.     Defendants' Market Definition Gambit Is A Meritless Distraction....................... 4

     B.     Drs. Starr And Gerhart Generate An Informed Hypothesis That Defendants' Collusion Suppressed The Pay Of All Or Nearly All Class Members ......................................................................................... 9

     C.     Dr. Starr Tests His And Dr. Gerhart's Hypothesis With Standard And Reliable Statistical Methods .................................................... 16

          1.     Dr. Starr's Damages Regression ............................................... 17

          2.     Dr. Starr's Common Impact Methods......................................... 20

     D.     Dr. Gerhart And Dr. Starr Also Investigate Qualitative Evidence Of Defendants' Pay Structures................................................. 22

          1.     Dr. Gerhart's Pay Structure Analysis......................................... 22

              a.     Defendants Set Systematic Compensation Structures Designed To Achieve Internal and External Equity ................... 22

              b.     Defendants' Pay Structures Likely Transmitted Pay Suppression Broadly ....................................................... 27

              c.     Standalone Qualitative Analysis Is A Reliable Methodology ......................................................................... 29

          2.     Dr. Starr's Pay Structure Analysis............................................. 31

     E.     Basing Expert Opinion On Record Evidence Does Not Usurp The Jury's Role ........................................................................... 33

          1.     Dr. Gerhart Appropriately Examines Evidence Regarding Defendants' Labor-Related Incentives And Employee Pay Structures ................................................................................... 33

          2.     Dr. Gerhart May Testify About Defendants' Incentives To Collude To Suppress Class Pay .............................................. 36

          3.     Drs. Starr And Gerhart Apply Their Economic Training And Expertise To The Facts ....................................................... 38

              a.     To Function, A Well-Specified Damages Regression Must Select The Start And End Dates Of The Misconduct ................. 38

              b.     Dr. Gerhart's Assessment Of The Record Comports With His Expertise ...................................................................... 41

**TABLE OF CONTENTS**
**(continued)**

**Page**

4.  Defendants Cannot Prevent Drs. Starr Or Gerhart From Considering The Full Record, Including Evidence Of Document Destruction ........................................................................... 43

III.  CONCLUSION ................................................................................ 45

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Honda Motor Co., Inc. v. Allen*,
600 F.3d 813 (7th Cir. 2010) ................................................................................................... 30

*Am. Needle, Inc. v. New Orleans La. Saints*,
No. 04-CV-7806, 2014 WL 1364022 (N.D. Ill. Apr. 7, 2014) .................................................. 5

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .................................................................................................... 20

*B & R Supermarket Inc. v. Visa Inc.*,
No. 17-cv-2738, 2024 WL 4252031 (E.D.N.Y. Sept. 20, 2024) .............................................. 37

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
214 F. Supp. 2d 530 (D. Md. 2002) ......................................................................................... 35

*Burns v. Sherwin-Williams Co.*,
No. 19-cv-5258, 2022 WL 4329417 (N.D. Ill. Sept. 18, 2022) ............................................... 42

*Cage v. City of Chicago*,
979 F. Supp. 2d 787 (N.D. Ill. 2013) ....................................................................................... 33

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*,
No. CV-00-1693-PA, 2003 WL 23715981 (D. Or. Jan. 21, 2003) .......................................... 34

*Corzo v. Brown Univ.*,
No. 22 C 125, 2025 WL 2753400 (N.D. Ill. Sept. 29, 2025) ............................................. 29, 30

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("*Daubert I*"),
509 U.S. 579 (1993) ..................................................................................................... 4, 9, 14

*Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"),
43 F.3d 1311 (9th Cir. 1995) ................................................................................................... 10

*Davis v. Duran*,
277 F.R.D. 362 (N.D. Ill. 2011) ............................................................................................... 42

*Deslandes v. McDonald's USA, LLC* ("*McDonald's*")
81 F.4th 699 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1057 (2024) .................................... 3, 6, 7

*Do It Best Corp. v. Passport Software, Inc.*,
No. 01 C 7674, 2005 WL 8178947 (N.D. Ill. Dec. 9, 2005) .................................................... 20

*Est. of Loury by Hudson v. City of Chicago*,
No. 16-cv-4452, 2019 WL 1112260 (N.D. Ill. Mar. 11, 2019) ............................................... 41

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ........................................................................................................ 5, 6, 8

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Fuesting v. Zimmer, Inc.*,
   362 F. App'x 560 (7th Cir. 2010) ..................................................................................... 33

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)........................................................................................................... 33

*Goldberg v. 401 N. Wabash Venture LLC*,
   755 F.3d 456 (7th Cir. 2014) ............................................................................................ 37

*Gopalratnam v. Hewlett-Packard Co.*,
   877 F.3d 771 (7th Cir. 2017) ............................................................................................ 33

*Graphic Prods. Distribs., Inc. v. ITEK Corp.*,
   717 F.2d 1560 (11th Cir. 1983) .......................................................................................... 7

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
   No. 1:02-cv-2600-RDP, 2010 WL 11561917 (N.D. Ala. Sept. 2, 2010) ............................... 35

*Gumwood HP Shopping Partners*,
   No. 11-cv-268, 2016 WL 6091244 (N.D. Ill. Oct. 19, 2016) ............................................... 7

*Hall v. Colvin*,
   18 F. Supp. 3d, 144 (D.R.I. 2014) ..................................................................................... 45

*Hannah's Boutique, Inc. v. Surdej* ("*Hannah's Boutique I*"),
   112 F. Supp. 3d 758 (N.D. Ill. 2015) .................................................................................. 7

*Hannah's Boutique, Inc. v. Surdej* ("*Hannah's Boutique II*"),
   No. 13-cv-2564, 2015 WL 4055466 (N.D. Ill. July 2, 2015) ................................................ 7

*Hershey v. Pac. Inv. Mgmt. Co. LLC*,
   697 F. Supp. 2d 945 (N.D. Ill. 2010) ............................................................................... 37

*Ill. Liberty PAC v. Madigan*,
   No. 12 C 5811, 2015 WL 5589630 (N.D. Ill. Sept. 21, 2015)............................................. 37

*In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*,
   MDL No. 3026, 2025 WL 1283927 (N.D. Ill. May 2, 2025) ................................................ 10

*In re Broiler Chicken Grower Antitrust Litig.* ("*Chicken Grower*"), No. 6:20-md-02977-RJS-
   CMR, 2024 WL 2117359 (E.D. Okla. May 8, 2024) ......................................................*passim*

*In re Cordova*,
   668 B.R. 413 (N.D. Ill. 2025) .......................................................................................... 36

*In re Dealer Management Systems Antitrust Litigation*,
   581 F. Supp. 3d 1029 (N.D. Ill. 2022) .............................................................................. 42

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
   No. 17-md-2785, 2020 WL 1164869 (D. Kan. Mar. 10, 2020)............................................. 34

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re High-Tech Emp. Antitrust Litig.* ("*High-Tech*"),
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) .............................................................................. *passim*

*In re High-Tech Employee Antitrust Litigation*,
    No. 11-CV-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ................................... 37

*In re NorthShore University HealthSystem Antitrust Litigation*,
    657 F. Supp. 3d 1077 (N.D. Ill. 2023) ..................................................................................... 7

*In re Opana ER Antitrust Litig.*,
    No. 14 C 10150, 2021 WL 2291067 (N.D. Ill. June 4, 2021) .................................................. 36

*In re Packaged Seafood Prods. Antitrust Litig.*,
    332 F.R.D. 308 (S.D. Cal. 2019) .......................................................................................... 37

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    No. 05-MD-1720 (MDB), 2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) .............................. 34

*In re Polyurethane Foam Antitrust Litig.*,
    No. 1:10 MD 2196, 2015 WL 12748012 (N.D. Ohio July 16, 2015) ...................................... 42

*In re Processed Egg Prods. Antitrust Litig.*,
    81 F. Supp. 3d 412 (E.D. Pa. 2015) ...................................................................................... 44

*In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*,
    No. 14 C 1748, 2017 WL 1836443 (N.D. Ill. May 8, 2017) ............................................ 41, 42

*In re Titanium Dioxide Antitrust Litig.*,
    No. RDB-10-0318, 2013 WL 1855980 (D. Md. May 1, 2013) ............................................... 35

*In re Turkey Antitrust Litig.* ("*Turkey*"),
    No. 19 C 8318, 2025 WL 264021 (N.D. Ill. Jan. 22, 2025) ............................................. *passim*

*Ind. GRQ LLC v. Am. Guar. & Liab. Ins. Co.*,
    No. 3:21-cv-227 DRL, 2023 WL 3451939 (N.D. Ind. May 14, 2023) .................................... 36

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
    No. 04-4213, 2011 WL 167259 (D. Minn. Jan. 14, 2011) ..................................................... 34

*Johnson v. Guevara*,
    No. 20 C 4156, 2025 WL 903813 (N.D. Ill. Mar. 24, 2025) .................................................. 45

*Kaepplinger v. Michelotti*,
    No. 17 CV 5847, 2022 WL 267886 (N.D. Ill. Jan. 28, 2022) ................................................ 29

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................................................ 20, 29

*Lassen v. Hoyt Livery, Inc.*,
    No. 13-cv-1529, 2016 WL 7165716 (D. Conn. Dec. 8, 2016) ............................................... 45

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ...................................................................................... 7

*Manpower, Inc. v. Ins. Co. of Pa.*,
    732 F.3d 796 (7th Cir. 2013) ................................................................................................ 17

*McLaughlin Equip. Co. v. Servaas*,
    No. IP98-0127-C-T/K, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004)...................................... 7

*Metavante Corp. v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010) ................................................................................................ 30

*Navelski v. Int'l Paper Co.*,
    244 F. Supp. 3d 1275 (N.D. Fla. 2017) ................................................................................ 20

*Nitsch v. Dreamworks Animation SKG Inc.* ("*Animators*"),
    315 F.R.D. 270 (N.D. Cal. 2016).................................................................................... *passim*

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)................................................................................................................ 6

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) ................................................................................................. 35

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
    632 F. Supp. 3d 1108 (S.D. Cal. 2022).................................................................................. 20

*Pessman v. Trek Bicycle Corp.*,
    No. 3:18-cv-50243, 2021 WL 5769530 (N.D. Ill. Dec. 6, 2021) ........................................... 41

*Pratts v. Chater*,
    94 F.3d 34 (2d Cir. 1996) ..................................................................................................... 45

*Reifert v. S. Central Wisc. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) .................................................................................................. 7

*Republic Tobacco Co. v. North Atlantic Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ......................................................................................... 2, 3, 6

*Rivera v. Guevara*,
    319 F. Supp. 3d 1004 (N.D. Ill. 2018) .................................................................................. 45

*Robertson Transformer Co. v. Gen. Elec. Co.*,
    No. 12 C 8094, 2016 WL 4417019 (N.D. Ill. Aug. 19, 2016)................................................ 35

*Seaman v. Duke Univ.* ("*Duke*"),
    No. 1:15-cv-462, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ........................................ *passim*

*Sec. & Exch. Comm'n v. SBB Rsch. Grp., LLC*,
    No. 19-CV-6473, 2024 WL 4894315 (N.D. Ill. Nov. 26, 2024) ............................................ 39

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Smith v. Ford Motor Co.*,
  215 F.3d 713 (7th Cir. 2000) ................................................................................ 33

*Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*,
  No. 97 C 5696, 2004 WL 783356 (N.D. Ill. Jan. 28, 2004) ...................................... 37

*Sullivan v. Alcatel-Lucent USA Inc.*,
  No. 12 C 07528, 2014 WL 3558690 (N.D. Ill. July 17, 2014) ........................................ 37, 42

*Tasha C. v. Saul*,
  No. 18-cv-4677, 2019 WL 6877190 (N.D. Ill. Dec. 17, 2019) ................................... 45

*Toys "R" Us, Inc. v. F.T.C.*,
  221 F.3d 928 (7th Cir. 2000) ................................................................................ 3, 8

*Turubchuk v. E.T. Simonds Constr. Co.*,
  No. 12-CV-594-SMY-DGW, 2017 WL 4784653 (S.D. Ill. Oct. 24, 2017) ........................... 31

*U.S. Gypsum Co. v. Lafarge N. Am. Inc.*,
  670 F. Supp. 2d 748 (N.D. Ill. 2009) ..................................................................... 31

*United States v. Hall*,
  93 F.3d 1337 (7th Cir. 1996) ................................................................................ 41

*United States v. Mamah*,
  332 F.3d 475 (7th Cir. 2003) ................................................................................ 33

*United States v. Schultz*,
  No. 14-cr-467-3, 2016 WL 7409911 (N.D. Ill. Dec. 22, 2016) ................................... 37

*Va. Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*,
  98 F. Supp. 2d 729 (W.D. Va. 2000) ...................................................................... 35

*Walker v. Soo R.R. Co.*,
  208 F.3d 581 (7th Cir. 2000) ................................................................................ 29

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
  746 F.3d 1008 (11th Cir. 2014) ............................................................................. 20

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*,
  395 F.3d 416 (7th Cir. 2005) ................................................................................ 31

*Zurbriggen v. Twin Hill Acquisition Co.*,
  No. 1:17-cv-5648, 2025 WL 1092973 (N.D. Ill. Apr. 11, 2025) ................................. 33

**Statutes**

Fed. R. Evid. 702 .................................................................................................. 4, 29, 41

**TABLE OF AUTHORITIES**
(continued)

Page

**Other Authorities**

Dennis W. Carlton & Jeffery M. Perloff,
*Modern Industrial Organization* 88–98 (4th ed. 2005)............................................................... 3

James J. Heckman,
47 *Sample Selection Bias as a Specification Error*, Econometrica 153–161 (1979) ............... 44

Leslie M. Marx & Claudio Mezzetti,
*Effects of Antitrust Leniency on Concealment Effort by Colluding Firms*, 2 J. Antitrust
Enforcement 20 (2014) ....................................................................................................... 44

Matthew D. Gibson,
*Employer Market Power in Silicon Valley*, The Econ. J. (2025)................................................. 5

Thomas Krattenmaker et al.,
*Monopoly Power and Market Power in Antitrust Law*, 76 Geo. L. J. 241–269 (1987)............. 3

Timothy Brennan,
*Bundled Rebates as Exclusion Rather Than Predation*, 4 J. Comp. L. & Econ. 335–374
(2008)................................................................................................................................. 3

## I.  **INTRODUCTION**

Defendants' *Daubert* Motion sidesteps the central question: have Plaintiffs submitted admissible expert evidence "that, if believed, would show that all or nearly all class members suffered antitrust injury as a result of the alleged conspiracy"?  *In re Turkey Antitrust Litig.* ("*Turkey*"), No. 19 C 8318, 2025 WL 264021, at *2 (N.D. Ill. Jan. 22, 2025).  Drs. Starr and Gerhart ("Plaintiffs' Experts") answer this question by generating an informed hypothesis that Defendants' decade-long effort to conspire against their own employees succeeded (the "Challenged Conduct"), and suppressed the pay of all or nearly all Class Members.[1]  This hypothesis results from Plaintiffs' Experts' review of the relevant peer-reviewed scholarship and research (including empirical studies estimating the impact of similar misconduct on worker pay), and the application of reliable economic methods to the facts.  *See* Parts II.B, D, and E, *infra*.

Dr. Starr tests this hypothesis with reliable, standard economic methods.  First, Dr. Starr uses regression analysis to estimate Class-wide damages, "a proven statistical methodology used in a wide variety of contexts."  *Turkey*, 2025 WL 264021, at *19 (citation omitted).  His damages regression provides different damages estimates for DaVita, SCA, and USPI Class Members.[2] All three estimates are statistically significant.[3]  But Defendants' Motion ignores Dr. Starr's damages regression, except to criticize his correct decision to account for Class Member equity compensation by using Defendants' own pay data.  This criticism is meritless.  At best, this issue is a question for the jury to resolve at trial.  *See* Part II.C.1, *infra*.

Second, Dr. Starr employs five different independent and mutually-reinforcing statistical

---

[1] *See* Dkt. No. 659, Decl. of Dean M. Harvey in Supp. Mot. Certify Class ¶¶ 3–11 (delineating the Parties' expert reports).
[2] Starr Report ¶¶ 105, 192; Starr Rebuttal ¶ 105 & Figure ("Fig.") 7.
[3] *Id.*

methods to test whether the Challenged Conduct suppressed the pay of all or nearly all Class Members. These methods include in-sample prediction, which "has been accepted by many courts to show predominance as to antitrust impact." *Turkey*, 2025 WL 264021, at *9 (citation omitted) (collecting authorities). The in-sample prediction method alone confirms that more than ▮▮▮ of Class Members were harmed in at least one year.[4] This is equivalent to, or surpasses, results that this and other courts have relied upon in certifying antitrust classes. *Id.* (summarizing in-sample prediction results in other cases). Remarkably, Defendants and their purported experts Drs. Johnson, McCrary, Saravia, and Stiroh (collectively, "Litigation Consultants") *completely ignore all five of these statistical methods*, conceding that they are admissible, reliable, and, "if believed," show that "all or nearly all class members suffered antitrust injury as a result of the alleged conspiracy." *Id.* at *2. *See* Part II.C.2, *infra*.

Unable to mount any serious argument regarding these relevant expert issues, Defendants resort to red herrings. According to Defendants, the Court should disregard Drs. Starr's and Gerhart's opinions because neither define a relevant market and calculate Defendants' shares of that market. Defendants represent that, without this indirect and circumstantial evidence of market power, Plaintiffs' Experts' opinions are "inadmissible under governing Seventh Circuit law," (Mot. at 23), relying exclusively on *Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004). Defendants misstate the law and textbook economics. As *Republic Tobacco* itself explains: "*Horizontal* agreements, which have not been alleged in this case, are illegal *per se*. Unlike horizontal agreements between competitors, vertical exclusive distributorships (like in this [*Republic Tobacco*] case) are presumptively legal." 381 F.3d at 736 (emphasis added). That was the express reason why the Seventh Circuit required proof of

---

[4] Starr Report ¶¶ 150–157 & Fig. 12; Starr Rebuttal ¶ 221 & Fig. 32.

market power and market definition in *Republic Tobacco*.

Here, Plaintiffs challenge horizontal agreements among competitors that are presumptively *unlawful* (i.e., illegal *per se*). Market power and market definition are not elements of Plaintiffs' claims. The Seventh Circuit eliminated any conceivable debate on this issue, in the controlling case Defendants do not even acknowledge: *Deslandes v. McDonald's USA, LLC* ("*McDonald's*"), 81 F.4th 699 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1057 (2024). In the context of no-poach agreements, the Seventh Circuit explained: "market power is not essential to antitrust claims involving naked agreements among competitors." *Id.* at 703. Thus, market power and market definition are irrelevant to Plaintiffs' claims, and the jury will not be asked to address them at trial. The Seventh Circuit explained why Defendants' argument is meritless in another case Defendants ignore—*Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000):

> [Defendants] seem[] to think that anticompetitive effects in a market cannot be shown unless [Plaintiffs] . . . first prove[] that [they have] a large market share. ***This, however, has things backwards.*** As we have explained elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration. The Supreme Court has made it clear that there are two ways of proving market power. One is through direct evidence of anticompetitive effects.

(emphasis added) (citations omitted).

The definition of labor market power is the ability to suppress pay below competitive levels.[5] When scholars like Plaintiffs' Experts investigate the effects of employer behavior on worker pay, they generate informed hypotheses and test those hypotheses with evidence. That is exactly what Drs. Starr and Gerhart did here. These expert opinions are reliable and

---

[5] Starr Report ¶ 194 (citing Dennis W. Carlton & Jeffery M. Perloff, *Modern Industrial Organization* 88–98 (4th ed. 2005); Thomas Krattenmaker et al., *Monopoly Power and Market Power in Antitrust Law*, 76 Geo. L. J. 241–269, 241 (1987); Timothy Brennan, *Bundled Rebates as Exclusion Rather Than Predation*, 4 J. Comp. L. & Econ. 335–374, 335 (2008)).

quintessentially admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("*Daubert I*"), 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Plaintiffs' Experts' opinions are also very similar to the expert opinions courts have relied upon in denying *Daubert* motions and certifying classes in other no-poach class actions. *See*, *e.g.*, *In re High-Tech Emp. Antitrust Litig.* ("*High-Tech*"), 985 F. Supp. 2d 1167, 1205–26 (N.D. Cal. 2013); *Nitsch v. Dreamworks Animation SKG Inc.* ("*Animators*"), 315 F.R.D. 270, 297–308 (N.D. Cal. 2016); *Seaman v. Duke Univ.* ("*Duke*"), No. 1:15-cv-462, 2018 WL 671239, at \*4–6 (M.D.N.C. Feb. 1, 2018); *In re Broiler Chicken Grower Antitrust Litig.* ("*Chicken Grower*"), No. 6:20-md-02977-RJS-CMR, 2024 WL 2117359, at \*18–30 (E.D. Okla. May 8, 2024). *See* Part II.A, *infra*.

Defendants' other *Daubert* arguments are similarly meritless and distract from the relevant issues. Drs. Starr's and Gerhart's qualitative examinations of Defendants' pay structures result from the reliable application of standard methods to the facts, and are consistent with expert opinions courts have relied upon in other no-poach cases. *See* Part II.D., *infra*. Defendants' contention that applying standard methods to record evidence somehow usurps the jury's fact-finding function is mistaken. Drs. Starr and Gerhart seek to help the jury, not replace it. *See* Part II.E.3, *infra*. Finally, Defendants cannot prevent Plaintiffs' Experts from considering the complete evidentiary record, including proof that relevant documents and communications were destroyed. *See* Part II.E, *infra*. Defendants' Motion should be denied.

## II.     ARGUMENT

### A.     Defendants' Market Definition Gambit Is A Meritless Distraction

According to Defendants, both Drs. Starr and Gerhart admit that their opinions should be discarded because they do not define a relevant labor market or calculate Defendants' market shares. Mot. at 5–8, 23–26. Of course, Drs. Starr and Gerhart make no such admissions. Consistent with controlling law and the standard and reliable methods of their fields of expertise,

Drs. Starr and Gerhart base their hypotheses on peer-reviewed research that demonstrates how and why employees benefit from unrestricted job mobility, and measures the effect of employer misconduct with direct evidence of the impact on employee pay. Dr. Starr then tests those informed hypotheses with a battery of reliable econometric methods that all show the same result: Defendants' collusion succeeded in substantially suppressing Class pay, and to very high levels of statistical confidence. This approach accords with the relevant scholarly literature,[6] as well as other no-poach class actions in which plaintiffs' experts relied upon direct evidence to establish damages and common impact.[7]

Defendants' argument is akin to ignoring direct evidence of the Titanic sitting on the bottom of the ocean when answering the question of whether the Titanic was unsinkable. As the Supreme Court explains:

> Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (citations omitted) (direct evidence of anticompetitive effects meant FTC need not prove the geographic market to show dentists violated the antitrust laws by agreeing not to provide insurers with x-rays when submitting claims); *see also Am. Needle, Inc. v. New Orleans La. Saints*, No. 04-CV-7806, 2014 WL 1364022, at *2 (N.D. Ill. Apr. 7, 2014) (characterizing the plaintiffs' evidence of higher prices as

---

[6] Gerhart Report ¶¶ 41–57, 60–61, 69–69, 71–72; Gerhart Rebuttal ¶¶ 99–117, 122–127, 164–171, 175–181, 235, 240, 256, 259, 261–266, 490, 503–504; Starr Report ¶¶ 44–52, 194–196; Starr Rebuttal ¶¶ 15–17, 305–18. Note that Matthew Gibson's article "Employer Market Power in Silicon Valley," cited by Dr. Starr (Starr Report ¶ 49; Starr Rebuttal ¶¶ 118(b)(ii), 190(a)(ii), 305 & n.22) completed peer review and was published in *The Economic Journal* on October 25, 2025. *See* Matthew D. Gibson, *Employer Market Power in Silicon Valley*, The Econ. J. (2025).

[7] *See High-Tech*, 985 F. Supp. 2d at 1205–26; *Duke*, 2018 WL 671239, at *4–6; *Animators*, 315 F.R.D. at 270, 297–308; *Chicken Grower*, 2024 WL 2117359, at *18–30.

"direct anticompetitive effects that the Sherman Act seeks to prevent," and rejecting the defendants' argument that summary judgment was appropriate because the plaintiff failed to define a "proper product market").

Defendants' cases provide no support for their "backwards" argument. As explained above, the only Seventh Circuit case on which Defendants rely limited the market power and market definition requirements to vertical restraints that are presumptively lawful. *Republic Tobacco*, 381 F.3d at 736 ("Horizontal agreements, which have not been alleged in this case, are illegal *per se*."). As this Court explained in *Turkey*, *Republic Tobacco* itself recognized that "there are some circumstances where to establish a violation of antitrust laws it is unnecessary to prove that defendant wielded market power in a properly defined product and geographic market, and may rely instead on direct evidence of anticompetitive effects." 2025 WL 264021, at *26 (quoting *Republic Tobacco*, 381 F.3d at 736). Those circumstances exist here, as the Supreme Court recognizes: because "horizontal restraints involve agreements between competitors not to compete in some way, this Court has concluded that it did not need to precisely define the relevant market to conclude that these agreements were anticompetitive." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018) (citing *Ind. Fed'n of Dentists*, 476 U.S. at 460–61).

Defendants ignore and contradict controlling Seventh Circuit authority. *McDonald's* confirmed in the specific context of no-poach agreements that market power and market definitions are not elements of Plaintiffs' claims, and explains that these issues are *irrelevant* unless Defendants prove an affirmative defense that the challenged horizontal restraints are reasonably necessary to a cooperative venture. 81 F.4th at 703–05. This affirmative defense involves "potentially complex questions" that "require careful economic analysis." *Id.* at 705. Discovery is now complete, and Defendants have provided zero evidence that could possibly

support this affirmative defense. Defendants' own witnesses uniformly rejected the notion that Defendants' collusion had anything to do with a cooperative venture, and Defendants' Litigation Consultants did not even address this issue in their reports.[8] There can no longer be any doubt that the *per se* standard governs Plaintiffs' claims.

Defendants' remaining authorities are inapposite district court decisions that predate *McDonald's*. *In re NorthShore University HealthSystem Antitrust Litigation*, 657 F. Supp. 3d 1077, 1092 (N.D. Ill. 2023), concerned a monopolization claim under Section 2 of the Sherman Act and a merger claim under Section 7 of the Clayton Act. Unlike here, for "both theories of liability advanced by the [p]laintiff—Section 2 of the Sherman Act and Section 7 of the Clayton Act—monopoly power in a defined market must be proven[.]" *Id. Gumwood HP Shopping Partners*, No. 11-cv-268, 2016 WL 6091244, at *9 (N.D. Ill. Oct. 19, 2016), concerned tying claims over "twenty-one (or more) different tying markets." *See also Reifert v. S. Central Wisc. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006) (tying claim); *McLaughlin Equip. Co. v. Servaas*, No. IP98-0127-C-T/K, 2004 WL 1629603, at *6–7 (S.D. Ind. Feb. 18, 2004) (same). *Hannah's Boutique, Inc. v. Surdej* ("*Hannah's Boutique I*"), 112 F. Supp. 3d 758, 769, 771–72 (N.D. Ill. 2015), found "simply no evidence of a horizontal agreement" and held that the "rule of reason [was] the appropriate standard for evaluating any vertical agreements."[9] *See also Hannah's Boutique, Inc. v. Surdej* ("*Hannah's Boutique II*"), No. 13-cv-2564, 2015 WL 4055466, at *5 (N.D. Ill. July 2, 2015) (same). Finally, *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794 (N.D. Ill. 2005), did not even involve antitrust claims, instead addressing breach of contract, breach of warranty, and fraud claims.

---

[8] *See* Dkt. No. 656, Mot. Certify Class at 22–23 & nn.67–68 (collecting record evidence).
[9] *See also* Mot. at 6 (citing *Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983) (market power analysis required to evaluate vertical agreements)).

Dr. Starr briefly addresses the issue of market power at the end of his opening report to make the same point the Supreme Court made in *Indiana Federation of Dentists*, 476 U.S. at 460–61, and that the Seventh Circuit made in *Toys "R" Us*, 221 F.3d at 937:  the definition of market power is the ability of firms to suppress pay below competitive levels, and the ███████

███████████████████████████████████████████████████

███████ [10]  At that time, Defendants had not yet served their expert reports, and Defendants earlier promised the Court that their expert reports would address "pro-competitive benefits of the challenged conduct."  Hearing Tr. at 5–6, 9, & 13 (Oct. 29, 2024).  Thus, it appeared that Defendants were going to attempt to prove an affirmative defense that, if successful, could have put market power at issue.  In that event, Plaintiffs and their experts were prepared to address market power with direct evidence.

To Plaintiffs' surprise, Defendants abandoned this affirmative defense and did not address it in any of their four expert reports, guaranteeing that market power will not be a relevant issue going forward.  Nonetheless, Defendants and their Litigation Consultants feature market power and market definition as their primary arguments.  Drs. Starr and Gerhart responded to these irrelevant arguments in their rebuttal reports, making the same point: direct evidence of market power establishes market power.[11]  Drs. Starr and Gerhart also explain that their approach is consistent with the scholarly consensus in labor economics that market definition and market share calculations are unnecessary and indeed misleading when assessing the effects of employer behavior on worker wages.[12]  Indeed, Defendants' own Consultants admit that direct evidence of sustained lower wages is proof of market power, by definition, and

---

[10] Starr Report ¶ 196.
[11] Gerhart Rebuttal ¶¶ 17, 234–290, 306–307, 321, 332, 573–574; Starr Rebuttal ¶¶ 8(e), 305–309.
[12] Gerhart Rebuttal ¶¶ 234, 240, 243; Starr Rebuttal ¶¶ 8(e), 310–318.

that there is no additional need to define the market or calculate market shares.[13]

### B. Drs. Starr And Gerhart Generate An Informed Hypothesis That Defendants' Collusion Suppressed The Pay Of All Or Nearly All Class Members

Unlike Defendants' Litigation Consultants, Plaintiffs' Experts follow the scientific method. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert I*, 509 U.S. at 593 (citation omitted). Plaintiffs' Experts generate informed and testable hypotheses based upon their training and expertise, a detailed examination of the relevant scholarly research, and the record evidence. That is what legitimate experts do.

By contrast, Defendants' Consultants have no relevant training or expertise regarding how employer conduct affects worker pay, or how employer pay structures work. Instead of educating themselves on the relevant research about which they know nothing, they *speculate* that the existence of alternative employers rendered Defendants' collusion a fool's errand, and that, even if Defendants' collusion had suppressed Class pay, such an effect would not have suppressed the pay of all or nearly all Class Members. Defendants' Consultants' unsupported speculation depends upon the debunked notion that labor markets are perfectly competitive—an untenable assumption that Defendants' own Consultants abandoned when questioned at deposition.[14] Unlike Plaintiffs' Experts, Defendants' Consultants "do[] not testify on the basis of

---

[13] *See, e.g.*, Ex. 184 at 194:15–195:3 (Dr. Johnson: ███████████████████████████████████████████████).

[14] Ex. 184 at 42:2–5, 151:17–152:16, 187:1–6 (Dr. Johnson testified, ████████████████████████████████████████████████████████████ , 267:11–16 ███████████████ ; Ex. 185 at 49:9–50:1 (Dr. Saravia testified ██████████ , 83:22–84:17 ██████████ ), 130:14–21 ("[I]n general, employees don't have perfect information about alternative job

the collective view of [their] scientific discipline, nor do[] [they] take issue with [their] peers and explain the grounds for [their] differences." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1319 (9th Cir. 1995). Instead, they ignore the collective views of the relevant scientific disciplines, and ignore that this research contradicts and disproves their speculative opinions. This is not science, and it is not admissible. "Failure to mention or discuss 'highly relevant' studies that directly refute an expert's opinion can be a basis for exclusion under *Daubert*." *In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, MDL No. 3026, 2025 WL 1283927, at *17 (N.D. Ill. May 2, 2025).

<u>Dr. Starr.</u> Dr. Starr is a Professor[15] of Management & Organization at the Robert H. Smith School of Business at the University of Maryland. He specializes in exactly the task at hand: "performing economic and statistical analyses of labor markets, with a focus on earnings and restrictions on employee mobility."[16] Unlike Defendants' Consultants, Dr. Starr's testimony "grows out of pre-litigation research" that has been "subjected to peer review." *Daubert II*, 43 F.3d at 1318–19. Dr. Starr has published eighteen articles in leading peer-reviewed journals, "the majority of which focus on mobility restrictions and compensation."[17]

Dr. Starr evaluates Defendants' collusion from an economic perspective[18]:

> I first explain how the economic literature views collusion generally, and no-poach agreements and exchange of CSI specifically. Economic theory clearly establishes that no-poach agreements and exchanges of CSI tend to anticompetitively suppress worker wages and are not in a firm's unilateral self-interest. That is, if the Defendants did engage in a no-poach agreement or exchange CSI, the economic

---

opportunities."); Ex. 187 at 81:14–82:11 (Dr. McCrary testified, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉). Dr. Stiroh impliedly agrees: the "[e]conomic literature suggests that increased transparency among producers can lead to more competitive outcomes. In fact, perfect information, for both consumers and producers, is an underlying assumption of a perfectly competitive market." Stiroh Report ¶ 114.

[15] Since serving his expert reports, the University of Maryland promoted Dr. Starr to full Professor.

[16] Starr Report ¶ 1.

[17] *Id.* ¶ 3.

[18] *Id.* ¶ 27; *see also id.* ¶¶ 30–58 (reviewing relevant scholarly research).

- 10 -

theory would predict that the Class Members who worked for the Defendants would be anticompetitively harmed by this conduct.

Dr. Starr then reviews the criteria economists use to evaluate no-poach agreements, and then applies those methods to the record evidence to assess whether the evidence in this case meets those criteria.[19]  All of this work generates the "hypothesis that, after controlling for other relevant economic factors, Defendants' alleged misconduct during this period economically and statistically significantly suppressed Class Member wages."[20]  As explained below, Dr. Starr then does what Defendants' Consultants never do: *tests* his informed hypothesis with "standard econometric techniques and data common to the Class."[21]  *See* Part II.C, *infra*.

To Dr. Starr's surprise, Defendants' Consultants completely ignored the relevant literature he summarized for them in his opening report[22]:

> None of Defendants' Experts raise any issues with my discussion of the economics of no-poach agreements, nor my discussion of the empirical literature estimating the harm from no-poach agreements.  In fact, nowhere in any report by any of the Defendants' Experts do they even discuss or acknowledge the multiple studies finding that no-poach agreements reduce worker compensation in both the franchise context and in the high-tech context.  I find this surprising, especially with respect to Dr. Johnson and Dr. McCrary, given that both of them have served expert reports in recent no-poach cases.  Given the centrality of the literature of no-poach agreements to the present case, as well as Dr. Johnson's and Dr. McCrary's prior expert experience in a no-poach case, I would have expected that at least they would explain how the No-Poach Agreements in this case compare to other no-poach agreements studied in the literature, or why the economic consensus that no-poach agreements tend to suppress pay would not apply in this case.  Instead, Dr. Johnson and Dr. McCrary, like the other two Defendant Experts, ignore the academic literature entirely and even offer certain analyses and arguments that directly contradict the prevailing literature.

And Dr. Starr provided specific examples of these omissions.  For instance[23]:

> Defendants' Experts do not refute my discussion of monopsony power, or how the

---

[19] *Id.* ¶¶ 59–101.
[20] *Id.* ¶ 103.
[21] *Id.*
[22] Starr Rebuttal ¶ 15; Starr Report ¶¶ 27, 30–58 (reviewing relevant scholarly research).
[23] Starr Rebuttal ¶ 16.

economic literature measures whether firms have labor market power to suppress wages (i.e., the labor supply elasticity). This is important, as I will discuss later in Section X when discussing market power, because all of Defendants' Experts' methods to assess market power are incapable of doing so because their methods do not include studying changes in wages and thus do not estimate labor supply elasticities, like in the literature.

Dr. Gerhart. Dr. Gerhart is the Bruce R. Ellig Distinguished Chair of Pay and Organizational Effectiveness at the Wisconsin School of Business, University of Wisconsin-Madison. Dr. Gerhart is among the world's leading experts on employee compensation, including how employer conduct affects worker pay, employee mobility and turnover, and how companies create and maintain compensation systems that link employee pay together. He literally wrote the book on these subjects—*Compensation*—a discipline-leading textbook now in its 14th edition. His Ph.D. is in Industrial Relations (Personnel and Organizational Behavior) with minors in Labor Economics and Research Methods and Statistics.[24] Over his distinguished forty-year career, Dr. Gerhart's methods and opinions on these subjects have been published dozens and dozens of times in leading peer-reviewed journals and learned treatises.[25] His opinions here are similar to those of other compensation experts who provided testimony on which courts have relied in certifying classes in other no-poach cases. *See*, *e.g.*, *High-Tech*, 985 F. Supp. 2d at 1205 & n.12, 1213–15 (similar analysis of plaintiffs' expert Dr. Kevin Hallock, "a leading labor economist and an expert in compensation structure and design," supported Plaintiffs' theories of common impact); *Duke*, 2018 WL 671239, at *5–6, *8–9 (relying on similar testimony of plaintiffs' expert Dr. Peter Cappelli, a human resources and management scholar). Like the compensation experts in *High-Tech* and *Duke*, Dr. Gerhart's primary role in this case is to assist the trier of fact in understanding the impact of Defendants' collusion on

---

[24] Gerhart Report ¶ 1 & Appendix ("App.") A (Dr. Barry Gerhart CV) at 204.
[25] *Id.*, App. A at 206–214 (Dr. Barry Gerhart CV); Gerhart Rebuttal ¶ 59.

Class pay, and in understanding how Defendants' compensation systems link Class pay together.

Dr. Gerhart reviews the academic literature "demonstrating that employees benefit from uninhibited access to job mobility, whereas it can increase employers' labor costs, because employers will have to pay higher compensation to retain employees and/or to replace them."[26] Dr. Gerhart summarizes the research regarding the importance of proactive recruiting methods.[27] He explains why labor markets are far from perfectly competitive because of limited information, substantial search frictions, and the nature of the employment relationship as a long-term match in which both employer and employee must agree.[28] Dr. Gerhart also explains that the "academic literature widely recognizes" that wage suppression can persist for years, because wages are paid along a long-term trajectory.[29]

Dr. Gerhart explains what compensation structures are, how they are created and maintained, and what economic factors operate to link worker wages together.[30] This discussion includes an overview of key compensation and human resource management concepts, such as equity theory (both internal and external equity),[31] and how employers develop internal pay structures by first assigning internal values to jobs and then systematically determining the relative worth of those jobs across an organization.[32] Dr. Gerhart explains how companies identify compensable factors to distinguish the value of different jobs, and how they group and order jobs on the basis of their relative value, including through salary levels, ranges, and

---

[26] Gerhart Report ¶ 41; *see also id.* ¶¶ 43–46, 50–57 (summarizing research regarding benefits to both departing and incumbent workers).
[27] *Id.* ¶¶ 61, 72.
[28] *Id.* ¶ 69.
[29] *Id.* ¶¶ 88–91.
[30] *Id.* ¶¶ 93–98, 103, 104–113.
[31] *Id.* ¶¶ 94–97.
[32] *Id.* ¶¶ 104–113.

grades.[33]

As with Dr. Starr, Defendants ignore the relevant academic research that Dr. Gerhart summarizes and applies. For example, Defendants' Consultants concede that the literature shows that missed job opportunities and recruiting calls can have a profound impact on an employee's compensation.[34] None of Defendants' Litigation Consultants dispute that employer wage structures exist or how they work, or challenge internal equity as a concept—nor could they, given that to do so would fly in the face of widely-understood phenomena in the fields of compensation, human resource management, and labor economics.[35] Defendants' Consultants "ignor[e] overwhelming evidence on how labor markets work and provid[e] no real reason to expect labor markets for Defendants to work differently."[36]

Throughout his analysis, Dr. Gerhart identifies concepts from the literature and applies them to the record evidence, to assist the trier of fact in understanding how Defendants' collusion could impact Class pay. That is exactly what Dr. Gerhart is supposed to do.

* * *

Both Drs. Starr and Gerhart opine that the likely effect of Defendants' decade-long collusion was suppression of the pay of all or nearly all Class Members. This likely effect represents an informed hypothesis that yields testable and falsifiable predictions. That is the essence of the scientific method. *Daubert I*, 509 U.S. at 593 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified . . . .") (citation omitted). The next step of the scientific method is to construct empirical tests of those

---

[33] *Id.* ¶¶ 112–113.
[34] Gerhart Rebuttal ¶¶ 9–10, 13, 15, 100–112, 124–127, 339–347.
[35] *Id.* ¶ 460; *see also* Starr Rebuttal ¶ 217 (citing McCrary Report ¶ 70 ("I do not dispute that Defendants consider internal equity to some degree[.]")).
[36] Gerhart Rebuttal ¶ 335.

- 14 -

predictions with reliable methods, which is exactly what Dr. Starr does, and exactly what Defendants' Litigation Consultants refuse to do.

Defendants contend that it is somehow unscientific to opine on the "likely" effects of Defendants' collusion. Mot. at 16–20. This argument is nothing less than a frontal assault on the scientific method itself, and Defendants provide no support for this proposition. Entire branches of science dedicate themselves to making informed predictions—in other words, hypotheses— that other scientists test with empirical analyses. For example, theoretical physicists make predictions that experimental physicists test. In 1964, Dr. Peter Higgs, Dr. François Englert, and four other theorists predicted the existence of a fundamental particle called the "Higgs boson" that gives mass to other fundamental particles.[37] Nearly half a century later, in 2012, experimental physicists confirmed the existence of the Higgs boson through experiments at the Large Hadron Collider at CERN in Switzerland, earning Dr. Higgs and Dr. Englert the 2013 Nobel Prize in Physics.[38]

Similarly, economists and other social scientists generate hypotheses about the likely effects of conduct under study that applied economists like Dr. Starr test with sophisticated statistical tools. For example, Defendants' Consultants' overarching "opinion" is that the existence of competing employers canceled out any potential anticompetitive effects of Defendants' collusion.[39] In other words, Defendants' Consultants predict that the likely effect of Defendants' collusion was zero impact on Class pay. Defendants' Consultants then do *nothing* to test that speculative prediction. They also ignore a mountain of empirical research

---

[37] Michael Cooke, *DOE Explains…the Higgs Boson*, U.S. Dept. Energy, https://www.energy.gov/science/doe-explainsthe-higgs-boson (last visited Nov. 11, 2025).
[38] *Id.*
[39] Johnson Report ¶¶ 26–49, 143–144, 186, 188; Saravia Report ¶¶ 70–103 & Ex. 10; McCrary Report ¶¶ 32, 37–68, 107–112, 196, 198 & App. C at Ex. 1; Stiroh Report ¶¶ 22–45 & Figs. 1, 3.

demonstrating that the mere existence of competing employers does not turn a labor market into a perfectly competitive commodity exchange.[40]  For instance, Dr. David Card (Dr. McCrary's Ph.D. advisor[41]) won the 2021 Nobel Prize in Economics for demonstrating that increasing the minimum wage does not necessarily lead to lower employment, showing that even minimum wage workers are paid less than their value to their employers, contrary to Defendants' Consultants' erroneous assumption of perfect competition.[42]  Defendants' Consultants ignore peer-reviewed studies showing that no-poach agreements like those at issue here substantially suppress worker pay, regardless of the existence of competing employers.[43]

Plaintiffs' Experts provide reliable and admissible opinions that follow the scientific method and are consistent with the relevant research, while Defendants' Consultants offer made-for-litigation pseudoscience that ignores and contradicts the relevant research.

### C. Dr. Starr Tests His And Dr. Gerhart's Hypothesis With Standard And Reliable Statistical Methods

Drs. Starr and Gerhart generate the same informed hypothesis—Defendants' collusion suppressed the pay of all or nearly all Class Members—through different and complementary scientific perspectives.  Dr. Starr tests that hypothesis with Defendants' own pay data, using a damages regression to estimate aggregate Class-wide damages and other econometric techniques to test for common impact.

Usually, defendants in antitrust class actions vigorously contest such empirical methods,

---

[40] Gerhart Report ¶¶ 41–57, 60–61, 69–69, 71–72; Gerhart Rebuttal ¶¶ 99–117, 122–127, 164–171, 175–181, 235, 240, 256, 259, 261–266, 490, 503–504; Starr Report ¶¶ 44–52, 194–196; Starr Rebuttal ¶¶ 15–17, 305–18.

[41] Ex. 187 at 91:10–15.

[42] *The Prize in Economic Sciences 2021*, The Nobel Prize, https://www.nobelprize.org/prizes/economic-sciences/2021/popular-information/#:~:text=Of%20course%2C%20there%20were%20differences, number%20of%20follow%2Dup%20studies (last visited Nov. 11, 2025).

[43] Starr Report ¶¶ 44–52, 194–196; Starr Rebuttal ¶¶ 15–17, 305–18.

as in *Turkey*. Here, Defendants largely ignore Dr. Starr's damages regression, and they completely ignore all of Dr. Starr's five quantitative tests of common impact. There is thus no real dispute in this case that "it is possible to use common evidence that, if believed, would show that all or nearly all class members suffered antitrust injury as a result of the alleged conspiracy." *Turkey*, 2025 WL 264021, at *2.

### 1.     Dr. Starr's Damages Regression

"As an initial matter, the Seventh Circuit has recognized that courts afford wide latitude to experts employing regression analysis, a proven statistical methodology used in a wide variety of contexts." *Turkey*, 2025 WL 264021, at *19 (citation omitted and modified). "Regression analysis permits the comparison between an outcome (called the dependent variable) and one or more factors (called independent variables) that may be related to that outcome." *Id.* at *8 (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013)).

Dr. Starr's damages regression has four components: "(1) the *dependent* variable, which is the logarithm of total compensation to each worker in a given year; (2) the key *independent* variable, which is an indicator for the Conduct Period; (3) the *control* variables, which collectively control for other factors that may confound the relationship between Conduct and compensation; and (4) an error term that captures residual determinants of earnings."[44] Dr. Starr's control variables "address geographic differences in pay, macro-economic factors, and healthcare specific factors that might otherwise confound the Conduct estimate."[45] Dr. Starr specifies his regression in order to generate three different Defendant-specific damages estimates. The resulting estimates are: ▮▮▮ wage suppression at DaVita, ▮▮▮ wage

---

[44] Starr Report ¶ 118.
[45] *Id.* ¶ 120.

suppression at SCA, and ▮▮▮ wage suppression at USPI.[46] All three estimates are statistically significant at the 1% level, meaning that there is less than a 1% probability that these conduct estimates result from random chance.[47] Dr. Starr's damages regression explains ▮▮▮ of all variation in Class pay.[48]

To confirm the robustness of these results, Dr. Starr considered several other regression specifications, including different measures of the dependent variable (Class compensation).[49] All of these robustness checks "show that the relationship between the Conduct and compensation is negative, statistically significant, and similarly sized across all fully saturated specifications, both overall and for each Defendant."[50] "These robustness checks demonstrate that the wage suppressing effects found by the model are not an artifact of the specific model I construct and provide additional confidence that the econometric modeling is detecting a true suppression of employee wages."[51]

While Defendants' Consultants spill hundreds of pages of ink attempting to undermine Dr. Starr's damages regression (in meritless, duplicative, and contradictory ways[52]), Defendants' *Daubert* Motion challenges only one narrow issue: how Dr. Starr accounts for equity compensation in the dependent variable (Class pay). Mot. at 28–34.

Defendants' Consultants agree that (1) Class pay should be the dependent variable and (2) equity compensation should be included in that dependent variable, but they disagree with Dr. Starr's decision to account for equity compensation by using *Defendants' own pay data*—

---

[46] Starr Rebuttal ¶ 105 & Fig. 7.
[47] *Id.*
[48] *Id.*
[49] *Id.* ¶¶ 130–131 & Figs. 26–36; *see also id.* ¶ 106 & App. C.
[50] *Id.* ¶ 106.
[51] Starr Report ¶ 131.
[52] *See* Starr Rebuttal ¶¶ 108–176.

data that correctly records equity compensation as Class pay when and if it was actually paid. Unlike Defendants' Consultants, Dr. Starr is a scholar who studies how employment restraints impact worker pay, and he explains why accounting for equity compensation by when it was actually paid is the correct approach when calculating Class underpayment.[53]

Defendants' Consultants agree that their clients' own pay data is accurate and reliable, but they insist that equity pay should not be accounted for when it was paid and received, but instead when it was first promised. This proposal is akin to assuming that a promised yearly salary was fully paid on January 1, even if an employee left the company the next day on January 2 and was paid only a tiny fraction of that yearly salary. That is not how Dr. Starr accounts for salaries, and it is not how he accounts for equity payments. This case is about suppression of actual compensation, not about suppression of promised compensation that might never be paid. Dr. Starr consistently and appropriately defines the dependent variable in terms of actual pay, not promised pay.[54] As Plaintiffs explain in their *Daubert* motion, Defendants' alternative approach is unreliable and inadmissible, including because Defendants' Consultants implement it in contradictory ways, their unreliable method requires them to ignore equity pay for large portions of the Class, and they reach different and demonstrably incorrect results. Plaintiffs' *Daubert* Mot. at 41–43. In any case, Dr. Starr's damages regression continues to show substantial and statistically significant pay suppression even under Defendants' Consultants' inconsistent and improper methods of valuing equity compensation.[55]

To exclude Dr. Starr's method of accounting for equity compensation under *Daubert*, Defendants must establish that accounting for equity when it is actually paid "falls 'outside the

---

[53] *Id.* ¶¶ 109–117.
[54] *Id.* ¶¶ 109–118 & Figs. 8–10.
[55] *Id.*, Fig. 8.

- 19 -

range where experts might reasonably differ.'" *Turkey*, 2025 WL 264021, at *7 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)). Defendants have not and cannot make this showing.[56] Plaintiffs provide herewith twenty examples of scholars accounting for equity pay in the same way as Dr. Starr, by measuring its value when it was actually paid.[57] Nearly all of these examples are publications in leading peer-reviewed journals, such as the *American Economic Review*, the *Quarterly Journal of Economics*, and *Econometrica*. *Id.* At best, this dispute is for the jury to resolve at trial. "As the Supreme Court and Seventh Circuit have confirmed on a number of occasions, the selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility." *Turkey*, 2025 WL 264021, at *16 (citations omitted).

### 2. Dr. Starr's Common Impact Methods

In antitrust class actions, common impact is almost always the most contested issue. For instance, in *Turkey*, evaluating the parties' dueling common impact arguments was the focus of the Court's analysis. 2025 WL 264021, at *7–24. In an extraordinary admission, Defendants and their Consultants completely ignore all five of Dr. Starr's econometric common impact tests. Defendants and their Consultants only address Dr. Starr's sixth common impact method, which he shares with Dr. Gerhart: assessing qualitative evidence that Defendants paid Class Members

---

[56] All Defendants' cited cases miss the mark. *See Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1166–68 (S.D. Cal. 2022) (expert did not justify selection of "clean" benchmark period "that contains four years of alleged anticompetitive misconduct, based on Plaintiffs' post-discovery contentions and the evidence on summary judgment" ); *Do It Best Corp. v. Passport Software, Inc.*, No. 01 C 7674, 2005 WL 8178947, at *1–2 (N.D. Ill. Dec. 9, 2005) (excluding expert who "fail[ed] even to spot-check the data" used to create a flawed database to support damages calculation); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268–69 (2d Cir. 2002) (expert testified that he should have used one methodology, but inexplicably applied another); *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1027–30 (11th Cir. 2014) (damages expert measured "the more general presence of a competitor" instead of "the effect of the violation"); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1300–01 (N.D. Fla. 2017) (expert's regression included outlier data point that by his own standard should have been omitted).

[57] *See* Exs. 153–172.

through structured compensation systems.  This brief addresses that separate argument in the next section.  *See* Part II.D, *infra*.

Dr. Starr's first common impact method explores whether the damages estimates differ between different tiers of workers at the same company, and demonstrates ████████████ ████████████████████████████████████████████████████████[58]  The second method is similar, but estimates how Defendants' collusion affected Class Member pay at every percentile of the compensation distribution.[59]  Dr. Starr finds that ████████████ ████████████████████████████████████████████ ████████████████████[60]  The third method is in-sample prediction, which "has been accepted by many courts to show predominance as to antitrust impact." *Turkey*, 2025 WL 264021, at *9 (citation omitted) (collecting authorities).  In-sample prediction confirms that more than ███ of Class Members were harmed.[61]  This result is similar or higher than results in other cases that have relied upon in-sample prediction for common impact. *Id.* (summarizing results in other cases).  Dr. Starr's fourth method—interval in-sample prediction—anticipates a critique of in-sample prediction that Defendants and their Consultants do not even make, and shows that his in-sample prediction results are robust to much higher demands of statistical confidence.[62]  Dr. Starr's fifth method—a random coefficient model—uses common evidence and methods to generate damages estimates for each Class Member individually.  This approach shows that even a conservative estimate confirms harm to over ███ of Class Members.[63]

---

[58] Starr Report ¶¶ 145–146 & Fig. 10.
[59] *Id.* ¶¶ 147–149 & Fig. 11.
[60] *Id.* ¶ 148 (emphasis in original) & Fig. 11.
[61] *Id.* ¶¶ 150–157 & Fig. 12; Starr Rebuttal ¶ 221 & Fig. 32.
[62] Starr Report ¶¶ 158–168 & Figs. 13–17.
[63] Starr Rebuttal ¶ 222 & Figs. 33–34; *see also* Starr Report ¶¶ 169–171 & Fig. 18.

**D.** **Dr. Gerhart And Dr. Starr Also Investigate Qualitative Evidence Of Defendants' Pay Structures**

**1.** **Dr. Gerhart's Pay Structure Analysis**

Dr. Gerhart's opinions about the likely effects of Defendants' no-poach agreements appropriately rely upon his experience and expertise, scholarly research and theory, and analysis of record evidence. Dr. Gerhart opines that Defendants maintained systematic compensation structures designed to maintain internal and external equity that were annually revised from the top-down, such that Defendants' collusion would have broadly suppressed Class pay.[64] Dr. Starr then tests and confirms this hypothesis, while Defendants' Consultants do nothing to test their speculative opinions to the contrary. Courts in other no-poach cases have relied upon opinions similar to Dr. Gerhart's in granting class certification. *See High-Tech*, 985 F. Supp. 2d at 1205, 1213–15; *Duke*, 2018 WL 671239, at *5, *8–9; *Animators*, 315 F.R.D. at 298–99; *Chicken Grower*, 2024 WL 2117359, at *20–21.

**a.** **Defendants Set Systematic Compensation Structures Designed To Achieve Internal and External Equity**

Dr. Gerhart determined that Defendants applied foundational principles of internal and external equity to design and maintain their own structured compensation systems.[65]

DaVita. Dr. Gerhart explains that DaVita followed the standard process for implementing a structured compensation system. To start, DaVita employed highly trained compensation employees to design and administer its structured pay systems;[66] they undertook a

---

[64] Gerhart Report ¶¶ 84–153.
[65] *Id.* ¶¶ 104–120.
[66] *Id.* ¶ 102(a). For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 102(a)(ii) (quoting Ex. 178 at 28:6–29:6; Ex. 190 at RC_OMCEAL_0000063). ▮▮▮▮▮▮▮▮▮▮▮



██████ [67] DaVita thereby created "job families/groups, job titles therein, job levels, and salary minimums, midpoints, and maximums."[68] DaVita also "ensured that similar roles were paid within a similar range, which ███████████████████████████████████████████████████████ [69] Additionally, DaVita maintained fixed percentage pay differentials between jobs.[70]

DaVita "sought to align its compensation practices to align with internal equity principles."[71] For example, ████████████████████████████████████████ [72] DaVita set pay raises and starting

███████████████████████████████████████████ *Id.* (citing Ex. 190 at RC_OMCEAL_0000064).

[67] *Id.* ¶ 110(a) (quoting Ex. 205 at DVA_OMEAL_001067255–56).

[68] *Id.* ¶ 114(a)(i). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* (citing Ex. 197; Ex. 84; Ex. 204 at DVA_OMCEAL_001057524; Ex. 198 at DVA_OMCEAL_001321377).

[69] *Id.* ¶ 114(a)(iii) (quoting Ex. 178 at 60:15–24).

[70] *Id.* ¶ 114(a)(v). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* (quoting Ex. 202 at DVA_OMCEAL_001068251–52).

[71] *Id.* ¶ 127(a).

[72] *Id.* ¶ 127(a)(i)(A) (citing Ex. 62 at DVA_OMCEAL_000906134) (providing an example wherein it would be ████████████████████████████████████████████████████████████████████████)).

salaries based on these principles of internal equity.[73] DaVita also █████████████ ████████████████████████████████████, and DaVita instructed that ██ ████████████████████████.[74]

SCA. Similarly, Dr. Gerhart found that SCA utilized typical practices to implement and maintain its structured pay systems.[75] SCA ensured the use and achievement of this structure by relying on highly-credentialed compensation professionals to manage its pay systems.[76] Moreover, like DaVita, SCA "used salary ranges, minimums, midpoints, and maximums for its employees," and "maintained job families/groups, job titles therein, and job levels, and used salary minimums, midpoints, and maximums."[77]

Like DaVita, SCA was committed to internal equity.[78] According to SCA's ████ ████████████████████████████████████████████████████████████████

---

[73] *Id.* ¶ 127(a)(iii) (citing Ex. 194 at DVA_OMCEAL_000957821); *id.* ¶ 127(a)(ii)(A) (citing Ex. 178 at 80:19–23). Indeed, DaVita's ████████████████████████████████████ ███████████████████████████████████ *See id.* ¶ 127(a)(ii)(C) (citing Ex. 84).

[74] *Id.* ¶¶ 127(a)(iv), 127(a)(iv)(A) (citing Ex. 174 at 132:13–133:2). For example, █████████ ████████████████████████████████████████████████████. *Id.* ¶ 127(a)(iv)(A) (citing Ex. 54).

[75] According to SCA Group VP of HR Warren Cinnick ("Cinnick"), ████████████████ ████████████████████████████████████ *Id.* ¶ 114(b)(i) (quoting Ex. 183 at 65:4–18).

[76] *Id.* ¶ 102(b). For example, "Chief Talent Officer Bridie Fanning, who was well educated about personnel management and compensation, ran SCA's human resources team," which involved "leading the team, paying benefits, recruitment, board responsibilities with regards to the compensation committee, Andrew[] [Hayek's] pay, executive compensation, communications." *Id.* ¶ 102(b)(i) (quoting Ex. 177 at 28:8–22). Fanning has a doctorate in corporate education, three master's degrees in strategic personnel management, corporate education, and business management, and has worked in the HR field for more than thirty years. *Id.* (citing Ex. 177 at 13:6–18).

[77] *Id.* ¶ 114(b). For instance, in 2015, SCA internally circulated a document that explained, ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* ¶ 114(b)(iii) (quoting Ex. 196 at SCA000109832 (emphasis added)).

[78] *Id.* ¶ 127(b).

[79] To correct outlier compensation, █████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████ [80] SCA also set starting salaries by comparing them with ranges of pay for similar incumbent employees.[81]

    USPI. As above, Dr. Gerhart analyzes evidence that USPI did not stray from standardized practices in designing and administering its systematic compensation system. For example, "USPI also employed persons to run compensation and recruiting who were well educated in human resources and compensation."[82] Further, USPI ███████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ [83] ████████ ████████████████████████████████████ [84]



[79] *Id.* ¶ 127(b)(i) (quoting Ex. 120 at SCA000079726).

[80] *Id.* ¶ 127(b)(iii) (quoting Ex. 115 at SCA001363537), 127(b)(iv). "In fact, in January 2012 SCA cut former Regional Director of Operations & Clinical Services (and Plaintiff) Scott Keech's ("Keech") compensation by ███████; according to SCA, Keech 'was paid too much and was not in line with the internal equity of the organization,' and [] he 'had to be paid similar to the other people in the role' so that SCA could 'maintain internal equity with the rest of the organization.'" *Id.* ¶ 127(b)(iv)(A) (quoting Ex. 23 at 203:1–204:2; Ex. 52).

[81] *Id.* ¶ 127(b)(ii). ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ *Id.* (quoting Ex. 183 at 74:5–15, 69:15–70:24).

[82] *Id.* ¶ 102(c). For instance, USPI's former SVP and Chief HR & Support Services Officer Sandi Karrmann ("Karrmann") ██████████████████████████████████████████ *Id.* ¶ 102(c)(i) (citing Ex. 180 at 22:11–23:19; 32:19–34:6; 34:24–35:16, 37:1–48:12). ████████████████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* (citing Ex. 180 at 30:2–31:16).

[83] *Id.* ¶¶ 114(c), 114(c)(i) (citing Ex. 126 (cover sheet and attachment with a sheet ████████ █████████ )).

[84] *Id.* ¶ 114(c)(ii) & Fig. 7 (citing Ex. 212 (sheet with █████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ )).

Dr. Gerhart also concludes that the evidence "shows that USPI accounted for internal equity in its compensation structure."[85]  According to former USPI SVP and Chief HR & Support Services Officer Karrmann, ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████[86]  Like DaVita and SCA, to establish salary recommendations, USPI ████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████[87]

Limited Pay Transparency is Immaterial.  Defendants mischaracterize Dr. Gerhart's assessment as inconsistent with his pay transparency analysis and based on insufficient evidence that Class Members had insight into each other's compensation.  Mot. at 19–20.  This argument is bizarre, since it attempts to fault Dr. Gerhart for not sufficiently appreciating how *imperfect* labor competition was: Class Members did not have perfect transparency into how their coworkers were paid.  This is undisputed, and it is one of the many reasons why Defendants' Consultants' assumption of perfect competition is unreliable and based on nothing but unsupported speculation.  Dr. Gerhart's actual opinion is that Defendants limited their employees' access to pay information, not that they eliminated it altogether.[88]  He explains that "some employees inevitably learn some information about certain other employees' salaries," but

---

[85] *Id.* ¶ 127(c).
[86] *Id.* ¶ 127(c)(i) (quoting Ex. 180 at 41:2–14).
[87] *Id.* ¶ 127(c)(ii) (quoting Ex. 181 at 39:21–40:2).  ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ *Id.* ¶ 127(c)(v) (quoting Ex. 69).

[88] *Id.* ¶ 70.

they "only acquire this information in spite of their employers."[89]  Indeed, employers generally do everything they can to limit access to pay information so that employees "cannot use that data to negotiate pay increases or create bidding wars between competitors."[90]

### b. Defendants' Pay Structures Likely Transmitted Pay Suppression Broadly

Dr. Gerhart explains how Defendants' pay structures would have transmitted suppressed pay broadly across the Class.

*First*, Dr. Gerhart explains that because Defendants value treating similarly-situated employees similarly, if an employee receives a higher-paying outside offer which they leverage into higher pay at their current company, similarly-situated employees at the current company will expect their own pay to increase to maintain internal equity.[91]  These adjustments in turn require the company to revisit pay levels for jobs below and above that role/job to maintain internally equitable pay differentials, which likewise results in upward pay adjustments.[92]  Dr. Gerhart also opines that in unrestricted markets, Defendants, like other employers, "will typically raise compensation systematically to preempt" turnover risks, "and to avoid the accompanying morale and retention costs."[93]

---

[89] *Id.*

[90] *Id.*

[91] *See id.* ¶ 143; Gerhart Rebuttal ¶ 491 (quoting Ex. 188 at 217:7–24 (Dr. Gerhart also explains, "'[I]t's possible that one offer could have a cascading effect,' though of course 'more offers would have a bigger cascading effect.'  In any event, one employee receiving an outside offer during the conduct period is hardly realistic.  One doubts that the Defendants would have gone to the trouble and risk of colluding to establish No-Poach Agreements if they believed outside offers in the absence of such agreements would be so rare.  If such agreements served to prevent a substantial number of unsolicited outside offers that Defendants' employees would have otherwise received, it would have had a major impact, including via cascading effects.")).

[92] Gerhart Report ¶¶ 138–143, 153.

[93] *Id.* ¶ 145.  In a footnote, Defendants contend that Dr. Gerhart's rebuttal analysis of pay interrelationships across job levels was improperly disclosed and cannot support common impact.  Mot. at 19 n.16.  Defendants are incorrect.  Judge Kim has since found that Dr. Gerhart's analysis properly responds to Defendants' Consultants.  ECF No. 671 at 4–5.  Defendants attempt to dismiss median wages as single observations.  But a median is not chosen at random, it is a measure of central tendency of an

*Second*, Dr. Gerhart reviews record evidence showing that Defendants directly exchanged confidential pay information, and used that confidential information to suppress Class pay.[94] Defendants assert that there is no evidence that they used this illicit exchange of confidential information to set Class pay. Mot. at 17–18. In fact, Dr. Gerhart analyzes ████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████[95] Defendants Consultants' provide no alternative explanation for Defendants' exchanges of confidential pay information, because none exists. *See id.*. at 17. Dr. Gerhart explains that using confidential information to lower company-wide merit increases would have lowered pay broadly across the Class: to maintain "the relative differentials between employees with different performance ratings and compa-ratios, the majority of individual employees' merit increase[s] would have to be reduced."[96]

*Third*, Defendants' C-suite executives set and regularly refreshed company-wide labor budgets and pay practices to reduce turnover, in light of perceived competitive threats that were suppressed artificially through the misconduct at issue. Dr. Gerhart explains[97]:

> The CEOs simultaneously eliminated competitive threats in the labor market by establishing No-Poach Agreements, and shared compensation-related information . . . which allowed them to set lower labor budgets, including lower merit increase budgets, than they would have in a competitive market. This misconduct would likely have directly impacted all or nearly all Class Members.

---

entire population. And Dr. Gerhart elsewhere explains the importance of median pay in the specific context of how Defendants created and maintained their compensation systems, including examples of Defendants themselves monitoring median salaries to maintain internal equity across their workforces. Gerhart Report ¶¶ 114, 116, 127; Gerhart Rebuttal ¶¶ 517, 540.

[94] Gerhart Report ¶¶ 82–83; Gerhart Rebuttal ¶¶ 299 (no dispute that that the evidence shows Defendants discussed sharing compensation information), 356–361, 368.

[95] Gerhart Rebuttal ¶ 365.

[96] Gerhart Report ¶ 153.

[97] Gerhart Rebuttal ¶ 572.

Defendants do not respond to this analysis, and instead resort to attacking a straw-man argument that this case is about the effects of one missed cold call or one missed raise. Mot. at 19. Defendants' CEOs did not conspire against their own employees for a decade to prevent one missed cold call, or to avoid giving a raise to one person. As Dr. Starr's largely unrebutted damages regression shows, Defendants' misconduct substantially reduced total Class compensation. Dr. Gerhart's qualitative analysis will help the trier of fact understand how Defendants' collusion would have interacted with Defendants' pay systems to suppress all or nearly all Class Member pay.

### c. Standalone Qualitative Analysis Is A Reliable Methodology

Finally, Defendants argue that Dr. Gerhart should have performed a statistical analysis in support of his pay structure analysis, which is the task that Dr. Starr already performs. Doing so would have been redundant and duplicative, and would have violated the "general rule" of "one-expert per-subject *per-side*." *Kaepplinger v. Michelotti*, No. 17 CV 5847, 2022 WL 267886, at *6 (N.D. Ill. Jan. 28, 2022) (emphasis in original) (collecting authorities). Plaintiffs' Experts' roles mirror those of plaintiffs' experts in *High-Tech* and *Duke*, in which a pay structure expert like Dr. Gerhart performs a qualitative analysis that is then tested by an applied economist like Dr. Starr. *See, e.g.*, *High-Tech.*, 985 F. Supp. 2d at 1205–26; *Animators*, 315 F.R.D. at 297–308; *Duke*, 2018 WL 671239, at *4–6; *Chicken Grower*, 2024 WL 2117359, at *18–30.

The law does not require a subject-matter expert to apply redundant statistical methods to those already provided by another expert. "It is of little import whether [Dr. Gerhart] utilizes a specific 'methodology' to formulate [his] opinions on these points; 'Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.'" *See Corzo v. Brown Univ.*, No. 22 C 125, 2025 WL 2753400, at *19 (N.D. Ill. Sept. 29, 2025) (quoting *Walker v. Soo R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000)); *see also Kumho Tire*, 526

U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on [] experience [and observation] rather than on [calculations of] data . . . .").

*Corzo* is instructive. There, the defendants sought to exclude the plaintiffs' expert's testimony that the defendant private universities in a price-fixing case competed with each other and had flexibility in their revenue streams, because the expert did not undertake a quantitative analysis. 2025 WL 2753400, at *19. *Corzo* rejected this argument because the challenged expert had years of relevant experience working as a private university's Chief Financial Officer and she applied this experience to review the defendants' 2022 annual reports and endowment reports. *Id.* at *18–19. Similarly, Dr. Gerhart reliably applied his decades of expertise as a leading scholar of compensation and human resource management and his "knowledge of the relevant literature, including theory and empirical evidence, as well as practice, to a qualitative analysis of the record evidence."[98] As such, "[t]his is not an instance where an expert is relying on data so insufficient that it lacks reliability," and "challenging [Dr. Gerhart's] opinion on this basis is properly done on cross-examination." *Id.* at *18.

Moreover, Defendants' cases involving experts whose methodologies violated industry standards or applied none at all underscore the validity of Dr. Gerhart's methodology, which applies widely-adopted standards he spent his career developing, teaching, and researching.[99] *See Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817–18 (7th Cir. 2010) (reliability unmet

---

[98] Gerhart Rebuttal ¶¶ 56, 59.

[99] *Id.* ¶ 58 (These standards require qualitative analysis like Dr. Gerhart's, because "[t]o explain and make sense of what we observe (empirical observations/data), we need theory," which "is informed by empirical research done broadly across different contexts, not just by the empirical analysis done in a single case.").

where expert developed standard for litigation and there was no indication anyone else had accepted it); *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 748, 753–54 (N.D. Ill. 2009) (expert failed "to rely on the empirical data metrics that he himself acknowledges are the industry standard."); *Turubchuk v. E.T. Simonds Constr. Co.*, No. 12-CV-594-SMY-DGW, 2017 WL 4784653, at *3 (S.D. Ill. Oct. 24, 2017) (expert disregarded customary practice of identifying factors supporting calculation of estimated settlement value).

### 2.     Dr. Starr's Pay Structure Analysis

Unlike the testimony at issue in *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005), Dr. Starr "follow[ed] scientific approaches normal to [his] disciplines."  While Defendants improperly rely on speculative "intuition," Dr. Starr relies on the "empirical toolkit of the [] sciences."  *Id.*

Dr. Starr first explains that in his fields, documentary evidence "can be informative in its own right," "can be falsified with other qualitative evidence" and "can help us understand the quantitative evidence, and vice versa, to help better inform our understanding."[100]  Accordingly, he initially examines the documentary evidence to inform his hypothesis that Defendants had compensation structures that linked employee compensation.[101]  He explains, "The evidence shows that ██████████████████████████████████████████████████████████ ███████████████████████████████"[102]  "SCA ████████████████████████

---

[100] Starr Report ¶ 28(a); Starr Rebuttal ¶ 19(c).
[101] Starr Report ¶ 178.
[102] *Id.* ¶¶ 179, 179(a).  "For instance, ████████████████████████████████████ ██████████████████████████████████████████████████████  *See id.* ¶ 179(a) (quoting Ex. 203 at DVA_OMCEAL_001329257); *see also id.* ¶ 179(i) (quoting Ex. 201 (█ ███████████████████████████████████████, DaVita COO Michael Staffieri wrote, ████ ██████████████████████████████████  i.e., a range of pay based on what the current incumbent DVPs were paid, ████████████████████████████)); *id.* (quoting Ex. 195 at DVA_OMCEAL_001339898 ████████████████████████████████████████████████ █████████████████████████████████████.

[REDACTED] [103] Likewise, [REDACTED]

[REDACTED] [104] For these reasons and those discussed above with respect to Dr. Gerhart's qualitative assessment, courts in other no-poach cases have relied on similar methods. *See Chicken Grower*, 2024 WL 2117359, at *25; *High-Tech*, 985 F. Supp. 2d at 1205, 1209–13 & n.19; *Animators*, 315 F.R.D. at 298–304; *Duke*, 2018 WL 671239, at *5–6, *8–9.

Next, Dr. Starr confirms these findings with correlation analyses of Defendants' available wage data, which "show strong support for compensation linking Class pay together."[105] "[C]ourts faced with similar correlation analyses," including this Court, "have found that they could serve as reliable evidence in conjunction with overcharge regressions," as here. *See Turkey*, 2025 WL 264021, at *10 (collecting cases); *Animators*, 315 F.R.D. at 299–300, 302–03; *High-Tech*, 985 F. Supp. 2d at 1211–13, 1218–20 & n.19; *Duke*, 2018 WL 671239, at *6, *8–9; *Chicken Grower*, 2024 WL 2117359, at *21–22. Contrary to Defendants' objection (Mot. at 36), this Court holds that "there is no reliability problem simply because [Dr. Starr's] correlation analysis alone does not identify the causal mechanism driving the correlation." *See Turkey*, 2025 WL 264021, at *10. Identifying the causal mechanism is what economic theory and qualitative analyses are all about.

Defendants' cases *confirm* the reliability of Dr. Starr's methodology because, as

---

[103] *Id.* ¶¶ 180, 180(a); *see also id.* ¶ 180(f) [REDACTED] (citing Ex. 175 at 135:6–17); *id.* ¶ 180(i) (Former SCA CFO Peter Clemens testified that SCA [REDACTED] ) (citing Ex. 179 at 164:10–165:3).

[104] *Id.* ¶¶ 181, 181(a) (USPI COO Mark Garvin testified that he [REDACTED] (quoting Ex. 176 at 93:24–94:9; Ex. 206 at DOJCIV-008-00000360); *id.* ¶ 181(b) [REDACTED] (citing Ex. 199 at USPI_CIV_000021906 and Ex. 200 at USPI_CIV_000021907).

[105] *Id.* ¶ 178.

discussed above, it derives from "robust economic literature" and principles that Defendants and their consultants do not challenge.[106] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (exclusion proper because studies conducted by animal scientists were too dissimilar to facts in litigation concerning cancer in human beings); *Zurbriggen v. Twin Hill Acquisition Co.*, No. 1:17-cv-5648, 2025 WL 1092973, at *14 (N.D. Ill. Apr. 11, 2025) (admission improper because proposed expert "provided no articles or studies" in support of theory); *Fuesting v. Zimmer, Inc.*, 362 F. App'x 560, 563–64 (7th Cir. 2010) (same); *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (same); *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 815–16 (N.D. Ill. 2013) (same). To the contrary, these cases further demonstrate the reliability of Plaintiffs' Experts' opinions and the inadmissibility of Defendants' Consultants' opinions that "fundamentally misunderstand what a pay structure is or how it works."[107] *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 784 (7th Cir. 2017) (reliability failed because proposed expert's "central underlying premise" was "contrary to generally accepted [] science").

### E. Basing Expert Opinion On Record Evidence Does Not Usurp The Jury's Role

Drs. Starr and Gerhart seek to help the jury, not replace it. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (expert opinions should be included if they will "assist the trier of fact with its analysis of any of the issues.").

#### 1. Dr. Gerhart Appropriately Examines Evidence Regarding Defendants' Labor-Related Incentives And Employee Pay Structures

First, Defendants assert that Dr. Gerhart, a preeminent expert on compensation, lacks the

---

[106] Starr Report ¶¶ 30–58, 172; Starr Rebuttal ¶ 217.
[107] Starr Rebuttal ¶¶ 245–246; *see also* Gerhart Rebuttal ¶¶ 535–541 ("Overlap is actually a feature of systematic compensation structures, and the only way to eliminate overlap is to greatly reduce the range spread . . . which would throttle the firm's ability to pay for performance at the same level and/or within the same job.").

requisite expertise to offer opinions regarding Defendants' employment-related incentives, because Dr. Gerhart is not an economist. Mot. at 8. To the contrary, Dr. Gerhart is one of the most qualified experts on the planet to address these issues. Courts regularly allow non-economists to opine on antitrust and economic-related issues, so long as the specific issues are within the expert's area of expertise. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MDB), 2022 WL 15053250, at \*9–10 (E.D.N.Y. Oct. 26, 2022) (permitting non-economist without formal antitrust experience to opine on antitrust-related topics); *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, No. CV-00-1693-PA, 2003 WL 23715981, at \*1 (D. Or. Jan. 21, 2003) (permitting non-economist to opine on the relevant market); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-md-2785, 2020 WL 1164869, at \*23–24 (D. Kan. Mar. 10, 2020) (permitting non-economist to offer expert testimony in an antitrust matter); *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, No. 04-4213, 2011 WL 167259, at \*4, \*6 (D. Minn. Jan. 14, 2011) (admitting non-economist testimony because "expertise in antitrust economics [is] not required to determine that certain actions by a competitor have detrimental effects on its competition").

Here, Dr. Gerhart's opinions that Defendants seek to exclude fall directly within Dr. Gerhart's expertise because they relate to Defendants' profit-maximizing incentives with respect to hiring, recruitment, retention, employee compensation, and labor costs.[108] For example, Dr. Gerhart describes how the academic literature has demonstrated that in unrestricted markets, employees that change jobs experience pay growth, and how that growth and unrestricted mobility also benefit even stationary employees that do not change employers.[109] He also

---

[108] Gerhart Report ¶¶ 7(a), 25, 27–33, 36–40, 47–49, 53, 57–58, 155; Gerhart Rebuttal ¶¶ 7, 60, 62–120, 566.
[109] *See* Gerhart Report ¶¶ 41–58 & nn.134–40, 142–46.

analyzes whether Defendants placed an emphasis on and monitored employee turnover rates, how turnover rates increase labor costs far beyond the simple cost of hiring a new employee, how significant Defendants' labor costs are relative to their profits, and the efforts that Defendants employed in managing their labor costs.[110] All of this analysis stems directly from Dr. Gerhart's training and expertise and will help a jury understand the details of and reasons for Defendants' strong economic incentives to limit employee turnover and decrease labor costs.

Defendants' cases are inapposite. For example, *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530 (D. Md. 2002), cuts *against* Defendants' argument. *Berlyn* permitted a non-economist to testify about *economic*-related issues in the newspaper industry such as newspaper costs and price structures based on his expertise in finance and business administration. *Id.* at 540. Defendants' other cases concerned the exclusion of experts whose opinions were far removed from their area of expertise or training. *See Robertson Transformer Co. v. Gen. Elec. Co.*, No. 12 C 8094, 2016 WL 4417019 (N.D. Ill. Aug. 19, 2016) (expert had no academic background in the subject on which he was opining); *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 WL 1855980, at *8 (D. Md. May 1, 2013) (expert's "status as a law professor is likely to mislead the jury when he purports to give a strictly economic and not legal opinion"); *Va. Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 732–35 (W.D. Va. 2000) (geological engineer who lacked "clear understanding of basic economic principles" not qualified to define relevant market); *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, No. 1:02-cv-2600-RDP, 2010 WL 11561917, at *2–4 (N.D. Ala. Sept. 2, 2010) (similar); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 475, 477–78 (9th Cir. 2021) (fraud examiner unqualified to rebut antitrust damages expert). Indeed, Defendants' "insistence

---

[110] *See id.* ¶¶ 24–37.

that [an expert] must be an economist to assist the court" on economic-related issues "is mistaken." *In re Cordova*, 668 B.R. 413, 459 (N.D. Ill. 2025); *see also In re Opana ER Antitrust Litig.*, No. 14 C 10150, 2021 WL 2291067, at *17 (N.D. Ill. June 4, 2021) (permitting expert who was not an economist to testify in an antitrust matter).

Second, Defendants' argument that these opinions should also be excluded for a lack of "methodology," Mot. at 9, mischaracterizes Dr. Gerhart's testimony by claiming that it is based on nothing more than his "say-so." As described above, Dr. Gerhart anchors his analysis in the academic peer-reviewed literature (including his own peer-reviewed scholarship), and his opinions result from applying the standard methods of his fields of expertise to the facts.[111] He takes the same approach, and uses the same methods, as other experts with similar qualifications who have assisted the triers of fact in similar cases. *See High-Tech*, 985 F. Supp. 2d at 1205, 1213–15; *Duke*, 2018 WL 671239, at *5, *8–9; *see also Ind. GRQ LLC v. Am. Guar. & Liab. Ins. Co.*, No. 3:21-cv-227 DRL, 2023 WL 3451939, at *6 (N.D. Ind. May 14, 2023) (exclusion proper only where expert failed to provide supporting studies or show general acceptance).

### 2. Dr. Gerhart May Testify About Defendants' Incentives To Collude To Suppress Class Pay

Similarly, Defendants argue that the Court should exclude Dr. Gerhart's opinions on the ground that they "improper[ly] opin[e] on Defendants' state of mind." Mot. at 21–22. But Dr. Gerhart's opinions do not stray into impermissible "state of mind" testimony. Dr. Gerhart's expertise qualifies him to analyze profit-maximizing incentives with respect to his areas of study, such as pay systems, employee turnover and retention, and compensation, including the incentives and motivations of Defendants. Indeed, the Seventh Circuit has held that a qualified expert may testify as to the "state of knowledge prevalent in a business that he has studied."

---

[111] *See, e.g., id.* ¶¶ 44–54 & nn.134–40, 142–146.

*Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 462 (7th Cir. 2014). Just as in *Goldberg*, Dr. Gerhart's opinions are well within his expertise. Defendants' mischaracterization of them as impermissible state of mind testimony "is a distortion of [his] testimony." *Id.* at 461.

Defendants' profit-maximizing motivations related to employment issues such as turnover, retention, mobility, compensation, pay structures, and labor costs—as well as the details and academic literature of how those issues affect a company's bottom line—are highly relevant issues, not "state of mind" testimony, and commonly allowed in no-poach antitrust cases like this. For example, the experts in *In re High-Tech Employee Antitrust Litigation*, No. 11-CV-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014), were allowed to analyze and describe the labor-related incentives of defendants, including, for example, that "[i]ssues of internal equity in general were important to the [d]efendant firms."[112] Courts, in turn, routinely rely on this sort of testimony at class certification. *See Animators*, 315 F.R.D. at 299 (expert "cited to documentary evidence showing that Defendants were concerned with internal equity"); *High-Tech*, 2014 WL 1351040, at *4 (expert opined that "[d]efendants and other high tech companies value potential employees who are not actively looking for new employment opportunities").[113]

---

[112] Ex. 152 ¶ 243. *See also B & R Supermarket Inc. v. Visa Inc.*, No. 17-cv-2738, 2024 WL 4252031, at *8 (E.D.N.Y. Sept. 20, 2024) (permitting expert to opine on Defendants' incentives to collude); *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 341 (S.D. Cal. 2019) (relying on expert report that found there were structural elements in the industry that indicated that Defendants had an incentive to collude); *see also Ill. Liberty PAC v. Madigan*, No. 12 C 5811, 2015 WL 5589630, at *5 (N.D. Ill. Sept. 21, 2015) (opinion regarding risk of corruption admissible so long as expert did not "make factual conclusions about actual quid pro quo corruption").

[113] None of the Defendants' cases are no-poach cases and none of them come close to the conclusions Dr. Gerhart draws. *See United States v. Schultz*, No. 14-cr-467-3, 2016 WL 7409911 (N.D. Ill. Dec. 22, 2016) (expert concluding that Defendant had a gambling problem); *Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*, No. 97 C 5696, 2004 WL 783356 (N.D. Ill. Jan. 28, 2004) (addressing pure state of mind, which was also ultimate question); *Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 07528, 2014 WL 3558690, at *7 (N.D. Ill. July 17, 2014) (excluding opinion because the expert "g[ave] an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense hereto") (citation omitted); *Hershey v. Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 949–50, & nn.3, 5–6 (N.D. Ill. 2010) (attorney not permitted to opine on parties' "mental states" in support of claims requiring a showing of intent).

Dr. Gerhart conducts a similar analysis here.

Indeed, Dr. Gerhart's opinions on Defendants' labor-related profit-maximizing incentives are particularly important in this case because Defendants have taken the position that the no-poach agreements could not have had any effect on compensation or profits.[114]  But Dr. Gerhart's extensive experience on just these types of issues makes him particularly qualified to analyze Defendants' labor incentives and to explain them to the jury.

### 3. Drs. Starr And Gerhart Apply Their Economic Training And Expertise To The Facts

#### a. To Function, A Well-Specified Damages Regression Must Select The Start And End Dates Of The Misconduct

Defendants contend—unsupported by the law and uninformed by the way regressions work—that Dr. Starr may not express any view on the proper start or end dates of the misconduct variable as it relates to his damages regression because it is a disputed "fact" issue.  Mot. at 38–39.  First, the law does not require that any disputed "fact" issue must be devoid of all expert opinion.  Indeed, it is difficult to identify a case in which an expert did *not* opine as to "fact" issues.  That is essentially what all experts do, since they generally do not opine on legal issues—which are largely reserved for the lawyers.  This case is no different.

Second, it is impossible to run a damages regression without selecting misconduct start and end dates, because that is a critical variable in the regression that allows it to work.  The entire idea of a damages regression is to compare "clean" periods without the misconduct, to "dirty" periods with the misconduct—controlling for other relevant factors—to isolate the effect of the misconduct and estimate damages.  As Defendants' own Consultants admitted at deposition, it is important that a regression correctly distinguishes between data created during

---

[114] Gerhart Rebuttal ¶¶ 17, 234 (citing Johnson Report ¶¶ 26–49, 143–144, 184–188; Saravia Report ¶¶ 21–23, 42, 70–103; McCrary Report ¶¶ 29–68, 107–112; Stiroh Report ¶¶ 22–45).

the misconduct with data created outside the misconduct.[115] Defendants and their Consultants criticize Dr. Starr for the start and end dates in his regression, while seeking to prevent him from responding to those criticisms or explaining to the jury why these dates are consistent with standard economic methods and the record evidence.[116] This is untenable. And this Court has already found otherwise: "disagreements over which time period to use . . . reflect a classic dispute among experts over the choice of inputs, which is inappropriate to resolve at this *Daubert* juncture." *Turkey*, 2025 WL 264021, at *13 (citation omitted); *see also Sec. & Exch. Comm'n v. SBB Rsch. Grp., LLC*, No. 19-CV-6473, 2024 WL 4894315, at *5 (N.D. Ill. Nov. 26, 2024) (same, particularly because expert's "conclusion was not based on cherry-picked data").

Here, Dr. Starr chose start and end dates to input into his regression analysis to determine damages. Dr. Starr concluded that the time frame for the conspiracy was from ███████ ███ by applying his expertise to the data and the record evidence.[117] The record readily supports his conclusion. Specifically, Dr. Starr determined that the start date for the SCA-DaVita no-poach agreement was ████████████████████████████ ████████████████████.[118] Shortly after, Hayek hired former DaVita executive Michael Rucker onto his team at SCA, which caused DaVita's then-CEO Kent Thiry ("Thiry") to demand that SCA establish a no-poach agreement with DaVita.[119] Dr. Starr also bases this conclusion on

---

[115] Ex. 184 at 170:15–172:8 (Dr. Johnson testified that to run a regression, ███████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████); Ex. 186 at 142:22–143:12 (Dr. Stiroh explains that ██████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████.

Starr Rebuttal ¶ 145 (citing Johnson Report ¶ 56; Saravia Report ¶ 251; Stiroh Report ¶ 86; McCrary Report ¶ 242).

[117] Starr Report ¶ 68; *see also* Ex. 189 at 331:20–332:11 (Dr. Starr examines ████████ ████████████████████ was consistent with the dates counsel gave him).

[118] Starr Report ¶ 69(a)(i).

[119] *Id.* ¶ 69(a)(iii) (citing Ex. 95 at DOJCIV-008-00000171).

an email between Thiry and Hayek wherein Thiry mentions that DaVita has a ▮▮▮▮▮ ▮▮▮▮▮▮ that they should ▮▮▮▮▮▮[120] Based on his experience, Dr. Starr determined that the foregoing was in line with academic literature explaining that companies often enter into no-poach agreements ▮▮▮▮▮▮▮▮▮▮[121] Dr. Starr referred to additional evidence between ▮▮▮▮▮ to determine that the parties continued to honor the agreement.[122] He concludes that the agreement ended in ▮▮ when Hayek and Thiry left their positions since Hayek testified at the criminal trial that the parties never told one another that they were going to end their agreement.[123]

Dr. Starr's determination that the SCA-USPI no-poach agreement was in effect between ▮▮▮▮▮ is also based in the record.[124] He drew this conclusion from Wilcox's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[125] Dr. Starr also noticed that there was ▮▮▮▮▮▮▮▮ which he determined was "▮▮▮▮▮▮▮▮▮."[126] Specifically, Dr. Starr stated that based on his ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[127] As such, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮



---

[120] Starr Report ¶ 69(a)(i) (quoting Ex. 40 at DVA00006531); *see also id.* ¶ 69(a)(ii) (quoting Ex. 42 at DVA_OMCEAL_000429389) (Hayek emailed Thiry ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮)).

[121] Starr Rebuttal ¶ 28(a)(i); *see also* Ex. 189 at 334:10–336:5.

[122] Starr Report ¶¶ 69–73; Starr Rebuttal ¶ 28.

[123] Starr Report ¶¶ 74, 74(c) (quoting Ex. 173 at 491:7–25).

[124] Starr Report ¶¶ 75–80; Starr Rebuttal ¶ 29.

[125] Starr Report ¶ 76(a); *see also* Ex. 96 at DOJCIV-008-00000218 (▮▮▮▮▮▮▮▮▮▮▮▮▮).

[126] Ex. 189 at 334:10–19.

[127] *Id.* at 334:20–335:4.

████████████████████████████████████████████████████ [128] Dr. Starr's examination of the record also supported these start and end dates because numerous employees and outside recruiters confirmed that the agreement was enforced then.[129] Dr. Starr determined that the Agreement ended in ██, when SCA stopped enforcing it.[130] This is sufficient. *See United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996) (permitting testimony based on disputed facts since "it is a rare case where everything is agreed except the subject matter for which the expert is presented").[131]

### b. Dr. Gerhart's Assessment Of The Record Comports With His Expertise

Defendants argue that Dr. Gerhart's opinions concerning the no-poach agreements' start dates, end dates, and terms, along with his opinions regarding Defendants' compensation practices should be excluded because they are mere "narrative" and therefore unhelpful to the jury. Mot. at 10–15. But expert testimony is "admissible even if it 'covers matters that are within the average juror's comprehension.'" *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, No. 14 C 1748, 2017 WL 1836443, at *13 (N.D. Ill. May 8, 2017) (quoting *United States v. Hall*, 93 F.3d at 1342). Insofar as an expert "summarize[es] voluminous records and materials . . . this aspect of his testimony is properly admitted under Federal Rule of Evidence 1006 as well as Rule 702 in the sense that he is

---

[128] *Id*. at 335:5–10.
[129] Starr Report ¶ 79.
[130] *Id*. ¶¶ 80(c), 80(c)(vi) (concluding that ████████████████ ████████ ); *see also* Starr Rebuttal ¶ 29.

Defendants' cited cases are off base. *See Pessman v. Trek Bicycle Corp.*, No. 3:18-cv-50243, 2021 WL 5769530, at *5 (N.D. Ill. Dec. 6, 2021) (excluding testimony where expert did "not perform any scientific tests or experiments" or analyze "relevant and reliable scientific literature"); *Est. of Loury by Hudson v. City of Chicago*, No. 16-cv-4452, 2019 WL 1112260, at *4 (N.D. Ill. Mar. 11, 2019) (excluding expert opinion that made credibility determinations from conflicting testimony that did not rely on a "scientific or experienced-based method").

identifying what he, given his background and expertise, considers to be the most salient aspects of those voluminous materials." *Id.* at \*15; *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 12748012, at \*2 (N.D. Ohio July 16, 2015) (experts "explaining economic concepts" may "review[] and summarize[] documents and deposition testimony to generate opinions"). Indeed, it is proper for an expert to "base[] his findings on case-specific materials." *Ernst v. City of Chicago*, 39 F. Supp. 3d 1005, 1010 (N.D. Ill. 2014).

Like the expert in *In re Dealer Management Systems Antitrust Litigation*, 581 F. Supp. 3d 1029 (N.D. Ill. 2022), Dr. Gerhart analyzed the documentary record regarding Defendants' no-poach agreements and compensation practices and then applied his experience to draw conclusions as to the dates and terms of the no-poach agreements and wage sharing to determine that these practices likely suppressed wages. *Id.* at 1052. It was perfectly appropriate for him to offer this testimony that "synthesize[d] the economic and non-economic evidence and opine[] that it supports" a conclusion that Defendants engaged in anticompetitive behavior. *Id*. at 1052–53. In fact, Defendants' Consultants do the same thing: they reviewed the same evidentiary record and concluded that the evidence *did not* support anticompetitive behavior.[132] *See id*. at 1053 (pointing out that Defendants' experts also examined the record and drew the opposite conclusion from the record). As such, "[t]he sufficiency of the evidence relied upon by [Dr. Gerhart should] be left to a battle of the experts." *Id*.[133]

---

[132] *See, e.g.*, Gerhart Rebuttal ¶¶ 39 (citing McCrary Report ¶ 13), 200 (citing McCrary Report ¶ 145), 313 (citing Johnson Report ¶ 106; Saravia Report ¶¶ 166–167; McCrary Report ¶¶ 162, 164, 169, 179, Ex. 24; Stiroh Report ¶ 209).

[133] Defendants' cases all involved an expert who narrated the evidence *without* applying the evidence to their expertise or experience. *See Sullivan*, 2014 WL 3558690, at \*5 (attorney not permitted to interpret documents concerning disputed agreement in breach of contract case ); *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) (testimony inadmissible where expert merely pointed out inconsistencies between documents); *Burns v. Sherwin-Williams Co.*, No. 19-cv-5258, 2022 WL 4329417, at \*20 (N.D. Ill. Sept. 18, 2022) (excluding opinion because expert did not link the summarized facts to his tests of the product).

### 4. Defendants Cannot Prevent Drs. Starr Or Gerhart From Considering The Full Record, Including Evidence Of Document Destruction

Defendants ask the Court to preclude Drs. Starr and Gerhart from providing rebuttal testimony regarding gaps in the evidentiary record, on the basis that it is "rank speculation." *See* Mot. at 20, 41–42. But Dr. Starr's and Dr. Gerhart's rebuttal opinions regarding the gaps in the record on wage-information exchanges are entirely proper and are not based on speculation.

Dr. Starr's and Dr. Gerhart's opinions at issue are rebuttal opinions that respond to Defendants' Consultants' opinions that *assume* that the documentary evidence in this case is complete and nothing further occurred.[134] Defendants cannot seriously contend that their Consultants may assume and opine that the wage-exchange communications produced in this case are the complete record of all such exchanges, while simultaneously muzzling Plaintiffs' Experts from pointing out that there is clear and direct evidence that the communications produced by Defendants are not the complete universe of wage-sharing communications.

Nor do Plaintiffs' Experts engage in speculation. Dr. Starr's and Dr. Gerhart's rebuttal reports analyze evidence that the written record memorializing Defendants' collusion is not complete.[135] The record establishes there are missing documents in three ways: (1) there are numerous documents that discuss prior exchanges of wage-information between the Defendants, yet the actual exchanges were never produced;[136] (2) USPI produced documents regarding wage

---

[134] *See e.g.*, McCrary Report ¶¶ 168–169 (Dr. McCrary concluded that the "evidence" is insufficient to show that SCA and USPI shared wage information with each other); Johnson Report ¶ 99 (evidence does not support conclusion that wage information exchanges occurred throughout entire Class Period); Saravia Report ¶ 155 (there is ███████████████████████████████████); Stiroh Report ¶ 107 (concluding it has not been established that DaVita and SCA exchanged wage information).

[135] *See* Starr Rebuttal ¶¶ 68–71; Gerhart Rebuttal ¶¶ 299–302.

[136] *See, e.g.*, Ex. 182 at 362:8–367:24; Ex. 213 at DOJCIV-008-00000408 (██████████████ ████████████████████████████████ ; Ex. 45 & Ex. 191 (documentation demonstrating ██████ is missing from the record); Ex. 192 (SCA internal email █████████████)

exchanges with SCA but SCA did not produce them;[137] and (3) third parties produced additional documentation showing that SCA and USPI exchanged wage information, but SCA and USPI did not produce them.[138]  There is thus a clear gap in the record, and direct evidence that wage exchanges occurred that no longer exist in Defendants' records and were never produced.[139]

Plaintiffs' experts should be allowed to rebut and respond to Defendants' Consultants' failure to account for this gap when discussing Defendants' wage exchanges.[140]  Indeed, courts often exclude expert opinions that do not account for gaps in the record when making their opinions.  *See Tasha C. v. Saul*, No. 18-cv-4677, 2019 WL 6877190, at *9, *12 (N.D. Ill. Dec.



; Ex. 65 & Ex. 72

); Ex. 211 & Ex. 88 (SCA and USPI

).

[137] *See, e.g.*, Ex. 72 (email from SCA's Brian Mathis ("Mathis") to USPI's Jason Cagle never produced by SCA); Ex. 65 (email to SCA's Mathis, Peter Clemens, and Lynn Howard (who are all SCA custodians), never produced by SCA); Ex. 207 (email from SCA's Hayek never produced by SCA); Ex. 208 (email      between SCA and USPI never produced by SCA); Ex. 209 (same); Ex. 58 (email between SCA and USPI      never produced by SCA); Ex. 192 iInternal SCA email      a never produced by SCA).

[138] *See* Ex. 191 at OMC_BM_000000885, 88 (SCA agenda and slide deck     ; Ex. 210 (     never produced by SCA or USPI); Ex. 193 (email in which     never produced by SCA or USPI).

[139] Whether these documents were intentionally deleted by Defendants is a question for the jury.

[140] Moreover, the fact that there are gaps in the evidence is entirely relevant to an economic analysis of collusion, because secrecy and efforts to hide criminal misconduct are consistent with collusive behavior. *See* Starr Rebuttal ¶ 70; *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 423–25 (E.D. Pa. 2015) ("An economic expert may permissibly testify as to whether certain conduct is consistent with collusion . . . it is consistent with sound economic practice to review the factual record and formulate a hypothesis that can then be tested using economic theory."); Leslie M. Marx & Claudio Mezzetti, *Effects of Antitrust Leniency on Concealment Effort by Colluding Firms*, 2 J. Antitrust Enforcement 20 (2014) (U.S. antitrust leniency program introduces incentives "for colluding firms to increase effort directed at concealing the cartel from authorities and at limiting the ability of an internal investigation by legal counsel to uncover evidence sufficient to support a leniency application.").  Moreover, economists can only study collusion (or any subject) based on what they can observe, and accordingly are trained to draw inferences in such circumstances to account for "sample selection," wherein the full set of information is unavailable for observation. *See, e.g.*, James J. Heckman, *Sample Selection Bias as a Specification Error*, 47 Econometrica 153–161 (1979).

17, 2019) (overruling decision based on expert report that overlooked large swath of evidence); *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (overruling decision that was based on "an incomplete medical history and an expert opinion rendered from it"); *Lassen v. Hoyt Livery, Inc.*, No. 13-cv-1529, 2016 WL 7165716, at *9 (D. Conn. Dec. 8, 2016) (expert obligated to "take steps to account for the flaws and gaps in the data"); *Hall v. Colvin*, 18 F. Supp. 3d 144, 155 (D.R.I. 2014) (overruling decision that was based on expert report that was "inconsistent with the record as a whole").

Given Defendants' failure to account for this evidentiary gap, it is entirely proper for Drs. Starr and Gerhart to describe the documented gaps in the record, and how they render Defendants' Consultants' opinions unreliable. *See Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903813, at *14–15 (N.D. Ill. Mar. 24, 2025) (slip copy) (permitting expert to infer "that there was systematic underproduction of materials"). Drs. Starr's and Gerhart's rebuttal opinions will "aid the jury in weighing the facts" regarding the documented gap in the record. *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1066 (N.D. Ill. 2018).

## III.    CONCLUSION

For the aforementioned reasons, the Court should deny Defendants' *Daubert* Motion.

Dated:  November 13, 2025          Respectfully submitted,

*/s/ Dean M. Harvey*

Dean M. Harvey (*pro hac vice*)
Lin Y. Chan (*pro hac vice*)
Sarah D. Zandi (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
dharvey@lchb.com
lchan@lchb.com
szandi@lchb.com

Jessica A. Moldovan (*pro hac vice*)
Emily Harwell (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
jmoldovan@lchb.com
eharwell@lchb.com

Joseph R. Saveri (admitted under L.R. 83.10)
Ronnie Seidel Spiegel* (*pro hac vice*)
Cadio Zirpoli (*pro hac vice*)
David Haskell Seidel (*pro hac vice*)
William W. Castillo Guardado (*pro hac vice*)
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1505
San Francisco, California 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
jsaveri@saverilawfirm.com
rspiegel@saverilawfirm.com
czirpoli@saverilawfirm.com
dseidel@saverilawfirm.com
wcastillo@saverilawfirm.com

*Located in Washington State

Michael L. Roberts (*pro hac vice*)
Karen Halbert (*pro hac vice*)
Sarah DeLoach (*pro hac vice*)
Kelly Rinehart (*pro hac vice*)
ROBERTS LAW FIRM US, PC
1920 McKinney Ave., Suite 700
Dallas, TX 75204
Telephone: (501) 821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us
sarahdeloach@robertslawfirm.us
kellyrinehart@robertslawfirm.us

Erich P. Schork (admitted under L.R. 83.10)
ROBERTS LAW FIRM US, PC
P.O. Box 31909
Chicago, IL 60631
Telephone: (708) 497-9068
erichschork@robertslawfirm.us

Linda P. Nussbaum (*pro hac vice*)
NUSSBAUM LAW GROUP, P.C.
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
(917) 438-9102
lnussbaum@nussbaumpc.com

*Interim Co-Lead Class Counsel*

- 48 -

## CERTIFICATE OF SERVICE

I, Dean M. Harvey, an attorney, hereby certify that **Plaintiffs' Opposition to Defendants' Motion to Exclude Expert Opinions of Dr. Evan Starr and Dr. Barry Gerhart [Redacted]** was electronically filed on November 13, 2025, and will be served electronically via the Court's ECF Notice system upon the registered parties of record.

Dated:  November 13, 2025

*/s/ Dean M. Harvey*
Dean M. Harvey