Case: 1:21-cv-00305 Document #: 681-9 Filed: 11/13/25 Page 1 of 164 PageID #:29100

# ZIELINSKI EXHIBIT 90

# Report of Orley Ashenfelter

## *[REDACTED PUBLIC VERSION]*

**REPORT OF ORLEY ASHENFELTER**

**IN CONNECTION WITH**

**IN RE ANIMATION WORKERS ANTITRUST LITIGATION**

**February 1, 2016**

**Contains Confidential and Attorneys' Eyes Only Materials**

## Table of Contents

I. QUALIFICATIONS ........................................................................................................ 1

II. ASSIGNMENT ............................................................................................................ 2

III. SUMMARY OF CONCLUSIONS ................................................................................ 3

IV. CASE AND BACKGROUND ...................................................................................... 5
   A. Named Plaintiffs ................................................................................................ 5
   B. Defendants ......................................................................................................... 6
   C. Animation Workers ............................................................................................ 9
   D. The Alleged Conspiracy to Suppress Class Members' Compensation ........................ 9
      1. Plaintiffs Allege that the Defendants Conspired by Entering Anti-Solicitation Agreements ................................................................................................ 10
      2. Plaintiffs Allege Collusion on Compensation Levels, Salary Ranges, and Benefits ..... 18
   E. The High-Tech Litigation and the Post-Period Benchmark ................................. 25

V. CLASS-WIDE EVIDENCE IS CAPABLE OF SHOWING THAT DEFENDANTS' ALLEGED CONSPIRACY SUPPRESSED CLASS MEMBERS' COMPENSATION ............ 30
   A. Class-Wide Evidence is Capable of Showing that Alleged Conspiracy Suppressed Compensation Generally ................................................................. 30
      1. The Economic Theory of Negotiations under Asymmetric Information ........................ 31
      2. Defendants' Documents Shows that The Purpose and Effect of the Alleged Conspiracy was to Suppress Compensation ........................................................ 39
      3. Econometric Analysis is Capable of Showing Reduced Compensation Generally ...... 44
   B. Class-Wide Evidence is Capable of Showing that Alleged Conspiracy Suppressed the Compensation of All or Nearly All Members of the Class ............................... 45
      1. Intra-firm factors: Wage suppression for some employees at a Defendant would spread to all or nearly all class members at that Defendant ........................ 46
      2. Inter-Firm Factors Led to Suppression of Compensation for All or Nearly All Class Members ...................................................................................................... 53
      3. Defendants' Coordination on Compensation Budgets Common to All Defendants Affected All Class Members ....................................................................... 57
      4. Econometric Analysis Confirms that Compensation was Spread Across Entire Class 58

VI. BENCHMARK REGRESSION ANALYSIS IS CAPABLE OF MEASURING CLASS-WIDE DAMAGES ......................................................................................................... 65

**Contains Confidential and Attorneys' Eyes Only Materials**

-1-

## I. QUALIFICATIONS

1.         I am the Joseph Douglas Green 1895 Professor of Economics at Princeton University. I am the former President of the American Economic Association and the former President of the American Law and Economics Association. I am a recipient of the IZA Prize in Labor Economics and the Mincer Award for Lifetime Achievement of the Society of Labor Economists. I am a Fellow of the Econometric Society, a Fellow of the American Academy of Arts and Sciences, a Fellow of the Society of Labor Economics, a Corresponding Fellow of the Royal Society of Edinburgh, and a Distinguished Fellow of the American Economic Association. My areas of specialization include labor economics, industrial organization, econometrics, and law and economics. I was previously the Director of the Industrial Relations Section at Princeton University, and I have been Director of the Office of Evaluation of the U.S. Department of Labor, a Guggenheim Fellow, and the Benjamin Meeker Visiting Professor at the University of Bristol. I edited the *Handbook of Labor Economics* and I was a previous editor of the *American Economic Review* and a previous co-editor of the *American Law and Economics Review*. My curriculum vitae and a list of my testimony in the last four years are attached to my report as Appendix A.

2.         My time is being billed at the rate of $900 per hour for my work in this matter. This is my normal hourly rate for this type of work. I may also receive payment from Ashenfelter & Ashmore, which has supported my work in this case.

**Contains Confidential and Attorneys' Eyes Only Materials**

-2-

## II. ASSIGNMENT

3.      I have been retained by counsel for a proposed class of animation and visual effects workers.  The Plaintiffs have alleged that Blue Sky Studios ("Blue Sky"), DreamWorks Animation ("DreamWorks"), ImageMovers Digital LLC ("IMD"), Lucasfilm (and its division Industrial Light & Magic) ("Lucasfilm"), Pixar, Sony Pictures Animation and Sony Pictures Imageworks (collectively "Sony"), and The Walt Disney Company ("Disney") conspired to suppress compensation for their animation and visual effects employees.[1] The Plaintiffs allege that the Defendants' conspiracy included agreeing not to solicit employees from each other, to inform one another when the employees of another conspirator contacted them and to coordinate compensation for class members by communicating with each other directly and through third party surveys. The Plaintiffs allege that this conspiracy began before 2001 and continued through 2009.

4.      Plaintiffs' counsel have asked me to give my opinion on two questions relevant to class certification:

•        Can it be shown using common evidence that all, or nearly all, members of the proposed Plaintiffs' class have been harmed as a result of the conspiracy?

---

[1] In Re Animation Workers Antitrust Litigation, Second Consolidated Amended Class Action Complaint, May 15, 2015.

**Contains Confidential and Attorneys' Eyes Only Materials**

-3-

- Is there one or more accepted and feasible methods for calculating any damages incurred by the Plaintiff class on a class-wide basis and are sufficient data available to implement those methods?

5.     This report summarizes the results of my research on these questions to date. Appendix B lists the documents, databases, and other sources I have relied on in the course of my analysis.

### III.  SUMMARY OF CONCLUSIONS

6.     In forming my conclusions, described at length in this report, I have reviewed extensive documentary and empirical evidence in this matter. To the extent that new evidence becomes available (including, but not limited to, testimonial evidence) I reserve the right to update and supplement my opinions.

7.     I conclude that there is evidence common to the class that the alleged conspiracy suppressed class members' compensation generally, and that the alleged conspiracy affected all or nearly all members of the class.

8.     Class-wide evidence capable of showing that the alleged conspiracy suppressed compensation generally falls into three categories: 1) evidence from economic theory and literature explaining that by reducing or eliminating active recruitment of employees of competitor firms, and by coordinating on compensation levels, the alleged conspiracy changed the balance of information between employers and employees (in favor of the employers), simultaneously strengthening employers' bargaining position and

**Contains Confidential and Attorneys' Eyes Only Materials**

-4-

weakening the employees' bargaining position, consequently reducing class members' compensation; 2) documentary evidence and testimony from the Defendants indicating that the purpose and effect of the alleged collusion was to suppress class members' compensation; 3) a "during-after" regression that compares compensation during the alleged conspiracy to a benchmark after the end of the alleged conspiracy, which shows that compensation of members of the class is suppressed generally.

9.      Class-wide evidence capable of showing that the alleged conspiracy suppressed compensation of all or nearly all members of the class falls into three categories: 1) documentary and empirical evidence that defendants have somewhat rigid compensation structures and were concerned with maintaining "internal equity" of pay within a firm, which provides a mechanism by which compensation suppression can spread within a single Defendant; 2) documentary and empirical evidence that Defendants were concerned with "external equity" and "benchmarked" their compensation against each other and to a third-party survey, which provides a mechanism by which compensation suppression can spread across Defendants; 3) documentary evidence that a reduction in compensation budgets would affect all or nearly all members of the class.

10.      I also conclude that standard econometric techniques provide a class-wide methodology for estimating the amount by which the alleged conspiracy suppressed the compensation of class members, in aggregate.

**Contains Confidential and Attorneys' Eyes Only Materials**

-5-

## IV. CASE AND BACKGROUND

### A. Named Plaintiffs

11.    Robert A. Nitsch was a Cloth/Hair Technical Director at Sony Pictures Imageworks in 2004 and a Senior Character Effects Artist at DreamWorks Animation from 2007 to 2011, both located in Los Angeles, California.[2]

12.    Georgia Cano was a Digital Artist at Rhythm & Hues from 1992 to 2004, a Lighting Technical Director at Walt Disney Feature Animation from 2004 to 2005, a Lighting Artist at Rhythm & Hues from 2006-2009, and a Lighting Artist at ImageMovers Digital in 2010.[3,4]

13.    David Wentworth worked at ImageMovers Digital as a Production Engineer, a Lead Production Engineer, and Associate Computer Graphics Supervisor from 2007 to 2010.[5]

---

[2] Second Consolidated Amended Class Action Complaint No. 14-cv-4062, ¶ 19.

[3] Rhythm & Hues was the studio behind, among others, the visual effects in *The Life of Pi*. Rhythm & Hues went bankrupt in 2013. *See* http://www.hollywoodreporter.com/behind-screen/revealing-rhythm-hues-life-pi-682526, accessed December 22, 2015.

[4] Second Consolidated Amended Class Action Complaint No. 14-cv-4062, ¶ 20.

[5] Second Consolidated Amended Class Action Complaint No. 14-cv-4062. ¶ 21.

**Contains Confidential and Attorneys' Eyes Only Materials**

-6-

### B.  Defendants

14.  Blue Sky Studios, Inc. is a subsidiary of Twentieth Century Fox.  Blue Sky was founded in 1986, and operates its studio in Greenwich, Connecticut.   It is the studio behind the movies Ice Age (and its sequels), Rio and the Peanuts Movie.[6]

15.  DreamWorks Animation is the studio behind the Shrek series, How to Train your Dragon, and Madagascar.[7]  Until October 2004, DreamWorks Animation was a division of DreamWorks LLC, which was founded in 1994 by Steven Spielberg, Jeffrey Katzenberg, and David Geffen.[8]  Since October 2004, DreamWorks Animation has been an independent, publicly traded company.[9]  DreamWorks Animation has studios in Glendale and Redwood City, California.[10]

16.  ImageMovers Digital is a joint venture of ImageMovers LLC and The Walt Disney Company.  ImageMovers Digital currently operates under the name Two Pic MC LLC.[11]  ImageMovers Digital produced two films, an animated version of A Christmas

---

[6] *See* http://blueskystudios.com/working-here/tour-studio/ *and* http://blueskystudios.com/our-story/.  Accessed December 29, 2015.

[7] http://www.dreamworksanimation.com/company/ Accessed December 29, 2015.

[8] http://ir.dreamworksanimation.com/phoenix.zhtml?c=185803&p=irol-faq.  Accessed December 29, 2015.

[9] http://ir.dreamworksanimation.com/phoenix.zhtml?c=185803&p=irol-faq .  Accessed December 29, 2015.

[10] Second Consolidated Amended Class Action Complaint, No. 14-cv-4062 at ¶ 23.

[11] Second Consolidated Amended Class Action Complaint, No. 14-cv-4062.

**Contains Confidential and Attorneys' Eyes Only Materials**

Carol and Mars Needs Moms. Disney ended its relationship with ImageMovers Digital in 2010.[12]

17.     Lucasfilm is a California-based studio, founded by filmmaker George Lucas in 1971.[13] Industrial Light & Magic (ILM) is their motion picture visual effects company. ILM did visual effects work for the Star Wars series, the Iron Man series, the Pirates of the Caribbean series, Avatar, and others.[14] Since 2012, ILM and Lucasfilm have been owned by The Walt Disney Company.[15] I will refer to Lucasfilm and ILM collectively as "Lucasfilm."

18.     Pixar is an animation studio based in Emeryville, California.[16] Steve Jobs purchased the Computer Graphics Division of Lucasfilm from George Lucas in 1986, and renamed it "Pixar."[17] Films produced by Pixar include the Toy Story series, Monsters,

---

[12] "Disney to close Zemeckis studio, lay off 450." http://www.reuters.com/article/us-disney-idUSTRE6294LU20100313. Accessed December 29, 2015.

[13] http://lucasfilm.com/our-story. Accessed December 29, 2015.

[14] http://www.ilm.com/archive/. Accessed December 29, 2015.

[15] http://lucasfilm.com/our-story. Accessed December 29, 2015.

[16] http://www.pixar.com/about/Welcome. Accessed December 29, 2015.

[17] http://www.pixar.com/about/Our-Story. Accessed December 29, 2015.

**Contains Confidential and Attorneys' Eyes Only Materials**

-8-

Inc., Cars, Finding Nemo, Up, Inside Out, Wall-E and others.[18]  Pixar was purchased by The Walt Disney Company in 2006.[19]

19.    Sony Picture Animation is a division of Sony Pictures Entertainment.[20] Sony Pictures Imageworks is the visual effects and animation unit of Sony Pictures Entertainment.[21]  I will refer to Sony Pictures Animation and Sony Pictures Imageworks as "Sony." Both have studios in Culver City, California. Films produced by Sony include Open Season, Cloudy with a Chance of Meatballs, and the Smurfs.[22]

20.    The Walt Disney Company of Burbank, California ("Disney"), has a division called Walt Disney Studios, which produces, markets and distributes films and other products.[23]  The Walt Disney Studios describes itself as "the foundation on which the Walt Disney Company (NYSE:DIS) was built."[24]  It oversees the operations of Walt Disney Animation Studios, Pixar (since 2006) and Lucasfilm (since 2012).  Walt Disney Animation Studios' recent films include Tangled and Big Hero 6.

---

[18] http://www.pixar.com/features_films. Accessed December 29, 2015.

[19] http://www.pixar.com/about/Our-Story.  Accessed December 29, 2015.

[20] http://www.sonypicturesanimation.com/about.php Accessed December 29, 2015.

[21] http://www.imageworks.com/about.php.  Accessed December 29, 2015.

[22] http://www.sonypicturesanimation.com/pastfilms.php.  Accessed December 29, 2015.

[23] http://waltdisneystudios.com/corp/about.  Accessed December 20, 2015.

[24] http://waltdisneystudios.com/corp/about.  Accessed December 20, 2015.

**Contains Confidential and Attorneys' Eyes Only Materials**

Case 2:14-cv-03050 Document 681 Filed 11/13/25 Page 10 of 164 PageID #:63112

C.     Animation Workers

21.     Plaintiffs define the proposed class as:

All animation and visual effects employees employed by defendants in the United States who held any of the jobs listed in Ashenfelter Report Appendix C during the following time periods: Pixar (2001-2010), Lucasfilm Ltd., LLC (2001-2010), DreamWorks Animation SKG, Inc. (2003-2010), The Walt Disney Company (2004-2010), Sony Pictures Animation, Inc. and Sony Pictures Imageworks, Inc. (2004-2010), Blue Sky Studios, Inc. (2005-2010) and Two Pic MC LLC f/k/a ImageMovers Digital LLC (2007-2010).  Excluded from the Class are senior executives, members of the board of directors, and persons employed to perform office operations or administrative tasks.

22.     The Appendix C referenced in the class definition is attached to this report. It is based on the review of the job titles provided in the Defendants' employment data.

D.     The Alleged Conspiracy to Suppress Class Members' Compensation

23.     I have not been asked to opine on whether the Defendants conspired or whether they should be liable under the law, but I have studied the allegations contained in the Plaintiffs' complaint and surveyed evidence of the alleged conspiracy.   I use this information to form a general understanding of the scope and duration of the alleged conspiracy and to ensure the reasonableness of the assumptions that I made when performing my empirical analyses.

24.     Plaintiffs allege that Defendants conspired to suppress compensation by agreeing not to solicit each other's employees, to take certain steps when contacted by each other's employees, and to coordinate compensation policies through direct and indirect, collusive communications (during in-person meetings, telephone calls and emails, and through third-party compensation surveys).  They allege that the conspiracy had the

**Contains Confidential and Attorneys' Eyes Only Materials**

-10-

purpose of avoiding "mess[ing] up the pay structure,"[25] and keeping Defendants out of "a normal industrial competitive situation."[26]

    *1.   Plaintiffs Allege that the Defendants Conspired by Entering Anti-Solicitation Agreements*

    25.      Plaintiffs allege that the conspiracy began in the 1980s with an anti-solicitation agreement between Pixar's CEO Steve Jobs and President Edwin Catmull and Lucasfilm's founder George Lucas.[27] This is corroborated by the statements made by Lucas, that "we want to avoid bidding wars,"[28] "we wouldn't actively try to raid each other's companies"[29] and "not to solicit each other's employees, is the crux of it."[30] Pixar executive Jim Morris (who had previously been in charge of Lucasfilm's ILM division) testified during the *High-Tech* litigation that "We have an anti-poach clause between the Lucas companies and—and this company. We don't –we don't recruit from one another, we don't call—if the people want to go from one company to another, we, you know, find

---

[25] PIXAR-AWAL_00100380.

[26] Deposition of George Lucas, March 28, 2013. ("Lucas Dep.") Dep. 52:5-6.

[27] Second Consolidated Amended Class Action Complaint, No. 14-cv-4062, ¶ 3.

[28] LUCAS_AWAL_00186410.

[29] Lucas Dep. 8:25.

[30] Lucas Dep. At 92:12-13; Deposition of Edward Catmull January 24, 2013 ("Catmull Dep.") at 79:10-16 "We were behaving this way right from the beginning towards Lucasfilm."

**Contains Confidential and Attorneys' Eyes Only Materials**

a way to let that happen. But we have a – sort of a gentleman's agreement that we've honored pretty well here for the last many years."[31]

26.     Plaintiffs allege that Pixar and Lucasfilm agreed to follow strict procedures if their employees initiated seeking employment with the other company. Plaintiffs allege they agreed to notify the current employer of any employee who applied for a position at the other company, and to limit counteroffers. For example, if an employee of Lucasfilm applied for a job at Pixar, Pixar would notify Lucasfilm. Additionally, Pixar would not counter any counteroffer by Lucasfilm.[32] As an internal Pixar email summarized, "we never counter if the candidate comes back to us with a better offer from Lucasfilm."[33] Plaintiffs allege that sometimes they took further action: Lucasfilm's summary of the "Gentleman's Agreements" confirmed that Lucasfilm "actually canceled offers to people that Pixar said were 'essential.'"[34] A recruiter from Lucasfilm described the process that an employee of Pixar would have to go through before being hired by Lucasfilm as follows: "they need to inform their manager that they are applying for a job at Lucasfilm and then we can start the dance, although this usually stops things dead in their tracks."[35]

---

[31] Deposition of Jim Morris, August 3, 2012, 113:10-16.

[32] Second Amended Complaint No 14-cv-4062, ¶ 45.

[33] PIXAR_AWAL_2261.

[34] LUCAS_AWAL_215265 at -67.

[35] LUCAS_AWAL_00002301.

**Contains Confidential and Attorneys' Eyes Only Materials**

-12-

27.     Plaintiffs allege that these procedures were used by Pixar and Lucasfilm with respect to other co-conspirators as well.[36]  A 2004 internal Pixar email, discussing an offer that Pixar was making to a current DreamWorks employee whose contract was near expiration, reads: "I think we need to treat this one similarly to how we treat ILM candidates, based on some instruction Ed & Sarah gave Lisa and me a while back…. Why don't we do this as a next step—I'll call my new friend Kathy Mandato who is the HR director at DWI [sic] and tell her that Ed is thinking we'd like to extend this type of courtesy as a practice…"[37]

28.     In the decades since the alleged conspiracy began, the Plaintiffs allege that Catmull and other co-conspirators enlisted additional visual effects and animation studios (including each of the defendants in this case) to join the conspiracy.[38]

29.     Plaintiffs allege that Steve Jobs and the CEO of DreamWorks, Jeffrey Katzenberg, personally discussed DreamWorks joining the conspiracy,[39] and that DreamWorks did so by 2003.[40]  The Defendants' documents indicate that Catmull reported

---

[36] LUCAS_AWAL_215265 at 65 (requiring Lucasfilm to contact DreamWorks before making any offers to DreamWorks employees); PIXAR_AWAL_00006091 (email directing Pixar recruiters to "treat [DreamWorks] like ILM" for purposes of contacting DreamWorks prior to making any offer).

[37] PIXAR_AWAL_00097786.

[38] Second Consolidated Amended Class Action Complaint, No. 14-cv-4062, ¶ 3.

[39] Catmull Dep. at 55:18-56:17.

[40] 231APPLE098786.

**Contains Confidential and Attorneys' Eyes Only Materials**

-13-

to Jobs in February 2004 that DreamWorks' participation in the alleged conspiracy "worked quite well,"[41] that DreamWorks' Head of HR Kathy Mandato confirmed to Pixar's VP of HR Lori McAdams in October 2004 that the two companies would not solicit each other's employees,[42] and that the companies reaffirmed they would continue their agreement.[43] A 2007 email between Ed Catmull, the president of Pixar, and Sean Lally, a recruiter at DreamWorks, reads, "we have an agreement with Dreamworks not to actively pursue each others' employees."[44] This email was apparently written because Sean Lally, the recipient of Catmull's email, had contacted a Pixar employee. The email from Catmull to Lally was forwarded from a Pixar employee to Kathy Mandato, DreamWorks' Director of HR, adding a note saying, "Just a heads up on an exchange that took place between one of your outside recruiters and our President Ed Catmull. Sean Lally contacted at least one person here at Pixar about the head of your software R&D position, and that was brought to Ed's attention by one of them. Since we all have an understanding about not directly soliciting from each other's studios, Ed sent the note below."[45] Lucasfilm's description of the "Gentleman's Agreement" with respect to DreamWorks reads, "We do not recruit actively or passively from Dreamworks or PDI for

---

[41] PIXAR_AWAL_00006023.

[42] PIXAR_AWAL_00006097.

[43] PIXAR_AWAL_100380.

[44] DWA-VFX-0000151.

[45] DWA-VFX-0000151.

**Contains Confidential and Attorneys' Eyes Only Materials**

-14-

ANY positions including accounting, production, or the art department…."[46]  ILM also contacted the employee's supervisor at DreamWorks prior to making an offer, and noted "that we will not get into a bidding war over an employee's services."[47]

30.     Plaintiffs allege that The Walt Disney Company joined the conspiracy by 2004 (by which time Pixar confirmed it would not recruit workers out of Disney).[48] After Disney purchased Pixar in 2006, Disney Chairman Dick Cook confirmed Disney's role in the alleged conspiracy in an email to Catmull, and also promised to "reaffirm our position again" with another Defendant, ImageMovers Digital.[49]  Disney appeared to follow the same non-poaching rules as Pixar.[50] Pixar's CEO, Steve Jobs, sent an email to Dick Cook after he learned that two Pixar employees were approached by Disney. Disney's Andrew Millstein replied: "We'll be extra careful when recruiting and I will reiterate to our team that Pixar employees are off limits.[51]

31.     Plaintiffs allege that Sony joined the conspiracy by 2004.  In response to Sony's hiring activities in the early 2000s, Pixar's Catmull sought to speak to Sony in 2004

---

[46] LUCAS_AWAL_00215265 at -66.

[47] LUCAS_AWAL_00215265 at -66.

[48] PIXAR_AWAL_80543.

[49] PIXAR_AWAL_100380.

[50] DISNEY_AWAL_00002165, DISNEY_AWAL_00003097, DISNEY_AWAL_00003128, DISNEY_AWAL_00003754.

[51] DISNEY_AWAL_00000524.

**Contains Confidential and Attorneys' Eyes Only Materials**

-15-

"to reach some agreement . . . to nip this in the bud."[52] Catmull wrote of Pixar's

employees: "our people are become [sic] really desirable."[53] According to Pixar

documents, Catmull then met in person with Sony executives Sandy Rabins and Penney

Finkelman Cox in 2004, "asked them to quit calling our employees," and that resulted in

"our gentleman's agreement not to raid each other."[54] Pixar later wrote in October 2005

that "with regards to ILM, SONY, Blue Sky, etc., we have no contractual obligations, but

we have a gentleman's agreement not to directly solicit/poach from their employee pool."[55]

Later Pixar's McAdams contacted Sony staff in 2006 to "make sure they're still honoring

it as they may have had turnover in their Recruiting team."[56] In April 2006, Sony's Robin

Linn wrote: "May I please meet with Tim [Sarnoff] for a few minutes at his convenience –

I came across some information this past week concerning, Penny [Finkelman Cox], Sandy

[Rabins] and our inability to recruit PIXAR animators into our ranks that I am just not sure

what I should do with."[57] A November 2008 email from Disney's and then Sony's recruiter

Chantal Bumgarner to ILM Recruiter Erin Meyers reads about Sony: "We don't attempt to

---

[52] PIXAR_AWAL_00006023.

[53] PIXAR_AWAL_00006023.

[54] PIXAR_AWAL_00055206; PIXAR_AWAL_00054594.

[55] PIXAR_AWAL_00061998.

[56] PIXAR_AWAL_00097937.

[57] SONY 333.

**Contains Confidential and Attorneys' Eyes Only Materials**

poach staff from other studios so I wouldn't want you to think that I was looking for a way in with your employees – other than the ones you'd be releasing."[58]

32.　　　Plaintiffs allege that Blue Sky was another member of the conspiracy, joining by 2005. George Lucas testified to that effect during his deposition in the *High-Tech* litigation.[59] A Pixar document indicates that Pixar confirmed Blue Sky's participation in 2005, noting their "gentleman's agreement" and stating that "this agreement is mutual."[60] Pixar and Blue Sky documents indicate that Blue Sky's Director of HR Linda Zazza communicated with Pixar's McAdams to ensure that both sides were honoring the agreement.[61] Blue Sky documents reveal that in 2006, a Disney recruiter had planned to attend a recruiting event in White Plains, NY, and had contacted several Blue Sky employees.  Upon Blue Sky's HR department receiving news of this planned event, the department notes that they're "already on it" and that Blue Sky was going to call her supervisor.[62]  Blue Sky apparently did contact Disney, and Disney did not attend this recruiting event: "we were successful in stopping them from going to New York.  I also spoke with her supervisor here in California, so I now have some names and numbers

---

[58] SONY259 at 304.

[59] Lucas Dep. at 75:4-9.

[60] PIXAR_AWAL_00061998.

[61] PIXAR_AWAL_00003781; BSKY001897.

[62] BSKY003619.

**Contains Confidential and Attorneys' Eyes Only Materials**

should we ever need them."[63]  When Zazza noticed a trend of departing employees in

2008, she quickly "probed to find out if they've been approached by Pixar, etc." to see if

Pixar was in breach.[64] None of the departing employees reported that they had been

contacted by another studio.[65]

33.　　　Plaintiffs allege that Pixar's Catmull successfully brought ImageMovers

(IMD) into the alleged conspiracy by 2007.  In a 2007 email, Catmull describes having met

personally with Steve Starkey, one of the founders of ImageMovers, and having "told

Steve how important it is that we not have a hiring war."[66] The same email notes that Steve

Starkey himself confirmed he had "told George [Lucas] that he would not raid ILM."[67]  A

Pixar document indicates that recruiters and HR staff from Lucasfilm and Pixar confirmed

on multiple later occasions that "we have a gentlemen's agreement with IMD that we

cannot recruit people from their studio."[68]  A 2008 email from Shannon Henry of IMD

---

[63] BSKY001922.

[64] BSKY001897.

[65] BSKY001897.

[66] PIXAR_AWAL_00000230.

[67] PIXAR_AWAL_00000230.

[68] LUCAS_AWAL_00075972.  *See also* LUCAS_AWAL_00071603 at 04 (potential recruits were "not available" when "working at IMdigital [sic]"); PIXAR_AWAL_00015289 (Lori McAdams at Pixar stating that "[w]e can't call our friends or leads who work at IMD, or Disney Animation (or Lucasfilm) and try to entice them to apply."); IMD_AWAL_00000061 (IMD's Lisa McNamara asking recruiters "if there are people you would like me to call at other companies (except, of course, ILM, Pixar, Sony, Disney Feature Animation and The Orphanage!)").

**Contains Confidential and Attorneys' Eyes Only Materials**

-18-

reads, "New news on who we can't recruit from... yes, the list grows longer! Apparently we are no longer allowed to recruit anyone from the 20[th] Century Fox's 'Avatar' project until November 2008—even if someone quits first. In addition to that, we are also in agreement not to recruit anyone from Dreamwork's 'Tintin' project."[69]

*2.  Plaintiffs Allege Collusion on Compensation Levels, Salary Ranges, and Benefits*

34.       Plaintiffs also allege that Defendants sought to suppress compensation for class members by coordinating the pay structure in the industry so that Defendants could "confirm or adjust our [defendants'] salary ranges."[70]   This includes the direct collusive discussions via email, phone, and face-to-face meetings concerning current and future salary and benefits information, including salary budgets.  Plaintiffs also allege that Defendants colluded by coordinating compensation through participation in wage and benefits surveys.

a)  Defendants' Alleged Direct Communications Coordinating on Salary Ranges, Salary Increase Budgets and Other Benefits

35.       Documents from the Defendants indicate that coordinating on compensation was a standard practice.  When deciding whether or not to respond to a request from Chevron for salary information, Lori McAdams of Pixar writes, "…generally, yes, we do share salary ranges with other employers/HR folks who write or call and ask us about how

---

[69] IMD_AWAL_00006760.

[70] PIXAR_AWAL_00001299.

**Contains Confidential and Attorneys' Eyes Only Materials**

-19-

we compensate positions that are the same as theirs (usually within the entertainment business, not an oil & gas company! ;-) )."[71]  A 2007 internal DreamWorks email describes DreamWorks' policy on sharing information: "[w]e do sometimes share general comp information (ranges, practices) in order to maintain the relationships with other studios and to be able to ask for that kind of information ourselves when we need it."[72]  In early 2007, Pixar's Lori McAdams wrote to Anita Peters (Laika) Sharon Berlin (Sony), Sharon Coker (Lucasfilm), Kathy Mandato (DreamWorks), Ann Le Cam  (Disney) and Linda Zazza (Blue Sky) saying, "Chatting with all of you each day is really becoming a fun habit.  I'm thinking it'd be a great resolution for 2007 that we all just have a short conference call each morning to start our days off right :-)."[73]

36.        Documents from the Defendants indicate that they coordinated on salaries specific to particular positions within their companies. These discussions concerned a number of jobs, including: animators, modelers, and lighters. For example, in March 2005, an email from Twentieth Century Fox (Blue Sky's parent company) stated: "I need a salary survey done on the following: Animators, Modelers, Lighting. . . . I do need it asap and not from the Dunlap survey. Studios i.e.: Sony, DreamWorks, PDI, ILM, Disney."[74]

---

[71] PIXAR_AWAL_00098514.

[72] DWA-VFX-0001326.

[73] SONY001841 at -43.

[74] BSKY-AWAL000464; *see also* BSKY-AWAL098819 ("I am in the process of trying to get some accurate Materials salary information from Pixar as the Croner survey doesn't

**Contains Confidential and Attorneys' Eyes Only Materials**

-20-

Defendants' documents indicate that the Defendants coordinated on pay before upcoming salary negotiations.[75]

37.     I have seen examples where, if a Defendant requested salary information from another Defendant that did not have a job with the same title, they would work together to make a meaningful comparison.  For instance, in May 2006, Kathy Mandato (DreamWorks) emailed Lori McAdams (Pixar) "looking for information on production supervisor salaries because we are doing a market survey to determine whether we are

---

quite match what we do."); BSKY-AWAL000352 (Disney's response with specific salary ranges and general job descriptions for animators, modelers, lighters); LUCAS_AWAL_00227602 (Lucasfilm compensation analyst requesting information for Pixar "Color Designer" position, noting that she'd be "open to returning the favor!"); DWA-VFX-0000127 (2006 email thread between DreamWorks and Disney exchanging salary ranges for production supervisors); DWA-VFX-0026166 (DreamWorks team member reporting to Kathy Mandato that he "caught Sony and here is their information: Job title is Digital Production Manager . . . their range is $57K-$74K-$91K, meaning that most new hires would be between $57K and $74K, and that the average is around $74K."); PIXAR_AWAL_00100182 (2008 email from DreamWorks to Pixar requesting information for "dubbing" position); PIXAR_AWAL_00097762 (DreamWorks request for a "quick salary survey" covering "Film Color Supervisor," noting that "[o]ur range is approximately $100K per year with a bonus target at roughly 20%."); DWA-VFX-0001305 (2005 email where Disney exchanges salary information with DreamWorks for specific positions).

[75] *See, for instance*, DWA-VFX-0027478 (Kathy Mandato requesting a survey of Pixar and Disney for "comps for post production supervisors . . . . We are going to have a problem with their deals and I need info[.] . . . Alane has already given me the salary info from Sony."); PIXAR_AWAL_92916 (McAdams email to DreamWorks, Disney, Sony, Lucasfilm, and another studio requesting information for "Manager of Archives" position that Pixar anticipated "in the $60K-80K base, but I'd like to do a reality check as we head into salary discussions.").

**Contains Confidential and Attorneys' Eyes Only Materials**

-21-

paying fairly." McAdams responded, "[w]e don't have a title like that here, so tell me more about what they do for you and I'll match them to a job here."[76]

38. Documents from the Defendants also indicate that they coordinated on budgets for future salary or across-the-board "merit" increases. In late 2006, Lori McAdams (Pixar) wrote an email to individuals at several Defendant firms asking what their salary increase budgets would be in the upcoming fiscal year. She writes, "our is 4%, but we may manage it closer to 3%. Are you doing anything close, more or less?" Sharon Berlin (Sony) responds, "we're doing the same, 4% but trying to manage 3% when we can." Sharon Coker (Lucasfilm) responds, "[w]e haven't finalized…we pay increases in April but could be in the ballpark."[77] In 2008, Catherine Khong (DreamWorks) emails Lori McAdams (Pixar) about budgets, asking "what your 2009 merit budget is? We're in the process of re-evaluating our budget and I was wondering if companies have adjusted theirs in light of what's going on in the economy."[78] In one message in the email thread, McAdams responds that she was "anticipating our merit budgets to be 4%." In another response in the email thread, McAdams responds "we're in the process of finalizing our merit budget for '09 but I expect it to be 3.5%."[79] In 2008, McAdams (Pixar) emails the HR Team at Pixar noting that she's having dinner with Lucas's head of HR, Jan

---

[76] DWA-VFX-0000127.

[77] LUCAS_AWAL_00036012.

[78] PIXAR_AWAL_00100149 at 50.

[79] PIXAR_AWAL_00100174.

**Contains Confidential and Attorneys' Eyes Only Materials**

-22-

Vandervoort, and says that she's "going to ask her about their merit increase budget in 2009."[80]

39.  Documents from the Defendants indicate that they shared information about non-monetary compensation, including health insurance,[81] 401(k) contributions,[82] relocation costs,[83] adoption assistance,[84] and reimbursement for membership in professional societies.[85]

 b) <u>Defendants' Alleged Coordination on Compensation in Connection with Industry Surveys</u>

40.  Plaintiffs also allege that Defendants coordinated on class members' compensation through their use of market surveys managed by companies such as Dunlap and Croner. Documentary evidence suggests that one purpose of the surveys was to suppress compensation. Pixar first participated at the request of Lucasfilm's President Jim Morris, who emailed Pixar's Ed Catmull in June 2004 about the survey and suggested Pixar participate: "I know you are adamant about keeping a lid on rising labor costs, so I

---

[80] LUCAS_AWAL_00216169; PIXAR_AWAL_00001393.

[81] DWA-VFX-0115880; DWA-VFX-0164499.

[82] DWA-VFX-0022977; DWA-VFX-0022986; DWA-VFX-0023010; DWA-VFX-0023022; DWA-VFX-0023023.

[83] DWA-VFX-0093913; BSKY-AWAL009544; DWA-VFX-0089276.

[84] PIXAR_AWAL_00100152.

[85] LUCAS_AWAL_00024957; LUCAS_AWAL_00013152.

**Contains Confidential and Attorneys' Eyes Only Materials**

-23-

thought it might be something you'd want to be involved with. We will foot the bill for the firm."[86]

41.      Throughout the class period, the Defendants participated in industry surveys: the Dunlap industry surveys (until 2006)[87] and then the Croner Survey (beginning in 2007).[88] Defendants' documents indicate that the Defendants used the annual planning meetings for the Croner survey as a way for their human resources and recruiting personnel to get together in informal meetings to discuss compensation.  For example, DreamWorks' Mandato organized a dinner in 2006 for an "an intimate group of us to get together" outside the official survey meetings.[89]  The dinner included DreamWorks, Disney, Pixar, Blue Sky, Sony, and Lucasfilm, but not other participants in the 2006 Dunlap Company survey.[90] At future meetings, HR officials from these companies worked to "organize our dinner as well, just like the past few years"[91] and to "separate out in the afternoon . . . for our own meeting."[92] Defendants described using these closed-door meetings to

---

[86] PIXAR_AWAL_00093297 at 98.

[87] PIXAR_AWAL_00102768.

[88] *See* Croner Survey Results: CRO00144; CRO00628; CRO01448; CRO02395; CRO04227; CRO05064; CRO06258.

[89] BSKY003621.

[90] DWA-VFX-0025390.

[91] BSKY-002570.

[92] LUCAS_AWAL_00013526 at 28.

**Contains Confidential and Attorneys' Eyes Only Materials**

-24-

"talk/visit/compare/benchmark stuff."[93] Defendants' agendas for these meetings included topics such as "long term incentive programs,"[94] "general hiring plans for 2007,"[95] "benchmarking,"[96] and "salary increases" including specific future salary ranges.[97]

42.     In addition to the general survey results, they sought more specific data concerning other Defendants through specialized "custom cuts" that provided more narrow sets of compensation data limited to subgroups of the Defendants.  For example, Pixar's Stephanie Sheehy told the Croner survey organizers in 2007 that Pixar "would ideally like our special cut to consist of: 1. Blue Sky Studios, 2. DreamWorks Animation, 3. Lucasfilm Entertainment, 4. Sony Pictures Entertainment. Any chance we can stop there?!?"[98] Pixar requested similar information in 2008: "Our five definites were Blue Sky, Dreamworks, Lucasfilm, Sony, and Disney."[99] Through the custom cuts, Defendants discovered compensation information they had not already received from each other directly.[100]

---

[93] PIXAR_AWAL_00001153.

[94] LUCAS_AWAL_00061411.

[95] LUCAS_AWAL_00061411.

[96] PIXAR_AWAL_00000968.

[97] DWA-VFX-0000096 (Mandato's notes from the March 2006 meeting, noting that "[a]ll of the companies give out 4% increases on average.").

[98] PIXAR_AWAL_00014050.

[99] PIXAR_AWAL_00021874.

[100] LUCAS_AWAL_00193338 (Michelle Maupin requesting a custom cut of Croner data, noting that it will include "Sony which would be helpful since I still have no response from them").

**Contains Confidential and Attorneys' Eyes Only Materials**

-25-

E.    The High-Tech Litigation and the Post-Period Benchmark

43.    On June 3, 2009, the New York Times reported that the Department of Justice ("DOJ") had opened investigations into the hiring practices of several Silicon Valley technology companies.[101] According to the article, the investigation included Google, Apple, and Yahoo, among others. The article was circulated at Lucas the same day.[102] The investigation ended up encompassing a variety of high-tech firms, including two defendants in this litigation, Pixar and Lucasfilm. On October 27, 2009, Pixar responded to the DOJ's Civil Investigative Demand ("CID") stating, "To the extent any of these documents may reflect any possible understanding between Pixar and any unaffiliated person not to recruit, solicit, or hire each other's employees, contractors, or consultants, to remove any potential for legal controversy, as communicated to Division staff on July 24, 2009, Pixar has terminated any such possible understanding by communicating to such companies that no such understanding exists and that Pixar decides whether and how to recruit, solicit, and hire employees, contractors, and consultants based solely on its own unilateral interest. Pixar has also taken steps to ensure that its senior management and other employees involved in the recruiting and hiring of employees understand the foregoing."[103]

---

[101] "Unwritten Code Rules Silicon Valley Hiring," *The New York Times* (Jun. 3, 2009) *available at* http://www.nytimes.com/2009/06/04/technology/companies/04trust.html. *See* DOJ's Civil Investigative Demands of Pixar (PIXAR_AWAL_00001958) and Lucas (LUCAS_AWAL_00014008).

[102] LUCAS_AWAL_00217551; LUCAS_AWAL_00041751.

[103] PIXAR_AWAL_00002050 at -58.

**Contains Confidential and Attorneys' Eyes Only Materials**

-26-

The DOJ entered consent decrees with Lucasfilm and Pixar on December 21, 2010, enjoining them from "enforcing or adhering to existing agreements that unreasonably restrict competition for employees" and "establishing any similar agreement unreasonably restricting competition for employees."[104] In May 2011, employees filed a class action lawsuit against Pixar, Lucas, and a number of other high-tech firms that were targets of the DOJ investigation. The United States District Court for the Northern District of California granted class certification on October 24, 2013.

44.     I have seen some evidence that Defendants began to adjust their policies relating to their participation in the Croner survey process in 2009 after they became aware of the DOJ investigation into the High Tech industry. In November 2009, Lori McAdams (of Pixar) informed Croner that she would not be attending the 2010 Animation and Visual Effects survey planning meeting.[105] McAdams also wrote to inform Anne Le Cam and Sharon Berlin (of Disney and Sony, respectively) that "I'm not planning to attend the Croner meeting on 1/14 – it's time for me to let go and bring a close to that era . . . without some of the other cronies it doesn't make sense."[106] On November 11, 2009, Disney emailed Croner recommending that "for purposes of disseminating data to multiple

---

[104] Complaint, No. 1:10-cv-02220-RBW Request for Relief; http://www.bloomberg.com/news/articles/2010-12-21/pixar-lucasfilm-to-end-no-call-policies-u-s-says-update1-.

[105] CRO09276.

[106] SP_AWAL_0069672.

**Contains Confidential and Attorneys' Eyes Only Materials**

-27-

companies participating in the survey, the standard should be revised so that the initial 'gate' (as I believe you put it) requires at least 3 unaffiliated companies to provide data before any aggregated data are provided."[107] Disney goes on to note that it had "spoken with the in-house antitrust counsel for Warner Brother and Sony Pictures Entertainment to make them aware of this (as they had not previously been aware) and they may have further comments once they get into the matter."[108]

45.     While the DOJ investigation may have begun changing defendants' conduct in 2009, it may have not been until late 2010 that Defendants explicitly responded to the investigation with renewed competitive behavior, according to the evidence I have seen. For example, on September 2, 2010 Lori McAdams (of Pixar) emailed Kathy Mandato (of DreamWorks): "I skipped Siggraph again this year.  Since the DOJ rained on our parade of getting together with other companies, there's not really a good reason for me to go since my team handles the Recruiting stuff so well."[109]  On November 9, 2010, an internal email among Disney recruiters discussing an annual industry event acknowledged that "I guess the theme of this year's expo is 'Poach What You Want."[110]  On November 23, 2010, Kim

---

[107] PIXAR_AWAL_00022311.

[108] PIXAR_AWAL_00022311.

[109] PIXAR_AWAL_00102340.

[110] DISNEY_AWAL_00000932.

**Contains Confidential and Attorneys' Eyes Only Materials**

-28-

Mackey, Head of Recruiting at DreamWorks, sent a "cold" recruiting email to an employee at Pixar.[111]

46.     A few months later, on February 7, 2011, Dan Satterthwaite (Head of HR at DreamWorks) wrote to Ann Daly (President of DreamWorks) that "[e]mployees have a growing awareness of the market when jobs open up, which is occurring now, along with the rise of online databases that publish market data for the animation and VFX communities." Noting that Croner had "implemented safe harbor provisions that limit the ability to match jobs and report market data on a geographic basis" and thus "has begun providing less valuable insight into the market," he explained that "our ability to understand DWA rates relative to other studios, and our ability to combat perception with facts, is diminishing."[112]

47.     The evidence I have reviewed, including that described above, is consistent with the hypothesis that the Defendants reverted to competitive behavior in the late 2010 or early 2011 time frame.[113] For this reason, the post-2010 period provides a good benchmark to compare compensation levels during the alleged conspiracy to what one

---

[111] DWA-VFX-0084957.

[112] DWA-VFX-0232789 at 89-91. The implementation of these safe harbor guidelines in 2011 implies that Croner and the Defendants did not use them during the conspiracy period.

[113] I have seen evidence that at least some explicit anticompetitive conduct continued well into 2010. For example, on Mar. 12, 2010, Lori Beck at ILM wrote "[w]e need a list of the IMD employees to do the dnr [do not recruit] list." LUCAS_AWAL_00143757.

**Contains Confidential and Attorneys' Eyes Only Materials**

might expect to see in the but-for world had Defendants engaged in normal competitive behavior.

48.        However, even if one assumed that Defendants had ceased all anticompetitive conduct in 2009 as soon as the DOJ investigation became public, I would expect to see continued suppression of compensation throughout a significant part of 2010, and possibly even into 2011.[114]  This is because wages generally exhibit "rigidity," by which I mean that they take some time to adjust to changes in the market such as an increase in demand triggered by renewed competition among the Defendants for labor.[115]  I would expect this general observation to apply in the animation and visual effects industry, where the salaries of most employees are only adjusted once per year, if at all.[116] Additionally, as described in Section V, the process of price discovery in markets where bargaining occurs infrequently (for instance, labor markets, including this one), happens slowly.  Further,

---

[114] To the extent the anticompetitive effects of Defendants' conspiracy did in fact persist into 2011 or beyond, that would indicate that my use of this period as a benchmark is conservative, because compensation would have been even higher in the but-for world, all else equal.

[115] For a discussion of why wages do not react instantaneously to changes in market conditions, *see, for example,* Armen Alchian, "Information Costs, Pricing, and Resource Unemployment."  Western Economic Journal. (1969) pp 109-128.

[116] For example, the Croner Survey asks participants to provide salary information effective April 1, to capture "focal" salary increase dates. *See, for instance,* the 2007 Questionnaire Instruction Manual at CRO 00047 at -52; PIXAR_AWAL_00001094 at -97; Croner 30(b)(6) Deposition at 35:22-24.

**Contains Confidential and Attorneys' Eyes Only Materials**

-30-

given the amount of suppression I estimate in 2009, I would expect a significant lag before compensation returned to a competitive level after the introduction of greater competition.

49.     That compensation would not increase to the competitive level immediately upon the end of the alleged conspiracy is also supported by the Defendants' documents. For example, the same February 7, 2011 internal DreamWorks email discussed above noted under the subject "Market/Competitive Hiring" that "market pay rates" are "on the rise" due to the fact that "many studios have begun ramping up staffing" and that "recruiters have had more difficulty in the last few months with senior talent deals than over the past couple of years."[117]

## V.  CLASS-WIDE EVIDENCE IS CAPABLE OF SHOWING THAT DEFENDANTS' ALLEGED CONSPIRACY SUPPRESSED CLASS MEMBERS' COMPENSATION

50.     In this section, I will first show that class-wide evidence is capable of showing that the alleged conspiracy depressed compensation generally.  I will then show that the compensation structure of each Defendant and across the industry and other factors show that the suppression affected all or nearly all members of the class.

A.      Class-Wide Evidence is Capable of Showing that Alleged Conspiracy Suppressed Compensation Generally

51.     In this section, I will describe three categories of evidence that can be used to show that the alleged conspiracy suppressed class members' compensation generally.

---

[117] DWA-VFX-0232789 at 89.

**Contains Confidential and Attorneys' Eyes Only Materials**

-31-

These three categories of evidence are 1) the economic theory of negotiations under asymmetric information, 2) evidence from the Defendants' documents showing that the purpose and effect of the alleged conspiracy was to suppress compensation across the class, and 3) a during-after regression (described more fully in Section VI) that estimates the level of undercompensation caused by the alleged conspiracy.

### 1. The Economic Theory of Negotiations under Asymmetric Information

52.         Classical economic models assume that all players in a market (i.e. buyers and sellers, or workers and employers) have perfect or nearly perfect information about the nature of the market.  In these basic models, the "market price" is simply the price at which supply is equal to demand. However, in reality, actual transaction prices can diverge greatly from the "market price," and this divergence can persist over time.  A critical source of this divergence from classical theory to observable reality is the fact that real markets do not feature complete, perfect information, but instead feature imperfect or asymmetric information.[118]

---

[118] For a general discussion of the role of information in economic theory, *see* Stiglitz, Joseph, "Information and the Change in the Paradigm in Economics." *American Economic Review*. Vol 92, No 3 (June 2002) pp 460-501.  This is a revised version of the lecture Professor Stiglitz gave upon receiving the Nobel Prize in Economics in 2001, along with George Akerloff and Michael Spence. *See also*, George Stigler, "The Economics of Information" *Journal of Political Economy*.  Volume LXIX, No. 3 (June 1961) pp 213-225.

**Contains Confidential and Attorneys' Eyes Only Materials**

-32-

53.        Divergence from the "market price" is more likely to persist for a prolonged time when bargaining between buyers and sellers happens infrequently.[119] If bargaining occurs frequently, then many opportunities exist for potential buyers and sellers to discover the "market price."  If bargaining occurs less frequently, there are fewer opportunities to discover the "market price."  Non-compete agreements, which limit the interactions between potential buyers and sellers, limit the amount of bargaining that occurs, and therefore the information available by which the parties can discover the "market price."

a)  Defendants' Anti-Solicitation Agreements Decreased the Amount of Information Available to Class Members

54.        Employers are likely to have better information about the prevailing wage rates for a job or industry than workers.  Employers—especially large employers—have information about the wages and salaries paid to their own employees (across a variety of job titles and for hundreds or thousands of employees), and engage with consultants to determine "market" compensation paid by competitors. The Defendants communicated with each other directly to determine the compensation being paid by their competitors.[120] Workers, on the other hand, know their own compensation history, may consult salary-tracking websites like Glassdoor.com or Payscale.com, and may rely on informal

---

[119]*See* Maureen O'Hara, "Presidential Address: Liquidity and Price Discovery" *Journal of Finance.*  Volume LVIII, No. 4 (August 2003) pp 1335-1358.

[120] See discussion in Section IV.D.2, above.

**Contains Confidential and Attorneys' Eyes Only Materials**

-33-

conversations with friends and colleagues (who may work for their employer or for other employers) to discover pay information for specific or related jobs.

55.     Because workers do not have access to the same amount of information as do employers, receiving cold-calls is a key avenue by which workers can obtain accurate information about the value of their services. An employee who receives a cold-call knows that the firm cold-calling him is interested in hiring workers with his skill set, and is provided information about the level of compensation the cold-caller is willing to offer. Thus, an agreement among the Defendants to refrain from cold-calling each others' employees would work to limit the information available to workers about potential outside opportunities.

56.     Furthermore, the information provided by the cold call is not limited to the individual who receives the call.  Rather, when employees receive such information, they tend to discuss it with their friends and colleagues, thus providing a mechanism by which information can spread beyond the original cold-call recipient.

57.     The Defendants recognized that employees talk to each other, that these conversations are an important source of information for their employees, and that their employees can and do use salary information gleaned from friends and colleagues to bargain for their own salary increases.  For instance, after a candidate emailed Pixar, "my salary is ▮▮▮▮, which I thought was the typical starting salary for new TD hires.  I heard recently, however, that ▮▮▮▮▮▮▮▮ was hired for a TD position and will be

**Contains Confidential and Attorneys' Eyes Only Materials**

-34-

receiving a salary of about ▮▮▮▮. While I don't think he's less qualified for the position, I'm not sure what the reasons behind the large increase in his salary offer are." This message was forwarded to other HR employees at Pixar with the note, "All these kids talk and share their salaries with each other!"[121] When discussing an ILM employee who had received an offer from Sony, ILM considered whether to agree to his terms. They decided not to, stating that "it would set a precedent," and that "as much as I hate to risk losing ▮▮▮▮, word will spread."[122] In a 2007 email from Ed Catmull (Pixar) to Dick Cook (Disney) about IMD's recent recruiting efforts, Catmull described the problem caused when a studio offers high salaries: "by offering higher salaries to grow at the rate they desire, people will hear about it and leave."[123]

58. Another example of the effect of employees discussing their salaries amongst themselves can be seen from DreamWorks. DreamWorks had pursued a strategy of paying employees at its two campuses (PDI, located in Redwood City, and Glendale) different rates, with workers at PDI earning less.[124] "Historically base pay rates between the two campuses have RWC at approx. 15% below Glendale; this has remained relatively opaque to employees over many years. However, as cross-site work has increased, and the number

---

[121] PIXAR_AWAL_00097923.

[122] LUCAS_AWAL_00178361. The portion of his offer under discussion is a "2+1" which appears from context to refer to a term of contract (rather than at-will) employment.

[123] PIXAR_AWAL_00100380.

[124] DWA-VFX-0243235 at slide 12.

**Contains Confidential and Attorneys' Eyes Only Materials**

-35-

of employee transfers/relocations has continued, the awareness has grown."[125] The

employees' discovery of this pay differential lead to a "demand that pay differentials be

addressed."[126]

59.     By agreeing not to solicit each others' employees, as the Defendants are

alleged to have done, the Defendants stopped the spread of this information to the entire

workforce before it could even start.

b)  Defendants' Collusion on Compensation Increased the Amount of Information
    Available to Defendants

60.     Documents from the Defendants indicate that the alleged conspiracy had the

effect of increasing the Defendants' information while simultaneously decreasing their

workers' information.  In February 2011, when the effects of the conspiracy had wound

down or were winding down, Dan Satterthwaite (Head of HR at DreamWorks) wrote an

email to Ann Daly (President of DreamWorks) with the subject line "Pay discussion."

This email noted that "[a]t the moment, they [market pay rates] are on the rise."[127] This

email then described the situation that DreamWorks was facing: "Employees have a

growing awareness of the market when jobs open up, which is occurring now, along with

the rise of online databases that publish market data for the animation and VFX

communities.  And because the Croner animation/vfx salary survey has begun providing

---

[125] DWA-VFX-0232789 at -90.

[126] DWA-VFX-0243235 at slide 14.

[127] DWA-VFX-0232789 at -89.

**Contains Confidential and Attorneys' Eyes Only Materials**

-36-

less valuable insight into the market*, our ability to understand DWA rates relative to other studios…is diminishing."[128]  Thus, after the alleged conspiracy ended, employees were acquiring more information through a "growing awareness" of the market facilitated by increased solicitation from other Defendants, and employers were acquiring less information due to the additional safeguards taken in the Croner survey[129] and possibly due to the cessation of direct communications about compensation.[130]  At the same time, compensation was "on the rise."[131]

61.     The Plaintiffs allege that, in addition to an agreement not to solicit each others' employees, the conspiracy among the Defendants to suppress their employees' compensation also included coordination on compensation, including current salaries, future salaries, annual budgets for salary increases and benefits.

62.     While the anti-solicitation agreement reduced the information available to employees, the alleged conspiracy (through the direct and indirect communications among Defendants on compensation) had an effect of increasing the amount of information available to the Defendants.  By frequently and systematically sharing information about

---

[128] DWA-VFX-0232789 at -90.  Asterisk in original.  Asterisk leads to a footnote at -91: "Croner, along with most salary survey purveyors, have implemented safe harbor provisions that limit the ability to match jobs and report market data on a geographic basis. This has hit Croner especially hard because it was already a small-market/niche survey."

[129] DWA-VFX-0232789 at -91.

[130] PIXAR_AWAL_00097257; DWA-VFX-0089010.

[131] DWA-VFX-0232789.

**Contains Confidential and Attorneys' Eyes Only Materials**

-37-

their employees' compensation, the Defendants were increasing their own information about "market" compensation for class members. This increased information would have augmented the Defendants' bargaining power when negotiating salary with their employees and candidates for employment.

63.     The Defendants' documents acknowledge that the purpose of colluding on compensation was to enable them to negotiate lower wages and benefits. For example, in 2004, Lucasfilm's President Jim Morris emailed Pixar's President Ed Catmull to encourage him to participate in "a salary survey" that would "share general ranges and results" among the participants. Morris explained that "I know you are adamant about keeping a lid on rising labor costs, so I thought it might be something you'd want to be involved with." Morris then volunteers to pay for this survey if Pixar will participate: "We will foot the bill for the firm."[132]

64.     In 2009, Sony laid off a number of employees and hired many of them back at lower rates.[133] When Sony implemented these cuts, it made sure that its alleged co-conspirators knew not to match its previous rates, telling other studios "that they [Sony] are rehiring folks back at a lower rate than when they left," and encouraging the other studios to "stand firm in [their] offers to exSony candidates and not worry too much about

---

[132] PIXAR_AWAL_00093297 at -98.
[133] LUCAS_AWAL_00009454.

**Contains Confidential and Attorneys' Eyes Only Materials**

-38-

matching their last Sony rate."[134] Similarly, in a 2005 DreamWorks email, Kathy Mandato requests "comps for post production supervisors…at other studios." She explained that she wanted the information because, "We are going to have a problem with their deals and I need info."[135]

65.     In line with the concerns raised by asymmetrical information between employers and employees, the DOJ and Federal Trade Commission (FTC) discuss the potential for anti-competitive collusion in this area in their Statements of Antitrust Enforcement Policy in Healthcare.  Though these guidelines were developed for the healthcare industry, the FTC notes that "the principles in these guidelines are broadly applicable to other industries as well."[136] These guidelines are clear that "[e]xchanges of…future compensation of employees are very likely to be considered anticompetitive.  If an exchange among competing providers of price or cost information results in an agreement among competitors as to the…wages to be paid to…employees, that agreement will be considered unlawful per se."[137]  Defendants' alleged collusive coordination on future compensation, such as salary ranges or merit increase budgets, is the sort of conduct that the DOJ recognizes is "very likely" to have anticompetitive effects.

---

[134] LUCAS_AWAL_00009454.

[135] DWA-VFX-0027478.

[136] https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade.

[137] Department of Justice and Federal Trade Commission. Statements of Antitrust Enforcement Policy in Healthcare (1996) at page 51.

**Contains Confidential and Attorneys' Eyes Only Materials**

-39-

### 2. Defendants' Documents Shows that The Purpose and Effect of the Alleged Conspiracy was to Suppress Compensation

a) Neither Unilateral Non-Solicitation Nor Unilaterally Providing Compensation Information to Competitors Is in the Defendants' Individual Interest

66. The Defendants' documents show why it was not in their interest to unilaterally cease cold-calling. They valued cold-calling as a way of recruiting "passive" candidates. Passive candidates are individuals who are currently employed and are not actively seeking new employment, but who might be interested in an offer if contacted by a recruiter. The defendants valued passive candidates, noting that "we desperately need to be in touch with" them;[138] but that "Passive Talent [is] difficult to find."[139] Lucas describes passive candidates as the "best" and "rarest" type of talent.[140] Sony describes the need to seek out passive candidates—those who are currently employed—because, "if we limit our offers only to people who are unemployed then we're basically limiting our talent pool to artists who are not in demand."[141]

67. Recruiters that were subject to the anti-solicitation agreements expressed that it was difficult to recruit talent with these agreements in place. "The answer to Production's concerns is not an additional person to the mix is not a solution….He or she would run into the same roadblocks the current team has:…being faced with not being able

---

[138] BSKY-AWAL000369.

[139] LUCAS_AWAL_00215826 at -45

[140] LUCAS_AWAL_00215826 at -87.

[141] SP_AWAL_0196870 at -71.

**Contains Confidential and Attorneys' Eyes Only Materials**

-40-

to go into about 90% of the companies that we would want to as there are 'no recruit' agreements in place with our studio and the top studios in Southern and Northern California, etc."[142]  A Disney email identifies VFX candidates at other studios but notes that "the poaching restriction can be a little challenging to work within."[143]  An email from a recruiter at IMD reads, "I know that I do not have to add how difficult adding more to the "do not recruit" list is for us recruiters to build a studio…." and reports that a colleague complained that "with the latest news on not being able to recruit from more studios, she feels like 'her fishing pond has been dried up.'"[144]

68.        Given that the Defendants valued recruiting passive candidates, it would have been economically irrational for the Defendants to forego this recruitment unless they received something of equal or greater value in return. What Defendants obtained from the alleged conspiracy was not having their own employees poached, and preventing the spread of information from employer to employee, each of which had the effect of suppressing their workers' salaries.  This is confirmed by the Defendants' documents, as described below.

69.        It would also be economically irrational for any Defendant to unilaterally provide compensation information to other Defendants if it did not expect that the other

---

[142] IMD_AWAL_00002460.

[143] DISNEY_AWAL_00003754 at 54-55.

[144] IMD_AWAL_00006760.

**Contains Confidential and Attorneys' Eyes Only Materials**

-41-

Defendants would provide the same information in return and coordinate their compensation accordingly. If an employer were to unilaterally provide its competitors with information on its planned offers to candidates, that information would allow its rival to tailor its offers to just outbid the first firm. Meanwhile, the firm that provided its compensation information unilaterally to its rivals would face either losing out on key talent or making higher-than-anticipated compensation offers. Similarly, if it were to unilaterally provide wage information for their current employees to a rival firm, they would be providing their rival with critical information on the lowest compensation level at which their employees or other prospective employees could reasonably be hired. In neither case is this rational behavior from a firm behaving unilaterally. These types of discussions only benefit a firm providing information to its rivals if this information is used to facilitate effective collusion.

b) Defendants' Documents State that the Alleged Conspiracy Suppressed Labor Costs

70. Consistent with the economic logic above, Defendants' own documents indicate that the purpose of the anti-solicitation agreements was to suppress compensation. As Pixar President Ed Catmull explained, competition for employees "messes up the pay structure. It does. It makes it very high . . . That's just the reality we've got. And I do feel strongly about it."[145] When Catmull emailed Disney in 2007 to "make sure that Disney

---

[145] Catmull Dep. 179:14-25.

**Contains Confidential and Attorneys' Eyes Only Materials**

-42-

and Pixar were non poaching areas," the reason for his email was "concern[s] about pay inflation… We can't afford to have a war for people to drive up costs."[146]

71.     Similarly, a 2006 Lucasfilm email explains that the purpose of the "gentleman's agreement" between Pixar and Lucas was "to prevent bidding wars between us."[147]  In his deposition, Lucasfilm Chairman George Lucas elaborated that the company "rule" was that "we cannot get into a bidding war with other companies because we don't have the margins for that sort of thing."[148]

72.     Defendants' own documents also show that the purpose and effect of their coordination on compensation was to suppress compensation across the class.  In addition to those examples above, in an email to ImageMovers' Sharon Coker, Pixar's Lori McAdams confirmed that suppressing compensation was the purpose of the collusive discussions among the Defendants: "Since money can always be a factor, that's the other thing we should consider (e.g., we wouldn't want to offer a lateral move more money than you, and vice versa.)"[149]

---

[146] DISNEY_AWAL_00002980.

[147] LUCAS_AWAL_00003635.

[148] Lucas Dep. 44:18-25.

[149] PIXAR_AWAL_00015291.

**Contains Confidential and Attorneys' Eyes Only Materials**

-43-

c) <u>An Anti-Solicitation Strategy and Coordination on Compensation Only Work for Defendants in Presence of Conspiracy</u>

73.         That Defendants would have engaged in increased solicitation in the but-for world is demonstrated by the fact that after the alleged conspiracy ended, Defendants began to poach each other again.  For instance, in late September 2009, a Blue Sky manager sent an internal email saying that an employee had resigned, stating "apparently he was poached by Sony…."  Another Blue Sky employee responded "and so it begins……"[150]  In January 2010, DreamWorks employees exchanged a series of emails about approaching "key talent" at Disney.[151]  In November 2010, the head of recruiting at DreamWorks sent a recruiting email to a Pixar employee, asking if he was interested in discussing openings at DreamWorks.[152]  In June 2011, a Blue Sky recruiter wrote to a DreamWorks recruiter "Damn Disney—they've been going down my animators list and hiring all of my senior guys!"[153]  Notes from a 2011 meeting at DreamWorks state that "Pixar was trying really hard to poach 2 of our directors—which is against their religion!"[154] Defendants also ceased colluding on compensation, *e.g.* salary budgets and ranges.[155]

---

[150] BSKY001530.  Both sets of ellipses in original.

[151] DWA-VFX-0085004.

[152] DWA-VFX-0084957.

[153] DWA-VFX-0089258.

[154] DWA-VFX-0085579.

[155] PIXAR_AWAL_00097257; DWA-VFX-0089010.

**Contains Confidential and Attorneys' Eyes Only Materials**

-44-

d) Increased Solicitation and the Cessation of Compensation Coordination Would Lead to Higher Compensation

74.     If employers are concerned that their employees will be cold-called by rival firms, there are effective, competitive means to entice these employees to stay. One option is to offer stock options or grants with a vesting period. The vesting period will incentivize employees to remain at their employer at least until the vesting period is complete. Ownership of company stock helps to align the employee's individual self-interest in increasing his own income with the profitability of the company.

75.     Another option an employer has to entice employees to stay in the face of cold-calls is to pay them sufficiently high wages that the cold-call will not be attractive. If a company in a competitive labor market thinks that it is at risk of having its talent poached by rivals, it will pay higher wages than if it does not.

76.     In addition, if the Defendants had not coordinated on compensation, class members would have had comparatively more information on compensation for labor and would have been in a stronger bargaining position to obtain higher compensation.

3.  *Econometric Analysis is Capable of Showing Reduced Compensation Generally*

77.     In Section VI, below, I describe a "during-after" regression analysis used to quantify the impact of the alleged conspiracy on the class by comparing compensation during the alleged conspiracy to a benchmark post-period, controlling for other variables. I

**Contains Confidential and Attorneys' Eyes Only Materials**

-45-

use this regression to demonstrate a method of calculating damages to members of the class. However, the regression analysis itself is also additional class-wide evidence that the alleged conspiracy reduced compensation generally and thus impacted the class broadly.

> B.      Class-Wide Evidence is Capable of Showing that Alleged Conspiracy Suppressed the Compensation of All or Nearly All Members of the Class

78.      In this section, I present four categories of evidence that can be used to show that the alleged conspiracy would adversely affect the compensation of all or nearly all members of the class.[156] These categories are: 1) evidence that wage suppression for a substantial portion of the employees at a Defendant would spread to all or nearly all employees at that Defendant (intra-firm effects), 2) evidence that wage suppression for employees of one Defendant would affect employees of other Defendants (inter-firm effects), 3) evidence that a reduction in salary increase budgets would affect all or nearly all members of the class and 4) econometric analysis of compensation structures industry-wide and by Defendant that confirms that compensation suppression was spread across the entire class.

---

[156] Additionally, note that as described by Defendants and summarized in Section V.A.1 above, class members' communications with friends and colleagues would have allowed information contained in cold-calls to spread beyond the direct recipients of such calls. This provides another mechanism by which the alleged collusion suppressed the compensation of all or nearly all members of the class.

**Contains Confidential and Attorneys' Eyes Only Materials**

-46-

*1. Intra-firm factors: Wage suppression for some employees at a Defendant would spread to all or nearly all class members at that Defendant*

79.     Although the evidence discussed above indicates that the direct effects of Defendants' alleged conduct would lead to broad effects across the class, the nature of Defendants' compensation structures indicates that even if the conduct only directly affected a substantial subset of employees, the suppression of those employees' compensation would quickly spread to the rest of the class.  This section discusses those factors, which I call "intra-firm" factors, that would lead suppressed pay for a substantial number of employees at one firm to spread to the rest of the employees at the same firm. These factors include the fact that each of the Defendants had a formal compensation structure, and that each Defendant valued internal equity in compensating their employees.

80.     Firms use formal compensation structures to ensure that employees are being paid comparable salaries for comparable work, and to establish relatively fixed pay grades between groups of employees with increasing responsibilities.  Each of the Defendants used formal administrative compensation structures that divided jobs into pay bands or grades.  The Defendants used these pay bands or grades to evaluate and pay employees in groups in relationship to other groups.  Each job title had a salary range that included a minimum, middle, and maximum compensation for any individual with that job title. Lucasfilm's Sharon Coker testified that "we had identified levels of positions within our

**Contains Confidential and Attorneys' Eyes Only Materials**

-47-

salary structure all the way through nonexempt up to the executive level."[157] Lucasfilm's

HR team focused on "[c]reat[ing] a framework, including: Job Families, Levels or Bands,

Job Title Structure (including System titles), Job Progression within Job Families, Job

Mapping between Jobs and across Divisions."[158] Lucasfilm's documents show that

"[g]rades represent a salary range and each job is slotted to a grade. Salary Range consists

of Salary Range Minimum[,] Salary Range Midpoint[,] Salary Range Maximum[.]"[159]  At

Blue Sky, each job was assigned to a "grade" and there were established minimum,

middle, and maximum salaries for each job code.[160]  Sony listed minimums, midpoints,

and maximums for "grades" of jobs when discussing candidates for Sony positions.[161]

Similarly, at Pixar, "Job families are also called job groups . . . They're a grouping of

employees that sit together in our structure."[162]  Pixar also "established salary ranges for

each of our positions, and an employee is offered or paid usually within that salary

range."[163]  At DreamWorks, salaries were "set to a specific hierarchy/ schedule."[164]

Disney had "a compensation strategy that is run through HR and Recruiting and Studio

---

[157] Deposition of Sharon Coker, November 1, 2012 at. 242:1-3.

[158] LUCAS_AWAL_00061450.

[159] LUCAS_AWAL_00024899.

[160] BSKY-AWAL094200.

[161] SP_AWAL_0097616 (discussing "Technical Animator – Dig Efx – Senior – Grade 15").

[162] Deposition of Stephanie Sheehy, March 5, 2013 at p. 78:20-24.

[163] Deposition of Lori McAdams, August 2, 2012 at p. 29:8-9.

[164] DWA-VFX-0025656 at 56.

**Contains Confidential and Attorneys' Eyes Only Materials**

-48-

Compensation. . . . We take what the hiring manager would recommend and work with Studio Compensation to see if what works within the salary guidelines, based on the resume, etc."[165] This compensation strategy included compensation "ranges and levels" for each job category in its salary structure.[166] Similarly IMD had a spreadsheet (broken out by departments and levels within each department) with the studio salary ranges indicating the highs and lows within each group.[167]

81.     These salary structures not only ensured that employees with similar job responsibilities were paid similarly, but also established a somewhat rigid structure between different grades and bands.  Thus, as Lucasfilm's Leslie Maupin explained in an email, when one grade was adjusted, it could affect others as well: "I don't have a problem looking at moving the ███████████. The one concern I have is it would be at the same pay range as a ██████████ and when we reviewed the job relationships with Peter it was clear that a ██████████ should be valued more highly than a ███████████. . . . What I would ask is do you have any reason to think we should also look at moving the ████ ████████ up a grade level as well?"[168]

_____

[165] DISNEY_AWAL_00002085.

[166] DISNEY_AWAL_00000870 at 75-77.

[167] IMD_AWAL_00002600.

[168] LUCAS_AWAL_00231285 at 86.

**Contains Confidential and Attorneys' Eyes Only Materials**

-49-

82.     The Defendants also used specific guidelines and tools to ensure that employees were paid within prescribed salary ranges, usually implemented through Human Resources or Recruiting departments.  For example, DreamWorks used a "Deal Calculator" spreadsheet to ensure that the deals offered to employees conformed to their compensation structure.[169]  Similarly, Blue Sky also refused to go above a specified offer during negotiation with a candidate because "if we go any higher we'll upset the salary structure in the dept."[170]  According to Lori McAdams, at Pixar "the salary range adjustments is something that's done by human resources so that we have ranges for all our established positions. And then the managers are provided any updated salary range information so that when they are distributing their salary increase pool, they know if someone is below – you know where their people are in those salary ranges and can provide, you know – can spend their pool accordingly."[171]

83.     When Defendants discovered outliers, they would typically correct them. Lucasfilm regularly and proactively reviewed employee salaries to ensure its workforce was within range and implemented "call-out equity adjustments[s]": individual compensation increases for the explicit purpose of "align[ing] the employee more appropriately in their salary range . . . [and] based on how that employee aligns with their

---

[169] DWA-VFX-0026298.

[170] BSKY-AWAL000287.

[171] Deposition of Lori McAdams, August 2, 2012 at pp. 40:25-41:7.

**Contains Confidential and Attorneys' Eyes Only Materials**

-50-

internal peer group based on the same set of criteria."[172] ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████[173] Sony utilized "equity adjustments" which are "a salary action intended to move an employee's base pay into a fair and equitable relationship with that of others that hold the same or comparable position[.]"[174]

84.     Deviations from the compensation guidelines required special approval, which was seldom granted.  For example, a Sony document indicates that "Tim Sarnoff (who has to approve every deal over the 5% pre-approved amount) is kicking back almost every deal – contracts, non-contract reviews & new hire deals."[175]  Similarly, a 2006 DreamWorks document entitled "Animation Compensation Philosophy" states that "[a]ny out-of-guidelines increase recommendations must be approved by Human Resources and the appropriate Department Head.  If the increase is outside established guidelines approval from the Company Executive is also needed."[176]  At Lucas, "[o]ffers above the hiring range require[d] executive approval."[177]  At Pixar, Stephanie Sheehy (Manager of

---

[172] Deposition of Michelle Maupin, February 12, 2013 at 194.

[173] DISNEY_AWAL_00000870.

[174] SP_AWAL_0104127 at 30.

[175] SP_AWAL_0000618.

[176] DWA-VFX-0025039 at 39.

[177] LUCAS_AWAL_00024899 at *8.

**Contains Confidential and Attorneys' Eyes Only Materials**

-51-

Human Resources Analysis) and Lori McAdams (Vice President of Human Resources and Administration) were responsible for ensuring that salaries for each job group remained within their allocated pool.[178]

85.     One of the primary purposes of a formal compensation structure such as those used by the Defendants is to maintain "internal equity" between employees.  That is, employers are often concerned about paying different individuals doing similar jobs at a similar level.  The Defendants stressed the importance of internal equity, citing a variety of business concerns that arise when compensation lacks internal equity, including reduced employee morale and problems with hiring and retention.  For example: in an email discussing an offer extended to a candidate, Pixar's Lori McAdams said that an offer was "the best we can do and still keep internal equity, which is important to us." Her colleague responded that they "raise some [current] folks up," noting that it's "just difficult bringing people in so much higher than the bulk of our in-house people."[179]  A 2005 presentation commissioned by DreamWorks describes the difference in pay between facilities in Redwood City and Glendale as becoming a "significant distraction to production and strategy."[180]  This presentation also describes dissatisfaction with compensation at

---

[178] Deposition of Stephanie Sheehy, March 5, 2013 at p. 77:8-11.

[179] PIXAR_AWAL_00097934.

[180] DWA-VFX-0001362 at -76.

**Contains Confidential and Attorneys' Eyes Only Materials**

-52-

Glendale as a reason for "low morale."[181] A Blue Sky email suggests "across the board" adjustments for current staff "to compensate for higher salaries of bringing people in at market rate. As we all know salary inequality breeds huge morale problems with the floor."[182]

86.     The Defendants cited internal equity as a consideration when determining compensation. For instance, in its Compensation Policies & Guidelines Manual, Sony described "equity adjustments" as "a salary action intended to move an employee's base pay into a fair and equitable relationship with that of others that hold the same or comparable positions, either within the organization and/or in the external relevant labor market."[183] This document also notes in the "Promotions" section that, "equity relative to others internally in the same position should be evaluated in determining the promotional increase."[184]

87.     This concern for internal equity provides another avenue by which suppressed compensation for some employees at a Defendant would spread to all or nearly all employees at that Defendant. In the absence of the alleged conspiracy, consider an employee who received a cold-call from a rival employer. If this employee brought his

---

[181] DWA-VFX-0001362 at -77.

[182] BSKY002834.

[183] SP_AWAL_0222302 at -15.

[184] SP_AWAL_0222301 at -14.

**Contains Confidential and Attorneys' Eyes Only Materials**

-53-

offer to his current employer and received and accepted a counteroffer, internal equity concerns at that employer would lead that employer to increase other workers' compensation to match the higher compensation of the employee who received the cold call.[185] If this employee left his original employer for employment at the cold-calling firm, internal equity concerns at *that* firm could increase compensation for other workers at the cold-calling firm.

>    *2. Inter-Firm Factors Led to Suppression of Compensation for All or Nearly All Class Members*

88.     The evidence discussed above indicates that the Defendants' alleged conduct would have suppressed compensation across all or nearly all class members at each of the Defendants. But if somehow the agreements, directly and through intra-firm effects, suppressed compensation across all (or nearly all) class members at  some Defendants, but across a smaller proportion of class members at other Defendants, "inter-firm" factors would lead to class-wide wage suppression at this latter group of Defendants as well.  This is because in addition to concerns of "internal equity" as described above, employers are also concerned with "external equity"—offering similar compensation as offered by other employers for similar work.[186]  In order to achieve external equity, the Defendants engaged in a process of "benchmarking" their compensation to "market" compensation.  Pixar

---

[185] The employer would also be likely to increase compensation for other employees for other reasons, including a desire to make future cold-calls less attractive to its workers.

[186] Pixar uses the term "External Equity" at PIXAR_AWAL_00022590 at -616.

**Contains Confidential and Attorneys' Eyes Only Materials**

-54-

describes this benchmarking process as "monitoring compensation routinely and validat[ing] our salaries with market data."[187]  Because Defendants are concerned about maintaining external equity, this provides a mechanism by which wage suppression for employees at one group of Defendants would spread to all or nearly all class members employed by the other Defendants.  In this section, I describe this process.

89.      The Defendants' direct coordination on compensation, described at length in Section IV, was one source of information for benchmarking done in pursuit of external equity. Another source of information was through the Defendants' participation in industry surveys.

90.      To participate in the Croner survey, defendants matched their own job titles to the common job titles that they created together for the Croner survey. Croner's list of job titles (positions) was broken down into job families and job functions. For example, in the 2008 Croner Survey, the position title "Animator" is part of the job family "Character Animation" and the Function "Animation."[188]  Defendants who did not share information related to particular compensation elements, or did not provide information on particular positions, would not receive the results for those in the Croner report.[189]

---

[187] LUCAS_AWAL_00122530 at -31.

[188] CRO00521 at -52.

[189] CRO01247-CRO01316.

**Contains Confidential and Attorneys' Eyes Only Materials**

-55-

91.     Defendants provided detailed, employee-level information to Croner, including: job titles, employee's geographic location and start date at the defendant, whether the position was hourly or salaried, contract or at will, whether an employee was hired for the duration of a project, or was a regular employee, whether he/she was a union member, and whether the position fell under animation, software, or videogames category. Defendants also provided information on hours worked and compensation, including: target annual base pay, standard week hours, whether an employee was eligible for short-term and long-term incentive awards and the value of such awards.

92.     Each Defendant received the results of the survey, comparing the pay of the survey participants' employees by the percentiles of the compensation elements for a particular survey participant versus the rest of the survey participants. For instance, a participant could compare its median and mean base and total compensation to that in the industry by position (job title matched to the Croner position title) and location. Additionally, Croner would provide the list of the participants to all survey recipients.[190] The Defendants used "market" compensation information, obtained from direct communications and from survey results (including "custom cuts" which limited the survey results to exclude nearly all firms other than the defendant firms) to determine salaries for their own employees.  For example, ███████████████ ██████████████████████████████████████████████

_____

[190] *See* CRO02038 for the results of the 2009 Croner survey.

**Contains Confidential and Attorneys' Eyes Only Materials**

-56-

████████████████████████████

████████████ ,"[191]  A DreamWorks email describes "Your total pay package is driven

by: You—Your skills, experience, and performance [,] The Market –Comparing our Total

Pay package to other companies where we compete for talent…."[192]  A Disney email

describes "Salary adjustments" as "Will be adjusted in relation to DW, Sony Pixar.  They

will be based on merit and average throughout industry."[193]  A Pixar presentation describes

compensation as based on internal equity and "External Equity [-] Industry Survey

(Dreamworks anim, laika, lucasfilm, sony, fox [sic])."[194]  As explained by Pixar's

Stephanie Sheehy: "Q: [H]ow are base salaries determined for Pixar employees? A: "We

use survey data for the most part. Q: "What do you do with the survey data? A: We use it

as a guideline to help us determine the minimum salary/maximum salary for a job."[195]

Lucasfilm's "Compensation Analysis" describes "matching internal positions to

benchmark positions for comparison to market data.  Each position will then be analyzed

and compared to available survey market data….Deliverables will include a final report,

---

[191] DWA-VFX-0025039.

[192] DWA-VFX-0026081.

[193] DISNEY_AWAL_00004367.

[194] PIXAR_AWAL_00022590 at -616.

[195] Deposition of Stephanie Sheehy, March 5, 2013 at 49:4-9.  *See also* Deposition of Lori McAdams, August 2, 2012 at 29:15-17: "We participate in salary surveys in the industry and—and in—in various fields, and use that information to determine the appropriate salary range."

**Contains Confidential and Attorneys' Eyes Only Materials**

-57-

outlining: [a]pproved ranges for each of the specified positions.  Ranges will include a low, high, and **approved exception** amount."[196]

### 3. Defendants' Coordination on Compensation Budgets Common to All Defendants Affected All Class Members

93.      As described above, documents from the Defendants indicate that they coordinated on budgets for future salary or across-the-board "merit" increases.[197]  The size of the merit increase budgets was an important factor when determining every individual employee's raise for the upcoming year.  For example, Lucas's "Pay for Performance Toolkit for Managers: 2004 Performance Reviews" includes the instructions to "consider the following factors prior to making a merit increase recommendation: Performance rating score[,] Peer Comparison (individual's vs. peers' base salaries)[,] Market Data[,] Merit Increase Guidelines[,] Budget" and notes that "[m]anagers are responsible for managing salary increases for their group within the annual merit budget given."[198]

94.      Indeed, a 2010 DreamWorks email indicates that for large groups of employees, the merit increase budget was the *only* factor determining their raises: "[f]or years prior to 2009, the merit budget for the company was 4% (and had been set at 5% in AT).  This amount applied to non-contractual employees and was given as a flat %

---

[196] LUCAS_AWAL_00025017.  Emphasis in original.  Lucasfilm used data from Dunlap, Croner, and Radford (among others), and compared its salaries to those from: Warner, Disney, HBO, Universal, Sony, Fox, Paramount, and Dreamworks.

[197] *See* ¶ 38, above.

[198] LUCAS_AWAL_00062208.

**Contains Confidential and Attorneys' Eyes Only Materials**

-58-

increase to each individual effective Jan 1 of that year. It was not performance-based."[199] Documents from other defendants also suggest that they similarly distributed their salary increase budget evenly across their employee base. As described in a 2009 Pixar document, "[r]estrictions on our salary increase budget prohibit us from making greater differentiations based on performance, so we try to recognize performance in other ways…."[200] Because the budget allotted for merit raises in an important factor when deciding the amount of a raise for each individual employee, and because evidence indicates that merit budget raises were spread relatively evenly across the employee base, a reduction in budgets for merit raises across Defendants likely would have reduced the compensation of all members of the class.

*4. Econometric Analysis Confirms that Compensation was Spread Across Entire Class*

95. The documentary evidence described above indicates that each defendant employed a formal compensation structure that ensured internal equity. That documentary evidence is confirmed by econometric evidence showing that each individual class member's compensation can be explained largely by reference to basic observable characteristics such as age, tenure, gender, title, and employer.

---

[199] DWA-VFX-0090184).

[200] PIXAR_AWAL_00080017 at -19.

**Contains Confidential and Attorneys' Eyes Only Materials**

-59-

a)    Common Factors Explain Compensation Structure

96.        Standard human capital theory links an individual's earnings to his or her level of education, job experience, industry and industry experience, and an individual's job title in a particular industry. Given the information provided by the Defendants, I can estimate the standard earnings models for the industry as a whole, and for each individual Defendant.  The results of this analysis confirm the existence of Defendants' formal compensation structures.

97.        To test how closely these observable characteristics of the class members can predict a class member's earnings, I performed a regression relating each class member's total annual compensation to his or her age and age squared, experience with the defendant (tenure) and experience squared, as well as gender.[201] Total compensation includes an individual's base earnings, overtime pay, performance pay (such as a bonus), and stock grants and options. Certain characteristics of individuals are not likely to change and it can be expected that an individual's compensation in a given year will not be independent from his or her compensation in prior years. To account for this, I use clustered standard errors. This makes the inference based on my models more robust.

98.        Standard human capital models rely on an individual's education as one of the factors that can predict earnings. Consistent educational attainment data were not made available to me for all Defendants. Should these data be provided in the future, I may

---

[201] I calculate tenure as the amount of time since the employee was hired.

**Contains Confidential and Attorneys' Eyes Only Materials**

Case: 1:14-cv-03050 Document #: 61 Filed: 11/13/15 Page 64 of 164 PageID #:163

update my regression models to account for it. I use age as a proxy for an individual's total job market experience, and I use tenure with the current employer to account for the fact that earnings increase as the total job market experience and tenure with the employer increase. I allow for these factors to enter the regression models in both linear and quadratic fashion to account for general diminishing returns to additional experience. I control for an individual's gender as is standard since it is a common finding in economic literature that earnings vary by gender. Indicators for each individual Defendant and location are included to control for differences in compensation that may be defendant- or location- specific. I also control for the job title of the individual.

99.     I present the results of my regression analyses in Table 1. The factors included in the regression models have the expected signs and explain most of the variation in an individual's compensation, which is measured by the R-squared statistic. The R-squared statistic varies from .63 to .77, indicating that the variables in the model explain from 63 to 77 percent of the variation in the class members' earnings. The coefficients associated with the factors included in the model generally vary from about .02 to .05 for age, and from .02 to .07 for tenure. The relative stability of these coefficients indicates the persistent importance of these factors over time in explaining variation in compensation.

100.     Table 1 presents the results calculated for the industry. I perform the same analysis for each Defendant and report the resulting R-squared statistics in Table 2.  These

**Contains Confidential and Attorneys' Eyes Only Materials**

-61-

range on from .45 to .92, indicating that the standard factors of the human capital model explain from 45 to 92 percent of the variation in the class members' earnings.

101.    That the standard human capital model is capable of explaining most of the variation in the earnings of the class members supports the conclusion that the Defendants had systematic pay structures.  This fact taken together with the fact that the R-squared statistics remain fairly high over time indicates that Defendants' compensation structures persisted over time.

b)   Correlation in Earnings and Compensation Structure

102.    In addition to the documentary and empirical evidence of systematic pay structures described above, other analyses can be used to show that earnings of the class members in different job titles are correlated over time.  I perform these analysis for the job titles for which I have at least 10 observations. I analyze the earnings of the class members by job title as follows: 1) I study correlation between changes in average real compensation growth of class members in a particular job title and changes in average real compensation growth of class members in other job titles (excluding the job title of interest); 2) I study correlations between average real compensation of class members in a particular job title and average real compensation of class members in other job titles (excluding the job title of interest); 3) I also relate an individual class member's real compensation growth by job title to: average real compensation growth in all other job titles; the natural logarithm of the ratio of previous year in-class compensation (excluding the job title of interest) to individual real compensation of the job title in question; the

**Contains Confidential and Attorneys' Eyes Only Materials**

-62-

natural logarithm of the per-employee inflation adjusted box office revenues, and GDP growth. Thus, I provide evidence for the systematic pay structures employed by the Defendants by using correlations and regression analyses. These compensation correlations show that all or nearly all members of the class would be affected by the alleged conspiracy.

103.    Figure 1 shows correlations of average real compensation growth of a given job title relative to other job titles (excluding the job title of interest). Table 3 provides a summary of these correlations indicating the percentage of the correlations that are positive and significant, and those that are negative and significant. The vast majority of the defendant-specific job titles (between 76 and 100 percent, weighted by year) are positively correlated over time with the real compensation growth of other employees.  While there are some negative correlations, nearly all of them are not statistically significant.

104.    Figure 2 shows correlations of compensation levels of the class members relating average compensation in a given job title to average compensation in all other in-class job titles (excluding the job title of interest).  Table 4 provides a summary of correlations in the levels of compensation, indicating the percentage of correlations that are positive and significant, and those that are negative and significant.  The majority of the defendant-specific job titles (between 79 and 95 percent, weighted by year) are positively correlated over time with the compensation levels of other employees.

**Contains Confidential and Attorneys' Eyes Only Materials**

-63-

105.     Actual compensation of class members in a given job title is strongly related to the average compensation of the other class members in the other job titles. Again, I would not expect all correlations to be positive, but there are relatively few negative correlations, and they are usually not statistically significant.

106.     While it is expected that the average compensation of the class members by job title would have positive correlation, it is possible that some job titles will have negative correlations (for instance, if 3D animation becomes more important over time, employees proficient in 3D animation may see increases in compensation while those doing more traditional animation may see decreases in compensation). Year-to-year, job titles may change as new techniques appear – weakening or strengthening the relationship between various job titles.

107.     These statistical analyses indicate strong relationships between the earnings of different class members and show that even if the alleged conspiracy directly suppressed the pay of only a subset of class members, the suppression nevertheless would spread to all or nearly all class members.

108.     Correlation measures the degree of linear association between two variables. It is possible that a correlation between two variables could be due to one of the factors being related to an unobserved, or unaccounted for variable. To account for this possibility, I use standard econometric techniques that allow me to control for more factors that may influence the relationship between compensation of class member in different job titles. As

**Contains Confidential and Attorneys' Eyes Only Materials**

Case 2:14-cv-03050 Document 681-9 Filed 11/13/25 Page 68 of 164 Page ID #:23167

described above, the purpose of these regressions is to estimate the contemporaneous relationship between changes in real compensation growth for individuals in a particular job title and average real compensation growth in other job titles, which is the contemporaneous sharing effect, as well as the natural logarithm of the ratio of the average real compensation of all other in-class job titles in the previous year, which is the lagged sharing effect. Figures 3 and 4 summarize the results of these regressions. The remaining factors, GDP growth and box office revenues, allow me to control for the external factors that may influence changes in compensation.

109.     Figure 3 shows that the contemporaneous sharing effect is largely positive and statistically significant. Table 5 shows the percentage of the contemporaneous effects that are positive (and statistically significant) as well as the percentage of the contemporaneous effects that are negative (and statistically significant) for each Defendant. This indicates the degree to which compensation increases for one group of employees are shared with other employees at the company.

110.     Figure 4 shows that the lagged sharing effect is largely positive and statistically significant. Table 6 summarizes the results of the lagged sharing effects and lists the percentage of the lagged sharing effects that are positive (and statistically significant) and negative (and statistically significant) for each Defendant. This shows that sharing not only affects compensation growth contemporaneously, but it also drives future compensation growth. Note that though approximately 20% of job titles at Blue Sky and Lucasfilm show negative and significant contemporaneous sharing effects, Figure 4 shows

**Contains Confidential and Attorneys' Eyes Only Materials**

-65-

that this percentage nearly entirely dissipates for both. Thus, over time, virtually all job titles at all Defendants show a positive sharing effect.

111.     That the majority of the job titles have a positive contemporaneous and lagged relationship with the other job titles further supports the claim that the impact of the alleged conspiracy spreads to all class members.

## VI.     BENCHMARK REGRESSION ANALYSIS IS CAPABLE OF MEASURING CLASS-WIDE DAMAGES

112.     I show above that economic theory predicts that in the presence of the alleged conspiracy, earnings of all or nearly all of the class members would be suppressed. I use the correlations analysis and the relationship between earnings of class members to demonstrate that the direct impact of the alleged conspiracy would spread to all class members. I now turn to an empirical analysis, which I can use to quantify the earnings suppression. In order to measure the degree to which earnings of the class members were suppressed during the class period, I use appropriate econometric techniques in which earnings of individual class members during the alleged conspiracy period are compared to a benchmark period.  I use the years 2011 through 2013 as my benchmark, since by this

**Contains Confidential and Attorneys' Eyes Only Materials**

-66-

point in time the wage-suppressing effects of the alleged conspiracy would have likely dissipated.[202]  This is sometimes called a "during-after" analysis.

113.      The regression explains class members' total compensation using a variety of individual, firm and economy-wide effects:

- Conspiracy Effects: How the Defendants' challenged conduct impacted annual compensation over time, allowing for this effect to vary as additional Defendants entered the alleged conspiracy;

- Employee Effects: How compensation normally varies across workers based on their individual characteristics.

- Employer Effects: How compensation normally varies across firms; and

- Macroeconomic Effects: How compensation normally varies according to changes in the broader economy.

114.      To control for employee-specific effects, I include variables for age, age squared, tenure with the Defendant, tenure with the Defendant squared, share of year worked, and the previous year's total compensation. [203]

---

[202] To the extent any effects of the alleged conspiracy persisted during the benchmark period that would mean that my analysis underestimates the impact of the alleged conspiracy and damages, and thus is conservative.

**Contains Confidential and Attorneys' Eyes Only Materials**

-67-

115.　　　To control for employer-specific effects I included variables for the total number of employees at the employer, annual worldwide box office revenue of the employer, and the ratio of the number of new in-class hires to the previous year's total in-class employment at the employer.

116.　　　To control for macroeconomic effects, I included variables for growth in the nominal gross domestic product in the U.S. (GDP), the consumer price index (CPI), and the time trend.　The growth rate of GDP is a measure of the strength of the economy and the CPI measures how purchasing power of consumers changes over time due to inflation.

117.　　　To measure the effect of the alleged conspiracy, I include a series of variables covering different periods of the class depending on how many Defendants had entered the alleged conspiracy during each period. The alleged conspiracy was a dynamic process with the Defendants entering at different times. Each time a Defendant enters the alleged conspiracy, the effect of the alleged conspiracy on the class members' compensation may change. Accordingly, I allow the effect of the alleged conspiracy to vary as new members join over time. Counsel for the Plaintiffs asked me to assume that the Defendants joined the alleged conspiracy by the following years, based on their review of the current record:

---

[203] I also control for the employee-employer "fixed effects", i.e., observable and unobservable characteristics that would remain unchanged over time for an individual-employer combination, such as an employee's gender and education level.

**Contains Confidential and Attorneys' Eyes Only Materials**

-68-

- Pixar and Lucas formed an agreement before 2001 (the start of the data produced by these companies);

- DreamWorks—2003;

- Disney—2004;

- Sony—2004;

- Blue Sky—2005; and

- IMD—2007.

118.    To allow for the sequential entry of the Defendants into the alleged conspiracy I include an indicator for each period in which an additional Defendant is alleged to have joined the alleged conspiracy based on Counsel's review of the current record. My model includes variables for the following conspiracy periods:

- Conspiracy 2001-2002: measures the conspiracy effect limited to Pixar and Lucasfilm, participants in the alleged conspiracy in 2001 and 2002;

- Conspiracy 2003: measures the conspiracy effect based on the assumption that DreamWorks joined the conspiracy in 2003;

- Conspiracy 2004: measures the conspiracy effect based on the assumption that Disney and Sony joined the conspiracy in 2004;

- Conspiracy 2005-2006: measures the conspiracy effect based on the assumption that Blue Sky joined the conspiracy in 2005.  Because no additional Defendants

**Contains Confidential and Attorneys' Eyes Only Materials**

-69-

are alleged to have joined in 2006, the conspiracy effect is assumed to be the same in 2005 and 2006;

- Conspiracy 2007-2008: measures the conspiracy effect based on the assumption that IMD joined the conspiracy in 2007. The conspiracy effect is assumed to be the same in 2007 and 2008 because the number of alleged conspirators did not change.

- Conspiracy 2009: The final year of the alleged conspiracy, when the DOJ began its investigation in High Tech.

- Wind-Down 2010: allows for the possibility of continued impact in 2010 during the "wind-down" period for the alleged conspiracy due to lingering effects on compensation.[204]

119.    These seven periods are used to estimate the under-compensation caused by the conspiracy after controlling for all other relevant factors. The results of this regression analysis are presented in Table 7. I find that in all periods, compensation is suppressed relative to my benchmark estimate, and that this suppression is statistically significant. This suppression ranges from about 5 percent in 2010 to nearly 32 percent in 2001 and

---

[204] Though the DOJ opened its investigation in High-Tech in 2009, as discussed in Section IV.E, above, it is likely that the effects of the alleged conspiracy continued through 2010.

**Contains Confidential and Attorneys' Eyes Only Materials**

-70-

2002.[205] This lower coefficient in 2010 is consistent with the conclusion that 2010 was a "wind-down" period during which the effect of the conspiracy was reduced, but not eliminated.

D. Lost Earnings Calculation

120.     Using the coefficients for the conspiracy variables estimated by my regression analysis, I can calculate the damages (lost earnings) to the class.  To calculate damages, I apply the relevant under-compensation percentages derived from the conspiracy coefficients as previously described to the earnings of employees of the Defendants who are in the class during each relevant period.  I estimate total class-wide damages of approximately $689 million. I show the results of these calculations in Table 8. The class members are easily identifiable from the Defendants' compensation data.

Orley Ashenfelter
_____

Orley Ashenfelter

February 1, 2016

_____

[205] Because my dependent variable is the natural logarithm of compensation, I transform the estimated conspiracy effects from log points to percentages, and report these percentages in Table 8.

**Contains Confidential and Attorneys' Eyes Only Materials**

Case 1:15-cv-00304-LBB Document Document Filed 11/13/25 Page 75 of 164 PageID #:2174

**Table 1: Standard Human Capital Model and Industry-Wide Compensation Structure**

| | 2001 | | 2002 | | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | |
| | Estimate | T-stat | Estimate | T-stat | Estimate | T-stat | Estimate | T-stat | Estimate | T-stat | Estimate | T-stat | Estimate | T-stat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | 0.02 | 3.34 | 0.00 | 0.18 | 0.04 | 3.05 | 0.05 | 3.88 | 0.05 | 5.24 | 0.05 | 4.70 | 0.05 | 5.32 |
| Age^2 | 0.00 | -2.77 | 0.00 | -0.10 | 0.00 | -2.52 | 0.00 | -3.39 | 0.00 | -4.29 | 0.00 | -3.78 | 0.00 | -4.38 |
| Tenure, years | 0.02 | 2.47 | 0.04 | 4.25 | 0.04 | 6.55 | 0.03 | 5.53 | 0.04 | 7.65 | 0.06 | 11.02 | 0.06 | 10.24 |
| Tenure^2 | 0.00 | -0.95 | 0.00 | -2.49 | 0.00 | -2.41 | 0.00 | -1.23 | 0.00 | -2.63 | 0.00 | -5.65 | 0.00 | -5.97 |
| Female | -0.03 | -1.08 | -0.07 | -2.06 | -0.13 | -3.99 | -0.11 | -3.52 | -0.07 | -2.91 | -0.09 | -3.92 | -0.07 | -3.83 |
| Employer | yes | | yes | | yes | | yes | | yes | | yes | | yes | |
| Location | yes | | yes | | yes | | yes | | yes | | yes | | yes | |
| Job Title | yes | | yes | | yes | | yes | | yes | | yes | | yes | |
| No. of Observations | 1,768 | | 1,906 | | 2,884 | | 3,247 | | 4,013 | | 4,389 | | 4,747 | |
| R-Squared | 0.77 | | 0.74 | | 0.71 | | 0.63 | | 0.74 | | 0.72 | | 0.71 | |

| | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | 2013 | |
| | Estimate | T-stat | Estimate | T-stat | Estimate | T-stat | Estimate | T-stat | Estimate | T-stat | Estimate | T-stat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | 0.03 | 2.15 | 0.02 | 3.09 | 0.04 | 3.52 | 0.02 | 3.93 | 0.03 | 3.92 | 0.04 | 3.24 |
| Age^2 | 0.00 | -1.57 | 0.00 | -2.22 | 0.00 | -2.74 | 0.00 | -2.65 | 0.00 | -3.15 | 0.00 | -2.68 |
| Tenure, years | 0.07 | 10.92 | 0.05 | 11.23 | 0.05 | 10.49 | 0.05 | 11.65 | 0.05 | 8.62 | 0.06 | 8.07 |
| Tenure^2 | 0.00 | -6.49 | 0.00 | -6.78 | 0.00 | -6.12 | 0.00 | -7.39 | 0.00 | -4.27 | 0.00 | -4.84 |
| Female | -0.07 | -3.74 | -0.10 | -6.82 | -0.07 | -3.53 | -0.10 | -4.93 | -0.10 | -4.94 | -0.07 | -3.77 |
| Employer | yes | | yes | | yes | | yes | | yes | | yes | |
| Location | yes | | yes | | yes | | yes | | yes | | yes | |
| Job Title | yes | | yes | | yes | | yes | | yes | | yes | |
| No. of Observations | 5,045 | | 5,600 | | 5,719 | | 5,723 | | 5,731 | | 5,502 | |
| R-Squared | 0.75 | | 0.73 | | 0.77 | | 0.71 | | 0.72 | | 0.72 | |

Note: Dependent variable is log of total annual compensation. Total annual compensation includes an individual's base earnings, overtime pay, performance pay (such as a bonus), and stock grants and options.The independent variables include age and age squared, work experience with the defendant (tenure) and tenure squared, gender, location, employer, and job title indicators. Valuations of stock grants and options are from company annual reports. The t-statistic provides a test of whether the estimated coefficient is statistically significant. Generally speaking, a t-statistic of 1.96 or higher, in absolute value, indicates that the coefficient estimate is statistically significant at the 5% significance level.

Source: Employee compensation data.

Contains Confidential and Attorneys' Eyes Only Materials

## Table 2: Standard Human Capital Model and Firm-Wide Compensation Structure

|      | Blue Sky | Disney | DreamWorks | IMD  | LucasFilm | Pixar | Sony |
|------|----------|--------|------------|------|-----------|-------|------|
| 2001 | 0.88     | .      | 0.76       | .    | 0.78      | 0.78  | 0.83 |
| 2002 | 0.92     | .      | 0.78       | .    | 0.73      | 0.75  | 0.74 |
| 2003 | 0.73     | 0.61   | 0.75       | .    | 0.78      | 0.59  | 0.71 |
| 2004 | 0.62     | 0.52   | 0.68       | .    | 0.75      | 0.78  | 0.71 |
| 2005 | 0.77     | 0.64   | 0.81       | .    | 0.63      | 0.82  | 0.75 |
| 2006 | 0.78     | 0.71   | 0.76       | .    | 0.71      | 0.78  | 0.65 |
| 2007 | 0.75     | 0.6    | 0.82       | 0.67 | 0.63      | 0.87  | 0.61 |
| 2008 | 0.74     | 0.71   | 0.82       | 0.72 | 0.66      | 0.84  | 0.71 |
| 2009 | 0.77     | 0.57   | 0.82       | 0.78 | 0.66      | 0.87  | 0.75 |
| 2010 | 0.64     | 0.54   | 0.76       | 0.93 | 0.74      | 0.84  | 0.73 |
| 2011 | 0.73     | 0.45   | 0.82       | 0.93 | 0.71      | 0.81  | 0.69 |
| 2012 | 0.7      | 0.46   | 0.79       | .    | 0.82      | 0.72  | 0.68 |
| 2013 | 0.92     | 0.55   | 0.69       | .    | 0.74      | 0.77  | 0.75 |

Note: Regressions performed separately for each defendant and year. Dependent variable is log of total annual compensation. Valuations of stock grants and options are from company annual reports. The independent variables include age and age squared, work experience with the defendant (tenure) and tenure squared, gender, location, and job title indicators. The t-statistic provides a test of whether the estimated coefficient is statistically significant. Generally speaking, a t-statistic of 1.96 or higher, in absolute value, indicates that the coefficient estimate is statistically significant at the 5% significance level.

Source: Employee compensation data.

Contains Confidential and Attorneys' Eyes Only Materials



Figure 1: Compensation Change Correlations Between Job Title and Class

Contains Confidential and Attorneys' Eyes Only Materials

## Table 3:  Compensation Change Correlations

| Defendant | Positive | Negative | Positive & Significant | Negative & Significant |
|---|---|---|---|---|
| Blue Sky | 0.84 | 0.16 | 0.39 | 0.00 |
| Disney | 1.00 | 0.00 | 0.83 | 0.00 |
| DreamWorks | 0.77 | 0.23 | 0.32 | 0.00 |
| LucasFilm | 1.00 | 0.00 | 0.56 | 0.00 |
| Pixar | 0.86 | 0.14 | 0.44 | 0.00 |
| Sony | 0.76 | 0.24 | 0.23 | 0.03 |

Note: Correlation between the growth of average total compensation for a job title versus all other job ittles in the class at the same company. Job titles are limited to those with at least 10 years of data.

Source: Employee compensation data.

Contains Confidential and Attorneys' Eyes Only Materials



Figure 2: Compensation Correlations Between Job Title and Class

Contains Confidential and Attorneys' Eyes Only Materials

Case 1:25-cv-00304-DII Document 68-1 Filed 11/13/25 Page 80 of 164 PageID #:23179

## Table 4: Compensation Correlations

| Defendant | Positive | Negative | Positive & Significant | Negative & Significant |
|---|---|---|---|---|
| Blue Sky | 0.79 | 0.21 | 0.40 | 0.00 |
| Disney | 0.87 | 0.13 | 0.68 | 0.02 |
| DreamWorks | 0.92 | 0.08 | 0.48 | 0.00 |
| LucasFilm | 0.91 | 0.09 | 0.74 | 0.00 |
| Pixar | 0.95 | 0.05 | 0.46 | 0.00 |
| Sony | 0.85 | 0.15 | 0.23 | 0.00 |

Note: Correlation between the average total compensation for a job title versus all other job titles in the class at the same company. Job titles are limited to those with at least 10 years of data.

Source: Employee compensation data provided by defendants.

Contains Confidential and Attorneys' Eyes Only Materials



Contains Confidential and Attorneys' Eyes Only Materials

Case 2:15-cv-00305-DB Document 681 Filed 11/13/25 Page 82 of 164 Page ID #:29181

**Table 5: Summary of Contemporaneous Sharing Effects**

| Defendant | Positive | Negative | Positive & Significant | Negative & Significant |
|---|---|---|---|---|
| Blue Sky | 0.76 | 0.24 | 0.62 | 0.21 |
| Disney | 0.98 | 0.02 | 0.82 | 0.00 |
| DreamWorks | 0.96 | 0.04 | 0.87 | 0.01 |
| LucasFilm | 0.70 | 0.30 | 0.62 | 0.26 |
| Pixar | 0.99 | 0.01 | 0.95 | 0.00 |
| Sony | 0.89 | 0.11 | 0.68 | 0.03 |

Note: Job titles are limited to those with at least 10 years of data. Based on the regression of log of compensation for a job title on the log of compensation of class members in other job titles, the ratio of the previous year's class compensation to the compensation the job title in question, as well as box-office revenues and GDP growth.

Source: Employee compensation data.

Contains Confidential and Attorneys' Eyes Only Materials



Contains Confidential and Attorneys' Eyes Only Materials

## Table 6: Summary of Lagged Sharing Effects

| Defendant | Positive | Negative | Positive & significant | Negative & significant |
|---|---|---|---|---|
| Blue Sky | 1.00 | 0.00 | 0.84 | 0.00 |
| Disney | 1.00 | 0.00 | 0.84 | 0.00 |
| DreamWorks | 0.90 | 0.10 | 0.82 | 0.03 |
| LucasFilm | 0.93 | 0.07 | 0.82 | 0.01 |
| Pixar | 0.99 | 0.01 | 0.95 | 0.00 |
| Sony | 0.95 | 0.05 | 0.79 | 0.00 |

Note: Job titles are limited to those with at least 10 years of data. Based on the regression of log of compensation for a job title on the log of compensation of class members in other job titles, the ratio of the previous year's class compensation to the compensation the job title in question, as well as box-office revenues and GDP growth.

Source: Employee compensation data.

Contains Confidential and Attorneys' Eyes Only Materials

Case 1:14-cv-03040-DLH Document 681-9 Filed 11/13/25 Page 85 of 164 PageID #:23184

## Table 7: Estimation of Undercompensation of Class Members over the Class Period

|  | Estimate | T-stat |
|---|---|---|
| Conspiracy_2001-2002 | -0.38 | -7.51 |
| Conspiracy_2003 | -0.27 | -5.88 |
| Conspiracy_2004 | -0.27 | -6.61 |
| Conspiracy_2005-2006 | -0.10 | -3.58 |
| Conspiracy_2007-2008 | -0.10 | -6.17 |
| Conspiracy_2009 | -0.21 | -8.45 |
| Conspiracy_2010 | -0.05 | -5.38 |
| Log(total annual compensation at [t-1]) | 0.17 | 6.47 |
| Age | 0.12 | 9.06 |
| Age^2 | 0.00 | -8.68 |
| Tenure | 0.00 | 0.39 |
| Tenure^2 | 0.00 | -0.34 |
| Year(trend) | -0.08 | -5.54 |
| Log(box office revenue) | 0.00 | 6.89 |
| Log(new hires by defendant/total employment by defendant) | 0.01 | 1.15 |
| D.lnom_gdp | -2.29 | -5.86 |
| Log(total employment by defendant) | -0.09 | -6.36 |
| Log(CPI) | 1.18 | 2.06 |
| Log(share of year employed) | 0.99 | 65.31 |
| Constant | 152.05 | 6.12 |
|  |  |  |
| No. of Observations | 41,757 |  |
| R-squared | 0.89 |  |

Note: Total annual compensation includes an individual's base earnings, overtime pay, performance pay (such as a bonus), and stock grants and options. Valuations of stock grants and options are from company annual reports. The t-statistic provides a test of whether the estimated coefficient is statistically significant. Generally speaking, a t-statistic of 1.96 or higher, in absolute value, indicates that the coefficient estimate is statistically significant at the 5% significance level.

Source: Employee compensation data.

Contains Confidential and Attorneys' Eyes Only Materials

### Table 8: Lost Earnings of Class Members

| Year | Undercompensation Percentage | Lost Earnings |
|---|---|---|
| 2001 | -31.47% | -$48,752,544.62 |
| 2002 | -31.47% | -$65,313,839.59 |
| 2003 | -23.71% | -$56,833,841.53 |
| 2004 | -23.53% | -$90,018,064.39 |
| 2005 | -9.57% | -$50,647,017.46 |
| 2006 | -9.57% | -$60,208,979.28 |
| 2007 | -9.80% | -$67,554,724.18 |
| 2008 | -9.80% | -$70,876,620.60 |
| 2009 | -19.21% | -$140,271,355.67 |
| 2010 | -4.93% | -$38,638,891.95 |
| **Total** | | **-$689,115,879** |

Note: Undercompensation percentages are converted from the log points reported in Table 7.

Contains Confidential and Attorneys' Eyes Only Materials

**APPENDIX A:**

**CV of Orley Ashenfelter**

Case 1:14-cv-03040 Document Doc#me Filed 11/13/15 Page 88 of 164 PageID #: 23187

October 2015

# Curriculum Vitae

NAME:            Orley C. Ashenfelter

BUSINESS         Industrial Relations Section
ADDRESS:         Firestone Library
                 Princeton University
                 Princeton, New Jersey 08544-2098

BUSINESS PHONE:  609-258-4040

FAX NUMBER:      609-258-2907

CURRENT          Joseph Douglas Green 1895 Professor of Economics
POSITION:
                               And
                 Vice-President, 2015-16, Western Economic
                 Association International
                 Executive Committee, Law and Public Affairs,
                 Princeton University
                 Scientific Advisory Committee, Graduate School of
                 Economics, Barcelona
                 Co-editor, *Journal of Wine Economics*

                 Advisory Board, Stanford University, Institute for
                 Economic Policy Research

                 Advisory Board, Center for Economic Policy Studies,
                 Princeton University

                 Editorial Board, *Journal of Cultural Economics*
                 International Advisory Board, the *Economic and
                 Labour Relations Review*
                 Editorial Board, the *Australian Bulletin of Labour*

PREVIOUS         President, American Economic Association, 2011
POSITIONS:       President, American Law and Economics Association, 2010
                 President, Society of Labor Economists, 2003
                 Section Editor, Economics, *International Encyclopedia of the Social*

*and Behavior Sciences*
Co-Editor, *American Law and Economics Review, 1999-2005*
Director, Industrial Relations Section, Princeton University
Co-editor, *American Economic Review*, 2001-2002.
Editor, *American Economic Review*, 1985-2001.
Meyer Visiting Research Professor, New York University School of Law, 1990.
Meeker Visiting Professor, University of Bristol, 1980-81.
Guggenheim Fellow, 1976-77.
Director, Office of Evaluation, U.S. Department of Labor, 1972-73.
Lecturer, Assistant Professor, and Associate Professor of Economics, Princeton University, 1968-72.

EDUCATION:    Claremont McKenna College, B.A. 1964

Princeton University, Ph.D. 1970

AWARDS AND HONORS:

Honorary Degree from Charles University, Czech Republic, January 15th, 2014.

Labor and Employee Relations Academic Fellow, 2010

Distinguished Fellow, American Economic Association, January, 2008.

Recipient of Karel Englis Honorary Medal, awarded by the Academy Council of the Academy of Science of the Czech Republic, May, 2007.

Society of Labor Economists' Jacob Mincer Award, June 4, 2005.

Corresponding Fellow of the Royal Society of Edinburgh, 2005.

IZA Prize in Labor Economics, 2003.

Doctor Honoris Causa, University of Brussels, November 29, 2002

Fellow, American Academy of Arts & Sciences, 1993-

Recipient of the Ragnar Frisch Prize of the Econometric Society, 1984.

Fellow, Econometric Society, 1977.

Guggenheim Fellowship, 1976-77.

BOOKS:

*Statistics and Econometrics: Methods and Applications*, (with Phillip Levine and David Zimmerman), New York: J. Wiley, 2003.

*The Collected Essays of Orley C. Ashenfelter*, Volumes I – III, (edited by Kevin Hallock), Cheltenham, England: Edward Elgar Publishing Limited, 1997.

Volume I        Employment, Labor Unions, and Wages

Volume II       Education, Training, and Discrimination

Volume III      Economic Institutions and the Demand and Supply of Labor

PUBLIC LECTURES:

Art Investment Forum, Shanghai, China, October 2013, "Trust and Transparency in the Art Market," Keynote Speech.

Shanghai Jiao Tong University, Antai College of Economics and Management, China, October 2013, "Comparing Real Wages".

Sotheby's Institute, London, May 2013, "Trust and Transparency in the Art Market" Plenary Lecture, Conference on Art Markets.

U.S. Department of Labor, November 2012, "History of Program Evaluation," presented at the 75th Anniversary Celebration and Conference.

Washington State University, March 2011, "McWages, Cross Country Comparison of Wages", 11th Annual Bertha C. and Roy E. Leigh Distinguished Lecture in Economics.

American Bar Association, December 2010, "Presentation, Conference on Labor Market Monopsony."

Yale University, November 2010, "Plenary Lecture, Conference on Empirical Legal Studies."

San Francisco Federal Reserve Board, July 2010, "Expert Opinion."

Brigham Young University, April 2010, "McWages, Cross Country Comnparison of Wages."

Stanford University, March, 2010, "Labor Markets and Their Recovery."

Vanderbilt University, February 2010, "McWages, Cross Country

Comparison of Wages."

Law and Economics Workshop, University of California-Berkeley, Berkeley, California, November 16, 2009, "The Effect of Mergers on the Consumer Prices: Evidence from Five Mergers on the Enforcement Margin."

District of Columbia Circuit Conference of the Federal Courts, Nemacolin Woods, Pennsylvania, Conference of the Third Circuit Judicial Court of Appeals, June 8, 2006, "How Not to Lie with Statistics."

Stanford Institute for Economic Policy Research, Stanford University, Stanford, California, May 30, 2006, "McWages: Cross-Country Comparison of Wages."

The Economics of Art and Culture in Honor of Victor Ginsburg, June 17, 2005, Brussels, Belgium, "Efficiency and Inefficiency in the Market for Bordeaux Wines."

David Hume Institute Lecture, Edinburgh, Scotland, March 24, 20005. "The Evolution of the Global Labor Market: Change vs. Continuity."

J. Denis Sargan Lecture to the Royal Economietric Society, Nottingham, England, March 23, 2005, "The Value of a Statistical Life: Problems and Prospects."

Edmund Clarke Distinguished Lecture, October 15, 2004, Queens College, Ontario, "Evolution of the Global Labor Market: Change vs Continuity."

Wei Lun Lecture, December 14, 2000, The Chinese University of Hong Kong, "How Large Is the Economic Payoff to Education?"

Paul Hartman Memorial Lecture, November 1, 1995, University of Illinois at Champaign-Urbana, "How Credible is the Evidence Linking Education and Income?"

Jerome Levy Economics Institute Lecture, November 21, 1995, Bard College, "How Credible Are Estimates of the Economic Returns to Schooling?"

Ida Cordelia Beam Lecture, November 10, 1994, University of Iowa, "Does a College Degree Pay Off? Evidence from Data on Identical Twins."

42nd Joseph Fisher Lecture, October 12, 1993, Adelaide University, Adelaide, Australia, "How Convincing is the Evidence Linking Education and Income?"

Lecture to honor Gregg Lewis, October 29, 1992, Duke University, "The Economic Returns to Schooling from a New Sample of Twins."

George Seltzer Distinguished Lecture, October 6, 1991, Industrial Relations Center, University of Minnesota, "How Convincing Is The Evidence Linking Education and Income?"

University of Bristol, Bristol, England, December 6, 1990, "The Market for Fine Wine: Is It Economically Efficient or Is There a Sucker Born Every Minute"

PUBLICATIONS:

(with D. Hosken; M. C. Weinberg) "Did Robert Bork Understate the Competitive Impact of Mergers? Evidence from Consummated Mergers." August 2014, *Journal of Law and Economics*, Vol. 57, No. S3. The Contributions of Robert Bork to Antitrust Economics, pp. S67-S100, The University of Chicago Press for The Booth School of Business of the University of Chicago and The University of Chicago Law School.

"The early history of program evaluation and the department of labor." May 2014, Special Issue: U.S. Department of Labor Centennial, *Industrial and Labor Relations Review*, 67 Supplement, 574-577.

(with Hosken, Daniel; Weinberg, Matthew) "Corrigendum: the price effects of a large merger of manufacturers: A case study of Maytag Whirlpool." February 2014, *American Economic Journal: Economic Policy*, 6(1), 308-309.

(with Bloom, David E. and Dahl, Gordon B.). "Lawyers as Agents of the Devil in a Prisoner's Dilemma Game." Princeton University

Industrial Relations Section Working Paper #270, NBER Working Paper No. 4447, September, 1993. September 2013, *Journal of Empirical Legal Studies* 10(3): 399-423.

(with Jones, Gregory). "The Demand for Expert Opinion: Bordeaux Wine". December 2013, *Journal of Wine Economics*, 8, pp 285-293.

(with Hosken, Daniel; Weinberg, Matthew) "The price effects of a large merger of manufacturers: A case study of Maytag-Whirlpool", February 2013, *American Economics Journal: Economic Policy*, 5(1), 239-261.

"Comparing real wage rates: Presidential address", National Bureau of Economic Research, Inc. Working Papers: 18006. *American Economic Review*, April 2012, 102(2), 617-642.

(with Gordon Dahl) "Bargaining and the role of expert agents: An empirical study of final-offer arbitration." *Review of Economics and Statistics*, February 2012, 94(1), 116-132.

(with Kathryn Graddy) *A Handbook of Culutural Economics*, Second Edition, Chapter 2 "Art Auctions", August 2011

"Foreward", *American Economic Review*, May 2011, v. 101, iss. 3, pp. x-xi

(with Kathryn Graddy) "Sale Rates and Price Movements in Art Auctions", *American Economic Review*, May 2011, v. 101, iss. 3, pp. 212-16

(with Hosken, Daniel; Vita, Michael; Weinberg, Matthew) "Retrospective Analysis of Hospital Mergers", *International Journal of the Economics of Business*, February 2011, v. 18, iss. 1, pp. 5-16

(with Kirk Doran and Bruce Schaller) "A Shred of Credible Evidence on the Long-run Elasticity of Labour Supply", *Economica,* October 2010, Vol. 77, issue 308, pages 637-650

"George E. Johnson", *Journal of Wine Economics,* vol. 5, no. 1, pg. 217, 2010

(with D. Hosken) "The Effect of Mergers on Consumer Prices: Evidence from Five Selected Case Studies", *Journal of Law and Economics,* August 2010, v. 53, iss. 3, pp. 417-66

(with K. Storchmann) "Measuring the Economic Effect of Global Warming on Viticulture Using Auction, Retail, and Wholesale Prices," *Review of Industrial Organization*, 2010, vol. 37, no. 1, 51-64

(with K. Storchmann) "Using Hedonic Models of Solar Radiation and weather to Assess the Economic Effect of Climate Change: The Case of Mosel Valley Vineyards, "*Review of Economics and Statistics*, May 2010, Vol. 92, No. 2, Pages 333-349

(with Henry Farber; Michael Ransom) "Labor Market Monopsony," *Journal of Labor Economics*, April 2010, v. 28, iss. 2, pp. 203-10

"Predicting the Quality and Prices of Bordeaux Wine," *Journal of Wine Economics*, Spring 2010, v. 5, iss. 1, pp. 40-52

(with John Pencavel) "Albert Rees and the 'Chicago School of Economics,'" in *Elgar Companion to the Chicago School of Economics*, edited by Ross B. Emmett, Edward Elgar, 2010.

(with Daniel Hosken and Matthew Weinberg) "Generating Evidence to Guide Merger Enforcement," in *Global Competition Policy,* vo. 5, no. 1, Spring 2009.

(with Richard E. Quandt and George M. Tabor) "Wine-Tasting Epiphany: An Analysis of the 1976 California vs. France Tasting," in *Wine and Philosophy*, edited by Fritz Allhoff, November 2007.

(with Stephen Ciccarella and Howard J. Schatz) "French Wine and the U.S. Boycott of 2003: Does Politics Really Affect Commerce?" July 2007, National Bureau of Economic Research Working Paper #13258. *Journal of Wine Economics*, Volume 2, No. 1, Spring 2007.

(with Kathryn Graddy) "Art Auctions" *Handbook of the Economics of Art and Culture*, edited by Victor Ginsburgh and David Throsby (Oxford, UK: Elsevier), vol. 1, 2006.

(with W. J. Collins and A.Yoon) "Evaluating the Role of Brown v. Board of Education in School Equalization, Desegregation and the Income of African Americans," *American Law and Economics Review*, vol. 8, no. 2, Summer 2006.

(with David Ashmore, Jonathan B. Baker, Suzanne Gleason and

Case 1:14-cv-00305-LPS Document 681 Filed 11/13/15 Page 95 of 164 PageID #: 23194

Daniel S. Hosken) "Empirical Methods in Merger Analysis: Econometric Analysis of Pricing in FTC v. Staples," *International Journal of the Economics of Business*, vol. 13, no. 2, July 2006. Reprinted in *Recent Developments in Monopoly and Competition Policy*, edited by George Norman (Edward Elgar Publishers: Cheltenham, UK) January 2008.

"George M. Tabor, Judgment of Paris: California vs. France and the Historic 1976 Paris Tasting That Revolutionized Wine," *Journal of Wine Economics*, vol. 1. no. 1 (Spring) 2006.

"Measuring the Value of a Statistical Life: Problems", *The Economics Journal*, vol. 118 (March) 2006.

(with Alan Krueger) "Estimates of the Economic Return to Schooling from a New Sample of Twins," in *Quantitative Social Science,* edited by Jacqueline Scott and Yu Xie, volume 1, part 6, October 2005.

"Predicting the Quality and Prices of Bordeaux Wines," in *Statistics: A Guide to the Unknown*, 4th edition, edited by Roxy Peck, et al., (Stamford, CT: Thomson), March 2005. Reprinted in the *Economic Journal*, vol. 118, no. 529, June, 2008. Reprinted in the *Journal of Wine Economics*, vol. 5, no. 1, 2010.

(with Kathryn Graddy) "Anatomy of the Rise and Fall of a Price-Fixing Conspiracy: Auctions at Sotheby's and Christies'" *Journal of Competition Law & Economics*, vol. 1, no. 1, March 2005.

(with David Ashmore and Olivier Deschenes) "Do Unemployment Insurance Recipients Actively Seek Work? Evidence From Randomized Trials in Four U.S. States," *Journal of Econometrics*, vol. 125, no. 1, March 2005.

(with Junsen Zhang) "Introduction: The Chinese Labor Market: New Quantitative Studies," *Pacific Economic Review*, vol. 9, no. 3, October 2004.

(with Michael Greenstone), "Estimating the Value of a Statistical Life: The Importance of Omitted Variables and Publication Bias," *American Economic Association Papers and Proceedings*, vol. 94, no. 2, May 2004.

Case 1:14-cv-03050-DLI-Document #: 681-1 Filed 11/13/25 Page 96 of 164 PageID #: 3195

(with Michael Greenstone) "Using Mandated Speed Limits to Measure the Value of a Statistical Life," *Journal of Political Economy*, vol. 112, no. S1, February 2004.

(with Kathryn Graddy) "Auctions and the Price of Art," *Journal of Economic Literature*, vol. 41, no. 3, September 2003.

(with Victor Ginsburgh) "Economists Argue the Payments Are Unfair," *The Art Newspaper*, October 2003.

"Art Auctions," in *Handbook of Cultural Economics*, edited by Ruth Towse (Edward Elgar Publishers: Cheltenham, UK) May 2003.

(with David Card) "Did the Elimination of Mandatory Retirement Affect Faculty Retirement Flows?" *American Economic Review*, vol. 92, no. 4, September 2002.

"Comment on the Age Discrimination Example," *Jurimetrics Journal,* vol. 42, Spring 2002.

(with John Abowd) "Using Price Indicies and Sale Rates to Assess Short Run Changes in the Market for Impressionist and Contemporary Paintings," in *The Economics of Art Auctions*, Edited by G. Mosetto and M. Vecco, (Milan: F. Angeli Press, 2002).

"Economics Overview," in *International Encyclopedia of Economics*, (Oxford, UK: Elsevier Science Ltd., December 2001).

(with Alessandro Corsi) "Predicting Italian Wines Quality From Weather Data and Expert 'Ratings'," *Cahier Scientifique de 'Observatoire des Conjonctures Vincoles Europeenenes*, no. 4, July 2001.

(with Karl Storchmann) "The Quality of Vineyard Sites in the Mosel Valley of Germany," *Cahier Scientifique de 'Observatoire des Conjonctures Vincoles Europeenenes*, no. 4, July 2001.

(with Dean Hyslop) "Measuring the Effect of Arbitration on Wage Levels: The Case of Police Officers," *Industrial and Labor Relations Review*, vol. 54, no. 2, January 2001.

Case 1:14-cv-03050 Document 1 Filed 11/13/15 Page 97 of 164 PageID #:196

(with Phillip B. Levine) "Unemployment Insurance Appeals in the State of Wisconsin: Who Fights and Who Wins?" *Research in Employment Policy*, vol. 2, 2000; *Long-Term Unemployment and Reemployment Policies*, Volume 2, edited by Laurie J. Bassi and Stephen Woodbury, (Stamford, CT: JAI Press.)

"Liquid Assets," *Optimus: The Magazine for the Private Investor*, vol. 2, 2000.

(with Gregory Jones) "The Demand for Expert Opinions: Bordeaux Wine," *Cahier Scientifique de 'Observatoire des Conjonctures Vincoles Europeenenes*, no. 3, March 2000.

"Orley Ashenfelter," in *Exemplary Economists,* Volume 1, edited by Roger E. Backhouse and Roger Middleton, (Cheltenham, United Kingdom: Edward Elgar Publishing, Ltd. 2000).

(with Cecilia Rouse) "Schooling, Intelligence, and Income in America: Cracks in the Bell Curve," *Meritocracy and Inequality*, edited by Kenneth Arrow, Steven Durlauf, and Samuel Bowles, (Princeton, NJ: Princeton University Press, 2000).

(with Colm Harmon and Hessel Oosterbeek) "A Review of Estimates of the Schooling/Earnings Relationship, with Tests for Publication Bias," *Labour Economics*, vol. 6, 1999.

"Paul Samuelson Teaching Federal Judges," *Journal of Economics Education*, vol. 30, no.4, Fall 1999.

(with Richard E. Quandt) "Analyzing a Wine Tasting Statistically (Wherein we rigorously analyze the famous 1976 Paris Tasteoff!)," *Chance*, vol. 12, no. 3, Summer 1999.

"Arbitration," in *The New Palgrave Dictionary of Economics and the Law*, edited by Peter Newman, (London, United Kingdom: Macmillian Reference Ltd., 1998).

(with Cecilia Rouse) "Income, Schooling and Ability: Evidence From A New Sample of Identical Twins," The *Quarterly Journal of Economics*, vol. 113, no. 1, February 1998, reprinted in *Income Distribution*, edited by Michael Sattinger, (Cheltenham, England: Edward Elgar Publishing Ltd., 2001).

(with David Ashmore and Randall Filer) "Contract Form and Procurement Costs: The Impact of Compulsory Multiple Contractor Laws in Construction," *Rand Journal of Economics*, vol. 28, no. 0, 1997, S5-S16.

(with David Zimmerman) "Estimates of the Returns to Schooling From Sibling Data: Fathers, Sons, Brothers," *The Review of Economics and Statistics*, vol. 79, no. 1, February 1997.

(with Robert LaLonde) "The Economics of Training," in *The Human Resource Management Handbook*, edited by David Lewin, Daniel Mitchell, and Mahmood Zaidi, (JAI Press, 1997).

(with Kevin Hallock) "Bibliography," *in Labor Market Discrimination, Labor Mobility, and Compensating Wage Differentials: Labor Economics*, Volume IV, (Cheltenham, England: Edward Elgar Publishing Ltd., 1995).

(with David Ashmore and Robert LaLonde) "Wine Vintage Quality and the Weather: Bordeaux," *Chance*, Fall 1995.

(with Theodore Eisenberg and Stewart Schwab) "Politics and the Judiciary: The Influence of Judicial Background on Case Outcomes," *Journal of Legal Studies*, vol. 24, no. 2, June 1995.

(with Ray Byron) "Predicting the Quality of the Unborn Grange," *The Economic Record*, Australia, vol. 71, no. 212, March 1995: 40-53.

(with Alan Krueger) "Estimates of the Economic Return to Schooling From A New Sample of Twins," *American Economic Review*, vol. 84, no. 5, December 1994. Reprinted in SAGE Benchmarks in Social Research Methods

"Have We Underinvested in Education?," *The Changing Distribution of Income in an Open U.S. Economy,* edited by Jeffrey Bergstrand, Thomas Cosimano, John Houck and Richard Sheehan, (North-Holland Publishing, 1994).

"How Convincing is the Evidence Linking Education and Income?" *Labour Economics and Productivity*, vol. 6, (1994) pp. 1-12. *In Australia's Economy in its International Context*, Volume 2 1950-

2001, edited by Kym Anderson, (Adelaide, Australia: Centre for International Economic Studies, 2001), 366-374.

(with Janet Currie, Henry S. Farber and Matthew Spiegel) "An Experimental Comparison of Dispute Rates in Alternative Arbitration Systems,"*Econometrica*, vol. 60, no. 6, November 1992: 1407-1433.

(with David Genesove) "Testing For Price Anomalies in Real Estate Auctions," *American Economic Review*, vol. 82, no. 2, May 1992, 501-505.

(with Ronald L. Oaxaca) "Labor Market Discrimination and Economic Development," in *Unfair Advantage Labor Market Discrimination in Developing Countries*, edited by Nancy Birdsall and Richard Sabot, (Washington, DC: The World Bank, 1991): 35-53.

(with Janet Currie) "Negotiator Behavior and the Occurrence of Disputes," *American Economic Review*, vol. 80, no. 2, May 1990: 416-20.

"Albert Rees: Teacher, Scholar, Public Servant," *Journal of Labor Economics*, vol. 8, no. 2, Part 2, January 1990, S1-S3.

(with Mark W. Plant) "Non-Parametric Estimates of the Labor Supply Effects of Negative Income Tax Programs," *Journal of Labor Economics*, vol. 8, no. 1, Part 2, January 1990.

"Evidence on U.S. Experiences with Dispute Resolution Systems," in *Organized Labor at the Crossroads*, edited by Wei-Chiao Huang, (Kalamazoo, Michigan: W.E. Upjohn Institute, 1989).

"How Auctions Work for Wine and Art," *Journal of Economic Perspectives,* vol. 3, no.3, Summer 1989, 23-36.

(with Ronald Oaxaca) "The Economics of Discrimination: Economists Enter the Courtroom," *American Economic Review*, vol. 77, no. 2, May 1987, 321-25.

"The Case for Evaluating Training Programs with Randomized Trials," *Economics of Education Review*, vol. 6, no. 4, 1987, 333-338.

"Arbitration and Negotiation Process," *American Economic Review*, vol. 77, no. 2, May 1987, 342-46.

(with D. Sullivan) "Nonparametric Tests of Market Structure: An Application to the Cigarette Industry," *Journal of Industrial Economics*, vol. 35, no. 4, June 1987, 483-98.

(with T. Hannan) "Sex Discrimination and Market Concentration: The Case of the Banking Industry," *Quarterly Journal of Economics*, vol. C1, Issue 1, February 1986, 149-73.

(with J. Brown) "Testing the Efficiency of Employment Contracts," *Journal of Political Economy*, vol. 94, no. 3, 1986, S40-S87.

(with D. Card) "Why Have Unemployment Rates in Canada and the United States Diverged?" *Economica*, vol. 53, 1986, S171-S195.

(with D. Card) "Using the Longitudinal Structure of Earnings to Estimate the Effect of Training Programs," *Review of Economics and Statistics*, vol. 67, no. 4, 1985, 648-60.

"Macroeconomic Analyses and Microeconomic Analyses of Labor Supply," *Carnegie-Rochester Conference Series on Public Policy*, vol. 21, 1984, 117-56.

(with D. Bloom) "Models of Arbitrator Behavior: Theory and Evidence," *American Economic Review,* vol. 74, no. 1, March 1984, 111-24.

(with D. Bloom) "The Pitfalls in Judging Arbitrator Impartiality by Win-Loss Tallies Under Final Offer Arbitration," *Labor Law Journal*, vol. 34, no. 8, August 1983, 534-39; reprinted in Proceedings of the 1983 Spring Meeting of the Industrial Relations Research Association.

"Determining Participation in Income-Tested Social Programs," *Journal of the American Statistical Association*, vol. 78, no. 383 *Evaluation Studies Review Annual*, vol. 10, 1985.September 1983, 517-25, reprinted in L. Aiken and B. Kehrer,

(with J. Abowd), "Compensating Wage and Earnings Differentials for Employer Determined Hours of Work," August, 1983.

(with R. Layard) "Incomes Policy and Wage Differentials," *Economica*, vol. 50 May 1983, 127-43.

"The Withering Away of a Full Employment Goal," *Canadian Public Policy*, vol. 9, no. 1, March 1983, 114-25.

(with D. Card) "Time-Series Representation of Economic Variables and Alternative Models of the Labor Market," *Review of Economic Studies*, vol. 49, Special Issue, 1982, 761-81; reprinted in *Foundations of Probability, Econometrics and Economic Games*, edited by Omar F. Hamouda and J. C. Rowley.

(with G. Solon) "Employment Statistics: The Interaction of Economics and Policy," The *American Economic Review*, vol. 77, no. 2, May 1982, 233-236.

(with G. Solon) "Longitudinal Labor Market Data: Sources, Uses and Limitations," in *What's Happening to American Labor Force and Productivity Measurements?*, National Council on Employment Policy, 1982; revised as Industrial Relations Section Working Paper No. 155, September 1982.

"The Economic Impact of an Older Population: A Brief Survey," in *Aging: A Challenge to Science and Society*, vol. 2 of *Medicine and Social Science*, (Oxford: Oxford University Press, 1981): 333-40.

(with J. Abowd) "Anticipated Unemployment, Temporary Layoffs, and Compensating Wage Differentials," in *Studies in Labor Markets*, edited by Sherwin Rosen, (Chicago: University of Chicago Press for the National Bureau of Economic Research, 1981), 141-70.

(with J. Altonji) "Wage Movements and the Labour Market Equilibrium Hypothesis," *Economica*, vol. 47, no. 187, August 198: 217-45.

"Commentary on Firm Size, Market Structure and Worker Satisfaction," in *The Economics of Firm Size, Market Structure and Social Performance*, edited by J. Siegfried, 1980.

"Unemployment as Disequilibrium in a Model of Aggregate Labor Supply," *Econometrica*, vol. 48, no. 3, April 1980, 217-245.

Case 5:14-cv-00305-OLG Document 68-9 Filed 11/13/15 Page 10 of 14 Page ID #:3201

"Estimating the Effect of Training Programs on Earnings," *Review of Economics and Statistics*, vol. 60, no. 1, February 1978, 47-57; reprinted in *Evaluating Manpower Training Programs*, edited by F. Bloch, 1979; and in *Evaluation Studies Review Annual*. vol. 5 edited by Stromsdorfer and Farkus, 1980.

(with J. Ham) "Education, Unemployment and Earnings," *Journal of Political Economy*, vol. 87, no. 51, October 1979, S99-S116.

(with M. Abbott) "Labour Supply, Commodity Demand, and the Allocation of Time Correction," *Review of Economic Studies*, vol. 46, July 1979, 576-79.

(with R. Smith) "Compliance with the Minimum Wage Law," *Journal of Political Economy*, vol. 87, no. 21, April 1979, 330-50.

"What Do Teenage Unemployment Statistics Measure?" Supplementary Papers from the Conference on Youth Unemployment: Its Measurement and Meaning, Washington, DC: US Government Printing Office, October 1978, 37-55.

"What Do Teenage Unemployment Statistics Measure?" Supplementary Papers from the Conference on Youth Unemployment: Its Measurement and Meaning, Washington, DC: US Government Printing Office, October 1978, 37-55.

"Current European Manpower Policies, July 1978" and "Some Highlights of Papers from the Conference on European Manpower Policies," in *European Labor Market Policies*, National Commission for Manpower Policy, Special Report No. 27, September 1978, 5-26.

"What is Involuntary Unemployment?" in *Proceedings of the American Philosophical Society*, vol. 122, no. 3 June 1978, 135-38.

Union Relative Wage Effects: New Evidence and a Survey of Their Implications for Wage Inflation," in *Econometric Contributions to Public Policy*, edited by R. Stone and W. Peterson, (New York: St. Martins Press, 1978), 31-63.

"Evaluating the Effects of the Employment Tax Credit," in Conference Report on Evaluating the 1977 Economic Stimulus Package, (Washington, DC: US Government Printing Office, 1978).

Case 1:14-cv-03050 Document 68-9 Filed 11/13/15 Page 102 of 164 PageID #:3202

"The Labor Supply Response of Wage Earners," in *Welfare in Rural Areas: North Carolina-Iowa Income Maintenance Experiment*, edited by J. Palmer and J. A. Pechman, (Washington: Brookings Institution, 1978), 109-48.

"Unemployment as a Constraint on Labor Market Behavior," in *Contemporary Economic Analysis*, edited by M. J. Artis and A. R. Nobay, (London: Croon Helm for the Association of University Teachers of Economics, 1978), 149-81.

"Demand and Supply Functions for State and Local Employment: Implications for Public Employment Programs," in *Essays in Labor Market Analysis. In Memory of Yochanan Peter Comay*, edited by O. Ashenfelter and W. Oates, (New York: John Wiley & Sons, 1978), 1-16.

"Will the Real Conventional Theory of Income Distribution Please Stand Up?" *Social Science Quarterly*, vol. 58, no. 1, June 1977, 147-50.

"Comments on 'Black/White Male Earnings and Employment," in *The Distribution of Economic Well-Being*, edited by F. T. Juster, (Cambridge, MA: Ballinger Publishing Co. for the National Bureau of Economic Research, 1977), 296-98.

(with M. Abbott) "Labour Supply, Commodity Demand, and the Allocation of Time," *Review of Economic Studies*, vol. 43, October 1976, 389-411.

Comment on "Does the Contract Compliance Program Work?" in *Industrial and Labor Relations Review*, vol. 29, no. 4, July 1976, 577-80.

(with J. Pencavel) "A Note on Measuring the Relationship Between Changes in Earnings and Changes in Wage Rates," *British Journal of Industrial Relations*, vol. 14, no. 1, March 1976, 70-76.

"Notes on the Interpretation of Urban Density Functions," *The Journal of Urban Economics*, vol. 3, January 1976, 82-87.

(with J. Heckman), "Measuring the Effect of an Antidiscrimination

Case 1:14-cv-03050-LMM Document 68-9 Filed 11/13/15 Page 104 of 164 PageID #:3203

Program," in *Evaluating the Labor Market Effects of Social Programs*, edited by O. Ashenfelter and J. Blum, (Princeton, NJ: Princeton University Press, 1976), 46-89.

(with J. Pencavel) "Estimating the Effects on Cost and Price of the Elimination of Sex Discrimination: The Case of Telephone Rates," in *Some New Perspectives on Equal Employment Opportunity: The A.T. & T. Case*, edited by Phyllis Wallace, (Cambridge, MA: MIT Press, 1976), 111-22.

(with S. Kelley) "Determinants of Participation in Presidential Elections," *Journal of Law and Economics*, vol.18, no. 3, December 1975, 695-733.

(with J. Pencavel) "Wage Changes and the Frequency of Wage Settlements," *Economica*, May 1975, 162-70.

"The Effect of Manpower Training on Earnings: Preliminary Results," Proceedings of the 27th Annual Meeting of the Industrial Relations Research Association, 1974, reprinted in *Monthly Labor Review*, April 1975.

(with R. Ehrenberg) "The Demand for Labor in the Public Sector," in *Labor in the Public and Nonprofit Sectors*, edited by D. Hamermesh, (Princeton, NJ: Princeton University Press, 1975), pp. 55-84; condensed and reprinted in *Public Sector Labor Relations: Analysis and Readings*, edited by D. Lewin, et al., (Glen Ridge, NJ: Thomas Horton and Daughters. 1977), 30-36.

"Blacks and Trade Unionism," Integrateducation, May-June 1975: 53-59; from a transcript of Hearings before the New York Commission on Human Rights, May 1974.

"Comments on 'Labor Market Discrimination: Analysis, Findings, and Problems,'" in Volume 2 of *Frontiers of Quantitative Economics*, edited by M. Intriligator and D. Kendrick, (Amsterdam: North Holland Press, 1974), 556-59.

(with J. Heckman) "The Estimation of Income and Substitution Effects in a Model of Family Labor Supply," *Econometrica*, vol. 42, no. 1, January 1974, 73-85.

Case 5:14-cv-03050-LHK Document 681-9 Filed 11/13/15 Page 105 of 164 Page ID #:3204

"Comment on 'Child Quality and the Demand for Children,'" *Journal of Political Economy*, vol. 81, no. 2, March-April 1973, pp. S96-S98; reprinted in *Economics of the Family*, edited by T. W. Schultz, 1974.

"Discrimination and Trade Unions," in *Discrimination in Labor Markets*, edited by O. Ashenfelter and A. Rees, (Princeton, NJ: Princeton University Press, 1973), 88-112; reprinted in *Readings in Labor Economics and Labor Relations*, edited by Reynolds, Masters and Moser, 1974, 432-443.

(with J. Heckman) "Estimating Labor Supply Functions," in *Income Maintenance and Labor Supply*, edited by G. Cain and H. Watts, (Madison, WI: University of Wisconsin Institute on Poverty Research, 1973, 265-78.

(with J. Pencavel) "American Trade Union Growth, 1900-1960: A Rejoiner," *Quarterly Journal of Economics,* vol. 86, no. 4, November 1972, 691-2.

(with G.E. Johnson) "Unionism, Relative Wages, and Labor Quality in U.S. Manufacturing Industries," *International Economic Review*, vol. 13, no.3, October 1972, 488-508.

"Racial Discrimination and Trade Unionism," *Journal of Political Economy*, vol. 8, no. 3, May-June 1972, 435-64.

(with G.E. Johnson and J. H. Pencavel) "Trade Unions and the Rate of Change of Money Wages in U.S. Manufacturing," *The Review of Economic Studies,* vol. 39, no. 1, January 1972, 27-54.

(with L. Godwin) "Some Evidence on the Effect of Unionism on the Average Wage of Black Workers Relative to White Workers, 1900-1967," Proceedings of the 24th Annual Winter Meeting of the Industrial Relations Research Association, 1971, 217-24.

(with M.K. Taussig) "Discrimination and Income Differentials: Comment," *American Economic Review*, vol. 61, no. 4, September 1971, 746-50.

"The Effect of Unionization on Wages in the Public Sector: The Case of Fire Fighters," *Industrial and Labor Relations Review*, vol. 24, no. 2, January 1971, 191-202.

Case 1:14-cv-03050 Document 681-9 Filed 11/13/25 Page 106 of 164 PageID #:23205

"Changes in Labor Market Discrimination Over Time," *The Journal of Human Resources*, vol. 5, no. 4, Fall 1970, 403-30.

(with J. H. Pencavel) "American Trade Union Growth," *Quarterly Journal of Economics*, vol. 83, August 1969, 434-48.

(with G.E. Johnson) "Bargaining Theory, Trade Union, and Industrial Strike Activity," *American Economic Review*, vol. 59, no. 1, March 1969, 35-49; reprinted in Bobbs-Merril Reprint Series in *Economics*.

"Some Statistical Difficulties in Using Dummy Dependent Variables," Appendix A in *The Economics of Labor Force Participation*, edited by W.G. Bowen and T.A. Finegan, (Princeton, NJ: Princeton University Press, 1969), 644-48.

(with J.D. Mooney) "Some Evidence on the Private Returns to Graduate Education," *Southern Economic Journal*, vol. 35, no. 3, January 1968, 247-56, reprinted in *Human Capital Formation and Manpower Development*, edited by R. Wykstra, 1971.

(with J.D. Mooney) "Graduate Education, Ability and Earnings," *Review of Economics and Statistics*, vol. 50, no. 1, February 1968, 78-86.

(with Wm. Pierce) "Industrial Conflict: The Power of Prediction," *Industrial and Labor Relations Review*, vol. 20, October 1966, 92-95.

BOOKS EDITED:

(with David Card) *Handbook of Labor Economics*, Volume IV A & B, (Elsevier Science, North Holland, 2010).

(with Radha Iyengar)  "Economics of Commercial Arbitration and Dispute Resolution", 2009, pp. ix-xv, An Elgar Reference Collection. Economic Approaches to Law, vol. 21. Cheltenham, U.K. and Northampton, Mass.: Elgar

(with D. Card) *Handbook of Labor Economics*, Volumes I - III, (Elsevier Science, North Holland, 1999).

*Worth Series in Outstanding Contributions: Labor Economics*, (Worth Publishing Inc., New York, NY, 1999).

(with R. LaLonde) *The Economics of Training I and II*, (Edward Elgar Publishing Limited, Cheltenham, England, 1996).

(with Kevin Hallock) *Labor Economics, Volumes I - IV*, (Edward Elgar Publishing Limited, Cheltenham, England, 1995).

| | |
|---|---|
| Volume I | -- Labor Supply and Demand |
| Volume II | -- Employment, Wages, and Education |
| Volume III | -- Unemployment, Trade Unions, and Dispute Resolution |
| Volume IV | -- Labor Market Discrimination, Labor Mobility, and Compensating Wage |

"Discussion," in *Lessons From the Income Maintenance Experiments*, edited by A. H. Munnel, (Federal Reserve Bank of Washington and Brookings Institution, 1986).

(with L. J. Bassi) "The Effect of Direct Job Creation and Training Programs on Low Skilled Workers," in *Fighting Poverty: What Works and What Doesn't*, S. H. Danzinger and D. H. Weinberg, (Cambridge, MA: Harvard University Press, 1986), 133-51.

(with R. Layard) *Handbook of Labor Economics*, 2 Volumes, (Amsterdam: North Holland Press, 1986). Translated to Spanish.

(with W. Oates) *Essays in Labor Market Analysis*. *In Memory of Yochanan Peter Comay*. (New York: John Wiley & Sons for Halsted Press, 1978).

(with L. Hausman, B. Rustin, R. Schubert and D. Slaiman) *Equal Rights and Industrial Relations*. (Industrial Relations Research Association, 1977).

(with J. Blum) *Evaluating the Labor Market Effects of Social Programs*. (Princeton, NJ: Princeton University Industrial Relations Section, 1976).

 (with W.G. Bowen) *Labor and the National Economy*. Revised edition, (New York: W.W. Norton, 1975).

(with A. Rees) *Discrimination in Labor Markets*. (Princeton, NJ: Princeton University Press).

BOOKS REVIEWED:

"Economic history or history of economics?" *Review of Grand Pursuit: The Story of Economic Genius*, Center for Economic Policy Studies, Working Papers: 1365. *Journal of Economic Literature*, March 2012, 50(1), 96-102.

Review of *Last Call: The Rise and Fall of Prohibition* by Daniel Okrent, *Journal of Wine Economics*, Volume 5, Issue 2, Pages 339–347. Also Barron's October 4, 2010, 90(40), 40-40.

Review  of *In Search of Bacchus* by George M. Taber, *Barron's* October 5, 2009, 89(40), 40-40.

Review of *The Billionaire's Vinega*r by Benjamin Wallace, *Barron's* July 7, 2008.

Review of *Wine into Words: A History and Bibliography of Wine Books in the English Language* by James M. Gabler, *Journal of Wine Economics*, vol. 2, no. 2, (Fall 2007), 213-225

Review of *Judgment of Paris* by George Taber, *Barron's* September 5, 2005.

Review of *Hollywood Economics* by Arthur DeVany. *Barron's* December 6, 2004.

Review of *The Far Side of Eden* by James Conaway. *Barron's* May 11, 2003.

Review of *The Future of Success* by Robert B. Reich. *Financial Times* (London), February 27, 2001.

Case 5:14-cv-03050-LHK Document 681-9 Filed 11/13/15 Page 109 of 164 Page ID #:3208

Review of *The National Supported Work Demonstration* by R. Hollister, et al. *Journal of Economic Literature*, 24 (September 1986), 1268-70.

Review of *Dangerous Currents* by L. Thurow. *National Review* (April 6, 1984), 53-55.

Review of *Jobs for Disadvantaged Workers: The Economics of Employment Subsidies* by R. Haveman and J.L. Palmer. *Journal of Economic Literature*, 21 (September 1983), 1039-41.

Review of *Collective Bargaining and Industrial Relations* by T.A. Kochan. *Industrial Relations*, 21, (Winter 1982), 73-78.

Review of *The Regulatory Process and Labor Earnings* by R. Ehrenberg. *Journal of Political Economy*, 89, (June 1981), 601-03.

Review of *Union Growth and the Business Cycle* by G.S. Bain and F. Elsheikh. *Economica*, 45, (August 1978), 319-320.

Review of *Economic Forecasting* by H. O. Stekler. *Journal of Finance*, 26, (June 1971), 816-17.

Review of *Still a Dream: The Changing Status of Blacks Since 1960* by Sar Levitan, et al. *Monthly Labor Review*, 98 (December 1975), 66-67.

Review of *Patterns of Racial Discrimination* by G. von Furstenburg, et al. *Journal of Economic Literature* (December 1975), 1372-74.

UNPUBLISHED PAPERS:

(with K. Storchmann) "Wine and Climate Change"

AAWE working paper No. 152, Economics, March 2014.

(with K. Graddy) "Regularities and Anomalies in Art Auctions" March 2003.

(with K. Graddy and M. Stevens) "A Study of Sale Rates and Prices in Impressionist and Contemporary Art Auctions," October, 2000.

(with S. Jurajda) "Cross-Country Comparisons of Wage Rates: The Big Mac Index," August 2000.

(with C. Rouse) "The Payoff to Education," August 1999.

(with N. Thurston) "Mink Markets: Price Determination, Pre-Sale Valuation and Seller-Specific Effects," Instituto y Universidad Torcuato Di Tella Seminar, September 1998.

(with P. B. Levine and S. Skeath) "Practicing Safe Game Theory: An Empirical Test of a Prisoners' Dilemma in Unemployment Insurance Disputes," July 1998.

(with D. Ashmore, J.B. Baker and S. M. McKernan) "Identifying The Firm-Specific Cost Pass-Through Rate," Federal Trade Commission, Bureau of Economics, Working Paper No. 217.

(with A. Papandreou and N. Papandreou) "Weather and the Quality of the Vintage for Greek Red Wines," October, 1997.

"The Hedonic Approach to Vineyard Site Selection," September, 1997.

(with K. Graddy) "An Empirical Study of Sale Rates and Prices in Impressionist and Contemporary Art Auctions," August, 1997.

(with J. Dow, D. Gallagher and D. Hyslop) "Arbitrator and Negotiator Behavior Under an Appellate System," August 1997.

(with C. Rouse) "How Convincing Is The Evidence Linking Education and Income?" October, 1995.

(with J. Waldfogel) "Bargaining in the Shadow of the Judge: Empirical Tests," Prepared for the American Association of the Advancement of Science, Boston, February 11-16, 1993.

(with J. Abowd) "Art Auctions: Price Indexes and Sale Rates for Impressionist Paintings," January 1988.

(with D. Card) "Using Longitudinal Data to Estimate Reemployment Effects of the Minimum Wage," Draft, (May, 1981).

"Minority Employment Patterns" 1966, Prepared for the U.S. Equal Employment Opportunity Commission and OMPER of the Department of Labor.

TESTIMONY BEFORE CONGRESS:

Hearings before the Committee on the Budget, House of Representatives, "Outlook and Budget Levels for FY 1979-80," 96th Congress: 645-659.

Case 1:14-cv-03040-LMM   Document 681-9   Filed 11/13/25   Page 110 of 164   Page ID #:3211

OTHER ACTIVITIES:

Member, URB Institutional Review Panel for Human Subjects Committee, July, 2007.

Selection Committee, Frisch Medal, 2004.

President, Society of Labor Economists, 2003.

Chairman, Frisch Medal Selection Committee, 2003

Advisory Committee of the Center for Arts and Cultural Policy Studies, Princeton University, 2002-

First Vice President, The Society of Labor Economists, 2002.

Associate Editor, *Journal of Population Economics*, 2001-

Member, Executive and Supervisory Committee, CERGE/EI, Charles University, Prague, Czech Republic, 2001- 2007.

Advisory, Job Opportunity Index National Advisory Board, 2001 – 2003.

Second Vice President, The Society of Labor Economists, 2001

Member, Editorial Board, *Contemporary Economic Policy*, 2000- 2001.

Member, Advisory Board, Stanford Institute for Economic Policy Research, 1999 -

Member, Center for Law and Public Affairs, 1999 -

Board Member, American Foundation for the Center for Graduate Education/Economics Institute of the Charles

University, Prague, Czech Republic, 1999 –
Chairman, 1999-2006.

Member, Board of Editors, *Australian Economic
Review*
1997 -

Member, Board of Trustees, Center for Advanced Study
in the Behavioral Sciences, Stanford University, 1994-
2000.

Member, Committee on Fellowships and Special
Projects, Center for Advanced Study in the Behavioral
Sciences, Stanford University, 1994-2000.

Member, Board of Directors, American Law and
Economics Association, 1994 – 1996.

Faculty Member, Law and Economics Center, George
Mason University, Advanced Course for Federal Judges
on Statistics, Econometrics, and Financial Data, 1979-

Faculty Member, Law and Economics Center, George
Mason University, Economics Institute for Federal
Judges, 1982 -

Faculty Member, "Statistics and Expert Testimony,"
The Federal Judicial Center, 1985.

Faculty Member, "Economics and Expert Testimony,"
The Federal Judicial Center, 1984.

Benjamin Meeker Visiting Professor, University of
Bristol, 1981.

Visiting Scholar, Federal Reserve Bank of Philadelphia,
1979-80.

Recipient of the Ragnar Frisch Prize of the Econometric
Society, 1984.

Member, Board of Editors, *Journal of Labor Economics*, 1983-2008

Member, Board of Editors, *Pakistan Development Review*, 1981-1985.

Member, Board of Editors, *Journal of Labor Research*, 1980-89.

Member, Board of Editors, *Journal of Urban Economics*, 1974-1978.

Member, Advisory Board, *Ricerche Economiche: An International Review of Economics*, 1992 – 1993.

Member, Advisory Board, *Labour Economics: An International Journal*, 1992-1997.

Member, Advisory Council of the Cornell Institute for Labor Market Policies, 1991- 2000.

Member, Advisory Board, Center for Economic Policy Research, Stanford University, 1984-1999.

Member, Executive Committee, Conference on Research in Income and Wealth, National Bureau of Economic Research, 1982-1989.

Member, Macro Advisory Panel, National Commission for Employment Policy, 1980-81.

Member, Advisory Board, Institute of Labor Management Relations, Rutgers University, 1979-2001.

Member, Advisory Panel of the American Economic Association to the National Commission on Employment and Unemployment Statistics, 1978-81.

Member, Panel of Statisticians for the National Commission on Employment and Unemployment Statistics, 1977-81.

Fellow, Econometric Society, 1977.

Guggenheim Fellowship, 1976-77.

Orley C. Ashenfelter
Sworn Testimony in the Past Four Years                                    January 20, 2016

Corey R. Shanus v. Robert Edward Auctions, LLC and Robert Lifson

Testimony:      Statistical analysis of the effect of alleged auction fraud on the prices of
                items of baseball memorabilia.

Jurisdiction:   District of New Jersey

Caption:        2:11-cv-2839-DMC-JAD

Retained by:    Counsel for Corey Shanus

Deposition:     May 2015


Certain Lightweight Thermal Paper from China and Germany

Testimony:      Statistical analysis of the effect of revocation of the antidumping order
                against imports of German lightweight thermal paper on U.S. prices

Jurisdiction:   United States International Trade Commission

Caption:        Inv. Nos. 701-TA-451 and 731-TA-1126-1127 (Review)

Retained by:    Papierfabrik August Koehler SE

Hearing:        October 2014


In Re: Polyurethane Foam Antitrust Litigation

Testimony:      Statistical analysis of the effect of an alleged conspiracy on prices in the
                market for flexible polyurethane foam.

Jurisdiction:   Northern District of Ohio

Caption:        10 MD 2196

Retained by:    A group of direct-action plaintiffs

Depositions:    April 2014; December 2014

In Re: Petition of Pandora Media, Inc., Related to United States of America v. American Society of Authors and Composers ("ASCAP")

Testimony: Statistical analysis of the levels of music use on Pandora Media and commercial radio.

Jurisdiction: Southern District of New York

Caption: 12 Civ. 8035 (DLC) (MHD)

Retained by: ASCAP

Deposition: November 2013

Trial: January 2013

In Re: Electronic Books Antitrust Litigation

Testimony: Statistical analysis of the effect of an alleged conspiracy on prices and quantities sold in the market for e-books.

Jurisdiction: Southern District of New York

Caption: 12 CV 03394 (DLC)

Retained by: Plaintiff states

Deposition: March 2013

Trial: June 2013

**APPENDIX B: Documents Relied Upon**

Complaint
In Re Animation Workers Antitrust Litigation, Second Consolidated Amended Class
Action Complaint, May 15, 2015.

Deposition Transcripts
Deposition of George Lucas, March 28, 2013.
Deposition of Edward Catmull January 24, 2013.
Deposition of Jim Morris, August 3, 2012.
Deposition of Stephanie Sheehy, March 5, 2013.
Deposition of Lori McAdams, August 2, 2012.
Deposition of Sharon Coker, November 1, 2012.
Deposition of Michelle Maupin, February 12, 2013.
30(b)(6) Deposition of the Croner Company, January 12, 2016.

Bates-Stamped Documents

231APPLE098786
BSKY-AWAL000287
BSKY-AWAL000352
BSKY-AWAL000369
BSKY-AWAL000464
BSKY-AWAL009544
BSKY-AWAL094200
BSKY-AWAL098819
BSKY001530
BSKY001897
BSKY001922
BSKY002570
BSKY002834
BSKY003619
BSKY003621
CRO00047
CRO00144
CRO00521
CRO00628
CRO01247
CRO01448
CRO02038
CRO02395
CRO04227
CRO05064
CRO06258
CRO09276
CRO11689

DISNEY_AWAL_00000524
DISNEY_AWAL_00000870
DISNEY_AWAL_00000932
DISNEY_AWAL_00002085
DISNEY_AWAL_00002165
DISNEY_AWAL_00002980
DISNEY_AWAL_00003097
DISNEY_AWAL_00003128
DISNEY_AWAL_00003754
DISNEY_AWAL_00004367
DWA-VFX-0000096
DWA-VFX-0000127
DWA-VFX-0000151
DWA-VFX-0001305
DWA-VFX-0001326
DWA-VFX-0001362
DWA-VFX-0022977
DWA-VFX-0022986
DWA-VFX-0023010
DWA-VFX-0023022
DWA-VFX-0023023
DWA-VFX-0025039
DWA-VFX-0025390
DWA-VFX-0026081
DWA-VFX-0026166
DWA-VFX-0026298
DWA-VFX-0027478

Contains Confidential and Attorneys' Eyes Only Materials

DWA-VFX-0084957
DWA-VFX-0085004
DWA-VFX-0085579
DWA-VFX-0089010
DWA-VFX-0089258
DWA-VFX-0089276
DWA-VFX-0090184
DWA-VFX-0093913
DWA-VFX-0115880
DWA-VFX-0164499
DWA-VFX-0232789
DWA-VFX-0243235
IMD_AWAL_00002460
IMD_AWAL_00002600
IMD_AWAL_00006760
IMD_AWAL_00000061
LUCAS_AWAL_00013152
LUCAS_AWAL_00002301
LUCAS_AWAL_00003635
LUCAS_AWAL_00009454
LUCAS_AWAL_00013526
LUCAS_AWAL_00014008
LUCAS_AWAL_00024899
LUCAS_AWAL_00024957
LUCAS_AWAL_00025017
LUCAS_AWAL_00036012
LUCAS_AWAL_00041751
LUCAS_AWAL_00061411
LUCAS_AWAL_00061450
LUCAS_AWAL_00062208
LUCAS_AWAL_00071603
LUCAS_AWAL_00075972
LUCAS_AWAL_00143757
LUCAS_AWAL_00178361
LUCAS_AWAL_00186410
LUCAS_AWAL_00193338
LUCAS_AWAL_00215265
LUCAS_AWAL_00216169
LUCAS_AWAL_00217551
LUCAS_AWAL_00225911
LUCAS_AWAL_00227602
LUCAS_AWAL_00231285
LUCAS_AWAL_00215265

LUCAS_AWAL_00215826
PIXAR_AWAL_00000230
PIXAR_AWAL_00000968
PIXAR_AWAL_00001153
PIXAR_AWAL_00001299
PIXAR_AWAL_00001393
PIXAR_AWAL_00001958
PIXAR_AWAL_00002050
PIXAR_AWAL_00003781
PIXAR_AWAL_00006091
PIXAR_AWAL_00006097
PIXAR_AWAL_00006023
PIXAR_AWAL_00014050
PIXAR_AWAL_00015289
PIXAR_AWAL_00015291
PIXAR_AWAL_00021874
PIXAR_AWAL_00022311
PIXAR_AWAL_00022590
PIXAR_AWAL_00054594
PIXAR_AWAL_00055206
PIXAR_AWAL_00061998
PIXAR_AWAL_00080017
PIXAR_AWAL_00093297
PIXAR_AWAL_00097257
PIXAR_AWAL_00097762
PIXAR_AWAL_00097786
PIXAR_AWAL_00097923
PIXAR_AWAL_00097934
PIXAR_AWAL_00097937
PIXAR_AWAL_00098514
PIXAR_AWAL_00100149
PIXAR_AWAL_00100152
PIXAR_AWAL_00100174
PIXAR_AWAL_00100182
PIXAR_AWAL_00102340
PIXAR_AWAL_00102768
SONY259
SONY333
SP_AWAL_0000618
SP_AWAL_0069672
SP_AWAL_0097616
SP_AWAL_0104127
SP_AWAL_0196870
SP_AWAL_0222301

Contains Confidential and Attorneys' Eyes Only Materials          2

SP_AWAL_0222302

Websites

http://www.bloomberg.com/news/articles/2010-12-21/pixar-lucasfilm-to-end-no-call-policies-u-s-says-update1-

http://blueskystudios.com/working-here/tour-studio/

http://blueskystudios.com/our-story/

http://www.dreamworksanimation.com/company/

https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade

http://www.hollywoodreporter.com/behind-screen/revealing-rhythm-hues-life-pi-682526

http://www.ilm.com/archive/

http://www.imageworks.com/about.php

http://lucasfilm.com/our-story

http://www.nytimes.com/2009/06/04/technology/companies/04trust.html

http://www.pixar.com/features_films

http://www.pixar.com/about/Our-Story

http://www.pixar.com/about/Welcome

http://www.reuters.com/article/us-disney-idUSTRE6294LU20100313

http://www.sonypicturesanimation.com/about.php

http://www.sonypicturesanimation.com/pastfilms.php

http://waltdisneystudios.com/corp/about

Contains Confidential and Attorneys' Eyes Only Materials

3

Academic Literature

Alchian, Armen, "Information Costs, Pricing, and Resource Unemployment." Western Economic Journal. (1969) pp 109-128

Stigler, George, "The Economics of Information" *Journal of Political Economy*. Volume LXIX, No. 3 (June 1961) pp 213-225.

Stiglitz, Joseph, "Information and the Change in the Paradigm in Economics." *American Economic Review*. Vol 92, No 3 (June 2002) pp 460-501.

O'Hara, Maureen, "Presidential Address: Liquidity and Price Discovery" *Journal of Finance*. Volume LVIII, No. 4 (August 2003). pp 1335-1358.


Other

Department of Justice and Federal Trade Commission. Statements of Antitrust Enforcement Policy in Healthcare. (1996)

Complaint, No. 1:10-cv-02220-RBW


Data Files and Data-Related Correspondence

12/15/2015 letter from Kathryn Cahoy to Shana Scarlett
11/18/2015 letter from Kathryn Cahoy to Shana Scarlett
9/30/2015 letter from Kathryn Cahoy to Shana Scarlett
11/3/2015 letter from Kathryn Cahoy to Shana Scarlett
10/27/2015 letter from Kathryn Cahoy to Shana Scarlett
7/31/2015 letter from Kathryn Cahoy to Ashley Bede
7/17/2015 letter from Kathryn Cahoy to Ashley Bede
8/11/2015 letter from Kathryn Cahoy to Ashley Bede
7/31/2015 letter from Kathryn Cahoy to Ashley Bede
7/27/2015 letter from Ashley Bede to Emily Henn
7/17/2015 letter from Kathryn Cahoy to Ashley Bede
7/6/2015 letter from Ashley Bede to Emily Henn
7/30/2015 letter from Kathryn Cahoy to Jeff Friedman
9/28/2015 letter from Kathryn Cahoy to Shana Scarlett
08-03-15 Friedman - Cahoy enclosing Pixar Production PIXAR_AWAL_00096831....pdf
08-03-15 Friedman - Cahoy enclosing Pixar Production PIXAR_AWAL_00096831-
    96940 (4).PDF
09-08-15 Scarlett - Cahoy enclosing Pixar and Disney productions (2).PDF
09-18-15 Johnson - Jasilli enclosing Blue Sky Production (BSKY-AWAL 000049 -
    BSKY-AWAL 000052).PDF
09-22-15 Scarlett - Cahoy re FTP Transfer of Disney, IMD and Pixar productions.PDF
09-30-15 Johnson - Rugani - Sony database production SONY-DB-000001-0000....pdf
114527_008_DreamWorks_BMK.pdf
2001-Annual-Report.pdf

Contains Confidential and Attorneys' Eyes Only Materials      4

2002-Annual-Report.pdf
2003-Annual-Report.pdf
2005_DreamWorks_AR.pdf
2009-Annual-Report.pdf
2010-Annual-Report.pdf
2011-Annual-Report.pdf
2012-Annual-Report.pdf
2013-Annual-Report.pdf
2015.07.09 - Peoplesoft - Leave Time Accrual Balance (REDACTED).pdf
2015.07.09 - Peoplesoft- Benefits (REDACTED).pdf
2015.08.05 - PeopleSoft Personal Info Data Map.PDF
2015.08.05 - PeopleSoft Screenshot Field Lists.xlsx
2015.08.05 - Taleo Field List.xlsx
2015.09.18 - Blue Sky PS Data (Export Notes).xlsx
2015.09.30_Letter to S. Scarlett.pdf
2015.10.22 - Blue Sky Ltr. re BSKY-AWAL 003 - Follow-Up Questions.pdf
2015.10.24 - Rugani Letter to Johnson.pdf
2015.10.27_K. Cahoy Letter to S. Scarlett.pdf
2015.11.03 Letter to S. Scarlett re Lucasfilm Data.pdf
2015.11.04 - P. Rugani Letter to B. Johnson re Databases.pdf
2015.11.06 Letter to S. Scarlett re Disney, IMD Data Questions (confiden....pdf
2015.11.16 Blue Sky Ltr. re BSKY-AWAL 003 - Follow-Up Questions.pdf
2015.11.16 Letter to S. Scarlett re Pixar Data Questions.pdf
2015.11.18 Letter to S. Scarlett re Disney Data Questions.pdf
2015.11.18 Letter to S. Scarlett re Lucasfilm Data Questions.pdf
2015.11.20 K. Cahoy Letter to S. Scarlett re Production.pdf
2015.11.24 Blue Sky Production Letter (BSKY-AWAL 011).pdf
2015.12.04 Letter from K. Cahoy to S. Scarlett.pdf
2015.12.15 Cahoy Letter to S. Scarlett re Lucasfilm Data Questions.pdf
2015-11-09 Animators---Second Questions on DreamWorks Data Production (3).pdf
2016.01.08 - Letter to B. Johnson re Data Questions.pdf
2016.01.16 - Letter to B. Johnson re Data Questions.pdf
2016-01-12 Croner 30b6.pdf
7.27.15 - Bede to Henn re Meet and Confer.pdf
7.6.15 - Bede to Cahoy re Data Fields.pdf
Animation Re Sony Data M&C Follow-up.pdf
ar_2004.pdf
ar_2005.pdf
AWAL - Att. 1 to Cahoy Letter to A. Bede 2015.07.23.pdf
AWAL - Att. 2 to Cahoy Letter to A. Bede 2015.07.23.pdf
AWAL - Letter to A  Bede  7 17 2015.pdf
AWAL - Letter to A  Bede in response to August 5 email  8 11 2015.pdf
AWAL - Letter to A  Bede re HR Data 2015 06 11.pdf
AWAL - Letter to A  Bede re July 24 Meet and Confer  7 31 2015.pdf
AWAL - Letter to A  Bede re Pixar, Lucasfilm Custodians  7 31 2015.pdf
AWAL - Letter to A. Bede 2015.07.23.pdf

Contains Confidential and Attorneys' Eyes Only Materials

BlackScholes-1.xls (https://www3.nd.edu/~scorwin/fin40610/BlackScholes.xls)
boxofficemojo.com
BSKY-AWAL 000049.xlsx
BSKY-AWAL 000050.xlsx
BSKY-AWAL 000051.001.xlsx
BSKY-AWAL 000051.002.xlsx
BSKY-AWAL 000051.xlsx
BSKY-AWAL 000052.xlsx
Copy of GDP.xls (http://www.bea.gov/)
CRO00012-CRO00046.pdf
CRO00047-CRO00141.pdf
CRO00143-CRO 00143.xls
CRO00144-CRO00401.pdf
CRO00402-CRO 00402.xls
CRO00403-CRO 00403.xls
CRO00404-CRO 00404.xls
CRO00420-CRO 00420.xls
CRO00421-CRO 00421.xls
CRO00422-CRO 00422.xls
CRO00423-CRO 00423.xls
CRO00424-CRO 00424.xls
CRO00445-CRO00520.pdf
CRO00521-CRO00626.pdf
CRO00628-CRO00927.pdf
CRO00928-CRO 00928.xls
CRO01121-CRO 01121.xls
CRO01138-CRO 01138.xls
CRO01155-CRO 01155.xls
CRO01162-CRO 01162.xls
CRO01179-CRO 01179.xls
CRO01196-CRO 01196.xls
CRO01197 password.txt
CRO01197-CRO 01197.xls
CRO01214-CRO 01214.xls
CRO01221-CRO 01221.xls
CRO01247-CRO01316.pdf
CRO01329-CRO01447.pdf
CRO01448-CRO02037.pdf
CRO02038-CRO 02038.xls
CRO02040-CRO 02040.xls
CRO02053-CRO 02053.xls
CRO02066-CRO 02066.xls
CRO02079-CRO 02079.xls
CRO02092-CRO 02092.xls
CRO02105-CRO 02105.xls
CRO02118-CRO 02118.xls

CRO02131-CRO 02131.xlsx
CRO02152-CRO02240.pdf
CRO02277-CRO02393.pdf
CRO02394-CRO 02394.xls
CRO02395-CRO02897.pdf
CRO03898-CRO 03898.xls
CRO03914-CRO03914.pdf
CRO03931-CRO 03931.xls
CRO03947-CRO 03947.xls
CRO03963-CRO 03963.xls
CRO03979-CRO 03979.xlsx
CRO04005-CRO04091.pdf
CRO04103-CRO04225.pdf
CRO04226-CRO 04226.xls
CRO04227-CRO04706.pdf
CRO04707-CRO 04707.xlsx
CRO04730-CRO 04730.xlsx
CRO04731-CRO 04731.xlsx
CRO04743-CRO 04743.xlsx
CRO04755-CRO 04755.xlsx
CRO04767-CRO 04767.xlsx
CRO04779-CRO 04779.xlsx
CRO04829-CRO04920.pdf
CRO04939-CRO05062.pdf
CRO05063-CRO 05063.xlsx
CRO05064-CRO05451.pdf
CRO05841-CRO 05841.xlsx
CRO05860-CRO 05860.xlsx
CRO05879-CRO 05879.xlsx
CRO05898-CRO 05898.xlsx
CRO05917-CRO 05917.xlsx
CRO05937-CRO 05937.xlsx
CRO05938-CRO 05938.xlsx
CRO05957-CRO 05957.xlsx
CRO06045-CRO06133.pdf
CRO06135-CRO06256.pdf
CRO06257-CRO 06257.xlsx
CRO06258-CRO06643.pdf
CRO07414-CRO 07414.xlsx
CRO07415-CRO 07415.xlsx
CRO07416-CRO 07416.xlsx
CRO07418-CRO 07418.xlsx
CRO07420-CRO 07420.xlsx
CRO07422-CRO 07422.xlsx
CRO07423-CRO 07423.xlsx
CRO07424-CRO 07424.xlsx

CRO07475-CRO07581.pdf
CRO07583-CRO 07583.xlsx
CRO07584-CRO07977.pdf
CRO08750-CRO 08750.xlsx
CRO08751-CRO 08751.xlsx
CRO08752-CRO 08752.xlsx
CRO08753-CRO 08753.xlsx
CRO08754-CRO 08754.xlsx
CRO08755-CRO 08755.xlsx
CRO08756-CRO 08756.xlsx
Database Sample #1.pdf
Database Sample #2.pdf
Database Sample #3.pdf
Database Sample #4.pdf
Database Sample #5.pdf
Database Sample #6.pdf
Database Sample #7.pdf
DISNEY_AWAL_00000489.xlsx
DISNEY_AWAL_00000490.xlsx
DISNEY_AWAL_00000491.xlsx
Dreamworks_2013_Annual_Report.pdf
DWA_07AR.pdf
DWA_2011_Annual_Report.pdf
DWA_2012_Annual_Report.pdf
DWA2008AR.pdf
DWA2009AR.pdf
DWA-VFX-0005098_2001 DWA
    Paytype_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xlsx
DWA-VFX-0005099_2002 DWA
    Paytype_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xlsx
DWA-VFX-0005100_2003 DWA
    Paytype_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xlsx
DWA-VFX-0005101_2004 DWA
    paytype_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005102_2005 DWA
    paytype_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005103_2006 DWA
    paytype_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005104_2007 DWA
    paytype_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005105_2008 DWA paytype EP
    original_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005106_2009 DWA paytype EP
    original_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005107_2010 DWA paytype EP
    original_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls

DWA-VFX-0005108_2011 DWA paytype EP
  original_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xlsx
DWA-VFX-0005109_2012 DWA paytype EP
  original_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xlsx
DWA-VFX-0005110_2013 DWA paytype EP
  original_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xlsx
DWA-VFX-0005111_2014 DWA paytype EP
  original_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xlsx
DWA-VFX-0005112_2015 DWA paytype thru
  150828_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xlsx
DWA-VFX-0005116_HR Data Dump, Address, 9-3-
  2015_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005117_HR Data Dump, Assignment, 9-3-2015, part
  1_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005118_HR Data Dump, Assignment, 9-3-2015, part
  2_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005119_HR Data Dump, Person, 9-3-
  2015_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005120_HR Data Dump, Salary 9-3-
  2015_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005123_PERCS Contracts 2001 and later (Headers) 9-10-
  2015_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005125_PERCS Contracts 2001 and later (Terms) 9-10-
  2015_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-0005126_Prodagio Dump (dwa_emp_contract_master) 9-9-
  2015_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.csv
DWA-VFX-0005127_Prodagio Dump (dwa_ind_contract_master) 9-9-
  2015_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.csv
DWA-VFX-
  0163179_CERIDIAN_PAYROLL_DATA_01JAN2004_31DEC2007_CONFIDENTI
  AL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-
  0163180_CERIDIAN_PAYROLL_DATA_01JAN2008_31DEC2010_CONFIDENTI
  AL_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-
  0163181_ORACLE_PAYROLL_DATA_01JAN2010_31DEC2010_CONFIDENTIA
  L_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-
  0163182_ORACLE_PAYROLL_DATA_01JAN2011_31DEC2013_CONFIDENTIA
  L_ATTORNEYS_EYES_ONLY.xls
DWA-VFX-
  0163183_awards_DWA_288081_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.c
  sv
DWA-VFX-0163184_Copy of FAS Superset - File layouts
  (2)_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xls

DWA-VFX-
    0163185_parts_DWA_288081_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.csv
DWA-VFX-0341568_DWA Paytype 2007 new style
    (1)_CONFIDENTIAL_ATTORNEYS_EYES_ONLY.xlsx
ECM Reason List.pdf
Email from Mader, Shannon to Talge, Jordan on 01-12-2016 10-11PM.msg
Email from Mader, Shannon to Talge, Jordan on 01-12-2016 1-28PM.msg
Email from Mader, Shannon to Talge, Jordan on 01-14-2016 1-52PM.msg
Email from Mader, Shannon to Talge, Jordan on 01-19-2016 10-48PM.msg
Email from Mader, Shannon to Talge, Jordan on 10-26-2015 6-39PM.msg
Email from Mader, Shannon to Talge, Jordan on 10-29-2015 11-20PM.msg
Email from Mader, Shannon to Talge, Jordan on 10-30-2015 2-23PM.msg
Email from Mader, Shannon to Talge, Jordan on 10-30-2015 4-30PM.msg
Email from Mader, Shannon to Talge, Jordan on 11-03-2015 4-28PM.msg
Email from Mader, Shannon to Talge, Jordan on 12-19-2015 5-24PM.msg
Email from Mader, Shannon to Talge, Jordan on 12-19-2015 7-24PM.msg
Email from Rugani, Paul F. to Johnson, Brent on 1/27/2016 at 7:39PM
Ex 1 to Cahoy letter of 2015.08.11.pdf
fredgraph.xls (https://research.stlouisfed.org/fred2)
fredgraph_cpi.xls (https://research.stlouisfed.org/fred2)
hashed SSN of named plaintiffs.txt
High Tech Bates Equivalency Chart.docx
HRIS - Action Reason Table.pdf
https://en.wikipedia.org/wiki/Blue_Sky_Studios
https://en.wikipedia.org/wiki/DreamWorks_Animation
https://en.wikipedia.org/wiki/ImageMovers
https://en.wikipedia.org/wiki/List_of_Pixar_films
https://en.wikipedia.org/wiki/Lucasfilm
LUCAS_AWAL_00216476-LUCAS_AWAL_00216480.pdf
LUCAS_AWAL_00224811.xlsx
LUCAS_AWAL_00224812.xlsx
LUCAS_AWAL_00224813.xlsx
LUCAS_AWAL_00224814.xlsx
LUCAS_AWAL_00224815.xlsx
LUCAS_AWAL_00224816.xlsx
LUCAS_AWAL_00224817.xlsx
LUCAS_AWAL_00224822.xlsx
LUCAS_AWAL_00224823.xlsx
LUCAS_AWAL_00224824.xlsx
LUCAS_AWAL_00224825.xlsx
LUCAS_AWAL_00224826.xlsx
LUCAS_AWAL_00224827.xlsx
LUCAS_AWAL_00224828.xlsx
LUCAS_AWAL_00224829.xlsx
LUCAS_AWAL_00224830.xlsx
LUCAS_AWAL_00224831.xlsx

LUCAS_AWAL_00224832.xlsx
LUCAS_AWAL_00224833.xlsx
LUCAS_AWAL_00224834.xlsx
LUCAS_AWAL_00224835.xlsx
LUCAS_AWAL_00224836.xlsx
LUCAS_AWAL_00224842.xlsx
LUCAS_AWAL_00224843.xlsx
LUCAS_AWAL_00224844.xlsx
LUCAS_AWAL_00224845.xlsx
LUCAS_AWAL_00224846.xlsx
LUCAS_AWAL_00224847.xlsx
LUCAS_AWAL_00224848.xlsx
LUCAS_AWAL_00224849.xlsx
LUCAS_AWAL_00224859.xlsx
LUCAS_AWAL_00224860.xlsx
LUCAS_AWAL_00224861.xlsx
LUCAS_AWAL_00224862.xlsx
LUCAS_AWAL_00224863.xlsx
LUCAS_AWAL_00224864.xlsx
LUCAS_AWAL_00224865.xlsx
LUCAS_AWAL_00224866.xlsx
LUCAS_AWAL_00224867.xlsx
LUCAS_AWAL_00224868.xlsx
LUCAS_AWAL_00224869.xlsx
LUCAS_AWAL_00224870.xlsx
LUCAS_AWAL_00224871.xlsx
LUCAS_AWAL_00224872.xlsx
LUCAS_AWAL_00224873.xlsx
LUCAS_AWAL_00224874.xlsx
LUCAS_AWAL_00224875.xlsx
LUCAS_AWAL_00224876.xlsx
LUCAS_AWAL_00224877.xlsx
LUCAS_AWAL_00224878.xlsx
LUCAS_AWAL_00224879.xlsx
LUCAS_AWAL_00224880.xlsx
LUCAS_AWAL_00224881.xlsx
LUCAS_AWAL_00224882.xlsx
LUCAS_AWAL_00224883.xlsx
LUCAS_AWAL_00224884.xlsx
LUCAS_AWAL_00224885.xlsx
LUCAS_AWAL_00224886.xlsx
LUCAS_AWAL_00224887.xlsx
LUCAS_AWAL_00224888.xlsx
LUCAS_AWAL_00224889.xlsx
LUCAS_AWAL_00224890.xlsx
LUCAS_AWAL_00224891.xlsx

Contains Confidential and Attorneys' Eyes Only Materials                    11

LUCAS_AWAL_00224892.xlsx
LUCAS_AWAL_00224893.xlsx
LUCAS_AWAL_00231358.xlsx
LUCAS_AWAL_00231359.xlsx
LUCAS_AWAL_00231360.xlsx
LUCAS_AWAL_00231361.xlsx
LUCAS_AWAL_00231362.xlsx
LUCAS_AWAL_00231363.xlsx
LUCAS_AWAL_00231364.xlsx
LUCAS_AWAL_00231365.xlsx
LUCAS_AWAL_00231366.xlsx
LUCAS_AWAL_00231367.xlsx
LUCAS_AWAL_00231368.xlsx
LUCAS_AWAL_00231369.xlsx
LUCAS_AWAL_00231370.xlsx
LUCAS_AWAL_00231371.xlsx
LUCAS_AWAL_00231372.xlsx
LUCAS_AWAL_00231373.xlsx
LUCAS_AWAL_00231374.xlsx
LUCAS_AWAL_00231375.xlsx
LUCAS_AWAL_00231376.xlsx
LUCAS_AWAL_00231377.xlsx
LUCAS_AWAL_00231378.xlsx
LUCAS_AWAL_00231379.xlsx
LUCAS_AWAL_00231380.xlsx
LUCAS_AWAL_00231381.xlsx
LUCAS_AWAL_00231382.xlsx
LUCAS_AWAL_00231383.xlsx
LUCAS_AWAL_00231384.xlsx
LUCAS_AWAL_00231385.xlsx
LUCAS_AWAL_00231386.xlsx
LUCAS_AWAL_00231387.xlsx
LUCAS_AWAL_00231388.xlsx
LUCAS_AWAL_00231389.xlsx
LUCAS_AWAL_00231390.xlsx
LUCAS_AWAL_00231391.xlsx
LUCAS_AWAL_00231392.xlsx
LUCAS_AWAL_00231393.xlsx
LUCAS_AWAL_00231394.xlsx
LUCAS_AWAL_00231395.xlsx
LUCAS_AWAL_00231396.xlsx
LUCAS_AWAL_00231397.xlsx
LUCAS_AWAL_00231398.xlsx
LUCAS_AWAL_00231399.xlsx
LUCAS_AWAL_00231400.xlsx
LUCAS_AWAL_00231401.xlsx

Contains Confidential and Attorneys' Eyes Only Materials                12

LUCAS_AWAL_00231402.xlsx
LUCAS_AWAL_00231403.xlsx
LUCAS_AWAL_00231404.xlsx
LUCAS_AWAL_00231405.xlsx
LUCAS_AWAL_00231406.xlsx
LUCAS_AWAL_00231407.xlsx
LUCAS_AWAL_00231408.xlsx
LUCAS_AWAL_00231409.xlsx
LUCAS_AWAL_00231410.xlsx
LUCAS_AWAL_00231411.xlsx
LUCAS_AWAL_00231412.xlsx
LUCAS_AWAL_00231413.xlsx
Notes on Sony Payroll Data Fields (As).xlsx
Notes on Sony Payroll Data Fields (Qs).xlsx
PeopleSoft Benefit Codes.pdf
PIXAR _CA_ - 10-K Annual Report - 01_01_2005.htm
PIXAR _CA_ - 10-K Annual Report - 01_03_2004.htm
PIXAR_AWAL_00093872-PIXAR_AWAL_00093880.pdf
PIXAR_AWAL_00093881-PIXAR_AWAL_00093899.pdf
PIXAR_AWAL_00093900-PIXAR_AWAL_00093903.pdf
PIXAR_AWAL_00093904-PIXAR_AWAL_00093907.pdf
PIXAR_AWAL_00093908-PIXAR_AWAL_00093908.pdf
PIXAR_AWAL_00093909.pdf
PIXAR_AWAL_00094048-PIXAR_AWAL_00094050.pdf
PIXAR_AWAL_00094051-PIXAR_AWAL_00094051.pdf
PIXAR_AWAL_00096831-PIXAR_AWAL_00096836.pdf
PIXAR_AWAL_00096837-PIXAR_AWAL_00096841.pdf
PIXAR_AWAL_00096842-PIXAR_AWAL_00096860.pdf
PIXAR_AWAL_00096861-PIXAR_AWAL_00096877.pdf
PIXAR_AWAL_00096878-PIXAR_AWAL_00096883.pdf
PIXAR_AWAL_00096884-PIXAR_AWAL_00096890.pdf
PIXAR_AWAL_00096891-PIXAR_AWAL_00096902.pdf
PIXAR_AWAL_00096903-PIXAR_AWAL_00096903.pdf
PIXAR_AWAL_00096904-PIXAR_AWAL_00096904.pdf
PIXAR_AWAL_00096905-PIXAR_AWAL_00096905.pdf
PIXAR_AWAL_00096906-PIXAR_AWAL_00096909.pdf
PIXAR_AWAL_00096910-PIXAR_AWAL_00096911.pdf
PIXAR_AWAL_00096912-PIXAR_AWAL_00096916.pdf
PIXAR_AWAL_00096917-PIXAR_AWAL_00096918.pdf
PIXAR_AWAL_00096919-PIXAR_AWAL_00096920.pdf
PIXAR_AWAL_00096921-PIXAR_AWAL_00096922.pdf
PIXAR_AWAL_00096923-PIXAR_AWAL_00096923.pdf
PIXAR_AWAL_00096924-PIXAR_AWAL_00096927.pdf
PIXAR_AWAL_00096928-PIXAR_AWAL_00096934.pdf
PIXAR_AWAL_00096935-PIXAR_AWAL_00096935.pdf
PIXAR_AWAL_00096936-PIXAR_AWAL_00096936.pdf

Contains Confidential and Attorneys' Eyes Only Materials                13

PIXAR_AWAL_00096937-PIXAR_AWAL_00096938.pdf
PIXAR_AWAL_00096939-PIXAR_AWAL_00096939.pdf
PIXAR_AWAL_00096940-PIXAR_AWAL_00096940.pdf
PIXAR_AWAL_00096941.xls
PIXAR_AWAL_00096942.xlsx
PIXAR_AWAL_00096943.xls
PIXAR_AWAL_00096944.xlsx
PIXAR_AWAL_00096945.xls
PIXAR_AWAL_00096946.xlsx
PIXAR_AWAL_00096948.xlsx
PIXAR_AWAL_00096949.xlsx
PIXAR_AWAL_00096958.xls
PIXAR_AWAL_00096959.xls
PIXAR_AWAL_00096960.xls
PIXAR_AWAL_00096961.xlsx
PIXAR_AWAL_00096964.xlsx
Producer-Screen Actors Guild Codified Basic Agreement Of 2005 [from
     http://www.sagaftra.org/files/sag/2005TheatricalAgreement.pdf]
Questions on Pixar Data Production.docx
Questions on Sony Data Production Sent on Oct 19 2015
Second Round of Questions on Sony Data Production.docx
SONY-DB-000015 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000016 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000017 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000018-A - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000019-A - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000020-A1 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000021 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000022 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000023 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000024 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000025 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000026 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000027 - Highly Confidential - Outside Counsel Only.xlsx
SONY-DB-000029 - Highly Confidential - Outside Counsel Only.xlsx
WDC-AR-2006.pdf
WDC-AR-2007.pdf
WDC-AR-2008.pdf
Workday Screenshots.pdf
zip_code_database.csv (http://www.unitedstateszipcodes.org/zip-code-database/)

Contains Confidential and Attorneys' Eyes Only Materials

**APPENDIX C: Definition of the Animation Workers Class**

1.    I was asked to identify job titles that correspond to Class members using the Defendants' employment databases.  The Class is defined as:

All animation and visual effects employees employed by defendants in the United States who held any of the jobs listed in Ashenfelter Report Appendix C during the following time periods: Pixar (2001-2010), Lucasfilm Ltd., LLC (2001-2010), DreamWorks Animation SKG, Inc. (2003-2010), The Walt Disney Company (2004-2010), Sony Pictures Animation, Inc. and Sony Pictures Imageworks, Inc. (2004-2010), Blue Sky Studios, Inc. (2005-2010) and Two Pic MC LLC f/k/a ImageMovers Digital LLC (2007-2010).  Excluded from the Class are senior executives, members of the board of directors, and persons employed to perform office operations or administrative tasks.

2.    To identify the job titles which correspond to employees who meet the class definition, I evaluated the job titles in the Defendants' employment databases, including employees' job title histories as well as alternative job titles and available department information.  The jobs titles that are included in the class are those that are responsible for performing the following animation and visual effects functions:

(a)    Animation
(b)    Effects / Live Action
(c)    Post Production
(d)    Producing
(e)    Story / Visual Development
(f)    Technical / Shot Production
(g)    Technology Systems and Support

3.    To help determine which job titles meet the class definition, I used data that Defendants provided to The Croner Company during the years in which they responded to the Croner Animation and Visual Effects Compensation Survey. For each year that Defendants responded to the survey, each Defendant provided a list of each of their animation and visual effects employees, and matched those employees to standardized positions agreed upon by the Defendants collectively during the Croner survey design process.[1]  The Croner survey organized the standardized positions into different job functions, including the seven listed

---

[1] CRO1448 at 460 (The 2009 "Survey Process" is as follows: "Potential participants and The Croner Company met in January 2009 to establish the survey's content and scope.  With results from this meeting, a survey questionnaire was developed and distributed to the participants.  After participants returned their completed questionnaires, follow-up telephone calls were made and emails were exchanged to clarify data and to ensure comparability of jobs matched.").

1

Contains Highly Confidential and Attorneys' Eyes Only Materials

above.[2] I examined which job titles the Defendants matched to the job functions listed above to assist me in selecting which job titles should be included in the class. [3]

4.  To help determine which job titles should be excluded from the Class, I examined which job titles the Defendants matched to two other Croner functions: Studio Executive, and General and Administrative. These titles include senior executives and persons employed to perform office operations or administrative tasks.

5.  The Croner survey does not include all of the job titles each Defendant used during the class period for employees that performed the job functions described in paragraph 2(a)-(g). Therefore, I used the job titles that matched to positions in the Croner survey as a guide to determine the functions of unmatched job titles.[4] An algorithm was developed to assist with this process.

6.  The Class does not include the following types of employees:

    (a)  Persons employed to perform office operations or administrative tasks (accounting, finance, human resources, legal, licensing, marketing, public relations, etc.)
    (b)  Senior executives
    (c)  Members of the board of directors
    (d)  Non-US employees
    (e)  Facility maintenance employees
    (f)  Food preparation staff
    (g)  Retail employees and cashiers
    (h)  Interns and temporary workers

7.  Below is a comprehensive list of every job title, by defendant, that is included in the class. The class consists of every employee who held these job titles at each defendant during the relevant class period for that defendant.

---

[2] CRO00521 at 552-557 (Croner instruction manual's chart entitled "Survey Position List and Changes" showing various job or position titles with their function)

[3] The specific functional classifications and criteria used by Croner vary from survey edition to survey edition.

[4] For example, the Croner survey did not begin until 2007, and each Defendant did not participate in the Croner survey every year thereafter. In addition, some job titles were matched to multiple Croner functions.

2

Contains Highly Confidential and Attorneys' Eyes Only Materials

**List of Job Titles by Defendant**

**Blue Sky**

| | |
|---|---|
| 2D/3D WORKBOOK ARTIST | CAMERA OPERATOR, LEAD |
| 2ND ASSISTANT EDITOR | CHARACTER ANIMATOR |
| 3D-SET DRESSER | CHARACTER LEAD - HORTON |
| ADMINISTRATOR, SYSTEM | CHARACTER TD, SR. |
| ADMINISTRATOR,SYSTEM | CHARACTER TECH. DIR / RIGGER |
| AFTER FX | COLOR KEY ARTIST |
| ANIMATION DEVELOPMENT LEAD | COMPOSITOR, SR |
| ANIMATION LEAD | COORDINATOR, ANIMATION |
| ANIMATION, LEAD | COORDINATOR, EDITORIAL |
| ANIMATOR | COORDINATOR, GRAPHICS |
| ANIMATOR, BACKGROUND | COORDINATOR, PROD |
| ANIMATOR, JR | COORDINATOR, PRODUCTION |
| ANIMATOR, SR | COORDINATOR, SCHEDULE |
| APM - DESIGN | COORDINATOR, STORY PRODUCTION |
| APM, LAYOUT | CREATIVE EXEC |
| APM, LIGHTING | CREATIVE EXECUTIVE |
| APM/ANIMATION | DESIGN APPRENTICE |
| APM/LIGHTING | DESIGNER |
| APM/PROD MGMT | DEVELOPER, SOFTWARE |
| APM/STAGING | DIGITAL ARTIST |
| ARTIST | DIGITAL PAINT ARTIST |
| ARTIST, COLOR KEY | DIGITAL RECORDIST |
| ARTIST, DIGITAL | DIR, SR TECH, LEAD ASSMBLY |
| ARTIST, LAYOUT | DIR, TECH PRODUCTION |
| ARTIST, PHOTOSHOP | DIR, TECHNICAL |
| ARTIST, SR DIGITAL 3D | DIRECTOR |
| ARTIST, STORY | DIRECTOR, PRODUCTION |
| ARTIST, STORYBOARD | DRAFTSMAN |
| ARTIST,PHOTOSHOP | EDITOR |
| ARTISTS, PHOTOSHOP | EDITOR, 2ND ASSISTANT |
| ASSISTANT EDITOR | EDITOR, ASSISTANT |
| ASSISTANT, TECHNICAL | EDITOR, ASSOCIATE |
| ASSOC PRODUCER | EDITOR, PRODUCTION |
| ASSOCIATE PRODUCER | EDITORIAL APPRENTICE |
| ASSOCIATE TECHNICAL DIRECTOR | ENVIRONMENTAL LEAD - HORTON |
| ASST. DEVELOPMENT | FINAL LAYOUT |
| BACKGROUND PAINTER | HEAD DIGITAL PRODUCTION |

3

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Blue Sky**

| | |
|---|---|
| HEAD OF LAYOUT | RESEARCH ASSOCIATE, SR |
| HEAD OF SYSTEMS | RIGGER |
| HEAD OF TECHNOLOGY - EDIT | SCHEDULING MANAGER |
| HEAD PHYSICAL PRODUCTION | SENIOR ANIMATOR |
| JR TECH DIRECTOR, FUR | SENIOR CREATIVE DIRECTOR |
| JR. STORYBOARD ARTIST | SENIOR/LEAD TECHNICAL DIRECTOR |
| JUNIOR ANIMATOR | SOFTWARE DEVELOPER |
| LAYOUT ARTIST | SR LIGHTING TD |
| LAYOUT ARTIST, LEAD | SR TECH DIR, LIGHTING |
| LAYOUT CAM. DESIGN | SR, ANIMATOR |
| LEAD ANIMATOR | SR, TECH DIR MATERIALS |
| LEAD LIGHTING TD | STORY ARTIST |
| LEAD, LAYOUT ARTIST | STORY ARTIST, JR. |
| LEAD, SR LIGHTING | STORY BOARD ARTIST |
| LIGHTING COORDINATOR | STORYBOARD ARTIST |
| LIGHTING, LEAD | STORYBOARD ARTIST - HORTON |
| MANAGER, IT | STORYBOARD ARTIST, AFTER F |
| MANAGER, SOFTWARE | SUPERVISOR ANIMATOR |
| MANAGER, TECHNICAL | SUPERVISOR, ANIMATOR |
| MGR, PROD INFO SYSTEMS | SUPERVISOR, CHARACTER DEV |
| MODELER | SUPERVISOR, DESIGN |
| MODELER, ENVIRONMENTAL | SUPERVISOR, DIGITAL |
| MODELER, SR | SUPERVISOR, PRODUCTION |
| MODELING PA | SUPERVISOR, SCULPTING |
| PA , STAGING | SUPV, RIGGING |
| PA - ART | SYSTEMS ADMINISTRATOR |
| PA LAYOUT | SYSTEMS ADMINISTRATOR, LEAD |
| PA, ANIMATION | SYSTEMS ADMINISTRATOR, SR |
| PA, TECHNICAL DIRECTION | SYSTEMS TA |
| POST PRODUCTION SUPERVISOR | TA, PROCEDURAL SET DRESSING |
| PRE-VIS/LAYOUT COORDINATOR | TA/ANIMATION |
| PROD ASSISTANT, FX/CLOTH | TA/LAYOUT |
| PROD SUPV OF ANIMATION | TA/LIGHTING |
| PRODUCER | TD |
| PRODUCTION ASSISTANT, FX | TD - SR EFFECTS |
| PRODUCTION ENGINEER | TD, FX |
| PRODUCTION EXECUTIVE | TD, LIGHTING |
| PRODUCTION MANAGER | TD, LIGHTING SR |
| PRODUCTION PROGRAMMER | TD, MATS |
| PROGRAMMER | TD,JR FX |
| PROGRAMMER, SR | TD/EFFECTS |
| PROJECT ENGINEER | TD/FX |
| RENDER WRANGLER | TD/LIGHTING |

4

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Blue Sky**

| | |
|---|---|
| TD/MATERIALS | TECHNICAL DIRECTOR, ASSOC |
| TECH ASSISTANT, LIGHTING | TECHNICAL DIRECTOR, SR/LEAD |
| TECH DIRECTOR, CHARACTER | TECHNICAL STEREO LEAD |
| TECH DIRECTOR, FX | TECHNICAL/ANIMATOR/RIGGER |
| TECH DIRECTOR, LIGHTING | TEXTURE PAINTER |
| TECH DIRECTOR, MATERIALS | VISUAL DEV'T ARTIST |
| TECH DIRECTOR, STEREOSCOPIC | VISUAL DEV/LAYOUT ARTIST |
| TECH. DIRECTOR, MATERIALS | VISUAL DEVELOPMENT ARTIST |
| TECHNICAL ANIMATOR/RIGGER | VP, CHIEF SCIENTIST |
| TECHNICAL ASSISTANT | VP, CREATIVE DEVELOPMENT |
| TECHNICAL DIRECTOR | |
| WRITER | |

5

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Disney**

ADMINISTRATOR, RENDER I/O
ANIMATION DIRECTOR
ANIMATION EDITOR
ANIMATION EDITOR - DAILY
ANIMATION STORYPERSON - WRITER
ANIMATION STORYPERSON - WRITER (DAILY)
ANIMATION STORYPERSON-WRITER
ANIMATION STORYPERSON-WRITER - DAILY
ANIMATOR
APPRENTICE ANIMATION EDITOR
ARTIST MANAGER
ASSISTANT PRODUCTION MANAGER
ASSISTANT RESEARCHER
ASSOCIATE PRODUCER II
ASSOCIATE SOFTWARE DEVELOPER
ASSOCIATE SYSTEMS ADMINISTRATOR
ASST ANIMATION EDITOR
ASST ANIMATION EDITOR - DAILY
ASST ANIMATOR
ASST MANAGER, ANIMATION COMMUNICATIONS
ASST MANAGER, DIGITAL RESOURCES
ASST MANAGER, PRODUCTION
ASST MANAGER, PRODUCTION COMMUNICATIONS
ASST PRODUCTION MANAGER
ASST RESEARCHER
ASST SUPERVISOR-INK & PAINT BACKGROUND
BUCKET - COLOR STYLIST
BUCKET - LAYOUT
BUCKET - MODEL DESIGNER
BUCKET - PROJECTIONIST
BUCKET - RECORD MACH OPERATOR-JOURNEY
BUCKET - SOUND EFFECTS EDITR-THEREAFTER
BUCKET - STORY SKETCH
BUCKET - SUPERVISING SOUND EDITOR
BUCKET - TIMING DIRECTOR
CAT IV-TRAIN ANIM STORY/WRITING DGT PROD

CAT IV-TRAIN ANIM STORY/WRITNG DGT PRD
CAT IV-TRAINEE STORY/WRITING-DIGITAL
CATEGORY 1, DIGITAL UNION
CATEGORY 1/DIGITAL UNION
CATEGORY 1/DIGITAL UNION (DAILY)
CATEGORY 1/DIGITAL UNION (REG)
CATEGORY 1/DIGITAL UNION - DAILY
CATEGORY 2, DIGITAL UNION
CATEGORY 2/DIGITAL UNION
CATEGORY 4/DIGITAL UNION
CATEGORY I - DIGITAL UNION
CATEGORY I -DIGITAL UNION
CATEGORY I -DIGITAL UNION - DAILY
CATEGORY II GROUP A - DIGITAL UNION
CATEGORY II GROUP A -DIGITAL UNION
CATEGORY II GROUP B -DIGITAL UNION
CATEGORY III -DIGITAL UNION
CATEGORY IV TRAINEE -DIGITAL UNION
CGI 3D COMPOSITOR 1
CGI 3D COMPOSITOR I
CGI 3D COMPOSITOR I - DAILY
CGI ANIMATOR/MODELER
COORDINATOR, QUALITY ASSURANCE
CREATIVE AFFAIRS COORDINATOR
CREATIVE DIRECTOR
CREATIVE EXECUTIVE
DATABASE COORDINATOR
DATABASE DEVELOPER
DESIGNER
DESIGNER (CASUAL LTD)
DEVELOPMENT COORDINATOR
DIGITAL ARCHIVIST
DIGITAL FILM RECORDER OPERATOR
DIGITAL IMAGING MANAGER
DIGITAL LIBRARY IMAGING SCANNER
DIGITAL PRODUCTION ANALYST
DIGITAL RESOURCES ADMINISTRATOR
DIRECTOR, CREATIVE AFFAIRS
DIRECTOR, MUSIC PRODUCTION
DIRECTOR, POST PRODUCTION
DIRECTOR, PRODUCTION

6

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Disney**

DIRECTOR, TECHNOLOGY
DUBBING MACHINE OPERATOR
FIRST ENGINEER
HARDWARE TECHNICIAN
HEAD SPECIAL EFFECTS
IMAGE & DATA SERVICE ADMINISTRATOR
KEY ASSISTANT ANIMATOR
KEY ASSISTANT LAYOUT
KEY ASST ANIMATOR
LAYOUT
MANAGER, ENGINEERING
MANAGER, MUSIC PRODUCTION
MANAGER, POST PRODUCTION
MANAGER, PRODUCTION RESOURCES
MANAGER, QUALITY ASSURANCE
MANAGER, RESEARCH - ARL
MANAGER, TECHNOLOGY
MEDIA EDITORIAL SUPPORT TECH 2
MEDIA EDITORIAL SUPPORT TECH 2 - DAILY
MEDIA EDITORIAL SUPPORT TECHNICIAN 1
MEDIA EDITORIAL SUPPORT TECHNICIAN 2
MEDIA ENGINEER - ANIM
MEDIA IMPLEMENTATION TECHNICIAN
MEDIA LEAD EDITORIAL SUPPORT TECH
MUSIC COORDINATOR
MUSIC MIXER
NETWORK ENGINEER - ANIM
OPERATIVE SUPERVISOR / ENGINEER
POST PRODUCTION COORDINATOR
PRINCIPAL MEDIA ENGINEER
PRINCIPAL NETWORK ENGINEER
PRINCIPAL SOFTWARE ENGINEER
PRINCIPAL SYSTEMS ENGINEER
PRINCIPAL SYSTEMS ENGINEER - ANIM
PROCESS ENGINEER
PROD TECHNICAL DIRECTOR I
PRODUCTION ADMINISTRATION MANAGER
PRODUCTION COMMUNICATIONS ASST MANAGER
PRODUCTION COORDINATOR
PRODUCTION COORDINATOR, CAPS
PRODUCTION DEPARTMENT MANAGER
PRODUCTION MANAGER

PRODUCTION SUPERVISOR
PROGRAM MANAGER - TECHNOLOGY
PROJECT MANAGER - TECHNOLOGY
PROJECTIONIST
QUALITY CONTROL ANALYST
RENDER I/O ADMINISTRATOR
RESEARCHER
SAG-TALENT
SERVICE RECORDER/TV ENGINEER/VIDEO ASST
SOFTWARE ENGINEER
SOFTWARE ENGINEER - ANIM
SOFTWARE ENGINEER - ANIM (CASUAL)
SOUND READER
SR DESIGNER
SR DEVELOPMENT SOFTWARE ENGINEER
SR DEVELOPMENT SOFTWARE ENGINEER - ANIM
SR DEVELOPMENT SYSTEMS ENGINEER
SR HARDWARE TECHNICIAN
SR IMAGE & DATA SERVICE ADMINISTRATOR
SR IMAGE & DATA SERVICES ADMINISTRATOR
SR MEDIA ENGINEER
SR NETWORK ENGINEER
SR PLANNER-CAMERA PLANNING
SR PROGRAMMER ANALYST
SR RENDER I/O ADMINISTRATOR
SR SCM TECHNICIAN
SR SOFTWARE ENGINEER
SR SOFTWARE ENGINEER - ANIM
SR SYSTEMS ADMINISTRATOR
SR SYSTEMS ADMINISTRATOR - ANIM
SR SYSTEMS ENGINEER
SR SYSTEMS ENGINEER - ANIM
SR TECHNICAL SUPPORT ADMIN - ANIM
SR TECHNICAL SUPPORT ANALYST - ANIM
SR TECHNICAL SUPPORT ENGINEER
SR TECHNOLOGY SUPPORT ENGINEER
STORY ANALYST E
STORY ANALYST F
STORY ANALYST F - DAILY
STORYPERSON

7

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Disney**

SUPERVISOR, CAPS

SUPERVISOR, INK & PAINT

SYSTEMS ADMINISTRATOR

SYSTEMS ADMINISTRATOR - ANIM

SYSTEMS ENGINEER

TECHNICAL DIRECTOR WEEKLY IA

TECHNICAL SUPERVISOR

TECHNICAL SUPPORT ADMIN - ANIM

TECHNICAL SUPPORT ENGINEER

8

Contains Highly Confidential and Attorneys' Eyes Only Materials

**DreamWorks**

| | |
|---|---|
| 2D LIGHTING ANIMATOR | ART DIRECTOR - THEREAFTER |
| 2D WORKBOOK ARTIST | ART DIRECTOR / PROD. DESIGNER |
| 3D ANIMATOR | ARTIST, CHARACTER |
| 3D FX ANIMATOR | ARTIST, GRAPHIC |
| 3D PAINTER/LIGHTER | ASSISTANT ANIMATION EDITOR |
| ACTOR | ASSISTANT ANIMATOR |
| ADDITIONAL DIALOGUE EDITOR | ASSISTANT ANIMATOR (JOURNEY) |
| ADMINISTRATOR, SR TECHNICAL RESOURCE | ASSISTANT CHAR EFFECTS ANIMATOR |
| ADMINISTRATOR, TECHNICAL RESOURCE | ASSISTANT CHARACTER TD |
| ADR - VOICE OVER | ASSISTANT EDITOR |
| ADR / VOICE OVER | ASSISTANT EFFECTS ANIMATOR |
| ADR VOICE OVER | ASSISTANT FINAL LAYOUT ARTIST |
| ADR/VOICE OVER ACTOR | ASSISTANT ILLUSTRATOR |
| ANALYST, HELP DESK | ASSISTANT LIGHTER |
| ANALYST, IT SECURITY | ASSISTANT MODEL DESIGNER |
| ANIMATION STORYPERSON | ASSISTANT MODELER |
| ANIMATION STORYPERSON - JRNYMN | ASSISTANT MX EDITOR |
| ANIMATION STORYPERSON SPVR O/C | ASSISTANT SCULPTOR |
| ANIMATION STORYPERSON-ON CALL | ASSISTANT SOUND EDITOR |
| ANIMATION STORYPERSON-SPRVISR | ASSISTANT STORY ARTIST |
| ANIMATION STORYPERSON/WRITER | ASSISTANT STORYBOARD ARTIST |
| ANIMATION STORYPRSN-JRNY(SONY) | ASSISTANT TD |
| ANIMATION TOOLS DEVELOPER | ASSISTANT TO DIRECTORS |
| ANIMATION TRAINEE | ASSISTANT TO PRODUCER |
| ANIMATOR | ASSISTANT VIS DEV ARTIST |
| ANIMATOR (ANIM/MOD 2) | ASSISTANT, ENGINEERING |
| ANIMATOR - JOURNEY | ASSISTANT, PRODUCTION |
| ANIMATOR - JOURNEYMAN | ASSISTANT-FL |
| ANIMATOR - SUPERVISOR | ASSO. EDITOR |
| ANIMATOR - SUPERVISOR ON CALL | ASSOC SND EDITOR - ON CALL |
| ANIMATOR-LIGHTING TD | ASSOCIATE ANIMATOR |
| APPRENTICE DEPARTMENT TD | ASSOCIATE CHARACTER EFFECTS ARTIST |
| APPRENTICE EDITOR | ASSOCIATE CHARACTER TD |
| APPRENTICE LAYOUT | ASSOCIATE CROWDS ARTIST |
| APPRENTICE MATTE PAINTER | ASSOCIATE CYCLE ANIMATOR |
| APPRENTICE VISUAL DEVELOPMENT ARTIST | ASSOCIATE DEPARTMENT TD |
| APPRENTICE, TECHNICAL RESOURCE | ASSOCIATE EDITOR |
| ARCHITECT, LIGHTING | ASSOCIATE EFFECTS ARTIST |
| ARCHITECT, PIPELINE | ASSOCIATE FINAL LAYOUT ARTIST |
| ARCHITECT, SOFTWARE | ASSOCIATE LIGHTER |
| ART DEPARTMENT ARTIST | ASSOCIATE LIGHTING TA |
| ART DIRECTOR | ASSOCIATE MODELER |

9

Contains Highly Confidential and Attorneys' Eyes Only Materials

**DreamWorks**

ASSOCIATE PRODUCER
ASSOCIATE ROUGH LAYOUT ARTIST
ASSOCIATE SURFACER
ASSOCIATE VISUAL DEVELOPMENT ARTIST
ASSOCIATE, DEVELOPMENT
ASST ANIMATOR
ASST CHAR FINALING TD
ASST CHARACTER DESIGN
ASST COMPLETION PAINTER
ASST DIRECTOR
ASST EDITOR - SOUND
ASST FINAL LAYOUT TD
ASST MX EDITOR
ASST SOUND EDITOR
ASST STORY ARTIST - 1ST 6 MOS
ASST STORYBOARD ARTIST - 1ST 6 MOS.
ASST TO PRODUCER/CENTRAL COORD
AVID ASST. EDITOR
BACKGROUND ACTOR
BACKGROUND ARTIST
BACKGROUND CO-HEAD
BREAKDOWN-FL
C G - SUPERVISOR
CALIBRATION TECH
CENTRAL COORDINATOR
CENTRAL PRODUCTION SUPERVISOR
CG CHAR T.D. SUPV - ON CALL
CG SUPERVISING ANIMATOR
CG SUPERVISO
CG SUPERVISOR
CGI MODELER
CHAR DESIGNER
CHAR DESIGNER (ANIM/MOD 1) - JOURNEY
CHAR DESIGNER - 1ST 6 MOS
CHAR EFX ANIMATOR (PROD TD 1) - JOURNEY
CHAR FINALING LEAD
CHAR T.D.
CHAR TD
CHAR. DESIGNER - 1ST 6 MOS
CHARACTER DESIGNER
CHARACTER EFFECTS ANIMATOR
CHARACTER EFFECTS ARTIST

CHARACTER EFFECTS SUPERVISOR
CHARACTER EFX ARTIST (PROD TD 4)JOURNEY
CHARACTER FINALING ANIMATOR
CHARACTER FINALING LEAD
CHARACTER FINALING SUPERVISOR
CHARACTER FINALING TD
CHARACTER T.D.
CHARACTER TD
CHARACTER TD DEPT HEAD
CHARACTER TD LEAD
CHARACTER TD SUPERVISOR
CHECKER
CHIEF ARCHITECT FOR GLOBAL EFFECTS
CLEAN UP ARTIST (KEY ASST. ANIM) (JOURNEY)
CLEAN UP CHARACTER LEAD
CLEAN-UP ARTIST
CLEAN-UP SUPERVISOR
CO PRODUCER
CO-EXEC PRODUCER/WRITER
COLOR MARK-UP
COLOR STYLIST
COMPLETION PAINTER
COMPOSER
COMPOSITING SUPERVISOR
COMPOSITING TD
COMPOSITOR
CONCEPT ARTIST
CONCEPT DESIGNER
CONCEPT ILLUSTRATOR
CONFIGURATION MANAGEMENT LEAD
CONSULTANT/STORY ARTIST - JOURNEY
CONSULTANT/WRITER
CONSULTING DIRECTOR
CONSULTING DIRECTOR-ON CALL
CONSULTING PRODUCER/WRITER
CONSULTING/WRITER
COORDINATOR, DEVELOPMENT
COORDINATOR, DIGITAL OPERATIONS
COORDINATOR, POST PRODUCTION
COORDINATOR, RESEARCH
COORDINATOR, TECHNOLOGY

10

Contains Highly Confidential and Attorneys' Eyes Only Materials

**DreamWorks**

| | |
|---|---|
| COSTUME DESIGNER | EDITOR |
| CREATIVE DIRECTOR | EDITOR - ON CALL |
| CREATIVE EXE | EDITOR FEATURE Z-1 |
| CROWDS ARTIST | EDITOR, HD AVID |
| CROWDS SUPERVISOR | EDITOR, LEAD |
| CYCLE ANIMATOR | EDITOR, SENIOR |
| DAILY SINGER | EDITORIAL ASSISTANT |
| DATABASE ADMINISTRATOR | EDITORIAL TD |
| DAY PLAYER | EDITORIAL TECHNICIAN |
| DEPARTMENT MANAGER, ANIMATION | EFFECTS ANIMATOR |
| DEPARTMENT TD | EFFECTS ARTIST |
| DEPARTMENT TD SUPERVISOR | EFFECTS ASSISTANT ANIMATOR |
| DEPT T.D. | EFFECTS BREAK/INBETWEEN |
| DEPT T.D. (LIGHTING) - JOURNEY | EFFECTS COMPOSER |
| DEPT TD (PROD TD 4) | EFFECTS LEAD |
| DEPT TD SUPERVISOR | EFFECTS PICTURE SUPERVISOR |
| DESIGNER | EFFECTS TD |
| DESIGNER, UI | EFX ANIMATOR |
| DEVELOPER, SENIOR SOFTWARE | EFX ARTIST (ANIMATOR 1) - JOURNEY |
| DEVELOPER, SOFTWARE | EFX ASSISTANT |
| DEVELOPER, SOFTWARE LEAD | EFX BREAKDOWN |
| DIA EDITOR - 48.6 | EFX INBETWEENER |
| DIAL EDTR | ENGINEER Y-1 DAILY |
| DIG. CHECKER | ENGINEER, ASSOCIATE PRODUCTION |
| DIGITAL CELL PAINTER | ENGINEER, HARDWARE |
| DIGITAL CHECKER | ENGINEER, POST PRODUCTION |
| DIGITAL EFFECTS SUPERVISOR | ENGINEER, POST TECHNOLOGY |
| DIGITAL SUPERVISOR | ENGINEER, PRE-VISUALIZATION |
| DIRECTING ANIMATOR | ENGINEER, PRINCIPAL |
| DIRECTOR | ENGINEER, PRINCIPAL/SUPV |
| DIRECTOR - ON CALL | ENGINEER, PRODUCTION |
| DIRECTOR OF PHOTOGRAPHY | ENGINEER, SENIOR HARDWARE |
| DIRECTOR OF PRE-VISUALIZATION | ENGINEER, SENIOR PRODUCTION |
| DIRECTOR, ASSISTANT | ENGINEER, SENIOR SOFTWARE |
| DIRECTOR, ASSOCIATE | ENGINEER, SOFTWARE |
| DIRECTOR, CO | ENGINEER, SOFTWARE QUALITY |
| DIRECTOR, DIGITAL OPERATIONS | ENGINEER, SOFTWARE SR I |
| DIRECTOR, INFORMATION SECURITY | ENGINEER, STAFF |
| DIRECTOR, INFORMATION TECHNOLOGY | ENTRY LEVEL ANIMATOR |
| DIRECTOR, PRODUCTION ENGINEERING | ENTRY LEVEL CHAR FINALING ANIMATOR |
| DIRECTOR, PRODUCTION TECHNOLOGY | ENTRY LEVEL CHARACTER EFFECTS ARTIST |
| DIRECTOR, R&D | ENTRY LEVEL CHARACTER TD |
| DIRECTOR, TECHNOLOGY | ENTRY LEVEL CROWDS ARTIST |

11

Contains Highly Confidential and Attorneys' Eyes Only Materials

**DreamWorks**

| | |
|---|---|
| ENTRY LEVEL CYCLE ANIMATOR | FINAL LAYOUT LEAD |
| ENTRY LEVEL DEPT TD | FINAL LAYOUT SUPERVISOR |
| ENTRY LEVEL EFFECTS ANIMATOR | FINAL LAYOUT TD |
| ENTRY LEVEL EFFECTS ARTIST | FINAL LINE KEY ASST |
| ENTRY LEVEL FINAL LAYOUT ARTIST | FOLEY EDITOR |
| ENTRY LEVEL ILLUSTRATOR | FOLEY EDTR |
| ENTRY LEVEL LIGHTER | FX ARTIST |
| ENTRY LEVEL LIGHTING TA | GENERAL TOOLS DEVELOPMENT |
| ENTRY LEVEL MATTE PAINTER | GLOBAL EFFECTS LEAD |
| ENTRY LEVEL MODELER | GLOBAL HEAD OF EFFECTS |
| ENTRY LEVEL ROUGH LAYOUT ARTIST | GLOBAL LEAD |
| ENTRY LEVEL STORY ARTIST | GLOBAL LEAD - ANIMATION |
| ENTRY LEVEL SURFACER | GLOBAL LEAD - EFFECTS |
| ENTRY LEVEL VISUAL DEV ARTIST | GLOBAL LEAD - HEAD OF GLOBAL CHAR DEV |
| EXECUTIVE PRODUCER | GLOBAL LEAD - HEAD OF GLOBAL TDS |
| EXECUTIVE PRODUCER, TV | GLOBAL LEAD - LAYOUT |
| EXECUTIVE, CREATIVE | GLOBAL LEAD - PIPELINE ARCHITECT |
| EXECUTIVE, DEVELOPMENT | GLOBAL LIGHTING DEPT MANAGER |
| EXECUTIVE, FRANCHISE CREATIVE | GLOBAL SHADER LEAD |
| EXECUTIVE, JUNIOR CREATIVE | GLOBAL TECHNICAL DIRECTOR |
| EXECUTIVE, PRODUCTION | GRAPHIC DESIGNER, JUNIOR |
| EXECUTIVE, TECHNOLOGY | HARDWARE  TECHNICIAN |
| FEATURE ANIMATION EDITOR | HARDWARE ENGINEER |
| FEATURE DAY PLAYER | HARDWARE LEAD |
| FEATURE DAY PLAYER  VO | HEAD OF ANIMATION |
| FEATURE DAY PLAYER (V.O.) | HEAD OF CHARACTER ANIMATION |
| FEATURE DAY PLAYER - SCRATCH | HEAD OF CREATIVE |
| FEATURE GROUPS 3-8 | HEAD OF DEVELOPMENT |
| FEATURE SCHEDULE F | HEAD OF DIGITAL OPERATIONS |
| FEATURE SCHEDULE F (VOICE) | HEAD OF DIGITAL PRODUCTION |
| FEATURE SCHEDULE F VO | HEAD OF EFFECTS |
| FEATURE SINGER | HEAD OF EFFECTS, CO |
| FEATURE SOLO & DUO | HEAD OF FINALING |
| FEATURE SOLO - OFF CAMERA | HEAD OF GLOBAL CHARACTER DEVELOPMENT |
| FEATURE STUNT DAILY | HEAD OF GLOBAL PIPELINE |
| FEATURE WEEKLY FREE LANCE | HEAD OF GLOBAL TECHNICAL DIRECTORS |
| FILM COORDINATION LEAD | HEAD OF INFORMATION TECHNOLOGY |
| FILM DIRECTOR | HEAD OF INK AND PAINT |
| FILM EDITOR | HEAD OF LAYO |
| FILM ROOM TECHNICIAN, LEAD | HEAD OF LAYOUT |
| FINAL COMPOSITOR | HEAD OF POST PRODUCTION |
| FINAL LAYOUT ARTIST | HEAD OF PRODUCTION DEVELOPMENT |
| FINAL LAYOUT ASST T.D. | |

12

Contains Highly Confidential and Attorneys' Eyes Only Materials

**DreamWorks**

HEAD OF PRODUCTION TECHNOLOGY
HEAD OF R&D
HEAD OF RESEARCH AND DEVELOPMENT
HEAD OF STOR
HEAD OF STORY
HEAD OF TECHNOLOGY
HELP DESK MA
ILLUSTRATOR
ILLUSTRATOR, JUNIOR
INBETWEENER-FL
INK & PAINT ARTIST
INK & PAINT ARTIST, LEAD
KEY ASSISTANT,LEAD-FL
KEY ASSISTANT-FL
LAYOUT
LAYOUT - ON CALL
LAYOUT ARTIST
LAYOUT LEAD
LAYOUT SUPERVISOR
LAYOUT TECHNICAL DIRECTOR
LEAD ANIMATOR
LEAD CG SUPERVISOR
LEAD CHARACTER TD
LEAD COMPOSITOR
LEAD DEPARTMENT TD
LEAD JOB TD
LEAD LIGHTER
LEAD LIGHTING TD
LEAD MATTE PAINTER
LEAD MODELER
LEAD SURFACING ARTIST
LIGHTER
LIGHTING ANIMATOR
LIGHTING ASSISTANT
LIGHTING BREAKDOWN
LIGHTING T.D.
LIGHTING TD
LIGHTING TOOL DEVELOPMENT
LIGHTING/SURFACING TD
LINE PRODUCER
LOOK DEV 3D PAINTER
LOOK DEV 3D/PAINTER/SURFACER
LOOK DEVELOPMENT TD

LOOP GROUP
LOOPING
LOOPING ADR
LUSTRE COLORIST
MANAGER OF POST TECHNOLOGIES
MANAGER, DIGITAL SYSTEMS
MANAGER, DIGITAL SYSTEMS - NON EXEMPT
MANAGER, HELP DESK
MANAGER, IMAGE MASTERING
MANAGER, PLATFORM ENGINEERING
MANAGER, POST
MANAGER, POST PRODUCTION
MANAGER, POST PRODUCTION ENGINEERING
MANAGER, PRODUCTION ENGINEERING
MANAGER, QA
MANAGER, R&D
MANAGER, SENIOR IT
MANAGER, SOFTWARE DEVELOPMENT
MANAGER, SYSTEMS ENGINEERING
MANAGER, SYSTEMS OPERATIONS
MANAGER, TECHNICAL RESOURCES
MANAGER, TECHNICAL STRATEGIC ALLIANCE
MANAGER, TECHNOLOGY PRODUCTION
MANAGER, VSC
MATTE PAINTER
MATTE PAINTING COMPOSITOR
MATTE PAINTING SUPERVISOR
MATTE TD
MODEL MAKER
MODEL SUPERVISOR
MODELER
MODELING LEAD
MODELING SUPERVISOR
MOTION PICTURE EDITOR
MOVE TECHNICIAN
MUSIC CONSULTANT
MUSIC EDITOR
MUSIC EDITOR - ON CALL
MUSIC MIXER
NEXT GENERATION DEPLOYMENT EXECUTIVE

13

Contains Highly Confidential and Attorneys' Eyes Only Materials

**DreamWorks**

NON AFFIL PRODUCER
NON UNION ASSOC. PROD.
NON UNION DIRECTOR
NON UNION PRODUCTION ASST
NON UNION WRITER
OFF CAMERA SINGER
OFF-CAMERA SINGER
OPERATIONS SYSTEM ADMINISTRATOR
OPERATOR, VIDEO TAPE
P.A.
PAINT FIX
PAINTER
PICTURE ED. BONUS ONLY
PIPELINE ENGINEER
PIPELINE ENGINEERING LEAD
POST PRODUCTION COORDINATOR
PRE-VISUALIZATION ARTIST
PRINCIPAL ENGINEER
PROD ASST
PROD ASST - ANIMATION
PROD ASST - ART
PROD ASST - ART/MODELING/SURFACING
PROD ASST - ART/VIS DEV
PROD ASST - CENTRAL
PROD ASST - CHARACTER EFFECTS
PROD ASST - CROWDS
PROD ASST - EDITORIAL
PROD ASST - EDITORIAL/STORY
PROD ASST - EFFECTS
PROD ASST - LAYOUT
PROD ASST - LIGHTING
PROD ASST - MODELING/SURFACING
PROD ASST - OFFICE
PROD ASST - STORY
PROD ASST - STORY/EDITORIAL
PROD ASST - VIS
DEV/MODELING/SURFACING
PROD ASST - VISUAL DEV
PROD COORD
PROD COORD -
PROD COORD - ANIMATION
PROD COORD - ART
PROD COORD -

ART/MODELING/SURFACING
PROD COORD - ART/VIS DEV
PROD COORD - CENTRAL
PROD COORD - CHAR EFFECTS
PROD COORD - CHAR TD
PROD COORD - CHAR TD/EFFECTS
PROD COORD - CHAR TD/MODELING
PROD COORD - CHARACTER ANIM
PROD COORD - CHARACTER EFFECTS
PROD COORD - CHARACTER TD
PROD COORD - EDITORIAL
PROD COORD - EDITORIAL/STORY
PROD COORD - EFFECTS
PROD COORD - LAYOUT
PROD COORD - LIGHTING
PROD COORD - LUSTRE
PROD COORD - MATTE PAINTING
PROD COORD - MODEL/SURFACING
PROD COORD - MODELING
PROD COORD - OFFICE
PROD COORD - PAINT FIX
PROD COORD - SCRIPT
PROD COORD - STORY
PROD COORD - SURFACING
PROD COORD - SURFACING/MATTE
PAINTING
PROD COORD - VIS
DEV/MODELING/SURFACING
PROD COORD - VISUAL DEV
PROD COORD - VISUAL DEVELOPMENT
PROD SUP
PROD SUP - ANIMATION
PROD SUP - ART
PROD SUP - ART/MODEL/SURF/CENTRAL
PROD SUP - C
PROD SUP - CENTRAL
PROD SUP - CHAR TD/MATTE PAINTING
PROD SUP - CHARACTER ANIM
PROD SUP - CHARACTER EFFECTS
PROD SUP - CHARACTER EFFECTS/CROWDS
PROD SUP - CHARACTER TD
PROD SUP - E
PROD SUP - EDITORIAL

14

Contains Highly Confidential and Attorneys' Eyes Only Materials

**DreamWorks**

| | |
|---|---|
| PROD SUP - EDITORIAL/STORY | QA SPECIALIS |
| PROD SUP - EFFECTS | QUALITY ASSURANCE MANAGER |
| PROD SUP - FRONT END | QUALITY ASSURANCE TESTER |
| PROD SUP - GLOBAL LUSTRE | R & D PROJECT MANAGER |
| PROD SUP - LAYOUT | R&D ENGINEER |
| PROD SUP - LIGHTING | R&D STAFF |
| PROD SUP - LIGHTING/MATTE PAINTING | RE-RECORDING MIXER |
| PROD SUP - MATTE PAINTING | READER |
| PROD SUP - MODEL/SURFACING | READER/ACTOR |
| PROD SUP - MODELING | RECORDING MACH OPERATOR 48.6 |
| PROD SUP - PAINT FIX | RECORDIST, FILM |
| PROD SUP - POST PROD | RENDER ARCHIVE DISK ADMIN LEAD |
| PROD SUP - SCRIPT | RENDER ARCHIVE DISK ADMINISTRATOR |
| PROD SUP - STORY | RENDER ASSISTANT |
| PROD SUP - STORY/EDITORIAL | RESEARCH ASSISTANT |
| PROD SUP - STORY/EFFECTS/LIGHTING | RESEARCH COORDINATOR |
| PROD SUP - STORY/VIS DEV | RESEARCHER |
| PROD SUP - SURFACING/COMPLETION | ROUGH INBETWEENER |
| PROD SUP - SURFACING/MATTE PAINTING | ROUGH INBETWEENER - 1ST 6 MONTHS |
| PROD SUP - VISUAL DEV | ROUGH LAYOUT ARTIST |
| PRODUCER | ROUGH LAYOUT LEAD |
| PRODUCER, CO | SAG TELEVISION |
| PRODUCER, CUSTOM ANIMATION | SCAN CHECKER |
| PRODUCTION ARTIST | SCANNER |
| PRODUCTION ASSOCIATE | SCORING MIXER Y-1 DAILY |
| PRODUCTION ASST | SCRATCH - VOICE OVER |
| PRODUCTION COORDINATOR | SCULPTOR |
| PRODUCTION DESIGNER | SCULPTOR, JR |
| PRODUCTION ENGINEER | SENIOR ANIMATOR |
| PRODUCTION ENGINEERING MGR | SENIOR CHARACTER TD |
| PRODUCTION EXECUTIVE, SENIOR | SENIOR EDITOR |
| PRODUCTION EXECUTIVE, VIRTUAL WORLDS | SENIOR EFFEC |
| | SENIOR EFFECTS ANIMATOR |
| PRODUCTION MANAGER | SENIOR EFFECTS ARTIST |
| PRODUCTION MANAGER, SENIOR | SENIOR FINAL LAYOUT ARTIST |
| PRODUCTION RESOURCE MANAGER | SENIOR HARDWARE ENGINEER |
| PRODUCTION SUPERVISOR-LIGHTING | SENIOR ILLUSTRATOR |
| PRODUCTION SUPPORT  ENGINEER | SENIOR LIGHTER |
| PROJECT LEAD, SUPERVISING | SENIOR MODELER |
| PROJECT MANAGER, IT | SENIOR PRODUCTION ENGINEER |
| PROJECTIONIST | SENIOR ROUGH LAYOUT ARTIST |
| PROP MAKER | SENIOR SET DESIGNER |
| QA LEAD | SENIOR SET MODEL BUILDER |

Contains Highly Confidential and Attorneys' Eyes Only Materials

**DreamWorks**

SENIOR SOFTWARE ENGINEER

SENIOR SURFACER

SENIOR SYSTEMS ADMINISTRATOR

SEQUENCE SUPERVISOR

SET BUILDER

SET DEC COORD.

SET DECORATOR

SET DESIGNER

SET DESIGNER - SPECIAL

SET DRESSER

SFX EDITOR

SHADER DEVELOPER

SHOT PREP

SINGER

SINGERS/DAILY SOLO & DUO

SOFTWARE COORDINATOR

SOFTWARE ENGINEER

SOFTWARE ENGINEERING MANAGER

SOUND APPRENTICE EDITOR

SOUND DESIGNER - ON CALL

SOUND EDITOR

SOUND EDITOR - 48.6

SOUND EDITOR-THRFTR 48.6

SOUND EFX EDITOR-THRFTR 48.6

SOUND FX MIXER

SPECIALIST, QA

SR CLOTHING/FINALING ANIMATOR

SR MANAGER, TECHNOLOGY PARTNERSHIPS

STAFF COMIC/ARTIST-JOURNEYMAN

STAFF WRITER

STAFF WRITER, TV

STEREO DIGITAL EFFECTS SUPERVISOR

STEREOGRAPHER

STEREOSCOPIC SUPERVISOR

STORY ARTIST

STORY ARTIST - JOURNEY

STORY EDITOR

STORY TRAINEE

STORY TRAINEE - 3RD 6 MOS.

STORY WRITER

STORYBOARD ARTIST

STORYPERSON

STRATEGIST, PRODUCTION

STUNT COORDINATOR - WEEKLY

SUP SOUND DESIGN

SUP. SOUND EDITOR - ON CALL

SUPERVISING ADR EDITOR

SUPERVISING ANIMATOR

SUPERVISING SOUND EDITOR

SUPERVISING TD

SUPERVISOR, CHARACTER TD

SUPERVISOR, DATABASE ADMINISTRATION

SUPERVISOR, DIGITAL MEDIA

SUPERVISOR, FILM COLOR

SUPERVISOR, HARDWARE

SUPERVISOR, NETWORK OPERATIONS

SUPERVISOR, POST PRODUCTION

SUPERVISOR, POST TECHNOLOGY

SUPERVISOR, PRODUCTION DEVELOPMENT

SUPERVISOR, PRODUCTION ENGINEERING

SUPERVISOR, QA

SUPERVISOR, R&D

SUPERVISOR, SYSTEMS ENGINEERING

SUPERVISOR, SYSTEMS OPERATIONS

SUPERVISOR, TECHNICAL RESOURCES

SURFACER

SURFACER - JOURNEY

SURFACING LEAD

SURFACING SUPERVISOR

SYSTEM ADMINISTRATION LEAD

SYSTEM ADMINISTRATOR

SYSTEM ARCHITECT

SYSTEM ARCHITECT, LEAD

SYSTEMS ADMI

SYSTEMS ADMINISTRATOR

SYSTEMS ADMINISTRATOR - EXEMPT

SYSTEMS ADMINISTRATOR, ENGINEERING

SYSTEMS ADMINISTRATOR, IT - EXEMPT

SYSTEMS ADMINISTRATOR, JUNIOR

SYSTEMS ADMINISTRATOR, OPERATIONS

SYSTEMS ADMINISTRATOR, SENIOR

SYSTEMS ADMINISTRATOR, SENIOR - EXEMPT

SYSTEMS ADMINISTRATOR, SENIOR OPERATIONS

16

Contains Highly Confidential and Attorneys' Eyes Only Materials

**DreamWorks**

SYSTEMS ARCHITECT
SYSTEMS ENGINEER
SYSTEMS MANAGER
SYSTEMS OPERATIONS LEAD
SYSTEMS OPERATIONS MANAGER
TECH DIRECTOR
TECH DIRECTOR I
TECH DIRECTOR I - 1ST 6 MOS
TECHNICAL DESIGN DIRECTOR
TECHNICAL DIRECTOR, EDITORIAL
TECHNICAL DIRECTOR-PROD
TECHNICAL LEAD, SYSTEMS ENGINEERING
TECHNICAL WRITER
TECHNICAL WRITER, SENIOR
TECHNICIAN, AUDIO/VISUAL
TECHNICIAN, COLOR CALIBRATION
TECHNICIAN, EDITORIAL
TECHNICIAN, HARDWARE
TECHNICIAN, JUNIOR
TECHNICIAN, MOVE
TECHNICIAN, POST
TECHNICIAN, SENIOR HARDWARE
TECHNOLOGY PRODUCTION COORDINATOR
TRACK READER
TV ANIMATION
TV DAY PLAYER
TV SCHEDULE F
TV SINGER
TV WEEKLY FREELANCE
VIDEO EDITOR - ON CALL
VIDEOGRAPHER
VIS DEV
VIS DEV / PROPS DESIGNER
VIS DEV ARTIST
VIS DEV ARTIST (ANIM/MOD 2) - JOURNEY
VIS DEV ARTIST (ANIM/MODEL 1) - JOURNEY
VIS DEV ARTIST (ANIMATOR 1) - JOURNEY

VIS DEV ARTIST (ANIMATOR 3) - 2ND 6 MOS.
VIS DEV ARTIST - 1ST 6 MOS.
VISUAL DEVELOPMENT ARTIST
VISUAL DEVELOPMENT TRAINEE
VISUAL EFFECTS SUPERVISOR
VOICE ACTOR
VOICE ACTOR - B
VOICE ACTOR - SCH F
VOICE OVER
VOICE OVER - LOOPING
VOICE TALENT
VOICEOVER
VOICEOVER ADR
VSC COORDINATOR
VSC PROJECT MANAGER
WEEKLY DIRECTOR FEATURE
WERITER CONSULTANT
WRITE/CONSULTANT
WRITER
WRITER (CONSULTANT)
WRITER / CONSULTANT
WRITER/ CONSULTANT
WRITER/CONSTULTANT
WRITER/CONSULT
WRITER/CONSULTANT
WRITER/CONSULTANT                    *
WRITER/CONULT
WRITER/PRODUCER
WRITERION STORYPERSON SPVR O/C
WRITERS
WRITING/CONSULTANT
WRITING/CONSULING
WRTER/CONSULTANT
WRTIER/CONSULTANT
Y-1
Y-1 (MUSIC MIXER)
Y-1 SUPERVISING MIXER

Contains Highly Confidential and Attorneys' Eyes Only Materials

**IMD**

ART DEPARTMENT COORDINATOR
ART DEPARTMENT PRODUCTION MANAGER
ART PRODUCTION ASSISTANT
ART RESEARCHER
ASSOCIATE PRODUCER
ASSOCIATE R&D ENGINEER
ASST PRODUCTION MANAGER
ASST PRODUCTION MANAGER, ENGINEERING
AV TECHNICIAN
BUILD/TEST ENGINEER
CATEGORY I - IM DIGITAL UNION
CATEGORY I - IMD UNION
CATEGORY I -IM DIGITAL UNION
CATEGORY I -IMD UNION
CATEGORY I -IMD UNION - DAILY
CATEGORY II GROUP A - IMD UNION
CATEGORY II GROUP A -IMD UNION
CATEGORY II GROUP B - IMD UNION
CATEGORY II GROUP B -IMD UNION
CATEGORY III - IM DIGITAL UNION
CATEGORY III -IMD UNION
CATEGORY IV TRAINEE -IMD UNION
CATEGORY VI -IMD UNION

DIGITAL PRODUCTION MANAGER
DIRECTOR, CREATIVE DEVELOPMENT
EVP / PHYSICAL PRODUCTION - IMD UNION
INFORMATION TECHNOLOGY COORDINATOR
PRINCIPAL A/V ARCHITECT
PRINCIPAL SYSTEMS ARCHITECT
PRODUCTION ASSISTANT
PRODUCTION COORDINATOR
PRODUCTION DEPARTMENT MANAGER
R&D ENGINEER
R&D ENGINEER (CASUAL LTD)
RESOURCE TECHNICAL ASSISTANT
RESOURCE TECHNICAL ASSISTANT (CAS LTD)
RESOURCE TECHNICAL ASSISTANT(CASUAL LTD)
RESOURCE TECHNICAL SUPERVISOR
SAG-TALENT
SR R&D ENGINEER
SR SYSTEMS ADMINISTRATOR
SR SYSTEMS ENGINEER
STORAGE ARCHITECT
SYSTEMS ADMINISTRATOR
SYSTEMS ADMINISTRATOR (CASUAL LTD)

Contains Highly Confidential and Attorneys' Eyes Only Materials

**LucasFilm**

| | |
|---|---|
| 1ST ASSITANT EDITOR | ASSISTANT EPISODIC DIRECTOR |
| 1ST CAMERA ASST | ASSISTANT GRAPHIC ARTIST |
| 2ND ASSISTANT EDITOR | ASSISTANT PRODUCTION MANAGER |
| 3D STORY ARTIST | ASSISTANT PRODUCTION MGR - LAL |
| 3RD ASSISTANT EDITOR/COLORIST | ASSISTANT TECHNICAL DIRECTOR |
| ADR EDITOR | ASSISTANT TO DIRECTOR/PRODUCER |
| ANIMATIC ARTIST LEVEL III | ASSITANT EDITOR |
| ANIMATICS ARTIST | ASSOC FX PRODUCER |
| ANIMATICS ARTIST I | ASSOC PRODUCTION MANAGER |
| ANIMATION DIRECOTR | ASSOC PRODUCTION TECH MANAGER |
| ANIMATION DIRECTOR | ASSOC VFX SUPERVISOR/TRAD |
| ANIMATION DIRECTOR/CG | ASSOC VISUAL EFFECTS PRODUCER |
| ANIMATION MANAGER | ASSOCIATE ARTIST |
| ANIMATION SUPERVISOR | ASSOCIATE CONCEPT DESIGNER |
| ANIMATION SUPERVISORS | ASSOCIATE DESIGNER |
| ANIMATOR (MID) (PROJECT) | ASSOCIATE DIGITAL ARTIST |
| ANIMATOR I | ASSOCIATE EDITOR, FEATURE |
| APPR MODELMAKER | ASSOCIATE PIPELINE PROJECT MGR |
| APPRENT VISUAL EFFECTS EDITOR | ASSOCIATE PRODUCER |
| APPRENTICE | ASSOCIATE PRODUCER, ANIMATION |
| APPRENTICE ART DIRECTOR | ASSOCIATE PRODUCTION MANAGER |
| APPRENTICE EDITOR | ASSOCIATE R&D ENGINEER |
| APPRENTICE EDITOR I | ASSOCIATE R&D PROJECT MANAGER |
| APPRENTICE EDITOR II | ASSOCIATE SOFTWARE ENGINEER |
| APPRENTICE EFFECTS EDITOR | ASSOCIATE TECHNICAL DIRECTOR |
| APPRENTICE MODEL MKR | ASST ANIMATICS ARTIST II |
| APPRENTICE STORYBOARD/CONCEPT | ASST ART DIRECTOR I |
| APPRENTICE/ASSISTANT | ASST DIG MATCHMOVE ARTIST V |
| ART DEPARTMENT APM | ASST DIG MATCHMOVE ARTIST VI |
| ART DEPARTMENT MANAGER | ASST DIGITAL ANIMATOR-V |
| ART DIRECTOR | ASST DIGITAL ANIMATOR-VI |
| ART DIRECTOR - LAL | ASST DIGITAL MATTE ARTIST-V |
| ART DIRECTOR I | ASST DIGITAL MATTE ARTIST-VI |
| ART DIRECTOR II | ASST DIGITAL MODEL PAINTER-V |
| ART/STORYBOARD-ILM | ASST DIGITAL MODEL PAINTER-VI |
| ARTIST | ASST DIGITAL MODELER-V |
| ARTIST I | ASST DIGITAL MODELER-VI |
| ARTIST II | ASST DIGITAL TECH DIRECTOR-V |
| ARTIST III | ASST DIGITAL TECHNICAL DIR-VI |
| ASSISTANT ART DIRECTOR | ASST EDITOR I |
| ASSISTANT DIRECTOR | ASST EDITOR II |
| ASSISTANT EDITOR I | ASST EFFECTS EDITOR-I |
| ASSISTANT EDITOR II | ASST EFFECTS EDITOR-II |

Contains Highly Confidential and Attorneys' Eyes Only Materials

**LucasFilm**

| | |
|---|---|
| ASST GRAPHIC ARTIST I | CG SOFTWARE ENGINEER |
| ASST GRAPHIC ARTIST II | CG SUP/ANIMATION SUP I |
| ASST GRAPHIC ARTIST III | CG SUPERVISOR |
| ASST LAB TECHNICIAN | CG SUPERVISOR, EPISODIC |
| ASST PRD MGR SCRIPTING/CASTING | CG TECHNICAL ASSISTANT |
| ASST SABRE OPERATOR-V | CG TECHNICAL ASST |
| ASST SCENIC ARTIST | CG-PRODUCTION |
| ASST SOUND EFFECTS EDITOR | CG-TA'S |
| ASST STORYBOARD/CONCEPT I | CHARACTER DESIGNER |
| ASST STORYBOARD/CONCEPT II | CHARACTER TECHNICAL DIRECTOR I |
| ASST SUPVERVISING SOUND EDITOR | CHIEF MODEL MAKER |
| ASST SUPVR EDITOR | CHIEF MODELMAKER |
| ASST SUPVR SOUND EDITOR | CHIEF MODELMAKER/SUPERVISOR 1 |
| ASST TECHNICAL DIRECTOR | CHIEF MODELMAKER/SUPERVISOR 2 |
| ASST TO EXECUTIVE PRODUCER | CHIEF MODELMAKER/SUPERVISOR-I |
| ASST VISUAL EFFECTS EDITOR | CHIEF MODELMAKER/SUPERVISOR-II |
| AUDI0 TECHNICIAN 2 | COLOR DESIGNER |
| AUDIO DESIGNER I | COLOR TIMING SUPERVISOR |
| AUDIO DESIGNER II | COMMERCIAL ASST EDITOR-I |
| AUDIO DESIGNER III | COMMERCIAL ASST EDITOR-II |
| AUDIO DESIGNER IV | COMMERCIAL EDITOR II |
| AUDIO TECHNICIAN I | COMMERCIAL EDITOR-I |
| AUDIO TECHNICIAN II | COMMERCIALS-SSN |
| AUDIO TECHNICIAN III | COMMERIALS LA |
| AUDIO-SSN | COMMERICALS-ILM |
| BEST BOY | COMPOSITOR (MID) (PRJ) |
| CAMERA ENGINEERING/AREA SUPERV | COMPUTER SUPPORT-SSN |
| CAMERA OPERATOR I | CONCEPT ARTIST |
| CAMERA OPERATOR II | CONCEPT DESIGNER I |
| CAMERA-ILM | CONCEPT DESIGNER II |
| CASTING/SCRIPTING APM | CONCEPTUAL ART SUPERVISOR |
| CG - 2D | COSTUME SUPERVISOR |
| CG - 3D | COSTUMER |
| CG - COMMERICALS | CREATURE TD |
| CG ADMIN/MODEL | CSE - ILM |
| CG ANIMATORS | D-CINEMA |
| CG ARTISTS (WAS DIGITAL PROD. MGMT) | DATABASE ADMINISTRATOR I |
| CG DEPARTMENT SUPERVISOR | DATABASE DEVELOPER |
| CG DEVELOPMENT-ILM | DATABASE SYSTEMS DEVELOPER I |
| CG DIG-MATTE | DESIGNER |
| CG PRINCIPAL ENGINEER | DESIGNER I |
| CG SCHEDULING MANAGER | DESIGNER II |
| CG SINGAPORE (WAS DIGITAL SUPS) | DESIGNER III |

20

Contains Highly Confidential and Attorneys' Eyes Only Materials

**LucasFilm**

DESIGNER LEVEL IV

DESKTOP SYSTEMS SPECIALIST

DIGITAL ANIMATOR 1, LEAD

DIGITAL ANIMATOR 2

DIGITAL ANIMATOR 3

DIGITAL ANIMATOR 4

DIGITAL ANIMATOR 5, ASST

DIGITAL ANIMATOR 6, ASST

DIGITAL ANIMATOR-II

DIGITAL ANIMATOR-III

DIGITAL ANIMATOR-IV

DIGITAL ARTISIT PRODUCTION MGR

DIGITAL ARTIST I

DIGITAL ARTIST II

DIGITAL ARTIST PRODCTN MANAGER

DIGITAL ARTIST SUPERVISOR

DIGITAL CHARACTER SUPERVISOR

DIGITAL COMPOSITOR 1, LEAD

DIGITAL COMPOSITOR 2

DIGITAL COMPOSITOR 3

DIGITAL COMPOSITOR 4

DIGITAL COMPOSITOR 5

DIGITAL COMPOSITOR 6

DIGITAL COMPOSITOR-II

DIGITAL COMPOSITOR-III

DIGITAL COMPOSITOR-IV

DIGITAL COMPOSITOR-V

DIGITAL FEATURES

DIGITAL MATCHMOVE ARTISIT III

DIGITAL MATCHMOVE ARTISIT IV

DIGITAL MATCHMOVE ARTIST 1

DIGITAL MATCHMOVE ARTIST 2

DIGITAL MATCHMOVE ARTIST 3

DIGITAL MATCHMOVE ARTIST 4

DIGITAL MATCHMOVE ARTIST 5

DIGITAL MATCHMOVE ARTIST 6

DIGITAL MATCHMOVE ARTIST II

DIGITAL MATCHMOVE ARTIST-II

DIGITAL MATCHMOVE ARTIST-III

DIGITAL MATCHMOVE ARTIST-IV

DIGITAL MATCHMOVE ARTIST-V

DIGITAL MATTE ARTIST 1, LEAD

DIGITAL MATTE ARTIST 2

DIGITAL MATTE ARTIST 3

DIGITAL MATTE ARTIST 4

DIGITAL MATTE ARTIST 5, ASST

DIGITAL MATTE ARTIST 6, ASST

DIGITAL MATTE ARTIST-II

DIGITAL MATTE ARTIST-III

DIGITAL MATTE ARTIST-IV

DIGITAL MODEL PAINTER 1, LEAD

DIGITAL MODEL PAINTER 2

DIGITAL MODEL PAINTER 4

DIGITAL MODEL PAINTER 5, ASST

DIGITAL MODEL PAINTER 6, ASST

DIGITAL MODEL PAINTER-II

DIGITAL MODEL PAINTER-III

DIGITAL MODEL PAINTER-IV

DIGITAL MODELER 2

DIGITAL MODELER 3

DIGITAL MODELER 4

DIGITAL MODELER 5, ASST

DIGITAL MODELER 6, ASST

DIGITAL MODELER-II

DIGITAL MODELER-III

DIGITAL MODELER-IV

DIGITAL PIPELINE SUPERVISOR

DIGITAL PLATE RESTORATION TECH

DIGITAL PLT RESTORATION TCH-I

DIGITAL PLT RESTORATN TECH-III

DIGITAL RESOURCE ASSISTANT

DIGITAL RESOURCE ASST

DIGITAL RESOURCE DEPT ASST

DIGITAL RESOURCE DEPT COORD

DIGITAL RESOURCE MANAGER

DIGITAL RESOURCE SUPERVISOR

DIGITAL ROTOSCOPE ARTIST 1

DIGITAL ROTOSCOPE ARTIST-II

DIGITAL ROTOSCOPE ARTIST-III

DIGITAL ROTOSCOPE ARTIST-IV

DIGITAL ROTOSCOPE ARTIST-V

DIGITAL ROTOSCOPE ARTIST-VI

DIGITAL SUPERVISOR

DIGITAL TECH DIRECTOR 1, LEAD

DIGITAL TECH DIRECTOR 2

DIGITAL TECH DIRECTOR 3

21

Contains Highly Confidential and Attorneys' Eyes Only Materials

**LucasFilm**

| | |
|---|---|
| DIGITAL TECH DIRECTOR 4 | EPISODIC DIRECTOR |
| DIGITAL TECH DIRECTOR 5, ASST | EXECUTIVE PRODUCER, VISUAL EFF |
| DIGITAL TECH DIRECTOR 6, ASST | EXECUTIVE PRODUCTION |
| DIGITAL TECHNICAL DIRECTOR-II | FEATURES-EDITORIAL |
| DIGITAL TECHNICAL DIRECTOR-III | FILM EFFECTS EDITOR-I |
| DIGITAL TECHNICAL DIRECTOR-IV | FILM EFFECTS EDITOR-II |
| DIGITAL TECHNOLOGIES ADMIN | FILM GROUP DEPT MGR |
| DIR OF PHOTOGRAPHY/NON-UNION | FILM GROUP PROD SUPERVISOR |
| DIR OF PHOTOGRAPHY/TRAD | FIRST ASST CAMERA OPERATOR |
| DIR OF PHOTOGRAPHYF/AREA SUP | FOLEY |
| DIR OF PHYSICAL PRODUCTION | FOLEY EDITOR |
| DIR, ANIMATION DEVELOPMENT | FOLEY WALKER |
| DIR, PRODUCTION TECHNOLOGY | FX SUPERVISORS-ILM |
| DIRECTOR OF FILM & EDITORIAL | GLOBAL PIPELINE (WAS CG RESOURCES) |
| DIRECTOR OF PHOTO/AREA SUP. | GRAPHIC ARTIST |
| DIRECTOR OF PHOTOGRAPHY | GRAPHIC ARTIST I |
| DIRECTOR OF SCORING | GRAPHIC DESIGN CONSULTANT |
| DIRECTOR TECHNICAL OPERATIONS | GRAPHIC DESIGNER I |
| DIRECTOR, ENGINEERING | GRIP |
| DIRECTOR, R&D DEVELOPMENT | HEAD OF ANIMATION TECHNOLOGY |
| DIRECTOR, R&D OPERATIONS | HEAD OF SOFTWARE ENGINEERING |
| DIRECTOR, RESEARCH & DEVELOPMT | HEAD STAGE TECH |
| DIRECTOR, SOUND DESIGN | HEAD STAGE TECH. |
| DOCUMENTARIAN PROJECT MGR | HEAD STAGE TECHNICIAN |
| DOCUMENTARIAN TECHNICAL ASST | HEAD WRITER |
| EDITING-SSN | HELPDESK FRNTLNE SUPP TECH I |
| EDITOR | IMAGE COORDINATOR |
| EDITOR I | IMAGE UNIT APM |
| EDITOR II | INFORMATION SYSTEMS |
| EDITOR, FEATURE | INFORMATION SYSTEMS MGR |
| EDITORIAL SERVICES ASST | IT MANAGER |
| EDITORIAL SERVICES TECHNICIAN | IT PRODUCTION ENG & SYS ADMIN |
| EDITORIAL WIRING TECH | IT SERVICES SPECIALIST |
| EFFECTS DEVELOPER | JAVA DEVELOPER |
| ELECTRONIC ENGR. 2 | JR R&D ENGINEER |
| ENGINEER | JR TECHNICAL OPERATOR |
| ENGINEERING MANAGER | JUNIOR ARTIST |
| ENGINEERING PROJECT MGR | LAYOUT ARTIST |
| ENGINEERING-ILM | LEAD ANIMATOR |
| ENGINEERING-SSN | LEAD CONCEPT DESIGNER |
| ENTRY LEVEL WIRE TECH | LEAD DIG COMPOSITOR-I |
| ENVELOPER-IV | LEAD DIG MATCHMOVE ARTIST I |
| EPISODIC DEVELOPMENT | LEAD DIG MATCHMOVE ARTIST-I |

22

Contains Highly Confidential and Attorneys' Eyes Only Materials

**LucasFilm**

| | |
|---|---|
| LEAD DIG ROTOSCOPE ARTIST-1 | MODELER II |
| LEAD DIG TECHNICAL DIRECTOR-I | MODELMAKER |
| LEAD DIGITAL ANIMATOR-I | MODELMAKER 1 |
| LEAD DIGITAL ARTIST I | MODELMAKER 3 |
| LEAD DIGITAL ARTIST II | MODELMAKER I |
| LEAD DIGITAL MATTE ARTIST-I | MODELMAKER-I |
| LEAD DIGITAL MODEL PAINTER-I | MODELMAKER-II |
| LEAD DIGITAL MODELER-I | MODELMAKER-III |
| LEAD IT SERVICES | MOTION CAPTURE |
| LEAD MODELER | MOTION CAPTURE ENGINEER-I |
| LEAD QUALITY ASSURANCE ANALYST | MOTION CAPTURE TECHNICIAN-IV |
| LEAD SABRE OPERATOR-I | MOTION CAPTURE TECHNICIAN-V |
| LEAD SOFTWARE ENGINEER | MOTION CAPTURE TECHNICIAN-VI |
| LEAD TECHNICAL DIRECTOR | MUSIC ASSISTANT |
| LEAD VIDEO TECHNICIAN | MUSIC SUPERVISOR |
| LIGHTING TD | NEGATIVE SUPERVISOR |
| LINEUP I | NETWORK SYSTEMS |
| MAC TECH ASST | NT SPECIALIST |
| MAC/PC TECHNICIAN | NT/2000 HARDWARE ADMINISTRATOR |
| MACHINIST I/CINEMA TECH I | ORACLE DATABASE ADMINISTRATOR |
| MACHINIST II/CINEMA TECHNICIAN | PHOTOGRAPHER |
| MANAGER MODEL SHOP | PHOTOGRAPHER /LAB TECH #1 |
| MANAGER OF SYSTEMS ENGINEERING | PHOTOGRAPHER/LAB TECH I |
| MANAGER, AUDIO | PHOTOGRAPHER/LAB TECH III |
| MANAGER, MEDIA OPERATIONS | PHOTOGRAPHER/LAB TECH IV |
| MATCHMOVE/MOCAP POST | PICTURE EDITOR |
| MATERIALS LIGHTING TD LEVEL II | PIPELINE ENGINEER I |
| MCR (FORMERLY COMM. EDITORIAL) | PIPELINE ENGINEER II |
| MEDIA OPERATIONS COORDINATOR | PIPELINE SUPERVISOR |
| MEDIA OPERATIONS PRODCTN ASST | PIPELINE SUPERVISOR - LAL |
| MEDIA SYSTEMS ENGINEER I | PLATE PRODUCTION COORDINATOR |
| MEDIA SYSTEMS ENGINEER II | POST EDITOR |
| MEDIA SYSTEMS TECHNICIAN | POST EDITOR, FEATURE |
| MGR OF COMM'L VISUAL EFFECTS | PRE-PRODUCTION ASSET ARTIST |
| MGR OF SOFTWARE SYS & TECH SUP | PRE-VIZ ARTIST I |
| MGR, PRODUCTION INFO SYSTEMS | PRE-VIZ ARTIST II |
| MGR, SYSTEMS OPERATION SUPPORT | PRE-VIZ ARTIST III |
| MIXER AUDIO DESIGNER 3 | PRE-VIZ LEAD ARTIST |
| MIXING AND DESIGN-SSN | PREVIS SUPERVISOR |
| MODEL MAKER | PRINCIPAL R&D ENGINEER |
| MODEL MAKER III | PROD SUPERVISOR/COMMERCIALS |
| MODEL SHOP-ILM | PRODUCER |
| MODELER I | PRODUCER, ANIMATION |

Contains Highly Confidential and Attorneys' Eyes Only Materials

**LucasFilm**

PRODUCER/COMM'LS

PRODUCERS (WAS PRODUCTION)

PRODUCT MANAGER

PRODUCT TECHNOLOGY SPECIALIST

PRODUCTION ASSISTANT

PRODUCTION ASSISTANT - LAL

PRODUCTION ASSISTANT, PROJECT

PRODUCTION ASST (A)

PRODUCTION ASST (B)

PRODUCTION COORD A

PRODUCTION COORD I

PRODUCTION COORD I (B)

PRODUCTION COORD II

PRODUCTION COORD II (B)

PRODUCTION COORDINATOR

PRODUCTION COORDINATOR - LAL

PRODUCTION COORDINATOR B

PRODUCTION ENGINEERING ADMIN

PRODUCTION MANAGER

PRODUCTION MANAGER I

PRODUCTION MANAGER II

PRODUCTION MGR

PRODUCTION OPERATIONS-ILM

PRODUCTION SERVICE COORD

PRODUCTION SOFTWARE ENGINEER

PRODUCTION STAFF - SSN

PRODUCTION SUPERVISOR

PRODUCTION SUPERVISOR - SS

PRODUCTION SUPPORT (WAS CREATIVE OPS)

PRODUCTION TECHNOLOGY MANAGER

PROGRAMMER

QUALIFICATN&AUTOMTN ENGINEER I

QUALIFICTN&AUTOMTN ENGINEER II

QUALITY ASSURANCE ANALYST I

QUALITY ASSURANCE ANALYST II

R&D ENGINEER

R&D ENGINEER I

R&D ENGINEER II

R&D ENGINEER III

R&D OPERATIONS MANAGER

R&D PRODUCT SPECIALIST II

R&D PROJECT COORDINATOR

R&D PROJECT MANAGER II

R&D SUPERVISOR

R&D TD'S

RE-RECORDING MIXER

RESEARCH & DEVELOPMENT

ROTO ARTIST (MID) (PRJ)

ROTO ARTIST (SR/LEAD)

SABRE OPERATOR-II

SABRE OPERATOR-IV

SABRE PRODUCTION MGR

SABRE SOFTWARE ENGINEER

SCANNING OPERATOR I

SCANNING SUPERVISOR

SCENIC ARTIST

SCORING-G & A

SCORING-SSN

SCRIPT/TOOLS PROGRAMMER

SCULPTER/DESIGNER

SENIOR ANIMATOR

SENIOR ART DIRECTOR

SENIOR ARTIST

SENIOR ARTIST I

SENIOR ARTIST II

SENIOR COLOR TIMER

SENIOR CONCEPT DESIGNER

SENIOR DIGITAL ARTIST

SENIOR ENGINEER

SENIOR MODELER

SENIOR PIPELINE ENGINEER

SENIOR PRODUCER/COMM'LS

SENIOR SCANNING OPERATOR

SENIOR TD

SEQUENCE SUPERVISOR

SET DESIGNER

SET DIRECTOR

SET-UP PRODUCTION ASST

SGI HARDWARE ADMINISTRATOR

SGI HARDWARE TECHNICIAN

SOFTWARE CONFIG ENGINEER

SOFTWARE ENGINEER

SOFTWARE ENGINEER I - LAL

SOFTWARE ENGINEERING

SOUND EFFECT EDITOR III

24

Contains Highly Confidential and Attorneys' Eyes Only Materials

**LucasFilm**

| | |
|---|---|
| SOUND EFFECTS EDITOR I | STAGE TECHNICIAN-I |
| SOUND EFFECTS EDITOR II | STAGE TECHNICIAN-II |
| SOUND EFFECTS EDITOR III | STAGE TECHNICIAN-III |
| SOUND RECORDIST | STAGE TECHNICIAN-IV |
| SR ART DIRECTOR | STAGE-ILM |
| SR CAMERA OPERATOR | STILL PHOTO PA/ARCHIVIST |
| SR COLORIST | STORY ARTIST |
| SR COMMERCIAL EDITOR | STORY CONSULTANT |
| SR CREATURE TECHNICIAN | STORYBOARD ARTIST |
| SR DIGITAL RESOURCE ASST | STORYBOARD/CONCENT ARTIST |
| SR FILM EDITOR | SUPERVISING DIRECTOR EPISODIC |
| SR GRAPHIC ARTIST | SUPERVISING DIRECTOR, LAL |
| SR MANAGER, R&D OPERATIONS | SUPERVISING SOUND EDITOR |
| SR MGR, MEDIA OPERATIONS | SUPERVISING TECHNICAL DIRECTOR |
| SR MGR, PRODUCTION MANAGEMENT | SUPERVISOR I |
| SR MODELMAKER | SUPERVISOR II |
| SR PROGRAMMER | SUPERVISOR OF ENGINEERING |
| SR R&D ENGINEER | SUPERVISOR, ENGINEERING |
| SR SOFTWARE ENGINEER | SUPERVISOR, VIDEO ENGINEERING |
| SR STAGE TECHNICIAN | SYSTEM ADMIN |
| SR SYSTEMS ENGINEER | SYSTEMS ENGINEER |
| SR TECHNICAL DIRECTOR | SYSTEMS ENGR- VIDEO SOFTWARE |
| SR TECHNICAL OPERATOR | SYSTEMS SECURITY ADMINISTRATOR |
| SR VFX EDITOR | SYSTEMS SECURITY ENGINEER |
| SR VIDEO EDITOR | SYSTEMS/TOOLS PROGRAMMER |
| SR VIDEO ENGINEER | TD (MID) |
| SR VIDEO SYSTEMS INTEGRATOR | TD (SR/LEAD) (PRJ) |
| SR VISUAL EFFECTS EDITOR | TD LEVEL I |
| SR VP, FEATURE PRODUCTION | TD LEVEL II MODELER |
| SR WIRE TECH | TD LEVEL III MODELER |
| SR. MODELMAKER | TD LEVEL III-FX/SIM |
| SR. MOLDMAKER | TECHNICAL ADVISOR |
| SR. STAGE TECH | TECHNICAL APPR/SKY |
| STAFF WRITER | TECHNICAL APPRENTICE |
| STAGE TECH | TECHNICAL APPRENTICE/CG |
| STAGE TECH 1 | TECHNICAL APPRENTICE/TRAD |
| STAGE TECH 3 | TECHNICAL ASSISTANT |
| STAGE TECH I | TECHNICAL ASSISTANT SUPERVISOR |
| STAGE TECHNICIA 3 | TECHNICAL ASSISTANT/TRAD |
| STAGE TECHNICIA 4 | TECHNICAL ASST/CG |
| STAGE TECHNICIAN | TECHNICAL ASST/SKY |
| STAGE TECHNICIAN 2 | TECHNICAL DIRECTOR |
| STAGE TECHNICIAN I | TECHNICAL DIRECTOR I |

25

Contains Highly Confidential and Attorneys' Eyes Only Materials

**LucasFilm**

| | |
|---|---|
| TECHNICAL DIRECTOR II | VIDEO SUPERVISOR |
| TECHNICAL MGR, EXTERNAL PROD | VIDEO SYS SOFTWARE ENGINEER |
| TECHNICAL OPERATOR | VIDEO TECHNICIAN |
| TECHNICAL PRODUCTION COORD | VIDEO-SSN |
| TECHNICAL SUPERVISOR | VISION ENGINEER |
| TECHNOCRANE OPERATOR | VISUAL EFFECTS EDITOR |
| TV ANIMATOR | VISUAL EFFECTS EDITOR I |
| UNIX/PRODUCTION SYSTEMS | VISUAL EFFECTS EDITOR II |
| VFX SUPERVISOR | VISUAL EFFECTS EDITOR III |
| VFX SUPERVISOR/NON-UNION | VISUAL EFFECTS PRODUCER |
| VID. ASSIST - HEAD STAGE TECH | VISUAL EFFECTS PRODUCER I |
| VIDEO ENGINEER | VISUAL EFFECTS PRODUCER II |
| VIDEO ENGINEERING TECH COORD | WEBMASTER |
| VIDEO ENGINEERING-ILM | WEBMASTER III |
| VIDEO SERVICES | WIRING TECHNICIAN |

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Pixar**

| | |
|---|---|
| 360 DEGREE CREATIVE LEAD | CAMERA OPERATOR |
| 360 DEGREE TECH. LEAD | CAMERA OPERATOR, ASST. |
| ADMINISTRATOR, TECH DEPT. | CAMERA OPERATOR, SR. |
| ANIMATION TECHNICIAN | CAMERA SUPERVISOR |
| ANIMATION WRANGLER | CGI PAINTER |
| ANIMATOR | CGI PAINTER 30 HRS |
| ANIMATOR, CROWD | CHARACTER DESIGN LEAD |
| ANIMATOR, CROWD LEAD | CHARACTER DESIGNER |
| ANIMATOR, DIRECTING | CO-PRODUCER |
| ANIMATOR, FIX | COLOR GRADING OPERATOR |
| ANIMATOR, FIX LEAD | COMPUTER OPERATOR |
| ANIMATOR, SUPERVISING | COORDINATOR, HELP DESK |
| APPLICATION DEVELOPER | CREATIVE ASSOCIATE |
| ARCHITECT, COLOR SYSTEMS | CREATIVE DIR., CANADA STUDIO |
| ARCHITECT, DIGITAL | CREATIVE DIRECTOR |
| ARCHITECT, SYSTEM | CREATIVE EXECUTIVE & DIRECTOR |
| ARCHIVE ASSISTANT | DATABASE PROJ. SPEC |
| ARCHIVE COORDINATOR | DATABASE PROJ. SPEC - 30 HRS |
| ARCHIVES TECHNICIAN | DESIGN LEAD |
| ARCHIVIST | DESIGNER |
| ARCHIVIST, COLLECTIONS | DESIGNER, CAMERA |
| ARCHIVIST, LEAD | DESIGNER, ENVIRONMENTAL |
| ARCHIVIST, LEAD - INFO RSRCS | DESIGNER, GRAPHIC |
| ARCHIVIST, LEAD - PROJ MGR. | DESIGNER, PRODUCTION |
| ART DIRECTOR | DESIGNER, SHADING |
| ART DIRECTOR, SHADING | DESIGNER, SHADING-HRLY |
| ARTIST, AFTER-EFFECTS | DEVELOPER, RENDERMAN PRODUCTS |
| ARTIST, ASST. STORY | DEVELOPMENT ASSOCIATE |
| ARTIST, CHARACTER | DEVELOPMENT COORDINATOR |
| ARTIST, DEVELOPMENT | DEVELOPMENT EXECUTIVE |
| ARTIST, DIGITAL | DIR. OF PRODUCTION |
| ARTIST, GRAPHIC | DIR., MEDIA SERVICES |
| ARTIST, MOTION GRAPHIC | DIR., MEDIA SYSTEMS |
| ARTIST, SKETCH | DIR., PHOTOSCIENCE |
| ARTIST, STORY | DIR., PIXAR UNIV. & ARCHIVES |
| ARTIST, STORY DEVELOPMENT | DIR., POST PRODUCTION & EDIT. |
| ARTIST, STORY-30 HRS | DIR., RENDERMAN PRODUCT DEV |
| ASSISTANT PROJECTIONIST | DIR., STEREO & IMAGE MASTERING |
| ASSISTANT, ART & FILM | DIR., STUDIO TOOLS |
| ASSISTANT, RAPID PROTOTYPE | DIR., SYSTEMS |
| ASSISTANT, SHADING PACKET | DIR., SYSTEMS INFRASTRUCTURE |
| ASST COLOR GRADING OPERATOR | DIRECTOR OF PHOTOGRAPHY |

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Pixar**

DIRECTOR, ASSOCIATE DEV
DIRECTOR, CO. - FEATURE
DIRECTOR, FEATURE FILM
DIRECTOR, SHADING ART
DVD SPECIALIST & TRANSFER OP
EDITOR
EDITOR, 1ST ASST.
EDITOR, 2ND ASST.
EDITOR, ASSOCIATE
EDITOR, DOCUMENTARY ASSISTANT
EDITORIAL ASSISTANT
EDITORIAL COORDINATOR
ENGINEER
ENGINEER SR., SOFTWARE
ENGINEER SR., SOFTWARE 30 HRS
ENGINEER, ANIMATION SUPPORT
ENGINEER, API QUALITY ASSURANC
ENGINEER, APPLICATIONS
ENGINEER, ASSOCIATE
ENGINEER, ASSURANCE AUTOMATION
ENGINEER, DATABASE ARCHITECT
ENGINEER, EDITORIAL PIPELINE
ENGINEER, EDITORIAL SUPPORT
ENGINEER, FRONT LINE SUPPORT
ENGINEER, IMAGE MASTERING
ENGINEER, INSTRUMENTATION
ENGINEER, LEAD
ENGINEER, LEAD INFRASTRUCTURE
ENGINEER, LEAD PHOTOSCIENCE
ENGINEER, LEAD SOFTWARE
ENGINEER, MEDIA SYSTEMS
ENGINEER, MENV SUPPORT
ENGINEER, PHOTOSCIENCE
ENGINEER, PIPELINE
ENGINEER, PIPELINE (ROTATION)
ENGINEER, PNG LEAD SOFTWARE
ENGINEER, PNG QUALITY ASSURANC
ENGINEER, PNG SOFTWARE
ENGINEER, PNG SR. SOFTWARE
ENGINEER, PRODUCTION
ENGINEER, PRODUCTION SUPPORT
ENGINEER, PU INFRASTRUCTURE
ENGINEER, QUALITY ASSURANCE

ENGINEER, RECORDING
ENGINEER, RENDERING PIPELINE
ENGINEER, RENDERMAN SUPPORT
ENGINEER, SCREENING ROOM
ENGINEER, SOFTWARE
ENGINEER, SOFTWARE (HOURLY)
ENGINEER, SOFTWARE (ROTATION)
ENGINEER, SOFTWARE 30 HRS
ENGINEER, SOFTWARE GRAPHICS
ENGINEER, SOFTWARE TEST
ENGINEER, SOFTWARE/TECHSUPPORT
ENGINEER, SOFTWARE/TTD
ENGINEER, SR SW INFRASTRUCTURE
ENGINEER, SR. AUTOMATION
ENGINEER, SR. MEDIA SYSTEM
ENGINEER, STUDIO SUPPORT
ENGINEER, SW INFRASTRUCTURE
ENGINEER, TECHNICAL SUPPORT
ENGINEER, VIDEO
ENGINEER, WEB
ENGINEER, WEB INFRASTRUCTURE
ENGINEER., PROJ. LEAD SOFTWARE
ENGINEERING MANAGER
FRANCHISE GUARDIAN, CARS
GRAPHIC ARTIST
IMAGE MASTER SUPERVISOR
IMAGE MASTERING COORDINATOR
INTERACTION DESIGNER
INTRANET DESIGNER, PNG
LAYOUT ARTIST
LAYOUT ARTIST, LEAD
LAYOUT SUPERVISOR
LAYOUT TD
MANAGER, PRODUCTION
MANAGER, PRODUCTION FRANCHISE
MEDIA SYSTEMS COORDINATOR
MGR, MEDIA SERVICES
MGR, SOFTWARE PROJECT RELEASE
MGR., 360 GROUP
MGR., A/V ENGINEERING
MGR., APPLICATIONS GROUP
MGR., ARCHIVES
MGR., BUILD

28

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Pixar**

| | |
|---|---|
| MGR., CAMERA DEPT. | PRODUCER, DVD |
| MGR., CAMERA DEPT. 35 HRS | PRODUCER, SHORTS |
| MGR., CAMERA DEPT. NE | PRODUCER, SHORTS EXECUTIVE |
| MGR., CREATIVE PROJECTS | PRODUCTION - CAMERA - HOURLY |
| MGR., DEPT. - 30 HRS | PRODUCTION ASSISTANT |
| MGR., DEPT. - FEATURE | PRODUCTION ASSISTANT - 3 DAYS |
| MGR., DEPT.-FEATURE (HRLY) | PRODUCTION ASSISTANT-EDIT |
| MGR., DESKTOP SYSTEMS | PRODUCTION ASST, EDITORIAL |
| MGR., EDIT & POST., SR. | PRODUCTION COORDINATOR |
| MGR., I.S. SUPPORT | PRODUCTION RESOURCES ASSOCIATE |
| MGR., IMAGE MASTERING | PRODUCTION SUPER-STORY/EDIT |
| MGR., INFRASTRUCTURE | PRODUCTION TECHNICIAN |
| MGR., IT CONSTRUCTION | PROGRAM MGR., STUDIO TOOLS |
| MGR., LEAD PROJ.-STUDIO TOOLS | PROGRAMMER |
| MGR., MEDIA SYSTEMS | PROGRAMMER-30 HRS |
| MGR., PRODUCTION OFFICE | PROJECT COORDINATOR |
| MGR., QUALITY ASSURANCE | PROJECT COORDINATOR, SPECIAL |
| MGR., RPG | PROJECT MGR., CARS |
| MGR., RPG & SYSTEMS OPS SVCS | PROJECT MGR., DVD |
| MGR., RPG - 32 HRS | PROJECT MGR., PNG |
| MGR., SR. PROJECT-STUDIO TOOLS | PROJECT MGR., RENDERMAN |
| MGR., SR. SYSTEMS | PROJECT MGR., SR. DESIGN |
| MGR., SW INFRASTRUCTURE | PROJECT MGR., STUDIO TOOLS |
| MGR., SYSTEMS INFRASTRUCTURE | PROJECTIONIST |
| MGR., SYSTEMS OPERATIONS | QA TESTER |
| MGR., TECHNICAL DIRECTORS | RAPD PROTOTYPE COMPUTER ARTIST |
| MGR., TOOLS WORKFLOW | RENDER COORDINATOR |
| MGR., TRAILER/INTERNATIONAL | RENDER PIPELINE SPECIALIST |
| MGR., USER INTERFACE | RENDER WRANGLER |
| NIGHT OPERATOR | RESEARCH ASSISTANT |
| PAINTER, DIGITAL | RESIDENT - ANIMATION |
| PAINTER, MATTE | RESIDENT - SOFTWARE ENGINEER |
| PHOTO EDITOR | RESIDENT - STORY ARTIST |
| PHOTOGRAPHER | RESIDENT - TECHNICAL DIRECTOR |
| PNG GROUP LEAD | SCHEDULING COORDINATOR |
| POST PRODUCTION ASSISTANT | SCIENTIST |
| POST PRODUCTION COORDINATOR | SCIENTIST, RESEARCH |
| POST PRODUCTION MANAGER | SCIENTIST, SR. |
| POST PRODUCTION SUPERVISOR | SCRIPT COORDINATOR |
| PRODUCER | SCRIPT SUPERVISOR |
| PRODUCER - PART TIME | SCULPTOR |
| PRODUCER, ASSOCIATE | SENIOR CAMERA OPERATOR |
| PRODUCER, DEVELOPMENT | SENIOR DEVELOPMENT EXECUTIVE |

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Pixar**

| | |
|---|---|
| SET DRESSER | TECHNICAL DIRECTOR, 3 DAYS |
| SET TD, SUPERVISING | TECHNICAL DIRECTOR, 4 DAYS |
| SOFTWARE DEVELOPER | TECHNICAL DIRECTOR, ASSOCIATE |
| SOUND DESIGNER, CHARACTER | TECHNICAL DIRECTOR, BLD_RENDER |
| SOUND EDITOR | TECHNICAL DIRECTOR, LEAD |
| SOUND EDITOR, ASSISTANT | TECHNICAL DIRECTOR, LEAD (30 H |
| SOUND EDITOR, ASSOCIATE | TECHNICAL DIRECTOR, SW ENG |
| SR CREATIVE DEVELOPER | TECHNICAL DIRECTOR, TOOLS |
| SR CREATIVE DEVELOPER 30 HRS | TECHNICAL LEAD, A/V |
| SR. PROJECTIONIST | TECHNICAL LEAD, BACKUP GROUP |
| SR. VP, TECHNOLOGY | TECHNICAL LEAD, IMAG MASTERING |
| STEREO, CREATIVE LEAD | TECHNICAL LEAD, MEDIA SYSTEMS |
| STORY ARTIST, DIGITAL | TECHNICAL LEAD, RENDERING |
| STORY EDITOR | TECHNICAL LEAD, RENDR PIPELINE |
| SUPERVISOR, DEPT/UNIT (30 HRS) | TECHNICAL LEAD, STEREO & INT'L |
| SUPERVISOR, MEDIA SERVICES | TECHNICAL LEAD, STORAGE |
| SUPERVISOR, SEQUENCE | TECHNICAL WRITER |
| SUPERVISOR, STORY | TECHNICAL WRITER, API |
| SYSTEMS ADMINISTRATOR | TECHNICIAN, A/V SYSTEMS |
| SYSTEMS ADMINISTRATOR, ASSET | TECHNICIAN, HARDWARE |
| SYSTEMS ADMINISTRATOR, JR. | TECHNICIAN, MEDIA SYSTEMS |
| SYSTEMS ADMINISTRATOR, JR. MAC | TECHNICIAN, PHOTOSCIENCE |
| SYSTEMS ADMINISTRATOR, LEAD | TOOLS COORDINATOR |
| SYSTEMS ADMINISTRATOR, SR. | TRANSFER OPERATOR |
| SYSTEMS ASSISTANT | TRANSITION COORDINATOR, PRD |
| SYSTEMS ASSISTANT 20 HRS | USER INTERFACE DESIGNER |
| SYSTEMS ASSISTANT 30 HRS | USER INTERFACE DESIGNER, SR. |
| SYSTEMS ASSISTANT PT | VIDEO, ENGINEER SR. |
| SYSTEMS COORDINATOR | VIDEOGRAPHER |
| TAILOR | VISUAL DESIGNER |
| TECH DIR., SR. ANIM SCIENTIST | VP, ADVANCED TECHNOLOGY |
| TECH DIRECTOR, CRTV SVCS | VP, COMPUTER OPERATIONS |
| TECH DIRECTOR, DEPT. SUPV | VP, CREATIVE & FEATURE DIR. |
| TECH DIRECTOR, SUPERVISING | VP, SOFTWARE ENGINEERING |
| TECH DIRECTOR-LEAD, CRTV SVCS | VP, SYSTEMS |
| TECHNICAL ASSISTANT | VP, TECHNOLOGY |
| TECHNICAL DIRECTOR | WORKFLOW ARTIST |
| TECHNICAL DIRECTOR (ROTATION) | WORKFLOW INTERACTION DESIGNER |

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Sony**

| | |
|---|---|
| ADMIN ASSOC SYS | CREATIVE EXECUTIVE |
| ADMIN DATA ARCHIVE | DC ANIMATION SUPV |
| ADMIN INT SYS | DC ANIMATION SUPV SR |
| ANIMATOR ASSOC DC | DC ANIMATOR ASSOC |
| ANIMATOR ASSOC TECHNICAL | DC ANIMATOR INT |
| ANIMATOR INT DC | DC ANIMATOR SPEC |
| ANIMATOR INT TECHNICAL | DC ANIMATOR SR |
| ANIMATOR SR | DC MODELER SPEC |
| ANIMATOR SR DC | DESIGNER CHARACTER |
| ANIMATOR SR TECHNICAL | DESIGNER PROD |
| ANIMATOR SUPV DC | DEV DIR,CONSOLE GAME DEVELOPMT |
| ARCHITECT PIPELINE | DEVELOPMENT SUPV |
| ARCHITECT SR SYS | DIGITAL ARTIST ASSOC |
| ARCHIVIST DIGITAL | DIGITAL ARTIST INT |
| ART DIRECTOR | DIGITAL ARTIST SR |
| ART DIRECTOR ASSOCIATE | DIGITAL EFFECTS SUPV |
| ART DIRECTOR PRINC | DIGITAL EFFECTS SUPV PROJ |
| ART DIRECTOR SR | DIGITAL PROD MGR ASSOC |
| ARTIST INT STORYBOARD | DIGITAL PROD MGR INT |
| ARTIST INT STORYBOARD I | DIGITAL PROD MGR SR |
| ARTIST INT STORYBOARD III | DIR |
| ARTIST INT VISUAL DEV | DIR ANIMATED FEATURES |
| ARTIST SR COMPOSITOR | DIR ANIMATION PRODUCTION |
| ARTIST SR LAYOUT | DIR ART |
| ARTIST SR STORYBOARD | DIR ART PROD DESIGNER |
| ARTIST SR VISUAL DEV | DIR DC ANIMATION |
| ARTIST TRAINEE STORYBOARD | DIR FILM INPUT/OUTPUT |
| ASSOCIATE COLOR TIMER | DIR PROD SVCS & RESOURCES |
| ASSOCIATE EDITOR LEVEL III | DIR SOFTWARE ENGINEERING |
| BACKGROUND ARTIST | DIR SYSTEMS RESEARCH |
| CG PROJ SUPV | EDITOR |
| CG SUP SR | EDITOR ASSOC |
| CHARACTER DESIGNER | EDITOR ASSOC VIDEO FX |
| CHARACTER DESIGNER ASST | EDITOR ASST |
| CHARACTER DESIGNER INT | EDITOR INT FILM FX |
| CO DIRECTOR - TERM DEAL | EDITOR INT FIM FX |
| CO-HEAD OF LAYOUT | EDITOR INT VIDEO FX |
| COMPOSITOR INT | EDITOR ON CALL |
| COMPOSITOR SR | EDITOR SR FILM FX |
| COORD ASSOC | EDITOR SR ONLINE |
| COORD PROD INT | ENGR ARCHITECT SOFTWARE |
| COORD PROD SR | ENGR ASSOC SOFTWARE |
| CREATIVE EXEC | ENGR ASSOC SYSTEMS |

31

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Sony**

| | |
|---|---|
| ENGR HARDWARE | MGR EDITORIAL |
| ENGR I SOFTWARE | MGR FEATURE ANIMATION ADMIN |
| ENGR II SOFTWARE | MGR HELP DESK |
| ENGR III SOFTWARE | MGR INT DIGITAL PROD |
| ENGR INT SYS | MGR PROD SERVICES & RESOURCES |
| ENGR PRINC SOFTWARE | MGR SR DCG |
| ENGR PRINC SYS | MGR SR DIGITAL PROD |
| ENGR SOFTWARE INT | MGR SR FEATURE PROD |
| ENGR SR SYS | MGR SR TECHNICAL PROD |
| ENGR SR SYSTEMS | MGR TECHNICAL PROD |
| ENGR SR VIDEO | MGR VISUAL DEV |
| ENGR VIDEO INT | MODELER ASSOC |
| EXEC DIR | MODELER INT |
| EXEC DIR POST PROD | MODELER SR |
| EXEC DIR PROD SVCS & RESOURCES | NEGATIVE FILM TECHNICIAN |
| EXEC DIR SOFTWARE ENGINEERING | PIPELINE SUPV |
| EXEC DIR SOFTWARE PROD | PROD ASST |
| FILM FX EDITOR INT | PROD ASST ASSOC |
| FILM FX EDITOR SR | PROD COORD ASSOC |
| FILM RECORDIST ASSOC | PROD COORD INT |
| FILM RECORDIST INT | PROD COORD SR |
| FILM RECORDIST SR LEAD | PROD MGR ASSOC |
| HEAD OF ANIMATION PIPELINE | PROD SVCS DEV SPEC |
| HEAD OF CHARACTER SETUP TECH | PROD SVCS TECH LEAD |
| HEAD OF LAYOUT | PROD SVCS TECH SR |
| HEAD OF STORY | PRODUCER |
| HEAD OF STORY TERM DEAL | PRODUCER ASSOC |
| HSC ARTIST INT | PRODUCER INT |
| HSC ARTIST SR | PRODUCER SR |
| IAC ARTIST ASSOC | PRODUCER SR VFX |
| IAC ARTIST SR | PRODUCTION ASST |
| IAC ARTIST SR LEAD | PRODUCTION DESIGNER |
| ILLUSTRATOR DESIGNER SR | PRODUCTION SERVICES DEV SPEC |
| LAYOUT SUPV | PRODUCTION SERVICES SPECIALIST |
| MATCH MOVER ASSOC | PRODUCTION SERVICES TECH LEAD |
| MATCH MOVER INT | RESEARCHER |
| MATCH MOVER SR | RESEARCHER VISUAL DEV |
| MATCHMOVER SR | ROTO ARTIST ASSOCIATE |
| MATTE PAINTER INT | ROTO ARTIST INT |
| MATTE PAINTER SR | ROTO ARTIST SR |
| MGR ASSOC TECHNICAL PROD | SCANNER TECHNICIAN INT |
| MGR ASST PROD | SCIENTIST COLOR |
| MGR DIGITAL PRODUCTION | SCIENTIST COLOR SPDP |

32

Contains Highly Confidential and Attorneys' Eyes Only Materials

**Sony**

SCULPTOR
SOFTWARE ENGINEER ARCHITECT
SOFTWARE ENGINEER II
SPEC
SPEC DATA ARCHIVE
SPEC OPS
SPEC PROD SVCS DEV
SPEC RESOURCE
SR ART DIRECTOR
STEREO SUPV
STORY ARTIST INT
STORY ARTIST SR
STORYBOARD ARTIST
SUPV CG PROJ
SUPV CHARACTER DESIGN
SUPV DEV
SUPV INT CG
SUPV MODELING DCG
SUPV POST PROD
SUPV SR CG
SUPV SR CG PROJECT
SUPV TECHNICAL ANIMATION
SUPV VISUAL DEV
SYSTEMS ADMIN ASSOC
SYSTEMS ADMIN LEAD
SYSTEMS ADMINISTRATOR ASSOC
SYSTEMS ADMINISTRATOR SR
SYSTEMS ARCHITECT

SYSTEMS ENGINEER SR
TECH LEAD PROD SVCS
TECH SR PROD SVCS
TECHNICAL ANIMATION SUPV
TECHNICAL ANIMATOR ASSOC
TECHNICAL ANIMATOR INT
TECHNICAL ANIMATOR SPECIALIST
TECHNICAL ANIMATOR SR
TECHNICAL ANIMATOR SUP SR
TECHNICAL ANIMATOR, INT
TECHNICAL DIRECTOR ASSOC
TECHNICAL DIRECTOR ASSOC - PIPELINE
TECHNICAL DIRECTOR INT
TECHNICAL DIRECTOR INT - PIPELINE
TECHNICAL DIRECTOR SR
TECHNICAL DIRECTOR SR - PIPELINE
TECHNICIAN DIGITAL RESOURCE
TECHNICIAN ROBOT
TIMER SR DIGITAL
VFX PRODUCER INT
VIDEO FX EDITOR INT
VISUAL DEV ARTIST TRAINEE
VISUAL EFFECTS SUPV
VISUAL EFFECTS SUPV SR
VISUAL FX SUPV
VISUAL FX SUPV SR
WRITER TECHNICAL

33

Contains Highly Confidential and Attorneys' Eyes Only Materials