# EXHIBIT 1

# FILED UNDER SEAL

| [1] | [2] | [3] | [4] = [2] / [3] |
|---|---|---|---|
| Unique Class Members | Total Single Damages ($M) | Class Member Years | Average Damages Per Class Member-Year ($) |
| 6,096 | $755.1 | 31,644 | $23,861 |

# EXHIBIT 11

# FILED UNDER SEAL

Michael D. Staffieri  Confidential
April 05, 2024

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL     Master Docket No. 1:21-cv-00305
CENTER EMPLOYEE ANTITRUST
LITIGATION,

_____

THIS DOCUMENT RELATED TO:
ALL ACTIONS

_____

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL D. STAFFIERI

600 Anton Boulevard, Suite 1800

Costa Mesa, California

Friday, April 5, 2024

9:24 a.m.

REPORTED BY:
Tifani L. Goetsch, CSR No. 10406
US Legal Support Job No. 6573469

Michael D. Staffieri  Confidential
April 05, 2024

shaking your head, please.

A.  Yes.

Q.  If you want to take a break, please let me know, and as long as I'm not in the middle of a question or something, we'll take a break.

A.  Okay.

Q.  What did you do to prepare for the deposition today?

A.  I've had a few meetings with my counsel.

Q.  When was your first meeting?

A.  I don't know the exact date.  3 or 4 weeks ago probably.

Q.  Who attended that meeting?

A.  Myself, I think the people here.  Was there anyone else at our first meeting?  I think just 3 or 4 people.

Q.  When was the next meeting?

A.  I think maybe a week ago.  I can't remember.

Q.  Was there another meeting after that?

A.  We met yesterday.

Q.  Okay.

A.  Yeah.

Q.  And that was the most recent meeting before today, I take it?

A.  Correct.

Michael D. Staffieri  Confidential
April 05, 2024

Q.  Did you review any documents to prepare for the deposition today?

A.  I have looked at documents, yes.

Q.  Did those documents refresh your recollection of any of the relevant events in this case?

A.  No.

Q.  Is that because your memory was already clear?

A.  No.  I think a lot of the documents are from a long time ago, so it's hard to refresh memories.

THE REPORTER:  Could you keep your voice up?

THE WITNESS:  Sure.  Thanks.

MR. HARVEY:  Is the audio coming through?  Okay.

BY MR. HARVEY:

Q.  Let's briefly go over your work history with DaVita.

A.  Okay.

Q.  Your first position at DaVita was as an entry-level financial analyst, and you were hired on -- in July of 2000, correct?

A.  Correct.

Q.  Was your next job as vice president of operations and new center development?

Michael D. Staffieri  Confidential
April 05, 2024

A.  No.  That would be a big jump.

Q.  That was -- that was my guess as well.  Same reaction I had.

What was the next job you had after you were an entry-level financial analyst?

A.  I stayed within finance, so I was probably a manager and then a director in finance with DaVita.  I also ran our purchasing function as a director.  That was probably through about 2005 or 2006.

Then I made a change to become a director of operations in San Diego, California.  So I was running 10 to 12 dialysis clinics in San Diego, California.

Then I became what's called a group director, and so I ran those same clinics in San Diego, California, plus another 10 to 12 in Orange County, California.

Then I became a vice president of operations.

Q.  Thank you for that.

A.  Yep.

Q.  Was your next job after that -- or your next title after that, rather, senior vice president kidney care?

A.  No.  I would have been -- I would have been a group vice president in between those 2 titles.

Q.  Was your next title after senior vice president kidney care the chief operating officer?

A.   I would have had -- I believe my next title would have been deputy chief operating officer.  That's a title I held for around 6 months.

Q.   When did you become the chief operating officer of DaVita?

A.   I believe that was around March of 2014.

Q.   And have you held that title continuously through today?

A.   Yes.

Q.   Why don't we start with the present, and we'll go backwards as necessary.

Could you describe at a general level your significant responsibilities as the chief operating officer?

A.   Presently?

Q.   Yes.

A.   I'm responsible for all of our kidney dialysis operations in the United States.

Q.   Who's -- who do you report to?

A.   The chief executive officer, Javier Rodriguez.

Q.   Is it fair to say that you're the number 2 at the company?

A.   Yes.

Q.   What role do you have as chief operating officer in setting labor budgets for the company?

A.  So I set labor budgets for all of our operations in the United States.  Well, in conjunction with our CFO and Javier.  But, yes.  And I have some -- I have a few teams on the corporate side of the business that I also set budgets for.

Q.  Could you describe what you mean by the corporate side of the business?

A.  Well, I think in DaVita we refer to kind of our clinic operations and healthcare services as the field, and then -- and then we have -- the corporate side is something we call Atlas.

But those would be all the supporting functions. So that would be your legal functions, finance, strategy, billing and collecting.  A lot of different -- that's what we call corporate functions.

Q.  Currently do all of DaVita employees fall into 1 of those 2 buckets?

A.  For the most part, yes.  We maybe have a different characterization of something we would call like strategic business initiatives, but might be other operating businesses outside of that.

Q.  Is this third category you just described a significant part of the company?

A.  No.

Q.  Okay.  So --

Michael D. Staffieri  Confidential
April 05, 2024

like a reasonable sentence.

Q.   Sitting here, do you agree with that sentence?

A.   Yes.

Q.   Where did this expectation come from?

A.   I don't know.  I think it was just a -- something you just sort of pick up on and just a general expectation.

Q.   Was it ever discussed at the company?

MS. LANE:  Objection as to form.

THE WITNESS:  I'm sure it was.

BY MR. HARVEY:

Q.   Did Mr. Thiry -- sorry, scratch that.

Did you ever see or hear Mr. Thiry tell senior executives of DaVita that if they leave DaVita for another company they should not recruit DaVita employees to join them?

A.   I don't recall Mr. Thiry saying that to existing executives ahead of them leaving.  Seems to be what you were -- the scenario you were laying out.

Q.   So the expectation didn't exist until an executive left the company?

MS. LANE:  Objection as to form.

THE WITNESS:  I don't think it's relevant until an executive leaves the company.

///

Michael D. Staffieri   Confidential
April 05, 2024

BY MR. HARVEY:

Q.  Well, my question is not whether it's relevant or not.

My question is, when does this expectation form among DaVita executives?  Was it -- did it first form while they were at DaVita, or did it come into being after they left DaVita because someone reached out to them and had a conversation with them or something?

MS. LANE:  Objection as to form.

THE WITNESS:  I would say that my understanding of that expectation would likely have come from seeing executives who had left the company and that being talked about as an expectation.

BY MR. HARVEY:

Q.  When you say talked about, who was doing the talking and listening there?

A.  I don't know.  It was just a thing among the executives at DaVita.

Q.  Okay.  So there are executives or were executives at DaVita that talked among each other about the expectation you describe here, correct?

MS. LANE:  Objection as to form.

THE WITNESS:  Can you ask the question one more time?

///

Michael D. Staffieri   Confidential
April 05, 2024

BY MR. HARVEY:

Q.  Yeah.

What I'm trying to get at here --

A.  Yeah.

███████████████████████████████████████████

█████████ I'm trying to figure out where it came from, when it first -- when it first arises, and I am trying to -- we'll get later -- certainly communications with executives who left the company, we'll get to that, but I'm trying to start first with conversations that occurred among existing executives that if you leave --

A.  Yeah.

Q.  -- we expect that you're not going to recruit employees of DaVita.

A.  Yeah.

Q.  Did that happen?

A.  Yeah.  So, look, you're asking me if like there were conversations.  I don't -- I couldn't point to a specific conversation or to a specific e-mail where this was created.  It's just something that, you know, I just sort of came to believe over time.  I know I have that belief.  You know, as to whether it came from a conversation or an e-mail or what type of a meeting, I don't recall.

Q.  You just said you came to believe this over

that we're not going to recruit from each other?

Was there any company-wide message like that at any point during your time at DaVita?

A.  No.

Q.  Okay.  So the transparency you describe is Mr. Thiry's view into what's happening, that he wanted that to be transparent, correct?

MS. LANE:  Objection as to form.

THE WITNESS:  Correct.

BY MR. HARVEY:

Q.  Going back to these heads-up conversations, did Mr. Thiry ever communicate to you how those conversations went, if he was pleased, not pleased, et cetera?

MS. LANE:  Objection as to form.

THE WITNESS:  As to whether he was pleased or not pleased, I can't speak specifically, but, I mean, he would generally -- some of the conversations he would relay.

BY MR. HARVEY:

Q.  And what was the content of those, you know, conversations that he relayed to you?  What did he -- what did he tell you?

MS. LANE:  Objection as to form.

THE WITNESS:  I think in -- I don't think Kent had a practice of every time he had a conversation to come have a conversation with me.

Michael D. Staffieri  Confidential
April 05, 2024

You know, it would usually be when there was somebody on my team or somebody that reported to me that he was aware of that was being recruited by one of these people that then I would sort of get caught up into that, and then, you know, I would understand what his expectations were.

BY MR. HARVEY:

Q.  Were the terms of the agreements, the understandings he entered into with these former senior executives, did they vary from company to company or were they largely the same?

MS. LANE:  Objection as to form.

THE WITNESS:  I think Kent had lots of conversations.  I never -- I don't think there was ever a codified agreement, you know, that was signed off on by companies.

So, for me, I just -- whether he and I had had a conversation or not, I just always assumed what I think I've stated, that Kent expected transparency, a heads-up, you know, in 1 of those 2 ways.

And I don't know that I needed a download on specific things.  I just -- that's what I understood.  That's what I made sure I kept him apprised of.

BY MR. HARVEY:

Q.  And those 2 ways to get a heads-up, just to make

Michael D. Staffieri   Confidential
April 05, 2024

sure I understand --

A.   Yeah.

Q.   -- 1 way is that the other company would give him a heads-up before the recruiting got serious, correct?

A.   Yeah, him or another member of his team.

Q.   And what was the second way?

A.   That the person -- that the employee themselves would let their boss know that they're talking to the other company.

Q.   And did Mr. Thiry care if the recruiting was initiated by the DaVita employee going to the competitor or if the competitor initiated by going to the employee first?

A.   Um --

MR. CAMPBELL:  Object to form.

MS. LANE:  Objection as to form.  Just wait -- just pause --

THE WITNESS:  Okay.

MS. LANE:  -- before you answer so I have an opportunity to get the objection in.

THE WITNESS:  I think whether the employee was out proactively looking for employment or the -- or the executive was recruiting, in either case he would have wanted transparency.

Did that answer your question?

Michael D. Staffieri   Confidential
April 05, 2024

BY MR. HARVEY:

Q.   No, but let me try again.

A.   Yeah.

Q.   Did Mr. Thiry prefer to get a heads-up before or after a competing employer initiated a recruiting conversation with one of his employees?

MS. LANE:   Objection as to form.

THE WITNESS:   He would have preferred before.

BY MR. HARVEY:

Q.   Did Mr. Thiry on occasion express strong feelings about this expectation?

A.   Yes.

Q.   Could you describe that?

Michael D. Staffieri   Confidential
April 05, 2024

BY MR. HARVEY:

Q.   Did these conversations go anywhere in terms of the business opportunities?

MS. LANE:  Objection as to form.

THE WITNESS:  Which conversations specifically?

BY MR. HARVEY:

Did those conversations go anywhere in terms of any business opportunities?

A.   Not that I'm aware of.

Q.   You just mentioned that you may not have been aware of such collaborations, business activities, joint ventures, et cetera, but as a senior executive of the

company, including as the number 2 of the company, you are made aware of significant business collaborations between DaVita and other companies, aren't you?

A.   Not all the time, and in -- and I think we have to remember that my present role is different than my role in the time period of some of these questions that you're asking.

Q.   Well, you've become aware of real and contemplated business collaborations, et cetera, in your current role as chief operating officer, correct?

A.   Not all of them, but most I would say, yes.

Q.   And in your prior roles, did you become aware of most significant business collaborations that would have affected the part of the company that you were dealing with?

A.   No.

MS. LANE:  Objection as to form.

BY MR. HARVEY:

Q.   That was handled by senior executives above you?

A.   Correct.

Q.   Have you ever participated in conversations with other companies with regards to joint business activities?

A.   Yes.

Q.   Are you aware of any -- scratch that.

At any point in any of those conversations, did

Michael D. Staffieri  Confidential
April 05, 2024

the other company say, You know, what we really need to make this business collaboration work, we need an agreement between us that we're not going to recruit each other or hire each other's employees?

MS. LANE:  Objection as to form.

THE WITNESS:  Not that I'm aware of.

BY MR. HARVEY:

Q.  When --

A.  Can I change my answer on that?

Q.  Well, your answer is your answer, but if you want to say something else, go for it.

A.  Yeah.  Well, I would just say, because I have been part of when we've done acquisitions of companies before, where the -- where when you make divestitures that are required by the Federal Trade Commission, the buyer of those assets has demanded non-solicit, non-recruiting clauses in those situations.  So I just want to be complete there.

Q.  And so this is a situation where there's a purchase or sale of the entire business, correct?

A.  No.  This would be the case where we are acquiring a business, they were acquiring dialysis clinics.  We buy 100 clinics.  Maybe we need to sell 30 of those as part of the transaction to be cleared by the FTC. The acquirer of those clinics would, as part of that

Michael D. Staffieri  Confidential
April 05, 2024

agreement, require that we not recruit, not solicit employees from that business.

Q.  Are those restrictions contained in the purchase contracts?

A.  I wouldn't know which contracts those are part of.

Q.  Were they put in writing in part of a contract?

A.  Yes.

Q.  Okay.  Are you aware of whether they were time limited or limited in geography?

A.  Time limited, yes.

Q.  That is, the noncompete, I'll describe it, expired at a set point in time?

A.  I don't know if it was a noncompete, but the -- the --

Q.  Non-solicit?

A.  -- agreements to not solicit or to not recruit from, that would be time-limited is my recollection.

Q.  Do you recall how long the amount of time was that that restriction would be in effect?

A.  I do not.

Q.  Do you recall any limitation by geography?

A.  I do not.

Q.  When -- I'm going to go back to the question.

When Mr. Thiry stopped having influence in the

particular geographic area or is it -- sorry -- or is it essentially nationwide?

MS. LANE:  Objection as to form.

THE WITNESS:  I think it would depend on the position that you're talking about.

BY MR. HARVEY:

Q.  What positions are more local versus more nationwide?

MS. LANE:  Objection as to form.

THE WITNESS:  Well, I would say, to a degree, all positions are local.  It's just whether the search is local or nationwide.  Does that make sense?

BY MR. HARVEY:

Q.  Yeah, kind of like all politics is local? Sorry.  Let me ask a question.

Are there certain categories of jobs where recruits are more likely to be willing to move to get the job?

For example, senior employees may be more willing to move for a senior position versus an administrative assistant?

A.  I don't know that I can answer that.

Q.  And is the reason for that in part that recruiting really isn't your focus that that reporting relationship goes around you?

Michael D. Staffieri  Confidential
April 05, 2024

A.  No.  I think it's more that I don't claim to understand who would be willing to move for a job and who wouldn't.  I've seen -- I've seen people move at all levels of the organization.

Q.  What types of jobs within DaVita -- scratch that.

What categories of open positions does DaVita value experience in DaVita's industry when trying to find people to fill that position?

MS. LANE:  Objection as to form.

THE WITNESS:  That would be a long list.  Are there any in particular you're interested in?

BY MR. HARVEY:

Q.  Why don't we do it the opposite, then.  Maybe that's easier.

Are there any categories of employees where DaVita has -- places no value on prior experience in DaVita's industry?

A.  Yes.

Q.  And which positions are those?

A.  That would also be a long list.

Q.  Can you -- okay.  Why don't we start at a high level of generality.

Can you create conceptual buckets where -- I don't know -- for example, clinical technicians or

something, that would go into the -- let's start with the bucket of jobs for which DaVita values experience in DaVita's industry when hiring people.

A.  I'm trying to be helpful.  I'm just not exactly sure what you're getting at.  Like DaVita has hundreds and hundreds of job titles.  So if you want to put them in the category where we value industry experience or not, I mean, I could give you a list of a lot of jobs in both categories.

Q.  And I'm trying to avoid going through hundreds of job titles.

A.  Yeah, I know.

Q.  And so what I'm trying to do is can you go at a higher level of generality from the individual job title?

For instance, are there entire categories of job titles that would fall into 1 bucket or another?

A.  I don't think so.  Let me give you some examples, and then you can see where you want to take it.

Q.  Sure.

A.  Like if we hire a nurse or a patient care technician, it would be great if they had experience in the industry because then it costs us less to train them to have them be productive and start contributing.

But we don't limit our searches to only people who have experience.  We often train people who don't have

Michael D. Staffieri   Confidential
April 05, 2024

experience.

Or I can give you another example.  I needed to hire somebody to lead our patient experience team.  I mean, I think of that as customer experience, and I actually wanted somebody from outside of the industry, but we could have taken somebody inside.

So I don't know if there's a blanket characterization that that's helpful.

Q.  I'm starting another category of questions.

MS. LANE:  Lunch is here.

MR. HARVEY:  All right.  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:50 p.m.

* * *

(LUNCHEON RECESS)

* * *

THE VIDEOGRAPHER:  We are back on the record. The time is 1:27 p.m.

BY MR. HARVEY:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  All right.  What are the options available to DaVita on the compensation front to retain an employee who is being recruited by a competitor?

Michael D. Staffieri   Confidential
April 05, 2024

MS. LANE:  Objection as to form.

THE WITNESS:  I think that that would be a long list.  Is there any --

BY MR. HARVEY:

Q.  Well, for example, could DaVita increase the base pay of the employees being recruited to retain that employee?

A.  Yes.

Q.  Could DaVita increase the bonuses that that employee would receive?

A.  Yes.

Q.  Could DaVita increase the stock award to the employee?

A.  Yes.

Q.  Has DaVita, in fact, done each of these things in different situations to retain employees who are being recruited?

A.  Yes.

MR. HARVEY:  I'm introducing Plaintiffs' Exhibit 18.  It is at Tab 76 Bates-stamped DVA 749426.

(Plaintiffs' Exhibit PX18 marked)

THE TECHNICIAN:  That is in the Chat now.

BY MR. HARVEY:

Q.  Please let me know when you are ready.

A.  Okay.

Michael D. Staffieri  Confidential
April 05, 2024

Okay.

Q.  Okay.  So the e-mail exchange begins with an e-mail from you to Field Palmer.

Could you explain what Field Palmer is?

A.  So those are each of the group vice presidents that run the geographies of the United States.

Q.  Does Palmer cover the entire United States?

A.  Yes.  Well, only where we have operations.

Q.  Okay.  And field is the clinics serving patients rather than headquarters?

A.  Correct.

Q.  Okay.  And you wrote:

Team - I'd like to hear from each of you which VSA, if any, in your group has extreme/abnormal wage pressure that is not likely to be solved with a larger merit pool.

I'm going to ask you a couple questions about that.

A.  Sure.

Q.  What is a VSA?

A.  Village Service Area.

Q.  How large of a geographic area is that, typically?

A.  Well, it would depend.  I would say in a dense

Michael D. Staffieri   Confidential
April 05, 2024

Baltimore as a result of the FMC

escalation - both chronic and acutes.

I'm going to stop there for a moment.

This is a reference to Fresenius, correct?

A.   Correct.

Q.   And the escalation she's referring to was Fresenius actively recruiting employees from DaVita?

MS. LANE:  Objection as to form.

THE WITNESS:  I don't know what she means by -- I don't know what she means by the word escalation.

BY MR. HARVEY:

Q.   Well, maybe the next point --

A.   Okay.

Q.   -- can handle that.

Number 2, she wrote [As Read:]

   Charlotte -- the place, Charlotte --

   also a result of FMC (they have been

   the clinical underdog and have adopted

   a strategy of poaching our nurses no

   matter what the price).

Does that refresh any recollection about what you meant by -- what you took her to mean by the Fresenius escalation in point 1?

A.   No.

MS. LANE:  Objection as to form.

Michael D. Staffieri  Confidential
April 05, 2024

THE WITNESS:  No.

BY MR. HARVEY:

Q.  Okay.  Are there other examples you're aware of where recruiting by 1 company puts pressure on the wages of a large group of employees at DaVita?

MS. LANE:  Objection as to form.

THE WITNESS:  Am I aware of other situations?

BY MR. HARVEY:

Q.  Yes.

A.  Yes.

Q.  Could you tell me which situations you're aware of?

A.  Well, I think that that might be also a long list.  I mean, look, we all -- we all compete for talent, so we need to be market-competitive.  So when somebody raises wages, you have a decision to make.

Q.  And also if one of your competitors aggressively recruits from DaVita, that can put pressure on the wages as well, correct?

MS. LANE:  Objection as to form.

THE WITNESS:  Potentially.

BY MR. HARVEY:

Q.  Going back to the merit pool you referenced.

So the -- you gave an example of 3 percent.  That would be a DaVita-wide merit increase number?

Michael D. Staffieri  Confidential
April 05, 2024

MS. LANE:  Objection as to form.

THE WITNESS:  It was just an example.

BY MR. HARVEY:

Q.  Does DaVita, while you've been there, determine sort of a baseline merit increase percentage that applies company-wide?

MS. LANE:  Objection as to form.

THE WITNESS:  That answer would be different over time.

BY MR. HARVEY:

Q.  Well, could you tell me, during the years you were at the company, what years in which that were true and which years where it was not true?

A.  I probably could not.  I've been with the company 25 years.  But, look, yeah.  So...

Q.  Why don't we start, say, from 2010 thereabout -- I'm sorry.  Scratch that.  Give me a moment.

Before we go down that road, how many alternatives to what I described occurred while you were at DaVita, that is, alternatives to having 1 merit number that applies company-wide?

MS. LANE:  Objection as to form.

THE WITNESS:  I think my experience is there were times where there wasn't any or a lot of guidance and then there are times where there's been more clear guidance.

Michael D. Staffieri  Confidential
April 05, 2024

reported to me, I would have had to approve it in our HR system.

Q.  So this is an administrative assistant that would work for you or somebody who --

A.  Reported to me.

Q.  -- reported to you?

A.  So it says -- it says I have an offer letter to approve.  That was probably in our HR system, so it came to me for approval.  But it would not be common for me to approve other people's administrative assistants.

Q.  I was wondering.  You would not do much else.

Okay.  And here you question the starting salary of 70,000.  You say it strikes you as really, really high, and then you ask for some comparative data that shows how that candidate would fit in the pool of Playa and other AAs.

What's Playa?

A.  Playa is the name of our -- that's the name of our corporate office in El Segundo, Los Angeles.

MS. LANE:  You obviously did not take Spanish in high school.

THE WITNESS:  La Playa.

MR. CAMPBELL:  We have to begin saying things saying Playa.

THE WITNESS:  Goes back to your Santa Ana days.

Michael D. Staffieri  Confidential
April 05, 2024

BY MR. HARVEY:

Q.  I -- yeah.  I didn't make good use of it, obviously.

All right.  But, you know, we talked earlier about pay equity, and is this sort of the way that you think about it, essentially, that, okay, in order to assess whether a pay level's appropriate, a good place to start is how that person would fit in existing employees and then we compare that to their pay?

MS. LANE:  Objection as to form.

THE WITNESS:  Yes.

BY MR. HARVEY:

Q.  And then you're provided with some examples, some comparators.

Yeah, you know what, that's enough on that.  You can put that aside.  Thank you.

MR. HARVEY:  14.  I'm introducing Plaintiffs' Exhibit 22.  It's at Tab 14.  It's Bates-stamped DVA 1339656.

(Plaintiffs' Exhibit PX22 marked)

THE TECHNICIAN:  And that is in the Chat now.

BY MR. HARVEY:

Q.  Please let me know when you're ready.

A.  Okay.

Okay.

Michael D. Staffieri   Confidential
April 05, 2024

Q.  So we're moving from administrative assistants now to directors, and Rob Chipman, director of People Services, is writing an e-mail to Bina Joban-Baxi.  I'm sure I'm murdering her name.  And he wrote that he's looking at her directors' salaries in Sierra Terrific as compared to Polaris and The Village.

Please remind me.  Sierra Terrific is a geographic region?

A.  Yes.

Q.  And what, roughly, does that -- what area does that encompass?

A.  It's changed over time, but it's in Northern California.  So most likely Bay Area.

Q.  And Polaris?

A.  So Sierra Terrific is a division, and Polaris is the bigger Palmer group.  So Sierra Terrific is a division inside of Polaris.

Q.  And is Polaris defined as a geographic area?

A.  Yes.

Q.  Could you please remind me again?

A.  Yeah.  It's Northern California, Oregon, Washington, Idaho, Utah, and at some point in there, we had clinics in Hawaii.

Q.  Okay.  And The Village, which is everything?

A.  Everything.

Michael D. Staffieri   Confidential
April 05, 2024

REPORTER'S CERTIFICATE

I, TIFANI GOETSCH, CSR No. 10406, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth.  At which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

The signature of the witness was waived by agreement.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Illinois that the foregoing is true and correct.

Dated:  April 13, 2024

_____
Tifani L. Goetsch
CSR No. 10406, CLR

# EXHIBIT 12

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         )
LITIGATION                        )
                                  )
                                  )    Master Docket No.
                                  )    1:21-cv-00305
_____)


CONFIDENTIAL
Videotaped Deposition of
LESLIE WACHSMAN


McGUIREWOODS
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1818


May 22nd, 2024

9:09 a.m.


Isaiah Roberts, CSR, RPR

Illinois CSR #084-004890

EXAMINATION

BY MR. SEIDEL:

Q.    Good morning.

A.    Good morning.

Q.    My name is David Seidel.  I'm an attorney with the Joseph Saveri Law Firm.  I represent the plaintiffs in this matter.

Could you please state and spell your name for the record.

A.    Sure.  Leslie Wachsman, L-e-s-l-i-e W-a-c-h-s-m-a-n.

Q.    Are you represented by counsel today?

A.    I am.

Q.    Okay.  And who is your counsel?

A.    McGuireWoods.

Q.    Okay.  And McGuireWoods is also SCA's counsel?

A.    It is.

Q.    And you're not paying for their representation; right?

A.    I am not.

Q.    Okay.  Who is your current employer?

A.    SCA Health.

Q.    And what does SCA stand for?

A.    It's just SCA.

Leslie Wachsman    Confidential
May 22, 2024

Q.    Oh, it's just SCA.

A.    Uh-huh.

Q.    Is that -- is Surgical Care Affiliates, you know, a related entity, I guess, of SCA?

A.    Surgical Care Affiliates.  I think it might still be our legal entity name, but we changed our name to SCA Health.

Q.    Got it.

A.    So --

Q.    Okay.  Do you know when that change was made?

A.    Two years ago, I believe.

Q.    Okay.  Do you understand that if, during this deposition, I refer to SCA or Surgical Care Affiliates --

A.    Yes.

Q.    -- we're referring to the same entity?

A.    I do.

Q.    Okay.  And how long have you been employed by SCA?

A.    11 1/2 years.

Q.    And what's your current title?

A.    Chief financial officer.

Q.    How long have you been the chief financial officer at SCA?

A.    Since December of 2019.

Q.    And, generally speaking, what are your job responsibilities as the chief financial officer?

A.    Sure.  So I serve in ownership of our -- all our accounting operations, all our financial operation services.  I have revenue cycle ownership under me.  I also have a unique role where I have the CIO of the information technology reporting to me, diligence and integration, supply chain operations, analytics, marketing, coms.  I think that's it.

Q.    Who -- who do you report?

A.    I report to the CEO, Jason Strauss.

Q.    And how many named executive officers are there at SCA?

A.    I'm not sure I know the answer to that question.

Q.    How many C-suite-level executives are there?

A.    Six.

Q.    Six.

Can you name who -- who those are?

A.    Sure.  Sure.

Myself, Jason Strauss, Winborne Macphail, Ladd Mark, Marie Edler, Kathy Grichnik, and Kerri Milless.

Q.    Can you name each of their titles?

Leslie Wachsman   Confidential
May 22, 2024

MS. ZIELINSKI:  Object to the form

THE WITNESS:  I'm not aware of any agreements that we have related to that.

BY MR. SEIDEL:

Q.   If SCA -- that wasn't my question.

If SCA had any agreements with its competitors not to poach each other's employees, would it be important for you to know about it?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  SCA would never enter into an agreement like that, and -- and I'm not aware of any agreements that we have like that.

BY MR. SEIDEL:

Q.   Why would SCA never enter into such an agreement?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I just don't think it's something that SCA would do.

BY MR. SEIDEL:

Q.   Why not?

A.   Because it's just not -- it's not a recruiting practice that SCA would -- would get into.

Q.   How -- I mean, why do you think SCA would never get into that practice?

Leslie Wachsman   Confidential
May 22, 2024

A.    Because it's not necessary.  And we also have, you know, other -- I mean, the -- the market is competitive enough that it's not necessary to have agreements like that to be able to hire strong people.

Q.    Are there any joint ventures that you have with competitors that would require such agreements?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Can you repeat the question -- clarify the question?

BY MR. SEIDEL:

Q.    Sure.  Are there any partnerships, joint ventures with any competitors that would require such a no-poach agreement?

A.    No.

MS. ZIELINSKI:  And same objection.

THE WITNESS:  No.

BY MR. SEIDEL:

Q.    So you said there would be no reason for SCA to enter into a no-poach agreement; correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  The hiring environment is competitive enough that there would be no reason for SCA --

BY MR. SEIDEL:

Leslie Wachsman   Confidential
May 22, 2024

Q.    Okay.

A.    -- to need to do that.

Q.    And your testimony is that you had no knowledge whatsoever about any agreement between SCA and anyone else that limited the recruiting --

A.    Correct.

Q.    -- of each other's employees.

A.    Correct.

Q.    As the CFO of SCA, would you say a large part of your job is ensuring that the company is profitable?

    MS. ZIELINSKI:  Object to the form.

    THE WITNESS:  Yes.  It's one of many jobs, yes.

BY MR. SEIDEL:

Q.    And as the CFO of SCA and one of the top six executives at SCA, do you have any role in ensuring that SCA is not only profitable but that it also acts with integrity?

    MS. ZIELINSKI:  Object to the form.

    THE WITNESS:  Yes.

BY MR. SEIDEL:

Q.    And you -- one of the reasons you came to SCA is because you thought it was on the right side of the health care industry; right?

A.    Correct.

Leslie Wachsman  Confidential
May 22, 2024

Q.    Okay.  Do you remember if SCA ever exchanged any other information with USPI?

A.    No.

Q.    Is the site-specific case volume data nonpublic?

A.    So when we were -- when we were a publicly held company, we did exchange case volume information on a quarterly basis as part of our filings.

Q.    And when you --

A.    As a private company, there's no legal obligation to just -- to share.  Sorry.

Q.    And to your knowledge, did SCA ever publicly disclose its site-specific case volume data when it was a private company?

A.    No.  I don't believe we did.

Q.    When did it become a publicly held company?

A.    October 2013.

Q.    And it's still a publicly held company.

A.    No.

Q.    No?  Okay.

A.    We are owned by UnitedHealth Group as of 2017.

Q.    Okay.  So, from 2013 to 2017, it was a publicly held company.  Before 2013, it was a privately held company.  And after UHG bought SCA in 2017, it

Leslie Wachsman   Confidential
May 22, 2024

became a privately held company again.

A.    It came -- part of a publicly held company.
So it's owned by UnitedHealth Group.  So I wouldn't say
we're private.  I would say we're a division of a
publicly held company.

Q.    Since UHG acquired SCA, does SCA publicly
disclose its site-specific case volume data?

A.    We do not.

Q.    Okay.  How often did SCA and USPI exchange
case volume data?

A.    My recollection is monthly, possibly.  It
could have been quarterly, but monthly or quarterly.

Q.    And that occurred regularly for how long?

A.    I don't recall.

Q.    Do you have any memory of a time when you were
at SCA when you weren't exchanging case volume data with
USPI?

A.    Yes.  I would say maybe the last five, six
years.

Q.    You have not?

A.    Yes.  Correct.

Q.    So you stopped exchanging case volume data
with USPI about five years ago?

A.    I believe so.  I'm not sure about the specific

date.

Q.    And you no longer exchange that information with USPI?

A.    We do not.

Q.    Do you exchange any information with USPI, currently?

A.    I do not.

Q.    Do you know if you currently exchange any information with any other competitors?

A.    I am not aware.

Q.    Does SCA have an antitrust policy, currently?

A.    It's part of our annual compliance training, and UHG actually has the antitrust policy that we follow.

Q.    And you had testified previously that you get a yearly training on that -- on that policy at SCA?

A.    Correct.

Q.    Does every employee get that training?

A.    Yes.

Q.    Did SCA have an antitrust policy prior to UHG acquiring SCA?

A.    I don't recall.

Q.    Did SCA require yearly trainings of antitrust issues at SCA prior to UHG acquiring them?

Leslie Wachsman   Confidential
May 22, 2024

A.   We had annual compliance training.  I don't recall if antitrust was part of it.  My recollection is it was, but I don't remember.

Q.   If -- if you wanted to review the current SCA antitrust policy, would you know where to find it?

A.   It's UnitedHealth Group, and it's on the website.

Q.   It's on UnitedHealth Group's website?

A.   Yes.

Q.   And that is the policy that is in place that you follow?

A.   Yes.

Q.   Is there any other policies in place that you follow?

A.   Not that I'm aware of.

Q.   Do you know whether the antitrust policy that's currently in place addresses the exchange of nonpublic data with competitors?

A.   I do not.

Q.   Why -- why was SCA exchanging case volume data with USPI?

A.   As a benchmark against -- as -- as we look at our financials, there's many benchmarks we use to determine how the industry's performing, and so having

Leslie Wachsman  Confidential
May 22, 2024

centers, but they're somewhere in between a hospital and an ASC.

Q.    Would you consider them to be outpatient or inpatient, those roughly seven surgery centers?

A.    They perform cases in both.  The majority is outpatient, but they do have inpatient cases where the patient has to spend the night.

Q.    Okay.

MS. ZIELINSKI:  Is this a good time to take a break?

MR. SEIDEL:  Sure.  This is a fine time to take a break.

Would you like to take a break?

THE WITNESS:  Sure.

MR. SEIDEL:  We'll take 10 minutes?

MS. ZIELINSKI:  Sure.

THE VIDEOGRAPHER:  We are off the record at 2:33 p.m.

(2:33 p.m., off the record.)

(2:50 p.m., on the record.)

THE VIDEOGRAPHER:  We are back on the record at 2:50 p.m.

BY MR. SEIDEL:

Q.    So, Ms. Wachsman, as we've seen in these

Leslie Wachsman   Confidential
May 22, 2024

emails, SCA and USPI regularly exchanged nonpublic data; correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  We have seen that SCA and USPI exchanged case volume data.

BY MR. SEIDEL:

Q.    Which was nonpublic; correct?

A.    It was nonpublic.

Q.    And SCA and USPI also exchanged payer mix data?

A.    I don't recall.  Did we -- I don't recall if we -- I don't recall.

Q.    And SCA and USPI also exchanged corporate overhead data; correct?

A.    We had conversations about -- yes, we exchanged corporate overhead data.

Q.    And that data is also not public?

A.    Is not publicly disclosed; no.

Q.    And you also -- and you exchanged this data over a number of years?

A.    Correct.

Q.    Regularly?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  We exchanged case volume data for

Leslie Wachsman   Confidential
May 22, 2024

a number of years regularly.

BY MR. SEIDEL:

Q.    And how did -- and how often did you do a full benchmarking with USPI based on that data?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  What do you mean by "a full benchmarking"?

Q.    How often did you perform a benchmarking between SCA and USPI based on the data you were exchanging with them?

A.    Based on the case volume?

MS. ZIELINSKI:  Sorry.  I just object to the form.

Q.    Based on any data you exchanged with them.

A.    How often?  We exchanged case volume information monthly.  If benchmarking -- if your definition of benchmarking is we reviewed it and compared it to ours and tried glean some sort of trends off of it, then on case volume, it was probably monthly. Other than that, it was not often at all.

Q.    How often did you exchange corporate overhead data?

A.    I don't recall.  It wasn't often at all though.

Q.   Does SCA still exchange any of this data with USPI currently?

A.   They do not.

Q.   Why not?

A.   You can get it publicly.

Q.   When it became public you no longer exchanged with them?

A.   No.  I don't know why we stopped.  I don't recall why we stopped.  How I get the data now, I just look at public filings.

Q.   When did you stop sharing this data with USPI?

A.   I don't recall.

Q.   Previously, you were the one who was sending this information to USPI for a period of time; correct?

MS. ZIELINSKI:  Object to the form. Mischaracterizes testimony.

THE WITNESS:  Correct.  For a period of time, I was involved in exchanging the information with USPI.

BY MR. SEIDEL:

Q.   When did you stop exchanging that information?

A.   I don't recall.

Q.   Do you remember if you ever exchanged that information when you were the CFO of SCA?

A.   I don't believe so.

# EXHIBIT 15

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL       )
CENTER EMPLOYEE ANTITRUST      )
LITIGATION,                    )
                               )
                               ) Master Docket No.
                               ) 1:21-cv-00305
THIS DOCUMENT RELATED TO:      )
ALL ACTIONS                    )
                               )

_____

CONFIDENTIAL VIDEO DEPOSITION OF:

JAMES "SKIP" THURMAN - June 17, 2024

_____

        PURSUANT TO SUBPOENA, the deposition of JAMES
"SKIP" THURMAN was taken on behalf of the Plaintiffs
at 370 17th Street, Suite 4500, Denver, Colorado, on
June 17, 2024, at 9:06 a.m., before Kirsten M.
Thorngate, Registered Professional Reporter and Notary
Public within Colorado.

James 'Skip' Thurman   Confidential
June 17, 2024

A.    I have a bachelor's degree.

Q.    From what school?

A.    University of Central Arkansas.   Go Bears.

Q.    What was your degree?

A.    English and political science.

Q.    Did you receive any other degrees or certifications besides your bachelor's?

A.    No, ma'am.

Q.    Prior to working at DaVita, what did you do as -- for work?

A.    I ran the communications department for a company called Level 3.   There was actually a VP above me and an SVP above me, but I functionally ran the communications department for, at the time, the biggest fiber-optic data carrier in the country.

Q.    Did you begin your career as a reporter?

A.    I did.

Q.    And you became the White House correspondent for the Christian Science Monitor, correct?

A.    Yes, ma'am.

Q.    How did you come to work for DaVita?

A.    I was recruited by -- I was working at Level 3, and I was recruited by Bill Myers.   And he

James 'Skip' Thurman  Confidential
June 17, 2024

had been -- he had been -- he had joined DaVita, and then he had been there for a few months.  And then he asked me to come over and join the company.

Q.  How did you know Mr. Myers?

A.  When I left Washington, D.C., and came to Denver, he coincidently happened to be the manager at Qwest that I reported to.  And then over the years, we just became very good friends and -- so there's a friend -- professional and a personal relationship with our families together.

Q.  So you kept in touch after he left Qwest, correct?

A.  Yeah.  When he -- yes.

Q.  When did he recruit you to work at DaVita?

A.  Would have been 2009, early 2010.

Q.  All right.  And what position did he recruit you to join DaVita as?

A.  So I took a demotion to go to DaVita.  I was a senior director.  I was just a click away from being a VP, but I took a demotion to director to be able to get in.  That was the only opening on the comms team at that point.

Q.  Why did you do that?

A.  Bill and I are like brothers, and we work

James 'Skip' Thurman  Confidential
June 17, 2024

really well together.  And I didn't have to go through the interview process.  I just literally walked in the front door, and they gave me a phone and a desk.

Q.  So Mr. Myers must have really liked you.

A.  It's a meritocracy, and we succeeded in a lot of things together.

Q.  What was your job responsibility as director?

A.  At DaVita?

Q.  Yes.

A.  It was to run -- to functionally run all of the communications for the department and for the company.  And that role expanded over time.  When I joined the company, the stock was in single digits.  And by the time I left, it had split and was in the hundreds.  And we had gone international at that point, so I had a comms team international.  So the job expanded over time.

Q.  All right.  As director at DaVita, who did you report to?

A.  Initially, Bill.

Q.  Did that change?

A.  It did.  It did.  In 2017, I then started reporting to Kent.  And then at some point, and I don't remember the date, I reported to both Kent and

Javier Rodriguez.

Q. As director at DaVita, who reported to you?

A. At the end, I had a team of about 65 people. It was marketing and communications.

Q. In the beginning, how many people reported to you?

A. About ten. And the team bifurcated in the communications side and then the marketing side.

Q. All right. When you were you promoted to senior director?

A. 2012, '13? It was a few years after I had gotten there.

Q. What were your responsibilities as senior director?

A. They were basically the same. We were always being pushed to expand our capability and -- our capability. And so Bill would be -- Bill would be sort of pioneering different aspects of the communications team, and I was operationalizing that.

So within our group, I was the -- my team reported to me, but I also operationalized a lot of what we would do.

Q. And as senior director, who did you report to?

James 'Skip' Thurman  Confidential
June 17, 2024

A.    Bill, and then Javier and Kent.

Q.    As senior director, how many people reported to you?

A.    10 to 12.

Q.    All right.  At some point, you were promoted to vice president, correct?

A.    That's correct.

Q.    When was that?

A.    It was around 2017, when Bill left and went to Liberty Global.

Q.    So were you ever serving in the role of vice president at the same time as Mr. Myers?

A.    Yes.

Q.    When was that?

A.    2016, 2017, just before he left.

And they did a carve-out, because they realized I was a flight risk at that point.  And they made -- it's rare to have a VP -- two VPs in the same group.  But they gave me a promotion and an increase in pay because I had not had a raise in a long time, basically.

Q.    And why did they think you were a flight risk?

James 'Skip' Thurman    Confidential
June 17, 2024

A.    Because I had not had any substantial pay increases since the time I joined.  And I was still -- even though I had not received a single call from a recruiter, I just knew that I had a valuable skill. And so I was ready to try to go out and look on the open market.

Q.    You mentioned that you had valuable skills, right?

A.    Yes.

Q.    What were your valuable skills?

A.    So when you do my job, you interface a lot with the media.  And a lot of people see the department as -- communication shop's a sort of PR.

And to me, PR is sort of 18-year-olds and balloons and ribbon cuttings and stuff.

It's a very sophisticated skill to deal with media.  And I was more valuable than just somebody who came in from doing PR, because I was a former journalist and had relationships with a lot of the journalists that covered us.  And I knew the questions they would ask.  I knew it's part of the function of guiding your company through good times and bad times with reporters.

Q.   And you knew the company, DaVita, correct?

A.   Yes.

Q.   And you had the trust of senior leadership, correct?

A.   Yes.

MS. LANE:  Objection to form.

A.   Yes.

Q.   (BY MS. CHAN)  You mentioned that DaVita thought you were a flight risk because you had valuable skills, correct?

A.   Yes.

Q.   And also because you hadn't had a substantial pay increase since joining DaVita, correct?

James 'Skip' Thurman   Confidential
June 17, 2024

A.   Yes.

Q.   Was there any other reason why you were perceived as a flight risk at that point?

MS. LANE:   Objection as to form.

A.   I was just very upfront about the fact that I was going to go out and start looking for a job.

Q.   (BY MS. CHAN)  Who did you talk to?

A.   I talked to Bill, who talked to Javier. And then I met with Javier.  And Javier was like, Not a problem; here's what you're asking for.

██████████████████████████████████████  I don't remember exactly what the increase was, but it was pretty immediate.

Q.   By "Javier," are you referring to Javier Rodriguez?

A.   Rodriguez.  Yes.

Q.   What was Mr. Rodriguez's title at the time?

A.   I hesitate, because at the very end, he was -- they had a joint sort of CEO role, but I think at that time he was president or CEO of the domestic operating unit.  But he was functionally the CEO along with Kent.

Q.   Approximately when was it that you

received this pay increase?

A.    2017 time frame.  Yeah.

Q.    At the time, did you have any idea what the pay would be at comparable positions at other companies?

A.    I knew that it was at least what I was asking for, ████████████████████████  I knew that was going to be the market, because I had been so under water for such a long time.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Q.    (BY MS. CHAN)  If you were being paid less than the market rate, why did you stay at DaVita?

MS. LANE:  Objection as to form.

A.    It is a -- the culture is extraordinary, and the loyalty -- the loyalty that I felt to my team and my coworkers was very strong.

Q.    (BY MS. CHAN)  At some point did

James 'Skip' Thurman   Confidential
June 17, 2024

Mr. Rodriguez?

A.   I came back with a list of things that I wanted in exchange for my departure, you know, the sort of things that you get when you sign a separation agreement and an amount of money.

Q.   What was Mr. Rodriguez's response?

A.   It was a pretty big amount, and he didn't know what to do with it.  He's like, The board is not going to let me do this.

So there were things like that we would discuss from a term perspective.

Q.   Do you recall anything else about that meeting?

A.   Just his -- he still couldn't get -- you know, my impression was he couldn't get it in his head why I wanted to leave and wanted him to pay me to leave, even though I was being crystal clear about it and bullet-pointed it out.

James 'Skip' Thurman   Confidential
June 17, 2024

I do remember the third meeting and an email that he sent that he did not write.  It clearly was -- it was somebody else who I can tell their writing.  And so at that point, I could tell that he had disengaged.  By the third meeting, it was like he wanted to be done with it.

Q.   Is there anything you remember -- anything else you remember about that second meeting?

A.   Not substantially, no.

Q.   Do you recall discussing Mr. Thiry's prominence in the Denver community?

A.   Yeah.

Q.   What about that did you discuss?

A.   So Kent works with -- continues to work with a lot of very influential people and runs political campaigns and redistricting.  I worked on a redistricting measure with him.  And so he knows everybody in town.

And I said, It's very intimidating to leave a company of this size with all of the relationships that, you know, DaVita has across the board, but especially Kent and Javier individually, and that it was intimidating to leave the safety and the comfort, if you will, of the mother ship and go out on my own, especially at the age of 55 at that

point.

Q.    Did you discuss the use of that prominence to limit your ability to work for others?

MS. LANE:  Objection as to form.

A.    Yes.

Q.    (BY MS. CHAN)  What was that discussion?

A.    It was -- the idea was when Javier told me that both he and Kent's Rolodex were effectively mine, that I could use any of them and that they would go to bat for me, and I just didn't trust that.

And, you know, part of the separation agreement was Kent -- as an example, Javier was supposed to write a letter of recommendation, and he never did it.  He was just like -- he didn't even honor the basic table stakes that we had agreed to in a contract.

So I felt pretty intuitively that I knew where he was coming from.  But I also did not think they were opening the Rolodexes to help me.  I thought that they would be like, Yep, be careful.  He was ready to blow the -- he called us on our shit.  Forgive my French, but that's what he did.

Q.    When did the third meeting happen?

A.    Again, it was probably two weeks or so, two and a half weeks after the initial meeting.  And

James 'Skip' Thurman  Confidential
June 17, 2024

he came with a pretty solidified position from a term sheet perspective and said, basically, This is it.

And, you know, at that point I agreed to it.

Q.  Do you remember anything else about that third meeting?

A.  Yeah, he stopped apologizing for the Kent thing.  And then in the email that he sent back, there was no acknowledgment that he had tried to talk me off the ledge with Kent.  And it was almost like he denied that it happened.  And that really put a nail in the coffin.  Like if there was ever a chance that I was ever going to go back and work with those guys, it was like no.

Q.  Do you remember anything else about that third meeting?

A.  Just by the third meeting, he was pretty solidified in his position.  And that was sort of -- and he was impatient.  Like I could tell like the party -- the discussions were over with, and he was

James 'Skip' Thurman   Confidential
June 17, 2024

12:46:29

12:46:30

12:46:30

12:46:34

12:46:36

12:46:38

12:46:39

12:46:43

12:46:47

12:46:48

12:46:53

12:46:59

12:47:02

12:47:04

12:47:06

12:47:06

12:47:10

12:47:11

12:47:14

12:47:17

12:47:20

12:47:24

12:47:26

12:47:28

12:47:31



James 'Skip' Thurman   Confidential
June 17, 2024

12:47:35

12:47:40

12:47:42

12:47:48

12:47:51

12:47:51

12:48:02

12:48:04

12:48:07

12:48:20

12:48:22

12:48:25

12:48:25

12:48:27

12:48:28

12:48:30

12:48:33

12:48:36

12:48:39

12:48:43

12:48:47

12:48:51

12:48:54

12:48:59

12:49:00



James 'Skip' Thurman   Confidential
June 17, 2024

12:49:02

12:49:05

12:49:09

12:49:10

12:49:13

12:49:15

12:49:15

12:49:19

12:49:24

12:49:29

12:49:29

12:49:32

12:49:36

12:49:38

12:49:41

12:49:44

12:49:47

12:49:51

12:49:53

12:49:55

12:50:00

12:50:03

12:50:04

12:50:08

12:50:16



James 'Skip' Thurman   Confidential
June 17, 2024



12:50:18
12:50:20
12:50:23
12:50:24
12:50:26
12:50:29
12:50:32
12:50:32
12:50:35
12:50:38
12:50:40
12:50:44
12:50:46
12:50:49
12:50:53
12:50:56
12:50:58
12:51:00
12:51:01
12:51:02
12:51:03
12:51:05
12:51:07
12:51:10
12:51:14

James 'Skip' Thurman   Confidential
June 17, 2024

01:08:40

01:08:44

01:08:48

01:08:53

01:08:56

01:09:00

01:09:06

01:09:08

01:09:13

01:09:17

01:09:19

01:09:22

01:09:23

01:09:26

01:09:27

01:09:27

01:09:29

01:09:35

01:09:36

01:09:42

01:09:47

01:09:51

01:09:53

01:09:55

01:09:58



James 'Skip' Thurman   Confidential
June 17, 2024



01:10:03

01:10:07

01:10:12

01:10:14

01:10:15

01:10:17

01:10:18

01:10:18

01:10:26

01:10:27

01:10:30

01:10:34

01:10:35

01:10:35

01:10:36

01:10:38

01:10:40

01:10:44

01:10:47

01:10:52

01:10:56

01:10:58

01:10:59

01:11:02

01:11:06

James 'Skip' Thurman   Confidential
June 17, 2024



01:11:12
01:11:13
01:11:13
01:11:14
01:11:17
01:11:20
01:11:24
01:11:30
01:11:31
01:11:34
01:11:40
01:11:42
01:11:50
01:11:53
01:11:56
01:11:59
01:12:04
01:12:06
01:12:09
01:12:14
01:12:18
01:12:20
01:12:23
01:12:25
01:12:29

James 'Skip' Thurman   Confidential
June 17, 2024



James 'Skip' Thurman   Confidential
June 17, 2024

REPORTER'S CERTIFICATE

STATE OF COLORADO            )
                             )  ss.
CITY AND COUNTY OF DENVER    )

I, KIRSTEN M. THORNGATE, a Registered Professional Reporter, do hereby certify that previous to the commencement of the examination, the witness was duly sworn or affirmed by me to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and thereafter reduced to a typewritten form; that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

_____
Kirsten M. Thorngate
Registered Professional Reporter

# EXHIBIT 17

# FILED UNDER SEAL

Robert Chipman   Confidential
August 07, 2024

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Civil Action No. 1:21-cv-00305-ARW-SRH


In re: Outpatient Medical Center
Employee Antitrust Litigation,

_____/



C O N F I D E N T I A L

REALTIME

VIDEOTAPED DEPOSITION OF


ROBERT CHIPMAN



Wednesday, August 7, 2024
9:10 a.m. - 5:39 p.m.



GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
(954)765-0500



Stenographically Reported By:
Shirley D. Frazier, CPR, FPR, RPR,
Certified Realtime Reporter

Robert Chipman  Confidential
August 07, 2024

stamped RC_OMCEAL_0000062264.

Mr. Chipman, please let me know when you've had a chance to review this document.

A.    I've reviewed it.

Q.    Have you seen this document before?

A.    I have.

Q.    Is this your current résumé?

A.    It is.

Q.    Is there anything in this document that seems incorrect to you?

A.    No.

Q.    Did you write this résumé or did someone write it for you?

A.    I wrote it with the aid of a professional résumé writer.

Q.    When did you work with a professional résumé writer to write this résumé?

A.    Sometime in 2020.

Q.    But this document is up to date with your current professional experience?

A.    It's the most up to date that I have, yes.

Q.    Let's turn to the last page in PX- 248, which is Bates stamped RC_OMCEAL_0000064.

Do you see the Education header at the bottom?

A.   I do.

Q.   You have a master's of business administration, correct?

A.   That's correct.

Q.   When did you receive this degree?

A.   1992 or '93.

Q.   Did you concentrate in a particular subject matter in this degree program?

A.   Primarily labor law.

Q.   Is that labor and employment law?

A.   That's correct.

Q.   If you look at page RC_OMCEAL_0000063, towards the top, do you see where it says, "People services group director"?

A.   Yes.

Q.   In 2011, you began working as a people services group director at DaVita, correct?

A.   That's correct.

Q.   The people services group director position was your first job at DaVita, correct?

A.   That's correct.

Q.   And you were in this role until 2012, correct?

A.   That's correct.

Q.   How did you get the people services group

Robert Chipman  Confidential
August 07, 2024

director job at DaVita?

A.    I applied to an ad that was on their website.

Q.    As people services group director, what were your job responsibilities?

A.    General HR process and procedure for all of the clinics within 18 -- basically, west of the Rockies.

Q.    What does general HR process and procedure mean?

A.    So it would be the hiring, onboarding. It's coaching of the managers, in terms of how they interact with their employees. It would be handling any types of disputes amongst employees and their managers. It would be about developing good pay practices for managing their employees.

Q.    Does "west of the Rockies" refer to all states on the continental U.S., west of the Rocky Mountains.

A.    Not necessarily. It was broken into palmer teams. At the time, there were five.

And the dream team comprised pretty much west of the Rockies, so those states generally. There were a couple that were in the Rocky Mountain area that were not.

Robert Chipman  Confidential
August 07, 2024

A.  I don't know what the board of directors' role was in any of that.

BY MS. ZANDI:

Q.  Would Dennis Kogod have been involved in creating or establishing these pay policies?

MS. LANE:  Objection as to form.

A.  I'm not sure what Dennis' responsibilities were related to pay.

BY MS. ZANDI:

Q.  Are there any other DaVita employees you can think of that fall under the corporate umbrella with respect to the pay policies?

MS. LANE:  Objection as to form.

A.  I can't come up with any particular name.

But there was a department, so there were several others, I'm sure.

BY MS. ZANDI:

Q.  What department are you referring to?

A.  Compensation and benefits.

Q.  And while you were people services group director, who ran that department?

A.  Cynthia Baxter.

Q.  Cynthia Baxter did.  Okay.  Thank you for reminding me.

When you say -- strike that.

Was one of DaVita's pay policies not to discriminate against employees in pay on the basis of race, gender, or any other protected category?

MS. LANE:  Objection as to form.

A.   That was the policy that was stated in, as I recall, the handbook, employee handbook.

BY MS. ZANDI:

Q.   Was the employee handbook known as the code of conduct?

A.   I don't think the two were mutually exclusive, because a code of conduct would have included values and behaviors.

Q.   Were you made aware of this nondiscrimination policy in any other way?

A.   I knew it coming into the role.  It's a standard obligation or a responsibility of any HR professional.

Q.   Did anyone at DaVita communicate it to you?

A.   I don't recall a specific conversation about it.  But I'm sure it was communicated in the handbook and the orientation.

Q.   Okay.  In 2013, you were promoted to vice president of recruiting and talent management, correct?

Robert Chipman  Confidential
August 07, 2024

A.   That's correct.

Q.   And you stayed in this position until 2015, correct?

A.   That's correct.

Q.   Vice president of recruiting and talent management was your last job at DaVita, correct?

A.   That's correct.

Q.   What were your job responsibilities as vice president of recruiting and talent management?

A.   It was to oversee the external-recruiting function to bring in candidates into the organization.  It was to oversee the talent-management system to develop and train and grow our existing teammates.  And I also picked up the HR-information systems process.  And I oversaw the diversity and inclusion initiatives.

Q.   Anything else?

A.   I think that's pretty much it.

Q.   When you say "external-recruiting function," what are you referring to?

A.   I may have misspoke on that.  It would be our internal-recruiting function for external hires.

Q.   Got it.  What -- strike that.

You were responsible for managing DaVita's in-house recruiters, right?

A.   That's correct.

Q.   How many in-house recruiters did DaVita employ at any given time while you were vice president of recruiting and talent management?

A.   About 110.

Q.   Does that number apply to each year that you were vice president?

A.   Yes.

Q.   What were the in-house recruiter's job responsibilities?

A.   They were assigned a territory to recruit for, for our clinical positions.  That would be the nurses and the PCTs.

They would also recruit for facility managers or facility administrators when we were looking to hire from outside.  And occasionally, they would get involved in a director hire as well.

Q.   So in-house recruiters did not typically recruit director-level and above employees?

A.   The mass of them did not.  Typically, that was done by a centralized in-house recruiting group called the executive search recruiters.

Q.   Can you restate the name of the centralized in-house recruiting group?

A.   There were so many acronyms at DaVita, and

BY MS. ZANDI:

Q.   Do you agree that recruiters should look for employees -- strike that.

Do you agree that recruiters should look for candidates who are potentially interested in positions with DaVita to build talent pools regardless of whether there are open positions?

MS. LANE:  Objection as to form.  Asked and answered.

A.   Yeah, it would depend based on the role.

BY MS. ZANDI:

Q.   Did you want talent pools for directors?

MS. LANE:  Objection as to form.  Asked and answered.

A.   Yeah, it would depend on the role.

BY MS. ZANDI:

Q.   So you deny that you wanted talent pools for director-level and above positions?

MS. LANE:  Objection as to form.

A.   That's not what I said.

BY MS. ZANDI:

Q.   So probably some director-level and above positions, you would have wanted talent pools?

MS. LANE:  Objection as to form.  Asked and answered.

Robert Chipman    Confidential
August 07, 2024

BY MS. ZANDI:

Q.    You can answer.

A.    I'm sorry.  It would depend on the role.

Q.    For at least some roles in the director-level and above position, you would have wanted talent pools, right?

MS. LANE:  Objection as to form.  Asked and answered.

A.    You'd have to define the role.

BY MS. ZANDI:

Q.    So you deny that for at least some roles in the director-level and above positions, you would have wanted talent pools?

MS. LANE:  Objection to form.  Asked and answered.

A.    In a perfect world for high incumbent positions like -- like a field role for a director, I would want a pool of candidates, but not for every Field role, just for the ones that we maybe had more difficulty filling those roles.  So it would depend.  It's market by market.  It's role by role.

BY MS. ZANDI:

Q.    Can you please turn to the next page, which is Bates stamped 36923.

Do you see at the top "Talent pipelines

Robert Chipman  Confidential
August 07, 2024

are defined as deep pools of named and known talent with which we have built relationships and that can be tapped quickly to fill interview slates"?

A.    Yes.

Q.    Do you agree with that definition?

MS. LANE:  Objection as to form.

A.    Again, it depends on your use of the pipeline.

BY MS. ZANDI:

Q.    In what context do you disagree with that definition?

A.    It wouldn't be for every role.  It would be for, again, roles that we had more difficulty in filling.  So it can cut down the time to fill the position.

Q.    When you say "it wouldn't be for every role," what does that mean?

A.    Some roles have a natural pipeline internally, and so you'd want to be able to tap that first.  Some roles don't have an expectation or a expected turnover anytime soon, and so to create a pipeline for roles that won't turn is just inefficient.

Q.    Which roles have a natural pipeline internally?

Robert Chipman    Confidential
August 07, 2024

A.    Oh, they vary.  It depends.

Q.    Can you think of any specifics?

A.    Higher incumbent roles of the same type of role would be one that has much ability to be able to fill from within.

Q.    Like an SVP role?

A.    No, because they're not large enough. There are not enough of those.

Q.    Yeah.  What is an example of a higher incumbent role that is more able to be filled from within?

A.    Like a regional director.

Q.    Okay.  So you needed -- strike that.

Can you think of any specific examples of roles that do not have a natural pipeline internally?

A.    Highly technical roles.  So typically in the technology area, where you might need someone to be both a leader and have technology acumen, those come to mind.  Finance comes to mind.  It's based on skill set and experiences, which may not be present over levels of the organization.

Q.    Okay.  Can you please turn to the next page ending in Bates stamp 36924.

And this slide lists the critical-talent

Robert Chipman  Confidential
August 07, 2024

segments.

Do you see that?

A.   Yes.

Q.   Okay.  So for Casa del Mundo, analysts-people services, and legal-needed talent pools, right?

MS. LANE:  Objection as to form.

A.   Yeah, I don't -- that's not what this tells me.

BY MS. ZANDI:

Q.   What does this tell me?

A.   It's just where there's critical talent needs.

Q.   Okay.  What are "ROPs"?

A.   Regional -- regional -- I don't remember.

Q.   Something regional?

A.   I'm not even sure that's right.  Because these are dependents, basically.

Q.   Okay.

A.   ROPs?  I should know.  I don't remember.

Q.   Are these all departments within Dream Team?

A.   No.

Q.   Okay.  What are -- are these departments across the company?

Robert Chipman   Confidential
August 07, 2024

A.   Thank you.

Okay.

Q.   Okay.  Please look at the email at the top of the first page of the exhibit.  Kathy Kaplan emailed you and CC'ed Craig Bradley and D.Dewitt @Caldwell Partners.com on March 6, 2013 at 4:06:50 p.m., with the subject line, "RE:  Passive VP Talent Discussions."

Do you see that?

A.   I do.

Q.   So you received this email, right?

A.   Yes.

Q.   Okay.  Can you please turn to the second page of the exhibit.

Okay.  In the middle of the page, or closer to the top, you emailed Ray Follett and Craig Bradley on March 5th, 2013, at 2:22 p.m. with the subject, "Passive VP Talent Discussions."

Do you see that?

A.   Yes.

Q.   And remind me who Ray Follett is.

A.   Ray, at this point, would be the Palmer for Polaris.

Q.   Okay.  And who is Craig Bradley?

A.   Craig is -- he succeeded me as the people

Robert Chipman   Confidential
August 07, 2024

services director in Polaris.

Q.   Just to clarify, when you left the people services director role, were you responsible for Dream Team and Polaris at that time?

A.   Yes.

Q.   Okay.  So did Craig Bradley also work in Dream Team?

A.   No.  He just did Polaris.

Q.   Just did Polaris.  Okay.  Thank you.

In the second paragraph of -- strike that.

Did Craig Bradley report to you at this time?

A.   No.

Q.   Okay.  Who did he report to?

A.   He reported to Ray Follett.

Q.   Got it.  Okay.

So in this second paragraph, you state, "I met with Darin Dewitt from Caldwell Partners VP search firm yesterday, and we talked about making some process changes for how they recruit for VP talent in Dream Team and Polaris.  As he comes across passive talent that fits our DaVita DVP/VP profile, would you be willing to have a conversation with these individuals?  This is a similar process we're using with the DVPs as we come across passive

raw talent, and it's working really well.  Joann and Kurt have been great partners and have helped to convert some of the passive talent into active candidates."

Do you see that?

A.   I do.

Q.   So Darin Dewitt worked with -- strike that.

Darin Dewitt worked for Caldwell Partners, right?

A.   That's correct.

Q.   And Caldwell Partners was an external recruiter that DaVita used to recruit employees at the director-level and above, right?

A.   Primarily vice president, but yes.

Q.   Okay.  Was Darin Dewitt your point of contact at Caldwell Partners?

A.   Yes.

Q.   Did you regularly speak with him?

A.   Probably got updates monthly.

Q.   You got updates monthly from Darin Dewitt.

Okay.  Did you regularly speak with other employees at Caldwell Partners to discusses DaVita's recruiting needs?

A.   Not at Caldwell, no.

Robert Chipman  Confidential
August 07, 2024

Q.    So you were recruiting passive talent for DVP, VP and ROD roles, right?

A.    The ROD, I think, was more internal.  The DVP and VP was external, yes.

Q.    So you were using external recruiters to find passive DVP and VP candidates, and you were using internal recruiters to look for passive ROD candidates, right?

MS. LANE:  Objection as to form.

A.    Darin was helping us find, yeah, passive. He was creating a pool for us, a pool for some of the markets.

BY MS. ZANDI:

Q.    For DVP and VP candidates?

A.    Not necessarily just for those.  Really anyone that fit our profile as DaVita as a VP.

Q.    That's what he was looking for?

A.    Um-hum.

Q.    Okay.

MS. LANE:  Yes or no?  Just say yes or no.

A.    Oh, yes.  Sorry.

MS. LANE:  That's okay.

BY MS. ZANDI:

Q.    The last sentence says, "Johann and Kurt have been great partners."

Robert Chipman   Confidential
August 07, 2024

Who is Johann?

A.   She was the DVP or VP for -- she was Clinical.  I don't remember her title, but she was Clinical.

Q.   And who is Kurt?

A.   Kurt was a division vice president for one of the markets.  Probably CR Pacific, the Bay area.

Q.   Why did you want Ray Follett to have conversations with passive candidates identified by Caldwell Partners?

A.   Ray was a really good discerner when it came to people that could be successful in these roles.  Big believer in developing people.

And so I wanted to help use him to vet potential candidates for the future.

Q.   Were passive candidates more likely to accept jobs at DaVita after they met with DaVita executives?

MS. LANE:  Objection as to form.

A.   It depends.

BY MS. ZANDI:

Q.   Were some more likely to accept positions with DaVita after they met with DaVita executives?

MS. LANE:  Objection as to form.

A.   Yeah, it depends on the role and the

Robert Chipman  Confidential
August 07, 2024

individual.  And so many factors go into the influence that a leader or executive would have on a candidate.

BY MS. ZANDI:

Q.   You said, "This is a similar process we're using with the DVPs as we come across passive raw talent and it's working really well."

What does "working really well" mean?

MS. LANE:  Objection as to form.

A.   Yeah, that's -- I can't remember this many years back.

BY MS. ZANDI:

Q.   But this process helped to convert some of the passive talent into active candidates?

A.   Yes, that's what's in the email.

Q.   Okay.  Did you implement a similar process to fill other positions?

MS. LANE:  Objection as to form.

A.   I don't recall.

BY MS. ZANDI:

Q.   Was this process used in all of the Palmers?

MS. LANE:  Objection as to form.

A.   Yeah, I don't remember.

BY MS. ZANDI:

Q.   So you implemented it in Dream Team and Polaris, right?

MS. LANE:  Objection as to form.

A.   No.

BY MS. ZANDI:

Q.   Okay.  You did not implement this change as part of the process changes for how recruiting was done for VP talent and Dream Team and Polaris?

A.   This is a way to build a talent pool for DVP and VPs, really, across the village.

Q.   Okay.  The second-to-last paragraph in this email states, "This really is the way of the future.  Always having talent available before we even have a formal need.  We are ahead of the industry in this regard.  But given our growth projections, need to be focused on developing internal talent and securing top talent from outside."

Do you see that?

A.   I do.

Q.   Did you tell your recruiters to develop talent pools before you had a formal need?

MS. LANE:  Objection as to form.

A.   Yeah, it would depend, based on the role.

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BROWARD

I, Shirley D. Frazier, CRR, FPR, RPR, Notary Public, State of Florida, certify that ROBERT CHIPMAN personally appeared before me on August 7, 2024 and was duly sworn.

Signed this 20th day of August, 2024.

_____
SHIRLEY D. FRAZIER, CRR, FPR, RPR
Notary Public, State of Florida
My Commission No. HH 197130
Expires: 7/26/2025

# EXHIBIT 18

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL )
CENTER EMPLOYEE ANTITRUST )
LITIGATION, )
 )
 ) Master Docket No.
 ) 1:21-cv-00305
 )
THIS DOCUMENT RELATED TO: )
ALL ACTIONS )
 )
 )

----------------------------------

CONFIDENTIAL

Videotaped Deposition of

PETER CLEMENS

Bradley Arant Boult Cummings LLP

1221 Broadway, Suite 2400

Nashville, Tennessee 37203

May 2, 2024

9:02 a.m.

Reported by:
Emily L. Sipe, RPR, LCR

Q.      Did any of your responsibilities at CVS Caremark involve recruiting?

A.      I think you're involved in recruiting, yeah, at the senior level.

Q.      Okay.  And, generally, what positions were you recruiting for at CVS Caremark?

A.      Recruiting for positions that would have been working in my organization.  I'm not all the positions, but certainly some of the positions.

Q.      And when you say working within your organization, what does that mean?

A.      Within my financial responsibilities.

Q.      So people working within your team?  Would that be correct?

A.      In my team, yeah.

Q.      And did you leave CVS Caremark voluntarily?

A.      Yes.

Q.      And, very briefly, I do want to go over some of your work experience before joining CVS Caremark.

A.      Okay.

Q.      You also worked at Wachovia Bank?

A.      Yes.

Q.      And when did you start and stop working at Wachovia Bank?

A.      Let's see.  I started there for a summer

internship, I think it was the summer of 1990 and then went full-time within 1991.  I'm going to say it was after graduating from graduate school, so it was May or June of 1991.

Q.      Okay.  And when did you leave Wachovia Bank?

A.      January or -- let's see.  Either January or February of 1995.

Q.      Okay.  And you were assistant vice president at Wachovia Bank?

A.      I think that's correct when I left I was.

Q.      Okay.  And before you worked at Wachovia Bank you worked at AmSouth Bank; is that right?

A.      That's right.

Q.      And you were a credit officer; is that right?

A.      When I left there I was a credit officer, that's correct.

Q.      Do you recall the years that you worked at AmSouth Bank?

A.      June of 1987 through July or August of 1989.

Q.      Okay.  So let's pivot to your career at SCA. When you joined SCA, was your title executive vice president and chief financial officer?

A.      Yes.

Q.      And did your title remain the same until the time that you left in June 2015?

Peter Clemens   Confidential
May 02, 2024

A.      Yes.

Q.      And who did you report to at SCA?

A.      Andrew Hayek, CEO.

Q.      And did you report to anyone else?

A.      No.

Q.      And who were your direct reports?

A.      Their names?

Q.      Yes.

A.      Leslie Wachsman, Jeff Fields, Chris Classen, Jennifer Kimbro, and there may have been others. Those are the ones that come to mind.  Did I say Jeff Fields?

Q.      You said Jeff Fields, yes.  And Leslie Wachsman , she was vice president of financial operations?

A.      Yes.  Most of the time.  She also handled investor relations when we were public.

Q.      Okay.  And Chris Classen, he was the vice president of supply chain?

A.      That's correct.

Q.      And Jeff Fields, he was vice president accounting and controller?

A.      And controller.

Q.      And Jennifer Kimbro?

A.      Kimbro.

Q.    What was her role?

A.    She was internal audit, vice president internal audit.

Q.    Okay.  Do you know who Aaron Bauck is?

A.    Yes.  He did work for me as well.

Q.    He was one of your direct reports?

A.    He was.  He was in the diligence area for acquisition diligence.

Q.    And Aaron Bauck was a senior director?

A.    That sounds correct.

Q.    Okay.  Do you know who Brian Medley is?

A.    Brian Medley?  No.

Q.    Would he have been one of your direct reports?

A.    Doesn't ring a bell.

Q.    Okay.  Did anyone else report to you?

A.    Not that I'm thinking of right here.  But if you have a specific question on a person that -- maybe that'll jog my memory, perhaps.

Q.    Sure.  And do you know who Brian Mathis is?

A.    Yes.

Q.    And who is he?

A.    He ran our strategy area at SCA.

Q.    Do you recall his role?

A.    Head of strategy.

Q.    Okay.  And he was the senior vice president of

Q.      Okay.  Did you ever become aware of Andrew Hayek communicating with Kent Thiry?

MR. LAYTIN:  Objection to form.  Lacks foundation.

THE WITNESS:  I don't really know how much they communicated or when they communicated.

BY MR. CASTILLO GUARDADO:

Q.      Well, are you aware that they communicated at all?

A.      I knew they did at least occasionally.

Q.      Okay.  And how did you become aware of that?

A.      Oh, I don't know.

Q.      Would Andrew Hayek tell you that he had spoken to Thiry, for example?

A.      Possibly, but I don't know.  I guess he would be the only one that knew that he spoke to him, so he must have said something or emailed it, but I don't know.

Q.      Were you ever present during conversations between Andrew Hayek and Kent Thiry?

A.      I don't know.

Q.      Were you ever copied on any emails between Andrew Hayek and Kent Thiry?

A.      I don't remember any.

Q.      Would Andrew Hayek also communicate with the

CEO of USPI and Bill Wilcox?

MR. LAYTIN:  Object to form.  Lacks foundation.

THE WITNESS:  I don't know the answer to that, no.

BY MR. CASTILLO GUARDADO:

Q.      Are you aware if he ever communicated with the CEO of USPI?

A.      I'm not aware.

Q.      Are you aware if Andrew Hayek and Bill Wilcox had a close relationship?

A.      I'm not aware.

Q.      Did Andrew Hayek ever share with you that SCA had an understanding with USPI not to recruit each other's employees?

MR. LAYTIN:  Object to form.

THE WITNESS:  Yeah, I don't -- I don't recall him ever making me aware of that.

BY MR. CASTILLO GUARDADO:

Q.      Did anyone ever tell you, don't recruit USPI employees?

A.      Not that I remember.

Q.      And if someone from USPI applied for a job at SCA, there would be no problem with that?

A.      We can't control who applies.  What I earlier

Peter Clemens  Confidential
May 02, 2024

said and meant was that we had somebody, my understanding, we had somebody that we were interested in hiring from that, from either USPI or DaVita, I would need to mention it to Andrew.  That's what I recall.  That's different than somebody reaching out and automatically talk, I guess, talking to Andrew.

Q.        And why would you need to speak to an Andrew Hayek?

A.        He was going to do whatever he was going to do with the information.  I don't know.  He would -- you know, he was my boss.  So if he wanted to approve that hire, he would.  He approved a lot of hires that I made.  He interviewed a lot of people that were -- even at the financial operations level sometimes he would interview people.

Q.        So you testified that if SCA was interested in hiring someone from either USPI or DaVita, that you would need to mention that to Andrew Hayek; is that correct?

A.        Correct.

Q.        Were you aware of any other companies -- let me withdraw that.

          Other than candidates from DaVita or USPI, did you have to mention to Andrew when employees from other companies applied to SCA?

MR. LAYTIN:  Object to form.
Mischaracterizing his testimony.

THE WITNESS:  That's not what I'm saying.
If you want to change the form of the question.

BY MR. CASTILLO GUARDADO:

Q.      Sure.  You mentioned that you would notify Andrew Hayek if there was a candidate from USPI or DaVita, correct?

MR. LAYTIN:  Object to form.  You're mischaracterizing his testimony.

THE WITNESS:  Yeah.  My testimony is that -- first of all, I don't recall getting people, having people in that position with other companies, any position with other companies where we were recruiting them from these companies.  My understanding was that had we been interested in somebody from one of those two companies, I would need to run it by Andrew Hayek.  That was my understanding.  I don't recall that happening, but that was my understanding.

BY MR. CASTILLO GUARDADO:

Q.      And if you ever were interested in candidates from other companies, would you also have to run that by Andrew Hayek?

A.      Not necessarily.  He was interested -- he was always interested in the caliber of people we were

Peter Clemens  Confidential
May 02, 2024

talking to and hiring.  But I don't recall any other companies where I had to run it by him.  Unless in some cases he may say when you interview, when you get it narrowed down to two or three people, I would like to be part of the interview process for this division, sometimes he would do that.  Certainly for VPs he did that.

Q.    And when SCA was hiring candidates, would you sometimes offer a verbal offer?

MR. LAYTIN:  You personally?  Mr. Clemens personally?

THE WITNESS:  That's how I understood the question; is that right?

BY MR. CASTILLO GUARDADO:

Q.    As you understand the question, please answer.

A.    It's possible I would do that before extending the written offer, but I don't -- nothing rings a bell as to if we had a process that we needed to follow on it.

Q.    And would a verbal offer come before sending a formal offer?

A.    Possibly.

Q.    I guess I don't imagine it coming after the formal offer?

A.    Yeah.  It wouldn't be after.  Either the first

offer was verbal or written.  I don't know if that matters.

Q.        Okay.  And if you were looking to hire someone from USPI, would that candidate need to tell their boss at USPI that they were looking to leave USPI?

MR. LAYTIN:  Object to form.  Lacks foundation.

THE WITNESS:  Yeah, I've testified to what I remember the agreement sort of being, and I don't recall that being part of it.

BY MR. CASTILLO GUARDADO:

Q.        Okay.

A.        You've got to understand something, I mean, this wasn't my world.  My world was restructuring processes.  The place was broken when I got there.  And it certainly wasn't focused on hiring people who I thought this applied to, but what I recall this applying to.  My job was to get financial processes in order because they hadn't had a CFO, a real CFO in probably five years.  And we had people just making decisions about very important things without really having the basis to make those decisions, such as revenue recognition, just a whole slew of things.  Other than hiring, replacing a couple of VPs that didn't like having a boss, I wasn't -- this was not my

was this one-to-one communications?

A.      Sometimes I think it was.  I think I probably had Leslie join, or I could have had Leslie join as well, and certainly at other times.

Q.      And when you say you had Leslie join, is that join in a phone call?

A.      Yeah.  Well, yeah.  We use a lot of video but I don't think we did with Jason.  I think it was just a phone call.

Q.      And when you say you use a lot of video, is that through an application that you were using?

A.      Yeah.

Q.      And what was the application?

A.      There was a couple.  Zoom was probably the main one.  It could have been Skype but it seems like there was another one, too, that we used.  There were internal meetings where many times done with video even then.

Q.      How did you go about scheduling those video calls with Jason Cagle?

MR. LAYTIN:  Object to form.  You are totally mischaracterizing his testimony.

THE WITNESS:  What do you mean?

MR. LAYTIN:  Did you hear the question?

THE WITNESS:  Yeah.  Repeat it.

BY MR. CASTILLO GUARDADO:

Q.      So you mentioned that at times you recalled having video communications with Mr. Cagle; is that correct?

A.      No, no, no.  I didn't say that.  Phone.  I said internal meetings were video usually, or sometimes, even then.  But not external.  I don't think in 2012 or whenever this was, people would even know what a Zoom call was.

Q.      Okay.  Thank you.  That clarifies things.  When you spoke to Jason Cagle, what topics did you discuss?

A.      Ways to benchmark, I think, on expense levels for the companies to see if we were different in any ways that were significant.

Q.      What do you mean by benchmark?

A.      A lot of what I did was benchmarking, but it was mostly looking at basically any piece of information that was available from any competitor or anybody in the space and comparing ourselves to them.  So we did a lot of this, especially with the other public companies -- or companies that -- not necessarily public companies, but if they reported public numbers to bond holders, or it may not be public from a stock standpoint, but we would gather

that information and we would compare it to how we look.

Without knowing, you know, there's obvious differences that you're going to have that you can't isolate, just in the way you account for things.  So benchmarking would be comparing ourselves to the industry.

Q.      What categories of information were you looking at in that benchmarking process?

A.      In the overall benchmarking, it was everything available.  With Jason it was looking at, you know, outside of that, because they had a lot of information that was available, if I recall, as well.  It was looking at, in particular, the expenses as percent of revenue of various categories.  But it was also taking what they say publically about their revenue per case, every number on their ballot sheet, every number on their profit and loss statement, every statistics you can calculate from that, like -- including net revenue per case, all the way down to P&L.  And you know of obvious differences why there would be differences but you don't have a lot of detail, you have what the public has in most cases.

Q.      So you would look at that public information from which sources?  Let me withdraw that question.

Where did you find that public information that you just mentioned?

A.      They would release it or file it in some cases.

Q.      File it?

A.      Off their website or with the SEC, Securities Exchange Commission.  You'd listen to their conference calls, the public conference calls that they would have each quarter like we had.  And that's where 99 percent of my time was spent on benchmarking.  I would say 99.9 was all that.

Q.      Did you ever consider nonpublic data as part of the benchmarking process, generally?

A.      If we could get it, we would want to use it, but didn't have a lot of that.

Q.      And why would you want to use that on public data?

A.      If it provided some other insight that you were trying to gain from it.

Q.      Was nonpublic data difficult to get?

                MR. LAYTIN:  Object to form.

                THE WITNESS:  I guess you'd have to get more specific.

BY MR. CASTILLO GUARDADO:

Q.      Sure.  You testified earlier that you would

use public data if you could get it, correct?

A.    You can get public data.  It's available.

Q.    Correction.  You testified earlier that you would use nonpublic data if you could get it, correct?

A.    (Witness nods head.)

Q.    How would you go about getting nonpublic data as part of the benchmarking process?

A.    I mean, in the case with Jason, we'd share a little bit.  It wasn't much, but a little bit.  I don't think -- I can't remember getting it from anybody else.  We may have.

Q.    And that little bit of data that you shared with Jason Cagle, what data was that?

A.    Expense data.  My department as a percent of revenue.  And I don't know how many times it was done but it wasn't often.  I didn't see it often.  As far as I'm aware, it wasn't often.

Q.    Okay.  Other than expense data by department, as a percentage of revenue, did you share any other data with Jason Cagle that was nonpublic?

A.    I don't believe so.

Q.    Would you consider expense data by department as a percentage of revenue to be material nonpublic information?

MR. LAYTIN:  Object to form.

THE WITNESS:  Yeah, it's -- yeah, I think you'd have to get more objective in your question, I think.  I'm not following exactly what you're after.

BY MR. CASTILLO GUARDADO:

Q.      Sure.  Earlier you testified that there's certain data that is material and nonpublic?

A.      Uh-huh.

Q.      For which there would be sensitivities in sharing with a competitor, correct?

A.      Yeah.

Q.      And --

A.      Or sharing with anybody.

Q.      Or sharing with anyone.  Would expense data by department as a percentage of revenue be within the category of data that is material nonpublic data for which there are sensitivities when sharing with competitors?

MR. LAYTIN:  Object to form.

THE WITNESS:  Let me say it this way.  I don't think it was material information that we shared back and forth.  And if I had a question on that, I'd pick up the phone and ask our general counsel and ask him.  And we may have done that.  I don't know.

BY MR. CASTILLO GUARDADO:

Q.      Did SCA share its expense data by department

Again, is there any reason why this document would not have appeared in your custodial file?

MR. LAYTIN:  Object to form.

THE WITNESS:  I guess we didn't produce it.  That's all I can say.  I don't know.

BY MR. CASTILLO GUARDADO:

Q.    Okay.  Did you delete this document from your custodial file?

A.    I would have no reason to delete this document, no.

Q.    Mr. Clemens, I do ask that you let me finish asking the question as a courtesy to the court reporter.

A.    I'm sorry.

Q.    So that we can get a clear record.

Okay.  So you cannot explain to me, sitting here today, why USPI produced this email chain but SCA did not?

A.    I can't explain it.

Q.    Okay.  How often did SCA share its monthly case volume data with USPI?

A.    I don't know.

Q.    Was it more than once?

A.    I honestly don't know.  It could have been.

Q.    Did you authorize the sharing of monthly case

volume data with USPI?

A.      I don't recall authorizing it but I was copied here, obviously.

Q.      Is there someone else who would have authorized sharing case volume, monthly case volume data with USPI?

MR. LAYTIN:  Object to form.

THE WITNESS:  We shared it, Brian shared it.  Brian worked for Andrew.  I don't know if Andrew authorized it.

BY MR. CASTILLO GUARDADO:

Q.      Mr. Clemens, are you familiar, generally, with general and administrative expense data?

A.      Sure, yeah.

Q.      What is it?

A.      Overhead expense.

Q.      Okay.  And if I referred to the data as G&A data, you would understand what I mean; is that fair?

A.      Say that again.

Q.      If I refer to general and administrative expense data as G&A data, would we understand each other?

A.      Yes.

Q.      Does G&A data include compensation expenses?

A.      Yes.

Q.      So, again, I'm trying to understand here.  You have SCA's overhead expenses, and within that compensation data is a subset of the overhead expenses; is that correct?

MR. LAYTIN:  Object to the form.

THE WITNESS:  Comp was a component of expenses.  Is that what you're asking me?

BY MR. CASTILLO GUARDADO:

Q.      Yes.

A.      Okay.

Q.      That's clear.

A.      Okay.

Q.      Okay.  And did you discuss SCA's G&A data with competitors?

A.      I think, as we talked about earlier, we had shared it with Jason, at least occasionally, and may have had a discussion.

Q.      Okay.  Did you discuss SCA's G&A data with anyone else other than Jason Cagle?

A.      Yeah, sure.

Q.      With who?

A.      About any public shareholder that would call me, we'd have to talk about it.  Certainly internally.

Q.      Were you aware if anyone else at SCA discussed G&A data with anyone at USPI?

A.        Leslie may have joined me for a call, but I don't know that that happened.  I don't think that happened often.  I don't know of anybody else.

Q.        Okay.  And is SCA's G&A data public?

          MR. LAYTIN:  Object to form.  Time period.

BY MR. CASTILLO GUARDADO:

Q.        While you were employed at SCA, was SCA's G&A data public?

A.        It became public in 2013.  It was certainly public then.  It was available to a lot of outside parties from 2011 because we had bonds outstanding.  So we wouldn't -- it wasn't like an SEC filing we would post it on Intralinks and all those parties could pull that information down and they would see categories of expense.

Q.        And who had access to those Intralinks that you mentioned SCA used post its G&A data prior to 2013?

A.        Bond holders and lenders certainly had it.  I don't know of anybody else.

Q.        Are you aware if competitors had access to these Intralinks?

A.        I'm not aware that they did.

Q.        Okay.

REPORTER'S CERTIFICATE

I, Emily L. Sipe, Court Reporter and Notary Public, do hereby certify that I recorded to the best of my skill and ability by machine shorthand all the proceedings in the foregoing transcript, and that said transcript is a true, accurate, and complete transcript to the best of my ability.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

SIGNED this 14th day of May 2024.

----------------------------------------
Emily L. Sipe, RPR, LCR
Tennessee LCR No. 608
Expires:  6/30/2024

# EXHIBIT 19

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--oOo--

IN RE OUTPATIENT MEDICAL CENTER  ) No. 1:21-cv-00305
EMPLOYEE ANTITRUST LITIGATION    )
_____ )
                                 )
                                 )

CONFIDENTIAL

_____

VIDEO DEPOSITION OF

SHANNON MOSLEY

August 13, 2024

_____

DEPOSITION OF SHANNON MOSLEY, produced as a witness, duly sworn by me via videoconference at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on August 13, 2024, from 9:18 A.M. to 3:05 P.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand via videoconference.

agreement?

A.    Could you rephrase that question.

Q.    Sure.  You just used the phrase "nonsolicitation agreement."  What did you mean by that?

A.    When I think of nonsolicitation, I think of do not solicit an individual or whatever, if it's a business, if it's an individual.  It's an agreement not to solicit an individual to potentially consider an opportunity.

Q.    So in the context of this case, what do you mean by nonsolicitation agreement?

A.    What I said is nonsolicitation of an employee.  I didn't say an agreement, I said nonsolicitation.

Q.    And how does that -- and what do you mean by that in the context of this case?

A.    Right.  As I mentioned, it could be an employee that a recruiter or anyone might reach out to, an organization, to solicit them to come work or consider working for an organization.

        And so it's a nonsolicitation agreement, not to solicit that employee.

Q.    So am I hearing you correctly that this case is about USPI and SCA agreeing not to solicit

Shannon Mosley   Confidential
August 13, 2024

each other's employees; is that correct?

MS. MOYE:  Objection.  Objection to the form.

Q.   (BY MR. ROSS)  You can answer.

A.   Yes, I hope I'm being clear. Nonsolicitation means -- you know, the word "solicit" means to reach out to, to invite, you know, someone to consider, in this case, working for your organization.

Q.   So in the context of this case, USPI and SCA agreed not to reach out to each other's employees to offer them jobs; correct?

MS. MOYE:  Objection to the form.

I'm sorry, can I hear that whole question back, please, Court Reporter.

(Record read by the reporter as follows:

"So in the context of this case, USPI and
SCA agreed not to reach out to each
other's employees to offer them jobs;
correct?")

MS. MOYE:  Object to the form.

If you understand it you can answer.

THE WITNESS:  Well, what I can say is that it was a specific group of individuals, administrators, operators, and development.  So it's

a specific group, not all employees.

Q.   (BY MR. ROSS)   What about that specific group of employees?   What do you mean?

A.   A group of --

MS. MOYE:   Objection to the form.

Just pause for a moment so I can get an objection in if I need to.

Will you repeat it, Jonathan.

Q.   (BY MR. ROSS)   So, what about those specific group of employees?

MS. MOYE:   Are you finished?   That's it?

Q.   (BY MR. ROSS)   In the context of your statement that this case is about nonsolicitation?

MS. MOYE:   Objection to the form.

Q.   (BY MR. ROSS)   You can answer.

A.   The focus was on administrator-level hires, which is an operator.   And operators above that administrator and potentially those in development, which is mergers and acquisition. Operators and development talent.

Q.   I'm still not quite understanding you. And what about those people?

A.   I don't understand why you're confused.

Q.   Are you saying that there was an agreement between SCA and USPI not to hire each other's

Shannon Mosley   Confidential
August 13, 2024

employees of that nature?

MS. MOYE:  Objection to the form.

THE WITNESS:  I don't know how else to answer it, so I'm kind of at a loss.

Q.   (BY MR. ROSS)  Okay.  When you said nonsolicitation, this case is about nonsolicitation, and you said specifically between USPI and SCA.

Am I correct that what you mean by that, is that USPI and SCA agreed not to solicit administrators and above employees from each other's organizations?

MS. MOYE:  Objection to the form.

THE WITNESS:  It's the same question that you asked me before, and I think I've answered it.

Q.   (BY MR. ROSS)  What's your answer?  Answer it again.

A.   The answer to the question you just asked me, to my understanding, is yes.

Q.   Thank you.

Now, are you aware that USPI has sought leniency from the government in connection with that agreement we just discussed?

MS. MOYE:  Objection to the form.

THE WITNESS:  Could you rephrase the question.

Shannon Mosley   Confidential
August 13, 2024

Q.   (BY MR. ROSS)   Are you aware that USPI has sought leniency from the government with respect to its nonsolicitation agreement with SCA?

MS. MOYE:  And again, Ms. Mosley, if you can't answer that without revealing communications with counsel, you should not answer it.

THE WITNESS:  I should not answer.

MS. MOYE:  So instructing her not to answer.  She doesn't have knowledge independent of communications with counsel.

Q.   (BY MR. ROSS)  Were you aware at any point that the government was investigating USPI for entering into what you call the nonsolicitation agreement, and I'll use the phrase "no poach agreement"; is that okay?

Do you understand what I mean by no poach agreement?

Let me start with that.  Scratch my first question.

Do you understand what I mean by no poach agreement?

MS. MOYE:  So we're scratching the first agreement.  The agreement -- the question on the table is?  Say it again now?

Q.   (BY MR. ROSS)  Pending question is, do you

to let him finish his whole question.  He's asking you not about what's in the document.  He's talking about your recall; okay?

So go ahead and restate the question, Jonathan.

And let him finish.

THE WITNESS:  Okay.

Q.   (BY MR. ROSS)  So as we sit here today, do you have a recollection of Mark Garvin telling you that Doug Swope had contacted Mark Garvin because he had been contacted about the no poaching agreements?

A.   I somewhat recollect that in a passing conversation.

Q.   Let's continue with the review.

MS. MOYE:  Are you finished with your review?

THE WITNESS:  I'm finished.

Q.   (BY MR. ROSS)  So other than the material that you pointed out, otherwise, ███████████ ████████████████████████████████████ ██████████████ ?

A.   Yes, from my recollection at that time, yes.

MS. MOYE:  We've been going about an hour now, Jonathan.  I'd like to take a quick break.

Shannon Mosley   Confidential
August 13, 2024

MR. ROSS:  Sure.  Let's come back at, 10 minutes, 11:45?

MS. MOYE:  Yeah, that's fine.

THE VIDEOGRAPHER:  We're off the record. The time is 15:33 UTC.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record. The time is 15:46 UTC.

Q.    (BY MR. ROSS)  Welcome back, Ms. Mosley.

███████████████████████████████████████

███████████████████████; is that correct?

A.    Yes, DOJ, yes.

MR. ROSS:  So we're going to mark as PX281 what's under Tab 4, which is --

THE VIDEOGRAPHER:  Pulling that up.

MR. ROSS:   --  ████████████████████

████████████████████ that occurred on June 18, 2020.

(Whereupon, Exhibit PX281 was marked for identification.)

Q.    (BY MR. ROSS)  My first question for you, Ms. Mosley, is have you seen this document before?

A.    Seen it but not read it in full detail.

Q.    And prior to the last week, before that, had you ever seen this document before?

A.    Honestly, I can't recall seeing this before.

Q.    And I think what I'm going to ask you to do is, with the other one, if you could review it -- well, first, let me just ask some background questions first.

Do you recall ██████████████████ ██ -- on June 18, 2020?

A.    Yes, I do.

Q.    Okay. ████████████████████ ██████████████████████████████ █████████████████████████████ ████████████████████ ?

A.    Yes.

Q.    And did you provide ████████████ ████████ at that time in 2020 to the best of your ability?

A.    Yes, to the best of my ability.

Q.    Did you see anyone taking notes during the interview in 2020?

A.    It was Zoom, so I don't recall being able to see someone take notes.

Q.    Was this interview in person or otherwise?

A.    It was a videoconference.

Q.    And you say that you have not reviewed

this document in detail at any point?

A.    No.

Q.    So I'm going to ask you to give it a review now and let me know if there's anything in there that you believe is inaccurate or not correct?

A.    Just for the record,

Q.    Continue reviewing it.

A.    Okay.

Shannon Mosley   Confidential
August 13, 2024



Q.   Okay. ████████████████████████

████ ██████████████████:?

A.   Right.

Q.   ████████████████████████████████

██████████; correct?

A.   ████████████████████████████████

Q.   ██████████████████ --

A.   ████████████████████████

Q.   █████ --

A.   █████████████ ████████████ ████████

████████████████████

Q.   ████████████████████████████

████ ██████████████████:?

A.   █████████ ████████████████████████

████ ██████████.

Q.   Yeah, I do.  But you don't have any personal knowledge of how the agreement was applied to positions for which you did not recruit?

MS. MOYE:  Object to the form.

THE WITNESS:  Well, so I was really the only recruiter for many years.

Q.   (BY MR. ROSS)  And you applied it to every

position that you recruited for; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  Again, for clarity, ███████
█ ██████████████████████████████████████.

Q.   (BY MR. ROSS)   Okay.   You would not solicit an SCA employee for any position you were recruiting for; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  I don't agree with how you're phrasing the question.

Q.   (BY MR. ROSS)   What don't you agree with?

A.   ████████████████████████████████████
█ ████████████████ ███████████████████████
█ ███████████████████
█ ██████ ████████████████████████████████
█ ████████████████████████████████ ███████
█ ████████████████, did you not?

MS. MOYE:  Objection to the form.

THE WITNESS:  I don't agree with the question.

Q.   (BY MR. ROSS)   What part don't you agree with?

A.   I want you to note that specifically I'm saying my main focus had been operations and development positions.  Occasionally I might assist

Shannon Mosley   Confidential
August 13, 2024

with other corporate positions, but it was rare.

My focus was on operations, which is administrators and above.

Q.   And with respect to your focus you applied the no poach agreement; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  Just said that.  I still don't understand the question.  I thought I answered it.

MS. MOYE:  Answer it again if you understand it.

THE WITNESS:  Right, yes.

MS. MOYE:  So we're continuing with the review now?

MR. ROSS:  Correct.

MS. MOYE:  Have you finished your review?

THE WITNESS:  Yes.

Q.   (BY MR. ROSS)  Okay.  Ms. Mosley, so you've reviewed the entire document that's been marked as PX281.

And other than the things that you mentioned during that review, ██████████ ████████████████████████████████ █████████████████████████████████?

A.   Yes.

Shannon Mosley · Confidential
August 13, 2024

Q.   Ms. Mosley, if you could describe for me briefly your educational background after high school?

A.   I'm sorry.  Hang on, I'm sorry.

Q.   Do you want to take a quick break?

MS. MOYE:  You want to take a break?

THE WITNESS:  Just for like five minutes.

MR. ROSS:  Okay.  Back on in five minutes, 12:25.

THE VIDEOGRAPHER:  We're off the record and the time is 16:18 UTC.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record. The time is 16:21 UTC.

Q.   (BY MR. ROSS)  Okay.  Ms. Mosley, we're about to go into your educational background following high school.  If you could briefly describe that for me.

A.   Yes.  I completed four years, with a Bachelor's in Arts degree, English major, Spanish minor.

Q.   And what school was that?

A.   Texas Southern University.

Q.   Was there any schooling after that?

A.   No.

Shannon Mosley   Confidential
August 13, 2024

A.   You want me to list all of the different companies that had -- I just want to be clear.  You want me to just call out a few?

Q.   Well, I'm asking, did you find that there were certain companies that had employees that would have provided good candidates for your administrator position, candidates that had those skills you were looking for?

A.   So if you're asking me -- if I understand the question, you're asking me if there were other facilities or companies that had these candidates, or these types of individuals, the answer is yes.

Q.   What were those companies?

A.   It's been a while since I've been in the ASC industry; okay, almost five years.  But it would have been a Symbion or of course ASCOA or an AMSURG.

But also we would look at hospitals and we would look at directors of the OR because we basically had -- our ASCs were ORs.  So I would look for directors of OR within the hospitals.

We would also potentially consider DaVita candidates to run our ASCs.  Because of the way they were trained it made a good transition over to ASCs.  Of course you already heard me call out SCA.

So those were some of the companies and

organizations that may have had that talent.

Q.   So that would include SCA and AMSURG companies?

A.   Of course, yes.

Q.   Yes.  Did there come a time that your position changed at USPI?

A.   My position expanded at USPI.

Q.   And when did your position expand?

A.   I have to tell you I do not remember the exact dates.

Q.   In what sense did the position expand?

A.   I became -- I was promoted to director of recruiting and retention, don't remember the year. And after that I was promoted to vice president of talent acquisition.

Q.   Now, when you were promoted to director of recruiting and retention, do you recall if you knew at that time that there was a no poach agreement with SCA?

MS. MOYE:  Object to the form.

THE WITNESS:  I just said I don't remember when I became director of recruiting, so I don't know.  I can't answer that question because --

Q.   (BY MR. ROSS)  Well, okay.  During your time as director of recruiting and retention and

Shannon Mosley   Confidential
August 13, 2024

before you became vice president of talent acquisition, do you recall having knowledge of a no poach agreement with SCA during that time period?

MS. MOYE:  Object to the form.

THE WITNESS:  Right, again, since I -- again, I don't want to answer that because I don't remember the timing of me becoming director of recruitment, if you're asking about that specific role.

Q.   (BY MR. ROSS)  About how many years were you the director of recruiting and retention before becoming vice president of talent acquisition?

A.   I cannot answer that because it would be a guess.

Q.   Do you recall when you became vice president of talent acquisition?

A.   Again, I can't answer.  It would be a guess.

Q.   Who was your supervisor when you became vice president of talent acquisition?

A.   Initially it was Kristin Blewett.

Q.   Am I correct that Kristin Blewett was your supervisor up until 2010?

A.   I don't remember, to be honest, don't remember the exact date.

Shannon Mosley   Confidential
August 13, 2024

SCD.

Q.   And were you ever told that you could now recruit talent from SCD?

A.   I don't recall there being a conversation about that.

Q.   And the last one was Foundation.  Do you know what the full title of that company is?

A.   I don't.  It's many years ago, yeah.

Q.   And do you recall when you were told not to recruit from Foundation?

A.   I don't remember the exact date.

Q.   And do you recall who told you not to recruit from Foundation?

A.   It would have been Brett Brodnax.

Q.   And what did he tell you about that?

A.   Same spirit as before, looking to acquire facilities that are owned by Foundation, so we would back off on recruiting talent.

Q.   And do you have any personal knowledge of any attempts to acquire facilities from Foundation by USPI?

A.   Personal knowledge, no.

Q.   And were you ever told that you could now recruit from Foundation?

A.   No, I did not have that conversation.

Q.    Well, when I say were you ever told you could recruit from any of these companies, I meant either in a conversation or an email or a text, in any manner of communication?

A.    Not that I can recall.

Q.    Now, with respect to recruiting RVPs, was the process different in any manner than what we discussed was the process for recruiting administrators?

A.    The main difference between the two processes was that the regional vice president candidate would have to potentially, depending on the situation, interview with our hospital partner, and would have to come in to Dallas to interview with the C-suite.

Q.    And with respect to RVPs, how do you become aware that USPI needed to recruit an RVP?

A.    Again, the title was group president, but it would be a group president or a market president would let me know.

Q.    And would they convey to you a salary range at that point for the RVP position?

A.    It could come up.  Again, I would have an idea of what the range was based on past hires.

Q.    And were there a set of skills that you

were looking for that would make a good candidate for an RVP position?

A.   Well, yes.  They would have to be able to really work independently, have good judgment and good discernment, mental agility, negotiation skills, excellent relationship building skills.

Ability to, I guess not learn on the fly, but pivot in certain situations and lead their team, other administrators.  Oh, and financial acumen.

Q.   And is there any type of prior experience you would be looking for that they would have?

A.   Prior experience running with an ASC organization, you know, having oversight for several facilities.  I will say that we did promote our administrators to regional vice president positions at times, depending on scope and scale of the role.

Q.   And how often would an RVP position be filled by an existing USPI administrator?

A.   I can't give you a number.

Q.   Was it often or...

A.   It was situational.

Q.   Was it rare for -- was it rare?

A.   That's not a fair question, I don't think.

Q.   Well, it's a fair question.  I'm just asking if you recall.  Do you recall that it would

Shannon Mosley   Confidential
August 13, 2024

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: August 26, 2024

_____

BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

# EXHIBIT 20

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--oOo--

IN RE OUTPATIENT MEDICAL CENTER  ) No. 1:21-cv-00305
EMPLOYEE ANTITRUST LITIGATION    )
                                 )

CONFIDENTIAL

_____

VIDEO DEPOSITION OF

SANDI KARRMANN

August 14, 2024

_____

DEPOSITION OF SANDI KARRMANN, produced as a witness, duly sworn by me via videoconference at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on August 14, 2024, from 9:12 A.M. to 11:49 A.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand via videoconference.

A.  No.

Q.  And if you could now describe for me your professional background after you finished school.

A.  So right out of undergrad I worked for Macy's Northeast and then Bullock's Department Stores, which Macy's had purchased.  I worked there from 1987 to 1990.

I then moved to Heller Financial in 1990 and then moved to Frito-Lay, a division of PepsiCo, in 1993.

Q.  And what position were you --

MS. MOYE:  I think the witness wasn't finished with the answer.

THE WITNESS:  1993.  And then moved to Meritage Homes in 2005.  And then moved back to -- well, not back to.  Moved to Yum Brands in 2007, I believe.  And then moved to USPI in 1990 -- I'm sorry, 2013.  Moved to Tenet in 2017.

And moved to Kimberly-Clark in 2020, and that's where I currently am working.

Q.  (BY MR. ROSS)  And what were you doing in each of those positions -- each of those companies?

A.  In Macy's I was in accounts payable.  It was a management training program.  My first assignment was in accounts payable.  When I moved to

Sandi Karrmann   Confidential
August 14, 2024

Bullock's Department Stores I became the safety and Workers' Compensation manager.

When I moved to Heller Financial I was the human resources representative.  When I moved to Frito-Lay I was compensation manager, then a group manager HR.  And HR director at Taco Bell in the corporate office.  And then field HR director.

And then back to Frito-Lay within PepsiCo as HR director for Southern California, then HR director for the West.  And then HR VP for all of sales for Frito-Lay North America.

Then CHRO for Meritage Homes.  Then chief people officer for Pizza Hut, chief people officer for Yum Restaurants International.  Then chief HR officer for USPI, chief HR officer for Tenet, and chief HR officer for Kimberly-Clark.

Q.   And during your long tenure in human resources, have you received any antitrust training?

A.   I don't recall.

Q.   Do you recall receiving any training about nonsolicitation agreements or no poach agreements during your tenure as an HR officer?

A.   Any of that would have been with counsel.

Q.   Did you instill any compliance training or -- compliance training of any sort in any of

Sandi Karrmann   Confidential
August 14, 2024

those positions that you were in?

MS. MOYE:  Jonathan, I'm sorry, I could not hear the second word you said.  Could you repeat it, or if the court reporter got it, read it back.

Q.   (BY MR. ROSS)  Did you institute any compliance training in any of your HR positions?

A.   I didn't institute training.  Training has typically been initiated through our legal department.

Q.   Did that training include antitrust issues?

A.   I don't recall.

Q.   Now, in all of your long tenure as a human resources officer, before joining USPI, had you encountered any nonsolicitation agreements between companies?

A.   No.

Q.   So moving to your time at USPI.

When you joined USPI in 2013, what were your duties and responsibilities for the company?

A.   I was responsible for the human resources function, which would include overseeing benefits, compensation administration, training, performance management, any labor activity.

Q.   And who did you report to at that time?

adjustments based on cost of labor changes in the market.

Q.   We're talking about compensation, salary and benefits for employees?

A.   Yes.

Q.   And were the pay levels evaluated at least once a year company-wide to determine the raises for the next year?

A.   There was an overall merit budget established each year.

Q.   Can you describe the process for doing that?

A.   We would look at overall projected merit budgets, we would look at merit budgets that companies were projecting based on compensation surveys.

And we would also evaluate our performance as a company and establish an appropriate merit budget balancing all the different factors.

Q.   What factors would go into that?

A.   Performance of the centers, performance of the company and marketplace changes in wages.

Q.   Can you describe for me the pay structure at USPI?

MS. MOYE:  Object to the form.

Sandi Karrmann    Confidential
August 14, 2024

THE WITNESS:  USPI did not have established salary ranges.  Are you specifically -- are you referencing a specific population?

Q.   (BY MR. ROSS)  For the employees, managers and above?

A.   So managers and above -- administrators and above?  Because there are managers underneath the administrator.

Q.   You can go with administrators and above?

MS. MOYE:  Could you just state a full question, please.

Q.   (BY MR. ROSS)  Well, the question was can you describe the pay structure at USPI?

MS. MOYE:  For administrators and above. That's the question now?

MR. ROSS:  Sure.

THE WITNESS:  For administrators and above, we did not have established salary ranges. We evaluated performance of centers, performance of the individuals.

And based on marketplace changes and cost of labor, we looked at those different factors and determined salary increases and compensation for administrators and above.

Q.   (BY MR. ROSS)  Did you also consider

Sandi Karrmann   Confidential
August 14, 2024

internal equity in setting salaries for employees?

A.    Yes.

Q.    And what is your understanding of internal equity?

A.    Based on size and scope of the center for an administrator, the center they were in, the complexity of the center.  All centers are different.

Based on an administrator's performance, based on the length of time they've been in the role and based on that local market, because different markets pay differently across the country.

Q.    So in what sense would you consider -- take internal equity into account?

A.    For people with comparable size, scope, complexity of centers and similar performance results, and performance of their position.

You would expect that people would move generally at the same rate, taking into account differences in market.

Q.    So you would also consider external equity in setting raises?

A.    We would look at the marketplace.

Q.    And so that would include obtaining compensation surveys or pay surveys?

A.   Yes.

Q.   Now, when you were considering internal equity, that would be among different employees with the same title; correct?

A.   Yes.

Q.   And would it also be among employees at different locations?

A.   Yes.

Q.   And would you consider that between new hires and current employees?

A.   Yes.

Q.   And between newly promoted people and existing people with that title?

A.   Yes.

Q.   And also between people with different titles.  For example, with the RVPs and market presidents, would you consider internal equity between -- to maintain different pay structures for RVPs and then market presidents?

MS. MOYE:  Object to the form.

THE WITNESS:  We wouldn't specifically compare an administrator to an RVP's pay.  We would look at administrators within their job classification, or job title.  And we would look at RVPs within RVPs.

Sandi Karrmann  Confidential
August 14, 2024

Q.   (BY MR. ROSS)  And would you take care to make sure RVPs weren't being paid more than market presidents?

A.   We wouldn't specifically compare a market president to an RVP's pay, but we would look at RVPs against RVPs and market presidents against market presidents.

Q.   Now, just give me a general description of how merit increases were instituted at USPI?

A.   To clarify, for any specific population or in general?

Q.   Well, were there different processes for different populations?

A.   We had one approach and we had different processes.  One approach was there was an overall merit budget for the organization.

But centers looked at their own pay and determined their own pay.  The corporate office determined their own.  And we had a process for administrators and above.

Q.   And who was involved in setting the merit budget for the year?

A.   Myself, Bill Wilcox, Brett Brodnax, Jason Cagle.

Q.   And who had the final approval over the

Sandi Karrmann   Confidential
August 14, 2024

recommendations for their administrators, review with their market presidents.  They're also reviewing with their physician owners in the centers to get feedback and input.  All of that rolled up to us at the center.

I reviewed it, as did Bill, Brett, and Jason.

Q.   (BY MR. ROSS)  And again, they were given a percentage increase, overall percentage increase within which to work; correct?

A.   Yes.

MR. ROSS:  If we could pull up Tab 9, which we will mark as PX -- that's Exhibit PX297?

THE VIDEOGRAPHER:  Yes.  Pulling that up.

(Whereupon, Exhibit PX297 was marked for identification.)

MR. ROSS:  Which is a document bearing Bates stamp number USPI_CIV_58049 and 58050.

MS. MOYE:  This is 297, PX297?

MR. ROSS:  Correct.

Q.   (BY MR. ROSS)  And you can look at the first email, the bottom email on May 15, 2014, from Sandi Karrmann to Bill Wilcox, Brett Brodnax, Jason Cagle, Niels Vernegaard, and Phil Spencer. And the subject is VP plus increases.

MS. MOYE:  You should take the time and review the whole document.

Q.   (BY MR. ROSS)  Yes.  Yes, please review.

A.   Yes, I have.

Q.   Is this an email that you sent during your normal course of business at USPI?

A.   Yes.

Q.   First of all, who is Niels Vernegaard?

A.   Niels was the COO.  He left.  I don't recall specifically when he left, but he left early on in my tenure.

Q.   And who was Phil Spencer?

A.   Phil Spencer led all of the sales organization.  So he didn't have oversight into the administrator pay, but he oversaw the sales piece.

Q.   So the people you're sending this to are the people who oversaw the VPs at USPI?

A.   Correct.

Q.   And in this email you say, it's that time of year for pay increases for VPs and above.  We are targeting 2 percent for all increases, so as you assess and pull together recommendations for your team, please use 2 percent as your overall raise budget.

So this is what we were discussing before.

Sandi Karrmann   Confidential
August 14, 2024

The 2 percent increase was set for the company and then individual managers had some discretion to individualize increases within that 2 percent budget; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  Yes.

Q.   (BY MR. ROSS)  And you say, it's that time of year again, so were pay increases done on an annual basis?

A.   Yes.

Q.   And you would send similar emails to the managers of other departments at USPI?

MS. MOYE:  Objection to the form.

THE WITNESS:  Cindy would send them out.

Q.   (BY MR. ROSS)  At your direction?

A.   Yes.

Q.   And the email above that one is from Cindy English to you, and she's sending to you the people under your -- the people you manage; is that correct?

A.   Correct.

Q.   And the process then would be the managers would return their proposed recommendations and those would be reviewed by you, Bill, and Jason for final approval; is that correct?

Sandi Karrmann   Confidential
August 14, 2024

A.   Correct.

Q.   And Bill being Bill Wilcox and Jason being Jason Cagle; correct?

A.   Yes.

Q.   And the same type of process would occur for administrators?

MS. MOYE:  Objection to the form.

THE WITNESS:  Yes.

Q.   (BY MR. ROSS)  And again, that would be on an annual basis?

A.   Yes.

Q.   And again, that would then -- and who would make the recommendations for the administrators?

A.   RVPs recommended to market presidents, who would have then submitted it to Niels.

Q.   And would it ultimately go to --

MS. MOYE:  I'm sorry, I'm sorry.  I think the witness wasn't finished with her --

THE WITNESS:  Sorry.  So RVPs made recommendations to the market presidents, who made recommendations to the group presidents, who made recommendation to Niels.  Until Niels left, and then we eliminated his role, his level.

Q.   (BY MR. ROSS)  And then it would

conversation with Bill outside of the Monday morning meetings?

A.   Yes.

Q.   And what is your recollection of that conversation?

A.   That we shouldn't be adhering to any type of agreement.

Q.   And what was Mr. Wilcox's response?

A.   I don't specifically recall.

Q.   What do you recall?

A.   I recall what I said.  I can't remember his response.

Q.   Well, did he agree with you?  Did he not agree with you?  Did he say don't worry about it? Do you have any recollection of what his response was?

A.   I don't recall his response to me.

Q.   And approximately when was that conversation?

A.   I do not remember.

Q.   Was it before you sent the October 22, 2017, email?

A.   Yes.

Q.   Was it before this issue was discussed at the Monday morning meetings?

Sandi Karrmann  Confidential
August 14, 2024

A.   Yes.

Q.   Do you recall approximately how many months or years before October 22, 2017 your conversation with Mr. Wilcox occurred?

MS. MOYE:  Objection to the form.

THE WITNESS:  I do not recall.

Q.   (BY MR. ROSS)  Did you have any conversations with Brett Brodnax concerning the illegality of no poach agreements?

MS. MOYE:  Objection to the form.

THE WITNESS:  I don't specifically recall.

Q.   (BY MR. ROSS)  Do you recall having conversations with anyone at USPI other than Mr. Wilcox or Mr. Brodnax about the illegality of no poach agreements?

MS. MOYE:  Objection to the form.

THE WITNESS:  I believe I had a conversation with Shannon Mosley.

Q.   (BY MR. ROSS)  And when did that conversation occur?

A.   I do not recall.

Q.   And what do you recall of that conversation, what you said to her, what she said to you?

A.   I do not remember.

Sandi Karrmann  Confidential
August 14, 2024

Q.   I'm sorry, did you --

A.   I said I don't remember.

Q.   Do you recall why you had that conversation with Ms. Mosley?

A.   Most likely because there was guidance that had come out.

Q.   How did Ms. Mosley respond?

A.   I don't specifically recall.

Q.   Do you recall, did she seem concerned? Did she seem happy?  Did she say anything like, great, I hate these agreements?

MS. MOYE:  Objection to the form.

THE WITNESS:  You would have to ask Shannon.

Q.   (BY MR. ROSS)  I'm asking you.  It was you and her in the conversation; correct?

A.   I don't recall.

Q.   I'm asking for your best recollection of what happened in that conversation?

A.   I don't recall.

Q.   Or her demeanor during that conversation?

MS. MOYE:  Object to the form.

THE WITNESS:  I don't recall her demeanor.

Q.   (BY MR. ROSS)  Okay.  And how many times did you bring up this issue at Monday morning

Sandi Karrmann  Confidential
August 14, 2024

meetings?

A.    I recall once.

Q.    And who was in the Monday morning meeting when you brought this issue up?

A.    I do not remember specifically every person in the room.  It was the senior management team.

Q.    And who was the senior management team at the time?

A.    It would be Bill, Brett, Jason, group presidents, chief nursing officer.

Q.    What is your recollection of what was --

MS. MOYE:  I think she was not finished.

Q.    (BY MR. ROSS)  You're not done?

A.    The head of sales.  The head of development.  And I believe that's it.

Q.    And it was you that brought up the issue of the no poach agreements?

A.    Yes.

Q.    And what did you tell the group?

A.    Just reiterated the DOJ guidance that these no poach agreements were not -- we should not be practicing or adhering to them, because they were in violation of the antitrust.

Q.    And did the group then discuss the issue?

A.    I don't recall any discussion.

Q.    Do you recall any comments from anyone?

A.    I do not recall.

Q.    Do you recall any other matters that were discussed during that particular Monday morning meeting?

A.    I do not.

MR. ROSS:  Sorry, apologize, my papers got shuffled here.

If we could pull up, I guess pull up at the same time Tabs 12 and 13.  Which we will mark as Exhibit PX299 for Tab 12, which is a document bearing Bates stamp number USPI_CIV_447.

And Tab 13 will be marked Exhibit PX300, which is a document bearing Bates stamp number USPI_CIV_448.

(Whereupon, Exhibits 299 & 300 were marked for identification.)

Q.    (BY MR. ROSS)  Am I correct that these two documents reflect that you scanned Exhibit PX300 on February 28, 2017, and sent it to yourself.

So that you could distribute the article that was scanned entitled DOJ, FTC Issue Antitrust Guidance to Human Resources Professionals, so that you could distribute that article to people within

Sandi Karrmann   Confidential
August 14, 2024

USPI?

MS. MOYE:  Object to the form.

THE WITNESS:  I don't recall doing it, but it appears I did, yes.

Q.   (BY MR. ROSS)  And seeing the date on this scan of 2/28/2017, does that refresh your recollection as to when you had conversations with Ms. Mosley?

A.   It does not.

Q.   Does it help refresh your recollection as to the time period when you brought up this issue in the Monday morning meeting?

A.   No, other than it would have been sometime between that date and October.

Q.   And why did you scan this document to yourself?

A.   I don't specifically recall.  Most likely to ensure that I had it in my system versus on paper.

Q.   And the article itself is dated October 25, 2016.  Do you recall receiving it in October of 2016?

A.   I don't remember.

Q.   Generally what does this article discuss?

A.   It discusses the antitrust guidance issue

Sandi Karrmann   Confidential
August 14, 2024

at the DOJ and the FTC.

Q.   And is this article the basis for your statement in October of 2017 to Brett, Bill, and Jeff Andrews that, we really can't push these kinds of gentleman's agreements.  The DOJ has cracked down on these as a violation of antitrust laws?

A.   I do not recall if it was this specific article.

Q.   Were there other articles that you read on the issue?

A.   I recall receiving maybe one other unsolicited trade publication.

Q.   Did you receive that before February of 2017?

A.   I don't believe so.

Q.   Was it that article that you -- that prompted you to speak to Ms. Mosley about this issue?

MS. MOYE:  Objection to the form.

THE WITNESS:  I don't recall.

Q.   (BY MR. ROSS)  Do you recall if USPI took any actions after you raised this issue in the Monday morning meeting with respect to their no poach agreements?

MS. MOYE:  Objection to the form.

Sandi Karrmann   Confidential
August 14, 2024

THE WITNESS:  I can't specifically state. I would ask Shannon Mosley, who was responsible for hiring.

Q.   (BY MR. ROSS)  Shannon Mosley reported to Mr. Miller; correct, who reported to you?

A.   Yes.

Q.   Did you instruct them in any way with respect to no poach agreements after receiving this article that's Exhibit PX230?

A.   I don't recall specific timing of conversations.

Q.   I didn't ask about conversations.  I asked if you gave them any instructions or orders or directions with respect to no poach agreements after receiving Exhibit PX230?

A.   At some point we discussed them.  I do not recall when that was.

Q.   In those discussions, did you give them any directions, orders, or instructions as their superior?

A.   I don't recall.

Q.   What was that answer, I'm sorry?

A.   I don't recall.

Q.   Do you recall Mr. Wilcox or Mr. Brodnax giving you any instructions, directions, or orders

with respect to no poach agreements after you advised them of their illegality?

MS. MOYE:  Objection to the form.

THE WITNESS:  I don't recall.

Q.   (BY MR. ROSS)  Did you have any discussions with Mr. Wilcox after October 22, 2017, concerning the no poach agreements?

MS. MOYE:  Objection to the form.

THE WITNESS:  I do not recall.

Q.   (BY MR. ROSS)  Did you have any discussions with Mr. Brodnax after October 22, 2017 with respect --

A.   I do not --

Q.   -- to no poach agreements?

MS. MOYE:  Objection to the form.

THE WITNESS:  I do not recall.

Q.   (BY MR. ROSS)  And did you provide any directions, orders, or instructions to Mr. Miller or Ms. Mosley after October 22, 2017, with respect to no poach agreements?

MS. MOYE:  Object to the form.

THE WITNESS:  I do not recall specific conversations.  I did talk to either Greg or Shannon that reiterated what I had stated in the email.

Q.   (BY MR. ROSS)  To them?

Sandi Karrmann   Confidential
August 14, 2024

A.   Yes.

Q.   Because they're not on the email; correct, of October 2017?

A.   Based on reviewing the email, that appears correct.

Q.   And what do you recall about your conversation with either Ms. Mosley or Mr. Miller after October of 2017?

A.   Just that we could not continue, if we were, we could not continue the practice.

Q.   Now, do you recall telling Ms. Mosley not to put anything in writing about no poach agreements at any point?

A.   I don't remember.

Q.   Ms. Karrmann, who was Scott Bontempo?

A.   Scott was the senior HR leader at Welsh, Carson, Anderson & Stowe, the private equity firm.

Q.   And what was their -- what was Welsh Carson's relationship with USPI?

A.   They owned USPI.

Q.   And as a private equity company they had ownership interests in numerous other companies as well; correct?

MS. MOYE:   Objection to the form.

THE WITNESS:   They did.  It was not

specifically all ambulatory.  They had different companies in their portfolio.

Q.   (BY MR. ROSS)  Did they have other ambulatory surgery center companies in their portfolio?

A.   I don't remember.

MR. ROSS:  If we can pull up Tab 11, which we'll mark as Exhibit PX301.

THE VIDEOGRAPHER:  Pulling that up now.

MR. ROSS:  This is a document bearing the Bates stamp number USPI_CIV_153226.  And also Document USPI_CIV_153228, which is the attachment to these emails.

THE VIDEOGRAPHER:  Is that a separate document?

MR. ROSS:  No, one document.  One exhibit.

THE VIDEOGRAPHER:  Okay.  Just checking.

(Whereupon, Exhibit PX301 was marked for identification.)

Q.   (BY MR. ROSS)  So Ms. Karrmann, are these emails that you sent and received in the ordinary course of your business at USPI?

A.    I don't remember these emails specifically, but it appears so based on what I'm reading.

Sandi Karrmann   Confidential
August 14, 2024

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

*Brandon B. Combs* DATED: August 26th, 2024

_____
BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

# EXHIBIT 21

# FILED UNDER SEAL

Clare Metcalf   Confidential
August 14, 2024

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL CENTER     )
EMPLOYEE ANTITRUST LITIGATION,      )
                                    )
          Plaintiffs,               )
                                    )Master Docket
                                    )No. 1:21-cv-00305
THIS DOCUMENT RELATED TO:           )
ALL ACTIONS                         )
                                    )
_____)

CONFIDENTIAL

The videotaped deposition of CLARE METCALF, called by the Plaintiffs for examination, pursuant to subpoena and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Michelle A. Duzan, Certified Shorthand Reporter and Registered Merit Reporter, at U.S. Legal Support, 200 West Jackson Boulevard, Suite 600, Chicago, Illinois, commencing at the hour of 9:04 a.m. on the 14th day of August, A.D., 2024.

Affiliates.

MS. SIEGEL:  Glenna Siegel from McDermott Will & Emery on behalf of Kent Thiry.

MR. KLIEBARD:  Good morning.  Ken Kliebard of Morgan Lewis on behalf of DaVita.

And good morning, Ms. Metcalf.

MS. NEWTON:  Good morning.  It's Emily Newton from King & Spalding on behalf of the USPI and Tenet Healthcare defendants.

MR. BANK:  Good morning.  This is Jeffrey Bank from Wilson Sonsini on behalf of Defendant Andrew Hayek.

MR. SCHORK:  Do you want to swear in the witness?

(Witness duly sworn.)

CLARE METCALF, called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SCHORK:

Q.   Good morning, Mrs. Metcalf.  My name is Erich Schork, and I represent the plaintiffs in this litigation.  I'll be taking your deposition today.

Can you please state and spell your name for

the record?

A.   Clare Metcalf, C L A R E, M E T C A L F.

Q.   And what's your current home address?

A.   ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮.

Q.   Okay.  And who is your current employer?

A.   Russell Reynolds Associates.

Q.   And what is your current job title?

A.   Managing director.

Q.   And how long have you been in that role?

A.   11 years.

Q.   Do you have a work address?

A.   155 North Wacker, Suite 4100, Chicago, Illinois.

Q.   Now, are you represented by an attorney today?

A.   Yes.

Q.   Who -- who is representing you?

A.   The gentleman to my right.

Q.   Okay.  And are you paying for the attorney yourself, or --

A.   No.

Q.   -- is Russell Reynolds paying for the attorney?

A.   Russell Reynolds.

Clare Metcalf   Confidential
August 14, 2024

Q.   Okay.  And do any other attorneys represent you in connection with this matter?

A.   No.

Q.   Have you ever been deposed before?

A.   No.

Q.   Have you ever given any sworn testimony such as at trial or before a grand jury?

A.   No.

Q.   Now, before we start, I'm going to go through some ground rules for the deposition.  Okay?

A.   Okay.

Q.   You understand that you just took an oath to tell the truth today, correct?

A.   Yes.

Q.   And so even though we're in a conference room as opposed to a courtroom, you're testifying under oath under a penalty of perjury just as if you were giving testimony in court -- in court.  Do you understand that?

A.   Yes.

Q.   Okay.  Now, throughout today's deposition, your testimony will be transcribed by the court reporter to my right.  So I'll ask that you give verbal answers to the questions that I ask because

Clare Metcalf   Confidential
August 14, 2024

after the kickoff meeting, what typically occurs?

A.   Then we draft a position spec reflecting the position.  We put together a list of organization -- like what's -- who are the organizations we want to target?  What's the level?  What's the position?  And then we begin outreach.

Q.   And how do you typically go about outreach?

A.   Could be e-mail, text, LinkedIn message, phone call.

Q.   And so those are the means through which you would contact potential candidates; is that correct?

A.   Correct.

Q.   Is this the way just about all of the executive searches work --

MR. CYPRYS:  Objection.

BY MR. SCHORK:

Q.   -- at Russell Reynolds?

MR. CYPRYS:  Form, vague, ambiguous.

You can answer.

BY MR. SCHORK:

Q.   You can answer, Clare.

A.   Yes.

Q.   Okay.  And are you involved in that process?

A.   Yes.

Q.   Okay.  And you recall -- now, a position spec, is that a particular document that you would prepare for the client?

A.   Yes.

Q.   Okay.  And what -- what's typically included in that?

A.   An overview of the company, so a description of the company, what they do, size, any key interesting things.  A description of the responsibilities of the role, and a description of requirements for -- for the position.  And contact information for the consultants.

Q.   Are those position specs typically provided to the client then?

A.   Yes.

Q.   Okay.  Is one of the purposes just to make sure that you're on the same page as the client?

MR. CYPRYS:  Objection, form.

You can answer.

BY MR. SCHORK:

Q.   You can answer.

A.   Yes.

Q.   Okay.  And now, you referred to organizations to target.  Can you elaborate on that?

A.   So we will often put together a target list of companies within the industry, without -- outside the industry.  Some searches, industry experience is very relevant and some searches it has zero relevance.  And we will use that as a guide to make sure we are being thorough in what we are -- in the search process.

Q.   Okay.  Now, with respect to outreach, how many -- how many individuals is it typical for you to reach out to in attempting to fill a position?

A.   There's a huge range.  It could be ten or it could be 400.

Q.   Okay.  Now, with respect to, for example, the SCA CFO search, do you recall approximately how many individuals you reached out to for that?

A.   I would conjecture it was probably under a hundred.

Q.   Okay.  Now, prior to reaching out to an individual, do you clear that individual with the company or do you do that after you have an initial conversation with the individual?

MR. CYPRYS:  Objection, form, calls for speculation.

To the extent you know.

Clare Metcalf   Confidential
August 14, 2024

THE WITNESS:  It depends.

BY MR. SCHORK:

Q.   Okay.  And what would it depend upon?

A.   Most often the level of confidentiality for the position.

Q.   Okay.  Do you recall how the process worked with respect to SCA?

MR. CYPRYS:  Objection, form, vague, ambiguous as to "the process."

You can answer.

THE WITNESS:  I believe it was not a confidential search.

BY MR. SCHORK:

Q.   Okay.  And what's the significance of whether it's confidential or not?

A.   If a search is confidential, you want to restrict how many people are aware of the search. The more people that know, the more you can risk the confidentiality being leaked.  So with clients in a highly confidential search, we will often preview so we are aligned that they are interested in that background because we want to just restrict the outreach.

In a nonconfidential search, we don't have

Clare Metcalf  Confidential
August 14, 2024

outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Orland Park, Illinois, this 19th day of August, 2024.

*Michelle Duzan*

Notary Public, Cook County, Illinois.

My commission expires 11/01/27.

Michelle A. Duzan, CSR, RMR

CSR No. 084-004270

# EXHIBIT 22

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         )
LITIGATION,                       )
                                  )
                                  ) Master Docket No.
                                  ) 1:21-cv-00305
THIS DOCUMENT RELATED TO:         )
ALL ACTIONS                       )
                                  )
_____

CONFIDENTIAL VIDEO DEPOSITION OF:
KENT THIRY - August 16, 2024
_____


        PURSUANT TO NOTICE, the deposition of KENT
THIRY was taken on behalf of the Plaintiffs at 370
17th Street, Suite 4500, Denver, Colorado, on
August 16, 2024, at 9:04 a.m., before Kirsten M.
Thorngate, Registered Professional Reporter.

Kent Thiry  Confidential
August 16, 2024

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

THE VIDEOGRAPHER:  We are on the record at 9:04 a.m. on August 16, 2024.  This is the video-recorded deposition of Kent Thiry regarding Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois.  This deposition is being held at 370 17th Street, Denver, Colorado.

My name is Michael Banks.  I'm the videographer on behalf of U.S. Legal Support.  The court reporter is Kirsten Thorngate on behalf of U.S. Legal Support.

I'm not related to any party in this action nor am I financially interested in the outcome.

Counsel will please state their appearances for the record, after which the court reporter will swear in the witness.

MR. HARVEY:  Dean Harvey of Lieff Cabraser Heimann & Bernstein for the plaintiffs.

MS. ZANDI:  Sarah Zandi of Lieff Cabraser Heimann & Bernstein for the plaintiffs.

Kent Thiry  Confidential
August 16, 2024

MR. CAMPBELL:  Dan Campbell of McDermott Will & Emery for Mr. Kent Thiry.

MR. STONE:  Jeffrey Stone, McDermott Will & Emery, representing Mr. Thiry.

MR. DODDS:  Jack Dodds, Morgan Lewis, for DaVita.

MR. RUSSO:  Angelo Russo, McGuireWoods, for Surgical Care Affiliates, LLC, and SCA Holdings, LLC.

MS. BARRETT:  Julia Barrett with King & Spalding on behalf of USPI and Tenet.

MR. ROSMAN:  Mark Rosman, Proskauer Rose, for Andrew Hayek.

MR. MOHRAZ:  Andrew Mohraz, in-house counsel for DaVita.

                    KENT THIRY,

having been first duly sworn to state the whole truth, was examined and testified as follows:

                    EXAMINATION

BY MR. HARVEY:

Q.   Good morning, sir.

A.   Good morning.

Q.   Are you now fully retired from DaVita?

A.   Yes.

Q.   Do you have a day job?

A.    I have a number of activities, yes, in part-time work and civic work.

Q.    Do you have any conflicts tonight that would prevent you from staying through as long as we need to?

A.    No.

Q.    Okay.  Do you have a definition in your mind of what a no-poach agreement is?

MR. CAMPBELL:  Object to the form.

THE DEPONENT:  So do I --

MR. CAMPBELL:  You can answer.

A.    So say the question again, please.

Q.    (BY MR. HARVEY)  Do you have a definition in your mind of what a no-poach agreement is?

A.    No.  I don't have a definition in my mind.

Q.    You've never used the term "no-poach agreement" before?

A.    Certainly through the course of this litigation, heard the word a lot and probably used it at some point.

Q.    Did you use it prior to this litigation in the course of your business at DaVita?

A.    I don't know if the word ever got used over 20 years.  Probably did at different times, but

maybe not.  I don't really remember.

Q.    Okay.  Well, let's be on the same page of what it means so there's no confusion during the day.

A.    Thank you.

Q.    When I use the phrase, the term "no-poach agreement," I will be referring to "any agreement or understanding, written or unwritten, between two competitors for labor that restrict the recruiting or hiring of employees of the other company."

Do you understand that?

A.    Well, that's saying an awful lot.  I would probably need you to repeat it a time or two, but certainly I heard the words.

Q.    Do you understand that what I -- the definition I used as you're sitting here now?

A.    Right.  It just will be hard to remember all those words in an area that has some inherent ambiguity.  So I'll do my best, but that was a lot of words.

Q.    What ambiguity are you referring to?

A.    If you would repeat it, please, because I wouldn't be able to repeat it to you, which is part of the problem.  It's so many words that I can't repeat it from memory after just hearing it once.

Q.    Okay.  I'll reread it.





Kent Thiry  Confidential
August 16, 2024

Do you recall being angry and making threats when Hayek left DaVita?

MR. CAMPBELL:  Object to the form.

A.    I was angry with some of the things Andrew did.  Yes.  Quite angry.

Q.    (BY MR. HARVEY)  Were you angry at the fact that he left DaVita for another company?

A.    I was not angry at him for that.  No.

Q.    Were there any events around his departure from DaVita to join Surgical Care Affiliates that made you angry?

A.    Say the question again, please?

Q.    Did anything about Mr. Hayek's move from DaVita to SCA make you angry?

A.    Yes.

Q.    What was that?

A.    It was our impression that he had had conversations with executives while he was still employed by DaVita, that he began recruiting other DaVita folks while he was still a DaVita executive.

Q.    Was Mr. Hayek under any contractual objections that limited his ability to do that?

MR. CAMPBELL:  Object to the foundation.

A.    I know that -- I believe it's a violation of an executive's fiduciary responsibility.  While you

Kent Thiry  Confidential
August 16, 2024

were employed by someone, you owe them your best efforts. And it is inappropriate while you're on the payroll of one company to recruit someone away from that company for a future job that you're going to take.

Now, I don't know if that's written in statute somewhere or not, or if it's just common sense that everyone finds that to be inappropriate behavior.

Q. (BY MR. HARVEY) But my question, sir, is was there a contract between DaVita and Mr. Hayek that limited his ability to recruit -- pardon me -- to recruit DaVita employees?

MR. CAMPBELL: Object to the form.

A. I don't know the terms of Andrew's employment contract.

Q. (BY MR. HARVEY) You mentioned that you believe it's a violation of an executive's fiduciary duties to recruit a company's employees while he's on the payroll.

What about when he's not on the payroll?

MR. CAMPBELL: Object to the form.

A. When he's not on the payroll and what?

Q. (BY MR. HARVEY) Is it still a violation in your mind of that executive's fiduciary duties to the company not to recruit his former teammates?

Q.   What business deals actually occurred between DaVita and SCA while you were the CEO of DaVita?

MR. CAMPBELL:  Objection.  Foundation.

A.   There was one little one and one huge one.  There may have been others that I don't recall.

But we entered into extensive conversations with them over a couple years about doing surgery centers with them in two different ways.  One way was with our large medical group, where we already had some surgery centers, doing some new ones with them or becoming partners in the existing ones.  So that was an extensive set of conversations that went on with a lot of back-and-forth for a couple years.

And the second was we had some Kidney Care-specific surgery centers, and we thought about joining them in with his more generic surgery centers, multispecialty surgery centers.  So another set of serious conversations.

So those are the -- and all of that led to one or two or three small deals, even though we had talked about it would be much bigger.  It just never turned out that way.

And then the very large deal that

Kent Thiry    Confidential
August 16, 2024

happened was huge, was a $4.5 billion sale of one of our divisions to Andrew's company.  And that was one of the most significant deals of the year, of the decade.

Q.    (BY MR. HARVEY)  Are there any other business deals between DaVita and SCA that occurred while you were CEO of DaVita?

A.    Not that I can think of.  But again, it was 15 years ago.

Q.    Okay.  So you mentioned three.  I would like to go one by one.

The first you mentioned, doing surgery centers with SCA, did that, in fact, occur?  Did DaVita do surgery centers with SCA?

A.    We did at least one.  I don't remember if it was more.  I think it may have been two or three, but at least one.

Q.    These are specific surgery centers?

A.    Yes.

Q.    Do you recall where these surgery centers were located?

A.    The one I remember clearly with 80 percent confidence was in Southern California.

Q.    Do you recall where the others, if they existed, were located?

Kent Thiry  Confidential
August 16, 2024

A.   We looked at about seven or eight different places across three or four states as a first wave.  And those were basically taking advantage and becoming partners in existing ones with one or two new, and then we were going to see what happened after that.

But the other states, I think one we looked at was Florida.  Another was Nevada, Las Vegas in particular.  And maybe one in the northwest up near Tacoma, Seattle.

Q.   Aside from the surgery --

A.   And all of that is an uncertain memory. I just know that -- I have the number seven in my head, of seven different specific.

Q.   In terms of the locations where you did surgery centers with SCA in fact, you mentioned with 80 percent certainty that one was located in Southern California.

Sitting here, can you recall the location of any others?

A.   Well, just -- I'm quite sure on Las Vegas and quite sure on Orlando that we looked at.  But, again, it's not 100 percent certainty.  I just don't think they were all in Southern California.

Q.   And when you said "looked at," that's

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  SS.
CITY AND COUNTY OF DENVER  )

I, KIRSTEN M. THORNGATE, a Registered Professional Reporter, do hereby certify that previous to the commencement of the examination, the witness was duly sworn or affirmed by me to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and thereafter reduced to a typewritten form; that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

_____
Kirsten M. Thorngate
Registered Professional Reporter

# EXHIBIT 23

# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL

CENTER EMPLOYEE ANTITRUST

LITIGATION                    Docket No. 1:21-cv-00305

_____|

C O N F I D E N T I A L

VIDEO DEPOSITION OF SCOTT KEECH

THURSDAY, AUGUST 22, 2024

SAN FRANCISCO, CALIFORNIA

Reported by:   Marilynn Hoover, RPR

California CSR No. 8841

you described for Mr. McMillan, there was a retirement benefit that was provided to you while you were there; correct?

A.    At CPMC, yes.

Q.    And how would that compare to the retirement benefits you received at Kaiser?

A.    Well, it's interesting, because I don't recall CPMC having a pension, but here at least I thought they did, and they had a 403(b) match.  So the difference would be Kaiser's 401(k) is not a match; it's just a contribution, direct contribution.  I could give nothing and I'd still get it.

And then I don't know how the defined pension benefit plan was calculated, if there's a difference between the way they were calculated.  They involve usually a percentage of your salary, the number of years of service you have, and that's some general formula.  So I don't know if the percentage of the formula was higher or lower between the two organizations.

Q.    Okay.  And then there's an entry there for PTO.

Do you see that?

A.    Yes.

Q.    That's paid time off?

Scott Keech Confidential
August 22, 2024

A.    Correct.

Q.    And does that equate to the maximum number of days that you could take for PTO during any given year?

A.    Correct.

Q.    What does ESL refer to?

A.    Extended sick leave.

Q.    And what did that cover?

A.    That would only kick in if you had a surgery or went out on a longer leave of absence for a medical condition.  It's not paid out annually for everyone.

Q.    Similar to short-term or long-term disability?

A.    Similar, yeah.

Q.    Okay.  All right.  Going back to Exhibit 42B, the résumé that's attached to that document:  You say at the top that in February 2009 you went to work for Surgery Center Partners; correct?

A.    Oh, the résumé.  Sorry.  Excuse me.  Yes.

Q.    And you were in the role of regional director of clinical operations; correct?

A.    Correct.

Q.    And you were in that role for the entire duration of your stay at Surgery Center Partners; correct?

A.    It's a little tricky.  There was a takeover of Surgery Center Partners by SCA, Surgical Care Affiliates.  I don't exactly remember when that happened and if my title was changed, but it was the same level of work.

Q.    Okay.  The same role?

A.    Yes.  My responsibilities -- My day-to-day responsibilities didn't change at all.

Q.    And it's my understanding that you left Surgery Center Partners in approximately February of 2012.

      Does that sound about right?

A.    I can't recall the exact dates.

Q.    I'll show you a document.

A.    Okay.  Thank you.

Q.    Yeah.  What was your compensation when you first started at Surgery Center Partners?

A.    Looks like from this e-mail it would have been ███████.

Q.    And that's in the e-mail that we marked previously as Exhibit 43; correct?

A.    Correct.

Q.    And you're seeing that number in an e-mail from you -- well, sorry -- from Mr. McMillan to you on Saturday, January 31, 2009, at 8:46 a.m.; correct?

A.    Yes.

Q.    And Mr. McMillan says to you:  "I can offer

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████

Right?

A.    Correct.

Q.    And you agreed to that amount; correct?

A.    Correct.

Q.    Now, isn't it the case, Mr. Keech, that your overall compensation at S -- at Surgery -- I'm just not going to get this acronym right -- Surgery Center Partners was, overall, less than what you had been earning at CPMC?

MR. HARVEY:  Objection to form.

THE WITNESS:  Correct.

Q.    BY MS. LANE:  And the reason why you were willing to accept less at Surgery Center Partners is because there were other non-quantitative benefits that the position offered to you; isn't that right?

A.    Correct.

Q.    And you understood that Surgery Center Partners was very different from CPMC and Kaiser in terms of the compensation it could offer; correct?

MR. HARVEY:  Objection to form.

A.   I do.

Q.   This position was salaried, though; correct?

A.   Correct.

Q.   Okay.

A.   I don't know why they do it like that.

Q.   Yeah.  And was that an increase in compensation for you from your position at SCA?

A.   I believe so.  I would have to calculate that ███ into an annual salary.

Q.   But is it your recollection that you received a salary increase when you moved from SCA to Kaiser in March of 2011 -- 2012?  Excuse me.

A.   Yes.

Q.   Okay.  And was it a substantial compensation increase?

A.   The total compensation increase was substantial.

Q.   And did you receive more valuable benefits at Kaiser when you moved from SCA?

A.   Sorry.  I'm sorry, I can't do the math.  But the compensation was -- The change in compensation was substantial due to the fact that SCA had cut my compensation significantly.  So, prior to that cut, I don't know that there was much of a huge difference in the base salary, but the benefits are better.

Q. SCA cut your compensation as of January 2012; correct?

A. I don't know the date.

Q. Okay. And did you have an understanding as to the reason why your compensation was cut at that time?

A. Yes. They told me I was paid too much and was not in line with the internal equity of the organization.

Q. Did they give you any other reasons for the cut in your compensation?

A. No. I had to be paid similar to the other people in the role.

Q. Did somebody tell you that?

A. Yes.

Q. Who told you that?

A. Colin.

Q. Did others at SCA receive compensation cuts at that same time?

A. I don't know.

Q. What specifically did Colin tell you about the reasons why your compensation was being cut?

A. That my compensation -- I was paid too much and not in line with the internal equity, the pay -- the pay structure, the pay bands, and they needed to

Scott Keech Confidential
August 22, 2024

maintain internal equity with the rest of the

organization.

Q.   Did Mr. McMillan tell you anything more

about the pay structure at SCA during that

conversation?

A.   No.

Q.   Did you have any understanding of the -- of

any pay ranges or pay bands at SCA at the time that

your compensation was decreased?

A.   No.

Q.   Were you involved in establishing

compensation for your team members while you were at

SCA?

A.   No.

(Sotto voce remarks.)

MS. LANE:  All right.  Let's mark as

Exhibit 63 --

THE STENOGRAPHIC REPORTER:  Sixty-four.

MS. LANE:  -- 64.  I'm going to be off all

day.

THE WITNESS:  Can I clarify?

MS. LANE:  Yeah.

THE WITNESS:  What was the last question you

asked me?

Q.   BY MS. LANE:  Were you involved in

establishing compensation for your team members while you were at SCA?

A. If I remember correctly, they came from HR.

Q. What came from HR?

A. The -- The salary offer. I'm not a hundred percent clear, but I believe that's the -- that was the process.

MS. LANE: Let's mark as Exhibit No. 64 the document behind tab 81 with the Bates number Keech 1252.

(Exhibit DX 64 marked.)

Q. BY MS. LANE: Mr. Keech, this is an e-mail from you to donorrelations@planusa.org on November 1st, 2011, and --

Well, who is donorrelations@planusa.org?

A. It's a charity that I used to provide monthly -- I think monthly donation to. It may have been annually.

Q. And you report to the e-mail address donorrelations@planusa.org that you recently became a donor. "Unfortunately, due to the economy, my compensation package was reduced by ███████ a year. As a result, I need to withdraw my monthly support at this time."

So you reported to

Scott Keech Confidential
August 22, 2024

donorrelations@planusa.org that your compensation was reduced because of the economy; correct?

A.    Yes.

Q.    And you did not tell them that your compensation was cut because you needed to be paid in line with others in your position at SCA; correct?

A.    I think the pay structures of organizations are part of the economy.  I wasn't going to go into detail with someone who doesn't have any idea who I am.

Q.    Okay.

A.    I just wanted to make the point.

MS. LANE:  All right.  I'm not sure I would agree with that, but I'll move on.

Okay.  Let's mark as Exhibit 65 a copy of the document behind tab 55.

(Exhibit DX 65 marked.)

THE WITNESS:  Thank you.

Q.    BY MS. LANE:  Mr. Keech, this is -- we've marked as Exhibit No. 65 a document with the Bates number 5478 -- Keech 5478 through 5479.

And this is a copy of your W-2 for the year 2014; correct?

A.    Correct.

Q.    And this reports that you were paid

STATE OF CALIFORNIA     )
                        )  SS.
COUNTY OF SAN FRANCISCO )

I, MARILYNN HOOVER, CSR No. 8841 for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced by me to typewritten form; and that the same is a true, correct, and complete transcript of the said proceedings.

Before completion of the deposition, review of the transcript [X] was [ ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed shall be appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 26th day of August 2024.

_____

Marilynn Hoover, RPR

California CSR No. 8841