# EXHIBIT 24

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION, | ) ) ) | |
| | ) | Master Docket No. |
| | ) | 1:21-cv-00305 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |

* * *CONFIDENTIAL* * *

VIDEOTAPED DEPOSITION OF MICHAEL RUCKER

Chicago, Illinois

August 27, 2024

Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR, CSR

JOB NO. 6616472-001

MICHAEL ALLEN RUCKER,   called as a

witness, having been duly sworn,

was examined and testified as

follows:

EXAMINATION BY

MR. ZIRPOLI:

Q.    Good morning, Mr. Rucker.  We met earlier this morning.  My name a Cadio Zirpoli, and I represent the plaintiffs in this matter.

A.    Good morning.

Q.    Could you please state your full name and spell it for the record.

A.    Michael Allen Rucker.  M-I-C-H-A-E-L, A-L-L-E-N, R-U-C-K-E-R.

Q.    And what is your current home address, sir?

A.    ██████████████████████ ████████ ██████.

Q.    And, Mr. Rucker, are you presently employed?

A.    I am.

Q.    And where are you employed, sir?

A.    At Ivy Rehab.

Q.    Is that Ivy Rehab Physical Therapy?

A.    Yes.

Q.    And what is your title at Ivy Rehab Physical Therapy?

A.    I'm the chief executive officer.

Q.    And how long have you been employed as the CEO at Ivy Rehab Physical Therapy?

A.    Approximately seven and a half years.

Q.    And what is your work address there, sir?

A.    1311 Mamaroneck Avenue in White Plains, New York  10605.

Q.    And prior to joining Ivy Rehab in 2017, were you employed?

A.    Yes.

Q.    And who were you employed by prior to Ivy Rehab, sir?

A.    Surgical Care Affiliates.

Q.    Can we agree that when I say "SCA" throughout the day today, I'm referring to your former employer, Surgical Care Affiliates?

A.    We can.

Q.    Thank you.

And what was your title at SCA at the time you left in 2017?

A.    I was the chief operating officer.

Q.    And were you also the executive vice

president, sir?

A.      Yes, I think that's what they -- yes.

Q.      And how long did you work at SCA?

A.      About eight and a half years.

Q.      Have you ever had your deposition taken before, sir?

A.      No.

Q.      I'm going to -- I'm sure you covered some of this with your counsel, but I'm going to go over some ground rules that hopefully we can both live by here today.  Okay?

A.      Super.

Q.      All right.  If you don't understand a question, please let me know, and I'll try and rephrase it.  Otherwise, I will assume that you understood the question that I asked that.

Is that fair, sir?

A.      Yes.

Q.      If you need to take a break, please let me know, and as long as a question is not pending, I'll try to do my best to accommodate you.  Okay?

A.      Thank you.

Q.      You understand that you just took an oath to tell the truth here today?

A.    Yes.

Q.    And do you understand that, even though we're here in a conference room, relatively informally, the oath you just took is the same as if you were testifying in court before a federal judge and a jury?

A.    I do.

Q.    And you understand that if you are found to be untruthful in any of your testimony here today under oath, there can be criminal consequences, including potential jail time?

A.    I do.

Q.    Is there anything that we should know about that would prevent you from testifying here today truthfully and to the best of your ability?

A.    No.

Q.    You're not on any medications that would affect your ability?

A.    No.

Q.    And you haven't been drinking this morning?

A.    No.

Q.    Have you ever been convicted of a crime, sir?

Surgical Care Affiliates.  And within the first few weeks of him being there, he thought that I could help with what was -- what he was trying to build at Surgical Care Affiliates, and so he reached out.

We had a conversation or two.  We wound up meeting, and shortly thereafter, we determined -- he extended an offer to join him as a senior vice president of operations.

Q.    Is it fair to say that Andrew Hayek recruited you from DaVita to go to SCA?

A.    Yes.

Q.    And do you recall how long Andrew had been at SCA when he recruited you to join him?

A.    Less than six months would be my estimate.

Q.    Okay.  And where did Mr. Hayek work before he joined SCA?

A.    At DaVita.

Q.    And do you recall what Mr. Hayek's role was at DaVita when he left?

A.    I don't know exactly what his role was.

Q.    And how well did you and Mr. Hayek know each other at DaVita?

A.    Not -- not very well.

I had previously met Andrew when he was with a radiology company based in Southern California, and he then joined DaVita, and we wound up engaging and spending a little bit of time at a couple of national leadership meetings.

Q.    While you were employed at DaVita in 2008, did you tell anyone at DaVita that Mr. Hayek from SCA was recruiting you to join him?

A.    No; not until I talked with Javier Rodriguez about the fact that I was going to be leaving.

Q.    Okay.  So, before you left, before you got a written offer, you didn't tell anyone at DaVita that you were speaking with Andrew Hayek about joining him at SCA; is that correct?

A.    I don't think so.

Q.    Okay.  Why not?

A.    It was none of their business.

Q.    Okay.  Do you recall previously being asked under oath, and this is at page 392:  "Did you tell anyone --"

392, lines 16 to 23:

"Did you tell anyone at DaVita about

your discussions with SCA or Mr. Hayek before you had an offer from SCA for employment?"

And you responded:  "No, I did not."

And then you were asked:  "Why not?"

And you said:  "I thought that having a written offer from SCA represented a certain security and certainty that was important to me personally."

Is that truthful testimony, sir?

A.    Yes.

Q.    Okay.  And if I asked you those same questions here today, you'd give me those same responses?

A.    Yes.

Q.    After you received a written offer from SCA, is that when you informed your employer at DaVita that you were leaving and accepting a position?

A.    Yes.

Q.    And who did you first tell at DaVita when you were leaving to accept a position at SCA?

A.    Javier Rodriguez.

Q.    And was Javier Rodriguez your boss at that time?

A.    Yes.

Q.    And who did Mr. Rodriguez report to at DaVita?

A.    He reported to Joe Mello, the chief operating officer.

Q.    And who did Mr. Mello report to at DaVita?

A.    Kent Thiry, the chief executive officer.

Q.    And after you told your boss, Javier Rodriguez, you were -- you were leaving to join SCA, were you contacted by anyone at DaVita?

A.    Yes.

Q.    Who contacted you, sir?

A.    Kent Thiry.

Q.    And so he was your boss' boss at that point in time; is that correct?

A.    Yes.

Q.    And did Mr. Thiry try and convince you to stay at DaVita and not join SCA?

A.    Yes.

Q.    And how did he do that, sir?

A.    He indicated that there would be an opportunity for me to take on more responsibility that they had recently been

would have received a written offer, and would have required me to first have a conversation with Javier Rodriguez, my supervisor at DaVita, ahead of SCA or Andrew Hayek writing the offer."

Do you see that, sir?

A.    Yes.

Q.    And that was truthful?

A.    Yes.

Q.    Okay.  And do you recall you were also asked:  "Why did you want to wait until after you had a written offer?"

This is at page 407, lines 12 through 19.

A.    Yeah.

Q.    And you stated, sir:  "I wanted to wait because that written offer represented a level of security and certainty that I didn't feel like I had without the written offer."

Is that truthful, sir?

A.    That is truthful.

What it doesn't say is that I would not have found my way to SCA from DaVita if he didn't give me the letter.

Q.    But, as you testified, you wanted the written offer because it provided you with a

level of security and certainty, correct?

A.    Yes, it did.

Q.    Okay.  And you didn't want to have a conversation with Mr. Rodriguez until you had that written offer, correct?

A.    I did not want to.

Q.    And you informed SCA that you would tell Mr. Rodriguez, but only after you obtained the written offer, correct?

A.    Yes.

Q.    Okay.  Are you aware that other DaVita employees felt that they would lose their job if DaVita found out that they were interviewing at SCA?

MS. ZIELINSKI:  Object to the form.  Lack of foundation.

MR. CAMPBELL:  Misstates the record.

MR. KLIEBARD:  Speculation.

THE WITNESS:  Am I aware of other employees?

I don't think so.  I don't --

BY MR. ZIRPOLI:

Q.    Okay.  Well, we'll get back to that later.  All right.

What was your understanding of the

purpose of the agreement, sir?

A.    The purpose of the agreement was -- was rooted in, to some degree, reducing the amount of employees moving back and forth between these two organizations and giving one another advanced notice where we could be competitive in attempting to retain our employees.

Q.    Did you understand that the purpose of the gentlemen's agreement between SCA and DaVita was to limit the number of employees that moved from DaVita to SCA and from SCA to DaVita?

MR. KLIEBARD:  Objection.  Foundation.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q.    Do you recall you were previously asked under oath in federal court:  "What was your understanding -- your understanding of the purpose of the gentlemen's agreement?"

This is at page 408, lines 5 through 16.

A.    Uh-huh.

Q.    And you responded:  "My understanding of the gentlemen's agreement was to limit the number of employees or teammates that moved from

Michael Rucker  Confidential
August 27, 2024

DaVita to SCA or from SCA to DaVita.  And in the event that there were situations where specific employment opportunities were being discussed between the two organizations -- between an employee of one organization and the other organization, that it would be mandated that the employee would need to go to their supervisor, their one-up, to describe the fact that they were seeking employment, exploring employment opportunities, and that one of those employment opportunities was with SCA."

Do you see that's how you testified previously under oath, sir?

A.    Yes.

Q.    And is that a truthful response, sir?

A.    Yes.

Q.    And if I asked you that same question today, would you give me that same response, sir?

A.    Yes, to the best of my ability.

Q.    Okay.  So, again, the purpose of the agreement was to limit the number of employees that moved from DaVita to SCA and SCA to DaVita, as you stated, correct?

MR. CAMPBELL:  Objection.  Misstates

his testimony.

MS. ZIELINSKI:  Same objection.

THE WITNESS:  And in the event that there was a -- you know, I'm not going to read this, but, yeah.

BY MR. ZIRPOLI:

Q.    Yeah.  And -- and we touched on this before.  You were not willing to go to your boss at DaVita, Javier Rodriguez, and tell him that you were interviewing with Mr. Hayek for a position with SCA until you had that written offer in your hand, correct?

A.    Yes.

And I do just think this is an important point:  It's not at all clear to me that -- so that is what I told SCA, and it was effective in -- in having them produce the letter.

It's not clear to me, and I -- it's a long time ago -- it's not clear to me that I would not have ultimately done that.  I strongly preferred to have that letter.

I did tell, in the midst of this negotiation, Andrew and SCA that I would not do that.

Q.    Right.  And do you recall you testified to that under oath?

A.    Yes.

Q.    You testified:  "I was not willing to take that step," correct?

A.    Did I testify, "I was not willing to take the step," or, "I shared with them that I was not willing to take the step"?

Q.    Okay.  In response to a question, "And what is your opinion with regards to an employee's willingness to take that step?"  You responded under oath, "I was not willing to take that step," correct?

        MR. CAMPBELL:  Incomplete reading of the transcript.

        MR. ZIRPOLI:  Please, no speaking objections.  You can make an objection as to form, but no speaking objections.

        MR. CAMPBELL:  Counsel, you don't have to wave your finger at me.  You can ask him --

        MR. ZIRPOLI:  Please follow the federal rules and only make an objection to form.  I don't want you coaching the witness.

hasn't been answered, but go ahead.

MR. CAMPBELL:  It's been answered.

THE WITNESS:  I'm confused in that we were on the record and then off the record, and then you guys did some lawyer talk, and then you said, "I'm not going to ask you about this agreement."

Are we asking about this agreement, or are we --

BY MR. ZIRPOLI:

Q.



Case: 1:21-cv-00305 Document #: 742-4 Filed: 04/10/26 Page 18 of 205 PageID #:34923

███████ ████ ████████████████████ ███████████████████ but I'm now asking you yourself, okay?  Right here and now today.

A.    About the conversation that we had?

Q.    No, I'm asking you your opinion, your answer.  Okay?

MS. ZIELINSKI:  So he's not asking you ██████████████████████ He's going to -- irrespective of this document, he's going to ask you a question, and he's going to ask --

THE WITNESS:  Okay --

MS. ZIELINSKI:  -- your thoughts on it.

Am I understanding?  I don't want to misstate it.

BY MR. ZIRPOLI:

Q.    Yes.  I'm asking you, sir, did the agreement, in your mind, hinder employees' abilities to join SCA from DaVita and vice versa?

A.    Yes.

Q.    Okay.  And in your opinion, sir, did it hurt the employees, the agreement?

MS. ZIELINSKI:  Object to the form.

Michael Rucker  Confidential
August 27, 2024

THE WITNESS:  It's not clear to me that it hurt employees.  I -- and -- and the basis of me sharing that, it may have had some effect on minimizing the number of people that went back and forth between DaVita and SCA, which is a very, very small part of the universe of opportunities that anybody at SCA or DaVita would have.

BY MR. ZIRPOLI:

Q.  ███████████████████████████
███ ████████████████████████████
███   ███████████  ?

MS. ZIELINSKI:  Objection to form.

MR. CAMPBELL:  Objection.  Misstates the record.

THE WITNESS:  ███████████████
██████████████████████████████
█████████  █████████████

BY MR. ZIRPOLI:

Q.   Do you recall -- not "do you recall."  Is it your opinion that hindering the movement of employees was the objective of the agreement?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  We've now talked -- I

Michael Rucker  Confidential
August 27, 2024

think we've now talked about this once or twice in terms of what the -- what the objective of the agreement was, and we looked at my testimony, and I -- I'm most comfortable indicating that what I testified is what I think the intent of the agreement was.

BY MR. ZIRPOLI:

Q.    Okay.  And was the intent of the agreement to hinder the movement of employees between DaVita and SCA and SCA and DaVita?

MS. ZIELINSKI:  Object to form.

MR. CAMPBELL:  Asked and answered.

THE WITNESS:  I'm going to refer back to the transcript here as a bit of a crutch, but it's -- it -- it would have had the effect of limiting the -- the flow of employees back and forth between the organizations, and it would have mandated the application of this pathway that would -- that involved the employees going to their supervisor.

BY MR. ZIRPOLI:

Q.    Okay.  And do you know when Mr. Hayek and Mr. Thiry entered into the agreement not to

recruit each other's employees?

A.   No, I don't.

Q.   Was the agreement in place before you joined SCA?

A.   No.

Q.   Okay.

A.   Not to my -- no.

Q.   All right.  And as far as you know, was the agreement between SCA and DaVita not to recruit each other's employees still in place when you left in 2017?

A.   I think so, yes.

Q.   Mr. Rucker, can you give me your best approximation on how many people you were involved in recruiting or hiring while you worked at SCA from 2008 to 2017?

A.   I guess -- just if I could go back for a second?

You just asked me whether the agreement that was in place to limit the recruitment was in place when I left.

The agreement was in place that would limit the recruitment to some degree and spells out this pathway.  So it was in place for two reasons.  You referenced one of them.

Michael Rucker   Confidential
August 27, 2024

you know, I don't have a -- I'm not specifically recalling Andrew sharing it. I'm not suggesting he wouldn't have. And I, as I just said a minute ago, I certainly did share the existence of the agreement with people beyond the Cabin Team.

Q. Okay. Okay. And is -- is -- is it true what you testified previously, that Andrew -- that you thought, as a part of a number of group conversations where the topic came up, that it was discussed openly by Andrew?

MR. SMITH: Object to form.

THE WITNESS: I don't recall -- I don't recall an instance where Andrew specifically referenced a gentlemen's agreement to a group broader than the Cabin Team.

It's not out of the question that he did. It wouldn't surprise me if he did. And again, I shared the existence of the agreement with third-party executive search firms and with members of my team.

BY MR. ZIRPOLI:

Q. Okay. You were asked: "Going back to your testimony that Andrew Hayek sort of

Michael Rucker   Confidential
August 27, 2024

discussed the gentlemen's agreement in group conversations, could you please expound on that? Explain who that group was."

This is at page 412, 18 to 25, and 413, 1 to 3. And you responded: "Well, Andrew's team of direct reports at SCA was known as the Cabin Team. And the Cabin Team was comprised of our chief people officer -- at one point, that was Bridie Fanning -- our chief development officer, Joe Clark; our general counsel, Rich Sharff; and there were two or three different chief financial officers over the course of my tenure and [sic] that would have also been members of the Cabin Team during their tenure with SCA."

Was that a truthful response, sir?

A.    Yes.

Q.    Okay. And if I were to ask that same question, would you give me that same response here today?

MR. CAMPBELL:  Object to the form.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q.    Okay. And then you started to explain to me who you told about the agreement, correct?

Michael Rucker   Confidential
August 27, 2024

A.      Yes.

Q.      Okay.  And you communicated the agreement to the team that directly reported to you, correct?

A.      Yes.

Q.      And did you also report it to members of the human resources or recruiting teams?

A.      Yes.

Q.      Okay.  And I believe you testified you also told members of outside recruiting firms about the agreement; is that correct?

A.      Yes.

Q.      Okay.  And do you recall which recruiting firms you told about the agreement between Mr. Thiry and Mr. Hayek?

A.      CT Partners and Heidrick & Struggles would have likely been among them.  I don't specifically recall.

Q.      Okay.  When you left DaVita and joined SCA, did you stay in touch with any of your colleagues from DaVita?

A.      Yes.

Q.      Who did you stay in touch with?

A.      I had a few conversations with Javier. Mike Staffieri is the chief operating officer

there.  I spoke to Kent Thiry some number of months into my tenure at Surgical Care Affiliates.  I have engaged with --

Anybody else?  Those are probably the main...

Q.    How often would you and Mr. Javier Rodriguez speak?

A.    We probably spoke three times after I left.

Q.    Do you recall that, early on, after you joined SCA, there was some hiring that went on between DaVita and SCA at the senior level, correct?

A.    I don't specifically recall.

Q.    Okay.  Did you and Mr. Rodriguez at some point discuss the fact that your companies should not solicit or recruit each other's employees?

MS. ZIELINSKI:  Object to form.

THE WITNESS:  Yes, there were -- I recall speaking to Javier and corresponding with Javier about recruitment efforts back and forth.

BY MR. ZIRPOLI:

Q.    And can you tell me about those

to Mr. Rodriguez about SCA and DaVita not recruiting or hiring each other's employees at this time?

MS. ZIELINSKI:  Object to form.

MR. SMITH:  Objection.  Form.

THE WITNESS:  I don't know.

BY MR. ZIRPOLI:

Q.   So he may have.  You just don't know as you sit here today?

A.   Yes.

Q.   Okay.  Do you recall any conversations that you had with Mr. Thiry about DaVita and SCA not hiring each other's employees?

A.   No.

Q.   What was the purpose in writing to Mr. Rodriguez and letting him know that you turned away six or more qualified DaVita candidates in the last six months?

A.   I don't know specifically.  I -- I don't know.

Q.   Okay.  So it's possible that one of the purposes in writing to Mr. Rodriguez was to let him know that SCA was abiding by the terms of the agreement; isn't that right, sir?

MR. KLIEBARD:  Object.

Michael Rucker  Confidential
August 27, 2024

MS. ZIELINSKI:  Object to the form.

Lack of foundation.

MR. KLIEBARD:  Speculation.

THE WITNESS:  If the agreement existed at that time, it would be possible.

BY MR. ZIRPOLI:

Q.    Okay.  Do you recall if Mr. Rodriguez responded to this message?

A.    I do not.

Q.    Do you recall if you had any further conversations with Mr. Rodriguez about SCA and DaVita not recruiting or hiring each other's employees?

A.    I do not.

Q.    Did you have any other discussions with any other DaVita employees about not hiring or recruiting each other's employees?

A.    No.

Q.    You can put that document aside. Thank you, sir.

Do you recall if other SCA employees would let you know if they felt DaVita was violating the terms of the agreement by trying to recruit SCA employees?

MS. ZIELINSKI:  Object to the form.

Michael Rucker    Confidential
August 27, 2024

THE WITNESS:  Other S- -- other SCA employees would -- would highlight for me occasions when DaVita was making inquiry and attempting to recruit our -- our teammates.

BY MR. ZIRPOLI:

Q.    And what would you do in those instances, sir?

A.    Sometimes I would call it to the attention of Andrew Hayek and have a conversation about what, if anything, we would -- we would want to do about it.

Q.    Do you recall instances where you were informed by SCA employees that DaVita was soliciting them, and you would bring it to Mr. Hayek's attention and ask him to contact Kent Thiry and have them stop it?

MR. KLIEBARD:  Objection.  Compound.

THE WITNESS:  I don't specifically remember asking him to contact Kent, but that's entirely possible that that would have happened.

BY MR. ZIRPOLI:

Q.    Okay.  Would recruiters sometimes forget about the agreement and try and recruit a DaVita employee?

Michael Rucker   Confidential
August 27, 2024

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Recruiters would -- recruiters on behalf of DaVita would sometimes recruit teammates at SCA and vice versa.

BY MR. ZIRPOLI:

Q.    Okay.  And would those sometimes be brought to the attention of Andrew and Kent?

MR. KLIEBARD:  Objection.  Foundation.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q.    Okay.  And do you recall instances where the CEOs, Mr. Thiry and Mr. Hayek, would reach out to each other and let the other know that a recruiter had violated the agreement?

MS. ZIELINSKI:  Object to the form. Lack of foundation.

THE WITNESS:  There -- yes, there were occasions where there was recruiting activity brought to the attention of -- of Andrew, at least, and Andrew would initiate a conversation with Kent.

BY MR. ZIRPOLI:

Q.    I'm now handing the witness what has been marked as Plaintiff's Exhibit 336.  This is

Tab 5.  It's Bates-numbered 00158130.

One for the court reporter, one for the witness.

(Plaintiff's Exhibit 336, Document Bates-stamped 00158130, marked for identification as of this date.)

MR. KLIEBARD:  Sorry.  335?

MR. ZIRPOLI:  336.

BY MR. ZIRPOLI:

Q.   Did you have an opportunity to review that, sir?

A.   Yes.

Q.   Okay.  Mr. Rucker, have you seen this document before today?

A.   I have.

Q.   Okay.  Did you -- is this one of the documents you reviewed before your deposition?

A.   I've reviewed this in the past.

Q.   Mr. Rucker, Exhibit 336 is a true and correct copy of a series of e-mails you sent and received while employed as the executive vice president and chief operating officer at SCA on June 13 and 14 of 2016, correct?

A.   Yes.

Q.   And you would have sent and received

these e-mails in the regular course of your job duties working for SCA at that time; is that correct?

A.    Yes.

Q.    And if you take a look at the first-in-time e-mail, it's from -- the last page, it's from Katrina Palmieri, P-A-L-M-I-E-R-I, a corporate recruiter at DaVita, correct?

A.    Yes.

Q.    And she's reaching out through LinkedIn to Christian Ellison about a job at DaVita, correct?

A.    Yes.

Q.    Do you know Christian Ellison?

A.    Yes.

Q.    And who -- who is Christian Ellison?

A.    Christian Ellison was a group vice president that reported to me.

Q.    Okay.  And Mr. Ellison forwards the e-mail from the recruiter to you, correct?

A.    Correct.

Q.    And he writes, "I thought there was a gentlemen's agreement between us and DaVita re: poaching talent," correct?

Michael Rucker   Confidential
August 27, 2024

A.    Yes.

Q.    All right.  So Mr. Ellison appears to believe that there's a no-poach agreement between DaVita and SCA, correct?

MS. ZIELINSKI:  Object to the form.  Calls for speculation.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q.    And do you know how Mr. Ellison knew about the agreement not to poach each other's employees between DaVita and SCA?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Mr. Ellison would have been part of a team that reports to me that would have been part of one or more conversations with myself, Andrew, other members of the Cabin Team with regard to there being a gentlemen's agreement in place that we've talked about.

BY MR. ZIRPOLI:

Q.    And was Mr. Ellison part of the Cabin Team?

A.    He was not.

Q.    Okay.  But he --

A.    He reported to me.  And Andrew's

direct reports, the chief operating officer, the chief development officer, the chief people officer, reported to Andrew and were the Cabin Team.

Q.    Okay.  And do you believe you told your direct report here, Mr. Ellison, about the agreement?

A.    Yes.

Q.    So, at this point in time, there was no question in your mind that SCA and DaVita had this agreement in place, correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q.    As he put it, "no-poach agreement," correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I would -- these are his words, not mine.

BY MR. ZIRPOLI:

Q.    Okay.

A.    The -- any reference I would have made would have had to do with this gentlemen's agreement that we discussed.

Q.    Okay.  Was Mr. Ellison senior enough,

Michael Rucker   Confidential
August 27, 2024

in your mind, that the agreement applied to him?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:   Yes.

BY MR. ZIRPOLI:

Q.    Okay.  And employees at Mr. Ellison's level would have been informed of the agreement, as he called it, "no-poach agreement," correct?

MS. ZIELINSKI:  Objection.  Form.

MR. KLIEBARD:  Objection.  Foundation.

THE WITNESS:   Yes.

BY MR. ZIRPOLI:

Q.    And were all senior-level employees at SCA aware of this agreement?

MS. ZIELINSKI:  Objection.  Form. Lack of foundation.  Calls for speculation.

THE WITNESS:  I don't know if all senior -- it wasn't something that was secretive or, you know, not broadly understood.

BY MR. ZIRPOLI:

Q.    And then you write, "Do you mind if I share with Andrew, who has most recently addressed with Kent?"  Correct?

A.    Correct.

Q.    And what did you mean by that, sir?

Michael Rucker   Confidential
August 27, 2024

A.    I was simply -- before I forwarded the e-mail to Andrew, I was paying Christian the courtesy of, do you mind if I share the e-mail? And you sent it to me.  I just want to make sure you know I'm going to forward it to somebody else, the CEO of the company.

Q.    And you wrote "who has most recently addressed with Kent," correct?

A.    Yes.

Q.    And what did you mean by that, sir?

A.    He would have been the individual who most recently had conversation with DaVita, Kent, about the gentlemen's agreement.

Q.    Okay.  And when you write "Andrew," you're referring to Andrew Hayek?

A.    Andrew Hayek.

Q.    And "Kent" is referring to Kent Thiry, the CEO of DaVita; is that correct?

A.    That's correct.

Q.    Okay.  Do you recall why Mr. Hayek had recently addressed the agreement with Kent?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  My -- my words were not that he "recently" addressed it with Kent, but "most recently."

So, you know, any -- any correspondence around the gentlemen's agreement would have happened between Andrew and Kent versus anybody else in the organization.

BY MR. ZIRPOLI:

Q.    Do you recall how you knew Mr. Hayek had recently addressed the agreement?

A.    So let me be clear.

MR. SMITH:  Objection to form.

THE WITNESS:  It's not -- it's not --
I'm not trying to convey that he recently spoke to Kent about it.  He would have had the most recent interaction here on that.

BY MR. ZIRPOLI:

Q.    And my question is, do you recall what that most recent interaction was?

A.    I don't, no.

Q.    Going further up, you then forward this exchange to Mr. Hayek, correct?

A.    Yes.

Q.    And you write, "Would you consider raising with Kent?"  Correct?

A.    Yes.

Q.    And you write that, "The thought, of

Michael Rucker   Confidential
August 27, 2024

course, being Christian is a pretty senior/high profile guy for them to be reaching out to," correct?

A.    Correct.

Q.    So you and Mr. Hayek both felt that the DaVita recruiter contacting --

I'm sorry.  Strike that.

And you and Mr. Ellison both felt that a DaVita recruiter contacting him was clearly violating the agreement, correct?

MS. ZIELINSKI:  Object to the form.  Calls for speculation.  Lack of foundation.

THE WITNESS:  Clearly violating the agreement?

Give me just a minute.

Yes, that this was a situation that was sensitive enough to -- to -- if it was not a violation of the agreement, it would certainly be a situation where I think that, if they were going to pursue the recruitment of Christian, we would be looking for the pathway that we've talked about a few times to ensure that they were planning to follow it.

Michael Rucker   Confidential
August 27, 2024

BY MR. ZIRPOLI:

Q.    And Mr. Hayek responds that he will reach out, correct?

A.    Yes.

Q.    And did Mr. Hayek tell you after this e-mail that he reached out to Kent Thiry to discuss the agreement?

A.    I don't recall.

Q.    Okay.  And the purpose of you forwarding this e-mail to Mr. Hayek was to inform him that DaVita was violating the agreement and trying to poach one of your employees, correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  The reason that I raised it to Andrew was that -- so he would make Kent aware of this active recruitment of a relatively senior executive, and then, you know, the two of them would talk about whether or not it would be discontinued or that they would acknowledge that they were going to adhere to the pathway, which would involve Christian coming back around and saying, hey, I'm serious about this and I'm interested.

BY MR. ZIRPOLI:

Q.    Okay.  And Christian was not interested; is that right?

A.    That's right.

Q.    Okay.  Was retention of --

You can put that document aside.  Thank you.

Was retention of employees important for SCA?

A.    Yes.

Q.    And why was that?

A.    It is expensive to lose employees who are creating value for an enterprise or an organization.

Q.    So retention was important because there was a substantial cost associated with having to replace employees; is that right?

A.    That would be part of the reason, yeah.

Q.    And is it also important because there can be disruption in parts of the business when senior-level people leave?

A.    Yeah; I would consider that to be a form of the cost.

Q.    Okay.  And so this agreement allowed

Michael Rucker   Confidential
August 27, 2024

SCA and DaVita to reduce the cost of turnover, correct?

MR. KLIEBARD:  Objection.  Foundation.

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  If the agreement did, on the margin, or, to some degree, reduce the number of people moving back and forth, there would have been a lower cost of turnover.

BY MR. ZIRPOLI:

Q.    Okay.  And so by lowering the turnover, employees had lowered SCA's cost, correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Lower turnover, lower cost.

BY MR. ZIRPOLI:

Q.    Okay.

MR. CAMPBELL:  Object to the form.

Michael Rucker   Confidential
August 27, 2024

MS. ZIELINSKI:  Same objection.

THE WITNESS:

BY MR. ZIRPOLI:

Q.    Okay.

A.    Yes.

Q.    Okay.  Would you agree that the provision that an employee had to first tell their one-up supervisor discouraged employees from seeking employment at the other company?

MR. KLIEBARD:  Objection to the form.

MS. ZIELINSKI:  Object to the form.

BY MR. ZIRPOLI:

Q.    Because they had to first tell their supervisor before they could be considered?

MS. ZIELINSKI:  Same objection.

THE WITNESS:  I could imagine that some employees would be more comfortable with that than others, yeah.

BY MR. ZIRPOLI:

Q.    And as you've testified at trial -- we

reviewed it -- you were not willing to take that step; that's what you testified at trial, correct?

MR. KLIEBARD:  Objection.  Asked and answered.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q.    And as we discussed, you were -- at least you told SCA you weren't willing to tell Mr. Rodriguez that you were being recruited by Mr. Hayek until you had a written offer, correct?

MS. ZIELINSKI:  Objection.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q.    And one of the reasons an employee might not want to tell their boss that they're looking for a new job at SCA from DaVita is because they think they might get fired if DaVita found out about that, right?

MS. ZIELINSKI:  Objection to form.

MR. KLIEBARD:  Objection.

THE WITNESS:  It would appear that the one individual thought that.

BY MR. ZIRPOLI:

Q.    We just saw an example of that, correct?

A.    Yes.

Q.    Okay.  And so you would agree with me that this provision that was in this agreement likely deterred DaVita employees from seeking a job opportunity at SCA if they had to first tell their boss; is that right?

MR. KLIEBARD:  Object to form.

MS. ZIELINSKI:  Object to the form.

MR. CAMPBELL:  Speculative.

THE WITNESS:  To some degree, some -- some employees would not want to walk through that process.

BY MR. ZIRPOLI:

Q.    Okay.  And would you also agree that this provision also likely deterred SCA employees from seeking a job at DaVita if they had to first tell their boss at SCA?

A.    Yes.

MS. ZIELINSKI:  Object to the form.

BY MR. ZIRPOLI:

Q.    Do you recall instances where SCA informed DaVita employees that reached out

regarding job opportunities that, in order for them to be considered, they needed to first tell their boss?

A.    Do I recall instances?

Q.    Specific instances, yeah.

A.    Where a DaVita employee reached out and then -- did --

Q.    And then were told that they had to first tell their boss --

A.    Yes.

Q.    -- before they could be considered?

A.    Yes.

Q.    Do you recall specific instances of that?

A.    I remember a specific instance.

Q.    And which specific instance do you recall, sir?

A.    There was a DaVita leader by the name of Jung Lee.

Q.    Okay.  And what do you recall about that situation, sir?

A.    I believe that Jung reached out to us about a position that had been posted.  We corresponded with Jung, may have interviewed him, I believe.  Ultimately, let him know that

THE WITNESS:  I think so.

MR. ZIRPOLI:  Why don't we go off the record, if agreed by all parties.

Off the record.

THE VIDEOGRAPHER:  We're off the record at 12:21 p.m.

(Luncheon recess.)

Michael Rucker   Confidential
August 27, 2024

AFTERNOON SESSION

VIDEOGRAPHER:  We are back on the record at 12:50 p.m.

MICHAEL ALLEN RUCKER, resumed and testified further as follows:

EXAMINATION BY (Cont'd.)

MR. ZIRPOLI:

Q.    Mr. Rucker, while you worked for SCA, were you aware of any contractual relationship between SCA and USPI?

A.    I don't think so.

Q.    While you worked for SCA, were you aware of any joint venture relationship between SCA and USPI?

A.    No.  I don't think so, no.

Q.    So you were not aware of any business relationship that existed between SCA and USPI during the time you worked there; is that correct?

A.    That's correct.  I'm not recalling anything like that.

Q.    Okay.  And, Mr. Rucker, you previously testified that SCA and DaVita did explore some business opportunities together while you were at SCA, correct?

A.    Correct.

Q.    And after you were asked that at trial, you were asked:  "Was the gentlemen's agreement formed before or after any of those business opportunities were explored?"

And you responded:  "My understanding is they were formed before."

And again, that was -- do you recall that testimony, sir?

A.    Not specifically, but I understand it.

Q.    If you can turn to page 409 then --

A.    Yes.

Q.    -- please.

And it's lines 14 through 16.

A.    Okay.

Q.    Again, you were asked if there were any business opportunities that you were aware of while you were at SCA.

A.    Uh-huh.

Q.    Let me get there myself.

Line 11, you were asked:  "Did SCA and DaVita ever explore any business opportunities together?"  And you responded:  "Yes."

Correct?

A.    Yes.

Q.   And then the next question was:   "Was the gentlemen's agreement formed before or after any of those business opportunities were explored?"

And you responded:   "My understanding is they were formed before."

Correct?

A.   Correct.

Q.   And then you were asked:   "Could SCA and DaVita have explored those business opportunities that they did explore after the agreement was reached without the gentlemen's agreement?"

And you responded:   "Yes."

Correct?

A.   Correct.

Q.   And that was truthful and accurate testimony, sir?

A.   Yes.

Q.   Okay.   If you could go back to the ███                                It's PX306.

You can put that aside for now.

A.   Got it.

Q.   Great.   Can you go to the last page of that.



Can you read that last paragraph into the record, please?

A.   The one that begins with "████"?

Q.   No, it begins with ████████."

I'm sorry.  The top paragraph.

A.   "████████████

Q.   Is that a true and accurate statement, sir?

MR. CAMPBELL:  Object to the form.

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  There were two substantive discussions that we held while I was at SCA with DaVita about building a

Michael Rucker  Confidential
August 27, 2024

business together.  One had to do with whether or not we could somehow work with their interventional radiology business that conducted procedures on dialysis patients, minor surgical procedures, and it was very much related to work that was done in the ambulatory surgery centers that SCA ran.

And the other had to do with partnering with healthcare partners, a medical group, a group of physicians, in joint venture agreements to co-own ambulatory surgery centers.

BY MR. ZIRPOLI:

Q.    And so my question to you is, is that statement that you read out loud, is that true and correct?

MR. CAMPBELL:  Object to the form.

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I'm going to read it one more time.  There's a bunch in here.

BY MR. ZIRPOLI:

Q.    Yeah.

A.    █████████████████████████
████████████████████████████████████████
████████████████████████████████████████



The two times that I just referenced is how I would answer the question.

I think both of the explorations that we conducted were after the gentlemen's agreement was in place.

Q.    Okay.  So is that a true and correct statement, sir?

MR. CAMPBELL:  Object to the form.

MS. ZIELINSKI:  Mr. Rucker, I know you had read -- do you want to read the rest of this transcript before you answer the question, or are you comfortable with that?

BY MR. ZIRPOLI:

Q.    I'm just asking you about this

discrete topic, and I asked you to read, verbatim, the entire paragraph.

Is it a true and correct statement that you made, sir?

MR. CAMPBELL:  Objection.  Foundation.

MS. ZIELINSKI:  Yeah, ███████████

███████  ████████  ████████████

████████     So I just want to make sure it's characterizing, before he adapts this as his own --

THE WITNESS:  Let me just take a minute and read a little bit more of this.

I believe that's a true and correct statement.

BY MR. ZIRPOLI:

Q.   Okay.  And that's ████████████
██  ████████████████████  ████  ████

MR. CAMPBELL:  Objection.  Form.

THE WITNESS:  ████████████
████████████████████████
██████  ████████████████████
████████████████████

BY MR. ZIRPOLI:

Q.   Okay.  And as you testified already, it was a true -- that's a true and correct

statement, correct?

MR. CAMPBELL:  Object to the form.

THE WITNESS:  Yes, I don't think there's anything in that paragraph that is inaccurate.

BY MR. ZIRPOLI:

Q.   Okay.  Thank you.  You can set that aside.

If you could get ▮▮▮▮▮ ▮▮▮▮▮ that was introduced as Exhibit 331, and if you could go to the second page, and the sixth paragraph down, beginning with "▮ ▮▮▮▮▮."

Do you see that?

A.   Yes.

Q.   Could you just read out loud the first sentence of that paragraph, please?

A.   ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮."

Q.   Can you read it again?  I think you missed a word.

A.   ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

Q.   And that's a true and correct statement, correct?

MR. CAMPBELL:   Object to the form.

MS. ZIELINSKI:   And, Mr. Rucker, if you want to take time to review it, that's -- you're allowed -- you're allowed to do that.

THE WITNESS:   Let me read the preceding and following paragraph real quick.

"[redacted]."

I believe that to be correct.

BY MR. ZIRPOLI:

Q.   Okay.  Thank you.  You can set that aside.

When you worked for SCA, who did you consider to be SCA's competitors in the outpatient medical center industry?

A.   There were many, many of them smaller, and our competition really varied market by market.  So there were a handful of markets in

which we might compete actively with another provider of scale, like USPI, but in most of the markets in which we operated, we did not compete -- we did not, you know, actively compete locally with USPI.

There were -- you know, Regent was the name of another company.  Compass was another surgery center business.

Oftentimes competition was with local health systems, hospital companies, that also operated operating rooms in the hospital and in ambulatory surgery centers.

Q.     But USPI, you believe -- you testified earlier today was one of SCA's major competitors, correct?

A.     USPI was a -- a company that was very comparable to SCA, and it was a company that we competed with in a number of markets, not most of the markets in which we operated.

Q.     ████████████████████████

█████████████████████████████████

████████████████████████████████

████████████    ███████████████████ ?

A.     ████████████████████████

████████████████████████████

Michael Rucker   Confidential
August 27, 2024

of legal and regulatory conduct.

I'm not -- it would take me a few minutes to review this to tell you more.

Q.    Okay.  I'll represent to you that the metadata that was produced to us states that it was created on November 4, 2013.

You don't have any recollection of having received this document; is that right?

A.    I don't have any specific recollection.

Q.    Do you have any reason to believe it's not SCA's standards of legal and regulatory conduct?

A.    No, I -- I believe that's what it likely is.

Q.    Okay.  If you turn to the page -- and we call the numbers down at the bottom "Bates numbers" -- the Bates number ending in 1398.

There's a section there titled "Antitrust and Business Competition."

Do you see that?

A.    Yes.

Q.    And it says, "SCA will compete vigorously, but fairly, in the marketplace.  We will not seek to restrict competition through

unlawful monopolistic or predatory practices."

Correct?

A.   Correct.

Q.   And it goes on to list four bullet points setting forth what SCA employees should not do, correct?

A.   Yes.

Q.   And it states "Teammates should not," and then the first bullet point says that one of the things SCA employees should not do is "discuss or agree with a competitor to set prices," like you said, correct?

A.   That's correct.

Q.   Okay.  And did you ever discuss prices with a competitor?

A.   No.

Q.   And in the fourth bullet point, it says, "Make any arrangement with a competitor to artificially reduce competition."

Correct?

A.   Correct.

Q.   Do you recall earlier today we reviewed your testimony under oath, and you were asked:  "What was your understanding -- your understanding of the purpose of the gentlemen's

Michael Rucker   Confidential
August 27, 2024

agreement?"

And your testimony under oath was:

"My understanding of the gentlemen's agreement was to limit the number of employees or teammates that moved from DaVita to SCA and SCA to DaVita."

Correct?

A.    Correct.

Q.    Okay.  So you would agree with me, at least from what you testified to previously, that the agreement's purpose was to limit movement of employees between the two companies, correct?

MR. CAMPBELL:  Objection to form.

MS. ZIELINSKI:  Objection.  Asked and answered as well.

BY MR. ZIRPOLI:

Q.    Correct?

A.    Correct.

Q.    Okay.  And since SCA and USPI had the same agreement, that agreement also limited the movement of employees between SCA and USPI and USPI and SCA, correct?

MR. CAMPBELL:  Objection to form.

THE WITNESS:  Correct.

Michael Rucker  Confidential
August 27, 2024

BY MR. ZIRPOLI:

Q.   Okay.  And going back to your previous testimony, you were asked:  "Based on your experience, did the gentlemen's agreement -- that part of the gentlemen's agreement that SCA and DaVita would not solicit each other's employees help or hurt employees?" -- this is at page 408 -- and you responded, under oath:  "I think it limited the -- it limited the number of opportunities by the amount of opportunities they might consider that at the other organization."

Do you recall that, sir?

A.   I don't recall, but I'm familiar with what I said.

Q.   Okay.  And it was truthful and accurate at that time, correct?

A.   Yes.

Q.   Okay.  So the gentlemen's agreement limited the number of opportunities employees might consider to move from SCA to DaVita and DaVita to SCA, correct?

A.   Correct.

Q.   And since SCA and USPI had the same agreement, the agreement also limited the number

of opportunities for employees to move between SCA and USPI and USPI to SCA, correct?

A.    Correct.

MR. CAMPBELL:  Objection to form.

MS. BARRETT:  Objection to form.

BY MR. ZIRPOLI:

Q.    So, according to your previous testimony under oath, I assume you would agree that the gentlemen's agreement between Mr. Thiry and Mr. Hayek reduced the competition for employees between the two companies, correct?

MR. KLIEBARD:  Object to form.

MS. ZIELINSKI:  Just give us a chance to object.

Object to the form.

BY MR. ZIRPOLI:

Q.    Go ahead.

A.    Yes.

Q.    Okay.

And the second bullet point says that you're not to do, as an SCA employee, is "exchange information with a competitor about pricing, margins, bids, contracts, plans, or other confidential business matters," correct?

A.    Correct.

Michael Rucker   Confidential
August 27, 2024

Q.    And lucky for us, this document defines what confidential information is.

If you turn to the page ending in 21402, do you see in the middle of the page it says, in bold, "Confidential or Proprietary Information"?

A.    Yes.

Q.    And it defines what is confidential or proprietary information, correct?

A.    Correct.

Q.    And it states, "This includes confidential or proprietary formulas, processes, inventions, pricing information, provider agreements, financial information, development plans, and other information that has not been made public and that would be of interest to a competitor or other party if disclosed."

Correct?

A.    Yes.

Q.    So that is the definition of "confidential or proprietary information" as it is subject to your former employer's code of standards of legal and regulatory conduct, correct?

MS. ZIELINSKI:  Object to the form.

Michael Rucker   Confidential
August 27, 2024

overhead spend is being spent on acquisitions and supporting that process versus how much a competitor is spending.

Q.   What about SCA's present and future managed care or strategy data, would you want to share that with a competitor?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Managed care or strategy?

That would be less likely.

BY MR. ZIRPOLI:

Q.   That shouldn't be shared with a competitor, you would agree?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  That would be more sensitive.  I would be less likely to share that.

BY MR. ZIRPOLI:

Q.   Okay.  And what about revenue cycle data, is that something you would want to share with a competitor, confidential present and future revenue cycle data?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I would be very interested in understanding what our -- how

Michael Rucker   Confidential
August 27, 2024

our competitors were performing in that part of their business and -- and might be willing to -- might be willing to share our information if we thought it would be helpful to understand how they were performing.

BY MR. ZIRPOLI:

Q.   And just so I'm clear, you're not saying, just because you would be interested in seeing a competitor's confidential business information, that it's appropriate to exchange that with your competitor, are you?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  No, I think what I'm trying to convey is, as long as it wasn't in violation of any regulation or law, that there are situations where I can imagine benefiting from a benchmarking process.

BY MR. ZIRPOLI:

Q.   And are you aware if SCA engaged in sharing its confidential business information to engage in benchmarking with its competitors?

A.   I think there was -- I think there was some exchange of information in the spirit of, you know, a shared benchmarking exercise.

Q.     Okay.  I'm now handing the witness what has been marked as Plaintiff's Exhibit 36, previously.  This is Tab 10.

MR. ZIRPOLI:  Sorry.  Handing the witness what has been previously marked as Exhibit 36, bearing Bates number SCA000050405.

And one for the court reporter and for counsel.

This is Tab 10.  Did I say that?

BY MR. ZIRPOLI:

Q.     And, Mr. Rucker, let me know when you're done reviewing the document.

A.     Okay, thanks.

MR. ZIRPOLI:  What was that?

MS. ZIELINSKI:  I was just making sure he read the whole thing.

THE WITNESS:  Okay.  I think I'm familiar.

BY MR. ZIRPOLI:

Q.     Mr. Rucker, is Exhibit 36 a true and correct copy of an e-mail chain that you sent and received while employed at SCA in January of 2015?

A.     Yes.

note that this -- this analysis is for our support services groups.  This does not having anything to do with the field leadership or the nurses or the technicians or anybody who's delivering the care that SCA was in the business -- was in business to provide.

BY MR. ZIRPOLI:

Q.    Right.  Okay.  But you could reduce senior-level employees' wages, correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  We could -- we would look at this from lots of different perspectives, and one of the things that undoubtedly would be a part of this analysis is, are there efficiencies in the amount that we're spending on human capital.

BY MR. ZIRPOLI:

Q.    Okay.  Thanks.  You can put that document aside.  Sorry.  There's only one of those, so it's got to stay with the court reporter.

A.    Yes.

Q.    Are you aware if anyone from SCA ever reached out to any USPI employees to obtain

plans for future wage increases?

A.    I think there was a year or two where we did talk about in high-level, blunt terms what sort of a merit pool they were planning to fund for one or two years forward.

Q.    So you did, for those one or two years, exchange with USPI merit pool information; is that right?

A.    I think so, yeah.

Q.    And did you reach -- ever reach out to any of your competitors to obtain future wage increase information?

A.    I did not reach out to USPI.

There's a chance I would have reached out to one or more other distributed healthcare service providers.

Q.    Okay.  What is merit pool information?

A.    A merit pool would, at a high level, be the amount of raises that we intended to -- to deliver to our workforce.  That would typically happen during the first quarter or at the end of ev- -- at the end of the first quarter every year.

And so it is intended to allow us to make sure that we're appropriately and

Michael Rucker   Confidential
August 27, 2024

competitively paying our workforce.

Q.    And does that include base compensation and bonus?

A.    It's a -- it's a -- it's a tool that is connected directly to base compensation.  So, in other words, if someone was making $100 in their salary or hourly rate, and we established a merit pool of 2 percent that -- and that person were granted an average merit adjustment, they would be making a salary or an hourly wage of $102 after the -- after the merit was applied.

Q.    And who do you recall you reached out to to exchange merit pool information with?

A.    I think I had a -- an informal conversation with -- it could have been Javier at -- Javier Rodriguez at DaVita.

I can't recall other organizations, but I -- I may have reached out to one or two others in each of those one or two years that we did this.

Q.    And what were the years you believe that you reached out to your competitors to share merit pool information?

MS. ZIELINSKI:  Object to the form.

Michael Rucker   Confidential
August 27, 2024

THE WITNESS:  I -- I don't -- I can't accurately answer your question.  I think it may have been 2012, 2013.

BY MR. ZIRPOLI:

Q.    Were the merit pools set annually?

A.    Yes.

Q.    And were they set each year that you worked at SCA?

A.    Yes.

Q.    And were you aware whether DaVita had merit pools?

A.    Yeah, most organizations and certainly most healthcare service providers, in order to keep pace with inflation and to be in a spot where they're paying their people competitively, would run through a similar process.

Q.    While you worked at DaVita, did you reach out to others and exchange merit pool information?

MR. KLIEBARD:  Object to form.

MS. ZIELINSKI:  Same objection.

THE WITNESS:  I can't recall, honestly.  And my role with DaVita was more limited to a certain geography, and I wouldn't have been working at quite the same

Michael Rucker  Confidential
August 27, 2024

level with the HR team.

BY MR. ZIRPOLI:

Q.    Okay.  Do you know if Brian Mathis ever traded future wage information?

A.    I don't know that.

Q.    Are you aware of anyone else at SCA that obtained future wage increase information from other companies?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I can't specifically recall who else may have been involved.

BY MR. ZIRPOLI:

Q.    Would you agree with me that contacting a competitor to exchange future wage increase information could be a violation of SCA's standards of legal and regulatory conduct?

MS. ZIELINSKI:  Object to form.

MR. CAMPBELL:  Object to form.

THE WITNESS:  Could it be?  Yes, I suppose it could be.  I don't -- I don't know that it necessarily was.

BY MR. ZIRPOLI:

Q.    Would you -- would you consider SCA's future intended wage increase information to be confidential business information?

Michael Rucker  Confidential
August 27, 2024

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Not necessarily.

BY MR. ZIRPOLI:

Q.    Is it publicly available what SCA intends to do with its future wage increases?

A.    No, but we've decided to share it selectively on a number of occasions, so -- but, no, it's not publicly available.

Q.    Would you consider that to be confidential business information?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  The merit pool?

BY MR. ZIRPOLI:

Q.    Future.  Future intended --

A.    Yeah, not necessarily.

Q.    -- merit pool wage increases?

A.    No.

Q.    You think that's publicly available information that competitors should be allowed to freely exchange with one another?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I don't -- I don't think it's publicly available, but I don't necessarily think it's confidential.

Again, I just -- so I don't think it's

confidential.

BY MR. ZIRPOLI:

Q.    Okay.  And when -- you don't know, as you sit here today, when you first started exchanging merit pool information with other companies; is that right?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  No, I can't better estimate it.

BY MR. ZIRPOLI:

Q.    Okay.  And when you obtained merit pool information, was it a mutual exchange with the other companies?

A.    Yes.

Q.    Meaning you gave them your future intended merit pool information, and they gave you their future intended merit pool information; is that correct?

MS. ZIELINSKI:  Object to form.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q.    And isn't it true that the purpose of sharing wage increase information with your competitors was to make sure that SCA didn't have to increase its wages more than was

Michael Rucker   Confidential
August 27, 2024

necessary?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Interestingly, in a service business where your people really are your business, as much of the rationale for the exchange was to ensure that we didn't fall behind, whereas if -- if there were other organizations in the marketplace that were offering larger raises, we -- we simply couldn't afford to fall behind.

BY MR. ZIRPOLI:

Q.    It also enabled you to not have to compete with them and overpay, correct?

MS. ZIELINSKI:  Object to form.

BY MR. ZIRPOLI:

Q.    Because you knew what their future intended pay increase was?

MS. ZIELINSKI:  Object to form. Incomplete hypothetical.

THE WITNESS:  We knew what their merit pool was when we were done exchanging that information.

BY MR. ZIRPOLI:

Q.    Yeah.  Okay.  And so finding out what your competitors' future wage increases were

compensation off-cycle?

A.     Yes; to the extent that -- to the extent that there were situations that arose where there was some obvious indication that an -- that an employer or teammate was underpaid and it put their employment with us at risk, local leaders had the wherewithal to intervene and provide a change to compensation.

Q.     Did SCA consider pay ranges for different positions?

A.     I think they did late in my tenure.  I don't -- I think it was something that was being implemented sort of as I was on my way out.  I think I may have -- I may have been around for one year where we had sort of guidance market-by-market, role-by-role that we would provide.

Prior to that, I think what we did is we provided only kind of what the range of the highest to lowest in a given role was.

Q.     Okay.  So that was a pay range that you would do for that specific role?

A.     Yeah, the range versus a band.  Yeah.

Q.     We'll get to that, but did SCA consider market rates for similar positions in

setting compensation?

A.    Yeah.  Absolutely.

Q.    And did SCA consider to try and achieve internal equity in its pay of employees?

MS. ZIELINSKI:  Object to form.

THE WITNESS:  Yes, we attempted for there to be a reasonable amount of internal equity.  It would never have been our objective to have every regional director paid the same amount.  With people distributed across the country, with varying degrees of experience, making varying levels of contributions to the organization, there was naturally going to be a distribution by role.

BY MR. ZIRPOLI:

Q.    Like equity was something that you were conscious of or --

A.    Yes.  Yes.  Yeah, we thought about it.

Q.    Okay.

A.    It was one of a number things that we thought about.

Q.    Okay.  The internal equity?

A.    Yes.

Q.    Okay.  And did -- SCA, obviously, also

considered its own budget in setting its compensation of its employees, correct?

A.    Yes, there were budget implications of -- of making changes to -- to compensation levels.

Q.    Did SCA have a ranking system for its employees for purposes of determining compensation?

A.    I -- we often talked about stack-ranking performance and -- you know, but I don't think that was one-to-one connected directly into compensation, no.

Q.    But did SCA rank its employees in any way?

A.    In an irregular and varied way.  From time to time, we would have a conversation about who are our best people in this position and who are our worst.

Q.    So would that be by title or by category?

A.    Yeah, by title.

Q.    Okay.  So SCA would -- would you give them a number, or how would you do it?

A.    So who are our best regional directors?  We've got 30 of these people, and,

Q.    Okay.  And when you left in 2017?

A.    Probably twice that.

Q.    Okay.

A.    Yeah.

Q.    So 4 or 5,000?

A.    Yeah, that's not -- that's not an accurate number, but I think it would have been at least 4,000.  But I'm not sure.  You should ask somebody who knows.  I'm telling you I don't know.

Q.    Did SCA have a formal policy to set wages?

A.    No, I don't believe there was a policy to set wages.

Q.    There was just a process that you described?

A.    Yeah.

Q.    Going back to internal equity, how did SCA create internal equity in the compensation process?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  We would, in the process of reviewing wage adjustments, review across the company and across a region people in the same roles and evaluate the variability

and make sure that it was purposeful and there was sensibility around it.

BY MR. ZIRPOLI:

Q.    And then compensation was --

A.    Yeah, and the -- you know, if somebody in -- somebody in a front desk role was making $18, and somebody else was making $14 in the same market, why?  Why was that?  And do we want to make an adjustment because we think we've got turnover risk, where somebody's being underpaid and there's a flight risk there, you know, do we want to make an investment there?

Q.    So you would create an internal equity in terms of making sure that compensation was similar?

A.    Yeah.  And then, honestly, the other edge of it was the $18 person, you know, are they above the market rate for what their role was?  Well, we might not give them as big of a raise if we determine that.

Q.    And why did SCA want to have internal equity in its compensation?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  We strove to have a reasonable amount of equity role-by-role --

Michael Rucker  Confidential
August 27, 2024

we strove to have internal equity --
reasonable internal equity role-by-role (A)
because there was an element of sort of
fairness to it, and (B) we thought if the
variability got too -- too great of an
extent, you were at risk of, you know,
having folks that you were underpaying, and
they would leave and not want to be a part
of the team.

BY MR. ZIRPOLI:

Q.    Have you -- are you familiar with a
concept of wage compression?

A.    Yes.  Well, I'd -- I'd appreciate it
if you would explain what you mean by it.

Q.    The concept that if one employee
within a role has an increase in wages, it
creates an upward pressure on everyone within
that role.

A.    Yes, I --

Q.    Okay.  And did you discuss the concept
of wage compression while you were at SCA?

A.    I don't remember ever talking about
wage compression at SCA.

Q.    So if SCA were to hire an external
person and pay them substantially more than

Michael Rucker   Confidential
August 27, 2024

others already at SCA who occupy that position, would there be any sort of fairness concern with respect to the employees that were already in that role?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I think, practically speaking, what would happen is, over time, if you've got -- if you've got one person and you had to pay them more to join in the same role that you've got a group of other people, who are now paid less than the person that you just brought aboard, we would encourage our leaders to think about, do you need to take any action today or do you need to take any action over time to stabilize your workforce.

BY MR. ZIRPOLI:

Q.    Did SCA have a general goal of paying people similarly for doing similar work?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I'd say similarly, yeah.

BY MR. ZIRPOLI:

Q.    And SCA looked to make sure that compensation was fair; is that right?  I think you said that before.

MR. ZIRPOLI:  Okay.  Why don't we pull them out now.  Let's pull them out.  First one.

MR. CAMPBELL:  He can answer that if he does review them.

MR. ZIRPOLI:  That's an improper speaking question, and you know it.

MR. CAMPBELL:  Counsel, are you just going to bully over people by talking over them?  You can be respectful on the record like everyone else has to you.

MR. ZIRPOLI:  You can follow the federal rules and not make speaking objections.

MR. CAMPBELL:  Counsel, be respectful to everyone on the record, please, like everyone has been to you.  That would be much appreciated.

MR. KLIEBARD:  How long have we been on the record?

VIDEOGRAPHER:  6 hours and 15 minutes.

MR. ZIRPOLI:  I've got another 45.

THE WITNESS:  Super.  Where do we want to start?

BY MR. ZIRPOLI:

Q.    The ▮▮▮▮▮ please.  Exhibit 305.

Why don't you take your time to review that.

A.    305.  Sure.

(Document review.)

Q.    What page are you on there, sir?

A.    7 of 17.

Q.    Okay.

(Document review continues.)

Q.    What page are you on there?

A.    13.

(Document review continues.)

Q.    When you're done, please let me know, Mr. Rucker.

(Document review continues.)

A.    I've finished reading this first document.

Q.    Okay.  So you've had an opportunity to review what has been marked as Plaintiffs' Exhibit 305, ▮▮▮▮▮ -- ▮▮▮▮▮

▮▮▮▮▮

▮▮▮ is that correct?

A.    Yes.

Q.    ▮▮▮▮▮

Michael Rucker   Confidential
August 27, 2024



MS. ZIELINSKI:   Object to the form.

MR. CAMPBELL:   Foundation.

THE WITNESS:

on page 4.   That just doesn't make any sense, so I don't -- that's inaccurate, in my estimation.

BY MR. ZIRPOLI:

Q.   Okay.

A.

Yeah, that's -- that's fine.   So it's really the          comment.

Q.   Okay.   And so, to the best of your knowledge,                                          , is that what you're saying?

A.   No,

Q.  Other than ████████████████

████████████████████████

████████████████████████

████████████████████████

MS. ZIELINSKI:  Object to the form.

MR. CAMPBELL:  Objection.  Foundation.

BY MR. ZIRPOLI:

Q.  Go ahead.

A.  Yes.

Q.  Okay.  And is there anything else that you can point me to ████████████████

████████████████████████████

████████████████████████████

MS. ZIELINSKI:  Object to the form.

MR. CAMPBELL:  Same objection.

THE WITNESS:  I don't think so.

What I will tell the group, as long as it took me to read that, I did my best to -- I would normally, in this circumstance, want to stare at this a second time with a fresh set of eyes, but I didn't pick up on anything else.

BY MR. ZIRPOLI:

Q.  Okay.  So the statements you made with

[REDACTED]

truthful and accurate?

MS. ZIELINSKI:  Objection.  Form.

MR. CAMPBELL:  Objection.

Mischaracterizes the document.

THE WITNESS:  I think that there wasn't anything else that, in reading this characterization of the conversation that we had, that I thought was inaccurate.

BY MR. ZIRPOLI:

Q.  Okay.  Or untruthful?

A.  Or untruthful, yeah.

Q.  All right.  Thank you.

I want to ask you about Jung Lee.  You were asked some questions about Jung Lee just now.  Do you recall that, sir?

A.  Yes.

Q.  Okay.  Did you ever -- do you know how Jung Lee was treated at DaVita after your conversation with him, where you told him that he needed to tell his boss before he could be considered for a job at SCA?

A.  I don't know how he was treated.  My

understanding is that he received a promotion and has -- and went on to work at DaVita successfully for a long time.

Q.    But you never spoke with him about that; is that correct?

A.    No, I never spoke with him.

Q.    So you don't have any firsthand knowledge of that; is that correct?

A.    Other than -- no, I don't have any firsthand knowledge of it, no.

Q.    Okay.  And so what you understand is that he stayed at DaVita, is that right?

A.    Yes.

MR. CAMPBELL:  Objection.  Misstates the testimony.

BY MR. ZIRPOLI:

Q.    And you also understand that he was never offered employment at SCA, correct?

MR. CAMPBELL:  Same objection.

THE WITNESS:  I don't think he was ever offered employment at SCA.

BY MR. ZIRPOLI:

Q.    He was never hired at SCA?

A.    He was absolutely never hired at SCA.

Q.    Okay.  And you don't know for certain

CERTIFICATE

I, Kathy S. Klepfer, a Registered Merit Reporter and Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That MICHAEL RUCKER, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 30th day of August, 2024.

---------------------------------
KATHY S. KLEPFER, RPR, RMR, CRR, CLR

# EXHIBIT 26

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         ) Master Docket No.
LITIGATION                        ) 1:21-cv-00305
                                  )
                                  )
_____     )
                                  )
THIS DOCUMENT RELATES TO:         )
                                  )
ALL ACTIONS                       )
                                  )

-------------------------------------

REMOTE/ ORAL/ VIDEOTAPED/ REALTIME DEPOSITION OF

ANDREW JOHNSTON

SEPTEMBER 6, 2024

RESTRICTED - CONFIDENTIAL

-------------------------------------

REMOTE/ ORAL/ VIDEOTAPED/ REALTIME DEPOSITION OF ANDREW JOHNSTON, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on September 6, 2024, from 9:08 a.m. to 11:58 a.m. Central Time, before Christy Cortopassi, CSR in and for the State of Texas, reported by machine shorthand remotely via Zoom videoconference, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Andrew Johnston   Confidential
September 06, 2024

MS. NEWTON:  Objection to form.

A.  I'm not sure I would describe it exactly that way.  There were budgets for increases each year, or targets for increases.

Q.  (BY MR. ROSS)  And how would those targets get set?

A.  Typically, the CFO would communicate targets out to the field.  I wasn't involved in setting them.  I received them.  I was not a setter.

Q.  Do you know who was involved in setting the targets?

A.  I know I received them typically from the CFO.

Q.  Do you know if Bill Wilcox had input into the labor budget?

A.  As the president of the company, I suspect he did.  But I wasn't involved in that process.

Q.  What was your involvement in the setting of the labor budget for the year?

A.  I wasn't involved in setting the labor targets, as I have described, for increases.

Q.  Well, okay.  So what would you do once you received the targets?

A.  Yeah.  The process that I'm talking about is the annual increase process, essentially, where we gave increases to the leaders in the field based on various

Andrew Johnston   Confidential
September 06, 2024

factors.  And the overall increases, you know, we tried to make consistent with a target that had, you know, come from the CFO.

Q.  So you were given a percentage increase as a target and then you tried to fit in your salary increases within that percentage increase, correct?

(Simultaneous crosstalk.)

MS. NEWTON:  Objection to form.

A.  Sorry.  That's correct.

Q.  (BY MR. ROSS)  And who would actually -- who would approve your recommendation?

MS. NEWTON:  Objection to form.

A.  It depends on the role that I was in and the role that was being considered.  But for the senior most roles that reported to me, I would make recommendations and submit those to the CFO, chief people officer, for approval.

Q.  (BY MR. ROSS)  And was there a pay structure at USPI?

A.  I'm not sure what you mean by pay structure.

Q.  Well, did USPI or did you in setting your salary recommendations, consider internal equity issues?

MS. NEWTON:  Objection to form.

A.  We looked at pay across like-positions at the company so that we knew who was on the high end and who

Andrew Johnston  Confidential
September 06, 2024

was on the low end and that would be a factor in our decisions on increases.

Q. (BY MR. ROSS)  And were there any external factors that were considered?

MS. NEWTON:  Objection to form.

A.  Externally, from time to time we might have market data on different positions.  Or we would have anecdotal external information that we had received from interviews or, you know, people that we had hired and what rates we might have to pay to attract them.

Q. (BY MR. ROSS)  And would you consider new hires as opposed to current employees in setting pay?

MS. NEWTON:  Objection to form.

A.  I'm not sure I understand your question.

Q. (BY MR. ROSS)  Well, would -- in offering a new hire a salary, would you consider how that would fit into the structure of your current employees?

MS. NEWTON:  Objection to form.

A.  When we hired people in from the outside we obviously had to make an offer that they would accept, so that was a part of the process thinking.  And we would also make sure we understood where that offer fit relative to the internal ranges at the company.

Q. (BY MR. ROSS)  And would the new hire salaries need to be approved by anybody above you?

Andrew Johnston  Confidential
September 06, 2024

MS. NEWTON:  Objection to form.

A.  Again, typically, for an RVP that reported to me or a market president that reported to me, the comp would also be approved by the CFO or the chief people officer, one level above me.

MR. ROSS:  If we could pull up tab nine, which we will mark as Exhibit PX 453.

THE VIDEOGRAPHER:  One moment.

(Exhibit PX 453 marked.)

Q.  (BY MR. ROSS)  Do you recognize this document, which is Bates-stamped number USPI 095467?  And it's an email chain in February of 2015 between Andy Johnston and Vanessa Smith and Cindy English.

Do you recognize this document as an email exchange from the ordinary course of business at USPI?

A.  Yes, I do.

Q.  Okay.  And does this email chain reflect the general process of salary increases for vice presidents and above during that time period?

MS. NEWTON:  Objection to form.

A.  This was a step in the process for annual increases for vice presidents and above at the time.

Q.  (BY MR. ROSS)  Now if you -- in the middle of the page there's a bullet point number three that refers to a proposed increase of two-and-a-half percent.  Is

Andrew Johnston   Confidential
September 06, 2024

responsibility and a promotion and was on her way to earning that and did eventually earn that. And I was asking for essentially a bridge from her RVP compensation to something that looked like more like a market president compensation.

And, you know, to keep her with the company and motivated and engaged while she went through that process of being, you know, promoted eventually into the market president role.

MR. ROSS: So now if we can pull up tab ten, which will be Exhibit PX 456, which is a series of emails from January of 2015 bearing Bates stamp number USPI CIV 95479.

(Exhibit PX 456 marked.)

A. Okay.

Q. (BY MR. ROSS) Do you recognize this as a series of emails between you and Ms. Smith, Vanessa Smith, in January 2015 during the course of business at USPI?

A. Yes, I do.

Q. Okay. Now, generally, these emails are discussing what to do about certain administrators that are at the top end of the salary range in the market. So am I correct that this series of emails is reflecting your consideration of internal equity at USPI, the

salaries of administrators as against each other, as well as external factors in determining what their salary should be?

MS. NEWTON:  Objection to form.

A.  This email chain appears to be specific to how to address those employees who are at the top of the range and what sort of increases or bonuses to provide to those employees.

Q.  (BY MR. ROSS)  And part of the process is to give them, employees that are at the top of the range, to give them smaller increases to keep them within a range of other administrators, correct?

MS. NEWTON:  Objection to form.

A.  The -- yeah, the thought process here is if they're at the top of the range we would give them smaller percentage increases, which might actually be larger dollar increases but would grow their earnings at a lower percentage rate, their base salaries at a lower percentage rate than the rest of the administrators in the region or market.

Q.  (BY MR. ROSS)  And what would -- what's the purpose behind that?

A.  Several purposes.  One to control the growth. If you provide smaller percentages to those that are at the top of the range then you can provide larger

Andrew Johnston  Confidential
September 06, 2024

percentages to others and still fit within the overall targeted percentage increase.  That would be one benefit.

And then the other benefit would be to, you know, just keep from paying them more than market where they're already at or above market.

Q.  Now in the top email you make a mention of pay scales and you say that -- well, first of all, what do you mean by pay scales?

A.  I believe what I meant here by pay scales is a specific documented scale for, you know, where an administrator position or any position would fall in a specific market.

Q.  You say that USPI doesn't have specific pay scales for administrators; is that correct at the time?

A.  Yes.  That's correct.

Q.  But you did, in setting salaries for your administrators, you did keep in mind their salaries against each other that would be within a range, correct?

MS. NEWTON:  Objection to form.

A.  Yes.  That was the information we had, was the range of salaries that we were paying to current administrators in the position.

Q.  (BY MR. ROSS)  Okay.

Andrew Johnston   Confidential
September 06, 2024

MR. ROSS:  Why don't we just take another five-minute break and come back and then we'll continue on.

THE VIDEOGRAPHER:  We are going off the record.  The time is 15:48 UTC.

(Break from 10:48 a.m. to 11:01 a.m. CDT)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 16:01 UTC.

Q.  (BY MR. ROSS)  And welcome back, Mr. Johnston.

MR. ROSS:  If we could pull up tab six.

THE VIDEOGRAPHER:  One minute.

MR. ROSS:  I believe this is Exhibit PX 457; is that right?

THE VIDEOGRAPHER:  Correct.

(Exhibit PX 457 marked.)

Q.  (BY MR. ROSS)  And this document is some emails from February of 2016 bearing Bates stamp number USPI CIV 11955.

A.  Okay.

Q.  Okay.  So first, do you recognize this as a series of emails that were exchanged in the ordinary course of business at USPI in February 2016?

A.  Yes.

Q.  Now going from the bottom up, it starts with an email from you to Rob Finnegan and Shannon Mosley with

Andrew Johnston  Confidential
September 06, 2024

Mr. Andrew E. Talbot...........00:00

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 10th day of September, 2024.

_____
Christy Cortopassi, Texas CSR 6222
Expiration Date: 10/31/2026

Firm Registration No. 343
U.S. LEGAL SUPPORT, INC.
8144 Walnut Hill, Suite 350
Dallas, Texas  75231
214.741.6001

# EXHIBIT 27

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--oOo--

IN RE OUTPATIENT MEDICAL CENTER    )   No. 1:21-cv-00305
EMPLOYEE ANTITRUST LITIGATION      )
_____)

_____

VIDEO DEPOSITION OF

BRETT BRODNAX

September 12, 2024

_____

DEPOSITION OF BRETT BRODNAX, produced as a witness, duly sworn by me at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on September 12, 2024, from 10:03 A.M. to 6:19 P.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand at:

2323 Ross Avenue, 19th Floor, Dallas, Texas

Brett Brodnax
September 12, 2024

counsel.

Q. And so what efforts have you made to cooperate and tell the truth to Plaintiffs' counsel?

A. I guess the interview and now the deposition.

Q. The deposition today you've been subpoenaed; is that correct?

A. I'll have to ask counsel if I've been specifically subpoenaed.

MS. MOYE: We'll stipulate a subpoena was served.

Q. (BY MS. NUSSBAUM) And therefore, you're under oath today; is that right?

A. Yes.

Q. So it's not cooperation. A subpoena was served --

MS. MOYE: Objection. Objection to the form.

Q. (BY MS. NUSSBAUM) -- and you're under oath.

MS. MOYE: Objection to the form.

Q. (BY MS. NUSSBAUM) So, for example, when during your interview with Plaintiffs' counsel, which you were obliged to give as part of your cooperation and you were shown certain documents and

Brett Brodnax
September 12, 2024

asked certain questions about wage sharing and the sharing of wage increase information.

Subsequent to that conversation you did nothing further with respect to those allegations; is that correct?

MS. MOYE: Objection to the form.

THE WITNESS: That's correct.

Q. (BY MS. NUSSBAUM) Now, what is your present position at USPI?

A. Executive chairman.

Q. And can you just tell us over the past 10 years what your positions have been with USPI?

A. I was a president and chief development officer. And then in 2018 became the CEO. And then earlier this year became the executive chairman.

Q. And when you became the CEO in 2018, was that one of the reasons that Mr. Cagle was terminated from the company?

A. No.

Q. Was that one of the sources of frustration?

MS. MOYE: Are you finished with the question?

MS. NUSSBAUM: Uh-huh.

MS. MOYE: Object to the form.

Brett Brodnax
September 12, 2024

THE WITNESS:  I'm not following the question.

Q.  (BY MS. NUSSBAUM)  Did there come a time that the relationship between you and Mr. Cagle at USPI deteriorated to the point that you made a presentation to the board of directors asking that Mr. Cagle be terminated?

MS. MOYE:  Objection to the form.

THE WITNESS:  No.

Q.  (BY MS. NUSSBAUM)  Did you make the presentation to the board asking that Mr. Cagle be terminated?

A.  No.

Q.  And if I told you that Mr. Wilcox so testified, would that refresh your recollection that you did that?

MS. MOYE:  Objection to form.

THE WITNESS:  Perhaps, but I don't recall making a presentation to the board.  Which board are -- by the way, which board are you referring to? That's why I'm probably confused.

Q.  (BY MS. NUSSBAUM)  The USPI board.

A.  The USPI board.  I don't recall that presentation.

Q.  Well, who made the determination to

Brett Brodnax
September 12, 2024



Q.   Okay.   Now, going to page 10, the first full paragraph,

Is that accurate and truthful?

A.   It is.   Again, replacing no-poach with nonsolicit.

Brett Brodnax
September 12, 2024

Q.   Okay.  Going to the next paragraph, the second sentence, it said, ██████████████████████

██████████████████████████████████

███████████

Is that accurate?

A.   Yes.

Q.   Okay.  Going to the next page, to page 11. And going to the last paragraph on the page, ████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██ ████████████ █████████████████████

██ █████████████████████████████████

██  ██████████████████████████████████

██ ██████ ███████████████████████████

██  █████████████████████████████████

██  █████████████████████████████████████

██  ███████████████████████████████████

██ ████████████ █████████████████████

██  ██████████████████████████████████

██  █████████████████████████████████

██  ████████████████████████

Brett Brodnax
September 12, 2024

Stopping there for a moment, is that true and accurate testimony?

A. Yeah, I mean, again, changing no-poaching to nonsolicit. I think the rest of it...

Yes, that's accurate.

Q. Okay. Going to page 12 now, just continuing. So we're on the third sentence from the top,

Is that an accurate and truthful statement?

A. Yes. Let me see, where it says ███ ███████████████████████, I don't recall a discussion. It could have been via

Brett Brodnax
September 12, 2024

email.  Again, changing no-poach to nonsolicit.  I think the rest of that sentence is okay.

The part about ███████████████. I did talk to Hayek from time to time, you know, conferences and that kind of thing.

But the part that it's -- that it seems contradictory is where it says, ███████████████. I just said above that I did have interaction with Andrew Hayek, so at least the contents of this contradict itself.

But Joe Clark was my counterpart, in acquisitions at SCA.  That part is true.

Q.   Okay.  And just for me to understand what you just said.

███████████████ you just don't recall?

A.   Correct.

Q.   Okay.  Then going to the third paragraph, ███████████████

Brett Brodnax
September 12, 2024

A. Okay.

Q. In that paragraph there's a sentence that says in part, quote, ███████████████

███ ██████████████ ███████████████████

██ ███████████ , end quote.

A. Yes, I see that.

Q. Okay. And do you recall Ms. Nussbaum directing your attention to that part of this document?

A. No, I don't, but...

Q. Do you have any reason to disagree that that statement is correct?

A. No, that statement -- I believe that statement is correct.

Q. Okay. So you would agree that if we want to know when Bill Wilcox and Andrew Hayek reached the Plaintiffs' alleged agreement, we should ask Bill Wilcox or Andrew Hayek; correct?

A. That's correct.

MS. STEINER: No further questions from counsel for Mr. Hayek.

MS. MOYE: Thank you.

Okay. So counsel for USPI just has a few follow-up questions for you, Mr. Brodnax.

Brett Brodnax
September 12, 2024

EXAMINATION

Q.   (BY MS. MOYE)   First, I'm just not sure we got a clear statement on the record.  What is your current title at USPI?

A.   Executive chairman.

Q.   Executive chairman, thank you.

And you were shown a subpoena for your testimony at the outset of the deposition.  It's marked as Plaintiffs' 467.  I don't know if you -- may be over here by now.  Here it is.

A.   Okay.

Q.   And did counsel accept -- your legal counsel accept service of that subpoena on your behalf?

A.   Yes.

Q.   And you were asked a lot of questions about whether you read all of the words in this document.

Do you remember that?

A.   Yes.

Q.   And I think you confirmed that you did not personally read all the words in this document; is that right?

A.   That's correct.

Q.   Did you in fact rely on counsel to provide

Brett Brodnax
September 12, 2024

you advice about your responsibilities with respect to responding to this subpoena?

A.   Yes.

Q.   You were asked about a specific entry in here.  See if I can find it.

It's Item Number 31 on page 15.

A.   Okay.

Q.   And the entry here that you were asked about says, all nonprivileged communications from January 1, 2021, to date, between you and any person concerning the action.

Do you remember those questions?

A.   Yes.

Q.   Have you in fact had any nonprivileged communications from January 1, 2021 to date concerning this action?

A.   No, not that I'm aware of, not that I recall.

Q.   Are you aware, Mr. Brodnax, of the fact that the Court has set a time parameter for production of documents in this case?

A.   Only through you.

Q.   Do you know whether or not -- and you can just answer yes or no, because, as throughout the rest of the deposition, I don't want you to reveal

Brett Brodnax
September 12, 2024

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: September 24, 2024

*Brandon D. Combs*

BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

# EXHIBIT 28

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION, | ) ) ) |
| | ) Master Docket No. |
| | ) 1:21-cv-00305 |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| ALL ACTIONS | ) |


* * *HIGHLY CONFIDENTIAL* * *

VIDEOTAPED DEPOSITION OF ANDREW PATRICK HAYEK

Chicago, Illinois

September 18, 2024


Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR, CSR

JOB NO. 6616478-001

ANDREW PATRICK HAYEK,  called as a

witness, having been duly sworn,

was examined and testified as

follows:

EXAMINATION BY

MR. SAVERI:

Q.     Good morning, Mr. Hayek.

A.     Good morning.

Q.     I introduced myself to you before we started, but, once again, my name is Joseph Saveri, and I'm one of the lawyers for plaintiffs in this matter.

Could you please state your name, full name, and spell it for the record, please.

A.     Andrew, A-N-D-R-E-W, Patrick, P-A-T-R-I-C-K, Hayek, H-A-Y-E-K.

Q.     Mr. Hayek, are you presently employed?

A.     Yes.

Q.     And where are you employed?

A.     Triple Aim Partners.

Q.     And what is your title at Triple Aim Partners?

A.     I'm the chief executive officer.

Q.     And how long have you been the CEO at Triple Aim Partners?

A.    Approximately five years.

Q.    And prior to joining Triple Aim Partners as the CEO in 2019, were you employed by Optum Health?

A.    Yes.

Q.    And what was your title at Optum Health?

A.    I was the CEO of Optum Health.

Q.    And how long were you in that role?

A.    Two years.

Q.    From approximately April 2017 to April 2019; is that correct?

A.    Approximately.

Q.    Great.  And prior to your role at Optum Health, were you employed by Surgical Care Affiliates?

A.    Yes.

Q.    Okay.  And can we agree that when I say "SCA" throughout the day today, I'm referring to your former employer, Surgical Care Affiliates?  Is that okay?

A.    Yes.

Q.    Great.  And how long did you work at SCA?

A.    Approximately nine years.  A little

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

over nine years.

Q.    From approximately April 2008 to March 2017?  Does that sound right?

A.    From April 2008, continuing through 2017.  There was a period where I had both the Optum Health CEO role, and I retained the Optum CEO role.  So there was a transition period during 2017.

Q.    Okay.  But from April 2008 through March 2017, at least with respect to SCA, you were contin- -- continuously employed; is that correct?

A.    Yes.

Q.    Great.  And what was your title at SCA at the time you left in 2017?

A.    In 2000 --

And to clarify, this is early 2017?

Q.    Yep.

A.    Early 2017, I was the chairman and chief executive officer.  I also had the president title, although did not use it publicly or regularly.

Q.    Is it fair to say that at that time you were the top executive at SCA?

MR. BANK:  Objection.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

THE WITNESS:  Yes, I was the top executive.

BY MR. SAVERI:

Q.     And as the top executive, were you ultimately responsible for the financial performance of the company?

MR. BANK:  Objection.

THE WITNESS:  Yes, along with responsibility, ultimately, for many facets of the company.

BY MR. SAVERI:

Q.     And is it fair to say every employee of SCA ultimately reported to you at that time?

MR. BANK:  Objection.

THE WITNESS:  Yes, in that, ultimately, divisions or regions or what have you report up through people who report to the CEO, ultimately.

BY MR. SAVERI:

Q.     And as the top executive, you didn't have a -- you didn't have a boss, did you?

A.     I viewed the board of directors as my boss.

Q.     Okay.  And so you --

A.     And for a period, I had a chairman,

and I was not chairman.  So I viewed those two as, effectively, my boss.

Q.    Okay.  So, while you were the CEO, you reported to the board of directors of SCA?

A.    Yes.

Q.    Okay.  And what -- today, what is your work address?

A.    500 Adams Avenue, Glencoe, Illinois.

Q.    And have you ever had your deposition taken before?

A.    Yes.

Q.    And how many times?

A.    I recall one.

Q.    And can you tell me generally when you had your deposition taken?

A.    Approximately 20 years ago.

Q.    Now you're challenging my math skills.

So approximately 2004?  Does that sound right?

A.    2004 to 2005, generally.  This is 20 years ago.

Q.    Right.  And can you just tell me generally what the -- what the -- what the dispute was about in which you gave your deposition?

someone was present, but that's my best recollection.

MR. KLIEBARD:  Joe, sorry to interrupt.

Can you keep your volume up just a little bit?  Veronica and I are having a hard time hearing.

MR. SAVERI:  Oh, sure.  Sure.  Sure. Sure.

MR. KLIEBARD:  You will never ask me to keep my volume up, but I think Cadio's curls might be absorbing the sound.

BY MR. SAVERI:





Andrew Patrick Hayek  Highly Confidential
September 18, 2024



Q.    And would it be fair to say that your memory of the events that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓ was fresher in your mind then than

today?

MR. BANK:  Objection.

MR. CAMPBELL:  Objection to form.

THE WITNESS:  No, I don't -- I don't have a view on that.

BY MR. SAVERI:

Q.    Okay.  Well, are you aware of anything that ████████████████████████████

████ ████████████████████████████████████

MR. CAMPBELL:  Same objection.

THE WITNESS:  As I shared, I was asked lots of questions.  If you step back and look at the totality of it, it is true, as what I'm doing here today.

BY MR. SAVERI:

Q.    Okay.  And is there anything about anything ██████████████████████████████ that you want to change or correct today?

MR. BANK:  Object to the form.

THE WITNESS:  Of a similar answer.  I ████ ████████████████████████████████

████ ██████████████████████

Stepping back, ██████████████████

████ ████, as I'm here to do with you.

THE WITNESS:  Yes.  I believe so.

BY MR. SAVERI:

Q.    And in fact, he was more than just thinking about it; he was actually discussing it with this company in Texas, correct?

A.    My recollection is he had been discussing it with a company in Texas and actively in process, yes.

Q.    And so is it fair to say that you -- you, as you said, you were under some -- you felt some time pressure because he was already speaking with another potential company, and you were interested in Mr. Rucker, correct?

A.    Yes, he was in process, and I recall feelings and, you got to act quickly, there's some time pressure, as you said.

Q.    But did you also understand that Mr. Rucker didn't want to put SCA and DaVita into a bidding war?

MR. BANK:  Objection.

THE WITNESS:  I don't recall those terms specifically.

BY MR. SAVERI:

Q.    Would you agree with me that a person has a right to explore career options that may

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

be best for her or him in privacy?

                MR. BANK:  Objection.

                THE WITNESS:  I think under most

    circumstances, yes.  There are some

    exceptions.

BY MR. SAVERI:

        Q.     And did Mr. Rucker's recruitment by

you provoke a response from Mr. Thiry at DaVita?

        A.     Yes.

                MR. BANK:  Objection.

BY MR. SAVERI:

        Q.     And did Mr. Thiry communicate to you

via e-mail?

        A.     Yes, as well as other means.

        Q.     Well, other means, did that include

the telephone?

        A.     Yes.

        Q.     Do you have other means in mind?

        A.     No.  E-mail and telephone, and

occasionally we met in person.

        Q.     Okay.  But I'm just focusing on the

conver- -- the communication about Mr. Rucker.

                Did Mr. Thiry communicate to you about

Mr. Rucker via e-mail?

        A.     Yes.

Q.    And did you speak with Mr. Thiry by telephone about that subject?

A.    Yes.

Q.    Did you speak with Mr. Thiry in person about the subject?

A.    I don't recall in person about the subject of Mr. Rucker.

Q.    In any of these communications or -- or -- or conversations with Mr. Thiry, did Mr. Thiry threaten you?

MR. BANK:   Objection.

THE WITNESS:   Yes.   If you include the e-mails and phone calls together, yes.

BY MR. SAVERI:

Q.    Did he threaten to harm your reputation?

A.    He made it clear that I was risking my reputation by doing this.   So you can call that a threat or calling out that would happen.

Q.    Did he threaten to bring legal action against you?

A.    Yes.

Q.    And did he threaten to retaliate?

MR. KLIEBARD:   Objection to the form.

THE WITNESS:   Yes.

BY MR. SAVERI:

Q.    Could you turn to your transcript, Exhibit 158, page 462, sir, starting at line 21.

A.    462, line 21?

Q.    Yes.  You with me?

A.    Yes.

Q.    "Q    Did Mr. Thiry make any threats to you in those conversations?

"A    I believe there were, you know, a number of things, you know, ranging from reputational harm to potentially being sued for it.  You know, various forms of retaliation."

Was that testimony truthful?

A.    Yes.

Q.    Sir, let me hand you what has been previously marked in this case as Plaintiff's 316, bearing the Bates numbers DVA00019820 to 823.

Do you have that in front of you, sir?

A.    I have the document you handed.  I don't see that number referenced.

MR. ZIRPOLI:  For the deposition, this is Tab 3.

MR. SAVERI:  Thanks, Cadio.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

BY MR. SAVERI:

Q.    Plaintiff's 316 is a true and correct copy of a series of e-mails you sent and received from Kent Thiry and Joe Mello of DaVita while you were employed as the CEO at SCA between July 19 -- excuse me, between July 17 and July 19, 2008; is that correct?

MR. BANK:  You can take a moment to review the document, if you need to.

THE WITNESS:  Yes.

BY MR. SAVERI:

Q.    Was this one of the documents that you reviewed in preparation for the deposition today?

MR. BANK:  Objection.  I instruct the witness not to answer that question.

BY MR. SAVERI:

Q.    Your business e-mail at the time was andrew.hayek@scasurgery.com; is that correct?

A.    I believe so.

Q.    And was that the e-mail you used for your business electronic mail communication while you were at SCA?

A.    Yes.

Q.    Was there another one you used?

changing my thinking.  I moved forward with

Michael, so it didn't -- it didn't change

what I did.

BY MR. SAVERI:

Q.    Okay.  Well, my question was, did it

feel right or not?

A.    I don't recall if specific, you know,

reaction to all the back-and-forth.  It didn't

change what I did, as I said.

Q.    You know the difference between right

and wrong, don't you?

MR. BANK:  Objection.

THE WITNESS:  Yes.

BY MR. SAVERI:

Q.    And you don't know today whether you

felt this was right or wrong?

A.    You're asking me to recall how I felt

about this e-mail?

Q.    Or what was going through your mind,

in particular, whether what Mr. Thiry was

proposing was right or wrong at this time?

A.    My recollection is that I proceeded

forward with Michael; that, you know, there was

a range of communication with Mr. Thiry, as I

shared with you earlier.  My mindset was

navigate through it, figure it out, and -- and I continued moving forward with Michael.  Those were my main memories.

Q.    Okay.  And then further down in the numbered paragraph 4, Mr. Thiry writes, in the middle of the paragraph, with respect to SCA recruiting Mr. Rucker, "(c)," the letter C.

Do you see where that is, sir?

A.    Yes, "(c)" in paragraph numbered 4?

Q.    Yes.  And it says, "it can create a string of negative stuff, lousy uncontrollable negative stuff.  For example, since he was on our promising list, we will have to tell our Board and the rest of the senior team exactly what happened, and many of them will take away negative conclusions about you."

Do you see that?

A.    Yes, I do.

Q.    Okay.  And again, "you" is you, sir, Mr. Hayek, Mr. Andrew Hayek, right?

A.    That's how I read it sitting here.

Q.    Okay.  And did you interpret Mr. Thiry here to be threatening harm to your reputation by telling the board what you did was not right?

MR. BANK:  Objection.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

THE WITNESS:  Yes, as I read this sitting here, I interpret that as a, you know, a threat to -- to my reputation.

BY MR. SAVERI:

Q.    Okay.  And if you turn back to the transcript of your first day at page 466, line 18, sir.

Tell me when you're there.

A.    466, line 18?

Q.    Yes, sir.

A.    Yes, I see that.

Q.    "And then directing you to the next sentence in the e-mail where he says, 'We will have to tell our board and the rest of the senior team exactly what happened, and many of them will take away negative conclusions about you.'  How did you interpret that statement?

"A    I think that falls under the description of reputational damage, that what I did would be shared with the board of directors and senior executives at DaVita, and that it was not right, that it was wrong what I was doing."

Is that testimony truthful?

A.    Yes.

Q.   So Mr. -- so you interpreted, at the time, Mr. Thiry to be threatening your reputation, correct?

A.   Among other things, yes.

Q.   Okay.  Now, going back to the letter, numbered paragraph 4.  Again, it's Plaintiff's Exhibit 316.

Mr. Thiry writes down at the bottom, "There are contracts and free markets."

Do you see where I'm reading from, sir?

A.   The second-to-last sentence of paragraph --

Q.   Yeah.

A.   -- Numbered 4?

Q.   Yeah.  Let me read it to you.

It says, "There are contracts and free markets, and there are relationships.  Some execs live business primarily according to contracts and free markets, others balance that with a heavy emphasis on relationships and caring about one another over the long-term."

Do you see that?

A.   Yes.

Q.   Okay.  And going back to the -- the

Andrew Patrick Hayek  Highly Confidential
September 18, 2024

trial, page 467, at line 12.

A.    467, line 12.

Q.    Right.

"Q    Did you understand him to be talking about competition here?"

You see where I'm reading from?

A.    Yes.

Q.    Let me read it again.

"Q    Did you understand him to be talking about competition here?

"A    I believe that's a reference in here. Yes.

"Q    What did you understand him to mean about free markets versus relationships?

"A    I think that the implication is that you can behave in a short-term manner, and that's technically okay, but you're impairing the long-term relationship, business-wise, personally, etc.

"Q    Is he asking you not to compete for employees?

"A    I think that's an implication, is that part of the short-term thinking."

And that was a truthful statement you gave in front of the jury, sir, correct?

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

A.    Yes.

Q.    Now, in the letter, then, you respond to Mr. Thiry's points, correct, with your own e-mail, which begins on the bottom of the first page and continues on the top of the second a little bit later -- or several hours later on Saturday, July 19, do you see that, sir?

A.    So this is the second page of the document, starting --

Q.    Yeah, it's actually -- it's at the bottom of the first page.  If you look at the very bottom of the first, it says "Original Message," and then it's your name.

Do you see that, sir?

A.    Yes.

Q.    And then it continues on to the top of the second?  You tracking with me?

A.    Yes.

Q.    Okay.  Great.

Now, on page 821, in the second numbered paragraph, you write -- and it's about, I don't know, almost halfway down, maybe a third to half of the way down.  You write:  "When I approached you about my decision to leave DaVita, I explicitly did not want to try to

leverage the situation into a bidding war -- I wanted to reach a decision and shift the focus on how to transition in a manner that was most helpful to DaVita."

You see where I'm reading from, sir?

A.   Yes.  The end of paragraph numbered 2?

Q.   Yeah.

And what you're telling Mr. Thiry is that your decision to leave was final, correct?

MR. CAMPBELL:  Object to the form.

THE WITNESS:  Yes, it -- it was -- I think "final" is a way to -- to describe it.

BY MR. SAVERI:

Q.   And as a result, you did not want there to be a bidding war, correct?

A.   Correct.

Q.   And you were not telling Mr. Thiry that you were leaving to go to SCA as a way of getting a new promotion at DaVita or get more compensation at DaVita, correct?

MR. BANK:  Objection.

THE WITNESS:  Correct.

BY MR. SAVERI:

Q.   But, in fact, he offered you that, and you turned that down, right?

Q.    Yes, 478, sir.  Line 10.

There's a question:  "And did there come a point..."

You with me, sir?

A.    Yes.

Q.    "Q    And did there come a point in time when you learned that Mr. Thiry had in fact spoken with the individuals who were recruiting you over to SCA?

"A    Yes, I came to learn that a number of days after my conversation where I shared I was leaving."

Is that testimony truthful and correct?

A.    Yes; and to clarify, Mr. Coslet was part of same firm.  He wasn't directly involved, but, yes, this is -- this is true.

Q.    But you testified under oath, sir, that Mr. Thiry spoke with a partner at the firm that owned a majority of SCA about your candidacy for SCA CEO behind your back, correct?

MR. BANK:  Objection.

THE WITNESS:  Could you point me to the relevant area?

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

BY MR. SAVERI:

Q.    Yeah, why don't -- why don't we do this.  On 478, line 21, it's down at the bottom of the page.

A.    Yes, I see line 21.

Q.    Okay.

"Q    And did Mr. Thiry speaking to the competing company that you were trying to get a job with occur with your knowledge or without your knowledge?

"A    The conversation was with a partner at the firm that owned the majority of SCA, and that conversation occurred without me knowing it."

Was that testimony accurate?

A.    Yes.

Q.    And then you were asked:

"Q    And did you learn of anything that Kent Thiry had done with regard to your offer at SCA?

"A    Mr. Thiry had requested that the offer be either pulled or frozen, meaning, in the negotiation of the job, to not -- kind of not move further."

Did I read that correctly?

A.      Yes.

Q.      And that testimony was correct?

A.      Yes.

Q.      And so Mr. Thiry, your boss at the time, without your knowledge or without your consent, was trying to prevent you from obtaining the opportunity you were seeking at SCA, correct?

MR. BANK:  Objection.

MR. CAMPBELL:  Objection.  Misstates the record.

THE WITNESS:  I came to learn through an e-mail that was forwarded to me that that is what appeared to have happened.

BY MR. SAVERI:

Q.      And of course, he was unsuccessful, correct?

A.      Unsuccessful convincing me not to leave or preventing me from leaving?

Q.      Correct.

A.      Correct.

Q.      Yes.  Let me start again so we don't have dueling "corrects."

Mr. Thiry was unsuccessful in preventing you or dissuading you from leaving

DaVita for SCA; is that correct?

A.   Yes.

Q.   Okay.  And again, you took the new job at SCA, correct?

A.   Yes.

Q.   Okay.  Do you think everyone is entitled to opportunities to build a career?

MR. BANK:  Objection.

THE WITNESS:  Do I think everyone's entitled to opportunities to build a career?

BY MR. SAVERI:

Q.   Yeah.

A.   Yes, generally.

Q.   You think it's fundamental?

MR. BANK:  Objection.

THE WITNESS:  I don't know what you mean by "fundamental."

BY MR. SAVERI:

Q.   In your mind, is it fundamental to one's personal or professional growth to have the opportunity to build a career?

MR. BANK:  Objection.

THE WITNESS:  I'm not sure I've thought in that way.

Is it fundamental?  Fundamental to,

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

again -- can you say it again?

BY MR. SAVERI:

Q.    Let me try it this way.

Well, you wanted to have the opportunity to build your career, didn't you?

MR. BANK:  Objection.

THE WITNESS:  Yes.

BY MR. SAVERI:

Q.    And did you believe that the -- that the -- the right or the opportunity to do that was -- was a fundamental right for you?

A.    I'm not sure I can recall thinking or using "fundamental right," and I built my career and -- yes, I've built my career.

Q.    Let me ask you:  Do you recall being asked how you felt about Mr. Thiry's conduct?

A.    I recall various e-mail exchanges about it, yes.

Q.    Well, look at the trial transcript at 479, 5 -- lines 5 to 6.

A.    I'm sorry, what's the page number, sir?

Q.    479.  I'm sorry.

A.    Okay.  And you said 5 and 6?

Q.    Yeah, I did.

And actually, start at 4.

"Q    How do you feel -- how did you feel about that conduct by Mr. Thiry?

"A    I didn't like it -- I didn't like that it occurred behind my back without me knowing, so it was disappointing and frustrating."

So, was that correct?

A.    Yes.

Q.    Was it frustrating because you were trying to keep your job search private from your employer?

MR. BANK:  Objection.

THE WITNESS:  As I said, I didn't like that it occurred behind my back and that I learned about it subsequently.

BY MR. SAVERI:

Q.    Well, why didn't you like it?

A.    I -- I think the answer, as you read it, shares it.

I didn't particularly like that it occurred behind my back.  I didn't know about it.  It wasn't forthright.

Q.    Okay.  And did you think you had a -- you had a right to conduct your -- your job

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

search or negotiate a -- a job opportunity in private?

MR. BANK:  Objection.

THE WITNESS:  Yes.  With respect to going to SCA, I had thought it was private, and learned that it was behind my back.

BY MR. SAVERI:

Q.    So if you go to page 2 in the third bullet.

A.    Page 2 -- oh, of the document?

Q.    Yeah, 821.  I'm sorry, sir.  I'm kind of flipping back and forth.

It says, "In terms of whether I should have called you prior to" -- let me read it: "In terms of whether I should have called you prior to Michael communicating with Javier" -- that's Mr. Rodriguez -- "my approach was largely informed by the experience I had in leaving DaVita a few months earlier.  I was deeply disappointed that TGP told you about my" -- TPG -- I'm sorry, TP -- let me see.  "I was deeply disappointed that TPG told you about my candidacy for SCA prior to my discussing it with you for a number of reasons," correct?

Did I read that correctly?

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

MR. BANK:   Objection.

THE WITNESS:   Yes.

BY MR. SAVERI:

Q.     And again, TPG is the firm that owned a majority stake in SCA at the time, correct?

A.     Correct.

Q.     And TPG had representatives on SCA's board of directors, correct?

A.     Correct.

Q.     And then in the letter you list three reasons why you were disappointed, correct?

A.     Correct.

Q.     And the first is, as you say, "I believed that a candidate (me) has a right to explore career -- career options that may be best for them in privacy."

You wrote that, correct?

A.     Yes.

Q.     And did you believe that that right belongs only to CEOs, or does it belong to all employees in the United States?

MR. BANK:   Objection.

THE WITNESS:   I don't recall thinking of it in a specific or narrow way.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

BY MR. SAVERI:

Q.    Well, you didn't think you were the only person who had that right that you describe here, the right to explore career options that may be best for them in privacy; you didn't think you were the only one that had that right at the time, were you -- did you?

MR. BANK:  Objection.

THE WITNESS:  My recollection in reading it here today, I don't read it or think of it as exclusive to me, no.

BY MR. SAVERI:

Q.    Okay.  And you thought Mr. Rucker, at least, had the same right, didn't you?

A.    Yes.

Q.    Can you think of anyone who doesn't have that right?

MR. BANK:  Objection.

THE WITNESS:  There can be circumstances that when the solicitation in a number of -- of situations, yes.

BY MR. SAVERI:

Q.    And so when you're talking about it, you're talking about some kind of formal non-solicitation agreement?

untapped)," you wrote that correct?

A.   Yes.

Q.   Okay.  And this refers to Mr. Thiry telling the TPG board member to either withdraw your offer or freeze your offer, correct?

MR. CAMPBELL:  Objection.  Misstates the record.

THE WITNESS:  As I shared, I received an e-mail, and I believe from Mr. Thiry, that had a string of e-mails beneath it, and what I wrote here is what I took away from that e-mail exchange that was forwarded to me.

BY MR. SAVERI:

Q.   Well, one is "e.g., the request for TPG to withdraw it," correct?

A.   Yes.

Q.   And second, "e.g., to freeze my offer and have the 10 percent wiggle room regarding base plus bonus untapped," that's also correct?

MR. BANK:  Objection.

THE WITNESS:  Correct.

BY MR. SAVERI:

Q.   And then you write, "None of this felt good or right," correct?

A.    Correct.

Q.    And is it true that it didn't feel right to you if your employer was informed before you had the opportunity to identify and negotiate a new job?

MR. BANK:  Objection.

THE WITNESS:  I think this whole situation, you know, communication without me knowing, you know, kind of behind my back, a request to withdraw it, the offer -- withdraw the offer, and the whole situation didn't feel, as I wrote, good or right.

BY MR. SAVERI:

Q.    Was it because S- -- DaVita was interfering, or attempting to interfere, with your ability to leave the company for a better job?

MR. BANK:  Objection.

THE WITNESS:  I think, as I've shared, and I wrote, a communication was without me knowing, you know, there was a request to withdraw an offer, my offer, with a request to kind of freeze a negotiation, as I wrote, that whole situation didn't feel good or right.

BY MR. SAVERI:

Q.    And again, if Mr. -- then Mr. Thiry, if he had been successful, your offer at SCA might have been completely withdrawn, right?

MR. BANK:  Objection.

MR. CAMPBELL:  Speculative.

THE WITNESS:  It's possible.

BY MR. SAVERI:

Q.    And you -- you would have remained at DaVita for longer than you would have otherwise wanted, correct?

MR. BANK:  Objection.

MR. KLIEBARD:  Objection. Speculation.

THE WITNESS:  I'm speculating, and that would have been a possible outcome.

BY MR. SAVERI:

Q.    And you would have missed the opportunity to join SCA as the CEO, right?

MR. BANK:  Objection.

THE WITNESS:  Yes.  If that was the outcome, I would have missed the SCA opportunity.

BY MR. SAVERI:

Q.    And Mr. Thiry in this e-mail chain was

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

also suggesting to interfere with SCA's offer to Michael Rucker, correct?

MR. BANK:  Objection.

THE WITNESS:  Is that a reference to the paragraph 4?

BY MR. SAVERI:

Q.   Yes, by offering more -- by offering $250,000 in exchange for withdrawing Mr. Rucker's offer, correct?

MR. BANK:  Objection.

THE WITNESS:  Yes, in Kent's e-mail, the prior e-mail, in that paragraph 2, he's asking to withdraw the offer because that would disrupt Michael's offer.

BY MR. SAVERI:

Q.   Now, moving on in the e-mail, the fourth point -- in the fourth point, you explained that Mr. Rucker had -- had also made a final decision to leave DaVita, correct?

A.   I'm sorry.  Where is that, sir?

Oh.  In my --

Q.   Yeah.

A.   -- e-mail to Kent on page 2.

Q.   Yes.

As you write, "Michael not only had an

Andrew Patrick Hayek  Highly Confidential
September 18, 2024

Central time, or his time.

Q.    Okay.

A.    Pacific.

Q.    Fair enough.  Fair enough.

It's still on Saturday, the 19th of July, though, right?

A.    Correct.

Q.    Okay.  Now, on that page, Mr. Thiry writes -- it's -- it's about two-thirds, maybe three-quarters of the way down the page.  It's a paragraph that begins, "It is potentially" -- "It is a potentially nasty thing."

Do you see where that is?

A.    Yes.

Q.    Okay.  And he writes, "It is a potentially nasty thing to start if you do otherwise -- because where does it stop?  The best people have the best people, so we are all going to make each other's lives -- each other's lifes more difficult than they are?"

And do you recall at the criminal trial you were asked what you understood Mr. Thiry to be referring to in this sentence?

A.     I don't specifically recall -- I recall talking about this e-mail exchange.

Q.    Okay.  Let's look.

Page 468 of your testimony, sir.

MR. CAMPBELL:  Still in 158, counsel?

THE WITNESS:  468.

MR. SAVERI:  Yes, 468.

BY MR. SAVERI:

Q.    468.

A.    Yes.

Q.    At lines 15 to 18:

"Q    And what did you understand him to be

referring to there?

"A    I think a downward spiral or cycle

of, you know, retaliatory acting and then more

retaliation, and creates a spiral."

Is that testimony correct?

MR. BANK:  Objection.

THE WITNESS:  Yes.

BY MR. SAVERI:

Q.    And again, this retaliation was in the

context of -- of companies recruiting each

other's employees or executives, correct?

MR. BANK:  Objection.

THE WITNESS:  Well, Mr. Thiry had made

a number of kind of threats or

communications, some of them reputational,

suing, kind of targeting, irrespective of whether they actually had a job opening, to be disruptive.

So there's -- there are a number of forms of the retaliation that he was -- that he was communicating.

BY MR. SAVERI:

Q.   And generally, then, you -- did you understand Mr. Thiry's statements to mean that DaVita would retaliate against SCA, or he was threatening they would do so, if SCA were to continue recruiting its senior executives?

MR. KLIEBARD:  Objection.  Compound.

THE WITNESS:  Could you restate that question?

MR. SAVERI:  Why don't you read it back.

(Record read.)

THE WITNESS:  Yes, I believe he had threatened a variety of forms of retaliation, and that's what I'm referring to, you know, at the -- when asked these questions.  He was threatening to retaliate, and then if retaliation creates more retaliation, that's the spiral that -- that

I'm referring to.

BY MR. SAVERI:

Q.    Now, when you worked at DaVita, did you have a non-solicitation provision in your employment agreement?

A.    I believe I did.

Q.    And can you explain the scope or the time period of what was covered by the non-solicitation provision that was in your employment agreement with DaVita?

A.    I believe it was a time period of approximately two years.  And with reference to the scope, I think it was companies that were in a competing business with DaVita.  That's my recollection.

Q.    Could you turn to page 463 of your trial testimony, sir, at line 7 to 11.

A.    463, starting on 7?

Q.    Yes.  Let me read it to you:

      "Q    And can you just explain just a little bit about maybe the scope of the time period or what it covered?

      "A    My recollection was that the time period covered two years.  And I think the scope would be soliciting anyone into a

business that competed on a business level with

DaVita."

You see that, sir?

A.    Yes.

Q.    Was that correct?

A.    Yes.

Q.    And at the time, did SCA compete in the underlying business with DaVita?

A.    Generally, no.  Dialysis is a very different clinical area than surgery.  The overlap would have been vascular access procedures.  But, generally, no.

Q.    Okay.  Would you look at -- a little bit further down there on 463, there's a question that begins "and to clarify."

Do you see that, sir?

A.    I'm sorry, which line?

Q.    I believe it's 12.  Line 12:  "And to clarify, did SCA compete in the underlying business with DaVita?"

Do you see where I'm reading from, sir?

A.    Yes.

Q.    Okay.  And let me read it, the question and answer:

at the time they were supposed to notify their boss?

"A   No.  I don't think that's the spirit of it."

Is that correct testimony?

A.   Yes, and the -- what they're sharing with their supervisor or boss is that they're generally considering outside opportunities.

Q.   So, obviously, under this set of circumstances, the candidate had -- had not or would not receive an offer from their boss?

MR. BANK:  Objection.

MR. CAMPBELL:  Objection.  Foundation.

THE WITNESS:  Could you clarify the situation you're referring to?

BY MR. SAVERI:

Q.   Well, under this part of the agreement, did you understand that, at the time that the candidate was obliged to tell their boss, they ordinarily would not have had an offer from the other company?

MR. BANK:  Objection.

MR. KLIEBARD:  Objection.  Incomplete hypothetical.

THE WITNESS:  To clarify, and I'll

state this as clearly as I can:  The candidate would have needed to share with their supervisor that they were generally considering outside opportunities before we would get to an offer stage in the process.

BY MR. SAVERI:

Q.   Did you ever hear the agreement between SCA and DaVita referred to as a "no-poach" agreement?

MR. BANK:  Objection.

THE WITNESS:  Yes, I've heard it characterized that way.

BY MR. SAVERI:

Q.   Now, what was the geographic scope of the agreement between SCA and DaVita with respect to recruiting senior employees?

A.   It was based where the executives were.  There wasn't a geographic limitation.

Q.   On page 474 of your trial transcript, line 24 to 25, you were asked --

A.   Pardon me.  474?

Q.   Yes.  It's down at the bottom of the page, sir.

You with me?

A.   Which line?

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

Q.    24.

"Q    So what was the geographical scope of your agreement with Mr. Thiry?"

Do you see where I'm reading from?

A.    Yes.

Q.    And your answer was:  "It was nationwide, wherever these senior executives were based."

Do you see that?

A.    Yes.

Q.    And that testimony was truthful, correct, sir?

A.    Yes.

Q.    And what was your understanding of the purpose of this no-poach agreement?

MR. BANK:  Objection.

THE WITNESS:  Well, first, I thought of it and characterized it as a non-solicitation agreement.  So a non-solicitation for senior executives, unless that person was already looking at outside roles and had shared that they're looking at outside roles.

The purpose --

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

BY MR. SAVERI:

Q.    I'm sorry.  You paused and I jumped in.  I'm sorry, sir.

A.    And there are multiple purposes.  It started with the business relationship.  It involved the avoidance of some of the risks or downsides that you and I talked about, and then there was reducing the likelihood of losing senior executives.

Q.    Could you turn to page 483 of your trial testimony, sir, at line 25.  And then it goes on to the following page.  I'm going to start at the bottom of that page.

Do you see that?

A.    Yes, I do.

Q.    And you were asked:

"Q    So considering all aspects of your agreement with Mr. Thiry, did it have a purpose to encourage or discourage the movement of senior-level employees between SCA and DaVita?

"A    I think to discourage."

Was that a truthful statement, sir?

A.    Yes, that is truthful.  And earlier on that page, we talked about the business relationship and the avoidance of risks, so it

had multiple purposes.

Q.    Including the one that I just read to you?

A.    Yes.

Q.    Now, could you turn to the second day of your testimony, which is Exhibit 483, sir, at page 621.

MR. KLIEBARD:  Are we going to break for lunch at some point?

MR. SAVERI:  I didn't even hear what he said.

MR. BANK:  He wants to know about when to break for lunch.

MR. SAVERI:  When I'm -- I have a few more questions.

It's fine if you wanted to go now, or we'll keep -- no, we're going to keep going. Just he wants to go, that's fine.

MR. BANK:  It's up to the witness, actually.

MR. SAVERI:  I have a few more questions, and then I'm done with this part of it.

BY MR. SAVERI:

Q.    621, sir, at line 14 to 22.  There's a

question:  "What was your agreement with Kent

Thiry intended to achieve?"

          Do you see where I'm reading from,

sir?

     A.    Yes.

     Q.    "Q    What was your agreement with

Kent Thiry intended to achieve with regard to

competition for senior-level employees between

DaVita and SCA?

          "A    The specific, you know, non-solicit

itself, to reduce the number of senior execs

coming to SCA and vice versa."

          And that was a truthful statement

under oath, sir, correct?

     A.    Yes, it was, and the question was

specific regarding senior executives moving back

and forth.  So there were other purposes to it,

but regarding that specific question, that is

the answer.

     Q.    Okay.  And isn't it true that the

agreement reduced competition between SCA and

DaVita for senior-level employees?

          MR. BANK:  Objection.

          THE WITNESS:  I understood that

question really to mean the movement of

Q.    And as you sit here today, you're not sure whether Mr. Brodnax succeeded Mr. Wilcox before or after you left SCA; is that correct?

A.    To be clear, I think Mr. Wilcox was in his role through the end of my tenure at SCA, but I'm -- I'm a little unclear on the exact timing of when Mr. Brodnax stepped into the CEO role.  It would have been near the end or potentially after the end of my tenure.

Q.    Fair enough.

Was Mr. Wilcox a friend of yours?

A.    We were work colleagues.

Q.    Were you -- did you socialize with Mr. Wilcox?

A.    Not outside of, you know, a work context.

Q.    Well, did you see him at conferences?

A.    I saw him one or two times at -- at a conference.  Is it possible it's three or some- -- a very limited number of times, and I remember one in particular.

Q.    Did you ever meet him for drinks or dinner?

A.    Yes.

Q.    Do you play golf?

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

A.   Minimally.

Q.   Did you ever play golf with Mr. Wilcox?

A.   No.

Q.   Okay.  Did Mr. Wilcox or his company have a -- have a corporate jet?

A.   I don't recall such.

Q.   Okay.  He never gave you a ride in his jet?

A.   No.  I'm not recalling a ride in an airplane with Mr. Wilcox.

Q.   Well, did you ever ride in a commercial plane with Mr. Wilcox?

A.   I don't recall that either.

Q.   Did you and Mr. Wilcox enter into the -- the -- the same agreement, where USPI and SCA agreed not to solicit each other's senior-level employees?

MR. BANK:  Objection.

MR. CAMPBELL:  Objection.  Misstates the record.

MS. MOYE:  Objection to form.

THE WITNESS:  Mr. Wilcox and I entered into a separate agreement at a separate time, and that was not soliciting senior

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

executives unless they were already considering roles, outside roles.

BY MR. SAVERI:

Q.    Which agreement did you enter first?

A.    The agreement with Mr. Wilcox.

Q.    Okay.  So just so I'm clear, the -- chronologically, the agreement that you reached with USPI preceded the agreement that you reached with Mr. Thiry; is that correct?

A.    The agreement with Mr. Wilcox came first, and then there was the second agreement, and that was with Mr. -- with DaVita.

Q.    When did you reach that agreement or understanding with Mr. Wilcox?

A.    My recollection is the agreement with Mr. Wilcox was formed in 2010 or 2011.

Q.    And just so we're clear, you -- at that time, you were the CEO of SCA?

A.    Yes.

Q.    Now, you talked about an agreement between you -- between SCA and DaVita, and you've talked briefly about an agreement between SCA and USPI.

What differences, if any, were there between the two agreements?

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

MR. BANK:  Objection.

MS. MOYE:  Objection to form.

THE WITNESS:  Can you repeat the question?

BY MR. SAVERI:

Q.    What differences, if any, were there between the two agreements?

MR. BANK:  Objection.

MS. MOYE:  Objection to form.

THE WITNESS:  The agreement with Mr. Wilcox was not to solicit senior executives unless they were already looking.  And then, over time, after Mr. Thiry in that different agreement suggested the -- or asked for the provision of the person has to have shared that they were looking with their supervisor, then I think I, for the sake of simplicity -- because these agreements came up so infrequently, maybe a couple times a year, I think I, for the sake of simplicity, also applied that at that point to the agreement with Mr. Wilcox.

BY MR. SAVERI:

Q.    Okay.  And when you did that, when you applied that to the agreement with Mr. Wilcox,

is it fair to say that the agreements were in --
were agreements that had the same or similar
terms?

MS. MOYE:  Objection to form.

MR. BANK:  Objection.

THE WITNESS:  Once I applied that --
again, something I did for the sake of
simplicity -- then the terms were, you know,
very similar.

BY MR. SAVERI:

Q.    Was there any difference?

MR. BANK:  Objection.

MS. MOYE:  Objection to the form.

THE WITNESS:  None come to mind.

BY MR. SAVERI:

Q.    And let me ask you this:  So I
understand you -- there was this time when
the -- we talked about earlier that the
agreement between SCA and DaVita changed.

Prior to that, were the agreements
that were in place at the time between SCA and
DaVita on one hand and SCA and USPI on the other
the same --

MR. KLIEBARD:  Object to form.

MS. MOYE:  Objection.  Form.

BY MR. SAVERI:

Q.    Excuse me.

-- with respect to their material terms?

MS. MOYE:  Objection to the form.

MR. BANK:  Objection.

THE WITNESS:  My recollection is that each of those two agreements were non-solicitation, senior executives, vice presidents and above, unless they were looking.

BY MR. SAVERI:

Q.    And so, just so I'm clear, was there -- were there any differences that you can identify between the two agreements?

MR. BANK:  Objection.

MS. MOYE:  Objection to form.

THE WITNESS:  How I thought of the two agreements, you know, the one with DaVita and the other with USPI, I thought of them substantially, you know, similar terms regarding the level, and the solicitation only being if they're already looking.

BY MR. SAVERI:

Q.    And were they the same with respect to

their geo- -- with respect to their -- well, strike that.

And then, after this adjustment was made, both the SCA/DaVita agreement and the SCA/USPI agreement had this "tell your boss" provision; is that correct?

MR. BANK:  Objection.

MS. MOYE:  Objection to form.

THE WITNESS:  To clarify, are you asking, once the agreement with DaVita was, you know, refined or changed to include the provision that the senior executive needed to be looking and have shared with their supervisor that they were generally looking --

BY MR. SAVERI:

Q.    Yes.

A.    -- when that adjustment was made, did I apply that same, you know, kind of term to our agreement with USPI?

Q.    Yes.

A.    Yes, I -- I applied that same term, again, for the sake of simplicity.  These things came up a couple times a year.

Q.    Okay.  Who -- just focusing on the

USPI and SCA agreement, who initiated it?  Was it you or Mr. Wilcox?

A.   You're asking about the agreement with USPI?

Q.   Yeah.  Excuse me.  Maybe I misspoke, sir.  Just let me rephrase it.

Who asked for or initiated the agreement between SCA and USPI?

A.   I recall Mr. Wilcox initiating.

Q.   Now, at the trial, you testified that Mr. Wilcox did it "in his own style."

Do you recall using those words?

A.   Yes.

Q.   What did you mean by that?

A.   I meant Mr. Thiry and Mr. Wilcox have very different leadership styles and ways of communicating, and Bill's was very different.

Q.   Well, when you said "in his own style," were there particular aspects or characteristics of Mr. Wilcox's style that you had in mind?

A.   Are you asking me to describe his characteristics as I think about them?

Q.   Yes.

A.   Bill is extremely thoughtful,

Thiry that, at the time, you at SCA had a -- had an agreement with USPI?

A.   No.  I don't recall ever bringing up the USPI agreement to Mr. Thiry or it ever coming up in any context with him.

Q.   But you would agree with me you knew that there was -- there were -- SCA had concurrently similar agreements with both companies?

MR. CAMPBELL:  Objection to form.

MR. RUSSO:  Objection.  Vague.

THE WITNESS:  At the time that I entered into the agreement with Mr. Wilcox -- Mr. Thiry, pardon me, was I aware that I had -- that SCA had an agreement with Mr. Wilcox?

BY MR. SAVERI:

Q.   Yeah.  Yes.

A.   I was aware of the USPI agreement at the time that I entered into the agreement with Mr. Thiry, which he suggested.

Q.   Now, would you agree that the agreement that you entered into between SCA and USPI had the same purposes as the agreement that you reached on behalf of SCA with DaVita?

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

MR. BANK:  Objection.

MS. MOYE:  Object to the form.

MR. RUSSO:  Object to the form.

THE WITNESS:  The purposes for the agreement with USPI had a different business context and a different relationship that we had with USPI.  So that part was different.  And then a second part was reducing the likelihood or chance of losing a senior executive.

BY MR. SAVERI:

Q.   And the -- is it fair to say that the -- the risks that were to be avoided by the contract between USPI and SCA were generally the same as the risks to be avoided by the agreement between SCA and DaVita?

MR. BANK:  Objection.

MR. RUSSO:  Objection.  Vague.

MS. MOYE:  Objection to form.

MR. KLIEBARD:  Objection.  No foundation.

MR. BANK:  Objection.

MS. MOYE:  Mr. Saveri, I'm still having difficulty hearing you.

MR. SAVERI:  Okay.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

THE WITNESS:  To clarify, I think you used the word "contract."  This was an agreement.

BY MR. SAVERI:

Q.    Okay.

A.    And again, as we discussed, an agreement not to solicit senior executives unless they are already considering roles and had shared with their supervisor such.

The business context with USPI was a tremendous amount of work we were doing collaboratively in Washington, D.C., quality reporting, advocacy, and that was what I was, you know, doing with Bill that was kind of foundation of the business relationship that grew.

Q.    Well, did the agreement between USPI and SCA reduce the cost of turnover?

MR. BANK:  Objection.

THE WITNESS:  I don't have any opinion about that.  I don't -- I don't -- I don't believe so.

BY MR. SAVERI:

Q.    Well, wait.  Which is it?  Do you have no opinion, or do you think it did not have that

reporting, really sharing the value of surgery centers and communicating that, be it to Medicare, Congress, other parts of the executive branch.

Quality reporting was a part of that, that we have really strong quality outcomes and how do we collect quality data and communicate that.  And then that makes its way into policy, and it makes its way into how ASCs are paid, and so I took a very active role, as did Bill, in trying to do that on behalf of the industry.

So that was the -- I can -- that was the business context.  And then, secondly, you know, the agreement reduced the likelihood of losing senior executives.

Q.    Now, when you left SCA in 2017, as far as you knew, was the agreement still in place between SCA and USPI?

MS. MOYE:  Objections to the form.

THE WITNESS:  Can you state that again?

MR. SAVERI:  Read it.

(Record read.)

THE WITNESS:  Yes, the agreement continued into 2017.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

BY MR. SAVERI:

Q.   Now, if you learned that USPI was going after senior-level SCA employees, would you reach out to Bill Wilcox, the CEO of USPI, to alert him?

MR. BANK:  Objection.

THE WITNESS:  Yes, from time to time, I would reach out to Mr. Wilcox.

BY MR. SAVERI:

Q.   And likewise, if USPI learned that USPI was -- excuse me.  And likewise, if USPI learned that SCA was going after senior-level USPI employees, would Bill Wilcox reach out to you and let you know?

MS. MOYE:  Objection to the form.

THE WITNESS:  To clarify, if there was an outreach that we thought didn't follow the agreement, I would reach out to Mr. Wilcox, and Mr. Wilcox might reach out to me, again, the -- the spirit of that being not following the agreement.

BY MR. SAVERI:

Q.   Well, in that sense, the agreement was reciprocal, correct?

A.   In those exchanges, that's how I

experienced it.

Q.    Would you agree that when you let Mr. Wilcox know that you learned USPI was going after senior-level SCA employees, that that communication let Mr. Wilcox know that you were following the agreement you and he had?

MR. BANK:  Objection.

MS. MOYE:  Objection to form.

THE WITNESS:  Could you clarify the question?

MR. SAVERI:  You can read it back.

(Record read.)

THE WITNESS:  So if there was an outreach to an SCA senior executive, that executive might pass that outreach along to myself; and if it was not that that senior executive was already looking and had already shared that they were looking and, thus, the outreach might not have followed the agreement, then I would forward it to Mr. Wilcox.  And again, this is time to time.  Maybe a couple times a year.

BY MR. SAVERI:

Q.    And when you did that, didn't that let Mr. Wilcox know that you, one, knew there was an

agreement and, two, you were following it?

MS. MOYE:  Objection to the form.

THE WITNESS:  I think the outreach was in the context of the agreement, and it's not always clear whether an outreach would have or would not have been in violation of the agreement.  But it was in the context of the agreement.

BY MR. SAVERI:

Q.   But in that event, if you communicated to Mr. Wilcox, didn't that indicate to Mr. Wilcox that you knew there was an agreement, and you were following it?

MS. MOYE:  Objection to the form.

THE WITNESS:  I think we're saying similar things.  It's just not every outreach would be in violation of the agreement.

If there was an outreach to a senior executive, and this person was already looking and had shared that they were considering outside students, then that would not be in violation of the agreement.

So not every outreach would necessarily be a violation of the agreement,

sir.

A.   Yes, I'm on page 476.

Q.   And would you turn to lines 15 through 19.  The first question begins:  "And what was the purpose of that provision?"

You see that, sir?

A.   Yes, I see that.

Q.   Okay.

"Q   What was the purpose of that provision?

"A   The notification?

"Q   Yes.

"A   As we talked about, the -- to prevent kind of cheating or making up the reason at the very end of the process."

Was that correct testimony?

A.   Yes.  And in other places we talked about the broader purpose of the agreement, but with respect to this provision, that is correct.

Q.   Okay.  And it -- it had that effect because it would allow SCA to know that one of its employees was thinking of leaving to DaVita or vice versa, correct?

MR. BANK:  Objection.

THE WITNESS:  Can you clarify?  Do you

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

mean the purpose of it?

BY MR. SAVERI:

Q.    Yes.  Yes.

A.    Regarding the purpose of that provision, I recall Mr. Thiry sharing it's easy to say someone was looking.  You get to the very end of the process.  Maybe they have an offer, and you say, oh, they were looking anyway.  And the only way to really know were they looking is that they had shared such with their supervisor.

And so this was a way to prevent, kind of, for better or worse, or for -- just to kind of put it plainly or simply, saying at the end of the process, and it was never true.

Q.    So the idea was, if this communication happened earlier in the process, you -- you could prevent that so someone at the end of the process wouldn't make up that they were leaving?  The intent was to have this communication early in the process so -- to find out what was really going on?

MR. BANK:  Objection.

THE WITNESS:  Just to make sure I understand, I think the intent was to avoid or prevent someone essentially making it up

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

at the very end of the process, and they weren't in fact looking or considering other roles.

And so, as you said, the spirit was that that ought to be something that is earlier in the process, where it's actually -- they are looking, and they have shared that they're generally looking with their supervisor.

BY MR. SAVERI:

Q.   Well, and one of the purposes was to make sure that DaVita didn't go ahead and give an offer to an SCA employee without SCA first learning about it, right?

MR. BANK:  Objection.

THE WITNESS:  No, that's not how I would characterize it.

As I shared when Mr. Thiry brought up the aspect of sharing with one's supervisor that you're looking at roles, outside opportunities, generally, it was a means to -- or a way to prevent the candidate getting to the very end of a process and there's perhaps an offer, but that candidate actually wasn't considering outside roles

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

between the two companies?

MR. BANK:  Objection.

THE WITNESS:  Are you asking about purpose, as I understood it, or --

BY MR. SAVERI:

Q.   Actually, effect.

A.   I don't know.

Q.   Now, further down --

Well, let me ask you about purpose. Was that one of its purposes?

MR. BANK:  Objection.

THE WITNESS:  As I shared, when Mr. Thiry proposed the aspect of the candidate, the senior executive needed to have shared with their supervisor that they were generally considering outside opportunities, one or more outside opportunities, he framed it as, it would be easy, if you didn't have that provision, to get to the very end of the recruitment, and then just say they were considering outside opportunities.  And so that's how it was framed originally.

And I think one of the -- one of the purposes was to, you know, reduce the likelihood of losing a senior executive.

BY MR. SAVERI:

Q.    Now, at the bottom of 476 at line 25, you were asked another question.

Do you see that?

A.    I'm sorry.  Could you repeat that?

Q.    Sure.  Page 476.

A.    Yes.

Q.    Line 25.  It's the last line on the page.

A.    Yes.

Q.    And let me read it to you:

"Q    And so did that provision have a purpose of encouraging or discouraging candidates from switching between the companies?

"A    I think between those two, it served to discourage."

Was that testimony true and correct?

A.    Yes, it was.  And it occurs in a longer kind of a -- set of questions and answers.

Q.    Well, would you agree, then, that this provision did in fact discourage employees from seeking employment at other companies because they were first required to tell their

supervisor that they were looking to leave without already having a job offer in hand?

MR. CAMPBELL:  Objection.  Calls for speculation.

MS. MOYE:  Objection to the form.

THE WITNESS:  Are you asking about the purpose?

MR. SAVERI:  Why don't you read it back.

(Record read.)

MR. BANK:  Objection.

MR. CAMPBELL:  Objection.  Speculation.

THE WITNESS:  I don't know.

BY MR. SAVERI:

Q.   But you would agree with me, wouldn't you, that an employee normally has a choice and the option to raise with their employer that they're looking for employment or -- or received a potential offer?

MR. BANK:  Objection.

MR. KLIEBARD:  Objection.

THE WITNESS:  Can you say that again?

BY MR. SAVERI:

Q.   Sure.  And would you agree that an

employee normally always has a choice or option to raise with their employer that they're looking for employment or -- or have received a potential offer?

MR. BANK:  Objection.

THE WITNESS:  I think, generally, yes.

BY MR. SAVERI:

Q.    And that's generally always true, isn't it?

MR. BANK:  Objection.

MR. KLIEBARD:  Form.

THE WITNESS:  Generally or always?

BY MR. SAVERI:

Q.    Is it generally true?

MR. BANK:  Objection.

THE WITNESS:  I think it is generally true.

BY MR. SAVERI:

Q.    And did the "tell your boss" provision remove that choice from an employee?

MR. BANK:  Objection.

MS. MOYE:  Objection to form.

THE WITNESS:  A couple clarifications:

Are we referring to senior executives in the context of DaVita and USPI

specifically for SCA's senior executives?

BY MR. SAVERI:

Q.     Regardless -- I think the agreement between -- I mean, I think you've testified that the agreements between -- with respect to this provision between SCA on the one hand and DaVita or USPI and SCA on the other were the same.

So, in terms of the effect, I'm just asking about the question -- about the -- the agreements jointly.

So my question is that did the -- did the agreements have the -- this "tell your boss" provision, did the agreement have the effect of removing a choice from employees to raise with their current employer that they had received an offer from someone else?

MR. BANK:  Objection.

MS. MOYE:  Objection to the form.

MR. CAMPBELL:  Objection. Mischaracterizes the record.

THE WITNESS:  As I shared earlier, the agreement with DaVita and the agreement with USPI applied to senior executives, and the agreement was not to solicit senior executives unless they had let their

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

supervisor know that they were generally considering outside opportunities.

BY MR. SAVERI:

Q.    Could you turn to page 643 in the second day of your trial testimony, please.

MS. MOYE:   Could the court reporter read that back?  I couldn't hear what page and line.

COURT REPORTER:   643.

MR. SAVERI:   643:21, please.

Actually, let's start at 17.

BY MR. SAVERI:

Q.    Do you have that in front of you, sir?

A.    643?

Q.    Yeah, page 17.

A.    Line 17, yes.

Q.    Yeah.

"Q    And in the ordinary course, does an employee always have their own choice and their option to raise a -- raise a potential offer to their own employee?"

Let me start again.

"Q    And in the ordinary course, does an employee always have their own choice and their option to raise a potential offer to their own

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

employer?

"A   Yes."

Do you see that, sir.

A.   Yes, I do.

Q.   And was that testimony correct?

A.   Yes.

Q.   And then you go on -- and you go on:

"Q   And did the agreement that you had with Mr. Thiry allow that choice, or did it take it away?

"A   It took that choice away."

Is that testimony correct?

A.   The testimony is correct.

And the broader context is, just as I shared with you, this is a non-solicitation agreement with senior executives; and if that senior executive was considering outside opportunities, and it's shared with their supervisor that they were considering outside opportunities, then they could progress in the process.

And so there's a lot of that context through both days of the testimony.

Q.   And again, you -- you don't disagree with your testimony that the -- among other

things, that agreement took that choice away?

A.    So the testimony is true.

Q.    Yes, sir.

A.    And the choice that it might take away is the choice to not share with one's supervisor that you're considering outside opportunities, generally.

Q.    But would you agree that employees also have the right or the ability to share with their current employee that they had received an offer from a specific potential employer?

MR. KLIEBARD:  Object to the form.

MR. BANK:  Objection.

THE WITNESS:  Can you restate that, sir?

BY MR. SAVERI:

Q.    Sure.  I mean, you would agree with me that employees always have the opportunity, once they have received an offer from another firm, to go to their current employer and say, I received an offer from another firm?

MR. KLIEBARD:  Object to form.

THE WITNESS:  One clarification.

I think that's generally true.  It's not always true.  There are -- there are

non-competes and non-solicits, and we talked about that earlier.

Second, with respect to these two agreements, the expectation was to solicit a senior executive. That senior executive needed to have already been considering outside opportunities and shared with their supervisor that they were exploring or considering outside opportunities, not a specific offer.

MR. SAVERI: Okay. I move to strike the answer.

Would you read the question back?

MR. BANK: Objection.

MR. SAVERI: That's fine.

Would you read the last question back?

(Record read.)

MR. CAMPBELL: Objection. Asked and answered.

THE WITNESS: I thought there was a question.

MR. BANK: Is there a question pending?

THE WITNESS: I thought I answered the question.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

Do you see where I'm reading?

A.    Yes.

Q.    So she's a recruiter and looking to place someone in the VP role; is that right?

A.    I'm reading this here alongside you.

I don't know Ms. Palmieri.  It appears to be from a DaVita recruiter about a VP of -- it's cut off, but operational, perhaps, strategy at DaVita.

Q.    Okay.  And this -- so Ms. Ellison then writes to Mr. --

Excuse me.  Mr. Ellison then writes to Mr. Rucker on June 13, do you see that?

A.    Yes.

Q.    And he says, "I thought there was a gentlemen's agreement between us and DaVita re poaching talent."

Do you see that?

A.    Yes.

Q.    And then Rucker shares it with you -- no, he responds to Mr. Ellison and says, "There is.  Do you mind if I share with Andrew, who has most recently addressed with Kent?"

Do you see that?

A.    Yes.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

Q.   And "Andrew" is you, sir, correct?

A.   I assume so from this context, yes.

Q.   And "Kent" is Mr. Thiry, the individual with whom you reached the agreement, correct?

A.   Again, given the context of this, I assume so.

Q.   And so Ellison says, "Not at all," and then Rucker shares it with you on June 14, 2016.

Do you see that?

A.   June 14, 2016?

Q.   Yeah.  It's the second from the top.

Rucker to you?

A.   Yes, I see that.

Q.   And he says, "Would you consider raising it with Kent?"

Do you see that?

A.   Yes.

Q.   And "Kent" is Mr. Thiry, and then you -- you say to Mr. Rucker, "Michael:  Will do.  Thanks.  Best, Andrew."

That's your response.

Did you take it up with Mr. Thiry, do you recall?

A.   Sitting here -- I generally did.  I

don't specifically recall the follow-up to this exchange, but as a general matter, I would.

Q.   Now, there's a reference in here to "gentlemen's agreement."

Do you see that?

A.   That's a reference to Christian's -- Mr. Ellison's original e-mail.

Q.   Now, did you refer to the agreement that you had reached with SCA as a gentlemen's agreement?

A.   No.  I recall referring to it as a non-solicitation agreement.

Q.   Okay.

A.   Again, non-solicitation, senior executives, unless they're already looking and they had shared such with their supervisor.

Q.   Okay.  But the -- the fact that the agreement was not in writing didn't detract from the agreements being adhered to, did it?

MR. BANK:  Objection.

THE WITNESS:  I can speak from my perspective.

From my perspective, it was an agreement.  It was not codified in a legal document, but I considered it an agreement.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

BY MR. SAVERI:

Q.   So, from your perspective, was it -- is it fair to say the agreements were enforced as if they were written down?

MR. BANK:  Objection.

THE WITNESS:  I hadn't thought of it that way.  Again, I'd say I -- I considered it an agreement, and from my perspective, I tried to live up to it.

BY MR. SAVERI:

Q.   ███████████████████████

████████████████████████████

████████████████████████████

███████████████████

MR. BANK:  Objection.

MR. CAMPBELL:  Objection.

THE WITNESS:  Can you restate the question?

BY MR. SAVERI:

Q.   Sure.  ███████████████████

████████████████████████████

████████████████████████████

████████████████████

MR. CAMPBELL:  Same objections.

THE WITNESS:  I don't recall so, and I

recollection, those -- you -- those were included with your edits of this document, correct?

MR. BANK:  Objection.

THE WITNESS:  Could you restate the question?

BY MR. SAVERI:

Q.    Sure.  Just looking at the first bullet point, you put a line through and made the text red for current partners and customers that we should not recruit from.

My question is you made those edits to the document, correct?

MR. BANK:  Objection.

THE WITNESS:  To clarify, yes, I wrote that bullet, and I believe I made these edits to the document.

BY MR. SAVERI:

Q.    Okay.  And then the second bullet says, "Putting two companies in italics (USPI and DaVita)."

Do you see that?

A.    Yes.

Q.    And if you look at the -- the PowerPoint, if you come to -- if you come to

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

them on page 1, you'll see US -- United Surgical Partners International, "USPI" is italicized, and then -- and then on the fourth page, the fourth page of the PowerPoint, DaVita Healthcare Partners is also italicized, correct?

A.    Yes, I see United Surgical Partners International italicized on page 1 and DaVita Healthcare Partners italicized on page 4.

Q.    And as we've discussed, these -- these are the only two companies with which SCA had agreements or understandings with respect to hiring, correct?

MR. CAMPBELL:  Object to the form.

THE WITNESS:  These are the two companies that I had an agreement --

Let me rephrase.

We had an agreement with USPI.  We had an agreement with DaVita regarding soliciting senior executives along the terms we've discussed.  And those are the only two companies with which we had that kind of agreement.  Again, an agreement with USPI and an agreement with DaVita.

BY MR. SAVERI:

Q.    And you indeed in your e-mail to Dr.

Fanning summarize material terms of -- of those agreements, that is, "We can recruit junior people (below director), but our agreement is that we would only speak with senior executives if they told their boss already that they wanted to leave and are looking."

You wrote that, sir, correct?

A.    Yes.

Q.    And to the best of your knowledge, you -- that was correct at the time you wrote it?

A.    Yes.  And as I mentioned earlier, I don't always phrase specifically the agreements identically.  You know, again, it comes up a few times a year.  But that's a reference to the agreement with USPI and the agreement with DaVita.

Q.    You can put that aside, sir.

Let me hand you what has been previously marked as Exhibit 337, please.

MR. ZIRPOLI:  Tab 19.

CONCIERGE:  Thank you.

BY MR. SAVERI:

Q.    And Exhibit 337 has the Bates number SCA002021140 through 413.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

And then, sir, if you look at the last page of this --

A.    The last page of -- of the full document?

Q.    Yeah, there's this -- there's this table, and just so you're -- do you have that in front of you?  It says "All Custodians" up at top?

A.    I see a table on the last page.

Q.    Yeah, for purposes of the record, that's the metadata that was connected to this document when it was provided by SCA to us.

A.    Can -- can you share what does "metadata" mean?

Q.    Sure.  When we get documents in the course of litigation, in addition to the documents themselves, we get kind of objective coding information, which indicates where it came from, the date, other kind of data about the data.

For example, the -- there's information about where it came from, where it was found in the computer systems, the author, the date it was created and other things, and it's used by these document systems to help

executives would do in the normal course of business that were nonpublic information.

I mean, public information is such a narrow sliver of all of the information people use in the course of their jobs.  So I would say this is probably nonpublic.

BY MR. SAVERI:

Q.   Well, was it confidential?

A.   I'd have to understand the context of what you mean by "confidential."

Q.   Okay.  Well, when you were using this information, I think, as you testified earlier, it was one of the data points in your process for determining future wage levels across the company, correct?

MR. BANK:  Objection.

THE WITNESS:  As I mentioned, we looked at public -- you know, what's in the news.  We looked at industry reports.  We looked at Wall Street analyst reports.  We looked at benchmarking surveys.  And, you know, we would collect -- I would collect, from time to time, opinions and perspectives on the healthcare environment, broadly, on a number of dimensions.  And I shared that

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

with you.  Be it strategy, be it hospitals, be it payors.

And then, as it relates to wage budgets, we would make our own independent decision -- just us -- with our board of directors.

BY MR. SAVERI:

Q.    And did you yourself ask CEOs or peers at other companies for their information regarding what they plan to do with respect to future wage increases?

MR. BANK:  Objection.

THE WITNESS:  From time to time, I reached out to people in healthcare and outside of healthcare for their opinion or perspective on a variety of matters.

BY MR. SAVERI:

Q.    Did you ask Mr. Wilcox for that information?

A.    By "that information," average wage increase, kind of pooled average increase?

Q.    Yes.

A.    I believe I did on one or more occasions from time to time.

Q.    Did you ask for the same information

from Mr. Thiry?

MR. BANK:  Objection.

THE WITNESS:  I don't recall if it was Mr. Thiry or Mr. Rodriguez, but on one or more occasions -- and again, I think it was maybe a couple, not a regular practice -- I did.

BY MR. SAVERI:

Q.  Now, in -- during this time while Mr. Mathis and others were asking other companies for their future plans for wage increases, did Mr. Mathis share SCA's information with them?

MR. BANK:  Objection.

THE WITNESS:  I don't know.

BY MR. SAVERI:

Q.  Sir, I'm handing you what has been marked as Exhibit 37.

Now --

MR. ZIRPOLI:  This is Tab 23.

BY MR. SAVERI:

Q.  -- this is a document that was produced by USPI in this case.  It says USPI_CIV_000016100.

And Mr. Hayek, you're not on this, but let me direct you to the first part of the

e-mail, which is an e-mail from Brian Mathis to someone named Jason Cagle on August 9, 2013.

Do you see that, sir?

A.    Yes.

Q.    Do you know Mr. Cagle?

A.    I do not know him.

Q.    Now, Mr. Mathis writes to Jason, "One of the things that we have shared in the past is plans for the following year wage increases. Have you all started set a number yet that you're planning to budget?"

Do you see that?

A.    Yes, I see that in Brian's e-mail.

Q.    And does that refresh your recollection that Mr. Mathis had in fact shared and exchanged this information with USPI?

A.    No.

Q.    Okay.  Now, I've handed you what has been marked as Exhibit 232, sir.

Do you have that in front of you?

MR. ZIRPOLI:  Tab 24.

THE WITNESS:  Yes.

BY MR. SAVERI:

Q.    This has the Bates numbers USPI_CIV_00021155.

it doesn't refresh my recollection.

MR. SAVERI:  Okay.  Let's go off the record.

VIDEOGRAPHER:  Now going off the record at 5:13 p.m.  This ends media unit 6.

(Recess.)

VIDEOGRAPHER:  This begins media unit 7.  Now going back on the record at 5:35.

BY MR. SAVERI:

Q.  Mr. Hayek, I'm handing you a document which I marked as Exhibit 490.

(Exhibit PX 490, E-mail Bates-stamped HAYEK-000012214 through 216, with attachment, marked for identification as of this date.)

BY MR. SAVERI:

Q.  And do you remember that speech I gave you about metadata, vaguely?

A.  Yes.

Q.  Okay.  If you turn to the back of this document, there's more metadata which shows where it's from and the type of the document.

So let me do it this way:  First, this document has the Bates number HAYEK-00012214 through 216.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

So, Mr. Hayek, will you take a moment to review the document, and my first is going to be, do you recognize it?

A.    Yes.

Q.    Do you recognize this document, sir?

A.    Yes.

Q.    What is it?

A.    Meaning what are the contents or what's it about?

Q.    Well, fair enough.

Did you prepare the document?

MR. BANK:  Objection.

THE WITNESS:  Yes, I believe I created and, in some cases, copied and pasted information, but kind of compiled or wrote.

BY MR. SAVERI:

Q.    Okay.  Could you just tell me generally what information this is and where you compiled it from, please?

A.    This is information about general average wage growth or wage increase, again, across pools -- broad pools of employees at six different companies.  That's how I would describe it.

Q.    Okay.  And at the top of this -- the

first page, there's a section under the word "KKR."

Do you see that?

A.    Yes, I see the "KKR."

Q.    Okay.  This -- just in terms of dates, do you see that this -- the -- the -- it looks like an e-mail from someone named Scott Wagner to yourself that's dated July 6, 2009?

A.    Yes.

Q.    Is -- does that refresh your recollection about generally when this -- when you compiled this document?

A.    I believe it was around this time frame in the -- 2009.

Q.    Okay.  Great.  And did you -- was Mr. Wagner someone with whom you worked when you were at KKR?

A.    Yes.

Q.    Okay.  And -- and so he provides some information to you regarding some of the companies in the KKR portfolio, correct?

A.    Yes, he provides that kind of average information or median that I referenced.

Q.    Okay.  And he says, "Have anything between 0 and 3 percent, depending on the

Andrew Patrick Hayek  Highly Confidential
September 18, 2024

company's situation.  Median would be approximately 2 percent," correct?

A.    Yes, I see that.

Q.    Okay.  And then -- so this information is information that -- at least this part was provided by Mr. Wagner to you, from information that he received from some of the KKR portfolio companies; is that correct?

A.    I don't know how he received it or compiled it.  I -- I know what he wrote to me.

Q.    Okay.  And there's another section entitled "DaVita."

Do you see that?

A.    Yes.

Q.    Did you get that yourself from Mr. Thiry?

MR. BANK:  Objection.

THE WITNESS:  No.  My recollection is that I spoke with Mr. Rodriguez.

BY MR. SAVERI:

Q.    Javier Rodriguez, the gentleman we've referred to a couple of times throughout the day?

A.    Yes.

Q.    And he was the COO at the -- at the

time at DaVita; is that correct?

A.    No, I don't believe so.

Q.    Okay.  But is it fair to say he was a top executive at DaVita at the time?

A.    Yes.

Q.    Okay.  And he indicates that the -- for non-field, they got zero increase this cycle, do you see that?

A.    Yes.  So that would be executives, corporate office, non-field.

Q.    Okay.  And the field got an average of 1.5 percent, correct?

A.    That's what I believe he relayed to me, and I captured in notes.

Q.    Okay.  And he also indicates what they budgeted for the -- for the -- for the year, the 2.2 percent wage increase.

Do you see that?  It's the last line.

A.    I -- yes, I see that.  I'm reading it.

Yeah, it appears to be the budget for 2009, which would have been created in the prior year.  And again, I'm kind of processing this reading it with you.

Q.    Okay.  Fair enough.

And the next section is "TPG."

That's, again, the company that, at least, I guess, at this time was a -- the largest shareholder in SCA; is that correct?

A.   Yes, it's a private equity firm, and SCA is a portfolio company of TPG.

Q.   So is it fair to say that at this time both KKR and TPG were able to get information like this across their portfolio companies?

MR. BANK:  Objection.

THE WITNESS:  I don't know how they compiled it.  I know what was shared with me.

BY MR. SAVERI:

Q.   Okay.  Fair enough.

And then the next section below that is "USPI," do you see that?

A.   Yes.

Q.   And did you obtain that information yourself?

MR. BANK:  Objection.

BY MR. SAVERI:

Q.   I draw your attention to the third paragraph that says, "Field raises are driven by divisional leaders."

Do you see where I'm reading from,

sir?

A.    Yes.

Q.    And it says, "They are empowered to do what they wish.  Bill expects another year of 3 percent raises on average with some markets higher (up to 10 percent) where competition is pushing wages faster."

Do you see that?

A.    Yes.

Q.    And "Bill" is Bill Wilcox, right?

A.    That's my understanding from this.

Q.    And did you -- does that refresh your recollection about whether or not you obtained this information from Mr. Wilcox or someone else at USPI?

MR. BANK:  Objection.

THE WITNESS:  I think it was Bill.  I think it was Bill.

BY MR. SAVERI:

Q.    And did you obtain it yourself from Mr. Wilcox?

A.    I believe so.

Q.    And then, on the next page, there's a section entitled "Alliance Imaging," do you see that?

A.    Yes.

Q.    And is that where Mr. Fusco worked?

A.    No.

Q.    Okay.  Who did you -- did you obtain this information from Alliance Imaging?

A.    I believe I did.

Q.    And from whom?

A.    I think it -- it was either Paul Viviano, the CEO at that time, or Howard Ihara, who was the CFO at the time.

Q.    Okay.  And the information regarding HealthSouth, did you obtain that yourself?

A.    I don't believe so.

Q.    Do you know who did?

A.    I don't know who did.

Q.    You can put that aside, sir.

I'm handing you what's been previously marked as Plaintiff's Exhibit 160.

MR. ZIRPOLI:  Tab --

MR. SAVERI:  It's Tab 16 for --

CONCIERGE:  Thank you, counsel.

MR. SAVERI:  -- those following at home.

BY MR. SAVERI:

Q.    Sir, Tab -- excuse me.  Exhibit 160

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

CERTIFICATE


        I, Kathy S. Klepfer, a Registered

Merit Reporter and Certified Shorthand

Reporter within and for the State of

Illinois, do hereby certify:

        That ANDREW PATRICK HAYEK, the witness

whose deposition is herein before set forth,

was duly sworn by me and that such

deposition is a true record of the testimony

given by such witness.

        I further certify that I am not

related to any of the parties to this action

by blood or marriage and that I am in no way

interested in the outcome of this matter.

        In witness whereof, I have hereunto

set my hand this 19th day of September 2024.


        --------------------------------
        KATHY S. KLEPFER, RPR, RMR, CRR, CLR