# EXHIBIT 29

# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

------------------------------  )

IN RE OUTPATIENT MEDICAL        )Case No.

CENTER EMPLOYEE ANTITRUST       )1:21-cv-00305

LITIGATION                      )

------------------------------  )

CONFIDENTIAL

DEPOSITION OF BRIAN TODD MATHIS

WASHINGTON, D.C.

SEPTEMBER 20, 2024

REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

Brian Todd Mathis   Confidential
September 20, 2024

had accepted the job with SCA?

A.   Before.

Q.   And what did they say when you told them that you had a job offer from SCA?

A.   In general terms we had a broad discussion about what would the opportunity look like to stay at Blue Ridge versus what did the opportunity look like to go to SCA.

Q.   Did they offer you a promotion or any more money if you were willing to stay at Blue Ridge?

A.   I don't recall.

Q.   And you had a discussion with them about the opportunities you'd have at both companies and ultimately you made the decision to go to SCA?

A.   I did.

Q.   How did Blue Ridge feel about that when you left?

MS. ZIELINSKI:  Object to the form.

A.   They were supportive of my choice to further my career is my recollection.

Q.   What were your primary job duties and responsibilities as the vice president of strategy at SCA?

A.   It depended on the time period.

Q.   When you first started at SCA.

Brian Todd Mathis  Confidential
September 20, 2024

A. My recollection is I was responsible for how we would grow our case volume in our surgery centers. I was responsible for overall company strategy and served effectively as a chief of staff to Andrew Hayek.

Q. When did those job duties or your title change?

A. The job duties changed a lot from time to time based on what was needed at that moment in the company. I don't recall when my title changed.

Q. What were all the titles you held during your employment at SCA?

A. I believe it was vice president of strategy, it was group vice president of -- might have been strategy and payer engagement. I don't recall exactly what followed the group vice president. It was senior vice president. I don't recall exactly what followed that. And it was chief development officer.

Q. When did you become the chief development officer?

A. I believe it was in the spring of 2017.

Q. Right around the time that Optum acquired SCA?

A. It was.

Brian Todd Mathis   Confidential
September 20, 2024

Q.   So you didn't hold the chief development officer title for very long?

A.   I did not.

Q.   Were you ever a chief strategy officer?

A.   Where?

Q.   At SCA.

A.   I don't think so.

Q.   Prior to the chief development officer do you remember what title you held?

A.   Senior vice president.

Q.   Was that senior vice president of strategy?

A.   I think there were more words than that, but I don't recall exactly what it was.

Q.   When you first came to SCA did you report directly to Andrew Hayek?

A.   Yes.

Q.   Did you always report to Andrew Hayek during your time at SCA?

A.   Yes.

Q.   What were your primary job duties and responsibilities as the chief development officer?

A.   I was responsible for our strategy and payer contracting function, our M&A team, and our physician recruiting team.

information that we could gather, and ultimately we had to make a decision about how to be competitive.

Q.  What do you mean "how to be competitive"?

A.  We needed to compete for a workforce, which meant that we needed to offer an overall experience and compensation package that would attract and retain the talent that we needed.

MR. SEIDEL:  Okay.  Let's take -- let's take a break.  Now is a good time for a break I think.  Let's go off the record.

THE VIDEOGRAPHER:  Going off the record at 11:11 a.m.

(A break was had.)

THE VIDEOGRAPHER:  We are going back on the record at 11:27 a.m.

BY MR. SEIDEL:

Q.  Mr. Mathis, before the break we were discussing how SCA set the budget for its annual wage increases; do you remember that?

A.  Yes.

MS. ZIELINSKI:  Sorry.  Object to the form.

Q.  Did SCA publicly disclose its intended wage increases for the following year?

MS. ZIELINSKI:  Object to the form.

Brian Todd Mathis   Confidential
September 20, 2024

A.   How would you define "publicly"?

Q.   Do you understand what that word means in the ordinary course of things?

A.   Not in this context I don't.

Q.   Did SCA publish its budget for the following year's wage increase in any public -- publicly filed document?

A.   I'm not sure.

Q.   Did it publish it on any Websites?

A.   I don't believe so.

Q.   Did it publish it in any other publicly available form?

A.   I don't believe so.

Q.   In determining what the yearly wage increase budget would be for the following year did SCA exchange its wage increase budgets with any of SCA's competitors?

MS. ZIELINSKI:   Object to the form.

A.   Some of the time we would.

Q.   Who would do that?

A.   Depended on who had a relationship with which company.

Q.   Which competitors did SCA exchange its yearly wage increase budgets with?

A.   I don't recall the specifics year by year.

Brian Todd Mathis  Confidential
September 20, 2024

Q.  Do you recall any of the competitors that SCA exchanged that information with?

A.  I recall USPI, I believe Symbion.

Q.  Any others?

A.  Not for sure.

Q.  How about HCA?

A.  I don't recall whether we did or we didn't.

Q.  What about AMSURG?

A.  I don't recall for sure.

Q.  What about NovaMed?

A.  I don't recall for sure.

Q.  How about DaVita?

A.  I wouldn't have put them in that category.

Q.  But did SCA exchange its yearly wage increase information with DaVita?

MS. ZIELINSKI:  Object to the form.

A.  I believe in some years we did.

Q.  Who exchanged that information with DaVita?

A.  I don't know.

Q.  Did you?

A.  I don't believe so.

Q.  Who exchanged that information with USPI?

Brian Todd Mathis   Confidential
September 20, 2024

A.  It would have depended on the year I believe.

Q.  Who are all the people you're aware of that exchanged that information with USPI?

A.  The only one I'm specifically aware of is me.

Q.  How many years did you exchange that information with USPI?

A.  I don't know.

Q.  Did you exchange with them regularly?

MS. NEWTON:  Objection to form.

MS. ZIELINSKI:  Same objection.

A.  How would you define regularly?

Q.  Did you exchange with them yearly?

MS. ZIELINSKI:  Object to the form.

A.  What does that mean?

Q.  What does what mean?

A.  Yearly.

Q.  You're not sure what yearly means?

A.  I know what a year is.  I don't know if you mean did I do that two years in a row or did I do that every year I was employed by SCA.

Q.  Why don't you explain when you exchanged SCA's wage increase budgets with USPI.

MS. ZIELINSKI:  Object to the form.

Brian Todd Mathis   Confidential
September 20, 2024

A.   I don't recall the specific years.

Q.   Did you exchange it with them each year?

A.   I'm not sure.

Q.   Are you not sure because you don't remember?

A.   I don't remember whether I did that every year that I was at SCA.

Q.   How many times did you exchange that information with USPI?

A.   I don't know.

MS. NEWTON:  Objection to form.

Q.   Did you exchange that information with them each year when you were setting -- when SCA was setting its budget for the following year's wage increase?

MS. ZIELINSKI:  Object to the form.

A.   I don't know whether I sent it every year.

Q.   You don't remember?

A.   I do not.

MR. SEIDEL:  Okay.  Let's introduce tab 24.  This has been previously marked as Plaintiffs' Exhibit 232.

MR. AZOFF:  Tab 24 is being marked PX-232. I will place this in the shared box folder.  And,

Counsel, would you like me to put this in the chat for everybody as well?

MR. SEIDEL:  That's fine.  It should already be marked as Plaintiffs' Exhibit 232.

MR. AZOFF:  Okay.  Yes.  Would you like me to bring this up on the screen as well?

MR. SEIDEL:  No.  I think you can just place it in the chat.

MR. AZOFF:  Thank you.

BY MR. SEIDEL:

Q.  I'm now handing the witness what has been marked as Plaintiffs' Exhibit 232 bearing the Bates No. USPI-CIV-000021155.

Mr. Mathis, is this a true and accurate copy of an e-mail between you and Jason Cagle of USPI while you were employed at SCA?

A.  I don't have any reason to believe it's not.

Q.  The subject of this e-mail is "Wage increase budgets," correct?

A.  It appears to be.

Q.  What do you mean "it appears to be"?

A.  That's what it says.

Q.  That's what it -- that's what it says.  So the subject of this e-mail is "Wage increase

Brian Todd Mathis  Confidential
September 20, 2024

it.

Q.  Do you know generally and not specifically if these companies' wage increase information was discussed at any cabin team meetings?

A.  I don't recall a specific discussion on it.

Q.  Do you recall any general discussion on it?

A.  I recall general discussions on budget increases.

Q.  And did that -- did those discussions include what other companies were budgeting for their wage increases?

A.  Yes.

Q.  Including USPI?

A.  If we had information on it, then we would have included it.

Q.  And Symbion?

A.  It would have been included in the materials if we had it.  That doesn't mean it was discussed.

Q.  Do you remember if the wage increase information for USPI, Symbion, Neuterra, NSC, LaVie, Alliance, and HealthSouth was discussed at cabin team meetings?

Brian Todd Mathis  Confidential
September 20, 2024

A.  I do not.

Q.  Previously -- you can set that document aside.

Previously we had discussed SCA's benchmarking activities with USPI; do you recall that?

A.  I do.

Q.  And do you recall that SCA benchmarked its corporate overhead expenses with USPI?

A.  I do.

Q.  How often did that benchmarking occur?

A.  I don't recall the specifics.  It was not a regular exercise.

Q.  Did you engage -- did SCA engage in that benchmarking with anybody other than USPI?

A.  I believe we attempted to, but I'm not sure we ever had the information from others outside of maybe some acquisition targets.

Q.  Were you the person tasked with carrying out that benchmarking with USPI?

A.  I recall working on it.  I don't know whether I was the one tasked with it every time that it was done as I don't know the totality of when it was done.

Q.  Did anyone instruct you to carry out

Brian Todd Mathis  Confidential
September 20, 2024

benchmarking with USPI?

A. I believe so.

Q. Somebody at SCA?

A. I believe.

Q. When you had the -- when you engaged in the benchmarking of corporate overhead with USPI it included all of the expenses that are included in SCA's corporate overhead, correct?

A. I believe so.

Q. And that would have included labor costs as well as other costs, correct?

A. I believe so.

Q. Did you benchmark with USPI by department?

A. Yes, I believe so.

Q. How specific was the benchmarking process with USPI?

A. I don't recall the exact parameters of it.

Q. Okay. Let's -- do you know if it was Andrew Hayek who instructed you to exchange benchmarking corporate overhead data with USPI?

A. I don't recall specifically that anyone instructed me to.

MR. SEIDEL: Okay. Let's turn to tab No. 4. This will be Plaintiffs' Exhibit 495.

(Plaintiffs' Exhibit 495 was marked for identification.)

BY MR. SEIDEL:

Q.  I'm handing the witness what's been marked Plaintiffs' Exhibit 495.  I'm handing the witness what's been marked Plaintiffs' Exhibit 495 with a Bates stamp of OMC-BM-000005462.  Do you have that in front of you, Mr. Mathis?

A.  I do.

Q.  Mr. Mathis, is this a true and accurate copy of an e-mail that you sent to Brian Jackson on December 20, 2009 with the subject "COH benchmarking files" and including two attachments?

(Witness reviewing document.)

A.  Yes, it appears to be.

Q.  In this e-mail you inform Brian Jackson that you sent the template file to USPI and AMSURG and that you'd follow up by phone early this week, correct?

A.  Yes, that's what it says.

Q.  And you sent Brian Jackson two attachments, correct?

A.  Yes.

Q.  And the first attachment is a template for information that could be -- could be filled in,

teammate cost within each of those subdepartments, correct?

A. Yes.

Q. So, for example, if you look at accounts payable, the 424,472-dollar cost --

A. Yes.

Q. -- that would be the cost for the teammates of the accounts payable portion of the accounting department?

A. Yes.

Q. And the same for payroll, cash management treasury, surgery center accounting, and corporate accounting, correct?

A. Different dollar numbers, but otherwise, yes.

Q. There's also a column for the number of teammates; do you see that?

A. I do.

Q. And that represents the number of employees within each of these departments and subdepartments, correct?

A. I believe so.

Q. And you've listed that information for all of SCA's departments, correct?

A. These are all the departments I recall.

Brian Todd Mathis    Confidential
September 20, 2024

Q.  And so this document has the cost that SCA is paying the employees of each department, not on a particular salary level, but on a per department and per subdepartment?

A.  Yes.

Q.  And those teammate costs, you said it wasn't clear which of all the labor costs were included in that, but presumably salaries would be included?

A.  Yes.

Q.  What other types of labor costs other than salary would likely be included in the teammate portion of these costs?

MS. NEWTON:  Objection to form.

A.  If we included it, then bonuses would be in there and probably benefits would be in there.

Q.  If you look back at the e-mail, you said that you sent the template file to USPI and AMSURG and will follow up by phone early this week; do you see that?

A.  I do.

Q.  Do you recall sending the template file to USPI and AMSURG?

A.  I do not.

Q.  Did you send the COH benchmarking

attachment, which included SCA's information, to USPI and AMSURG?

A.  I don't believe so.

Q.  Do you have -- do you remember whether you sent either of these attachments to USPI and AMSURG?

A.  I don't recall exchanging any information with AMSURG.

Q.  With USPI do you remember sending either of these attachments to them?

A.  I recall sending information like this to them.  I can't say did I send exactly this.  All I know for sure is what the e-mail says that says I sent the template file.

Q.  When you engaged in the corporate overhead benchmarking exercises with USPI did you send them this type of corporate overhead that we just discussed in this -- attached to this e-mail?

MS. ZIELINSKI:  Object to the form.

MS. NEWTON:  Objection, form.

A.  I don't recall exactly the template that we landed on and therefore what information I would have sent at what level of detail.

Q.  Do you remember what level of detail you did exchange with USPI?

Brian Todd Mathis   Confidential
September 20, 2024

A.  I do not.

Q.  Is this the type of corporate overhead information that was exchanged with USPI --

MS. ZIELINSKI:  Objection --

Q.  -- regardless of the format that it's in?

MS. ZIELINSKI:  Object to the form.

A.  I don't recall the specific format or the level of detail that was exchanged.

Q.  Did you ever run it by your general counsel or any other counsel whether or not this type of corporate overhead benchmarking was appropriate?

MS. ZIELINSKI:  I'm going to instruct the witness not to reveal any privileged communications.

MR. SEIDEL:  So I'm not asking you what was said, if anything was said.

A.  Yes.

Q.  I'm just asking if you ever ran it by your general counsel or any other counsel to see if the corporate overhead benchmarking exercise you were doing with USPI was appropriate?

A.  I had discussions with our general counsel about appropriateness of information to share as we

Brian Todd Mathis   Confidential
September 20, 2024

were benchmarking overhead.

Q.  You did think that it was important to get your general counsel's opinion as to the appropriateness of this exercise?

A.  I can't speak to this exercise in particular.

Q.  With respect generally to the corporate overhead benchmarking that you were doing with USPI?

A.  I can't speak to specifics of corporate overhead benchmarking with USPI.  My comment was simply I recall discussions with our general counsel about corporate overhead benchmarking.

Q.  So you don't remember whether you ran this benchmarking exercise by your general counsel or other counsel?

A.  I do not recall.

MR. SEIDEL:  Okay.  Let's turn to tab No. 5.  This will be Plaintiffs' Exhibit 496.

(Plaintiffs' Exhibit 496 was marked for identification.)

BY MR. SEIDEL:

Q.  I'm handing the witness what's been marked as Plaintiffs' Exhibit 496 bearing the Bates stamp No. OMC-BM-000006875.

Brian Todd Mathis   Confidential
September 20, 2024

Mr. Mathis, is this a true and accurate copy of an e-mail that you sent to C. Gulmi at AMSURG, Mark Kopser at USPI with the subject "Corporate overhead benchmarking" in December of 2009?

A.   It appears to be.

Q.   And this was -- this e-mail that you sent was in your capacity as an employee of SCA, correct?

A.   Yes.

Q.   And it was sent in the regular scope of your employment?

A.   I believe so.

Q.   In this e-mail you say "Claire and Mark," you address your e-mail to Claire and Mark.  Who is Claire?  Is she the cgulmi@AMSURG.com?

A.   Yes.

Q.   And do you know her full name?

A.   Claire Gulmi.

Q.   What was her role at AMSURG?

A.   She was the CFO.

Q.   And did you -- okay.  Strike that.

You say "I hope you're both having a great weekend.  Andrew let me know that he spoke to Chris and Bill recently about a corporate overhead

Brian Todd Mathis   Confidential
September 20, 2024

benchmarking exercise and that AMSURG and USPI are interested in participating"; do you see that?

A.  I do.

Q.  Do you know who you're referring to when you say that Andrew spoke to Chris and Bill?

A.  I believe that is Chris Holden and Bill Wilcox.

Q.  Who is Chris Holden?

A.  Chris Holden was the CEO of AMSURG.

Q.  And who's Bill Wilcox?

A.  Bill Wilcox was the CEO of USPI.

Q.  And then you say "The idea of the exercise is to benchmark the levels of corporate resources allocated to the various activities from a purely corporate perspective"; do you see that?

A.  I do.

Q.  Is that an accurate representation of what the idea of the exercise -- of the benchmarking exercise was?

A.  I believe so.

Q.  You say "For example, how many and what level of people do we each have dedicated to development and what additional cost do our development teams incur"; do you see that?

A.  I do.

Brian Todd Mathis   Confidential
September 20, 2024

Q.   And you say "Not what are the salaries of the individuals but one level of detail up from that"; do you see that?

A.   I do.

Q.   Is that consistent with the information that was attached in the prior e-mail that we just walked through with all the teammate costs and other costs?  Is that -- is it consistent to say that that information was not what are the salaries of the individuals but one level of detail up from that?

MS. ZIELINSKI:  Object to the form.

A.   Yes, I believe it is.

Q.   Then you say "We ran this by our general counsel as well as outside counsel to ensure the planned exercise is completely appropriate"; do you see that?

A.   I do.

Q.   But you have no memory of running this by your general counsel or outside counsel to ensure the planned exercise is completely appropriate?

A.   I do not.

Q.   But you did feel it important to tell Claire and Mark that you had run this by general counsel and they had given it the okay?

Brian Todd Mathis   Confidential
September 20, 2024

A.  All I know is what I wrote in the e-mail. I don't know what I was feeling at the time.

Q.  Did you -- I mean, you did inform them that you had run it by your general counsel and outside counsel to ensure that they had said that it was appropriate?

A.  I know what it says, which is "We ran this by our general counsel as well as outside counsel to ensure the planned exercise is completely appropriate."

Q.  So you did inform Claire and Mark that you had run this by -- this benchmarking exercise by your general counsel and your outside counsel to ensure that the benchmarking exercise was completely appropriate?

A.  Yes, I did.

Q.  Then in the second paragraph you say "In the attached template we have compiled a spreadsheet based on our corporate overhead structure for 2010 and I filled in some sample data for the accounting data to illustrate our suggested approach"; do you see that?

A.  I do.

Q.  Now, this e-mail was sent at the end of 2009, correct?

Brian Todd Mathis  Confidential
September 20, 2024

A.  It is.

Q.  And you tell them that the attached template was based on SCA's corporate overhead structure for 2010, correct?

A.  Yes, I did.

Q.  So this was the planned corporate overhead expenses for 2010, correct, not what occurred previously in 2009?

MS. ZIELINSKI:  Object to the form.

A.  I'm not sure.  There's no actual expenses in this file and it's a reference to structure, not expenses.

Q.  So this was the structure that SCA anticipated for its corporate overhead for 2010?

A.  Probably.  Also could have been a typo.

Q.  And you say to Claire and Mark specifically that you're not looking to exchange salaries of individuals but only one level of detail up, correct?

A.  Yes.

Q.  Do you remember why you told them that you didn't want to exchange individual salaries but only one level of detail up from that?

A.  I do not.

Q.  Did it have anything to do with your

Brian Todd Mathis  Confidential
September 20, 2024

having run it by general counsel and outside counsel?

MS. ZIELINSKI:  Object to form.  I think I'm going to instruct the witness not to answer.  I think that calls for privileged information.

BY MR. SEIDEL:

Q.  Why did you feel the need to run this benchmarking exercise through both your general counsel and outside counsel?

A.  I don't know that I did.

Q.  Why did you run the benchmarking exercise through both your general counsel and your outside counsel?

A.  I don't know that I did.

Q.  You don't know whether you, in fact, ran this -- ran this benchmarking exercise through both your general counsel and your outside counsel?

A.  It doesn't say I ran it by our general counsel as well as outside counsel.  It says we.  You asked me I.

Q.  As in SCA.

A.  Yes.

Q.  Did SCA run this benchmarking exercise through general counsel and outside counsel?

A.  That's what it says.

Brian Todd Mathis   Confidential
September 20, 2024

Q.  Do you know if that happened?

A.  I don't recall.

Q.  You have no memory of that?

A.  I do not.

Q.  Did you personally run this benchmarking exercise through both general counsel and outside counsel?

A.  I don't recall.

Q.  You don't remember?

A.  I do not.

Q.  Do you know why -- strike that.

Did USPI send their information back to SCA?

A.  Which information?

Q.  In response to this e-mail did USPI send its corporate overhead information back to SCA?

A.  I don't know whether they responded to this e-mail.

Q.  You have no memory of whether they engaged in this corporate overhead benchmarking exercise?

A.  I recall them engaging in a corporate overhead benchmarking exercise.  I don't recall whether it followed this specific template or if it was in direct response to this e-mail or not.

Q.  So you do remember that USPI did provide

SCA with its corporate overhead costs in order to benchmark against SCA?

A.  Yes.

Q.  And SCA provided its corporate overhead costs to USPI in order to benchmark with USPI?

A.  Yes.

Q.  Do you remember how many times you actually exchanged those -- those costs?

A.  I do not.

Q.  Do you remember if -- strike that.

Okay.  Did you ever talk to Mark Kopser about the corporate overhead benchmarking exercise with him by phone?

A.  I don't recall.

Q.  Did you ever talk to him about it in person?

A.  No, I don't believe so.

Q.  You don't believe that you did or you don't remember?

A.  I don't believe that I did.

Q.  You never spoke to him about this at any industry events?

A.  I don't recall ever meeting him in person.

MR. SEIDEL:  Okay.  Let's pull up tab No. 6.

(Plaintiffs' Exhibit 497 was marked for identification.)

BY MR. SEIDEL:

Q.   This is Plaintiffs' Exhibit 497.   I'm handing the witness what's been marked Plaintiffs' Exhibit 497 with the Bates stamp No. OMC-BM-000007716.

Mr. Mathis, is this a true and accurate copy of an e-mail you sent to Brian Jackson with the subject "USPI" in December 2009?

A.   I believe so.

Q.   And you say "Talked to Mark Kopser at USPI and he's going to fill out the template over the next couple days"; do you see that?

A.   I do.

Q.   Do you remember talking to Mark Kopser at USPI about this corporate overhead benchmarking exercise?

A.   I do not.

Q.   Do you remember about him telling you that he was going to fill out the template over the next couple of days?

A.   I do not.

Q.   Do you know if he did fill out this particular template over the next couple days?

Brian Todd Mathis   Confidential
September 20, 2024

Q.  Cindy is somebody at USPI, but did -- when you spoke to Rich Sharff did Rich Sharff tell you why he wanted to follow up directly with Cindy?

MS. ZIELINSKI:  I'm just going to direct you not to reveal any privileged communications.

A.  I don't recall any of this.

Q.  And then if you look at the top e-mail, Rich Sharff tells Cindy that he left a voicemail for her, correct?

A.  Yes.

Q.  VM stands for voicemail?

A.  I believe so.

Q.  And they talk about discussing this matter by cell phone, correct?

A.  Yes.  Well, he says "Best way to reach me is by cell phone."  Whether they ever talked about it I don't know.

Q.  Did anyone ever instruct you not to put things in writing?

A.  Not that I recall.

Q.  Did anyone at SCA ever tell you to have certain conversations by phone only?

A.  Not that I recall.

Q.  Did Rich Sharff ever tell you to only have communications -- certain communications by phone

Brian Todd Mathis  Confidential
September 20, 2024

only?

MS. ZIELINSKI:  I'm going to direct him not to answer that question as privileged.

BY MR. SEIDEL:

Q.  Did you ever decide to only have certain conversations with competitors by phone and not put anything -- put it in writing?

A.  I don't recall that.

Q.  You have no memory of that either way?

A.  I do not.

MR. SEIDEL:  Okay.  Now's a fine time to take a break.  Why don't we go off the record.

THE VIDEOGRAPHER:  Going off the record at 4:42 p.m.

(A break was had.)

THE VIDEOGRAPHER:  We are going back on the record at 4:54 p.m.

MR. SEIDEL:  Let's introduce tab No. 36. This will be Plaintiffs' Exhibit 501.

(Plaintiffs' Exhibit 501 was marked for identification.)

BY MR. SEIDEL:

Q.  I've handed the witness what's been marked Plaintiffs' Exhibit 501 bearing the Bates No. SCA-002277742.

Brian Todd Mathis  Confidential
September 20, 2024

Mr. Mathis, is this a true and accurate copy of an e-mail that you sent to Rikki Sobel and Leslie Wachsman on -- in May of 2018?

A.  Yes.

Q.  And was this e-mail sent in the ordinary course of your business responsibilities at SCA?

A.  Yes.

Q.  In the very top e-mail -- this e-mail was actually sent when you were at Optum, correct, in 2018?

A.  Yes.

Q.  And at the time Optum owned SCA; is that right?

A.  Yes.

Q.  And you were still -- at some time when you were working for Optum you did work for both Optum and SCA, correct?

A.  I had responsibilities at both.  I was only employed by one or the other.

Q.  Do you remember in May of 2018 who you were employed by, Optum or SCA?

A.  I believe I was employed by Optum.

Q.  And did you have responsibility at this time with respect to both Optum and SCA or just Optum?

Brian Todd Mathis   Confidential
September 20, 2024

A.  I believe I still had some SCA responsibilities.

Q.  And you were the chief strategy officer at Optum Care at this time, correct?

A.  Yes.

Q.  And if you look at the top e-mail, you say to Rikki and Leslie "Only datapoint we had in the past was USPI who we benchmarked with every approximately two years for the last decade"; do you see that?

A.  I do.

Q.  Is it a fair reading to say again when you have that little squiggly line that means an approximation -- approximately two years?

A.  Yes.

Q.  And is it true that SCA and USPI benchmarked with each other approximately every two years for the last decade?

A.  Whatever is stated in this e-mail is going to be better than my recollection six years later.

Q.  So no reason now as we sit here today to dispute that SCA and USPI benchmarked with each other approximately every two years for the last decade?

A.  I do not.

Q.  In the e-mail if you look at the second paragraph it says "AMSURG always said no."  Do you know why AMSURG always declined benchmarking with SCA?

MS. ZIELINSKI:  Object to the form.

A.  I do not.

Q.  Do you have any memory of asking AMSURG to benchmark with SCA?

A.  I do.

Q.  Was it you or somebody else that reached out to AMSURG to potentially benchmark with SCA?

A.  I believe that I did and I believe others did.

Q.  When you reached out to AMSURG who did you reach out to at AMSURG?

A.  Claire Gulmi.

Q.  Anybody else?

A.  Not that I recall.

Q.  Do you remember why they declined?

A.  I do not.

Q.  But it's fair to say that they did always decline?

A.  I don't specifically recall them declining.  I also don't recall them ever sharing

Brian Todd Mathis   Confidential
September 20, 2024

any of that information.

Q.   And then in that same e-mail you also say "Same for Surgery Partners.  Surgery Partners always also declined, but they have a new CEO who I have developed a relationship with and could ask him"; do you see that?

A.   I do.

Q.   Do you remember previously reaching out to Surgery Partners to do benchmarking?

A.   I do not.

Q.   Do you know why Surgery Partners always also declined like AMSURG?

A.   As I said, I don't recall reaching out.

Q.   So you have no knowledge as to why Surgery Partners declined?

A.   I do not.

Q.   Did you reach out to the new CEO at Surgery Partners who you had developed a relationship with?

A.   Did I reach out to him about what?

Q.   About benchmarking.

A.   I don't recall doing so.

Q.   Who is the -- who was the new CEO at Surgery Partners who you had developed a relationship with?

have been some specific nonsolicitation agreements within some of these relationships with DaVita --

A.  Yes.

Q.  -- right?  Do you remember that?

A.  I do.

Q.  Do you have any knowledge of any particular nonsolicitation agreements being part of any of these discussions and potential joint ventures that we just discussed?

A.  I don't recall the specifics of the agreements surrounding any of them.

Q.  Did you ever decide that you needed a nonsolicitation agreement for any of these joint -- possible joint ventures and discussions that you worked on?

A.  I don't recall.

Q.  Did you ever decide that you needed to form an agreement with DaVita not to solicit each other's employees in order to pursue all of these discussions and potential joint ventures?

A.  I don't recall specifically coming to that conclusion, but I don't know that I didn't.

Q.  Sitting here today, did you need to do that?

A.  I could --

Brian Todd Mathis  Confidential
September 20, 2024

MS. ZIELINSKI:  Objection -- go ahead.

THE WITNESS:  I could see a lot of reasons to do that.

Q.  How about did you work on the charitable collaborations between SCA and DaVita?

A.  I don't recall a charitable collaboration with DaVita.

Q.  Do you recall ever engaging in any collaborations with DaVita with respect to SCA's medical missions?

A.  No.

Q.  Did you work on any collaborations with DaVita on SCA's Bridge of Life?

A.  I don't know what SCA's Bridge of Life is.

Q.  Okay.  That's a fair enough answer.

With USPI did you -- were you involved in any joint ventures with USPI?

A.  I don't believe we had any joint ventures with USPI.

Q.  Were you involved in any potential business transactions with USPI?

A.  Over the years we analyzed whether there were certain centers that we would sell our interests in to them or that we would like to

Brian Todd Mathis  Confidential
September 20, 2024

acquire their interests in.

Q.  In facilities?

A.  Yes.

Q.  Were you involved in any discussions or actual occurrences of facility purchases between SCA and USPI?

A.  I can recall having discussions about them internally.  I'm not sure whether I ever discussed them with USPI directly myself.

Q.  Did you have internal or external discussions about possibly swapping facilities with USPI?

A.  I recall that internally that we would have discussions around it.  I'm not sure there was a technical definition to swapping, though, as that could imply that it was a cashless transaction, but I'm not sure that's what the intent was.

Q.  Were you involved in a possible joint purchase of Symbion by SCA and USPI?

A.  I vaguely recall an internal discussion about the concept.  I'm not sure it really gained any traction.

Q.  Were you involved in any joint advocacy work between SCA and USPI?

A.  Yes.

Q.  What advocacy work was that?

A.  I was on the board of the ASC Assoc- -- the Ambulatory Surgery Center Association for six years.  USPI was also represented on that board.  One of the functions of that board and of the association was advocacy on behalf of the industry.

Q.  Other than possible facility or asset swaps, facility purchases, a possible joint purchase of Symbion, and advocacy work, was there any other joint ventures or business transactions or endeavors that you personally engaged in on behalf of SCA with USPI?

A.  At least internally we had discussions about whether there were opportunities to do joint purchasing of supplies.  I don't know whether I ever had a discussion about that with USPI or not.

Q.  Did that -- did SCA and USPI ever engage in any joint purchasing of supplies?

A.  Not that I'm aware of.

Q.  Are you aware of any other joint ventures or business transactions or business endeavors that SCA engaged in with USPI other than what we just discussed?

Brian Todd Mathis   Confidential
September 20, 2024

A.  I am not.

Q.  Are you aware of whether any of those discussions or possible joint ventures ever required an agreement between SCA and USPI not to solicit each other's employees?

A.  I'm not aware.

Q.  Are you aware of whether any of those necessitated a nonsolicitation agreement?

MS. ZIELINSKI:  Object to the form.

A.  I thought I just answered that question. Was it a different question?

Q.  Kind of.  If it's the same answer, it's the same answer.

A.  I do not recall any.

MR. SEIDEL:  You know, I think I'm getting close -- very close to the end.  Let's take a short break.

MS. ZIELINSKI:  Okay.

MR. SEIDEL:  Can we go off the record, please.

THE VIDEOGRAPHER:  Going off the record at 5:22 p.m.

(A break was had.)

THE VIDEOGRAPHER:  We are going back on the record at 5:39 p.m.

BY MR. SEIDEL:

Q.  Mr. Mathis, at some point in time were you ever asked to preserve materials in this case?

A.  I don't recall that.

Q.  At any time while you were at SCA or Optum did anyone instruct you to preserve relevant materials either for this case or the related criminal probe?

A.  I don't recall that.

Q.  Now, previously when we were talking about some of these documents we discussed whether some of them had been deleted; do you remember that?

A.  I do.

Q.  And you testified that you did in your course of business delete e-mails, but you didn't remember which e-mails you deleted or which ones you didn't.  Is that an accurate representation of what you testified previously?

A.  Yes.

Q.  Did you recall receiving a subpoena to appear for this deposition?

A.  I don't recall receiving the subpoena, no.

Q.  Do you recall your lawyers contacting you and informing you that you'd been subpoenaed for this deposition?

Brian Todd Mathis   Confidential
September 20, 2024

C E R T I F I C A T E

I, TINA M. ALFARO, Registered Professional Reporter, Certified Realtime Reporter, and Registered Merit Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand on this 25th day of September, 2024.

_____

Tina M. Alfaro, RPR, CRR, RMR

# EXHIBIT 30

# FILED UNDER SEAL

Bill Wilcox   Confidential
September 24, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) | MASTER DOCKET NUMBER 1:21-CV-00305 <br><br> CONSOLIDATED AMENDED CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

-------------------------------------------------

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF

BILL WILCOX

September 24, 2024

-------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF BILL WILCOX,

produced as a witness at the instance of the Plaintiffs,

was taken in the above-styled and numbered cause on

September 24, 2024, from 9:59 a.m. to 5:47 p.m., before

Jamie K. Israelow, Certified Shorthand Reporter in and

for the State of Texas, Registered Merit Reporter and

Certified Realtime Reporter, reported by machine

shorthand, at the offices of Jones Day, 2727 North

Harwood Street, Suite 600, in the City of Dallas, County

of Dallas and State of Texas, and the provisions stated

on the record or attached hereto; that the deposition

shall be read and signed before any notary public.

Bill Wilcox   Confidential
September 24, 2024

Have you spoken to any other person about the litigation?

A.   None other -- not about the litigation.

Q.   Have you had any discussions with Mr. Brodnax about the subject of this litigation, that is, the no-poach agreement between USPI and SCA?

MS. MOYÉ:  Object to the form.

A.   Not that I recall.

Q.   (By Ms. Nussbaum)  What about with Mr. Garvin?

A.   Not that I recall.

Q.   Ms. Karrmann?

A.   No, not that I recall.

Q.   Ms. Mosley?

A.   Not that I recall.

Q.   Mr. Cagle?

A.   No, not that I recall.

Q.   Mr. Hayek?

A.   No.

Q.   Now, have you been deposed before in any other matter?

A.   Yes.

Q.   What matter was that?

A.   Do you consider the interview with the DOJ a deposition?

Q.   Well, a deposition is with a court reporter,

such as we're at today, where you're under oath and there is somebody taking down what you're saying.

I think you just told us that you met with the Department of Justice with respect to the no-poach agreements; is that correct?

MS. MOYÉ:  Object to the form.

A.    I interviewed with the DOJ with respect to the self-reporting that we did on the not actively soliciting and there was a -- it was under oath and I -- there wasn't a court reporter there.  There was an FBI person there who took minutes of the interview.

Q.    (By Ms. Nussbaum)  And did you meet with the Department of Justice on two occasions?

A.    Yes.

Q.    And was there somebody from the FBI taking notes of the interview on both of those occasions?

A.    I believe so.

Q.    And have you had an opportunity to see those notes and review them?

A.    Yes.

Q.    When is the last time that you saw them?

A.    Yesterday.

Q.    And before yesterday, had you seen them?

A.    Yes.

Q.    And when was that?

A.    Friday.

Q.    Now, have you been deposed, that is, with a court reporter, in any other matter?

A.    Yes.

Q.    And what was that?

A.    That was Jason Cagle versus USPI -- well, I'm not sure who it was against, but it was Jason Cagle's deposition.

Q.    And Mr. Cagle is a former employee of USPI and a former colleague of yours; is that right?

A.    Correct.

Q.    Mr. Cagle had served in a number of capacities for USPI, including as general counsel and chief financial officer; is that right?

A.    Yes.

Q.    Mr. Cagle's employment was terminated by USPI and he sued the company; is that right?

A.    Yes.

Q.    And in that litigation, you were deposed?

A.    Yes.

Q.    Did USPI settle with Mr. Cagle shortly after your deposition?

A.    Yes.

Q.    And do you recall the terms of that settlement?

A.    No.

Bill Wilcox  Confidential
September 24, 2024

Department of Justice?

A.   Yes.

Q.   And assuming that there is a resolution of this litigation that involves money, either by settlement or judgment or some other way, would that be the responsibility of USPI?

A.   My understanding is -- my understanding is yes.

Q.   And has USPI reserved any money for this litigation and the potential liability with respect to the no-poach agreement or no-solicitation agreement between USPI and SCA?

MS. MOYÉ:  Object to the form.

A.   I don't know.

Q.   (By Ms. Nussbaum)  Has Tenet reserved any money with respect to the potential liability?

A.   I don't know.

Q.   Who would know that?

A.   The CFO of USPI and CFO of Tenet.

Q.   And who is that at this time?

A.   I don't recall their names.

Q.   Now, what is your current cell phone number?

MS. MOYÉ:  It's fine to give.

A.   ███████.

Q.   (By Ms. Nussbaum)  And do you have one or more email addresses presently?

Bill Wilcox  Confidential
September 24, 2024

A.    Yes.

Q.    And can you tell us what those email addresses are?

A.    One is my USPI email, which is ███████████, and then my personal one is a Gmail one, ██████████████████.

Q.    Now, from 2008 to the present, did you have any other cell phone numbers?

A.    No.

Q.    Did you have any other email addresses?

A.    Not that I recall.

Q.    Now, you started with USPI in 1998, shortly after it was founded; is that right?

A.    Correct.

Q.    And can you just give us a short history of your various job titles from 1998 to the present, when you're serving as a consultant for the company?

A.    Yes.  So in 1998, I invested in USPI.  A few months later, September '98, I came on as president and served as president until 2004, when I became CEO.  And then when we went private -- no, then when we first did our acquisition with -- or merger with Tenet, I think was 2015, I became chairman and CEO.

And then when we promoted Brett Brodnax, I was chairman, but around then, Brett was a direct -- I

didn't have any reporting responsibilities and I was winding down and then I went half-time, became vice chair of Tenet along the way, in that same kind of time frame, and was winding down, part-time, and then became a consultant without any agreement in -- without any written agreement in -- I believe it was effective January 1st, 2020.

Q.   Okay.  So can you -- let's just focus on your compensation for a few minutes.  So I would assume that after 2020, when you became a consultant, your compensation changed.  But before that, for the 10 years before that, from approximately 2010 to 2020, can you tell us what your compensation was?

A.   I could be directionally accurate, but you might need to fact-check me on it.

Q.   Absolutely.

A.   When did you want me to start, 2010?

Q.   2010 and go for that 10-year period to 2020.

A.   Well, my compensation, in general, was three parts:  Base salary, bonus and some type of equity participation, either through investments or granting of restricted stock or options.  And I couldn't tell you -- early on, it was probably more -- on the equity piece, probably more, you know, rollover of investments, a combination of that and the participation equity plan.

Bill Wilcox - Confidential
September 24, 2024

Do you care about base?  Do you want me to --

Q.   Well, what was the base, if you recall?

A.   Well, fortunately, it changed over the years. Again, I guess, 2010 --

MS. MOYÉ:  Mr. Wilcox, let me remind you again not to guess.

THE WITNESS:  Not to guess?

MS. MOYÉ:  Just your best recall.

A.   Hopefully, I've sufficiently caveated my best recall.  Let's do it this way:  So my base over the -- over that time period was ███████████████████████, increasing over that.  My bonuses all depended on how we did from a financial perspective, a quality perspective, other factors, and that was a ████████████ ████████████████████████ I just gave.

And the equity was just specific to what was -- what was happening with -- with the company at the time.  Some of it had been tied to whatever equity plan I was on and some of it would have been tied to a cash investment that I made in the company.

Sorry to be --

Q.   (By Ms. Nussbaum)  No.

A.   -- unclear on that.

Q.   So let's just focus on the equity plans to

Bill Wilcox   Confidential
September 24, 2024

[redacted]

[redacted]?

MS. MOYÉ:  Objection to the form.

A.    I don't recall that.  I'd have to see the minutes.

Q.    (By Ms. Nussbaum)  Yeah.  I think you told us earlier that USPI had gotten conditional leniency from the Department of Justice with respect to this no-poach/non-solicitation agreement; is that right?

MS. MOYÉ:  Objection to the form.

A.    Again, that's what I know through counsel.

Q.    (By Ms. Nussbaum)  And as part of the process of qualifying to get conditional leniency, first, you have to self-report, right?

MS. MOYÉ:  Objection to the form.

Again, we're in legal areas, so to the extent any question is asked --

THE WITNESS:  Right.

MS. MOYÉ:  -- that your only knowledge of is based on communications with counsel, please put that on the record and decline to include that in your responses.

A.    I know that through counsel.

Q.    (By Ms. Nussbaum)  Okay.  But you told us --

MS. MOYÉ:  So I instruct you -- excuse me.

Bill Wilcox   Confidential
September 24, 2024

I instruct the witness not to answer the question because it calls for privileged communications.

Q.   (By Ms. Nussbaum)   You told us that USPI chose to self-report; is that correct?

A.   Yes.

Q.   And you were the CEO of the company at the time.

A.   Yes.

Q.   And that was a decision that you certainly had a lot of input into; is that right?

MS. MOYÉ:   Objection to the form.

A.   I was involved with counsel on that decision.

Q.   (By Ms. Nussbaum)   And as part of that decision of self-reporting to the Department of Justice, ███████ ████████████████████████████████████████ ████████████████████████████████████████ ████████

MS. MOYÉ:   Objection to the form.

A.   I don't recall that.  Again, we should look at the -- we should look at the -- it's not minutes.  What do you call it?

Q.   (By Ms. Nussbaum)   ████████?

A.   Whatever the --

Q.   We'll look at them.

A.   You know what I mean.

Bill Wilcox  Confidential
September 24, 2024

Q.   Yeah, we'll do it shortly.

A.   I don't recall that.  And again, Andrew has a crisper -- if Mr. Hayek has a crisper memory of that and said it under oath, I'd stipulate it.

Q.   Well, Mr. Wilcox, I have no idea if Mr. Hayek has a crisp memory or -- or you know, whether he would say something under oath or not say something under oath.  So is that your view, that his memory is crisper than yours?

MS. MOYÉ:  Objection to the form.

MS. SHARP:  Object to form.

A.   No disrespect.  You're the one that told me that during the interview.

Q.   (By Ms. Nussbaum)  I never told you he had a crisper memory than you do.

A.   No, you said --

Q.   I asked you, I said:  Hypothetically --

MS. MOYÉ:  Excuse me.  Excuse me.  I don't think the witness was finished with his answer.

Can we have the question back and the portion of the witness's answer that he got out.

(The reporter read back the requested text.)

THE REPORTER:  I didn't get the response. I got an objection.

Bill Wilcox   Confidential
September 24, 2024

████████████████████████████ ; is that right?

A.   I don't know ██████████

Q.   ████████████████████████████

████████████████████████████ ?

A.   Yes.

Q.   And the letter goes on to say:  ██████████

████████████████████████████

████████████████████████████

████████████████████████ .

Do you see that?

A.   Again, I'm not following.  I accept that you

read it correctly.

Q.   Okay.  Well, let's turn to the second physical

page under ██████████  ██████████████

██████████████  ██████████████

██████████████████████

████████████████████████████

██████████████████████████

██████████████████████████

██████████████████████████

████████████

████████████████████████

████████████████████

████████████████████

████████

Bill Wilcox   Confidential
September 24, 2024

MS. MOYÉ:  Mr. Wilcox, you've already confirmed on the record that your understanding of this document is based solely on communications with counsel. I'd just remind you to please leave out communications with counsel from your responses.  And anytime your sole basis for knowledge is communications with counsel, please let us know and I will instruct you not to answer.

A.   Would you mind repeating again?

Q.   (By Ms. Nussbaum)  Sure.  This is a factual issue and it's asking -- I'm asking you: ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇ ?

MS. MOYÉ:  And I am again instructing you that to the extent your response to that question is based solely on communications with counsel, please decline to answer.

A.   I'll decline to answer.

Q.   (By Ms. Nussbaum)  Okay.  And then the ▇▇▇▇

██ ████████████

Do you see that?

A.    Yes.

Q.    And what is your personal knowledge on the factual record --

A.    Again --

Q.    -- with respect to that, with respect to (b)?

MS. MOYÉ:  Again, Mr. Wilcox, same instruction.  To the extent you're being asked questions about the letter that you've only reviewed with counsel and your understanding of its terms is based solely on communications with counsel, you should decline to answer.

A.    I'll decline to answer.

Q.    (By Ms. Nussbaum)  Well, you know, Mr. Wilcox, this is plain English.  You're a very sophisticated businessman.  And this is plain English.  You said that you've seen this letter.  You volunteered earlier in the deposition that you were quite aware of the conditional leniency, and so I am asking you the factual basis, not anything that you've reported or heard from counsel, but the factual basis.

████████████████

██ ██████████████████████

██ ████████████████████████

MS. MOYÉ:  Same instruction, Mr. Wilcox.

A.   I stand by the -- this was -- this -- my awareness of this is through the interaction I had with my counsel.

Q.   (By Ms. Nussbaum)  Now, were you also aware

MS. MOYÉ:  Same instruction, Mr. Wilcox.

A.   All my understanding related to this letter is in conjunction with my counsel.

MS. MOYÉ:  I instruct the witness not to answer.

Q.   (By Ms. Nussbaum)  Okay.

Bill Wilcox  Confidential
September 24, 2024

MS. MOYÉ:  Object to the form and same instruction on privilege.

A.   Again, this is a matter that I discussed solely with my counsel.

Q.   (By Ms. Nussbaum)  So other than discussions with your counsel, you have absolutely no other understanding of the leniency letter, which has been previously marked as Exhibit 0091.

A.   That's correct.

Q.   And other than discussions with your counsel, you have had no discussions with any other senior management at USPI with respect to its obligations under the agreement and its eligibility to participate in the agreement.  Is that your testimony?

MS. MOYÉ:  Object to the form.

A.   Yes.

Q.   (By Ms. Nussbaum)  Now, was there any discussion at a Monday morning meeting about the no-poach agreement between SCA and USPI?

MS. MOYÉ:  Object to the form.

MR. RUSSO:  Object to the form.

A.   Not that I recall.

Q.   (By Ms. Nussbaum)  Are you aware of litigation brought by two former employees of USPI, Aric Burke and Vaughn Ward?

A.    Yes.

Q.    What is your understanding of that litigation?

A.    Well, I -- I may have misanswered.  I don't really have much of an understanding of their litigation against USPI.  It arose, I believe, as we felt like those two were leaving, taking proprietary information from USPI.  And I -- that's what I -- that's what I recollect.  And I do know that there was a follow-on, them suing us, but I don't recall the details.

Q.    Do you recall, as part of the litigation between Messrs. Burke and Ward and USPI, they alleged the illegal no-poach agreements between SCA and USPI, amongst other companies?

            MS. MOYÉ:  Object to the form.

            MR. RUSSO:  Object to the form.

A.    I recall that -- I don't recall the language. I don't recall if they used your words or not, but I know they referenced the no-active-solicitation agreement that we had.

Q.    (By Ms. Nussbaum)  And when they referenced the no-active-solicitation agreement between USPI and SCA, was USPI concerned that that agreement was being referenced in a lawsuit filed in a court?

            MS. MOYÉ:  Objection to the form.

A.    I believe that was primarily responsible for

Bill Wilcox  Confidential
September 24, 2024

self-reporting, but I -- I'm not real clear on that.

Q.    (By Ms. Nussbaum)  So it's your best recollection that the allegations made in the Burke-Ward litigation about the no-poach or no-solicitation agreement between SCA and USPI was the impetus for USPI to self-report the agreement to the Department of Justice.

MS. MOYÉ:  Object to the form.

Q.    (By Ms. Nussbaum)  Is that your best recollection?

MS. MOYÉ:  Objection to the form.

A.    Yes.  May I ask the date of that, the Ward-Burke?  I want to make sure my dates are okay.

MS. MOYÉ:  She just wants to get your best recollection as you sit here right now.

A.    That's my -- that's my recollection.

Q.    (By Ms. Nussbaum)  And do you also recall that counsel for Mr. Burke and Mr. Ward served subpoenas on both your competitors and also recruiters that you used with respect to this no-poach agreement?

MS. MOYÉ:  Objection to the form.

A.    I recall that that was going to happen.  I don't know if it -- it did indeed happen.

Q.    (By Ms. Nussbaum)  How did you learn that that was going to happen?

A.   I don't recall.  I'm sure it would have been through counsel.

Q.   And was there concern at USPI that the recruiters that the company used and that, you know, your competitors, including SCA, were going to be served with subpoenas in the Burke-Ward litigation seeking documents about the no-poach agreement?

MR. RUSSO:  Object to the form.

MS. MOYÉ:  Objection to the form.

A.   I was embarrassed that they'd get drug into a -- that -- you know, especially Mr. Hayek and, I believe, also, Mr. Holden from AmSurg -- would get drug into a -- an employee dispute.  It had nothing to do -- it had no concerns about the latter part of your question.

Q.   (By Ms. Nussbaum)  So you had no concern about the no-poach agreement becoming public?

MS. MOYÉ:  Objection to the form.

MR. RUSSO:  Object to the form.

THE WITNESS:  No.  Would you mind re-reading her -- is that appropriate for me to ask?

MS. MOYÉ:  Absolutely.  Anytime.  You want to hear back the entire --

THE WITNESS:  I may have made a clarification that...

talking about that conversation we had, you know, nine or 10 years ago where we agreed to be courteous as it relates to recruiting each other's executives.

And that was it.  That's all I remember.

Q.   And what are the bullet points that you read off the script?  Do you remember what they were?

A.   No, I don't remember that.

Q.   Well, when he said to you:  You must be talking about that conversation that we had concerning --

A.   Yeah.

Q.   -- each other's employees, was that related to one of the bullet points?

A.   Yes.

MS. SHARP:  Objection, form.

THE WITNESS:  Sorry.

Q.   (By Ms. Nussbaum)  What did you say to him about that?

A.   I don't recall the specifics of the conversation, just the summary I just gave you, and that would have been in response to me saying that part of the matter that they've raised, that Burke and Ward had raised, relates to that non-solicitation agreement that we had.

Q.   Did you say anything more to Mr. Hayek about the non-solicitation agreement?

A.    No, not that I recall.

Q.    Did he say anything more to you about it?

A.    Not that I recall.

Q.    At that point, did either of you say to the other:  We need to end this agreement?

A.    I don't recall that.

Q.    And was the agreement still ongoing at that point, as far as you know?

A.    Again, that gets back to the timing, that if I could see the documents, my CHRO raised it and the subsequent action for that was to stop it.  I just -- I'm sorry.  I just don't know the calendar of it.

Q.    Did you tell Mr. Hayek that USPI was going to self-report the agreement to the Department of Justice?

A.    Not that I recall.

Q.    Did Mr. Hayek tell you that SCA had similar agreements with any other competitor?

            MS. SHARP:  Objection, form.

            MR. RUSSO:  Object to the form.

A.    No.

Q.    (By Ms. Nussbaum)  Okay.  So other than what you've told us about the conversation, is there anything else that you can recall about it?

A.    No.

Q.    Now, did other colleagues of yours at USPI

reach out to other proposed subpoena recipients, including your competitors and recruiters?

MS. MOYÉ:  Objection to the form.

A.   I believe they were assigned to do so as a courtesy.  I don't know for a fact that they did that.

Q.   (By Ms. Nussbaum)  Did you have any follow-up discussion with any of your colleagues about the conversations that you had with the recruiters and the competitors?

A.   Not that I recall.

Q.   Now, was the Burke-Ward litigation resolved?

A.   I don't recall.

Q.   Do you remember if USPI paid any money to -- to Burke-Ward?

A.   No.

Q.   Okay.  Let's mark what's under Tab Exhibit 4, and I believe that we previously gave you a copy of this.  And it's --

MR. ROSS:  505.

Q.   (By Ms. Nussbaum)  It's 505.  And this is a -- a one-page email from yourself to Daphne Walker dated 2/13/18.  It says:  Update-Confidential.

Do you see that?

A.   Yes.

Q.   Okay.  And this is Bates stamp Number

Bill Wilcox  Confidential
September 24, 2024

And Mr. Hayek said:  By "that information," average wage increase, kind of pooled average wage increase?

And the question was:  Yes.

And Mr. Hayek said:  I believe I did on one or more occasions from time to time.

MS. MOYÉ:  Objection to the form.  Counsel is reading from some unidentified document.  We have no idea whether it's an accurate recitation or not.

MS. NUSSBAUM:  It's not an unidentified document.  I indicated that --

MS. MOYÉ:  It's two pieces of paper.

MS. NUSSBAUM:  -- it's from the transcript of Mr. Hayek's under-oath testimony in this action last week.

MS. MOYÉ:  My -- my objection stands.  Again, Counsel is --

MS. NUSSBAUM:  That's fine.

MS. MOYÉ:  -- reading from two pages.  Who knows whether she's reading it accurately or not?  So we object to the form of the question.

MR. RUSSO:  Join --

Q.   (By Ms. Nussbaum)  Does that --

MR. RUSSO:  -- the objection.

Q.   (By Ms. Nussbaum)  -- refresh your recollection

Bill Wilcox   Confidential
September 24, 2024

as to whether you and Mr. Hayek had discussions from time to time on wage increases?

A.   No, I don't recall those conversations.

Q.   Now, do you recall sharing information with Mr. Hayek or others at SCA about volume?

MR. RUSSO:  Object to form.

MS. MOYÉ:  Object to the form.

MS. SHARP:  Object to the form.

A.   I don't.

Q.   (By Ms. Nussbaum)  Do you recall sharing G&A information with SCA?

A.   I don't recall that.

Q.   Now, let's go back to Exhibit 6, and now we're looking at Page 4 of 13.

MS. MOYÉ:  Exhibit 507?

MR. ROSS:  Correct.  Tab 6, 507.

MS. MOYÉ:  And Page 4, you said?

MS. NUSSBAUM:  Yeah.

Q.   (By Ms. Nussbaum)  █████████████

███████████████████████████████

████████████████████████████████

██████████████████████████████████?

A.   I don't recall that discussion, but clearly, it was -- we had it.

Bill Wilcox  Confidential
September 24, 2024

A.    No, but that is my approximation.

Q.    Was Riley somebody that was going to leave and then did USPI offer him more money to keep him?

A.    Correct.

Q.    Okay.  So is it fair to say that when an employee is looking to leave, to the extent that you want to keep them, you have to pay more money, you have to offer them more money?

MS. MOYÉ:  Objection to the form.

MS. O'CONNOR:  Object, form.

A.    That could be one of the moves.  In Riley's instance, I think it was expanding -- expanding authority.  That came with a higher compensation.

Q.    (By Ms. Nussbaum)  And in fact, when you were going to speak to Mr. Riley Orr, you said that they needed to give you ammunition to get him to stay and

that that ammunition would inclde money; is that right?

MS. MOYÉ:  Objection to the form.

A.    Ammunition?

Q.    (By Ms. Nussbaum)  Yeah, that you needed arguments.  You needed something to say to him and that you needed the authority to be able to offer him more money.

MS. MOYÉ:  Objection to the form.

A.    Me?

Q.    (By Ms. Nussbaum)  Yeah.

A.    Oh, no, I didn't mean to -- if I said that, I misstated it.  I would not have had that conversation with Riley.  I would not have needed ammunition because I was the CEO of the company.

Q.    Okay.  Well, we'll look at that later.

So, Mr. Wilcox, it is your belief that every time an employee left, it would cost the company about 25 percent of that employee's salary; is that right?

MS. MOYÉ:  Objection to the form.

A.    It would have been -- my view on this relates to senior level executives to which we have an executive search firm engaged and you go through that cost, and then the -- the period of training and onboarding.  That's where -- that's where my logic on that is.

Q.    (By Ms. Nussbaum)  And senior level executives would include administrators and above?

A.    The 25 percent generally is the level above, in my mind, the level above the administrator.  When I talk about executives and we talk about my personal interpretation of the agreement that I had with SCA, it includes administrators and up.

Q.    Okay.  We're still on Page 4 and we're now on the paragraph that starts:

█████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

█████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

███████████████████

Okay.  So far, for that portion of the paragraph, is that correct and accurate?

A.    Yes, with the clarification that -- not

Bill Wilcox   Confidential
September 24, 2024

recalling the specific impetus of the conversation.  I believe it was related to some M&A discussions we were having at the time.

Q.   Now, what has triggered your recollection sitting here today of that, as that is not reflected in these notes or in any other document that we've seen or looked at?

A.   I don't know why it's not in here.  And it's -- I just offered it as some additional color.  It's not clear to me that that's the case.

Q.   You then say: ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

                    Is that accurate?

A.   Yes.

Q.   And the date of this interview was October 2, 2018, so doing the math here of nine or 10 years ago would have this agreement start in 2008 or 2009; is that right?

                    MR. RUSSO:  Object to form.

                    MS. MOYÉ:  Object to form.

A.    As I said, that's the arithmetic.

Q.    (By Ms. Nussbaum)  The agreement -- I'm sorry. The bottom -- the last sentence of the page then says:

Is that correct?

A.    I'm surprised that he interpreted it that strict or that harsh or that I ▓▓▓▓▓▓ I would have ▓▓▓▓▓▓ And the spirit of it was to treat it as -- essentially, as we would treat intracompany transfers, just through the courtesy of notifying their supervisor.  Other than that, that's correct.

Q.    It then goes on to say: ▓▓▓▓▓▓

Is that accurate?

A.    Well, it's accurate in terms of ▓▓▓▓▓▓ I assumed it applied to management level --

Bill Wilcox  Confidential
September 24, 2024

Q.    Okay.

A.    -- which I would define as administrative and above.

Q.    You then ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████ ██████████ Is that accurate?

MS. MOYÉ:  Objection to the form.

A.    I'm pretty sure that that's a misstatement because I -- I don't think we got into -- I'm pretty sure we didn't get into any level of detail during that initial conversation.

Q.    (By Ms. Nussbaum)  Well, when you had your ████████████████████████████████ in 2018, was that closer in time to the events than today is?

MS. MOYÉ:  Object to the form.

A.    Is that a question?

Q.    (By Ms. Nussbaum)  Yeah.

A.    Yes.

Q.    And you were under oath at the time; is that correct?

A.    Yes.

Q.    Under penalty of perjury; is that right?

Bill Wilcox  Confidential
September 24, 2024

A.    I assumed, yes.

Q.    And so you were at that time doing the best you could to be accurate as to what had occurred approximately nine to 10 years before; is that right?

MS. MOYÉ:  Objection to the form.

A.    Yeah.  If you rephrased it and said:  In the past, I would say yes.  The nine to 10 -- 10 years may not be important, but it's -- that's just a recollection.

Q.    (By Ms. Nussbaum)  Now, Mr. Wilcox, at the very bottom paragraph on -- on Page 5, it says:  ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████      ████████████

███████████████████████████████████████████████

██████████      █████████████████████████████████

████████████████████████████████

Is that correct?

A.    Yes, other than it was a not-to-actively-solicit agreement.

Q.    Now, do you recall an agreement that USPI had with Tenet with respect to the solicitation of accountants?

MS. MOYÉ:  Object to the form.

MS. MOYÉ:  Objection to the form.

A.    Correct.  I could not recall any specifically.

Q.    (By Ms. Nussbaum)  Okay.  You then ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████  Is

that right?

MS. MOYÉ:  Objection to the form.

A.    Yes.

Q.    (By Ms. Nussbaum)  And so it is fair to say that when you and others at USPI learned that when Riley Orr, a senior level employee that you wanted to maintain, was going to leave, he stayed when you were willing to offer him better compensation; is that right?

MS. MOYÉ:  Objection to the form.

MR. RUSSO:  Objection to the form and foundation.

A.    In Riley's case, I believe it was much more related to an expanded role, but I am almost certain it included additional compensation.

Q.    (By Ms. Nussbaum)  So the sentence in Exhibit 508, where it says:  ████████████████

████████████████████████████████████████████

████████████████████████████████████████



Bill Wilcox   Confidential
September 24, 2024

A.   With the clarification that I would have expected me to also include that it was a nice promotion for Riley.

Q.   Okay.  Then let's look at the next page, the last sentence of that same paragraph: ▮

▮

▮

               Is that accurate and is that ▮

▮ under oath?

               MS. MOYÉ:  Object to the form.

A.   Yes.

Q.   (By Ms. Nussbaum)  The next paragraph: ▮

               Is that an accurate statement in what you ▮ when you were under oath

Bill Wilcox   Confidential
September 24, 2024

and being interviewed by them?

A.    I believe so.

Q.    Let's look at the next paragraph: ███████

██████████████████████████████████████████

█████████████████████████████      █████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████        █████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

            Is that correct and is that what you told

the ████████████████████?

            MS. MOYÉ:  Object to the form.

            MR. RUSSO:  Object to the form.

            MS. SHARP:  Objection, form.

A.    Yeah, I think important context, which you may

be getting to, is it went on to say:  ████████████

████████████████████████████████████████████

█████████

            And that's what I was saying earlier.

There were a myriad of M&A opportunities between us and

with us, along with efforts that we needed to promote

the industry.  I think that all was part of this -- the

Bill Wilcox  Confidential
September 24, 2024

Q.    (By Ms. Nussbaum)  Okay.  Let's now go to Page 7 of 15, and we'll start in the middle of the page. And the sentence starts: ███████████████

███████████████

A.    I see it.

Q.    Okay.  So here, it says: ████████

███████████████████████

███████████

████████████████

███████████████████████

███████████████████████

██████████████████

██████████████████

████████████████

██████

MS. MOYÉ:  Objection to the form.

A.    There's a doc- -- there's an email that we reviewed -- I reviewed in preparation that might lend some insight into that.  I don't recall.  It had to do with a potential acquisition.

Another possible explanation is I do recall when I talked to Andrew about the subpoena from the Burke-Ward, giving him the courtesy heads-up, he said:  Oh, you must be talking about the agreement we reached, I think he may have said nine or 10 years ago.

So I think the math triangulated -- it didn't triangulate.  It -- it's confusing.

Q.   (By Ms. Nussbaum)  Yeah.  So it's confusing because we have, you know, some documentary evidence as to 2008, some as to 2009, and now the document saying ███████████████████████.  And so I'm just trying to, you know, ask you if -- I know it's many years ago.  It was an oral conversation -- if you keep any diary or calendar or there would be anything else, you know, specific, that would, you know, let you definitively know when this agreement was.

A.   I don't keep any kind of diary or calendar.  I think that one email that I'm recalling may give us some clarity on it, but I need to talk to Ms. Moyé about that.

Q.   Perhaps when we finish this, you can speak to her during the next break.

A.   Okay.

Q.   Okay.  Then, in the next paragraph, it says:

███████████████████████████████████████████

███████████████████████████████████████████

████████████     ██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Bill Wilcox   Confidential
September 24, 2024



Is that accurate in what you ▮▮▮▮ ▮▮▮▮ under oath?

MR. RUSSO:  Object to the form.

A.   So if someone from SCA reached out to USPI -- I think it should -- I think USPI would treat it like an intercompany transfer and ask if the SCA employee notified his or her direct supervisor of their desire to leave SCA.  I think that --

Q.   (By Ms. Nussbaum)  So that's how you would interpret or articulate the "tell your supervisor" requirement?

A.   I think he just picked up the wrong company --

Q.   Okay.

A.   -- on that.

Q.   Okay.  That was the confusion.

Okay.  You then go on to say in the last paragraph, this is still on Page 7 of 15: ▮▮▮▮



Is that accurate?

A.    Yes.

That's accurate?

A.    Correct.

Q.    Okay.

Is that accurate?

A.    Yes.

MS. MOYÉ:  Objection, form.

A.    Yes.

Q.    (By Ms. Nussbaum)

Is that accurate?

Bill Wilcox  Confidential
September 24, 2024



A.   Yes.

Q.   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆

          Is that accurate?

A.   No, it should be " ▆▆▆ "

Q.   " ▆▆▆ "  Okay.

          Next paragraph:  ▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆   ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆

          Is that accurate?

A.   In my mind, yes.

Q.   Okay.  ▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆

          Is that accurate?

A.   Yes.

Q.   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆   ▆▆▆▆▆▆▆▆▆▆▆▆

Bill Wilcox  Confidential
September 24, 2024

[REDACTED]

Is that accurate?

A.    I think we're missing some words:  [REDACTED]

[REDACTED]

I'm not -- I think I'm following the intent, but I'm not sure of the sentences.

Q.    Well, how would you then rephrase it to make it accurate?

A.    I think I would just emphasize it was for the administrators and above, somewhere in there.  I think in general, it's accurate.

Q.    Okay.  And then looking at the last full paragraph on that page and the first continued paragraph on -- on Page 9, [REDACTED]

[REDACTED]

Is that accurate?

Bill Wilcox  Confidential
September 24, 2024



MS. MOYÉ:  Object to the form.

A.   Just to emphasize that, twice there, it said:

Again, we didn't have any discussions to clarify this with Mr. Hayek.

Q.   (By Ms. Nussbaum)  If you look at the next paragraph, the third sentence down:

Is that what you

:?

A.   Yes.

Q.

Is that accurate in what you



▌ ██████████████████████ ?

A.   Yes, that was --

MS. MOYÉ:  Object to the form.

Sorry.  Go ahead.

THE WITNESS:  Sorry.

A.   ████████████████████████████████

▌ █████████████████████████████████████████

▌ ███████████████. So that is accurate.

Q.   (By Ms. Nussbaum)  Okay.  Let's look now on
Page 10 and the second paragraph:  ███████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████.

Is that accurate in what ███████████████ ?

A.   I -- I can't imagine me stating what
Mr. Hayek's intent was.  I don't know that I didn't, but
I -- I question that.

Q.   Was that your intent?

A.   Yes.

Q.   Let's go now to the last paragraph and let us
look at -- starting where it says:  ███████████████

██████████████████████████████████████████

███████████████████████

████████████████████████████████████████████



Is that accurate?

A.    Yeah.

Q.    Last sentence: ▮

Is that accurate?

A.    I don't recall saying that.

Q.    Do you have any reason to believe that you did not say that?

A.    It would have -- it would have been -- I guess the answer is no.  We'll leave it at that.

Q.    Okay.  Let's go now to Page 13.  Let's start at the top of the page: ▮

Bill Wilcox   Confidential
September 24, 2024

A.   I read it a little differently, that Mr. Johnston, under the subject, SCA Gentleman's Agreement, said not to poach their folks.  I don't know what Mr. Johnston -- how he defined that.  I was operating under the same assumption we've discussed all day, that we had the agreement not to actively solicit and to treat it as an intracompany matter -- as the same as an intracompany matter.

And so then I reinforced that if she did indeed approach us and is willing to talk to Andrew and clarify above, after we know we want to offer her the job, then I'd be okay with that.

Q.   (By Ms. Nussbaum)  And then the final email on the chain is from Ms. Mosley.  And she says:  I just talked with Bill -- referring to you -- and he wanted me to make double sure that Pat did reach out to Gary and we were -- in no way reached out to her first.

So you had a conversation with Ms. Mosley in which you wanted her to confirm the facts with respect to the situation with Ms. Jepsen to see whether or not it violated your agreement with Andrew; is that right?

MS. MOYÉ:  Object to the form.

MR. RUSSO:  Object to the form.

MS. SHARP:  Object to the form.

Bill Wilcox    Confidential
September 24, 2024

A.    Yes.  And I also said that we should not ask her to speak with -- it would have been Andrew or whomever appropriate until we knew we wanted to offer her the job.

Q.    (By Ms. Nussbaum)  So, Mr. Wilcox, is it fair to say that over the years, anytime any issue with respect to the agreement came up, the other executives at USPI -- Mr. Brodnax, Ms. Mosley, others -- reached out to you if there was any question as to clarification or what was covered or not covered by the agreement?

MS. MOYÉ:  Objection to the form.

A.    Well, it certainly happened at least on this occasion.  And again, in those seven years or so, it didn't happen very often.  I couldn't say that it happened every time.  And I don't think it happened -- there weren't many instances and I don't know if they approached me on every instance, but I -- obviously, I was committed to sticking to that nonsolicit agreement and had -- had no intent of hiding it.  I didn't think there was anything inappropriate about it.

Q.    (By Ms. Nussbaum)  Let me show what we're marking as Exhibit 514.  It's under Tab 14.  And it is a series of emails in December of 2013, CIV_0000397215.

(Exhibit PX514 was marked.)

A.    Okay.

Q.    (By Ms. Nussbaum)  Do you recognize this document?

A.    I do.

Q.    And is this one of the documents that you reviewed in preparation for your deposition?

A.    Yes.

Q.    Okay.  Now, this concerns Terri Seidel, who was an employee with SCA and who is being considered as a finalist for a regional vice president position by USPI; is that right?

A.    Yes.

Q.    Okay.  And the first email, which is to you, is from a Chris Hartshorn.  And who is that?

A.    He -- at that point, he was a relatively senior operator over the St. Louis market.  I'm not sure what his title was.

Q.    Okay.  And Mr. Hartshorn, writing to you, says: Shannon wanted me to let all of you know that we did not approach her.

So first, he's letting you know that USPI did not violate your agreement with Mr. Hayek.  USPI did not approach her.

MS. SHARP:  Objection, form.

Q.    (By Ms. Nussbaum)  You see that?

A.    Yes.

Q.    (By Ms. Nussbaum)   And I think you also told us you cannot recall sharing any volume information.

A.    Correct.

Q.    Okay.   Now, let me show you Exhibit 516.   And this is an email from Mr. Kopser to you and others and it is in February of 2010.   And it says:   GA cost comparison, SCA versus USPI.

Do you see that?

A.    I do.

Q.    And can you identify this?   Is this a series of emails at USPI between senior management that was done in the ordinary course of business?

A.    Yes.

Q.    Okay.   And Mr. Kopser is -- you told us this morning, Mr. Kopser was the CFO before Mr. Cagle took over that function.   And then Mr. Kopser took on another function with respect to some European entities of USPI; is that right?

A.    That's correct.

Q.    And Mr. Kopser is circulating.   The subject is: Cost comparison versus SCA.

And it says:   GA cost comparison, SCA versus USPI.

Do you see that?

A.    I do.

Q.    And what is "GA"?

A.    General and administrative.  It's shorthand for general and administrative expense, which is corporate overhead.

Q.    Okay.  So general and administrative expense. And is it fair to say that salaries are one of the largest components of corporate expense?

MS. MOYÉ:  Object to the form.

MR. RUSSO:  Object to the form.

A.    Generally, yes.

Q.    (By Ms. Nussbaum)  And at USPI, in fact, were salaries one of the largest components of GA, or general and administrative expense?

MS. MOYÉ:  Object to the form.

A.    Yes.

Q.    (By Ms. Nussbaum)  Now, if you then look at the document, it appears that there are departments.  It says:  Accounting/Finance, Audit and Process Improvement, Broker/ Dealer.

And unfortunately, this is the way that this was produced by your counsel and this is one of the types of documents that we were referring to this morning where we were asking what efforts had been made to continue to search for documents.

Now, did you ever have any discussion with

Bill Wilcox    Confidential
September 24, 2024

Mr. Kopser as to where he got that information?

MS. MOYÉ:  Objection to the form.

A.    Not that I recall.

Q.    (By Ms. Nussbaum)  And that's not publicly available information, is it?

MS. MOYÉ:  Objection to the form.

A.    This level of detail, I don't know.  I don't know.  This is obviously high-level.  I don't know or remember what's in the various filings or where we were and where SCA was at that point in time.  This is obviously high-level summary information.

Q.    (By Ms. Nussbaum)  And SCA is, as I think you told us ███████████████████████████, a major competitor of USPI in the ASC market; is that right?

MS. MOYÉ:  Objection to the form.

A.    I would describe -- in terms of the competition -- in terms of competing for business volume, our main competition is not with the other ASC companies.  It's with health systems in the -- in the market.  Occasionally, we would compete with a surgery center company if they happen to have surgery centers in that market.

The way in which we -- we'd compete with companies like SCA would be when we're competing for an acquisition or the creation of a relationship to build a

new facility, I think an important distinction.

Q.    (By Ms. Nussbaum)  And so if you were competing with SCA in any way, why would you share cost comparisons with them?

A.    Oh, this is --

MS. MOYÉ:  Objection to the form.

A.    -- simply a benchmarking exercise, high-level benchmarking exercise.  It is routine.

Q.    (By Ms. Nussbaum)  What did you do with it?

MS. MOYÉ:  Object to the form.

A.    I don't recall.  I'm sure we digested it and tried to understand where they may be doing things better or differently than us.

Q.    (By Ms. Nussbaum)  Now, did you authorize Mr. Kopser to share GA cost comparisons between the two companies?

A.    Not that I recall, but I -- I don't think I had forbidden that.

Q.    And who is Niels Vernegaard?

A.    He is -- well, he was at that point our chief operating officer.

Q.    And he finds it impressive.  He says: Impressive.  Can we get anything at facility level, i.e., staffing?

You see that?

Bill Wilcox  Confidential
September 24, 2024

MS. MOYÉ:  Object to form.

THE REPORTER:  I'm sorry.  I didn't hear an answer.

A.    I do.

Q.    (By Ms. Nussbaum)  And do you know if Mr. Kopser was able to do that?

A.    I do not.

Q.    Do you recall any discussion at any Monday morning team or any other team meeting in which you discussed with Mr. Kopser and Mr. Vernegaard or Mr. Brodnax getting that information from SCA?

A.    No.

Q.    Now, to your knowledge, did anybody at USPI share general and administrative costs with any other company other than SCA?

MS. MOYÉ:  Object to the form.

A.    Not to my knowledge.  I don't know that we shared it with SCA, but I assume that we did.

Q.    (By Ms. Nussbaum)  Did you ever discuss with Mr. Hayek the sharing of information between the two companies?

MS. SHARP:  Objection to form.

A.    Not that I recall.

Q.    (By Ms. Nussbaum)  Now, I think that you told us earlier, and it's reflected in the interview that you

Bill Wilcox  Confidential
September 24, 2024

A.   No.  I think an important distinction -- I believe I said it.  If not, I should have said:  I don't recall that.

Q.   (By Ms. Nussbaum)  Now, let us look again at Exhibit 507, which is the notes of your ████████████ ████████████████████████████ on October 2, 2018.  And if we look at Page 3, in the second full paragraph --

A.   I may have given it away.

MS. MOYÉ:  The court reporter may have it at this point.

Q.   (By Ms. Nussbaum)  Now we're looking on Page 3 in the second full paragraph.

MS. MOYÉ:  Did you say:  Second?

MS. NUSSBAUM:  Second, yeah.

Q.   (By Ms. Nussbaum)  It says in pertinent part:

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████    ████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████    Do you see that?

MS. MOYÉ:  Objection to the form.

Bill Wilcox  Confidential
September 24, 2024

A.    I see where you just read.

Q.    (By Ms. Nussbaum)  Now, does that refresh your recollection to the fact that ████████████████████ ████████████████████████████████████████ ████████████████████████

A.    Well, it simply reads that ██████████████ ████████████████████████████████████████████ ██████████████████████████.  Those are just really high-level.  Those -- that's a kind of "How was your first quarter?" kind of conversation.  And then -- and I did say that ████████████████████████████ ████████████████████████████████████████████ ██████████████████.

Q.    Right.  So before the information was publicly available, you were the person on behalf of USPI that reached out to two of your competitors, one of which was SCA, to get their volume information from them; is that right?

MS. MOYÉ:  Object to the form.

A.    As it relates to just very high-level, in conversations with these two people, I would occasionally ask about their -- what they're seeing in the marketplace.

Q.    (By Ms. Nussbaum)  Now, as you sit here now, refreshing your recollection on information sharing, is

there any other information that you recall sharing in phone calls or in any other way with SCA?

A.   No.  High-level benchmarking would have been what we'd done.  I don't recall anything more than that. Not at this -- at this point, I don't recall anything more than that.

Q.   Okay.  But this information was not available unless you shared it with these companies; is that right?

MS. MOYÉ:  Objection to the form.

MR. RUSSO:  Object to the form.

A.   I don't -- I don't think that's right, but I'm not sure.  We had public -- public filings.  I don't remember -- HCA was public the whole time.  I don't remember what level of detail they had in their filings and, frankly, don't remember whether SCA had public data or not.  Sorry.

Q.   (By Ms. Nussbaum)  If the information was publicly available, why would you need to get it from your competitors?

A.   Again, this would be high-level:  What trends are you seeing in the industry?

It might be more specific to, you know, the cyclical nature of the business.  It might have more in terms of timing, a tighter time frame.  I just don't

recall specifics.  If I could see something, I'd be happy to review it.

Q.  Okay.  Do you recall speaking with Andrew Hayek or emailing with him and arranging to have the two companies pool their data and then hire a consulting firm to analyze their data with respect to health care consumer confidence?

MS. SHARP:  Objection to the form.

MR. RUSSO:  Object to the form.

A.  I do not.

Q.  (By Ms. Nussbaum)  Let me show you what's been marked as Exhibit 517.  It's under Tab 22.

(Exhibit PX517 was marked.)

MS. MOYÉ:  This is 517?

MS. NUSSBAUM:  Correct.

Q.  (By Ms. Nussbaum)  Do you recognize this document?

A.  I do not.  I've read it.

Q.  You've read it, but you don't recognize it?

A.  I haven't seen it in a long time --

Q.  Okay.

A.  -- I think.

Q.  And is this a series of emails between yourself and other senior people at USPI with respect to USPI business?

Bill Wilcox  Confidential
September 24, 2024

A.    I don't.

Q.    (By Ms. Nussbaum)  Do you know what data he provided?

A.    No.  It's clear to me it's related to the consumer confidence.

Q.    So as you sit here today, you have no recollection of what you meant when you said:  We are in, or what data you provided to Mr. Mathis or his -- his colleagues.

MS. MOYÉ:  Or his what?  I'm sorry.

MS. NUSSBAUM:  Colleagues.

A.    No, I know exactly what I meant by:  We are in.

I have a high level of comfort that it was related to an industrywide -- our small industrywide health care consumer confidence to differentiate us from others in the surgical space.  I don't recall what information it was.  And pooling would be so we could give an industrywide picture of how our said industry compares to others.

Q.    (By Ms. Nussbaum)  Okay.  Let me show you what we're marking as Exhibit 518, and this is under Tab 23.

(Exhibit PX518 was marked.)

Q.    (By Ms. Nussbaum)  Now, who is Don Steen?

A.    He is the founder of USPI.

Q.    Okay.  So he is emailing you --

A.    Give me just a second to...

Q.    Sure.

(Witness perusing document.)

A.    Okay.

Q.    (By Ms. Nussbaum)  And this is Bates-stamped 000104518.

So Mr. Steen is emailing you.  There's no subject.  And he says:  I hope we can show stats on doctors being employed and USPI overhead compared to others at upcoming board meeting.

You then email Mr. Kopser, who was the CFO at the time, Mr. Brodnax and others, and you say: Fourth request on competitor info!  Let's also get info on employment, both in general and by specialty.

And then Jarod Moss -- who is he?

A.    At that point, I think he was in -- I think he was the Number 2 in development at that point.

Q.    Okay.  And he says:  Thanks.  With respect to employment, I'll gather info and circulate.

Now, what is this referring to?

A.    This is referring to board preparation --

Q.    Right.

A.    -- with the -- typical, in a board, you present benchmarking information.  And this is Mr. Steen's request that we gather that.  And in terms of

employment, it's all -- he's only referring to physician employment of which we had almost none.

Q.   And when you say:  Fourth request on competitor info, what are you referring to?

A.   I must have --

MS. MOYÉ:  Do not guess.  I was going to say:  Do not guess.

If you can recall, go ahead and answer.  Just don't speculate or guess.

A.   I don't recall why I typed this specific sentence.

Q.   (By Ms. Nussbaum)  Let me show you what we're marking as Exhibit 519.  It's under Tab 24 with 000337290, and it is a forwarded message to you.

(Exhibit PX519 was marked.)

Q.   (By Ms. Nussbaum)  And the message is first from a Jason Hatley at SCA to Mr. Mathis at SCA, and then Mr. Mathis sends it to Mr. Cagle.  And Mr. Cagle sends it to you?

And it says:  Forwarded, August volume.

And it says:  SCA up 2.8 percent in August.

Do you see that?

A.   I do.

Q.   Now, does this refresh your recollection that

Bill Wilcox  Confidential
September 24, 2024

SCA and USPI were sharing volume information on a regular basis?

MS. MOYÉ:  Objection to the form.

MR. RUSSO:  Objection, form.

A.    As I stated earlier, some of the data -- some of the information we would share would be in a tighter time frame.  This appears to be for just one month.  I don't know if it was routine, but again, it's only volume information, high-level.

Q.    (By Ms. Nussbaum)  And then you send this to Ed Sobol at Welsh Carson.  Do you see that?

A.    Yes.

Q.    So the information flow here is from somebody at SCA who gathers the information, who sends it to Brian Mathis, who is the go-between between SCA and USPI.  Mr. Mathis then sends it to Mr. Cagle.  Mr. Cagle sends it to you.  And you send it to Ed Sobol.

And what is Mr. Sobol's role at the time of all of this, which is in September of 2014?

MS. MOYÉ:  Object to the form.  It mischaracterizes the document.

A.    Well, I simply cc'd Mr. Sobol who was a -- and again, this was benchmarking information only, high-level, and Mr. Sobol was in 2011 -- no, 2014.

Q.    (By Ms. Nussbaum)  Right, 2014.

Bill Wilcox  Confidential
September 24, 2024

A.    He would have been one of the sponsor's board members.

Q.    And what do you do with this information?

A.    It's simply benchmarking.

Q.    What do you mean by that, that it's simply benchmarking?  I mean, it looks like you went to a lot of trouble to get it from SCA, and so the question is: What are you doing with it?

MS. MOYÉ:  Objection to the form.

MR. RUSSO:  Object to the form.

A.    I don't -- I don't have a better way to explain it.  Benchmarking, which every company is -- that I've ever been associated with or aware of, benchmark studies in the industry.  And this is -- this is high-level volume.

Q.    (By Ms. Nussbaum)  And you were sharing the high-level volume with SCA, and then you're internally sharing that information with the financial team and others at -- at USPI; is that right?

MS. MOYÉ:  Objection to the form.

A.    This is just SCA sharing with us.  It's likely reciprocal.  And I'm sharing it with the operators and with the representative from the sponsor.

Q.    (By Ms. Nussbaum)  Now, let me --

A.    Oh, no, I'm sorry.  I misspoke.  Jason Cagle is

sharing it.

Q.   Okay.  Let me show you --

A.   The way I read -- I may have misspoke.  I think -- the "to" line is -- on the very top, the "to" line is to myself, Mr. Brodnax, other senior executives and a carbon copy, or cc, to Mr. Sobol from Jason.

Q.   Right.  Let's look at what's previously been marked as Plaintiffs' 235, and that's under Tab 25.  This is 0000110943.  This is an email dated January of 2015 and it's from Mr. Cagle.

Mr. Cagle writes:  We do this every so often and I thought you might be interested to see it.  I can send it to MMG -- that's the Monday morning group -- if you want, but wanted you to have it first.  There may be some comparability issues, but it should be fairly clean.  A few highlights, from my perspective.

And he then is comparing what SCA and USPI spend in various different categories:  Legal spending, corporate spending, finance, HR, development, strategy, et cetera.  Do you see that?

MS. MOYÉ:  Objection to the form.

A.   I do.

Q.   (By Ms. Nussbaum)  And the name of document is Overhead Comparison, SCA USPI.

Now, do you recall that USPI and SCA

shared, quote, every so often their overhead comparisons?

MS. MOYÉ:  Objection to the form.

A.    I do now.

Q.    (By Ms. Nussbaum)  And when Mr. Cagle said to you:  I can send to the Monday morning management [sic] if you want, you respond to Mr. Cagle, quote:  Please keep this just amongst the three of us, referring to yourself, Mr. Cagle and Mr. Brodnax; is that right?

A.    That's correct.

Q.    Now, why was USPI sharing with SCA their overhead every so often?

MS. MOYÉ:  Objection to the form.

A.    As I've stated before, it's benchmarking.

Q.    (By Ms. Nussbaum)  Well, the numbers here -- for example, HR.  The biggest component in HR would be salaries; is that right?

MS. MOYÉ:  Objection to the form.

A.    I don't know -- I don't know how they handled systems on this.

Q.    (By Ms. Nussbaum)  What about corporate accounting?  Wouldn't the biggest input expense there be salaries?

A.    It would be one of the main ones.

Q.    And the same is true in finance, right?  The

main expense there would be salaries.

A.    Likely.

Q.    And the same is true in legal.  Main expense would be salaries, right?

A.    Probably not.

Q.    It says:  2.2 versus 900K or probably, and then he says:  1.3 with Tonya.

Who is Tonya?  Is that one of the lawyers?

MS. MOYÉ:  What was the question?

MS. NUSSBAUM:  I'm asking if he knows who Tonya is and whether or not that's one of the lawyers.

A.    I probably should, but I don't recall.

Q.    (By Ms. Nussbaum)  Mr. Cagle -- I'm sorry.

Mr. Wilcox, do you recall why you told Mr. Cagle that he should not share the overhead comparison between SCA and USPI with the entire Monday morning group and, instead, quote:  Please keep this just amongst the three of us, referring to yourself, Mr. Cagle and Mr. Brodnax?

A.    No.

Q.    Do you recall if there was any discussion with in-house counsel or any other counsel about whether or not it was proper to be sharing overhead information with SCA?

MS. MOYÉ:  I instruct you not to answer

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of October, 2023.

_Jamie K. Israelow_

_____
Jamie K. Israelow, CSR, RMR, CRR
Texas CSR 3801
Expiration Date:   4/30/2025
US LEGAL SUPPORT, INC.
Firm Registration No. 122
16825 Northchase Drive, Suite 900
Houston, Texas   77060
713.653.7100

Charge for transcript and exhibits $ _____

To be paid by Class Plaintiffs / Linda P. Nussbaum, Esq.

SERVICE NO. 6616480-001

# EXHIBIT 31

# FILED UNDER SEAL

Case: 1:21-cv-00305 Document #: 742-5 Filed: 04/10/26 Page 109 of 158 PageID #:35219

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         )
LITIGATION,                       )
                                  ) Master Docket No.
                                  ) 1:21-cv-00305
                                  )
THIS DOCUMENT RELATES TO:         )
ALL ACTIONS                       )


* * *CONFIDENTIAL* * *

VIDEOTAPED DEPOSITION OF WARREN JOSEPH CINNICK

Chicago, Illinois

November 22, 2024


Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR, CSR

JOB NO. 6744811-001

that's in ███████████████████████.

Q.    Okay.  And are you presently employed?

A.    I am self-employed.

Q.    Okay.  And what kind of work do you do?

A.    I do human resources consulting work, primarily surrounding career counseling and support of businesses with their talent acquisition and talent strategies.

Q.    Okay.  And how long have you been working for yourself in human resources consulting?

A.    Since June of 2023.

Q.    And what is your work address?

A.    The same as my home address.

Q.    Okay.  And prior to this role that you currently have, were you employed by Surgical Care Affiliates?

A.    I was.  Last known as SCA Health.

Q.    And previously, they were known as Surgical Care Affiliates?

A.    That's correct.

Q.    Okay.  And how long did you work at SCA?

A.     From November 2017 until June of 2023.

Q.     And what was your title at SCA at the time that you left in 2023?

A.     Group vice president of human resources, which was the top human resources job at that division.

Q.     Did you have the same title throughout your entire time at SCA?

A.     I did not.

Q.     Okay.  And what title did you have when you first joined?

A.     Vice president of human resources.

Q.     Any other titles?

A.     I did not have any other titles there.

Q.     Okay.  Mr. Cinnick, have you ever had your deposition taken before?

A.     Not in this case.

Q.     In any other case?

A.     Yes.

Q.     Okay.  And how many times?

A.     About 11 or 12 times.

Q.     Okay.  And when -- generally, when did those depositions take place?

A.     In the 1980s and 1990s.

Q.    Okay.  And generally, what were those cases about?

A.    Human resources matters with respect to the companies that I was working for at the time.

Q.    Okay.  So I'm sure you might know a lot of this already, but I just want to go over some of the basic rules of this deposition, which you might have covered with your counsel.

But, please, if there's anything that I say that you don't understand, please let me know, and I'll do my best to rephrase that for you.  Otherwise, I'll assume that you understand what I said; is that fair?

A.    That's fair.

Q.    Okay.  And please, we're here to accommodate you.  If you need to take a break, let us know; just make sure there's no question pending.

A.    Thank you.

Q.    Okay.  And do you understand that you just took an oath to tell the truth here today?

A.    I do.

Q.    Okay.  And you understand that even

BY MR. CASTILLO GUARDADO:

Q.    Uh-huh.

A.    So, across the board, that concept comes from labor law and the idea that an entire bargaining unit will get an across-the-board increase, everybody sees the same.

That doesn't apply in a -- in a company that doesn't have that kind of a system, and we had -- we had no represented employees, so we didn't do across-the-board increases.

Q.    Would there be a percentage increase of base salary across the company?

A.    Widely across the company, yes.  There would be a large participation in some kind of an increased plan, differentiated, significantly, by performance and where the person is in the range, their work, and all of -- a number of factors.

Q.    Uh-huh.

A.    A wide number of factors.

Q.    Would that be known as a merit pool --

A.    That's correct.

Q.    -- increase?

A.    That's correct.

Warren Joseph Cinnick   Confidential
November 22, 2024

Q.    Can you describe for me what a merit pool is, more specifically?

A.    Certainly.  A merit pool is a pool of funds generated by looking at the total payroll of a group, applying a percentage to that, and then allocating back to the managers for distribution to individuals that pool.

To give it some numbers, if we had a million dollars of payroll, and we gave -- decided on a pool, a merit pool of 4 percent, it would say, now, among that million dollars of payroll, you have $40,000 to spread around between the people who are receiving the million dollars.

Q.    Uh-huh.

A.    And how that gets spread is going to vary by situation.  You take into account performance of each individual.  You take into account how they're particularly paid for their job.  You take into account the outside marketplace and whether it's moving rather quickly in certain jobs.  You might take into account fairness with respect to other employees.

Warren Joseph Cinnick   Confidential
November 22, 2024

So a whole number of factors that would go into the distribution of that specific $40,000, in this case.

Q.   And who was involved at SCA in determining that percentage for the year?

A.   It would start with myself and the CFO.  We would eventually then take it to the CEO and their direct -- and that level direct reports for approval, and then would release it to managers for distribution.

Q.   And can you let me know how spot bonuses were calculated or determined?

A.   Spot bonuses?

Q.   Yeah.

A.   Spot bonuses, at the time I joined, it wasn't clear how those were determined.  Later on, we put into place a plan that recommended certain levels of spot bonus for different people, for different types of contributions to the company.

And so I would say, at the outset, it was not clear to me from the data that I inherited how spot bonuses were given out.  That's not great practice in a company.  You

So we would also consider outside marketplace at the time.

Q.    Uh-huh.

A.    So at the time of -- or should we say, gee, have we looked at current data, those benchmark jobs I spoke of?  So a lot of things would go into it.

From a process perspective, the manager raises the question, perhaps even raises a proposed number, and then that would be reviewed with Kevin Zaideman or the folks in compensation.

If it was vice president and above, it came to me for review.

Q.    Uh-huh.

A.    Below that, Kevin would review it with a person that -- you would be in the title of HR business partner.  That simply means that they are the person assigned to work with leaders and help them with their HR topics.

Q.    Uh-huh.

A.    So there were -- clearly, I didn't do all of them in a company of 14,000 employees -- or, clear to me anyway I didn't do them all in a

company of 14,000 employees.

Q.     It would be very difficult.

A.     Right on.

Q.     And so were there parameters to an employee's salary?  When one of the managers would say, hey, you know, I'd like to promote so and so, were there parameters to a salary, like a minimum, a maximum, that you would be looking at based on this information that we discussed?

A.     Great question.

For sure.  All jobs eventually ended up inside of a salary structure.  The salary structure has a minimum and a maximum targeted pay, has a midpoint pay.

Q.     Uh-huh.

A.     And each job resides somewhere in that structure.  So that was the eventual place that it all ended up.

If a manager brought forth a promotion, and -- and the structure was in place, we would reference that.  We would say where is -- you know, where is this in the structure?  Where is your pay with respect to the band, the pay band?

Secondly, we would take that outside marketplace data --

Q.   Uh-huh.

A.   -- and bring that immediately to bear.

Bands are very wide.  Bands give tremendous room to be able to pay what you want. However, you want to tie it down a bit to the outside marketplace.

Q.   Uh-huh.

A.   And so we would also bring that data to bear.  And, of course, the start of the whole conversation really is, where is the performance, where is the change in the job responsibility that this should -- that this should be even considered?

Q.   Uh-huh.

A.   So a lot of factors go into it.  The limitation, though, would be that -- that mid/max of -- of the grade, which is a very common, very common practice.

Q.   And so you're trying to find that sweet spot number within the external benchmark figures that you're looking at and any internal figures, say, well, is that right?

Warren Joseph Cinnick   Confidential
November 22, 2024

A.    That's a fair way to say that, yeah.

It is not a -- it is not an exact calculation.  It's not a -- it's not a precise, you know, run the equation and out comes a number.  It is definitely one that you take some judgment on.

Q.    Uh-huh.

A.    For example, sometimes the pressure on pay for an individual will be driven by the outside market.  They had a job offer.

Q.    Uh-huh.

A.    And now you were wanting to retain them.  The job offer might be so spectacular that we would actually say to the person, Go with God.  That sounds like a great offer.  Go ahead and take that.  And we would have that conversation.

I can think of one very clearly where a person left us for Amazon, and they had a $75,000 raise on a job that we didn't think was worth that.  Three years later, turned out that was right.  They got laid off from Amazon.

I know this for fact.  This is a true case we went through.  And I felt bad for the

individual because they chased the money, and it was unsustainable in the job marketplace.

Q.   Uh-huh.

A.   We kind of knew that so we didn't match it.

Q.   Uh-huh.

A.   Other times, we said, gee, the difference is only a little bit.  We were already going to give them in the spring a bump with their pay, we were already going to increase their pay, why don't we just move it up?

Q.   Uh-huh.

A.   We'll just move up the action to now. We retain them.  They stay in the company.  We spent the same amount of money we were going to spend.  We just spent it a little early.

Q.   Uh-huh.

A.   So I'm characterizing those two stories for you to give you that sense of -- you used the phrase, you know, it's kind of a "sweet spot."  There's an example of how you've --

Q.   Uh-huh.

A.   -- got to do that sweet spot.  You

have to take into account a lot of things about the current facts of the -- of the situation.

Q.    Sure.

MS. ZIELINSKI:  Hey, Will, we've been going for a little over an hour.  Do you want to take a break at some point?

MR. CASTILLO GUARDADO:  Yeah, let's take a break.  This is a good point.

VIDEOGRAPHER:  Off the record.  10:08 a.m.

(Recess.)

VIDEOGRAPHER:  Going on the record. 10:22 a.m.

BY MR. CASTILLO GUARDADO:

Q.    Mr. Cinnick, you've mentioned a couple of times or you've referred to equity within the company.  Not the stock option equity, but I believe you were referring to internal equity with respect to pay system -- sorry, with respect to pay at SCA; is that right?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I'm not certain that I said the word "internal equity."  However, I did reference fairness and kind of internal

fairness and those sorts of things, sometimes referred to as an internal equity kind of idea, but I'm not certain that I said it in my earlier testimony.  I'm just not recalling.

Nonetheless, I did refer -- just to reinforce you, I did refer to the idea that you do look internally and say, well, where is this person against others, similar job, that kind of thing.  Absolutely, that's a task.  Yeah, absolutely.

BY MR. CASTILLO GUARDADO:

Q.     And that would be referred to as internal equity or internal fairness?

MS. ZIELINSKI:  Objection to the form.

THE WITNESS:  You would refer to it as kind of a -- a double-check on where other people are paid internally.  You would refer to it as a way to say, what are we doing with others that are similarly placed?

BY MR. CASTILLO GUARDADO:

Q.     Uh-huh.

A.     There's -- there's a -- there's an element of equitable treatment in it.

Warren Joseph Cinnick   Confidential
November 22, 2024

Q.    Uh-huh.

A.    But I'm not sure I would exactly refer to it as "internal equity."  I don't -- that's not a term I would ordinarily use myself.

Maybe others have used it.  Maybe you're using it in some other way, but, you know -- so my definition of that is what I said. You look inside.  You see what others are paid that are similarly placed.  You take that into account as you're making an individual decision, so...

Q.    And what does that -- what is the purpose of that equitable treatment in pay within SCA?

A.    Anytime you're in a bonus-based system, you have to watch that you don't distort one element and then have it impact the entire cash compensation of a person.

So, for example, if I'm paying a group of people somewhere between 120 and 140,000, and -- and generally, there are all little dot points along that line, and they're all doing the same job, they're all -- they're all doing, call it, director of -- of finance.

years, I got people who have been there two years.  The one with ten years, they're doing more for me.  They know more stuff.  They're smarter.

Q.    Uh-huh.

A.    The one two years in, same title, same job, same accountabilities on paper, but they don't know everything.  They're leaning on the others.  So they have got -- they have got room to move yet in the band.

Q.    Uh-huh.

A.    So that concept of stepping back and saying, how am I treating everybody that's on this job is a bit of a calculus.  You used the term "sweet spot."  It's a bit of looking at that sweet spot and say, what's there?

So that -- that's -- that's more what I would define as that process of internal equity or internal fair treatment.

Q.    Uh-huh.

A.    It's an amalgam of -- of -- of considerations about the marketplace and about their maturity in the job, that sort of thing.

Q.    Sure.

A.    Geography, as I got in there.

That was a lot I covered there, so if, you know...

Q.    I appreciate that.

And so do you believe that SCA wanted to pay all its employees fairly?

A.    I --

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I do believe that.  I do believe that fairness was an important part of our thinking, yes.

It wasn't the only part of our thinking, to extend the remarks there.  The other part of our thinking was, are we paying enough to make sure we keep people?

BY MR. CASTILLO GUARDADO:

Q.    Uh-huh.

A.    Are we pay enough to make sure we keep this person at this time?  Sometimes it got to a very individualized case, right?

Q.    Uh-huh.

A.    So -- and you had to do something different or something special to make sure that you could keep a person.  However, fairness was

absolutely an element of what we did.

MR. CASTILLO GUARDADO:  Okay.  Let's pull up Tab 3.

CONCIERGE:  Is that going to be 560?

MR. CASTILLO GUARDADO:  That's going to be 560, I believe.

(PX Exhibit 560, E-mail chain Bates-stamped SCA001093310 through 3311, marked for identification as of this date.)

BY MR. CASTILLO GUARDADO:

Q.    Mr. Cinnick, I'm now handing you what is being marked as Plaintiff's Exhibit 560, bearing Bates number SCA001093310 through 3311.

Please take a moment to read the document.

A.    I will.

Okay.

Q.    Okay.  Mr. Cinnick, is this a true and correct copy of e-mails you sent to Tony Kilgore and Jennifer Sandoz in January 2018 during the regular course of your employment at SCA?

A.    Yes.

Q.    Okay.  And who is Tony Kilgore?

A.    Tony Kilgore, at the time, was the CEO

CERTIFICATE

I, Kathy S. Klepfer, a Registered Merit Reporter and Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That WARREN JOSEPH CINNICK, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 24th day of November 2024.

---------------------------------------
KATHY S. KLEPFER, RMR, CRR, CLR, CSR

# EXHIBIT 32

# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - - - -  X

IN RE OUTPATIENT MEDICAL          :   Docket No.

CENTER EMPLOYEE ANTITRUST         :   1:21-cv-00305

LITIGATION                        :

- - - - - - - - - - - - - - - - -  X

Wednesday, May 7, 2025

Videoconference Deposition of JOHN

JOHNSON, Ph.D., an expert witness herein, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to notice, the

witness being duly sworn by Desirae S. Jura, a Notary

Public in and for the District of Columbia, held at

McGuireWoods, LLP, 888 16th Street, NW, Washington,

DC, at 9:02 a.m., ET, Wednesday, May 7, 2025, and the

proceedings being taken down by Stenotype by Desirae

S. Jura, RPR, CSR (CA), and transcribed under her

direction.

John Johnson, Ph.D.
May 07, 2025

minimum wage, employment suddenly goes up. I don't think that's been accepted in the canon of economics. I think it's an interesting set of studies that at least raised important issues about how we think about these issues.

Q. If you assume that labor markets are perfectly competitive, what does classic economic theory say would happen if you increased the minimum wage with respect to low wage employment?

MS. ZIELINSKI: Object to the form.

THE WITNESS: Well, in a theoretical context, with perfect competition, which implies an infinite number of firms and one wage -- one prevailing wage, what one would expect is that if you increase those wages, employment would go up.

BY MR. HARVEY:

Q. But that's not what Card and Krueger found, is it?

A. That's not what Card and Kreuger found, no.

Q. Does that suggest that -- to you that the labor markets at least they were studying were not perfectly competitive, and that the employers of these employees had some degree of market power?

MS. ZIELINSKI: Object to the form.

John Johnson, Ph.D.
May 07, 2025

THE WITNESS: No, I don't think you can draw that conclusion. First of all, I think we all agree that there are different types of market structures and perfect competition is a theoretical construct.

But more important, I think it's a step too far to take those results and point it in that direction. I don't -- my problem or issue with those results would be a little bit more foundational. And again, let's remember, Card and Krueger was an outlier paper amongst hundreds of papers that found the usual expected relationship that we just described.

So although that was an influential paper and it was an outlier paper, that's partly why it got so much attention, I don't think it's a fair reading of the labor economics literature, or even the state of labor economics today, that it's been accepted that that is true.

BY MR. HARVEY:

Q. You don't think that it's a widely held belief among labor economists today that all employers have at least some degree of market power?

MS. ZIELINSKI: Object to the form.

THE WITNESS: I think we should be a

little careful, because I see a lot of confusion over the way labor economists sometimes use the term market power, and the way antitrust economists use the term market power.

When an antitrust economist uses the term market power, what we are talking about is the ability to suppress -- or in the wage context, suppress wages below competitive levels for a sustained period of time.

I think labor economists tend to talk about a little more broadly about, can you set wages at all for any length of time, right?  So I don't think it's a -- I think you need to be precise about what it means.  I don't think there's broad consensus about all employers have labor market power in the context that an antitrust economist would use the term.  I don't think there's broad consensus on that.

BY MR. HARVEY:

Q.    Are there labor economists who following the Card and Krueger paper and work by others, tested the degree of market power that employers have over their employees in a wide variety of contexts?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I am sure there are many different papers in many contexts where people have

John Johnson, Ph.D.
May 07, 2025

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  No, I don't think so.  I think I had a positive damage number.  It was different than what the plaintiff had put forward, and used a different set of -- it built off that methodology, but it was different.  But I was affirmatively testifying about the damage number in that case, which I think is distinct from your question about other cases.

BY MR. HARVEY:

Q.  I misspoke, so I apologize for that.  What method did you use to find positive classified damages in that case?

A.  Right, in that case, I used -- it was a regression the plaintiff had put forward.  And particularly, it had to do with averaging of the data, where the plaintiffs' expert took thousands and thousands of observations and summed into one data point per month.  And I unpacked the data and reran the model, and showed the numbers would be very different and much lower.

Q.  Since you left the University of Illinois, at least one of your primary focuses has been litigation consulting, correct?

A.  Yes.

John Johnson, Ph.D.
May 07, 2025

Q. And a large part of that is consulting with respect to class action litigation, correct?

A. Yes.

Q. Are there any certified classes that you believe were properly certified, that is that you believe that the plaintiffs in those cases put forward reliable methods for establishing common impact with common proof?

MS. ZIELINSKI: Object to the form.

THE WITNESS: There are so many cases, I actually can't keep track of every case that's ever been certified. I can speak to specifics of cases that I've worked on. And in those cases, I've had certain opinions. But I can't broadly speak to all potential classes.

BY MR. HARVEY:

Q. Can you identify a single one, sitting here today?

A. Again, I'm not comfortable trying to generalize. Generally, if I'm going to do an assessment of a case, I want to actually see the data, see the information. I haven't seen the data and information for all cases or classes that have been certified.

I can speak to specific issues with the

cases that I've testified in, but I can't opine either way, whether it should be certified or not, on cases that I haven't worked on, especially given my expertise is antitrust and econometrics, where the details of the data in the models matter so much to the methodologies.

Q. So you have looked at the details of the models in the 17 class cases you mentioned, correct?

A. Yes.

Q. Have the plaintiffs in any of those cases established common impact with common proof to your satisfaction?

MS. ZIELINSKI: Object to the form.

THE WITNESS: I don't think it's to my satisfaction. It has to do with the specific class definitions, how broad the class is, and specifically, whether the methodologies used applied to those class definitions apply.

And in those particular cases, we can talk about specific details. It has not been the case that I found that those models have been capable of demonstrating impact with common proof or appropriately could be used to calculate formulaic damages.

BY MR. HARVEY:

John Johnson, Ph.D.
May 07, 2025

Q.     Your clients in these class cases are all defendants, correct?

A.     In the cases that I have testified in, in this stretch, yes, they are defendants.

Q.     And the defendants here are large companies, correct?

A.     They're definitely corporate entities.

Q.     Have you ever tried to work for people who were injured by anticompetitive conduct in a class case?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Not in a class case, no.

BY MR. HARVEY:

Q.     But you put a lot of effort into trying to obtain clients who were accused of injuring people through anticompetitive conduct, correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I don't know what you mean by that.  I have certain scientific standards that I apply to my work.  I have written papers, I have worked -- and so I don't think it's fair to say I put effort in any particular type of client.  I put effort into making sure I can do the best work possible, that I can explain results, and that kind of thing.

John Johnson, Ph.D.
May 07, 2025

people that were targeted and see if there's some change in their compensation that way. We do use other benchmarking. But I just want to be clear, it's not purely regression is a problem. It's the application of the regression in the context as it's being used.

Q. Yeah, and I certainly understand that you take issue with the way that Dr. Starr applies a regression. And we can talk about that later in the day. Right now, I'm just sort of setting the table and talking about the method itself. Is there anything inherently unreliable about using a regression to answer the question of the extent to which the allegations in this case suppress class pay?

MS. ZIELINSKI: Object to the form.

THE WITNESS: Given how frequently I have seen regression used improperly by economists, yes, there is -- you need to test the assumptions, and you need to know that it applies in that context.

So here, I take issue with the way Dr. Starr applied it. But generally, we can't speak to, oh, regression exists, we can use it. There's a very specific set of assumptions, there's a very specific set of information that goes into it. You

John Johnson, Ph.D.
May 07, 2025

have to do the totality of the assessment to determine whether it's reliable or not.

BY MR. HARVEY:

Q.    So Dr. Starr should not have used a regression at all.  Is that your opinion?

A.    That's not what I said.  What I said is the particular -- what I was asked to study was the regression that Dr. Starr put forward.  The regression Dr. Starr put forward in this context for this fact set is not appropriate for a whole host of reasons.

I don't know about other regressions he could have run, but I can't foresee how, given his failure to account for outside opportunities of these employees, given the highly sensitive nature of the models, I don't understand what regression he would have run on a class-wide basis to do this.  I don't know if there's other regressions.  I would have to see them.  But clearly here in this context, it seems like the basic predicates fail across the board.

Q.    Do you propose in this case a superior regression that the jury should rely on to determine the damages in this case?

A.    I do not affirmatively provide a regression analysis of my own.  I do a series of

John Johnson, Ph.D.
May 07, 2025

analyses that demonstrate the highly sensitive nature of Dr. Starr's analysis, in particularly I think Exhibit 33, which is probably salient to your question, I demonstrate how sensitive Dr. Starr's results are, taking his model as given to the timing issues, which I think is significant.

And there are implied much smaller damages from those. But I view that as a sensitivity that a jury could potentially find quite useful in terms of understanding, in a practical sense, why when Dr. Starr opines, his models are robust to a large number of alternative specifications, in fact, they are not. And they imply a very wide swing in damages. That's the sign of an unreliable model. That's what I could see testifying to to a jury.

Q.    So suppose this case goes to a trial and the jury agrees with plaintiffs and concludes that the alleged no poach agreements and improper sharing of competitively sensitive information occurred.  So plaintiffs establish liability.  Let's just assume that for purposes of this question.  Do you put forward an alternative estimate of damages for the jury to consider?

A.    I want to be careful about parsing the language.  I put forward other sensitivities of

John Johnson, Ph.D.
May 07, 2025

they are trying to advance their career. And they're not just staying put, but they're out there and they're thinking about what's best for the future.

So again, with these types of issues, I think they're very factually and individual company specific. And then it depends on the particular recruiting practices and what positions.

Q. Do you have an opinion that the defendants in this case had no preference over passive versus active candidates for positions that class members held?

A. I don't think you can generalize across all positions that class members held. There are many, many positions here. There are many different competitive options. There were many different types of recruiting that occurred amongst the purported class. I don't think you can generalize.

Q. You can't generalize one way or the other?

A. Not across 6,308 people, no.

Q. Well, I'm talking about defendants' preferences now. I'm talking about three companies, not 6,308 people. For these three companies, do you have an opinion that they never had a preference for passive versus active candidates for any position that a class member held?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I think that's a slightly different question.  I don't know how to broadly characterize that a company has a uniform preference for passive versus active.

When you add the clarifier for any position, I think it is possible that for some positions, there might have been certain people who were hiring that would have had a preference for that.  I think my objection was to the uniform idea that each of these three companies, given the diverse sets of need they have and the hiring and the different people that do it, that uniformly somehow there's a preference for passive versus active candidates across the board.

BY MR. HARVEY:

Q.  Did members of the class all have perfect information about alternative job opportunities?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Look, I have not studied every individual class member's information they had.  I would be surprised if you thought that every employer in any organization had perfect information.  I think that's an abstract theoretical concept.

BY MR. HARVEY:

John Johnson, Ph.D.
May 07, 2025

Q.    That never applies in the real world context of employers and employees, correct?  That in the real world, employees never have perfect information about all alternative job opportunities, correct?

A.    In the real world, I would be surprised if you could say across all employees, they had perfect information.  That does not seem realistic to me.  I think there are certain employees who are more clued into what outside options might be, I know there's less.  But I think perfect information essentially implies you have a crystal ball.

Q.    Are you aware of any class members who had a crystal ball?

A.    I didn't study that.  I would have to go look, but I am not aware of that.

Q.    As tempting as it is to pursue, I'm going to go on to a different topic.  Okay.  Did any of the defendants make their -- how they paid members of the class totally transparent to all other members of the class who worked for the same company?

A.    Again, let me sort of make sure I have it right, so I'll repeat it back.  I believe what you're asking me is whether I have seen something that suggests that each of the defendants made the pay of

other class members accessible to all other class members. Did I say that correctly? I've not seen that, no.

Q. Have you seen any evidence of any defendant showing a class member, here's how all other class members at this company is being paid?

A. I'm looking for something. What I was looking for is the section in my expert report starting on page 51 about compensation data for relevant employees, contradicting Dr. Gerhart and Dr. Starr's conclusions of cascading effects. It's on page 51.

And the reason I was going here is because when you describe that, I'm not aware of that, in part, because as I cite the testimony here from DaVita and SCA compensation professionals, they describe it as the Wild Wild West, for example, and a lack of structure.

And so I don't understand how they would do that in these companies, where the testimony is that they didn't have formality in the way these things were determined across the class.

Q. Is it your understanding that pay of employees was totally random, that there was no rhyme or reason at all to how class members were being

John Johnson, Ph.D.
May 07, 2025

paid?

A.    I don't think I said that.  I think I'm just trying to stay close to the testimony that I saw with respect to -- from the people that did it, which squares with the empirical evidence, that there appears to be wide variation, a lot of degree of sort of individuality.  And again, I just keep citing Kevin Zaideman who was the director of compensation, that it was very inconsistent, and a little bit of the Wild Wild West.

Q.    Do you have an opinion that receiving solicitations, job offers from competing employers provides no additional information beyond what would otherwise be available to members of the class?

A.    I think that's very specific to the individual class member, the nature of the solicitation, and the nature of the other types of solicitations that person would have received from other companies outside of the defendants.

Q.    Just generally, does receiving a job offer with a rate of pay, you know, come work for us, here are the terms of employment, does that provide some information beyond what would be generally available from doing, say, internet searches or looking at job postings?

collaborations?

MS. ZIELINSKI: Object to the form.

THE WITNESS: Given the contours of the bilateral information exchange that I just described or the potential -- the allegations about the information exchanged, acknowledging that SCA and DaVita is about certain merit increases only, I have no opinion about each of those elements with respect to that potential information exchange.

Similarly with respect to USPI and SCA, and the possibility of exchange of certain merit budgets in certain years and specific compensation information for internal audit position, and regional VP and administrators in the San Francisco-Bay Area and certain case volume data, aggregate overhead cost information, I have no opinion on those issues with respect to that -- each of the elements you described with that respect to that information exchange that is alleged.

MR. HARVEY: I'm about to go on another topic. Can we take a break?

THE VIDEOGRAPHER: Off the record at 1:58 p.m.

(Recess.)

THE VIDEOGRAPHER: We are going back on

John Johnson, Ph.D.
May 07, 2025

the record at 2:13 p.m.

BY MR. HARVEY:

Q. Sir, could you define perfect competition for me?

A. Okay. Perfect competition is a theoretical model, an abstraction that economists use to describe a world with an infinite number of competitors, all who will charge the same single price for the product or service they are providing.

Q. And it assumes among other things that the products or services are identical?

A. Yes, it does.

Q. And it assumes perfect resource mobility?

A. I haven't thought about it that way, but I think that is part of -- I mean, you can't get to the assumptions without the ability to freely move product, so yes.

Q. And perfect knowledge on the part of both buyers and sellers?

A. Yes.

Q. And firms are price takers, that is, price negotiation is irrelevant, doesn't happen? People just take the market price?

A. That is true. That is an assumption of the model.

John Johnson, Ph.D.
May 07, 2025

Q.    Are labor markets perfectly competitive?

A.    No.  I don't think there's any market that's perfectly competitive in the pure theoretical sense.  There's no market with infinite competitors, there's no market with perfect knowledge.  It's a theoretical abstraction.

Q.    Let's assume for a moment counter factually that the labor market for class members was perfectly competitive.

A.    Okay.

Q.    Under conditions of perfect competition, how would a class member pay be set?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  So you've asked me to assume a single labor market for class members as an abstraction, because there isn't a single labor market.  But let's assume that you're a single labor market which then means that all of the workers are identical and that all employers are offering the same wage.  In that context I think we have abstracted away from the matching market notion and you're talking about firms setting the wage and all of the employees taking the wage in that abstraction.

BY MR. HARVEY:

Q.    Would every class member's pay always

John Johnson, Ph.D.
May 07, 2025

equal their marginal revenue product?

MS. ZIELINSKI: Object to the form.

THE WITNESS: I think in that hypothetical, yes.

BY MR. HARVEY:

Q. Moving from the hypothetical to reality. Would you expect class members here to have their pay constantly be equal to their marginal revenue product?

A. I think given what we see in terms of the wide range of class members, the wide range of pay, the wide number of competitive alternatives, no, I do not think you would always see every class member at their marginal revenue product. And again, we're not in this theoretical construct.

Q. We're in the real world?

A. Yes. I hope.

Q. That's a terrible question.

A. I'm going to agree with you on that.

Q. Sometimes I ask really stupid questions. Okay. Class members for purposes of their pay are not identical with each other, correct?

A. That is true.

Q. And the defendants were not offering class members identical jobs, correct?

John Johnson, Ph.D.
May 07, 2025

A.    That is true.

Q.    Class members were not perfectly mobile, correct?

A.    Perfectly mobile?  No.

Q.    Are employers for class members, that is their current employer, potential employer, perfect substitutes for each other?

A.    Again, when you add the word "perfect substitutes," that I think implies they're literally interchangeable.  I'm a little cautious because that decision in part is going to come from what the individual employees' preferences are.  And they might decide that an alternative employer is substitutable for them.  But in general, I don't we think of them as perfect substitutes.  I think of them as a continuum whereby there are different dimensions they might compete in terms of the type of job, in terms of the wages, in terms of the compensation, in terms of what they're going to do.  It's all those factors together which is how competition works in these magic markets.

Q.    Do class members have perfect information about potential substitute jobs?

A.    Again, I haven't conducted a study of every individual class member's particular knowledge

of the labor markets at issue. But what I do see is a fair amount of both hiring by each of these companies from other companies and I also see a fair number of departures to other competitors outside of the defendants which implies that there's clearly information and a fair amount of information amongst employers -- employees who are within the class definition.

Q. So given that labor competition for class members was not perfect during the class period, the defendants had at least some degree of market power over those employees, correct?

MS. ZIELINSKI: Object to the form.

THE WITNESS: So again, I think we have to be a little careful about the terminology because, again, I think I've generally seen labor economists use these terms slightly differently. If what you're asking me is, is it the case that in the short run because of certain labor market frictions there could be some degree of market power for a given employee -- employer over a given individual because of their outside opportunities or changing job costs, things like that, that is true.

The broader concept though is always about whether or not it is the case that you pay below

competitive wages for a sustained period of time. That's what we're talking about when we talk about antitrust market power, and particularly here again what I'm taking issue with is Dr. Starr's opinion about a suppression of wages by 14.5 percent over an 11-year time period across all of the class members.

BY MR. HARVEY:

Q. And I understand that you disagree with Dr. Starr's damages estimate in many ways. So granting that. But if the jury agrees with Dr. Starr at the end of the day that because of the misconduct at issue, the alleged misconduct at issue, the defendants succeeded in suppressing class pay by, as you said, 14-1/2 percent over 11 years, there's no way that could have happened without the exercise of a significant amount of market power on the part of the defendants, correct?

MS. ZIELINSKI: Object to the form.

THE WITNESS: I think it's a little -- a little tautological. I think you're asking me to assume that the only outcome is Dr. Starr's model with 14.5 percent suppression over an 11-year period. And you've ruled out any other explanation except market power. So I don't know how to answer that.

I mean, as I think we said repeatedly, I

John Johnson, Ph.D.
May 07, 2025

have many problems with the model. That's not realistic given all of the different things I've talked about. I think if you're saying, well, if somehow we assume away all of the other outside opportunities and we assume away all of the different types of problems I've raised with Dr. Starr's model, is the only other explanation market power? It could be. I don't know. I think it's a bad model, so I don't know.

BY MR. HARVEY:

Q. And you said it's tautological because a company can't suppress the pay of their employees below competitive levels to that extent for that long without market power, correct?

A. Yeah, I -- it's more fundamental. I'm hard pressed to imagine a scenario where a set of companies could suppress pay 14-1/2 percent for that long especially given that it appears that there's no effect on base salary at all in his models. So I mean, we're kind of backing into if the bad model and nothing else matters, the only alternative explanation, I'm having trouble answering that because I just -- analytically I just can't get there. I don't understand how that could be -- that's the residual answer. That's the only thing

MS. ZIELINSKI: Believe it or not we've been going for an hour again. So if there's a good time to take a break, let me know.

MR. HARVEY: Sure. Let's take a break.

THE VIDEOGRAPHER: Going off the record at 4:12 p.m.

(Recess.)

THE VIDEOGRAPHER: We are going back on the record at 4:23 p.m.

BY MR. HARVEY:

Q. Sir, could you please turn to Exhibit 11 on page 54 of your report.

A. Yes.

Q. To calculate these dots here, did you use just base salary or did you use some other combination of pay?

A. One second. For Exhibit 11 and 12, as I describe in paragraph 71, I show Dr. Starr's calculated hourly rate, i.e., total compensation divided by the number of hours worked by the employee in that year for jobs he identifies as being in the director level in 2017.

Q. Why didn't you limit these exhibits to base pay only?

A. I guess I could have, but I thought this

John Johnson, Ph.D.
May 07, 2025

was the relevant illustration of the flaw with Dr. Gerhart's theory.

Q.    Why does the median pay for directors differ across the three companies?

A.    It can be any number of reasons why.  It's basically to the extent that there are different types of employees within the director ranks across each of the companies and pay varies across the companies.  There's no reason to expect the median to be the same across them.

Q.    There's no market clearing pay rate for directors?

A.    That's right.  There is no single market clearing pay rate.  That's a fallacy that wouldn't exist in a matching market like a labor or labor markets.

Q.    Does your Exhibit 11 put together directors at each company that actually have different job titles within the director category?

A.    I believe I just followed Dr. Starr's definition of directors as he used in his model here. So what is true is that just like Dr. Starr's model across different directors would have different -- a single effect, this is a demonstration that there's a wide range of directors, people called directors, and

John Johnson, Ph.D.
May 07, 2025

merely the term directors and then combining directors with VPs and SVPs is combining disparate sets of employees with different jobs.

Q. In paragraph 73, page 55, could you look to about the middle of that paragraph where it starts, for example, Dr. Gerhart's theory.

A. Yes.

Q. In that sentence you say that his theory implies that an employee making near the top of the range, and then you refer to an employee at the bottom of the range. What range are you talking about there?

A. What I mean there is if you look at the data in Exhibit 12, for example, there's a high -- there's people within the vice president category at DaVita that are making ███ and there's people that are making ███. So when I'm talking about within the range, what I mean is go back to paragraph 66 in his specific theory where he says a director does not receive an unsolicited job offer having higher pay than their current job due to the alleged conduct. Then due to this offer, the director would have received absent the alleged conduct other directors at the defendant firm who were not cold called will immediately increase their own pay expectations and

require higher pay to feel their pay is fair.

What I'm pointing out is that within the range of vice presidents or directors the range maxed them in, you can do -- remove some outliers, that's what I'm talking about, there's a wide range of pay.

Q. So the range you're referring to is the range of pay in those two exhibits?

A. Yes.

Q. If you could go on to Exhibits 13 and 14, do those also include more than base pay, that is, includes bonuses and equity?

A. Yes. Yes, it does.

Q. In the last sentence at page 58, paragraph 76, you note an overlap in the distribution of compensation between directors and vice presidents.

Do you see that?

A. Yes.

Q. Do you believe that an overlap in pay across adjacent job levels is inconsistent with a structured compensation system?

A. I think -- I couldn't determine based only on that data point whether it were consistent or inconsistent with a structured pay system.

MR. HARVEY: I think I may be wrapping up. Could we take a quick break?

John Johnson, Ph.D.
May 07, 2025

MS. ZIELINSKI: Sure.

THE VIDEOGRAPHER: Off the record at 4:33 p.m.

(Recess.)

THE VIDEOGRAPHER: We are going back on the record at 4:40 p.m.

MR. HARVEY: Dr. Johnson, I have no further questions. Thank you for your time.

THE WITNESS: Thank you.

MS. ZIELINSKI: And the defendants have no questions. We just want to designate the transcript as highly confidential pursuant to the protective order.

THE VIDEOGRAPHER: We are going off the record at 4:40 p.m.

(Whereupon, at 4:40 p.m., the deposition concluded.)

John Johnson, Ph.D.
May 07, 2025

CERTIFICATE OF REPORTER.

UNITED STATES OF AMERICA     ) ss:

DISTRICT OF COLUMBIA          )

        I, Desirae S. Jura, RPR, CSR (CA), the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically to the best of my ability and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any parties to this case and have no interest, financial or otherwise, in its outcome.

_____

Notary Public in and for

The District of Columbia

My commission expires:  1/31/2030