# EXHIBIT 33

# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )

CENTER EMPLOYEE ANTITRUST         )   No. 1:21-cv-00305

LITIGATION                        )

* DESIGNATED HIGHLY CONFIDENTIAL *

The videotaped discovery deposition of CELESTE SARAVIA, Ph.D., called as a witness for examination, taken stenographically before Michelle M. Yohler, a Certified Shorthand Reporter, Registered Merit Reporter, and Certified Realtime Reporter for the State of Illinois, CSR No. 84-4531, appearing at King & Spalding LLP, 110 North Wacker Drive, Suite 3800, Chicago Illinois 60606, on the 9th day of May, 2025, at 9:15 a.m. CST.

Q  And approximately how many people?

A  At least four.  I assume it's a little bit more; probably six or seven.

Q  Do you know the hourly rates of those individuals?

A  I do not.

Q  Do you know approximately the hourly rates?  Can you provide a range?

A  No.

Q  Do you know how much Cornerstone has billed in this matter?

A  No, I don't.

Q  Do you know how much you personally -- excuse me.  You can strike that.

Do you know how many hours you personally have spent on this case so far?

A  I don't.

Q  When were you retained to work in this matter?

A  I believe it was in the fall of 2024.  The fall or the summer of 2024.

Q  Okay.  And you had stated that the board at Cornerstone determines your pay, but that the work you did and the amount you bring in this case

would be a factor; is that correct?

A  It's a factor.

Q  Okay.  Are you on the board?

A  No.

Q  Do you have equity in Cornerstone?

A  Yes.

Q  Okay.  And so if there's an equity distribution, then the amount you bring in would be a factor in that, correct?

A  We are black box, so it's a little bit -- we're a non-formulaic firm, so it would be a factor is all I can say.

Q  And can you describe how the amount you charge in this case will ultimately translate into income for you?

A  No, I can't.  We're a non-formulaic compensation firm.

Q  Are you on the compensation committee?

A  No.

Q  Now, in the cases that you identify that you offered expert testimony in, can we walk through a few of those?

Looking at the top, can we just go -- can you just identify which of these cases are class

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

cases?

A  So the first one is, National ATM, Inc., versus Visa, et al.

And the Amitiza Antitrust Litigation is.

The in re: Qualcomm Securities Litigation is a class action.

In re: Broiler Chicken Grower Antitrust Litigation is a class action.

In re:  HIV Antitrust Litigation is a class action.

B&R Supermarket, Inc., versus Visa is a class action.

In re:  Restasis is a class action.

In re: Dental Supplies Antitrust Litigation is a class action.

And that's it.

Q  Now, in the In re: Dental Supplies case, can you describe the nature of your opinion?

A  I was retained by one of the defendants to assess competitive effects, I think would be the easiest way to put it.

I was just -- I was retained by one of the defendants to assess issues related to competitive effects.  And potentially market power, too.   I

don't remember.  It was quite a while ago.

Q  And in that case, were you responding to the reports of the plaintiffs' experts?

A  Yes.

Q  Do you recall whether you offered any opinion in that matter as to the scope of the relevant market?

A  I may have; I don't really recall.

Q  And when you say "competitive effects," can you provide a little bit more detail on that?

A  So I don't really recall that case that well.  What I believe I was doing was responding to plaintiffs' claims that some conduct could have an anticompetitive effect.

And so I assessed whether it -- I assessed whether the evidence was consistent with the alleged conduct having an anticompetitive effect.

I may have also assessed whether -- I think that would be the best way to put it, whether the alleged conduct could have had an anticompetitive effect and whether the evidence was consistent with it having an anticompetitive effect.

I know I addressed those two things.

And I believe I may also have had some -- addressed the plausibility of a relevant market, but I just don't remember.

Q   And now in Restasis, can you just briefly describe your testimony?

A   In Restasis, I responded to the plaintiff's experts' claims that -- I offered some opinions related to numerosity of the class.  And I also responded to plaintiffs' damages models, and I think there were multiple damages models.

And responded to their but-for world claims; so alternative entry date, which is related to damages but also impact.

And that would be both -- I mentioned it was a class action.  It was also -- it was a class action, and also I responded to the damages models, I believe, of different opt-out plaintiffs' experts, which would be separate from the class.

Q   Did you provide any testimony in that case as to what the damages should be?

A   I don't recall.  I don't recall my report that well.  I know I addressed damages issues.

Q   Now, in the B&R Supermarket case, do you

recall your testimony in that case?

A   In that case, yes.

I was retained by Mastercard -- I have a vague memory of it.  I was retained by Mastercard, and I responded to the plaintiffs' experts' analysis of market definition, whether the evidence was consistent with -- whether Mastercard was acting against its unilateral interest and competitive effects.

Q   Anything else?

A   I think that was it.

Q   In HIV, do you recall what you -- your opinions in that matter?

A   In that matter, I responded to -- I guess there were actually three different areas that I analyzed.  One part of it was responding to plaintiffs' experts' model of -- sorry.  I'm trying to remember.

So I responded to the potential competitive effects of an agreement between -- of a settlement between Teva and Gilead, I responded to plaintiffs' experts' analysis of certain other licensing agreements and joint development agreements, the alleged competitive effects.

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

So really I analyzed competitive effects, I think, across a range of different allegations.

Q  And essentially your testimony was that the conduct was not anticompetitive; is that correct?

MS. MOYE:  Objection to the form.

BY MR. SCHORK:

Q  Let me strike that.

What were your conclusions with respect to anticompetitive effects?

A  So there were different -- there was different conduct.

So with respect to the settlement agreement between Teva and Gilead, I reached the opinion that there was no evidence of a -- or the economic evidence was inconsistent with the claim that there was a -- that there was delayed entry, and I responded to the plaintiffs' -- it was called an alternative settlement model.

And then -- I guess -- I don't remember the exact way that I framed my opinions in the case; it was quite a few years ago.

And there were three different parts of it.  The one that went to trial I have a better

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

memory of, which would be the settlement issues.

Q  Can you briefly describe your testimony in the Broiler Chicken matter?

A  So, in that case, I addressed the issue of -- I analyzed whether plaintiffs' expert had provided evidence that was consistent with being able to show that all or almost all proposed class members were harmed by the alleged conduct.

And I concluded that the economic evidence was inconsistent with a conclusion that all or almost all proposed class members were harmed by the alleged conduct and that there were clearly unharmed class members.

That would be a high -- I'm sure I had other opinions, too; those are just some of them.

Q  Was that opinion provided at the class certification stage?

A  In that case, I believe it was on a -- all parts of the case were on the same timeline, so it was at the same time as other reports being filed.

Q  Now, in the Qualcomm case, can you briefly describe what you -- your opinions were in that case?

A  In that case, I responded to a plaintiff's

Celeste Saravia, Ph.D.  Highly Confidential
May 09, 2025

expert who offered opinions about whether Qualcomm's -- certain contracts Qualcomm had and certain practices were consistent with anticompetitive bundling.

Q  And what were your conclusions?

A  I don't remember exactly how they were framed.  It's a little bit of a funny case.

I concluded that he didn't -- it's a funny case.  It was a funny assignment, and so -- I mean an unusual assignment, so the opinion was a little bit unusual because we weren't actually looking at effects.

So I don't remember how it -- how it was phrased.  It was just -- it was a little bit unusual.

Q  Is it safe to say your conclusion was that the defendant did not act in a manner that was anticompetitive?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  That really wasn't the issue at hand.  It's a funny case.  It's funny because the Ninth -- I mean, legal stuff as I understand it, the Ninth Circuit had already found that

Qualcomm's conduct wasn't anticompetitive, it was a securities litigation, and so it wasn't actually about effects.

So I don't remember, sitting here, because it's a -- it's a little bit of a strange case.

BY MR. SCHORK:

Q  Now, with respect to Amitiza, can you just briefly describe your opinions in that matter?

A  So, in that matter, I addressed -- so that matter is a matter involving an allegation of a claimed reverse payment and a settlement agreement between a brand and a generic.

And I analyzed whether or not -- I analyzed whether the -- there was evidence of a -- economic evidence of a payment, and I also analyzed whether there was evidence of -- whether the economic evidence was consistent with a delay -- delayed entry.

And I addressed -- I responded to plaintiffs' damage -- plaintiffs' experts' damage analysis.

Q  And what were your conclusions in that matter?

A  So, in that matter, with respect to the

allegation that the settlement agreement included a reverse payment, the economic evidence did not support -- did not support the conclusion that there was a payment.

And then I believe I just -- and then I just -- with respect to damages, I critiqued -- I provided critiques of the plaintiffs' damages analysis.

Q  And the last one is the National ATM Council case, correct?

A  Yes.

Q  And can you describe your opinions and conclusions in that matter?

A  In that matter, I assessed -- I responded to plaintiffs' experts' claims about alleged collusion and -- I'm trying to separate out the two Mastercard cases.  Just a second.  Let me remember what this one was about.

So I responded to the plaintiffs' experts' analysis of -- I responded to the plaintiffs' experts' analysis related to whether or not the evidence was consistent with Mastercard being -- acting against its unilateral interest.

Q  And was it your conclusion that the

evidence was not consistent with Mastercard acting against its unilateral interest?

A  Yes.  There were other -- there were other things, too; I just don't remember right now what they were.  But that was one of the opinions.

Q  Now, I think I asked you before whether you're familiar with economic literature on no-poach agreements -- the effects of no-poach agreements, correct?

A  Yes.

Q  Are you familiar with an article that was written by Gibson relating to the effects of no-poach agreements on -- between certain Silicon Valley companies?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  I've reviewed the article by Gibson at some point, yes.

BY MR. SCHORK:

Q  Okay.  And you're aware that he concluded that, as a lower bound, a single no-poach agreement for one year reduced salaries by 5.6 percent; is that right?

A  I --

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  I don't have that kind of memory of the paper.  If you'd like to ask me specific -- specific conclusions about the paper, I'll need to see it.

BY MR. SCHORK:

Q  Okay.  But you don't recall whether the article concluded that no-poach agreements reduced salaries?

A  I don't recall the -- I don't recall the specific conclusions of the paper.

Q  Okay.  So I'll hand you the paper which has already been marked Exhibit -- Plaintiffs' Exhibit 592.

A  Okay.

MR. SCHORK:  It's Tab 3.

(WHEREUPON, PX Exhibit No. 592 was presented to the witness.)

THE TECHNICIAN:  You said this is PX-592?

MR. SCHORK:  Is that incorrect?  Let me just confirm for a second.

Yeah, this is Plaintiffs' Exhibit 592, which was offered during Dr. Johnson's deposition.

question:  As an economist, do I agree that companies have certain processes.  And so, as an economist, to agree that something generally happens, I would need to see the data.

Is it probable that most firms watch their budgets?  Yes.  Is it -- or are aware of their costs and consider them?  Yes, I would assume that's the case.  It would be hard to be a firm where you didn't have any interest or concern with your costs.  That would be hard to be a very successful firm for very long.

But in terms of the way you formed your question, you're asking me empirically do I know do firms generally use certain processes, and that's an empirical question.  Which I don't know the processes of all the firms, and so I can't tell you which ones they use more likely -- more often than others.

BY MR. SCHORK:

Q  Now, in Paragraph 70 of your report, moving down.  You state that a buyer has market power if its decision on how much to buy affects the market price, correct?

A  Yes.

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

Q  Now, this statement assumes a single market price, correct?

A  In the most simplistic form, it does.

Q  Now, you'd agree that there's generally -- that it is generally accepted that there's no single price of labor, right?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  There are -- employees receive different wages.  I mean, especially in this case, we see high variability of pay and bonuses even within a -- even within a -- for a given title.

So I agree that there's quite a bit of variation and compensation -- and compensation trends in this case that varies across different senior employees as well; at least for USPI, which I looked at.  And I assume the others, but I've done the work for USPI.

BY MR. SCHORK:

Q  Outside this case, would you agree as an economist that it's generally accepted that there's no single price for labor?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  Generally, labor is -- there is generally, yes, vary -- variation in compensation.  Not always; there can be long-step compensation, so it really depends what you're looking at.

But, in general, there is variation.  And also because there are other terms besides just the salary.

BY MR. SCHORK:

Q  Now, in Paragraph 71, you cite to the following statement from Carlton and Perloff's economics textbooks, it's:  "If the cartel controls only a small share of the relevant market, which includes all close substitutes, firms not in the cartel undercut the cartel and prevent it from raising the market price," correct?

A  You read that correctly, yes.  It's from Carlton and Perloff.

Q  While this assertion may apply to commodities, it does not apply to labor, correct?

A  Incorrect.

Q  And why is that your view?

A  Well, if -- let's suppose we had a labor

cartel, or an attempted cartel.  If members -- if two members -- if two -- this is a hypothetical, but if two firms got together and said:  "Let's agree not to compete," and, yet -- for a certain type of employee and this type of employee had many outside options, that they had hundreds of other outside options and the real competitive constraint for both of the two firms that made this agreement were hundreds of others firms, then those firms would not -- then the competition from the hundreds of other firms would prevent the two firms who have entered into an agreement -- or tried to form a cartel from actually affecting the price and being able to suppress pages.

But -- and the reason for this is that any employee of the two firms, if those two firms, without market power combined, tried to suppress wages, their employees could go to the hundreds of other employers that are out there.

And so this would undermine the fact that the two -- the two firms that were trying to suppress wages would lose their employees, this would undermine their ability to be an effective cartel.

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

employers outside of the defendants, then that

tells me empirically that those are good

substitutes.

     Q   Do you disagree that USPI considered SCA

as a relevant labor market competitor?

          MS. MOYE:   Objection to the form.

BY THE WITNESS:

     A   I don't disagree with that.   It was one

of -- it was likely one of hundreds of labor

market competitors.

          As I've noted that USPI also competed with

hundreds of other employees, that -- or employers

that have either lost employees to or recruited

them from.

BY MR. SCHORK:

     Q   Do you disagree that SCA viewed USPI as a

relevant labor market competitor?

          MS. ZIELINSKI:   Objection to form.

          MS. MOYE:   Objection to the form.

BY THE WITNESS:

     A   I don't -- I don't know one way or

another.   I mean, I would assume that -- I mean, I

have some tables that show that USCA [sic] also

lost the vast, vast majority of its employees

Celeste Saravia, Ph.D.  Highly Confidential
May 09, 2025

out -- to other -- to non-defendants.

And so it would really be -- I don't think SCA is differentially situated than USPI, even though I haven't looked at where SCA employees go to.

What I do know is that across all the defendants, the vast, vast majority -- outside all defendants, employees -- actually, the vast majority of employees who transition, actually transition to employers that are outside of OCCs and ASCs.  Which would mean -- OCCs and ASCs include the defendants and many other companies. But the vast majority of employees actually transition in and out of outside of OCCs.

BY MR. SCHORK:

Q  Okay.  I think we kind of got away from the question there.  It was just:  Do you disagree that SCA viewed USPI as a relevant labor market competitor?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  I really haven't studied that.  I'm just pointing out that the evidence I have in my report -- while I haven't studied SCA

independently, the evidence, like in Exhibit 9,

shows that for all of the defendants, the vast

majority of transitions are outside of the OCC

industry.

BY MR. SCHORK:

Q  I mean, the fact that the CEOs of USPI and

SCA entered into a no-poach agreement is strong

evidence that they considered each other to be

labor competitors, right -- labor market

competitors?  Excuse me.

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  I think you're asking me about motives

again.  You know, there could be -- there could be

a lot of reasons that firms enter into

nonsolicitation agreements.

So that wouldn't, you know, necessarily

have to be it; you could have it being as part

of -- you could just have a lot of reasons, and so

I wouldn't want to infer motive.

BY MR. SCHORK:

Q  Are you familiar with a concept of

friction in labor markets?

A  Generally, of course -- generally familiar

with it.  If you're going to use it in a specific defined way -- because it's not necessarily specifically defined, but, yes, of course there are frictions in labor markets.

Q  And what's your understanding?  What's that mean to you?

A  So there are just -- so switching employers is -- they're switching costs.  It's more costly than switching from Diet Coke to Diet Pepsi.

There are other things that are -- that are also -- have switching costs besides employment.  For example, it's actually -- there's switching costs in terms of switching your bank.  And so there are other things with switching costs, too, but employment definitely has switching costs.

MR. SCHORK:  I think we've been going for about an hour, so why don't we take a ten-minute break.

MS. MOYE:  Okay.  Thank you.

THE VIDEOGRAPHER:  We are off the record at 11:27 a.m.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER:  We are back on the record at 11:45 a.m.

BY MR. SCHORK:

Q  Can I draw your attention to footnote 132 of your report.  The section I'm going to ask you about appears on Page 40 of your report.

A  Okay.

Q  And in the footnote, you state that: Labor markets are markets for inputs rather than products.  The principle of identifying a set of close substitutes is the same, correct?

A  Yes.  You read that correctly.

Q  Okay.  Is it your testimony or your opinion that product markets and labor markets are the same?

A  I'm not offering the opinion -- so every market is unique.  This is why there's a saying that a relevant market analysis is specific to the facts and the issues of the case at hand.

And so many markets are unique, and you have to study the specifics of -- of competition within -- within a specific context.

I am -- and so labor markets, like many other types of markets -- or even different labor

And so here what I'm pointing out is that this idea that the defendants collectively have market power makes no sense when 40 percent of the employees flowing in and out of the defendants are even outside of the health care industry.

And, to be clear, the health care -- the health care industry by itself are huge, and OCCs are only a small portion of it.  So this is -- this is -- you know, it's just pointing out -- that's what I'm pointing out.  So that's one thing.

And then in Exhibit 10 I use the Lightcast data to give examples of where employees transition from and to and list a number of different potential -- or a number of addition -- a number of employees that USPI people transition from and to.

And then I use the Lightcast data again in Section 5.  And Section 5 is a little bit different because Section 5 is looking at -- is looking at the extent to which the mobility restrictions could have impacted employees.

And so here I have a very similar exhibit -- Exhibit 12, a very similar exhibit, in

which I show the people who leave USPI outside the conduct period, again, only a very small portion of them go to OCCs or ASCs, which would include SCA.

BY MR. SCHORK:

Q  What is your understanding of where the Lightcast data set comes from?

A  So what the Lightcast data set is it's -- it's from a private company.  It's really scraped information -- it's -- so Lightcast is a proprietary data provider.

And what they've done is, they've constructed a database of job histories that's based on résumés that are posted online and online review websites, résumé websites.

And so -- so that's what it is.  It's a proprietary data set that basically collects information online about people's work histories and creates a data set.

Q  You'd agree that not all of the senior employees of USPI and SCA would have a résumé online, correct?

A  That -- yes, that seems reasonable.  The Lightcast data set is -- or the data that

Celeste Saravia, Ph.D.  Highly Confidential
May 09, 2025

Lightcast has been able to combine, I do not see -- it's over the relevant time period, does not include as many employees as the -- the defendants' compensation data.

Q  And when you received the data from Lightcast, did you receive it in the aggregate, or did you receive the actual resumes and the pages of the -- that the data was being pulled from?

A  No.  No, it's -- they create it into a data set so they create it into -- I can't remember right now.  I think it's -- I'm trying to remember what the raw data looked like.

But I don't -- we do not receive a million pages of PDFs; we receive a data set where the -- where that information has already been created into rows of data.

Q  But given that you just received the aggregate data, there's no way for you to check whether the source of the information was real; is that true?

A  Source of...

I have no -- am I trusting that Lightcast, which is used in academic papers and which is used in many industries and which sells its data, am I

trusting that they actually scraped data and -- and then made it into a data set?  Yes.

I have not gone and tried to replicate the creation of their data set by finding the resumes online, and so I have to trust that, when they have found the resumes and turned them into data, that -- that Lightcast has done that correctly.

Q  And, in fact, there's no way to check whether the resumes that Lightcast was scraping actually relate to real people; is that correct?

A  Is it --

MS. MOYE:  Let me object to the form of that one.  I'm sorry.

Go ahead, Dr. Saravia.

THE WITNESS:  Okay.

BY THE WITNESS:

A  It plausible that there are a lot of fake resumes out there that had stents in the OCC industry that do not have anything to do with a real person?  I guess that's plausible.

It seems a little bit unlikely, but -- and all data has errors, so maybe -- maybe Lightcast did pick up a fake person writing up a fake résumé.  I guess -- I guess that's plausible.

BY MR. SCHORK:

Q   Okay.

A   But it seems -- it seems pretty unlikely, but it's plausible.

And I guess something else to just recognize is that economists recognize that most data has some data errors.  If we look at the compensation, there's some data errors, and so that's just part of doing empirical work.

But the type of error that you're suggesting, that there could be a bunch of fake resumes out there that includes stents in the OCCs industry seems -- seems a little bit unlikely to me.

BY MR. SCHORK:

Q   And I think we got confused regarding -- my question just relates to verification, whether we can verify one way or the other whether the Lightcast data was picking up resumes that relate to fake people.

And my understanding is your answer is there's no way to verify that, one way or the other; is that correct?

MS. MOYE:  Objection to the form.

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

BY THE WITNESS:

A   Yeah, I don't think that I would have a way to verify that, or it's not something I have verified.

BY MR. SCHORK:

Q   And, to your understanding, did Lightcast do any -- strike that.

In providing you the aggregate data, to your understanding, did Lightcast do anything to ensure that duplicate -- that resumes relating to the same people do not show up as multiple moves, essentially --

MS. MOYE:  Objection to --

BY MR. SCHORK:

Q   -- do you understand the question?

A   Can you repeat it?

Q   I can rephrase.

What I'm getting at is, if, for example, somebody had five different resumes online that showed they went to company X, in the aggregate data, would that show up as five people moved to company X?  Do you know one way or the other?

MS. MOYE:  Objection to the form.

Celeste Saravia, Ph.D.  Highly Confidential
May 09, 2025

BY THE WITNESS:

A  I'm not positive.

I mean, so given -- given the way I'm using it, even if that were true, it won't -- as long as that were random -- so let's assume that -- take your example and there's 1,000 people out there that post their résumé five places, and so those 1,000 people end up in the data five times each, for all of the analyses I'm doing, if that's random, if the people who -- who post multiple places are random, then it should -- it should just wash out in the percentages.

So what you -- what it would mean is that maybe you have a few extra resumes, or a few duplicate resumes going to classified industries, excluding health care, and then a few extra ones going to office physicians; but they'd be in the numerator and the denominator.

So I don't know off the top of my head if Lightcast attempts to remove duplicate -- duplicate entries.

But if they did -- like if they did not, then as long as the duplicate entries are random and they're not all of a certain type -- which I

And then so I said if you took Dr. Starr's estimates of transitions, then you could say: Well, if he's expecting that many transitions, how many offers would have had to be given to get that many transitions.

And -- so I've done that analysis, which is taking Dr. Starr's transition numbers as given his 11 lost switches and then saying, well, if you accept SCA's acceptance rate of 70 percent, then that would suggest you'd need about 18 offers.

Q  But you made no attempt to quantify the number of cold calls, by way of example, that would have happened in the absence of the alleged no-poach agreements?

A  No, I haven't done that.

Q  Do you have any expert opinions specifically with respect to Dr. Starr's common impact quantile regression?

A  So I've provided a number of critiques to his base regression and to his difference-in-difference regression, and those critiques would flow through to the quantile regressions and the rest of his regressions, which are basically building on his base analysis.

So I don't separately offer critiques of the quantile regression, but it's derivative of his original regression.

MS. MOYE:  Do you need more water?

THE WITNESS:  That would be great.

MS. MOYE:  Can we maybe go off the record for one second?

MR. SCHORK:  Sure.

MS. MOYE:  Thank you.

THE VIDEOGRAPHER:  We are off the record at 1:12 p.m.

(WHEREUPON, a recess was had.)

THE WITNESS:  We are back on the record at 1:12 p.m.

BY MR. SCHORK:

Q  Do you disagree with Dr. Gerhart that defendants cared about their employee turnover rates?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  So I'm, again, not in the business of getting inside the heads of executives or -- so I don't want to speculate on what's inside the executives' heads at USPI, but, in general, it is

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

true that firms worry about turnover.

BY MR. SCHORK:

Q  Do you have an opinion that defendants made no effort to manage their labor expenses?

A  I do not have the opinion that defendants had made no effort to manage their labor expenses.

Q  Do you disagrees that the parting employees tend to experience pay growth from voluntary job changes?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  I mean, it really depends.  I think that would be an individualized analysis.

When I've looked at switchers outside of the alleged and omitted conduct periods -- these are individuals that switch from USPI to SCA -- I actually observed some that earned higher and some that earned lower upon switching.

This would be Exhibit 37.

BY MR. SCHORK:

Q  Do you believe that voluntary job changes also benefit incumbent employees?

A  I mean, it would -- it would really depend.  So in this case my Exhibit 38 and 39

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

conduct.

BY MR. SCHORK:

Q   Does your model specifically take into account the possibility of turnover contagion?

MS. MOYE:   Objection to the form.

BY THE WITNESS:

A   So what the analysis does is that it shows that even in the absence of the restrictions, there is very little movement from USPI to SCA, and so that doesn't require taking account of the concern of contagion.

Instead it says:   If I look at periods in which there are no restraints alleged, assessed, or admitted restraints, do I see significant evidence of contagion?

And the answer's, no, I don't see significant movements outside of the alleged, assessed, and admitted -- and admitted conduct.

And that would be, you know, Exhibit 6 and Exhibit 7, and also Exhibit 11.

BY MR. SCHORK:

Q   Do you have an opinion on whether defendants placed value on recruiting passive candidates for employment?

Celeste Saravia, Ph.D.  Highly Confidential
May 09, 2025

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  Again, I'm not in the head of the defendants.

BY MR. SCHORK:

Q  Do you have an opinion -- is it your opinion that the defendants in this case had no preference over passive versus active candidates?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  I'm an economist; I don't have opinions about what's in people's heads.

BY MR. SCHORK:

Q  Is it your understanding that members of the proposed class had perfect information about alternative job opportunities?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  No, in general, employees don't have perfect information about alternative job opportunities.

For the employees here, given that we see 80 -- given that we see relatively high rates of turnover and that we see 80 percent -- over 80

percent of the employees even went outside the OCC industry, there's a lot of evidence that they could have good information -- or that information's available.

BY MR. SCHORK:

Q  Is there any evidence that you're aware of that defendants made how they paid members of the proposed class transparent to all other members of the proposed class who worked at that company?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  I have not looked at that at all with DaVita and SCA -- I'm sorry -- yeah, DaVita and SCA.

With respect to USPI, my understanding is, no, they didn't because -- because compensation is individualized and that they are offering individual bonuses and we're seeing, you know, the heterogeneity compensation and differentials over time, my understanding is that it was -- that kind of information was not publicly available to everyone.

BY MR. SCHORK:

Q  So, just to be clear, it's your

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

C E R T I F I C A T E   O F   R E P O R T E R

I, MICHELLE M. YOHLER, a Certified Shorthand Reporter within and for the County of Will, State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

Celeste Saravia, Ph.D.  Highly Confidential
May 09, 2025

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois, this 12th day of May, 2025.

Michelle M. Yohler, CSR, RMR, CRR

Certified Shorthand Reporter

CSR No.:  84-4531

# EXHIBIT 34

# FILED UNDER SEAL

Lauren Stiroh
May 29, 2025

UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF ILLINOIS
------------------------------------------X
IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE
ANTITRUST LITIGATION,

                                Plaintiffs,


        -against-              Index No. 1:21-cv-00305



THIS DOCUMENT RELATES TO:

ALL ACTIONS,

                                Defendants.

------------------------------------------X

                                May 29, 2025

                                9:08 a.m.



   AN IN PERSON VIDEOTAPED DEPOSITION of

Lauren Stiroh, taken by the respective

parties, pursuant to Order, before Larin

Kaywood, a Notary Public for and within the

State of New York.

Lauren Stiroh

product liability case or a product case?

What type of case was it?  Let me put it that way.

A.    It is an antitrust litigation, so not product liability.  I will not at all be able to remember all of the allegations, but some of them had to do with exclusive contracts, preventing or delaying or impeding entry and expansion of TreeHouse Foods.

There were certain allegations with respect to the agreements between Keurig and retailers and then also technological changes that Keurig had made to Single-Serve coffee machines.  That meant they wouldn't work if you put in a competitor pod.  That the machine would read that it was a competitor pod and not function.

Q.    And in the Keurig action, do you recall if the other side made a Daubert Motion in connection with your opinions?

A.    I believe that they did -- as far as I know, it was not granted.

Lauren Stiroh

Q.    Okay.  Do you recall if the opinion had any -- the court's opinion had any remarks about how you addressed economic theories?

A.    I don't remember.

Q.    With respect to these litigations from the last four years where you submitted economic expert opinions, do you recall if any of them were rejected in whole or in part by the -- a court?

A.    I don't believe so, no.

Q.    Do you recall opinion from the Turkey Antitrust Litigation?

A.    Yes.

Q.    And what do you recall about that?

A.    In the Turkey Antitrust Litigation, a class was certified.

Q.    And did the court reject certain -- some of your opinions?

A.    I don't recall the court rejecting any of my opinions that -- in the way that I would say, the court found basis to certify a class, and my opinions were

Lauren Stiroh
May 29, 2025

Lauren Stiroh

related to individual impact.

I had an opinion related to the economic damages that would be incurred by entities in the middle of a supply chain that for legal reasons, the judge ruled that I would not -- I will not testify to those opinions for the jury.

I understand that to be a legal reason, not anything wrong with the economic opinion, which I still think today is correct. If a entity has not -- if there are economic situation is not worse than it would've been, they have not suffered economic damages.

Q. Okay. Now, do you recall any other courts not permitting, for whatever reason, that your opinions to be presented to the jury?

A. I do. I worked -- sorry. I'll let you ask the question before I just --

Q. What do you recall?

A. I worked on a matter involving photochromic lenses, and those are the lenses that darken when exposed to

Lauren Stiroh

sunlight. And there was an evidentiary hearing about my report and the plaintiff's expert report in my matter in evaluating the relevant markets. And the primary question there was whether the photochromic lenses compete with clear lenses.

I did a number of statistical tests. A series of them had to do with whether there is correlation in the two prices, and then whether there was remaining correlation after correcting for -- or adjusting for common cost components and then a third statistical test. And the judge ruled that I would not tell the jury -- the first, the baseline correlation which was quite high.

My recollection of it was the feeling that that would be unduly influential to the jury. So I could talk about my later tests that I had done, but not describe that the -- how highly correlated photochromic lenses and clear lenses were.

Q. Okay. Do you recall any other

Lauren Stiroh

magnitudes of the data, and including the numbers of people who came from SCA or went to SCA and the Lighcast data generally matches what we see from what we see in the databases produced by SCA and DaVita.

There may be other things described in my report, but generally I have information up front on the magnitude of employees, the magnitude of hiring, and a rough number of what -- the number of companies from which DaVita hires, and that's what I see reflected in the data as well.

Q.   Okay.  My question was, what did you do to verify the accuracy that of the data that Lighcast provided to you? I.e, that the resumes that they purport to have scraped off of the web contain accurate information.

MR. EVERETT:  Object to the form.  Asked and answered.

A.   The answer that I gave you was what I did and my team did that is consistent what we do with data that comes

Lauren Stiroh

from public sources or parties to a litigation.

It is not part of what we do to rebuild the dataset ourselves in the sense of looking at all of the CVs and the other sources in addition to publicly available information that Lighcast gets its data from.  But we evaluate whether the general scope of it is reasonable given other available information.

And the conclusions that I draw from the Lighcast data are also supported by other information in the record.

Q.    Did those Lighcast provide to you copies of the actual resumes?

A.    I don't believe so.  I have not seen copies of the actual resumes.

Q.    Have you done anything to verify, either by sampling or any other way, whether those resumes were real?

MR. EVERETT:  Object to the form.

A.    I have not looked at the underlying resumes or information that is

Lauren Stiroh

part of the Lighcast database.  I'd looked at whether what the -- for the conclusions that I am drawing forward or the opinions that are in form, whether they are reasonable in light of other information that is available.

Q.   Okay.  And did anyone on your team -- just to make sure we can button this down, did anyone on your team do anything to verify whether the resumes were real?

MR. EVERETT:  Same objection.

A.   To the best of my recollection, the verification process is looking at what is revealed by the Lighcast data and how that accords with other information in the record.  I do not believe anyone on my team had access to the underlying resumes that were part of what Lighcast uses.

Q.   And did anyone on your team do its own independent research to determine whether those resumes were real?

MR. EVERETT:  Object to the form.

Lauren Stiroh
May 29, 2025

Lauren Stiroh

and I work together.  There's whoever first suggested it, it gets evaluated by the others on the team as well.  Those are terms that appear in the data.

Q.    And as the -- and it -- during the process of preparing your report, did you run any tests with other words before landing on these three?

A.    It's -- the style of analysis isn't something that I would test before running.  It is looking at what the data say.  And these are reflecting what the data say for those titles to the extent that there are -- you could put in additional titles and see what it says.  It does not change the fact that there are hundreds of firms with which DaVita competes for director, VP, vice president level titles.  And that is what is relevant to my analysis and opinions.

Q.    Okay.  If we could flip to Footnote 67 on Page 18.  Hold on one second.  Okay.  Yeah.  So in the beginning of this paragraph, you note that you have

Lauren Stiroh
May 29, 2025

Lauren Stiroh

excluded employees the title "medical director."

Why were they excluded from your analysis?

A.    As I note in Footnote 67, I am excluding employees with titles related to HR recruiting or legal functions because my understanding is they are not part of the class.

And as the sentence reads, I also don't include what is listed in the data as a medical director, at it appears that there are more medical directors in the data than are in the Lightcast data than are in DaVita's structured data.  And so that title may have a different meaning within Lightcast.

And for the purpose of my -- purposes of my analysis, it is reasonable to do a more narrow search because I am looking at what the set of companies is that DaVita is competing with. And so making that more narrow is conservative in that sense that I am not

Lauren Stiroh
May 29, 2025

Lauren Stiroh

including industries or firms that DaVita may not be directly competing with for the senior level employees in this matter.

Q.    So you are excluding it because there was a flaw in the Lightcast data with respect to identifying people as medical directors?

MR. EVERETT:  Object to form.

A.    Not a flaw in the data.  It could be a mismatch in terms for the way that that term would get used for identifying class members.  And so for purposes of determining which titles to look at, I am being informed by DaVita's structured data.

Q.    But isn't it a -- am I correct to assume that they're using the -- Lightcast is using medical director because people's resumes use that term?

A.    I don't know the answer to that.  The Lightcast data, as described earlier in my report and with respect to their profile database, also uses information that comes directly from

Lauren Stiroh
May 29, 2025

Lauren Stiroh

those companies, tells me as an economic matter that they cannot have been offering wages that were substantially below market value.

And finally, even if you agree on some set amount -- some pool, that does not tell you that the compensation of all or any employee has been reduced.

Q. Now, do you have any opinion in this case as to why DaVita and SCA were exchanging information?

MR. EVERETT: Object to the form.

A. I do not.

Q. Why don't we take a five-minute break?

THE VIDEOGRAPHER: Okay. The time is 1:45 p.m., and we're going off the record.

(Whereupon, a short recess was held.)

THE VIDEOGRAPHER: The time is 1:59 p.m., and we're back on record.

Q. Okay. Dr. Stiroh, are you

Lauren Stiroh
May 29, 2025

Lauren Stiroh

opining as to any alternative damages

assessment in this action?

A.      I do not have an alternative

damages assessment in this action.  I do

have various demonstrations that

Dr. Starr's model yields no economic

evidence of an overcharge, and that is

consistent with zero damages.  I don't have

a alternative damages assessment that gives

any other number.

Q.      Okay.  And do you have any

opinion as to why the DaVita SCA agreement

and the SCA USPI agreement both include the

tell-your-boss provision?

A.      Does -- your question is, do I

have an opinion as to why?

Q.      Mm-hmm?

A.      I do not.

Q.      And do you have any opinion as

to the intent or motive of DaVita in

entering into these -- in the alleged

no-poach agreement?

A.      I do not have an opinion on

intent or motive in this matter.

Lauren Stiroh
May 29, 2025

Lauren Stiroh

Q.    And do you have any opinion on whether DaVita understood that it was entering into a broader agreement than just with SCA?

MR. EVERETT:  Object to the form.

A.    I do not have any opinion on DaVita's understandings of any of the agreements or actions.

Q.    And do you have any opinion as to whether the no poach -- the alleged no poach agreements at issue here were reasonably necessary to a legitimate business collaboration between DaVita and SCA?

A.    I am not offering any opinions on that subject.

Q.    Okay.  And are you offering any opinion that the no poach -- alleged no-poach agreement between DaVita and SCA was procompetitive?

A.    I'm offering opinions as to why -- the fact that there can be procompetitive reasons for -- oh, sorry.  I

C E R T I F I C A T E

STATE OF NEW YORK )

                              :ss

COUNTY OF SUFFOLK )

        I, LARIN KAYWOOD, a Notary Public within and for the State of New York, do hereby certify:

        That the witness whose examination is hereinbefore set forth was duly sworn and that such an examination is a true record of the testimony given by such a witness.

        I further certify that I am not related to any of these parties to this action by blood or marriage, and that I am not in any way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of May, 2025.

_signature_

# EXHIBIT 35

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
---------------------------------------------X
IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE

ANTITRUST LITIGATION,

                         Plaintiffs,


     -against-         Index No. 1:21-cv-00305


THIS DOCUMENT RELATES TO:

ALL ACTIONS

                         Defendants.

---------------------------------------------X

                              June 12, 2025

                              9:01 a.m.



          ** HIGHLY CONFIDENTIAL **


     AN IN PERSON DEPOSITION OF Dr. Justin

McCrary, taken by the respective parties,

pursuant to Order, before Larin Kaywood, a

Notary Public for and within the State of

New York.

Dr. Justin McCrary

Q.    Okay.

A.    If I listen to your question about education, what I am thinking of is 12 versus 11.  Is there a difference in compensation?  That I get.  But here I don't think I really understand the distinction.

Q.    Okay.  Could a person's job title affect their compensation?

A.    Maybe in these questions what you mean is, back to your gender question, are you asking the question might there be a difference?

Q.    Yes.

A.    Ah, that's a different question.

So go back again to the new hires question.

Q.    Well, the -- answer that with that clarification.

Does -- is there a difference in -- or could there be a difference between new hires and current employees?

A.    Sure.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Q.    And could a person's job title affect their compensation?

A.    I can probably spare you some time in your outline.

In terms of pretty much anything that you say, there could be a difference in people's compensation on an aspect of their background, their experience, what they bring to the table.

That could be just as true for whether there's a difference between new hires and people who have tenure at the firm.  Sure, there could be a difference.

In terms of the current question, sure, there could be a difference.  And probably about virtually everything that pertains to the worker.

I would have an expectation actually that it's hard to think of any two workers as being exactly alike and interchangeable, particularly for proposed class members.

So focusing on this context, that's almost surely right that the skill

Dr. Justin McCrary

sets of specific members of the proposed class are quite different from another member of the proposed class.

I suppose that's less likely to be true about a different labor market, such as entry level workers, the minimum wage level of compensation we were talking about before.

I would agree that that's less true there, but focusing on this case and these facts, I would say your current question sounds right to me, but maybe even understates the case.

Q.    Okay.  And negotiation between an employer and employee, what factors provide employers with negotiating power?

MR.  KLIEBARD:  Object to form.

A.    Depends.

Q.    Can you identify any?

A.    Well, I think you're asking me something like, what is an economic model of negotiation?  And I can try to speak to that.

In economic models of

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

A.      I am.

Q.      And what generally is his field?

A.      He's an economist.

Q.      Would you recognize him as leading scholar in the field of labor economics?

A.      I think what I said before is right, he is an economist.  I don't -- I can't tell you how he self describes.  Main thing that sticks out of my mind is great hair.

If you think of the work that he is most well known for, probably is the exact monograph that you've put in front of me.

Q.      Okay.

A.      So I would just say he's an economist.

Q.      Okay.  So could you turn to the first page of the work, it's Page 1.  And he starts with -- or in the second paragraph, he writes this, "In contrast this book."

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Do you see where I'm reading from?

A.    Yes.

Q.    And he says, "In contrast this book is based on two assumptions about the labour market."

Do you see that?

A.    Yes.

Q.    And he's English, so he uses the U.

Do you see that?

A.    Labour of market, yes.

Q.    "And they can be stated very simply; there are important frictions in the labour market, employers set wages."

Do you see that?

A.    I do.

Q.    Do you agree with those statements?

A.    Well, the first one is uncontroversial.  The second one is subtle. And I can clarify if you'd like.

Q.    Well, sure.  And my question was, do you agree with it or not?

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

A.     Right.  And what I was describing is that the first, I think I can't really imagine anybody who does disagree with that.  Maybe the word important might mean different things to different people.

But the idea that there are frictions in labor markets, the same way that there are frictions in every market should be uncontroversial.

As to the second statement, there is subtlety there, and the subtlety goes to the distinction between a firm setting a price versus a market setting a price.

And that's really what Manning is getting out there.

Q.     Now, he goes on to say the following.  He writes, "The implications of these assumptions can also be stated simply."

Do you see where I'm reading from, sir?

A.     I do.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Q.    And he says, "The existence of frictions means that there are generally rents to jobs.  I.e., if an employer and worker are forcibly separated, one, or more commonly, both of the parties would be made worse-off.  This gives employers some market power over their workers as a small wage cut will no longer induce them to leave the firm.

The assumption that employers set wages then tells us that employers exercise this market power."

Do you see where I read from?

A.    I do.

Q.    And do you agree with that?

A.    Well, that's the thing about your prior question that was interesting, right?

Which is there are assumptions and what Professor Manning is doing is he's saying, if these assumptions are true here are the things that follow.

There's a difference between making assumption and believing it.  That's

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

4.

Q.    I'm sorry.  What's Section 4?

A.    The answer to your question.
In particular, I believe it's Section 4.1.
I think it's -- if I'm understanding the
question correctly, it's exactly that
section.

Q.    We -- I asked you some
questions about the input and output
markets earlier this morning.  Do you
recall those generally?

A.    Yes.

Q.    In this case are -- do you have
any opinion about whether the conduct
alleged had procompetitive effects in the
output market?

A.    In the output market?

I don't think I've offered any
opinion along those lines.

Q.    And in this case, you don't
provide your own calculation of damages,
correct?

A.    Well, that's kind of an in
between, which is to say that I reviewed

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

the work put forward by Professor Starr.

My view is that it's unlikely that there's any damages in this context, but it's also true that I put forward a variety of sensitivities with respect to the calculations that Professor Starr put forward.

I can't tell you exactly what counsel might do with those analysis. That's not for me to say, but they might be responsive to your question with a yes as opposed to a no.

Q.   Well, you don't do your own calculation of the damages sustained by the class in this case, do you?

A.   I'm not sure there are damages. Certainly not ones that would pertain to class-wide harm.

Q.   Okay.  And you don't do damages calculations and you don't present one in your opinion, correct?

A.   Well, that's why I answered the question the way that I did before, which is, I think I know what you're getting at,

Dr. Justin McCrary

which is, there might be a, like an affirmative model sometimes that's put forward.  And I'm not putting forward something along those lines.

At the same time, I can't speak to how counsel might use sensitivity that I've done in connection with the presentation that they might have.

Q.    Okay.  So you don't intend to offer your own damages calculations in this case; is that correct?

MR.  KLIEBARD:  Objection.

Asked and answered.

A.    Well, see, that one sounds to me like a trick question actually, which is, earlier you asked me about whether I had, I think that your phrasing was, "Finish my work in this case."

And I told you that sitting here right now I haven't been asked to do anything in particular, but that I have a sense that I might be later on.

And now your question is about intent.  So the only intent that I have is

Dr. Justin McCrary

to answer truthfully the questions that are put to me, that's true here, in connection with this deposition, that would be true at any such trial.

And if subsequent to this somebody asks me to do a particular type of work, I might do that. So the question is as to what do I intend to do sounds to me like a trick question actually.

Q. Well, let me be clear.

You understand that if you the -- if you attempt to offer a trial opinions that haven't been properly disclosed in your expert reports that they can be excluded because they have not been previously disclosed.

Do you understand that?

MR. KLIEBARD: Object to form.

A. Well, see, there that involves very specific language where I would say that's not for me. That's for the lawyers.

So I think you said something like, I think it was properly disclosed. To me, that's a pure question of legal

Dr. Justin McCrary

you identify any academic articles or anything in the academic literature that adopts or applies that test that you put forward in this case?

A.    Sure.  I've written on that myself.

Q.    Other than you?

A.    What's the question more precisely?

Q.    Can you identify any piece in the academic literature or published scholarship other than the ones you've written yourself which adopt or apply the test that you've put forward in this case?

MR. KLIEBARD:  Object to form.

A.    If I'm not mistaken, you're asking me the question, can I specify for you off of a memory test, a discussion of switching in connection with questions of market definition from the academic literature?  And I would say that's virtually all of it.

Q.    Any particular piece other than the ones you wrote yourself?

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

A.    Well, let's be clear about what the question is.

So what portion of my report are you asking me about now?

Q.    Are you -- the one that's set forth in Section 2 where you address the subject of market power or market definition?

A.    Well, then the answer is an easy one.  It's a 75-page section and there's piles of footnotes, which lay out the academic literature that I'm pointing to.  In terms of the memory test that I think you're now giving me, I think you're asking me is it right that switching analyses are part of market definition?  And the question is a clear yes.

Q.    Now, you don't offer an affirmative opinion on the outer boundary of the relevant market in this case, correct?

A.    That's correct.

Q.    So could you turn to Paragraph 34 of your report.  It's on Page 27.  Do

Dr. Justin McCrary

you have that in front of you?

A.    I do.  Give me a moment. There's a glitch with the photocopy or there is blank pages.  I don't think there's anything missing, but give me a sec.

Q.    I'm sorry about that.

A.    No, it's okay.

Q.    What's missing?  I'll come and look at it.

A.    I think it's --

Q.    You don't know what's missing because it's not there.  I got you.

A.    Yeah.  So I --

MR. KLIEBARD:  Trick question.

THE WITNESS:  Yeah, exactly.

Q.    Well, with this guy.  Okay.

A.    I think it's okay.  I think there was just pages that got stuck together in the photocopier, so I've got there to Paragraph 34.

Q.    All right.  So I have a couple of questions about some of the sentences you write.

Dr. Justin McCrary

The -- down at the bottom of that paragraph, there's a sentence that begins, "The analysis I present."  Do you see where I am?

A.    I don't actually.

Q.    Okay.  Paragraph 34.

A.    Okay.

Q.    It's --- it starts four lines from the bottom of that paragraph.  Do you see where --

A.    I see.

Q.    All right.

A.    Yeah, I see it.

Q.    And it's -- let me read it to you.

It says, "The analysis I present below show that it is implausible that there is a single relevant antitrust labor market for the proposed class, or that in each of the relevant antitrust labor markets that do exist, defendants had market power sufficient to suppress pay."

Do you see where I am reading from?

A.    I do.

Dr. Justin McCrary

Q.    Why is it implausible for there to be a single relevant antitrust market for the proposed class?

A.    Well, the proposed class is set of highly compensated individuals at the high end of the skill distribution.  As I lay out in the report, they do lots of different things drawings on varied backgrounds and skill sets.

For example, management, accounting, information technology, you know, and others.  So those are contexts in which it would be expected that people's options would vary from class member to class member.

It's also true that the evidence on employer switching that I put forward drawing on the Lightcast data show that heterogeneity, that also might come up.  I'll give you the spelling in the break, across the proposed class in connection with this conclusion.

And further, if you look at the patterns of job switching, it's different

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

across subgroups of the proposed class in a way that's consistent with what I was just describing to you.

So that's an expectation just based on the economics literature, and then that's what the evidence from third-party production that I've put forward indicates as well.

Q.    Is it possible for there to be a single relevant antitrust market?

A.    You know, in my experience, questions revolving around possibility or impossibility are questions that are hard for economists to answer.  Because things that are impossible are rare, things that are possible are frequent, but I'm not really sure what that proves.

So in my experience, my role as an expert is probably more consistent with not opining as to what's possible, but it's instead consistent with opining as to what's probable or what's likely.  And that's exactly why I wrote the sentence that I did.

Dr. Justin McCrary

you omitted from your answer?

A.   I'm not sure.  So your question's pitched at a pretty high level of abstraction.  Sitting here right now, I don't think there is anything that was missing from what I said.  But I couldn't tell you with 100 percent certainty.  There may be some subsequent question you asked that jogs a memory, but sitting here right now, those are the things that I was thinking of.

Q.   Did Lightcast seek or obtain permission from any of its sources for the data that it obtained?

MR. KLIEBARD:  Objection.  Scope.

A.   It sounds to me like that's a question from Lightcast perhaps.  I take them to have, yes.

Q.   I'm sorry.  You believe they did?

A.   I take them to have, yes.

Q.   And who --

A.   But I don't have direct

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

knowledge of that.

Q.    And who do you believe that they obtained permission from?

MR. KLIEBARD:  Objection. Outside the scope.

A.    I couldn't tell you as to their internal processes.  I'd say they're a data provider.  They're a reliable data provider that you see featured in the academic literature for some purposes.

The resumes that I'm relying upon, I don't have any reason to doubt their accuracy.  And, in fact, I've confirmed with record evidence that the resumes in question point to the same conclusions to the extent that I can collaborate them based on information in this case's record.

Q.    Does Lightcast pay LinkedIn for the data?

MR. KLIEBARD:  Objection. Scope.

A.    I couldn't tell you.  Again, if you're asking me about the internal

Dr. Justin McCrary, Highly Confidential
June 12, 2025

                    Dr. Justin McCrary

processes for a data provider, that's the

outside of my -- outside of the domain over

which I'd have a basis for answering your

question.

    Q.    So you don't know how Lightcast
maintained its data, correct?

            MR. KLIEBARD:  Objection.

      Misstates.

    A.    What do you mean when you say
"maintained"?

    Q.    Well, you don't know
what -- anything about -- strike it.

            You generally -- is it your
testimony that all of the Lightcast data
was obtained by web scrapping?

    A.    As opposed to?

    Q.    Any other means.

    A.    Well, this is a bit of a memory
test, but just off of that memory test, I
believe it's right that the website says
that it obtains that information through
web scrapping.  They do name something like
65 different sources for the resume
collection.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

It's also right that it's possible that your questions about web scrapping versus APIs. As to that distinction, I can't confirm for you off of the memory test whether it's web scrapping versus APIs for sure. I just couldn't tell you off the memory test.

Q. And do you know what efforts -- Lightcast or the current company, do you know what efforts they undertake to check for errors in the data?

A. Sure. There's some information on that as well that I can provide. So they make, for example, efforts to deduplicate. They have information that allows for them to do that that you as a user can't because the data is anonymized, which is to say it doesn't have the name of the individual who posted the resume. And so it's easier for them to engage in that deduplication.

I double checked that with respect to the data that I draw upon here. If you look at deduplication, you can't do

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

that using name, but you can do that using the set of prior employers. And that happens very rarely in the data, which is consistent with that.

As to more which is to say do they place a phone call or something along those lines to confirm the resume? No. The resume is the resume that Lightcast takes and then they take that information in the same way that you would take in, for example, a household survey, the respondent's information as the underlying data value.

Q. And so the basis of your information was conversations that you had with Lightcast prior to your engagement in the case, and the Lightcast website; is that correct? As well as some of these operations you did yourself on the data once you had obtained --

MR. KLIEBARD: Objection.

Q. -- is that accurate?

MR. KLIEBARD: Misstates prior testimony.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

A.    You know, it actually sounds mostly inaccurate.  I'd say the following, which is I'm an academic, this is a data set that I knew of from my work as an academic.

The way in which I went about informing myself as to the contours of this particular data collection is what I would normally do.  The process that I followed, you're right as to that part of your question, that I had initially encountered the Lightcast data in an academic paper, was curious about it, placed an e-mail, I believe first, and then a follow up phone call with employees at Lightcast.  I believe that was before it was known as Burning Glass, but I'm not 100 percent sure about that.

And then in this case, I obtained the manner and exactly the way that I laid out in Appendix D.  As to the basis that I've got, I'd say this is exactly how academics analyze data.

Q.    Now, did -- other than the

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

website in your -- which you looked at and your conversations with Lightcast, did you obtain any other information from Lightcast about how they obtained the information, where they obtained the information or any other efforts they made to process or clean up or validate the information?

A.    I'm not really sure that I'm tracking your question.  As I listen to it, I don't think that there is anything missing in the description that I gave you, which might be consistent with a yes.

I think as I hear the question, I think you've probably figured out from the testimony what my process was.  And I'm not sure what you're driving at really.

MR. SAVERI:  Could you read the last question back, please?

(Whereupon, the above record was read back by the court reporter.)

Q.    Would you answer the question, please?

A.    I think I did.

Q.    Other than those efforts, did

Dr. Justin McCrary, Highly Confidential
June 12, 2025

                    Dr. Justin McCrary

you do anything?

          MR. KLIEBARD:  Objection.

     Vague.

     A.    I don't really know what you're

driving at.  I did lots, I described that

to you earlier.

     Q.    Is that it?

          MR. KLIEBARD:  Object to form.

     A.    It's clear from your questions

that I must misunderstand something because

you keep asking the same question when I've

given you, I think an extremely clear

answer.

     Q.    Indeed.  When -- what subset of

the Lightcast data was purchased?

     A.    The exact one that's described

in Page 5 of Appendix D.

     Q.    And does it then include data

on defendants' employees?

     A.    It includes information on

employees who either currently are or

previously were at any of the three

defendants that are in the Lightcast resume

data.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Q.    So it includes profiles of some class members, correct?

A.    It's most.  So I can't quote for you the exact number, but it's the majority.

Q.    But it's not all class members, correct?

A.    I can't quote for you the exact number.  I don't take it to be all, but it's a majority.

Q.    And are there individuals who are included in the profiles who are not class members as you understand?

A.    Well, what I've described in my report is my evidence as to switching.  I suppose there's some sense in which I actually think the definition of the proposed class is something that probably requires individualized inquiry, that's at the back of the report.

So I couldn't 100 percent guarantee that, but I think it's correct, that the analysis that I've done is indicative of what we'll be true about the

Dr. Justin McCrary

proposed class members.

Q. Okay. Now, it includes non class members because the data set includes anyone who worked in the NAICS Code 6214 as decided by Lightcast, correct?

A. I'm not sure I follow.

Q. Well, you say in your description of the Lightcast data that the report includes job histories for individuals who work for one of the three defendants, right?

A. That's correct.

Q. That's one part of it. And so all of those people, if I understand those words, were employees of the defendants, correct?

A. Yes, I believe that's correct, if I'm tracking your question correctly.

Q. Okay. And then or, right? So it's disjunct if not conjunct, right? Or in the occu -- outpatient cen -- care centers industry NAICS Code 6214 to which all three defendants belong, correct?

A. I'm not sure I am following

Dr. Justin McCrary

Q.    Well, does the Lightcast data come from third-party resume databases?

A.    I suppose it depends on how you would say databases, but I think the answer is no.  So Lightcast is itself a data provider, but I don't take Lightcast to be at least in connection with the resumes data collection.

I don't take it to be purchasing a data set from somebody else and then reselling that, which is I think what you were asking.

Q.    Does -- is the Light -- does Lightcast base on data from job boards?

A.    That sounds more accurate.  I don't see on this document the exact statement that I'm thinking of, but there is a place on the website that I believe says somewhere that might be something along those lines.

Q.    Does Lightcast -- is the Lightcast data based on information gathered from the recruiting industry?

A.    Earlier you were asking me

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

questions, where I told you, you know, I'm not sure that I have the basis to answer the question.  And I think this question is like those, which is to say I can tell you how I've used the Lightcast data.  I can talk to you in detail about that.  But I think your question is about something more like what precise process is the data provider itself following?

Q.    Yes.

A.    And I would say that's a question which I don't really have a basis to answer the question.  I thought I was clear on that before the break.

Q.    Okay.

A.    But for the avoidance of any doubt, that's what I've told you.

Q.    Okay.  And so for example, do you know whether the Lightcast data is based on opt-in data from employers?

A.    Based on, say it again?

Q.    Based on opt-in data from employers.

A.    You know, I couldn't rule it

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

out.  I don't have that understanding.  I guess it's possible, but I don't think so.

Q.    How about whether or not Lightcast data is based on opt-in data from applicant tracking systems?

A.    Same answer.  So Lightcast is a provider of data as to the details of what exact process they follow.  What I can tell you is just off of what I remember, they describe their process as web scrapping from online sources.

There might be some technicality associated with that that you and I talked about earlier.  And I'm not distinguishing between something like web scrapping versus APIs, but some manner of obtaining information that's posted publicly online by individuals.

Q.    Do you know if the Lightcast data was based on data found in sales and marketing CRM databases?

A.    Same answer.  I don't think so. But I've given you, I think, pretty precise testimony on this point several times now.

                    Dr. Justin McCrary

I don't know of a more precise way to say it.

     Q.    Okay.  Let me show you what's been marked as -- what I've marked as Exhibit 600.

               (Whereupon, Exhibit 600 was marked for identification.)

               EXHIBIT TECHNICIAN:  Is this Tab 10?

     Q.    And --

               THE REPORTER:  What exhibit was --

               MR. SAVERI:  It's 600.

     Q.    And Exhibit 600 is information that can be found at the URL that's indicated in the footer.

               Do you see that, sir?

     A.    I do.

     Q.    And I'll just represent to you that that's where I got it from.  And up at the top of the document, it's printed out on the date that's indicated there.

               Will you turn to, I guess the third page, sir?

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

A.    I'm there.

Q.    Okay.  And there's a section there entitled "Profiles."

Do you see that?

A.    I do.

Q.    Okay.  And the -- this says a few things.  Let me read it to you.  First, it says, "Lightcast profile database currently contains profiles for over a hundred million distinct individuals."

Do you see that?

A.    I do.

Q.    And then it goes on to say, "Lightcast profiles data is gathered from publicly available information on the web, third party resume, databases and job boards, the recruiting industry opt-in data from employers and applicant tracking systems, sales and marketing, CRM databases and various consumer identity databases."

Do you see that?

A.    I do.

Q.    Do you believe that's a correct statement?

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

A.    Do I believe it -- believe it's a what?

Q.    A correct statement of where -- of --

A.    I can't tell if you're saying incorrect or correct.

Q.    Excuse me.  I apologize for that, sir.

A.    It's okay.

Q.    Do you believe that is a correct statement of the profiles included in Lightcast data?

A.    Probably, which is to say this is something I didn't remember when you were asking me the prior questions, but I take them to be giving a description of their process.  So this is a helpful page.  Thanks for bringing it up.

Q.    Okay.  So this indicates that the Lightcast data comes from sources broader than just resume scraped from the internet, correct?

A.    That's correct.

Q.    So your statement in your

Dr. Justin McCrary

Appendix D that the Lightcast is a proprietary data provider that has constructed a structured database of job histories based on resumes posted to online resume websites is incomplete, isn't it?

A.     Oh.  You think that I should have flagged this, yeah, sure.

Looking at it right now, I hadn't remembered that at the time that you asked me.  But the statement doesn't seem as though it's incorrect.

I suppose probably what's right is that the page that you're pointing to now could have been added as an additional footnote.  And I will take that as a friendly amendment.

Q.     And have you undertaken any efforts to confirm with Lightcast that their database in fact contains the information that's described here in this profile section?

A.     Well, I can only tell you what I've done, which is what I've already testified to before the break in some

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

detail. But in terms of the work that I've done, the Lightcast data corroborate what's observed and what's produced in record evidence. So we talked earlier about the confirmation of the rarity of the three defendants with respect to job switches. That's true in the produced data. That's true in the Lightcast data, that checks out.

It's also true that the two named plaintiffs' resumes appear to be present in the Lightcast data as well. It's also true that there are analyses in the academic literature that draw upon the Lightcast data. And all of the above are consistent with it being a reliable data source. That's my view on the source of the data.

Q. So there's a reference in this profile to opt-in data from employers and applicant tracking systems.

Do you see that?

A. I don't. I'm not looking at the page anymore, but I don't know that it

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

matters.

Q.    Okay.  So let -- excuse me, sir.  Let me ask you this question, do you know what is meant by Lightcast when it refers to "opt-in data from employers?"

A.    I think so, yes.

Q.    And what's your understanding?

A.    That would be an employer opting into -- you know, your employee's information regarding the resumes are something that we Lightcast can draw upon. So opt-in in that sense.

Q.    Well, does this mean that this is -- the opt-in data that's referred to here is data that's voluntarily supplied to Lightcast by the employers?

A.    Well, I can only speak to the words that are on the page, if that's what you're asking me about.  But if you're asking me about the details of an arrangement between the employers that are described here and Lightcast, I don't have the basis for answering the question.

Q.    Okay.  And do you know if

Dr. Justin McCrary

DaVita is one of those opt-in employers?

A. I'm not sure.

Q. And do you know if SCA is one of those opt-in employers?

A. Well, as to that, I can tell you the following, which is there are thousands of resumes that have SCA, USPI, or DaVita as employers. That's exactly what I've shown in Exhibits 1, 2, 3, 4, and 5 in my report, as I'm sure you know.

So as to whether the resume in question comes from opt-in information from DaVita, SCA, or USPI versus one of the other sources of information that Lightcast draws upon I wouldn't have a basis for answering you.

Q. Would you read the last question back, please?

(Whereupon, the above record was read back by the court reporter.)

Q. Would you answer that question, please, sir?

MR. KLIEBARD: Objection. Asked and answered.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

A.    I'm confident if you go back and look at the transcript, I did.

Q.    Is your answer yes or no?

A.    I think I described it in exactly the right way.

Q.    Is your answer yes or no?  It's a yes-or-no question.

MR.  KLIEBARD:  Objection.

A.    It's actually not.  So --

Q.    Excuse me, sir, let me ask my question.  If you refuse to answer, we'll address that in another way.

Is SCA one of the opt-in employers that's referred to in the Lightcast resume that I've handed you -- shown you as part of Exhibit 600?

MR.  KLIEBARD:  Objection.
Argumentive.

A.    I can give it to you again, but I -- if you go back to the transcript, I answered your question.  But I'll describe it to you again if you like it.  Maybe you missed part of it.

So as I hear your question,

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

entirely or largely duplicated and the stub

to Exhibits 2 through 5 in the report as

well.

Q.    Okay.  So that's one, two,

three, four, and five?

A.    I think that's right.  I

haven't gone back to double check the

language is identical, but I think that it

is.

Q.    And each of those studies, or

graphic representations or tables, for lack

of a better word, are all based on

your -- on the Lightcast data or the

operations you're describing with respect

to the Lightcast data?

A.    If you look in the report, each

time I'm drawing on the Lightcast data that

you and I have been discussing, there's the

first line from a particular exhibit which

reads, "Source: Lightcast data."

Q.    Okay.

A.    And so for the avoidance of any

doubt, if you're trying to figure out which

analyses draw upon the Lightcast data, the

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

stub to the exhibit will tell you.

Q.    Okay, thanks.

I have a couple of more questions about the acquisition of the data by Lightcast, in particular, the scraping.

To the best of your knowledge, do you know if Lightcast itself did the web scraping or was it outsourced?

A.    I don't think I have a basis for answering the question.  I think I understand what you're getting at.  But I don't think I actually have encountered any aspect of the documentation that speaks to that.  I might have, and if so, I've forgotten it.

Q.    Okay.  And you don't know as you sit here today, whether Lightcast purchased the scraped data from any other company or just obtained it for free without permission from the internet?

MR.  KLIEBARD:  Objection.

Asked and answered.

Q.    Or in some other way?

A.    I take it that that's not true.

Dr. Justin McCrary

But, you know, as I listen to the question,

I think it's something where it's outside

of my -- it's outside of the domain where I

would have a basis to answer you

definitively.  And it certainly doesn't

seem helpful for me to speculate.  So I

think the best answer to your question is

just I don't really have a way of knowing

for sure one way or the other.

Q.   Okay.  And before the last

break, I think you mentioned that you

understood that one source of the Lightcast

data was LinkedIn; is that correct?

A.    That's my understanding.  I

could be wrong about that, but that's my

understanding.

Q.   Okay.  And your -- is your

understanding based on these conversations

that -- or strike that.

Was that information based on

the conversations that you referred to with

Lightcast personnel or from some other

source?

A.    You know, I remember the phone

Dr. Justin McCrary

conversation, but I don't remember its contents, which is to say I could be wrong about that.  It's not something that I'm relying upon.  But it is consistent with my understanding.

If it turns out to be incorrect, I don't think it matters for me one way or the other, which is to say, if you ask about the import of the Lightcast data for me, it's probably overdetermined, the conclusion that I've reached in the sense that the Lightcast data corroborates what the academic literature would indicate and corroborates what record evidence indicates.

And both of -- or all three of those pieces of information are consistent with there being many labor markets in which proposed class members would participate, and in each such instance, many alternative employers.  And that's really all that I've drawn upon the Lightcast data to substantiate with the empirical presentations that I've done.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Q.    Are you familiar with a website called indeed.com?

A.    Yes.

Q.    Do you know if Lightcast scraped data from indeed.com?

A.    I don't know.

Q.    Are you familiar with the a website called monster.com?

A.    Yes.

Q.    Do you know if Lightcast scraped data from monster.com?

A.    Same answer.  And I could probably save you time in your outline, which is, I think this series of questions is the same as a line of earlier questions, which is, I'm drawing upon the Lightcast data for my empirical analyses, but I'm not in a position to tell you about the details of their process.  To me, that sounds like maybe something that somebody at Lightcast could answer.

But sitting here right now, that sounds like a question where I don't have a basis for answering you.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Q.    And do you know if the defendants or anyone in this case took a deposition or got any sworn testimony from Lightcast to discuss their methodology for putting together the Lightcast data you obtained?

A.    I don't think they would've needed to.  I'm comfortable relying upon datasets such as Lightcast in the same way that I would in an academic publication. The conclusions that I've drawn here are consistent with other pieces of evidence.

The dataset itself checks out with respect to things that I observed from the record.  I'm happy to tell you that I consider this to be a reliable dataset upon which academics would draw and I have observed academics drawing upon.

Q.    Now, before the break, I asked you a couple of questions about the relationship between the membership and the class and the Lightcast data.  Let me try to clarify, and I guess, my understanding of your understanding.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

with the sentence, "When competing..."  do you see that?

A.    Yes.

Q.    And the next one begins, "Exhibit 1 -- "

A.    I see.

Q.    Okay?

A.    Yes, I'm there.

Q.    All right.  Great.  And it says, "Exhibit 1 summarizes the firms that defendant's employees working in class positions arrive from when they are hired by a defendant, prior employers and the firms they join after working for a defendant, next employers, using data on the move to and from a defendant based on a sample of resumes collected from career websites by the proprietary data provider, Lightcast."

Do you see where I read from?

A.    I do.

Q.    When you say "sample of resumes," what do you mean by that there?

A.    Oh.  I didn't intend for that

Dr. Justin McCrary, Highly Confidential
June 12, 2025

                    Dr. Justin McCrary

to confuse.  The resumes that are described

in the stub maybe the -- if I had said set

instead of sample, would that have been

more clear for your ear?

        Q.    Well, it depends what happened,

right?  So I mean, you used the word

"sample."

        A.    I'm not using the word "sample"

in the sense of a statistical sample.  I'm

using the word "sample" in the sense of

set, which is to say a collection or you

could have said the resumes that correspond

to the stub to the table to Exhibit 1 that

I read into the record a moment ago.

        Q.    Okay, and fair enough.  And so

it was the word "sample" that threw me

because at least from time to time in the

statistical context, sample is a term of

art.

        A.    It's a term of art.  That's

correct.  And I didn't intend it in that

way, not here.

        Q.    Okay.  So just to nail that

down, so you're not saying that this is

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

some kind of -- the data here is some kind of randomized sample of any of the data sets?

A.     We wouldn't say randomized sample, we'd say random sample, but it -- that's correct.  It's the -- you might say it's the universe of resumes and the Lightcast data that correspond to the sentence that I read into the record a moment ago.  All unique moves to or from a defendant that took place during or before 2024, involving defendant's employees in class positions.

Q.     Okay.  And then that sentence goes on to say -- well, it also says, "Using data on the moves to and from a defendant based on a sample of resumes collected from career websites."

        Do you see that?

A.     I do.

Q.     And --

A.     That particular passage doesn't really matter to me, which is to say -- and I think I basically know where you're

Dr. Justin McCrary

going, which is that if you had deleted the phrase "collected from career websites" and just said "a sample of resumes provided by data provider, Lightcast," that would have been fine for my purposes too.

Q.   Okay.  And that's -- you would agree that that second version, right, would be accurate then?

A.   Sometimes saying less is saying more.

Q.   So could you turn to Page 201 of your report?

A.   I'm sorry, page?

Q.   Excuse me, Paragraph 201.

A.   Paragraph 201.

THE REPORTER:  Page 201?

MR. SAVERI:  No, Paragraph --

THE WITNESS:  Paragraph 201.

Q.   Yeah.  Are you --

A.   Page 173, I believe.

Q.   Yeah.  Are you with me, 201?

A.   I think I am.

Q.   Okay.  And you critique the use of the 10 percent significance level by

Dr. Justin McCrary, Highly Confidential
June 12, 2025

C E R T I F I C A T E

STATE OF NEW YORK)

                              :ss

COUNTY OF SUFFOLK  )


        I, LARIN KAYWOOD, a Notary Public

within and for the State of New York, do

hereby certify:

        That the witness whose examination is

hereinbefore set forth was duly sworn and

that such an examination is a true record

of the testimony given by such a witness.

        I further certify that I am not

related to any of these parties to this

action by blood or marriage, and that I am

not in any way interested in the outcome of

this matter.

        IN WITNESS WHEREOF, I have hereunto

set my hand this 12th day of June, 2025.


                              _signature_

# EXHIBIT 40

# FILED UNDER SEAL

**Message**

| | |
|---|---|
| **From:** | Kent Thiry [kent.thiry@davita.com] |
| **Sent:** | 4/6/2008 1:44:39 PM |
| **To:** | Andrew Hayek [andrew.hayek@villagehealth.com] |
| **Subject:** | RE: thx and misc |



Redacted Medical Information

we can talk tonite or tomorrow am. which would you prefer?

ps: if you go with them, it does create some "competitive response" issues for dva — because i would have never taken one of tpg's key people from a major investment of theirs. when companies do that to us, we have a historical response strategy, which you and i should discuss live.

---

**From:** Andrew Hayek
**Sent:** Sunday, April 06, 2008 12:18 PM
**To:** Kent Thiry
**Subject:** RE: thx and misc

Redacted Medical Information

Is there a good time to speak either this evening or tomorrow morning?

---

**From:** Kent Thiry
**Sent:** Saturday, April 05, 2008 3:48 PM
**To:** Andrew Hayek
**Subject:** thx and misc
**Importance:** High

Redacted Medical Information

second, i will leave you a vm with some thoughts on the relative lack of economic/strategic levers in asc biz



EXHIBIT

PX 485



GX

21-cr-229

4

HIGHLY CONFIDENTIAL

DVA00006531

# EXHIBIT 41

# FILED UNDER SEAL

**EXHIBIT**
PX 316
Kent Thiry
8.16.24

Message

| From: | Kent Thiry [kent.thiry@davita.com] |
|---|---|
| Sent: | 7/19/2008 9:51:18 PM |
| To: | Hayek, Andrew [andrew.hayek@scasurgery.com] |
| CC: | Joe Mello [joe.mello@davita.com] |
| BCC: | Kent Thiry [kent.thiry@davita.com] |
| Subject: | RE: Call - ruminations ...... |

You raise relevant points.

I will listen.

I do not buy the parallels beteen your situation and michael's. The issue of disclosure was radically different -- if he had in fact decided to take another offer, he had no downside in telling us. Period. And you could have said this to him, if in fact that premise was important to you. So that whole premise simply cannot be accepted. And that changes all that follows. Period. We could take the story to 10 objective seasoned outside parties, 9 of 10 would all say the same thing. If michael had decided to take that other offer, there was no downside in telling us that, in which case he still could have said he wanted no counter-offer from us and talked to you.

Not that it is relevant, but you had downside with a disclosure of your search, because if the tpg offer was not good enough you would have wanted to keep working while you looked -- and I have no problem, nor ever have, with the fact that you were open to ceo offers. Anyway that is why I totally get why you were upset about the tpg disclosure -- and I pity the tpg senior partner who got caught in the middle with two terrible choices. A friendship and a business transaction. He chose disclosure.

I agree you have been a wonderful supporter of Village Health. But I don't know how to connect that to the hiring of one of our best people about whom you had inside information. Would you have ever considered leaving the people you recruited higher and dryer in a tough spot without some follow-up support? I would hope that support for village health did not have to rely on any relationship to davita, but would have happened just thru your caring for the people who joined in large part because of you, and were left with a business that was further off profit plan than any other part of the entire company, facing some hellacious business decisions, and the probability of a bunch of them losing their jobs because of your departure being much higher because jess is not you.

I repeat, I will listen. This process is much more hurtful than the tpg thing, because the facts were quite different in terms of how things got started and why ... And because joe and I thought we had a much different relationship with you than I had with the senior partner at tpg. Much different. Much different. And that is the issue. What is the relationship?

When I joined total renal care, I never talked to anyone in joe's organization -- except yoda, but when I introduced yoda to joe to start the recruiting of yoda into joe's company I explicitly said that I have the right to recruit him if I get back into dialysis. I never recruited anyone from tom's company. Not from doug william's company. Not from any bill price company. I could go on -- the list of companies I have told my folks we don't recruit senior people from, unless they have first told their employer they are leaving.

It is a potentially nasty thing to start if you do otherwise -- because where does it stop? The best people have the best people, so are we all going to make each other's life's more difficult than they are? Are you going to let michael "coincidentally talk to other dva folks who have decided to leave?" do you think we can just sit around and not work hard to change the math of your equation? And do you think friendships are easy to maintain and develop over the years when you do that? What world are you living in? I have competitors where we have basically stopped going after each other's people because it is a lose/lose. And those do not even have friendships at risk.

There are short term company performance issues and there are important friendship issues. Sometimes they conflict.

Thank you for your email, I look forward to listening tomorrow.

-----Original Message-----
From: Hayek, Andrew [mailto:Andrew.Hayek@scasurgery.com]

**GX**
21-cr-229
**8**

Sent: Saturday, July 19, 2008 7:34 PM
To: Kent Thiry
Cc: Joe Mello
Subject: RE: Call - ruminations ......

KT

I am very sorry that this situation is unfolding this way. Let's talk tomorrow -- you can reach me on my cell phone any time (205-306-2662). Let me share a few thoughts and emotions with you that may help form the basis of tomorrow's discussion.

1. I consider you a friend and consider myself a supporter of the DaVita Village. I tried to manage my transition and the time since my transition in a manner that went beyond any contractual relationships. I have spoken many times with Jess, both on conference calls and one-on-one, to help him with the VillageHealth challenge in DC and to help think through business challenges he is going through in VillageHealth. I volunteered to do Hill visits on VillageHealth's behalf, and, indeed, did spend an afternoon in DC doing VillageHealth visits. I've continued to serve as a resource to Buddy and to Bob Van Heuvelen. I also tried to be very supportive in helping Allen reach the decision to join DaVita.

2. I've always tried to do the right thing -- based on what is right. When I was thinking of leaving, I intentionally delayed discussing my Touchdown bonus, which, at the time the discussion was supposed to take place, might have had a considerable pay-out. I delayed the conversation because I wanted you to know that I was leaving, and I did not want to get paid those $$s, which I viewed as partly a payment for future value (not just past contributions). When I approached you about my decision to leave DaVita, I explicitly did not want or try to leverage the situation into a bidding war -- I wanted to reach a decision and shift the focus to how to transition in a manner that was most helpful to DaVita.

3. In terms of whether I should have called you prior to Michael communicating with Javier, my approach was largely informed by the experience I had in leaving DaVita a few months earlier. I was deeply disappointed that TPG told you about my candidacy for SCA prior to my discussing it with you for a number of reasons: first, I believed that a candidate (me) has a right to explore career options that may be best for them in privacy; second, I never wanted to leverage SCA and DaVita against each other in a "bidding war"; and, third, the net effect of the "heads up" discussion that occured prior to me discussing my decision to leave with you was to put my offer at risk (eg. the request for TPG to withdraw it) and to lower my ultimate economics (eg, to freeze my offer and leave the 10% wiggle room regarding base + bonus untapped). None of this felt good or right.

4. This experience formed a foundation for how I approached Michael's situation. Michael not only had an offer, he had met with each member of the board, met with the CEO multiple times, and had actually traveled to Houston with his wife to finalize their decision. Michael told me that he had made a decision to leave DaVita, that he had considered it deeply, that the decision was about him moving on after several years in the same organization, that he was not looking to create a bidding war (in fact, that he expressly didn't want that), and that he had deeply considered the Fidelis opportunity with his wife and had mutually decided to go. Michael expressly did not want me to talk to anyone prior to him talking to Javier, and he expressly did not want to create a "bidding war".

5. It's hard for me to contemplate not allowing Michael to have this opportunity because: (a) he had already decided to leave, (b) he had fully vetted the other opportunity (multiple meetings, house hunting with his wife, etc), and (c) SCA literally has an open position that he wanted to explore. Limiting this option just doesn't feel like the right thing for Michael.

6. Although I have multiple open positions, I have not been calling DaVita people, because of our friendship and my respect for the Village. Moreover, there was a DaVita person in the process of being recruited for an SCA role when I joined, and, despite being an excellent candidate, I decided not to pursue them. The difference, to me, was that Michael had already decided to leave.

I hope that you can trust me when I say that I believe that I have done the right thing in the path that I've pursued. Talk to you tomorrow.

Andrew

-----Original Message-----
From: Kent Thiry [mailto:Kent.Thiry@davita.com]
Sent: Saturday, July 19, 2008 1:29 PM

To: Hayek, Andrew
Cc: Joe Mello
Subject: RE: Call - ruminations ......

Before we talk, I would like you to have the benefit of knowing the question I am going to ask ....

1. If michael was sure he was going to leave anyway, why wasn't it
the right thing to say "michael, call davita and tell them that, and then I will give you an offer. I am not comfortable recruiting from
that/those company/friends unless that is a public fact." just so you
know, that is what I have done a few times in my career, so I am not moralizing in some theoretical way. Most of the time the candidate refuses to do it, because they are not in fact sure they are going to leave,

2. you can still test the truth of it. Withdraw the offer and see
if he submits his resignation and takes the other job. We will pay your company $250,000 if that happens, as long as no attorney says there is nothing wrong with that, we would have to check. I am doing it because jr is quite confident he would not have taken that other job.

3. the tpg situation was interestingly different. The business
transaction was initiated by a tpg team. The senior partner found out
later. Faced with a choice of a friendship and putting at risk a tpg
transaction, he chose to disclose to me and put at risk the transaction.
If this set of facts holds, you decided to intiate a business transaction explicitly against any value of a relationship --
without even testing the veracity of the candidates assertion, when that could have been done without any risk to the
candidate, because they would have self-disclosed since they "were going to leave anyway". The senior tpg partner
behaved strikingly different than you have -- strikingly, objectively, with cost to his organization, in business risk and
in disclosing something confidential. You had a zero cost option, as you could have forced michael to self-disclose,
you did not have to say anything to anyone until he did.

4. some execs do use their inside info to recruit after they leave
companies, with all appropriate winks/nods/coincidental conversations/phone calls, the usual rationalizations. Some
don't.
Situational facts are relevant of course -- in this case it would have been easy to establish the fact that he was going
to leave no matter what -- but you chose not to do that. It is not immoral to do it in a business sense -- not at all -- but
good friends don't do it to one another on a stealth basis, (a) because it is hurtful, and (b) it often has a negative net
present value in business and career terms -- why would you ever help someone after they take an exec in this way?
How would it make sense to do that, and (c) it can create a string of negative stuff, lousy uncontrollable negative stuff
... For example, since he was on our promising list, we will have to tell our Board and the rest of the senior team
exactly what happened, and many of them will take away negative conclusions about you -- not as a capitalist, but
they will redefine what kind of person you are. It will still be positive, business is business and you are a good person,
but there will be something special that you gave up that will be very hard to get back, given the option you had and
did not take. There are contracts and free markets, and there are relationships. Some execs live business primarily
according to contracts and free markets, others balance that with a heavy emphasis on relationships and caring
about one another over the longterm.

So when we talk I would like to get more clarity on what are the words that capture the nature of your relationship with
joe and I -- we think we would not have done to you what you have done to us, and so we have a fundamental
misunderstanding about what our friendship is.

I look forward to talking. kt

-----Original Message-----
From: Hayek, Andrew [mailto:Andrew.Hayek@scasurgery.com]
Sent: Thursday, July 17, 2008 2:42 PM
To: Cheryl Indech
Cc: Kent Thiry; Snider, Julia
Subject: Call

Cheryl

I hope all is well with you. Nicole + the boys are great -- we're getting ready for our move to Birmingham.

HIGHLY CONFIDENTIAL

DVA00019822

Could you suggest a few times that I could speak with KT for 15 min?
I've copied my assistant, Julia, who can coordinate for me.
Take care
Andrew
Sent from my Blackberry device.
DaVita Inc.

HIGHLY CONFIDENTIAL       DVA00019823