# **Exhibit 1**

# Lane Declaration

# (Filed Under Seal)

**THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO: | |
| ALL ACTIONS | |

**<u>EXPERT WITNESS REPORT OF DR. EVAN P. STARR</u>**

**TABLE OF CONTENTS**

**Page**

I. QUALIFICATIONS ................................................................ 1

II. ASSIGNMENT AND SUMMARY OF CONCLUSIONS ............................................. 3

III. PRIOR TESTIMONY ............................................................... 7

IV. BACKGROUND .................................................................... 8

    A. The Outpatient Medical Center Industry ............................... 8

    B. The Challenged Conduct ............................................... 9

    C. Parties .............................................................. 10

V. EVALUATING EVIDENCE OF THE CHALLENGED CONDUCT .......................... 14

    A. Economic Background of the Challenged Conduct ........................ 17

    B. Defendants Established No-Poach Agreements to Suppress Compensation ....... 30

    C. Defendants Exchanged CSI to Suppress Labor Market Competition ............. 85

VI. ECONOMETRIC EVIDENCE OF WAGE SUPPRESSION ......................... 96

    A. Standard Econometric Methods To Demonstrate Wage Suppression ............. 97

    B. Data Summary ........................................................ 100

    C. Wage Suppression Models ............................................. 102

VII. COMMON IMPACT .............................................................. 125

    A. By-Employee-Level Category and Defendant Suppression Model ............... 128

    B. Quantile Regression ................................................. 129

    C. In-Sample Prediction ................................................ 131

    D. Interval In-Sample Prediction ....................................... 135

    E. Random Coefficient Model ............................................ 142

    F. Evidence of a Compensation Structure That Would Transmit Wage Suppression Across All Class Members ....................................... 144

VIII. AGGREGATE DAMAGES ......................................................... 162

IX. MARKET POWER ................................................................ 168

X. CONCLUSIONS .................................................................. 170

PROOF OF SERVICE ............................................................... 172

APPENDIX A ..................................................................... 173

APPENDIX B ..................................................................... 193

**TABLE OF CONTENTS**
**(continued)**

**Page**

APPENDIX C ....................................................................................................... 212

APPENDIX D ....................................................................................................... 215

APPENDIX E ....................................................................................................... 227

## I.     Qualifications

1.     I am Evan P. Starr, a tenured Associate Professor at the University of Maryland's Robert H. Smith School of Business in the Department of Management and Organization. I specialize in performing economic and statistical analyses of labor markets, with a focus on earnings and restrictions on employee mobility. Before I joined the University of Maryland, I was an Assistant Professor at the University of Illinois at Urbana-Champaign, with a joint appointment in the Department of Economics and the School of Labor and Employment Relations.

2.     I earned a Ph.D. in Economics from the University of Michigan, an M.A. in Economics from the University of Michigan, and a B.A. from Denison University with majors in Math, Economics, and Spanish. I have taught courses to all levels of students (undergraduate, Masters, M.B.A., and Ph.D.); including a Ph.D. course in labor economics; Ph.D., Masters, and undergraduate courses in applied statistical methods; and M.B.A. and undergraduate courses in strategic management. I have also made presentations to several practitioner audiences, including as part of George Mason University's Continuing Education program for Attorneys General, Practicing Law Institute's Continuing Legal Education Programs, the Illinois Attorneys General Office, and the American Intellectual Property Law Association. My study of restrictions on employee mobility began when I was in graduate school as part of my dissertation, which examined the use of noncompete clauses, and how noncompete policies affect worker wages and on-the-job training, and firm creation, growth, and survival.

3.     To date, I have published 18 articles in several leading journals in economics, management, and law, the majority of which focus on mobility restrictions and compensation. These journals include the *Review of Economics and Statistics*, the *Journal of Law and Economics*, the *Journal of Law, Economics, and Organization*, the *Journal of Legal Studies*, the

1

*Journal of Human Resources*, *Management Science*, *Organization Science, Industrial and Labor Relations Review*, and the *Strategic Management Journal*. My research has been cited in major media outlets, including *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *NPR*, *The Financial Times*, *The Economist*, *The Baltimore Sun*, *The New Yorker*, *MIT Sloan Management Review*, and many others. My work is also cited regularly throughout U.S. Treasury and White House reports on restrictive covenants, as well as in policy discussions about noncompete clauses headed by the Federal Trade Commission. Moreover, I served on the Uniform Law Commission's drafting committee for the Uniform Restrictive Employment Agreement Act. In addition, I have written several policy memos regarding mobility restrictions, including no-poach agreements.

4.       I am also an Associate Editor at *Management Science* and an Associate Editor at the *Strategic Management Journal*, two of the leading journals publishing work on organizations. I also regularly review scholarly work as an ad hoc referee for many leading journals in economics and management.[1] I am, or have recently been, a member of the American Economic Association, the Labor and Employment Relations Association, the Academy of Management, the Strategic Management Society, the Society of Labor Economists, the Society for Institutional and Organizational Economics, and the American Law and Economics Association.

---

[1] These include the *American Economic Review: Insights, Management Science*, *Quarterly Journal of Economics*, *American Economic Review*, *Review of Economics and Statistics*, *Organization Science*, *Strategic Management Journal*, *Administrative Science Quarterly*, *Journal of Labor Economics*, *The Journal of Human Resources*, *American Economic Journal: Applied, Industrial and Labor Relations Review*, *Journal of Law, Economics, and Organization*, *Journal of Law and Economics*, *American Law and Economics Review*, *Academy of Management Review*, *Research Policy*, *Strategy Science*, *Strategic Entrepreneurship Journal*, *Journal of Economics and Management Strategy*, *Journal of Business Venturing, Industry and Innovation*, *Information Systems Research*, *Journal of Management Studies*, *European Financial Management Review*, *Advances in Strategic Management*, *Organizational Research Methods*, and *Production and Operations Management.*

3154924.9

5.    A more complete description of my qualifications is included in my curriculum vitae in **Appendix A**.

6.    In connection with this matter, I reviewed and considered materials from this case and from the related criminal investigation *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.), including the Third Consolidated Amended Class Action Complaint (ECF No. 555), depositions, deposition exhibits, trial transcripts, Federal Bureau of Investigation ("FBI") interview reports, and structured compensation data produced by, or compiled from materials produced by Defendants Andrew Hayek ("Hayek"), Kent Thiry ("Thiry"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC (together, "SCA"), DaVita Inc. ("DaVita"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation (together, "USPI") (altogether, "Defendants"). I also evaluated relevant studies from the academic literature. Overall, the information that I considered in forming my opinions include the materials listed in **Appendix B** as well as those cited in this report and any appendices. I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

7.    I am being compensated for my time in this matter at a rate of $990 per hour. My compensation does not depend upon the results of my analysis, any related testimony, or the outcome of this matter.

8.    For purposes of convenience, **Appendix C** provides a list of the names, employers, job titles, and years worked for individuals I reference in my report.

## II.    Assignment and Summary Of Conclusions

9.    I understand that Plaintiffs seek to certify a class of employees who worked in positions at the director-level and above (hereafter "Senior-Level Employees") for one or more of the following: (a) from May 1, 2008, through December 31, 2019, Surgical Care Affiliates,

3154924.9

LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, through December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries (hereafter the "Class" or "Class Members").

10.  I further understand that the Plaintiffs allege that Defendants colluded to suppress the compensation of each other's Senior-Level Employees, i.e., their employees at the director-level and above.[2] Specifically, the Plaintiffs challenge two mutually reinforcing methods that Defendants used to suppress Class pay: No-Poach Agreements and Exchanges of Competitively Sensitive Information ("CSI") (together, the "Challenged Conduct"):[3]

11.  Assignment. In my capacity as an applied microeconomist with a focus on labor markets, Counsel for Plaintiffs have asked me to do the following:

a.  *Assess if the Qualitative Evidence is Consistent with Anticompetitive Collusion and Inconsistent with Unilateral Conduct.* I have been asked to review Defendant's internal documents and communications to determine whether the qualitative evidence is consistent with anticompetitive collusion and inconsistent with unilateral conduct;

b.  *Analyze if the Quantitative Evidence is Consistent with Anticompetitive Collusion and Inconsistent with Unilateral Conduct.* I have been asked to analyze Defendant's data, including econometric analysis of Defendants' compensation data, to determine whether the Challenged Conduct is economically and statistically significantly associated with artificially

---

[2] 3rd Am. Class Action Compl., *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305 [hereafter Compl.] ¶¶ 19–32. Senior corporate officers, as well as members of the human resources, recruiting, or legal departments are excluded from the Class. *Id*.
[3] *Id.* ¶ 38.

4

3154924.9

suppressed compensation, beyond what can be explained by competitive factors, and whether this evidence is consistent with anticompetitive collusion and inconsistent with unilateral conduct;

c. *Determine Common Impact.* I have been asked to determine whether qualitative and quantitative evidence demonstrates that any wage suppression caused by the Challenged Conduct would commonly impact all or nearly all Class Members;

d. *Determine Aggregate Damages.* I have been asked to evaluate whether common methods and evidence can be used to quantify the damages to the Class, if any, caused by the Challenged Conduct;

e. *Determine Market Power.* I have been asked to determine whether Defendants have market power over Class Members; and,

f. *Assess Common Evidence.* I have been asked to assess whether evidence, data, and analyses common to the Class can be used to assess (a) through (e) above.

12. Conclusions. As a result of my work to date, the following are my conclusions:

a. *The Qualitative Evidence is Consistent with Anticompetitive Conduct and Inconsistent with Unilateral Conduct.*

i. **No-Poach Agreements**. In Section V.B, I review qualitative evidence which shows that Defendant firms entered into No-Poach Agreements so as to restrict competition for each other's employees. The evidence I have reviewed shows that SCA and DaVita, and SCA and USPI agreed to not solicit each other's employees, including but not limited to Senior-Level Employees, without their knowledge or consent. The SCA-DaVita and SCA-USPI No-Poach Agreements were monitored and enforced by Defendants' CEOs and C-

suite executives. I conclude that the evidence regarding Defendants' No-Poach Agreements is consistent with anticompetitive conduct and inconsistent with unilateral conduct.

        ii.        **CSI Exchanges.** In Section V.C, I review qualitative evidence which shows Defendants shared CSI, including employee compensation-specific data. The SCA-DaVita CSI exchanges and SCA-USPI CSI exchanges indicate that (1) each Defendant in the pair considered the other Defendant a relevant labor market competitor and (2) allowed them to coordinate on pay levels or increases, potentially lowering Class pay. I conclude that the evidence regarding Defendants' CSI exchanges is consistent with anticompetitive conduct and inconsistent with unilateral conduct.

        b.        *The Quantitative Evidence is Consistent with Anticompetitive Conduct and Inconsistent with Unilateral Conduct.* Quantitative evidence regarding the mobility of Class Members between Defendants that I have reviewed shows that Defendants' Conduct artificially suppressed the bilateral mobility of Senior-Level Employees between SCA and DaVita, and SCA and USPI. I also conclude based on the wage suppression model I develop in Section VI that the Challenged Conduct suppressed wages by 14.5 percent overall. Specifically, the Challenged Conduct suppressed wages by 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI. This quantitative evidence is consistent with anticompetitive conduct and inconsistent with unilateral conduct.

        c.        *The Challenged Conduct Commonly Impacted Class Members.* In Section VII, I develop a series of econometric tests that I developed from the wage suppression model in Section VI, which shows that Defendants' Conduct, which occurred over a "Conduct Period" defined as 2008 to 2019 for DaVita and SCA and 2010 to 2019 for USPI,[4] harmed all or nearly

---

[4] *See* ¶118, *infra.*

3154924.9

all Class Members by suppressing their compensation. Moreover, I conclude based on my analysis of qualitative and quantitative evidence that Defendant firms had structured compensation systems wherein pay moved systematically, and as such would commonly transmit any harms from the Challenged Conduct to all or virtually all Class Members.

d. *Aggregate Damages Are Calculable.* In Section VIII, I compute aggregate damages to the Class as a whole using classwide methods and data. I employ the standard "but-for world" method of calculating damages to calculate that single damages to the Class sum to $869.5 million over the Conduct Period, which is composed of $631.7 in damages for Class Members at DaVita, $113.9 million in damages for Class Members at SCA, and $123.8 million in damages for Class Members at USPI.

e. *Defendants Wield Market Power over Class Members*. In Section IX, I conclude that the evidence includes direct proof of market power, such that Defendants wielded substantial market power over Class Members. Defendants' Challenged Conduct could not have suppressed Class Member wages if Defendants lacked market power over them.

f. *The Evidence is Common to the Class.* All of the evidence, data, and analyses I relied on to reach each of the foregoing conclusions are common to the Class.

## III. Prior Testimony

13. I have testified as an expert in arbitration proceedings and/or or been deposed in the following cases: *Collier HMA Physician Management, LLC et al., v. NCH Healthcare System Inc., et al.*, No. 2:18-cv-408-SPC-MRM (M.D. Fla.); *Echo Global Logistics Inc. v. Traffic Tech, Inc. and Jack Ford Jr.*; *Jefferies LLC v. Credit Suisse Securities (USA) LLC*; and *The Dufresne Spencer Group, LLC et al. v. Han Nara Enterprises LP et al.*, No. 21-1857 (D. Del.).

14. Within the last six years, I have also testified on the topic of mobility restrictions in front of the U.S. Senate, the U.S. House of Representatives, at multiple events at the Federal

7

3154924.9

Trade Commission ("FTC"), and the Department of Justice ("DOJ"). I have also presented research on these topics in approximately 100 conferences or university seminars. Additionally, I testified twice in front of the D.C. City Council regarding a noncompete bill and provided testimony to the state legislatures of Massachusetts, Washington, and Connecticut in their deliberations related to restrictive covenants.

## IV. Background

### A. The Outpatient Medical Center Industry

15. Outpatient surgery refers to scheduled surgical services performed on patients who do not remain in the hospital overnight.[5] These procedures may occur in operating hospital suites also used for inpatient suites, hospital suites specifically designated for outpatient care, or procedure rooms within a dedicated outpatient care facility.[6] Ambulatory surgery centers ("ASCs"), or outpatient surgery centers, are facilities that focus on providing same-day surgical care in fields like endoscopy, ophthalmology, orthopedics, pain-treatment, dentistry, and other medical specialties.[7]

16. A wide variety of employees are necessary to keep ASCs and outpatient surgery centers functioning. Physicians, nurses, technicians, registration staff, and operations managers are all required.[8] As with any large company, higher-level management employees located in the corporate headquarters and regional business offices are also required to manage an individual ASC or a region of ASCs and perform a wide variety of administrative functions.

---

[5] *See Outpatient Surgery*, CDC, https://www.cdc.gov/nchs/hus/sources-definitions/outpatient-surgery.htmhttps://www.cdc.gov/nchs/hus/sources-definitions/outpatient-surgery.htm (last updated Jul. 24, 2024).
[6] *Id.*
[7] *What is an ASC?*, AMBULATORY SURGERY CENTER ASSOCIATION, https://www.ascassociation.org/asca/about-ascs/surgery-centers (last visited Jan. 9, 2025).
[8] *Medical Staff and Specialists At Outpatient Centers*, TAG MEDSTAFFING, https://www.tagmedstaffing.com/what-is-a-outpatient-center/ (last visited Jan. 9, 2025).

3154924.9

## B.     The Challenged Conduct

17.     In this matter, Plaintiffs allege that Defendants colluded to suppress the pay of each other's Senior-Level Employees, i.e., their employees at the director-level and above.[9]

18.     Plaintiffs allege that DaVita and SCA began colluding at least as early as May 2008, and that USPI and SCA began colluding at least as early as May 2010 (hereafter (the "Class Period").[10]

19.     Plaintiffs allege two mutually reinforcing anticompetitive methods: No-Poach Agreements and Exchanges of CSI (together, the Challenged Conduct):[11]

a.     *No-Poach Agreements.* Plaintiffs allege that SCA and DaVita, and SCA and USPI agreed not to proactively recruit each other's Senior-Level Employees.[12] Further, Defendants agreed not to pursue recruiting, soliciting, hiring, and/or cold calling (i.e. wherein a hiring company proactively calls, emails, or otherwise reaches out through a platform like LinkedIn or Indeed to a passive candidate, i.e., an employee at a competitor firm who has not proactively solicited employment), each other's Senior-Level Employees unless those Senior-Level Employees informed their current employers that they intended to seek employment elsewhere.[13]

---

[9] Compl ¶¶ 19–32. Senior corporate officers, as well as members of the human resources, recruiting, or legal departments are excluded from the Class. *Id*.

[10] *Id.* ¶ 92.

[11] *Id.* ¶ 38.

[12] *Id.* ¶ 7 ("Beginning no later than 2008, however, Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above [i.e., "Senior-Level Employees"], by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers. These 'no-poach' agreements continued through 2021. The CEOs and other senior executives of each co-conspirator monitored and enforced the agreements.").

[13] *Id.* ¶¶ 44, 51.

9

b. *CSI Exchanges.* Plaintiffs also allege that SCA and DaVita, and SCA and USPI suppressed Class pay by regularly sharing competitively-sensitive information regarding employee compensation and other costs.[14]

20. Plaintiffs allege the Challenged Conduct "denied [Defendants'] employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment" as well as eliminating "the need for compensation increases to preempt competitive offers and retain employees."[15] Plaintiffs allege that the ultimate effect of the Challenged Conduct was a classwide suppression of employee compensation.[16]

## C. Parties

### 1. Plaintiffs and Class Members

21. The named Plaintiffs in this matter are Scott Keech and Allen Spradling. Keech worked at SCA from approximately February 2009 to March 2012 as a Regional Director of Operations and Clinical Services in the San Francisco, California area.[17] Spradling worked for Surgical Care Affiliates from September 22, 2008 to April 26, 2013 as a Manager in the Program Management Office, and then as a Director of Information Technology.[18]

---

[14] *Id.* ¶ 8.
[15] *Id.* ¶ 11.
[16] *Id.* ¶ 11.
[17] *See* Appendix ("App.") C.
[18] *Id.*

10

22.     Class Members are all Senior-Level Employees holding director-level or above positions, excluding senior officers and those in Defendants' legal, recruiting, and HR departments.[19] The Class is comprised of 6,308 unique Class Members.[20]

### 2.     Defendants

23.     Defendant firms are among "the largest employers in the outpatient medical care center industry, with a nationwide reach,"[21] and the two individual Defendants are their former CEOs and key co-conspirators.

24.     DaVita and Thiry. Defendant DaVita Inc., colloquially referred to by DaVita employees as "The Village" or "DVA," is the largest Defendant in this litigation.

a.     DaVita "owns and operates outpatient medical care facilities around the United States"[22] and has over 77,000 employees.[23]

b.     DaVita focuses on kidney care, treating over 200,000 dialysis patients in the US.[24] It is "one of the largest providers of kidney care services in the US" and owns 2,675

---

[19] Compl. ¶ 92.

[20] To calculate the number of unique Class Members, I limit the structured data to the Conduct Period and count the number of unique employee hashed SSNs (a 64-character combination of letters and numbers that are designed to uniquely identify employees across companies, time, and other changes such as job title change) present across all three Defendant companies after removing outlier observations. *See* my workpapers (which include the data and code to replicate the empirical analyses conducted in this report) for details.

[21] Compl. ¶ 63.

[22] *Id.* ¶ 31.

[23] *About Us*, DAVITA REDWOODS, https://www.redwoods.davita.com/about-us (last visited Jan. 2025); *Investors*, DAVITA, https://investors.davita.com/ (last visited Jan. 2025); *Annual Report 2023*, DAVITA (Apr. 26, 2024), https://investors.davita.com/download/DaVita_2023_Annual_Report.pdf.

[24] *About*, DAVITA, https://www.davita.com/about (last visited Jan. 9, 2025).

3154924.9

outpatient dialysis centers in the United States.[25] DaVita also operates 367 centers located in 11 other countries worldwide.[26]

        c.      Formerly comprised of two divisions, DaVita Medical Group (formerly known as DaVita Healthcare Partners) and DaVita KidneyCare, DaVita sold its DaVita Medical Group business to Optum in 2019.[27]

        d.      Thereafter, Defendant Thiry, who was DaVita's CEO from 1999 to 2019, left DaVita, and then-CEO of DaVita KidneyCare Javier Rodriguez took over as CEO for the entire company.[28]

        e.      DaVita is based in Denver, Colorado.[29]

25.    <u>SCA and Hayek.</u> Defendant Surgical Care Affiliates, LLC is another dominant firm in the healthcare space.

        a.      SCA was the direct operating subsidiary of parent company Surgical Care Affiliates, Inc., which in 2017 became a wholly-owned subsidiary of UnitedHealthcare Group Inc., a subsidiary of Optum.[30]

---

[25] *Improving Health, Health Care and Quality of Life*, DAVITA, https://investors.davita.com/ (last visited Jan. 9, 2025).

[26] *Home*, DAVITA INVESTORS, https://www.davita.com/about (last visited Jan. 9, 2025).

[27] *Press Release: Optum completes acquisition of DaVita Medical Group from DaVita*, UNITEDHEALTH GROUP (Jun. 19, 2019) https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html; *Press Release: DaVita Medical Group Acquires Respected Physician Practices in the Orlando Area*, DAVITA NEWSROOM (Jul. 13, 2017), https://newsroom.davita.com/press-releases?item=123281.

[28] *See* App. C.

[29] *Contact Us*, DAVITA, https://www.davita.com/about/contact-us (last visited Jan 14, 2025).

[30] *Press Release: Surgical Care Affiliates (SCA), OptumCare to Combine*, UNITEDHEALTH GROUP (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html.

    b.      SCAI Holdings, LLC is a successor entity to Surgical Care Affiliates, Inc. and a subsidiary of UnitedHealthcare.[31] These various SCA entities all did business as "SCA" and conducted business as a single enterprise.[32]

    c.      SCA is comprised of over 320 ambulatory surgery centers.[33] SCA currently operates in 35 states and treats approximately one million patients each year.[34] It further employs 10,000 individuals and partners 9,200 physicians affiliated with its centers.[35]

    d.      SCA's facilities reportedly generate "more than $2 billion in revenue" annually through its range of surgical services, including orthopedics, ophthalmology, gastroenterology, pain management, otolaryngology, urology, cardiology and gynecology.[36]

    e.      Hayek was SCA's Chairman and CEO from May 2008 to January 1, 2018. Afterwards, and following a merger between SCA and OptumHealth, Hayek served as OptumHealth's CEO, through March 2019.[37]

    f.      SCA's main offices are in Birmingham, Alabama and Deerfield, Illinois.[38]

---

[31] SCAI Holdings, Certification and Notice of Termination of Registration (Form 15) (Apr. 3, 2017).

[32] Compl ¶ 22.

[33] *About Us*, SCA HEALTH, https://sca.health/about-us/ (last visited Jan. 9, 2025).

[34] Dan Luu, *How Many Locations Does Surgical Care Affiliates Have?*, NWCC-OR (Aug. 3, 2022), https://www.nwcc-or.com/how-many-locations-does-surgical-care-affiliates-have#:~:text=SCA%20Health%20is%20dedicated%20to,patients%2C%20providers%2C%20and%20community; *About Us*, SCA HEALTH, https://sca.health/about-us/ (last visited Jan. 9, 2025).

[35] *About Us*, SCA HEALTH, https://sca.health/about-us/ (last visited Jan. 9, 2025).

[36] Compl ¶ 23.

[37] *See* App. C; Deposition of Andrew Hayek (Sept. 18, 2024) [hereafter Hayek Dep.] at 35:20–23, 190:2–9.

[38] *See Contact Us*, SCA HEALTH, https://sca.health/about-us/contact/ (last visited Jan. 2025) (Naming Birmingham as the location of Alabama Corporate Headquarters); *SCA Health*, LINKEDIN, https://www.linkedin.com/company/scahealth (last visited Jan. 2025) (Showing SCA being based in Deerfield, Illinois). *See also* Hayek Dep. 197:22–198:6 (listing Birmingham, Chicago, Connecticut, Texas, and California as the locations of senior SCA employees).

3154924.9

26.    USPI. Defendants United Surgical Partners International, Inc. and United Surgical Partners Holdings, Inc. comprise the largest ambulatory surgery company in the country, with more than 535 surgical centers.[39]

a.    USPI is a subsidiary of Defendant Tenet Healthcare Corporation.[40] In June 2015, Tenet merged with USPI.[41]

b.    USPI has over 21,000 employees,[42] including over 6,000 physician partners.[43] It performs over 2 million procedures annually across 37 states.[44]

c.    Bill Wilcox served as USPI's CEO from 2004 to 2018, after which former USPI COO Brett Brodnax replaced him.

d.    USPI's main office is in Dallas, Texas.[45]

## V.    Evaluating Evidence of The Challenged Conduct

27.    In this section, I evaluate the Challenged Conduct from an economic perspective. I first explain how the economic literature views collusion generally, and no-poach agreements and exchanges of CSI specifically. Economic theory clearly establishes that no-poach agreements and exchanges of CSI tend to anticompetitively suppress worker wages and are not in a firm's unilateral self-interest. That is, if the Defendants did engage in a no-poach agreement

---

[39] *Who We Are*, UNITED SURGICAL PARTNERS INT'L, https://uspi.com/about-us/who-we-are/default.aspx (last visited Jan. 9, 2025).

[40] Compl. ¶¶ 24, 28.

[41] *Press Release: Tenet Completes Purchase of USPI from WCAS*, INVESTOR TENET HEALTH (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx.

[42] Compl. ¶ 25.

[43] *Home*, UNITED SURGICAL PARTNERS INT'L, https://uspi.com/home/default.aspx (last visited Jan. 9, 2025).

[44] *Home*, UNITED SURGICAL PARTNERS INT'L, https://uspi.com/home/default.aspx (last visited Jan. 9, 2025).

[45] Compl. ¶ 36. App. E.

14

3154924.9

or exchange CSI, the economic theory would predict that the Class Members who worked for the Defendants would be anticompetitively harmed by this conduct.

28.     Armed with this economic background, I then evaluate whether the qualitative and quantitative evidence in this matter is *consistent* with anticompetitive conduct and inconsistent with unilateral conduct. To do this, I first explain how Economists typically use qualitative and quantitative evidence to evaluate the Challenged Conduct, and then proceed to do so using the evidence in this case.

a.     Economists consider qualitative evidence when studying economically significant aspects of cartel behavior, and economists frequently bring their expertise to bear in analyzing documentary evidence of communications among cartel members and other qualitative aspects of cartel organization and behavior.[46] For example, economists will consider evidence of communications between horizontal competitors regarding the restriction of competition to aid in assessing what products, services, or inputs may be affected. An economist may also assist in

---

[46] *See, e.g.*, Margaret C. Levenstein & Valerie Y. Suslow, *What Determines Cartel Success?*, 44 J. ECON. LITERATURE 43–95 (2006) [hereafter Levenstein & Suslow (2006)]. Professors Margaret Levenstein and Valerie Suslow review the empirical economic literature studying the determinants of cartel success. They explain that economists recognize that cartels often achieve collusion through the "development of sophisticated and flexible organizations," which they establish "over time as a result of organizational learning." *Id.* at 67. Economists also recognize the "difficulties in observing and quantifying such information [on organizational learning] for a large number of industries." *Id* at 69. For this reason, economic case studies, which focus on a single cartel within a single industry, relying less on large data sets and more on qualitative evidence, "are much more amenable to studying organizational issues[.]" *Id.*

15

3154924.9

evaluating whether such communications are in a firm's unilateral self-interest, or if the action requires another firm to collude for the action to be beneficial.[47]

b. Economists also use quantitative evidence by observing whether the period of alleged Conduct is associated with supracompetitive market outcomes. For example, an economist can empirically observe whether rates of employees switching between firms who are parties to a no-poach agreement were diminished when the agreement was in place. Economists can also evaluate whether employee compensation was suppressed during alleged misconduct.

29. I find that both the qualitative and quantitative evidence is consistent with the alleged anticompetitive collusion and inconsistent with competition. The communications and deposition testimony of the Defendants are textbook examples of how a no-poach agreement operates in practice. The exchanges of CSI are the exact kind of data exchanges that could lead to the suppression of employee compensation. A quantitative analysis of Class Member wages shows that wages were artificially suppressed during the Conduct Period after accounting for other relevant factors. A further analysis of Class Member mobility during the Conduct Period shows dampened inter-firm movement between Defendants with a no-poach agreement during the Conduct Period. All of this evidence and analysis, which is common to the Class as a whole, is consistent with anticompetitive collusion and inconsistent with competition.

---

[47] *Prosecuting Cartels without Direct Evidence of Agreement*, ORG. FOR ECON. COOP. & DEV. (Sept. 11, 2006), https://www.oecd.org/content/dam/oecd/en/publications/reports/2006/05/prosecuting-cartels-without-direct-evidence-of-agreement_75732b6f/9640e3d4-en.pdf at 18 ("Economic theories of oligopoly provide several valuable insights for competition law enforcers: They show that acts consistent with unilateral incentives can lead to a different outcome than when firms act collectively, and that oligopoly does not inevitably lead to cooperation and collective action to increase prices. As a result, enforcers and decision makers should carefully examine whether firm conduct can be described as actions in unilateral self-interest absent an agreement to act jointly, or as actions in the collective interest of all competitors. Conduct consistent with unilateral self interest does not constitute good evidence in a circumstantial cartel case.").

16

### A.    Economic Background of the Challenged Conduct

30.    In this section I review the economic background of collusion. Collusion among horizontal competitors enables those firms to increase their market power in both product markets (referred to as "Monopoly Power") and input markets (referred to as "Monopsony Power"). I then explain how the two specific forms of collusion at issue here—no-poach agreements and CSI exchanges—would be expected to suppress employee compensation.

#### 1.    Collusion Gives Firms Monopsony Power

31.    Collusion occurs when a group of buyers or sellers coordinate their economic behavior to collectively approximate (or even replicate) the same pricing and associated profits of a monopolist (for sellers) or monopsonist (for buyers).[48]

32.    Economists have long recognized that monopolists and monopsonists enjoy greater profits than firms in competitive industries.[49] In the case of a monopsonist, a firm with monopsony power (i.e., buying power) sets the prices at which they will purchase inputs (such as labor) below what would be realized in a competitive market, increasing the monopsonist's own profits at the expense of the employee.

33.    Such a position is obviously desirable for a firm, but difficult to obtain because antitrust law impedes a firm from acquiring all of its input market rivals to make itself a true monopsonist.[50]

---

[48] *See generally*, DENNIS W. CARLTON & JEFFERY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION, 122–154 (4th ed. 2005) [hereafter MODERN IO 4TH ED.].

[49] *See* N. GREGORY MANKIW, PRINCIPLES OF MICROECONOMICS, 291–292 (Cengage 8th ed. 2018) [hereafter MANKIW] ("Because these laws give one producer a monopoly, they lead to higher prices than would occur under competition. But by allowing these monopoly producers to charge higher prices and earn higher profits, the laws also encourage some desirable behavior.")

[50] ROBERT C. MARSHALL & LESLIE M. MARX, THE ECONOMICS OF COLLUSION, CARTELS AND BIDDING RINGS, 4 (MIT Press 2012) ("[T]he successful suppression of interfirm rivalry can produce relatively quick improvements in profits . . . [however] there are many circumstances in which collusion is illegal.").

17

3154924.9

34.  If a group of firms in an industry reach an agreement to not compete with one another for inputs, however, they can achieve monopsony-like prices and profits (supra-competitive outcomes) by collectively behaving like a single buyer of inputs.[51] In the case of a service market for labor, monopsony power is commonly achieved by an agreement not to compete over labor, or to coordinate the price setting of labor below competitive levels among firms that hire similar employees. Such agreements are termed "collusion," and the group of firms with such an agreement is called a "cartel." [52]

### 2.  The Economics of No-Poach Agreements

35.  A no-poach agreement is an agreement between firms to limit or restrict competition for each other's employees.

36.  From an economic perspective, an agreement to suppress competition in an input market (i.e., labor is an input to delivering a product or service) is directly analogous to an agreement to suppress competition in an output market (i.e., a product or services market).

37.  For example, if Defendants had agreed to suppress competition in a product market through a market-allocation agreement (divvying up markets to each firm and agreeing not to compete in markets assigned to another firm),[53] the predicted result would be

---

[51] *Id*. at 7 ("A monopolist internalizes the consequences of decreased output and so achieves enhanced profits. In contrast, when prices increase as a consequence of collusion, each colluding firm has a strong profit incentive not to restrict its own output."). Colluding firms do not need to achieve the optimal monopoly price to enjoy enhanced profits. Any supra-competitive price (that is, prices above what would exist in competition) benefits the firms at the expense of customers.
[52] MANKIW at 339 ("collusion[:] an agreement among firms in a market about quantities to produce or prices to charge"; "cartel[:] a group of firms acting in unison[.]").
[53] *Price Fixing, Bid Rigging, And Market Allocation Schemes*, DOJ (Feb. 2021), https://www.justice.gov/atr/price-fixing-bid-rigging-and-market-allocation-schemes at 3 ("Market division or allocation schemes are agreements in which competitors divide markets among themselves. In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves.").

3154924.9

unambiguously anticompetitive, with higher prices (and lower output) than would otherwise prevail.[54] Similarly, if Defendants here agreed to lessen competition for Senior-Level Employees by ceasing solicitations or cold calling for recruitment purposes between them, the predicted result is lower compensation for Senior-Level Employees and less mobility between Defendants.

38.     No-Poach Agreements Yield Monopsony Power. A no-poach agreement is a means of restricting prices in the input market by allowing would-be competitors to behave with more monopsony power.[55] In other words, when firms agree not to compete for labor, they effectively enter into an allocation agreement in the input market for employees, such that employees *artificially* face fewer purchasers for their services.

39.     A no-poach agreement restricts the mobility and bargaining leverage of the employee in three ways: (i) directly by reducing efforts by firms to reach out to other company's employees; (ii) by rebuffing individual efforts to join the other companies covered by the agreements; and (iii) indirectly by reducing the information about outside options available to employees. For example, in a competitive environment, when a firm actively solicits a rival's employee, they impart information to that employee about what the solicitor is willing to pay for

---

[54] S*ee, e.g.*, MANKIW at 339 ("Once a cartel is formed, the market is in effect served by a monopoly and we can apply our analysis from Chapter 15. That is, if Jack and Jill collude, they will agree on the monopoly outcome because that outcome maximizes their total profit. Our two producers produce a total of 60 gallons, which sell at a price of $60 a gallon. Once again, price exceeds marginal cost, and the outcome is socially inefficient.").

[55] *See* Section IX, describing monopsony power; *see also* Alan B. Krueger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, 57 J. HUMAN RESOURCES S324–S348, S332 (2022) [hereafter Krueger & Ashenfelter (2022)] (describing the phenomenon of no-poach agreements as "equivalent to making the group [] a single employer in this labor market[.]").

3154924.9

the employee's services. Even if that employee does not end up switching, this information may be used to negotiate for a higher rate from their current employer.[56]

40.　A recent 2022 report by the U.S. Department of the Treasury on *The State of Labor Market Competition* classified no-poach agreements as a form of "restrictive employment agreement."[57] As shown in **Figure 1** below, other types of restrictive employment agreements include noncompete agreements, non-solicitation agreements, non-recruit agreements, training-repayment agreements, and non-disclosure agreements. A no-poach agreement, like all of the restrictive employment agreements listed in **Figure 1**, limits an employee's outside employment options. The key distinction between no-poach agreements and the other restrictions listed in **Figure 1** is that the no-poach agreement operates between firms, where the workers affected by the no-poach agreement are likely to be unaware of its existence. In contrast, the other types of agreements (noncompete, non-solicit, training repayment, non-disclosure) are all agreed to by the employee.

41.　The fact that workers in general do not choose to enter into a no-poach agreement—but that it then constrains their subsequent job options—suggests that workers will not in general be able to demand compensating differentials in exchange for the subsequent

---

[56] *See* ROGER FISHER & WILLIAM URY, GETTING TO YES, 100 (2nd ed. 1983) [hereafter GETTING TO YES] ("The reason you negotiate is to produce something better than the results you can obtain without negotiating. What are those results? What is that alternative? What is your BATNA—your Best Alternative To a Negotiated Agreement? That is the standard against which any proposed agreement should be measured. That is the only standard which can protect you both from accepting terms that are too unfavorable and from rejecting terms it would be in your interest to accept. . . . If you have not thought carefully about what you will do if you fail to reach an agreement, you are negotiating with your eyes closed.").

[57] *See, e.g.*, *The State of Labor Market Competition,* U.S. DEP'T OF TREASURY (Mar. 7, 2022), https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf at 13.

3154924.9

restrictions on their mobility. Thus, a no-poach agreement, like the other restrictions, "weakens workers' bargaining power and raises hiring costs for other firms."[58]

42. All else equal, restrictive covenants "lock-in" employees to their employers, which results in lower worker mobility and "a flat or declining wage profile."[59]

**Figure 1: Types of Restrictive Employment Agreements[60]**

| Clause | Description |
|---|---|
| Non-compete agreements | Former employee cannot work for a competitor following separation. Typically applies for a certain amount of time, over a certain geographic area, and within a specific industry. |
| Non-solicitation agreements | Employee agrees to not solicit a company's clients or customers for their own benefit, or the benefit of a competitor, after leaving the company. |
| Non-recruitment agreements | Employee or former employee is forbidden from recruiting employers' employees away from employer for a period. |
| Training repayment agreements | Employee must repay the cost of training provided by employer if they leave employment prior to some period. Agreement is typically pro-rated based on length of employment following training. |
| Non-disclosure agreements | Prevents employee or former employee from disclosing information. Meant to protect information that is both confidential and valuable. |
| No-poach agreements | Two or more employers agree to not solicit or hire each other's current or former employees. |

---

[58] *Id.* at 16 ("By design, non-compete agreements limit employees' outside options, which, in turn, weakens workers' bargaining power and raises hiring costs for other firms.").

[59] *Id.* at 16. Note that the economic literature may refer to "wages," "pay," or "compensation." "Wages" tends to specifically refer to the dollar compensation given to employees in exchange for work. "Pay" and "compensation" tend to refer to the total compensation employees receive, which can include non-wage benefits (i.e., healthcare, 401k matching, stock options, etc.) in addition to dollar compensation.

[60] *Id.* at 14.

21

43. In economic terms, no-poach agreements give employers monopsony power, meaning they face less competition for workers. The way that monopsony power is often measured in the economic literature is by the "elasticity of labor supply" to the firm. This measure considers how changes in the firm's wages affect the labor supply to the firm. When this value is low, it means that the firm's workers are not sensitive to wage changes at the firm, which allows the firm to mark down their wages relative to how much they produce for the firm.[61] This is perhaps most intuitively understood in dynamic models, where the firm's elasticity of labor supply comes from how likely workers are to quit their jobs if the firm were to reduce their wages.[62] If the firm can lower its wages without losing workers, then it has a low labor supply elasticity and greater monopsony power. That is, when workers cannot or will not leave a job even when wages are lower, the firm can drive down employee compensation relative to the value the employee adds to the firm. Thus, firms can suppress wages below (or further below) competitive levels by engaging in conduct that has the effect of limiting employee mobility and thus dampening their firm's labor supply elasticity.

---

[61] *See, e.g.*, Suresh Naidu et al., *Antitrust Remedies for Labor Market Power*, 132 HARV. L. REV. 536, 557 (2018) (discussing supply curves in a labor context) ("Residual labor supply elasticity is a simple measure of a firm's labor market power. If workers do not quit even if the firm lowers wages significantly (elasticity is low), then the firm enjoys significant market power over the workers. This is the number that antitrust policy focuses on. If the residual labor supply elasticity that a firm faces is high, then the labor market from which a firm draws its workers is competitive, and the firm cannot 'exploit' workers.").

[62] *See, e.g.*, ALAN MANNING, MONOPSONY IN MOTION: IMPERFECT COMPETITION IN LABOR MARKETS, Chapter 4 (2003).

22

### a. Extensive Literature Discusses Harms Caused by No-Poach Agreements

44. There is robust economic literature demonstrating how no-poach agreements suppress labor supply elasticities and affect compensation.[63]

45. For example, economists Dr. Alan Krueger and Dr. Orley Ashenfelter (2022) built no-poach agreements into a dynamic job search model, showing how they dampen the labor supply elasticity faced by an employer by reducing the rate at which workers receive outside job offers, thereby allowing the employer to drive a larger wedge between how much the firm pays the worker and how much revenue the worker produces for the firm.[64] They write, "no-poaching

---

[63] *See, e.g.*, Kevin Caves & Hal Singer, *When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer-Welfare Standard*, 26 GEO. MASON L. REV 395, 410–411 (2019) [hereafter Caves & Singer (2019)]; *see also* Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,* ANTITRUST SOURCE (2015) at 3–4. *See also Justice Department and Federal Trade Commission Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation*, DOJ (Oct. 20, 2016), https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-guidance-human-resource-professionals ("Workers are entitled to the benefits of a competitive market for their services. They are harmed if companies that would ordinarily compete against each other to recruit and retain employees agree to fix wages or other terms of employment or enter into so-called 'no-poaching' agreements by agreeing not to recruit each other's employees."); *see also No More No-Poach: The Antitrust Division Continues to Investigate And Prosecute "No-Poach" And Wage-Fixing Agreements*, DOJ (Apr. 10, 2018), https://web.archive.org/web/20230408175427/https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements ("When companies agree not to hire or recruit one another's employees, they are agreeing not to compete for those employees' labor. The same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services. After all, workers, like consumers, are entitled to the benefits of a competitive market. Robbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment.").

[64] Krueger & Ashenfelter (2022).

3154924.9

agreements increase employer concentration and have the potential for driving a wedge between the value of a worker's marginal product and wage."[65]

46.     In their empirical analysis, Krueger and Ashenfelter examine in detail a series of no-poach agreements within many large franchises. In an addendum to their paper, they later describe how the Washington State Attorney General reached an agreement with the franchises to remove their no-poach agreements.

47.     Two recent papers study how the removal of these no-poach agreements in the franchise context affect compensation. In one study, Callaci et al. (2024) found that the Washington State Attorney General's enforcement campaign against no-poach clauses increased posted annual compensation by 6 percent and increased worker-reported earnings by 4 percent.[66]

48.     In another study by Lafontaine et al. (2024), the removal of no-poach agreements in the chain restaurant industry "caused wages in those chains to rise by about 5% relative to chains that did not have" no-poach agreements.[67] Lafontaine et al. (2024) conclude: "[W]e find strong support for the hypothesis that NPCs increased buyer power, limited workers' labor market opportunities, and suppressed wages."[68]

49.     Perhaps more germane to the present context is a study of the Silicon Valley no-poach case by Gibson (2024). Therein, Gibson examines the effects of the no poach agreements between Silicon Valley tech giants on salary and non-salary compensation. He finds that, as a lower bound, a single no-poach agreement for one year reduced salaries by 5.6 percent.[69] He also

---

[65] *Id.* at S331.
[66] Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings*, REV. ECON. & STATISTICS 1–35, 1 (2024).
[67] Francine Lafontaine, Saattvic Saattvic, & Margaret Slade, *No–Poaching Clauses in Franchise Contracts: Anticompetitive or Efficiency Enhancing*, SSRN (Sept. 9, 2024) at 1.
[68] *Id.* at 35.
[69] Matthew Gibson, *Employer Market Power in Silicon Valley*, UPJOHN RESEARCH (2024) at 3.

3154924.9

finds that a no-poach agreement reduced the probability of a positive stock bonus by 8.3 percentage points and reduced stock bonuses on average by 79.6 percent.[70] Gibson's explanation for the reduction in stock bonuses is that "[a] firm engaged in no-poaching agreements has less need to offer employees incentives to stay[.]"[71] Put differently, stock compensation generally ties the worker to the firm by aligning company performance and individual payouts—but if there is less need to worry about worker retention then there is less need to provide stock compensation.

50.     While no-poach agreements are only one way to suppress labor market competition, the idea that firms can suppress pay by limiting employee outside options has broad support throughout the economics literature.

51.     A prominent early study on labor mobility found that for the first 10 years of a worker's career, the wage gains from changing jobs accounted for one third of their total wage growth.[72] More recently, Caldwell and Danieli (2024) develop a method for estimating individual-level outside options and study how it relates to earnings.[73] They find that a ten percent increase in outside options increases earnings by 1.7 percent.[74] Similarly, researchers studying other restraints on employee mobility have found that they reduce worker pay. For example, both low-wage and high-wage bans on noncompete clauses raise compensation by 2-5

---

[70] *Id.* at 20.

[71] *Id.* at 20.

[72] Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men,* 107 Q. J. ECON. 439–479, 442 (1992) ("Wage gains at job changes average about 10 percent, and account for about one third of total wage growth during the first ten years in the market."). *See also* Serdar Ozkan et al., *Anatomy of Lifetime Earnings Inequality: Heterogeneity in Job-Ladder Risk versus Human Capital*, 1 J. POL. ECON. MACROECONOMICS 506–550, 506 (2023) (The authors studied the effects of job switching on lifetime earnings, finding that job switching is prevalent both among low earners and high earners relative to the median earners, indicating that the nature of job switching is different across earning categories.).

[73] Sydnee Caldwell & Oren Danieli, *Outside Options in the Labour Market*, REV. ECON. STUDIES (2024).

[74] *Id.*

3154924.9

percent on average, including by up to as much as 21 percent for workers with noncompetes.[75]

Similarly, workers with noncompete, non-solicit, and non-disclosure restrictions have 3-7

percent lower earnings on average than workers with only a nondisclosure agreement.[76]

52.     Taken together, this body of research suggests that firms' suppression of worker

mobility, whether via a no-poach agreement, noncompete agreement, or other mechanism that

limits workers' outside options, leads to lower worker compensation. These mechanisms lower

workers' mobility and bargaining power,[77] which translates into lower pay.[78]

---

[75] *See* Michael Lipsitz & Evan Starr, *Low-wage workers and the enforceability of noncompete agreements*, 68(1) MGMT. SCI. 143–170, 143 (2022). *See also* Natarajan Balasubramanian at el., *Locked in? The enforceability of covenants not to compete and the careers of high-tech workers*, 57 J. HUMAN RES. S349–S396, S349 (2022); Takuya Hiraiwa, Michael Lipsitz & Evan Starr, *Do firms value court enforceability of noncompete agreements? A revealed preference approach*, REV. OF ECON. & STATISTICS 1–71 (2024); B. N. Greenwood, B.H. Kobayashi, & E. Starr, *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation*, DONALD G. COSTELLO COLL. OF BUS. AT GEORGE MASON UNIV. RESEARCH PAPER (2024). *See also* Matthew S. Johnson et al., *The labor market effects of legal restrictions on worker mobility*, FEDERAL TRADE COMMISSION 1–77 (2021).

[76] Natarajan Balasubramanian, Evan Starr & Shotaro Yamaguchi, *Employment restrictions on resource transferability and value appropriation from employees*, STRATEGIC MGMT. J. 2519–2547, 2522 (2024).

[77] John M. McAdams, *Non-Compete Agreements: A Review of the Literature*, SSRN 5 (2019) ("In a Nash bargaining model, equilibrium wages will be determined by the bargaining power and outside options of each party to the negotiation. A worker's outside options could include outside wage offers generated from on-the-job search, expected wage offers from job search during unemployment, or non-market activities. A worker with generous outside wage offers, for example, will have greater negotiating leverage and hence will tend to receive higher wages than a worker with less generous offers.").

[78] In classic negotiation theory, a negotiator's "strength" relative to her counterparty is determined by her "Best Alternative To a Negotiated Agreement" or "BATNA." *See, e.g.*, GETTING TO YES at 102–104. As the value of a negotiator's BATNA increases, she can press for more favorable terms from her counterparty. A "strong" negotiator has many attractive outside options should the present negotiation fail, while a "weak" negotiator has a poor or no alternative to the present negotiation—consider a job candidate with five other options versus a candidate with none. Empirical studies on the strength of one's BATNA confirm that having strong alternatives significantly increases the share of value that a negotiator can claim. *See also* Robin L. Pinkley et al., *The Impact of Alternatives to Settlement in Dyadic Negotiation*, 57 ORGANIZATIONAL BEHAV. & HUMAN DECISION PROCESSES, 97–116, 97 (1994).

3154924.9

**b.** **No-Poach Agreements Can Broadly Suppress Employee Pay**

53.     Importantly, where there is a single market-clearing wage, a no-poach agreement would tend to have widespread compensation suppression effects across *all* employees, and not just the compensation for employees who would have been poached in a but-for world.

a.     This is true because the decision to purchase additional units of a good or service raises the price that must be paid for all units.[79] Just as the market price for a product is determined by the most price-sensitive customers on the product's demand curve, the market price paid to a service provider is determined by the most wage-sensitive input providers on the supply curve.[80] Agreements to lessen competition for employees therefore have the capacity to suppress the compensation paid to employees generally, and not just the wages of those employees whose mobility is directly suppressed by the alleged no-poach agreement. In a dynamic labor market search model, no-poach agreements suppress pay broadly by reducing the rate at which job offers are made. Notably, the rate of job offers can still affect pay even if those

---

[79] ROBERT PINDYCK & DANIEL RUBINFELD, MICROECONOMICS, 384 (9th ed. 2017) ("The decision to buy an extra unit raises the price that must be paid for *all* units, not just the extra one.").

[80] In economic terms, suppression of the market wage affects not just marginal workers, but also inframarginal workers. Similarly, a price-fixing conspiracy causes inflated prices for all buyers, not just marginal customers. *See, e.g.*, DENNIS W. CARLTON & JEFFERY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION (3rd ed. 2000) [hereafter MODERN IO 3RD ED.] at 105–107. *See also* Johnathan Masur & Eric A. Posner, *Horizontal Collusion and Parallel Wage-Setting in Labor Markets*, UNIVERSITY OF CHICAGO LAW SCHOOL CHICAGO UNBOUND, Coase-Sandor Working Paper Series in Law & Econ. No. 941 (2022) at 8–9 (describing how salaries between marginal and inframarginal employees are connected). *See also* Caves & Singer (2019) at 412 (explaining how in an employee context, "do not call lists" to recruit individualized employees results in generalized wage suppression: "top executives at several of the most prominent firms in Silicon Valley, including Adobe, Apple, Intel, and Google, allegedly conspired to restrict recruiting and hiring of technical, creative, and research-and-development employees via so-called 'do not call lists' as a mechanism for suppressing compensation").

3154924.9

job offers are turned down. This is because those job offers can be used as leverage for bargaining for a raise at the current employer. [81]

54.     Further, as discussed in detail below in Section VII.F, there is ample qualitative and quantitative evidence that Defendants' employee compensation is highly correlated due to the presence of Defendants firms' compensation structures. Thus, any dampening of competition for individual Senior-Level Employees could reasonably flow through to affect the compensation paid to all Senior-Level Employees in the Class.

### 3.     The Economics of CSI Exchanges

55.     Economists and antitrust authorities have long recognized that exchanges of CSI among horizontal competitors—or exchanges of information regarding price, quantity, capacity, costs, and specific customers, shared among participants that are actual or potential competitors—can and does help effectuate collusive outcomes.[82]

---

[81] Fabien Postel-Vinay & Jean-Marc Robin, *To match or not to match?: Optimal wage policy with endogenous worker search intensity*, 7 REV. ECON. DYNAMICS 297–300, 297 (2004) (explaining how it may be optimal for an "employer to try to retain the employee by matching the offer. This results in a wage increase for the worker."); *see also* P.F. Cahuc et al., *Wage Bargaining with On-the-job Search: Theory and Evidence*, 74 ECONOMETRICA 323 (2006) (explaining, "We find that between-firm competition matters a lot in the determination of wages.").

[82] The FTC defines competitively sensitive information as "information relating to price, cost, output, customers, or strategic planning." *See* Michael Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (citing *Antitrust Guidelines for Collaborations Among Competitors,* DOJ & FTC (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf [hereafter *Guidelines*]); *see also Guidelines* at 15 ("[T]he sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may

3154924.9

56. The direct sharing of prices (i.e., what a firm intends to pay or intends to sell at), is the precursor to what economists and antitrust practitioners consider a traditional "naked" price-fixing agreement.[83]

57. This is the most straightforward type of collusion, whereby "rival sellers in some manner arrive at an understanding as to what price [to charge]," similar to how a monopolist would set its own prices.[84]

58. In this case, discussed at length below, Plaintiffs allege that Defendants shared CSI on what they would pay their employees, which would have allowed them to fix Senior-Level Employee pay. Such a price-fixing agreement has relatively straightforward economic effects: fixing prices for Senior-Level Employee pay reduces the value of searching for and moving to a new job, allowing companies to depress their compensation without suffering mobility losses. This form of CSI sharing could also allow Defendants to set compensation below competitive levels with the knowledge that their rivals would do the same.

---

increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables."). In a recent case brought by the DOJ against U.S. meat packers accused of CSI exchanges, the DOJ found that the defendants exchanged in "direct exchanges of compensation information" and that "[b]y exchanging large amounts of current and future, disaggregated, and identifiable data, the processors collaborated to accumulate a set of industry compensation information they could use to set their workers' wages and benefits at a nationwide level (for example, to set budgets on plant worker spending across the country) or locally (for example, to determine pay for shoulder cutters in a specific plant)." Complaint, *United States v. Cargill Meat Solutions Corp., et al.*, No. 1:22-cv-01821-ELH (D. Md. Jul. 25, 2022)¶ 110.

[83] *Price Fixing*, FTC, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/price-fixing (last visited Dec. 11, 2024) ("A naked agreement among competitors to fix prices is almost always illegal, whether prices are specified at a minimum, maximum, or within some range. Illegal price fixing occurs whenever two or more competitors agree to take actions to raise, lower, maintain, or stabilize the price of any product or service.").

[84] Levenstein & Suslow (2006) at 45.

3154924.9

**B.** **Defendants Established No-Poach Agreements to Suppress Compensation**

59.     Below, I review the criteria economists use to assess no-poach agreements. I then review whether the evidence meets these criteria. I find that the evidence is consistent with anticompetitive collusion, and inconsistent with unilateral competition.

### 1.     Economic Criteria for Assessing No-Poach Agreements

60.     Evidence of a no-poach agreement itself is typically qualitative. Economists and courts recognize that no-poach agreements "may be express or implied, written or oral."[85]

61.     For example, in the no-poach article by Professors Krueger and Ashenfelter described above, the no-poach agreements were formally written within franchise contracts, but the authors imply that the no-poach agreement at issue there also extended *informally* to entities beyond the written agreement.[86]

62.     Similarly, in the antitrust case *In re Animation Workers Antitrust Litigation*, "agreements between [] companies were expressed orally."[87]

63.     In *In re High-Tech Employees Antitrust Litigation*, the Google-Intel agreement took the form of a "handshake 'no recruit'" between executives.[88]

---

[85] Rochelle T. Davis, *Talent Can't Be Allocated: A Labor Economics Justification for No-Poaching Agreement Criminality in Antitrust Litigation*, 12 BROOKLYN J. CORP., FIN. & COM. LAW 279–310, 281 (2018).

[86] Krueger & Ashenfelter (2022) at S331 ("[I]t is apparent that franchise no-poaching agreements increase employer concentration and have the potential for driving a wedge between the value of a worker's marginal product and the wage. From this point of view, franchise agreements have the same anticompetitive effects in labor markets as mergers do in product markets.").

[87] Rochelle T. Davis, *Talent Can't Be Allocated: A Labor Economics Justification for No-Poaching Agreement Criminality in Antitrust Litigation*, 12 BROOKLYN J. CORP., FIN. & COM. LAW 279–310, 281 (2018) at n.10.

[88] *Id.* at 281, n.12.

3154924.9

64. Implied or oral no-poach agreements are more difficult to detect given there is no paper trail. However, regardless of how they are made, the economic import is in the substance of the no-poach conduct, not its form.

65. Therefore, qualitative evidence of a no-poach agreement would include any evidence of communication or coordination among horizontal competitors with the intent or effect of reducing competition for each other's employees. Any communications that reference a prohibition on hiring, recruiting, or soliciting a rival's employees constitute direct evidence of a no-poach agreement.

66. Quantitative evidence of a no-poach agreement would be an attendant decrease in employee mobility between firms with an active no-poach agreement. A generalized suppression of wages during the period of the no-poach agreement would also be consistent with the existence of such an agreement.

67. In contrast, evidence consistent with unilateral conduct in this instance might be a choice not to hire from a horizontal competitor because it is the company's own best interest, absent any other changes in behavior from other economic actors. For example, a company might not hire from another because they have low quality employees. However, I have seen no evidence consistent with unilateral conduct. Moreover, the direct and repeated communications between Defendants as they relate to beginning and enforcing the No Poach Agreements is inherently inconsistent with unilateral conduct.

### 2. The Qualitative Evidence is Consistent with a No-Poach Agreement Between SCA and DaVita

68. Ample qualitative record evidence supports the allegation that SCA and DaVita established a no-poach agreement (hereafter the "SCA-DaVita No-Poach Agreement"). At the 2022 criminal trial of DaVita and Thiry, DaVita admitted it entered into a no-poach agreement

3154924.9

with SCA.[89] Based on the evidence below, the agreement appears to have been in effect from May 2008 through 2019.

> 69.　　The DaVita-SCA Agreement's Beginnings.

> > a.　　*Hayek's and Rucker's Departures.*

> > > i.　　The No-Poach Agreement between DaVita and SCA began at least as early as May 2008, when Hayek left DaVita to become SCA's CEO.[90] In an April 2008 email to Hayek after his departure, Thiry wrote, "if you go with [SCA], it does create some 'competitive response' issues for [DaVita] . . . when companies do that to us, we have a historical response strategy, which you and I should discuss live."[91]

> > > ii.　　As soon as he started at SCA, Hayek complied with Thiry's expectation that former DaVita executives not poach DaVita employees. In a July 2008 email to Thiry, Hayek wrote, "Although I have multiple open positions [at SCA], I have not been calling DaVita people, because of our friendship and my respect for the Village [i.e., jargon DaVita employees used to refer to DaVita]. Moreover, there was a DaVita person in the process of being recruited for an SCA role when I joined, and, despite being an excellent candidate, I decided not to pursue them."[92]

---

[89] Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 4, 2022) at 22:11–15 (at trial, DaVita told the jury that it did not dispute that DaVita had ground rules with competitors to "not actively solicit DaVita executives"; "[W]e don't dispute that these agreements existed.").

[90] Hayek Dep. at 74:15–21; Ex. PX158 at 455:25–456:3; Ex. PX484 at DVA_OMCEAL_000429388–9.

[91] Ex. PX485 at DVA00006531.

[92] Ex. PX484 at DVA_OMCEAL_000429389.

3154924.9

iii.    Also in July 2008, Hayek recruited DaVita's then-Division Vice President ("DVP") Michael Rucker to help run SCA.[93]



[94]

iv.    Nevertheless, Rucker persisted, in part for an increased compensation package.[95] In response, Thiry emailed Hayek to [redacted] [96]

v.    According to former DaVita COO Dennis Kogod, Thiry also threatened Hayek, and told him that Rucker's departure could create "'competitive response' issues" for DaVita, because Thiry would never take another company's key employee, which Thiry warned warranted a "historical response strategy."[97] Indeed, Hayek testified that Thiry threatened to harm Hayek's reputation and retaliate against SCA if he learned that SCA recruited additional Senior-Level Employees.[98] Thiry emailed Hayek to explain, "[Poaching] is not immoral to do . . . in a business sense—not at all—but good friends don't do it to one another on a stealth basis, (a) because it is hurtful, and (b) it often has a negative net present value in business and career terms—why would you ever help someone after they take an exec this way?

---

[93] *See id. See also* Deposition of Michael Rucker (Aug. 27, 2024) [hereafter Rucker Dep.] at 55:18–56:12 (Rucker stating that Hayek recruited him in 2008).
[94] Ex. PX305 at DOJCIV-008-00000171. *See also* Rucker Dep. at 59:10–60:3.
[95] Rucker Dep. at 31:25–32:9.
[96] Ex. PX304 at DOJCIV-008-00000301.
[97] Ex. PX485.
[98] Hayek Dep. at 93:7–95:14, 11:4–115:1 and Ex. PX304.

3154924.9

How would it make sense to do that, and (c) it can create a string of negative stuff, lousy uncontrollable negative stuff . . . For example, since [Rucker] was on our promising list, we will have to tell our Board and the rest of the senior team exactly what happened, and many of them will take any negative conclusions about you—not as a capitalist, but they will redefine what kind of person you are. . . . There are contracts and free markets, and there are relationships. Some execs live business primarily according to contracts and free markets, others balance that with a heavy emphasis on relationships and caring about one another over the long term."[99]

vi.     The record evidence shows that because of this incident, Thiry and Hayek established the SCA-DaVita No-Poach Agreement.[100] Subsequent email exchanges between Thiry and Hayek outlined Thiry's expectations for Hayek to instruct potential hires to

---

[99] Ex. PX484 at DVA_OMCEAL_000429390.

[100] Deposition of Kent Thiry (Aug. 16, 2024) [hereafter Thiry Dep.] at 86:24–87:20 (Thiry admitted he was "angry with some of the things Andrew [Hayek] did. . . . Quite angry."); *id.* at 145:23–146:7 (Thiry and Hayek were close friends, which Thiry weaponized against Hayek); Hayek Dep. at 94:8–25 (Hayek agreed that Thiry threatened him, stating, "He made it clear that I was risking my reputation by doing this [recruiting Micheal Rucker]." Thiry also threatened legal action and to retaliate against SCA. ). *See also id.* at 149:21–150:12 (Hayek stating that DaVita would retaliate against SCA if SCA recruited senior DaVita Executives. Hayek thought that this retaliation would have disrupted SCA's operations).

alert DaVita of their intent to leave.[101] Hayek testified at DaVita's criminal trial that he understood Thiry's message to be a warning of a downward spiral of retaliatory recruitment.[102]

70. <u>The Terms of the Agreement.</u>

a. *The Proactive Recruitment Restriction.*

i. According to former DaVita COO Dennis Kogod, the "no-poach agreement meant that DaVita employees were excluded from being able to go to work for one of those companies that had a reciprocal hands-off and their employees couldn't be hired at DaVita [if someone directly reached out to them]."[103]

ii. Hayek likewise testified that the Agreement was reciprocal.[104]

iii. Under the terms of the agreement, DaVita and SCA could "not directly hire each other's employees or solicit them to switch between SCA and DaVita as their employer[.]".[105] To "solicit" was defined as "[t]o call to describe a job opportunity."[106]

b. *The Tell-Your-Boss Provision.*

---

[101] Ex. PX316 at DVA00019822 ("If [M]ichael [Rucker] was sure he was going to leave anyway, why wasn't it the right thing to say 'michael, call davita and tell them that, and then I will give you an offer. I am not comfortable recruiting from that/those company/friends unless that is a public fact.'"). *See also* Hayek Dep. at 103:5–14 (Hayek agreed that he understood Thiry to imply that Rucker should have told DaVita he was planning to leave before SCA made him an offer.); Ex. PX316 at DVA00019820 (Thiry warned Hayek via email, "It is a potentially nasty thing to start if you do otherwise—because where does it stop? The best people have the best people, so are we all going to make each other's life's more difficult than they are? Are you going to let [M]ichael [Rucker] 'coincidentally talk to other dva folks who have decided to leave?' . . . I have competitors where we have basically stopped going after each other's people because it is a lose/lose. And those do not even have friendships at risk.").
[102] Ex. PX158 at 468:7–21 (Hayek testified at the criminal trial that he understood Thiry to be threatening "a downward spiral or cycle of, you know, retaliatory acting and then more retaliation [*i.e.*, recruitment of each other's executives].").
[103] Deposition of Dennis Kogod (Sept. 6, 2024) [hereafter Kogod Dep.] at 153:10–154:10.
[104] *See* Hayek Dep. at 168:25–169:9; DOJCIV-007-00000084 at DOJCIV-007-00000084.
[105] Deposition of Michael Staffieri (Apr. 5, 2024) [hereafter Staffieri Dep.] at 35:2–22; Ex. PX313 at DOJCIV-008-00000187.
[106] Ex. PX158 at 473:21–25.

3154924.9

i.      Later, DaVita and SCA added an additional enforcement mechanism: the "tell-your-boss" provision. Hayek testified that the "tell your boss" requirement of the SCA-DaVita No-Poach Agreement meant that if an employee was not already looking at other opportunities and had not told their boss or supervisor, the employee could not be advanced in the recruitment process.[107] DaVita COO Michael Staffieri testified that this provision precluded DaVita and SCA from even pursuing each other's employees who had proactively solicited them unless the candidates' bosses were made aware that the employees wanted to pursue external job opportunities.[108] Discussions about compensation were considered part of the "substantive recruiting" that should be preceded by notice to the competitor.[109] The agreement applied in both directions: neither company would recruit from the other without providing early notice.[110]

---

[107] Ex. PX158 at 475:13–18.

[108] Ex. PX158 at 473:21–25; Staffieri Dep. at 40:17–41:9 (Staffieri testified "that Kent expected transparency, a heads-up, you know, in 1 of those 2 ways," in that –"1 way is that the other company would give him a heads-up before the recruiting got serious, correct," and otherwise, "the employee themselves would let their boss know that they're talking to the other company."); Ex. PX30 at SCA002213759–60 (August 2012 email between Hayek, Clemens, and a current DaVita employee seeking a Director of Financial Operations role at SCA, wherein Hayek explained, "Our relationship with DaVita is such that we would only want to engage in discussions if you have resolved to leave DaVita and communicated that intent to your one-up manager."); Kogod Dep. at 80:3–7 ("It seems to me it kind of flew in the face of what was being contemplated, and that is you post a job, a DaVita employee responds, and the first question asked is, Do your bosses know that you're looking to leave.").

[109] Ex. PX13 at DVA_OMCEAL_000397493 (Thiry instructed that "[o]f course, [the notice to the interviewing employee's current boss] needs to happen right up front, or it turns into one of those farcical situations where there has been a bunch of talk about the role, comp, etc . . .and so the substantive recruiting happens before the notice.").

[110] Staffieri Dep. at 48:11–22 (Staffieri testified that Thiry expected that both DaVita and the competing employer gave each other a heads-up before a serious recruiting conversation occurred[.]").

36

ii.    Hayek referred to this provision as a way to enforce the SCA-DaVita No-Poach Agreement and limit "cheating," as well as discourage employees from looking for outside employment.[111]

iii.    Kogod testified at deposition that he understood the provision intended "to ensure that the employee that was leaving had communicated to their direct supervisors that they were leaving and that they had applied for a job within a company known to DaVita[.]"[112]

iv.    Hayek similarly characterized the "spirit" of the agreement as a requirement for candidates to tell their bosses early in the process, before the candidate had an offer.[113]

c.    *Senior-Level Employees.* The No-Poach Agreement also appears to have been primarily targeted to the Senior-Level Employees of each firm.

---

[111] Ex. PX158 at 476:15–477:2 (describing how the provision discouraged cheating and acted as a potential deterrent for employees to seek outside opportunities.). *See also* Hayek Dep. at 262:4–14.

[112] Kogod Dep. at 24:11–19.

[113] Ex. PX158 at 476:9–14. *See also* Hayek Dep. at 179:17–180:5 (Hayek stated that "[t]he candidate would have needed to share with their supervisor that they were generally considering outside opportunities before we would get to an offer stage in the process."); Ex. PX483 at 629:16–24 (describing the provision as a "required step" in the process of looking for outside opportunities.).

37

3154924.9

i.  For example, Skip Thurman understood, based on his personal experience, that the SCA-DaVita No-Poach Agreement applied to all executives, i.e., employees at the director-level and above.[114]

ii.

[115]

iii.  Thurman also testified that the SCA-DaVita No-Poach Agreement applied to director-level and above employees.[116]

d.  *Secretive Nature.* The SCA-DaVita No-Poach Agreement was secretive by design:

i.

[118]

---

[114] Deposition of James "Skip" Thurman (Jun. 17, 2024) [hereafter Thurman Dep.] at 76:14–20 (Thurman believed the agreements pertained to employees at the director-level and above). *See also id.* at 127:22–128:6 (Thurman testified that the agreement amounted to a "blanket prohibition and a blanket effort to keep executives in-house," such that "executives across DaVita were affected by these agreements[.]"). Thiry also described directors to be executives. Thiry Dep. at 257:16–18. Hayek thought the agreement was expanded to incorporate directors in sometime after January 2012. *See* Hayek Dep. at 205:22; *see also* Ex. PX458 at 474:5–17 (Hayek testified at trial that the agreement expanded to include director-level and above employees).
[115] Ex. PX305 at DOJCIV-008-00000180.
[116] Thurman Dep. at 76:14–20.
[117] Ex. PX313 at DOJCIV-008-00000188.
[118] Ex. PX313 at DOJCIV-008-00000190–91.

3154924.9

ii.     Neither Hayek nor Thiry believed that every Senior-Level Employee was aware of the No-Poach Agreement.[119]

iii.     Some employees never learned why they lost opportunities when SCA and/or DaVita enforced the No-Poach Agreement against them and attributed the harm to other causes.



[120]

iv.     When former VP of Communications Thurman joined DaVita in 2010, he was unaware that he would be restricted from seeking employment elsewhere.[121]

e.     *No Time or Geographic Limitations.*

i.     Both Thiry and Hayek could not recall any time limitation or geographical limitation on the No-Poach Agreement.[122]

ii.     Former DaVita COO Kogod was also unaware of any geographical or time restraints.[123]

---

[119] Hayek Dep. at 296:3–9 ("I don't believe that every director and above knew [about the agreement]."). Thiry Dep. at 176:6–15 (Thiry stating that he did not communicate the "understanding" to everyone at DaVita or to all employees who were directors or above.).
[120] DOJCIV-007-00000141 at DOJCIV-007-00000141.
[121] Thurman Dep. at 166:17–167:4 (Thurman testified that when he joined DaVita, no one ever explained he "would be restricted from getting employment," which he would have liked to have known, because he "took a pay cut and a title cut in my late forties to go to a place betting on the outcome. And the outcome was—it was not that outcome.").
[122] Thiry Dep. at 33:11–34:6; Ex. PX158 at 474:24–475:2 (Hayek referred to the agreement as "nationwide" at the DaVita criminal trial); Hayek Dep. at 197:22–198:16 (Hayek testified that "there wasn't a geographic limit. It was really where the senior executives were based.").
[123] Kogod Dep. at 54:11–55:3.

39

iii.     Former SCA Chief Talent Officer Fanning also testified that SCA's no-poach agreements with DaVita and USPI were not limited in time, geography, or scope of employee work.[124]

71.     The Tell-Your-Boss Provision Created a Chilling Effect.

a.     Some employees testified that they prefer to keep their job searches private.



[126] Fanning additionally testified at deposition that SCA employees would only have the ability to tell their boss if they knew why they were being restricted from DaVita job opportunities.[127]

c.     Kogod acknowledged at deposition that informing one's boss of the intent to pursue other job opportunities could be a difficult conversation for any employee to initiate, "because you were telegraphing I'm unhappy and you weren't certain you had a job to go to."[128] He testified at the DaVita criminal trial that employees who complied with the tell-your-boss provision risked financial repercussions: "[W]hat you're saying is, I'm unhappy; I'm leaving; I've made a decision. So when you think about future consideration for salary increases, your annual bonus, your performance rating, any stock equity—which was a big piece of DaVita's

---

[124] Deposition of Bridget Fanning (Jul. 17, 2024) [hereafter Fanning Dep.] at 159:12–160:3.
[125] DOJCIV-007-00000141 at DOJCIV-007-00000142–43.
[126] DOJCIV-008-00000431 at DOJCIV-008-00000432–33.
[127] Fanning Dep. at 310:24–311:11.
[128] Kogod Dep. at 43:2–5.

3154924.9

compensation package—that's what people would remember. This person was looking to leave; they're unhappy here; they're going to leave anyway, so we shouldn't give them this next big job; we shouldn't give them the right amount of options. So there was an absolute downside of making that known. That's why most people do confidential searches; they don't want their boss to know."[129]

      d.      █████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████[130]

      e.      SCA Group Vice President of Human Resources Warren Cinnick testified that he thought it would be very reasonable for employees to fear telling their boss they were looking for outside opportunities, given the difficulty of negotiating without an alternative position ready.[131]

      f.      Rucker similarly testified that when SCA recruited him, he waited until he had received a formal written offer to bring it to his supervisor at DaVita, because "having a written offer from SCA represented a certain security."[132] He testified that the requirement to tell your supervisor could limit the opportunities for SCA and DaVita employees.[133]

72.      <u>SCA and DaVita Enforced the No-Poach Agreement.</u> Both SCA and DaVita enforced the terms of the Agreement.

      a.      *Top Executives Enforced the Agreement.*

---

[129] Ex. PX157 at 89:16–90:7.

[130] DOJCIV-007-00000105 at DOJCIV-007-00000107.

[131] Deposition of Warren Cinnick (Nov. 22, 2024) at 29:4–30:9.

[132] PX158 at 392:16–23. *See also* Rucker Dep. at 57:8–20.

[133] Rucker Dep. at 87:8–25.

41

3154924.9

i. Top DaVita and SCA executives were in contact with each other regularly, which facilitated enforcement of the Agreement. For example, Hayek reached out to Thiry if SCA encountered potential poaching attempts from DaVita. When a DaVita recruiter reached out to an SCA VP regarding an open position at DaVita, the SCA VP's supervisor brought it to Hayek's attention, asking if he would address the matter with Thiry. Hayek explained at deposition that he generally did bring such matters to Thiry's attention.[134]

ii. Similarly, former SCA CFO Peter Clemens testified if he had been interested in hiring a candidate from DaVita or USPI, he would have had to run it by Hayek first. Clemens also testified that if he was interested in hiring candidates from companies other than USPI or DaVita, he would not have to first clear their hiring with Hayek.[135]

iii. According to former DaVita COO Kogod: "



."[136]

iv. When competitors violated their No-Poach Agreements with DaVita, DaVita COO Michael Staffieri "felt strongly" that he had to "make Kent [Thiry] aware

---

[134] Ex. PX336 at SCA-DOJ-00158130 (June 2016 emails between Christian Ellison, a SCA Group President, and Rucker regarding a DaVita recruiter contacting Ellison, wherein Ellison asked, "I thought there was a gentlemen's agreement between us and DaVita re: poaching talent." Rucker responded affirmatively and forwarded the email chain to Hayek and asked him to contact Thiry about the agreement breach); *see also* Hayek Dep. at 324:23–325:2 (Hayek testified he generally would follow up on these emails).
[135] Deposition of Peter Clemens (May 2, 2024) [hereafter Clemens Dep.] at 79:23–82:7.
[136] Ex. PX313 at DOJCIV-008-00000188.

42

of things [he] thought were not in line with his expectations."[137] On one such occasion, Thiry responded that he was "livid" and stated that a "major competitive response" would ensue if the offers were not withdrawn.[138]

v. As another example, in July 2011, Rucker had a DaVita Facility Administrator contact him through a recruiter. She asked to remain anonymous because "she would lose her job" if DaVita found out she was talking with SCA.[139] Rucker informed Rodriguez that SCA would not be moving forward with interviewing the DaVita employee and would "continue to steer recruiting efforts away from DaVita teammates," to prove that SCA was abiding by the agreement.[140]

vi. DaVita made its top executives aware of the SCA-DaVita No-Poach Agreement verbally and in writing,[141] so that the executives could enforce the agreement as well. The agreement was talked about amongst a subset of DaVita executives as an expectation associated with the hiring process.[142] These executives were responsible for

---

[137] Staffieri Dep. at 65:9–67:3 (Staffieri testified that he would inform Thiry with urgency about a no-poach breach because he "felt strongly to make Kent aware of things I thought were not in line with his expectations."); Ex. PX3 at DVA_OMCEAL_001354506–7.

[138] Ex. PX4 at DVA01922502; *see also* Ex. PX5 at DVA_OMCEAL_000417583 (following a discussion with IntegraMed CEO Hughson regarding IntegraMed's recruitment of DaVita employees, Thiry stated,"[a]ll I said was you could expect fierce competition if you pursue our people"); Ex. PX12 at DVA_OMCEAL_000387563 (a November 2015 email in which Thiry requests that DaVita executives "let all search firms know, when appropriate, to go after greg Hartman and rob mahan companies" because "[t]hey have both taken dva folks lately", so it is "[t]ime to make them pay").

[139] Ex. PX333 at DVA_OMCEAL_000658781.

[140] *Id*.

[141] Staffieri Dep. at 31:19–23 (Staffieri testified that the agreements were discussed verbally, either in person or over the phone, and also via email and text).

[142] Staffieri Dep. at 29:4–18 (Staffieri testified that his understanding of the no-poach expectation among DaVita executives "would likely have come from seeing executives who had left the company and that being talked about as an expectation."); *see also* Ex. PX1 at DOJCIV-008-0000062.

43

monitoring their subordinates, to ensure that SCA did not violate the terms of the agreement and poach DaVita employees.[143] In another example, when a DaVita employee left for SCA in January 2010, Kogod's first reaction was to ask, "do we know who contacted who first," because "our folks are supposed to be off limit[s] to Andrew [Hayek] and his company."[144] Presumably, if the DaVita employee did not reach out first, SCA would be in violation of this "off-limits" requirement.

vii.     Moreover, in April 2016, a DaVita Senior Group Director of Operations reached out to Fanning, expressing his interest in working at SCA. Fanning reached out to Hayek to check if non-VPs could be hired. Hayek upheld the terms and responded, "give him the message that we would only engage if he had already shared with his supervisor that he wants to explore outside opportunities and speak with SCA[.]"[145]

b.     *SCA and DaVita Told Recruiters to Uphold the Agreement.*

i.     Kogod explained that recruiters would ask DaVita about companies to avoid, to prevent a bidding war over talent.[146] For example, in 2012 DaVita used an external recruitment firm to search for a Chief Development Officer ("CDO").[147] The firm identified several candidates (including current CDOs) at SCA, but flagged these candidates as "will not pursue per client."[148]

ii.     Fanning enforced the tell-your-boss provision when working with external recruiters. For example, when Nate Haines, a third-party recruiter at Russell Reynolds

---

[143] Kogod Dep. at 69:9–20, 76:4–10, and 108:16–20.

[144] Ex. PX376 at DVA_OMCEAL_000122783.

[145] Ex. PX171 at CA-DOJ-00156929; Hayek Dep. at 318:15–319:4 (Hayek testified that he instructed Fanning to follow the SCA-DaVita No-Poach Agreement).

[146] Kogod Dep. at 53:18–54:10.

[147] *See* Ex. PX275 at DOJ-PROD003-00117878.

[148] *See id.* at DOJ-PROD003-00117892.

3154924.9

Associates, performing a search for SCA, asked if SCA was interested in a DaVita candidate, Fanning responded, "[I]f he can get this leaders [sic] permission to pursue SCA then fine— otherwise no—DaVita is a no go for us."[149]

iii.    Similarly, when DaVita Senior Group Director of Operations Andrew Kay proactively solicited a position with SCA from Fanning in April 2016, Fanning responded, "DaVita are priority strategic partners for us and we have a company policy that we don't recruit from our clients and strategic partners unless candidates have been given [explicit] permission by their employers that they can be considered for employment with us. Sorry we are unable to consider you at this time and hopefully you will understand that these key partnerships are of the utmost importance to us."[150]

iv.    Likewise, SCA's former CFO Peter Clemens testified that whenever a DaVita employee applied for a job at SCA, Clemens was required to inform Hayek.[151]

73.    The SCA-DaVita No-Poach Agreement Harmed Employees. SCA's and DaVita's no-poach restrictions harmed their employees by limiting their mobility and suppressing their compensation.

a.    *SCA and DaVita Would Otherwise Have Recruited From Each Other.* But for the No-Poach Agreement, SCA and DaVita would have recruited and/or hired each other's employees:

---

[149] Ex. PX170 at DOJ-PROD004-00476230.
[150] Ex. PX172 at DOJ-PROD001A-00000001.
[151] Clemens Dep. at 79:23–80:20.

45

3154924.9

       i.      Fanning acknowledged at deposition that DaVita would have been a desirable company to target for talent, because DaVita "had a very similar approach to talent that Andrew [Hayek] had created and was trying to create at SCA."[152]



       b.     *The Agreement Artificially Suppressed Employee Mobility.*

---

[152] Fanning Dep. at 33:15–34:18. Fanning could not recall any DaVita employees being hired by SCA or any SCA executive being hired by DaVita. *See* Fanning Dep. at 39:21–40:25. Former SCA COO Michael Rucker also could not recall any DaVita employees being hired by SCA. Rucker Dep. at 71:18–72:12.

[153] Ex. PX555 at DOJCIV-007-00000013 (adding that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[154] *Id.*

[155] DOJCIV-008-00000431 at DOJCIV-008-00000432–33.

[156] DOJCIV-010-00000110 at DOJCIV-010-00000111.

3154924.9

████████████████████████████████ [157] But from the employee perspective, as SCA CFO

Leslie Wachsman testified, it is important to have freedom of movement between employment

opportunities.[158]

       ii.    ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ "[159] Further, employees "never got calls from recruiters who were in

sort of peer companies"[160] and that there were "no recruiting calls" as a result of the

agreement.[161]

       iii.    Thurman also described working at DaVita as being like "dogs in a

big kennel" surrounded by "an invisible fence" that prevented recruiters from reaching out to

---

[157] *Id.*

[158] Deposition of Leslie Wachsman (May 22, 2024) [hereafter Wachsman Dep.] at 94:12–17.

[159] *See* Ex. PX123 at DOJCIV-007-00000094 (Thurman told the FBI that ███████████████ ███████████████████████████████████████████ ). *See also* Thurman Dep. at 124:2–18 (Thurman testified that the agreements were an "open secret"); SCA001204745 (a September 2012 email between SCA executives (including Hayek) discussing a potential hire: "I will reach out to Bill Wilcox (CEO) and Brett Brodnax (President/CDO) to let them know that Holle contacted us about an open position we have in California and that she is quite interested-further, I will indicate that she shared that she will be leaving USPI anyway—thus, this is very much like Debra Ledak, and my presumption is that it is OK for us to proceed with them, but that we would only do so after checking with them."); Thurman Dep. at 124:20–125:2 (the agreements operated as a "a blanket prohibition and a blanket blocking . . . of recruiters and other opportunities.").

[160] Thurman Dep. at 44:6–25 (Thurman testified that DaVita built an "invisible fence" around its employees," wherein employees "never got calls from recruiters who were in sort of peer companies. So healthcare companies . . . recruiting firms that specialized in healthcare, or, in my case, in our case, communications firms, there are recruiting firms that just go out and hire people who do my job so that they can then go—just like a legal recruiter, same idea. But nobody -- like nobody got those phone calls[,]" which was "unusual.").

[161] *Id.* at 76:14–20.

3154924.9

him or his coworkers.[162] He felt like the "invisible fence" caused the "unusual" lack of recruitment calls from peer companies and their recruiters.[163] Before he worked for DaVita, Thurman's experience was that he would be called "at least four to six times a year with . . . real jobs."[164] But in his decade-plus tenure at DaVita, he ███████████████████████████.[165]

        iv.     DaVita's former Transactions Director Asher similarly said to the FBI that he ███████████████████████████████████████ ████████.[166] Prior to joining DaVita, ████████████████████████ █████████████████████████████████████████████████████ █████████████[167] Asher stated that during his tenure, █████████████████████ at DaVita.[168]

        v.     Moreover, ███████████████████████████████████ ███████████████████████████████████████████████████████016

---

[162] *Id.* at 37:6–21 (Thurman testified that DaVita built an "invisible dog fence" around its employees: "I think of us at DaVita, the executives, we're all like dogs in a big kennel. We all work really well together, but none of us left. We all stayed within these confines. And just like there's not a physical fence, there was an invisible fence. And we intuitively knew not to go outside of it, but we were stuck inside of it, if this makes sense. Like I didn't know until way later on that like there was a reason why I was not getting calls from recruiters . . . that was part of the invisible fence.").

[163] *Id.* at 44:6–25 (Within the confines of the "invisible dog fence," DaVita employees "never got calls from recruiters who were in sort of peer companies. So healthcare companies . . . recruiting firms that specialized in healthcare, or, in my case, in our case, communications firms, there are recruiting firms that just go out and hire people who do my job so that they can then go—just like a legal recruiter, same idea. But nobody . . . got those phone calls," which was unusual in Thurman's experience.).

[164] *Id.* at 45:1–4 (Thurman explained that before he joined DaVita, recruiters would contact him "at least four to six times a year with like real jobs.").

[165] *See* Ex. PX124 at DOJCIV-012-00000133 ████████████████████████ █████████████████████████████████████████████████████ ████████████████████).

[166] DOJCIV-007-00000141 at DOJCIV-007-00000142–43.

[167] *Id*. at DOJCIV-007-00000141.

[168] *Id.* at DOJCIV-007-00000142–43.

48

3154924.9

 [169] He

eventually ███████████████████████████████████████

████ .[170]

        c.     *In Turn, the Agreement Suppressed Employee Compensation.*

        i.     Thiry, when broaching the concept of poaching, highlighted the spiraling impact of having to increase wages to retain people, calling it a "lose/lose" situation.[171]

        ii.     DaVita executives understood that the No-Poach Agreement would allow them to suppress wages. According to Skip Thurman, DaVita enacted this system because "a lot of money went to the bottom line that didn't go into the executives' pockets, or a certain class of employees' pockets."[172] Thurman testified that recruiting attempts can help inform an employee about whether their current compensation is fair or not.[173]

        iii.     For instance, when Thurman was equipped with sufficient information about his position being under market pay, he was able to effectively demand that

---

[169] DOJCIV-007-00000105 at DOJCIV-007-00000106.

[170] *Id.*

[171] Ex. PX316 at DVA00019820 (Thiry writing an email to Hayek in July 2008, asking "do you think we can just sit around and not work hard to change the math of your equation?" He also said that he has "competitors where we have basically stopped going after each other's people because it is a lose/lose.").

[172] Thurman Dep. at 82:23–83:9 (DaVita enacted this system because "a lot of money went to the bottom line that didn't go into the executives' pockets, or a certain class of employees' pockets," i.e., it reduced labor costs.).

[173] Thurman Dep. at 45:5–20 (Thurman acquired information about pay ranges for external job opportunities through cold calls, which helped him understand whether DaVita paid him fairly: "If you're being paid ███████████████ as a director, and they call and say, Hey, listen, you know, there's a job across town; we'll pay you ███ because that's what other directors are making, you know that you're making below market value."); *id.* at 156:2–10 (cold calls "change a person's ability to know what their market value was" "[b]ecause if you're getting a range of what somebody else is willing to pay you to come to their shop, you understand where you are relative to your current salary at DaVita. And it was always well below what the market would bear.").

3154924.9

DaVita pay him a higher wage.[174] Thurman's raise not only indicates that DaVita had the ability to raise wages, but also that he needed relevant compensation information to negotiate such raises. Prior to his 2017 raise, Mr. Thurman had only ever received "token end-of-year" merit raises, all of which were ████████████[175] He testified that he believed that his pay was substantially under the market pay for his role,[176] because he had seen peers more than double their pay by leaving DaVita.[177] He said he felt that his wages had been "systematically suppressed from the time [he] got there [at DaVita]" and still felt his compensation was under market even after his substantial 2017 raise.[178]

    iv.  Thurman testified that his direct reports told him that they were receiving insufficient pay increases relative to what their peers made at other companies; his reports also told Thurman that they felt like there was a significant reduction in their exposure to

---

[174] *Id.* at 156:21–158:3 (Thurman testified that Bill Myers looked at external job opportunities in 2017, "and found a role similar to Thurman's at another company that paid roughly a hundred thousand more" than Thurman made at DaVita. Thurman brought that information to Rodriguez and got himself a raise as a result. It was not that DaVita was unable to afford paying people more money.). *See also* Ex. PX124 at DOJCIV-012-000000133.

[175] Thurman Dep. at 21:7–18 (Thurman testified that he did not receive a "████████████ ████ " while at DaVita: ██████████████████████████████████████ ████████████████████████████████████████████████████).

[176] *Id.* at 32:14–18 (Thurman said his "pay at DaVita was [not] consistent with the market rate for the type of work" he did, and that "[it] was below market level").

[177] *Id.* at 24:3–18 (Thurman knew the pay at comparable positions at other companies "was at least what I was asking for, which was 80 to 100 grand. I knew that was going to be the market, because I had been so under water for such a long time. And then anecdotally, Bill Myers walked across the street to Liberty and almost doubled, if not tripled, his pay for the exact same job, basically."); *id.* at 35:23–36:5 (Thurman's "understanding of what [he] could have made by going to a different company and staying in the same role?," was "At least a double multiplier. And it's not anecdotal. It's watching people leave and having their salaries double.").

[178] *Id.* at 35:6–12 (Thurman testified about his "salary issues" at DaVita, in that he "felt like my wages had been systematically suppressed from the time I got there. And frankly, even after I got that huge bump, it was still not where it needed—it was not where—what the market would bear.").

50

recruiters while they worked for DaVita.[179] Thurman testified that he redirected funds from other programs to increase his communications team's compensation.[180] But he claimed that this was an abnormal practice specific to his team at DaVita.[181] Thurman stated that there was a culture at DaVita that they were going to get "paid more down the road" but that the pay increases never came until he "put his foot down in 2017."[182] Overall, Thurman described a "general feeling of frustration at the wage suppression idea and the lack of mobility" resulting from the no poach agreement.[183] He testified that he felt that junior-level employees at DaVita had the potential to

---

[179] *Id.* at 30:20–31:9 (In Thurman's experience, his direct reports were "concerned about how they were paid in comparison to others doing similar work": "I had teammates on my team come to me and say, Hey, I— especially around bonus time or merit pay increase, they would say, Hey, you know, this 3 or 5 percent raise isn't really cutting it, and I have peers in smaller companies who are making a lot more than me. They would also complain to me about the fact that none of them had ever received a call from a recruiter, which used to be very common for— when you're not at DaVita, I used to get a lot of calls from recruiters, and so did my team."); *id.* at 66:6–19 (With respect to one of Thurman's reports, "She could have made more outside of DaVita. She would have been part of that group of females, however, that I balanced or up-leveled their salaries. But again, that was based on the DaVita scale and not the free market scale. It was the DaVita scale."); *id.* at 70:24–71:6 (another of Thurman's reports was "like the rest of us. I mean, she left and made more money."); *id.* at 173:13–174:3 (multiple members on Thurman's team asked him why recruiters never reached out to them.).

[180] *Id.* at 31:18–32:5 (Thurman knew both he and his direct reports cared about being paid fairly for their work, such that he "would take money out of program dollars and add that into the salary bucket to pay my people more. And it's just the way I decided to do it, but that's how I got around being able to pay my team more.").

[181] *Id.* at 273:25–274:10 (With respect to using program dollars to pay his team equity, Thurman testified that other managers may have done the same thing, but it was unlikely: "I felt pretty naked and alone out there doing it myself, but it's possible.").

[182] *Id.* at 32:6–13.

[183] *Id.* at 78:9–19 (The No-Poach Agreements created "a general feeling of frustration at the wage suppression idea and the lack of mobility, the opportunity to, you know, get a different or a better job or, you know, the way people normally go about their lives, professional lives. There was a general frustration with that."); *id.* at 78:23–79:4 (Thurman defined "wage suppression" as follows: "I mean if you're confined inside that fence, and you never look for anything outside of that fence, you're content—or you're stuck with what you've got, unless you go out and actively search for a different opportunity beyond your current role.").

51

52

grow in the company, but that progress would stall once you became a director.[184] He claimed

that promotions at DaVita did not always result in a raise because Thiry "thought you should be

grateful for the title increase and not the amount, not the salary increase."[185]

    v.  I have also reviewed evidence showing that the absence of no-

poach conduct can lead to higher compensation. For example,



[187]

---

[184] *Id.* at 163:12–20 (Employees at the director level were "trapped" in their roles: "But once you hit the director level, yeah, you were going into a chute, and there was not a back door to it. You were going into a chute.").

[185] *Id.* at 163:21–164:4 (Employees were trapped in their role unless they got promoted, "[a]nd even then, promotions did not always mean a raise. Kent thought you should be grateful for the title increase and not the amount, not the salary increase. So sometimes a promotion would mean a title and not money. And so that's another flavor of, in my view, the wage suppression that occurred.").

[186] DOJCIV-007-00000162 at DOJCIV-007-00000162.

[187] *Id.*



*Id.* at DOJCIV-007-00000163.

3154924.9

74. <u>The End of the SCA-DaVita No-Poach Agreement.</u> Qualitative and quantitative evidence suggest that the No-Poach Agreement between SCA and DaVita ended by approximately the end of 2019.

a. After the SCA-Optum merger, in April 2017 Hayek took over as CEO of Optum Health while remaining the CEO of SCA.[188] The no-poach agreement with Thiry moved with Hayek to Optum: ███████████████████████████████████████████

████████████████████████████████████[189]

b. Moreover, ████████████████████████████████████████

████████████████████████████████████████ which was in 2017.[190] Former DaVita COO Kogod said the same at deposition.[191]

c. Both Hayek and Thiry, who were the primary architects and enforcers of the No-Poach Agreements, stepped down from their respective CEO roles at Optum (SCA's new parent company) and DaVita in 2019.[192] According to Hayek's testimony at the DaVita criminal trial, prior to their departures, Hayek and Thiry never told each other that they were ending their agreement not to solicit each other's Senior-Level Employees.[193] Hayek was also not aware of anyone else at DaVita or SCA telling the other that the agreement was no longer in effect. But when Thiry stopped down from his CEO position in 2019, current COO Staffieri testified that Thiry thereby ceded his "influence and power" to current DaVita CEO Rodriguez, who "hated" DaVita's No-Poach Agreements and "wanted nothing to do with this."[194]

---

[188] Hayek Dep. at 35:20–23.
[189] DOJCIV-008-00000423 at DOJCIV-008-00000424.
[190] Ex. PX305 at DOJCIV-008-00000182; Rucker Dep. at 179:12–23; *see also* App. C.
[191] Kogod Dep. at 55:2–3.
[192] *See* App. C.
[193] Ex. PX158 at 491:7–25.
[194] Staffieri Dep. at 45:11–25.

3154924.9

d.

[197]

### 3. The Qualitative Evidence is Consistent with a No-Poach Agreement Between SCA and USPI

75.     In this section, I review qualitative evidence that shows SCA and USPI

established a No-Poach Agreement largely identical to the SCA-DaVita No-Poach Agreement.

Based on the evidence below and in Section V.B.4, the agreement appears to have been in effect

from May 2010 through 2019.

76.     The SCA-USPI Agreement's Beginnings.

a.      Former SCA CEO Hayek and former USPI CEO Bill Wilcox established

the SCA-USPI No-Poach Agreement no later than May 2010.[198]

---

[195] *See, e.g.*, DOJCIV-007-00000131; DOJCIV-010-00000112.

[196] Ex. PX314 at DOJCIV-008-00000230.

[197] Ex. PX257 at DOJCIV-007-00000060.

[198] Ex. PX227 (May 14, 2010 internal USPI email between then-CEO Wilcox, then-EVP and CDO Brett Brodnax, and then-VP Jason Cagle in which Wilcox states, "I had a conversation with Andrew [Hayek] re people, and we reached agreement that we would not approach each other's proactively."); Ex. PX507 at DOJCIV-008-00000269; *see also* Ex. PX89 at USPI_CIV_000000598 (in December 2015, Brodnax stated that USPI has "a deal with SCA that we won't recruit each other's people," because USPI's then-CEO Bill Wilcox made the deal with SCA's then-CEO Andrew Hayek); Ex. PX508 at DOJCIV-008-00000222 .



██████████████████████████████ Moreover, at the DaVita criminal trial, Hayek testified that the SCA-USPI Agreement began in or around 2010.[201]

  b. ███████████████████████████

██████████████████████████████

████████████████████[202]

  c. ████████████████████████████

  d. The introduction of the no-poach agreement appears to follow the establishment of a friendly relationship by summer of 2008 between former USPI CEO Wilcox and former SCA CEO Hayek. ██████████████████

██████████████████████████████

████████████████"[204]

  e. ████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████

██████████████████████████████

---

[199] Ex. PX508 at DOJCIV-008-00000218; *see also* Ex. PX507 at DOJCIV-008-00000269 (In ███████████████████████████████████

[200] Ex. PX508 at DOJCIV-008-00000218.

[201] Hayek Dep. at 219:13–16.

[202] DOJCIV-007-00000101 at DOJCIV-007-00000102–103.

[203] Ex. PX508 at DOJCIV-008-00000213; Deposition of Bill Wilcox (Sept. 24, 2024) [hereafter Wilcox Dep.] at 129:21–131:2.

[204] Ex. PX507 at DOJCIV-008-00000268; Wilcox Dep. at 93:19–94:3.



f.      According to USPI's former primary internal recruiter Shannon Mosley,

g.

---

[205] Ex. PX314 at DOJCIV-008-00000233.

[206] *Id.*

[207] *Id.*

[208] *Id.*

[209] Ex. PX281 at DOJCIV-008-00000041; Deposition of Shannon Mosley (Aug. 13, 2024) [hereafter Mosley Dep.] at 45:15–50:25.

[210] *Id.* at DOJCIV-008-00000042; Mosley Dep. at 45:15–50:25.

[211] DOJCIV-007-00000118 at DOJCIV-007-00000120.

3154924.9

████████████████████████████████████████████████ █████████

████████████████████████████████████████████ [213]

     h.     Indeed, Hayek suggested in a September 2012 email to Wilcox, "It would be great to get back in the habit of touching base by phone and even in person for dinner. Would you be open to that?"[214]

     i.     These friendly relationships extended beyond Hayek and Wilcox. For example, in a 2013 email exchange between former SCA CDO Joseph Clark, Hayek, and current USPI CEO Brodnax, Clark wrote, "Nice to have friendly and collaborative[] competitors."[215]

77.     <u>The Terms of the Agreement.</u>

     a.     *The Restriction on Proactive Recruiting.* The evidence shows that the SCA-USPI No-Poach Agreement restricted either company from cold calling each other's employees.

     i.     ████████████████████████████████████████

████████████████████████████████████████ [216]

Hayek also testified that he entered into an agreement with the CEO of USPI, Bill Wilcox, to not solicit senior executives unless they were already considering outside roles.[217]

     ii.     USPI's current Manager of Talent Acquisition and Onboarding Shannon McGarry testified that the Agreement prevented her from soliciting SCA employees.[218]

---

[212] DOJCIV-012-00000056 at DOJCIV-012-00000058–59.

[213] *Id.*

[214] Ex. PX478 at USPI_CIV_000390138.

[215] Ex. PX464 at USPI_CIV_000013967.

[216] Ex. PX508 at DOJCIV-008-00000218; Wilcox Dep. at 136:19–138:3.

[217] Hayek Dep. at 218:15–219:2.

[218] Deposition of Shannon McGarry (Jun. 11, 2024) [hereafter McGarry Dep.] at 73:10–15.

57

iii.      According to former SCA COO Rucker,



[219]

iv.

[220]

b.      *The Tell-Your-Boss Provision.* The SCA-USPI No-Poach Agreement included the tell-your-boss provision.

i.      As with the SCA-DaVita Agreement, SCA and USPI employees were required to inform their boss that they were looking at other opportunities before having an offer in hand. Former SCA CEO Hayek testified at the DaVita criminal trial and at deposition that after he and Thiry agreed to implement the "tell-your-boss" provision in the SCA-DaVita No-Poach Agreement, Hayek took that provision and "applied it to the USPI relationship" "for the sake of simplicity."[221]

ii.      Wilcox testified that if "someone from SCA reached out to USPI . . . I think USPI would treat it like an intercompany transfer and ask if the SCA employee notified his or her direct supervisor of their desire to leave SCA."[222]

---

[219] Ex. PX305 at DOJCIV-008-00000176.

[220] Ex. PX281 at DOJCIV-008-00000041; Mosley Dep. 45:15–50:25.

[221] Ex. PX483 at 630:19–631:3; Hayek Dep. at 219:20–221:9.

[222] Wilcox Dep. at 137:11–15; Ex. PX508 at DOJCIV-008-00000218 (

Wilcox Dep. at 139:2–6.

58

3154924.9



iii. ████████████████████

████████████████████████████

███████████████████████

███████████████████████████ ■ █

███████████████████████

████████████████████████

████████████████ [224]

iv. ████████████████████

████████████████████████

███████████████████████████

████████████████████████

████████████████████████████

███████████████████████████

██████████████████████████

██████████ [225]

v. ████████████████████

██████████████████████████

---

[223] Ex. PX88 at DOJCIV-008-00000357 ████████████████
████████████████████████████████████████
████████████████████████████████
████████████████████████████ ; Deposition of
Mark Garvin (May 30, 2024) [hereafter Garvin Dep.] at 82:13–83:10 (confirming ██████████
██████ ).

[224] *See* Ex. PX88 at DOJCIV-008-00000358; Garvin Dep. at 158:21–159:11 (testimony
confirming accuracy of ██████████████ ).

[225] Ex. PX305 at DOJCIV-008-00000176–77.

3154924.9



      vi.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

      vii.     Hayek informed SCA Chief Talent Officer Bridie Fanning about the provision: "[W]e can recruit junior people (below Director) [from USPI and DaVita], but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."[230]

      c.     *Senior-Level Employees*. Like the DaVita-SCA No-Poach Agreement, the SCA-USPI No-Poach Agreement applied to employees at the director-level and above:

      i.     Wilcox testified that he assumed the agreement applied to "management level" employees, which he considered to be "administrative and above," but that

---

[226] Ex. PX281 at DOJCIV-008-00000041; Mosley Dep. at 45:13–50:25.

[227] Ex. PX281 at DOJCIV-008-00000041–42; Mosley Dep. at 45:13–50:25.

[228] Ex. PX219 at DOJCIV-012-00000068–69; Deposition of Jimmy Tanner (Jul. 31, 2024) [hereafter Tanner Dep.] at 32:20–33:13; Tanner Dep. at 45:22–46:19 (Catapult excluded SCA employees from their LinkedIn searches for candidates).

[229] Ex. PX219 at DOJCIV-012-00000069.

[230] Ex. PX159 at SCA-DOJ-00152696.

3154924.9

he never discussed a specific level of employee affected with Hayek.[231]

[232]

    ii.

[233]

    iii.    As noted above, Hayek informed SCA's then-Chief Talent Officer Bridie Fanning about the restriction in an October 2015 email, saying "we can recruit junior people (below Director)[.]"[234]

    iv.    In an April 2016 email, Hayek instructed that the No-Poach Agreement applied to Senior Group Directors and Vice Presidents.[235]

    v.    USPI's then-primary internal recruiter Shannon McGarry testified that when she started working at USPI, USPI's then-VP of Talent Acquisition Mosley instructed McGarry not to recruit from SCA.[236] At the time, McGarry was not involved in the recruitment

---

[231] Wilcox Dep. at 104:15–105:3 (Wilcox stated that the no-poach agreement was "assumed to apply to management level employees" and that he "never had a discussion that I recall with Mr. Hayek with any degree of specificity over what levels the not-to-actively-solicit agreement was."); s*ee also* Ex. PX507 at DOJCIV-008-00000270. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. PX508 at DOJCIV-008-00000219.

[232] Ex. PX508 at DOJCIV-008-00000219.

[233] Ex. PX281 at DOJCIV-008-00000042.

[234] Ex. PX159 at SCA-DOJ-00152696.

[235] Ex. PX171.

[236] McGarry Dep. at 65:24–67:20 (McGarry testified that two weeks after she began working at USPI, Mosley "provided me with a list of companies that I was not to actively solicit for my CEO and administrator positions," or, in other words, a list of companies McGarry could not "[r]ecruit, actively go out and recruit candidates from these particular companies."); *see also id.* at 27:23–28:8 (McGarry reported to Mosley). *See also* Mosley Dep. at 47:14–48:18 (the agreement applied to administrators, ambulatory surgical center CEOs, Regional Vice Presidents and above in Operations, etc.).

3154924.9

of regional vice presidents, but she was instructed to not solicit the aforementioned companies' employees for ASC administrator and hospital CEO roles.[237]

        d.     *No Geographic/Time Restrictions*. Like the DaVita-SCA No-Poach Agreement, the SCA-USPI No-Poach Agreement had no geographic or time limitations.

        i.     ████████████████████████

████████████████████████[238]

        ii.     Former SCA Chief Talent Officer Fanning also testified at deposition that the SCA-USPI No-Poach Agreement was not limited by time or geography.[239]

        iii.     SCA's former Chief Development Officer Joseph Clark also testified that the Agreement did not have a time restriction.[240]

        e.     *Secretive Nature.* SCA and USPI took steps to conceal their No-Poach Agreement from their employees.

        i.     ████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████[241] But he did not

---

[237] McGarry Dep. at 67:21–68:7 (When Mosley handed McGarry the Post-It note, "She just told me, these are candidates that we don't solicit employees from for our administrator and CEO roles.").

[238] Ex. PX508 at DOJCIV-008-00000219.

[239] Fanning Dep. at 64:12–65:19, 159:16–160:21.

[240] Deposition of Joseph Clark (Sept. 11, 2024) at 52:22–55:1.

[241] DOJCIV-007-00000118 at DOJCIV-007-00000119.

3154924.9

███████████████████████████████████████████████████████████

██████████████████████████ [242]

      ii.   ██████████████████████████████████████████

██████████████████████████████ [243]

78.    <u>The Tell-Your-Boss Provision Created a Chilling Effect.</u>

a.    The SCA-USPI No-Poach Agreement included the tell-your-boss provision.[244] Former SCA CEO Hayek had experienced the repercussions of such a provision himself. Specifically, Hayek explained to his former boss, DaVita's then-CEO Thiry, that when Texas Pacific Group ("TPG"), the then-majority owner of SCA, went behind Hayek's back to inform Thiry about Hayek's candidacy, "the net effect of the 'heads up' discussion that occured [sic] prior to me discussing my decision to leave with you was to put my offer at risk ([e.g.,] the request for TPG to withdraw it) and to lower my ultimate economics ([e.g.], to freeze my offer and leave the 10 [percent] wiggle room regarding base [plus] bonus untapped). None of this felt good or right.").[245]

b.    Multiple employees testified that they were unlikely to consider alerting their employer that they were exploring alternative job opportunities. ███████████

███████████████████████████████████████████████████████████

██████████████████████████████ [246]

---

[242] *Id.* at DOJCIV-007-00000120.
[243] Ex. PX508 at DOJCIV-008-00000218.
[244] Ex. PX507 at DOJCIV-008-0000269 ███████████████████████

████████████████████████████████████████████████████

[245] Ex. PX316 at DVA00019821; Hayek Dep. at 120:2–126:9, 134:2–135:23.
[246] DOJCIV-007-00000070 at DOJCIV-007-00000072.

3154924.9

64

c.

247

d.

249

e.

250

79.     <u>SCA and USPI Enforced the Agreement.</u> I have reviewed evidence that both SCA

and USPI took steps to enforce the terms of the No-Poach Agreement.

a.     *Senior Executives Enforced the Agreement.* I have reviewed extensive

evidence that senior SCA and USPI executives, including former SCA CEO Hayek and former

USPI CEO Wilcox, enforced the SCA-USPI No-Poach Agreement internally and against each

other.

i.

[247] Ex. PX508 at DOJCIV-008-00000220.
[248] DOJCIV-010-00000110 at DOJCIV-010-00000111.
[249] DOJCIV-008-00000431 at DOJCIV-008-00000432–33.
[250] DOJCIV-012-00000094 at DOJCIV-012-00000096.

3154924.9

████████████████████████████████████████████████████████████

███████████████████████████████████████████████[251]

     ii.    Hayek testified that if he learned that USPI was going after senior-level SCA employees, he would reach out from time to time to alert the CEO of USPI, Bill Wilcox, and vice versa.[252] For example, in 2012, Hayek emailed Wilcox to confirm that SCA had complied with the terms of the agreement with respect to a USPI employee who proactively pursued a job opportunity with SCA: "I double-checked that she called us (i.e., we did not call her), and I confirmed that her message to our team was that she is intending to leave . . . I wanted to check that you are Ok with this—I believe it fits the model that you, Brett [Brodnax], and I have discussed previously—we will not target[.]"[253]

     iii.    Additionally, in a December 2015 email, Hayek reminded SCA's then COO Rucker and then-Chief Talent Officer Fanning that "we should continue to flag USPI on our 'do not call' list to recruiters," saying that "outbound calls should not be occurring."[254] Fanning replied, "Andrew, sorry about this, I've recommunicated this to our firms."[255]

     iv.    ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████[256]

---

[251] Ex. PX305 at DOJCIV-008-00000177.
[252] Hayek Dep. at 237:2–238:1.
[253] Ex. PX478.
[254] Ex. PX160 at SCA000002866.
[255] *Id.*
[256] DOJCIV-008-00000155 at DOJCIV-008-00000155.

3154924.9

v. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ [257] For example, in a May 2012 email with the subject line "I thought you had gentleman's agreement with SCA not to go after each other's people . . . ?", Wilcox alerted Hayek that an internal recruiter at SCA had reached out to a USPI employee.[258] In response to this email, Hayek said he would "investigate" and identify the recruiter who caused this infringement of the agreement.[259]

vi. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

vii.     There are also numerous examples in the record evidence of USPI employees checking in with Wilcox to be certain that they could interview SCA employees who reached out directly, but who were not recruited. For example, in an internal USPI December 2013 email chain regarding a potential hire from a current SCA employee, USPI's then-President Brett Bodnax asked Wilcox, "Bill, any concerns with the [interview] process outlined below based on your agreement with Andrew [Hayek of SCA]?"[261] Wilcox responded, "Only that we

---

[257] Ex. PX88 at DOJCIV-008-00000359; Garvin Dep. at 87:14–88:17 (confirming ████████████ ████ ).

[258] Ex. PX486 at USPI_CIV_000014009; *see also* Hayek Dep. at 244:10–15, 245:15–23.

[259] Ex. PX487 (Hayek responded to Wilcox, "Bill: I will engage in this. Can you forward me the name of the person who was recruited? If not, I will investigate generically and follow up with you."); *see also* Hayek Dep. at 247:24–248:17 (Hayek testified that "investigate generically" meant, "I think, as the e-mail says, I asked him to forward me the name of the person who was recruited.").

[260] Ex. PX508 at DOJCIV-008-00000219.

[261] Ex. PX514.

3154924.9

need to ask [the SCA employee] to let them know she approached us, not vice versa."[262] In January 2014, Wilcox followed up on the hiring process, letting USPI executives know, "I talked to Andrew. Thank you all for ensuring that we lived up to our understanding not to poach from each other."[263]

        viii.    USPI's then-primary internal recruiter Shannon McGarry testified that shortly after she joined USPI, USPI's then-VP of Talent Acquisition Mosley provided McGarry with a Post-It Note with a list of companies to not actively recruit from, including SCA.[264] To remember these off-limits companies, McGarry kept the Post-It note at her desk.[265] McGarry testified that she followed this directive.[266]

        ix.



"[267]

---

[262] *Id.*

[263] Ex. PX515 at USPI_CIV_000018231.

[264] McGarry Dep. at 65:24–67:20 (McGarry testified that two weeks after she began working at USPI, Mosley "provided me with a list of companies that I was not to actively solicit for my CEO and administrator positions," or, in other words, a list of companies McGarry could not "[r]ecruit, actively go out and recruit candidates from these particular companies."); *see also id.* at 27:23–28:8 (McGarry reported to Mosley); Ex. PX99 (a Post-It note Mosley gave to McGarry with a list of companies not to solicit from). Mosley also testified that she received instructions to avoid recruiting SCA employees to fill administrator-level and above positions. *See* Mosley Dep. at 47:14–48:18 (the agreement applied to administrators, ambulatory surgical center CEOs, Regional Vice Presidents and above in Operations, etc.).

[265] Ex. PX99; *see also* Mosley Dep. at 118:6–118:16 (Mosley testified that she told McGarry that USPI had "a nonsolicitation no-poach agreement with SCA. And I would have told her that the other organizations listed on this sticky note were organizations that we should not solicit talent from.").

[266] McGarry Dep. at 68:11–12 (McGarry obeyed Mosley's directive).

[267] Ex. PX281 at DOJCIV-008-00000043; Mosley Dep. at 45:13–50:25.

3154924.9

b.    *External Recruiters Enforced the Agreement.* I have also reviewed evidence that shows SCA and USPI instructed its external recruiters to uphold the No-Poach Agreement.

i.    Mosley also testified that USPI ensured its external recruiters followed the directive.[268]



ii.

---

[268] Mosley Dep. at 97:25–98:7 (Mosley testified that the terms of the agreement were shared with the third-party recruiting firms). *See also* Ex. PX281 at DOJCIV-008-00000045.

[269] DOJCIV-012-00000038 at DOJCIV-012-00000038–39.

[270] *Id.*

[271] DOJCIV-008-00000029 at DOJCIV-008-00000030.

3154924.9



iii. ████████████████████████████

████████████████████████████████████ [272]

████████████████████████████████████

██████ ██████████████████████████████

████████████ [274]

iv. ████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ [275]

v.    Likewise, former SCA Chief Talent Officer Fanning instructed SCA's external recruiters to avoid USPI and DaVita.[276]

vi.    At SCA, former COO Rucker testified that he ████████████

████████████████████████████████████

---

[272] Ex. PX281 at DOJCIV-008-00000045; Mosley Dep. at 45:13–50:25.
[273] Ex. PX558 at SS-DOJ-01325 ███████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

Ex. PX555 at DOJCIV-007-00000011. *See also* Ex. PX555 at DOJCIV-007-00000004; DOJCIV-012-00000013 at DOJCIV-012-00000016–18.
[274] Ex. PX555 at DOJCIV-007-00000013.
[275] DOJCIV-007-00000101 at DOJCIV-007-00000102.
[276] Ex. PX162 ("note that USPI and Davita [sic] are off limits to SCA."); Ex. PX163 at DOJ-PROD004-00693673.

3154924.9

███████████████████████████████████████."[277] Rucker also testified at deposition that he notified members of his team, members of the HR and recruiting teams, and third-party executive search firms such as CT Partners and Heidrick & Struggles of the no-poach agreement.[278]

80. <u>The Agreement Harmed Employees.</u> As with the SCA-DaVita agreement, the SCA-USPI No-Poach Agreement had a direct effect on employee compensation:

a. *SCA and USPI Would Have Recruited Each Other's Employees.* But for the SCA-USPI No-Poach Agreement, SCA and USPI would have considered recruiting each other's employees:

i.

[281]

ii. Likewise, in USPI primary internal recruiter McGarry's experience, she did encounter potential candidates that worked at firms covered by the

---

[277] Ex. PX305 at DOJCIV-008-00000178.
[278] Rucker Dep. at 103:24–104:18.
[279] Ex. PX281 at DOJCIV-008-00000055; Mosley Dep. at 45:13–50:25.
[280] *Id.* at DOJCIV-008-00000042; Mosley Dep. at 45:13–50:25.
[281] Ex. PX508 at DOJCIV-008-00000220; Wilcox Dep. at 141:18–142:8.

3154924.9

"gentlemen's agreement" while she was actively recruiting.[282] To uphold the agreement, when she encountered these potential candidates, McGarry would skip that potential candidate and not consider them for the position.[283] For example, in an email communication with a subordinate recruiter, McGarry explained that the recruiter could not solicit a "great" SCA candidate to work at USPI because the candidate "works for one of our partners so I can't poach her."[284] McGarry stated that this is a "problem we face all the time."[285]

        iii.      Former SCA COO Michael Rucker testified that his understanding of the purpose of the gentlemen's agreement between SCA and DaVita was to limit the number of employees or teammates that moved between the two companies,[286] and that requiring an employee to notify his or her boss when interviewing would be limiting for some employees.[287]



[288]

        iv.      

---

[282] McGarry Dep. at 76:23–77:6.
[283] McGarry Dep. at 77:13–77:18.
[284] *See* Ex. PX101 at USPI_CIV_000004082. Note that McGarry referred to SCA as a "partner," despite recognizing that no formal business relationship existed. McGarry Dep. at 93:21–94:9 (McGarry testified that it was her "understanding that there was no business relationship between USPI and SCA at that time that caused [her] to not want to poach" a candidate from SCA.).
[285] *See* Ex. PX101; *see also* McGarry Dep. at 95:1–96:12.
[286] Rucker Dep. at 81:25–84:5.
[287] *Id.* at 87:16–87:25; *see also id.* at 94:18–96:22 (Rucker testified that he believed the agreement hindered an employee's ability to join SCA from DaVita and vice versa, because the agreement would have had the effect of limiting the flow of employees between the organizations.).
[288] Ex. PX305 at DOJCIV-008-00000176.

71

 [289] In other words, USPI would have served as a valuable pool of candidates for SCA employees.

        v.     Likewise, ███████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ [290]

        b.     *The Agreement Suppressed Employee Mobility and Compensation.*

        i.     An external recruiter for USPI, Jimmy Tanner, testified that Mosley told him that he was not able to recruit from SCA because USPI wanted to avoid situations where there were counteroffers or salaries were consistently raised from competition.[291]

        ii.     ████████████████████████████████

███████████████████████████████████████████████████████

███████████████ .[292] Garvin admitted that the agreement was successful in preventing him

---

[289] Ex. PX555 at DOJCIV-007-00000011–12; Ex. PX162 (Fanning instructed Schultz, "note that USPI and Davita [sic] are off limits to SCA.").

[290] DOJCIV-012-00000056 at DOJCIV-012-00000059.

[291] Tanner Dep. at 40:24–42:6 ("Essentially her reasoning was . . . you create this competition to where they're consistently losing leaders to SCA and vice versa. And then you just kind of get into counteroffers, hiking up salaries, you know, in open positions, . . . is kind of what the gist of it was.").

[292] Ex. PX88 at DOJCIV-008-00000361 ███████████████████████████████

████████████████████████████████████████ ); Garvin Dep. at 94:16–22 (confirming his statement to the FBI).

3154924.9

from recruiting SCA employees.[293]

.[294]

iii.

[298] Garvin also noted that he

---

[293] Garvin Dep. at 96:11–20 (Garvin testified that "the agreement prevented me from reaching out to SCA employees as potential candidates. So, yes, the agreement in its form prevented me from soliciting candidates personally. That part is true."); *see also* Ex. PX88 at DOJCIV-008-00000361.

[294] Ex. PX88 at DOJCIV-008-00000361

; Garvin Dep. at 96:21–97:12 (confirming
).

[295] Ex. PX88 at DOJCIV-008-00000358

"); Garvin Dep. at 84:24–85:7 (Garvin testified to the accuracy of .).

[296] Ex. PX88 at DOJCIV-008-00000358

; Garvin Dep. at 85:6–18 (Garvin was "personally . . . . frustrated by the agreement between USPI and SCA because it prohibited [him] from recruiting candidates from SCA who [he] believed would have been appropriate fits for openings at USPI[.]" and confirming accuracy of ).

[297] Ex. PX88 at DOJCIV-008-00000358

Garvin Dep. at 86:19–87:13 (Garvin confirmed at his deposition, "I was frustrated by the agreement and I thought that it was wrong.").

[298] Ex. PX88 at DOJCIV-008-00000358.

73

3154924.9



iv.

v.

299 *Id.* ██████████████████████████████████████████ Garvin Dep. at 86:12–18 (confirming accuracy of his statement to the FBI).

300 *Id.* at DOJCIV-008-00000365 (██████████████████████████████████████████ ); Garvin Dep. at 124:25–125:17 (confirming ██████████ ).

301 DOJCIV-007-00000118 at DOJCIV-007-00000120.

302 *Id.* at DOJCIV-007-00000121.

3154924.9

███████████████████████████████████████████████████████

████████████████████████████████████ [303]

        vi.     Evidence also shows the absence of a no-poach agreement led to higher compensation at SCA and USPI. Twice, McGarry personally experienced being recruited by a competitor not bound by a no-poach agreement, which ultimately led to USPI (via Tenet) increasing her pay each time to retain her.[304] Similarly, current SCA CFO Leslie Wachsman personally benefited from the ability to be recruited and even stated that she may not have been able to advance to her role as CFO without being recruited by SCA.[305] Wachsman agreed at deposition that it is important for employees to have the freedom of movement between employment opportunities.[306] Moreover, just before USPI decided not to uphold the Agreement any longer, USPI discussed enforcing the terms against SCA regarding SCA's attempt to poach USPI employee Riley Orr. Instead of demanding SCA back off Orr, USPI began a bidding war with SCA, and Orr ultimately chose to stay with USPI after it offered greater compensation and responsibilities.

        vii.    All told, according to USPI's former VP of Talent Acquisition Mosley, ████████████████████████████████████████

████████ [307]

---

[303] DOJCIV-008-00000283 at DOJCIV-008-00000283.

[304] McGarry Dep. at 22:1–23:3, 20:1–23, 29:1–10 (McGarry testified that on two occasions when a competitor recruited her, Tenet changed her title, "[a]nd they wanted to match my compensation or increase my compensation.").

[305] Wachsman Dep. at 94:18–95:9 (Wachsman testified that she benefited by leaving CVS for SCA, and that she might not be CFO today if SCA's then-CFO Peter Clemens had not recruited her to SCA.).

[306] Wachsman Dep. at 94:12–17.

[307] Ex. PX281 at DOJCIV-008-00000042; Mosley Dep. at 45:15–50:25.

3154924.9

c.    The End of the SCA-USPI No-Poach Agreement. The record evidence suggests that the SCA-USPI No-Poach Agreement fully ended in or around 2019. While USPI appears to have ceased actively enforcing its end of the No-Poach Agreement in late 2017, SCA appeared to continue enforcing the agreement through 2019. Moreover, as detailed further in Section V.B.4, Senior-Level Employee mobility between SCA and USPI stayed low from 2013-2019, but picked up markedly after 2019.

i.    In February 2017, USPI's then-SVP, Chief Human Resources & Support Services Officer Sandi Karrmann received and widely circulated an article regarding the DOJ's 2016 guidelines concerning no-poach agreements.[308] But USPI did not take any action to terminate the No-Poach Agreement in 2016 or February 2017.[309]

ii.    USPI appears to have stopped enforcing the agreement eight months later, in or around October 2017. On October 22, 2017, Sandi Karrmann, then USPI's Chief Human Resource Officer, sent an email to Wilcox and others reminding them the DOJ was cracking down on no-poach agreements and that USPI shouldn't enforce them anymore: "fyi we can't really push these kinds of 'gentleman's agreements'—the DOJ has cracked down on these as a violation of antitrust laws."[310] The following day, USPI's then-VP of Talent Acquisition

---

[308] USPI_CIV_000000442; Deposition of Sandi Karrmann (Aug. 14, 2024) [hereafter Karrmann Dep.] at 54:12–56:24 (at a meeting with the "senior management team," Karrmann "reiterated the DOJ guidance" that USPI "should not be practicing or adhering to [the No-Poach Agreements], because they were in violation of the antitrust [laws].").

[309] Karrmann Dep. at 59:21–62:10; Mosley Dep. at 41:3–17, 123:15–127:23 (Mosley testified that she recalls that she did not advise internal or external recruiters that the SCA-USPI No-Poach Agreement had ended until October 2017); Ex. PX281 at DOJCIV-008-00000053–54

[310] Ex. PX298 at USPI_CIV_000001260.

3154924.9

Mosley emailed an external recruiter to instruct, "Please disregard the non-poaching agreement between USPI and SCA. I give you permission to recruit out of SCA going forward."[311]

iii. Further, in an October 2017 email chain, Mosley informed USPI's then-primary internal recruiter McGarry that McGarry was now allowed to recruit administrators from SCA, to which McGarry responded, "Great. Yay!!"[312] McGarry stated that she expressed excitement because it allowed for a larger pool of candidates.[313] McGarry was additionally informed in a January 2018 email that she could target employees of SCA and other companies to fill a Regional Vice President ("RVP") position.[314] The very next day, McGarry indicated that she had already identified several potential candidates from SCA.[315]

iv. But USPI took no steps to inform SCA that the No-Poach Agreement was terminated.[316] Former USPI CEO Wilcox testified ▮▮▮▮▮▮ at deposition that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[317] ▮▮▮▮▮▮



---

[311] Ex. PX282 at USPI_CIV_000006432; *see also* Ex. PX281 at DOJCIV-008-00000053–54.
[312] Ex. PX103.
[313] McGarry Dep. at 99:2–9 (McGarry testified that she was happy when Mosley gave her the directive to poach from SCA "because it opened a larger pool of candidates.").
[314] Ex. PX104 at USPI_CIV_000001842 (January 2017 internal USPI email chain discussing recruiting for a Dallas RVP opening, wherein a list of companies to target includes SCA.).
[315] *Id.*; *see also* McGarry Dep. at 101:8–16.
[316] Wilcox Dep. at 112:7–21.
[317] Ex. PX507 at DOJCIV-008-00000276; Wilcox Dep. at 81:24–82:6.
[318] Ex. PX508 at DOJCIV-008-00000223–24.

██████████████████."[319] Wilcox stepped down as USPI's CEO in 2018, and as Chairman in 2020.

        v.      Hayek did not leave SCA (including his status as CEO of Optum Health) until the end of 2019 (discussed above).[320] It is possible that the No-Poach Agreement continued and that SCA still upheld its end of the bargain. When Anthony Kilgore took over as SCA CEO after Hayek stepped down in January 2018, Hayek arranged an in-person meeting with Kilgore, Wilcox, and Brodnax in Dallas to build "a great working relationship" and "continue the great collaboration of our two organizations." [321] Hayek wrote: "Bill is a fantastic person who has become a friend . . . there will be many opportunities to collaborate[.]"[322]

        vi.     While the SCA-USPI No-Poach Agreement may have fully ended with the departure of Hayek, ████████████████████████████ ████████████████████████████████████████████

### 4. The Quantitative Evidence is Consistent with No-Poach Agreements Between SCA and DaVita and SCA and USPI

81.    The qualitative evidence described above suggests that Defendants' conduct suppressed the flow of Senior-Level Employees between Defendant firms. I next assess whether the quantitative evidence shows suppression of Senior-Level Employee movement between Defendant firms.

82.    To assess whether the No-Poach Agreements suppressed the flow of Senior-Level Employees during the Conduct Period, I utilize the payroll records provided by Defendants,

---

[319] *Id.* at DOJCIV-008-00000224; *see also id.* at DOJCIV-008-00000221.
[320] *See* App. C.
[321] USPI_CIV_000006960.
[322] *Id.*
[323] *See, e.g.*, DOJCIV-007-00000131; DOJCIV-010-00000112.

3154924.9

which includes each employee's unique Social Security number.[324] Because this number is unique to an individual, I am able to track Class Members if they appear in different Defendant's payroll datasets. A complete discussion of the data is provided in Section VI and Appendix E.

83.     As explained in Section V, SCA and DaVita entered into a No-Poach Agreement from 2008 to 2019, while SCA and USPI entered into a No-Poach Agreement from 2010 to 2019. I refer to these pairs of Defendants, "SCA-DaVita" and "SCA-USPI," as "Covered Defendants." Using the payroll data, I develop an indicator for whether each Senior-Level Employee left to work for a "Covered Defendant" in each year. The resulting data, aggregated to the individual-year level, allows me to study movements of Senior-Level Employees between "Covered Defendants" from 2008 to 2021.[325]

84.     **Figure 2** below graphs the Senior-Level Employee flows between Covered Defendants during and after the Conduct Period. The left panel considers the total count of moves between Covered Defendants in a given year, while the right panel examines the percentage of all Senior-Level Employee departures that are moves between Covered Defendants. Between 2010 and 2019 during the Conduct Period, the average number of departures between Covered Defendants was 4.3 per year. However, in 2020 and 2021, after the No-Poach Agreements ended, the average number of departures between Covered Defendants

---

[324] Note that the Social Security Number was anonymized into a 64-character combination of numbers and letters that uniquely identify each employee regardless of company, location, or job title changes. Each Defendant used the same code to analyze the Social Security number, such that the same number would produce the same 64-character anonymized code.

[325] I used Defendants' 2022 data to determine which Class Members left their jobs in 2021. However, because I would need to observe where Class Members worked in 2023 to see if they left for a Covered Defendant in 2022, I cannot assign mobility events to workers in 2022. Note also that while USPI and DaVita provided data before 2008, the earliest year of the SCA data is 2008, and thus mobility events to SCA (from either USPI or DaVita) cannot be examined until 2008.

3154924.9

more than doubled to 10.5. In terms of the percentage of departures that are moves between Covered Defendants, in the initial years of the Conduct Period the percentage is around 2–4 percent, then falls down to below 1 percent for all but one year between 2014–2019, before rising precipitously in 2020 and 2021. Both of these patterns suggest that, although mobility between Covered Defendants may have been elevated in the early years of the Conduct Period, the bilateral flow of Senior-Level Employees slowed markedly in the middle and end of the Conduct Period, and then rose markedly following the end of the Conduct Period. This evidence is consistent with a no-poach agreement and its termination by 2020.

**Figure 2: Director and Above Mobility Events Between Covered Defendants**



85.     The right panel of **Figure 2**, which measures moves between Covered Defendants as a fraction of all departures, accounts for the fact the employees may be leaving for reasons other than the relaxation of the No-Poach Agreements. For example, I understand that in the 2019/2020 period a number of senior USPI employees left USPI in response to USPI's drastic

re-valuation of its 2015 Employee Stock Equity Plan.[326] As part of the Tenet acquisition of USPI, in 2015 key employees of USPI were offered participation in the 2015 Employee Stock Equity Plan, which had a maturation date in the year 2022.[327] In 2018, however, Tenet commissioned a new valuation of the plan, resulting in a significant drop in the value of the stock options that were given to the key employees.[328] This led to litigation against USPI in 2019 and 2020 and the subsequent departures of numerous senior employees of USPI in 2019 and 2020.[329] For example, former USPI Market President Alex Bateman testified that he left USPI in 2020 because of the de-valuation of his stock options.[330] Former USPI SVP, Chief Human Resources

---

[326] 2d Am. Class Action Compl., *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.), ECF 101 ¶¶ 25, 47, 110–111, 122; Karrmann Dep. at 12:12–21; Mosley Dep. at 81:14–82:22.

[327] Compl., *Cagle v. United Surgical Partners Int'l, Inc.*, No. 3:20-cv-01681-BN (N.D. Tex.), ECF 1 ¶¶ 23–30; 2d Am. Class Action Compl., *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.), ECF 101 ¶¶ 1–2, 6–7.

[328] 2d Am. Class Action Compl., *Andrews,* ECF 101 ¶ 83; Mem. Op. & Order, *Cagle v. United Surgical Partners Int'l, Inc.*, No. 3:20-cv-01681-BN (N.D. Tex.), ECF 34 at 5.

[329] Garvin Dep. at 9:20–21 (Garvin left at the end of 2020); Deposition of Andrew Johnston (Sept. 6, 2024) at 32:22–24 (Johnston left in 2020); Karrmann Dep. at 35:21–36:1 (Karrmann left in 2020); Deposition of Alex Bateman (Jul. 19, 2024) [hereafter Bateman Dep.] at 30:1–5 (Bateman left in 2020); Mosley Dep. at 79:2–10 (Mosley left in 2020); McGarry Dep. at 21:18 (McGarry left in 2021); Deposition of Cindy English (Jun. 12, 2024) [hereafter English Dep.] 21:7 (English left in 2019); Deposition of Anthony Martin (Jun. 27, 2024) at 15:4–5, 20:7–8 (Martin left in December 2019); Compl., *Cagle*, ECF 1 ¶¶ 10, 35, 38 (Cagle was terminated May 9, 2019 and filed a complaint with the Department of Labor on October 31, 2019); 2d Am. Class Action Compl., *Andrews*, ECF 101 ¶¶ 25, 122; Ex. PX185 (James Walker left in 2019); *Jeff Andrews*, LINKEDIN, https://www.linkedin.com/in/jeff-andrews-b7300b8/ (last visited Jan. 2025) (Market President, left in November 2019); *Kelly Barker*, LINKEDIN, https://www.linkedin.com/in/kelly-barker-462332/ (last visited Jan. 2025) (SVP, Controller of U.S. Operations, left in January 2020); *Matt Pate*, LINKEDIN, https://www.linkedin.com/in/matt-pate/ (last visited Jan. 2025) (SVP, left in June 2020); *Daphne Walker*, LINKEDIN, https://www.linkedin.com/in/daphne-walker-a351759a/ (last visited Jan. 2025) (SVP and Chief Legal Officer, left in June 2020); *Philip A. Spencer*, LINKEDIN, https://www.linkedin.com/in/phil-spencer-1547546/ (last visited Jan. 2025) (SVP of Business Development, left in December 2019).

[329] Bateman Dep. at 30:18–31:5.

[330] Bateman Dep. at 30:18–31:5.

3154924.9

& Support Services Officer and Tenet/USPI EVP Sandi Karrmann testified that USPI/Tenet agreed to pay her a $5.00 per share bonus to settle the de-valuation claims.[331] Because my analysis assesses moves between Covered Defendants as a fraction of all departures from the company, my analysis accounts for this mass departure.

86.     I confirm that the Conduct Period end date of 2019 is appropriate for both the SCA-DaVita No-Poach Agreement and the USPI-SCA No-Poach Agreement by using a regression approach. I take the individual-year data and I test how the probability of a move between each pair of Covered Defendants varies from 2008 to 2021, relative to 2017, when Sandi Karmann at USPI first circulated an antitrust memo internally regarding no poach agreements.[332] If 2019 is the last year of the No-Poach Agreements, then in 2020 we should observe a statistically significant uptick in the movement of Senior Employees between the Covered Defendants, and we should see no statistically significant differences in the other years just before or just after 2017. **Figure 3** below shows exactly this for both sets of No-Poach Agreements. Relative to 2017, in 2020 there is a statistically significant increase in mobility between SCA and DaVita, and there is also a statistically significant increase in mobility between SCA and USPI—while no other years between 2013 and 2019 show any statistically significant differences in the mobility rates between the Covered Defendants relative to 2017.

---

[331] Karrmann Dep. at 11:13–20.
[332] Ex. PX299; Ex. PX300.

3154924.9

**Figure 3: Annual Probability of Mobility Between Covered Defendants Relative to 2017**

| Dependent Variable: | [1] 1(Leave for DaVita or SCA) | [2] 1(Leave for USPI or SCA) |
|---|---|---|
| Year = 2008 | 0.00322* | 0.00209 |
| | (0.00186) | (0.00213) |
| Year = 2009 | 0.00212 | -0.000739 |
| | (0.00150) | (0.000739) |
| Year = 2010 | 0.00192 | 0.00735** |
| | (0.00136) | (0.00337) |
| Year = 2011 | 0.00334** | -0.000739 |
| | (0.00167) | (0.000739) |
| Year = 2012 | 0.00220* | 0.00478* |
| | (0.00127) | (0.00257) |
| Year = 2013 | 0.000667 | 0.00352 |
| | (0.000667) | (0.00225) |
| Year = 2014 | -0 | 0.000220 |
| | (0) | (0.00121) |
| Year = 2015 | 0.000594 | 0.00195 |
| | (0.000594) | (0.00172) |
| Year = 2016 | 0.000432 | 2.95e-05 |
| | (0.000432) | (0.00107) |
| Year = 2017 | *Base Year* | *Base Year* |
| Year = 2018 | 0.000807 | 0.00276 |
| | (0.000571) | (0.00173) |
| Year = 2019 | 0.000506 | 0.000643 |
| | (0.000506) | (0.00123) |
| Year = 2020 | 0.00149* | 0.00382** |
| | (0.000862) | (0.00187) |
| Year = 2021 | -0 | 0.00596*** |
| | (5.11e-11) | (0.00215) |
| Constant | 0 | 0.000739 |
| | (0) | (0.000739) |
| Sample | DaVita & SCA | USPI & SCA |
| Observations | 23,735 | 15,694 |
| R-squared | 0.001 | 0.002 |

*Note:* Robust standard errors in parentheses *** $p<0.01$, ** $p<0.05$, * $p<0.1$

87.     Moreover, to test that the cumulative effect of the No-Poach Agreements was to suppress movement—and that the patterns above are not simply noise or explained by time trends, I use a standard multivariate regression framework to assess the degree of movement

84

suppression associated with the Conduct Period both overall and for each pair of bilateral No-Poach Agreements.[333]

88.     The results of this analysis are shown in **Figure 4** below. Column (1) examines whether the likelihood that a Class Member left for a Covered Defendant in a given year is lower during the Conduct Period, controlling for year trends. I find that the Conduct Period is associated with a statistically significant 0.226 *percentage point* reduction in the probability of movement between Covered Defendants. When expressed in relative terms to the average number of employees who leave each year, this estimate shows movement between Covered Defendants during the Conduct Period decreased by 104 *percent* relative to sample average.

89.     Columns (2) and (3) repeat the analysis of Column (1) but do so by looking only at the *bilateral* covered Defendants, as opposed to grouping them together. Column (2) considers the SCA-DaVita No-Poach Agreement, while Column (3) considers the SCA-USPI No-Poach Agreement independently. In both cases, I find that the No-Poach Agreements are associated with a statistically significant decline (121 percent and 55 percent respectively) in movement between Covered Defendants.

---

[333] *See* Section VI for a detailed explanation of this regression framework.

84

3154924.9

**Figure 4: Probability of Mobility Between Covered Defendants**

|  | [1] | [2] | [3] |
|---|---|---|---|
| Dependent Variable: | 1(Leave for Covered Defendant) | 1(Leave for DaVita or SCA) | 1(Leave for USPI or SCA) |
| Conduct | -0.00226*** | -0.00117* | -0.00169* |
|  | (0.000772) | (0.000618) | (0.00100) |
| **% Effect Relative to Sample Mean** | **-104.4%** | **-121.1%** | **-55.3%** |
| Year | -0.000172** | -0.000250*** | 8.30e-05 |
|  | (8.31e-05) | (9.01e-05) | (0.000117) |
| Sample | All | DaVita & SCA | USPI & SCA |
| Sample Mean of DV | 0.00217 | 0.000969 | 0.00306 |
| Observations | 32,726 | 23,735 | 15,694 |
| R-squared | 0.000 | 0.001 | 0.000 |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

90. Taken together, the quantitative evidence presented in this section is strongly consistent with a No-Poach Agreement to prevent Class Members from moving between Covered Defendants.

91. In addition to the previous mobility analysis, the wage suppression results in Section VI also constitute evidence of the effects of the No-Poach Agreements. Those analyses demonstrate that the Conduct Period is associated with an economically and statistically significant decrease in Senior-Level Employee compensation.

**C.     Defendants Exchanged CSI to Suppress Labor Market Competition**

92. I next review the criteria economists use to assess whether CSI Exchanges are indicative of anticompetitive cartel behavior. I then assess whether the information exchanged among the Defendants meets these criteria.

3154924.9

## 1. Economic Criteria for Assessing CSI Exchanges

93.     The exchange of CSI is often a key component of collusion.[334] In an article

published in the *Journal of Economic Literature*, Professors Margaret Levenstein and Valerie

Suslow explain that "[i]ndustry associations often engage in the collection and dissemination of

information, which may facilitate collusion."[335] Levenstein and Suslow explain that "[c]ollusion

in general implies . . . . that the rival sellers in some manner arrive at an understanding as to what

price to charge or what outputs to produce, or both."[336] This does not necessarily mean that firms

in a cartel explicitly choose a specific price or compensation level, but rather that the cartel

pursues a commonly understood goal (lowering input prices below competitive levels) and

shares information to achieve that goal.[337] In this case, the exchange of Senior-Level Employee

compensation information would give Defendants sufficient information to arrive at a general

understanding between Defendants of what prices to pay Senior-Level Employees for their

services.

94.     The DOJ and FTC's *Competitor Collaboration Guidelines* state that the exchange

of "competitively sensitive information . . . . may facilitate explicit or tacit collusion."[338] The

*Guidelines* highlight that: "[T]he sharing of information relating to price, output, costs, or

---

[334] *See, e.g.*, Levenstein & Suslow (2006). *See also* MODERN IO 4TH ED. at 122–156; Jonathan B. Baker, *The Case for Antitrust Enforcement*, 17 J. ECON. PERSPECTIVES 27–50, 27 (2003). *See also* ADAM SMITH, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS, 105–106 (W. Strahan & T. Cadell, London 1776) ("People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices.").

[335] Levenstein & Suslow (2006) at 69.

[336] *Id.* at 45.

[337] *Id.* at 45 (noting there are often "multiple [price] equilibria" coordinated by a cartel). *See also* Steven G. Lanning, *Costs of Maintaining a Cartel*, 36(2) J. INDUS. ECON. 157, 160 (1987) (describing "allowed pricing variation" within a cartel structure).

[338] *Guidelines* at 6.

3154924.9

strategic planning is more likely to raise competitive concern[.]"[339] The timing of the information being exchanged is also relevant: "[T]he sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information[.]"[340] Finally, the level of aggregation is also important: "[T]he sharing of individual company data is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data."[341]

95.     Further, the *direct and explicit* coordination among rivals to fix prices is anticompetitive and thus direct evidence of anticompetitive conduct. Episodes of direct inter-buyer information exchanges are even more likely to suppress employee compensation. Antitrust authorities appropriately consider "direct inter[firm] communications of current prices on specific transactions to be nearly naked restraints" of trade.[342] These "hard-core cartel agreements" are accordingly per-se illegal under federal antitrust law.[343]

96.     Therefore, qualitative evidence of exchanges of competitively-sensitive wage data would include any evidence of communication or coordination among horizontal competitors

---

[339] *Id.* at 15.

[340] *Id.*

[341] *Id.* at 16.

[342] PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 21113e (4th ed. 2017).

[343] *See* Michael Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (citing *Guidelines* at 3 ("Agreements of a type that always or almost always tends to raise price or to reduce output are per se illegal. The Agencies challenge such agreements, once identified, as per se illegal. Types of agreements that have been held per se illegal include agreements among competitors to fix prices or output, rig bids, or share or divide markets by allocating customers, suppliers, territories, or lines of commerce. The courts conclusively presume such agreements, once identified, to be illegal, without inquiring into their claimed business purposes, anticompetitive harms, procompetitive benefits, or overall competitive effects. The Department of Justice prosecutes participants in hard-core cartel agreements criminally.")).

3154924.9

involving employee compensation, particularly if it includes future plans for compensation. Evidence of firms agreeing to match or set compensation at certain levels would be evidence of price-fixing.

97.     Quantitative evidence of CSI exchanges would also include evidence of generalized wage suppression during the period Plaintiffs alleged the CSI exchanges occurred.

98.     In contrast, evidence consistent with unilateral conduct with regards to sharing information might include sharing with a third-party aggregator or the government for benchmarking purposes. I am not aware of an example of how a firm can directly share CSI with a horizontal competitor that is in the company's unilateral self-interest. Moreover, the direct communications between horizontal competitors to agree to share CSI with each other is inherently inconsistent with unilateral conduct.

### 2.     The Qualitative Evidence is Consistent with Sharing CSI

99.     The qualitative record evidence supports the allegation that Defendants SCA and DaVita shared CSI on employee pay data with one another, and SCA and USPI did the same. The type of CSI shared could be used by Defendants to suppress employee wages. I review this evidence below.

100.    The SCA-DaVita CSI Exchanges

a.     In or around 2009, SCA's then-CEO Hayek communicated directly with Javier Rodriguez, DaVita's then-SVP (and currently, its CEO) and obtained DaVita's planned wage increases budgeted for the upcoming year.[344]

---

[344] Hayek Dep. at 369:11–24 (Hayek testified that he spoke with DaVita's then-SVP Rodriguez to obtain planned wage increase information.).

3154924.9

b.      In July 2009, Hayek received an email regarding employee pay raises at various companies, including DaVita.[345] Hayek testified that the raise information was "information about general average wage growth or wage increase, again, across pools -- broad pools of employees at six different companies."[346] Further, Hayek testified that he understood the information was compiled by DaVita's then-SVP Javier Rodriguez.[347]

c.      SCA's and DaVita's senior executives repeated this exercise regularly. For example, Hayek testified that he reached out to DaVita executives, including former CEO Thiry, for "average wage increase" information on "one or more occasions."[348]

d.      SCA's former Chief Development Officer Brian Mathis, who joined SCA in February 2009, testified that SCA exchanged yearly wage increase budgets with DaVita, but did not recall the years or exact number of times.[349]

e.      In 2011 and 2012, SCA contacted numerous labor competitors, including DaVita, to exchange planned merit adjustments for the upcoming years. For example, in 2012 SCA's then-VP of HR Lynn Howard wrote to Mathis that SCA had reached out to DaVita and others in 2011 to find what other companies were planning for their merit increase budgets, and that SCA was doing the same in 2012.[350]

---

[345] Ex. PX490 at HAYEK-000012214–16 (2009 email from Wagner to Hayek listing various raises at companies including DaVita).
[346] Hayek Dep. at 367:17–24.
[347] *Id.* at 369:11–24.
[348] *Id.* at 362:8–363:7.
[349] Deposition of Brian Mathis (Sept. 20, 2024) [hereafter Mathis Dep.] at 53:14–56:20.
[350] Ex. PX491 at OMC_BM_000013355.

3154924.9

   f.  Former COO Michael Rucker testified that in or around 2012 and 2013, he reached out to Rodriguez at DaVita "to obtain future wage increase" and "merit pool information"[351] under the guise of benchmarking.[352]

   g.  The record evidence does not show that SCA and USPI ever agreed to stop exchanging wage data. Note, however, that SCA's current CFO Wachsman did testify that such data exchanges generally no longer occur as of sometime around 2019.[353]

  101. <u>The SCA-USPI CSI Exchanges.</u> The evidence shows that SCA and USPI routinely shared nonpublic Senior-Level Employee wage increase data with one another, in addition to other forms of CSI.

   a.  The record evidence demonstrates years of correspondence between SCA and USPI regarding wage data.[354] Mathis testified that SCA regularly shared annual wage increase budgets with USPI.[355]

   b.  Around 2009, Hayek obtained USPI's planned wage increases to be budgeted for the upcoming 2009 year.[356] SCA and USPI repeated this exercise regularly.[357]

---

[351] Rucker Dep. at 255:10–256:12.
[352] *Id*. at 234:20–25.
[353] Wachsman Dep. at 177:22–178:4, 232:19–233:1.
[354] *See, e.g.*, Ex. PX489 (a 2013 email wherein USPI and SCA exchange 2013 wage increase expectations). *See also* Hayek Dep. at 353:16–354:2 (Hayek testified that Mathis "would have been part of discussions about an annual budget."); *id.* at 360:14–361:6 (Hayek also testified that SCA's own wage increase information was "probably nonpublic".); Ex. PX232 at USPI_CIV_000021155 (2014 email exchange between USPI and SCA regarding exchanging wage increase data).
[355] Mathis Dep. at 53:11–56:10.
[356] Ex. PX490 at HAYEK-000012215–16; Hayek Dep. at 366:10–372:22 (Hayek explained that he contacted Rodriguez to gather the DaVita wage information contained within Ex. PX490.).
[357] Ex. PX501 at SCA002277742; *see also* Mathis Dep. at 208:18–211:1.

3154924.9

c.　　　In February 2010, USPI's then-CFO Mark Kopser circulated a general and administrative "cost comparison vs SCA" with the costs by department for USPI and SCA.[358] Wilcox confirmed that salaries are generally one of the largest components of general and administrative expenses.[359]

d.　　　Former SCA CFO Peter Clemens testified that he would benchmark SCA's expenses with Jason Cagle, USPI's former SVP and CFO, which included wage information.[360] The record shows that Clemens and Cagle exchanged nonpublic expense data (which contained compensation expenses) disguised as ordinary "benchmarking" on more than one occasion.[361] Clemens said that SCA competed with USPI in the market for employees, and "it's possible" that SCA and USPI sharing wage data would impact competition for employees.[362]

e.　　　SCA CFO Leslie Wachsman also testified that SCA provided non-public data with the expectation that USPI would reciprocate.[363]

f.　　　An internal SCA January 2011 slide deck regarding SCA's compensation planning noted that USPI's salary increase budget was 203 percent at the facility level, and unclear at the management level, "but no raises last 2 yrs[.]"[364] The slide requested that the viewer keep the information confidential.[365]

---

[358] Ex. PX516 at USPI_CIV_000105175.
[359] Wilcox Dep. at 177:1–10 (Wilcox testified that salaries are one of the largest components of corporate expenses.).
[360] Clemens Dep. at 106:10–107:23.
[361] *Id.* at 108:12–109:17, 128:12–132:1.
[362] *Id.* at 188:24–189:7.
[363] Wachsman Dep. at 206:13–19 ("SCA provided information, and USPI, on certain occasions, provided it back.").
[364] Ex. PX522 at OMC_BM_000000888.
[365] *Id.*

3154924.9

g.      In at least the years 2011 and 2012, SCA reached out to USPI and DaVita to exchange planned merit adjustments for the upcoming years, which SCA would then incorporate into its labor budget planning.[366]

h.      In a May 2012 email exchange, former USPI CFO Mark Kopser contacted Mathis to compare explicit pay rates for comparable positions.[367]

i.      In October 2012, Mathis and Kosper again emailed to exchange wage information: Mathis contacted Kopser regarding "2013 Labor" and asked for USPI's planned wage increases for 2013.[368] Kopser promptly provided the requested information to Mathis, who then relayed the information to the SCA personnel preparing the labor budget for the upcoming year.[369]

j.      For example, in a July 2013 email Clemens asked a subordinate to fill out a spreadsheet for USPI for benchmarking purposes.[370] In that email chain, Cagle writes to Clemens, "I know that a few years back we exchanged data on corporate G&A with each other. I

---

[366] Ex. PX524 at OMC_BM_000013354–55; Mathis Dep. at 53:5–63:5, 66:5–76:12; Ex. PX232 at USPI_CIV_000021155; Ex. PX37 at USPI_CIV_000016100; Deposition of Mark Kopser (Dec. 12, 2024) at 32:3–38:2, 105:5–108:9; Deposition of Jason Cagle (Aug. 6, 2024) at 119:24–120:23; Ex. PX240 at USPI_CIV_000686081 (USPI Cost Reduction Analysis notes that SCA has "the only good comp" for the G&A comparison, and that SCA would likely cooperate in the information exchanges.).

[367] *See* Ex. PX523 at OMC_BM_000010778 (Kopser asked Mathis, "We pay our internal audit manager 150K[.] Is that close to what you pay[?]" Mathis responded, "A few years ago we combined our compliance and our audit departments and now have a single VP ($175k + 40% potential bonus) that leads both. There is a director who focuses solely on audit which is probably the relevant position to compare to and she has a base of $103k with potential bonus of 25%. There are 3 ~$65k roles that report to her.").

[368] Ex. PX489 at OMC_BM_000014759.

[369] *Id.*

[370] Ex. PX33 at SCA002364259–60.

3154924.9

was wondering if you would be interested in repeating that exercise. . . . Just send what we exchanged the last time we did this."[371]

k.      In another August 2013 email from Brian Mathis to Cagle, Mathis wrote, "One of the things we have shared in the past is plans for the following year wage increases. Have you all started set a number yet that you're planning to budget?" Cagle responded, "Not yet, but probably will nail down the second half of August. We'll remember to share with you when we do."[372]

l.      USPI and SCA also shared non-public corporate overhead cost on multiple occasions, which would include Senior-Level Employee compensation.[373] For example, in a July 2013 email chain between executives at USPI and SCA discussing the exchange of corporate overhead costs, Cagle wrote, "I know that a few years back we exchanged data on corporate G&A [general and administrative data] with each other. I was wondering if you would be interested in repeating that exercise." Clemens responded, "Sure, I would like to do this again. Just send what we exchanged the last time we did this."[374] Clemens testified that part of the reason SCA exchanged general and administrative expense data with USPI was to identify potential areas where SCA could reduce its costs.[375] Similarly, Wachsman testified that it was beneficial for SCA to manage overhead cost growth at a lower percentage rate than revenue growth, that workforce costs were a component of SCA's overhead cost, and that SCA tries to manage labor costs as a percent of revenue.[376]

---

[371] *Id*.

[372] Ex. PX37.

[373] *See* Ex. PX63 at SCA000609009 (a September 2017 email exchange between USPI and SCA wherein both provide their G&A as a percentage of revenue for 2013–2017).

[374] Ex. PX59 at SCA002364265.

[375] Clemens Dep. at 135:21–137:11.

[376] Wachsman Dep. at 102:18–103:14, 107:6–10.

3154924.9

m.      Moreover, in a June and August 2014 email chain, former USPI VP of Financial Operations Cindy English and former SCA Executive VP and General Counsel Rich Sharff discussed detailed information regarding their respective companies' paid time off ("PTO") policies.[377] English testified that Sharff shared an overview of how PTO is earned at SCA with her over the phone.[378]

n.      In December 2014, SCA and USPI also planned to exchange general and administrative expenses.[379]

o.      SCA and USPI also exchanged general and administrative cost comparison data to compare 2014–2015 expenses by department.[380]

p.      In 2015, Mosley prepared an internal USPI document wherein she noted, "SCA: Find out what they are paying at the regional level and admin level."[381]

q.      Further, in a February 2015 email, former USPI VP of Talent Acquisition Mosley informed Wilcox that she had been asked to reach out to SCA to "see if they would be open to sharing salary information with us on their [Regional Vice Presidents] and

---

[377] Ex. PX119 at USPI_CIV_000601224–26.

[378] English Dep. at 60:8–10 (English testified that Sharff gave her this information "orally"); Ex. PX120 at USPI_CIV_000584419–20 (a June 2014 email exchange between English and Sharff with an overview of their phone call regarding SCA's and USPI's PTO policies.).

[379] Ex. PX138 at USPI_CIV_000122239; Deposition of Brett Brodnax (Sept. 12, 2024) at 42:5–18.

[380] Ex. PX520 at USPI_CIV_000111382 (a May 2015 email circulating an expense comparison between USPI and SCA for 2014 forecast and 2015 budgets). *See also* Wilcox Dep. at 199:10–14 (when asked whether the USPI and SCA expense data was publicly available, Wilcox replied, "I don't think so").

[381] Ex. PX283 at USPI_CIV_000035856.

3154924.9

Administrators in the San Francisco/Bay Area."[382] Wilcox replied that he was happy to have Mosley gather and share that information.[383]

       r.     SCA and USPI's finance team leaders conducted calls to discuss forecasting methodologies.[384] Wachsman, described the ASC business as "very unique" for forecasting, and testified that the conversations were mutually beneficial.[385]

       s.     None of the extensive types of data exchanged were published to the public or to the affected employees of the suppressed compensation.[386]

       t.     The record evidence does not show that SCA and USPI ever formally agreed to stop exchanging CSI. SCA's current CFO Wachsman did, however, testify that SCA and USPI stopped exchanging data in or around 2019, and that such data exchanges generally no longer occur.[387]

---

[382] Ex. PX239 at USPI_CIV_000046079 (a February 2015 email between Mosley and Wilcox discussing whether USPI should share information with SCA).

[383] *Id.*

[384] *See* Ex. PX60 at SCA001075713–714.

[385] Wachsman Dep. at 202:22–203:9 (Wachsman testified that SCA wanted information about SCA's forecasting "[b]ecause forecasting for ambulatory surgery centers is very unique. I mean, there are several aspects of budgeting and forecasting that are similar across industries, and there are some things that are very unique. And so connecting with a finance leader that was doing—in the similar industry that was going through the same—having to forecast the same sort of industry was helpful. It added just more information that we could glean on tools and processes."); *id.* at 204:16–21 (Wachsman testified that "intel about different companies' processes . . . is definitely helpful when you're looking to make improvements in your own.").

[386] *See* Ex. PX235 at USPI_CIV_000110943 (Wilcox ordered that the overhead exchanges be disclosed only to himself, USPI's then-CFO Cagle, and USPI's then-President Brett Brodnax and not the whole management group); Ex. PX135 at USPI_CIV_000016089 (SCA did not publicly file general and administrative data, and shared it only with SCA's banks and bondholders); USPI_CIV_000467624 and USPI_CIV_000411545 (sample USPI quarterly results and SEC filings contain none of the exchanged information); Wachsman Dep. at 192:19–21 (Wachsman confirmed the shared data was nonpublic).

[387] Wachsman Dep. at 177:22–178:4, 232:19–233:1.

95

3154924.9

### 3. The Quantitative Evidence is Consistent with Wage Suppression

102. If exchanging CSI among Defendants allowed them to agree on a (lower) pay increase for Senior-Level Employees, this would quantitatively manifest in lower pay in subsequent years. The wage suppression regression I perform next in Section VI demonstrates that Senior-Level Employee wages were suppressed during the Conduct Period. This evidence is consistent with exchanges of CSI in support of colluding to suppress Senior-Level Employees' pay.

## VI. Econometric Evidence of Wage Suppression

103. In this section, I empirically test the hypothesis that, after controlling for other relevant economic factors, Defendants' alleged misconduct during this period economically and statistically significantly suppressed Class Member wages. I use standard econometric techniques and data common to the Class to perform these analyses.

104. I use granular employee-level pay data provided by each of the Defendants to evaluate whether there exists a causal relationship between the Challenged Conduct and Class Members' compensation. The key question this analysis answers is: *What would the compensation of Class Members have been during the Conduct Period had the Challenged Conduct not taken place*? The goal of this section is to develop an appropriate econometric model that estimates the causal effect of the Challenged Conduct.

105. Below, I first explain how a multivariate regression model can be used to isolate the effect of the Challenged Conduct by accounting or "controlling" for other relevant factors that might also cause changes in compensation. I then describe the data and documents produced by each Defendant that I used to perform this analysis. Next, I demonstrate that after controlling for other relevant wage-determining factors, the Challenged Conduct is economically and statistically significant, and associated with suppressed pay for Class Members. Moreover,

96

compensation was suppressed to a similar degree at each Defendant firm. I then employ a series of robustness checks and alternative models to test the validity of this finding. I conclude by discussing an additional analysis that rules out the possibility that unmeasured, omitted variables from the model are responsible for the wage suppression results and provide a lower bound on the wage suppression estimates.

106. Given that Plaintiffs allege that both elements of the Challenged Conduct (i.e., the No-Poach Agreements and CSI Exchanges) occurred simultaneously, my analysis measures suppressed compensation from the whole of the Challenged Conduct rather than from each individual component. I note that if the fact finder determines that only one element of the Challenged Conduct occurred, then the findings of wage suppression revealed by the analyses below must be wholly attributable to the that element of Challenged Conduct.[388]

107. My analyses below demonstrate that the Challenged Conduct suppressed wages by 14.5 percent overall, or when measured at each individual Defendant, by 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI. These findings are robust to a series of alternative models and are statistically and economically significant findings of harm.

A.    **Standard Econometric Methods To Demonstrate Wage Suppression**

108. To estimate the causal effect (if any) of the Challenged Conduct on Class Member compensation, I use a standard "but-for world" economic framework.[389] A "but-for world"

---

[388] Put differently, if one of the elements of the Challenged Conduct is deemed not to have suppressed wages (because it did not happen), then the finding of suppressed wages below must be due to the other element of the Challenged Conduct.

[389] Theon van Dijk & Frank Verboven, *Quantification of Damages*, in 3 ISSUES IN COMPETITION LAW AND POLICY 2331–2348, 2332 (ABA Section of Antitrust Law 2008) ("The concept underlying most economic damages assessments is that of the 'but-for' world. In the case of a price-fixing agreement, the but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages.").

3154924.9

framework ascribes the causal effect of the Challenged Conduct as the difference between the observed compensation during the Conduct Period and what the compensation would have been during that period in a world "but-for," or absent, the Challenged Conduct.

109. The fundamental challenge of this exercise, as with any causal question, is that we cannot directly observe the counterfactual but-for world: i.e., what compensation *would have been had the Conduct not occurred*. Thus, to generate an estimate of the causal effect of the Challenged Conduct we need to develop a suitable, observable comparison group that plausibly reflects compensation absent the Conduct. A multivariate regression model is a tool that allows an economist to model what Class Members' compensation would have been but-for the Challenged Conduct. When properly constructed, regression models can produce unbiased estimates of the causal effect of the Challenged Conduct on Class Member compensation, given the compensation data provided by the Defendants and other external sources.[390] The use of regression analysis allows an economist to test the "null hypothesis" that the Challenged Conduct did not have an effect on Class Member compensation beyond what can be explained by competitive factors.[391] Indeed, the Federal Judicial Center's *Reference Manual on Scientific Evidence* explains that multiple regression analysis is "a well-accepted scientific

---

[390] *See, e.g.*, JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH, 68 (South-Western 5th ed. 2013) [hereafter WOOLDRIDGE] 68 ("Multiple regression analysis is more amenable to ceteris paribus analysis because it allows us to *explicitly control* for many other factors that simultaneously affect the dependent variable." (emphasis in original)). *See also* Carlos Cinelli et al., *A crash course in good and bad controls*, 53 SOCIOLOGICAL METHODS & RESEARCH 1–30 (2022) [hereafter Cinelli et al. (2022)].
[391] WOOLDRIDGE at 121–123.

methodology."[392] A key advantage of multiple regression analysis is that it "distinguishes among a number of competing factors . . . allowing the court to isolate a key relationship[.]"[393]

110.    Regressions work by making comparisons between observations. For example, a simple regression might compare average annual compensation of Class Members during the Conduct Period to average annual compensation after the Conduct Period. In order for us to believe that this simple comparison estimates the causal effect of the Conduct, we have to believe that annual compensation after the Conduct Period reflects the "but-for" compensation in a world where the Conduct did not happen but everything else remained the same. This simple comparison is unlikely to deliver causal estimates. Suppose, for example, that inflation rose after the Conduct Period, and that Class Members received cost of living adjustments to account for the increased inflation. Then, compensation during the Conduct Period may be lower than the total compensation after the Conduct Period, simply because of the differences in inflation, and not because the Challenged Conduct suppressed compensation. In statistical parlance, we would refer to inflation here as a confounder, which is a variable that, unless properly accounted for, creates bias in our estimate of the effect of the Challenged Conduct. The role of multivariate regression analysis is to control for such confounders and thus isolate the effect of the Challenged Conduct from confounding factors.

---

[392] FED. JUD. CTR., NAT'L RSCH. COUNCIL, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 308 (3rd ed. 2011) [hereafter REFERENCE MANUAL] ("Because multiple regression is a well-accepted scientific methodology, courts have frequently admitted testimony based on multiple regression studies[.]").

[393] Johnathan Baker & Daniel Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique,* 1 AM. LAW & ECON. REV. 386, 388 (1999) ("Empirical methods can help courts identify what happened and why. This can often be accomplished through a multiple regression analysis that distinguishes among a number of competing factors that were correlated with a fact pattern—allowing the court to isolate a key relationship or critical influence using models that describe the statistical relationship between one variable and a number of others.").

### B. Data Summary

111. Defendants produced a variety of data, including employee pay data and "teammate" data. The pay data includes employees' gross pay for a given date/year by payment type. The payment types in the pay data include regular salaried or hourly payments, bonuses, and sick pay, among others. Each Defendant firm also provided a dollar amount for stock payments. This payment appears to be the market value of the stock at the date it was issued.[394]

112. From the pay data, I calculate the total gross compensation. I use gross compensation because it is available for all three Defendant firms. Total compensation is defined using all available payment sources, including the employee's salary, bonuses, stocks, and all other pay. In robustness checks I consider alternative measures of compensation, such as subtracting out stock payments or looking at hourly compensation.[395]

113. While SCA and USPI provided pay data on a daily level, DaVita supplied pay data on an annual level. Therefore, to properly compare across Defendants, I aggregate the pay data to an annual level for all three Defendant firms. The pay data also includes the job titles held by the employee when they earned the listed pay amount.

114. DaVita and SCA also supplied separate data files with teammate data, which includes employee names, hire and departure dates, and the employees' work locations. USPI supplied the same data within its pay data files. I combine the compensation and teammate data

---

[394] I accept the employee payout to be the dollar value of the stock payments as it is displayed in the pay data.

[395] I understand that the stock amounts present in the pay data include only payments to employees, not unvested stock amounts. While DaVita supplied the unvested amounts, I only consider the realized payments, which are present in the pay data for each Defendant. *See* 2024-12-19 Ltr to S. Zandi re structured data questions from 11-27-24 Ltr (DaVita's response to Plaintiffs' Question 3: . . . "The Stock Option Data reflects stock options awarded to employees. The Payroll Data reflects cash distributed to employees.").

3154924.9

(where applicable) to match a given employee's location and other personal information with their payment amounts and job title. DaVita supplied job "levels," which identified employees as being Directors, Vice Presidents, and Senior Vice Presidents (among other levels). I use key terms to classify job titles into comparable levels for SCA and USPI.[396] I combined the available data with publicly available sources, such as Federal Reserve Economic Data (FRED) at the Federal Reserve Bank of St. Louis, to obtain variables such as real GDP. A complete description of the Defendant-supplied data used, the publicly available data used, and my data processing work is provided in Appendix E.

115. I use the resulting data set, at the individual-company-year level as my main dataset. Note that the main dataset for the compensation analysis is limited to employees who worked the full year.[397] The dataset for the mobility analysis I perform in Section V.B.4 is collapsed to the individual-year level and includes employee-years when they worked only part of the year.

116. Below are the summary statistics for my regression dataset.[398] **Figure 5** includes the mean, standard deviation, maximum, and minimum value of each variable in my regression.

---

[396] I use the "Director," "Vice President," and "Senior Vice President" levels to define Senior-Level Employees (after also removing employees from excluded departments). *See* App. E for details.

[397] Employees are considered to work a partial year if they were hired in a given year other than in January or if they left in a given year other than in December. *See* my workpapers for details.

[398] The data is limited to Senior-Level Employees, with excluded departments removed. The data are also limited to 2005 through 2022. While USPI provided some data in 2023, it did not cover the full year (it only contains payments for January and the beginning of February 2023)). Employees who worked only part of a year (considered a partial year if an employee was hired in a given year other than in January, or if an employee left in a given year other than in December) are excluded. Finally, anomalous data points (such as employees who earned less than minimum wage, employees who worked fewer than 50 hours in the year, employees who worked over 5,000 hours in the year, and employees who worked negative hours or earned negative pay) are excluded from the main compensation analysis, but included in the mobility analysis. *See* my workpapers and App. E for details.

3154924.9

For example, the mean total hours worked per year is 2,015.70, while the hours worked per year vary from 51.80 to 3,120.08.

**Figure 5: Defendant Regression Data Summary Statistics**

| Variable | Mean | Standard Deviation | Minimum | Maximum |
|---|---|---|---|---|
| *Total Amount* | $207,737 | $264,930 | $2,719 | $14,847,362 |
| *Avg. State Mgr. Earnings* | $82,855 | $10,586 | $33,857 | $131,245 |
| *State Health Expend. PC* | $6,292 | $1,132 | $3,461 | $10,881 |
| *Covid* | 14.8% | -- | 0.00 | 1.00 |
| *State GDP PC* | $58,516 | $9,208 | $35,609 | $195,485 |
| *State Unemployment Rate* | 5.66 | 2.19 | 1.99 | 13.73 |
| *Census Region Annual CPI* | 2.44 | 0.26 | 1.88 | 3.11 |
| *Total Hours* | 2,015.70 | 316.54 | 51.80 | 3,120.08 |

*Notes:* The standard deviation measures variation (spread) of data around the average. WOOLDRIDGE at 734–36

### C.      Wage Suppression Models

117.    From a conceptual perspective, the ideal comparison would be to compare each individual's compensation during the actual-world Conduct Period to that same individual's counterfactual earnings in a but-for world were the Conduct not to have occurred. Naturally, absent time travel or a crystal ball, it is not possible to observe the counterfactual directly. However, a well-specified empirical model, coupled with variation in the Challenged Conduct, can estimate the causal effect. The broad idea is to mimic the ideal comparison by examining how an individual's total compensation differs during the Conduct Period relative to before it started and after it ended, while adjusting for other relevant factors that might otherwise confound the relationship between the Conduct and total compensation.

118.    Four Components of the Regression Equation. The regression equation has four components: (1) the *dependent* variable, which is the logarithm of total compensation to each worker in a given year; (2) the key *independent* variable, which is an indicator for the Conduct Period; (3) the *control* variables, which collectively control for other factors that may confound

102

the relationship between Conduct and compensation; and (4) an error term that captures residual determinants of earnings. The regression equation is as follows:

$$y_{ict} = \beta_0 + \beta Conduct_{ct} + \lambda X_{ict} + \alpha_{ic} + \epsilon_{ict}$$

I describe each component below:

a.      *First*, the dependent variable of the regression model $y_{ict}$ is the natural logarithm of total compensation of worker $i$ in year $t$ from company $c$. It is standard to use natural logarithms (ln) for compensation in labor economics. This also allows the regression coefficients to be interpreted in (approximate) percentage terms.[399] Note that as a baseline I include in total compensation all compensation provided, including equity compensation.

b.      *Second*, the key variable of interest, $Conduct_{ct}$, measures variation in the Conduct within company $c$ over time $t$. It is an indicator variable equal to zero before the start and after the end of the Conduct for company $c$, and one during the Conduct Period. My review of the evidence in Section V.B and V.C, summarized below, is consistent with a Conduct Period for SCA and DaVita starting May 1, 2008 and through 2019. For USPI and SCA, the evidence is consistent with a Conduct Period of May 1, 2010 through 2019. Given that the data is annualized, the Conduct Period is defined as 2008 to 2019 for DaVita and SCA and 2010 to 2019 for USPI.

i.      *Conduct Period for DaVita and SCA Challenged Conduct.* The qualitative and quantitative evidence presented in Section V.B and V.C suggests that the No-Poach Agreement between SCA and DaVita began in May 1, 2008 and ended in 2019. The evidence also indicates that the No-Poach Agreement had an immediate effect. The evidence

---

[399] WOOLDRIDGE at 234 ("[W]hen log(y) is the dependent variable in a model, the co-efficient on a dummy variable, when multiplied by 100, is interpreted as the percentage difference in y, holding all other factors fixed.").

3154924.9

presented above related to the SCA and DaVita CSI exchanges similarly ended in 2019, but started sometime in 2009. CSI that was exchanged related to *planned* increases in compensation, and thus the effective start date for measuring the impact of the CSI exchanges would be in the year after its exchange, which implies a start date of 2010. Given the start of the No-Poach Agreement preceded the start date of the CSI exchange, and that it had immediate effect, I conclude that the relevant start date of the Challenged Conduct is May 1, 2008 while the end date is December 31, 2019.

ii. *Conduct Period for USPI and SCA Challenged Conduct.* The qualitative and quantitative evidence presented in Section V.B and V.C suggests that the No-Poach Agreement between SCA and USPI began in May 1, 2010 and (fully) ended in 2019. The evidence presented above related to the CSI exchanges between SCA and USPI similarly ended in 2019, but started sometime in 2009. Given that the compensation information that was exchanged related to planned increases in compensation, the effective start date for the impact of the CSI exchanges would be in the year after the exchange, which implies a start date of 2010. Thus, I conclude that the relevant start date of the Challenged Conduct for USPI and SCA is May 1, 2010 while the end date is December 31, 2019.

c. In the equation above, the approximate percent change in compensation associated with the Conduct is given by $\beta_1$.[400] If $\beta_1$ is negative, this implies the Conduct is associated with a reduction in total compensation, holding other factors constant. If the coefficient has a low p-value (typically lower than 10 percent), then we can reject the null

---

[400] The exact percent change is given by $e^{\beta_1} - 1$. *See, e.g.*, *FAQ*, UCLA STATISTICAL METHODS & DATA ANALYTICS, https://stats.oarc.ucla.edu/other/mult-pkg/faq/general/faqhow-do-i-interpret-a-regression-model-when-some-variables-are-log-transformed/ (last visited Jan. 9, 2025).

hypothesis that there is no relationship between the Conduct and total compensation, and we say that the estimate is statistically significant.

d. *Third,* control variables in the model ($X_{ict}$ and $\alpha_{ic}$) account for other factors that might confound the effect of the Conduct on total compensation. By holding these other factors fixed, the regression isolates the impact of the Challenged Conduct on total compensation. Note that, although this is sometimes confused, it is *not* the goal of control variables to maximize how much variance can be explained in the dependent variable. Rather, some controls are "bad controls" and should be excluded because they induce bias or reduce precision, while others are "good controls" because they either reduce bias and/or increase precision.[401] Broadly speaking, good controls are ones that block non-causal pathways (e.g., confounders), leave mediating paths untouched, do not open new spurious pathways (e.g., colliders), and/or increase the precision of the estimate (so long as they do not induce bias).

119.     Two Baseline Control Variables. I select two baseline control variables to mimic the ideal comparison described above:

a. *First*, I include *individual fixed effects* to mimic the ideal comparison. Inclusion of individual fixed effects means the regression model compares the same worker during and absent the Conduct Period. As a result, identification of the Conduct coefficient derives only from workers who are present both during and absent (e.g., either before or after) the Conduct. The inclusion of individual fixed effects also ensures that any characteristics that are inherent to an individual (e.g., a superior negotiation ability) do not drive the Conduct

---

[401] *See generally*, NICK HUNTINGTON-KLEIN, THE EFFECT: AN INTRODUCTION TO RESEARCH DESIGN AND CAUSALITY, Chapter 8 (2021). *See also* Cinelli et al. at 1–30, 1–2 (2022).

3154924.9

coefficient.[402] In my later discussion of "bad controls," I describe why I later modify these fixed effects to be individual-by-company fixed effects.[403]

b. *Second,* because the Conduct effect is identified by comparing the same worker at different points in time (during vs. absent the Conduct), it is natural for individuals to have different earnings at different time periods. To address this, I include a *linear time trend*. This time trend accounts for the natural growth in annual compensation that would have happened over time even absent the Conduct.[404]

120. <u>Other Control Variables.</u> I next select other control variables to address geographic differences in pay, macro-economic factors, and healthcare-specific factors that might otherwise confound the Conduct estimate. These include:

a. *Zip Code Fixed Effects*: Class Members who work in different locations could plausibly earn different amounts just because of local pay differences. Indeed, the Defendant firms do seem to take into account geography when determining compensation.[405] For example, if workers move from rural settings to urban settings their compensation may rise. To account for these geographic differences, I account for fixed differences in total compensation that relates to geographic differences by including zip code fixed effects. In other words, this control makes sure that fixed, location-specific differences in pay do not confound the Conduct coefficient.

---

[402] That is, control variables do not contribute to the Conduct coefficient. Rather, the effects of control variables are purged from the Conduct variable and the dependent variable, per the Frisch-Waugh-Lovell theorem.

[403] *See* VI.C, *infra*.

[404] *See, e.g.*, WOOLDRIDGE at 363 ("Many economic time series have a common tendency of growing over time. We must recognize that some series contain a time trend in order to draw causal inference using time series data.").

[405] *See* Section VII.F.1, *infra*, for evidence that companies adjusted compensation based on location.

106

3154924.9

b.      *The Consumer Price Index at the Census region-year level*: While zip code fixed effects account for fixed regional differences in pay and local prices, regional inflation differences may confound the Conduct estimate if increases in the cost of living are passed on to workers in the form of higher nominal wages. Accordingly, I control for price levels at the most disaggregated level possible (the Census region-year level).

c.      *Unemployment Rate and the Real Gross Domestic Product Per Capita at the state-year level*: Prior research suggests that compensation changes along with macroeconomic business cycles.[406] If, in our comparison of the same worker during vs. absent the Conduct, unemployment were to fall or local GDP to rise then this could plausibly confound the Conduct estimate. Accordingly, I control for the natural log of unemployment and the natural log of GDP per capita at the state-year level, which purges from the Conduct estimate any changes in compensation due to changes in the business cycle.

d.      *An indicator for the timing of the COVID-19 pandemic*: This binary variable takes the value of one for the years 2020 and 2021, and zero otherwise.[407] The COVID-19 pandemic dramatically altered the supply and demand for labor broadly, as businesses closed

---

[406] On the procyclicality of wages, *see* Gary Solon et al., *Measuring the cyclicality of real wages: how important is composition bias?*, 1 QUARTERLY J. ECON 1 (1994). On the effects of entering the labor market during a recession *see* Hannes Schwandt & Till Von Wachter, *Unlucky cohorts: Estimating the long-term effects of entering the labor market in a recession in large cross-sectional data sets*, 37 J. LABOR ECON. S161 (2019).

[407] Even though the national public health emergency declaration related to the COVID-19 pandemic was not officially declared over in the US until May 2023, *Fact Sheet*, U.S. DEPT. HEALTH & HUMAN SERVS. (May 9, 2023), https://www.hhs.gov/about/news/2023/05/09/fact-sheet-end-of-the-covid-19-public-health-emergency.html, I do not include the year 2022 in the COVID indicator variable because, per a 2022 Johns Hopkins review: "In 2022, COVID-19 illness was less severe and less deadly compared to 2020 and 2021, and no new variant has emerged with the capacity to fuel a major wave of cases." Jackie Powder, *COVID-19 in 2022: A Year-End Wrap-Up*, JOHNS HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH (Dec. 15, 2022), https://web.archive.org/web/20240620113903/https://publichealth.jhu.edu/2022/covid-year-in-review.

3154924.9

and workers were laid off in large numbers.[408] It also had specific impacts in medical employment given the physician shortages nationwide and the challenges of working in a medical field during global pandemic.[409] If I did not control for the timing of COVID, the changes in the labor market created by the COVID pandemic might otherwise confound the Conduct estimate.

121.    Healthcare-Specific Controls. The next set of controls ensures that trends specific to the healthcare industry do not confound the relationship between the Conduct and total compensation. These healthcare-specific controls include:

a.      *Average annual earnings of managers in the healthcare field at the state-year level*: This controls for a baseline level of managerial earnings in the industries represented by the Defendant firms. If earnings in the labor market for managerial work in healthcare changed during vs. before/after the conduct, then Defendants might also have adjusted Class Member earnings even absent the Conduct.[410]

b.      *Healthcare services personal consumption expenditure per capita by state-year*: Similar to the macroeconomic controls, the goal of this control variable is to hold fixed consumer spending on healthcare services, which might otherwise drive managerial earnings. For example, if changes in demand for healthcare are passed on to workers then this could affect their total compensation and thus confound the Conduct estimate.

---

[408] *See* Pedro Brinca et al., *Measuring labor supply and demand shocks during COVID-19*, EUROPEAN ECONOMIC REVIEW 1 (2021) ("Most sectors were subject to large negative labor supply and demand shocks in March and April 2020[.]").

[409] Karen Shen et al., *Job flows into and out of health care before and after the COVID-19 Pandemic*, 5 JAMA HEALTH FORUM 1 (2024).

[410] Because the Defendants comprise a small portion of total managers in healthcare, I do not expect the inclusion of this control to materially control for the effects of the Conduct itself. And even if it does, the empirical strategy captures deviations from this earnings of other managers, biasing the Conduct estimate towards zero.

3154924.9

122. Finally, because the data are *annual* compensation data, the workers who work only part of the year or part-time may seem to have low *annual* compensation. In the main sample I have already limited the data to full-year employees, but this does not address those who work only part-time. Thus, if a worker moves to part-time work, then the individuals may appear to have low *annual* earnings simply because they are working fewer hours. Accordingly, I control for the *logarithm of total hours* worker $i$ spent working in company $c$ in year $t$.

123. <u>Control Variable Considerations.</u> There are two important notes to consider as it relates to the control variables.

a. *First*, in reviewing the regression output, it is important *not* to over-interpret the relationship between the control variables and the dependent variable. This is because, as Hünermund and Luow (2023) point out, "the estimated effect sizes of controls are unlikely to have a causal interpretation themselves . . . This is because even valid controls are possibly endogenous and represent a combination of several different causal mechanisms operating jointly on the outcome, which is hard to interpret[.]"[411] In other words, the empirical specification is designed to interpret only *one* coefficient causally: the Conduct coefficient. Were I trying to estimate the causal effect of one of the control variables, the empirical specification would necessarily change, and it is likely that the coefficient on the control variables would change too.

b. *Second*, it is important to emphasize why some control variables are *omitted* from the regression. Based on the literature and my own editorial experience, the idea that potential control variables should be omitted from a model is not widely known. Indeed, a

---

[411] Paul Hünermund & Beyers Louw, *On the nuisance of control variables in causal regression analysis*, ORGANIZATIONAL RSCH. METHODS 138 (2023).

3154924.9

recent paper by Cinelli, Forney, and Pearl (2022) on good and bad controls notes that it is not uncommon for empirical researchers to "get the impression that adding 'more controls' to a regression model is always better."[412] This is likely because, as they note, "While most of the widely adopted textbooks discuss the problem of omitting 'relevant' variables, they do not provide guidance on deciding which variables are relevant, nor which variables, if included in the regression could induce, or worsen existing biases."[413] Variables that, when included in the regression, induce bias are known as "bad controls." Bad controls operate by closing mediating pathways between the Conduct and compensation, open non-causal pathways, or (assuming they do not increase bias) otherwise reduce precision.

      c.      What does it mean for a variable to "close a mediating pathway" and thus be a bad control? Mediating pathways are the causal pathways that link the independent variable of interest and the outcome but go through a third variable (called a "mediator"). A classic example of why controlling for a mediator (which closes the pathway) induces bias is from the literature on gender discrimination at work.[414] It is often the case that women earn less than men in the same company, and a potential explanation for this finding is that women are discriminated against. In its defense, a company may look within certain job titles and show that the discrepancy in pay between men and women within those jobs is much smaller than it is at the company overall. The problem with this approach, however, is that, while it may be true that there is no gender discrimination in pay *within* an occupation, the discrimination might be operating by preventing women from getting into those jobs in the first place. For example, it is

---

[412] Cinelli et al. (2022) at 2.

[413] *Id.*

[414] *See* the discussion in Section 3.1.5 in SCOTT CUNNINGHAM, CAUSAL INFERENCE: THE MIXTAPE (2021), https://mixtape.scunning.com/03-directed_acyclical_graphs.

3154924.9

well known that women are underrepresented in top management teams. Thus, by looking within a certain occupation, it may not be surprising that you see less evidence of discrimination because by looking in certain occupations we are in fact controlling for the discrimination that we were seeking to find. Put differently, in this example, occupation is a "bad control."

        d.      The logic of this example holds in this case as well, where we are interested in how the Conduct affects Total Compensation. There are many causal mediating pathways that link these two variables, and we should *not* in general control for those mediators. For example, as in Lipsitz and Starr (2022) in the case of noncompete clauses, and as supported by the qualitative evidence regarding the No-Poach Agreements, suppose that Conduct prevents workers from getting promotions to higher-paying jobs (because the company doesn't face as much labor market competition for the worker). Then, like in the discrimination example above, the *job* the worker has is an outcome of the Conduct, and lies on a causal pathway between the Conduct and total compensation. As a result, controlling for the job either directly or by limiting the sample to certain jobs induces bias in the estimates by closing off a causal pathway that connects the Conduct and compensation. Thus, several variables that one might think *should* be controlled for are omitted from the main empirical specification. In addition to the worker's job title, I describe several such "bad controls" briefly.

        e.      Similar to a worker's job title, it may seem natural to include a worker's *tenure* as a control variable, because workers with longer tenures are also likely to receive higher earnings. However, if one effect of the Conduct is to reduce the likelihood that a worker will leave, and mobility has an effect on compensation, then longer tenure is an *outcome* of the Conduct (a lack of mobility), and thus conditioning on tenure would close the mediating pathway between the Conduct, tenure, and compensation, resulting in biased estimates.

f.      One might also conceive that *company performance* should be controlled for, because workers may receive bonuses tied to company performance. However, if the Conduct affects company performance, and company performance affects total compensation, then controlling for company performance closes off this causal pathway between the Conduct and earnings.[415]

g.      In the same vein, given that the Conduct was designed to prevent workers from moving between Defendant companies—and was successful at doing so per the mobility analysis in Section V.B.4—then even which *company* a worker works at is a bad control. For example, if absent the Conduct a worker would have changed employers and received a large raise, then the company a worker works for lies on a pathway between the Conduct and total compensation. Thus, if our goal is to estimate the aggregate of the effect of the Conduct, then we should not limit the data to a single company, and we should not control for a worker's employer because it is a "bad control."

h.      I initially follow the approach of not controlling for a worker's employer for this reason. However, because the ultimate goal of the empirical exercise is to consider whether *all or nearly all* Senior-Level Employees were commonly harmed by the Conduct, I want to ensure that my estimates are not driven *only* by those who move between companies. That is, I want to explicitly estimate harm that occurred even for those who did not change employers. Thus, I violate the "bad control" rules in this instance and in my preferred model I include individual-by-company fixed effects. Because the inclusion of individual-by-company

---

[415] Alternatively, if total compensation is an input to company performance (depending on the measure used) then company performance would be a collider (a collider is a variable that is affected by both the Conduct and total compensation) and should be omitted because conditioning on a collider creates bias. Cinelli et al. (2022) at 3.

3154924.9

fixed effects identifies the Conduct effect by leveraging comparisons of the same individual within the same company, during vs. absent the Conduct, it rules out the possibility that the Conduct effect is driven only by the movers. In the empirical model specified above, $\alpha_{ic}$ are individual-by-company fixed effects for individual $i$ working at company $c$.

124. <u>Clustering in the Standard Errors.</u> While the discussion above relates to control variables and how they might reduce bias in the Conduct estimate, it is also important to emphasize clustering in the standard errors, because it relates to the issue of statistical significance.

a. Because individual earnings are likely to be serially correlated, I cluster the standard errors at the individual level. This allows the error term to be arbitrarily correlated within an individual over time, when estimating the standard error of the coefficient estimate (which is the key input to computing the p-value of that coefficient estimate).

b. However, it also implies that limiting the sample to a few individuals (even if the number of individual-year observations is large), will produce imprecise estimates or even be undefined. This is because, when the intra-class correlation is large (i.e., when one observation within an individual is highly informative of the other observations of that individual), clustering the standard errors by individual limits the *effective* sample size to the number of individuals in the sample (as opposed to the number of individual-year observations).[416]

---

[416] *See, e.g.*, Shersten Killip et al., *What is an intracluster correlation coefficient? Crucial concepts for primary care researchers*, 2 ANNALS OF FAMILY MED. 204–208, 204 (2004). *See*

3154924.9

125.    <u>Defendant-Specific Conduct Variables.</u> Finally, in the empirical models below, I keep the complete dataset in all analyses, rather than limiting the data to a single company. The reason behind this is twofold: First, the pooled model allows for the Conduct coefficients to be identified in part from the same individuals being present in multiple companies, whereas this is not the case when limiting the sample to a single company. This is important because part of the effect of the Conduct is to affect whether workers move across these companies. Second, the pooled model improves identification of the coefficients on the control variables when they are identified based on all of the observations in the data. Nevertheless, in order to estimate a model that includes all Senior-Level Employees while generating Defendant-specific estimates, I modify the main specification to include Defendant-specific Conduct variables. In particular:

a.    *DaVita Conduct$_{ct}$* is an indicator set to 1 if the Class Member works at DaVita between 2008 and 2019, and is set to 0 otherwise.

b.    *SCA Conduct$_{ct}$* is an indicator set to 1 if the Class Member works at SCA between 2008 and 2019, and is set to 0 otherwise.

c.    *USPI Conduct$_{ct}$* is an indicator set to 1 if the Class Member works at USPI between 2010 and 2019, and is set to 0 otherwise.

d.    The estimating equation for the model that delivers Defendant-specific wage suppression estimates is the same as above, except that instead of a common Conduct variable it includes a separate conduct variable for each Defendant, for a total of three:

---

*also Intraclass Correlation Coefficient Cheat Sheet*, NIH COLLABORATORY (Mar. 15, 2020), https://dcricollab.dcri.duke.edu/sites/NIHKR/KR/Intraclass_Correlation_Coefficient_Cheat_She et_March_15_2020.pdf ("When this is the case, the data from one member of the cluster provides almost as much information as if all of the members are included. Hence, the effective sample size is closer to the number of clusters as opposed to the entire sample size of study participants.").

3154924.9

$$y_{ict} = \beta_0 + \beta_1 DaVitaConduct_{ct} + \beta_2 SCAConduct_{ct} + \beta_3 USPIConduct_{ct}$$

$$+\lambda X_{ict} + \alpha_{ic} + \epsilon_{ict}$$

In this specification $\beta_1$ represents the (approximate) percentage effect of the DaVita Conduct on total compensation, $\beta_2$ represents the (approximate) percentage effect of the SCA Conduct, and $\beta_3$ represents the (approximate) percentage effect of the USPI Conduct.

126. Below I present the main regression models, iteratively adding control variables to build up to the main specification. I later consider several robustness checks to ensure the stability of these results to various alternative specifications.

### 1. Aggregate Suppression Model

127. **Figure 6** reports the results for the sample of Directors and above, building up to the main specification. In a model with only individual fixed effects and a year trend, the regression estimates aggregate wage suppression of 9.5 percent (Column 1). Including the geographic, macroeconomic, and healthcare controls in Column (2) indicates wage suppression of 12.1 percent. Next, adding the natural log of total hours worked as a control results in a wage suppression estimate of 14.6 percent in Column (3). Finally, including individual-by-company fixed effects (as opposed to individual fixed effects) in Column (4) results in an aggregate wage suppression estimate of 14.5 percent. The R-squared in the final model is 0.856, indicating that the model explains approximately 85.6 percent of the variation in (log) total compensation. The existence of wage suppression as a result of the Conduct is consistent with the existence of the Challenged Conduct, and that the Challenged Conduct is anticompetitive and inconsistent with unilateral conduct.

115

**Figure 6: Aggregate Effect of Conduct on Earnings for Directors and Above**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Conduct | -0.100*** | -0.129*** | -0.158*** | -0.157*** |
| | (0.00749) | (0.0120) | (0.0117) | (0.0117) |
| **% Wage Suppression** | **-9.5%** | **-12.1%** | **-14.6%** | **-14.5%** |
| | | | | |
| Year | 0.0521*** | 0.0538*** | 0.0525*** | 0.0522*** |
| | (0.00160) | (0.00437) | (0.00377) | (0.00379) |
| Ln(Avg. State Mgr. Earnings) | | 0.0316 | -0.00709 | -0.00242 |
| | | (0.0246) | (0.0198) | (0.0197) |
| Ln(State Health Expend. PC) | | 0.0708 | 0.0516 | 0.0521 |
| | | (0.123) | (0.110) | (0.110) |
| Covid | | -0.0500*** | -0.0521*** | -0.0496*** |
| | | (0.0157) | (0.0139) | (0.0139) |
| Ln(State GDP PC) | | -0.0704 | -0.128 | -0.153 |
| | | (0.132) | (0.123) | (0.124) |
| Ln(State Unemployment Rate) | | 0.00192 | -0.0273* | -0.0288* |
| | | (0.0172) | (0.0162) | (0.0163) |
| Census Region Annual CPI | | -0.0423 | -0.0698 | -0.0582 |
| | | (0.0672) | (0.0604) | (0.0604) |
| Ln(Total Hours) | | | 0.569*** | 0.570*** |
| | | | (0.0267) | (0.0270) |
| Individual FE | Yes | Yes | Yes | No |
| Individual-Company FE | No | No | No | Yes |
| Location FE | No | Yes | Yes | Yes |
| Observations | 27,676 | 27,047 | 27,047 | 27,010 |
| R-squared | 0.787 | 0.808 | 0.856 | 0.856 |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

128. To visualize the aggregate results presented above, **Figure 7** below presents the unconditional and conditional trends in Ln(Total Compensation) for Senior-Level Employees, using 2017 as a reference year. Recall that changes in Ln(Total Compensation) from one year to the next can be interpreted in approximate percentage terms. The unconditional trends reveal a broadly upward sloping trend in Ln(Total Compensation) over time, though the trend has been largely flat since 2015. However, because the unconditional trends do not account for the control variables described above, they do not isolate the effect of the Conduct on Ln(Total Compensation) from other factors that might cause compensation to vary. In contrast, the bottom panel repeats the same analysis but now conditions on the control variables in the fully saturated

116

model (in column 4 of **Figure 6**). In contrast to the top panel, Ln(Total Compensation) indicates more of a U-shaped relationship, where the compensation is lower during the Conduct relative to either before or after. Perhaps most clearly, following the end of the Conduct in 2019, there is a sustained rise in compensation, corresponding to the exact time frame that mobility between the Covered Defendants spikes in **Figure 4** above.

**Figure 7: Unconditional and Conditional Trends in Ln(Total Compensation) for Directors and Above, Relative to 2017**



### 2. Defendant-Specific Suppression Model

129. **Figure 8** replicates the structure of **Figure 6**, but instead of imposing a common Conduct effect on each Defendant, it allows each Defendant to have its own Conduct effect. The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Directors and above was to reduce total compensation by 17.2 percent at DaVita, 13.9 percent at

3154924.9

SCA, and 12.0 percent at USPI as shown in Column (4). The final model explains 85.7 percent

of the variation in total compensation.

3154924.9

**Figure 8: Defendant-Specific Effect of Conduct on Earnings for Directors and Above**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| DaVita Conduct | -0.135*** | -0.186*** | -0.189*** | -0.188*** |
| | (0.0116) | (0.0154) | (0.0145) | (0.0145) |
| **% Wage Suppression** | **-12.7%** | **-17.0%** | **-17.2%** | **-17.2%** |
| | | | | |
| SCA Conduct | -0.115*** | -0.161*** | -0.145*** | -0.149*** |
| | (0.0149) | (0.0200) | (0.0175) | (0.0177) |
| **% Wage Suppression** | **-10.9%** | **-14.9%** | **-13.5%** | **-13.9%** |
| | | | | |
| USPI Conduct | -0.0395*** | -0.0721*** | -0.130*** | -0.128*** |
| | (0.0112) | (0.0141) | (0.0141) | (0.0142) |
| **% Wage Suppression** | **-3.9%** | **-7.0%** | **-12.2%** | **-12.0%** |
| | | | | |
| Year | 0.0508*** | 0.0531*** | 0.0517*** | 0.0514*** |
| | (0.00167) | (0.00439) | (0.00380) | (0.00381) |
| Ln(Avg. State Mgr. Earnings) | | 0.0299 | -0.00442 | -0.000381 |
| | | (0.0246) | (0.0197) | (0.0197) |
| Ln(State Health Expend. PC) | | 0.210* | 0.132 | 0.134 |
| | | (0.124) | (0.111) | (0.111) |
| Covid | | -0.0646*** | -0.0521*** | -0.0513*** |
| | | (0.0164) | (0.0143) | (0.0144) |
| Ln(State GDP PC) | | -0.139 | -0.226* | -0.242* |
| | | (0.139) | (0.128) | (0.130) |
| Ln(State Unemployment Rate) | | 0.00491 | -0.0314* | -0.0318* |
| | | (0.0177) | (0.0165) | (0.0166) |
| Census Region Annual CPI | | -0.126* | -0.0925 | -0.0861 |
| | | (0.0692) | (0.0616) | (0.0617) |
| Ln(Total Hours) | | | 0.567*** | 0.568*** |
| | | | (0.0267) | (0.0270) |
| Individual FE | Yes | Yes | Yes | No |
| Individual-Company FE | No | No | No | Yes |
| Location FE | No | Yes | Yes | Yes |
| Observations | 27,676 | 27,047 | 27,047 | 27,010 |
| R-squared | 0.788 | 0.809 | 0.856 | 0.857 |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 3.      Robustness Checks

130.    In robustness checks, presented in Appendix D, I consider several other specifications and sample restrictions to ensure the results presented above are robust to deviations from the baseline setup provided above. I summarize these briefly.

3154924.9

a.      Given that the economic literature suggests that no-poach agreements can suppress various types of compensation, including salary and stock-based compensation, in **Figure 26** and **Figure 27** I show that the results are robust to using different measures of compensation, including total compensation minus stocks, regular plus other pay, and hourly wages.

b.      In **Figure 28**, I use an alternative approach to estimating the effect of the Conduct called a Poisson regression. Some advocate for using a Poisson regression instead of least squares regression (the regression framework employed previously) because it is better at handling situations when the natural logarithm of the outcome variable is zero.[417] While annual compensation in the main sample does not include zero, I nevertheless confirm that the results are robust to Poisson regressions.

c.      In **Figure 29,** I allow for the fact that Defendants may respond differentially to control variables (e.g., Defendants might give different cost of living adjustments for the same level of inflation). I account for these potential differences by interacting control variables with company-indicators.[418]

d.      Even though they are bad controls, as discussed above, in **Figure 30** I show the results are nevertheless robust to controls for tenure and job title fixed effects.

---

[417] Chen, J. and Roth, J., *Logs with zeros? Some problems and solutions*, QUARTERLY J. ECON.1–22, 1 (2024).

[418] Note that fully interacting company indicators with all controls is equivalent to a subsample approach where we limit the sample to a given firm. Given the need to allow for workers to contribute to the Conduct estimates at multiple firms simultaneously (because part of the effect of the Conduct is to change where people work), I disfavor this particular approach.

120

e.  Some may worry that including the COVID years at all may bias my results. While I include a control for COVID in my main specification, an alternative approach is to drop the COVID years altogether. I do that in **Figure 31** and find consistent results.

f.  The main sample excluded those who worked only part of the year because it then systematically underestimates *annual* earnings. Nevertheless, in **Figure 32** I show that the results are robust, even including employees who work only part of the year.

g.  In the main sample I had excluded certain anomalous observations.[419] In **Figure 33** I include these outlier observations to ensure that the results are robust to including them in the sample.

h.  Because Defendants did not provide a harmonized time frame for their compensation data, some of the point estimates derive from using data from different time periods. **Figure 34** shows that the results are robust to harmonizing the time frame of the data across Defendants (i.e., 2008 to 2022).

i.  Because individual fixed effects rely on comparisons of the same individual during and absent the Conduct, in the main specification there may be Senior-Level Employees who are not contributing to the Conduct estimate. To ensure the results are similar when all Class Members are included, I pursue two approaches. I first show that the results are robust to dropping the individual-by-company fixed effects (**Figure 35**). Second, instead of a fixed effects model, I use a random effects models, which reflects a weighted average of the individual-fixed effects model and the "pooled" model (**Figure 36**).[420]

---

[419] Outliers dropped include observations such as employees who earned less than minimum wage, employees who worked fewer than 50 hours in the year, employees who worked over 5,000 hours in the year, and employees who worked negative hours or earned negative pay. *See* my workpapers for details.

[420] WOOLDRIDGE at 492–496.

3154924.9

131. Across all of these robustness checks, while the estimates vary to some degree (as expected), they are all broadly similar in that the relationship between the Conduct and compensation is negative, statistically significant, and similarly sized across all fully saturated specifications, both overall and for each Defendant. These robustness checks demonstrate that the wage suppressing effects found by the model are not an artifact of the specific model I construct and provide additional confidence that the econometric modeling is detecting a true suppression of employee wages.

### 4. Sensitivity to Unobservable Variables

132. The multivariate regression models above are designed to compare the same worker in the same company during the Conduct Period to themselves in the same company at a time when the Conduct is not present, while controlling for potential confounding variables that might otherwise create a spurious relationship between the Conduct and compensation. While the model includes many control variables that reduce the likelihood of identifying a spurious relationship, it is not possible to include all such control variables. Thus, a remaining question is whether the estimates above are susceptible to "omitted variable bias," which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation. To assess the potential for unobserved variables to be responsible for the observed relationships above, I deploy an approach designed to not only account for such omitted variables, but also to plausibly provide a lower-bound estimate of the effect of the Challenged Conduct on Class compensation.

133. The idea behind the analysis is to compare Class Members (Senior-Level Employees, i.e., employees at the Director-level and above) to the next-highest level of workers within each company (Managers). These Managers are excluded from the Class because the documentary evidence suggests that the Conduct was *primarily* targeted to employees at the

122

3154924.9

Director-level and above. However, if there are unobserved variables that are responsible for the Conduct effect, but Manager compensation is similarly affected by such unobserved variables, then by taking the difference between Class Member compensation and Manager compensation in a given company-year, we can difference out the effects of those unobserved variables. The downside to this approach is that Managers may also be directly or indirectly affected by the Conduct via intra-firm pay structures (as suggested by the empirical results in Section VII.F). In that case, differencing between Class Members and Managers will provide *a lower bound* estimate of the effect of the Conduct on Senior-Level Employees.

134.    To implement this empirical approach, I return to my primary empirical model from **Figure 6**, but now include Managers in the sample. I then add an interaction between the Conduct and whether the worker is a Senior-Level Employee, as well as an indicator for being a Senior-Level Employee. In these models, the coefficient on the Conduct variable reflects the influence of the Conduct on Managers, while the interaction term reflects how the Conduct affects Senior-Level Employee compensation *above and beyond* how the Conduct affected Manager compensation. To further mitigate the possibility of omitted variables, I include in this specification company-by-year fixed effects, which ensures that the Conduct coefficient is being identified by comparing Director and above and Manager compensation *in the same firm-year.*[421] The inclusion of these fixed effects subsumes the main Conduct effect, but not the differential effect for Class Members.

135.    **Figure 9** shows the results. Columns (1) and (2) look at the overall Conduct effect, and find that not only is Manager compensation negatively affected by the Conduct (by

---

[421] Note that this set of fixed effects is not possible to include in the baseline model because it would subsume the Conduct effect, which only varies at the company-year level.

123

approximately -3.3 percent), but that Class Members are harmed above and beyond Managers by 9.0 percent. Breaking the results down by Defendant in columns (3) and (4) reveals similar patterns at play for each Defendant firm. For each company not only are Managers harmed by the Conduct, but Class Members are harmed above and beyond Managers, with the additional harm ranging from 6.8 percent to 9.6 percent. Because Managers appear to be harmed by the Conduct (though to a lesser degree), these estimates represent a very conservative level of wage suppression for Senior-Level Employees.

136. Taken together, the quantitative analysis I performed in this section finds that the Challenged Conduct suppressed compensation by, on average 14.5 percent, including from 12.0 percent to 17.2 percent at each Defendant. I performed a bevy of robustness checks to ensure that the final empirical model and results are robust to various alternative specifications and empirical considerations. Finally, I generate a lower bound estimate of compensation suppression which also accounts for the influence of unobserved variables by comparing Senior-Level Employees to Managers. This evidence suggests that Managers were indeed harmed by the Challenged Conduct, but that Senior-Level Employees were harmed 6.8 to 9.6 percent more than Managers.

124

3154924.9

**Figure 9: Directors Are More Strongly Affected By Conduct Than Managers**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
| --- | --- | --- | --- | --- |
| *Baseline Category: Managers* | Overall | | By Defendant | |
| | [1] | [2] | [3] | [4] |
| Conduct (Managers) | -0.0331*** | | | |
| | (0.00495) | | | |
| Conduct*1(Directors & Above) | -0.0939*** | -0.0909*** | | |
| | (0.00718) | (0.00744) | | |
| **Lower Bound Suppression %** | **-9.0%** | **-8.7%** | | |
| | | | | |
| DaVita Conduct (Managers) | | | -0.0356*** | |
| | | | (0.00488) | |
| DaVita Conduct*1(Directors & Above) | | | -0.0973*** | -0.0972*** |
| | | | (0.00959) | (0.00921) |
| **DaVita Lower Bound Suppression %** | | | **-9.3%** | **-9.3%** |
| | | | | |
| SCA Conduct (Managers) | | | -0.0565*** | |
| | | | (0.0109) | |
| SCA Conduct*1(Directors & Above) | | | -0.0700*** | -0.0800*** |
| | | | (0.0124) | (0.0125) |
| **SCA Lower Bound Suppression %** | | | **-6.8%** | **-7.7%** |
| | | | | |
| USPI Conduct (Managers) | | | -0.0206** | |
| | | | (0.00866) | |
| SCA Conduct*1(Directors & Above) | | | -0.101*** | -0.0777*** |
| | | | (0.0134) | (0.0124) |
| **USPI Lower Bound Suppression %** | | | **-9.6%** | **-7.5%** |
| | | | | |
| 1(Directors & Above) | 0.248*** | 0.239*** | 0.248*** | 0.240*** |
| | (0.00952) | (0.00913) | (0.00980) | (0.00919) |
| Healthcare, Macro, Hours | Yes | Yes | Yes | Yes |
| Individual-Company FE | Yes | Yes | Yes | Yes |
| Location FE | No | Yes | No | Yes |
| Observations | 81,698 | 81,698 | 81,698 | 81,698 |
| R-squared | 0.908 | 0.915 | 0.908 | 0.915 |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

## VII.    Common Impact

137.    In Section VI, I demonstrated that the Challenged Conduct suppressed wages for Class Members at each of the Defendant firms in the aggregate. In this section, I demonstrate that the generalized wage suppression found above impacted all or nearly all Class Members.

125

138.     I use <u>six</u> independent and complementary methods to demonstrate that the generalized wage suppression found by the regression in Section VI would harm all or nearly all Class Members. The first two approaches extend the regression models developed in Section VI to analyze logical subgroupings of employees. The next three approaches use common econometric methods to generate *individual-specific* estimates of harm. The final method demonstrates the existence of an intra-firm compensation structure which could transmit harm to all Class Members within that structure. I describe each approach briefly.

139.     *First*, I use a similar regression model to those developed in Section VI to examine the extent of wage suppression for natural subgroupings of Class Members at each firm. I find that Directors experienced wage suppression of 13.1 percent, while Vice Presidents and Senior Vice Presidents experienced wage suppression of 17.1 percent. The fact that natural subgroupings of Class Members reveal similar (or even more) wage suppression as a result of the Conduct is consistent with generalized harm across the Class, even though conditioning on the job level is a "bad control."

140.     *Second*, to avoid the bad control problem from conditioning on specific job levels in the prior analysis, and to get a better perspective on how the Conduct affects Class Members at different points in the compensation distribution, I perform *quantile regressions* of employees at different pay levels. These analyses show how the Conduct affects the compensation of Class Members at each percentile of the earnings distribution. For example, this analysis reveals that the 50th percentile of Class Member compensation (the median) was 14.5 percent lower as result of the Conduct. I then repeat this analysis to show that the Conduct reduced compensation at every or nearly every percentile of the compensation distribution.

126

141.  *Third*, I use a technique known as "in-sample prediction" to assess whether individual Class Members were able to escape the aggregate suppression resulting from the Challenged Conduct.[422] This approach uses the regression models established in Section VI to predict what each Class Member would have been paid but for the Challenged Conduct, and then compares the but-for compensation to the compensation the Class Member actually received. Using this method and a modified version of it to further account for the possibility of false positives, I show that at least 92 percent of Class Members were underpaid based on their cumulative earnings during the Conduct Period.[423]

142.  *Fourth*, I deploy a "random coefficient model," which uses the same baseline model as in **Figure 6**, but allows estimation of the effect of the Conduct for each individual Class Member. This approach differs from the in-sample prediction approach in that it does not rely on *generalized* harm to predict individual "but-for" compensation. Rather, it uses the same empirical model but directly delivers individual estimates of harm for each individual. This approach estimates that more than 94.5 percent of Class Members were harmed by the Conduct.

143.  *Finally*, I demonstrate using both qualitative and quantitative evidence that Defendants pay Class Members in the context of a compensation structure. The existence of such a compensation structure would provide a natural mechanism for how the wage suppression

---

[422] *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods*, 31 F.4th 651, 672 (9th Cir. 2021) [hereafter *Olean v. Bumble Bee*] ("Finally, Dr. Mangum used the output of the pooled regression model to predict the but-for prices (i.e., what the price of tuna during the conspiracy period would have been without the overcharge caused by the conspiracy), and compared these predicted but-for prices to the actual prices paid by the DPP class.").

[423] Although a few Class Members appear unharmed under this method, my opinion is that these Class Members were likely in fact harmed, based on the evidence of pricing structures discussed below. Many of these employees have only one or two observations in the data. In any case, I can identify each Class Member for whom my in-sample method does not show harm, so that they could be excluded from the Class.

3154924.9

caused by the Challenged Conduct propagates across the whole Class. That is, a compensation structure would transmit any generalized suppression of wages broadly across Class Members within that compensation structure.[424]

144.    Taken together, these complementary analyses demonstrate that all or virtually all Class Members were harmed by the Challenged Conduct. These analyses all rely on methods and data common to the Class.

A.    **By-Employee-Level Category and Defendant Suppression Model**

145.    I first consider whether the aggregate wage suppression estimates differ between workers at different tiers within the same company. I do so by modifying the main empirical specification to include an interaction between the Conduct variable and an indicator for whether the worker is a Vice President ("VP") or Senior Vice President ("SVP"). The interpretation of the Conduct coefficient in this model is the aggregate wage suppressing effect on Directors, while the coefficient on Conduct*1(VPs & SVPs) reflects the differential effect of the conduct on VPs and SVPs relative to the effect of the Conduct on Directors.

146.    I show these results in **Figure 10** below. Column 1 reports the overall results for this model, while Column 2 reports the same pooled model but allows the Conduct effect to differ for each Defendant. As before, the results suggest that Directors at each company suffer earnings losses. In column (1), the estimates suggest that the Conduct lowered compensation by 13.1 percent. The interaction effects reveal that, relative to these losses for Directors, the losses

---

[424] The same methodology utilized in *Johnson* was accepted by the court in Order Granting Plaintiffs' Supplemental Motion for Class Certification, *In re High-Tech Employees Antitrust Litigation*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013) ("Plaintiffs noted that Dr. Leamer's approach followed a roadmap widely accepted in antitrust class actions that uses evidence of general price effects plus evidence of a price structure to conclude that common evidence is capable of showing widespread harm to the class.").

128

3154924.9

for SVPs and VPs are greater at DaVita, SCA, and USPI. Overall, in column (1), SVPs and VPs suffer compensation losses of 17.1 percent. In the Defendant-specific regressions, the models explain at least 86.5 percent of the variation in Ln(Total Compensation). The fact that the Conduct had similar negative effects on compensation of Directors and VPs and SVPs is consistent with common harm.

**Figure 10: Aggregate Effect of Conduct on Earnings By Job Level and Defendant**

| | Dependent Variable: Ln (Total Annual Compensation) | |
| --- | --- | --- |
| *Baseline Category: Directors* | Overall | By Defendant |
| | [1] | [2] |
| Conduct (Directors) | -0.140*** | |
| | (0.0119) | |
| Conduct*1 (VPs & SVPs) | -0.0475*** | |
| | (0.0143) | |
| DaVita Conduct (Directors) | | -0.181*** |
| | | (0.0136) |
| DaVita Conduct*1 (VPs & SVPs) | | -0.0389 |
| | | (0.0248) |
| SCA Conduct (Directors) | | -0.0896*** |
| | | (0.0181) |
| SCA Conduct*1(VPs & SVPs) | | -0.0941*** |
| | | (0.0188) |
| USPI Conduct (Directors) | | -0.0680*** |
| | | (0.0156) |
| USPI Conduct*1(VPs & SVPs) | | -0.109*** |
| | | (0.0203) |
| 1(VPs & SVPs) | 0.327*** | 0.339*** |
| | (0.0202) | (0.0216) |
| Healthcare, Macro, Hours | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 27,010 | 27,010 |
| R-squared | 0.864 | 0.865 |

Note: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

## B. Quantile Regression

147. The regressions above, and those in Section VI reflect the effect of the Conduct on *average* (log) total compensation of Class Members. The results in Section VII.A above

129

demonstrate that logical groupings of Class Members were harmed similarly on average, and are consistent with generalized harm across the Class. I next focus not on how *average* compensation changes as a result of the Conduct, but rather on how the Conduct affected compensation at every percentile of the earnings distribution. That is, using an identical empirical model, I estimate how the Conduct affected compensation for workers at the 1st percentile of the compensation distribution, the 2nd percentile, up to the 99th percentile. [425] If the Conduct negatively affects compensation at every percentile, this is consistent with common harm.

148.    The results of this quantile regression are shown in **Figure 11**. In the model with a common Conduct effect, corresponding to Column 4 of **Figure 6**, I find that compensation is both suppressed and statistically significantly different from zero at *every* percentile of the compensation distribution (top left panel of **Figure 11**).

149.    The remaining three panels of **Figure 11** show the coefficients on the Defendant-specific Conduct variable from the pooled model, corresponding to Column 4 of **Figure 8**. For each Defendant, I find that the Conduct reduced compensation to a statistically significant degree for at least 95 percent of the compensation percentiles. These results are strongly consistent with widespread harm across Class Members.

---

[425] In particular, I use the quantile regression approach described in José AF Machado & JMC Santos Silva, *Quantiles via Moments*, 213 J. ECONOMETRICS 145–173 (2019).

**Figure 11: Quantile Regressions**



### C.    In-Sample Prediction

150.    The prior two analyses assessed workers in logical sub-groups based on title and compensation percentile. I next use three separate approaches to generate estimates of individual-level harm.

151.    The first approach is known as an "in-sample prediction." Having performed a regression analysis that shows compensation suppression, I use the regression equation to predict what each individual in the data ("in sample") would have received absent the Challenged Conduct. Under this method, a Class Member suffers antitrust injury whenever the compensation they actually received during at least one year during the Conduct Period is less than the compensation they would have received absent the Challenged Conduct. This standard form of in-sample prediction allows me to directly compute whether there were any Class Members who were able to consistently escape injury from the Challenged Conduct. Courts have certified

131

numerous classes in antitrust cases where Plaintiffs' economists have used this method to demonstrate common impact.[426]

152. The main idea behind this method is described in the introductory chapter of the Federal Judicial Center's Reference Manual on Multiple Regression, which illustrates how multiple regression analysis can be used to determine whether individual plaintiffs suffered injury from employment discrimination.[427] Here, I apply the same framework to determine whether individual Class Members suffered injury from the Challenged Conduct. The in-sample prediction method progresses as follows:

153. **Step 1: Specify a regression model to determine *general* compensation suppression across Class Members.**[428] The coefficient on the Conduct variable represents the

---

[426] *Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, 2:15-cv-01045-RFB-BNW (D. Nev. Aug. 9, 2023). *Olean v. Bumble Bee* at 672 ("Finally, Dr. Mangum used the output of the pooled regression model to predict the but-for prices (i.e., what the price of tuna during the conspiracy period would have been without the overcharge caused by the conspiracy), and compared these predicted but-for prices to the actual prices paid by the DPP class."). *See also In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014); *In re Capacitors Antitrust Litig.* (No. III), No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018); *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019).

[427] REFERENCE MANUAL at 305, n.4 ("The first step in such a regression analysis is to specify all of the possible 'legitimate' (i.e., nondiscriminatory) factors that are likely to significantly affect the dependent variable and which could account for disparities in the treatment of male and female employees. By identifying those legitimate criteria that affect the decision-making process, *individual plaintiffs* can make predictions about what job or job benefits similarly situated employees should ideally receive, and then can measure the difference between the predicted treatment and the actual treatment of those employees. If there is a disparity between the predicted and actual outcomes for female employees, plaintiffs in a disparate treatment case can argue that the net 'residual' difference represents the unlawful effect of discriminatory animus on the allocation of jobs or job benefits.") (emphasis added).

[428] *Id.* ("The first step in such a regression analysis is to specify all of the possible 'legitimate' (i.e., nondiscriminatory) factors that are likely to significantly affect the dependent variable and which could account for disparities in the treatment of male and female employees.").

132

*general* or aggregate wage suppression to Class Members. If the coefficient is statistically significantly different from zero, proceed to Step 2.

154.     **Step 2: Compute the "but-for" compensation for each individual in the sample.**[429] Using the same regression model, calculate the compensation associated with each individual in each year *but for* the Challenged Conduct. This is done by using standard regression prediction methods after "turning off" the Challenged Conduct by manually setting the Conduct variable to zero. This simulates the compensation but-for the Challenged Conduct to each Class Member, based on the common econometric model.

155.     **Step 3: Compare the actual compensation to the but-for compensation.**[430] The difference between the actual and but-for compensation is the wage suppression for each Class Member each year. Using the regression models developed in Section VI, I empirically demonstrated that Class Members' underpayments were economically and statistically significant in the aggregate. This completes Step 1. In Step 2, I calculate "but-for" compensation for each year for each Class Member. In Step 3, I then take the difference between the but-for compensation and the actual compensation in each year for each Class Member. I perform this process both using the overall wage suppression estimates from column 4 of **Figure 6** and then separately for the Defendant-specific wage suppression estimates from column 4 of **Figure 8**.

156.     With this process to calculate "but-for" compensation, I then perform three different analyses. First, I calculate the percentage of workers harmed in each year, where a

---

[429] *Id.* ("By identifying those legitimate criteria that affect the decision-making process, *individual plaintiffs* can make predictions about what job or job benefits similarly situated employees should ideally receive, and then can measure the difference between the predicted treatment and the actual treatment of those employees.") (emphasis added).
[430] *Id.* ("If there is a disparity between the predicted and actual outcomes for female employees, plaintiffs in a disparate treatment case can argue that the net 'residual' difference represents the unlawful effect of discriminatory animus on the allocation of jobs or job benefits.").

3154924.9

worker is considered harmed in a given year if the but-for compensation is higher than the actual compensation in that year. Second, I calculate the percentage of workers harmed in *any* year. Third, I calculate cumulative compensation across all years an individual is present during the Conduct Period,[431] and examine the proportion of individuals for whom their cumulative earnings but-for the Conduct are higher than their realized, cumulative earnings.

157.    The results in **Figure 12** show that, across all Defendants, at least 86 percent of Class Members were harmed by the Conduct in each year, more than 99 percent of Class Members were harmed by the Conduct in at least one year, and that more than 96.8 percent of Class Members were harmed by the Conduct on net. These results are strongly consistent with widespread harm across the Class.

---

[431] Because the data is at the individual-company-year level, the results for cumulative earnings requires aggregating the compensation for each individual across years during the Conduct Period. Further, because it requires summing compensation in *levels*, the fact that the estimation was in *natural logs* requires using the Duan "smearing" technique to avoid re-transformation bias. Re-transformation bias refers to the fact that we cannot simply exponentiate a prediction for Ln(Total Compensation) to get the prediction in levels. *See* Duan, Naihua, *Smearing estimate: a nonparametric retransformation method*, 78(383) JOURNAL OF THE AMERICAN STATISTICAL ASSOCIATION, 605–610 (1983). *See also* WOOLDRIDGE AT 213 (discussing the "smearing estimate").

134

3154924.9

**Figure 12: In-Sample Prediction Method**

| | [1] | [2] | [3] | [4] |
|---|---|---|---|---|
| | Annual Wage Suppression % | Percentage Harmed: | | |
| | | In any Year? | In each Year? | Cumulatively? |
| Common Conduct Model | -14.5% | 99.50% | 86.97% | 97.64% |
| *Defendant-Specific Model* | | | | |
| DaVita | -17.2% | 99.72% | 86.25% | 98.09% |
| SCA | -13.9% | 99.37% | 91.88% | 98.47% |
| USPI | -12.0% | 99.34% | 87.14% | 96.88% |

*Note:* This table reports the results from the in-sample prediction method. Column (1) Provides the wage suppression estimates corresponding to Common Conduct effect and the Defendant-Specific Conduct model provided earlier. Based on the generalized harm in Column (1), Column (2) shows the percentage harmed in each year. Column (3) calculates the percentage of Class Members who had at least one year in which they were harmed by the conduct; that is, at least one year where there earnings under the conduct were lower than what they were predicted to be absent the conduct. Column (4) calculates the cumulative compensation of the Class Member over the time they were employed during the Conduct Period and compares them to the cumulative predicted compensation the Class Member would have received absent the conduct; a Class Member is rated as "harmed" if the cumulative "but for" compensation is higher than the actual received compensation.

## D. **Interval In-Sample Prediction**

158. The results presented in **Figure 12** are based on traditional in-sample prediction that has been accepted by various courts. While traditional in-sample prediction begins with a finding of statistically significant harm from the conduct, critics of this method have written that if the effect of the conduct is truly zero (and therefore not statistically significantly different from zero), then a traditional in-sample prediction approach would generate too many "false positives."[432] I address this criticism below.

---

[432] Michael Kheyfets, *Evolving or Running in Place? Empirical Approaches to "Common Impact" in Antitrust Class* Actions, EDGEWORTH ECONOMICS 74–85, 84–85 (Oct. 23, 2024), https://www.edgewortheconomics.com/assets/htmldocuments/UPDATED_Kheyfets%20PDF%20common%20impact.pdf ("The general response from proponents of these methodologies has been that they are meant to be applied only in periods of anticompetitive conduct—and that applying them to periods where no anticompetitive conduct existed (as a showing of the "false positive" results they generate) is somehow not relevant or appropriate. This argument, however, seems to turn the notion of statistical testing on its head. A reliably designed methodology should not find widespread antitrust impact when tested against a period where there is no anticompetitive conduct. One that does find injury that does not exist should raise red flags about its viability as proof of common impact.").

159.     **Figure 13** illustrates this criticism for a simulated individual with 10 years of Conduct Period pay data and a statistically significant effect of Conduct of -4.1 units on compensation.[433] The solid black line is what the regression predicts compensation would be "but for" the Conduct. Traditional in-sample prediction would consider as harmed observations where the actual compensation is below the "but for" predicted compensation, which in this simulation is 100 percent of observations (e.g., all dots are below the black line).

160.     However, critics of the in-sample prediction method point out that *if* the Conduct actually had no effect (the dotted grey line), then the traditional in-sample prediction approach will nevertheless find that approximately half of the observations are "harmed." Because the regression line of best fit runs through the middle of the individual's data points, approximately half of the observations will lie above the line, and half below. In this simulation, we identify as harmed 5 of the 10 observations (the ones in red) because they lie below the gray line.

---

[433] I simulate 20 years of pay data with Conduct lasts 10 years, the simulation estimates that the Conduct reduces compensation by 3.8 units each year.

136

3154924.9

**Figure 13: Simulation: Traditional In-Sample Prediction**



161.     Critics of in-sample prediction claim that a finding of harm when there is no effect of the Conduct implies a faulty test. I believe this goes too far. The reason is that the in-sample prediction method fundamentally relies on an initial, *statistically significant* finding of harm. So, a critique that argues that in-sample prediction is faulty when there is no effect of the Conduct does not impugn the test because the test is only performed when there is a finding of statistically significant harm.

162.     The problem with the critique is that it dispenses with this initial statistically significant finding of harm. In other words, applying the in-sample prediction test when there is no effect guarantees that findings of harm or no harm are driven purely by statistical noise. This critique loses sight of the fact that the test requires the measured deviations in compensation (such as the unwinding of wage suppressing Conduct) to be statistically significantly different from zero.

3154924.9

163. Even though my main models do estimate statistically significant harm, I nevertheless address this "false positive" critique for when there is no harm. To do so, I bring back the idea of statistical significance to the situation which the Conduct has no effect. I do this by modifying the traditional in-sample prediction approach with a prediction interval.[434] This prediction interval serves two purposes: (1) It sets the false positive rate ($p$) when there is no effect of the Conduct at a particular level of statistical significance level (e.g., $p=10 \ percent$); and (2) it determines the proportion of observations that are statistically significant harmed in a but-for world given the statistical confidence level of $1\text{-}p$ (e.g., if the level of statistical significance is 10 percent, then the statistical confidence level is 90 percent.). I term this method "interval in-sample prediction."

164. Below I illustrate the core ideas of this approach with a simulation, and then turn to applying it in this setting. **Figure 14** illustrates the first step of the interval in-sample prediction method, which shows the same data as **Figure 13**. The key is that, relative to **Figure 13**, where 5 observations were classified as harmed if they were below the dashed gray line (which is our best guess about compensation when the Conduct has no effect), we now include a prediction interval around the regression line consistent with no effect and only say that a unit is harmed if it lies below the lower limit of the prediction interval. In this simulation, the size of the

---

[434] Note that I am using the term "prediction interval" precisely and not the term "confidence interval" because they are different in this context, even if they are both intervals. The prediction interval derives from the standard error of the point prediction for a single observation (e.g., for a given individual-year observation). In Stata, it derives from the "predict, stdf" option. In contrast, the term confidence interval is usually used in the context of the predicted mean for a *given set of covariates*. It derives from the Stata command "predict, stdp." As a result, the prediction interval is always larger than the confidence interval. For more details, *see Regress Post Postestimation*, STATA, https://www.stata.com/manuals/rregresspostestimation.pdf (last visited Jan. 9, 2025).

3154924.9

prediction interval yields a *p=10 percent* false positive rate (because one out of 10 observations are categorized as "harmed" when the Conduct has no effect).

165. **Figure 14** illustrates that the key input into the false positive rate is the size of the prediction interval. A larger prediction interval will reduce false positives, while a shorter one will increase false positives. Scientific standards for false positives are typically set at 5 percent or 10 percent. That is, in traditional hypothesis testing, we say that we can reject the null hypothesis of no effect if there is a sufficiently low probability (typically below 10 percent) that we would observe our results or something more extreme if the null hypothesis of no effect were in fact true. In such a case, we say that our results are "statistically significant." I adopt the same thresholds here for setting the size of the prediction intervals.

**Figure 14: Simulation: Identifying the False Positive Rate *p***



166. The second step of the method is illustrated in **Figure 15**. As in traditional in-sample prediction, I now create the but-for predictions when the Conduct is "turned off" (the

3154924.9

shifted up black line). I also shift the prediction intervals determined in the first step up by the amount of the estimated harm. I then call an estimate *statistically significantly harmed* with a confidence level of *1-p%* if it lies below the lower limit of the "but for" prediction interval. In the simulation, we can see that all but one data point lie below the lower limit of the prediction interval (in year 10). Thus we would conclude that with a confidence level of 90 percent we estimate that 90 percent of observations are statistically significantly harmed.

167.    Lastly, the data may be sensitive to different prediction intervals, depending on the dispersion of compensation in the data. Accordingly, we can vary the length of the prediction interval to target different statistical significance levels and then see how those choices affect the proportion deemed harmed for a given level of statistical confidence.

**Figure 15: Simulation: Identifying Statistically Significantly Harmed**



168.    Next, I apply this interval in-sample approach to the data at hand. In **Figure 16** below, I examine the proportion of individuals that are statistically significantly harmed for a

140

3154924.9

given confidence level, based on their cumulative compensation during the Conduct Period. The top-left panel considers the main model in **Figure 6** with a common Conduct effect, while the other three repeat the same analysis but for the Defendant-specific results in **Figure 8. Figure 17** below summarizes the information from **Figure 16** by showing the associated confidence level when the proportion of Senior-Level Employees that are statistically significant harmed is approximately 90 percent. Together, the results suggest that more than 92 percent of individuals are statistically significantly harmed at a confidence level of 91.4 percent. At each Defendant, with confidence levels between 89.5 and 94.5 percent, I find that more than 91.5 percent of Senior-Level Employees are statistically significantly harmed. These results are strongly consistent with generalized harm from the Conduct.

**Figure 16: Interval In-Sample Prediction Results— Rates of Statistically Significant Harm At Each Confidence Level**



141

**Figure 17: Interval In-Sample Prediction Results—90 Percent Confidence Level**

| | [1] | [2] | [3] |
|---|---|---|---|
| Model | Annual Wage Suppression % | Confidence Level | Percentage Harmed Cumulatively |
| Common Conduct Model | -14.5% | 91.36% | 92.42% |
| *Defendant-Specific Model* | | | |
| DaVita | -17.2% | 92.15% | 93.16% |
| SCA | -13.9% | 94.50% | 94.95% |
| USPI | -12.0% | 89.48% | 91.54% |

*Note:* This table reports the results from the Interval In-Sample Prediction method for the cumulative compensation of individuals over the Conduct Period.

### E. Random Coefficient Model

169. Another critique of traditional in-sample prediction is that it applies the *general* wage suppression estimate to each class member for each year, when individual members may have been harmed to a greater or lesser extent. To address this, I next estimate the effect of the Conduct for each Class Member individually. I expand the regression model to allow the Conduct to have a differential effect on every Senior-Level Employee by using a "Random Coefficient Model." This approach is used by econometricians to understand how a specific variable affects different units in the sample.[435] In contrast to the traditional in-sample prediction model, this approach only estimates a single Conduct effect per individual, and thus is not capable of estimating whether the Conduct harmed an individual *in any year*. In this sense, the Random Coefficient Model is likely more conservative than the traditional in-sample prediction approach.

---

[435] *See* Juan Alcácer et al., *Applying random coefficient models to strategy research: Identifying and exploring firm heterogeneous effects*, 3 STRATEGY SCIENCE 533–553, 533 (2018). *See* also WOOLDRIDGE at 315–17. *See* also Sophia Rabe-Hesketh and Anders Skrondal, *Multilevel and Longitudinal Modeling Using Stata, Volumes I and II, Fourth Edition*, Stata Press (2022) (eBook) at 137–160.

3154924.9

170.     The regression equation is the same as before with one subtle modification: The model not only estimates a common effect from the Conduct $\beta$, but the Random Coefficient Model allows the effect to vary for each individual $i$, such that for each individual I can estimate $\beta_i = \beta + u_i$, where $u_i$ is individual i's deviation from the common effect $\beta$. The regression equation is the largely same as before, except now $\beta$ is replaced with $\beta_i$.[436]

$$y_{ict} = \beta_0 + \beta_i Conduct_{ct} + \lambda X_{icst} + \gamma_c + \alpha_i + \epsilon_{icst}$$

171.     **Figure 18** reports the results from this regression. In particular, it shows both the statistically significantly estimated common effect (which is -14.59 percent) in the red dashed line, and the distribution of the Conduct effects ($\beta_i$) for each Class Member during the Conduct Period around the common effect. Calculating what percentage of these individual Conduct estimates are less than zero reveals the percentage of individuals identified as harmed by this common method. Overall, this approach reveals that 94.55 percent of individuals were harmed by the Conduct. This includes 94.65 percent of individuals at DaVita who were harmed, 98.02 percent at SCA, and 90.7 percent at USPI. Taken together, this common method provides strong evidence that all or nearly all Class Members were harmed by the Challenged Conduct.

---

[436] Note: Due to the data structure, we must now use random effects instead of fixed effects. As shown in **Figure 36**, the random effects models deliver very similar estimates to the previously reported fixed effects models. In addition, because the model does not estimate random effects at the individual-by-company level as before (because it is estimating a random coefficient for each individual—not each individual-company combination), to preserve a comparison to previous models I modify the regression to include company fixed effects directly.

143

**Figure 18: Results from the Random Coefficient Model**



Common harm, given by the dashed red line, estimated at -0.158 log points, or -14.59%.

### F. Evidence of a Compensation Structure That Would Transmit Wage Suppression Across All Class Members

172. Compensation structures tend to arise in firms due to the interrelated concepts of internal and external equity. Compensation structures connect all employee pay within a firm, such that any suppression of wages for one group of employees would tend to suppress the pay of other employees. Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own. Here, the

3154924.9

existence of compensation structures within Defendant firms would mean that any wage suppressing effects of the Challenged Conduct would be broadly transmitted across the Class.[437]

173. Internal equity is the idea that individuals doing comparable work within a firm should receive similar compensation. An article in the *Quarterly Journal of Economics* explains, "a long tradition in economic thought—as well as in psychology, sociology, and organizational behavior—has advanced the notion that individuals also care about their pay relative to that of their co-workers."[438] Because employees value internal equity, employers tend to respond by implementing uniform compensation structures that pay comparable compensation for comparable work. One textbook explains that "[p]ay structure refers to the array of pay rates for different work or skills within a single organization,"[439] and refers to examples of pay structures at companies such as Merrill Lynch and Lockheed Martin.[440] Payroll software companies offer advice to employers on achieving internal equity:

> Internal equity is the comparison of positions within your business to ensure fair pay. You must pay employees fairly compared to coworkers. Employees must also perceive that they are paid fairly compared to their coworkers. Otherwise, they might feel unvalued and leave. It is easy for employees to find out how much other employees earn via the Internet and word of mouth. If an employee works hard but is paid less than her coworkers who do not work as

---

[437] *Olean v. Bumble Bee* at 670 ("After examining the economic structure of the tuna market and the available record evidence concerning the Tuna Suppliers' behavior, Dr. Mangum determined that the packaged tuna market was conducive to price-fixing, given the Tuna Suppliers' dominance in the market, the attendant barriers to entry for competitors, the Tuna Suppliers' use of price lists for their products, and other characteristics of the packaged tuna industry. According to Dr. Mangum, these findings supported a baseline economic theory that the Tuna Suppliers' collusive behavior would affect the DPPs on a class-wide basis.").

[438] Emily Breza et al., *The Morale Effects Of Pay Inequality*, 133 QUARTERLY J. ECON. 611–663, 611 (2018). *See also* GEORGE MILKOVICH, JERRY NEWMAN & BARRY GERHART, COMPENSATION, 72 (11th ed. 2011) [hereafter COMPENSATION] ("Internal alignment, often called *internal equity*, refers to the pay relationships among different jobs/skills/competencies within a single organization." (emphasis in original)).

[439] COMPENSATION at 72.

[440] *Id.* at 72–74.

3154924.9

> hard, she might become upset about her wages. When you adopt a straightforward and honest payment system, your employees will believe that they are being paid fairly and with equality. This boosts company morale and employee loyalty, bringing many benefits in the long run . . . .
>
> To create fair pay, you compare employees who do similar jobs for your company. You should consider the tasks your employees do. *If two employees perform similar tasks, they should earn similar wages.*[441]

174. The relevant implication is that if employee compensation is driven, in part, by considerations of internal equity, then the firm's ability to suppress wages of a group of employees would also be indirectly felt even by those employees who were not the target of wage suppression.

175. A related concept is "external equity," wherein employees seek to achieve pay similarities between laborers doing similar jobs at different firms.[442] External equity arises from competition between firms in the relevant labor market.[443] If there is external equity in an industry or job category, increases (or decreases) in wages *within* a firm or group of firms impact

---

[441] *Payroll Blog: Payroll Training, Tips, and News*, PATRIOT SOFTWARE (Jan. 12, 2022), https://www.patriotsoftware.com/payroll/training/blog/what-is-internal-equity/ (emphasis added). *See also* Conrado Tapado, *Does Your Company Have Internal Pay Equity?*, PAYSCALE (Mar. 31, 2009), https://web.archive.org/web/20210508234343/http://www.payscale.com/compensation-today/2009/03/importance-of-internal-pay-equity.

[442] *See, e.g.*, Kent Romanoff et al., *Pay Equity: Internal and External Considerations*, 18 COMP. & BENEFITS REV. 17–25, 17 (1986) ("Companies typically emphasize external equity in the design of their compensation structures. This focus on external equity enables a company to develop compensation structures and programs that are competitive with other companies in appropriate labor markets.").

[443] *Id.*

3154924.9

the relevant market price of labor *across* firms competing for the same pool of labor.[444] The relevant implication here is that if Firm A is able to suppress the wages of its own employees, Firm B (which nominally competes with Firm A over labor) can pay its own employees less in the face of reduced wage competition from Firm A.

176.    It is important to point out here that taking external equity into account does not mean that compensation is entirely determined by a larger labor market and that the employer has no monopsony power. It means that a company will, systematically, ensure that employee pay bears some determined relationship to external benchmarks. This systematic concern is itself a powerful compensation structure, linking pay of employees together. For instance, a company may seek to pay its employees at approximately the 75th percentile of some external pay benchmark. But if that company suppresses labor competition through, say, a no-poach agreement with an important labor competitor, the company may instead seek to pay its employees at approximately the 50th percentile of some external pay benchmark. This illustrates both that all pay within a firm would move together, and that paying attention to external equity does not mean that wages are simply set by a larger labor market. Management must consciously choose how to align internal wages with external pay, in light of anticipated labor competition.

177.    Internal and external equity may occur organically or through conscious effort. For internal equity, a firm may have a formal compensation structure that it applies to its

---

[444] Lois Friss, *External Equity and the Free Market Myth*, 7(3) REVIEW OF PUBLIC PERSONNEL ADMINISTRATION 74–91, 76–77 (1987) ("[H]ospitals join employer associations that provide members with benchmark job descriptions, salary surveys, and other price trends . . . [T]he very existence of these programs confirms that hospitals believe their individual actions could have a noticeable effect on nurse wages. Because of this belief, among other reasons, they voluntarily join."). *Id.* at 74 ("Market surveys are routinely conducted by public employers to maintain external equity. Personnel professionals assume that the market survey reflects fair pay resulting from free market forces. Unfortunately, community wages may reflect wage fixing rather than competitive wages.").

147

employees. However, even a firm with no explicit formal compensation structure may nonetheless end up achieving internal equity if the firm's managers value standardization, if employee pay is openly discussed (and unexplained deviations in pay would be viewed as discrimination or favoritism), or if external market forces dictate what pay must be to remain competitive. For external equity, firms may track and benchmark wages across the industry and base pay off of those benchmarks. However, a firm that lacks this market intelligence is still subject to the laws of supply and demand in the labor market, and may end up paying externally equitable wages simply by not having monopsony power over labor.

178.     Accordingly, the evidence for both internal and external equity may be qualitative (documents showing a wage structure or tracking competitive wages) or may quantitative (analyses that demonstrate that groups of employee wages are tied together). As explained below, there is substantial documentary evidence indicating that the compensation paid to Class Members followed a compensation structure driven, in part, by considerations of both internal and external equity. In addition, econometric analyses of available wage data show strong support for compensation structures linking Class pay together.

### 1.     Qualitative Record Evidence of a Compensation Structure

179.     DaVita Used Compensation Structures to Maintain Internal and External Equity.

a.     The evidence shows that DaVita policy was to maintain compensation equity both within DaVita and in comparison with the external market. For instance, a March 2018 email discussing compensation structures at DaVita stated that DaVita "look[s] at compensation to judge internal equity/market competitiveness."[445]

---

[445] Ex. PX77 at DVA_OMCEAL_001329257.

3154924.9

b. *Compensation Adjustments.* DaVita adjusted compensation based on its commitment to internal and external equity and compared compensation across geographies, i.e., nationally.

c. For example, DaVita's internal compensation policy document instructed that internal equity should be maintained for high-level employees specifically, such as by increasing bonuses for some VPs in the event that their equity compensation underperformed relative to peers due to happenstance.[446]

d. The evidence shows that DaVita's Compensation Team reviewed external market data when it was concerned about retention of its employees.[447] To acquire external compensation information for roles, DaVita's Compensation Team used salary survey databases such as Kenexa, Payfactors, or Tower Watson.[448] DaVita also worked with third-party compensation research providers such as Qualigence.[449] Additionally, DaVita retained a

---

[446] Ex. PX78 at DVA_OMCEAL_001070929 (DaVita's Compensation Philosophy instructs, "Tom and Sharon are VPs in a similar position. They were both hired in the same year and granted equity. Tom happens to have been granted equity at a lower strike price. Sharon is granted equity as well, but because of timing and market fluctuations, her strike price is higher. Three years later, both are performing at the same level. However, Tom's equity value is much higher than Sharon's based solely on the timing of when he was granted equity. In this situation, it is fair and appropriate to differentiate bonus dollars to ensure more balanced compensation for these two leaders.").

[447] Ex. PX84 at DVA_OMCEAL_001321377; Deposition of Colleen Arthur (May 23, 2024) [hereafter Arthur Dep.] at 200:17–201:7.

[448] Arthur Dep. at 108:7–21 (Arthur testified that "Kenexa was a compensation salary survey database that the team used for some time," and that DaVita also used Payfactors and Towers Watson surveys, among others).

[449] Arthur Dep. at 109:13–23 (Arthur testified that "Qualigence was a service provider that would do research into specific geographies and specific positions related to compensation data.").

149

compensation consultant firm named Compensia that rendered services related to executive compensation.[450]

      e.     After reviewing external market rates related to compensation, "internal valuation was done to ensure equity between lanes and positions was maintained."[451] Both former DaVita Senior Director of Compensation & Analytics Colleen Arthur and internal DaVita documents discussed using merit increases to support pay equity: Arthur testified that merit increases could also be used to "rectify potential pay inequities within a team."[452] And, a 2013 PowerPoint presented by DaVita's then-President Rodriguez emphasized that "pay fairness within a team" is one of three things DaVita evaluates in regard to base salary increases.[453]

      f.     DaVita personnel put this philosophy into practice. For instance, an internal DaVita document shows that in 2016, DaVita's compensation team reviewed market adjustments for pay at the Palmer-level (DaVita's term for large geographic markets) nationwide.[454]

      g.     For internal promotions, DaVita's compensation team compared salary recommendation for the promotion to employees who already occupied very similar positions.[455]

---

[450] *Id*. at 149:8–19 (Arthur testified that "Compensia provides consultative services related to executive compensation.").

[451] Ex. PX85 at DVA_OMCEAL_001067252 and Arthur Dep. at 208:15–209:3

[452] Ex. PX78 at DVA_OMCEAL_001070929 ("Merit dollars are used as one component of total compensation to reward highest performers and rectify potential pay inequities within a team.").

[453] Ex. PX269 at DVA_OMCEAL_000957821 (a 2013 presentation titled "2012 Compensation summary," which lists the other two criteria as "Performance Differentiation" and "Total Compensation").

[454] Arthur Dep. at 203:3–25, 204:14–24 (DaVita reviewed market (i.e., pay) adjustments across geographies).

[455] Ex. PX83 at DVA_OMCEAL_001057524 and Arthur Dep. at 198:8–199:2.

3154924.9

h.      *Starting Salaries.* DaVita's Compensation Team reviewed both internal and external (market) compensation for relevant positions when hiring new employees.[456]

i.      When determining an initial compensation offer for the hiring Senior-Level Employees at DaVita, the DaVita compensation team compared the current range of pay for DaVita employees in the same or similar positions nationwide.[457] DaVita executives referenced whether the employee was within the compensation range of existing employees with equivalent responsibilities.[458] As such, to determine pay levels for new employees, DaVita benchmarked against the pay of incumbent employees with similar duties.[459] This pay comparison was made to comparable employees across geographic regions,[460] as well as by region.[461] In 2016, DaVita's Compensation Team reviewed market adjustments for pay at the Palmer-level (DaVita's term for large geographic markets) nationwide.[462]

---

[456] *See* Ex. PX81 at DVA_OMCEAL_001068250 (a Feb. 2018 email chain regarding a request for a market and internal compensation comparison for new positions in the Chicago area).

[457] Arthur Dep. at 126:19–127:5; *see*, *e.g.*, Ex. PX75 at DVA_OMCEAL_001321757 (a June 2016 email chain regarding an initial compensation offer for a DaVita General Manager).

[458] Ex. PX24 at DVA_OMCEAL_000386711 and Staffieri Dep. at 161:8–23 (in deciding appropriate pay for a new hire in the Bay Area, DaVita COO Staffieri wrote, "I don't want to get too out of whack with our DVP comp range," i.e., a range of pay based on what the current incumbent Division Vice Presidents were paid, in order to maintain "pay equity").

[459] Staffieri Dep. at 134:11–16 (DaVita COO Staffieri testified that DaVita "pay[s] attention to pay equity with respect to wages and salaries"); *id.* at 154:4–11 (Staffieri testified that "in order to assess whether a pay level's appropriate, a good place to start is how that person would fit in existing employees and then we compare that to their pay[.]"; Ex. PX21 at DVA_OMCEAL_001339977 ("Regarding your email on our EA position, we have worked extensively with People Services and Comp to do the benchmarking and evaluate the candidate."); Ex. PX27 at DVA_OMCEAL_001339898 ("I did get a recommendation from Comp which I agree with. Given that [the new hire] is already very well compensated, we are a little limited if we don't want him completely out of line with other Senior Directors.").

[460] Staffieri Dep. at 156:1–12.

[461] Ex. PX24 (an Apr. 2017 email in which Staffieri evaluates how to possibly raise an employee's pay, stating that "I don't want to get too out of whack with our DVP comp range but this job is in the Bay Area[.]").

[462] Ex. PX84 at DVA_OMCEAL_001321377 and Arthur Dep. at 203:3–25, 204:14–24.

151

3154924.9

j.　　　　DaVita also benchmarked starting salaries using external market surveys. For example, in April 2018, DaVita used competitor compensation survey provided by third parties (Mercer, Towers, Watson, and Kenexa) to benchmark pay based on companies of similar sizes in similar industries.[463]

k.　　　　Finally, the evidence presented Section V.C.2 regarding the CSI Exchanges between DaVita and SCA shows that DaVita actively sought after SCA compensation data for external benchmarking purposes. The implication of the CSI exchange is twofold. First, it directly indicates that DaVita sees SCA as a relevant labor market competitor that it is important to benchmark against. Second, the CSI exchanges allow for SCA and DaVita to match each other's compensation patterns should they want to, which might have allowed DaVita to reduce its compensation relative to what it would have done without the specific SCA benchmark data. As a result, the CSI exchange may have helped actually set Defendant-specific external benchmarks.

180.　　SCA Used Compensation Structures to Maintain Internal and External Equity.

a.　　　　SCA maintained a similar commitment to both internal and external pay equity. Indeed, SCA COO Michael Rucker testified that SCA tried to keep pace with the market, while not creating large internal pay disparities.[464] Rucker further testified at deposition that SCA strove to have internal equity because of fairness, and to reduce the risk of having employees who were underpaid and would leave as a result.[465]

---

[463] Ex. PX268 at DVA_OMCEAL_001344573 (an April 2018 presentation titled "DaVita Compensation Risk Assessment – Part 2: Broad-Based Employee Programs" produced by the compensation consulting firm Compendia.).
[464] Ex. PX305 at DOJCIV-008-00000183.
[465] Rucker Dep. at 325:21–326:9.

3154924.9

b.      *Compensation Adjustments.* Internal SCA documents show how they applied their commitment to pay equity to compensation decisions.

c.      For example, internal documents show this policy at work during the 2017 budgeting process for various Development roles, including Analyst Development, Senior Development analyst, Director Development, Senior Director Development, and VP Development. SCA incorporated "market pricing and job mapping using our Mercer Survey results and position descriptions."[466] SCA also referenced internal equity: "I would recommend a slightly higher budget . . . for Dir[ector] Development to more closely align with where we typically pay Directors and the avg/median for this role (even though our bonus target is a bit higher. We have one outlier on the low end who was recently promoted that likely should have received a higher base."[467]

d.      For example, Plaintiff Scott Keech had his compensation cut by ▮▮▮▮ in January 2012. According to SCA, Keech was "paid too much and was not in line with the internal equity of the organization."[468] SCA stated that he "had to be paid similar to the other people in the role" to "maintain internal equity with the rest of the organization."[469]

---

[466] Ex. PX528 at SCA001046573.
[467] *Id.*
[468] Deposition of Scott Keech (Aug. 22, 2024) at 203:1–204:2; Ex. DX64.
[469] *Id*.

153

e. Within this pay structure,

████████████████████████████████████████████

████████████[470]

f. SCA used salary bands prior to 2021, which were based on job title, role, and location of the position.[471]

g. SCA often maintained consistent merit increases. If an employee exceeded the pay range for their role, SCA would award lump sum bonuses in place of merit increases.[472] The lump sum payments did not depend on salary level, so they were used to avoid

---

[470] Wachsman Dep. at 117:9–118:5 (Wachsman testified, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

[471] Wachsman Dep. at 135:6–17 (SCA's salary grades "would involve the title . . . . the type of job, the location, and then that would determine the band.").

[472] Wachsman Dep. at 130:12–131:16 (Wachsman testified that lump sums can be used for multiple reasons: "One, if an individual is on the outside of the range high, so, you know, we do have situations sometimes where teammates are above the range and in that case—and, again, it's not black and white, but in some cases we don't allow for a merit increase if you're above the range, and so at times leaders will use the lump sum payment for that. . . . So if you have an individual—if you have a range and they're outside the range at the high end, if you give them merit increases every year . . . . —they may determine that instead of giving that person merit increases every year and making the problem—continue to get worse, they give them a lump sum."); Ex. PX53 at SCA000131233.

compounding wage discrepancies "between the employee and the market and/or the employee's peers."[473]

       h.     This comports with SCA CFO Wachsman's understanding that SCA wanted to have merit increases be "fair" and "market competitive."[474] For example, a January 2015 merit process and performance review from former SCA Chief Talent Officer Fanning to "SCA Leaders" explains that the merit based adjustment is "based on several factors including: teammate performance, internal equity, market rates and our merit budget."[475] The email also advises supervisors to "consider a teammate's current pay in alignment to market rates," and that "We have reviewed SCA's salary ranges to ensure they are in line within the healthcare industry. We have provided salary ranges in the Compensation Management System (CMS), so you can see this individual information for each teammate. We encourage you to maintain compensation levels within the noted ranges to ensure we remain competitive."[476]

       i.     SCA also benchmarked its pay against the market. For example, in 2011, SCA compared its 2011 increases to broader compensation data from third-party provider Mercer.[477] Moreover, former SCA CFO Clemens testified that SCA considered the

---

[473] Ex. PX54 at SCA000130861 ("Lump sums are intended to be used in lieu of (not in addition to) merit increases. Lump sums are typically used when an employee is performing well, but is already paid at the high end of the market or is paid high relative to his/her peers from an internal equity standpoint. Instead of giving the employee an increase to base salary, the manager can request a one-time lump sum payment in an amount similar to an annual merit salary increase amount. As an advantage to the employee, the lump sum is paid out at once (not over the upcoming year). As an advantage to the company, the amount is not added to the employee's salary so it does not continue to compound year over year and further increase the wage disparity between the employee and the market and/or the employee's peers, and it does not add to certain benefit costs (e.g. life insurance which is a multiple of salary).").
[474] Wachsman Dep. at 248:22–24.
[475] SCA000109831.
[476] *Id.* at SCA000109832.
[477] Ex. PX522 at OCM-BM_000000888, –90.

3154924.9

compensation practices of its peer companies when analyzing its own employee compensation practices.[478]

j.      *Starting Salaries.* SCA also sought to maintain internal and external equity in setting pay for new hires. For example, with respect to a new RVP hire, SCA's then-Senior Director of HR Jennifer Sandoz provided "internal and external market data which was run last year. Even after merit increases, we will unlikely have an RVP at ████. While I think we could support ████████ in [the] Bay Area, increasing to ██████ seems [like] a stretch to get someone to move."[479]

k.      Finally, the evidence presented in Section V.C.2 show that SCA actively sought out compensation information from both DaVita and USPI. This is explicit evidence that SCA considered both DaVita and USPI relevant labor market competitors. Moreover, such CSI exchanges may have helped SCA to coordinate its pay levels directly with DaVita and USPI, potentially reducing the rate of e.g., wage increases it would have given absent this information.

181.    USPI Used Compensation Structures to Maintain Internal and External Equity.

a.      Deposition testimony and internal USPI documents demonstrate that USPI also focused on maintaining compensation equity. For example, COO Mark Garvin, who oversaw the hiring and determining of compensation for presidents and regional vice presidents, testified to how compensation equity principles informed its decision making. Garvin explained that USPI considered whether an employee had been solicited for an outside opportunity when

---

[478] Clemens Dep. at 164:10–165:3.
[479] Ex. PX529 at SCA000065974.

3154924.9

deciding how much to increase employee compensation.[480] Whether an employee had been solicited for a job could then result in an increase in compensation on a "case-by-case" basis.[481] In addition, he explained that to retain employees against poaching attempts, USPI needed "to properly compensate employees at market rates."[482] Garvin focused on the level of compensation for USPI employees, often asking himself "are we compensating properly" to avoid competitors successfully poaching USPI employees.[483]

        b.     To gather reference points for a fair-market salary to maintain external equity, USPI used external sources, such as CareerBuilder.[484]

        c.     USPI VP of Financial Operations English testified that salary increases at USPI originated from a budget percentage that was recommended to department heads.[485] The recommended salary increases occurred annually,[486] based on the budgeting process that occurred in the previous year.[487] In an email regarding proposed administrator salary increases, English stated that the proposed salary increases will have to be discussed and approved by then-CEO Wilcox then-CFO Kopser, and then-COO Niels Vernegaard.[488] English also stated that for

---

[480] Garvin Dep. at 89:22–90:5 (Garvin testified that "if an employee was solicited for an outside opportunity, management did take that into account in deciding whether and how much to increase employee compensation[,]" "specific to an individual employee that would have been offered an opportunity."); Ex. PX88 at DOJCIV-008-00000360.

[481] Garvin Dep. at 90:6–14.

[482] Garvin Dep. at 93:13–23; Ex. PX88 at DOJCIV-008-00000360.

[483] Garvin Dep. at 93:24–94:9; Ex. PX88 at DOJCIV-008-00000360.

[484] Ex. PX105 at USPI_CIV_000021906 and Ex. PX106 at USPI_CIV_000021907 (a February 2017 email with attachment between Mosley and Karrmann sharing market pay data for regional vice presidents from CareerBuilder).

[485] English Dep. at 27:3–12.

[486] *Id.* at 28:12–13.

[487] *Id.* at 29:7–14.

[488] *Id.* at 35:6–25, 40:14–18; Ex. PX111 (an October 2012 email from USPI VP of Financial Operations English discussing proposed salary increases for administrators); *see also* Ex. PX112 (an internal USPI spreadsheet with proposed Administrator salary increases).

3154924.9

the staff she oversaw, final approval for bonuses also came from the CFO and CEO.[489] Annually, USPI gave its supervisors a spreadsheet with guidelines for salary increases and their proposed increases would be discussed by the relevant senior and executive vice presidents with final approval by the CHRO and CFO.[490] USPI salary increases corresponded to merit (or performance) with non-merit increases (such as cost of living adjustments) referred to as "Market" increases.[491] In 2015, the default increase for VP and above was 2.5 percent.[492] In 2012, the proposed increase for everyone below the VP level was 2 percent.[493]

        d.     Finally, the evidence presented in Section V.C.2 show that USPI actively sought out compensation information from SCA. This is explicit evidence that USPI considered SCA a relevant labor market competitor. Moreover, such CSI exchanges may have helped USPI to coordinate its pay levels directly with SCA's, potentially reducing the amount of pay increases it would have otherwise given absent this information.

### 2. Quantitative Evidence of a Compensation Structure

182.    The qualitative evidence above demonstrates there exist compensations structures at Defendant firms. I next find that the quantitative evidence is consistent with the existence of these compensation structures. I consider two distinct analyses to demonstrate this. *First*, I study whether earnings are positively correlated across job levels, conditional on a variety of macroeconomic and healthcare specific controls. That is, if wages for one job level are higher,

---

[489] English Dep. at 48:15–19.
[490] *Id.* at 50:9–51:2; *see also* Ex. PX115 at USPI_CIV_000039752 (a February 2015 email regarding the performance salary adjustment process at USPI).
[491] English Dep. at 51:21–52:13; *see also* Ex. PX118 (an internal 2017 USPI salary planning document listing proposed salary changes for corporate employees).
[492] English Dep. at 51:21–52:13.
[493] Ex. PX109 at USPI_CIV_000810693 (a September 2013 email from English to Karrmann, discussing that "[l]ast year we included a proposed increase of 2% for everyone below the VP level who had not had an adjustment for at least a year as of November 1.").

3154924.9

then are they also higher in another job level? *Second*, I study whether wages are positively correlated within specific job titles. That is, if a random subset of individuals with the same job title had higher wages, would the other individuals with that same job title also have higher wages? The former analysis suggests that there are equity forces at work across job levels within the firm, while the latter suggests that there are compensation structures within job titles.[494]

### a. Wages Are Positively Correlated Across Job Levels

183. To study the extent to which wages co-vary across worker job levels, I take the individual-company-year panel dataset described in Section VI and limit it to Senior-Level Employees. I then define the two job levels studied earlier: whether a worker is a) a Director or b) a Vice President or Senior Vice President. I then calculate the average (effective) hourly wage for each job level in each company in each year (Total Compensation divided by Total Hours worked).[495] To test whether wages for Directors are positively correlated with wages for Vice Presidents and Senior Vice Presidents, I then run the following regressions separately for each company:

$$Ln(Mean\ Director\ Wages_{ct}) = \beta_0 + \beta_1 Ln(Mean\ VP\ and\ SVP\ Wages_{ct}) + \gamma X_{ct} + e$$

184. Where $X_{ct}$ corresponds to the macroeconomic and healthcare controls described in Section VI.C. If $\beta_1 > 0$ and statistically significant, then wages of VPs and SVPs positively co-move with the wages of Directors within the company, even controlling for macroeconomic and healthcare factors that might otherwise cause them to move together.

---

[494] *Olean v. Bumble Bee* at 671 ("Dr. Mangum first performed a pricing correlation test, which demonstrated that the prices of the Tuna Suppliers' products moved up or down together regardless of product or customer type, and thus supported the proposition that the Tuna Suppliers' collusion had a common, supra-competitive impact on their prices.").
[495] I study effective hourly wage because variation in *annual* compensation depends on how many hours were worked that year. That is, even if effective hourly wages are highly correlated, total compensation may not be if there are discrepancies in how many hours individuals work.

3154924.9

185.     The results are provided in **Figure 19.** For each company, the wages of VPs and SVPs are positively correlated with the wages of Directors, both unconditionally and conditional on macroeconomic and healthcare controls. Moreover, these correlations are statistically significant. Indeed, by themselves, the natural log of the average wages of VPs and SVPs explains 38.5 percent of the variation in the natural log of average wages of Directors at DaVita, 90.9 percent at SCA, and 87.9 percent at USPI, as measured by the R-squared values. Thus, knowing just the average wages of VPs and SVPs is in general highly informative of the average wages of Directors.

**Figure 19: Relationship Between Director and (S)VP Wages**

| | Dependent Variable: Ln(Mean Hourly Rate for Directors) | | | | | |
|---|---|---|---|---|---|---|
| | DaVita | | SCA | | USPI | |
| Ln(Mean Hourly Rate of VPs & SVPs) | 0.227*** | 0.260*** | 0.886*** | 0.728* | 0.822*** | 0.953*** |
| | (0.0637) | (0.0512) | (0.0582) | (0.377) | (0.107) | (0.0959) |
| Ln(Avg. State Mgr. Earnings) | | -0.384 | | 0.0729 | | -0.994 |
| | | (0.398) | | (0.481) | | (1.392) |
| Ln(State Health Expend. PC) | | 0.458** | | 0.417 | | 0.320 |
| | | (0.201) | | (0.792) | | (1.267) |
| Covid | | 0.0921 | | -0.0454 | | 0.00167 |
| | | (0.115) | | (0.101) | | (0.167) |
| Ln(State GDP PC) | | -1.225 | | 2.457 | | -3.577 |
| | | (1.848) | | (2.717) | | (3.237) |
| Ln(State Unemployment Rate) | | -0.157 | | 0.119 | | -0.00366 |
| | | (0.135) | | (0.202) | | (0.336) |
| Census Region Annual CPI | | 0.222 | | -0.400** | | 1.377* |
| | | (0.411) | | (0.161) | | (0.744) |
| Observations | 18 | 18 | 15 | 15 | 18 | 18 |
| R-squared | 0.385 | 0.803 | 0.909 | 0.972 | 0.879 | 0.939 |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

186.     These results are consistent with the qualitative evidence that there is a compensation structure within the firm that aligns wages across job levels. **Figure 37** in the Appendix reports the reverse analysis, examining how Director wages relate to VP and SVP wages. The same positive correlations and explanatory power hold.

3154924.9

### b.    Within-Job-Title Wages Are Highly Correlated

187.    A second dimension of compensation structures is to consider whether the wages of workers with the same job title move together. To examine this, I perform a test that relies on the following insight: if there is a compensation structure within a job, then the wages of a random subset of workers within the job will be highly predictive of the wages of the remaining workers with the same job title.

188.    To implement this test, I use a randomized hold-out sample analysis. To illustrate the idea, consider the following example: Suppose that there are 100 Directors in a given company in a given year. I randomly split 50 into group A, and 50 into group B. I then examine whether the average wages of the 50 randomly selected Directors in group A are predictive of the individual wages of the other 50 Directors in group B. If so, then this is strong evidence in favor of a compensation structure.

189.    To implement this test, I take the dataset described in Section VI at the individual-company-year level. Then, I calculate the number of individuals in each job in each company in each year, and I randomly assign half of the individuals in each job in each company in each year to be in a "hold-out sample." With the workers who *are not in the hold-out sample*, I calculate their average hourly wages in their job in that year. I then merge this value into the hold-out sample by job title, company and year. Finally, I regress the natural log of the hourly wages of the individual workers in the hold-out sample against the natural log of the average wages of the randomly selected subset of workers the same job-title, company, and year. I also include the same macroeconomic and healthcare-specific controls as before.

190.    The results are shown in **Figure 20**. For each company, the natural log of the average hourly wages of the random subsample are statistically significantly predictive of the natural log of hourly wages in the hold-out sample. In terms of explanatory power, by

161

themselves, the average wages of the random subset of workers with the same job title explain between 54.2 and 69.3 percent of the total variation in wages in the hold-out sample. These findings are strongly consistent with the existence of a pay structure within jobs.

**Figure 20: Within-Job Hourly Rate are Highly Correlated With Hold Out Sample**

| | Dependent Variable: Ln(Mean Hourly Rate for Directors) | | | | | |
|---|---|---|---|---|---|---|
| | DaVita | | SCA | | USPI | |
| Ln(Hourly Rate of others in same job-year) | 0.873*** | 0.866*** | 0.948*** | 0.952*** | 0.859*** | 0.881*** |
| | (0.0360) | (0.0331) | (0.0253) | (0.0495) | (0.0610) | (0.0576) |
| Ln(Avg. State Mgr. Earnings) | | 0.0722 | | 0.196*** | | 0.209 |
| | | (0.0649) | | (0.0542) | | (0.150) |
| Ln(State Health Expend. PC) | | 0.124* | | 0.00608 | | -0.190*** |
| | | (0.0731) | | (0.126) | | (0.0507) |
| Covid | | -0.00605 | | -0.0292** | | -0.0607*** |
| | | (0.0234) | | (0.0143) | | (0.0204) |
| Ln(State GDP PC) | | 0.0842 | | -0.0634 | | 0.433*** |
| | | (0.0627) | | (0.129) | | (0.0896) |
| Ln(State Unemployment Rate) | | -0.000772 | | 0.0519*** | | 0.101*** |
| | | (0.0425) | | (0.0172) | | (0.0229) |
| Census Region Annual CPI | | 0.0354 | | 0.108** | | 0.226*** |
| | | (0.0375) | | (0.0513) | | (0.0753) |
| Observations | 6,887 | 6,887 | 2,591 | 2,591 | 4,052 | 4,052 |
| R-squared | 0.634 | 0.640 | 0.693 | 0.700 | 0.542 | 0.559 |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

## VIII.   Aggregate Damages

191.    In this section, I calculate aggregate damages to Class Members due to the Challenged Conduct. To do this, I again use the standard but-for world economic framework, where damages to the class are the difference between total compensation but-for the Challenged Conduct and total compensation in the real-world with the Challenged Conduct in place.[496] Real-

---

[496] Theon van Dijk & Frank Verboven, *Quantification of Damages*, in 3 ISSUES IN COMPETITION LAW AND POLICY 2331–2348, 2332 (ABA Section of Antitrust Law 2008) ("The concept underlying most economic damages assessments is that of the 'but-for' world. In the case of a price-fixing agreement, the but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages.").

3154924.9

world compensation is available in the Defendant's data. I compute total compensation but-for the Challenged Conduct using the wages suppression regressions developed in Section VI.

192.    **Figure 21** shows the results of this analysis. For each Defendant, I first calculate the total number of class members present during the Conduct (Column 1) and the total real-world compensation during the Conduct Period (Column 2).[497] I then take the wage suppression estimate from **Figure 8**, which shows that the Challenged Conduct suppressed wages by 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI (Column 3). I then calculate what total compensation would have been but-for the Challenged Conduct (Column 4) by multiplying the real-world compensation by $1/(1-P)$, where P is the Defendant-specific wage suppression.[498] Damages are the difference between the but-for and real world compensation (Column 5). With this, single aggregate damages (that is, damages before any potential trebling) are calculated as $869.5 million, composed of $631.7 in damages for Class Members at DaVita, $113.9 million in damages for Class Members at SCA, and $123.8 million in damages for Class Members at USPI.

---

[497] Note that because the Conduct began in May, we drop the first four months in the first year of the Conduct, scaling the first year's total compensation by 0.67.

[498] Suppose, for example, that total compensation in the actual world was $100, and that the wage suppression estimate found by the model was as 10 percent. Letting real-world compensation but-for the Conduct be X, we know that $X(1-0.1)=\$100$, where 0.1 is the 10 percent wage suppression. Solving for X gives $X=\$100/(1-0.1)$, such that Total But-For Compensation is $111.11. This example helps us understand that the Total But-For Total Compensation is $1/(1-P)*$Total Compensation Under the Conduct, where P is the wage suppression estimate.

163

**Figure 21: Aggregate Damages by Defendant**

| Company | Number of Class Members | Total Compensation Under the Conduct ($M) | Wage Suppression Percentages | But-For Total Compensation ($M) | Damages ($M) |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] = [2]/(1-[3]) | [5] = [4] - [2] |
| DaVita | 3,439 | $3,041.1 | 17.2% | $3,672.9 | $631.7 |
| SCA | 1,390 | $705.5 | 13.9% | $819.4 | $113.9 |
| USPI | 1,551 | $908.2 | 12.0% | $1,032.0 | $123.8 |
| | | | | **Total Single Damages ($M):** | **$869.5** |

*Note:* Outlier observations (as defined above) are conservatively removed from these damages calculations.

193.     Across all unique Class Members over the 12-year Conduct Period, average damages to each Class Member-year comes to $26,707.[499] **Figure 22** through **Figure 25** show Class Members' total compensation and damages visually by year in total and for each Defendant separately.

---

[499] I calculate these average damages by first determining the number of unique Class Members (excluding outliers) who are present during the Conduct Period. I sum up the total number of years in the Conduct Period for which each Class Member works at a Defendant company. I divide the total single damages ($869.5) by the 32,556 unique Class Member-Years, yielding $26,707 per Class Member-Year.

164

3154924.9

**Figure 22: Yearly Damages — All Defendants**



*Note:* The total but-for and Class compensation for all Defendants decreases in 2019, likely as a result of DaVita's sale of a portion of its business, DaVita Medical Group, to Optum (a subsidiary of UnitedHealth Group) in 2019. *See Press Release: Optum completes acquisition of DaVita Medical Group from DaVita,* UNITEDHEALTH GROUP (Jun. 19, 2019) https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html. The corresponding total compensation is therefore decreasing as well. In 2015, the increase in total but-for and Class compensation appears to be related to Tenet's acquisition of USPI. *See Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform*, TENET HEALTHCARE (Mar. 23 2015), https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx. Around this time, USPI executives discussed the need to expand their workforce to expend Tenet's proposed investment in USPI. *See* Ex. PX479. The acquisition could explain the total compensation increase in 2015.

165

**Figure 23: Yearly Damages — DaVita**



*Note:* The drop in total but-for and Class compensation in 2019 coincides with when DaVita Inc. completed a sale of a portion of its business, DaVita Medical Group, to Optum (a subsidiary of UnitedHealth Group). The overall compensation thus dropped in 2019. *See Press Release: Optum completes acquisition of DaVita Medical Group from DaVita,* UNITEDHEALTH GROUP (Jun. 19, 2019) https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html.

166



**Figure 24: Yearly Damages — SCA**

3154924.9

**Figure 25: Yearly Damages — USPI**



☐ USPI But-For Compensation ($M)   ☐ USPI Class Compensation ($M)

*Note:* In 2015, Tenet Healthcare became the majority shareholder in USPI and began the process of merging the two companies. *See Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform*, TENET HEALTHCARE (Mar. 23 2015), https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx. Around this time, USPI executives discussed the need to expand their workforce to expend Tenet's proposed investment in USPI. *See* Ex. PX479. The acquisition could explain the sudden total compensation increase in 2015.

## IX.    Market Power

194.    Market power is the ability of a firm to restrict output, raise prices, suppress wages, reduce quality or consumer choice, or inhibit innovation relative to the levels that would have prevailed under competition.[500] The terms "monopoly power" and "monopsony power" are

---

[500] *See* MODERN IO 3RD ED. at 88–98; *see also* Thomas Krattenmaker et al., *Monopoly Power and Market Power in Antitrust Law*, 76 GEORGETOWN LAW JOURNAL 241–269, 241 (1987); Timothy Brennan, *Bundled Rebates as Exclusion Rather Than Predation*, 4 J. COMPETITION LAW & ECON. 335–374, 335 (2008).

3154924.9

directionally specific variants of the term "market power."[501] A firm or a group of firms has *selling* power or monopoly power if it possesses "the power to control prices or exclude competition" in some relevant output market.[502] Monopsony power or *buying* power[503] is the mirror image of monopoly power on the input side of the market. A firm possesses monopsony power if it wields market power over factors of production, such as labor.[504] The harm to competition from monopsony is directly analogous to the harm from monopoly.

195.    In this matter, Defendants are alleged to have market power, specifically monopsony power, over Class Members. This market power is alleged to have been achieved or increased via the Challenged Conduct.

196.    Market power can be directly established if there is evidence of the ability of firms to suppress wages below competitive levels.[505] In the instant case, the evidence of wage

---

[501] MODERN IO 3RD ED. at 7–8.

[502] *United States v. E. I. du Pont de Nemours & Co.* ("*Cellophane*"), 351 U.S. 377, 391 (1956).

[503] *Horizontal Merger Guidelines*, DOJ & FTC (2010) §1; §12 [hereafter *Merger Guidelines 2010*].

[504] *See, e.g.*, MODERN IO 3RD ED. at 105–107. *See also Merger Guidelines 2010* §1 ("Enhancement of market power by buyers, sometimes called "monopsony power," has adverse effects comparable to enhancement of market power by sellers. The Agencies employ an analogous framework to analyze mergers between rival purchasers that may enhance their market power as buyers.").

[505] *Horizontal Merger Guidelines*, DOJ & FTC (2023) §4.3 ("Direct evidence of the exercise of market power can demonstrate the existence of a relevant market in which that power exists. This evidence can be valuable when assessing the risk that a dominant position may be entrenched, maintained, or extended, since the same evidence identifies market power and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized."); Carl Shapiro, *Antitrust: What Went Wrong and How to Fix It*, 35(3) ANTITRUST L. J. 33–45, 40 (2021) ("IO economists know that the actual economic effects of a practice do not turn on where one draws market boundaries. I have been involved in many antitrust cases where a great deal of time was spent debating arcane details

169

3154924.9

suppression found in Section VI directly demonstrates that Defendants wield market power over Class Members. Put differently, Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members. These common methods and evidence are thus direct proof of Defendants' market power.

## X. Conclusions

197. Plaintiffs allege that both DaVita and SCA and USPI and SCA engaged in two forms of Challenged Conduct to suppress the pay of their Senior-Level Employees: (1) *No-Poach Agreements* not to proactively recruit each other's Senior-Level Employees; (2) *CSI Exchanges*, which included compensation data. I was tasked with assessing the extent to which the qualitative and quantitative evidence is consistent with anticompetitive collusion, whether all or nearly all members of the Class experienced harm as a result of the Challenged Conduct, and to estimate the amount of that harm (the amount by which Defendants' suppressed Class pay).

198. The qualitative evidence, which consists of direct communications between company executives, documentary evidence, as well as detailed deposition testimony and FBI interview summaries, is consistent with anticompetitive collusion and inconsistent with unilateral

---

of market definition, distracting from the real economic issues in the case. I shudder to think about how much brain damage among antitrust lawyers and economists has been caused by arguing over market definition."). Aaron S. Edlin & Daniel L. Rubinfeld, *Exclusive or Efficient Pricing? The Big Deal Bundling of Academic Journals*, 72 ANTITRUST L. J. 119, 141 (2004) ("Market definition is only a traditional means to the end of determining whether power over price exists. Power over price is what matters . . . if power can be shown directly, there is no need for market definition: the value of market definition is in cases where power cannot be shown directly and must be inferred from sufficiently high market share in a relevant market."); Daniel A. Crane, *Market Power Without Market Definition*, 90 NOTRE DAME L. REV. 31, 43 (2014) ("Although the market definition/market share paradigm predominates in antitrust analysis, formal doctrine holds that this is merely one of two available routes to proving market power; the other being a "direct" evidence route."); ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS, 229 (7th ed. 2012) (noting that economists and antitrust practitioners have embraced the use of direct evidence of monopoly power in antitrust litigation).

3154924.9

competition. The quantitative evidence I examined, which derives from Defendants' payroll data, is also consistent with anticompetitive collusion over approximately a decade, and inconsistent with unilateral competition. I find that the Challenged Conduct reduced employee mobility between the covered Defendants and lowered compensation at Defendants by approximately 14.5 percent annually. Defendant-specific results indicate similar harm at each company. Moreover, using a range of empirical tests, I estimate that all or nearly all Senior-Level Employees were harmed by the Conduct. I provide qualitative and quantitative evidence that Defendants use compensation structures that are capable of transmitting harm classwide. These results are consistent with broad empirical evidence in the economics literature that No-Poach Agreements and other similar limits on employee outside options reduce employee mobility and compensation.

199.    Relative to the average annual compensation of a Senior-Level Employee during the Conduct Period, this 14.5 percent wage suppression amounts to approximately $26,707 annually per Class Member. In total, over the course of the approximately decade-long Conduct Period, I estimate that as a result of the Challenged Conduct Defendants were able to underpay Senior-Level Employees by, cumulatively, $869.5 million.

*        *        *

Dated: January 15, 2025                 Respectfully submitted,

/s/ _____
Evan P. Starr

171

3154924.9

## PROOF OF SERVICE

I, Sarah D. Zandi, an attorney, hereby certify that on January 15, 2025, I served a true and correct copy of the foregoing **Expert Witness Report of Dr. Evan P. Starr** by electronic mail upon the following parties and non-parties as set forth below:

| | |
|---|---|
| Kenneth M. Kliebard<br>Staci M. Holthus<br>MORGAN, LEWIS & BOCKIUS LLP<br>110 North Wacker Drive<br>Chicago, IL 60606<br>(312) 324-1000<br>Kenneth.kliebard@morganlewis.com<br>Staci.holthus@morganlewis.com | Jeffrey C. Bank<br>Jordanne Steiner<br>WILSON SONSINI GOODRICH &<br>ROSATI, P.C.<br>1700 K Street NW, Fifth Floor<br>Washington, DC 20006<br>(212) 497-7761<br>jbank@wsgr.com<br>jordanne.miller@wsgr.com |
| Amy B. Manning<br>MCGUIREWOODS LLP<br>77 West Wacker Drive<br>Suite 4400<br>Chicago, IL 60601-7567<br>amanning@mcguirewoods.com | Veronica Moyé<br>KING & SPALDING LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br>(215) 556-2100<br>vmoye@kslaw.com |
| Brian Joseph Smith<br>K&L GATES, LLP<br>70 W. Madison Street<br>Chicago, IL 60602<br>(312) 807-4202<br>brian.j.smith@klgates.com | Molly Moriarty Lane<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Market<br>Spear Street Tower<br>San Francisco, CA 94105-1596<br>(415) 442-1000<br>Molly.lane@morganlewis.com |
| Jeffrey E. Stone<br>Katharine M. O'Connor<br>MCDERMOTT, WILL & EMERY LLP<br>444 West Lake Street, Suite 400<br>Chicago, IL 60605<br>(312) 372-2000<br>jstone@mwe.com<br>koconnor@mwe.com | |

Dated: January 15, 2025           Respectfully submitted,

_/s/ Sarah D. Zandi_____
Sarah D. Zandi

172

3154924.9

## APPENDIX A

### Dr. Evan P. Starr

University of Maryland,
Robert H. Smith School of Business
Management and Organization
4512 Van Munching Hall
7621 Mowatt Lane
College Park, Maryland, 20742
estarr@umd.edu

E-mail: estarr@umd.edu
http://evanpstarr.com/http://evanpstarr.com/
Google Scholar Profile

Phone: +1 (301) 405-1054
Citizenship: US

**Employment**

| | |
|---|---|
| August 2021 – | Associate Professor (with tenure), Robert H. Smith School of Business, Department of Management and Organization, University of Maryland |
| August 2015 – July 2021 | Assistant Professor, Robert H. Smith School of Business, Department of Management and Organization, University of Maryland |
| August 2014 – August 2015 | Assistant Professor, School of Labor and Employment Relations and the Department of Economics, University of Illinois at Urbana Champaign |
| August 2010 – May 2011 | Instructor, Department of Strategy and Policy, National University of Singapore Business School |

**Education**

| | |
|---|---|
| 2014 | *Ph.D.* in Economics, University of Michigan, |
| 2009 | *Master of Arts* in Economics, University of Michigan |
| 2007 | *Bachelor of Arts* in Mathematics, Economics, Spanish, Denison University (*Summa Cum Laude*) |

**Published Manuscripts**[*]

1) *Balasubramanian, Natarajan, Evan Starr, and Shotaro Yamaguchi, "Employment Restrictions on Resource Transferability and Value Appropriation from Employees" Forthcoming at *Strategic Management Journal*.

2) *Lipsitz, Michael, Takuya Hiraiwa, and Evan Starr. "Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach" (ungated) Forthcoming at *Review of Economics and Statistics*.

3) Teodorovicz, Thomaz, Prithwiraj Choudhury, and Evan Starr, "Location-Specificity and Geographic Competition for Remote Workers." (ungated) *Organization Science* (2024).

---

[*] Alphabetical by author last name.

3154924.9

4) King, Ben, Martin Ganco, and Evan Starr, "Reconciling Theories on Why Employees of Small Firms Are More Likely to Become Entrepreneurs" (ungated) *Industrial and Corporate Change (*2024) 33(1):194–215.

5) *Prescott, JJ and Evan Starr, "Subjective Beliefs about Contract Enforceability." (ungated) *Journal of Legal Studies.*

6) *Rothstein, Donna and Evan Starr, "Mobility Restrictions, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997." *BLS Monthly Labor Review, June 2022.*

7) *Lipsitz, Michael, and Evan Starr, "Low-Wage Workers and the Enforceability of Non-Compete Agreements." *Management Science* (2022) 68(1):143–170. (ungated)
   • Academy of Management Best Paper Proceedings 2020
   • Finalist, Best Paper Award for the Careers Division of the Academy of Management 2020

8) Starr, Evan, JJ Prescott, and Norman Bishara, "Noncompete Agreements in the US Labor Force." *Journal of Law and Economics* (2021) 64:1 53-84. (ungated)

9) *Balasubramanian, Natarajan, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, and Evan Starr, "Locked In? Noncompete Enforceability and the Careers of High Tech Workers." *Journal of Human Resources* (2020): 1218-9931R1.
   • Academy of Management Best Paper Proceedings 2016 ("Locked In? Noncompete Enforceability and the Mobility and Earnings of High-Tech Workers")
   • Winner, Academy of Management BPS Distinguished Paper Award 2016

10) Starr, Evan and Brent Goldfarb, "Binned Scatterplots: A Simple Tool to Make Research Easier and Better." *Strategic Management Journal* 12 (2020): 2261-2274. (ungated)

11) Starr, Evan, JJ Prescott, and Norman Bishara, "The Behavioral Effects of (Unenforceable) Contracts." *Journal of Law, Economics, and Organization*, (2020) 36(3): 633–687. (ungated)
   • Academy of Management Best Paper Proceedings 2019 ("Noncompetes and Employee Mobility")
   • Winner, Careers Michael Driver Best Applied Paper Award 2019

12) Choudhury, Prithwiraj, Evan Starr, and Rajshree Agarwal, "Machine Learning and Human Capital Complementarities: Experimental Evidence on Bias Mitigation." *Strategic Management Journal*, 8 (2020): 1381-1411. (ungated) (video abstract)
   • Winner, Best Conference Paper Award, Strategic Management Society 2019
   • Winner, Best Interdisciplinary Paper Award, Strategic Human Capital Interest Group at the Strategic Management Society 2019

13) Starr, Evan, Justin Frake, and Rajshree Agarwal. "Mobility Constraint Externalities." *Organization Science*, (2019), 30(5): 961-980. (ungated)

174

3154924.9

14) Starr, Evan, "Consider This: Training, Wages and the Enforceability of Covenants Not to Compete." *ILR Review*, (2019), 72(4): 783–817. (ungated)

15) Starr, Evan, Martin Ganco, and Benjamin Campbell, "Strategic Human Capital Management in the Context of Cross-Industry and Within-Industry Mobility Frictions." *Strategic Management Journal* (2018) 39(8): 2226-2254. (ungated)

16) Starr, Evan, Natarajan Balasubramanian, and Mariko Sakakibara. "Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms." *Management Science*, (2018), 64(2): 552-572. (ungated)
    • Academy of Management Best Paper Proceedings 2014 (1), 13238 ("Enforcing Covenants Not to Compete: The Lifecycle Impact on New Firms")

17) *Bishara, Norman and Evan Starr, "The Incomplete Noncompete Picture." *Lewis & Clark Law Review,* (2016), 20: 497–546.
    • Reprinted in *Employment Law and Intellectual Property Law: Critical Concepts in Intellectual Property Law Series*, Edited by Ann L. Monotti (2018).

18) Prescott, JJ, Norman Bishara, and Evan Starr, "Understanding Noncompetition Agreements: The 2014 Noncompete Survey Project." *Michigan State Law Review,* (2016), 369-464.

**Working Papers**

1) Frake, Justin, Anthony Gibbs, Brent Goldfarb, Takuya Hiraiwa, Evan Starr, and Shotaro Yamaguchi, "From Perfect to Practical: Partial Identification Methods for Causal Inference in Strategic Management Research." *(Minor Revision at Strategic Management Journal)*

2) Greenwood, Brad, Bruce Kobayashi, and Evan Starr, "Can you keep a secret? Banning noncompete clauses does not increase trade secret litigation." (*Revise and Resubmit at Journal of Law, Economics, and Organization*)

3) *Sockin, Jason, Aaron Sojourner, and Evan Starr, "Non-Disclosure Agreements and Externalities from Silence." Updated September, 2022. *(Under Review)*
    • Winner, Strategy Science 2022 Conference Best Paper Award

4) *Adrjan, Pawel, Svenja Gudell, Emily Nix, Allison Shrivastava, Jason Sockin, Evan Starr, "We've Got You Covered: Employer and Employee Responses to Dobbs v. Jackson" *(Under Review)*.

5) *Cowgill, Bo Brandon Frieberg, and Evan Starr, "Clause and Effect: Theory and Field Experimental Evidence on Noncompete Clauses."

6) Pillai, Sandeep, Brent Goldfarb, David Kirsch, Seojin Kim, and Evan Starr, "From Hypothesis Testing Towards Inference to Best Explanation: Testimonial Structure for Abductive Studies in Strategy." (*Under Review*)

3154924.9

7) *Kryscynski, David and Evan Starr, "Examining Employment Practice Bundles: When Firms Adopt Value Creation and Value Protection Practices." *(Resting)*

8) Balasubramanian, Natarajan, Mariko Sakakibara, Evan Starr, and Seethalakshmi Ramanathan, "Restricting Physician Noncompete Agreements and Healthcare Access." *(Resting)*

9) Goldfarb, Brent, David Waguespack, and Evan Starr, "Verifying Published Work: The Case of Family Firms and Pollution." *(Resting)*

**Works In Progress**

1) *Balasubramanian, Natarajan, Martin Ganco, Ben King, Evan Starr, and Jake Valentine, "Employment Restrictions, Idea Generation and Entrepreneurship" *(Data analysis stage)*

2) *Kambayashi, Ryo, Evan Starr, and Shotaro Yamaguchi, "Noncompete Agreements in the Japanese Labor Force" *(Data analysis stage)*

3) *Braguinsky, Serguey, Seth Carnahan, Joonkyu Choi, Yuheng Ding, Martin Ganco, Florence Honore, Evan Starr, "Management and Organizational Practices, Business Dynamism, Employee Sorting, and Entrepreneurship" (*Data analysis stage*)

**Book Chapters and Policy Briefs**

1) Noncompete Clauses: A Policymaker's Guide through the Key Questions and Evidence. October 2023. Policy Brief written for the Economic Innovation Group.

2) How Do Broad Non-Disclosure Agreements Affect Labor Markets? With Aaron Sojourner and Jason Sockin, *Upjohn Institute.* November 2022.

3) "Work-From-Anywhere As A Public Policy: Three Lessons from the Tulsa Remote Program." *Brookings Institute 2022.* With Prithwiraj Choudhury and Thomaz Teodorovicz.

4) Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining in Non-Disclosure Agreements, with Rachel Arnow-Richman, Gretchen Carlson, Orly Lobel, Julie Roginsky, and Jodi Short. January 2022. *Day One Project*.

5) Tackling the Dual Economic and Public Health Crises Caused by COVID-19 in Baltimore Early Lessons from the Baltimore Health Corps Pilot, with Dylan Roby, Neil Sehgal, Elle Pope, and Melvin Seale. April 2021. *Rockefeller Foundation.*

6) Are Noncompetes Holding Down Wages? Chapter in *Inequality and the Labor Market: The Case for Greater Competition*. Brookings Institution Press, Edited by Ben Harris and Sharon Block 2021.

3154924.9

7) [Recent Arguments for Reforming the Law Surrounding Noncompete Agreements](#), with Mike Lipsitz. Chapter in *Practicing Law Institute Course Handbook* on *Noncompetes and Restrictive Covenants 2020: What Every Lawyer, Human Resources Professional, and Key Strategic Decisionmaker Should Know,* December 2019.

8) [The Use, Abuse, and Enforceability of Non-Compete and No-Poach Agreements: A Brief Review of the Theory, Evidence, and Recent Reform Efforts](#). Policy brief written for Economic Innovation Group, February 2019.

**Popular Press and Other Writing**

1) [First Evidence on the Use of Training Repayment Agreements in the US Labor Force](#), *Promarket.org*, with JJ Prescott and Stewart Schwab. March 27, 2024.

2) [Jobs after Dobbs: How Public Support for Female Employees Both Helped and Hurt Some Employers After Roe v. Wade Was Overturned](#), *Indeed Hiring Lab*, with Pawel Adrjan, Svenja Gudell, Emily Nix, Allison Shrivastava, and Jason Sockin. August, 2023.

3) [Comment submitted to the Federal Trade Commission with regards to the proposed noncompete rule,](#) April 2023.

4) [Franchise owners are colluding to suppress Minnesota workers' wages](#), *Minnesota Reformer*, March 2023, with Aaron Sojourner.

5) [Companies Say They Need Noncompete Clauses. Here's How We Know That's Not True.](#) *Slate,* March 2023, with Takuya Hiraiwa.

6) [Work-from-anywhere as a public policy: 3 findings from the Tulsa Remote program](#), *Brookings Institute*, September 2022, with Thomaz Teodorovicz and Prithwiraj Choudhury.

7) [The Ties that Bind Workers to Firms: No-Poach Agreements, Noncompetes, and Other Ways Firms Create and Exercise Labor Market Power](#). *Promarket.org.* January 2022.

8) [What happens when states limit nondisclosure agreements? Employees start to dish.](#) *Washington Post* October 4, 2021. With Jason Sockin and Aaron Sojourner.

9) [Banning Noncompete Agreements Benefits Low-Wage Workers](#), *Promarket.org* with Mike Lipsitz. October 2019.

10) [A new White House proposal targets a hidden culprit holding down Americans' pay](#), *Vox.com*, October 2016.

**Fellowships and Awards**

1) Smith Teaching Innovation Grant ($6,000), with David Waguespack (Summer 2024)
2) Russel Sage Foundation Grant for $65,000, with Emily Nix and Jason Sockin (October 2023)

177

3) Emerging Fellow at the Smith School (October 2023 to August 2028)
4) Research Grant for $24,000 from sponsor (name withheld due to contract requiring the name of the organization to not be disclosed). September 2023.
5) Russel Sage Foundation Presidential Grant $25,000, with Bo Cowgill (June 2023)
6) Robert H. Smith School of Business External Research Impact Award 2023
7) Allen J. Krowe Excellence in Teaching Award 2022
8) Russel Sage Foundation Presidential Grant $50,000, with Bo Cowgill (October 2020)
9) Rockefeller Foundation Grant $275,000, with Dylan Roby, Neil Sehgal, Melvin Seale (July 2020 to December 2021)
10) Teaching Innovation Grant $12,700 (Summer 2020)
11) Upjohn Institute Early Career Research Award (March 2020)
12) Robert H. Smith School Distinguished Teacher Award (2016, 2019)
    - Top 10% of student evaluations across the Smith School in the previous year
13) University of Maryland Research Communicator Impact Award (May 2017)
    - Given to 3 individuals University-wide
14) Kauffman Grant for $237,937 (Dec 2015 to Dec 2018)
15) SYLFF Fellowship (Winter 2014)
16) Office of the Vice President for Research $15,000 Matching Grant (for Noncompete Survey)
17) Mitre Economics Research Award $5,000 (Spring 2013, Fall 2013, for Noncompete Survey)
18) University of Michigan Rackham Research Award (Summer 2013)
19) University of Michigan Rackham Graduate School Dissertation Fellowship (Winter 2013)
20) University of Michigan Center for Research on Learning and Teaching Preparing Future Faculty Program (May 2012)
21) Michigan Economics Society Outstanding Graduate Student Instructor Award (2009-10)
    - Voted by all University of Michigan Economics undergraduate students
22) Letters of Commendation for Excellent Teaching (Fall 2008, Fall 2009, Winter 2010)
    - Voted top 10 Graduate Student Instructors in Economics at UM
23) University of Michigan Research Grant (Summer 2008, 2009)
24) Denison University President's Medalist (2007): Top Academic Award at University
25) Phi Beta Kappa (Spring 2007)

**Conferences, Keynotes, and Seminar Presentations**

**2025 (planned):** New York University Law School

**2024:** Columbia Business School, University of North Carolina, Eastern Economic Association, University of Toronto, Federalist Society, Economic Innovation Group, UK Competition Authority, Spring American Bar Association Antitrust Meetings, Columbia Law School, Brookings Institute, Non-Market Strategy Conference at Columbia University, Rochester Labor Conference, Strategy and Business Environment Conference at the University of Virginia, Hal White Antitrust Conference, Empirical Contracts Conference at UPenn Law, OECD Noncompete Webinar (Keynote), American Bar Association Debate on the Economics of Non-Compete Agreements, Richmond Association for Business Economics and Virginia Association of Economists, Virginia Commonwealth University, Federal Trade Commission Microeconomics Conference

178

3154924.9

**2023:** American Economic Association, Georgetown University McDonough School of Business, Technology Policy Research Initiative at Boston University, Denison University, University of Utah, Strategy Research Forum, Non-Market Strategy Conference at Columbia University, Empirical Contracts Conference at NYU Law, Strategy and Business Environment Conference at Georgetown University, Bureau of Labor Statistics, Strategic Management Society, Regulatory Transparency Project Webinar on Noncompete Agreements, Economic Policy Institute Virtual Panel, American Bar Association Hot Tub Debate, Economic Innovation Group American Dynamism Series, University of Maryland Smith School Advisory Board, American Antitrust Institute Annual Policy Conference, OECD Webinar on Non-competes (Keynote), Conference on Empirical Legal Studies, People and Organization Conference at Wharton, Australian Treasury and e61 Institute Webinar on Non-compete Clauses (Keynote)

**2022:** LMU Munich, London Business School, Society of Labor Economists, University of Florida Methodological Frontiers Mini-Conference, University of Maryland Snider Center Conversations, Strategic Management Society Methods Program, Google, Academy of Management, Strategic Management Society, SKEMA, Monopsony, Wages and Work Conditions Conference, Duke University, University of Southern California, People & Organizations Conference at Wharton, Department of Justice, American Bar Association Antitrust Fall Forum, Strategy Science, Minneapolis Fed How the Rules of the Labor Market Matter for Workers

**2021:** UT Austin, Society of Labor Economists, Copenhagen Business School, UCLA Anderson, Western Economic Association International, Society for Institutional and Organizational Economics, Academy of Management, Strategic Management Society, Labor and Employment Relations Association, Ludwig Maximilian University of Munich, Navigating Law of Trade Secrets Conference, Practicing Law Institute Conference on Noncompetes and Other Restrictive Covenants, People & Organizations Conference at Wharton, KCON Contracts Conference, NYC Bar Association Trade Secret and Noncompete Forum

**2020:** American Economic Association, Washington University St. Louis, Practicing Law Institute Conference on Noncompetes and Restrictive Covenants 2020, University of Florida (2 Presentations), George Mason University Attorney General Education Program, ESMT Berlin, Boston University School of Law Conference on Technology and Declining Economic Dynamism, George Mason University Scalia Law School, Georgetown Law and Economics Workshop, People and Organizations Conference, Strategic Management Society Conference, Academy of Management, CUNY Baruch Zicklin School of Business, Johns Hopkins Carey School of Business (postponed), London Business School (postponed)

**2019:** American Economic Association, Cornell Law School, Hitotsubashi University, Japanese Cabinet Office, Academy of Management, Darden Global Entrepreneurship and Innovation Research Conference (discussant), Syracuse University Conference on the Changing Nature of Work and Workplaces, Dartmouth Strategy Conference, Strategic Management Society Conference, University of Michigan, University of Maryland Summer Seminar, People and Organizations Conference at Wharton, Federal Trade Commission, University of Maryland Smith School Advisory Board, Bureau of Economic Analysis

179

**2018:** American Intellectual Property Law Association, INSEAD Conference on Innovator Mobility, Labor and Employment Relations Association, University of Minnesota Department of Work and Organizations, Consortium for Competition and Cooperation (participant) at UC Berkeley, Wharton Technology and Innovation Conference, Strategy Research Forum, Unrigging the Labor Market at Harvard Law School, Monopsony in Labor Markets Conference, University of Maryland Summer Seminar, Cornell University, Department of Justice Antitrust Division, Federal Trade Commission Hearings on Competition in the 21st Century, Aspen Institute, Conference on Empirical Legal Studies at the University of Michigan, NBER Summer Institute (participant)

**2017:** Harvard Business School, Clemson University, Utah-BYU Winter Strategy Conference, NYU Economics of Strategy Workshop, SMS Milan, Bureau of Labor Statistics, Dartmouth Strategy Conference, Society of Labor Economists, Industry Studies Association, Strategy Research Forum, DRUID, Western Economic Association International, Strategic Management Society, Frontiers of Entrepreneurial Strategy at Wharton, Consortium for Competitiveness and Cooperation (participant), Harvard Business School WIGE Mini-Conference, People and Organizations Conference at Wharton, University of Maryland Brown-Bag Seminar, Empirical Management Conference at the World Bank, NBER Summer Institute (participant)

**2016:** American Economic Association, University of Maryland Smith Entrepreneurship Research Conference, Society of Labor Economists, American Law and Economics Association at Harvard Law School, Consortium for Competitiveness and Cooperation (participant), Society for Institutional and Organizational Economics at Sciences Po, Strategy Summer Camp at Dartmouth College, Academy of Management, Strategic Management Society, People and Organizations Conference at Wharton, Census Bureau, Duke Strategy Conference, Roundtable for Engineering Entrepreneurship Research (REER) at Georgia Tech, Illinois Attorney General's Office**,** NBER Summer Institute (participant

**2015:** American Economic Association (2 Presentations), University of Delaware, American Law and Economics Association at Columbia University Law School, Industry Studies Association, International Society for New Institutional Economics at Harvard Law School, Society of Labor Economists, Lewis and Clark Fall Forum, Academy of Management, Strategic Management Society, U.S. Department of the Treasury, Roundtable for Engineering Entrepreneurship Research (REER) at Georgia Tech, University of Michigan Law and Economics Seminar

**2014:** IZA Entrepreneurship Conference at the University of Potsdam, The International Society for New Institutional Economics at Duke University, University of Pennsylvania Wharton Mack Institute Conference on Entrepreneurship and Innovation, Census Bureau Center for Economic Studies, Department of Justice Antitrust Division, Federal Trade Commission, Oberlin College, California State University Fullerton, University of Illinois Urbana Champaign, University at Buffalo, University of Maryland Smith School of Business

3154924.9

**2011-2013**: Business Econ & Public Policy, Kelley School of Business at Indiana University, Industrial Organization Seminar at the University of Michigan, Zwerdling Labor Seminar at the University of Michigan (2 times), Research Data Center Conference (Census Bureau) at the Atlanta Fed, EconCon at Columbia University, Summer Seminar at the University of Michigan, London Business School Trans-Atlantic Doctoral Conference, Midwestern Economics Association

**Editorial Positions**
Associate Editor, Strategic Management Journal (2021 - )
Associate Editor, Management Science (2019 - )
Editorial Board Member, Strategy Science (2022 - )
Editorial Board Member, Strategic Management Journal (2019 - 2021)

**Refereeing For**
American Economic Review: Insights, Management Science, Quarterly Journal of Economics, American Economic Review, Review of Economics and Statistics, Organization Science, Strategic Management Journal, Administrative Science Quarterly, Journal of Labor Economics, The Journal of Human Resources, American Economic Journal: Applied, Industrial and Labor Relations Review, Journal of Law, Economics, and Organization, Journal of Law and Economics, American Law and Economics Review, Academy of Management Review, Research Policy, Strategy Science, Strategic Entrepreneurship Journal, Journal of Economics and Management Strategy, Journal of Business Venturing, Industry and Innovation, Information Systems Research, Journal of Management Studies, European Financial Management Review, Advances in Strategic Management, Organizational Research Methods, Production and Operations Management, Academy of Management Annual Conference, Strategic Management Society Annual Conference

**Professional Affiliations**

- Strategic Management Society
- Labor and Employment Relations Association
- American Economic Association
- Society of Labor Economists
- Academy of Management
- American Law and Economics Association
- Society for Institutional and Organizational Economics
- Strategy Research Forum

**Teaching**

1) The Best Methods Course Ever, Really (PhD), co-taught with Brent Goldfarb, University of Maryland Smith School of Business (Fall 2017 *4/4*, Fall 2019 *4/4* )
2) Strategic Management (MBA), University of Maryland Smith School of Business (Fall 2019 *3.7/4*, Fall 2020, 3.9/4)

181

3154924.9

3) Strategic Management (Undergrad), University of Maryland Smith School of Business (Spring 2016 *3.81/4*, Spring 2017 *3.16/4*, Fall 2017 *3.52/4*, Spring 2019 *3.7/4*, Fall 2019 *3.8/4,* Fall 2020 *3.7/4*)
4) Quantitative Methods (Masters Level), University of Illinois Urbana Champaign (Spring 2015)
5) Labor Economics II (PhD), University of Illinois Urbana Champaign (Fall 2014)

*Instructor:*

1) International Macroeconomics, National University of Singapore (Winter 2011)
2) Managerial Economics, National University of Singapore (Winter 2011, Fall 2010)
3) Introduction to Macroeconomics, University of Michigan (Summer 2008)

*Graduate Student Instructor:*

1) Applied Microeconometrics (Graduate Level), University of Michigan (Fall 2012)
2) Introduction to Microeconomics, University of Michigan (Winter 2012)
3) Intermediate Macroeconomics, University of Michigan (Winter 2010)
4) Intermediate Microeconomics, University of Michigan (Winter 2009, Fall 2009)
5) Introduction to Macroeconomics, University of Michigan (Fall 2008)
6) Government Regulation of Industry, University of Michigan (Winter 2008)

**Selected Media Coverage**

*Interviews:*

1) "Evan Starr | The Noncompete Effect, From CEOs to Sandwich Makers" EMERGE Everywhere Podcast, Financial Health Network, August 7, 2024

2) "Does the FTC Ban Get It Right or Go Too Far? Economists Debate the FTC Non-Compete Rule" *Our Curious Amalgam Podcast, American Bar Association* July 1, 2024.

3) "La Prohibición de los acuerdos do no competencia (NCA) por la FTC", *Contrafactual* June 12, 2024.

4) "No one knows what's in the fine print," *The New Way We Work Podcast* June 3, 2024.

5) "This often-hidden aspect of employment contract costs U.S. employees $300 billion a year", *Fast Company* June 3, 2024.

6) "May Day: The FTC Bans Noncompete Agreements", *WORT 89.9 A Public Affair*, May 1, 2024

7) "Would $10,000 convince you to move to a new city?" *MarketWatch Best New Ideas in Money* podcast, June 1, 2023

3154924.9

8) "She Can't Own Me: Inside the FTC's Proposed Ban on Noncompetes." *UnCommon Law* Podcast, May 31, 2023

9) "Banning Noncompetes is Good, Actually (With Evan Starr)" *Pitchfork Economics*, April 4, 2023

10) "Why Noncompetes Could Soon Be a Non-Thing," *Maryland Today*, March 14, 2023

11) "What an FTC Noncompete Ban Could Mean for Workers and Businesses" *Sloan Management Review*, February 22, 2023

12) "Slingshot Episode 3," *The Slingshot*, February 17, 2023

13) Guest Starr Discusses The Research Behind the FTC's Proposed Noncompete Ban, *Fairly Competing,* February 4th, 2023

14) "What a Ban on Non-compete Agreements Could Mean for American Workers," *The New Yorker*, January 10, 2023

15) "Biden administration may ban 'exploitative practice' of non-compete clauses," *Fox 13 Tampa Bay,* January 6, 2023

16) "More evidence worker noncompete contracts hurt wages," *Scripps National News*, March 2022

17) "Evan Starr on The Economic Benefits of Banning Non-competes," *The Capitol Forum Second Request Podcast,* February 2022

18) "Take the Lead", *Bloomberg Quicktake,* October 2021

19) Interview re: Biden's Executive Order, *Bloomberg Radio,* July 2021

20) Interview with Global Antitrust Institute, June 2020

21) "Gretchen Carlson Urges 2020 Candidates To End NDAs" *Newsy*, February 2020.

22) "How Fair – Or Legal – Are Non-Poaching Agreements?" *Knowledge@Wharton*, July 17, 2018

23) "For American workers, noncompete agreements are pervasive – and might hold down their wages" *NPR Interview on 'Marketplace,'* July 5, 2018.

24) "Employers use non-compete agreements even for low-wage workers." *Baltimore Sun, July 2017*.

3154924.9

25) "Study Finds Many Companies Require Non-Compete Clauses For Low-Wage Workers," *NPR Interview on 'All Things Considered,'* November 7, 2016.

*Selected Mentions:*

26) "WA law restricts noncompete agreements. They keep popping up anyway" *Cascade PBS* November 1, 2024

27) "Can Remote Workers Reverse Brain Drain?" *New York Times, October 16, 2024*

28) "The Last-Minute Curveball for a Big FTC Ban" *The Atlantic, August 28, 2024*

29) "FTC's Noncompete Ban Got Struck Down. What Happens Next?" *Bloomberg,* August 21, 2024

30) "An SAP employee reported a workplace sexual assault. Now she's breaking her NDA" *Business Insider*, June 25, 2024.

31) "The Consequences of Signing Noncompete Agreements among Low-Wage Workers and Those without College Degrees" *Urban Institute WorkRise*, April 30, 2024.

32) "Battles Over Noncompete Clauses Poised to Heat Up in Statehouses" *Bloomberg Law,* April 29, 2024

33) "The Mostly Persuasive Logic Behind the New Ban on Noncompetes" *New York Times,* April 26, 2024.

34) "How the FTC's Noncompete Ban Will Affect Bosses and Workers" *Bloomberg, April 25, 2024*

35) "The FTC is banning noncompete agreements. Did your job search just get easier?" *MarketWatch* April 24, 2024.

36) "F.T.C. Issues Ban on Worker Noncompete Clauses" *New York Times,* April 23, 2024

37) "FTC bans contracts that keep workers from jumping to rival employers" *Washington Post*, April 23, 2024

38) "Ban on Worker Noncompete Agreements Could Spur Job Hopping, Legal Fights" *Barron's*, April 23 2024.

39) "Noncompetes Are Dead—and Tech Workers Are Free to Roam" *Wired*, April 23, 2024

40) "The FTC just banned most noncompetes" *Fast Company*, April 23, 2024

3154924.9

41) "Millions of workers are caught in a 'non-compete' trap" *Financial Times, April 18, 2024*.

42) "Biden Scrutiny of Labor Competition Extends to Bank Noncompetes" *Bloomberg Law, March 29, 2024*.

43) "The brewer behind Sam Adams has long kept former employees on a tight leash. Now some are suing to break free." *Boston Globe. March 8, 2024*.

44) "Was Research — on Physicians and Noncompete Agreements — Before Its Time?" *UCLA Anderson Review*, Dec 13, 2023.

45) "Innovation-Killing Noncompete Agreements Are Finally Dying" *Wired Dec 4, 2023*.

46) "What Happens When a Founder Leaves?" *New York Times,* November 20, 2023.

47) "Company-Sponsored, Out-of-State Abortion Benefits a Poor Substitute for State Policies, Research Finds" *Maryland Today,* Aug 11, 2023

48) "Big businesses rally to preserve their right to limit ex-workers' job options," *NBC News,* April 20, 2023

49) "New lawsuit against Tiger Woods could get ugly after breakup with girlfriend: What we know," *USA Today,* March 10, 2023

50) "Noncompete clauses are everywhere, even for dancers and hair stylists" *Washington Post* March 10, 2023

51) "Noncompete Agreements, Come On" *Stuff You Should Know* Podcast, March 7, 2023

52) "US companies mount resistance to proposed ban on non-compete clauses" *Financial Times,* February 9, 2023

53) "Noncompete agreements cost Seattle-area man a new job, lawsuit says" *Seattle Times,* January 30, 2023.

54) "How noncompete agreements harm women and people of color: 'Consequences can be devastating'" *USA Today,* January 19, 2023

55) "Noncompete Ban Holds Out Promise of Better Pay Without Inflation" *Bloomberg*, January 19 2023

56) "The FTC's New Rule Against Noncompetes Could Raise Wages by $300 Billion", *The Nation*, January 18, 2023

57) "In labour markets, the devil is often in the details" *Financial Times*, January 16 2023

58) "The FTC's proposed noncompete ban could be a boon for lower-wage workers" NPR Marketplace January 9, 2023

3154924.9

59) "U.S. Moves to Bar Noncompete Agreements in Labor Contracts" *New York Times* Jan. 5, 2023

60) "Why are Fast Food Workers Signing Noncompete Agreements?" *New York Times* Sept 29, 2021

61) "You Deserve a Bigger Paycheck. Here's How You Might Get It." *New York Times* Sept 23, 2021.

62) "Where can I go"? *Chicago Medicine Magazine*, September 2021

63) "Gaming Industry Nondisclosures Become Key Test of #MeToo Laws", *Bloomberg Law*, September 14, 2021

64) "The Noncompete Clause Gets a Closer Look", *Wall Street Journal,* July 21, 2021

65) "Noncompete Agreements Target Janitors as Well as VPs, But Why?" *How Stuff Works,* July 19, 2021

66) "Biden once again bungles a story about low-wage noncompete agreements", *Washington Post,* July 14, 2021

67) "Biden Noncompete Order Risks Legal Disputes Over FTC Overreach", *Bloomberg Law,* July 12, 2021

68) "Biden Moves To Restrict Noncompete Agreements, Saying They're Bad For Workers", *NPR,* July 9, 2021

69) "Employee Noncompete Clause Limits Adopted by Three More States", *Bloomberg Law,* June 29, 2021

70) "An airport executive warns its concessionaires not to steal one another's employees", *Quartz,* June 29, 2021

71) "Number of Americans moving homes hits lowest level in 73 years" *NPR Marketplace, December 16, 2020.*

72) "Noncompete Misconceptions May Be Inhibiting Reform" *Law360.com, December 2019,* by Russell Beck and Erika Hahn.

73) "Half of U.S. businesses make workers sign noncompete agreements" *CBS News, December 2019.*

74) "Resistance to Noncompete Agreements Is a Win for Workers" *Wall Street Journal, May 2019*.

75) "Keep Increasing Pressure Against Noncompetes" *Law360.com, May 2019*, by Eric Posner.

186

76) "The Freedom to Leave: Curbing Noncompete Agreements to Protect Workers and Support Entrepreneurship," *Center for American Progress*, January 2019.

77) "Cushman v the cleaner: the fight over non-competes," *Financial Times*, October 2018

78) "Efforts to restrict worker mobility are bad for the economy," *Financial Times*, October 2018

79) "WeWork Reaches Settlement on Noncompete Pacts," *Wall Street Journal*, September 2018

80) "The Hidden Reason Why Your Pay Is Stuck in Neutral," *Vice*, July 2018

81) "The Class Struggle According to Donald Trump," *The New York Times,* June 2018.

82) "Lawmakers are trying to curb contracts that make it harder to change jobs," *The Economist*, May 2018

83) "N.J. lawmaker wants to crack down on non-compete clauses," *WHYY NPR*, November 2017

84) "Illinois Wields New Power to Challenge Noncompete Agreements," *New York Times,* Oct 2017

85) "CIOs Likely to Face More Noncompete Disputes," *Wall Street Journal,* August 2017

86) "Work for Us – Or Else: The Rise of Noncompete Contracts," *Governing,* August 2017

87) "Why Janitors Get Noncompete Agreements, Too," *Stateline (Pew),* May 2017

88) "How Noncompete Clauses Keep Workers Locked In," *New York Times,* May 2017

89) "The Rigged Labor Market," Alan Krueger, *Milken Institute Review,* April 2017

90) "To Compete Better, States Are Trying to Curb Noncompete Pacts" *New York Times,* June 2016

91) "Non-Compete Agreements: Analysis of the Usage, Potential Issues, and State Responses", *White House*, May 2016

92) "Leveling the playing field for workers by reforming non-competes," *Brookings Blog*, May 2016

93) "Job hopping helped Silicon Valley thrive. So why do other states restrict it?" *Vox.com*, April, 2016.

94) "The Tyranny of the Noncompete Clause," *Bloomberg View*, April 2016.

95) "Non-compete Contracts: Economic Effects and Policy Implications", *US Department of the Treasury*, March 2016

96) "The Rent-Seeking is Too Damn High," *FiveThirtyEight,* February 2016.

3154924.9

97) "Noncompete Agreements Hobble Junior Employees," *The Wall Street Journal*, February 2016.

98) "Hawaii ban on noncompetes leaves out a huge chunk of workers," *Fortune,* July 2015.

99) "New Legislation Targets Non-Compete Agreement for Employees Blocking Wage Growth," *Forbes*, June 2015.

100)    "Can the Senate stop low-wage employers from tying up workers with non-competes?" *The Washington Post*, June 2015.

101)    "Exclusive: Amazon makes even temporary warehouse workers sign 18-month non-competes," *The Verge*, March 2015.

## Expert Witness Testimony

1) Collier HMA Physician Management, LLC et al., v. NCH Healthcare System Inc., et al.

2) Echo Global Logistics Inc. v. Traffic Tech, Inc. and Jack Ford Jr.

3) IQVIA Inc. vs. Mansoor Khan and Veeva Systems Inc.

4) Jefferies LLC v. Credit Suisse Securities (USA) LLC

5) The Dufresne Spencer Group, LLC et al. v. Han Nara Enterprises LP et al.

## Policy-Related Work and Testimony

1) Testified at Maryland Senate Hearing on HB1388 on March 28, 2024.

2) Submitted comment to FTC regarding noncompete rule. April 2023.

3) Testified at Minnesota Hearing on BF999 related to noncompete agreements on February 22, 2022 (here).

4) Presenter at Federal Trade Commission workshop: "Making Competition Work: Promoting Competition in Labor Markets" December 6, 2021.

5) Testified at DC City Council Hearing on B24-256 bill related to noncompetes on July 14, 2021.

6) Testified at Connecticut Labor & Public Employees Committee hearing on SB 906 "An Act Concerning Noncompete Agreements" on March 4, 2021. See my testimony here (from 15:47 to 41:35)

7) Observer, Uniform Law Commission for the "Uniform Restrictive Employment Agreement Act"

3154924.9

8) Presented to the Uniform Law Commission committee on the Covenants Not to Compete Act, November 18, 2020.

9) Presented to the National Association of Attorneys General on noncompete agreements on February 10, 2020.

10) Panelist and Presenter at Federal Trade Commission workshop: "Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues" on January 9, 2020. See my testimony here (from 22:30 to 46:10).

11) Testified at District of Columbia Labor & Workforce Development Public Hearing, related to B23-494, Ban on Non-Compete Agreements Amendment Act of 2019, on December 6, 2019. See the full hearing here.

12) Submitted policy memo on noncompetes to National Governor's Association, and National Council on State Legislatures, with Michael Lipsitz, on November 19, 2019.

13) Testified at the US Senate Committee on Small Business and Entrepreneurship Hearing on "Noncompete Agreements and American Workers" on November 14, 2019. See the full hearing here and read my written testimony here.

14) Responded to follow-up questions from Senator Cardin (MD) & Senator Hirono (HI)

15) Testified at the US House of Representatives Judiciary Subcommittee hearings on "Antitrust and Economic Opportunity: Competition in Labor Markets" on October 29, 2019. See my oral testimony here (from 1:28 to 1:33) and read my written testimony here.

16) Panelist at Federal Trade Commission Hearings on Competition and Consumer Protection in the 21st Century, October 16, 2018. Video from 39:00 to 49:33.

17) Met with Federal Trade Commission commissioners Noah Phillips and Rohit Chopra to discuss the use and effects of covenants not to compete, July 2018. Commissioner Chopra later released a statement on covenants not to compete to encourage rulemaking within the FTC.

18) Provided input to CT Senator Chris Murphy's office in crafting the Workforce Mobility Act of 2018.

19) Submitted testimony to the Massachusetts Joint Committee on Labor and Workforce Management and to the Wisconsin Assembly Committee on Jobs and the Economy, October 2017.

20) Organizer and panelist at White House Summit on Employee Non-compete Agreements, October 2016.

21) Provided input to White House Noncompete Report, "Non-Compete Agreements: Analysis of the Usage, Potential Issues, and State Responses," May 2016

189

22) Provided input to the US Treasury Noncompete Report, "Non-compete Contracts: Economic Effects and Policy Implications," March 2016

23) Provided input to the offices of Senators Murphy regarding the Senate MOVE Act (Mobility and Opportunity for Vulnerable Employees), September 2015.

**Ph.D. Thesis Supervision**

1) Jacob Valentine, ongoing (Committee member)
2) Beril Yacinkaya, ongoing (Committee member)
3) Haifeng Wang at University of Wisconsin, ongoing (Committee Member)
4) Chris Calway, ongoing (Committee member, placed at West Point)
5) Shotaro Yamaguchi, 2024 (Committee member, Placed at University of Wisconsin)
6) Yuheng Ding, 2023 (Committee member, placed at World Bank)
7) Ed Olivares, Economics 2023 (Committee member, placed at US Treasury)
8) Paul Cheung, Economics 2022 (Committee member, placed at University of Texas at Dallas)
9) Audra Wormald, 2022 (Committee member, placed at UNC Chapel Hill)
10) Anthony Gibbs, 2021, (Committee member, placed at George Washington University)
11) Ben King, 2021 (Co-chair, placed at University of Illinois at Urbana Champaign)
12) Cynthia Boruchowicz, Public Policy 2021 (Committee member)
13) Justin Frake, 2018 (Committee member, placed at University of Michigan)
14) Lauren Aydinliyim at Rutgers University, 2018 (Committee member, placed at CUNY Baruch)
15) Daniel Olson, 2016 (Committee member, placed at University of Washington)

**Miscellaneous Information**

1) Coach, Univ. of Michigan Women's Club Water Polo: 48-5 overall record (Winter 2012 & 2010)
   • Finished 2nd (2010) & 4th (2012) at National Championship Tournament

190

3154924.9

# APPENDIX B

## Materials Relied Upon Include the Following:

### I.   PAPERS, BOOKS, AND WEBSITES

Aaron S. Edlin & Daniel L. Rubinfeld, *Exclusive or Efficient Pricing? The Big Deal Bundling of Academic Journals*, 72 Antitrust L. J. 119 (2004)

ABA Section of Antitrust Law, Antitrust Law Developments (7th ed. 2012)

*About Us*, DaVita Redwoods, https://www.redwoods.davita.com/about-us (last visited Jan. 2025)

*About Us*, SCA Health, https://sca.health/about-us/ (last visited Jan. 9, 2025)

*About*, DaVita, https://www.davita.com/about (last visited Jan. 9, 2025)

Adam Smith, An Inquiry into the Nature and Causes of the Wealth of Nations, 105-106 (W. Strahan & T. Cadell, London 1776)

Alan B. Krueger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, 57 J. Human Resources S324–S348 (2022)

Alan Manning, Monopsony in Motion: Imperfect Competition in Labor Markets (2003)

*American Community Survey Information Guide*, United States Census Bureau, https://www.census.gov/programs-surveys/acs/about/information-guide.html (last visited Jan. 2025)

*Annual Report 2023*, DAVITA (Apr. 26, 2024), https://investors.davita.com/download/DaVita_2023_Annual_Report.pdf

B. N. Greenwood, B.H. Kobayashi, & E. Starr, *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation*, Donald G. Costello Coll. Of Bus. At George Mason Univ. Research Paper (2024)

Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings*, Rev. Econ. & Statistics 1–35, 1 (2024)

Carl Shapiro, *Antitrust: What Went Wrong and How to Fix It*, 35(3) Antitrust L. J. 33–45 (2021)

Carlos Cinelli et al., *A crash course in good and bad controls*, 53 Sociological Methods & Research 1-30 (2022)

Chen, J. and Roth, J., *Logs with zeros? Some problems and solutions*, QUARTERLY J. ECON. 1–22 (2024)

Conrado Tapado, *Does Your Company Have Internal Pay Equity?*, Payscale (Mar. 31, 2009), https://web.archive.org/web/20210508234343/http://www.payscale.com/compensation-today/2009/03/importance-of-internal-pay-equity

*Contact Us*, DaVita, https://www.davita.com/about/contact-us (last visited Jan 14, 2025)

*Contact Us*, SCA Health, https://sca.health/about-us/contact/ (last visited Jan. 2025)

Dan Luu, *How Many Locations Does Surgical Care Affiliates Have?*, NWCC-OR (Aug. 3, 2022), https://www.nwcc-or.com/how-many-locations-does-surgical-care-affiliates-have#:~:text=SCA%20Health%20is%20dedicated%20to,patients%2C%20providers%2C%20and%20community

Daniel A. Crane, *Market Power Without Market Definition*, 90 Notre Dame L. Rev. 31 (2014)

*Daphne Walker*, LinkedIn, https://www.linkedin.com/in/daphne-walker-a351759a/ (last visited Jan. 2025)

Dennis W. Carlton & Jeffery M. Perloff, Modern Industrial Organization (3rd ed. 2000)

Dennis W. Carlton & Jeffery M. Perloff, Modern Industrial Organization (4th ed. 2005)

Duan, Naihua, *Smearing estimate: a nonparametric retransformation method*, 78(383) Journal of the American Statistical Association, 605-610 (1983)

Emily Breza et al., *The Morale Effects Of Pay Inequality*, 133 Quarterly J. Econ. 611–663 (2018)

Fabien Postel-Vinay & Jean-Marc Robin, *To match or not to match?: Optimal wage policy with endogenous worker search intensity*, 7 Rev. Econ. Dynamics 297 (2004)

*Fact Sheet*, U.S. Dept. Health & Human Servs. (May 9, 2023), https://www.hhs.gov/about/news/2023/05/09/fact-sheet-end-of-the-covid-19-public-health-emergency.html

*FAQ*, UCLA Statistical Methods & Data Analytics, https://stats.oarc.ucla.edu/other/mult-pkg/faq/general/faqhow-do-i-interpret-a-regression-model-when-some-variables-are-log-transformed/ (last visited Jan. 9, 2025)

Fed. Jud. Ctr., Nat'l Rsch. Council, Reference Manual on Scientific Evidence (3rd ed. 2011)

SCAI Holdings, Certification and Notice of Termination of Registration (Form 15) (Apr. 3, 2017).

Francine Lafontaine, Saattvic Saattvic, & Margaret Slade, *No–Poaching Clauses in Franchise Contracts: Anticompetitive or Efficiency Enhancing*, SSRN (Sept. 9, 2024)

Gary Solon et al., *Measuring the cyclicality of real wages: how important is composition bias?*, 1 Quarterly J. Econ 1 (1994)

George Milkovich, Jerry Newman & Barry Gerhart, Compensation (11th ed. 2011)

Hannes Schwandt & Till Von Wachter, *Unlucky cohorts: Estimating the long-term effects of entering the labor market in a recession in large cross-sectional data sets*, 37 J. Labor Econ. S161 (2019)

*Home*, DaVita Investors, https://www.davita.com/about (last visited Jan. 9, 2025)

*Home*, United Surgical Partners Int'l, https://uspi.com/home/default.aspx (last visited Jan. 9, 2025)

*Improving Health, Health Care and Quality of Life*, DaVita, https://investors.davita.com/ (last visited Jan. 9, 2025)

*Intraclass Correlation Coefficient Cheat Sheet*, NIH Collaboratory (Mar. 15, 2020), https://dcricollab.dcri.duke.edu/sites/NIHKR/KR/Intraclass_Correlation_Coefficient_Cheat_Sheet_March_15_2020.pdf

*Investors*, DaVita, https://investors.davita.com/ (last visited Jan. 2025)

Jackie Powder, *COVID-19 in 2022: A Year-End Wrap-Up*, Johns Hopkins Bloomberg School of Public Health (Dec. 15, 2022), https://web.archive.org/web/20240620113903/https://publichealth.jhu.edu/2022/covid-year-in-review

*Jeff Andrews*, LinkedIn, https://www.linkedin.com/in/jeff-andrews-b7300b8/ (last visited Jan. 2025)

Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach (South-Western 5th ed. 2013)

John M. McAdams, *Non-Compete Agreements: A Review of the Literature*, SSRN 5 (2019)

Johnathan Baker & Daniel Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, 1 Am. Law & Econ. Review. 386 (1999)

Johnathan Masur & Eric A. Posner, *Horizontal Collusion and Parallel Wage-Setting in Labor Markets*, University of Chicago Law School Chicago Unbound, Coase-Sandor Working Paper Series in Law & Econ. No. 941 (2022)

Jonathan B. Baker, *The Case for Antitrust Enforcement*, 17 J. Econ. Perspectives 27 (2003)

José AF Machado & JMC Santos Silva, *Quantiles via Moments*, 213 J. Econometrics 145-173 (2019)

Juan Alcácer et al., *Applying random coefficient models to strategy research: Identifying and exploring firm heterogeneous effects*, 3 Strategy Science 533–553 (2018)

*Justice Department and Federal Trade Commission Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation*, DOJ (Oct. 20, 2016), https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-guidance-human-resource-professionals

Karen Shen et al., *Job flows into and out of health care before and after the COVID-19 Pandemic*, 5 Jama Health Forum 1 (2024)

*Kelly Barker*, LinkedIn, https://www.linkedin.com/in/kelly-barker-462332/ (last visited Jan. 2025)

Kent Romanoff et al., *Pay Equity: Internal and External Considerations*, 18 Comp. & Benefits Rev. 17–25 (1986)

Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases*, Antitrust Source (2015)

Kevin Caves & Hal Singer, *When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer-Welfare Standard*, 26 Geo. Mason L. Rev 395 (2019)

Lois Friss, External Equity and the Free Market Myth, 7(3) REVIEW OF PUBLIC PERSONNEL ADMINISTRATION 74-91 (1987)

Margaret C. Levenstein & Valerie Y. Suslow, *What Determines Cartel Success?*, 44 J. Econ. Literature 43-95 (2006)

*Matt Pate*, LinkedIn, https://www.linkedin.com/in/matt-pate/ (last visited Jan. 2025)

Matthew Gibson, *Employer Market Power in Silicon Valley*, Upjohn Research (2024)

Matthew S. Johnson et al., *The labor market effects of legal restrictions on worker mobility*, Federal Trade Commission 1-77 (2021)

*Medical Staff and Specialists At Outpatient Centers*, Tag Medstaffing, https://www.tagmedstaffing.com/what-is-a-outpatient-center/ (last visited Jan. 9, 2025)

Michael Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable

Michael Kheyfets, *Evolving or Running in Place? Empirical Approaches to "Common Impact" in Antitrust Class Actions*, Edgeworth Economics 74–85 (Oct. 23, 2024), https://www.edgewortheconomics.com/assets/htmldocuments/UPDATED_Kheyfets%20PDF%20common%20impact.pdf

Michael Lipsitz & Evan Starr, *Low-wage workers and the enforceability of noncompete agreements*, 1 Mgmt. Sci. 143-170 (2022)

N. Gregory Mankiw, Principles of Microeconomics (Cengage 8th ed. 2018)

Natarajan Balasubramanian at el., *Locked in? The enforceability of covenants not to compete and the careers of high-tech workers*, 57 J. Human Res. S349–S396, S349 (2022)

Natarajan Balasubramanian, Evan Starr & Shotaro Yamaguchi, *Employment restrictions on resource transferability and value appropriation from employees*, Strategic Mgmt. J. 2519–2547 (2024)

Nick Huntington-Klein, *The Effect: An Introduction to Research Design and Causality*, Chapter 8 (2021)

*No More No-Poach: The Antitrust Division Continues to Investigate And Prosecute "No-Poach" And Wage-Fixing Agreements*, DOJ (Apr. 10, 2018), https://web.archive.org/web/20230408175427/https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements

*Outpatient Surgery*, CDC, https://www.cdc.gov/nchs/hus/sources-definitions/outpatient-surgery.htmhttps://www.cdc.gov/nchs/hus/sources-definitions/outpatient-surgery.htm (last updated July 24, 2024)

P.F. Cahuc et al., *Wage Bargaining with On-the-job Search: Theory and Evidence*, 74 Econometrica 323 (2006)

Paul Hünermund & Beyers Louw, *On the nuisance of control variables in causal regression analysis*, Organizational Rsch. Methods (2023)

*Payroll Blog: Payroll Training, Tips, and News*, Patriot Software (Jan. 12, 2022), https://www.patriotsoftware.com/payroll/training/blog/what-is-internal-equity/

Pedro Brinca et al., *Measuring labor supply and demand shocks during COVID-19*, European Economic Review 1 (2021)

*Philip A. Spencer*, LinkedIn, https://www.linkedin.com/in/phil-spencer-1547546/ (last visited Jan. 2025)

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: an Analysis of Antitrust Principles and their Application (4th ed. 2017)

*Press Release: DaVita Medical Group Acquires Respected Physician Practices in the Orlando Area*, DaVita Newsroom (Jul. 13, 2017), https://newsroom.davita.com/press-releases?item=123281

*Press Release: Optum completes acquisition of DaVita Medical Group from DaVita*, UnitedHealth Group (Jun. 19, 2019) https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html

*Press Release: Surgical Care Affiliates (SCA), OptumCare to Combine*, UnitedHealth Group (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html

*Press Release: Tenet Completes Purchase of USPI from WCAS*, Investor Tenet Health (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx

*Price Fixing, Bid Rigging, And Market Allocation Schemes*, DOJ (Feb. 2021), https://www.justice.gov/atr/price-fixing-bid-rigging-and-market-allocation-schemes

Price Fixing, FTC, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/price-fixing (last visited Dec. 11, 2024)

*Prosecuting Cartels without Direct Evidence of Agreement*, Org. for Econ. Coop. & Dev. (Sept. 11, 2006), https://www.oecd.org/content/dam/oecd/en/publications/reports/2006/05/prosecuting-cartels-without-direct-evidence-of-agreement_75732b6f/9640e3d4-en.pdf

*Regress Post Postestimation*, Stata, https://www.stata.com/manuals/rregresspostestimation.pdf (last visited Jan. 9, 2025)

Robert C. Marshall & Leslie M. Marx, The Economics of Collusion, Cartels and Bidding Rings (2012)

Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 107 Q. J. Econ. 439-479 (1992)

Robert Pindyck & Daniel Rubinfeld, Microeconomics (9th ed. 2017)

Robin L. Pinkley et al., *The Impact of Alternatives to Settlement in Dyadic Negotiation*, 57 Organizational Behav. & Human Decision Processes 97–116 (1994)

Rochelle T. Davis, *Talent Can't Be Allocated: A Labor Economics Justification for No-Poaching Agreement Criminality in Antitrust Litigation*, 12 Brooklyn J. Corp., Fin. & Com. Law 279–310 (2018)

Roger Fisher & William Ury, Getting to Yes (2nd ed. 1983)

*SCA Health*, LinkedIn, https://www.linkedin.com/company/scahealth (last visited Jan. 2025)

Scott Cunningham, Causal Inference: The Mixtape (2021), https://mixtape.scunning.com/03-directed_acyclical_graphs

Serdar Ozkan et al., *Anatomy of Lifetime Earnings Inequality: Heterogeneity in Job-Ladder Risk versus Human Capital*, 1 J. Pol. Econ. Macroeconomics 506–550 (2023)

Shersten Killip et al., *What is an intracluster correlation coefficient? Crucial concepts for primary care researchers*, 2 Annals of Family Med. 204–208 (2004)

Sophia Rabe-Hesketh and Anders Skrondal, *Multilevel and Longitudinal Modeling Using Stata, Volumes I and II, Fourth Edition*, Stata Press (2022)

Steven G. Lanning, *Costs of Maintaining a Cartel*, 36(2) J. Indus. Econ. 157 (1987)

Suresh Naidu et al., *Antitrust Remedies for Labor Market Power*, 132 Harv. L. Rev. 536 (2018)

Sydnee Caldwell & Oren Danieli, *Outside Options in the Labour Market*, Rev. Econ. Studies (2024)

Takuya Hiraiwa, Michael Lipsitz & Evan Starr, *Do firms value court enforceability of noncompete agreements? A revealed preference approach*, Rev. of Econ. & Statistics 1–71 (2024)

*Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform*, Tenet Healthcare (Mar. 23 2015), https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx

*The State of Labor Market Competition*, U.S. Dep't of Treasury (Mar. 7, 2022), https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf

Theon van Dijk & Frank Verboven, *Quantification of Damages*, in 3 Issues in Competition Law and Policy 2331–2348 (ABA Section of Antitrust Law 2008)

Thomas Krattenmaker et al., *Monopoly Power and Market Power in Antitrust Law*, 76 Georgetown Law Journal 241–269 (1987)

Timothy Brennan, *Bundled Rebates as Exclusion Rather Than Predation*, 4 J. Competition Law & Econ. 335–374 (2008)

*What is an ASC?*, Ambulatory Surgery Center Association, https://www.ascassociation.org/asca/about-ascs/surgery-centers (last visited Jan. 9, 2025)

*Who We Are*, United Surgical Partners Int'l, https://uspi.com/about-us/who-we-are/default.aspx (last visited Jan. 9, 2025)

## II. DOCUMENTARY EVIDENCE AND DEPOSITION TRANSCRIPTS AND EXHIBITS

I was provided access to all deposition transcripts and exhibits and all documents produced in the case. The following are among the materials I considered:

**Deposition Transcripts**

Deposition of Alex Bateman (Jul. 19, 2024)

Deposition of Andrew Hayek (Sept. 18, 2024)

Deposition of Andrew Johnston (Sept. 6, 2024)

Deposition of Anthony Martin (Jun. 27, 2024)

Deposition of Bill Wilcox (Sept. 24, 2024)

Deposition of Brett Brodnax (Sept. 12, 2024)

Deposition of Brian Mathis (Sept. 20, 2024)

Deposition of Bridget Fanning (Jul. 17, 2024)

Deposition of Cindy English (Jun. 12, 2024)

Deposition of Colleen Arthur (May 23, 2024)

Deposition of Dennis Kogod (Sept. 6, 2024)

Deposition of James "Skip" Thurman (Jun. 17, 2024)

Deposition of Jason Cagle (Aug. 6, 2024)

Deposition of Jimmy Tanner (Jul. 31, 2024)

Deposition of Joseph Clark (Sept. 11, 2024)

Deposition of Kent Thiry (Aug. 16, 2024)

Deposition of Leslie Wachsman (May 22, 2024)

Deposition of Mark Garvin (May 30, 2024)

Deposition of Mark Kopser (Dec. 12, 2024)

Deposition of Michael Rucker (Aug. 27, 2024)

Deposition of Michael Staffieri (Apr. 5, 2024)

Deposition of Peter Clemens (May 2, 2024)

Deposition of Sandi Karrmann (Aug. 14, 2024)

Deposition of Scott Keech (Aug. 22, 2024)

Deposition of Shannon McGarry (Jun. 11, 2024)

Deposition of Shannon Mosley (Aug. 13, 2024)

Deposition of Warren Cinnick (Nov. 22, 2024)


**Defendants' Structured Data Files**

DaVita
DVA_OMCEAL_000000029–45
DVA_OMCEAL_000000047
DVA_OMCEAL_000902589–91
DVA_OMCEAL_000902592
DVA_OMCEAL_001182111
DVA_OMCEAL_001408544
DVA_OMCEAL_001408550
DVA_OMCEAL_001421632
DVA_OMCEAL_001421634
DVA_OMCEAL_001421733
2022-8-3 Ltr SDZ to DaVita RE Structured Data Questions
2022-8-24 Ltr R Quinto to Pls. RE DaVita 1RFP Structured Data
2022-11-22 Ltr R. Quinto to LYC & SDZ RE DaVita RFP Responses
2023-7-26 - Letter to DaVita re structured data questions
2023-10-5 - DaVita Ltr re structured data
2024-03-27 Ltr to S. Zandi re 2-28-24 Letter
2024-03-27 Ltr to S. Zandi re Structured Data Questions from 2-7-24 Letter
2024-09-30 Ltr to S. Zandi re structured data questions from 7-19-24 Ltr
2024-10-25 Ltr to S. Zandi re 10-1-24 and 7-19-24 Letters
2024-11-07 Ltr to S. Zandi re structured data questions from 7-30-24 Ltr
2024-12-19 Ltr to S. Zandi re structured data questions from 11-27-24 Ltr

SCA
2021 Teammate Roster
2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data
2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions
CheckSumm
CheckSummHE
Check History Hours and Earnings
EEmploy
EJob
SCA Hashed SSNs
SCA - Structured00000005
SCA - Structured00000013
SCA-Structured00000007
SCA-Structured00000009
SCA-Structured00000010

SCA-Structured00000011

SCA-Structured00000012

SCA-Structured00000013

Termed in 2021

2022-1-21 Ltr C. Ventura to Y. Salahi re Structured Data Sample

2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data

2022-4-21 Letter from C. Ventura to L. Chan re 4-20-22 IT Rep Meet & Confer

2022-9-16 Ltr. C. Ventura to S. Zandi RE Structured Data

2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions

2024.08.29 - Letter from J. Wade to S. Zandi re structured data

2024.10.11 - Letter from J. Wade to S. Zandi re structured data

2024-03-13 Letter from T. Rothman to S. Zandi re Response to Plaintiffs' 2-7 Letter

2024-3-6 Ltr T. Rothman to S. Zandi RE Response to Pls' 2-28 Letter

2024-11-13 Ltr J. Wade to S. Zandi RE SCA Structured data


USPI

2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions

2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes

4.19.24 Paygroup location

Exhibit A_Paygroup_Location

Exhibit B_ERNCD Values

USPI_CIV_000021819

USPI_CIV_000659222–33

USPI_CIV_000659234

USPI_CIV_001168726

2022-6-1 Ltr K Limarzi to Plaintiffs Encl USPI Doc Prod Vol004

2022-7-28 - LYC Letter to USPI re structured data questions – LYC

2022-12-2 Ltr K Limarzi to Pls RE USPI Responses & Objs to RFPs

2023.09.26 - K. Limarzi Ltr. re Structured Data Productions

2023-1-25 Ltr K. Limarzi to Plaintiffs RE USPI Responses & Objs to RFPs

2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions

2024.03.27 Ltr from USPI to Plaintiffs re 2.7 Ltr

2024.03.27 Ltr from USPI to Plaintiffs re 2.28 Ltr

2024.04.08 USPI Suppl Ltr to Plaintiffs re 2.7 ltr

2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter

2024.12.12 Ltr to Plaintiffs re Reporting Structure

2024-10-1 Ltr SDZ to USPI re Structured Data Question

2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions

2025.01.06 USPI Resp to Pls 11.22.24 Ltr re Structured Data

2024.11.18 USPI Production - Vol. 27

**Deposition Exhibits (in ascending order by exhibit number)**

Ex. DX64

Ex. PX001, DOJCIV-008-00000059–71

Ex. PX003, DVA_OMCEAL_001354505–06

Ex. PX004, DVA 01922502

Ex. PX005, DVA_OMCEAL_000417583–84

Ex. PX012, DVA_OMCEAL_000387563

Ex. PX013, DVA_OMCEAL_000397493

Ex. PX021, DVA_OMCEAL_001339976–78

Ex. PX024, DVA_OMCEAL_000386711

Ex. PX027, DVA_OMCEAL_001339898–901

Ex. PX030, SCA002213758–62

Ex. PX033, SCA002364259–61

Ex. PX037, USPI_CIV_000016100

Ex. PX053, SCA000131233–34

Ex. PX054, SCA000130861–67

Ex. PX059, SCA002364264–65

Ex. PX060, SCA001075713–15

Ex. PX063, SCA000609009–11

Ex. PX075, DVA_OMCEAL_001321755–59

Ex. PX077, DVA_OMCEAL_001329256–61

Ex. PX078, DVA_OMCEAL_001070924, -28–30

Ex. PX081, DVA_OMCEAL_001068250–52

Ex. PX083, DVA_OMCEAL_001057524–25

Ex. PX084, DVA_OMCEAL_001321377–78

Ex. PX085, DVA_OMCEAL_001067247–81

Ex. PX088, DOJCIV-008-00000353–67

Ex. PX089, USPI_CIV_000000597–600

Ex. PX099, USPI_CIV_000021321

Ex. PX101, USPI_CIV_000004081–82

Ex. PX103, USPI_CIV_000003394

Ex. PX104, USPI_CIV_000001842

Ex. PX105, USPI_CIV_000021906

Ex. PX106, USPI_CIV_000021907–11

Ex. PX109, USPI_CIV_000810693

Ex. PX111, USPI_CIV_000810697

Ex. PX112, USPI_CIV_000810694

Ex. PX115, USPI_CIV_000039752–53

Ex. PX118, USPI_CIV_000022040–66

Ex. PX119, USPI_CIV_000601224–29

Ex. PX120, USPI_CIV_000584419–21

Ex. PX123, DOJCIV-007-00000091–96

Ex. PX124, DOJCIV-012-000000131–37

Ex. PX130, DOJCIV-014-00000009–15

Ex. PX135, USPI_CIV_000016089–92

Ex. PX138, USPI_CIV_000122239

Ex. PX157

Ex. PX158

Ex. PX159, DOJ-PROD001B-00152893–908

Ex. PX160, SCA000002866–68

Ex. PX162, DOJ-PROD004-00725757–58

Ex. PX163, DOJ-PROD004-00693673–74

Ex. PX170, DOJ-PROD004-00476230–31

Ex. PX171, DOJ-PROD001B-00157126–28

Ex. PX172, DOJ-PROD001A-00000001–02

Ex. PX185

Ex. PX219, DOJCIV-012-00000066–69

Ex. PX227, USPI_CIV_000014146

Ex. PX232, USPI_CIV_000021155

Ex. PX235, USPI_CIV_000110943

Ex. PX239, USPI_CIV_000046079

Ex. PX240, USPI_CIV_000686081–92

Ex. PX257, DOJCIV-007-00000060–63

Ex. PX268, DVA_OMCEAL_001344567–82

Ex. PX269, DVA_OMCEAL_000957816–28

Ex. PX275, DOJ-PROD003-00117878–93

Ex. PX281, DOJCIV-008-00000039–55

Ex. PX282, USPI_CIV_000006432

Ex. PX283, USPI_CIV_000035855–56

Ex. PX298, USPI_CIV_000001260–62

Ex. PX299, USPI_CIV_000000447

Ex. PX300, USPI_CIV_000000448–51

Ex. PX304, DOJCIV-008-00000298–303

Ex. PX305, DOJCIV-008-00000170–86

Ex. PX313, DOJCIV-008-00000187–95

Ex. PX314, DOJCIV-008-00000228–43

Ex. PX316, DVA00019820–23

Ex. PX336, SCA-DOJ-00158130–31

Ex. PX376, DVA_OMCEAL_000122783–84

Ex. PX464, USPI_CIV_000013967

Ex. PX478, USPI_CIV_000390138

Ex. PX479, USPI_CIV_000112061

Ex. PX483

Ex. PX484, DVA_OMCEAL_000429386–90

Ex. PX485, DVA00006531

Ex. PX486, USPI_CIV_000014009

Ex. PX487, USPI_CIV_000014006

Ex. PX489, OMC_BM_000014729

Ex. PX490, HAYEK-000012214–16

Ex. PX491, OMC-BM-000013354–56

Ex. PX501, SCA-002277742–44

Ex. PX507, DOJCIV-008-00000266–78

Ex. PX508, DOJCIV-008-00000212–26

Ex. PX514, USPI_CIV_000397215

Ex. PX515, USPI_CIV_000018231

Ex. PX516, USPI_CIV_000105175–77

Ex. PX520, USPI_CIV000111376–82

Ex. PX522, OMC_BM_000000884–95

Ex. PX523, OMC_BM_000010778–79

Ex. PX524, OMC_BM_000013354–56

Ex. PX528, SCA001046573–74

Ex. PX529, SCA000065974–83

Ex. PX555, DOJCIV-007-00000004–15

Ex. PX558, SS-DOJ-01190-367

**Other Evidence Produced by Defendants and Third Parties**

DOJCIV-007-00000070

DOJCIV-007-00000084

DOJCIV-007-00000101

DOJCIV-007-00000105

DOJCIV-007-00000118

DOJCIV-007-00000131

DOJCIV-007-00000141

DOJCIV-007-00000162

DOJCIV-008-00000029

DOJCIV-008-00000155

DOJCIV-008-00000283

DOJCIV-008-00000423

DOJCIV-008-00000431

DOJCIV-010-00000110

DOJCIV-010-00000112

DOJCIV-012-00000013

DOJCIV-012-00000038

DOJCIV-012-00000056

DOJCIV-012-00000094

SCA000109831

SCA001204745

USPI_CIV_000000442

USPI_CIV_000006960

USPI_CIV_000411545

USPI_CIV_000467624

USPI_CIV_001168726


## III.  LEGAL DOCUMENTS

2d Am. Class Action Compl., *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.), ECF 101

3rd Am. Class Action Compl., *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

*Antitrust Guidelines for Collaborations Among Competitors*, DOJ & FTC (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf

Compl., *Cagle v.United Surgical Partners Int'l, Inc.*, No. 3:20-cv-01681-BN (N.D. Tex.), ECF 1

Complaint, *United States v. Cargill Meat Solutions Corp., et al.*, No. 1:22-cv-01821-ELH (D. Md. Jul. 25, 2022)

*Cung Le, et al. v. Zuffa*, LLC d/b/a Ultimate Fighting Championship, 2:15-cv-01045-RFB-BNW (D. Nev. Aug. 9, 2023)

*Horizontal Merger Guidelines*, DOJ & FTC (2010)

*Horizontal Merger Guidelines*, DOJ & FTC (2023)

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. o6-MD-1775 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)

*In re Capacitors Antitrust Litig. (No. III)*, No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018)

*In re High-Tech Employees Antitrust Litigation*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013)

*In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019)

Mem. Op. & Order, *Cagle v. United Surgical Partners Int'l*, Inc., No. 3:20-cv-01681-BN (N.D. Tex.), ECF 34

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods*, 31 F.4th 651, 672 (9th Cir. 2021)

Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 4, 2022)

*United States v. E. I. du Pont de Nemours & Co. ("Cellophane")*, 351 U.S. 377, 391 (1956)

**APPENDIX C**

| Employee | Company, Job Title (Years) |
|---|---|
| Colleen Arthur | DaVita, Intern (2013); DaVita, Redwoods Resident (2014–2015); DaVita, Facility Administrator (2015); DaVita, Manager, Compensation & Analytics (2015); DaVita, Director, Compensation & Analytics (2015–2018); DaVita, Senior Director, Compensation & Analytics (2018–2021); DaVita, Senior Director, Recruiting Operations, Strategy & Employment Branding (2021–2022) |
| Scott Asher | DaVita, Director (2010-2014) |
| Alex Bateman | DaVita, Senior Financial Analyst (2005), DaVita, Manager (2006-2008), USPI, Regional VP (2008-2011), USPI, Market President (2011–2020) |
| Tony Blake | DaVita, Director (2006-2009), Vice President (2010-2012) |
| Brett Brodnax | USPI, Executive Vice President ("EVP")/Chief Development Officer ("CDO") (2005–2011); USPI, President (2011–2018); USPI, Chief Executive Officer ("CEO") (2018–Present) |
| Jason Cagle | USPI, Vice President ("VP") (2005–2010); USPI, Senior Vice President ("SVP") (2010–2013); USPI, Chief Financial Officer ("CFO"), (2013–2020) |
| Warren Cinnick | SCA, VP Human Resources ("HR") (2017–2020); SCA, SVP HR (2020); SCA, Group VP ("GVP") HR (2021–2023) |
| Joseph ("Joe") Clark | SCA, EVP & Chief Operating Officer ("COO") (2008); SCA, EVP Development (2008–Present) |
| Peter Clemens | SCA, EVP and CFO (2011–2015), SCA, Senior Advisor (2015–2017) |
| Goran Dragolovic | SCA, SVP Operations (2011–2017) |
| Kristen Neubert DesPalmes | DaVita, Manager (2007-2009), Manager – Corporate (2009-2013), Director (2013), Director Employment Strategy (2013-2017), Senior Director of Employment Strategy (2017–2021).) |
| Cindy English | USPI, VP Financial Operations (2007–2019) |
| Bridie Fanning | SCA, Chief Talent Officer (2014–2016) |
| Mark Garvin | SCA, VP Operations (1992–1996); USPI, COO (2001–2020) |
| Andrew Hayek | DaVita, President (2007); DaVita, VP (2007–2008); SCA, President & CEO (2008–2017); OptumHealth, CEO (2017–2019) |
| Elliott Holder | DaVita, Analyst EX (2013); DaVita, Financial Analyst (2014); DaVita, Senior Financial Analyst (2015–2016); DaVita, Manager, Payor Contacting (2017); DaVita, Senior Manager, Payor Contracting (2018–2021) |
| Andrew ("Andy") Johnston | USPI, RVP Operations (2001-2004), USPI, SVP Development (2004–2007); USPI, SVP/DVP (2007–2014); USPI, COO, East (2014–2018); USPI, CDO (2018–2020); U.S. Renal Care, COO (2020–2021); USPI, Chief Administrative Officer ("CAO") (2023) |
| Sandi Karrmann | USPI, SVP, Chief Human Resources & Support Services Officer (2013–2017); Tenet Healthcare/USPI, EVP, Chief Human Resources Officer (2017–2020) |
| Scott Keech | SCA, Regional Director of Operations & Clinical Services (2009–2012) |
| Dennis Kogod | DaVita, Division President (2006–2010); DaVita, SVP (2008); DaVita, COO (2008–2016); DaVita, COO, HealthCare Partners (2014–2016); DaVita, Advisor to CEO (2016) |
| Mark Kopser | USPI, CFO (2000–2021) |

212

| Anthony Martin | USPI, Senior Vice President, Corporate Controller and Chief Accounting Officer (1998–2019) |
|---|---|
| Brian Mathis | SCA, VP Strategy (2009–2014); SCA, Group VP Strategy and Payer Engagement (2014–2015); SCA, SVP, Strategy and Payment Innovation (2015–2017); SCA, CDO (2017–2018); OptumCare, CDO (2017–2018); OptumCare, Chief Strategy Officer (2018–2020) |
| Shannon McGarry | USPI, Executive Recruiter (2016–2020); USPI, Manager, Executive Recruitment (2020–2021); USPI, Regional Market Recruiter (2021 – Present) USPI, Manager – Talent Acquisition/Onboarding (2023 – Present) |
| Laura Mildenberger | DaVita, DVP / Chief People Officer, (2005); DaVita, DVP/Regional Vice President ("RVP") (2006–2007); DaVita, SVP (2008); DaVita, Chief People Officer (2008–2016) |
| Shannon Mosley | USPI, Director (2003–2006); USPI, Director (2007); USPI, VP Talent Acquisition (2007–2020) |
| Bill Myers | DaVita, VP Marketing Communications (2016–2018); DaVita, VP, Communications, Marketing & Corporate Social Responsibility (2012–2016); DaVita, VP, Communications and Corporate Social Responsibility (2010–2012); UnitedHealth Group, VP – Government Affairs (2008–2010) |
| Javier Rodriguez | DaVita, SVP (2005–2018); DaVita, DVP (2006); DaVita, VP Value Management Operation (2006); DaVita, President (2008, 2012–2014); DaVita, CEO, Kidney Care (2014-2022) |
| Michael Rucker | DaVita, DVP/RVP (2006–2008); SCA, SVP Operations (2008–2009); SCA, EVP & COO (2009–2017) |
| Jennifer Sandoz | SCA, Director HR (2016–2017); SCA, Senior Director (2017–2020); SCA, VP HR (2021) |
| John Schultz | Russell Reynolds Associates, Consultant (2010–2014); Spencer Stuart, Consultant (2014–2016), Spencer Stuart, Principal (2016–2019); Spencer Stuart, Partner, Private Equity Healthcare Practice Leader (2019–Present) |
| Rich Sharff | SCA, EVP, General Counsel & Secretary (2007–Present); OptumHealth, General Counsel (2017–Present) |
| Allen Spradling | SCA, Project Management Office Director, (2008–2013) |
| Mike Staffieri | DaVita, Director (2005–2006); SVP (2005, 2011, 2013); DaVita, Regional Ops Director (2006–2008); DaVita, Group Director (2008); DaVita, SVP; DaVita, DVP/RVP (2008–2010); DaVita, VP (2010–2011); DaVita COO, Kidney Care (2014-2022); DaVita, COO (2013–2022) |
| Doug Swope | HCA Healthcare, Manager, Executive Recruitment C-Level (1995–1998); HCA Healthcare, Director, HR Executive Recruitment (1998–2008); HCA Healthcare, Senior Director, HR (2008–2011); e+CancerCare (2011–2013); President, Surgical Care Partners (2013–Present) |
| Jimmy Tanner | Aerotek, Recruiter (2009-2013); Catapult Staffing, Director of Recruiting (2013-2016); Catapult Staffing, Vice President of Recruiting & Strategic Accounts (2017-2018); Advantis Medical Staffing, Recruiting Manager (2018-2021); Advantis Medical Staffing, Delivery Manager (2018-2019); Advantis Medical Staffing, Director of Recruiting (2021-2022); Advantis Medical Staffing, Vice President of Recruiting (2022-present). |
| Sean Taylor | DaVita, Senior Director of Business Development (2015–2016) |

| Kent Thiry | DaVita, Chairman and CEO (1999–2019); DaVita, Chairman and CEO, HealthCare Partners Inc. (2014–2020); DaVita, Executive Chairman of the Board of Directors (2019–2021) |
| James "Skip" Thurman | DaVita, Director (2010–2011); DaVita, Senior Director (2011–2013); DaVita, Senior Director, Communications (2014–2017); DaVita, VP (2017–2020) |
| Niels Vernegaard | USPI, COO (2006–2021) |
| Leslie Wachsman | SCA, VP Finance & Investor Relations (2012–2018); SCA, GVP, Finance (2018–2019); SCA, CFO (2019–Present) |
| James Walker | USPI, Director of Technical Accounting (2006–2021); USPI, VP of Corporate Accounting (2011–2019) |
| William ("Bill") Wilcox | USPI, President (2005–2011); USPI, CEO (2011–2018), Chairman (2018–2020); USPI, Consultant (2020–2023) |

3154924.9

214

## **APPENDIX D**

## **Appendix Figures**

### **Figure 26: Other Measures of Compensation**

| | Ln(Regular Plus Other Compensation) | | Ln(Total Compensation Minus Stocks) | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Conduct | -0.0807*** | | -0.0952*** | |
| | (0.00902) | | (0.00858) | |
| % Wage Suppression | -7.8% | | -9.1% | |
| | | | | |
| DaVita Conduct | | -0.0488*** | | -0.0908*** |
| | | (0.0102) | | (0.00988) |
| % Wage Suppression | | -4.8% | | -8.7% |
| | | | | |
| SCA Conduct | | -0.110*** | | -0.122*** |
| | | (0.0130) | | (0.0137) |
| % Wage Suppression | | -10.4% | | -11.5% |
| | | | | |
| USPI Conduct | | -0.108*** | | -0.0966*** |
| | | (0.0113) | | (0.0108) |
| % Wage Suppression | | -10.2% | | -9.2% |
| | | | | |
| Year Trend | Yes | Yes | Yes | Yes |
| Healthcare, Macro, Hours | Yes | Yes | Yes | Yes |
| Individual-by-Company FE | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Observations | 26,976 | 26,976 | 27,010 | 27,010 |
| R-squared | 0.849 | 0.849 | 0.877 | 0.877 |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The two measures of compensation are the natural log of regular pay plus the other category of pay, and the natural logarithm of total pay minus stock compensation.

**Figure 27: Hourly Wages**

| | Dependent Variable: Ln(Hourly Wage) | |
|---|---|---|
| | [1] | [2] |
| Conduct | -0.177*** | |
| | (0.0140) | |
| **% Wage Suppression** | **-16.2%** | |
| | | |
| DaVita Conduct | | -0.189*** |
| | | (0.0149) |
| **% Wage Suppression** | | **-17.2%** |
| | | |
| SCA Conduct | | -0.138*** |
| | | (0.0179) |
| **% Wage Suppression** | | **-12.9%** |
| | | |
| USPI Conduct | | -0.170*** |
| | | (0.0187) |
| **% Wage Suppression** | | **-15.7%** |
| | | |
| Year Trend | Yes | Yes |
| Healthcare, Macro | Yes | Yes |
| Log-Total Hours | No | No |
| Individual-by-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 27,010 | 27,010 |
| R-squared | 0.821 | 0.821 |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The dependent variable is the natural log of hourly wages (total compensation divided by total hours). Note that total hours do not appear as a control variable in this specification, because they are incorporated into the denominator of the dependent variable.

**Figure 28: Poisson Models**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.148*** | -0.213*** | -0.226*** |
| | (0.0181) | (0.0302) | (0.0303) |
| **% Wage Suppression** | **-13.7%** | **-19.2%** | **-20.2%** |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.173*** | -0.259*** | -0.257*** |
| | (0.0258) | (0.0352) | (0.0351) |
| **% Wage Suppression** | **-15.9%** | **-22.8%** | **-22.7%** |
| | | | |
| SCA Conduct | -0.116*** | -0.181*** | -0.170*** |
| | (0.0201) | (0.0395) | (0.0396) |
| **% Wage Suppression** | **-11.0%** | **-16.6%** | **-15.6%** |
| | | | |
| USPI Conduct | -0.0930*** | -0.146*** | -0.183*** |
| | (0.0229) | (0.0336) | (0.0341) |
| **% Wage Suppression** | **-8.9%** | **-13.5%** | **-16.7%** |
| Year Trend | Yes | Yes | Yes |
| Healthcare, Macro, Hours | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The model is estimated using a Poisson regression.

**Figure 29: Control Variables Interacted by Company**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0891*** | -0.130*** | -0.131*** |
| | (0.00778) | (0.0133) | (0.0119) |
| **% Wage Suppression** | **-8.5%** | **-12.2%** | **-12.3%** |
| Observations | 27,010 | 27,010 | 27,010 |
| R-squared | 0.810 | 0.812 | 0.867 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.126*** | -0.163*** | -0.151*** |
| | (0.0118) | (0.0202) | (0.0189) |
| **% Wage Suppression** | **-11.9%** | **-15.0%** | **-14.0%** |
| | | | |
| SCA Conduct | -0.0928*** | -0.320*** | -0.226*** |
| | (0.0158) | (0.0448) | (0.0329) |
| **% Wage Suppression** | **-8.9%** | **-27.4%** | **-20.3%** |
| | | | |
| USPI Conduct | -0.0263** | -0.0617*** | -0.0936*** |
| | (0.0112) | (0.0163) | (0.0129) |
| **% Wage Suppression** | **-2.6%** | **-6.0%** | **-8.9%** |
| Observations | 27,010 | 27,010 | 27,010 |
| R-squared | 0.810 | 0.813 | 0.867 |
| Year Trend | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Note that the macroeconomic, healthcare-specific, and ln(total hours) controls are fully interacted with each company when they are included (e.g., the main effect of each control and the interaction are included).

**Figure 30: Models Controlling for Job Titles and Tenure**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0824*** | -0.127*** | -0.149*** |
| | (0.00709) | (0.0117) | (0.0112) |
| **% Wage Suppression** | **-7.9%** | **-12.0%** | **-13.8%** |
| | | | |
| Tenure | 0.0448*** | 0.0385*** | 0.0315*** |
| | (0.00937) | (0.0103) | (0.00812) |
| Observations | 26,893 | 26,893 | 26,893 |
| R-squared | 0.833 | 0.834 | 0.879 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.121*** | -0.179*** | -0.177*** |
| | (0.00981) | (0.0145) | (0.0134) |
| **% Wage Suppression** | **-11.4%** | **-16.4%** | **-16.2%** |
| | | | |
| SCA Conduct | -0.0453*** | -0.109*** | -0.0868*** |
| | (0.0136) | (0.0195) | (0.0155) |
| **% Wage Suppression** | **-4.4%** | **-10.3%** | **-8.3%** |
| | | | |
| USPI Conduct | -0.0351*** | -0.0804*** | -0.128*** |
| | (0.0120) | (0.0140) | (0.0133) |
| **% Wage Suppression** | **-3.5%** | **-7.7%** | **-12.1%** |
| | | | |
| Tenure | 0.0540*** | 0.0463*** | 0.0475*** |
| | (0.0106) | (0.0121) | (0.0104) |
| Observations | 26,893 | 26,893 | 26,893 |
| R-squared | 0.834 | 0.834 | 0.879 |
| Job Title FE | Yes | Yes | Yes |
| Year Trend | Yes | Yes | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The model includes controls for tenure and for job title fixed effects.

**Figure 31: Drop COVID Years**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0789*** | -0.115*** | -0.140*** |
| | (0.00955) | (0.0126) | (0.0123) |
| % Wage Suppression | **-7.6%** | **-10.8%** | **-13.1%** |
| Observations | 22,623 | 22,623 | 22,623 |
| R-squared | 0.824 | 0.824 | 0.856 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.0884*** | -0.141*** | -0.140*** |
| | (0.0149) | (0.0173) | (0.0161) |
| % Wage Suppression | **-8.5%** | **-13.1%** | **-13.1%** |
| SCA Conduct | -0.128*** | -0.217*** | -0.203*** |
| | (0.0223) | (0.0295) | (0.0273) |
| % Wage Suppression | **-12.0%** | **-19.5%** | **-18.4%** |
| USPI Conduct | -0.0484*** | -0.0870*** | -0.139*** |
| | (0.0136) | (0.0155) | (0.0160) |
| % Wage Suppression | **-4.7%** | **-8.3%** | **-12.9%** |
| Observations | 22,623 | 22,623 | 22,623 |
| R-squared | 0.824 | 0.825 | 0.856 |
| Year Trend | Yes | Yes | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample drops the COVID years, 2020 and 2021.

3154924.9

220

### Figure 32: Include Partial Years Worked

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0686*** | -0.0729*** | -0.127*** |
| | (0.0104) | (0.0184) | (0.0128) |
| % Wage Suppression | **-6.6%** | **-7.0%** | **-11.9%** |
| Observations | 34,540 | 34,540 | 34,481 |
| R-squared | 0.629 | 0.630 | 0.874 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.107*** | -0.132*** | -0.147*** |
| | (0.0153) | (0.0233) | (0.0147) |
| % Wage Suppression | **-10.1%** | **-12.3%** | **-13.7%** |
| SCA Conduct | -0.0791*** | -0.0940*** | -0.0974*** |
| | (0.0218) | (0.0295) | (0.0184) |
| % Wage Suppression | **-7.6%** | **-9.0%** | **-9.3%** |
| USPI Conduct | -0.00154 | -0.0138 | -0.112*** |
| | (0.0168) | (0.0208) | (0.0165) |
| % Wage Suppression | **-0.2%** | **-1.4%** | **-10.6%** |
| Observations | 34,540 | 34,540 | 34,481 |
| R-squared | 0.630 | 0.630 | 0.874 |
| Year Trend | Yes | Yes | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes workers who worked part of the year.

**Figure 33: Including Outliers**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.103*** | -0.135*** | -0.160*** |
| | (0.00883) | (0.0133) | (0.0119) |
| **% Wage Suppression** | **-9.8%** | **-12.6%** | **-14.7%** |
| Observations | 27,142 | 27,142 | 27,039 |
| R-squared | 0.766 | 0.767 | 0.856 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.137*** | -0.190*** | -0.190*** |
| | (0.0131) | (0.0167) | (0.0146) |
| **% Wage Suppression** | **-12.8%** | **-17.3%** | **-17.3%** |
| SCA Conduct | -0.117*** | -0.170*** | -0.145*** |
| | (0.0171) | (0.0229) | (0.0180) |
| **% Wage Suppression** | **-11.0%** | **-15.6%** | **-13.5%** |
| USPI Conduct | -0.0442*** | -0.0806*** | -0.132*** |
| | (0.0144) | (0.0167) | (0.0145) |
| **% Wage Suppression** | **-4.3%** | **-7.7%** | **-12.4%** |
| Observations | 27,142 | 27,142 | 27,039 |
| R-squared | 0.767 | 0.768 | 0.856 |
| Year Trend | Yes | Yes | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note:* *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes full-year employees, including outliers.

**Figure 34: Harmonizing Data Time-Frame Across Defendants (2008–2022)**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0876*** | -0.106*** | -0.0827*** |
| | (0.00720) | (0.0135) | (0.0103) |
| % Wage Suppression | **-8.4%** | **-10.1%** | **-7.9%** |
| Observations | 25,489 | 25,489 | 25,489 |
| R-squared | 0.819 | 0.819 | 0.888 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.159*** | -0.286*** | -0.249*** |
| | (0.0113) | (0.0209) | (0.0171) |
| % Wage Suppression | **-14.7%** | **-24.8%** | **-22.1%** |
| SCA Conduct | -0.111*** | -0.209*** | -0.142*** |
| | (0.0144) | (0.0224) | (0.0172) |
| % Wage Suppression | **-10.5%** | **-18.8%** | **-13.2%** |
| USPI Conduct | 0.00848 | -0.0592*** | -0.0420*** |
| | (0.0111) | (0.0139) | (0.0102) |
| % Wage Suppression | **0.9%** | **-5.8%** | **-4.1%** |
| Observations | 25,489 | 25,489 | 25,489 |
| R-squared | 0.821 | 0.822 | 0.890 |
| Year Trend | Yes | Yes | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes only years 2008 to 2022.

3154924.9

223

**Figure 35: No Individual-Company Fixed Effects**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] | [2] |
| *Panel A. Common Conduct Effect* | | |
| Conduct | -0.120*** | |
| | (0.0164) | |
| % Wage Suppression | **-11.3%** | |
| *Panel B. Defendant-Specific Conduct* | | |
| DaVita Conduct | | -0.0879*** |
| | | (0.0199) |
| % Wage Suppression | | **-8.4%** |
| | | |
| SCA Conduct | | -0.131*** |
| | | (0.0217) |
| % Wage Suppression | | **-12.3%** |
| | | |
| USPI Conduct | | -0.147*** |
| | | (0.0190) |
| % Wage Suppression | | **-13.7%** |
| | | |
| Year Trend | Yes | Yes |
| Healthcare, Macro, Hours | Yes | Yes |
| Individual-by-Company FE | No | No |
| Location FE | Yes | Yes |
| Observations | 28,786 | 28,714 |
| R-squared | 0.368 | 0.364 |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. There are no individual-by-company fixed effects in these regressions.

**Figure 36: Random Effects Model**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0817*** | -0.113*** | -0.147*** |
| | (0.00711) | (0.0114) | (0.0110) |
| **% Wage Suppression** | **-7.8%** | **-10.7%** | **-13.7%** |
| Observations | 28,786 | 28,786 | 28,786 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.116*** | -0.166*** | -0.169*** |
| | (0.0106) | (0.0144) | (0.0135) |
| **% Wage Suppression** | **-10.9%** | **-15.3%** | **-15.5%** |
| | | | |
| SCA Conduct | -0.0960*** | -0.150*** | -0.140*** |
| | (0.0131) | (0.0181) | (0.0156) |
| **% Wage Suppression** | **-9.2%** | **-13.9%** | **-13.1%** |
| | | | |
| USPI Conduct | -0.0197* | -0.0583*** | -0.127*** |
| | (0.0108) | (0.0134) | (0.0130) |
| **% Wage Suppression** | **-2.0%** | **-5.7%** | **-11.9%** |
| Observations | 28,786 | 28,786 | 28,786 |
| Year Trend | Yes | Yes | Yes |
| Individual-by-Company RE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed. The model is estimated with random effects.

**Figure 37: Reverse Relationship Between Director and (S)VP Wages**

| | Dependent Variable: Ln(Mean Hourly Rate of VPs & SVPs) | | | | | |
|---|---|---|---|---|---|---|
| | DaVita | | SCA | | USPI | |
| Ln(Mean Hourly Rate of Directors) | 1.696*** | 2.439*** | 1.026*** | 0.448** | 1.069*** | 0.943*** |
| | (0.457) | (0.657) | (0.0982) | (0.162) | (0.0320) | (0.0534) |
| Ln(Avg. State Mgr. Earnings) | | 0.501 | | 0.634 | | 0.453 |
| | | (1.156) | | (0.400) | | (1.361) |
| Ln(State Health Expend. PC) | | -1.617 | | 0.953* | | -0.0311 |
| | | (0.945) | | (0.423) | | (1.416) |
| Covid | | 0.0274 | | 0.0576 | | 0.0484 |
| | | (0.393) | | (0.0543) | | (0.184) |
| Ln(State GDP PC) | | -0.299 | | -4.999*** | | 3.262 |
| | | (5.612) | | (0.924) | | (3.357) |
| Ln(State Unemployment Rate) | | 0.116 | | -0.294** | | -0.0994 |
| | | (0.469) | | (0.0950) | | (0.352) |
| Census Region Annual CPI | | 0.425 | | 0.210 | | -1.474 |
| | | (1.357) | | (0.182) | | (0.821) |
| Observations | 18 | 18 | 15 | 15 | 18 | 18 |
| R-squared | 0.385 | 0.752 | 0.909 | 0.985 | 0.879 | 0.954 |

*Note:* *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

## APPENDIX E

### Data Construction

200.     I relied on several data sources to build my complete dataset, which I used for all econometric analysis. Three data types come from discovery as structured data (one for each Defendant). I supplemented the structured data with publicly available data from several sources, as described below.

### A.     DaVita Data

201.     DaVita provided three different types of data: (1) Hashed SSN Data; (2) Teammate Data; and (3) Payroll Data. I describe each data type below.

202.     DaVita's Hashed SSN Data is comprised of Bates Excel files DVA_OMCEAL_001408550, DVA_OMCEAL_000000047, and DVA_OMCEAL_001421733. These files each contain two variables: the DaVita employee ID and a hashed SSN. I appended the three files, removed any exact duplicates between the files, and removed observations with a "null" hashed SSN. I was left with 280,937 observations unique to DaVita employee ID number. The hashed SSNs are 64-character combinations of letters and numbers that are designed to uniquely identify a DaVita employee over time and across companies, which the DaVita employee ID alone cannot do.

203.     DaVita's Teammate Data consists of Bates Excel file DVA_OMCEAL_000902592. After cleaning, this dataset has 1,1707,307 observations. Each observation details an employee's ID, hire and departure date, name, ethnicity, gender, age, job title, manager level, department, facility location, among other related data. Employees have more than one observation in the data if any of the information changes. For example, if an employee changes locations, they will appear in the data as working at the old location and in another observation listed as working at the new location. To clean this data, I limited it to

relevant data, combined it with the Hashed SSN Data, and removed observations with no job title and/or no hashed SSN. I then split the data to have one observation per employee and year. This means that if an employee changes locations, they will now have one observation with location one and location two listed. I flagged the final job, location, etc. for the year for each employee, using the provided job start date and job end date. I combine the Teammate Data with a crosswalk file, DVA_OMCEAL_001421632, to supplement the data with additional department descriptions.

204.    DaVita's Payroll Data is comprised of Bates files DVA_OMCEAL_000000029 – DVA_OMCEAL_000000045, DVA_OMCEAL_000902589 – DVA_OMCEAL_000902591, and DVA_OMCEAL_001408544. The Payroll Data contains the employee's name and ID, along with their job title, manager level, pay amount, the pay component being disbursed (e.g., regular pay, sick pay, stock plan awards, etc.), and the hours worked. Each observation is for one employee, job title, and pay type in a year. After standardizing and combining the files, there are 8,465,790 observations, over years 2005-2022. I combine the Payroll Data with a crosswalk, file DVA_OMCEAL_001182111, which provides additional pay code details to identify what each payment covers (e.g., regular pay, sick pay, bonuses, etc.).

205.    I combined the full Payroll Data with the Hashed SSN Data, then removed any employees without a hashed SSN. I combined the full Payroll Data with the Teammate Data to have employee location and demographic data where available. As with the Teammate Data, I marked the final job and manager level of the year for each employee and consolidated the data to have only one observation per employee and year. I flagged employees in excluded jobs or departments, then classified the manager level numerically to be compared across companies. I also added the crosswalk file DVA_OMCEAL_001421634 to supplement the job level

classifications. I flag the payment codes that DaVita indicated correspond to hours that are double counted, so that I can disregard the hours from these observations while including the amount in the total compensation.[506] Finally, I summed up the hours worked and amount earned over the year for each employee and pay type (including all locations, job titles, etc. the employee held in the year). The DaVita annual dataset has 8,465,429 observations.

**B.      SCA Data**

206.      SCA provided a myriad of data types. I use five main sources: (1) 2008-2020 Payroll Data; (2) Job Data; (3) 2021 Data; (4) 2022 Data; and (5) Hashed SSN and other crosswalks. I describe these datasets and the files I use to create them below.

207.      The SCA 2008-2020 Payroll Data is made up of the cleaned CheckSumm and CheckSummHE data. Both CheckSumm and CheckSummHe contain pay data. However, CheckSummHE contains more granular data that identifies what the payment is for (e.g., regular pay, bonuses, sick pay, etc.). I could not only use the CheckSummHE data, however, because the employee ID in the CheckSummHE does not align with the employee ID in the other datasets, including the hashed SSN data. Therefore, I first clean the CheckSumm dataset to include hashed SSNs (using file "SCA Hashed SSNs") and various crosswalks to identify the check type and surgery center names (from file "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data"). I then combined the CheckSummHE data with the CheckSumm data, to have the hashed SSN and the pay amounts and hours with the payment type. I removed observations that only exist in the CheckSummHE data, because they do not have a hashed SSN. The

---

[506] *See* 2024-12-19 Ltr to S. Zandi re structured data questions from 11-27-24 Ltr (DaVita's Response to Plaintiffs' Question 4, providing a list of relevant codes that are "associated with hours that should not be counted as 'hours worked.'").

combined dataset contains 10,069,655 observations with the employee's name, hashed SSN, the payment type, hours, total earnings, dates of the pay period, and location.

208.    The SCA Job Data is the cleaned version of the EJob Data. The EJob data contains employees' job titles and the dates during which the employee held that job title. I combined the EJob Data with the crosswalks to get the facility names, facility addresses (including state and zip code), and department descriptions (using files "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data" and "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions"). I flagged excluded departments, then used my job level classification file to standardized the job levels based on job title. This standardization allows for comparison of different job titles across the Defendants' data. I added the hashed SSN data to identify the same employees across files. The cleaned Job Data contains 83,626 observations.

209.    The Employee Types Data is a cleaned subset of the EEmploy data. The EEmploy data contains, among other things, the hire and termination dates of employees. I use the year I combine this data with the Eecategory crosswalk (file "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data") to identify what employment category applies to each employee (e.g., full time, part time, etc.). I also combined the data with the hashed SSN data. I create a new employee description, which contains all employment categories that pertain to the given employee in the given year. The Employee Types Data contains 267,576 observations.

210.    The Hire Dates Data is a cleaned subset of the EEmploy data. The EEmploy data contains, among other things, the hire and termination dates of employees. I isolate the hire and term dates for each employee, identified by hashed SSN. If an employee has more than one set of

hire dates, I use the value with the most recent "status date." The Hire Dates Data contains 32,973 observations.

211.    The 2021 data is primarily comprised of the file "Check History Hours and Earnings." It includes the employee's name, job title, pay amount, hours worked, pay period, and what the payment covered (regular pay, PTO, etc.). I combine this data with the four files to identify the hashed SSNs for 2021 data specifically ("Termed in 2021," "2021 Teammate Roster," "SCA - Structured00000005," and "SCA - Structured00000013"). I also combine the data with various crosswalks to identify the earning code definitions, zip codes, and location data (using files "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data" and "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions"). I identify excluded departments using keywords. I then use my job level standardization file to classify job levels based on the job titles. The resulting 2021 data has 754,645 observations.

212.    The 2022 data is created using files "SCA-Structured00000007," "SCA-Structured00000009," "SCA-Structured00000010," and "SCA-Structured00000011." File SCA-Structured00000007 contains employee's names, job titles, pay periods, pay amounts, hours worked, and what the payment covers (regular pay, holiday pay, etc.). File SCA-Structured00000009 contains an employee number, date, total earnings, and hours worked. I supplement the SCA-Structured00000007 data with additional payments in the SCA-Structured00000009 file. If an employee only had payments in file SCA-Structured00000009, they were excluded because there was no way to identify their job title. Files SCA-Structured00000010 and SCA-Structured00000011 contain employee names, hire and termination dates, job titles, and location data. In addition to combining these four files, I combine these data with the 2022 hashed SSN crosswalks (files SCA-Structured00000012 and

SCA-Structured00000013). As with the 2021 data, I also combine the data with various crosswalks to identify the earning code definitions, zip codes, and location data (using files "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data" and "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions"). I identify excluded departments using keywords. I then use my job level standardization file to classify job levels based on the job titles. The resulting 2022 dataset has 835,627 observations.

213.    I cleaned the 2008-2020 Payroll Data to create separate variables for each location present for the same employee in the same year. I also standardized employee names. I then collapsed the data to get the total hours worked and pay amount for a given employee in a given year. Next, I cleaned the Job Data to have the have one observation per employee and year, with multiple job titles (and locations, departments, etc.) listed if applicable. I combined the 2008-2020 Payroll Data with the Job Data. I limited the data to values that exist in both the 2008-2020 Payroll Data and the Job Data (so that each observation must have both an employee with a job title and some compensation in the given year). I supplemented the Pay and Job Data with the Employee Types Data and Hire Dates Data. Because the 2021 and 2022 data were separate from the 2008-2020 data, I then standardized and appended the 2021 and 2022 datasets. The resulting SCA annual dataset has 11,650,219 observations.

## C.    USPI Data

214.    USPI has two main data types: (1) Tenet Payroll Data and (2) USPI Payroll Data. It also supplied a number of crosswalks to decipher various coded variables. I describe each dataset below.

215. The Tenet Payroll Data is created from Bates files USPI_CIV_000659234 and USPI_CIV_001168726.[507] The data contains the hashed SSN, name, job title, pay amount for a year, hire date and termination date, and other related information. I reshaped the data to have the gross pay for the given hashed SSN in a given year. I removed any observations with zero or missing gross pay. I consolidated the data to have one observation per employee and year (for example, if there were two observations for the same employee at two different jobs, both in 2018, now there will only be one observation for that employee in 2018, with two job titles listed). For the single observation with two different pay amounts in the same year (after consolidating for any other differences), I average the two annual pay amounts. The resulting cleaned dataset had 3,425 observations.

216. The USPI Payroll Data is comprised of Bates files USPI_CIV_000659222 – USPI_CIV_000659233. After combining the files, there are 10,154,601 observations over years 2005-2023. The data contains the employee names, demographic data, hashed SSN, check date, total hours, total earnings, job title, hire and termination date, and location number. I then appended the Tenet Payroll Data. I combined the Payroll Data (USPI and Tenet data) with the various crosswalks described below. I classified the excluded departments and job titles. I then classified the job level using the job description USPI provided. Unlike DaVita, USPI did not

---

[507] Note that USPI_CIV_001168726 contains Tenet employee data and repeated data from USPI_CIV_000659234. However, two USPI employees who were transferred to the Tenet system and do not appear in USPI_CIV_000659234. USPI was unable to determine why these two employees had been excluded from USPI_CIV_000659234. *See* 2025.01.06 USPI Resp to Pls 11.22.24 Ltr re Structured Data for details. Therefore, I incorporate the one USPI employee from USPI_CIV_001168726 who has a hashed SSN available. USPI also informed me that USPI_CIV_001168726 does not include "certain off-cycle bonus payments made to the listed employees." *See* 2024.11.18 USPI Production - Vol. 27. Therefore, this single employee may be missing some bonus payments. I include these observations to make my dataset as complete as possible.

provide its own level classification. To allow for comparison, I assigned a job level (based on the levels DaVita provided) using keywords from the USPI job description. I then consolidated the data to have one observation per employee and pay type in a year, by indicating the final version of any repeated variables (such as the final job held in the year) and keeping all additional repeated variables as additional jobs, locations, etc. for the same year, rather than keeping those as separate observations. The USPI annual dataset has 1,396,384 observations.

217. The USPI crosswalks used come from files "Exhibit A_Paygroup_Location" and "4.19.24 Paygroup location" (location zip code), "Exhibit B_ERNCD Values" (earn code description), "2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions" (job position classification), "USPI_CIV_000021819" (employee status, employee type, and compensation frequency), "2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes" (which earning codes are associated with double counted hours). The location zip code crosswalk matches the location code and description in the Payroll Data to the corresponding location zip code. The earn code description provides a description for what the earning payment is for (such as severance, bonuses, etc.) to correspond to the pay group and earn codes in the Payroll Data. There is no "regular" pay as is defined in the DaVita or SCA data. Instead, USPI informed me that any values that do not have a pay group and earn code matching that in the crosswalk are regular payments.[508] The job position classifications were provided by USPI to indicate which job descriptions are considered admin or above in level, and which were subject to the no-poach agreement. I include these as the minimum number of impacted employees by job description. The employee status lists if the employee is active, retired,

---

[508] 2024.03.27 Ltr from USPI to Plaintiffs re 2.7 Ltr ("it is our understanding that a missing value for 'erncd' indicates that the corresponding record in the data is a regular salary or wage payment (*i.e.*, not a bonus, shift pay, holiday pay, bereavement pay, etc.").

terminated, etc. The employee type indicates if the employee is full time, part time, temporary, PRN, or part time without being eligible for benefits. The compensation frequency lists how often the employee is paid (annually, hourly, biweekly, semimonthly, or weekly). The double counted hours identify cases such as the same hours being tracked for overtime and regular pay, but with compensation for overtime showing the additional compensation beyond regular for the same hours. For these values, I keep the compensation from both sources, but replace the double counted hours second instance as zero hours.

### D.        Publicly Available Data

218.    I use public datasets to acquire the following variables: (1) Per Capita Healthcare Services Spending by State-Year; (2) Real GDP Per Capita by State-Year; (3) CPI by Census Region-Year; (4) Unemployment Rate by State-Year; (5) Annual Medical and Healthcare Manager Earnings in the Defendants' industries; and (6) Minimum Wage Data by State and Year. This data come from Federal Reserve Economic Data (FRED) at the Federal Reserve Bank of St. Louis, the U.S. Department of Commerce's Bureau of Economic Analysis (BEA), the U.S. Bureau of Labor Statistics (BLS), the Department of Labor, and the Census Bureau. I describe each dataset below.

219.    The Per Capita Healthcare Services Spending by State-Year Data comes from FRED. Each state has an individual dataset, which I appended together. The data contain the per capita personal consumption expenditure (PCE) for healthcare services in the given state. Once compiled into one dataset, there are 1,326 observations, with the per capita healthcare services spending for all 50 states and DC between 1997 and 2022.

220.    The Real GDP Per Capita by State-Year Data comes from FRED and BEA. BEA has a real GDP table. FRED has population data by state. I combined the state real GDP data

with the corresponding state population data to calculate the real GDP per capita. Once compiled

into one dataset, there are 1,377 observations, with the real GDP per capita for all 50 states and

DC between 1997 and 2023.

221.    The Unemployment Rate by State-Year Data comes from the BLS. It contains

seasonally adjusted unemployment rates by month and state. I average the rate for each month to

estimate an annual rate. The data extends from 2005-2023 for the 50 states and DC.

222.    The CPI by Census Region Data comes from BLS. The Consumer Price Index

(CPI) is reported on the census region level (northeast, Midwest, south, and west).[509] I expanded

the dataset to include an observation for each state (plus DC and Puerto Rico) and classified the

states in their respective regions. The final dataset has 988 observations with the annual CPI for

the 50 states and DC and Puerto Rico between 2005 and 2023.

223.    The Minimum Wage Data comes from the U.S. Department of Labor. The

publicly available table lists the federal and state-specific minimum wage by year. I classify the

effective minimum wage as the higher of the two minimum wages (state and federal). The

available data extends through 2022.

224.    The American Community Survey is an annual survey produced by the Census

Bureau. I use the harmonized version from IPUMS for the years 2005 to 2022. Per the Census

Bureau, it "is a nationwide, continuous survey designed to provide communities with reliable

and timely social, economic, housing, and demographic data every year. Since its

implementation in 2005, the ACS has been providing a continuous stream of updated

---

[509] I use the census region level because no state level is available. The only less aggregated
version, census divisions, is available for 2018–2023. Therefore, to cover the entire payroll
dataset period, I can only use the census region level data.

information for states and local areas[.]"[510] With this dataset, I calculate annual earnings of health and medical managers in each state-year in the industries of the Defendants.

**E.      Combining Datasets**

226. 225.    I combine the cleaned and annualized files for each Defendant to create my final dataset. After combining the three annual datasets, I cleaned out repeated information (such as matching job titles that appear more than once). I standardize variables to consolidate the descriptions. I remove null values for states and zip codes. I also flag if the overall or current (as of a given year) tenure variables appear to be unreasonable (such as negative tenure values).[511] I remove any blank variables. The resulting dataset with combined annual data has multiple observations per employee, year, and company, because there are still different observations for each time the employee was paid within the year.

226.    I classify the pay types into groups, such as regular pay, overtime, bonuses, and other categories based on the pay type descriptions. This allows me to standardize within and between companies. All unclassified pay types are grouped into "other" pay types. I replace the double counted hours as identified by USPI and DaVita as zero hours worked to avoid double counting. I calculate the total pay by year and pay type for a given employee at a given company. I attribute overall negative annual pay for a given pay type as applying to the previous year, per

---

[510] *American Community Survey Information Guide*, UNITED STATES CENSUS BUREAU, https://www.census.gov/programs-surveys/acs/about/information-guide.html (last visited Jan. 2025).

[511] Defendants informed me that such negative or otherwise unreasonable values are likely the result of data entry errors. *See*, *e.g.*, 2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions (Ejob Question 12 (indicating that values with "ejdatebeg" after "ejdateend" can arise from manual data entry errors).

Defendant instructions.[512] I then sum the total hours and pay amount for a given employee, year, and company. The resulting dataset has one observation per employee, company, and year, with the total pay and hours worked as well as the pay amount and hours associated with the various pay types, included.

227.    I create a clean job title with standardized formatting (such as removing commas, correcting typos, etc.) using the final job title each employee held in a given year. This cleaning allows for easier comparison between job titles. However, there are still various job titles that may contain the same responsibilities. Therefore, I use the job levels to inform which employees are considered Senior Employees.

228.    I combine the resulting dataset with my various controls from publicly available sources. These controls include healthcare services spending per capita, real GDP per capita, CPI, minimum wage rates, unemployment rates, and ACS health manager data. The controls are assigned at the state-year level, except for CPI, which is only available at the census region-year level. For observations missing a state, I assign the missing value as the average value for the corresponding job title and company. If there are no matching job titles, I assign the missing value as the average value for the corresponding level and company. If there are no populated values at the same level, I assign the missing value as the average value for directors and above at the company.[513]

---

[512] Defendants described these negative amounts as corrections to previous payments. *See* 2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions (CheckSummHE Question 10 answer: "Entries with negative earnings typically reflect a corrective action made to a prior paycheck."). Given this explanation, I retain all negative payments within a year and only make adjustments if the total annual amount of a given pay type is negative.

[513] *See* my workpapers for details.

229.     I next clean the dataset for potential outliers. I make an adjustment to the total hours for USPI to not count "on-call" hours as hours worked, but retain the pay earned.[514] I make a similar adjustment for SCA's overtime and shift hours.[515] I then flag outliers. I consider an observation to be an outlier if the total or regular hourly pay is below the effective minimum wage, meaning the higher of the relevant state and federal minimum wage in the given year. I also classify very high regular hourly rates as outliers, using a rate of greater than $5,000 per hour as a cutoff.[516] I consider negative total or regular pay or hours worked as outliers. I also flag employees who worked more than 5,000 hours in a year, meaning that they worked over 100 hours per week for 50 weeks, and employees who worked fewer than 50 hours in a year (fewer than one hour a week) while being listed as working the entire year.[517] Using these classification criteria, I identify approximately 2.3 percent of the data to be outliers.[518] I use the resulting dataset to evaluate summary statistics, conduct my econometric analyses, and calculate damages, all as described above.

---

[514] *See* 2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter (stating that on-call hours are often doubled-counted).

[515] *See* 2024.10.11 - Letter from J. Wade to S. Zandi re structured data (Request 2 answer describing shift pay as an "additional, incremental rate for the hours worked." Request 6 answer listing overtime as hours that are double-counted while reflecting the correct pay amount.).

[516] The greater than $5,000 per hour cutoff only includes a small number of observations, all of whom worked fewer than 24 hours in the year, suggesting that the total hours worked might not be properly tracked for these employees.

[517] This assumes two non-working weeks in the year. However, even using 52 weeks, the employee would be working over 96 hours or under 0.96 hours every week.

[518] The 2.3 percent is approximately 32,000 observations out of over 1.43 million total observations. When the data is limited to 2005–2022 and to Senior-Level Employees, approximately 900 observations (2.4 percent of the data) are classified as outliers.

# **Exhibit 2**

# Lane Declaration

# (Filed Under Seal)

1. The text on page 7, paragraph 12(d) should say: ". . . which is composed of $631.7 million in damages for Class Members at DaVita . . .

2. There is a typo in the first sentence in paragraph 70(a)(iii) on page 35, which should state: "Under the terms of the agreement, DaVita and SCA could 'not direct[ly] hire each other's employees or solicit them to switch between SCA and DaVita as their employer[.]'"

3. Footnote 105 on page 35 should cite to "Thiry Dep. at 143:17 – 145:6; Ex. PX313 at DOJCIV-008-00000188."

4. Footnote 114 on page 38 should cite to Ex. PX158.

5. Footnote 240 on page 62 should cite to "Deposition of Joseph Clark (Sept. 11, 2024) at 59:20–61:23."

6. The first sentence in paragraph 80(a)(iii) on page 71 (including footnotes 286–87) properly belongs under the header "SCA and DaVita Would Otherwise Have Recruited From Each Other," beginning on page 45.

7. In paragraph 80(b)(vi) on page 75 the last two sentences inadvertently omitted the citation to "Ex. PX298; Wilcox Dep. at 100:9–22, 116:23-123:1."

8. The "Note" in Figure 4: Probability of Mobility Between Covered Defendants on page 85 should state, "*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses. Note the constant term is suppressed."

9. The first sentence in paragraph 100(g) on page 90 inadvertently references "SCA and USPI," and instead should refer to "SCA and DaVita."

10. Footnote 353 on page 90 should cite to "Wachsman Dep. at 177:22–178:19, 232:19–233:1."

11. Footnote 385 on page 95 should state: ". . . Wachsman testified that SCA wanted information about USPI's forecasting . . ."

12. Footnote 433 on page 136 should say, "I simulate 20 years of pay data with Conduct lasting 10 years. The simulation estimates that the Conduct reduces compensation by 4.1 units each year."

13. The header for "Figure 20: Within-Job Hourly Rate are Highly Correlated With Hold Out Sample" on page 162 should read, "Figure 20: Within-Job Hourly Rates are Highly Correlated With Hold Out Sample." Additionally, the text "Dependent Variable: Ln(Mean Hourly Rate for Directors)" should instead say, "Dependent Variable: Ln(Hourly Rate)." Further, the column "Ln(Hourly Rate of others in same job-year)" should say "Ln(Mean Hourly Rate of others in same job-year)."

14. In the second sentence in paragraph 148 on page 130, I inadvertently omitted the word "nearly" before the word "every."

# **Exhibit 3**

# Lane Declaration

# (Filed Under Seal)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## EXPERT WITNESS REPORT OF DR. BARRY GERHART

**TABLE OF CONTENTS**

Page

I. QUALIFICATIONS ................................................................................................. 1

II. ASSIGNMENT AND SUMMARY OF CONCLUSIONS ................................................. 3

III. PRIOR TESTIMONY ............................................................................................. 8

IV. FACTUAL AND PROCEDURAL BACKGROUND ......................................................... 8

    A. Defendants. ................................................................................................. 8

    B. U.S. DOJ Criminal Investigation and Trial. ......................................................... 11

        1. USPI Cooperated with the DOJ and Admitted Unlawful No-Poach Conduct. .................................................................................................. 11

        2. Criminal Indictments and Trial. ............................................................... 11

    C. Defendants' Alleged Conspiracy. ....................................................................... 12

V. DEFENDANTS ARE INCENTIVIZED TO COLLUDE TO SUPPRESS EMPLOYEE COMPENSATION. ................................................................................................ 15

    A. Defendants Are Incentivized to Collude to Keep Senior-Level Employee Turnover and Labor Costs Low. ........................................................................... 16

        1. Defendants Care About Their Employee Turnover Rates. ....................... 16

        2. Defendants Seek to Manage Their Substantial Labor Expenditures. ...... 24

    B. The Incentives to Collude Are Stronger in a Close-Knit Industry ....................... 33

    C. Collusion Suppresses Compensation Because It Pays to Change Employers. .............................................................................................................. 35

        1. In Unrestricted Markets, Departing Employees Experience Pay Growth from Voluntary Job Changes. ....................................................... 35

        2. Incumbent Employees Also Benefit from Unrestricted Job Mobility ...................................................................................................... 41

VI. DEFENDANTS' COLLUSION WOULD LIKELY HAVE SUPPRESSED EMPLOYEES' COMPENSATION. ............................................................................ 49

    A. In a Normally-Functioning Competitive Market, Defendants Value Recruiting High-Value Passive Candidates for Employment. ........................... 50

    B. Defendants' No-Poach Agreements' Cold Calling Restrictions and Tell-Your Boss Provision Decreased Employees' Job Mobility and Bargaining Power. ................................................................................................. 63

        1. Employees Typically Have Limited Access to Labor Market Information. ............................................................................................... 65

        2. Unsurprisingly, Defendants Limited Pay Transparency. ........................ 68

        3. Absent Defendants' Collusion, Employees Could Acquire Labor Market Information Through Cold Calls and Proactive Recruitment. ............................................................................................. 69

        4. Because of Defendants' No-Poach Agreements, Employees Often Never Learned About Higher-Paying Job Opportunities ........................ 73

**TABLE OF CONTENTS**

Page

    5.    Defendants' Tell-Your-Boss Provision Further Limited Employee Bargaining Power and Mobility. ........................................................................... 79

    C.    Defendants' CSI Exchanges Likely Restricted Labor Market Competition. ........ 91

    D.    Defendants' No-Poach Agreements and CSI Exchanges Harmed Employee Compensation. ....................................................................... 97

    E.    Wage Suppression Can Persist for Years........................................................... 102

VII.    DEFENDANTS IMPLEMENTED STRUCTURED COMPENSATION SYSTEMS THAT MAINTAINED INTERNAL AND EXTERNAL EQUITY. ........... 103

    A.    Defendants Employed Highly-Trained and Qualified Compensation Professionals. ..................................................................................................... 105

    B.    Defendants Designed Systematized Compensation Structures.......................... 113

        1.    Step 1:  Assign Internal Value to Jobs. .................................................. 113

        2.    Step 2:  Job Evaluation and Benchmarking. .......................................... 116

        3.    Substantial Additional Common Evidence Shows That Defendant Firms Implemented Systematized Compensation Structures. ............... 138

    C.    Defendants' Compensation Systems Sought to Achieve Internal Equity and Pay Fairness. ............................................................................................. 148

    D.    Internal Equity and Pay for Performance Are Not Mutually Exclusive. ........... 167

VIII.    A STRUCTURED COMPENSATION SYSTEM WOULD LIKELY LEAD TO CLASS-WIDE COMPENSATION EFFECTS. ............................................................. 177

    A.    Agreements Not to Poach Employees Likely Lead to Cascading Effects Class-Wide. ........................................................................................................ 177

    B.    Defendants' CSI Exchanges Would Likely Suppress Employee Compensation Across the Board. ....................................................................... 194

IX.    CONCLUSIONS........................................................................................................ 196

APPENDIX A ...................................................................................................................... 203

APPENDIX B ...................................................................................................................... 223

APPENDIX C ...................................................................................................................... 245

APPENDIX D ...................................................................................................................... 249

## I.  QUALIFICATIONS

1.  I am the Bruce R. Ellig Distinguished Chair of Pay and Organizational Effectiveness at the Wisconsin School of Business, University of Wisconsin-Madison. Previously, I held faculty positions at Cornell University and Vanderbilt University.  I have published several books on compensation.  These books include two textbooks on human resource management, the preeminent textbook on compensation,[1] a research book on compensation, an edited book on compensation, and a case book (including software) students use to learn to build a structured compensation system.  My curriculum vitae in **Appendix A** includes a more complete description of my qualifications.  I have taught courses on Compensation Management, Human Resource Management, and Research Methods at all three universities.  I have served as department chair at all three universities, and previously served as senior associate dean and interim dean (for 18 months) at the Wisconsin School of Business, as well as interim vice provost and dean of the International Division at the University of Wisconsin-Madison.  I received a Ph.D. in Industrial Relations from the University of Wisconsin-Madison and my Bachelor of Science degree in Psychology from Bowling Green State University.  I am a Fellow of the American Psychological Association (& Society for Industrial and Organizational Psychology) and of the Academy of Management.  Additionally, I am a recipient of three career awards:  the Herbert Heneman Jr. Award for Career Achievement from the Human Resources Division of the Academy of Management, the Thomas A. Mahoney Mentoring Award (from the same organization), and the Michael R. Losey Excellence in Human Resource Research Award from the Society for Human Resource Management.  My work has covered a variety of fields including compensation design, employee mobility/turnover, and

---

[1] BARRY GERHART, COMPENSATION (14th ed. 2023).

human resource management. My work has been published in a variety of outlets including the *Academy of Management Journal*, *Journal of Applied Psychology*, *Industrial and Labor Relations Review*, and *Personnel Psychology*.

2.      In connection with this matter, I reviewed and considered materials from this case and from the related criminal investigation *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.), including the Third Consolidated Amended Class Action Complaint (ECF No. 555), depositions, deposition exhibits, FBI investigation interview reports, DaVita criminal trial transcripts, and salary or market pay range materials produced by or compiled from materials from Defendants Andrew Hayek ("Hayek"), Kent Thiry ("Thiry"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC (together, "SCA"), DaVita Inc. ("DaVita"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation (together, "USPI") (together, "Defendants"). I have also reviewed and drawn on compensation-related literature, as well as survey data collected by WorldatWork, the professional association for those working in compensation management, to describe the workings of formal compensation systems, which are typically found in U.S. companies. Based on documentary evidence and data from the Defendants, their structured compensation systems resemble the compensation systems within most U.S. companies. The information that I considered in forming my opinions include the materials listed in **Appendix B** as well as those cited in this report and the attached **Appendices**. The bases for my opinions are described in this report and any attached exhibits. I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

3.      My compensation for my work in this matter is not contingent upon my findings or the outcome of this litigation.  I am being compensated at my current hourly rate of $1,000 per hour.

4.      For purposes of convenience, in **Appendix C** I provide the names, employers, job titles, and years worked for all individuals I reference in my report.

## II.      ASSIGNMENT AND SUMMARY OF CONCLUSIONS

5.      I understand that Plaintiffs are seeking certification of a class of employees who worked in positions at the director-level and above (hereafter "Senior-Level Employees") in the United States for one or more of the following:  (a) from May 1, 2008 to December 31, 2019 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, to December 31, 2019 for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008 through December 31, 2019 for DaVita Inc. or one of its subsidiaries (hereafter, "the Class" or "Class Members").

6.      Assignment.  I have been asked by Plaintiffs' counsel to:

a.      Determine whether the evidence common to the Class regarding Defendants' turnover rates and labor costs is consistent with incentives to collude;

b.      Explain whether based on compensation-related theory and literature, collusion that suppresses labor market competition, such as agreements not to poach employees (hereafter, "No-Poach Agreements") or exchanges of Competitive Sensitive Information (i.e., nonpublic company data, including wage data) (hereafter, "CSI Exchanges") is harmful because it does not allow employees to benefit from the ability to move jobs, as long as higher-paying and/or better external opportunities exist;

-3-

c.      Assess whether evidence common to the Class demonstrates that Defendants' No-Poach Agreements and CSI Exchanges are inconsistent with unilateral conduct and would likely have suppressed employee compensation;

d.      Assess what theory and research in the related fields of compensation design, employee turnover, and human resource management show about the effect of No-Poach Agreements and CSI Exchanges on employees' current and future wages;

e.      Analyze Defendant firms' pay practices to determine whether Defendants used structured administrative pay systems that seek to maintain internal and external equity; and

f.      Determine whether, because of Defendants' systematized pay structures, the effects of restricting Defendants' employees' job mobility and Defendants' CSI Exchanges, as alleged in this case, would likely have cascading effects and suppress the pay of Defendants' employees, including all or nearly all members of the proposed Class.

7.      <u>Conclusions.</u>  As a result of my work to date and my experience and research in compensation and human resource management, the following are among my conclusions:

a.      *Incentives to Collude.*  Here, evidence that is common to the Class shows that Defendants were incentivized to collude to suppress labor market competition.  Defendants cared about keeping turnover lower and reducing their significant labor costs, as a means to increase Defendant firms' profits and stock value, and which likely inured to the benefit of Defendants' C-Suite executives, who were paid in stock and/or were otherwise financially incentivized to keep costs low.

i.      Moreover, I discuss how these incentives are particularly strong where, as here, the industry is small and tight-knit and firms' top executives can develop the relationships that become foundational to the collusion.

b.      *Harm to Employees.*  Such collusion would be harmful to Defendants' employees because employees benefit when they have uninhibited access to other jobs, i.e., job mobility.  Employees who receive outside employment offers benefit from job mobility by either voluntarily changing employers to obtain substantial compensation increases or by using the outside offers as leverage to negotiate higher compensation in return for remaining with their current employers.  Employees not receiving offers who become aware of coworker offers then receive updated, more accurate information on their own outside pay opportunities, making job searches and job mobility more likely.  Moreover, in competitive labor markets, employers often proactively raise compensation of incumbent employees (i.e., workers currently employed by the employer) to prevent them from being receptive to outside offers and leaving.  Employees accrue these benefits, however, only where higher-paying external job opportunities actually exist and are accessible to employees.

c.      *Ways to Lower Labor Costs.*  To lower their labor costs and increase profits, Defendants could collude with their competitors to restrict their competitors' recruiting activities and their own employees' job mobility.  Defendants could also achieve lower labor costs by fixing wages, thereby keeping the labor market rate low and limiting the number of higher-paying jobs available to employees seeking better jobs.

d.      *Hiring Where No Labor Market Restrictions Exist.*  I explain that in the absence of labor market restrictions, Defendants would solicit, hire, or recruit a broad swath of employees, and particularly high-value passive candidates who did not proactively seek alternative employment.  Likewise, employees would have been free to seek employment at competitor firms on their own initiative.  Solicitation (and self-initiated moves by employees) can and often does increase the compensation of employees who ultimately accept job offers

elsewhere. Additionally, solicitation can increase the compensation of employees who choose to stay after using outside offers to negotiate higher pay with their current employers.

e. *Effect of No-Poach Agreements on Job Mobility.* I conclude from my review of evidence common to the Class that Defendants' No-Poach Agreements limited employees' job mobility in two ways. First, Defendants agreed not to solicit passive candidates who were not proactively seeking employment. Second, Defendants agreed not to make job offers to either proactive or passive candidates who worked at Defendant firms unless the candidates first informed their current bosses that they were leaving the company and seeking employment elsewhere, which most employees are disinclined to do. Consequently, Defendants' employees often did not receive higher-paying job offers they otherwise would have received and could either accept or use as leverage or data points.

f. *Competitively Sensitive Information Exchanges.* Based on my experience and research in compensation and human resource management, common evidence that Defendants' years-long CSI Exchanges are inconsistent with unilateral conduct and would have harmed employees. No company benefits by unilaterally sharing wage-related data with competing employers. Rather, mutual CSI Exchanges would have enabled Defendants to agree to keep Class pay low and limited the number of higher-paying jobs available to Class Members seeking better opportunities. As such, Defendants could have kept Class Members' pay low without fear of rising turnover rates.

g. *Long-Term Effects.* Such wage suppression resulting from Defendants' anticompetitive No-Poach Agreements and CSI Exchanges would likely persist into the future, as relative compensation and compensation levels often do not change much in the short term.

-6-

h.  *Compensation Structure.*  Exacerbating this issue, pay at Defendant firms moved in systematic and structured ways, such that wage suppression as to a subset of employees would have impacted other employees' pay.

i.  Defendant firms had structured compensation systems. Additionally, Defendants cared about maintaining external and internal equity, and equity in general was important to them, regardless of whether they used the foregoing specific terms.

ii.  Defendants utilized compensation components beyond salary, such as bonuses and stock grants and options.  Their compensation systems relied on market surveys to stay current, had clear structures, and deployed market pay lines and grades, among many other features of structured compensation systems.  Ordinarily, firms make upward compensation adjustments in response to market conditions.  But restraints that constrain the employee labor market and suppress compensation (such as No-Poach Agreements and CSI Exchanges) enable firms to benchmark to lower rates, so that upward pay adjustments do not occur.

iii.  With respect to internal equity, Defendants valued treating similarly-situated employees (i.e., employees in similar roles/jobs with similar performance contributions) within their companies similarly.  Thus, in a systematic pay structure, if an employee receives a higher-paying outside offer which they leverage into higher pay at their current company, similarly-situated employees at the current company will expect their own pay to increase to maintain internal equity.  The result is upward pay adjustments.  Those adjustments in that role/job, in turn, will additionally require the company to revisit pay levels for jobs below and above that role/job to maintain what are seen as internally equitable pay differentials.  Again, the result is adjusting pay upward in these jobs.  However, in the absence of

outside offers of higher pay—because of collusion that interferes with typical labor market competition—these upward pay adjustments would not take place.

8.      *Effect of No-Poach Agreements and CSI Exchanges on Compensation Given Compensation Structures.*  Given the systematized pay structures and compensation design at Defendant firms, anticompetitive No-Poach Agreements and CSI Exchanges interfered with labor market competition broadly.  Defendants' No-Poach Agreements and CSI Exchanges suppressed the wages of some Class Members directly and the focus on internal equity embodied in the systematized pay structures and compensation design would additionally limit and otherwise negatively affect the compensation of nearly all employees in the proposed Class.  Put plainly, such collusive conduct would suppress compensation levels for those employees who otherwise would have been cold-called or solicited for new positions, as well as for nearly all salaried employees of Defendant firms.  Even if Defendants restricted the No-Poach Agreements to individuals and job titles at the top of the salary structure, a No-Poach Agreement's artificial suppression of compensation would have had a cascading effect on other employees.

## III.    PRIOR TESTIMONY

9.      I have never testified at a deposition or at trial.

## IV.    FACTUAL AND PROCEDURAL BACKGROUND

10.     In this section I will provide a factual background of all parties in this litigation, the related U.S. Department of Justice ("DOJ") criminal investigation and trial, and Plaintiffs' conspiracy claim.

### A.      Defendants.

11.     DaVita.  DaVita is by far the largest Defendant in this action.  Formerly comprised of two divisions, DaVita Medical Group ("DMG") (previously called DaVita Healthcare Partners) and DaVita KidneyCare ("DKC"), DaVita sold its DMG business to Optum

in 2019.[2] DaVita is currently one of the leading players in the outpatient medical center industry with thousands of outpatient medical centers nationwide and more than 70,000 employees.[3] Javier Rodriguez serves as DaVita's current Chief Executive Officer ("CEO").[4]

12. <u>Kent Thiry.</u> Thiry served as DaVita's CEO for two decades, from 1999–2019.[5] After DaVita sold its DMG business to Optum, Rodriguez took over as DaVita's CEO, and Thiry continued to serve as DaVita's Executive Chairman until 2021.[6] A powerful figure, Thiry demanded that many companies led by former DaVita executives, including SCA, not solicit or hire DaVita employees, ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████

13. <u>SCA.</u> SCA is a large firm in the ambulatory surgical center ("ASC") industry. SCA now runs more than 230 outpatient medical centers and ambulatory surgical facilities in 35 states, employs approximately 10,000 workers, and treats approximately 1 million patients

---

[2] Press Release, UnitedHealth Group, Optum completes acquisition of DaVita Medical Group from DaVita (June 19, 2019), https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html; Press Release: DaVita Inc., DaVita Medical Group Acquires Respected Physician Practices in the Orlando Area (July 13, 2017), https://newsroom.davita.com/press-releases?item=123281.

[3] *About Us*, DAVITA REDWOODS, https://www.redwoods.davita.com/about-us (last visited Jan. 13, 2025); *Investors*, DAVITA, https://investors.davita.com/ (last visited Jan. 13, 2025); Annual Report, DAVITA (2023), https://investors.davita.com/download/DaVita_2023_Annual_Report.pdf.

[4] *See* Appendix ("App.") C.

[5] *Id.*

[6] *Id.*

[7] DOJCIV-008-00000090 at DOJCIV-008-00000091 (████████████████████████ ████████████████████████████████████████████████████ .

annually.[8]  In the spring of 2017, Optum purchased SCA.[9]  Caitlin Zulla serves as SCA's current CEO.[10]

14.  Andrew Hayek.  Hayek served as SCA's Chairman and CEO from May 2008 to January 1, 2018,[11] and plays a key role in this litigation.  Prior to SCA, Hayek worked for DaVita as a Vice President.[12]  After Optum purchased SCA, in or around April 2017, Hayek took over as OptumHealth's CEO while remaining as SCA's CEO until January 1, 2018, when he stepped down from SCA entirely.[13]  Thereafter, Anthony Kilgore became SCA's CEO.[14]

15.  USPI.  USPI is another dominant firm in the ASC industry.  From 2004 to 2018, Bill Wilcox served as CEO after which Brett Brodnax took over.[15]  USPI operates approximately 461 ambulatory surgical centers and 24 surgical hospitals in 35 states, and employs approximately 22,500 employees.[16]  In 2015, Tenet purchased a controlling share in USPI, and thereafter completed its purchase of USPI in April 2018.[17]

---

[8] Dan Luu, *How Many Locations Does Surgical Care Affiliates Have?*, NWCC-OR (Aug. 3, 2022), https://www.nwcc-or.com/how-many-locations-does-surgical-care-affiliates-have#:~:text=SCA%20Health%20is%20dedicated%20to,patients%2C%20providers%2C%20and%20community; *About Us*, SCAHEALTH, https://sca.health/about-us/ (last visited Jan. 13, 2025).

[9] Press Release, UnitedHealth Group, Surgical Care Affiliates (SCA), OptumCare to Combine (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html.

[10] *See* App. C.

[11] Hayek Dep. at 11:14–13:10, 36:4–37:23.

[12] *See*. App. C.

[13] Press Release, UnitedHealth Group, Surgical Care Affiliates (SCA), OptumCare to Combine (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html; Hayek Dep. at 190:2–9.

[14] Kilgore Dep. at 9:5–6.

[15] *See*. App. C.

[16] Form 10-K, TENET HEALTH CARE CORP. (Dec. 31, 2023), https://s23.q4cdn.com/674051945/files/doc_financials/2023/q4/tenet-10K.pdf.

[17] Press Release, Tenet Health Completes Purchase of USPI from WCAS (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx; Press Release, Tenet Healthcare Corp., Tenet

B.     **U.S. DOJ Criminal Investigation and Trial.**

1.     **USPI Cooperated with the DOJ and Admitted Unlawful No-Poach Conduct.**

16.     USPI "self-reported" its no-poach conduct to the DOJ and sought leniency under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (ACPERA) in 2018, and the DOJ and FBI began an investigation that involved interviewing many of Defendants' current and former employees as well as third parties associated with Defendants (hereafter, "FBI investigation").[18]  I review and rely on many of the FBI's interview reports from this investigation in my analysis.

2.     **Criminal Indictments and Trial.**

17.     The DOJ brought criminal indictments against SCA, DaVita, and DaVita's former CEO Kent Thiry in early 2021, alleging that they agreed with their competitors to suppress labor competition by refraining from soliciting or hiring each other's employees.[19]

18.     In April 2022, the DOJ tried DaVita and Thiry for the alleged conspiracy.[20] Many key co-conspirators testified, including SCA's CEO Hayek and DaVita's former Chief Operating Office ("COO") Dennis Kogod.  Although the jury ultimately acquitted DaVita and Thiry, the DOJ presented substantial evidence and testimony that substantiated the presence of a No-Poach Agreement with SCA led by DaVita and Thiry.

19.     I review and rely on testimony from the DaVita criminal trial in my analysis.

---

Healthcare Corp. Completes United Surgical Partners Int'l & Aspen Healthcare Transactions (June 16, 2015), https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm#:~:text=DALLAS%20%E2%80%93%20June%2016%2C%202015%20%E2%80%93,U.S.%20short%2Dstay%20surgery%20platform.

[18] *See, e.g.,* Ex. PX506.

[19] Compl. ¶ 2.

[20] *See, e.g.,* Ex. PX157.

### C.   Defendants' Alleged Conspiracy.

20.    In this section, I discuss Defendants' anticompetitive conduct as background in support of my analysis.

21.    Plaintiffs allege that Defendants unlawfully conspired to suppress competition in the market for Senior-Level Employees in two ways:  (1) SCA and DaVita and SCA and USPI agreed not to cold call, recruit, hire, or otherwise poach each other's Senior-Level Employees (the "No-Poach Agreements");[21] and (2) SCA and DaVita and SCA and USPI engaged in anticompetitive CSI Exchanges.[22]

22.    No-Poach Agreements.  Plaintiffs allege that the Defendants established two No-Poach Agreements as part of their overarching conspiracy to suppress labor market competition:

a.    *The SCA-DaVita No-Poach Agreement.*  Plaintiffs allege and the documents and testimony that I have reviewed about the SCA-DaVita No-Poach Agreement that began at least as early as May 2008, when Andrew Hayek left DaVita to be SCA's CEO, provide factual context on which I base my analysis as an expert in the field of Management and Human Resources.[23]  When he departed DaVita, Hayek committed to refrain from proactively recruiting from DaVita out of respect for his longtime relationship with Thiry.[24]  Shortly thereafter, Hayek hired DaVita's then-Division Vice President ("DVP") Michael Rucker to help run SCA. DaVita's then-CEO Thiry immediately contacted Hayek to demand that he justify his decision and that SCA "stop soliciting employees of DaVita to go work for SCA.  The DaVita agreement

---

[21] Compl. ¶¶ 38, 105.

[22] *Id.*

[23] Ex. PX484.

[24] *Id.* at DVA_OMCEAL_000429389.

arose as a result of this exchange."[25] As such, according to DaVita's former COO Kogod, "there would be no outreach, no recruiting by either company[.]"[26]

           i.       SCA and DaVita expanded the terms to include a tell-your-boss requirement in 2011 and 2012; they "agreed not to solicit each other's senior executives" unless "the senior executive was already looking at outside jobs and had told their supervisor," before the candidates had job offers in hand.[27] They defined "solicit" as "[t]o call to describe a job opportunity"[28] (the "tell-your-boss" provision). Initially, the scope of employees was limited to Vice Presidents and above, but it was ultimately expanded to include Director-level employees and above.[29] The geographical scope was nationwide.[30] This agreement did not have an end date.[31]

           b.     *The SCA-USPI No-Poach Agreement.* Plaintiffs allege and the documents and testimony I have reviewed about SCA and USPI's No-Poach Agreement that began by 2010 provide factual context on which I base my analysis as an expert in the field of Management and

---

[25] Ex. PX484; Ex. PX304 at DOJCIV-008-00000301; *see also* Thiry Dep. at 86:24–87:20 (Thiry admitted he was "angry with some of the things Andrew [Hayek] did . . . Quite angry."); *id.* at 145:23–146:7 (Thiry and Hayek were close friends, which Thiry weaponized against Hayek); Hayek Dep. at 93:7–95:14, 11:4–115:1 and Ex. PX304 (Thiry strong-armed Hayek and threatened to harm his reputation and to retaliate against SCA if he learned that SCA recruited additional senior executives).

[26] Ex. PX157 at 67:8–69:23.

[27] Ex. PX158 at 473:14–20.

[28] Ex. PX158 at 473:21–25.

[29] *Id.* at 475:7–76:4, 494:16–23; Hayek Dep. at 204:6–9.

[30] Hayek Dep. at 181:2–13; Kogod Dep. at 54:10–24.

[31] Kogod Dep. at 55:2–3; *see also* Ex. PX158 at 491:7–23 (Hayek testified at trial that he and Thiry never told one that they were ending their agreement not to solicit each other's senior-level employees. Hayek was not aware of anyone else at DaVita or SCA telling the other that the agreement was no longer in effect. The agreement was in place until he left.).

Human Resources.[32]  This agreement was identical to the SCA-DaVita No-Poach Agreement.[33]

SCA and USPI explicitly agreed to "not approach each other's [employees] proactively."[34]  After

Hayek and former DaVita CEO Thiry agreed to implement the "tell-your-boss" provision in the

SCA-DaVita No-Poach Agreement, Hayek took that provision and "applied it to the USPI

relationship"[35] "for the sake of simplicity."[36]  The agreement had no geographic limitations,[37]

and applied to employees at the administrator / director-level and above.[38]  Because USPI and

SCA never discussed terminating the agreement, there was also no end date.[39]

23.     Defendants' CSI Exchanges.  Plaintiffs allege and the documents and testimony

that I have reviewed about  SCA and DaVita and SCA and USPI's exchange of Competitively

Sensitive Information, including wage data, to further suppress the labor market pay rate, provide

factual context on which I base my analysis as an expert in the field of Management and Human

Resources.  Over the years, DaVita, SCA, and USPI exchanged future merit increase data under

---

[32] Hayek Dep at 219:6–16; Ex. PX483 at 648:3–5.

[33] Ex. PX227; Hayek Dep. at 219:4–16; Ex. PX508 at DOJCIV-008-00000218–219; Wilcox Dep. at 130:8–131:2, 136:19–140:5.

[34] Ex. PX227.

[35] Ex. PX483 at 630:19–631:3.

[36] Hayek Dep. at 219:20–221:9.

[37] *Id.* at 180:14–181:13.

[38] Ex. PX159 at SCA-DOJ-00152696 (Hayek instructed former SCA Chief Talent Officer Bridie Fanning that with respect to USPI and DaVita, SCA "can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."); Mosley Dep. at 17:10–19:18, 48:7–17.

[39] Wilcox Dep. at 112:7–21; *see also* DOJCIV-008-00000345 at DOJCIV-008-00000348 (█████████ ).

-14-

the guise of lawful benchmarking.[40]  SCA and DaVita began exchanging data by at least 2009,[41] and SCA and USPI began exchanging data in at least 2008.[42]  The exchanges were carried out by senior executives.[43]

## V.    DEFENDANTS ARE INCENTIVIZED TO COLLUDE TO SUPPRESS EMPLOYEE COMPENSATION.

24.    In this section, I will review evidence that, based on my experience and research in compensation and human resource management, is consistent with employers (Defendants) who were incentivized to collude to suppress employee job mobility and compensation.  I assess evidence common to the Class showing that Defendants are incentivized to collude because (1) they cared about turnover and wanted to keep it low, and (2) they wanted to manage labor costs, their largest expenditure.  Further, I explain that these incentives are particularly powerful where, as here, the industry is small and tight-knit and executives have ample opportunities to develop relationships with their competitors necessary to collude.  Finally, I discuss the compensation-related literature and background showing that any collusive conduct will likely suppress employee mobility and compensation, because employees financially benefit from unrestricted job mobility.

---

[40] Rucker Dep. at 254:24–256:12, 260:11–20; Hayek Dep. at 362:18–363:7.

[41] Ex. PX490.

[42] Ex. PX501; *see also* Mathis Dep. at 208:18–211:1.

[43] Mathis Dep. at 41:22–47:19; Hayek Dep. at 362:8–373:1; Wilcox Dep. at 179:2–180:18; Ex. PX490; SCA000862885; OMC_BM_000006875 at OMC_BM_000006875 ("Andrew [Hayek] let me know that he spoke to Chris [Holden] and Bill [Wilcox] recently about a corporate overhead benchmarking exercise and that . . . USPI [is] interested in participating."); USPI_CIV_00010451C8 (USPI requested SCA overhead to use in the USPI board meeting for the fourth time in 2011).

A.      **Defendants Are Incentivized to Collude to Keep Senior-Level Employee Turnover and Labor Costs Low.**

25.      In this section, I review evidence common to the Class that, based on my experience and research in compensation and human resource management, is consistent with employers (here, Defendants) that are strongly incentivized to collude because they care about and seek to minimize Senior-Level Employee turnover, as high turnover increases labor costs. Further, I review evidence showing that the foregoing matters because labor costs, which are all Defendant firms' largest expenditures, are a key driver of Defendants' performance, and thus an important factor in the compensation of the individual co-conspirators.

26.      The evidence I reviewed included earnings call transcripts, proxy statements and other public financial reporting, deposition testimony, documents produced in this litigation, statements from the FBI investigation interview reports, DaVita criminal trial testimony, and compensation-related literature.

### 1.      Defendants Care About Their Employee Turnover Rates.

27.      Based on my experience and resource, evidence common to the Class shows that all three Defendants cared about employee turnover and retention.

28.      <u>DaVita Wanted to Keep Turnover Low.</u>  DaVita cared about its turnover rates and wanted to retain Senior-Level Employees.

a.      DaVita wanted to keep turnover low in part to increase enterprise productivity (i.e., the amount of resources a firm puts into a task compared to its output, results, profits, etc.).

b.      *Earnings Calls.*  At a 2020 DaVita earnings call, current CEO Javier Rodriguez explained that "higher productivity" corresponds to "lower turnover, lower training

-16-

costs, other things related to salary, wage and benefit."[44]  Moreover, during a 2023 earnings call, Rodriguez connected "elevated turnover" to resulting elevated "training costs."[45] "[I]mprovement in our training productivity" "will largely depend on successful teammate retention[.]"[46]

       c.     *Testimony of Steve Priest, Javier Rodriguez, Mike Staffieri, and Robert Chipman.*  Former Chief Wisdom Officer Steve Priest testified that "retention mattered to DaVita," because "[t]he cost of turnover is much higher than the cost of retaining good teammates.  It's true in any business."[47]  Consistent with Priest's testimony, DaVita CEO Rodriguez testified that he "always like[s] to have the good people stay."[48]  Current DaVita COO Mike Staffieri likewise testified that it matters whether "DaVita employees think their pay is fair," because it affects turnover:  if they believe otherwise, they may "leave for a competitor."[49] Of course, they can only do so in an unrestricted market—which was not the case here, because Defendants' No-Poach Agreements literally limited mobility and their CSI Exchanges eliminated better-paying opportunities.  Former DaVita VP of Recruiting and Talent Management and People Services Group Director Robert Chipman testified that as a business leader at DaVita, employee retention was "absolutely" important to him, and he "would hope" it would be important "to other business leaders at DaVita."[50]  Chipman also recalled that he frequently had

---

[44] Ex. PX259 at 6.

[45] Ex. PX260 at 2.

[46] *Id.*; *see also* Ex. PX261 at 2 (lower retention will "drive higher than typical training and onboarding costs").

[47] Priest Dep. at 139:4–16.

[48] Rodriguez Dep. at 133:2–5.

[49] Staffieri Dep. at 139:10–140:2; *see also* Ex. PX1 at DOJCIV-008-0000060 (▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[50] Chipman Dep. at 53:13–24.

conversations with various DaVita executives, including Staffieri, about the importance of employee retention.[51]

   d. *Tracking of Turnover Rates.* Additionally, DaVita obviously cared about turnover because it tracked turnover rates internally, and "[m]easure[d] all separations over a rolling 12 month period."[52] DaVita also compared its turnover rates "with external health care Compdata survey."[53] Moreover, a slide deck for DaVita executives, "DVA 2012 and 2013 Management Compensation (March 2013)," reported on turnover, stating that DaVita's Operating Income had "[s]olid productivity/[l]ow [t]urnover."[54] This slide deck underscores the point that DaVita considered turnover a marker of performance.

   e. *Former CEO Kent Thiry's Emphasis on Low Turnover.* Based on my experience and resource, the evidence I reviewed from this case shows that Thiry emphasized low turnover, particularly with Senior-Level Employees, and viewed such departures as personal betrayals.[55] The fact that the leader of DaVita strongly discouraged Senior-Level Employee departures would have added to DaVita's incentives to keep employee turnover low. Below are additional examples of record evidence that Thiry strongly discouraged senior-level departures and took them personally.

---

[51] *Id.* at 54:2–55:2.

[52] Ex. PX19 at DVA_OMCEAL_001399753.

[53] *Id.*

[54] Ex. PX264 at DVA_OMCEAL_001145976.

[55] Thiry Dep. at 98:6–98:24; *see also* Ex. PX1 at DOJCIV-008-00000061 (███████ ████████████████████████████████████████████████████ ); Staffieri Dep. at 25:4–27:9 (Staffieri testified that he gave truthful and complete answers ███████████████ ).

i.      **Thiry's Testimony:** Thiry testified at deposition that at times, when he felt that he had invested in an employee's "personal and professional growth . . . fought to get them raises and equity grants that turned out to be worth quite a bit of money, helped them get new jobs, helped them once they were in those new jobs[,]" "and they would turn around and recruit someone when they benefited from the inside information they had about that person because they had been executives with" DaVita, Thiry "would get angry" and "sometimes use inappropriately strong language."[56]

ii.      **Kogod's Statements** ███████ : ████████████████



A.      ████████████████████████

████████████████████[60]:

<hr />

[56] Thiry Dep. at 98:6–98:24

[57] DOJCIV-008-00000304 at DOJCIV-008-00000306; *see also id.* at DOJCIV-008-00000307 ████████████████████████████ ██████ .

[58] DOJCIV-008-00000304 at DOJCIV-008-00000313.

[59] DOJCIV-008-00000090 at DOJCIV-008-00000097.

[60] DOJCIV-008-00000304 at DOJCIV-008-00000306.



B. ████████████████████ :

████████████████████████

iii. **Rodriguez's Testimony:** According to current CEO Javier Rodriguez, Thiry became upset when valued DaVita employees left, particularly "when a person that he had mentored or taken underneath his wing didn't . . . [show] respect to him and didn't communicate well with him and surprised him[.]"[63]

iv. **Thurman's Testimony** ███████████████



[64]

---

[61] DOJCIV-008-00000090 at DOJCIV-008-00000091.

[62] *Id.* at DOJCIV-008-00000092.

[63] Rodriguez Dep. at 136:3–10.

[64] Ex. PX123 at DOJCIV-007-00000095; *see also* Thurman Dep. at 131:16–132:7 (confirming accuracy of ████████████ ).

A. As such,



[65]

v. **Mildenberger's Testimony:** Former DaVita Chief People Officer Laura Mildenberger confirmed Thiry's emotional reaction to DaVita employees who left to work for companies run by former DaVita executives[66]:

> [W]hen Kent [Thiry] had relationships with executives, and those executives would either leave, or worse, somebody from DaVita would go work for those new organizations . . . it was very difficult for [Thiry] to handle that and he was quite emotional.

A. She elaborated that Senior-Level Employee departures were "an emotional issue for [Thiry], and I believe my impression was that he was very offended when this type of thing occurred. Loyalty was very important and . . . my impression was that he saw it as a betrayal."[67]

vi. **Hayek's Departure and Testimony:** Thiry's reaction to former DaVita executives poaching DaVita employees was exemplified by a 2008 email chain between Thiry and former DaVita VP Hayek. Thiry reacted poorly when former protégé Hayek left DaVita to be SCA's CEO and shortly thereafter, recruited DaVita's then-DVP Michael Rucker to help run SCA.[68]

[69]

---

[65] Ex. PX124 at DOJCIV-012-00000133; Thurman Dep. at 153:5–154:6 (Thurman testified that this                                     ).

[66] Mildenberger Dep. at 166:1–167:31.

[67] *Id.* at 167:4–24.

[68] Ex. PX484.

[69] Ex. PX304 at DOJCIV-008-00000301.

vii.     Hayek testified about this incident at deposition, stating that Thiry was so aggressive about retaining DaVita employees that Thiry strong-armed Hayek into the No-Poach Agreement; Thiry threatened him with reputational harm and retaliation against SCA if SCA recruited additional senior executives beyond Rucker.[70]  Thereafter, according to former DaVita COO Kogod's testimony at the DaVita criminal trial, Thiry and Hayek formally established the SCA-DaVita No-Poach Agreement "[t]o make it more difficult for people to leave . . . and make it impossible for them to go to a company that has a former DaVitan as their leader[.]"[71]

f.     The evidence I reviewed demonstrated that it was important to DaVita to "preserve talent."[72]

29.     <u>SCA Cared About Turnover.</u>  I have also reviewed evidence that SCA cared about and sought to reduce turnover.

a.     *Deposition Testimony.*  The following deposition testimony of former SCA COO Michael Rucker and former SCA Chief Talent Officer Fanning illustrate SCA's interest in reducing turnover.  Rucker testified that "retention of employees [was] important for SCA[,]" because "[i]t is expensive to lose employees who are creating value for an enterprise or an organization."[73]  He agreed that "there was a substantial cost associated with having to

---

[70] Hayek Dep. at 93:7–95:14, 111:4–115:1; *see also* Ex. PX304; *see also* DOJCIV-008-00000090 at DOJCIV-008-00000092 ( ████████████████████████████████████ ████████████████████████████████████████ .

[71] Ex. PX157 at 134:24–135:4; Kogod Dep. at 57:9–20 (Kogod confirmed he gave truthful testimony); *see also* DOJCIV-008-00000090 at DOJCIV-008-00000091 ████████████ ████████████████████████████████████ ████████ .

[72] Ex. PX157 at 139:25–140:11.

[73] Rucker Dep. at 154:8–14.

replace employees," in part "because there can be disruption in parts of the business when senior-level people leave[.]"[74] Rucker also testified that SCA placed such an emphasis on reducing turnover that "if your turnover amongst your team was too high, you would lose part of the bonus."[75] Consistent with Rucker's testimony, Fanning testified that a rationale for SCA's No-Poach Agreements was to lower turnover, and specifically to "avoid . . . executives quitting and the business disruption that comes when an executive quits."[76] This same rationale applies to Defendants' CSI Exchanges, because employees are less likely to quit if there they lack other job opportunities.

b. *Documentary Evidence.* Internal documents also showed that SCA reacted to employee turnover with a sense of urgency. For example, after a labor market competitor successfully recruited SCA employees, SCA's then-CFO and current CEO Caitlin Zulla sought to redress increased turnover[77]:

> I also think that we have an obligation to inspect why our teammates are willingly jumping ship . . . do we need to pay more money? Do we need to address workload? . . . Please let me know how I can help, as I think we need to evaluate and address what we can with a sense of urgency.

30. <u>USPI Valued Low Senior-Level Employee Turnover.</u> I have reviewed similar evidence produced by USPI. In particular, statements made by former USPI Chairman and CEO Bill Wilcox and former USPI recruiter Shannon McGarry ▮▮▮▮▮ and during deposition, based on my experience and research in compensation and human resource management, showed that USPI tried to minimize employee turnover.

---

[74] *Id.* at 154:15–24.

[75] Rucker Dep. at 303:2–304:15.

[76] Fanning Dep. at 82:1–15.

[77] Ex. PX562 at SCA001777878.

a.

b.

USPI could accomplish both tasks by restricting its employees' job mobility and CSI Exchanges to eliminate employees' alternative opportunities.

c.      USPI also compiled and maintained monthly turnover rate reports tracking employee movement.[82]

### 2.      Defendants Seek to Manage Their Substantial Labor Expenditures.

31.      In this section, I review evidence that Defendants' biggest costs are their labor expenditures.  Further, I review evidence common to the Class demonstrating that Defendant firms considered labor costs a measure of performance, and as such their C-suite executives (and key co-conspirators in this litigation) are motivated by bonuses and/or equity grants to keep labor costs as low as possible.

32.      Labor Costs Constitute Defendants' Biggest Expenditure.  Labor costs generally comprise a substantial portion of a firm's total operating costs, and Defendants are no exception.

---

[78] Wilcox Dep. at 99:13–25; Ex. PX507 at DOJCIV-008-00000269.

[79] Wilcox Dep. at 100:1–8; Ex. PX507 at DOJCIV-008-00000269.

[80] *Id.*

[81] Ex. PX98 at DOJCIV-012-00000128; McGarry Dep. at 35:5–37:2.

[82] *See e.g.,* USPI_CIV_000022268.

a.      *DaVita's Labor Costs Are Its Largest Expenditure.*  DaVita's former CEO Thiry and current CEO Rodriguez testified and stated during earnings calls that labor costs comprise an outsize portion of DaVita's costs.  For example, Thiry testified that the cost of labor represents the "largest single category of cost at DaVita."[83]  Rodriguez similarly has repeatedly told shareholders during DaVita earnings calls that labor costs are a primary driver of DaVita's performance.[84]  And he testified at deposition that labor costs are a meaningful component of a company's financial metrics.[85]

i.      DaVita COO Staffieri's deposition testimony and CEO Rodriguez's statements to shareholders during a 2020 earnings call show that DaVita spends more than $3 billion per year on compensation and benefits, which represents DaVita's largest expenditure.[86]

b.      *SCA's Labor Costs Are Significant.*  Testimony from former SCA COO Rucker and SCA's Group VP ("GVP") of Human Resources Warren Cinnick confirms that labor costs comprise a significant component of SCA's total costs.  Rucker testified that wages are one of SCA's largest cost items, and wages were likely the largest component of SCA's overhead expenses.[87]  Likewise, Cinnick testified that "[s]alary . . . is a part of the big cost structure of a company."[88]

---

[83] Thiry Dep. at 109:8–10; *see also* Annual Report at 84, DAVITA (2010), https://filecache.investorroom.com/mr5ir_davita/118/2010%20DVA%20Annual_0.pdf (DaVita reported that its "business is labor intensive").

[84] Ex. PX260; Ex. PX261; Rodriguez Dep. at 44:19–46:8, 47:3–7.

[85] Rodriguez Dep. at 44:19–46:8.

[86] Staffieri Dep. at 128:24–129:15; *see also* Ex. PX259 at 8 (labor was DaVita's largest cost item in 2020).

[87] Rucker Dep. at 252:23–253:8.

[88] Cinnick Dep. at 60:7–8.

c.  *USPI's Largest Costs Are Its Labor Expenses.*  Deposition testimony from former USPI CEO and Chairman Bill Wilcox shows that generally, "salaries are one of the largest components of corporate expense" and that at USPI specifically, "salaries [were] one of the largest components of . . . general and administrative expense [i.e., corporate overhead] [.]"[89]

33.  <u>Defendant Firms Cared About Managing Labor Costs.</u>  In general, any reduction in costs (that does not reduce revenues) results in profit.  Profits drive long-term stock performance.  A company can distribute those profits to multiple places:  (1) to shareholders in the form of dividends; (2) to shareholders in the form of increased equity/stock price appreciation; (3) reinvestment in the business; and/or (4) to executives.

34.  Typically, most executive pay is related to stock performance (i.e., price appreciation plus dividends).

35.  Because labor costs are a large part of a firm's operating costs, firms typically take great care not to raise compensation levels any higher than necessary to increase profits and stock performance, which, in turn, increases executive compensation.  The expectation, however, is that they will do so through legal means.

36.  I have reviewed the following evidence that, based on my experience and research in compensation and human resource management, is consistent with employers (here, Defendant firms) seeking to control labor costs, which could have financially benefited C-suite executives (and others) who were paid primarily in stock and were rewarded for their firms' performance.

---

[89] Wilcox Dep. at 177:1–15.

a.  *DaVita.*

i.  **Labor Costs Drive DaVita's Profitability.**  Deposition testimony and earnings call transcripts from DaVita CEO Rodriguez show that DaVita sought to control labor costs.  For instance, Rodriguez testified that DaVita "spends a lot of time focusing on labor costs," which "can be a big driver of DaVita's performance."[90]  Rodriguez also testified that he "care[s] about how profitable DaVita is."[91]  Further, "[o]ne component of profit is cost," and "part of profit or being profitable is doing your best to control costs," including labor.[92]  Controlling labor budgets represents one way to control labor costs.[93]  The earnings call statements echo Rodriguez's testimony.  During a 2019 earnings call DaVita reported to shareholders, "Wage rates are a pressure.  We do not get revenue per treatment increases commensurate with our labor costs increases.  So labor will always be a headwind relative to margin."[94]  During a 2023 earnings call, Rodriguez explained to shareholders, "As we have said in the past, successful labor management requires effectively managing the interplay between wage growth, contract labor and training costs."[95]  Rodriguez similarly told shareholders that labor remarkets "remain a key swing factor in our performance" during another earnings call later in 2023.[96]

---

[90] Rodriguez Dep. at 43:5–11; *see also* Ex. PX259 at 8 (Rodriguez told shareholders during a 2020 DaVita earnings call that labor drives productivity).

[91] Rodriguez Dep. at 39:8–10.

[92] *Id.* at 39:8–40:4.

[93] *Id.* at 40:5–23.

[94] Ex. PX262 at 13.

[95] Ex. PX260 at 2 (Rodriguez also told shareholders that "the biggest driver of Q1 outperformance" was labor).

[96] Ex. PX261 at 2.

ii.       Former DaVita CEO Thiry provided similar deposition testimony, stating that he viewed it "as part of [his] job to control DaVita's labor costs and make sure they didn't get too high."[97]  Thiry testified, "It was part of everyone's job to manage our productivity. The government was our biggest reimburser, and we want to be very efficient with taxpayer dollars."[98]  When asked if Thiry "view[ed] an increase in labor costs as bad news[,]" Thiry testified, "when your [labor] costs are going up, and the government doesn't . . . increase your reimbursement despite the fact that you need to pay more to your nurses and techs, then things get very difficult."[99]

iii.     Former DaVita VP and Chief Wisdom Officer Steve Priest also testified to the importance of managing labor costs, stating during deposition, "Managing labor costs within any organization is important with the overall structure of the economic performance of that business."[100]

iv.     Moreover, companies often replace some of their merit increase budgets with bonuses, because bonuses better help control growth in compensation costs given that they do not become part of base pay (unlike base merit increases).  The evidence I have reviewed suggests that DaVita did just that.  For instance, DaVita provided for a "Maximum Bonus Potential" ("MBP") for eligible employees, and the merit pool is typically accrued at 65% of MBP" for "'solid' company performance, 'solid' group performance and 'solid' individual performance."[101]  Further, DaVita's compensation "General Principles" instructed, "Err on the

---

[97] Thiry Dep. at 110:13–19.

[98] *Id.*

[99] *Id.* at 124:23–125:18; *see also* Ex. PX309 at 12 ("The bad news is that labor costs more every year[.]").

[100] Priest Dep. at 17:18–25.

[101] Ex. PX77 at DVA_OMCEAL_001329257–58.

-28-

side of committing less initially, because we can always give spot bonuses for achievements, but can never take money away because of unexpected events that weren't contemplated[.]"[102]  This indicates that DaVita sought to control base pay growth.

>        v.        **DaVita Used Profit Sharing to Incentivize Top Executives to Manage Labor Costs.**  The evidence I reviewed shows DaVita's profit sharing/equity compensation for senior executives incentivized top executives to increase profit, which depended on keeping labor costs low.  For example, DaVita paid Thiry more than ███████ during his tenure.[103]  The "███████" of Thiry's pay at DaVita "███████████," which ████████████████████████████████████████,[104] which ██████████████████████████████.[105]  Likewise, current CEO Rodriguez testified that his compensation as CEO can increase if DaVita becomes more profitable and its stock goes up.[106]  In its 2012 proxy statement, DaVita reported the compensation it paid to various C-Suite executives in 2011, including Thiry, Rodriguez, and Kogod.[107]  The vast majority (71%) of DaVita's executives' compensation was comprised of long-term equity.[108]  In 2011, equity awards ranged from 48–74% of DaVita's named executive officers' compensation.[109]

---

[102] *Id.* at DVA_OMCEAL_001329257.

[103] Thiry Dep. at 108:7–21.  Note also that Thiry received other forms of pay.  ████████
████████████████████████████████  Rodriguez Dep. at 81:18–25.

[104] Terry D. Warfield & John J. Wild, *Accounting recognition and the relevance of earnings as an explanatory variable for returns*, 67 ACCT. REV. 821–842 (Oct. 1992).

[105] Thiry Dep. at 108:22–111:17.

[106] Rodriguez Dep. at 35:24–36:21.

[107] Proxy Statement at 47, DAVITA (2012), https://filecache.investorroom.com/mr5ir_davita/175/2012%20Proxy%20Statement_2.pdf.

[108] *Id.* at 41.

[109] *Id.* at 42.

b.    *SCA.*

i.    The evidence I reviewed regarding SCA similarly indicates that SCA was concerned about controlling labor costs and incentivized senior executives to do so through profit sharing.

ii.    Equity compensation in the form of company equity grants and bonuses was a significant portion of senior executive compensation and tied to company performance. Internal SCA documents, such as its "Equity Compensation Philosophy," show that equity compensation was an important component of market compensation for senior leadership roles at SCA.[110] SCA intended to periodically award equity to approximately 25% of Senior Directors and 10% of Directors based on extraordinary value contributions and retention considerations.[111]

iii.    Former SCA CFO Peter Clemens' testimony confirmed the connection between bonuses and company performance. He stated that part of his compensation included bonuses, and "a component of [the bonus] would have been based on the performance of the . . . financial performance of the company[.]"[112]

iv.    SCA CEO Hayek's testimony also confirmed the connection between company profits and senior executive compensation, stating that senior executives "had stock options and ownership, so they benefited when the company did well[.]"[113] Indeed, Hayek, former COO Rucker, and former CEO Anthony Kilgore all testified that they received

---

[110] SCA000545210 at SCA000545215.

[111] *Id.*

[112] Clemens Dep. at 35:14–25.

[113] Hayek Dep. at 300:2–301:8.

-30-

equity as part of their respective SCA compensation packages.[114]  For example, Hayek's 2012 compensation included ███████████████████████, Rucker's 2012 compensation included █████████████████████████████████████, and Kilgore's 2012 compensation included ██████████████████████████████████████ ████.[115]

    v.  The testimony I reviewed shows that SCA's use of profit sharing as a form of compensation for senior executives incentivized them to control labor costs.  For instance, former SCA COO Rucker acknowledged during his deposition that "one way to reduce overhead would be to reduce compensation."[116]  He elaborated that senior executive compensation could vary based on the ability to manage labor costs, testifying, "if your turnover amongst your team was too high," which can drive up labor costs, "you would lose part of the bonus."[117]  Additionally, Rucker testified that these dynamics also applied to other senior-level executives because their bonuses depended upon profitability; if SCA was profitable, it paid higher bonuses.[118]

    c.  *USPI.*

    i.  Based on my review of the evidence, USPI, similar to DaVita and SCA, cared about controlling labor costs, its profits were affected by labor costs, and it compensated senior executives in a way that incentivized them to manage labor costs.  Former

---

[114] *Id.* at 74:9–14; Rucker Dep. at 305:3–306:4; Kilgore Dep. at 149:12–150:7.

[115] HAYEK-000011525 at HAYEK-000011540, 44.

[116] Rucker Dep. at 253:18–24.

[117] *Id.* at 303:18–304:15.

[118] *Id.* at 307:02–308:11.

USPI CEO Wilcox, for example, was paid in large part in the form of equity (i.e., stock).[119]

During the course of his tenure at USPI, Wilcox earned approximately ████████████

███████████████████████████████████████.[120] Wilcox's compensation was tied

to USPI profit and labor costs. Accordingly, Wilcox testified that USPI's performance depended

in part on USPI's financial performance, which includes managing labor costs, and which in turn

affected his bonus. He testified that his "bonuses all depended on how we did from a financial

perspective, a quality perspective, other factors . . . And the equity was just specific to what . . .

was happening . . . with the company at the time."[121] Further, Wilcox testified that his annual

████████████████████████████████████████████████████

███████████████████████████████████████.[122] In short, if

USPI did well, Wilcox did well.[123]

    ii.  Similar to Wilcox, stock also comprised a significant portion of

compensation for other USPI C-suite executives including Brett Brodnax, Sandi Karrmann,

Mark Garvin, and Jason Cagle.[124]

  37.  Firms are particularly motivated to reduce labor costs where competitive

pressures in the labor market are strong. Thus, if firms in a given labor market can reduce costly

employee turnover (discussed below) in some manner other than by increasing pay, such as by

enacting anti-competitive No-Poach Agreements and/or via CSI Exchanges, those firms thereby

---

[119] *See, e.g.,* USPI_CIV_000023148 at USPI_CIV_000023148 (stock options granted to Wilcox in 2015 and 2016).

[120] Wilcox Dep. at 26:1–16; 27:4–21, 28:2–21.

[121] *Id.* at 24:8–30:7.

[122] *Id.* at 25:11–16.

[123] *Id.*

[124] *See, e.g.,* USPI_CIV_000150417 at USPI_CIV_000150420; USPI_CIV_000150817.

substantially reduce their labor costs. This activity, of course, embodies an illegal, albeit tempting measure. Such extralegal measures benefit firms at the expense of the labor market's efficiency and employees' income and long-term earning potential.

### B. The Incentives to Collude Are Stronger in a Close-Knit Industry.

38. The foregoing incentives are amplified where there is also common evidence regarding the industry's small size and showing that the major co-conspirators all knew each other and had meaningful personal relationships that could more easily facilitate collusion.

39. The evidence I have reviewed includes deposition testimony, documents produced in this litigation, and statements from the FBI investigation interview reports. This evidence, based on my experience and research in compensation and human resource management, showed that the industry in this case was close-knit, increasing the likelihood that employers who would otherwise compete for labor might instead collude to avoid such competition.

40. The evidence I have reviewed in support shows:

a. Former DaVita CEO Thiry, for example, maintained personal relationships with many DaVita alumni who went on to run competitor companies.[125] He used these relationships to his advantage: he testified that "with respect to close friends and business associates, people that we were doing business with" such as his former protégée SCA CEO Hayek, Thiry had a "strong preference" "that we should have a high degree of transparency with respect to recruiting each other's people[.]"[126]

---

[125] Thiry Dep. at 32:10–33:1 (Thiry regularly hosts DaVita alumni events, including an event in August 2024 he held at a hotel and his house).

[126] *Id.* at 22:5–24:6.



the

---

[127] DOJCIV-007-00000084 at DOJCIV-007-00000084; Hayek Dep. at 51:25–52:20 (Hayek testified that he gave truthful and accurate statements ██████████████████ ).

[128] Ex. PX305 at DOJCIV-008-00000176; Rucker Dep. at 385:19–388:14 (confirming accuracy of ██████████████ ).

[129] DOJCIV-008-00000345 at DOJCIV-008-00000346.

[130] *Id.* at DOJCIV-008-00000347.

[131] DOJCIV-012-00000056 at DOJCIV-012-00000058.

███████████████████████████████████████ ██ ████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

████ ██

### C.   Collusion Suppresses Compensation Because It Pays to Change Employers.

41.   In this section, I review the literature demonstrating that employees benefit from uninhibited access to job mobility, whereas it can increase employers' labor costs, because employers will have to pay higher compensation to retain employees and/or to replace them. As such, any anticompetitive restrictions on the labor market that suppress job mobility would likely harm employee compensation.

42.   The evidence I reviewed includes deposition testimony, documents produced in this litigation, statements from the FBI investigation interview reports, and compensation-related literature.

### 1.   In Unrestricted Markets, Departing Employees Experience Pay Growth from Voluntary Job Changes.

43.   Employees of all kinds undoubtedly benefit from voluntary (employer) job changes. This is true almost by definition: Why would someone choose to take a different job if it did not benefit them to do so?

44.   Pay Growth from Job Mobility.   The literature on this topic is extensive and instructs, for example, that one-third of all wage growth individuals experienced during the first ten years of their careers (when the majority of career wage growth occurs) came from changing

---

[132] Ex. PX314 at DOJCIV-008-00000233; Hayek Dep. at 51:25–52:20 (Hayek testified that he gave truthful and accurate statements ██████████████████████ ).

[133] Ex. PX281 at DOJCIV-008-00000041; Mosley Dep. at 50:18–25 (Mosley testified that her ████████████████████████████ ).

employers (and the rest came from advancement within the same organization).[134] Pay growth from voluntary job changes is larger for those in higher paid jobs (*see* **Figure 1** below). We also know that mobility is much more likely to occur within same/similar industries (and occupations) and that such mobility has a higher payoff (than switching industry or occupation).[135] Thus, restrictions on employee mobility within an industry are especially detrimental to employee pay level and growth. Finally, it is not just those employees who change employers that realize a pay increase—incumbent employees do as well.[136]

45. Importance of Employee Mobility for Labor Markets. Gerhart and Professor of Human Resource Management Jie Feng (2021) provide an overview of the importance of employee mobility to a well-functioning labor market and economy, summarized below:[137]

a. "Only with adequate mobility can the labor market carry out its major function of matching, which works to 'allow workers to move to their most productive use.'"[138]

b. "Workers remain on jobs in which their productivity is revealed to be relatively high," and "they select themselves out of jobs in which their productivity is evaluated to be low."[139]

---

[134] For a classic study, *see* Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 108 Q. J. ECON. 439–79 (May 1992).

[135] Eric Parrado, Asena Caner & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007).

[136] Huasheng Gao, Juan Luo & Tilian Tang, *Effects of Managerial Labor Market on Executive Compensation: Evidence from Job-Hopping*, 59 J. ACCT. & ECON. 203–220 (Apr.–May 2015).

[137] Barry Gerhart & Jie Feng, *The Resource-Based View of the Firm, Human Resources, and Human Capital: Progress and Prospects*, 47 J. MGMT. 1796–1819 (Jan. 4, 2021).

[138] *Id.* at 1809.

[139] *Id.* (cleaned up) (citation omitted).

c.      Economists Boyan Jovanovic and Robert A. Moffitt estimate that economic output for the U.S. economy would be lower by 6% to 9% if employees "were not able to act on their match information by exercising their option to change jobs."[140]

d.      Likewise, Jovanovic and Moffitt find matching through worker mobility also raises wages by 8.5% to 13%, consistent with the idea that mobility allows "workers to move to their most productive use."  (Below I will examine more detailed evidence that worker mobility increases wages and that restrictions on mobility thereby reduce workers' wages.)[141]

e.      Economists Steven J. Davis and John Haltiwanger "point to 'low worker mobility rates' in 'centrally planned economies . . . [that] choke off the productivity-enhancing role of worker sorting.'"[142]

f.      According to economist Niklas Engbom, "reducing workers' ability to find a job that fully utilizes their skills [i.e., reducing mobility] . . . discourage[s] workers from accumulating human capital."  In support of this, Engbom relied on panel data from 23 Organisation for Economic Co-operation and Development ("OECD") countries.  He found that "life-cycle wage growth and on-the-job training are greater in more fluid labor markets" and that "aggregate productivity is 30 percent lower in the least fluid labor market relative [to the most fluid] primarily due to a lower stock of human capital."[143]

---

[140] *Id.* (cleaned up).

[141] For example, former SCA COO Rucker testified that he left a position as DaVita's DVP "to be one of the most senior executives" at SCA, where he would receive a larger compensation package.  Rucker Dep. at 31:21–32:5.

[142] Barry Gerhart & Jie Feng, *The Resource-Based View of the Firm, Human Resources, and Human Capital: Progress and Prospects*, 47 J. MGMT. 1796–1819 (Jan. 4, 2021) (citing Davis and Haltiwanger 1999: 2778).

[143] Niklas Engbom, *Labor market fluidity and human capital accumulation*, NAT'L BUREAU ECON. RSCH. (No. 29698 Jan. 2022), https://www.nber.org/papers/w29698.

g.      The OECD notes that "[b]arriers to exit, like barriers to entry, 'weaken the market discipline of the competitive process, which . . . can lead to less efficient firms staying in the market' and 'resources (both financial and [human capital] become trapped in existing firms instead of being relocated to their most efficient use.  This can make it more difficult for efficient firms to expand and can crowd out the growth of more innovative firms' and 'can have an adverse impact on economic growth.'"[144]  In other words, employee mobility restrictions run the risk of benefiting less efficient firms, which survive by suppressing wages, at the expense of more efficient firms, which in turn comes at the expense of (i.e., lowers) workers' wages.

46.      Effect of Changing Jobs on Compensation.  **Figure 1** below summarizes key research findings showing a substantial increase in compensation for employees who (voluntarily) change employers.[145]  Additionally, these studies show that percentage pay increases from job changes are greater for higher-paid jobs (e.g., Senior-Level Employees, or jobs at the director-level and above).

---

[144] ORG. FOR ECON. CO-OPERATION & DEV., BARRIERS TO EXIT – BACKGROUND NOTE at 2 (Oct. 23, 2019), https://one.oecd.org/document/DAF/COMP(2019)15/en/pdf.
[145] BARRY GERHART, COMPENSATION 242, EX. 7.16 (14th ed. 2023).

**Figure 1:  The Impact of (Voluntary) Employee Turnover on Subsequent Employee Pay Level**[146]

| Study | Sample | Results |
|---|---|---|
| Groysberg, Healy, & Lin (2020), ILR Review | Global executive search firm placements | 13% increase (in salary plus bonus only) after employer change.  (Stock-based compensation, the largest component of executive compensation was not measured.) |
| Bidwell (2015), Organization Science | MBA alumni from a leading U.S. business school | 35% increase in earnings from voluntary employer change within same job function.  4% increase from involuntary employer change.<br><br>Internal moves (promotion) experienced 34% earnings increase.  (Mean of 5.4 years post-MBA work experience.  During that time, 87% changed employer at least once; 2.6 moves per person, with 65% being internal, 26% voluntary external, and 9% involuntary external.) |
| Dreher & Cox (2000), Academy of Management Journal | Recent MBA graduates | Pay was 20% higher among those who had changed employers at least once. |
| Keith & McWilliams (1999), ILR Review | National sample of young adults | Pay was 8% to 11% higher for those who voluntarily quit their job relative to those who stayed.<br><br>Pay was 14% to 18% higher if searched prior to voluntarily quitting. |
| Gomez-Mejia & Balkin (1992), Academy of Management Journal | College and university faculty | Each employer change associated with 25% higher 9-month salary. |
| Topel & Ward (1992), Quarterly Journal of Economics. | National sample of young adults | 10% increase in wage from employer change (first 10 years in labor market; 84% moved). |

47.     When employees accept new, higher-paying job opportunities, they can also later use their compensation at their new employer to return to and leverage higher pay at their

---

[146] BARRY GERHART, COMPENSATION (14th ed. 2023), EXHIBIT 7.16, P. 242.

original employer.  Former DaVita VP of Communications Thurman, for example, testified that DaVita "had a thing called a boomerang," wherein DaVita employees "would leave" "and increase their pay," and then later return to DaVita in higher-paying roles.[147]

48.     <u>Additional Job Opportunities for Remaining Employees.</u>  Additionally, when employees change employers, they often recruit their colleagues to leave with them.  For example, ████████████████████████████████████████████████

████████████████████████████████████████████████████ ██

        a.     This trend increases the labor market consequences of a single job offer.

49.     <u>Defendants Were Aware of the Effects of Restricting Employee Mobility.</u>  The evidence I reviewed shows that Defendants were aware of this trend, which served as further incentive to collude.  For example, when then-DaVita VP Hayek left DaVita to run SCA as its CEO, he recruited DaVita's then-DVP Rucker to work at SCA and help grow the company.[149]  DaVita's then-CEO Thiry reacted poorly, and criticized Hayek[150]:

> I agree you have been a wonderful supporter of Village[151] Health.  But I don't know how to connect that to the hiring of one of our best people about whom you had inside information.  Would you have ever considered leaving the people you recruited higher and dryer [sic] in a tough spot without some follow-up support?

Thiry knew that Hayek could bring over more DaVita employees to SCA and threatened to retaliate[152]:

---

[147] Thurman Dep. at 36:12–37:5.

[148] Ex. PX124 at DOJCIV-012-00000134; Thurman Dep. at 159:8–160:5 (confirming accuracy of ███████████████ ).

[149] Ex. PX316; Ex. PX305 at DOJ-CIV-008-00000171; Rucker Dep. at 385:19–388:14 (confirming accuracy of ███████████████ ).

[150] Ex. PX316 at DOJ-PROD001A-00000029.

[151] The "Village" is internal jargon employees used to refer to DaVita.  Thurman Dep. at 145:6–20.

[152] Ex. PX316 at DOJ-PROD001A-00000029; Hayek Dep. at 93:23–95:14.

> It is a potentially nasty thing to start . . . —because where does it stop? The best people have the best people, so are we all going to make each other's life's [sic] more difficult than they are? Are you going to let [M]ichael [Rucker] 'coincidentally talk to other [DaVita] folks who have decided to leave?'

Hayek perceived that Thiry "made it clear that I was risking my reputation by doing this."[153]

### 2. Incumbent Employees Also Benefit from Unrestricted Job Mobility.

50. The foregoing analysis applies to incumbent employees (i.e., a firm's current employees who remain at the firm) as well as employees who accept positions elsewhere. Where labor markets are competitive, employers often raise wages of current employees to prevent them from leaving. In other words, higher pay constitutes an important tool that employers use to retain remaining employees, and every guide to employee retention emphasizes the need to provide compensation that is competitive with the levels offered elsewhere.[154] Job changes therefore create cascading "spillover" effects, by benefitting those who leave the organization as well as those who remain.[155]

51. For example, a study of executives found "companies dramatically raise pay for their incumbent [i.e., remaining] executives after losing executives" to executive positions at

---

[153] Hayek Dep. at 94:15–25.

[154] *See, e.g.*, Laura Lorber, *How to Retain Employees*, WALL ST. J., Sept. 12, 2008, http://guides.wsj.com/small-business/hiring-and-managing-employees/how-to-retain-employees/. That point is so obvious that the attention has focused on other approaches. *See* Peter Cappelli, *A Market-Driven Approach to Retaining Talent*, 78 HARV. BUS. REV. 103–11 (Jan.– Feb., 2000).

[155] Historically, the "spillover" term was used to describe how unions raised wages at non-union firms because employers there increased wages to buy out interest in unionization. The most common example of spillover effects in contemporary research is with minimum wages pushing up wage rates for higher-paid jobs. *See* DAVID NEUMARK & WILLIAM L. WASCHER, MINIMUM WAGES (2008).

other companies.[156]  And the incumbent executives received a 46% increase in compensation one year later (primarily in the form of stock-related compensation).[157]

52.      Moreover, outside hiring into higher-level jobs is expensive, and outside hires perform worse on average than inside hires (i.e., those who are promoted from within) and have higher turnover than inside hires.  This problem is one more reason why an employer will be reluctant to allow current incumbents of a job or their potential replacements to leave.[158]

53.      Paying higher compensation represents an effective tool in reducing employee turnover.  However, it is also a costly tool, at least compared to the alternative of simply prohibiting employees from moving to what would otherwise be their best alternative job opportunities.  For example, the No-Poach Agreements "did, on the margin, or, to some degree, reduce the number of people moving back and forth, there would have been a lower cost of turnover," and in turn, "lower cost" expended by SCA.[159]

54.      **Figure 2** below summarizes key research findings on the impact of employee turnover on employee compensation level.  This research shows that a 10% increase in compensation level generally corresponds to lowering employee turnover by 10% to 35%.[160]

---

[156] Huasheng Gao, Juan Luo, & Tilian Tang, *Effects of Managerial Labor Market on Executive Compensation:  Evidence from Job-Hopping*, 59 J. ACCT. & ECON. 203–220 (Apr.–May 2015).
[157] *Id.*
[158] Matthew Bidwell, *Paying more to get less:  The effects of external hiring versus internal mobility*, 56 ADMIN. SCI. Q. 369–407 (Dec. 27, 2011).
[159] Rucker Dep. at 154:25–155:16.
[160] BARRY GERHART, COMPENSATION 241, Ex. 7.15 (14th ed. 2023).

**Figure 2: The Impact of Compensation Level on Employee Turnover (Mobility)**[161]

| Study | Sample | Results | Elasticity |
|---|---|---|---|
| Riddell, *Industrial Relations* (2011) | 390 firms in Greater Toronto, 6 occupational groups | A 10% increase in ratio of firm pay to market pay associated with quit rate going from .106 to .095, a 10% reduction | −1.01 |
| Falch, *American Economic Review* (May 2011) | 161 primary and secondary schools in Norway | Schools having teacher "shortage" and located in far north eligible to pay teachers wage premium of 10%. Introduction (also studied its removal) of 10% wage premium associated with quit rate going from .18 to .12, a 35% reduction | −3.50 |
| Siebert & Zubanov, *Academy of Management Journal* (2009) | 325 retail clothing stores in the United Kingdom | A 10% increase in ratio of store wage/county wage associated with separation rate going from .0500 to .0364, a 28% reduction | −2.78 |
| Shaw, Delery, Jenkins, & Gupta, *Academy of Management Journal* (1998) | 227 trucking companies in the United States | Regression coefficient (beta) = −.31 for quits on pay level. A 10% increase in average annual pay level ($34,912 to $38,403) associated with quit rate going from .256 to .200, a 22% reduction | −2.20 |
| Raff & Summers, *Journal of Labor Economics* (1987) | Ford Motor Company in 1914 | Increasing daily wage *100%*, from $2.50 to $5.00, associated with turnover reduction from 370% to 54%, an 85% reduction | −0.85 |

Elasticity = % change in y/% change in x

55.     Moreover, ordinarily, firms such as Defendants can acquire insight into competitor pay practices through pay surveys, which are conducted by independent third parties that provide at least three-month old composite data that mask individual company responses so as to preclude collusion.[162]

56.     As discussed at length below, companies rely on this external market data to choose their pay levels so as to avoid the serious pitfalls of paying too much or too little relative to their competitors. Paying too much for its jobs increases a company's labor costs, which either directly lowers profits or which are passed on to customers as higher prices. Additionally, higher prices reduce the market demand for the company's product or service, which in turn

---

[161] BARRY GERHART, COMPENSATION 241, Ex. 7.15 (14th ed. 2023).
[162] *See, e.g.,* Ex. PX85 at DVA_OMCEAL_001067253.

-43-

reduces the company's profits.  Paying below market, on the other hand, precludes the company from competing adequately in the labor market to hire and retain sufficient employees, particularly high-quality employees.  Paying too little becomes a vicious cycle, because it translates into lower-quality services and/or products, which again works to reduce service demand and thus the price that customers are willing to pay, in turn lowering profits.  Accordingly, it is critically important for companies to avoid both overpaying and underpaying their employees in comparison to their competitors.  That explains why companies in general, including Defendant firms, place a premium on "pricing" their jobs.

57.     However, competitors can avoid these risks, and can also avoid increasing their labor costs, by exchanging information to align their compensation and keep the market rate low.  Such collusion would likely reduce each Defendants' labor costs:  by gaining assurances from each other that their competitors' labor costs would be lower, each Defendant could lower its own labor costs (including by reducing labor cost growth) without risking (1) the loss of disgruntled employees to rivals or (2) the loss of morale from employees perceiving a lack of external equity with pay offered by comparable employers.

58.     Based on my experience and research in compensation and human resource management, the evidence (that is common to the Class) that I have reviewed in this case supports the foregoing principles.

a.     *DaVita.*  The evidence I have reviewed in this case shows that in some circumstances, turnover increased labor market rates and pressured DaVita to adjust compensation upward to retain employees.  The SCA-DaVita No-Poach Agreement was a way to avoid this need to increase compensation to prevent employee turnover.

-44-

      i.      For example, current DaVita COO Staffieri testified that if a competitor aggressively recruits from a firm, "that can put pressure on wages[.]"[163]

      ii.      Similarly, in 2012 former CEO Thiry provided the following talking points with respect to compensation and market pressure[164]:

> Also on comp, I think you should have [an] example. Maybe 'when stock was flat for 2-3 years, we had many folks come up and say 'JR-KT-DK [Javier Rodriguez-Kent Thiry-Dennis Kogod] our cash comp needs to go up, substantially. Because other companies are calling me, and their equity has performed better the last couple of years, and the market seems much more optimistic about their prospects (which is really the same point twice, or high overlap). [W]e consider that to be a rational point, and we did increase cash comp in many cases, significantly.

      iii.      Similarly, former DaVita VP of Communications Thurman testified that if a competitor had tried to recruit him, he would have been interested because he could have doubled his pay.[165]

      b.      Further, Staffieri testified that given the connection between compensation and turnover, in an unrestricted market, "to retain employees who are being recruited," DaVita can increase a flight-risk employee's base pay, bonuses, and/or stock awards, and has done each of these things to prevent turnover.[166] Former DaVita VP of Recruiting and Talent Management and People Services Group Director Robert Chipman echoed this connection. He testified that "being able to retain [] employees" is "always a concern in any company," because pay "could be" "a reason why an employee might decide to leave a company."[167]

---

[163] Staffieri Dep. at 125:13–21.

[164] Ex. PX551.

[165] Thurman Dep. at 56:8–22.

[166] Staffieri Dep. at 120:23–124:18.

[167] Chipman Dep. at 41:13–42:4.

c.  For example, DaVita's then-CEO Thiry offered DaVita's then-VP Hayek more money to entice Hayek to stay at DaVita and not take the SCA CEO position.[168]

d.  When former DaVita VP Josh Golomb informed Thiry that positions for which he was being recruited "reached the point where they were almost 1.75x what [he] was making at DaVita," he received an upward compensation adjustment.[169]

e.  Former DaVita VP of Communications Thurman also testified that DaVita promoted him and increased his pay by ▮▮▮▮▮▮▮ when Thurman "was a flight risk" after he "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" since joining.[170]  Later, when Thurman decided to leave DaVita for good because DaVita suppressed his pay and restricted his job mobility, Rodriguez offered Thurman a salary increase to encourage him to stay (though the offer did not change Thurman's mind).[171]  This attempt to retain through additional compensation supports Thiry's testimony that "[p]ay can affect retention, absolutely."[172]

f.

---

[168] Hayek Dep. at 79:8–82:9.

[169] DVA_OMCEAL_000942244 at DVA_OMCEAL_000942245.

[170] Thurman Dep. at 20:11–21:15, 22:19–23:7; *see also* Ex. PX124 at DOJCIV-012-00000134 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Thurman Dep. at 156:21–157:11 (confirming accuracy of ▮▮▮▮▮▮▮▮).

[171] Thurman Dep. at 90:21–24.

[172] Thiry Dep. at 111:13–17.

[173] Ex. PX124 at DOJCIV-012-00000133; Thurman Dep. at 153:5–154:6 (confirming accuracy of ▮▮▮▮▮▮▮).

██████████████████████████████████████████████████████████

████████████████████ [174]

> g.    *SCA.*  SCA sometimes increased compensation to address turnover (but note that SCA did not prevent turnover with higher pay as often as it otherwise would have, likely because it benefited from the No-Poach Agreements and CSI Exchanges).

>> i.    SCA GVP of Human Resources Cinnick explained how this would play out at SCA:  "For example, sometimes the pressure on pay for an individual will be driven by the outside market.  They had a job offer."[175]  Where appropriate, SCA determined increased pay:  "[T]he difference is only a little bit.  We were already going to give them in the spring a bump with their pay, why don't we just move it up? . . . We'll just move up the action to now.  We retain them.  They stay in the company."[176]

>> ii.    For instance, in 2015 SCA became particularly concerned about retaining then-VP of Strategy Brian Mathis.  Mathis expressed concern that SCA paid him "████████████████" relative to his role for an extended period.[177]  SCA management had recognized Mathis's compensation concerns and the retention risk, and recommended making Mathis an ███████████████████████████████████.[178]  Mathis ultimately received a promotion to Group Vice President and an ████████████████████████████████████.[179]

---

[174] *Id.* at DOJCIV-012-00000135; Thurman Dep. at 161:10–162:7 (confirming accuracy of ████████████████).

[175] Cinnick Dep. at 67:8–10.

[176] *Id.* at 68:7–17.

[177] SCA001123358 (cover email) and SCA001123359 (attachment).

[178] Ex. PX465 at SCA000048816.

[179] BF000048126 at BF000048126–27.

iii.     Similarly, in 2016, SCA management recommended "meaningful" equity grants for other Senior-Level Employees in an effort "to reward and retain these high performers over the mid- to long-run."[180]  Here, SCA did not wait for concrete competitive threats to manifest, and instead took proactive measures to further reduce turnover risks.

h.     *USPI.*  Similar common evidence at USPI shows that USPI increased compensation to address turnover, but as above, this happened less frequently than one would expect in an unrestricted market.

i.     At times, USPI raised an employee's pay to prevent turnover.[181] For example, USPI retained then-Regional VP of Operations Riley Orr by offering him more money:

ii.     Similarly, during USPI's 2014 discussions about salary increases for Vice Presidents, USPI's then-Group President Andrew Johnston noted that one employee "is a high potential and will leave if we don't find a way to increase her responsibility and comp."[183] Johnston accordingly advised that USPI should "do that either now, or in the very near future."[184]

---

[180] Ex. PX465 at SCA000048816.

[181] Wilcox Dep. at 100:14–22.

[182] *Id.* at 99:21–100:13, 132:7–15; Ex. PX507 at DOJCIV-008-00000269; Ex. PX508 at DOJCIV-008-00000213–14.

[183] Ex. PX454.

[184] *Id.*

        iii.      Also in 2014, USPI's then-SVP, Corporate Controller and Chief Accounting Officer Anthony Martin urged a pay increase for an employee who represented a flight risk[185]:

> Very soon we need to do something about Courtney's [USPI employee] base pay or she will be out of here. She likes it here . . . [but] our recruiting efforts so far indicate strongly that she is under market and very easy to poach. We are seeing enough to indicate this even if we didn't know that less-qualified Ryan left for a job that pays ▇▇▇▇▇ than we are paying Courtney. . . . This is likely true for a few of our other top performers[.]

        iv.



▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ If USPI had had a no-poach agreement with that other company, USPI likely would not have had to give a counteroffer to McGarry because McGarry would never have received the outside job offer in the first place.

## VI. DEFENDANTS' COLLUSION WOULD LIKELY HAVE SUPPRESSED EMPLOYEES' COMPENSATION.

59.      In this section, I discuss common evidence of Defendants' typical cold calling recruitment practices regarding high-value passive candidates in an unrestricted labor market. Further, I review evidence that, based on my experience and research in compensation and

---

[185] Ex. PX142.

[186] Ex. PX98 at DOJCIV-012-00000129; McGarry Dep. 35:3–37:2 (confirming accuracy of ▇▇▇▇▇▇▇▇▇).

[187] *Id.*

human resource management, shows that Defendants' No-Poach Agreements restricted cold calling, which in turn limited job mobility. The Agreements also deprived employees of confidentiality in the hiring process, which created a chilling effect and further suppressed employees' job mobility and bargaining power. Moreover, evidence common to the Class shows that Defendants' CSI Exchanges are likely to have further harmed employees' compensation levels.[188] Finally, I explain that the foregoing wage suppression will likely to persist for years.

**A.** **In a Normally-Functioning Competitive Market, Defendants Value Recruiting High-Value Passive Candidates for Employment.**

60. In this section, I explain why many high-value employees, particularly those with specialized skills, do not proactively seek employment even though they would be very interested in such higher-paying external opportunities. I also review evidence demonstrating that Defendant firms sought such passive candidates with specialized skills, and therefore needed to proactively solicit or recruit those employees. The evidence I review includes compensation-related literature, statements from the FBI investigation interview reports, deposition testimony and exhibits, documents produced in this litigation, and testimony from the DaVita criminal trial.

61. Cold Calling Constitutes a Valuable Recruitment Mechanism. Like many firms, Defendants regularly engaged in proactive recruiting of job candidates.[189] This recruitment practice is colloquially referred to as "cold calling," wherein a hiring company proactively calls,

---

[188] Frank M.H. Neffke, Anne Otto & Antje Weyh, *Inter-industry labor flows*, 142 J. ECON. BEHAV. & ORG. 275, 281 (Oct. 2017). They observe that workers "remain in their 5-digit industry 39 times more often than random." Eric Parrado, Asena Caner & Edward. N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007).

[189] *See, e.g.,* Tae Hon Lee, Barry Gerhart, Ingo Weller & Charlie O. Trevor, *Understanding Voluntary Turnover: Path-Specific Job Satisfaction Effects and The Importance of Unsolicited Job Offers*, 51 ACAD. MGMT. J. 651, 655 (Aug. 2008) ("As Gerhart observed, an individual labor market can change quickly so that although 'a person may perceive ease of movement to be low, an attractive job offer may nevertheless arise that results in turnover.'").

emails, or otherwise reaches out through a platform like LinkedIn or Indeed to a passive candidate, i.e., an employee at a competitor firm who is not actively looking for a new job.

a.      Employees in general are naturally interested in higher-paying alternative job opportunities.  However, to the degree they are unaware of such opportunities, they may be "passive," in that they are less likely to proactively seek alternative employment.  Jobs that come to these passive employees via active recruiting by other employers consequently play a critical role in facilitating high-value employee moves to better and higher-paying jobs at firms who need them.

b.      Employees can incur high search costs from searching for jobs and gathering information about alternative employment options and compensation; it is often time-consuming to identify and assess the suitability of alternative employers.  Moreover, "sometimes . . . employees remain unaware of job opportunities because the constant and daily routine of work, home, and family demands shields that person from alternative possibilities."[190]  Many potential employees, particularly those satisfied in their current roles because they do not yet know about higher-salary opportunities elsewhere, are unlikely to choose to incur those costs.  Therefore, cold calling helps employers to reach much larger groups of prospective, passive candidates.  And as discussed herein, many companies believe these passive candidates are particularly valuable.

c.      One study of turnover in a national sample of employees ages 31 to 38 reported that 28% (of which 32% were in professional and managerial occupations) of those who

---

[190] Thomas W. Lee & Terence R. Mitchell, *An Alternative Approach: The Unfolding Model of Voluntary Employee Turnover*, 19 ACAD. MGMT. REV. 51–89 (Jan. 1994).

left their employer to take a job with another employer accepted "unsolicited job offers."[191] The survey defined such offers as answering "no" to the question, "Were you looking for work elsewhere when you were offered this job?"[192] Because this number only includes those employees who actually left their current positions, the 28% statistic likely substantially understates the number of employees who actually received a cold call. It does not include employees who received cold calls and then used their unsolicited job offers to negotiate higher salaries with their current employers, or who simply stayed at their current employers and maintained their salary levels.

d.  More recent evidence suggests that cold calling and other forms of proactive recruitment may play an even larger role than indicated above. Based on data from the Contingent Worker Supplement Survey (part of the Census Bureau's Current Population Survey), a Federal Reserve Bank of San Francisco study concluded that "more than three-quarters of workers [77.6% based on their Table 1] who switched employers did not report active job search in the previous three months."[193] Thus, "a majority of people" actually "find jobs without ever reporting actively looking for one."[194] *This study "implies that, rather than them finding jobs, the jobs actually find them."*[195] But if a no-poach agreement restricts proactive recruiting, alternative employers will *not* find passive candidates, resulting in less employee mobility and thereby a reduced likelihood of a mobility-linked wage increase.

---

[191] Tae Heon Lee, Barry Gerhart, Ingo Weller, & Charlie O. Trevor, *Understanding Voluntary Turnover: Path-Specific Job Satisfaction Effects and The Importance of Unsolicited Job Offers*, 51 ACAD. MGMT. J. 651, 652–53, 659 (Aug. 2008).

[192] *Id.*

[193] Carlos Carrillo-Tudela, Bart Hobijn, Patryk Perkowski & Ludo Visschers, *Majority of Hires Never Report Looking for a Job*, FED. RSRV. BANK OF S.F. ECON. LETTER (Mar. 30, 2015).

[194] *Id.*

[195] *Id.* (emphasis added).

e.      The foregoing studies and other literature demonstrate that cold calling passive candidates is widely used in U.S. labor markets as a tool to recruit top talent. It represents an especially useful tool for recruiting and hiring Senior-Level Employees who have highly-sought after specialized skills and industry-specific experience[196] and may tend to respond only to direct solicitation, as here.

f.      Much human capital is industry-specific, especially for higher-level/higher-paid employees.[197] Accordingly, the great majority of employee movement is within the same industry. Industry is measured at different levels of specificity. At low specificity are 20 sectors (2-digit) industry categories. At higher specificity are 689 industries (5-digit).[198] The rate of mobility across industries is low, with only about 11% of employees changing sector (2-digit industry) from year to year.[199] That rate is especially low when one considers that the great majority of jobs in the economy are not in any one industry. When adjusting for this fact, employees "remain in their 5-digit industry 39 times more often than random" (i.e., compared to what would be expected if their current industry had no effect on

---

[196] *See, e.g.,* Ex. PX219 at DOJCIV-012-00000066 (███████████████████████ ███████████████████████████████████████████ ; Tanner Dep. at 32:20–33:13 (confirming accuracy of ██████████████████ ).

[197] Richard P. Castanias & Constance E. Helfat, *The managerial rents model: Theory and empirical analysis*, 27 J. MGMT. 661–678 (Nov.–Dec. 2001); John K. Mawdsley, & Deepak Somaya, *Employee Mobility and Organizational Outcomes: An Integrative Conceptual Framework and Research Agenda*, 42 J. MGMT. 85–113 (Nov. 19, 2015); Derek Neal, *Industry-specific human capital: Evidence from displaced workers*, 13 J. LAB. ECON. 653–677 (Oct. 1995).

[198] Three sector examples (out of 20 total) are manufacturing, information, finance/insurance, and health care/social assistance. Within these three sectors, there are 176 industries (5-digit) within manufacturing, 24 industries (5-digit) within finance/insurance, and 30 (5-digit) within health care/social assistance. Examples of 5-digit industries within health care/social assistance (Sector 62) include: General Medical and Surgical Hospitals, as well as Other Outpatient Care Centers (which includes HMO Medical Centers, Kidney Dialysis Centers).

[199] Gueorgui Kambourov & Iourii Manovskii, *Rising occupational and industry mobility in the United States: 1968–97*, 49 INT'L ECON. REV. 41–79 (Feb. 2008).

their new destination industry when they switch firms).[200] Evidence also shows that the strong tendency to move within the same industry is even more pronounced for higher-paid employees.[201]

62. <u>Defendants' Senior-Level Positions Require Specialized Skills.</u> Applied here, the common evidence in this case demonstrates that Defendant firms perceived that their senior-level positions required specialized, industry-specific skills and were difficult to fill:

    a. *DaVita.*

        i. DaVita had difficulty filling any executive or leadership role at the Vice President-level or above, because such roles required a skilled and dynamic employee with a specific set of values.[202]

        ii. For example, former DaVita VP of Recruiting and Talent Management and People Services Group Director Chipman testified that "any executive role or leadership role" is "hard to fill," "just because the role is very specific and very dynamic. And so finding the right person with the value base, the values that DaVita has . . . and the skill set required for that role was more complicated."[203]

        iii. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████ ██ ████

---

[200] Frank M.H. Neffke, Anne Otto, & Antje Weyh, *Inter-industry labor flows* 142 J. ECON. BEHAV. & ORG. 275–292 (Oct. 2017).

[201] *Id.*; Eric Parrado, Asena Caner, & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007).

[202] Chipman Dep. at 96:21–97:10.

[203] *Id.* at 96:19–97:13.

[204] DOJCIV-008-00000304 at DOJCIV-008-00000306.



[206]

        b.    *SCA.*

        i.    At SCA, former Chief Talent Officer Fanning testified at the DaVita criminal trial and at her deposition in this case that it is difficult to find good candidates for business development positions [i.e., employees at the Vice President level and above], who are "in short supply and highly talented. There certainly were not hundreds of them."[207] Fanning explained[208]:

> A lot of executives, especially in these BD [business development] roles are not successful. The failure rate is very much there. And you're trying to avoid risk. Recruiting is all about maximizing the odds of someone being successful. So the more you can recruit somebody from a similar culture or a similar event and pull them in, where the standards are similar, the targets are similar, the demands are similar, you're maximizing your odds all the time that this person is going to be successful.

---

[205] *Id.*

[206] *Id.* at DOJCIV-008-00000308.

[207] Fanning Dep. at 39:10–40:4.

[208] Ex. PX157 at 222:4–25; *see also* Fanning Dep. at 112:22–113:20 ("Finding those people in healthcare, it wasn't—I mean yeah, we got a list of 500 companies on that list or I know—I never did count there—but there aren't a lot of people like that in health care doing business development work . . . oh, and they're highly compensated too. . . . But generally the industry doesn't have a lot of those people, which is why you look in consulting firms and all these other places.").

As such, Fanning would have preferred to recruit from DaVita given the limited supply of these niche employees.[209]

        ii.      The following provides an example of what such a niche candidate might look like. In one instance, SCA sought a candidate for Regional Vice President ("RVP") who had a "[s]olid foundation of general management principles and strong financial acumen achieved through a minimum of 10-15 years in a progressive career (healthcare industry preferred)"; "[s]trategic planning and business development across various markets"; "[e]xperience growing and scaling an innovative service oriented business model"; "[s]trong background in the high touch service business with customer experience as one of the primary metrics for success"; "[e]xperience in healthcare services, ambulatory care, integrated delivery systems and/or physician practice management (Preferred)"; and "[e]xperience creating and managing budgets for a large, distributed organization."[210] This internal SCA document underscores the highly specific and specialized qualities SCA looked for in director-level and above candidates.

        c.     *USPI.*

        i.      The pool of talent that USPI recruited from was also very small.

        ii.      USPI's former primary internal recruiter McGarry agreed with Wilcox:

---

[209] *Id.* at 114:12–115:4.

[210] Ex. PX529 at SCA000065982.

[211] Wilcox Dep. at 103:11–19; Ex. PX507 at DOJCIV-008-00000269.



For example, McGarry testified that to fill administrator positions, USPI looked for candidates with: (1) experience in healthcare, preferably in an ambulatory surgical center or hospital setting; (2) strong business and financial acumen, and preferably an MBA; and (3) an understanding of surgery's ambulatory side.[213]



   iii.  Former USPI VP of Talent Acquisition Mosley testified to how specific the skill set for executive candidates needed to be. For Regional Vice President positions, USPI looked for[215]:

> [Candidates who would be] able to really work independently, have good judgment and good discernment, mental agility, negotiation skills, excellent relationship building skills. Ability to I guess not learn on the fly, but pivot in certain situations and lead their team, other administrators . . . and financial acumen . . . . Prior experience running with an ASC organization . . . having oversight for several facilities.

   iv.  Similarly, ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████ ██ ███████████████████████████████████

---

[212] Ex. PX98 at DOJCIV-012-00000124.

[213] McGarry Dep. at 49:16–50:2, 53:3–54:3; *see also* Mosley Dep. at 58:10–23.

[214] Ex. PX98 at DOJCIV-012-00000128; McGarry Dep. 35:5–37:2.

[215] Mosley Dep. at 108:25–109:14.

[216] DOJCIV-007-00000101 at DOJCIV-007-00000102.

[REDACTED] [217] [REDACTED]

[REDACTED] [218]

v. Likewise, third-party Catapult recruiter Jimmy Tanner testified that candidates with ASC industry experience were important to USPI and that SCA employees would have been excellent candidates for positions at USPI.[219]

63. Defendants Needed to Cold Call Senior-Level Employee Candidates. Substantial evidence shows that Defendants heavily relied on proactive recruiting methods such as cold calling to hire senior-level passive candidates.

i. *DaVita.* The evidence shows that DaVita valued recruiting passive candidates for employees. Former COO Dennis Kogod testified[220]:

> It was a typical practice for recruiting firms or search firms to reach out to people whether they had expressed an interest or not . . . . [I]t became a worthwhile exercise, part of the recruiter's business model, to identify the candidates regardless of where they're working and make cold calls to see if any of them would consider leaving.

ii. Indeed, DaVita clearly valued proactive solicitation because it maintained an internal team to search for and recruit candidates to fill executive positions.[221]

[REDACTED]

[REDACTED]

[REDACTED] [222]

---

[217] *Id.* at DOJCIV-007-00000103.

[218] *Id.*

[219] Tanner Dep. at 34:13–38:15; Ex. PX220.

[220] Ex. PX157 at 64:2–20.

[221] Chipman Dep. at 71:18–72:18.

[222] DOJCIV-008-00000304 at DOJCIV-008-00000306.

iii. Moreover, DaVita's human resources department wanted to develop "[t]alent pipelines," which it defined "as deep pools of named and known talent with which we have built relationships and that can be tapped quickly to fill interview slates."[223]  In other words, DaVita wanted to have slates of candidates it could proactively contact to fill open roles.

iv. Former DaVita VP of Recruiting and Talent Management and People Services Group Director Chipman testified that such pipelines or pools were valuable for roles DaVita "had more difficulty in filling," such as regional director positions, as well as "[h]ighly technical roles" in the technology and finance areas.[224]  An internal human resources directive emphasized the value of passive candidates, directing those within DaVita to start "[t]racking proactive recruiting activities," and "[r]ecognizing proactive recruiting behavior."[225]

v. In **Figure 3** below, DaVita disseminated the graphic below to demonstrate the benefits of proactive solicitation:

---

[223] Ex. PX254 at DVA_OMCEAL_000036923.
[224] Chipman Dep. at 209:16–211:22.
[225] Ex. PX254 at DVA_OMCEAL_000036922.

**Figure 3**[226]

vi.      To further illustrate this point, in 2013, Chipman asked Ray

Follett, a high-level DaVita executive, to meet with passive candidates to encourage the

candidates to accept job offers with DaVita.[227]  Chipman had previously used a similar process

to covert passive candidates for Regional Operations Director positions into active talent.[228]

vii.      Further, former DaVita Chief Wisdom Officer Priest testified that

proactively calling competitors' employees represents one way to find top candidates.[229]

---

[226] *Id.* at DVA_OMCEAL_000036929.

[227] Ex. PX255.

[228] *Id.*; Chipman Dep. at 219:17–223:15.

[229] Priest Dep. at 121:13–16.

viii.     DaVita also wanted to recruit candidates who it internally referred to as a "pactive candidate." "Pactive" is a portmanteau of "passive" and "active," and DaVita defined such a candidate as "one who is traditionally passive, but may be involved in subtle online activities showing their possible willingness to have a conversation about new opportunities."[230] DaVita informed its recruiters that "[p]assive talent represents at least 80% of the workforce," such that it was important that recruiters "understand how to successfully attract this valuable group of candidates."[231] Accordingly, DaVita instructed its recruiters, "If you notice people doing any of this, pick up the phone and call them (or shoot them an email). This may be the perfect time to connect with them!"[232]

b.     *SCA.* I have also reviewed evidence that SCA valued recruiting passive candidates.

i.     Former SCA Chief Talent Officer Fanning put it simply: "[T]he best candidates are often passive and not actively looking."[233] As such, "the proactive outreach of contacting candidates to tell them about opportunities" "is very important."[234] Fanning testified that proactive recruiting represented one of the most important recruiting methods[235]:

> For executive hires, senior hires, VP and above, *it's how most people will find out about opportunities.* They'll either be referred to recruiters, through their own personal networks, through referrals, people you know. It's . . . not like more junior roles where [there is] advertising and people applying. *Executives generally, especially high-in-demand business development-type executives, which was the bulk of the recruitment I'm talking about, didn't post roles. They don't apply to job advertisements.*

---

[230] Ex. PX253 at DVA_OMCEAL_000012085.

[231] *Id.*

[232] *Id.*

[233] SCA002209521 at 524.

[234] Fanning Dep. at 48:24–49:8.

[235] *Id.* at 49:9–22 (emphasis added).

-61-

In Fanning's experience, "the vast majority, and I would say 80, 90 percent" of senior-level positions are filled through the proactive solicitation process.[236]  In other words, most of the time, reaching candidates, who will not otherwise proactively solicit new opportunities, requires proactive solicitation.

ii.     Proactive solicitation was so crucial to SCA's recruitment process that SCA implemented a standardized process for proactively soliciting job candidates[237]:

> [I]t usually starts with a job spec, the responsibilities of the role, what you're expecting somebody to do. . . . You would write a spec that would include [the] kind of culture, the successful traits, the behaviors, the responsibilities of the roles, the key deliverables, the things that generally would make a candidate successful . . . . And then you would say, so based on this is what we're looking for, this is what would be successful, where are we going to find people like that?  And then you would make a list of target companies of where you might find people with those skill sets, those cultural attributes and behaviors.

c.     *USPI.*  I also reviewed substantial evidence that USPI valued recruiting passive candidates.

i.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ ██  ████████████████

████████████████████████████████████████ ██

---

[236] *Id.* at 49:23–50:6.

[237] *Id.* at 47:25–48:23.

[238] Ex. PX98 at DOJCIV-012-00000129.

[239] *Id.*

ii.

iii.     Similarly, former USPI VP of Talent Acquisition Mosley testified that she would solicit passive candidates through LinkedIn Recruiter Seat for difficult-to-fill positions at USPI.[241]

iv.

### B.     Defendants' No-Poach Agreements' Cold Calling Restrictions and Tell-Your Boss Provision Decreased Employees' Job Mobility and Bargaining Power.

64.     In this section, I explain why proactive solicitation and recruitment of employees, discussed above, which typically benefit employers by connecting them with high-value candidates, also give *employees* increased access to higher-paying job opportunities.  Further, I show that restrictions on labor competition decrease employee mobility and thereby deprive employees of those opportunities.

---

[240] Ex. PX98 at DOJCIV-012-00000123.

[241] Mosley Dep. at 90:23–91:7, 92:7–93:18.

[242] Ex. PX280 at DOJCIV-008-00000288.

[243] Ex. PX88 at DOJCIV-008-00000358; Garvin Dep. at 82:13–85:18.

65.     I also review common evidence that, based on my experience and research in compensation and human resource management, is consistent with employers who are not competing for labor but instead consistent with Defendant employers' top executives agreeing to implement restrictions on labor competition by (1) agreeing not to actively recruit each other's employees, and (2) requiring candidates to inform their bosses they wanted to pursue external opportunities *before* these candidates had other job offers in hand, which created a chilling effect.  This evidence comports with other evidence that executives had the opportunities to collude because of the tight-knit nature of the industry and their longstanding relationships with one another.  Finally, I explain that these restrictions would likely have reduced employees' mobility and suppressed their compensation.

66.     In this section, the evidence I review includes compensation-related literature, statements from the FBI investigation interview reports, deposition testimony and exhibits, documents produced in this litigation, testimony from the DaVita criminal trial, and federal regulations.

67.     At Defendant firms, the logical course of action when a senior-level vacancy occurs would be to:  (a) cold call or otherwise proactively recruit qualified Senior-Level Employees at competitor firms; and/or (b) readily entertain proactive applications from such employees.  One would consequently expect to see substantial employee mobility between Defendant firms, as well as wage increases across the board.  Instead, the No-Poach Agreements effectively suppressed employees' bargaining power and mobility because they cut off key avenues by which employees could obtain better information on alternative employment opportunities, including those with higher wages.  That prevented employees from moving to

higher-paying outside opportunities or having the leverage of an outside offer instrumental in negotiating higher pay/better position at their current employer.[244]

68.     Former SCA Chief Talent Officer Fanning put the loss succinctly: "I believed that [these agreements] limited people's opportunities.  It was for them to decide what they wanted to do,"[245] but Defendant firms never gave them the chance.

### 1.     Employees Typically Have Limited Access to Labor Market Information.

69.     The labor market has long been characterized by imperfect information; searching for better information about the labor market carries with it an associated cost.  Such frictions translate into imperfect matches between workers and employers and opportunities for better matches arising in a less than systematic and planned manner.

a.     Typically, "[i]n a competitive labor market, a worker is paid their marginal product, possibly adjusted for job amenities. . . .  Job search and recruiting, however, are not the frictionless processes that are required for perfect competition.  It takes time, resources, and luck for the worker to locate a vacant job and thus for the firm to locate a qualified worker."[246]  Further, "[t]urnover plays a major role because workers are seen as acquiring much of their information about match quality only after having actually been in a job for some time (i.e., match is an 'experience good').  The limited amount of information available to firms and workers at the point of hire limits the quality of matches at that point."[247]

---

[244] Barry Gerhart & Sara Rynes, *Determinants and Consequences of Salary Negotiations by Graduating Male and Female MBAs*, 76 J. APPLIED PSYCH. 256–262 (1991).

[245] Fanning Dep. at 79:7–17.

[246] Giuseppe Moscarini & Fabien Postel-Vinay, *The Cyclical Job Ladder*, 10 ANN. REV. ECON. 165–188 (Aug. 2018).

[247] Barry Gerhart & Jie Feng, *The Resource-Based View of the Firm, Human Resources, and Human Capital: Progress and Prospects*, 47 J. MGMT. 1796–1819 (Jan. 4, 2021).

b.     However, the pronounced information asymmetry between employees and employers represents a notable feature of compensation systems in U.S. companies.  In general, employees are less informed about compensation than their employers.  Most U.S. companies share little information with employees regarding how their compensation systems are designed and still less information regarding what other employees are paid.

c.     Further, U.S. companies typically enforce policies that discourage employees from sharing such information if they do possess it.  As Gerhart, compensation expert Ingrid Fulmer, and human resources and industrial relations expert Ji Hyun Kim explain[248]:

> A lack of pay transparency is referred to as pay secrecy.  Historically, in the U.S. private sector, for nonunion employees, there has been little perceived pay transparency in terms of ability to discuss pay with coworkers or ability to access company provided information on pay, with pay secrecy perceptions continuing to be reported in recent years (e.g., 2017–18[)][.]

Avoiding pay transparency can reduce job mobility[249]:

> [A]n organization with known pay inequities may decide to avoid pay transparency.  An organization may also avoid transparency to limit worker mobility by limiting their information on pay, making comparisons difficult.  Of course, mobility is a key to workers moving to their most productive job/organization match . . . so while the private return to an organization of pay secrecy may be positive, the effect on individual workers and on society may be negative[.]

d.     Gerhart and human resources management and compensation experts George Milkovich and Jerry Newman summarize data from a WorldatWork survey of compensation professionals.  Only 41% of compensation professionals agreed that employees "know the pay ranges for their [own] pay grade or position" and only 21% agreed that

---

[248] Ingrid Smithy Fulmer, Barry Gerhart & Ji Hyun Kim, *Compensation and Performance:  A Review and Recommendations for the Future*, 76 PERS. PSYCH. 701 (Feb. 27, 2023) (internal citation omitted).

[249] *Id.* (internal citations omitted).

"employees know what the pay ranges are for the grade or the positions immediately above their own."[250]

e.     In a second WorldatWork survey of compensation professionals, only 15% reported that "information is shared with employees" about "[b]ase salary ranges for all pay grades or jobs," and merely 2% reported that "information is shared with employees" about "[a]ctual pay levels for all employees."

f.     The results of a third survey, conducted by the Institute for Women's Policy research and which surveyed employees (rather than compensation professionals), found that 66% of private sector respondents report that "discussion of wages and salaries at work" is either "formally prohibited" or "discouraged by managers."[251]

g.     Indeed, the important role that asymmetric information plays in suppressing pay was a major impetus for recent Executive Order 13665, "Non-retaliation for Disclosure of Compensation Information," which was driven by the belief that more transparency will reduce pay discrimination by shining a light on pay inequities.[252]  This Order prohibits federal contractors and subcontractors from "discharging or discriminating in any other way against employees or applicants who inquire about, discuss, or disclose their compensation

---

[250] JERRY NEWMAN, BARRY GERHART, & GEORGE MILKOVICH, COMPENSATION 686, EX. 18.10 (12th ed. 2016).

[251] *Id.,* Ex. 18.11, p. 687.  Note also that not much has changed as of 2023, when WorldatWork reported that according to its 2022 study, "2 in 5 employers don't communicate salary ranges to employees when they aren't required, and 4 out of 5 organizations say a majority of their workers don't understand their compensation philosophy."  Tom McMullen & Serra Aladag, *Pay Transparency:  A Closer Look at the risks, rewards and Regulations*, WORLDATWORK, INC. (Oct. 19, 2023), https://worldatwork.org/publications/workspan-daily/pay-transparency-a-closer-look-at-the-risks-rewards-and-regulations; *see also* WORLDATWORK, INC., COMPENSATION STRUCTURE POLICIES & PRACTICES (2023), https://worldatwork.org/research/salary-structure-policies-and-practices.

[252] Ingrid Smithy Fulmer, Barry Gerhart, & Ji Hyun Kim, *Compensation and Performance:  A Review and Recommendations for the Future*, 76 PERS. PSYCH. 701 (Feb. 27, 2023).

or the compensation of another employee applicant."[253]  The key rationale is that "[s]trictures against revealing compensation can conceal compensation disparities among employees.  This makes it impossible for an employee to know he or she is being underpaid compared to his or her peers."[254]

### 2.      Unsurprisingly, Defendants Limited Pay Transparency.

70.      Although some employees inevitably learn some information about certain other employees' salaries, whether in the form of salary ranges or actual salaries, the results of the surveys summarized earlier show that these employees only acquire this information in spite of their employers.  Employers typically work to ensure both internal and external pay information is *unavailable* to their employees precisely so that they cannot use that data to negotiate pay increases or create bidding wars between competitors, consistent with evidence in this litigation that is common to the Class:

a.      *DaVita.*  In general, DaVita did not want employees having access to pay points.  For instance, a 2012 DaVita internal email regarding salary guidelines instructs, "As always we do not share the salary guidelines with teammates [and]  it is for management use only. . . . We have not shared the suggested salary guidelines with the VP's [sic].  Please keep this confidential."[255]

---

[253] Gov't Contractors, Prohibitions Against Pay Secrecy Policies and Actions, 79 Fed. Reg. 55712-02, 55713 (proposed Sept. 17, 2014) (to be codified at 41 C.F.R. pt 60).

[254] *Id.* at 55714.

[255] DVA_OMCEAL_001188391; *see also, e.g.,* Ex. PX73 at DVA_OMCEAL_001332708 (DaVita's Compensation Team sent a reminder "that internal compensation information is confidential"); *see also* Thurman Dep. at 28:13–29:11 (Thurman realized DaVita paid women on his team less than men and increased their pay, indicating that these women likely did not realize they were underpaid).

b. *SCA.* Avoiding a bidding war was a critical consideration, such that SCA's then-CEO Hayek used the phrase four times in an early, lengthy discussion with DaVita's then-CEO Thiry regarding the SCA-DaVita No-Poach Agreement.[256]

c. *USPI.* USPI shared the same goal of avoiding a bidding war for talent.



Consequently,

### 3. Absent Defendants' Collusion, Employees Could Acquire Labor Market Information Through Cold Calls and Proactive Recruitment.

71. Due to the foregoing limitations in labor market information available to employees and the high costs of searching, cold calling and proactive recruiting represent critical

---

[256] Ex. PX484 at DVA_OMCEAL_000429388–89 ("I explicitly did not want or try to leverage the situation into a bidding war"; "I never wanted to leverage SCA and DaVita against each other in a 'bidding war'"; "Michael [Rucker] told me that he had made a decision to leave DaVita, that he had considered it deeply, that the decision was about him moving on after several years in the same organization, that he was not looking to create a bidding war (in fact, that he expressly didn't want that)"; "Michael expressly did not want me to talk to anyone prior to him talking to Javier [Rodriguez] [about leaving DaVita to work at SCA], and he expressly did not want to create a 'bidding war[.]'").

[257] Ex. PX219 at DOJCIV-012-00000066–67; *see also* Tanner Dep. at 30:9–12 (Tanner confirmed the truthfulness of ▇▇▇▇▇▇▇▇▇).

[258] *Id.* at DOJCIV-012-00000066; *see also* Tanner Dep. at 45:2–21 (because USPI instructed Tanner not to solicit from SCA, he never intentionally tried to go after those candidates); Tanner Dep. at 30:9–12 (confirming accuracy of ▇▇▇▇▇▇▇▇▇▇▇).

ways workers can supplement their knowledge about the value of their services in a labor market where firms do not have anticompetitive agreements.

72.     Information from Proactive Recruiting Is Valuable.  Proactive recruiting mechanisms like cold calls are particularly valuable sources of information for two major reasons:  the timeliness of the information, and the specificity and relevance of the information to that particular employee.

a.     *Timeliness.*  Proactive recruiting provides an employee information about a job offer and its potential compensation at the exact moment when the information is most actionable—an employer has an opening, and the employee knows they are qualified for the position.  Thus, a cold call informs the recipient as well as any other workers who hears about an existing alternative to their current position.

i.     Proactive recruiting is also timely in that it provides information about the employer's demand for employees at that very moment.  The knowledge that an employer has an active shortage of a certain type of employee increases the candidate's bargaining power vis à vis the potential employer as well as the current employer, because the candidate can use that information and subsequent job offers to negotiate higher compensation.

b.     *Specificity.*  Cold calls are also valuable because they provide information specific to the solicited employee.  In contrast, public information *at best* provides a view of the average market value for an employee with a particular skill set and credentials.  There are many high-performing or otherwise in-demand employees whose service value to their organization is substantially higher than the average for their cohort.[259]  Inside an organization, these employees

---

[259] Michael C. Sturman, Charlie O. Trevor, John W. Boudreau, Barry Gerhart, *Is it Worth it to Win the Talent War? Evaluating the Utility of Performance-Based Pay*, 56 PERS. PSYCH. 997, 1017 n.4 (2003) (providing empirical support for the assumption that the service value of

are generally paid according to a systematized compensation structure (such as those discussed below). However, proactive recruiting offers a unique opportunity for employees who are in particular demand to gain insight into the value they generate for a firm, and thus to capture a greater proportion of that value in their salary negotiations. This proactive recruiting can create a bidding war that enables employees to bid their compensation up to more closely approximate their value.[260]

               i.        Former DaVita VP of Communications Thurman's testimony confirmed the importance of cold calling for employees who want to know their value in the broader labor market. He testified that "recruiting calls change a person's ability to know what their market value [is]," "[b]ecause if you're getting a range of what somebody else is willing to pay you to come to their shop, you understand where you are relative to your current salary at [your current employer]."[261]

               c.       *Public Information Is Inferior.* By contrast, the information which employees can discover through public sources or through union surveys is not equivalent to that provided by proactive recruiting and ultimately, job offers. Publicly available information—such as information on job-posting websites, salary websites, or union surveys—is less useful because it has an inherent time lag. By the time the employee sees the information, the opening may no longer be available.

---

employees whose performance is one standard deviation above average, between 74%-100% more than that of the average employee) (citation omitted).

[260] *See, e.g.,* Kogod Dep. at 53:13–54:10 (firms can tell recruiters not to solicit employees from certain companies so as to avoid a "[b]idding war" which drives up the market price of labor). Note that this benefit also accrues to those who are not proactively recruited, who now have the opportunity to learn more about the labor market from those who did.

[261] Thurman Dep. at 155:8–156:16; *see also* Ex. PX124 (same).

d.      *Proactive Recruiting Increases Bargaining Power.*  Proactive recruiting further increases employees' bargaining power because, in the absence of a no-poach agreement, competing employers would more frequently engage in proactive recruiting hiring of competitors' employees.

e.      *Proactive Recruiting Benefits Employees Who Stay.*  Due to ongoing concerns about turnover and increased churn among firms' most valuable employees, employers may take proactive measures to increase compensation of incumbent employees.  Employee turnover scholars Gerhart, Lee, Weller, and Trevor explain[262]:

> [E]ach organization must decide if it can or should work to preempt raids by other employers (e.g., by proactively adjusting salaries, managing careers/promotion opportunities, etc.).  The fact that unsolicited job offer shocks are hard to see in advance perhaps magnifies the importance of such strategies and also raises the question of whether organizations would be well served to develop additional systems that more systematically and proactively seek out information about alternative offers.

i.      Thus, the decision to stay at a current employer without an increase in salary would nonetheless benefit the employee who entertained competitor job offers because that employee gained information about alternative job opportunities.

ii.      For example, former SCA Chief Talent Officer Fanning testified that solicitation is "valuable to a potential candidate even if they don't take the job," because[263]:

> [I]t tells you if you're known in the market; what reputation you've got in the market; if you're employable; the hey, if you lost your job you could get another one or if you resigned you could get another one.  It tells you about your own skill set and your confidence—and if it goes all the way through to compensation or you even get into those conversations, because they don't happen usually until later, although sometimes there might be a ballpark at the beginning . . . you get to

---

[262] Tae Hon Lee, Barry Gerhart, Ingo Weller & Charlie O. Trevor, *Understanding Voluntary Turnover:  Path-Specific Job Satisfaction Effects and The Importance of Unsolicited Job Offers*, 51 ACAD. MGMT. J. 651, 667 (Aug. 2008).

[263] Fanning Dep. at 50:7–51:2.

understand a bit more about your job worth [i.e., what your potential compensation could be].

iii.    The likelihood of engaging in salary negotiations with current employers, as well the likelihood of their success, largely depend on employees' ability and motivation to negotiate.  Ability is whether a worker has one or more alternative job offers.[264] With zero alternative employers, the employee has no actual leverage.  Motivation denotes the degree to which the salary of the alternative job is higher than the employee's current salary.  Negotiation is more likely to occur and succeed when both factors are maximized:  the employee has the ability because an alternative offer is in hand, and the motivation, because the offer has a higher salary.  For example, former SCA Chief Talent Officer Fanning testified that solicited employees can use offers "to negotiate or at least tell their current employer how valuable they are, but I'm staying because I'm really loyal to you."[265]  But "if [executives] cannot be solicited by certain companies," those employees "would miss out on the opportunities for that particular firm that wouldn't be proactively recruiting for them."[266]

### 4.    Because of Defendants' No-Poach Agreements, Employees Often Never Learned About Higher-Paying Job Opportunities.

73.    Here, I have reviewed extensive common evidence to conclude, based on my experience and research in compensation and human resource management, that because of Defendants' No-Poach Agreements, many candidates at Defendant firms never learned about outside opportunities with higher salaries because they never received the necessary phone calls, and their job mobility suffered.

---

[264] Barry Gerhart & Sara Rynes, *Determinants and consequences of salary negotiations by male and female MBA graduates*, 76 J. APPLIED PSYCH. 256 (1991).
[265] Fanning Dep. at 51:15–52:2.
[266] *Id.* at 52:3–17.

74.     DaVita.  DaVita stopped actively soliciting SCA employees:

a.     At the DaVita criminal trial, former DaVita COO Kogod testified that as part of the SCA-DaVita No-Poach Agreement, which DaVita executives "discussed openly," "there would be no outreach, no recruiting by either company[.]"[267]  According to Kogod,



b.     DaVita recruiting documents reflect this agreement.  For example, third-party recruiter Korn Ferry's "Search Status Report" for a Senior Vice President, Chief Development Officer role at DaVita commented next to SCA executive Joe Clark, "Will not pursue per client."[271]

---

[267] Ex. PX157 at 67:8–69:23.
[268] DOJCIV-008-00000304 at DOJCIV-008-00000316.
[269] DOJCIV-008-00000090 at DOJCIV-008-00000091.
[270] DOJCIV-008-00000304 at DOJCIV-008-00000307.
[271] Ex. PX275 at DVA00097065.

c.      The fact that DaVita and SCA stopped recruiting from each other is reflected in reports from employees that recruiters stopped recruiting them after they joined DaVita. ████████████████████

████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

d.      Similarly, DaVita's former VP of Communications Thurman testified that while at DaVita, he did "not receive[] a single call from a recruiter."[273]  He further testified that his colleagues "would also complain to me about the fact that none of them had ever received a call from a recruiter."[274]  The lack of cold calls from recruiters was abnormal:  "[W]hen you're not at DaVita, I used to get a lot of calls from recruiters, and so did my team." [275]  Moreover,

████████████████████████████████████████████████

██████████[276]  But by the time he decided to leave DaVita, he felt he had "[n]o career mobility" and was "limited in what I can do next in my field."[277]

---

[272] DOJCIV-007-00000105 at DOJCIV-007-00000105–06.

[273] Thurman Dep. at 21:1–6; *see also* Ex. PX124 at DOJCIV-012-00000133 (same).

[274] Thurman Dep. at 30:24–9; *see also id.* at 74:15–75:3 ("Just like any other company, people talk . . . my team kept coming to me to say, Why are we not getting recruiting calls?"); Ex. PX124 at DOJCIV-012-00000133 ███████████████████████
████████████████████████████ ; Thurman Dep. at 30:20–31:9 (confirming accuracy of ████████████ ).

[275] Thurman Dep. at 30:24–31:9, 74:15–75:3.

[276] Ex. PX124 at DOJCIV-012-00000133; Thurman Dep. at 253:5–254:3 (confirming accuracy of ████████████ ).

[277] Ex. PX126.

e. Thurman testified that DaVita successfully created an "invisible dog fence," wherein no DaVita employees left. "We all work really well together, but none of us left. We all stayed within these confines. And just like there's not a physical fence, there was an invisible fence. And we intuitively knew not to go outside of it, but we were stuck inside of it[.]"[278]

75. SCA. The evidence I have reviewed shows that SCA stopped cold calling DaVita and USPI employees:

a. Former SCA Chief Talent Officer Fanning testified with respect to SCA's no-poach conduct, "If a company is off-limits to a recruiter it also means that recruiters cannot go find employees at companies that would otherwise potentially be a target of that talent recruitment[.]"[279] ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ ██

b. Indeed, shortly after former SCA CEO Hayek left DaVita to lead SCA, Hayek went out of his way to assure DaVita's then-CEO Thiry that he would not poach from DaVita[281]:

> Although I have multiple open positions, I have not been calling DaVita people, because of our friendship and my respect for the Village. Moreover, there was a DaVita person in the process of being recruited for an SCA role when I joined, and, despite being an excellent candidate, I decided not to pursue them.

---

[278] Thurman Dep. at 36:12–37:2.

[279] Fanning Dep. at 52:18–24.

[280] DOJCIV-008-00000032 at DOJCIV-008-00000032; Fanning Dep. at 80:12–81:24 (confirming accuracy of ████████████████ ).

[281] Ex. PX484 at DVA_OMCEAL_000429389.

c.

d.      Hayek enforced the terms of the No-Poach Agreement:  for example, in December 2015 Hayek instructed Rucker and Fanning, "We should continue to flag USPI on our 'do not call' list to recruiters. . . . [W]e should not be making outbound calls to them[.]"[285] Fanning responded that she had "recommunicated this to our firms."[286]

e.      Rucker enforced the SCA-DaVita No-Poach Agreement.  For example, in July 2011, he assured DaVita's then-SVP Rodriguez that Rucker was "continuing to steer

---

[282] Ex. PX305 at DOJCIV-008-00000176; Rucker Dep. at 385:19–388:14 (confirming accuracy of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[283] Ex. PX281 at DOJCIV-00000041; Mosley Dep. at 34:23–35:1 (Mosley testified that she understood she needed to be truthful ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also* Ex. PX314 at DOJCIV-008-00000233 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[284] Ex. PX314 at DOJCIV-008-00000233.

[285] Ex. PX160 at SCA000002866.

[286] *Id.*

[287] Ex. PX305 at DOJCIV-008-00000178; Rucker Dep. at 102:7–22, 385:19–388:14 (Rucker testified that he was truthful and accurate in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

recruiting efforts away from DaVita teammates,"[288] and followed up in September 2011 to share that SCA had "turned away six or more inquiries from qualified DaVita teammates over the last six months."[289] As a result, SCA and DaVita employees' job mobility suffered: Rucker testified at trial that his "understanding of the [No-Poach Agreement] was to limit the number of employees or teammates that moved from DaVita to SCA or from SCA to DaVita."[290]

76. USPI. I have reviewed similar evidence of this behavior at USPI, which is consistent with a determination that USPI colluded with SCA to suppress labor competition:

a.

b. For example, former USPI recruiter McGarry testified that shortly after she started working at USPI, USPI's then-VP of Talent Acquisition Mosley "provided [her] with a list of companies that [she] was not to actively solicit for . . . CEO and administrator positions," including SCA.[293] Accordingly, when McGarry "came across a candidate [for an administrator

---

[288] Ex. PX333.

[289] Ex. PX335 at DOJ-PROD001A-00000239.

[290] Ex. PX158 at 408:5–16; *see also* Rucker Dep. at 82:16–83:16 (Rucker confirmed at his deposition that his prior testimony was truthful).

[291] Ex. PX508 at DOJCIV-008-00000218; Wilcox Dep. at 136:19–137:22.

[292] Ex. PX508 at DOJCIV-008-00000219; Wilcox Dep. at 138:20–139:1; *see also* Ex. PX98 at DOJCIV-012-00000124 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

[293] McGarry Dep. at 65:24–67:20; Ex. PX99.

position] on LinkedIn or CareerBuilder that was working at SCA," she "would not reach out to that candidate."[294]

     c.    Mosley also instructed third-party Catapult Staffing recruiters not to "poach [from] SCA under any circumstance."[295]

### 5. Defendants' Tell-Your-Boss Provision Further Limited Employee Bargaining Power and Mobility.

77.    <u>Defendants Implemented a "Tell-Your-Boss" Provision.</u>  Compounding this issue, and as further common evidence of the impact of Defendants' collusive conduct, both proactive and passive candidates at Defendant firms often did not receive job offers they could use as leverage or data points if they did not "did not want to inform their boss that they were leaving and looking for a new job"[296] (the "tell-your-boss provision").

78.    <u>DaVita.</u>

     a.    DaVita's former COO Kogod testified at the DaVita criminal trial about the tell-your-boss requirement: "[I]f a DaVita executive wanted to interview with one of these [co-conspirator] companies, they had to disclose to their boss that they were looking to leave the village and interview outside of the village. And that became one of the requirements before the other company could interview them."[297]

     b.    Likewise, current DaVita COO Staffieri testified that if one of former CEO Thiry's "friends or former executives was recruiting people from DaVita, he expected them

---

[294] McGarry Dep. at 74:17–75:5.

[295] Ex. PX216 at USPI_CIV_000010056.

[296] Fanning Dep. at 71:19–24.

[297] Ex. PX157 at 73:7–13.

-79-

to give him a phone call, give him a heads-up . . . before conversations were serious[.]"[298]  This included SCA CEO Hayek.

        c.      Current CEO Rodriguez corroborated this:  "There was a small subset of people that were viewed as friends and mentees of Kent.  And he thought it was polite, etiquette . . . that if they were going to recruit from one person that the person should notify their boss so that there would be transparency."[299]  Included within this subset was SCA CEO Hayek.[300]

     79.    SCA.

        a.      Former SCA Chief Talent Officer Fanning testified that "[w]here people [from USPI and DaVita] approached us and wanted to be considered for opportunities at SCA[,] . . . we had to go back to them and say, 'Sorry, can't consider you unless you notify your boss that you want to talk to us.'"[301]

        b.      Additionally, SCA told its external recruiters not to recruit from DaVita or USPI unless the candidate informed their boss first.[302]  This provision was not a suggestion—it was mandatory.[303]

---

[298] Staffieri Dep. at 35:2–22.

[299] Rodriguez Dep. at 144:1–11.

[300] *Id.* at 144:12–18.

[301] Fanning Dep. at 71:19–72:10; *see also* Ex. PX171 (Hayek instructed Fanning to tell a DaVita candidate "that we would only engage if he had already shared with his supervisor that he wants to explore outside opportunities and speak with SCA[.]"); Ex. PX172 (Fanning told a DaVita employee that SCA could not explore hiring him unless he received "explicit permission" from DaVita).

[302] *See, e.g.,* Ex. PX167; Ex. PX170 (Fanning told an external recruiter not to pursue hiring process with DaVita candidate unless candidate complied with the tell-your-boss provision); *see also* Rucker Dep. at 181:10–182:11 (SCA told external recruiters not to recruit from DaVita or USPI).

[303] Rucker Dep. at 162:18–23.

80.     USPI.

a.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ ██

b.     Wilcox's subordinates enforced this restriction. For example, former USPI VP of Talent Acquisition Shannon Mosley told third-party Catapult Staffing recruiters not to recruit from SCA unless the candidate "applied for a posting and is willing to inform his supervisor that he's talking to USPI."[305]

81.     The Tell-Your Boss Provision Had a Chilling Effect on Class Members. The tell-your-boss provision can expose employees to potential risks, such as the possibility that their current employer will react badly (e.g., by firing the employee on the spot or limiting the employee's opportunities for growth going forward). So ordinarily, before candidates are ready to have that conversation with their bosses, confidentiality is crucial. This expectation is by no means unusual—even Hayek (formerly at DaVita) believed that when SCA recruited him for the CEO position, he felt that he had the right to negotiate the job opportunity in private.[306] Herein, I discuss extensive evidence that is common to the Class that demonstrates the tell-your-boss provision likely harmed Defendants firms' employees, and that Class Members were likely paid below market or paid less than they otherwise would have been absent such a provision.

---

[304] Ex. PX508 at DOJCIV-008-00000218; Wilcox Dep. at 136:19–137:22.

[305] Ex. PX216 at USPI_CIV_000010056; *see also* Ex. PX221 (Mosley told Tanner not to schedule a call with a candidate because "[s]he would have had to apply for the job first. We cannot reach out to SCA folks. Take any SCA folks off the list.").

[306] Ex. PX316 at DVA00019821.

a.      Such a requirement will therefore have a chilling effect and will stop the hiring process in its tracks, because many employees will not want to risk negative reactions from their current employers if they do not have a safe place to land.

b.      In turn, such a provision reduces job mobility and exacerbates information asymmetries, because the employees never get far enough in the process to receive job offers. Former SCA COO Rucker, for example, testified that he did not "tell anyone at DaVita about [his] discussions with SCA or Mr. Hayek before [he] had an offer from SCA for employment," because he "thought that having a written offer from SCA represented a certain security and certainty[.]"[307]

c.      *DaVita.*  I have reviewed substantial evidence that the tell-your-boss requirement had a chilling effect and harmed DaVita employees, by dissuading them from pursuing and accepting better jobs or using their offers as leverage.  This evidence is consistent with (successful) collusion and is common to the Class.

i.      **DaVita Employees Would Not Want to Tell Their Bosses That They Were Exploring Job Opportunities.**  For example, former DaVita COO Kogod testified that people would not want to tell their boss[308]:

> There are a lot of people that just don't want to have that conversation.  It's a tough one to have. . . . [F]or the most part, once you make the decision to leave, sitting down with your boss and telling that person you're going to leave makes you somewhat vulnerable.  So I think it had a chilling effect with a lot of people.

---

[307] Ex. PX158 at 392:16–23; *see also* Rucker Dep. at 57:21–58:14 (Rucker confirmed he gave truth testimony at trial and would give the same responses at his deposition).

[308] Ex. PX157 at 73:13–19; DOJCIV-008-00000090 at DOJCIV-008-00000093 (███████ ██████████████████████████████████████████████████████████████████ ); Kogod Dep. at 45:5–46:14.

-82-

██████████████████████████████████████████ [309] Even Kogod, who admittedly benefitted from the agreement, thought the "restrictions on notification of one's boss was too much to ask for."[310]

       ii.      Former DaVita CEO Thiry knew that the tell-your-boss requirement would have this chilling effect. For instance, an internal document shows that when discussing DaVita's internal protocol regarding *intra*-company recruiting, even Thiry admitted that "*it will not work to tell people to talk to their bosses. Too many won't.*"[311] He made a similar statement to SCA's then-CEO Hayek regarding the departure of Rucker from DaVita to be an SCA executive[312]:

> If [Rucker] was going to leave anyway, why wasn't it the right thing to say[,] '[M]ichael [Rucker], call [D]a[V]ita and tell them that, and then I will give you an offer. I am not comfortable recruiting from that/those company/friends unless that is a public fact.' . . . *Most of the time the candidate refuses to do it, because they are not in fact sure they are going to leave.*

       iii.      ███████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████ ██

       iv.      The chilling effect of the tell-your-boss requirement extended to executives. Former DaVita VP of Communications Thurman testified that while at DaVita, he

---

[309] DOJCIV-008-00000304 at DOJCIV-008-00000307.

[310] PX157 at 139:25–140:11.

[311] Ex. PX330 at DVA_OMCEAL_000214999.

[312] Ex. PX316 at DVA00019822 (emphasis added).

[313] DOJCIV-007-00000105 at DOJCIV-007-00000107.

"would never tell Kent that [he] was trying to find a job and leave, because . . . [he] wouldn't want to have to then stay at DaVita and incur the frustration and anger from that."[314]

v.     Similarly, ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

vi.     **The Tell-Your-Boss Requirement Was Meant to Have a Chilling Effect on Job Exploration.** █████████████████████

████████████████████████████████████████

████████████████████████



vii.     **Employees Who Told Their Boss Faced Potential Retribution.**

Kogod further testified that DaVita employees were justified in fearing the repercussions if they complied with this provision[317]:

> [W]hat you're saying is, I'm unhappy; I'm leaving; I've made a decision. So when you think about future consideration for salary increases, your annual bonus, your performance rating, any stock equity—which was a big piece of DaVita's compensation package—that's what people would remember. This person was looking to leave; they're unhappy here; they're going to leave anyway, so we shouldn't give them this next big job; we shouldn't give them the right amount of

---

[314] Thurman Dep. at 139:22–140:7.

[315] Ex. PX124 at DOJCIV-012-00000132; Thurman Dep. at 137:16–138:15.

[316] DOJCIV-008-00000090 at DOJCIV-008-00000093 ████████████████████ ████████████████████████████ (emphasis added).

[317] Ex. PX157 at 89:16–90:7 (emphasis added).



options.  So *there was an absolute downside of making that known.  That's why most people do confidential searches; they don't want their boss to know*.



viii.    Kogod ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, Kogod

recalled "a couple of cases where the individual did let their supervisors know that they were

looking to leave, didn't see a career path, and there were ramifications after disclosing that."[320]

Specifically, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

ix.    For example, Kogod told the FBI what he witnessed when

"longtime DaVita teammate" Jung Lee "expressed an interest in pursuing other opportunities,

including outside of the village" [323]:

> [W]ithin a couple of days there were memos written about him from his two superiors, alleging a variety of kind of behavior leadership issues that were new to me, and I'm sure to others who knew Jung.  So it was a good example of, I followed the rules, and the response was, people are now writing emails and talking about alleged investigation for excessive alcohol use at company functions.  So I think it's a good example of what it can look like if it backfires on you.

---

[318] DOJCIV-008-00000090 at DOJCIV-008-00000093.

[319] *Id.*

[320] Kogod Dep. at 63:3–22.

[321] DOJCIV-008-00000304 at DOJCIV-008-00000313.

[322] *Id.* at DOJCIV-008-00000315.

[323] Ex. PX157 at 90:8–21 (emphasis added); Kogod Dep. 160:2–14.

Lee ultimately became a Senior Vice President at DaVita.[324]  However, DaVita foreclosed the range of alternative job opportunities that should have been available to him.  Thus, although Lee received a higher-level opportunity at DaVita, he may have had better opportunities outside of DaVita not only in terms of a better immediate job,[325] but perhaps also in terms of better later-career opportunities job, which he lost out on.  Moreover, although Lee did ultimately receive a higher-level opportunity at DaVita, this result is seemingly only because someone as powerful as then-COO Kogod stuck his neck out to protect Lee.[326]

x.      Not all, or even most, employees would be so fortunate; nor should employees need such good fortune to advance their careers (and be able to do so only at their current company).  This situation comports with Kogod's testimony at trial that the overall effect of telling your boss is negative[327]:

> [I]n some small number of cases, [the tell-your-boss requirement] elevated [the employee], and the employee walked away with a better position, at least for that time.  But *more times than not, it shut down conversations, it had a chilling effect*, and it took this opportunity off the table for DaVita employees who didn't want to have it.



---

[324] Kogod Dep. at 202:14-18; *see also id.* at 160:21–161:1.

[325] *See, e.g.,* Ex. PX124 at DOJCIV-012-00000133 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛);
Thurman Dep. at 24:3–18 (same).

[326] Kogod Dep. at 160:21–161:1 (Kogod testified at deposition, "I'd like to think because of my efforts, [Lee] ended up with the senior VP spot at [DaVita] Healthcare Partners in the California Market.").

[327] Ex. PX157 at 109:5–14 (emphasis added).

[328] DOJCIV-008-00000304 at DOJCIV-008-00000307.



███████████████████████████████████████ ██ ██████████

████████████████████████████████████████████████

████████████████████ ██ "far more times than not."[331]

xi.     Former DaVita VP of Communications Thurman confirmed the

negative consequences that came with telling one's supervisor about finding another job.  He

████████████████████████████████████████████████

█████████████████████████████████████████ ██ Thurman

elaborated, "once you decided that you were going to leave the tribe, especially if you were

going to leave the Village, if there was concern, especially if you were going to compete against

DaVita[,] . . . it would anger the leadership team, especially Kent Thiry."[333]

xii.     Internal documents and former DaVita VP Hayek's testimony

show that Hayek himself experienced the repercussions of the "tell-your-boss" provision when

---

[329] *Id.* at DOJCIV-008-00000313.

[330] *Id.*; *see also* DOJCIV-008-00000090 at DOJCIV-008-00000093 ████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ ); Kogod Dep. at 48:9–49:13.

[331] Ex. PX157 at 140:12–25; Kogod Dep. at 48:9–49:13.

[332] Ex. PX124 at DOJCIV-012-00000132; Thurman Dep. at 137:20–138:18 (Thurman confirmed the accuracy of ████████████████ ); *see also* DOJCIV-008-00000304 at DOJCIV-008-00000313 ████████████████████████████████████████████

████████████████████████████████████████████████

██████ ); Priest Dep. at 63:19–64:2 (Employees might be reluctant to tell their bosses before seeking employment elsewhere because of a "fear of the unknown, fear of conversation.  So that's common.  It's human nature.").

[333] Thurman Dep. at 139:8–21.

he decided to leave DaVita. When TPG, the then-majority owner of SCA went behind Hayek's

back to inform Thiry about Hayek's candidacy[334]:

> *[T]he net effect of the 'heads up' discussion* that occurred prior to [Hayek] discussing [his] decision to leave with [Thiry] *was to put [Hayek's] offer at risk* (eg, the request for TPG to withdraw it) *and to lower [his] ultimate economics* (eg, to freeze [his] offer and leave the 10% wiggle room regarding base + bonus untapped). None of this felt good or right.

      d.    *SCA.* I have reviewed similar evidence of the chilling effect of the tell-

your-boss requirement at SCA.

      i.    Former SCA Chief Talent Officer Fanning testified at her

deposition that a tell-your-boss requirement is "dangerous" to employees and would have a

"chilling effect."[335] She elaborated[336]:

> [If] you go to your boss and you say, 'Hey, I'm looking around, I'm thinking of leaving,' your boss might say to you, 'Well, you go then.' Or they might say, 'Oh, God, you know'—and some of [Hayek's] executives did that a lot and got substantial pay [raises] for doing so. Or your boss might turn around and say, 'No, no, no, I want to give you more money; please don't go.' Or they might question their loyalty and they might let them carry on working there, but they might find their career opportunities limited going forward. So *it's a very dangerous game to play.* Lots of people play it. But *it's generally not a good idea in my professional opinion*, in my view."

      ii.    Moreover, Fanning explained that it is unusual for candidates "to

tell their boss that they're planning to leave without having another job lined up," "and, in fact, if

---

[334] Ex. PX316 at DVA00019821 (emphasis added); *see also* Hayek Dep. at 120:2–126:9, 134:2–135:23.

[335] Fanning Dep. at 67:3–69:8.

[336] *Id.* at 69:9–70:5 (emphasis added); *see also id.* at 154:14–155:1 ("People do not usually want their employer to know if they are looking at other opportunities. . . [I]t's not usually a good thing for your employer to know that you might be seeking other opportunities.").

you do do that you're just putting yourself at risk, unless you have a high expectation that you can use it to negotiate with your boss."[337]

iii.     Likewise, SCA's former GVP of Human Resources Warren Cinnick testified that employees would not want to tell their bosses without an employment offer in hand[338]:

> My experience with it is that an employee is concerned that they're probably not going to get the job they're running for. So they have stepped away to run for office at another company. Let's say SCA. They're still employed back where they are, but they don't have the job in their hand at SCA. . . . So as a result, *they don't want to start to have a conversation back there about that topic because they don't have the other one solidified yet.* So that's . . . a very common motivation, in my experience, that a candidate will have, and it's understandable.

i.     Further, Fanning testified that even absent such a requirement, the hiring process can create risks for the candidate in their current position: if a job candidate receives an offer and uses it to negotiate with their current employer, "that can . . . backfire spectacularly, so you do have to be careful about that."[339] This process therefore becomes even riskier when employees are required to inform their bosses they are seeking employment elsewhere. As Fanning explained at her deposition[340]:

> *[I]t's a big deal for someone to go to their boss and say[,] 'I'm thinking about leaving and I want to explore something else.'* They don't have an offer in hand. They don't know anything about the job. They haven't even spoken to anyone else. They've been put in a pretty difficult situation.

---

[337] *Id.* at 70:6–15; *see also* Ex. PX158 at 385:2–13 (Fanning testified at the DaVita criminal trial that the tell-your-boss provision "means even if I really want to be considered for a job, I can't consider you unless you go and tell your boss. And people don't want to go and tell their boss, I am leaving, and I want to be considered by the other company, because you don't know how your boss is going to react. In a lot of cases, they're going to say, Okay. Bye. And then you're unemployed for six or twelve months until you find another job.").

[338] Cinnick Dep. at 29:4–30:9 (emphasis added).

[339] Fanning Dep. at 51:15–52:2.

[340] *Id.* at 109:18–110:6 (emphasis added).

ii.      Fanning could not recall any instances wherein SCA enforced this requirement against a candidate that resulted in a job offer outside of SCA, i.e., where the candidate told his boss, pursued the hiring process, and received a job offer.[341]

iii.     Similarly, former SCA COO Rucker testified that he agreed "that this provision . . . likely deterred SCA employees from seeking a job at DaVita if they had to first tell their boss at SCA."[342]

e.     *USPI.* I have also reviewed evidence of the tell-your-boss provision's consequences at USPI.

i.



ii.     Similarly, former USPI VP of Talent Acquisition Mosley complained to former USPI SVP, Chief Human Resources & Support Services Officer Sandi Karrmann that asking a candidate to notify their SCA supervisor "never pans out."[344]



---

[341] *Id.* at 72:4–20; *see also* Ex. PX158 at 385:2–16.

[342] Rucker Dep. at 157:16–158:21.

[343] Ex. PX508 at DOJCIV-008-00000220; Wilcox Dep. at 141:18–142:8.

[344] USPI_CIV_000000457.

[345] Ex. PX281 at DOJCIV-008-00000044 (emphasis added).

███████████████████████████

**C.** **Defendants' CSI Exchanges Likely Restricted Labor Market Competition.**

82.     In this section, I review common evidence that, based on my experience and research in compensation and human resource management, Defendants' Competitively Sensitive Information Exchanges would likely lead to Class-wide wage suppression.  Plaintiffs have developed an extensive record of evidence common to the Class to demonstrate that these CSI Exchanges, which Defendants engaged in under the guise of lawful benchmarking, are inconsistent with unilateral conduct and would have harmed employee pay.  This evidence includes statements from the FBI investigation interview reports, deposition testimony and exhibits, and documents produced in this litigation, as follows:

        a.     *Wage Data Exchanges Generally.*  Former USPI CEO Brodnax testified that USPI shared "growth stats"[346] with other companies in the ambulatory surgical center space,

---

[346] In addition to the wage data exchanges discussed at length in this section, note that the SCA-USPI CSI Exchanges were not limited to compensation information.  SCA VP of Strategy Brian Mathis also testified that SCA and USPI exchanged same-site case volume growth data twice a month at the beginning of his tenure at SCA, and later monthly.  Mathis Dep. at 42:20–43:2.  Mathis believed the exchanges started in late 2008 or early 2009, and he further testified he undertook them at Hayek's behest.  *Id.* at 43:7–21.  Indeed, for a decade SCA and USPI did not act like competitors, and exchanged the following (non-exhaustive) categories of information: net revenue per case (USPI_CIV_000113340; USPI_CIV_000114132); cash collections (USPI_CIV_000021103); Medicare acuity levels (USPI_CIV_000021181); number of cases through exchange contracts (USPI_CIV_000122223; USPI_CIV_000021210); supply costs per case or as a percentage of revenue (USPI_CIV_000021190); quality data (USPI_CIV_000321269); recruiter costs (USPI_CIV_000001857; USPI_CIV_000002122); information regarding messaging at physician-owned hospitals (USPI_CIV_000014178); economic impact study proposals (USPI_CIV_000105047); discussions about price-fixing (USPI_CIV_000016552); stock structures and management options (USPI_CIV_000014031; USPI_CIV_000014062); operating income margin disclosures in press releases (USPI_CIV_000016582); patient accounting and electronic health records (USPI_CIV_000015993; USPI_CIV_000015994; SCA000165836; SCA000957620); roadshow materials for raising capital (USPI_CIV_000472872); ASC facility quality initiatives (USPI_CIV_000321278); cyber security training (USPI_CIV_000006921); payor mix comparisons (USPI_CIV_000016007; USPI_CIV_000016572; USPI_CIV_000016019;

-91-

and particularly with SCA,[347] ████████████████████████████████ █ ███

████████████████████████████ [349] In other words, based on my experience and

research in compensation and human resource management, these exchanges would have

facilitated USPI's and SCA's ability to agree to set their pay rates lower than they otherwise

would have.

    i.     Former SCA CEO Hayek also testified that he occasionally asked

former USPI CEO and Chairman Wilcox and either former DaVita CEO Thiry or current DaVita

CEO Rodriguez to provide average wage increase data.[350]

    ii.     Likewise, SCA VP of Strategy Brian Mathis testified that SCA

exchanged yearly wage increase budgets with USPI, DaVita, and other competitors.[351] As

above, based on my experience and research, such exchanges would reduce threats of turnover

by lowering the labor market pay rate.

    iii.     Mathis elaborated that he recalled exchanging "a[n] expected

budgeted number for wage increases" for the following year with USPI, defined as "[a]

---

USPI_CIV_000016564; USPI_CIV_000016029; Ex. PX58; USPI_CIV_000016041); ASC
management options (USPI_CIV_000014031); medical device accounting
(USPI_CIV_000016013; USPI_CIV_000114069); nurse-patient ratios (*id.*); contract
management systems (USPI_CIV_000021128; USPI_CIV_000021077); charges for physician
credentialing process (SCA001314584); gender diversity mix and organizational hierarchies
(USPI_CIV_000000464; USPI_CIV_000000462); methodology to measure same-site growth
(USPI_CIV_000010321; USPI_CIV_000010971); facilities per accountant
(USPI_CIV_000131250; USPI_CIV_000131719); outlook by specialty, mix, and volume
(SCA001436215); revenue cycle management (SCA000681919; SCA000680384); and
forecasting processes (USPI_CIV_000010321).

[347] Brodnax Dep. at 42:3–18.

[348] DOJCIV-008-00000345 at DOJCIV-008-00000346.

[349] *Id.*

[350] Hayek Dep. at 362:18–363:7.

[351] Mathis Dep. at 53:14–56:20.

percentage that we would increase individuals' compensation in the aggregate" for employees' base pay. Mathis testified he exchanged this information directly with USPI's former General Counsel and CFO Cagle and/or USPI's former CFO Mark Kopser.[352]

        b.    *2012.* Specifically, in May 2012, SCA's Mathis emailed USPI's then-CFO Kopser seeking information about SCA's compensation for an internal audit manager: "We pay our internal audit manager 150K[.] Is that close to what you pay[?] If you can share great[.]"[353] Mathis followed up with information about the corresponding SCA roles[354]:

> A few years ago we combined our compliance and our audit departments and now have a single VP ($175k + 40% potential bonus) that leads both. *There is a director who focuses solely on audit which is probably the relevant position to compare to and she has a base of $103k with potential bonus of 25%.*

        i.    Even USPI's and SCA's general counsel exchanged salary information. For example, in May 2012 Cagle requested that SCA's General Counsel Rick Sharff provide the total compensation for the number two lawyers at SCA.[355] Sharff provided even more than Cagle initially sought[356]:

> Had a number 2 until he left last fall. *He was around $145K with a 40% bonus opportunity.* Might have been a little low from a total comp perspective for what I was expecting from the position. *Haven't refilled the position yet, and if I do I will probably shift to the handful of equals (have them on the low side, in my opinion-- $120K base plus 10% bonus potential for 10-year lawyers).* Just to calibrate, associates in the good firms here make $100-130K, and new full equity partners probably make $200-225K or so.

        i.    Likewise, former SCA COO Rucker testified that in or around 2012 and 2013, he reached out to Rodriguez, DaVita's current CEO, "to obtain future wage

---

[352] *Id.* at 68:20–71:14.

[353] Ex. PX523 at OMC_BM_000010778.

[354] *Id.* (emphasis added).

[355] Ex. PX234.

[356] *Id.* (emphasis added).

increase" and "merit pool information."[357]  Rucker also testified that he "exchange[d] with USPI

merit pool information."[358]  These exchanges were mutual.[359]

> c.    *2013.*  In August 2013, Mathis emailed USPI's then-CFO Cagle with the

following request:  "One of the things we have shared in the past is plans for the following year

wage increases.  Have you all started [to] set a number yet that you're planning to budget?"[360]

Cagle responded, "Not yet, but probably will nail down the second half of August.  We'll

remember to share with you when we do."[361]

> d.    *2014.*  In May 2014, former USPI VP of Financial Operations English

emailed Cagle with the subject line, "Contacts a[t] SCA Baylor and Tenet for PTO Policy and

Accrual Inquiry?"[362]  She wrote[363]:

> Sandi [Karrmann] [then USPI's SVP, Chief Human Resources & Support Services
> Officer] has asked me to find out what other companies do around accruing PTO
> based on 'hours worked.'  She specifically mentioned reaching out to SCA, Baylor
> & Tenet.  Do you have contacts that either you or I could pose the question to?  Are
> there other companies with similar workforces that you think we should reach out?
> *I would really like to ask for their current PTO policies and accrual rates and
> compare the structure to ours*[.]

Cagle then had various accounting contacts at SCA and Tenet forwarded to English who could

"definitely find the correct answer."[364]

---

[357] Rucker Dep. at 255:10–257:3.

[358] *Id.* at 254:24–255:9.

[359] *Id.* at 260:11–20.

[360] Ex. PX37.

[361] *Id.*

[362] Ex. PX140.

[363] *Id.* (emphasis added).

[364] *Id.*

i.  In December 2014, Mathis again emailed Cagle with the subject "Re: Overhead Benchmarking," saying[365]:

> Here is a draft template as a starting point.  Let me know if you would suggest any changes or want to review what the departments are before we both fill it in.  At one point *in the past I think we had done both number of FTEs [full-time equivalents]*[366] *and dollars.  Do you want to take that approach again?*

Cagle forwarded this email internally and instructed, "I want to compare G&A [general and administrative expenses in financial planning and analysis] with SCA."[367]  Based on my experience and research in compensation and human resource management, the sharing of this data and subsequent discussion of expenses is consistent with a discussion about expenses that include labor costs.

e.  *2015.*  After Tenet acquired USPI in April 2015, Mathis wrote to SCA executives:  "My inclination is to continue to share data with USPI in many of the same ways we have since 2008 *as it has proven to provide helpful insight*."[368]  Neither Mathis, Hayek, Sharff, Clark [SCA's then-Executive VP of Development], Rucker, nor Clemens [SCA's then-Executive VP and CFO] expressed reservations or instructed that SCA stop the exchanges of output, costs or wages.[369]  Rather, Clark and Rucker agreed, and Rucker responded, "I am supportive of us continuing to apply what we can learn from them to advance our agenda and do not personally see any additional downside given the [T]enet relationship."[370]

---

[365] Ex. PX138.

[366] Full-time equivalent employees are a unit of measurement used to compare the workload of different employees (i.e., full-time employees vs. part-time employees).

[367] *Id.*

[368] SCA000862885.

[369] *Id.*

[370] *Id.*

f.    *2018.*  Moreover, in 2018 Mathis wrote to SCA executives that SCA and USPI had exchanged confidential corporate overhead budget costs [i.e., salary, technology, administrative costs, etc.] broken out by each administrative department, *approximately every two years for the last decade.*[371]

83.    CSI Exchanges Reduce Class Pay.  Based on my experience and research in compensation and human resource management, Defendants' CSI Exchanges were likely to lower Class pay for the following reasons:

a.    None of the extensive types of data exchanged were published to the public or to the affected employee victims of the suppressed compensation.[372]  This suggests that Defendants used the data for nefarious purposes (i.e., to fix wage rates).

b.    The identity of the competitor producing the data was completely disclosed to the other competitor.[373]  Sharing information that links wage data with competitor identities is inconsistent with the behavior of employers who are competing for labor.[374]

c.    Moreover, the granularity of the overhead expense data exchanged was significant.[375]  For example, SCA and USPI admittedly used the data to set their respective

---

[371] Ex. PX501 at SCA002277742; Mathis Dep. at 43:19–47:8.

[372] *See* Ex. PX235 (Wilcox ordering that the overhead exchanges be disclosed only to himself, USPI's then-CFO Jason Cagle, and USPI's then-President Brett Brodnax and not the whole management group); Ex. PX135 (SCA states that general and administrative ("G&A" data is not filed publicly, but is shared only with SCA's banks and bondholders); USPI_CIV_000467624 and USPI_CIV_000411546 (sample USPI quarterly results and SEC filings contain none of the exchanged information).

[373]  *Id.*

[374] BARRY GERHART, COMPENSATION 268–269 (14th ed. 2023).

[375] *See e.g.,* USPI_CIV_000113333 and USPI_CIV_000113335; Ex. PX497; USPI_CIV_000962508 and USPI_CIV_000962509 (USPI calculated salaries based on the overhead G&A data shared by SCA and attaching detailed comparison of expenses); Ex. PX138A (a template to compare SCA and USPI expenses by department with SCA managers broken out).

annual merit increases, and USPI also used the data to facilitate its cost reduction efforts, which would necessarily include the largest cost: employee compensation.[376]

      d.     Based on my review of the evidence, the "overall effect of the information exchange [was] to interfere with competitive prices and artificially hold down wages."[377]

### D. Defendants' No-Poach Agreements and CSI Exchanges Harmed Employee Compensation.

84.     In this section, I review evidence that, based on my experience and research in compensation and human resource management, is consistent with the effects of successful collusion that is common to the Class and inconsistent with the behavior and effects of employers that compete for labor. As expected, Defendant firms benefited from their anticompetitive conduct whereas their employees experienced suppressed job mobility and compensation. The evidence I review includes statements given during FBI interviews, deposition testimony and exhibits, and testimony from the DaVita criminal trial.

85.     DaVita.

      a.     ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ The No-Poach Agreement was "intended to benefit" DaVita and operated at the expense of "[p]eople wishing to leave DaVita."[379]

      b.     For instance, former DaVita VP of Communications Thurman testified that he would discuss his salary with a friend of his who worked in executive compensation for a

---

[376] Mathis Dep. at 53:5–63:5, 66:5–76:6; Ex. PX232; Ex. PX37; Kopser Dep. at 32:3–38:2, 105:5–108:9; Cagle Dep. at 119:24–120:23; Ex. PX240 at USPI_CIV_000686081 (USPI Cost Reduction Analysis notes that SCA has "the only good comp" for the G&A comparison, and that SCA would likely cooperate in the information exchanges).

[377] BARRY GERHART, COMPENSATION 268–269 (14th ed. 2023).

[378] DOJCIV-008-00000090 at DOJCIV-008-00000098.

[379] Ex. PX157 at 69:24–70:2.

national company.[380]  "[O]n occasion I would reach out to him and say, I just want to benchmark this; like am I even in the ballpark?  And he would say, No you're way, way under for your role."[381]

        c.     Additionally, Thurman testified to "a general feeling of frustration at the wage suppression idea and the lack of mobility, the opportunity to . . . get a different or a better job . . . the way people normally go about their lives, professional lives.  There was a general frustration with that."[382]  DaVita employees "knew that they weren't making what they could make," but had limited access to higher-paying opportunities both externally and internally because of the No-Poach Agreement.[383]  ███████████████████████████████████ ████████████████████████████████████  Thurman's assessment is also consistent with CSI Exchanges, because even absent the SCA-DaVita No-Poach Agreement, SCA and DaVita's CSI Exchanges would have kept the labor market rate low and deprived employees of higher-paying opportunities in this way as well.

        d.     Former DaVita CEO Thiry also confirmed that DaVita's "turnover was way lower than our competition."[385]  The lower turnover is to be expected where employees

---

[380] Thurman Dep. at 45:8–46:8.

[381] *Id.*

[382] *Id.* at 78:9–22; *see also* Ex. PX157 at 208:19–21 (Kogod testified that the SCA-DaVita No-Poach Agreement resulted in less opportunities for DaVita employees) and Kogod Dep. at 66:16–67:8 (Kogod confirmed he gave truthful testimony).

[383] *Id.* at 78:20–80:1; *see also* Ex. PX124 at DOJCIV-012-00000134 (████████████████ ██████████████████████████████ ███████████████████); Thurman Dep. at 154:18–155:7 (Thurman testified that his ███████████████████████).

[384] Ex. PX124 at DOJCIV-012-00000133.

[385] Thiry Dep. at 109:11–110:19.

could not move and/or had to tell their boss first, and where higher-paying opportunities did not exist because collusive CSI Exchanges suppressed the labor market rate.

e.   Indeed, █████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████

f.   Former SCA Chief Talent Officer Fanning also testified at trial and confirmed at her deposition that absent the SCA-DaVita No-Poach Agreement, DaVita would have been a top three "'priority company'" to proactively recruit from, because it "had a very similar approach to talent that Andrew [Hayek] had created and was trying to create at SCA."[387] Generally speaking, DaVita was a company to target for qualified healthcare executives. . . . DaVita had the characteristics of a company that would be included on a list of target companies for [an] SCA [] search. . . .  In general, DaVita had fairly desirable candidates and [DaVita employees] would have been pursued but for the gentleman's agreement."  But because of the No-Poach Agreement, DaVita employees never learned about those opportunities.

86.   SCA.

a.   ████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████

b.   █████████████████████████

---

[386] DOJCIV-008-00000090 at DOJCIV-008-00000091.

[387] *Id.* at 33:15–34:18; Ex. PX157 at 221:16–222:3.

[388] Ex. PX331 at DOJCIV-007-00000051; *see also* Rucker Dep. at 155:18–156:10 (confirming his ████████████████ ).

[389] *Id.* (emphasis added).



Moreover, Rucker's testimony is consistent with an assessment that Defendants' CSI Exchanges further limited employees' options because once Defendants fixed the labor market rate, higher-paying job opportunities simply would not exist.

c. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████ ███████████████

███████████████████████████████████████

███████████████████████ ███████████████

███████████████████████

87. USPI.

a. ███████████████████████████

███████████████████████████████

███████████████████████████████████ █

█████████████████████████████

███████████████████████████████████████

██████████ █

[390] DOJCIV-008-00000345 at DOJCIV-008-00000349.

[391] *Id.* at DOJCIV-008-00000351.

[392] Ex. PX88 at DOJCIV-008-00000358; Garvin Dep. at 204:6–206:21.

[393] Ex. PX508 at DOJCIV-008-00000213; Wilcox Dep. at 130:8–131:2 (confirming his statement was truthful).



The foregoing is likewise consistent with the collusive effects of competitor CSI Exchanges. As above, even absent the SCA-USPI No-Poach Agreement, USPI employees could only take higher-paying external jobs in theory. The employees would have been able to move companies in name only, because Defendants' wage-fixing would have suppressed the labor market rate and higher-paying jobs would not have existed at all.

d. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This concern is consistent with a determination that USPI's collusive no-poach and wage-fixing conduct had the intended effect of keeping employee pay rates low.

e. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

As above, those USPI employees were harmed because they never learned about opportunities that otherwise would have been available to them.

---

[394] DOJCIV-008-00000345 at DOJCIV-008-00000349.

[395] Ex. PX88 at DOJCIV-008-00000358; Garvin Dep. at 80:21–81:13, 86:12–18 (confirming he gave truthful ▮▮▮▮▮▮▮▮▮).

[396] Ex. PX88 at DOJCIV-008-00000360–61; Garvin Dep. at 93:15–94:9.

[397] Ex. PX555 at DOJCIV-007-0000006.

### E.    Wage Suppression Can Persist for Years.

88.    In this section, I review compensation-related literature, statements from the FBI investigation interview reports, and deposition testimony and exhibits and explain that the impacts of artificial wage suppression on employee pay can be felt long-term.

89.    Once wages are artificially depressed, they can remain depressed well after the cause of the suppression has ended.  This extended effect occurs because markets adjust over time, but not necessarily quickly.  Moreover, such adjustments will not necessarily remedy the persisting wage trajectory, because losses accumulate over time.

90.    The academic literature widely recognizes this principle.  Gerhart and Milkovich observe that "even a small initial salary disadvantage can take many years to be eliminated."[398] Further, the crowding literature explains that women's occupations have lower wages today because of decades-old restrictions on women in many occupations.  These restrictions created an imbalance between a highly supply of female job candidates and a limited demand for them in most roles other than nurses, teachers, secretaries, and the like.  And the consequences continue to be reflected in lower wages in female-dominant occupations today.[399]

91.    Accordingly, companies, such as Starbucks, Amazon, and Bank of America, recently instructed recruiters not to ask candidates about prior compensation or benefits (i.e.,

---

[398] Barry A. Gerhart & George T. Milkovich, *Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm*, PAY EQUITY: EMPIRICAL INQUIRIES (R. Michael & H. Hartmann, Eds. 1989); Barry Gerhart & Sara Rynes, *Determinants and Consequences of Salary Negotiations by Graduating Male and Female MBAs*, 76 J. APPLIED PSYCH. 256–262 (1991); Armen Alchian, *Information Costs, Pricing, and Resource Unemployment*, 7 ECON. INQUIRY, 109–128 (1969).

[399] BARRY GERHART, COMPENSATION  Ch. 17 (14th ed. 2023).  Elaine Sorensen, *The Crowding Hypothesis and Comparable Worth*, 25 J. HUMAN RES. 55–89 (1990); Kimberly Bayard, Judith Hellerstein, David Neumark, & Kenneth Troske, *New evidence on sex segregation and sex differences in wages from matched employee-employer data*, 21 J. LAB. ECON. 887–922 (Oct. 2003).

their "salary history").[400]  The logic is that if, as a general matter, women are paid less than men, the salary difference will amplify if subsequent employers rely on salary history to craft job offers.  Likewise, approximately twenty states prohibit salary history questions for this reason.[401]

92.  ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ ██

## VII. DEFENDANTS IMPLEMENTED STRUCTURED COMPENSATION SYSTEMS THAT MAINTAINED INTERNAL AND EXTERNAL EQUITY.

93.  In this section, I describe the process for designing a systematized compensation structure.  I assess the evidence demonstrating that Defendants employed compensation professionals trained to implement and maintain systematized compensation structures.  I also review evidence showing that this included assigning internal value to jobs, creating salary grades and ranges, benchmarking their internal structures to external data, implementing pay policies, and regularly updating the compensation structure, among other practices.

94.  Further, I assess the compensation-related literature and evidence to explain that a fundamental objective of Defendants' structured compensation systems is to achieve equity. External equity means paying similar employees similarly to employees in other companies doing similar work and making similar performance contributions.  In the absence of external equity, a company is at greater risk of employee turnover.  However, if pay is suppressed in these other companies, achieving external equity will require lower labor costs than in a competitive

---

[400] RAYMOND NOE, JOHN HOLLENBECK, BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCES MANAGEMENT:  GAINING A COMPETITIVE ADVANTAGE, 513 (13th ed. 2023).

[401] RAYMOND A. NOE, JOHN R. HOLLENBECK, BARRY GERHART, & PATRICK M. WRIGHT, HUMAN RESOURCE MANAGEMENT:  GAINING A COMPETITIVE ADVANTAGE (14th ed. 2024).

[402] DOJCIV-008-00000345 at DOJCIV-008-00000347.

market.  Internal equity means paying employees within the same company similarly to other employees within the same company doing similar work and making similar performance contributions.  Internal equity depends on maintaining certain pay differentials based on job title, level, performance, etc.  Any time these differentials stray from the internal equity objective (e.g., two employees doing similar work and making similar performance contributions are paid very differently), the goal is to correct the outliers so as to avoid undesirable and costly employee reactions to perceived pay inequity.  Finally, I review evidence of Defendants' compensation structures to explain why objectives to pay for performance *and* to maintain internal equity are not mutually exclusive, and rather are compatible.

95.     The role of compensation is to attract candidates to work for the compensation, prevent them from leaving for jobs elsewhere (because turnover is costly), and motivate them to perform their jobs well.  The compensation-related literature describes some of the factors at work here—that employees search for and leave if they find jobs that pay better than their current positions.  In addition, pay fairness concerns affect a range of employee behavior, from motivation to perform jobs to decisions to search for new jobs or leave.

96.     What constitutes "fair" is based on the comparisons that employees make with others doing similar work.  They also care about how they are paid as compared to employees doing similar jobs elsewhere,[403] but as they stay in their current organizations, their comparisons additionally shift to include those with whom they work even if the jobs are not identical.[404]

---

[403] *See, e.g.,* Peter Cappelli & Peter D. Sherer, S*atisfaction, Market Wages, and Labor Relations: An Airline Study*, 27 INDUS. REL. 56–73 (Jan. 1988).  In this study, pay satisfaction depended on the gap between current pay and market averages.

[404] *See, e.g.,* Peter Cappelli & Peter D. Sherer, *The Effect of a Two-Tier Wage Plan on Employee Attitudes*, 43 INDUS. & LABOR REL. REV. 225–44 (Jan. 1990).  New hires who entered a firm under a lower, two-tier pay scale eventually shift their referents from outside the firm to the inside.

Moreover, they care about whether their performance is recognized and rewarded, again typically in a relative context: common sense and academic theory and research dictate that we want to be paid better than others if we believe our performance is better than their performance.

97.     The reason employers care that their employees feel that pay is fair is that if pay feels unfair (i.e., if they are paid less than referents), it may stifle productivity or harm retention. This well-documented phenomenon is known in organizational psychology as "equity theory." Fairness, or equity, is based on what we contribute to a job relative to what we get out of it; we compare that ratio to what we see in our referents, and when we believe it is unfair, we try to adjust it.[405]

98.     As a result, compensation in such organizations, including in Defendant firms, is organized within a carefully designed system. This system is highly structured and seeks to maintain internal equity and to adapt to market pressures.

## A.     Defendants Employed Highly-Trained and Qualified Compensation Professionals.

99.     In this section, I explain that compensation professionals are trained to design and implement systematized compensation structures that maintain internal and external equity. I also review evidence that Defendant firms' employed compensation professionals with the requisite education and training to maintain Defendants' systematic compensation structures. Finally, I review evidence regarding WorldatWork as a source of continuing education for compensation professionals.

---

[405] The foundational study relevant here is J. Stacy Adams, *Toward an understanding of inequity*, 67 J. ABNORMAL & SOC. PSYCH. 422–36 (1963). *See also* Charlie O. Trevor, Greg Reilly & Barry Gerhart, *Reconsidering pay dispersion's effect on the performance of interdependent work: Reconciling sorting and pay inequality*, 55 ACAD. MGMT. J. 585–610 (Sept. 8, 2012).

100.    The evidence I reviewed includes deposition testimony and exhibits, documents produced in this litigation, statements from FBI investigation interview reports, and compensation-related literature.

101.    The education and professional standards for workers in the compensation management field in the United States are highly standardized.  Compensation management professionals are trained to design and administer compensation systems that maintain internal and external equity.  One source of this set of practices is compensation textbooks, of which there are essentially two:  *Compensation* by Gerhart (2023) and *Strategic Compensation* by Martocchio (2020).  The first editions of these books were published in 1984 and 1998, respectively.  I am the author of *Compensation* and am familiar with *Strategic Compensation.* Most compensation professionals who began studying compensation management in college likely learned from one of these two books, which provide similar descriptions of how to design and administer compensation systems.  Working adults pursuing an MBA and similar degrees in part-time programs would also be likely to use these books in a compensation class.

102.    Defendants' Compensation Professionals.  I have reviewed extensive evidence that Defendants were no exception to this trend and employed many highly-educated and credentialed compensation professionals.

a.    *DaVita Employed Highly Trained Compensation Employees.*  DaVita's employees responsible for compensation had extensive education and training in the field.  For example, DaVita employed Laura Mildenberger, Robert Chipman, and Colleen Arthur, who were all heavily involved in human resources functions and highly educated in the area of compensation.

     i.  Laura Mildenberger served as DaVita's Chief People Officer / Senior Vice President, and VP of Operations. As Chief People Officer / SVP, Mildenberger "manage[d] a $298 [million] budget, [led] a 302-person team, and over[saw] recruiting policies and procedures, benefits planning and execution, compensation requirements, talent management and HR adherence for . . . teammates in the United States[.]"[406] "Under her guidance, People Services . . . revolutionized its on-boarding processes and launched several new programs that improved recruiting strategies and processes, increased retention, and enhanced [DaVita's] compensation and benefits policies."[407] In her Operations role at DaVita, Mildenberger was likewise responsible for "human resource management and expansion."[408] Prior to her tenure at DaVita, she led human resource management and expansion as a VP of Operations at Matrix Rehabilitation, Inc., and also oversaw "clinic operations, financial management . . . and personnel management" at NovaCare Outpatient Rehabilitation as a General Manger/Clinical Operations Director.[409]

     ii.  Robert Chipman is a former DaVita VP of Recruiting and Talent Management and People Services Group Director. As VP of Recruiting and Talent Management, Chipman oversaw the "internal-recruiting function for external hires," as well as the "talent-management system to develop and train and grow our existing teammates."[410] He also "picked up the HR-information systems process," and "oversaw the diversity and inclusion initiatives."[411] Previously, as People Services Group Director, Chipman was responsible for

---

[406] DVA_OMCEAL_000277557 at DVA_OMCEAL_000277557.

[407] *Id.* at DVA_OMCEAL_000277558.

[408] Ex. PX192 at DVA_OMCEAL_000277554.

[409] *Id.* at DVA_OMCEAL_000277554–55.

[410] Chipman Dep. at 70:8–22; Ex. PX248 at RC_OMCEAL_0000062–63.

[411] *Id.*

-107-

"[g]eneral HR process and procedure for all of the clinics . . . west of the Rockies," including "hiring, onboarding," "coaching of the managers, in terms of how they interact with their employees," "handling any types of disputes amongst employees and their managers," and "developing good pay practices for managing [] employees."[412] Chipman was highly educated: he obtained an MBA from the Keller Graduate School of Business at DeVry University, and also held a Certificate of Organizational Development from DePaul University.[413]

        iii.       Similarly, Colleen Arthur worked at DaVita as a Senior Director of Recruiting Operations, Strategy & Employment Branding, Senior Director of Compensation, and Director of Compensation.[414] Arthur, as Director of Compensation, "was responsible for certain parts of [DaVita's] administrative operating responsibilities, including [DaVita's] annual compensation review process."[415] With respect to the annual compensation process, "one of [Arthur's] primary responsibilities was supporting the creation of materials for [DaVita's] compensation committee."[416] She also was responsible for: "supporting the team and the individuals on the team who were managing [DaVita's] system for compensation recommendations;[417] creating reports for DaVita's internal senior leaders, "ensuring approval of all decisions, and then working with payroll to ensure that all the decisions were then transitioned into [DaVita's] payroll system for payment"; and supporting "the equity team on the compensation team, similar to the support for payroll, to ensure that all of the decisions that were

---

[412] Chipman Dep. at 28:6–29:6; Ex. PX248 at RC_OMCEAL_0000063.

[413] Ex. PX248 at RC_OMCEAL_0000064.

[414] Ex. PX70 at 1–2.

[415] Arthur Dep. at 28:20–29:10.

[416] *Id.* at 29:11–20.

[417] *Id.*; *see also* Ex. PX70 at 1–2.

approved were processed appropriately."[418] Arthur was extensively educated and trained in the compensation field. She has a bachelor's degree in economics from the University of Virginia, where she performed well in her studies,[419] as well as a Master of Business Administration Degree in Business Administration and Management from the Darden Graduate School of Business Administration at the University of Virginia.[420] She has also attended the Total Rewards WorldatWork conference regarding compensation (discussed below).[421]

          b.       *SCA Employed Highly-Credentialed Workers to Manage Compensation.*

          i.       Similarly, the evidence I have reviewed about SCA shows that Chief Talent Officer Bridie Fanning, who was well educated about personnel management and compensation, ran SCA's human resources team. Fanning performed SCA's "human resources function, and that consisted of everything you would expect from running a human resources function: leading the team, paying benefits, recruitment, board responsibilities with regards to the compensation committee, Andrew[] [Hayek's] pay, executive compensation, communications."[422] She had more than sufficient education and training to carry out these responsibilities. Fanning received her doctorate in corporate education from the University of Pennsylvania Graduate School of Education, where she jointly studied at the Wharton School.[423] Additionally, Fanning has three master's degrees, in strategic personnel management, corporate education, and business management.[424] She has worked "in the human resources field for over

---

[418] Arthur Dep. at 29:21–30:21.

[419] *Id.* at 18:16–25; Ex. PX70 at 3.

[420] Arthur Dep. at 21:19–25; Ex. PX70 at 3.

[421] Arthur Dep. at 22:7–23:1.

[422] Fanning Dep. at 28:8–22.

[423] *Id.* at 12:17–13:5.

[424] *Id.* at 13:6–9.

30 years," where she has acquired extensive experience in "recruiting and job replacement work[.]"[425]

        c.    *USPI Relied on Highly-Qualified Human Resources Professionals.*  USPI also employed persons to run compensation and recruiting who were well educated in human resources and compensation.

        i.    For instance, at USPI (and later Tenet), Sandi Karrmann oversaw the human resources function as SVP and Chief Human Resources & Support Services Officer, which included overseeing compensation administration, such as the annual merit budget, among other duties.[426] Part of her responsibilities included working on the annual merit budget. Karrmann was highly qualified. She graduated from the University of Michigan in 1987 and obtained an MBA from the University of Southern California in 1992.[427] After graduating and prior to starting with USPI, Karrmann worked in senior-level human resources roles for numerous companies that one would expect would maintain structured compensation systems consistent with best practices, including Macy's, Bullock's, Heller Financial, Meritage Homes, and Yum Brands.[428] She also was a Compensation Manager at Frito-Lay.[429]

        ii.    Similarly, Shannon McGarry previously worked as USPI's primary internal Senior-Level Employee recruiter, wherein her "responsibilities were to recruit CEOs [for USPI's surgical hospitals], administrators, and regional vice presidents."[430] Prior to occupying

---

[425] *Id.* at 13:10–18.

[426] Karrmann Dep. at 22:11–23:19; 32:19–34:6; 34:24–35:16, 37:1–48:12.

[427] *Id.* at 29:16–23.

[428] *Id.* at 30:2–31:16.

[429] *Id.*

[430] McGarry Dep. at 23:24–27:12.

this recruiting role, she earned a master's degree in human resources/training and development.[431]

103. <u>WorldatWork Is a Valuable Resource for Compensation Professionals.</u> Once compensation professionals enter the workforce, WorldatWork becomes a valuable source of continuing education. WorldatWork reports that it has 65,000 members and subscribers worldwide.[432]

a. *Use by Defendants.* Defendants' human resources professionals, similar to human resources professionals from other employers, likely used WorldatWork. The evidence I reviewed shows that DaVita and SCA relied upon WorldatWork as a resource. For example, former DaVita Senior Director of Compensation Arthur attended the Total Rewards WorldatWork conference regarding employee compensation.[433] DaVita also regularly compared its merit increases to WorldatWork data.[434] Similarly, as part of its 2014 salary range refresh, SCA used WorldatWork to research "historical salary range movement in the market."[435]

b. *Certification.* WorldatWork offers a certification for compensation professionals called the Certified Compensation Professional© (CCP©).[436] The certification's coursework emphasizes the design and administration of structured compensation systems. *See* **Figure 4** for examples of (CCP©) course content.

---

[431] *Id.* at 37:3–7; Ex. PX98 at DOJCIV-012-00000121.

[432] WORLDATWORK, CERTIFICATION (2025), https://worldatwork.org/certifications.

[433] Ex. PX70; Arthur Dep. at 18:16–25, 22:7–24:5.

[434] Ex. PX19 at DVA_OMCEAL_001399751; Ex. PX201 at DVA_OMCEAL_000944847.

[435] BF00098905.

[436] *Learning Options, Designing and Managing Base Pay Systems*, WORLDATWORK, https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual.

**Figure 4**[437]

**WorldatWork® Total Rewards Association**
**Certified Compensation Professional | (CCP©)**

**Sample Course Titles (3 of the 8 required courses): Designing and Managing Base Pay Systems; Market Pricing and Competitive Pay Analysis; Compensation Analytics and Insights**

**One course in more detail: Designing and Managing Base Pay Systems**

## What You Will Learn:

- Important concepts like compensation philosophy, internal vs. external pay equity, relevant labor markets, benchmark jobs and market-pricing.
- Key steps to build a base pay structure – job analysis, documentation, evaluation and job worth hierarchy.
- Base structure design components like range spread, minimum, midpoint, and maximum, midpoint differentials, range overlap plus methods to adjust and maintain pay structures.
- Determination of individual pay rates, including concepts like new- hire rates, pay differentials, step rate pay progression, merit increases, skill-based pay, promotions, equity adjustments and pay compression.
- Merit pay programs, pay for performance and merit matrix development.
- Pay transparency, communications about pay programs and compensation program audits.

       c.     *Compensation Surveys.* WorldatWork regularly surveys its membership to facilitate benchmarking of compensation practices against other companies. These surveys provide extensive evidence that U.S. companies implement the types of formalized compensation structures described and taught in the aforementioned widely-used compensation textbooks (Gerhart (2023); Martocchio (2020)) and in the WorldatWork CCP© coursework. WorldatWork survey data show that the typical U.S. company uses systematized compensation

---

[437] WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025), https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual.

structure policies and practices. Specifically, the typical U.S. company relies on job analyses, job evaluations, market surveys and external market data, market pay lines, salary grades/ranges, midpoint progression (i.e., fixed percentage differentials) between pay grades/ranges, grade/rate ranges, and merit pay increase grids. Below, I describe these features in detail, as distilled from Gerhart (2023), Martocchio (2020), and WorldatWork. These sources provide consistent descriptions of American companies' compensation systems.

### B. Defendants Designed Systematized Compensation Structures.

104. The design of compensation systems is a two-step process: (1) create an internal structure to assign relative internal value to jobs and sort jobs into clusters or hierarchies (job groups or families) reflecting the organizational hierarchy and advancement pathways; and (2) benchmark the internal structure to external market data. I will take both steps in turn.

105. In this section, I also review evidence including compensation-related literature, deposition testimony and exhibits, documents produced in this litigation, and statements from the FBI investigation interview reports.

### 1. Step 1: Assign Internal Value to Jobs.

106. This step requires developing an internal structure. A major purpose of an internal structure is to assign relative internal value or worth to jobs. For example, what is the value of a Vice President of Talent Acquisition relative to a Director? This relative value can be expressed as a percentage differential. Companies choose such percentage differentials to support various objectives, e.g., internal equity. Where competitive market forces operate, the pay differentials that support internal equity often become similar over time to the pay differentials that support external equity (i.e., percentage differentials between jobs found in external market pay surveys) as a shared view within and across organizations on the relative value of jobs develops.

107. <u>Job Analysis.</u>  To begin developing an internal structure, human resources professionals first undertake job analysis, which is the "systematic process of collecting information that identifies similarities and differences in the work."[438]  In part, this process involves classifying groups in families or groups that that reflect the firm's job professional hierarchy and promotional pathways.

a. Industrial psychologist Dr. Robert J. Harvey notes two important features of job analysis.  First, job analysis should describe observable characteristics of jobs.  Second, at this point, the analysis should not take into account individual people in those jobs.  In other words, the goal is to describe the job, not individuals in the job.[439]

108. <u>Job Content.</u>  Specifically, job analysis entails collecting information on job content (e.g., tasks, activities, work demands), characteristics of employees who hold these types of jobs (e.g., technical skills, manual dexterity, leadership), internal relationships (e.g., supervisors, peers), and external relationships (e.g., regulators, customers, suppliers).[440] Henderson (2006) describes a series of questionnaire examples firms use to collect this kind of information in their organizations.  O*NET Online—a revision of the U.S. Department of Labor Dictionary of Occupational Titles—is an example of these systems.  O*NET includes a set of overarching descriptors:  abilities, interests, knowledge, skills (basic), skills (cross-functional), work activities, work context, work styles, and work values.[441]

---

[438] BARRY GERHART, COMPENSATION 109 (14th ed. 2023).

[439] R. J. Harvey, *Job Analysis*, *in* HANDBOOK OF INDUS. & ORG. PSCH. 71–163 (arvin. D. Dunnette & Leatta. M. Hough eds, 1991).

[440] BARRY GERHART, COMPENSATION Ch. 4 (14th ed. 2023); JOSEPH J. MARTOCCIO, STRATEGIC COMPENSATION: A HUMAN RESOURCE MANAGEMENT APPROACH, (10th ed. 2020); KEVIN F HALLOCK, PAY:  WHY PEOPLE EARN WHAT THEY EARN AND WHAT YOU CAN DO NOW TO MAKE MORE (2012).

[441] O*NET ONLINE, https://www.onetonline.org/ (last visited Jan. 14, 2025).

109.     Levels of Information.  Job analysis provides information that ranges from specific ("element") to general ("occupation").  Common levels of information are:  element, task, position, job, occupation, and job family.[442]  An element can be as specific/simple as putting a piece of paper in a scanner to scan a document.  A task might be the multiple elements taken together that are necessary for scanning.  A group of tasks performed by one person makes up a position.  Identical positions make up a job at one company.  An occupation is the same job across companies.  A job family is a "group[] of occupations based upon work performed, skills, education, training, and credentials."[443]  For example, software developers and biostatisticians would be occupations that are both part of the computer and mathematical job family.

110.     Job Analysis Output.  The main output of a job analysis is a job description that contains key job characteristics and a job specification that includes key person characteristics necessary to do the job, as illustrated by evidence from Defendant firms:

a.     *DaVita.*  For example, DaVita instructed that job descriptions used for job mapping purposes should include "[g]eneral purposes of [the] job," "[e]ssential duties and % time for each," "[e]ducation and [e]xperience," and "[s]pecialized requirements."[444]

b.     *SCA.*  In 2018 SCA undertook a job mapping assessment wherein it described the various functions of each job that it could later use to map to salary ranges.[445]

---

[442] BARRY GERHART, COMPENSATION Ch. 4 (14th ed. 2023); JOSEPH J. MARTOCCIO, STRATEGIC COMPENSATION : A HUMAN RESOURCE MANAGEMENT APPROACH (10th ed. 2020).

[443] O*NET ONLINE, https://www.onetonline.org/ (last visited Jan. 14, 2025).

[444] Ex. PX85 at DVA_OMEAL_001067255–56.

[445] SCA002226644 (cover email), SCA002226645 (attachment), and SCA002226646 (attachment).

   c.  *USPI.* An internal USPI spreadsheet tracking compensation ranges for senior-level positions included a "Job Description" sheet to delineate each title's function, job family, summary, responsibilities, and qualifications.[446]

### 2.  Step 2: Job Evaluation and Benchmarking.

111. Job evaluation represents the next step in setting up a compensation system or structure. Job evaluation "is the process of systematically determining the relative worth of jobs to create a job structure for the organization. The evaluation is based on a combination of job content, skills required, value to the organization, organizational culture, and the external market. This potential to blend organizational forces and external market forces is both a strength and a challenge of job evaluation[.]"[447]

112. <u>Compensable Factors.</u> Prior to benchmarking jobs to external data, companies often identify "compensable factors," i.e., the factors for which the company assigns value, to distinguish the value of different jobs. For example, compensable factors might include complexity, leadership, responsibility, etc. The idea is that jobs with more valuable compensable factors should receive higher job evaluations, and in turn, higher pay, because they contribute more value to the company. However, note that we are not yet focused on pay levels, but rather on differentiating jobs in terms of their relative value to the organization.

   a.  Job evaluation can take a variety of specific forms, but the common objective is to order jobs in terms of relative worth. One form of job evaluation is the point-factor approach. Using this approach, after each compensable factor for a job is defined, a set of degrees (i.e., levels) for each factor is created.

---

[446] USPI_CIV_000214742 (cover email) and USPI_CIV_000214746 (attachment).

[447] BARRY GERHART, COMPENSATION 144 (14th ed. 2023).

b.     For example, **Figure 5** below shows the compensable factor of complexity.  Each job is assigned a degree and complexity.  The same process is followed to assign degrees on the other compensable factors for each job.  The sum of the points across compensable factors for each job indicates its internal value.  Percentage differentials in point values for jobs indicate their relative internal value to the company.

**Figure 5:  Example of a Compensable Factor (Complexity)[448]**

| Degree | 1st | 2nd | 3rd | 4th | 5th | 6th |
|---|---|---|---|---|---|---|
| Points | 20 | 40 | 60 | 80 | 100 | 120 |

| Degree Definitions for Complexity (of Duties) Compensable Factor | |
|---|---|
| Complexity of duties involves the degree of independent action, the extent to which the duties are standardized, the exercise of judgment, the type of decisions the job requires and the exercise of discretion, resourcefulness, or creative effort in devising methods, procedures, products, scientific applications, etc. | |
| 1st Degree – Little Judgment | Understand and follow simple instructions and use simply technology involving few decisions. |
| 2nd Degree – Some Judgment | Perform repetitive or routine duties working from detailed instructions and under standard procedures.  Requires the making of minor decisions. |
| 3rd Degree – Simple Analytical Judgment | Plan and perform diversified duties requiring an extensive knowledge of a particular field, and the use of wide range of procedures.  Involves the exercise of judgment in the analysis of facts or conditions regarding individual problems or transactions to determine what action should be taken, within the specifications of standard practice. |
| 4th Degree – Complex Analytical Judgment | Plan and perform a wide variety of duties requiring general knowledge of company policies and procedures applicable within area of responsibilities, and including their application to cases not previously covered.  Requires considerable judgment to work independently toward general results, devising methods, modifying or adapting standard procedures to meet different |

---

[448] MIDWEST INDUS. MGMT. ASS'N, MIMA'S GUIDE TO THE EFFECTIVE USE OF ITS JOB EVALUATION PLAN (SHOP) (1974).

| | conditions, making decisions based on precedent and company policies. |
|---|---|
| 5th Degree – Advanced Analytical Judgment | Plan and perform difficult work where only general methods are available. Involves highly technical or involved projects, presenting new or constantly changing problems. Requires outstanding judgment and initiative in dealing with complex factors not easily evaluated, also making of decisions for which there is little precedent. |
| 6th Degree – Advanced Judgment and Ingenuity | Plan and perform complex work which involves new or constantly changing problems where there is little accepted method of procedure. Involves participation in the formulation and carrying out of company policies, objectives and programs for major decisions or functions. Considerable ingenuity and exceptional judgment required to deal with factors not easily evaluated, interpret results and make decisions carrying a great deal of responsibility. Direct and coordinate the work of subordinate supervision in order to attain objectives. |

113.     Salary Levels, Ranges, and Grades.  While job evaluation need not be this explicitly quantitative, any form of job evaluation must group and order jobs on the basis of their relative value, as the necessary result of any job evaluation procedure is a set of salary grades/ranges.  I describe ranking ("simply orders job descriptions from highest to lowest based on a global definition of relative value")[449] and classification forms of job evaluation ("a job description is compared to descriptions of existing groupings or classes of jobs to determine which class of job it most aligns with in terms of value").[450]  For example, SCA's 2018 job mapping assessment assigned levels, codes, and grades to job titles to map onto salary ranges.[451]

a.     Firms also used fixed percentage pay differentials between jobs at different levels of a grade/range system.  Specifically, survey data indicate that companies used a

---

[449] BARRY GERHART, COMPENSATION 150 (14th ed. 2023).

[450] Id. at 151.

[451] SCA002226644 (cover email), SCA002226645 (attachment), SCA002226646 (attachment).

-118-

fixed percentage differential between salary midpoints of grades/ranges, referred to as the "midpoint progression." [452] The survey data also show that the most typical midpoint progression for salaried employees is 10–30%. Thus, if a firm increases the pay for grade 1 by 10%, then the firm must also increase the pay for grade 2 by 10% to maintain the chosen midpoint progression policy.

b. In addition to deciding on salary midpoints, firms also need to set the minimum and maximum pay for each salary grade/range. Range spread is defined as (pay maximum – pay minimum) / pay minimum. Survey data indicate that the typical range spread is 46–59%.[453] A single midpoint progression (i.e., a percentage differential between pay midpoints) typically pertains to all adjacent grades/ranges, from the bottom to the top of a particular structure, with the caveat that they are often somewhat larger at higher pay grades/ranges. The typical practice of using a (single) midpoint progression indicates that companies seek to maintain specific, fixed differentials between different grades/ranges. These fixed differentials can be maintained even as pay level policy choices change.

c. The most common structures are market-based structures, wherein pay range minimums, maximums (and midpoints) are "anchored" to the 25th, 50th, and 75th percentiles.[454] **Figure 6** below illustrates this point:

---

[452] WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023).

[453] *Id.*

[454] *Id.*; *see also* BARRY GERHART, COMPENSATION 282 (14th ed. 2023) ("Quartiles (25th and 75th percentiles) are often used to set pay ranges.").

**Figure 6**[455]

| Market-Based |
| --- |
| • Range spreads of 30% to 80% and midpoint progressions of 10% to 15% growing wider for higher-level jobs |
| • Minimums and maximums are anchored to market data points and encompass the reasonable wage span of the job in the market (i.e., 25th, 50th and 75th percentiles) |

114. <u>Defendants Implemented the Foregoing Principles.</u>  The evidence I have reviewed shows that Defendant firms implemented the foregoing principles and created salary grades and ranges and is common to the Class.

a. *DaVita.*  DaVita's pay structures included salary ranges, levels, and structured pay differentials:

i. **Job Levels.**  DaVita had job families/groups, job titles therein, job levels, and salary minimums, midpoints, and maximums.  For instance, the Compensation Team was able to pull internal DaVita base and Maximum Bonus Potential data for all incumbent Division Vice Presidents in the company upon request.[456]  Similarly, DaVita tracked 25th percentile, 50th percentile, 75th percentile and average annual salary and maximum bonus potential for GVPs and DVPs companywide.[457]  The Compensation Team could pull internal pay ranges upon request to determine a pay increase for an employee promoted to Vice President.[458]  The documents showed that DaVita effectively had job levels, in that it conducted "internal valuation" "to ensure equity between lanes/positions."[459]

---

[455] WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023).

[456] Ex. PX74.

[457] Ex. PX75.

[458] Ex. PX83 at DVA_OMCEAL_001057524; *see also* Ex. PX84 at DVA_OMCEAL_001321377 (With respect to Division Vice Presidents and Directors, "[i]t is okay to move forward with analysis of how incumbents compare to our ranges[.]").

[459] Ex. PX85 at DVA_OMCEAL_001067252.

ii. **Pay Differentials Based on Market Value.** DaVita employed standard market-based structures, wherein a firm "anchors" pay range minimums, maximums (and midpoints) to the 25th, 50th, and 75th percentiles.[460] For example, former DaVita VP of Recruiting and Talent Management and People Services Group Director Chipman testified that with respect to pay processes, "there's a value that the organization has for a role, and that goes into looking at what it contributes to the organization."[461] As such, by ranking or grouping jobs based on their relative value, point factor, ranking, and classification, companies use job evaluation methods as vehicles to create salary grades/ranges. [462]

iii. **Salary Ranges Within Similar Jobs.** DaVita ensured that similar roles were paid within a similar range. For instance, Chipman testified that at DaVita, "as an HR professional, I do want to make sure that similar roles are within a relevant range." Specifically, "[t]hat means that there is a range of pay for individuals based on their experience, skill sets, geography, and that you can compensate individuals within that range based on the performance and potential."[463] The documentary evidence showed this concept at work with respect to specific employees. For example, in discussing what bonus to award an employee promoted to Senior Director, DaVita internally compared his bonus to the relevant range[464]:

> Given that he is already very well compensated, we are a little limited if *we don't want him completely out of line with other Senior Directors*. So, our recommendation is a ███ increase to his salary, which would bring him to about

---

[460] WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023); *see also* BARRY GERHART, COMPENSATION 282 (14th ed. 2023) ("Quartiles (25th and 75th percentiles) are often used to set pay ranges.").

[461] Chipman Dep. at 34:2–11.

[462] Note that job evaluation is not a process that is conducted each year. Rather, it is a process that would most likely be conducted as part of developing a set of grades/ranges. Job evaluation would be used later as needed (e.g., for newly created jobs).

[463] Chipman Dep. at 60:15–24.

[464] Ex. PX27 at DVA_OMCEAL_001339898 (emphasis added).

▮▮▮▮▮ base and then increase his bonus potential to ▮▮▮. ▮▮▮ *is pretty much the top of the range for Sr Director bonus levels.* Most are between ▮▮▮▮▮ The median salary for Sr Directors is around ▮▮▮, so he is well above that with this offer.

Current DaVita COO Staffieri also testified that the People Services Group helped determine the "top end of pay for certain jobs," such that these roles had a maximum pay not to be exceeded.[465]

iv. These salary ranges within similar jobs also applied to bonuses. DaVita established maximum bonus potential for employees. DaVita not only set maximum bonus potential for employees, but checked to make sure the compensation structure was being applied correctly to specific individuals. For example, in 2018, DaVita's Compensation Team informed DaVita KidneyCare CEO Rodriguez that, with respect to merit bonuses, "we didn't do a merit if the [employee] was recently promoted and/or was recently hired."[466] Further, "if a[n] [employee] had a bump up in [maximum bonus potential] during the year, we prorated their bonus based off weighted average [maximum bonus potential]."[467] Current CEO Rodriguez also testified that he approves all equity grants, and reviews these grants "to see if they make sense," i.e., to see whether they are "in a range that I believe to be appropriate for the role."[468]

v. **Pay Differentials and Ranges Within and Between Job Levels.**
DaVita used fixed percentage pay differentials between jobs. For example, when DaVita Health Solutions sought to "determine wage ranges for new positions being created," it reached out to DaVita's Compensation Team for "base salary and bonus information" for multiple jobs and job levels simultaneously: Division Vice President, Regional Director, and Group Regional Director

---

[465] Staffieri Dep. at 143:11–25; *see also* Ex. PX19 at DVA_OMCEAL_001399752.

[466] Ex. PX267 at DVA_OMCEAL_001238631.

[467] *Id.*

[468] Rodriguez Dep. at 83:14–84:6.

-122-

positions.[469]  The Compensation Team then provided 25th, 50th, and 75th percentile wage data for each job to assist with this process of choosing minimum, midpoint, and maximum pay for each job and the relative pay (midpoint progression) between these different jobs and job levels.[470]

        b.     *SCA.*  The evidence shows that SCA used salary ranges, minimums, midpoints, and maximums for its employees.  SCA maintained job families/groups, job titles therein, and job levels, and used salary minimums, midpoints, and maximums.

        i.     SCA human resources professionals Bridie Fanning and Warren Cinnick testified to this structure.  For example, former SCA Chief Talent Officer Fanning testified that "there were ranges for different levels for different jobs for different markets, geographies."[471]  Further, Fanning testified that SCA employed salary ranges based on not just the job, but the type of job within that level.  She testified that at SCA[472]:

> [Employees at the Vice President level and above] were paid according to their job. So you might be a VP of technology . . . and your market rate for that specific job might be this kind of range.  If you're a VP of HR then you're going to have a different kind of range.  If you're a VP of business development you're going to have a different kind of range again.  So *it's by job skill set.  It's not just by level.*

Similarly, SCA Group VP of HR Warren Cinnick testified that SCA employed a salary structure that placed each job within that structure:  "The salary structure has a minimum and a maximum targeted pay, [and] has a midpoint pay. . . .  And each job resides somewhere in that structure."[473]

        ii.     This pay structure included consideration of merit increases, and SCA applied that compensation to individual merit increase decisions.  Thus, former SCA COO

---

[469] Ex. PX81 at DVA_OMCEAL_001068252.

[470] *Id.* at DVA_OMCEAL_001068251.

[471] Fanning Dep. at 172:13–19.

[472] *Id.* at 173:13–174:1 (emphasis added).

[473] Cinnick Dep. 65:4–18.

Rucker testified that with respect to merit increases, SCA "start[ed] at a certain percentage of the median . . . pay rates for different roles[.]"[474] Lump sum awards were then used to "reward a teammate for performance when the teammate is outside the salary range for the role (higher)."[475]

iii. SCA regularly reviewed its salary structure to ensure that it was consistent with the healthcare industry and actively encouraged its managers to follow that structure in making compensation decisions. For instance, in 2015, SCA circulated a document regarding its annual merit planning process that explained[476]:

> We have reviewed SCA's salary ranges to ensure they are in line within the healthcare industry. We have provided salary ranges in the Compensation Management System (CMS), so you see this individual information for each teammate. *We encourage you to maintain compensation levels within the noted ranges to ensure we remain competitive.*

CMS also included "the salary range midpoint and range penetration for each teammate."[477] Managers were informed, "The range penetration you see is focused on the mid-range of the healthcare market. You will be able to evaluate each teammate's compensation in relation to this mid-range. For example, if a teammate were at the midpoint of the range, the range penetration would be 50%."[478]

c. *USPI.* Similar to DaVita and SCA, the evidence shows that USPI maintained job structures and pay ranges.

---

[474] Rucker Dep. at 263:5–13.

[475] SCA001363536 at SCA001363537.

[476] Ex. PX34 at SCA000109832 (emphasis added).

[477] *Id.* at SCA000109836.

[478] *Id.* at SCA000109837.

i.      The documents delineate USPI's job families/groups, job titles therein, and job levels using spreadsheets.[479]

ii.      USPI also used pay ranges.[480]  As demonstrated by **Figure 7** below, these ranges included salary minimums, averages, and maximums:

**Figure 7**[481]

| Position | USPI Minimum | Average | Maximum |
|---|---|---|---|
| RVP | $140,000.00 | $198,691.90 | $ 300,000.00 |
| Market President | $245,000.00 | $300,451.11 | $ 346,006.00 |
| Administrator | $ 69,875.00 | $124,650.73 | $ 211,160.98 |
| CFO | $ 98,800.00 | $151,100.43 | $ 271,294.40 |
| CNO | $122,387.20 | $137,843.41 | $ 159,764.80 |
| CEO | $163,000.03 | $188,193.90 | $ 250,016.00 |
| COO | $ 111,758.40 | $ 132,904.51 | $ 154,999.94 |
| CSO | | | |
| CHRO | | | |
| CMO | $ 22,184.00 | $221,846.00 | $ 221,846.00 |
| AA | | | |
| Director of Nursing | $ 68,744.00 | $106,912.00 | $ 158,600.00 |
| Director of Operations | | | |
| Clinical Director | $ 61,443.20 | $ 98,979.25 | $ 144,185.60 |
| BOM | $ 39,728.00 | $ 68,985.92 | $ 144,200.00 |
| RN (Full Time) | $ 44,928.00 | $ 77,222.85 | $ 135,200.00 |
| RN (PRN) | $ 15,177.60 | $ 19,258.83 | $ 27,289.60 |
| RN (Part Time) | $ 17,810.00 | $ 56,184.16 | $ 77,851.28 |
| RN (Regular Part-Time | $ 39,800.00 | $ 60,138.00 | $ 80,475.20 |

iii.      USPI applied this overall salary and job structure to individual compensation decisions.  For instance, USPI Chief Development Officer Andrew Johnston testified that to set salaries for administrators, USPI considered "the range of salaries that we were paying to current administrators in the position."[482]

---

[479] *See, e.g.,* USPI_CIV_000214742 (cover email) and USPI_CIV_000214746 (attachment with a sheet delineating each job title's family).

[480] *See, e.g., id.* at USPI_CIV_000214744–45 (Mosley requested salary range and minimum/midpoint/maximum data for Administrator, Regional VP, Regional Director, Market President, Hospital CFO, Hospital CEO, Hospital Chief Nursing Officer, Assistant Chief Nursing Officer, and Hospital COO titles).

[481] *Id.*

[482] Johnston Dep. at 51:17–24.

-125-

iv.     The documentary evidence shows that USPI put these salary ranges into action for individual compensation decisions.  For instance, a USPI document shows Johnston referring to USPI's pay scales in an email regarding a merit increase for an incumbent Vice President[483]:

> I would like to get specific with Vanessa about what she can expect over the next year.  Are you comfortable committing to ███████████████████████ ██████████ whenever the raises are given next year?  *That gets her up the scale* fairly rapidly, but she will still be on the lower end of the MP [Market President] comp.  I would like to commit to this, assuming she performs as we expect.

v.     When working with recruiters, USPI human resources professionals communicated pay ranges as part of the recruiting process.  For instance, former USPI VP of Talent Acquisition Mosley testified that when she hired external recruiters to fill administrator positions, she "would have to provide a range in salary" for the recruiters to share with candidates.[484]  And when a "group vice president or a market vice president" informed Mosley that USPI "needed to recruit an RVP" a salary range for that position "could come up," and Mosley "would have an idea of what the range was based on past hires."[485]  Similarly, former USPI recruiter McGarry testified that when recruiting candidates, during her "initial conversation with the hiring manager about the position I do ask . . . is there a range that they would like to pay this person.  And typically they will provide me with a range of what they can pay."[486]  For instance, Mosley and/or USPI Market Presidents would provide pay ranges for open RVP positions, whereas RVPs provided pay ranges for open hospital CEO and administrator positions.[487]

---

[483] Ex. PX455 (emphasis added).

[484] Mosley Dep. at 96:18–97:5.

[485] *Id.* at 108:16–24.

[486] McGarry Dep. at 63:11–17.

[487] *Id.* at 64:20–65:7.

115.    Defendants Benchmarked Their Internal Pay Structures Against External Pay
Data.  Next, potential pay levels, salary midpoints, and minimums and maximums are
benchmarked against data for equivalent jobs in the labor market.  Jobs that are identical across
similar employers are referred to as "benchmark" jobs.  Benchmark jobs are similar enough in
their content to be meaningfully matched across companies.  They are important because
employees regularly express concerns to their employers about external equity, meaning fairness
in how similar jobs at different companies are paid.

a.      Surveys of show that employees are very concerned about external equity.
For example, a WorldatWork (2011) survey of compensation professionals demonstrated that
28% of employees "frequently" or "constantly" express concern regarding external equity or
fairness of base pay amount, and 51% "occasionally" express concern.[488]

b.      I have reviewed evidence in this litigation showing that employees at
Defendant firms were also concerned about external equity.

c.      *DaVita.*  Deposition testimony and documents from DaVita show that
DaVita employees were concerned about external equity.

i.      Former DaVita VP of Communications Thurman testified that in
his experience, his "direct reports [were] concerned about being paid fairly for the work that they
did,"[489] and he was also concerned about his own pay "in comparison to others at [his] level,"
because he "knew . . . [i]t was below market level."[490]  Thurman himself expressed concerns

---

[488] K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness:  Slippery Slope or Manageable Terrain?*, 20 WORLDATWORK J. 50–64 (Fall 2011).

[489] Thurman Dep. at 31:18–32:1.

[490] *Id.* at 32:2–25.

about his own pay to his supervisors, and received assurances that his salary would be adjusted appropriately.[491]

      ii.      DaVita also asked its employees to communicate their concerns about external equity. For example, a 2012 presentation regarding DaVita's merit pool reported that in 2007, 60% of employees who responded to a Village Engagement Survey stated that they felt their pay was unfavorable "[i]in comparison with people in similar jobs in other companies."[492]

      d.      *SCA.* The deposition testimony and documents show that SCA employees were also concerned about external equity.

      i.      SCA GVP HR Cinnick testified[493]:

> It's fair to say that *individuals take stock of where they're at in the marketplace on a regular basis. . . .* [T]here was no doubt that [SCA employees] would do that. What they would do with that information once they got it in their head . . . whatever their source was that they were not paid so well or that they could be paid more or that they could make money—sometimes they'd take it up with their boss, sometimes they would take it up by looking for a job outside.

      ii.      For instance, in 2015, SCA's then GVP of Strategy and Payer Engagement Brian Mathis expressed this concern to SCA's then CEO Hayek and then-COO Rucker about his compensation[494]:

> I want to call out [something] I noticed in there [a worksheet with Mathis's 2014 pay data] that I was not sure how to handle: It showed my ███████████ ████████████████████████████████████ I raised this as I was under the impression we pay bonuses based on current comp. If that is not true then I'd like to discuss it given ████████████

---

[491] *Id.*

[492] Ex. PX19 at DVA_OMCEAL_001399749. Note that read the other way around (i.e., 40% of DaVita employees who responded to the survey felt their pay is unfavorable "[i]in comparison with people in similar jobs in other companies") the survey results nonetheless demonstrate that many DaVita employees were concerned about external equity.

[493] Cinnick Dep. at 53:1–19 (emphasis added).

[494] SCA001123358 (cover email) and SCA001123359 (attachment) (emphasis added).

███████████████████████████████████

iii.     Similarly, 2017 SCA internal email discussed compensation for a Financial Operations Manager who "expressed some concerns . . . about being paid fairly for the type of work and amount of hours."[495]

e.     *USPI.*  The documentary evidence shows that USPI employees, including senior executives, were also concerned about external equity.

i.     This employee concern about external equity was raised with USPI executives.  For instance, then-Group President Andrew Johnston flagged concerns from Regional Vice Presidents about being underpaid relative to similar executives at other companies.  In an email, he wrote to his superiors[496]:

> [A]pparently there was a recruiter that called each of my RVPs recently to discuss an RVP job for Victory with a starting base of $250K.  *There is a general feeling among the RVPs . . . in Houston that our comp ranges are below market for Administrators and for RVPs.*

f.     *Benchmarking.*  Given widespread external equity concerns, benchmark jobs can ultimately be used to match a company's internal compensation structure (i.e., the relative value of jobs in terms of job evaluation points assigned) that I have described with the value (as indicated by pay level) assigned by the external market.  Put plainly, this matching allows for a direct comparison of internal value and external value for these jobs.[497]  It ultimately enables a company to decide how to price jobs (i.e., what pay level is chosen), and wages for

---

[495] Ex. PX530 at SCA001191901.

[496] Ex. PX455 (emphasis added).

[497] The process of deciding on appropriate peer groups to use in benchmarking pay against other companies and finding the right market data and the appropriate survey is described in the literature, including by KEN CARDINAL & BETH FLORIN, HANDBOOK FOR CONDUCTING COMPENSATION & BENEFITS SURVEYS (2012); and by BARRY GERHART, COMPENSATION (14th ed. 2023).

-129-

those jobs form the foundation of a pay system.[498]  Over time, in a properly functioning labor market, the internal and external value indicators tend to converge.

         i.      Real-world survey data corroborates widespread use of comparing pay for benchmark jobs.  According to WorldatWork, most companies use market pricing, which means that if they have a benchmark job that matches a benchmark job in the external pay survey, they typically aim to pay their job (on average) the same as the pay in the external market pay survey.[499]

         ii.      For example, if a company's Director job's content etc. match best to a job in the external market pay survey called "Administrator" (actual content match, not title match, is what matters), then the company might well choose to pay Director job at the 50th percentile pay level for Administrator jobs in the external market pay survey.  That might, for example, be $150,000.  The company would group jobs with similar job evaluation rankings and similar pay levels in external market pay surveys into grades/ranges.  The company would then set its midpoint for that range at $150,000 (or slightly higher or lower, depending on the other jobs in that range and what their external market pay levels are).

         iii.      Clearly, and as discussed at length below, if pay levels in the market for any of these benchmark jobs have been artificially depressed, then pay in for these

---

[498] To simplify exposition, I have focused on salaries.  For the average employee, wage and salary income accounts for the majority of compensation.  But there are other components in total compensation, including bonuses, stock, stock options and benefits.  The proportion of compensation that comes from bonuses, stock plans, and individual performance is higher on average at higher job levels (e.g., KEVIN F. HALLOCK, PAY:  WHY PEOPLE EARN WHAT THEY EARN AND WHAT YOU CAN DO NOW TO MAKE MORE, 92 (2012); BARRY GERHART, COMPENSATION 349–50, Exs. 10.2–10.3 (14th ed. 2023).

[499] BARRY GERHART, COMPENSATION 295 (14th ed. 2023).

jobs in a company will also be lower, given that its pay midpoints are chosen to reflect pay levels in the external market.

iv.  Pay for jobs that cannot be matched well to benchmark jobs is determined based on their job evaluation ranking relative to job evaluation rankings for jobs that can be benchmarked.  For example, let's say that the job "Regional Operations Director" cannot be matched, but it has 60 job evaluation points.  We know that the "Director" job has been matched and it has a pay midpoint of $150,000 and 80 job evaluation points.  Thus, one estimate of what the "Regional Operations Director" level should be is 60/80 x $150,000 = $112,500.[500] Similar interpolation could be done using the ranking and/or classification methods of job evaluation.  As a result, artificially depressed external pay levels would also affect non-benchmark jobs, given that non-benchmark jobs are priced based on how many job evaluation points they have relative to benchmark jobs that can be priced directly to the market.  The relative value of different jobs is reinforced and maintained by the use of job evaluation as well as by pressures for internal equity, discussed below.

116.  Defendants Relied on the Foregoing Benchmarking Practices.  I have reviewed extensive evidence of Defendants' benchmarking practices in this litigation.  Note that while of course Defendants had to keep pay in some reasonable range with respect to the labor market, their No-Poach Agreements and CSI Exchanges likely enabled them to:  (1) pay substantially less than would have been required of them in the absence of these anticompetitive practices;

---

[500] A better, more sophisticated approach is to use regression analysis to regress an external pay survey salary on internal job evaluation points and use the resulting equation as a policy line.  By plugging job evaluation points into the equation, one can obtain better estimates of predicted salaries for non-benchmark jobs.  *See*, *e.g.,* Chapter 8 of BARRY GERHART, COMPENSATION (14th ed. 2023) and/or chapter 11 of RAYMOND NOE, JOHN HOLLENBECK, J. BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCE MANAGEMENT:  GAINING A COMPETITIVE ADVANTAGE (13th ed. 2023).

and/or (2) in a large number of individual cases, suppress pay.  As discussed above, Defendants'

conduct would likely have artificially depressed external pay rates, such that Defendants could

safely offer their employees lower compensation than they otherwise would have.

Benchmarking against peer companies where pay suppression exists provides a less costly path

to achieving external equity.

      a.    *DaVita.*  There is abundant evidence common to the Class that DaVita

benchmarked its internal pay structures to external market data:

      i.    Current CEO Rodriguez testified that DaVita has "'[v]arious

structures . . . in place to ensure that compensation is at fair market value[.]'"[501]

      ii.    DaVita human resources professionals testified that DaVita used

benchmarking to promote external equity.  For instance, former DaVita VP of Recruiting and

Talent Management Chipman testified that "using a market benchmark is a best practice for how

you determine what is a good pay range."[502]  Former DaVita Senior Director of Compensation &

Analytics Arthur testified that, as part of that benchmarking process, her team at DaVita used

various external compensation surveys and data providers to benchmark internal positions to

external pay data.[503]

      iii.    DaVita's documents corroborate its use of benchmarking to ensure

external pay equity.  For instance, one document stated that DaVita "select[ed] market

benchmarks based on job content as described in job descriptions."[504]  An internal 2018

Compensation Risk Assessment similarly shows that as a company practice, "[c]ompensation

---

[501] Rodriguez Dep. at 113:17–23.

[502] Chipman Dep. at 79:13–23.

[503] Ex. PX73; Arthur Dep. at 108:3–109:9; *see also* Ex. PX268.

[504] Ex. PX85 at DVA_OMCEAL_001067252.

surveys are used to benchmark pay."[505] The document also connects pay ranges to specific surveys: "[p]ay ranges are developed using Mercer, Towers, Watson, and Kenexa Surveys[.]"[506]

iv. DaVita's use of benchmarking extended to individual pay decisions for purposes of recruiting. In one instance, Arthur was asked to "run a market report for CFO or VP finance in the Denver area" to assist with "a search for a CFO for Paladina."[507] Arthur and her team provided an internal base pay range for current DaVita employees in a Vice President of Finance role, as well as an external range using data collected from third-party Kenexa.[508] Former DaVita VP of Recruiting and Talent Management Chipman also testified that external recruiters provided data regarding a job candidate's current compensation, "and they would have a pretty good feel for what the market was for that role, so they would bring their perspective."[509] The external recruiters provided "a relevant range of what the pay requirements were, pay ranges were," and DaVita used that "market data or a candidate['s] current salary" as "a data point of what we might need to structure an offer for."[510]

b. *SCA.* Common evidence shows that SCA also benchmarked its pay to external data:

i. Former SCA Chief Talent Officer Fanning testified that SCA used between six and ten surveys to benchmark its pay structures and set compensation, because "it's not smart to use just one."[511] She explained[512]:

---

[505] Ex. PX268 at DVA_OMCEAL_001344573.

[506] *Id.*

[507] Ex. PX73 at DVA_OMCEAL_001332711.

[508] Ex. PX73 at DVA_OMCEAL_001332708–10.

[509] Chipman Dep. at 100:17–101:5.

[510] *Id.* at 101:6–103:16.

[511] Fanning Dep. at 175:11–16.

[512] *Id.* at 175:17–176:15 (emphasis added).

*[These surveys were used] to make sure this apple at this company is the same at this apple at this company.* . . . And that information is consolidated and managed through different survey companies like Hewett, Mercer, Willis Towers, Watson, et cetera. . . . And *they will tell you for this kind of job that scores this number of points in these geographies, these are the kind of ranges you would expect at the lower quartile, mid, upper quartiles, and so on*.

ii.     Former SCA COO Rucker testified, SCA "would hold up every data point that we could possibly get our hands on to say what is this information telling us the market's doing, how do we ensure that we don't fall behind and that we don't overdo it."[513] SCA did this to ensure it was "getting it right and that we're absolutely maintaining market-level total compensation packages so that we can effectively compete."[514]

iii.     Fanning put further color on how companies apply this data in practice[515]:

*You might have a strategy where you decide you only want to pay what you have to keep people and you're going to be 50th percentile.* Total compensation decisions are strategic business decisions that you make, and it's not one-size-fits-all. *You might decide you're going to pay up a quartile for your business development people who bring in the revenue, but you're going to pay lower quartile to X population because they're easily replaced.* Supply and demand. The market forces drive pay forces too.

iv.     Former SCA GVP of HR Warren Cinnick corroborated Fanning's testimony about SCA's use of pay surveys, testifying that SCA tracked market conditions "every year and regularly through surveys that we used through professional organizations who did private surveys . . . in the salary space," including "Mercer Meidinger."[516]

v.     **Job Benchmarking.** The documents also show that SCA utilized job benchmarking.

---

[513] Rucker Dep. at 262:15–20.

[514] *Id*. at 262:22–263:3.

[515] *Id.* at 266:13–25 (emphasis added).

[516] Cinnick Dep. at 54:12–55:10.

A.      For instance, as part of a 2011 compensation analysis, SCA compared its pay with that of USPI and DaVita.  Then-CEO Hayek asked for feedback regarding a proposed list of peer companies.[517]  This list initially included USPI, and SCA Executive VP of Development Joe Clark suggested adding DaVita.[518]

B.      Similarly, a 2017 compensation analysis used salary survey data from third-party data aggregator Mercer and Towers to create salary budget recommendations for Development roles (i.e., VP Development, Sr Dir Development, Dir Development, Sr Development Analyst, and Analyst Development)[519]:

> See the attached analysis.  It took me a bit longer to finalize because I encountered some problems with both the Mercer and Towers websites . . . I used the Facility Comp Analysis template as a reference.  I modified it slightly to construct and complete a 'functional budgetary' type of analysis.  *It includes market pricing and job mapping use our Mercer Survey results and position descriptions . . . The budget base is slightly lower than market median since our incentive targets are significantly above market.*

C.      SCA also applied job benchmarking to individual salary decisions.  For instance, in 2018 SCA had the following internal discussion about an annual merit increase for an employee (referred to as "Jenny") and whether it promoted external equity: "I am recommending bringing Jenny to ███████████████████████████ ████████████████████████████████.  This would put her in line with the other director of ops in market."[520]

D.      And SCA admitted to another form of benchmarking— wage sharing.  Former SCA COO Rucker testified that SCA exchanged confidential business

---

[517] Ex. PX35.

[518] *Id.*

[519] Ex. PX528 at SCA001046573 (emphasis added).

[520] Ex. PX541 at SCA000331970.

information with USPI "in the spirit of" "a shared benchmarking exercise."[521]  Likewise, former

SCA CFO Peter Clemens testified that he discussed with USPI's then-CFO Jason Cagle "[w]ays

to benchmark . . . on expense levels for the companies to see if we were different in any ways

that were significant."[522]  Clemens elaborated[523]:

> A lot of what I did was benchmarking, but it was mostly *looking at basically any piece of information that was available from any competitor or anybody in the space and comparing ourselves to them. . . .* So benchmarking would be comparing ourselves to the industry.

c.      *USPI.*  The evidence also shows that USPI benchmarked its internal pay

practices to external market data:

i.      The deposition testimony and documents show that USPI regularly

used benchmarking to control for external equity.  For instance, former USPI internal recruiter

McGarry testified that she ran compensation reports between ten and twelve times per month to

benchmark internal pay "for pretty much anybody in the company who would ask for a

report."[524]  These reports provided information regarding "people with this job title in this

market make X amount of money,"[525] and "typically . . . we're trying to get just a general idea of

what the demand was in the market for a particular job title as far as compensation."[526]

ii.      USPI also benchmarked pay against defendants DaVita and SCA.

For instance, one document shows that USPI's SVP, Chief Human Resources & Support

Services Officer Karrmann emailed USPI's then-CFO Cagle and  then-President Brodnax about

---

[521] Rucker Dep. at 234:20–25.

[522] Clemens Dep. at 106:10–15.

[523] *Id.* at 106:11–109:17 and 128:20–129:17 (emphasis added).

[524] McGarry Dep. at 108:14–19, 110:3–12.

[525] *Id.* at 108:1–8; *see also* Ex. PX105 (cover email) and Ex. PX106 (attachment) (McGarry forwarded RVP compensation reports to Mosley).

[526] McGarry Dep. at 109:21–110:2.

benchmarking.  Karman wrote that USPI planned "to benchmark our senior positions against the market and want to define the companies that we feel are the best matches," including SCA.[527] Brodnax responded that they should consider benchmarking against DaVita as well.[528]

           iii.      USPI employed benchmarking to ensure external equity for compensation, as well as for benefits, including PTO accrual.  Karrmann ███████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████  █  At deposition, Karrmann "clarif[ied] that competitive benefits also includes compensation and benefits."[530]  USPI would also "obtain[] compensation surveys or pay surveys" to set raises.[531]  Similarly, an email shows that, in 2014 at the direction of Karrmann, USPI's then-VP of Financial Operations Cindy English emailed SCA executive Rich Sharff to ask about SCA's policies regarding "accruing PTO based on 'hours worked.'"[532] English testified[533]:

> [USPI had] discover[ed] that . . . the way that we were accruing PTO [paid time off] was dissimilar to a lot of the acquired surgery centers.  We based ours on years of service versus hours worked.  And so *this was a market analysis . . . specifically to kind of have some comparability between what others were doing versus what we had in our policies.*

---

[527] Ex. PX482.

[528] *Id.*

[529] Ex. PX296 at DOJCIV-008-00000389; Karrmann Dep. at 21:20–23:4.

[530] Karrmann Dep. at 23:13–19.

[531] *Id.* at 40:21–41:1.

[532] Ex. PX119 at USPI_CIV_000601228 and Ex. PX120 at USPI_CIV_000584420.

[533] English Dep. at 56:17–57:21 (emphasis added).

### 3. Substantial Additional Common Evidence Shows That Defendant Firms Implemented Systematized Compensation Structures.

117. Overall, additional documentary and deposition evidence that I have reviewed in this case shows that the Defendants implemented the foregoing principles to design structured compensation systems and is common to the Class.

118. <u>DaVita.</u> The following additional evidence demonstrates that DaVita had systematized compensation structures.

a. *DaVita Maintained Systematized Compensation Structures.* DaVita set pay practices for its employees to follow:

i. DaVita documents referred to "internal pay practices" that included "typical guidance" for base salary increases when promoting Senior-Level Employees: "An 8% increase is within our typical guidance and puts [the newly-promoted employee] (as a new VP) at the bottom of the internal range."[534]

ii. DaVita's formal compensation structures were created and maintained by its Compensation Team. DaVita former DaVita VP of Recruiting and Talent Management and People Services Group Director Chipman testified that the Compensation Team "did comp and benefits. So they did the systems and structure on comp and benefits."[535] Chipman testified that he "would work with the compensation team at DaVita headquarters to get their best thinking on what pay was for a particular role, and then I would share that with the leader about talk about the incumbent's performance, potential geography, things like that."[536]

---

[534] Ex. PX83 at DVA_OMCEAL_001057524.

[535] Chipman Dep. at 30:11–13.

[536] *Id.* at 30:3–10.

Such leaders who received this information would include "the [P]almer, the leader of that division," or "one of the division vice presidents[.]"[537]

        iii.     As Chipman testified, DaVita then housed its centralized compensation system in the "HRIS system," which was a "human resources information system. It's where all of the data is collected from recruitment through separation," including compensation.[538] "[M]erit recommendations were conducted through [this] system," which also maintained "[p]erformance analyses." [539] Chipman testified that he would have used the compensation planning system in his Vice President role "[t]o select and identify annual merit increases and . . . to award the bonuses for the annual [process]."[540]

        b.     *DaVita Enforced Its Centralized Compensation Structure.*

        i.     DaVita made sure its managers understood their responsibility to adhere to its structured compensation systems. For instance, former DaVita VP of Recruiting and Talent Management Chipman testified that in his earlier role at DaVita as Group People Services Director, his job responsibilities included the "[g]eneral HR process and procedure," which specifically involved "hiring, onboarding. . . . It would be about developing good pay practices for managing their employees."[541] He elaborated, "My role would be to advise [and] counsel on some best practices for pay[.]"[542]

        ii.     DaVita also implemented and enforced pay practices with respect to bonuses. For employers at the manager-level and above, "bonus is accrued as a pool based on

---

[537] *Id.* at 30:16–23.

[538] *Id.* at 90:5–11.

[539] *Id.* at 90:12–20.

[540] *Id.* at 163:13–20.

[541] *Id.* at 28:4–30:1.

[542] *Id.* at 29:16–30:1.

Company and group performance, and allocated between groups based on relative performance among the groups."[543] Thereafter, "[e]ach group leader" "allocates bonus pool to employees based on individual performance."[544] But equity remains top of mind through this process: "HR analyzes all allocations and notes one that are not aligned with performance reviews," and "[a]llocations are reviewed closely by the executive in charge of the group for VPs as well as for outliers noted by HR."[545] The bonus award process had to abide by certain standards that set a range for bonuses within particular jobs[546]:

> *[E]ach group leader is expected to further allocate the bonus pool to individuals based on relative performance and principles of total compensation. . . .* We like to say that for 'solid/solid/solid' performance, payout for an individual would be 65% of [maximum bonus potential]. That is 'solid' company performance, 'solid' group performance and 'solid' individual performance.

iii.     In applying its structured pay practices to bonuses, DaVita took care to ensure it was consistent as to particular employees and that individual pay fit within the overall structured pay system. For example, in evaluating what bonus to give a specific employee, DaVita's then-SVP Mike Staffieri asked the team whether the proposed bonus complied with equity principles: "You have her force ranked last, and she has the highest bonus % at 90%. Why is that? Seems too high compared to the rest of the team."[547] Her supervisor responded: "[The employee] is underpaid for her position I believe and is actually very strong. . . . The fact that [her subordinate] left [DaVita] for a $40K comp increase plus a signing bonus I

---

[543] Ex. PX268 at DVA_OMCEAL_001344575; *see also* Chipman Dep. at 28:4–30:1, 45:4–46:10 (bonus recommendations at DaVita are "based on performance and time in position, and then it would have been based on the role").

[544] Ex. PX268 at DVA_OMCEAL_001344575.

[545] *Id.*

[546] Ex. PX77 at DVA_OMCEAL_001329257–58 (emphasis added).

[547] Ex. PX250 at DVA_OMCEAL_000904770.

[think] is evidence that [the employee] ([the subordinate's] boss) is also underpaid."[548]

Staffieri's response stressed fidelity to DaVita's centralized compensation structure[549]:

> My opinion . . . if someone is 'underpaid' then you should recommend an adjustment to their base, not give them a huge bonus. Giving someone a 90% bonus sends a strong performance message. If someone is 'underpaid', performs average and you give them a 90% bonus—then the messaging is convoluted. I will approve the 90%, but *you need to fix the overall comp structure and make sure [the employee] is clear on the messaging around her bonus*.

iv. **Annual Compensation Process.** DaVita's compensation structure was refreshed annually through a careful process, wherein compensation was reviewed in connection with and to ensure alignment with the labor budget.[550] Former DaVita VP of Recruiting and Talent Management Chipman testified as part of that process, "[a]nnual company-wide merit increase budgets help[ed] DaVita offer competitive pay[.]"[551]

v. **Limited Discretion.** This structured annual compensation setting process limited the ability to deviate from set labor budgets. Chipman testified that DaVita implemented hierarchical protocols with respect to awarding merit dollars: "Merit dollars were computed based on your salary budget. . . . If you are going to go above budget, you must follow the protocols set in going above budget,"[552] including by getting approval for any exceptions.[553] Chipman testified that Chief People Officer Laura Mildenberger's approval was required to exceed the budget.[554]

---

[548] *Id.* at DVA_OMCEAL_000904769.

[549] *Id.* (emphasis added).

[550] Chipman Dep. at 162:16–164:19.

[551] *Id.* at 167:16–19.

[552] *Id.* at 135:2–11.

[553] Staffieri Dep. at 163:1–164:25; Ex. PX25.

[554] Chipman Dep. at 135:12–13.

-141-

A.      The lack of discretion to set pay also applied to compensation decisions for new hires.  "Depending on the level of pay," compensation offers had "to be approved by their manager or their manager's manager."[555]  For example, as SVP and DVP/RVP, Staffieri's compensation recommendations for VP had to be approved by former DaVita COO Kogod, to whom Staffieri reported.[556]

vi.      **Recruiting and Hiring.**  Further, DaVita also applied top-down involvement to recruiting and hiring.  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

119.   SCA.  Similar to DaVita, SCA has produced additional ample evidence of its formalized compensation structures.

a.      *SCA's Compensation Structure Applied to All Jobs and All Types of Pay.*  The testimony and documents I reviewed illustrate the comprehensiveness of SCA's formalized compensation structure:

i.      SCA GVP of HR Warren Cinnick testified that at SCA, "[a]ll jobs eventually ended up inside of a salary structure."[558]  SCA's compensation structure was comprised of four parts, including base pay, bonuses, "the UHG [UnitedHealth Group, SCA's parent company] equity, which is really stock options and restricted stock units," and spot bonuses.[559]  **Figure 8** below illustrates this structure:

---

[555] Staffieri Dep. at 131:8–19.

[556] *Id.* at 158:15–159:4; Ex. PX23.

[557] DOJCIV-008-00000304 at DOJCIV-008-00000306.

[558] Cinnick Dep. at 65:4–14.

[559] *Id.* at 37:9–38:5.

-142-

**Figure 8**[560]



ii.　　SCA documents show that its Compensation Managers maintained its formal compensation structures. They were "responsible for managing the compensation function for SCA in alignment with the company's compensation philosophy and strategy."[561] Compensation Managers would "plan, develop and implement current and revised compensation programs to be responsive to the company's goals."[562] Specifically, they "[m]anage annual compensation processes, merit budget[s], and annual incentive plans," and also "[p]rovide advice and counsel to department leaders on teammate compensation, benchmarking, structure plan guidelines and provisions."[563]

---

[560] SCA000079723 at SCA000079726.

[561] SCA000065816 at SCA000065816.

[562] *Id.*

[563] *Id.*

b. *SCA Systematically Refreshed Compensation.* The testimony and documents I reviewed show that SCA systematized its process for refreshing compensation.

i. Compensation was systematically refreshed annually. Former SCA Chief Talent Officer Fanning testified that SCA had an annual compensation-setting process.[564] That process was designed to ensure SCA's compensation "is in alignment with our compensation philosophy, competitive with market practice, supports our recruitment and retention objectives, is internally equitable and ensures that the overall economic cost of compensations is reasonable, and therefore sustainable, in relation to our peers."[565] To implement this process, SCA used a centralized software system.[566]

ii. SCA GVP of HR Cinnick corroborated Fanning's testimony, stating that "[a]nnually, there would be a review of the base pay plan," which was "delivered in spring of the year."[567] SCA then set one companywide merit budget percentage to be applied to increase employees' base pay.[568] Cinnick testified that annual compensation-setting also applied to equity decisions: "[a]nnually, there would be a review of the available equity that would be released right in December of the year and then would be delivered in the spring, but the decisions were made by that first week in January."[569] For bonuses, the process was similar:

---

[564] Fanning Dep. at 170:15–19.

[565] SCA000079723 at SCA000079734.

[566] Rucker Dep. at 323:8–20; *see also* SCA000065816 (annual incentives and merit increases input in SuccessFactors system); SCA000093346 (instructions for entering merit increase proposals into SCA's Compensation Management System); SCA000112688 (instructions for entering bonus proposals into SCA's Compensation Management System).

[567] Cinnick Dep. at 39:4–13.

[568] Sandoz Dep. at 36:15–38:10.

[569] Cinnick Dep. at 39:14–18.

"And then bonuses, were, at the end of each year . . . adjudicated and worked through with [employees'] plans. Payouts [were] in the spring of the year."[570]

       c.    *SCA Implemented and Enforced Bonus Practices.* The testimony and documents show that SCA implemented standardized pay practices regarding bonuses:

       i.    SCA GVP of HR Warren Cinnick testified that though SCA's bonus practices provided for "a strong connection between real work, real deliverables, and the pay that people would receive[,]" SCA's bonus structures were still highly structured and standardized.[571]

       ii.    Former SCA COO Rucker testified that SCA had "metrics that it applied to rank the performance of employees," including "[c]linical outcomes," "turnover, teammate engagement levels," and "operational metrics."[572]

       iii.    Cinnick also testified about the detailed metrics that were used to make bonus decisions[573]:

> *In the building of bonuses, there were very specific written plans for individuals to participate in. . . . The written plan primarily had metrics that were related to the business*: Financial outcomes; service outcomes, meaning the satisfaction of . . . our physician partners, patient satisfaction; employee engagement levels, meaning higher the better. And so there were many metrics that were . . . a significant part of bonuses that were very measureable[.]

       iv.    Put simply, bonuses could not be awarded willy-nilly. For example, in 2016 SCA set bonus percentages for manager, director, and senior director employees. To maintain equity, an internal SCA document shows SCA's human resources

---

[570] *Id.* at 39:23–40:2; *see also* Clemens Dep. at 144:24–145:4.

[571] Cinnick Dep. at 45:22–48:18.

[572] Rucker Dep. at 319:8–320:24.

[573] Cinnick Dep. at 45:22–47:7 (emphasis added).

employees "worked through these earlier in the year and changed the bonus percentage amounts to make them consistent and not have the different levels all different."[574]

    120.   USPI.

       a.    *USPI Used Formal Compensation Structures.*  Additional testimony and USPI documents that I reviewed confirm that USPI utilized formal compensation structures.

          i.    To maintain its pay structures, internal documents show that USPI regularly refreshed its compensation levels.  For example, in May 2014 USPI initiated its annual process "for pay increases for VPs and above."[575]  This process was formalized and consistent, providing percentage targets:  "We are targeting 2.0% for all increases, so as you assess and pull together recommendations for your team, please use 2% as your overall raise budget."[576]

          ii.    The mechanics of the process was also formalized and consistent. For instance, former USPI VP of Financial Operations Cindy English testified that the company maintained a centralized compensation system for salary increases that worked similarly year-on-year.  That system involved her dissemination of a salary increase spreadsheet to managers, a further approval process, and then housing salary decisions in a centralized location.  English testified that in her role[577]:

> [She] was involved in preparing a spreadsheet [regarding salary increases] that was routed for approval to managers of different departments, so that they could indicate what increase [they] were giving their employees, accumulate it, and return[] [it] to me.  And . . . after all the approvals were in place, it was provided to payroll to upload into our ADP system.

---

[574] Ex. PX56.

[575] Ex. PX297 at USPI_CIV_000058049.

[576] *Id.*

[577] English Dep. at 26:2–17.

Indeed, at one point, USPI further centralized the process: "There was a point that we moved from just keeping it in an Excel document into a tool that was provided that made the routing of the approvals easier[.]"[578]

        iii.     USPI also implemented standardized pay practices with respect to bonuses. USPI structured its bonus award system to limit discretion. A 2015 internal memo highlights the system's goal of avoiding individualized manipulation: "The measurement and calculation of bonus payments are designed to protect our compensation programs from being susceptible to manipulation by any employee, including required approvals by senior executives and the Compensation Committee."[579] Moreover, **Figure 9** below provides USPI's 2015 bonus levels, including minimum, targets, and maximums:

**Figure 9**[580]

| Min | Target | Max | Level |
|---|---|---|---|
| 5% | 10% | 15% | Staff |
| 10% | 15% | 20% | Manager & Director |
| 10% | 20% | 35% | Director & VP |
| 10% | 30% | 45% | VP 2 |
| 10% | 35% | 55% | SVP |
| 10% | 50% | 75% | SVP 2 |
| 10% | 50% | 75% | Market President |
| 10% | 75% | 100% | Group President |
| 10% | 50% | 90% | EVP |
| 10% | 75% | 100% | President, CFO |
| 10% | 75% | 125% | CEO |

---

[578] *Id.* at 26:18–27:2.

[579] USPI_CIV_000901340 at USPI_CIV_000901342.

[580] *Id.* at USPI_CIV_000901341.

b. *USPI Maintained Salary Increase Structures.* USPI also systematized its annual processes for salary increases.

i. USPI's former VP of Financial Operations English testified that for corporate salaries every January and February, "the payroll department would download the employees into a spreadsheet with their current salary. The recommended percentage—let's just say 2 percent—was applied to each salary to show what the increase would be at the budgeted 2 percent."[581]

ii. In March, USPI then instituted recommended salary increases based on performance[582]:

> [They provided] a budgeted percentage that was recommended. It was based on performance. And it was provided to the department heads, so I received one for accounts payable and payroll, and then the controller over the operational accounting side would have received, for her department, the same with the corporate accounting and so on.

### C. Defendants' Compensation Systems Sought to Achieve Internal Equity and Pay Fairness.

121. In this section, I discuss the literature describing the importance of internal equity and fairness to compensation practices. Additionally, I review evidence that Defendants' formal pay structures sought to maintain internal equity and pay similar employees performing similar work and making similar performance contributions.

122. The evidence I review includes compensation-related literature, deposition testimony and exhibits, and documents produced in this litigation.

---

[581] English Dep. at 28:21–29:14, 30:25–31:2.
[582] *Id.* at 27:3–28:20.

123. <u>Internal Equity Principles Are Fundamental to Defendants' Compensation Structures</u>. According to equity theory, "people compare the ratio of their own outcomes [e.g., pay] to inputs [e.g., performance]" with the same outcomes/inputs ratio of "one or more comparison others. . . . Perceived equity results if the ratios are very similar. The ratios can be similar despite differences in pay if performance differences are perceived to exist."[583]

124. Consider **Figure 10** below, which shows the choice an organization can make between two different pay structures. In this case, the two pay structures have different pay levels, but identical internal job structures (i.e., identical percentage pay differentials between jobs at different levels in a line of progression). For example, in each structure, the pay differential between the Advisor Engineer and Lead Engineer is 28%. But the pay level is lower for all jobs in the left pay structure. A company choosing the left pay structure would have lower labor costs. The left (lower) pay structure would be easier to choose if labor market competition was constrained. A company or companies engaged in collusion could, for example, perhaps achieve the left lower pay level structure, but not have any additional internal equity problems because the internal equity/internal pay differentials between jobs will stay the same. In contrast, in the absence of collusion, some employees in some jobs would get higher pay at their current company or elsewhere. Higher pay at their current company would increase the pressure on the current employer on to raise the pay of other employees (i.e., to maintain internal equity). Higher pay from people moving to higher-paying jobs at other companies would also pressure the company to raise pay to be competitive (i.e., externally equitable to employees) with other companies.

---

[583] BARRY GERHART, COMPENSATION 88 (14th ed. 2023).

**Figure 10: Pay Structure (for Engineering) at Lockheed Martin, under Two Alternative Pay-Level Policies[584]**



**EXHIBIT 3.3** Pay Structure (for Engineering) at Lockheed Martin, under Two Alternative Pay-Level Policies

---

[584] *Id.* at 78.

125. <u>Literature and Other Evidence Shows That Fairness Is Important to Compensation Considerations.</u> There is evidence common to the Class in economics and other areas that fairness in wage-setting and consideration of peers is important in compensation matters.[585]

a. Labor market economist Kevin Hallock opined that "[t]he idea behind equity theory (Adams, 1965) is that workers will be motivated when their perceived inputs (e.g. effort) match their perceived outputs (e.g. pay). If someone thinks she is being unfairly paid (e.g. others are being paid more for the same perceived effort), she will become uncomfortable and unmotivated."[586] Similarly, in the absence of perceived equity, employees take actions to restore equity, many of which (e.g., lower performance, turnover, legal action, collective bargaining) employers prefer to avoid.[587]

b. I also note that the research that discusses how employees judge internal pay equity[588]:

> [A major avenue by which] employees judge the fairness of their pay through comparisons with the compensation paid to others for work related in some fashion to their own. . . . Employees make multiple pay comparisons to assess the fairness of an internal pay structure. They compare both with other jobs in the same internal structure and with the pay for their job in the external market (i.e., at competing employers).

c. Employees regularly express concerns to their employers about equity. For example, 21% of compensation professionals surveyed by WorldatWork (2011) responded

---

[585] *See, e.g.,* David I. Levine, *What do Wages Buy?,* 38 ADMIN. SCI. Q. 462–483 (Sept. 1993); and David Card, Alexandre Mas, Enrico Moretti, & Emmanuel Saez, *Inequality at Work: The Effect of Peer Salaries on Job Satisfaction*, 102 AM. ECON. REV. 2981–3003 (Oct. 2010).

[586] KEVIN F. HALLOCK, PAY: WHY PEOPLE EARN WHAT THEY EARN AND WHAT YOU CAN DO NOW TO MAKE MORE 121 (2012).

[587] *Id.*

[588] BARRY GERHART, COMPENSATION 137–38 (14th ed. 2023).

that employees "frequently" or "constantly" "express concerns about the lack of internal equity regarding base pay amount," and 45% of employees do so "occasionally." [589]

       d.     The same survey also asked the compensation professionals "about what influence they believe internal reward equity or fairness has on 'employee engagement,' 'employee motivation,' and 'employee satisfaction.'"  More than half of respondents reported that they believe internal equity is "extremely influential" for engagement (56%), motivation (53%), and satisfaction (55%).[590]

       e.     Other evidence also supports the importance of equity to employee satisfaction.  I summarize meta-analytic evidence based on 64 studies and 29,754 employee respondents from Williams, McDaniel, and Royal (2011).  That analysis reports that employee perception of pay discrepancy (i.e., the difference between an employee's perception of what pay should be and what pay currently is) correlates at a substantial level (corrected $r = -.54$) with pay satisfaction.[591]  Theory and research are clear that what employees think their pay should be is influenced strongly by internal equity and external equity comparisons.

       f.     Further, as **Figure 3** demonstrated earlier, employee mobility is higher when pay levels are lower and when employees move voluntarily, their pay increases significantly.

       g.     Moreover, internal equity (in terms of the size of pay differentials between different job levels) is important because it influences employee answers to questions, such as

---

[589] K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness:  Slippery Slope or Manageable Terrain?*, 20 WORLDATWORK J. 50–64 (Fall 2011).

[590] *Id.*

[591] BARRY GERHART, COMPENSATION 243 (14th ed. 2023) (citing Margaret L. Williams, Michael A. McDaniel, & Nhung T. Nguyen, *A meta-analysis of the antecedents and consequences of pay level satisfaction*, 91 J. APPLIED PSYCH. 392 (2006)).

"Is taking a 'bigger' job worth it?" and "Is it worth it to invest in further training to get promoted?"

126.     Compensation Professionals Seek to Maintain Internal Equity.  It is therefore unsurprising, based on the foregoing analysis, that compensation professionals devote so much attention to internal equity:  it is a means to positively influence pay satisfaction, engagement, motivation, performance, retention, and employees' willingness to participate in training and take on higher-level positions with greater responsibilities.  Discussed at length above, a firm's failure to attend to these concerns can lead to reduced employee productivity as well as increased employee turnover, both of which can hurt an organization's bottom line.

a.     This step also involves addressing concerns about fairness in pay levels across jobs and job levels that are otherwise similar but differ in the experience levels.  For example, Senior Vice Presidents in an area are paid more than Vice Presidents in that same area.

b.     Finally, compensation structures must address concerns about the structure of pay across different job titles, so as to maintain equity between employees in different jobs who nevertheless have similar relative skills and value to their employer, or who work together on projects.  These employees care about their compensation relative to their professional peers, and pay structures reflect those concerns.  For example, employees in the same organizational units, such as Peoples Services or human resources, care about what others there earn.  Pay systems adjust pay levels to reduce some of the differences in pay that we might otherwise expect in order to create more consistent pay levels where those comparisons matter.  And pay systems also recognize differences in performance across individuals within the same jobs, paying more to those who perform better.

c.     In fact, creating and maintaining internal equity constitutes one important reason organizations set up formal internal pay structures in the first place, as discussed above. Recall that those structures are typically set up internally, even before adjusting to the external market data.

127.    Defendants Prioritized Internal Equity in Their Compensation Structures.  Indeed, the evidence I have reviewed indicates that Defendant firms sought to maintain internal equity in their formal compensation structures and correct for outliers to restore equity.

a.     *DaVita Maintained Internal Equity.*  Evidence common to the Class demonstrates that DaVita sought to align its compensation practices to align with internal equity principles.

i.     **DaVita Values Internal Equity.**  DaVita "pa[id] attention to pay equity with respect to wages and salaries."[592]  As current CEO Rodriguez testified, it is "useful to know what people get paid," because "[y]ou want to understand if they're underpaid, overpaid, paid appropriately."[593]

A.     DaVita's Compensation Philosophy policy stressed the importance of maintaining internal equity in compensation decisions.  It provided the following example to illustrate how DaVita adjusts pay to comport with internal equity[594]:

> Tom and Sharon are VPs in a similar position.  They were both hired in the same year and granted equity [i.e., stock options].  Tom happens to have been granted equity at a lower strike price [i.e., his options are worth more than Sharon's].  Sharon is granted equity as well, but because of timing and market fluctuations, her strike price is higher.  Three years later, both are performing at the same level.  However, Tom's equity value is much higher than Sharon's based solely on the timing of when he was granted equity.  In this situation, *it is fair and appropriate*

---

[592] Staffieri Dep. at 134:11–16.

[593] Rodriguez Dep. at 72:23–73:13.

[594] Ex. PX249 at DVA_OMCEAL_000906134 (emphasis added); *see also* Ex. PX266.

-154-

*to differentiate bonus dollars to ensure more balanced compensation for these two leaders.*

In this example, the objective is therefore to restore equity between Tom and Sharon in their compensation (which includes "equity" in the sense of stock-related compensation).

B. Similarly, former Chief Wisdom Officer Priest testified that "cared about fairness and compensation fairness across the organization. . . . [F]airness as a theme was spoken about frequently."[595] Priest did not know anyone at DaVita "who didn't care at all about fairness in compensation[.]"[596]

C. Internal DaVita documents about specific individuals reflect this commitment to internal equity. For example, when DaVita tried to ███████████ ████████████████████████, DaVita tried to maintain internal equity with respect to similarly situated employees. DaVita COO Staffieri instructed as to the compensation offer, "I don't want to get too out of whack with our DVP comp range" "because of pay equity."[597]

D. Additionally, DaVita's pay policy required employees "not to discriminate against employees in pay on the basis of race, gender, or any other protected category[.]"[598] According to former DaVita VP Recruiting and Talent Management and People Services Group Director, this policy is "a standard obligation or [] responsibility of any HR professional."

ii. **DaVita Paid Attention to Internal Equity When Setting Starting Salaries.** Priest also testified that with respect to compensation, DaVita's goal "[w]as

---

[595] Priest Dep. at 128:24–129:9.

[596] *Id.* at 144:5–16.

[597] Staffieri Dep. at 160:19–161:23; Ex. PX24.

[598] Chipman Dep. at 69:1–17.

to always have a fair and reasonable base salary[.]"[599]  In setting pay for new hires and for annual increases, DaVita "look[ed] at what other people in the same role [within DaVita] were making."[600]

           A.      DaVita's former VP of Recruiting and Talent Management and People Services Group Director Chipman similarly testified that DaVita set starting salaries in reference to the pay of current employees, stating that "current incumbent pay" was used as a "data point" "to make recommendations about pay offers for new hires."[601]  DaVita used incumbent salaries as a reference point because "in order to assess whether a pay level's appropriate, a good place to start is how that person would fit in [with] existing employees and then we compare that to their pay[.]"[602]  In the event DaVita was "hiring a role that has several incumbents in it," DaVita HR professionals "could provide information to the [role's] leader about, [h]ere is what we're currently paying those that are in that particular similar role, as a data point."[603]  The Compensation Team provided this data.[604]

           B.      The use of incumbent salaries in setting starting pay is borne out by internal DaVita documents I have reviewed that show this concept at work with respect to particular individuals.  For example, to put together an offer for a candidate at the Vice President level, the Compensation Team collected average base pay and maximum bonus potential information using company-wide data for GVPs and DVPs as comparators.  The

---

[599] Priest Dep. at 122:18–23.

[600] *Id.* at 123:9–24; *see also id.* at 128:17–22 ("My objective was always to have people paid fairly for the role they had, the work they did, background, experience, education.").

[601] Chipman Dep. at 80:19–23.

[602] Staffieri Dep. at 154:4–11.

[603] Chipman Dep. at 80:24–81:5.

[604] *Id.* at 81:7–9.

Compensation Team also provided data for specific individual employee comparators to ensure the offer was in line with incumbent employee pay.[605]

        C.      As another example, in October 2016, Rodriguez approved an offer for a new hire Senior Director that accounted for internal equity and was comparable to the pay of an incumbent DaVita executive in the same role.[606]

        D.      Likewise, in putting an offer together for a new-hire Senior Director, DaVita explicitly considered internal equity, and noted that the new hire's pay "would be comparable" to that of an incumbent employee, and that the new hire "will be in the top quartile of pay for Senior Directors."[607]  DaVita also considered the market rate, because the new hire asked "to be at least ██ given other offers, but I believe she really wants to come work for us so propose ██ base with the parameters above."[608]

        iii.      **DaVita Used All Forms of Compensation to Balance Compensation for Similarly-Situated Employees to Ensure Internal Equity.**  I have reviewed additional evidence that DaVita's policy with respect to salary increase decisions instructed that such decisions account for "performance differentiation," "total compensation," and "pay fairness within a team."[609]  Indeed, DaVita's People Services team disseminated a Compensation Philosophy instructing that "[m]erit dollars are used as one component of total compensation to reward highest performers and rectify potential pay inequities within a team. . . .

---

[605] Ex. PX75.

[606] Rodriguez Dep. at 129:14–131:14; Ex. PX272.

[607] Ex. PX272 at DVA_OMCEAL_000957089.

[608] *Id.* at DVA_OMCEAL_000957090.

[609] Ex. PX269 at DVA_OMCEAL_000957821.

This means that even high performers may receive lower than expected merit increases or potentially no increase at all in a given year."[610]

    A.    Deposition testimony illustrates how DaVita adjusted different forms of compensation to ensure internal equity. At his deposition, former VP of Recruiting and Talent Management Chipman agreed that "[i]n theory," "if an employee has a lot of equity vesting and they receive a large annual bonus, that employee may be paid significantly more that year than a similarly performing employee in a similar position[,]"[611] Similarly, an internal 2012 email from former DaVita CEO Thiry explained how to adjust different components of compensation to ensure internal equity[612]:

> Now when [the] stock [is] way up, we need to maintain equity. If we have 2 citizens, both with salary of [] $200,000, both with bonus potential of $100,000, and both with some performance and potential. Only diff[erence] is one of the people has $100,000 in vested equity value this value. Therefore if right comp is $300,000[], one should get $100k bonus, other zero. That is equity[.]

    B.    Internal DaVita documents show this approach at work for specific employees. For example, as part of internal discussions at DaVita regarding promoting an employee to Senor Director, the Compensation Team recommended as follows[613]:

> Given that he is already very well compensated, we are a little limited if we don't want him completely out of line with other Senior Directors. So, our recommendation is a ▮▮▮ increase to his salary, which would bring him to about ▮▮▮▮ base and then increase his bonus potential to ▮▮▮▮ is pretty much the top of the range for Sr Director bonus levels. Most are between ▮▮▮▮. The median salary for Sr Directors is around ▮▮▮, so he is well above that with this offer.

---

[610] Ex. PX249 at DVA_OMCEAL_000906134.

[611] Chipman Dep. at 142:11–143:4.

[612] Ex. PX551.

[613] Ex. PX27 at DVA_OMCEAL_001339898.

C.      Similarly, current CEO Rodriguez testified that when he reviewed Senior-Level Employee Compensation, he would make adjustments as needed if he thought a compensation component [i.e., salary, base, performance bonuses, equity, etc.] "is off, either high or low," because he wanted to ensure people were "appropriately compensated."[614] For example, in February 2015, Rodriguez "calibrate[d]" salary adjustments for two DaVita VPs by comparing "their pay with other employees at the vice president level and above[.]"[615]

D.      Additionally, DaVita internally assessed compensation data for its Regional Operations Directors ("ROD") to determine what pay rate to offer an employee newly promoted to the Regional Operations Director position.[616] Chipman recommended that DaVita "bring him in at ▉▉▉▉▉▉▉▉▉. This allows us to get him into the ball park of our lowest Director salary and provide some room for him to perform and grow his salary."[617] Additionally, the increased maximum bonus potential "represents a ▉▉ increase and keeps him consistent with all other RODs."[618]

iv.      **DaVita Monitored Compensation to Ensure Internal Equity.**

Current COO Staffieri testified that to ensure it offered equitable compensation, DaVita tasked its People Services Group with monitoring pay equity.[619] Staffieri defined "pay equity" "as a way of ensuring that there is not bias in pay decisions within an organization. People who are doing the same job at the same performance level are paid generally equally regardless of race,

---

[614] Rodriguez Dep. at 59:3–62:1.

[615] *Id.* at 124:13–128:20; Ex. PX271.

[616] Ex. PX252.

[617] *Id.* at DVA_OMCEAL_001187352.

[618] *Id.* at DVA_OMCEAL_001187354.

[619] Staffieri Dep. at 132:13–133:2

gender, other characteristics."[620] DaVita's People Services Group would monitor pay decisions for bias to correct it later.[621]

A.     DaVita regularly corrected outlier compensation to account for internal equity.  For instance, upon request then-Group People Services Director Chipman assessed Director salaries across various divisions in the company and "stratified by years in position as a way of comparing like experience."  He determined, "your more tenured Directors are more highly compensated, as one would expect," but there were two Directors who fell below the median.  Accordingly, he recommended ▮ and ▮ pay increases for those employees.[622]

B.     Consistent with this practice of correcting for internal equity, Chipman testified that he would correct compensation when he became aware of issues[623]:

> [If I had] found out that a manager decided to pay all of their men 20% more than all of their women employees, [I] would have worked with that manager to explain why I thought that was not a good idea.  I would have then escalated that to the division vice president and to the [P]almer [i.e., the DaVita executive in charge of the entire division].

He explained that he would have initiated a conversation "about understanding why they wanted to pay certain employees a certain amount," "starting with the manager.  And then when I escalated that to the division vice president and/or the [P]almer, it would have been a similar

---

[620] *Id.* at 132:19–23.

[621] *Id.* at 132:24–133:11.

[622] Ex. PX22.

[623] Chipman Dep. at 34:12–19.

conversation."[624] "If the division vice president agreed, he or [she] would then take the appropriate action with that manager,"[625] including "mak[ing] a change to that compensation."[626]

        C.      Further, CEO Rodriguez testified that as part of the annual Senior-Level Employee compensation review process, DaVita monitored for pay equity[627]:



The outliers are then reviewed and modified as needed.[628]

        b.      *SCA Wanted to Maintain Internal Equity.* I have seen similar supporting evidence at SCA that is common to the Class.

        i.      **SCA Was Committed to Internal Equity.** SCA's Total Compensation Philosophy states that SCA seeks to maintain internal equity: "We monitor both the external marketplace and internal parity / comparisons to ensure our programs are implemented in a consistent and equitable way[.]"[629]

        A.      Former SCA COO Rucker's testimony aligned with SCA's Compensation Philosophy. He testified that SCA "attempted for there to be a reasonable amount

---

[624] *Id.* at 35:24–37:16.

[625] *Id.* at 38:17–24.

[626] *Id.* at 39:2–9.

[627] Rodriguez Dep. at 98:16–99:25 (emphasis added).

[628] *Id.* at 100:1–3.

[629] SCA000079723 at SCA000079726.

of internal equity" in setting employee compensation,[630] and had a "general goal of paying people similarly for doing similar work."[631] He explained[632]:

> We strove to have a reasonable amount of equity role-by-role—*we strove to have internal equity* . . . (A) because there was an element of sort of fairness to it, and (B) we thought if the variability got . . . great of an extent, you were at risk of . . . having folks that you were underpaying, and they would leave and not want to be a part of the team.

As above, these concerns are less paramount where artificial interference, such as No-Poach Agreements and CSI Exchanges, suppress the labor market rate.

> B.     Moreover, SCA compared pay of employees in different positions to maintain internal equity.  For instance, in 2017, SCA crafted budget recommendations for the family of "Development" roles, including VP Development, Sr Dir Development, Dir Development, Sr Development Analyst, and Analyst Development, wherein the more senior roles received more compensation than the less senior roles.[633]

> ii.     **SCA Checked Employee Compensation to Ensure That It Maintained Internal Equity.**  For instance, SCA human resources executive Cinnick testified that that to maintain "fairness" in pay structures[634]:

> [Y]ou do look internally and say, well, where is this person against others, similar job, that kind of thing.  Absolutely, that's a task . . . You would refer to it as a way to say, what are we doing with others that are similarly placed? . . . [T]here's an element of equitable treatment in it.

---

[630] Rucker Dep. at 317:3–24.

[631] *Id*. at 327:18–21.

[632] *Id*. at 325:21–326:9 (emphasis added); *see also* Sandoz Dep. at 85:19–24 ("fairness was an important principle for compensation setting" at SCA).

[633] Ex. PX528 at SCA001046573.

[634] Cinnick Dep. at 74:5–15, 69:15–70:24.

SCA did this because "[a]nytime you're in a bonus-based system, you have to watch that you don't distort one element and then have it impact the entire cash compensation of a person."[635]

> A.   *SCA Considered Internal Equity Principles When Deciding Starting Salaries.*  For instance, with respect to new hires, former SCA COO Rucker testified[636]:

> [I]f you've got one person and you had to pay them more to join in the same role that you've got a group of other people, who are now paid less than the person that you just brought aboard, we would encourage our leaders to think about, do you need to take any action today or do you need to take any action over time to stabilize your workforce.

> B.   Internal SCA documents illustrate how this worked for individual salary decisions.  For example, in deciding what salary to offer a new Director of Financial Operations ("DFO"), SCA discussed internally "the salary range for this position."[637] The Senior DFO commented, "I'm not aware of the exact range for the DFO pool but I expect this offer would make her the highest paid DFO."[638]  Peter Clemens, SCA's CFO, decided that he was "ok moving forward with this offer," but they could not go higher, "because she is on the top end,"[639] such that a higher offer would be unaligned with other similar employees' compensation.

> C.   Another internal email chain regarding compensation for a new hire also stressed internal equity principles[640]:

> I think she brings energy, clinical skills and market knowledge however, her salary is high for someone in an administrator role without a graduate degree.  With us I could offer her a ██████████████, which would be more than her current situation and I guess I could offer ███████ ??  *Where I struggle with this is I hate*

---

[635] *Id.* at 71:12–18.

[636] Rucker Dep. at 326:24–327:16.

[637] Ex. PX55 at SCA001204514.

[638] *Id.*

[639] *Id.*

[640] *Id.* at SCA000331971 (emphasis added).

*giving her more than [current employees]* ███████ . *This is an internal concern I am struggling with.*

### iii. SCA Used Different Forms of Compensation to Ensure

**Internal Equity.** For instance, SCA used "lump sum awards in adjusting salaries" to "reward a teammate for performance when the teammate is outside the salary range for the role (higher). It helps to manage internal equity among members of the team."[641] Note that lump sums do not increase base salaries, allowing inflation to help bring salaries back within the salary range.

A. Similarly, in 2015, SCA advised employees responsible for merit pay proposals that with respect to its annual merit planning process, "If you have a teammate who was recently promoted and received a pay increase, you may decide to award that individual with a smaller or no additional award at this time."[642] This would keep the recently-promoted employee's pay in line with other similar employees' pay and the overall pay structure.

B. Likewise, in 2018 SCA had the following internal discussion about an annual merit increase for an employee and whether it maximized internal equity[643]:

> Essentially, all merits for my team will be as usual and will be within the 2.85% guideline approach budgeted. However, ████████████████████ ████████████████████████ This is based on strong performance . . . as well as him now taking over as lead for the market (unofficially). This is in line with people planning ideas going back to mid-year last year . . . and also creates the right internal equity comp for the role in the market. Finally, as he takes on the OSCD surgery center, it provides a little buffer from one of his new reports, ████ ██████████████████████████████████ ███████ .

---

[641] SCA001363536 at SCA001363537.

[642] Ex. PX34 at SCA000109837.

[643] Ex. PX541 at SCA000331970.

iv.     **SCA Also Sought to Correct Outlier Compensation.**  For example, an internal SCA document showed adjustments to labor budgets for particular roles to achieve internal equity.  In setting budgets for "Development" roles, SCA's then-Senior Director of HR Jennifer Sandoz wrote[644]:

> I recommend a slightly higher budget to ████████████████ to more closely align with where we typically pay Directors and the avg/median for this role (even though our bonus target is a bit higher).  We have one outlier on the low end who was recently promoted that likely should have received a higher base.

A.     In fact, in January 2012 SCA cut former Regional Director of Operations & Clinical Services (and Plaintiff) Scott Keech's compensation by ██████;  according to SCA, Keech "was paid too much and was not in line with the internal equity of the organization," and that he "had to be paid similar to the other people in the role" so that SCA could "maintain internal equity with the rest of the organization."[645]

c.     *USPI Wanted Internally Equitable Compensation Structures.*  The evidence also shows that USPI accounted for internal equity in its compensation structure, and is common to the Class.

i.     Former USPI SVP and Chief Human Resources & Support Services Officer Karrmann testified that USPI "consider[ed] internal equity in setting salaries for employees."[646]  Specifically, "[f]or people with comparable size, scope, complexity of centers and similar performance results, and performance of their position," "[y]ou would expect that people would move generally at the same rate, taking into account differences in [the] market."[647]  USPI sought to maintain internal equity "among different employees with the same

---

[644] Ex. PX528 at SCA001046573.

[645] Keech Dep. 203:1–204:2; Ex. DX64.

[646] Karrmann Dep. at 39:25–40:12.

[647] *Id.* at 40:13–20.

title," between "employees at different locations," "between new hires and current employees," and "between newly promoted people and existing people with that title[.]"[648]

> ii.  Likewise, when asked if USPI "consider[ed] internal equity issues" in establishing salary recommendations, USPI Chief Development Officer Johnston testified that USPI "looked at pay across like-positions at the company so we knew who was on the high end and who was on the low end and that would be a factor in our decisions on increases."[649]

> iii.  USPI's pay structures maintained internal equity between employees doing similar work.  For example, Johnson testified that with respect to administrators' salary increases[650]:

[T]he thought process here is if they're at the top of the range we would give them smaller percentage increases, which might actually be larger dollar increases but would grow their earnings at a lower percentage rate, their base salaries at a lower percentage rate than the rest of the administrators in the region or market.

This represents a classic example of a merit increase grid, and according to USPI Chief Development Officer Johnston enabled USPI to "control the growth.  If you provide smaller percentages to those that are at the top of the range then you can provide larger percentages to others and still fit within the overall targeted percentage increase.  That would be one benefit."[651]

> iv.  USPI sought to maintain internal equity between new hires and incumbent employees.  Johnston testified that when USPI "hired people inform the outside[,] we obviously had to make an offer that they would accept, so that was a part of the process thinking.

---

[648] *Id.* at 41:2–14.

[649] Johnston Dep. at 39:21–40:2.

[650] *Id.* at 50:9–20.

[651] *Id.* at 50:21–51:3.

And we would also make sure we understand where that offer fit relative to the internal ranges at the company."[652]

        v.      For example, during discussions about 2014 salary increases for Vice Presidents, USPI's then-Group President Johnston flagged that one employee was "~$7,500 under market in my opinion, and as a seasoned professional she should not be making less than all of my new hires. We got her at a bargain when we hired her, but could lose her if we continue to pay her less than she could get elsewhere."[653]

### D.      Internal Equity and Pay for Performance Are Not Mutually Exclusive.

128.    In this section, I demonstrate that Defendant firms' purported "pay for performance" practices are not incongruous with internal equity principles, and that Defendants did not maximize compensating performance at the expense of pay equity, because equity and equality are not the same.

129.    In this section I also explain how a compensation system that is guided by both pay-for-performance and internal equity principles can still be internally consistent. In fact, it is impossible for a system to maintain internal equity without paying for performance. Paying employees who perform differently equally is clearly inequitable, because pay should be proportional to an employee's contribution to the enterprise.

130.    The evidence I reviewed includes compensation-related literature, deposition testimony and exhibits, and documents produced in this litigation.

131.    To maintain a competitive and well-functioning pay system, it is important that the firm determines how the pay of individual employees within each grade/range will be

---

[652] *Id.* at 40:11–23.
[653] Ex. PX454.

adjusted over time.  Regular, planned adjustments happened annually.  Survey data indicate that the types of salary adjustments / increases used by a majority of U.S. companies are:  (1) promotional increases (96%), which usually involve movement to a higher pay grade/range; (2) merit increases (94%); (3) market adjustments (84%); and (4) internal equity adjustments (69%).[654]  Typically, merit increases are awarded each year and depend on employee performance as well as the employee's position in the salary range.  This is often defined as the compa-ratio, which is employee salary divided by the salary midpoint for his or her grade/range.[655]  Given that organizations typically set their salary grade/range midpoints to match the market, the compa-ratio also then indicates the employee's level of pay as a percentage of market pay.

132.    Most organizations use a merit increase grid to calculate employees' merit increases, under which employees with higher performance ratings receive larger merit pay increases and employees with higher compa-ratios receive (given the same performance rating) lower merit pay increases.  The compa-ratio is used in this manner to control the growth in salary over time.  It is also used to achieve equity, in that companies typically have compa-ratios targets, explicit or implicit, that vary depending in an employee's sustained performance over time.  An employee who consistently receives average performance ratings should be at or moving toward a compa-ratio of 1.00 (i.e., 100% of both market pay and the company's own grade/range midpoint pay).  By contrast, an organization might have a target compa-ratio of 1.20 (120% of market pay and the company's own grade/range midpoint pay) for an employee with consistently high performance ratings.  An employee who is at a compa-ratio that matches their

---

[654] WORLDATWORK, COMPENSATION PROGRAMS AND PRACTICES SURVEY (2016).
[655] *Id*.

target compa-ratio for their performance rating would receive a merit increase that maintains the compa-ratio. For example, with an overall merit budget of 3%, the foregoing employee would receive a 3% increase. However, an employee below their target compa-ratio would receive a larger merit increase, such as 5%, to move them toward the higher salary and compa-ratio. An employee above their compa-ratio would receive a smaller percentage increase, such as 1%, to allow the grade/range midpoint to move to catch up with the employee's salary.

133. The foregoing approach to merit pay increases is designed to pay employees equitably by moving them toward a target pay level that is equitable compared to the pay of similarly-performing employees both internally and externally. Relevant to my earlier assessment, this process also allows the company to ensure that it does not underpay or overpay employees relative to its competitors, and that it can compete effectively in the labor and product/service markets.

134. **Figure 11** (below) exemplifies a merit increase grid that simultaneously incorporates the idea of both pay-for-performance and internal equity. It provides for different compensation increases for equally-performing employees depending on where they are situated in the salary structure (i.e., their compa-ratio) so as to maintain internal equity. In the diagram, the columns represent a worker's position in the pay range (compa-ratio) and the rows indicate a worker's performance rating (1 is the worst and 5 is the best).

**Figure 11**[656]

Table 12.3
Merit Increase Grid

| RECOMMENDED SALARY INCREASES BY PERFORMANCE RATING AND COMPA-RATIO | | | |
|---|---|---|---|
| | COMPA-RATIO[a] | | |
| | 80–90% | 91–110% | 111–120% |
| Performance rating | | | |
| Exceeds expectations | 7% | 5% | 3% |
| Meets expectations | 4 | 3 | 2 |
| Below expectations | 2 | 0 | 0 |

[a]Employee salary/midpoint of their salary range.

135.  Defendants' Practices Account For Equity and Performance.  Documents I have reviewed show that Defendants used these practices to determine merit compensation increases to their employees' base salaries.  These practices demonstrate that a company's commitment to pay employees for performance does not conflict with internal equity principles and the continued maintenance of a formal compensation structure.

a.  *DaVita Balanced Internal Equity and Individual Employee Performance.*  Common evidence shows that DaVita used various processes to award merit increases throughout the Class Period.

i.  DaVita used the same logic as merit increase grids/compa-ratios.  For example, according to DaVita's 2011 Merit Process Manager Talking Points[657]:

> DaVita is a 'pay for performance' company.  This philosophy directly links monetary reward with individual performance. *We recommend that you use your merit pool to reward your highest performances and/or rectify potential pay inequities within your team.*  This means that some teams and teammates will receive a lower percentage or potentially no increase at all.  However, although a team may be made up of solid performers, not everyone is guaranteed a merit increase. *As leaders we also have to differentiate based on facility needs, team needs, retention needs and internal equity.*  As such, *to maintain internal equity, high performers who are already paid higher than peers in their same pay range will probably get smaller percentage increases than similar performers lower in the same pay range.*

---

[656] RAYMOND NOE, JOHN HOLLENBECK, J. BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCE MANAGEMENT:  GAINING A COMPETITIVE ADVANTAGE 538 (13th ed. 2023).

[657] Ex. PX552 at DVA_OMCEAL_000313490 (emphasis added).

ii. Current CEO Javier Rodriguez testified that when he reviews Senior-Level Employee compensation, he "review[s] holistic compensation," which requires him "to look at all the components: salary, base, if they've gotten any performance bonuses, do they have any other compensation structures, how is the equity doing. So their overall compensation."[658] He "look[s] at their [the mix of compensation components] and what the value is to see if it's aligned with what we believe that person should make."[659] This focus on alignment is consistent with the goal of pay fairness.

iii. Similarly, former Chief Wisdom Officer Priest testified that as part of the annual merit increase process, "we were constantly looking at our teams and balancing base, bonus and equity and benefits as a total compensation package."[660] Priest defined "balance" as "[r]ewarding performance, rewarding experience, rewarding people who had performed during that most recent period and had potential going forward, performing at higher levels, and putting all that in the constructive of creating some fairness around for pay for performance versus simply cost of living increases."[661] As above, this goal of aligning relative employee pay with relative employee performance indicates DaVita's focus on fairness in making its performance-related compensation decisions.

iv. The evidence I have reviewed shows that DaVita applied fixed merit increase pools annually to raise employees' base salaries: "Merit increase pools allocated to each group within the Company range[] from 1 to 2.5% per year in most years."[662] By doing

---

[658] Rodriguez Dep. at 59:3–23.

[659] *Id.* at 59:24–60:10.

[660] Priest Dep. at 133:21–134:7.

[661] *Id.* at 133:25–135:6 ("[W]hen you talk about compensation, you look at those situations and try to improve everybody's situation in a fair and reasonable way.").

[662] Ex. PX268 at DVA_OMCEAL_001344574.

so, DaVita put managers in a situation wherein implementing compa-ratio principles would typically be necessary for them to stay within the overall budgeted percentage increase. Managers would need to assign smaller percentage increases to employees with higher salaries within the salary range in order to assign larger percentage increases to employees with lower (i.e, too low given their performance) salaries within the salary range, where performance was the same. This merit increase pool system is consistent with the goal of moving employees' compensation to a level consistent with their performance, which includes allocating smaller percentage increases to those with higher performances already reflected in higher compensation.

v.      Similarly, in 2012, DaVita "[u]sed two models to create [an] overall merit pool" to increase employees' base compensation: "Baseline yielding a __% merit pool," and "Award merit pool by Team then use merit model to allocate by state within the team."[663] Moreover, to determine merit pools, "Numerous factors enter into the decision process, but the goal is to find the correct balance between what is right for the [employees] and what will ensure stability, continued growth, and fiscal responsibility for" DaVita.[664] Such factors take into account both internal and external equity, and include unemployment rates, the industry employment outlook, the availability of qualified candidates, time to fill key positions, local labor competition, and external market rates.[665] As above, DaVita paid employees for performance subject to the available merit pool, or in other words, subject to the limitations and aims of the overall compensation structure, including moving towards achieving internal and external equity.

---

[663] Ex. PX19 at DVA_OMCEAL_001399752.
[664] *Id.* at DVA_OMCEAL_001399773.
[665] *Id.*

-172-

vi.     DaVita also used grids to align performance of its executives, Vice Presidents, Directors, and Managers with cash-based long-term incentive awards.[666] This approach would enable DaVita to pay its employees equitably by moving their compensation toward a target that is equitable compared to the pay of similarly-performing employees internally.

b.     *SCA Aligns Pay and Performance.*  I have reviewed similar evidence of these processes at SCA that is common to the Class.

i.     SCA's "total compensation philosophy aligns pay and performance," and compensates its "leaders and teammates in a manner that is designed to achieve one or more of our performance, alignment, or retention objectives."[667]  SCA "set[s] base salaries (fixed pay) at levels that are competitive in our marketplace and provide[s] annual cash and annual equity incentives (variable pay) that are competitive in our marketplace, are tied to performance outcomes, and that allow us to retain outstanding leaders in a competitive market for executive talent."[668]

ii.     Further, former SCA Chief Talent Officer Fanning testified that SCA deployed "compa-ratios that became [more] sophisticated" during her tenure.[669]  Discussed above, such compa-rations are used to achieve equity, by moving employees towards target pay levels that are equitable as compared with the compensation of similarly-performing employees internally.  SCA's use of compa-ratios is also evidence that SCA implemented and maintained a broader compensation structure.

---

[666] DVA_OMCEAL_001411518.

[667] SCA000079723 at SCA000079725.

[668] *Id.*

[669] Fanning Dep. at 172:13–19.

-173-

iii.     SCA GVP of HR Cinnick testified that SCA applied "a percentage increase of base salary" "widely across the company. . . .  There would be a large participation in some kind of increased plan, differentiated, significantly, by performance and where the person is in the range, their work," and "[a] wide number of factors."[670]  SCA referred to this percentage as a "merit pool increase."[671]  SCA defined base salary merit pool increases as "a pool of funds generated by looking at the total payroll of a group, applying a percentage to that, and then allocating back to the managers for distribution to individuals [in] that pool."[672]  In other words, SCA's internal documents show that salary merit pool increases are designed to monitor overall compensation to ensure internal equity, among other goals [673]:

> [Merit pool is] the amount of raises that [SCA] intended to [] deliver to our workforce.  That would typically happen during the first quarter or at . . . the end of the first quarter of every year.  And so it is intended to allow us to make sure that we're appropriately and competitively paying our workforce.

Like DaVita, SCA's performance-related compensation decisions were made within the context of the available merit pool, within the broader compensation structure that SCA designed to achieve internal and external equity.

iv.     To allocate the merit pool, SCA took many factors into account, including pay fairness: "You take into account performance of each individual.  You take into account how they're particularly paid for their job.  You take into account the outside marketplace and whether it's moving rather quickly in certain jobs.  You might take into account

---

[670] Cinnick Dep. at 41:11–20.

[671] *Id.* at 41:21–24.

[672] *Id.* at 42:1–14.  SCA defined a merit pool as "a tool that is connected directly to base compensation.  So, in other words, if someone was making $100 in their salary or hourly rate, and we established a merit pool of 2 percent . . . and that person were granted an average merit adjustment, they would be making a salary or an hourly wage of $102 after the . . . merit was applied."  Rucker Dep. at 256:2–12.

[673] Rucker Dep. at 255:17–256:1.

fairness with respect to other employees."[674]  This commitment to pay equity was reflected in another 2015 internal document in which SCA instructed its leaders that its "annual merit planning process" "is based on several factors including:  teammate performance, internal equity, market rates and our merit budget."[675]

        v.      Further, SCA documents provide instructions on how to balance internal equity and employee performance.  SCA instructs that[676]:

> [Base compensation adjustments] should take into account the competitiveness of each teammate's pay.  That is, where they fall into the range coupled with their performance.  It is our goal to compensate teammates for performance at the mid-range of the local ASC market.  The chart below [**Figure 12**] provides guidance which may help you with this process.

**Figure 12**[677]

| If teammate's pay is ... | Below Mid-Point | At Mid-Point | Above Mid-Point |
|---|---|---|---|
| ... and the performance rating is ... | ... compensation adjustment should be | | |
| Does **not meet** standards (0-4) | 0.0% | 0.0% | 0.0% |
| Meets standards (5-7) | 1.5%-2.5% | 1.0%-2.0% | 0.0%-1.5% |
| Exceeds standards (8-10) | 3.5%-4.5% | 3.0%-4.0% | 2.5%-3.5% |

        c.      *USPI's Pay Structures Account for Both Equity and Employee Performance.*  I have seen similar supporting common evidence produced by USPI.

        i.      When USPI annually set a budget for merit pay increases for VPs, it established, for example, a "2 percent increase . . . for the company[.]"[678]  Thereafter,

---

[674] Cinnick Dep. at 42:16–24.

[675] Ex. PX34 at SCA000109831.

[676] SCA000078134 at SCA000078134.

[677] SCA000078134

[678] Karrmann Dep. at 45:19–46:16; Ex. PX297.

"individual managers" only "had some discretion to individualize increases within that 2 percent budget[.]"[679] "And the process then would be [that] the managers would return their proposed recommendations and those would be reviewed by [Karrmann, former USPI SVP and Chief Human Resources & Support Services Officer], Bill [Wilcox, former USPI CEO and Chairman], and Jason [Cagle, former USPI CFO] for final approval[,]"[680] In other words, supervisors did not have unlimited discretion to award increases regardless of how strong an employee's performance was.

        ii.      USPI Chief Development Officer Johnston testified that he tried to maintain internal consistency when increasing salaries such that if he set any salaries above the salary increase target, such exceptions "needed to be obviously requested and validated, justified. And they would be considered."[681]

        iii.     The documents bear this out. For instance, a 2015 USPI master worksheet included guidelines for merit increases for employees at the Vice President-level and above.[682] USPI instructed supervisors that for employees "to be eligible for a merit increase, a performance review and accompanying ratings will need to be completed" on USPI's internal tracking system.[683] The worksheet listed various Vice Presidents and tracked their current annual rates, prior pay increases, performance increases, and resulting proposed increases.[684]

---

[679] *Id.*

[680] *Id.* at 46:22–47:4.

[681] Johnston Dep. at 44:10–17; Ex. PX454.

[682] Ex. PX115 (cover email) and Ex. PX116 (attachment); *see also* Ex. PX453 at USPI_CIV_000095467 ("Merit increase guidelines are attached.").

[683] Ex. PX115 at USPI_CIV_00039752.

[684] Ex. PX116; *see also* Ex. PX181 (cover email) and Ex. PX182 (attachment).

iv.     Likewise, USPI used the same process to set annual merit increases for administrators: Regional Vice Presidents submitted their recommendations to market presidents, who then escalated those recommendations "to the market presidents, who made recommendations to the group presidents, who made recommendations to Niels [Vernegaard, USPI's former COO]."[685]  Karrmann, Wilcox, and Cagle then reviewed the recommendations, and Wilcox had final approval.[686]

## VIII.   A STRUCTURED COMPENSATION SYSTEM WOULD LIKELY LEAD TO CLASS-WIDE COMPENSATION EFFECTS.

### A.     Agreements Not to Poach Employees Likely Lead to Cascading Effects Class-Wide.

136.     In this section I explain that, as demonstrated above, the No-Poach Agreements likely suppressed Class Members' pay.

137.     The evidence I review to aid in my assessment includes statements from the FBI investigation interview reports, deposition testimony and exhibits, and documents produced in this litigation.

138.     The most visible mechanism of suppression is in the case of individual employees who were denied the opportunity to be passive recipients of cold calling by other employers, and the higher pay and advancement opportunities those calls would have provided.  However, the suppression effects of the No-Poach Agreements go well beyond that, because of the systematic way in which the pay of all employees is connected in companies through their widespread use of standardized principles and practices of employee compensation management.  Below, I review evidence showing that Defendants' pay systems were structured in a way that linked the

---

[685] Karrmann Dep. at 47:5–24.

[686] *Id.* at 47:25–48:7.

pay of employees with different job titles and at different job levels, such that the No-Poach Agreements would suppress pay systematically.

139.    A structured pay system of the type I have described here is characterized by purposeful pay differentials between employees meant to maintain internal and external equity. Thus, when upward pressure is put on the compensation of some employees, organizations must adjust others' employees' compensation as well to maintain equity.

140.    This plays out as follows:

a.      Typically, as inflation rises, so does pay across the board; overall rates of increase also reflect resources available to the employer, such as budgetary changes.  For example, former DaVita CEO Thiry testified that DaVita "would look at what inflation is and then take that into account in terms of what we would pay to people."[687]  Former SCA Executive VP and CFO Clemens similarly testified that SCA accounted for inflation to set the merit increase budget.[688]

b.      Notably, although merit increases typically differ according to performance (and often according to current position in range/compa-ratio), they do not typically differ by job or job level.  Thus, a 3% average merit increase in a firm will maintain current pay differentials based on job, job level, and individual performance.

c.      Additionally, shifts in supply and demand within specific labor markets can raise the pay of benchmark jobs, which is reflected in external market pay surveys of competitors.  As discussed above, employers respond by raising the internal pay of those jobs to match external pay to prevent employees in them from feeling underpaid and/or from leaving.

---

[687] Thiry Dep. at 114:17–23 (inflation "was a very important variable").
[688] Clemens Dep. at 150:11–18.

Such increases also spill over to other jobs; higher pay for managers may lead to higher pay for Directors and similarly for Vice Presidents to maintain the necessary pay differentials to achieve equity and/or motivation to advance/be promoted to higher-level jobs.

d.      And as discussed earlier, individual employees may have opportunities to change employers, which may reflect changes in market pay before market survey data does, leading to adjustments of the kind delineated above.

e.      Raising the pay of one employee in order to retain them may lead to pay raises for similar employees, who otherwise recognize that they too could secure higher offers in the outside market and/or feel unfairly treated if their performance contributions are under rewarded relative to peers.  In this way, increases for one employee spill over to increases for another.

141.    Accordingly, given Defendants' formalized pay structures and compensation design and their commitment to maintaining equity and pay fairness, the No-Poach Agreements would have negative, widespread, and systematic effects on Class Members' compensation.

142.    Even if not *every* Class Member would have received a cold call or job offer but for Defendants' conspiracy, the increased wages of each individual employee who *would* have received a cold call or job offer would have a widespread, systematic impact on the salaries of other employees.  This widespread, systemic impact on other employees happens as a function of Defendants' commitment to maintain desired and accepted pay differentials based on jobs, grades/ranges (e.g., the midpoint progressions/differentials described earlier), and employee performance (i.e., internal equity).

143.    An Example of the No-Poach Agreements' Cascading Effects on Defendants' Salary Structures.  For example, even if the No-Poach Agreements were restricted to individuals

and job titles at the top of the salary structure, a No-Poach Agreement prevents compensation increases that would have had a cascading effect on other employees, in the following ways:

a.  *First:*  In the absence of a No-Poach Agreement, a current employee (e.g., a Director) at a Defendant firm could have received an unsolicited job offer having higher pay (and potentially higher pay opportunities in later jobs at the new company) than their current job (which provides an incentive to move to the new employer).  That Director could then either accept the outside offer or use the outside offer as leverage to negotiate a higher salary at the Defendant firm.  However, under a No-Poach Agreement, that higher salary is never offered.

b.  *Second:*  A second, less visible, but wider and more pervasive suppression effect of a No-Poach Agreement impacts incumbent employees at the same job level who did not receive unsolicited job opportunities.  For example, other Directors at the Defendant firm who were not cold called will immediately increase their own pay expectations and require higher pay to feel their pay is fair:  their performance contributions relative to those of the Director with the outside offer have not changed, but their relative pay has become lower relative to the Director with the outside offer.  Given the emphasis we have seen that firms, including the Defendant firms, put on internal equity, there would then be a focus on increasing the pay of Directors (plural) whose performance contributions are similar to those of the now higher-paid Director due to the outside offer.  In a no-poach context, there would not be this internal equity pressure to increase the pay of the other Directors to restore internal equity.

c.  *Third:*  The next effect is also indirect, but again wide-ranging.  Vice Presidents (one level above Directors) who did not receive cold calls notice that their pay is now unfair because the differential between their pay and the pay of Directors has now decreased.

-180-

The pressure is now on to increase Vice Presidents' pay to the targeted differential to restore this important element of internal equity.

d. *Fourth:* Other job titles whose functions sometimes overlap with those of Director now notice that the gap between their pay and that of Directors in the same firm has grown, and they demand increases to restore pay fairness. This compounds the pressure on the firm to maintain internal equity.

e. *Fifth:* When the firm performs its annual system-wide compensation review, it now discovers that Director pay has moved substantially ahead of pay for other job titles whose work overlaps. Maintaining internal equity requires increasing pay for those job titles as well, and so forth.

f. The pressures to raise pay diminish as one gets further removed from the new-hire Director, and the adjustments take time to play out. But when there are many of these new hire and retention perturbations across a firm, and when they continue year-after-year, the pressures to increase pay system-wide are continuous and substantial.

144. Further, in competitive labor markets, employers ordinarily do not wait for the ripple effects outlined above to play out and for employees to begin entertaining competitive offers before responding to these threats. A responsible employer cannot sit back and wait to react to competitive offers from elsewhere, because by that point, it may be too late—the competitive threat has already manifested. The recruited employee may simply leave without offering the current employer a chance to counter. Otherwise, the recruited employer may use the offer to negotiate higher compensation in their current role, but may lose morale. The employee may conclude that the employer was happy to pay less than what the employee was worth, and only offered higher compensation when forced to do so under threat of departure.

-181-

Similarly, other employees who hear of an ad-hoc retention increase in response to a competitive threat may also lose morale. Their loyalty was punished, and these employees will learn the lesson that, in order to receive fair pay from the employer, employees must "shop around" at other competing employers.

145. Thus, employers will typically raise compensation systematically to preempt these risks, and to avoid the accompanying morale and retention costs. But by reducing the chance that the firm's own employee could make a move to another employer, the need to proactively increase compensation to fend off cold calling by (would-be) competitors and employee moves to those firms may become much less necessary. That, in turn would have cascading effects, lowering the pay of other employees.

146. Moreover, as discussed above, given the evidence that Defendants benchmark their data to external sources, to the extent that pay is lowered at other firms through anti-competitive conduct, the market data Defendants use for their own structures will be lower. This will cause widespread effects, because Defendants' own pay levels will be lower than they would be in the absence of such conduct.

147. Finally, in top-down salary structures wherein those at the top of a pay scale in a firm help determine the relative gains of those "below" them, restricting the pay of those at the top necessarily affects those below, as here.

148. Defendants' Employees Would Experience Cascading Effects. Defendants' documents indicate that top-down salary structures would cause "across the board" cascading effects, and are evidence common to the Class:

a.      *DaVita.*

i.      For example, DaVita sought to manage average starting wages company-wide.[689]  DaVita updated its salary structure by comparing its merit pool with other employers in the healthcare industry "to make sure that they're staying competitive so that they can retain their employees and keep them productive."  Of course, staying externally competitive (i.e., achieving external equity) is less costly where pay suppression exists.[690]

ii.      To illustrate this point, in 2014, DaVita obtained "healthcare comparator data" from its "survey vendors" to facilitate its 2015 merit increase planning process.[691]

iii.      DaVita did not apply these increases uniformly—instead, the increases for various job titles were dependent on one another, because DaVita maintained an internal job hierarchy.  Indeed, DaVita's internal human resources system wherein DaVita maintained compensation data and recommendations "starts with [an] understanding [of] who the individual employee is, and then what his or her direct reports and indirect reports are, and who that person reports to directly and indirectly."[692]  For example, **Figure 13** below excerpts a 2013 internal "Compensation Planning System" slide deck demonstrating that when supervisors proposed base salary increases for their direct reports, they had access to compensation data for both their direct and indirect reports.

---

[689] Ex. PX265.

[690] Staffieri Dep. at 142:1–12.  Note that, as discussed above, the No-Poach Agreements and CSI Exchanges did not absolve DaVita of external equity concerns altogether.  However, with the No-Poach Agreements and CSI Exchanges' likely suppressant effects, DaVita created the conditions by which it could offer less competitive compensation than it otherwise would have.

[691] Ex. PX201 at DVA_OMCEAL_000944848.

[692] Chipman Dep. at 90:25–91:14.

**Figure 13**[693]



iv. **DaVita Sets Its Compensation Structure From the Top-Down.**

DaVita's formal compensation structures are also set from the top-down and regularly refreshed, such that pay restrictions at the top will cascade to those below:

A. <u>CEO.</u> DaVita pay was set through company-wide labor budgeting determined by DaVita's CEO. DaVita CEO Rodriguez testified that DaVita's COO

---

[693] Ex. PX251 at DVA_OMCEAL_000907141 (in this example, the supervisor had access to compensation data for a Regional Operations Director, a Group Director, and an SVP of Operations).

and finance team work together to set one labor budget for the entire company.[694] This process incorporates the CEO's feedback.[695]

           B.     In addition to setting the labor budget, DaVita's CEO also reviewed compensation decisions. The documents and testimony illustrate this top level involvement in compensation setting. Rodriguez testified to his compensation setting role: his "role is to make sure that the enterprise has achieved its objectives of retaining, motivating, and incenting people, and that it's all done within our budget parameters,"[696] and he reviews compensation for Senior-Level Employees.[697] He also is responsible for approving all equity grants.[698] In his previous role as CEO of DaVita KidneyCare, Rodriguez reviewed and made adjustments to annual salary increases for his reports.[699] Consistent with this testimony, an internal 2014 email shows that then-President Rodriguez set up a meeting in May 2014 "to start to discuss merit increases for planning purposes for 2015."[700]

           C.     Board of Directors. In addition to the CEO, DaVita's Board of Directors oversees certain forms of compensation. For instance, Rodriguez testified that the Board of Directors has to approve the budget for its long-term incentive plan ("LTIP")

---

[694] Rodriguez Dep. at 62:2–9.

[695] *Id.* at 63:3–6.

[696] *Id.* at 58:17–23.

[697] *Id.* at 59:3–10.

[698] *Id.* at 83:18–24.

[699] *Id.* at 63:17–64:5.

[700] Ex. PX201 at DVA_OMCEAL_000944852.

benefit.[701]  The Board of Directors also has authority over stock offers for executive roles.[702]

Moreover, any equity grants issued off-cycle (i.e., at any time other than through the typical

annual award process), must be reviewed by senior leadership.[703]

              D.      Other Executives.  Other executives are also involved in

setting compensation.  For instance, Staffieri testified that as COO, he tries "to manage and

control DaVita's total labor costs."[704]  Former Chief Wisdom Officer Priest testified that at

DaVita, he was involved in setting pay and reviewing compensation for the employees who

reported to him, including Vice Presidents, and for the Directors who reported to his Vice

Presidents.[705]

              E.      Annual Compensation Process.  DaVita's compensation

structure was refreshed annually through a careful process,[706] wherein compensation was

reviewed in connection and to ensure alignment with the labor budget.  DaVita documents show

that "[s]alaries and merit increases are reviewed annually at Director and below levels."[707]  As

part of that process, "[a]nnual company-wide merit increase budgets help[ed] DaVita offer

competitive pay[.]"[708]  DaVita documents emphasize the careful, top-down nature of this

---

[701] *See, e.g.,* Ex. PX264 at DVA_OMCEAL_001145991.  According to DaVita's Compensation Philosophy, DaVita uses its LTIP benefit "strategically & carefully as part of a holistic pay approach.  They are provided only to high performers and viewed as a long-term appreciating asset.  Vesting schedules vary based on individual circumstances and to support retention of high performers.  DaVita has typically provided long-term incentives in the form of equity."  Ex. PX249 at DVA_OMCEAL_000906135.

[702] Chipman Dep. at 84:9–85:15.

[703] Staffieri Dep. at 168:11–169:24.

[704] *Id.* at 129:16–19.

[705] Priest Dep. at 122:12–124:21.

[706] Chipman Dep. at 162:16–164:19.

[707] Ex. PX268 at DVA_OMCEAL_001344574.

[708] Chipman Dep. at 167:16–19.

process: "Each year senior leadership devotes significant time and thought to determine the right amount to allocate for merit increases."[709]

v.        Other times, DaVita also sought to lower average starting wages company-wide. For example, in 2011 DaVita issued new practices "to manage the creep that occurs with overall Village wages."[710] With respect to senior-level employees, DaVita provided hiring managers with salary caps for new hires "equivalent to 95% of the previous incumbent's base salary," so as to "lower starting wages by 5%."[711] Simultaneously, DaVita instructed hiring managers to hire clinical-level employees (e.g., nurses) "[at] or below the average starting wage."[712]

vi.        **The SCA-DaVita No-Poach Agreement Already Shows Cascading Effects.** The No-Poach Agreement suppressed employee pay at all levels: Former DaVita VP of Communications Thurman testified, "Everyone should be paid a salary and paid what the market will bear. And that was not happening."[713]



---

[709] Ex. PX552 at DVA_OMCEAL_000313490.

[710] Ex. PX196 at DVA_OMCEAL_001216214.

[711] *Id.* at DVA_OMCEAL_001216215.

[712] *Id.*

[713] Thurman Dep. at 32:14–25.

[714] Ex. PX123 at DOJCIV-007-00000094; *see also* Ex. PX124 at DOJCIV-012-00000136; Thurman Dep. at 127:6–21, 164:5–167:21 (confirming truthfulness of ▓▓▓▓▓ ▓.).

His observation was likely due to the No-Poach Agreements and CSI Exchanges.  He testified that DaVita underpaid Senior-Level Employees by "a multiplier of two or three."[715]

A.      Thurman's testimony is consistent, for example, with **Figure 14** below, which provides external data DaVita collected in 2014 showing that between 2006–2014, DaVita's annual base salary merit increases were consistently lower than average base salary increases in comparison with the healthcare industry and all industries.  (As discussed above, a company such as DaVita may choose to replace a merit base pay increase with one-time bonus payouts to keep its labor expenditures low.).

**Figure 14**[716]

## Merit History & Projections    Merit Pool

| | 2008 - Actual | 2009 - Actual | 2010 - Actual | 2011 - Actual | 2012 - Actual | 2013 - Actual | 2014 - Projected |
|---|---|---|---|---|---|---|---|
| All Industries | 3.9%[1] | 2.2%[1] | 2.5%[1] | 2.6%[2] | 2.8%[2] | 3.0%[5] | 3.0%[5] |
| Healthcare | 4.2%[1] | 2.7%[1] | 2.8%[1] | 2.6%[1] | 2.7%[3] | 2.6%[5] | 2.7%[5] |
| Fresenius | N/A | N/A | 2.8%[4] | 2.75%[4] | 2.75%[4] | | |
| DaVita | 2.10% | 1.50% | 1.40% | 2.00% | 2.40% | 2.20% | 1.50% |

1 – World at Work 2008, 2009, 2010 & 2011 Annual Salary Budget Survey July 2011
 • Mercer 2011/2012 US Compensation Planning Survey July 2011
 • EMPSight: 2011 Analysis of Merit Budget, Staffing and Practices
 • HayGroup: 2011/2012 Salary Analysis

2 – Blended % based on Mercer, World at Work, HayGroup, and EMPSight
3 – Blended % based World at Work, HayGroup & EMPSight as of Aug 29, 2011
4 – Actual for 2011 and initial projection, not formally released (Source: Qualigence)
5 – World at Work Actual 2013 and Projected 2014

©2010 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only    Attorney Client Privileged and Confidential

---

[715] Thurman Dep. at 37:6–38:11.
[716] Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854.

b. *SCA.*

i. **Salary Range Movements.** Similarly, in 2014 SCA assessed whether to update its salary ranges and "compared our midpoints to the midpoints" from market data, and ultimately decided to apply "market salary range movements" to "move the ranges."[717]

ii. **SCA Uses a Top-Down Compensation Structure.** There is also extensive evidence that SCA treated compensation-setting as a top-down exercise, such that pay suppression at the top will trickle down to lower-level employees.

A. SCA's CEO ultimately decided compensation. Former SCA CFO Clemens testified that, as SCA's CEO, Hayek had the "ultimate say" with regarding to "setting or determining compensation across the board."[718] "[I]t was Hayek's style to be very involved in everything about the business."[719]

B. Additionally, SCA's board of directors reviewed the annual budget and any other sort of "macro adjustment" such as a merit pool or bonus program.[720] SCA's finance group then communicated the merit pool to its compensation team to implement.[721]

C. Other high-level executives, including SCA's COO, reviewed and set compensation. For instance, former SCA COO Rucker testified as to his control over compensation, stating that[722]:

---

[717] SCA000078353 (cover email) and SCA000078354 (attachment).

[718] Clemens Dep. at 32:1–4.

[719] Ex. PX305 at DOJCCIV-008-00000175; Rucker Dep. at 385:19–388:14 (Rucker testified that he was truthful and accurate in his ▮▮▮▮▮▮▮▮▮▮).

[720] Rucker Dep. at 330:25–332:4.

[721] Sandoz Dep. at 38:7–39:24.

[722] Rucker Dep. at 26:12-27:5, 32:10–33:10, 309:25–310:18.

> [He, as COO,] had hundreds of people or thousands of people who reported in to the organization that I had responsibility for, and each year we would wind up establishing a merit pool and running through a process where we were attempting to ensure that we were paying our workforce fairly and in a competitive way.

Rucker reviewed compensation of these employees annually; he testified that[723]:

> [He] would also review annually whether or not we thought that the team that reported to me was . . . all being paid competitively paid; and . . . I was involved in various levels of review of compensation levels and compensation adjustments for other teams that were parts of departments and/or the field.

As COO, Rucker also testified that he set starting compensation at SCA: When hiring someone, he was "actively involved, in consultation with our HR resources, to determine . . . what the optimal offer would be for someone who was new coming to the organization."[724] And Rucker testified that he set "the budget for labor across the country."[725]

> D.      SCA's SVP of Operations also helped set compensation.

Rucker testified that one of his job responsibilities in his former position as SVP of Operations involved "budgeting for labor," and that he "was a major contributor to how we managed employee compensation."[726] In this role, Rucker reported to SCA CEO Andrew Hayek.[727]

> E.      SCA's CFO and Executive VP was involved in setting compensation. Former SCA Executive VP and CFO Peter Clemens testified that as CFO, he would review "employee compensation related expenses across multiple departments, not just [his] own . . . . [I]f they were off, they were too high on expenses, it would be, all right what are we going to do to get it back in line."[728]

---

[723] *Id.* at 310:12–18.

[724] *Id.* at 309:25–310:11.

[725] *Id.* at 34:21–36:7.

[726] *Id.* at 32:10–33:10.

[727] *Id.* at 34:14–16.

[728] Clemens Dep. at 92:4–17.

iii.      **SCA's High-Level Compensation Practices Trickled Down to Lower Level Leadership.**  The testimony that I reviewed showed the compensation setting processes that SCA's human resources professionals set were disseminated to lower level managers whose pay decisions had to in turn be reviewed and approved by higher level managers.

A.      For instance, former SCA GVP of HR Cinnick testified that "as HR leader, I would set the strategy and tone for how we would do compensation, for the way that it was fairly handled with the CFO to help set the budget for the year, and to, overall, administer . . . the compensation system."[729]  "The people who would then work the details would report either directly to me or through others to me.  So that function reported up to me."[730]

B.      This process also applied to pay increases associated with promotions.  Cinnick testified that with respect to internal promotions, the promoted employee's manager would propose a pay increase, which SCA's Director of Compensation Kevin Zaideman and the SCA Compensation Team reviewed.[731]  Cinnick reviewed pay increase proposals for employees promoted at the Vice President level and above.[732]

C.      Consistent with Cinnick's testimony, former SCA Chief Talent Officer Fanning testified that during the annual compensation-setting process, SCA's

---

[729] Cinnick Dep. at 37:7–15.

[730] *Id.* at 37:16–19.

[731] *Id.* at 62:2–64:12.

[732] *Id.* at 64:13–14.

"compensation committee approved the incentives and pay levels," and "the board would sign off [on] the budget, the amounts for all the [executives], the equity," etc.[733]

        c.      USPI. USPI's salary structure would also lead to cascading effects.

        i.      For example, USPI's salary structure moved altogether. To establish the "overall [companywide] merit budget" every year, USPI "would look at overall projected merit budgets, [and] we would look at merit budgets that companies were projecting based on compensation surveys. And we would also evaluate our performance as a company and establish an appropriate merit budget balancing all the different factors," including "[p]erformance of the centers, performance of the company and marketplace changes in wages."[734]

        ii.      **USPI Refreshed Its Compensation Structures from the Top-Down.** Similar to DaVita and SCA, USPI's formal compensation structures were controlled from the top. Each year, USPI implemented salary increases based on its annual budget, and the Chief Financial Officer was involved in the budgeting process.[735] Former USPI SVP and Chief Human Resources & Support Services Officer, Karrmann, former CEO and Chairman Wilcox, former President and current CEO Brodnax, and former CFO Cagle set the merit budget each year, and Wilcox had final approval.[736]

        A.      USPI's Merit Increase Decision Were Controlled from the Top. The testimony and documents I reviewed also showed that merit increases were controlled

---

[733] Fanning Dep. at 170:25–171:17; *see also* Clemens Dep. at 100:8–11 ("The compensation committee of the board of directors" "reviewed compensation[.]").

[734] Karrman Dep. at 38:6–22.

[735] English Dep. at 33:15–34:8; *see also* Johnston Dep. at 37:21–38:16 ("Typically, the CFO would communicate targets out to the field," and Wilcox likely had input into the labor budget as well.).

[736] Karrman Dep. at 42:21–43:2.

by and required approval from higher-level executives. Oftentimes, C-level officers had to approve compensation decisions. USPI's former VP of Financial Operations English testified that former CEO Wilcox and former CFO Mark Kopser had to approve the annual salary increases for administrators.[737] USPI Chief Development Officer and former Group President Andrew Johnston similarly testified that "for an RVP [Regional Vice President] that reported to me, the comp would also be approved by the CFO or the chief people officer, one level above me."[738] An internal USPI document from 2012 shows that USPI tracked its corporate salary increases for job titles including Regional Vice Presidents, Vice Presidents, Directors, Administrators, and others.[739] These increases were sent to USPI's then COO Garvin to "review and make any recommended changes," and the increases would then be discussed with Bill Wilcox, USPI's then-CEO, and Mark Kopser, then USPI's CFO.[740]

B.      As shown in internal USPI documents, Regional Vice Presidents, Market Presidents, Executive and Senior Vice Presidents, and Group Presidents were also sometimes involved in approving compensation decisions. A 2012 internal document, for instance, showed USPI tracking its Administrator salary increases, and noted that these increases were approved by the higher-level Regional Vice Presidents and Market Presidents.[741] Similarly, a 2015 USPI document instructed supervisors to complete a worksheet for employees eligible for merit increases.[742] These proposals were escalated for senior-level review and approval: "The proposed increases will be accumulated for calibrations with the EVP/SVP

---

[737] English Dep. at 40:14–18; *see also* Karrmann Dep. at 37:5–38:2.

[738] Johnston Dep. at 40:24–41:5.

[739] Ex. PX113 (cover email) and Ex. PX112 (attachment to Ex. PX113).

[740] *Id.*

[741] Ex. PX111 (cover email) and Ex. PX112 (attachment).

[742] Ex. PX115 (cover email) and Ex. PX116 (attachment).

[Executive Vice President/Senior Vice President] Leads, Jason Cagle and Sandi Karrmann."[743] Further, supervisors were instructed to "not disseminate or otherwise set expectations for any adjustments included in the spreadsheet . . . until final approvals have been communicated."[744] Another document shows USPI instructing that for "Administrators' proposed 'pro-rated' salary adjustments," "[a]ny increases above the original percentage approved in November will need approval from your Group President."[745]

iii.    As such, █████████████████████████



## B.    Defendants' CSI Exchanges Would Likely Suppress Employee Compensation Across the Board.

149.    As above, in this section I opine that pursuant to common evidence (and based on my experience and research in compensation and human resource management), coordination on compensation for a subset of job titles would likely cascade to the rest of the Class.  Even if the Defendants did not coordinate on compensation for *every* single job title, if they successfully coordinated to suppress the compensation of some positions, that would be spread widely to other employees as well.  Finally, a reduction in the merit increase budget would likely directly reduce the compensation of all of Defendants' employees.

---

[743] *Id.* at USPI_CIV_000039752.

[744] *Id.*

[745] Ex. PX180 at USPI_CIV_000091768.

[746] Ex. PX281 at DOJCIV-008-00000054; Mosley Dep. at 50:18–50 (confirming accuracy of ██ ██████████████████ ).

150.    The evidence I review in this section includes compensation-related literature.

151.    First, note that all employees in companies are typically covered by the same salary merit increase budget and that the sizes of merit increases in percentage terms are usually uniform within a company across jobs and job levels.

152.    For example, WorldatWork and other surveys that that collect data on planned and/or actual merit budgets (that have already been implemented) typically do not find any meaningful differences in the size of merit percent awarded to employees in different levels or types of jobs.  **Figure 15** (below), from a WorldatWork merit increase budget survey conducted in 2016–2017 (one of the years during the period of interest) illustrates this point.

**Figure 15**[747]

FIGURE 2    **Total Salary Budget Increases, by Employee Category**

Salary Budget Increases (zeros included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 2.9% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% |
| Exempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Officers/Executives | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| All | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |

Salary Budget Increases (zeros not included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Exempt Salaried | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |
| Officers/Executives | 3.1% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% |
| All | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |

---

[747] WORLDATWORK, SALARY BUDGET SURVEY at 20 (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf.

153.    Even where Defendants did allocate their merit increase budget differentially across different employees, recall that SCA and USPI used merit pay increase grids and DaVita used merit increase guidelines that incorporated employees' performance ratings to determine how much merit increase each employee would get.  The way a merit increase grid works is that any employee with performance above the average, will receive a larger merit pay increase in percentage terms the lower his/her compa-ratio is.  The logic is that a high performer should have a compa-ratio of 110 to 120% (or equivalently, be paid at 110 to 120% of midpoint, which is also equivalent to being paid 110 to 120% of the average salary among competitors for that job).  (This logic is similar to DaVita's internal equity logic, wherein an important objective was to align individual pay with individual performance and do this consistently across individual employees.)  However, all of the merit increases combined must add up to the average merit increase budget.  Thus, to reduce the overall merit increase budget while maintaining the relative differentials between employees with different performance ratings and compa-ratios, the majority of individual employees' merit increase would have to be reduced.

## IX.    CONCLUSIONS

154.    Based on the documents I have considered and my knowledge of labor markets and compensation systems, I have a number of conclusions.  These views are expressed in the report and some are summarized here.

155.    Defendants were incentivized to collude to suppress labor market competition, because they valued low employee turnover rates and wanted to keep labor costs low.  Further, industry conditions facilitated conclusion, given the exclusive and tight-knit nature of Defendants' industry which provided executives with better opportunities to establish their agreements.

-196-

156.     Collusion that restricts job mobility is harmful because employee mobility is a core tenet of a properly-functioning labor market and economy.  It allows workers to move to positions where they are more productive, which in turn increases their wages.  Additionally, it benefits incumbent employees, because employers must raise compensation to prevent further turnover.  But even absent Defendants No-Poach Agreements, access to job mobility is insufficient if no higher-paying jobs exist because CSI Exchanges in the form of competitor wage data exchanges have suppressed the labor market rate.

157.     Common evidence shows that Defendants' No-Poach Agreements and CSI Exchanges would likely have limited employees' job mobility and bargaining power.

a.     Foremost, Defendants valued recruiting passive candidates who were not actively seeking employment elsewhere.  In the absence of the No-Poach Agreements, Defendants routinely cold called their competitors' employees to recruit them.  This practice generally yields higher wages for job candidates, who are offered more compensation to entice them to leave their jobs, and who can use those offers to negotiate higher salaries with their current employers.  It also gives employees who receive cold calls more information about the job market, which is frequently shared with employees who were not proactively solicited.  Accordingly, restrictions on proactive recruiting clearly would have had impacts on employees among the Defendant firms.  Specifically, such restrictions would exacerbate information asymmetries and to depress levels of compensation for those who would have been solicited, as well as for all or nearly all salaried employees of Defendant firms.

b.     Defendants' No-Poach Agreements also included an unusual "tell-your-boss" provision that further suppressed employee compensation.  Therein, Defendants agreed not to offer jobs to each other's employees unless at an early stage in the hiring process—well before

-197-

the candidates received formal job offers—the employees notified their current supervisors that they intended to leave their positions. Inevitably, this provision eliminated confidentiality in the hiring process, and I conclude it would have discouraged employees from pursuing opportunities at Defendant firms, and eliminated opportunities to increase their compensation.

c. The evidence I have reviewed further demonstrates, based on my experience and research in compensation and human resource management, that Defendants CSI Exchanges are inconsistent with the conduct of employers who are competing for labor and would have suppressed Class pay. There is no benefit to a firm if it unilaterally shares, for example, nonpublic wage data. Rather, such exchanges between competitors facilitate anticompetitive collusion to suppress employee pay.

158. Defendant firms' No-Poach Agreements and CSI Exchanges harmed Defendants' employees by suppressing their compensation.

159. Compensation-related theory and literature, which are evidence common to the Class, show that the wage suppression caused by the foregoing conduct is expected to persist for years.

160. The evidence shows that pay moved in Defendant firms in systematic and structured ways. Moreover, I conclude that common evidence shows that Defendant firms implemented and maintained compensation systems that sought to achieve pay equity. Issues of internal and external equity were important to Defendants.

a. Defendants' systematized compensation structures that used market surveys, pay lines, pay grades, and many other typical features of compensation structures. Moreover, Defendants made use of compensation principles beyond salary. These other forms of compensation include components such as bonuses and stock.

-198-

b. Whether or not Defendants used the specific term "internal equity," Defendants' compensation systems valued pay fairness and aimed to pay similar employees similarly, and to correct for outliers to restore equity.

c. A compensation system that includes pay for performance is not mutually exclusive with one that that takes internal equity into account. Compensation structures that pay for performance can maintain internal equity as a key objective, as here.

161. Because Defendant firms had systematized pay structures, impacts to these systems cycle on to other employees and their levels of compensation. Defendants' No-Poach Agreements and CSI Exchanges therefore limited and had negative consequences on employee compensation not only for the workers who were directly involved, but also for nearly all employees. Consequently, nearly all salaried employees, including Class Members, would have been paid more but for the challenged conduct.

162. Although I have not been asked to estimate the magnitude of damages in this case, my knowledge of compensation systems and the materials I considered informs my opinion that No-Poach Agreements, such as the agreements at issue in this case, and exchanges of confidential wage information, such as the CSI Exchanges at issue in this case, will suppress the compensation of all or nearly all members of Plaintiffs' proposed Class, including those with different job titles.

163. I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

Dated:  January 15, 2025         Respectfully submitted,

Dr. Barry Gerhart

## PROOF OF SERVICE

I, Sarah D. Zandi, an attorney, hereby certify that on January 15, 2025, I served a true and correct copy of the foregoing **Expert Witness Report of Dr. Barry Gerhart** by electronic mail upon the following parties and non-parties as set forth below:

| | |
|---|---|
| Kenneth M. Kliebard<br>Staci M. Holthus<br>MORGAN, LEWIS & BOCKIUS LLP<br>110 North Wacker Drive<br>Chicago, IL 60606<br>(312) 324-1000<br>Kenneth.kliebard@morganlewis.com<br>Staci.holthus@morganlewis.com | Jeffrey C. Bank<br>Jordanne Steiner<br>WILSON SONSINI GOODRICH &<br>ROSATI, P.C.<br>1700 K Street NW, Fifth Floor<br>Washington, DC 20006<br>(212) 497-7761<br>jbank@wsgr.com<br>jordanne.miller@wsgr.com |
| Amy B. Manning<br>MCGUIREWOODS LLP<br>77 West Wacker Drive<br>Suite 4400<br>Chicago, IL 60601-7567<br>amanning@mcguirewoods.com | Veronica Moyé<br>KING & SPALDING LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br>(215) 556-2100<br>vmoye@kslaw.com |
| Brian Joseph Smith<br>K&L GATES, LLP<br>70 W. Madison Street<br>Chicago, IL 60602<br>(312) 807-4202<br>**brian.j.smith@klgates.com** | Molly Moriarty Lane<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Market<br>Spear Street Tower<br>San Francisco, CA 94105-1596<br>(415) 442-1000<br>Molly.lane@morganlewis.com |
| Jeffrey E. Stone<br>Katharine M. O'Connor<br>MCDERMOTT, WILL & EMERY LLP<br>444 West Lake Street, Suite 400<br>Chicago, IL 60605<br>(312) 372-2000<br>jstone@mwe.com<br>**koconnor@mwe.com** | |

Dated:  January 15, 2025

Respectfully submitted,

*/s/ Sarah D. Zandi*
Sarah D. Zandi

## APPENDIX A

## DR. BARRY GERHART CV

**Barry Gerhart**
Bruce R. Ellig Distinguished Chair in Pay and Organizational Effectiveness
Professor of Management & Human Resources
Wisconsin School of Business
University of Wisconsin-Madison
4194 Grainger Hall
975 University Avenue
Madison, WI 53706-1323
barry.gerhart@wisc.edu

## I.   EDUCATION

Ph.D.   University of Wisconsin--Madison, 1985
Major:   Industrial Relations (Personnel and Organizational Behavior)
Minors:   Labor Economics, Research Methods/Statistics

B.S.   Bowling Green State University, 1979 Major: Psychology

## II.   PROFESSIONAL EXPERIENCE

January 2023 – July 2023. Interim Vice Provost and Dean, International Division, UW-Madison.

February 2018 – July 2019. Interim Albert O. Nicholas Dean, Wisconsin School of Business, University of Wisconsin-Madison.

January 2018. Acting Dean, Wisconsin School of Business, University of Wisconsin-Madison.

July 2017 – January 2018. Senior Associate Dean for Faculty and Research, Wisconsin School of Business, University of Wisconsin-Madison.

Summer 2015. Otto Mønsted Visiting Professor, Copenhagen Business School.

April 2014. Visiting Professor, King's College London, University of London.

August 2008 – July 2012. Chair, Department of Management & Human Resources, Wisconsin School of Business, University of Wisconsin-Madison.

June 2011. Visiting Scientist. Center for Advanced Management Studies, Ludwig-Maximilian-University Munich.

September 2004 – present.  Bruce R. Ellig Distinguished Chair in Pay and Organizational Effectiveness.  School of Business, University of Wisconsin-Madison.

-204-

June 2008.  Ludwig Erhard Professor.  Bayreuth University, Germany.

August 2000 – August 2004.  John and Barbara Keller Distinguished Chair of Business, August 2000 – present. Professor of Management & Human Resources, School of Business, University of Wisconsin-Madison.

July 1996 – July 2000.  Professor of Management, Frances Hampton Currey Professor of Organization Studies, and Area Coordinator, Owen Graduate School of Management, Vanderbilt University.

March 1995 - April 1995, October 1995.  Visiting Faculty Member, Faculty of Social Sciences, Charles University, Prague, Czech Republic and Faculty of Management, Comenius University, Bratislava, Slovakia.

August 1992 – August 1995. Chair, Department of Human Resource Studies, School of Industrial and Labor Relations, Cornell University.

August 1985 -- August 1996.  Assistant Professor and Associate Professor (with tenure), Department of Human Resource Studies, School of Industrial and Labor Relations, Cornell University.

## III.    AWARDS & HONORS

### Wisconsin School of Business Awards

Erwin A. Gaumnitz Distinguished Faculty Award for Service, Wisconsin School of Business, University of Wisconsin-Madison, 2017

Erwin A. Gaumnitz Distinguished Faculty Research Award, Wisconsin School of Business, University of Wisconsin-Madison, 2011

### Career Awards

Michael R. Losey Excellence in Human Resource Research Award, Society for Human Resource Management, 2018. ("This award honors lifetime achievement in human resource research.")

Thomas A. Mahoney Mentoring Award, Academy of Management, Human Resources Division, 2018. (Given "to an individual who has distinguished himself/herself in the mentoring of PhD students.")

Fellow, Academy of Management, 2013. (Roughly 1 % of non-emeritus faculty in the Academy of Management are Fellows.)

Herbert Heneman Jr. Award for Career Achievement, Human Resources Division, Academy of Management, 2012. (Roughly 1 % of non-emeritus faculty in the Human Resources Division have received the Heneman Award. The Division has 2200+ non-emeritus, non-student academic members.)

Fellow, American Psychological Association (& Society for Industrial and Organizational Psychology), 2001

## Article/Paper Awards

International Human Resource Management Scholarly Research Award (best international article), Academy of Management, Human Resources Division, 2015

Outstanding Author Contribution Award, *Research in Personnel and Human Resources Management*, 2010 (best article in that annual volume)

International Human Resource Management Scholarly Research Award (best international article), Academy of Management, Human Resources Division, 2007

Scholarly Achievement Award (best article), Academy of Management, Personnel/Human Resources Division, 1991

Outstanding Paper Award (best paper at meeting), Academy of Management, Personnel/Human Resources Division, 1989

*Runner-up*, *Human Resource Management Review* (*HRMR*) 2019 Scholarly Impact Award for Gerhart, B. & Fang, M. 2014. (This award recognizes the article published in print in *HRMR* during the previous five calendar years that has made the biggest contribution to the field.)

*Finalist*, Scholarly Achievement Award (best article), Human Resources Division, Academy of Management, 2011

## Dissertation Awards (where I was chair of committee)

Mevan Jayasinghe, First Prize, 2013 Industry Studies Association Dissertation Award Competition.

Anthony Nyberg, Ralph Alexander Best Dissertation Award, 2009, Human Resources Division, Academy of Management.

## IV.    CITATIONS/RESEARCH IMPACT

36,473 (13,032 since 2019) in Google Scholar
h-index = 61 in Google Scholar (as of end of 2023)
https://scholar.google.com/citations?user=q6n8ZHcAAAAJ&hl=en&oi=ao

Top 2% in Research Impact of Scientists Worldwide, Stanford University and Elsevier (as of end of 2022), https://elsevier.digitalcommonsdata.com/datasets/btchxktzyw/6

## V.    TEACHING

Areas: Strategic Human Resources (masters, Ph.D.); Compensation (undergraduate, masters); Research Methods (Ph.D.)

Course Evaluation Scores, Fall 2000—Fall 2022, UW-Madison, Mean = 4.66/5.00, 31 sections. (Scale 1 instructor score used through Fall 2020, then new overall scale score used beginning Fall 2021).

## VI.    PUBLICATIONS

### Articles in Academic Journals/Annual Volumes and Selected Handbook Chapters

Fulmer, I.S., Gerhart, B., & Kim, J.H. (2023). Compensation and Performance: A Review and Recommendations for the Future. Personnel Psychology, 76, 687–718.

Kim, J.H., Gerhart, B., & Fang, M. (2022). Do Financial Incentives Help or Harm Performance in Interesting Tasks? Journal of Applied Psychology, 107, 153–167

Gerhart, B. & Feng, J. (2021). Human Resources and the Resource-Based View. Journal of Management, 47, 1796–1819.

Gerhart, B. (2017). Incentives and Pay for Performance in the Workplace. Advances in Motivation Science, 4, 91–140.

Gerhart, B. & Fang, M. (2017). Competence and Pay for Performance. In A.J. Elliot, C. S. Dweck, & D.S. Yeager (Eds.), Handbook of Competence and Motivation: Theory and Application. Guilford Press: New York. 2nd edition.

Gerhart, B. & Fang, M. (2015). Pay, Intrinsic Motivation, Extrinsic Motivation, Performance, and Creativity in the Workplace: Revisiting Long-held Beliefs. Annual Review of Organizational Psychology and Organizational Behavior, 2, 489–521.

Rabl, T., Jayasinghe, M., Gerhart, B. &. Kühlmann, T. A. (2014). Meta-Analysis of Country Differences in the High Performance Work System-Business Performance Relationship: The Roles of National Culture and Managerial Discretion. Journal of Applied Psychology,

99, 1011–1041. [Recipient, 2015 International Human Resource Management Scholarly Research Award, Human Resources Division, Academy of Management]

Gerhart, B. & Fang, M. (2014). Pay for (Individual) Performance: Issues, Claims, Evidence and the Role of Sorting Effects. Human Resource Management Review, 24, 41–52.

Trevor, C.O., Reilly, G, & Gerhart, B. (2012). Reconsidering Pay Dispersion's Effect on the Performance of Interdependent Work: Reconciling Sorting and Pay Inequality. Academy of Management Journal, 55, 585–610.

Gerhart, B. (2012). Construct Validity, Causality, and Policy Recommendations: The Case of High Performance Work Practice Systems. Human Resource Management Review, 22, 157–160.

Fang, M. & Gerhart, B. (2012). Does Pay for Performance Diminish Intrinsic Interest? A Workplace Test Using Cognitive Evaluation Theory and the Attraction-Selection-Attrition Model. International Journal of Human Resource Management, 23, 1176-1196.

Nyberg, A., I. Fulmer, B. Gerhart, & M.A. Carpenter. (2010). Agency Theory Revisited: CEO returns and Shareholder Interest Alignment. Academy of Management Journal, 53, 1029–1049. [Finalist (one of five), Scholarly Achievement Award (best article), Human Resources Division, Academy of Management.]

Gerhart, B. (2009). Does National Culture Constrain Organization Culture and Human Resource Strategy? The Role of Individual Mechanisms and Implications for Employee Selection. Research in Personnel and Human Resources Management, 28, 1–48. [Recipient, Outstanding Author Contribution Award. For best article in that year's volume.]

Gerhart, B., Rynes, S.L., & Fulmer, I.S. (2009). Pay and Performance: Individuals, Groups, and Executives. Academy of Management Annals, 3, 251–315.

Gerhart, B. (2009). How Much Does National Culture Constrain Organization Culture? Management and Organization Review, 5, 244–259.

Lee, T.H., Gerhart, B., Weller, I. & Trevor, C.O. (2008). Understanding voluntary turnover: Path-specific job satisfaction effects and the importance of unsolicited job offers. Academy of Management Journal, 51, 651–671.

Gerhart, B. (2008). Cross-Cultural Management Research: Assumptions, Evidence, and Suggested Directions. International Journal of Cross Cultural Management, 8, 259–274.

Gerhart, B. (2008). Review Essay: The Growth of International Human Resource Management. International Journal of Human Resource Management, 19, 1989–1994.

Rynes, S.L., Gerhart, B., & Parks, L. (2005). Personnel Psychology: Performance Evaluation and Pay-for-Performance. Annual Review of Psychology, 56, 571–600.

Gerhart, B. & Fang, M. (2005). National Culture and Human Resource Management: Assumptions and Evidence. International Journal of Human Resource Management, 16, 975–990. [Recipient, 2007 International Human Resource Management Scholarly Research Award, Human Resources Division, Academy of Management]

Gerhart, B. (2005). Human Resources and Business Performance: Findings, Unanswered Questions, and an Alternative Approach. Management Revue: The International Review of Management Studies, 16, 175–185.

Gerhart, B. (2005). The (Affective) Dispositional Approach to Job Satisfaction: Sorting out the Policy Implications. Journal of Organizational Behavior, 26, 79–97.

Rynes, S.L., Gerhart, B., & Minette, K.A. (2004). The Importance of Pay in Employee Motivation: Discrepancies between What People Do and What They Say. Human Resource Management. 43, 381–394.

Gerhart, B. (2004). Comment on Promise and peril in implementing pay-for performance. Human Resource Management, 43, 29–31.

Fulmer, I.S., Gerhart, B., Scott, K.S. (2003). Are the 100 Best Better? An Empirical Investigation of the Relationship between Being a Great Place to Work and Firm Performance. Personnel Psychology, 56, 965–993.

Sturman, M.C., Trevor, C.O., Boudreau, J.W., & Gerhart, B. (2003). Is It Worth It to Win the Talent War? Evaluating the Utility of Performance-Based Pay. Personnel Psychology, 56, 997–1035.

Wright, P.M., McMahan, G. & Snell, S, & Gerhart, B. (2001). Comparing Line and HR Executives' Perceptions of HR Effectiveness: Services, Roles, and Contributions. Human Resource Management, 40, 111–124.

Wright, P.M., Gardner, T.M., Moynihan, L.M., Park, H.J., Gerhart, B., & Delery, J.E. (2001). Measurement Error in Research on Human Resources and Firm Performance: Additional Data and Suggestions for Future Research. Personnel Psychology, 54, 875-901.

Gerhart, B., Wright, & P.M, McMahan, G.C. (2000). Measurement Error in Research on Human Resources and Firm Performance: Further Evidence and Analysis. Personnel Psychology, 53, 855–872.

Gerhart, B., Wright, P.M, McMahan, G.C., & Snell, S.A. (2000). Measurement

Error in Research on Human Resources and Firm Performance:  How Much Error Is there and How Does it Influence Effect Size Estimates?  Personnel Psychology, 53, 803–834.

Graham, M.E., Hotchkiss, J.L., & Gerhart, B. (2000).  A Fixed-effects Analysis of Starting Pay Differences across Gender.  Eastern Economic Journal, 26, 9–27.

Murray, B. & Gerhart, B. (2000).  Skill-Based Pay and Skill Seeking. Human Resource Management Review, 10, 271–288.

Gerhart, B. (1999).  Human Resource Management and Firm Performance:  Challenges in Making Causal Inferences.  In Patrick Wright et al. (Eds.), Research in Personnel and Human Resources Management, 31–74.

Murray, B.C. & Gerhart, B. (1998).  An Empirical Analysis of a Skill-Based Pay Program and Plant Performance Outcomes.  Academy of Management Journal, 41(1), 68–78.

Trevor, C., Gerhart, B., & Boudreau, J.W. (1997). Voluntary Turnover and Job Performance:  Curvilinearity and the Moderating Influences of Salary Growth and Promotions.  Journal of Applied Psychology, 82, 44–61.

Gerhart, B. & Trevor, C. (1996). Employment Stability under Different Managerial Compensation Systems.  Academy of Management Journal, 39, 1692–1712.

Becker, B. & Gerhart, B. (1996).  The Impact of Human Resource Management on Organizational Performance:  Progress and Prospects.  Academy of Management Journal, 39, 779–801.

 Gerhart, B., Trevor, C., & Graham, M.  (1996). New Directions in Employee Compensation Research.  In G.R. Ferris (Ed.), Research in Personnel and Human Resources Management, pp. 143–203.

Bretz, R.D., Rynes, S., & Gerhart, B. (1993).  Recruiter Perceptions of Applicant Fit:  Implications for Individual Career Preparation and Job Search Behavior.  Journal of Vocational Behavior, 43, 310–327.

Gerhart, B. & Milkovich, G.T. (1992).  Employee Compensation: Research and Practice.  In M.D. Dunnette & L.M. Hough (Eds.), Handbook of Industrial & Organizational Psychology, 2nd Edition, Volume 3.  Palo Alto, CA:  Consulting Psychologists Press, Inc.

Rynes, S., Bretz, R. & Gerhart, B. (1991). The importance of recruitment in job choice:  A different way of looking.  Personnel Psychology, 44, 487–521.

Gerhart, B. & Rynes, S. (1991).  Determinants and Consequences of Salary Negotiations by Graduating Male and Female MBAs.  Journal of Applied Psychology, 76, 256–262.

Milkovich, G.T., Gerhart, B., Hannon, J. (1991). The Effects of Research and Development Intensity on Managerial Compensation in Large Organizations. Journal of High Technology Management Research, 2, 133–150.

Gerhart, B. & El Cheikh, N. (1991). Earnings and Percentage Female: A Longitudinal Study. Industrial Relations, 30, 62–78.

Gerhart, B. & Milkovich, G.T. (1990). Organizational Differences in Managerial Compensation and Financial Performance. Academy of Management Journal, 33, 663–691. [Co-recipient, 1991 Scholarly Achievement Award, Personnel/Human Resources Division, Academy of Management]

Gerhart, B. (1990). The Prediction of Voluntary Turnover Using Tenure, Behavioral Intentions, Job Satisfaction and Area Unemployment Rates. Journal of Applied Psychology, 75, 467–476.

Gerhart, B. (1990). Gender Differences in Current and Starting Salaries: The Role of Performance, College Major, and Job Title. Industrial and Labor Relations Review, 43, 418–433.

Rynes, S. & Gerhart, B. (1990). Interviewer Assessments of Applicant Fit: An Exploratory Investigation. Personnel Psychology, 43, 13–36.

Gerhart, B. (1988). Sources of Variance in Incumbent Perceptions of Job Complexity. Journal of Applied Psychology, 73, 154–162

Haberfeld, Y. and Gerhart, B. (1988). Re-examining Employment Discrimination: An Empirical Test of Forward versus Reverse Regression. Journal of Human Resources, 23, 138–143.

Gerhart, B. (1987). How Important Are Dispositional Variables as Determinants of Job Satisfaction? Implications for Job Design and Other Personnel Programs. Journal of Applied Psychology, 72, 366–373.

Gerhart, B. and Jarley, P. (1987). Comment on Louis Jacobson's A Tale of Employment Decline in Two Cities: How Bad Was the Worst of Times? Industrial and Labor Relations Review, 40, 280–284.

 **Chapters (or Contributions) in Edited Books**

Gerhart, B., Trevor, C., & Scott, D. (2023). Merit Pay. In Performance Management Systems: A Global Perspective. Routledge. [update of Gerhart & Trevor, 2008].

Gerhart, B. (2019). Commentary on Larkin and Nyberg and Reilly. In A.J. Nyberg and T.P. Moliterno (Eds.), Handbook of Research on Strategic Human Capital Resources. Edward Elgar Publishing.

Gerhart, B. & Weller, I. (2019). Compensation. In A. Wilkinson et al. (Eds.), Sage Handbook of Human Resource Management. [update of Gerhart, 2009]

Weller, I. & Gerhart, B. (2018). Methodological Challenges for Quantitative Research in Comparative HRM. In C. Brewster, W. Mayrhofer & E. Farndale (Eds.), Handbook of Research in Comparative Human Resource Management, Edward Elgar Publishing. 2nd edition. [update of Weller & Gerhart, 2012]

Gerhart, B. (2013). Research on Human Resources and Effectiveness: Some Methodological Challenges. In Jaap Paauwe, David E Guest, & Patrick M. Wright (Eds.), HRM and Performance: Achievements and challenges, West Sussex, UK: Wiley, pp. 149–171.

Weller, I. & Gerhart, B. (2012). Empirical Research Issues in Comparative HRM. In W. Mayrhofer & C. Brewster (Eds.), Handbook of Research in Comparative Human Resource Management, Edward Elgar Publishing.

Gerhart, B. (2009). Compensation. In A. Wilkinson et al. (Eds.), Sage Handbook of Human Resource Management.

Gerhart, B. (2008). Compensation. In John Storey and Patrick Wright (Eds.), The Routledge Companion to Strategic Human Resource Management. London, U.K.: Routledge.

Gerhart, B. & Trevor, C.O. (2008). Merit Pay. In A. Varma, P.S. Budhwar, & A. DeNisi (Eds.), Performance Management Systems: A Global Perspective. Oxford, U.K.: Routledge.

Gerhart, B. (2008). Compensation and National Culture. In S. Werner & L.R. Gomez-Mejia (Eds.), Global Compensation: Foundations and Perspectives. London, U.K.: Routledge

Gerhart, B. (2007). Modeling Human Resource Management—Performance Linkages. In P. Boxall, J. Purcell, & P. Wright (Eds.), The Oxford Handbook of Human Resource Management. Oxford University Press.

Gerhart, B. (2007). Horizontal and Vertical Fit in Human Resource Systems. C. Ostroff and T. Judge (Eds.), Perspectives on Organizational Fit. SIOP Organizational Frontiers Series. New York: Lawrence Erlbaum Associates, Taylor & Francis Group.

Gerhart, B. (2001). Designing Reward Systems: Balancing Results and Behaviors. In Charles H. Fay (Ed.), The Executive Handbook on Compensation. New York: Free Press.

Gerhart, B. (2000).  Compensation Strategy and Organizational Performance.  In S.L. Rynes & B. Gerhart (Eds.), Compensation in Organizations.  San Francisco:  Jossey-Bass.  Frontiers of Industrial and Organizational Psychology series.

Gerhart, B. (1997).  Managerial Compensation and Gender Issues in Compensation.  In L. Peters, C. Greer, & S. Youngblood (Eds.), The Blackwell Encyclopedic Dictionary of Human Resource Management.  Oxford:  Basil Blackwell Ltd.

Broderick, R. & Gerhart, B. (1996).  Nonwage Compensation.  In D.J.B. Mitchell, D. Lewin, & M.A. Zadi (Eds.), The Human Resource Management Handbook.  JAI Press, pp. 145–173.

Gerhart, B. (1995).  Bonus Payments; Performance-Related Pay; Rewards; Payment Systems. In N. Nicholson (Ed.), The Blackwell Encyclopedic Dictionary of Organizational Behavior. Oxford:  Basil Blackwell Ltd, pp. 33, 405–409, 415–417, and 491–492, respectively..

Gerhart, B., Minkoff, H., & Olsen, R. (1995).  Compensation and Reward Systems.  In G.R. Ferris, S.D. Rosen, & D.T. Barnum (Eds.), Handbook of Human Resource Management. Cambridge, MA:  Blackwell Publishers.

Gerhart, B. & Bretz, R.D. (1994).  Employee Compensation.  In W. Karwowski & G. Salvendy (Eds.), Organization and Management of Advanced Manufacturing.  New York: John Wiley & Sons.

Gerhart, B., Milkovich, G.T., Murray, B. (1992).  Pay, Performance, and Participation.  In D. Lewin, O. Mitchell, & P. Sherer (Eds.), Research Frontiers in Industrial Relations. Madison, WI:  Industrial Relations Research Association.

Gerhart, B. & Milkovich, G.T. (1989).  Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm.  In R. Michael & H. Hartmann (Eds.), Pay Equity: Empirical Inquiries.  Washington, D.C.:  National Academy Press.

**Research Books/Monographs**

Gerhart, B. & Rynes, S.  (2003). Compensation:  Theory, Evidence, and Strategic Implications.  Thousand Oaks, CA:  Sage Publications, Inc., Foundations for Organizational Science series.  [also published in Chinese]

Rynes, S.L. & Gerhart, B. (2000).  Compensation in Organizations.  San Francisco:  Jossey-Bass.  Edited Volume.  Frontiers of Industrial and Organizational Psychology series.

**Textbooks**

Gerhart, B. (2023). Compensation.  New York: McGraw-Hill/Irwin, 14th edition.

Gerhart, B. & Newman, J.M. (2020). Compensation.  New York: McGraw-Hill/Irwin, 13th edition.

Newman, J.M., & Gerhart, B., & Milkovich, G.T. (2017).  Compensation.  New York: McGraw-Hill/Irwin, 12th edition.

Milkovich, G.T., Newman, J.M., & Gerhart, B. (2010, 2014).  Compensation.  New York: McGraw-Hill/Irwin, 10th and 11th editions.

Noe, R.A., Hollenbeck, J.R., Gerhart, B., & Wright, P.M. (2023).  Human Resource Management:  Gaining a Competitive Advantage.  New York:  McGraw-Hill/Irwin. [1[st] through 13th editions].

Noe, R.A., Hollenbeck, J.R., Gerhart, B., & Wright, P.M.  (2022). Fundamentals of Human Resource Management.  New York:  McGraw-Hill/Irwin. [1[st] through 9th editions].

Milkovich, G.T. & Gerhart, B. (2013, 2021).  Cases in Compensation. [11e, 11.1e, and 12e editions]. Self-published.

DeCieri, H., Kramar, R. Noe, R.A., Hollenbeck, J.R., Gerhart, B., & Wright, P.M. (2002, 2005, 2008, 2010). Human Resource Management in Australia: Strategy, People & Performance. New York:  McGraw-Hill/Irwin.

Noe, R.A., Hollenbeck, J.R., Gerhart, B., & Wright, P.M. (1994, 1997).  Readings in Human Resource Management.  Chicago:  Irwin.

*Note: There are additional versions of the textbooks adapted to other countries and/or in other languages, in collaboration with additional co-authors.*

### **Practice-Oriented Journals**

Conroy, S. A., Yoon, Y. J., Bamberger, P. A., Gerhart, B., Gupta, N., Nyberg, A. J., Park, Park, Shaw, & Sturman, M. C. (2016). Past, Present and Future Compensation Research Perspectives. Compensation & Benefits Review, 47(5–6), 207–215.

Ledford, G.E. Jr., Fang, M., & Gerhart, B. (2013).  Negative Effects of Extrinsic Rewards on Intrinsic Motivation:  More Smoke than Fire. World at Work Journal. 22(2), 17–29.

## VII.    PRESENTATIONS AND MEETINGS PAPERS (selected, since 2015)

Gerhart, B. Panelist. Professional Development Workshop. Calibrating Lens of Research in Compensation. Academy of Management, August 2023.

Gerhart, B. Facilitator. Compensation. HR Division Research Roundtable Networking Forum. Academy of Management, August 2023.

[pandemic period]

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. China Europe International Business School (Shanghai), November 2019.

Gerhart, B. Pay for Performance: Separating Fact from Fiction. Zhejiang University, November 2019.

Gerhart, B. Panelist. Strategic Human Capital and Entrepreneurship. Strategic Management Society (extension), Madison, October 19.

Kim, J.H., Gerhart, B., & Fang, M. Do Financial Incentives Help or Harm Performance in Interesting Tasks? Academy of Management. August 2019.

Gerhart, B. [& many others]. HR Research Roundtable. Academy of Management, August 2019.

Gerhart, B. [& many others]. Exploring Tough Research Questions with Compensation Scholars. Academy of Management, August 2019.

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. Nanjing University, May 2019.

Gerhart, B. Pay for Performance: Separating Fact from Fiction. Greater Toronto Area Rewards Association/World at Work, September 2018.

Gerhart, B. [& many others]. HR Research Roundtable. Academy of Management, August 2018.

Fang, M. & Gerhart, B. Does Pay for Performance Help or Harm Performance in Intrinsically Interesting Jobs? 6th European Reward Management Conference. Brussels, December 2017.

Gerhart, B. Pay for Performance, Motivation, Creativity, and Effectiveness: Claims, Evidence, and Future Directions. 6th European Reward Management Conference. Brussels, December 2017.

Gerhart, B. The United States System of Workplace Compensation. Korea Labor Institute, September 2017.

Gerhart [& several others]. Fostering Research and Relationships among Compensation Scholars. Academy of Management, August 2017.

Gerhart, B. Intrinsic Motivation and Pay. 6th Annual Research Symposium of the Centre for Leadership and Innovation, Hong Kong Polytechnic University, March 2017

Gerhart, B. Strategic Human Resource (HR) Perspective on Human Capital (HC) and HC Management Processes and Systems. New Perspectives on Human Capital, LMU Extension Mini-Conference, Strategic Management Society. Munich, Germany. September 2016

Gerhart, B. Strategy Microfoundations and Human Capital (& Human Resources). Strategic Management Society. Berlin, Germany. September 2016.

Conroy, S. A., Yoon, Y. J., Bamberger, P. A., Gerhart, B., Gupta, N., Nyberg, A. J., Park, Park, Shaw, & Sturman, M. C. Past, Present and Future Compensation Research Perspectives. Academy of Management, August 2016.

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. University of Wisconsin-Milwaukee, February 2016.

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. National Taiwan University, December 2015.

Gerhart, B. Does the Effectiveness of Management Practices Depend on National Culture? Claims and Evidence. National Central University, December 2015.

Gerhart, B. Pay for Individual Performance in a Global Economy. Taiwan Semiconductor Manufacturing Company, Hsinchu, Taiwan, December 2015.

Gerhart, B. Does the Effectiveness of Human Resource Management (High Performance Work Systems) Depend on National Culture? Claims and Evidence. Poster Session. Wisconsin Alumni Research Foundation. Poster Session, 2015.

Gerhart, B. Publishing, Impact, and Effect Size in the Field of Management. Copenhagen Business School, July 2015.

Gerhart, B. People Management, National Culture, and Performance: Claims and Evidence. Copenhagen Business School, May 2015.

Gerhart, B. Pay for Individual Performance in a Global Economy. Danish Confederation of Industry (Dansk Industri), Copenhagen, February 2015.

Gerhart, B. Intrinsic Motivation, Incentives, and Performance (in the workplace). Copenhagen Business School, February 2015.

## VIII. THESIS COMMITTEES (Chaired or co-chaired only)

### Ph.D.

<u>University of Wisconsin-Madison</u>

Yerim Sim. (Co-chair, current). The Unexpected Benefits of Delayed Feedback in Creativity: The Role of the Timing of Feedback in Idea Generation.

Kim, Ji Hyun. (2022). An Experimental Examination of Incentive and Sorting Effects of Pay-for-Performance on Creative Performance. Assistant Professor, National University of Singapore.

Feng, Jie (Jasmine). (2015). Organization change, employee attitudes, and turnover:  The role of sorting. Associate Professor, Rutgers University.

Jayasinghe, Mevan. (2013). Labor Codes and Human Resource Strategy in Emerging Economies: Establishment Outcomes and Worker Outcomes.  Recipient, First Prize, 2013 Industry Studies Association Dissertation Award Competition. Associate Professor, Michigan State University.

Nyberg, Anthony. (2008). Performance, Promotions, and Pay.  Recipient, Ralph Alexander Best Dissertation Award, 2009, Human Resources Division, Academy of Management. Professor, University of South Carolina.

Choi, Jang-Ho. (2008). High Performance Work Systems and Performance in Domestic and Overseas Korean-owned Firms. Professor, Sogang University (Korea)

Oh, Kye Taik. (2006). Perceived Management Style, Cultural Adjustment, and Job Attitudes among Korean and non-Korean Employees in Korean-owned Domestic and Foreign Subsidiary Operations:  Nationality and Organization Differences. Director, Center for Wage and Innovation, Korea Labor Institute.

Lee, Tae Heon. (2004). Distinct Voluntary Turnover Paths and Determinants.

<u>Vanderbilt University</u>

Fulmer, Ingrid S. (2003).  Labor Market Influences on Executive Pay Setting. Professor and Dean,  School of Labor and Employment Relations, University of Illinois Urbana-Champaign.

Cornell University

Trevor, Charles O. (1997).  Examining New and Contested Relationships from Traditional Voluntary Turnover Models:  A Multidimensional Approach to Unemployment Rate and Job Market Ease of Movement.  Professor, University of Wisconsin-Madison.

Fang, Meiyu. (1997).  A Study of Work Motivation:  The Influence of Organizational Variables and Individual Characteristics on Work Motivation and Outcomes. Professor, National Central University (Taiwan).

Smith (Hybels), Catherine. (1997). The Effects of Recruitment Practices and Organizational Reputation on Applicant Attraction:  A Multi-Employer Perspective. Director, Leadership in Medicine.

Graham, Mary. (1995). Employee Responses to Pay Policy Changes:  An Organizational Justice Perspective. Professor, Syracuse University.

Takao, Shojiro. (1995). The Multidimensionality of Organizational Commitment:  An Analysis of its Antecedents and Consequences among Japanese Systems Engineers. Associate Professor, Keio University (Japan). Deceased.

Murray, Brian. (1993). Organizational Outcomes of a Skill-Based Pay Program. Professor, University of Dallas.

## **M.S.**

Cornell University

Fang, Meiyu. (1993). The Relative Impact of Country, Job Attributes, and Employee Attributes on Employee Attitudes.

Graham, Mary.  (1993). Starting Salary Differences between Women and Men: Organization-Level Findings and an Analysis of Current Policy Options.

Murray, Brian. (1991). External Competitiveness and Internal Consistency in Compensation: Consequences for Organization Performance.

Smith, Cathy. (1990). Job Search Strategies:  Their Effects on Placement Success.

Chang, Ling-Jiuan (Joann) (1989).  Objective Measures of Alternative Job Opportunities and Voluntary Turnover.

El Cheikh, Nabil. (1988). Earnings and Occupational Characteristics of Men and Women:  A Cross-sectional and Longitudinal Study.

**IX.    SERVICE-UNIVERSITY OF WISCONSIN-MADISON (selected, Wisconsin School of Business unless noted otherwise)**

Interim Vice Provost and Dean, International Division, UW-Madison, January 2022

Academic Planning Committee, International Division, UW-Madison, 2019

Interim Albert O. Nicholas Dean, February 2018–July 2019

Acting Dean, January 2018

Senior Associate Dean for Faculty and Research, July 2017–January 2017

Ad hoc Committee, International Business undergraduate major redesign, 2016–2017

Masters Curriculum Committee, 2015–2016, 2016–2017

Co-Chair, Career Development & Placement Project Team, Full-time MBA review, 2015–2016

Ad hoc Committee, Review (5-year) of Certificates in E-ship and Innovation, 2015–2016

Ad hoc Committee, Review (5-year) of Weinert Center, 2015–2016

Academic Planning Council (consult to Dean on resource allocation) and Subcommittee of Executive Committee (promotion, tenure, salary, and other personnel decisions), School of Business, 2003–2004, 2004–2005, 2005–2006, 2010–2011, 2011–2012, 2012–2013, 2016–2017, 2020–21, 2022–2023 [elected by faculty in all years]

Director, MBA Program in Strategic Human Resource Management, 2003–2004, 2004–2005, 2005–2006, Fall 2006, Fall 2008 (acting director while L. Hunter on sabbatical), Fall 2013, Spring 2014, 2015-2016.

Department Chair, Management & Human Resources, two terms, August 2008–July 2012

Coordinator, Committee to Develop Graduate Certificates in Entrepreneurship and Innovation and Undergraduate Certificate in Entrepreneurship, 2009–2010

Five-Year Review Committee of Dean, School of Business, Spring 2007

Chair, Subcommittee of the Executive Committee, School of Business, 2004–2005

Chair, Ph.D. Committee, Department of Management and Human Resource Studies, School of Business, 2001–2002, 2002–2003, 2003–2004

Ad Hoc MBA Curriculum Committee, School of Business (complete redesign of curriculum to current MBA specialization model), 2002–2003

Executive Committee, Industrial Relations Research Institute

## X.  SERVICE-VANDERBILT UNIVERSITY (selected)

Dean Search Committee

Director, Human Resource Steering Committee (monthly lunch meeting of area HR Vice-Presidents)

Area Coordinator/Department Chair, Organization Studies, August 1996–December 1999

Research Committee, Owen School

Chair, Ad Hoc Promotion and Tenure Committees

Chair, Search Committee, Cal Turner Professor of Moral Leadership

## XI.  SERVICE-CORNELL UNIVERSITY (selected)

Department Chair, Human Resource Studies, August 1992–July 1995

Policy Board, Center for Advanced Human Resource Studies

Graduate Committee

Chair, Ad Hoc Faculty Search Committees

Chair, Ad Hoc Promotion and Reappointment Committees

University Research Policy Committee

## XII.  SERVICE-FIELD

**Editorial Boards:**

Industrial and Labor Relations Review, 1994

Management & Organization Review, 2011 (China, International Association for Chinese Management Research)

German Journal of Human Resource Management, 2017 (Germany)

Journal of International Business Studies, 2017–2022

International Journal of Human Resource Management, 1998–2020 (United Kingdom)

Academy of Management Journal, 1993–1999, 2002–2020

Journal of Applied Psychology, 1994–1996, 2007–2020

Journal of Management & Organization (Australia), 2006–2020

Personnel Psychology, 1996–2018

Journal of World Business, 2012–2017

Human Relations (United Kingdom), 2006–2011

Administrative Science Quarterly, 1999–2000

Ad Hoc Reviewer, numerous journals

**Guest Co-editor**

Special Issue on Human Resources and Organizational Performance, Academy of Management Journal (August 1996 issue)

**Chair, Outside Review Committee**

Department of Labor Studies, Tel Aviv University, January 2011

**Academy of Management Activities:**

Chair, Thomas A. Mahoney Mentoring Award Committee, Academy of Management, Human Resources Division, 2019.

Chair, Thomas A. Mahoney Mentoring Award Committee, Academy of Management, Human Resources Division, 2018.

Member, Herbert Heneman Jr. Award for Career Achievement Committee, Human Resources Division, Academy of Management, 2016, 2017, 2018, 2019

Member, International Human Resource Management Scholarly Research Award Committee, Academy of Management, HR Division, 2008, 2014, 2016

Member, Early Career Achievement Award Committee, Human Resources Division, Academy of Management, 2009, 2013, 2016.

Member, Scholarly Achievement Award Committee, Academy of Management, HR Division, 2014

Member, Ralph Alexander Dissertation Award, Academy of Management, HR Division, 2007, 2014

Chair, Herbert Heneman Jr. Award for Career Achievement Committee, Human Resources Division, Academy of Management, 2013

Member, All-Academy Career Achievement Awards Committee, Academy of Management, 2010

Chair, International Human Resource Management Scholarly Research Award Committee, Academy of Management, HR Division, 2010

Chair, Scholarly Achievement Award Committee, Academy of Management, HR Division, 2003

Chair, Awards Committee, HR Division, Academy of Management, 1997

Past Member, Executive Committee, HR Division, Academy of Management

Speaker, Doctoral Consortium, Academy of Management, HR Division, multiple occasions

Speaker, Junior Faculty Consortium, Academy of Management, HR Division, multiple occasions

## APPENDIX B

## Materials Considered Include the Following:

## I.  PAPERS, BOOKS, AND WEBSITES

## Papers, Books, and Websites

*About Us*, DAVITA REDWOODS, https://www.redwoods.davita.com/about-us (last visited Jan. 14, 2025)

*About Us*, SCAHEALTH, https://sca.health/about-us/

Andrew Hayek, LINKEDIN, https://www.linkedin.com/in/andrewhayek/

Annual Report, DAVITA (2010), https://filecache.investorroom.com/mr5ir_davita/118/2010%20DVA%20Annual_0.pdf

Annual Report, DAVITA (2023), https://investors.davita.com/download/DaVita_2023_Annual_Report.pdf

Armen Alchian, *Information Costs, Pricing, and Resource Unemployment,* 7 ECON. INQUIRY 109–128 (1969)

B. Jovanovic, *Job matching and the theory of turnover*, 87 J. POL. ECON. 972-990 (1979), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr75-0149206320978799

B. Jovanovic & R. Moffitt, *An estimate of a sectoral model of labor mobility*, 98 J. POL. ECON. 827-852 (1990), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr76-0149206320978799

BARRY GERHART, COMPENSATION (14th ed. 2023)

Barry A. Gerhart & George T. Milkovich, *Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm*, PAY EQUITY:  EMPIRICAL INQUIRIES, (R. Michael & H. Hartmann, Eds. 1989)

Barry Gerhart & Jie Feng, *The Resource-Based View of the Firm, Human Resources, and Human Capital: Progress and Prospects*, 47 J. MGMT. 1796–1819 (Jan. 4, 2021), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr85-0149206320978799

BARRY GERHART & SARA L. RYNES. COMPENSATION (2003)

Barry Gerhart & Sara Rynes, *Determinants and Consequences of Salary Negotiations by Graduating Male and Female MBAs*, 76 J. APPLIED PSYCH. 256–262 (1991)

Bill Myers, LINKEDIN, https://www.linkedin.com/in/bill-myers-6b88a12/

Boris Groysberg, Paul Healy & Eric Lin, *Determinants of Gender Differences in Change in Pay among Job-Switching Executives*, CORNELL UNIV. ILR REV. (June 14, 2020)

Brett Brodnax, LINKEDIN, https://www.linkedin.com/in/brett-brodnax-0022301/

Brian Mathis, LINKEDIN, https://www.linkedin.com/in/briantmathis/

Carlos Carrillo-Tudela, Bart Hobijn, Patryk Perkowski, & Ludo Visschers, *Majority of Hires Never Report Looking for a Job*, FED. RSRV. BANK OF S.F. ECON. LETTER (Mar. 30, 2015)

Charlie O. Trevor, Greg Reilly & Barry Gerhart, *Reconsidering pay dispersion's effect on the performance of interdependent work: Reconciling sorting and pay inequality*, 55 ACAD. MGMT. J. 585–610 (Sept. 8, 2012)

Dan Luu, *How Many Locations Does Surgical Care Affiliates Have?*, NWCC-OR (Aug. 3, 2022), https://www.nwcc-or.com/how-many-locations-does-surgical-care-affiliates-have#:~:text=SCA%20Health%20is%20dedicated%20to,patients%2C%20providers%2C%20and%20community

David Card, Alexandre Mas, Enrico Moretti, & Emmanuel Saez, *Inequality at Work: The Effect of Peer Salaries on Job Satisfaction*, 102 AM. ECON. REV. 2981-3003 (Oct. 2010)

David I. Levine, *What do Wages Buy?,* 38 ADMIN. SCI. Q. 462–483 (Sept., 1993)

DAVID NEUMARK & WILLIAM L. WASCHER, MINIMUM WAGES (2008)

Dennis Kogod, LINKEDIN, https://www.linkedin.com/in/dennis-kogod-02110b323/

Derek Neal, *Industry-specific human capital: Evidence from displaced workers*, 13 J. LAB. ECON. 653–677 (Oct. 1995)

Doug Swope, LINKEDIN, https://www.linkedin.com/in/doug-swope-a0178b5/

Dow Scott, Tom McMullen, & Mark Royal, *Reward Fairness: Slippery Slope or Manageable Terrain?,* WORLDATWORK J. (Fourth Quarter 2011)

E. P. Lazear & J. R. Spletzer, *Hiring, churn and the business cycle*, AM. ECON. REV. (2012), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr85-0149206320978799

Elaine Sorensen, *The Crowding Hypothesis and Comparable Worth*, 25 J. HUMAN RES. 55-89 (1990)

Eric Parrado, Asena Caner & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007)

Form 10-K, TENET HEALTH CARE CORP. (Dec. 31, 2023), https://s23.q4cdn.com/674051945/files/doc_financials/2023/q4/tenet-10K.pdf

Frank M.H. Neffke, Anne Otto, & Antje Weyh, *Inter-industry labor flows,* 142 J. ECON. BEHAV. & ORG. 275–292 (Oct. 2017)

George F. Dreher & Taylor H. Cox, Jr., *Labor Market Mobility and Cash Compensation: The Moderating Effects of Race and Gender*, ACAD. MGMT. J. (Oct. 1, 2000)

Giuseppe Moscarini & Fabien Postel-Vinay, *The Cyclical Job Ladder*, 10 ANN. REV. ECON. 165-188 (Aug. 2018)

Government Contractors, Prohibitions Against Pay Secrecy Policies and Actions, 80 Fed. Reg. 54934-01 (Sept. 11. 2015) (41 CFR Part 60-1)

Gov't Contractors, Prohibitions Against Pay Secrecy Policies and Actions, 79 Fed. Reg. 55712-02, 55713 (proposed Sept. 17, 2014) (to be codified at 41 C.F.R. pt 60).

Gueorgui Kambourov & Iourii Manovskii, *Rising occupational and industry mobility in the United States: 1968–97*, 49 INT'L ECON. REV. 41–79 (Feb. 2008)

Huasheng Gao„Juan Luo, & Tilian Tang, *Effects of Managerial Labor Market on Executive Compensation: Evidence from Job-Hopping*, 59 J. ACCT. & ECON. 203–220 (2015)

Ingrid Smithy Fulmer, Barry Gerhart, & Ji Hyun Kim, *Compensation and Performance: A Review and Recommendations for the Future*, 76 PERS. PSYCH. 687–718 (Feb. 27, 2023)

*Investors*, DAVITA, https://investors.davita.com/ (last visited Jan. 13, 2025)

J. Stacy Adams, *Toward an understanding of inequity*, 67 J. ABNORMAL & SOC. PSYCH. 422–36 (1963)

James "Skip" Thurman, LINKEDIN, https://www.linkedin.com/in/james-skip-thurman-320b69a/

Jennifer Sandoz, LINKEDIN, https://www.linkedin.com/in/jennifer-sandoz-4125071/

JERRY NEWMAN, BARRY GERHART, & GEORGE MILKOVICH COMPENSATION (2010–2013)

JERRY NEWMAN, BARRY GERHART, & GEORGE MILKOVICH, COMPENSATION (12th ed. 2016)

Joe Clark, LINKEDIN, https://www.linkedin.com/in/joe-clark-43726011/

John K. Mawdsley & Deepak Somaya, *Employee Mobility and Organizational Outcomes: An Integrative Conceptual Framework and Research Agenda*, 42 J. MGMT. 85–113 (Nov. 19, 2015)

John Schultz, LINKEDIN, https://www.linkedin.com/in/johnwschultz/

JOSEPH J. MARTOCCIO, STRATEGIC COMPENSATION: A HUMAN RESOURCE MANAGEMENT APPROACH (10th ed. 2020)

K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness: Slippery Slope or Manageable Terrain?*, 20 WorldatWork J. 50–64 (Fall 2011)

KEN CARDINAL & BETH FLORIN, HANDBOOK FOR CONDUCTING COMPENSATION & BENEFITS SURVEYS (2012)

Kent Thiry, LINKEDIN, https://www.linkedin.com/in/kent-thiry-0a996298/

KEVIN F HALLOCK, PAY: WHY PEOPLE EARN WHAT THEY EARN AND WHAT YOU CAN DO NOW TO MAKE MORE (2012)

Kimberly Bayard, Judith Hellerstein, David Neumark,& Kenneth Troske, *New evidence on sex segregation and sex differences in wages from matched employee-employer data*, 21 J. LAB. ECON. 887–922 (Oct. 2003)

Kimberly Kephart, LINKEDIN, https://www.linkedin.com/in/kimkephart/details/experience/

Kristen Keith & Abigail McWilliams, *The Returns to Mobility and Job Search by Gender*, CORNELL UNIV. ILR REVIEW (Apr. 1999)

L. R. Gomez-Mejia & D. B. Balkin, *Determinants of faculty pay: An agency theory perspective*, ACAD. MGMT. J. (1992)

Laura Lorber, *How to Retain Employees*, WALL ST. J., Sept, 12, 2008, http://guides.wsj.com/small-business/hiring-and-managing-employees/how-to-retain-employees

Margaret L. Williams, Michael A. McDaniel & Nhung T. Nguyen, *A meta-analysis of the antecedents and consequences of pay level satisfaction*, 91 J. APPLIED PSYCH. 392 (2006)

Mark Kopser, LINKEDIN, https://www.linkedin.com/in/mark-kopser-a9b06816/

Matthew Bidwell, *Paying more to get less: The effects of external hiring versus internal mobility*, 56 ADMIN. SCI. Q. 369–407 (Dec. 27, 2011)

Matthew Bidwell & Ethan Mollick, *Shifts and Ladders: Comparing the Role of Internal and External Mobility in Managerial Careers*, ORG. SCI. (Oct. 5, 2015)

Michael C. Sturman, Charlie O. Trevor, John W. Boudreau, Barry Gerhart, *Is it Worth it to Win the Talent War? Evaluating the Utility of Performance-Based Pay*, 56 PERS. PSYCH. 997–1035 (2003)

Michael Rucker, LINKEDIN, https://www.linkedin.com/in/michael-rucker-82ba0a1b/

MIDWEST INDUS. MGMT. ASS'N , MIMA'S GUIDE TO THE EFFECTIVE USE OF ITS JOB EVALUATION PLAN (SHOP) (1974)

Niklas Engbom, *Labor market fluidity and human capital accumulation*, NAT'L BUREAU ECON. RSCH. (No. 29698 Jan. 2022), https://www.nber.org/papers/w29698

O*NET ONLINE, https://www.onetonline.org/ (last visited Jan. 14, 2025)

ORG. FOR ECON. CO-OPERATION & DEV., DIRECTORATE FOR FIN. & ENTER. AFFAIRS COMPETITION COMMI., BARRIERS TO EXIT- BACKGROUND NOTE (Oct. 23, 2019), https://one.oecd.org/document/DAF/COMP(2019)15/en/pdf

Peter Cappelli & Peter D. Sherer, S*atisfaction, Market Wages, and Labor Relations: An Airline Study*, 27 INDUS. REL. 56–73 (1988)

Peter Cappelli & Peter D. Sherer, *The Effect of a Two-Tier Wage Plan on Employee Attitudes*, 43 INDUS. & LABOR REL. REV. 225–44 (1990)

Peter Cappelli, *A Market-Driven Approach to Retaining Talent*, 78 HARV. BUS. REV. 103–11 (Jan.–Feb., 2000)

Peter Clemens, LINKEDIN, https://www.linkedin.com/in/peter-j-clemens-iv-a5727520/

Press Release:  DaVita Inc., DaVita Medical Group Acquires Respected Physician Practices in the Orlando Area (July 13, 2017), https://newsroom.davita.com/press-releases?item=123281

Press Release, Tenet Health Completes Purchase of USPI from WCAS (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx

Press Release, Tenet Healthcare Corp., Tenet Healthcare Corp. Completes United Surgical Partners Int'l & Aspen Healthcare Transactions (June 16, 2015), https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm#:~:text=DALLAS%20%E2%80%93%20June%2016%2C%202015%20%E2%80%93,U.S.%20short%2Dstay%20surgery%20platform.

Press Release, UnitedHealth Group, Optum completes acquisition of DaVita Medical Group from DaVita (June 19, 2019), https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html

Press Release, UnitedHealth Group, Surgical Care Affiliates (SCA), OptumCare to Combine (Jan. 9, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html

Proxy Statement, DAVITA (2012), https://filecache.investorroom.com/mr5ir_davita/175/2012%20Proxy%20Statement_2.pdf

R. J. Harvey, *Job Analysis, in* HANDBOOK OF INDUS. & ORG. PSYCH. 71–163 (Marvin. D. Dunnette & Leatta. M. Hough eds., 1991)

RAYMOND NOE, JOHN  HOLLENBECK, BARRY GERHART &  PATRICK WRIGHT, FUNDAMENTALS OF HUMAN RESOURCE MANAGEMENT (2022)

RAYMOND A. NOE, JOHN R. HOLLENBECK, BARRY GERHART, & PATRICK M. WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE (14th ed. 2024)

RAYMOND A. NOE, JOHN R. HOLLENBECK, BARRY GERHART, & PATRICK M. WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE. (13th ed. 2023)

Rich Sharff, LINKEDIN, https://www.linkedin.com/in/rich-sharff-27b8abb./

Richard P. Castanias & Constance E. Helfat, *The managerial rents model: Theory and empirical analysis*, 27 J. MGMT. 661–678 (Nov.–Dec. 2001)

Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 108 Q. J. ECON. 439–79 (May 1992)

S. J. DAVIS & J. HALTIWANGER, GROSS JOB FLOWS, HANDBOOK OF LABOR ECONOMICS (1999), https://journals.sagepub.com/doi/full/10.1177/0149206320978799#bibr40-0149206320978799

Sandi Karrmann, LINKEDIN, https://www.linkedin.com/in/sandikarrmann/

Shannon Mosley, LINKEDIN, https://www.linkedin.com/in/shannonmosley/

Tae Hon Lee, Barry Gerhart, Ingo Weller & Charlie O. Trevor, *Understanding Voluntary Turnover: Path-Specific Job Satisfaction Effects and The Importance of Unsolicited Job Offers*, 51 ACAD. MGMT. J. 651, 655 (Aug. 2008)

Terry D. Warfield & John J. Wild, *Accounting recognition and the relevance of earnings as an explanatory variable for returns*, 67 ACCT. REV. 821–842 (Oct. 1992)

Thomas W. Lee & Terence R. Mitchell, *An Alternative Approach: The Unfolding Model of Voluntary Employee Turnover*, 19 ACAD. MGMT. REV. 51–89 (Jan. 1994)

Tom McMullen & Serra Aladag *Pay Transparency:  A Closer Look at the risks, rewards and Regulations*, WORLDATWORK, INC. (Oct. 19, 2023), https://worldatwork.org/publications/workspan-daily/pay-transparency-a-closer-look-at-the-risks-rewards-and-regulations

Warren J. Cinnick, LINKEDIN, https://www.linkedin.com/in/warrencinnick/

WORLDATWORK, https://worldatwork.org/research/compensation-programs-and-practices

WORLDATWORK, CERTIFICATION (2025), https://worldatwork.org/certifications

WORLDATWORK, COMPENSATION PROGRAMS AND PRACTICES SURVEY (2016)

WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023)

WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025),  https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual

WORLDATWORK, SALARY BUDGET SURVEY (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf

## II. DEPOSITION TRANSCRIPTS AND EXHIBITS, AND DOCUMENTARY EVIDENCE

I was provided access to all deposition transcripts and exhibits and all documents produced in the case. The following are among the materials I considered:

**Deposition Transcripts (in alphabetical order)**

Deposition of Colleen Arthur, DaVita, May 23, 2024 ("Arthur Dep.")

Deposition of Brett Brodnax, USPI, September 12, 2024 ("Brodnax Dep.")

Deposition of Jason Cagle, USPI, August 6, 2024 ("Cagle Dep.")

Deposition of Robert Chipman, DaVita, August 7, 2024 ("Chipman Dep.")

Deposition of Warren Cinnick, SCA, November 22, 2024 ("Cinnick Dep.")

Deposition of Peter Clemens, SCA, May 2, 2024 ("Clemens Dep.")

Deposition of Cindy English, USPI, June 12, 2024 ("English Dep.")

Deposition of Bridie Fanning, SCA, July 17, 2024 ("Fanning Dep.")

Deposition of Mark Garvin, USPI, May 30, 2024 ("Garvin Dep.")

Deposition of Andrew Hayek, September 18, 2024 ("Hayek Dep.")

Deposition of Andrew Johnston, USPI, September 6, 2024 ("Johnston Dep.")

Deposition of Sandi Karrmann, USPI, August 14, 2024 ("Karrmann Dep.")

Deposition of Scott Keech, Plaintiff, August 22, 2024 ("Keech Dep.")

Deposition of Anthony Kilgore, SCA, October 22, 2024 ("Kilgore Dep.")

Deposition of Dennis Kogod, DaVita, September 6, 2024 ("Kogod Dep.")

Deposition of Mark Kopser, USPI, December 12, 2024 ("Kopser Dep.")

Deposition of Brian Mathis, SCA, September 20, 2024 ("Mathis Dep.")

Deposition of Shannon McGarry, USPI, June 11, 2024 ("McGarry Dep.")

Deposition of Laura Mildenberger, DaVita, July 30, 2024 ("Mildenberger Dep.")

Deposition of Shannon Mosley, USPI, August 13, 2024 ("Mosley Dep.")

Deposition of Steven Priest, DaVita / Third-Party, November 5, 2024 ("Priest Dep.")

Deposition of Javier Rodriguez, DaVita, August 12, 2024 ("Rodriguez Dep.")

Deposition of Michael Rucker, SCA, August 27, 2024 ("Rucker Dep.")

Deposition of Jennifer Sandoz, SCA, September 26, 2024 ("Sandoz Dep.")

Deposition of Michael Staffieri, DaVita, April 5, 2024 ("Staffieri Dep.")

Deposition of Jimmy Tanner, Third Party, July 31, 2024 ("Tanner Dep.")

Deposition of Kent Thiry, August 16, 2024 ("Thiry Dep.")

Deposition of James "Skip" Thurman, DaVita, June 17, 2024 ("Thurman Dep.")

Deposition of William "Bill" Wilcox, USPI, September 24, 2024 ("Wilcox Dep.")

**Deposition Exhibits (in ascending order by exhibit number)**

Exhibit DX6

Exhibit DX64, KEECH_ 000001252

Exhibit DX72

Exhibit PX1, DOJCIV-008-00000059–71.

Exhibit PX19, DVA_OMCEAL_001399746–74

Exhibit PX21, DVA_OMCEAL_001339976–78

Exhibit PX22, DVA_OMCEAL_001079804–05

Exhibit PX24, DVA_OMCEAL_000386711

Exhibit PX25, DVA_OMCEAL_001339745–46

Exhibit PX26, DVA_OMCEAL_000751501–02

Exhibit PX27, DVA_OMCEAL_001339898–901

Exhibit PX34, SCA000109831–37

Exhibit PX37, USPI_CIV_000016100

Exhibit PX50

Exhibit PX55, SCA001204514–15

Exhibit PX56, SCA001239262–63

Exhibit PX70

Exhibit PX71, DVA_OMCEAL_001383294–95 with attachments DVA_OMCEAL_001383296–307

Exhibit PX73, DVA_OMCEAL_001332708–11

Exhibit PX74, DVA_OMCEAL_001323118–20

Exhibit PX75, DVA_OMCEAL_001321755–59

Exhibit PX77, DVA_OMCEAL_001329256–61

Exhibit PX79, DVA_OMCEAL_001385528-29, with attachment DVA_OMCEAL_001385530

Exhibit PX81, DVA_OMCEAL_001068250–52

Exhibit PX82, DVA_OMCEAL_001170440–41

Exhibit PX83, DVA_OMCEAL_001057524–25

Exhibit PX84, DVA_OMCEAL_001321377–78.

Exhibit PX85, DVA_OMCEAL_001067247–59

Exhibit PX87

Exhibit PX88, DOJCIV-008-00000353–67

Exhibit PX89, USPI_CIV_000000597–600, with attachment Exhibit PX90, USPI_CIV_000000601

Exhibit PX97

Exhibit PX98, DOJCIV-012-00000121–29

Exhibit PX108

Exhibit PX109, USPI_CIV_000810693, with attachments Exhibit PX112, USPI_CIV_000810694, Exhibit PX113, USPI_CIV_000810696, and Exhibit PX114, USPI_CIV_000810695

Exhibit PX115, USPI_CIV_000039752–53, with attachment Exhibit PX116, USPI_CIV_000039754

Exhibit PX117, USPI_CIV_000022038, with attachment Exhibit PX118, USPI_CIV_000022040

Exhibit PX123, DOJCIV-007-00000091–96

Exhibit PX124, DOJCIV-012-000000131–37

Exhibit PX126, DOJCIV-014-000000001

Exhibit PX133

Exhibit PX135, USPI_CIV_000016089–92

Exhibit PX138, USPI_CIV_000122239

Exhibit PX140, USPI_CIV_000146394

Exhibit PX142, USPI_CIV_000122072

Exhibit PX166, DOJ-PROD001B-00538908–09

Exhibit PX157

Exhibit PX158

Exhibit PX159, DOJ-PROD001B-00152893–908

Exhibit PX160, SCA000002866–68

Exhibit PX167, DOJ-PROD004-00835491–92

Exhibit PX170, DOJ-PROD004-00476230–31

Exhibit PX171, DOJ-PROD001B-00157126–28

Exhibit PX172, DOJ-PROD001A-00000001–02

Exhibit PX180, USPI_CIV_000091768–69

Exhibit PX181, USPI_CIV_000039752–53, with attachment Exhibit PX182, USPI_CIV_000039754

Exhibit PX183, USPI_CIV_000039819–20

Exhibit PX185

Exhibit PX192, DVA_OMCEAL_000277553–58

Exhibit PX196, DVA_OMCEAL_001216213–16

Exhibit PX201, DVA_OMCEAL_000944847–52

Exhibit PX202, DVA_OMCEAL_001217979–81

Exhibit PX203, DVA_OMCEAL_000944853–54

Exhibit PX216, USPI_CIV_000010048–57

Exhibit PX219, DOJCIV-012-00000066–69

Exhibit PX220, USPI_CIV_000019262–65

Exhibit PX221, USPI_CIV_000017726–27

Exhibit PX227, USPI_CIV_000014146

Exhibit PX234, USPI_CIV_000016522

Exhibit PX235, USPI_CIV_000110943

Exhibit PX240, USPI_CIV_000686081–92

Exhibit PX248, RC_OMCEAL_0000062–64

Exhibit PX249, DVA_OMCEAL_000906132–35

Exhibit PX250, DVA_OMCEAL_000904769–70

Exhibit PX251, DVA_OMCEAL_000907134–52

Exhibit PX252, DVA_OMCEAL_001187352–54

Exhibit PX253, DVA_OMCEAL_000012083–88

Exhibit PX254, DVA_OMCEAL_000036918–35

Exhibit PX255, DVA_OMCEAL_000008843–44

Exhibit PX259

Exhibit PX260

Exhibit PX261

Exhibit PX262

Exhibit PX264, DVA_OMCEAL_001145958, with attachments
DVA_OMCEAL_001145959–006

Exhibit PX265, DVA_OMCEAL_000957201–04, with attachment
DVA_OMCEAL_000957205

Exhibit PX266

Exhibit PX268, DVA_OMCEAL_001344567–82

Exhibit PX267, DVA_OMCEAL_001238631–32

Exhibit PX269, DVA_OMCEAL_000957816, with attachment
DVA_OMCEAL_000957817–28

Exhibit PX270, DVA_OMCEAL_000958748, with attachment
DVA_OMCEAL_000958749–60

Exhibit PX271, DVA_OMCEAL_001144619–20

Exhibit PX272, DVA_OMCEAL_00095708990

-235-

Exhibit PX275, DOJ-PROD003-00117878–93

Exhibit PX280, DOJCIV-008-00000284–97

Exhibit PX281, DOJCIV-008-00000039–55

Exhibit PX297, USPI_CIV_000058049–50

Exhibit PX304, DOJCIV-008-00000298–303

Exhibit PX305, DOJCIV-008-00000170

Exhibit PX309

Exhibit PX311, DVA_OMCEAL_001143800-01, with attachment DVA_OMCEAL_001143803–13

Exhibit PX314, DOJCIV-008-00000228–43

Exhibit PX316, DOJCIV-008-00000260–65

Exhibit PX330, DVA_OMCEAL_000214999–21500

Exhibit PX331, DOJCIV-007-00000050–52

Exhibit PX333, DVA_OMCEAL_000658781

Exhibit PX335, DOJ-PROD001A-00000239

Exhibit PX452

Exhibit PX454, USPI_CIV_000058068

Exhibit PX455, USPI_CIV_000027565

Exhibit PX465, SCA000048815–17

Exhibit PX483

Exhibit PX484, DVA_OMCEAL_000429386–90

Exhibit PX490, HAYEK-000012214–16

-237-

Exhibit PX497, OMC-BM-000007716

Exhibit PX501, SCA002277742

Exhibit PX506, DOJCIV-005-00000011

Exhibit PX507, DOJCIV-008-00000266–78

Exhibit PX508, DOJCIV-008-00000212–26

Exhibit PX523, OMC_BM_000010778–79

Exhibit PX528, SCA001046573–74

Exhibit PX529, SCA000065974–75, with attachment SCA000065976–84

Exhibit PX530, SCA001191900–01

Exhibit PX531

Exhibit PX537

Exhibit PX541, SCA000331970–73

Exhibit PX546

Exhibit PX551, DVA_OMCEAL_000405110

Exhibit PX552, DVA_OMCEAL_000313489–91

Exhibit PX554

Exhibit PX555, DOJCIV-007-00000007–15

Exhibit PX562, SCA001777877–78

**<u>Other Evidence Produced by Defendants and Third Parties</u>**

BF000048126
BF000095333
BF000098905
DOJCIV-007-00000041–44

DOJCIV-007-00000069
DOJCIV-007-00000101–103
DOJCIV-007-00000105–07
DOJCIV-008-00000032–33
DOJCIV-008-00000090
DOJCIV-008-00000345
DOJCIV-010-00000117
DOJCIV-012-00000056
DVA_OMCEAL_000277557
DVA_OMCEAL_000942244
DVA_OMCEAL_001188391
DVA_OMCEAL_001411518
EVER13532
HAYEK-000011525
HAYEK-000012301
HAYEK-000012301
OMC_BM_000006875
OMC_BM_000007833
OMC_BM_000009010
OMC_JC_000001411
OC_JC_000001411
SCA000035060
SCA000050575
SCA000051019
SCA000051046
SCA000052830
SCA000065816
SCA000073150
SCA000077243
SCA000077247
SCA000078126
SCA000078134
SCA000078155
SCA000078353
SCA000078354
SCA000079723
SCA000081410
SCA000083983
SCA000093346
SCA000094797
SCA000097183
SCA000098561
SCA000106501

SCA000109496
SCA000111304
SCA000111305
SCA000111311
SCA000111312
SCA000111313
SCA000111314
SCA000111315
SCA000111332
SCA000111335
SCA000111574
SCA000112688
SCA000128582
SCA000128584
SCA000150918
SCA000165836
SCA000363209
SCA000496894
SCA000512099
SCA000512100
SCA000512101
SCA000518874
SCA000528950
SCA000529876
SCA000531068
SCA000539858
SCA000539878
SCA000539880
SCA000539927
SCA000539963
SCA000540080
SCA000540082
SCA000541665
SCA000542598
SCA000542599
SCA000542600
SCA000542742
SCA000542750
SCA000545210
SCA000546011
SCA000546069
SCA000554705
SCA000567838

-240-

SCA000571101
SCA000571120
SCA000626812
SCA000662232
SCA000662233
SCA000669368
SCA000669369
SCA000680384
SCA000681919
SCA000836095
SCA000836097
SCA000838370
SCA000838374
SCA000838484
SCA000849033
SCA000861792
SCA000861794
SCA000862885
SCA000870806
SCA000870807
SCA000872849
SCA000872850
SCA000878779
SCA000910975
SCA000957620
SCA000972653
SCA000975231
SCA000975231
SCA000988636
SCA000988976
SCA001060322
SCA001094909
SCA001094914
SCA001095587
SCA001115841
SCA001116610
SCA001123366
SCA001124520
SCA001154146
SCA001154146
SCA001187512
SCA001189759
SCA001192477

-241-

SCA001123358 (cover email) and SCA001123359 (attachment).
SCA001204514
SCA001204745
SCA001208498
SCA001210714
SCA001210714
SCA001211596
SCA001211599
SCA001214609
SCA001214610
SCA001215246
SCA001215495
SCA001223273
SCA001225462
SCA001225946
SCA001227036
SCA001228948
SCA001228949
SCA001233178
SCA001235058
SCA001235058
SCA001239994
SCA001239995
SCA001262933
SCA001262937
SCA001266926
SCA001279872
SCA001280924
SCA001280924
SCA001293537
SCA001314584
SCA001363536
SCA001370884
SCA001384336
SCA001436215
SCA001437912
SCA001451596
SCA001453220
SCA001453227
SCA001477484
SCA001487074
SCA001508595
SCA001508596

-242-

SCA001519131
SCA001519132
SCA001519137
SCA001519138
SCA001519139
SCA001519952
SCA001519954
SCA001547086
SCA001547088
SCA001589291
SCA001589292
SCA001589332
SCA001589334
SCA001604084
SCA001604085
SCA001613450
SCA001617479
SCA001634127
SCA001634128
SCA001637622
SCA001667523
SCA001667523
SCA001676501
SCA001676501
SCA001754229
SCA001754230
SCA001754231
SCA001757138
SCA001774581
SCA001775416
SCA002100814
SCA002100816
SCA002194370
SCA002209145
SCA002209521
SCA002223610
SCA002226644
SCA002226645
SCA002226646
SCA002268744
SCA002272830
SCA002275090
SCA002283959

SCA002297032
SCA002313664
USPI_CIV_000000457
USPI_CIV_000000462
USPI_CIV_000000464
USPI_CIV_000000601
USPI_CIV_000000652
USPI_CIV_000001857
USPI_CIV_000001881
USPI_CIV_000001885
USPI_CIV_000001886
USPI_CIV_000006921
USPI_CIV_000010321
USPI_CIV_000010971
USPI_CIV_000013866
USPI_CIV_000014031
USPI_CIV_000014062
USPI_CIV_000014178
USPI_CIV_000015993
USPI_CIV_000015994
USPI_CIV_000016013
USPI_CIV_000016019
USPI_CIV_000016029
USPI_CIV_000016031
USPI_CIV_000016041
USPI_CIV_000016552
USPI_CIV_000016564
USPI_CIV_000016582
USPI_CIV_000021077
USPI_CIV_000021103
USPI_CIV_000021128
USPI_CIV_000021181
USPI_CIV_000021190
USPI_CIV_000021210
USPI_CIV_000021991
USPI_CIV_000022268
USPI_CIV_000023148
USPI_CIV_000045294
USPI_CIV_000058049
USPI_CIV_000064524
USPI_CIV_000064780
USPI_CIV_000096518
USPI_CIV_000099553

USPI_CIV_000101136
USPI_CIV_000101137
USPI_CIV_000104518
USPI_CIV_000105047
USPI_CIV_000109590
USPI_CIV_000110162
USPI_CIV_000110943
USPI_CIV_000113340
USPI_CIV_000113396
USPI_CIV_000114069
USPI_CIV_000114132
USPI_CIV_000122223
USPI_CIV_000131250
USPI_CIV_000131719
USPI_CIV_000150417
USPI_CIV_000150817
USPI_CIV_000214742
USPI_CIV_000214746
USPI_CIV_000228756
USPI_CIV_000228762
USPI_CIV_000321269
USPI_CIV_000411546
USPI_CIV_000467624
USPI_CIV_000472872
USPI_CIV_000533945
USPI_CIV_000658451
USPI_CIV_000785652
USPI_CIV_000810134
USPI_CIV_000810694
USPI_CIV_000901340
USPI_CIV_000962508

## III.    LEGAL DOCUMENTS

3rd Am. Class Action Compl. (ECF No. 555), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

**APPENDIX C**

| Employee | Company, Job Title (Years) |
|---|---|
| Colleen Arthur | DaVita, Intern (2013); DaVita, Redwoods Resident (2014–2015); DaVita, Facility Administrator (2015); DaVita, Manager, Compensation & Analytics (2015); DaVita, Director, Compensation & Analytics (2015–2018); DaVita, Senior Director, Compensation & Analytics (2018–2021); DaVita, Senior Director, Recruiting Operations, Strategy & Employment Branding (2021–2022) |
| Brett Brodnax | USPI, Executive Vice President ("EVP")/Chief Development Officer ("CDO") (2005–2011); USPI, President (2011–2018); USPI, Chief Executive Officer ("CEO") (2018–Present) |
| Jason Cagle | USPI, Vice President ("VP") (2005–2010); USPI, Senior Vice President ("SVP") (2010–2013); USPI, Chief Financial Officer ("CFO"), (2013–2020) |
| Robert Chipman | DaVita, People Services Group Director (2011–2012); DaVita, VP of Recruiting and Talent Management (2012–2015) |
| Warren Cinnick | SCA, VP Human Resources ("HR") (2017–2020); SCA, SVP HR (2020); SCA, Group VP ("GVP") HR (2021–2023) |
| Joseph ("Joe") Clark | SCA, EVP & Chief Operating Officer ("COO") (2008); SCA, EVP Development (2008–Present) |
| Peter Clemens | SCA, EVP and CFO (2011–2015), SCA, Senior Advisor (2015–2017) |
| Goran Dragolovic | SCA, SVP Operations (2011–2017) |
| Cindy English | USPI, VP Financial Operations (2007–2019) |
| Bridie Fanning | SCA, Chief Talent Officer (2014–2016) |
| Ray Follett | DaVita, Intern (2005); DaVita, Specialist NE (2006); DaVita, Special Project Consultant (2006); DaVita, Regional Operations ("Ops") Director (2006–2009); DaVita, GVP (2008); DaVita, Group Director (2009–2010); DaVita, DVP/RVP (2010–2012); DaVita, GVP (2012–2022) |
| Mark Garvin | SCA, VP Operations (1992–1996); USPI, COO (2001–2020) |
| Joshua Golomb | DaVita, General Manager-DaVita Rx (2005, 2014–2015); DaVita, Director, Special Projects (2005); DaVita, Senior Manager (2005); DaVita, Director Star Rx (2005–2006); DaVita, Senior Director DaVita Rx (2006); DaVita, Senior Director (2006–2007); DaVita, VP, DaVita Rx (2007–2015); DaVita, CEO, Paladina Health [a DaVita subsidiary] |
| Andrew Hayek | DaVita, President (2007); DaVita, VP (2007–2008); SCA, President & CEO (2008–2017); OptumHealth, CEO (2017–2019) |
| Elliott Holder | DaVita, Analyst EX (2013); DaVita, Financial Analyst (2014); DaVita, Senior Financial Analyst (2015–2016); DaVita, Manager, Payor Contacting (2017); DaVita, Senior Manager, Payor Contracting (2018–2021) |
| Andrew ("Andy") Johnston | USPI, RVP Operations (2001-2004), USPI, SVP Development (2004–2007); USPI, SVP/DVP (2007–2014); USPI, COO, East (2014–2018); |

| | |
|---|---|
| | USPI, CDO (2018–2020); U.S. Renal Care, COO (2020–2021); USPI, Chief Administrative Officer ("CAO") (2023) |
| Sandi Karrmann | USPI, SVP, Chief Human Resources & Support Services Officer (2013–2017); Tenet Healthcare/USPI, EVP, Chief Human Resources Officer (2017–2020) |
| Scott Keech | SCA, Regional Director of Operations & Clinical Services (2009–2012) |
| Kimberly Kephart | Novotus, Senior Recruiter (2010–2016) |
| Anthony Kilgore | SCA, Group VP (2011–2012); SCA, SVP Operations (2013–2016); SCA, Group President (2017); SCA, CEO (2018–2019) |
| Dennis Kogod | DaVita, Division President (2006–2010); DaVita, SVP (2008); DaVita, COO (2008–2016); DaVita, COO, HealthCare Partners (2014–2016); DaVita, Advisor to CEO (2016) |
| Mark Kopser | USPI, CFO (2000–2012) |
| Jung Lee | DaVita, Regional Ops Director (2005); DaVita, Director – Audit and Compliance (2005–2006); DaVita, Director (2006–2008), DaVita, VP (2008–2014); DaVita, Regional Ops Director (2011–2013); DaVita, Division Vice President ("DVP") (2014–2015); DaVita, GVP, New Market CA (2015); DaVita, SVP, HealthCare Partners (2015–2018) |
| Anthony Martin | USPI, Senior Vice President, Corporate Controller and Chief Accounting Officer (1998–2019) |
| Brian Mathis | SCA, VP Strategy (2009–2014); SCA, Group VP Strategy and Payer Engagement (2014–2015); SCA, SVP, Strategy and Payment Innovation (2015–2017); SCA, CDO (2017–2018); OptumCare, CDO (2017–2018); OptumCare, Chief Strategy Officer (2018–2020) |
| Shannon McGarry | USPI, Executive Recruiter (2016–2020); USPI, Manager, Executive Recruitment (2020–2021); USPI, Regional Market Recruiter (2021 – Present) USPI, Manager – Talent Acquisition/Onboarding (2023 – Present) |
| Laura Mildenberger | DaVita, DVP / Chief People Officer, (2005); DaVita, DVP/Regional Vice President ("RVP") (2006–2007); DaVita, SVP (2008); DaVita, Chief People Officer (2008–2016) |
| Shannon Mosley | USPI, Director (2003–2006); USPI, Director (2007); USPI, VP Talent Acquisition (2007–2020) |
| Bill Myers | DaVita, VP Marketing Communications (2016–2018); DaVita, VP, Communications, Marketing & Corporate Social Responsibility (2012–2016); DaVita, VP, Communications and Corporate Social Responsibility (2010–2012); UnitedHealth Group, VP – Government Affairs (2008–2010) |
| Riley Orr | USPI, Intern (2012–2014); USPI, Business Office Manager (2014–2016); USPI, Administrator-in-Training (2015); USPI, Administrator (2015–2017); USPI, Regional Director (2017–2018), USPI, Regional VP – Operations (2018–2020) |
| Steven Priest | DaVita, SVP (2001–2016); DaVita, Chief Wisdom Officer (2014-2016) |

| | |
|---|---|
| Julio Quinones | DaVita, Regional Ops Director (2006–2011); DaVita, Redwoods (2006); DaVita, Senior Director (2008, 2013–2015); DaVita, Director (2011–2013); DaVita, Senior Manager (2013); DaVita, Senior Director International (2014); DaVita, Senior Director, Finance (2014–2016); DaVita, Embassy VP (2016–2017); DaVita, VP (2016–2017) |
| Javier Rodriguez | DaVita, SVP (2005–2018); DaVita, DVP (2006); DaVita, VP Value Management Operation (2006); DaVita, President (2008, 2012–2014); DaVita, CEO, Kidney Care (2014-2022) |
| Michael Rucker | DaVita, DVP/RVP (2006–2008); SCA, SVP Operations (2008–2009); SCA, EVP & COO (2009–2017) |
| Jennifer Sandoz | SCA, Director HR (2016–2017); SCA, Senior Director (2017–2020); SCA, VP HR (2021) |
| John Schultz | Russell Reynolds Associates, Consultant (2010–2014); Spencer Stuart, Consultant (2014–2016), Spencer Stuart, Principal (2016–2019); Spencer Stuart, Partner, Private Equity Healthcare Practice Leader (2019–Present) |
| Rich Scharff | SCA, EVP, General Counsel & Secretary (2007–Present); OptumHealth, General Counsel (2017–Present) |
| Allen Spradling | Director, IT Governance and Administration (2008–2013) |
| Mike Staffieri | DaVita, Director (2005–2006); SVP (2005, 2011, 2013); DaVita, Regional Ops Director (2006–2008); DaVita, Group Director (2008); DaVita, SVP; DaVita, DVP/RVP (2008–2010); DaVita, VP (2010–2011); DaVita COO, Kidney Care (2014–2022); DaVita, COO (2013–2022) |
| Doug Swope | HCA Healthcare, Manager, Executive Recruitment C-Level (1995–1998); HCA Healthcare, Director, HR Executive Recruitment (1998–2008); HCA Healthcare, Senior Director, HR (2008–2011); e+CancerCare (2011–2013); President, Surgical Care Partners (2013–Present) |
| Jimmy Tanner | Catapult Staffing, Director of Recruiting (2013–2016); Catapult Physician Staffing, VP of Recruiting & Stragetic Accounts (2017–2018) |
| Kent Thiry | DaVita, Chairman and CEO (1999–2019); DaVita, Chairman and CEO, HealthCarePartners Inc. (2014–2020); DaVita, Executive Chairman of the Board of Directors (2019–2021) |
| James "Skip" Thurman | DaVita, Director (2010–2011); DaVita, Senior Director (2011–2013); DaVita, Senior Director, Communications (2014–2017); DaVita, VP (2017–2020) |
| Sean Taylor | DaVita, Senior Director of Business Development (2015–2016) |
| Niels Vernegaard | USPI, COO (2006–2021) |
| Leslie Wachsman | SCA, VP Finance & Investor Relations (2012–2018); SCA, GVP, Finance (2018–2019); SCA, CFO (2019–Present) |
| William ("Bill") Wilcox | USPI, President (2005–2011); USPI, CEO (2011-2018), Chairman (2018–2020); USPI, Consultant (2020–2023) |

-247-

| | |
|---|---|
| Kevin Zaideman | SCA, Compensation Senior Manager (2017–2020); SCA, Director of Compensation (2021–2022) |
| Caitlin Zulla | SCA, SVP, Revenue Cycle Operations ("RCO") (2015–2017); SCA, CAO 2017–2018); SCA, CFO and CAO (2018–2019); SCA, CEO (2019–2022) |

**APPENDIX D**

**FIGURES**

**Figure 1: The Impact of (Voluntary) Employee Turnover on Subsequent Employee Pay Level**[748]

| Study | Sample | Results |
|---|---|---|
| Groysberg, Healy, & Lin (2020), ILR Review | Global executive search firm placements | 13% increase (in salary plus bonus only) after employer change. (Stock-based compensation, the largest component of executive compensation was not measured.) |
| Bidwell (2015), Organization Science | MBA alumni from a leading U.S. business school | 35% increase in earnings from voluntary employer change within same job function. 4% increase from involuntary employer change.<br><br>Internal moves (promotion) experienced 34% earnings increase. (Mean of 5.4 years post-MBA work experience. During that time, 87% changed employer at least once; 2.6 moves per person, with 65% being internal, 26% voluntary external, and 9% involuntary external.) |
| Dreher & Cox (2000), Academy of Management Journal | Recent MBA graduates | Pay was 20% higher among those who had changed employers at least once. |
| Keith & McWilliams (1999), ILR Review | National sample of young adults | Pay was 8% to 11% higher for those who voluntarily quit their job relative to those who stayed.<br><br>Pay was 14% to 18% higher if searched prior to voluntarily quitting. |
| Gomez-Mejia & Balkin (1992), Academy of Management Journal | College and university faculty | Each employer change associated with 25% higher 9-month salary. |
| Topel & Ward (1992), Quarterly Journal of Economics. | National sample of young adults | 10% increase in wage from employer change (first 10 years in labor market; 84% moved). |

---

[748] BARRY GERHART, COMPENSATION 242, Ex. 7.16 (14th ed. 2023).

**Figure 2: The Impact of Compensation Level on Employee Turnover (Mobility)**[749]

| Study | Sample | Results | Elasticity |
|---|---|---|---|
| Riddell, *Industrial Relations* (2011) | 390 firms in Greater Toronto, 6 occupational groups | A 10% increase in ratio of firm pay to market pay associated with quit rate going from .106 to .095, a 10% reduction | −1.01 |
| Falch, *American Economic Review* (May 2011) | 161 primary and secondary schools in Norway | Schools having teacher "shortage" and located in far north eligible to pay teachers wage premium of 10%. Introduction (also studied its removal) of 10% wage premium associated with quit rate going from .18 to .12, a 35% reduction | −3.50 |
| Siebert & Zubanov, *Academy of Management Journal* (2009) | 325 retail clothing stores in the United Kingdom | A 10% increase in ratio of store wage/county wage associated with separation rate going from .0500 to .0364, a 28% reduction | −2.78 |
| Shaw, Delery, Jenkins, & Gupta, *Academy of Management Journal* (1998) | 227 trucking companies in the United States | Regression coefficient (beta) = −.31 for quits on pay level. A 10% increase in average annual pay level ($34,912 to $38,403) associated with quit rate going from .256 to .200, a 22% reduction | −2.20 |
| Raff & Summers, *Journal of Labor Economics* (1987) | Ford Motor Company in 1914 | Increasing daily wage *100%*, from $2.50 to $5.00, associated with turnover reduction from 370% to 54%, an 85% reduction | −0.85 |

Elasticity = % change in y/% change in x

---

[749] BARRY GERHART, COMPENSATION 241, Ex. 7.15 (14th ed. 2023).

**Figure 3**[750]



©2009 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.

---

[750] Ex. PX254 at DVA_OMCEAL_000036929.

**Figure 4[751]**

**WorldatWork® Total Rewards Association
Certified Compensation Professional | (CCP©)**

**Sample Course Titles (3 of the 8 required courses):  Designing and Managing
Base Pay Systems; Market Pricing and Competitive Pay Analysis;
Compensation Analytics and Insights**

**One course in more detail: Designing and Managing Base Pay Systems**

## What You Will Learn:

- Important concepts like compensation philosophy, internal vs. external pay equity, relevant labor markets, benchmark jobs and market-pricing.
- Key steps to build a base pay structure – job analysis, documentation, evaluation and job worth hierarchy.
- Base structure design components like range spread, minimum, midpoint, and maximum, midpoint differentials, range overlap plus methods to adjust and maintain pay structures.
- Determination of individual pay rates, including concepts like new- hire rates, pay differentials, step rate pay progression, merit increases, skill-based pay, promotions, equity adjustments and pay compression.
- Merit pay programs, pay for performance and merit matrix development.
- Pay transparency, communications about pay programs and compensation program audits.

---

[751] WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025), https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual.

**Figure 5:  Example of a Compensable Factor (Complexity)**[752]

| Degree | 1st | 2nd | 3rd | 4th | 5th | 6th |
|---|---|---|---|---|---|---|
| Points | 20 | 40 | 60 | 80 | 100 | 120 |

| Degree Definitions for Complexity (of Duties) Compensable Factor | |
|---|---|
| Complexity of duties involves the degree of independent action, the extent to which the duties are standardized, the exercise of judgment, the type of decisions the job requires and the exercise of discretion, resourcefulness, or creative effort in devising methods, procedures, products, scientific applications, etc. | |
| 1st Degree – Little Judgment | Understand and follow simple instructions and use simply technology involving few decisions. |
| 2nd Degree – Some Judgment | Perform repetitive or routine duties working from detailed instructions and under standard procedures. Requires the making of minor decisions. |
| 3rd Degree – Simple Analytical Judgment | Plan and perform diversified duties requiring an extensive knowledge of a particular field, and the use of wide range of procedures.  Involves the exercise of judgment in the analysis of facts or conditions regarding individual problems or transactions to determine what action should be taken, within the specifications of standard practice. |
| 4th Degree – Complex Analytical Judgment | Plan and perform a wide variety of duties requiring general knowledge of company policies and procedures applicable within area of responsibilities, and including their application to cases not previously covered.  Requires considerable judgment to work independently toward general results, devising methods, modifying or adapting standard procedures to meet different conditions, making decisions based on precedent and company policies. |
| 5th Degree – Advanced Analytical Judgment | Plan and perform difficult work where only general methods are available.  Involves highly technical or involved projects, presenting new or constantly changing problems.  Requires outstanding judgment and initiative in dealing |

---

[752] MIDWEST INDUS. MGMT. ASS'N, MIMA'S GUIDE TO THE EFFECTIVE USE OF ITS JOB EVALUATION PLAN (SHOP) (1974).

| | with complex factors not easily evaluated, also making of decisions for which there is little precedent. |
|---|---|
| 6th Degree – Advanced Judgment and Ingenuity | Plan and perform complex work which involves new or constantly changing problems where there is little accepted method of procedure. Involves participation in the formulation and carrying out of company policies, objectives and programs for major decisions or functions. Considerable ingenuity and exceptional judgment required to deal with factors not easily evaluated, interpret results and make decisions carrying a great deal of responsibility. Direct and coordinate the work of subordinate supervision in order to attain objectives. |

**Figure 6**[753]

| Market-Based |
|---|
| • Range spreads of 30% to 80% and midpoint progressions of 10% to 15% growing wider for higher-level jobs |
| • Minimums and maximums are anchored to market data points and encompass the reasonable wage span of the job in the market (i.e., 25th, 50th and 75th percentiles) |

---

[753] WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023).

**Figure 7**[754]

| | USPI | | |
|---|---|---|---|
| **Position** | **Minimum** | **Average** | **Maximum** |
| RVP | $140,000.00 | $198,691.90 | $ 300,000.00 |
| Market President | $245,000.00 | $300,451.11 | $ 346,006.00 |
| Administrator | $ 69,875.00 | $ 124,650.73 | $ 211,160.98 |
| CFO | $ 98,800.00 | $151,100.43 | $ 271,294.40 |
| CNO | $122,387.20 | $137,843.41 | $ 159,764.80 |
| CEO | $163,000.03 | $188,193.90 | $ 250,016.00 |
| COO | $ 111,758.40 | $ 132,904.51 | $ 154,999.94 |
| CSO | | | |
| CHRO | | | |
| CMO | $ 22,184.00 | $221,846.00 | $ 221,846.00 |
| AA | | | |
| Director of Nursing | $ 68,744.00 | $106,912.00 | $ 158,600.00 |
| Director of Operations | | | |
| Clinical Director | $ 61,443.20 | $ 98,979.25 | $ 144,185.60 |
| BOM | $ 39,728.00 | $ 68,985.92 | $ 144,200.00 |
| RN (Full Time) | $ 44,928.00 | $ 77,222.85 | $ 135,200.00 |
| RN (PRN) | $ 15,177.60 | $ 19,258.83 | $ 27,289.60 |
| RN (Part Time) | $ 17,810.00 | $ 56,184.16 | $ 77,851.28 |
| RN (Regular Part-Time | $ 39,800.00 | $ 60,138.00 | $ 80,475.20 |

---

[754] USPI_CIV_000214742 (cover email) and USPI_CIV_000214746 (attachment with a sheet delineating each job title's family).

-256-

**Figure 8**[755]



---

[755] SCA000079723 at SCA000079726.

**Figure 9**[756]

| Min | Target | Max | Level |
|---|---|---|---|
| 5% | 10% | 15% | Staff |
| 10% | 15% | 20% | Manager & Director |
| 10% | 20% | 35% | Director & VP |
| 10% | 30% | 45% | VP 2 |
| 10% | 35% | 55% | SVP |
| 10% | 50% | 75% | SVP 2 |
| 10% | 50% | 75% | Market President |
| 10% | 75% | 100% | Group President |
| 10% | 50% | 90% | EVP |
| 10% | 75% | 100% | President, CFO |
| 10% | 75% | 125% | CEO |

---

[756] USPI_CIV_000901340 at USPI_CIV_000901341.

**Figure 10: Pay Structure (for Engineering) at Lockheed Martin, under Two Alternative Pay-Level Policies**[757]



**EXHIBIT 3.3** Pay Structure (for Engineering) at Lockheed Martin, under Two Alternative Pay-Level Policies

---

[757] BARRY GERHART, COMPENSATION 78 (14th ed. 2023).

**Figure 11**[758]

| RECOMMENDED SALARY INCREASES BY PERFORMANCE RATING AND COMPA-RATIO | | | | Table 12.3 Merit Increase Grid |
|---|---|---|---|---|
| | COMPA-RATIO[a] | | | |
| | 80–90% | 91–110% | 111–120% | |
| Performance rating | | | | |
| Exceeds expectations | 7% | 5% | 3% | |
| Meets expectations | 4 | 3 | 2 | |
| Below expectations | 2 | 0 | 0 | |

[a]Employee salary/midpoint of their salary range.

---

[758] RAYMOND NOE, JOHN HOLLENBECK, BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCES MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE 529 (13th ed. 2023).

**Figure 12**[759]

| If teammate's pay is ... | Below Mid-Point | At Mid-Point | Above Mid-Point |
|---|---|---|---|
| ... and the performance rating is ... | ... compensation adjustment should be | | |
| Does **not meet** standards (0-4) | 0.0% | 0.0% | 0.0% |
| Meets standards (5-7) | 1.5%-2.5% | 1.0%-2.0% | 0.0%-1.5% |
| Exceeds standards (8-10) | 3.5%-4.5% | 3.0%-4.0% | 2.5%-3.5% |

---

[759] SCA000078134.

-261-

**Figure 13**[760]



---

[760] Ex. PX251 at DVA_OMCEAL_000907140.

**Figure 14**[761]

Merit History & Projections — Merit Pool

| | 2008 - Actual | 2009 - Actual | 2010 - Actual | 2011 - Actual | 2012 - Actual | 2013 - Actual | 2014 - Projected |
|---|---|---|---|---|---|---|---|
| All Industries | 3.9%[1] | 2.2%[1] | 2.5%[1] | 2.6%[2] | 2.8%[2] | 3.0%[5] | 3.0%[5] |
| Healthcare | 4.2%[1] | 2.7%[1] | 2.8%[1] | 2.6%[1] | 2.7%[3] | 2.6%[5] | 2.7%[5] |
| Fresenius | N/A | N/A | 2.8%[4] | 2.75%[4] | 2.75%[4] | | |
| DaVita | 2.10% | 1.50% | 1.40% | 2.00% | 2.40% | 2.20% | 1.50% |

1 – World at Work 2008, 2009, 2010 & 2011 Annual Salary Budget Survey July 2011
- Mercer 2011/2012 US Compensation Planning Survey July 2011
- EMPSight: 2011 Analysis of Merit Budget, Staffing and Practices
- HayGroup: 2011/2012 Salary Analysis

2 – Blended % based on Mercer, World at Work, HayGroup, and EMPSight
3 – Blended % based World at Work, HayGroup & EMPSight as of Aug 29, 2011
4 – Actual for 2011 and initial projection, not formally released (Source: Qualgence)
5 – World at Work Actual 2013 and Projected 2014

©2010 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only    Attorney Client Privileged and Confidential

2

---

[761] Ex. PX201 (cover email) and Ex. PX202 (attachment) at DVA_OMCEAL_000944854.

**Figure 15**[762]

FIGURE 2  **Total Salary Budget Increases, by Employee Category**

Salary Budget Increases (zeros included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 2.9% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% |
| Exempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Officers/Executives | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| All | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |

Salary Budget Increases (zeros not included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Exempt Salaried | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |
| Officers/Executives | 3.1% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% |
| All | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |

---

[762] WORLDATWORK, SALARY BUDGET SURVEY at 20 (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf.

# **Exhibit 4**

# Lane Declaration

# (Filed Under Seal)

**THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**<u>UPDATED REBUTTAL EXPERT WITNESS REPORT OF DR. EVAN P. STARR</u>**

3244633.4

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................1

II. QUALIFICATIONS ........................................................................................3

III. ASSIGNMENT AND SUMMARY OF CONCLUSIONS ..............................3

IV. PRIOR TESTIMONY ...................................................................................10

V. BACKGROUND ...........................................................................................10

VI. EVALUATING EVIDENCE OF THE CHALLENGED CONDUCT ...........12

    A. Economic Background of the Challenged Conduct............................12

    B. Defendants Established No-Poach Agreements to Suppress Compensation .......14

        1. The Qualitative Evidence Is Consistent with No-Poach Agreements Between SCA and DaVita and SCA and USPI ...................14

            a. Qualitative Evidence Is Falsifiable and Informative ...................15

            b. Access to Third-Party Information Would Not Defeat a No-Poach Agreement .......................................................................16

            c. Qualitative Evidence on the Timing of the SCA-DaVita and SCA-USPI No-Poach Agreements ..............................................18

        2. The Quantitative Evidence Is Consistent with No-Poach Agreements Between SCA and DaVita and SCA and USPI ...................31

            a. The Evidence Is Consistent with a 2019 End Date......................33

            b. The Evidence Is Consistent with Depressed Bilateral Mobility Between Covered Defendants During the Alleged Conduct Period .........................................................................40

            c. Defendants' Experts' Lightcast Data Are Unreliable, but Still Show That Defendants Are Primary Labor Market Competitors and That the Challenged Conduct Suppressed Hiring and Departures Between Defendants Relative to Other Employers.........................................................................43

            d. COVID Does Not Explain the Mobility Results ........................57

    C. Defendants Exchanged CSI to Suppress Labor Market Competition.................59

        1. The CSI Exchanges Could Have Been Used to Suppress Compensation.......................................................................60

            a. We Know the Record Evidence Is Not the True Universe of CSI Exchanges..........................................................................60

3244633.4

**TABLE OF CONTENTS**
**(continued)**

**Page**

b.     The Data Exchanged Are Sufficient to Suppress Wages ............. 65

c.     The No-Poach Agreement Served as an Enforcement Mechanism ................................................................................. 69

d.     Dr. Johnson's Comparison of Changes in Base Salary Are Not Informative of the Wage-Suppressing Effects of CSI Exchanges .................................................................................. 71

2.     The CSI Exchanges Are Not Consistent with Procompetitive Benchmarking ............................................................................. 72

3.     The CSI Exchanges Were Regular ............................................. 74

VII.     ECONOMETRIC EVIDENCE OF WAGE SUPPRESSION ........................................ 80

A.     Revisions to the Underlying Data ........................................................ 82

1.     Uncontroversial Changes ........................................................... 82

2.     Correcting for USPI Undercounting Some Hours in 2005 and 2006 ....... 84

3.     Dropping Johnson-Identified Individuals ................................... 87

4.     Revised Data Summary .............................................................. 88

B.     Primary Wage Suppression Model ....................................................... 89

1.     Aggregate Suppression Model .................................................... 89

2.     Defendant-Specific Suppression Model ..................................... 91

3.     Robustness Checks ..................................................................... 92

C.     Defendants' Experts' Variant Models ................................................. 94

1.     Accounting for Equity and Firm Performance ........................... 94

2.     Wage Suppression Estimates Are Not Sensitive to COVID ................. 111

3.     Time Trend ................................................................................ 122

4.     Standard Errors ......................................................................... 124

5.     Comparability of Benchmark Periods and Class Periods ................. 134

6.     Start and End Dates .................................................................. 135

a.     Appropriate DaVita-SCA Start and End Dates of the Challenged Conduct ................................................. 136

b.     Appropriate USPI-SCA Start and End Dates of the Challenged Conduct ................................................. 138

3244633.4

**TABLE OF CONTENTS**
**(continued)**

|  |  | Page |
|---|---|---|

c. Sensitivity of the Results to the Start and End Dates of the Challenged Conduct .................................................................. 139

7. Pooling Data Is Standard Economic Practice ...................................... 146

    a. Pooling Data Across Defendants Is Appropriate ...................... 146

    b. Throwing Out Pre- or Post-Conduct Data ................................ 151

8. The Conduct Suppressed Starting Wages ............................................ 156

D. Defendants' Miscellaneous Arguments About My Model Are Meritless ......... 161

1. It Is Not Necessary to Disentangle the Effects of Defendants' CSI Exchanges and the No-Poach Agreements ........................................... 161

2. The Mobility Analysis Need Not Be Informative About the Compensation Suppression Estimates .................................................. 162

3. The Results Are Consistent with Benchmark Estimates of No-Poach Effects from the Academic Literature ....................................... 166

4. Managers Are an Appropriate Benchmark to Gauge the Effects of the Conduct on the Wages of Senior-Level Employees ........................ 172

5. Alleged Model "Unreliability" ........................................................... 177

6. Dr. Johnson's Base Salary Regressions Are Uninformative About Harm ................................................................................................... 180

7. Job Offer and Cold Call Data Is Not Required to Estimate the Effect of the Conduct ........................................................................ 180

8. The Model Does Account for Individualized Factors ........................... 182

9. It Is Inappropriate to Measure Year-Over-Year Differences ................ 183

10. Graphical, Unconditional Compensation Comparisons to Industry Benchmarks Are Not Capable of Discerning Harm from the Challenged Conduct .......................................................................... 184

11. Unconditional Trends in Employment, Hiring, and Departure Rates Are Meaningless ................................................................................. 187

VIII. COMMON IMPACT ............................................................................................ 188

A. By-Employee-Level-Category and Defendant Suppression Model .................. 190

B. Quantile Regressions ..................................................................................... 191

C. In-Sample Prediction ...................................................................................... 192

D. Interval In-Sample Prediction ........................................................................ 193

3244633.4

**TABLE OF CONTENTS**
**(continued)**

Page

| | | |
|---|---|---|
| E. | Random Coefficient Model | 195 |
| F. | Evidence of a Compensation Structure | 195 |
| | 1. Qualitative Record Evidence of Defendant Firms' Compensation Structures | 198 |
| | 2. Quantitative Evidence of a Compensation Structure | 204 |
| | a. 79 Percent of Dispersion in Compensation is Explained by Four Common Factors | 205 |
| | b. Treatment of USPI Hours Does Not Change Across Job-Level Wage Regression Results | 208 |
| | c. Overlapping Pay Bands Do Not Disprove a Systematic Pay Structure | 210 |
| | d. Dr. Saravia's and Dr. Johnson's Non-Randomly Generated Compensation Paths Generate Pre-Determined Relationships | 211 |
| | e. A Common Wage Structure Does Not Require Uniform Changes in Compensation Across Employees | 214 |
| | f. Visual Analyses of Employee Pay Does Not Refute the Existence of a Common Wage Structure | 220 |
| | g. Nearly All Workers Are in Jobs with Positive Within-Job Wage Correlations | 221 |
| | h. Dr. Saravia's Criticism of Cascading Effects Misunderstands How the Conduct Affects Wages | 223 |
| | i. Dr. McCrary and Dr. Johnson Offer Inapposite Criticisms of My Quantitative Evidence of a Wage Structure | 225 |
| G. | Dr. McCrary's Subsample Common Impact Analysis | 226 |
| H. | Dr. McCrary's Theoretical Arguments of Immunized Workers | 234 |
| | 1. Dr. McCrary's Subgroup 1: Employees in Labor Markets Where Dr. McCrary Claims Defendants Lacked Market Power | 235 |
| | 2. Dr. McCrary's Subgroup 2: So-Called Indirectly Affected Class Members | 236 |
| | 3. Dr. McCrary's Subgroup 3: New Hires | 238 |
| | 4. Dr. McCrary's Subgroup 4: Employees with Substantial Equity Pay | 239 |

3244633.4

**TABLE OF CONTENTS**
**(continued)**

**Page**

        5.     Dr. McCrary's Subgroups 5 and 6: People Who Would Not Switch Jobs or Engage in Solicitation ............................................................... 240

        6.     Dr. McCrary's Subgroup 7: Employees Who Were Already Mobility Impaired .............................................................................. 242

IX.     AGGREGATE DAMAGES ...................................................................... 243

     A.     The Class Definition Is Objective .................................................... 244

X.     MARKET POWER .................................................................................. 246

     A.     Direct Evidence of Wage Suppression from the Challenged Conduct Shows Market Power ....................................................................... 248

     B.     Defendants' Experts' Lightcast and Market Share Analyses Do Not Measure Market Power ..................................................................... 248

XI.     CONCLUSIONS ..................................................................................... 257

APPENDIX A ..................................................................................................... 260

APPENDIX B ..................................................................................................... 272

APPENDIX C ..................................................................................................... 274

## I.     **Introduction**

1.     I, Dr. Evan P. Starr, hereby submit the following Updated Rebuttal Expert Witness Report ("Rebuttal"). I previously submitted an interim Rebuttal Expert Report on May 30, 2025 in response to the April 16, 2025 expert reports of Dr. John H. Johnson, IV ("Johnson Report") and Celeste Saravia, Ph.D. ("Saravia Report"), which were submitted by Defendants in response to the initial report I served on January 15, 2025 ("Starr Report").[1] In this Updated Rebuttal Expert Report, I supplement my interim Rebuttal Expert Report to respond to the April 16, 2025 reports of Defendants' Experts Dr. Justin McCrary ("McCrary Report") and Dr. Lauren Stiroh ("Stiroh Report"). Herein, I refer to Dr. Johnson, Dr. McCrary, Dr. Stiroh, and Dr. Saravia collectively as "Defendants' Experts." Given the significant overlapping nature of the four expert reports submitted by Defendants, I have retained references and responses to the Reports of John Johnson and Celeste Saravia contained in my May 30, 2025 Rebuttal Report.[2]

2.     Plaintiffs' Counsel have asked me to comment on all four of Defendants' Experts, testimony and supporting evidence, and in particular to determine whether any of the opinions expressed by Defendants' Experts cause me to change the conclusions reached in my Starr Report. The criticisms of Defendants' Experts do not overturn my initial analyses and opinions. While I accept a limited number of changes to the construction of the underlying dataset that informs my analyses, none of these data changes materially affect the outcome of any analysis.

---

[1] Further, on January 21, 2025, I served an amended version of my initial report to correct non-substantive errors ("Starr Report"). On May 1, 2025, Dr. Saravia served an amended version of her report. On June 26, 2025, Dr. Stiroh served an amended version of her report. Throughout my Rebuttal, I refer to these amended reports. I use the defined terms from my initial report.

[2] My prior responses to Dr. Johnson and Dr. Saravia are integrated into this supplemental report. While this report contains many new analyses to respond to Dr. Stiroh and Dr. McCrary, I supplement my analyses from the interim report in two places. *First,* to address theoretical criticisms raised by Defendants' Experts, I expand my study of first year compensation to include the starting compensation of new hires (Section VII.C.8). *Second*, I include a simulation to prove a theoretical point I made in response to criticisms by Dr. Johnson and Dr. Saravia about my compensation structure analyses (Section VIII.F.2.d).

3244633.4         1

For completeness, I rerun the analyses from my Starr Report using the updated data.[3] My opinion remains that the Challenged Conduct is consistent with anticompetitive conduct and inconsistent with unilateral conduct, and that common evidence and methods can be used to demonstrate that all or nearly all Class Members were harmed by the Challenged Conduct.

3.      In connection with this matter, I reviewed and relied upon materials from this case and from the related criminal investigation *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.), including the Third Consolidated Amended Class Action Complaint (ECF No. 555), the Johnson Report, the Saravia Report, the McCrary Report, the Stiroh Report, depositions, deposition exhibits, FBI investigation interview reports, DaVita criminal trial transcripts, and documents and structured compensation data produced by, or compiled from materials produced by Defendants Andrew Hayek ("Hayek"), Kent Thiry ("Thiry"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC (together, "SCA"), DaVita Inc. ("DaVita"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation (together, "USPI") (together, "Defendants"). I have also evaluated relevant studies from the academic literature. Overall, the information that I relied upon in forming my opinions include the materials listed in **Appendix A**. The bases for my opinions are described in this report and any attached exhibits. I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

4.      For purposes of convenience, **Appendix B** provides a list of the names, employers, job titles, and years worked for individuals I reference in my Rebuttal.

---

[3] These data changes are discussed in Section VII.A, *infra*.

## II.    Qualifications

5.      My qualifications were set forth in the Starr Report.[4] Subsequent to the submission of my initial report, there is a material change in my qualifications. In addition to publishing a new manuscript on partial identification methods, I recently received notice from the University of Maryland that I will be promoted to Full Professor, starting in the Fall of the 2025 academic year.

## III.   Assignment and Summary of Conclusions

6.      Summary of Defendants' Experts Opinions. There is a considerable amount of overlap among all four of the Defendants' Expert opinions. Broadly, their reports offer three high-level opinions that contrast with my own:

a.      Idiosyncratic Harm: Defendants' Experts do not dispute the factual existence of the record evidence, but claim that the Challenged Conduct would not be expected to harm all Class Members, either due to its alleged sporadic application, lack of mobility effects, or due to the alleged lack of a common wages structure. I do not find any of these arguments compelling. Fundamentally, Defendants' Experts have offered no alternative economic justification for the No-Poach Agreements or CSI Exchanges (other than a brief, easily refutable "benchmarking" justification). Their sole defense appears to rest on the notion that the harms of the Challenged Conduct would not be felt by all Class Members. Yet their evidence that the Defendants' lack standard within-firm wage structures is fundamentally flawed, and, aside from criticisms of the baseline model, Defendants' Experts have offered *zero criticisms* of my Common Impact models which demonstrate that any harms caused by the Challenged Conduct

---

[4] Starr Report ¶¶ 1–5; *id.* Appendix ("App.") A.

would be felt by all or virtually all Class Members.[5] Indeed, even taking on the new analyses

proffered by Defendants' Experts, I continue to find Common Impact.

b.  Regression Model Misspecification: No expert disputes my use of a

regression framework. Instead, Defendants' Experts' core criticisms are that my wage regression

model, which underpins my opinions on the effect of the Challenged Conduct, is misspecified for

a number of reasons. Having considered each criticism in turn and performed a bevy of new

robustness checks in response, I am not convinced that any of the modeling criticisms or

proposed alterations are correct or appropriate. But, even if I accept each argument at face value,

implementing each criticism individually continues to show that the Challenged Conduct is

statistically and economically associated with pay suppression to Class Members. Defendants'

Experts are only able to extract a finding of "no suppression" from my model by layering on

multiple inappropriate alterations to the model simultaneously. The fortitude of my original

model to withstand such dramatic changes before it yields a tortured result of "no suppression" is

a testament to its robustness, not its fragility.

c.  No Market Power: Defendants' Experts opine at length that the

Challenged Conduct *could not* have harmed Class Members because none of the Defendants,

---

[5] At deposition, Dr. Johnson testified that he did not specifically address the quantile regressions in my report. Deposition of John Johnson, Ph.D. (May 7, 2025) [hereafter Johnson Dep.] at 132:11–19. He does not "have additional opinions on the quantile regression beyond the critiques of the econometrics." *Id.* at 134:6–135:8. Similarly, Dr. Saravia testified that that she does not "separately offer critiques of the quantile regression" because it is "derivative of [the] original regression." Deposition of Celeste Saravia, Ph.D. (May 9, 2025) [hereafter Saravia Dep.] at 122:16–123:3. Dr. Johnson testified that he had no opinions separate from what he wrote in the Johnson Report ¶ 77, n.166 regarding my in-sample prediction and interval in-sample prediction analyses. Johnson Dep. at 135:15–136:8. In her deposition, Dr. Saravia offered no explicit critiques on the validity of my in-sample prediction model. The most direct criticism I received was that she believed compensation is "an individualized issue." Saravia Dep. at 147:22–148:12. Dr. Johnson testified that he did not have any opinions specifically pertaining to my random coefficient model. Johnson Dep. at 137:9–138:9. Dr. Saravia's deposition testimony never raised any criticisms of my random coefficient model. Dr. McCrary also testified that he did not submit an affirmative damages model. Deposition of Justin McCrary (June 12, 2025) [hereafter McCrary Dep.] at 122:14–123:5.

3244633.4                                                        4

either individually or collectively, have market power in any relevant labor market.[6] Defendants'

Experts all attempt to demonstrate that the Defendants all have low market shares and compete

with many other employers for labor using third party "Lightcast" data. Notwithstanding several

fundamental flaws in the Lightcast data that makes Defendants' Experts' analyses unreliable, I

find these arguments and analyses uninformative for assessing whether the Defendants had

market power or whether the Challenged Conduct resulted in harm to Class Members. Indeed,

Defendants' Experts' Lightcast analyses are fundamentally incapable of shedding light on the

extent of market power because they do not study variation in wages.[7] Just like in a hypothetical

monopsonist test, variation in wages is the key ingredient to measuring labor supply elasticities

and thus market power. Because Defendants' Experts' Lightcast analyses do not incorporate

wage variation, their resulting claims about market power amount to mere speculation. In

contrast, the labor economics literature recognizes that firms have firm-specific market power

over their own employees, both in healthcare and even in otherwise unconcentrated industries.[8]

Moreover, the labor economics literature on market power and labor supply elasticities I cited in

---

[6] Johnson Report ¶ 185 ("Dr. Starr does not assess the competition Defendants face for the labor of relevant employees."); *id.* at ¶ 186 ("Dr. Starr further does not address that [this] evidence contradict[s] his conclusion with respect to Defendants' 'market power.'"); Saravia Report ¶ 72 ("[T]here is clear evidence that USPI and SCA's (or all Defendants') collective labor market power is limited by the many employment options available to their employees beyond Defendants."); McCrary Report ¶ 68 ("Defendants did not have market power sufficient to suppress pay, given the abundance of alternative employers besides Defendants that I observe in my analysis of employment histories for members of the proposed class."); Stiroh Report ¶ 44 ("It is clear from this economic evidence that DaVita and SCA represented a small share of employment among the many alternative employers that the data show were competing or DaVita Senior-Level employees, and are thus unlikely to have been able profitably to suppress wages to all Senior-Level employees[.]").

[7] McCrary Dep. at 165:11–166:3.

[8] Starr Report ¶ 43 ("In economic terms, no-poach agreements give employers monopsony power, meaning they face less competition for workers. The way that monopsony power is often measured in the economic literature is by the 'elasticity of labor supply' to the firm. This measure considers how changes in the firm's wages affect the labor supply to the firm. When this value is low, it means that the firm's workers are not sensitive to wage changes at the firm, which allows the firm to mark down their wages relative to how much they produce for the firm."). *See also* Alan Manning, *Imperfect Competition in the Labor Market*, 4 HANDBOOK OF LABOR ECONOMICS 973–1041, 974 (2011) ("[I]t has been increasingly recognized that many aspects of labor markets are best analyzed from the perspective that there is some degree of imperfect competition.").

my initial report,[9] which Defendants' Experts completely ignore, is *not conditioned* on any of the firms studied having high market shares in a relevant antitrust market. Indeed, prior evidence on labor supply elasticities in the healthcare context, and on the effects no-poach agreements in more competitive markets, all suggest that Defendants wield market power. Even despite this, the question of whether firms have market power over their employees is best assessed directly, by seeing whether or not they are capable of suppressing wages. One could claim that the Titanic was unsinkable by reviewing its design documents and blueprints, but observing the wreck at the bottom of the ocean would be a more informative method.

7.      Assignment: In my capacity as an applied microeconomist with a focus on labor markets, Counsel for Plaintiffs' have asked me to do the following:

a.      *Assess if the Qualitative Evidence is Consistent with Anticompetitive Collusion and Inconsistent with Unilateral Conduct.* I have been asked to determine whether Defendants' Experts' opinions have caused me to change my opinion that the qualitative evidence (i.e., Defendants' internal documents and communications) is consistent with anticompetitive collusion and inconsistent with unilateral conduct;

b.      *Analyze if the Quantitative Evidence is Consistent with Anticompetitive Collusion and Inconsistent with Unilateral Conduct.* I have been asked to analyze Defendants' Experts' critiques of my analysis of Defendants' data, including econometric analysis of Defendants' compensation data. In particular, I have been asked to determine whether Defendants' Experts have successfully refuted my opinions that the Challenged Conduct (i.e., Defendants' No-Poach Agreements and Competitively Sensitive Information ("CSI")

---

[9] Starr Report ¶¶ 35–58. None of Defendants' Experts dispute my review of the economic literature or otherwise engage with its findings.

Exchanges)[10] is economically and statistically significantly associated with artificially suppressed compensation, beyond what can be explained by competitive factors, and whether this evidence is consistent with anticompetitive collusion and inconsistent with unilateral conduct;

      c.      *Determine Common Impact.* I have been asked to assess whether Defendants' Experts have persuaded me that the qualitative and quantitative evidence does not support my opinion that any wage suppression caused by the Challenged Conduct would commonly impact all or nearly all Class Members;

      d.      *Determine Aggregate Damages.* I have been asked to evaluate whether Defendants' Experts have given me cause to change my testimony that common methods and evidence can be used to quantify the damages to the Class caused by the Challenged Conduct;

      e.      *Determine Market Power.* I have been asked to assess whether Defendants' Experts have put forth sufficient testimony and evidence to refute my opinion that Defendants have market power over Class Members; and

      f.      *Assess Common Evidence.* I have been asked to assess whether Defendants' Experts have successfully demonstrated that evidence, data, and analyses common to the Class cannot be used to assess (a) through (e) above.

    8.      <u>Conclusions.</u> As a result of my work to date, the following are my conclusions:

      a.      *The Qualitative Evidence is Consistent with Anticompetitive Conduct and Inconsistent with Unilateral Conduct.*

      i.      **No-Poach Agreements.** In Section VI.B, I discuss Defendants' Experts' review of the evidence on the No-Poach Agreements in this matter. Defendants' Experts

---

[10] Starr Report ¶ 10.

do not argue against the existence of these Agreements or attempt to argue that they are procompetitive in nature. Their criticisms narrowly pertain to the exact scope of harm and the exact timing of the Agreements, yet they do not suggest that alternative start and end dates are preferable to the dates I apply.

ii.     **CSI Exchanges.** In Section VI.C, I discuss Defendants' Experts' review of the evidence on CSI Exchanges in this matter. Defendants' Experts argue that the available evidence of CSI Exchanges would be mechanically insufficient to suppress wages. Qualitative evidence shows that this is incorrect. It also shows that the available evidence in the record does not represent the universe of communications between the Defendants. Defendants' Experts also fail to understand how the No-Poach Agreements work in concert with the CSI Exchanges to facilitate compensation suppression. Defendants' Experts also claim that the CSI sharing *could* be procompetitive, but I find that the CSI Exchanges do not fit the criteria set forth by the material they cite.

b.     *The Quantitative Evidence is Consistent with Anticompetitive Conduct and Inconsistent with Unilateral Conduct.* In Section VII, I review every wage regression model criticism made by Defendants' Experts. I explain why the vast majority of these arguments are incorrect in principle or in practice. After accepting certain changes to the underlying regression data (made collectively among all of Defendants' Experts), I then demonstrate that even if I accept each modeling argument at face value, implementing each criticism continues to show that the Challenged Conduct is statistically and economically associated with pay suppression to Class Members. Having re-run my primary models on the revised data, I find that Challenged

Conduct suppressed wages by 12.6 percent overall, and specifically that the Challenged Conduct suppressed wages by 17.2 percent at DaVita, 11.9 percent at SCA, and 8.1 percent at USPI.[11]

      c.      *The Challenged Conduct Commonly Impacted Class Members.* In Section VIII, I discuss that none of Defendants' Experts make any criticism of my Common Impact models, which continue to demonstrate that harms from the Challenged Conduct were transmitted to all or virtually all Class Members. I also discuss their arguments against the evidence of a common compensation structure at each of the Defendant firms, finding that their arguments are fundamentally flawed and that the existing evidence is consistent with a wage structure, the existence of which would independently suggest that harms from the Challenged Conduct would flow to all Class Members. Finally, in response to Dr. McCrary, I examine several new analyses he advocated for, which continue to show Common Impact across specialties, seniority and company, and geography.

      d.      *Aggregate Damages Are Calculable.* In Section IX, I discuss how Aggregate Damages are calculable once a finding of harm has been established from the wage regression model. I also refute Dr. McCrary's claims that the criteria for the Class is not objective.

      e.      *Defendants Wield Market Power Over Class Members.* In Section X, I discuss Defendants' Experts' misguided analyses into issues of market definition, mobility, and calculating market shares. These approaches are incapable of estimating the extent of market power, because doing so requires combining wage information with mobility information to estimate labor supply elasticities. Defendants' Experts do not do this. The issues they raise are not relevant to an assessment of harm of the Challenged Conduct given (a) other, direct evidence

---

[11] *See* Figure 6 and Figure 7, *infra.* Initially, these values were 14.5 percent overall, or 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI. Starr Report ¶ 12(b).

of harm common across workers (including for individuals in labor markets Defendants' Experts consider to be competitive) and (b) the fact that firms are understood to have some degree of firm-specific monopsony power even in unconcentrated industries or when workers move across industries.

f.      *The Evidence is Common to the Class.* Defendants' Experts argue that individualized inquiry is necessary to identify harm from the Challenged Conduct. I fundamentally disagree because either individualized data is not necessary or because theoretical arguments about the necessity of individualized inquiry are illogical. I conclude that the issues of harm to Class Members turn on classwide evidence and methods. Indeed, all of the evidence, data, and analyses I relied on to reach each of the foregoing conclusions are common to the Class.

## IV.    Prior Testimony

9.      I described my prior experience testifying as an expert in arbitration proceedings in my initial report.[12]

10.     Additionally, I produced a report in *Veeva Systems Inc. vs. Medidata Solutions, Inc; Quintiles IMS Inc. (now IQVIA) and Sparta Systems* on April 24, 2025.

## V.     Background

11.     Class Definition. As I explained in my initial report, I understand that Plaintiffs are seeking certification of a class of employees who worked in positions at the director-level and above (hereafter "Senior-Level Employees") in the United States for one or more of the following: (a) from May 1, 2008 to December 31, 2019 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010,

---

[12] Starr Report ¶ 13.

to December 31, 2019 for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008 through December 31, 2019 for DaVita Inc. or one of its subsidiaries (hereafter "the Class" or "Class Members").[13]

    12.    <u>Challenged Conduct.</u> In my initial background section, I reviewed the Challenged Conduct, and the Defendants. As I described in my initial report, Plaintiffs alleged two "mutually reinforcing methods[:] No-Poach Agreements and Exchanges of Competitively Sensitive Information ('CSI') (together, the Challenged Conduct)."[14]

    a.    Defendants' Experts do not raise any objections to my summary of the background, although all four of Defendants' Experts use different language than I used. Dr. Johnson uses the term "alleged mobility restrictions" to refer to the alleged No-Poach Agreements,[15] and the "alleged information sharing" to refer to the alleged CSI Exchanges.[16] And given that USPI admitted to having a No-Poach Agreement with SCA, Dr. Saravia distinguishes between "Alleged, Assessed, Or Admitted" mobility restrictions.[17] And while Dr. Saravia acknowledges that USPI admitted to sharing information with SCA,[18] she uses the term "Alleged or Assessed Information Sharing" to refer to the CSI Exchanges.[19] Dr. Stiroh uses the terms "mobility restriction" and "information exchanges"[20] while Dr. McCrary refers to "information sharing" and "mobility restrictions."[21]

---

[13] Note that Dr. Saravia wrongly provides a prior version of the Class definition in her Report. Saravia Report ¶ 10.
[14] Starr Report ¶ 10.
[15] Johnson Report ¶ 16.
[16] *Id.* ¶ 17.
[17] Saravia Report ¶ 16.
[18] *Id.* ¶ 15.
[19] *Id.* ¶ 16.
[20] Stiroh Report ¶ 20(d)(i) and ¶ 20(e).
[21] McCrary Report ¶ 119 and ¶ 161.

b.  In order to keep the language consistent with my initial report, I will continue use the term the "Challenged Conduct" as the combination of the two elements of the alleged conspiracy, which I will continue to refer to as the "No-Poach Agreements" and the "CSI Exchanges."

## VI.  Evaluating Evidence of the Challenged Conduct

13.  In Section V of my initial report, I provided an overview of how economists see monopsony power, no-poach agreements, CSI exchanges, and how they use qualitative and quantitative evidence to assess the existence of such agreements. I then reviewed the evidence in this case and demonstrated that it was consistent with both a No-Poach Agreement and CSI Exchanges, which is consistent with Plaintiffs' allegations.

14.  Broadly, Defendants' Experts do not dispute my framework for assessing the Challenged Conduct nor my evaluation of the evidence. Their main arguments are that the Challenged Conduct would have affected a minority of individuals at the three Defendant firms, that the CSI Exchanges in particular may have procompetitive benefits, and that I selectively considered evidence in forming my opinions. As I explain in detail below, I find these arguments unavailing.

### A.  Economic Background of the Challenged Conduct

15.  None of Defendants' Experts raise any issues with my discussion of the economics of no-poach agreements, nor my discussion of the empirical literature estimating the harm from no-poach agreements. In fact, nowhere in any report by any of the Defendants' Experts do they even discuss or acknowledge the multiple studies finding that no-poach agreements reduce worker compensation in both the franchise context and in the high-tech

context.[22] I find this surprising, especially with respect to Dr. Johnson and Dr. McCrary, given that both of them have served expert reports in recent no-poach cases.[23] Given the centrality of the literature of no-poach agreements to the present case, as well as Dr. Johnson's and Dr. McCrary's prior expert experience in a no-poach case, I would have expected that at least they would explain how the No-Poach Agreements in this case compare to other no-poach agreements studied in the literature, or why the economic consensus that no-poach agreements tend to suppress pay would not apply in this case. Instead, Dr. Johnson and Dr. McCrary, like the other two Defendant Experts, ignore the academic literature entirely and even offer certain analyses and arguments that directly contradict the prevailing literature.[24]

16.     Defendants' Experts do not refute my discussion of monopsony power, or how the economic literature measures whether firms have labor market power to suppress wages (i.e., the labor supply elasticity). This is important, as I will discuss later in Section X when discussing market power, because all of Defendants' Experts' methods to assess market power are incapable

---

[22] There are two references to no-poach studies in the Johnson Report, but neither of the references engage with the actual results of those papers. Dr. Johnson references Lafontaine et al. (2024), but only to mention it uses Lightcast data. Johnson Report n.66 ("Dr. Starr points to academic literature that relies on data tracked by Lightcast[.]"); Francine Lafontaine, Saattvic Saattvic, & Margaret Slade, *No–Poaching Clauses in Franchise Contracts: Anticompetitive or Efficiency Enhancing*, SSRN (Feb. 18, 2025) [hereafter Lafontaine et al. (2025)] (Note both Johnson and I, in the Johnson Report and Starr Report, respectively, cite to a previous draft of this working paper published on Sept. 9, 2024). On this point, it bears noting that Lafontaine et al. (2025) does not use the *resume* data from Lightcast, which is used in both the Johnson and Saravia Reports. Rather, it uses *job posting* data from Lightcast. Note also that Dr. Johnson's Report does not include LaFontaine et al. in its materials relied upon. Dr. Johnson further references the no-poach study by Gibson (2024). However, he only does so to reference that "long-term incentive programs … are commonly used as retention tools by firms." Johnson Report ¶ 94 and n.192; Matthew Gibson, *Employer Market Power in Silicon Valley*, UPJOHN RESEARCH (2024) [hereafter Gibson (2024)]. There are no references to the studies estimating the harms of no-poach agreements on workers in the Saravia Report or the Stiroh Report. Dr. McCrary references only the Gibson (2024) study in n.421, but does not discuss the findings of the study and simply references my own report and deposition testimony.

[23] Dr. Johnson served an expert report in January 2024 specifically in a no-poach case in the Aerospace industry (*Tarah Kye Borozny, et al. vs. RTX Corp., Pratt & Whitney Division, et al*). Johnson Report App. A. Similarly, Dr. McCrary served an expert report in a franchise no-poach case in March 2025 in *Leinani Deslandes and Stephanie Turner v McDonalds USA, LLC*. McCrary Report App. A.

[24] *See, e.g.,* Section VII.C.8 and VII.D.7, *infra*.

of doing so because their methods do not include studying changes in wages and thus do not estimate labor supply elasticities, like in the literature.[25]

17. Defendants' Experts argue that my analysis of cartel behavior is incomplete because in order for a cartel to exist, it must be able to identify and punish cheaters.[26] Given that my initial report detailed exactly how the No-Poach Agreements were enforced and monitored,[27] I presume that Defendants' Experts are referring to monitoring and enforcing the CSI Exchanges and potential wage fixing. Given this, I address these claims fully in Section VI.C on CSI Exchanges below.

### B. Defendants Established No-Poach Agreements to Suppress Compensation

#### 1. The Qualitative Evidence Is Consistent with No-Poach Agreements Between SCA and DaVita and SCA and USPI

18. Notwithstanding Defendants' Experts claims about the timing of the No-Poach Agreements, which I address later in Section VI.B.1.c and Section VI.B.2.a, none of Defendants' Experts dispute the details of the recruitment restrictions and the tell-your-boss provisions. Defendants' Experts do assert that the No-Poach Agreements changed over time—specifically that the No-Poach Agreements were expanded to Directors and that the tell-your-boss provision was added after the recruitment restrictions[28]—but documentary evidence reviewed below suggests that the tell-your-boss provision was in fact a part of the No-Poach Agreements from the beginning and that Directors were included early on.[29] Defendants' Experts also do not dispute the qualitative evidence that the No-Poach Agreements were primarily targeted to

---

[25] *See* Section X, *infra.*
[26] *See* Section VI.C.1.cVI.B.2.c, *infra*.
[27] Starr Report Section V.B.
[28] Johnson Report ¶¶ 4, 55; McCrary Report ¶ 250 ("Plaintiffs' experts assert that the alleged mobility restrictions began as non-solicitation agreements, but later became more restrictive when Defendants adopted a 'tell your boss' requirement.").
[29] *See* Section VI.B.1.c, *infra.*

Senior-Level Employees, that they were secretive by design, that they had no geographic[30] or time limitations, or that top executives enforced the agreements both internally and with external recruiters. They also do not dispute qualitative evidence that the alleged No-Poach Agreements harmed at least some employees. Further, they provide no procompetitive justification for, or even economic explanation for the existence of, the alleged No-Poach Agreements.[31]

### a. Qualitative Evidence Is Falsifiable and Informative

19. Dr. Johnson broadly casts doubt on the informativeness of qualitative evidence because, in his words, "[u]nlike an empirical economic analysis, the conclusions drawn from a narrative based on a review of documents are (i) not falsifiable, (ii) have no known error rate, and (iii) are subject to bias if they fail to assess other contradictory and competing documents."[32] Dr. Johnson's perspective fails to appreciate the value of qualitative evidence for at least three reasons.

a. First, the record evidence can be informative in its own right. For example, in this case it can help us understand whether the Challenged Conduct fits the characteristics of what no-poach agreements look like in theory.

b. Second, qualitative evidence can be falsified with other qualitative evidence. For example, if in a deposition somebody says "I did not do X" but the record evidence directly shows them doing X, then we should put less credence in the deposition testimony.

---

[30] *See also* Johnson Dep. at 176:17–25 ("If what you're asking me is, do I recall anything particularly about a geographic restriction, I do not recall that, no.").

[31] McCrary Dep. at 121:14–20.

[32] Johnson Report ¶ 57 ("Unlike an empirical economic analysis, the conclusions drawn from a narrative based on a review of documents are (i) not objectively falsifiable, (ii) have no known error rate, and (iii) are subject to bias if they fail to assess other contradictory and competing documents. Dr. Starr's and Dr. Gerhart's presentations of documentary evidence highlight the limitation of simply reviewing documents to assess the impact of the alleged conduct.").

c.      Third, we need not pit the qualitative evidence against the quantitative evidence. Rather, the qualitative evidence can help us understand the quantitative evidence, and vice versa, to help better inform our understanding. Indeed, in my academic work, when possible I complement rigorous econometric work with interviews and survey data to help understand what is going on.[33] The same is true in this case. For example, the documentary evidence suggests that the No-Poach Agreements were primarily targeted to Senior-Level Employees; thus suggesting that we should see that the Challenged Conduct has stronger negative effects on Senior-Level Employees than managers—which we do. Similarly, the qualitative evidence alone can indicate when the likely start and end dates of the Challenged Conduct are, and the quantitative analysis can help provide confirmatory evidence. Thus, even when there are certain gaps in our understanding based on the qualitative and quantitative record, when evidence from the qualitative and quantitative data align (as they do here), then we should have more confidence in the results.

### b.      Access to Third-Party Information Would Not Defeat a No-Poach Agreement

20.     Dr. Stiroh argues that, even if the No-Poach Agreements limited solicitations, and thus gave employees less information about how much they were worth to the market, employees nevertheless had other publicly available sources of information they could rely upon

---

[33] *See* Thomaz Teodorovicz, Prithwiraj Choudhury, & Evan Starr, *Location-specificity and relocation incentive programs for remote workers*, 36(1) ORGANIZATION SCIENCE 186–212 (2025). *See also* Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do firms value court enforceability of noncompete agreements? A revealed preference approach*, REVIEW OF ECONOMICS AND STATISTICS 1–47 (2024).

to understand their salary potential.[34] Dr. McCrary makes the same point.[35] Dr. Stiroh points to Glassdoor and Indeed,[36] where salary ranges are often reported, as well as solicitations from non-Defendant competitors.[37]

21.     This argument ignores the fact that only 14 percent of job postings have salary ranges, and that the salary ranges are often too broad to be informative.[38] Glassdoor earnings data may provide some earning information, but Glassdoor did not start posting estimated job salaries in job postings until 2017.[39] Even here, Glassdoor listings provide broad earnings ranges, the data may be outdated, and early in the Conspiracy coverage was thin because Glassdoor first launched in 2008.[40] What individuals could have learned from these outside sources about their value elsewhere was likely limited. Finally, outside job offers from non-Defendant competitors will not always be available when an employee wants such information, and may be unlikely to reflect how much a Defendant would be willing to pay. Thus, these tools are likely to be of

---

[34] Stiroh Report ¶ 81 ("Salary information has been available on Glassdoor since at least June 2008. Job listings have been available since 2004 on Indeed and since at least June 2010 on Glassdoor.").

[35] McCrary Report ¶ 160 ("Plaintiffs and their experts have also not demonstrated that the claimed information sharing was the unique way in which the Defendants could access the information that was allegedly shared, or if Defendants learned anything new from the limited compensation-related information that was shared. First, very similar information may have been available from other sources.").

[36] Stiroh Report ¶ 80 ("DaVita employees also had access to public sources of information on compensation and employment opportunities through companies like Glassdoor and Indeed.").

[37] Stiroh Report ¶ 79 ("One such source of information to DaVita employees was information from the departure of employees to employers other than SCA.").

[38] See Honey Batra, Amanda Michaud, & Simon Mongey, *Online job posts contain very little wage information*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 31984 (2023) [hereafter Batra et al. (2023)] ("First, wage information is rare: only 14% of posts contain any wage information and the minority of these (6%) have a point wage. The majority (8%) a range of wages that are on average wide[.]").

[39] See *Glassdoor Announces Salary Estimates, Find Out What a Job Pays Before Applying,* GLASSDOOR (Feb. 9, 2017), https://www.glassdoor.com/blog/salary-estimates-announcement/ ("Today, Glassdoor announced it has introduced estimated salary ranges in job listings to help people instantly know what they could be paid before applying to a job.").

[40] See Catherine Clifford, *Meet the 3 co-founders who built the jobs website that just sold for more than $1 billion,* CNBC (May 9, 2018), https://www.cnbc.com/2018/05/09/meet-founders-of-glassdoor-sold-to-recruit-holdings-for-1-point-2-billion.html ("Barton and Hohman brought on a third former Expedia colleague, Tim Besse, and officially launched glassdoor in 2008.").

limited value, especially as opposed to receiving a real-time job offer or learning what your colleague was offered by a Defendant when they received a solicitation.

<b>c.     Qualitative Evidence on the Timing of the SCA-DaVita and SCA-USPI No-Poach Agreements</b>

22.     Defendants' Experts raise questions about the start and end dates of the No-Poach Agreements in this case. These questions relate to changes in the dates across different documents, USPI's admitted timing, and deposition testimony. I address these questions in this section as they relate to the qualitative evidence.

23.     All of Defendants' Experts assert that the start and end dates of the Challenged Conduct have differed across the dates in the Complaint, USPI's admitted dates, the DOJ's indictment, and the dates in my initial report,[41] with the implication being that I cherry-picked the dates. These criticisms are misleading. As I explain below, the alleged "inconsistencies" related to the start and end dates highlighted by the Defendants' Experts do not overturn my view that the evidence is most consistent with the start and end dates I was assigned to consider by Counsel.

24.     Moreover, despite raising the fact that different evidence may indicate different dates, none of Defendants' Experts affirmatively state an opinion on the appropriate start and end dates.[42] Given the existing evidence (described below, in Section VI.B.2.a and in Section VII.C.6) and that none of the Defendants' Experts are offering an alternative approach or stake out an affirmative position, I have no basis to substitute my current selection of the start and end dates with an alternative.

---

[41] Johnson Report ¶¶ 4–5; Saravia Report ¶¶ 250–251; McCrary Report ¶ 12; Stiroh Report ¶ 87.

[42] *See, e.g.,* Johnson Dep. at 169:21–173:22; Saravia Dep. at 133:22–134:18; McCrary Dep. at 126:9–19; Stiroh Report ¶¶ 87–88; Deposition of Lauren Stiroh (May 29, 2025) [hereafter Stiroh Dep.] at 142:22–25.

25.    <u>DOJ Indictments.</u> The way the timing was described in the DOJ's indictment clearly acknowledged that the exact dates were unknown to the DOJ at the time. Importantly, the dates in the DOJ indictment *encompass* the dates I was asked to review. The most reasonable explanation for the differences in timing reflects the state of the evidence at a given point in time, and nothing more.

a.    Dr. McCrary inaccurately describes the dates in the DOJ indictments as "from May 2010 to October 2017" for SCA and USPI and from "February 2012 to July 2017" for SCA and DaVita."[43] Dr. Johnson describes the DOJ indictment dates as "2012-2017 (DaVita), 2010-2017 (SCA), 2010-2017 (USPI)"[44] and Dr. Saravia writes that "[Dr. Starr] chooses a date (2019) that does not align with either the allegations (2021), the admission (2017), or the DOJ's indictment (again, 2017)."[45] In reality, the DOJ indictment related to the SCA-USPI No-Poach Agreement reads: "Beginning *at least as early as* May 2010 and continuing until *at least as late as* October 2017, the exact dates being unknown to the Grand Jury[.]"[46] Similarly, the DOJ indictment for SCA and DaVita reads "Beginning *at least as early as* February 2012 and continuing until *at least as late as* July 2017, the exact dates being unknown to the Grand Jury."[47] The language in the DOJ indictment clearly allows for the timing

---

[43] McCrary Report ¶ 12.

[44] Johnson Report n.383.

[45] Saravia Report ¶ 251. Note that Dr. Saravia inaccurately describes how the end date was selected. I did not "choose" a date. Per my initial report, counsel selected those dates, and my report then considers and validates those dates based on the qualitative and quantitative evidence.

[46] Indictment, *United States v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, No. 3:21-cr-0011-L (N.D. Tex. Jan. 5, 2021) ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017, the exact dates being unknown to the Grand Jury, in part in the Northern District of Texas and elsewhere, SCA and Company A [USPI] entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.").

[47] Indictment, *United States v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, No. 3:21-cr-0011-L (N.D. Tex. Jan. 5, 2021) ¶ 17 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates being unknown to the Grand Jury, in part in the Northern District of Texas and elsewhere, SCA and Company B [DaVita] entered into and engaged in a conspiracy to suppress competition between them for the services for senior-level employees by agreeing not to solicit each other's senior-level employees.").

of the No-Poach Agreements to begin before 2012 and end after 2017. The language is also clear that "the exact dates" are "unknown to the Grand Jury."

26.     Plaintiffs' Complaint. As it relates to the way timing was discussed in the Third Amended Complaint, Plaintiffs contend that the SCA-DaVita No-Poach Agreement "began *at least as early as* May 2008," citing to the departure of Hayek and Rucker from DaVita to SCA.[48] The Complaint also describes the beginning of the SCA-USPI No-Poach Agreement as starting "*No later than* May 2010."[49] In identifying these dates, the Complaint cites to specific documentary evidence indicating this timeline. In describing the end of the Class Period as January 2021, the Complaint is clear that the end date was selected based on when the DOJ publicly announced the SCA Indictment: "Until January 7, 2021, when the DOJ publicly announced the SCA Indictment, Plaintiffs and members of the proposed Class did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaged in secret no-poach agreements and wage-fixing exchanges."[50] Thus, the start dates in the Complaint are earlier than the DOJ dates, following the revelation of new information, and the end date is longer, based on the timing in which the DOJ announced its indictment of SCA.

27.     Class Definition. Relative to the Complaint, for my initial report, Counsel kept the same initial start dates but shortened the end date from January 2021 to December 31, 2019. My understanding of this change is to align with documentary evidence on when the Challenged Conduct ended, as opposed to when it was publicly revealed by the DOJ. Thus, contrary to the criticisms of Defendants' Experts, the changing of the timing of the Challenged Conduct between the DOJ Indictment, the Complaint, and my initial report does not imply anything

---

[48] 3rd Am. Class Action Compl. (ECF No. 555), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed October 27, 2024 ¶¶ 40–41.
[49] *Id.* ¶ 49.
[50] *Id.* ¶ 87.

except a better grasp of the evidence. Indeed, my review of the qualitative and quantitative evidence corroborates the start and end dates I was asked to consider.

28. *SCA-DaVita No-Poach Agreement.* Defendants' Experts point to qualitative evidence suggesting that the SCA-DaVita No-Poach Agreement may have started in 2012.[51] Similarly, Defendants' Experts reference qualitative evidence that the end date may have been 2017.[52] I am not persuaded that the evidence weighs in favor of either of these alternative dates.

a. **Start Date of SCA-DaVita No-Poach Agreement.** Defendants' Experts point to the fact that former SCA CEO Hayek testified that the SCA-DaVita start date of the No-Poach Agreement was 2012.[53] The record evidence reviewed in my initial report refutes a start date of 2012 for the SCA and DaVita No-Poach Agreement, and is consistent with a start date mid-2008.[54] Below is a brief overview of the evidence reviewed in my initial report supporting a 2008 start date of the DaVita-SCA No-Poach Agreement:

i. In an April 2008 e-mail discussing the potential for Hayek to leave DaVita for SCA, DaVita's then-CEO Thiry described how Hayek's departure created "competitive response issues" and that DaVita has a "response strategy" that Hayek and Thiry "should discuss live."[55] Shortly after leaving for SCA, Hayek hired DaVita's then-Divisional Vice President ("DVP") Michael Rucker from DaVita, and in a July 2008 e-mail chain discussing this departure, Thiry effectively describes the tell-your-boss provision: "If michael

---

[51] Johnson Report ¶ 56 ("For example, Andrew Hayek (SCA) testified that the agreement between DaVita and SCA did not begin until 2012."). McCrary Report ¶ 243 ("Andrew Hayek, called as a government witness against DaVita and Kent Thiry, testified at trial that the SCA-DaVita agreement did not begin until January 2012."). Stiroh Report ¶ 93 ("As noted above, I understand that Mr. Hayek testified that the mobility restriction began no earlier than January 1, 2012 and ended in 2017 when he stepped down as CEO of SCA.").

[52] McCrary Report ¶ 243 ("Hayek also testified that the SCA-DaVita agreement ended when he left SCA at the end of 2017."). Stiroh Report ¶ 93. Johnson Report ¶ 56.

[53] *See, e.g.,* Johnson Report ¶ 56 ("For example, Andrew Hayek (SCA) testified that the agreement between DaVita and SCA did not begin until 2012.").

[54] Starr Report ¶ 69.

[55] Ex. PX485.

was sure he was going to leave anyway, why wasn't it the right thing to say 'michael, call davita and tell them that, and then I will give you an offer. I am not comfortable recruiting from that/those company/friends unless that is a public fact' … Most of the time the candidate refuses to do it, because they are not in fact sure they are going to leave."[56] As I testified at deposition, "based on my experience in studying employment restrictions, my understanding is that often the instantiation of a no-poach agreement or a noncompete agreement or similar choice to restrict the mobility of employees comes about following departure events."[57]

ii. Hayek responded to Thiry in this July 2008 e-mail by confirming that he was not recruiting DaVita people and that Rucker was already going to leave DaVita: "Although I have multiple open positions [at SCA], I have not been calling DaVita people, because of our friendship and my respect for the Village [i.e., jargon DaVita employees used to refer to DaVita]. Moreover, there was a DaVita person in the process of being recruited for an SCA role when I joined, and, despite being an excellent candidate, I decided not to pursue them. The difference, to me, was that Michael had already decided to leave."[58]

iii. Per Hayek's testimony, his and Rucker's departures caused Thiry to threaten to harm Hayek's reputation and retaliate against Hayek and SCA if he learned that SCA recruited additional Senior-Level Employees.[59] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

iv. Notably, in this initial exchange, from which the SCA-DaVita No-Poach Agreement "arose," Thiry effectively communicated the core ideas of the tell-your-boss

---

[56] Ex. PX484 at DVA_OMCEAL_000429389.
[57] Deposition of Evan P. Starr, Ph.D. (March 20, 2025) [hereafter Starr Dep. Vol. 2] at 335:11–336:5.
[58] Ex. PX484 at DVA_OMCEAL_000429389.
[59] Deposition of Andrew Hayek (Sep. 18, 2024) [hereafter Hayek Dep.] at 93:7–95:14, 11:4–115:1, and Ex. PX304.
[60] Ex. PX304 at DOJCIV-008-00000301.

provision ("why wasn't it the right thing to say 'michael, call davita and tell them that, and then I will give you an offer"[61]). Thus, this evidence suggests the tell-your-boss provision was a part of the Challenged Conduct from the beginning, contrary to Defendants' Experts' assertion that it was added later.[62]

v.      Documentary evidence also suggests that the No-Poach Agreement was already in force by January 2010, and that it had already included Directors. A January 2010 e-mail between DaVita's Dennis Kogod and DaVita's Mark Gildea about a regional operations director who was "going to Andrew Hayek's company"[63] indicates that the No-Poach Agreement was already in effect for Directors. Gildea reveals that he indicated to Hayek that the individual was "not promotable" and Kogod responds by asking "Do we know who contacted who first Mark" and follows up with "Our folks are supposed to be off limited [sic] to Andrew and his company."[64] Gildea responds by emphasizing that the individual "reached out to them and not the other way around" and that this "prompted Andrew's call to me."[65]

vi.      Thus, the record evidence is clearly consistent with a start date of the SCA-DaVita No-Poach Agreement in mid-2008, and inconsistent with a start date of 2012. It also indicates that the tell-your-boss provision was operative at the beginning and Directors were included early in the No-Poach Agreement, which challenges Defendants' Experts assertion that the No-Poach Agreement was expanded later to include Directors.[66]

---

[61] Ex. PX484 at DVA_OMCEAL_000429389.
[62] Johnson Report ¶ 55. McCrary Report ¶ 250.
[63] Ex. PX376 at DVA_OMCEAL_000122784.
[64] *Id*. at DVA_OMCEAL_000122783.
[65] Ex. PX376 at DVA_OMCEAL_000122783.
[66] Johnson Report ¶ 4. McCrary Report ¶ 145 ("Andrew Hayek testified that the agreement initially applied only to Vice Presidents and more senior executives, and was later expanded to include corporate executives with the title of Director and more senior.").

vii.     Moreover, Dr. Johnson testified at deposition that he had not seen evidence of a No-Poach Agreement between SCA and DaVita prior to May 1, 2008.[67]

viii.     Finally, I am not persuaded that 2008 is the incorrect start year because of evidence that "there is higher mobility in the early years of" the SCA-DaVita No-Poach.[68] As I testified in my deposition, "There is evidence that the [N]o-[P]oach [A]greement[] early on had an impact … but at the same time, the communication of the [N]o-[P]oach [A]greement[] to all of the relevant individuals, the internal recruiters, the external recruiters, that all takes time. Everyone has to learn. There are mistakes that are made."[69]

b.     **End Date of SCA-DaVita No-Poach Agreement.** Counsel instructed me to consider an end date of 2019, and thus in my initial report I considered whether, among all reasonable end-dates, 2019 is the date with which the qualitative and quantitative evidence is most consistent. Defendants' Experts raise concerns about whether 2019 is the appropriate end date for both the SCA-DaVita No-Poach Agreement and the SCA-USPI No-Poach Agreement, suggesting that the end date may be 2017.[70] Below I consider their arguments and conclude that

---

[67] Johnson Dep. at 174:20–175:2.

[68] Deposition of Evan P. Starr, Ph.D. (March 19, 2025) [hereafter Starr Dep. Vol. 1] at 242:7–18.

[69] *Id.*

[70] Saravia Report ¶ 251 ("By contrast, for the end of his assessed conduct period, he chooses a date (2019) that does not align with either the allegations (2021), the admission (2017), or the DOJ's indictment (again, 2017). It also conflicts with documentary evidence, cited by Dr. Starr himself, that USPI abandoned the mobility restrictions with SCA in October 2017. According to USPI's contemporaneous email communications, USPI was no longer upholding the agreement and was instead actively recruiting SCA employees for all positions starting in October 2017."). Johnson Report ¶ 56 ("In addition, both experts ignore other evidence contradicting Plaintiffs' assertions about the end dates of the agreements. For example, Andrew Hayek (SCA) and Anthoy Kilgore (SCA) testified that the alleged mobility restrictions between SCA and DaVita as well as between SCA and USPI 'ended effectively when [Hayek] was outside of [his] role' as CEO of SCA at the end of 2017."). McCrary Report ¶ 243 ("I understand that there is evidence suggesting the possibility of other alternative class periods … Hayek [] testified that the SCA-DaVita agreement ended when he left SCA at the end of 2017. USPI documents also demonstrate that the agreement with SCA ended in October 2017.").

even the qualitative evidence is consistent with an end-date of 2019, and in particular inconsistent with Defendants' Experts suggestion that the end date may be 2017.[71]

       c.      Dr. Johnson agrees that the record does not include evidence that the executives agreed to stop the No-Poach Agreements.[72] At deposition, Dr. Johnson testified that he had not seen evidence that the SCA-DaVita No-Poach Agreement continued after 2019.[73] Dr. Johnson argues that I ignored evidence that Hayek and former SCA CEO Kilgore "testified that the alleged mobility restrictions between SCA and DaVita as well as between SCA and USPI 'ended effectively when [Hayek] was outside of [his] role' as CEO of SCA at the end of 2017."[74]

       i.      Dr. Johnson's description of Hayek's testimony is incomplete. In his deposition testimony, Hayek indicates that he viewed the No-Poach Agreements as no longer "relevant … after I left my role" but that he did not "recall any specific conversation with Mr. Kilgore about either [No-Poach] agreement."[75] Hayek further testified that when he transitioned out of his role at SCA to Optum, he did not have a specific communication with Thiry terminating the DaVita-SCA No-Poach Agreement.[76] When asked if he was aware if Kilgore ever communicated to Thiry or anybody at DaVita that the Agreement was no longer in effect, Hayek said that he was "not aware of Mr. Kilgore communicating something specific."[77]

       ii.     Dr. Johnson's description also omits the fact Kilgore himself testifies that Hayek did not tell him about any No-Poach Agreements when he transitioned into

---

[71] Johnson Report ¶ 56; Johnson Dep. at 169:21–170:5; McCrary Report ¶¶ 17, 123; Stiroh Report ¶¶ 87–88; Stiroh Dep. at 142:22–25.

[72] Ex. PX158 at 491:7–25; Hayek Dep. at 190:24–191:7. *See also* Ex. PX507 at DOJCIV-008-00000276; Deposition of William ("Bill") Wilcox (Sep. 24, 2024) [hereafter Wilcox Dep.] at 81:24–82:6; Johnson Dep. at 177:23–178:12.

[73] Johnson Dep. at 175:4–13.

[74] Johnson Report ¶ 56.

[75] Hayek Dep. at 329:14–330:8.

[76] *Id.* at 190:24–191:7.

[77] *Id.* at 191:8–21.

the CEO role.[78] And given Kilgore's testimony that he never had any conversation or interaction with Thiry during his time as CEO of SCA, Kilgore could not have communicated with Thiry to end the No-Poach Agreement.[79]

       iii.    Together, the documentary evidence suggests that when Optum bought SCA in 2017 and Hayek moved to Optum, neither Hayek nor Thiry communicated to end the SCA-DaVita No-Poach Agreement. When Kilgore transitioned into the SCA role in 2018, Hayek did not tell Kilgore about the SCA-DaVita No-Poach Agreement, and Kilgore and Thiry never interacted at all, and so could not have discussed the end of the SCA-DaVita No-Poach Agreement.

       iv.    To bolster the suggestion that the DaVita-SCA No-Poach Agreement ended in 2017, Defendants' Experts could have found other record evidence that the SCA-DaVita No-Poach Agreement ended in 2017. But they did not. For example, Defendants' Experts did not identify any communications between SCA and DaVita confirming the end of the No-Poach Agreement. Defendants' Experts did not identify any communications within SCA from 2017 telling human resource ("HR") staff and recruiters that they can now recruit from DaVita. Similarly, Defendants Experts did not identify any communications from 2017 within DaVita, telling HR staff and recruiters that they can now recruit from SCA.[80] Thus, Defendants' Experts provided no actual documentary evidence indicative of a 2017 end date. Moreover, even if SCA stopped enforcing the SCA-DaVita No-Poach Agreement in 2017 when Hayek transitioned to Optum, that does not mean that DaVita also stopped enforcing the No-Poach

---

[78] Deposition of Anthony Kilgore (Oct. 22, 2024) at 67:11–21.
[79] *Id.* at 173:20–174:8.
[80] *Id.* at 67:11–68:13.

Agreement. Taken together, I am not aware of any documentary evidence that would corroborate a 2017 end date to the DaVita-SCA No-Poach Agreement.

v.      Moreover, as I reviewed in my initial report, there are several clear reasons that the DaVita-SCA No-Poach Agreements most likely ended in 2019. ████████

████████████████████████████████████

███████████████████████████████████████

████████████████████████████████[81] At a minimum, this suggests that DaVita still saw the No-Poach Agreement as intact even after Hayek moved to Optum. Moreover, as I review in more detail below, ██████████████████████

████████████████████████████[82] which suggests that he also likely continued upholding the SCA-DaVita No-Poach agreement as well. Ultimately, both Hayek and Thiry, the creators and ultimate enforcers of the SCA-DaVita No-Poach Agreement, both stepped down in 2019, ████████████████████████████████

██████████████████████████.[83] Finally, at deposition, Dr. Johnson testified that he was not aware of any evidence showing that SCA and DaVita formally agreed to terminate the conduct.[84] Given the scope and weight of this qualitative evidence, 2019 is a much more likely end date to the DaVita-SCA No-Poach Agreement compared to 2017. In light of any residual uncertainty on the end date, the quantitative analysis of instances in which Senior-Level Employees work for different "Covered Defendants" in Section VI.B.2 provides complementary quantitative evidence consistent with the SCA-DaVita No-Poach Agreements ending in 2019 and not 2017.

---

[81] DOJCIV-008-00000423 at -424.
[82] Ex. PX304 at DOJCIV-008-00000300–301.
[83] *See* Starr Report ¶ 74.
[84] Johnson Dep. at 177:23–178:12.

29.   *SCA-USPI No-Poach Agreement.*

a.   **Start Date of SCA-USPI No-Poach Agreement.** Neither Dr. Johnson, Dr. Saravia, nor Dr. McCrary dispute the start date of May 2010 for the SCA-USPI No-Poach Agreement, which coincides with USPI's admitted start date.[85] As I explained above, this timeline coincides with higher mobility between SCA and USPI.[86]

b.   **End Date of SCA-USPI No-Poach Agreement.** Drs. Johnson, Dr. Saravia, and Dr. McCrary all reference qualitative evidence that the end date of the SCA-USPI No-Poach Agreement was 2017,[87] and raise questions about 2019 as a likely end date.[88] While all three indicate that they have no opinion on the end date of the SCA-USPI No-Poach Agreement,[89] the primary alternative end date is 2017, as I acknowledged in my initial report.[90] This is because USPI admitted to having a No-Poach Agreement with SCA until 2017, and because there is some documentary evidence which I reviewed in my initial report to suggest that USPI may have stopped enforcing the No-Poach Agreement in 2017.[91] Nevertheless, the weight of the qualitative and quantitative evidence is still most consistent with an end-date of 2019.

i.   As a practical matter, because the SCA-USPI No-Poach Agreement is bilateral, for it to end SCA and USPI would have to *both* stop abiding by it. As I described in my initial report, ██████████████████████

██████████████████████████████████████████ ▪ ███████

---

[85] Saravia Report ¶ 250 ("The start of Dr. Starr's assessed conduct period, May 2010, coincides with the start of USPI's Admitted Mobility Restrictions with SCA, as well as the start of the Alleged SCA-USPI Mobility Restrictions.").

[86] Starr Dep. Vol. 2 at 335:11–336:5.

[87] Johnson Report ¶¶ 178–179; Saravia Report ¶ 35, ¶¶ 251–252, McCrary Report ¶ 243.

[88] Johnson Report ¶ 56; Saravia Report ¶ 251; McCrary Report ¶¶ 17, 123; McCrary Dep. at 126:9–19.

[89] Johnson Dep. at 169:21–173:22; Saravia Dep. at 133:22–134:18; McCrary Report ¶¶ 17, 123; McCrary Dep. at 126:9–19.

[90] Starr Report ¶ 80(c).

[91] *Id.*

[92] Ex. PX507 at DOJCIV-008-00000276; Wilcox Dep. at 81:24–82:6.

████████████████████████████████████████████████████████████████████.[93] At deposition, Dr. Johnson testified that he was not aware of any evidence wherein USPI and SCA formally agreed to end the No-Poach Agreement.[94]

        ii.      If SCA stopped enforcing the SCA-USPI No-Poach Agreement in 2017, then Defendants' Experts should be able to point to evidence of internal SCA communications that indicate that SCA can now recruit from USPI. However, Defendants' Experts point to no such evidence. Rather, and to the contrary, direct, qualitative evidence shows that Hayek continued to uphold the SCA-USPI No-Poach agreement even as he transitioned between SCA and Optum in April 2017. █████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ █ ████████████████████████████████████████████

████████████████████████████[96] In light of this evidence, it is reasonable to expect that at least SCA continued to uphold its part of the SCA-USPI No-Poach Agreement until Hayek left Optum in 2019.

        iii.      It is also possible that USPI continued to uphold the No-Poach Agreement with SCA, even after the February 2017 e-mail from USPI's then-SVP, Chief Human Resources & Support Services Officer Sandi Karrmann, wherein she "reiterated the DOJ guidance" that USPI "should not be practicing or adhering to [the No-Poach Agreements],

---

[93] Ex. PX304 at DOJCIV-008-00000300.
[94] Johnson Dep. at 177:23–178:12.
[95] Ex. PX304 at DOJCIV-008-00000301.
[96] *Id.*

because they were in violation of the antitrust [laws]."[97] While internal USPI documents suggest that recruiters were now able to recruit from SCA in 2017,[98] neither Dr. Saravia, Dr. Johnson, nor Dr. McCrary point to any qualitative evidence on the outcome of such efforts. Given that Hayek intended to keep enforcing the SCA-USPI No-Poach Agreements after he moved to Optum, it is possible that after USPI recruited SCA employees that Hayek reached out to maintain the No-Poach Agreement, as he had previously done.

     iv.  Moreover, after two former USPI employees filed a lawsuit alleging that USPI engaged in unlawful no-poach conduct,[99] Wilcox texted Hayek in February 2018 to ask to schedule a call, and Wilcox warned that Hayek "may get dragged into it tangentially, meaning SCA may receive a subpoena for documents."[100] Wilcox testified that he spoke with Hayek shortly thereafter, and that Hayek recalled the SCA-USPI No-Poach Agreement.[101] Moreover, Wilcox testified that he did not recall either of them saying, "We need to end this agreement[,]" and Wilcox did not tell Hayek that USPI intended to self-report the Agreement to the DOJ.[102] In other words, that would have been an obvious point at which to agree to terminate the No-Poach Agreement, given their firms' known exposure to civil and criminal liability. But they deliberately chose not to take that opportunity.

     v.  In addition to this evidence above, 2019 is also a reasonable end date because Hayek stepped down in 2019, ██████████████████████████████

████████████████████████████████.[103]

---

[97] USPI_CIV_000000442; Deposition of Sandi Karrmann (Aug. 14, 2024) at 54:12–56:24.
[98] Deposition of Shannon McGarry (June 11, 2024) at 99:2–9 (McGarry testified that she was happy when Mosley gave her the directive to poach from SCA "because it opened a larger pool of candidates.").
[99] Wilcox Dep. at 75:2–80:15.
[100] Ex. PX504.
[101] Wilcox Dep. at 80:16–82:3.
[102] *Id.* at 82:4–15.
[103] *See* Starr Report ¶ 74.

vi.    Taken together, the qualitative evidence suggests that while it may have been possible that USPI stopped enforcing the SCA-USPI No-Poach Agreement in 2017, the bulk of the qualitative evidence suggests that the SCA-USPI No-Poach Agreement fully ended in 2019. As reviewed in my initial report, and even despite Defendants' Experts' objections which I address below, this is consistent with the quantitative evidence on instances in which Senior-Level Employees worked for both SCA and USPI.

### 2.    The Quantitative Evidence Is Consistent with No-Poach Agreements Between SCA and DaVita and SCA and USPI

30.    In my initial report, I described quantitative evidence based on the payroll records provided by Defendants about the extent to which Senior-Level Employees worked for "Covered Defendants."[104] The goal of this analysis was two-fold: First, given that the qualitative evidence implies an end-date to both sets of No-Poach Agreements of 2019, I looked for evidence to see if the patterns of Senior-Level Employees working for different Covered Defendants are most consistent with an end date of 2019. Second, I looked to see if there is descriptive evidence that Senior-Level Employees are less likely to work for Covered Defendants during the alleged Conduct Period. Based on this analysis in my initial report, I found that the quantitative evidence was consistent with a 2019 end-date, and that there was evidence consistent with the idea that Senior-Level Employees were less likely to work at different Covered Defendants during the Challenged Conduct.[105]

31.    Below I reproduce **Figure 1** and **Figure 2**, representing the same tables and figures as in my initial report which show that the results are unchanged with the revised data

---

[104] *See* Starr Report ¶¶ 81–91.
[105] Starr Report V.B.4.

(explained in Section VII.A). They continue to show a statistically significant uptick in mobility in 2020, and that mobility between Covered Defendants was suppressed during the Conduct.

**Figure 1 [Figure 3 Revised]: Annual Probability of Mobility Between Covered Defendants Relative to 2017**

| Dependent Variable: | [1] 1(Leave for DaVita or SCA) | [2] 1(Leave for USPI or SCA) |
|---|---|---|
| Year = 2008 | 0.00331* | 0.00213 |
|  | (0.00191) | (0.00217) |
| Year = 2009 | 0.00218 | -0.000746 |
|  | (0.00154) | (0.000746) |
| Year = 2010 | 0.00299* | 0.00744** |
|  | (0.00173) | (0.00341) |
| Year = 2011 | 0.00352** | -0.000746 |
|  | (0.00176) | (0.000746) |
| Year = 2012 | 0.00224* | 0.00482* |
|  | (0.00129) | (0.00259) |
| Year = 2013 | 0.000702 | 0.00356 |
|  | (0.000702) | (0.00227) |
| Year = 2014 | 0 | 0.000221 |
|  | (0) | (0.00122) |
| Year = 2015 | 0.000619 | 0.00197 |
|  | (0.000619) | (0.00174) |
| Year = 2016 | 0.000455 | 3.01e-05 |
|  | (0.000455) | (0.00108) |
| Year = 2017 | *Base Year* | *Base Year* |
| Year = 2018 | 0.000856 | 0.00279 |
|  | (0.000605) | (0.00175) |
| Year = 2019 | 0.000546 | 0.000645 |
|  | (0.000546) | (0.00123) |
| Year = 2020 | 0.00160* | 0.00381** |
|  | (0.000926) | (0.00187) |
| Year = 2021 | 0 | 0.00595*** |
|  | (0) | (0.00215) |
| Constant | -0 | 0.000746 |
|  | (0) | (0.000746) |
| Sample | DaVita & SCA | USPI & SCA |
| Observations | 22,508 | 15,572 |
| R-squared | 0.001 | 0.002 |

*Note*: Robust standard errors in parentheses *** p<0.01, ** p<0.05, * p<0.1.

**Figure 2 [Figure 4 Revised]: Probability of Mobility Between Covered Defendants**

| | [1] | [2] | [3] |
|---|---|---|---|
| Dependent Variable: | 1(Leave for Covered Defendant) | 1(Leave for DaVita or SCA) | 1(Leave for USPI or SCA) |
| Conduct | -0.00237*** | -0.00132** | -0.00169* |
| | (0.000806) | (0.000662) | (0.00101) |
| **% Effect Relative to Sample Mean** | **-103.4%** | **-123.6%** | **-54.9%** |
| Year | -0.000186** | -0.000281*** | 8.01e-05 |
| | (8.70e-05) | (9.67e-05) | (0.000118) |
| Sample | All | DaVita & SCA | USPI & SCA |
| Sample Mean of DV | 0.00229 | 0.00107 | 0.00308 |
| Observations | 31,382 | 22,508 | 15,572 |
| R-squared | 0.000 | 0.001 | 0.000 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses. Note the constant term is suppressed.

32.     Defendants' Experts raise several objections to the quantitative analyses in my initial report. Note, however, that Dr. Johnson and Dr. McCrary do not have opinions on the *existence* of Defendants' No-Poach Agreements.[106] Some of those criticisms I will deal with in Section X on Market Power. Below I describe their core criticisms as they related to the end date of the Challenged Conduct, and whether mobility between Covered Defendants was lower during the Conduct Period.

### a.     The Evidence Is Consistent with a 2019 End Date

33.     With regards to the quantitative evidence being consistent with an end-date of 2019, Dr. Johnson argues that "correctly accounting for statistical significance" to 5 percent and correcting a "double counting of one employee" then there is "no statistically significant change

---

[106] Johnson Dep. at 163:20–164:1; McCrary Dep. at 118:14–18.

in the probability of mobility for either Defendant pair in 2020."[107] Dr. Stiroh, Dr. McCrary, and Dr. Saravia make the same point about statistical significance.[108]

34. Both claims are inaccurate. First, there was no double counting of an employee. The employee in question was appropriately classified as being paid by both Covered Defendants in consecutive years.[109] Nevertheless, regardless of how the employee is classified, the level of mobility in 2020 is the highest for any year between 2016 and 2020.[110] For DaVita and SCA, the level of mobility in 2020 is nearly twice as large as the second highest year (2018). For USPI and SCA, the level of mobility in 2020 is 29 percent higher than the second highest year.

35. In addition, Defendants' Experts do not recognize or account for the various mergers that happened in 2017 and 2019, which naturally suppress the extent to which we observe mobility after the end of the Challenged Conduct. Recall that Optum bought DaVita Medical Group ("DMG") in 2019, and that Optum bought SCA in 2017. As reviewed above, the

---

[107] Johnson Report ¶ 59.

[108] Stiroh Report n.132 ("Daniel L. Rubinfeld, 'Reference Guide on Multiple Regression,' in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: The National Academies Press, 2011, p. 320 ('In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%.'"); AMERICAN BAR ASSOCIATION, PROVING ANTITRUST DAMAGES 142 (2017) ("[S]tatistical hypotheses are carried out at conventional levels of 5 percent."); McCrary Report ¶ 201 ("However, this statement is only true if Prof. Starr's results are evaluated using a 10% significance level, which is not the typical level used by statisticians. In other words, simply evaluating Prof. Starr's own results using a more-typical 5% significance level results in a finding of no statistically significant change in mobility between DaVita and SCA, and no statistically significant change in mobility between SCA and USPI, during the Class Period."); Saravia Report n.177 ("Note that the effect of the conduct found in Dr. Starr's Figure 4, Column 3 (-0.00169), is not significant at a conventional level of statistical significance used by economists, the 5 percent level (i.e., the 95 percent confidence interval).").

[109] Defendants claim to correct for "double counting" of Heather Way in the mobility analysis. There is no double counting of Heather Way. Among the three Defendants, Heather Way is first observed in the data in 2019, being paid only by SCA. In 2020, she was paid by both SCA and USPI. In 2021, Heather Way is also paid by both SCA and USPI. In 2022, Heather Way is only paid by USPI. Thus, based on the payroll data, we have an individual who was first paid only by SCA, then paid by both USPI and SCA in two consecutive years (2020 and 2021), and then paid only by USPI. Because the goal is to count the number of instances in which Senior Employees worked for Covered Defendants, it is appropriate to count Heather Way as working for both Covered Defendants in 2020 and 2021. The coding procedure captured this appropriately by tracking whether an individual worked for multiple Covered Defendants in the same year.

[110] *See* my workpapers.

qualitative evidence suggests that the No-Poach Agreements moved with former SCA CEO Hayek to Optum (and to Optum's parent company United Healthcare). Because Optum and United Healthcare are not parties to this litigation, we do not have data on their employees. To understand how this might influence the mobility patterns observed, and why the mobility between Covered Defendants after 2020 are likely to be under-estimated as a result, consider the following examples.

a. Suppose that individual A works at SCA in 2019 and would have transitioned to DMG in 2020 after the end of the Conduct Period because of the removal of the SCA-DaVita No-Poach Agreement. Because by 2020, Optum owned DMG, this individual will not be counted as moving to DaVita, even if individual A moved internally between SCA and Optum's newly-owned DMG.

b. The reverse scenario is also true. Suppose that individual B works at DMG and would have transitioned to SCA in 2020 after the removal of the SCA-DaVita No-Poach Agreement. Because DMG was purchased by Optum, if the individual who would have moved to SCA is now a part of Optum instead, then we would not see the move in the data.

c. A similar analysis holds even for workers at USPI and DaVita Kidney Care (which was not acquired by Optum). Consider a worker at USPI or DaVita Kidney Care that would have moved to SCA in 2020 due to the removal of the No-Poach Agreement. Now because SCA is owned by Optum, if those individuals join Optum or United Healthcare more broadly, then we would not see those moves in the data.

36. Thus the acquisition events and ownership structure of SCA and DaVita Medical Group that occur towards the end of the Conduct Period imply that we will systematically undercount moves between SCA and DaVita after the Conduct Period. Another way to make this

point is to note that, due to the various mergers, it is not an apples-to-apples comparison to look at mobility between Covered Defendants after vs. during the Conduct Period. Dr. Stiroh acknowledges this point with regards to the Lightcast Data, but fails to point out how it could manifest in the Defendants' data as well.[111]

37.     Second, Defendants' Experts points about statistical significance are both misguided and are contradicted by the way that statisticians think about "statistical significance" and p-values being less than 5 percent.[112] Indeed, the American Statistical Association position statement on p-values specifically rejects Defendants' Experts proposal of only referring to results with a p-value of less than 5 percent as statistically significant:

> Scientific conclusions and business or policy decisions should *not* be based only on whether a p-value passes a specific threshold. Practices that reduce data analysis or scientific inference to mechanical "bright-line" rules (such as "$p < 0.05$") for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making. A conclusion does not immediately become "true on one side of the divide and "false" on the other … The widespread use of "statistical significance" (generally interpreted as "$p < 0.05$") as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process.[113]

a.     Similarly, a 2021 press release in The American Statistician referring to an issue of the journal titled "Statistical Inference in the 21st Century: A World Beyond p<0.05," describes that this journal issue "calls for an end to the practice of using a p-value of less than

---

[111] Stiroh Report n.67.

[112] *See* Johnson Report n.95 ("See*, e.g.,* American Bar Association, Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, 3rd ed., ABA Book Publishing, 2017 ('ABA Proving Antitrust Damages',) p. 142 ('[S]tatistical hypotheses are carried out at conventional levels of 5 percent[.]'); Daniel L. Rubinfeld, 'Reference Guide on Multiple Regression,' *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 320 ('In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at .05 or 5%.').").

[113] Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70(2) THE AMERICAN STATISTICIAN 129–133 (2016).

0.05 as strong evidence against a null hypothesis or a value greater than 0.05 as strong evidence favoring a null hypothesis."[114]

b.　　Defendants' Experts' mistake perhaps results from the fact that standard statistical software (including those used in my report) often defaults to including one, two, or three asterisks on coefficients that have a p-value less than 10 percent, 5 percent, and 1 percent, respectively. And despite the American Statistical Association's recommendations, these are often used as short-hand to refer to results as "statistically significant." However, even while the practice of asterisks as short-hand for indicating ranges of p-values is still used in many journals today, some have dropped this practice altogether due to the problems raised above with specific cutoffs of e.g., 5 percent. For example, the policy of one of the journals at which I am an Associate Editor, the Strategic Management Journal, has a "[r]eporting results of statistical analyses" policy for authors that reads "SMJ no longer accepts papers for publication that report or refer to cutoff levels of statistical significance (p-values). In statistical studies, authors should report either standard errors or exact p-values (without asterisks) or both and should interpret these values appropriately in the text."[115] It continues that authors should not refer to "specific cutoff points."[116]

c.　　Taken together, the consensus of the scientific community firmly rejects Defendants' Experts' outdated claim that only results with a p-value less than 5 percent should

---

[114] *See Editorial Calls Time on 'Statistically Significant' in Research*, AMERICAN STATISTICAL ASSOCIATION, https://www.amstat.org/news-listing/2021/10/08/editorial-calls-time-on-statistically-significant-in-research (last visited June 2025) ("Instead, p-values should be reported as continuous quantities and described in language stating what the value means in the scientific context.").

[115] *See Author Guidelines*, STRATEGIC MANAGEMENT JOURNAL at 6 (updated June 8, 2023), https://onlinelibrary.wiley.com/pb-assets/assets/10970266/SMJ%20Author%20Instructions%2006%2008%2023%20FINAL-1686755077677.pdf.

[116] *Id.*

be referred to as "statistically significant" and it recommends against basing scientific decisions on such thresholds.

38.     With this background on statistical significance, we can now revisit Defendants' Experts' claim that there is "no statistically significant change in the probability of mobility for either Defendant pair in 2020."[117] Recall that for every year from 2016 to 2020, the probability of movement between Covered Defendants is the highest in 2020 for both sets of Covered Defendants, even with the caveats mentioned above related to merger activity suppressing mobility that we may have otherwise observed. For DaVita and SCA, the level of mobility in 2020 is nearly twice as large as the second highest year, and the estimated difference in the level of mobility in relative to 2017 has a p-value of 8.3 percent. For USPI and SCA, the level of mobility in 2020 is 29 percent higher than the second highest year and the estimated difference relative to 2017 has a p-value of 4.2 percent.[118] Moreover, no other year between 2016 and 2019 has a difference in mobility levels with a p-value less than 10 percent relative to 2017.

39.     Given these results and the findings from the qualitative discussion above, if one was to select an end-year to the No-Poach Agreements, 2019 is the only year that one could reasonably select. Picking any other year is inconsistent with both the qualitative evidence and the quantitative evidence.

40.     Defendants' Experts argue my mobility "analysis is sensitive to the specification he selects, finding results that contradict his conclusions when tested using 'base years' other

---

[117] Johnson Report ¶ 59.

[118] These results are robust to how we allocate Heather Way, the individual who Defendants' Experts argue is double counted. When Heather Way is assigned to move in 2020 (which is the first year she is seen being paid by both USPI and SCA) but not in 2021, then the coefficient estimate on 2020 and the corresponding p-value is unchanged relative to the baseline model. When Heather Way is assigned to move in 2021, but not in 2020, then 2020 is still the highest level of mobility between USPI and SCA relative to all years between 2016 and 2017, and the estimated difference in mobility relative to 2017 has a p-value of 7.2 percent.

than 2017."[119] Given this, Defendants' Experts conclude that the evidence is inconsistent with a 2019 end-date of the No-Poach Agreements.[120]

41.    Defendants' Experts points are misguided and misleading, and do not in any way indicate that my mobility analysis is inconsistent with a 2019 end date for the No-Poach Agreements. This is clear for two reasons.

a.    First, one must pick a base year to study changes against. As I reference in my initial report, and as discussed above,[121] Defendants' Experts raise in their rebuttals that 2017 is the only alternative year that could possibly be considered the end-date of both the USPI-SCA and the SCA-DaVita No-Poach Agreements. Thus, the most natural benchmark year is 2017.

b.    Second, the fact that the results do not indicate a "statistically significant" rise in mobility in 2020 when other benchmarks years are considered is a complete red herring. By this logic, Dr. Johnson, Dr. McCrary, and Dr. Stiroh would conclude that the No-Poach Agreements would have never ended because from 2016 onward there is not a statistically significant rise in mobility in any year for all potential benchmark years.[122] Indeed, this critique

---

[119] Johnson Report ¶ 58; McCrary Report ¶ 246 ("Indeed, Exhibit 43 shows that, when I estimate Prof. Starr's year-by-year mobility regression model using 2018 or 2019 as the reference years (instead of 2017), I find no statistically significant differences between inter-Defendant mobility in those years and inter-Defendant mobility in 2020."); Stiroh Report ¶ 73 ("As a matter of econometrics, Dr. Starr could have chosen any base year. If he instead used as the base year any of the 10 years during the alleged conduct period when employee mobility was higher than zero, he would not have found a statistically significant positive coefficient for 2020, eliminating his supposed quantitative support for his decision to analyze a conduct period that ends in 2019.").

[120] Johnson Report ¶ 59 ("This result undermines his conclusion that his mobility regression is consistent with a conspiracy ending in 2019."); Stiroh Report ¶ 72 ("In fact, Dr. Starr's regression analysis provides no robust support for choosing 2019 as the end year for his conduct period.").

[121] See Section VI.B.1.c, supra.

[122] Dr. Stiroh raises the possibility that if the criteria is a statistically significant increase in mobility then the end dates could have been 2008, 2011, or 2012. Stiroh Report ¶ 72 ("In fact, if the criteria for assessing years in which the alleged agreements did not affect mobility is a statistically significant increase in mobility relative to a year when there were zero movements between SCA and DaVita, then Dr. Starr could equally have concluded that there was no impact of the agreements on mobility in 2008, 2011, or 2012. Each of these years has coefficients with larger magnitudes than the 2020 coefficient that Dr. Starr uses as meaningful economic evidence of the end of the alleged conspiracy period."). This argument is clearly wrong. The qualitative evidence reviewed in Section V.B. is entirely inconsistent with an end-date of the No-Poach Agreements before 2017.

misses the important question: Given that the No-Poach Agreement ended, which year provides the most compelling quantitative evidence of the end of the No-Poach Agreements? As discussed above, among the potential years in which the No-Poach Agreement's plausibly ended (between 2016 and 2020), the highest level of mobility is in 2020 for both SCA-DaVita and SCA-USPI, and it is the only year from 2016 to 2020 that picks up a p-value less than 10 percent for any base year. Given this, and the qualitative evidence described above which also indicate 2019 is the last year of both sets of No-Poach Agreements, it is unreasonable to argue that the evidence is more consistent with an end-date other than 2019.

### b. The Evidence Is Consistent with Depressed Bilateral Mobility Between Covered Defendants During the Alleged Conduct Period

42.     The second analysis I run in this section is to discern if there is descriptive evidence consistent with bilateral mobility between the Covered Defendants being lower than during the Conduct Period. With a simple model that includes a linear trend and an indicator for the Challenged Conduct, I find that mobility is lower for both sets of No-Poach Agreements during versus after/before the Challenged Conduct. I'll note that the goal of this analysis was not to try to estimate the causal effect of the Challenged Conduct on mobility between Covered Defendants.[123] Indeed, doing so is practically impossible because, as described above, the merger activity and data availability makes impossible an apples-to-apples comparison pre- vs. post-2019.

43.     Defendants' Experts raise several criticisms of this analysis. Dr. Stiroh argues that because the R-squared of my analysis is small, I have no reason to "conclude that the changes in

---

[123] Starr Report ¶ 88 and ¶ 89 describe these results. Note that I use the term "associated with" and not "caused" (*e.g.*, "I find that the Conduct Period is associated with a statistically significant 0.226 *percentage point* reduction in the probability of movement between Covered Defendants.").

employee mobility … are the result of the alleged conduct."[124] Dr. McCrary makes the same point.[125] This claim is incorrect and is a fundamental misrepresentation of econometrics. First, it is well-known that the level of the R-squared in no way changes the interpretation of a given coefficient estimate. Second, it is also well-known that linear probability models have low R-squared values, because they fit a line to data that is inherently non-linear. This is because the mobility variable only take on values of zero or one. Dr. Stiroh further argues that my inclusion of a time trend in my regression analysis is incorrect because she alleges I have no reason to believe "there would be a trend over time to employee mobility."[126] Dr. Stiroh's removal of the time trend is inappropriate.[127] As Figures 2 and 3 in my initial report show, there is a clear downward trend in mobility between Covered Defendants over time. This is because, based on both the qualitative and quantitative evidence, mobility between Covered Defendants is elevated in the early years of both No-Poach Agreements (in part because mobility events in both cases spurred the instantiation of the No-Poach Agreements) and then falls over time. As a result, it is clearly important to account for the time trend.

---

[124] Stiroh Report ¶ 65 ("With almost none of the variability in employee mobility explained by the model, there is no basis for Dr. Starr to conclude that the changes in employee mobility his model shows are the result of the alleged conduct.").

[125] McCrary Report ¶ 200.

[126] Stiroh Report ¶ 66 ("Dr. Starr does not offer any reason to think that there would be a trend over time to employee mobility, and there is no economic basis to anticipate that there would be one. Without a sound economic justification for what variable is omitted, and why it is appropriate to capture the effect of the omitted variable with a time trend, Dr. Starr has no basis to opine that his results are economically meaningful instead of the result of poor specification.").

[127] Dr. Stiroh also errs in her construction of the mobility patterns in 2022, which affect her estimates in her Figure 12. She claims in n.120, "Thus, it is possible to flag employee movements in 2022 using Dr. Starr's methodology." This is incorrect, as I explained in Starr Report n.325 ("I used Defendants' 2022 data to determine which Class Members left their jobs in 2021. However, because I would need to observe where Class Members worked in 2023 to see if they left for a Covered Defendant in 2022, I cannot assign mobility events to workers in 2022."). Dr. Stiroh fails to appreciate that, while my code measures *same-year* moves in 2022, this does not account for all potential 2022 moves because I cannot capture moves when a worker leaves in 2022 but shows up at a Defendant in 2023. Her error implies she has no basis for the claim that there were "zero employee movements between DaVita and SCA" in 2022. Stiroh Report ¶ 62.

44.     Dr. Stiroh also respecifies my model, adding in control variables for GDP per capita and unemployment rate, noting that "even with Dr. Starr's linear time trend, adding controls for GDP and the unemployment rate results in a conduct effect that is not statistically significantly different from zero."[128] Dr. Stiroh's focus on statistical significance is misplaced and her discussion obscures the fact that the point estimate in this specification is both negative and exactly the same magnitude as the model without these controls.[129] Just because a result is not statistically significant does not mean that the estimate is in fact zero. This is a common fallacy that I address regularly in my PhD econometrics class. In general, economists recognize that there is a difference between economic and statistical significance and that a finding of no statistical significance does not imply that an estimate is not economically significant.[130]

45.     In addition, Dr. Saravia criticizes my analysis based on her recognition that there are several individuals at USPI who are only available through 2021 due to availability in Tenet data, while the rest of the data goes through 2022.[131] However, Dr. Saravia's own exhibit shows that correcting for this does not materially change the estimate.[132]

---

[128] Stiroh Report Figure 13 column (b) and column (e).

[129] *See* ¶ 37, *supra*, discussing statistical significance.

[130] *See* K.D. Hoover & M.V. Siegler, *Sound and fury: McCloskey and significance testing in economics*, 15 JOURNAL OF ECONOMIC METHODOLOGY 1–37,2 (2008) ("To avoid any misapprehension, let us declare at the outset that we accept the main point without qualification: a parameter or other estimated quantity may be statistically significant and, yet, economically unimportant or it may be economically important and statistically insignificant. Our point is the simple one that, while the economic significance of the coefficient does not depend on the statistical significance, our certainty about the accuracy of the measurement surely does.").

[131] Saravia Report App. F ¶ 2 ("The Tenet Payroll Data, which contain compensation information for a subset of USPI Senior Employees, are only available through 2021, while the rest of USPI's compensation data are available into 2022. Dr. Starr identifies employees that depart USPI as those who appear as Senior Employees in the compensation data one year and not the following year. Because the Tenet Payroll Data end in 2021 and are not available in 2022, this method leads Dr. Starr to flag every USPI employee in the Tenet Payroll Data in 2021 as a departing employee. Dr. Starr's methodology cannot distinguish between employees in the Tenet Payroll Data who departed versus those that remained at USPI."). Dr. Johnson identifies the same issue at n.60 ("Second, Dr. Starr's classification of departures (i.e., employees who are in this year's, but not in next year's data) considers nearly 40 percent of all relevant USPI relevant employees in 2021 as departures. The lack of 2022 payroll data for many of these employees was related to a migration in payroll systems and not due to departures[.]").

[132] Saravia Report App. F Ex. 16, Column (1).

46.     Dr. Saravia also raises concerns that the mobility results are driven by the fact that workers at USPI and SCA were more likely to leave after the Conduct Period.[133] She finds that, after controlling for the departure rate, that the mobility results become statistically insignificant.[134] Dr. Saravia's approach is logically unsound because Dr. Saravia uses the mobility of those who left for SCA and USPI in both the dependent variable and the independent variable, meaning she is controlling for the variation she is trying to explain. In essence, she finds that when we hold mobility fixed, we find no changes in mobility. As a result, this is not a useful analysis.

          **c.**       **Defendants' Experts' Lightcast Data Are Unreliable, but Still Show That Defendants Are Primary Labor Market Competitors and That the Challenged Conduct Suppressed Hiring and Departures Between Defendants Relative to Other Employers**

47.     Defendants' Experts all provide a variety of analyses with "anonymous data from millions of online professional profiles" provided by Lightcast.[135] According to Dr. McCrary, the Lightcast data reflects "job histories for individuals who worked for one of the three Defendants, or in the Outpatient Care Centers industry (NAICS code 6214) to which all three Defendants belong, in 2024 or earlier."[136] Defendants' Experts attempt to use their Lightcast data to support their claim that Defendants were not significant labor competitors in light of competition with other employers. In this section, I first point to several fundamental flaws in the Lightcast Data

---

[133] Saravia Report Ex. 15.

[134] Saravia Report Ex. 16.

[135] *See Social Profile Data,* LIGHTCAST, https://lightcast.io/products/data/overview (last visited June 2025) [hereafter Social Profile Data] ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability."); *see also* Lightcast Data: Basic Overview, available at https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview (last visited June 2025) (describing additional sources).

[136] McCrary Report App. D ¶ 6.

or Defendants' Experts' treatment of it, which make their analyses unreliable. Then, I show that even with the flaws in the Lightcast data, the data nonetheless show that a) Defendants are each others' primary labor market competitors *relative to other potential employers*, and b) that the Challenged Conduct suppressed the extent to which Defendants moved to or departed from each other *relative to other employers*.

48.     *Flaws in the Lightcast Data Make It Unreliable.* There are at least four flaws in the Lightcast data that Defendants' Experts do not address. These flaws make it unclear to what extent any results from the Lightcast data are representative of the experiences of Senior-Level Employees at Defendants, and lead Defendants' Experts to systematically mis-measure an employee's previous and next employer. These flaws arise due to a) the nonrandom nature of the Lightcast sample, b) the omission of an end date for a given job, or an individual otherwise reporting working at a large number of companies simultaneously, c) Defendants' Experts not correcting for variations in the spelling of Defendants' or other companies names, and d) Defendants' Experts asymmetrically treating the Defendants and non-Defendant firm data in terms of the frequency with which they hire and lose employees to each other. I describe each of these in turn.

49.     The first flaw is that the Lightcast data is a nonrandom subsample of Defendants' employees' histories and that there is ultimately no way to verify its accuracy and reliability for representing the experiences of Defendants' Senior-Level Employees.

a.     Because the Lightcast data is allegedly drawn from "online professional profiles," the existence of an individual in the data is predicated on both their having posted their resume somewhere online and posted it in a location that Lightcast was able to find it and scrape it. As a result, the Lightcast data will not capture any individuals at Defendants who did not post

their employment resume online or who posted their resume in a place that Lightcast did not include in their search. The resulting sample is not a random subsample of Defendants' Employees (e.g., Defendants' Employees were not randomly selected to be in the Lightcast data).[137] Since those individuals who are searching for jobs are the most likely to both put their resume online and in prominent places that Lightcast is likely to find, the Lightcast data is likely skewed towards individuals who are more likely to change employers. Further, individuals who do not need to find employment or find new employment through other means besides posting their resume online (e.g., via recruiters or networking), may also be less likely to appear in the Lightcast data or not appear at all. Defendants' Experts offer no analyses to help us understand the extent to which the Lightcast data is reflective of the population of Defendants' Senior-Level Employees.[138]

b. Moreover, because the Lightcast data is "anonymous" there is no way to determine or verify whether the Lightcast data is what Lightcast purports it to be. Lightcast sells the data *after* it has been processed, enriched, and anonymized by Lightcast.[139]As a result, we cannot tie the Lightcast data to Defendant's data by each individual. Thus we have a limited basis to understand the reliability of the Lightcast data and the extent to which the nonrandom

[137] McCrary Dep. at 302:10–305:11 (Agreeing that the Lightcast data is from the "universe of resumes" found by Lightcast and not a random sample).
[138] The only reference to the representativeness of the Lightcast data is from Dr. Stiroh, who appears to acknowledge that the data are at least not representative for medical directors, though she presents no analysis to support this claim, and she does not otherwise compare the representativeness of the Lightcast data to Defendants' Data. Stiroh Report n.67.
[139] Lightcast states on its website that it "enriches" the data using "machine learning algorithms," among other things. *See Lightcast Data: Basic Overview*, Lightcast, https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview (last visited June 2025).

3244633.4 45

nature of the Lightcast data biases any conclusions made by Defendants' Experts based on that data.[140]

50.    In a series of analyses, Defendants' Experts limit the Lightcast data to "Defendants' employees in class positions"[141] and consider both the prior employer before being hired by a Defendant and the subsequent employer.[142] These data are self-reported, and so the reliability of the data rests on both completeness and accuracy of the data, as well as proper data handling by Lightcast, and then by Defendants' Experts.[143] Below I provide several examples that involve either typos, omissions, or improper handling of multiple job holdings, which cause Defendants' Experts to systematically overcount the number of "competitors" that Defendants compete with. Despite these obvious errors in the data or data processing, Defendants' Experts do not attempt to evaluate the potential extent of this shortcoming or even acknowledge that the issue exists. Moreover, quantifying the full scope of these errors in the Lightcast data is impossible because there is no ground truth to rely upon. Nevertheless, the examples below are indicative of the types of problems in the Lightcast data which Defendants' Experts ignore.

a.    One individual is listed as going to nine different companies from DaVita, because each of those nine jobs was started after the individual started at DaVita and there was

---

[140] I note that Defendants' Experts do reference academic studies that use Lightcast data. *See e.g.,* McCrary Report n. 311. But these studies do not examine Lightcast's resume data that Defendants' Experts use. Rather, they use Lightcast's job posting data.

[141] McCrary App. C Ex. 1 ("The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer is the indicated firm. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions.").

[142] McCrary Report App. C Ex. 1 ("Previous or Next Employer"). Stiroh Report Figure 1 ("Immediate Prior Employer to DaVita") and Figure 3 ("Immediate Next Employer of DaVita"). Saravia Report Ex. 10 ("Companies that USPI hires Senior Employees from and loses them to"). Johnson Report Ex. ¶ 36 ("The Lightcast data shows that all three Defendants compete with a broad set of different employers[.]").

[143] *See* Social Profile Data ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of *how workers describe their own experience*. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability.") (emphasis added).

no official end date to the individual's time at DaVita.[144] The same individual's overlapping time period of jobs prior to joining DaVita causes Dr. McCrary to count three companies as being a "previous employer" of DaVita.[145] Thus, this single individual's lack of an end date in their DaVita job and the overlapping time period of their other jobs causes Dr. McCrary to list twelve different companies as the previous or next employer to Davita for this single individual. Without any way to check who this individual is, or what their actual employment experiences are, we are left with no basis to address this obvious overcounting.

b.      Another individual in the Lightcast data who reported working at DaVita as a Medical Director from May 2013 to January 2015 had six immediately previous employers according to Dr. McCrary. According to the Lightcast data, this individual was working at DaVita, Air Methods, Superior Ambulance Service, Emsrx, Imaging Advantage, and Engage Healthcare Marketing simultaneously in May 2013.[146] Without any way to check who this individual is, or what their actual employment experiences are, we are left with no basis to address this obvious overcounting.

c.      Another individual was counted by Dr. McCrary as leaving nine different companies to become a Vice President of Marketing and Communications at SCA in January

---

[144] *See* my workpapers for details. The nine listed "next employer" companies are Abbott Laboratories, Amgen, Paragonrx International, Renal Advantage, Belmont University, Meharry Medical College, Accretive Health, Corizon Health, and the State of Tennessee.

[145] *See* my workpapers for details. The individual is listed as having worked at Baptist Hospital Nashville as a Physician from January 1996 to July 2015, at Gambro as a Medical Director from January 1997 to January 2003 (prior to Gambro being acquired by DaVita in 2005), and at Signature Nephrology Group Pc as a Vice President/Practice Leader from October 2002 to January 2013. This individual began at DaVita as a Medical Director in January 2003 and did not list an end date for that position. Dr. McCrary then counts each of these three companies (Baptist Hospital Nashville, Gambro, and Signature Nephrology Group Pc) as having an employee leave the company for a Defendant.

[146] *See* my workpapers for details. This individual reported working at Air Methods as a Medical Director from February 2004 to January 2017, at Superior Ambulance Service as a Medical Director starting in December 2004 with no end date, at Emsrx as a Chief Medical Officer from August 2010 to December 2016, at Scan as a Medical Director from October 2011 to May 2013, at Imaging Advantage as an Executive Vice President of Operations from May 2012 to August 2013, and at Engage Healthcare Marketing as a Chief Executive Officer from August 2012 to December 2016.

2022. The individual listed only two of the nine jobs as ending in January 2022, the Executive Director at Orthocarolina Foundation and the Vice President of Talent Management at OrthoCarolina. (Note that OrthoCarolina and Orthocarolina Foundation are treated as two separate employers according to Dr. McCrary, even though they clearly share a common name; I discuss this limitation in more detail below.) The other seven jobs presumably all continued into the individual's tenure at SCA. These jobs include Instructor at Skillpop, Member of the Board of Advisers at Noda Brewing Company, Founding Member at Pink Mentor Network, Member of the Board of Directors at Launch Tower Health, Board of Directors and Chairs at 7th Street Public Market, Corporate Educator at University of North Carolina, and Founding Member at Ondeck. An individual could certainly be affiliated with a number of organizations as a member of the board of directors or as a founding member. However, to count each of these as a distinct "competitor" from a given company to SCA seems misleading, given that the individual continued to hold six of these nine jobs the entire time they were employed at SCA and five of the jobs beyond their time at SCA.[147]

51.    These examples illustrate how Defendants' Experts overcount the number of moves to a given company from a Defendant or from a Defendant to a given company. This overcounting stems from the self-reported nature of the data. It cannot be corrected within the data processing itself.

52.    A third issue with the Lightcast data relates to how Defendants' Experts process it. For example, Dr. McCrary describes an analysis of the "previous" and "next" employers of

---

[147] *See* my workpapers for details. The individual indicated that they left SCA in June 2023. They listed leaving Launch Tower Health in June 2023 as well. They listed leaving Pink Mentor Network in December 2023, Noda Brewing Company in February 2024. They did not list any end date for their positions at Skillpop, 7th Street Public Market, or the University of North Carolina. Presumably this employee continued these six jobs throughout their tenure at SCA, yet Dr. McCrary counts these each as moves from the listed companies to SCA.

Defendants' Senior-Level Employees.[148] Because the data are self-reported, there are discrepancies in how the Defendant's company names are written, and Dr. McCrary does not account for the fact that company names, including Defendants' names, are written differently throughout the data. This leads both to an overcounting of previous and next employers, and mismeasures whether a given individual worked at a Defendant, thus also mismeasuring who is a previous or next employer to a Defendant. I provide a few examples of this mismeasurement from the data for each Defendant and from other cFompanies that appear as distinct in the data when in fact they are the same:

a. For DaVita, I found 11 entities with DaVita in the name which were not counted as being "DaVita" entities by Dr. McCrary. These include, for example, "Davita Intergrated Kidney Care" [sic] and "Applachian Davita Dialysis Center" [sic], and "Davita's Redwoods Leadership Development Program" [sic].[149]

b. For SCA, I found three entities that were clearly working for SCA but were not counted as such. These include an individual who worked for "SCA Health," an individual who worked at "Grossmont Surgery Center, Surgical Care Affiliates," and an individual who worked at "Center For Minimally Invasive Surgery, Affiliate Of Surgical Care Affiliates."[150]

c. For USPI, I found eight entities that were clearly USPI but were not counted as such. These include, for example, individuals working at "United Surgical Partners

---

[148] *See, e.g.,* McCrary Report Ex. 2.
[149] DaVita's Redwoods Program is a "Leadership Development Program" that includes "summer internship and full-time" opportunities for undergraduate and MBA students. *See* DaVita Redwoods Program, DAVITA, https://www.redwoods.davita.com/ (last visited June 2025). *See* my workpapers for details.
[150] The Center for Minimally Invasive Surgery advertises SCA Health prominently on its website. *See Center for Minimally Invasive Surgery*, CENTER FOR MINIMALLY INVASIVE SURGERY, https://cmisurgery.com/ (last visited June 2025). *See* my workpapers for details.

International Memorial Herman Surgery Center Katy," "Uspi - St. Joseph's Outpatient Surgery Center", and "Uspi Baylor Scott & White Surgical Hospital At Sherman."[151]

        d.        In total, Dr. McCrary mischaracterizes 22 "companies" as being separate from Defendants when in fact they are Defendant entities. This mischaracterization leads to a mechanical overcounting of the number of prior and next employers. This is because each of these companies is listed as a separate next or previous employer, when in fact they are wrongly mischaracterized as different companies (e.g., "SCA Health" is not a competitor with SCA). This mischaracterization also then misses who exactly was the previous and next employer for Defendants. For example, if an individual is tracked as moving from "SCA Health" to SCA, then SCA Health is counted as the previous employer to SCA, when in fact the previous employer to SCA should be the employer previous to "SCA Health." But because "SCA Health" was not counted as being an SCA entity, this is not tracked in Dr. McCrary's processing of the data. Because this data processing error for Defendants can be corrected, I do so in my analysis of the Lightcast data below.[152]

        e.        The possibility that company names are not consistent across individuals also systematically inflates the number of Non-Defendant previous and next employers. Like Defendants, there are many companies that appear as separate entities in the data, but are in fact the same entity. I provide several examples below:

        i.        For example, "Aetna," "Aetna Northeast Region," and "Aetna/Schaller Anderson" are three different versions that are all Aetna.

---

[151] *See* my workpapers for details.

[152] I additionally correct for acquisitions that Dr. McCrary did not include in his "Acquisitions" Excel. *See* my workpapers for details.

ii.     Similarly, "Baylor Medical Center At Garland," "Baylor Medical Center At Grapevine," "Baylor Medical Center At Uptown," "Baylor Scott & White Health," "Baylor Scott & White Surgical Hospital," "Baylor Scott And White Quality Alliance," "Baylor Surgical Hospital At Las Colinas," and "Baylor Surgicare" are eight iterations of Baylor University Medical Center, which is a part of Baylor Scott & White Health.[153]

iii.     Similarly "Gambro," "Gambro / Cobe Laboratories," "Gambro Dialysis Clinic," "Gambro Healtcare" [sic], "Gambro Health Care," and "Gambro Healthcare USA" are all treated as different employers.

iv.     While these are a few obvious examples, the Lightcast data is replete with these errors. And because every typo, or every different writing of a given employer is treated as a completely different entity, Defendants' Experts systematically overcount the number of companies that Defendants hire from and to whom Defendants lose employees. Quantifying the exact scope of this problem is, unfortunately, impossible. This is because in the data itself there are too many instances in which we cannot tell if companies with similar names are in fact distinct. For example, "Surgery Center," "Surgery Center Consulting Services," "Surgery Center Management Services," "Surgery Center Of Central Nj," "Surgery Center Of Naples," "Surgery Center Of Peoria," and "Surgery Center Partners" are all listed in the data. However, there is no way to determine if these seven employers are in fact the same entity or different entities.

53.     Finally, Defendants' Experts perform an analysis comparing the extent to which Defendants hire from and lose employees to each other, versus the extent to which Non-

---

[153] *See Baylor University Medical Center, part of Baylor Scott & White Health,* BAYLOR SCOTT & WHITE HEALTH, https://www.bswhealth.com/locations/hospital/dallas (last visited June 2025). ("Baylor University Medical Center, part of Baylor Scott & White Health, is a nationally recognized, faith-based, academic medical center providing quaternary care to Dallas, the Southwest region and patients seeking specialized care from around the world.").

Defendant Employers hire from and lose employees to Defendants.[154] The process by which Defendants' Experts count previous or next employers systematically disadvantages Defendants, because Defendants can only be the previous or next employer of the two other Defendants, while Non-Defendants can be the previous or next employer for all three Defendants. As a result, holding hiring levels constant, a comparison of the number of times a given employer is a previous or next employer of Defendants' employees artificially suppresses Defendants' position relative to Non-Defendants.

a.  To observe this, consider the following example. Suppose that in 2010, each of Company A, SCA, DaVita, and USPI all lose three employees, with one employee going to each of the other three companies (e.g., Company A's three departing employees go to SCA, DaVita, and USPI while SCA's three departing employees go to Company A, DaVita, and USPI). If we were to follow Dr. McCrary's approach to counting the instances in which Company A was a previous or next employer of Defendants in 2010, we would find that the answer is six (Company A lost three individuals to Defendants and hired three individuals from Defendants). If we were to perform the same analysis for each of the Defendants, Dr. McCrary's analysis would count only four instances in which a Defendant was the previous or next employer of other Defendants' employees (i.e., SCA lost three employees, two of which went to Defendants, and hired three employees, two of which came from Defendants). Because six is more than four, Dr. McCrary's analysis would make it seem like Company A is a bigger competitor with Defendants than Defendants are with each other, even though all four companies lost and hired the same number of employees from each other.

---

[154] *See, e.g.,* McCrary Report App. C Ex. 1.

b.      The mechanical inflation of Non-Defendants relative to Defendants in terms of their relative frequency of being the previous or next employer occurs because Non-Defendants can be the previous or next employer for three Defendants, while Defendants can only be the previous or next employer for two Defendants. Thus, a natural solution to this problem is to treat Defendants and Non-Defendants symmetrically by calculating the average number of instances in which a given employer is a previous or next employer of a Defendant on a *per Defendant basis*. Thus for Non-Defendants, we would divide the total count of instances in which they were previous or next employer of a Defendants' employee by three, while for Defendants we would divide by two. Absent this, any ranking approach that compares Defendants to Non-Defendants is conservative in that Defendants will be ranked artificially lower than Non-Defendants.

54.      These errors in the Lightcast data and Defendants' Experts' handling of the Lightcast data make their analyses wholly unreliable. Defendants' Experts want to use this analysis to claim that, e.g., "Defendant Firms Are Not Dominant Prior and Next Employers for Proposed Class Members."[155] But, due to these errors in the Lightcast data, the results from their analyses systematically overcount the number of prior and next employers, inaccurately capture moves to and from Defendants, and systematically inflate the extent to which Non-Defendants are competitors over Defendants. Moreover, because we possess no ground truth as to what individuals' career trajectories were, and we cannot track them down using other methods because their data is "anonymous," we cannot universally correct for these errors. As a result, Defendants' Experts' conclusions from the Lightcast data are evidently unreliable.

---

[155] McCrary Report Ex. 1.

55.     *Lightcast Data show Defendants are Primary Labor Market Competitors*. Even if I were to grant that the Lightcast Data is reliable, which I do not due to the errors mentioned above, the data nevertheless reveals that Defendants are primary labor market competitors.

56.     To study what the Lightcast data reveals about the extent to which Defendants are primary labor market competitors with each other, I replicate the approach of Appendix C Exhibit 1 provided by Dr. McCrary, which ranks employers by the number of times they were the previous or next employer of a worker employed by a Defendant. As described above, if a worker moves from Company A to a Defendant and then leaves for Company B, then this worker's experience would mean that a Defendant hired from Company A and that the worker left for Company B. The analysis done by Dr. McCrary aggregates these patterns for all Senior-Level Employees employed by Defendants, counting the instances in which Company A, Company B, and all other such companies appear as the previous or next employer (however their names were written in the Lightcast data and however their start and end dates were or were not recorded).

57.     I depart from Dr. McCrary's analysis in three ways.

a.     First, Dr. McCrary's analysis inexplicably covers the entire time period of the Lightcast data, from 1979 to 2024.[156] This is especially perplexing because, as Dr. McCrary recognizes earlier in his report, "SCA was founded in mid-2007."[157] Because SCA is part of both sets of bilateral No-Poach Agreements (and CSI Exchanges), including data before 2008 biases any results towards finding no departures to or hiring by SCA. Note that each of the Defendants' Experts who include pre-2008 data in their Lightcast analyses suffer from the same bias, making

---

[156] McCrary Report App. C Ex. 1 ("The analysis includes all unique moves to or from a Defendant that took place during or before 2024[.]").
[157] McCrary Report Ex. 39 ("SCA employees are not reflected in the data until 2008 because SCA was founded in mid-2007.").

it appear that Defendants are less common employers of each others' employees than they are.[158]

Thus, I begin by excluding moves to or from Defendants that happened before 2008.

b.  Second, I also fix four errors in Dr. McCrary's analysis in Appendix C Exhibit 1 where, as highlighted above, (1) he does not account for variations in Defendants' names, (2) he does not account for certain acquisition events, (3) he arbitrarily breaks ties based on alphabetical ordering, and (4) his ranking code does not account for the full number of companies ranked above a given company. Note that I am unable to fix the fundamental flaws related to typos, company names written in different ways, multiple job holding, and a lack of an end date described above.

c.  Third, as described above, because Dr. McCrary treats Defendants and Non-Defendants asymmetrically in his counting, it artificially inflates the extent to which Non-Defendants are perceived to be competitors. I initially replicate Dr. McCrary's approach because it is conservative. However, I also adjust his analysis to put Defendants and Non-Defendants on equal footing, by making the counts of instances in which a given employer is a previous or next employer on a *per Defendant* basis (i.e., dividing total counts by three for Non-Defendants, and by two for Defendants).

58.  With these data, and subject to caveats about its reliability highlighted above, I calculate in each year how frequently each Defendant appears as a previous or next employer of other Defendants' employees *relative to other potential employers*. The resulting data describes where each Defendant *ranks* in each year based on the number of times they were the previous or next employer of Defendants' employees among other potential employers in that year. Note that a rank of one for a given Defendant in a given year implies that that Defendant was the most

---

[158] This includes McCrary Exs. 1–5, McCrary Report App. C Exs. 1–4, Stiroh Exs. 4–5, and Saravia Report Exs. 8–10 and 12.

common prior or subsequent employer of the other Defendants' employees in that year. The year-by-year results are plotted in **Figure 44** in Appendix C.

59.    This analysis clearly indicates that Defendants are all primary labor market competitors, and in some years the top labor market competitor. A nice summary statistic is the highest rank each Defendant achieved between 2008 and 2024. Using Dr. McCrary's conservative ranking approach, both USPI and SCA were the most frequent previous or next employer of the other Defendants' employees in at least one year, while DaVita's highest annual rank was fifth. If we adjust the ranks to reflect counts on a *per Defendant* basis, as described above, then DaVita's highest annual rank achieved between 2008 and 2024 is two. Thus, even with McCrary's conservative counting and the flaws in the Lightcast data, Defendants are all "top 5" labor market competitors and "top 2" competitors on a per Defendant basis.[159]

60.    *Lightcast Data show Defendants are less likely to be Primary Labor Market Competitors during versus after the Conduct Period.* The results in **Figure 44** show that Defendants were highly ranked as competitors after the Challenged Conduct ended, from 2020 to 2024. Using Dr. McCrary's conservative ranking approach, from 2020 to 2024 SCA's rank was 3rd, USPIs was 4th, and DaVita's was 11th.[160] However, in the years before the Challenged Conduct ended, the Defendants were ranked much lower. From 2013 to 2019 both USPI's and SCA's rank as a previous or next employer of the other Defendants' Employees was 45th, while

---

[159] Note that this analysis includes moves between DaVita and USPI, which follows what Dr. McCrary did. I agree with Dr. McCrary that including all three Defendants as a baseline is useful because, as a result of the Challenged Conduct (in totality), moves between DaVita and USPI may have been affected even though there is no direct No-Poach between DaVita and USPI. Nevertheless, removing those moves from the analysis does not change the results. For example, under McCrary's conservative ranking, the highest rank for each Defendant is still one for SCA, fifth for DaVita, and second for USPI. Repeating this analysis using the per Defendant ranking (and adjusting the per Defendant calculations for the fact that we are now not counting moves between DaVita and USPI), the highest rank for SCA, DaVita, and USPI is all one. *See* my workpapers.
[160] *See* my workpapers.

DaVita's rank was 89th.[161] Using the per Defendant rank measure I find similar results.[162] I also find similar results when I exclude moves between DaVita and USPI.[163] This analysis confirms that, while Defendant's Employees do move to other employers, this is in part driven by the Challenged Conduct itself because the Challenged Conduct suppressed the extent to which Defendants hired from each other relative to other employers.

61.     Finally, while Defendants' Experts posit many explanations for the mobility results documented in Section VI.B.2.b, including macroeconomic effects and changes in overall mobility levels,[164] this Lightcast analysis confirms that those ideas do not have merit. While those variables might affect *levels* of mobility, Defendants' Experts do not explain why those variables would make it more likely for Defendants to appear as more frequent next or previous employers relative to other employers after the Challenged Conduct ends relative to during the Challenged Conduct.

### d.     COVID Does Not Explain the Mobility Results

62.     Defendants' Experts point out that the ending of the mobility analysis in 2021 coincides with the COVID pandemic.[165] Dr. McCrary argues that the mobility results are susceptible to controls from the Job Openings and Labor Turnover Survey (JOLTS) for the

---

[161] *See* my workpapers.
[162] On per Defendant basis, from 2020 to 2024 SCA ranked 2nd, USPI ranked 3rd, and DaVita ranked 6th. From 2013 to 2019, on a per Defendant basis, SCA and USPI ranked 25th, while DaVita ranked 47th. *See* my workpapers.
[163] *See* my workpapers.
[164] Stiroh Report ¶ 68 ("Figure 13 shows the sensitivity of Dr. Starr's regression model of employee mobility to his unjustified inclusion of a time trend and his omission of standard labor supply and demand conditions"); Saravia Report ¶ 132 ("Dr. Starr's mobility regression can be modified to account for the overall increase in departures from USPI and SCA in 2020. To do so, I estimate his regression, including a control for the departure rate of Senior Employees each year.").
[165] McCrary Report ¶ 202 ("This means his mobility regression model may confound the effects of the alleged conduct with the effects of the COVID-19 pandemic."); Stiroh Report ¶ 67 ("Dr. Starr's employee mobility analysis failed to control for the underlying labor supply and demand conditions that affect employee mobility, including the COVID-19 pandemic and its impact on labor markets[.]").

pandemic.[166] I dispute how Dr. McCrary treats the pandemic due to the inclusion of highly collinear, national-level control variables (see the discussion in Section VII.C.2). Nevertheless, in this section I show that COVID is not responsible for the mobility results. This is clear for two reasons that emerge from the prior analysis which ranked employers based on the extent to which they are the previous or next employer of Defendants' Senior-Level Employees.

63.     First, after the Conduct Period, while the *level* of hiring and departures in 2020 and 2021 might generally be affected by the pandemic, Defendants' Experts posit no reason that the pandemic alone would change *where* Defendants' Senior-Level Employees are hired from or go to. The fact that (using Dr. McCrary's conservative ranking method), SCA, DaVita, and USPI move from the 45th (USPI and SCA) and 89th (DaVita) most frequent previous or next employers of Defendants' employees during the middle and end of the Conduct Period to the 3rd (SCA), 4th (USPI), and 11th (DaVita) most frequent previous or next employers after the Challenged Conduct ends cannot be explained by a pandemic that might broadly change mobility levels.

64.     Second, the best way to study whether the COVID pandemic is responsible for the results is to gather more information on hires and departures *after the pandemic*. With the structured data produced by Defendants, it is not possible to study movement between Covered Defendants between 2022 and 2024. However, the Lightcast data includes data post-pandemic. Repeating the conservative ranks analysis for the time period 2022 to 2024 reveals that USPI is the 3rd most common previous or next employer, SCA is the 12th, and DaVita is the 15th. On a per Defendant basis over this time period, USPI is ranked 3rd, SCA is ranked 4th, and DaVita is

---

[166] McCrary Report 202 ("Consistent with this, his results are sensitive to adding even basic controls for the effect of the COVID-19 pandemic on labor markets and employee mobility, as shown in Exhibit 28. Specifically, I assess how controlling for the healthcare job openings, quits, and layoffs and discharges rates from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey affects Prof. Starr's results.").

ranked 7th.[167] Thus, it is clear that even after the pandemic, movement between the three Defendants was relatively higher than it was during the middle and end of the Challenged Conduct before the pandemic started.

### C.      Defendants Exchanged CSI to Suppress Labor Market Competition

65.      In my initial report, I described the economic criteria for evaluating exchanges of competitively sensitive information (CSI), and then reviewed qualitative, documentary evidence on the nature of the CSI Exchanges in this case. This included evidence on merit pool raises, information on corporate overhead, information on bonuses and related compensation for specific jobs, and it also included exchanges where specific information was sought. The evidence was consistent with SCA and DaVita sharing pay-related CSI, and with USPI and SCA sharing pay-related CSI. I concluded that this evidence is consistent with anticompetitive conduct and inconsistent with unilateral conduct. Defendants' Experts do not dispute that SCA and DaVita shared pay-related information, and they also do not dispute that SCA and USPI shared pay-related information.[168]

66.      Broadly, Defendants' Experts make three distinct arguments as it relates to the CSI Exchanges. First, they argue that the CSI Exchanges could not have been used to suppress compensation. Second, they argue that CSI Exchanges could be procompetitive. Third, they argue that the CSI Exchanges were irregular. Below I describe and respond to each of these arguments.

---

[167] *See* my workpapers. If instead we limited the sample to 2023 and 2024, then McCrary's conservative ranking approach shows that SCA and DaVita are the 16th most frequent previous or next employer, while USPI is the 3rd. The per Defendant approach suggests that SCA and DaVita are the 8th most frequent previous or next employer over this time period, while USPI is still the 3rd. The mergers between DaVita Medical Group and Optum in 2019, and Optum and SCA in 2017 may also affect how these companies are ranked after the 2019.

[168] McCrary Dep. at 168:23–170:20 (acknowledging that he reviewed evidence showing that Defendants exchanged "aggregate information").

### 1. The CSI Exchanges Could Have Been Used to Suppress Compensation

67. Defendants' Experts argue that the CSI Exchanges could not have facilitated a wage-fixing conspiracy. Dr. Johnson argues that there are "limited" examples of information sharing,[169] and that I offer "no explanation for how the alleged wage fixing cartel could effectively set compensation for this diverse set of employees,"[170] given their varied forms of compensation.[171] Dr. Saravia, Dr. McCrary, and Dr. Stiroh make the same points.[172] Defendants' Experts also criticize the examples of information sharing available to me in the record, noting that "[m]any examples of alleged information sharing are conversations about the possibility of exchanging or obtaining some type of information" rather than information sharing itself.[173] All four further argue that there is no mechanism for monitoring and punishing cheaters as part of a wage-fixing agreement.[174] None of these points have merit.

### a. We Know the Record Evidence Is Not the True Universe of CSI Exchanges

68. My review of the record evidence is limited to what is obtained in discovery and through deposition testimony. Accordingly, it is all we have, but we do not observe all

---

[169] Johnson Report ¶ 111 ("As I describe below, aside from limited examples of information for specific jobs, Plaintiffs' experts do not point to any alleged information sharing of compensation levels for relevant jobs—let alone all relevant jobs over a 12-year period.").

[170] *Id.* ¶ 103.

[171] *Id.* ¶ 120 ("Compensation for proposed class members includes not just base salary but bonus and equity payments, which were substantial. Plaintiffs' experts fail to explain how information on the aggregate merit budget for base salary would impact the levels of variable compensation—compensation included within Dr. Starr's 'wage suppression' regression—or how this information sharing would 'allow' Defendants to 'agree' to lower variable compensation levels."); *see also id.* ¶¶ 98–127.

[172] Saravia Report ¶¶ 133–167 (arguing that with respect to evidence showing mutual data exchanges, I offer no analysis of whether the "data in the communication … would be sufficient to coordinate on agreed-upon compensation levels"); McCrary Report ¶¶ 147–183; Stiroh Report ¶¶ 107–117.

[173] Johnson Report ¶¶ 99, 121–123; Saravia Report ¶ 155; McCrary Report ¶¶ 147–148, 174; Stiroh Report ¶¶ 110–111.

[174] Johnson Report ¶ 101, 106, 111; Saravia Report ¶¶ 142–143, 146–147; McCrary Report ¶¶ 151, 163; Stiroh Report ¶ 112 ("Moreover, Plaintiffs' experts do not provide any analysis to support Plaintiffs' allegation that the information sharing was conducted in support of the Alleged Three-Party Conspiracy and ignore evidence that the information sharing they identify would not be adequate for monitoring and enforcing an agreement to suppress compensation.").

communications between Defendants. Defendants' Experts all incorrectly treat the record evidence we do have as if it includes every communication that occurred in reality.[175] This is almost certainly not the case. For example, I have reviewed evidence that gives me reason to believe that SCA, which exchanged CSI with both DaVita and USPI, did not produce all of its relevant internal communications. For example:

        a.     USPI provided e-mails between USPI and SCA which SCA did not provide.[176]

        b.     Several key documents that were discovered in this action were not produced by Defendants but rather were produced from the personal files of a former SCA employee, Brian Mathis, in response to a subpoena.[177] They clearly should have been in the files of USPI and SCA as well, but Defendants did not produce them.[178] This includes an email exchange produced by Brian Mathis wherein USPI and SCA exchange specific wage increase expectations for 2013,[179] as well as a 2012 e-mail between Brian Mathis and USPI's CFO Mark Kopser sharing specific base and bonus pay information for an "internal audit manager" as well as a compliance and audit department VP.[180]

---

[175] *See* Johnson Report ¶¶ 98–127; Saravia Report ¶¶ 133–167; McCrary Report ¶¶ 147–183; Stiroh Report ¶¶ 107–117.

[176] Plaintiffs' Mot. to Compel SCA to Perform Supp. ESI Search (ECF 419), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305 (June 11, 2024) at 1.

[177] I understand from counsel that the documents produced by Mr. Mathis bear the Bates Stamp prefix "OMC_BM_".

[178] I have not been able to locate the documents produced by Mr. Mathis in Defendants' production, and I have been further advised by counsel that neither SCA nor USPI produced copies of these two documents.

[179] *See* Ex. PX489 at OMC_BM_000014759

[180] Ex. PX523 at OMC_BM_000010778 (an email chain only produced by Brian Mathis, wherein USPI's CFO, Mark Kopser asked Mr. Mathis (while he was at SCA), "We pay our internal audit manager 150K[.] Is that close to what you pay[?]" Mathis responded, "A few years ago we combined our compliance and our audit departments and now have a single VP ($175k + 40% potential bonus) that leads both. There is a director who focuses solely on audit which is probably the relevant position to compare to and she has a base of $103k with potential bonus of 25%. There are 3 ~$65k roles that report to her.").

c. ████████████████████████████████████████████

████████████████[81]

d.    The testimony of SCA's Director of IT Security and corporate designee

Brian Rasco shows that ██████████████████████

██ ████████████████████████████████████

████████████ ██████████████████████████████████

████████████████████████████ ██████████████████████

██████████████████████████████████████████████████ ██

██████████████████████████████████████

██████████████████████████████████████ ██

████████████████████████████████████████

████████.[186]

ii.    ████████████████████████████████████

██████████████████████████████████████████

██████████████████ ██████████████████████████

████████████████████████████████

████████████████[188] ██████████████████████

---

[181] Ex. PX314 at DOJCIV-008-00000236.

[182] Deposition of Brian Rasco (Nov. 26, 2024) [hereafter Rasco Dep.] at 108:12–20.

[183] *Id*. at 72:7–16; Ex. PX566.

[184] Rasco Dep.at 72:4–73:2.

[185] *Id*. at 73:3–10, 74:5–16.

[186] *Id*. at 73:21–74:4.

[187] *Id*. at 111:16–112:13 ██████████████████████████████

").

[188] *Id.* at 115:17–116:5; *id.* at 118:17–119:8.



iii.

iv.     We therefore cannot know if there is more evidence that SCA did not produce as it relates to either USPI or DaVita.

69.     Moreover, despite some evidence that CSI Exchanges occurred over the phone,[192] we generally do not observe phone calls, in-person meetings, text messages, or similarly private forms of communication. Deposition testimony can help clarify some of this missing information, but a lack of memory makes it near impossible to gather all relevant information.

a.      For example, Thiry had a habit of leaving long voicemails, which has the practical impact of avoiding a written record that can be discovered in legal proceedings like this one.[193]

i.      After SCA's then-CEO Hayek poached DaVita's then-DVP Rucker to become a top SCA executive, DaVita's then-CEO Thiry asked DaVita's then-SVP

---

[189] *Id.* at 77:24–79:22.
[190] *Id.* at 123:4–124:15.
[191] *Id.* at 138:18–139:20.
[192] *See, e.g.,* Deposition of Cindy English (June 12, 2024) at 60:8–10 (Ms. English testified that Sharff gave her this information "orally[.]"); Ex. PX120 at USPI_CIV_000584419–20 (a June 2014 e-mail exchange between English and Sharff with an overview of their phone call regarding SCA's and USPI's PTO policies.).
[193] *See, e.g.,* Starr Report ¶ 70(d)(i) (citing Ex. PX313 at DOJCIV-008-00000188, -190–191 (███████████████

█████████████████████████████████████████████████████████████.

Javier Rodriguez, "should we do anything?"[194] Thiry then made sure to instruct Rodriguez to "pls send thoughts on vm."[195]

           ii.      Likewise, former DaVita VP Joshua Golomb testified at deposition that Thiry "definitely communicated a lot by voicemail for sure[,]" and that Thiry not uncommonly left "two- to three-minute voicemail[s][.]"[196]

70.      The foregoing is consistent with typical conspirators' efforts to hide criminal misconduct. As I testified in my initial report, Defendants' No-Poach Agreements were secretive by design.[197]

71.      Given all of these reasons, it is highly likely that the full record of CSI Exchanges can never be fully discovered. Nevertheless, the available record evidence is still clear that the Defendants shared bonus information, salary information, merit raise information, overhead cost information, paid time off policies, case volume information, forecasting methodologies, and other types of information.[198] This information was both forward looking and contemporaneous. Defendants' Experts' review of specific documents,[199] and what might be gleaned from a single specific document, ignores the plain evidence that SCA and USPI and SCA and DaVita were regularly sharing all sorts of proprietary, pay-related information with each other. This includes aggregated information and detailed, specific information on specific job titles and specific salary and bonuses.[200] It also includes requests to find specific information out from specific

---

[194] DVA_OMCEAL_000385858.

[195] *Id.*

[196] Deposition of Joshua Golomb (Aug. 28, 2024) at 171:2–172:1.

[197] Starr Report ¶ 70(d), ¶ 77(e).

[198] Starr Report V.C. and VII.F.

[199] Saravia Report ¶ 155 ("First, Dr. Starr and Dr. Gerhart identify 26 examples of what they purport are instances of compensation-related information sharing. Appendix E summarizes all 26 examples.").

[200] Saravia Report App. E.

Defendants about specific jobs.[201] As Dr. Saravia acknowledges,[202] SCA and USPI had such open lines of communication that they also shared information on corporate policies[203] and shared case volume data *monthly*.[204] Given the amount and nature of CSI exchanged, it is not clear what, if any, information was in fact off-limits. Indeed, Defendants' Experts point to no record evidence which suggests that Defendants ever declined a request for information from another Defendant.

b.    <u>The Data Exchanged Are Sufficient to Suppress Wages</u>

72.    Defendants' Experts posit that I provide no argument for how Defendants could have used information to set pay across many different jobs, with different types of compensation.[205] The implication of these arguments is that Defendants would have required in-depth communication and granular data exchanges to set the individual wages of over 6,300 employees with heterogeneous titles, backgrounds, geographies, etc. Even setting aside the fact that Defendants were regularly in touch and shared all sorts of CSI, as discussed above, the idea that the CSI Exchanges were insufficient to suppress Class pay has no merit.

a.    Drs. Levenstein and Suslow write that "[c]ollusion in general implies … that the rival sellers in some manner arrive at an **understanding** as to what price to charge or

---

[201] Ex. PX283 at USPI_CIV_000035856 (In 2015, Ms. Mosley prepared an internal USPI document wherein she noted, "SCA: Find out what they are paying at the regional level and admin level.").

[202] Saravia Report ¶ 163.

[203] Ex. PX119 at USPI_CIV_000601224–26.

[204] Saravia Report n.245.

[205] Johnson Report ¶¶ 98, 100, 102–106, 113, 118, 123; Saravia Report ¶¶ 154, 156, 160 n.236, 165–168; McCrary Report ¶¶ 148, 150–151, 154–155, 157, 162, 170–171, 175, 177, 181–182; Stiroh Report ¶¶ 107–112.

what outputs to produce, or both."[206] In this case, the *understanding* of what price to charge could be as simple as a reduction in year-over-year wage increases or bonus payments, which is a single figure and consistent with the record evidence.

        b.     Dr. Johnson and Dr. Saravia contend that when CSI was exchanged that I did not explain whether the information shared regarding merit increases would be "sufficient to coordinate on agreed-upon compensation levels," and suppress pay Class-Wide.[207] Dr. Stiroh makes the same point.[208] Dr. McCrary reaches a similar conclusion, though he concedes that "cartels are thought of as anticompetitive,"[209] and also argues that any negative effects would not be common.[210] Yet these conclusions are undercut by their own evidence and by how Defendants' own decisionmakers interpreted the CSI Exchanges. For example, Dr. Saravia describes how proposed salary increases are "across the board"[211] even with some "case-by-

---

[206] Margaret Levenstein & Valerie Suslow, *What Determines Cartel Success?*, 44(1) JOURNAL OF ECONOMIC LITERATURE 43–95, 45 (2006) [hereafter Levenstein & Suslow (2006)] ("'Collusion in general implies … that the rival sellers in some manner arrive at an understanding as to what price to charge or what outputs to produce, or both.' Producers form cartels with the goal of limiting competition to increase profits. By restricting output and increasing price, ideally to the price a monopolist would set, profits are jointly maximized. Upon its creation, a cartel immediately faces three key problems: coordination, cheating, and entry. Firms must be able to coordinate on an equilibrium-in a situation in which there are often multiple equilibria-which increases prices and allocates reduced out- put among member firms. The equilibrium must increase profits to cartel members as a group and provide a mechanism for distributing those profits 'fairly' to member firms. The cartel must develop an incentive compatible structure—a combination of monitoring, rewards, and punishments—to prevent cheating by members. The cartel must also prevent entry by outsiders. In a dynamic economy, the solution to all these problems will change over time, so successful cartels must develop an organizational structure that allows them to solve these problems continuously.") (emphasis added).

[207] Johnson Report ¶¶ 98, 100, 102–106, 112–123; Saravia Report ¶¶ 154, 156–168; McCrary Report ¶¶ 148, 150–152, 154–155, 157, 162, 170–171, 175–177, 181–182; Stiroh Report ¶ 112.

[208] Stiroh Report ¶ 112 ("Plaintiffs and their experts do not explain how exchanging information about company-level merit increases could be used to fix wages across hundreds of job titles in different states for employees in broad labor markets in which DaVita and SCA did not have market power.").

[209] McCrary Dep. at 42:21–43:5.

[210] McCrary Report ¶ 168 ("Even where the evidence does support information being shared, I have seen no explanation for how aggregate information of this type could be used to facilitate coordination on pay for proposed class members, and I find it implausible it could be used in such a manner."); *id.* ¶¶ 177–183.

[211] Saravia Report ¶ 59 ("For example, for the November 2009 salary increases, while 'senior management' provided a spreadsheet showing a 'proposed' salary increase of 2 percent across the board, 'many returned the spreadsheets requesting varying increase percentages with explanations for the increase,' and varying increases were approved.").

base" adjustments.[212] Such "across the board" increases could clearly be influenced by the CSI Exchanges. Moreover, internal equity issues suggest that even though there may be some individualized adjustments here or there, the wage structure could easily propagate any changes in compensation broadly across the Class.[213]

        c.      Bridie Fanning, SCA's then-Chief Talent Officer directly anticipates exactly how these CSI Exchanges could facilitate an understanding of what to pay and how that might commonly affect Class Members. In a 2014 e-mail with former SCA COO Rucker in which they are discussing gathering merit pool information from competitors, Fanning writes "One question - even if they come back confirming 2.9 to 3 percent, would we make our budget that level? Can we afford it? If they come back 2.5 percent, will we stay at 2.5 percent or reduce to 2 percent? The question is simply, would we -- would the input change our decision?"[214] Rucker responds "At the end of the day, I think we will want to know that we are all able to guide our folks to pay wages that are 'at market[.]'"[215]

73.      The interaction between Fanning and Rucker reveals precisely the type of mechanism that would cause the CSI Exchanges to lead to an understanding of what to pay. More generally, if SCA knows ahead of time what salary and bonus a given worker receives over at DaVita or USPI, they can choose to match it.[216] If they know how much merit raises are going

---

[212] Saravia Report ¶ 158 ("The merit pool budget was provided to department leaders to determine specific salary increases on a case-by-case basis.").

[213] *See* Section VIII.F, *infra.*

[214] Deposition of Michael Rucker (Aug. 27, 2024) [hereafter Rucker Dep.] at 277:10–16.

[215] *Id.* at 278:12–17.

[216] Deposition of Leslie Wachsman (May 22, 2024) [hereafter Wachsman Dep.] at 249:1–22 ("Q. So when you set -- when SCA was setting merit increases, where did you get, you know, market information -- A. Yeah. Q. -- for that? A. HR was primarily the owner of getting that, so I don't know specifically. There are occasions where we used

to happen at DaVita or USPI, they can choose to match it. Now the companies need not match exactly to suppress wages, or fix wages for each and every job title, but as long as the information shared results in lower compensation than would have otherwise been paid without that information, then the CSI Exchanges will result in reduced compensation.

a.     Substantial record evidence suggests that Defendants were incorporating information from the CSI Exchanges into their compensation decisions. For example, USPI acknowledged that the SCA's future merit increase information was used by USPI in setting its merit budget as well as its cost reduction plans.[217] Similarly, SCA incorporated information from the CSI Exchanges into its budget and cost reduction plans.[218] SCA's former CDO likewise acknowledged that SCA obtained USPI's planned merit increase information to use as a data point in setting SCA's own merit adjustments.[219]  And Peter Clemens testified that part of the reason SCA exchanged CSI was to identify potential areas where SCA could reduce costs.[220]

74.     Moreover, as I argued in my initial report, issues of internal equity in compensation setting have the potential to magnify the effects of such CSI Exchange to affect many more workers. For example, SCA CFO Leslie Wachsman testified that SCA has an █████

---

outside firms, like, consulting firms that we were helping. So at times they would engage an AON or another firm in helping with that, but I wasn't involved in getting that, so I don't know exactly how they went about getting that. HR was leading that. Q. Got it. But then that data was used in helping you set merit increases for SCA? A. One of many pieces of information we used. Q. And if you -- if the information was available from your ASC peers, that would also be another useful data point? A. It would be interesting to know -- Q. In order to incorporate into setting the merit increases of SCA? A. It would be interesting to know, one of many aspects on which we would set the merit."). *See also* Starr Dep. Vol. 1 at 45:16–21 (I testified that these exchanges "allowed [Defendants] to coordinate should they want to because now they have information.").

[217] Kopser Dep. at 32:3–38:2, 105:5–108:9 (SCA's future merit increases were used by USPI to help form merit increase decisions, as well as USPI cost reduction plans); Cagle Dep. at 119:24–120:23 (SCA's merit increase budge used by USPI as part of it cost reduction plans).

[218] Wachsman Dep. at 196:3–7 and 249:1–23.

[219] Mathis Dep. at 87:10–91:11 and 99:11–24.

[220] Clemens Dep. at 135:21–137:11.

█████████████████████████████████████████[221] Thus, as an example, if SCA has learned what bonuses will be at, say, USPI, based on the CSI Exchanges, and this results in the lowering the bonus amount, then ██████████████████ will have lower compensation. This mechanism can also manifest as it relates to merit raises, base pay, or other forms of compensation that were shared. As a result, it is easy to see how the CSI Exchanges could not only facilitate wage suppression but also how it would be commonly felt across Class Members.

75.     Dr. Johnson further contends that "simply speculating about what would happen *if* the alleged information sharing 'allowed' Defendants 'to agree on a (lower) pay increase' on base salaries is not sufficient to show impact to the proposed class."[222] This is false. As reviewed in Section VIII, I developed a variety of econometric tests and showed that all or nearly all Class Members were harmed by the Challenged Conduct. Finally, I was not tasked with determining whether Defendants engaged in wage-fixing, which I understand is a task for the jury.

c.     **The No-Poach Agreement Served as an Enforcement Mechanism**

76.     Defendants' Experts emphasize that wage-fixing cartels need a method to monitor and punish cheaters.[223] For example, Dr. Saravia writes, "The ability to punish is fundamental to

---

[221] Wachsman Dep. at 117:10–118:5 (Wachsman testified, █████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████

[222] Johnson Report ¶ 113.
[223] Johnson Report ¶ 101, 105–106, 111 ("[T]hree major tasks that must be performed if a buyer cartel is to be successful [are] agreement, implementation, and monitoring. They also highlight two significant obstacles to

---

the sustainability of a cartel because each individual participant in a cartel will always have an incentive to deviate."[224] Dr. Johnson further argues that I did not provide any analysis "to assess whether the economic conditions to facilitate a successful wage-fixing cartel exist in this case, nor how the information sharing they cite would overcome these obstacles."[225] Accordingly, in Dr. Johnson's view, the CSI Exchanges could not have supported a wage-fixing cartel.[226]

77.     I do not dispute the criteria that Defendants' Experts have described as it relates to the sustainability of a cartel, which is consistent with my understanding of the economic literature related to cartels.[227] However, Defendants' Experts seem to have forgotten that the Challenged Conduct includes a No-Poach Agreement, and the existence and enforcement of this No-Poach Agreement, which I discussed in detail in my initial report,[228] naturally mitigates "an incentive to deviate" when it comes to wage-fixing.[229] In this sense, Defendants' Experts fail to consider the totality of the Challenged Conduct and what it means for the efficacy of the CSI Exchanges in suppressing compensation.

a.     To understand how the No-Poach Agreements mitigate the need to monitor and punish cheaters, consider the following example. Suppose that DaVita decides that

---

maintaining a cartel—restricting entry and limiting cheating."); Saravia Report ¶¶ 142–143, 146–147; McCrary Report ¶¶ 151, 163, 183 ("Assuming then that Defendants would have cheated on any agreement they reached to fix salary pay because they could earn more profits by doing so, the effects of the alleged information sharing would vary across proposed class members and would require individualized inquiry to quantify. This is because the importance of non-salary pay components varied across proposed class members and the degree to which Defendants would have been able to offset any suppression in salary pay with an increase in non-salary pay therefore varied across proposed class members."); Stiroh Report ¶ 112 ("Moreover, according to economic theory, collusive agreements cannot be sustained without monitoring and enforcement mechanisms, but Plaintiffs and their experts do not describe any monitoring or enforcement mechanisms that DaVita and SCA could have used or establish that DaVita and SCA employed any such mechanisms.").

[224] Saravia Report ¶ 143.
[225] Johnson Report ¶ 101.
[226] Id. ¶ 111 ("Neither Dr. Starr nor Dr. Gerhart provide any explanation for how the Defendants could limit deviations from the alleged cartel (i.e., cheating), particularly in light of the types of information allegedly shared.").
[227] Levenstein & Suslow (2006).
[228] Starr Report Section V.B.
[229] Saravia Report ¶ 143.

it is not going to raise compensation next year, and that it shares this information with SCA. Knowing that DaVita is not going to raise compensation next year, SCA could choose to raise compensation of their workers by more next year, making SCA jobs relatively more enticing to DaVita employees. This reflects SCA's "incentive to deviate" and it arises because paying workers more than what DaVita is paying might give SCA a chance to hire away DaVita's workers. Defendants' Experts effectively argue that if there is no way to detect and punish such deviations, then the wage-fixing cartel cannot be sustained. However, it is easy to see that if SCA cannot so easily hire DaVita's workers away because of the No-Poach Agreement between SCA and DaVita—which is actively monitored and enforced—then SCA has no incentive to deviate and pay higher compensation. As a result, SCA may well choose to match DaVita and keep compensation the same or otherwise pay less than they would have.

b.      In this direct sense, we should not think of the CSI Exchanges and the No-Poach Agreements as independent pieces of the Challenged Conduct. Rather, precisely by mitigating the competitive value from paying higher compensation, they reinforce each other to give firms more incentive to suppress compensation. Thus, I reject Defendants' Experts' claims that the CSI Exchanges could not have facilitated wage suppression.

d.      **Dr. Johnson's Comparison of Changes in Base Salary Are Not Informative of the Wage-Suppressing Effects of CSI Exchanges**

78.      In Exhibit 19 and 20, Dr. Johnson shows the distribution of changes in base salary in 2009 and 2013 at each level across DaVita, SCA, and USPI. The basis for this analysis is apparently to examine if Defendants have similar raises, potentially as a result of the CSI Exchanges. He concludes that there are "similar results in 2013, where the Defendants did not

apply uniform merit increases across all of their employees nor did the Defendants have similar distributions of merit increases, even within the same job level."[230]

79.     There are several flaws with this analysis.

a.     First, despite Dr. Johnson using the term "test" to describe this analysis,[231] he does not provide any actual empirical test to measure whether the data are consistent with the CSI Exchanges. He makes observations about the distribution of changes in base salary at two points in time.

b.     Second, Dr. Johnson overlooks that there is in fact compression in the distribution of changes in base pay even in his own results. If we consider the range across Defendants of the most frequent raise for VPs & SVPs, it ranges from ▇▇▇▇▇▇▇▇ in 2009 and narrows to ▇▇ percent in 2013.[232] Thus, when we look at the typical raise experienced by the plurality of VPs & SVPs, the dispersion in raises did fall in 2013 versus 2009. As a result, contrary to Dr. Johnson's conclusion, this analysis does suggest that the CSI Exchanges did pull base salary raises closer to each other across Defendants.

**2.     The CSI Exchanges Are Not Consistent with Procompetitive Benchmarking**

80.     While Defendants' Experts acknowledge that information sharing existed, Dr. Saravia, Dr. McCrary, and Dr. Stiroh dispute my opinion that the CSI Exchanges were

---

[230] Johnson Report ¶ 117.

[231] *Id*. ¶ 115 ("Defendants' own data can be used to test if Defendants set similar merit increases across relevant employees (and each other) in the same year.").

[232] *See* Johnson Report Ex. 19. The most frequent raise for VPs & SVPs across the Defendants in 2009: 25 percent of DaVita VPs & SVPs ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, while 43 percent of VPs & SVPs at SCA had ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and 33 percent of USPI VPs & SVPs had ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. This range is large (going from ▇▇▇▇▇▇▇▇▇), but narrows considerably in 2013 for VPs & SVPS (going from ▇▇ ▇▇▇▇▇▇). Again, focusing on the most frequent raise, 25 percent of VPs & SVPs at DaVita received a ▇▇▇ ▇▇▇▇▇▇▇, 30 percent of VPs & SVPs at SCA received a raise of ▇▇▇▇▇▇, and 45 percent of VPs & SVPs at DaVita received a raise of ▇▇▇▇▇▇.

anticompetitive and not in the Defendants' unilateral interest.[233] Dr. Saravia argues that "[economic] literature recognizes that sharing information with competitors is not inherently anticompetitive."[234] Dr. McCrary and Dr. Stiroh make the same point.[235] To support their contention that the information exchanges can lead to increased wages, they point to a study by Cullen et al. (2024), which finds that benchmarking reduces dispersion in salaries, reduces salaries (but not statistically significantly) for high-skill jobs but raises salaries for low-skill jobs, leading to a null average effect.[236] In essence, Dr. Saravia, Dr. McCrary, and Dr. Stiroh argue that benchmarking can raise worker salaries (even though estimates for high-skill workers in the study is in fact negative and the average effect is not statistically significantly different from zero, with p-values from 0.119 to 0.288).

81.     Aside from misrepresenting this study's findings, the foregoing narrative fails to acknowledge that the CSI Exchanges in fact are *not* benchmarking as discussed in the paper. For example, the first paragraph in Cullen et al. (2024) reads:

> While U.S. legislation, in an effort to hinder collusive practices, prohibits employers from sharing compensation information with each other, employers are still allowed to acquire and use more aggregated data provided by third parties. This practice of using market pay data to identify typical market salaries for an internal position is known as salary benchmarking.[237]

---

[233] Saravia Report ¶¶ 141, 145; McCrary Report ¶¶ 148, 152–160; Stiroh Report ¶¶ 107, 113–117.

[234] Saravia Report ¶ 145.

[235] McCrary Report ¶ 153 ("Economists recognize that information sharing can support competition as there are 'legitimate efficiency reasons for industry members to exchange information,' including 'monitor[ing] their own efficiency better' by comparing their costs to other firms."); Stiroh Report ¶ 113 ("However, economic literature and theory recognize that information sharing and benchmarking across firms can have procompetitive benefits and can be in a firm's unilateral self-interest.").

[236] Zoe B. Cullen, Shengwu Li, & Ricardo Perez-Truglia, *What's My Employee Worth? The Effects of Salary Benchmarking*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 30570 (Aug. 2024) [hereafter Cullen et al. (2024)] Section 4, n.45 ("More precisely, the average salary drops by 2.9% and 1.6%, depending on the control group used, but these effects are statistically insignificant (p-values of 0.119 and 0.288, respectively). These results are reported in Appendix F.1.").

[237] *Id.* at 1.

Thus, by Cullen et al.'s definition, the CSI Exchanges in this case are in fact *not benchmarking* because they do not reflect "aggregated data provided by third parties." Moreover, as I discussed in my initial report, Defendants were already engaged in seemingly lawful benchmarking exercises (such as using aggregated data distributed by a third party). The CSI Exchanges discussed here are above and beyond the benchmarking behavior discussed in this paper. It was clearly not anonymized, nor was it facilitated by a third party. Indeed, the Challenged Conduct involved the sharing of information well beyond the scope of acceptable "benchmarking" and warrants antitrust scrutiny. Even some HR professionals that worked at Defendants during the Class Period acknowledged that the information sharing that Defendants engaged in was legally dubious.[238] And in her own deposition, Dr. Saravia conceded that the CSI Exchanges considered here were in fact not benchmarking as studied in Cullen et al. (2024).[239]

### 3. The CSI Exchanges Were Regular

82. Dr. Johnson and Dr. McCrary claim that the CSI Exchanges were irregular and occurred only in the early years of the proposed Conduct Period.[240] The implication of this claim is that they could not have been used to maintain a conspiracy. This claim is without merit.

83. SCA-USPI CSI Exchanges. Direct documentary evidence confirms that, at the very least, USPI and SCA were regularly sharing information approximately every two years,

---

[238] *See, e.g.,* Deposition of Bridget A. Fanning, Ph.D. (Jul. 14, 2024) at 175:17–176:1 (The Chief Talent Officer at SCA from September 2014 to July 2016 explained that external surveys should be used in lieu of direct information sharing between competitors: "[I]n my professional experience … You use third parties that scrub all the data because you never share data between companies. It's an antitrust issue.").

[239] Saravia Dep. at 175:15–20 ("Q Okay. But the article they used doesn't analyze companies exchanging information with one another, right, directly? A. No, I believe it's something kind of automated in the third-party system, is my recollection.").

[240] Johnson Report ¶ 99 ("Although the evidence they present about merit budget information and compensation information for a few individual jobs is limited to discrete conversations in specific years in the early portion of the proposed class period, Dr. Starr and Dr. Gerhart assume, without support, that this alleged information sharing continued for the full relevant period."); McCrary Report ¶ 169 ("Evidence of such ad hoc information sharing in a few years during a Class Period spanning 12 years (2008–2019) does not strike me as 'regular.'"); *id.* ¶¶ 149, 151, 162, 165, 171, 177.

including in 2018. In a May 2018 e-mail, Brian Mathis reveals, "Only data point we had in the past was USPI who we benchmarked with every ~2 years for the last decade. Leslie, let me know if you need any help with the CFO."[241] Thus, we know that SCA and USPI were sharing CSI regularly for at least a decade.

a.     Further, and discussed at length below, in October 2014, SCA's then-COO Rucker proposed that SCA executives reach out to USPI, among other competitors, on an "informal" basis "to see what they are intending to do in terms of pool for [their 2015] merit increase."[242] Rucker explained, "At the end of the day I think we will want to know that we are able to guide our folks to pay wages that are 'at market' so I think my question is what do we need to know in order to know that guidance of 2.25% or 2.5% keeps us within a reasonable range that one would consider 'at market'?"[243]

b.     Likewise, I submitted evidence in my opening report showing that in August 2014, SCA's then-GVP Mathis asked USPI's then-CFO Jason Cagle if USPI was "willing to swap wage increase budgets as we have in the past?"[244] When asked at deposition if Mathis's question would imply "that the companies had done it before," Dr. McCrary testified, "the document on its face does indicate that , yes … I've not offered an opinion that's inconsistent with what you just described. It could be true."[245]

c.     Leslie Wachsmann similarly testified that SCA and USPI shared a variety of information but stopped exchanging data in or around 2019.[246] This is consistent with

---

[241] Ex. PX501 at SCA002277742.
[242] Ex. PX36 at SCA000540406–07.
[243] *Id.* at SCA000540405.
[244] Ex. PX232.
[245] McCrary Dep. at 177:14–180:11.
[246] Wachsman Dep. at 177:22–178:4, 232:19–233:1.

evidence I have reviewed showing that SCA's and USPI's top executives behaved more like conspirators than competitors throughout the Conduct Period.

      i.     In my initial report, I provided evidence showing that Hayek and USPI's former CEO Wilcox had a longstanding personal relationship and spoke regularly.[247] None of Defendants' Experts provided contrary evidence.

      ii.    Moreover, even after Hayek left the SCA position and became solely Optum's CEO, he and USPI's former CEO Wilcox maintained an open channel of communication.

      A.    For example, Hayek and Wilcox set up a call in January 2018, shortly after Hayek left SCA.[248]

      B.    Shortly thereafter, Hayek introduced Wilcox to two other members of One World Surgery, a non-profit Hayek was involved with, because Wilcox wanted to offer his support.[249]

      d.    Thus, in the case of USPI and SCA, there is strong documentary evidence that suggests that the CSI Exchanges were in fact regular, that they lasted approximately a decade, and that they ended approximately in 2019.

84.    <u>SCA-DaVita CSI Exchanges</u>. With regards to the DaVita-SCA CSI Exchanges, the evidentiary record suggests that the CSI Exchanges began shortly after Hayek left DaVita for SCA and that they were regularly occurring until, at the very least, 2014 and likely later.[250] Moreover, it is clear based on this evidence that DaVita and SCA shared this information over

---

[247] Starr Report ¶¶ 76(d)–(i).
[248] USPI_CIV_000007019; SCA001395985 (appointment entry).
[249] USPI_CIV_000290705.
[250] Ex. PX490 at HAYEK-000012214–16 (2009 e-mail from Wagner to Hayek listing various raises at companies including DaVita).

the phone, and via informal calls between senior leadership, including between Hayek and his former colleagues Javier Rodriguez and Kent Thiry.

a. The evidence indeed suggests that the record is likely to be incomplete because conversations were likely to be had over the phone or in person. When asked about a 2009 e-mail with annual raise information and a section about DaVita, Hayek testified that he gathered this material when he "spoke" with Javier Rodriguez, DaVita's then COO.[251] The fact that this information was collected via phone or in person implies that in general it may be hard to collect the full record. The deposition testimony helps clarify, but only to a limited degree: Hayek admits that he asked for this information "on one or more occasions," though he does qualify this statement by saying "I think it was maybe a couple, not a regular practice[.]"[252] When subsequently asked whether Brian Mathis was asking other companies for future plans of wage increases, Hayek said he did not know.[253]

b. Brian Mathis also admits in that "in some years" SCA exchanged "yearly wage increase information with DaVita," though he did not know who was exchanging the information, and that he did not "believe" that it was him.[254]

c. Michael Rucker at SCA likewise testified that he had an "informal conversation" with Javier Rodriguez at DaVita to exchange merit pool information in 2012 and 2013.[255]

---

[251] Hayek Dep. at 369:11–19 ("Q. Okay. And there's another section entitled 'DaVita.' Do you see that? A. Yes. Q. Did you get that yourself from Mr. Thiry? … THE WITNESS: No. My recollection is that I spoke with Mr. Rodriguez.").

[252] *Id*. at 362:25–363:7.

[253] *Id*. at 363:9–14.

[254] Deposition of Brian Mathis (Sep. 20, 2024) at 54:16–24.

[255] Rucker Dep. at 256:13–257:3.

d. Further evidence suggests that not only were SCA and DaVita sharing CSI before 2014, but that Hayek was personally assigned to "informally" reach out to gather this information from DaVita.

i. In an October 2014 e-mail to Bridie Fanning, Rucker writes "In the past, SCA has attempted to array information regarding broad overall marketplace, healthcare services, ASC competitors, DaVita and/or specific provider organizations."[256] He also writes, "Let's discuss when we next connect how we could get even an *informal series of calls* out to known comparable firms to see what they are intending to do in terms of pool for '15 merit increase."[257] After confirming that Rucker wants her to collect merit pool information from SCA's competitors, Fanning writes "Usually firms won't talk to other competitors in their space about this kind of data – it's why we all use the big HR firms -- Aon Hewitt, Mercer, Hay, etc."[258]

ii. Rucker responds by placing initials of SCA employees next to a series of companies, and he puts an AH for "Andrew Hayek" next to DaVita.[259] Rucker then confirms that these initials correspond to the senior executives who are supposed to "reach out to the companies next to their initials and obtain their future merit pool information[.]"[260] The next day, Rucker wrote an e-mail to Fanning, Wachsman, and Peter Clemens, "Discuss on Cabin a simple plan to assemble data points from more direct comparables the likes of DaVita-MR[.]"[261]

---

[256] *Id.* at 268:16–20.
[257] *Id*. at 270:8–13.
[258] *Id*. at 272:7–14.
[259] *Id*. at 272:15–273:11.
[260] *Id*. at 275:3–11.
[261] Ex. PX340 at SCA000540065. *See also* Rucker Dep. at 286:15–20.

His e-mail continued by acknowledging that "this relatively straightforward and simple process has *served us reasonably well over the past several years*."[262]

iii.     Rucker indicated in his deposition that he cannot recall if the senior executives followed through on gathering this information, but indicated that he knows that they did the year before.[263]

e.     Further, according to the evidence, Hayek and DaVita's former CEO Thiry were close and in regular communication.

i.     I provided evidence in my initial report that by 2008, Thiry and Hayek were "good friends."[264] Defendants' Experts did not attempt to submit contrary evidence.

ii.     Moreover, additional evidence supports my testimony that Hayek and Thiry frequently interacted. For example, Hayek and Thiry's friendship continued after Hayek became Optum's CEO. In February 2018, Hayek visited Thiry's cabin in Colorado.[265] Hayek also attended the Annual Summit of the Aspen Group, which was comprised of healthcare industry executives, including Thiry, who worked to address "the biggest challenges facing America's health and healthcare system" in mid-2018.[266] In July 2018, Thiry flagged for Hayek that during their next meeting, Thiry wanted "to talk about your 'culture building strategy' in your new empire[.]"[267]

f.     Given this evidence, and given that we have no documentary evidence indicating that SCA and DaVita agreed to stop sharing this information, it seems plausible and

---

[262] Ex. PX340 at SCA000540065. *See also* Rucker Dep. at 292:18–24.
[263] Rucker Dep. at 275:18–276:1.
[264] *See* Starr Report ¶ 69(a)(v) (citing Ex. PX484 at DVA_OMCEAL_000429390); *id.* ¶ 69(a)(ii) (citing Ex. PX484 at DVA_OMCEAL_000429389); *id.* ¶ 69(a)(vi) n.100 (citing Thiry Dep. at 145:23–146:7).
[265] SCA000484064 (Hayek's driving directions from airport to Thiry's cabin); SCA000484054 (Hayek's calendar entry for dinner with Thiry).
[266] SCA000160352; SCA000629524 (Thiry e-mailed Hayek after the Summit, "I would like you to emerge as a leader of this group.").
[267] SCA000630035.

perhaps likely that this information gathering continued in some form until Hayek and Thiry stepped down in 2019, and when Wachsmann testified that SCA no longer shared data.[268] At the very least, the evidence suggests that the SCA and DaVita CSI Exchanges were, in fact, regular, for much of the Conduct Period.[269]

## VII.    Econometric Evidence of Wage Suppression

85.    In my initial report, I empirically tested the hypothesis that, after controlling for other relevant economic factors, Defendants' alleged misconduct during this period economically and statistically significantly suppressed Class Member wages.[270] Using granular employee-level pay data provided by each of the Defendants and a multivariate regression model, I demonstrated that the Challenged Conduct is economically and statistically significantly associated with suppressed pay for Class Members.[271] I then demonstrated that my primary model[272] was robust to a series of robustness checks.[273]

86.    Defendants' Experts offer opinions and perform their own variations of my regression model. Their arguments, broadly, are that when my primary regression model is altered to include additional or replacement variables, the results of the model show lower wage suppression. I note that few specifications offered by Defendants' Experts *overturn* the finding of

---

[268] Wachsman Dep. at 177:22–178:4, 232:19–233:1.

[269] Even if there were changes or alterations to the CSI Exchanges over time (e.g., even if the SCA-DaVita CSI Exchanges stopped in 2014), it is still possible that, because the CSI Exchanges lowered compensation artificially in the beginning of the Conduct Period, the effects of sharing such CSI reverberated for many years later.

[270] Starr Report Section VII.

[271] Starr Report ¶ 107 ("My analyses below demonstrate that the Challenged Conduct suppressed wages by 14.5 percent overall, or when measured at each individual Defendant, by 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI. These findings are robust to a series of alternative models and are statistically and economically significant findings of harm.").

[272] I consider the Defendant-Specific model in Section VI.C.2 (Figure 8) of the Starr Report to be my primary econometric model, as that is what I used to calculate Aggregate Damages.

[273] Starr Report Section VI.C.4.

economically and statistically significant harm caused by the Challenged Conduct.[274] Moreover, Dr. Johnson did not "affirmatively provide a regression analysis of [his] own" and neither did Dr. McCrary.[275]

87.     Below, I first review Defendants' Experts' changes to the underlying dataset for these regression models. While some of these changes are meritless, I accept that four changes to the underlying data are legitimate. I also identify and rectify dataset construction errors by Defendants' Experts. Having revised the underlying dataset, I next re-run my primary regression model on the revised data and demonstrate that these changes make essentially no difference to the regression results. Starting from this revised primary model as a baseline, I then review each of the Defendants' Experts proposed alterations to my model. Because there is significant overlap between Defendants' Experts' arguments, I consolidate the various attacks on my model by concept.

88.     Having reviewed all of the arguments, my opinion remains that my primary regression model (applied on the revised data), is the most empirically valid model. This model shows that the Challenged Conduct suppressed wages by 12.6 percent overall, or when measured at each individual Defendant, by 17.2 percent at DaVita, 11.9 percent at SCA, and 8.1 percent at USPI. I reject the Defendants' Experts' proposed variations to my model. As I explain in detail below, these modeling changes either lack econometric merit or are not grounded in the facts of the case.

---

[274] Dr. Saravia presents results that are not statistically significant in her Exs. 31, 32, and 33. Dr. Johnson presents results that are positive and statistically significant in his Exs. 21, 28, and 33, and results that are not statistically significant in his Exs. 24 and 29.
[275] Johnson Dep. at 119:21–25. McCrary Dep. at 122:14–123:5.

## A.    Revisions to the Underlying Data

89.    In Section VI of my initial report, I described how I used a variety of datasets produced by the three Defendants to assemble a dataset that formed the underlying data for my econometric wage regressions.[276] Because the datasets produced by each Defendant had a different structure, after cleaning and processing this data, I aggregated the data so that each row or observation represented an individual at a particular company in a given year. Defendants' Experts do not take issue with this methodology.

90.    However, Defendants' Experts contend that I made several errors in processing the underlying data.[277] Some of these observations are legitimate, and the fix is uncontroversial. I make the appropriate change to the underlying data in this report. Other observations are true, but the Defendants' Experts' remedy is either (a) correct in principle but coded erroneously or (b) incorrect or problematic in principle. I discuss all of the relevant changes to the underlying data below, and then use this revised regression dataset for the remainder of my report.

### 1.    Uncontroversial Changes

91.    There are a number of uncontroversial changes made by the Defendants' Experts that I either accept outright, or accept with minor modification to fix an error in their proposed remedy. These changes include:

---

[276] Starr Report ¶¶ 111–116, Figure 5.
[277] *See generally* Saravia Report App. C ¶ 5.

a.     Using more (allegedly) up-to-date DaVita data to classify workers than the original files I received in discovery.[278]

b.     Excluding more observations corresponding to certain job titles or departments that my original data processing code did not catch.[279]

c.     Incorporating hours data for certain employees at USPI from 2018–2021, whose data on hours was missing in the primary USPI data;[280]

d.     Including additional stock compensation payments from SCA between 2013 and 2020.[281]

92.     Note that in reviewing the updated data provided by Dr. Saravia and Dr. McCrary, there are also clear errors in their data construction as it relates to classifying job levels.[282] In my analysis below I correct these errors in keeping with Dr. Saravia's and Dr. McCrary's stated intent.

---

[278] Johnson Report ¶ 137 ("Finally, Dr. Starr does not utilize all available DaVita Teammate data, which includes relevant information on employee jobs, for example."). I will note that Defendants' Experts do not explain why the updated DaVita data is more complete than the prior version that I used. They simply assert it. *See* Saravia Report App. C ¶ 5 ("Dr. Starr relied on the following DaVita Teammate Data files for his analysis: DVA_OMCEAL_000902592. However, DaVita subsequently produced a similar, but more complete and up-to-date, DaVita Teammate Data file: DVA_OMCEAL_001421635."). DaVita similarly provided no explanation for why the new but almost entirely duplicative data was updated and improved relative to what they previously provided. Accordingly, it is not obvious that the new data provided should be used, but ultimately this choice matters little in the ultimate analysis. *See also* Saravia Report App. C ¶ 5.

[279] Johnson Report ¶ 138 ("Dr. Starr makes an error in applying his own methodology for identifying non-relevant 'members of the human resources, recruiting, [and] legal departments' in the Defendants' data, which entails running keyword searches."). *See also* Saravia Report App. C ¶ 5.

[280] Johnson Report ¶ 137 ("For USPI employees in 2018–2021, Dr. Starr does not include available data on total hours worked and excludes these employee-years from his regression analysis."); Saravia Report App. C ¶ 5.

[281] Johnson Report ¶ 137 ("In addition, while Dr. Starr includes equity payments made to SCA employees in 2021 and 2022, he omits equity payments between 2013 and 2020 from his analysis."); Saravia Report App. C ¶ 5.

[282] There are two variables ("v6" and "v7") that indicate the manager level as defined by DaVita. Dr. Saravia and Dr. McCrary only use "v7." However, approximately 7.4 percent of the observations for "v7" have an unclassified management level. Only approximately 0.32 percent of the observations of "v6" have an unclassified. Therefore, I supplement the unclassified values of "v7" with those from "v6." By not using the "v6" classifications, Dr. Saravia and Dr. McCrary mark over 186,000 employee-year observations as missing a management level when the classification was in fact available.

### 2. Correcting for USPI Undercounting Some Hours in 2005 and 2006

93. Defendants' Experts argue that I do not appropriately account for the fact that total hours worked at USPI are under-counted in 2005 and 2006.[283] While a visual analysis of the data does make it appear that USPI hours are lower in those years than in other years, Defendants' Experts provide no reason why USPI's hours worked data is incomplete in 2005 and 2006 relative to other years. There are two key issues to consider here: (1) whose hours are too low and (2) what should we do about their low hours?

94. To address the fact that total hours are lower for USPI in 2005 and 2006, Dr. Saravia and Dr. McCrary assume workers worked 52 weeks a year at the "standard hours" level.[284] As a result, by Dr. Saravia's and Dr. McCrary's calculations, 92.8 percent of USPI workers in 2005 and 2006 are assigned *exactly* 2080 hours worked in the year. This blunt approach clearly generates measurement error in hours worked at USPI for the majority of USPI workers, because on average across all years from 2007–2022 only 34.3 percent USPI Senior-Level Employees worked exactly 2080 hours.

95. It is clear that the total hours worked at USPI are lower on average in the years 2005 and 2006 relative to other years. However, I reject Dr. McCrary and Dr. Saravia's remedy to this alleged problem, which is to assume that nearly every worker in those two years at USPI worked exactly 2,080 hours. First, it is not clear that every worker's hours *should* be overwritten, as done by Dr. Saravia and Dr. McCrary. Total hours are not uniformly lower for all USPI workers during 2005 and 2006. For example, the data indicates that 37.9 percent of USPI workers in 2005 and 2006 were observed to work more than 2000 hours per year. Defendants'

---

[283] Johson Report ¶ 136 ("Dr. Starr overestimates the total compensation per hour for USPI employees in the early portion of his relevant period as he makes no adjustment for relevant employee-years that have missing hours information, predominantly in 2005 and 2006.").
[284] Saravia Workpapers at Workpaper 5.

Experts provide no rationale why we should override this seemingly accurate data. Defendants' Experts present no analysis or understanding of why so many worker hours seem to be accurately recorded, and for workers with positive hours which worker hours are correct or incorrect. Rather, they override real data and real variation with a brute, constant assumption.

96.     In contrast, Dr. Johnson takes a somewhat more targeted approach to *identifying* those employees with undercounted hours, but a similarly blunt approach in *treating* them: He assumes that workers worked 40 hour work weeks if they had zero recorded hours, but leave hours in place for those workers with low but nonzero hours.[285] While this more targeted approach has the advantage of respecting that non-missing data is likely accurate and informative, it still imputes a constant variable (40 hours) that is likely to create measurement error. Put simply, there is no reason to assume that someone with 0 hours recorded worked 40 hours a week, as opposed to working part time or some other amount.

97.     I instead use a third approach that starts with Dr. Johnson's identification strategy, but instead of overwriting data on total hours with a constant as he does, I control for those identified workers with zero hours. This is a standard econometric approach which ensures that the variation in the Conduct estimate is not driven by the workers who Dr. Johnson identifies as having mismeasured hours. Indeed, this exact approach is identical to the one taken by Dr. Saravia and Dr. McCrary when trying to address COVID by including an additional dummy variable for 2022.[286] I similarly accomplish this by adding a control variable ("USPI Low Hours") indicating Dr. Johnson's identified workers at USPI in the years 2005 and 2006.

---

[285] Johnson Report ¶ 136 ("To correct Dr. Starr's data error, I identify employee pay records for full time employees where the pay type is coded as 'regular' with positive total earnings and zero hours worked and adjust the hours worked to be equal to 40 hours per week.").
[286] *See* Section VII.C.2, *infra.*

98.     While this is my preferred approach to dealing with USPI's hours, regardless of how USPI's hours are handled in 2005 and 2006, my compensation regression still finds evidence of statistically significant wage suppression at each Defendant.[287] **Figure 3** below compares my original baseline model using the revised dataset (with no USPI hour control) with the McCrary/Saravia approach, the Johnson Approach, and my preferred approach.

### Figure 3: USPI Low Hours Modeling Approaches

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] Original Model | [2] Saravia/McCrary Approach | [3] Johnson Approach | [4] Revised Model |
| DaVita Conduct | -0.200*** | -0.173*** | -0.180*** | -0.189*** |
| | (0.0154) | (0.0146) | (0.0149) | (0.0151) |
| **% Wage Suppression** | **-18.1%** | **-15.9%** | **-16.5%** | **-17.2%** |
| | | | | |
| SCA Conduct | -0.156*** | -0.106*** | -0.121*** | -0.127*** |
| | (0.0180) | (0.0176) | (0.0178) | (0.0178) |
| **% Wage Suppression** | **-14.4%** | **-10.0%** | **-11.4%** | **-11.9%** |
| | | | | |
| USPI Conduct | -0.135*** | -0.0601*** | -0.0802*** | -0.0842*** |
| | (0.0146) | (0.0117) | (0.0132) | (0.0128) |
| **% Wage Suppression** | **-12.6%** | **-5.8%** | **-7.7%** | **-8.1%** |
| | | | | |
| Ln(Total Hours) | 0.613*** | | | 0.693*** |
| | (0.0299) | | | (0.0284) |
| Ln(Total Hours-Saravia) | | 0.849*** | | |
| | | (0.0269) | | |
| Ln(Total Hours-Johnson) | | | 0.804*** | |
| | | | (0.0312) | |
| USPI Low Hours Control | | | | 0.830*** |
| | | | | (0.0632) |
| Baseline Model Controls | Yes | Yes | Yes | Yes |
| Individual-Company FE | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Observations | 25,871 | 25,918 | 25,896 | 25,871 |
| R-squared | 0.851 | 0.875 | 0.868 | 0.859 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. This data is inclusive of the dropped Dr. Johnson Individuals discussed in the next section. Note that the observation counts

---

[287] Johnson Report ¶ 139 ("After correcting Dr. Starr's data errors, I re-run his 'wage suppression' regression, which he reports in Figures 6 and 8 of his report with no additional changes. In Exhibit 22, I show the results of this analysis. As the exhibit shows, Dr. Starr's aggregate 'wage suppression' estimate drops from 14.5 percent to 11.3 percent.").

change between the regression as the handling of outliers (which are dropped from the regression analysis) is dependent on how hours are measured.

### 3. Dropping Johnson-Identified Individuals

99. Dr. Johnson identifies a few individuals in the regression data who either participated in the conspiracy to suppress wages or were at least aware of the conspiracy's existence. Dr. Johnson argues these individuals should be dropped from the regression data as there is no explanation for "why employees would take part in a conspiracy to suppress their own compensation."[288] None of Defendants' other Experts argue that these individuals should be dropped from the sample.

100. While these Senior-Level Employees (below the C-Suite) may have been involved in the conspiracy, it is not clear to me that they would be unaffected by it. These individuals may not have known or considered how the Challenged Conduct might have affected themselves. Moreover, even if these Senior-Level Employees did understand the likely effects, the most likely explanation for their behavior is that they were acting as instructed from their superiors. "Taking part" in a conspiracy is not the same as designing and orchestrating it.

101. Regardless, out of an abundance of caution I remove these identified individuals from the data entirely. As shown in **Figure 4** below, comparing my baseline regression from **Figure 7** (on the revised dataset) with or without these employees shows no material difference in the outcome to the model. Based on the regression output, removing these individuals results in the removal of 3 Class Members and 15 observations, or approximately 0.06 percent of the overall data.

---

[288] Johnson Report ¶ 183 ("Dr. Starr and Dr. Gerhart do not address why employees would take part in a conspiracy to suppress their own compensation. It is illogical that individuals would have acted to suppress their own pay, yet that is exactly what Dr. Starr assumes.").

**Figure 4: Dropping Johnson-Identified Individuals**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] Individuals Included | [2] Individuals Dropped |
| DaVita Conduct | -0.191*** | -0.189*** |
| | (0.0152) | (0.0151) |
| **% Wage Suppression** | **-17.4%** | **-17.2%** |
| | | |
| SCA Conduct | -0.128*** | -0.127*** |
| | (0.0178) | (0.0178) |
| **% Wage Suppression** | **-12.0%** | **-11.9%** |
| | | |
| USPI Conduct | -0.0853*** | -0.0842*** |
| | (0.0129) | (0.0128) |
| **% Wage Suppression** | **-8.2%** | **-8.1%** |
| | | |
| Baseline Model Controls | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 25,886 | 25,871 |
| R-squared | 0.859 | 0.859 |

*Note*: \*\*\* $p<0.01$, \*\* $p<0.05$, \* $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Column [1] includes the Johnson-Identified Individuals, while they are dropped in column [2].

## 4.    Revised Data Summary

102.    Having incorporated all of the changes discussed above, I recalculate the summary statistics for my main wage regression dataset.[289] As before, each observation represents an individual at the company-year level. **Figure 5** includes the mean, standard deviation, maximum, and minimum value of each variable in my regression. For example, the mean total hours worked per year is 2,022.25, while the hours worked per year vary from 51.80

---

[289] The data is limited to Senior-Level Employees, with excluded departments removed. The data are also limited to 2005 through 2022. While USPI provided some data in 2023, it did not cover the full year (it only contains payments for January and the beginning of February 2023)). Employees who worked only part of a year (considered a partial year if an employee was hired in a given year other than in January, or if an employee left in a given year other than in December) are excluded. Finally, anomalous data points (such as employees who earned less than minimum wage, employees who worked fewer than 50 hours in the year, employees who worked over 5,000 hours in the year, and employees who worked negative hours or earned negative pay) are excluded from the main compensation analysis, but included in the mobility analysis. *See* my workpapers and App. C, *infra*, for details.

to 3,120.08. Similarly, less than 1 percent of the observations in the data have a "USPI Low Hours Control" set to one.

**Figure 5 [Figure 5 Revised]: Defendant Regression Data Summary Statistics**

| Variable | Mean | Standard Deviation | Minimum | Maximum |
|---|---|---|---|---|
| *Total Amount* | $206,423 | $257,274 | $2,719 | $14,847,362 |
| *Avg. State Mgr. Earnings* | $82,687 | $10,618 | $33,857 | $131,245 |
| *State Health Expend. PC* | $6,265 | $1,131 | $3,461 | $10,881 |
| *Covid* | 15.5% | -- | 0.00 | 1.00 |
| *State GDP PC* | $58,282 | $9,276 | $35,609 | $198,904 |
| *State Unemployment Rate* | 5.70 | 2.18 | 1.99 | 13.73 |
| *Census Region Annual CPI* | 2.43 | 0.26 | 1.88 | 3.11 |
| *Total Hours* | 2,022.25 | 305.41 | 51.80 | 3,120.08 |
| *USPI Low Hours Control* | 0.8% | -- | 0.00 | 1.00 |

*Note*: The standard deviation measures variation (spread) of data around the average. Wooldridge (2013) at 734–36

### B.     Primary Wage Suppression Model

103.     Having incorporated all of the changes discussed above in Section VII.A, I next demonstrate that these changes make little difference to any of the regression models I performed in my initial report.

### 1.     Aggregate Suppression Model

104.     **Figure 6** below is a replication of Figure 6 from my initial report with the revised regression data. As before, **Figure 6** below shows the aggregate wage suppression regression model, building up to the main specification.[290] In a model with only individual fixed effects and a year trend, the regression estimates aggregate wage suppression of 10.4 percent (Column 1), up from 9.5 percent in the original model. Including the geographic, macroeconomic, and healthcare controls in Column (2) indicates wage suppression of 13.4 percent, up from 12.1 percent in the original model. Next, adding the natural log of total hours worked as a control results in a wage

---

[290] Starr Report Figure 6, ¶¶ 127–128.

suppression estimate of 12.6 percent in Column (3), down from 14.6 percent in the original model. Finally, including individual-by-company fixed effects (as opposed to individual fixed effects) in Column (4) results in an aggregate wage suppression estimate of 12.6 percent, down from 14.5 percent in the original model. The R-squared in the final model is essentially unchanged, explaining 85.8 percent of the variation in total compensation.

**Figure 6 [Figure 6 Revised]: Aggregate Effect of Conduct on Earnings for Directors and Above**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Conduct | -0.109*** | -0.143*** | -0.135*** | -0.134*** |
| | (0.00776) | (0.0127) | (0.0115) | (0.0116) |
| **% Wage Suppression** | **-10.4%** | **-13.4%** | **-12.6%** | **-12.6%** |
| | | | | |
| Year | 0.0524*** | 0.0563*** | 0.0548*** | 0.0549*** |
| | (0.00168) | (0.00452) | (0.00375) | (0.00378) |
| Ln(Avg. State Mgr. Earnings) | | 0.0512* | 0.0680*** | 0.0704*** |
| | | (0.0287) | (0.0227) | (0.0227) |
| Ln(State Health Expend. PC) | | 0.0895 | 0.128 | 0.127 |
| | | (0.132) | (0.117) | (0.117) |
| Covid | | -0.0649*** | -0.0420*** | -0.0401*** |
| | | (0.0159) | (0.0134) | (0.0134) |
| Ln(State GDP PC) | | -0.195 | -0.296** | -0.322** |
| | | (0.146) | (0.128) | (0.129) |
| Ln(State Unemployment Rate) | | -0.00673 | -0.0298* | -0.0317* |
| | | (0.0182) | (0.0166) | (0.0167) |
| Census Region Annual CPI | | -0.0730 | -0.0748 | -0.0690 |
| | | (0.0711) | (0.0615) | (0.0616) |
| Ln(Total Hours) | | | 0.695*** | 0.694*** |
| | | | (0.0281) | (0.0284) |
| USPI Low Hours Control | | | 0.813*** | 0.801*** |
| | | | (0.0621) | (0.0625) |
| Individual FE | Yes | Yes | Yes | No |
| Individual-Company FE | No | No | No | Yes |
| Location FE | No | Yes | Yes | Yes |
| Observations | 26,702 | 25,907 | 25,907 | 25,871 |
| R-squared | 0.781 | 0.794 | 0.858 | 0.858 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 2. Defendant-Specific Suppression Model

105. **Figure 7** is a replication of Figure 8 from my initial report with the revised regression data. As before, instead of imposing a common Conduct effect on each Defendant, it allows each Defendant to have its own Conduct effect. The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Senior-Level Employees was to reduce total compensation by 17.2 percent at DaVita (the same as the original model), 11.9 percent at SCA (down from 13.9 in the original model), and 8.1 percent at USPI as shown in Column (4) (down from 12.0 percent in the original model). The final model explains 85.9 percent of the variation in total compensation.

**Figure 7 [Figure 8 Revised]: Defendant-Specific Effect of Conduct on Earnings for Directors and Above**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| DaVita Conduct | -0.143*** | -0.211*** | -0.190*** | -0.189*** |
| | (0.0126) | (0.0169) | (0.0150) | (0.0151) |
| % Wage Suppression | **-13.3%** | **-19.0%** | **-17.3%** | **-17.2%** |
| | | | | |
| SCA Conduct | -0.117*** | -0.174*** | -0.123*** | -0.127*** |
| | (0.0151) | (0.0205) | (0.0175) | (0.0178) |
| % Wage Suppression | **-11.0%** | **-16.0%** | **-11.5%** | **-11.9%** |
| | | | | |
| USPI Conduct | -0.0624*** | -0.0799*** | -0.0850*** | -0.0842*** |
| | (0.0105) | (0.0144) | (0.0128) | (0.0128) |
| % Wage Suppression | **-6.1%** | **-7.7%** | **-8.1%** | **-8.1%** |
| | | | | |
| Year | 0.0517*** | 0.0550*** | 0.0531*** | 0.0532*** |
| | (0.00174) | (0.00453) | (0.00377) | (0.00379) |
| Ln(Avg. State Mgr. Earnings) | | 0.0533* | 0.0760*** | 0.0777*** |
| | | (0.0286) | (0.0225) | (0.0225) |
| Ln(State Health Expend. PC) | | 0.264** | 0.281** | 0.279** |
| | | (0.133) | (0.117) | (0.117) |
| Covid | | -0.0804*** | -0.0451*** | -0.0445*** |
| | | (0.0166) | (0.0139) | (0.0140) |
| Ln(State GDP PC) | | -0.278* | -0.439*** | -0.457*** |
| | | (0.153) | (0.132) | (0.133) |
| Ln(State Unemployment Rate) | | -0.00179 | -0.0320* | -0.0329* |
| | | (0.0186) | (0.0167) | (0.0168) |
| Census Region Annual CPI | | -0.162** | -0.119* | -0.117* |
| | | (0.0732) | (0.0629) | (0.0632) |
| Ln(Total Hours) | | | 0.694*** | 0.693*** |
| | | | (0.0281) | (0.0284) |
| USPI Low Hours Control | | | 0.841*** | 0.830*** |
| | | | (0.0629) | (0.0632) |
| Individual FE | Yes | Yes | Yes | No |
| Individual-Company FE | No | No | No | Yes |
| Location FE | No | Yes | Yes | Yes |
| Observations | 26,702 | 25,907 | 25,907 | 25,871 |
| R-squared | 0.782 | 0.795 | 0.858 | 0.859 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 3. Robustness Checks

106.     In **Appendix C**, I perform the same robustness checks as performed in Section VI.C.3 of my initial report. All of the robustness checks continue to show that the relationship

between the Conduct and compensation is negative, statistically significant, and similarly sized across all fully saturated specifications, both overall and for each Defendant.[291]

107. I note that Dr. McCrary criticizes my main model because it "only identifies the effect of the alleged conduct on pay using a subset of proposed class members."[292]

a. Dr. McCrary's criticism is wholly unwarranted for two reasons. First, as described in my initial report, it is standard practice to use fixed effects to parse out the cleanest comparison, which results in some variation not being used to identify the Conduct effect.[293] Second, Dr. McCrary provides an inaccurate and misleading characterization of my initial report, in which I recognized the fact that not all Senior-Level Employees were contributing to the Conduct effect estimate, and I took two different approaches to ensure that I find similar results when I use a less restrictive fixed effects structure that allow for all Senior-Level Employees to contribute to the Conduct effect estimate.[294] One extreme approach I took is to remove the individual by company fixed effects altogether, which even here (**Figure 58** in Appendix C) I find negative and statistically significant wage suppression overall and for each Defendant. A more reasonable approach, however, and as I described in my initial report, is to use random

---

[291] Note that in **Figure 53** there was a coding error in the earlier version of that table. Rather than control for an individual's tenure in each year, the prior table controlled for the total number of years an individual worked at the Defendant. The revised table controls for an individual's tenure in each year, though the results are quantitatively and qualitatively similar. I also note that in **Figure 54**, where I dropped the COVID years entirely, I incidentally dropped the years 2019 and 2020 in my initial report, instead of years 2020 and 2021. I have corrected this and the results are unchanged.

[292] McCrary Report ¶ 247 ("Finally, another limitation of Prof. Starr's pay regression model is that he only identifies the effect of the alleged conduct on pay using a subset of proposed class members, but he extrapolates the resulting conduct estimate to calculate damages for the entire proposed class.").

[293] Starr Report ¶ 119(a) ("*First*, I include *individual fixed effects* to mimic the ideal comparison. Inclusion of individual fixed effects means the regression model compares the same worker during and absent the Conduct Period. As a result, identification of the Conduct coefficient derives only from workers who are present both during and absent (e.g., either before or after) the Conduct.").

[294] Starr Report ¶ 130(i) ("Because individual fixed effects rely on comparisons of the same individual during and absent the Conduct, in the main specification there may be Senior-Level Employees who are not contributing to the Conduct estimate. To ensure the results are similar when all Class Members are included, I pursue two approaches.").

effects instead of fixed effects. This is because random effects leverage all of the data from Senior-Level Employees to estimate the Conduct effect and are the primary alternative to fixed effects (as opposed to dropping them altogether). I did this in my main report, which I report in **Figure 59** in Appendix C, and, as before, I find similar estimates of harm overall and across each Defendant as in my main specification. Nowhere in Dr. McCrary's report does he acknowledge this analysis or how it undercuts his unwarranted criticisms. Moreover, neither Dr. McCrary nor any of Defendants' other experts offer any criticisms of this approach.

### C. Defendants' Experts' Variant Models

108. Defendants' Experts allege that I make a number of other mistakes related to data processing. In this section I review and respond to those claims.

#### 1. Accounting for Equity and Firm Performance

109. Defendants' Experts argue that there is an important "timing issue" as it relates to equity payments because equity grants are often made well before they are received by workers. Dr. Johnson argues that the lack of accounting for this timing issue biases my estimates, as well as the lack of accounting for how the value of those grants change over time.[295] Dr. McCrary and Dr. Stiroh make the same point about needing to account for the value of equity at the time of the equity grant, rather than measuring what equity income workers receive.[296]

---

[295] Dr. Johnson also misrepresents my deposition testimony about how I think about this timing issue, writing in n.363 that I assumed "that employees (and firms) place *no value* on unvested equity." My deposition testimony that the value of a stock grant was "entirely zero before the vesting period" is clear and accurate. Starr Dep. Vol. 2 369:5–6. Before a stock grant vests, it is not income for a worker. This does not mean that the worker does not value it; but it means that that value comes entirely from their expectation of the likelihood that they will stay until it vests.

[296] McCrary Report ¶ 222 ("Prof. Starr does not properly handle equity pay in the data. When constructing the outcome variable that he uses in his pay regression model, Prof. Starr measures equity pay not in the year that it is issued, but in the year that it vests, or is exercised or sold by, the employee."); Stiroh Report ¶ 97 ("Specifically, Dr. Starr included the value of stock options in an employee's total compensation in the year the employee decided to exercise the options rather than in the year DaVita elected to grant the stock option to them.").

110.     I reject both Defendants' Experts' points. As I will explain, my approach of measuring stock payments when they vest, are exercised, or are otherwise counted as income, as opposed to when they are granted, is consistent with how the IRS assesses income, SEC disclosure rules, and, perhaps more importantly, is exactly what one should care about if we care about estimating the effect of firm conduct on *worker-experienced* harm. Moreover, as I will discuss below, Senior Executives admitted that the point of the Challenged Conduct was to benefit the firm, such that firm or stock performance is an outcome of the Conduct and thus should *not* be controlled for as the baseline. Finally, I will show using a simulation that the fact that some equity might be granted during the Conduct but received afterwards either leads to no bias in my estimates or results in conservative estimates.

111.     I will begin with the argument that I need to account for this timing issue of when stock grants are made versus when they are received as income for workers. Defendants' Experts argue that my approach "contradicts how the Defendants calculated expected values for stock grants and options prior to vesting."[297] I understand that Defendants need to determine how much stock to grant in a given year and what a vesting schedule might be. But the value of the equity grant at the grant date is not necessarily what the worker receives, and, so long as there is a vesting schedule, the worker does not receive any income on that grant date.

a.     Take a simple example to illustrate: Suppose that a worker receives an equity grant of 100 shares with a fair market value of $500 in 2010, which vests if the worker stays until 2014. Per Defendants' Experts' claims, I should account for the timing of the stock grant by giving the worker the fair market value of the grant ($500) in 2010. This is clearly

---

[297] Johnson Report n.363; Stiroh Report ¶ 97 ("As a result of these decisions, Dr. Starr's equity compensation measure does not reflect DaVita's compensation decisions, which are the focus of this matter."); McCrary Report ¶ 222 ("That means that when Prof. Starr measures equity pay, he is measuring something other than the employer's choice of how to set equity pay.").

wrong because in 2010 the worker experiences no change in their actual income. If the worker leaves in 2010, 2011, 2012, or 2013, then the equity would not vest and they would receive $0. In this situation, Defendants' Experts approach would give the worker $500 in 2010, when the realized value of the equity to the worker is $0. As a result, Defendants' Experts approach would both misallocate earnings to years when it did not occur, and overstate realized earnings.

b.     Only if the worker stays until 2014 does the worker receive the 100 shares, which, if the price stayed the same, would be worth $500 in *realized* income. But even in this case, the realized income from the worker's perspective happens in 2014, not 2010. Indeed, as described below, this is also when the stock grants are taxed as income by the IRS. Note that it is also possible that the price did not stay the same between the grant and vesting date, such that when the worker realizes the stock equity, the price of the stock may have gone up or down (e.g., as a result of the Challenged Conduct), resulting again in differences in realized stock compensation relative the initial grant amount. For example, if the stock price tanked to $0, then the realized value of the equity grant from 2010 is $0 in 2014. In this situation, as before, Defendants' Experts approach would give the worker $500 more dollars than they earned, and would give it to them in a year that they did not earn it. This simple example illustrates that if we care about what workers are compensated and in which years they receive that compensation— which is the whole point of the wage-suppression exercise—then in general we should *not* be shifting compensation from worker equity grants to a time period when they did not receive them as income.

112.    The examples above are fictitious, but represent the real experiences of many Senior Employees. Below I document several examples in this case of stock grants that did not

reflect actual, realized compensation, as well as how Dr. McCrary's and Dr. Stiroh's calculations correspond to the realized compensation.

a. ████████████████ worked as a Vice President at DaVita for the entirety of 2011 and left in early 2012. In January 2011, ██████ received an equity grant of ████████ ████████████████████ of which I understand ████████████████████ ████████████████[298] In DaVita's compensation data, ████████████ received ██████ from stocks in 2012 and ████████████████ in 2011.[299] Dr. McCrary credits ████████ in stock equity to ████████ in 2011. Dr. Stiroh adjusts this granted value to be ████████ in 2011. Note that Dr. McCrary and Dr. Stiroh's estimates differ by ████████, indicating the uncertainty in *how* to account for the value of a stock grant at the grant date. More importantly, both Dr. McCrary and Dr. Stiroh credit ████████ with over ████████ during the Conduct Period, which he never received at any point in time.[300] They also allocate it to a year, 2011, in which he did not receive it or pay taxes on it.

b. ████████████ worked as a Senior Vice President and Medical Director at DaVita from 2016 to 2018.[301] ████████ received ████████████ in 2016 or 2018, but did receive ████████████ in 2017, ████████████████████████ I understand that ████████████████████████████████████[302] The DaVita payment data only shows ████████ as receiving ██████ from stocks in 2016, and ████████

---

[298] *See* McCrary Report ¶ 142 ("For example, at DaVita, one employment agreement describes ████████████ ████████████████████████████████████ The same letter describes ████████████████████ ████████████████████████████████████

[299] Note that because ████████ only worked part of 2012, his pay data in 2012 was not included in my main regression analysis, which considers only full-year compensation.

[300] *See* my workpapers for details.

[301] Note that because ████████ only worked part of 2016 and 2018, his pay data in those years was not included in my main regression analysis, which considers only full-year compensation.

[302] The "Vesting ID" variable is described in the DaVita grant data as ████████".

██████████ in 2017 or 2018. Yet, Dr. McCrary counts ██████████ as equity received by ██

██████ in 2017. Dr. Stiroh adjusts this value to ██████████. Neither Dr. Stiroh nor Dr. McCrary

██████████████████████████████████ in 2016 or 2018 for ██████████ Thus, both Dr. Stiroh and

Dr. McCrary count over ██████████ as part of ██████████ total pay during the Conduct Period

██████████████████████████[303]

        c.      ██████████ worked as a Regional Director, Group Director, and

ultimately Division/Region Vice President at DaVita from 2007 to 2011.[304] ██████████ received

██████████ from DaVita, ██ in 2008 (March and July), two in 2009 (May and October),

and ██ in 2010 (March). In each grant, the vesting period was ██████████[305] Based on

DaVita's payment records, ██████████ received ██████████ in stock payments in 2011 and

██████ from stock payments in prior years. Dr. McCrary attributes a total of ██████████ to ██

██████ between 2008 and 2010, and ██ in 2011. Dr. Stiroh attributes ██████████ in stock equity

to ██████ between 2008 and 2010, and ██ in 2011. Both Dr. McCrary and Dr. Stiroh

therefore consider an additional ██████ as income for ██████████ during the Conduct Period,

which he never received.[306] They also allocated his income to years in which he did not receive it

or pay taxes on it.

        d.      These examples highlight how Dr. McCrary's and Dr. Stiroh's data

manipulations to account for equity compensation at the time of the equity grant do *not* reflect

the equity compensation workers realized. But these examples also do not do justice to the sheer

---

[303] *See* my workpapers for details.

[304] Note that because ██████████ worked only part of 2007 and 2011, those years are excluded from my main regression analysis, which considers only full-year compensation.

[305] Specifically, the ██ grants in 2008 have a "vestingid" of ██████ the ██ grants in 2009 have a "vestingid" of ██████ the ██ grant from 2010 has a "vestingid" of ██████ It is my understanding that these numbers in the "vestingid" variable correspond to the number of months over which the stock grants vest.

[306] *See* my workpapers for details.

number of observations in which Dr. McCrary and Dr. Stiroh wrongly adjust compensation. Cumulatively, Dr. McCrary and Dr. Stiroh's approach to handling equity fundamentally alters the compensation of 70.4 percent and 65.1 percent of DaVita employee-year observations, respectively.[307] These alterations include both reallocating equity income to years in which workers did not receive it, and including equity that workers did not receive at all.

113.    Treating equity income when it is received, as opposed to when it is granted, is consistent with how government agencies treat equity grants for the purposes of taxation and disclosure of executive compensation.

a.      An article by Itzkowitz (2025) called "Taxes on Equity" summarizes how the IRS taxes equity. He writes, "[w]hen you vest restricted stock, it triggers ordinary income tax on the fair market value (FMV) of the shares on the vesting date. This income tax is due by the filing of your tax return for the related calendar year."[308] Thus, the IRS taxes restricted stock units based on what the worker *receives*, including the fair market value of the shares *on the vesting date* (not the grant date). With regards to non-qualifying stock options, he writes "[i]f you're exercising NSOs, you will have to pay income tax on the difference, or spread, between the exercise price and the fair market value (FMV) of the shares at the time of exercise."[309] As in the case of Restricted Stock Units, the IRS taxes the difference between the value of the equity and the strike price *at the time of vesting or exercise.*

---

[307] *See* my workpapers for details.
[308] Eitan Itzkowitz, *Taxes on Equity*, CARTA (Apr. 1, 2025), https://carta.com/learn/equity/equity-taxes/.
[309] *Id.*

b.     The issue of what executives are *actually paid* as it relates to equity is also the subject of a new SEC disclosure rule.[310] In January 2022, with the goal of making "it easier for shareholders to assess a public company's decision-making with respect to its executive compensation policies" the SEC finalized a disclosure rule that implemented the "pay versus performance" disclosure requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.[311] A summary of the new disclosure rule notes that "[i]n particular, the new rule will require companies to quantify and describe (in both tabular and narrative format) the relationship between compensation *actually paid* to executives and company financial performance across multiple metrics."[312] Precisely because various long-term equity or similar grants may not reflect actual compensation, the new SEC disclosure emphasizes the importance of understanding what executives are actually paid.

114.     Similarly, the fact that worker harm arises from what workers receive versus what they were promised is evident in the experience of USPI's stock devaluation, which led to a separate lawsuit.[313] As I described in my initial report, in 2018, Tenet devalued the prior 2015 Employee Stock Equity Plan, which had a maturation date of 2022.[314] The results of this

---

[310] Academic studies have also grappled with how to measure equity pay for executives, and highlighted how important it is for understanding whether executive pay reflects firm performance. *See, e.g.,* Anthony J. Nyberg, Ingrid Smithey Fulmer, Barry Gerhart, & Mason A. Carpenter, *Agency theory revisited: CEO return and shareholder interest alignment*, 53(5) ACADEMY OF MANAGEMENT JOURNAL 1029–1049 (2010); Brian J. Hall & Jeffrey B. Liebman, *Are CEOs really paid like bureaucrats?*, 113(3) QUARTERLY JOURNAL OF ECONOMICS 653–691 (1998).

[311] *See SEC Adopts Pay Versus Performance Disclosure Rules*, U.S. SECURITIES AND EXCHANGE COMMISSION (Aug. 25, 2022), https://www.sec.gov/newsroom/press-releases/2022-149.

[312] Eric W. Wilfers et al., *SEC's New Pay Versus Performance Disclosure Rule: Important Things To Know*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (Oct. 28, 2022), https://corpgov.law.harvard.edu/2022/10/28/secs-new-pay-versus-performance-disclosure-rule-important-things-to-know/.

[313] 2nd Am. Class Action Compl. (ECF 101), *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.) ¶ 2–3.

[314] Starr Report ¶ 85.

devaluation led to employees feeling "cheated out of the value" they believed they "would receive" at USPI,[315] resulting in some of them leaving altogether,[316] or being unhappy.[317]

115.     Taken together, it is clear that what we should care about when studying whether firm conduct reduces compensation for workers is in fact what workers receive in compensation. Defendants' Experts are fundamentally confused on this point.

a.     Dr. Johnson writes: "For the question at issue—whether or not Defendants suppressed compensation for proposed Class Members—one would need to compare the pay decisions Defendants actually made to those they would have made but-for the alleged conduct *during* the proposed Class Period."[318] The first part of this statement is correct: the question at issue is indeed whether or not Defendants suppressed compensation for proposed Class Members. But the second part of the sentence is misleading because Dr. Johnson has now switched from describing "compensation for proposed class members" in the first part of the sentence to "pay decisions Defendants actually made" in the second. This is highly misleading

---

[315] Deposition of Mark Garvin (May 30, 2024) at 146:16–147:20 ("And when the valuation of the plan changed to be much less favorable to plan participants, he was cheated out of the value that he believed he would receive for his work at USPI. … THE WITNESS: I can understand that. And generally speaking that was Jeff Andrews' point, yes[.]").

[316] Alex Bateman indicates he was harmed by the devaluation of his equity to the point where he left USPI. Deposition of Alex Bateman (Jul. 19, 2024) at 30:6–31:5 ("Q: Are you aware of a class action lawsuit brought by Jeff Andrews against USPI? A. Yes. Q. Who is Jeff Andrews? A. He was a market president as was I. As I mentioned, I was responsible mainly for the East Coast and Jeff was responsible for Texas. Q. What's your understanding of what the allegations were in that class action complaint? A. It was a matter related to the equity plan and a devaluation of the equity of the senior employees. Q. (BY MR. ROSS) Did that issue have anything to do with you leaving USPI in 2020? A. Yes. Q. (BY MR. ROSS) And what about that -- what was the issue that was related to you leaving USPI? A. I was a participant in the equity plan that was devalued. So I was affected personally. Q. (BY MR. ROSS) To the point where you decided to leave USPI, correct? A. Yes.").

[317] Deposition of Shannon Mosley (Aug. 13, 2024) at 81:2–82:22 ("Q. (BY MR. ROSS) Did you discuss with any of your fellow employees at USPI whether or not to sign the agreement USPI was offering? THE WITNESS: Repeat the question again. MR. ROSS: Yeah. Why don't you just read it back. Sorry about that. (Record read by the reporter as follows: 'Did you discuss with any of your fellow employees at USPI whether or not to sign the agreement USPI was offering?') THE WITNESS: I don't recall. Q. (BY MR. ROSS) Do you recall if there were a number of employees at USPI that were not happy with that agreement? THE WITNESS: Yes. Q. (BY MR. ROSS) And what do you recall about that? A. I mean, mainly there were individuals that were expecting something different. And when that did not seem to be coming to fruition, they were upset by that. And I can't name names, I don't remember who. It was all a very tumultuous time, but I do recall some folks being unhappy.").

[318] Johnson Report ¶ 167.

because in the context of stock grants, as explained above, "pay decisions" do not necessarily reflect "compensation received." If the second part of his sentence was consistent with the first, it would have read "one would need to compare the **compensation class members actually received** to what they would have received but-for the alleged conduct during the proposed class period." And that is exactly what I do.

        b.      Dr. McCrary's and Dr. Stiroh's confusion is the same. Dr. McCrary writes: "That means that when Prof. Starr measures equity pay, he is measuring something other than the employer's choice of how to set equity pay."[319] Similarly, Dr. Stiroh writes "As a result of these decisions, Dr. Starr's equity compensation measure does not reflect DaVita's compensation decisions, which are the focus of this matter." Dr. McCrary and Dr. Stiroh are wrong. The goal of this analysis is to understand whether the Challenged Conduct affected *what workers actually receive*. If instead I were to focus on company pay decisions when those pay decisions do not reflect what workers actually received, then I would not be studying whether workers were harmed, because the definition of harm is lower *realized* compensation, not the extent of unrealized promises.

116.    Even if I were to accept Defendants' Experts' claims that we should count as income the value of equity at the time it is granted, which I firmly reject, then we must decide on how to value those grants. Here, Defendants' Experts themselves do not agree on how to do this. Dr. Johnson does not even attempt to measure the equity at the grant date, while Dr. Stiroh and Dr. McCrary take different approaches overall and for different Defendants. I describe these briefly.

---

[319] McCrary Report ¶ 222.

a.      Dr. McCrary makes the extreme choice to drop equity income received by Senior-Level Employees at SCA and USPI entirely.[320] His remarkable justification for dropping this income—income that workers had to pay taxes on—is that he cannot calculate the value of the equity at the time of issuance.[321] And for DaVita, he records "equity compensation at the time of issuance"[322] based on "the value of stock options at the time of issuance as 25% of the market value of the stock options at the time of issuance."[323] Altogether, Dr. McCrary alters 39 percent of the observations in the final compensation dataset for Senior-Level Employees, including 70.4 percent of observations at DaVita, 11.2 percent at SCA, and 5.5 percent at USPI.[324]

b.      Dr. Stiroh only considers DaVita, but she uses a different approach to "valuing equity compensation at the time of the grant" than Dr. McCrary.[325] This results in her altering 67.5 percent of the observations at DaVita in the final compensation dataset for Senior-Level Employees. Dr. Stiroh's approach results in compensation numbers that are different from Dr. McCrary's for 65.1 percent of DaVita employees.[326]

117.    Clearly the extent to which Dr. McCrary and Dr. Stiroh are altering the actual compensation received by Senior-Level Employees is extreme, and I reiterate my objections to their approach. However, even if I take their approaches at face value and re-run my primary wage suppression models, as shown in **Figure 8**, I still see similar levels of wage suppression in

---

[320] McCrary Report ¶ 233 ("[F]or SCA and USPI, removing equity compensation altogether, since equity compensation at the time of issuance is not available for either firm.").
[321] *Id.* ¶ 233.
[322] *Id.* ¶ 233.
[323] *Id.* n.435.
[324] *See* my workpapers for details.
[325] Stiroh Report ¶ 98 ("DaVita reports the value of its total equity grants in its 10-K filing each year. I have constructed a value of equity compensation at the grant date using the 'weighted-average fair value' of grants from DaVita's 10-K in the year of the grant.").
[326] *See* my workpapers for details.

the aggregate and at each Defendant as in my baseline model. The only potential discrepancy is for USPI the estimate is negative 1.5 percent, where the p-value is 14.4 percent. However, this is from Dr. McCrary's model where he inexplicably drops all USPI and SCA equity income. Adding that income back in (shown in Column [6]) restores the more negative and statistically significant effect. Thus, the results are robust to how I treat equity compensation.

**Figure 8: Equity Accounting Methods**

| | Dependent Variable: Ln(Total Annual Compensation) Stiroh Equity Method | | Dependent Variable: Ln(Total Annual Compensation) McCrary Equity Method | | Dependent Variable: Ln(Total Annual Compensation) McCrary Equity Method, No USPI/SCA Subtraction | |
|---|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] | [6] |
| Conduct | -0.103*** | | -0.0560*** | | -0.0774*** | |
| | (0.0101) | | (0.00912) | | (0.00984) | |
| **% Wage Suppression** | **-9.8%** | | **-5.4%** | | **-7.5%** | |
| DaVita Conduct | | -0.138*** | | -0.0987*** | | -0.105*** |
| | | (0.0125) | | (0.0117) | | (0.0120) |
| **% Wage Suppression** | | **-12.9%** | | **-9.4%** | | **-10.0%** |
| SCA Conduct | | -0.123*** | | -0.0618*** | | -0.108*** |
| | | (0.0163) | | (0.0144) | | (0.0158) |
| **% Wage Suppression** | | **-11.6%** | | **-6.0%** | | **-10.2%** |
| USPI Conduct | | -0.0683*** | | -0.0153 | | -0.0481*** |
| | | (0.0120) | | (0.0105) | | (0.0118) |
| **% Wage Suppression** | | **-6.6%** | | **-1.5%** | | **-4.7%** |
| Baseline Model Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Individual-Company FE | Yes | Yes | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 25,871 | 25,871 | 25,871 | 25,871 | 25,871 | 25,871 |
| R-squared | 0.878 | 0.878 | 0.887 | 0.888 | 0.879 | 0.879 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

118.     Defendants' Experts also argue that without accounting for equity at the time of grant that my estimates are susceptible to changes in the value of stock performance or that my

estimates may be biased by grants made during the Conduct Period that pay out afterwards.[327] I respond to these two concerns in turn.

        a.     First, the fact that stock prices might change the value of equity grants is part of a broader argument that Dr. Johnson makes, where he believes that firm performance (whether measured as a stock price or otherwise) should be included in the model because my causal reasoning that firm performance is a "bad control" is insufficient to exclude it from my analysis.[328]

        i.     Dr. Johnson does not seem to understand what bad controls are, and why firm performance, including stock price, is a bad control and should not be controlled

---

[327] Johnson Report ¶ 166 ("[N]or do his models account for changes in the value of these grants over time due to factors outside of Defendants' compensation setting process, for example, changes in stock prices over multiple years which can impact both the value of the payment itself and the employee's behavior (e.g., if they decide to 'exercise' vested stock options on a certain date because of gains in the underlying stock price[.])"); id. ¶ 157 ("As these exhibits indicate, the level of variable compensation that employees received would depend not only on the compensation practices of a given Defendant but also on the performance of the firm itself in that year, which Dr. Starr does not account for in his regression analysis."). Dr. Johnson also reports examples of when individuals receive grants at one date but stock compensation at another. Johnson Report ¶ 168 (When should one value stock options?); id. ¶ 169 ("Dr. Starr ignores that DaVita made the compensation decision in 2006, two years *before* the alleged conduct period."); id. ¶ 170 ("In Exhibit 31 I show an example of proposed class member ███████ who was granted ████ stock options by DaVita in May of 2018, during the proposed class period. At the time of the grant, DaVita's stock price (the blue line) was trading at $66.29. In May of 2022, two and a half years after the end of the proposed class period, ███████ decided to exercise ████ options. Because DaVita's stock price increased by about 50 percent, ███████ received ████ per option (and ███████ total) in May of 2022. Dr. Starr considers the ███████ for ███████ in 2022 as post-period stock earnings, ignoring that ███████ benefited from a compensation decision made by DaVita in 2018, during the proposed class period. In addition, Dr. Starr's model lacks any explanatory factors which could account for the (sizeable) stock price increase between 2018 and 2022 or ███████ decision to exercise ████ stock options in May of 2022."); McCrary Report ¶ 223 ("To illustrate why it is problematic that Prof. Starr does not use equity at the time it was issued in his pay regression, consider that, by doing so, he inappropriately assigns equity pay that was issued during the Class Period to after the Class Period. For example, if an SCA or a USPI employee was issued equity pay during the Class Period, but that equity pay did not vest, or the employee did not choose to sell their stocks or exercise their stock options, until after the Class Period, then that would elevate Prof. Starr's pay measure in the post period relative to the Class Period, and bias his pay regression model in favor of finding a pay suppression effect.").

[328] Johnson Report ¶ 154 ("Dr. Starr understates the problem that occurs when a relevant variable is excluded from a 'wage suppression' model such as the one he proposes. When a regression omits a critical factor, such as firm financial performance, it suffers from what is known as 'omitted variable bias.' … Simply speculating that a given variable is a 'bad' control is not a justification for its exclusion."). *See also* Starr Dep. Vol. 2 at 339:21–342:3 ("I think that we should be leery of overinterpreting regression models that include many, many bad control variables," which "can actually increase bias in your estimates.").

for as a default. I do not dispute that firm performance likely drives compensation, but that does not mean it should be included as a control variable in the regression. The problem is that the Challenged Conduct also affects firm performance, making firm performance a mediator variable on the causal pathway between the Challenged Conduct and compensation. So, if we wish to understand the effect of the Challenged Conduct on compensation, then we should not in general control for mediators, as I explained in my initial report.[329]

        ii.     Dr. Johnson argues that "Simply speculating that a given variable is a 'bad; control is not a justification for its exclusion."[330] I am not "simply speculating." Rather, Dr. Johnson ignores direct evidence that the Challenged Conduct was designed to improve firm performance. As I described in my initial report, Thiry described in an e-mail to Hayek how going after competitors' employees is "lose/lose."[331] ▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬[332] Thus, it is clear from the record that both the SCA-DaVita and SCA-USPI No-Poach agreements were implemented to affect firm performance, and thus measures of firm performance should *not* be included in the model. Similarly, as described above, the CSI Exchanges were also designed to "cut some expenses."[333]

---

[329] *See* Starr Report ¶ 123(b) ("*Second*, it is important to emphasize why some control variables are *omitted* from the regression."). *See also* Carlos Cinelli, Andrew Forney, & Judea Peral, *A crash course in good and bad controls*, 53 SOCIOLOGICAL METHODS & RESEARCH 1–30 (2022) [hereafter Cinelli et al. (2022)].

[330] Johnson Report ¶ 154.

[331] Ex. PX316 at DVA00019820 ("I have competitors where we have basically stopped going after each other's people because it is a lose/lose. And those do not even have friendships at risk.").

[332] Ex. PX304 at DOJCIV-008-00000300.

[333] Clemens Dep. 135:21–137:11.

iii.      To drive the point home, note that no study on the effects of no-poach agreements takes Dr. Johnson's perspective when it comes to controlling for firm performance. This is true across both the franchise and the high-tech no-poach studies.[334]

iv.      Thus, for the aforementioned reasons, I reject Dr. Johnson's arguments that I should adjust for firm performance or stock prices in my base model.

v.      Even if we were to accept Dr. Johnson's claim that we should control for company performance, which I do not, including stock prices or firm performance in the model does not materially change the results. In **Figure 9** below I control for stock prices and in **Figure 10** I control for DaVita performance as measured by Dr. Johnson.[335] Even with these firm performance controls, I still estimate similarly sized and statistically significant wage suppression both overall and at each Defendant.

---

[334] Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings*, REVIEW OF ECONOMICS AND STATISTICS 1–35, 1 (2024) [hereafter Callaci et al. (2024)]; Lafontaine et al. (2025); Gibson (2024).

[335] Johnson Report ¶ 175 ("DaVita's stock price returns increased again after the proposed class period, corresponding with higher stock earnings of proposed class members in and after 2020, as they profited from the stock grants DaVita distributed during the proposed class period. That is, Dr. Starr both misattributes (i) the lower earnings of proposed class members in the proposed class period due to lower stock price returns to the effect of the alleged conduct, and (ii) the higher earnings of proposed class members in the post-period to the end of the alleged conspiracy period, even though proposed class members in this period gained from stock grants received *during* the proposed class period.").

**Figure 9: Controlling for Stock Prices**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] | [2] |
| Conduct | -0.115*** | |
| | (0.0114) | |
| **% Wage Suppression** | **-10.9%** | |
| DaVita Conduct | | -0.180*** |
| | | (0.0150) |
| **% Wage Suppression** | | **-16.5%** |
| SCA Conduct | | -0.101*** |
| | | (0.0177) |
| **% Wage Suppression** | | **-9.6%** |
| USPI Conduct | | -0.0467*** |
| | | (0.0120) |
| **% Wage Suppression** | | **-4.6%** |
| End of Year Stock Pirce | 0.0273*** | 0.0334*** |
| | (0.00410) | (0.00399) |
| Baseline Model Controls | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 25,871 | 25,871 |
| R-squared | 0.859 | 0.860 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

**Figure 10: Controlling for DaVita Performance (Dr. Jonhson's DaVita Subsample)**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| DaVita Conduct | -0.161*** | -0.127*** | -0.133*** | -0.129*** |
| | (0.0192) | (0.0200) | (0.0199) | (0.0200) |
| % Wage Suppression | -14.9% | -11.9% | -12.5% | -12.1% |
| | | | | |
| 3-Year Growth Rate of Dialysis Adjusted OI For 2015-2020 U.S. Dialysis Employees | | 0.0180*** | | |
| | | (0.00150) | | |
| 3-Year Growth Rate of Dialysis Adjusted OI Before G&A Expenses For 2015-2020 U.S. Dialysis Employees | | | 0.0204*** | 0.0172*** |
| | | | (0.00192) | (0.00191) |
| 2015-2020 U.S. Dialysis Employees Indicator | | -0.138*** | -0.149*** | -0.107*** |
| | | (0.0173) | (0.0189) | (0.0202) |
| End of Year Stock Price | | | | 0.109*** |
| | | | | (0.0230) |
| Baseline Model Controls | Yes | Yes | Yes | Yes |
| Individual-Company FE | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Observations | 13,220 | 13,220 | 13,220 | 13,220 |
| R-squared | 0.831 | 0.835 | 0.834 | 0.835 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

b.　　Second, Defendants' Experts point out that if one considers the fact that equity is granted during the Conduct Period, but then paid out during the post-Conduct Period, that it could bias the results.[336] This claim is a red herring for two reasons.

i.　　First, Dr. Johnson points out that some stock grants are made during the Conduct Period but paid out after it.[337] Yet the same is true before the Conduct Period as well, when, e.g., DaVita makes grants before 2008 but then it pays out during the Conduct Period. For example, if DaVita provides a stock grant worth $10,000 in 2007, and it pays out during the Conduct Period (assuming that it vests), then this increases Conduct Period

---

[336] McCrary Report ¶ 223.

[337] Johnson Report ¶ 72 ("The timing issue I illustrate above, where Dr. Starr misattributes stock earnings to the post-period for compensation decision *during* the proposed class period, is pervasive."). Dr. Johnson makes a similar point about Davita's "cash long-term incentives." Johnson Report ¶ 155.

compensation. However, if DaVita also provides a similar stock grant worth $10,000 in 2018 and it pays out after the Conduct Period, then this will increase post-Conduct compensation. On net, as long as equity grants are unaffected by the Conduct, they will cancel each other out and not lead to any bias in the estimates.

ii.     Second, if instead the Challenged Conduct systematically suppresses the amount of equity granted, as found in Gibson (2024), and as suggested by my results with equity (**Figure 7**) versus without equity (**Figure 49**), then the delay between a stock grant and its realization will only make my estimates *conservative*. To see this, consider the same $10,000 grant scenario as above, but instead of assuming that the stock grant from during the Conduct Period was $10,000, assume that the Challenged Conduct reduced it to $5,000, but that it still paid out after the Conduct Period (assuming the worker stays until it vests). In this case, as a result of these changes, post-Conduct equity compensation would be $5,000 (halved due to when it was issued during the Conduct Period), while during Conduct Period compensation would still be $10,000 (intact because it was issued before the Conduct Period). As a result, the regression model will see that equity compensation would appear to be $5,000 lower in the post-Conduct Period relative to the during Conduct Period. Because my results, in general, suggest that compensation *rose* in the post-Conduct Period relative to the Conduct Period, this timing issue related to equity compensation only makes my Conduct estimate conservative. This is a basic spillover problem where the Conduct period is made more "clean" by the "clean" period, and the "clean" period is made less "clean" by the Conduct Period. However, such spillovers simply reduce the difference between the two periods, leading to either no bias or conservative estimates.

iii.     To illustrate that my theoretical arguments above are accurate, I develop a simulation.[338] In the simulation I compare situations when the equity is all received within the same period versus when equity grants are received in a subsequent period. As I argued above, the simulation shows that, when equity grants are independent of the Challenged Conduct, the fact that equity might be received in a different period than it was granted does not bias the Conduct estimate. The simulation also shows that if the Challenged Conduct reduces equity grants in the first place, then this makes the Conduct estimate conservative.

### 2.     Wage Suppression Estimates Are Not Sensitive to COVID

119.     Defendants' Experts argue that I have not appropriately addressed COVID in my empirical model. In my initial empirical model I included an indicator variable for the timing of the COVID pandemic (2020 and 2021). Defendants' Experts offer alternative ways to account for COVID, though Dr. Saravia does not have an opinion on the "correct" way to do it.[339] Dr. Stiroh, Dr. McCrary, and Dr. Saravia suggest that effects of the COVID-19 pandemic continued until 2022.[340] Dr. McCrary and Dr. Saravia then addressed COVID-19 by including three binary variables indicating 2020, 2021, and 2022.[341] Dr. McCrary also includes three national variables

---

[338] *See* my workpapers.

[339] I note that Dr. Saravia testified that she did not have an opinion "as to what the correct model to account for COVID would be[.]" Saravia Dep. at 202:16–21. She did not "actually do analysis to model the effect of the 2020 COVID on employees instead of simply sticking in a dummy." Saravia Dep. at 199:20–200:12.

[340] Saravia Report ¶ 260 ("Effects of the pandemic persisted in the ASC industry in particular. During the pandemic and for some time after, Americans deferred elective healthcare procedures, including many of the kind of surgeries performed at ASCs. This eventually caused a dramatic rise in demand for elective procedures. Patients who had put off their healthcare needs during the pandemic caused a backlog of demand that extended into 2021 and 2022 and even beyond."); McCrary Report ¶ 221 ("These patterns also align with Prof. Gerhart's deposition testimony, where he indicated the job openings rate swung "wildly" during the COVID-19 pandemic and that the impacts of COVID-19 in labor markets continued into 2022 and beyond."); Stiroh Report ¶ 103 ("However, the COVID-19 pandemic continued to affect labor markets through at least 2022. While labor demand recovered in 2021, labor supply was slower to recover, leading labor markets to be historically tight in 2021 and 2022.").

[341] Saravia Report ¶ 262 ("A more flexible way to control for the effect of the pandemic on wages would be to allow its effect to persist, and perhaps differ, into 2022. To allow for the persistence of effects from the pandemic—but also for the possibility that effects had ended by 2022—I estimated Dr. Starr's model adding a separate COVID pandemic indicator for 2022.").

from the Job Openings and Labor Turnover Survey ("JOLTS").[342] In contrast, Dr. Stiroh

modifies my compensation regression to limit the COVID-19 control to only the year 2020[343]

and adds a control variable for the average annual unfilled job openings in a state-year (across all

industries) from the JOLTS Survey. Dr. Johnson also raises questions about handling the

COVID-19 pandemic but does not provide an assessment of how to address it.[344]

120.    Dr. Saravia also argues that my comparison of Directors and Above to Managers

does not properly account for COVID-19 because "Differencing manager and Senior-Level

Employee pay will not remove any bias caused by the COVID pandemic if the pandemic

affected manager and Senior-Level Employee compensation differently, and it will not correct

for a misspecification of the conduct period."

121.    In this section I respond to these critiques. As evidenced by Dr. Saravia's

admission and the multitude of approaches Defendants' Experts took to address sensitivity to the

COVID pandemic, there is no single, obvious way to address potential biases from COVID.

Indeed, the only way to fully address COVID is to collect more data after COVID ended. I

---

[342] McCrary Report ¶ 202 ("Specifically, I assess how controlling for the healthcare job openings, quits, and layoffs and discharges rates from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey affects Prof. Starr's results.").

[343] Stiroh Report ¶ 104.

[344] Johnson Report ¶ 149 ("Dr. Starr purports to account for this 'dramatic' change by including a dummy variable for 2020 and 2021. However, the sensitivity of his analysis to the use of this benchmark period can be seen from the results of Dr. Starr's own 'robustness checks.'").

anticipated this potential issue and requested data extending into 2023 from Defendants for exactly this reason.[345] Defendants declined to provide more post-COVID data.[346]

122. Nevertheless, as Defendants' Experts' own analyses show, and as my analyses below fully document, the COVID pandemic does not drive my results. Even though I dispute how Defendants' Experts treat COVID, regardless of how I incorporate their suggestions to address COVID, I find evidence of wage suppression both overall and at each Defendant.

123. To address how different approaches to handling COVID influence the wage suppression estimates, I begin by focusing on potential ways to handle the year fixed effects. These analyses are in general more flexible than Defendant's other approaches using JOLTS variables because they purge from the model variation in compensation coming from post-2019. In my benchmark model, I include one fixed effect for 2020 and 2021, because in 2022 vaccines were widely available and there was no new threatening variant. Alternative approaches include having a fixed effect for both 2020 and 2021 (as opposed to one fixed effect for both years), and adding a fixed effect for 2022, which Defendants' Experts advocate. I incorporate these suggestions in **Figure 11**, which shows that regardless of how I use fixed effects for the post-

---

[345] In February 2024, Plaintiffs requested that SCA and DaVita produce structured data for 2022 and 2023, and that USPI produce structured data for the remainder of 2023. *See* 2024-2-7 Ltr SDZ to DaVita RE Structured Data Questions ("Plaintiffs request that DaVita produce structured data matching the data fields produced to date for the calendar years 2022 and 2023."); 2024-2-7 Ltr SDZ to SCA RE Structured Data Questions ("Plaintiffs request that SCA produce structured data matching the data fields produced to date for the calendar years 2022 and 2023."); 2024-2-7 Ltr SDZ to USPI RE Structured Data Questions ("Plaintiffs request that USPI produce structured data matching the data fields produced to date for the calendar year 2023."). *See also* 2024-2-20 E-mail SDZ to DaVita RE Structured Data Questions; 2024-2-20 E-mail SDZ to SCA RE Structured Data Questions; 2024-2-20 E-mail SDZ to USPI RE Structured Data Questions (e-mails from Plaintiffs requesting an update on the data requests).
[346] All three Defendants declined to produce 2023 data. DaVita and SCA declined to produce 2022 data. *See* 2024-3-13 Ltr T. Rothman to S. Zandi RE Response to Plaintiffs' 2-7 Letter; 2024-3-27 Ltr J Barrett to SDZ RE USPI Structured Data 2.7 Ltr; 2024-3-27 Ltr M Lane to SDZ RE DaVita 2022-23 Structured Data. Thereafter, in May 2024 SCA and DaVita agreed only to match USPI and produce 2022 data. *See* 2024-4-3 Ltr SDZ to Ds RE Structured Data ("Plaintiffs propose the following compromise to avoid motion practice. … DaVita and SCA would produce class data for 2022, which is what USPI has already done."); 2024-5-29 Email SDZ to DaVita & SCA RE 2022 Structured Data ("Defendants DaVita and SCA agree to join USPI in producing 2022 structured data[.]").

Conduct years, in each specification the results are nevertheless still negative and statistically significant overall and for each Defendant.[347]

**Figure 11: Alternative Controls for COVID**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| DaVita Conduct | -0.189*** | -0.190*** | -0.141*** | -0.140*** |
| | (0.0151) | (0.0152) | (0.0176) | (0.0177) |
| % Wage Suppression | **-17.2%** | **-17.3%** | **-13.2%** | **-13.1%** |
| | | | | |
| SCA Conduct | -0.127*** | -0.127*** | -0.0677*** | -0.0640*** |
| | (0.0178) | (0.0187) | (0.0203) | (0.0202) |
| % Wage Suppression | **-11.9%** | **-12.0%** | **-6.6%** | **-6.2%** |
| | | | | |
| USPI Conduct | -0.0842*** | -0.0845*** | -0.0411*** | -0.0391*** |
| | (0.0128) | (0.0132) | (0.0142) | (0.0142) |
| % Wage Suppression | **-8.1%** | **-8.1%** | **-4.0%** | **-3.8%** |
| | | | | |
| Covid (2020–2021) | -0.0445*** | | | 0.0512** |
| | (0.0140) | | | (0.0236) |
| Year 2020 Dummy | | -0.0461** | 0.0356 | |
| | | (0.0231) | (0.0263) | |
| Year 2021 Dummy | | -0.0447*** | 0.0552** | |
| | | (0.0146) | (0.0237) | |
| Year 2022 Dummy | | | 0.166*** | 0.154*** |
| | | | (0.0359) | (0.0336) |
| Baseline Model Controls | Yes | Yes | Yes | Yes |
| Individual-Company FE | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Observations | 25,871 | 25,871 | 25,871 | 25,871 |
| R-squared | 0.859 | 0.859 | 0.859 | 0.859 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

---

[347] Dr. Saravia also acknowledges that my analysis comparing Senior Employees to Managers addresses COVID. This is because, in that analysis, I compared how the difference between Senior Employee and Manager compensation in a given company-year changes as a result of the Conduct. Naturally, because this comparison is done within a company-year, it at least partially if not fully accounts for COVID and all other omitted variables that similarly affect manager and Senior Employee pay in any given year for each company. Dr. Saravia pushes back on the idea that this differencing approach fully accounts for COVID because "Differencing manager and Senior Employee pay will not remove any bias caused by the COVID pandemic if the pandemic affected manager and Senior Employee compensation differently[.]" *See* Saravia Report ¶ 278. While Dr. Saravia posits this conditional, the results above suggest that the Director and Above results are not sensitive to COVID. Nevertheless, in **Figure 26** I show that the Senior-Level Employee versus manager differentials are robust to controlling for fixed effects for each year in the post-Conduct period.

124.    As an alternative approach to handling COVID, Dr. McCrary and Dr. Stiroh relax the post-Conduct year fixed effects and instead control for various measures of COVID coming from the Job Openings and Labor Turnover Survey (JOLTS). Dr. Stiroh inexplicably controls for only a fixed effect in 2020 and average state unfilled job openings data across all industries.[348] Dr. McCrary drops the post-Conduct year fixed effects altogether and instead controls for three JOLTS variables at the national level, "job openings, quits, and layoffs and discharges rates in the health care and social assistance industry."[349]

125.    Dr. Stiroh and Dr. McCrary offer no justification for why controlling for national or cross-industry JOLTS measures are preferable to controlling for fixed effects for the initial years of the pandemic. Indeed, using fixed effects is a more complete approach to washing out the variation driven by COVID. Moreover, the coarse JOLTS measures cannot by their nature pick up local, industry-specific effects of the pandemic. In addition, the JOLTS measures used by Defendants' Experts are highly correlated: The health-industry-specific job openings variable, the health-industry specific job quits variable, and the state average job openings variable are all correlated at or above 0.949.[350] Yet this high degree of multicollinearity goes unmentioned by Dr. McCrary. The resulting feature of multicollinearity is that it can make results highly unstable.[351] Accordingly, I fundamentally disagree that Dr. McCrary's model which includes JOLTS is appropriately specified. Similarly, Dr. Stiroh's approach of controlling only for 2020 and then adding a JOLTS job openings variable is highly selective. She offers no justification for

---

[348] Stiroh Report Figure 22.
[349] McCrary Report Ex. 40.
[350] *See* my workpapers for details.
[351] *See* Arturs Kalnins, *Multicollinearity: How common factors cause Type 1 errors in multivariate regression*, 39 STRATEGIC MANAGEMENT JOURNAL 2362–2385 (2018).

why we should only include a year fixed effect for 2020 and not 2021, when clearly the effects of the pandemic continued into 2021, as I described in my initial report.[352]

126.    Despite my disagreement with both Dr. Stiroh's and Dr. McCrary's analysis, I perform two analyses, both of which suggest that the wage suppression results are not driven by the COVID pandemic and the JOLTS control variables used by Dr. Stiroh and Dr. McCrary.

127.    First, note that Defendants' Experts JOLTS variables cover either *all industries* at the state-year level (Stiroh) or cover *national* patterns in the healthcare industry as a whole. These are coarse controls, especially given that I am already controlling for local unemployment rates and GDP. If these JOLTS measures corresponding to the COVID pandemic are going to account for how earnings of Senior-Level Employees at the three Defendants change, then because COVID is a national shock, we should observe that that the earnings of managers in the healthcare industry also changed when these measures changed due to COVID. **Figure 12** plots how average manager earnings in healthcare change over time, relative to 2017, alongside Defendants' Experts JOLTS measures of COVID. The graph shows clearly that while layoffs spike and recover relatively quickly in 2020 and 2021, the quit rate and job opening rates are elevated in 2021 and 2022. However, despite these changes, note that average healthcare manager earnings, as shown in the red-line, do not change in any visible way from 2020 to 2022. Rather, healthcare manager earnings continue along its pre-2020 trend. Dr. Saravia even acknowledges that her study of Senior-Level Employee turnover at USPI is consistent during and

---

[352] Starr Report n.407 ("[P]er a 2022 Johns Hopkins review: 'In 2022, COVID-19 illness was less severe and less deadly compared to 2020 and 2021, and no new variant has emerged with the capacity to fuel a major wave of cases.'").

before COVID.[353] This is a strong sign that COVID is unlikely to explain the observed wage suppression.

**Figure 12: Comparison of COVID Controls to HealthCare Manager Earnings**



128.      To put a finer point on it, in **Figure 13** I convert **Figure 12** above into a regression and show that, after controlling for a year trend, none of Dr. Stiroh's or Dr. McCrary's JOLTS control variables are statistically significant predictors of healthcare manager earnings. This is true in the full sample from 2005 to 2022, as well as from 2014 to 2022, which better isolates the COVID changes because it does not include data from around the Great Recession. These findings further cast doubt on the idea that Dr. McCrary and Dr. Stiroh's JOLTS controls are likely to account for the effect of COVID on Senior-Level Employee compensation.

---

[353] Saravia Report n.138 ("Because the COVID pandemic affected labor market dynamics, I also review the same patterns restricting to years prior to the pandemic. These patterns are consistent with Exhibit 8.").

**Figure 13: Dr. McCrary and Dr. Stroh's Covid Measures are Not Significantly Correlated with Healthcare Manager Earnings**

| | Dependent Variable: Ln(Medical Healthcare Manager Earnings) | | | | | |
|---|---|---|---|---|---|---|
| | [1] All Years No Controls | [2] All Years Stiroh Controls | [3] All Years McCrary Controls | [4] Post 2013 No Controls | [5] Post 2013 Stiroh Controls | [6] Post 2013 McCrary Controls |
| Year | 0.0164*** | 0.0182*** | 0.0176*** | 0.0172*** | 0.0193*** | 0.0186** |
| | (0.00111) | (0.00216) | (0.00203) | (0.00164) | (0.00267) | (0.00597) |
| JOLTS: Healthcare Layoff Rates | | | 0.0136 | | | 0.0100 |
| | | | (0.0140) | | | (0.0143) |
| JOLTS: Healthcare Job Opening Rates | | | 0.0277 | | | -0.00406 |
| | | | (0.0765) | | | (0.0939) |
| JOLTS: Healthcare Job Quit Rates | | | -0.0931 | | | -0.0190 |
| | | | (0.0941) | | | (0.208) |
| State Average Job Openings | | -0.0371 | | | -0.0227 | |
| | | (0.0260) | | | (0.0251) | |
| Observations | 18 | 18 | 18 | 9 | 9 | 9 |
| R-squared | 0.939 | 0.946 | 0.951 | 0.882 | 0.887 | 0.895 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual.

129. These findings are perhaps not surprising, as the measures used by Defendants' Experts are very coarse. Dr. McCrary's variables cover the entire healthcare industry across the whole United States—only a tiny fraction of which is populated by managers and Senior-Level Employees. Dr. Stiroh, in contrast, uses a JOLTS variable that is at the state-level but aggregated across *all industries*, of which healthcare is only a fraction. If these coarse variables are unlikely to affect average compensation for managers in healthcare, it strains credulity that they would explain the effects of the observed wage effects for Senior-Level Employees. More likely, and if anything, it might appear that COVID accounts for some of the wage suppression estimated because they rise in 2020 and after, but given the coarseness of the measures and the relationship with baseline benchmarks documented above, any extent to which the JOLTS controls diminish

the wage suppression effects is likely to be just a spurious relationship—like how ice cream sales and shark attacks move together, even though ice cream sales do not cause shark attacks.[354]

130.    Thus, it is not clear why any of these JOLTS measures would have a causal effect on Senior-Level employee wages. COVID was certainly a disruption to the economy at large and pressured the medical industry specifically, but it is not clear how COVID would lead to higher or lower wages. Although the Defendants' Experts claim that there may be omitted variable bias in my model to justify the inclusion of their JOLTS measures,[355] econometric textbooks explicitly warn against this practice of throwing in "the kitchen sink" to identify omitted variable bias:[356]

> At first glance a strategy of 'throwing in everything but the kitchen sink as regressors' seems to be a good way of avoiding bias. This creates what is sometimes referred to as the 'kitchen sink' dilemma—omitted variables, and the bias they cause, will be avoided, but the irrelevant variables that will inevitably be present will cause high variances. There is no easy way out of this dilemma.

131.    Dr. McCrary and Dr. Stiroh do not follow these best practices. They have introduced a number of highly collinear control variables without clarity on why those specific coarse variables are the appropriate control variables, and why they better than alternative fixed effects approaches. Indeed, whatever arguments Defendants' Experts have for a specific control variable their myriad approaches suggest that at baseline they disagree about which ones should be in the model. Given this "kitchen sink" approach, the lack of a relationship with manager compensation, and the lack clarity on why a specific set of control variables is better than others,

---

[354] *See* Eric Siegel, *Why eating ice cream is linked to shark attacks*, BIG THINK, https://bigthink.com/the-present/correlation-causation/ (last visited June 2025). ("According to the data, ice cream consumption is linked to shark attacks. How the why? Well, maybe eating ice cream makes you taste better? So, you consume the ice cream and the shark consumes you. But the more accepted sharksplanation is that it's seasonal. It just so happens that, when it's warmer, more people are eating ice cream and also more people are swimming in the ocean. That is to say that there's no causal relationship, in either direction—neither of these things causes the other, even indirectly.").
[355] McCrary Report ¶ 202.
[356] PETER KENNEDY, A GUIDE TO ECONOMETRICS 94 (Blackwell Publishing 6th ed. 2008) (emphasis in original).

the myriad approaches Defendants' took to address COVID at best introduce noise into the regression model, and at worst mask the true effect of the Challenged Conduct by introducing spurious correlations in the data.

132. Even though I dispute how Defendants' Experts treat COVID, incorporating all possible variants of their suggestions reveals similar levels of wage suppression at each Defendant. In **Figure 14** below, I perform a complete analysis of all potential approaches to handling year fixed effects as raised by Defendants' Experts, and all potential approaches to Defendants' Experts JOLTS variables. This results in 45 different specifications (5 different ways to handle year fixed effects and 9 different ways to incorporate JOLTS variables), and 180 wage suppression estimates.

**Figure 14: Regression Models Using All Proposed COVID Controls**



*Note*: This figure shows every potential combination of handling COVID based on Defendants' Experts' approaches. These approaches come in two forms: First, they broadly drop or expand the set of year fixed effects, and second they bring in four different measures from the JOLTS survey. Dr. Stiroh uses average job openings across all industries at the state-year level, while Dr. McCrary uses three variables reflecting national trends across the whole healthcare industry, including job openings, quits, and layoffs. Given the high degree of collinearity between these JOLTS measures, I report 9 different regression specifications for every potential combination of JOLTS measures, for each approach to handling the year fixed effects. This results in 45 different estimates. In the figure, the labels on the x-axis delineate how year fixed effects are handled, while within each approach to handling year fixed effects the 9 specifications report every potential way of handling the JOLTS variables. These are, in order, 1. No JOLTS controls; 2. Stiroh control for job openings; 3. McCrary control for healthcare layoffs; 4. McCrary control for healthcare quits; 5. McCrary control for healthcare job openings; 6. McCrary controls for both healthcare layoffs and openings; 7. McCrary controls for both healthcare layoffs and quits; 8. McCrary controls for both healthcare job openings and quits; 9. McCrary controls for all three healthcare measures, layoffs, job openings, and quits.

133.    As **Figure 14** reveals, the wage-suppressing effects of the Challenged Conduct are clearly not driven by how COVID is handled. Across the 180 different Conduct estimates, *all* of the estimated effects of the Conduct are negative. Only 7.2 percent of the Conduct estimates have p-values above 0.1 (13/180). This number is clearly elevated due to the multicollinearity induced by the JOLTS measures: Considering the 100 estimates that include just one or no JOLTS measures, only 3 percent have a p-value above 0.1. Moreover, they are all for USPI and

they are in models that either control for all of the variation between 2020 and 2022, or include fixed effects for only 2020 (and not 2021 or not 2022). Given these results, as well as the fact that benchmark manager compensation does not respond to COVID, I see no reason to diverge from my initial approach to handling COVID as a baseline.

### 3. Time Trend

134.    Dr. McCrary argues that I have improperly included a time trend, because there are other covariates in the model to address trends and because the time trend is forced to have the same effect before and after the Class Period.[357] Dr. Johnson also argues that the time trend is included inappropriately in my model.[358] He then drops the time trend from the analysis and finds that the results change somewhat.[359] Below I describe why dropping the time trend is inappropriate, show that the results are robust to dropping it, and show that the results are also robust to allowing for the time trend to change during the Conduct Period, as Dr. McCrary suggests.

135.    **Figure 15** documents that the Conduct resulted in statistically significant wage suppression at each Defendant, regardless of how time trends are handled.

a.    Dr. McCrary and Dr. Johnson choosing to drop the time trend is inconsistent with standard econometrics approaches, as well as the academic literature on no-

---

[357] McCrary Report ¶ 238 ("His inclusion of the linear time trend is unsupported because, although he claims he includes it to account 'for the natural growth in annual compensation that would have happened over time even absent the Conduct' for individual workers, he already includes three other variables in his pay regression model that serve that purpose: wages for a benchmark group of health and medical manager, gross domestic product (GDP) per capita, and the consumer price index (CPI) in each year.").

[358] Johnson Report ¶ 146 ("Specifically, Dr. Starr includes a linear time trend to purportedly account 'for the natural growth in annual compensation that would have happened over time even absent the Conduct.' Dr. Starr does not address what 'natural growth' in compensation this linear time trend accounts for that are not accounted for by his other controls. Dr. Starr offers no additional explanation for including his linear time-trend beyond the 'natural growth in annual compensation,' despite already including CPI as a control, which he purports accounts for increases over time (i.e., employees may receive 'cost of living adjustments to account for the increased inflation.')").

[359] Johnson Report Ex. 24.

poach agreements. As I referenced in my initial report, Dr. Wooldridge notes on page 363 in his econometrics textbook that "Many economic time series have a common tendency of growing over time. We must recognize that some series contain a time trend in order to draw causal inference using time series data."[360] Because compensation is likely to grow over time for a variety of reasons, including those not controlled for in the baseline regression, including a time trend in general is an appropriate methodological choice. Where possible, such as in the director versus managers approach, when I drop the year trend and include year fixed effects, I find nearly identical results.[361]

        b.      In addition, the academic literature on no-poach agreements estimates models either using year-fixed effects, as I am able to do in the manager vs. director model, or using time trends.[362] None of the studies in the academic literature drop time trends altogether like Dr. Johnson and Dr. McCrary.

        c.      Dr. McCrary raises another concern that the time trend is required to have the same relationship to compensation both during and absent the Conduct.[363] To address this criticism, I re-run my main analysis, but instead allow the trend to differ based on the Conduct Period. The results in **Figure 15**, remain nearly identical. If anything, my current approach is conservative relative to an interacted trend approach.

---

[360] *See, e.g.,* JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH 363 (South-Western 5th ed. 2013) [hereafter Wooldridge (2013)].

[361] *See* Figure 44.

[362] *See* LaFontaine et al. (2025) at 21 ("This is similar to the approach used, for example, in (Clark, Horstmann, and Houde, 2024), who evaluate the effects of cartel formation and breakdown on prices by including a cartel membership dummy variable interacted with a time trend. Using time period fixed effects interacted with the treatment variable, as we do, is somewhat more general."). *See also* Gibson (2024) at 13 ("The parameters $\beta_{jt}$ control for arbitrary job-year time trends, $\gamma_{lt}$ for arbitrary location-year time trends.").

[363] McCrary Report ¶ 238 ("It is also econometrically incorrect because the linear time trend is forced to have the same effect throughout the Class Period and periods outside the Class Period, even though his 'before-and-after' pay regression model design relies on variation over time to isolate the effect of the alleged conduct. In other words, although a foundational assumption of his pay regression model is that he can utilize differences over time to isolate the impact the alleged conduct had on pay, he is himself constraining factors in his model related to time to remain the same across the non-Class Period and Class Period years.").

**Figure 15: Alternative Trend Controls**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1]<br>No Trend | [2]<br>Common Trend | [3]<br>Interacted Trend |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0734*** | -0.134*** | -0.149*** |
| | (0.0120) | (0.0116) | (0.0147) |
| % Wage Suppression | -7.1% | -12.6% | -13.8% |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.137*** | -0.189*** | -0.208*** |
| | (0.0155) | (0.0151) | (0.0174) |
| % Wage Suppression | -12.8% | -17.2% | -18.8% |
| | | | |
| SCA Conduct | -0.0494*** | -0.127*** | -0.156*** |
| | (0.0181) | (0.0178) | (0.0222) |
| % Wage Suppression | -4.8% | -11.9% | -14.5% |
| | | | |
| USPI Conduct | -0.0219* | -0.0842*** | -0.101*** |
| | (0.0131) | (0.0128) | (0.0159) |
| % Wage Suppression | -2.2% | -8.1% | -9.6% |
| | | | |
| Individual-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Observations | 25,871 | 25,871 | 25,871 |

*Note*: \*\*\* p<0.01, \*\* p<0.05, \* p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 4. Standard Errors

136. Dr. McCrary also argues that I have improperly clustered the standard errors, though none of the other three Defendants' Experts raise this issue.[364] In my report I described why I originally clustered the standard errors by individual.[365] Dr. McCray proposes to cluster standard errors by each individual employee, as well as the Defendant by year level. Dr. McCrary's argument, even if it were correct, would make no practical difference if implemented at face value. The clustering of the standard errors does not affect what the estimate of the

---

[364] McCrary Report ¶ 238 ("I correct Prof. Starr's standard errors by properly clustering at both the individual level, as well as at the Defendant and year level.").

[365] Starr Report ¶ 124(a) ("Because individual earnings are likely to be serially correlated, I cluster the standard errors at the individual level.").

coefficient is, only whether that coefficient might be statistically significant. Thus, the key result of any such modifications to how the standard errors are clustered is what they do to the p-value of any estimates, not to the estimates themselves. As I will explain below, Dr. McCrary's clustering approach is inconsistent with the econometric literature on standard error estimation. However, even if I incorporate Dr. McCrary's approach, I still estimate statistically significant wage suppression at each Defendant.

137.    Before I proceed, I note that standard error estimation is a relatively complicated topic. Thus, to set the stage I provide a brief, conceptual description of what standard errors are, how they relate to the estimation of p-values, and why clustering the standard errors is important in this case.

a.    Standard errors reflect the variability of an estimate based on repeatedly sampling from the population. Imagine we could repeatedly draw 10,000 independent random samples of the same size from our population of interest, and then run the same regression 10,000 times (once on each sample) and capture 10,000 estimates for our coefficient of interest. The resulting distribution of 10,000 regression coefficient estimates is known as a "sampling distribution" because it shows how the distribution of a sample statistic (a regression coefficient estimate) varies across repeated samples.[366] The *standard error* of the regression coefficient estimate is *the standard deviation* (e.g., a measure of variability) of the sampling distribution (which reflects the 10,000 regression estimates).[367] If the regression estimate changes

---

[366] Technically, the sampling distribution would show the distribution of a sample statistic across *all possible samples* of the same size within the population. I use 10,000 samples in this example for expositional purposes. *See* generally Wooldridge (2013) at 93–94 (Describing the calculation of the variance of a regression coefficient based on the sampling distribution) and at 760–767 (Describing the sampling variance of estimators and asymptotic properties of estimators).

[367] Note that the standard deviation of a sample of $N$ values of a variable $x$ (with each value denoted $x_i$, where $i$ goes from 1 to N), is given by $Standard\ Deviation(x) = \sqrt{\sum_{i=1}^{N} \frac{(x_i - \bar{x})^2}{N-1}}$, where $\bar{x}$ is the average value of $x_i$.

considerably from sample to sample, then the standard error will be large. Conversely, if the regression estimate changes little from sample to sample, then the standard error will be small. I illustrate this idea graphically in **Figure 16** below, which shows the sampling distribution of 10,000 independent regression estimates from 10,000 repeated samples from a given population.[368] I repeat this for both a high standard error (spread out sampling distribution) and a low standard error (narrow sampling distribution).

**Figure 16: Sampling Distribution of Coefficient Estimates Compared to the True Coefficient Value**



b.      With this conceptual understanding of a sampling distribution and the associated standard error, we can now think about p-values. P-values are calculated by comparing the coefficient estimate we observe in a single sample to the sampling distribution we

---

[368] Note, I assume that the regression model is well-specified such that the sampling distribution of the regression coefficient estimate is centered on the population value. This means that the regression coefficient estimate is unbiased in expectation.

would get in repeated samples *if the true coefficient was zero.* The p-value is the percentage of observations from a "zero effect" sampling distribution that are (by random chance) greater than our sample estimate.[369] The p-value is shown graphically in **Figure 17**, where it is the proportion of observations above our sample estimate (the shaded portion underneath the probability density, above the sample estimate of 0.5). If the p-value is 5 percent, this means that in 5 percent of the 10,000 independent random samples we would find a regression coefficient estimate greater than our sample estimate when the true effect is zero.[370]

**Figure 17: Sampling Distribution of Coefficient Estimates When The True Effect is Zero Compared to the Sample Coefficient**



---

[369] This is for a "one-tailed" p-value. For a "two-tailed" p-value, it is the percentage of observations in the sampling distribution that are greater *in absolute value* than the estimate in our sample. *See* Wooldridge (2013) at 128.
[370] Wooldridge (2013) at 785 describes p-values as follows: "The *p*-value in this example has another useful interpretation: it is the probability that we observe a value of $T$ as large as 1.52 when the null hypothesis is true. If the null hypothesis is true, we would observe a value of $T$ as large as 1.52 due to chance only 6.5% of the time. Whether this is small enough to reject $H_0$ depends on our tolerance for a Type I error."

c.  Holding the estimate from the sample fixed, **Figure 17** makes clear that if the variation in the sampling distribution consistent with no effect is narrow (i.e., the standard error is small), then there will be fewer observations in the sampling distribution that are above our sample estimate, leading to a low p-value (the shaded area under the dark probability density). If in contrast the sampling distribution consistent with no effect is wide (high standard error), then the p-value will be higher (the red shaded portion). Thus, holding all else equal, larger standard errors lead to larger p-values.

d.  In reality, we usually cannot sample data from the population more than once, let alone 10,000 times. That means we cannot know what the true standard error or p-value of a coefficient is. To generate *an estimate of the standard error* of a regression coefficient based on our single sample, a researcher must make several assumptions about how the error terms, which reflect *all unobserved* factors (things not in the regression) that affect the dependent variable (employee compensation in this case), are related to each other across observations in the dataset.[371] The validity of the standard error estimate hinges on the extent to which these assumptions are true.[372] I describe three sets of assumptions.

i.  **I.I.D. Standard Errors:** The researcher assumes that (i) the sampling distribution of the estimate is approximately normally distributed,[373] (ii) the error terms

---

[371] *See* Wooldridge (2013) at 99–101 (Describing estimation of standard errors and how those estimates are biased if our assumption of homoskedasticity is wrong).

[372] I will note that there is a debate about the value of even estimating standard errors and the usefulness of p-values when you have the full population of data. *See, e.g.,* Hoover and Siegler (2008), at 4 ("In general, she leaves the strong impression that tests of statistical significance have next to no place in economics for a variety of reasons. Tests are appropriate only when the data are a proper sample and not when they constitute the whole population.").

[373] This is known as the "Central Limit Theorem." Wooldridge (2013) at 790 ("The central limit theorem implies that, in large samples, the sampling distribution of most estimators is approximately normal"). Technically, when performing actual tests the distribution is known as a "T-distribution," which has slightly fatter tails than the normal distribution. Wooldridge (2013) at 122.

are independent across observations (meaning the error in one observation is not related to the error in another observation), and (iii) the error terms have constant variance (homoskedasticity).

ii. **Robust Standard Errors**: The researcher relaxes assumption (iii), allowing the error variance to differ across observations. Wooldridge (2013) describes this as a situation in which "the variance of the unobserved factors changes across different segments of the population[.]"[374] However, it is still assumed that observations error terms are independent from one another.

iii. **Clustered Standard Errors**: The researcher relaxes both assumption (ii) and (iii).[375] Clustering allows for correlation of errors within some defined "cluster" (e.g., an employee's error terms are correlated over time), but assumes independence between clusters (e.g., errors between employees are independent). I clustered the standard errors by employee in my initial report. There is a long literature on how to estimate standard errors and "cluster robust" inference.[376]

138.    To illustrate why clustering standard errors can be important, and why I cluster standard errors by individual, consider the XKCD comic below:

---

[374] Wooldridge (2013) at 268.

[375] Wooldridge (2013) at 483 ("The general approach to obtaining fully robust standard errors and test statistics in the context of panel data is known as clustering, and ideas have been borrowed from the cluster sampling literature. The idea is that each cross-sectional unit is defined as a cluster of observations over time, and arbitrary correlation— serial correlation—and changing variances are allowed within each cluster.").

[376] *See, e.g.,* A. Colin Cameron & Douglas L. Miller, *A Practitioner's Guide to Cluster-Robust Inference*, 50(2) JOURNAL OF HUMAN RESOURCES 317–372 (2015).

**Figure 18: XKCD Comic on Clustered Standard Errors**



*Source: Slope Hypothesis Testing, XKCD, https://xkcd.com/2533/ (last visited June 2025).*

With only three observations from three students, the comic shows that there is a positive but statistically insignificant (p-value=0.58) relationship between scream loudness and exam grade. To try to increase the statistical significance of the estimate, the researchers get each student to scream two more times, such that we now have three observations for each student, even though the newly added observations replicate the first observation for each student. Re-running the analysis on the nine observation dataset (three nearly identical observations for each student), the p-value falls to 3.7 percent, and the researcher asks "Are you sure we're doing slope hypothesis testing right?" The problem evinced by the comic is that the observations (and their associated error terms) are not independent within students. As a result, unless we account for the within-student correlation by clustering the standard errors by student, we will estimate the wrong standard error and thus the wrong p-value.

139.     Dr. McCrary's argument is that standard errors should be clustered by both employee *and* Defendant-by-year. This is taking clustering too far. One well-known study in this literature by Bertrand, Duflo, and Mullainathan (2004) specifically examines and rejects Dr.

McCrary's suggestion to cluster the standard errors by Defendant-year combination.[377] The Bertrand et al. (2004) study examines data at the state-year level (as opposed to the individual-company-year level as in this case) and seeks to study when "fake laws" are identified as having a statistically significant effect (even though they are fake and should have no effect), based on how the standard errors are clustered. The basic idea of their study follows these two steps.

   a.  First, they ignore any actual laws that are passed by states and instead assume that random states passed laws at random times ("fake laws"). Due to this randomness, when Bertrand et al. (2004) run a regression estimating the effect of the fake state law, the estimate should be close zero. The authors then re-randomize the laws and re-run their same regression a large number of times, effectively deriving a sampling distribution consistent with no effect.[378] Given that the laws have no effect, the authors argue that "If OLS were to provide consistent standard errors, we would expect to reject the null hypothesis of no effect roughly 5 percent of the time."[379] Put differently, across all the iterations where state laws are randomized and the regressions are re-run, the coefficient estimates should have a p-value of 5 percent or less approximately 5 percent of the time.[380]

   b.  Second, Bertrand et al. (2004) cluster the standard errors at different levels to understand which level of standard error clustering hits the correct 5 percent mark. When Bertrand et al. (2004) cluster their standard errors at the state-year level, they find that the results appear statistically significant 44 percent of the time, which is clearly much higher than the 5

---

[377] *See* Marianne Bertrand, Esther Duflo, & Mullainathan Sendhil, *How much should we trust differences-in-differences estimates?*,119 QUARTERLY JOURNAL OF ECONOMICS 249–275, 250 (2004) ("We assume away biases in estimating the intervention's effect and instead focus on issues relating to the standard error of the estimate.").

[378] Bertrand et al. (2004) at 256 ("[W]e can repeat this exercise a large number of times, each time drawing new laws at random.").

[379] Bertrand et al. at 256.

[380] Bertrand et al. (2004) at 251 ("Since these laws are fictitious, a significant "effect" at the 5 percent level should be found roughly 5% of the time.").

percent of time they should have found if the standard errors were properly clustered. Bertrand et al. (2004) highlight that clustering at the state-year level in this case results in the wrong standard error estimation because clustering at the state-year assumes the error terms are independent across state-years, when in fact they are not.[381] This is the same problem as in the XKCD comic, where the observations and error terms were not independent within an individual. The standard guidance since this study, including in the Abadie et al. (2023) paper Dr. McCrary references, is to *not* cluster at the state-year when studying state policies.[382]

140.    While the Bertrand et al. (2004) study is looking at state policies, their guidance applies to this case, where we are looking at firm conduct. Rather than having data at the state-year level, the data in this case is at the individual-company-year level. Thus, taking the guidance of Bertrand et al. (2004) to this data means that we should avoid doing exactly what Dr. McCrary did, cluster the standard errors at the company-by-year level. Notably, and perhaps not surprisingly in light of this discussion, none of the other three of Defendants' Experts raised Dr. McCrary's point about clustering standard errors.

141.    Even if Dr. McCrary's approach were valid, which it is not, it has no meaningful effect on the results. As shown in **Figure 19**, using his approach to clustering standard errors still reveals wage suppression at each Defendant, all with p-values below 7.9 percent.

---

[381] *Id*. at 258 ("In row 2 we allow for an arbitrary correlation of the error terms at the state-year level. We still find a very high (44 percent) rejection rate.").

[382] Alberto Abadie, Susan Athey, Guido W. Imbens, & Jeffrey M. Wooldridge, *When should you adjust standard errors for clustering?*, 138 QUARTERLY JOURNAL OF ECONOMICS 1–35 (2023). In particular, Abadie et al. (2023) do not even consider clustering at the state-year level when studying the effect of living in a state with a high degree of collegiate experience. *Id.* at 8 ("We report the ordinary least squares (OLS) estimate, as well as robust and cluster standard errors. Since the late 1980s, it has been common practice to report cluster standard errors in settings where the regressors are constant in a cluster. Clustering at the *state level* makes a substantial difference relative to using robust standard errors, with the cluster standard errors approximately 26 times larger than the robust standard errors."). The guidance in Abadie et al. (2023) may be interpreted to suggest clustering by company, but doing so implies only three clusters, in which case, per Cameron and Miller (2015) at 2, "test statistics based on the cluster-robust standard errors over-reject and confidence intervals are too narrow."

**Figure 19: Alternative Clustered Standard Errors**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] Cluster by ID | [2] Cluster by ID | [3] Twoway Cluster by ID & Company-Year | [4] Twoway Cluster by ID & Company-Year |
| Conduct | -0.134*** | | -0.134*** | |
| | (0) | | (0.00195) | |
| **% Wage Suppression** | **-12.6%** | | **-12.6%** | |
| DaVita Conduct | | -0.189*** | | -0.189*** |
| | | (0) | | (0.000435) |
| **% Wage Suppression** | | **-17.2%** | | **-17.2%** |
| SCA Conduct | | -0.127*** | | -0.127*** |
| | | (0) | | (0.00538) |
| **% Wage Suppression** | | **-11.9%** | | **-11.9%** |
| USPI Conduct | | -0.0842*** | | -0.0842* |
| | | (6.20e-11) | | (0.0786) |
| **% Wage Suppression** | | **-8.1%** | | **-8.1%** |
| Year | 0.0549*** | 0.0532*** | 0.0549*** | 0.0532*** |
| | (0) | (0) | (2.53e-07) | (5.05e-09) |
| Ln(Avg. State Mgr. Earnings) | 0.0704*** | 0.0777*** | 0.0704 | 0.0777 |
| | (0.00193) | (0.000569) | (0.135) | (0.107) |
| Ln(State Health Expend. PC) | 0.127 | 0.279** | 0.127 | 0.279 |
| | (0.279) | (0.0175) | (0.625) | (0.193) |
| Covid | -0.0401*** | -0.0445*** | -0.0401 | -0.0445 |
| | (0.00289) | (0.00145) | (0.367) | (0.204) |
| Ln(State GDP PC) | -0.322** | -0.457*** | -0.322 | -0.457 |
| | (0.0125) | (0.000594) | (0.308) | (0.188) |
| Ln(State Unemployment Rate) | -0.0317* | -0.0329* | -0.0317 | -0.0329 |
| | (0.0570) | (0.0507) | (0.421) | (0.354) |
| Census Region Annual CPI | -0.0690 | -0.117* | -0.0690 | -0.117 |
| | (0.263) | (0.0642) | (0.713) | (0.490) |
| Ln(Total Hours) | 0.694*** | 0.693*** | 0.694*** | 0.693*** |
| | (0) | (0) | (3.13e-08) | (3.31e-08) |
| USPI Low Hours Control | 0.801*** | 0.830*** | 0.801*** | 0.830*** |
| | (0) | (0) | (0.00837) | (0.00651) |
| Individual-Company FE | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Observations | 25,871 | 25,871 | 25,871 | 25,871 |
| R-squared | 0.858 | 0.859 | 0.858 | 0.859 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. P-values in parentheses. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Columns [1] and [2] are clustered by individual, and Columns [3] and [4] are two-way clustered by individual and company-year.

**5.**     **Comparability of Benchmark Periods and Class Periods**

142.     Dr. Johnson finds evidence that the control variables included in my model "do not have the same relationships with compensation in the benchmark and alleged misconduct periods."[383] Based on this analysis, he concludes that my wage suppression model is not reliable.[384]

143.     As I discuss in depth in Section VII.C.7, the results of the Chow test Dr. Johnson performs to reach his conclusion is incapable of indicating the reliability of the model or diagnosing any bias in the estimate of wage suppression. Indeed, just because a given control variable's coefficient differs between certain time periods does not mean that the aggregate estimate of the Conduct is inaccurate. As I discussed in my initial report, we should not give too much credence to the interpretation of coefficients on control variables.

144.     More importantly, if Dr. Johnson had continued in his analysis to understand how the Challenged Conduct might change when the controls are allowed to vary with the Conduct, he would have found that his conclusions are unwarranted, and that if anything, my baseline estimates are conservative relative to the analysis proposed by his results. I perform the same analysis that Dr. Johnson proposes (but does not perform himself), allowing the effect of each of his control variables in his Exhibit 25 to differ during versus absent the Challenged Conduct. I then calculate the marginal effect of the Challenged Conduct, both overall and by Defendant, as shown in **Figure 20**. The results are similar to the baseline model estimates of harm both overall and by each Defendant.

---

[383] Johnson Report Ex. 25 and ¶ 151.
[384] Johnson Report ¶ 151 ("These results provide further evidence that Dr. Starr's 'wage suppression' model has not reliably captured the relevant non-conspiratorial economic factors that affected total compensation for relevant employees.").

**Figure 20: Interacted Conduct and Control Regressions**

| | Dependent Variable: Ln(Total Annual Compensation) | |
| --- | --- | --- |
| | [1] Common Controls | [2] Interacted Controls |
| *Panel A. Common Conduct Effect* | | |
| Conduct | -0.134*** | -0.133*** |
| | (0.0116) | (0.0153) |
| % Wage Suppression | **-12.6%** | **-12.4%** |
| *Panel B. Defendant-Specific Conduct* | | |
| DaVita Conduct | -0.189*** | -0.195*** |
| | (0.0151) | (0.0194) |
| % Wage Suppression | **-17.2%** | **-17.8%** |
| | | |
| SCA Conduct | -0.127*** | -0.136*** |
| | (0.0178) | (0.0229) |
| % Wage Suppression | **-11.9%** | **-12.7%** |
| | | |
| USPI Conduct | -0.0842*** | -0.0874*** |
| | (0.0128) | (0.0164) |
| % Wage Suppression | **-8.1%** | **-8.4%** |
| | | |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 25,871 | 25,871 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 6.     Start and End Dates

145.    Defendants' Experts make two arguments related to the start and end dates of the Challenged Conduct. First, although they do not have an opinion on the appropriate dates of the Challenged Conduct,[385] they raise questions about the appropriate start and end dates. Second, Defendants' Experts make various adjustments to the baseline empirical model to argue that the

---

[385] *See* n.42, *supra.*

results are sensitive to different start and end dates of the Challenged Conduct.[386] I take these two sets of arguments in turn.

146.    The Challenged Conduct is comprised of two sets of bilateral agreements, one between DaVita and SCA, and one between SCA and USPI. Within each of these agreements the Challenged Conduct includes two reinforcing methods to suppress Class pay: No-Poach Agreements and CSI Exchanges. Thus, to think about the appropriate start and end dates of the Challenged Conduct for each bilateral agreement, we must consider the start and end dates of each subcomponent of that agreement.

### a.    Appropriate DaVita-SCA Start and End Dates of the Challenged Conduct

147.    In my initial report, Counsel asked me to consider a start date for the DaVita-SCA Challenged Conduct of May 1, 2008 and an end date of December 31, 2019.[387] My initial report reviewed qualitative and quantitative evidence that was consistent with these start and end dates.[388] Claims made by Defendants' Experts about alternative start and end dates are

---

[386] Johnson Report ¶ 56 ("Both experts also ignore evidence contradicting Plaintiffs' assertions regarding the start dates of the agreements. … In addition, both experts ignore other evidence contradicting Plaintiffs' assertions about the end dates of the agreements."); Saravia Report ¶ 251 ("By contrast, for the end of his assessed conduct period, he chooses a date (2019) that does not align with either the allegations (2021), the admission (2017), or the DOJ's indictment (again, 2017). It also conflicts with documentary evidence, cited by Dr. Starr himself, that USPI abandoned the mobility restrictions with SCA in October 2017."); Stiroh Report ¶ 86 ("In this section, I show that Dr. Starr's conduct effect is highly sensitive to changes in the start and end dates he uses for the alleged conduct period, such that if the finder of fact were to determine a different conduct period than that evaluated by Dr. Starr, his model would offer no support for a finding of impact, injury or market power for DaVita's Senior-Level employees."); McCrary Report ¶ 242 ("Importantly, Prof. Starr's pay regression model also shows no effect on proposed class members' pay if I make slight modifications to the class period's start and end dates.")

[387] Starr Report ¶ 9 ("I understand that Plaintiffs seek to certify a class of employees who worked in positions at the director-level and above (hereafter 'Senior-Level Employees') for one or more of the following: (a) from May 1, 2008, through December 31, 2019, Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, through December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries (hereafter the 'Class' or 'Class Members').").

[388] Starr Report ¶ 118(b)(i) ("Conduct Period for DaVita and SCA Challenged Conduct.").

3244633.4                                    136

unpersuasive, and I stand by initial conclusion that the evidence supports the start and end dates Counsel asked me to consider in my initial report.

148.    *Start and End Dates of the DaVita-SCA No-Poach Agreements.* In Section VI.B.1.c above, I reviewed Defendants' Experts claims that the start date of the DaVita-SCA No-Poach Agreement began in 2012, and that the end date was 2017. I also reviewed the discrepancies in the date ranges provided in the DOJ indictment, the Complaint, and my initial report. Finally, I reviewed the quantitative evidence in Section VI.B.2 in light of Defendants' Experts Criticisms.

149.    As I described in Section VI.B.1.c, the record evidence firmly rejects the claim that the DaVita-SCA No-Poach Agreement start date was later than mid-2008. And, among all possible end dates of the DaVita-SCA No-Poach Agreement, as described in Section VI.B.1.c and Section VI.B.2, choosing any end date besides 2019 is inconsistent with the weight of the qualitative and quantitative evidence.

150.    *Start and End Dates of the DaVita-SCA CSI Exchanges.* In Section VI.C , I reviewed the CSI Exchanges between DaVita and SCA. The direct documentary evidence suggests that the CSI Exchanges begin in 2009 and would have lasted until at least 2015 or 2016. However, due to the informal and secretive nature of these conversations between high-level executives who used to work together (e.g., Hayek and Rodriguez and Hayek and Thiry), the fact that there is no evidence that anybody stopped the CSI Exchanges suggest that they likely continued in some form until Hayek stepped down in 2019. Indeed, Wachsmann's testimony that SCA stopped sharing information with competitors in or around 2019 also suggests an end date of 2019.

151.    *Start and End Dates of the DaVita-SCA Challenged Conduct.* Taken together, the evidence is most consistent with start and end dates of the DaVita-SCA Challenged Conduct which align with my assignment: mid 2008 through the end of 2019.

### b.    Appropriate USPI-SCA Start and End Dates of the Challenged Conduct

152.    In my initial report, Counsel asked me to consider a start date for the USPI-SCA Challenged Conduct of May 1, 2010 and an end date of December 31, 2019.[389] My initial report reviewed qualitative and quantitative evidence that was consistent with these start and end dates.[390] Defendants' Experts do not dispute the start date of the USPI-SCA Challenged Conduct. While Defendants' Experts do not offer any opinions on the end date of the USPI-SCA Challenged Conduct, they suggest an alternative end-date of 2017. Based on my review of the qualitative and quantitative record, I find Defendants' Experts alternative end date of 2017 is unsupported, and that 2019 is the only date consistent with the qualitative and quantitative evidence.

153.    *Start and End Dates of the USPI-SCA No-Poach Agreements.* In Section VI.B.1.c above, I reviewed Defendants' Experts claims that the end date of the USPI-SCA No-Poach Agreement end date was 2017. I also reviewed the date ranges provided in the DOJ indictment, the Complaint, and my initial report. Finally, I reviewed the quantitative evidence in Section VI.B.2 in light of Defendants' Experts' criticisms.

---

[389] Starr Report ¶ 9 ("I understand that Plaintiffs seek to certify a class of employees who worked in positions at the director-level and above (hereafter 'Senior-Level Employees') for one or more of the following: (a) from May 1, 2008, through December 31, 2019, Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, through December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries (hereafter the 'Class' or 'Class Members').").

[390] Starr Report ¶ 118(b)(ii) ("Conduct Period for DaVita and SCA Challenged Conduct.").

154. Among all possible end dates of the USPI-SCA No-Poach Agreement, as described in Section VI.B.1.c and Section VI.B.2, choosing any end date besides 2019 is inconsistent with the weight of the qualitative and quantitative evidence.

155. *Start and End Dates of the USPI-SCA CSI Exchanges.* In Section VI.B.2.c, I review the CSI Exchanges between USPI and SCA. The evidence suggests that the CSI Exchanges between USPI and SCA began in 2009, and continued until 2019. Given that the information shared in 2009 related to next year's raises, the effective start date would be 2010.

156. *Start and End Dates of the USPI-SCA Challenged Conduct.* Taken together, the start and end dates of the SCA-USPI Challenged Conduct are most reasonably mid-2010 to the end of 2019. The only disagreement is whether or not the USPI-SCA Challenge Conduct should have started in 2009, because that is when the CSI Exchange started. I address that possibility in the empirical analyses below.

c. **Sensitivity of the Results to the Start and End Dates of the Challenged Conduct**

157. Defendants' Experts argue that the results are sensitive to the start and end dates of the Challenged Conduct. In this section, I describe the various approaches Defendants' Experts took to address the potential sensitivity of the results to the start and end dates of the Challenged Conduct. I then respond to each of those criticisms.

158. Defendants' Experts report a variety of analyses to suggest that the results are sensitive to the start and end dates. Dr. Johnson and Dr. McCrary run my wage suppression model varying the dates of the Challenged Conduct according to dates drawn from the SCA and DaVita Indictments, the Second Amended Complaint, and the Third Amended Complaint.[391] Dr.

---

[391] Johnson Report Ex. 33. McCrary Report Ex. 42.

Stiroh limits the data to DaVita only and estimates a model for every start date and end date.[392] Despite evidence that USPI was sharing CSI with SCA in 2018,[393] Dr. Saravia focuses on USPI and modifies my regression model to include an additional dummy variable that takes the value of one for 2018 and 2019 and zero elsewhere.[394] In each case, Defendants' Experts point out that the estimated Conduct effect varies when different start and end dates are adjusted.

159. To begin, it is important to emphasize that the results *should* be sensitive to the start and end dates of the Challenged Conduct. To the extent that dates are included in the Conduct variable when the Challenged Conduct was in fact not present, the results should change. Or, conversely, to the extent that dates that are excluded from the Conduct variable when the Challenged Conduct was in fact present, then again changes in the start and end date should change the results. Thus, the fact that the results change when Defendants' Experts alter the Conduct date is not informative about the effects of the Challenged Conduct or the integrity of the model. Indeed, something would likely be *wrong* with the model if the results did not change when the Conduct dates are changed. Rather, the key question is what are the appropriate start and end dates of the Challenged Conduct? To that, Defendants' Experts express no opinions. Therefore, these variations on the model only serve to demonstrate that the model is working as intended—as you change the inputs, the outputs change. My review of the qualitative and quantitative evidence suggests that the input dates I selected are best supported by the available

---

[392] Stiroh Report Figures 17–19. Dr. Stiroh Dr. Stiroh suggests that I don't properly consider the time lags associated with merit increases for DaVita. Stiroh Report ¶ 91 ("First, DaVita reviews salaries once a year during its annual merit process, with changes to compensation being implemented between April and May of each year. Thus, merit increases would not have been affected by the alleged conduct—assuming it began in May 2008—until April or May 2009, if at all.").

[393] *See* Ex. PX501 at SCA002277742 (E-mail from Brian Mathis in May 2018 indicating that SCA benchmarked with USPI for every "~2 years for the last decade.").

[394] Saravia Report Ex. 31.

evidence. No other set of start or end dates are more consistent with the evidence than the start and end dates of the Challenged Conduct Counsel asked me to consider in my initial report.

160.     Nevertheless, below I offer several specific robustness checks to show how robust the results are to different potential start and end dates. I focus my attention on the places where there is documentary evidence in the record that could possibly suggest different start and end dates. Because the DOJ Indictments and the initial Complaints were clearly based on an incomplete understanding of the documentary evidence at the time they were written, I do not replicate analyses with those dates.

161.     As I explained in my initial report,[395] and as I further detail in my response on pooling the data below, in general I reject limiting the sample to one firm to estimate damages, as in Dr. Johnson's, Dr. Stiroh's, and Dr. Saravia's Reports. There are many reasons for this, which I elaborate on in Section VII.C.7. The core issues are that a) subsampling by Defendant is equivalent to including many bad controls in the model, introducing bias relative to a pooled regression, and b) because the Challenged Conduct involved coordinating the mobility and sharing of pay information between DaVita and SCA and SCA and USPI, then we should allow the data from all the companies to inform the damages estimate, and not force them to be fully independent of each other.

162.     The first point of contention across Defendants' Experts is that both the SCA and DaVita and SCA and USPI Challenged Conduct ended in 2017. Defendants' Experts address this concern by manually changing the Conduct Period, which necessarily should change the estimate if indeed 2018 and 2019 do in fact belong in the Conduct Period. To test this idea, I repeat my main wage specification, with the Conduct defined in my preferred way (from 2008–2019 for

---

[395] Starr Report ¶ 123(g) ("Thus, if our goal is to estimate the aggregate of the effect of the Conduct, then we should not limit the data to a single company[.]").

DaVita and SCA, and from 2010 to 2019 for USPI), but I add a control variable for each year 2018 and 2019, as Dr. Saravia does in her USPI analysis.[396] These control variables ensure that the years 2018 and 2019 do not contribute to the Conduct estimate, but also ensure they do not count as a "clean period" either – essentially categorizing both years as a gray period where the presence of the Conduct is unknown. The focus then is on the estimate on the Conduct variable. The result, shown in **Figure 21**, shows that the Conduct suppression estimate is largely unchanged, at 11.1 percent overall, and 15.7 percent at DaVita, 9.5 percent at SCA, and 7.0 percent at USPI.

---

[396] Saravia Report Ex. 31.

**Figure 21: 2018 and 2019 "Grey Period" Controls**

| | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | [1] | [2] |
| Conduct | -0.118*** | |
| | (0.0118) | |
| % Wage Suppression | **-11.1%** | |
| DaVita Conduct | | -0.170*** |
| | | (0.0156) |
| % Wage Suppression | | **-15.7%** |
| SCA Conduct | | -0.0996*** |
| | | (0.0181) |
| % Wage Suppression | | **-9.5%** |
| USPI Conduct | | -0.0730*** |
| | | (0.0129) |
| % Wage Suppression | | **-7.0%** |
| 2018 Control | -0.0191*** | -0.0162*** |
| | (0.00594) | (0.00609) |
| 2019 Control | -0.123*** | -0.120*** |
| | (0.00891) | (0.00910) |
| Baseline Model Controls | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 25,871 | 25,871 |
| R-squared | 0.860 | 0.861 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

163.     Dr. Stiroh raises the point that perhaps the start date of DaVita's Conduct should be 2009, even though the documentary evidence strongly suggests 2008, because merit increases may have already been budgeted for 2009 by the time the No-Poach Agreement was agreed to.[397] I disagree with the logic of Dr. Stiroh's claim. The record evidence suggests that the DaVita-SCA No-Poach Agreement had an immediate effect in stemming recruiting, and it could have

---

[397] Stiroh Report ¶ 91 ("In addition, it is implausible that the alleged conduct would have impacted DaVita compensation starting in January 2008 at all for several reasons. First, DaVita reviews salaries once a year during its annual merit process, with changes to compensation being implemented between April and May of each year. Thus, merit increases would not have been affected by the alleged conduct—assuming it began in May 2008—until April or May 2009, if at all.").

otherwise influenced bonus or other types of pay even if merit pay was unaffected in 2008. Nevertheless, to address Dr. Stiroh's concern, in **Figure 22,** I repeat my main wage regression, but I include a dummy variable for 2008, such that the Conduct estimate is not driven by data in 2008. Doing this, I find that my point estimates overall and for each Defendant are largely unchanged.

**Figure 22: 2008 "Grey Period" Control**

|  | Dependent Variable: Ln(Total Annual Compensation) | |
| --- | --- | --- |
|  | [1] | [2] |
| Conduct | -0.110*** |  |
|  | (0.0117) |  |
| % Wage Suppression | **-10.4%** |  |
| DaVita Conduct |  | -0.167*** |
|  |  | (0.0168) |
| % Wage Suppression |  | **-15.4%** |
| SCA Conduct |  | -0.108*** |
|  |  | (0.0182) |
| % Wage Suppression |  | **-10.2%** |
| USPI Conduct |  | -0.0754*** |
|  |  | (0.0125) |
| % Wage Suppression |  | **-7.3%** |
| 2008 Control | -0.0729*** | -0.0463*** |
|  | (0.0112) | (0.0127) |
| Baseline Model Controls | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 25,871 | 25,871 |
| R-squared | 0.858 | 0.859 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

164.    Finally, given that USPI's CSI Exchanges first began in 2009, there is an argument that perhaps the start date of USPI's Challenged Conduct should be 2009 and not 2010. While the record evidence supporting a 2009 start date indicates future wage information that would be incorporated in 2010, it is possible that the effects also showed up in 2009 to some

degree. To address this concern, I expand USPI's start date to 2009 and re-run my baseline model. **Figure 23** shows that the results are similar and that, if anything, my baseline model is conservative.

**Figure 23: USPI Start Date in 2009**

|  | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
|  | [1] | [2] |
| Conduct | -0.164*** | |
|  | (0.0143) | |
| % Wage Suppression | **-15.1%** | |
| DaVita Conduct | | -0.208*** |
|  | | (0.0164) |
| % Wage Suppression | | **-18.8%** |
| SCA Conduct | | -0.146*** |
|  | | (0.0193) |
| % Wage Suppression | | **-13.6%** |
| USPI Conduct | | -0.113*** |
|  | | (0.0168) |
| % Wage Suppression | | **-10.7%** |
| Baseline Model Controls | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 25,871 | 25,871 |
| R-squared | 0.858 | 0.859 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

165.     Taken together, the quantitative and qualitative evidence suggests that my initial report used the proper start and end dates. But even across all other potentially reasonable start and end dates, my model delivers similar estimates. Accordingly, I view Defendants' Experts claims about the sensitivity of the results as they relate to the start and end date of the Conduct as meritless.

### 7. Pooling Data Is Standard Economic Practice

166.    Defendants' Experts make a variety of arguments around pooling the data, i.e. running a regression model on all Defendants' data, as opposed to three separate regression models, one per Defendant. Dr. Saravia argues that I inappropriately pool data across Defendants, and her work mostly focuses on a USPI subsample.[398] Dr. Johnson, Dr. Stiroh, and Dr. McCrary similarly consider a DaVita or other company-based subsample for some of their analyses.[399] Dr. Saravia, Dr. Johnson, and Dr. Stiroh also raise questions about pooling the periods before and after the Challenged Conduct.[400] I respond to these criticisms in turn.

### a. Pooling Data Across Defendants Is Appropriate

167.    Defendants' Experts argue that I have inappropriately pooled the data across Defendants, and that I have ignored statistical tests to validate the assumptions of my model.[401] Dr. Saravia, for example, argues that her Chow test indicates that a pooled model is inappropriate, and that I should have looked at subsamples of specific companies, as she does.[402]

---

[398] Saravia Report Section 8.2.2 ("Dr. Starr inappropriately pools data across Defendants[.]").

[399] Johnson Report Exs. 28 and 29. Stiroh Report Figures 17–22. McCrary Report Exs. 46–48.

[400] Saravia Report Section 8.2.5 ("Excluding post-admitted-conduct period data from Dr. Starr's Regression[.]"); Johnson Report Ex. 25 and ¶ 148 ("Dr. Starr's model assumes that, with the exception of the alleged conduct, economic conditions—measured by the controls he includes in his model—affected compensation in the same way in both the benchmark and proposed conduct periods."). Stiroh Report Figure 21 and ¶ 102 ("Figure 21 displays the results of Dr. Starr's regression specification run as two separate 'before-during' and 'during-after' regressions.")

[401] Saravia Report ¶¶ 245–246. *See also* Saravia Report Ex. 30, which documents how the estimates change using a subsample approach.

[402] Saravia Report n.366 ("I performed a Chow test on Dr. Starr's before/during/after model that permits the conduct effects to vary across Defendants, testing the restriction that the effects of the other covariates (other than the conduct dummy) are equal across Defendants. The Chow test rejects this restriction above the 99% confidence level."). I note that Dr. Saravia also challenges the Senior Employee vs. Manager differentials with a similar logic. Saravia Report ¶ 277 ("As with his before/during/after regressions, Dr. Starr pools data from the three Defendants to estimate his difference-in-differences regressions, and, as I show in section 8.2, the restriction that his covariates affect compensation in the same way for each Defendant is rejected by the data. When Dr. Starr's difference-in-differences models are estimated on data for USPI only, his conduct effect estimates change."). For the reasons described in this section, I also reject this characterization.

168.     As I explained in my initial report, I considered the pooled data as my primary specification, and argue against limiting the data to a single company for two reasons.[403] First, pooling the data helps to identify the control variables when they are based on all of the observations in the data. Second, because part of the Challenged Conduct is to affect whether workers move across Defendants, limiting the sample to a single Defendant is effectively controlling for a bad control, which induces bias in the Conduct estimate.[404] In a pooled model, however, the Conduct coefficient is allowed to be identified in part by the presence of the same individual in multiple companies; but this is not possible in a single firm subsample. As Drs. Singer and Caves put it, "performing separate regressions excludes, ex ante, any and all variation in prices from one buyer to the next, even though such variation is likely to inform the price-formation process."[405] Thus, when Dr. Saravia discards approximately two thirds of the data to run separate regressions for each Defendant, she ignores how doing so induces bias in the estimates.

---

[403] Starr Report ¶ 125 ("I keep the complete dataset in all analyses, rather than limiting the data to a single company. The reason behind this is twofold: First, the pooled model allows for the Conduct coefficients to be identified in part from the same individuals being present in multiple companies, whereas this is not the case when limiting the sample to a single company. This is important because part of the effect of the Conduct is to affect whether workers move across these companies. Second, the pooled model improves identification of the coefficients on the control variables when they are identified based on all of the observations in the data.").

[404] Starr Report ¶ 123(g) ("In the same vein, given that the Conduct was designed to prevent workers from moving between Defendant companies—and was successful at doing so per the mobility analysis in Section V.B.4—then even which *company* a worker works at is a bad control. For example, if absent the Conduct a worker would have changed employers and received a large raise, then the company a worker works for lies on a pathway between the Conduct and total compensation. Thus, if our goal is to estimate the aggregate of the effect of the Conduct, then we should not limit the data to a single company, and we should not control for a worker's employer because it is a 'bad control.'"). Note that I later describe why I include individual by company fixed effects, though in some models those controls are not included (*e.g.*, the random coefficient model).

[405] Kevin Caves & Hal Singer, *Econometric Tests for Analyzing Common Impact*, 26 LAW AND ECONOMICS OF CLASS ACTIONS 135–160, 154 (2014) ("In particular, performing separate regressions excludes, ex ante, any and all variation in prices from one buyer to the next, even though such variation is likely to inform the price-formation process. In contrast, estimating a common regression model preserves degrees of freedom by pooling data across a large number of buyers allowing the expert to evaluate the degree of uniformity in the price-setting process through statistical tests … Performing only individualized regressions, as suggested by the CPP, simply imposes a separate pass-through parameter $\gamma_i$ for each customer ex ante, while ignoring the cross-buyer variation that is available to test the validity of this assumption.").

169.    The statistical tests Defendants' Experts use to determine whether the actual analysis should be pooled or subsampled are of no value. The Chow test Dr. Saravia performs is a "joint test" that compares whether all of coefficients on the *control variables* are different across different companies.[406] There are several important reasons that this test is uninformative in this case, and that the proposed remedy of subsampling is likely to induce bias. First, as I emphasized in my initial report, and consistent with the advice in Hünermund & Louw (2025), "it is important *not* to over-interpret the relationship between the control variables and the dependent variable."[407] However, this is exactly what the Chow test does. Rather, the focus of the analysis should be squarely on properly identifying the Conduct coefficient and closing backdoors by controlling for confounders and not inducing bias via bad controls.[408] Second, because subsampling on a mediator (in this case, which company a worker joins) is effectively controlling for many bad control variables (because it is the same as allowing company indicators to be interacted with each control variable), then subsampling could create more bias in the estimate of the Conduct effect than a pooled model without those bad controls. For these reasons, the results of the Chow Test is generally not informative of whether the appropriate model is pooled or subsampled.

a.    To show that when the Chow Test produces a statistically significant test result that the appropriate conclusion is *not* necessarily to subsample on a bad control, in my workpapers I design a simulation to demonstrate that the Chow Test will lead to biased results. In the simulation, the Conduct variable impacts a mediator variable, and that mediator variable

---

[406] Dr. McCrary's similarly performs Chow tests (McCrary Report ¶ 260 "For each of the exhibits, I perform a standard statistical test, which is known as a "Chow test," to assess whether, from a statistical perspective, it is appropriate to pool the data across the corresponding subgroups when estimating the alleged conduct effect.").
[407] Starr Report ¶ 123(a). *See also* Paul Hünermund & Beyers Louw, *On the Nuisance of Control Variables in Causal Regression Analysis*, 28(1) ORGANIZATIONAL RESEARCH METHODS 138–151 (2025).
[408] Cinelli et al. (2022).

also relates to the dependent variable based on the level of another control variable. When the Chow test is applied to this simulated data it uncovers a statistically significant effect, but subsequently sub-sampling based on the results of the Chow Test result in more biased estimates than a pooled model. In particular, the simulation demonstrates that the regression model's estimate is unbiased when the data are pooled, but returns a biased estimate when the Chow Test results suggest that we subsample on the mediator (a bad control). The rationale behind the simulation is exactly as I laid out above: the fact that other control variables differ for different levels of a bad control variable does not mean that the pooled model is biased, and it does not mean that a subsample analysis will be less biased than the pooled model.[409]

b.      I am not the only one to reach this conclusion. Indeed, Finkelstein[410] notes that:

> A Chow test that shows no statistically significant difference in coefficients is good evidence that aggregation does not create serious bias, but a contrary finding does not necessarily mean that a regression based on combined data must be rejected. Since a Chow test is of the statistical significance of the difference in all the coefficients in two models, a statistically significant finding will appear if any pair of coefficients is sufficiently different.[411]

170.    Nonetheless, even if one were to accept Dr. Saravia's (and other Defendants' Experts') premise that the data should not be pooled, which I do not, then we can run subsample

---

[409] *See* my workpapers.

[410] MICHAEL O. FINKELSTEIN, BASIC CONCEPTS OF PROBABILITY AND STATISTICS IN THE LAW 119 (Springer 1st ed. 2009).

[411] The court in *Chen-Oster v. Goldman Sachs* addressed this issue in some detail. *See Chen-Oster v. Goldman, Sachs & Co.*, 114 F.Supp.3d 110, 122–123 (S.D.N.Y. 2015) ("There are also sound statistical reasons for being cautious about using the Chow test alone to reject a model. In effect, the Chow test measures whether the coefficients of all variables in separate regressions are the same. Thus, an analysis could fail the Chow test even if the coefficient for the variable of interest was identical in each regression on disaggregated data, if the coefficients for other variables were dissimilar. … More importantly, an analysis could fail the Chow test where the coefficient for the variable of interest varies in magnitude but not in the direction of impact. For instance, if being female is always negatively associated with compensation, even if not always to the same magnitude, it may be appropriate to utilize a unitary model notwithstanding failure to satisfy the Chow test.").

models. Doing so in **Figure 24** reveals similar levels of wage suppression as in the pooled model at each Defendant.

**Figure 24: Unpooled Models**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| | Pooled | Davita Only | SCA Only | USPI Only |
| DaVita Conduct | -0.189*** | -0.161*** | | |
| | (0.0151) | (0.0192) | | |
| **% Wage Suppression** | **-17.2%** | **-14.9%** | | |
| | | | | |
| SCA Conduct | -0.127*** | | -0.246*** | |
| | (0.0178) | | (0.0403) | |
| **% Wage Suppression** | **-11.9%** | | **-21.8%** | |
| | | | | |
| USPI Conduct | -0.0842*** | | | -0.0701*** |
| | (0.0128) | | | (0.0127) |
| **% Wage Suppression** | **-8.1%** | | | **-6.8%** |
| | | | | |
| Individual-Company FE | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Observations | 25,871 | 13,220 | 5,366 | 7,284 |
| R-squared | 0.859 | 0.831 | 0.920 | 0.851 |

*Note*: \*\*\* $p<0.01$, \*\* $p<0.05$, \* $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

171. Dr. Saravia later argues that my Senior Employee vs. Manager analysis stays negative but becomes smaller when we look only at USPI.[412] She argues, like before, that my prior analysis reflects an inappropriate pooling of the data.[413] These conclusions lack merit for two reasons. For the same reasons raised above, results of the Chow test are not informative of whether a subsample analysis is preferred, and can exacerbate bias when conditioning on a bad control—as is the case here. When I run the pooled model, as shown in **Figure 48** in Appendix

---

[412] Saravia Ex. 35.

[413] Saravia Report ¶ 277 ("As with his before/during/after regressions, Dr. Starr pools data from the three Defendants to estimate his difference-in-differences regressions, and, as I show in section 8.2, the restriction that his covariates affect compensation in the same way for each Defendant is rejected by the data.").

C, I find similar differential effects of -6.1 percent and -5.6 percent on Senior-Level Employees versus managers.[414]

### b. Throwing Out Pre- or Post-Conduct Data

172. Defendants' Experts perform analyses where they systematically drop data from before the Conduct Period.[415] For example, Dr. Stiroh argues that if my model were properly specified it would "lead to the same conclusion" if I dropped either the before or after period. Dr. Saravia argues that a dispute exists with respect to whether 2018, 2019, or 2020 belong in the Conduct Period, and argues that the estimates are sensitive to how COVID is treated.[416] In response, Dr. Saravia argues that, because there is no dispute that the Agreement began in 2010:

> [I]t may be preferable to run Dr. Starr's regression on the "before" and "during" data only. As I explain above, comparing "before" and "during" data is a standard way to estimate the effect of a treatment on an outcome when "after" treatment period data are unavailable or are contaminated by other factors for which one cannot control.[417]

To clarify, Dr. Saravia proposes excluding the entire post-conspiracy period altogether, and that estimating only a before and during model "may be preferable."

173. As a practical matter, Dr. Saravia's approach is generally not feasible for all Defendants because SCA did not provide *any* "before" data. Thus, it is impossible to incorporate this suggestion in a subsample analysis for each Defendant. Moreover, given my analysis in

---

[414] In addition, in Column 2 of Dr. Saravia's Ex. 35, which inappropriately subsamples on USPI, the effect of the Conduct for managers is -4.1 percent, and the differential effect for Senior Employees is only -0.2 percent more. This does not mean that Senior Employees were not harmed by the Conduct—it just means they were harmed similar to managers, at -4.1 percent.

[415] Stiroh Report ¶ 102 ("Figure 21 displays the results of Dr. Starr's regression specification run as two separate 'before-during' and 'during-after' regressions. The results show that Dr. Starr's results are highly sensitive to the time frame of the analysis."); Saravia Report ¶ 263.

[416] Saravia Report ¶ 263 ("As I explain above, whether 2018, 2019, or 2020 belong in the conduct period or outside of it is in dispute, and the answer matters. It is also clear that how one controls for the effects of the COVID pandemic on compensation matters. … This makes it difficult to use a comparison of the 'during' period data and the 'after' data to estimate the effect of the assessed conduct on Senior Employee pay.").

[417] Saravia Report ¶ 264.

Section VII.C.2 showing that my results are in fact not sensitive to how COVID is handled, in general I do not view Dr. Saravia's suggestion as necessary or appropriate.

174.    Nevertheless, to consider whether the results are robust to using either benchmark period, I use a pooled sample approach where, rather than ignoring relevant data, I use indicator variables for either the before-Conduct Period or the after-Conduct Period to ensure that only certain benchmark periods are driving the Conduct effect. This is consistent with how Defendants' Experts handled the COVID pandemic when they included fixed effects for 2022.[418] The results, shown below in **Figure 25**, indicate that, regardless of the benchmark period used, the wage suppression estimates are similarly negative and statistically significant both in the aggregate and across each Defendant.[419]

---

[418] *See* Section VII.C.2, *supra.*

[419] Note also that SCA's Conduct coefficient here is identified here even with the post-period dummied out in Model 2. This is due to the slightly staggered nature of USPI's Conduct relative to SCA and because the control variables are not specific to each Defendant.

**Figure 25: Before or After Benchmark Models**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Conduct | -0.0883*** | | -0.165*** | |
| | (0.0138) | | (0.0265) | |
| % Wage Suppression | **-8.5%** | | **-15.2%** | |
| DaVita Conduct | | -0.141*** | | -0.222*** |
| | | (0.0176) | | (0.0282) |
| % Wage Suppression | | **-13.2%** | | **-19.9%** |
| SCA Conduct | | -0.0677*** | | -0.158*** |
| | | (0.0203) | | (0.0284) |
| % Wage Suppression | | **-6.6%** | | **-14.6%** |
| USPI Conduct | | -0.0411*** | | -0.143*** |
| | | (0.0142) | | (0.0280) |
| % Wage Suppression | | **-4.0%** | | **-13.3%** |
| 2005 Control | | | 0.270*** | 0.224*** |
| | | | (0.0572) | (0.0582) |
| 2006 Control | | | -0.0958** | -0.142*** |
| | | | (0.0435) | (0.0439) |
| 2007 Control | | | 0.00649 | -0.0291 |
| | | | (0.0393) | (0.0398) |
| 2008 USPI Control | | | -0.123*** | -0.121*** |
| | | | (0.0336) | (0.0342) |
| 2009 USPI Control | | | -0.147*** | -0.141*** |
| | | | (0.0323) | (0.0333) |
| 2020 Control | 0.0315 | 0.0356 | | |
| | (0.0250) | (0.0263) | | |
| 2021 Control | 0.0592*** | 0.0552** | | |
| | (0.0228) | (0.0237) | | |
| 2022 Control | 0.172*** | 0.166*** | | |
| | (0.0357) | (0.0359) | | |
| Individual-Company FE | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Observations | 25,871 | 25,871 | 25,871 | 25,871 |
| R-squared | 0.858 | 0.859 | 0.862 | 0.862 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Note also that SCA's Conduct coefficient here is identified here even with the post-period dummied out in Model 2. This is due to the slightly staggered nature of USPI's Conduct relative to SCA and because the control variables are not specific to each Defendant.

175.    Dr. Saravia also re-runs my Senior Employee versus manager analysis, dropping the post-Conduct Period and limiting the sample to USPI.[420] She finds that managers suffered losses of 4.2 percent, and her estimates suggest that harm to Senior Employees was no different. While I dispute her analysis, as I describe below, I note that even in her analysis, Senior Employees are still harmed; they are just harmed to a similar degree as managers. Her analysis underscores why I characterize this comparison between Senior Employees and managers as showing a lower bound.

176.    As I discussed in VII.C.7.a, I prefer to keep the pooled sample, and as noted above, I prefer to control for the post-Conduct Period as opposed to throwing out the data entirely. Doing so and re-running Dr. Saravia's model with post-Conduct indicators in **Figure 26** reveals that Senior Employees experienced statistically significantly lower compensation relative to managers as a result of the Challenged Conduct, including at each Defendant.

---

[420] Saravia Report Ex. 36.

**Figure 26: Managers Vs. Senior-Level Employees With Post Conduct Period Controls**

| Baseline Category: Managers | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|
| | Overall | By Defendant |
| | [1] | [2] |
| Conduct (Managers) | -0.00368 | |
| | (0.00652) | |
| Conduct*1(Directors & Above) | -0.0765*** | |
| | (0.00696) | |
| **Lower Bound Suppression %** | **-7.4%** | |
| | | |
| DaVita Conduct (Managers) | | -0.0164** |
| | | (0.00656) |
| DaVita Conduct*1(Directors & Above) | | -0.0918*** |
| | | (0.00995) |
| **DaVita Lower Bound Suppression %** | | **-8.8%** |
| | | |
| SCA Conduct (Managers) | | -0.0322*** |
| | | (0.0117) |
| SCA Conduct*1(Directors & Above) | | -0.0657*** |
| | | (0.0123) |
| **SCA Lower Bound Suppression %** | | **-6.4%** |
| | | |
| USPI Conduct (Managers) | | 0.0164* |
| | | (0.00935) |
| SCA Conduct*1(Directors & Above) | | -0.0644*** |
| | | (0.0114) |
| **USPI Lower Bound Suppression %** | | **-6.2%** |
| | | |
| 1(Directors & Above) | 0.228*** | 0.232*** |
| | (0.00850) | (0.00891) |
| 2020 Control | 0.0390*** | 0.0276** |
| | (0.0109) | (0.0108) |
| 2021 Control | 0.0417*** | 0.0294*** |
| | (0.0104) | (0.0104) |
| 2022 Control | 0.0665*** | 0.0548*** |
| | (0.0162) | (0.0162) |
| Healthcare, Macro, Hours | Yes | Yes |
| USPI Low Hours Control | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | No | No |
| Observations | 79,898 | 79,898 |
| R-squared | 0.912 | 0.912 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

### 8. The Conduct Suppressed Starting Wages

177. Defendants' Experts posit that because the three Defendants compete in the labor market with a variety of different non-conspiratorial competitors, Defendants would have had to pay competitive wages to attract new workers, implying that Defendants could not have suppressed initial wages.[421] This is a theory-based argument—none of Defendants' Experts perform any analysis to examine whether starting wages are suppressed—and this argument is inconsistent with how labor economists understand labor market competition, inconsistent with the literature on no-poach agreements and noncompete clauses, and inconsistent with the qualitative evidence on wage setting at Defendants in this case. Moreover, a direct empirical analysis of new hires at each of the Defendants shows that starting wages were indeed suppressed by the Challenged Conduct.

178. Dr. Johnson and Dr. Saravia acknowledge that labor markets generally do not have a single market clearing wage, and that "perfect competition is a theoretical construct."[422] Rather, modern labor economists view the labor market in terms of search and matching frictions, where identical workers being competed over by identical firms can end up being paid starkly different amounts due to the matching process of job offers reaching certain workers and not others.[423] The result is that the labor market generally resembles a job ladder, where identical

---

[421] Johnson Report ¶ 92; Saravia Report ¶ 77, ¶¶ 197–201; McCrary Report ¶ 121 ("Thus, as above, pay for new hires would have to be competitive.").

[422] Johnson Dep. at 42:2–5, 267:11–16 ("There is no single market clearing pay rate. That's a fallacy that wouldn't exist in a matching market like a labor or labor markets."). *See also id.* at 187:1–6 ("I don't think there's any market that's perfectly competitive in the pure theoretical sense. There's no market with infinite competitors, there's no market with perfect knowledge. It's a theoretical abstraction."); Saravia Dep. at 75:4–76:8 ("[E]mployees receive different wages.").

[423] *See* ALAN MANNING, MONOPSONY IN MOTION: IMPERFECT COMPETITION IN LABOR MARKETS (Princeton University Press 2003) [hereafter Manning (2003)]. Likewise, Dr. Saravia testified at deposition that "of course there are frictions in labor markets." Saravia Dep. at 83:22–84:17. Dr. McCrary also agreed with economist Alan Manning that "'there are important frictions in the labour market[.]'" McCrary Dep. at 81:14–82:11 (discussing Ex. PX597 (Manning 2003) at 1) ("[T]he idea that there are frictions in labor markets, the same way that there are frictions in every market should be uncontroversial.").

workers are not paid the same, with some workers earning more due to having been able to climb the job ladder while other workers are left behind even though they may be otherwise identical.[424] Thus, as a practical matter, when Defendants are hiring, they *do not* need to pay a "competitive wage" because there is no single "competitive wage" to offer. Rather, they must only find a worker for whom their present wage offer is better than the worker's current wage (holding other amenities etc., constant). Thus, even from a theoretical perspective, the possibility that outside competition for workers makes it impossible for Defendants to suppress starting wages is wrong. Indeed, as discussed further in Section X, mobility restrictions result in monopsony power even over starting wages, and the average firm in the healthcare industry generally has significant market power, with the average firm being able to mark down compensation to just 56 percent of productivity.[425]

179. To underscore these points, the academic literature on noncompete clauses and no-poach agreements, which none of Defendants' Experts review or discuss, finds that they reduce *starting* wages. For example, LaFontaine et al. (2025) studies the removal of no-poach agreements among restaurant chains, finding that that removal of the no-poach agreements increased *wages posted in job ads* by 5 percent, with no detectable differences between workers and managers. They attribute the fact that the removal of the no-poach agreement increased

---

[424] *See* Kenneth Burdett & Dale T. Mortensen, *Wage Differentials, Employer Size, and Unemployment*, 39(2) INTERNATIONAL ECONOMIC REVIEW 257–273 (1998) [hereafter Burdett & Mortensen (1998)]. *See also* Starr Dep. Vol. 1 at 147:16–148:19 ("[I]t's not as if everybody is paying the exact same thing all at once … In reality there is [] differential pay across companies for the same jobs.").

[425] Douglas A. Webber, *Firm market power and the earnings distribution*, 35 LABOUR ECONOMICS 123–134, 133 (2015) [hereafter Webber (2015)] (Table 7, average firm-level labor supply elasticity in Healthcare and Social Assistance is 0.78, indicating a markdown of 44%).

posted wages to "reduction in frictions and barriers to labor mobility."[426] Because the wage changes observed here are in posted job ads, they matter most for workers starting their job. Similarly, Callaci et al. (2024) study a broader set of industries and find that the removal of franchise no-poach agreements increased *posted* annual earnings by 6 percent and worker-reported earnings by 4 percent.[427] Thus, these findings suggest that the removal of no-poach agreements caused firms to advertise 5–6 percent higher compensation to prospective workers.

180.    It is important to note that while posted wages are likely to indicate what a new worker will earn, there may nevertheless be a discrepancy between the posted wage and the actual starting wage. While the no-poach studies above do not have evidence on *received* starting compensation, the literature on noncompete agreements provides such estimates. In Balasubramanian et al. (2022), my coauthors and I study how starting compensation changes after Hawaii banned noncompete clauses for high-tech workers.[428] We find that the Hawaii ban on noncompetes for high-tech workers increased new-hire monthly earnings by 4.2 percent.[429] Using a different empirical strategy leveraging both within-state and cross-state variation covering the universe of workers in the US, we also find that noncompete enforceability lowers *starting* quarterly compensation for tech workers.[430] This is consistent with Dr. McCrary's

---

[426] Lafontaine et al. (2025) at 1 ("We find robust evidence that the legal cases, proposed legislation, and negative attention surrounding NPCs, which led many chains to remove such clauses from their contracts, caused wages in those chains to rise by about 5% relative to chains that did not have NPCs. We show that … low wage workers suffer losses that are as large as the losses of their managers. We attribute these effects to a reduction in frictions and barriers to labor mobility.").

[427] Callaci et al. (2024) ("Implementing a staggered difference-in-differences research design using Burning Glass Technologies job vacancies and Glassdoor salary reports from numerous industries, we estimate a 6% increase in posted annual earnings from the job vacancy data and a 4% increase in worker-reported earnings.").

[428] Natarajan Balasubramanian et al., *Locked in? The enforceability of covenants not to compete and the careers of high-tech workers*, 57(S) JOURNAL OF HUMAN RESOURCES S349–S396 (2022).

[429] *Id*. at 3 ("In our preferred specifications, we find that Hawaii's 2015 CNC [covenants not to compete] ban increased new-hire monthly earnings by 4.2%[.]").

[430] *Id*. at 20 ("Column 1 of Table 4 presents results on the initial start of job spell wage (this specification naturally excludes initial wage fixed effects)—consistent with the results for new hire wages for Hawaii, we find that initial wages are lower in states with higher [covenants not to compete] enforceability[.]").

testimony that "competition benefits sellers in general and input markets [i.e., labor markets][,]"[431] and such benefits can include compensation increases.[432]

181.  While this prior academic scholarship suggests that no-poach agreements and noncompete clauses can reduce starting compensation, it would be preferable to have confirmatory evidence that the Challenged Conduct had similar effects in this case. In my initial report, I reviewed qualitative evidence from each Defendant which indicates that when they bring in new hires they take into account issues of internal equity when considering what to offer an individual.[433] If the Challenged Conduct suppressed the pay of incumbent employees at Defendants, and that suppressed pay is used to help set starting pay for new Senior Employee, then starting pay for Senior Employees may also be suppressed.

182.  To provide quantitative evidence that this is the case, I pursue two similar analyses. First, I take my main regression model and I allow the effect of the Challenged Conduct to vary with an employee's tenure. To do this, I include tenure as a control variable in the regression and interact it with the Conduct variable. I then recenter the employee's tenure on one, so that the interpretation of the Conduct coefficient is for employees with a tenure of one year.[434] Second, as a robustness check, I look at only an employee's first full year in the data as a Senior Employee. I re-run the same model with the first-year data, interacting tenure with the Conduct. In this specification, note that because first-year compensation cannot vary within

---

[431] McCrary Dep. at 48:13–50:2 ("[I]s it right [that] the competition benefits workers in the way of they are selling their labor services? Does competition for those labor services benefit them? Then the answer is yes.").
[432] *Id.* at 50:3–13.
[433] Starr Report VII.F.
[434] I performed a similar analysis in the context of noncompete clauses. *See* Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72(4) ILR REVIEW 783–817, 802 (2019) ("Table 7 examine how noncompete enforceability is differentially related to training and wages by tenure[.]).

individual-company, I cannot include individual-by-fixed effects.[435] I note, as I did initially in my report, that we should be somewhat careful in interpreting the exact numbers in these tables because tenure is an outcome of the Conduct, and thus a bad control. Nevertheless, in both approaches, the results in **Figure 27** indicate that the Challenged Conduct suppressed compensation for Senior Employees with tenures of one year, both overall and at each Defendant. Thus, I reject Defendants' Experts' arguments that external competition prevents the Challenged Conduct from suppressing compensation for newly hired workers.

---

[435] Starr Report ¶ 123(e) ("Similar to a worker's job title, it may seem natural to include a worker's tenure as a control variable, because workers with longer tenures are also likely to receive higher earnings. However, if one effect of the Conduct is to reduce the likelihood that a worker will leave, and mobility has an effect on compensation, then longer tenure is an outcome of the Conduct (a lack of mobility), and thus conditioning on tenure would close the mediating pathway between the Conduct, tenure, and compensation, resulting in biased estimates.").

**Figure 27: The Conduct Suppresses Starting Compensation**

| | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| | First Year in Data | First Year in Data | All Data | All Data |
| Conduct | -0.122*** | | -0.167*** | |
| | (0.0278) | | (0.0132) | |
| **% Wage Suppression For Tenure = 1** | **-11.4%** | | **-15.4%** | |
| DaVita Conduct | | -0.118*** | | -0.236*** |
| | | (0.0307) | | (0.0190) |
| **% Wage Suppression For Tenure = 1** | | **-11.1%** | | **-21.0%** |
| SCA Conduct | | -0.0863** | | -0.200*** |
| | | (0.0335) | | (0.0218) |
| **% Wage Suppression For Tenure = 1** | | **-8.3%** | | **-18.1%** |
| USPI Conduct | | -0.123*** | | -0.0475*** |
| | | (0.0356) | | (0.0155) |
| **% Wage Suppression For Tenure = 1** | | **-11.6%** | | **-4.6%** |
| Tenure | -0.000804 | -0.000813 | -0.0111 | -0.0103 |
| | (0.00167) | (0.00167) | (0.0160) | (0.0132) |
| Conduct*Tenure | -0.00473** | | 0.00400*** | |
| | (0.00217) | | (0.000815) | |
| DaVita Conduct*Tenure | | -0.00302 | | 0.00544*** |
| | | (0.00259) | | (0.00115) |
| SCA Conduct*Tenure | | -0.00912*** | | 0.00967*** |
| | | (0.00248) | | (0.00123) |
| USPI Conduct*Tenure | | -0.00457 | | -0.00361** |
| | | (0.00444) | | (0.00159) |
| Baseline Model Controls | Yes | Yes | Yes | Yes |
| Individual-Company FE | No | No | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Observations | 6,561 | 6,561 | 25,824 | 25,824 |
| R-squared | 0.508 | 0.508 | 0.857 | 0.858 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The Tenure variable is centered at 1, such that the interpretation of the Conduct main effect is for those with Tenure of 1.

### D. Defendants' Miscellaneous Arguments About My Model Are Meritless

#### 1. It Is Not Necessary to Disentangle the Effects of Defendants' CSI Exchanges and the No-Poach Agreements

183.    Dr. Johnson argues that my model is unable to disentangle the effects of the CSI Exchanges and the No-Poach Agreement.[436] That is not necessary, nor was it my assignment. My assignment was to estimate the aggregate harm as a result of the Challenged Conduct, and then

to assess whether, using common methods or evidence, that all or nearly all members of the proposed Class were harmed as a result of the Challenged Conduct. Thus my empirical work was designed to estimate wage suppression resulting from the Challenged Conduct, not to estimate wage suppression resulting from each specific component of the Challenged Conduct.

184.    Indeed, "there are several pieces to this misconduct, several subparts; and the wage regressions stand on their own such that … if a fact finder was to come along or a jury was to say, well, we have determined that the [N]o-[P]oach [A]greements didn't happen, if they're right about that, then that means that … the wage estimates that I come up with are due to the other remaining pieces … of the conduct."[437]

### 2.    The Mobility Analysis Need Not Be Informative About the Compensation Suppression Estimates

185.    One set of criticisms raised by Defendants' Experts is that the changes in observed movement patterns between Covered Defendants related to the No-Poach Agreement cannot explain any wage suppression observed later. For example, Dr. Johnson claims disbelief that my finding of wage suppression could be entirely driven by foreclosing the moves of a few employees.[438] Similarly, Dr. Stiroh argues that my regression assessing the probability of mobility between Covered Defendants[439] is "small in magnitude" and therefore implausible.[440]

---

[437] Starr Dep. Vol. 1 at 204:19–205:4.

[438] Johnson Report ¶ 30 ("That is, Dr. Starr purports to find that the Defendants, in aggregate, 'suppressed wages' for all proposed class members by up to 14.5 percent by foreclosing 6.2 additional moves between the two pairs of 'Covered Defendants' each year out of the approximately 300 employees, on average, that departed one of the Defendants each year during the proposed class period—almost 50 times more than the difference in moves Dr. Starr purports to find."). *See also* Johnson Report ¶ 92 ("Neither Dr. Starr nor Dr. Gerhart has described how an additional six employees failing to move between the Defendants each year would suppress compensation for all proposed class members while the Defendants hiring hundreds of employees each year would not have the opposite effect on compensation due to these same forces.").

[439] Starr Report Figure 4.

[440] Stiroh Report ¶ 64. *See also* Stiroh Report ¶ 84 ("Dr. Starr's preferred estimate of compensation suppression implies that a decrease in employee mobility between DaVita and SCA of approximately two employees per year resulted in an immediate 17.2 percent suppression of compensation for all DaVita Senior-Level employees in the class. The implausibility of Dr. Starr's results reinforce that his regression analysis of compensation is critically flawed.").

Dr. Saravia makes the same point.[441] These arguments are unfounded and irrelevant for several reasons.

        a.      First, the goal of this analysis was not to identify a causal effect of mobility levels in a but-for world without the Challenged Conduct. The goals were explicitly descriptive and not causal.[442] The merger activity before the end of the Conduct Period in 2019 implies that we will systematically undercount the number of moves post-2019. And, perhaps more importantly, movement between Covered Defendants need not change at all for the observed wage suppression to occur. This is because (a) there are also the alleged CSI Exchanges that operated in tandem with the No-Poach Agreements, and (b) No-Poach Agreements can reduce compensation by reducing the rate of job offers, bargaining power, and information flow even when actual movement is entirely unaffected. And even if there is movement, that does not mean that the Challenged Conduct did not suppress compensation. For example, even if a worker received a job offer from a Covered Defendant and moved, the tell-your-boss provision of the No-Poach Agreement may have nevertheless stunted the counter offer process (because the Defendant knew the worker was going to leave regardless), resulting in lower compensation even with a job move between Covered Defendants.

---

[441] Saravia Report ¶ 121 ("This analysis is crucial to Dr. Starr's damages estimate because it quantifies the magnitude of the conduit—mobility restrictions—for the compensation suppression he purports to find."). Dr. Saravia misrepresents the findings of Figure 4 in my report, which represents the change in probability of mobility between Covered Defendants. Starr Report ¶ 89, Figure 4. While the goal of this analysis was to provide quantitative evidence that was consistent with the existence of a No-Poach Agreement, Dr. Saravia extrapolates that my results can be used to compute how many additional USPI and SCA employees would have switched but for the Conduct. This is wrong. The results should be read as descriptive. Further, Dr. Saravia misreports the likelihood that a given USPI employee leaves for SCA and vice versa; she reports that this probability is -0.17 percent, when the correct interpretation is -0.17 percentage points. *See* Saravia Report ¶ 122 ("[H]e estimates that the likelihood that any given employee leaves USPI for SCA or vice versa is 0.17 percent lower[.]").

[442] Dr. Stiroh mischaracterizes the goals of my analysis when she writes "Dr. Starr seeks to establish that mobility was suppressed during the conduct period by applying a regression analysis that purports to control for other underlying economic factors." Stiroh Report ¶ 64.

b.    As I discussed in my overview, a rich literature in economics highlights how the offer and counteroffer process can result in compensation increases even when no movement occurs.[443] Thus, conversely, by reducing solicitations and job offers as a result of the No-Poach Agreements (as well as concomitant information flows), the lack of an offer and counteroffer process results in lower compensation. Defendants' Experts ignore this economic literature. As a result, regardless of what the movement analysis shows, it was not meant to be interpreted causally, and the results are not necessarily determinative of any wage-suppression.

c.    The fact that movement between Covered Defendants picks up right when compensation picks up indicates the increase in mobility may be tied to the increase in compensation, but in no way does that mean that increased movement is the only factor driving the wage suppression estimates. Indeed, as I discussed in my initial report, in my baseline econometric specification, the possibility of only mobile workers driving the wage estimates is in fact foreclosed upon by the inclusion of individual by company fixed effects.[444]

186.    Thus, Defendants' Experts' claims that the rise in mobility between Covered Defendants is incapable of explaining the wage effects is meritless. Their narrow focus on movement obscures the fact that the No-Poach Agreement suppressed opportunities. Their claims fail to take into account the full suite of mechanisms that could generate wage

---

[443] Starr Report ¶ 53(a) ("In a dynamic labor market search model, no-poach agreements suppress pay broadly by reducing the rate at which job offers are made. Notably, the rate of job offers can still affect pay even if those job offers are turned down. This is because those job offers can be used as leverage for bargaining for a raise at the current employer."). *See also* Starr Report n.81, which references studies that consider wage bargaining and on the job search, and in particular counteroffering that results in wage increases without workers changing employers. Those studies are: Fabien Postel-Vinay & Jean-Marc Robin, *To match or not to match?: Optimal wage policy with endogenous worker search intensity*, 7 REVIEW OF ECONOMIC DYNAMICS 297–300, 297 (2004) and Pierre Cahuc, Fabien Postel-Vinay & Jean-Marc Robin, *Wage Bargaining with On-the-job Search: Theory and Evidence*, 74(2) ECONOMETRICA 323–364 (2006).

[444] Starr Report ¶ 123(h) ("Because the inclusion of individual-by-company fixed effects identifies the Conduct effect by leveraging comparisons of the same individual within the same company, during vs. absent the Conduct, it rules out the possibility that the Conduct effect is driven only by the movers.").

suppression as a result of the Challenged Conduct, and reflects their lack of understanding that the identifying variation in the baseline wage suppression model identifies wage suppression by comparing individuals within the same company both during and absent the Challenged Conduct.

a. Defendants' Experts also argue that the time trends in the mobility analysis and compensation results do not follow the same timing.[445] Defendants' Experts again mischaracterize my report by claiming that I assumed that the wage effects were driven entirely by any mobility effects.[446] As the prior discussion makes clear, there are several mechanisms by which the Challenge Conduct can affect compensation, with or without actual mobility changing. Thus, I reject their characterizations of my assumptions and their criticisms that the wage trends and the mobility trends must follow the same patterns. I will note however, that Defendants' Experts do not point out contrary evidence to their view, when mobility and conditional wage trends both rise sharply after the Challenge Conduct ended.

187. While the discussion above relates to movements between Covered Defendants, Dr. Johnson performs a turnover analysis that looks broadly at separations from Defendants. He runs the same mobility regression model in my initial report and finds that overall turnover was

---

[445] Stiroh Report ¶ 91 ("[A]ssuming, as Plaintiffs' experts do, that the mechanism for compensation suppression was suppression of Senior-Level employee mobility, then the fact that Dr. Starr finds that employee mobility was 'elevated in the early years of the Conduct Period' suggests that compensation would not have been suppressed during those years."). Dr. McCrary makes a similar point that the time trends in compensation suppression do not exhibit in his view the appropriate pattern. McCrary Report ¶ 251 ("When I compare Exhibit 44 to the description above of how the alleged conduct changed over time according to Plaintiffs and their experts, I find that the patterns in Figure 7 are not in alignment with what would be expected based on their claims."). This argument is meaningless too because the time trends in wage suppression may well depend on how many solicitations were made, how precisely Defendants incorporated information from the CSI exchanges, the propagation of initial negative wage shocks from the Challenged Conduct. In general, there's no reason they should follow a particular type of pattern, except to suppress compensation in each year.

[446] Stiroh Report ¶ 91 ("[A]ssuming, as Plaintiffs' experts do, that the mechanism for compensation suppression was suppression of Senior-Level employee mobility, then the fact that Dr. Starr finds that employee mobility was 'elevated in the early years of the Conduct Period' suggests that compensation would not have been suppressed during those years.").

higher at DaVita during the Conduct Period and that there was no statistically significant change in SCA turnover while USPI turnover fell.[447] Dr. Johnson concludes that this evidence is inconsistent with my finding that "that the cumulative effect of the No-Poach Agreements was to suppress movement."

a.    Dr. Johnson's analysis in no way undermines my movement analysis between Covered Defendants, and neither does it undermine the wage suppression estimates. To begin, Dr. Johnson misleadingly references my analysis as "suppressing movement" broadly, when my analysis was targeted only at movement *between* Covered Defendants, consistent with the No-Poach Agreement. His strategic mis-representation of my analysis leads to the illusion that the results are inconsistent, but there is no inherent inconsistency between the two results. It is clearly possible that turnover between Covered Defendants fell during the Conduct Period, but rose to non-Covered Defendants resulting in an overall uncertain effect. For example, it is possible that DaVita's increased turnover during the Challenged Conduct is precisely due to the fact that Senior Employees are unhappy because they are underpaid, but, because the No-Poach Agreement with SCA makes it near impossible to join a Covered Defendant, they move elsewhere. In fact, this is exactly what I find in my analysis of Defendant's Lightcast data in Section VI.B.2.c. Thus, the turnover analysis performed by Dr. Johnson is not inconsistent with my mobility analysis between Covered Defendants, and whatever the results of his analysis are, they do not influence the wage suppression estimates.

### 3.    The Results Are Consistent with Benchmark Estimates of No-Poach Effects from the Academic Literature

188.    Defendants' Experts argue that my results are implausible based on inappropriate benchmarks. Rather than compare to the most natural benchmarks in the literature—the

---

[447] Johnson Report Ex. 7 and ¶ 16.

estimated harm of no-poach agreements—they chose other, uninformative benchmarks. Dr. Saravia argues that my estimates are implausible compared to changes in compensation for switchers.[448] Dr. Johnson argues my estimates are implausible when compared to an outside options estimate derived from representative German data.[449] And Dr. McCrary argues my estimates are too large relative to general labor supply elasticities.[450] I discuss these in turn.

189.    Dr. Saravia argues that the compensation increase from switchers "provides an indication of the offers that Senior Employees could have leveraged for compensation increases." She analyzes the compensation of 19 Senior-Level Employees who switched between SCA and USPI outside the Conduct Period, and finds that the annualized average increase in compensation for switchers is -1.4 percent.[451] Because the average switcher does not earn more by switching, she argues that my estimates of harm are implausibly large.[452]

a.    Dr. Saravia's analysis is meritless and uninformative for at least three reasons. First, Dr. Saravia's comparison presumes that mobility is the only reason for any wage

---

[448] Saravia Report ¶ 281 ("As this exhibit shows, switching employees did not uniformly earn higher compensation at the destination firm. The average increase in compensation for switchers was *minus* 1.4 percent. Dr. Starr purports to find that the assessed conduct lowered compensation across all Senior Employees by 12 percent. Compared to the actual compensation increase of essentially zero, Dr. Starr's 12 percent estimate of the impact from the Expert's Assessed SCA-USPI Mobility Restrictions is implausibly large.").

[449] Johnson Report ¶ 141 ("While Dr. Starr claims that there is 'broad support throughout the economic literature' for the 'idea that firms can suppress pay by limiting employee outside options,' the inconsistency of Dr. Starr's estimate with the literature he cites further indicates the unreliability of his regression model. For example, the Caldwell and Danieli paper which Dr. Starr describes as having 'develop[ed] a method for estimating individual-level outside options and stud[ied] how it relates to earnings' finds that a 10 percent increase in outside options increases earnings by only 1.7 percent.").

[450] McCrary Report ¶ 211 ("For example, a textbook that Prof. Starr relies upon in his own report estimates that a 1% decrease in wages should be expected to increase departures by between 0.5% and 0.9% - which would mean that, if pay is suppressed by 14.5% as Prof. Starr claims, then that should be expected to increase departures by between 7% and 13% during the Class Period.").

[451] Saravia Report ¶ 281. I also note that Dr. Saravia's finding that wages fall for switchers on average is inconsistent with the academic literature, which tends to find that wages rise when workers move jobs. *See, e.g.,* Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 107 QUARTERLY JOURNAL OF ECONOMICS 439–479, 442 (1992) ("Wage gains at job changes average about 10 percent, and account for about one third of total wage growth during the first ten years in the market."). Her analysis likely finds a negative change in compensation because she annualizes compensation in the year of the switch, as opposed to examining full compensation both before and after the switch.

[452] Saravia Report ¶ 281.

suppression in this case. As I discussed above, this is not true; compensation can change regardless of how people move and what compensation they earn when they do switch. Indeed, my estimates are specifically not driven by the switchers. Second, because in her analysis switchers are not better off, then any amount of harm would be deemed implausible by her standards.[453] Third, and most importantly, nowhere in her Report does Dr. Saravia reference any of the evidence on the extent to which no-poach agreements harm workers—even though it is cited and discussed in my initial report. These are clearly the most relevant benchmarks, and my estimates are clearly in line with them. As I described in my initial report, two studies estimate that the franchise no-poach agreements reduced posted compensation by 4–6 percent, and realized compensation by 4 percent.[454] And a study of the Silicon Valley no-poach case finds that a single no-poach agreement for one year reduced *salaries* by 5.6 percent, reduced the probability of a positive stock bonus by 8.3 *percentage points*, and reduced stock bonuses on average by 79.6 percent.[455] In turn, my regression model estimates that non-equity based compensation fell 6.3 percent,[456] while the overall estimate is 12.6 percent including equity.[457] These numbers are not only in-line with the prior literature, but they likely should be expected to be higher than the prior literature because the literature estimates the effect of only no-poach

---

[453] Indeed, Dr. Saravia does not explore the reason for the "switch." Many factors can motivate an employee's decision to "switch." Switching can be voluntary or involuntary. An employee may switch to another firm to take a position that offers a lower initial pay but greater opportunity for advancement. This outcome would not appear as an increase in pay in the short-term period that forms the sole basis for Dr. Saravia's analysis. Relatedly, for the comparison that Dr. Saravia makes to carry any meaning, the reason for the switch matters. If a company terminates a position or a particular line of business, employees in that division may need to quickly find alternative employment. Such a necessity would limit the matching process that occurs between a worker and a firm, resulting in a suboptimal outcome where the worker takes a disfavored position out of necessity rather than because of an ideal match between the worker's skills and the firm's needs. Dr. Saravia's mechanical analysis of switching ignores such realities.

[454] Callaci et al. (2024) at 1. Lafontaine et al. (2025).

[455] Gibson (2024).

[456] *See* Figure 49, *infra*.

[457] *See* Figure 6, *supra*.

agreements, and not the combined effect of No-Poach Agreements and CSI Exchanges, as in the present case.

190.    Dr. Johnson misrepresents the literature when benchmarking my estimates.[458] Instead of benchmarking my estimates to those from the actual literature on no-poach agreements—indeed nowhere in his paper does he even discuss the estimates of harm from no-poach agreements in the economics literature—he instead tries to benchmark my estimates against a study by Caldwell and Danieli that develops an outside options index using German data to show that workers with reduced outside options have lower wages.[459] He then tries to tie the mobility estimates I derived as a measure of changes in outside options to argue that my wage suppression estimates are implausibly large.[460]

a.    Dr. Johnson's comparisons and claims that my estimates are inflated are meritless for several reasons. First, Dr. Johnson's choice to benchmark my estimates against Caldwell and Danieli is a clear attempt to mislead because (a) those estimates of harm do not come from no-poach agreements but rather by comparing people who have different outside options because they live in different parts of the country, and (b) those estimates derive from a broad sample of German workers from 1993–2014.

---

[458] Johnson Report ¶ 141 ("While Dr. Starr claims that there is 'broad support throughout the economic literature' for the 'idea that firms can suppress pay by limiting employee outside options,' the inconsistency of Dr. Starr's estimate with the literature he cites further indicates the unreliability of his regression model. For example, the Caldwell and Danieli paper which Dr. Starr describes as having 'develop[ed] a method for estimating individual-level outside options and stud[ied] how it relates to earnings' finds that a 10 percent increase in outside options increases earnings by only 1.7 percent.").

[459] Johnson Report Ex. 23.

[460] Johnson Report ¶ 142 ("As shown in Exhibit 23, this estimate from the literature implies that, due to the alleged mobility restrictions, the available outside employment options would be expected to decrease by *approximately 60 percent* to reach the magnitude of Dr. Starr's estimated 14.5 percent 'wage suppression' across Defendants. Put in context, this decrease is significantly larger than Dr. Starr's own finding that the alleged conduct changed employee mobility rates by, at most, only 2 percent (6.2 additional moves between the 'Covered Defendants' each year out of the approximately 300 employees, on average, that departed one of the Defendants each year during the proposed class period).").

i. Even if we believe that this benchmark is reasonable, which we should not, Dr. Johnson's attempts to claim that the change in outside options is driven only by the mobility effect is wrong. As I discussed above, wage suppression can result even without any mobility effects, and the wage suppression effects I estimated are specifically not due to the changes in mobility.

ii. More importantly, measured against the most natural benchmarks in the literature—estimates of the harm to workers as a result of no-poach agreements—my estimates are reasonable and in-line with prior research. For example, as I cited in my initial report, Matt Gibson's study of the Silicon Valley no-poach agreements finds that "On average, the no-poaching agreements reduced salaries at colluding firms by 5.6 percent."[461] My estimates for the effect of the No-Poach Agreements on total compensation minus equity is 6.3 percent.[462] Similarly, when considering stock-based compensation, Gibson finds that the no-poach agreements reduced the probability of a positive stock bonus and the amount of that stock bonus.[463] While Gibson does not provide an overall compensation (i.e., including equity compensation) estimate to directly benchmark against, when we also acknowledge that the evidence is consistent with Defendants sharing compensation-related CSI for a decade (a feature not present in the Silicon Valley no-poach case to the best of my knowledge)—my aggregate estimate of 12.6 percent wage suppression is entirely within the scope of the existing literature.[464]

---

[461] Gibson (2024) at 3.

[462] *See* Figure 49, *infra*.

[463] Gibson (2024) at 20 ("The estimated effect of the no-poaching agreements on the probability of a positive stock bonus is -8.3 percentage points. Conditional on a positive stock bonus, the amount declines by 65 percent (105 log points).").

[464] *See* Figure 6, *supra*.

191.    Finally, Dr. McCrary argues that my estimates are too large when compared to broad estimates of labor quit elasticities of -0.5 to -0.9.[465] He reasons that if the Challenged Conduct caused pay to fall by 14.5 percent then he would expect that departures would increase "by between 7% and 13% during the Class Period."[466] He then examines a visual of unconditional turnover rates and concludes that this exhibit "contradicts this expectation."[467] Dr. McCrary's claims and analysis are misleading and misguided for several reasons.

a.    First, Dr. McCrary's analysis does not reflect any actual tests of how turnover changed, and he does not put forward an actual model to establish how turnover would have changed but for the Challenged Conduct. His speculative conclusions are based only on his eyeballing of unconditional trends. Given the extent to which he criticizes my wage suppression and mobility models for omitting certain variables, applying his own standards to this analysis suggests that we should not treat his conclusion as credible.

b.    Second, as explained in Section X, Dr. McCrary should not be extrapolating any estimates based on quit elasticities from the broad population. Healthcare is a labor market with a particularly low labor supply elasticity and particularly high market power, with the average firm possessing enough labor market power to mark down compensation by 44 percent.[468] This implies that for the average healthcare firm, even if wages change, the labor supply response is not generally strong. Thus, and notwithstanding the fact that Dr. McCrary didn't put forth a regression model to establish but-for turnover rates, the reason for Dr. McCrary's conclusion that "departures were similar across all three Defendants before, during, and after the Class Period" could in fact reflect that Defendants do possess significant market

---

[465] McCrary Report ¶ 211 and n.401.
[466] McCrary Report ¶ 211.
[467] McCrary Report ¶ 211 and Ex. 33.
[468] Webber (2015) at Table 7.

power, like other firms in healthcare.[469] Dr. McCrary could have used standard approaches in labor economics to estimate a labor supply elasticity for each Defendant and thus come up with a proper extrapolation in this case. He did not.[470] As a result, his benchmarking and extrapolation exercise from broad estimates in the population is without merit.

      i.     To further drive this point home, note that Dr. McCrary's extrapolation pulls from Table 4.7 in Manning (2003), and he cherry picks the labor quit elasticities he considers (from -0.5 to -0.9[471]) when in fact the table indicates quit elasticities as low as -0.15 and -0.21. Had he used these labor quit elasticities he would have extrapolated a turnover effect of just 2–3 percent, in line with significant market power and his observation that "departures were similar" across all three Defendants during and absent the Challenged Conduct.

      c.     Third, Dr. McCrary could have benchmarked my estimates to those in the literature related to how no-poach agreements affect compensation, given that No-Poach Agreements are one prong of the Challenged Conduct. However, at no point in his 310-page report did Dr. McCrary even discuss the results of that literature.[472] Had he done so, it would have revealed, as discussed above and in my initial report, that my estimates are directly in line with this literature.

### 4. Managers Are an Appropriate Benchmark to Gauge the Effects of the Conduct on the Wages of Senior-Level Employees

192.    In my initial report, I tested the estimates that I obtained from my before-during-after regression models by comparing Class Members to the next-highest level of workers within

---

[469] McCrary Report ¶ 211.

[470] McCrary Dep. at 151:21–23 (testifying that he did not "calculate demand or supply elasticities for labor[.]").

[471] McCrary Report n.401.

[472] The only point at which Dr. McCrary mentions one such paper is in n.421, where he quotes from my report regarding the Gibson (2024) no-poach Silicon Valley paper, but does not engage with the actual findings of that paper.

each company, i.e., Managers.[473] I also explained that the Challenged Conduct may have directly or indirectly affected Managers via intra-firm pay structures.[474] For this reason, I explained that differencing between Class Members and Managers will provide a lower bound estimate of the effect of the Challenged Conduct on Senior-Level Employees.[475]

193.    In Figure 9 of my initial report, I implemented this empirical approach by (1) including managers in my primary empirical model, (2) adding a dummy variable that identified the Senior-Level Employees, and (3) including an interaction term between the Senior-Level Employee dummy and the Conduct term. The latter interaction term aims to recover a lower bound of causal effect of the Challenged Conduct on Senior-Level Employee wages. I also included company-by-year fixed effects to ensure that the process of identifying the Conduct effect compares compensation in Senior-Level Employee positions versus Manager positions within the same firm-year combination.

194.    Both Dr. McCrary and Dr. Saravia argue that my Senior-Level-Employee analysis is unreliable. They contend that my analysis is a "difference-in-differences" analysis and that the above method can only recover a causal effect if two conditions are met: "manager compensation must have followed the same path as Senior Employee compensation over time, relative to observed and unobserved factors, but for the assessed conduct; and (2) manager compensation must not have been affected by the conduct."[476] Both Dr. Saravia and Dr. McCrary criticize my

---

[473] Starr Report ¶ 133.
[474] Id. ¶¶ 172–193. See also Starr Dep. Vol. 2 at 320:5–16 ("There may have also been spillovers because compensation at these companies is not set on an individual negotiated basis. It's set by HR, and they're deciding on compensation based on internal equity issues within the company, and they involve compensation structures. And to the extent that any effects on directors might have been passed down to managers, either through the [N]o-[P]oach [A]greements directly or through any effects on the compensation structures, the effects of the alleged conduct here could reasonably have spilled over to managers as well.").
[475] Starr Report ¶ 133.
[476] Saravia Report ¶ 270.

model on the basis that the first condition "likely does not hold[.]"[477] To demonstrate this, in Dr. Saravia's Exhibit 34, she plots the total average compensation for Managers and Senior-Level Employees at USPI, which she contends suggests followed different paths over time.[478] Dr. McCrary makes the same point.[479] As a result Dr. Saravia concludes that this "is another indication that manager compensation is not a suitable benchmark for Senior Employee compensation but for the assessed conduct."[480] Dr. McCrary similar concludes "that managers are not a defensible control group."[481]

195.    I do not dispute that these two assumptions are key to delivering a causal estimate to a difference-in-differences analysis, among others. However, as a preliminary matter, I did not use the language of "difference[-]in[-]differences" in my report, and I disputed it during my deposition.[482] There are two reasons for this: First, as I described in my initial report, because managers are likely to be affected by the Challenged Conduct, I do not believe the analysis is capable of delivering an unbiased, causal estimate—rather, any estimate would be a lower bound. Second, the current setup does not map cleanly onto a traditional difference-in-differences setup. In the traditional difference-in-differences setup, we track a treated group before and after treatment and an untreated group over the same time frame. In the current setup, we have data on only two Defendants (DaVita and SCA) before the Challenged Conduct begins, with data on all three Defendants during and after the Challenged Conduct. This complicates the

---

[477] Saravia Report ¶ 271; McCrary Report ¶ 228.
[478] Saravia Report Ex. 34.
[479] McCrary Report Ex. 39 and ¶ 228 ("However, as I show in Exhibit 39 below, the parallel trends assumption is not supported by the evidence. Exhibit 39 shows average pay for proposed class members, as compared to average pay for managers, from 2005 through 2022 (the years included in Prof. Starr's pay regression sample), using the exact measure of total compensation that Prof. Starr relies on for his pay regression analyses.").
[480] Saravia Report ¶ 274.
[481] McCrary Report ¶ 228.
[482] Starr Dep. Vol 2. at 321:14–322:3.

set of assumptions required to believe a difference-in-differences estimate is causal.[483] In light of this, I described my analysis as identifying how the differential in compensation between Senior Employees and Managers changed as a result of the Challenged Conduct, and specifically refrained from making strong causal claims.

196.    Despite this, I still believe that managers are an appropriate benchmark for Senior-Level Employees. Dr. Saravia's and Dr. McCrary's analysis comparing average trends in compensation for managers and Senior-Level Employees before the Challenged Conduct began is not generally how economists study the parallel trends assumption. The standard approach to examining the parallel trends assumption is not to plot unconditional averages, but rather to report an event-study graph that shows how the *conditional* difference between Senior-Level Employee and manager compensation changes year over year relative to some benchmark year.[484] Then, if the differences between managers and Senior-Level Employee compensation are similar during untreated periods, that gives confidence that manager compensation does trend similarly with Senior Employee compensation.

197.    I do this analysis in **Figure 28** below. In particular, I take my regression of Senior-Level Employee vs. manager compensation differentials and I allow the differential to vary by year, relative to 2021, two years after the Challenged Conduct has ended. I also include company-year fixed effects. The way to understand the event-study graph is to notice the line at 0 on the y axis. When the dots are near 0, this tells you that there is no difference between Senior-Level Employee and manager compensation in that year relative to the difference in compensation between Senior-Level Employees and managers in the baseline year, 2021 (i.e.,

---

[483] *See* Clément De Chaisemartin & Xavier d'Haultfoeuille, *Difference-in-differences estimators of intertemporal treatment effects*, REVIEW OF ECONOMICS AND STATISTICS 1–45 (2024).
[484] SCOTT CUNNINGHAM, CAUSAL INFERENCE: THE MIXTAPE (Yale University Press 2021) at Chapter 9 ("We now discuss the obligatory test for any DD design—the event study.").

that the trends are parallel). Note that in 2021 the difference is at zero precisely because it is the baseline year. In contrast, when the dots are below zero, this tells you that the difference between Senior-Level Employee and manager compensation has fallen below what the difference was in 2021. With this background, the results in **Figure 28** show that, after the Challenged Conduct ended in 2019, manager and director compensation trended similarly (e.g., the 2020 and 2022 dots are on the zero line with 2021). Before that, however, directors experienced lower compensation relative to managers before 2020. This event study plot mirrors that done in Gibson (2024) in the high tech no-poach case.[485]

**Figure 28: Difference in Ln(Total Compensation) Between Directors and Above and Managers Relative to 2021**



198.     The important point of the event-study is the post-Conduct years 2020 through 2022, where we observe that manager and Senior-Level Employee pay trended similarly (e.g.,

---

[485] *See* Gibson (2024) at Figure 2.

the confidence intervals in 2020 and 2022 include zero). Both Dr. McCrary and Dr. Saravia ignore this evidence. Instead, they plot unconditional averages and calculate whether the pre-2008 period trends are parallel. However, such an analysis is fraught because, as both Dr. McCrary and Dr. Saravia emphasize, (a) USPI's hours are undercounted and mismeasured in that same pre-period in 2005 and 2006, rendering an analysis of pre-trends inconclusive, and (b) there is no SCA data before 2008. Thus, a much more natural benchmark to assess whether managers are a suitable comparison to Senior Employees is after the Challenged Conduct ends, when neither of those issues are present. There, I find that managers are a suitable comparison group because their conditional compensation trends are similar to Senior Employees.

199.    Despite the comparability of managers and Senior Employees, I do not expect that this approach will deliver causal estimates. This is because I expect that managers were affected by the Challenged Conduct. Thus, I expect that these estimates will deliver a lower bound on the extent of harm.

### 5.    Alleged Model "Unreliability"

200.    Dr. Johnson claims that my empirical wage suppression model is unreliable because "the results of Dr. Starr's 'robustness checks' show significant variation in the estimated effect of the Challenged Conduct, highlighting the instability of Dr. Starr's model." Dr. Stiroh makes the same point.[486]

201.    Defendants' Experts analysis of my robustness checks is misguided and misleading. For example, Dr. Johnson misdescribes results as statistically insignificant when in

---

[486] Stiroh Report ¶ 83 ("Dr. Starr's estimates of the effect of the alleged conduct on the compensation of DaVita employees vary greatly across his regression models, from a purported compensation suppression of 4.8 percent in his Figure 26 to 24.8 percent in his Figure 34.").

fact they are statistically significant,[487] and his comparisons seem to conflate the idea that a lack of statistical significance implies that the magnitude of the effect is zero. This is clearly wrong, as the American Statistical Society pointed out—the magnitude of an estimate and exactly what the p-value of that estimate are completely different things. There is no reason that in general a regression cannot report an economically meaningful point estimate but a p-value above 0.1.

202. Both Dr. Johnson and Dr. Stiroh also seek to mislead about the robustness of the results by picking the most extreme estimates from models that are clearly not the primary model because they suffer from an obvious flaw. For example, Dr. Johnson compares models without individual fixed effects—which, as I described in my initial report, are critical for comparing the same individual to themselves during versus absent the Challenged Conduct—to a specification that throws out a significant amount of data from a benchmark period.[488] Similarly, Dr. Stiroh cherry picks a wage suppression estimate for DaVita in a model without bonus or stock compensation and a model that throws out three years of DaVita data.[489] As I discussed, there is a reason that all the models in the robustness checks section are *not* the preferred model, because they suffer from different types of deficiencies. The fact that my model withstands these extreme alterations is a testament to its robustness, not its fragility.

---

[487] Johnson Report ¶ 145 ("The DaVita specific 'wage suppression' was not statistically different from 0 (in his Figure 35 specification, excluding individual-company fixed effects) or as high as 22.8 percent (in his Figure 34 specification, harmonizing time periods across Defendants)[.]"). The DaVita specific estimate from Figure 35 was -8.4 percent and was statistically significant at the 1 percent level. Dr. Johnson makes the same mistake in reference to SCA. *Id.* ("The SCA specific 'wage suppression' was not statistically different from 0 (in his Figure 35 specification, excluding individual-company fixed effects)."). The SCA wage suppression estimate was -12.3 percent and it was statistically significant at the 1 percent level.
[488] Starr Report ¶ 119.
[489] *Id.* ¶ 83.

203.    Dr. Johnson also misrepresents the nature of the control variables I use in my regression, claiming that I am alleging that my model "accounts for all relevant factors aside from the alleged conduct that determine compensation for all 6,300 proposed class members."[490]

a.    As I discussed at length in my initial report, the goal of a causal empirical analysis is *not* to control for all relevant factors that determine compensation.[491] Rather, as I explained and as is consistent with standard, modern econometrics, one has to be judicious in considering control variables and sampling decisions because the inclusion of "bad controls" can result in biased estimates.

b.    Second, at no point did I claim that I controlled for all relevant factors "that determine compensation", as Dr. Johnson claims. Rather, I omitted certain factors precisely because including them would cause bias, and I included other controls variables explicitly to close backdoors and reduce bias. I then perform a variety of analyses to rule out that other unobservable variables are not biasing my results.[492] Defendants' Experts do not identify any other control variables that either should be in the regression model (e.g., firm performance should not be in the regression model) or overturn my original estimates (e.g., inappropriate JOLTS controls).

---

[490] Johnson Report ¶ 128 ("Dr. Starr claims that this model accounts for all relevant factors aside from the alleged conduct that determine compensation for all 6,300 proposed class members[.]"). *Id*. ¶ 135 ("Second, Dr. Starr's model assumes that all relevant factors that impact total compensation for all 6,300 proposed class members are accounted for.").
[491] Starr Report ¶ 123.
[492] Starr Report Section VI.C.4 ("Sensitivity to Unobservable Variables").

### 6. Dr. Johnson's Base Salary Regressions Are Uninformative About Harm

204. Dr. Johnson estimates a model only on base salary and finds that the estimate of the effect of the Conduct is statistically insignificant or even positive for some Defendants.[493] Dr. Johnson concludes that my wage suppression model is therefore unreliable.

205. Dr. Johnson's analysis ignores the fact that what matters for worker harm is not base salary, but total compensation. Total compensation includes not only base salary but also bonuses, equity, and other forms of compensation. When I run my model on total compensation, total compensation minus equity, regular plus other pay, and log hourly wages, I find that the Challenged Conduct resulted in negative and statistically significant wage suppression. Thus, Dr. Johnson's claim about model reliability lack merit, and his cherry picking of one particular type of compensation obscures the broader scope of potential compensation and worker harm.

### 7. Job Offer and Cold Call Data Is Not Required to Estimate the Effect of the Conduct

206. Dr. Johnson argues that to study the effects of the Challenged Conduct we must consider job offers received. He writes[494]

> To properly study the direct effects of the alleged mobility restrictions, one has to consider not only an alleged offer not received, but also whether that offer would have made any difference given the other job opportunities available to that employee. That is, "it is necessary to study whether, but for the alleged conduct, an employee would receive an additional job opportunity that was "accessible to" that employee and "higher-paying" than any other job offer they received in the actual world.

---

[493] Johnson Report Ex. 28.
[494] Johnson Report ¶ 51.

Dr. Johnson makes a similar point about cold calls, which can convey timely information about workers and their specific value to specific employers, beyond what can generally be found from publicly available salary ranges.[495] Dr. McCrary makes the same point.[496]

207. Dr. Johnson's and Dr. McCrary's critique that we should measure job offers (or cold calls) is misguided, inconsistent with the academic literature, and only displays their lack of understanding of bad control variables.

208. Dr. Johnson and Dr. McCrary are arguing that because the No-Poach Agreements affected cold calls and job offers made, that I need to take that into account in my empirical model. To understand why this is wrong, and why data on cold calls and job offers are not needed to estimate the causal effect of the Challenged Conduct, we need to revisit the discussion from my initial report about controlling for mediators.[497] Mediating variables are those that lie on a causal pathway between the Challenged Conduct and compensation. Based on Dr. Johnson and Dr. McCrary's logic, cold calls and job offers are one such mediator, because the No-Poach Agreements likely reduced them, which would have then reduced compensation. As I described in my initial report, if we control for a mediator variable, like job offers, then we induce bias in our overall estimate because we close that causal pathway and prevent it from contributing to the overall Conduct estimate. Thus in general we should *not* control for job offers, cold calls, or any

---

[495] Johnson Report n.111 ("Plaintiffs' experts also suggest that cold calls (absent an outside job offer) provide employees information on the 'market value' of their labor (Starr Report, ¶73(c), footnote 173). Similarly, Plaintiffs' experts have done no analysis to show that relevant employees had access to meaningfully different market information due to the alleged conduct."). On the lack of availability of pay information from external employers, *see* Batra et al. (2023) at abstract ("First, wage information is rare: only 14% of posts contain any wage information and the minority of these (6%) have a point wage. The majority (8%) a range of wages that are on average wide[.]").

[496] McCrary Report ¶ 67 ("[T]he fact that proposed class members leverage outside job offers from non-Defendant firms to negotiate pay increases with Defendants on a case-by-case basis, mean that individualized inquiry would be necessary to evaluate whether pay could have been suppressed due to the alleged conduct for any proposed class member[.]").

[497] Starr Report ¶ 123(c) ("What does it mean for a variable to 'close a mediating pathway' and thus be a bad control? Mediating pathways are the causal pathways that link the independent variable of interest and the outcome but go through a third variable (called a 'mediator').").

181

other mediating variable. Indeed, we specifically *do not* need data on job offers or cold calls to identify the effect of the Challenged Conduct

209.    The academic literature similarly rejects Dr. Johnson's and Dr. McCrary's claims. None of the studies estimating the causal effects of no-poach agreements or noncompete clauses rely on data from job offers or cold calls.[498] Neither Dr. Johnson nor Dr. McCrary seem to be aware of this because they do not review any of this relevant literature.

### 8.    The Model Does Account for Individualized Factors

210.    Dr. McCrary critiques my regression model that derives aggregate estimates of the effect of the Challenged Conduct because, in his view, the "regression model does not account for numerous individualized" factors including employee skills and preferences, the existence of noncompete clauses, and other similar factors.[499] I reject this criticism for three reasons.

a.    First, as discussed above, it is obvious that I do not need to measure certain individualized factors, such as job offers or subsequent negotiations, as described above in Section VII.D.7. This is because those characteristics are an outcome of the Challenged Conduct, and thus we do not want to control for them.

b.    Second, the baseline empirical model does account for individualized factors via the use of individual by company fixed effects. As described in my initial report in Section VI.C, the baseline empirical model compares individuals *to themselves* both during and absent the Challenged Conduct. Thus, any fixed individual-specific skills, individual-specific preferences, individual-specific constraints, are all accounted for in the empirical model.

---

[498] *See* Starr Report Section V.
[499] McCrary Report ¶ 240.

c.      Third, if Dr. McCrary is concerned that there may be differences in the effect of the Challenged Conduct across individuals, as described in the Common Impact section of my initial report, and as fully detailed below in Section VIII, the evidence is clear, across a range of models, including those advocated by Dr. McCrary himself, and including those of mine which he does not criticize, that all or nearly all Class Members are harmed by the Challenged Conduct.

### 9.      It Is Inappropriate to Measure Year-Over-Year Differences

211.    Dr. McCrary argues that the dependent variable and control variables should be measured in year-over-year differences.[500] This suggestion is inappropriate and inconsistent with the literature on mobility constraints. In that literature, as reviewed in my initial report, all of the research focuses primarily on the levels of pay. This is because, as is the case here, the goal is generally to understand to what extent mobility constraints reduce compensation—not necessarily the extent to which they reduce compensation *growth*. Moreover, as I explain later in Section VIII.F.2.e, focusing on the *growth* of wages, rather than wages themselves, can inadvertently mask the reality of the data. Thus, I reject this argument.

---

[500] McCrary Report n.438 ("If I alternatively estimate this pay regression model by removing the individual fixed effects, and replacing the outcome variable and the control variables with the corresponding year-over-year differences, I similarly find that Prof. Starr's aggregate conduct estimate becomes positive and statistically insignificant. *See* Workpaper 26. Studies in the economics literature have concluded that earnings are best modelled in terms of first differences. *See* Costas Meghir and Luigi Pistaferri, *Earnings, Consumption, and Life Cycle Choices*, *in* HANDBOOK OF LABOR ECONOMICS 773–854, 813 (Orley Ashenfelter & David Card eds. Vol. 4B 2011) ("Following these two papers are two of the most important works in this literature, namely Macurdy (1982) and Abowd and Card (1989) … They both conclude that the best representation of earnings is a unit root in levels and MA(2) in first differences."). Note that Nobel Prize-winning labor economist David Card was Dr. McCrary's advisor. McCrary Dep. at 91:10–25.

### 10. Graphical, Unconditional Compensation Comparisons to Industry Benchmarks Are Not Capable of Discerning Harm from the Challenged Conduct

212. Dr. McCrary and Dr. Stiroh both compare Defendants' compensation to my benchmark group of medical and health services managers in the health care and social assistance industry.[501] Dr. Stiroh also compares DaVita compensation to three other benchmarks.[502] They both conclude that the unconditional trends are indicative of the fact that Defendant's compensation was in line with "competitive benchmarks" and that the evidence suggests that Defendants did not suppress pay during the Class Period.[503]

a. Dr. McCrary's and Dr. Stiroh's analyses related to benchmarks are not informative about the extent to which the Challenged Conduct suppressed compensation for three reasons. First, as a general matter, these analyses are unconditional and do not incorporate any other control variables. Thus, they are susceptible to omitted variable bias and should not generally be interpreted to reflect but-for relationships.

---

[501] McCrary Report Ex. 29; Stiroh Report Figure 11.

[502] *See* Stiroh Report Figure 9 and Figure 10. These three benchmarks are (1) the OEWS 3-Digit Industry Benchmark, which is the average salary of management employees in the ambulatory health care services industry excluding executives, compensation and benefits managers, and HR managers, as calculated from the United States Bureau of Labor Statistics' Occupational Employment and Wages Series (Stiroh Report n.101); (2) the Top 5 NAICS Benchmark, which is according to Dr. Stiroh is the "average annual salary of management employees in the top five industries from which DaVita hired employees or to which it lost employees during the alleged conduct period, according to my analysis of the Lightcast data" (Stiroh Report ¶ 51); and (3) The QWI Industry Benchmark is the mean compensation excluding equity of workers with at least a bachelor's degree (Stiroh Report n.106).

[503] Stiroh Report ¶ 55 ("These figures and analysis discussed above demonstrate that DaVita's compensation practices were in line with competitive benchmarks and do not support Plaintiffs' contention that compensation at DaVita was anticompetitively suppressed for more than a decade as a result of an agreement that affected a very small part of the labor pool in which DaVita competes for Senior-Level employees."); McCrary Report ¶ 208 ("Exhibit 29 shows average pay by year for proposed class members at each Defendant, as compared to the same benchmark group that Prof. Starr uses in his pay regression analysis. To ensure an 'apples-to-apples' comparison, this analysis excludes any equity pay earned by proposed class members, since the ACS data does not reflect equity pay. Exhibit 29 demonstrates three key patterns, none of which align with Prof. Starr's claim that pay was suppressed during the Class Period[.]").

b.  Second, Dr. Stiroh's and Dr. McCrary's benchmark analyses are also purely graphical, and Defendants' Experts do not perform any tests to see if compensation was suppressed relative to the benchmarks.

c.  Third, if indeed Defendants' compensation for Senior-Level Employees was in-line with competitive benchmarks before, during, and after the Challenged Conduct then when I control for the benchmark in my wage suppression regression I should not find that the Conduct suppressed compensation. However, when I include each benchmark as a control variable, which I do in my main specification, I still find that the Conduct suppressed compensation. Given that Dr. Stiroh considers three additional benchmarks, in **Figure 29** below, I show that, regardless of which of the four benchmarks I use, I still find that the Challenged Conduct suppressed compensation to a similar degree overall and at each Defendant.

3244633.4

185

**Figure 29: Including Other Benchmarks**

| | Dependent Variable: Ln(Total Annual Compensation) | | | | | |
|---|---|---|---|---|---|---|
| | [1]<br>QWI<br>Industry<br>Benchmark | [2]<br>QWI<br>Industry<br>Benchmark | [3]<br>OEWS 3-<br>Digit<br>Industry<br>Benchmark | [4]<br>OEWS 3-<br>Digit<br>Industry<br>Benchmark | [5]<br>Top 5<br>NAICS<br>Benchmark | [6]<br>Top 5<br>NAICS<br>Benchmark |
| Conduct | -0.128*** | | -0.147*** | | -0.135*** | |
| | (0.0117) | | (0.0111) | | (0.0114) | |
| **% Wage Suppression** | **-12.0%** | | **-13.7%** | | **-12.7%** | |
| DaVita Conduct | | -0.185*** | | -0.205*** | | -0.190*** |
| | | (0.0153) | | (0.0145) | | (0.0147) |
| **% Wage Suppression** | | **-16.9%** | | **-18.6%** | | **-17.3%** |
| SCA Conduct | | -0.0641*** | | -0.136*** | | -0.130*** |
| | | (0.0200) | | (0.0177) | | (0.0183) |
| **% Wage Suppression** | | **-6.2%** | | **-12.7%** | | **-12.2%** |
| USPI Conduct | | -0.0771*** | | -0.0974*** | | -0.0853*** |
| | | (0.0126) | | (0.0126) | | (0.0130) |
| **% Wage Suppression** | | **-7.4%** | | **-9.3%** | | **-8.2%** |
| QWI Industry Benchmark | 0.383*** | 0.533*** | | | | |
| | (0.0882) | (0.0988) | | | | |
| OEWS 3-Digit Industry Benchmark | | | 1.194*** | 1.323*** | | |
| | | | (0.286) | (0.285) | | |
| Top 5 NAICS Benchmark | | | | | -0.159 | 0.107 |
| | | | | | (0.334) | (0.337) |
| Individual-Company FE | Yes | Yes | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 25,815 | 25,815 | 25,871 | 25,871 | 25,871 | 25,871 |
| R-squared | 0.859 | 0.859 | 0.858 | 0.859 | 0.858 | 0.859 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

**11.      Unconditional Trends in Employment, Hiring, and Departure Rates Are Meaningless**

213.      Dr. Stiroh argues broadly that DaVita's employment growth[504] are inconsistent with my econometric evidence of wage suppression.[505] Dr. McCrary makes the same argument about employment, hiring rates, and turnover rates.[506] Dr. Johnson argues that "to facilitate a successful monopsony cartel, firms must implement 'a restriction' on their purchases (i.e., the amount of labor to employ) and 'the group must decide on how much each participant will curtail its purchases.'"[507] He then argues that I provided "no assessment of whether, or to what extent, the Defendants restricted demand for proposed class member labor, " and then shows that the number of Senior-Level Employees in different positions grew over time at each firm and claims that this is "the opposite of what one would expect if they were 'suppressing' wages."[508]

214.      The observation that certain metrics changed in absolute terms reveals nothing about what those metrics might have been in the but-for world. While Defendants' Experts criticize my econometric model for not considering certain control variables, they do not put forth a regression model to establish how Defendants would have grown, or how hiring rates would have changed but-for the Challenged Conduct. Thus, we should not overly interpret these unconditional trends. Regardless of the Challenged Conduct, firms can still grow. The fact that

---

[504] Stiroh Report ¶ 47 ("There is no economic evidence of reduced employment of Senior-Level employees by DaVita during the conduct period, which is inconsistent with Dr. Starr's assertion that Defendants' alleged conduct meaningfully suppressed employee mobility or compensation. If the alleged conduct suppressed employee compensation, then Defendant firms would be unable to compete for new employees.").

[505] Stiroh Report ¶ 50 ("Not only was DaVita's compensation consistent with competitive offerings during the alleged conduct period (as demonstrated by DaVita's ability to attract hundreds of Senior-Level employees), but the growth rate of Senior-Level compensation was similar to or higher than that of comparable benchmarks during the alleged conduct period, indicating that DaVita did not underpay Senior-Level employees once it attracted them to the firm.").

[506] McCrary Report Exs. 21, 22, and 33.

[507] Johnson Report ¶ 107.

[508] *Id.*

Defendants grew is neither surprising nor indicative of any wage-suppressing effects of the Challenged Conduct.

215.    In addition, Dr. Johnson's claims that I did not assess whether Defendants restricted demand for Class Member labor are misleading. I did analyze moves between Covered Defendants and found that they were suppressed, particularly towards the middle and end of the Conduct Period.[509] My analysis of Defendants' Experts own Lightcast data, described in Section VI.B.2.c above, reaches the same conclusion.

## VIII.    Common Impact

216.    In my initial report, I used six independent and complementary methods to demonstrate that the generalized wage suppression found by the regression models would harm all or nearly all Class Members.[510] Aside from the criticisms about my baseline model, Defendants' Experts offer zero criticisms of the empirical models that show Common Impact (though they do criticize the wage structure analysis).[511] Defendants' Experts do mischaracterize my analysis, however. For example, Dr. Johnson posits that I do "not consider the possibility that any subset of employees within the class could be in different relevant labor markets, and fails to assess any geographic constraints that would limit or expand competition for some proposed class members."[512] Dr. McCrary makes a similar criticism, including alleging that my analysis

---

[509] Starr Report Section V.B.
[510] Starr Report Section VIII.
[511] *See* n.5, *supra.*
[512] Johnson Report ¶ 12.

estimates a "single effect."[513] Both criticisms are wrong and reflect a fundamental misunderstanding of the analyses I performed in the Common Impact section. The empirical analyses in this section, particularly the in-sample prediction methods and the random coefficient models, use common methods and data to generate an estimate of harm *for every individual*, regardless of any specific geographic constraints, relevant labor markets, or even individual preferences, skills, or circumstances.

217.    Defendants' Experts only substantive arguments pertain to the evidence of a compensation structure which would transmit harm to all Class Members. Neither Dr. Johnson nor Dr. Saravia dispute that wage structures are a real economic phenomenon. None of Defendants' Experts challenge the concept of internal equity on a theoretical level, nor do they contend that wage compression would not exist.[514] (Nor can they, as these are well understood phenomena among economists.) Instead, Defendants' Experts' arguments in this section boil down to claims that competitive pressures may create upward wage pressure, selectively reviewing documents, inapposite visual analyses of wage distributions, and poorly designed analyses which are insufficient to show a wage structure.

218.    Before proceeding to address their arguments on the merits of a compensation structure, I reproduce all of the figures in my initial report below using the revised data. All of

---

[513] McCrary Report ¶ 25 ("He purports to estimate the effect of the alleged conduct on average in his pay regression analysis but, by focusing on averages, he conceals variation within the proposed class, ignoring the diversity of jobs and skills among proposed class members."); *id.* ¶ 240 ("Further, Prof. Starr's pay regression model does not account for numerous individualized factors I discussed earlier including what the skills and preferences, and in turn the relevant labor market, are for each employee; whether Defendants had market power sufficient to suppress pay for a given individual; the role that individualized negotiations, performance, or managerial discretion played in determining each employee's pay; and whether the mobility of some proposed class members was limited regardless of the alleged conduct (e.g., non-compete agreements or unvested equity)."); *id.* ¶ 249 ("Finally, in addition to the methodological flaws discussed above, Prof. Starr's primary pay regression model (the model in which he estimates a pay suppression effect of -14.5%) suffers from another specification problem: it simply estimates a single effect across all forms of conduct and throughout the Class Period, despite the fact that Plaintiffs allege multiple forms of conduct that varied in nature (mobility restrictions versus information sharing), varied in terms of which Defendants and which proposed class members were involved, and varied in terms of when the conduct occurred.").
[514] *See, e.g.,* McCrary Report ¶ 70 ("I do not dispute that Defendants consider internal equity to some degree[.]").

these Common Impact methods continue to demonstrate that all or virtually all Class Members were harmed by the Challenged Conduct, and none of these methods (subsections A through E below) are disputed by Defendants' Experts.

## A. By-Employee-Level-Category and Defendant Suppression Model

219. **Figure 30** below recreates Figure 10 from my initial report, which demonstrated that Challenged Conducted harmed workers at different tiers within the same company. The results below are not materially different from the results in my initial report, and continue to show the Challenged Conduct had similar negative effects on compensation of Directors and VPs and SVPs overall and at each Defendant.

**Figure 30 [Figure 10 Revised]: Aggregate Effect of Conduct on Earnings By Job Level and Defendant**

| Baseline Category: Directors | Dependent Variable: Ln (Total Annual Compensation) | |
| --- | --- | --- |
| | Overall | By Defendant |
| | [1] | [2] |
| Conduct (Directors) | -0.123*** | |
| | (0.0116) | |
| Conduct*1 (VPs & SVPs) | -0.0321** | |
| | (0.0141) | |
| DaVita Conduct (Directors) | | -0.179*** |
| | | (0.0138) |
| DaVita Conduct*1 (VPs & SVPs) | | -0.0426* |
| | | (0.0255) |
| SCA Conduct (Directors) | | -0.0764*** |
| | | (0.0180) |
| SCA Conduct*1(VPs & SVPs) | | -0.0709*** |
| | | (0.0195) |
| USPI Conduct (Directors) | | -0.0317** |
| | | (0.0136) |
| USPI Conduct*1(VPs & SVPs) | | -0.0992*** |
| | | (0.0179) |
| 1(VPs & SVPs) | 0.324*** | 0.342*** |
| | (0.0194) | (0.0208) |
| Healthcare, Macro, Hours | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 25,871 | 25,871 |
| R-squared | 0.866 | 0.867 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

## B.    Quantile Regressions

220.    **Figure 31** below recreates Figure 11 from my initial report, which examined how the Challenged Conduct affected compensation at every percentile of the earnings distribution.[515] As before, the quantile regressions show that compensation is both suppressed and statistically significantly different from zero at virtually every percentile of the compensation distribution, both in the aggregate and across Defendants.

---

[515] Note that the various data changes and control variable changes resulted in the standard errors not being estimable under the stringent individual-company fixed effects structure for the overall conduct regression. Thus, I relax the individual by company fixed effects to individual fixed effects, which allows for the estimation of standard errors and confidence intervals in the quantile regression specifications.

**Figure 31 [Figure 11 Revised]: Quantile Regressions**



### C.      In-Sample Prediction

221.     **Figure 32** below recreates Figure 12 from my initial report, which is the traditional method of in-sample prediction for estimating harm to individual Class Members following a regression model. The revised show that, across all Defendants, at least 80 percent of Class Members were harmed by the Conduct in each year, more than 99 percent of Class Members were harmed by the Conduct in at least one year, and that more than 95 percent of Class Members were harmed by the Conduct on net.

**Figure 32 [Figure 12 Revised]: In-Sample Prediction Method**

| | [1] | [2] | [3] | [4] |
|---|---|---|---|---|
| | Annual Wage Suppression % | Percentage Harmed: | | |
| | | In any Year? | In each Year? | Cumulatively? |
| Common Conduct Model | -12.6% | 99.30% | 84.51% | 97.13% |
| *Defendant-Specific Model* | | | | |
| DaVita | -17.2% | 99.70% | 86.13% | 98.05% |
| SCA | -11.9% | 99.28% | 88.45% | 98.28% |
| USPI | -8.1% | 99.08% | 80.52% | 95.84% |

*Note*: This table reports the results from the in-sample prediction method. Column (1) provides the wage suppression estimates corresponding to Common Conduct effect and the Defendant-Specific Conduct model provided earlier. Based on the generalized harm in Column (1), Column (2) shows the percentage harmed in each year. Column (3) calculates the percentage of Class Members who had at least one year in which they were harmed by the Conduct; that is, at least one year where there earnings under the Conduct were lower than what they were predicted to be absent the Conduct. Column (4) calculates the cumulative compensation of the Class Member over the time they were employed during the Conduct Period and compares them to the cumulative predicted compensation the Class Member would have received absent the Conduct; a Class Member is rated as "harmed" if the cumulative "but for" compensation is higher than the actual received compensation.

### D.    Interval In-Sample Prediction

222.    **Figure 33** and **Figure 34** recreate Figure 16 and Figure 17 from my initial report, which report the harm to Class Members using the interval in-sample prediction approach. Using the revised data, the results suggest that more than 92 percent of individuals are statistically significantly harmed at a confidence level of 90 percent. At each Defendant, with confidence levels between 83 and 93 percent, I find that more than 91 percent of Senior-Level Employees are statistically significantly harmed.

**Figure 33 [Figure 16 Revised]: Interval In-Sample Prediction Results— Rates of Statistically Significant Harm At Each Confidence Level**



**Figure 34 [Figure 17 Revised]: Interval In-Sample Prediction Results—Confidence Level with 90 Percent Harm[516]**

|  | [1] | [2] | [3] |
|---|---|---|---|
| Model | Annual Wage Suppression % | Confidence Level | Percentage Harmed Cumulatively |
| Common Conduct Model | -12.6% | 90.13% | 92.20% |
| *Defendant-Specific Model* |  |  |  |
| DaVita | -17.2% | 92.29% | 93.29% |
| SCA | -11.9% | 93.59% | 93.86% |
| USPI | -8.1% | 83.19% | 91.35% |

*Note*: This table reports the results from the Interval In-Sample Prediction method for the cumulative compensation of individuals over the Conduct Period.

---

[516] Note that I updated the title of Figure 34 to align with how it was described in the text of my original report. Starr Report ¶ 168 ("Figure 17 below summarizes the information from Figure 16 by showing the associated confidence level when the proportion of Senior-Level Employees that are statistically significant harmed is approximately 90 percent.").

### E.    Random Coefficient Model

223.    **Figure 35** below recreates Figure 18 from my initial report, which used a Random Coefficient Model to allow the Conduct to have a differential effect on every Senior-Level Employee. Using the revised data, this approach reveals that 93.83 percent of individuals were harmed by the Challenged Conduct. This includes 94.6 percent of individuals at DaVita who were harmed, 97.39 percent at SCA, and 88.63 percent at USPI.

**Figure 35 [Figure 18 Revised]: Results from the Random Coefficient Model**



### F.    Evidence of a Compensation Structure

224.    In this section, I reviewed the basics of compensation structures, before turning to qualitative and quantitative evidence in this case.[517] My discussion emphasized issues of internal equity, which refers to the idea that workers doing similar work and performing similarly would

---

[517] Starr Report Section VII.F.

be paid similarly. I discussed how, due to internal equity concerns "employers tend to respond by implementing uniform compensation structures that pay comparable compensation for comparable work."[518] I also discussed issues of external equity, which refers to pay similarities between workers doing similar jobs at different firms. I described how companies balance internal and external equity, and that by taking external equity into account it "does not mean that compensation is entirely determined by a larger labor market and that the employer has no monopsony power."[519] The cumulation of these ideas suggests that, as I wrote in my initial Report, "if employee compensation is driven, in part, by considerations of internal equity, then the firm's ability to suppress wages of a group of employees would also be indirectly felt even by those employees who were not the target of wage suppression."[520]

225. Before turning to the qualitative and quantitative evidence in this case, I first consider Defendants' Experts' common claim that that wage structures also put upward pressure on wages when new employees are hired because new employees "would have to be paid a competitive rate."[521] I agree with Defendants' Experts that wage structures can propagate harm or benefits across the workforce, but I disagree with their claim that the external market will necessarily put upward pressure on compensation that would propagate throughout the firm.

---

[518] Starr Report ¶ 173.

[519] *Id*. ¶ 176.

[520] *Id*. ¶ 174.

[521] Johnson Report ¶¶ 92–93 ("Taking Dr. Starr's and Dr. Gerhart's description of the Defendants' purported 'wage structures' at face value, the continued addition of new employees would put *upward* pressure on compensation. According to Plaintiffs' experts, Defendants' purported 'wage structures' imply that any 'wage suppression' would impact all employees. If that were the case, compensation across employees would also have to *increase* in response to newly hired employees paid competitive rates (i.e., joining the Defendants at higher compensation levels compared to current employees' compensation that was allegedly 'suppressed')."). Dr. Saravia makes similar claims in the context of USPI about how external competition makes it hard to suppress compensation. Saravia Report ¶ 198 ("Yet, Dr. Starr fails to recognize that the qualitative evidence specific to USPI that he highlights is consistent with outside options for USPI Senior Employees acting as a competitive check on USPI's ability to suppress wages.").

226. As I discussed in Section VII.C.8, Defendants' Experts rely on an outdated notion that the external labor market is competitive, and that companies must offer a single competitive wage. Labor economists have long debunked this myth. The canonical job search and matching models reveal that identical workers searching for jobs at identical firms can wind up receiving dramatically different compensation, simply by din of which job offers one receives and thus where they fall on the job ladder.[522] The resulting frictions in the labor market give companies some degree of market power, and in the context of Healthcare, recent estimates suggest that the average firm has the power to suppress compensation by 44 percent, such that workers earn only 56 percent of their productivity.[523] Thus, the economic consensus disputes the broad assumption on which Defendants' Experts rely that the external labor market is generally competitive. Perhaps most directly, as shown in Section VII.C.8, while Defendants' Experts assume that starting compensation must be competitive and thus unaffected by the Challenged Conduct, this is inconsistent with both the academic literature and with the evidence in this case. The academic literature finds that posted wages and starting wages are reduced as a result of no-poach agreements and noncompete clauses, and my own analysis confirms that the Challenged Conduct lowered starting compensation of Class Members in this case.[524]

227. Thus, these analyses suggest that Defendants' Experts arguments that an outside competitive market is likely to result in upward pressure on compensation are meritless. Rather, Defendants do have power to suppress even starting compensation, and thus the wage structures and concerns about internal equity do help maintain suppressed compensation among Class Members across the Defendants.

---

[522] *See* Burdett & Mortensen (1998). *See also* Manning (2003).
[523] Webber (2015) at 133 (Table 7, average firm-level labor supply elasticity in Healthcare and Social Assistance is 0.78, indicating a markdown of 44%).
[524] *See* Figure 27, *supra.*

### 1. Qualitative Record Evidence of Defendant Firms' Compensation Structures

228. In this section, I reviewed documentary evidence from each Defendant about how they set pay. This review considered documentary evidence and deposition testimony of how pay was set, and in particular regarding issues of external benchmarking and internal equity. It described a variety of pay setting practices related to how internal equity affects compensation for new hires and compensation adjustments. I concluded that the qualitative evidence was consistent with a compensation structure at each Defendant.

229. Defendants' Experts dispute my characterization of the evidence. Dr. Johnson points to an internal DaVita document I reviewed "which describes the 'high degree of customization' used by DaVita in determining compensation, such as 'unique structures for individual groups, or even individual people' and that DaVita did not 'believe in 'salary bands' or 'pay grades.'""[525] Similarly, Dr. Johnson suggests that SCA did not "have a formal base salary/incentive structure, pay grades, or pay ranges."[526] Dr. Saravia and Dr. McCrary make the same points.[527] Dr. McCrary argues that pay is "highly individualized" and posits five reasons, including that Defendants negotiate over pay with Class Members, managerial discretion helps determine pay, pay is conditioned on individual performance, pay depends on differences in supply and demand for skills, and that Defendants offer different types of compensation.[528]

230. None of Defendants' Experts' points are compelling evidence that a wage structure does not exist.

---

[525] Johnson Report ¶ 68 referencing DVA_OMCEAL_001329256 at -9257.
[526] *Id*. referencing SCA001669270 at slide 3.
[527] Saravia Report ¶ 207; McCrary Report ¶ 104.
[528] McCrary Report ¶ 72.

a.     Indeed, the qualitative evidence Defendants' Experts describe—that pay at DaVita is customized and that Defendants did not believe in pay ranges—does not mean that internal equity issues are not present. Rather, evidence from each Defendant point to the fact that internal equity issues are present.[529]

b.     Further, at deposition, Dr. Johnson testified that he does not "think there's anything inconsistent" with a company paying employees for performance "while also adhering to principles of internal equity."[530]

c.     Dr. Saravia's description of USPI compensation types also provides evidence of a wage structure.[531] For example, Dr. Saravia indicates that annual bonus amounts were "based on a mathematical calculation" that factored in completion towards goals set for "[e]ach job."[532] Salary increases were recommended "across the board,"[533] which were then centrally reviewed and "approved in aggregate" by USPI executives. Equity compensation was also centrally approved.[534] Dr. Saravia tries to point out that some of these components could be individualized, but the broad, formula-based, "across the board," centrally-approved nature of compensation at USPI suggests that indeed USPI has a compensation structure. For example, Dr. Saravia's discussion of how at USPI supervisors could ask for "additional discretionary amount based on employee performance"[535] is undercut by the testimony of Cindy English, who she cites to support her claim. As Dr. Saravia acknowledges, English testified during her deposition about

---

[529] Starr Report ¶¶ 179–181.
[530] Johnson Dep. at 159:4–15.
[531] Saravia Report ¶¶ 57–69.
[532] Id. ¶ 61.
[533] Id. ¶ 59 ("For example, for the November 2009 salary increases, while 'senior management' provided a spreadsheet showing a 'proposed' salary increase of 2 percent across the board[.]").
[534] Id. ¶ 64 ("In both plans, equity compensation was governed by USPI's compensation committee, which determined employee eligibility, award terms, vesting schedules, and types and amounts of equity compensation for USPI employees. The committee reviewed and approved equity grants proposed by USPI executives for Senior Employees.").
[535] Id. ¶ 208.

how bonuses were determined, and noted that "I believe it was based on -- if an EBITDA target was met, different titles would get a different percentage of their salary. If they did something that was over and above the normal cause -- the call of duty, so to speak, we could request a discretionary amount."[536] Thus only in exceptional cases could a discretionary amount be requested, and even then it was based on a formulaic set of criteria.

231.    Similarly Dr. McCrary's "five facts" which in his view "highlight the individualized nature of proposed class members' pay" are ignorant of the fact that all compensation decisions, even when part of negotiation decisions with an individual, are made within the context of internal equity and centralized control and guidance.[537] I describe how these ideas manifest in regards to each of Dr. McCrary's five reasons below.

a.    Dr. McCrary first argues that Defendants often engage in individual negotiations.[538] In this section, he describes how individuals leveraged job offers and high performance to negotiate for higher pay, and offers specific instances of counteroffering behavior.[539] Dr. McCrary fails to understand that even when individual negotiations happen, the result of those negotiations are inevitably linked to issues of internal equity. For example, evidence I reviewed in my initial report discusses how each Defendant considered internal equity when deciding on starting salaries or compensation adjustments.[540] Thus, even when an individual requests higher pay, the company is considering how any adjustments to

---

[536] Saravia Report n.328.

[537] McCrary Report ¶ 72.

[538] *Id*. ¶ 73 ("The first reason that proposed class members' pay is individualized is that Defendants often engage in individualized pay negotiations with proposed class members, resulting in individualized differences in pay across the proposed class.").

[539] Note that one argument that Dr. McCrary makes in this section is that "existing employees leverage their strong performance to negotiate better terms with Defendants." McCrary Report ¶ 74. Workers being paid according to their performance is perfectly in line with a compensation structure where workers receive similar pay for similar performance.

[540] Starr Report Section VII.F.1.

compensation compare to those doing similar work at the company. A company may be willing to grant an individual's request precisely because it falls right within where others are already being paid. Or, even if a company grants an extraordinary pay increase, this inevitably creates internal equity issues in subsequent years. The fact that individuals sometimes negotiate pay does not imply that there is no compensation structure.

b. Dr. McCrary next argues that "the specific decision makers involved in determining pay vary across proposed class members."[541] He describes how these decision makers exert "discretion by assigning merit pay increases or bonuses to the employees they oversee" and provides selected examples. The fact that different decision makers make decisions over pay is not inconsistent with a compensation structure. Indeed, as evidence by my review about compensation decisions in my initial report, those who decide at each Defendant still take into account internal equity issues. Thus, when they are deciding what to pay the employees they oversee, the issues of internal equity imply that workers will be paid similarly for similar work. The fact that there may be a handful of decision makers instead of just one is immaterial. Moreover, none of these decision makers have limitless authority to do whatever they want; they are still part of the same, centrally-managed firm-wide system.

c. Dr. McCrary next argues that Class Member pay is based on "individual performance, resulting in additional variation in compensation across the proposed class."[542] Dr. McCrary provides selected examples of how Defendants "pay for performance."[543] Dr. McCrary's point is not inconsistent with a pay structure. Indeed, internal equity implies that individuals with similar performance for similar work are paid similarly. Dr. McCrary provides

---

[541] McCrary Report ¶ 76.
[542] *Id.* ¶ 77.
[543] *Id.*

an example where an individual with outsized performance would demand a high raise if they could get it elsewhere. He claims that "[m]arket forces would persistently chip away at such a structure."[544] But even in his example, internal equity requires that people with similar performance, doing similar work, are paid similarly. The "market forces" Dr. McCrary references are generally weak constraints on the pay structure, because in the Healthcare and Social Industry the average firm possesses more market power than in all but one other industry.[545]

        d.      The fourth argument that Dr. McCrary makes is that "Defendants make adjustments to proposed class members' pay based on differences in skills, and in the demand for those skills across workers."[546] Dr. McCrary's point is that companies might take into account external equity when setting pay. I made the same point in my initial report.[547] However, just because the company is taking into account external equity does not mean that internal equity doesn't matter. Indeed, as I wrote in my initial report, "taking external equity into account does not mean that compensation is *entirely* determined by a larger labor market and that the employer has no monopsony power."[548]

        e.      Finally, Dr. McCrary points out that "Defendants offer many types of pay that depend on different factors."[549] He then describes some examples of the mix of pay types, and shows it for different types of workers at DaVita, though in all such categories pay is almost entirely comprised of regular pay, bonus, and regular pay.[550] The fact that compensation types

---

[544] McCrary Report ¶ 82.
[545] *See* Webber (2015) (Table 7, average firm-level labor supply elasticity in Healthcare and Social Assistance is 0.78, indicating a markdown of 44%.). *See* Section IX.A, *infra.*
[546] McCrary Report ¶ 83.
[547] Starr Report ¶ 175 ("A related concept is 'external equity,' wherein employees seek to achieve pay similarities between laborers doing similar jobs at different firms.")
[548] Starr Report ¶ 176.
[549] McCrary Report ¶ 84.
[550] *Id*. ¶ 85 and Ex. 11.

can vary, or that they differ for different types of workers, is not generally inconsistent with a pay structure. Internal equity requires similar compensation for similar work.

232.    Taken together, Dr. McCrary concludes that these five facts are "contrary" to a pay structure in which a decrease in pay for some employees would be felt by all employees.[551] Even notwithstanding the quantitative evidence, which clearly refutes Dr. McCrary's conclusion, Dr. McCrary's conclusion is fundamentally unfounded because, as the qualitative evidence at each Defendant shows, internal equity pervades compensation decisions, even if they are a part individual negotiations, even if there are multiple decision makers, even if there are different types of compensation, and even if there is an outside market.

233.    Dr. McCrary also claims I provided no evidence that compensation structures govern equity pay, which can be a significant portion of an employee's total compensation.[552] The record evidence from USPI shows that compensation structures extended to equity grants:

    a.    February 2016 USPI-Tenet presentation details compensation practices for executives at USPI, including base salary, bonus plans, and stock options. The presentation specifically contains three slides explaining its "Equity Plan Design" and details how equity grants are issued, and what their terms are, to VPs and above.[553]

    b.    2016 USPI compensation committee notice of consent to 2017 Bonus Plan.[554] The plan lists the standard terms  for the stock options and contains an appendix of employees at USPI employees that the Committee has determined should be eligible for stock options.

---

[551] *Id.* ¶ 87.
[552] McCrary Report ¶ 105.
[553] USPI_CIV_000242381.
[554] USPI_CIV_000624407.

c. A December 2015 email exchange between Jonathan Bond at USPI and Kyle Burtnett at Tenet Health discussing job offer for Alan Cason make reference of a "Bonus structure" file and a "compensation review schedule".[555] The bonus structure includes an "equity plan." The email chain concludes with a statement that Mr. Carson should "go on the standard USPI Market President bonus plan" which includes equity grants.

d. An October 2017 offer letter for Riley Orr at USPI, detailing base salary, bonus plan, and stock options. The details of the stock options were to be decided by a the compensation committee which would set the purchase price of the options.[556] The committee sets the same option price for all eligible employees.[557]

e. November 2014 email exchange between Sandi Karrmann, Marc Steen, Brett Brodnax, and Phil Spencer of USPI discussing compensation plans for David Lewis. The email chain specifically discusses internal equity with regard to options ("He knows others have gotten equity," "I think he should get options similar to others in a similar position.").[558]

## 2. Quantitative Evidence of a Compensation Structure

234. In this section, I developed two analyses to help shed light on the existence of a compensation structure: whether compensation was positively correlated within a company across job levels, and whether compensation was positively correlated within a job across individuals. I found that compensation was positively correlated both within a job and between job levels. I concluded that the evidence was consistent with a compensation structure.

---

[555] USPI_CIV_000026885. *See also* USPI_CIV_000243441 (A December 2015 detailing job offer for Alan Cason, detailing his new base salary, bonus plan, stock options, and benefit plans.).
[556] USPI_CIV_000167345 (An October 2017 offer letter for Riley Orr at USPI, detailing his new base salary, bonus plan, stock options, and benefit plans.). *See also* USPI_CIV_000514831 (An August 2018 email from Alex Jenkins to Riley Orr presenting stock option award, granting Mr. Orr the right to purchase shares of USPI stock.).
[557] USPI_CIV_000624407.
[558] USPI_CIV_000401250.

235. Given the updates to the data as discussed above, I have re-run those models and found that the results are unchanged (**Figure 46, Figure 47,** and **Figure 60** in Appendix C).[559] I continue to believe that these results are consistent with a wage structure.

  a.  I note that Dr. McCrary repeats my within-job-level analysis but takes a slightly different approach with regards to the hold out sample. I replicate his results with my revised data, and find consistent results with my initial analysis.[560]

236. Defendants' Experts offer several criticisms of my analyses. I address each of these below. As my response below fully documents, Defendants' Experts' analyses, "basic corrections,"[561] and arguments are flawed, incomplete, and misleading. I maintain my opinion that the quantitative evidence is consistent with a wage structure at each Defendant.

  a.  **79 Percent of Dispersion in Compensation is Explained by Four Common Factors**

237. Defendants' Experts document dispersion in the compensation within each company and within each job level.[562] They claim that this dispersion is large, arises from varied types of compensation, and argue that it is inconsistent with the idea that compensation between

---

[559] Note that in order to calculate hourly wages in the comparison of (S)VP and Director compensation I need to impute hours for those who were identified as low measured earnings for USPI. I avoided this in the primary wage regressions above by using an indicator variable, but given here that I am aggregating the data beyond the individual level I need to impute these hours. I use Dr. Johnson's approach for this imputation because it is significantly less likely to create measurement error relative to Dr. Saravia's. This is because, as discussed in Section VII.A.2, Dr. Saravia's approach imputed nearly everyone's hours at USPI to be 2080 in 2005 and 2006, whereas Dr. Johnson took a more targeted approach to determine whose hours were likely too low.

[560] In particular, Dr. McCrary limits the hold out sample to all but five individuals in a given company-job-year and then examines how the average earnings of those five individuals relates to the earnings of the remaining individuals in the same company-job-year (McCrary ¶ 101 "*Second*, I adjust both analyses to calculate average year over year wage changes for a smaller group of randomly selected proposed class members (i.e., five randomly-selected VPs and SVPs, or five randomly-selected proposed class members in each job title), and then compare that to individual year-over-year wage changes."). In my original approach, I had limited the hold out sample to half of the individuals in a given company-job-year. Nevertheless, repeating Dr. McCrary's approach and repeating it 1,000 times, I find that for each Defendant hourly wages of the five randomly selected workers are positively and statistically significantly correlated with the remaining workers in the hold out sample. *See* my workpapers.

[561] McCrary Report ¶ 70 ("[T]he quantitative analyses are uninformative and generate results that are inconsistent with the claimed rigid pay structures once basic corrections are made[.]").

[562] Johnson Report Exs. 11 and 12; Saravia Report Ex. 20. McCrary Report Exs. 15–18.

workers is "connected."[563] They further lament that I collapse this variation into averages for subsequent analyses.[564]

238. Defendants' Experts' observations about the dispersion in compensation and subsequent claims that the existing evidence is inconsistent with a wage structure are meritless. In general, dispersion in compensation arises naturally from wage structures because, as discussed in my initial report, companies pay workers differently based on their different roles and contributions to the organization.[565] None of Defendants' Experts put forth an economic analysis that seeks to quantify what amount of variation in compensation is due to individualized versus common factors.[566] Rather, they plot the unconditional range of compensation, marvel at the variation, and make unsupported claims about what it means. These visual analyses are meaningless. Indeed, at deposition, Dr. Saravia contradicted her own claims about what the dispersion means when she agreed "that the economic literature recognizes that companies using … structured compensation systems have a great deal of variation in paid jobs and job levels[.]"[567] This variation within a compensation structure is what Defendants' Experts' uninformative visual analyses are showing.

239. To shed light on how much of the variation in compensation can be explained by a handful of common factors, I run a simple regression explaining log hourly wages with just

---

[563] Johnson Report ¶ 70 ("That is, Plaintiffs' experts' theory of 'cascading effects' assumes that the compensation for all Directors (or all Vice Presidents) are connected, such that a change on one Director's (or Vice President's) compensation will immediately cause consistent changes in the compensation of all Directors (or all Vice Presidents)."); Saravia Report ¶ 210 ("The multiple components of pay, each determined in different ways, would make a systematized compensation structure difficult to maintain."); McCrary Report ¶ 98 ("The wide observed pay ranges within a level, and substantial overlap in observed pay ranges for adjacent seniority levels, additionally mean that changes in pay at one level would not necessitate changes in pay at other levels.").

[564] Saravia Report ¶ 221 ("[T]he averages Dr. Starr uses as inputs to his regression do not contain the variation in compensation underlying those averages.").

[565] Starr Report Section VII.F.

[566] *See, e.g.,* Saravia Dep. at 147:22–148:12.

[567] Saravia Dep. at 146:7–19.

four common factors: indicators for a worker's job title, the number of years employed at the Defendant, their location, and the year.[568] This regression is reported in **Figure 36**. These four factors alone explain 79.0 percent of the observed variation in hourly wages across all Senior-Level Employees, including 76.2 percent at DaVita, 88.9 percent at SCA, and 71.8 percent at USPI. The same regressions explain 60.6 percent of variation for all Directors, and 74.0 percent for all VPs and SVPs. At DaVita, the regression explains 54.6 percent of pay for Directors, 58.2 percent for VP & SVPS, at SCA the respective numbers are 73.7 percent and 80.7 percent, and at USPI the same numbers are 35.4 percent and 64.8 percent.

240.    To be clear, I do not dispute the fact that there is room for some individual negotiations or customization, but the fact that approximately 80 percent of the dispersion in total compensation can be explained by just the job title, tenure, year, and location shows that indeed the wage structures are highly systematic at each Defendant. My conclusion is bolstered by the evidence showing that compensation at Defendant firms is "set by HR," which decides "on compensation based on internal equity issues within the company, and they involve compensation structures."[569]

241.    One question this analysis raises is at what point does a high R-squared prove that compensation is explained by just a few common factors. Is an R-squared of 80 percent high enough? What about 60 percent? To answer this question, I revisit the academic literature on compensation and find a company with a compensation structure that is known to be systematic and examine what the R-squared values are from a similar regression model. I consider two studies that study the same company. In Gerhart and Milkovich (1989), the authors study a large

---

[568] I allow how the job title relates to wages to differ based on tenure, and I also allow how the year matters for the wage to differ based on location. For USPI, I also include an indicator for low measured hours so that I do not miscalculate hourly wages.

[569] Starr Dep. Vol. 2 at 320:5–16.

fortune 500 company and highlight how the firm has highly structured pay.[570] Analyzing that company's compensation, Gerhart (1990) runs regressions similar to those I ran above, seeking to explain variation in log compensation as a function of human capital, college major, tenure, job title, job performance ratings, education, and experience.[571] Even though he has even more variables than I do (e.g., college major and performance ratings), when he runs his regressions he finds that he gets a 68 percent R-squared for men, and 66 percent for women.[572] Given that we know that this company had a systematic pay structure, and that in my simpler model with only four variables we can account for similar and in some cases substantially more variation in compensation at each Defendant and job level, this quantitative analysis rejects Defendants' Experts' arguments and instead is strongly consistent with a wage structure at Defendants.[573]

**Figure 36: R-Squared Value by Defendant and Job Level**

| | R-Squared | | | |
|---|---|---|---|---|
| | **All** | **Davita** | **SCA** | **USPI** |
| **All Employees** | 0.790 | 0.762 | 0.889 | 0.718 |
| **Directors** | 0.606 | 0.546 | 0.737 | 0.354 |
| **Vice Presidents** | 0.740 | 0.582 | 0.807 | 0.648 |

**b.      Treatment of USPI Hours Does Not Change Across Job-Level Wage Regression Results**

242.    Based on the idea that maintaining internal equity across the company implies in part that compensation should move together even across groups, I studied whether increases in

---

[570] Barry A. Gerhart & George T. Milkovich, *Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm*, *in* 23 PAY EQUITY: EMPIRICAL INQUIRIES (R. Michael, H. Hartmann, & B. O'Farrell Eds. 1989).
[571] Barry A. Gerhart, *Gender differences in current and starting salaries: The role of performance, college major, and job title*, 43(4) ILR REVIEW 418–433 (1990) [hereafter Gerhart (1990)] at Table 2.
[572] *Id.* at Table 2.
[573] Defendants' Experts may argue that the R-squared from this regression is high because of external equity issues. I have two responses to this. First, as discussed in my initial report, wage structures incorporate both internal and external equity considerations, so at baseline this argument does not contradict the fact that the high R-Squared values are consistent with compensation structures. Second, after I remove the effects of the macroeconomic and healthcare-specific variables and the compensation benchmarks, I still find that these job, year, tenure, and location explain 78.4 percent of the overall variation in compensation across Defendants, including 75.7 percent at DaVita, 86 percent at SCA, and 70.5 percent at USPI. *See* my workpapers.

compensation in one job level are associated with increases in compensation in another job level within the same firm. I found that this was true for all three Defendants, consistent with an internal compensation structure.[574]

243.    Dr. Saravia argues that under-counting USPI's hours is responsible for the finding that compensation within USPI is correlated across job levels. After "correcting" for this, she finds that the coefficient is positive but no longer statistically significant. Dr. McCrary makes the same point.[575]

a.    Both Dr. McCrary's and Dr. Saravia's analysis is flawed. Rather than the change in the USPI results being due to an error, it is due to their incorrect imputation of USPI hours in 2005 and 2006. As I discussed in Section VII.A.2, Dr. Saravia and Dr. McCrary imputed hours for more than 92 percent of USPI workers in 2005 and 2006 to be *exactly* 2080, resulting in serious measurement error in counting hours for many UPSI workers. Thus, I rejected how Dr. Saravia and Dr. McCrary imputed hours and preferred Dr. Johnson's approach because it first identified the specific individuals who were likely to have mismeasured earnings. While Dr. Johnson's approach still generates measurement error because it assumes 40 hours per week, it generates less measurement error overall than Dr. Saravia and Dr. McCrary's approach because it targets fewer workers. Nevertheless, using the updated and corrected data, and including Dr. Johnson's measure of hours for the low-measured USPI workers, as shown in **Figure 46**, illustrates that my initial results continue to hold.

---

[574] Starr Report Figure 19.

[575] McCrary Report ¶ 102 ("Prof. Starr ignores the fact that actual hours worked are underreported in the structured data for USPI employees in 2005 and 2006, and again in 2018 to 2021, which results in an improperly inflated measure of hourly wages in each of those years. Exhibit 19 shows that, when I correct this error, along with other data processing errors that I detail in Section 5.2, the regression coefficient for USPI in Prof. Starr's between-job analysis decreases substantially and is much closer to zero than the uncorrected regression coefficient.").

c.    **Overlapping Pay Bands Do Not Disprove a Systematic Pay Structure**

244.    Dr. Saravia claims that "overlapping compensation ranges across job categories indicates that USPI does not maintain compensation differentials across job levels, inconsistent with Plaintiffs' experts' claims."[576] Drs. Johson echoes this opinion. In arguing against the existence of a wage structure, Dr. Johnson claims that "there is substantial overlap in the distribution of compensation between Directors and Vice President."[577] Dr. McCrary finds "large overlap in observed pay ranges for different seniority levels."[578]

245.    Defendants' Experts fundamentally misunderstand what a pay structure is or how it works. To see why overlap does not indicate the lack of internal equity, consider one of the most common wage structures in the United States: the General Schedule (GS) pay scale used for civilian federal employees.[579] The GS consists of fifteen grades, each of which has ten steps, for a total of 150 positions. **Figure 37** below provides the 2025 GS pay scale.[580] Note that, despite the systematic nature of this pay structure, overlap exists between grades. For example, Grade 6, Step 8 offers higher pay ($55,448) than Grade 8, Step 1 ($55,328). Likewise, Grade 3, Step 10 offers higher pay ($41,744) than Grade 5, Step 2 ($41,676). One would be hard pressed to argue that the General Schedule does not represent a systematic compensation structure, despite general overlap between grades.

---

[576] Saravia Report ¶ 174. Saravia Report ¶ 172 ("Pay within a job level should be similar and pay across job levels should be differentiated.").

[577] Johnson Report ¶ 76.

[578] McCrary Report ¶ 98.

[579] *General Schedule*, U.S. OFFICE OF PERSONAL MANAGEMENT, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited June 2025) ("The General Schedule (GS) classification and pay system covers the majority of civilian white-collar Federal employees (about 1.5 million worldwide) in professional, technical, administrative, and clerical positions. GS classification standards, qualifications, pay structure, and related human resources policies (e.g., general staffing and pay administration policies) are administered by the U.S. Office of Personnel Management (OPM) on a Governmentwide basis.").

[580] *Pay & Leave*, U.S. OFFICE OF PERSONAL MANAGEMENT, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/25Tables/html/RUS.aspx (last visited June 2025).

**Figure 37: General Services Pay Scales, 2025**

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $26,175 | $27,053 | $27,922 | $28,790 | $29,658 | $30,166 | $31,028 | $31,895 | $31,930 | $32,742 |
| 2 | $29,431 | $30,131 | $31,106 | $31,930 | $32,289 | $33,238 | $34,187 | $35,137 | $36,086 | $37,035 |
| 3 | $32,114 | $33,184 | $34,254 | $35,324 | $36,394 | $37,464 | $38,534 | $39,604 | $40,674 | $41,744 |
| 4 | $36,049 | $37,251 | $38,453 | $39,655 | $40,857 | $42,060 | $43,262 | $44,464 | $45,666 | $46,868 |
| 5 | $40,332 | $41,676 | $43,020 | $44,363 | $45,707 | $47,051 | $48,395 | $49,739 | $51,083 | $52,426 |
| 6 | $44,959 | $46,458 | $47,956 | $49,454 | $50,953 | $52,451 | $53,949 | $55,448 | $56,946 | $58,445 |
| 7 | $49,960 | $51,626 | $53,292 | $54,957 | $56,623 | $58,289 | $59,955 | $61,620 | $63,286 | $64,952 |
| 8 | $55,328 | $57,173 | $59,018 | $60,863 | $62,708 | $64,553 | $66,398 | $68,242 | $70,087 | $71,932 |
| 9 | $61,111 | $63,148 | $65,185 | $67,222 | $69,259 | $71,295 | $73,332 | $75,369 | $77,406 | $79,443 |
| 10 | $67,297 | $69,539 | $71,782 | $74,025 | $76,268 | $78,511 | $80,754 | $82,997 | $85,240 | $87,482 |
| 11 | $73,939 | $76,403 | $78,867 | $81,331 | $83,795 | $86,259 | $88,723 | $91,187 | $93,652 | $96,116 |
| 12 | $88,621 | $91,576 | $94,531 | $97,485 | $100,440 | $103,394 | $106,349 | $109,304 | $112,258 | $115,213 |
| 13 | $105,383 | $108,896 | $112,409 | $115,922 | $119,435 | $122,948 | $126,461 | $129,974 | $133,487 | $137,000 |
| 14 | $124,531 | $128,682 | $132,833 | $136,984 | $141,135 | $145,286 | $149,436 | $153,587 | $157,738 | $161,889 |
| 15 | $146,481 | $151,363 | $156,246 | $161,128 | $166,011 | $170,894 | $175,776 | $180,659 | $185,541 | $190,424 |

*Source*: *Pay & Leave*, U.S. OFFICE OF PERSONAL MANAGEMENT, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/25Tables/html/RUS.aspx (last visited June 2025)

246.     The same overlap appears in Federal Wage System (FWS), which "is a uniform pay-setting system that covers Federal appropriated fund and nonappropriated fund blue-collar employees who are paid by the hour."[581] As with the GS, rates overlap between grades. For example, Grade 9, step 5 FWS employee in the Dallas-Ft. Worth area receives $34.77 per hour in 2025, while a Grade 12, Step 1 employee in the same area receives only $34.36.[582] Such overlaps do not overcome the existence of a common wage structure.

**d.      Dr. Saravia's and Dr. Johnson's Non-Randomly Generated Compensation Paths Generate Pre-Determined Relationships**

247.     In response to my demonstrating that wages are positively correlated within and across worker job levels, Dr. Johnson and Dr. Saravia both perform similar exercises: They attempt to create a "placebo" exercise in which they seek to show that the positive correlations I find in the data could occur even when wage changes are independent across groups.

---

[581] *Federal Wage System*, U.S. OFFICE OF PERSONNEL MANAGEMENT, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/#url=Overview (last visited June 2025) ("The system's goal is to make sure that Federal trade, craft, and laboring employees within a local wage area who perform the same duties receive the same rate of pay.").

[582] *Federal Wage System Regular and Special Production Facilitating Wage Rate Schedules for the Dallas-Fort Worth, Texas (DFW) Wage* Area, DEFENSE CIVILIAN PERSONNEL ADVISORY SERVICE (Jan. 2, 2025), https://wageandsalary.dcpas.osd.mil/Content/AF%20Schedules/survey-sch/131/131R-02Jan2025.pdf.

248.     Dr. Saravia's analysis starts with an example of a Director and a VP, where she assumes they have different levels of total earnings ($100k for Directors and $150k for VPs). Then, she allows each value to change year over year between -25 percent and +50 percent randomly. She then correlates the two series and concludes: "This exercise demonstrates that a high R-squared or a coefficient significantly higher than zero resulting from a regression like Dr. Starr's across-job correlation regression is not sufficient to conclude that manager and VP and SVP pay are dependent on one another in a way that would translate alleged harm across job levels or across the firm."[583]

249.     Dr. Saravia's analysis is fundamentally flawed: it finds that there is a relationship between the two time series because it is an artifact of her own construction. To understand why this is the case, consider the method in which she generated the random numbers. She chose a random increase for each series (VPs and SVPs separately from Directors) based on a range between -0.25 and 0.50 from a uniform distribution, meaning each random number has an equal chance of occurring. As a result, the up-sides and down-sides are asymmetrical, with the former range twice as large as the latter. The expected value (i.e., mean) of a series randomly drawn from a uniform distribution equals the average of the upper and lower bounds (i.e., lower + upper divided by two). In this case, the mean of the uniform distribution from which Dr. Saravia chose her random numbers equals 0.50 + (-.25) divided by two, or 0.125. In other words, we expect that series of numbers drawn from this distribution would *both* increase over time by an average of 12.5 percent. Indeed, Dr. Saravia's Exhibit 26 confirm this mathematical reality: both series trend upward over time, even though each may move up or down in a given year. This outcome reflects the fact that Dr. Saravia has not created two independent paths, but rather two paths

---

[583] Saravia Report ¶ 225.

linked together by a common trend. She finds a high correlation between these paths because she generated them to create this exact result.

250.     To demonstrate this problem, I re-construct Dr. Saravia's illustration with asymmetric raises (between -0.25 and 0.5 percent) and also with symmetric raises each year for fifteen years (between -0.5 and 0.5 percent). I then regress the natural log of VP compensation on the natural log of Director compensation. Because the randomization may produce erratic estimates in a single analysis, I re-run the randomization and analysis 5,001 times.[584] I find that in Saravia's asymmetric condition, the median coefficient on log of director compensation is 0.72 with a p-value of 8.5 percent and an R-squared of 12.9 percent. In contrast, in the symmetric raise condition, the median coefficient on the log of director compensation is 0.105 with a p-value of 70 percent and an R-squared of 0.6 percent. Moreover, in Appendix C **Figure 45**, I plot the distribution of coefficients on the log of director compensation across all 5,001 unique randomizations, and find that the asymmetric raise scenario produces systematically higher estimates than the symmetric raise scenario, while the symmetric raise scenario is centered around an estimate of zero. This analysis clearly shows that Dr. Saravia manufactured her placebo analysis to generate a predetermined result by choosing asymmetric raises.

251.     Dr. Johnson performs a similar "placebo test" for the within-job analysis. He explains his "placebo test" as follows,[585]

> I replicate Dr. Starr's "hold-out sample test" with only one modification: I replace the actual wages for any worker who remained in the same job with a completely *independent* and *random* wage change between –5 and +10 percent. This "placebo test" thus ensures by definition that wages of workers with the same job title do *not* move together.

---

[584] Note, I chose 5,001 instead of 5,000 because with 5,001 iterations the median is an observation in the data when the number of iterations is odd, but it is not when the number of iterations is even.
[585] Johnson Report ¶ 87.

252.    Dr. Johnson commits the same error as Dr. Saravia. Quite the opposite from his claim, his "random wage change" ensures that wages *move together by his own construction*. As I explained above, the expected value of a uniform distribution (which Dr. Johnson uses to extract his random numbers) equals the average of the upper and lower bounds. Like Dr. Saravia, Dr. Johnson uses asymmetric boundaries, with a higher upper bound (+10 percent) than lower bound (-5 percent). As a result, his random number series should expect to see a 2.5 percent increase (average of 10 and -5 percent) per year. Because he applies these "placebo" changes to both the hold-out sample and the remaining workers, both rise in expectation by 2.5 percent. The fact that he finds these series to be correlated reflects the fact that he constructed them to do exactly that. These two series do not "move randomly and independently" of each other. Dr. Johnson generated them to show the exact same trend, on average, over time. Dr. Johnson then incorrectly claims that, based on his "placebo test,"[586]

> A meaningful statistical test should falsely reject that "wages of workers in the same job title do not move together" only around 5 percent of the time. Dr. Starr's test, however, rejects this true null hypothesis 100 percent of the time.

Again, the test should reject the null hypothesis that these two series are independent 100 percent of the time, as it does, because the series are not independent. In confirming my results, Dr. Johnson only highlights his own error.

### e.    A Common Wage Structure Does Not Require Uniform Changes in Compensation Across Employees

253.    In my initial report I describe internal equity as "comparable compensation for comparable work."[587] Defendants' Experts appear to misunderstand this fundamental idea.

---

[586] *Id*. n.176.

[587] Starr Report ¶ 173 ("Because employees value internal equity, employers tend to respond by implementing uniform compensation structures that pay comparable compensation for comparable work.").

Rather, Dr. Johnson argues that the relevant question is not whether compensation *levels* move together, but whether "*changes* in compensation for one employee related to *changes* in compensation for the other employees?"[588] Dr. Saravia's analyses similarly reflect the mistaken impression that non-uniform changes in compensation among workers across time implies the absence of a common wage structure.[589] Dr. McCrary makes the same claim.[590] Dr. McCrary even goes so far as to argue that he is "correcting" my analysis when he changes the dependent variable to "year-over-year wage changes."[591]

254.     These ideas are misguided, and changing the dependent variable to "changes" in wages is certainly not a "correction" to my original analysis. A wage structure can accommodate differential movements in wages among employees. Indeed, the record evidence I reviewed in my initial report is consistent with Defendants bumping up the compensation of some workers while lowering the compensation of others specifically to maintain internal equity across *levels* of pay.[592] As a result, and as I demonstrate below, I reject Defendants' Experts' claims. Nevertheless, even if one assumes that this argument has merit (which it does not), both Dr. McCrary and Dr. Johnson's analysis still demonstrates that pay changes move positively both

---

[588] Johnson Report ¶ 82 and Ex. 16. Dr. Saravia also studies year-over-year changes and argues that "Year-over-year changes in compensation differ by individual[.]" Saravia Report ¶ 178 and Ex. 21. Dr. McCrary ¶ 92 also looks at year-over-year changes, arguing that predictions about a rigid pay structure "that shorter-run changes in pay should be similar across workers." McCrary Report Exs. 12–14.

[589] Saravia Report ¶ 172 ("When one or some Senior Employees' compensation increases (or decreases), other Senior Employees' compensation should also reflect similar changes to maintain the compensation structure."); *id.* ¶ 178 ("Each of the analyses I present in this section is inconsistent with Plaintiffs' experts' claims of a compensation structure among Senior Employees at USPI. Compensation is differentiated within a job category and overlapping across job categories within a given year. Year-over-year changes in compensation differ by individual. Finally, compensation paths are differentiated over time."); Saravia Ex. 22.

[590] McCrary Report ¶ 92 ("The first prediction of a rigid pay structure is that shorter-run changes in pay should be similar across workers.").

[591] McCrary Report ¶ 102 ("When I additionally correct Prof. Starr's between-job and within-job analyses to focus on year-over-year wage changes (instead of wage levels), and to compare wage changes for individual proposed class members to wage changes for a smaller group of randomly selected proposed class members, I obtain a range of regression coefficients, all of which are closer to zero than Prof. Starr's estimates, and some of which are not statistically different from zero[.]").

[592] Starr Report Section VII.F.1.

within and across jobs within each of the Defendants.[593] Thus, even by their own standards, there exists evidence of a compensation structure at each Defendant.

255. A common wage structure does not mean that if a single employee receives a pay raise for, *inter alia*, exceptional performance, all other employees in her level must also receive such an increase at the same time. Rather, some employees may receive pay increases one year, creating internal pressures related to internal equity that may drive differential pay changes in the subsequent years. Conversely, as I explained in my initial report, such a wage structure would allow a *broad negative shock* to employee compensation to impact all employees whose pay depends on the pay of other similarly situated employees—though the timing with which it happens need not be the same for all employees.

256. To begin to show that changes in compensation are not sufficient for identifying a compensation structure, note that a time series contains two components: a trend and a periodic component. The trend refers to systematic changes that occur over time after removing period-to-period differences. The periodic component refers to differences in the series across periods. For example, we might expect ice cream sales to have both a trend and periodic component: (1) an upward trend over time as population increases, new flavors are created, etc., and (2) a periodic component that captures seasonality, such as increased sales during the summer season each year. Now consider Dr. Johnson's approach of "first differencing." First differences effectively removes the trend component, looking only at period-to-period changes. In doing so, it requires any relationships between two first-differenced series to occur *in the same period*. As a result, first-differencing does not capture any long-term evidence of a wage structure. Dr. Johnson's

---

[593] Johnson Report Ex. 16 (Showing positive correlations in first differences in all models).

first differencing analysis requires any relationship to occur in the short term (same year) only. This requirement is both unnecessary and inconsistent with a wage structure.

257.     To see this, consider Dr. Johnson's two-employee toy example.[594] Dr. Johnson assumes Employee 1 starts at $85,000 and Employee 2 starts at $80,000. He assumes both receive an average merit increase of 2 percent each year, but that in 2019 Employee 1 receives a 15 percent increase that Employee 2 does not receive. The two employees' compensation trajectories show a high degree of correlation (0.96), an unsurprising result as they both increase monotonically (i.e., no decreases), both receive the exact same raise in seven of the eight years, and only differ in the size of the raise in a single year. Suppose we were to take the first difference of these series. By definition, we would lose the first year of data, so we would have one less observation to analyze. In addition, our correlation would drop to approximately 0.035. In other words, first differencing would ignore the fact that each employee received the same raise 88 percent of the time (7 out of 8 years).

258.     Next, consider another scenario in which Employee 2 received a matching 15 percent raise *in the following year*. This could occur, for example, if Employee 1 received the competing offer and the countervailing match toward the end of the calendar year. Internal equity might require that Employee 2 receive a similar raise during the following year. In this scenario, the wage levels still show a 0.92 correlation, but the first differences now show a *negative correlation of 0.157*. Thus, because it focuses only on short-term, immediate changes, Dr. Johnson's approach of first differencing would entirely miss an existing wage structure even under such obvious conditions.

---

[594] Johnson Report ¶ 79.

259. I note that Dr. McCrary attempts a similar modification to my analysis as Dr. Johnson, likewise focusing on first differences or year-to-year changes.[595] As a result, Dr. McCrary's opinions suffer from the flaws that apply to Dr. Johnson's approach. To further clarify this point, consider again Dr. Johnson's Employee 1 and 2 toy example. Suppose they both started in 2014 at salaries of 85,000 and $80,000, respectively, just as in Dr. Johnson's example. Now, suppose that their employer maintained a wage structure such that each employee received a 2 percent and a 5 percent increase on alternating years. The two employees receive the same increases every year, but their alternating year differs: Employee 1 receives a 2 percent increase in 2015 and a 5 percent increase in 2016, repeating the same pattern thereafter. Employee 2 begins with a raise of 5 percent in 2015, 2 percent in 2016, again repeating the same pattern thereafter. The table below illustrates this example.

**Figure 38: Example of Alternative Raises Being Negatively Correlated**

| Year | Employee 1 | Employee 2 |
|------|-----------|-----------|
| 2015 | 2.0% | 5.0% |
| 2016 | 5.0% | 2.0% |
| 2017 | 2.0% | 5.0% |
| 2018 | 5.0% | 2.0% |
| 2019 | 2.0% | 5.0% |
| 2020 | 5.0% | 2.0% |
| 2021 | 2.0% | 5.0% |
| 2022 | 5.0% | 2.0% |

Note that this common wage structure maintains the same wage differential with which the employees first started. Employee 1 received a starting salary of $85,000, 6.25 percent higher than the $80,000 starting salary that Employee 2 received. Using the common wage structure

---

[595] McCrary Report Ex. 12 ("Year-Over-Year Changes in Pay Vary Across Proposed Class Members[.]").

above, Employee 1 and 2's earnings are correlated at 0.99, and in 2023 would earn $111,835 and $105,256, respectively, a 6.25 percent difference in salaries.

260.    The above example clearly demonstrates a common wage structure. However, the wage *changes* show a *negative* 0.94 correlation. In other words, adopting Dr. Johnson and Dr. McCrary's suggestion of focusing only on changes would erroneously lead to the conclusion that no wage structure exists. As the table above shows, Employee 1 and 2's employer has set up a wage structure that maintain a similar pay differential in percentage terms to the one with which the two similarly situated employees started.

261.    Thus, at a basic level, even if the results suggest that compensation changes between groups are negatively related, it does not necessarily indicate that there is no compensation structure. Moreover, even if we are to grant Defendants' Experts analyses are right—which they are not—then all of their results, at each Defendant, find that changes in Director compensation are positively correlated with changes in (S)VP compensation.[596] Defendants do not seem to acknowledge this, and make their judgement based purely on the p-value of the estimates and whether they deem them statistically significant. As already discussed, just because a p-value is not below a threshold does not mean that the coefficient estimate is zero. Moreover, in a sample with just 14–17 observations, and six control variables, the regressions clearly suffer from the problem identified in Goldberger (1991) which he terms "micronumerosity," which reflects the idea that it can be hard to detect patterns in small samples.[597]

---

[596] Johnson Report Ex. 16.
[597] ARTHUR S. GOLDBERGER, A COURSE IN ECONOMETRICS (Harvard University Press 1991).

### f. Visual Analyses of Employee Pay Does Not Refute the Existence of a Common Wage Structure

262.     Both Dr. McCrary and Dr. Saravia present visual analyses of compensation growth to argue that compensation did not move together.[598] For instance, in Exhibit 19 of her report, Dr. Saravia shows percentage changes in USPI Senior Employees' salaries from 2010 onwards. She claims that "Senior Employees' compensation did not move together." Dr. McCrary similarly argues that "percent change in annualized total pay without equity" does not "move together" based on unconditional visual analysis of pay growth for Senior-Level Employees.[599] Setting aside the discussion above about whether *changes* in compensation say anything about compensation structures, which I addressed in VIII.F.2.e, this analysis is flawed and the conclusion is not merited. For one, neither Dr. McCrary nor Dr. Saravia test whether compensation observed in their figures moves together. Instead, they present their interpretation of the visual data as factual truth. As reported in **Figure 46** and **Figure 47**, tests of whether compensation moves together within and across jobs indicate the opposite of their conclusions. Indeed, even Dr. McCrary's full sample analysis of percentage changes in compensation reveals that at each Defendant even percentage changes in compensation move together within and across jobs.[600] Dr. Saravia also testified at deposition that she did not "have any reason to expect that each employee would have nearly identical pay growth over time[,]"[601] and she also did not have an opinion about "what explains the differences in the pay growth over time[.]"[602]

---

[598] Saravia Report ¶¶ 165–167; McCrary Report ¶¶ 92–95.

[599] McCrary Report Ex. 13 and Ex. 14. I note that Dr. McCrary's titles on these figures are misleading. The title for Ex. 13 is "Pay of Randomly Selected Proposed Class Members Does Not 'Move Together' Over Time." But this title is not accurate because Ex. 13, as made clear in the exhibit notes, studies "the percent change in annualized total pay without equity[.]" Thus, the title should read "**Percentage Change of Pay** of Randomly Selected Proposed Class Members Does Not 'Move Together' Over Time." The same critique is true of Ex. 14.

[600] McCrary Report Ex. 19 and Ex. 20.

[601] Saravia Dep. at 138:19–24.

[602] *Id*. at 139:6–9.

263.     Dr. Saravia argues that "compensation paths of individual Senior Employees (thin lines) cross because some are moving in different directions,"[603] a finding that she claims does not support the existence of a compensation structure that would permit the effects of a restraint to propagate across all or nearly all Class Members. I reject this argument. The fact that individual compensation patterns can move in different directions does not belie the existence of a compensation structure. A compensation structure does not mean that every individual wage must move in concert.

264.     Consider, for example, professional sports. The NBA uses a collectively-bargained compensation structure. Nevertheless, not all NBA players' salaries move in concert. While most players may increase over time, some suffer pay decreases, either willingly or involuntarily. These realities do not obviate the existence of a structure that would permit a wage shock (e.g., increased revenue subject to sharing) to propagate across all or nearly all Class Members.

### g.     Nearly All Workers Are in Jobs with Positive Within-Job Wage Correlations

265.     Dr. Saravia argues that compensation is not correlated within job titles. She claims that my within-job regression model is unreliable because my "regression identifies correlation based on across-job differences in pay rather than within-job correlation in pay over time."[604] To illustrate this, she disaggregates the within-job regressions into specific jobs in Exhibit 29. Here, she points to a number of instances where there is little or negative correlation within a job title.[605]

---

[603] Saravia Report ¶ 221.
[604] Saravia Report ¶ 227.
[605] *Id*. Ex. 29.

266. Dr. Saravia's analysis is misleading for several reasons. First, Dr. Saravia misses that my approach is a summary of what is happening for the *average* worker. Instead, she looks to point towards job titles with few observations as proof that there is a lack of correlation. In jobs with more than 140 employees (across the whole sample), all of her estimates suggest a positive within-job wage correlation.[606] Dr. Saravia ignores this fact in presenting her data, opting instead to paint a skewed picture of the degree of variation within the data.

267. Second, while the randomized hold-out sample approach I developed works well when samples are large, as in my initial analysis, doing the randomized hold out-sample only one time when the sample is small, as in jobs with just a handful of workers, can result in skewed outcomes depending on where outliers are classified.

268. To address both points, I replicate Dr. Saravia's analysis across all three Defendants. To ensure that the results are not driven by a particular randomization, I re-randomize the hold-out sample 25 different times and take the average across the 25 iterations. Overall, across all three Defendants, 95.7 percent of workers work in a job that had a positive within-job wage correlation. At DaVita, the corresponding number is 95.9 percent. At SCA it is 99.1 percent, and at USPI it is 93.7 percent.[607] Thus, contrary to Dr. Saravia's conclusions, nearly all workers at each of the Defendants work in jobs in which there is a positive, within-job wage correlation.

---

[606] *Id.*

[607] *See* my workpapers for details. The results presented in the text are weighted to describe the experience of the typical worker. If instead we weighted all job titles the same, regardless of how many workers are in them, the results indicate that overall, 85% of job titles have a positive within-job wage correlation, including 86.2% at DaVita, 94.7% at SCA, and 68.8% at USPI. The difference here shows the importance weighting by the number of workers, especially for USPI, to capture the typical worker's experience, rather than give significant weight to just a handful of workers.

h.      **Dr. Saravia's Criticism of Cascading Effects Misunderstands
How the Conduct Affects Wages**

269.    Dr. Saravia contends that switchers' compensation patterns contradict the theory of indirect harm, namely that when some employees switch to other firms, their current employer must not only raise their pay in response but also raise the pay for workers generally. She claims that, "When Senior Employees switch, they tend to earn compensation within the range earned by other employees with the same title at USPI and at SCA."[608]

270.    Dr. Saravia's analysis seems to belie her misunderstanding of compensation structures and the mechanisms through which the Challenged Conduct could have affected wages. For example, Dr. Saravia assumes that when USPI hires somebody from SCA that the new hires' compensation levels would be high relative to incumbent USPI workers with the same job title, thus putting pressure on USPI to raise wages for its workers.[609] However, this assumption plainly ignores the qualitative evidence that Defendants' benchmarked new hire pay against their existing worker's pay to maintain internal equity. In light of the internal equity considerations, it would not be surprising at all for a new hire to earn similar amounts relative to others doing similar work. Thus, rather than dispel the notion that USPI has a wage structure, her results are in fact consistent with it.

271.    Similarly, in her analysis of compensation patterns when a worker leaves USPI for SCA, she argues that "The former USPI Senior Employee's new compensation at SCA tends

---

[608] Saravia Report ¶ 290.

[609] *Id.* ¶ 285 ("Based on Dr. Gerhart's and Dr. Starr's theory of indirect harm, new hires' compensation levels would be high relative to incumbent USPI employees with the same job title, which they assert, would compel USPI to increase compensation of other Senior Employees in similar positions[.]"); *id.* ¶ 77 ("If Senior Employees have many employment options beyond Defendants, they will be free to move to these options in response to suppressed compensation. Likewise, employees of non-Defendant competitors hired by Defendants could demand competitive compensation.").

to fall in the middle of the distribution of former peers."[610] Dr. Saravia's conclusion from this analysis is that there are no "cascading effects" because "USPI did not systematically increase compensation for the remaining incumbents after these Senior Employees accepted an offer from SCA."[611] As in the prior analysis, Dr. Saravia's analysis is not based on any objective statistical test. Rather her conclusions are based on her eyeballing where a black dot lies within a sea of blue dots and how those blue dots may have vertically shifted. This is guesswork. Based on an ocular examination, even her own conclusions seem meritless—indeed, for several switchers it does seem that the distribution of workers at USPI move similarly with the individual who just joined SCA.[612]

272.    Despite emphasizing the importance of control variables in her Report, Dr. Saravia's analysis in her Exhibits 38 and 39 compares compensation before and after a switch without controlling for any other variables. As a result, her own analysis stands in direct contradiction to her criticisms she attempts to levy at my own regression models. As I have explained in my initial report and reiterated above, my compensation analysis controls for relevant factors that could have confounded the effects of the Challenged Conduct and impeded recovery of any attendant causal effect. She does not do the same.

273.    Finally, this test is an extreme and unlikely reflection of how the Challenged Conduct is likely to affect compensation. It doesn't account for how the CSI Exchanges might have suppressed compensation, and it does not address the impact of solicitations when somebody does not move.

---

[610] Saravia Report ¶ 289 ("The former USPI Senior Employee's new compensation at SCA tends to fall in the middle of the distribution of former peers.").
[611] *Id.*
[612] This includes IDs 107425, 137423, 255844.

### i. Dr. McCrary and Dr. Johnson Offer Inapposite Criticisms of My Quantitative Evidence of a Wage Structure

274. Dr. McCrary argues that my between-job analysis "simply reflects that similar market forces affect labor markets where Directors, VPs, and SVPs participate."[613] He similarly argues that my within-job analysis "is entirely consistent with highly similar workers being subject to similar labor supply and demand forces, which has nothing to do with the claimed rigid pay structures."[614] Dr. McCrary's claims fail to consider that the control variables in the model include related macroeconomic and healthcare specific factors, including benchmark compensation. The fact that I find a correlation in pay both between and within jobs, even after accounting for supply and demand factors and for benchmark pay in the industry, implies that the correlations I observe are explicitly *not* driven by those forces. Indeed, Dr. McCrary has pointed to no unobserved variables that overturn my results.

275. Dr. Johnson argues that my quantitative analysis "cannot determine *why* the average compensation series he studies move together, i.e., whether a change in compensation for one job is the reason for any part of any movement in compensation for other jobs."[615] He later raises some other possible explanation for why my results could exist, e.g., the Reflection Problem, but does nothing to investigate whether such an explanation is plausible, let alone incorporate it into my model to observe its results. Such purely hypothetical rebuttals reflect the *argumentum ad ignorantiam* informal logical fallacy. In other words, Dr. Johnson implies that, because I have not ruled out the possibility that his factors could overturn my results, then they

---

[613] McCrary Report ¶ 100.

[614] McCrary Report ¶ 100.

[615] Johnson Report ¶ 78. Dr. Johnson further critiques Dr. Gerhart for making similar claims. *See id.* ¶ 73 ("The first step in Dr. Gerhart's theory is that a single employee receiving one job offer or cold call in the but-for world would result in an adjustment of expectations across all employees in that same job level—irrespective of what job those employees held or where their compensation fell within the wide distribution of compensation for employees within their job level. The range of compensation for Directors and Vice Presidents—hundreds of dollars per hour— illustrates how unrealistic the predicate of his 'cascading effects' theory is.").

3244633.4                          225

must do so. Not only does he not show this to be the case, he does not even identify what factors he claims I omitted.

276. To clarify, I did not begin my quantitative investigation of the existence of a wage structure with a *tabula rasa*. I first evaluated qualitative evidence, which I found to offer strong support that Defendants' compensation followed such a common structure. My subsequent quantitative analysis sought to answer the question of whether the data provide evidence consistent with—or whether they contradict—the qualitative evidence. I found the former to be true: my quantitative analysis demonstrated that actual pay structures offer no contradiction to the qualitative evidence. Additional responsive analyses performed above, namely that 79 percent of total compensation can be explained by just four common factors, lends additional credence to this conclusion. Defendants' Experts' arguments that the qualitative and quantitative evidence is inconsistent with a wage structure is unsupported.

### G. Dr. McCrary's Subsample Common Impact Analysis

277. In Section 6 of Dr. McCrary's report, he takes his flawed regression model and performs a variety of "subsample analyses" to argue that my regression model does not show Common Impact for certain subgroupings of Class Members.[616] However, Dr. McCrary analyzes sub*groups* by sub*sampling* the regression data, meaning that he runs a regression model on only small portion of the full data (a "subsample" approach), rather than using the full data by allowing the Conduct to vary by subgroup a (a "pooled data" approach). In particular, he cuts up the data by employee specialty,[617] by Defendant and seniority level,[618] by state,[619] and by year[620]

---

[616] McCrary Report Section 6.
[617] McCrary Report Ex. 46.
[618] *Id*. Ex. 47.
[619] *Id*. Ex. 48.
[620] *Id*. Ex. 49.

and then re-runs his regression model on these chopped up datasets. Having chopped up and analyzed each bit of the data in isolation, his flawed regression model finds no negative and statistically significant effects, leading him to conclude that the "patterns are inconsistent with Plaintiffs' common impact allegations."[621]

278.    While assessing if the effect of the Challenged Conduct varied for different groups is a legitimate inquiry, as I myself studied in Section VIII.A through VIII.E, Dr. McCrary's approach to the task is not. There are at least three serious flaws with his subgroup analyses which biases Dr. McCrary's analyses to a finding of no effect from the Challenged Conduct:

a.    First, Dr. McCrary uses his flawed regression models as the baseline. As I discussed at length in Section VII.C, Dr. McCrary's regression models are fundamentally flawed because of how he treats equity compensation and COVID. As a reminder, Dr. McCrary drops all *realized* stock income entirely from SCA and USPI. For DaVita, Dr. McCrary ignores *realized* stock income entirely, even though individuals have to pay tax on it, and instead reallocates equity income to when it is granted, regardless of whether the worker received it (or received a different amount). With regards to COVID, Dr. McCrary's preferred approach is to control for highly multicollinear JOLTS variables, which is known to create instability in estimates. I reject both of these modifications.

b.    Second, Dr. McCrary's decision to analyze subsamples of the full dataset, instead of using pooled models, biases his results towards a finding of no statistical significance. This arises naturally because, all else equal, the size of the p-value is inversely related to the

---

[621] *Id.* ¶ 253.

number of observations in the sample.[622] This means that the fewer the number of observations that are fed into a regression model, the harder it is to find a statistically significant result, all else equal. This can be seen most clearly in Dr. McCrary's Exhibit 48, where he limits the data to each state and re-runs the regression. In the exhibit, Dr. McCrary drops states with fewer than 50 observations. Dr. McCrary's choice to drop ultra-low observation states is a tacit admission that limiting the data to tiny subsamples will not yield meaningful results. However, 43 states have fewer than 500 observations across the whole time period, 32 states have fewer than 200 observations, and 22 states have less than 100 observations. Dr. McCrary justifies this subsampling approach based on the results of a Chow test,[623] but as I explain in Section VII.C.7, the results of a Chow test do not indicate whether the model should be pooled or subsampled.

c.     Third, Dr. McCrary presents his analyses in a misleading manner because his exhibits give primacy to statistical significance over the direction and economic magnitude of the estimates. This is seen clearly in each of Dr. McCrary's Exhibits 46–49, where the column headings are "Positive Estimate: Significant", "No Significance", and "Negative Estimate: Significant".[624] By showing the results this way, Dr. McCrary runs afoul of the American Statistical Association's dictum that "Scientific conclusions and business or policy decisions should not be based only on whether a p-value passes a specific threshold."[625] Thus, even if an

---

[622] PETER KENNEDY, A GUIDE TO ECONOMETRICS 19 (Blackwell Publishing 6th ed. 2008) ("The sampling distribution of most estimators changes as the sample size changes. The sample mean statistic, for example, has a sampling distribution that is centered over the population mean but whose variance becomes smaller as the sample size becomes larger. In many cases it happens that a biased estimator becomes less and less biased as the sample size becomes larger and larger - as the sample size becomes larger its sampling distribution changes, such that the mean of its sampling distribution shifts closer to the true value of the parameter being estimated."). *See also* ROBERT PINDYCK & DANIEL RUBINFELD, ECONOMETRIC MODELS AND ECONOMIC FORECASTS 43–44 (Irwin/McGraw-Hill 1998).

[623] McCrary Report ¶ 260 ("For each of the exhibits, I perform a standard statistical test, which is known as a 'Chow test,' to assess whether, from a statistical perspective, it is appropriate to pool the data across the corresponding subgroups when estimating the alleged conduct effect.").

[624] McCrary Report Exs. 46–49.

[625] Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70(2) THE AMERICAN STATISTICIAN 129–133 (2016). *See also* Section VI.B.2.a.37, *supra*.

estimate was economically significant and negative but had a p-value of 0.06, it would show up as "No Significance" under Dr. McCrary's labeling. This approach is particularly misleading when paired with his decision to use subsamples, rather than pooled models. By slicing the data so thin (many regressions have fewer than 200 observations), Dr. McCrary practically guarantees that some estimates will be statistically insignificant, which he can then sweep under the rug using his presentation style which ignores economic significance.

279.    In the remainder of this section, I replicate Dr. McCrary's analysis, keeping Dr. McCrary's identified subgroups the same, but I correct his regression by making three changes. *First,* I use my main empirical specification (which properly accounts for *realized* stock income and uses a COVID dummy for 2020 and 2021). *Second,* I use a pooled regression model that allows the effect of the Challenged Conduct to differ according to the group identified by Dr. McCrary, rather than throwing out all of the non-subgroup data. This distinction is critical: A pooled model offers superior statistical power over a subsample approach, because it allows all of the data to contribute to a more accurate estimate of the effect of the Challenged Conduct. Even data from observations outside of the subgroup contribute to the estimation of the Challenged Conduct on a subgroup, because all of the explanatory variables are interrelated, and accurately estimating the effect of the Challenged Conduct depends on accurately estimating the effect of other control variables in the model.[626] *Third,* I appropriately report the results as clearly as possible, rather than focusing only on statistical significance like Dr. McCrary. I present the point estimate for each subgroup and the corresponding 95 percent confidence interval. To account for the fact that some groups have few observations, I label the variables so

---

[626] *See, e.g.,* Wooldridge (2013) at 807–809 (demonstrating that, in multiple regression analysis, regression coefficients are simultaneously calculated using all data in the regression model).

it is clear how many observations are in each group, and I weight the scatterplot by the number of observations, so the larger the dot then the more individuals in that group.

280.     I first present the results according to employee specialty, which are shown in **Figure 39**. In the figure, the point estimate of the effect of the Conduct is given by the blue dot (the size of which reflects the number of individuals reflected in that group), and the 95 percent confidence interval on that estimate around each estimate is provided as a red bar. When this red bar does not include zero, that means that the p-value on the estimate is less than 0.05. **Figure 39** shows that nearly every specialty experiences statistically significant wage suppression as a result of the Conduct. Visually, this is seen because nearly all the blue dots are below zero (indicating harm from the Conduct) and the upper end of the red bar is also below zero for all but two estimates. For one group, Physicians Relations and Management, comprising of 276 workers over the whole time period, are estimated to experience similar wage suppression as other groups, but the upper limit of the 95 percent confidence interval includes zero. The wide confidence interval is a result of having few observations in that group. The only exception to the finding of common harm is Pharmacy Management. However, with only 274 Pharmacy Managers in this subgroup (an average of 25 each year), the confidence interval is so wide that it encompasses the estimates of harm to other groups, and thus is not possible to determine harm to that subgroup with this analysis alone. With that one exception, the evidence is clear that that there is Common Impact across specialties.

**Figure 39: Regression Analysis by Employee Specialty**



281.    **Figure 40** repeats the same analysis according to Dr. McCrary's measure of employee seniority, which varies by both the job level and Defendant. **Figure 40** shows the estimates of the effect of the Challenged Conduct from a pooled model on each seniority-Defendant group. As in the case of specialty, I find a negative (and statistically significant) Conduct estimate for nearly each subgroup identified by Dr. McCrary. The only potential discrepancy is for Senior VPs at SCA, where the point estimate is close to zero. But for this group there are only 115 individuals across the whole sample (just 11.4 per year), and the confidence interval is so wide that it encompasses the negative harm done to most other groups. Thus, the evidence here is indicative of Common Impact across seniority and Defendant.



**Figure 40: Regression Analysis by Employee Seniority**

282.    **Figure 41** performs a similar analysis by state. Mirroring Dr. McCrary, I do not report states with fewer than 50 observations. **Figure 41** shows that that the effect of the Challenged Conduct is negative in every state except for one (New Mexico), but even there the estimate is basically zero and the confidence interval is so wide that it encompasses the harm done in most other states because there are only approximately 100 individuals in that state across the whole time period. These wide confidence intervals are to be expected, because in some states the estimates are noisier due to the small sample size. As above, this evidence is consistent with Common Impact of the Challenged Conduct across states.

3244633.4                                           232



**Figure 41: Regression Analysis by Employee State**

283.    Finally, Dr. McCrary reports estimates by year. As opposed to using the full pre-

and post-period as the baseline, his analysis uses only 2007 as a base year.[627] He provides no

basis or explanation for why he chose 2007 as the appropriate base year. I replicate his analysis,

but rather than use 2007 as a base year, I use all years where the Conduct is not present as the

baseline. The results of this analysis are shown in **Figure 42**. The Conduct estimate is negative in

every year, and only in one year is the estimate not statistically significant at the 10 percent level

(2015), but even then the p-value is 11.3 percent and the estimate of -3.9 percent is still

economically meaningful.[628] Thus, contrary to Dr. McCrary's analysis, the results do show

consistent negative wage suppression effects in each year of the Challenged Conduct.

---

[627] McCrary Report Ex. 49 ("Estimates reflect the effect of the indicated year on pay relative to 2007[.]").
[628] *See* my workpapers.

**Figure 42: Regression Analysis Year**



284.     The results in this section underscore that the Challenged Conduct indeed had a

Common Impact on Senior-Level Employees regardless of their specialty, seniority, geography,

or year in which they were employed. These results are indeed expected given the results of my

other Common Impact models, which Defendants' Experts do not criticize.

### H.     Dr. McCrary's Theoretical Arguments of Immunized Workers

285.     In Section 3 of his report, Dr. McCrary posits a series of arguments that there are

distinct "groups of proposed class members who could not, or would not, be harmed by the

alleged conduct, assuming it occurred."[629] Dr. McCrary's arguments in this section are entirely

speculative. Dr. McCrary offers no empirical evidence that any of these seven groups would be

---

[629] McCrary Report ¶ 107 ("In this section, I turn to a discussion of groups of proposed class
members who could not, or would not, be harmed by the alleged conduct, assuming it occurred.").

immunized from the effects of the Challenged Conduct, and indeed this is contrary to the empirical evidence of common impact presented in my report and above.

286.     For this section, I show there is no theoretical reason why any of the seven subgroups identified by Dr. McCrary would be unaffected by a conspiracy to suppress employee wages, and point to direct evidence that Class Members in these groups were indeed harmed.

### 1.     Dr. McCrary's Subgroup 1: Employees in Labor Markets Where Dr. McCrary Claims Defendants Lacked Market Power

287.     In Section 3.1 of his report, Dr. McCrary argues that "where Defendants did not have market power, neither the alleged mobility restrictions nor the alleged information sharing could suppress pay."[630] For example, he points out that "certain specialty areas including Accounting, Tax, and Treasury jobs" may be "particularly likely" to have employment options outside of healthcare,[631] such that Defendants would have "struggled to retain and hire workers" if they were suppressing compensation.[632]

288.     It is tautological to argue that Defendants cannot suppress compensation if they have no market power. The ability to suppress compensation below competitive levels is the definition of market power. Therefore, the relevant question is whether Defendants have market power over *all* workers, or if there are subgroups of workers with either countervailing market power or where the Defendants' market power is somehow absent.

---

[630] McCrary Report ¶ 112.

[631] *Id*. ¶ 109 ("Proposed class members have many (and varied) employment options besides Defendants, including in the healthcare industry generally, and outside of the healthcare industry altogether. Employment options outside of the healthcare industry may be particularly likely for some proposed members of the class, such as those in certain specialty areas including Accounting, Tax, and Treasury jobs, but may also be likely for proposed class members generally.").

[632] *Id*. ¶ 110 ("Since proposed class members have many employment options outside of the Defendants, had compensation been suppressed below what non-Defendant competitors were offering, Defendants would have struggled to retain and hire workers.").

289.     There is no evidence of this. Dr. McCrary specifically suggests that Defendants could not suppress compensation for workers in Accounting, Tax, and Treasury jobs. However, as shown in **Figure 39** above, I find that the Challenged Conduct did indeed suppress compensation in Accounting, Tax, and Treasury jobs to a similar degree to other specialties.

290.     While I defer a full discussion of market power to Section X, I note that Dr. McCrary does not present any estimates of labor market power. The Lightcast analysis he performs is fundamentally not capable of measuring whether Defendants have market power. Significant empirical evidence, both in the academic literature and in this case, shows that Defendants did indeed have market power, over all Class Members.[633]

### 2.     Dr. McCrary's Subgroup 2: So-Called Indirectly Affected Class Members

291.     In Section 3.2 of Dr. McCrary's report, he argues that "Proposed Class Members Not Directly Impacted by the Alleged Conduct" would not be harmed. Dr. McCrary's basis for this conclusion rests on his conclusion that "empirical and qualitative evidence does not support the existence of a rigid pay structure, but rather indicates that individualized factors were important in compensation setting." Indeed, throughout his report Dr. McCrary argues that common evidence cannot be used to quantify harm and that individualized inquiry would be necessary to show Class Member harm.[634] For example, Dr. McCrary highlights the truism that

---

[633] *See* Section X, *infra.*

[634] McCrary Report ¶ 19 ("[I]t would not be possible to reliably measure any impact or harm using common evidence given the unique context of this case including among other things the diversity of proposed class members, the many and varied job options available to them, and the individualized nature of compensation for Defendants' senior-level employees such as proposed class members."); McCrary Report ¶ 107 ("[I]ndividualized inquiry would be necessary to identify proposed class members in each of these groups of unharmed class members."); McCrary Report ¶ 146 ("It is not possible using evidence common to the proposed class to identify which individuals would not or could not have been impacted by the alleged conduct for the above reasons, nor is it possible to reliably quantify harm for proposed class members who were harmed by the alleged conduct (if any). Rather, individualized inquiry would be necessary given the wide array of complexities discussed throughout this section.").

individuals are unique, with idiosyncratic skills and specific outside employment options,[635] or that in the absence of the No-Poach Agreement not every Class Member would receive solicitations.[636] None of these arguments convince me that individualized inquiry is required to determine harm from the Challenged Conduct.

a.      *First,* Dr. McCrary's analysis does not incorporate the fact that the CSI Exchanges and the wage setting practices at Defendants could have materially affected the compensation of all Senior Level Employees directly. That is, if bonuses, base salary, merit raises, or other elements of the CSI Exchanges reduced compensation broadly, then all or virtually all workers would in fact be directly harmed by the Challenged Conduct.

b.      *Second*, Defendants' CEOs with ultimate control over Defendants' labor budgets were the individuals who engaged in the No-Poach Agreements. Labor budgets are set in light of expected competition. If Defendants' CEOs knew that labor competition was suppressed because of the No-Poach Agreements or the CSI Exchanges, they would have set lower labor budgets, directly suppressing Class pay. Indeed, the vast majority of employee pay changes are anticipatory: employers do not wait until their employees receive job offers before providing raises that anticipate the possibility of those job offers (or anticipates the expected absence of those offers, because of no-poach agreements).

c.      *Finally*, as I discussed in Section VIII.F, Dr. McCrary's conclusion about pay structure is fundamentally unsupported. Indeed, 79 percent of compensation can be explained by four common factors, and pay does move together, both within and across jobs within each Defendant. Thus, the evidence is strongly consistent with wage structures and

---

[635] *Id.* ¶ 111 ("[E]ach individual's relevant outside employment options, and thus relevant labor market, depend on individualized factors like skills, experience, location, and preferences.").
[636] *Id.* ¶ 20 ("Individualized inquiry into the suitable employment options for a given individual would be necessary to assess who is and is not harmed.").

3244633.4                                        237

internal equity playing a role in compensation setting at each Defendant, which would transmit harm from the Challenged Conduct across the Class.

d.    For these same reasons, I am also not persuaded to change my assessment by Dr. Saravia's similar argument that the "direct impact" of Defendants' No-Poach Agreements would "have been limited to the employees who lost a relevant outside option for employment."[637]

### 3.    Dr. McCrary's Subgroup 3: New Hires

292.    Dr. McCrary argues in Section 3.3 of his report that newly hired Class Members could not have been harmed.[638] Dr. McCrary's basis for this claim is his assertion that "[c]ompensation for such a person would be competitive, otherwise they would not have accepted the offer and would not have been a new hire."[639] Dr. McCrary also plots unconditional trends in Defendant's size and hiring rates, but does not do any empirical analysis to assess whether, in fact, the Challenged Conduct suppressed new hire pay.

a.    Dr. McCrary's claim that new hire pay is not suppressed by the Challenged Conduct is inconsistent with the academic literature and with the empirical evidence in this case. As I discussed in Section VII.C.8, the academic literature on no-poach and noncompete agreements find that they reduce starting wages. And the evidence presented in **Figure 27** shows that new hire pay was in fact suppressed. This finding is not surprising for two reasons: First, as the qualitative evidence on pay structures confirms, starting pay at each Defendant is set in part with respect to the pay of incumbent employees. Thus, to the extent that compensation is suppressed for incumbent employees as a result of the Challenged Conduct, it

---

[637] Saravia Report ¶¶ 104–132.
[638] McCrary Report Section 3.3.
[639] McCrary Report ¶ 116.

would also be suppressed for the new hires. Second, the labor market is not characterized by a single market clearing wage, but instead by a job ladder, where identical workers can get paid different amounts by the types and nature of the job offers they receive.[640] These search frictions naturally allow Defendants to possess market power, even for new hires. Taken with the rest of the results on Common Impact described in this section, the results indicate that the Challenged Conduct suppressed both starting compensation and incumbent compensation for all or nearly all workers. Accordingly, Dr. Johnson's, Dr. Saravia's, and Dr. Stiroh's similar objections do not cause me to change my opinion.[641]

293.    Dr. McCrary also argues that those employed in the beginning of the Class Period and who left shortly thereafter could not have been harmed.[642] However, as shown in **Figure 42**, the Conduct had an immediate suppressing effect on compensation which persisted in every year between 2008 and 2010.

### 4.    Dr. McCrary's Subgroup 4: Employees with Substantial Equity Pay

294.    In Section 3.4 Dr. McCrary argues that "individuals for whom a large share of their total compensation was equity pay, and who held a large amount of equity, could have been less harmed, unharmed, or possibly even benefited, from the alleged conduct."[643] He gives an example of DaVita SVPs, where he finds that equity pay accounts for up to 43 percent of total compensation.[644] Yet Dr. McCrary is wrong that employees with high equity earnings would be immunized for two reasons.

---

[640] *See* Manning (2003).

[641] Johnson Report ¶ 43; Saravia Report ¶ 77 n.135; Stiroh Report ¶ 49.

[642] McCrary Report ¶ 128 ("I roughly approximate the share of proposed class members who could not be harmed because they were already employed by one of the Defendants at the onset of the Class Period and left during the first two years of the Class Period. 3.8% of proposed class members meet these criteria.").

[643] *Id*. ¶ 129.

[644] *Id*. ¶ 129 ("For DaVita, this is illustrated in Exhibit 11, which shows that the percent of annual total pay that is adjusted equity (valued at the time of issuance) ranges from 5% of annual total pay for Directors compared to 43% for SVPs.").

a.  First, existing research and evidence from this case refutes Dr. McCrary's claims. Gibson (2024) finds that, in the high-tech no-poach case, the no-poach agreements reduced the probability of a stock bonus and the bonus amount, such that those who received equity were harmed in party by receiving less equity.

b.  Second, in **Figure 40**, I examine the extent to which the Challenged Conduct affected those with high equity pay, including DaVita SVPs. That analysis shows that even DaVita SVPs suffered wage suppression as a result of the Challenge Conduct, to a similar degree as in other jobs at each Defendant.

c.  For the foregoing reasons, as well as my analysis controlling for stock prices in Section VII.C.1, Dr. Johnson's contention that I neglected to "discuss how potential increases in stock prices … would improve the position of the proposed class members, a large portion of whose compensation was comprised of equity" is unavailing.[645]

295.  Moreover, Dr. McCrary's meritless argument here is further illustration of why, contrary to Defendants' Experts, it is important to focus on total compensation, and to assess—as I do—the impact of the Challenged Conduct on total realized compensation.

### 5.  Dr. McCrary's Subgroups 5 and 6: People Who Would Not Switch Jobs or Engage in Solicitation

296.  In Sections 3.5 and 3.6 of his report, Dr. McCrary argues that employees who would not engage with solicitations, or employees at DaVita and USPI who would not consider SCA as a viable employment option would not be directly harmed by the No-Poach Agreement.[646] I group these claims as they are essentially identically describing an employee that

---

[645] Johnson Report ¶ 97.

[646] McCrary Report ¶ 130 ("[A]ny proposed class members employed by DaVita or USPI who would not have considered employment options at SCA (for example due to location considerations) could not have been directly harmed by the alleged mobility restrictions."). Dr. Saravia makes a similar claim about workers who would not switch jobs or engage in a solicitation not being harmed (Saravia Report ¶¶ 106–107).

would not entertain an alternative employment option. Dr. McCrary's justification for these claims are both based on his conclusion that there is no pay structure that would transmit harm to those not directly affected by the No-Poach Agreements.[647] Dr. McCrary's claims are meritless.

    a.    First, as described fully in Section VIII.F, Dr. McCrary's criticisms of my wage structure analyses are entirely unpersuasive. Rather, there is strong evidence of a compensation structure at each Defendant that ties together compensation across workers.

    b.    Second, because an individual would not consider employment at SCA does not mean that they would not learn from a solicitation or use that solicitation to raise their wages. And even those who would not engage with a solicitation still learn about demand for their services, or may learn about wages paid elsewhere (through either their or another's outreach). As such, Dr. Saravia's objection that the "direct impact" of Defendants' No-Poach Agreements would "have been limited to the employees who lost a relevant outside option for employment"[648] is likewise unpersuasive.

    c.    Moreover, the Challenged Conduct also includes the CSI Exchanges that could have otherwise suppressed compensation.

    d.    Finally, the random coefficient model and in-sample prediction analyses described in Sections VIII.C, VIII.D, VIII.E allow for *individual* estimates of harm from the Challenged Conduct, and both find that all or nearly all Class Members were harmed by the Challenged Conduct.

---

[647] *Id*. ¶ 132 ("Plaintiffs may claim such individuals could still be harmed by the alleged mobility restrictions indirectly through a rigid pay structure, but I have addressed this possibility in Section 3.2 where I concluded that Plaintiffs' experts have not demonstrated this would be the case, and many (if not all) would not be.").
[648] Saravia Report ¶¶ 104–132.

**6.    Dr. McCrary's Subgroup 7: Employees Who Were Already Mobility Impaired**

297.    In Section 3.7 of his report, Dr. McCrary lists a variety of other sets of Class Members that he claims would not have been harmed, or been less harmed, by the No-Poach Agreements. These include (1) individuals with noncompete agreements that prohibit them from joining a product market competitor, (2) those affected by recruitment restrictions with external search firms, and (3) Class Members with unvested equity. The basis for Dr. McCrary's claim rests on a similar presumption, namely that individuals who would be less likely to join another Covered Defendant (for one of these three reasons) could not have been harmed by the No-Poach Agreement, or would have been less harmed than others.[649]

298.    The idea that other factors may have dampened harm from the No-Poach Agreements because certain individuals may be less likely to move to a Covered Defendant does not necessarily imply that the Challenged Conduct overall did not still harm workers. Indeed, in the high-tech no-poach case, where noncompetes, equity, and external recruitment are common, the no-poach agreements alone still facilitated wage suppression.[650] Dr. McCrary offers no discussion of why we would expect the answer to be any different in this case. Moreover, the existence of a pay structure and the CSI Exchanges could facilitate wage suppression on their own, even if the No-Poach Agreements did not create their own harm. Indeed, the random coefficient and in-sample prediction methods I described in Section VIII.C, VIII.D, VIII.E allow for *individual* estimates of harm from the Challenged Conduct, and find that all or nearly all Class Members were harmed by the Challenge Conduct. This evidence clearly cuts against Dr. McCrary's claims, as well as Dr. Johnson's similar suggestion that unvested equity prevents

---

[649] *Id*. ¶ 135 ("There are at least three ways in which proposed class members' mobility between Defendants may have already been restricted for reasons other than the alleged conduct.")
[650] Gibson (2024).

employees from taking new jobs.[651] Notably, none of Defendants' Experts criticize these methods or their ability to estimate harm from the Challenged Conduct.

## IX.     **Aggregate Damages**

299.     Defendants' Experts do not criticize my method for calculating Aggregate Damages in my initial report. Nor does any expert put forward an affirmative damages analysis.[652]

300.     Given the Class Members I identified, I recalculate damages based on the same standard but-for world economic framework used in my initial report, using the revised dataset and regression results from **Figure 7** above. The results in **Figure 43** below shows that single Aggregate Damages are calculated as $755.1 million (down from $869.5 million), composed of $576.7 million in damages for Class Members at DaVita (down from $631.7 million), $101.1 million in damages for Class Members at SCA (down from $113.9 million), and $77.2 million in damages for Class Members at USPI (down from $123.8 million). Across all unique Class Members over the 12-year Conduct Period, average damages to each Class Member-year comes to $23,861.[653]

---

[651] Johnson Report ¶¶ 95–96.

[652] Dr. Johnson testified at deposition that he did not "put forward an affirmative regression model with [his] own damage estimate[.]" Johnson Dep. at 123:12–19. Dr. McCrary also testified that he did not put forward an affirmative damages model. McCrary Dep. at 122:14–123:5.

[653] I calculate these average damages by first determining the number of unique Class Members (excluding outliers) who are present during the Conduct Period. I sum up the total number of years in the Conduct Period for which each Class Member works at a Defendant company. I divide the total single damages ($755.1 million) by the 31,644 unique Class Member-Years, yielding $23,861 per Class Member-Year.

**Figure 43 [Figure 21 Revised]: Aggregate Damages by Defendant**

| | [1] | [2] | [3] | [4] = [2]/(1-[3]) | [5] = [4] - [2] |
|---|---|---|---|---|---|
| Company | Number of Class Members | Total Compensation Under the Conduct ($M) | Wage Suppression Percentages | But-For Total Compensation ($M) | Damages ($M) |
| DaVita | 3,236 | $2,776.2 | 17.2% | $3,353.0 | $576.7 |
| SCA | 1,386 | $748.8 | 11.9% | $849.9 | $101.1 |
| USPI | 1,544 | $879.7 | 8.1% | $956.9 | $77.2 |
| | | | | **Total Single Damages ($M):** | **$755.1** |

*Note*: Outlier observations (as defined above) are conservatively removed from these damages calculations.

## A.    The Class Definition Is Objective

301.    The only potential criticism as it relates to how to calculate Aggregate Damages is by Dr. McCrary, who argues that the criteria for being in the proposed Class are "not objective."[654] Dr. McCrary proposes three sets of criteria to identify directors and above and concludes that the method I used to identify director and above positions is "arbitrary and subjective."[655] Dr. McCrary first argues that director and above jobs could be classified by job responsibilities, with inquiry needing to determine whether jobs are more "complex" than director jobs.[656] His second approach is to consider internal hierarchies, which he acknowledges DaVita already provides.[657] Third, he suggests that directors and above could be distinguished by pay.[658] I disagree with Dr. McCrary's claims and assessment, for several reasons.

302.    First, the "Directors and Above" language is the language that Defendants themselves used. For example, Hayek himself, when referring to SCAs No-Poach Agreements, wrote "[W]e can recruit junior people *(below Director)*[.]"[659] ▮▮▮▮▮▮▮▮▮▮▮▮

---

[654] McCrary Report Section 8 ("Plaintiffs Criteria For the Proposed Class Are Not Objective").
[655] McCrary Report ¶ 268.
[656] *Id*. ¶ 269.
[657] *Id*. ¶ 270.
[658] *Id*. ¶ 272.
[659] Ex. PX159 at SCA-DOJ-00152696 (emphasis added).



"[660] and testified that with regards to the SCA-DaVita No-Poach Agreement "the scope included directors and above."[661] USPI admitted to having a No-Poach Agreement with SCA at the "administrator level and above."[662]

[663]

303. Second, for DaVita, it is clear who is a Director and above, because they provided such data. For SCA and USPI, the job titles are clearly labeled Director, VP, or SVP, or make it clear that the job title is above Director (e.g., President, Executive).[664] For the few jobs that had some ambiguity (e.g., CEOs), I asked for clarification from Defendants or it was clear based on their descriptions or prior admissions that the job was above director and above.[665] Dr. McCrary specifically asks how I determined that "administrators" at SCA and USPI are in the category of directors or above.[666] This question is surprising, given that USPI specifically confirmed that Administrators were subject to the Agreement, and SCA clarified the Administrator

---

[660] Ex. PX304 at DOJCIV-008-00000302.

[661] Hayek Dep. at 317:13–21.

[662] Answer of Defendants United Surgical Partners International and Tenet Healthcare Corporation to Third Consolidated Amended Class Action Complaint (ECF No. 568), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed December 20, 2024 ¶ 50 ("USPI and Tenet admit USPI told certain executives, human resources employees, and recruiters to avoid actively soliciting SCA employees at the administrator level and above[.]").

[663] Ex. PX304 at DOJCIV-008-00000298.

[664] *See* McCrary Report App. E Ex. 1 for a list of job titles in the Class from USPI.

[665] Ex. PX304 at DOJCIV-008-00000302.

[666] McCrary Report ¶ 273 ("[Dr. Starr] includes 'administrator' job titles at USPI and SCA as class-relevant jobs, but how did he decide that administrators at SCA and at USPI are director level and above employees?").

responsibilities, making it clear that the job was above director level.[667] Moreover, if there were any concern that such workers were not harmed, the analyses above in my Common Impact section indicate that all or nearly all Class Members were harmed by the Challenged Conduct.

304. More broadly, if anything, the Class is too narrowly construed. Indeed, the Challenged Conduct likely spilled over to managers, as found in my manager vs. Senior-Level Employee analysis. This is because even though the No-Poach Agreements may have been targeted to Senior Employees, they may have also reduced solicitations for managers, or managers may have otherwise been affected by the CSI Exchanges. Thus, I broadly reject Dr. McCrary's claims about the lack of objectivity of the Class definition.

## X. Market Power

305. In my initial report I described how economists assess whether a firm has labor market power. In the literature on no-poach agreements, evidence that the no-poach agreements reduce compensation constitutes direct evidence of market power. For example, in the context of franchise no-poach clauses, LaFontaine et al. (2025) "find strong support for the hypothesis that NPCs [no-poach agreements] suppressed wages, an effect that suggests that they increased buyer

---

[667] *See* 2024-08-29 Ltr J. Wade to S. Zandi RE Structured Data ("SCA assigns the job title 'CEO' to the employee who leads an individual ambulatory surgical center or surgical hospital. SCA previously assigned the job title 'Administrator' for employees performing this role. The data reflect both job titles for this role, in both ambulatory surgical centers and surgical hospitals."). USPI also admitted that "it had an agreement with Surgical Care Affiliates … to avoid actively soliciting each other's employees at the level of administrator or above[.]" Answer of Defendants United Surgical Partners International and Tenet Healthcare Corporation to Third Consolidated Amended Class Action Complaint (ECF No. 568), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed December 20, 2024 ¶ 1. *See also* 2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions (in which USPI defines Administrators as being subject to the no-poach agreements. I use this list as a basis for the minimum of which positions were affected by the agreements.). USPI's internal recruiter Shannon McGarry similarly testified that she was given a "list of companies that [she] was not to actively solicit for [] CEO and administrator positions." *See* Deposition of Shannon McGarry (June 11, 2024) at 65:24–67:20. Former SCA CEO Andrew Hayek similarly informed SCA's then-Chief Talent Officer Bridie Fanning about the restriction in 2015 and noted that SCA "can recruit junior people (below Director)." *See also* Ex. PX159 at SCA-DOJ-00152696.

market power and limited workers' labor market opportunities."[668] Similarly, Gibson (2024) concludes in his study of Silicon Valley no-poach agreements that "On average the no-poaching agreements reduced salaries at colluding firms by 5.6 percent, consistent with considerable employer market power." Thus, like in the literature on no-poach agreements, I conclude that the direct evidence of wage suppression found above as a result of the Challenged Conduct is consistent with Defendants' wielding market power.

306.    Aside from this direct evidence, I also described in Section V.A of my initial report how economists otherwise measure labor market power: by estimating the firm-specific labor supply elasticity. The labor supply elasticity summarizes how sensitive the firm's labor supply is to changes in the firm's wage. It mimics the hypothetical monopsonist test by studying how drops in compensation affect whether workers leave the firm. In a perfectly competitive market, a small drop in wages would result in no workers being willing to work for the firm, resulting in an infinite labor supply elasticity. If instead the labor supply elasticity is close to zero, then this suggests that the firm's supply of labor changes little when the firm cuts wages, thus giving the firm power to reduce wages below productivity. Given an estimate of the firm's labor supply elasticity, economists convert them into wage markdowns: i.e., what portion of worker productivity workers receive as compensation.

307.    Defendants' Experts do not object to the idea that a finding that the Challenged Conduct reduced compensation would constitute direct evidence of market power. Defendants' Experts also do not object to my discussion of how labor economists have estimated firm-level market power via labor supply elasticities.

---

[668] Lafontaine et al. (2025) at 35.

A.   **Direct Evidence of Wage Suppression from the Challenged Conduct Shows Market Power**

308.   Defendants' Experts argue that, after their inappropriate adjustments to the data and my regression model, that the model no longer shows that the Challenged Conduct suppressed compensation—and therefore that this is evidence that the Defendants do not have market power.[669]

309.   As I discussed fully in Sections VI and VII, Defendants' Experts' adjustments to my model are inappropriate, and indeed my model reliably estimates, using common evidence, that the Challenged Conduct suppressed compensation for all or nearly all Class Members. Thus, as in the literature on no-poach agreements, this is direct evidence that Defendants have market power.

B.   **Defendants' Experts' Lightcast and Market Share Analyses Do Not Measure Market Power**

310.   Defendants' Experts also argue that I did not define a "relevant antitrust labor market" and that in any such market Defendants do not have market power to sustain suppressed compensation.[670] To make this argument, they rely on Lightcast data, which purpotedly

---

[669] Johnson Report ¶ 184 ("As a threshold matter, given that the only evidence Dr. Starr uses to support his conclusion that 'Defendants wield market power' is his wage suppression regression, all of the flaws that render his 'wage suppression' model unreliable undermine its use as 'direct proof of Defendants' market power.'"). However, Dr. Johnson testified at deposition that he did not conduct any direct tests of Defendants' market power over Class Members. *See* Johnson Dep. at 196:9–15.

[670] Johnson Report ¶¶ 26–49, 143–144, 184–188; *id.* ¶ 185 ("First, Dr. Starr does not assess the competition Defendants face for the labor of relevant employees. A relevant antitrust labor market represents the area of effective competition within which a set of firms actively compete for the services of worker."); Saravia Report ¶¶ 21–23, 42, 70–103; McCrary Report ¶¶ 29–68, 107–112; *id.* ¶ 34 ("As I explain below, proposed class members had far too many labor market options for suppression of compensation to be plausible and his empirical analyses do not support his claim."); Stiroh Report ¶¶ 22–45; *id.* ¶ 26 ("These market facts demonstrate that 'market frictions' are either not present or not sufficient to prevent employees moving between jobs, including to DaVita and are therefore not sufficient to bestow market power to DaVita[.]").

aggregates "anonymous data from millions of online professional profiles"[671] and aggregate market data on the Defendants' industry to calculate what portion of industry employment is derived from Defendants' employees.[672] With the Lightcast data, Defendants' Experts attempt to document where Defendants hire from and where workers go when they leave Defendants.[673] Defendants' Experts conclude from these analyses that Defendants do not hold a substantial share of employees in the market, and that Defendants compete with many different types of companies, including from different industries.[674] From these analyses, Defendants' Experts uniformly conclude that Defendants do not have market power.[675]

311.    Setting aside the flaws in the Lightcast data that lead them to systematically overcount the number of competitors, as I discussed in Section VI.B.2.c, Defendants' Experts' claims that Defendants lack market power are meritless. Not only do their claims reflect an ignorance of the modern labor economics literature, but the analyses that form the basis for their claims cannot, by construction, support a definitive characterization about the extent to which Defendants have labor market power.

---

[671] *Id.*; *see also Overview*, LIGHTCAST, https://lightcast.io/products/data/overview (last visited June 2025). The Lightcast website also states that its profile data comes from many other sources, including "publicly available information on the web, third-party resume databases and job boards, the recruiting industry, opt-in data from employers and applicant tracking systems, sales and marketing CRM databases, and various consumer/identity databases." *See* Lightcast Data: Basic Overview, available at https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview (last visited June 2025).

[672] Johnson Report ¶ 47 ("Plaintiffs' experts also do not assess the Defendants' share of employment within the industries that they suggest are relevant."); Johnson Report Ex. 8; Stiroh Report Figure 7; McCrary Dep. at 146:23–149:19 (Dr. McCrary testified that he did not make "any effort to calculate [each] defendant's market shares[.]" Instead, he "looked specifically at substitution between employers using the Lightcast data … But that's somewhat different than putting forward, for example, the outer boundary of the market and calculating a market share in that claimed market … that's a switching analysis that's indicative. It's not a formal calculation of market share.).

[673] *See, e.g.,* Saravia Report Exs. 8, 9, 10, and 12. *See also* Johnson Report Exs. 4 and 5, Stiroh Report Figures 1–6, and McCrary Report Exs. 1–5.

[674] Johnson Report ¶ 48 and Ex. 8; Stiroh Report Figure 7 and ¶ 44 ("It is clear from this economic evidence that DaVita and SCA represented a small share of employment among the many alternative employers that the data show were competing [f]or DaVita Senior-Level employees[.]").

[675] Saravia Report ¶ 78 ("These patterns indicate that USPI and SCA's (and Defendants' collective) ability to suppress compensation is constrained by competition from non-Defendants.").

a.    As a preliminary matter, Defendants' Experts' claims about the necessity of defining a relevant antitrust market to determine market power are misguided.[676] None of the studies examining whether no-poach agreements or noncompete agreements suppress compensation define a relevant labor market or count the number of unique employers a firm's workers are hired from or leave to. Instead, like I do here, they are focused on identifying the causal effect of such Conduct on compensation, which does not require defining a market, studying market shares or mobility patterns. Thus, as a general matter, Defendants' Experts' proclamations about the need to define a relevant labor market are misplaced and unnecessary.

b.    Defendants' Experts claim that I failed to analyze the outside employment options for Senior-Level Employees beyond the Defendants.[677] I did not do so because 1) I was not asked to do so,[678] and because 2) analyzing outside employment options is *not necessary* to establish that the Defendants collectively wield market power over Class Members.[679] The evidence of wage suppression due to the Challenged Conduct, which directly informs market power, does not turn on any separate analysis or understanding of what the outside employment options may be.

312.    More broadly, Defendants' Experts' market share and Lightcast analyses belie their misunderstanding of how labor markets work and the modern labor economics literature. As reviewed in Section V.A. of my initial report, modern labor economists understand that labor

---

[676] Johnson Report ¶¶ 27 n.47, 47; Saravia Report ¶¶ 76, 152–153; McCrary Report ¶¶ 33, 335; Stiroh Report ¶¶ 27–29.

[677] Johnson Report ¶¶ 26–49, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 32, 52–59, 107–112; Stiroh Report ¶¶ 22–45.

[678] Starr Report ¶ 11.

[679] *Id*. ¶ 196 ("Market power can be directly established if there is evidence of the ability of firms to suppress wages below competitive levels. In the instant case, the evidence of wage suppression found in Section VI.C.3 directly demonstrates that Defendants wield market power over Class Members. Put differently, Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members.").

markets are frictional.[680] Just because an individual is able to move from Firm A to Firm B does not mean that Firm B is willing to make an offer to every worker at Firm A, or that Firm A is willing to make an offer to every worker from Firm B. As Dr. McCrary testified, "it's hard to think of any two workers as being exactly alike and interchangeable, particularly for proposed class members."[681] This core idea has important implications for Defendants' Experts' conclusions as it relates to their employment share and Lightcast analyses.

313.    The employment shares analysis done by Defendants' Experts is designed to argue that Defendants have so few workers relative to the market that they could not possibly have market power.[682] This is an illusion. The fact that a firm employs only a small fraction of a market does not mean that the firm does not have market power. In fact, in some search and matching models, a smaller share of the market is indicative of higher monopsony power.[683] This is because the firms that optimally choose to pay low wages end up extracting more value from each worker, but they lose workers more frequently than the higher paying firms, and so they end up staying small. A recent discussion on how these "concentration" measures relate to market power by Jha et al. (2025) echoes these ideas:[684]

> Although concentration measures like HHI are widely used, theoretical considerations suggest important limitations. In Burdett and Mortensen (1998), for example, an increase in the job offer rate—a sign of greater competition—can lead to higher concentration, as larger or more productive firms attract and retain a disproportionate share of workers. Similarly, in markets characterized by monopsonistic competition, firms may be atomistic and hold small market shares, yet still possess significant wage-

---

[680] Starr Report Section V.A.

[681] McCrary Dep. at 74:19–23.

[682] Stiroh Report ¶ 43 ("[H]owever one might try to define appropriate relevant labor markets, so long as they include the companies with which DaVita actually competes for Senior-Level employees, DaVita and SCA's combined share of employment is too small to support an inference of market power.").

[683] *See* Burdett & Mortensen (1998).

[684] Priyaranjan Jha, Jyotsana Kala, David Neumark, & Antonio Rodiguez-Lopez, *City Size, Monopsony, and the Employment Effects of Minimum Wages*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 30570 (May 2025) [hereafter Jha et al. (2025)] at 1.

setting power (e.g., Jha and Rodriguez-Lopez, 2021). In these cases, HHI fails to accurately capture the degree of monopsony power. Finally, a market with many establishments could still be monopsonistic if workers rarely move, while a concentrated market may not always imply high monopsony power if workers can easily switch jobs.

314.     The economics literature also emphasizes that employment shares are misleading because they do not indicate the amount of *opportunities* in the market available to workers. In standard search and matching models, when no firm hires, the equilibrium outcome is monopsony—even in the presence of many potential competitors.[685] The Jha et al. (2025) quote above emphasizes this when they write that "a market with many establishments could still be monopsonistic if workers rarely move."[686] This finding is known as the Diamond Paradox, and recent research highlights how mobility restrictions push labor markets towards monopsony even when there are many competitors.[687] The literature on concentration in labor markets has acknowledged that what matters for studying market power are opportunities, not employment shares. And when using vacancies to measure opportunities, they find that many labor markets are in fact concentrated.[688] Thus, concluding that Defendants do not have market power based on the employment shares analysis reflects a fundamental misunderstanding of the labor economics literature, which clearly highlights that market power exists even in unconcentrated markets, markets with low mobility, and even in markets with low switching costs.[689]

---

[685] Manning (2003). *See also* McCrary Dep. at 47:5–48:12 ("If there is a single firm which is the buyer of goods for which there are not substitutes," Dr. McCray agrees "that monopsonist [is] a price setter[.]").

[686] Jha et al. (2025) at 1.

[687] *See* Axel Gottfries & Gregor Jarosch, *Dynamic Monopsony with Large Firms and Noncompetes*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 31965 (2023) at 2 ("When some firms introduce noncompetes this reduces competition along the job ladder and spills over to all other firms in the market. In the limit where all firms can offer noncompetes, the Diamond (1971) equilibrium reappears, and wages collapse. This shows that the widespread adoption of noncompetes can sharply hurt workers by undermining labor market competition.").

[688] *See* José Azar, Ioana Marinescu, & Marshall Steinbaum, *Labor market concentration*, 57(S) JOURNAL OF HUMAN RESOURCES S167–S199 (2022).

[689] *See* Arindrajit Dube, Jeff Jacobs, Suresh Naidu, & Siddharth Suri, *Monopsony in Online Labor Markets*, 2(1) AMERICAN ECONOMIC REVIEW: INSIGHTS 33–46 (2020).

315. The idea that labor markets are frictional also has implications for what we can learn from the Lightcast analyses Defendants' Experts perform. Defendants' Experts contend that by hiring from different industries and different employers that Defendants could not possibly suppress compensation.[690] However, Defendants' Experts once again ignore the fact that labor markets reflect a search and matching process, not a spot market where employers are simultaneously and continuously submitting bids for workers. As before, a key insight is that because a worker leaves Firm A and joins Firm B, that does not mean that Firm A is willing to make an offer to all of Firm B's employees, that Firm A's workers would take them, or vice versa. Indeed, it's possible that Firm B only had one vacancy and does not make any other offers to Firm A. As before, what matters for the extent of market power is the rate of job offers, not the number or type of moves. Indeed, whatever the extent of those moves, it need not prevent companies from suppressing even starting compensation. Evidence that no-poach agreements and noncompete clauses suppress starting compensation, including in this case, was reviewed in Section VII.C.8. This section highlights that fast-food no-poach agreements and high tech noncompete clauses, and the Challenged Conduct in this case suppressed *starting compensation*. This evidence directly contradicts and invalidates Defendants' Experts' many claims that the external competition would prevent the Challenged Conduct from suppressing pay.

316. Dr. Johnson and Dr. McCrary also argue that Defendants Senior-Level Employees operate in multiple different labor markets based on their specialty, geography, skills, and related characteristics.[691] Based on their Lightcast data analyses, Defendants' Experts conclude that

---

[690] Johnson Report ¶¶ 37–43; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 115–128; Stiroh Report ¶¶ 22–55.
[691] Johnson Report ¶ 26; McCrary Report ¶¶ 20, 34–36 & n.38, 42–59, 111. *See also,* McCrary Report Section 2.1.2 ("Proposed Class Members Participate in Different Labor Markets with Widely Varying Employment Options, Including Many Non-Defendant, and Even Non-Healthcare, Firms") and Section 2.1.3 ("Proposed Class Members Have Widely Varying Skills and Preferences").

3244633.4

253

Defendants "Lack Market Power Sufficient to Suppress Pay for Many or Most (if Not All) Proposed Class Members."[692] I do not dispute the broad idea that individuals might differ in the types of jobs they would consider, or where geographically they would consider working, such that the scope of the outside labor market options might differ across different employees. But the fact that labor market options might be different for different workers does not imply that Defendants do not have market power and it does not imply that the Challenged Conduct did not suppress compensation. Rather, the evidence in Section VIII broadly, and Section VIII.G specifically, fully rebuts Dr. Johnson's and Dr. McCrary's arguments. Rather than finding that Defendants have no market power to suppress compensation, I find that Defendants were indeed able to suppress compensation in every or nearly every specialty, seniority level, and geography.

317. Finally, and in general, Defendants' Experts' Lightcast analysis is not capable of measuring whether Defendants have market power. This is because labor market power is about how sensitive labor supply is to changes in the wage. If wages were to go down, as in a hypothetical monopsonist test, then how much would labor supply fall? Defendants' Experts' Lightcast analyses—measuring labor market employment shares and mobility patterns—cannot answer this question, because their analyses do not even incorporate any variation in wages, and they do not estimate the Defendants' labor-supply elasticities. They may show mobility patterns, but they do not estimate how those mobility patterns are sensitive to the firm's wage. Without

---

[692] McCrary Report Section 2.1.4.

this, Defendants' Experts' Lightcast analyses are fundamentally incapable of showing that Defendants have no labor market power.[693] All they can do is speculate.

318.     Moreover, Defendants' Experts do acknowledge that Defendants do have some degree of market power.[694] Indeed, any conclusion otherwise is illogical in light of existing evidence on the effects of no-poach and noncompete agreements in more competitive labor markets and evidence estimating labor supply elasticities precisely in the healthcare setting.

a.     If prior studies find that no-poach agreements in the fast-food and franchise chain context give firms additional labor market power, or that no-poach agreements give firms additional labor market power over high-tech workers, then why would we think that the answer would be any different in the context of Senior-Level Employees in the Outpatient Medical Services context? Defendants' Experts do not even review or discuss this prior literature on no-poach agreements, let alone provide any guidance as to why we would expect the

---

[693] Dr. McCrary noted at his deposition that he disagrees that his report "doesn't apply the hypothetical monopolist test in this case," because "that was exactly the framework that [he] had in mind," because "in the work that I did, I'm doing what economists would do in assessing questions of market power, which is the hypothetical monopolist test that you have described. That's the framework that we think of. And that's exactly how I think of the analysis that I did." McCrary Dep. at 150:23–151:11. I disagree that Dr. McCrary's analysis of Lightcast data is reflective of the hypothetical monopsonist test. The hypothetical monopsonist test begins with a "small but significant and nontransitory" reduction in wages. *See e.g.*, Suresh Naidu et al.*, Antitrust Remedies for Labor Market Power,* 132 HARV. L. REV. 536, 557 (2018) *("To determine market definition, we can use, by analogy to the "hypothetical monopolist test" used in product market analysis, a hypothetical monopsonist test. Under this test, the analyst asks whether a single monopsonist — in this case, a single hypothetical firm that employs all specialists who live in this town (rather than the actual four firms, acting independently) — could reduce wages by a "small but significant and non-transitory" amount, what we call the small but significant and non-transitory decrease in wages (SSNDW) test.")*. Yet, Dr. McCrary testified that he did not review compensation data from Defendants, either on its own or as part of his Lightcast analysis (McCrary Dep. at 165:11–166:3). Because Dr. McCrary's Lightcast analyses, just like the other Defendants' Lightcast analyses, do not examine changes in wages, none of their Lightcast analyses are consistent with a hypothetical monopsonist test. Indeed, in their reports none of Defendants' Experts characterize their Lightcast analyses as reflecting a Hypothetical Monopsonist Test. Dr. McCrary also acknowledges that he did not measure the marginal product of labor, which, when combined with wage data, could also measure market power ("[T]o answer the questions that were put to me in this case, did I set about to measure the marginal revenue product of labor? … [T]he answer is no." McCrary Dep. at 64:12–65:12.).

[694] Johnson Report ¶ 27; Johnson Dep. at 190:17–23 ("If what you're asking me is, is it the case that in the short run because of certain labor market frictions there could be some degree of market power for a given employee -- employer over a given individual because of their outside opportunities or changing job costs, things like that, that is true."), 267:11–16; Saravia Report ¶ 38 n.36; Saravia Dep. at 82:22–84:17; McCrary Report ¶¶ 53–59, 145; McCrary Dep. at 74:19–23; Stiroh Report ¶ 38 (arguing that labor is not a homogenized commodity).

---

Outpatient Medical Services industry to behave differently. If anything, the labor market for fast-food employees is likely to be even more competitive than the much thinner market for Senior-Level Employees in Outpatient Medical Care industry. Yet even for fast-food workers, no-poach agreement suppress compensation. Thus, whatever the results of Defendants' Experts' Lightcast analysis, they are insufficient to make claims about market power.

           b.      Similarly, Defendants' Experts argue that because individuals leave Defendants for jobs in different industries that Defendants cannot have market power.[695] This argument is without merit and is clearly rebutted by the academic literature. First, Dr. Saravia's own data shows that many if not the majority of their workers do stay in the healthcare industry when they leave.[696] Indeed, when hiring, Defendants often specifically asked candidates how many years of healthcare experience they had.[697] Thus, healthcare-specific experience and expertise is clearly valued, and many departing Senior Employees do stay in the healthcare field. Second, the academic literature shows that the fact that workers move between industries is generally insufficient to claim that mobility constraints do not give firms market power. For example, in Lipsitz and Starr (2021) we show that low-wage workers are the most likely to switch industries when they change jobs.[698] Nevertheless, we find that a ban on noncompete clauses for low-wage workers still caused wages to rise by as much as 6 percent over a seven-year period. Thus, there is no reason why no-poach agreements are incapable of suppressing

---

[695] Johnson Report ¶¶ 27–49, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 37–68, 107–112, 196, 198; Stiroh Report ¶¶ 22–45.

[696] Saravia Report Ex. 9. Note that this table is misleading because it groups together all non-healthcare industries instead of breaking them out. Even with this, Saravia Report Ex. 9 shows that nearly the same number of workers depart to Healthcare specifically as they do to all other non-Healthcare industries (setting aside the unclassified industry category).

[697] USPI_CIV_000422931 at -936 (The bottom of page six of an employment application for a USPI VP Development job asks "How many years of healthcare experience do you have?").

[698] See Michael Lipsitz & Evan Starr, Low-wage workers and the enforceability of noncompete agreements, 68(1) MANAGEMENT SCIENCE 143–170, 143 (2022) at Figure 1.

compensation even when workers sometimes move across industries. Indeed, that is precisely what I find even in the Accounting, Tax, and Treasury specialty, which per Dr. McCrary is the most likely specialty to come from or go to a different industry.[699]

c.     Prior literature already provides some estimates of labor market power in the healthcare industry. Webber (2015) estimates firm-level labor supply elasticities according to each industry, and finds that the average healthcare services company faces a labor supply elasticity of just 0.78. A labor supply elasticity of 0.78 implies that the typical healthcare employer enjoys a substantial degree of labor maker power, with workers earning just 56 percent of their productivity, for a markdown of 44 percent. A 44 percent markdown reflects substantial market power, and is indeed the second-highest level of market power across all industries.[700]

d.     To rebut my claim that Defendants do wield labor market power, Defendants' Experts could have followed the academic literature and estimated labor supply elasticities for Senior-Level Employees. They did not do so. Instead, they offer speculative claims unmoored from a modern understanding of labor markets.

## XI.     Conclusions

319.     Having reviewed the Reports and workpapers of Defendants' Experts, I am not persuaded to alter any conclusion in my initial report. My opinion remains that the qualitative evidence, which consists of direct communications between company executives, documentary evidence, as well as detailed deposition testimony and FBI interview summaries, is consistent with anticompetitive collusion and inconsistent with unilateral competition. The quantitative evidence I examined, which derives from Defendants' payroll data and Defendants' Experts'

---

[699] McCrary Report Ex. 5.
[700] Webber (2015) Table (only Administrative Support has a lower elasticity of labor supply than Healthcare and Social Assistance at 0.72).

Lightcast data, is also consistent with anticompetitive collusion over approximately a decade, and inconsistent with unilateral competition. No analysis or opinion offered by Defendants' Experts unseat this evidence.

320.    I continue to find that Challenged Conduct reduced employee mobility between the Covered Defendants and lowered compensation at Defendants by approximately 12.6 percent annually, and further that all or nearly all Senior-Level Employees were harmed by the Conduct. Aggregate Damages to the Class, after incorporating revisions to the underlying date, sum to $755.1 million.

*        *        *

Dated: June 30, 2025                    Respectfully submitted,

_____

Evan P. Starr

**PROOF OF SERVICE**

I, Sarah D. Zandi, an attorney, hereby certify that on June 30, 2025, I served a true and

correct copy of the foregoing **Updated Rebuttal Expert Witness Report of Dr. Evan P. Starr**

by electronic mail upon the following parties as set forth below:

| | |
|---|---|
| Kenneth M. Kliebard<br>Staci M. Holthus<br>MORGAN, LEWIS & BOCKIUS LLP<br>110 North Wacker Drive<br>Chicago, IL 60606<br>(312) 324-1000<br>Kenneth.kliebard@morganlewis.com<br>Staci.holthus@morganlewis.com | Jeffrey C. Bank<br>Brian J. Smith<br>Jordanne Steiner<br>WILSON SONSINI GOODRICH &<br>ROSATI, P.C.<br>1700 K Street NW, Fifth Floor<br>Washington, DC 20006<br>(212) 497-7761<br>jbank@wsgr.com<br>brian.smith@wsgr.com<br>jordanne.miller@wsgr.com |
| Amy B. Manning<br>MCGUIREWOODS LLP<br>77 West Wacker Drive<br>Suite 4400<br>Chicago, IL 60601-7567<br>amanning@mcguirewoods.com | Veronica Moyé<br>KING & SPALDING LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br>(215) 556-2100<br>vmoye@kslaw.com |
| Jeffrey E. Stone<br>Katharine M. O'Connor<br>MCDERMOTT, WILL & EMERY LLP<br>444 West Lake Street, Suite 400<br>Chicago, IL 60605<br>(312) 372-2000<br>jstone@mwe.com<br>koconnor@mwe.com | Molly Moriarty Lane<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Market<br>Spear Street Tower<br>San Francisco, CA 94105-1596<br>(415) 442-1000<br>Molly.lane@morganlewis.com |

Dated: June 30, 2025                    Respectfully submitted,

                                        */s/ Sarah D. Zandi*
                                        Sarah D. Zandi

3244633.4                                    259

## APPENDIX A

## Materials Relied Upon Include the Following:

### I.   PAPERS, BOOKS, AND WEBSITES

A. Colin Cameron & Douglas L. Miller, *A Practitioner's Guide to Cluster-Robust Inference*, 50(2) Journal of Human Resources 317–372 (2015)

Alan Manning, *Imperfect Competition in the Labor Market*, Handbook of Labor Economics 973–1041 (2011)

Alan Manning, Monopsony in motion: Imperfect Competition in Labor Markets (Princeton University Press 2003)

Alberto Abadie, Susan Athey, Guido W. Imbens, & Jeffrey M. Wooldridge, *When should you adjust standard errors for clustering?*, 138 Quarterly Journal of Economics 1–35 (2023)

American Bar Association, Proving Antitrust Damages (2017)

Anthony J. Nyberg, Ingrid Smithey Fulmer, Barry Gerhart, & Mason A. Carpenter, *Agency theory revisited: CEO return and shareholder interest alignment*, 53(5) Academy of Management Journal 1029–1049 (2010)

Arindrajit Dube, Jeff Jacobs, Suresh Naidu, & Siddharth Suri, *Monopsony in Online Labor Markets*, 2(1) American Economic Review: Insights 33–46 (2020)

Arthur S. Goldberger, A Course in Econometrics (Harvard University Press 1991)

Arturs Kalnins, *Multicollinearity: How common factors cause Type 1 errors in multivariate regression*, 39 Strategic Management Journal 2362–2385 (2018)

*Author Guidelines*, Strategic Management Journal (updated June 8, 2023), https://onlinelibrary.wiley.com/pb-assets/assets/10970266/SMJ%20Author%20Instructions%2006%2008%2023%20FINAL-1686755077677.pdf

Axel Gottfries & Gregor Jarosch, *Dynamic Monopsony with Large Firms and Noncompetes*, National Bureau of Economic Research, Working Paper No. 31965 (2023)

Barry A. Gerhart & George T. Milkovich, *Salaries, Salary Growth, and Promotions of Men and Women in a Large Private Firm*, *in* 23 Pay Equity: Empirical Inquiries (R. Michael, H. Hartmann, & B. O'Farrell Eds. 1989)

Barry Gerhart, *Gender differences in current and starting salaries: The role of performance, college major, and job title*, 4(43) ILR Review 418–433 (1990)

*Baylor University Medical Center, part of Baylor Scott & White Health*, Baylor Scott & White Health, https://www.bswhealth.com/locations/hospital/dallas (last visited June 2025)

Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings*, Review of Economics and Statistics 1–35 (2024)

Brian J. Hall and Jeffrey B. Liebman, *Are CEOs really paid like bureaucrats?*, 113(3) Quarterly Journal of Economics 653–691 (1998)

Carlos Cinelli et al., *A crash course in good and bad controls*, 53 Sociological Methods & Research 1–30 (2022)

Catherine Clifford, *Meet the 3 co-founders who built the jobs website that just sold for more than $1 billion*, CNBC (May 9, 2018), https://www.cnbc.com/2018/05/09/meet-founders-of-glassdoor-sold-to-recruit-holdings-for-1-point-2-billion.html

*Center for Minimally Invasive Surgery*, Center for Minimally Invasive Surgery, https://cmisurgery.com/ (last visited June 2025)

Clément De Chaisemartin & Xavier d'Haultfoeuille, *Difference-in-differences estimators of intertemporal treatment effects*, Review of Economics and Statistics 1–45 (2024)

Costas Meghir and Luigi Pistaferri, *Earnings, Consumption, and Life Cycle Choices*, *in* Handbook of Labor Economics 773–854, 813 (Orley Ashenfelter & David Card eds. Vol. 4B 2011)

*DaVita Redwoods Program*, DaVita, https://www.redwoods.davita.com/ (last visited June 2025)

Douglas A. Webber, *Firm market power and the earnings distribution*, 35 Labour Economics 123–134 (2015)

*Editorial Calls Time on 'Statistically Significant' in Research*, American Statistical Association, https://www.amstat.org/news-listing/2021/10/08/editorial-calls-time-on-statistically-significant-in-research (last visited June 2025)

Eitan Itzkowitz, *Taxes on Equity*, Carta (Apr. 1, 2025), https://carta.com/learn/equity/equity-taxes/

Eric Siegel, *Why eating ice cream is linked to shark attacks*, Big Think, https://bigthink.com/the-present/correlation-causation/ (last visited June 2025)

Eric W. Wilfers et al., *SEC's New Pay Versus Performance Disclosure Rule: Important Things To Know*, Harvard Law School Forum on Corporate Governance (Oct. 28, 2022), https://corpgov.law.harvard.edu/2022/10/28/secs-new-pay-versus-performance-disclosure-rule-important-things-to-know/

Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72(4) ILR Review 783–817 (2019)

Fabien Postel-Vinay & Jean-Marc Robin, *To match or not to match?: Optimal wage policy with endogenous worker search intensity*, 7 Review of Economic Dynamics 297–300 (2004)

*Federal Wage System Regular and Special Production Facilitating Wage Rate Schedules for the Dallas-Fort Worth, Texas (DFW) Wage Area*, Defense Civilian Personnel Advisory Service (Jan. 2, 2025), https://wageandsalary.dcpas.osd.mil/Content/AF%20Schedules/survey-sch/131/131R-02Jan2025.pdf

*Federal Wage System*, U.S. Office of Personnel Management, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/#url=Overview (last visited June 2025)

Francine Lafontaine, Saattvic Saattvic, & Margaret Slade, *No–Poaching Clauses in Franchise Contracts: Anticompetitive or Efficiency Enhancing*, SSRN (Feb. 18, 2025)

*General Schedule*, U.S. Office of Personal Management, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited June 2025)

*Glassdoor Announces Salary Estimates, Find Out What a Job Pays Before Applying*, Glassdoor (Feb. 9, 2017), https://www.glassdoor.com/blog/salary-estimates-announcement/

Honey Batra, Amanda Michaud, & Simon Mongey, *Online job posts contain very little wage information*, National Bureau of Economic Research, Working Paper No. 31984 (2023)

Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach (South-Western 5th ed. 2013)

José Azar, Ioana Marinescu, & Marshall Steinbaum, *Labor market concentration*, 57(S) Journal of Human Resources S167–S199 (2022)

Kenneth Burdett & Dale T. Mortensen, *Wage Differentials, Employer Size, and Unemployment*, 39(2) International Economic Review 257–273 (1998)

Kevin Caves & Hal Singer, *Econometric Tests for Analyzing Common Impact*, 26 Law and Economics of Class Actions 135–160 (2014)

*Lightcast Data: Basic Overview, Lightcast, https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview (last visited June 2025).*

Margaret Levenstein & Valerie Suslow, *What Determines Cartel Success?*, 44(1) Journal of Economic Literature 43–95 (2006)

Marianne Bertrand, Esther Duflo, & Mullainathan Sendhil, *How much should we trust differences-in-differences estimates?*, 119 Quarterly Journal of Economics 249–275 (2004)

Matthew Gibson, *Employer Market Power in Silicon Valley*, Upjohn Research (2024)

Michael Lipsitz & Evan Starr, *Low-wage workers and the enforceability of noncompete agreements*, 68(1) Management Science 143–170 (2022)

Michael O. Finkelstein, Basic Concepts of Probability and Statistics in the Law (Springer 1st ed. 2009)

Natarajan Balasubramanian et al., *Locked in? The enforceability of covenants not to compete and the careers of high-tech workers*, 57(S) Journal of Human Resources S349–S396 (2022)

*North American Industry Classification System, Year 2022*, United States Census Bureau, https://www.census.gov/naics/?input=621&year=2022&details=621 (last visited June 2025)

*North American Industry Classification System, Year 2022, Details 6214 Code*, United States Census Bureau, https://www.census.gov/naics/?input=6214&year=2022&details=6214 (last visited June 2025)

*Overview*, Lightcast, https://lightcast.io/products/data/overview (last visited June 2025)

Paul Hünermund & Beyers Louw, *On the Nuisance of Control Variables in Causal Regression Analysis*, 28(1) Organizational Research Methods 138–151 (2025)

*Pay & Leave*, U.S. Office of Personal Management, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/25Tables/html/RUS.aspx (last visited June 2025)

Peter Kennedy, A Guide to Econometrics (Blackwell Publishing 6th ed. 2008)

Pierre Cahuc, Fabien Postel-Vinay, & Jean-Marc Robin, *Wage Bargaining with On-the-job Search: Theory and Evidence*, 74(2) Econometrica 323–364 (2006)

Priyaranjan Jha, Jyotsana Kala, David Neumark, & Antonio Rodiguez-Lopez, *City Size, Monopsony, and the Employment Effects of Minimum Wages,* National Bureau Of Economic Research, Working Paper No. 30570 (May 2025)

Robert H. Topel & Michael P. Ward, *Job Mobility and the Careers of Young Men*, 107 Quarterly Journal of Economics 439–479 (1992)

Robert Pindyck & Daniel Rubinfeld, Econometric Models and Economic Forecasts (Irwin McGraw-Hill 1998).

Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70(2) The American Statistician 129–133 (2016)

Scott Cunningham, Causal Inference: the Mixtape (Yale University Press 2021)

*SEC Adopts Pay Versus Performance Disclosure Rules*, U.S. Securities and Exchange Commission (Aug. 25, 2022), https://www.sec.gov/newsroom/press-releases/2022-149

*Slope Hypothesis Testing*, XKCD, *https://xkcd.com/2533/* (last visited June 2025).

*Social Profile Data*, Lightcast, https://lightcast.io/products/data/overview (last visited June 2025)

Suresh Naidu et al*., Antitrust Remedies for Labor Market Power,* 132 Harv. L. Rev. 536 (2018)

Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do firms value court enforceability of noncompete agreements? A revealed preference approach*, Review of Economics and Statistics 1–47 (2024)

Thomaz Teodorovicz, Prithwiraj Choudhury, & Evan Starr, *Location-specificity and relocation incentive programs for remote workers*, 36(1) Organization Science 186–212 (2025)

Zoe B. Cullen, Shengwu Li, & Ricardo Perez-Truglia, *What's My Employee Worth? The Effects of Salary Benchmarking*, National Bureau of Economic Research, Working Paper No. 30570 (Aug. 2024)

## II.   EXPERT REPORTS, DEPOSITION TRANSCRIPTS AND EXHIBITS, AND DOCUMENTARY EVIDENCE

I was provided access to all Expert Reports, deposition transcripts and exhibits, and all documents produced in the case. The following are among the materials I relied upon:

**Expert Reports (in alphabetical order)**

Expert Report of Celeste Saravia, Ph.D. (Apr. 16, 2025)

3244633.4                                           264

Expert Report of Dr. John H. Johnson, IV (Apr. 16, 2025)

Expert Report of Justin McCrary, Ph.D. (Apr. 16, 2025)

Expert Report of Lauren J. Stiroh, Ph.D. (Apr. 16, 2025)

Expert Witness Report of Dr. Barry Gerhart (Jan. 15, 2025)

Expert Witness Report of Dr. Evan P. Starr (Jan. 15, 2025)

**Deposition Transcripts (in alphabetical order)**

30(b)(6) Deposition of Surgical Care Affiliates, LLC, By and Through its Corporate Designee, Brian Rasco (Nov. 26, 2024)

Deposition of Alex Bateman (Jul. 19, 2024)

Deposition of Andrew Patrick Hayek (Sept. 18, 2024)

Deposition of Anthony Kilgore (Oct. 22, 2024)

Deposition of Bill Wilcox (Sept. 24, 2024)

Deposition of Brian Mathis (Sept. 20, 2024)

Deposition of Bridget A. Fanning, Ph.D. (Jul. 14, 2024)

Deposition of Celeste Saravia, Ph.D. (May 9, 2025)

Deposition of Cindy English (June 12, 2024)

Deposition of Evan P. Starr, Ph.D., Vol. 1 (Mar. 19, 2025)

Deposition of Evan P. Starr, Ph.D., Vol. 2 (Mar. 20, 2025)

Deposition of John Johnson, Ph.D. (May 7, 2025)

Deposition of Joshua Golomb (Aug. 28, 2024)

Deposition of Justin McCrary (June 12, 2025)

Deposition of Lauren Stiroh (May 29, 2025)

Deposition of Leslie Wachsman (May 22, 2024)

Deposition of Mark Garvin (May 30, 2024)

Deposition of Michael Rucker (Aug. 27, 2024)

Deposition of Sandi Karrmann (Aug. 14, 2024)

Deposition of Shannon McGarry (June 11, 2024)

Deposition of Shannon Mosley (Aug. 13, 2024)

**Defendants' Structured Data Files**

DaVita
DVA_OMCEAL_000000029–47
DVA_OMCEAL_000000047
DVA_OMCEAL_000902589–91
DVA_OMCEAL_000902592
DVA_OMCEAL_001182111
DVA_OMCEAL_001408533
DVA_OMCEAL_001408536
DVA_OMCEAL_001408539
DVA_OMCEAL_001408542–44
DVA_OMCEAL_001408547
DVA_OMCEAL_001408550
DVA_OMCEAL_001408829
DVA_OMCEAL_001421632–35
DVA_OMCEAL_001421640DVA_OMCEAL_001421733
2022-8-3 Ltr SDZ to DaVita RE Structured Data Questions
2022-8-24 Ltr R Quinto to Pls. RE DaVita 1RFP Structured Data
2022-11-22 Ltr R. Quinto to LYC & SDZ RE DaVita RFP Responses
2023-7-26 - Letter to DaVita re structured data questions
2023-10-5 - DaVita Ltr re structured data
2024-03-27 Ltr to S. Zandi re 2-28-24 Letter
2024-03-27 Ltr to S. Zandi re Structured Data Questions from 2-7-24 Letter
2024-09-30 Ltr to S. Zandi re structured data questions from 7-19-24 Ltr
2024-10-25 Ltr to S. Zandi re 10-1-24 and 7-19-24 Letters
2024-11-07 Ltr to S. Zandi re structured data questions from 7-30-24 Ltr
2024-12-19 Ltr to S. Zandi re structured data questions from 11-27-24 Ltr

SCA
2021 Teammate Roster

2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data
2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions
CheckSumm
CheckSummHE
Check History Hours and Earnings
EEmploy
EJob
SCA Hashed SSNs
SCA - Structured00000005
SCA - Structured00000013
SCA-Structured00000007
SCA-Structured00000009
SCA-Structured00000010
SCA-Structured00000011
SCA-Structured00000012
Teammate Roster Point In TimeTermed in 2021
2022-1-21 Ltr C. Ventura to Y. Salahi re Structured Data Sample
2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data
2022-4-21 Letter from C. Ventura to L. Chan re 4-20-22 IT Rep Meet & Confer
2022-9-16 Ltr. C. Ventura to S. Zandi RE Structured Data
2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions
2024.08.29 - Letter from J. Wade to S. Zandi re structured data
2024.10.11 - Letter from J. Wade to S. Zandi re structured data
2024-03-13 Letter from T. Rothman to S. Zandi re Response to Plaintiffs' 2-7 Letter
2024-3-6 Ltr T. Rothman to S. Zandi RE Response to Pls' 2-28 Letter
2024-11-13 Ltr J. Wade to S. Zandi RE SCA Structured data

USPI
2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions
2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes
4.19.24 Paygroup location
Exhibit A_Paygroup_Location
Exhibit B_ERNCD Values
USPI_CIV_000021819
USPI_CIV_000422931
USPI_CIV_000659222–33
USPI_CIV_000659234
USPI_CIV_001168726
2022-6-1 Ltr K Limarzi to Plaintiffs Encl USPI Doc Prod Vol004
2022-7-28 - LYC Letter to USPI re structured data questions – LYC
2022-12-2 Ltr K Limarzi to Pls RE USPI Responses & Objs to RFPs
2023.09.26 - K. Limarzi Ltr. re Structured Data Productions
2023-1-25 Ltr K. Limarzi to Plaintiffs RE USPI Responses & Objs to RFPs

2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions

2024.03.27 Ltr from USPI to Plaintiffs re 2.7 Ltr

2024.03.27 Ltr from USPI to Plaintiffs re 2.28 Ltr

2024.04.08 USPI Suppl Ltr to Plaintiffs re 2.7 ltr

2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter

2024.12.12 Ltr to Plaintiffs re Reporting Structure

2024-10-1 Ltr SDZ to USPI re Structured Data Question

2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions

2025.01.06 USPI Resp to Pls 11.22.24 Ltr re Structured Data

2024.11.18 USPI Production - Vol. 27

**Deposition Exhibits (in ascending order by exhibit number)**

DOJCIV-008-00000423

DVA_OMCEAL_000385858

DVA_OMCEAL_001329256

Ex. PX36

Ex. PX119

Ex. PX120

Ex. PX158

Ex. PX159

Ex. PX232

Ex. PX283

Ex. PX304

Ex. PX305

Ex. PX313

Ex. PX314

Ex. PX316

Ex. PX340

**Deposition Exhibits (in ascending order by exhibit number)**

Ex. PX376

Ex. PX484

Ex. PX485

Ex. PX489

Ex. PX490

Ex. PX501

Ex. PX507

Ex. PX523

Ex. PX566

Ex. PX597

SCA000160352

SCA000484054

SCA000629524

SCA000630035

SCA001395985

SCA001669270

USPI_CIV_000000442

USPI_CIV_000007019

USPI_CIV_000026885

USPI_CIV_000167345

USPI_CIV_000242381

**Deposition Exhibits (in ascending order by exhibit number)**

USPI_CIV_000243441

USPI_CIV_000290705

USPI_CIV_000401250

USPI_CIV_000422931

USPI_CIV_000514831

USPI_CIV_000624407

## III. LEGAL DOCUMENTS

2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions

2024-2-7 Ltr SDZ to DaVita RE Structured Data Questions

2024-2-7 Ltr SDZ to SCA RE Structured Data Questions

2024-2-7 Ltr SDZ to USPI RE Structured Data Questions

2024-2-20 Email SDZ to DaVita RE Structured Data Questions

2024-2-20 Email SDZ to SCA RE Structured Data Questions

2024-2-20 Email SDZ to USPI RE Structured Data Questions

2024-3-13 Ltr T. Rothman to S. Zandi RE Response to Plaintiffs' 2-7 Letter

2024-3-27 Ltr J Barrett to SDZ RE USPI Structured Data 2.7 Ltr

2024-3-27 Ltr M Lane to SDZ RE DaVita 2022-23 Structured Data

2024-4-3 Ltr SDZ to Ds RE Structured Data

2024-5-29 Email SDZ to DaVita & SCA RE 2022 Structured Data

2024-08-29 Ltr J. Wade to S. Zandi RE Structured Data

271

Answer of Defendants United Surgical Partners International and Tenet Healthcare Corporation to Third Consolidated Amended Class Action Complaint (ECF No. 568), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed December 20, 2024

2nd Am. Class Action Compl. (ECF 101), *Andrews v. USPI Holding Co., Inc.*, No. 1:20-cv-00344-LPS (D. Del.)

3rd Am. Class Action Compl. (ECF No. 555), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305, filed October 27, 2024

*Chen-Oster v. Goldman, Sachs & Co.*, No. 1:10-cv-6950 (S.D.N.Y. Mar. 10, 2015)

Indictment, *United States v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, No. 3:21-cr-0011-L (N.D. Tex. Jan. 5, 2021)

Plaintiffs' Mot. to Compel SCA to Perform Supp. ESI Search, Dkt. No. 419

**APPENDIX B**

| Employee | Company, Job Title (Years) |
|---|---|
| Jeff Andrews | USPI, Administrator (2005–2008), Regional VP (2009–2010), Market President (2010–2020) |
| Alex Bateman | DaVita, Senior Financial Analyst, Mergers and Acquisitions (2005); DaVita, Manager (2008); USPI, Regional Vice President ("VP") (2008–2010); USPI, Market President (2011–2020) |
| Tony Blake | DaVita, Director (2006–2009), Vice President (2010–2012) |
| Jason Cagle | USPI, VP (2005–2010); USPI, Senior Vice President ("SVP") (2010–2013); USPI, Chief Financial Officer ("CFO"), (2013–2020) |
| Peter Clemens | SCA, EVP and CFO (2011–2015), SCA, Senior Advisor (2015–2017) |
| Cindy English | USPI, VP Financial Operations (2007–2019) |
| Bridie Fanning | SCA, Chief Talent Officer (2014–2016) |
| Mark Gildea | DaVita, SVP of Operations (2005–2015) |
| Joshua Golomb | DaVita, General Manager-DaVita Rx (2005, 2014–2015); DaVita, Director, Special Projects (2005); DaVita, Senior Manager (2005); DaVita, Director Star Rx (2005–2006); DaVita, Senior Director DaVita Rx (2006); DaVita, Senior Director (2006–2007); DaVita, VP, DaVita Rx (2007–2015); DaVita, CEO, Paladina Health [a DaVita subsidiary] |
| Andrew Hayek | DaVita, President (2007); DaVita, VP (2007–2008); SCA, President & CEO (2008–2017); OptumHealth, CEO (2017–2019) |
| Sandi Karrmann | USPI, SVP, Chief Human Resources & Support Services Officer (2013–2017); Tenet Healthcare/USPI, EVP, Chief Human Resources Officer (2017–2020) |
| Anthony Kilgore | SCA, Group VP (2011–2012); SCA, SVP Operations (2013–2016); SCA, Group President (2017); SCA, CEO (2018–2019) |
| Dennis Kogod | DaVita, Division President (2006–2010); DaVita, SVP (2008); DaVita, COO (2008–2016); DaVita, COO, HealthCare Partners (2014–2016); DaVita, Advisor to CEO (2016) |
| Brian Mathis | SCA, VP Strategy (2009–2014); SCA, Group VP Strategy and Payer Engagement (2014–2015); SCA, SVP, Strategy and Payment Innovation (2015–2017); SCA, CDO (2017–2018); OptumCare, CDO (2017–2018); OptumCare, Chief Strategy Officer (2018–2020) |
| Laura Mildenberger | DaVita, DVP / Chief People Officer, (2005); DaVita, DVP/Regional Vice President ("RVP") (2006–2007); DaVita, SVP (2008); DaVita, Chief People Officer (2008–2016) |
| Shannon Mosley | USPI, Director (2003–2006); USPI, Director (2007); USPI, VP Talent Acquisition (2007–2020) |
| Brian Rasco | SCA, Director of IT Security (2021–Present) |
| Javier Rodriguez | DaVita, SVP (2005–2018); DaVita, DVP (2006); DaVita, VP Value Management Operation (2006); DaVita, President (2008, 2012–2014); DaVita, CEO, Kidney Care (2014–2022) |
| Michael Rucker | DaVita, DVP/RVP (2006–2008); SCA, SVP Operations (2008–2009); SCA, EVP & COO (2009–2017) |

273

| Employee | Company, Job Title (Years) |
|---|---|
| Rich Sharff | SCA, EVP, General Counsel & Secretary (2007–Present); OptumHealth, General Counsel (2017–Present) |
| Kent Thiry | DaVita, Chairman and CEO (1999–2019); DaVita, Chairman and CEO, HealthCarePartners Inc. (2014–2020); DaVita, Executive Chairman of the Board of Directors (2019–2021) |
| Leslie Wachsman | SCA, VP Finance & Investor Relations (2012–2018); SCA, GVP, Finance (2018–2019); SCA, CFO (2019–Present) |
| Heather Way | SCA, CEO (2019–2021); USPI, Administrator (2020–2022) |
| William ("Bill") Wilcox | USPI, President (2005–2011); USPI, CEO (2011–2018), Chairman (2018–2020); USPI, Consultant (2020–2023) |
| Kevin Zaideman | SCA, Compensation Senior Manager (2017–2020); SCA, Director of Compensation (2021–2022) |

## APPENDIX C

## REBUTTAL REPORT FIGURES

**Figure 44: The Challenged Conduct Reduced the Extent to Which Defendants Hire From Each Other Relative to Other Employers**



*Note*: Corrected Lightcast Data. The graph show for each year how each Defendant ranked among all other labor market competitors in the Lightcast Data in terms of the number of times a Defendant hired from or lost employees to the other Defendants in a given year. These ranks are not adjusted to be on a *per Defendant* basis.

**Figure 45: Dr. Saravia's Nonrandom Compensation Paths Generate Predetermined Relationships**

*Source*: Simulated data, see workpapers. The figure shows the distribution of coefficients on the log of director hourly compensation from 5,001 iterations of Dr. Saravia's toy simulation. In the dashed gray line I keep her asymmetric raises, and in the black line I repeat her analysis but make the raises symmetric around zero. The vertical lines are the median of each distribution.

**Figure 46 [Figure 19 Revised]: Relationship Between Director and (S)VP Wages**

| | Dependent Variable: Ln(Mean Hourly Rate for Directors) | | | | | |
|---|---|---|---|---|---|---|
| | DaVita | | SCA | | USPI | |
| Ln(Mean Hourly Rate of VPs & SVPs) | 0.260*** | 0.250*** | 0.732*** | 0.399* | 0.650** | 0.844** |
| | (0.0639) | (0.0610) | (0.0581) | (0.179) | (0.239) | (0.323) |
| Ln(Avg. State Mgr. Earnings) | | -0.339 | | 0.186 | | -1.357 |
| | | (0.518) | | (0.348) | | (1.523) |
| Ln(State Health Expend. PC) | | 0.410 | | 0.649 | | 0.644 |
| | | (0.230) | | (0.576) | | (1.169) |
| Covid | | 0.150 | | -0.0152 | | -0.0564 |
| | | (0.119) | | (0.0709) | | (0.194) |
| Ln(State GDP PC) | | -1.544 | | 0.708 | | -4.066 |
| | | (1.971) | | (1.733) | | (3.779) |
| Ln(State Unemployment Rate) | | -0.227 | | 0.0405 | | -0.149 |
| | | (0.156) | | (0.148) | | (0.349) |
| Census Region Annual CPI | | 0.189 | | -0.124 | | 1.166 |
| | | (0.349) | | (0.187) | | (0.832) |
| Observations | 18 | 18 | 15 | 15 | 18 | 18 |
| R-squared | 0.487 | 0.773 | 0.919 | 0.975 | 0.538 | 0.686 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses. Note the constant term is suppressed.

**Figure 47 [Figure 20 Revised]: Within-Job Hourly Rate are Highly Correlated With Hold Out Sample**

| | Dependent Variable: Ln(Mean Hourly Rate) | | | | | |
|---|---|---|---|---|---|---|
| | DaVita | | SCA | | USPI | |
| Ln(Hourly Rate of others in same job-year) | 0.895*** | 0.888*** | 0.960*** | 0.965*** | 0.872*** | 0.855*** |
| | (0.0189) | (0.0186) | (0.0267) | (0.0453) | (0.0452) | (0.0447) |
| Ln(Avg. State Mgr. Earnings) | | 0.0411 | | 0.240*** | | 0.262*** |
| | | (0.0587) | | (0.0504) | | (0.0877) |
| Ln(State Health Expend. PC) | | 0.0603 | | -0.0148 | | -0.322*** |
| | | (0.0696) | | (0.0507) | | (0.0856) |
| Covid | | -0.0321** | | -0.0221 | | -0.00560 |
| | | (0.0158) | | (0.0197) | | (0.0286) |
| Ln(State GDP PC) | | 0.123** | | -0.0867 | | 0.470*** |
| | | (0.0608) | | (0.132) | | (0.0760) |
| Ln(State Unemployment Rate) | | 0.0425* | | 0.0478*** | | 0.0342 |
| | | (0.0251) | | (0.0161) | | (0.0286) |
| Census Region Annual CPI | | 0.0676** | | 0.0650 | | 0.160** |
| | | (0.0300) | | (0.0529) | | (0.0710) |
| Observations | 6,326 | 6,326 | 2,590 | 2,590 | 4,085 | 4,085 |
| R-squared | 0.641 | 0.646 | 0.704 | 0.709 | 0.524 | 0.540 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

**Figure 48 [Figure 9 Revised]: Senior-Level Employees Are More Strongly Affected By Conduct Than Managers**

| Baseline Category: Managers | Dependent Variable: Ln(Total Annual Compensation) | | | |
|---|---|---|---|---|
| | Overall | | By Defendant | |
| | [1] | [2] | [3] | [4] |
| Conduct (Managers) | -0.0260*** | | | |
| | (0.00488) | | | |
| Conduct*1(Directors & Above) | -0.0754*** | -0.0820*** | | |
| | (0.00697) | (0.00761) | | |
| **Lower Bound Suppression %** | **-7.3%** | **-7.9%** | | |
| | | | | |
| DaVita Conduct (Managers) | | | -0.0354*** | |
| | | | (0.00487) | |
| DaVita Conduct*1(Directors & Above) | | | -0.0908*** | -0.0911*** |
| | | | (0.00995) | (0.00968) |
| **DaVita Lower Bound Suppression %** | | | **-8.7%** | **-8.7%** |
| | | | | |
| SCA Conduct (Managers) | | | -0.0540*** | |
| | | | (0.0109) | |
| SCA Conduct*1(Directors & Above) | | | -0.0658*** | -0.0815*** |
| | | | (0.0123) | (0.0127) |
| **SCA Lower Bound Suppression %** | | | **-6.4%** | **-7.8%** |
| | | | | |
| USPI Conduct (Managers) | | | -0.00107 | |
| | | | (0.00845) | |
| SCA Conduct*1(Directors & Above) | | | -0.0626*** | -0.0576*** |
| | | | (0.0113) | (0.0115) |
| **USPI Lower Bound Suppression %** | | | **-6.1%** | **-5.6%** |
| | | | | |
| 1(Directors & Above) | 0.227*** | 0.228*** | 0.231*** | 0.230*** |
| | (0.00848) | (0.00855) | (0.00889) | (0.00866) |
| Healthcare, Macro, Hours | Yes | Yes | Yes | Yes |
| USPI Low Hours Control | Yes | Yes | Yes | Yes |
| Individual-Company FE | Yes | Yes | Yes | Yes |
| Location FE | No | Yes | No | Yes |
| Observations | 79,898 | 79,898 | 79,898 | 79,898 |
| R-squared | 0.912 | 0.916 | 0.912 | 0.916 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects.

**Figure 49 [Figure 26 Revised]: Other Measures of Compensation**

|  | Ln(Regular Plus Other Compensation) | | Ln(Total Compensation Minus Stocks) | |
|---|---|---|---|---|
|  | [1] | [2] | [3] | [4] |
| Conduct | -0.0445*** |  | -0.0654*** |  |
|  | (0.00874) |  | (0.00851) |  |
| % Wage Suppression | **-4.4%** |  | **-6.3%** |  |
|  |  |  |  |  |
| DaVita Conduct |  | -0.0366*** |  | -0.0807*** |
|  |  | (0.0101) |  | (0.0102) |
| % Wage Suppression |  | **-3.6%** |  | **-7.8%** |
|  |  |  |  |  |
| SCA Conduct |  | -0.0743*** |  | -0.0905*** |
|  |  | (0.0125) |  | (0.0136) |
| % Wage Suppression |  | **-7.2%** |  | **-8.7%** |
|  |  |  |  |  |
| USPI Conduct |  | -0.0485*** |  | -0.0482*** |
|  |  | (0.0111) |  | (0.0103) |
| % Wage Suppression |  | **-4.7%** |  | **-4.7%** |
|  |  |  |  |  |
| Year Trend | Yes | Yes | Yes | Yes |
| USPI Low Hours Control | Yes | Yes | Yes | Yes |
| Healthcare, Macro, Hours | Yes | Yes | Yes | Yes |
| Individual-by-Company FE | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Observations | 25,839 | 25,839 | 25,871 | 25,871 |
| R-squared | 0.863 | 0.863 | 0.883 | 0.883 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The two measures of compensation are the natural log of regular pay plus the other category of pay, and the natural logarithm of total pay minus stock compensation.

**Figure 50 [Figure 27 Revised]: Hourly Wages**

| | Dependent Variable: Ln(Hourly Wage) | |
|---|---|---|
| | [1] | [2] |
| Conduct | -0.130*** | |
| | (0.0117) | |
| **% Wage Suppression** | **-12.2%** | |
| | | |
| DaVita Conduct | | -0.179*** |
| | | (0.0149) |
| **% Wage Suppression** | | **-16.4%** |
| | | |
| SCA Conduct | | -0.105*** |
| | | (0.0176) |
| **% Wage Suppression** | | **-10.0%** |
| | | |
| USPI Conduct | | -0.0860*** |
| | | (0.0137) |
| **% Wage Suppression** | | **-8.2%** |
| | | |
| Year Trend | Yes | Yes |
| USPI Low Hours Control | Yes | Yes |
| Healthcare, Macro | Yes | Yes |
| Log-Total Hours | No | No |
| Individual-by-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 25,871 | 25,871 |
| R-squared | 0.836 | 0.836 |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The dependent variable is the natural log of hourly wages (total compensation divided by total hours). Note that total hours do not appear as a control variable in this specification, because they are incorporated into the denominator of the dependent variable.

**Figure 51 [Figure 28 Revised]: Poisson Models**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.148*** | -0.246*** | -0.236*** |
| | (0.0192) | (0.0297) | (0.0289) |
| **% Wage Suppression** | **-13.8%** | **-21.8%** | **-21.0%** |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.175*** | -0.305*** | -0.289*** |
| | (0.0280) | (0.0377) | (0.0364) |
| **% Wage Suppression** | **-16.1%** | **-26.3%** | **-25.1%** |
| | | | |
| SCA Conduct | -0.118*** | -0.208*** | -0.176*** |
| | (0.0208) | (0.0351) | (0.0346) |
| **% Wage Suppression** | **-11.1%** | **-18.8%** | **-16.1%** |
| | | | |
| USPI Conduct | -0.0922*** | -0.168*** | -0.163*** |
| | (0.0232) | (0.0317) | (0.0289) |
| **% Wage Suppression** | **-8.8%** | **-15.5%** | **-15.0%** |
| Year Trend | Yes | Yes | Yes |
| USPI Low Hours Control | No | No | Yes |
| Healthcare, Macro, Hours | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The model is estimated using a Poisson regression. As I explained at deposition, a Poisson regression "is better at accounting for zeros and can be more efficient, and I show the results are robust when using a Poisson regression." Starr Dep. Vol. 2 at 312:7–17.

**Figure 52 [Figure 29 Revised]: Control Variables Interacted by Company**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0897*** | -0.145*** | -0.127*** |
| | (0.00838) | (0.0143) | (0.0120) |
| % Wage Suppression | **-8.6%** | **-13.5%** | **-11.9%** |
| Observations | 25,871 | 25,871 | 25,871 |
| R-squared | 0.795 | 0.797 | 0.867 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.138*** | -0.195*** | -0.163*** |
| | (0.0132) | (0.0221) | (0.0193) |
| % Wage Suppression | **-12.9%** | **-17.7%** | **-15.0%** |
| | | | |
| SCA Conduct | -0.0628*** | -0.339*** | -0.248*** |
| | (0.0172) | (0.0501) | (0.0398) |
| % Wage Suppression | **-6.1%** | **-28.8%** | **-21.9%** |
| | | | |
| USPI Conduct | -0.0247** | -0.0548*** | -0.0647*** |
| | (0.0111) | (0.0166) | (0.0124) |
| % Wage Suppression | **-2.4%** | **-5.3%** | **-6.3%** |
| Observations | 25,871 | 25,871 | 25,871 |
| R-squared | 0.796 | 0.798 | 0.867 |
| Year Trend | Yes | Yes | Yes |
| USPI Low Hours Control | No | No | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. Note that the macroeconomic, healthcare-specific, and ln(total hours) controls are fully interacted with each company when they are included (e.g., the main effect of each control and the interaction are included).

**Figure 53 [Figure 30 Revised]: Models Controlling for Job Titles and Tenure**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0836*** | -0.139*** | -0.130*** |
| | (0.00738) | (0.0121) | (0.0109) |
| **% Wage Suppression** | **-8.0%** | **-13.0%** | **-12.2%** |
| | | | |
| Tenure | 0.0147 | 0.00983 | -0.0187 |
| | (0.0288) | (0.0294) | (0.0142) |
| Observations | 25,706 | 25,706 | 25,706 |
| R-squared | 0.820 | 0.820 | 0.881 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.122*** | -0.197*** | -0.175*** |
| | (0.0107) | (0.0153) | (0.0137) |
| **% Wage Suppression** | **-11.5%** | **-17.9%** | **-16.1%** |
| | | | |
| SCA Conduct | -0.0756*** | -0.153*** | -0.0937*** |
| | (0.0129) | (0.0186) | (0.0143) |
| **% Wage Suppression** | **-7.3%** | **-14.2%** | **-8.9%** |
| | | | |
| USPI Conduct | -0.0335*** | -0.0897*** | -0.0949*** |
| | (0.0120) | (0.0142) | (0.0123) |
| **% Wage Suppression** | **-3.3%** | **-8.6%** | **-9.1%** |
| | | | |
| Tenure | 0.0154 | 0.0109 | -0.0201 |
| | (0.0306) | (0.0313) | (0.0131) |
| Observations | 25,706 | 25,706 | 25,706 |
| R-squared | 0.820 | 0.821 | 0.881 |
| Job Title FE | Yes | Yes | Yes |
| USPI Low Hours Control | Yes | Yes | Yes |
| Year Trend | No | No | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The model includes controls for tenure and for job title fixed effects.

**Figure 54 [Figure 31 Revised]: Drop COVID Years**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.110*** | -0.137*** | -0.130*** |
| | (0.0101) | (0.0132) | (0.0119) |
| % Wage Suppression | **-10.4%** | **-12.8%** | **-12.2%** |
| Observations | 21,209 | 21,209 | 21,209 |
| R-squared | 0.798 | 0.798 | 0.849 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.125*** | -0.175*** | -0.157*** |
| | (0.0164) | (0.0188) | (0.0166) |
| % Wage Suppression | **-11.8%** | **-16.1%** | **-14.5%** |
| | | | |
| SCA Conduct | -0.199*** | -0.257*** | -0.213*** |
| | (0.0225) | (0.0300) | (0.0268) |
| % Wage Suppression | **-18.1%** | **-22.6%** | **-19.2%** |
| | | | |
| USPI Conduct | -0.0610*** | -0.0909*** | -0.0965*** |
| | (0.0147) | (0.0164) | (0.0152) |
| % Wage Suppression | **-5.9%** | **-8.7%** | **-9.2%** |
| Observations | 21,209 | 21,209 | 21,209 |
| R-squared | 0.798 | 0.799 | 0.849 |
| Year Trend | Yes | Yes | Yes |
| USPI Low Hours Control | No | No | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample drops the COVID years, 2020 and 2021.

**Figure 55 [Figure 32 Revised]: Include Partial Years Worked**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0647*** | -0.0832*** | -0.102*** |
| | (0.0109) | (0.0189) | (0.0118) |
| % Wage Suppression | **-6.3%** | **-8.0%** | **-9.7%** |
| Observations | 33,131 | 33,131 | 33,072 |
| R-squared | 0.626 | 0.627 | 0.877 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.0990*** | -0.140*** | -0.151*** |
| | (0.0168) | (0.0245) | (0.0152) |
| % Wage Suppression | **-9.4%** | **-13.1%** | **-14.0%** |
| | | | |
| SCA Conduct | -0.0911*** | -0.123*** | -0.0887*** |
| | (0.0218) | (0.0300) | (0.0185) |
| % Wage Suppression | **-8.7%** | **-11.6%** | **-8.5%** |
| | | | |
| USPI Conduct | 0.00161 | -0.0244 | -0.0553*** |
| | (0.0167) | (0.0210) | (0.0134) |
| % Wage Suppression | **0.2%** | **-2.4%** | **-5.4%** |
| Observations | 33,131 | 33,131 | 33,072 |
| R-squared | 0.627 | 0.627 | 0.878 |
| Year Trend | Yes | Yes | Yes |
| USPI Low Hours Control | No | No | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes workers who worked part of the year.

**Figure 56 [Revised 33 Revised]: Including Outliers**

| | | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0960*** | -0.104*** | -0.133*** |
| | (0.0112) | (0.0177) | (0.0116) |
| % Wage Suppression | **-9.2%** | **-9.9%** | **-12.5%** |
| Observations | 26,546 | 26,546 | 25,921 |
| R-squared | 0.615 | 0.615 | 0.859 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.117*** | -0.154*** | -0.188*** |
| | (0.0191) | (0.0242) | (0.0151) |
| % Wage Suppression | **-11.0%** | **-14.2%** | **-17.2%** |
| SCA Conduct | -0.181*** | -0.203*** | -0.120*** |
| | (0.0179) | (0.0264) | (0.0180) |
| % Wage Suppression | **-16.5%** | **-18.4%** | **-11.3%** |
| USPI Conduct | -0.0230* | -0.0466** | -0.0834*** |
| | (0.0130) | (0.0183) | (0.0130) |
| % Wage Suppression | **-2.3%** | **-4.6%** | **-8.0%** |
| Observations | 26,546 | 26,546 | 25,921 |
| R-squared | 0.616 | 0.616 | 0.859 |
| Year Trend | Yes | Yes | Yes |
| USPI Low Hours Control | No | No | Yes |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes full-year employees, including outliers.

**Figure 57 [Figure 34 Revised]: Harmonizing Data Time-Frame Across Defendants (2008–2022)**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0848*** | -0.115*** | -0.0805*** |
| | (0.00747) | (0.0140) | (0.0104) |
| % Wage Suppression | **-8.1%** | **-10.9%** | **-7.7%** |
| Observations | 24,294 | 24,294 | 24,294 |
| R-squared | 0.806 | 0.807 | 0.887 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.162*** | -0.308*** | -0.251*** |
| | (0.0124) | (0.0221) | (0.0175) |
| % Wage Suppression | **-14.9%** | **-26.5%** | **-22.2%** |
| SCA Conduct | -0.111*** | -0.222*** | -0.141*** |
| | (0.0146) | (0.0229) | (0.0174) |
| % Wage Suppression | **-10.5%** | **-19.9%** | **-13.1%** |
| USPI Conduct | 0.0104 | -0.0683*** | -0.0422*** |
| | (0.0112) | (0.0142) | (0.0102) |
| % Wage Suppression | **1.0%** | **-6.6%** | **-4.1%** |
| Observations | 24,294 | 24,294 | 24,294 |
| R-squared | 0.807 | 0.809 | 0.889 |
| Year Trend | Yes | Yes | Yes |
| USPI Low Hours Control | N/A | N/A | N/A |
| Individual-by-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note*: *** p<0.01, ** p<0.05, * p<0.1. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. The sample includes only years 2008 to 2022.

**Figure 58 [Figure 35 Revised]: No Individual-Company Fixed Effects**

| | | Dependent Variable: Ln(Total Annual Compensation) | |
|---|---|---|---|
| | | [1] | [2] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | | -0.0719*** | |
| | | (0.0155) | |
| | **% Wage Suppression** | **-6.9%** | |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | | | -0.0640*** |
| | | | (0.0198) |
| | **% Wage Suppression** | | **-6.2%** |
| | | | |
| SCA Conduct | | | -0.0778*** |
| | | | (0.0211) |
| | **% Wage Suppression** | | **-7.5%** |
| | | | |
| USPI Conduct | | | -0.0789*** |
| | | | (0.0170) |
| | **% Wage Suppression** | | **-7.6%** |
| | | | |
| Year Trend | | Yes | Yes |
| USPI Low Hours Control | | Yes | Yes |
| Healthcare, Macro, Hours | | Yes | Yes |
| Individual-by-Company FE | | No | No |
| Location FE | | Yes | Yes |
| Observations | | 27,726 | 27,726 |
| R-squared | | 0.388 | 0.388 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed because it has no practical meaning in a regression with absorbed fixed effects. There are no individual-by-company fixed effects in these regressions.

3244633.4                                    287

**Figure 59 [Figure 36 Revised]: Random Effects Model**

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| | [1] | [2] | [3] |
| *Panel A. Common Conduct Effect* | | | |
| Conduct | -0.0804*** | -0.121*** | -0.117*** |
| | (0.00751) | (0.0121) | (0.0109) |
| **% Wage Suppression** | **-7.7%** | **-11.4%** | **-11.1%** |
| Observations | 27,726 | 27,726 | 27,726 |
| *Panel B. Defendant-Specific Conduct* | | | |
| DaVita Conduct | -0.116*** | -0.178*** | -0.158*** |
| | (0.0117) | (0.0158) | (0.0140) |
| **% Wage Suppression** | **-11.0%** | **-16.3%** | **-14.6%** |
| | | | |
| SCA Conduct | -0.0951*** | -0.158*** | -0.112*** |
| | (0.0135) | (0.0186) | (0.0156) |
| **% Wage Suppression** | **-9.1%** | **-14.6%** | **-10.6%** |
| | | | |
| USPI Conduct | -0.0172 | -0.0647*** | -0.0792*** |
| | (0.0107) | (0.0135) | (0.0119) |
| **% Wage Suppression** | **-1.7%** | **-6.3%** | **-7.6%** |
| Observations | 27,726 | 27,726 | 27,726 |
| Year Trend | Yes | Yes | Yes |
| USPI Low Hours Control | No | No | Yes |
| Individual-by-Company RE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Healthcare, Macro | No | Yes | Yes |
| Log-Total Hours | No | No | Yes |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed. The model is estimated with random effects.

**Figure 60 [Figure 37 Revised]: Reverse Relationship Between Director and (S)VP Wages**

| | Dependent Variable: Ln(Mean Hourly Rate of VPs & SVPs) | | | | | |
|---|---|---|---|---|---|---|
| | DaVita | | SCA | | USPI | |
| Ln(Mean Hourly Rate of Directors) | 1.875*** | 2.110*** | 1.257*** | 1.154*** | 0.829*** | 0.699*** |
| | (0.353) | (0.648) | (0.0876) | (0.264) | (0.0796) | (0.0890) |
| Ln(Avg. State Mgr. Earnings) | | 0.593 | | 0.719 | | 0.963 |
| | | (1.364) | | (0.543) | | (1.251) |
| Ln(State Health Expend. PC) | | -0.990 | | 0.650 | | 0.104 |
| | | (1.101) | | (0.677) | | (1.494) |
| Covid | | 0.294 | | 0.0283 | | 0.225 |
| | | (0.479) | | (0.0986) | | (0.193) |
| Ln(State GDP PC) | | -5.993 | | -4.262* | | 3.798 |
| | | (7.835) | | (2.077) | | (3.305) |
| Ln(State Unemployment Rate) | | -0.300 | | -0.309 | | -0.0748 |
| | | (0.685) | | (0.210) | | (0.343) |
| Census Region Annual CPI | | 1.279 | | -0.243 | | -1.692* |
| | | (1.262) | | (0.363) | | (0.835) |
| Observations | 18 | 18 | 15 | 15 | 18 | 18 |
| R-squared | 0.487 | 0.735 | 0.919 | 0.959 | 0.538 | 0.796 |

*Note*: *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Robust standard errors in parentheses, clustered by individual. Note the constant term is suppressed.

3244633.4

289

# **Exhibit 5**

# Lane Declaration

# (Filed Under Seal)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**<u>UPDATED REBUTTAL EXPERT WITNESS REPORT OF DR. BARRY GERHART</u>**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................... 1

II. ASSIGNMENT AND SUMMARY OF CONCLUSIONS ............................... 2

III. FACTUAL AND CASE BACKGROUND ..................................................... 13

    A. Outpatient Medical Center Industry.................................................... 14

    B. Defendants' Alleged Conspiracy. ........................................................ 14

IV. DEFENDANTS HAD INCENTIVES AND OPPORTUNITIES TO COLLUDE TO SUPPRESS EMPLOYEE COMPENSATION. ......................................... 27

    A. Defendants Are Incentivized to Collude to Keep Senior-Level Employee Turnover and Labor Costs Low. ........................................... 28

        1. Defendants Care About Their Employee Turnover Rates. ...................... 29

        2. Defendants Seek to Manage Their Substantial Labor Expenditures. ...... 33

    B. A Close-Knit Industry Increases Incentives and Opportunities to Collude. ......... 39

    C. Collusion Robs Employees of Pay Growth from Voluntary Job Changes and Unrestricted Job Mobility. ................................................ 41

        1. In Unrestricted Markets, Departing Employees Experience Pay Growth from Voluntary Job Changes. ..................................................... 41

        2. Incumbent Employees Also Benefit from Unrestricted Job Mobility.......................................................... 45

V. DEFENDANTS' COLLUSION WOULD LIKELY HAVE HARMED EMPLOYEES' COMPENSATION. ............................................................. 47

    A. In an Unrestricted Labor Market, Defendants Highly Value Recruiting Passive Candidates with Specialized Skills. ......................................... 48

    B. The No-Poach Agreements' Cold Calling Restrictions and Tell-Your Boss Provision Decreased Employees' Job Mobility and Bargaining Power. ............. 64

        1. Senior-Level Employees Typically Have Limited Access to Labor Market Information.................................................................... 65

        2. Defendants Limited Pay Transparency.................................................. 67

        3. Absent Defendants' Collusion, Employees Could Acquire Labor Market Information Through Cold Calls and Proactive Recruitment.............................................................. 69

        4. Because of the No-Poach Agreements, Employees Often Never Learned About Higher-Paying Job Opportunities at Defendant Firms. ............................................................................ 74

        5. Defendants' Tell-Your-Boss Provision Further Limited Employee Bargaining Power and Mobility.............................................. 86

        6. Defendants Have Market Power. .......................................................... 92

    C. Defendants' CSI Exchanges Likely Restricted Labor Market Competition...... 121

    D. Defendants' No-Poach Agreements and CSI Exchanges Harmed Employee Compensation. ................................................................... 134

**TABLE OF CONTENTS**

Page

1. Defendants' No-Poach Agreements Harmed Class Member Pay.......... 138

2. Defendants' CSI Exchanges Harmed Employee Compensation. .......... 142

E. Wage Suppression Can Persist for Years........................................................... 153

VI. DEFENDANTS MAINTAINED STRUCTURED COMPENSATION SYSTEMS THAT SOUGHT TO ACHIEVE INTERNAL EQUITY AND EXTERNAL EQUITY...................................................................................................................... 153

A. Defendants' Highly-Trained and Qualified Compensation Professionals Established and Maintained Structured Compensation Systems. ...................... 154

B. Defendants Designed Systematized Compensation Structures........................... 156

1. Step 1: Defendants Assigned Internal Value to Jobs. ........................... 159

2. Step 2: Defendants Undertook Job Evaluation and Benchmarking...... 161

3. Substantial Additional Common Evidence Shows That Defendant Firms Used Systematized Compensation Structures. ........................... 173

C. Defendants' Compensation Systems Sought to Achieve Internal Equity and Pay Fairness. ........................................................................................... 185

D. Internal Equity and Pay for Performance Are Not Mutually Exclusive. ........... 194

VII. DEFENDANTS' CONDUCT LIKELY HAD CLASS-WIDE COMPENSATION EFFECTS VIA THEIR STRUCTURED COMPENSATION SYSTEMS. ................... 199

A. Defendants' No-Poach Agreements Likely Lead to Cascading Compensation Effects Class-Wide. ................................................................... 199

B. Defendants' CSI Exchanges Would Likely Broadly Suppress Employee Compensation. ...................................................................................................... 230

VIII. CONCLUSIONS.................................................................................................................. 238

APPENDIX A ................................................................................................................... 246

APPENDIX B ................................................................................................................... 258

APPENDIX C ................................................................................................................... 261

APPENDIX D ................................................................................................................... 271

## I.     **INTRODUCTION**

1.      I, Dr. Barry Gerhart, hereby submit the following Updated Rebuttal Expert Witness Report ("Rebuttal"), in response to the April 16, 2025 Expert Reports submitted by Dr. John H. Johnson, IV ("Johnson Report"), Celeste Saravia, Ph.D. ("Saravia Report"), Justin McCrary, Ph.D., ("McCrary Report"), and Dr. Lauren Stiroh ("Stiroh Report").[1]  On May 30, 2025, I submitted my Rebuttal to the Johnson and Saravia Reports.  I hereby update my Rebuttal to include rebuttal to the McCrary and Stiroh Reports.  My qualifications were set forth in my January 15, 2025 report.[2]

2.      I have been asked by Plaintiffs to comment on the Johnson, Saravia, McCrary, and Stiroh Reports, and in particular to determine whether any of the opinions expressed by Defendants' Experts cause me to change the conclusions reached in my report.  They do not.

3.      In connection with this matter, I reviewed materials from this case and from the related criminal investigation *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.), including the Johnson Report, the Saravia Report, the McCrary Report, the Stiroh Report, the Third Consolidated Amended Class Action Complaint (ECF No. 555), depositions, deposition exhibits, FBI investigation interview reports, DaVita criminal trial transcripts, and documents including salary or market pay range materials produced by or compiled from materials from Defendants Andrew Hayek ("Hayek"), Kent Thiry ("Thiry"), Surgical Care Affiliates, LLC and

---

[1] Herein, I refer to Dr. Johnson, Dr. Saravia, Dr. McCrary, and Dr. Stiroh collectively as "Defendants' Experts."  Note that all Defendants retained Dr. McCrary (McCrary Report ¶ 16), whereas only DaVita, SCA, Hayek, and Thiry retained Dr. Johnson (Johnson Report ¶ 1), only USPI and Tenet retained Dr. Saravia (Saravia Report ¶ 4), and only DaVita and Thiry retained Dr. Stiroh (Stiroh Report ¶ 4).

[2] On May 1, 2025, Dr. Saravia served an amended version of her report.  On February 11, 2025, I served an amended version of my opening report to correct non-substantive errors.  Throughout my Rebuttal, I refer to these amended reports.

SCAI Holdings, LLC (together, "SCA"), DaVita Inc. ("DaVita"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation (together, "USPI") (together, "Defendants"). I have also reviewed and drawn on compensation-related and economics literature, as well as survey data collected by WorldatWork, the professional association for those working in compensation management, to describe the structured compensation typically utilized by U.S. companies. The information that I relied upon in forming my opinions include the materials listed in **Appendix A** as well as those cited in this report and the attached **Appendices**. The bases for my opinions are described in this Rebuttal, any attached exhibits, and my workpapers. I reserve the right to supplement my Rebuttal in view of any new material or information provided to me after the date of this Rebuttal.

4. For purposes of convenience, in **Appendix B,** I provide the names, employers, job titles, and years worked for all individuals I reference in my report.

II. **ASSIGNMENT AND SUMMARY OF CONCLUSIONS**

5. Below, I explain Defendants' Experts' objections to my opinions. I also explain the conclusions I have drawn as a result of my review of Defendants' Experts' Reports and testimony, my work to date, and my experience and research in compensation and human resource management.

6. Background of Anticompetitive Conduct. Foremost, I am not persuaded by Defendants' Experts' critiques of the background I provided regarding Defendants' anticompetitive conduct in support of my analysis. I maintain that the SCA-DaVita No-Poach Agreement began at least as early as 2008, applied to employees at the Director-level and above, and had a nationwide geographic scope. Moreover, I have no cause to change my analysis that the SCA-USPI No-Poach Agreement began by 2010 and was identical to the SCA-DaVita No-Poach Agreement. As I explain below, it is also my opinion that both No-Poach Agreements

-3-

continued through 2019. I also have no cause my opinions regarding Defendants' exchanges of competitively sensitive information ("CSI Exchanges").

7. <u>Incentives to Collude.</u> Defendants' Experts have not persuaded me to change my assessment that evidence common to the Class shows that Defendants were incentivized to collude to suppress labor market competition. I have no reason to change my opinions that Defendants sought to keep turnover low and reduce their substantial labor expenditures in order to (1) increase Defendant firms' profits and stock values, and, relatedly, (2) increase the compensation of Defendants' C-Suite executives, who were paid in stock and/or were otherwise financially incentivized to keep costs low. Indeed, annual turnover rates at Defendant firms were far below economy-wide and industry-wide quit rate levels and remained at those lower levels even when quit rates economy-wide and industry-wide increased by 50 percent or more, which suggests depressed turnover, or mobility, of Class Members. Moreover, employment growth (and the added upward pressure that would put on pay levels) at Defendant firms would have further incentivized collusion.

8. <u>Harm to Employees.</u> Defendants' Experts have also not put forth testimony or evidence sufficient to cause me to change my opinion that such collusion would have harmed Defendants' employees because employees benefit when they have uninhibited access to other jobs, i.e., job mobility.

9. Defendants' Experts do not contradict my opinion that employees who receive outside employment offers benefit from job mobility by (1) voluntarily changing employers to obtain substantial compensation increases or (2) using the outside offers as leverage to negotiate higher compensation in return for remaining with their current employers. Not all outside job offers result in moves, but almost all likely result in a pay increase, either from moving or

negotiating a counteroffer with higher pay to stay. Thus, moves are a relevant, but incomplete indicator of employee opportunities for mobility and pay increases.

10. Moreover, Defendants' Experts do not contest the testimony and other evidence I cite about employees who do not receive outside job offers: those employees become aware of coworker offers then receive updated, more accurate information on their own outside pay opportunities (and their assessment of external equity), making job searches and job mobility (and thus upward pressure on pay) more likely. Defendants' Experts also do not refute my opinion that when employees use outside offers to negotiate higher pay at their current employer, that will disrupt internal equity and require pay adjustments for other employees.

11. Further, Defendants' Experts do not refute my opinion that in competitive (i.e., unrestricted) labor markets, employers often proactively raise compensation of incumbent employees (i.e., workers currently employed by the employer) to prevent turnover. I also have not changed my view that employees accrue these benefits, however, only when employees' access to these higher-paying external job opportunities is not restricted.

12. Ways to Lower Labor Costs. Defendants' Experts have not persuaded me to change my opinion that, to lower labor costs and increase profits, Defendants could collude with their labor market competitors to restrict their competitors' recruiting activities and their own employees' job mobility. Moreover, I have not changed my opinion that Defendants could also achieve lower labor costs by sharing competitively sensitive information, including wage information, to fix wages, thereby keeping the labor market rate low and limiting the number of higher-paying jobs available to employees seeking better jobs.

13. Hiring Where No Labor Market Restrictions Exist. Defendants' Experts have not rebutted my opinion or provided supporting evidence sufficient to cause me to change my

opinions about hiring in the absence of Defendants' labor market restrictions. Specifically, I opined that in the absence of labor market restrictions, Defendants would have solicited, hired, or recruited a broad swath of employees from each other, and particularly high-value passive candidates with specialized skills who did not proactively seek alternative employment. Likewise, I have no cause to change my opinion that employees would have been free to seek employment at competitor firms on their own initiative. Accordingly, in the absence of no-poach agreements, Defendants expected to lose valuable employees to each other and anticipated that they would have to increase pay to prevent turnover. Once the losses began, the risk would be that they snowball due to turnover contagion, as other employees follow (e.g., former DaVita Division Vice President ("DVP") Michael Rucker left DaVita followed SCA CEO Andrew Hayek to help run SCA as Chief Operating Officer ("COO")). Thus, they decided to obstruct the turnover by restricting Class Members' mobility. Defendants' Experts do not contest my opinion that solicitation (and self-initiated moves by employees) can and often does increase the compensation of employees who ultimately accept job offers elsewhere. They also do not object to my opinion that, additionally, solicitation can increase the compensation of employees who choose to stay after using outside offers to negotiate higher pay with their current employers.

14. Effect of No-Poach Agreements on Job Mobility. Defendants' Experts contend that, contrary to my assessment, Defendants' No-Poach Agreements would have caused harm to only a limited number of employees because of competition from non-Defendant employers.[3] Dr. Johnson also asserts that I improperly neglected to consider evidence contrary to the factual background I provided regarding the SCA-DaVita No-Poach Agreement.[4] Specifically, Dr.

---

[3] Johnson Report ¶ 3; Saravia Report ¶¶ 21(2), 22–25; McCrary Report ¶¶ 19, 21, 24(a); Stiroh Report ¶¶ 19, 20(a)–20(c).

[4] Johnson Report ¶ 4.

Johnson claims I should have accounted for evidence allegedly showing (1) that the scope of the SCA-DaVita No-Poach Agreement expanded over time from Vice Presidents ("VPs") and Senior Vice Presidents ("SVPs") to Directors, and (2) start dates for the agreement that were different from the ones I used.[5] Dr. McCrary and Dr. Stiroh similarly argue that the evidence is consistent with different start and end dates.[6] Moreover, Dr. McCrary asserts that Defendants' conduct would not have had a common impact given Class Members' diversity and the variety of job opportunities available to them.[7] In response, I explain that Defendants' Experts have not given me cause to change my opinion that evidence common to the Class shows that Defendants' No-Poach Agreements limited employees' job mobility.

15. <u>Effect of Defendants' Recruiting Restrictions.</u> Further, Defendants' Experts do not contest my opinion that the evidence is consistent with Defendants agreeing not to solicit passive candidates who were not proactively seeking employment. Second, Defendants' Experts do not contradict my opinion about the existence of a tell-your-boss restriction. I found that, based on my analysis of common evidence, Defendants agreed not to make job offers to either proactive or passive candidates who worked at Defendant firms. The exception was if the candidates first informed their current bosses that they were seeking employment elsewhere before the candidates had received external job offers, which most employees are disinclined to do. Consequently, Defendants' employees often did not receive higher-paying job offers they otherwise would have received and could either have accepted or used as leverage or data points.

---

[5] *Id.* ¶ 4.

[6] McCrary Report ¶¶ 17, 173; Stiroh Report ¶¶ 20(d)(i), 87.

[7] McCrary Report ¶¶ 19, 20(a), 21 ("Identifying exactly which proposed class members" would have been harmed by Defendants' conduct "would require individualized inquiry[.]"), 22, 23(c) ("[I]mpact stemming from the alleged information sharing would not be common[,]" because of "variation across proposed class members in labor market opportunities . . . performance, which years of the Class Period they were employed by Defendants, and their compensation mix[.]").

-6-

16.     <u>Negative Impact on Class Members.</u>  Defendants' Experts do not convince me that Defendants' conduct was harmless because Class Members had job opportunities at Non-Defendant firms.  As a threshold matter, Class Members would have valued opportunities at Defendant firms.  Given Defendants' employment growth, we would expect to see an increase in the number of Class Members switching to Defendant firms in an unrestricted market, but we did not.  Moreover, I am also not swayed by Defendants' Experts' contentions regarding Class Members' employment opportunities at non-Defendant firms.  Given frictions in the labor market and that finding a match between an employer and employee is challenging, unsolicited offers are valuable.  Defendants' Experts cannot show that non-Defendant job opportunities were as valuable as opportunities that Class Members would have received from Defendants in an unrestricted market.  Moreover, this critique does not capture the cascading harm to employees of their peers not receiving outside offers.  Foremost, such employees would never have received information about outside offers from their peers who had received unsolicited offers.  Second, there would not have been upward pressure on the pay of those who did not receive outside offers, due to the internal equity pressures created by their peers using their outside offers to negotiate higher pay to stay.

17.     <u>Defendants' Labor Market Power.</u>  Finally, Defendants' Experts claim that my opinions are flawed because I failed to show that Defendants had sufficient market power to suppress employee compensation.[8]  Dr. Johnson, for example, argues that Defendants "made up only 16.8 percent of total employment" in the 5-digit NAICS industry code 62149 (Other Outpatient Care Centers).[9]  Further, Dr. McCrary and Dr. Stiroh argue that, because I cannot

---

[8] Johnson Report ¶ 2; Saravia Report ¶¶ 21(1), 22–25; McCrary Report ¶ 20(a); Stiroh Report ¶¶ 19–20(a).

[9] Johnson Report ¶ 48.

show that Defendants have sufficient market power to suppress pay for all or nearly all Class Members, I cannot show that Defendants' conduct would commonly impact Class Members (and an individualized inquiry is necessary to assess each individual employee's employment options).[10]  In response, I explain that Defendants' Experts' assertions that Defendants lacked sufficient market power to harm employee mobility and pay is incorrect and unsupported by compensation-related and economic theory and literature.

18.      <u>Competitively Sensitive Information Exchanges.</u>  Defendants' Experts claim that my opinion that Defendants' Exchanges of Competitively Sensitive Information ("CSI Exchanges") would likely have facilitated wage suppression is unsupported by the record evidence and the economic literature.[11]  Relatedly, Defendants' Experts claim that economic conditions would have precluded any CSI Exchanges from suppressing compensation.[12]  But Defendants' Experts have not convinced me to change my assessment that the common evidence showed that Defendants' years-long CSI Exchanges are inconsistent with unilateral conduct and would have harmed employees.  Indeed, it would be quite a coincidence for the same companies to engage in both No-Poach Agreements and CSI Exchanges.

19.      Though Dr. Saravia, Dr. McCrary, and Dr. Stiroh object that data exchanges can be legal and procompetitive in some circumstances, they have not put forth convincing testimony

---

[10] McCrary Report ¶¶ 20(a), 21(a), 23(c) ("[I]mpact stemming from the alleged information sharing would not be common[,]" in part because of "variation across proposed class members in labor market opportunities (and thus whether Defendants would have market power)[.]"); Stiroh Report ¶ 38 ("[T]he industries DaVita competed with differed across jobs, a fact that is inconsistent with firmwide impact.").

[11] Johnson Report ¶¶ 6–8; Saravia Report ¶¶ 21(3), 27–29; McCrary Report ¶¶ 19, 23; Stiroh Report ¶¶ 20(a)–(c), 20(e).

[12] Johnson Report ¶ 7; Saravia Report ¶ 21(3); McCrary Report ¶ 23; Stiroh Report ¶ 20(a)(iii).

or evidence that contradicts my opinion that no company benefits by unilaterally sharing wage-related data directly with competing employers.

20. Defendants' Experts have also not convinced me that the evidence I have provided is insufficient to support my opinion that Defendants' CSI Exchanges could have facilitated wage suppression. It is still my opinion that, based on the evidence I have reviewed, Defendants' mutual CSI Exchanges would have enabled them to agree to keep Class pay lower than it would have been otherwise and limit the number of higher-paying jobs available to Class Members seeking better opportunities, without fear of rising turnover rates. Further, Defendant firms' CEOs control their respective budgets, which are set in light of retention risks and turnover concerns. These same CEOs eliminated competitive threats in the labor market through their No-Poach Agreements, and shared compensation-related information through their CSI Exchanges, which allowed them to set lower labor budgets, including lower merit increase budgets, than they would have in a competitive market. Accordingly, this misconduct would directly cause Class-wide compensation suppression, in addition to the direct effects experienced by employees who did not receive job offers because of Defendants' No-Poach Agreements, and the consequent cascading effects on Defendants' systematic pay structures and Senior-Level Employees' pay.

21. Long-Term Effects. Defendants' Experts have not refuted my opinion that such wage suppression resulting from Defendants' anticompetitive No-Poach Agreements and CSI Exchanges would accumulate and likely persist into the future, as suppressed compensation levels are unlikely to fully recover immediately.

22. Systematic Compensation Structures. Dr. Johnson, Dr. Saravia, and Dr. McCrary also contend that my opinion that Defendant firms had systematic and structured pay systems

-9-

with a focus on internal equity and external equity (such that the effects of the No-Poach Agreements and CSI Exchanges would have cascading effects on other employees' pay) is unsupported by the evidence.[13] I maintain my opinion that Defendant firms had structured compensation systems. Additionally, Defendants' Experts have given me no cause to change my testimony that Defendants cared about maintaining internal equity and external equity, and equity in general was important to them, regardless of whether they used the foregoing specific terms. I disagree with Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's opinions that Defendant firms lacked pay structures because pay was individualized, randomized, or provided for entirely discretionary pay decisions, none of which are supported by the evidence.[14]

23. Defendants' Experts do not disagree that Defendants utilized compensation components beyond salary, such as bonuses and stock grants and options. Further, Defendants' Experts have not undermined my opinion that Defendant firms' compensation systems (1) relied on market surveys to stay current, (2) had clear structures, and (3) deployed market pay lines and grades. Their Reports also do not undermine my opinion that the foregoing features are among many other features of their structured compensation systems. Moreover, Dr. Johnson, Dr. Saravia, and Dr. McCrary agree that ordinarily, firms make upward compensation adjustments in response to market conditions. But they do not convince me to change my opinion that restraints that constrain the employee labor market and suppress compensation (such as No-Poach Agreements and CSI Exchanges) enable firms to benchmark to lower rates, so that upward pay adjustments do not occur or are smaller.

---

[13] Johnson Report ¶¶ 6–8; Saravia Report ¶¶ 21(4), 30–32; McCrary Report ¶¶ 20(b), 21(b), 23(c), 26.

[14] Johnson Report ¶ 6; Saravia Report ¶¶ 21(4), 30–32; McCrary Report ¶¶ 19, 20(b).

24.     Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's opinions that Defendant firms' pay structures did not seek to maintain internal equity are unavailing.  I have not changed my opinion that Defendants valued treating similarly-situated employees (i.e., employees in similar roles/jobs with similar performance contributions) within their companies similarly.  I also have no cause to change my assessment that accordingly, in their systematic pay structures, if an employee receives a higher-paying outside offer which they leverage into higher pay at their current company, similarly-situated employees at the current company will expect their own pay to increase to maintain internal equity.  As the evidence shows, the result is upward pay adjustments.  Further, I maintain that those adjustments in that role/job, in turn, will additionally require the company to revisit pay levels for jobs below and above that role/job to maintain what are seen as internally equitable pay differentials.  Again, the result is adjusting pay upward in these jobs.  I also have no cause to change my view that, in the absence of outside offers of higher pay—because of collusion that interferes with typical labor market competition—these upward pay adjustments would not take place.

25.     <u>Cascading Effects of No-Poach Agreements and CSI Exchanges and Common Impact on Compensation Given Compensation Structures.</u>  Dr. Johnson, Dr. Saravia, and Dr. McCrary claim that each form of labor market restriction would only have directly affected a small number of employees, and would not have had cascading effects on other Class Members' pay.[15]  As I explained in my report and at deposition, "To the extent mobility was restricted, then it would have negative consequences for the [C]lass.  That's my main conclusion."[16]  Defendants' Experts have not given my cause to draw a different conclusion.

---

[15] Johnson Report ¶ 6; Saravia Report ¶¶ 21(2), 21(4); McCrary Report ¶¶ 19, 20(b), 23(c).

[16] Gerhart Dep. at 105:10–19.

26.     Dr. Johnson, Dr. Saravia, and Dr. McCrary do not persuade me that Defendants did not maintain systematized pay structures and compensation design, such that Defendants' anticompetitive No-Poach Agreements and CSI Exchanges could not interfere with labor market competition broadly.

27.     Defendants' Experts also do not persuasively refute my opinion about wage suppression as to all or nearly all Class Members.  Based on my experience, the compensation research, and my analysis of the record evidence, Defendants' No-Poach Agreements and CSI Exchanges suppressed the wages of some Class Members directly.  But those are not the only ones who were harmed.  Given Defendants' commitment to internal equity and systematized pay structures, their No-Poach Agreements and CSI Exchanges would likely cause cascading effects and suppress the compensation of all or nearly all employees in the proposed Class.  Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's objections that such collusive conduct would not suppress compensation levels for those employees who otherwise would have been cold-called or solicited for new positions are meritless and inconsistent with the research and my experience. I have no cause to change my opinion that even if Defendants restricted the No-Poach Agreements to individuals and job titles at the top of the salary structure, a No-Poach Agreement's artificial suppression of compensation would have had a cascading effect on other employees.

28.     <u>Common Evidence and Methods.</u>  Finally, Dr. McCrary contends that I have failed to set forth a reliable methodology, based on information common to the Class, that can be used to assess whether Defendants' No-Poach Agreements and CSI Exchanges would harm all or nearly Class Members.[17]  I disagree, for the same reasons discussed above.  Moreover, all of the

---

[17] McCrary Report ¶ 19.

materials on which I relied to reach each of the foregoing conclusions, including Defendants'

Experts' Reports, documents produced by Defendants and third parties, materials from the

DaVita criminal case, the compensation-related and economics literature, and survey data

collected by WorldatWork, are common to the Class.

### III.     FACTUAL AND CASE BACKGROUND

29.      In this section, I respond to the overviews Defendants' Experts provided

regarding the litigation, outpatient medical center industry, Defendants' No-Poach Agreements,

and Defendants' CSI Exchanges.[18]  I also clarify certain aspects of the factual background I

provided in my report regarding Plaintiffs' conspiracy claim.[19]

30.      Class Definition.  Whereas Dr. Johnson and Dr. McCrary provided the correct

Class definition,[20] Dr. Saravia incorrectly relies on an earlier version of the Complaint in stating

the Class definition.[21]  Similarly, Dr. Stiroh incorrectly contends that I address a different time

period than the Class Period alleged in the Complaint.[22]  I have been informed that Plaintiffs'

counsel have since narrowed the Class definition.  For clarity, below I re-state the Class

definition provided by Plaintiffs' counsel for my report[23]:

> [Employees] who worked in positions at the director-level and above [hereafter
> "Senior-Level Employees"] in the United States for one or more of the following:
> (a) from May 1, 2008 to December 31, 2019 for Surgical Care Affiliates, LLC,
> SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers;
> (b) from May 1, 2010, to December 31, 2019 for United Surgical Partners Holdings,
> Inc., United Partners International, Inc., or one of their subsidiary outpatient
> medical care centers; or (c) from May 1, 2008 through December 31, 2019 for

---

[18] Saravia Report ¶¶ 10–13, 37–52; Johnson Report ¶¶ 16–23, 98; McCrary Report ¶¶ 13, 17, 136, 145, 243, 250; Stiroh Report ¶ 13.

[19] Gerhart Report ¶¶ 10–23.

[20] Johnson Report ¶ 18; McCrary Report ¶ 12.

[21] Saravia Report ¶ 10.

[22] Stiroh Report ¶¶ 13–14, 16, 91.

[23] Gerhart Report ¶ 5; Compl ¶ 92.

DaVita Inc. or one of its subsidiaries (hereafter, "the Class" or "Class Members"). Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.[24]

### A.    Outpatient Medical Center Industry.

31.    In my report, I explained that DaVita, SCA, and USPI are all leading players in the outpatient medical center industry.[25]  Specifically, as Dr. Johnson explains, all three fall within the 5-digit NAICS industry code 62149 - Other Outpatient Care Centers.[26]  I provided evidence that DaVita runs thousands of outpatient medical centers in the United States, and employs more than 70,000 workers.[27]  Further, SCA operates more than 230 outpatient medical centers and ambulatory surgical centers in 35 states, with more than 10,000 workers.[28]  Likewise, USPI runs more than 461 ambulatory surgical centers and 24 surgical hospitals nationwide and employs more than 22,500 workers.[29]

### B.    Defendants' Alleged Conspiracy.

32.    Overarching Conspiracy.  Dr. Saravia, Dr. McCrary, and Dr. Stiroh opine that I do not describe an overarching conspiracy, and instead have analyzed two separate bilateral agreements.[30]  Their characterizations are misleading.

---

[24] Dr. Johnson contends that I failed to address "why employees would take part in a conspiracy to suppress their own compensation."  Johnson Report ¶ 183.  On the contrary, I am informed that is precisely why Plaintiffs' counsel excluded these employees from the Class.

[25] Gerhart Report ¶¶ 11, 13, 15.

[26] Johnson Report ¶ 48 n.104.

[27] Gerhart Report ¶ 11.

[28] *Id.* ¶ 13.

[29] *Id.* ¶ 15.

[30] Saravia Report ¶ 11; McCrary Report ¶¶ 13, 250; Stiroh Report ¶ 13.  Note that Dr. Johnson did not opine as to whether Defendants' conduct was part of an overarching conspiracy.  Johnson Dep. at 180:10–181:8.  Further, Dr. Stiroh did not opine as to "whether DaVita understood that it was entering into a broader agreement than just with SCA[.]"  Stiroh Dep. at 170:2–10.

-14-

33. As I explained in my report, Plaintiffs allege that Defendants SCA and DaVita and SCA and USPI established two No-Poach Agreements as part of their overarching conspiracy to suppress competition and thus wages in the labor market.[31] I understand that Plaintiffs allege that the SCA-DaVita and SCA-USPI CSI Exchanges also facilitated Defendants' overarching anticompetitive conspiracy.[32]

34. Further, at deposition, I testified that my report includes evidence showing "that the mobility of employees at these three companies was restricted, and then my focus is on what would be the consequences. . . for the [C]lass."[33]

35. However, I do not have an opinion as to whether Defendants' conduct constitutes an overarching conspiracy. I understand that may be a question for the jury to answer at trial. Plaintiffs' counsel did not ask me to provide an opinion, and I have not done so.[34]

36. No-Poach Agreements. In my report, I explained that in 2018, USPI "self-reported" its No-Poach Agreement with SCA to the DOJ and sought leniency under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (ACPERA).[35] Plaintiffs allege that SCA and DaVita and SCA and USPI formed two No-Poach Agreements in furtherance of their conspiracy to suppress Senior-Level Employee labor market competition.[36] Below, I clarify my prior testimony and correct certain of Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's descriptions of the No-Poach Agreements, and explain that my prior opinions have not changed.

---

[31] Gerhart Report ¶ 21.
[32] Compl. ¶¶ 38, 105.
[33] Gerhart Dep. at 102:8–19.
[34] *Id.* at 301:24–302:14.
[35] Gerhart Report ¶ 16 (citing Exhibit ("Ex.") PX506).
[36] *Id.* ¶ 22.

-15-

37. *Nomenclature.* Nomenclature is important here, and Dr. Saravia and Dr. McCrary muddy the waters with imprecise language.

38. **Non-Solicitation Agreements.** At times, Dr. Saravia and Dr. McCrary incorrectly refer to Defendants' No-Poach Agreements as "non-solicitation agreements."[37] "Non-solicitation agreements" typically refer to a very different kind of employment restriction, wherein the "[e]mployee agrees to not solicit a company's clients or customers for their own benefit, or the benefit of a competitor, after leaving the company."[38] In contrast, Defendants' Senior-Level Employees were not a party to their employers' alleged agreements with each other not to solicit, recruit, and/or hire from each other.[39] Note that "non-solicitation agreements" also refer to "contractual hiring and recruitment limitations agreed to by external search firms used by Defendants," wherein the external search firms "agree to not recruit and hire *from* firms for which they recruit."[40] These provisions are contractualized, typically time-bound, and for the most part prevent the search firms from recruiting a specific subset of employees, in exchange for obtaining the recruiting contract.[41]

39. **No-Hire Agreements.** Similarly, Dr. McCrary objects that I have failed to sufficiently show that the evidence is consistent with "no-hire agreements" (i.e., agreements that prevent hiring between employers altogether) between Defendant firms.[42] His objection is irrelevant, because Plaintiffs allege that Defendants established No-Poach Agreements, which

---

[37] *See, e.g.,* Saravia Report ¶ 12; McCrary Report ¶¶ 13, 250.

[38] U.S. DEPT. OF TREASURY, THE STATE OF LABOR MARKET COMPETITION 13 (Mar. 7, 2022), https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf.

[39] Compl. ¶¶ 87–90.

[40] McCrary Report ¶ 140 (emphasis omitted).

[41] *Id.* & ns.262–272.

[42] McCrary Report ¶ 13.

typically restrict various activities beyond simply hiring, such as solicitation.[43]  For example, Plaintiffs allege that SCA and DaVita and SCA and USPI agreed to restrict labor market competition in a number of ways, including by refraining from cold calling, recruiting, hiring, or poaching each other's Senior-Level Employees.[44]  Further, that these No-Poach Agreements included an identical "tell-your-boss" provision (discussed below) does not undermine my testimony.[45]  As I explained in my report, this provision would likely have created a chilling effect that suppressed Class Member mobility between Defendant firms, if it did not prevent it altogether.[46]

40.    **Non-Compete Agreements.**  Non-compete agreements are another type of labor market restriction.  According to Dr. McCrary, "Non-compete agreements are agreements between an employee and an employer that restrict an individual from seeking employment with certain competing firms (for example those in a defined geographic scope or those explicitly listed or described) for some period of time."[47]  Crucially, "[n]on-compete agreements are negotiated:  to the extent that individuals did not view non-compete agreements as favorable when considering their employment contract, they could negotiate for additional compensation or employment terms."[48]

41.    *The Tell-Your-Boss Provision.*  In my report, I analyzed documentary evidence demonstrating that both No-Poach Agreements included a "tell-your-boss" requirement.[49]

---

[43] LABOR MARKET COMPETITION, *supra* note 38, at 13–14.

[44] Gerhart Report ¶ 21 (citing Compl. ¶¶ 38, 105).

[45] McCrary Report ¶ 13.

[46] Gerhart Report ¶ 81.

[47] McCrary Report ¶ 136.

[48] *Id.*; *see also* LABOR MARKET COMPETITION, *supra* note 38, at 15.

[49] Gerhart Report ¶¶ 77–81.

Accordingly, SCA and DaVita and SCA and USPI "agreed not to solicit each other's senior executives" unless "the senior executive was already looking at outside jobs and had told their supervisor," before the candidates had job offers in hand.[50]

42.     Though Dr. Saravia explains that Plaintiffs' Complaint alleges that the "tell-your-boss" provision precluded Defendants "from considering *unsolicited* job applications from each other's employees,"[51] this description is overly narrow. Based on my review of the evidence, Defendants enforced this requirement against both passive and proactive candidates.[52]

43.     Further, Dr. McCrary opines that I "appear to assert that [the SCA-DaVita and SCA-USPI No-Poach Agreements] were no solicit agreements initially (from May 2008 until approximately 2011 or 2012), and then when the 'tell-your-boss' provision was adopted, the agreements became more restrictive."[53] First, recall that Plaintiffs allege and I have opined that, based on the evidence I have reviewed, SCA and USPI initiated their No-Poach Agreement in 2010, not 2008, unlike the SCA-DaVita No-Poach Agreement.[54] Moreover, and as I explain at length below, to clarify, the SCA-DaVita No-Poach Agreement always included an informal version of the "tell-your-boss" provision that SCA and DaVita later agreed to implement more formally.[55]

---

[50] *Id.* ¶¶ 22(a)(i), 22(b) (citing Ex. PX158 at 473:14–20; Hayek Dep. at 219:20–221:9).

[51] Saravia Report ¶ 6 (emphasis added).

[52] Gerhart Report ¶ 77; *see also* McCrary Report ¶ 250.

[53] McCrary Report ¶¶ 13, 250.

[54] Gerhart Report ¶¶ 22(a), 22(b).

[55] *Id.* ¶ 22(a)(i).

44.     Finally, Dr. Johnson, Dr. Saravia, and Dr. McCrary do not dispute that Defendants' No-Poach Agreements included a "tell-your-boss" provision.[56] As such, my opinions regarding this provision have not changed.

45.     *The SCA-DaVita No-Poach Agreement.* In my report, I submitted evidence demonstrating that SCA and DaVita established their No-Poach Agreement as early as May 2008, when Andrew Hayek left his DaVita VP role to be SCA's CEO.[57] The agreement derived from Hayek's extensive relationship with DaVita's then-CEO Kent Thiry, who demanded that Hayek stop soliciting DaVita employees after Hayek successfully recruited DaVita's then-DVP Michael Rucker to help run SCA as COO.[58] The agreement applied to Director-level employees and above, had a nationwide geographical scope, and as I explain below, continued through 2019.[59]

46.     **Scope.** With respect to the SCA-DaVita No-Poach Agreement, Dr. Johnson and Dr. McCrary contend that I failed to consider evidence showing that the agreement initially applied only to employees at the VP-level and above, and only later expanded to include Directors.[60] This critique has not caused me to change any of my opinions, which I clarify below.

---

[56] Johnson Dep. at 178:13–179:5; Saravia Report ¶ 14; McCrary Report ¶ 17.

[57] Gerhart Report ¶ 22(a).

[58] *Id.*

[59] *Id.* ¶ 22(a)(i).

[60] Johnson Report ¶¶ 4, 55–63; McCrary Report ¶ 145.

47.     SCA and DaVita did not perfectly execute their No-Poach Agreement.  The co-conspirators designed the agreement to be implicit and did not write the terms down or otherwise formalize them, or broadly communicate their terms.[61]

48.     In support of his contention, Dr. Johnson cites only to Hayek's testimony that the agreement initially applied to VPs and above and later expanded to include Directors.[62]  But based on my review of the evidence, which Dr. Johnson neglects to assess, the Agreement's terms were not narrowly invoked, and in the early years, the evidence indicates that SCA and DaVita did not limit the restrictions to employees at the VP-level and above.  For example, Dr. Johnson ignores my discussion in my report regarding Hayek's 2008 reassurance to Thiry that, though SCA had "multiple open positions," Hayek refrained from "calling DaVita people."[63]  Similarly, Dr. Johnson does not address my citation to July 2011 correspondence in which former SCA COO Rucker assured DaVita's then-SVP Javier Rodriguez that SCA was "continuing to steer recruiting efforts away from DaVita teammates."[64]  Likewise, Dr. Johnson does not account for the September 2011 correspondence that I cited in which Rucker informed Rodriguez that SCA had "turned away six or more inquiries from qualified DaVita teammates

---

[61] *See, e.g.*, Ex. PX313 at DOJCIV-008-00000188–91 (                                                                                                                    );
Hayek Dep. at 296:3–9 (Hayek testified that he did not "believe that every director and above knew [about the agreement]."); Thiry Dep. at 176:6–15 (Thiry testified that he did not communicate the "understanding" to everyone at DaVita or to all employees who were directors or above.); *see also* Saravia Report ¶ 14 (citing USPI and Tenet's Answer to the Third Amended Complaint ¶ 88, ECF No. 569 (likewise, with respect to the SCA-USPI No-Poach Agreement, "USPI admitted that the 'agreement was oral[.]'")).  Note that Dr. McCrary testified that he is not "offering any opinion" about whether "the agreements that are alleged in this case [were] in writing or oral[.]" McCrary Dep. at 136:9–14.

[62] Johnson Report ¶ 55.

[63] Gerhart Report ¶ 22(a) (citing Ex. PX484 at DVA_OMCEAL_000429389).

[64] *Id.* ¶ 75(e) (citing Ex. PX333).

-20-

over the last six months."[65]  In each instance, nowhere did the co-conspirators indicate that SCA and DaVita enforced the restriction only as to employees at the VP-level and above.

49.    Additional evidence also supports my assessment that SCA and DaVita enforced the No-Poach Agreements against employees at the Director-level and above for the duration of the agreement.  For example, in January 2010, DaVita's then-SVP of Operations Mark Gildea emailed DaVita's then-COO Dennis Kogod to notify him that a DaVita Regional Operations Director ("ROD") was leaving to join SCA "as a Regional Vice President rumored to be making ███████████████████."[66]  Despite Gildea's attempt to convince Kogod that the employee's departure was ultimately "a good thing," Kogod responded, "Do we know who contacted who first Mark[?]  *Our folks are supposed to be off limit[s] to Andrew [Hayek] and his company [SCA][.]*"[67]

50.    Further, however the precise terms of the SCA-DaVita No-Poach Agreement may have evolved over time, my opinion that a No-Poach Agreement preventing compensation increases would have had a cascading effect on other employees remains unchanged.[68]  Accordingly, even if the No-Poach Agreements were restricted for a time to employees at the VP-level and above, Defendants' systematic salary structures would cause the pay suppression to cascade to other employees, such as those at the Director-level.[69]  This cascading pay suppression is a consequence of both (1) internal equity with its focus on appropriate pay differentials based on role and performance contributions, and (2) the fact that, in the absence of

---

[65] *Id.* (citing Ex. PX335 at DOJ-PROD001A-00000239).

[66] Ex. PX376 at DVA_OMCEAL_000122784.

[67] *Id.* at DVA_OMCEAL_000122783–84 (emphasis added).

[68] Gerhart Report ¶ 143.

[69] *Id.* ¶ 148.

No-Poach Agreements, Directors would glean important information about their own likely external higher-paying alternative employment opportunities based on observing the higher-paying external employment opportunities that VPs would likely have received. Further, if a Senior-Level Employee does leave, they often recruit those they know (a form of turnover contagion, which I define below) from their former employer, and Director-level employees would be obvious recruiting targets.

51. **Agreement Start and End Dates.** In my report, I provided evidence showing that the SCA-DaVita No-Poach Agreement began at least as early as May 2008, and had no end date.[70] Dr. Johnson contends that I ignore contradictory evidence,[71] and Dr. McCrary and Dr. Stiroh opine that the evidence suggests other time periods,[72] but their contentions are unavailing.

52. *Start Date.* Dr. Johnson, Dr. McCrary, and Dr. Stiroh suggest that the SCA-DaVita No-Poach Agreement may have instead begun in 2012, but they rely only on the testimony of former SCA CEO Hayek that the SCA-DaVita No-Poach Agreement began in 2012 and do not actually opine as to when the Agreement began.[73] They also fail to address the substantial evidence in my opening report demonstrating that Hayek and Thiry established the agreement soon after Hayek's departure from DaVita in May 2008.[74] Moreover, the evidence I

---

[70] *Id.* ¶ 22(a).

[71] Johnson Report ¶ 56.

[72] Stiroh Report ¶ 87; McCrary Report ¶¶ 17, 73.

[73] Johnson Report ¶ 56; Johnson Dep. at 169:21–170:5; McCrary Report ¶¶ 17, 243; McCrary Dep. at 126:9–19 (Dr. McCrary does not opine as to the conspiracy's start and end dates.); Stiroh Report ¶¶ 87–88 ("I do not offer an opinion about which conduct or class period is correct."); Stiroh Dep. at 142:22–25.

[74] *See, e.g.,* Gerhart Report ¶¶ 22(a), 28(e)(vi) ████████████ ████████████████████████████████████████ ), 75(b) (after Hayek's departure, Hayek immediately reassured Thiry he would not poach from DaVita); *see also* Johnson Dep. at 170:7–14 (Dr. Johnson testified that he did not have an opinion about the start date).

have put forth showing that Hayek began enforcing the agreement against DaVita employees immediately, discussed above, undercuts Dr. Stiroh's claim that it "would have taken time for the alleged agreement between Mr. Thiry and Mr. Hayek to be implemented throughout DaVita and SCA."[75]  I have also reviewed evidence showing that, according to January 2010 DaVita internal emails, SCA and DaVita had agreed not to proactively solicit each other's employees and had also agreed to the tell-your-boss provision by that time.[76]  Dr. Stiroh also states that the DaVita indictment "alleged a conduct period from February 1, 2012 to July 31, 2017." [77]  This is incorrect.  Rather, the indictment alleged misconduct "[b]eginning at least as early as February 2012 and continuing until at least as late as July 2017, th*e exact dates being unknown to the Grand Jury*[.]"[78]  Moreover, Dr. Johnson, Dr. McCrary, and Dr. Stiroh ignore Rucker's deposition testimony ██████████████████████████████████████████ ███████████████.[79]  My opinion that the evidence is consistent with a May 2008 start date for the SCA-DaVita No-Poach Agreement is therefore unchanged.

53.     *End Date.*  With respect to the Agreement's end date, Dr. Johnson, Dr. McCrary, and Dr. Stiroh likewise rely only on the testimony of Hayek and former SCA CEO Anthony Kilgore to undermine my assessment, but again they do not express an opinion about when the conduct ended.[80]  As above, I am not convinced because Dr. Johnson, Dr. McCrary, and Dr.

---

[75] Stiroh Report ¶ 91; Gerhart Report ¶ 22(a) (citing Ex. PX484 at DVA_OMCEAL_000429389).

[76] Ex. PX376.

[77] Stiroh Report ¶ 44, n.88.

[78] Superseding Indictment ¶ 9, *United States v. DaVita Inc.*, No. 21-cr-00229-RBJ (D. Colo. Nov. 3, 2021) (emphasis added).

[79] Gerhart Report ¶ 75(e).

[80] Johnson Report ¶ 56; Johnson Dep. at 169:21–170:5; McCrary Report ¶¶ 17, 243; Stiroh Report ¶¶ 87–88; Stiroh Dep. at 142:22–25.

Stiroh have not provided any evidence sufficient to show the No-Poach Agreement ended in 2017. As I explained in my report, ███████████████████████████████████

████████████████████████████████████████████████[81]

Similarly, Dr. Johnson, Dr. McCrary, and Dr. Stiroh do not address Hayek's trial and deposition testimony in which he stated that he and former DaVita CEO Thiry never had a conversation wherein they explicitly discussed ending the No-Poach Agreement and that he was not aware of anyone else at DaVita and SCA who had a conversation terminating the Agreement.[82] Moreover, Dr. Johnson's, Dr. McCrary's, and Dr. Stiroh's testimony that DaVita and SCA hired very few of each other's employees at best after the Class Period ended in 2019 also belies the suggestion that, according to the evidence, the Agreement ended in 2017.[83] Accordingly, to put a finer point on my prior assessment, it is my opinion that the evidence is consistent to show that the SCA-DaVita No-Poach Agreement continued through 2019.

54.     *The SCA-USPI No-Poach Agreement.*  I previously found that, based on Plaintiffs' allegations and my review of the documents and testimony, the SCA-USPI No-Poach Agreement began by 2010. I also found that it was identical to the SCA-DaVita No-Poach Agreement, and that applied to employees at the Administrator/Director-level and above and had no geographic limitations or end date.[84] Dr. Johnson and Dr. Saravia have not objected to the foregoing opinions.[85] Dr. McCrary suggests that the SCA-USPI No-Poach Agreement may have ended in 2017, based solely on Hayek's testimony, but does not express an opinion about the

---

[81] Gerhart Report ¶ 22(a)(i) n.31.

[82] *Id.*; Hayek Dep. at 190:12–191:7 (Hayek testified that he "did not have a specific communication terminating the agreement" with Thiry).

[83] Johnson Report ¶ 38; Stiroh Report ¶ 41; McCrary Report ¶ 211 & Ex. 33.

[84] Gerhart Report ¶ 22(b).

[85] Johnson Dep. at 169:21–170:14; Saravia Dep. at 133:23–137:3.

correct end date.[86]  I am not convinced.  As such, my conclusions remain largely the same.  As above, to clarify, it is my opinion that the evidence is consistent to show that the SCA-USPI No-Poach Agreement continued through 2019.

55.    CSI Exchanges.  In my report, I explained that, pursuant to Plaintiffs' allegations and my review of the documents and testimony, SCA and DaVita and SCA and USPI exchanged competitively sensitive information, including wage data, to further suppress labor competition and, consequently, pay rates.[87]  Moreover, I found that the evidence showed that SCA's and DaVita's senior executives began their CSI Exchanges by at least 2009, whereas SCA and USPI began exchanging data as early as 2008.[88]  I did not assess whether the CSI Exchanges had an end date.  Defendants' Experts have not provided evidence or testimony that has caused me to reconsider the background I provided in my report regarding Defendants' CSI Exchanges.[89]  I therefore have no cause to change my testimony.

56.    Qualitative Analysis Is a Reliable and Robust Methodology.  Defendants' Experts opine that my opinions are deficient because I do not conduct any empirical analysis of the conduct.[90]  I disagree.  My opinion regarding Defendants' anticompetitive conduct is well-founded because it applies my expertise and knowledge of the relevant literature, including

---

[86] McCrary Report ¶¶ 17, 243; McCrary Dep. at 126:9–19.

[87] Gerhart Report ¶ 23.

[88] *Id.* ¶ 23.

[89] McCrary Report ¶ 17 ("I do not express an opinion about whether the alleged conduct," including the CSI Exchanges, "occurred."); *see also* McCrary Dep. at 118:14–18.

[90] *See, e.g.,* Johnson Report ¶¶ 57, 91 n.189, 100; Saravia Report ¶¶ 75, 182 (critiquing my assessments as "not falsifiable"); McCrary Report ¶¶ 15, 82, 99 (remarking, "Prof. Gerhart presents no quantitative evidence of the pay structure he claims exists in his report[.]"), 106, 186; Stiroh Report ¶ 17 ("Dr. Gerhart does not provide any quantitative analysis of compensation data at DaVita or any other Defendant to support his opinions.").

theory and empirical evidence, as well as practice, to a qualitative analysis of the record evidence.

57.     Foremost, Plaintiffs' counsel limited my task to a qualitative assessment of the evidence and theory and research in the fields of compensation design, employee turnover, and human resource management.[91]  I was not tasked with conducting quantitative analysis in this matter, which is a task that I understand Plaintiffs' expert Dr. Evan Starr performs.  Both qualitative and quantitative assessments support antitrust impact in this litigation.

58.     To explain and make sense of what we observe (empirical observations/data), we need theory.  Theory explains why we observe empirical relationships between variables (e.g., how and why employees react to their pay being inconsistent with internal equity and/or external equity) and the conditions (e.g., they are more likely to react when they or another employee receive an unsolicited outside job offer) under which that relationship is likely smaller or larger. Theory is informed by empirical research done broadly across different contexts, not just by the empirical analysis done in a single case.  As such, if empirical analysis in a single case yields results inconsistent with theory, we can look more closely to understand why.  In some cases, we will see that the empirical analysis in that single case is inconsistent with theory (which is based on broader evidence) because of the manner in which the analysis was conducted.

59.     As I explained in my opening report and at deposition, in forming my opinions in this matter, I relied on my extensive academic and research experience in the fields of compensation design, employee mobility/turnover, and human resource management.[92]  That

---

[91] Gerhart Report ¶ 6.

[92] *See* Gerhart Dep. at 29:9–21.

-26-

experience includes my work publishing thirty-plus peer-reviewed articles on these subjects,[93]

two textbooks on human resource management, the world's foremost textbook on

compensation,[94] a research book on compensation, and a case book (which includes software to

help simulate an organizational setting) students use to build a structured compensation system.[95]

I then applied my decades of knowledge and my compensation-related expertise to my review

and assessment of materials from this case and from the related criminal investigation *United*

*States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo.). That material included the Third

Consolidated Amended Class Action Complaint (ECF No. 555), depositions, deposition exhibits,

FBI investigation interview reports, DaVita criminal trial transcripts, and salary or market pay

range materials produced by or compiled from materials from all Defendants.[96] With respect to

my opinions that Defendants have structured compensation systems typical of most American

companies' compensation systems, I also relied on (1) peer-reviewed compensation-related

literature grounded in substantial theory and evidence, and (2) survey data on typical company

compensation management practices from WorldatWork.[97] The foregoing constitutes a firm

foundation for my assessment.

## IV.  DEFENDANTS HAD INCENTIVES AND OPPORTUNITIES TO COLLUDE TO SUPPRESS EMPLOYEE COMPENSATION.

60.  Based on my review of the evidence in this litigation and my expertise in

compensation and human resource management, my opinion is that Defendant firms were

---

[93] Gerhart Report, Appendix ("App.") A. In contrast, Dr. Johnson, a career expert witness (*see* Johnson Dep. at 63:19–23; Johnson Report, App. A at 1) has only published three peer-reviewed articles. *See* Johnson Dep. at 20:12–22:19; Johnson Report, App. A at 7.

[94] BARRY GERHART, COMPENSATION (14th ed. 2023).

[95] Gerhart Report ¶ 1.

[96] *Id.* ¶ 2.

[97] *Id.*

-28-

incentivized to collude to limit employee job mobility and pay and had the opportunities to do so.[98]  Specifically, I opined that Defendants' motives to collude included:  (1) the need to keep turnover low; and (2) the need to manage large labor costs.[99]  Moreover, these incentives were powerful and Defendants had an opportunity to act on them because of the small and close-knit nature of the industry.[100]  Finally, I applied the compensation-related literature and theory to explain that, because employees financially benefit from unrestricted labor markets, Defendants' collusive conduct would likely suppress employees' mobility and compensation.[101]

61.     Below, I explain that Defendants' Experts have not given me cause to change the foregoing opinions.

### A.     Defendants Are Incentivized to Collude to Keep Senior-Level Employee Turnover and Labor Costs Low.

62.     I have testified that, based on my experience and research in the compensation and human resource management fields, common evidence is consistent with Defendants' strong incentives to collude to minimize Senior-Level Employee turnover because high turnover yields increased labor costs.[102]  As Dr. McCrary explains, if a firm sets pay too low, "the worker may leave and the firm will incur costs to find a new employee and train them.  The firm would have been better off to pay more[.]"[103]

63.     Moreover, I explained that the evidence shows that increased labor costs are a key consideration for Defendants because labor costs are Defendant firms' biggest expenditures,

---

[98] *Id.* ¶ 24.

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.* ¶¶ 25–37.

[103] McCrary Report ¶ 158.

drive Defendant firms' performance, and have significant pay implications for the individual co-conspirators.[104] In this section, I explain that my opinions are unchanged by Defendants' Experts' Reports because they did not submit contrary evidence or otherwise sufficiently counter my opinion.

### 1. Defendants Care About Their Employee Turnover Rates.

64. I testified that based on my experience and research, common evidence shows that DaVita, SCA, and USPI cared about employee turnover and retention.[105] This is consistent with Dr. McCrary's testimony that "compensation such as equity [i.e., in the form of stock] . . . that vests over time" "or signing bonuses" "is a common tool employers use to increase retention, as was recognized by Defendants themselves."[106]

65. For example, I explain in my textbook that "[c]ompensation strategy, HR [human resource] strategy, and business strategy ultimately seek to decrease costs or increase revenues, relative to competitors."[107] Moreover, "[s]uccess in recruiting and retention will depend on competitive compensation."[108] As such, "[n]ot acting quickly enough or not setting compensation at a sufficiently competitive level means losing out on employees who choose to work elsewhere and thus losing out on profits and sales."[109]

66. Below, I explain that Defendants' Experts have not put forth testimony or evidence that has caused me to change my opinions.

---

[104] Gerhart Report ¶ 25.

[105] *Id.* ¶¶ 27–30.

[106] McCrary Report ¶ 143.

[107] GERHART, *supra* note 94, at 48.

[108] *Id.* at xv.

[109] *Id.*

-29-

67.     <u>DaVita Valued Low Senior-Level Employee Turnover.</u>  My opinion that DaVita cared about its turnover rates and sought to retain Senior-Level Employees is unchanged by Dr. Johnson, Dr. McCrary, and Dr. Stiroh.[110]  Whereas Dr. Johnson and Dr. Stiroh did not address my opinion,[111] Dr. McCrary provided additional evidence that supports my opinion. Specifically, Dr. McCrary cited to record evidence that DaVita "issued retention bonuses to proposed class members whose skills were in high demand from competing employers."[112] Likewise, he explained that according to DaVita COO Mike Staffieri, "DaVita had 'a long list' of other options it could turn to if facing a retention battle with a competitor for talent."[113]

68.     <u>SCA Valued Low Senior-Level Employee Turnover.</u>  In my opinion, the record evidence shows that SCA cared about and sought to reduce Senior-Level Employee turnover.[114] Dr. Johnson and Dr. Saravia did not address my opinion or provide contrary evidence to persuade me otherwise.[115]  Moreover, Dr. McCrary provided additional supporting evidence that SCA used retention bonuses to hang onto high-value employees.[116]  For example, Dr. McCrary discussed "[a]n internal email from 2014 [which] show[ed] that SCA issued retention bonuses to three proposed class members, following the departure of another employee in their group."[117] He also provided evidence that SCA used equity to increase retention.[118]  I therefore maintain my opinion.

---

[110] Gerhart Report ¶ 28.

[111] Johnson Dep. at 141:15–21.

[112] McCrary Report ¶ 66 & n.126.

[113] *Id.* ¶ 83 (citing Staffieri Dep. at 120:23–121:18).

[114] Gerhart Report ¶ 29.

[115] Johnson Dep. at 141:15–21; Saravia Dep. at 123:16–124:1.

[116] McCrary Report ¶ 66 & n.126.

[117] *Id.* ¶ 83 (citing SCA000091011).

[118] *Id.* ¶ 143 & n.276 (citing SCA000545210 at SCA000545215 (SCA's 2015 internal Compensation Committee Meeting slide deck explains, "We also intend to make awards from

69.     <u>USPI Valued Low Senior-Level Employee Turnover.</u>  Again, based on my review of the evidence and my experience and research in compensation and human resource management, USPI tried to minimize employee turnover.[119]

70.     Examples from the Saravia and McCrary Reports actually *support* my opinion that USPI made efforts to reduce turnover.  For example, Dr. Saravia opined that USPI used retention bonuses "to avoid losing Senior Employees" "or to adjust employee compensation for changes in the labor market."[120]  Further, USPI utilized deferred compensation plans to employees at the Vice-President level and above to "giv[e] USPI a greater ability to retain participants through a five-year rolling vest period."[121]  Dr. Saravia also provided a number of examples wherein USPI awarded its employees equity compensation "for the purposes of retaining or awarding select employees."[122]  Likewise, Dr. McCrary put forth evidence that at times, USPI used deferred compensation plans to promote retention.[123]  Note, however, that USPI likely did so less often than it would have in an unrestricted market.

71.     Additionally, Dr. Saravia agrees that "in general, it is true that firms worry about turnover."[124]  Dr. Saravia otherwise declined to address my opinions or submit evidence inconsistent with my opinions regarding USPI and the value it placed on keeping Senior-Level Employee Turnover low.[125]

---

time to time to approximately 25% of Senior Directors and 10% of Directors, based on extraordinary value contribution and retention considerations.")).

[119] Gerhart Report ¶ 30.

[120] Saravia Report ¶¶ 58, 63.

[121] *Id.* ¶ 67.

[122] *Id.* ¶ 192.

[123] McCrary Report ¶ 142 & n.275.

[124] Saravia Dep. at 123:16–124:1.

[125] *Id.*

-31-

72.     Moreover, as above, Dr. McCrary provided additional examples of USPI's practice of issuing retention payments to prevent turnover to competing employers.[126]  For example, the McCrary Report states that "[a]nother internal email chain from 2014 shows that USPI offered a promotion and an enhanced compensation plan (which included an equity award) to a proposed class member who USPI was worried they would lose to another firm," because the employee's skills were in demand.[127]  As such my opinion is unchanged.

73.     Turnover Rates and JOLTS Data.  Further, Dr. Johnson and Dr. McCrary provided additional evidence in *support* of my opinion that DaVita, SCA, and USPI wanted to keep Senior-Level Employee turnover low.

74.     Dr. Johnson reported that "[a]nnual turnover at DaVita, SCA, and USPI" "was between 12 and 14 percent, on average."[128]  This turnover is low compared to national data from the U.S. Bureau of Labor Statistics, Job Openings and Labor Turnover Survey (JOLTS) data on the industry during the Class Period.[129]  Moreover, Dr. McCrary opines that according to his Exhibit 33, "departures were similar across all three Defendants before, during, and after the Class Period[.]"[130]

        a.     According to national JOLTS data, the employee quit rate, economy-wide (total nonfarm) increased from 16.1% in 2009 to 27.8% in 2019, an increase of 11.7 percentage points or an increase of a factor of 1.73 (27.8/16.1).[131]  The narrowest industry classification

---

[126] McCrary Report ¶ 66 & n.126.

[127] *Id.* ¶ 83 (citing USPI_CIV_000401250 at USPI_CIV_000401250).

[128] Johnson Report ¶¶ 45, 109.

[129] *Data Tool, Job Openings and Labor Turnover Survey*, U.S. BUREAU OF LABOR STATISTICS, https://data.bls.gov/multi-screen?survey=jt (last visited June 26, 2025).

[130] McCrary Report ¶ 211 & Ex. 33.

[131] *Job Openings and Labor Turnover Survey*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/jlt/ (last visited June 26, 2025).

using the JOLTS data is the 2-digit NAICS level. Looking at the most detailed industry level (2-digit) data available, NAICS 62, the Health Care and Social Assistance industry, we see that the employee quit rate in this industry increased from 16.0% in 2009 to 24.0% in 2019, or by a factor of 1.50x. Given the 1.73x factor increase in the economy-wide quit rate and the 1.50x increase in the Health Care and Social Assistance industry quit rate, one might have expected a similar large increase in the quit rates at the Defendants. According to Dr. Johnson, that did not happen as he says Defendants' quit rates in 2019 were "between 12 and 14 percent," which were far below the 27.8% economy-wide and 24.0% Health Care and Social Assistance industry 2019 quit rates described above.[132] In other words, the relative stability of Defendants' departure rates in the face of increased economy-wide and industry quit rates suggests *depressed* quit (or mobility) of Class Members.

75.     Employment Growth.  The substantial growth in the number of Senior-Level Employees (discussed below) and the even greater growth in employee hires necessary in the face of, not only employment growth, but also the need to replace employees due to turnover, would likely have resulted in increasing labor costs and reinforced Defendants' concern with controlling labor costs. No-Poach Agreements and coordination on pay increases would be ways to reduce competition in the labor market as a means to control labor costs.

### 2.     Defendants Seek to Manage Their Substantial Labor Expenditures.

76.     In this section, I explain that Defendants' Experts have failed to change my opinion about their C-suite executives' concern with labor costs. Based on my review of the

---

[132] Johnson Report ¶¶ 45, 109.  Dr. Johnson focused on the most notable increase in quits in Exhibit 6, which was at USPI starting in 2015, and attributed it to changes in equity valuation at USPI, thus reinforcing his assessment that quit rates were relatively stable over time at the Defendants. *Id.* ¶ 45 n.97.

common evidence, I found that (1) Defendants' labor costs represent their largest cost and (2) Defendants used labor costs as a performance measure. Consequently, their C-suite executives (and key co-conspirators in this litigation) are motivated by bonuses and/or equity grants to keep these costs low.[133]

77.     I Maintain My Opinion That Labor Costs Constitute Defendants' Biggest Expenditure. Below, I explain that Defendants' Experts do not refute my conclusion that like with most organizations,[134] labor costs comprise a substantial portion of Defendant firms' operating costs.[135]

78.     *DaVita.* Dr. Johnson, Dr. McCrary, and Dr. Stiroh failed to submit evidence inconsistent with my opinion that DaVita's labor costs are its largest expenditure.[136] Further, Dr. Johnson testified that he was not "aware of any year for any [D]efendant where there was a category of cost that was larger than that [D]efendant's labor cost[.]"[137] My opinions therefore remain the same.

79.     *SCA.* I concluded in my report that SCA's most significant costs are its labor costs. Dr. Johnson, Dr. Saravia, and Dr. McCrary did not rebut my opinion.[138] My opinions have therefore not changed.

80.     *USPI.* Dr. Saravia and Dr. McCrary did not address my opinion that USPI's largest costs are its labor expenses,[139] so my opinion has not changed.

---

[133] Gerhart Report ¶ 31.

[134] GERHART, *supra* note 94, at 58 ("Compensation is often a company's largest controllable expense.").

[135] Gerhart Report ¶ 32.

[136] *Id.* ¶ 32(a).

[137] Johnson Dep. at 161:3–8.

[138] *Id.* at 161:3–8; Saravia Dep. at 124:3–6.

[139] Gerhart Report ¶ 32(c); Saravia Dep. at 124:3–6.

81.     <u>Defendant Firms Cared About Managing Labor Costs.</u>  I opined that labor costs typically constitute an organization's largest expense.[140]  Because lower labor costs generally translate into higher profits and increased executive compensation, firms are usually careful not to raise pay levels higher than necessary—though of course, they are expected to manage these costs legally.  As I noted in my opening report, Defendants had incentives to collude to reduce their labor costs and increase the stock price[141]:

> Defendants cared about keeping turnover lower and reducing their significant labor costs, as a means to increase Defendant firms' profits and stock value, and which likely inured to the benefit of Defendants' C-Suite executives, who were paid in stock and/or were otherwise financially incentivized to keep costs low.

82.     I write in my compensation textbook that "compensation is a powerful tool that has major consequences for the success or failure of an organization."[142]  "Other things being equal, the higher the pay level, the higher the labor costs[,]" and "the higher the pay level relative to what competitors pay, the greater the relative costs to provide similar products or services."[143] As the McCrary Report elaborates, using what appears to be agency theory logic[144]:

> Equity compensation is particularly common for more senior level positions.  From an economic perspective, ideal employee compensation reflects employee performance.  From this perspective, equity compensation is anomalous:  people dislike risk, and rewarding an employee with equity compensation saddles them with risk.  The economics literature describes, however, that for some employees sufficiently high in the organization, equity compensation is expected, because the value of aligning firm incentives and employee incentives outweighs the inefficiency of giving employees the risk they dislike.

Dr. McCrary helpfully explains in a footnote, "'[P]erhaps the most important justification for equity-based pay is to generate incentives.  This explanation is likely to apply . . . among very

---

[140] Gerhart Report ¶¶ 33–36.

[141] *Id.* ¶ 7(a).

[142] GERHART, *supra* note 94, at xvi.

[143] *Id.* at 212.

[144] McCrary Report ¶ 78.

high-level managers at large firms. These employees can have an important impact on the firm's value[.]"[145]

> 83. I also testified at deposition that[146]:
>
> [P]rofits depend on, of course, revenues and costs. Labor costs, as I recall, was the largest single operating cost in these companies; so controlling labor costs was critically important to their profitability. And, over time, profitability, the longer the time period you use, the more it correlates with total shareholder return. The higher up you are in an organization, the more your pay is based on incentive plans. Short-term incentive plans often relate to profit, some measure of profit. The long-term plans, [t]ypically, total shareholder return is the main factor. So both shareholders and executives benefit to the extent they can keep costs down compared to revenues; and, in a competitive market . . . there's a lot of pressure to do that. And we hope that, when companies look to control costs, they do it in a . . . legal way; but there's . . . a lot of pressure on companies, so sometimes companies do things that . . . they should not have done.

For example, employers may instead choose to engage in more nefarious efforts to "alter the structure of their own work relationships to lower their labor costs and undercut competition at the expense of workers."[147]

84. The 2022 U.S. Department of Treasury paper "The State of Labor Market Competition" (which Dr. Johnson and Dr. Stiroh cite[148]) explains, "A labor market monopsonist leverages their position to pay their workers less than the competitive rate for a given job. In a perfectly competitive market, each worker earns the market value of what they contribute to production[.]"[149] According to Dr. Johnson, perfect competition "assumes perfect resource

---

[145] *Id.* ¶ 78 n.167 (citing Edward P. Lazear & Paul Oyer, *Personnel Economics*, *in* THE HANDBOOK OF ORGANIZATIONAL ECONOMICS 502 (Robert Gibbons & John Roberts eds., 2013)); *see also* McCrary Report ¶ 87 n.184 (citing George-Levi Gayle & Robert A. Miller, *Has Moral Hazard Become a More Important Factor in Managerial Compensation?*, 99 AMERICAN ECONOMIC REVIEW 1740–1769, 1740 (2009) ("Executive compensation is tied [] to various indicates of managerial effort, such as the firm's performance.")).

[146] Gerhart Dep. at 59:18–60:17.

[147] LABOR MARKET COMPETITION, *supra* note 38, at ii.

[148] *See, e.g.,* Johnson Report ¶ 27 n.47; Stiroh Report ¶ 24 n.43.

[149] LABOR MARKET COMPETITION, *supra* note 38, 3–4.

mobility."[150]  As explained in the Treasury paper, however, "A labor-market monopsonist instead sets its compensation below" the market value of what its workers contribute, "which reduces its cost of production and therefore raises profits."[151]

85.     Below, I explain that here, there is no evidence to suggest that Defendants are any less focused on controlling labor costs than any other large employer in the United States.[152] Controlling labor costs would likely have financially benefited Defendants' C-suite executives (and others) who were paid primarily in stock and were rewarded for their firms' performance.[153]

86.     *DaVita.*  I opine that DaVita cared about managing its labor costs, which are its largest expenditure, and that DaVita used profit sharing to incentivize its top executives to manage labor costs.[154]

87.     The Johnson Report references evidence that in fact supports my opinion regarding DaVita.  Dr. Johnson notes that "returns on DaVita's stock price were smaller during the proposed class period."[155]  This lower stock price resulted in "lower earnings of proposed class members in the proposed class period due to lower stock price returns."[156]  This lower stock price and its effects actually *strengthened* Defendants' incentives to collude to reduce labor costs because such a reduction would have increased profits and the stock price.  It would also

---

[150] Johnson Dep. at 186:3–25.

[151] LABOR MARKET COMPETITION, *supra* note 38, at 3–4.

[152] The U.S. Census Bureau defines a large employer as having 500 or more employees. Christopher Goetz & Martha Stinson, *The Business Dynamics Statistics:  Describing the Evolution of the U.S. Economy from 1978-2019*, U.S. CENSUS BUREAU (Oct. 2021), https://www2.census.gov/ces/wp/2021/CES-WP-21-33.pdf.

[153] Gerhart Report ¶¶ 33–36.

[154] *Id.* ¶ 36 (a).

[155] Johnson Report ¶ 173 & Ex. 32.

[156] *Id.* ¶ 175; *see also id.* ¶ 173 & Ex. 32.

reduce the likelihood that Senior-Level employees receiving lower stock-related compensation would quit to join another Defendant.

88.     The McCrary Report also contains additional supporting evidence showing that DaVita cared about managing its labor costs.  DaVita COO Mike Staffieri testified that with respect to DaVita's budget-setting practices during the Class Period, "So was there a lot of intensity around managing the cost of labor?  Yes.  Was that chaotic?  No.  That was managed well."[157]

89.     Otherwise, Dr. Johnson, Dr. McCrary, and Dr. Stiroh have not provided any testimony or evidence to show that DaVita made no effort to manage its labor expenses.[158]  As such, my opinion is unchanged.

90.     *SCA.*  I also explained in my report that SCA was similarly concerned about controlling labor costs and used profit sharing to induce senior executives to promote this goal.[159]  As above, Dr. Johnson ignored my analysis, and likewise Dr. Saravia did not address my opinion or submit contrary evidence regarding my assessment of SCA's labor cost control measures.[160]  The McCrary Report supports my testimony and cites to the deposition testimony of former SCA Chief Talent Officer Bridie Fanning that "[e]quity for more senior executives [at SCA] is a big part of their pay."[161]  My opinion has therefore not changed.

---

[157] McCrary Report ¶ 77 (citing Staffieri Dep. at 150:7–152:1).

[158] *See* Johnson Dep. at 141:22–142:8.

[159] Gerhart Report ¶ 36(b); *see also* Johnson Dep. at 141:22–142:8.

[160] Gerhart Report ¶ 36(b).

[161] McCrary Report ¶ 85 n.179 (citing Fanning Dep. at 169:5–13).

91.     *USPI.*  In my opinion, the evidence demonstrates that USPI's labor costs were a significant part of its costs and its executives took care not to raise them higher than necessary.[162]

92.     At deposition, Dr. Saravia testified that "the fact that USPI's salary recommendations were collected at corporate headquarters, [and] reviewed and approved in the aggregate" was consistent with a situation in which "the senior executives were aware and considered their cost of their labor[.]"[163]  She explained[164]:

> Is it probable that most firms watch their budgets . . . or are aware of their costs and consider them?  Yes, I would assume that's the case.  It would be hard to be a firm where you didn't have any interest or concern with your costs.  That would be hard to be a very successful firm for very long.

This testimony supports my own.

93.     Dr. Saravia and Dr. McCrary did not otherwise refute my analysis, such that I have no cause to change my opinion.

### B.     A Close-Knit Industry Increases Incentives and Opportunities to Collude.

94.     In my report, I opine that Defendants had stronger incentives to collude because their industry's small size provided opportunities for the major co-conspirators to develop collaborative relationships that in turn became opportunities to facilitate collusion.[165]

95.     Indeed, both the Johnson and Saravia Reports contain evidence that further supports my assessment that the industry was close-knit.  As Dr. Johnson and Dr. Saravia explain, SCA and a former unit of DaVita are currently owned by the same parent company: UnitedHealth Group's Optum division purchased SCA in 2017 and shortly thereafter purchased

---

[162] Gerhart Report ¶ 36(c).

[163] Saravia Dep. at 72:8–16.

[164] *Id.* at 73:18–74:11.

[165] Gerhart Report ¶¶ 38–40; Gerhart Dep. at 71:6–15.

DaVita Medical Group ("DMG"), formerly DaVita Healthcare Partners, in 2019.[166] But Defendants' connections go back even further. DaVita, formerly Total Renal Care Holdings, Inc., was founded in 1979 as Medical Ambulatory Care, Inc., as a subsidiary of National Medical Enterprises, Inc., now Tenet, to own and operate Tenet's dialysis services.[167] USPI is now owned by Tenet.[168]

96.     The close-knit nature of the industry corresponds with the record evidence. For example, USPI's former Chief Financial Officer ("CFO") Jason Cagle testified that, while at USPI, he met SCA's former Chief Development Officer ("CDO") Brian Mathis at industry conferences.[169]

97.     Further, even after former SCA CEO Hayek became the Optum CEO in 2017, his close relationships with Thiry and former USPI CEOs Bill Wilcox and Brett Brodnax continued. For example, shortly after Hayek took over Optum full-time in January 2018, Thiry and Hayek emailed to set up a ski weekend with Hayek's family at Thiry's cabin in Colorado.[170] Also in January 2018, Hayek and Wilcox set up two calls with each other in two days.[171] Similarly, in

---

[166] Johnson Report ¶¶ 20–21 & n.27; Saravia Report ¶ 49; McCrary Report ¶ 84 n.175; Stiroh Report ¶¶ 9–10.

[167] Total Renal Care Holdings, Inc., Form 10K at 39 (Oct. 8, 1999), http://pdf.secdatabase.com/409/0000898430-99-003846.pdf.

[168] Gerhart Report ¶ 15 (citing Press Release, Tenet Health Completes Purchase of USPI from WCAS (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx; Press Release, Tenet Healthcare Corp., Tenet Healthcare Corp. Completes United Surgical Partners Int'l & Aspen Healthcare Transactions (June 16, 2015), https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm#:~:text=DALLAS%20%E2%80%93%20June%2016%2C%202015%20%E2%80%93,U.S.%20short%2Dstay%20surgery%20platform); *see also* McCrary Report ¶ 84 n.175; Stiroh Report ¶ 11.

[169] Cagle Dep. at 62:4–8.

[170] SCA000153859.

[171] USPI_CIV_000007019 (setting up call for January 19, 2018); SCA001395985 (calendar entry for January 19 call); SCA000412504 (setting up second call for January 19, 2018).

July 2018, Thiry emailed Hayek asking to discuss Hayek's "culture building strategy" in his "new empire[.]"[172]

98.     Defendants' Experts did not otherwise address my opinion that Defendants had the opportunities to act on their incentives to collude to suppress competition with each other for labor.  As such, my opinions in my report regarding the foregoing have not changed.

### C.     Collusion Robs Employees of Pay Growth from Voluntary Job Changes and Unrestricted Job Mobility.

99.     I opine that, based on my review of the literature, employees benefit from uninhibited opportunities for job mobility, which includes unsolicited outside offers as well as actual employer moves/changes.  Again, the key inquiry is about opportunities/offers and not just actual moves.[173]  Uninhibited job mobility, which includes both job offers and actual moves to another employer, can increase employers' labor costs because employers will have to increase compensation in response to outside offers and/or the threat of outside offers to retain and/or replace employees.[174]  My opinion that any anticompetitive labor market restrictions that suppress opportunities for job mobility would likely harm employee pay is unchanged by Defendants' Expert Reports.

### 1.     In Unrestricted Markets, Departing Employees Experience Pay Growth from Voluntary Job Changes.

100.     In my report, I opined that all types of employees benefit from voluntary job changes.[175]  Below, I explain that Defendants' Experts have not rebutted my opinion.

---

[172] SCA000630035.

[173] Gerhart Report ¶¶ 41–58; *see also* Johnson Dep. at 226:2–22 (Dr. Johnson agreed at deposition that "movement requires actually moving to another employer while mobility can be taking advantage of the fact that you could move.").

[174] Gerhart Report ¶¶ 41–58.

[175] *Id.* ¶¶ 43–49.

101.     Pay Growth from Job Mobility.  In my report, I explained that according to the extensive literature on the topic, which is evidence common to the Class, employees (and in particular senior employees) experience substantial pay growth when they voluntarily change employers or use offers to negotiate higher pay at their current employers.[176]  Dr. McCrary agrees:  "[C]ompetition benefits sellers in general and input markets,"[177] including by increasing employees' compensation in the labor market.[178]  In turn, mobility restrictions will suppress employee pay level and growth and will also harm incumbent employees who would have otherwise benefited from indirect compensation effects and/or new opportunities themselves (discussed below).[179]  Note that my distinction between direct and indirect effects is not meant to be a distinction in any legal sense.[180]  Rather, I am explaining additional ways mobility restrictions will suppress employee pay.  These indirect effects, or cascading effects, as I refer to them, are no less important or real than direct pay effects, as Dr. McCrary contends.[181]

102.     Here, it is worth reiterating a study of executives that I cited in my opening report, which reported that "companies dramatically raise pay for their incumbent [i.e., remaining] executives after losing executives" to executive positions at other companies.[182]  The study also reported that the incumbent executives received a 46% increase in compensation one year later (chiefly as stock-related compensation).[183]

---

[176] *Id.* ¶ 44.

[177] McCrary Dep. at 48:20–49:6.

[178] *Id.* at 49:7–50:13.

[179] Gerhart Report ¶ 44.

[180] *See* Johnson Report ¶ 6; Saravia Report ¶ 169.

[181] McCrary Report ¶¶ 113–114.

[182] Gerhart Report ¶ 51 (citing Huasheng Gao, Juan Luo, & Tilian Tang, *Effects of Managerial Labor Market on Executive Compensation:  Evidence from Job-Hopping*, 59 J. ACCT. & ECON. 203–220 (Apr.–May 2015)).

[183] *Id.*

103.    Defendants' Experts did not rebut or otherwise address this testimony.  As such, my opinions are unchanged.

104.    Importance of Employee Mobility for Labor Markets.  I also previously provided an overview showing that employee mobility and mobility opportunities are crucial to a well-functioning labor market and economy.[184]  As above, Defendants' Experts did not address or provide evidence to refute my opinion, and as such my opinions have not changed.

105.    Effects of Changing Jobs on Compensation.  My opinion is that much research shows a substantial increase in compensation for employees who voluntarily change employers, particularly for higher-paid jobs.[185]  Since Defendants' Experts have not addressed this testimony, I have not changed my opinion.

106.    Additional Job Opportunities for Remaining Employees.  I opined that employees who accept new job opportunities often recruit their colleagues to leave with them, which increases the consequences of a single job offer.[186]  Defendants' Experts object that only employees who would have received cold calls in the absence of the No-Poach Agreements would have been "directly" affected.[187]  That viewpoint is reductive.

107.    Their opinion is contradicted, for instance, by human resource management professors Jie Feng, Junchao (Jason) Li, Su Chen, and Alex L. Rubenstein (2024).  They define "group turnover" as "'employee departures that occur within *groups*,' including 'teams, work groups, or departments, which are often nested within a single organization and/or location'

---

[184] Gerhart Report ¶ 45.

[185] *Id.* ¶ 46.

[186] *Id.* ¶ 48.

[187] Johnson Report ¶ 51; Saravia Report ¶ 108; McCrary Report ¶ 21; Stiroh Report ¶ 56.

-43-

(Hausknecht & Trevor, 2011, p. 353, emphasis ours)[.]"[188]  The concept of "turnover contagion" explains that "the notion of a collective withdrawal spiral, even if due to distinct individual causes, is common among groups to the extent that members (and leaders) often appreciably influence each other's expectations at work and subsequently, each other's attitudes and behaviors, ultimately triggering sequential or concerted departures[.]"[189]  Further, because co-workers know each other's performance and values better than anyone, they are in the very advantageous position of knowing which employees are the most valuable targets.

108.    Recall that in my opening report I explained that former DaVita CEO Thiry reacted badly when then-DaVita VP Hayek left DaVita to run SCA as its CEO and shortly thereafter recruited DaVita's then-DVP Rucker to join him.[190]  Thiry then coerced Hayek into establishing the SCA-DaVita-No-Poach Agreement.[191]  This reaction is precisely an example of what Feng, Li, Chen, and Rubenstein (2024) deem "group turnover development" that[192]:

> operates via a self-reinforcing dynamic, in which departure-initiator(s)' thoughts of leaving or their actual departure (i.e., a turnover spark) can prompt other members (i.e., early onboarders) to leave, thereby establishing a psychosocial context for quitting that further begets other responders (or perhaps even the entire group) to exit, often within a short time interval (or even simultaneously[)].

109.    As the Hayek-Rucker departures demonstrated, the loss of one employee could lead to more employee losses in a short timeframe, which would thereby reduce productivity and

---

[188] Jie Feng, Junchao (Jason) Li, Su Chen & Alex L. Rubenstein, *From a Spark to a Sweeping Fire: An Integrative Conceptual Review of Group Turnover and a Theoretical Exploration of Its Development*, 109 J. OF APPLIED PSYCH. 13–38, at 13 (2024).

[189] *Id.* at 13–14.

[190] Gerhart Report ¶ 49.

[191] *Id.*

[192] Feng et al., *supra* note 188 at 14.

increase training and labor costs.[193]  Such losses are especially serious when those departing were likely on the path to be high impact future top leaders (as in the case of Hayek and Rucker).

110.    Additional evidence in the Stiroh Report bears this out.  Dr. Stiroh's Figure 1 shows that Bain & Company was one of the top three employers DaVita most frequently hired from during the Class Period.[194]  Given what we now know about turnover contagion, this comes as little surprise, because DaVita's former CEO Thiry was a partner at Bain prior to joining DaVita.[195]

111.    Relevant here, according to Feng, Li, Chen, and Rubenstein (2024), the foregoing dynamic of a loss leading to more employee losses has even greater consequences where "highly regarded, influential members" leave because "their departures should have a stronger effect on remaining members."[196]  Thiry and Hayek watched this principle play out in real time.

112.    <u>Defendants Were Aware of Effects of Mobility Restrictions.</u>  In my report, I opined that I reviewed evidence consistent with Defendants' awareness of this trend, which compounded their incentives to collude.[197]  Defendants' Experts have not put forth any rebuttal testimony or evidence to cause me to change my opinion.

### 2.    Incumbent Employees Also Benefit from Unrestricted Job Mobility.

113.    Dr. Saravia objects that the "direct impact" of Defendants' No-Poach Agreements would "have been limited to the employees who lost a relevant outside option for employment."[198]  Dr. McCrary also objects that I have failed to show that Class Members

---

[193] *See, e.g.,* Gerhart Report ¶ 28.

[194] Stiroh Report ¶ 33 & Figure 1.

[195] Thiry Dep. at 34:14–16.

[196] Feng et al., *supra* note 188 at 27–28.

[197] Gerhart Report ¶ 49.

[198] Saravia Report ¶¶ 104–132.

-46-

indirectly impacted by Defendants' conduct would be harmed.[199] But as I explained in part above, the indirect harms are no less pernicious. In my report, I explained the principles underlying my analysis that employees' compensation benefits from voluntary job changes in the absence of mobility restrictions also apply to incumbent employees (i.e., a firm's current employees who remain at the firm).

114. Put simply, employers can use higher pay to incentivize remaining employees to stay at the firm, and often need to do so in response to turnover, either in a proactive manner to head off outside offers and employees' receptiveness to them or to retain an employee with an outside offer.[200]

115. Of course, in a restricted market, employers will still likely proactively raise compensation to head off turnover, but likely will not need to raise it as much as they would have in the absence of mobility restrictions.[201]

116. I also applied my experience and research in compensation and human resource management to my review of evidence common to the Class in this litigation and found further support for these principles.[202]

117. Defendants' Experts did not address the foregoing testimony and did not put forth evidence to rebut my assessment. Accordingly, I have not changed my opinions.

118. The Connection Between Turnover and Incumbent Compensation at DaVita. In my opinion, pursuant to common evidence, at times, turnover increased market rates for compensation, which in turn put pressure on DaVita to initiate upward compensation

---

[199] McCrary Report ¶¶ 113–114 & n.230.

[200] Gerhart Report ¶¶ 50–57.

[201] Gerhart Dep. at 134:3–25.

[202] Gerhart Report ¶ 58.

adjustments to improve retention.[203] As such, DaVita and SCA could use their No-Poach Agreement to limit turnover and reduce the need for upward pay adjustments.[204] Dr. Johnson, Dr. McCrary, and Dr. Stiroh have not persuaded me to change my opinion.

119. <u>SCA Increased Compensation in Response to Turnover.</u> As above, Dr. Johnson and Dr. McCrary have not provided any reason for me to change my view that, based on my review of common evidence, SCA sometimes offered more pay to prevent further turnover (but likely would have needed to raise pay more so, in the absence of the No-Poach Agreements and CSI Exchanges).[205] My opinions are therefore unchanged.

120. <u>USPI Used Pay Adjustments to Address Turnover.</u> Again, Dr. Saravia and Dr. McCrary did not address my opinion or the evidence I submitted showing that USPI increased compensation to address turnover (though this happened less frequently due to labor market restrictions),[206] so I maintain my opinions.

## V. DEFENDANTS' COLLUSION WOULD LIKELY HAVE HARMED EMPLOYEES' COMPENSATION.

121. In my report, I assessed evidence common to the Class documenting that in a normal (i.e., unrestricted) labor market, Defendant firms regularly cold called high-value, passive candidates for employment.[207] I also applied my experience and research in compensation and human resource management to my analysis of common evidence showing that Defendants' No-Poach Agreements restricted cold calling and limited employees' confidentiality in the hiring process, which in turn suppressed Senior-Level Employees' job mobility and bargaining

---

[203] *Id.* ¶ 58(a).

[204] *Id.*

[205] *Id.* ¶ 58(g).

[206] *Id.* ¶ 58(h).

[207] *Id.* ¶ 59.

power.[208]  Additionally, I examined common evidence and determined that Defendants' No-Poach Agreements likely harmed Class Members' compensation, and opined that such wage suppression will likely persist for years.[209]  Based on my review of the evidence and my expertise in compensation and human resource management, Dr. Johnson and Dr. Saravia have not put forth any compelling rebuttal testimony or evidence sufficient to persuade me to change any of the foregoing opinions.

122.    According to the 2022 U.S. Department of Treasury paper, No-Poach Agreements and CSI Exchanges are part of a[210]:

> [R]ange of practices that firms use to restrain competition for workers, most clearly to lower wages and benefits, but also potentially to negatively impact job characteristics beyond just compensation.  Firms can engage in tacit collusion by sharing wage information for different occupations, conspiring to fix wages, [and/or] adopting no-poach agreements where firms agree not to hire other firms' workers[.]

### A.    In an Unrestricted Labor Market, Defendants Highly Value Recruiting Passive Candidates with Specialized Skills.

123.    In my opinion, high-value employees with specialized skills, such as Class Members, often do not proactively search for alternative employment opportunities, despite their likely interest.[211]  But Defendant firms intently sought this category of employees, known as passive candidates, and as such needed to engage in proactive recruitment measures to hire these workers.[212]  In this section, I explain that based on my review of the compensation-related literature, my expertise in compensation and human resource management, and the quantitative

---

[208] *Id.*

[209] Gerhart Report ¶ 59.

[210] LABOR MARKET COMPETITION, *supra* note 38, at i.

[211] Gerhart Report ¶ 60.

[212] *Id.*

-48-

and qualitative evidence in this litigation, Defendants' Experts have not provided any testimony or contrary evidence that has caused me to change the foregoing opinions.

124.     Cold Calling Constitutes a Valuable Recruiting Mechanism.  I previously provided an overview of the compensation-related literature, which is evidence common to the Class, to explain that cold calling is a valuable recruiting mechanism that benefits both passive employees and employers, and is broadly used in U.S. labor markets to recruit valuable talent with specialized skills.[213]

125.     For example, human resource management professors Feng, Li, Chen, and Rubenstein (2024) explain that "alternative job offers usually come in unsolicited from the competing organization rather than from group members' individual proactive search efforts (Groysberg & Abrahams, 2006)."[214]

126.     Similarly, in my opening report,[215] I described a Federal Reserve Bank of San Francisco study.  That study concluded that "more than three-quarters of workers who switched employers did not report an active job search in the previous three months," and thus the study observed that "a majority of people" actually "find jobs without ever reporting actively looking for one."[216]

127.     Defendants' Experts declined to persuade me otherwise.[217]  As such, my opinion is unchanged.

---

[213] *Id.* ¶ 61.

[214] Feng et al., *supra* note 188 at 21.

[215] Gerhart Report ¶ 61.

[216] Carlos Carrillo-Tudela, Bart Hobijn, Patryk Perkowski & Ludo Visschers, *Majority of Hires Never Report Looking for a Job*, FED. RSRV. BANK OF S.F. ECON. LETTER (Mar. 30, 2015).

[217] *See* Saravia Dep. at 129:22–130:12.

128.    Class Members Possess Specialized, Industry-Specific Skills.  I testified that common evidence shows that Defendant firms perceived that they required Senior-Level Employees with specialized, industry-specific skills, who were often difficult to find.[218] Similarly, Dr. McCrary described Class Members as "individuals at the high end of the skill distribution."[219]  Below I explain that Defendants' Experts have not given me cause to change my opinions.

129.    *Skill Variety.*  Dr. Saravia, Dr. McCrary, and Dr. Stiroh object that Defendants hire employees from various industries and that Class Members had different kinds of specialized skills.[220]  This is not inconsistent with my opinions.  Regardless, lost opportunities to work at Defendant firms would have been especially good matches, requiring little search effort and greatly reduced risk/uncertainty, and would have resulted in substantially higher pay for Class Members at their current Defendant employer or at their new Defendant employer.  The opportunities would have also resulted in substantially higher pay for other employees connected to them because Defendant companies were committed to internal equity and a structured compensation system.  Further, it is important to note that there were no exemptions for particular skill areas in these agreements.[221]  In other words, the agreements stipulated no recruiting from *any* Director-level or above job.  The agreements did not, for example, prohibit recruiting at the Director-level and above, except for business development or except for finance or except for information technology, and so forth.  Again, it was a prohibition that applied to *all* Director-level and above positions.

---

[218] Gerhart Report ¶ 62.

[219] McCrary Dep. at 156:2–10.

[220] Saravia Report ¶¶ 56, 102–103; McCrary Report ¶¶ 41, 45, 53–57, 107–112; Stiroh Report ¶¶ 32–40.

[221] Gerhart Report ¶¶ 22(a)(i), 22(b).

130.     *DaVita.*  I have not changed my assessment that DaVita sought to hire difficult-to-find Senior-Level Employees with specialized skills.[222]

131.     Dr. Johnson, Dr. McCrary, and Dr. Stiroh cite evidence that DaVita hired employees from and turned employees over to management consulting companies to undermine my opinion that Senior-Level Employee roles required specialized skills.[223]  However, they do not explain whether these new hires had consulting experience in the healthcare industry and/or for DaVita specifically.  But based on my decades of experience in the compensation and human resource management fields, they likely did.

132.     **2014 DaVita Communication re VP Role.**  For example, consider a 2014 internal DaVita communication discussing a candidate from Boston Consulting Group ("BCG") for DaVita's then-CEO Thiry's Chief of Staff role, who would be "next in line for [the] VP strategy job[.]"  Listed as a "negative" was the fact that "his HC [healthcare] background is lighter than others."[224]  Simultaneously, DaVita considered other candidates with stronger healthcare backgrounds (e.g., a former Aetna executive, a BCG Principal with an MD, etc.).[225]  Also in 2014, DaVita referred to another current BCG Principal with "[d]edicated project experience in provider space last 2 years; this includes large hospital systems," etc. as an "outstanding candidate."[226]

133.     **Andrew Boyink.**  Indeed, the evidence Dr. McCrary submitted regarding Andrew Boyink, a DaVita VP of the Hospital Services Group who previously worked at McKinsey,

---

[222] *Id.* ¶ 62(a).

[223] Johnson Report ¶¶ 39–41; McCrary Report ¶¶ 41, 43; Stiroh Report ¶¶ 33–34, Figure 1.

[224] DVA_OMCEAL_000010256 at DVA_OMCEAL_000010258.

[225] *Id.*

[226] DVA_OMCEAL_000413696 at DVA_OMCEAL_000413696.

-51-

supports my opinion and is contrary to Dr. McCrary's.[227]  Dr. McCrary cites to Boyink's LinkedIn page, wherein Boyink represents that he has "a strong background in Healthcare Consulting primarily focused on provider and system improvement driving effective and efficient care delivery in the US, UK, and Developing Markets.  My goal is to improve care and efficiency, in developed and developing markets, through new delivery models and capabilities."[228]  Further, prior to joining DaVita, Boyink earned a dual Masters in Public Health in Hospital Administration and MBA at the University of Michigan, where he participated in the Michigan Healthcare Executives Student Association and the Healthcare and Life Sciences Club.[229]  Additionally, according to a 2015 internal DaVita discussion, ███████████

████████████████████████████████████████████████████ ██

██████████████████████████ ██ ██████████████████████████████

██████████████████████████████

134.     **Consideration of Other Non-Defendant Candidates.**  The evidence in the McCrary and Stiroh Reports showing that DaVita considered candidates from non-Defendant companies outside of the healthcare industry, such as Advance Auto Parts, National Veterinary Associates, and Walmart Global eCommerce is also insufficient to rebut my testimony.[232]  As I explain above, that certain of Defendants' Senior-Level Employees possess skills that transfer to

---

[227] McCrary Report ¶ 41 (citing Andrew Boyink, LINKEDIN https://www.linkedin.com/in/andrewboyink).

[228] Andrew Boyink, LINKEDIN, https://www.linkedin.com/in/andrewboyink (last visited June 26, 2025).

[229] *Id.*

[230] DVA_OMCEAL_001144622 at DVA_OMCEAL_001144622.

[231] HIGHMARK, https://www.highmark.com/ (last visited June 26, 2025).

[232] McCrary Report ¶ 45 (citing DVA_OMCEAL_000011812 at DVA_OMCEAL_000011815; DVA_OMCEAL_000538771 at DVA_OMCEAL_000538801; DVA_OMCEAL_000760685 at DVA_OMCEAL_000760687); Stiroh Report ¶¶ 39–40.

some degree to other industries is not surprising.  The point, though, is that there is no guarantee that those jobs would be as good of matches for those employees, and Dr. McCrary and Dr. Stiroh makes no attempt to demonstrate as much.

135.    Further, though Dr. Stiroh states that according to DaVita COO Staffieri, "there was 'a long list' of roles for which DaVita did not value healthcare experience," she tellingly neglects to mention that immediately prior, Staffieri also testified that there "would be a long list" of "categories of open positions [for which] DaVita value[s] experience in DaVita's industry when trying to find people to fill that position[.]"[233]

136.    Moreover, the Stiroh Report includes evidence that undermines her opinion and supports mine.  For example, she submits a 2013 list of candidates assembled by a third-party recruiter to show that "[i]n 2013, DaVita engaged a recruiter to search for DVP and VP Acute roles and considered candidates from a diverse set of employers, including GE Healthcare and ConvaTec (a medical products company)."[234]  But other employers of additional candidates on the list are in the healthcare industry, including Renown Health and Austin Regional Clinic.[235] Moreover, according to Dr. Stiroh, "a December 2009 [DaVita] posting for 'Director – Revenue Management' listed multiple required qualifications, and stated 'experience in Healthcare, Consulting, Information Technology, or Insurance industries preferred.'"[236]  DaVita also *required* that the candidate possess a "[w]orking knowledge of ICH [International Council for

---

[233] *Id.* ¶ 39 (citing Staffieri Dep. at 118:5–120:8).

[234] *Id.* ¶ 39 (citing DVA_OMCEAL_000124754).

[235] DVA_OMCEAL_000124754 at DVA_OMCEAL_000124754–55.

[236] Stiroh Report ¶ 40 (citing DVA_OMCEAL_001294850 at DVA_OMCEAL_001294852; DVA_OMCEAL_001296753).

Harmonization of Technical Requirements of Pharmaceuticals for Human Use], GCP [Good Clinical Practice], [and] FDA standards."[237]

137. Further, Dr. Johnson, Dr. McCrary, and Dr. Stiroh have not refuted my assessment that the qualitative evidence shows that DaVita would have recruited such high-value employees from SCA in the absence of the No-Poach Agreement.[238] For example, Dr. Johnson and Dr. McCrary have not accounted for evidence I submitted of third-party recruiter Korn Ferry's "Search Status Report" for an SVP, Chief Development Officer role at DaVita. That report states that SCA executive Joe Clark would have been an appropriate candidate for the DaVita opportunity absent the mobility restrictions.[239]

138. Finally, Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not opine as to whether the evidence shows that DaVita placed value on recruiting passive candidates for employment.[240] As such, I find that I do not have cause to change my opinion that DaVita needed to proactively recruit employees with specialized skills to fill its open senior-level positions.

---

[237] DVA_OMCEAL_001296753 at DVA_OMCEAL_001296754. *See also* McCrary Report ¶ 55 (citing DVA_OMCEAL_001317525–27 (The job description for an open Senior Director of Information Technology position at DaVita stated that healthcare experience was "strongly preferred."); DVA_OMCEAL_001313820 at DVA_OMCEAL_001313821 (DaVita's IT Director of Product Management position job description listed "Healthcare Revenue Cycle knowledge and experience required. Knowledge of Healthcare IT market, products, systems, and technologies" under its "Minimum Qualifications.")).

[238] Gerhart Report ¶ 62(a)(iii) (citing DOJCIV-008-00000304 at DOJCIV-008-00000308 ███████████████████████████████████████████████████).

[239] Gerhart Report ¶ 74(b) (citing Ex. PX275 at DVA00097065 (the note next to Clark read, "Will not pursue per client")).

[240] Johnson Dep. at 147:18–150:15.

139. *SCA.* My opinion that SCA sought candidates from a finite talent pool and in ordinary circumstances would have proactively recruited DaVita and USPI employees is also unchanged by Defendants' Expert Reports.[241]

140. **SCA Valued DaVita Candidates.** Dr. Johnson and Dr. Stiroh did not submit persuasive testimony or other qualitative evidence to show that SCA did not value DaVita candidates.[242] Dr. McCrary, however, attempts to chip away at my opinion by pointing to evidence that SCA would not have recruited DaVita employees even in an unrestricted labor market.[243] I am unconvinced.

141. Dr. Johnson, along with Dr. McCrary and Dr. Stiroh, failed to address the evidence I analyzed showing that, had former SCA CEO Hayek and former DaVita CEO Thiry *not* established the SCA-DaVita No-Poach Agreement, SCA would have pursued DaVita employees.[244]

142. Similarly, Dr. Johnson, Dr. McCrary, and Dr. Stiroh ignore the evidence I analyzed demonstrating that SCA considered DaVita employees "qualified" to work at SCA.[245] The foregoing is consistent with former SCA COO Rucker's testimony at trial that the goal of

---

[241] Gerhart Report ¶ 62(b).

[242] Johnson Dep. at 147:18–150:15; Johnson Report ¶¶ 39–42.

[243] McCrary Report ¶ 52.

[244] Gerhart Report ¶¶ 75(b) (citing Ex. PX484 at DVA_OMCEAL_000429389 (Hayek told Thiry that, though SCA had multiple open positions, Hayek ceased pursuing a DaVita employee because of his relationship with Thiry and DaVita)), 75(e) (citing Ex. PX333 (In July 2011, former SCA COO Rucker reassured DaVita's then-SVP Javier Rodriguez that SCA continued to "steer recruiting efforts away from DaVita teammates.")).

[245] *Id.* ¶ 75(e) (citing Ex. PX335 at DOJ-PROD001A-00000239 (In September 2011, Rucker told Rodriguez that SCA had turned away at least six inquiries from DaVita teammates otherwise "qualified" to work at SCA.)).

the SCA-DaVita No-Poach Agreement was precisely "to limit the number of employees or teammates that moved" between SCA and DaVita, which would otherwise have been higher.[246]

143.    Dr. McCrary cites to evidence that supposedly shows that "proposed class members who work for one Defendant may not be a good fit for another Defendant."[247]  For example, he puts forth (1) internal emails wherein former SCA CEO Hayek and former SCA CDO Mathis doubted the ability of DaVita Senior-Level Employees to succeed at SCA, and (2) the testimony of SCA executive Joe Clark that SCA and DaVita required different skill sets.[248]  I am not persuaded.  For one thing, the irony is palpable here, given that SCA's longtime CEO, Hayek, was himself a former DaVita VP, who recruited DaVita's then-DVP Rucker to be SCA's COO, a role which Rucker occupied for nearly a decade.[249]  In fact, former SCA Chief Talent Officer Bridie Fanning made this exact point in her testimony at the DaVita criminal trial (which directly contradicts her deposition testimony) when she told the court that she would "have expected movement in the absence of" the SCA-DaVita No-Poach Agreement.[250]  She explained that many "of the culture practices and talent practices from DaVita were at SCA," because Hayek and Rucker "brought them with them.  So culturally, the demands, the targets, the expectations were very similar."[251]  Fanning elaborated that Hayek and Rucker "both came from DaVita to SCA and were wildly successful at SCA."[252]  Further, the SCA executives questioned

---

[246] *Id.* (citing Ex. PX158 at 408:5–16; Rucker Dep. at 82:16–83:16 (Rucker confirmed at his deposition that his prior testimony was truthful)).

[247] McCrary Report ¶ 145.

[248] *Id.* ¶ 52 (citing SCA000838956; SCA000163727; Clark Dep. at 145:15–22).

[249] Gerhart Report ¶ 49.

[250] Ex. PX157 at 228:25–229:10.

[251] *Id.* at 229:11–16.

[252] *Id.*; *see also* Fanning Dep. at 33:11–22 (DaVita would "have been one of the top places [Fanning] would have looked for talent.").

DaVita DVPs' ability to succeed in SCA's environment in the context of an internal discussion about the SCA-DaVita No-Poach Agreement—possibly as cover for Defendants' collusive conduct.[253]  In other words, the fact of the agreement by itself would be less damning if SCA could make it look like it was uninterested in DaVita employees even in an unrestricted market.

144.    **Metcalf's Testimony About Industry Experience is Unreliable.**  Dr. Saravia's, Dr. McCrary's, and Dr. Stiroh's contentions that "[i]ndustry experience had 'zero relevance' for some candidate searches," in part based on the testimony of Clare Metcalf, an external Russell Reynolds recruiter who performed searches for SCA, also does not move the needle.[254]  Indeed, Metcalf simultaneously admitted that, by that same token, for other searches "industry experience is very relevant," and Russell Reynolds "often put together a target list of companies within the industry[.]"[255]  Moreover, ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ [256]

145.    **Saravia and McCrary Ignore Qualitative Evidence.**  Dr. Saravia and Dr. McCrary also do not rebut the qualitative evidence I analyzed that SCA would have recruited from USPI in an unrestricted labor market.  Whereas Dr. Saravia ignores the evidence altogether, Dr. McCrary submitted other qualitative evidence purporting to show that SCA did not consider USPI Senior-Level Employees valuable candidates.[257]  I am unconvinced.

---

[253] SCA000163727.

[254] Saravia Report ¶ 103; Metcalf Dep. at 27:1–9; McCrary Report ¶ 46; Stiroh Report ¶ 39.

[255] Metcalf Dep. at 43:23–44:7.

[256] Ex. PX304 at DOJCIV-008-00000301.

[257] McCrary Report ¶ 52.

146.    First, Dr. Saravia and Dr. McCrary ignored the evidence in my report wherein

███████████████████████████████████████████████████████████████████████

████████████ [258]  This instruction implies that SCA would otherwise have recruited USPI

employees.

147.    Indeed, Dr. Saravia agrees with my view:  according to her assessment, during the

Class Period, "SCA continued to be a source and a destination for USPI employees."[259]  (Note

that this indicates most employer switches are likely attributable to cheating on the SCA-USPI

No-Poach Agreement.  Moreover, and as discussed herein, SCA hired USPI employees at a

much lower rate than it likely would have absent the No-Poach Agreement).

148.    The fact that SCA and USPI established their No-Poach Agreement makes it clear

that they believed their employees would be very interested in job opportunities at the other

Defendants and that, in the absence of such an agreement, they expected to lose valuable

employees to each other and/or have to increase pay to prevent that from happening.  Once such

losses started, the risk would be that the losses snowball due to turnover contagion.  Thus, they

decided to nip it in the bud early by restricting Class Members' mobility.

149.    **McCrary's Record Evidence Does Not Support His Views.**  Further, the

qualitative evidence Dr. McCrary put forth to rebut my opinion is unconvincing.

150.    For example, Dr. McCrary explains that according to Fanning, "SCA recruited job

candidates from firms outside of the healthcare industry when filling business development

roles."[260]  It is, of course, impractical for any organization of any size to recruit and hire all of its

---

[258] Gerhart Report ¶ 75(e) (citing Ex. PX305 at DOJCIV-008-00000178; Rucker Dep. at 102:7–
22, 385:19–388:14).
[259] Saravia Report ¶ 86.
[260] McCrary Report ¶ 45 (citing Fanning Dep. at 112:22–113:20).

employees from one or two other organizations.  That SCA recruited candidates from other organizations is not surprising, but does not change the fact that SCA did not recruit from the other Defendant firms.

151.    Dr. McCrary also points to Naomi Kruger, an SCA VP of Strategy and Payor Engagement who previously worked at Navigant (a market research and advisory firm) as evidence that SCA hired from disparate industries.[261]  Dr. McCrary's framing is misleading, because Kruger had extensive experience in healthcare, including at Navigant.[262]  According to her resume, as a Navigant Managing Consultant, Kruger worked specifically with health networks:  she "[l]ed financial modeling and strategy development for a value-based care contracting engagement for a clinically integrated network"; "[s]upported a health system's execution of Medicare's bundled payment program"; and "[l]ed a chargemaster optimization project to support a health system's defensible pricing strategy and revenue enhancement goals."[263]  She did similar work in her prior Consultant roles at Navigant.[264]  Previously, she worked in the healthcare space at The New Jewish Home as a Strategic Planning Intern, where she focused on the "home health aide retention rate" and "[l]ed [the] implementation and evaluation of a pilot initiative to enhance [the] patient experience in community-based elder care programs."[265]  She also interned at the Pan American Health Organization, where she researched "the integration of gender and equity in health initiatives[.]"[266]  Kruger received a Bachelor of Science degree in Community Health from the University of Maryland, and a Master of Public

---

[261] *Id.* ¶ 41.

[262] SCA001551238 (cover email) and SCA001551239 (attachment) (Kruger resume).

[263] *Id.*

[264] *Id.*

[265] *Id.*

[266] *Id.*

-59-

Health degree in Healthcare Management from the Mailman School of Public Health at Columbia University, where she worked as a teaching assistant in an "Analytic Methods for Health Services Management" course.[267]

152.     Moreover, like Dr. Johnson, Dr. McCrary submits evidence that SCA performed a 2015 search for a Regional Vice President ("RVP") and targeted employees from management consulting firms.[268]  This evidence is unconvincing for the same reasons discussed above with respect to DaVita.  Moreover, the documents Dr. McCrary cite undermine his testimony and support my own.  SCA required that the RVP candidate "[u]nderstand healthcare, where it has been, where it is and where it can go . . . how do we deliver healthcare differently?"[269] Moreover, SCA listed as an "[e]ssential skill" "[b]road ASC [ambulatory surgery center] experience with leadership capabilities to implement processes, resources, and training."[270]  SCA also required that the candidate have a bachelor's degree, with an "MBA or advanced degree preferred, with at least 10 years management experience in the ASC industry and with ASC operations" and preferred "experience in managing multiple centers or a group of hospital outpatient centers."[271]  Moreover, SCA included merely four management consulting firms on its target recruiting list, as compared with 15 healthcare providers and 54 national healthcare organizations.[272]  This document also demonstrates that SCA valued recruiting passive candidates:  in its "Project Timeframe," SCA scheduled an initial internal recruitment meeting regarding "passive market approach initiation," and provided for various stages of "headhunting

---

[267] *Id.*

[268] McCrary Report ¶ 45 (citing SCA000003962 at SCA000003962; SCA002270032).

[269] SCA000003962 (cover email) and SCA000003963 at SCA000003965 (attachment).

[270] SCA000003963 at SCA000003966–67.

[271] *Id.* at SCA000003967.

[272] *Id.* at SCA000003967–69.

calls" to passive candidates.[273] Further, Dr. McCrary's "evidence" that SCA considered a candidate from the management consulting firm CAPCO *demonstrates* that SCA typically looked for candidates with healthcare experience, and only considered candidates without this experience in specific circumstances.[274]

153. Indeed, Dr. McCrary provides evidence that supports my assessment. For example, Dr. McCrary explains that in 2014, SCA considered candidates from Baylor Healthcare System and University of Texas Southwestern Medical Center, both employers in the healthcare industry.[275]

154. As such, my opinion that, according to the qualitative evidence, SCA required niche candidates for its Director-level and above positions remains unchanged.

155. *USPI.* I opine that USPI valued a small pool of employees with a specialized skillset, which often derived from industry experience;[276] Dr. Saravia and Dr. McCrary say USPI did not.[277] I am unconvinced.

156. I am not swayed by Dr. Saravia's and Dr. McCrary's contentions that I failed to account for qualitative evidence regarding the broader pool of employees from which USPI recruits.[278] For example, Dr. Saravia, like Dr. Johnson and Dr. Stiroh, cites to evidence that USPI hired employees from the management, scientific, and technical consulting industry to

---

[273] *Id.* at SCA000003970.

[274] SCA002270032 at SCA00227032.

[275] McCrary Report ¶ 45 (citing SCA002270032 at SCA002270032–34). *See also* McCrary Report ¶ 55 (citing SCA000128921 (SCA's job description for its Director of Financial Operations position instructed that "healthcare experience is a plus")).

[276] Gerhart Report ¶ 62(c).

[277] Saravia Report ¶¶ 53–56, 102–103, 110–116; McCrary Report ¶ 41.

[278] Saravia Report ¶¶ 102–103; McCrary Report ¶¶ 41, 45.

refute my opinion that Senior-Level Employee roles required specialized skills.[279]  Dr. McCrary

similarly cites to evidence that USPI hired at least one employee from the technology industry,

who later joined a veterinary care firm after leaving USPI.[280]

157.    First, in all likelihood, USPI's new hires from consulting firms typically had

healthcare consulting experience, and/or consulted for USPI specifically.  For example, a 2014

discussion of a potential hire illustrates USPI's interest in candidates with healthcare experience.

In 2014, USPI learned of a BCG principal who was "in the process of leaving BCG, and

expressed interest in an open USPI job, Regional Vice President.  [He] [h]as a background in

health care services, med tech, and consumer products."[281]  USPI's then-VP of Talent

Acquisition Shannon Mosley agreed to "interview him and see if he's a fit and [if] we can afford

him."[282]

158.    In support of his opinion, Dr. McCrary cites to a former USPI employee's

LinkedIn profile to show that "[p]roposed class member Stephanie A. Phillips, a VP of

Procurement at USPI during the Class Period, worked at Avaya (a cloud-based software

computing firm) immediately before joining USPI, and at Mars Veterinary Health (a veterinary

care firm) immediately after leaving USPI."[283]  However, Dr. McCrary neglects to account for

internal USPI documents showing that one of the job requirements for Phillips' role instructed,

---

[279] Saravia Report ¶ 56.

[280] McCrary Report ¶ 41.

[281] USPI_CIV_000449339 at USPI_CIV_000449340.

[282] *Id.* at USPI_CIV_000449339.

[283] McCrary Report ¶ 41 (citing Stephanie A. Phillips, LINKEDIN,
https://www.linkedin.com/in/stephanie-a-phillips-651913).

"Must have background in HEALTHCARE."[284]  As such, I am not persuaded to change my view.

159.    That USPI at times recruited from a broader pool of employers does not change the fact that USPI *did* value employees with industry experience, including SCA employees.  For example, ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████[285]  Indeed, Dr. McCrary admits that USPI recruited from healthcare employers, including ambulatory surgery centers.[286]

160.    Moreover, Dr. Saravia and Dr. McCrary do not address the multiple examples I provided wherein USPI employees issued mandates not to recruit from SCA, implying that SCA employees would otherwise have been acceptable candidates in an unrestricted market.[287] Further, additional evidence supports my assessment.  For example, in a 2017 internal USPI discussion, USPI's then-primary internal recruiter Shannon McGarry explained to another recruiter that USPI could not consider a job candidate from SCA:  "Katherine works for one of our partners so I can't poach her . . . . *That's the problem we face all of the time.  Running*

---

[284] USPI_CIV_000115447 at USPI_CIV_000115447–48 (discussing asking Phillips to update the job description for her role).  *See also* McCrary Report ¶ 55 (citing USPI_CIV_000457557 (USPI's job description for a Director of Operations, Finance position stated:  "Knowledge of Health Care Industry Preferred.")).

[285] Ex. PX88 at DOJCIV-008-00000354.

[286] McCrary Report ¶ 45 (citing Garvin Dep. at 195:15–196:2 (According to Garvin, "Any and all health systems in the United States of America, any and all ambulatory surgery center companies in the United States of America, private equity firms employing physician management with various ancillary [subsidiaries]" are "[c]ompetitors to USPI for employees in general[.]")).

[287] Gerhart Report ¶¶ 62(c), 76(b) (citing McGarry Dep. at 65:24–67:20, 74:17–75:5; Ex. PX99), 76(c) (citing Ex. PX216 at USPI_CIV_000010056).

*across people who are affiliated with USPI. It sucks. It makes my job that much harder.*"[288] My opinions are therefore unchanged.

**B.** **The No-Poach Agreements' Cold Calling Restrictions and Tell-Your Boss Provision Decreased Employees' Job Mobility and Bargaining Power.**

161. In my report, I opined that, based on my experience in compensation and human resource management and the related literature and theory, employers generally benefit from proactively soliciting and recruiting workers because these mechanisms connect them with high-value candidates.[289] Moreover, proactive solicitation and recruiting also benefits employees by facilitating their increased access to higher-paying job opportunities.[290] Consequently, restrictions on employee mobility deprives employees of those opportunities.[291]

162. I therefore concluded that, based on my expertise and research experience, common evidence in this litigation is consistent with Defendant firms' top executives colluding to restrict labor competition in two key ways.[292] Defendants: (1) agreed not to proactively recruit each other's workers; and (2) agreed to require candidates currently employed at each other's firms to inform their supervisors that they wanted to pursue external opportunities before those candidates had job offers in hand, which created a widespread chilling effect.[293] Taken together, in my opinion, these restrictions would likely have reduced Senior-Level Employees' mobility and suppressed their compensation.[294]

---

[288] Ex. PX101 at USPI_CIV_000004081 (cover email) (emphasis added) and Ex. PX102 (attachment) (the candidate's resume reflecting her employment at SCA).

[289] Gerhart Report ¶¶ 64, 66.

[290] *Id.*

[291] *Id.*

[292] *Id.* ¶¶ 65–66.

[293] *Id.*

[294] *Id.*

163.    Below, I explain that Defendants' Experts have not put forth rebuttal testimony or evidence that has changed my foregoing opinions.

### 1.    Senior-Level Employees Typically Have Limited Access to Labor Market Information.

164.    I previously opined that, based on my expertise in compensation and human resource management, relevant literature and theory, and WorldatWork and Institute for Women's Policy surveys of compensation professionals and employees, the labor market is characterized by frictions that impede employees' access to better job opportunities.[295]  The foregoing evidence is common to the Class.

165.    "A friction is any factor that makes job searches or switches more difficult than the theoretical idea of switching" employers.[296]  Such frictions include information asymmetry between employees and employers and high costs of proactive job searches, which make it difficult, if not impossible, for employees to know they are underpaid.[297]  Non-compete agreements, which Dr. McCrary opines restricted certain Class Members' mobility,[298] also "introduce frictions into the labor market, weaken workers' bargaining positions, and reduce competition over wages[.]"[299]

166.    In contrast with consumers in the product market, "it is typically impossible for workers to learn the compensation associated with every potential employment opportunity."[300]  The situation for employers is different.  As the 2022 U.S. Treasury paper stated[301]:

---

[295] *Id.* ¶ 69.

[296] LABOR MARKET COMPETITION, *supra* note 38, at  5–6.

[297] Gerhart Report ¶ 69.

[298] McCrary Report ¶ 137.

[299] LABOR MARKET COMPETITION, *supra* note 38, at 15.

[300] *Id.* at 6.

[301] *Id.* at 34.

> [Employers, on the other hand] often have more information regarding workers' outside options than the workers. Many employers have access to non-public compensation surveys, giving them a better understanding of the wage distribution for a given occupation and geography. Even when information is publicly available, HR departments of firms are in a better position to use the data than the typical workers—HR departments have institutional knowledge and a stronger incentive to know where vacancies are posted than a time-constrained worker.

As such, it is unsurprising that alternatively, increased information transparency can increase competition to employees' benefit, according to Dr. McCrary.[302]

167. Employers' actions will often exacerbate this asymmetry. For example, employers usually delay wage and benefit negotiations with higher-level employees until "the final stage of the hiring process."[303]

168. These amplified frictions harm employee outcomes because, as the 2022 U.S. Treasury paper explains, "[i]f workers underestimate the wages paid by similar employers, then they will be less likely to actively search for a new employer. For workers, acquiring information about outside options is often more costly than for firms."[304] Taken together, "[l]ack of pay transparency from firms' use of salary history, pay secrecy, and punitive practices against workers sharing pay information" all help employers "restrain[] competition."[305] As such, "the ultimate way of finding out what your opportunities are is to get a concrete, specific opportunity," which usually "come[s] without looking."[306]

169. Defendants' Experts declined to rebut the foregoing analysis and opinions. Rather, Dr. Johnson testified that he "would be surprised if you could say across all employees,

---

[302] McCrary Report ¶¶ 153, 158.

[303] LABOR MARKET COMPETITION, *supra* note 38, at 6.

[304] *Id.* at 7.

[305] *Id.* at i.

[306] Gerhart Dep. at 125:11–126:2.

they had perfect information."[307]  Likewise, Dr. Saravia agreed that "in general, employees don't have perfect information about alternative job opportunities."[308]  Dr. McCrary also points out that according to the economics literature, which is evidence common to the Class, higher-paid employees learn less (than those with lower pay) about their own individual alternative pay opportunities from generally available information,  which yields an additional friction in the labor market.[309]  Dr. Stiroh impliedly agrees pursuant to her assertion that "[e]conomic literature suggests that increased transparency among producers can lead to more competitive outcomes. In fact, perfect information, for both consumers and producers, is an underlying assumption of a perfectly competitive market."[310]  If even the employer cannot readily look up the labor market rate for a job, the employee will have even less of a chance of accessing the relevant information.

170.    I therefore have not changed my opinion that, according to compensation-related literature and theory, firms typically have more information about labor markets than employees and prohibit or discourage employees from sharing what information they do have, which can reinforce pay suppression.[311]

### 2.    Defendants Limited Pay Transparency.

171.    Defendants Obscured Pay Data.  Based on my review of the evidence, Defendants' conduct accords with typical employer practices in the United States.  Defendants sought to limit their employees' access to pay information, as a means to limit internal equity

---

[307] Johnson Dep. at 151:17–152:16.

[308] Saravia Dep. at 130:14–21.

[309] McCrary Report ¶ 65.

[310] Stiroh Report ¶ 114.

[311] Gerhart Report ¶ 69.

and external equity pay comparisons by employees.[312]  Defendants' Experts did not refute this part of my report.  My opinions are unchanged.

172.  *DaVita.*  In my report, I explained that the common evidence I analyzed showed that DaVita sought to limit its employees' access to pay data for jobs other than their own.[313]  Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not rebut my assessment.  Accordingly, I have not changed my opinion.

173.  *SCA.*  Based on my review of common evidence, SCA sought to limit its employees' access to compensation information.[314]  Dr. Johnson, Dr. Saravia, and Dr. McCrary did not address my opinion that SCA sought to avoid bidding wars, which are often provoked when employees acquire access to labor market information.[315]  As such, my assessment is unchanged.

174.  *USPI.*  In my report, I put forth common evidence to show that USPI shared SCA's same goal of avoiding a bidding war that would have put upward pressure on salary levels.[316]  While Dr. McCrary ignored this testimony, at deposition, Dr. Saravia testified that USPI did not make compensation information transparent to all Class Members.[317]  As such, my testimony is unchanged.

---

[312] *Id.* ¶ 70.

[313] Gerhart Report ¶ 70(a); Johnson Dep. at 152:17–153:22 (Dr. Johnson acknowledged that had he done so, it would have been inconsistent with his contention that Defendant firms lacked pay structures).

[314] Gerhart Report ¶ 70(b).

[315] Johnson Dep. at 152:17–153:22

[316] Gerhart Report ¶ 70(c).

[317] Saravia Dep. at 131:6–132:4.

### 3. Absent Defendants' Collusion, Employees Could Acquire Labor Market Information Through Cold Calls and Proactive Recruitment.

175. Based on my experience and research in the fields of compensation and human resource management, compensation-related literature and theory, and evidence in this litigation, which is common to the Class, in unrestricted labor markets, cold calls and proactive recruitment are valuable mechanisms by which employees can overcome labor market frictions and access more accurate wage information.[318] Defendants' Experts have not identified any testimony or evidence sufficient to change my view.

176. Federal Reserve Study. As discussed, in my original report, I described a Federal Reserve Bank of San Francisco study, which concluded that "a majority of people" actually "find jobs without ever reporting actively looking for one."[319] In other words, unsolicited job offers dominate actual employer changes. This Federal Reserve study concluded that "rather than them [employees] finding jobs, the jobs actually find them[,]"[320] "so any level of restriction on [unsolicited job offers] would be consequential."[321] Defendants' Senior-Level Employees were no different.

177. Documentary Evidence. For example,



[322]

---

[318] Gerhart Report ¶¶ 71–72.

[319] Carrillo-Tudela, *supra* note 216.

[320] *Id*.

[321] Gerhart Dep. at 98:12–99:4.

[322] Ex. PX88 at DOJCIV-008-00000354.

███████████████████████████████████████████████████

███████████████████████████████████████[323]

178. <u>Theoretical Alternatives vs. Real Matches.</u> There are, of course, many jobs out there that are theoretical alternatives. However, there is a big gap between a generically available job and an available job that matches the employee's needs, abilities, and preferences and provides enough beyond the current job for the employee to incur the cost of changing jobs. In the absence of an unsolicited offer, the employee either never receives an offer (because they are not searching) or they search, but then face the large search costs inherent in finding, pursuing, and evaluating many low-percentage alternative job opportunities.

179. <u>Tendency to Remain in the Same Industry.</u> As I discussed in my opening report, research has concluded that employees "remain in their 5-digit industry 39 times more often than random" (i.e., compared to what would be expected if their current industry had no effect on their new destination industry when they switch firms).[324] Further, I cited evidence showing that the strong tendency to move within the same industry is even more pronounced for higher-paid employees.[325] This research is directly relevant to this case because all three Defendants fall within the same 5-digit industry, NAICS 62149, Other Outpatient Care Centers.

180. <u>Turnover Contagion.</u> Additionally, this information is valuable even for employees who do not receive cold calls. The social network connected Defendants' employees. Turnover contagion operates in such cases and works like this: "[A] coworker's search for job alternatives or actual quitting can spread, through a process of social contagion, to affect another

---

[323] *Id.*

[324] Gerhart Report ¶ 61(f) (citing Frank M.H. Neffke, Anne Otto, & Antje Weyh, *Inter-industry labor flows*, 142 J. ECON. BEHAV. & ORG. 275–292 (Oct. 2017)).

[325] *Id.* (citing Eric Parrado, Asena Caner, & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007)).

employee's quitting behavior. Like the contagion of illness, the process involves the transmission of something from one individual to another."[326] Turnover contagion operates with particular force when more employees pursue alternative employment[327]:

> Given that high levels of risk and uncertainty often characterize job transition, . . . we expect employees to look to others in evaluating whether to seek alternative employment. When a number of coworkers are looking for other jobs, it may increase the salience and perceived viability of leaving for a focal employee.

181. Similarly, recall that Feng, Li, Chen, and Rubenstein (2024) describe how "one or a few" employee departures can result in "igniting a turnover spark" that spreads to a group of employees, "ultimately resulting in a sweeping group turnover fire."[328]

182. DaVita Executives Were Likely Aware of Turnover Contagion. This turnover contagion may have been what Thiry feared and took steps to avoid after Hayek left DaVita to run what eventually became SCA as CEO and then in turn recruited DaVita's then-DVP Rucker from DaVita to follow him, hiring him for the very senior position of Chief Operating Officer.[329] If Thiry had not taken these steps, it seems likely that Hayek and Rucker would have looked to DaVita for more of their former co-workers whom they knew and whose capabilities they knew to help SCA going forward. In turn, these former DaVita co-workers would have had concrete job opportunities at SCA. Those opportunities would have come through cold calls, and these opportunities would be seen as less risky and less uncertain given that Hayek and Rucker knew

---

[326] W. Felps, T.R. Mitchell, D.R. Hekman, T.W. Lee, B.C. Holtom & W.S. Harman, *Turnover contagion: How coworkers' job embeddedness and job search behaviors influence quitting*, 52 ACADEMY OF MGMT. J. 545–561, at 546 (2009).

[327] *Id.* at 547.

[328] *See* Feng et al., *supra* note 188 at 23. This "turnover 'spark'" consists of one or a few departure-initiators' turnover decisions or their actual exits. *Id.* In turn, this spark can prompt a set of early onboarders to also quit, which then builds an increasingly salient psychosocial context for leaving that permeates the group to fuel further departures. *Id.*

[329] *See* Gerhart Report ¶ 49.

them, as well as the fact that they knew both SCA and DaVita and thus that these candidates would fit at SCA. Once this process of turnover contagion begins, it can snowball. If that had been allowed to unfold in this case, it could have resulted in a well-beaten path from DaVita to SCA. Making matters worse, Thiry knew that Hayek and Rucker were uniquely capable of identifying and targeting DaVita's best talent.[330]

183. Similarly, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ [331]

184. <u>Johnson/McCrary/Stiroh Arguments.</u> As such, I am not persuaded by Dr. Johnson's, Dr. McCrary's, and Dr. Stiroh's objections that I have not shown that employees acquire uniquely valuable information from competing employers' proactive recruiting mechanisms where they also had access to public sources of market data.[332] I am also not persuaded by Dr. McCrary's objection that not all employees necessarily acquire pay information even when they receive cold calls.[333] Based on my expertise and experience in the compensation and human resource management fields, general labor market information (e.g., the unemployment rate) has nowhere near the utility of proactive recruiting. By definition, general and/or public labor market information such as "job alerts" from "internet resource[s]"[334] cannot capture the number and/or quality of opportunities for a particular employee as well as a

---

[330] *See, e.g.,* Ex. PX316 at DOJ-PROD001A-00000029.

[331] *Id.* ¶ 48 (citing Ex. PX124 at DOJCIV-012-00000134; Thurman Dep. at 159:8–160:5 (confirming accuracy of ████████████████ )).

[332] Johnson Report ¶ 51 n.111; McCrary Report ¶ 145; Stiroh Report ¶¶ 57, 76–77, 80–81.

[333] McCrary Report ¶ 132 ("[E]ven many individuals who would engage by answering the phone or reviewing a message sent to them may not get to the point of learning what the job is paying.").

[334] Stiroh Report ¶ 81.

cold call, which is why unsolicited offers are so important.[335]  Moreover, "job alerts" from internet resources have far less applicability or relevance to any individual passive candidate than a targeted search that has invested in identifying a specific individual passive candidate deemed to be a likely good match to the position.  At that point, which is essentially the starting point for the passive candidate, the two parties can establish relatively quickly what the parameters of the offer would be (including a narrower salary range than what would ordinarily be posted in a more cast-a-wide-net sort of posting, such as in Figure 15 in the Stiroh Report[336]) and whether there is mutual interest and a match.  At this point also the candidate has the option to use the outside opportunity as leverage for a higher pay counteroffer from their current employer.

185.    Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not address the remainder of my opinions and evidence on this subject.[337]  Further, at deposition, Dr. Saravia confirmed that she had not opined as to whether proactive recruiting efforts would not provide better information to Senior-Level Employees.[338]  As such, my opinion that cold calls and proactive recruiting

---

[335] *See* Gerhart Dep. at 118:12–119:13 ("I don't think there's anything as valuable as a cold call. I mean, certainly looking at a general advertisement isn't the same."); *see also id.* at 122:2–24 (looking for job opportunities online is "not nearly as good of an avenue" as cold calls to get "information about market compensation and job opportunities").  Additionally, Dr. Stiroh cites to evidence that Plaintiff Scott Keech received information about job opportunities from LinkedIn to support her argument that "considerable information about job openings and salaries became increasingly available from public sources during the alleged conduct period."  Stiroh Report ¶ 81 n.163.  However, Keech's experience also provides further support for my opinions regarding turnover contagion, because Keech testified at deposition that he accepted a job offer from Kaiser Permanente (his current employer) after he had been recruited by a former co-worker who previously left to work there.  *See* Keech Dep. at 57:8–60:2 (Keech's former coworker "really enjoyed working for Kaiser Permanente and was recruiting [Keech] to come work with her again.").

[336] Stiroh Report ¶ 80 & Figure 15.

[337] Johnson Dep. at 155:17–22.

[338] Saravia Dep. at 132:5–10.

uniquely benefit employees because they provide timely, actionable, and specific information that is superior to public information, and increase employees' bargaining power and wages remains unchanged.[339]

### 4. Because of the No-Poach Agreements, Employees Often Never Learned About Higher-Paying Job Opportunities at Defendant Firms.

186.    I opined that, based on my review of extensive common evidence and my experience in compensation and resource management, Defendants' No-Poach Agreements successfully stalled proactive recruiting, prevented many candidates at Defendant firms from learning about higher-paying outside opportunities, and suppressed Class Members' mobility.[340] Defendants' Experts have failed to submit convincing rebuttal testimony or evidence that undermines my assessment. As such, I have not changed my opinions.

187.    Class Members Would Have Valued Employment Opportunities at Defendant Firms Regardless of Non-Defendant Opportunities. Defendants' Experts opine that my analysis is deficient because I fail to consider that Class Members had plenty of job opportunities at non-Defendant firms, such that I inflate the harm Defendants' mobility restrictions inflicted on the Class.[341] However, based on the evidence and my expertise and research in the compensation and human resource management fields, Defendants' Experts' opinions are unpersuasive.

188.    It is unsurprising that there are job opportunities beyond the three Defendant firms and that Defendants' employees sometimes possess skills that are transferable to employment at non-Defendant employers within and outside the healthcare industry.[342] Nonetheless,

---

[339] Gerhart Report ¶ 72.

[340] *Id.* ¶¶ 73–76.

[341] Johnson Report ¶¶ 27–49; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 52–59, 107–112; Stiroh Report ¶¶ 32, 36–42.

[342] McCrary Report ¶¶ 52–59, 109.

Defendants' employees were denied what was likely a substantial number of alternative opportunities, which did not come around every day. For example, as Dr. McCrary explains, "Economic literature discusses how workers with highly specialized skills may consider employment options in a national or even global geography because, in any narrower geography, the number of employers who can utilize their skills may be too small for them to find a good employment match."[343]

189. Moreover, it is unclear to what labor markets Dr. McCrary refers when he argues that "proposed class members who participate in labor markets where Defendants do not have labor market power could not have been harmed by the alleged market," and Dr. McCrary makes no attempt to explain.[344]

190. *SCA and DaVita Employees.* In my report, I explained that DaVita and SCA employees were interested in opportunities at the other firm. For example, I explained that after former SCA CEO Hayek left DaVita to lead SCA, he reassured DaVita's then-CEO Thiry that he would not poach DaVita employees.[345] To show good-faith, Hayek told Thiry that "there was a DaVita person in the process of being recruited for an SCA role when I joined, and, despite being an excellent candidate, I decided not to pursue them."[346] Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not address this anecdote, which supports my view that DaVita employees would have appreciated and benefited from job opportunities at SCA.

---

[343] McCrary Report ¶ 47 (citing Kathleen O'Toole, *Enrico Moretti: The Geography of Jobs*, INSIGHTS BY STANFORD BUSINESS (June 10, 2013), available at https://www.gsb.stanford.edu/insights/enrico-moretti-geography-jobs ("If you are in a very highly specialized position, you want to be in a labor market where there are a lot of employers looking for workers, and a lot of workers looking for employers.")).

[344] McCrary Report ¶ 21(a).

[345] Gerhart Report ¶ 75(b) (citing Ex. PX484 at DVA_OMCEAL_000429389).

[346] *Id.*

191.   Similarly, Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not address the qualitative evidence I analyzed regarding former DaVita Senior Director of Business Development Sean Taylor. ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████.[347]   Likewise, when a DaVita candidate sought employment at SCA, former SCA CEO Hayek instructed Fanning to respond that SCA "would only engage if [the candidate] had already shared with his supervisor that he wants to explore outside opportunities and speak with SCA[.]"[348]   Fanning then informed this candidate that SCA could not pursue the hiring process unless the candidate received "explicit permission" from DaVita.[349] The foregoing demonstrates DaVita employees' interest in job opportunities at SCA, yet Dr. Johnson does not account for any of this evidence in his testimony.

192.   Dr. Johnson's, Dr. McCrary's, and Dr. Stiroh's analyses of the data are also unconvincing and *support* my opinion that SCA and DaVita employees wanted to work at the other company because, according to the data, some employees got around the No-Poach Agreement and switched between SCA and DaVita.[350]

193.   Dr. Johnson and Dr. Stiroh also claim that the foregoing assessment is incorrect because DaVita did not hire a single SCA employee after the Class Period ended in 2019.  Dr. Stiroh also points out that during the same period, "departures from DaVita to SCA represented less than one percent of DaVita's 318 Senior-Level departures."[351]   Foremost, Dr. Johnson and

---

[347] *Id.* ¶ 74(c) (citing DOJCIV-007-00000105 at DOJCIV-007-00000105–06).

[348] *Id.* ¶ 79(a) n.301 (citing Ex. PX171 at DOJ-PROD001B-00157126).

[349] *Id.* (citing Ex. PX172).

[350] Johnson Report ¶¶ 37–38; McCrary Report ¶¶ 187, 189; Stiroh Report ¶ 41 n.84; *see also* Stiroh Report ¶ 62, Figure 12.

[351] Johnson Report ¶ 38; Stiroh Report ¶ 41.

Dr. Stiroh also fail to consider that the during-and-after conduct periods are not an apples-to-apples comparison. By the time the conduct ended, Optum had acquired both SCA and DaVita Medical Group. As such, SCA acquired an entire DaVita division's worth of co-workers through the Optum merger.[352] Moreover, DaVita employed fewer people after the merger.[353] Accordingly, fewer external DaVita positions would have been available to SCA employees post-merger, and DaVita would have had fewer employees seeking new job opportunities.

194. *SCA and USPI Employees.* In my report, I opined that the evidence showed that that SCA and USPI employees were interested in job opportunities at the other firm.

195. For example, in my report, I cited to the deposition testimony of former SCA Chief Talent Officer Bridie Fanning, who explained that "[w]here people [from USPI and DaVita] approached us and wanted to be considered for opportunities at SCA[,]" SCA would enforce the tell-your-boss provision against those candidates.[354] Fanning's testimony shows that USPI employees were interested in positions with SCA.

196. At deposition, Dr. Saravia testified that she did not "disagree that USPI considered SCA as a relevant labor market competitor," or vice versa.[355] Moreover, the Saravia and McCrary Reports discuss evidence that SCA and USPI employees wanted to work at the competitor firm because some employees circumvented the mobility restrictions and switched to Defendant employers.[356] As such, I have no cause to change my opinion.

---

[352] Johnson Report ¶¶ 20–21 & n.27; Saravia Report ¶ 49.

[353] *See* Johnson Report, App. E at 2, Ex. E-2.

[354] Gerhart Report ¶ 79(a) (citing Fanning Dep. at 71:19–72:10).

[355] Saravia Dep. at 81:4–82:5.

[356] Saravia Report ¶¶ 80–90; McCrary Report ¶¶ 187, 190.

197.    Defendants Ceased Proactively Soliciting Each Other's Employees.  In my report, I analyzed substantial qualitative evidence showing that Defendant firms complied with the No-Poach Agreements' prohibition on proactive solicitation and that the Agreements negatively impacted employees' compensation.[357]  Defendants' Experts do not provide any cause for me to change my opinion.

198.    *DaVita.*  In my opinion, based on the common evidence I have reviewed, DaVita stopped actively soliciting SCA employees, which blocked SCA workers from learning about opportunities at DaVita.[358]  Dr. Johnson and Dr. Stiroh do not rebut my assessment of this evidence.  Dr. McCrary objects that this evidence has limited utility, and "at best shows that mobility was restricted (or was believed to be restricted) in certain instances, rather than on a classwide basis,"[359] but ultimately does not "express any opinion about whether the alleged conduct in fact occurred."[360]  As I explain below, Dr. McCrary's argument is unavailing, because he wrongly focus on moves between Defendants, as opposed to job offers.  As such, I have not changed my opinion.

199.    *SCA.*  In my view, based on the common evidence I reviewed, SCA stopped calling DaVita and USPI employees to disrupt their competitor's employees' knowledge about external opportunities.[361]  Dr. Johnson did not rebut my analysis of this evidence.  Moreover, Dr. Saravia testified that she has no opinion as to whether the qualitative evidence is consistent with a No-Poach Agreement between SCA and USPI.[362]

---

[357] Gerhart Report ¶¶ 73–76.

[358] *Id.* ¶ 74.

[359] McCrary Report ¶ 190.

[360] McCrary Dep. at 118:14–18.

[361] *Id.*¶¶ 74(d)–(e), 75.

[362] Saravia Dep. at 133:23–137:3.

200.    However, Dr. McCrary objects that at times, SCA's external recruiters did not enforce its No-Poach Agreements with DaVita and USPI.[363]  I disagree that this weakens my analysis.  Even lawful, publicly-known policies in an organization are not executed with 100 percent success.  When a policy is decidedly not public and is not written down to avoid detection, as here (discussed below), perfect enforcement will be a challenge.  This is especially true when external recruiters are used as there is the goal of adhering to the no-poach agreement, but ideally without telling recruiters more than necessary.  Despite these challenges, it is clear that the Defendants vigorously monitored each other and that enforcement was by and large very effective.[364]  Dr. McCrary also ignores the substantial evidence I provided regarding the Agreements' robust enforcement mechanisms.[365]  Finally, Dr. McCrary's contention that this evidence shows merely that mobility was restricted in individual instances fails for the same reasons as discussed below, particularly given that he does not ultimately opine as to whether the conduct actually occurred.[366]  As such, my opinions are unchanged.

201.    *USPI.*  As above, Dr. Saravia did not object to my assessment that based on the evidence I reviewed, USPI colluded with SCA to suppress labor market competition,[367] and she likewise testified that she has no opinion regarding the foregoing qualitative evidence.[368]  Similarly, Dr. McCrary does not have an opinion as to whether this collusion occurred.[369]  Further, pursuant to my analysis below, I am not persuaded by his objection that there is

---

[363] McCrary Report ¶ 145.

[364] *See* Gerhart Report ¶¶ 73–76.

[365] *Id.* ¶ 75.

[366] McCrary Dep. at 118:14–18.

[367] Gerhart Report ¶ 76.

[368] Saravia Dep. at 133:23–137:3.

[369] McCrary Dep. at 118:14–18.

insufficient evidence to show that Defendants ceased to proactively solicit each other's employees.[370]  I therefore have no cause to modify my opinion.

202.    Employment Growth and Turnover and Hiring Rates.  Moreover, Defendants' Experts incorrectly focus exclusively on data regarding moves between Defendants to show that Defendants' No-Poach Agreements did not impact employee movement, whereas the real concern is job offers (unsolicited or otherwise).[371]  Below, I explain that Defendant firms experienced employment growth during the Class Period.  But in the context of an unrestricted labor market, this trend would be inconsistent with the ongoing small number of inter-Defendant moves.

203.    Growing Employment Numbers.  Relevant to the inquiry is "the degree to which employees would move between these companies in a competitive, unrestricted labor market."[372] According to Dr. Johnson's Exhibit C-1 and his Exhibit 18, between 2009 and 2019, the number of Class Members at the three Defendant firms more than doubled, from 1,360 in 2009 to 2,736 in 2019 (and from 1,360 in 2009 to when Class Members peaked at 3,216 in 2017).[373]  Dr. McCrary also opines that according to his Exhibit 21, "Defendants' employee counts grew substantially during the Class Period."[374]  Further, Dr. Stiroh reports that "DaVita expanded its global workforce from 32,500 employees in 2008 to approximately 70,000 by 2023, representing employment growth of approximately 115 percent[,]" and that SCA grew "from 288 employees

---

[370] McCrary Report ¶ 190.

[371] Johnson Report ¶¶ 38, 44–46; Saravia Report ¶¶ 104–132; McCrary Report ¶¶ 38, 185–198; Stiroh Report ¶¶ 56–75.

[372] Gerhart Dep. at 49:22–50:19.

[373] Johnson Report, App. C at 1, Ex. C-1; *id.* ¶ 48, Ex. 8 (note that the number of Class Members declined to 1,314 in 2019 with the sale of DMG to Optum).  *See also* Stiroh Report ¶ 44, Figure 7 (Figure 7 is nearly identical to Exhibit 8 in the Johnson Report).

[374] McCrary Report ¶ 122, Exs. 21–22.

in 2008 to 614 employees by 2019."[375]  As such, in the absence of such restrictions, we would have anticipated that moves between Defendants would have also at least doubled between 2009 and 2019.  The left panel of Figure 2 of the Starr Report shows that did not happen.[376]

204.     We also know that Hires = Employment Growth + Employee Turnover.  Thus, Hires > Employment Growth.  Consistent with this, Dr. Johnson's Exhibit 5 shows 3,570 hires during the class period he defined.[377]  There were 1,360 Class Members in 2009.  Thus, there were 2.63x as many hires over that period as there were Class Members at the beginning of the period (3,570/1,360 = 2.63).  Despite this tremendous hiring, of these 3,570 hires, Dr. Johnson's Exhibit 5 reports that only 50 (1.4%) were from other Defendants.[378]

205.     Moreover, by 2019, total employment at Defendants had grown to 100,912, which Dr. Johnson reports represented 14.15 percent of all employment in the Other Outpatient Care Centers industry.[379]  Thus, the Defendants' share of total employment in the Other Outpatient Care Centers industry grew by a factor of 14.15/12.04 = 1.18, or 18 percent from 2009 to 2019.  At its peak, Defendants' share of employment in the industry reached 16.8% in 2016, an increase of 16.80/12.04 = 1.40, or 40 percent, from 2009.  The Defendant firms' growing share of employment in the Other Outpatient Care Centers industry would have been expected to

---

[375] Stiroh Report ¶ 8, ¶ 44 n.90, ¶¶ 46–48, Ex. 8.

[376] Starr Report ¶ 84, Figure 2.  Note that on January 21, 2025, Dr. Starr served an amended version of his opening report.  Here and throughout my Rebuttal, I refer to this amended report.

[377] Johnson Report ¶ 38, Ex. 5.

[378] *Id.*

[379] Johnson Report, App. E at 1, Ex. E-1 (Dr. Johnson here uses data from the U.S. Bureau of Labor Statistics, Occupational and Wage Statistics survey to estimate employment in NAICS 62149, Other Outpatient Care Centers.).

contribute to an increase in moves between the Defendants.  But, again, Figure 2 (left panel) of the Starr Report indicates that did not happen.[380]

206.    Rather, despite Defendants' accounting for 16.8% of all employment in this industry by 2016, again, only a small percentage—1.4%—of Defendants' hires was from each other.  The McCrary Report also states that "Defendants are the previous and next employer for 0.4% of moves for DaVita employees, 3.7% of moves for SCA employees, and 2.0% of moves for USPI employees" before, during, and after the Class Period.[381]  Likewise, Dr. Stiroh's Figure 12 shows that only 20 moves (0.59%) occurred (2008–2019) between DaVita and SCA.[382]  This disparity is consistent with Defendants' market power, which would have enabled them to hire fewer employees than they would have in a competitive environment.[383]

207.    Defendants Experienced Less Than Expected Turnover.  Moreover, if Defendants' employee turnover rates had not remained stable, but instead increased by 1.73x, as they did economy-wide, or by 1.50x, as in the broad Health Care and Social Assistance industry during the period (as noted earlier), that would have resulted in higher employee turnover requiring additional hires beyond the actual 3,570 hires identified based on Dr. Johnson's Exhibit 5.[384]  In other words, the number of needed hires would have been even higher than the observed 3,570 hires, further raising the amount by which mobility between Defendants that would have been expected to increase.  Again, however, Dr. Starr's Exhibit 2 (left panel) stands in sharp

---

[380] Starr Report ¶ 84, Figure 2.

[381] *See* McCrary Report ¶¶ 37–40 & Exs. 1–3.

[382] Stiroh Report ¶¶ 60–64, Figure 12; *see also id.* ¶ 41 n.84 ("From 2008 to 2019, less than 0.5 percent of DaVita's 1,295 hires were from SCA.  During the same period SCA was the destination for one percent of DaVita's 1,408 departures.").

[383] LABOR MARKET COMPETITION, *supra* note 38, at 26.

[384] Johnson Report ¶ 38, Ex. 5.

contrast to that expectation.[385]  Likewise, according to Dr. McCrary, "his Exhibit 22 [] shows that hiring rates for Defendants were similar during the Class Period, as compared to periods before or after the Class Period."[386]

208.    The foregoing also rebuts Dr. Stiroh's contention that "the fact that Dr. Starr finds that employee mobility was 'elevated in the early years of the Conduct Period' suggests that compensation would not have been suppressed during those years";[387] she does not account for the additional hires Defendants would have otherwise made in an unrestricted market.  It also renders irrelevant Dr. Stiroh's contention that "[o]n average, more employees moved between DaVita and SCA during the alleged conduct period than after the conduct period."[388]  Again, we would expect to see much more mobility than we do.  The likely explanation is that moves between Defendants were very effectively prevented by the No-Poach Agreements.

209.    The "turnover contagion" phenomenon discussed above would again have played a role here, as departing colleagues would likely have encouraged their colleagues to join them at their new organizations.[389]  Indeed, former DaVita CEO Thiry expressed concern about likely turnover when he warned Hayek against recruiting DaVita employees after Hayek recruited Rucker from DaVita to become a top executive[390]:

> It is a potentially nasty thing to start . . . —because where does it stop? The best people have the best people, so are we all going to make each other's life's [sic]

---

[385] Starr Report ¶ 84, Figure 2.

[386] McCrary Report ¶ 122, Exs. 21–22.

[387] Stiroh Report ¶ 91 (citing Starr Dep., Vol. II, 336:6–337:12).

[388] *Id.* ¶ 62 & Figure 12.

[389] Feng et al., *supra* note 188 at 21 (explaining that "alternative job offers usually come in unsolicited from the competing organization rather than from group members' individual proactive search efforts (Groysberg & Abrahams, 2006)").

[390] Gerhart Report ¶ 49 (citing Ex. PX316 at DOJ-PROD001A-00000029).

more difficult than they are?  Are you going to let [M]ichael [Rucker] "coincidentally talk to other [DaVita] folks who have decided to leave?"

210.    The personal contacts between former co-workers (e.g., between Hayek and Rucker and their former DaVita co-workers) would have diminished with each passing year, especially with the amount of employee turnover and hiring at DaVita and the suppressed movement between SCA and DaVita.  After roughly ten years, the personal connections and experiences with former colleagues and the ability that provided to tap into the (top) talent known to them at DaVita would have been largely gone.

211.    Moreover, Dr. Johnson states, "[a]s this exhibit [5] shows, the Defendants did not hire a large number of employees from 'Covered Defendants' even outside the alleged conduct periods."[391]  But this exhibit *contradicts* the conclusions drawn by Dr. Johnson:  Exhibit 5 shows that SCA hiring from DaVita and USPI *increased* from 3.4% percent during the proposed Class Period (in the presence of mobility restrictions) to 4.7 percent during the *post*-proposed Class Period (when mobility restrictions had ended), a 38 percent increase.[392]

212.    Impact of Long-Term Incentives on Mobility.  Below, I explain that Dr. Johnson's and Dr. McCrary's contentions that Defendants' No-Poach Agreements could not have suppressed employee mobility and pay is due to their use of long-term incentives such as equity as a retention tool are not logically sound.[393]

213.    Unvested stock-related compensation can inhibit movement.  However, any such inhibition is not limited to moves from one Defendant to another.  In addition, if an employee is pessimistic about future stock price performance, this pessimism will reduce the degree to which

---

[391] Johnson Report ¶¶ 37–38.

[392] *Id.* ¶ 38, Ex. 5.

[393] *Id.* ¶¶ 94–97; McCrary Report ¶¶ 107, 135.

-84-

unvested stock-related compensation will inhibit movement. No doubt, former SCA CEO Hayek and former SCA COO Rucker left DaVita despite possessing substantial unvested stock-related compensation.

214.     Moreover, while equity can *incentivize* an employee to stay at the current employer, it does not *prevent* the employee from taking a new job, as Dr. Johnson suggests, and as the No-Poach Agreements did.[394] In the words of Dr. McCrary, Class Members "may also have *self-restricted* themselves" from changing employers—in these circumstances, the employers did not impose the restriction.[395]

215.     Increases in Stock Prices Would Not Have Created a Net Benefit for Class Members. Dr. Johnson and Dr. McCrary also argue that I did not account for potential increases in stock prices, which would limit the impact of the No-Poach Agreements.[396] I am not persuaded.

216.     As I testified at deposition[397]:

> [T]o know whether they benefited, you'd have to know what would have happened in the absence of [the No-Poach Agreements] and the absence of sharing competitively sensitive information. That would be the actual true test. But if your pay is tied to company profits and stock performance, then, the higher those are, the better off you'll be. But in the absence of any kind of restrictions on the labor market, then the logic would be you would have made even more money in the absence of those.

These employees "may have done significantly better in the absence of" Defendants' anticompetitive conduct.[398] One pathway by which "they may have done better [is] if they would have gotten an outside offer, which they could have either leveraged or taken, which

---

[394] Johnson Report ¶¶ 95–96.

[395] McCrary Report ¶ 135 (emphasis added).

[396] Johnson Report ¶ 97; McCrary Report ¶¶ 107, 129.

[397] Gerhart Dep. at 75:11–76:21.

[398] *Id.* at 76:22–77:9.

could have had higher compensation. So . . . it's not clear to me that people benefited."[399] As such, my opinion is unchanged.

### 5. Defendants' Tell-Your-Boss Provision Further Limited Employee Bargaining Power and Mobility.

217. I explained in my report that common evidence shows that both No-Poach Agreements incorporated the same tell-your-boss provision.[400] This type of provision would have served to strongly discourage both proactive and passive Defendant employees from job offers they could have used to acquire higher pay (by changing employers or by negotiating higher pay to stay) or as valuable information on their external value, unless those candidates informed their bosses that they were leaving and pursuing external opportunities—before they had offers in hand.[401] It should come as no surprise that, as I explained in my report, this requirement had a chilling effect because telling their boss can expose employees to many risks, such as retaliation from their current employers.[402] Defendants' Experts have not provided any testimony or evidence sufficient to cause me to reconsider the foregoing opinions.

218. Defendants Implemented a "Tell-Your-Boss" Provision. I have no cause to change my assessment that the common evidence shows that Defendants' No-Poach Agreements included an identical tell-your-boss provision.[403]

219. *DaVita.* In my report, I explained that SCA and DaVita expanded the terms of their No-Poach Agreement in 2011 and 2012 to include the tell-your-boss provision.[404] Dr.

---

[399] *Id.*

[400] Gerhart Report ¶¶ 77–81.

[401] *Id.*

[402] *Id.* ¶ 81.

[403] *Id.* ¶¶ 77–80.

[404] *Id.* ¶ 22(a)(i).

-86-

Johnson contends that I failed to address how SCA and DaVita's addition of the tell-your-boss provision in or around 2011 and 2012 would affect the proposed Class.[405]  Similarly, Dr. McCrary objects that[406]:

> Prof. Starr's Figure 7 does not show the effect of the alleged conduct becoming *more negative* over time even though . . . Plaintiffs alleged and Plaintiffs' experts claim that the alleged conduct strengthened over time as the alleged mobility restrictions and information sharing took effect in a staggered fashion, and as the alleged mobility restrictions allegedly became more restrictive with the addition of the 'tell your boss' requirement.

I disagree.

220.    To clarify, the SCA-DaVita No-Poach Agreement always included an informal version of the "tell-your-boss" provision.  The documentary evidence shows that former DaVita CEO Thiry considered the provision a standard business practice, a consideration for which Dr. Johnson does not account.  For example, when then-SCA CEO Hayek recruited DaVita's then-DVP Rucker to work at SCA in 2008, Thiry was appalled that Hayek did not force Rucker to disclose his plans with DaVita.[407]  Thiry demanded Hayek explain[408]:

> [Why,] [i]f [M]ichael [Rucker] was sure he was going to leave anyway . . . wasn't it the right thing to say, "[M]ichael, call [D]a[V]ita and tell them that, and then I will give you an offer.  I am not comfortable recruiting from that/those compan[ies]/friends unless that is a public fact."  [J]ust so you know, that is what I have done a few times in my career, so I am not moralizing in some theoretical way.  Most of the time the candidate refuses to do it, because they are not in fact sure they are going to leave.

221.    Similarly, in January 2010, Hayek called DaVita's then-SVP of Operations Gildea.  He "indicated that the ROD had contacted his company and [Hayek] wanted to ascertain if they were promotable within Da[V]ita" before Hayek pursued the hiring process with the

---

[405] Johnson Report ¶ 55.

[406] McCrary Report ¶ 251.

[407] Ex. PX484 at DVA_OMCEAL_000429389.

[408] *Id.*

DaVita candidate.[409] Post-2011, the only thing that changed is that SCA and DaVita more formally agreed to enforce the provision.[410]

222. Dr. Johnson, Dr. McCrary, and Dr. Stiroh do not otherwise rebut my opinion that common evidence shows that DaVita and SCA implemented a tell-your-boss provision in their No-Poach Agreement. Indeed, Dr. McCrary testified that he does not have any opinion as to whether any of the alleged conduct occurred.[411] As such, my opinion remains the same.

223. *SCA.* As above, Dr. Johnson claims that I failed to address how SCA and DaVita's addition of the tell-your-boss provision in or around 2011 and 2012 would affect the proposed Class,[412] and Dr. McCrary contends that the data should therefore show that Defendants' conduct became more harmful over time, but do not.[413] Neither claim holds water.

224. The evidence shows that SCA enforced this provision even without a specific request to do so. For example, when Thiry confronted Hayek over Rucker's departure from SCA, Hayek attempted to convince Thiry of his loyalty. Hayek assured Thiry, "There was one [DaVita] executive in the final stages of being selected for an SCA role when I arrived, and [I] decided not to move forward with them."[414] Hayek further explained that he terminated this candidate's recruitment because, though the "executive said they wanted to move on from DaVita[,] . . . there was no way to validate the veracity of the statement[.]"[415] In other words,

---

[409] Ex. PX376 at DVA_OMCEAL_000122784.

[410] Gerhart Report ¶ 22(a)(i).

[411] McCrary Dep. at 118:14–18.

[412] Gerhart Report ¶ 79; Johnson Report ¶ 55.

[413] McCrary Report ¶ 251.

[414] Ex. PX484 at DVA_OMCEAL_000429387.

[415] *Id.*

Hayek decided not to hire a candidate who had not widely shared their plans to leave with DaVita.

225. Moreover, former SCA Chief Talent Officer Fanning testified that the provision "impact[ed] a candidate's ability to proactively be considered or respond to opportunities at DaVita or USPI" "[o]r [to] get solicit[ed] in the first place[.]"[416]

226. **Johnson/Saravia/McCrary Do Not Rebut My Opinions re the Tell-Your-Boss Requirement.** Dr. Johnson does not otherwise object to my opinions that SCA enforced the tell-your-boss provision against DaVita employees.[417] Likewise, Dr. Saravia did not respond to my opinions that SCA enforced the tell-your-boss provision against USPI employees, so my opinions are unchanged. Dr. McCrary also has no opinion as to whether the conduct occurred.[418] I therefore have no cause to change my opinion.

227. *USPI.* In my report, I submitted evidence consistent with USPI's enforcement of the tell-your-boss provision against SCA employees.[419] Dr. Saravia does not rebut this evidence. Dr. McCrary testified at deposition that he has no opinion as to whether USPI enforced the provision against SCA employees.[420] Regardless, he claims that I have opined that SCA and USPI added this provision a year or two after establishing their No-Poach Agreement, and that my opinion is inconsistent with the data, which does not show increasing pay suppression over time.[421]

---

[416] Fanning Dep. at 305:14–25.

[417] Gerhart Report ¶ 79.

[418] McCrary Dep. at 118:14–18.

[419] Gerhart Report ¶ 80.

[420] McCrary Dep. at 118:14–18.

[421] McCrary Report ¶ 251.

228.     To clarify, the SCA-USPI No-Poach Agreement always included a version of the "tell-your-boss" provision.  I put forth evidence in my report wherein ███████████████████ ████████████████████████████████████████████[422]:



████████████████████████████████████████████████████████████████████████████████

████████████████████████████████     Accordingly, I have no reason to modify my opinions.

229.     The Tell-Your-Boss Provision Had a Chilling Effect on Class Members.  In my report, I opined that pursuant to common evidence, before employees receive offers, they generally value confidentiality in their job-seeking processes to avoid potential retaliation or negative reactions from their current employers.[423]  I then testified that, in my assessment of common evidence in this litigation, Defendants' No-Poach Agreements' tell-your-boss provision likely created a chilling effect and ultimately suppressed employee pay.[424]

230.     For example, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

---

[422] Gerhart Report ¶ 80 (citing Ex. PX508 at DOJCIV-008-00000218; Wilcox Dep. at 136:19–137:22).

[423] *Id.* ¶ 81.

[424] *Id.*



425 [REDACTED] 426:

[REDACTED]

231.    Moreover, I submitted evidence showing that former DaVita COO Kogod made the same point[427]:

> There are a lot of people that just don't want to have that conversation.  It's a tough one to have. . . . [F]or the most part, once you make the decision to leave, sitting down with your boss and telling that person you're going to leave makes you somewhat vulnerable.  So I think it had a chilling effect with a lot of people.

[REDACTED][428]  Even Kogod, who admittedly benefitted from the agreement, thought the "restrictions on notification of one's boss was too much to ask for."[429]

232.    That some Class Members may have complied with the provision and told their bosses of their intent to leave, as Dr. McCrary objects, does not change my analysis that the provision chilled mobility Class-wide.[430]  Obviously, if the only way to be considered for a job at another Defendant was to adhere to the tell-your-boss provision, some employees would decide to take on the risk of notifying their supervisors.  (That is another indication of the high interest

---

[425] Ex. PX88 at DOJCIV-008-00000355.

[426] *Id.* at DOJCIV-008-00000357.

[427] Gerhart Report ¶ 81(c)(i) (citing Ex. PX157 at 73:13–19; DOJCIV-008-00000090 at DOJCIV-008-00000093 [REDACTED] ; Kogod Dep. at 45:5–46:14).

[428] Gerhart Report ¶ 81(c)(i) (citing DOJCIV-008-00000304 at DOJCIV-008-00000307).

[429] *Id.* ¶ 81(c)(i) (citing Ex. PX157 at 139:25–140:11).

[430] McCrary Report ¶ 145.

Defendants' employees had in alternative job opportunities at other Defendants.)  However, as I explained in my report, according to Kogod, ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████[431]  Thus, there is agreement that the tell-your-boss provision had a serious chilling effect causing many Class Members to not to take the risk necessary to consider alternative job opportunities at other Defendant companies.  As a result, these employees had to forego the pay increase that would have come from either moving to another Defendant or from using an outside offer from another Defendant as leverage to increase their pay at their current Defendant company.  For those who did take the risk of notifying their supervisor in hopes of a pay raise through one of these paths, Kogod's belief (which is a reasonable one) is that, in the vast majority of cases, it did not work and instead led to negative consequences for these employees.

233.    Defendants' Experts did not otherwise put forth testimony to rebut my views regarding the chilling effect the tell-your-boss requirement had on Class Members, which I therefore have no cause to change.

### 6.    Defendants Have Market Power.

234.    In my expert opinion, Defendants' No-Poach Agreements would likely have decreased Class Members' job mobility and suppressed their pay.[432]  Defendants' Experts attempt to argue that the evidence does not show that Defendant firms have the market power

---

[431] Gerhart Report ¶ 81(c)(x) (citing DOJCIV-008-00000304 at DOJCIV-008-00000307).
[432] *Id.* ¶¶ 84–87.

necessary for the No-Poach Agreements to harm Class Members' compensation.[433]  Below, I explain that their testimony does not comport with the compensation-related literature, basic labor economics, or with the evidence consistent with Defendants' exercise of monopsony power, which is common to the Class.  Further, Defendants' Experts do not persuade me that I should have defined a relevant labor market for Defendants' employees,[434] and Dr. McCrary and Dr. Stiroh also do not persuade me that individualized inquiry would be necessary to define a labor market for each Class Member.[435]  Moreover, none convince me that non-Defendant labor market competition undermines my view that Defendants' No-Poach Agreements would likely harm all or nearly all employees.[436]  Defendants obviously recruited and hired employees from non-Defendant firms.[437]  But again, their attempts to argue that this fact renders my opinion deficient are not convincing, and accordingly do not cause me to change my opinions.

235.    Background.  Monopsony power in the labor market is "a firm's power to reduce the compensation it pays to its workers, paying less than an equivalent job would, in a hypothetical perfectly competitive market.  Market power allows a firm to decrease its compensation without losing its entire workforce[.]"[438]  "Sources of this market power include natural labor market frictions, employer concentration, and anti-competitive labor market

---

[433] Johnson Report ¶¶ 26–49, 143–144, 184–188; Saravia Report ¶¶ 21–23, 42, 70–103; McCrary Report ¶¶ 29–68, 107–112; Stiroh Report ¶¶ 22–45.

[434] Johnson Report ¶¶ 27 n.47, 47; Saravia Report ¶¶ 76, 152–153; McCrary Report ¶¶ 33, 335; Stiroh Report ¶¶ 27–29.

[435] McCrary Report ¶¶ 32, 107–108; Stiroh Report ¶ 38.

[436] Johnson Report ¶¶ 26–36, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 32, 107–112; Stiroh Report ¶¶ 22–45.

[437] Johnson Report ¶¶ 37–43, 143–144; Saravia Report ¶¶ 70–103; McCrary Report ¶ 32; Stiroh Report ¶ 31.

[438] LABOR MARKET COMPETITION, *supra* note 38, at 3; *see also* McCrary Dep. at 38:21–39:7 (Dr. McCrary agreed that "monopsony power is power with respect to the purchase of goods[.]").

practices."[439]  According to Nobel Prize-winning economist David Card (and Dr. McCrary's former advisor[440]), "many—or even most—firms have some wage-setting power."[441]  This concept is consistent with the U.S. Department of Treasury's assessment "that the American labor market is characterized by high levels of employer power."[442]  In turn, "[e]mployers exploit this market power by holding wages and certain non-wage benefits beneath their competitive level."[443]

236.  <u>Outpatient Medical Center Industry.</u>  Dr. Johnson and Dr. Saravia argue that the outpatient medical center industry (referred to by Dr. Johnson as the "Other Outpatient Care Center industry" and by Dr. Saravia and Dr. Stiroh as the "outpatient care center" industry) is large.  They argue that Defendant firms comprise "only 16.8% of total employment."[444]  These arguments are meant to lay the groundwork for their opinion that Defendants do not have the requisite market power to suppress employee compensation.[445]  Dr. Stiroh similarly argues that DaVita and SCA have too small a share of employment in the labor market to suppress compensation.[446]  This description is incorrect.

237.  *Defendants Occupy a Large Share of Employment in the Outpatient Medical Center Industry.*  Dr. Johnson, Dr. Saravia, and Dr. Stiroh understate the significance of

---

[439] LABOR MARKET COMPETITION, *supra* note 38, at 1.

[440] McCrary Dep. at 91:10–15).

[441] LABOR MARKET COMPETITION, *supra* note 38, at i (cleaned up).

[442] *Id.* at 1.

[443] *Id.*

[444] Johnson Report ¶ 48.

[445] *Id.* ¶¶ 27–49; Saravia Report ¶¶ 70–103 (though note Dr. Saravia concedes that she does not consider the outpatient medical center industry "the relevant labor market for analyzing the issues in the case").

[446] Stiroh Report ¶¶ 31, 43–45.

Defendants' share of employment in the outpatient medical center industry.[447]  16.8% (as reported by Dr. Johnson[448]) is a significant portion (approximately 1 in 6) of jobs in the industry.

238.    Moreover, each Defendant's share of facilities within the industry is not the relevant inquiry where Plaintiffs have alleged that Defendants suppressed competition in the labor market.  Dr. Saravia neglected to account for Defendants' share of employees within the most specific (5-digit) industry classification shared by the three Defendants (Other Outpatient Care Centers, NAICS code 62149), which Dr. Johnson reports is "16.8 percent of total employment in 2016."[449]  In any case, Dr. Stiroh's Figure 7 shows that even in the broader 4-digit industry code NAICS 6214, Outpatient Medical Centers, the Defendants DaVita and SCA accounted for 16.0 percent of industry employment of what Dr. Stiroh describes as "managers and above."[450]  This 16.0 percent again stands in stark contrast to what Figure 12 in the Stiroh Report shows (less than 1 percent of employee moves were between DaVita and SCA) and what Dr. Johnson's Exhibit 5 shows (1.4 percent of Defendants hires were from each other).[451]  Even more striking perhaps is that Dr. Stiroh's Figure 7 shows that DaVita and SCA went from accounting for employment of 12.2 percent of employees at the manager-level and above in the Outpatient Medical Centers industry (NAICS 6214) in 2008 to 16.0 percent by 2017, an increase of 31 percent.[452]  Yet, as Defendants' Experts acknowledge, hiring from each other, rather than

---

[447] Johnson Report ¶ 48; Saravia Report ¶ 42; Stiroh Report ¶¶ 31, 43–45.  At deposition, Dr. McCrary testified that he had not calculated each Defendant's market share.  McCrary Dep. at 146:23–148:2.

[448] Johnson Report ¶ 48.

[449] *Id.* ¶ 48.

[450] Stiroh Report ¶¶ 43–45, Figure 7.

[451] *Id.* ¶ 62, Figure 12.

[452] *Id.* ¶ 44, Figure 7.

growing at a similar rate, instead stayed at a very low level.[453]  This again suggests the effectiveness of the No-Poach Agreements in preventing employee movement between them.

239.    Defendants' substantial share of employment undermines the suggestion that Defendant firms comprise a small share of the outpatient medical center industry.  In an unrestricted market, with Defendants accounting for 16.8 percent (or 1 in 6) jobs in the 5-digit industry and with their substantial employment growth and hiring, we would expect that Defendants would have hired much more from each other.

240.    *Labor Markets Are Characterized by Monopsonistic Competition.*  Finally, "pure monopsony," which "describes a market with a single buyer[,]" "is clearly an inappropriate descriptor for American labor markets.  A more realistic model of labor markets in the United States is that of monopsonistic competition."[454]  Defining a labor market as monopsonistic does not require there to be only one or a small number of potential alternative employers, but rather more broadly "applies to labor markets that have many employers in them."[455]  In the latter framework, "a firm may be *neither large nor dominant* in its market but still exercise market power."[456]  Given this, the size of Defendants' industry share is that much more significant.

241.    Frictions Within the Labor Market Exacerbate Market Power.  Moreover, explained at length above, employees have imperfect information about external labor market alternative opportunities.  Thus, the process of finding a better match in the labor market is far more complex than in the product market, which forces workers to invest extensive time and

---

[453] *See* Johnson Report ¶ 38, Ex. 5; Saravia Report ¶ 80, Ex. 6, ¶ 111, Ex. 11; McCrary Report ¶ 198, Ex. 27; Stiroh Report ¶ 62, Figure 12.

[454] LABOR MARKET COMPETITION, *supra* note 38, at 4–5.

[455] RONALD G. EHRENBERG & ROBERT S. SMITH, MODERN LABOR ECONOMICS:  THEORY AND PUBLIC POLICY 132 (11th ed. 2012).

[456] LABOR MARKET COMPETITION, *supra* note 38, at 6.

resources to seek out such a match.[457]  These frictions facilitate Defendants' ability to grow their labor market power.

242.    Dr. Saravia states that Defendants' Senior-Level Employees can "find similarly attractive positions at employers beyond Defendants" and that these alternative employers would need to pay "competitive compensation."[458]  Dr. Johnson, Dr. McCrary, and Dr. Stiroh make similar objections.[459]  My response is that yes, pay is obviously very important.  However, as I explain below, the two-way matching process, imperfect information, and labor market frictions generally mean it is costly for employees and employers to determine how well they match more broadly and, with respect to pay specifically, what pay it would take for both to make a match.

243.    <u>My Opinions Do Not Depend on Defining a Relevant Labor Market.</u>  Defendants' Experts contend that to demonstrate that Defendants had sufficient market power to suppress Class pay, I must define a relevant labor market or assess Defendant firms' share of employment within relevant industries.[460]  I disagree.  Foremost, I was not asked to perform such an analysis, which is unnecessary to my opinion that the No-Poach Agreements would likely harm employee pay.[461]  Moreover, Defendants' Experts also did not define the scope of the relevant labor market, or sufficiently explain why it would be necessary to do so.[462]  Accordingly, my opinions have not changed.

---

[457] *Id.* at 4.

[458] Saravia Report ¶ 77.

[459] Johnson Report ¶¶ 27–49, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 37–68, 107–112, 196, 198; Stiroh Report ¶¶ 25–44.

[460] Johnson Report ¶¶ 27 n.47, 47; Saravia Report ¶¶ 73–76; McCrary Report ¶¶ 33, 35, 111; Stiroh Report ¶¶ 27–30.

[461] Gerhart Report ¶ 6.

[462] Johnson Dep. at 198:19–199:4; Saravia Dep. at 94:9–13; Saravia Report ¶ 38 n.36 ("My description of the OCC [outpatient care center] industry does not imply that I view the OCC industry as the relevant labor market for analyzing the issues in this case."); McCrary Report ¶ 37 n.45 ("I am not offering an affirmative opinion on the outer boundary of the relevant

244. <u>Competition from Non-Defendant Firms Does Not Change My Assessment.</u> It comes as no surprise that non-Defendants competed to hire Defendants' employees. Nevertheless, Defendants' Experts contend that Class Members' employment opportunities at non-Defendant firms constrained Defendants' ability to suppress compensation.[463] It is obvious that some of Defendants' employees left for jobs at alternative employers. But it does not change my assessment that evidence common to the Class shows that regardless, Defendants' No-Poach Agreements restricted labor market competition.

245. Based on his assessment of the Lightcast data, Dr. Johnson describes his Exhibit 4 as showing that "movements to other employment opportunities far exceeded movements to 'Covered Defendants' during and outside the proposed class period."[464] He says it is indicative of "the broad employment opportunities proposed class members availed themselves of when they departed from the Defendants."[465] (Though crucially, he admits that he would not conclude from his Exhibit 4 that "[D]efendants did not have the market power to lower class pay below competitive levels."[466])

246. Likewise, Dr. Saravia argues that movement of Senior-Level Employees between Defendants was rare before, during, and after the period when the SCA-USPI No-Poach Agreement was in place and that SCA employees came from and went to other employers during

---

antitrust market."); McCrary Dep. at 153:19–23; Stiroh Report ¶ 43 ("My analysis of shares among these employers should not be interpreted as an affirmative opinion that I am endorsing . . . [a] relevant antitrust market for this matter.").

[463] Johnson Report ¶¶ 27–49, 143–144, 186, 188; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 37–68, 107–112, 196, 198; Stiroh Report ¶¶ 22–45.

[464] Johnson Report ¶ 33, Ex. 4.

[465] *Id.* ¶ 34.

[466] Johnson Dep. at 218:13–18.

that period.[467] Dr. Saravia states: "an employer's ability to suppress wages is limited by workers' ability to find similarly attractive jobs at other employers. If employees have many other employment options, they will be free to move to these options in response to receiving sub-competitive wages from their employer."[468]

247.    Dr. McCrary is in accord. His Report provides a series of analyses purporting to "demonstrate that, in general, Defendants face substantial labor market competition from non-Defendant firms from proposed class members, . . . [which] means that Defendants would not have market power sufficient to suppress class members' pay classwide."[469] Dr. McCrary opines that according to his Exhibit 1, "Defendants are not the dominant previous or next employers for Defendants' employees working in class positions in the Lightcast Data[.]"[470] Further, he claims that Defendants cannot have market power because Defendants hired from and turned over substantial Senior-Level Employees to employers outside the healthcare and outpatient medical center industries.[471]

248.    Dr. Stiroh also argues that her "analysis shows that DaVita . . . lost Senior-Level employees to[] hundreds of employers in many industries, demonstrating that DaVita competes for Senior-Level employees with many different employers in addition to SCA." She claims that this holds true "before, during, and after the alleged conduct period."[472] Further, "[f]rom 2008 to 2019, less than 0.5% of DaVita's 1,295 hires were from SCA. During the same period SCA was

---

[467] Saravia Report ¶¶ 70–103.

[468] Id. ¶ 77.

[469] McCrary Report ¶ 37. Note that if we accept his claims that Class Members and employers had individualized preferences and other frictions, we would expect to see Class Members with far fewer potential matches than implied by his assessment of the Lightcast data.

[470] Id. ¶ 38 (emphasis omitted).

[471] McCrary Report ¶¶ 43–45.

[472] Stiroh Report ¶¶ 31–45.

the destination for one percent of DaVita's 1,408 departures."[473]  Accordingly, such "competition from employers outside of the alleged agreement limits firms' ability to suppress compensation."[474]

249.    There are two primary issues with Defendants' Experts determinations that, because of employment opportunities at non-Defendant employers, the No-Poach Agreements did not greatly harm Class Members' employment options.

250.    *Not all Job Opportunities Are Created Equal.*  First, Defendants' Experts wrongly assume all employment opportunities are equally valuable.  This assumption is a fatal error.  That is especially so when employers accounting for 1 in 6 jobs in their shared 5-digit industry become unavailable to each other's employees.

251.    Dr. Saravia's testimony that "when you have 90 percent of the transitions going to employers outside of the [D]efendants, then that tells me empirically that those are good substitutes[]" is unsound.[475]  There is almost always *some* alternative external job alternative.  For example, when employees are laid off, they often find other jobs, but the pay is typically much lower.  As such, although Defendant Class Members moved to non-Defendants, one cannot assume that non-Defendant employment options are as well paid or attractive to Class Members as job opportunities with Defendants.

252.    In fact, many job opportunities will be less attractive to employees.  Again, there are always alternative job opportunities, but it does not follow that depriving employees of what were likely very attractive and low risk alternative job opportunities is then defensible.  This point carries particular force pursuant to evidence discussed in my report and above that in

---

[473] *Id.* ¶ 41 n.84.

[474] *Id.* ¶ 27.

[475] Saravia Dep. at 80:12–81:3.

unrestricted markets, more senior and highly-paid employees tend to move employers within the same industry.[476]  If employees would have had access to these opportunities, there would likely have been more employee moves, higher pay for them (at either their new or current employer), and higher pay for other employees due to the internal equity norm and the focus on internal equity in a structured compensation system as found at Defendants.  Access to such opportunities would have additionally provided other incumbent employees with valuable information on external equity and their own external opportunities.  For these same reasons, I am not swayed by Dr. Stiroh's contention that there could not have been any "reduction in information flowing from mobility."[477]

253.    Defendants' Expert Reports do not submit any data to test this assumption either way.  Moreover, both Dr. Johnson and Dr. Saravia acknowledged in their depositions that they had no data on outside offers received and therefore could not speak to a major component of harm to Defendant employees.[478]  For employees who did move to non-Defendant firms, both Dr. Johnson and Dr. Saravia also acknowledged that they had no data with which to evaluate whether jobs at non-Defendant firms were as good as the jobs Class Members would have taken (or received offers for) at the Defendant firms had such jobs been available.[479]

254.    Finally, Dr. McCrary concedes that not all employment opportunities are equally good.  He weakens his own argument by virtue of his assertion that workers with specialized

---

[476] Gerhart Report ¶ 61(f) (citing Eric Parrado, Asena Caner, & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007)).

[477] Stiroh Report ¶¶ 76–79, 82 (claiming that Class Members could have acquired labor market information "from outreach by, or information provided by, the hundreds of other alternative employers who competed for DaVita Senior-Level employees").

[478] Johnson Dep. at 90:15–20, 233:6–17; Saravia Dep. at 110:14–112:22.

[479] Johnson Dep. at 201:23–202:19; Saravia Dep. at 78:24–81:3.

skills often consider positions in national and global markets precisely because if they restrict themselves to a more narrow geography, they risk being forced to make worse matches.[480]

255.    *Frictions / Switching Costs.*  Second, compensation and economics-related theory and literature, which is evidence common to the Class, demonstrates that labor markets operate differently from product markets.[481]

256.    **Everyone Agrees That Labor Markets Operate Differently.**  Though Dr. Johnson, Dr. McCrary, and Dr. Saravia make some suggestions that labor and product markets are very similar, it is widely recognized (including by Defendants' Experts) that labor markets are unique in key respects.[482]  One key difference is that there is typically no going single price (pay rate) for similar employees and which is much more complex because it is a two-sided matching market with frictions and one where it is, at a minimum, costly (if not infeasible) to accurately assess the match of a new job without experiencing it.[483]

257.    Dr. Johnson concedes that labor markets are matching markets, and require far more specific information than is generically available, which underscores the key role unsolicited offers play throughout workers' careers.[484]  As Dr. Johnson acknowledges, "Competition within labor markets functions differently than competition in product markets as labor markets are 'matching markets' where the employer and the job applicant must 'match' in

---

[480] McCrary Report ¶ 48.

[481] *See* Gerhart Dep. at 47:21–48:6 ("[T]he product market is different than the labor market.").

[482] Johnson Report ¶¶ 36–43, 143–144; Saravia Report ¶ 76 & n.132; McCrary Dep. at 162:15–164:23.  Further, Dr. Saravia testifies about "the cartel" and its ability in "raising the market price."  Saravia Report ¶¶ 70–71.

[483] B. Jovanovic, *Job matching and the theory of turnover*, 87 J. OF POLITICAL ECONOMY 972–990, 973 (1979).

[484] Johnson Report ¶ 27; Johnson Dep. at 267:11–16 ("There is no single market clearing pay rate.  That's a fallacy that wouldn't exist in a matching market like a labor or labor markets.").

their preferences."[485]  He contrasts that with "a product market," where "the customer decides to purchase a product from a specific vendor and pays a specific price for the product."[486]  He states, "In labor markets, depending on the jobs at issue, both employees and employers may have a range of choices for potential matches across firms, industries, and geographic locations."[487]  Similarly, Dr. Saravia acknowledges that "labor markets are not the same as industries or even product markets."[488]  "[O]f course there are frictions in labor markets. . . . they're switching costs.  It's more costly than switching from Diet Coke to Diet Pepsi."[489]  Further, at deposition, Dr. Saravia appeared to agree that there is no single price (pay rate) for employees.[490]  Dr. McCrary likewise agrees that geography is a labor market friction, and his assessment that Class Members' skills, experience, and preferences affect their employment options impliedly concedes that labor markets are matching markets.[491]  Dr. McCrary also conceded at deposition that "it's hard to think of any two workers as being exactly alike and interchangeable, particularly for proposed class members."[492]  Moreover, he testified that he "can't really imagine anyone who" disagrees with the principle that there are frictions in the labor market.[493]

---

[485] Johnson Report ¶ 27.

[486] *Id.*

[487] *Id.*

[488] Saravia Report ¶ 38 n.36.

[489] Saravia Dep. at 82:22–84:17.

[490] *Id.* at 75:4–76:8 (Dr. Saravia testified that in the labor market, "there is generally . . . variation in compensation.").

[491] McCrary Report ¶¶ 53–59, 145.

[492] McCrary Dep. at 74:19–23.

[493] McCrary Dep. at 79:17–82:11 ("[T]he idea that there are frictions in labor markets, the same way that there are frictions in every market should be uncontroversial.").

258.     In other words, the labor market is much more complicated than the product market when it comes to finding a better match and thus requires a major time investment to seek that better match.  Thus, any implication that a large number of potential homogeneous employers and homogeneous employees are interchangeable or close substitutes for each other with all employers paying a single going rate in a competitive market without significant elements of monopsony does not reflect the current understanding of how labor markets work. And it certainly does not explain why the Defendants felt it was necessary to restrict mobility of their employees as to other Defendants if Dr. Johnson, Dr. Saravia, and Dr. McCrary are correct.

259.     Dr. Johnson, Dr. Saravia, and Dr. McCrary also argue that Defendant firms had wide variations in pay and that pay at Defendant firms was individualized.[494]  Their admissions reinforce the fact that there is no single going market pay rate for a job.  In other words, "it is possible for firms offering the same employment to offer different wages—a key characteristic of monopsony models."[495]

260.     The foregoing also exposes an inconsistency in the McCrary and Stiroh Reports: they cannot simultaneously argue that labor is not a homogeneous commodity (i.e., it requires individualized inquiry),[496] which is consistent with the presence of labor market frictions, and that Defendants lack market power, because frictions are the basis of market power.

261.     **Jobs Are Experience Goods.**  It is difficult and perhaps even unlikely that one can determine the other attributes of a job to assess the match without actually working at that

---

[494] Johnson Report ¶¶ 68, 71–73; Saravia Report ¶¶ 186–187, 190–193; McCrary Report ¶¶ 30 ("[M]any individualized factors influence proposed class members' pay."), 60–68, 71, 84, 96.

[495] LABOR MARKET COMPETITION, *supra* note 38, at 6.

[496] McCrary Report ¶ 107; Stiroh Report ¶ 38.  As Dr. McCrary testified, "it's hard to think of any two workers as being exactly alike and interchangeable, particularly for proposed class members."  McCrary Dep. at 74:19–23.

-104-

alternative job. In his seminal work on job matching and turnover, economist Boyan Jovanovic conceptualizes a job as an "experience good," which means "the only way to determine the quality of a particular match is to form the match and 'experience it'."[497] Thus, as noted in my opening report[498]:

> Employees can incur high search costs from searching for jobs and gathering information about alternative employment options and compensation; it is often time-consuming to identify and assess the suitability of alternative employers. Moreover, "sometimes . . . employees remain unaware of job opportunities because the constant and daily routine of work, home, and family demands shields that person from alternative possibilities." Many potential employees, particularly those satisfied in their current roles because they do not yet know about higher-salary opportunities elsewhere, are unlikely to choose to incur those costs.

262. **Compensation Information Is Difficult to Acquire.** For employees, even obtaining information on the pay of alternative jobs is no simple matter. One reason is because there is no one correct data point employees can look for. In his deposition, Dr. Johnson was asked if there was a single market clearing pay rate, and he responded, "There is no single market clearing pay rate. That's a fallacy that wouldn't exist in a matching market like a labor or labor markets."[499] Moreover, the first pay transparency law (in California) was not adopted until 2018.[500] Even such laws only require posting of a pay range for a job. It does not tell a prospective employee what pay they would receive or what they could negotiate. That would

---

[497] B. Jovanovic, *Job matching and the theory of turnover*, 87 J. OF POLITICAL ECONOMY 972–990, 973 (1979). As I documented in my original report, employees who voluntarily change employers, especially higher-level employees, receive a substantial pay increase on average from such changes. Gerhart Report ¶ 46 & Figure 1. In addition to pay, employees may seek to estimate how well an alternative job matches on other dimensions such as the nature of the work (interest, challenge), learning/development opportunities, relations with supervisor and coworker, and so forth. These are generally seen as key reasons why a job is an "experience good" (i.e., determining the match before actually working on the job may not be possible).

[498] Gerhart Report ¶ 61.

[499] Johnson Dep. at 267:11–16.

[500] Jennifer Lu, *How much do others make for the same job? Here's where employers are required by law to share salary ranges when hiring*, CNBC.COM (Jan. 12, 2022).

take an investment of time and this investment would be necessary for each potential alternative job.

263. **Matching Is Challenging.** As such, finding a match in the labor market is a unique challenge. All told, the frictions (or relatedly, switching costs) include the inability of employees to access or be able to meaningfully utilize complete information on the scope of potential alternative jobs available. They would also have difficulty determining which of these would actually prove to be a better job than what they have and whether it is worth the risk/uncertain payoff to switch jobs. Employers face a similar challenge in finding and identifying potential employees and their likely value. Combined, "workers find it costly to change employers and . . . firms find it costly to hire or fire workers."[501] Mobility thus brings with it "high levels of risk and uncertainty" and one way employees can reduce that is "to look to others in evaluating whether to seek alternative employment."[502] When others with whom you have worked move to a new employer and are satisfied with their new employer match, "it may increase the salience and perceived viability of leaving for a focal employee."[503]

264. **The Two-Sided Nature of Labor Markets Exacerbates the Negative Effects of Employer Collusion.** This costly and imperfect worker mobility "has profound theoretical implications."[504] Under such frictions/costs, rather than the labor supply curve to an employer being horizontal as in a perfectly competitive market, the supply curve to an employer becomes upward sloping. Defining a labor market as monopsonistic "rests only" on this assumption of an upward-sloping supply curve. It does not rest on there being only a limited number of potential

---

[501] EHRENBERG, *supra* note 455, at 128.

[502] Felps, *supra* note 326, at 546.

[503] *Id.* at 547.

[504] *Id.*

alternative employers, but rather "applies to labor markets that have many employers in them."[505]  The two-sided matching nature of labor markets (acknowledged by Dr. Johnson[506]) with distinct preferences on both sides comes into play here to make for thinner markets in terms of viable employee-employer matches.  "The set of workers one firm prefers may be small, and the set of workers that prefer that firm is even smaller.  This 'differentiation-squared' may exacerbate market power in labor markets relative to product markets."[507]  Under such conditions, collusion on the part of employers to take themselves out of competition with one another for employees can have major negative consequences for employees.

265.     **Frictions Decrease in Competitive Labor Markets.**  In contrast, when employees have unfettered access to unsolicited job offers, the search costs are minimized for the employee and the employer has already likely invested in information that allows it to identify the employee as a likely strong match.  To the extent the employee already has personal relationships with employees at the new prospective employer (e.g., as a previous co-worker— peer, supervisor, direct report, etc.), that relationship is likely to increase the employee's assessment of the potential match and reduce the risk and uncertainty of moving to the new employer.

266.     **The Benefits of Unsolicited Offers Extend Beyond Actual Job Movement.**  Of course, an external unsolicited offer does not necessarily require the employee to move in order to benefit.  As Dr. McCrary agrees, the outside offer can be used to negotiate higher pay and

---

[505] EHRENBERG, *supra* note 455, at 132.

[506] "Competition within labor markets functions differently than competition in product markets as labor markets are 'matching markets' where the employer and the job applicant must 'match' in their preferences."  Johnson Report ¶ 27.

[507] S. Naidu & E.A. Posner, *Labor Monopsony and the Limits of the Law*, 57 J. OF HUMAN RESOURCES S284–S323 (2022).

higher future pay opportunities with one's current employer.[508]  Additionally, benefits do not accrue only to the employee receiving the outside offer.  As I described in my opening report, a structured compensation system, which I documented existed at Defendant firms, has the objective of internal equity.[509]  I also reviewed evidence documenting that the Defendants sought to achieve internal equity and external equity.[510]  Internal equity has two parts:  (1) similar pay for employees in similar jobs/roles with similar performance contributions; and (2) maintaining certain pay differentials based on job title, job level, performance, etc.  Internal equity includes maintaining certain pay differentials between Directors, VPs, and SVPs.  Thus, outside offers that lead to higher pay (at the new or current employer) affect the pay of other employees given that internal equity is the norm and expectation among employees (pay commensurate with contribution) and the goal of the structured compensation system.  As I have noted, outside offers also provide new and highly relevant information on external equity not only to those receiving the offers, but to others as well.

267.    **The Heterogeneity of Labor Market Matching Does Not Negate Harm to Employees from Collusion.**  Dr. Johnson and Dr. McCrary focused on the individualized nature of employee job markets.  For example, Dr. Johnson argues that "the competition for an individual employee's labor will depend on their own background, location, and which job opportunities that employee is qualified for (and would be interested in).  Dr. Gerhart described this dynamic when he testified that, 'each person almost has their own individual market for opportunities.'"[511]  Similarly, Dr. McCrary opined that "the degree to which labor market

---

[508] McCrary Report ¶¶ 66–68, 72–73.

[509] Gerhart Report ¶¶ 121–135.

[510] *Id.* ¶¶ 127–135.

[511] Johnson Report ¶ 26 (citing Gerhart Dep. at 119:14–120:6); *see also* McCrary Report ¶¶ 34–36 & n.38.

competition would have been impacted by the alleged conduct—and, in turn, the degree to which Defendants would have had market power and been able to lower compensation for proposed class members—differs based on a proposed class member's outside employment options, which varied widely across proposed class members. This contradicts Plaintiffs' and Plaintiffs' experts' claims of common impact."[512]  I am not persuaded.

268.  *Labor Markets Involve Two-Way Matching.*  As Dr. Johnson, Dr. McCrary, and I agree, the labor market involves a complex two-way matching process.  For example, Dr. McCrary testified at deposition that "[i]t's also true that the evidence on employer switching that I put forward drawing on the Lightcast data show that heterogeneity, that also might come up."[513]  In other words, if employees were a homogeneous commodity, such matching would not be necessary.  As I explain above, the fact that employees are not homogeneous means that, when an expert identifies what they deem to be a feasible set of alternative jobs/employers, those alternatives may or may not be a good match for an individual employee.

269.  *Collusion Harms Despite Heterogeneity.*  However, it hardly follows from that fact that if employers collude to reduce the number of alternative jobs/employers in that supposed feasible set that the collusion would somehow produce no harm to employees because they are not homogeneous.  Based on Dr. Johnson's own estimate, Defendants at one time comprised 16.8% (1 in 6) of employment in this industry.[514]  It is not possible to argue that collusion has no harmful effect simply because the harmful effect would be smaller for some, larger for others, depending on their individual characteristics.  As I testified at deposition, "get[ting] an opportunity from somewhere else is better than not getting any opportunity from

---

[512] McCrary Report ¶ 29; *see also id.* ¶¶ 42–59, 111.

[513] McCrary Dep. at 156:17–23; *see also* Johnson Report ¶ 27.

[514] Johnson Report ¶ 48.

somewhere else, but it's definitely not as good as getting all opportunities that would have come your way but for some sort of restriction."[515]

270. Additionally, Dr. McCrary's contention that evidence I submitted in my report demonstrating that Defendant firms benchmarked pay at the job level and that benchmark pay can depend on job-specific tasks is inconsistent with Defendants' market power is unavailing.[516] To my knowledge, there is no disagreement that average pay level varies by job and that external benchmarking of pay is done by job. At the same time, there are stable relationships/differentials between the pay levels of jobs, both inside organizations and in the organizations included in the external pay surveys/benchmarking. For example, the percentage difference in base pay between a Director-level job and a VP-level job would not be expected to vary much year to year, either internally or in the pay survey/benchmarking data. That is because changes over time in base pay levels for different jobs are significantly correlated and pay levels of jobs mostly move similarly. In other words, the forces that influence pay level tend to broadly influence the pay level of different jobs similarly. I discuss the interrelated nature of pay levels of different jobs more fully below.

271. *Intraclass Differences Do Not Negate Impact.* I am also not convinced to change my opinion by Dr. McCrary's assertion that I failed to account for "variation among proposed class members in which non-Defendant firms would be alternative employers. Some proposed class members have many non-Defendant alternative employers, whereas others may have fewer."[517] Dr. McCrary's Exhibit 4 shows that Class Members' top five most frequent pre-

---

[515] Gerhart Dep. at 119:14–121:24 ("[S]ome opportunities are better . . . than none, but the best opportunities are when none are restricted.").

[516] McCrary Report ¶ 36.

[517] *Id.* ¶ 42.

Defendant and post-Defendant employers are not identical across job areas.[518] That is not surprising. It would be odd indeed if each of the organizations shown in Exhibit 4 somehow hired exactly the same number of employees in each job area. Further, his Exhibit 5 shows that not all employee moves are within the outpatient care centers (OCCs) or the (broader) "Healthcare Related (non-OCC) industries," however Dr. McCrary defined the latter (and note that no NAICS codes were specified).[519] Again, this is not surprising. What we know is that while employee moves are much more likely to be within-industry, not that all employee moves are within-industry. Although it is difficult to know precise percentages based on Exhibit 5, we can make a few observations. First, green (about 20 percent it appears) indicates the industry is unknown.[520] Pink and orange are healthcare, which appear to account for generally 30 percent to 50 percent of moves, which for purposes of my analysis we can call 40 percent.[521] Thus, of the 80 percent of moves for which we know the industry, about 50 percent (40 percent/80 percent) are within the healthcare industry. To put that in context, in 2015, 13 percent of all employment was in the Healthcare and Social Assistance Industry.[522] Thus, we again see the importance of within-industry employee movement. However, the expected level of within-industry moves between the Defendants did not happen during the conduct period, despite the employment growth and large number of external hires by Defendants during that time period.

---

[518] *Id.* ¶ 43, Ex. 4.

[519] *Id.* ¶ 44, Ex. 5.

[520] *Id.*

[521] *Id.*

[522] *Data Retrieval: Employment, Hours, and Earnings (CES)*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/webapps/legacy/cesbtab1.htm (last visited June 26, 2025).

272.    Moreover, I am not moved by Dr. McCrary's explanation that Class Members' employment options varied based on geography.[523]  Dr. McCrary cites my textbook, *Compensation*, to say that employment options tend to be more national for higher-level jobs like those at issue in this litigation, and more local for lower-level jobs.  That is correct.  However, Dr. McCrary seems to infer that this means Defendants' employees have what he deems to be sufficient alternative employment opportunities such that being foreclosed from employment opportunities at other Defendants is not a problem.  As I have made clear throughout this Rebuttal, I do not agree with that argument, and Dr. McCrary does not provide any basis for it.

273.    *The Argument That Assessing Harm Requires Modeling Employee's Additional Job Opportunities Is Misguided.*  Dr. Johnson also argues[524]:

> [T]o assess if an employee was harmed "directly" by the alleged mobility restrictions, Plaintiffs' experts would have to model the additional job opportunities that would have been available to that employee absent the alleged mobility restrictions and determine if these were "higher-paying external job opportunities" than the opportunities available to that employee in the actual world[.]

Relatedly, Dr. McCrary argues that my assessment of likely harm fails to account for Senior-Level Employees who had fewer additional job opportunities because they:  (1) had unvested equity and self-restricted their mobility; (2) signed non-compete agreements with Defendant employers; (3) were subject to third-party recruiters' non-solicitation agreements with Defendants; (4) had preferences that limited their options; and/or (5) were unqualified.[525]  In response, I provide additional context to explain why the foregoing does not undermine my opinion.

---

[523] McCrary Report ¶¶ 47–51, 58–59.

[524] Johnson Report ¶ 52.

[525] McCrary Report ¶¶ 53–59, 134–145.

274.    First, I documented in my report that unsolicited job offers play a dominant role in employee mobility.[526] The Federal Reserve Bank of San Francisco reported that "more than three-quarters of workers [77.6% based on their Table 1] who switched employers did not report active job search in the previous three months." The report concluded that "a majority of people" in fact "find jobs without ever reporting actively looking for one," and "rather than them [workers] finding jobs, the jobs actually find them."[527] No explanation has been provided for why that would not likewise be the case for employees of DaVita, SCA, and USPI.

275.    Second, I documented in Figure 1 in my report that employees receive a substantial pay increase when they voluntarily change employers, especially higher-level employees.[528] Again, there is no reason to expect something different for DaVita, SCA, and USPI Senior-Level Employees. Of course, not every employee who receives an outside offer must move to increase their pay. As we have noted, they can also use that outside offer to negotiate higher pay at their current employer.

276.    Apparently, the inference Dr. Johnson and Dr. McCrary want to make here is that nobody should worry about the harm to Defendants' employees who were deprived of employment opportunities at the other Defendants,[529] all of whom are within the same 5-digit

---

[526] Gerhart Report ¶¶ 61, 71–72.

[527] *Id.* ¶ 61(d) (citing Carrillo-Tudela, *supra* note 216).

[528] *Id.* ¶ 46, Figure 1.

[529] Dr. Johnson and Dr. McCrary point to the experiences of Plaintiffs Scott Keech and Allen Spradling to argue that Class Members had different outside opportunities available to them. Johnson Report ¶ 40; McCrary Report ¶ 41. But Keech and Spradling proceeded to sign up as Named Plaintiffs to sue Defendants for colluding to restrict their job mobility. This would strongly suggest that they feel harmed by Defendants' conduct, and that though they took positions at non-Defendant firms, these positions were not their first choices. Indeed, Spradling testified that if DaVita had offered him a job while he was at SCA, he would have been interested in that opportunity. Spradling Dep. at 289:12–18.

NAICS industry Other Outpatient Care Centers.[530] We have seen that employer changes within 5-digit industries are much, much more likely than moves outside of a 5-digit industry. That increased movement within 5-digit industries is likely because that 5-digit industry is where employees find the best matching and most desired jobs for themselves, given that much human capital is industry-specific, especially for higher-level/higher-paid employees.[531] Dr. Johnson reported that the three Defendants accounted for a substantial share (16.8%, or 1 in 6 jobs) of this industry.[532] There is substantial evidence that Defendants believed each other's employees would be good matches, as discussed above and as demonstrated by the fact that that Defendants established their No-Poach Agreements in anticipation (one presumes) of likely increased employee movement between them. Thus, the low number of moves between Defendants can be interpreted instead as a result of restrictions on their movements.

277. _Removing Industry-Specific Opportunities Has an Impact._ Dr. Johnson refers to Kaiser Permanente as an alternative employer for Class Members.[533] Kaiser Permanente is in the same 5-digit industry (NAICS 62149, Other Outpatient Care Centers) as the Defendants.[534]

---

[530] Johnson Report ¶ 48 n.104.

[531] Gerhart Report ¶ 61(f) (citing Richard P. Castanias & Constance E. Helfat, *The managerial rents model: Theory and empirical analysis*, 27 J. MGMT. 661–678 (Nov.–Dec. 2001); John K. Mawdsley, & Deepak Somaya, *Employee Mobility and Organizational Outcomes: An Integrative Conceptual Framework and Research Agenda*, 42 J. MGMT. 85–113 (Nov. 19, 2015); Derek Neal, *Industry-specific human capital: Evidence from displaced workers*, 13 J. LAB. ECON. 653–677 (Oct. 1995)).

[532] Johnson Report ¶ 48.

[533] *Id.* ¶¶ 36, 39, 42.

[534] *Profile Page*, NAICS (July 1, 2022), https://www.naics.com/company-profile-page/?co=16124; Code Description, NAICS, https://www.naics.com/naics-code-description/?code=62149 (last visited June 26, 2025).

In 2016, Kaiser Permanente had 192,607 employees.[535] Based on Dr. Johnson's Exhibit E-1, the Defendants had 105,733 employees and industry NAICS 62149 had 629,192 employees.[536] If we remove only Kaiser Permanente, Defendants' share of employment in the industry rises from 16.8% to 24.2% [105,733/(692,192-192,607)]. That is 1 in 4 jobs in the industry. It is also interesting to note that Kaiser Permanente operates in only 9 states.[537] In contrast, for example, SCA and USPI each operate in 35 states.[538] Even for jobs where moves can be national, geographic constraints of some employees (in addition to other labor market frictions) still effectively eliminates some potential alternative employers from consideration, as Dr. McCrary points out.[539]

278.    Further, as noted earlier, given the growth in the number of Class Members at the Defendants, one would have expected commensurate growth in the number of employee moves between Defendants. We did not see that. That lack of commensurate growth in employee movement exists despite the potential for turnover contagion due to the personal connections between Defendants,[540] which would have ordinarily been expected to further increase moves between Defendants during the conduct period. This disconnect between expected growth in mobility between Defendants and the actual (lack of) growth in mobility is compelling and,

---

[535] *Number of Kaiser Permanente Employees from 2007-2023*, STATISTA, https://www.statista.com/statistics/403098/kaiser-permanente-employee-numbers/ (last visited June 26, 2025).

[536] Johnson Report, App. E at 1, Ex. E-1.

[537] *Our Company*, KAISER PERMANENTE, https://about.kaiserpermanente.org/who-we-are/fast-facts (last visited June 26, 2025).

[538] Gerhart Report ¶¶ 13–15.

[539] McCrary Report ¶ 145.

[540] *See, e.g.,* Gerhart Report ¶¶ 38–40.

-115-

combined with the qualitative evidence I have provided, points to the impact of the No-Poach Agreements.

279.     This is true despite the presence of employee non-compete agreements with Defendant firms and Defendants' non-solicitation agreements with third-party recruiters.[541] As Dr. McCrary acknowledges, Non-Defendant employers also use such agreements, and accordingly are not any easier or harder to move to.[542] Additionally, Dr. McCrary's argument is particularly unavailing given that he expressly disclaims any "view as to the enforceability of the non-competes that were relevant for proposed class members."[543]

280.     I am also not persuaded to change my opinion by Dr. McCrary's argument that individualized inquiry would be necessary to quantify harm.  He wrote, "[I]ndividualized inquiry would be necessary to reliably quantify harm because it would be important to understand for which proposed class members the recruitment and hiring limitations imposed by external search firms would have restricted mobility between Defendants thus rendering the alleged mobility restrictions partially or entirely irrelevant."[544] Not only does the McCrary Report put forth evidence demonstrating that Defendant firms only used the external search firms for certain

---

[541] McCrary Report ¶¶ 136–141.

[542] McCrary Report ¶ 126, n.261 (citing Tanner Dep. at 56:3–57:24 (third-party Catapult recruiter Jimmy Tanner testified that such non-solicitation agreements are "common in the industry"); Schultz Dep. at 11710–119:8 ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████. *See also* LABOR MARKET COMPETITION, *supra* note 38, at 1 ("[A] recent paper estimates that one-in-five workers is currently subject to non-compete agreements and double that number report having been bound by a non-compete agreement in the past.").

[543] McCrary Report ¶ 136 n.252.

[544] *Id.* ¶ 141.

-116-

positions,[545] but the non-solicits were established by contractual agreements between Defendants and the third-party recruiters,[546] and as such are evidence common to the Class.

281.     Finally, my assessment of Defendants' market power undermines Dr. McCrary's contention that the harm would be individualized.  While it is true that Defendants' conduct may harm some Class Members more than others, it strains credulity to argue that market power does not reduce valuable outside employment opportunities for all or nearly all Class Members.  As such, my testimony is unchanged.

282.     **Actual Alternate Job Offers Are Not the Only Harm Flowing from Collusion.** Lastly here, it bears repeating that it is not only that mobility is restricted.  Where there is a No-Poach Agreement, unsolicited offers do not happen.  An offer can result in a move.  However, just as important, it can result in negotiation of a counter-offer of higher compensation to stay. Thus, the harm to the Class is not fully captured by the reduction in employee mobility between the Defendants.  Further, it is not just the employees who do not receive offers and thus do not receive higher compensation by either moving to the other employer or negotiating a counteroffer to remain.  Another uncaptured form of harm is to the employees who would not have received outside offers, but who would have benefited from their peers receiving outside offers.  These benefits would accrue by virtue of the importance of internal equity comparisons among employees, which are also reflected in the design of structured compensation systems, which are found at the Defendants.  These outside offers also provide uniquely valuable information to other employees on how externally equitable their pay is and on potential higher

---

[545] *Id.* ¶ 141 n.273 (citing Chipman Dep. at 98:5–13 (DaVita infrequently used external recruiting agencies for Director-level positions); Sandoz Dep. at 27 (SCA's use of external recruiters varied)); *see also id.* ("At USPI, the use of external recruiters varied by position.").
[546] *Id.* ¶ 141.

-117-

paying external opportunities for them.  I am therefore not persuaded by Dr. McCrary's claim that Defendants' conduct would not have harmed (1) USPI and DaVita Senior-Level Employees who would not have considered job opportunities at SCA, (2) Class Members who did not engage with proactive recruiting attempts, (3) Class Members with non-compete agreements and/or unvested equity, and (4) Class Members impacted by Defendant firms' non-solicitation agreements with external search firms.[547]

283.    *Empirical Analysis.*  Dr. Johnson and Dr. Saravia object that my opinions are unfounded because I did not perform a quantitative analysis of Defendant Senior-Level Employee departures to non-Defendant firms.[548]  In my opinion, such an analysis is unnecessary and does not change my opinion.  In fact, Dr. Johnson and Dr. Saravia's focus on quantitative analysis misses the point:  the issue is not whether Class Members would have been paid more elsewhere.  Instead, the issue is what Class Members would have been paid in a labor market where competition was not artificially and significantly constrained by the actions of Defendants.

284.    Defendants' Hiring from Non-Defendant Companies Does Not Undercut My Opinions.  Defendants' Experts opine that I neglected to consider data showing that Defendants hired many employees from non-Defendant companies during the Class Period, which contradicts my conclusions.[549]  Defendants' Expert Reports have not caused me to change my opinion that the No-Poach Agreements would likely harm all or nearly all Senior-Level Employees.[550]

---

[547] McCrary Report ¶¶ 107, 130–144.

[548] Johnson Report ¶ 33; Saravia Report ¶ 75.

[549] Johnson Report ¶¶ 37–43; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 115–128; Stiroh Report ¶¶ 22–55.

[550] Gerhart Report ¶¶ 84–87.

285.    *Benchmarking Spreads Artificial Pay Suppression to Other Firms.*  Defendants'
Experts contend that Defendants would have had to offer candidates from non-Defendant firms
competitive pay rates to successfully hire them, and accordingly could not have suppressed new
hire pay.[551]  In turn "there would have been upward pressure on the pay structure" that "could
potentially entirely offset, or at a minimum insulate against, any downward pressure on
compensation stemming from the alleged mobility restrictions[.]"[552]  I disagree.

286.    First, this argument assumes that it is easy for employees to generate offers and to
maximize their own pay.  As discussed above, in realty, it is much harder for employees to do
these things.

287.    Further, in my report, I found that Defendants, and most other companies,
benchmark their internal pay levels to external market pay data, and then price non-benchmark
jobs based on this data.[553]  This benchmarking would play out as mutually-reinforcing pay
suppression.  Competitors who benchmarked against Defendants' artificially-depressed pay rates
would be able to safely lower their own pay rates.[554]  Moreover[555]:

> [G]iven the evidence that Defendants benchmark their data to external sources, to
> the extent that pay is lowered at other firms through anti-competitive conduct, the
> market data Defendants use for their own structures will be lower.  This will cause
> widespread effects because Defendants' own pay levels will be lower than they
> would be in the absence of such conduct.

288.    In other words, competitor benchmarking practices would permit Defendant firms
to suppress pay rates market-wide, and not merely firm-wide.  Accordingly, Defendants' conduct

---

[551] Johnson Report ¶¶ 42–43, 92–93; Saravia Report ¶¶ 194–196, 285; McCrary Report ¶¶ 33 & n.35, 107–112, 115–128; Stiroh Report ¶¶ 41, 46.

[552] Johnson Report ¶¶ 92–93; McCrary Report ¶¶ 263–267.

[553] Gerhart Report ¶ 115.

[554] *Id.* ¶ 115(f)(iii).

[555] *Id.* ¶ 146.

would have made it *easier* to hire employees from non-Defendant organizations at suppressed pay rates, not harder, as Dr. Johnson and Dr. Saravia attempt to argue.[556] It would also enable competitors to hire Class Members at lower rates than they would have in an unrestricted market, which refutes Dr. McCrary's contention that "competition stemming from [Class Members'] outside employment options would apply upward pressure to the pay of Defendants' workers" that offsets any downward pressure from the No-Poach Agreements.[557] These effects would then cascade via Defendants' wage structures, discussed below.

289. Finally, Dr. McCrary argues that the foregoing is not credible because "it would imply that Defendants would have struggled to fill positions and maintain adequate staffing. Empirical evidence in this case points to the opposite conclusion. Exhibit 21 below shows that Defendants' employee counts grew substantially during the Class Period."[558] But it is entirely possible that Defendants' employee counts would have grown *more* if Defendants' conduct had not suppressed pay during the Class Period, and Dr. McCrary does not put forth any evidence to the contrary.

290. *Not All Companies Are Created Equal.* Moreover, Defendants' Experts did not submit any evidence that Defendants considered non-Defendant organizations equally attractive sources of recruits. Their quantitative analyses of Lightcast data regarding Defendants' hiring practices therefore do not change my assessment that Defendants' conduct would have harmed

---

[556] Johnson Report ¶¶ 42–43, 92–93; Saravia Report ¶¶ 194–196.
[557] McCrary Report ¶¶ 266–267.
[558] *Id.* ¶ 122, Ex. 21.

all or nearly all Class Members.[559]  Moreover, their critique that I did not perform a quantitative analysis of my own likewise falls flat.[560]

### C. Defendants' CSI Exchanges Likely Restricted Labor Market Competition.

291.    In my report, I applied my review of common evidence and my experience and research in compensation and human resource management to determine that Defendants' Exchanges of Competitively Sensitively Information would likely cause Class-wide pay suppression.[561]  I then provided an overview of the evidence demonstrating that, though Defendants concealed this conduct as legal benchmarking, such CSI Exchanges are inconsistent with unilateral conduct and would have harmed Class Member pay.[562]  Below, I assess Defendants' Experts' testimony and determine that they have not convinced me to alter my opinions.[563]

292.    CSI Exchanges Generally.  I previously provided an overview of Defendants' years-long CSI Exchanges as background in support of my assessment that this conduct is consistent with collusion and would reduce employee pay.[564]  Defendants' Experts' objections to my analysis miss the mark.

293.    *Specific Position Data.*  Dr. Johnson's contention that the evidence I submitted of an exchange between SCA and USPI regarding compensation information for an "internal audit"

---

[559] Johnson Report ¶¶ 37–43; Saravia Report ¶¶ 70–103; McCrary Report ¶¶ 37–58; Stiroh Report ¶¶ 32–35, 37–42.

[560] Johnson Report ¶ 43; Saravia Report ¶ 75; McCrary Report ¶ 35; Stiroh Report ¶ 20(a)(i).

[561] Gerhart Report ¶ 82.

[562] *Id.* ¶ 82.

[563] Johnson Report ¶¶ 98–127; Saravia Report ¶¶ 133–167; McCrary Report ¶¶ 147–183; Stiroh Report ¶¶ 107–117.

[564] Compl. ¶ 92.

position does not show that Defendants actually shared any information is wrong.[565] In the relevant email exchange, SCA clearly tells USPI that its single VP who leads both SCA's compliance and audit departments has a base salary of $175,000 and 40% bonus potential.[566] SCA also shares that an employee in a Director position "who focuses solely on audit which is probably the relevant position to compare to" "has a base of $103k with potential bonus of 25%."[567]

294.  Dr. Johnson claims that a May 2012 wage data exchange I analyzed concerns an SCA legal department employee, who is not a Class Member.[568] Like Dr. Johnson, Dr. Saravia objects that the evidence I submitted showing an exchange between USPI and SCA regarding compensation data for an employee in SCA's legal department is inconsistent with my analysis, because Defendants' legal personnel are not Class Members.[569] Dr. McCrary makes this same point.[570] Dr. Saravia makes a similar objection with respect to a document that shows salary and bonus data for three non-Senior-Level Employees,[571] and Dr. McCrary does the same with respect to the SCA-USPI CSI Exchange regarding compensation information for an "internal audit" position, discussed above.[572] To clarify, I understand Plaintiffs are not seeking damages on behalf of employees in Defendants' legal and compliance departments. Rather, I have submitted this testimony as background in support of my assessment that SCA and DaVita

---

[565] Johnson Report ¶ 98 (citing Ex. PX523).

[566] Ex. PX523 at OMC_BM_000010778.

[567] *Id.*

[568] Johnson Report ¶ 99 n.212 (citing Ex. PX234).

[569] Saravia Report ¶ 161.

[570] McCrary Report ¶¶ 168, 174.

[571] Saravia Report ¶ 161.

[572] McCrary Report ¶¶ 168 n.336 (This evidence "may pertain to a class position for USPI but may pertain to a position in an excluded department for SCA."), 174.

exchanged CSI, and these exchanges are inconsistent with unilateral conduct.  Moreover, pursuant to my analysis that Defendants' wage structures would cause cascading pay effects, wage exchanges as to non-Class Members would still impact Class Member pay.

295.    *Regular Practice.*  I found that the evidence is consistent with SCA and DaVita beginning their CSI exchanges by at least 2009,[573] and though I did not form an opinion as to an end date, I noted that Plaintiffs' counsel are seeking to certify a Class of employees who worked for DaVita and SCA until December 31, 2019.[574]  In response, Dr. Johnson contends that I wrongly assumed that the SCA-DaVita CSI Exchanges occurred throughout the entire Class Period, based on former SCA CEO Hayek's testimony that SCA and USPI exchanged this information "maybe a couple" of times.[575]  Dr. McCrary also contends that because "the cadence of the information sharing was irregular," the CSI Exchanges "would not be sufficient to suppress pay" Class-wide.[576]  I disagree.

296.    The foregoing argument is problematic because of persisting effects of pay suppression that I explained in my report[577]:

> [T]he issue is that, even in some subset of the years, if you were able to suppress compensation, that that effect would likely persist for some time into the future . . . [and] suppression in any year, even one year, could have persisting effects such that pay would be lower into the future.

297.    Dr. Johnson and Dr. McCrary also ignore evidence I analyzed that in 2018, SCA's then-CDO Brian Mathis emailed other SCA executives that SCA and USPI had exchanged confidential corporate overhead budget costs, including salary costs broken out by each

---

[573] Gerhart Report ¶ 23.

[574] *Id.* ¶ 5.

[575] Johnson Report ¶¶ 99 (citing Hayek Dep. at 362:8–363:7), 96.

[576] McCrary Report ¶¶ 149, 151, 162, 165, 169, 171, 177.

[577] Gerhart Dep. at 174:19–175:11.

administrative department, *approximately every two years since 2008.*[578]  This evidence undermines the argument that these data exchanges were not a regular practice throughout the Class Period.  It also dismantles Dr. McCrary's objection that "USPI's and SCA's ability to use this information to coordinate on pay was further hindered because according to Defendants' employees, these data were not easily comparable between USPI and SCA due to differences between USPI and SCA in the classification of departments and expenses."[579]  If the data was so useless, why bother exchanging it for a decade?

298.     By ignoring the foregoing, Dr. Johnson and Dr. McCrary misconstrue my opinion to suggest that, in my view, the only harmful exchanges pertained to merit budgets and individual-specific compensation data.[580]  Discussed below, their interpretation is overly narrow and does not account for the harmful effects of sharing other wage-related data, such as salary budgets, which, as I previously explained, USPI used to facilitate its cost reduction efforts, which would have included its largest expenditure:  employee pay.[581]

299.     *Limited Evidence Is Unsurprising.*  Defendants' Experts object that I have only produced limited evidence to support my opinions regarding Defendants' CSI Exchanges.[582]  Dr. Johnson, Dr. McCrary, and Dr. Stiroh also argue that, in some of the examples I provided, Defendants only discussed whether to share compensation information, but I did not put forth

---

[578] Gerhart Report ¶ 82(f) (citing Ex. PX501 at SCA002277742; Mathis Dep. at 43:19–47:8).

[579] McCrary Report ¶ 167.

[580] Johnson Report ¶ 99; McCrary Report ¶ 168.

[581] Gerhart Report ¶ 83(c) (citing Mathis Dep. at 53:5–63:5, 66:5–76:6; Ex. PX232; Ex. PX37; Kopser Dep. at 32:3–38:2, 105:5–108:9; Cagle Dep. at 119:24–120:23; Ex. PX240 at USPI_CIV_000686081).

[582] Johnson Report ¶¶ 99, 121–123; Saravia Report ¶ 155; McCrary Report ¶¶ 147–148, 174; Stiroh Report ¶¶ 110–111.

evidence to show that Defendants actually followed through.[583]  (Though Dr. McCrary did admit at deposition that certain documents did "appear[] to indicate" that there were "some examples of information at an aggregate level that were shared[.]"[584])  Dr. Johnson and Dr. McCrary also contend that I neglected to identify any evidence showing that DaVita and SCA exchanged information relating to individual jobs.[585]  Further, Dr. McCrary objects that some of the evidence "only supports the notion that information was shared in one direction[.]"[586]  But the fact that Defendants have not produced extensive evidence of these exchanges is unsurprising and consistent with my assessment of the conspiracy, given that generally, collusion is a secretive matter.  Defendants did not deviate from this norm.[587]

300.    Secrecy was a concern and a goal.  For example,



[588]

[589].

---

[583] Johnson Report ¶¶ 99, 121–123; McCrary Report ¶¶ 147–148, 168, 172; Stiroh Report ¶¶ 110–112.

[584] McCrary Dep. at 169:23–170:20; *see also* Rucker Dep. at 260:11–20 (former SCA COO Rucker testified that when he obtained merit pool information from SCA and USPI, it was a mutual exchange).

[585] Johnson Report ¶ 123; McCrary Report ¶¶ 173–174.

[586] McCrary Report ¶ 169.

[587] *See, e.g.,* DVA_OMCEAL_000385858 (When Hayek poached Rucker in 2008, Thiry emailed DaVita's then-SVP Rodriguez to ask, "[S]hould we do anything?" in response, and instructed Rodriguez to "Pls send thoughts on vm [voicemail]" instead of by email, likely to avoid a written record.).

[588] Kogod Dep. at 80:12–86:9; Ex. PX157 at 83:2–24 (Kogod's testimony at the DaVita criminal trial); Ex. PX313 at DOJCIV-008-00000190–191 (                                             ).

[589] Kogod Dep. at 80:12–81:6.



301. ██████████████████████████████████████████

████.[590] Indeed, ████████████████████████████████████████

██████████████████████████████████[591] Former DaVita Rx General

Manager Josh Golomb confirmed the existence of this policy and testified at deposition that it

included a practice of copying legal counsel in order to "invok[e] . . . attorney-client

privilege."[592]

302. Moreover, it is my understanding that, during the fact discovery period, Plaintiffs'

counsel became concerned that SCA had destroyed relevant documents pertaining to the CSI

Exchanges. For example, whereas USPI produced certain documents documenting exchanges of

propriety wage information, SCA never produced those same emails.[593] The fact of these

missing documents corroborates my opinion that colluding parties generally make efforts to

conceal their unlawful conduct. I have assessed the evidence that I know exists. Defendants'

Experts have not convinced me that there is no other evidence that once existed, but now does

not. Moreover, Dr. McCrary testified that he is not "offering any opinion" about whether "the

agreements that are alleged in this case [were] in writing or oral[.]"[594]

303. Finally, Dr. Stiroh fails to cite compelling evidence in support of her contention

that the evidence does not demonstrate that SCA and DaVita always complied with each other's

---

[590] *Id.* at 81:7–10.

[591] Ex. PX313 at DOJCIV-008-00000190.

[592] Golomb Dep. at 41:18–42:17; *see also* Ex. PX313 at DOJCIV-008-00000191 ██████
███████████████████████████████████ .

[593] Pls.' Mot. to Compel SCA to Perform Supp. ESI Search (ECF. No. 419) at 1.

[594] McCrary Dep. at 136:9–14.

requests for CSI.  She cites only to deposition testimony wherein co-conspirators claim that they cannot remember much about the CSI Exchanges, not that they never happened.[595]  This is hardly convincing.  As such, my opinions are unchanged.

304.    CSI Exchanges Would Likely Successfully Reduce Class Pay.  In my report, I testified that, based on my experience and review of the evidence, Defendants' CSI Exchanges were likely to suppress Class pay.[596]  Defendants' Experts object that I have not offered sufficient supporting evidence, because Defendant firms lacked market power, the economic conditions necessary to facilitate a successful cartel were not present, and Defendants did not have a mechanism to prevent cheating.[597]  Below, I demonstrate why the foregoing rebuttals are unpersuasive, not well-founded, misinterpret the evidence, and do not change my opinions.

305.    *Market Power.*  Defendants' Experts argue that I have failed to demonstrate that Defendants had monopsony power, such that their CSI Exchanges would not have harmed employees' job and pay outcomes.[598]  Their arguments fall flat.

306.    Discussed at length above, Defendants do exert monopsony power in their employee labor market, as many employers do.[599]  In fact, according to economist David Card, a "widespread lack of competition has become the consensus view in economics."[600]

---

[595] *See* Stiroh Report ¶¶ 110–111.

[596] Gerhart Report ¶ 83.

[597] Johnson Report ¶¶ 100–127; Saravia Report ¶¶ 138–167; McCrary Report ¶¶ 147–183; Stiroh Report ¶¶ 11–45, 107–117.

[598] Johnson Report ¶¶ 109–110; Saravia Report ¶¶ 70–103, 140, 144; McCrary Report ¶¶ 107–112, 151, 177–178; Stiroh Report ¶¶ 11–45.

[599] LABOR MARKET COMPETITION, *supra* note 38, at 1.

[600] *Id.* at 2.

307. Defendants' Experts' testimony regarding labor competition from non-Defendant employers for Defendant employees and evidence that Defendants hired non-Defendant employees therefore does not undermine my assessment.

308. *Single Price.* Dr. Johnson and Dr. Saravia argue that unless the product that is the subject of the collusion is homogeneous (i.e., the product has "a single price to fix"), the cartel cannot fix the price.[601] In their view, this crucial criteria is unmet here, where Defendants employ many different types of employees, and compensation includes various components.[602] This premise is wrong as a matter of economics and is otherwise illogical.

309. **No Single Price for Labor.** Dr. Johnson's and Dr. Saravia's analyses here wrongly treat product markets and labor markets as indistinguishable. As discussed above, the widely-accepted economics literature instructs, and Dr. Johnson and Dr. Saravia agree, that these markets are very different.[603] While there is often a single product price, there is generally not a single price for labor, as the 2022 U.S. Department of Treasury report explains[604]: "[L]abor markets are very different than some product markets, like commodity markets, where the product is relatively homogeneous, and buyers are usually indifferent to who is selling and vice-versa. In the labor market, both buyers (firms) and sellers (workers) take great interest in their counterpart's characteristics." This is borne out by evidence in the McCrary Report showing that according to former SCA Chief Talent Officer Fanning, "there's a lot of complexity involved" in setting pay: "You're looking at judgment; you're looking at the individual; you're looking at

---

[601] Johnson Report ¶¶ 102–105; Saravia Report ¶¶ 165–167.

[602] *Id.*

[603] Johnson Report ¶ 27; Saravia Dep. at 75:4–76:8.

[604] LABOR MARKET COMPETITION, *supra* note 38, at 3.

skills; you're looking at market data. You're making it sound like you get market data and the machine sets it. And it doesn't work that way at all."[605]

310. **Variable Compensation.** Defendants' Experts also contend that Defendants paid compensation with various components, such as base salary, bonuses, and equity, and could only have successfully fixed wages if they fixed every component.[606] Their analyses are inconsistent with the economics.

311. As I discuss in detail below, common evidence submitted by both Dr. Johnson and Dr. Saravia shows that base pay accounted for the majority of direct pay at all three Defendants. Thus, the higher (lower) the merit increase budget, the more (less) labor costs would be. This is contrary to Dr. McCrary's claim that at Defendant firms, "a high share of pay is skewed towards bonuses and equity."[607]

312. Finally, these arguments defy common sense. If employees and jobs comprise one large homogeneous market where jobs/employers and employees are perfect substitutes for each other, then Defendants would have exchanged CSI with non-Defendant employers, including those Defendants' Experts identified as Defendants' competitors. Unsurprisingly, Defendants' Experts do not try to make this point and also do not try to explain this inconsistency. As such, I have no cause to change my opinions.

313. *Long-Lasting Coordination Mechanism.* Dr. Johnson and Dr. Saravia contend that Plaintiffs' allegations that Defendants' CSI Exchanges occurred over nearly twelve years undermines my opinion.[608] Specifically, they and Dr. McCrary contend that I did not provide

---

[605] McCrary Report ¶ 64 & n.122 (citing Fanning Dep. at 176:16–177:1).
[606] Johnson Report ¶¶ 104–105; Saravia Report ¶¶ 165–167; McCrary Report ¶¶ 151, 155, 175, 177, 181–182; Stiroh Report ¶ 112.
[607] McCrary Report ¶ 182.
[608] Johnson Report ¶ 106; Saravia Report ¶¶ 166–167.

evidence of a mechanism by which Defendants could suppress pay during years when no exchanges occurred.[609]  Moreover, Dr. Saravia, Dr. McCrary, and Dr. Stiroh assert that I did not sufficiently provide evidence that Defendants exchanged forward-looking wage data, and Dr. Saravia further objects that I did not account for organizational compensation changes.[610]  I disagree.

314.    Evidence that both Dr. Saravia and Dr. McCrary included in their testimony supports my opinions:  USPI emailed SCA in 2012 to confirm that USPI was expecting its "typical" 2-3% merit increases for 2013.[611]  (And note that according to evidence put forth by Dr. McCrary, USPI's then-CEO Wilcox did ultimately seek approval for a 3.3% average merit increase for senior officers, and a 2.3% average increase for employees at the VP-level and above.)[612]  This exchange of percentage merit increase is precisely an example of an exchange of forward-looking wage data.  That USPI referred to this increase as "typical" is also evidence that USPI's merit increases did not vary significantly year-to-year, despite organizational compensation changes.  In other words, USPI gave SCA the ability to predict USPI's forthcoming merit increases with a high degree of certainty, even if they did not explicitly exchange that information every year, and even if the organization modified its pay structure.

315.    The foregoing is also consistent with evidence I analyzed in my report showing that labor market pay stayed relatively flat over the Class Period.  Recall ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[609] *Id.*; McCrary Report ¶¶ 162, 164, 179.

[610] Saravia Report ¶¶ 166–167; McCrary Report ¶¶ 162, 169; McCrary Report, Ex. 24; Stiroh Report ¶ 109.

[611] Saravia Report ¶ 159 and McCrary Report ¶ 170 (citing Ex. PX489).

[612] McCrary Report ¶ 77 (citing USPI_CIV_000121836 at USPI_CIV_000121836).

██████████████████████████████████████████████ [613] As such, the evidence is consistent with Defendants' ability to coordinate compensation over an extended period of time.

316. **Effects in Product Market.** Finally, Dr. Johnson objects that I failed to account for the complexity of the alleged conspiracy because I did not address the impact Defendants' collusion would have on the product market.[614] His testimony is deficient and unconvincing.

317. Dr. Johnson ignores my opinions explaining that Defendants are incentivized to collude in part because of the relationship between the labor and product/services market.[615] Previously, I explained that companies must avoid paying its employees too much, which will increase their labor costs and either directly suppress profits, or which are passed on to customers as higher prices.[616] In turn, higher prices reduce market demand, which in turn reduces profits.[617] Paying too little is also problematic due to lowered employee quality, which in turn yields lower-quality services and/or products, which thereby reduces market demand, the price customers are willing to pay, and company profits.[618] But if competitors can collude to suppress labor market competition without risking turnover or loss of employee morale from perceived external inequity, Defendants can reduce their labor costs without consequences to the product/services market.[619]

318. Moreover, Dr. Johnson's statement is true only in a perfectly competitive market, which does not exist here.

---

[613] Gerhart Report ¶ 92 (citing DOJCIV-008-00000345 at DOJCIV-008-00000347).

[614] Johnson Report ¶ 108.

[615] Gerhart Report ¶¶ 56–57.

[616] *Id.* ¶ 56.

[617] *Id.*

[618] *Id.*

[619] *Id.* ¶ 57.

319.    <u>Non-Defendant Employers and Employees.</u>  Defendants' Experts argue that I wrongly ignored non-Defendant employers' competition for Defendants' employees.[620]  Dr. Johnson, Dr. Saravia, and Dr. McCrary also contend that I failed to explain how Defendants could have prevented other employers from bidding up compensation, which would have put upward pressure on Defendants' pay structures and offset downward pressure from the CSI Exchanges.[621]  I am unconvinced.

320.    In their arguments, Dr. Johnson and Dr. Saravia seem to have forgotten their own acknowledgements that labor markets do not operate as product markets.[622]  Thus, both note that there are frictions and costs to changing employers.  Dr. Johnson suggests this is especially true in the short run (an undefined number of years).[623]

321.    I noted earlier that frictions include limits of information on what actual alternative jobs are available externally, how much they would improve on what they have in their current job, and the risk/uncertainty of making a move to find out, the only way to know for sure.  Combined with the fact that there is no discernible single market pay rate[624] and that Defendants had market power (which need not affect all potential employers),[625] it becomes difficult to envision an immediate mass exodus of Defendants' employees to alternative

---

[620] Johnson Report ¶¶ 109–110; Saravia Report ¶¶ 70–103, 144; McCrary Report ¶¶ 121–128, 263–267; Stiroh Report ¶¶ 107, 112.

[621] Johnson Report ¶¶ 109–110; Saravia Report ¶¶ 70–103, 144; McCrary Report ¶¶ 121–128, 263–267.

[622] Johnson Report ¶ 27; Saravia Dep. at 83:22–84:17.

[623] Johnson Dep. at 190:9–191:6.

[624] *Id.* at 267:11–16.

[625] *See also* LABOR MARKET COMPETITION, *supra* note 38, at 3 ("To illustrate the contrast between competition and market power, consider this question:  If an employer cut their wages by 5 percent, what fraction of their workers would quit?  In a perfectly competitive market, all workers would leave.  Yet, we know that is not true in practice—indicating that many employers have some degree of market power.").

employers (and certainly not to Defendant co-conspirators) in response to lower annual merit increase budgets. However, these lower annual merit increase budgets would certainly have saved the Defendants a substantial amount in labor costs, especially as the savings accumulate over time.

322. Otherwise, for the same reasons as explained above, evidence of non-Defendant employer competition and Defendants' need to hire non-Defendant employees is not inconsistent with my opinions.

323. Defendants Had a Mechanism to Prevent Cheating. Defendants' Experts further contend that my analysis is deficient because I did not adequately show that Defendants had a mechanism to monitor and enforce their wage-fixing agreement and prevent cheating.[626] This contention is inaccurate and does not change my opinion.

324. In my report, I described many documents reflecting that Defendants, and in particular former DaVita CEO Thiry, used various tactics to monitor and enforce their No-Poach Agreements, including threats of retribution.[627] Likewise, the Saravia Report also includes evidence showing that Defendants enforced the antitrust conspiracy against each other. This evidence shows that USPI admitted that its former CEO Wilcox and former SCA CEO Hayek communicated with each other about the SCA-USPI No-Poach Agreement, and both monitored and enforced the terms.[628] Accordingly, Defendants' key co-conspirators already had open channels of communications that could be used to enforce a wage-fixing agreement. Moreover,

---

[626] Johnson Report ¶¶ 101, 106, 111; Saravia Report ¶¶ 142–143, 146–147; McCrary Report ¶¶ 151, 163; Stiroh Report ¶ 112.

[627] Gerhart Report ¶¶ 12 (citing Ex. DOJCIV-008-00000090 at DOJCIV-008-00000091 (███████████████████████████████████████), 22(a) n.25 (citing Thiry Dep. at 145:23–146:7; Hayek Dep. at 93:7–95:14, 11:4–115:1 and Ex. PX304), 73–76.

[628] Saravia Report ¶ 14.

this assessment is consistent with evidence I provided in my report regarding the incestuous nature of the industry and the CEOs' close personal relationships and regular interactions.[629] Defendants' Experts ignore this evidence.

325.     Moreover, Defendants' Experts fail to account for the fact that there would be no benefit to cheating on wage-fixing agreements where Defendants also maintained No-Poach Agreements which suppressed labor market competition, and which obviously mitigate incentives to cheat on the wage-fixing.  There is much less incentive to deviate if the shared goal is to reduce costs, as opposed to in a product market cartel, where the goal is to maximize profits from selling a particular product.[630]  As such, I have no cause to change my opinion.

### D.     Defendants' No-Poach Agreements and CSI Exchanges Harmed Employee Compensation.

326.     In my report, I explained that based on my experience and research in the compensation and human resource management spaces, my opinion is that the common evidence I analyzed regarding Defendants' collusion is consistent with harm to Class Members' compensation.[631]

327.     Dr. Johnson argues that I am unable to show Defendants could have fixed employee compensation where I did not demonstrate that Defendants restricted demand for labor, and where the data shows that Defendants expanded Senior-Level Employment during the Class Period.[632]  Similarly, Dr. Stiroh argues that "[t]here is no economic evidence of reduced

---

[629] Gerhart Report ¶ 40.

[630] This also refutes Dr. McCrary's argument that presuming "Defendants would have cheated on any argument they reached to fix salary pay because they could earn more profits by doing so, the effects of the alleged information sharing would vary across proposed class members and would require individualized inquiry to quantify."  McCrary Report ¶ 183.  It is not clear how paying more would increase profits, and Dr. McCrary does not attempt to explain.

[631] Gerhart Report ¶¶ 84–87.

[632] Johnson Report ¶ 107.

employment of Senior-Level employees by DaVita during the conduct period, which is inconsistent with Dr. Starr's assertion that Defendants' alleged conduct meaningfully suppressed employee mobility or compensation."[633] Their testimony does not compel me to change my own.

328. By Dr. Johnson's and Dr. Stiroh's logic, pay should have increased dramatically given Defendants' dramatic increase in employment and demand for employees. But it did not.[634] Dr. Johnson states that "during the relevant period, all three companies expanded employment within the jobs allegedly targeted by the wage fixing conspiracy—the opposite of what one would expect if they were 'suppressing' wages."[635] The Stiroh Report echoes that "Plaintiffs and their experts fail to demonstrate that employment levels decreased at DaVita compared to what they otherwise would have been, nor do they address the implications of the fact that DaVita grew substantially during the purported conduct period."[636] In, response, I note that: Labor cost = Labor cost per employee x Number of employees.

329. Most businesses welcome an increase in product demand and find it necessary, all else equal, to hire more employees to do so. However, labor costs can be controlled somewhat by keeping labor cost per employee (average pay) as low as possible, conditional on having enough sufficiently qualified employees. That is more achievable to the degree competition for employees from other companies is restricted. Another avenue for employers seeking to keep labor costs low is to lower their employee hiring standards.

---

[633] Stiroh Report ¶¶ 46–48, Figure 8.

[634] Johnson Report ¶ 107.

[635] *Id.* ¶ 107;

[636] Stiroh Report ¶ 47.

330.     It is possible that Defendants would have expanded Senior-Level Employment more than they did if pay had not been suppressed.  Dr. Johnson's Exhibit 13 includes the trend in compensation over time for directors at DaVita from 2005 to 2022.[637]  During that time period, Directors represented 78 to 86% of all class employees at DaVita, thus accounting for a major share of labor costs.  Dr. Johnson's Exhibit 13 appears to show that average pay for Directors at DaVita was somewhat stagnant over time, with nominal pay in 2009 and 2019 being about the same.  Real pay (i.e., pay that is adjusted for increases in consumer prices) declined from 2009 to 2019.

331.     Additionally, over that same 2009–2019 period, Dr. Johnson's Exhibit E-1 shows that employment in the Other Outpatient Care Centers industry (NAICS) 62149 to which the Defendants belonged, grew from 456,583 to 713,133, an increase of 56%.[638]  Based on Dr. Johnson's logic, we may have expected average pay for directors at DaVita to have increased significantly in the face of this substantial growth in industry demand for employees (instead of appearing stagnant in his Exhibit 13[639]), while DaVita (and the other Defendants) sought to and did grow their own class employment substantially (as noted by Dr. Johnson and Dr. Stiroh).  Likewise, we would not have expected average salary at DaVita to have grown only 31 percent from 2007 to 2019 according to Figure 10 in the Stiroh Report, which is less than the 35 percent growth at the "Top 5 NAICS Benchmark" used by Dr. Stiroh or the 37 percent at the OEWS 4-digit Industry Benchmark I describe below.[640]

---

[637] *Id.* ¶ 75, Ex. 13.

[638] Johnson Report, App. E, Ex. E-1.

[639] *Id.* ¶ 75, Ex. 13.

[640] Stiroh Report ¶ 53, Figure 10.

-136-

332.     Dr. Stiroh's argument that because DaVita's "growth rate of Senior-Level compensation was similar or higher than that of comparable benchmarks during the alleged conduct period . . . , DaVita did not underpay Senior-Level employees once it attracted them to the firm" is also unavailing.[641]  One explanation for this trend is the presence of labor market frictions.  In other words, DaVita's market power would have enabled it to deviate from "market pay."  Another explanation is that DaVita may have lowered its hiring standards.

333.     Further, Dr. Stiroh's argument is undermined by her Figure 9, which compares the salary growth of Senior-Level Employees at DaVita to the salary growth of two benchmarks.[642]  Figure 10 in the Stiroh Report presents the same salary growth data, but with each year's salary expressed as a percentage of 2007 salary.[643]  Based on her Figure 10, she argues that DaVita's salaries grew similarly to the benchmarks during the alleged conduct period.  There are two problems with that conclusion.  First, one benchmark she uses, "Top 5 NAICS Benchmark" salaries, grew by 35 percent from 2007 to 2019 versus 31 percent salary growth at DaVita during that same period.  Thus, salary growth is actually larger at this benchmark than at DaVita.  Second, for her other benchmark, "OEWS 3-digit Industry Benchmark," she uses the occupation category of management employees in NAICS industry code 621, Ambulatory Health Care Services.  Dr. Stiroh reports that 29 percent salary growth (between 2007 and 2019) in this industry, which is less than that of DaVita (31 percent) during the same period.  However, it is not clear why she used the 3-digit industry, when OEWS data

---

[641] *Id.* ¶¶ 50–55, Figures 9–11.  Note also that Dr. Stiroh's decision to compare only DaVita's salaries to benchmarks is ironic, given that Dr. Johnson, Dr. Saravia, and Dr. McCrary all allege that I fail to account for other compensation components in my assessments. *See, e.g.,* Johnson Report ¶¶ 74–76; Saravia Report ¶¶ 183–185; McCrary Report ¶¶ 79–80, 84–87.

[642] Stiroh Report ¶ 52, Figure 9.

[643] *Id.* ¶ 53, Figure 10.

are available for the more detailed 4-digit industry shared by all three Defendants, NAICS 6214, Outpatient Care Centers. Using this more applicable 4-digit industry benchmark instead, salary growth of management employees from 2007 to 2019 was 37 percent, which is considerably larger than the 31 percent salary growth at DaVita during the same time period.[644] In summary, contrary to Stiroh's conclusion, DaVita's salary growth from 2007 to 2019 of 31 percent was considerably less than the salary growth at both benchmarks, where it was 35 percent and 37 percent.[645]

334.    Below, I explain that Defendants' Experts fail to persuade me that Defendants' No-Poach Agreements and CSI Exchanges did not suppress Senior-Level Employees' Compensation.

### 1.    Defendants' No-Poach Agreements Harmed Class Member Pay.

335.    Dr. Johnson contends that to properly assess direct effects of the Agreements, I should have: (1) quantified the number of lost opportunities; (2) accounted for the specific details of each offer Class Members did not receive because of Defendants' No-Poach Agreements; and (3) considered how each individual offer would have affected the Class Member's compensation in light of other available opportunities.[646] Likewise, Dr. Stiroh contends that "Plaintiffs also fail to establish that information from cold calls and other recruiting efforts would in fact, have been transmitted through DaVita. Plaintiffs' experts offer no method

---

[644] Consistent with Dr. Stiroh's estimation approach as she describes it, I removed "executives, compensation and benefit managers, and HR managers" from my salary and salary growth estimates. Stiroh Report ¶ 51. Note that in 2007, the only occupational category containing "executives" is the "Chief Executives" category. In 2019, there are two occupational categories containing "executives": "Chief Executives" and "Top Executives" (which has roughly eight times as many employees/observations). I removed "Chief Executives" from both years. *See* my workpapers.

[645] Stiroh Report ¶¶ 50–55, Figures 9–11.

[646] Johnson Report ¶¶ 51–54.

of measuring the supposed reduction in cold-calling, and do not quantify its impact."[647]  Below, I explain how the foregoing is an example of ignoring overwhelming evidence on how labor markets work and providing no real reason to expect labor markets for Defendants to work differently.

336.    <u>Tracking Cold Calls Is a Red Herring.</u>  Foremost, it is unclear how Defendants would track cold calls/job opportunities that Senior-Level Employees never received, and Dr. Johnson and Dr. Stiroh do not explain.[648]  To the extent Defendants did collect this data, it is my understanding that they did not produce it to Plaintiffs.  Likewise, Dr. Johnson testified that he is not aware of any such data,[649] and Dr. Saravia and Dr. Stiroh also did not "attempt to quantify the number of cold calls . . . that would have happened[.]"[650]

337.    Additionally, I am not persuaded that such an analysis would change my opinion. As a logical matter, from a company's perspective, as I explained during my deposition, it would not make sense to create a restriction that did not impact mobility[651]:

> [Y]ou probably wouldn't put a restriction in place if you weren't concerned about cold calls leading to people leaving that you don't want to leave and you didn't want to have to raise your labor cost to keep them if you could find another way to keep them from leaving in response to cold calls. . . .  [I]t's one fact that's very relevant; that if you introduce an agreement like this, you must do it for a reason. And it's a no-poach agreement, so the reason is so you'll reduce the number of opportunities that are coming from proactive recruiting of your employees.

---

[647] Stiroh Report ¶ 77 n.149.

[648] *See* Johnson Dep. at 90:15–20 (Dr. Johnson testified that he "did not do anything affirmative" "to quantify in this case the recruiting that would have happened in the absence of the alleged no poach agreements.").

[649] *Id.* at 233:6–17.

[650] Saravia Dep. at 122:11–15; Stiroh Dep. at 118:6–12 ("I don't have any information on the frequency of cold calls or job offers.").

[651] Gerhart Dep. at 137:12–138:17.

338.     As such, I did not perform a quantitative analysis to determine the number of missed opportunities.[652]

339.     <u>Even One Missed Opportunity Can Have a Profound Impact.</u>  Second, Dr. Johnson's and Dr. Stiroh's critiques improperly devalue the potential impact of just one missed job opportunity on an employee's compensation.

340.     For example, discussed at length above, not all job opportunities will be equally good matches for the employee.  As I testified at deposition, even one cold call can have a significant impact[653]:

> You don't necessarily have a firm call you very often with a specific interest in you and with a specific opportunity that would be good for you, . . . good for now, good to open up future doors to higher-paying opportunities.  So when you restrict that . . . I think it's important.  People don't necessarily have offers just rolling in.  Missing out on even one offer could be very consequential.

341.     Moreover, Dr. Johnson's contention that "people generally don't move because they have worse options[]"[654] is misleading.  Rather, given the frictions inherent to the job search process, "[a] worker will sometimes prefer to accept a job with a discounted wage than to continue a job search that may not yield a better alternative quickly or at all."[655]

342.     Further, I have repeatedly explained that most employee movement occurs in response to unsolicited opportunities.  As I have noted, such offers to passive job seekers provide important new information on alternative employment opportunities, including those with higher wages, which is of great value, given what we have seen is the cost and difficulty of obtaining such information, especially information specific to that individual employee's potential match

---

[652] *Id.* at 55:1–4.

[653] Gerhart Dep. at 116:22–117:14.

[654] Johnson Dep. at 202:13–14.

[655] LABOR MARKET COMPETITION, *supra* note 38, at 5.

and with which employer. Recipients of such offers have often been screened by the prospective new employer and the recipient and prospective employer may even know each other (e.g., as in the case of SCA CEO Hayek recruiting SCA COO Rucker from DaVita). This prior knowledge or information reduces the risk/uncertainty of a potential move to a new, typically higher paying job for the employee. It also typically gives the employee an option to negotiate higher pay at their current employer. The outside offer will typically have cascading effects on the pay of other employees through internal equity and/or external equity (because of what it may tell other employees about their potential value externally).

343.    I have described the Federal Reserve Bank of San Francisco study, which concluded that "more than three-quarters of workers who switched employers did not report active job search in the previous three months." This finding lead the authors to observe that "a majority of people" actually "find jobs without ever reporting actively looking for one."[656] At deposition, I testified that according to these findings, missing a cold call can have a negative effect regardless of whether the employee would have taken the offer[657]:

> [I]f you're at one of these companies and there's an unsolicited offer that never came, . . . that's going to have a negative effect . . . it's not that you have to move to take advantage of the outside offer; you could also leverage it in negotiations with your current company.

344.    Accordingly, where cold calls are restricted, employers will also have less incentive to negotiate employees pay, which undercuts Dr. McCrary's assertion that "proposed class members' pay is determined in a highly individualized, and highly negotiated, manner[.]"[658]

---

[656] Carrillo-Tudela, *supra* note 216.

[657] Gerhart Dep. at 53:5–54:6.

[658] McCrary Report ¶¶ 71, 74.

345. I also reviewed evidence in Figure 1 in my report showing the substantial average increase in pay to those voluntarily changing employers, especially higher level employees as the Class Members are.[659] Dr. Johnson's opinions therefore miss the mark because if anything, the pay increase to outside offers is not fully captured by employer changes for higher pay because we know that some use their offers to negotiate higher pay at their current employer and stay.[660]

346. Of course, unsolicited outside offers do not necessarily come in often or regularly. Many employers think about their own careers and how one opportunity appeared and had a major impact by providing access to that job and/or to other future opportunities/jobs. Thus, if an employee is denied even one such offer, it can have major consequences for them (and as we have seen, for other employees).

347. Finally, Defendants' Experts do not refute the substantial qualitative evidence I provided in my report that is consistent with Class Members receiving fewer cold calls during the Class Period and thereby experiencing suppressed compensation. As such, I have no cause to change my opinions.

## 2. Defendants' CSI Exchanges Harmed Employee Compensation.

348. Defendants' Experts claim I neglected to show how Defendants could have weaponized their CSI Exchanges to lower Class pay, and thus that this conduct did not harm Class Members' pay.[661] None has convinced me that the CSI Exchanges are consistent with unilateral conduct or that its impact on compensation would likely have been benign.

---

[659] Gerhart Report ¶ 46, Figure 1.

[660] Johnson Report ¶ 54.

[661] Johnson Report ¶¶ 111–113, 118; Saravia Report ¶ 157 n.228 (Dr. Saravia also incorrectly asserts that I "backed away" from my opinion that these exchanges would have enabled Defendants to fix compensation levels.); McCrary Report ¶¶ 161–176; Stiroh Report ¶¶ 107–117.

349.     <u>CSI Exchanges Are Inconsistent with Unilateral Interest.</u>  Though Dr. Saravia agrees that co-conspirators "must behave in ways that are not in their unilateral incentives or individually rational,"[662] she protests that companies have some legitimate incentives to share such data, and can do so legally through third-party surveys.[663]  Similarly, Dr. McCrary contends that the alleged information exchanges "can be used by firms to enhance, rather than suppress, competition."[664]  Moreover, he objects that I failed to submit "evidence that Defendants shared information in support of a 'commonly understood goal' to suppress pay."[665]  Dr. Stiroh also objects that my analysis "is in conflict with economic literature that establishes unilateral incentives to engage in information exchange and compensation benchmark."[666]  Their testimony is misleading and obscures the harm likely incurred by competitor exchanges of propriety business information.

350.     *CSI Exchanges of Compensation Data Differ from Normal Salary Surveys.*  As explained in my opening report and at deposition, Defendants' sharing of compensation information bears little resemblance to legal salary surveys that purportedly promote efficiency.[667]

---

[662] Saravia Report ¶¶ 141, 145.

[663] *Id.* ¶ 145.

[664] McCrary Report ¶¶ 148, 152–160.

[665] *Id.* ¶¶ 155, 171.

[666] Stiroh Report ¶¶ 107, 113–117.

[667] Gerhart Report ¶ 83(b); Gerhart Dep. at 145:10–146:2 ("In compensation, the recommended way to get external market data in compensation would be to use an independent third party. The companies shouldn't be identifiable as to . . . which company is paying what.  So . . . in that sense, the exchanges of pay-related information [were] not what I would expect to see."); *see also* McCrary Report ¶ 153.

351.    According to a DaVita internal document, data in salary surveys must be collected by independent third parties, and be three months old.[668]  The surveys must also include at least five data points and mask individual company responses, and an individual company's data cannot comprise more than 25% of the data reported.[669]  These criteria are clearly unmet with respect to Defendants' exchange of compensation data, and, as I stated during my deposition, "I do not see how [these CSI Exchanges] would help foster competition in the labor market."[670]

352.    The foregoing is consistent with Dr. Johnson's testimony that in his experience, pay surveys "combin[e] disparate sets of companies together or certain companies for certain positions for the purposes of anonymizing them[.]"[671]  He agreed that one reason third-party benchmarking firms take these precautions could be "to avoid antitrust risk," and to prevent companies receiving the benchmark data from using it to fix wages.[672]  The foregoing is also consistent with Dr. Stiroh's testimony that "[i]n all matters, there are benchmarking firms that gather industry information and report it that I think are primarily backward looking."[673]  As such, Dr. McCrary's objection that "very similar information [as the data in the CSI Exchanges] may have been available from other sources" does not undermine my assessment.[674]  Absent the CSI Exchanges, Defendants could only make educated guesses about each other's compensation-related decisions; with them, Defendants could be certain.  Moreover, the foregoing begs the question:  if Defendants already had access to largely similar information, why engage in the CSI

---

[668] Ex. PX85 at DVA_OMCEAL_001067253.

[669] *Id.*

[670] Gerhart Dep. at 146:23–147:9.

[671] Johnson Dep. at 247:13–25.

[672] *Id.* at 248:1–15.

[673] Stiroh Dep. at 162:19–163:17.

[674] McCrary Report ¶ 160.

Exchanges at all?  That they did would tend to imply some additional benefit to directly sharing de-anonymized, forward-looking data directly with competitors.

353.   Dr. McCrary's and Dr. Stiroh's attempts to characterize Defendants' CSI Exchanges as pay transparency efforts, let alone required by law, are futile.[675]  Pay transparency, discussed above, refers to *employees'* access to labor market data, and not to one competitors' access to another competitors' CSI.[676]  Similarly, I disagree with Dr. McCrary's contention that "[a] much more obvious interpretation of the information sharing alleged is that it would orient a firm as to where it was relative to its competitors, which can have procompetitive effects on pay," particularly where he has made no effort to demonstrate that Defendants' CSI Exchanges had such effects.[677]  Moreover, Dr. Stiroh's effort is particularly unavailing given that she testified at deposition that she does not have an opinion as to whether "appropriate benchmarking would include . . . known companies sharing known information[.]"[678]

354.   *Nonpublic Data.*  In my report, I opined that "[n]one of the extensive types of data exchanged [by Defendants] were published to the public or to the affected employee victims of the suppressed compensation.  This suggests that Defendants used the data for nefarious purposes (i.e., to fix wage rates)."[679]  Dr. Stiroh contends that SCA's 2009 CSI exchange with DaVita regarding wage increases, which I cited to in my report, could not have harmed class pay, because the information exchanged was largely publicly available.[680]  I disagree.

---

[675] McCrary Report ¶¶ 158–159; McCrary Dep. at 196:5–198:12 (Dr. McCrary conceded that the study he relied on in support of his argument concerned mandatory price reporting act disclosures in public auction context, unlike here); Stiroh Report ¶¶ 113–117.

[676] *See* Gerhart Report ¶ 83(a).

[677] McCrary Report ¶ 171.

[678] Stiroh Dep. at 161:21–162:11.

[679] Gerhart Report ¶ 83(a).

[680] *Id.* ¶ 23 (citing Ex. PX490).

-145-

355.     In support, Dr. Stiroh explains that "[i]n advance of DaVita's June 2009 shareholders meeting, DaVita released a public proxy statement stating, 'the Compensation Committee elected not to award merit increases to base salary in 2009 to our named executive officers and other members of management across the company.'"[681]  This information is far more generalized and high-level than what SCA acquired from DaVita in July 2009.[682]  For example, DaVita told SCA that "[a]ll non-field (corporate office, business office, execs) [DaVita employees] got zero increase"; "Field receiving an average of 1.5% increase:  60–70% of teammates receiving zero increase . . . 30–40% getting 3–5% (in cases where raise is merited or necessary to retain high performer)."[683]  Further, DaVita informed SCA that its "2009 budget (created late last year) allowed for 2.2% wage increases on average, but field operators are coming in at 1.5%)[.]"[684]  As such, Dr. Stiroh's analysis is wrong and has not given me cause to change my own.

356.     *Defendants Were Aware That Their CSI Exchanges Were Anticompetitive.* Further, Defendants' Experts ignore evidence that Defendants were aware of the anticompetitive implications of these exchanges.

357.     For context, I have opined that Defendant firms, like other large organizations, have annual merit planning processes,[685] which generally involve "looking at compensation for all employees across the organization and identifying a percentage increase to be applied."[686]

---

[681] Stiroh Report ¶ 109 (citing DaVita, *Notice of Annual Meeting of Stockholders* 21 (June 15, 2009).

[682] Ex. PX490.

[683] *Id.* at HAYEK_000012214.

[684] *Id.*

[685] Ponds Dep. at 27:25–28:8.

[686] Gerhart Report ¶¶ 119(b)(ii) (citing Sandoz Dep. at 36:15–38:10 (SCA set one companywide merit budget percentage each year to be applied to increase employees' base pay)), 118(b)(iv)

358. According to DaVita internal documents, in October 2014 then-SCA COO Rucker emailed former SCA's then-Chief Talent Officer Fanning about information sharing; he requested her assistance with scheduling "an informational series of calls out to known comparable firms," including DaVita and USPI, "to see what they are intending to do in terms of [merit] pool for [2015] merit increase."[687] Fanning testified that she had a strong reaction to Rucker's request, and "very diplomatically told him yeah, that ain't happening . . . . It's not lawful. I'm not doing this shit . . . . You don't do this. And I would never do it."[688] Specifically, she cautioned him, "Usually firms won't talk to other competitors in their space about this kind of data—it's why we all use the big HR firms[.]"[689] She testified that in her experience, "competitors don't share their future data," and that third-party pay surveys are "the lawful professional way to share information between these companies, and I'm making it clear that I ain't doing anything that ain't right"[690] (though of course legality concerns did not stop Fanning from enforcing the SCA-DaVita and SCA-USPI No-Poach Agreements).[691]

359. Former SCA CFO Peter Clemens, who was on the foregoing email chain, seemingly did not share Fanning's concerns about Rucker's request. At deposition, he testified that he "[c]ould have been" "comfortable sharing SCA's future intended wages with a

---

(citing Chipman Dep. at 167:16–19 (DaVita implemented annual company-wide merit increase budgets)), 120(b)(ii) (citing English Dep. at 27:3–28:20 (USPI recommended merit salary increases based on performance and budget)).

[687] Ex. PX36 at SCA000540406–07.

[688] Fanning Dep. at 177:20–183:11.

[689] Ex. PX36 at SCA000540407.

[690] Fanning Dep. at 182:25–183:11.

[691] *See, e.g.,* Gerhart Report ¶ 75(d) (citing Ex. PX160 at SCA000002866 (Fanning instructed SCA's third-party recruiters to comply with the SCA-USPI No-Poach Agreement)).

competitor,"[692] and that he "wouldn't have been shocked" if SCA and USPI exchanged wage increase information, given that the competitors "did exchange data[.]"[693]

360.    Moreover, Defendants' own compliance policies prohibited them from sharing such information.  For example, DaVita's Code of Conduct defined "confidential business information" as including "financial management" information, "departmental performance metrics" and "administrative policies," and precluded employees from disclosing this information externally "unless expressly directed to do so by legal counsel."[694]  Likewise, SCA instructed all of its employees that "SCA will compete vigorously but fairly in the market place. We will not seek to restrict competition through unlawful monopolistic or predatory practices."[695]  Accordingly, SCA instructed its employees not "[t]o set prices, divide sales territories or compromise the integrity of a bidding process," and not to "[e]xchange information with the competitor about pricing margins, bids, contracts, plans or other confidential business matters."  SCA also warned that its assets "include certain intangible or 'intellectual' property. This includes . . . pricing information . . . financial information . . . and other information that has not been made public and that would be of interest to a competitor or other party if disclosed."[696]  Similarly, USPI's Code of Conduct instructed all of its employees not to disclose its "confidential information to third parties," including "all information of the Company [USPI] that is not generally known by others with whom the Company competes or plans to compete and any and all information which, if disclosed by the Company, would assist in competition

---

[692] Clemens Dep. at 174:1–3.

[693] *Id.* at 179:21–180:21.

[694] Ex. PX49 at DVA_OMCEAL_000285349.  I have not seen any evidence wherein DaVita's legal counsel instructed its employees to share CSI with SCA.

[695] Ex. PX337 at SCA002021398.

[696] *Id.* at SCA002021398, SCA002021402.

-148-

against the Company."[697]  This Code of Conduct also defined "confidential information" to include information regarding USPI's "financial activities" and its "financial performance and strategic plans."[698]

361.    The foregoing further supports my opinion that these exchanges were inconsistent with unilateral conduct.

362.    <u>Defendants Used the CSI Data They Received.</u>  Though I was not tasked with performing an empirical analysis,[699] I did provide ample qualitative evidence of Defendants' exchanges of granular overhead expense data to set their annual merit increases and facilitate cost reduction efforts.[700]  Below, I explain that Defendants' Experts' objections that I did not sufficiently demonstrate how Defendants could implement data from these exchanges to suppress Senior-Level Employees' compensation is unpersuasive.[701]  For the same reasons, Dr. McCrary's and Dr. Stiroh's objections that I failed to present evidence "that Defendants agreed to use any information they shared to suppress pay" also fails.[702]

363.    Dr. Stiroh's assertion that "Dr. Gerhart suggests that granular data (in contrast to information about firmwide increases) is preferable for supporting" a wage-fixing agreement[703] is divorced from reality.  I said the complete opposite.  In fact, I used exchanges of annual merit increases as an example to illustrate that "the granularity of the overhead expense data

---

[697] USPI_CIV_000433011 (cover email) and USPI_CIV_000433030 (attachment) at USPI_CIV_000433032.

[698] *Id.*

[699] Gerhart Report ¶ 6.

[700] *Id.* ¶ 83.

[701] Johnson Report ¶¶ 112–123; Saravia Report ¶¶ 156–161; McCrary Report ¶¶ 148, 152; Stiroh Report ¶ 112.

[702] McCrary Report ¶¶ 148, 152; Stiroh Report ¶ 112.

[703] Stiroh Report ¶ 112 (citing Gerhart Report ¶ 83).

-149-

exchanged [by Defendants] was significant."[704]  Moreover, I opined that such exchanges would

"interfere with competitive prices and artificially hold down wages."[705]  This effect is borne out

by the evidence.

364.    Former SCA COO Rucker and former SCA Chief Talent Officer Fanning

provided a concise explanation of how Defendants could use this data in a 2014 email exchange

regarding SCA's 2015 merit pool, discussed above.[706]  Therein, Rucker asked Fanning to help

devise a plan to informally call competitors to collect their 2015 merit pool data.[707]  For

example, Rucker proposed that SCA's then-CEO Hayek could call DaVita, and SCA's then-

Group VP of Strategy and Payer Engagement Mathis could call USPI.[708]  Fanning raised the

same issue as Defendants' Experts:  "One question—even if they come back confirming 2.9-

3%—would we make our budget that level?, can we afford it?—if they come back 2.5%—will

we stay at 2.5% or reduce to 2%.  The question is simply would the input change our

decision?"[709]  Rucker responded:[710]

> At the end of the day I think we will want to know that we are able to guide our
> folks to pay wages that are "at market" so I think my question is what do we need
> to know in order to know that guidance of 2.25% or 2.5% keeps us within a
> reasonable range that one would consider "at market"?  This, of course, assumes
> we are starting from a band that is "at market[.]"

In other words, the evidence demonstrates that SCA planned to rely on SCA's and USPI's data

to set its own merit pool.

---

[704] Gerhart Report ¶ 83(c).

[705] Gerhart Report ¶ 83(d) (citing GERHART, *supra* note 94, at 268–269).

[706] Ex. PX36 at SCA000540410.

[707] *Id.*

[708] *Id.*; Fanning Dep. at 185:13–18, 186:2–4.

[709] Ex. PX36 at SCA000540406.

[710] *Id.* at SCA000540405.

365.    Consistent with the foregoing is evidence that SCA and USPI admitted to using the data to set their annual respective merit increases, and that USPI also admitted to using the data to assist with its cost reduction efforts, which would include reducing labor costs.[711]

366.    Further, Dr. Johnson, Dr. Saravia, and Dr. McCrary object that exchanges of aggregate general and administrative ("G&A") and overhead cost data would not facilitate pay suppression.[712]  Further, Dr. McCrary contends, "Prof. Gerhart states that the overhead expense data has 'granularity' that is 'significant,' but does not state in what sense or what kind of information would not be 'granular' or would have a granularity that would not be 'significant.'"[713]  I disagree.

367.    As I stated during my deposition, G&A data provides information "on a per-person basis" about the organization's "average . . . labor cost per person, which is very useful to know."[714]  It "would . . . help you understand where your labor costs are relative to these particular other companies,"[715]  "provides an opportunity to control labor costs or other costs," and "opens the opportunity to coordinate on these kind[s] of metrics,"[716] and as such is "significant."  For additional clarity, in the absence of more detailed data on labor costs, G&A is the next best thing.  G&A would include labor cost, but also other costs.  Many times labor costs are not broken out separately, but rather lumped together into G&A.[717]

---

[711] Gerhart Report ¶ 83 (c) (citing Mathis Dep. at 53:5–63:5, 66:5–76:6; Ex. PX232; Ex. PX37; Kopser Dep. at 32:3–38:2, 105:5–108:9; Cagle Dep. at 119:24–120:23; Ex. PX240 at USPI_CIV_000686081).

[712] Johnson Report ¶¶ 125–126; Saravia Report ¶ 157; McCrary Report ¶¶ 164, 166–167.

[713] McCrary Report ¶ 167 (citing Gerhart Report ¶ 83).

[714] Gerhart Dep. 183:6–19.

[715] *Id.* at 185:5–23.

[716] *Id.* at 184:2–185:1.

[717] Note that G&A expenses and overhead costs are both terms used to describe expenses. "Selling, general, and administrative expense" (i.e., G&A expense) is an actual line typically

368. Finally, Dr. Johnson and Dr. Stiroh ignore other evidence assessed by me, Dr. Starr, Dr. Saravia, and Dr. McCrary showing that Defendants admitted these exchanges were inconsistent with unilateral conduct, and considered them a "benchmarking" exercise.[718] In other words, Defendants admitted that they used each other's data to make pay-related decisions.[719]

369. Accordingly, such exchanges between Defendants were certainly granular enough to harm employee compensation. I am therefore not persuaded to change my opinion.

370. <u>Exchanges of General Business Information and Other Non-Compensation Data.</u> In my opening report, I provided evidence showing that SCA and USPI regularly exchanged many kinds of proprietary business information, apart from wage data.[720] Below, I respond to Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's arguments that I did not explain how this evidence supports my opinion that the SCA-USPI CSI Exchanges would facilitate suppressing competition in the labor market.[721] These arguments fall flat.

---

appearing in annual reports (the income statement). *See Overheads*, CFI https://corporatefinanceinstitute.com/resources/accounting/overheads/ (last visited June 26, 2025).

[718] Gerhart Report ¶ 23 (citing Rucker Dep. at 254:24–256:12, 260:11–20; Hayek Dep. at 362:18–363:7; OMC_BM_000006875 ("Andrew [Hayek] let me know that he spoke to Chris [Holden] and Bill [Wilcox] recently about a corporate overhead benchmarking exercise and that . . . USPI [is] interested in participating.")); *see also* Ex. PX518 (USPI requested SCA overhead to use in the USPI board meeting for the fourth time in 2011); Saravia Report ¶ 145 n.204; McCrary Report ¶ 156.

[719] *See* Gerhart Report ¶ 83(c) n.375 (citing USPI_CIV_000962508 and USPI_CIV_000962509 USPI calculated salaries based on the overhead G&A data shared by SCA and attaching detailed comparison of expenses)); McCrary Report ¶ 156.

[720] *See, e.g.,* Gerhart Report ¶ 82(a) n.346.

[721] Johnson Report ¶¶ 124–127; Saravia Report ¶¶ 154–155, 157, 163; McCrary Report ¶¶ 164–165.

-152-

371.     Obviously, sharing information about payor mix comparisons or case volume, for example, would not by itself enable Defendants to fix wages.  To clarify, I provided this evidence to illustrate that Defendants shared vast amounts of information above and beyond the compensation and overhead cost data.  As I stated during my deposition, "it seems to me that a lot of times companies would treat those kind of data as pretty valuable and they wouldn't want to share it with competitors, or at least not any earlier than []necessary."[722]  This is relevant to my assessment that they behaved far more like co-conspirators than competitors.  This conclusion is reinforced by the fact that these same Defendants entered into No-Poach Agreements in tandem.

372.     It also bears repeating that regardless, Defendants primarily exchanged nonpublic information.[723]

### E.     Wage Suppression Can Persist for Years.

373.     In my report, I opined that, once wages are artificially suppressed, they can remain at depressed levels long after the anticompetitive restraint is limited, because markets do not necessarily adjust quickly.[724]  Defendants' Experts do not rebut my analysis.  As such, my opinions are unchanged.

### VI.     DEFENDANTS MAINTAINED STRUCTURED COMPENSATION SYSTEMS THAT SOUGHT TO ACHIEVE INTERNAL EQUITY AND EXTERNAL EQUITY.

374.     In my report, I opined that, based on my expertise and review of the evidence, Defendant firms used compensation professionals to carry out their pay strategies and maintain

---

[722] Gerhart Dep. at 157:17–158:6.

[723] *See* Gerhart Report ¶¶ 82–83.

[724] *Id.* ¶¶ 88–92.

their pay structures.[725]  I then provided a step-by-step process for designing a systematized compensation structure.[726]  Further, I opined that a fundamental goal of Defendants' pay strategies is to achieve internal equity and external equity.[727]  Finally, I explained that internal equity and pay-for-performance policies are not mutually exclusive concepts, and that, in fact, paying for performance promotes internal equity.[728]  Defendants' Experts' rebuttal opinions fail to address many of my opinions, and, to the extent they respond, those responses run counter to the qualitative evidence and widely-accepted compensation-related literature.  As such, I have no cause to change my opinion.

> ### A.     Defendants' Highly-Trained and Qualified Compensation Professionals Established and Maintained Structured Compensation Systems.

375.    Based on my experience and research in the compensation and human resource management fields, compensation professionals receive standardized training to implement structured pay systems that are geared towards achieving internal equity and external equity.[729] Moreover, I analyzed the evidence in this litigation and opined that Defendants employed this exact group of highly-educated professionals to effectuate their pay systems.[730]  Finally, I explained that WorldatWork is a valuable reference source for these professionals when they enter the workforce.[731]

376.    Below, I explain that Defendants' Experts make no efforts to refute the foregoing opinions.  In fact, Dr. Johnson agreed that Defendants "employ compensation professionals

---

[725] *Id.* ¶¶ 99–103.

[726] *Id.* ¶¶ 104–120.

[727] *Id.* ¶¶ 121–127.

[728] *Id.* ¶¶ 128–135.

[729] *Id.* ¶¶ 99–103.

[730] *Id.* ¶ 102.

[731] *Id.* ¶ 103.

whose job it was, at least in part, to assist the company in setting pay rates of its employees."[732] Further, Dr. McCrary declined to opine as to whether Defendant firms maintained pay structures, and testified only that it "might be true, in some of the instances, it might not be true at all" that each Defendant firm "had HR departments and other job functions that were responsible for determining pay to employees[.]"[733]

377. <u>Defendants' Compensation Professionals.</u> I have not changed my view that Defendants employed highly-educated and credentialed compensation professionals.[734]

378. *DaVita.* I opined that DaVita employees responsible for maintaining its compensation structures were well-trained and well-educated.[735] Apart from the testimony discussed above, Dr. Johnson, Dr. McCrary, and Dr. Stiroh do not submit contrary evidence to respond to my opinion that DaVita employed compensation professionals with extensive training and experience to maintain its compensation structures.[736] Moreover, Dr. Saravia testified that she did not opine about whether DaVita "employed highly trained compensation specialists[,]" but that she knew Defendants "employed HR professionals."[737] As such, my opinion is unchanged.

379. *SCA.* As above, I opined that SCA's HR professionals responsible for compensation had extensive education and training in human resource management and compensation.[738] As above, Dr. Johnson and Dr. McCrary do not put forth evidence contrary to

---

[732] Johnson Dep. at 156:9–13.

[733] McCrary Dep. at 361:21–362:24, 364:20–365:12.

[734] Gerhart Report ¶ 102.

[735] *Id.* ¶ 102(a).

[736] Johnson Dep. at 155:23–156:8; McCrary Dep. at 361:21–362:24, 364:20–365:12.

[737] Saravia Dep. at 132:11–14.

[738] Gerhart Report ¶ 102(b).

the evidence I analyzed showing that SCA hired highly-credentialed employees to manage its compensation structure.[739] Likewise, Dr. Saravia does not submit any testimony or evidence contrary to my assessment that SCA's compensation professionals had extensive training.[740] Accordingly, I have not changed my opinions.

380. *USPI.* Finally, I testified that like DaVita and SCA, USPI employed workers with comprehensive human resource and compensation training to maintain its systematic pay structures.[741] As above, Dr. Saravia and Dr. McCrary do not rebut my assessment that USPI relied on highly-qualified human resources professionals to administer its structured pay systems.[742]

381. WorldatWork Is a Valuable Resource for Compensation Professionals. I stated that WorldatWork is a valuable resource for professional compensation and human resource employees, and that Defendants' compensation employees regularly consulted WorldatWork resources.[743] Defendants' Experts decline to address my opinion, and I therefore have no cause to change my own.

## B. Defendants Designed Systematized Compensation Structures.

382. In my report, I provided an overview of the two-step process to design structured compensation systems.[744] I then determined that the evidence showed that Defendants applied the principles of internal and external equity foundational to this design process in designing and

---

[739] Johnson Dep. at 155:23–156:8; McCrary Dep. at 361:21–362:24, 364:20–365:12.

[740] Saravia Dep. at 132:11–14.

[741] Gerhart Report ¶ 102(c).

[742] Saravia Dep. at 132:11–22; McCrary Dep. at 361:21–362:24, 364:20–365:12.

[743] Gerhart Report ¶ 103.

[744] *Id.* ¶¶ 104–120.

-156-

maintaining their own structured compensation systems.[745] Below, I correct Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's attempts to redefine systematic pay structures that cause wage suppression to have cascading effects on employees as "rigid" structures incapable of transmitting impact across subsets of employees.[746] I also explain that they and Dr. Stiroh have not provided compelling testimony or evidence to refute my assessment of Defendants' pay structures.[747]

383.    Dr. Johnson, Dr. Saravia, and Dr. McCrary argue that my (purported) opinion that Defendants had "rigid" pay structures, which would have transmitted the effects of Defendants' anticompetitive conduct Class-wide (discussed below), is unsupported by the evidence.[748] In their view, Defendant firms' pay practices involved a high degree of customization in setting compensation, did not utilize formal structures, pay grades, or pay ranges, and are ultimately non-systematic.[749] Dr. McCrary puts forth "five basic facts" that he purports to "highlight[] the individualized nature of Defendants' pay-setting processes."[750] He also argues that "the idea of pay being set based on rigid pay structures is especially implausible in light of the high-level nature of the employees in the proposed class." He claims that the presence of "rigid" pay structures is implausible given that "pay dispersion is largest among high-level employees with more years of education and experience," and is predicated on such factors "as the amount of on-

---

[745] *Id.*

[746] Johnson Report ¶¶ 6, 43, 68, 74; Saravia Report ¶¶ 30–31, 186; McCrary Report ¶¶ 30, 69–106.

[747] Johnson Report ¶¶ 64–97; Saravia Report ¶¶ 168–196; McCrary Report ¶¶ 30, 69–106.

[748] Johnson Report ¶¶ 6, 43, 68, 74; Saravia Report ¶¶ 30–31, 186; McCrary Report ¶¶ 30, 69–106.

[749] Johnson Report ¶¶ 64–97; Saravia Report ¶¶ 165–196; McCrary Report ¶¶ 30, 69–106.

[750] McCrary Report ¶ 87.

-157-

the-job training they receive; their firm's size and performance; and their negotiating ability."[751] Each of the features he identifies as problematic are, to the contrary, typical of structured compensation systems. Moreover, Dr. McCrary's testimony that he does not have an opinion about whether each company maintained a pay structure appears at odds with his testimony that Defendant firms lacked pay structures capable of transmitting harm Class-wide.[752] It is unclear how he could have an opinion on one topic but not the other, and Dr. McCrary does not explain how he distinguishes between the two.

384. In structured compensation systems, there are generally substantial differences (differentials) between average salary and total direct compensation according to job level. If an employee wants to maximize the likelihood of high pay, the employee would obviously choose to be a VP rather than a Director, or an SVP rather than a VP. The idea that all VPs would be paid more than all Directors would only be possible to the degree within-job pay variance was eliminated by a compensation system that did not allow Director and VP pay to vary as a function of individual performance contributions. Taken to the extreme, that would require all Directors to be paid the same, all VPs the same, and all SVPs the same. That homogeneity

---

[751] *Id.* Note that Dr. McCrary relies on a paper by management scholars Matt Bloom and John G. Michel in support of this proposition. *Id.* at n.185 (citing Matt Bloom & John G. Michel, *The Relationships among Organizational Context, Pay Dispersion, and Managerial Turnover*, 45 THE ACADEMY OF MANAGEMENT JOURNAL 33–42, 34 (2002)). However, there is no data in this source regarding employee performance (and its role in determining pay), either relative or absolute, and this paper in fact supports my assessment. Bloom and Michel explain that according to "a large body of research," "the distribution of rewards within an organization is fundamental to employee attitudes and behaviors such as job-related satisfactions, organizational commitment and withdrawal, and job performance (Folger & Cropanzano, 1998; Greenberg, 1990)." *Id.* at 33. "This evidence indicates people care more about how their rewards compare to those of relevant others than about the absolute amount of rewards they receive because reward distributions signal an individual's relative performance proficiency and her or his organizational value and status." *Id.* In other words, they agree that the comparison of pay and performance contributions—what I call "internal equity"—is what matters.
[752] McCrary Dep. at 361:21–362:24.

would effectively eliminate the within-job variation in pay and the overlap in pay of Directors and VPs about which Dr. Johnson and Dr. McCrary are so concerned, as I explain below. However, that is not how a structured compensation system works. (All Directors paid the same would instead be more akin to how blue-collar workers covered by a union-negotiated contract would be paid.) A structured compensation system ensures that *on average*, VPs are paid more than Directors, but that there is significant variation in how much Directors and VPs are paid (based on performance contributions) and thus there will be some overlap in pay of the two jobs. That will be more true to the degree bonus and equity compensation are used to pay for performance. Of course, these are also very structured—indeed often formulaic.

385.     Below, I correct Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's misrepresentations regarding my opinion, and then explain why their rebuttals are inconsistent with the evidence and compensation-related theory and do not cause me to change my opinions. I also explain that Dr. Stiroh has declined to rebut this testimony altogether.

## 1.     Step 1:  Defendants Assigned Internal Value to Jobs.

386.     I testified that according to the compensation-related literature, this first step requires an organization to create an internal pay structure, which primarily involves assigning internal value or worth to jobs.[753] The internal value is frequently expressed as a percentage differential, and companies choose percentage differentials with different strategies and goals in mind, e.g., to promote internal equity.[754] Over time, in a competitive labor market the internal equity-promoting pay differentials begin to approximate the external equity-promoting pay differentials (i.e., percentage differentials between jobs found in external market pay surveys),

---

[753] Gerhart Report ¶¶ 106–110.
[754] *Id.*

-159-

and are consistent internally and across organizations.[755]  Defendants' Experts have not provided any testimony or evidence sufficient to persuade me to change my opinion.

387.    Job Analysis.  Job analysis is the first step in developing an internal pay structure, and I explained the systematic process by which organizations collect information to establish similarities and differences in different kinds of work.[756]  Defendants' Experts have not addressed this opinion or given me cause to change it.

388.    Job Content.  Further, I opined that, to perform job analysis, compensation and human resource professionals must collect information about a job's tasks, activities, and work demands, as well as the required characteristics of employees in those roles, and the job's internal and external relationships.[757]  As above, Defendants' Experts do not address my views on the subject.

389.    Levels of Information.  Moreover, I testified that the job analysis process provides both high-level and specific information, such as elements, tasks, positions, jobs, occupations, and job families.[758]  Again, Defendants' Experts made no effort to put forth contrary evidence or testimony.

390.    Job Analysis Output.  I opined that the primary purpose of job analysis is to put out a job description that sets forth key roles and person characteristics, and I reviewed Defendant firms' evidence in support of my assessment.[759]

---

[755] *Id.*

[756] *Id.* ¶ 107.

[757] *Id.* ¶ 108.

[758] *Id.* ¶ 109.

[759] *Id.* ¶ 110.

391.    Dr. Johnson did not submit evidence contrary to the evidence of DaVita's and SCA's job mapping assessments, which demonstrates that DaVita and SCA utilized job analysis practices.[760]  Dr. Saravia also does not object that the internal USPI spreadsheet I provided showing USPI used "Job Description" sheets is inconsistent with my description of the job analysis output.[761]  Likewise, Dr. Stiroh ignores my assessment altogether.

392.    Dr. McCrary claims that I have not addressed or explained how to use common evidence to set "objective criteria for determining which jobs are senior to the director-level."[762] Foremost, I was not tasked with identifying director-level and above jobs at Defendant firms,[763] which is a task that I understand Dr. Starr performs.  Moreover, Dr. McCrary's contention that I "endorsed" job analysis at my deposition, such that Dr. Starr's approach for identifying job titles to include in the Class is "flawed," mischaracterizes my testimony.[764]  I did not endorse any one approach over another; instead, I made the point, as Dr. McCrary notes, that job titles alone are not sufficient for matching internal jobs to external pay survey jobs because job titles do not necessarily mean the same thing in different companies.[765]  But of course, they can mean the same thing—one clearly needs to take care in establishing they do.  As such, my opinion is unchanged.

### 2.    Step 2:  Defendants Undertook Job Evaluation and Benchmarking.

393.    I then opined that the second step in the pay structure design process is to undertake job evaluation, which is a systematic determination of jobs' relative worth to create a

---

[760] *Id.* ¶ 110(a)–(b).

[761] *Id.* ¶ 110(c).

[762] McCrary Report ¶ 272.

[763] *See* Gerhart Report ¶ 6.

[764] McCrary Report ¶¶ 269, 273 (citing Gerhart Dep. at 44:5–45:6).

[765] *Id.*

job structure.[766]  Below, I explain that Defendants' Experts have not persuaded me to change any of my opinions explaining this process or my opinion that Defendants implemented these organizing principles.

394.    Compensable Factors.  I explained that companies will often identify "compensable factors" (i.e., the factors for which the company assigns value), to distinguish an individual job's value.[767]  A job with more high-value compensable factors should correspondingly receive higher pay, because that job yields higher value for the company. Defendants' Experts do not address the foregoing opinions, so I have no cause to change them.

395.    Salary Levels, Ranges, and Grades.  Moreover, I opined that, however a company chooses to perform job evaluation, the process must involve grouping and ordering jobs by relative value, and will always produce a set of salary grades/ranges, however informal or unstructured.  Defendants' Experts do not provide any testimony or contrary evidence to rebut my analysis.  Accordingly my opinion is unchanged.

396.    Defendants Implemented Salary Levels, Ranges, and Grades.  I thereafter found that the evidence I analyzed is consistent with Defendant firms' implementation of the foregoing principles to create salary grades and ranges.[768]

397.    A structured compensation system uses pay ranges with minimums, midpoints, and maximums.[769]  How formalized these are is not the key factor.  Rather, it is whether the company takes steps to, on average, pay SVPs more than VPs, and pay VPs more than Directors. It is also about whether the pay of most Directors, for example, falls within a range.  Contrary to

---

[766] Gerhart Report ¶¶ 111–116.

[767] *Id.* ¶ 112.

[768] *Id.* ¶ 114.

[769] *Id.* ¶ 113(b).

Dr. McCrary's objections,[770] variation within a range is by design in a structured compensation system to allow different pay for the same role or same level role based on performance contributions. In other words, another indicator of a structured compensation system is whether the company considers and compares the pay and performance contributions of employees in a job like Director to those of others and takes steps to ensure pay is consistent with contributions (internal equity).[771] In a structured compensation system, some employees will have base pay below the minimum or above the maximum of their salary range. Indeed, these are common enough in structured compensation to have names. Below-minimum base pay is a "green circle rate" and above-maximum base pay is a "red circle rate."[772]

398. Dr. Johnson, Dr. Saravia, and Dr. McCrary disagree with my analysis of the evidence and claim that Defendants did *not* implement salary grades, levels, or ranges.[773] I analyzed their arguments and found that they are not supported by the evidence or by the compensation-related theory and literature.

399. *DaVita.* I testified that, based on my experience and the evidence, DaVita's pay structures clearly incorporated salary ranges, levels, and structured pay differentials.[774] Below, I explain that Dr. Johnson, Dr. McCrary, and Dr. Stiroh have not given me cause to revise this testimony.

400. Whereas Dr. Stiroh neglected to address my assessment altogether, Dr. Johnson and Dr. McCrary object that a March 2018 DaVita internal document relied on by Dr. Starr,

---

[770] McCrary Report ¶ 96.

[771] Gerhart Report ¶ 94.

[772] GERHART, *supra* note 94, at Chapter 18.

[773] Johnson Report ¶¶ 6, 68–69, 74–75; Saravia Report ¶¶ 179–182; McCrary Report ¶ 71.

[774] Gerhart Report ¶ 114(a).

which explains that DaVita did not "believe in 'salary bands' or 'pay grades[,]'" is contrary to my opinion regarding structured compensation systems.[775] Dr. McCrary also points to various instances wherein DaVita executives and compensation professionals similarly characterize DaVita as lacking pay ranges.[776]

401.    The best evidence of a company's pay structure is evidence of what the company actually did, and not just what it says it does. For example, in February 2017 DaVita internally discussed whether it was paying its Corporate Development VPs at a competitive level. Its HR department requested external market data, as well as average base and bonus data points for DaVita's RODs, DVPs, and GVPs.[777] The 25th, 50th, and 75th percentiles for base and maximum bonus potential ("MBP") data were provided as comparators.[778] Similarly, in 2018 DaVita's Compensation Team internally shared "internal ranges" with 25th, 50th, and 75th percentiles for base salaries, MBPs, and Long Term Incentive Plan (i.e., equity) grants for DaVita Directors, VPs, GVPs, and SVPs.[779] Recall also that in my opening report, I provided extensive evidence that DaVita actually did use job families/groups, job titles, job levels, salary minimums, midpoints, and maximums, and fixed pay differentials,[780] none of which Dr. Johnson takes into account.

---

[775] Johnson Report ¶ 68 and McCrary Report ¶ 104 (citing Ex. PX77 at DVA_OMCEAL_001329257).

[776] McCrary Report ¶ 104.

[777] DVA_OMCEAL_001068058 at DVA_OMCEAL_001068059.

[778] *Id.*

[779] DVA_OMCEAL_001329840 (cover email), DVA_OMCEAL_001329841 (attachment, *see* "Pay Ranges" sheet) and DVA_OMCEAL_001329842 (attachment). *See also* DVA_OMCEAL_001385318 (cover email) and DVA_OMCEAL_001385327 (attachment).

[780] Gerhart Report ¶¶ 114(a), 127(a).

402. Further, Dr. Johnson objects that I did not assess whether "pay differentials" would apply to total compensation.[781] In the typical structured compensation system, the rate ranges apply to salary/base pay. There is no minimum or maximum as such for "variable pay" (bonus, equity) as these are tools to even more strongly differentiate pay to recognize differences in employee performance. In other words, bonus and equity are part of how a structured compensation system recognizes differences in performance contributions. However, it continues to be the case that higher job levels have more opportunity for higher bonus and equity pay, consistent with the nature of a structured compensation system where salary is higher at higher job levels. It is also the case that bonus payouts are to a large extent as structured as it gets given the typical use of a formula with predetermined performance metrics and payout schedules (often expressed as a percentage of salary) to determine bonus payouts. Here, DaVita's compensation process further shows that DaVita's pay system is structured, given evidence discussed above that rate ranges did apply to bonuses and equity grants. Accordingly, my opinion is unchanged.

403. *SCA.* In my opinion, the common evidence shows that SCA likewise maintained a pay structure with salary ranges, job families, job titles, job levels, and salary minimums, midpoints, and maximums.[782] Dr. Johnson and Dr. McCrary put forth various pieces of evidence, including SCA internal documents, email exchanges, and deposition testimony to attempt to rebut my opinion that SCA used salary grades, levels, and ranges.[783] But I remain unconvinced.

---

[781] Johnson Report ¶¶ 74–76.

[782] Gerhart Report ¶ 114(b).

[783] Johnson Report ¶ 68 & n.150; McCrary Report ¶¶ 103–104.

404. Dr. Johnson and Dr. McCrary cite to a 2018 internal email exchange between SCA human resource professionals, who explain that SCA does not use "'official published ranges'" or "'unified job grades,'" and instruct others not to rely on the prior pay ranges.[784] Dr. McCrary also opines that according to internal SCA emails, SCA stopped using a structured pay system: "[B]y 2017, SCA had elected to remove [its] salary ranges from their internal compensation data systems because they were 'outdated,' 'not actively managed' by SCA, didn't 'carry a lot of weight,' and 'possibly aren't even providing real value to the users of the application.'"[785] Likewise, Dr. Johnson relies on a September 2020 internal SCA presentation to show that SCA did not "have a formal base salary/incentive structure, pay grades, or pay ranges," and was in the process of implementing a new Human Capital Management System by 2021.[786] But pay ranges do not need to be formal to be structured and systematic, as long as the firm acts like such a range exists, which SCA did.

405. Further, taken together, these documents show that SCA previously focused on maintaining a systematic pay structure (albeit one that still included pay ranges), and then turned to formalizing that structure, and this variation over time further supports my opinion. This is consistent with my statement in my compensation textbook that "[p]ay levels at firms [with structured compensation systems] are not completely static. They also can adjust over time to changing market conditions and/or business strategies."[787] As such, Dr. Johnson and Dr. McCrary have not given me reason to change my opinions.

---

[784] Johnson Report ¶ 68 n.150 and McCrary Report ¶ 104 (citing SCA000098450–51).

[785] McCrary Report ¶ 104.

[786] Johnson Report ¶ 68 & n.150 (citing SCA001669270).

[787] GERHART, *supra* note 94, at 211.

406.     Additionally, the evidence Dr. Johnson and Dr. McCrary rely on as the basis of their testimony actually weakens their argument and strengthens mine.  For example, both Dr. Johnson and Dr. McCrary cite to evidence that SCA maintained a fairly formalized pay structure even before 2021.  According to Kevin Zaideman, SCA's former Director of Compensation and Senior Compensation, pre-January 2021, in lieu of pay grades or bands, SCA used[788]:

> [E]xternal market data and internal teammate pay data . . . compiled in . . . a statistical function in Excel, where, let's say, I had a leader that asked for an analysis of internal pay for a specific job and there were ten teammates in that job.  I would grab those ten data points and use a percentile function in Excel to display the 25th, 50th, and 75th percentile of what that range of data was.

Based on my expertise and research in the compensation and human resource management fields, evidence that SCA kept track of employee pay data and calculated the minimum, midpoint, and maximum percentiles is consistent with a relatively formal systematic compensation structure.

407.     Likewise, Dr. Johnson's and Dr. McCrary's claims rely on the testimony of current SCA CFO Leslie Wachsman that pre-2021, SCA did use job levels, which actually undermines their point and provides additional evidence of SCA's systematic pay structure.  When asked what levels SCA used before conforming to its parent company's job levels, Wachsman responded, "The levels are more based on title[.]"[789]  Job levels based on title are a feature of systematic pay structure.

408.     *USPI.*  Similarly, Dr. Saravia's and Dr. McCrary's assessments that USPI did not use salary ranges that would transmit harm broadly has no basis in widely-accepted

---

[788] Johnson Report ¶ 68 n.150 and McCrary Report ¶ 103 n.206 (citing Zaideman Dep. at 52:14–53:18).

[789] Johnson Report ¶ 68 n.150 and McCrary Report ¶ 104 n.212 (citing Wachsman Dep. at 118:8–119:14).

compensation-related literature, or in the evidence.[790]  Again, it is important to look at what the company *does*, and not merely what it *says* it does.

409.    Dr. McCrary puts forth various pieces of evidence wherein USPI compensation professionals claim that USPI did not use pay ranges.[791]  But even Dr. Saravia admits that, like most companies, USPI reviewed salary ranges, provided these ranges to Senior-Level Employee recruiters, and tracked employee compensation.[792]  This guidance supports my opinion that USPI maintained a structured pay system.

410.    Dr. Saravia's objections that I failed to provide evidence to show that USPI used salary ranges is also unavailing, and that my analysis is deficient because what ranges USPI did use were broad and "summarize salary . . . one of many components of compensation" are not borne out by Exhibit 20 in the Saravia Report.[793]

411.    USPI also has differentiated pay across job levels.  The median SVP base pay is 80% higher than that of VPs, which, in turn, is 22% higher than that of directors.  Dr. Saravia's Exhibit 20 uses total compensation (not just base pay) and also seems to use the entire range of actual employee pay.[794]

412.    Obviously, job level (title here) is a major determinant of how much an individual is paid.  In 2019 (using 2019 $, not 2017 $ as she used), the median base pay (and 25th percentile to 75th percentile range) for an SVP was $205,833 ($147,281 to $239, 042) for a VP $114,500 ($96,402 to $140,162), and for a Director $94,040 ($80,951 to $112,869).  The range spread is

---

[790] Saravia Report ¶¶ 32, 181–182, 185; McCrary Report ¶¶ 103–104.

[791] McCrary Report ¶ 104.

[792] Saravia Report ¶¶ 181–82.

[793] *Id.* ¶ 185.

[794] *Id.* ¶ 174, Ex. 20.

defined as the salary range maximum/salary range minimum – 1. (The minimum is often set equal to the 25th percentile and the maximum equal to the 75th percentile, based on external market pay surveys.) Therefore, the range spread at USPI was 62% for SVPs, 45% for VPs, and 39% for Directors.

413. In its 2019 survey, WorldatWork found that the typical range spread is 70% to 80% for the executive level.[795] WorldatWork survey participants have highly structured compensation systems. Therefore, USPI has less variation in pay within its ranges (smaller/narrower range spreads) than the highly structured WorldatWork survey participants. The fact that USPI has *less* variation in pay than established, highly structured compensation systems studied by WorldatWork demonstrates that USPI has a highly structured compensation system.

414. Defendants Benchmarked Their Internal Pay Structures Against External Pay Data. I testified that the next step in creating a structured compensation system is benchmarking potential pay levels and salary midpoints, minimums, and maximums against external data for equivalent jobs in the labor market.[796] "Benchmark" jobs share enough similar content to be matched against similar employers.[797] This step is important because at every company, employees share their concerns about external equity with their employers (i.e., pay fairness across similar jobs at different companies).[798] Below, I explain that Defendants' Experts do not refute my assessment of the evidence showing that Defendants' employees valued external

---

[795] GERHART, *supra* note 94, at 290, Exhibit 8.20.

[796] Gerhart Report ¶ 115.

[797] *Id.*

[798] *Id.*

equity, or my analysis of the evidence in support of my opinion that Defendants' administrative pay systems implemented fundamental benchmarking principles.[799]

415.     *Defendants' Employees Care About External Equity.*  Based on my experience and research in the compensation and human resource management fields, the evidence demonstrates that Defendants' employees were not unique, and like most other employees in the United States, had concerns about external equity and pay fairness.[800]  Defendants' Experts do not attempt to rebut my opinion, so I have no cause to change it.

416.     *Benchmarking.*  I testified that according to my compensation-related expertise and the compensation-related literature and theory, to manage employees' widespread concerns about external equity, organizations can use benchmark jobs to match their internal pay structures with pay values assigned by the external market.[801]  In other words, a firm can use benchmarking for many jobs to directly compare a job's internal value with its external value (e.g., the 25th, 50th, and 75th percentile values), and thereafter price its own jobs.[802]  This process forms the basis of a systematic pay structure.[803]

417.     Dr. Johnson and Dr. Stiroh do not address the overview I provide regarding the relationship between benchmarking and external equity.  Dr. Saravia likewise does not rebut my opinion that benchmarking facilitates a firm's structured pay system's ability to achieve external equity.  Rather, she agrees that "[c]ompanies regularly consider information about their

---

[799] *Id.* ¶¶ 115–116.

[800] *Id.* ¶ 115(a)–(e).  Note that though "employees are very interested in knowing how their compensation compares to the market[,]" "[a] separate question is how good is the information they have on that," which I discuss above.  Gerhart Dep. at 124:20–125:10.

[801] Gerhart Report ¶ 115(f).

[802] *Id.*

[803] *Id.*

competitors' compensation for Senior Employees as part of benchmarking analyses."[804] Similarly, Dr. McCrary agrees that benchmarking efforts "are common in labor markets to determine whether pay for a job generally aligns with what competitors are offering for workers in similar jobs."[805] Further, he explains that "without information about what other competitors are paying, the firm has to guess at where to set pay and risks setting pay too low."[806] I therefore have no cause to change my views.

418. *DaVita Relied on the Foregoing Benchmarking Practices.* I testified that DaVita produced an overwhelming amount of common evidence that DaVita benchmarked its internal pay against external market data.[807] Notably, Dr. Johnson and Dr. McCrary explicitly agreed that DaVita utilized benchmarking practices,[808] which further substantiates my opinion. Otherwise, Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not submit any evidence that refutes my opinion regarding DaVita's benchmarking practices. As such, my opinion is unchanged.

419. *SCA Implemented Typical Benchmarking Practices.* Similarly, I determined that based on my review of the common evidence, SCA also benchmarked its compensation to external pay data.[809] Dr. Johnson agrees that SCA used benchmarking practices, and he also did not put forth any evidence contrary to my opinions that SCA benchmarked its internal pay to external pay rates.[810] Moreover, Dr. Saravia provided additional evidence that *supports* my

---

[804] Saravia Report ¶ 145.

[805] McCrary Report ¶ 63.

[806] *Id.* ¶ 158.

[807] Gerhart Report ¶ 116(a).

[808] Johnson Report ¶¶ 89–91 ("Defendants regularly benchmarked compensation to external labor market data[.]"); McCrary Report ¶¶ 60–64 ("Defendants benchmark proposed class members' pay against what competing employers are offering to workers in similar jobs.").

[809] Gerhart Report ¶ 116(b).

[810] Johnson Report ¶¶ 89–91.

-171-

analysis of SCA's benchmarking practices. For example, she cites to the deposition testimony of former SCA CDO Mathis and former SCA COO Rucker, wherein both explained that SCA relied on benchmarking to achieve external equity.[811] Dr. McCrary also provided evidence supporting my finding that SCA used benchmarking; he explained that "SCA engaged PricewaterhouseCoopers to conduct an 'Executive Total Cash Assessment in 2012, in which they compared pay for certain VPS and above to aggregate pay statistics reported in industry surveys from Mercer, Economic Research Institute, and Towers Watson."[812] Accordingly, my opinion is unchanged.

420. *USPI Benchmarked Its Pay Structures*. I testified that USPI used benchmarking to achieve external equity.[813] As with SCA, Dr. Saravia referenced additional evidence in support of my opinion regarding USPI's benchmarking practices. For example, she provided numerous examples wherein USPI offered retention bonuses "to adjust employee compensation for changes in the labor market," which shows that USPI monitored labor market pay rates and adjusted internal pay accordingly.[814] Dr. Saravia also puts forth evidence to show "that USPI sought to pay 'market-based' and 'performance-driven' base salaries," and its compensation decisions accounted for "research on what other firms paid."[815] Dr. McCrary also provided additional evidence that bolsters my assessment: he explained that "USPI collected market salary data from PayScale and CareerBuilder when considering whether to issue market pay

---

[811] Saravia Report ¶ 145 n.204 (citing Mathis Dep. at 51:21–52:2; Rucker Dep. at 261:24–263:24).

[812] McCrary Report ¶ 63 (citing SCA001280928).

[813] Gerhart Report ¶ 116(c).

[814] Saravia Report ¶ 63.

[815] *Id.* ¶ 189 & nn.286, 289; *see also id.* ¶ 145 & n.204 (citing Martin Dep. at 92–93 (deposition testimony wherein former USPI SVP, Corporate Controller and Chief Accounting Officer Anthony Martin explained that USPI benchmarked to assess its company performance)).

adjustments for certain RVPs in 2017, and former USPI SVP and Chief Human Resources ("HR") & Support Services Officer Sandi Karrmann also testified that USPI obtained market compensation surveys when setting pay raises for class positions."[816] This is dispositive and consistent with my opinion.

### 3. Substantial Additional Common Evidence Shows That Defendant Firms Used Systematized Compensation Structures.

421. Moreover, I explained that I reviewed extensive additional documentary and deposition testimony common to the Class in support of my opinion that Defendant firms had structured and systematic compensation practices.[817] Below, I explain that Dr. Johnson, Dr. Saravia, and Dr. McCrary cannot credibly argue otherwise, particularly where their Reports cite to additional evidence that undermines their arguments and bolsters mine. I also explain that Dr. Stiroh ignored my analysis entirely.

422. Figure 15 in my opening report (below) shows that employers use the same percentage salary budget increase for different job levels. Using the same increase year after year contributes to average pay at different levels moving in lockstep over time.

---

[816] McCrary Report ¶ 63 (citing USPI_CIV_000021897 at USPI_CIV_000021898; USPI_CIV_000021899 at USPI_CIV_000021899; Karrmann Dep. at 40:21–41:1).

[817] Gerhart Report ¶¶ 117–120.

**Gerhart Report, Figure 15**[818]

FIGURE 2    **Total Salary Budget Increases, by Employee Category**

Salary Budget Increases (zeros included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 2.9% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% |
| Exempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Officers/Executives | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| All | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |

Salary Budget Increases (zeros not included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Exempt Salaried | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |
| Officers/Executives | 3.1% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% |
| All | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |

423.     When using actual compensation data, things are complicated by the fact that there are hires and departures, as well as promotions (and perhaps a few demotions) from year to year. Therefore, actual compensation at different levels will not appear to move in as tight of a lockstep. However, the presence of such "complications" actually provides an opportunity to see how structured the compensation system is. If, despite the churn of individual employees over time, pay at different levels continues to move in tandem, that would be evidence that compensation is so systematized and structured that it can be seen even when the population of employees changes substantially.

---

[818] Gerhart Report ¶ 152, Figure 15 (citing WORLDATWORK, SALARY BUDGET SURVEY at 20 (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf).

-174-

424. According to Dr. Johnson' Exhibit 5, there were 3,570 total external hires into the Class during 2008 to 2019.[819] Based on Dr. Johnson's Exhibit 8 and Exhibit C-1, the mean number of Class Members during 2008–2019 was 2,182.[820] As such, there were clearly a great many departures as well. It would be compelling evidence of the existence of a structured pay system if pay at different levels moved together at different levels despite the huge change in who the employers are.

425. In **Figure 1** (below), there are plots of how base pay at the three job levels (SVP, VP, and Director) moved across 15 years for each of the three Defendants and simple descriptive statistics (correlations) showing how those movements are interrelated.

**Figure 1**[821]



---

[819] Johnson Report ¶ 38, Ex. 5.

[820] *Id.* ¶ 48, Ex. 8; *id.*, App. C., Ex. C-1.

[821] *See* my workpapers.



426.    At DaVita, the correlations between adjacent levels are .95 and .97.  The
correlation between Directors and SVPs, two levels apart, is .92.

427.    We see very similar results at USPI.

428.    SCA is more complicated given that SCA was acquired by Optum in 2017 and
had a highly unusual and large decline in base pay among SVPs from $293,977 in 2016 to
$211,560 in 2017, with a further decline, only ending in 2021.  This unusual and large volatility
in base pay likely has to do with the small number of SVPs (12, in 2016, 8 in 2017), as well as

the fact that a decline in SVPs from 12 to 8 is substantial (a decline of one-third). Further, as noted, acquisitions often translate into considerable restructuring of positions at higher levels. If we instead use the 2008–2016 period for SCA, we see that SVP pay correlates at a substantial positive level with that of VPs and Directors. In both time periods, the pay over time of VPs and Directors is highly correlated (.96, .93). The very high correlation across the three job levels over time, despite the tremendous change in who the employees were during that time, provides compelling evidence of the existence of a highly structured compensation system.

429. Defendants' Pay Structures. I opined that common evidence I have reviewed shows that Defendants created and maintained structured pay systems.[822]

430. *DaVita.* I submitted substantial evidence to provide additional support for my opinion that DaVita maintained systematized pay structures.[823] Below, I explain that Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not provide any contrary evidence and therefore have not convinced me to change my views.

431. Dr. Johnson argues that a March 2018 internal DaVita document discussing a "high degree of customization" used by DaVita to determine compensation shows that pay at DaVita was individualized.[824] Dr. McCrary similarly argues that pay was individualized, because, for example DaVita's current CEO Javier Rodriguez and former Chief Wisdom Officer Steven Priest testified that DaVita negotiated pay with new hires and to retain employees, which is a standard practice in American companies.[825] There are two problems with this argument.

---

[822] Gerhart Report ¶¶ 117–120.

[823] *Id.* ¶ 118.

[824] Johnson Report ¶ 68 (citing DVA_OMCEAL_001329257).

[825] McCrary Report ¶¶ 73 (citing Rodriguez Dep. at 58:5–23, 84:7–14 ("My role is to make sure that the enterprise has achieved its objectives of retaining, motivating, and incenting people, and that it's all done within our budget parameters."); Priest Dep. at 142:1–25), 74–76.

432.    First, the argument ignores the documentary record in my report showing that DaVita limited discretion in compensation decisions.  For example, DaVita required higher-level approval to deviate from set labor budgets.[826]  DaVita also limited managers' discretion in setting pay for new hires, which also required higher-level approval.[827]  The McCrary Report also includes evidence showing that DaVita managers had to consider specific factors, including "outstanding performance, facility needs, team needs, retention need and internal equity" to award merit increases to employees.[828]  This is exactly what a merit matrix / grid does.[829]  Dr. McCrary also explains that at DaVita, "leaders within each group are tasked with allocating bonuses to their employees based on their individual performance," subject to higher-level approval.[830]  Specifically, "HR analyzes all allocations and notes ones that are not aligned with performance reviews . . . .  Allocations are reviewed closely by the executive in charge of the group for VPs as well as for outliers noted by HR."[831]  The foregoing belies Dr. McCrary's citation to the deposition testimony of DaVita COO Mike Staffieri to argue that "that, during the Class Period, there was no formalized or clear process for how leaders allocated their compensation budgets among the employees who worked under them."[832]

---

[826] Gerhart Report ¶ 118(a)(b)(iv) (citing Chipman Dep. at 135:2–13; Staffieri Dep. at 163:1–164:25; Ex. PX25).

[827] *Id.* ¶ 118(a)(b)(iv)(A) (citing Staffieri Dep. at 131:8–19, 158:15–159:4; Ex. PX23).

[828] McCrary Report ¶ 77 (citing Ex. PX19 at DVA_OMCEAL_001399774 (DaVita's pay policy instructed supervisors, "We recommend that you use your merit pool to reward your highest performers and/or rectify potential pay inequities within your team.")).

[829] Gerhart Report ¶ 134,  Figure 11 (citing RAYMOND NOE, JOHN HOLLENBECK, J. BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCE MANAGEMENT:  GAINING A COMPETITIVE ADVANTAGE 538 (13th ed. 2023)).

[830] McCrary Report ¶ 77 (DVA_OMCEAL_001344570 at DVA_OMCEAL_001344575).

[831] *Id.*

[832] *Id.* ¶ 76 (citing Staffieri Dep. at 150:7–152:1).

-178-

433. Further, Dr. Johnson admitted that he was not offering the opinion that there are no "rules or principles" that Defendants use to actually determine pay for their employees,[833] nor was he offering the opinion that "employee pay levels were set in a random and unstructured fashion[.]"[834]

434. Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not otherwise rebut my assessment of the evidence showing that DaVita implemented and maintained systematic pay structures. Accordingly, my opinion is unchanged.

435. *SCA Used Compensation Structures*. I similarly opined that SCA systematized its pay practices.[835] Below, I confirm that Dr. Johnson and Dr. McCrary have not given me cause to change my opinion.

436. Dr. Johnson and Dr. McCrary appear to argue that SCA did not have a systematic pay structure (i.e., a pay structure capable of transmitting impacts Class-wide) in place.[836] Not only would this be unfathomable in a company of its size, it's also unsupported by the evidence.

437. For example, I am not persuaded that SCA's former Director of Compensation and Senior Compensation Zaideman was being accurate when he testified to the absence of a compensation structure. He stated that SCA "had absolutely no framework for compensation" before 2021, and that "there was no system in place" "to help managers decide what to pay their employees."[837] His testimony is belied by the breadth of evidence I submitted showing that SCA had a considerable network of pay policies, practices, and procedures—none of which Dr.

---

[833] Johnson Dep. at 258:6–25.

[834] *Id.* at 259:12–260:5.

[835] *Id.* ¶ 118(b).

[836] Johnson Report ¶ 68; McCrary Report ¶¶ 72–87.

[837] Johnson Report ¶ 68 n.150 and McCrary Report ¶ 104 (citing Zaideman Dep. at 54:22–56:5); *see also* McCrary Report ¶ 76.

Johnson and Dr. McCrary dispute.[838] Such practices included, as Dr. McCrary points out, maintaining a "'strong connection between real work, real deliverables, and the pay that people would receive,'" as well as accounting for "several factors," including performance," "when setting pay for proposed class members."[839]

438.    Additional evidence also casts doubt on Zaideman's assertion. For example, SCA's former VP of HR Service Delivery and corporate designee Brandon Ponds testified on behalf of SCA that SCA had structured compensation systems. Between 2009 and 2012, SCA used a salary review system as its compensation management system.[840] According to Ponds, "[i]n 2013 a new system was implemented, Success Factors, and that had internal nomenclatures assigned to it—gateway, teammate management system, and compensation management system—all interchangeably used for the Success Factors system."[841] These nomenclatures "are comprehensive of performance, development, . . . [and] the compensation module."[842]

439.    As at DaVita, SCA's compensation professionals maintained its systematic compensation structures. Ponds testified that SCA's compensation team was "responsible for inputting compensation-related data into salary review[]" and "configuring those systems."[843] The "compensation team has direct access to [this system] for purposes of maintaining the system, for purposes of configuring the merit planning worksheets, and then managers have access to go in to their organization specifically."[844]

---

[838] Gerhart Report ¶ 119.

[839] McCrary Report ¶ 77 (citing Cinnick Dep. at 46:3–11; Sandoz Dep. at 54:17–55:2).

[840] Ponds Dep. at 24:10–16.

[841] *Id.* at 24:17–25:1.

[842] *Id.* at 25:2–14.

[843] *Id.* at 28:9–15.

[844] *Id.* at 27:4–11. *See also* McCrary Report ¶ 76 n.154 (citing Fanning Dep. at 169:19–170:12 ("Very few people have absolute authority" to set pay at SCA.)).

440.    Moreover, according to evidence in the McCrary Report, SCA sought "to be thoughtful and deliberate regarding how we make equity awards each year[.]"[845]

441.    Even if managers truly sought help with pay decisions exclusively by asking Zaideman, that is still evidence of a pay system.[846]  In other words, the fact that managers knew to email Zaideman for guidance because Zaideman was responsible for maintaining SCA's compensation structure is evidence of a pay system.  Further, evidence in the McCrary Report belies Dr. McCrary's own argument.  Dr. McCrary cites to an internal SCA email wherein Zaideman says that SCA does "not have a traditional merit matrix for the merit [increase] process."  Zaideman elaborated, however, that he has "advised and guided these mangers towards best practice which recommends they consider the teammate's current pay position compared to the external marketplace in conjunction with their performance rating when making a merit recommendation."[847]  This type of guidance and structure is precisely what a merit matrix does, as demonstrated by Figure 11 in the Gerhart Report.[848]

442.    I am also not persuaded by Dr. McCrary's contention that evidence that SCA Senior-Level Employees often leveraged job offers to negotiate pay increases shows that SCA did not have systematic pay structures.[849]  Such negotiations would have occurred within the context of SCA's overall pay structure, as I explained in my report.[850]  Indeed, in support of his

---

[845] McCrary Report ¶ 143 & n.276 (citing SCA000545210 at SCA000545215 (SCA's 2015 internal Compensation Committee Meeting slide deck explains, "We also intend to make awards from time to time to approximately 25% of Senior Directors and 10% of Directors, based on extraordinary value contribution and retention considerations.")).

[846] *Id.* ¶ 104.

[847] *Id.* ¶ 76 (citing SCA000075527 at SCA000075527).

[848] Gerhart Report ¶ 134, Figure 11 (citing NOE ET AL., *supra* note 829, at 538).

[849] McCrary Report ¶¶ 73–76.

[850] Gerhart Report ¶ 119(a) (citing Cinnick Dep. at 65:4–14 (According to SCA GVP of HR Warren Cinnick, "[a]ll jobs eventually ended up inside of a salary structure" at SCA.)).

-181-

opinion Dr. McCrary relies on an internal SCA exchange wherein SCA negotiated pay associated with a promotion with a Class Member.[851] These negotiations were not only subject to higher-level approval, but conducted so as to "preserve existing SCA title, job, and pay frameworks[,]" "prevent compression[,]" and "uphold current internal equity and organizational reporting hierarchy."[852] As such, my opinion is unchanged.

443. *USPI Used Systematic Compensation Structures.* I have also provided ample documentary and deposition testimony confirming that USPI's administrative pay structure was systematic.[853] Below, I explain that Dr. Saravia and Dr. McCrary have not convinced me to modify my opinions, and in fact succeeded in doing the opposite. Indeed, at a minimum, Dr. Saravia agrees that USPI had a compensation system.[854]

444. **Compensation Components.** Dr. Saravia and Dr. McCrary agree that USPI used base salary, bonus pay (including annual and one-off bonuses), deferred compensation, and equity to pay its employees.[855] According to **Figure 2** (below) from my compensation textbook, the foregoing are typical compensation components:

---

[851] SCA000523268 (cover email) and SCA000523273 (attachment).

[852] SCA000523268 at SCA000523269.

[853] Gerhart Report ¶ 118(b).

[854] Saravia Report ¶ 69.

[855] *Id.* ¶¶ 57–69; McCrary Report ¶¶ 78, 142 & n.275. *See also* GERHART, *supra* note 94, at 14–15 (explaining that compensation returns "include pay received directly as cash (e.g., base, merit, incentives, cost-of-living adjustments)[.]").

**Figure 2: Total Returns for Work**[856]



445. **Annual Compensation Process**. Further, the Saravia Report supports my determination that USPI systematized its pay system.[857]

446. For example, Dr. Saravia introduced evidence showing that USPI set an annual merit budget, and thereafter USPI's managers recommended salary increases for their subordinates in line with the budget.[858] Dr. Saravia explains that the merit pool budget was "a company-wide 'starting point,' expressed as a percentage (e.g., 2 percent) that typically tracks inflation."[859] This corroborates the evidence I provided to show that USPI had systematic pay practices.

---

[856] GERHART, *supra* note 94, at 15, Exhibit 1.5.

[857] *See, e.g.,* Saravia Report ¶¶ 57–69.

[858] *Id.* ¶ 59.

[859] *Id.* ¶ 158.

447.    Dr. Saravia also confirmed that USPI had an annual process for setting a bonus pool, and managers were tasked with awarding bonuses based on performance.[860]  These bonuses were highly formulaic, which confirms that USPI had a highly systematic pay system.[861]

448.    **Limited Discretion**.  Dr. Saravia's and Dr. McCrary's argument that I failed to consider evidence showing that pay at USPI was individualized is contradicted by the evidence, and is not supported by compensation-related literature and theory.[862]

449.    For example, Dr. Saravia submits evidence that managers had limited discretion to deviate from the bonus formula, and exceptions required supervisor approval.[863]

450.    The evidence Dr. Saravia and Dr. McCrary submitted to show that USPI considered individualized factors in putting together pay offers for new hires and in making salary increase, equity, and retention payment recommendations only reinforces my opinion.[864] As I explain above, it is normal that managers exercise a degree of discretion in setting pay. Generally, companies permit managers to exercise judgment in a manner consistent with their organization's pay strategy, and their judgment is subject to approval.  This is borne out by evidence I produced in my opening report showing that USPI put structural limits on manager's discretion in setting pay, which Dr. Saravia and Dr. McCrary ignore.[865]

451.    Additional support can be found in the Saravia Report.  For example, here is how Dr. Saravia describes how bonus payouts were decided at USPI[866]:

---

[860] *Id.* ¶ 60.

[861] *Id.* ¶ 61.

[862] *Id.* ¶¶ 190–193; McCrary Report ¶¶ 69–87.

[863] Saravia Report ¶¶ 61–62, 191.

[864] *Id.* ¶¶ 190–193; McCrary Report ¶¶ 73–76.

[865] *See, e.g.,* Gerhart Report ¶¶ 120(a)(iii) (citing USPI_CIV_000901340), 135(c)(ii) (citing Karrmann Dep. at 45:19–47:4; Ex. PX297).

[866] Saravia Report ¶ 61; McCrary Report ¶ 73.

[A]nnual bonus amounts were "based on a mathematical calculation" that factored in the performance of the company or a specific facility, as well as the employee's performance toward certain goals. Each job had a different bonus target. For example, the target in 2015 for administrators was 14 percent of their salary, while it was 30 percent for RVPs, 25 percent for home office vice presidents [] and senior vice presidents [], and 50 percent for market presidents. The weighting and measure of USPI or facility performance also varied by job, with less-senior field operations employees evaluated on case growth in addition to earnings before interest, taxes, depreciation, and amortization ("EBITDA"), while employees at the corporate office were evaluated on USPI's EBITDA.

452.     Dr. Saravia goes on to opine that "individual supervisors could override" the "annual bonus formula."[867]  Of course, "override" implies it would be unusual.  Also, Dr. Saravia in her next sentence says "supervisors could request" a higher "discretionary amount" in addition to the formula.[868]  In other words, the supervisor could not unilaterally override the formula-based bonus amount.  It also seems likely that few supervisors would request a lower payout than generated by the formula.

## C.     Defendants' Compensation Systems Sought to Achieve Internal Equity and Pay Fairness.

453.     I testified that according to the compensation-related literature, internal equity and fairness are core tenets of organizational compensation processes.[869]  I also explained that the evidence is consistent to show that Defendant firms had structured pay systems to maintain internal equity.  Below, I explain that Defendants' Experts have failed to convince me to change my opinion.

454.     According to Dr. Saravia, I define internal equity as such[870]:

1. Pay within a job level should be similar and pay across job levels should be differentiated.  2. When one or some Senior Employees' compensation increases (or decreases), other Senior Employees' compensation should also reflect similar

---

[867] Saravia Report ¶ 62.

[868] *Id.*

[869] Gerhart Report ¶¶ 121–126.

[870] Saravia Report ¶ 172.

changes to maintain the compensation structure. 3. Compensation paths should be similar across Senior Employees over the course of their career at USPI.

455.    Similarly, according to Dr. McCrary, I "discuss the concepts of 'internal equity,' the idea that individuals doing similar work within a firm should receive similar pay."[871]

456.    Their language is ambiguous and misrepresents my views. For clarity, my report stated[872]:

> Internal equity means paying employees within the same company similarly to other employees within the same company doing similar work and making similar performance contributions. Internal equity depends on maintaining certain pay differentials based on job title, level, performance, etc. Any time these differentials stray from the internal equity objective (e.g., two employees doing similar work and making similar performance contributions are paid very differently), the goal is to correct the outliers so as to avoid undesirable and costly employee reactions to perceived pay inequity.

457.    Dr. Saravia omits my emphasis on performance contributions. Internal equity has no meaning if one ignores performance contributions in determining an individual's pay. She also omits my documentation of a structured compensation system as being characterized by pay ranges.[873] Pay ranges exist to differentiate the pay of employees at the same level, within the same pay range, based on their different performance contributions. Thus, internal equity and pay ranges go hand in hand. By ignoring the fundamental role of pay ranges to allow pay

---

[871] McCrary Report ¶ 70.

[872] Gerhart Report ¶ 94.

[873] *Id*. ¶ 113. There, I gave the standard definition of range spread: (pay maximum – pay minimum)/pay minimum. I then noted: "Survey data indicate that the typical range spread is 46–59%" and in my Figure 6, showed that range spread of up to 80% was used. *Id.* ¶ 113(b) (citing WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (2023)). Likewise, above I cite survey evidence that a 70% to 80% range spread is typical at a higher level. I showed there that USPI's rate ranges were 62% for SVPs, 45% for VPs, and 39% for Directors. Based on that, I concluded earlier in my current report that USPI has less variation in pay within its ranges (smaller/narrower range spreads) than the highly structured WorldatWork survey participants. The fact that USPI has less variation in pay than established, highly structured compensation systems studied by WorldatWork demonstrates that USPI has a highly structured compensation system.

variation based on performance contributions, to support internal equity, Dr. Saravia implies that employees in a structured compensation system are all paid the same (including over time), regardless of their performance. That is not accurate and is, in fact, very contrary to the design of a typical structured compensation system. Dr. McCrary recognizes that Defendants pay individuals differently based on differences in individual performance, but also seems to (mistakenly) believe that is inconsistent with a structured compensation system.[874] Again, nothing is farther from the truth. Internal equity is defined as paying different employees in a similar role differently based on their individual performance differences.

458. Pay growth over time for those who stay with the same company is higher with promotions. Promotions, in turn, are based on individual performance. That is another mechanism by which a structured compensation system results in differentiated pay over time for different performance at the individual level.[875]

459. As a final note, Dr. McCrary effectively concedes that Defendants sought to maintain internal equity. He opines[876]:

> Prof. Starr's within-job analysis is also incapable of testing for rigid pay structures, and instead is merely able to show that hourly wages for workers who are highly similar in terms of their skills, experience levels, and other characteristic (e.g., workers in the same granular job title at the same Defendant in a given year) tend to be similar.

His determination that "[t]his pattern is entirely consistent with highly similar workers being subject to similar labor supply and demand forces, which has nothing to do with the rigid

---

[874] McCrary Report ¶ 77 ("A third reason that proposed class members' pay is highly individualized is that Defendants condition many components of proposed class members' pay on individual performance, resulting in additional variation in compensation across the proposed class.") (emphasis omitted).

[875] GERHART, *supra* note 94, at 350–351.

[876] McCrary Report ¶ 100.

claimed pay structures" is absurd.[877]  Market benchmark data is used to set pay levels in systematic compensation structures, as at Defendant firms.

460.  Internal Equity Principles Are Fundamental to Systematic Pay Structures.  In my report, I provided an overview of equity theory.[878]  Dr. Johnson and Dr. McCrary did not attempt to refute my opinion explaining internal equity principles.  Moreover, both freely admit that external equity is a legitimate concept.[879]  Why would external equity be legitimate, but internal equity is not?  Dr. Johnson and Dr. McCrary cannot square this circle, and they do not try.  Similarly, Dr. Saravia and Dr. Stiroh ignore my analysis of equity theory's role in pay structures.  As such, I have no cause to change my opinion.

461.  Literature and Other Evidence Demonstrates the Importance of Fairness in Compensation-Setting.  Moreover, I opined that common evidence in economics and other disciplines establish that pay fairness is an important consideration in compensation matters.[880]  Defendants' Experts did not put forth any testimony or evidence contrary to my assessment that according to economics and compensation-related literature, compensation professionals aim to achieve internal equity in their organizations' pay structures, because it is important to employees.  As such, my opinion is unchanged.

462.  Compensation Professionals Seek to Maintain Internal Equity.  I also explained that, pursuant to the foregoing, compensation professionals expend a lot of time and energy to achieve internal equity in their companies' pay structures.[881]  If they fail to address internal

---

[877] *Id.*

[878] Gerhart Report ¶¶ 123–124.

[879] Johnson Report ¶ 88 (discussing the "well understood [] econometrics and statistics literature on 'peer effects.'"); McCrary Report ¶¶ 60–64.

[880] Gerhart Report ¶ 125.

[881] *Id.* ¶ 126.

-188-

equity concerns or disruptions, employee productivity will likely drop and turnover will increase.[882] Defendants' Experts did not rebut my analysis explaining that compensation professionals must address concerns about fairness in pay levels across jobs and job levels, as well as across different job titles. I therefore have not changed my assessment.

463. <u>Defendants Prioritized Internal Equity in Their Compensation Structures.</u> Next, I explained that, based on my experience in the compensation-related and human resource management fields, the evidence shows that Defendant firms sought to achieve internal equity in their systematic pay structures.[883]

464. Individualized pay determinations are not inconsistent with pay structures geared towards maintaining internal equity. The definition I gave of internal equity, as reflected in a structured compensation system in my opening report, was companies "treating similarly-situated employees (i.e., employees in similar roles/jobs with similar performance contributions) within their companies similarly."[884] Of course, then individuals making different performance contributions would be paid differently and each company has a highly structured process in place to accomplish that (through merit increases, short-term incentives, long-term incentives), as well as practices in place to monitor that these highly structured processes (i.e., paying for performance) are being used and to flag exceptions, which are scrutinized. The fundamental rationale for why companies have salary ranges is exactly because it allows them to "individualize" pay based on different performance contributions made by those in the same job level and/or same job title. Supervisors (and often others) are asked to provide input into merit pay decisions by providing performance ratings. (No one in the compensation-related field

---

[882] *Id.*

[883] *Id.* ¶ 127.

[884] *Id.* ¶ 7(h)(iii).

disagrees that part of being a manager is to make judgments.) Short-term incentive payments typically have a major formulaic component and long-term incentive decisions are made at the highest levels of the organization, presumably in a systematic manner.

465. For example, Dr. McCrary argues[885]:

[P]ay for proposed class members [was] highly individualized [because] Defendants make adjustments to proposed class members' pay based on differences in skills, and in the demand for those skills, across workers. For example, Named Plaintiff Allen Spradling testified that it was "probable" that SCA considered matching job offers made to IT employees by competing firms during his tenure at SCA, as IT skills were "very in demand and transferable" during this period.

This anecdote does not make the point Dr. McCrary thinks it does. If IT is an in-demand field in the labor market, then the combination of internal and external equity forces will place *broad pressure* on IT employees' pay.

466. Below, I explain that while Dr. Stiroh did not attempt to refute my assessment, Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's efforts to rebut my opinion are unconvincing, and their arguments that I inaccurately describe the role of internal equity in Defendants' pay systems lack foundation in the evidence and in the compensation-related literature. I also explain that variable compensation and internal equity principles are consistent with one another.

467. In fact, Dr. Johnson concedes that it was "unsurprising" that Dr. Starr's wage suppression regression shows that compensation at all Defendant Firms "generally moved together between 2005 and 2022," which is also in alignment with the general principle that pay differentials between jobs tend to be consistent over time both internally and externally. Moreover, Dr. McCrary is clear that he does "not dispute that Defendants consider internal

---

[885] McCrary Report ¶ 83 (citing Spradling Dep. at 123:12–125:24).

equity to some degree . . . nor that Defendants have one or more processes for thinking about setting compensation."[886] Case in point.[887]

468. *DaVita Maintained Internal Equity.* I testified that common evidence is consistent to show DaVita aligned its compensation policies and practices with internal equity principles.[888] Dr. Johnson and Dr. Stiroh did not put forth any evidence or testimony contrary to my assessment that DaVita's systematic pay structures were grounded in internal equity considerations.[889] Additionally, Dr. Saravia testified at deposition that she does not "have an opinion on whether DaVita used compensation structures to maintain internal and external equity[.]"[890] Dr. McCrary also does not dispute that DaVita's compensation structures accounted for internal equity, but argues that pay was highly individualized.[891] The argument that individual employees must be paid the same in a structured compensation system is simply wrong. The only circumstance where pay truly lacks any individualization in a company is in the traditional union context. As such I have no cause to change my opinion.

469. *SCA Maintained Internal Equity.* I opined that SCA produced extensive common evidence documenting its systematic pay structures.[892] Discussed above, Dr. Johnson appears to make the inconceivable argument that SCA did not have a pay system altogether. Otherwise,

---

[886] *Id.* ¶ 70.

[887] Johnson Report ¶ 78. This is also contrary to Dr. Saravia's assertion that her Exhibit 21 shows that USPI's compensation did not move together year-over-year. Saravia Report ¶ 176, Ex. 21; ¶ 185. Likewise, it refutes Dr. McCrary's contention that "proposed class members' pay does not move together over time," as demonstrated by his Exhibits 12–14, such that Defendants' conduct would not have commonly impacted Class Members. McCrary Report ¶¶ 30, 90–98, Exs. 12–14.

[888] Gerhart Report ¶ 127(a).

[889] *See* Johnson Dep. at 158:8–12.

[890] Saravia Dep. at 64:14–19.

[891] McCrary Report ¶¶ 70–71.

[892] Gerhart Report ¶ 119.

Johnson did not refute my analysis explaining that SCA sought to maintain internal equity.[893] Moreover, Dr. Saravia testified at deposition that she does not "have an opinion on whether SCA used compensation structures to maintain internal and external equity[.]"[894] Dr. McCrary also does not disclaim that SCA sought to maintain internal equity, but does object that internal equity and the degree to which SCA permitted individualized pay are inconsistent.[895] As above, this is inaccurate.

470. *USPI Maintained Internal Equity.* I opined that based on my experience and review of testimony and USPI documents, USPI maintained a systematic compensation structure.[896]

471. **All Pay Structures Allow for Individualization.** Dr. Saravia and Dr. McCrary make the implausible argument that decisions about how much to pay individual employees at USPI had no rhyme or reason, being unsystematic to the point of being random. In some cases, Dr. Saravia claims that I failed to consider that at USPI, "pay was individualized."[897] As noted, above, that pay differs based on individual performance is a core principle of a structured compensation system. That is far different from pay differences having no rhyme or reason or core principles. As such, for the same reasons as above, this argument is wrong and does not cause me to change my own opinion.

472. This is borne out by evidence introduced in the Saravia Report, which supports my view that Dr. Saravia and Dr. McCrary overstate the extent to which USPI's pay structures

---

[893] *See* Johnson Dep. at 158:8–12.

[894] Saravia Dep. at 64:8–13.

[895] McCrary Report ¶¶ 70–71.

[896] Gerhart Report ¶ 120.

[897] Saravia Report ¶¶ 30–31, 172–193; McCrary Report ¶¶ 72–87.

provide for rampant principle-free pay individualization. As I discuss above, USPI limited managers' discretion to set pay, though of course there will always be a degree of discretion in any systematic pay structure. But even Dr. Saravia agrees that pay decisions required higher-level approval. For example, she opined that USPI executives reviewed and either approved or denied salary increase recommendations "in aggregate along with market adjustments[.]"[898] Likewise, she states, "for the November 2009 salary increases, while senior management' provided a spreadsheet showing a 'proposed' salary increase of 2 percent across the board, 'many returned the spreadsheets requesting varying increase percentages with explanations for the increase,' and varying increases were approved."[899]

473. The foregoing also deflates Dr. Saravia's argument that "USPI considered internal equity only across employees in comparable roles with similar performance at facilities that were similar in terms of size and complexity."[900] It is unclear what the issue is here, because this is how internal equity works.[901]

474. **Taking Account of Market-Based Salaries Is Not Inconsistent with Internal Equity.** Dr. Saravia also opines that evidence that USPI paid "market-based" base salaries is inconsistent with my opinion that internal equity was a core tenet of USPI's pay structures.[902] Dr. Saravia appears not to understand the interplay between internal and external equity.

475. Internal equity cannot be achieved without taking full account of external equity / the market. The idea that internal equity and external equity give very different indications of

---

[898] Saravia Report ¶ 59 (citing Ex. PX88 at DOJCIV-008-00000359; English Dep. at 40:10–18; Ex. PX111 at USPI_CIV_000810697).

[899] *Id.* (citing USPI_CIV_000147704 at USPI_CIV_000147704).

[900] *Id.* ¶ 189.

[901] *Id.*

[902] *Id.*

what to pay jobs is not correct. Most organizations price jobs based on external equity (i.e., consistent with firms they choose outside as comparisons). The difference between a Director and a VP in a comparable company should not typically be much different from the internal differences, lest the firm risk overpaying or underpaying its employees.

476. However, the firm must also evaluate internal equity because, as I explained in my opening report[903]:

> [A major avenue by which] employees judge the fairness of their pay through comparisons with the compensation paid to others for work related in some fashion to their own. . . . Employees make multiple pay comparisons to assess the fairness of an internal pay structure. They compare both with other jobs in the same internal structure and with the pay for their job in the external market (i.e., at competing employers).

477. The primary difference between internal equity and external equity is that the former involves not only job-to-job pay comparisons, but also person-to-person comparisons (which are more possible given that everyone is employed by the same company and is evaluated with the same general system and by the same general people). Internal equity is most likely to deviate from external equity to the degree there are certain occupations/jobs that are especially critical to successfully executing a specific company's strategy. Accordingly, Dr. Saravia and Dr. McCrary have not convinced me to change my opinion.

### D. Internal Equity and Pay for Performance Are Not Mutually Exclusive.

478. I opined that internal equity and "pay for performance" policies are not incongruous, because paying employees who perform differently in proportion to their contributions to the organization is equitable.[904] Indeed, paying employees equally despite their different performance contributions is inequitable, and it can hardly be the case that some

---

[903] Gerhart Report ¶ 125(b) (citing GERHART, *supra* note 94, at 137–138).
[904] *Id.* ¶¶ 128–134.

companies prefer to hire worse performers and pay them more. I also opined that Defendants'

documents show that Defendants' pay-for-performance practices were consistent with their

commitments to achieving internally equitable systematic pay structures.[905]

479.    Dr. McCrary provides a hypothetical example wherein "Defendants used job-

specific pay ranges or grades to set pay," and[906] :

> [A] top performer attempts to negotiate pay higher than what the pay range or grade
> to which they are assigned based on their job title and annual performance rating
> would allow (i.e., because there are individualized components of their
> performance that cannot be captured by an annual performance rating, but that
> Defendants and competing performers value).  The employer suspects the top
> performer could seek employment elsewhere and command a higher salary.  The
> employer must then decide whether to respond to these latent competitive forces by
> granting the requested pay increase, or to prioritize internal equity by not agreeing
> to the pay increase.  If the top performer avails herself of outside options, then the
> employer prioritizing internal equity risks losing the top performer to another firm.

To respond, context is important here because the purpose of the pay maximum is not only to

promote internal equity—it is also there as a cost control tool.  There is typically a limit to how

much value someone can create in a job, and thus there is a logic to how much a firm may wish

to pay someone in a job.  Firms typically prefer to pay significantly more when that employee is

promoted to a higher-level job where they can have a greater impact on the firm's performance.

Moreover, if employees are regularly receiving external pay offers with salaries beyond the

firm's pay range or grade maximums, that sends an important message to the firm that it must

consider raising the pay structure altogether, or consider widening the pay ranges (if justified by

substantially large differences in performance).  All told, internal equity requires paying

employees equitably, which is different than paying them equally.

---

[905] *Id.* ¶ 135.
[906] McCrary Report ¶ 81.

480.    Below, I explain that Defendants' Experts have not convinced me to change my views.

481.    <u>Defendants Achieve Equity by Paying for Performance.</u>  I opined that Defendants' compensation structures sought to maintain internal equity and to pay for performance.[907]

482.    *DaVita's Practices Account for Equity and Performance.*  I opined that common evidence supports my opinion that DaVita used various practices to award employees merit increases during the Class Period.[908]  Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not rebut the evidence I provided showing that DaVita used the logic of merit increase grids/compa-ratios to reward high performers and rectify pay inequities.  Rather, the McCrary Report includes additional evidence that supports my testimony.  For example, Dr. McCrary explained, "[A] set of internal talking points from 2018 describing DaVita's pay practices explains that '[p]erformance is the first consideration when making pay decisions,' such that '[o]ver time a top performer should earn substantially more' than other employees."[909]  He also explains that according to former DaVita Senior Director of Recruiting Operations, Strategy & Employment Branding Colleen Arthur, "'there was a strong philosophy to pay for performance' when she worked at DaVita."[910]  Finally, he put forth evidence that at DaVita, incumbent employees could

---

[907] Gerhart Report ¶ 135.

[908] *Id.* ¶ 135(a).

[909] McCrary Report ¶ 77 (citing DVA_OMCEAL_001322030 at DVA_OMCEAL_001322034).

[910] *Id.* (citing Arthur Dep. at 52:5–19 ("[T]he philosophy was to differentiate pay based on performance.")); *see also id.* ¶ 180 & n.361 ("Internal business documents at DaVita also indicate that not all employees receive merit pay increases due to factors including performance.").

leverage their performance to negotiate for higher pay, which is internal equity.[911]  Accordingly, my opinion is unchanged.

483.  *SCA's Practices Account for Internal Equity and Performance.*  I also opined that SCA used similar processes to align pay and performance in its compensation structures.[912]  As above, Dr. Johnson and Dr. McCrary did not engage with the evidence or testimony I put forth to show that SCA used compa-ratios and other typical pay-for-performance practices to achieve internal equity.  Instead, the McCrary Report contains support for my testimony:  "Similarly, an internal presentation from 2016 discussing total compensation at SCA explains that '[SCA's] total compensation philosophy aligns pay and performance.'"[913]  Moreover, Dr. McCrary relied on the testimony of SCA's former GVP of HR Warren Cinnick to show that "'there was a strong connection between real work, real deliverables, and the pay that people would receive' at SCA."[914]  He likewise explains that according to former SCA VP of HR Jennifer Sandoz, SCA considered a variety of factors, among them performance, when setting pay for its Senior-Level Employees.[915]  Dr. McCrary also cited an example wherein former SCA Director of IT Governance and Administration, Plaintiff Spradling, sought and received a pay increase because of his performance, which shows that SCA cared about maintaining internal equity.[916]  As such, I have not changed my opinions.

---

[911] *Id.* ¶ 74 (citing DVA_OMCEAL_001059650 at DVA_OMCEAL_001059652).

[912] Gerhart Report ¶ 135(b).

[913] McCrary Report ¶ 77 (SCA001159728 at SCA001159729).

[914] *Id.* (citing Cinnick Dep. at 46).

[915] *Id.* (citing Sandoz Dep. at 54–55); *see also id.* ¶ 180 (citing SCA001125179 at SCA001125180 ("[A]t SCA, an internal business document from 2013 indicates that SCA employees that received a performance rating of '[d]oes not meet standards' would receive a 0% pay increase.")).

[916] *Id.* ¶ 74 (citing SCA000000198 at SCA000000200).

484. *USPI's Practices Account for Equity and Performance.* I testified that, like DaVita and SCA, USPI produced similar common evidence documenting internally equitable pay-for-performance practices.[917] Below, I explain that the Saravia and McCrary Reports contain additional evidence that provides further support for my opinion, and that Dr. Saravia and Dr. McCrary have not otherwise persuaded me that my opinion is incorrect.

485. Dr. Saravia contends that I failed to consider documents that show USPI calibrated pay to performance; those documents, she claimed, show USPI aimed to pay "'performance-driven' base salaries," and that managers evaluated employee performance when setting salaries. Dr. Saravia argued that those documents contradict the idea that USPI implemented systematic pay structures that sought to achieve internal equity.[918] This argument is again predicated on a basic misunderstanding of how internal equity works. Relatedly, Dr. McCrary asserts that I failed to consider evidence showing that at USPI, "performance was one of several factors that [USPI] considered when setting pay for proposed class members."[919] Indeed, "USPI's '2014/2015 Merit Guidelines' recommended a 0% merit increase for candidates that received a performance review of 'Doesn't Meet/Perf. Plan.'"[920]

486. As I have testified, accounting for performance in pay-setting is part and parcel with internal equity. It would be far more inequitable to pay employees in similar roles similarly if those employees performed dissimilarly. Moreover, as I explained in my opening report, USPI's managers did not evaluate employee performance without any guidance or oversight. For example, I provided evidence that USPI issued merit increase guidelines, and required that

---

[917] Gerhart Report ¶ 135(c).

[918] Saravia Report ¶ 189.

[919] McCrary Report ¶ 77.

[920] *Id.* ¶ 180 (citing USPI_CIV_000099574).

annual merit increase recommendations be reviewed up the ladder.[921] The McCrary Report provides additional support. For example, Dr. McCrary explained that "USPI evaluates employees' performance according to a Performance Management Plan ('PMP'), which assigns ratings to individual employees."[922] "The overall purpose of USPI's Performance Management Plan (PMP) is to align individual performance to the company's business objectives . . . . This plan provides a supportive work environment to help our employees achieve[] their goals."[923] That USPI limited supervisors' discretion to award increases regardless of how strong an employee's performance was supports my opinion that USPI had a structured compensation system. The McCrary Report also provides evidence of specific instances wherein USPI Class Members received pay increases on the basis of their strong performance.[924] These are examples of USPI taking action to promote internal equity.

487. Dr. Saravia and Dr. McCrary do not contest the other testimony or evidence I submitted to show that USPI baked both internal equity and pay-for-performance considerations into its pay structures. As such, I have no cause to change my opinion.

## VII. DEFENDANTS' CONDUCT LIKELY HAD CLASS-WIDE COMPENSATION EFFECTS VIA THEIR STRUCTURED COMPENSATION SYSTEMS.

### A. Defendants' No-Poach Agreements Likely Lead to Cascading Compensation Effects Class-Wide.

488. I opined that Defendants' No-Poach Agreements likely suppress Class Members' compensation.[925] Below, I explain that Defendants' Experts' Reports do not rebut my opinion

---

[921] Gerhart Report ¶¶ 135(c)(iii) (citing Ex. PX115 (cover email) and Ex. PX116 (attachment); Ex. PX453 at USPI_CIV_000095467 ("Merit increase guidelines are attached.")), 135(c)(iv) (citing Karrmann Dep. at 47:5–48:7).

[922] McCrary Report ¶ 77 n.165 (citing USPI_CIV_000037627 at USPI_CIV_000037627).

[923] *Id.*

[924] *Id.* ¶ 74 (citing USPI_CIV_000499023 at USPI_CIV_000499023).

[925] Gerhart Report ¶¶ 136–148.

-199-

that the No-Poach Agreements would have cascading effects on Defendants' systematic salary structures.[926]  I also explain that Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's analyses that Defendants' purported external equity concerns would limit the No-Poach Agreements' pay suppression effect are not relevant.[927]

489.    Cascading Effects to "All" vs. "Nearly All" Employees.  Dr. Johnson, Dr. Saravia, and Dr. McCrary dispute that Defendants had structured pay systems that would yield cascading effects to all or nearly all Class Members' compensation.[928]  Below, I explain why their critiques are unconvincing and unsupported by the evidence and compensation-related literature and theory.

490.    In my opening report, I cited a Federal Reserve study finding that 77% of employees changing employers do so in response to an unsolicited outside offer and my Figure 1 summarized research documenting that employees receive a substantial pay increase when they voluntarily change employers, especially higher-level employees.[929]  Of course, one does not have to change employers to *increase* pay.  One can instead use the offer as leverage to negotiate a higher salary at one's current employer.  Thus, there are more offers than employer changes/moves.  This means that any implication that harm to Class Members can be fully captured by estimating how many more employer changes/moves would have been made in the absence of restrictions is incorrect.  I also opined that the employee receiving the outside offer is

---

[926] Johnson Report ¶¶ 50–97; Saravia Report ¶¶ 104–132, 168–196, 283–291; McCrary Report ¶¶ 88–108; Stiroh Report ¶¶ 82–106.

[927] Johnson Report ¶¶ 65, 89–93; Saravia Report ¶¶ 194–196.

[928] Johnson Report ¶¶ 50–97; Saravia Report ¶¶ 21, 24–25, 104–132, 168–196, 283–291; McCrary Report ¶¶ 88–108.

[929] Gerhart Report ¶ 61(d) (citing Carrillo-Tudela, *supra* note 216).

not the only employee to benefit from higher pay, and I explained the logic of how over time, cascading effects would result in higher pay for other employees.[930]

491.    Dr. Johnson, Dr. Saravia, and Dr. McCrary describe my logic as requiring that a change in one employee's compensation due to an outside job offer—or even a "cold-call"—lead to rapid adjustments of a similar magnitude for all or nearly all employees' compensation.[931] The Stiroh Report makes the similar argument that in order for outside job offers to change compensation for all or nearly all employees, compensation information would have to "be transmitted throughout the organization."[932]  Of course, I never argued that one outside offer or cold call would rapidly increase the compensation of "all employees" as Defendants' Experts claim, though "[i]t's possible that one offer could have a cascading effect," though of course "more offers would have a bigger cascading effect."[933]  In any event, one employee receiving an outside offer during the conduct period is hardly realistic.  One doubts that the Defendants would have gone to the trouble and risk of colluding to establish No-Poach Agreements if they believed outside offers in the absence of such agreements would be so rare.  If such agreements served to prevent a substantial number of unsolicited outside offers that Defendants' employees would have otherwise received, it would have had a major impact, including via cascading effects.

492.    Dr. Stiroh argues that "Plaintiffs' alleged mechanisms by which impact from the conduct would purportedly flow to all Senior-Level employees at DaVita would have taken time to impact compensation, if they did so at all.  Dr. Gerhart acknowledges that adjustments to

---

[930] *Id.* ¶¶ 50–51, 143(c)–(f), 157(a); *see also* Gerhart Dep. at 37:7–22 (I testified at deposition that "an indirect effect is [not] unimportant in any sense.").

[931] Johnson Report ¶ 64; Saravia Report ¶ 168; McCrary Report ¶¶ 87, 89.

[932] Stiroh Report ¶ 82.

[933] Gerhart Dep. at 217:7–24.

compensation 'take time to play out.'"[934] This analysis is incomplete. Smaller merit increases would account for some, but not all of the harmful effect of the conduct on pay. The cessation of cold calls from other Defendants and with that the lack of external salary offers and external salary information and the consequent reduced upward pressure on pay levels would also account for the harmful effect on pay. Some of these harmful effects would be immediate, in response to these cold calls stopping. Some harmful cascading effects could take somewhat longer as the cascading effects that would have otherwise occurred over time no longer occurred.

493. Base pay adjustments are made in reference to job titles/levels and pay ranges. Recall that I testified that the logic of merit increase grids grants smaller pay increases to employees with higher compa-ratios, which is employee salary divided by the salary midpoint for the employee's grade/range.[935] If a company adjusts salary midpoints upward to compete externally, that adjustment will diminish the compa-ratio for all employees.[936] Based on the logic of a typical merit grid, such an adjustment would likewise move many employees into a grid "cell" where they would receive a larger merit increase. In other words, such an adjustment will cause cascading effects to compensation that transmit across job titles/levels, and across the Class.[937]

494. However, the foregoing does not necessarily mean that "from one year to the next, different employees' pay would trend in the same direction (either increasing for all employees or decreasing for all employees)," as Dr. McCrary asserts.[938] Indeed, this would *not*

---

[934] Stiroh Report ¶ 91 (citing Gerhart Report ¶ 143).

[935] Gerhart Report ¶¶ 131–133.

[936] *Id.*

[937] *Id.*

[938] McCrary Report ¶ 90.

be consistent with a structured compensation system, where pay for performance is a fundamental component. As noted above, one aspect of pay for performance is that merit increases are higher for high performers in a role on average than for low performers in that role. Equal merit increases (equal changes in base pay) are not consistent with the standard merit increase grid or with structured compensation systems. Bonuses are often even more closely tied to performance. Indeed, bonus payout size is often based on a predetermined formula specifying higher bonus payouts as a function of higher performance on metrics. Again, there is no expectation of equal bonuses (except when performance on metrics is equal).[939]

495. It also does not follow that "when observed over a longer time horizon, employees' pay profiles would move together over time."[940] Over time, employee differences in performance not only result in different merit increases and bonuses, they also result in some employees getting promoted more often than other employees, which is a major explanation for differences in salary growth/changes over time. Again, this is a fundamental feature of structured compensation systems. In his Exhibits 13 and 14, Dr. McCrary shows that different employees have different pay growth over time.[941] That is exactly what is expected under a structured compensation system, given its emphasis on pay for performance and the fact that employees do not have equal performance and that their performance can vary over time. As noted earlier, surveys by WorldatWork of its members, which use structured compensation systems, show, contrary to Dr. McCrary's claim, that narrow observed pay ranges are *not* part of a structured compensation system.[942] (As noted, such narrow pay ranges are more likely to be

---

[939] *Id.* ¶ 92, Ex. 12.

[940] *Id.* ¶¶ 90, 93 (emphasis omitted).

[941] *Id.* ¶¶ 93–84 & Exs. 13–14.

[942] *Id.* ¶ 96.

found in a traditional blue collar union setting, not among professional and managerial employees.)

496.　How Cascading Effects Work.　**Figure 3** below provides a hypothetical example of how cascading effects would work using just a small subsample of four employees (two Directors, one VP, and two SVPs) to simplify things.

**Figure 3**

| Employee | Job Title/Level | Salary | Performance | Salary/Performance | Salary/Performance Differential versus Row Below | Job Title/Level | Salary | Performance | Salary/Performance | Salary/Performance Differential versus Row Below | Job Title/Level | Salary | Performance | Salary/Performance | Salary/Performance Differential versus Row Below |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Pre-Offer** | | | | | **Post-Offer (immediate)** | | | | | **Post-Offer (near term)** | | | |
| 1 | SVP A | 160 | 4 | 40 | 1.33 | SVP A | 160 | 4 | 40 | 1.33 | SVP A | 207.0 | 4 | 51.8 | 1.33 |
| 2 | VP A | 120 | 4 | 30 | 1.20 | VP A | 120 | 4 | 30 | 0.92 | VP A | 155.5 | 4 | 38.9 | 1.20 |
| 3 | Director A | 100 | 4 | 25 | 1.00 | Director A | 130 | 4 | 32.5 | 1.30 | Director A | 130 | 4 | 32.5 | 1.00 |
| 4 | Director B | 125 | 5 | 25 | | Director B | 125 | 5 | 25 | | Director B | 162.5 | 5 | 32.5 | |
| | | | | | | | | | | | | | | | |
| | Salary Total Cost | 505 | | | | | 535 | | | | | 655 | | | |

497.　In practice, there would be many employees in each role and many unsolicited outside job offers coming in (in the absence of restrictions) throughout the company.　Internal equity, as I described in my original report, is fundamental to employee compensation management.[943]　First, equity theory tells us that employees compare their pay to the pay of others, including peers, as well as those in higher and lower level jobs.　Employees do not expect to be paid the same.　They do, however, expect their pay to be in line with their performance/contributions to the success of the company.　A structured compensation system strives for this same goal, by paying jobs that are more important to the success of the business more (e.g., VPs earn more on average than Directors) and by paying employees with higher performance more than employees with lower performance.

---

[943] Gerhart Report ¶¶ 121–135.

498.    To capture this internal equity, **Figure 3** above is a hypothetical scenario that shows the ratio of salary/performance and how that ratio compares across employees ("Salary/Performance Differential versus Row Below").  Director A and Director B report to VP A, and VP A reports to SVP A.  Pre-offer, Director A and Director B have different salaries, but their ratios of salary/performance are equal.  Thus, internal equity between them exists.  Then, Director A receives an unsolicited outside offer for $130,000 ("130") versus a current $100,000 ("100") salary.  Director A has now learned their external market value (and that external equity of their pay is in doubt).  Director A does not move.  Rather, Director A negotiates an increase of $30,000 in salary to match the external $130,000 offer.  Internal equity with respect to Director B no longer exists because Director A has lower performance, but (now) a higher salary compared to Director B.  In this scenario, Director B is likely to be very dissatisfied due to a perception of a lack of internal equity (and with the realization that external equity is lower than realized).

499.    *Impact on Director B.*  Director B has at least a few courses of action.  First, Director B can begin an active job search.  After all, Director B has now learned from Director A's offer that there may be jobs in the external market that pay more than Director B's current $125,000.  Indeed, if Director A, whose performance is lower than that of Director B's, can earn $130,000, then Director B might anticipate an external offer well above $130,000.  Second, Director B can tell the company that if Director A, with lower performance, now makes $130,000, it would only be appropriate for Director B's salary to be raised to beyond $130,000.  If the company does not increase Director B's salary, then Director B may leave (turnover) due to dissatisfaction with internal equity, but also with external equity.  The company then will need to promote someone into Director B's job (resulting in a salary increase for the person promoted,

-205-

which this person would likely not have received in a restricted market) or conduct an external search, which is not only costly, but will likely require hiring someone (if of equal performance/contribution level to Director B) in at a salary higher than what Director B was earning. As such, the company may decide to increase Director B's salary. To restore the previous ratio of salary/performance would require a new salary of $162,500 for Director B.

500. *Impact on VP A.* Another cascading effect comes because now VP A has a smaller pay differential compared to Director A and to Director B if Director B is given a salary increase and stays. VP A expects there to be an appropriate payoff to being a Vice President rather than a Director. Further, VP A now also has better external market salary information thanks to Director B's outside offers (an impact which is further reinforced if the company decided to increase Director B's salary rather than do an external search). To restore the previous relationship between VP A's salary and that of the Directors would require increasing VP A's salary to $155,500. The final effect in this example is that SVP A's salary is now less different than that of VP A. To restore the previous situation would require an increase to $207,000 for SVP A. Thus, in the post-offer (near term) stage, we see that the salary for these four employees has increased from a total of $505,000 to $655,000, a 30% increase.

501. Of course, in the absence of Defendants' mobility restrictions, there would be many (more) unsolicited outside offers throughout the companies, providing the impetus for disruption of internal equity (which means salary is proportionate to performance/contribution), resulting in salary increases for those receiving offers, as well as for those not receiving offers (either by having their salaries adjusted upwards internally or searching/leaving for higher paying external jobs).

502.     *Turnover Contagion.*  The scenario could also play out with any of Director A, Director B, VP A, or SVP A changing employers after the impetus of the outside offer to Director A.  Should that happen, the possibility of turnover contagion comes into play.  If others at my current company move for higher pay to another company and I learn from them, who are uniquely positioned to compare both my current employer and my prospective employer, that they are happy with their move(s), then I see less risk/uncertainty and will likely focus more on the upside of making such a move myself.  Especially when these alternative employers are growing and hiring, one employee leaving can easily turn into many following that employee.  With unsolicited outside offers coming into many employees throughout a company, the potential for turnover contagion can grow rapidly.  This large-scale turnover risk (or, alternatively, higher labor costs required to head off such turnover) would provide an incentive to implement no-poach agreements, especially with what would be deemed especially attractive alternative employers to one's employees.

503.     At deposition, Dr. Johnson testified to the cascading effects scenario I provide as "preposterous."[944]  It is unclear why.  Employees place a strong value on pay that is equitable based on internal and external equity comparisons and react when they perceive it is not.  That is why internal equity and external equity are a major focus and key objectives for companies (including the Defendants) in managing employee compensation.  In my original report, my

---

[944] Johnson Dep. at 231:16–232:13.

Figure 4 included courses from WorldatWork, the leading association of compensation professionals.[945]  Prominent were internal equity, external equity, and pay structure design.[946]

504.  The foregoing analysis also dismantles Dr. McCrary's argument that Defendants' No-Poach Agreements would not affect (1) Class Members employed by USPI and DaVita who were uninterested in employment opportunities at SCA, (2) Class Members who did not engage with proactive solicitation, and (3) Class Members whose employment options were restricted because of non-compete agreements, unvested equity, and/or Defendants' non-solicitation agreements with third-party recruiters.[947]  In the study cited by Dr. McCrary, Bloom and Michel argue[948]:

> A large body of research indicates that the distribution of rewards within an organization is fundamental to employee attitudes and behaviors . . . .  This evidence indicates people care more about how their rewards compare to those of relevant others than about the absolute amount of rewards they receive[.]

In other words, consistent with equity theory, employees compare the ratio of their pay to their performance contributions to the corresponding ratio of other employees they deem to be relevant comparisons.  Their attitudes and behaviors will be more negative if they think their pay

---

[945] Gerhart Report ¶ 103(b), Figure 4 (citing WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025), https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual).  *See also id.* ¶ 115(a) (citing K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness:  Slippery Slope or Manageable Terrain?*, 20 WORLDATWORK J. 50–64 (Fall 2011)) ("Surveys [] show that employees are very concerned about external equity.  For example, a WorldatWork (2011) survey of compensation professionals demonstrated that 28% of employees 'frequently' or 'constantly express concern regarding external equity or fairness of base pay amount, and 51% "occasionally" express concern.").  Moreover, at least 14 states have passed pay disclosure laws since 2018, to make it easier for employees to assess pay equity.  *See* Lu, *supra* note 500.

[946] Gerhart Report ¶ 103(b), Figure 4 (citing WORLDATWORK, *supra* note 945).

[947] McCrary Report ¶¶ 107, 130–144.

[948] Bloom & Michel, *supra* note 751 at 33.

in not equitable based on this comparison. Again, this is why the design and execution of compensation systems focuses so much on equity.

505. <u>Top-Down Salary Structures Would Cause Cascading Effects.</u> Below, I explain that Defendants' Experts have not convinced me to change my view that Defendants implemented top-down salary structures that would cause "across the board" cascading effects.[949] In such structures, employees at the top of a pay scale in a firm play a role in determining the relative gains of those "below them," such that restricting the pay of those at the top will necessarily affect the pay of those below, as here.[950]

506. *DaVita.* Dr. Johnson, Dr. McCrary, and Dr. Stiroh did not address my opinion that common evidence shows that DaVita had top-down salary structures that would cause "across the board" cascading compensation effects.[951] As such, my opinions are unchanged.

507. *SCA.* As above, because Dr. Johnson and Dr. McCrary did not address my opinion that based on my review of evidence common to the Class, SCA had top-down salary structures that would cause the No-Poach Agreements to have widespread effects,[952] my opinions have not changed.

508. *USPI.* Dr. Saravia and Dr. McCrary failed to refute my opinion that USPI set its compensation structures from the top down.[953] Moreover, Dr. Saravia provided additional evidence common to the Class that USPI's top-down pay structures would have cascading effects on Defendant's Senior-Level Employees' pay.

---

[949] Gerhart Report ¶ 148.

[950] *Id.* ¶ 147.

[951] *Id.* ¶ 148(a).

[952] *Id.* ¶ 148(b)(ii).

[953] *Id.* ¶ 148(c)(ii).

-209-

509.    Dr. Saravia states that former USPI SVP and Chief HR & Support Services Officer Karrmann "testified that USPI 'didn't manage centrally, ultimately, the decisions that each center made about their employee increases.'"[954]  For one thing, this testimony is irrelevant because Karrmann was referring to lower-level employees employed at each outpatient medical care facility, who I understand are not members of the Class.  Moreover, managing pay centrally and managing pay from the top-down are two different things.  As such, Dr. Saravia's contention is not inconsistent with my opinion that USPI set its compensation from the top-down, which is also borne out by evidence that Dr. Saravia produced.

510.    For example, the Saravia Report includes evidence showing that USPI executives set the company-wide annual merit budget, and department heads and facility supervisors were tasked with recommending salary increases for their subordinates.[955]  These increases "were collected at corporate headquarters, reviewed, and approved in aggregate along with market adjustments by USPI executives."[956]  Moreover, Dr. Saravia cited to evidence that annual bonuses at USPI were based on several factors, including an "employee's performance toward certain goals[,]" which "were set by their supervisors, and could be very detailed.  Progress towards these goals would be evaluated by the supervisors."[957]  Likewise, both equity plans offered to Senior-Level Employees during the Class Period were "governed by USPI's compensation committee, which determined employee eligibility, award terms, vesting

---

[954] Saravia Report ¶ 59 (citing Karrmann Dep. at 43:8–19).

[955] *Id.* (citing Ex. PX88 at DOJCIV-008-00000359; English Dep. at 27:24–28:4, 52:2–17; Karrmann Dep. at 38:6–19; Ex. PX11 at USPI_CIV_000810697; USPI_CIV_000650633 at USPI_CIV_000650635–36; USPI_CIV_000689431).

[956] *Id.* (citing Ex. PX88 at DOJCIV-08-00000359; English Dep. at 40:10–18; Ex. PX111 at USPI_CIV_000810697).

[957] *Id.* ¶ 61 (citing Ex. PX88 at DOJ-CIV-008-00000360; USPI_CIV_000056611 at USPI_CIV_000056612, 615, 620, 622–823; USPI_CIV_000037627 at USPI_CIV000037627; USPI_CIV_000034853; USPI_CIV_000023134 at  USPI_CIV_000023140–41).

schedules, and types and amounts of equity compensation for USPI employees. The committee reviewed and approved equity grants proposed by USPI executives" for Senior-Level Employees.[958]

511.    Variable Compensation and Pay Differentials. Dr. Johnson, Dr. Saravia, and Dr. McCrary argue that my opinion regarding cascading effects is unsupported because many proposed Class Members received variable compensation.[959] Dr. McCrary also asserts that I failed to explain how compensation other than salary, and in particular equity pay, "would be linked across proposed class members."[960] Below, I explain that these arguments are inconsistent with the compensation-related literature and with the evidence I reviewed.

512.    A 2022 WorldatWork survey reported that in 2019, 87% of companies determined their competitive position using base salary, 8% used total cash compensation, and the remaining companies used some other approach.[961] That means the primary focus is on salary midpoints that align with market pay levels and pay minimums and maximums that align with lower and higher levels in the market (one approach is to use the 25th and 75th percentiles, respectively).[962] As such, a major focus on base pay makes sense. Unlike variable pay, base pay provides certainty in compensation-based income. Indeed, on a risk-adjusted basis, a dollar of uncertain variable pay is worth less than a dollar of certain base salary pay. (Dr. Johnson provided

---

[958] *Id.* ¶ 64 (citing USPI_CIV_000336973 at USPI_CIV_000336973; USPI_CIV_000022791 at USPI_CIV_000022805; USPI_CIV_000041645 at USPI_CIV_000041656; USPI_CIV_000890968 at USPI_CIV_000890973; USPI_CIV_000039709 at USPI_CIV_000039709; USPI_CIV_000121836 at USPI_CIV_000121836, 839; USPI_CIV_000467447 at USPI_CIV_000467458–60).

[959] Johnson Report ¶¶ 74–76; Saravia Report ¶¶ 183–185; McCrary Report ¶¶ 79–80, 84–87.

[960] McCrary Report ¶ 105.

[961] COMPENSATION STRUCTURE POLICIES & PRACTICES, *supra* note 873.

[962] GERHART, *supra* note 94, at 290.

examples of Defendants' employees not receiving variable pay when performance missed the target.)[963]  A structured compensation system does not have as a goal to use the salary structure to limit variable pay such as short-term and long-term incentives.  Rather, as the evidence has borne out, it determines short-term and long-term incentive payouts to its employees using a highly structured approach that relies on formulas using predetermined performance metrics and payout schedules.

513.    Exhibit 5 in the Saravia Report presents "Components of compensation."[964] Ordinarily, indirect pay (benefits such as paid time off ("PTO") and other benefits, which appear to be included in her Other category) are treated separately.  Focusing only on "Regular" pay (presumably base pay), Equity, and Bonus as total direct pay from her Exhibit 5, base pay as percentage of total direct pay was 64% at DaVita, 77% at SCA, and 80% at USPI.  Thus, base pay is the primary component.  This is not surprising—performance-based bonus and equity payments are more likely to comprise significant portions of pay for higher level jobs such as top executives.

514.    The same problem applies to Dr. McCrary's Exhibit 11.[965]  PTO is a benefit that is ordinarily treated separately from direct pay.  "Other" also includes benefits (e.g., "holiday") that are ordinarily treated separately.  If these are pulled out (as is standard practice in analyzing direct pay), "regular pay" becomes a larger share of direct pay, as I showed just above in examining Exhibit 5 in the Saravia Report.[966]  Note also that across the three Defendant firms,

---

[963] Johnson Report ¶¶ 155–157.

[964] Saravia Report ¶ 68, Ex. 5.

[965] McCrary Report ¶¶ 84–85, Ex. 11.

[966] There is insufficient detail (percentage represented by each category in each bar) in Dr. Johnson's Exhibit 11 to allow a similar adjustment to be made.

the largest employment category is Director, where base pay as a percentage of total direct pay is highest.

515.    In addressing the SCA-DaVita CSI Exchanges, Dr. Saravia questions how pay could have been suppressed "given that merit budgets pertain only to base pay."[967]  The answer is that, yes, there are multiple components to pay and the more of these components that are suppressed and the more each is suppressed, the more overall pay will be suppressed.  I never argued that suppression of merit budgets alone would account for the total amount of pay suppression.  However, it is part of the suppression.

516.    In my report, I provided other evidence that the Defendants were focused on internal equity in setting bonuses and issuing equity, which would cause compensation impacts to have cascading effects.[968]  Moreover, at higher-job levels, like Senior-Level Employee positons at Defendant firms, **Figures 4** and **5** below show that it is standard practice for companies using structured compensation systems to have bonus (short-term incentive) and equity (long-term incentive) payouts that add significantly to base pay, just as we see here. Bonus and equity payouts are determined in a systematic manner at companies generally and at Defendants specifically, which deflates Dr. McCrary's argument that I failed to show how Defendants' pay structures governed equity pay.[969]  Note also that the more compensation is

---

[967] Stiroh Report ¶ 112 & n.236.

[968] *See, e.g.,* Gerhart Report ¶¶ 127(a)(i)(A) (citing Ex. PX249 at DVA_OMCEAL_000906134 (DaVita's Compensation Philosophy instructed that bonus awards can be used to help restore internal equity), 127(a)(iii)(A) (citing Ex. PX551 (DaVita's then-CEO Thiry explained that bonus and equity should be adjusted to ensure internal equity)), 127(b)(ii) (citing Cinnick Dep. at 74:5–15, 69:15–70:24 (SCA granted bonuses with pay fairness in mind)), 120(a)(iii) (citing USPI_CIV_000901340 at USPI_CIV_000901341 (USPI implemented 2015 bonus levels, including minimums, targets, and maximums)).

[969] McCrary Report ¶ 105.

comprised of bonus and equity pay, the more the harm will be common to Class Members, given the impact of business performance on payouts.

**Figure 4:  Estimated Short-Term Incentive/Variable (Bonus) Pay as a Percentage of Salary and Performance Basis, by Employee Group**[970]

| Employee Group | Percentage of Organizations Where Eligible | Bonus/Variable Pay as a Percentage of Salary (Target) | | Performance Basis for Bonus Payout | | |
|---|---|---|---|---|---|---|
| | (A) | In Organizations Using Such Plans (B) | All Organizations (A x B) | Corporate | Division/Business Unit | Individual |
| Officers/executives | 99% | 49% | 49% | 62% | 19% | 19% |
| Exempt, salaried | 99 | 15 | 15 | 48 | 28 | 26 |
| Nonexempt, salaried | 48 | 6 | 3 | 44 | 29 | 26 |
| Nonexempt, hourly nonunion | 54 | 5 | 3 | 40 | 32 | 27 |

**Figure 5:  Allocation and Use of Long-Term Incentive Plans**[971]

| Employee Group | Median Percentage of Long-Term Incentive Grants Allocated |
|---|---|
| CEO | 13% |
| Officers/executives (excluding CEO) | 50 % |
| Exempt, salaried | 25 % |
| Nonexempt, salaried | 0% |
| Nonexempt, hourly nonunion | 0% |
| | **Practices/Use** |
| Percentage of organizations using long-term incentive | 91 % |
| Number of long-term incentive plans used | |
| One plan | 18% |
| More than one plan | 82% |

---

[970] GERHART, *supra* note 94, at 349, Exhibit 10.2.

[971] *Id.* at p. 350, Exhibit 10.3.

-214-

517.     *Bonus and Equity Payments at DaVita.*  As established by the Stiroh Report,

bonuses were "an important part of Senior Level employees' compensation packages" at

DaVita.[972]  For example, in the case of an employee being promoted to Senior Director, the

DaVita Compensation Team recommended[973]:

> Given that he is already very well compensated, we are a little limited if we don't want him completely out of line with other Senior Directors.  So, our recommendation is a ▮▮▮ increase to his salary, which would bring him to about ▮▮▮▮▮ base and then increase his bonus potential to ▮▮▮▮▮ is pretty much the top of the range for Sr Director bonus levels.  Most are between ▮▮▮▮▮ The median salary for Sr Directors is around ▮▮▮, so he is well above that with this offer.

518.     I also provided numerous pieces of evidence showing how equity pay fit into

DaVita's pay structures.  For example, in an internal 2012 email, former DaVita CEO Thiry

wrote[974]:

> Now when [the] stock [is] way up, we need to maintain equity.  If we have 2 citizens, both with salary of [] $200,000, both with bonus potential of $100,000, and both with some performance and potential.  Only diff[erence] is one of the people has $100,000 in vested equity value this value.  Therefore if right comp is $300,000[], one should get $100k bonus, other zero.  That is equity[.]

519.     *Bonus and Equity Payments at SCA.*  In my report, I explained that SCA

accounted for bonuses in its pay structure.[975]  I put forth consistent evidence showing that

according to former SCA GVP of HR Warren Cinnick, to maintain "fairness" in pay

structures[976]:

> [Y]ou do look internally and say, well, where is this person against others, similar job, that kind of thing.  Absolutely, that's a task . . . .  You would refer to it as a

---

[972] Stiroh Report ¶ 113.

[973] Gerhart Report ¶ 127(a)(iii)(B) (citing Ex. PX27 at DVA_OMCEAL_001339898).

[974] *Id.* ¶¶ 127(a)(iii)(A) (citing Ex. PX551), 127(a)(i)(A) (citing Ex. PX249 at DVA_OMCEAL_000906134 (DaVita's Compensation Philosophy policy explained that it was important to maintain internal equity in compensation decisions)).

[975] *Id.* ¶ 127(b)(ii).

[976] *Id.* (citing Cinnick Dep. at 74:5–15, 69:15–70:24).

way to say, what are we doing with others that are similarly placed? . . . [T]here's an element of equitable treatment in it.

SCA did this because "[a]nytime you're in a bonus-based system, you have to watch that you don't distort one element and then have it impact the entire cash compensation of a person."[977]

520.     SCA also took internal equity into account when issuing stock.  For example, former SCA COO Rucker explained[978]:

We strove to have a reasonable amount of equity role-by-role—*we strove to have internal equity* . . . (A) because there was an element of sort of fairness to it, and (B) we thought if the variability got . . . great of an extent, you were at risk of . . . having folks that you were underpaying, and they would leave and not want to be a part of the team.

The McCrary Report also put forth evidence consistent with Rucker's testimony.  According to a 2015 internal Compensation Committee Meeting slide deck, SCA sought to account for the "[i]mpact on internal pay outcomes and perceived fairness" in designing equity grants.[979]

521.     *Bonus and Equity Payments at USPI.*  Further, I previously explained that the Saravia Report provides evidence that at USPI, bonus potential varied systematically with job level,[980] which is very consistent with a structured compensation system and a focus on internal equity.  Moreover, according to an internal 2011 USPI memo[981]:

All USPI corporate employees are eligible for an annual bonus, based primarily on the Company meeting budgeted EBITDA goals . . . .  A portion of the bonus is considered "at risk" based on employees' achievement of personal performance objectives set by each individual and their manager.  Bonus ranges are set for each staff level, with a minimum of 5% for a staff level accountant and a maximum of 125% for the CEO.

---

[977] *Id.* ¶ 127(b)(ii) (citing Cinnick Dep. at 71:12–18).

[978] *Id.* ¶ 127(b)(i)(A) (citing Rucker Dep. at 325:21–326:9).

[979] McCrary Report ¶ 142 (citing SCA000545210 at SCA000545226).

[980] Saravia Report ¶ 61.

[981] USPI_CIV_000964138 at USPI_CIV_000964138; *see also* USPI_CIV_000901340 (2015 internal evaluation of USPI's compensation plan).

522.    Additional evidence illustrates how bonus payments fit into USPI's pay structure. For example, an internal USPI document prepared for its Compensation Committee explained that the firm planned to set the same minimums, target, and maximum bonus payments in 2017 as in 2016.[982]  "Other components" of the 2017 bonus plan "include[d] personal goals through our performance management plan system[.]"[983]

523.    The record evidence also shows that USPI did seek to achieve internal equity when issuing stock option grants.  USPI employees receive "a mix of base salary, bonuses, and, for qualifying employees, commissions, stock awards and deferred compensation."[984]  Pursuant to USPI's merger with Tenet in 2015, USPI began awarding stock options to its employees "in anticipation of [their] contributions to our Company's continuing success[.]"[985]

524.    USPI sought to make internally equitable stock option grants.  For example, in December 2015 USPI internally discussed how much equity to offer a Market President candidate.[986]  USPI's then-SVP and Chief HR & Support Services Officer Karrmann flagged[987]:

> [The candidate's] eventual upside potential will be a lot less than other Market Presidents, solely because he missed the first [tranche] of 40% of the total equity pool this past July.  We can't make this up without taking away from others in future grants.  Going forward, he will participate equal to other Market Presidents, but he just won't have the first 40% the others do.

525.    *Pay Levels.*  Dr. Johnson, Dr. Saravia, and Dr. McCrary allege that the so-called "wide distribution of compensation" for employees within Defendant firms' job levels and job

---

[982] USPI_CIV_000070529 (cover email) and USPI_CIV_000070534 (attachment) at USPI_CIV_000070534–35.

[983] *Id.*

[984] USPI_CIV_000964138 at USPI_CIV_000964138.

[985] *See, e.g.,* USPI_CIV_000059623 at USPI_CIV_000059623.

[986] USPI_CIV_000026885.

[987] *Id.* at USPI_CIV_000026886.

titles would prevent Defendants' conduct from causing cascading compensation effects.[988] Below, I explain why their arguments are unsound. Moreover, the only way to avoid overlap is to eliminate pay ranges at each level.

526.    First, Dr. Johnson, Dr. Saravia, and Dr. McCrary fail to understand that structured compensation systems use pay levels and salary ranges. Different job titles at different levels are paid differently on average and everyone in a job title does not need to be paid the same, and there is no expectation that this will occur. Further, "wide" is relative, and it is unclear what is being compared.

527.    Regardless, the differences are intentional:  salary ranges exist for the very purpose of ensuring variation in pay within a job, specifically as a function of performance contribution. Recall that equity requires paying employees in line with their contributions to the firm. If Employee A contributes much more to the organization than Employee B, but Employee B's pay is suddenly too close to Employee A's, Employee A will perceive this as inequitable.

528.    As I discussed, according to my compensation textbook and the 2019 WorldatWork survey, the typical range spread (i.e., the salary range maximum/salary range minimum – 1) for executives is 70% to 80%, and between 50 and 60% for other salaried employees.[989] This explains in part Dr. McCrary's assertion that benchmarking may "play[] a bigger role in compensation for low-skill positions than high-skill positions."[990]

529.    The purpose of the range is to recognize differences in performance contributions by different employees within the same pay range and/or job title. The maximum/minimum

---

[988] Johnson Report ¶¶ 71–73; Saravia Report ¶¶ 186–187; McCrary Report ¶¶ 90, 96–90, Exs. 15–18.

[989] GERHART, *supra* note 94, at 290, Exhibit 8.20.

[990] McCrary Report ¶ 65.

pertain to the salary range, and not to the lowest-paid and highest-paid employees in the range or title.

530.    Dr. McCrary again erroneously claims that in a structured compensation system, all employees within a role are paid similarly.[991]  As I have noted, only employees with similar performance contributions would be expected to be paid similarly.  (Dr. McCrary, of course, does not measure or include any measures of performance in his analysis.)  Dr. McCrary also erroneously claims that "observed pay ranges for adjacent seniority levels are not highly differentiated from one another, as Plaintiffs' experts claimed rigid pay structures would require."[992]  One simple question here:  Does Dr. McCrary feel that a current Vice President at a Defendant company would be indifferent to being demoted to the Director level because the pay is not really different at the two levels?  Of course not.  As I explained above, the only way to completely eliminate overlap in pay between adjacent job levels would be to pay everyone at a particular job level the same or nearly the same.  That, of course, would be inconsistent with the principle of equity (different pay based for different performance contributions), which is fundamental to structured compensation systems.  That is why overlap, as I noted previously, is a standard feature of structured compensation systems.

531.    **Quantitative Assessments Regarding Pay Differentials Are Unnecessary.**  Dr. Johnson also contends that I neglected to conduct any quantitative assessments regarding Defendants' pay differentials.[993]  Similarly, Dr. McCrary remarks that I neglected to provide any

---

[991] *Id.* ¶¶ 96, 98, Ex. 15.

[992] McCrary Report ¶ 96.

[993] Johnson Report ¶ 74.

quantitative evidence of the pay structure I opine exists at each Defendant firm.[994] Their critiques are ineffective.

532. An empirical analysis of Defendants' pay differentials is not needed because the vast majority of large companies use salary to define ranges, not total (direct) compensation (salary, bonus, equity). Salary ranges at the Defendants, whether formalized or not, are systematic, and are similar from year to year. No salary range is defined as the difference between the lowest and highest salary or between the lowest and highest total direct compensation for a job. The within-level variation (technically, this is the range, not the variance) and across-level overlap from following such an approach will look much larger as it is a function of the most extreme observations. It is also the case that the range of total direct pay will be larger because in a typical structured compensation system, it is standard practice for Senior-Level Employees to receive a significant share of total direct compensation in the form of equity and bonus. With respect to salary, contrary to how Dr. Johnson, Dr. Saravia, and Dr. McCrary approach the matter, it is typical for the minimum salary to be set, for example, at the 25th percentile in the external market (however that is defined and estimated) and the maximum at the 75th percentile (as opposed to, for example, the 5th and 95th percentile). When using actual compensation data, things are complicated by the fact that there are hires and departures, as well as promotions (and perhaps a few demotions) from year to year. Therefore, actual compensation at different levels will not appear to move in as tight of a lockstep.

533. Recall also that typically, merit increase percentages are almost always identical for different job levels, which indicates an organization's intent to maintain current base pay differentials between levels.

---

[994] McCrary Report ¶¶ 99, 106.

534.    Throughout this Rebuttal, I have provided some basic analyses to demonstrate that the Defendants did use structured compensation systems that aligned with the foregoing principles and maintained systematic and consistent difference in pay levels across job levels over time.  Accordingly, I am not persuaded to change my views.

535.    <u>Overlapping Pay Ranges Are Consistent with Structured Compensation Systems.</u> Dr. Johnson, Dr. Saravia, and Dr. McCrary argue that Defendants' job levels overlap, such that the harm would not spread.[995]  This is incorrect.  Range overlap, as seen in Exhibit 20 in the Saravia Report is a design characteristic of structured compensation systems.[996]

536.    There will of course be overlap in pay across adjacent levels in a structured compensation system.  Overlap is actually a feature of systematic compensation structures, and the only way to eliminate overlap is to greatly reduce the range spread, discussed above, which would throttle the firm's ability to pay for performance at the same level and/or within the same job.  For example, consider **Figure 6** (below), which shows different options for salary grade/range overlap in a structured compensation system:

**Figure 6:  Range Overlap**[997]



---

[995] Johnson Report ¶¶ 75–76; Saravia Report ¶¶ 186, 188; McCrary Report ¶¶ 30, 71, 96–98.
[996] Saravia Report ¶ 174, Ex. 20.
[997] GERHART, *supra* note 94, at 291, Exhibit 8.21.

Notice that in the example above, there is no option shown with zero overlap.

537.    Here, a Director performing at a very high level can be paid more in base salary than a newly-hired VP whose performance may not yet be to expectations given that she just started her job.  If that VP performs at a high level, she will get a large merit increase soon due not only to her performance but also due to the use of a compa-ratio in a standard merit increase grid.[998]

538.    Moreover, the example I provided in my opening report explicitly explains how effects cascade.[999]  I hypothesized that a current employee (e.g., a Director) at a Defendant firm received a cold call resulting in an offer of an external job with higher pay.[1000]  There were three jobs in the example, representing three different salary ranges (low to high):  Director, VP, and SVP, and these are in a reporting relationship.  That Director (Director A) can accept the offer, or can use the offer as leverage to negotiate higher pay in the current role.[1001]  In the example, a second Director (Director B) learns of the offer and of Director A's new higher salary (either at the current employer as a result of leveraging the offer or as a result of moving to the new employer).  Director B, the vice president, and senior vice president all gain new information about alternative external job and pay opportunities and perhaps Director A's new employer now is seen as a more concrete possibility.  If Director A leaves, others may follow, possibly to that employer.  If they stay, they may raise their pay expectations at their current employer due either to the new information on external equity of lack thereof.  If Director A and others stay, each will make comparisons between their pay and their performance contributions and those of

---

[998] Gerhart Report ¶ 132.

[999] *Id.* ¶ 143.

[1000] *Id.* ¶ 143(a).

[1001] *Id.*

Director A.  Upon doing so, they may feel a lack of internal equity and seek pay increases.[1002]

As this same chain of events takes place throughout the firm, it creates upward pressure on pay

and labor costs.  That upward pressure is lower to the degree outside offers have been restricted

due to No-Poach Agreements.

539.    Employees working in different job groups or functions also compare their pay

and performance contributions.  The Zhang et al. study of the effects of between-group pay

dispersion explains[1003]:

> Employees are likely to compare their pay against that of others in different job
> groups, especially when those others belong to a shared, larger unit (e.g., division,
> organization) and frequently interact toward a common goal . . . .  Such frequent
> work interactions under a shared collective goal render colleagues working in other
> job groups both relevant and proximal, increasing the likelihood that such
> colleagues will be selected as social comparison referents.

540.    Dr. McCrary also argues that "wide observed pay ranges within a level, and

substantial overlap in observed pay ranges for adjacent seniority levels, additionally mean that

changes in pay at one level would not necessitate changes in pay at other levels."[1004]  He

provides the following example using his Exhibit 15[1005]:

> [A] Vice President earning the median pay for his level (approximately $300,000)
> could experience a pay decrease of 14.5% (equivalent to Prof. Starr's estimated pay
> suppression effect) to $256,500, which is still within the observed range for Vice
> Presidents, as well as the observed range for Senior Vice Presidents.  Thus there
> would be no need for adjustments to the pay of other Vice Presidents or Senior Vice
> Presidents to maintain internal equity (or what Prof. Gerhart refers to as the

---

[1002] *Id.* ¶ 125(d) (citing Dow et al., *supra* note 945 (A WorldatWork survey "asked []
compensation professionals about what influence they believe internal reward equity or fairness
has on employee engagement, employee motivation, and employee satisfaction.  More than half
of respondents reported that they believe internal equity is 'extremely influential' for
engagement (56%), motivation (53%), and satisfaction (55%).") (cleaned up)).

[1003] Z. Zhang et al., *The effects of between-group pay dispersion*, 66 ACADEMY OF MGMT. J.
1860–1895, 1862 (2023).

[1004] McCrary Report ¶ 98.

[1005] *Id.* & Ex. 15.

'targeted differential' in pay between Vice Presidents and Senior Vice Presidents)[.]

It would be very interesting to see Dr. McCrary put his (novel) view of how people react to pay decreases in action. He again fails to recognize that equity is not about pay alone, it is instead about how one's pay compares to one's performance contributions and how fair they believe that ratio is when they compare the pay others receive for their performance contributions. Two people paid the same, but with different performance contributions, will be perceived as inequitable by the higher performer. Likewise, in Dr. McCrary's example, the VP receiving the pay cut will very likely perceive a strong sense of inequity if others with similar performance contributions do not receive such a pay cut and would be expected to seek a way to restore equity, which could include considering other jobs.

541. Finally, Dr. Johnson testified that he could not determine, based only on "overlap in pay across adjacent job levels," whether such overlap is "consistent or inconsistent with a structured pay system."[1006] And he, Dr. Saravia, and Dr. Stiroh decline to rebut the foregoing analysis. Accordingly, I have no cause to change my opinion.

542. <u>External Equity Constraints Do Not Preclude Pay Suppression.</u> Defendants' Experts also argue that my opinion that Defendants sought to achieve external equity is inconsistent with my opinion that Defendants' No-Poach Agreements would have suppressed pay Class-wide.[1007] Their opinions rest on a fundamental misunderstanding of how

---

[1006] Johnson Dep. at 269:18–23.

[1007] Johnson Report ¶¶ 65, 89–93; Saravia Report ¶¶ 194–196; McCrary Report ¶¶ 64–68 ("[R]ecord evidence shows that proposed class members leveraged outside offers from non-Defendant employers to negotiate pay increases . . . . Had Defendants tried to suppress these proposed class members' pay below what other firms were offering, these workers could simply have accepted their competing job offer."), 80 ("A 'pay-for-performance' strategy creates a tension between internal equity and market forces that Defendants are likely to resolve differently from one another, or differently for different workers."); Stiroh Report ¶¶ 46–49.

organizations, and in particular Defendants, incorporate external equity principles into their compensation structures, which is evidence common to the Class.[1008]

543.    First, external equity is not a total check on labor market restrictions because of the labor market fictions that advantage employers and disadvantage employees that I articulated above.  Because employees do not have perfect information about job opportunities (what they are, how well they match, what the pay would be), they do not have unfettered mobility or ease of movement even in unrestricted labor markets.  Indeed, as the U.S. Department of Treasury report points out, "monopsony does not imply a complete absence of market forces."[1009]

544.    Moreover, despite the fact that Dr. Johnson, Dr. Saravia, and Dr. McCrary mischaracterize my opinion, it is not the pay strategy of Defendants, or indeed of any company, to exclusively rely on the market to dictate pay.  Even if a company wished to do that, it would first have to figure out what market pay is, which is hard to do when there is no single going market rate of pay.  Further, not all jobs can be matched directly to comparable jobs in external market pay surveys.  In such cases, a company will compare the internal value of the job with jobs that can be matched and pay the unmatched job in proportion to its value relative to the matched jobs.  In other words, internal equity in this case helps bring external equity inside.  Finally, a company may decide that certain jobs are more critical to successful execution of its strategy and pay such jobs more, consistent with the internal equity focus on paying more for greater contributions.  Thus, although internal equity and external equity generally largely

---

[1008] This point is contrary to Dr. McCrary's assertion that he is "not aware of any information common to the proposed class that would allow Plaintiffs to address [] complex individualized considerations."  McCrary Report ¶ 68.

[1009] *See also* LABOR MARKET COMPETITION, *supra* note 38, at 3.

coincide, external equity alone does not fully explain pay levels, even if figuring out market pay was as easy as in simple economics models.

545.    Additionally, Dr. Johnson agrees:  at deposition, he testified that he had "not offered the opinion that the entirety of class pay levels were determined by external benchmarking."[1010]

546.    Further, as I explain in my textbook[1011]:

> [P]eople love to talk about 'the market rate' as if a single rate exists for any job, with the implication that organizations are constrained to pay that same rate to their own employees in that job.  Nevertheless, [**Figure 7** below] instead shows that organizations can and do vary in how closely they match the 'going rate.'  There is no single 'going mix' of pay forms, either.  [**Figure 7**] compares the pay fix for the same job (software marketing manager) at two companies in the same geographic area.  Both companies offer about the same total compensation.  Yet the percentages allocated to base, bonuses, benefits, and options are very different.

As such, contrary to Defendants' Experts' opinions, my testimony that new hire compensation "would probably have to be within sight of what the competitive rate would be" is consistent with my assessment, because as I have explained, there is no single market-clearing wage.[1012]

---

[1010] Johnson Dep. at 246:9–25.

[1011] GERHART, *supra* note 94, at 217–218.

[1012] Gerhart Dep. at 56:1–9; Johnson Report ¶ 43; Saravia Report ¶ 77 n.135; McCrary Report ¶ 120 n.235; Stiroh Report ¶ 49.

**Figure 7: Two Companies: Same Total Compensation, Different Mixes**[1013]





547.     As my compensation textbook and **Figure 8** below explain[1014]:

[T]he factors that affect decisions on pay level and pay mix include (1) competition in the labor market for people with various skills; (2) competition in the product and service markets, which affects the financial condition of the organization; and (3) characteristics unique to each organization and its employees, such as its

---

[1013] GERHART, *supra* note 94, at 219, Exhibit 7.4.

[1014] *Id.*

business strategy, technology, and the productivity and experience of its workforce. These factors act in concert to influence pay-level and pay-mix decisions.

**Figure 8: What Shapes External Competitiveness?**[1015]



548.     This is borne out by the evidence in my report of a table consolidating external data DaVita collected in 2014 showing that between 2006–2014, DaVita's annual base salary merit increases were consistently lower than average base salary increases as compared with the healthcare industry and all industries, which Dr. Johnson and Dr. Saravia do not address.[1016] Clearly, DaVita perceived that it could safely offer sub-market merit base pay increase rates at no detriment to its performance.

549.     Consider also that there is substantial variation in pay across employers within an industry, calling into question whether all of the employers in an industry are actually competing for the same employees.  For example, in 2010, in the NAICS industry Outpatient Care Centers,

---

[1015] *Id.* at 220, Exhibit 7.5.

[1016] Gerhart Report ¶ 148(a)(vi)(A), Figure 14 (citing Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854).

Management Occupations (621400), the 25th-percentile annual pay was $60,840, the 50th-percentile (median) was $79,940, and the 75th-percentile pay was $107,890.[1017] Either these are major differences in pay level that do not prevent firms from competing in labor markets for the same employees, or firms within this industry are not all comparable and are thus competing for some subset of employees within this industry. If the latter is true, it is incorrect to treat these firms as equally viable employment options. In other words, there are fewer employers in competition for Defendants' employees than might have been inferred.

550.    Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's testimony is also inconsistent with their opinions regarding variations in Defendants' pay levels, discussed below.[1018] If there is variation, each company will have significant discretion in choosing whether to pay at, above, or below market for a particular job, which is exactly how it played out. Specifically, Exhibits 11 and 12 from Dr. Johnson's report show clear differences in median pay level for the Defendants with DaVita highest, SCA next highest, and USPI lowest.[1019] The foregoing also undercuts Dr. McCrary's assertion that "[m]arket forces would persistently chip away at such a structure in ways that are inherently individualized, as high performers seek outside options or, in negotiation with their incumbent firm, point to their ability to do so."[1020]

---

[1017] *Occupational Employment and Job Statistics*, U.S. BUREAU LABOR OF LABOR STATISTICS, https://www.bls.gov/oes/tables.htm (last visited June 26, 2025). In addition, although the 75th percentile is not available for the occupation of "Chief Executives," the median pay is $142,370. That is obviously much lower than the pay for CEOs at the Defendants, and using chief executives has the advantage of using one single well-defined occupation. This comparison again points to many employers in the industry not actually being in competition with the Defendants for employees.

[1018] Johnson Report ¶¶ 71–73; Saravia Report ¶¶ 186–187; McCrary Report ¶¶ 60–62, Exs. 8–10.

[1019] Johnson Report ¶ 71, Ex. 11; *id.* ¶ 72, Ex. 12.

[1020] McCrary Report ¶¶ 80–82.

**B.**     **Defendants' CSI Exchanges Would Likely Broadly Suppress Employee Compensation.**

551.     I opined that, pursuant to common evidence and based on my experience and research in compensation and human resource management, Defendants' coordination on pay for a subset of job titles would likely cascade to all or nearly all Class Members.[1021] As such, Defendants did not need to coordinate on compensation for all Senior-Level Employee job titles, as long as they successfully colluded to suppress compensation for some positions because those suppressive effects would be spread widely to other Senior-Level Employees.[1022] I also opined that if the collusion successfully reduced Defendant firms' merit increase budgets, all of Defendants' employees would experience reduced pay.[1023]

552.     Moreover, I opined that Defendants' CSI Exchanges of merit increase budgets were likely to reduce Class pay because a salary merit increase budget typically applies to all employees in a company, and the merit increases sizes in percentage terms are usually uniform across jobs and job levels intra-company.[1024] Defendants' Experts contend that it is my opinion that Defendants' CSI Exchanges would "likely" have impacted compensation, but I have not sufficiently demonstrated that this conduct *could* suppress pay, let alone shown that it actually *did* suppress pay Class-wide.[1025] Moreover, they represent that I did not provide any empirical assessment of the CSI Exchanges' impact on employee pay to suggest that my analysis is inadequate.[1026] Below, I explain why their critiques have not convinced me to change my views.

---

[1021] Gerhart Report ¶¶ 149–153.

[1022] *Id.*

[1023] *Id.*

[1024] *Id.* ¶ 83(c).

[1025] Johnson Report ¶¶ 98, 100, 106, 113, 118, 123; Saravia Report ¶¶ 154, 156, 160 n.236, 168; McCrary Report ¶¶ 148, 150, 154, 157, 162, 170–171, 176; Stiroh Report ¶¶ 107–112.

[1026] Johnson Report ¶ 118; Saravia Report ¶ 160 n.236.

553.     The Scope of My Assignment.  First, recall that Plaintiffs' counsel did not task me with performing a quantitative analysis of the impact of Defendants' CSI Exchanges on Senior-Level Employees' compensation.[1027]

554.     Common Evidence.  Second, common evidence shows that, as I testified at my deposition, each Defendant, like other companies, used "an overall merit increase budget . . . and if that is suppressed and that's what's applied as the overall budget in each company, that's going to have a very pervasive effect."[1028]  So if the overall merit increase budget is suppressed, obviously not everyone will be harmed equally, but harm will certainly be shared across the general population.

555.     Dr. Johnson Ignored My Clarification.  Dr. Johnson cites my deposition testimony that "knowing the percent increase would not by itself tell you what [another Defendant's] average pay level is."[1029]  That is obviously true.  Dr. Johnson conveniently omits my subsequent clarification that a company's percent merit pool increase "tells you about the pay for everybody. If you had a 10 percent merit increase pool, I think you'd feel pretty comfortable saying that employees in that company will get bigger pay increases than in a company that had a 1 percent pool."[1030]  If the Defendants can collaborate to increase their average pay level less than it would have been raised in the absence of collusion, then all would realize lower labor costs than they would have otherwise.  This would directly impact all or nearly all Class Members' pay.

556.     Suppression of Average Pay Suppresses Pay of All or Nearly All Jobs, Contrary to McCrary/Stiroh's Claims.  The foregoing also renders irrelevant Dr. McCrary's arguments

---

[1027] Gerhart Report ¶ 6.

[1028] Gerhart Dep. at 39:17–40:10.

[1029] Johnson Report ¶ 111 (citing Gerhart Dep. at 163:7–17).

[1030] Gerhart Dep. at 163:7–164:4.

that CSI Exchanges of aggregate merit increase budgets "would not be sufficient to enable firms to coordinate on pay for specific jobs or proposed class members,"[1031] and that "it is unclear how [exchanges of] information for groups of employees that were largely not proposed class members (such as facility or field employees) would have affected proposed class members."[1032] It likewise refutes Dr. Stiroh's assertion that I have failed to "explain how exchanging information about company-level merit increases could be used to fix wages across hundreds of job titles in different states for employees in the broad labor markets in which DaVita and SCA competed with hundreds of other employers for talent."[1033]

557.    Evaluating Plausibility Requires Understanding the Compensation Package.  I am also not persuaded by Dr. McCrary's argument that because pay increase budgets were typically on the order of 2 percent or compensation, 14.5% pay suppression during the Class Period is implausible.[1034]  First, even suppressing merit increases by 1 percentage point would add up to sizeable suppression over time.  For example, a 2 percent pay increase each year would result in 22 percent higher pay after 10 years, whereas a 3 percent pay increase each year would result in 41 percent higher pay after 10 years, a difference of 19 percentage points.  In other words, with a salary of $100,000 at the beginning, after 10 years, it would mean a salary of $122,000 (with a 2 percent increase each year) versus $141,000 (with a 3 percent increase each year).[1035]  Further, in this scenario, there is a salary shortfall in each of the 10 years from receiving 2 percent rather than 3 percent.  Summing those shortfalls from each year adds up to a $62,908 year shortfall

---

[1031] McCrary Report ¶ 170.

[1032] *Id.* ¶ 170.

[1033] Stiroh Report ¶¶ 107–112.

[1034] McCrary Report ¶ 171.

[1035] The salary at a future point is:  $(\text{Salary}_{\text{time0}} \times \text{annual increase percent})^{\text{Number of Years}}$.

total, which is roughly 60 percent of the $100,000 salary at the beginning of the 10 year period.[1036] Second, merit increases are one major component of pay (and labor cost) growth over time, but not the only component. For example, pay growth also comes from making counteroffers of higher pay in an effort to retain those who have received outside offers. When those receiving outside offers obtain higher pay, either by receiving a counteroffer or by leaving, this has cascading effects on the pay of others (as I have described) that goes beyond the costs of the annual merit increase program. Further, labor cost growth is also a function of changes in bonus and stock compensation over time. Thus, reducing merit increase budgets is one key part of a strategy to reduce labor costs over time. There are, of course, other parts of such a strategy. However, organizations are especially concerned about controlling base pay growth because it is a fixed labor costs. Variable pay (e.g., bonus plans) payouts, in contrast, are one-time payments that do not become fixed labor costs and thus such payouts can automatically decline when business performance declines (in contrast to base pay costs).

558.    Johnson/McCrary's Requirement That Merit Increases Across Relevant Employees Mirror Each Other Rests on a False Premise.  Dr. Johnson states that it is relevant "to test if Defendants set similar merit increases across relevant employees (and each other) in the same year."[1037]  Dr. McCrary similarly objects that my analysis wrongly ignores "the varied impacts the alleged information sharing concerning merit pay increase budgets would have on low and high performers[.]"[1038]  It is not clear why either test is relevant. First, as described in

---

[1036] *See* my workpapers.

[1037] Johnson Report ¶¶ 113–117.

[1038] McCrary Report ¶¶ 151 (opining that "the sharing of merit pay budgets at the firm level (or for broad groups of employees within the firm) would differentially impact high and low performers"), 170 n.344 (arguing that "actual pay increases for Defendants' employees could, and did, vary widely from the budgeted percentage based on employee performance and other factors"), 177, 180.

-233-

my opening report, it is standard practice to not set similar merit increases across employees.[1039] In fact, in a structured compensation system, it is exactly the opposite. In this vein, in Figure 11 in my report, I provided an example of a merit increase grid, which I reproduce below for convenience.[1040] Obviously, it shows different (higher) merit increases for higher performing employees. (It also provides higher merit increases for high performing employees with lower current pay/lower compa-ratio.)

**Gerhart Report, Figure 11[1041]**

| RECOMMENDED SALARY INCREASES BY PERFORMANCE RATING AND COMPA-RATIO | | | | Table 12.3 Merit Increase Grid |
|---|---|---|---|---|
| | COMPA-RATIOª | | | |
| | 80–90% | 91–110% | 111–120% | |
| Performance rating | | | | |
| Exceeds expectations | 7% | 5% | 3% | |
| Meets expectations | 4 | 3 | 2 | |
| Below expectations | 2 | 0 | 0 | |

ªEmployee salary/midpoint of their salary range.

559. Moreover, I provided an example of this kind of standard merit increase grid being used at SCA in Figure 12 in my report, also reproduced here for convenience:

**Gerhart Report, Figure 12[1042]**

| If teammate's pay is … | Below Mid-Point | At Mid-Point | Above Mid-Point |
|---|---|---|---|
| … and the performance rating is … | … compensation adjustment should be | | |
| Does **not meet** standards (0-4) | 0.0% | 0.0% | 0.0% |
| Meets standards (5-7) | 1.5%-2.5% | 1.0%-2.0% | 0.0%-1.5% |
| Exceeds standards (8-10) | 3.5%-4.5% | 3.0%-4.0% | 2.5%-3.5% |

---

[1039] Gerhart Report ¶¶ 131–134.

[1040] *Id.* ¶ 134, Figure 11 (citing NOE ET AL., *supra* note 829, at 538).

[1041] *Id.*

[1042] *Id.* ¶ 135(b)(v), Figure 12 (citing SCA000078134).

560.     Additionally, whatever variation in merit increases that does or does not exist within a Defendant or across a Defendant is irrelevant for assessing whether pay was suppressed for the Class, and Dr. Johnson and Dr. McCrary do not persuade me otherwise.  What is relevant is the overall merit increase budget, which determines the overall level of employees' base pay growth going forward.  Below, I reproduce Figure 14 from my opening report, which shows that DaVita is below all merit increase budget benchmarks all years.[1043]  We know that base pay is the largest component of direct pay at each of the three Defendants.  Therefore, DaVita was able to save a substantial amount of compensation cost each year and these savings accumulated over time.

---

[1043] *Id.* ¶ 148(a)(vi)(A), Figure 14 (citing Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854).  It is therefore hardly the case that, as Dr. McCrary states, that the "merit pay increase in the range of 2-3%" was "very similar to what was reported in a WorldatWork salary budget survey presented in Figure 15 of Prof. Gerhart's report," or that as Dr. Stiroh opines, "DaVita's compensation grew in line with comparable industry benchmarks during the alleged conduct period."  McCrary Report ¶ 160; Stiroh Report ¶ 46.

**Gerhart Report, Figure 14**[1044]

## Merit History & Projections — Merit Pool

| | 2008 - Actual | 2009 - Actual | 2010 - Actual | 2011 - Actual | 2012 - Actual | 2013 - Actual | 2014 - Projected |
|---|---|---|---|---|---|---|---|
| All Industries | 3.9%[1] | 2.2%[1] | 2.6%[1] | 2.6%[2] | 2.8%[2] | 3.0%[5] | 3.0%[5] |
| Healthcare | 4.2%[1] | 2.7%[1] | 2.8%[1] | 2.6%[1] | 2.7%[3] | 2.6%[5] | 2.7%[5] |
| Fresenius | N/A | N/A | 2.8%[4] | 2.75%[4] | 2.75%[4] | | |
| DaVita | 2.10% | 1.50% | 1.40% | 2.00% | 2.40% | 2.20% | 1.50% |

1 – World at Work 2008, 2009, 2010 & 2011 Annual Salary Budget Survey July 2011
• Mercer 2011/2012 US Compensation Planning Survey July 2011
- EMPSight: 2011 Analysis of Merit Budget, Staffing and Practices
- HayGroup: 2011/2012 Salary Analysis

2 – Blended % based on Mercer, World at Work, HayGroup, and EMPSight
3 – Blended % based World at Work, HayGroup & EMPSight as of Aug 29, 2011
4 – Actual for 2011 and initial projection, not formally released (Source: Quaigence)
5 – World at Work Actual 2013 and Projected 2014

©2010 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.   Attorney Client Privileged and Confidential

561.    Dr. McCrary seeks to argue that a 3% firmwide average merit increase could "be borne entirely by *non-class* members."[1045]  Apparently, the idea would be that, if there were an equal number of class members and non-class members, for example, that class members could get an average 6% increase and non-class members would get an average 0% increase.  This certainly is possible.  It is, however, very unlikely, and Defendants' Experts cite no evidence to show that it occurred at the Defendant firms.  As I have already documented using survey evidence, organizations give nearly equal merit increases on average to different employee

---

[1044] Gerhart Report ¶ 148(a)(vi)(A), Figure 14 (citing Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854).
[1045] McCrary Report ¶ 170, n.344.

groups, whether executives, non-executive exempt employees, or hourly. Dr. McCrary provides no evidence that the Defendants are any different. Dr. McCrary also contends that I have implied that "if the budgeted pay increase is 3% firmwide that every single person in the firm will see a 3% increase in their pay[.]"[1046] Of course, I have also documented using survey evidence that firms do not give equal pay (merit) increases to employees. What I have documented using survey evidence is that firms give the same average pay increase to different employee groups, but that, within each group, they give different size pay increases to different employees based on differences in their performance.

562. Dr. Johnson, Dr. Saravia, and Dr. McCrary also claim that my analysis is unsupported because I failed to account for employees who were ineligible for merit increases.[1047] They are incorrect. In fact, my analysis does account for ineligible employees, because my analysis is predicated on the logic of a typical merit increase grid/compa-ratio, discussed above. These principles typically provide for little or no merit increases for low performers. Regardless, this argument is a red herring, because based on my experience and research in the compensation and human resources management fields, "the vast majority of employees would be eligible for a merit increase; and, in most companies, . . . probably the vast majority would get a merit increase."[1048]

563. Defendants' Experts do not otherwise refute my analysis. Accordingly, I am not persuaded to change my opinion.

564. <u>Exchanges of Pay Data for Specific Jobs.</u> Dr. Johnson, Dr. Saravia, and Dr. McCrary also contend that I do not explain how exchanging compensation data for a few specific

---

[1046] *Id.* (citing Gerhart Report ¶ 151).

[1047] Johnson Report ¶ 114 n.249; Saravia Report ¶ 191; McCrary Report ¶ 180.

[1048] Gerhart Dep. at 167:2–15.

job titles would likely restrict pay for all or nearly all Class Members.[1049]  My response is two-fold.  First, as I have explained above, Defendants implemented structured wage systems that seek to achieve internal and external equity.  Accordingly, exchanging data for some job titles would have cascading pay effects on other employees.  Moreover, Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's arguments discount the bulk of my opinion on this subject, discussed above, explaining that Defendants' CSI Exchanges of merit increase budgets, which are broadly applicable to Defendants' employees, would cause cascading Class-wide pay suppression effects.

## VIII.  CONCLUSIONS

565.    Based on my review of Defendants' Experts' Reports and testimony, the common evidence I have relied on, and my knowledge of labor markets and compensation systems, I have a number of conclusions.  These views are expressed throughout this Rebuttal and some are summarized here.

566.    Defendants' Incentives to Collude.  Defendants' Experts have not rebutted my opinion that based on my compensation-related literature and evidence common to the Class, Defendants were incentivized to collude to suppress labor market competition because they valued low employee turnover rates and wanted to keep labor costs low.  Further, they do not contest my opinions that industry conditions facilitated collusion, given the exclusive and tight-knit nature of Defendants' industry, which provided executives with better opportunities to establish their agreements.  As such, I have no cause to change my opinions.

567.    Mobility Suppression Harms Employees.  Defendants' Experts have not persuaded me to change my opinion that common evidence shows that Defendants' No-Poach

---

[1049] Johnson Report ¶¶ 121–123; Saravia Report ¶ 161; McCrary Report ¶ 162.

Agreements and CSI Exchanges would likely have limited employees' job mobility and bargaining power.

568.  *Benefits of Mobility.*  Defendants' Experts do not refute my opinion that collusion that restricts job mobility is harmful because employee mobility is a core tenet of a properly-functioning labor market and economy.  It allows workers to move to positions where they are more productive, which in turn increases their wages.  Additionally, it benefits incumbent employees because employers must raise compensation to prevent further turnover.  Defendants' Experts also have not given me cause to change my testimony that, even absent Defendants No-Poach Agreements, access to job opportunities is insufficient because CSI Exchanges in the form of competitor wage data exchanges have suppressed pay rates.

569.  *Importance of Cold Calling.*  Foremost, Defendants' Experts do not contest that Defendants valued recruiting passive candidates who were not actively seeking employment elsewhere.  In the absence of the No-Poach Agreements, Defendants routinely cold called their competitors' employees to recruit them.  This practice generally yields higher wages for job candidates, who are offered more compensation to entice them to leave their jobs, and who can use those offers to negotiate higher salaries with their current employers.  It also gives employees who receive cold calls more information about the job market, which is frequently shared with employees who were not proactively solicited.  Defendants' Experts have therefore not convinced me that, accordingly, restrictions on proactive recruiting would not impact employees among the Defendant firms.  Specifically, I have no cause to change my opinion that such restrictions would exacerbate information asymmetries and to depress levels of compensation for those who would have been solicited, as well as for all or nearly all salaried employees of Defendant firms.

-239-

570.    *Chilling Effect of the Tell-Your-Boss Requirement.*  Defendants' Experts do not contest that Defendants' No-Poach Agreements also included a "tell-your-boss" provision that further suppressed employee compensation.  Defendants agreed not to offer jobs to each other's employees unless at an early stage in the hiring process—well before the candidates received formal job offers—the employees notified their current supervisors that they intended to leave their positions.  Defendants' Experts also do not contest that, inevitably, this provision eliminated confidentiality in the hiring process, and I conclude it would have discouraged employees from pursuing opportunities at Defendant firms, and eliminated opportunities to increase their compensation.  As such, my opinions are unchanged.

571.    <u>Competitively Sensitive Information Exchanges.</u>  Defendants' Experts also have not given me cause to change my opinion that the common evidence I have reviewed demonstrates, based on my experience and research in compensation and human resource management, that Defendants' CSI Exchanges are inconsistent with the conduct of labor market competitors, and would have suppressed Class pay.  There is no benefit to a firm if it unilaterally shares, for example, nonpublic wage data.  Defendants' CSI Exchanges are inconsistent with lawful data surveys conducted by third-parties.  Moreover, Defendants' Experts have not convinced me that the data exchanged would not facilitate collusion to suppress employee pay.  As such, I have not changed my opinion that Defendants' exchanges would facilitate anticompetitive collusion to suppress employee pay.

572.    Moreover, Defendant firms' CEOs control their respective budgets, which are set to reduce employee turnover and promote retention.  The CEOs simultaneously eliminated competitive threats in the labor market by establishing No-Poach Agreements, and shared compensation-related information through their CSI Exchanges, which allowed them to set lower

labor budgets, including lower merit increase budgets, than they would have in a competitive market. This misconduct would likely have directly impacted all or nearly all Class Members.

573. Market Power. Further, Defendants' Experts also do not successfully rebut my opinion that based on my experience in compensation and human resource management and my review of evidence common to the Class, Defendant firms had sufficient labor market power, such that their No-Poach Agreements and CSI Exchanges harmed Defendants' employees by suppressing their compensation.

574. Moreover, that Class Members had job opportunities at non-Defendant firms is unavailing. The common evidence tells us that Class Members would have valued opportunities at Defendant firms. Moreover, I am also not swayed by Defendants' Experts' contentions regarding Class Members' employment opportunities at non-Defendant firms. Given frictions in the labor market and that finding a match between an employer and employee is challenging, unsolicited offers are valuable. Defendants' Experts cannot show that non-Defendant job opportunities were as valuable as opportunities that Class Members would have received from Defendants in an unrestricted market. Further, based on the common evidence, given that Defendants accounted for 1 in 6 jobs in the 5-digit (NAICS 62149) Outpatient Care industry and further that Defendants' employment grew substantially during the period, we would expect to see more Class Members and a growing number of Class Members switch to Defendant firms in an unrestricted market, but we did not. We would have expected turnover contagion (e.g., Rucker following Hayek from DaVita to SCA could have been just the start of DaVita's losses to SCA) to contribute to this growth in movement, but the No-Poach Agreements nipped this in the bud. Moreover, Defendants' Experts' critiques do not account for harm to employees who never received information about outside offers from their peers who had received unsolicited offers.

575. <u>Long-Term Effects.</u>  Similarly, Defendants' Experts do not contest that compensation-related theory and literature, which are evidence common to the Class, show that the wage suppression caused by the foregoing conduct is expected to accumulate and persist for years.

576. <u>Compensation Structures.</u>  I also have no cause to change my opinion that the common evidence shows that pay moved in Defendant firms in systematic and structured ways. Moreover, Dr. Johnson's, Dr. Saravia's, and Dr. McCrary's opinions that pay at Defendants was individualized and discretionary does not undermine my conclusion that common evidence shows that Defendant firms implemented and maintained compensation systems that sought to achieve internal equity and external equity.  Achieving internal equity requires that individual pay differ based on individual differences in performance.  I am not convinced by Defendants' Experts that issues of internal equity and external equity were unimportant to Defendants.  As such, I have not changed my testimony.

577. *Typical Features and Compensation Components.*  Defendants' Experts have not rebutted my opinion that according to common evidence, Defendants' systematized compensation structures used market surveys, pay lines, pay grades, and many other typical features of compensation structures.  Moreover, as we all agree, Defendants made use of compensation principles beyond salary, such as bonuses and stock.

578. *Internal Equity.*  I maintain that whether or not Defendants used the specific term "internal equity," Defendants' compensation systems valued pay fairness and thus aimed to pay similar employees (i.e., those with similar roles and performance contributions) similarly, to pay dissimilar employees dissimilarly, and to correct for outliers inconsistent with fairness to restore equity.  A degree of individualization and managerial judgment in pay decisions, based on

achieving the closely related principles of pay for performance and internal equity, are standard in structured pay systems.

579.     *Paying for Performance.*  Defendants' Experts fail to demonstrate that a compensation system that includes pay for performance and a compensation system that takes internal equity into account are mutually exclusive.  Compensation structures that pay for performance do so to achieve and maintain internal equity, a key objective for companies in general, as we saw it was for the Defendants.  As such, my testimony is unchanged.

580.     Cascading Effects on Class Members' Compensation and Common Impact. Defendants' Experts also have not given me cause to change my opinion that because Defendant firms had systematized pay structures, impacts to these systems cascade to other employees and their levels of compensation.  I maintain that Defendants' No-Poach Agreements and CSI Exchanges therefore limited and had negative consequences on employee compensation not only for the workers who were directly involved, but also for nearly all employees.  Consequently, I have not changed my opinion that all of nearly all Class Members would have been paid more but for the challenged conduct.  Defendants' goals of achieving external equity in their pay systems would not prevent this pay suppression.

581.     Although I have not been asked to estimate the magnitude of damages in this case, my knowledge of compensation systems and the materials I have relied on inform my opinion that No-Poach Agreements, such as the agreements at issue in this case, and exchanges of confidential information, such as the CSI Exchanges at issue in this case, will suppress the compensation of all or nearly all members of Plaintiffs' proposed Class, including those with different job titles.

582.    <u>Common Evidence and Methods.</u>  I conclude that evidence common to the Class, including Defendants' Experts' Reports, documents produced by Defendants and third parties, materials from the DaVita criminal case, the compensation-related and economics literature, and survey data collected by WorldatWork, can be used to conclude that Defendants' No-Poach Agreements and CSI Exchanges would harm all or nearly Class Members.

583.    I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

Dated:  June 30, 2025                    Respectfully submitted,

*Barry Gerhart*

Dr. Barry Gerhart

## PROOF OF SERVICE

I, Sarah D. Zandi, an attorney, hereby certify that on June 30, 2025, I served a true and

correct copy of the foregoing **Updated Rebuttal Expert Witness Report of Dr. Barry Gerhart**

by electronic mail upon the following parties as set forth below:

| | |
|---|---|
| Kenneth M. Kliebard<br>Staci M. Holthus<br>MORGAN, LEWIS & BOCKIUS LLP<br>110 North Wacker Drive<br>Chicago, IL 60606<br>(312) 324-1000<br>Kenneth.kliebard@morganlewis.com<br>Staci.holthus@morganlewis.com | Jeffrey C. Bank<br>Brian J. Smith<br>Jordanne Steiner<br>WILSON SONSINI GOODRICH &<br>ROSATI, P.C.<br>1700 K Street NW, Fifth Floor<br>Washington, DC 20006<br>(212) 497-7761<br>jbank@wsgr.com<br>brian.smith@wsgr.com<br>jordanne.miller@wsgr.com |
| Amy B. Manning<br>MCGUIREWOODS LLP<br>77 West Wacker Drive<br>Suite 4400<br>Chicago, IL 60601-7567<br>amanning@mcguirewoods.com | Veronica Moyé<br>KING & SPALDING LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br>(215) 556-2100<br>vmoye@kslaw.com |
| Jeffrey E. Stone<br>MCDERMOTT, WILL & EMERY LLP<br>444 West Lake Street, Suite 400<br>Chicago, IL 60605<br>(312) 372-2000<br>jstone@mwe.com | Molly Moriarty Lane<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Market<br>Spear Street Tower<br>San Francisco, CA 94105-1596<br>(415) 442-1000<br>Molly.lane@morganlewis.com |

Dated:  June 30, 2025          Respectfully submitted,

          */s/ Sarah D. Zandi*
          Sarah D. Zandi

-245-

## APPENDIX A

## Materials Relied Upon Include the Following:

## I. PAPERS, BOOKS, AND WEBSITES

## Papers, Books, and Websites

Andrew Boyink, LINKEDIN, https://www.linkedin.com/in/andrewboyink

Andrew Hayek, LINKEDIN, https://www.linkedin.com/in/andrewhayek/

BARRY GERHART, COMPENSATION (14th ed. 2023)

B. Jovanovic, *Job matching and the theory of turnover*, 87 J. OF POLITICAL ECONOMY 972–990, 973 (1979)

Brandon Ponds, LINKEDIN, https://www.linkedin.com/in/brandon-ponds-8a6a297/

Brett Brodnax, LINKEDIN, https://www.linkedin.com/in/brett-brodnax-6488a029b/

Brian Mathis, LINKEDIN, https://www.linkedin.com/in/briantmathis/

Carlos Carrillo-Tudela, Bart Hobijn, Patryk Perkowski & Ludo Visschers, *Majority of Hires Never Report Looking for a Job*, FED. RSRV. BANK OF S.F. ECON. LETTER (Mar. 30, 2015)

Christopher Goetz & Martha Stinson, *The Business Dynamics Statistics: Describing the Evolution of the U.S. Economy from 1978-2019*, U.S. CENSUS BUREAU (Oct. 2021), https://www2.census.gov/ces/wp/2021/CES-WP-21-33.pdf

*Code Description*, NAICS, https://www.naics.com/naics-code-description/?code=62149 (last visited June 26, 2025)

*Data Retrieval: Employment, Hours, and Earnings (CES)*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/webapps/legacy/cesbtab1.htm (last visited June 26, 2025)

*Data Tool, Job Openings and Labor Turnover Survey*, U.S. BUREAU OF LABOR STATISTICS, https://data.bls.gov/multi-screen?survey=jt (last visited June 26, 2025)

DaVita, *Notice of Annual Meeting of Stockholders* (June 15, 2009)

Dennis Kogod, LINKEDIN, https://www.linkedin.com/in/dennis-kogod-02110b323/

Derek Neal, *Industry-specific human capital: Evidence from displaced workers*, 13 J. LAB. ECON. 653–677 (Oct. 1995)

Doug Swope, LINKEDIN, https://www.linkedin.com/in/doug-swope-a0178b5/

Edward P. Lazear & Paul Oyer, *Personnel Economics*, *in* THE HANDBOOK OF ORGANIZATIONAL ECONOMICS 502 (Robert Gibbons & John Roberts eds., 2013)

Eric Parrado, Asena Caner, & Edward N. Wolff, *Occupational and Industrial Mobility in the United States*, 14 LAB. ECON. 435–455 (June 2007)

Frank M.H. Neffke, Anne Otto, & Antje Weyh, *Inter-industry labor flows*, 142 J. ECON. BEHAV. & ORG. 275–292 (Oct. 2017)

George-Levi Gayle & Robert A. Miller, *Has Moral Hazard Become a More Important Factor in Managerial Compensation?*, 99 AMERICAN ECONOMIC REVIEW 1740–1769, 1740 (2009)

HIGHMARK, https://www.highmark.com/ (last visited June 26, 2025)

Huasheng Gao, Juan Luo, & Tilian Tang, *Effects of Managerial Labor Market on Executive Compensation: Evidence from Job-Hopping*, 59 J. ACCT. & ECON. 203–220 (Apr.–May 2015)

James "Skip" Thurman, LINKEDIN, https://www.linkedin.com/in/james-skip-thurman-320b69a/

Jennifer Lu, *How much do others make for the same job? Here's where employers are required by law to share salary ranges when hiring*, CNBC.COM (Jan. 12, 2022)

Jennifer Sandoz, LINKEDIN, https://www.linkedin.com/in/jennifer-sandoz-4125071/

Jie Feng, Junchao (Jason) Li, Su Chen & Alex L. Rubenstein, *From a Spark to a Sweeping Fire: An Integrative Conceptual Review of Group Turnover and a Theoretical Exploration of Its Development*, 109 J. OF APPLIED PSYCH. 13–38 (2024)

*Job Openings and Labor Turnover Survey*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/jlt/ (last visited June 26, 2025)

Joe Clark, LINKEDIN, https://www.linkedin.com/in/joe-clark-43726011/

John K. Mawdsley, & Deepak Somaya, *Employee Mobility and Organizational Outcomes: An Integrative Conceptual Framework and Research Agenda*, 42 J. MGMT. 85–113 (Nov. 19, 2015)

Kathleen O'Toole, *Enrico Moretti: The Geography of Jobs*, INSIGHTS BY STANFORD BUSINESS (June 10, 2013), available at https://www.gsb.stanford.edu/insights/enrico-moretti-geography-jobs

Kent Thiry, LINKEDIN, https://www.linkedin.com/in/kent-thiry-0a996298/

K. Scott Dow, Tom McMullen, & Mark Royal, *Reward Fairness: Slippery Slope or Manageable Terrain?*, 20 WORLDATWORK J. 50–64 (Fall 2011)

Matt Bloom & John G. Michel, *The Relationships among Organizational Context, Pay Dispersion, and Managerial Turnover*, 45 THE ACADEMY OF MANAGEMENT JOURNAL 33–42, 34 (2002)

Michael Rucker, LINKEDIN, https://www.linkedin.com/in/michael-rucker-82ba0a1b/

*Number of Kaiser Permanente Employees from 2007-2023*, STATISTA, https://www.statista.com/statistics/403098/kaiser-permanente-employee-numbers/ (last visited June 26, 2025)

*Occupational Employment and Job Statistics*, U.S. BUREAU LABOR OF LABOR STATISTICS, https://www.bls.gov/oes/tables.htm (last visited June 26, 2025)

*Our Company*, KAISER PERMANENTE, https://about.kaiserpermanente.org/who-we-are/fast-facts (last visited May 28, 2025)

*Overheads*, CFI, https://corporatefinanceinstitute.com/resources/accounting/overheads/ (last visited June 26, 2025)

Peter Clemens, LINKEDIN, https://www.linkedin.com/in/peter-j-clemens-iv-a5727520/

Press Release, Tenet Health Completes Purchase of USPI from WCAS (Apr. 26, 2018), https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx

Press Release, Tenet Healthcare Corp., Tenet Healthcare Corp. Completes United Surgical Partners Int'l & Aspen Healthcare Transactions (June 16, 2015), https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm#:~:text=DALLAS%20%E2%80%93%20June%2016%2C%202015%20%E2%80%93,U.S.%20short%2Dstay%20surgery%20platform

*Profile Page*, NAICS (July 1, 2022), https://www.naics.com/company-profile-page/?co=16124

RAYMOND A. NOE, JOHN R. HOLLENBECK, BARRY GERHART, & PATRICK M. WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE. (13th ed. 2023)

Richard P. Castanias & Constance E. Helfat, *The managerial rents model: Theory and empirical analysis*, 27 J. MGMT. 661–678 (Nov.–Dec. 2001)

RONALD G. EHRENBERG & ROBERT S. SMITH, MODERN LABOR ECONOMICS: THEORY AND PUBLIC POLICY 128 (11th ed. 2012)

S. Naidu & E.A. Posner, *Labor Monopsony and the Limits of the Law*, 57 J. OF HUMAN RESOURCES S284–S323 (2022)

Sandi Karrmann, LINKEDIN, https://www.linkedin.com/in/sandikarrmann/

Stephanie A. Phillips, LINKEDIN, https://www.linkedin.com/in/stephanie-a-phillips-651913

Total Renal Care Holdings, Inc., Form 10K at 39 (Oct. 8, 1999), http://pdf.secdatabase.com/409/0000898430-99-003846.pdf

U.S. DEPT. OF TREASURY, THE STATE OF LABOR MARKET COMPETITION (Mar. 7, 2022), https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf

Warren J. Cinnick, LINKEDIN, https://www.linkedin.com/in/warrencinnick/

W. Felps, T.R. Mitchell, D.R. Hekman, T.W. Lee, B.C. Holtom & W.S. Harman, *Turnover contagion: How coworkers' job embeddedness and job search behaviors influence quitting*, 52 ACADEMY OF MGMT. J. 545–561 (2009)

WORLDATWORK, COMPENSATION STRUCTURE POLICIES & PRACTICES (June 2023)

WORLDATWORK, LEARNING OPTIONS, DESIGNING AND MANAGING BASE PAY SYSTEMS (2025), https://worldatwork.org/courses/designing-and-managing-base-pay-systems?tab=virtual

WORLDATWORK, SALARY BUDGET SURVEY (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf

Z. Zhang et al., *The effects of between-group pay dispersion*, 66 ACADEMY OF MGMT. J. 1860–1895 (2023)

## II. EXPERT REPORTS, DEPOSITION TRANSCRIPTS AND EXHIBITS, AND DOCUMENTARY EVIDENCE

I was provided access to all expert reports, deposition transcripts and exhibits, and all documents produced in the case. The following are among the materials I relied upon:

**Expert Reports (in alphabetical order)**

Expert Witness Report of Dr. Barry Gerhart ("Gerhart Report")

Expert Report of Dr. John H. Johnson, IV ("Johnson Report")

Expert Witness Report of Justin McCrary, Ph.D. ("McCrary Report")

Expert Report of Celeste Saravia, Ph.D. ("Saravia Report")

Expert Witness Report of Dr. Evan P. Starr ("Starr Report")

Expert Witness Report of Lauren J. Stiroh, Ph.D. ("Stiroh Report")

**Deposition Transcripts (in alphabetical order)**

30(b)(6) Deposition of Surgical Care Affiliates, LLC, By and Through its Corporate Designee, Brandon Ponds, November 26, 2024 ("Ponds Dep.")

Deposition of Colleen Arthur, DaVita, May 23, 2024 ("Arthur Dep.")

Deposition of Jason Cagle, USPI, August 6, 2024 ("Cagle Dep.")

Deposition of Robert Chipman, DaVita, August 7, 2024 ("Chipman Dep.")

Deposition of Joseph T. Clark, SCA, September 11, 2024 ("Clark Dep.")

Deposition of Warren Cinnick, SCA, November 22, 2024 ("Cinnick Dep.")

Deposition of Peter Clemens, SCA, May 2, 2024 ("Clemens Dep.")

Deposition of Cindy English, USPI, June 12, 2024 ("English Dep.")

Deposition of Bridie Fanning, SCA, July 17, 2024 ("Fanning Dep.")

Deposition of Mark Garvin, USPI, May 30, 2024 ("Garvin Dep.")

Deposition of Barry Gerhart, Ph.D., Expert, March 5, 2025 ("Gerhart Dep.")

Deposition of Joshua Golomb, DaVita / Third Party, August 28, 2024 ("Golomb Dep.")

Deposition of Andrew Hayek, September 18, 2024 ("Hayek Dep.")

Deposition of John Johnson, Ph.D., Expert, May 7, 2025 ("Johnson Dep.")

Deposition of Sandi Karrmann, USPI, August 14, 2024 ("Karrmann Dep.")

Deposition of Scott Keech, Plaintiff, August 22, 2024 ("Keech Dep.")

Deposition of Dennis Kogod, DaVita, September 6, 2024 ("Kogod Dep.")

Deposition of Mark Kopser, USPI, December 12, 2024 ("Kopser Dep.")

Deposition of Anthony Martin, USPI, June 27, 2024 ("Martin Dep.")

Deposition of Brian Mathis, SCA, September 20, 2024 ("Mathis Dep.")

Deposition of Dr. Justin McCrary, Expert, June 12, 2025 ("McCrary Dep.")

Deposition of Shannon McGarry, USPI, June 11, 2024 ("McGarry Dep.")

Deposition of Clare Metcalf, Third Party, August 14, 2024 ("Metcalf Dep.")

Deposition of Steven Priest, DaVita / Third-Party, November 5, 2024 ("Priest Dep.")

Deposition of Javier Rodriguez, DaVita, August 12, 2024 ("Rodriguez Dep.")

Deposition of Michael Rucker, SCA, August 27, 2024 ("Rucker Dep.")

Deposition of Jennifer Sandoz, SCA, September 26, 2024 ("Sandoz Dep.")

Deposition of Celeste Saravia, Ph.D., Expert, May 9, 2025 ("Saravia Dep.")

Deposition of John Schultz, November 19, 2024 ("Schultz Dep.")

Deposition of Allen Spradling, Plaintiff, July 18, 2024 ("Spradling Dep.")

Deposition of Michael Staffieri, DaVita, April 5, 2024 ("Staffieri Dep.")

Deposition of Evan P. Starr, Ph.D., Vol. II, Expert, March 20, 2025 ("Starr Dep., Vol. II")

Deposition of Lauren Stiroh, Expert, May 29, 2025 ("Stiroh Dep.")

Deposition of Jimmy Tanner, Third Party, July 31, 2024 ("Tanner Dep.")

Deposition of Kent Thiry, August 16, 2024 ("Thiry Dep.")

Deposition of James "Skip" Thurman, DaVita, June 17, 2024 ("Thurman Dep.")

Deposition of Leslie Wachsman, SCA, May 22, 2024 ("Wachsman Dep.")

Deposition of William "Bill" Wilcox, USPI, September 24, 2024 ("Wilcox Dep.")

Deposition of Kevin Zaideman, SCA, December 18, 2024 ("Zaideman Dep.")

**Deposition Exhibits (in ascending order by exhibit number)**

Exhibit PX11, DVA_OMCEAL_000402427–28

Exhibit PX19, DVA_OMCEAL_001399746–74

Exhibit PX23, DVA_OMCEAL_001079804–05

Exhibit PX25, DVA_OMCEAL_001339745–46

Exhibit PX27, DVA_OMCEAL_001339898–901

Exhibit PX36, SCA000540405–11

Exhibit PX37, USPI_CIV_000016100

Exhibit PX49, DVA_OMCEAL_000285328–62

Exhibit PX50

Exhibit PX70

Exhibit PX77, DVA_OMCEAL_001329256–61

Exhibit PX85, DVA_OMCEAL_001067247–81

Exhibit PX87

Exhibit PX88, DOJCIV-008-00000353–67

Exhibit PX97

Exhibit PX99, USPI_CIV_000021321

Exhibit PX101 (cover email), USPI_CIV_000004082–83, and Exhibit PX102 (attachment), USPI_CIV_000004090–91

Exhibit PX108

Exhibit PX111, USPI_CIV_000810697

Exhibit PX115 (cover email), USPI_CIV_000039752–53, and Exhibit PX116 (attachment), USPI_CIV_000039754

Exhibit PX124, DOJCIV-012-000000131–37

Exhibit PX133

Exhibit PX157

Exhibit PX158

Exhibit PX160, SCA000002866

Exhibit PX171, DOJ-PROD001B-00157126–28

Exhibit PX172, DOJ-PROD001A-00000001–02

Exhibit PX201 (cover email), DVA_OMCEAL_000944847–52 and Exhibit PX203 (attachment), DVA_OMCEAL_000944853–54

Exhibit PX216, USPI_CIV_000010048–57

Exhibit PX232, USPI_CIV_000021155

Exhibit PX234, USPI_CIV_000016522

Exhibit PX240, USPI_CIV_000686081–92

Exhibit PX249, DVA_OMCEAL_000906132–35

Exhibit PX275, DOJ-PROD003-00117878–93

-253-

Exhibit PX297, USPI_CIV_000058049–50

Exhibit PX304, DOJCIV-008-00000298–303

Exhibit PX305, DOJCIV-008-00000170

Exhibit PX313, DOJCIV-008-00000187–95

Exhibit PX316, DOJ-PROD001A-00000029–32

Exhibit PX333, DVA_OMCEAL_000658781

Exhibit PX335, DOJ-PROD001A-00000239

Exhibit PX337, SCA002021140–413

Exhibit PX376, DVA_OMCEAL_000122783–84

Exhibit PX453, USPI_CIV_000095467–68

Exhibit PX484, DVA_OMCEAL_000429386–90

Exhibit PX489, OMC_BM_000014729

Exhibit PX490, HAYEK-000012214–16

Exhibit PX501, SCA002277742–44

Exhibit PX506

Exhibit PX508, DOJCIV-008-00000212–26

Exhibit PX518, USPI_CIV_000104518

Exhibit PX523, OMC_BM_000010778–79

Exhibit PX537

Exhibit PX546

Exhibit PX551, DVA_OMCEAL_000405110

-254-

**Other Evidence Produced by Defendants and Third Parties**

DVA_OMCEAL_000010256
DVA_OMCEAL_000011812
DVA_OMCEAL_000124754
DVA_OMCEAL_000385858
DVA_OMCEAL_000413696
DVA_OMCEAL_000538771
DVA_OMCEAL_000760685
DVA_OMCEAL_001059650
DVA_OMCEAL_001068058
DVA_OMCEAL_001144622
DVA_OMCEAL_001294850
DVA_OMCEAL_001296753
DVA_OMCEAL_001313820
DVA_OMCEAL_001317525
DVA_OMCEAL_001322030
DVA_OMCEAL_001329257
DVA_OMCEAL_001329840 (cover email), DVA_OMCEAL_001329841 (attachment), and
DVA_OMCEAL_001329842 (attachment)
DVA_OMCEAL_001344570
DVA_OMCEAL_001385318 (cover email) and DVA_OMCEAL_001385327
DOJCIV-007-00000105
DOJCIV-008-00000090
DOJCIV-008-00000304
DOJCIV-008-00000345
OMC_BM_000006875
SCA000000198
SCA000003962 (cover email) and SCA000003963 (attachment)
SCA000075527
SCA000078134
SCA000091011
SCA000098450
SCA000128921
SCA000153859
SCA000163727
SCA000412504
SCA000523268 (cover email) and SCA000523273 (attachment)
SCA000545210
SCA000630035
SCA000838956
SCA001125179
SCA001159728

SCA001280928
SCA001395985
SCA001551238 (cover email) and SCA001551239 (attachment)
SCA001669270
SCA002270032
USPI_CIV_000021897
USPI_CIV_000021899
USPI_CIV_000022791
USPI_CIV_000023134
USPI_CIV_000026885
USPI_CIV_000034853
USPI_CIV_000037627
USPI_CIV_000039709
USPI_CIV_000041645
USPI_CIV_000056611
USPI_CIV_000059623
USPI_CIV_000070529 (cover email) and USPI_CIV_000070534 (attachment)
USPI_CIV_000007019
USPI_CIV_000099574
USPI_CIV_000115447
USPI_CIV_000121836
USPI_CIV_000147704
USPI_CIV_000336973
USPI_CIV_000401250
USPI_CIV_000433011 (cover email) and USPI_CIV_000433030 (attachment)
USPI_CIV_000449339
USPI_CIV_000457557
USPI_CIV_000467447
USPI_CIV_000499023
USPI_CIV_000650633
USPI_CIV_000689431
USPI_CIV_000890968
USPI_CIV_000901340
USPI_CIV_000962508
USPI_CIV_000962509
USPI_CIV_000964138

**Data**

14_Final Defendant Stack (produced by Dr. Johnson)

"Figure 9, 10, 11" output file (produced by Dr. Stiroh and located within her workpapers at Figures\Figure 9, 10, 11\Figure)

-257-

### III.      LEGAL DOCUMENTS

3rd Am. Class Action Compl. (ECF No. 555), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

Pls.' Mot. to Compel SCA to Perform Supp. ESI Search (ECF. No. 419), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

Superseding Indictment, *United States v. DaVita Inc.*, Case No. 21-cr-00229-RBJ (D. Colo. Nov. 3, 2021)

USPI and Tenet's Answer to the Third Amended Complaint (ECF No. 569), *In Re Outpatient Medical Center Employee Antitrust Litig.*, No. 1:21-cv-00305

## APPENDIX B

| Employee | Company, Job Title (Years) |
|---|---|
| Colleen Arthur | DaVita, Intern (2013); DaVita, Redwoods Resident (2014–2015); DaVita, Facility Administrator (2015); DaVita, Manager, Compensation & Analytics (2015); DaVita, Director, Compensation & Analytics (2015–2018); DaVita, Senior Director, Compensation & Analytics (2018–2021); DaVita, Senior Director, Recruiting Operations, Strategy & Employment Branding (2021–2022) |
| Andrew Boyink | DaVita, National Director of Strategy & Operations for Hospital Services (2015–2017); DaVita, Senior Director of Strategy & Operations, Hospital Services (2017–2021); DaVita, Vice President ("VP"), Hospital Services Group (2021–Present) |
| Brett Brodnax | USPI, Executive Vice President ("EVP")/Chief Development Officer ("CDO") (2005–2011); USPI, President (2011–2018); USPI, Chief Executive Officer ("CEO") (2018–Present) |
| Jason Cagle | USPI, VP (2005–2010); USPI, Senior Vice President ("SVP") (2010–2013); USPI, Chief Financial Officer ("CFO"), (2013–2020) |
| Warren Cinnick | SCA, VP Human Resources ("HR") (2017–2020); SCA, SVP HR (2020); SCA, Group VP ("GVP") HR (2021–2023) |
| Joseph ("Joe") Clark | SCA, EVP & Chief Operating Officer ("COO") (2008); SCA, EVP Development (2008–Present) |
| Peter Clemens | SCA, EVP and CFO (2011–2015), SCA, Senior Advisor (2015–2017) |
| Bridie Fanning | SCA, Chief Talent Officer (2014–2016) |
| Mark Garvin | SCA, VP Operations (1992–1996); USPI, COO (2001–2020) |
| Mark Gildea | DaVita, SVP of Operations (2005–2015) |
| Joshua Golomb | DaVita, General Manager-DaVita Rx (2005, 2014–2015); DaVita, Director, Special Projects (2005); DaVita, Senior Manager (2005); DaVita, Director Star Rx (2005–2006); DaVita, Senior Director DaVita Rx (2006); DaVita, Senior Director (2006–2007); DaVita, VP, DaVita Rx (2007–2015); DaVita, CEO, Paladina Health [a DaVita subsidiary] |
| Andrew Hayek | DaVita, President (2007); DaVita, VP (2007–2008); SCA, President & CEO (2008–2017); OptumHealth, CEO (2017–2019) |
| Sandi Karrmann | USPI, SVP, Chief Human Resources & Support Services Officer (2013–2017); Tenet Healthcare/USPI, EVP, Chief Human Resources Officer (2017–2020) |
| Scott Keech | SCA, Regional Director of Operations & Clinical Services (2009–2012) |
| Anthony Kilgore | SCA, GVP (2011–2012); SCA, SVP Operations (2013–2016); SCA, Group President (2017); SCA, CEO (2018–2019) |
| Dennis Kogod | DaVita, Division President (2006–2010); DaVita, SVP (2008); DaVita, COO (2008–2016); DaVita, COO, HealthCare Partners (2014–2016); DaVita, Advisor to CEO (2016) |
| Anthony Martin | USPI, SVP, Corporate Controller and Chief Accounting Officer (1998–2019) |

-258-

| | |
|---|---|
| Brian Mathis | SCA, VP Strategy (2009–2014); SCA, GVP, Strategy and Payer Engagement (2014–2015); SCA, SVP, Strategy and Payment Innovation (2015–2017); SCA, CDO (2017–2018); OptumCare, CDO (2017–2018); OptumCare, Chief Strategy Officer (2018–2020) |
| Shannon McGarry | USPI, Executive Recruiter (2016–2020); USPI, Manager, Executive Recruitment (2020–2021); USPI, Regional Market Recruiter (2021 – Present) USPI, Manager – Talent Acquisition/Onboarding (2023 – Present) |
| Shannon Mosley | USPI, Director (2003–2006); USPI, Director (2007); USPI, VP Talent Acquisition (2007–2020) |
| Stephanie A. Phillips | USPI, VP, Procurement (2010–2021) |
| Brandon Ponds | SCA, Financial Analyst (2012–2015); SCA, Manager of Financial Planning and Analysis (2015–2017); SCA, Director, Financial Operations (2017–2019); SCA, Director, Payroll and HR Measurement (2019–2021); SCA, Senior Director, Payroll, HRIS and HR Analytics (2021–2022); SCA, Senior Director, Compensation, Payroll, D&I, Service Delivery, HR Technology and HR Analytics (2022–2023); SCA, VP, HR Service Delivery (2023–Present) |
| Steven Priest | DaVita, SVP (2001–2016); DaVita, Chief Wisdom Officer (2014-2016) |
| Javier Rodriguez | DaVita, SVP (2005–2018); DaVita, DVP (2006); DaVita, VP Value Management Operation (2006); DaVita, President (2008, 2012–2014); DaVita, CEO, Kidney Care (2014–2022) |
| Michael Rucker | DaVita, DVP/RVP (2006–2008); SCA, SVP Operations (2008–2009); SCA, EVP & COO (2009–2017) |
| Jennifer Sandoz | SCA, Director HR (2016–2017); SCA, Senior Director (2017–2020); SCA, VP HR (2021) |
| Allen Spradling | Director, IT Governance and Administration (2008–2013) |
| Doug Swope | HCA Healthcare, Manager, Executive Recruitment C-Level (1995–1998); HCA Healthcare, Director, HR Executive Recruitment (1998–2008); HCA Healthcare, Senior Director, HR (2008–2011); e+CancerCare (2011–2013); President, Surgical Care Partners (2013–Present) |
| Jimmy Tanner | Catapult Staffing, Director of Recruiting (2013–2016); Catapult Physician Staffing, VP of Recruiting & Strategic Accounts (2017–2018) |
| Kent Thiry | DaVita, Chairman and CEO (1999–2019); DaVita, Chairman and CEO, HealthCare Partners Inc. (2014–2020); DaVita, Executive Chairman of the Board of Directors (2019–2021) |
| James "Skip" Thurman | DaVita, Director (2010–2011); DaVita, Senior Director (2011–2013); DaVita, Senior Director, Communications (2014–2017); DaVita, VP (2017–2020) |
| Sean Taylor | DaVita, Senior Director of Business Development (2015–2016) |
| Leslie Wachsman | SCA, VP Finance & Investor Relations (2012–2018); SCA, GVP, Finance (2018–2019); SCA, CFO (2019–Present) |

| William ("Bill") Wilcox | USPI, President (2005–2011); USPI, CEO (2011-2018), Chairman (2018–2020); USPI, Consultant (2020–2023) |
|---|---|
| Kevin Zaideman | SCA, Compensation Senior Manager (2017–2020); SCA, Director of Compensation (2021–2022) |

-261-

## APPENDIX C

## REBUTTAL REPORT FIGURES

**Figure 1**[1050]





---

[1050] *See* my workpapers.



**Figure 2:  Total Returns for Work**[1051]



---

[1051] BARRY GERHART, COMPENSATION 15, Exhibit 1.5 (14th ed. 2023).

**Figure 3**

| Employee | Job Title/Level | Salary | Performance | Salary/ Performance | Salary/ Performance Differential versus Row Below | Job Title/Level | Salary | Performance | Salary/ Performance | Salary/ Performance Differential versus Row Below | Job Title/Level | Salary | Performance | Salary/ Performance | Salary/ Performance Differential versus Row Below |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pre-Offer | | | | | Post-Offer (immediate) | | | | | Post-Offer (near term) | | | |
| 1 | SVP A | 160 | 4 | 40 | 1.33 | SVP A | 160 | 4 | 40 | 1.33 | SVP A | 207.0 | 4 | 51.8 | 1.33 |
| 2 | VP A | 120 | 4 | 30 | 1.20 | VP A | 120 | 4 | 30 | 0.92 | VP A | 155.5 | 4 | 38.9 | 1.20 |
| 3 | Director A | 100 | 4 | 25 | 1.00 | Director A | 130 | 4 | 32.5 | 1.30 | Director A | 130 | 4 | 32.5 | 1.00 |
| 4 | Director B | 125 | 5 | 25 | | Director B | 125 | 5 | 25 | | Director B | 162.5 | 5 | 32.5 | |
| | | | | | | | | | | | | | | | |
| | Salary Total Cost | 505 | | | | | 535 | | | | | 655 | | | |

**Figure 4: Estimated Short-Term Incentive/Variable (Bonus) Pay as a Percentage of Salary and Performance Basis, by Employee Group**[1052]

| Employee Group | Percentage of Organizations Where Eligible | Bonus/Variable Pay as a Percentage of Salary (Target) | | Performance Basis for Bonus Payout | | |
|---|---|---|---|---|---|---|
| | (A) | In Organizations Using Such Plans (B) | All Organizations (A x B) | Corporate | Division/Business Unit | Individual |
| Officers/executives | 99% | 49% | 49% | 62% | 19% | 19% |
| Exempt, salaried | 99 | 15 | 15 | 48 | 28 | 26 |
| Nonexempt, salaried | 48 | 6 | 3 | 44 | 29 | 26 |
| Nonexempt, hourly nonunion | 54 | 5 | 3 | 40 | 32 | 27 |

---

[1052] BARRY GERHART, COMPENSATION 349, Exhibit 10.2 (14th ed. 2023).

**Figure 5: Allocation and Use of Long-Term Incentive Plans**[1053]

| Employee Group | Median Percentage of Long-Term Incentive Grants Allocated |
|---|---|
| CEO | 13% |
| Officers/executives (excluding CEO) | 50 % |
| Exempt, salaried | 25 % |
| Nonexempt, salaried | 0% |
| Nonexempt, hourly nonunion | 0% |
| | **Practices/Use** |
| Percentage of organizations using long-term incentive | 91 % |
| Number of long-term incentive plans used | |
| One plan | 18% |
| More than one plan | 82% |

---

[1053] BARRY GERHART, COMPENSATION 350, Exhibit 10.3 (14th ed. 2023).

-267-

**Figure 6: Range Overlap**[1054]



---

[1054] BARRY GERHART, COMPENSATION 291, Exhibit 8.21 (14th ed. 2023).

**Figure 7: Two Companies: Same Total Compensation, Different Mixes**[1055]







---

[1055] BARRY GERHART, COMPENSATION 219, Exhibit 7.4 (14th ed. 2023).

**Figure 8:  What Shapes External Competitiveness?**[1056]

LABOR MARKET FACTORS
Nature of Demand
Nature of Supply

PRODUCT MARKET FACTORS
Degree of Competition
Level of Product Demand

ORGANIZATION FACTORS
Industry, Strategy, Size
Individual Manager

EXTERNAL COMPETITIVENESS

---

[1056] BARRY GERHART, COMPENSATION 220, Exhibit 7.5 (14th ed. 2023).

-271-

# APPENDIX D

# GERHART REPORT FIGURES

-272-

**Gerhart Report, Figure 11**[1057]

| RECOMMENDED SALARY INCREASES BY PERFORMANCE RATING AND COMPA-RATIO | COMPA-RATIO[a] | | | Table 12.3 Merit Increase Grid |
| --- | --- | --- | --- | --- |
| | 80–90% | 91–110% | 111–120% | |
| **Performance rating** | | | | |
| Exceeds expectations | 7% | 5% | 3% | |
| Meets expectations | 4 | 3 | 2 | |
| Below expectations | 2 | 0 | 0 | |

[a]Employee salary/midpoint of their salary range.

---

[1057] Gerhart Report ¶ 134, Figure 11 (citing RAYMOND NOE, JOHN HOLLENBECK, J. BARRY GERHART, & PATRICK WRIGHT, HUMAN RESOURCE MANAGEMENT: GAINING A COMPETITIVE ADVANTAGE 538 (13th ed. 2023)).

**Gerhart Report, Figure 12**[1058]

| If teammate's pay is ... | Below Mid-Point | At Mid-Point | Above Mid-Point |
|---|---|---|---|
| ... and the performance rating is ... | ... compensation adjustment should be | | |
| Does **not meet** standards (0-4) | 0.0% | 0.0% | 0.0% |
| Meets standards (5-7) | 1.5%-2.5% | 1.0%-2.0% | 0.0%-1.5% |
| Exceeds standards (8-10) | 3.5%-4.5% | 3.0%-4.0% | 2.5%-3.5% |

---

[1058] Gerhart Report ¶ 135(b)(v), Figure 12 (citing SCA000078134)

**Gerhart Report, Figure 14**[1059]

## Merit History & Projections — Merit Pool

| | 2008 - Actual | 2009 - Actual | 2010 - Actual | 2011 - Actual | 2012 - Actual | 2013 - Actual | 2014 - Projected |
|---|---|---|---|---|---|---|---|
| All Industries | 3.9%[1] | 2.2%[1] | 2.5%[1] | 2.6%[2] | 2.8%[2] | 3.0%[5] | 3.0%[5] |
| Healthcare | 4.2%[1] | 2.7%[1] | 2.8%[1] | 2.6%[1] | 2.7%[3] | 2.6%[5] | 2.7%[5] |
| Fresenius | N/A | N/A | 2.8%[4] | 2.75%[4] | 2.75%[4] | | |
| DaVita | 2.10% | 1.50% | 1.40% | 2.00% | 2.40% | 2.20% | 1.50% |

1 – World at Work 2008, 2009, 2010 & 2011 Annual Salary Budget Survey July 2011
• Mercer 2011/2012 US Compensation Planning Survey July 2011
- EMPSight: 2011 Analysis of Merit Budget, Staffing and Practices
- HayGroup: 2011/2012 Salary Analysis

2 – Blended % based on Mercer, World at Work, HayGroup, and EMPSight
3 – Blended % based World at Work , HayGroup & EMPSight as of Aug 29, 2011
4 – Actual for 2011 and initial projection, not formally released (Source: Qualigence)
5 – World at Work Actual 2013 and Projected 2014

©2010 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only    Attorney Client Privileged and Confidential

---

[1059] Gerhart Report ¶ 148(a)(vi)(A), Figure 14 (citing Ex. PX201 (cover email) and Ex. PX203 (attachment) at DVA_OMCEAL_000944854).

**Gerhart Report, Figure 15**[1060]

**FIGURE 2    Total Salary Budget Increases, by Employee Category**

Salary Budget Increases (zeros included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 2.9% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 2.9% | 3.0% | 3.0% | 3.0% |
| Exempt Salaried | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Officers/Executives | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| All | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |

Salary Budget Increases (zeros not included)

| | Actual 2014 | | Actual 2015 | | Projected 2016 | | Actual 2016 | | Projected 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| Nonexempt Hourly Nonunion | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% |
| Nonexempt Salaried | 3.0% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.0% | 3.0% | 3.1% | 3.0% |
| Exempt Salaried | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |
| Officers/Executives | 3.1% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% | 3.2% | 3.0% |
| All | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.1% | 3.0% | 3.2% | 3.0% |

---

[1060] Gerhart Report ¶ 152, Figure 15 (citing WORLDATWORK, SALARY BUDGET SURVEY at 20 (2016–2017), https://worldatwork.org/media/CDN/dist/CDN2/documents/pdf/resources/sbs/2016_2017-SBS-ExecutiveReport.pdf).

# **Exhibit 6**

# Lane Declaration

# (Filed Under Seal)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| In Re Outpatient Medical Center Employee Antitrust Litigation | Case No. 1:21-cv-00305<br><br>**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL/EXPERTS ONLY** |

**EXPERT REPORT OF JUSTIN MCCRARY, PH.D.**

April 16, 2025

## Table of contents

1. Introduction ...................................................................................................................................5

    1.1. Qualifications ..........................................................................................................................5

    1.2. Allegations and Summary of Opposing Expert Opinions .......................................................6

    1.3. Assignment ...........................................................................................................................13

    1.4. Summary of Opinions .........................................................................................................14

2. The Alleged Conduct, Assuming it Occurred, Would Not Have Had a Common Impact on Proposed Class Members ...................................................................................................................... 24

    2.1. Plaintiffs' Experts Have Not Explained How Impact Could Possibly Be Common Given That Proposed Class Members Participate in Different Labor Markets with Varying Competitive Circumstances and Many Non-Defendant Employers.........................................................................................................................25

        2.1.1. Plaintiffs' Experts Do Not Properly Analyze the Relevant Labor Markets or Market Power for Proposed Class Members ...................................................................................................................26

        2.1.2. Proposed Class Members Participate in Different Labor Markets with Widely Varying Employment Options, Including Many Non-Defendant, and Even Non-Healthcare, Firms..............................................29

        2.1.3. Proposed Class Members Have Widely Varying Skills and Preferences.................................45

        2.1.4. Defendants Face Varying Competitive Pressures When Setting Compensation, and Lack Market Power Sufficient to Suppress Pay for Many or Most (if Not All) Proposed Class Members.......................53

    2.2. Plaintiffs' Experts Have Not Demonstrated that Proposed Class Members Not Directly Affected by the Challenged Conduct Would Be Indirectly Affected Through a Rigid Pay Structure.............................61

        2.2.1. Evidence Indicates that Proposed Class Members' Pay is Highly Individualized and That Defendants Did Not Have Rigid Pay Structures Through Which Changes in Pay for One Group of Proposed Class Members Would Be Transmitted to All (or Nearly All) Other Proposed Class Members .............................64

        2.2.2. Empirical Analysis is Inconsistent with Plaintiffs' Claimed Rigid Pay Structures and Consistent with Proposed Class Members' Pay Being Individualized.................................................................81

        2.2.3. Plaintiffs' Experts Fail to Properly Consider Qualitative Evidence That is Inconsistent with Defendants Having Rigid Pay Structures Or Job-Specific Pay Ranges and Grades for Class Positions Throughout the Class Period ...............................................................................................................100

3. Many Proposed Class Members Could Not, Or Would Not, Be Harmed by The Alleged Conduct, And It Is Not Possible to Reliably Measure Harm Using Common Evidence ............................................106

    3.1. Proposed Class Members Who Participate in Labor Markets Where Defendants Do Not Have Market Power Could Not Have Been Harmed by the Alleged Conduct..................................................108

    *3.2. Plaintiffs Have Not Demonstrated that Proposed Class Members Not Directly Impacted by the Alleged Conduct Would Be Harmed, And Many (If Not All) Would Not Be*....................................110

    3.3. Pay for Proposed Class Members Newly Hired from Somewhere Other than Defendant Firms Could Not Have Been Harmed by Alleged Conduct, At Least Initially, and Possibly Ever...........................................111

    3.4. Any Proposed Class Members Whose Alleged Pay Suppression Was Entirely Offset by Increases in Equity Would Not Have Been Harmed by the Alleged Conduct......................................................120

3.5. Proposed Class Members Employed by DaVita and USPI Who Would Not Consider Employment Options at SCA Could Not be Directly Harmed by the Alleged Mobility Restrictions..................................................121

3.6. Any Proposed Class Members Who Would Not Engage with Any Solicitation Outreach Could Not be Directly Harmed by the Alleged Mobility Restrictions..................................................121

3.7. Proposed Class Members Whose Mobility Between Defendants Was Already Restricted Would Not Have Been Directly Harmed by the Alleged Mobility Restrictions in Some Cases, and in Other Cases Would Have Been Less Harmed ..................................................122

3.8. Common Evidence Cannot Be Used to Reliably Quantify the Extent of Harm for Proposed Class Members (If Any) Who Were Impacted by the Alleged Conduct For Several Other Reasons ..................................................132

**4. The Compensation Information Allegedly Shared Between Defendants Could Have Had Procompetitive Effects, Was Not Sufficient to Coordinate on Pay, And Even If It Were, Would Not Have Had Common Impact ..................................................136**

4.1. The Alleged Information Sharing between Defendants Cannot be Assumed to be Anticompetitive and Could Have Procompetitive Effects..................................................138

4.2. The Information Allegedly Shared by Defendants Would Not be Sufficient to Suppress Pay, Even by Plaintiffs' Experts' Own Standards..................................................145

4.3. The Impact of the Alleged Information Sharing on Proposed Class Members' Pay Would Not be Common......158

4.3.1. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Due to Their Varied Employment Opportunities, and the Varied Competition that is Implied for Their Labor..........................159

4.3.2. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Who Worked for Defendants at Different Times..................................................159

4.3.3. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Based on Performance..................................................160

4.3.4. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Based on their Compensation Mix..................................................161

**5. Prof. Starr Has Not Developed a Reliable Methodology to Assess Impact and Damages Stemming from the Challenged Conduct..................................................164**

5.1. Empirical Evidence Does Not Show a Reduction in Mobility Between Defendants During the Class Period ......164

5.1.1. Prof. Starr's Own Empirical Analysis Does Not Demonstrate that Mobility Was Lower During the Class Period..................................................166

5.1.2. Prof. Starr's Mobility Regression Analysis is Fundamentally Flawed and Unreliable..................................172

5.2. Prof. Starr Has Not Developed a Reliable Methodology to Estimate Whether, and by How Much, Proposed Class Members' Pay Changed Due to the Alleged Conduct..................................................175

5.2.1. Prof. Starr's Findings are Factually Implausible and Inconsistent with the Reality of How Proposed Class Members' Pay and Turnover Rates Evolved Before, During, and After the Class Period ..........................176

5.2.2. Prof. Starr's Pay Regression Model Suffers from Methodological Flaws and His Estimated Effect Cannot Be Interpreted as the Change in Proposed Class Members' Pay Caused by the Alleged Conduct ..................................184

5.2.3. The Alleged Suppression of Pay Measured by Prof. Starr's Pay Regression Model Disappears Once Certain Obvious Flaws are Corrected..................................................202

5.2.4. Prof. Starr's Pay Regression Model is Highly Sensitive to the Class Period Dates Selected by Plaintiffs, Which Have Changed Over Time..................................................210

5.2.5. Prof. Starr's Pay Regression Model Extrapolates a Conduct Estimate Based on a Subset of Proposed Class Members ........................................................................................................................................................215

5.3. Prof. Starr's Pay Regression Model is Not Properly Linked to the Alleged Conduct, as it Assumes a Single Effect Across Numerous Forms of Conduct That Varied in Nature and Timing ...........................................................................216

**6. Prof. Starr's Pay Regression Model Does Not Demonstrate Common Impact During the Class Period, Nor Does It Even Measure the Effect of the Alleged Conduct on Pay Using All or Nearly All Proposed Class Members** ........................................................................................................................................................**222**

**7. Pay Structures Capable of Generating Classwide Impact, As Plaintiffs' Experts Contend, Would Also Generate Upward Pressure on Pay for All or Nearly All Proposed Class Members** ...............................................**230**

**8. Plaintiffs' Criteria for the Proposed Class are Not Objective** ....................................................................**232**

## 1. INTRODUCTION

### 1.1. Qualifications

1. I am an economist with expertise in labor economics, antitrust, corporations, law and economics, economic modeling, and statistical methods, among other subjects. I hold an A.B. in Public Policy from Princeton University (1996) and a Ph.D. in Economics from the University of California, Berkeley ("Berkeley") (2003). I currently hold the position of Paul J. Evanson Prof. at the Law School at Columbia University ("Columbia"), and previously held academic positions at the University of Michigan ("Michigan") (2003–2007) and Berkeley (2008–2019). Over the course of my academic career, I have taught courses on labor economics, antitrust, corporations, law and economics, and statistics to undergraduates, M.B.A., J.D., L.L.M., and Ph.D. students.

2. From September 2009 until July 2014, I co-directed the Law and Economics Program at Berkeley Law. From 2017 to 2019, I was a member of the Board of Directors of the American Law and Economics Association. I currently serve on the Board of Editors of the *Journal of Law and Economics*.

3. While at Berkeley, I served as the Founding Director of the Social Sciences Data Laboratory ("D-Lab") from June 2014 to June 2017. At D-Lab, I lectured on and advised graduate students and faculty regarding high performance computing, statistical software, and statistical techniques.

4. I have been a Faculty Research Associate of the National Bureau of Economic Research ("NBER") since 2012. I was first asked to join the NBER in 2006 as a Faculty Research Fellow, and I co-directed the NBER Economics of Crime Working Group from 2008 to 2019. The NBER is the preeminent professional association of economists in the world, with over 1,800 members worldwide.

5. My research spans a diverse range of topics, including labor economics, antitrust, econometric and statistical methodology, and other topics. I have published papers in leading journals within economics, such as the *American Economic Review*, the *Review of Economics and Statistics*, the *Journal of Economic Literature*, and the *Journal of Econometrics*. Over the years, my research has been supported by Michigan, Berkeley, Columbia, the MacArthur Foundation, the NBER, the National Institutes of Health, the National Science Foundation, the Arnold Foundation, and the Robert Wood Johnson Foundation.

6. I regularly review articles for the leading peer-reviewed journals within economics, including *Econometrica*, the *American Economic Review*, the *Quarterly Journal of Economics*, the *Journal of Political Economy*, the *Review of Economic Studies*, the *Journal of Econometrics*, the *Review of Economics and Statistics*, and the *American Law and Economics Review*. Peer review specifically focuses on assessing whether submitted manuscripts are employing methodologies that are consistent with academic standards.

7. I am being compensated for my work on this matter at my standard hourly consulting rate of $1,350. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter. A copy of my curriculum vitae, including my previous testimony, is included as Appendix A. A list of the materials I have relied upon in forming my opinions is included as Appendix B.

## 1.2. Allegations and Summary of Opposing Expert Opinions

8. Plaintiffs allege that at different points in time between May 2008 and January 2021, DaVita Inc. ("DaVita"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC ("SCA"), and United Surgical Partners Holdings, Inc., United Partners International, Inc., and Tenet Healthcare Corporation ("USPI") (collectively "Defendants") conspired to "reduce and limit compensation and mobility of their employees."[1] Specifically, Plaintiffs claim that Defendants "entered into agreements to avoid competing for employees, particularly those at the director level or above ('Senior Employees'), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers."[2] Plaintiffs challenge two forms of conduct: (1) alleged "no-poach agreements," and (2) alleged collusive "exchange[s] [of] competitively

---

[1] Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024 ("Third Amended Complaint"), ¶ 38, ¶ 92 ("All natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 2010 to January 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries. Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.").

[2] Third Amended Complaint, ¶ 7.

sensitive information" ("CSI").[3] Plaintiffs claim that the alleged information exchanges were used in addition to the alleged mobility restrictions to suppress compensation and "assure each [Defendant] that they did not need to increase pay levels as much as they otherwise would have[.]"[4] In this report, I will refer to both forms of conduct collectively as the "alleged conduct" or the "challenged conduct," to the alleged conduct concerning the no poach agreements specifically as the "alleged mobility restrictions" or "challenged mobility restrictions," and to the conduct concerning the alleged exchanges of competitively sensitive information as the "alleged information sharing" or "challenged information sharing."

9. Plaintiffs claim that the alleged mobility restrictions impacted all proposed class members, not just those who were allegedly not solicited or hired as a result of the alleged mobility restrictions, because of Defendants' "formal compensation systems" that allegedly spread pay suppression for some proposed class members to all or nearly all other proposed class members.[5]

10. Plaintiffs allege that the challenged conduct had the effect of restricting competition and lowering pay for proposed class members.[6] Plaintiffs allege that it did so by denying proposed class members "access to job opportunities," "restrict[ing] their mobility," "depriv[ing] them of significant information that they would have used to negotiate for better compensation and terms of employment," and "eliminat[ing] the need for compensation increases to preempt competitive offers and retain employees."[7] Plaintiffs allege they are seeking to certify a class comprised of all DaVita, SCA, and USPI employees in the United States with job positions at the director-level and above, excluding senior corporate officers and employees in human resources, recruiting, and legal departments (hereafter referred to as "Senior Employees" or "proposed

---

[3] Third Amended Complaint, ¶ 38 ("In furtherance of the conspiracy, Defendants, and each of them, (i) entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees, and (ii) exchanged competitively sensitive information to fix and maintain the compensation of their employees.").

[4] Third Amended Complaint, ¶ 82.

[5] Third Amended Complaint, ¶¶ 74, 78, 80 ("Because of such formal systems, however, Defendants' no-poach agreements would have affected the proposed Class as a whole, and not just individual employees who would have otherwise received job offers from rival companies in the industry.").

[6] Third Amended Complaint, ¶ 105 ("Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through no-poach agreements, and through exchanging competitively sensitive information, thereby fixing and suppressing Class members' compensation.").

[7] Third Amended Complaint, ¶ 11.

class members") who worked at SCA or DaVita from May 2008 to January 2021, and at USPI from May 2010 to January 2021.[8]

11. Plaintiffs have disclosed two experts: Prof. Evan Starr, a labor economist, and Prof. Barry Gerhart, who studies industrial relations.[9]

12. Plaintiffs' experts analyzed a purported "Class Period" that varies by Defendant: for SCA and DaVita, it is May 1, 2008 to December 31, 2019, but for USPI, it is May 1, 2010 through December 31, 2019.[10] This Class Period departs from what was alleged in the Third Amended Complaint (the operative complaint in this matter): there, Plaintiffs defined a class period of May 2008 to January 2021 for SCA and DaVita, and May 2010 to January 2021 for USPI.[11] It also differs from what was alleged in the criminal indictments against SCA and DaVita. The indictment against SCA alleged that the agreement between SCA and USPI was in place from May 2010 to October 2017. The indictments against SCA and DaVita both alleged that the agreement between SCA and DaVita occurred from February 2012 to July 2017.[12] Finally, the periods alleged

---

[8] Third Amended Complaint, ¶ 92 ("All natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 2010 to January 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries. Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.").

[9] Amended Expert Witness Report of Dr. Evan P. Starr, January 21, 2025, and Backup Materials ("Starr Report"), ¶ 1 ("I specialize in performing economic and statistical analyses of labor markets, with a focus on earnings and restrictions on employee mobility."); Amended Expert Witness Report of Dr. Barry Gerhart, February 11, 2025, and Backup Materials ("Gerhart Report"), ¶ 1 ("I have taught courses on Compensation Management, Human Resource Management, and Research Methods at all three universities [...] I received a Ph.D. in Industrial Relations from the University of Wisconsin-Madison[.]").

[10] Starr Report, ¶ 9 ("I understand that Plaintiffs seek to certify a class of employees who worked in positions at the director-level and above (hereafter 'Senior-Level Employees') for one or more of the following: (a) from May 1, 2008, through December 31, 2019, Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, through December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries ('hereafter the 'Class' or 'Class Members')"); Gerhart Report, ¶ 5 ("I understand that Plaintiffs are seeking certification of a class of employees who worked in positions at the director-level and above (hereafter 'Senior-Level Employees') in the United States for one or more of the following: (a) from May 1, 2008 to December 31, 2019 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, to December 31, 2019 for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008 through December 31, 2019 for DaVita Inc. or one of its subsidiaries (hereafter, 'the Class' or 'Class Members').").

[11] Third Amended Complaint, ¶ 92.

[12] Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC,* January 5, 2021 ("Indictment of SCA"), ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017, the exact dates being unknown to the Grand Jury, in part in the Northern District of Texas and elsewhere, SCA and Company A [USPI] entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees."), ¶ 17 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates being unknown to the Grand Jury, in part in the Northern District of Texas and elsewhere, SCA

---

by Plaintiffs also differ from those Plaintiffs alleged in the Consolidated Amended Class Complaint and the Second Amended Complaint: there, Plaintiffs defined a class period of May 1, 2010 to January 5, 2021 for SCA and USPI, and February 1, 2012 through January 5, 2021 for DaVita.[13]

13. Besides the class period at issue, there are also at least two other instances where Plaintiffs' allegations in their pleadings or to the court and in Plaintiffs' experts' assertions are not in alignment.

- First, although Plaintiffs claim a conspiracy between DaVita, SCA, and USPI, nowhere in the Third Amended Complaint do Plaintiffs allege facts supporting any alleged mobility restrictions or alleged information sharing between DaVita and USPI.[14] Plaintiffs' expert reports and testimony also do not discuss any evidence of mobility restrictions or information sharing between DaVita and USPI. Prof. Starr claimed during his deposition that DaVita was "a partner" to the alleged mobility restrictions and information sharing with SCA, but not with USPI.[15] He presents no qualitative evidence in his report of

and Company B [DaVita] entered into and engaged in a conspiracy to suppress competition between them for the services for senior-level employees by agreeing not to solicit each other's senior-level employees."); Indictment, *United States of America v. DaVita Inc. and Kent Thiry*, November 3, 2021, ¶ 9 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates being unknown to the Grand Jury, in part in the District of Colorado and elsewhere, DAVITA and THIRY entered into and engaged in a conspiracy with SCA to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.").

[13] Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, August 9, 2021 ("Consolidated Amended Class Complaint"), ¶ 101 ("All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCA Holdings, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holding Company, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries"); Second Consolidated Amended Class Action Complaint, In Re Outpatient Medical Center Employee Antitrust Litigation, June 6, 2023 ("Second Amended Complaint"), ¶ 101 ("All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries").

[14] For instance, while the Third Amended Complaint broadly alleges a global 'overarching conspiracy', it elsewhere more specifically alleges two bilateral agreements. Specifically, it claims that (1) SCA and DaVita and (2) SCA and USPI agreed not to poach each other's employees without making any such claim between USPI and DaVita. See Third Amended Complaint, ¶ 7, ¶ 105, p. 12 ("In Furtherance of the Conspiracy, SCA and DaVita Agree Not to Poach Each Other's Employees"), p. 14 ("In Furtherance of the Conspiracy, SCA and USPI Agree Not to Poach Each Other's Employees").

[15] Deposition of Evan P. Starr, Ph.D. (Expert), March 19, 2025 ("Starr Deposition, Volume I"), p. 38 ("Q. And you were not asked to assess whether the evidence is consistent or inconsistent with anticompetitive conduct with regard to any solicitation agreement between USPI and DaVita; correct? A. That's correct. [...] Q. And you're not offering an opinion that there was such an agreement; is that correct? A. As written here, I have no opinion on the existence or nonexistence of an agreement between DaVita and USPI."), p. 216 ("Q. Okay. So, again, I just want to get a sense of the number and scope of agreements with regard to agreements that you analyze or have opinions about for SCA. There are twice as many of those as there are for DaVita; is that correct? [...] A. SCA is a

any agreement or information sharing  between DaVita and USPI, and in fact excludes moves between DaVita and USPI when analyzing mobility between Defendants.[16] Prof. Gerhart similarly discusses no evidence related to any agreement or information sharing between DaVita and USPI.[17] That is, Plaintiffs' experts only assert evidence regarding alleged dyadic agreements between SCA and DaVita, on the one hand, and SCA and UPSI, on the other hand. Plaintiffs' experts do not assert any evidence regarding an alleged overarching agreement.

- Second, while the Third Amended Complaint alleges a no hire agreement in addition to a no solicit agreement, Prof. Starr and Prof. Gerhart's reports and deposition testimony taken together do not support a no hire agreement.[18] Specifically, in his summary of conclusions, Prof. Starr describes the alleged mobility restrictions between SCA and DaVita, and SCA and USPI, as agreements "to not *solicit* each other's employees, including but not limited to Senior-Level Employees, without their knowledge or consent" (emphasis added).[19] Then when discussing the challenged conduct in Section IV.B of his report, he says "Plaintiffs allege that SCA and DaVita, and SCA and USPI agreed not to proactively *recruit* each other's Senior-Level Employees. Further Defendants agreed not to pursue recruiting, soliciting, hiring and/or cold calling [...] each other's Senior-Level Employees unless those Senior-Level Employees informed their current employers that they intended to seek employment elsewhere" (emphasis added).[20] He also explains that the "tell-your-boss" provision whereby employees allegedly had to

---

partner to [...] both portions of the agreement, the no-poach and the CSI, with both DaVita and with USPI. Q. Okay. So two -- with both of the other defendants and both types of agreements, whereas with DaVita, it's only with regard to SCA? A. That's correct.").

[16] Starr Report, ¶ 83 ("As explained in Section V, SCA and DaVita entered into a No-Poach Agreement from 2008 to 2019, while SCA and USPI entered into a No-Poach Agreement from 2010 to 2019. I refer to these pairs of Defendants, 'SCA-DaVita' and 'SCA-USPI,' as 'Covered Defendants.'"). This is consistent with Starr Report, Figure 3, which does not analyze mobility between DaVita and USPI. See Starr Report, Figure 3.

[17] Gerhart Report, ¶ 22 ("Plaintiffs allege that the Defendants established two No-Poach Agreements as part of their overarching conspiracy to suppress labor market competition: a. The SCA-DaVita No-Poach Agreement [...] The SCA-USPI No-Poach Agreement.").

[18] Third Amended Complaint, ¶ 7 ("Beginning no later than 2008, however, Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above ('Senior Employees'), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers."), ¶ 39 ("Defendants participated in meetings, conversations, and communications to discuss the solicitation and compensation of each other's employees, and agreed during those meetings, conversations, and communications not to solicit each other's employees and to suppress the wages of their employees.").

[19] Starr Report, ¶ 12.

[20] Starr Report, ¶ 19.

Highly Confidential – Outside Counsel/Experts Only

inform their current employer they intended to seek employment elsewhere (before the recruiting and hiring process would be completed) was added "later" for both the SCA-DaVita and SCA-USPI alleged mobility restrictions.[21] Prof. Starr further testified in his deposition that he does not have an opinion as to the exact contours of the alleged mobility restrictions (e.g., whether they prevented hiring), but he explained that it is his understanding that the "tell-your-boss" provision further "dampened" (but did not necessarily prevent) mobility between Defendants.[22] Similarly, Prof. Gerhart testified in his deposition that the "tell your boss" provision did not prevent hiring (and therefore was weaker than a no hire agreement), and claimed in his report that the "tell your boss" provision was added to the alleged mobility restrictions in 2011 or 2012.[23] Thus, although Plaintiffs allege a no solicit and no hire agreement, Plaintiffs' experts appear to assert that there were no solicit agreements initially (from May 2008 until approximately 2011 or 2012), and then when the "tell-your-boss" provision was adopted, the agreements became more restrictive.

14. Prof. Starr opines that his analysis demonstrates proposed class members' pay was suppressed by 14.5% overall as a result of the alleged conduct leading to classwide damages of $869.5 million.[24] Prof. Starr also opines that all or nearly all proposed class members were impacted by the alleged conduct based

---

[21] Starr Report, ¶ 70 ("Later, DaVita and SCA added an additional enforcement mechanism: the 'tell-your-boss' provision."), ¶ 77 ("The SCA-USPI No-Poach Agreement included the tell-your-boss provision. [...] Former SCA CEO Hayek testified at the DaVita criminal trial and at deposition that after he and Thiry agreed to implement the 'tell-your-boss' provision in the SCA-DaVita No-Poach Agreement, Hayek took that provision and 'applied it to the USPI relationship' 'for the sake of simplicity.'").

[22] Starr Deposition, Volume I, p. 54 ("[W]hat I was asked to do in this case was to assess whether the qualitative evidence as it relates to these no-poach agreements was consistent with anticompetitive conduct. [...] I don't have an opinion as to whether the exact contours of the agreements were a no-hire agreement."), p. 84 ("Q. And that tell-your-boss provision with regard to both of the bilateral agreements that you're labeling as no-poach agreements, whether or not it was economically material, would be a, an empirical question; correct? [...] A. I think that we would have a clear theoretical prediction about what this would mean for the ability of workers employed at, for example, SCA to then become subsequently employed at DaVita. And so theoretically it seems very likely that it would dampen that mobility, but if you want to try to put numbers to it and say this dampened mobility by this percent or that percent, that's an inherently quantitative exercise.").

[23] Deposition of Barry Gerhart, Ph.D. (Expert), March 5, 2025 ("Gerhart Deposition"), pp. 96–100 ("I think that, with the 'tell your boss,' there was a chance for there to be a hire; [...] [T]he no-hire sounds like it would be the most restrictive [relative to the 'tell your boss'].""); Gerhart Report, ¶ 22 ("SCA and DaVita expanded the terms to include a tell-your-boss requirement in 2011 and 2012 [...] After Hayek and former DaVita CEO Thiry agreed to implement the 'tell-your-boss' provision in the SCA-DaVita No-Poach Agreement, Hayek took that provision and 'applied it to the USPI relationship' 'for the sake of simplicity.'").

[24] Starr Report, ¶ 12 ("I also conclude based on the wage suppression model I develop in Section VI that the Challenged Conduct suppressed wages by 14.5 percent overall [...] I employ the standard 'but-for world' method of calculating damages to calculate that single damages to the Class sum to $869.5 million over the Conduct Period").

upon his analyses purportedly demonstrating the existence of Defendant pay structures, as well as extensions of his pay regression model and other econometric tests.[25] Additionally, based on his pay regression model findings, Prof. Starr opines that Defendants had market power over proposed class members.[26]

15. For his part, Prof. Gerhart opines that Defendants had an incentive to collude to suppress labor market competition,[27] that the alleged conduct including both the alleged mobility restrictions and the alleged information sharing would likely harm proposed class members by suppressing employee compensation,[28] that qualitative evidence demonstrates that Defendants' alleged information sharing is inconsistent with unilateral conduct,[29] and that Defendants had structured pay systems that tied proposed class members' pay together such that all or nearly all proposed class members would be impacted by the alleged conduct.[30] As he testified in his deposition, Prof. Gerhart's opinions are supported only by qualitative evidence and academic literature, as opposed to any quantitative analysis of Defendants' compensation data.[31]

---

[25] Starr Report, ¶ 12 ("In Section VII, I develop a series of econometric tests that I developed from the wage suppression model in Section VI, which shows that Defendants' Conduct, which occurred over a 'Conduct Period' defined as 2008 to 2019 for DaVita and SCA and 2010 to 2019 for USPI, harmed all or nearly all Class Members by suppressing their compensation."), ¶ 138 ("I use six independent and complementary methods to demonstrate that the generalized wage suppression found by the regression in Section VI would harm all or nearly all Class Members.").

[26] Starr Report, ¶¶ 12, 196.

[27] Gerhart Report, ¶ 7 ("Here, evidence that is common to the Class shows that Defendants were incentivized to collude to suppress labor market competition [...] Such collusion would be harmful to Defendants' employees.").

[28] Gerhart Deposition, pp. 33–34 ("Q. Are you offering an opinion that Defendants' alleged conduct actually suppressed employees' compensation [...] or likely would? [...] A. Likely.").

[29] Gerhart Report, ¶ 82 ("Plaintiffs have developed an extensive record of evidence common to the Class to demonstrate that these CSI Exchanges, which Defendants engaged in under the guise of lawful benchmarking, are inconsistent with unilateral conduct and would have harmed employee pay.").

[30] Gerhart Report, ¶ 8 ("Given the systematized pay structures and compensation design at Defendant firms, anticompetitive No-Poach Agreements and CSI Exchanges interfered with labor market competition broadly. Defendants' No-Poach Agreements and CSI Exchanges suppressed the wages of some Class Members directly and the focus on internal equity embodied in the systematized pay structures and compensation design would additionally limit and otherwise negatively affect the compensation of nearly all employees in the proposed Class.").

[31] Gerhart Deposition, p. 208 ("Q. And whether or not a compensation structure causes cascading effects can be verified by analyzing actual pay data; correct? [...] A. It would -- It seems like it could be relevant. Q. But -- But you didn't conduct that analysis; correct? [...] A. I did not."), pp. 285–286 ("Q. And, again, I'd just want to confirm: You did not perform any empirical or quantitative analysis to support your opinions in this case; correct? [...] A. That is correct.").

### 1.3. Assignment

16. Counsel for Defendants have asked me to evaluate the analysis and opinions in Prof. Starr and Prof. Gerhart's expert reports and address the following questions:

a. Assuming the alleged conduct occurred, would it be expected to have had a common impact on proposed class members? Have Plaintiffs' experts Prof. Starr and Prof. Gerhart demonstrated that it would?

b. Have Plaintiffs' experts sufficiently analyzed the alleged conduct in the context of:

    i. the labor markets in which proposed class members participate?

    ii. whether Defendants had market power sufficient to suppress pay for proposed class members in any such claimed antitrust labor market?

    iii. the way in which Defendants set compensation, including whether Defendants pay was structured in such a way that any impact from the alleged conduct would have been spread or could be measured classwide?

c. Are there groups of proposed class members who, from an economic perspective, could not or would not be harmed by the alleged conduct? Can common evidence be used to determine whether a given proposed class member was impacted, and by how much he or she was harmed?

d. Have Plaintiffs' experts demonstrated that the alleged information sharing was anticompetitive and part of an agreement to coordinate on pay, that the information shared would be sufficient to effectuate successful coordination on pay, or that any impact from the alleged information sharing, assuming it occurred, would be common to proposed class members?

Highly Confidential — Outside Counsel/Experts Only

    e. Have Plaintiffs' experts proposed a reliable methodology based on common evidence that measures the impact *caused by* the alleged conduct, appropriately accounting for the various forms of alleged conduct?

        i. Does Prof. Starr's pay regression model demonstrate that pay was suppressed for proposed class members, on average? Does it further demonstrate that pay was suppressed classwide?

    f. Finally, have Plaintiffs provided a class definition that is clear and based on objective criteria, such that proposed class members may be identified using common evidence?

17. I do not express an opinion about whether the alleged conduct (both the alleged mobility restrictions and the alleged information sharing) occurred. Rather, my analysis focuses on whether the alleged conduct, assuming it occurred, had an economic impact on proposed class members, and whether that impact was experienced classwide and can be reliably assessed using common evidence. Further, my analysis relies on the Class Period that Plaintiffs' experts analyzed in their reports (which extends through December 31, 2019), unless otherwise specified.

18. In forming my opinions, I have relied on several sources of information, including deposition testimony in this matter; documents produced by Plaintiffs, Defendants, and third parties in this matter; documents produced in *United States of America v. DaVita Inc. and Kent Thiry*; employment and compensation data produced by Defendants; publicly available data on employment and compensation; and proprietary data on employment histories for healthcare employees.

### 1.4. Summary of Opinions

19. I understand that at this phase of the litigation, the Court needs to determine whether Plaintiffs have put forward a reliable methodology, based on information common to the class, that can be used to assess whether the challenged conduct caused harm to, and impacted, all or nearly all of the proposed class members. It is my opinion that Plaintiffs' experts have failed to do so. My own analysis indicates that any impact caused by the challenged conduct would not have been common, and, moreover, that it would not be

possible to reliably measure any impact or harm using common evidence given the unique context of this case including among other things the diversity of proposed class members, the many and varied job options available to them, and the individualized nature of compensation for Defendants' senior-level employees such as proposed class members. In addition, I find that Plaintiffs have failed to demonstrate that the challenged conduct suppressed pay on average, let alone classwide. I detail my findings further below.

20. First, Plaintiffs' claims are at odds with how labor market competition, and compensation decisions, for proposed class members actually occur. Once I properly account for the reality of how Defendants compete for labor and set compensation, I find that the alleged conduct, assuming it occurred, would not have had a common impact on proposed class members (**Section 2**).

a. Plaintiffs and their experts assume that Defendants had market power sufficient to suppress pay for proposed class members. This assumption ignores a basic fact: proposed class members have widely varying skills, job titles, employment preferences, and outside employment options that include many non-Defendant, and even of course non-healthcare-related, firms. Using proprietary data, which shows prior and next employers for individuals employed by Defendants in class positions, I find that Defendants face extensive competition from non-Defendant firms for proposed class members' labor: non-Defendant firms are the prior or next employers for more than 98% of moves to or from a Defendant. This aligns with Prof. Starr's own analysis using produced data, which shows that at least 95% of departures from Defendants on an annual basis did not involve a move between USPI and SCA, or between SCA and DaVita. This also aligns with qualitative evidence, which shows that Defendants recruited and hired proposed class members from many firms besides Defendants. Together, these results are incompatible with Plaintiff's contention that the three Defendants have labor market power sufficient to suppress pay for all or nearly all proposed class members, and mean that any effect of the alleged conduct on pay would not be common. Individualized inquiry into the suitable employment options for a given individual would be necessary to assess who is and is not harmed. Despite the need for individualized inquiry, it is evident that, for many or most (if not all) proposed class members, Defendants did not have market power sufficient to

suppress pay, given the abundance of alternative employers besides Defendants that I observe in my analysis of employment histories (**Section 2.1**).

b. Further, Plaintiffs and their experts unreasonably assume that proposed class members who were not directly affected by the alleged conduct were nonetheless indirectly affected through a rigid pay structure that supposedly links together pay for each of the proposed class members. This assumption is problematic because it ignores the reality of how Defendants set compensation. Qualitative evidence shows that the Defendants engaged in individualized negotiations and considered individualized factors when setting pay. Quantitative evidence shows that, consistent with proposed class members pay being individualized, and inconsistent with rigid pay structures, (1) there is wide variation in pay across proposed class members, even among those at the same seniority level (e.g., Administrator, Director, Vice President, etc.), (2) there is substantial overlap in the observed pay ranges for adjacent seniority levels, and (3) proposed class members' pay does not generally move together over time. Moreover, Plaintiffs' experts' qualitative and quantitative evidence, which they purport shows that Defendants had rigid pay structures, fails to do so. Prof. Starr's quantitative evidence does not speak to whether Defendants had rigid pay structures sufficient to generate classwide impact, and generates results inconsistent with Plaintiffs' claimed rigid pay structures once basic corrections are made. Prof. Starr and Prof. Gerhart additionally fail to properly consider qualitative evidence showing that Defendants did not have job-specific pay ranges and grades for class positions throughout the Class Period (**Section 2.2**).

21. Second, from an economic perspective, there are several groups of proposed class members who could not or would not have been harmed by the alleged conduct. Identifying exactly which proposed class members belong to each of these groups would require individualized inquiry (**Section 3**). These groups of proposed class members include the following:

a. First, proposed class members who participate in labor markets where Defendants do not have labor market power could not have been harmed by the alleged conduct. This is because without market

power, Defendants would not be able to suppress pay. Evidence of extensive competition from non-Defendant employers for proposed class members' labor demonstrates that Defendants would not have had market power sufficient to suppress pay for many or most (if not all) proposed class members (**Section 3.1**).

b.  Second, proposed class members who were not directly affected by the alleged conduct could only have been indirectly harmed through Plaintiffs' claimed rigid pay structures. However, quantitative and qualitative evidence militate against the existence of a rigid pay structure capable of classwide harm. As a result, Plaintiffs and their experts have not shown that all or nearly all individuals not directly affected by the alleged conduct would be harmed indirectly, and many (if not all) would not be (**Section 3.2**).

c.  Third, proposed class members who were newly hired during the Class Period from a non-Defendant firm (or after graduating from school or returning to work after time off) could not be harmed by the alleged conduct, at least initially, and possibly ever. Compensation for new hires is set competitively at the time of hire (because Defendants and non-Defendant firms alike could compete for such workers), and it would take time for new hires' pay to be impacted by the conduct. Plaintiffs' experts have provided no methodology for identifying when newly hired individuals would transition from no harm at hire to the claimed harms later on, if ever. More than half of proposed class members were newly hired during the Class Period. Pay suppression for new hires would be unlikely to occur through pay cuts as economics teaches that it is rare for nominal wages to fall. The other option would be to suppress new hires' pay by withholding or reducing pay increases year after year, but this is not plausible given substantial pay increases experienced by new hires during Class Period years: the median new hire experienced annual pay increases which averaged 7.1% during the Class Period. Similarly, individuals who were employed by Defendants at the start of the Class Period but who had short tenures could not be harmed, at least initially, and possibly ever. Like new hires, those individuals' pay would be competitive at the start of the Class Period (since it was set prior to the onset of any alleged conduct) and would take time to be affected (if ever). I

roughly approximate the share of proposed class members who could not be harmed by the alleged conduct for these reasons by computing a) the percentage of class members who were newly hired and whose tenure was 2 or less years, and b) the percentage of class members who were employed by Defendants at the start of the Class Period and remained for less than 2 years. I find that these groups correspond to 25% and 3.8% of proposed class members respectively, although I believe this is likely an underestimate of the share of proposed class members who were not harmed because they were newly hired during the Class Period (**Section 3.3**).

d. Fourth, any proposed class members whose compensation was highly skewed toward equity pay, and who held a large amount of equity from Defendant firms, could have been unharmed, or possibly even benefited, from the alleged conduct. As Prof. Gerhart explains, proposed class members with substantial equity may have benefited from any alleged scheme to suppress pay because, under Plaintiffs' theory, it would have made their equity more valuable than it would have been absent the alleged conduct (**Section 3.4**).

e. Fifth, proposed class members employed by DaVita or USPI who would not consider employment with SCA, for example due to location considerations, could not have been directly harmed by the alleged mobility restrictions given that Plaintiffs' experts have presented no evidence of mobility restrictions between DaVita and USPI (**Section 3.5**).

f. Sixth, proposed class members who would not engage with solicitation outreach (for example because they would not consider changing jobs) could not be directly harmed by the alleged mobility restrictions (**Section 3.6**).

g. Seventh, proposed class members whose inter-Defendant mobility was already restricted for other reasons could not be directly harmed by the alleged mobility restrictions, at least in some cases. Reasons proposed class members' inter-Defendant mobility may have already been restricted include (1) having a non-compete agreement which prevented movement to at least some other Defendant firms, which was common among senior-level employees at SCA and USPI; (2)

contractual recruiting and hiring limitations agreed to by external recruiting firms used by Defendants; and (3) having substantial unvested equity (**Section 3.7**).

22. I also discuss several additional reasons why it is not possible to use evidence common to the proposed class to reliably quantify harm (if any) (**Section 3.8**).

23. Third, Plaintiffs' experts have not established that the information allegedly shared by Defendants was shared for anticompetitive reasons, and it could have increased compensation for proposed class members rather than enabled pay suppression. The information allegedly shared by Defendants was also insufficient to support coordination on pay throughout the Class Period even assuming that was the goal, and would not have had a common impact on proposed class members pay even assuming it was used anticompetitively and was sufficient to support coordination on pay (**Section 4**).

a. Plaintiffs' experts have no evidence that information was shared for purposes of coordinating on pay, and admit as much. From an economic perspective, compensation-related information can be used by firms to improve their compensation offers and enhance competition, just as much as it could be used to collude. It is therefore possible the information sharing had procompetitive effects, i.e., improved pay for at least some proposed class members, and Plaintiffs' experts have failed to consider or address this possibility (**Section 4.1**).

b. Plaintiffs' experts have also failed to establish that the information sharing was sufficient to support a conspiracy to suppress pay throughout the Class Period. Much of the evidence Plaintiffs' experts point to does not concern actual sharing of information, or is not related to compensation. Their evidence of compensation-related information sharing (the merit pay increase budgets) demonstrates that the information sharing did not occur regularly (contemporaneous business documents only support a few instances all prior to 2013 and deposition testimony confirms that the exchanges were not regular) and thus was insufficient to sustain a conspiracy to coordinate on pay over a Class Period spanning 10 to 12 years depending on the Defendant. It was also aggregate in nature

for each firm (i.e., for the entire firm or for broad groups of employees at the firm). For example, it would not even allow for the calculation of average pay for individuals in a particular job. Indeed, this information does not even meet Prof. Starr's own criteria stated in his report regarding the types of information that when shared can lead to anticompetitive outcomes due to its aggregated nature, and lack of information about specific salaries (**Section 4.2**).

c. Even assuming for the sake of argument that the alleged information sharing was undertaken with a goal of suppressing pay, and that the information shared was sufficient to support a conspiracy to suppress pay, impact stemming from the alleged information sharing would not be common. There are several reasons for this, including variation across proposed class members in labor market opportunities (and thus whether Defendants would have market power), performance, which years of the Class Period they were employed by Defendants, and their compensation mix (i.e., what share of their total compensation came from salary versus bonus versus equity versus other types of pay) (**Section 4.3**).

24. Fourth, Prof. Starr has not developed a reliable methodology to measure impact and damages stemming from the alleged conduct (**Section 5**).

a. Although Plaintiffs, Prof. Starr, and Prof. Gerhart all assert that mobility would be suppressed by the alleged conduct, Prof. Starr's own analysis examining the inter-Defendant mobility of proposed class members does not demonstrate that mobility was suppressed throughout the Class Period, or that mobility was statistically significantly lower during the Class Period as compared to before and after the Class Period. This fact alone is critical: a reduction in mobility underpins Plaintiffs' theory of harm with regard to the alleged mobility restrictions, and Plaintiffs have no evidence that mobility was impacted by the alleged conduct. A far more significant takeaway from Prof. Starr's mobility analysis is that it shows that movement between covered Defendants accounted for only a small share (between 0.2% and 5%) of total departures per year before, during, and after the Class Period, a fact that is consistent with Defendants facing extensive competition from non-Defendant firms

for proposed class members' labor throughout the Class Period (**Section 5.1**).

b. When I compare proposed class members' pay to pay for a benchmark group of medical and health services managers in the health care and social assistance industry (one that Prof. Starr incorporates in his own pay regression analysis), I find proposed class members' pay trended similarly to, or even grew at a faster rate than, the benchmark group during most years before, during, and after the Class Period, a pattern that is wholly inconsistent with Prof. Starr's finding that proposed class members' pay was suppressed by 14.5%. This inconsistency is not surprising, as Prof. Starr has not identified a reliable methodology that measures impact caused by the alleged conduct. The fact that Prof. Starr's pay regression model fails as a matter of causation is evidenced by issues with Prof. Starr's "before-after" methodology that are raised in the economics literature. Moreover, Prof. Starr's pay regression model does not even demonstrate an average reduction in pay during the Class Period when I correct certain obvious flaws in his methodology such as basic errors he made in processing the data, his treatment of equity pay, and his treatment of the COVID-19 pandemic. His pay regression model also does not demonstrate an average reduction in pay when I consider alternative class period dates (which is notable, since these dates have changed considerably over time since the initial filing of Plaintiffs' Consolidated Amended Class Complaint, and the dates that Prof. Starr analyzes are not even consistent with the Third Amended Complaint). Additionally, as Prof. Starr himself admits in his report, only 44% of proposed class members contribute to the estimation of the conduct effect in his pay regression model, and Prof. Starr provides no explanation for why the resulting conduct estimate can be extrapolated to reliably estimate damages for the remaining proposed class members who constitute more than half of the proposed class (**Section 5.2**).

c. Further, Prof. Starr's pay regression model is not sufficiently linked to the alleged conduct because, despite the fact that Plaintiffs themselves allege at least two forms of conduct (mobility restrictions and information sharing) that applied differentially across Defendants (there is no allegation of mobility restrictions or

information sharing between USPI and DaVita), that Plaintiffs' experts opine became more restrictive over time (the mobility restrictions began as no solicitation agreements, but later additionally included a "tell your boss" requirement), and that occurred during different time periods (2009–2019 for the alleged information sharing, 2010–2019 for the alleged USPI-SCA mobility restrictions, and 2008–2019 for the alleged SCA-DaVita mobility restrictions), Prof. Starr remarkably estimates a single effect that he claims is a reliable measure of the impact of the alleged conduct over the entire proposed class period (**Section 5.3**).

25. Fifth, Prof. Starr's pay regression model does not demonstrate a common reduction in pay during the Class Period for the proposed class (**Section 6**). He purports to estimate the effect of the alleged conduct on average in his pay regression analysis but, by focusing on averages, he conceals variation within the proposed class, ignoring the diversity of jobs and skills among proposed class members. When I correct Prof. Starr's pay regression model for certain obvious flaws (basic errors he made when processing the data, his treatment of equity pay, and his treatment of the COVID-19 pandemic) and estimate the model separately for key subgroups within the class (e.g., by seniority level and Defendant, by state, by job specialty group, or by year), I find substantial variation in the alleged pay suppression across subgroups, including groups for which the pay effect estimate is positive and groups for which it is zero. These patterns are entirely inconsistent with common impact. I additionally show that Prof. Starr's other analyses allegedly demonstrating that proposed class members were commonly impacted are driven by his flawed pay regression model, and that once such flaws are corrected, those results no longer show that most proposed class members were impacted using Prof. Starr's model.

26. Sixth, a rigid pay structure capable of generating classwide downward pressure on pay, as Plaintiffs allege, would also generate classwide upward pressure on pay, potentially insulating proposed class members from any harm (**Section 7**). Even if one were to take Plaintiffs' claim that Defendants had a rigid pay structure sufficient to generate classwide harm at face value, under such a pay structure both decreases and increases in pay for one proposed class member should impact pay for all (or nearly all) other proposed class members. This, in turn, would mean that there would have been upward pressure on the pay structure due to employees newly hired from somewhere other than a Defendant firm, whose pay is set competitively, or from proposed class

members who had non-Defendant employment options, and who negotiated pay increases due to outside offers. Given that more than half of proposed class members were newly hired during the Class Period, and that Defendants compete with many non-Defendant firms for proposed class members' labor, this upward pressure would be considerable, and could offset any downward pressure resulting from the alleged conduct either partially or completely. Prof. Starr's damages estimates do not account for this, nor has he explained how he could.

27. Seventh, and finally, proposed class members cannot be identified based on clear, objective criteria using common evidence.  It is subjective and unclear what constitutes a "director-level and above" employee and there are multiple ways to think about it. For example, whether someone is above the director level could be argued to depend on pay, or on skills and tasks associated with the job, or on a defined company hierarchy, and these different ways of thinking about it would lead to different decisions about which proposed class members (and associated jobs) are in Plaintiffs' proposed class. Moreover, there are no objective criteria to identify proposed class members in excluded groups (e.g., legal or HR "departments") based on common evidence. Consistent with this, Prof. Starr's method for identifying class positions is not based on objective criteria and contains employees who facially should not be included within Plaintiffs' definition of the class (**Section 8**).

## 2. THE ALLEGED CONDUCT, ASSUMING IT OCCURRED, WOULD NOT HAVE HAD A COMMON IMPACT ON PROPOSED CLASS MEMBERS

28. Plaintiffs' experts claim that the challenged conduct commonly impacted proposed class members by suppressing compensation of members of the proposed class.[32] They claim this occurred for two reasons. First, they claim that some proposed class members were directly impacted by the alleged conduct (for example because they did not receive solicitation outreach or compensation information that they otherwise would have or because information about pay was shared between Defendants), and that this enabled Defendants to suppress pay for such individuals. Second, they claim that proposed class members not directly affected by the alleged conduct would also be indirectly impacted through a pay structure that spreads changes in pay for some proposed class members to all or nearly all other proposed class members. (Throughout this report, for ease of exposition, I will refer to such a pay structure as "rigid.") Embedded in these claims are significant assumptions about how labor market competition and compensation for proposed class members work, which are at odds with quantitative and qualitative evidence regarding how Defendants compete for labor and set compensation.

29. First, Plaintiffs' experts assume that the alleged conduct would have enabled Defendants to suppress compensation for proposed class members.[33] For example, they assume that if a proposed class member were prevented from moving between Defendant firms, or from receiving information about what Defendants were paying, this would enable Defendants to pay that individual an amount that is not competitive. However, as the evidence I present in Section 2.1 demonstrates, the degree to which labor market competition would have been impacted by the alleged conduct — and, in turn, the degree to which Defendants would have had market power and been able to lower compensation for proposed class members — differs based on a proposed class

---

[32] Starr Report, ¶ 12 ("[...] Defendants' Conduct, which occurred over a 'Conduct Period' defined as 2008 to 2019 for DaVita and SCA and 2010 to 2019 for USPI, harmed all or nearly all Class Members by suppressing their compensation."); Gerhart Report, ¶ 162 ("[M]y knowledge of compensation systems and the materials I considered informs my opinion that No-Poach Agreements, such as the agreements at issue in this case, and exchanges of confidential wage information, such as the CSI Exchanges at issue in this case, will suppress the compensation of all or nearly all members of Plaintiffs' proposed Class, including those with different job titles.").

[33] Starr Report, ¶ 198 ("I find that the Challenged Conduct reduced employee mobility between the covered Defendants and lowered compensation at Defendants by approximately 14.5 percent annually."); Gerhart Report, ¶ 158 ("Defendant firms' No-Poach Agreements and CSI Exchanges harmed Defendants' employees by suppressing their compensation."). Prof. Starr distinguishes between Senior Employees who were "directly" affected by the alleged conduct because they were "the target of wage suppression," and Senior Employees who were "indirectly" affected through a pay structure. See Starr Report, ¶ 174 ("[I]f employee compensation is driven, in part, by considerations of internal equity, then the firm's ability to suppress wages of a group of employees would also be indirectly felt even by those employees who were not the target of wage suppression.").

member's outside employment options, which varied widely across proposed class members. This contradicts Plaintiffs' and Plaintiffs' experts' claims of common impact. Further, given the abundance of outside employment options for members of the proposed class besides Defendants, it is evident that Defendants did not have market power sufficient to be able to lower compensation for many or most (if not all) proposed class members.

30. Second, Plaintiffs' experts assume that the alleged conduct would have suppressed pay for proposed class members who were not directly affected by the alleged conduct because such individuals were indirectly impacted through a rigid pay structure, that would cause any pay suppression experienced by some proposed class members to spread to all or nearly all proposed class members.[34] However, as the evidence I present in Section 2.2 demonstrates, a rigid pay structure is not supported. Rather, evidence reveals several facts that are inconsistent with rigid pay structures. First, many individualized factors influence proposed class members' pay. Second, proposed class members' pay varies widely among those at the same seniority level, and there is substantial overlap in the observed pay ranges for adjacent seniority levels. Third, proposed class members' pay does not move together over time. These facts completely undermine Plaintiffs' claims that any impact from the alleged conduct would be common to the class. Moreover, these facts are not surprising given record evidence, which Plaintiffs' experts fail to properly consider, indicating that Defendants did not have job-specific pay ranges and grades for class positions throughout the Class Period.

### 2.1. Plaintiffs' Experts Have Not Explained How Impact Could Possibly Be Common Given That Proposed Class Members Participate in Different Labor Markets with Varying Competitive Circumstances and Many Non-Defendant Employers

31. Plaintiffs' experts ignore the reality of labor market competition for proposed class members — specifically, that Defendants employ many different types of proposed class members who hold different jobs, have different job

---

[34] Plaintiffs' experts purport to demonstrate the existence of Defendants' rigid pay structures through their review of the qualitative and quantitative evidence in this matter. However, as I will explain in Section 2.2 and Section 6, the evidence is inconsistent with rigid pay structures (either on its face, or once key flaws are corrected), which means that Plaintiffs' experts unreasonably assume that Defendants had rigid pay structures in place despite the lack of evidence that this was the case. See Starr Report, ¶ 12 ("I conclude based on my analysis of qualitative and quantitative evidence that Defendant firms had structured compensation systems wherein pay moved systematically, and as such would commonly transmit any harms from the Challenged Conduct to all or virtually all Class Members."); Gerhart Report, ¶ 7 ("[P]ay at Defendant firms moved in systematic and structured ways, such that wage suppression as to a subset of employees would have impacted other employees' pay.").

titles, have different seniority levels, have different skills, have different outside employment opportunities, and therefore participate in different labor markets where they are subject to different competitive pressures relevant for determining compensation. These competitive pressures vary widely across proposed class members and are inconsistent with the notion that Defendants would have had market power sufficient to suppress pay for proposed class members classwide. This means that neither the alleged mobility restrictions nor the alleged information sharing would have common impact.

32. To start, in Section 2.1.1, I explain that Plaintiffs' experts do not properly analyze the relevant labor markets in which proposed class members participate, nor do they properly assess whether Defendants had market power sufficient to suppress pay in those labor markets. Then, unlike Plaintiffs' experts, I analyze the record and economic evidence regarding labor market competition for proposed class members. In Section 2.1.2, my analysis shows that proposed class members participate in different labor markets with varying outside employment options. In Section 2.1.3, I explain the economic basis for this variation: outside employment options depend on skills and preferences, and these vary a great deal from person to person and thus among proposed class members. Finally, in Section 2.1.4, I explain that proposed class members' outside employment options affect whether Defendants have market power sufficient to suppress proposed class members' pay through the alleged conduct. If there are many non-Defendant employment options for proposed class members in a certain position, then Defendants could not suppress pay for that position below what other non-Defendant firms were offering, while still being able to retain and recruit enough employees to fill Defendants' available jobs. Individualized inquiry is necessary to determine whether Defendants had market power in the labor market for a given proposed class member, and thus whether that employee could potentially be harmed by the alleged conduct assuming it occurred, although the abundance of alternative employers besides Defendants makes it clear that Defendants did not have market power sufficient to suppress pay for many or most (if not all) proposed class members.

*2.1.1. Plaintiffs' Experts Do Not Properly Analyze the Relevant Labor Markets or Market Power for Proposed Class Members*

33. As an initial matter, Plaintiffs' experts do not properly account for proposed class members' many (and varied) employment opportunities with non-Defendant firms when analyzing labor market competition for proposed class members. Consideration of proposed class members' employment

opportunities is critical because broad competition from numerous firms that are not alleged to be part of a conspiracy constrains the ability of the conspirators to suppress pay – Defendants must pay competitive wages when faced with broad competition, or they will struggle to hire and retain workers.[35] Neither expert engages in an analysis of market definition that includes understanding the alternative employment opportunities for proposed class members. Both Prof. Starr and Prof. Gerhart reach various conclusions in their reports that assume Defendants have market power sufficient to suppress pay. However, neither does any analysis of any market to support the claim that Defendants have market power or to outline the boundary of the market being proposed.

34. Prof. Starr's opinion on this topic is limited to the assertion that Defendants have "market power over Class Members."[36] In his deposition, he clarified that he did not make any attempt to analyze the relevant labor market for proposed class members.[37] Prof. Starr's assertion reflects a misunderstanding of market power, which requires showing that Defendants had the ability to suppress compensation in a claimed relevant antitrust market. I disagree with Prof. Starr's conclusion. As I explain below, proposed class members had far too many labor market options for suppression of compensation to be plausible and his empirical analyses do not support his claim. However, the issue here is more fundamental: Prof. Starr is claiming market power, but does not address the question of "in what market?" The analyses I present below show that it is implausible that there is a single relevant antitrust labor market for the proposed class, or that in each of the relevant antitrust labor markets that do exist, Defendants had market power sufficient to suppress pay. Indeed, labor

---

[35] Prof. Gerhart acknowledges this basic economic fact in his report and textbook. See Gerhart Report, ¶ 50 ("Where labor markets are competitive, employers often raise wages of current employees to prevent them from leaving. In other words, higher pay constitutes an important tool that employers use to retain remaining employees, and every guide to employee retention emphasizes the need to provide compensation that is competitive with the levels offered elsewhere."), ¶ 56 ("Paying below market, on the other hand, precludes the company from competing adequately in the labor market to hire and retain sufficient employees, particularly high-quality employees."); Barry Gerhart, Jerry Newman and George Milkovich, *Compensation ISE*, (McGraw-Hill Education, 2022) ("Gerhart (2022)"), p. 243 ("A policy of paying below-market rates may hinder a firm's ability to attract potential employees.").

[36] Starr Report, ¶ 12 ("I conclude that the evidence includes direct proof of market power, such that Defendants wielded substantial market power over Class Members.").

[37] Starr Deposition, Volume I, p. 139 ("Q. Okay. So you'd need data on where the departing employees went to, to determine who the relevant, competitors in the relevant labor market are; right? [...] A. Yes, that's right. Q. Okay. And you haven't examined or tried to determine whether such data's available? [...] A. I wasn't asked to, to examine where every departing worker went to, and I did not do that."), p. 155 ("In this context I wasn't asked to study the relevant labor market and define the precise contours of the labor market.").

market definition for proposed class members can itself be an individualized question, as Prof. Gerhart explained in his deposition.[38]

35. For his part, Prof. Gerhart claims in his report that, according to Plaintiffs, "Defendants unlawfully conspired to suppress compensation *in the market for Senior-Level Employees*" (emphasis added),[39] though he notably reached the opposite conclusion during his deposition when he claimed that, rather than a single labor market for proposed class members, labor markets are in fact individualized.[40] However, like Prof. Starr, Prof. Gerhart does not conduct any analysis of labor market definition. Prof. Gerhart also does not opine on labor market power, although he assumes Defendants had market power when he concludes that the alleged conduct (both the alleged mobility restrictions and the alleged information sharing) would likely lead to suppressed pay classwide.[41]

36. Neither expert considers whether different types of proposed class members may have faced different competitive conditions.[42] For example, while Prof. Starr acknowledges that Defendants account for only a "small portion" of employment for medical and health services managers in the health care and social assistance industry (a group that Prof. Starr considers in his own pay regression analysis) and that proposed class members' compensation may be affected by the average wage level for healthcare managers, he does not discuss non-Defendant employers of healthcare managers at all when evaluating whether Defendants have market power sufficient to suppress proposed class

---

[38] Gerhart Deposition, p. 119 ("A. Well, I'll try not to do this too much; but I'm kind of thinking of an article that I wrote, I think, in 1990, where I think I said something about 'each person almost has their own individual market for opportunities.'"). See also Barry Gerhart, "Voluntary Turnover and Alternative Job Opportunities," *Journal of Applied Psychology*, 75(5), 1990, pp. 467–476 ("Gerhart (1990)") at pp. 467–468 ("Finally, although general labor-market conditions influence the probability of an employee's receiving an alternative job offer, the 'specific mix of skills and experiences of the person in question' are at least equally important (Hulin et al., 1985, p. 239). At the extreme, one could think of a separate labor market existing for each person. Thus, although general labor-market conditions should influence perceived ease of movement, the magnitude of the relation is limited to the extent that perceived ease of movement also reflects idiosyncratic differences in individual labor markets stemming from variations in skills, abilities, experience, and so on.").

[39] Gerhart Report, ¶ 21. Prof. Gerhart also refers to "the labor market" or "the labor market rate" throughout his report. See, e.g., Gerhart Report, ¶ 7 ("Defendants could also achieve lower labor costs by fixing wages, thereby keeping the labor market rate low and limiting the number of higher-paying jobs available to employees seeking better jobs.").

[40] Footnote 38.

[41] Gerhart Report, p. 177 ("Agreements Not to Poach Employees Likely Lead to Cascading Effects Class-Wide."), p. 194 ("Defendants' CSI Exchanges Would Likely Suppress Employee Compensation Across the Board.").

[42] The only "direct evidence" that Plaintiffs' experts offer to support their claim that Defendants had market power sufficient to suppress Senior Employees' compensation is Prof. Starr's pay regression analysis. See Starr Report, Section IX. However, as I explain in Sections 5 and 6 below, Prof. Starr's pay regression analysis does not demonstrate any impact on proposed class members' pay once obvious flaws are corrected and is not sufficient evidence to reliably conclude that Defendants had market power over proposed class members.

members' compensation.[43] Similarly, Prof. Gerhart discusses a single "market for Senior-Level Employees," but he does not explain how this reconciles with the extensive evidence he describes in his report that Defendants engaged in external pay benchmarking *at the job level*, that Defendants' selection of the appropriate firms against which to benchmark pay depended on the tasks associated with a specific job, or that according to his own admission in his deposition, labor markets for proposed class members are individualized.[44]

### 2.1.2. Proposed Class Members Participate in Different Labor Markets with Widely Varying Employment Options, Including Many Non-Defendant, and Even Non-Healthcare, Firms

37. A basic fact that Plaintiffs' experts fail to account for is that proposed class members are qualified for, and consider, many jobs with employers besides Defendants before, during, and after the proposed Class Period. Below, I describe a set of empirical analyses using a sample of resume data for proposed class members, as well as additional analyses based on record evidence and academic literature, which show that proposed class members participate in different labor markets with widely varying outside employment options. These analyses demonstrate that, in general, Defendants face substantial labor market competition from non-Defendant firms for proposed class members. As I explain in Section 2.1.4, that means that Defendants would not have market power sufficient to suppress proposed class members' pay classwide. When employees come to an employer from a set of firms "A" and leave the employer to a set of firms "B," the firms in "A" and "B" pose obvious employers that should be considered, and likely included, in any claimed relevant antitrust market.[45] In fact, Prof. Gerhart acknowledges in his deposition that the key information for defining the scope of a labor market is "where people come from and where they go to,"[46] and Prof. Starr similarly acknowledges in his

---

[43] Starr Report, ¶ 121 ("This controls for a baseline level of managerial earnings in the industries represented by the Defendant firms. If earnings in the labor market for managerial work in healthcare changed during vs. before/after the conduct, then Defendants might also have adjusted Class Member earnings even absent the Conduct."), footnote 410 ("[T]he Defendants comprise a small portion of total managers in healthcare[.]"), Section IX.

[44] Gerhart Report, ¶ 21 ("Plaintiffs allege that Defendants unlawfully conspired to suppress competition *in the market for Senior-Level Employees*" (emphasis added)), ¶ 115 ("Next, potential pay levels, salary midpoints, and minimums and maximums are benchmarked against data for equivalent jobs in the labor market. Jobs that are identical across similar employers are referred to as 'benchmark' jobs. Benchmark jobs are similar enough in their content to be meaningfully matched across companies. [...] Given widespread external equity concerns, benchmark jobs can ultimately be used to match a company's internal compensation structure (i.e., the relative value of jobs in terms of job evaluation points assigned) that I have described with the value (as indicated by pay level) assigned by the external market. Put plainly, this matching allows for a direct comparison of internal value and external value for these jobs."); Footnote 38.

[45] I am not offering an affirmative opinion on the outer boundary of the relevant antitrust market.

[46] Gerhart Deposition, p. 47 ("Q. And how is the scope of a labor market determined? [...] A. I think the logic would typically be where -- where people come from and where they go to, let's say, from companies: So where do

deposition that if a proposed class member was hired from or departed for another employer, then that employer is a "relevant competitor[] in the relevant labor market" for that employee.[47]

38. When competing for proposed class members' labor, Defendants must consider a wide range of non-Defendant employers, whose efforts to attract and retain proposed class members would be unaffected by the alleged conduct. Exhibit 1 summarizes the firms that Defendants' employees working in class positions arrive from when they are hired by a Defendant ("prior employers"), and the firms they join after working for a Defendant ("next employers"), using data on the moves to and from a Defendant based on a sample of resumes collected from career websites by the proprietary data provider Lightcast ("Lightcast Data"). Exhibit 1 shows an important result that is entirely inconsistent with Plaintiffs' allegation that Defendants engaged in a successful conspiracy to suppress proposed class members' pay: **Defendants are not the dominant previous or next employers for Defendants' employees working in class positions in the Lightcast Data**: 2,640 non-Defendant firms are the previous employer for 98.9% of moves, while the three Defendants account for the remaining 1.1%. Similarly, 2,429 non-Defendant firms are the next employer for 98.8% of moves, while the three Defendants account for the remaining 1.2%. Looking at prior and next employers together, no single non-Defendant firm accounts for more than 1.3% of moves, and Defendants collectively only account for 1.2% of moves.[48] As I discuss in Section 5.1, these statistics align with Prof. Starr's own results based on Defendants' structured data, which show that only between 0.2% and 5% of departures from Defendants on an annual basis were moves between USPI and SCA, or between SCA and DaVita, between 2005 and 2022.

---

your hires come from? Where do people depart to if they go to another employer? That would be key information in determining what -- what the labor market is that -- for you.").

[47] Starr Deposition, Volume I, pp. 132–133 ("Q. You would agree with me, would you not, that if a senior-level employee departed, say, DaVita for another employer, then that employer is clearly a relevant employment alternative for that employee; correct? [...] A. Yes."), p. 147 ("[T]o the extent that there were hires from other employers, those other employers would also be relevant competitors in the relevant labor market for those employees. Do you agree with that? A. Yes.").

[48] See Workpaper 1. In Appendix C, I provide a list of the most common previous and next employers for moves to and from Defendants and ranks them based on the percentage of moves that the employer accounts for.

**EXHIBIT 1**
*Defendant Firms Are Not Dominant Prior and Next Employers for Proposed Class Members*



Source: Lightcast Data

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer is another Defendant versus a non-Defendant firm. The exhibit also lists the number of unique non-Defendant firms that Defendants' employees move to and from. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. In Exhibit 3, I show that the results are similar when I restrict to moves that took place before, during, or after the Class Period. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

39. Exhibit 2 shows a similar result. Exhibit 2 identifies the 40 most common prior and next employers for proposed class members in the Lightcast Data (where, as noted above, even the "most common" employer in this exhibit accounts for only 1.3% of moves to or from prior and next employers in the sample). Exhibit 2 shows that proposed class members in the Lightcast Data worked for a wide range of non-Defendant employers just before or after working for Defendants. These non-Defendant employers include other firms in the outpatient care centers industry (e.g., Fresenius), the industry to which all three Defendants belong according to the standard industry classification system used by federal agencies.[49] Non-Defendant employers also include

---

[49] Industries do not necessarily align with relevant product markets or labor markets for several reasons discussed throughout this section. I use the industry classification provided in the Lightcast Data, which is the North American Industry Classification System (NAICS), to determine the industry that each employer belongs to. In the case of firms that operate in multiple lines of business, the industry codes native to the Lightcast Data reflect only one line of business. To assess whether my results are driven by Lightcast's determination of industry codes, I run my analyses that rely on industry categorizations with an alternative set of industry codes provided by the NAICS Association. The pattern of results does not substantively change. See U.S. Census Bureau, "North American Industry Classification System: Introduction to NAICS," December 20, 2024, available at https://www.census.gov/naics/, accessed on April 2, 2025 ("The North American Industry Classification System

healthcare-related employers outside of the outpatient care centers industry (e.g., Kaiser Permanente), and employers that are not healthcare related (e.g., Amazon, Target, McKinsey, Bain & Company, Guidehouse, Regions Financial). This makes sense because, while a worker's alternative employers might bear some relation to what industry their current employer is in, they also depend on the worker's skills and preferences.[50] This includes to what extent the individual is open to opportunities in another industry, and to what extent the individual's skills are well suited to employment in another industry. Notably, Defendants are also typically not among the most highly ranked previous and next employers.[51]

---

(NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy."); NAICS Association, "NAICS Code Description 6214 – Outpatient Care Centers," available at https://www.naics.com/naics-code-description/?code=6214, accessed on April 3, 2025.

[50] The economics literature has found that employment opportunities for senior-level employees have expanded over the last several decades, as computers and other technological changes have increased the demand for educated workers with skills such as solving complex problems and managing other employees. As computers and other technological changes have become increasingly integral to firms' day-to-day operations, senior-level employees with these skills have had a broader set of employment options across a wider set of firms available to them. See David H. Autor, Frank Levy and Richard J. Murnane, "The Skill Content of Recent Technological Change: An Empirical Exploration," *The Quarterly Journal of Economics*, 118(4), 2003, pp. 1279–1333 at p. 1279; Luis Garicano and Esteban Rossi-Hansberg, "Organization and Inequality in a Knowledge Economy," *The Quarterly Journal of Economics*, 121(4), 2006, pp. 1383–1435 at p. 1385; Erik Brynjolffson and Andrew McAfee, *The Second Machine Age*, (New York, NY: W. W. Norton & Company, 2014) at pp. 4–5.

[51] Appendix C.

**EXHIBIT 2**
**Proposed Class Members' Outside Options Extend Beyond Defendants, Beyond the Outpatient Care Centers Industry, and Even Beyond Healthcare-Related Industries**



Source: Lightcast Data

Note: The exhibit shows the 40 most common previous and next employers for Defendants' employees in the Lightcast Data aggregated across Defendants. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

40. These patterns are consistent before, during, and after the Class Period. Even if I only consider employee moves *before or after* the Class Period, Defendants are also not the dominant previous or next employers. As shown in Exhibit 3, Defendants never account for more than 2.1% of the moves to or from prior and next employers before, during, and after the Class Period. Exhibit 3 also shows that Defendants do not account for a large share of the moves to or from prior and next employers for any one specific Defendant: Defendants are the previous and next employer for 0.4% of moves for DaVita employees, 3.7% of moves for SCA employees, and 2.0% of moves for USPI employees.[52]

---

[52] Workpaper 2 presents the results in Exhibit 3, separately for previous employers and for next employers.

*EXHIBIT 3*
**Defendants Were Not a Dominant Previous or Next Employer Before, During, or After the Class Period or For Any One Defendant**



Source: Lightcast Data

Note:  The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer is another Defendant versus a non-Defendant firm, separately by time period or Defendant. I restrict to moves that took place before, during, or after the Class Period. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

41. To further demonstrate that Defendants compete with many non-Defendant firms for proposed class members, I next describe a set of illustrative examples where proposed class members moved to or from a non-Defendant employer during the Class Period:

- Named Plaintiff Allen Spradling had no healthcare experience and worked for Teksystems (a business and technology services firm) immediately before joining SCA as a Project Management Office Director in 2008, and for Bank of America (a financial services firm) immediately after departing from SCA in 2013.[53] Spradling testified

[53] Deposition of Allen Spradling (Named Plaintiff), July 18, 2024 ("Spradling (Named Plaintiff) Deposition"), p. 57 ("Q [...] [T]hat resume that was attached, that was your resume at this point in time before you got your position at SCA; correct? A I think that's a true statement, yes. Q [...] And at this point in time, you had never worked for a company in the health care industry; correct? A Correct. Q You had no prior health care experience;

that he has "a broader range of employment opportunities" available to him and that his IT skills are "very in demand and transferable."[54]

- Named Plaintiff Scott Keech worked for Kaiser Permanente (a healthcare provider) immediately after departing from SCA as a Regional Director of Clinical Operations in March 2012.[55] Keech testified that he believed his leadership skills were "transferable to industries outside of healthcare."[56]

- Proposed class member Stephanie A. Phillips, a VP of Procurement at USPI during the Class Period, worked at Avaya (a cloud-based software computing firm) immediately before joining USPI, and at Mars Veterinary Health (a veterinary care firm) immediately after leaving USPI.[57]

- Proposed class member Naomi Kruger, a Director of Strategy and Payor Engagement at SCA during the Class Period, is currently a VP of Strategy and Payor Engagement at SCA and worked at Navigant, a

---

correct? [...] A Correct. Q You had no specialized experience or skills that were particular to the health care industry; correct? [...] A Correct."), pp. 66–67 ("Q And this is your letter to Rachel Frerman resigning from TEKSystems; is that correct? A Correct. Q And you say your resignation will be effective September 19th, 2008; correct? A Yes, I'm sure that's correct. [...] You say, I was presented with a unique opportunity to start up a PMO for a relatively new company which spun out of the HealthSouth [...] specialization activities about a year ago. Do you see that? A I do. Q That is referring to your opportunity with SCA; correct? A It is."), p. 134 ("Q Okay. You ultimately left SCA to -- and went to Bank of America; correct? A. Correct."); TekSystems, "IT and Business Services," available at https://www.teksystems.com/en/it-and-business-services, accessed on April 2, 2025; Bank of America, "Our Company," available at https://about.bankofamerica.com/en/our-company, accessed on April 2, 2025.

[54] Spradling (Named Plaintiff) Deposition, pp. 59–60 ("Q. So you were conveying in this letter that you're qualified in both of how you describe it technology and nontechnology initiatives; correct? A. [...] Correct. Q. And did those different skill sets mean that you had a broader range of employment opportunities available to you? A. Well, I was certainly promoting that I did. Q. But you believe that to be true; right? A. I did, and I do."), pp. 123–124 ("A. It is highly possible that during my tenure at SCA — not possible, probable that someone had an offer from another company and SCA considered matching it. Almost guaranteed that happened. Just don't ask me for specifics because I have none. Q. Sure. Sure. And why are you so confident that that's something that would have happened? [...] A. The — the IT skill set is very in demand and transferable, so in general IT resources are constantly reassessing their value to the market, so to speak, and as a result of that, opportunities present themselves.").

[55] Third Amended Complaint, ¶ 17 ("Scott Keech, R.N., M.B.A., was employed by Defendant SCA from approximately 2011 to March 2012 as a Regional Director of Operations and Clinical Services in the San Francisco, California area."); Deposition of Scott Keech (Named Plaintiff), August 22, 2024 ("Keech (Named Plaintiff) Deposition"), p. 218 ("Q. Equally exciting to be leaving SCA and -- rejoining Kaiser? A. Yes. Absolutely."); Kaiser Permanente, "What is Kaiser Permanente," available at https://healthy.kaiserpermanente.org/learn/what-is-kaiser-permanente, accessed on April 13, 2025.

[56] Keech (Named Plaintiff) Deposition, p. 168 ("Q. Do you believe that the skills you've learned in the operations side of the business, the various companies that you've worked for, would translate to other industries easily today? [...] A. I think leadership skills are transferrable. Q. And do you believe that the leadership skills you've learned as a result of the various roles you've held over the years would be transferable to industries outside of healthcare? A. Yes.").

[57] LinkedIn, "Stephanie A. Phillips," available at https://www.linkedin.com/in/stephanie-a-phillips-651913, accessed on February 26, 2025. See also Avaya, "What We Do: Avaya Empowers CX Innovation Without Disrupting Your Business," available at https://www.avaya.com/en/, accessed on April 2, 2025; Mars Veterinary Health, "Who We Are," available at https://marsveterinary.com/who-we-are/, accessed on April 2, 2025.

specialized global professional services firm, immediately before joining SCA.[58]

- Proposed class member Andrew Boyink, a National Director of Strategy & Operations for Hospital Services at DaVita during the Class Period, worked at McKinsey, a management consulting company, immediately before joining DaVita.[59]

42. Not only does any claimed relevant antitrust labor market include many non-Defendants, but there is also variation among proposed class members in which non-Defendant firms would be alternative employers. Some proposed class members have many non-Defendant alternative employers, whereas others may have fewer. As a proxy for variation amongst proposed class members, I grouped proposed class members into various specialty areas based on Defendants' departments and job titles. If there were one claimed relevant antitrust labor market, then prior and next employers would be similar across specialty areas. I constructed these specialty areas by manually reviewing and grouping department and job titles in Defendants' data that relate to a similar subject matter. These specialty areas include the following (among others):

- **Marketing and Communications** (which includes departments such as "Communications" and "Marketing PR-Strategy Operations" and job titles such as "Director, Communications" and "Sr Director, Marketing")
- **Accounting, Tax, and Treasury** (which includes departments such as "Tax Department" and "Facility Accounting" and job titles such as "Senior Director, Accounting" and "Director, Tax")
- **Information Technology** (which includes departments such as "IT-Management" and "IT-Enterprise Architecture" and job titles such as "Director, Applications Development" and "VP, Information Technology")
- **Clinical and Research** (which includes departments such as "Clinical-PC" and "Nursing Administration" and job titles such as "Regional VP - Imaging" and "Director, Clinical Services")

---

[58] LinkedIn, "Naomi Kruger," available at https://www.linkedin.com/in/naomi-kruger-74986420/, accessed on February 26, 2025. See also Navigant, "Guidehouse," available at https://www.navigant.com/, accessed on April 2, 2025.

[59] LinkedIn, "Andrew Boyink," available at https://www.linkedin.com/in/andrewboyink/, accessed on April 10, 2025. See also McKinsey, "McKinsey & Company About Us," available at https://www.mckinsey.com/about-us/overview, accessed on April 15, 2025.

- **Business Office Administration and Management** (which includes departments such as "Administration" and "Regional Office" and job titles such as "Administrator" and "Regional Operations Director (ROD)")

43. Exhibit 4 demonstrates that the most common prior and next employers for proposed class members (according to the Lightcast Data) vary by specialty area.[60] For each specialty area, the exhibit shows five of the most common previous and next employers (although, as before, no employer is very common).[61] For some specialty areas, such as Clinical and Research, the employers consist of firms within the outpatient care centers and healthcare-related industries (e.g., Fresenius, HCA Healthcare, Optum, and Kaiser Permanente), whereas for other specialty areas, such as Accounting, Tax, and Treasury, several of the employers are outside of healthcare-related industries altogether (e.g., Ernst & Young and Deloitte). The employer names in Exhibit 4 are shaded according to how frequently they appear among the top five prior and next employers across specialty areas (darker shading indicates the employer is a top previous or next employer for many specialty areas). Few employers show up as a top previous and next employer for many specialty areas. In contrast, most employers are a top previous and next employer for very few specialty areas: USPI is only among the top previous and next employers for one specialty area (Business Office Administration and Management specialty area), as are other non-Defendant employers including Cigna and Accenture (Information Technology specialty area), Amazon (Operations specialty area), Express Scripts and AstraZeneca (Pharmacy Management specialty area), and TransUnion (Finance specialty area). DaVita is not among the most frequent previous and next employers for any of the specialty areas.

---

[60] As the Lightcast Data does not contain data on the departments individuals work in, the specialty areas in the Lightcast Data are constructed only using job title.

[61] If more than five employers would be considered among the five most common prior and next employers for a given specialty area due to ties, the employers listed in the exhibit are randomly selected from among the top prior and next employers for each specialty area. See Workpaper 3 for a list of the top 20 previous and next employers for each specialty area.

**EXHIBIT 4**

***Proposed Class Members Have Varying Outside Employment Opportunities Depending on
Their Specialty Area: Top 5 Prior and Next Employers by Specialty Area***



Source: Lightcast Data

Note: The exhibit lists five of the most common previous and next employers by specialty area. If more than five employers would be considered among the top five prior and next employers for a given specialty area due to ties, the employers listed are randomly selected from among the top prior and next employers for each specialty area. Employer names are shaded according to how often the employer shows up among the five most common previous and next employers across specialty areas. Lighter shading indicates that the employer shows up as a top previous or next employer for few specialty areas, and darker shading indicates the employer shows up as a top previous or next employer for several specialty areas. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

44. Exhibit 5 further illustrates that proposed class members come from and go to employers in different industries, including industries outside of the outpatient care centers industry to which all three Defendants belong. It shows, for Defendants' employees in class positions in the Lightcast Data, the percentage of moves to or from an employer that is: (1) a Defendant (blue shading); (2) a firm in the outpatient care centers industry (orange shading); (3) a firm outside of the outpatient care centers industry, but in a healthcare-

related industry (pink shading); (4) a firm outside of the healthcare-related industry (yellow shading); or (5) a firm whose industry could not be classified in the data (green shading), separately for each specialty area.[62] The percentage of moves to or from an employer outside of the outpatient care centers industry but in a healthcare-related industry (shown in pink) varies substantially across specialty areas, ranging from 10% for moves in or out of Accounting, Tax, and Treasury jobs, to 34% for moves in or out of Finance jobs, to 50% for moves in or out of Pharmacy Management jobs. The variation in the percentage of moves to or from an employer outside of a healthcare-related industry altogether (shown in yellow) is even larger, ranging from 16% for moves in or out of Pharmacy Management jobs to 50% for moves in or out of Information Technology jobs, to 63% for moves in or out of Accounting, Tax, and Treasury jobs. Indeed, Named Plaintiff Allen Spradling, who worked at Teksystems (a business and technology services firm in the computer programming services industry) immediately prior to joining SCA, and at Bank of America (a financial services firm in the financial transactions processing industry) after leaving SCA, would contribute to this latter category (moves to or from an employer outside of a healthcare-related industry) for the Information Technology specialty area if he were to appear in the Lightcast Data.[63] Exhibit 5 also shows that Defendants (shown in blue) are a tiny share of prior and next employers across all specialty areas.

---

[62] In Appendix C, I reproduce the analysis presented in Exhibit 5 with an alternative set of industry codes provided by the NAICS Association. This analysis shows that the pattern of results is broadly the same. I also summarize the industries that Defendants' employees in the Lightcast Data come from and go to separately by Defendant using the industry codes native to the Lightcast Data and industry codes provided by the NAICS Association, respectively.

[63] Resume of Allen M. Spradling (Named Plaintiff), SPRAD000014–15 at SPRAD000014.

**EXHIBIT 5**
**The Industries Proposed Class Members Come From and Go To Vary by Specialty Area, and Few Proposed Class Members Come From or Go To Defendants**



Source: Lightcast Data

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer belongs to the indicated industry grouping. The results are shown separately by specialty area. "Outpatient Care Centers" is defined by NAICS codes beginning with 6214. "Healthcare Related (non-OCC)" includes NAICS codes related to healthcare that I identified based on a review of the industries for the top 50 most common previous and next employers for Defendants' employees in the Lightcast Data. "Other Industries" contains all remaining classified industries. "Unclassified Industry and Non-Defendant" includes firms that were not assigned NAICS codes in the Lightcast Data. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendant employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

45. The patterns shown in Exhibit 4 and Exhibit 5 align with business documents and depositions, which show that Defendants recruited proposed class members from many different types of non-Defendant employers. For example, at SCA, Bridie Fanning testified that SCA recruited job candidates from firms outside of the healthcare industry when filling business development roles.[64] An internal email chain from 2014 listing candidates for a Senior Director of Financial Operations position at SCA included a Principal Consultant at CAPCO (a management consulting firm focused on the financial industry), a Director of Finance at Baylor Healthcare System, and a Finance

---

[64] Deposition of Bridget A. Fanning. Ph.D. (SCA), July 17, 2024 ("Fanning (SCA) Deposition"), pp. 112–113 ("Why was it hard to recruit for business development? A. Because it was a very specific skill set and culture. [...] [T]here aren't a lot of people like that in healthcare doing business development work. [...] [G]enerally the industry doesn't have a lot of those people, which is why you look in consulting firms and all these other places.").

Highly Confidential – Outside Counsel/Experts Only                40 of 237

Manager at the University of Texas Southwestern Medical Center.[65] An internal document from 2015 describing the "target companies" for a Regional Vice President search at SCA included management consulting firms McKinsey, Bain & Company, Boston Consulting Group, and Accenture.[66] Similarly, at USPI, Mark Garvin testified that USPI competed with a wide range of employers for proposed class members, including "a host of" healthcare and non-healthcare multi-state, multi-site business operators.[67] An internal email chain from 2018 listing candidates for a Regional Vice President role at USPI included several individuals who previously held senior-level positions at hospitals.[68] Further, at DaVita, email exchanges between DaVita and external recruiting firms conducting candidate searches on DaVita's behalf show that DaVita considered candidates for class positions who were employed by non-Defendant (and even non-healthcare) firms, including a Senior Vice President of Operations at Advance Auto Parts (considered for a Group Vice President position in 2013), a Chief Development Officer at National Veterinary Associates (considered for a Senior Vice President, Business Development position in 2015), and a Chief Operating Officer at Walmart Global eCommerce (considered for a Senior Vice President, Kidney Care position in 2016).[69]

---

[65] Email chain from Leslie Wachsman (SCA) to Caitlin Covey (SCA), "RE: Sr DFO Epic," June 6, 2014, SCA002270032–35 at SCA002270032–34 ("Please see attached interview notes and resumes for candidates that I have had phone interview with [for the Senior DFO position, including] [...] a Principal Consultant at CAPCO, a global management consulting firm that focuses on the financial industry [...] the Director of Finance for Baylor HealthCare System [...] a Finance Manager with Texas Instruments [...] a Director of Financial Operations with USPI [... and] the CDO at USMD Hospital in Arlington. [...] Finance Manager at University of Texas Southwestern Medical Center").

[66] Email chain from Gina Thomas (Cielo) to Tony Kilgore (SCA) and Laura Shively (SCA), "RE: Regional Vice President – RSM," with attachment, April 1, 2015, SCA000003962–70 at SCA000003962 ("We have also tried to put a robust target list of companies together that we believe will yield us the top talent with the skillset you are looking for [for the Regional Vice President position]."); Attachment to Email from Gina Thomas (Cielo) to Tony Kilgore (SCA) and Laura Shively (SCA) about SCA's Regional Vice President Search with Cielo, "Assignment Brief: Regional Vice President – Dallas, Texas," March 30, 2015, SCA000003963–70 at SCA000003967–69 ("Target List of Companies [...] McKinsey[,] Bain & Company[,] The Boston Consulting Group[,] Accenture").

[67] Deposition of Mark Garvin (USPI), May 30, 2024 ("Garvin (USPI) Deposition"), pp. 195–196 ("[W]ho would you consider to be competitors for the senior level type of employees who were involved in the SCA agreement to your understanding? A. Competitors to USPI for employees in general? Q. Correct. A. Any and all health systems in the United States of America, any and all ambulatory surgery center companies in the United States of America, private equity firms employing physician practice management with various ancillary subs. And a host of multi-state, multi-site business operators, healthcare or not.").

[68] Email chain from Shannon McGarry (USPI) to Shannon Mosley (USPI), "RE: RVP Dallas candidates," March 21, 2018, USPI_CIV_000142589–90 at USPI_CIV_000142589–90 ("Please see below for a list of candidates I am targeting for the RVP role in Dallas and their current titles [...] ▬▬▬ Former COO at North Hills Hospital [...] ▬▬▬, CEO at Accell Rehab Hospital [...] ▬▬▬, VP at Providence Hospital [...] ▬▬▬ CEO at Franklin Foundation Hospital [...] ▬▬▬ CEO at Cook Children's Northeast Hospital.").

[69] Email chain from Rob Chipman (DaVita) to Brian Schaffer (DaVita), "FW: DaVita GVP Status Report," with attachments, October 23, 2013, DVA_OMCEAL_000011812–22 at DVA_OMCEAL_000011815; Email chain from Darin DeWitt (Caldwell Partners) to Vijay Kotte, "FW: HCP SVP BD 04 08 15," with attachments, April 8, 2015, DVA_OMCEAL_000538771–803 at DVA_OMCEAL_000538801; Email chain from Kelsey Landahl

46. Deposition testimony also shows that, consistent with Exhibit 4 and Exhibit 5, the employers from whom Defendants recruited candidates for class positions varied depending on the employee's specialty area. In particular, Clare Metcalf, an external recruiter for SCA who was involved in recruiting for class positions, testified that industry experience had "zero relevance" for some roles, and that she would often create a target list of companies to hire from both within and outside the industry.[70]

47. The set of outside employment options, and in turn the degree to which Defendants compete with non-Defendant firms for proposed class members, can also vary across proposed class members based on geography. The relevant employment options may be limited to a local or regional geography for some proposed class members but span a national geography for others. Prof. Gerhart seems to agree, as is apparent based on the following excerpt from his textbook, *Compensation*:

> "[Q]ualifications interact with geography to define the scope of relevant labor markets. As the importance and the complexity of qualifications increase, the geographic limits also increase. Competition tends to be national or international for managerial and professional skills [...] but local or regional for clerical and production skills. However, these generalizations do not always hold true. In areas with high concentration of scientists, engineers, and managers (e.g., Boston or San Jose/Silicon Valley), the primary market comparison may be regional, with national data used only secondarily."[71]

48. Economic literature discusses how workers with highly specialized skills may consider employment options in a national or even global geography because, in any narrower geography, the number of employers who can utilize their skills may be too small for them to find a good employment match.[72] For instance, economist David Wildasin explained that "the chance of a highly

---

(Heidrick) to Mike Staffieri (DaVita), "H&S Update Call," with attachments, September 12, 2016, DVA_OMCEAL_000760685–699 at DVA_OMCEAL_000760687.

[70] Deposition of Clare Metcalf (Russell Reynolds), August 14, 2024 ("Metcalf (Russell Reynolds) Deposition"), pp. 43–44 ("Q. Okay. And now, you referred to organizations to target. Can you elaborate on that? A. So we will often put together a target list of companies within the industry, without — outside the industry. Some searches, industry experience is very relevant and some searches it has zero relevance."), p. 99 ("This e-mail relates to fulfilling the role for the RVP in California [for SCA?] A. Yes.").

[71] Gerhart (2022), p. 264.

[72] Kathleen O'Toole, "Enrico Moretti: The Geography of Jobs," *Insights by Stanford Business*, June 10, 2013, available at https://www.gsb.stanford.edu/insights/enrico-moretti-geography-jobs, accessed on April 2, 2025 ("If you are in a very highly specialized position, you want to be in a labor market where there are a lot of employers looking for workers, and a lot of workers looking for employers.").

specialized worker finding a good employment match within the local labor market is [...] reduced, and it would not be surprising, therefore, to find such workers and firms searching in more than one local market; in some cases, indeed, workers and employers may search over an entire country or over the entire world in order to find the best employment match."[73] Consistent with this idea, economist Abigail Wozniak also found that changes in state labor demand affect where college graduates decide to locate post-graduation "several times" more than they affect where high school graduates decide to locate.[74]

49. These findings from the economics literature align with evidence in the record showing that the geographic scope of Defendants' recruitment efforts varied by role. Jimmy Tanner, an external recruiter for USPI involved in recruiting for proposed class member roles, testified that this was "100 percent" the case.[75] Clare Metcalf, the same external recruiter for SCA mentioned above who was involved in recruiting for class positions, testified that some roles targeted individuals who had experience working in a specific geographic area,[76] while Kristen DesPalmes, Senior Director of Employment Strategy at DaVita, testified that certain recruitment initiatives for VPs and above targeted candidates on a national basis.[77]

---

[73] David E. Wildasin, "Labor-Market Integration, Investment in Risky Human Capital, and Fiscal Competition," *American Economic Review*, 90 (1), 2000, pp. 73–95 at p. 73.

[74] Abigail Wozniak, "Are College Graduates More Responsive to Distance Labor Market Opportunities?" *Journal of Human Resources*, 45(4), 2010, pp. 944–970 at p. 944 ("I find effects of changes in state labor demand on college graduate location choice that are several times greater than for high school graduates.").

[75] Deposition of Jimmy Tanner (Catapult Staffing), July 31, 2024 ("Tanner (Catapult Staffing) Deposition"), p. 61 ("Could the different roles that you would be recruiting for also have maybe a different geographic scope? A. 100 percent."), pp. 59–60 ("Q. So you mentioned, you know, administrators. I believe you also mentioned partnership liaison and clinical positions; is that right? A. Yeah. So on the partnership liaison side they had like a liaison, which is like a lower level, they had a manager, and they had like a VP level. Those were all sales positions. And the – on the clinical side, they would do like an OR director or like a, maybe a director of nursing. And then there was the administrator role. And then there was a business office manager role which kind of reported in to [sic] the administrator. And then above the administrator was like a regional vice president or like a – and there was – I think there was a market president role too. I don't think we ever did a search for a market president though. Q. Okay. But all of those other roles that you just mentioned could have been roles that you all were hired to fill? A. Yes.").

[76] Metcalf (Russell Reynolds) Deposition, p. 36 ("Q. Now, I think you previously testified that during the kickoff meeting, you would typically discuss the requirements for a qualified candidate. Can you elaborate on what you mean by 'qualified candidates'? A. So it would typically include what functional expertise they come with, that's related to the position that – at hand. Oftentimes how many years of experience they have, could include how many people they've managed, could include what size of organization they've – what revenue size they've been involved in, could include what geography they have experience in, could include specific initiatives they've led.").

[77] Deposition of Kristen DesPalmes (DaVita), May 21, 2024, pp. 36–37 ("Q. Were you recruiting nationally for executives? A. Do you mean did we want any talent from anywhere in the U.S. to come to Denver? Q. Correct. A. Yes. Q. When you say 'executives,' what level of employee are you talking about? A. VP up for that initiative."), Exhibit 41 ("DaVita Senior Director, Employment Strategy February 2007 - July 2021 (14 years 6 months)").

50. Further, internal documents also show that the set of candidates considered by Defendants for specific roles varied in geographic scope. An internal email chain from 2018 shows that USPI targeted out-of-state candidates from Kansas and Louisiana when recruiting for a Regional Vice President position based in Dallas, Texas.[78] However, searches for other positions were local in scope. An internal e-mail chain from 2015 showed that SCA sought a local hire for a Director of Finance position in Omaha.[79] In an internal email chain from 2018, USPI indicated that they were focusing on local candidates while recruiting for an Administrator position.[80] Similarly, recruiter Jimmy Tanner testified that USPI sometimes requested that he focus his recruiting efforts on candidates within specific geographic locations.[81]

51. In addition to the fact that the set of outside employment options for proposed class members can vary based on geography, it is also notable that many proposed class members participate in a labor market that is national in scope. Proposed class members who participate in a national labor market have many alternative employment options besides Defendants. This is illustrated by data from the Bureau of Labor Statistics showing that proposed class members who worked at Defendant firms in 2019 accounted for only 0.8% of national employment in 2019 (the last year of the Class Period) among the relatively-narrow group of medical and health services managers in the health care and

---

[78] Email chain from Shannon McGarry (USPI) to Shannon Mosley (USPI), "RE: RVP Dallas candidates," March 21, 2018, USPI_CIV_000142589–90 at USPI_CIV_000142589–90 ("Please see below for a list of candidates I am targeting for the RVP role in Dallas and their current titles [...] ▮▮▮▮▮▮, CEO of Surgicenter of [Johnson] County (HCA) [...] ▮▮▮▮▮▮▮▮▮▮▮ CEO at Franklin Foundation Hospital"); HCA Midwest Health: Surgicenter of Johnson County, "About Surgicenter of Johnson County: Welcome to Surgicenter of Johnson County," available at https://surgicenterjc.com/, accessed on April 2, 2025 ("The Surgicenter of Johnson County is an accredited, freestanding outpatient surgery center in Overland Park, Kansas"); Department of Children & Family Services, "About Us: Franklin Foundation Hospital," available at https://www.dcfs.louisiana.gov/directory/office/9047, accessed on April 2, 2025.

[79] Email chain from Aaron Cho (SCA) to Leslie Wachsman (SCA), "RE: Open Finance Roles," September 25, 2015, SCA001437481–82 at SCA001437481 ("I am attaching two job specs – one is for a Manager Finance and one is for a Director Finance. [...] We can discuss during our 1on1 tomorrow but I have 4 open roles with ▮▮▮ leaving. Discussed with Tony and it is important to hire locally in Omaha as we build our relationship with CHI since they are used to the level of finance support ▮▮▮ provided onsite.").

[80] Email chain from Shannon McGarry (USPI) to John Snyders (USPI), "RE: Medplex - Administrator Search," with attachments, October 2, 2018, USPI_CIV_000764198–99 at USPI_CIV_000764198, ("Hello Medplex partners. I wanted to give you a general update on the recruiting process for the administrator position. We posted the job about two weeks ago. We've had interest from about a dozen viable candidates. I've focused my attention on local candidates with relevant experience.").

[81] Tanner (Catapult Staffing) Deposition, p. 18 ("Q. And do you recall that – if USPI ever instructed you to create a pipeline of candidates for certain areas or certain geographic locations? A. Yeah, we did a couple. I know in markets where I think they had either issues with just general staffing or maybe a growth sector, where they anticipated some openings coming available. They would say – we would – I don't recall exactly what our fee was, it wasn't crazy, but they just wanted a pipeline of like, hey, start looking in the Chicago market, we may have some needs there.").

social assistance industry (the benchmark group of employees that Prof. Starr analyzes in his pay regression model).[82]

52. Finally, the set of outside employment options may differ for proposed class members who work for different Defendants. Depending on the job, one Defendant is not necessarily an outside employment option for employees at another Defendant (e.g., due to differences in the size of these firms, or in what these firms do). In an internal email exchange from 2014, SCA's Andrew Hayek explained that "success in [business] development [at DaVita] does not necessarily translate to success at SCA."[83] In another internal email exchange from 2017, SCA's Brian Mathis noted that "[w]e had a few DVPs from DaVita in the past and they were not successful in our environment."[84] Similarly, SCA's Joseph Clark testified that the development functions at SCA and DaVita were not "a match in the skill sets" required, which meant that SCA "generally wouldn't recruit the development function out of DaVita."[85] Further, SCA's Anthony Kilgore testified that SCA and USPI were looking for something "different" from one another in terms of the employees they recruited.[86] Additionally, SCA's Bridie Fanning testified that "there wouldn't have been many people at USPI [that SCA] would have wanted to hire," in part due to differences in firm culture across SCA and USPI.[87]

### 2.1.3. Proposed Class Members Have Widely Varying Skills and Preferences

53. The exact set of outside employment options available to each proposed class member, and in turn the labor market in which each proposed class

---

[82] Workpaper 4.

[83] Email from Andrew Hayek (SCA) to Joe Clark (SCA) and Michael Rucker (SCA), "Re: Marsha Dodd," December 2, 2014, SCA000838956 ("I don't know her well, and I retain some concern from our ▮▮▮▮▮▮ experiences that would raise a flag as to whether our model is sufficiently different from DaVita to evidence that success in development there does not necessarily translate to success at SCA.").

[84] Email from Andrew Hayek (SCA) to Brian Mathis (SCA) and Tim Buono (SCA), "Re: DaVita 'No Fly Zone'," July 3, 2017, SCA000163727.

[85] Deposition of Joseph T. Clark (SCA), September 11, 2024, p. 145 ("I began to understand how DaVita ran its development function and [...] realized it wasn't a match in the skill sets. Q. And based on that how did that impact your recruiting decisions going forward? A. We generally wouldn't recruit the development function out of DaVita.").

[86] Deposition of Anthony Kilgore (SCA), October 22, 2024 ("Kilgore (SCA) Deposition"), p. 43 ("Did SCA compete with USPI for the recruitment of employees? [...] A. [...] I believe what we were looking for was different. [...] My own experience was I never interviewed a candidate who was also interviewing at USPI.").

[87] Fanning (SCA) Deposition, pp. 114–115 ("Q. Did you dislike the fact that the agreement that SCA had with DaVita and USPI placed a total ban on recruiting? A. You know, I didn't really – I'm going to be frank. I didn't care that much about USPI. It wasn't a talent-rich organization. It wasn't like it was full of candidates I thought could be successful in SCA. Its culture was completely different, had a very different approach to recruiting. And, in fact, I think a lot of the people that the [sic] weren't successful at SCA went to USPI. So I know I found a person and offered them a job. We wanted to hire them. But there wouldn't have been many people at USPI we would have wanted to hire.").

member participates, depends on their skills and preferences, which vary across the proposed class. For example, if many workers who are qualified to fill a certain job have skills that are valuable to firms outside of the healthcare sector (e.g., a proposed class member with a background in accounting), then Defendants must compete with a broad set of healthcare and non-healthcare employers for these workers.[88] Indeed, Prof. Gerhart agreed during his deposition that different individuals have different employment options depending on their skills and preferences, and that the set of employment options for each worker can extend beyond the product market where their firm operates (i.e., beyond healthcare for proposed class members).[89] However, if many of the same workers have a strong preference not to relocate (e.g., a proposed class member whose children are enrolled in school), and there are enough of these to workers to fill all of the available jobs in a particular area, then Defendants only need to compete with the employers in that area for these workers. Further, the preferences proposed class members have over the desirability of jobs in other industries or occupations will also impact the set of employers with which Defendants must compete for a proposed class member's labor.

54. Seniority is one dimension of a proposed class member's skills, and I use available data to examine variation across proposed class members in seniority. Exhibit 6 shows the number of proposed class members who fall into five broad categories of seniority.[90] In ascending order of seniority, these categories are: Administrators and Hospital CEOs, Directors, Senior Directors, Vice Presidents ("VPs"), and Senior VPs ("SVPs"). Those in more-junior positions (e.g., Administrators and Hospital CEOs) generally will have fewer years of experience, and thus different skills, than those in more-senior positions (e.g., VPs).

---

[88] See, e.g., Fanning (SCA) Deposition, p. 262 ("[U]ltimately the market is based on jobs. [...] These people with general AI skills, there is not many of those and they get paid very differently to [...] lots of HR managers [...] The total amount of the money is going to be different.").

[89] Gerhart Deposition, p. 48 ("Q. Is it true that different individuals have different employment options based on their skills, their preferences, geographic mobility, things like that? [...] A. Generally speaking, yes."), pp. 47–48 ("Q. So labor markets include not only companies that a firm competes with in the products or services market, but also other companies outside of that market that may also have employees with the right skills? A. Yeah. Yeah. [...] So the product market is different than the labor market. They don't have to be different but they can be different.").

[90] I group job titles for class positions into five seniority levels based on Prof. Starr's three class-relevant seniority levels ("Director," "Vice President," and "Senior Vice President,") with two adjustments: (1) I create a separate category for "Administrator and Hospital CEO" (job titles that Prof. Starr categorizes as "Vice President"), and (2) I separate "Director" into "Director" and "Senior Director."

**EXHIBIT 6**
**Proposed Class Members Have Varying Seniority Levels and, In Turn, Varying Skills**

Source: Corrected Starr Data

Note: This exhibit shows the number of proposed class members at Defendants between 2008 and 2019 (for SCA and DaVita) or between 2010 and 2019 (for USPI) by seniority level. The analysis only includes proposed class members who were included in Prof. Starr's damages analysis. Employees are counted in the seniority level corresponding to the last job they held during the Class Period. There is a total of 6,169 employees included.

55. Further evidence of proposed class members' varying skills are the different job requirements associated with the specialty areas in which they work. Exhibit 7 reports the number of proposed class members who worked in each of the specialty areas (such as Clinical and Research, Business Development, Sales, Strategy, and Planning, and Information Technology) that I analyzed in Section 2.1.2. The educational, skill, and experience requirements can differ across these specialty areas, as illustrated in the following examples from Defendants' job descriptions and online job postings:

- The job description for DaVita's "Senior Director, Clinical Services (CSS)" position (which belongs to either the Clinical and Research specialty area or the Business Office Administration and Management specialty area, depending on the department where the position is located) lists a Bachelor's Degree in Nursing and a minimum of ten years' clinical experience in dialysis or a related service as requirements.[91]

---

[91] "DaVita Job Description, Sr. Director, Clinical Services," DaVita, November 2018, DVA_OMCEAL_001297898–900 at DVA_OMCEAL_0012978898–899.

- The job description for SCA's "Director[,] Financial Operations" position (which typically belongs to the Finance specialty area) lists a Bachelor's Degree in Accounting or Finance as a requirement.[92]

- The job description for DaVita's "Senior Director, Information Technology" position (which belongs to the Information Technology specialty area) list a Bachelor's Degree in Information Technology, Business, or a related field and a minimum of five years of experience "leading an IT organization in a rapidly growing business environment" as requirements.[93]

- The job description for USPI's "Director of Operations, Finance" position (which belongs to the Accounting, Tax, and Treasury specialty area) lists a Master's Degree in Computer Science, Information Technology, Finance, Accounting or a related field, along with a "[m]inimum of 5 years related business intelligence experience," as requirements.[94]

---

[92] "SCA Position Description for Director Financial Operations/DFO," SCA, September 27, 2007, SCA000128921.

[93] "DaVita Position Description, Senior Director, Information Technology," DaVita, January 2014, DVA_OMCEAL_001317525–27.

[94] Email from Shelly Campbell (USPI) to Shannon Mosley (USPI), "FW: Director of Operations Finance," August 20, 2014, USPI_CIV_000457557–60 at USPI_CIV_000457557.

---

***EXHIBIT 7***
***Proposed Class Members Work in Different Specialty Areas that Require Varying Educational Backgrounds and Skills***



Source: Corrected Starr Data

Note: This exhibit shows the number of proposed class members at Defendants between 2008 and 2019 (for SCA and DaVita) or between 2010 and 2019 (for USPI) by specialty area. The analysis only includes proposed class members who were included in Prof. Starr's damages analysis. Employees are counted in the specialty area corresponding to the last job they held during the Class Period. The "other" category is omitted. There is a total of 6,169 employees considered in this analysis.

---

56. Seniority level and specialty area may serve as proxies for skills, but case evidence shows that skill requirements vary among proposed class members even at the same seniority level in the same specialty area. Consider, for instance, Directors in the Information Technology category. This group accounts for 55 unique job titles across the three Defendants,[95] and jobs in this category have different educational requirements. For example, the "IT Director — Product Management" position at DaVita requires a Bachelor's degree, and DaVita prefers that candidates have an MBA.[96] However, the position "Director, Project Management" in the IT department at DaVita requires only a high school diploma and a Project Management Professional certification, and allows candidates to substitute work experience for a Bachelor's degree.[97]

---

[95] Workpaper 5.

[96] "DaVita Position Description, IT — Product Management," DaVita, Undated, DVA_OMCEAL_001313820–23 at DVA_OMCEAL_001313820–21 ("IT Director — Product Management [...] MINIMUM QUALIFICATIONS [...] Bachelor's degree, MBA preferred").

[97] "DaVita Position Description, Director, Project Management," DaVita, September 2012, DVA_OMCEAL_001313824–27 at DVA_OMCEAL_001313824–25 ("Director, Project Management [...]  Reports to: Vice President, IT [...] High school diploma or equivalent required [...] Bachelor's degree in related area required or a combination of education and progressively responsible work experience in related area may be substituted in lieu of degree on a year-for-year basis [...] Project Management Professional certification or completion of another recognized project management certification required").

Highly Confidential — Outside Counsel/Experts Only

Similarly at SCA, the "Director, IT Security & Technology Compliance" position does not require a college degree or specify a minimum number of years of experience, but does require a technical certification, while the "IT Systems Integration Director" position requires a Bachelor's degree in IT or a related area of study and at least ten years of experience, but does not explicitly require any certifications.[98]

57. Named Plaintiffs Allen Spradling, whose background is in project management and IT, and Scott Keech, whose background is in nursing and clinical operations, illustrate the wide variation in skills among proposed class members. Allen Spradling worked for SCA as a "Manager, Program Management Office" and an "IT Director" from 2009 to 2013 where, according to his resume, he was responsible for "[directing] all activities within IT that involved application development, projects, project discipline, product quality, vendor management, strategic planning, and contract resources."[99] He was employed in project management and IT roles outside of the healthcare industry immediately before and after working for SCA.[100] He holds a bachelor's degree in law and society, as well as multiple certifications in information technology and project management.[101] In contrast, Scott Keech worked for SCA as a "Regional Director of Operations & Clinical Services" from 2011 (when the firm he worked for, Surgery Center Partners, was acquired by SCA) to March 2012 where, according to his resume, he was responsible for "clinic operations, nursing practice, and the provision of care at ambulatory

---

[98] "SCA Position Description for Director, IT Security & Technology Compliance," SCA, February 20, 2009, SCA001773262 at SCA001773262, ("Position Title: Director, IT Security & Technology Compliance [...] Division: Information Technology [...] Total education, vocational training and experience: [...] Achieved Certifications or Actively working on vendor specific technical training and certification. [...] College Degree Preferred."); "SCA Position Description for Systems Integration Director," SCA, November 1, 2011, SCA001200665–66 at SCA001200665–66 ("Position Title: Systems Integration Director [...] Division: IT [...] Required Skills: [...] Minimum of 10 years of experience in Information Technology field. [...] Minimum of 5 years of direct healthcare experience (ASC setting a plus). [...] Bachelor's degree in Information Technology or related study.").

[99] Resume of Allen M. Spradling (Named Plaintiff), SPRAD000014–15 at SPRAD000014 ("SURGICAL CARE AFFILIATES [...] IT Director, July 2010 – April 2013 [...] Directed all activities within IT that involved application development, projects, project discipline, product quality, vendor management, strategic planning, and contract resources.").

[100] Resume of Allen M. Spradling (Named Plaintiff), SPRAD000014–15 at SPRAD000014 ("TekSystems – Birmingham, AL[,] May 2008–April 2009[,] Senior Project Manager [...] Assigned to Compass Bank Project Management Office (PMO) fulltime and responsible for the planning and implementation of projects for the Financial Risk Management Group. [...] Bank of America – Birmingham, AL, May 2013–May 2019[,] Senior Vice President, Senior Services Delivery Manager, ATM [...] Led initiatives to replace legacy software distribution tool (Tivoli) with SCCM and to replace legacy SNMP monitoring tool (Gasper) with ESQ.").

[101] Resume of Allen M. Spradling (Named Plaintiff), SPRAD000014–15 at SPRAD000015 ("Education & Credentials[:] Bachelor of Science (BS), Law and Society, Concentration in Economics[.] Florida State University – Tallahassee, FL[.] Project Management Professional (PMP)[.] Certified Scrum Master (CSM)[.] SAFe 4 Agilist (SA)[.] SAFe 4 Product Owner/Production Manager (PO/PM)[.] Microsoft Certified Professional (MCP)[.] Certified NetWare Administrator (CNA)[.]").

surgery centers (ASCs) throughout California and Texas."[102] He was employed in other clinical operations roles in the healthcare industry immediately before and after working for SCA.[103] He holds a post-graduate degree in nursing, as well as an MBA.[104]

58. In addition to varying skills, proposed class members also have varied preferences that are often correlated with the specific requirements of their jobs. Defendants' job descriptions and online job postings show that some jobs require travel.[105] Such jobs would be more attractive to workers who are willing to travel for work. This would have included Allen Spradling in May 2019, who testified that he was open to "traveling to other areas as needed" while searching for work at that time.[106] Conversely, other jobs require in-person attendance.[107] Such jobs would be unattractive to workers who are unwilling to

[102] Keech (Named Plaintiff) Deposition, pp. 125–126 ("You say at the top that in February 2009 you went to work for Surgery Center Partners; correct? A. [...] Yes. Q. And you were in the role of regional director of clinical operations; correct? A. Correct.  Q. And you were in that role for the entire duration of your stay at Surgery Center Partners; correct? A. It's a little tricky. There was a takeover of Surgery Center Partners by SCA"); Exhibit 72 at p. 3 ("Surgical Care Affiliates[.] Regional Director of Operations & Clinical Services[.] February 2009 - March 2012 [...] responsible for clinic operations, nursing practice, and the provision of care at ambulatory surgery centers (ASCs) throughout California and Texas"); Email chain from Scott Keech (Named Plaintiff) to Shannon Kelly (Kaiser Permanente), "Re: Application," February 21, 2012, KEECH_000000339 ("[M]y current employers is SCA (they bought my company in mid December.").

[103] Keech (Named Plaintiff) Deposition, Exhibit 72 at pp. 2–3 ("Presidio Surgery Center[.] Administrator[.] July 2007 - February 2009 (1 year 8 months)[.] Provided executive leadership and direction to a team of clinical, operations, and front office managers at this six room, multi-specialty, ambulatory surgery center. [...] Kaiser Permanente[.] Area Continuum Administrator[.] April 2012 - August 2015 (3 years 5 months). [...] Responsible for all areas of continuing care operations").

[104] Keech (Named Plaintiff) Deposition, Exhibit 72 at p. 4 ("Education[.] University of Toronto - Rotman School of Management[.] Master of Business Administration, Business Administration and Management, General[.] (2002 - 2004)[.] Henry Ford Hospital/U of Michigan[.] RN, Nursing[.] (1994 - 1996).").

[105] For example, SCA specifies that "frequent travel is required (approximately 40%)" for its "Director, Acquisition Due Diligence" position. Similarly, DaVita specifies that travel is required "up to 60%" of the time for its "Vice President – VillageHealth Clinical Operations" position, and that travel is required "up to 90%" of the time for the "Director – Acquisition Integration" position. Further, a job posting for a "Regional Vice President" position at USPI specifies that "[u]p to 75% travel required." See "SCA Position Description for Director, Acquisition Due Diligence," SCA, July 23, 2009, SCA001613450; "DaVita Job Description, Vice President – VillageHealth Clinical Operations," DaVita, November 2009, DVA_OMCEAL_001296546–49 at DVA_OMCEAL_001296546–47; "DaVita Job Description, Director – Acquisition Integration," DaVita, July 2008, DVA_OMCEAL_001294747–50 at DVA_OMCEAL_001294747–48; United Surgical Partners International, "USPI Regional Vice President, Operations II – New Jersey," 2025, available at https://careers.uspi.com/job/lakewood/uspi-regional-vice-president-operations-ii-new-jersey/26425/78736071152, accessed on April 6, 2025.

[106] Spradling (Named Plaintiff) Deposition, p. 209 ("At that time, were you open to relocating to other areas? A. No, I was open to being a remote employee and traveling to other areas as needed.").

[107] For example, DaVita specifies that a Senior Director of Finance role "will be based out of Denver, Colorado" and require travel only "10%" of the time, and that a Director of Corporate Strategy role is "required" to be based out of Denver. See DaVita, "Senior Director, Finance Job in 2000 16th Street, Denver, CO 80202 | Leadership & Supervisor Jobs at DaVita," March 26, 2025, available at https://careers.davita.com/job/R0397738/Senior-Director-Finance, accessed on April 8, 2025; DaVita, "Director, Corporate Strategy Job in 2000 16th Street, Denver, CO 80202 | Leadership & Supervisor Jobs at DaVita," February 13, 2025, available at https://careers.davita.com/job/R0378916/Director-Corporate-Strategy, accessed on April 8, 2025. Some positions, including Hospital Administrator and CEO positions require in-person attendance because they involve the day-to-day management of specific facilities. Other positions require in-person visits to several facilities and require that candidates reside nearby.  See, e.g., SCA, "CEO - Gladiolus Surgery Center in Ft Myers,



commute or relocate to the assigned office location. This would have included both Allen Spradling and Scott Keech at various points in time, who testified that they were unwilling to relocate while searching for work due to ██████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████[108] Similarly, other examples in the record show that proposed class members switched jobs or turned down job offers with Defendants during the Class Period because they preferred a shorter commute,[109] or less work-related travel.[110]

59. Importantly, these preferences can also change over time. Scott Keech testified that he actively sought to relocate to California from Michigan during a job search in 1999. Soon after arrival in California, he commuted daily almost 50 miles each way from San Francisco to Santa Clara.[111] Ultimately, however, he

[108] Spradling (Named Plaintiff) Deposition, pp. 164—165 ("[D]id the reason for not wanting to relocate even initially or for the delay in relocation have to do with your children being in school? [...] Yes."), p. 196 ("[My wife] wouldn't consider going south. Q. And why was that? A. Just comfort desire with climate, that kind of thing. [...] [P]ersonal preference."); Keech (Named Plaintiff) Deposition, p. 44 ("Why did you relocate from Michigan to California in 1999? A. ████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████ pp. 185—186 ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ pp. 186—187 ████████████████████████ ███████████████████████████████████████████████████████ ██████).

[109] "Exit Interview Questionnaire of Wayne C. Jones," USPI, October 12, 2016, USPI_CIV_000239009—12 at USPI_CIV_000239010 ("Name & Phone #: Wayne C. Jones Dept./Facility Name: Broward Specialty Surgical Center Title: Administrator"), USPI_CIV_000239009 ("Relocation is not related to duties performed. Presently travel 120 miles round-trip and opportunity to work 9 miles from home.").

[110] Email chain from Rich Sharff (SCA) to Michael Rucker (SCA), "RE: Confidential — ████████████ USPI," January 7, 2014, SCA000227468—70 at SCA000227468—69 ████████████████████████ ████████████████████████████████████████████████████████ ██████.

[111] Google Maps, "Santa Clara, California to San Francisco, California," available at https://www.google.com/maps/dir/santa+clara/san+francisco/, accessed on April 2, 2025.

Highly Confidential — Outside Counsel/Experts Only

acquired a job at Presidio Surgery Center in San Francisco and the experience made him averse to commuting.[112] Similarly, Allen Spradling testified that he was unwilling to move to another city at one point while his children were in school.[113] However, during his tenure at a previous employer, he moved almost 500 miles between offices in Montgomery, AL and Lexington, KY.[114]

*2.1.4. Defendants Face Varying Competitive Pressures When Setting Compensation, and Lack Market Power Sufficient to Suppress Pay for Many or Most (if Not All) Proposed Class Members*

60. In order for the challenged conduct to suppress competition and pay for all or nearly all proposed class members, it must be the case that Defendants have sufficient market power to restrict labor competition for each of the many different jobs that proposed class members hold. However, as the data and record evidence I have already discussed in this section establish, proposed class members' pay is subject to different competitive pressures that vary depending on their alternative employers. The alternative employers for a worker depend in turn on that worker's skills and preferences and are thus individualized.

61. In what follows, I explain how Defendants take these varying competitive pressures into account when setting proposed class members' pay. This occurs in at least two different ways. First, as I explain below, Defendants benchmark proposed class members' pay against what competing employers are offering to workers in similar jobs. This might be thought of as job-based variation in

---

[112] Keech (Named Plaintiff) Deposition, p. 44 ("Why did you relocate from Michigan to California in 1999? A. ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that I previously mentioned, because I figured there was no reason for a skilled registered nurse to live in a miserable place like Detroit. [...] Q. Did you consider taking positions anywhere else in the country, other than in California? A. I may have briefly considered Chicago at some point, but not at that particular point; because, by then, I was done with the snow and ice."), pp. 157–158 ("Q. [...] [W]hen you were at Kaiser as the director of department of emergency medicine and the assistant director of department of emergency medicine, did you commute from San Francisco to Santa Clara? A. [...] I did move to San Francisco and I commuted from San Francisco to Santa Clara for a significant period of time. [...]. Q. Yeah. At some point in time, did your appetite for commuting change? A. Yes. It's never – It's never super fun, but once I ended up at Presidio Surgery Center, I was reminded of how easy it is when you live ten minutes from – from work. Q. Did that realization make you less interested in positions that required a commute? A. Sure.").

[113] Spradling (Named Plaintiff) Deposition, pp. 164–165 ("Q. Okay. And what was the reason that you weren't able to relocate immediately? A. Well, there was never a requirement to relocate immediately. They were fine with me working remotely. I just had to have a definite ending to that remote engagement, and I think it was three years. But during my three years, my personal circumstances changed which caused me not to be able to relocate to Charlotte. Q. Was – did the reason for not wanting to relocate even initially or for the delay in relocation have to do with your children being in school? [...] A. Yes.").

[114] Spradling (Named Plaintiff) Deposition, pp. 34–35 ("Q. Why did you leave your role at ASD? A. So I started in Montgomery as the branch manager. Then I moved to Kentucky and started a new branch there, and during that spin-up of that new branch, I was contacted by a friend at Regions to come work at Regions. Q. When you were a branch manager, you act – you had relocated to Kentucky? A. Yes. Correct. Q. Where in Kentucky? A. Lexington."); Google Maps, "Montgomery, Alabama to Lexington, Kentucky," available at https://www.google.com/maps/dir/Montgomery+alabama/lexington+kentucky/, accessed on April 2, 2025.

competitive pressures. Second, as I show in Section 2.2, there is also person-based variation in competitive pressures. Compensation for proposed class members can vary based on several individualized factors including pay negotiations, managerial discretion, individual performance, the supply and demand for workers' highly specific skills, and the proportion of compensation that different types of pay that depend on different factors (including individual-specific factors) comprise. I am aware of no information common to the proposed class that would allow all of the above factors to be accounted for.

62. I begin by describing preliminary evidence that is consistent with competitive pressures varying across proposed class members at both the job and person level, as the above discussion explained is the case. Exhibit 8, Exhibit 9, and Exhibit 10 show that average pay for proposed class members *differs across jobs in different categories* – and specifically, by seniority level, by specialty area, and by geography.[115] Further, Exhibit 8, Exhibit 9, and Exhibit 10 also indicate that there is a wide range of pay *within each of these categories*, which is consistent with the individualized nature of proposed class members' outside employment options due to their varied skills and preferences.

---

[115] I present exhibits similar to Exhibit 8, separately for each of the three Defendants, in Appendix C.

**EXHIBIT 8**
**Differences in Pay Across Seniority Levels Reflect Varying Competitive Pressures**



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay without equity for proposed class members of the indicated seniority level. Pay is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at USPI between 2010–2019 and SCA and DaVita between 2008–2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay without equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median.

*EXHIBIT 9*

***Differences in Pay Across Specialty Areas Reflect Varying Competitive Pressures***



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay without equity for proposed class members of the indicated specialty area. Pay is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at USPI between 2010–2019 and SCA and DaVita between 2008–2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay without equity among employees in the specialty area, the blue circle represents the mean, and the orange triangle represents the median.

**EXHIBIT 10**
**Differences in Pay Across States Reflect Varying Competitive Pressures**



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay without equity for proposed class members in the indicated state. Pay is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at USPI between 2010–2019 and SCA and DaVita between 2008–2019, were included in Prof. Starr's regression analysis (which only considered full-year employees), and were not missing state information. The range of plotted values represents the 5th to 95th percentile of annualized total pay without equity among employees in the state, the blue circle represents the mean, and the orange triangle represents the median.

63. Turning back to the two types of variation in competitive pressures that Defendants consider when setting pay, record evidence shows that Defendants consider job-based variation in competitive pressures when setting proposed class members' pay, in part by relying on external market data and industry surveys that are *specific to a job.* These kinds of benchmarking efforts are common in labor markets to determine whether pay for a job generally aligns with what competitors are offering for workers in similar jobs.[116] There are numerous examples of Defendants benchmarking pay against the competition in this way during the Class Period, using information collected from a variety of sources (e.g., external market data from CareerBuilder and PayScale; industry surveys from Mercer). For example, SCA engaged PricewaterhouseCoopers to conduct an "Executive Total Cash Compensation Assessment" in 2012, in which they compared pay for certain VPs and above to aggregate pay statistics reported in industry surveys from Mercer, Economic Research Institute, and Towers Watson.[117] Similarly, USPI collected market salary data from PayScale and CareerBuilder when considering whether to issue market pay adjustments for certain RVPs in 2017,[118] and USPI's Sandi Karrmann also testified that USPI obtained market compensation surveys when setting pay raises for class positions.[119] Additionally, an internal presentation from 2012 compared DaVita's projected merit pay raises for 2013 against market salary data from various compensation survey providers, including World at Work, Mercer, EMPSight, and Hay Group.[120] Indeed, Prof. Starr and Prof. Gerhart cite this evidence extensively in their own reports.[121]

---

[116] Zoe Cullen, Shengwu Li and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," *National Bureau of Economic Research,* 2024 ("Cullen, Li, Perez-Truglia (2024)"), p. 1 ("[I]n our survey of Human Resources (HR) managers, 87.6% report using salary benchmarks to set pay.").

[117] "PwC Executive Total Cash Compensation Assessment," SCA, January 2012, SCA001280928–79. See also "SCA Benchmark – GVP Development," SCA, Undated, SCA001669826.

[118] Email chain from Mark Garvin (USPI) to Sandi Karrmann (USPI) and Andy Johnston (USPI), "RE: PayScale Information – RVP Nationwide," with attachments, February 8, 2017, USPI_CIV_000021897–98 at USPI_CIV_000021898; "PayScale Market Report: Regional Vice President (RVP), Operations," USPI, February 3, 2017, USPI_CIV_000021899–904 at USPI_CIV_000021899. See also Email chain from Sandi Karrmann (USPI) to Andy Johnston (USPI) et al., "FW: RVP Compensation Reports - Career Builder," February 7, 2017, USPI_CIV_000021906; "Talent Compensation Report," CareerBuilder, February 7, 2017, USPI_CIV_000021907–11 at USPI_CIV_000021907.

[119] Deposition of Sandi Karrmann (USPI), August 14, 2024 ("Karrmann (USPI) Deposition"), pp. 40–41 ("Q. So you would also consider external equity in setting raises? A. We would look at the marketplace. Q. And so that would include obtaining compensation surveys or pay surveys? A. Yes.").

[120] "Village Vitality Murphy Update," DaVita, September 2012, DVA_OMCEAL_001360570–622 at DVA_OMCEAL_001360573.

[121] Gerhart Report, ¶ 116 ("DaVita's documents corroborate its use of benchmarking to ensure external pay equity. For instance, one document stated that DaVita 'select[ed] market benchmarks based on job content as described in job descriptions.' An internal 2018 Compensation Risk Assessment similarly shows that as a company practice, '[c]ompensation surveys are used to benchmark pay.' [...] Former SCA GVP of HR Warren Cinnick corroborated Fanning's testimony about SCA's use of pay surveys, testifying that SCA tracked market conditions 'every year

64. Further, even though external pay benchmarking plays an important role in Defendants' pay decisions for proposed class members, Defendants set pay in an individualized manner that accounts for person-level variation in competitive pressures.[122] For example, in her deposition, Bridie Fanning responded to a question implying that compensation was largely algorithmic by noting that "[y]ou're making it sound like you get market data and the machine sets it. And it doesn't work that way at all."[123]

65. This aligns with findings from the economics literature. For example, a 2024 study by economists Zoe Cullen, Shengwu Li, and Ricardo Perez-Truglia concludes that salary benchmarking plays a bigger role in compensation for low-skill positions than high-skill positions.[124] In particular, in an empirical analysis those authors conduct, while the median market salary may serve as a "starting point" for setting pay for high-skilled positions, employers tend to

---

and regularly through surveys that we used through professional organizations who did private surveys […] in the salary space,' including 'Mercer Meidinger.' […] The evidence also shows that USPI benchmarked its internal pay practices to external market data: The deposition testimony and documents show that USPI regularly used benchmarking to control for external equity. For instance, former USPI internal recruiter McGarry testified that she ran compensation reports between ten and twelve times per month to benchmark internal pay[.]"); Starr Report, ¶ 179 ("The evidence shows that DaVita's Compensation Team reviewed external market data when it was concerned about retention of its employees. To acquire external compensation information for roles, DaVita's Compensation Team used salary survey databases such as Kenexa, Payfactors, or Tower Watson. DaVita also worked with third-party compensation research providers such as Qualigence. Additionally, DaVita retained a compensation consultant firm named Compensia that rendered services related to executive compensation."), ¶ 180 ("SCA also benchmarked its pay against the market. For example, in 2011, SCA compared its 2011 increases to broader compensation data from third-party provider Mercer."), ¶ 181 ("To gather reference points for a fair-market salary to maintain external equity, USPI used external sources, such as CareerBuilder.").

[122] Bridie Fanning testified that, in addition to external market data, "[y]ou're looking at [the decision maker's] judgment; you're looking at the individual; [and] you're looking at skills" when setting compensation. I will discuss these individualized factors further in Section 2.2. See Fanning (SCA) Deposition, pp. 176–177 ("[D]id you use those [consolidated market data] reports in setting compensation? A. Setting compensation, […] that's a really strong term. […] [I]t's an art as much as a science. And there's a lot of complexity involved. You're looking at judgment; you're looking at the individual; you're looking at skills; you're looking at market data. You're making it sound like you get market data and the machine sets it. And it doesn't work that way at all."). See also Deposition of Robert Chipman (DaVita), August 7, 2024 ("Chipman (DaVita) Deposition"), pp. 82–83 ("Q. Did you typically recommend that the leader's compensation offer align with the average low, average median or average high? […] A. It was not a rule of thumb. It varied. And by each situation based on experience levels, geographies, unique skill sets that the individual may be bringing to the table.").

[123] Fanning (SCA) Deposition, pp. 176–177.

[124] Cullen, Li, Perez-Truglia (2024), p. 3 ("According to anecdotal accounts from interviews with compensation managers, salary benchmarking may play a more prominent role for low-skill positions. Intuitively, employers see candidates for a low-skill position as 'interchangeable' (Adler, 2020), so they want to identify the market rate and offer that amount to all candidates. In contrast, in high-skill positions, employers may supplement salary benchmarks with additional information tailored to each specific candidates, such as salary expectations and outside offers."), p. 27 ("Low-skill candidates are given take-it-or-leave-it offers, and the candidate's efforts to ask for more are not only rejected, but are even considered inappropriate (Adler, 2020). On the other hand, in high-skill positions, there can be large differences in quality from one candidate to another. HR professionals emphasize the importance of tailoring offers to specific candidates (Adler, 2020). The firm may still look up and use the salary benchmark as a starting point, but there are other factors that can come into play, such as the line manager's opinion of the candidate, the candidate's own salary history, outside offers, and salary expectations. Consistent with this view, survey data suggest that, relative to low-skill candidates, high-skill candidates are substantially more likely to engage in salary negotiations (Hall and Krueger, 2012).").

"tailor the offer to the individual candidates" by paying attention to individualized factors such as outside offers.[125]

66. Indeed, consistent with this, and as I discuss in Section 2.2, record evidence shows that proposed class members leveraged outside job offers from non-Defendant employers to negotiate pay increases with Defendants on a case-by-case basis during the Class Period. Had Defendants tried to suppress these proposed class members' pay below what other firms were offering, these workers could have simply accepted their competing job offer. Further, as I will also discuss in Section 2.2, record evidence also shows that Defendants issued retention bonuses to proposed class members whose skills were in high demand from competing employers.[126] These are the kinds of competitive constraints that render implausible Prof. Starr's assertion that the Defendants have "market power over Class Members" in an undefined relevant antitrust labor market.[127]

---

[125] Cullen, Li, Perez-Truglia (2024), p. 29 ("In high-skill roles, although the median market salary may serve as a starting point, other factors often become more significant as employers tailor the offer to the individual candidate. Another way to view this is that benchmarks are less informative for high-skill positions. In low-skill positions, candidates are seen as interchangeable, so the firm only needs to determine the median pay and offer that to every candidate. For high-skill positions, however, the information on the median pay may fall short of ideal. For example, rather than a single benchmark for "software developer," a firm might prefer two distinct benchmarks: one for "below-average software developer" and another for "above-average software developer," to be used depending on the perceived quality of the candidate").

[126] Email from Jason Strauss (SCA) to Jeff Fields (SCA) and Leslie Wachsman (SCA), "RE: Notable Forecasting Items Northern California – Retention Agreements," July 22, 2014, SCA000091011 ("[W]e have entered into retention agreements with ███████████████████████████ given ██████ recent departure. The bonuses are contingent upon them being employed in good standing in January"); Email chain from Bill Wilcox (USPI) to Brett Brodnax (USPI), "Re: David Lewis Draft Offer Letter and Compensation Plan," November 15, 2014, USPI_CIV_000401250–54 at USPI_CIV_000401250 ("Bill, we're trying to put together an offer to keep ████████████ [...] We're all afraid we'll lose him if we don't offer him something different from what he's doing now [...] I think he should get options equivalent to others in similar position but on low end until we know he has skills for this position"); Deposition of Michael D. Staffieri (DaVita), April 5, 2024 ("Staffieri (DaVita) Deposition"), pp. 120–121 ("Q. All right. What are the options available to DaVita on the compensation front to retain an employee who is being recruited by a competitor? [...] A. I think that that would be a long list. Is there any -- Q. Well, for example, could DaVita increase the base pay of the employees being recruited to retain that employee? A. Yes. Q. Could DaVita increase the bonuses that that employee would receive? A. Yes. Q. Could DaVita increase the stock award to the employee? A. Yes. Q. Has DaVita, in fact, done each of these things in different situations to retain employees who are being recruited? A. Yes."); Email from Paul Slavin (USPI) to Mark Corcoran (USPI) et al., "RE: Retention Review Recommendations," July 10, 2018, USPI_CIV_000064623–27 at USPI_CIV_000064623 ("Sandi and I agreed not to do blanket retention but only target highest risk."); Email from Mark Corcoran (USPI) to Sandi Karrmann (USPI) et al., "Retention Plan for my team," July 3, 2018, USPI_CIV_000064628 ████████████████████████████████████ ███████████████████████████████ Email chain from Carolyn Campbell (USPI) to Rachelle Pitts (USPI) et al., "Re: ████████████ - Foundation Interim VP- IT," March 23, 2017, USPI_CIV_000235807 ████████████████ ████████████████████████████████ Email from Rachelle Pitts (USPI) to Corey Ridgway (USPI) et al., "RE: Saginaw Staff Retention," August 15, 2018, USPI_CIV_000563699–700 at USPI_CIV_000563699 ("We are evaluating a potential sale of Saginaw and would like our Clinical Director to hang through end of year or sale. [...] My thought was to offer a bonus that would be paid at year end or completion of sale whichever is sooner.").

[127] Starr Report, ¶ 196.

Highly Confidential – Outside Counsel/Experts Only

67. The varying job-level and person-level competitive pressures that Defendants consider when setting pay for proposed class members, and the fact that proposed class members leverage outside job offers from non-Defendant firms to negotiate pay increases with Defendants on a case-by-case basis, mean that individualized inquiry would be necessary to evaluate whether pay could have been suppressed due to the alleged conduct for any proposed class member, let alone all or nearly all proposed class members. For example, to understand whether Defendants had market power sufficient to suppress pay for a certain job, it would be necessary to understand not only what other firms Defendants compete with for that type of labor, but also what other jobs individuals in that role consider when conducting a job search. Similarly, it would be necessary to understand which proposed class members leveraged outside offers to negotiate their pay. Individualized inquiry would be required to determine the answer to these key questions.

68. Despite the need for individualized inquiry, it is evident that, for many or most (if not all) proposed class members, Defendants did not have market power sufficient to suppress pay, given the abundance of alternative employers besides Defendants that I observe in my analysis of employment histories for members of the proposed class. Moreover, in the event that it was determined Defendants did have market power with respect to some set of proposed class members (which Plaintiffs have not demonstrated), individualized inquiry would also be necessary to quantify harm (if any), given the varying competitive pressures that Defendants face when setting pay for proposed class members. I am not aware of any information common to the proposed class that would allow Plaintiffs to address these complex individualized considerations.

### 2.2. Plaintiffs' Experts Have Not Demonstrated that Proposed Class Members Not Directly Affected by the Challenged Conduct Would Be Indirectly Affected Through a Rigid Pay Structure

69. Plaintiffs' experts assert that, due to Defendants having rigid pay structures that link together pay for each of the proposed class members, proposed class members not directly impacted by the alleged conduct also experienced suppressed pay as a result of the alleged conduct.[128] Prof. Starr concludes that, according to his review of the evidence, Defendants' pay structures "mean that any wage suppressing effects of the Challenged Conduct would be broadly

---

[128] Starr Report, ¶ 172 ("[T]he existence of compensation structures within Defendant firms would mean that any wage suppressing effects of the Challenged Conduct would be broadly transmitted across the Class."); Gerhart Report, ¶ 7 ("[P]ay at Defendant firms moved in systematic and structured ways, such that wage suppression as to a subset of employees would have impacted other employees' pay.").

transmitted across the Class."[129] Similarly, Prof. Gerhart opines that it would likely be the case that the alleged conduct "limited and had negative consequences on employee compensation not only for the workers who were directly involved, but also for nearly all employees."[130] In order for this to be true, it would need to be the case that Defendants' pay structures were sufficiently rigid that changes in pay for some proposed class members would lead to changes in pay for all or nearly all other proposed class members. Plaintiffs' experts have not established that such a rigid pay structure exists for any of the Defendants, let alone all three (as would be required to support Prof. Starr's damages model).

70. In support of their claimed rigid pay structures, Prof. Starr and Prof. Gerhart discuss the concepts of "internal equity," the idea that individuals doing similar work within a firm should receive similar pay, and "external equity," the idea that workers doing similar work at different firms should have pay that is similar. They then assume that because Defendants at times considered both internal equity and external equity, they had rigid pay structures in place that linked together pay for each of the proposed class members. They further purport to demonstrate that Defendants did, in fact, have rigid pay structures in place through their review of qualitative and quantitative evidence.[131] As an initial matter, I do not dispute that Defendants consider internal equity to some degree and are constrained by market forces (i.e., the fact that employers' decisions about how much to pay their workers are constrained by what other employers who compete for the same worker's pay) when setting pay, nor that Defendants have one or more processes for thinking

---

[129] Starr Report, ¶ 172.

[130] Gerhart Report, ¶ 161. See also Gerhart Deposition, p. 288 ("Q. Because you didn't perform any quantitative work in this case, is it fair to say that your report contains your opinions on what could have happened and not on what did happen? [...] A. I think my report is framed as 'the likely impact.'"), p. 230 ("Q. All right. Let's turn to page 103. So I want to talk about the features that are necessary to have a structured compensation system that would likely cause class-wide impact. So, I guess, before we refer to the language in your report: [...] What are those features? A. I would say that you make pay decisions in a systematic way, and a big part of that is internal equity, which, again, is [...] one component of it is that people in a similar role, similar performance, would get paid similarly. And I think we talked about the other parts of a systematic compensation system. I mean, the key is that people's pay, even not in that same role that I was talking about, same role, same performance, pay of employees is linked in other ways such that, in a system, when one part of the system changes, it cascades to have other effects in the system.").

[131] Starr Report, ¶¶ 172–175 ("Compensation structures tend to arise in firms due to the interrelated concepts of internal and external equity. [...] Internal equity is the idea that individuals doing comparable work should receive similar compensation. [...] A related concept is 'external equity,' wherein employees seek to achieve pay similarities between laborers doing similar jobs at different firms."); Gerhart Report, ¶ 94 ("Further, I assess the compensation-related literature and evidence to explain that a fundamental objective of Defendants' structured compensation systems is to achieve equity. External equity means paying similar employees similarly to employees in other companies doing similar work and making similar performance contributions. [...] Internal equity means paying employees within the same company similarly to other employees within the same company doing similar work and making similar performance contributions.").

about and setting compensation. However, in this section I show that case evidence casts doubt on Defendants' purported reliance on internal equity and market forces as a basis for assuming rigid pay structures, and I further dispute the claim that the qualitative or quantitative evidence in this matter is consistent with the existence of a rigid pay structure whereby any pay suppression or changes in pay for some proposed class members would spread to all or nearly all other proposed class members. I also show that, while Plaintiffs' experts put forward flawed qualitative and quantitative evidence to support their claimed rigid pay structures, the quantitative analyses are uninformative and generate results that are inconsistent with the claimed rigid pay structures once basic corrections are made, and their review of the qualitative evidence does not properly account for business documents and testimony showing that Defendants did not have job-specific pay ranges or grades for class positions throughout the Class Period.

71. In the first part of this section, I discuss evidence demonstrating that proposed class members' pay is determined in a highly individualized, and highly negotiated, manner rather than according to rigid pay structures (Section 2.2.1). In the second part, I turn to a discussion of quantitative evidence, which shows that there is wide variation in pay for proposed class members at the same seniority level, that there is substantial overlap in the observed pay ranges for adjacent seniority levels (i.e., observed pay ranges are not highly differentiated across seniority levels); and that proposed class members' pay does not move together over time. Further, I show that Prof. Starr's quantitative analyses, once corrected for basic errors, also show no evidence consistent with rigid pay structures. Each of these points militates against the existence of rigid pay structures (Section 2.2.2). In the final part of this section, I explain that these findings are not surprising, given record evidence showing that Defendants did not have job-specific pay ranges and grades for class positions throughout the Class Period (Section 2.2.3). Both Prof. Starr and Prof. Gerhart fail to properly consider the evidence from this section. Ultimately, the facts and arguments summarized above lead me to conclude that, even assuming the alleged conduct occurred and impacted some proposed class members, impact from the alleged conduct would not be common across proposed class members.

*2.2.1. Evidence Indicates that Proposed Class Members' Pay is Highly Individualized and That Defendants Did Not Have Rigid Pay Structures Through Which Changes in Pay for One Group of Proposed Class Members Would Be Transmitted to All (or Nearly All) Other Proposed Class Members*

72. Plaintiffs' experts assume that proposed class members' pay was set through rigid pay structures capable of spreading harm classwide. However, this assumption ignores at least five basic facts about the setting of proposed class members' pay. First, Defendants engage in individualized negotiations with proposed class members to determine their pay. Second, Defendants rely in part on managerial discretion to determine proposed class members' pay, which means that many different decentralized decision makers are involved in making pay decisions. Third, Defendants condition a portion of proposed class members' pay on their individual performance. Fourth, Defendants adjust proposed class members' pay to account for differences in the supply and demand for their highly specific skills. Fifth, Defendants offer many different types of pay, and the proportion of total compensation that each type of pay represents can vary substantially across workers. **These five facts highlight the individualized nature of proposed class members' pay.** In such a context, it is not plausible that proposed class members' pay would move together over time in accordance with the rigid pay structure that Plaintiffs' experts assert. In the absence of a rigid pay structure, any effect of the alleged conduct on pay would not be common.

73. The first reason that proposed class members' pay is individualized is that **Defendants often engage in individualized pay negotiations with proposed class members, resulting in individualized differences in pay across the proposed class**. SCA's Bridie Fanning testified that at SCA, VPs and above leveraged outside job offers to successfully negotiate for large increases in their pay "all the time."[132] USPI's Mark Garvin testified that USPI

---



[132] Fanning (SCA) Deposition, p. 35 ("Q. Do you understand what I mean by [senior employee]? A. I would say executives. I was responsible for mainly VP and above."), pp. 171–172 ("Q. And are you aware of SCA increasing compensation off cycle, outside of that? A. Oh, God. They did it all the time. I mean, as I said before, there were a number of executives at SCA that were always going to Andrew about, 'Hey, I've been approached for job, I'm thinking about it,' and then all hell would break loose and they'd get big pay increases."). See also Email chain from Warren Cinnick (SCA) to Jason Strauss (SCA), "RE: CONFIDENTIAL – Title and Compensation Recommendation – ▮▮▮▮▮▮▮▮ with attachments, September 20, 2018, SCA000523268–72 at SCA000523270▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Email chain from Andy Johnston (USPI) to Sandi Karrmann (USPI), "RE: Fwd: LDP," December 5, 2013, USPI_CIV_000473082–83 at USPI_CIV_000473083▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. "Offer of Employment Letter to▮▮ for Vice-President, Development," USPI, Undated, USPI_CIV_000026215–216 at USPI_CIV_000026215▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Email

matched outside job offers on a "case-by-case scenario," and USPI's Anthony Martin similarly testified that he was asked to match outside job offers by employees who worked for him in the accounting department "from time to time."[133] DaVita's Steven Priest, testified that "it's not uncommon" for job applicants to negotiate higher pay upon receiving a job offer from DaVita, and DaVita's Javier Rodriguez similarly testified that he had experienced employees in class positions trying to negotiate higher pay with him after receiving an outside job offer.[134] Further, Prof. Gerhart acknowledges in his report that Defendants negotiate pay with proposed class members (citing testimony from SCA's Bridie Fanning that solicited employees can use outside offers to negotiate higher pay), and similarly testified during his deposition that he was aware of examples where Defendants' employees used outside job offers to negotiate higher pay.[135]

74. There are various ways that proposed class members leverage their individual circumstances (their "bargaining position") to obtain better terms from Defendants during these negotiations. For example:

- **Some individuals leverage employment offers or expressed interest from competing firms to negotiate better terms**

---

chain from Shannon Mosley (USPI) to Mark Garvin (USPI) et al., ▮▮▮▮▮ Offer Letter 09 26 14.docx – please approve," September 26, 2014, USPI_CIV_000244825 ("▮▮▮▮▮▮▮▮▮▮▮▮ Letter from Mark Garvin (USPI) to ▮▮▮▮▮ 2014, USPI_CIV_000036006 ("I would like to confirm USPI's desire for you to join our company as the Director of Operations Finance in Addison, Texas.").

[133] Garvin (USPI) Deposition, p. 90 ("Q. And so is it fair to say that if an employee was offered an opportunity outside of USPI for more money, at that point USPI would consider that and would match that increased compensation because they did not want to lose that employee? [...] A. That would all depend on the employee. And it was a case-by-case scenario and not a broad application."); Deposition of Anthony Martin (USPI), June 27, 2024 ("Martin (USPI) Deposition"), p. 59 ("And also from time to time employees who worked for me received other offers of employment and asked if I wanted to match it in order to keep them.").

[134] Deposition of Steven Priest (DaVita), November 5, 2024 ("Priest (DaVita) Deposition"), p. 142 ("Have I given job offers to somebody who works somewhere else, and then they come ask for more money? Q. Yes. A. It happens. Yes, that happens. Q. Frequently? A. I'm not hiring that many people now, but it's not uncommon for people to say, 'Hey, I know the job pays X, but I need Y. Can you do that?'"); Deposition of Javier Rodriguez (DaVita), August 12, 2024 ("Rodriguez (DaVita) Deposition"), p. 59 ("Q. So you review executive compensation, correct? A. I review executive compensation. Yes. Q. And what level of employee do you include in the executive comp that you review? A. Very high-level [...] overview of directors plus. A little more time on the vice presidents and a lot more time on the more senior people."), p. 84 ("Q. Have you experienced executives trying to negotiate higher pay after receiving a pay offer? A. Sure.").

[135] Gerhart Report, ¶ 72 ("Negotiation is more likely to occur and succeed when both factors are maximized: the employee has the ability because an alternative offer is in hand, and the motivation, because the offer has a higher salary. For example, former SCA Chief Talent Officer Fanning testified that solicited employees can use offers 'to negotiate or at least tell their current employer how valuable they are, but I'm staying because I'm really loyal to you.'"); Gerhart Deposition, pp. 133–134 ("Q. And, during the class period, you saw examples of defendants' employees using outside offers as leverage to negotiate higher compensation; correct? [...] A. That's my recollection, yes."). Note that, despite Prof. Gerhart's admission, and despite the evidence discussed above which shows that individualized negotiations were common among proposed class members, Prof. Starr claimed in his deposition that "wages are not set in a spot market" and are "not individually negotiated" at Defendants. See Starr Deposition, Volume I, p. 268.

**with Defendants.** For example, at SCA, a candidate for a Director of Financial Operations position in 2016 successfully negotiated a ██████ increase in starting salary based on a job offer he had received from a competing employer.[136] A Senior Director in 2017 leveraged an outside job offer from competing employer ████ ██████████ to negotiate an additional ████ in salary and an additional ████ in equity pay from SCA, as well as the continued ability to pursue a part-time MBA.[137] Further, at USPI, a candidate for an Administrator position in 2015 successfully negotiated a starting pay package similar to what more-senior Market Presidents at USPI typically receive after being "heavily recruited" by both USPI and SCA.[138] Another candidate for an Administrator position in 2013 agreed that she would accept USPI's offer over a competing offer "if [USPI] can match what the other company is offering" in terms of salary and bonus.[139] Additionally, at DaVita, former employee Steven Priest testified that job applicants used several factors, including "what somebody else [was] willing to pay them," to negotiate higher pay.[140]

- **Some individuals — in particular, candidates who are employed by another firm at the time that they apply for a**



[136] Email chain from Jennifer Sandoz (SCA) to Melissa Hayes (SCA) and Rita Benavides (SCA), "RE: *EXTERNAL* SCA Offer Letter/Director, Financial Operations," August 1, 2016, SCA000100643–46 at SCA000100643–46, ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████.

[137] Email chain from Tim Buono (SCA) to Christian Ellison (SCA) and Brian Mathis (SCA), "RE: Personnel —Need feedback this afternoon, if at all possible," April 7, 2017, SCA001129757–58 at SCA001129758 ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████.

[138] Email chain from Alex Bateman (USPI) to Andy Johnston (USPI), "RE: Admin merit increase," February 6, 2015, USPI_CIV_000336479 ("████████████████████████████████████████████████████ ████████████████████████████████████.

[139] Email chain from Leah Cerkvenik (USPI) to Shannon Mosley (USPI) and Teresa Danna (USPI), "RE: ████████ ████████ offer information," December 26, 2013, USPI_CIV_000192177–78 at USPI_CIV_000192178, ("What do you all think about offering her the same salary and sign on along w/with our annual bonus? [...] ████████ has agreed to take our offer [for an Administrator position at USPI] if we can match what the other company is offering[.]"); "Confidential Assessment for ████████████," December 17, 2013, USPI_CIV_000376500–06 at USPI_CIV_00376500 ("████████████ Administrator Candidate for United Surgical Partners").

[140] Priest (DaVita) Deposition, p. 142 ("Have I given job offers to somebody who works somewhere else, and then they come ask for more money? Q. Yes. A. It happens. Yes, that happens. Q. Frequently? A. I'm not hiring that many people now, but it's not uncommon for people to say, 'Hey, I know the job pays X, but I need Y. Can you do that?' Q. What factors do they use to negotiate higher pay? A. What they were making before, what somebody else is willing to pay them, so market conditions, their experience, their education, the scarcity of resources in that particular geography. If you need a medical director, and there's only one doctor in town, that's a factor. So all those things come into play.").

**job with one of the Defendants — leverage their current employer's compensation package to negotiate better terms with Defendants.** In one such instance, in 2016, DaVita negotiated an additional bonus opportunity for a job candidate who would have lost out on a large cash bonus with his contemporaneous employer were he to have switched jobs.[141] In another instance, in 2018, USPI considered whether to offer an Administrator candidate an additional week of vacation, based on the fact that her current employer offered five weeks while USPI typically only offered three weeks to new hires.[142] Additionally, in 2014, a candidate for an Administrator position at USPI who was currently employed at DaVita indicated that "[h]e need[ed] to see a significant enough raise to make the move from DaVita."[143]

- **Some existing employees leverage their strong performance to negotiate better terms with Defendants**. Named Plaintiff Allen Spradling did so successfully in 2009, when he requested, and was granted, a salary increase from SCA, in part based on him being viewed by at least one decision maker as "the most coher[e]nt and reasoned member of the senior IT team."[144] Similarly, an Administrator at USPI in 2014 requested a salary increase, and

---

[141] Email chain from Faisal Rashid (DaVita) to Colleen Arthur (DaVita), "RE: Davita Offer and Next Steps," January 20, 2016, DVA_OMCEAL_001382483–86 at DVA_OMCEAL_001382483–85 ("If I choose to stay with ████████ through the office closure date of early this summer, the company will pay out this cash bonus amounting to ████████ This is a lot to walk away from given it is right around the corner. If a sign-on bonus is an option, I would propose a sign-on bonus of this amount (or less pending what overall value may be included in the relocation package). [...] In order to show good faith and stick to our DaVita policy of paying for performance, we've come up with an additional bonus structure outside of his annual bonus").

[142] Email from Shannon McGarry (USPI) to Marc Steen (USPI), "RE: USPI Employment Offer," February 14, 2018, USPI_CIV_000030396–99 at USPI_CIV_000030396–97 ("Here is what she's asking for now. [...] She currently has five weeks of vacations and wants to negotiate more PTO. [...] We offer three weeks of PTO to new hires. We have adjusted PTO for some candidates but we usually try to meet in the middle. I would suggest going up to maybe four weeks and ████████ ."); Letter from Marc Steen (USPI) to Julianne Christy, February 8, 2018, USPI_CIV_000274099 ("I would like to confirm USPI's desire for you to join our company as the Administrator at Baylor Surgicare at North Dallas.").

[143] Email chain from Peter Blach (USPI) to Shannon Mosley (USPI), "RE: FW: Todd interview with Andy," June 4, 2014, USPI_CIV_000452281–283 at USPI_CIV_000452281; "Offer of Employment Letter to Robert 'Todd' Greene for Administrator at Franklin Surgery Center," USPI, 2014, USPI_CIV_000295492 ("I would like to confirm USPI's desire for you to join our company as the Administrator at Franklin Surgery Center in Franklin, TN.").

[144] "SCA Personnel Action Form — Allen Spradling," SCA, October 23, 2009, SCA000000198–200 at SCA000000200 ("I am inclined to give [Spradling] a raise, as is the most coherant [sic] and reasoned member of the senior IT team and he is also the lowest paid."). See also Email chain from Andrew Hayek (SCA) to Joe Clark (SCA) and Michael Rucker (SCA), "RE: Followup-this morning," August 7, 2015, SCA001284417–18 at SCA001284417 ("The session with ███ went fine, although I think he feels quite strongly about getting to ████████ ████████ I think he's coming from an authentic place, and that he views a ████████████ [...] is inconsistent with his performance (which has been very strong) and a promotion. [...] He (not inappropriately) views himself as producing at a level that is unique [...] I think we probably should proceed with what is on the table ████████████████ ████████ ").

was ultimately granted an additional ███████████ in part because he had "proven to be an asset" at his facility.[145] Another Administrator at USPI in 2018 was considered likely to "negotiate up" her salary offer after being recommended for a promotion to an RVP position.[146] Further, a VP of Business Development at DaVita requested an increase in pay in 2016, which a more-senior employee working on the same team recommended they approve based on him "providing real value" to the organization.[147]

75. The above discussion underscores that pay negotiations are common among proposed class members. There is likely also variation in whether proposed class members choose to negotiate in the first place, and how successful such negotiations would be. For example, a 2020 study by economists Christine Exley, Muriel Niederle, and Lise Vesterlund found that, in a series of laboratory experiments, women tended to "self-select" into pay negotiations if doing so was expected to result in gains for them financially, and avoid pay negotiations if doing so was expected to result in losses.[148] They also found that women with higher negotiating ability were more likely to engage in pay negotiations in the first place and tended to achieve higher returns when they did engage in pay negotiations.[149] Similarly, DaVita's Kent Thiry testified during his deposition that workers differ in terms of their negotiating ability and bargaining position,



---

[145] Email chain from Teresa Danna (USPI) to Cindy English (USPI), "RE: FW: Message from, KMBT_C454," with attachments, January 15, 2014, USPI_CIV_000499023–24 at USPI_CIV_000499023 ("██████████████ ███████████████████████████████████████████████ ██████████████████████████████████").

[146] Email chain from Peter Blach (USPI) to Sandi Karrmann (USPI) and Shannon Mosley (USPI), "RE: Donita stock question," February 28, 2018, USPI_CIV_000272179–182 at USPI_CIV_000272181 ███████████ ███████████████████████████████████████████████████████████ ██████████████).

[147] Email chain from Arthur Colleen (DaVita) to Gary Main (DaVita), "RE: ███████████," with attachments, January 27, 2016, DVA_OMCEAL_001059650–52 at DVA_OMCEAL_001059652 ("My recommendation is that we give ████ a compensation adjustment. [...] ████ is providing real value and now would not be a good time to lose him. I'm raising this compensation issue because I want to be sure we take necessary steps to keep ████ engaged.").

[148] Christine L. Exley, Muriel Niederle, and Lise Vesterlund, "Knowing When to Ask: The Cost of Leaning In," *Journal of Political Economy,* 128(3), 2020, pp. 816–854 ("Exley, Niederle and Vesterlund (2020)") at pp. 818–819 ("When women choose to enter negotiations in the Choice treatment, they largely gain from doing so. [...] [W]e find, from the counterfactual of women always negotiating, that there are no gains from increased negotiations. When given a choice, women already enter negotiation opportunities that result in gains. They only avoid negotiation opportunities that would have resulted in losses. [...] When comparing the financial outcomes from 'self-selected' negotiations that workers choose to enter in the Choice treatment to those from 'non-self-selected' negotiations in the Always treatment, it is clear that women know when to ask and men are not more adept at knowing when to ask than women are.").

[149] Exley, Niederle and Vesterlund (2020), p. 841 ("While female workers with higher [bargaining] ability measures are significantly more likely to enter negotiations [...], male workers with higher [bargaining] ability measures are not [...] [T]hese [bargaining] ability measures are correlated with higher average profits [...] These results therefore suggest that men are not more likely, and if anything appear less likely than women, to positive select on [bargaining] ability.").

noting that: "a junior person is very different than an executive. An executive has a lot of leverage, a lot of sophistication, a lot of options, a lot of negotiating ability. It's a huge difference."[150]

76. Above, I discussed the *first* reason that proposed class members' pay is individualized: pay is negotiated differently from one proposed class member to another. Next, I turn to the *second* reason that proposed class members' pay is highly individualized: **the specific decision makers involved in determining pay vary across proposed class members.** Differences across proposed class members in terms of who decides on their pay lead to another layer of individualized inquiry. Two otherwise-similar employees assigned to different decision makers would potentially see different pay based on differences across decision makers. In discussing the first reason for individualized pay, I cited a number of examples in the record where decision makers negotiated pay with proposed class members. These decision makers additionally exercise pay-setting discretion by assigning merit pay increases or bonuses to the employees they oversee. My review of record evidence reveals this pattern for each Defendant:

- At SCA, an internal email sent in 2018 by a Senior Compensation Manager explained that SCA does not provide "concrete" guidelines to supervisors about how to determine merit pay increases.[151] Similarly, an internal presentation from 2012 described SCA's "[a]pproach" to assigning merit pay increases as "giv[ing] managers discretion to vary merit increases by teammate" and "encourag[ing] merit increase differentiation among high and low performers."[152] In fact, in his deposition testimony, SCA's Michael Rucker noted that SCA encouraged the hundreds of different supervisors involved in determining merit pay increases for SCA's employees to use their discretion to "differentiate the amounts of merit award[s] that were

---

[150] Deposition of Kent Thiry (DaVita), August 16, 2024 ("Thiry (DaVita) Deposition"), p. 257 ("[A] junior person is very different than an executive. An executive has a lot of leverage, a lot of sophistication, a lot of options, a lot of negotiating ability. It's a huge difference.").

[151] Email from Kevin Zaiderman (SCA) to Suzanne Rogers (SCA), "Comp Analysis," with attachments, February 8, 2018, SCA000075527–28 at SCA000075527, ("I have conducted a large number of comp analyses for managers. Managers are making these requests as advocates for their teammates to ensure they are aligned with the external competitive marketplace. Now, we do not have a traditional merit matrix for the merit process nor do we provide more concrete guidelines around how to determine a merit increase for teammates with successful performance. As a result, I have advised and guided these managers towards best practice which recommends they consider the teammate's current pay position compared to the external marketplace in conjunction with their performance rating when making a merit recommendation.").

[152] "SCA Compensation Committee Meeting," March 6, 2012, SCA000641812 at p. 10.

being made from one employee to the other."[153] More generally, SCA's Bridie Fanning testified in her deposition that "anyone gets involved in compensation for their own direct team" at SCA, to the extent that even relatively junior Directors and Managers play a role in setting pay for the team members they oversee.[154]

- Similarly, at USPI, internal email exchanges from 2014 and 2015 contain examples of supervisors making discretionary adjustments to certain proposed class members' merit pay increases based on their strong performance or to match an outside offer.[155] In line with these examples, USPI's Sandi Karrmann testified in her deposition that individual managers at USPI had discretion to set merit pay increases for the employees they oversaw, subject to remaining within their overall budget.[156]

---

[153] Deposition of Michael Rucker (SCA), August 27, 2024 ("Rucker (SCA) Deposition"), pp. 344–345 ("Q. And once a merit pool percentage is set, how is it determined -- how is base pay or changes in base pay compensation actually set after that point? A. So -- so once the merit pool is established, the pool is divided to parts of the business to be distributed individually, and we made it a practice to encourage our leaders to differentiate the amounts of merit award that were being made from one employee to the other. Q. And was that differentiation based on performance? A. Yes. Q. So, in a given year, did some people receive more than the average merit pool -- A. Yes. Q. -- budget percentage? [...] Q. And did others receive no increase in their salary? A. Yes. [...] Q. And were these merit increases decided by -- how -- who decided the actual -- like who decided whether a particular employee would -- what their increase would be? [...] A. Their individual supervisor. Q. Okay. And how many supervisors -- how many distinct supervisors across SCA would be involved in deciding compensation? A. Oh, gosh. Hundreds."). See also Deposition of Brian Mathis (SCA), September 20, 2024 ("Mathis (SCA) Deposition"), p. 247 ("Q. How in your experience are merit increases at SCA differentiated? A. They would be differentiated based on performance of the individual and the competitive nature of that role and the specifics of the market that the individual was in.").

[154] Fanning (SCA) Deposition, pp. 169–170 ("[A]nyone gets involved in compensation for their own direct team. [...] So directors would set pay. You'd even find managers setting pay for their teams. Lots of people would set pay at all different levels [...] Very few people have absolute authority.").

[155] Email chain from Mark McCormick (USPI) to Teresa Danna (USPI), "RE: Corporate Salary Increases - Nov 2014_Garvin_Danna (Due by Mon 10/20)," with attachment, October 20, 2014, USPI_CIV_000689431 ("I added proposed increases for ▮▮▮▮▮▮▮ to the truncated file you sent me. Variance is based on performance."); Email chain from Alex Bateman (USPI) to Cindy English (USPI), "RE: PLEASE RESPOND: Administrator Increase Questions Ellinger & Bray — JOHNSTONBATEMAN," February 2, 2015, USPI_CIV_000650633–36 at USPI_CIV_000650634 ("▮▮▮▮ [, an administrator,] was bumped up to match an outside offer — we had to keep him. [...] ▮▮▮▮▮▮▮▮▮ [, an administrator,] was given a big increase also — we started her low with strategy to bring her up if she is doing well").

[156] Karrmann (USPI) Deposition", pp. 43–44 ("RVPs would make recommendations [on merit increases] for their administrators, review with their market presidents. They're also reviewing with their physician owners in the centers to get feedback and input. All of that rolled up to us at the center. I reviewed it, as did Bill, Brett, and Jason."), pp. 45–47 ("Q. And in this email you say, it's that time of year for pay increases for VPs and above. We are targeting 2 percent for all increases, so as you assess and pull together recommendations for your team, please use 2 percent as your overall raise budget. So this is what we were discussing before. The 2 percent increase was set for the company and then individual managers had some discretion to individualize increases within that 2 percent budget; correct? [...] A. Yes. [...] Q. And the process then would be the managers would return their proposed recommendations and those would be reviewed by you, Bill, and Jason for final approval; is that correct? A. Correct."). See also Email chain from Mark Kopser (USPI) to Cindy English (USPI), "Re: Salary Adjustment Considerations — Wilcox (Nov 2010)," October 21, 2010, USPI_CIV_000147704–706 at USPI_CIV_000147704 ("Looking at the final spreadsheet for the November 2009 increases, many returned the spreadsheets requesting varying increase percentages with explanations for the increase requested. John presented those for final approval and then submitted for processing, so there was not an across the board 2% increase for everyone last year. [...] Bill wants to make sure managers use their heads and give some people 4 and others 0[.]"); Email from Cindy English (USPI) to Jonathan Bond (USPI), "Administrator Salary Considerations

- Further, at DaVita, an internal presentation from 2011 discussing the 2012 merit pool explained that "not everyone is guaranteed a merit increase," and noted that "[a]s leaders, we have to differentiate based on factors such as outstanding performance, facility needs, team needs, retention needs and internal equity."[157] Another internal presentation from 2018 discussing the results of a compensation risk assessment conducted by a third party firm explained that the bonus pool at DaVita is calculated based on firm and group performance, and then leaders within each group are tasked with allocating bonuses to their employees based on their individual performance.[158] DaVita's Colleen Arthur further testified that, as part of DaVita's pay-setting process, "individual leaders would [...] make recommendations for the people on their teams related to the annual compensation process."[159] DaVita's Mike Staffieri similarly testified that, during the Class Period, there was no formalized or clear process for how leaders allocated their compensation budgets among the employees who worked under them.[160]

---

— BOND — Nov 2012," October 11, 2012, USPI_CIV_000810697; "Year End Performance Review Process," USPI, December 2014, USPI_CIV_000056611–43 at USPI_CIV_000056620; Email chain from Mark Garvin (USPI) to John Wellik (USPI), "Preliminary bonus calculations – Garvin," February 23, 2013, USPI_CIV_000045232–33 at USPI_CIV_000045232; Email chain from Alex Bateman (USPI) to Cindy English (USPI)., "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Johnston-Bateman (Due by Friday, February 6, 2015)," February 6, 2015, USPI_CIV_000039752–53 at USPI_CIV_000039752; "Base Salary – Proposed Increases Effective 3/1/15 – Alpha by EVP/SVP," USPI, January 1, 2015, USPI_CIV_000039754; Email chain from John Wellik (USPI) to Andy Johnston (USPI), "Re: Preliminary bonus calculations – Johnston – 2/27," March 6, 2013, USPI_CIV_000040585–87 at USPI_CIV_000040586; Email chain from Andy Johnston (USPI) to Teresa Danna (USPI), "Re: Administrator Salary Considerations – JOHNSTON – Danna – Nov 2012," October 19, 2012, USPI_CIV_000044404–405 at USPI_CIV_000044404; Email chain from Mark Garvin (USPI) to Peggy Wellmann (USPI) et al., "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Garvin-Wellman (Due by Friday, February 6, 2015)," February 9, 2015, USPI_CIV_000045211–12 at USPI_CIV_000045211.

[157] "Palmer Meeting," October 10, 2011, DVA_OMCEAL_001399746–74 at DVA_OMCEAL_001399774 ("A team may be made up of solid performers; however, not everyone is guaranteed a merit increase. As leaders we have to differentiate based on factors such as outstanding performance, facility needs, team needs, retention needs and internal equity. [...] We recommend that you use your merit pool to reward your highest performers and/or rectify potential pay inequities within your team. This means that some teammates will receive a lower percentage or potentially no increase at all, nor an increase in every year.").

[158] "Compensation Risk Assessment – Part 2: Broad-Based Employee Programs," April 17, 2018, DVA_OMCEAL_001344570–82 at DVA_OMCEAL_001344575 ("Bonus is accrued as a pool based on Company and group performance and allocated between groups based on relative performance among groups [...] Each group leader then allocates bonus pool to employees based on individual performance [...] HR analyzes all allocations and notes ones that are not aligned with performance reviews [...] Allocations are reviewed closely by the executive in charge of the group for VPs as well as for outliers noted by HR").

[159] Deposition of Colleen Arthur (DaVita), May 23, 2024 ("Arthur (DaVita) Deposition"), pp. 39–40 ("[I]ndividual leaders would go into the system and make recommendations for the people on their teams related to the annual compensation process [...] Leaders were also able to review decisions and make changes, so there was some functionality of changing recommendations or approving recommendations. Q. By 'leaders,' do you mean managers or somebody at a higher level? A. Both.").

[160] Staffieri (DaVita) Deposition, pp. 150–152 ("[B]efore 2021, there was no normal. You know this is kind of normal, which is there was a lot of chaos in how compensation was done at DaVita. [...] Q. So the process that determined how much a decision maker had, the -- how much money that decision maker had to distribute to the people under her, that was formalized and pretty clear. But how that decision-maker allocated the money as between -- as among the people under her, that was less clear? [...] A. Yes.").

77. A third reason that proposed class members' pay is highly individualized is that **Defendants condition many components of proposed class members' pay on individual performance, resulting in additional variation in compensation across the proposed class**. Individual performance plays a central role in Defendants' pay decisions. For example, a set of internal talking points from 2018 describing DaVita's pay practices explains that "[p]erformance is the first consideration when making pay decisions," such that "[o]ver time a top performer should earn substantially more" than other employees.[161] Similarly, an internal presentation from 2016 discussing total compensation at SCA explains that "[SCA's] total compensation philosophy aligns pay and performance."[162] Further, DaVita's Colleen Arthur testified that "there was a strong philosophy to pay for performance" when she worked at DaVita.[163] SCA's Walter Cinnick testified that "there was a strong connection between real work, real deliverables, and the pay that people would receive" at SCA.[164] Both USPI's Sandi Karrmann and SCA's Jennifer Sandoz testified that performance was one of several factors that their employers considered when setting pay for proposed class members.[165]

---

[161] Email chain from Colleen Arthur (DaVita) to Carley St. Clair (DaVita), "RE: Comp FAQs talking pts," with attachments, July 10, 2018, DVA_OMCEAL_001322030–34 at DVA_OMCEAL_001322034.

[162] "SCA 2016 Total Compensation," SCA, March 2016, SCA001159728–48 at SCA001159729.

[163] Arthur (DaVita) Deposition, p. 52 ("Generally, when I was at DaVita, there was a strong philosophy to pay for performance.").

[164] Deposition of Warren Joseph Cinnick (SCA), November 22, 2024 ("Cinnick (SCA) Deposition"), p. 46 ("SCA, particularly, like, was a place that was based on merit. In fact, in my 40-year career we've been talking about, only at General Electric did I see a place that was so meritoriously-based, where there was a strong connection between real work, real deliverables, and the pay that people would receive."). See also Kilgore (SCA) Deposition, pp. 102–103 ("And to that point, if you're divvying up the pool [...] those that are underperforming and get very little [increase] are going to probably start to see variation to the competition. And if they choose to leave, that's okay because they're underperformers. By leveraging a meritorious environment, you're putting your money behind your best performers because you do want them to be at or higher than the market.").

[165] Karrmann (USPI) Deposition, p. 39 ("For administrators and above, we did not have established salary ranges. We evaluated performance of centers, performance of the individuals. And based on marketplace changes and cost of labor, we looked at those different factors and determined salary increases and compensation for administrators and above."); Deposition of Jennifer Sandoz, Volume I (SCA), September 26, 2024 ("Sandoz (SCA) Deposition, Volume I"), pp. 54–55 ("Q. And so, broadly, as part of compensation analysis either for the annual process or for individual or selected teammates, what factors did SCA consider when determining an employee's compensation? A. It was a variety of factors that might include their performance, how long they've been in the role, any particular knowledge, skills, and abilities that they might have that contribute to that role, the scope of the role, the scale or impact of the role would also have been considered."). USPI evaluates employees' performance according to a Performance Management Plan ("PMP"), which assigns ratings to individual employees. See "USPI Performance Management Strategy," USPI, USPI_CIV_000037627–29 at USPI_CIV_000037627 ("The overall purpose of USPI's Performance Management Plan (PMP) is to align individual performance to the company's business objectives. [...] This plan provides a supportive work environment to help our employees achieved [sic] their goals."); "Brett Brodnax Personal Objectives," USPI, January 2009, USPI_CIV_000034853–54 at USPI_CIV_000034853 ("Enhance the effectiveness of the Performance Management Plan process by working to improve the quality of the interaction during the PMP meetings."). Many components of proposed class members' pay at USPI, including salary, bonuses, and equity pay, depend on these performance ratings specifically, and on individual performance generally. See Memo from Bill Wilcox (USPI) to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041648 ("Payment of PMP bonuses will be calculated separate for the USPI performance

78. A special example of Defendants' pay-for-performance strategy that is particularly relevant for proposed class members involves equity compensation (i.e., compensation awarded in the form of stock shares or stock options). Equity compensation is particularly common for more senior level positions.[166] From an economic perspective, ideal employee compensation reflects employee performance. From this perspective, equity compensation is anomalous: people dislike risk, and rewarding an employee with equity compensation saddles them with risk. The economics literature describes, however, that for some employees sufficiently high in the organization, equity compensation is expected, because the value of aligning firm incentives and employee incentives outweighs the inefficiency of giving employees risk they dislike.[167]

79. Defendants' pay-for-performance approach is also consistent with broader trends documented in the economics literature. A 2007 study by Edward Lazear and Katherine Shaw concluded that pay has become more variable across U.S. workers over time, in part because firms have shifted toward a pay-for-

---

calculation, with payment of PMP bonuses still being subject to USPI having positive year-over-year organic EBITDA performance."); "Minutes: USPI Holding Company, Inc. Compensation Committee Meeting," USPI, March 8, 2017, USPI_CIV_000023134–45 at USPI_CIV_000023144–145; "Unanimous Written Consent of the Compensation Committee of the Board of Directors," USPI, February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467450. See also "2015 Bonus Plan Regional Vice President," USPI, 2015, USPI_CIV_000152743 ("Individual Objectives (PMPs) [...] Weight: % Target: 20%"); "Tenet HR Committee USPI Compensation Overview," USPI, November 4, 2015, USPI_CIV_000024185 at p. 2 ("Base salary and bonus: Performance-driven"); "USPI Group Holdings, Inc. 2007 Equity Incentive Plan," USPI, 2007, USPI_CIV_000336973–85 at USPI_CIV_000336974 ("The Administrator will select Participants from among those key Employees and directors of, and consultant and advisors to, the Company or its Affiliates who, in the opinion of the Administrator, are in a position to make a significant contribution to the success of the Company and its Affiliates."); "Resolutions of Compensation Committee of USPI Holding Company, Inc.," USPI, November 13, 2016," USPI_CIV_000068808–21 at USPI_CIV_000068815 ("A discretionary positive or negative bonus adjustment may apply to reflect any eligible employee's performance related to areas such as quality, ethics, accreditation, licensure and compliance issues or noteworthy accomplishments."). Pay varies across proposed class members at USPI, which may in part reflect varying performance. See Memo from Bill Wilcox to Option and Compensation Committee, "Request for Approval," June 25, 2013, USPI_CIV_000121836–40 at USPI_CIV_000121836 ("The average increase for all (~100) vice presidents and above (ignoring promotions) is 2.3%. This amount goes to 3.0% taking into account promotions and special considerations."); "Minutes: United Surgical Partners International, Inc. Compensation Committee Meeting," USPI, May 3, 2011, USPI_CIV_000890968–76 at USPI_CIV_00890971.

[166] I demonstrate that this is the case later in this section. See e.g., Exhibit 11.

[167] See e.g. Edward P. Lazear and Paul Oyer, "Personnel Economics," *The Handbook of Organizational Economics*, ed. Robert Gibbons and John Roberts (Princeton, N.J.: Princeton University Press, 2013), pp. 479–519 at p. 502 ("[P]erhaps the most important justification for equity-based pay is to generate incentives. This explanation is likely to apply in small firms or among very high-level managers at large firms. These employees can have an important impact on the firm's value, and the incentive effects of ownership can outweigh the inefficiency in asking these employees to bear the risk of factors beyond their control that affect firm value."). The economics literature has also found that deferred compensation could "may induce a worker to perform at a higher level of effort." Equity pay is one such form of deferred compensation. See Edward Lazear, "Why Is There Mandatory Retirement?" *Journal of Political Economy*, 87(6), 1973, pp. 1261–1284 at p. 1264.

performance approach (which generates larger differences in pay between high and low performers).[168]

80. Before proceeding, it is important to note that Prof. Gerhart claims in his report that a "pay-for-performance" strategy is *not inconsistent* with internal equity, and in turn is not inconsistent with Plaintiffs' claimed rigid pay structures. He argues that performance is simply another factor (similar to job title or years of experience) that Defendants can condition on within their structured compensation systems.[169] However, this, too, is individualized: a "pay-for-performance" strategy creates a tension between internal equity and market forces that Defendants are likely to resolve differently from one another, or differently for different workers.

81. To make this more concrete, consider a hypothetical example. Suppose I accept Prof. Gerhart's claim that, as part of their rigid pay structures, Defendants used job-specific pay ranges or grades to set pay (even though, as I show in Section 2.2.3, evidence in this matter indicates that Defendants did not have job-specific pay ranges or grades for class positions throughout the Class Period).[170] Further suppose a top performer attempts to negotiate pay higher than what the pay range or grade to which they are assigned based on their job title and annual performance rating would allow (i.e., because there are individualized components of their performance that cannot be captured by an annual performance rating, but that Defendants and competing employers value). The employer suspects the top performer could seek employment elsewhere and command a higher salary. The employer must then decide whether to respond to those latent competitive forces by granting the requested pay increase, or to prioritize internal equity by not agreeing to the pay increase. If the top performer avails herself of outside options, then the employer prioritizing internal equity risks losing the top performer to another firm.

---

[168] Edward P. Lazear and Kathryn L. Shaw, "Personnel Economics: The Economist's View of Human Resources," *Journal of Economic Perspectives*, 21(4), 2007, pp. 91–114 at p. 92 ("The rising variance of pay across individuals surely reflects changing demand for skills, but also is likely to reflect changes in human resource practices. Compensation has shifted towards pay-for-performance. The proportion of employees' pay that comes from bonuses rather than from base salary has increased. [...] [T]he share of large firms that have more than 20 percent of their workforce working with some form of individual incentives, like a performance bonus, has grown from 38 percent to 67 percent. The percent of firms using any form of 'gain-sharing' or group-based incentives has grown from 26 percent to 53 percent.").

[169] Gerhart Report, Section VII.D, ¶ 135 ("Internal Equity and Pay for Performance Are Not Mutually Exclusive. [...] Defendants' Practices Account For Equity and Performance.").

[170] Gerhart Report, ¶ 114 ("The evidence I have reviewed shows that Defendant firms implemented the foregoing principles and created salary grades and ranges and is common to the Class.").

82. Turning from this hypothetical to the Defendants in this matter, it is not clear why faced with such a choice, the three Defendant firms would make the same decision as each other. Similarly, it is not clear why any one Defendant faced with such a choice for one employee would make the same decision for another employee. These considerations undercut the idea that a rigid pay structure based on internal equity considerations is tenable. Market forces would persistently chip away at such a structure in ways that are inherently individualized, as high performers seek outside options or, in negotiation with their incumbent firm, point to their ability to do so.

83. A fourth reason pay for proposed class members is highly individualized is that **Defendants make adjustments to proposed class members' pay based on differences in skills, and in the demand for those skills, across workers**. For example, Named Plaintiff Allen Spradling testified that it was "probable" that SCA considered matching job offers made to IT employees by competing firms during his tenure at SCA, as IT skills were "very in demand and transferable" during this period.[171] Consistent with Allen Spradling's testimony, there are several examples in the record where Defendants issued retention and signing bonuses during the Class Period to groups of proposed class members, or even to individual workers, whose skills were in high demand. An internal email from 2014 shows that SCA issued retention bonuses to three proposed class members, following the departure of another employee in their group.[172] Another internal email chain from 2014 shows that USPI offered a promotion and an enhanced compensation plan (which included an equity award) to a proposed class member who USPI was worried they would lose to another firm.[173] Turning to DaVita, Michael Staffieri testified that DaVita

---

[171] Spradling (Named Plaintiff) Deposition, pp. 123–125 ("It is highly possible that during my tenure at SCA – not possible, probable that someone had an offer from another company and SCA considered matching it. Almost guaranteed that happened [...] Q. Sure, sure. And why are you so confident that that's something that would have happened? [...] A. The – the IT skill set is very in demand and transferable, so in general IT resources are constantly reassessing their value to the market, so to speak, and as a result of that, opportunities present themselves.").

[172] Email from Jason Strauss (SCA) to Jeff Fields (SCA) and Leslie Wachsman (SCA), "RE: Notable Forecasting Items Northern California – Retention Agreements," July 22, 2014, SCA000091011, ("[W]e have entered into retention agreements with ███████████████████████████ given ██████ recent departure. The bonuses are contingent upon them being employed in good standing in January"); Email from Peter Clemens (SCA) to Julie Smith (SCA) et al., "RE: Retention Pay," January 29, 2015, SCA001117010–13 at SCA001117010 ("For ██████████████, we put the retention agreements in place as we believed them to be flight risks. For ████ we did not put a retention agreement in place as she was not a flight risk; however, made the commitment to give her a bonus at the same time as the retention payments to ██████████████ for stepping into the new role and the additional workload, travel requirements, etc. that she was taking on.").

[173] Email chain from Bill Wilcox (USPI) to Brett Brodnax (USPI), "Re: ████████████ Draft Offer Letter and Compensation Plan," November 15, 2014, USPI_CIV_000401250–54 at USPI_CIV_000401250 ("Bill, we're trying to put together an offer to keep ██████████████ [...] We're all afraid we'll lose him if we don't offer him something different from what he's doing now [...] I think he should get options equivalent to others in similar position but on low end until we know he has skills for this position."). See also Memo from Bill Wilcox (USPI) to

could and did offer higher base pay, increased bonuses, and increased equity awards to retain specific employees who were being recruited by a competing firm. Further, Staffieri noted that DaVita had "a long list" of other options it could turn to if facing a retention battle with a competitor for talent.[174]

84. Finally, a fifth reason pay is individualized for proposed class members is that **Defendants offer many different types of pay that depend on different factors, and the proportion of total compensation that each type of pay represents can vary substantially across workers.** Exhibit 11 demonstrates the variation in the types of pay that feed into total compensation across proposed class members, focusing on DaVita only. SCA and USPI are excluded from the analysis because structured data on equity pay at the time of issuance is only available for DaVita.[175] While there is some data on equity pay at SCA and USPI, it does not reflect the value of equity at the time it is issued by Defendants to employees as part of a total compensation package.[176] Rather it reflects equity when it vests, or is exercised or sold by,

Arie Burke (USPI), July 16, 2014, USPI_CIV_000044881–83 at USPI_CIV_000044881 ("Your expertise, efforts and leadership are key to our future. To appropriately recognize and reward you, and to position you better to benefit from USPI's future success, we are granting additional equity to you […] This equity will vest over four years at ▮▮▮▮▮▮▮▮▮▮▮▮ respectively. The ▮▮▮▮▮▮▮▮▮▮▮▮▮ is a retention incentive."), USPI_CIV_000044883 ("These are one-time grants for our 'difference makers.'").

[174] Staffieri (DaVita) Deposition, pp. 120–121 ("Q. All right. What are the options available to DaVita on the compensation front to retain an employee who is being recruited by a competitor? A. I think that that would be a long list. Is there any-- Q. Well, for example, could DaVita increase the base pay of the employees being recruited to retain that employee? A. Yes. Q. Could DaVita increase the bonuses that that employee would receive? A. Yes. Q. Could DaVita increase the stock award to the employee? A. Yes. Q. Has DaVita, in fact, done each of these things in different situations to retain employees who are being recruited? A. Yes.").

[175] The available data on equity pay for SCA and USPI comes from payroll records. Payroll records reflect income that is reportable for tax purposes (i.e., income that must be reported on an employee's W-2 tax form) and that appears on an employee's paycheck. Restricted stock units, stock grants, and stock options become taxable income at the time of vesting, or at the time of sale or exercise by the employee, depending on the type of equity. See Turbotax, "How to Report RSUs or Stock Grants on Your Tax Return," February 18, 2025, available at https://turbotax.intuit.com/tax-tips/investments-and-taxes/how-to-report-rsus-or-stock-grants-on-your-tax-return/L55yZieuO, accessed on April 11, 2025; Fidelity Investments, "How equity compensation and stock purchase plans are taxed," available at https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/fidelity/equity-compensation-tax-treatment-guidelines.pdf,accessed on April 11, 2025; Intuit Quickbooks, "Payroll records: What are they and why do you need them?," January 22, 2020, available at https://quickbooks.intuit.com/r/payroll/payroll-records/, accessed on April 11, 2025.

[176] DaVita has been a publicly-held company since their initial public offering in 1995. SCA was founded in 2007 as a privately-held company, but later became publicly-held following their initial public offering in 2013. They were acquired by Optum (part of UnitedHealth), a publicly-held company, in 2017. USPI was a publicly-held company from their initial public offering in 2001 to 2007, at which point they were purchased by a private equity firm and became privately-held. They were later acquired by Tenet, a publicly-listed company, in 2018. See Total Renal Care Holdings, Inc., SEC Form 10-K for period ended December 31, 1998, filed on October 8, 1999, p. 40 ("We raised additional capital to fund the continuation of our growth strategy through an initial public offering, or IPO, in October 1995"); "Total Renal Care Holdings, Inc. Announces Legal Name Change to DaVita Inc.," DaVita, October 9, 2000, available at https://investors.davita.com/2000-10-04-Total-Renal-Care-Holdings-Inc-Announces-Legal-Name-Change-to-DaVita-Inc, accessed on April 10, 2025; Reuters, "HealthSouth to Sell Surgery Unit for $945 Mln," August 9, 2007, available at https://www.reuters.com/article/business/healthsouth-to-sell-surgery-unit-for-945-mln-idUSN26342795/ , accessed on April 15, 2025; GlobeNewsWire, "Surgical Care Affiliated Announces Closing of its Initial Public

proposed class members which conflates employer conduct (with respect to compensation setting) with vesting schedules, employee behavior, and changes in the market value of the equity more generally. Exhibit 11, focusing on DaVita, shows that equity pay and bonuses account for a larger share of total compensation for more-senior workers (the expected pattern): for example, equity pay and bonuses account for 43% and 25% of total compensation, respectively, for SVPs, compared to 5% and 14% of total compensation for Directors. The same exhibit shows that pay composition is complex. Even for the least-senior DaVita workers in the proposed class, Directors, only three-quarters of total compensation is salary; fully one-quarter is non-salary compensation such as bonus pay, equity awards, or other types of pay.

Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares," November 4, 2013, available at https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-to-Purchase-Additional-Shares.html, accessed on April 10, 2025; GlobeNewsWire, "Surgical Care Affiliates (SCA), OptumCare to Combine," January 9, 2017, available at https://www.globenewswire.com/news-release/2017/01/09/904294/28633/en/Surgical-Care-Affiliates-SCA-OptumCare-to-Combine.html, accessed on April 10, 2025; "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," *CNBC,* January 8, 2007, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 10, 2025; United Surgical Partners International, Inc., SEC Form Schedule 14A, 2007, p. 15 ("USPI's initial public offering was in 2001"); Tenet Health, "Tenet Completes Purchase of USPI from WCAS," April 26, 2018, available at https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx, accessed on April 10, 2025.

**EXHIBIT 11**
**DaVita Proposed Class Members' Compensation Mix Varies by Seniority Level**



Source: Corrected Starr Data

Note: The exhibit shows the share of annual total pay with adjusted equity that is regular pay, PTO, bonus, equity, or other pay for proposed class members at DaVita between 2008 and 2019. Adjusted equity reflects equity at time of issuance for DaVita. Pay in each year is adjusted for inflation and presented in 2019 dollars. This exhibit reflects DaVita only, since information on equity pay at the time of issuance is only available for DaVita.

85. While I cannot perform the same analysis for SCA and USPI, the available qualitative and quantitative evidence indicates that similar patterns hold for both Defendants.

- For SCA, internal spreadsheets generated during the Class Period contain "Total Rewards Statements" that describe the various components of total compensation for Directors, Senior Directors, VPs, and SVPs in 2014 and 2015.[177] These spreadsheets show that equity pay and bonuses account for an increasing (and substantial) share of total compensation for more-senior workers. For Directors and Senior Directors, equity pay accounts for between 2% and 4% of total compensation (as measured by the sum of salary, bonuses, and equity pay), while bonuses account for between 17% and 19% of total compensation. In contrast, for VPs and SVPs, equity pay accounts for between 25% and 28% of total compensation, while bonuses account

---

[177] "Total Rewards Statement for 2016," March 8, 2016, BF000233732; "Total Rewards Statement for 2015," August 8, 2015, SCA001478736.

for between 20% and 22% of total compensation.[178] These data align with Bridie Fanning's deposition testimony that "[e]quity for more senior executives [at SCA] is a big part of their pay," and with a 2016 internal presentation on total compensation, which noted that "[a]s your leadership responsibilities grow, your portion of overall compensation 'at risk' generally grows."[179]

- For USPI, the structured data contain a measure of equity pay at the time that it vests, or is exercised or sold by, the employee.[180] While I explained above that equity at the time of issuance is the appropriate measure for the purposes of understanding the share of total compensation that equity accounts for in terms of employer compensation decisions, equity pay at the time that it vests, or is exercised or sold by, the employee can still provide some information about the importance of equity for proposed class members employed by USPI. When I analyze this share for USPI using the value of equity pay at the time that it vests, is exercised, or is sold, instead of at the time that it is issued, I find that that equity pay (and bonuses) account for a larger share of total compensation for more-senior workers: for example, equity pay and bonuses account for 9.2% and 20.7% of total compensation, respectively, for SVPs, compared to 0.5% and 7.8% of total compensation for Directors.[181]

86. Further, internal emails during the Class Period demonstrate variation across proposed class members in pay composition as a result of pay negotiations. These internal emails show that while some negotiations related to salaries, others involved signing bonuses, equity compensation, tuition reimbursement, and relocation packages.[182]

---

[178] Workpaper 6.

[179] Fanning (SCA) Deposition, p. 169 ("Equity for more senior executives [at SCA] is a big part of their pay"); "SCA 2016 Total Compensation," SCA, March 2016, SCA001159728–48 at SCA001159734 ("As your leadership responsibilities grow, your portion of overall compensation 'at risk' generally grows").

[180] I compared documents describing equity awards at USPI to the structured data, and I confirmed that the structured data for USPI do not record equity at time of issuance. See Email chain from Alex Jenkins (USPI) to Andy Johnston (USPI), "FW: Grant of Stock Options," USPI_CIV_000337004–7005; Email from Alex Jenkins (USPI) to Paula Baldwin (USPI) et al., "Stock Option Grant & Agreement Dated July 14, 2017 (Paula Baldwin)," USPI_CIV_000231289–90; Email chain from Jeffrey Andrews (USPI) to broncojeff16@gmail.com, "FW: Grant of Stock Options," September 19, 2016, USPI_CIV_000701723–24; Email from Alex Jenkins (USPI) to Kelly Barker (USPI), "Stock Option Grant & Agreement Dated July 14, 2017 (Kelly Barker)," July 19, 2017, USPI_CIV_000314724–25.

[181] Workpaper 7.

[182] Email chain from Joe Clark (SCA) to Bridie Fanning (SCA) et al., "RE: 16 02 17–Drekhoff recap," February 20, 2016, SCA000900508–10 at SCA000900509 ("[W]here Andrew and I came out was to sweeten the offer we made which is pasted in below with a ▮▮▮ signing bonus and increase in the LTI of ▮▮▮ which steps the offer

87. The discussion of these five basic facts above highlights the individualized nature of Defendants' pay-setting processes. These facts mean that contrary to Plaintiffs' experts' claims regarding rigid pay structures, a decrease in pay for some employees *does not necessarily imply* a similar decrease in pay for all other employees. Aside from these five basic facts, the idea of pay being set based on rigid pay structures is especially implausible in light of the high-level nature of the employees in the proposed class. Numerous studies in economics have shown that pay dispersion is largest among high-level employees with more years of education and experience,[183] in part due to variation in individual and firm level factors among these employees, such as the amount of on-the-job training they receive; their firm's size and performance; and their negotiating ability.[184] Further, because managerial performance is difficult to observe and

---

up from █████████"); Email chain from Warren Cinnick (SCA) to Jennifer Sandoz (SCA), "RE: Craig's final offer," February 6, 2018, SCA000532931–33 at SCA000532931–33 ("Scott believes he is excited, but was a little disappointed with the base, hoping to be closer to the ████ [...] [H]e is hoping to split the difference and get the base to █████ [...] I think we should go back with █████ in equity, and/or we can split that with cash and equity if he wants a balance."); Email chain from Tim Buono (SCA) to Christian Ellison (SCA) and Brian Mathis (SCA), "RE: Personnel – Need feedback this afternoon, if at all possible," April 7, 2017, SCA001129757–58 at SCA001129758, ("[M]y recommendation is as follows: [...] Offer to explore and advocate tuition reimbursement within confines of Optum/SCA policies."); Staffieri (DaVita) Deposition, p. 121 ("Q. Well, for example, could DaVita increase the base pay of the employees being recruited to retain that employee? A. Yes. Q. Could DaVita increase the bonuses that that employee would receive? A. Yes. Q. Could DaVita increase the stock award to the employee? A. Yes. Q. Has DaVita, in fact, done each of these things in different situations to retain employees who are being recruited? A. Yes."); Email chain from Faisal Rashid (DaVita) to Colleen Arthur (DaVita), "RE: Davita Offer and Next Steps," January 20, 2016, DVA_OMCEAL_001382483–86 at DVA_OMCEAL_001382483, ("We also have two additional options that you could present to JR: [...] Enhanced relo package: 1 visit to look for housing, paid move, and 6 months paid rent (up to █████████"); Email chain from Bill Wilcox (USPI) to Brett Brodnax (USPI), "Re: ██████████ Draft Offer Letter and Compensation Plan," November 15, 2014, USPI_CIV_000401250–54 at USPI_CIV_000401251, ("He knows others have gotten equity and he's been here a long time. I think we need to include some options in his offer. We don't want to lose █████"); Email chain from Shannon Mosley (USPI) to Andy Johnston (USPI), "RE: ██████████ Offer Ltr 01142014.docx.," January 14, 2014, USPI_CIV_000338903–04 at USPI_CIV_000338903, ("What is her deal on tuition with her current employer? [...] She told me █████████████████████ [...] Perhaps we should match the offer then? █████████████████████ [...] Agree, I'll type that up and send."); Email chain from Brett Brodnax (USPI) to Sandi Karrmann (USPI), "RE: ██████████ Offer Letter 4 2016," April 19, 2016, USPI_CIV_000900796–801 at USPI_CIV_000900801 ("One note – she prefers to come in to the Brentwood office ██████████████████████████████████ █████████ I don't think we'd be opposed to that since she will likely be traveling quite a bit.").

[183] Thomas Lemieux, "Increasing Residual Wage Inequality: Composition Effects, Noisy Data, or Rising Demand for Skill?," *American Economic Review,* 96(3), 2006, pp. 461–498 ("Lemieux (2006)") at p. 462 ("Wage dispersion among narrowly defined groups of workers is substantially larger for older and more educated workers than for younger and less-educated work[ers]."), p. 465 ("There is pervasive evidence of heteroskedasticity in wages, however. For example, Mincer (1974) and more recently Chay and Lee (2000) show that the variance of wages generally grows with both education and labor market experience.").

[184] Lemieux (2006), p. 466 ("In particular, Mincer (1974) argues that wage dispersion increases as a function of experience (past the overtaking point) because of differential investments in on-the-job training (OJT). In other words, inequality in the distribution of unobserved skills (OJT) increases with experience."); George-Levi Gayle and Robert A. Miller, "Has Moral Hazard Become a More Important Factor in Managerial Compensation?," *American Economic Review*, 99(5), 2009, pp. 1740–1769 at p. 1740 ("[T]he market for managers has become more differentiated, increasing the premium paid to managers of large versus small firms. [...] Executive compensation is tied instead to various indicators of managerial effort, such as the firm's performance."); Exley, Niederle and Vesterlund (2020), p. 841 ("While female workers with higher [bargaining] ability measures are significantly more likely to enter negotiations [...], male workers with higher [bargaining] ability measures are not [...] [T]hese [bargaining] ability measures are correlated with higher average profits [...] These results therefore suggest that men are not more likely, and if anything appear less likely than women, to positive select on [bargaining] ability.").

monitor, the economics literature has found that firms often pay high-level employees in accordance with their relative performance (rather than according to absolute performance standards), which leads to a wider range of pay among employees in similar jobs.[185]

### 2.2.2. Empirical Analysis is Inconsistent with Plaintiffs' Claimed Rigid Pay Structures and Consistent with Proposed Class Members' Pay Being Individualized

88. I next turn to a discussion of the empirical implications of rigid pay structures and describe tests I conducted to assess whether Defendants' compensation is consistent with rigid pay structures. These tests demonstrate that pay is highly individualized. I also show that Prof. Starr's empirical analyses that he claims are evidence of rigid pay structures are uninformative. Making simple corrections to Prof. Starr's methodology to better align the tests with what Prof. Starr purports to be testing belies rigid pay structures.

### a) Empirical Analysis is Inconsistent with Defendants Setting Pay Based on Rigid Pay Structures

89. As an initial matter, Plaintiffs' experts assert that Defendants set pay according to rigid pay structures. As a result, they claim the alleged conduct generates "cascading" effects on proposed class members' pay, primarily through two mechanisms:[186]

- **First, Plaintiffs' experts claim that any pay suppression for a worker or group of workers at a particular seniority level would spread to all other workers at that same seniority level.** Prof. Gerhart provides the following example in his report to show how this supposedly works: in the absence of the alleged conduct, a current Director could have negotiated a higher salary

---

[185] Matt Bloom and John G. Michel, "The Relationships among Organizational Context, Pay Dispersion, and Managerial Turnover," *The Academy of Management Journal*, 45(1), 2002, pp. 33–42 at p. 34 ("Tournament theory also alludes to context, in, for example, the assertion that 'it is the amount of uncertainty that determines the wage spread' (Lazear, 1995: 31)"), p. 35 ("Uncertain environments make it increasingly difficult to assess managerial performance in absolute terms both because of monitoring difficulties and because managerial actions cannot be prescribed a priori (Lambert et al., 1993). More dispersed pay structures are posited to be appropriate under such circumstances because they rely on relative, not absolute, performance standards, which reduces the monitoring burden (Lazear, 1995)."); Edward P. Lazear and Sherwin Rosen, "Rank-Order Tournaments as Optimum Labor Contracts," *Journal of Political Economy*, 89(5), 1981, pp. 841–864 at p. 848 ("Salesmen, whose output level is easily observed, typically are paid by piece rates, whereas corporate executives, whose output is more difficult to observe, engage in contests.").

[186] Gerhart Report, ¶ 8 ("*Effect of No-Poach Agreements and CSI Exchanges on Compensation Given Compensation Structures*. [...] Even if Defendants restricted the No-Poach Agreements to individuals and job titles at the top of the salary structure, a No-Poach Agreement's artificial suppression of compensation would have had a cascading effect on other employees.").

after receiving an unsolicited job offer with higher pay, which means that "other Directors at the Defendant firm who were not cold called will immediately increase their own pay expectations and require higher pay to feel their pay is fair," and in turn means that "there would then be a focus on increasing the pay of Directors (plural) whose performance contributions are similar to those of the now higher-paid Director due to the outside [job] offer."[187] Assuming the alleged conduct did occur, Prof. Gerhart opines this would work in reverse, and the lack of an increase in pay for the Director who did not receive the unsolicited job offer as a result of the alleged conduct would in turn lead to a lack of an increase in pay for all other Directors.[188]

- **Second, Plaintiffs' experts claim that any pay suppression for workers at one seniority level would spread to workers at all other seniority levels.** Extending his previous example, Prof. Gerhart claims that this supposedly works as follows: in the absence of the alleged conduct, any increase in pay for Directors means that "Vice Presidents (one level above Directors) who did not receive cold calls notice their pay is now unfair because the differential between their pay and the pay of Directors has now decreased," which means that "[t]he pressure is now on to increase Vice Presidents' pay to the targeted differential to restore this important element of internal equity."[189] Assuming the alleged conduct did occur, Prof. Gerhart opines this would once again work in reverse, and the lack of an increase in pay for Directors would in turn lead to a lack of an increase in pay for Vice Presidents.[190]

---

[187] Gerhart Report, ¶ 143. See also Starr Report, ¶¶ 173–174 ("Because employees value internal equity, employers tend to respond by implementing uniform compensation structures that pay comparable compensation for comparable work. [...] The relevant implication is that if employee compensation is driven, in part, by considerations of internal equity, then the firm's ability to suppress wages of a group of employees would also be indirectly felt even by those employees who were not the target of wage suppression.").

[188] Gerhart Report, ¶ 143 ("In a no-poach context, there would not be this internal equity pressure to increase the pay of the other Directors to restore internal equity.").

[189] Gerhart Report, ¶ 143. See also Starr Report, ¶ 172 ("Compensation structures connect all employee pay within a firm, such that any suppression of wages for one group of employees would tend to suppress the pay of other employees. Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own. Here, the existence of compensation structures within Defendant firms would mean that any wage suppressing effects of the Challenged Conduct would be broadly transmitted across the Class.").

[190] Gerhart Report, ¶ 143.

90. If Plaintiffs' experts were correct that Defendants had rigid pay structures that would spread any pay suppression classwide in the manner they claim, I would expect to observe three key patterns in Defendants' structured data:

- **First, it should be the case that, from one year to the next, different employees' pay would trend in the same direction (either increasing for all employees or decreasing for all employees).** This is evident from Prof. Gerhart's example above, which purports to show that when pay goes up for one Director, it should go up for other Directors as well as for proposed class members at other seniority levels.

- **Second, it should be the case that, when observed over a longer time horizon, employees' pay profiles would move together over time.** Again, this is evident from Prof. Gerhart's example, if one considers that the same scenario could play out multiple times throughout the Class Period.

- **Third, observed pay ranges within a seniority level should be narrow (meaning that employees in the same seniority level would receive similar pay), and observed pay ranges across seniority levels should be differentiated and have minimal overlap.** In Prof. Gerhart's example, if this were not the case and observed pay ranges were very wide with substantial overlap, then there would be no reason for pay of other Directors to adjust, or for pay of proposed class members at other seniority levels to adjust, in response to a change for a single Director since the ranges and differentials could be maintained without adjusting pay for others.

91. In what follows, I show that none of these three key patterns hold under scrutiny. I note that when I refer to "observed pay ranges" in this subsection, I am referring to the observed range in actual pay corresponding to the 5th and 95th percentiles of the pay distribution for a given group, not to the job-specific pay ranges or grades that Prof. Gerhart claims Defendants used to set pay, and which I show in Section 2.2.3 are inconsistent with record evidence.

92. The first prediction of a rigid pay structure is that shorter-run changes in pay should be similar across workers. My analysis gives no indication that, on a year-over-year basis, pay changed similarly across proposed class members. Exhibit 12 plots the percentage change in total pay without equity from 2015 to

2016 for all proposed class members in Defendants' structured data, separately by seniority level. (I perform this and the subsequent analyses in this section using total pay without equity because as I have discussed the structured data do not include equity at the time of issuance for all three Defendants.) Exhibit 12 shows that, from 2015 to 2016, total compensation increased markedly for some proposed class members, increased by a small amount or remained flat for many others (shown in orange), and decreased for some others (shown in blue), regardless of which seniority level I consider. The results are similar if I instead focus on alternative pairs of years for which data is available (e.g., 2008 to 2009, 2009 to 2010, 2010 to 2011, etc.).[191]

*EXHIBIT 12*
*Year-Over-Year Changes in Pay Vary Across Proposed Class Members*



Source: Corrected Starr Data

Note: The exhibit shows the year-over-year percent change in annualized total pay without equity between 2015 and 2016 for proposed class members who were employed for the full year in 2015 and 2016. Seniority level is determined by an employee's job title in 2015. Compensation is adjusted for inflation and presented in 2019 dollars.

93. The second prediction of a rigid pay structure is that longer-run changes in pay should be similar across workers. My analysis gives no indication that proposed class members' pay changed similarly over a longer time horizon. Exhibit 13 plots the percentage change in total compensation in each year from 2009 to 2022 relative to 2009, for a random sample of proposed class members hired in 2009. Exhibit 13 shows wide variation in how proposed class members' pay trended over time: while some proposed class members in the sample saw

[191] Workpaper 8.

their pay more than double over the 14-year time period under consideration, others saw their pay increase by less than half over the same time period. The exhibit is organized by seniority levels, with different line colors corresponding to different seniority levels. Even within the same seniority level, pay does not appear to move similarly across proposed class members, a point I will return to just below.

**EXHIBIT 13**
**Pay of Randomly Selected Proposed Class Members Does Not "Move Together" Over Time**



Source: Corrected Starr Data

Note: The exhibit shows the percent change in annualized total pay without equity relative to 2009 by year for proposed class members who were hired in 2009 in a class position, appear in Prof. Starr's regression sample for the duration of their employment, and remained at a Defendant in a class position for at least four years. Compensation is adjusted for inflation and presented in 2019 dollars. The percent change in each year is calculated relative to the employee's compensation in 2009. Data for USPI employees in the Tenet Payroll Data is unavailable in 2022, as the Tenet Payroll Data end in 2021.

94. I also perform a similar analysis as the one in Exhibit 13 separately for each Defendant, and separately for each seniority level. These analyses are included in Appendix C. As just one example of the additional analyses I perform, Exhibit 14 shows that similar patterns hold when I focus on Directors, the most numerous seniority level in the data. For each of the additional analyses I perform for each seniority level and each Defendant, the conclusion remains the same: proposed class members' pay does not generally move together over time, and instead, there is wide variation in how proposed class members' pay trends over time.

**EXHIBIT 14**
**Pay of Randomly Selected Directors Does Not "Move Together" Over Time**



Source: Corrected Starr Data

Note: The exhibit shows the percent change in annualized total pay without equity relative to 2009 by year for proposed class members who were hired in 2009 at the Director level, appear in Prof. Starr's pay regression sample for the duration of their employment, and remained at a Defendant in a class position for at least four years. Compensation is adjusted for inflation and presented in 2019 dollars. The percent change in each year is calculated relative to the employee's compensation in 2009. Data for USPI employees in the Tenet Payroll Data is unavailable in 2022, as the Tenet Payroll Data end in 2021.

95. The results in Exhibit 12, Exhibit 13, and Exhibit 14 indicate that a change in pay for one proposed class member would not be expected to result in a change in pay for all other proposed class members. Pay simply does not move similarly for different proposed class members. These patterns are inconsistent with rigid pay structures, and instead show that pay is individualized.

96. The third prediction of a rigid pay structure is narrow observed pay ranges for proposed class members at the same seniority level (e.g., Administrator and Hospital CEO, Director, Senior Director, or Vice President) and differentiation in observed pay ranges for adjacent seniority levels. My analysis shows that the observed ranges of pay for proposed class members in the same seniority level (i.e., the 5th and 95th percentiles of pay for individuals in a given seniority level as observed in the compensation data) are wide, and frequently overlap with the observed pay ranges for proposed class members in adjacent seniority levels. In other words, proposed class members at a given seniority level do not

have pay that is similar, and the observed pay ranges for adjacent seniority levels are not highly differentiated from one another, as Plaintiffs' experts' claimed rigid pay structures would require. Exhibit 15 plots the observed pay range (i.e., the range of values between the 5th percentile of pay and the 95th percentile of pay), as well as the mean and median pay, for proposed class members in Defendants' structured data from 2008 to 2019 by seniority level. Exhibit 15 demonstrates that pay varies substantially across proposed class members, even among those at the same seniority level. It also shows enormous overlap in the observed pay ranges for different seniority levels. These patterns do not align with Prof. Gerhart's deposition testimony that "companies are trying very hard to have people in the same role, with the same performance contributions, be paid very similarly."[192] They also do not align with Prof. Gerhart's statements in his report regarding differentiation in pay across seniority levels — i.e., the need "to maintain the necessary pay differentials to achieve equity and/or motivation to advance/be promoted to higher-level jobs."[193] Further, these analysis are done pooling Defendants and years, but if I modify my analysis to instead focus on variation in pay for proposed class members by seniority level, but specific to a particular Defendant and year, I continue to find wide variation in observed pay ranges for proposed class members at a given level, as well as substantial overlap in observed pay ranges for adjacent seniority levels in many cases.[194] For example, Exhibit 16, Exhibit 17, and Exhibit 18 show that this was the case for DaVita, SCA, and USPI in 2016.

97. These wide observed pay ranges within a level mean that, even if pay for proposed class members at one seniority level changed, there is no clear reason that pay for other proposed class members at that same level would need to change to maintain "internal equity" within a level. As an illustrative example using Exhibit 15, a Director earning the median pay for his level (approximately $150,000) could experience a pay decrease of 14.5% (equivalent to Prof. Starr's estimated pay suppression effect) to $128,250, and there would be no need for other Directors in the same observed pay range to experience a pay decrease to

---

[192] Gerhart Deposition, p. 214. See also Gerhart Report, ¶ 126 ("Compensation Professionals Seek to Maintain Internal Equity [...] This step also involves addressing concerns about fairness in pay levels across jobs and job levels that are otherwise similar but differ in the experience levels. For example, Senior Vice Presidents in an area are paid more than Vice Presidents in that same area. [...] Pay systems adjust pay levels to reduce some of the differences in pay that we might otherwise expect in order to create more consistent pay levels where those comparisons matter.").

[193] Gerhart Report, ¶ 140.

[194] Workpaper 9.

maintain internal equity relative to other Directors, as $128,250 is still within the observed pay range for Directors.

98. The wide observed pay ranges within a level, and substantial overlap in observed pay ranges for adjacent seniority levels, additionally mean that changes in pay at one level would not necessitate changes in pay at other levels. As an illustrative example using Exhibit 15, a Vice President earning the median pay for his level (approximately $300,000) could experience a pay decrease of 14.5% (equivalent to Prof. Starr's estimated pay suppression effect) to $256,500, which is still within the observed range for Vice Presidents, as well as the observed range for Senior Vice Presidents. Thus there would be no need for adjustments to the pay of other Vice Presidents or Senior Vice Presidents to maintain internal equity (or what Prof. Gerhart refers to as the "targeted differential" in pay between Vice Presidents and Senior Vice Presidents) in response to this hypothetical pay change.[195] In sum, given the wide observed pay ranges for a given seniority level, and large overlap in observed pay ranges for different seniority levels, illustrated in Exhibit 15 through Exhibit 18, Plaintiffs' experts' claims that concerns about internal equity would result in a rigid pay structure sufficient to spread impact from the alleged conduct classwide are not supported.

---

[195] Gerhart Report, ¶ 143.

*EXHIBIT 15*
**There is Wide Variation in Compensation Within a Specific Seniority Level, and Substantial Overlap in the Observed Compensation Ranges for Adjacent Seniority Levels (Defendants, 2008–2019)**



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay without equity for proposed class members of the indicated seniority level. Pay in each year is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at USPI between 2010-2019 and SCA and DaVita between 2008-2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay without equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median.

*EXHIBIT 16*

**There is Wide Variation in Compensation Within a Specific Seniority Level, and Substantial Overlap in the Observed Compensation Ranges for Adjacent Seniority Levels (DaVita, 2016)**



Source: Corrected Starr Data

Note: This exhibit shows the annualized total compensation without equity for proposed class members of the indicated seniority level. The exhibit includes employee-year observations for proposed class members who were employed at DaVita in 2016, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total compensation without equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median. I observe similar patterns when I consider Class Period years besides 2016. See Workpaper 9.

*EXHIBIT 17*

**There is Wide Variation in Compensation Within a Specific Seniority Level, and Substantial Overlap in the Observed Compensation Ranges for Adjacent Seniority Levels (SCA, 2016)**



Source: Corrected Starr Data

Note: This exhibit shows the annualized total compensation without equity for proposed class members of the indicated seniority level. The exhibit includes employee-year observations for proposed class members who were employed at SCA in 2016, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total compensation without equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median. I observe similar patterns when I consider Class Period years besides 2016. See Workpaper 9.

***EXHIBIT 18***
***There is Wide Variation in Compensation Within a Specific Seniority Level, and Substantial***
***Overlap in the Observed Compensation Ranges for Adjacent Seniority Levels (USPI, 2016)***



Source: Corrected Starr Data

Note: This exhibit shows the annualized total compensation without equity for proposed class members of the indicated seniority level. The exhibit includes employee-year observations for proposed class members who were employed at USPI in 2016, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total compensation without equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median. I observe similar patterns when I consider Class Period years besides 2016. See Workpaper 9.

### b) *Prof. Starr's Quantitative Evidence of Plaintiffs' Claimed Rigid Pay Structures is Flawed*

99. While Prof. Gerhart presents no quantitative evidence of the pay structure he claims exists in his report, Prof. Starr puts forward two flawed empirical analyses to purportedly test for the presence of rigid pay structures. First, he puts forward an empirical analysis that claims to test whether "wages are positively correlated across job levels" (the between-job analysis in Figure 19 of his report).[196] For this analysis, Prof. Starr calculates average hourly wages for VPs and SVPs, and compares those to average hourly wages for Directors, for

---

[196] Starr Report, p. 159 ("Wages Are Positively Correlated Across Job Levels"), ¶ 183 ("To study the extent to which wages co-vary across worker job levels, I take the individual-company-year panel dataset described in Section VI and limit it to Senior-Level Employees. I then define the two job levels studied earlier: whether a worker is a) a Director or b) a Vice President or Senior Vice President. I then calculate the average (effective) hourly wage for each job level in each company in each year (Total Compensation divided by Total Hours worked). To test whether wages for Directors are positively correlated with wages for Vice Presidents and Senior Vice Presidents, I then run the following regressions separately for each company"), Figure 19.

each Defendant and year using a regression model. Second, he puts forward an analysis that claims to test whether "wages are highly correlated" within a specific job title (the within-job analysis in Figure 20 of his report).[197] For this analysis, Prof. Starr calculates the average hourly wage based on a randomly selected 50% sample of the employees in each job title (the "hold-out sample"), and compares that to the individual hourly wages for the other half of employees in the job title, for each Defendant and year using a regression model. In the discussion below, I first explain why Prof. Starr's empirical analyses are uninformative for understanding whether proposed class members' pay moves together over time in accordance with rigid pay structures. I then show that making simple corrections to Prof. Starr's methodology generates results that are inconsistent with Plaintiffs' claimed rigid pay structures.

100. As an initial matter, Prof. Starr's between-job and within-job analyses do not speak to whether Defendants had rigid pay structures sufficient to generate classwide impact, and therefore cannot possibly show that they did. Prof. Starr's between-job analysis is a regression with 15 to 18 observations (depending on the Defendant), and focuses on high-level average hourly wages for Directors, VPs and SVPs in each year. It is not capable of revealing rigid pay structures as much as a truism: average hourly wages for one group of workers at a firm (e.g., Directors) track average hourly wages for another group of workers at the same firm (e.g., VPs and SVPs). This pattern is to be expected, as it simply reflects that similar market forces affect labor markets where Directors, VPs, and SVPs participate. Prof. Starr's within-job analysis is also incapable of testing for rigid pay structures, and instead is merely able to show that hourly wages for workers who are highly similar in terms of their skills, experience levels, and other characteristics (e.g., workers in the same granular

---

[197] Starr Report, p. 161 ("Within-Job-Title Wages Are Highly Correlated"), ¶¶ 187–189 ("A second dimension of compensation structures is to consider whether the wages of workers with the same job title move together. To examine this, I perform a test [...] To implement this test, I take the dataset described in Section VI at the individual-company-year level. Then, I calculate the number of individuals in each job in each company in each year, and I randomly assign half of the individuals in each job in each company in each year to be in a 'hold-out sample.' With the workers who are not in the hold-out sample, I calculate their average hourly wages in their job in that year. I then merge this value into the hold-out sample by job title, company and year. Finally, I regress the natural log of the hourly wages of the individual workers in the hold-out sample against the natural log of the average wages of the randomly selected subset of workers the same job-title, company, and year. I also include the same macroeconomic and healthcare-specific controls as before."), Figure 20.

Although Prof. Starr provides an example in his report that seems to indicate he is relying on seniority levels (e.g., Director) to define the "job levels" he uses for this analysis, he actually relies on much more granular job titles (e.g., Director of Finance) in practice. See Starr Report, ¶ 188 ("To implement this test, I use a randomized hold-out sample analysis. To illustrate the idea, consider the following example: Suppose that there are 100 Directors in a given company in a given year. I randomly split 50 into group A, and 50 into group B. I then examine whether the average wages of the 50 randomly selected Directors in group A are predictive of the individual wages of the other 50 Directors in group B."), Backup Materials.

job title at the same Defendant in a given year) tend to be similar. This pattern is entirely consistent with highly similar workers being subject to similar labor supply and demand forces, which has nothing to do with the claimed rigid pay structures.[198] At root, when Prof. Starr observes average wages moving together over time, or individual wages moving together with average wages over time, in his between-job and within-job analyses, he concludes that Defendants have rigid pay structures. However, this fails to account for alternative explanations that could generate the same patterns.

101. Moreover, if I correct key flaws in Prof. Starr's between-job and within-job analyses, the results that he relies on to conclude that Defendants had rigid pay structures disappear. In Exhibit 19 and Exhibit 20, I implement the following corrections to Prof. Starr's between-job analysis (Exhibit 19) and within-job analysis (Exhibit 20)

- I correct for several basic errors that Prof. Starr made when processing Defendant's structured data (which I will return to in Section 5.2), including Prof. Starr's improper treatment of hours worked for USPI. (The orange bars in each exhibit correspond to a version of his between-job and within-job analyses where I make these corrections.)
- I then make two additional adjustments, on top of correcting Prof. Starr's data processing errors.[199] *First*, I adjust both analyses to focus on the relationship between year-over-year changes in wages, rather than the relationship between wage levels (i.e., instead of comparing

---

[198] Prof. Starr's within-job analysis suffers from the "reflection problem," a term coined by economist Charles Manski to refer to the problem "that arises when a researcher observing the distribution of behavior in a population tries to infer whether the average behavior in some group influences the behavior of the individuals that comprise the group." See Charles F. Manski, "Identification of Endogenous Social Effects: The Reflection Problem," *The Review of Economic Studies,* 60(3), 1993, pp. 531–542 at p. 531. As a simple illustrative example of how the reflection problem works in the context of Prof. Starr's within-job analysis, suppose numerous competing employers offer a similar compensation package to workers with a specific set of characteristics (e.g., information technology workers with experience using a specific software), and one of the Defendants hires three of these workers. Prof. Starr's within-job analysis cannot distinguish whether pay for these three workers is the same because their value in the labor market is the same, or due to a rigid pay structure. Further, suppose that the software in which these three information technology workers specialize surges in popularity, such that they are heavily recruited after they are hired and receive numerous outside employment offers. Prof. Starr's within-job analysis cannot distinguish whether pay for these three workers moves together over time due to similar increases in their value in the labor market (e.g., the Defendant matches the increasingly-generous compensation packages offered by competing employers to avoid losing these workers), or due to a rigid pay structure.

[199] For the between-job analysis, I calculate average year-over-year wage changes for five randomly selected VPs and SVPs and compare that to individual year-over-year wage changes for Directors over the same two years using a regression model. For the within-job analysis, I calculate the average year-over-year wage change based on a randomly selected sample of five employees in each job title (the "hold-out sample") and compare that to the individual year-over-year wage changes for the remaining employees in the same job title over the same two years using a regression model. I repeat the exercise 1000 times to account for correlation that might arise due to random chance because of my use of small samples.

the amounts workers earn in a given year, I compare changes in workers' earnings from one year to the next).  By using wage levels instead of wage changes, Prof. Starr misaligns his analysis with Plaintiffs' theory of how rigid pay structures spread harm classwide, which focuses on whether changes in pay over time are similar across workers, rather than on whether levels of pay are similar across workers.[200] *Second*, I adjust both analyses to calculate average year-over-year wage changes for a smaller group of randomly selected proposed class members (i.e., five randomly-selected VPs and SVPs, or five randomly-selected proposed class members in each job title), and then compare that to individual year-over-year wage changes. Plaintiffs' theory of how rigid pay structures spread harm classwide requires that changes in pay for some individuals would lead to changes in pay for all (or nearly all) other proposed class members. To assess whether this is the case, it is necessary to look at disaggregated individual level data, not averages over large groups of individuals as Prof. Starr does.[201] (The pink bars in each exhibit correspond to a version of his between-job and within-job analyses that corrects the basic data processing errors as well as these additional adjustments. They reflect a range because in both the between and within job analyses, I repeat this exercise 5,000 times, each time for a randomly selected group of five employees, and

---

[200] A method using wage changes instead of wage levels has additional advantages. *First*, it is well understood in the economics literature and in statistics that it is easier to find a relationship between variables measured in levels than between variables measured in changes. As a result, Prof. Starr's use of levels rather than changes makes it is more likely he would find there is positive relationship between the wages of different workers when there is in fact none. *Second*, comparing changes in wages for an individual on a year-over-year basis abstracts from individual-level attributes that don't vary over time and that are correlated with wage levels. *Third*, when run on individual-level data, comparing changes in wages for an individual on a year-over-year basis also avoids any spurious correlation due to changing composition of the workforce over time. For instance, suppose one of the Defendants decided to start placing an emphasis on hiring higher-quality applicants, and thus hired new, higher-quality Directors and SVPs. A regression based on wage levels (such as Prof. Starr's between-jobs analysis) would tend to find a positive relationship between average wages of Directors and SVPs, but a regression based on wage changes would not necessarily find a positive relationship. See A. C. Harvey, "On Comparing Regression Models in Levels and First Differences," *International Economic Review*, 21(3), 1980, pp. 707–720 at p. 707 ("It has long been recognized that regressions involving economic variables in levels can be misleading. A high value of $R^2$ is often obtained even when there is no underlying causal relationship between the dependent and explanatory variables. [...] Spurious correlations are less likely to occur with variables in first differences, and this has lead some researchers to adopt first difference formulations automatically.").

[201] For the between-job analysis, Prof. Starr compares two averages, the average pay of Directors and the average pay of VPs and SVPs. This approach captures firm-wide pay correlations between levels, but does not quantify the impact of a change in one or a few proposed class members' wages on the wages of all or nearly all other proposed class members. For the within-job analysis, Prof. Starr compares a proposed class members' compensation to the average compensation of other proposed class members with the same job title. While this approach does use individual level data as the outcome variable in the regression, in cases where a job title encompasses many proposed class members, the outcome (or "dependent" variable) is equal to the average wage for a large group of proposed class members, which muddies the ability of the analysis to measure how changes in one person's pay affects the pay of all or nearly all others within the same role. See, Starr Report, Backup Materials.

present a range of the regression coefficients and R-squared values produced (which corresponds to the 90% confidence interval for the regression coefficients and R-squared values I calculate)).

102. As I explain below, making these corrections to Prof. Starr's between-job and within-job analyses reduces the regression coefficients (which capture how predictive one or some proposed class members' pay is for other proposed class members' pay) and the R-squared values (which capture the degree of explanatory power that one or some proposed class members' pay has for other proposed class members' pay) that Prof. Starr estimates:[202]

- When I correct for Prof. Starr's data processing errors, but make no other changes, Prof. Starr's results in the between-jobs analysis change with respect to USPI. Prof. Starr ignores the fact that actual hours worked are underreported in the structured data for USPI employees in 2005 and 2006, and again in 2018 to 2021, which results in an improperly inflated measure of hourly wages in each of those years.[203] Exhibit 19 shows that, when I correct this error, along with other data processing errors that I detail in Section 5.2, the regression coefficient for USPI in Prof. Starr's between-job analysis decreases substantially and is much closer to zero than the uncorrected regression coefficient. (This can be seen by comparing the height of the orange bar for USPI to the height of the blue bar for USPI in the top panel of the exhibit.) In other words, simply correcting data processing errors generates results that are inconsistent with Prof. Starr's claim that "wages are positively correlated across job levels,"[204] at least as it relates to USPI.
- When I additionally correct Prof. Starr's between-job and within-job analyses to focus on year-over-year wage changes (instead of wage levels), and to compare wage changes for individual proposed class members to wage changes for a smaller group of randomly selected proposed class members, I obtain a range of regression coefficients, all of which are closer to zero than Prof. Starr's estimates, and some of which are not statistically different from zero, as shown in Exhibit

[202] Prof. Starr estimates his between-job and within-job analyses in two ways: first, without including any control variables in his regression model, and second, including control variables in his regression model. My analyses focus on Prof. Starr's results without control variables, as these are the results that he relies upon when he interprets the R-squared values that his analyses generate. Prof. Starr's estimated coefficients are similar in his models with and without controls. See Starr Report, Figure 19, Figure 20.

[203] Appendix D.

[204] Starr Report, p. 159.

19 for the between-job analysis and Exhibit 20 for the within-job analysis. This is apparent from the fact that the pink bars and the associated ranges cover, or lie just above or below, zero in the top panel of each exhibit. (This is in contrast to the blue bars and associated ranges representing coefficients from Prof. Starr's uncorrected version of the between-job and within-job analyses which typically do not.) In other words, inconsistent with Plaintiffs' claimed rigid pay structures, I find little evidence using Prof. Starr's methodology that changes in pay for some proposed class members are "positively correlated" with changes in pay for all or nearly all proposed class members, once key corrections are made to his analysis.

• My corrected results also show that, for both Prof. Starr's between-job and within-job analyses, wage changes for a small group of randomly selected proposed class members explain less than 10% of the total variation in wage changes for other proposed class members (as measured by the "R-squared" value).[205] This is apparent from the fact that the pink bars and associated ranges in the bottom panel of each exhibit, representing the range of R-squared estimates I estimate, lie below 0.1. (This is in contrast to the blue bars representing R-squared values from Prof. Starr's uncorrected version of the between-job and within-job analyses which are substantially higher and generally in the range of 50-100%).

---

[205] The R-squared values in Exhibit 19 and Exhibit 20 reflect the joint explanatory power of year-over-year wage changes for the relevant group of randomly selected proposed class members, as well as the year-over-year changes for the other control variables that Prof. Starr included in the regression models for his between-job and within-job analyses. See Jeffrey M. Wooldridge, *Introductory Econometrics*, (Mason, OH: South-Western Cengage Learning, 2009) ("Wooldridge (2009)"), p. 40 ("$R^2$ is the ratio of the explained variation compared to the total variation; thus, it is interpreted as *the fraction of the sample variation in y that is explained by x*." (emphasis in original)).

***EXHIBIT 19***

***Correcting Flaws in Prof. Starr's Between-Job Analysis Shows That Changes in Hourly Wages of Vice Presidents and Senior Vice Presidents are Not Positively Correlated with Changes in Hourly Wages of Directors***



Source: Starr Data; Corrected Starr Data

Note: This exhibit shows the results of Prof. Starr's between-job analysis from Figure 19 in his report, after correcting for certain flaws. For Starr's Model with Starr Data and Starr's Model with Corrected Starr Data, the exhibit reports the regression coefficient and the 95% confidence interval in the top panel, and the R-squared in the bottom panel (blue and orange bars). For the Adjusted Starr Model with Corrected Data, the exhibit reports the median regression coefficient and 95% confidence interval in the top panel, and the median R-squared estimate and the 95% confidence interval in the bottom panel, based on 5,000 resamplings (pink bars). Starr's Model with Starr Data and Starr's Model with Corrected Data analyze hourly wages based on total compensation, whereas Adjusted Starr Model with Corrected Starr Data analyzes hourly wages based on total compensation with adjusted equity. Total compensation with adjusted equity reflects equity at time of issuance for DaVita, but removes equity pay altogether for SCA and USPI.

Highly Confidential – Outside Counsel/Experts Only

**EXHIBIT 20**
***Correcting Flaws in Prof. Starr's Within-Job Analysis Shows That There is Not a Strong Positive Correlation Between Changes in Hourly Wages for Some Individuals in a Given Job Title and Other Individuals in That Same Job Title***



Source: Starr Data; Corrected Starr Data
Note: This exhibit shows the results of Prof. Starr's within-job analysis from Figure 19 in his report, after correcting for certain flaws. For Starr's Model with Starr Data and Starr's Model with Corrected Starr Data, the exhibit reports the regression coefficient and the 95% confidence interval in the top panel, and the R-squared in the bottom panel (blue and orange bars). For the Adjusted Starr Model with Corrected Data, the exhibit reports the median regression coefficient and 95% confidence interval in the top panel, and the median R-squared estimate and 95% confidence interval in the bottom panel, based on 5,000 resamplings (pink bars). Starr's Model with Starr Data and Starr's Model with Corrected Data analyze hourly wages based on total compensation, whereas Adjusted Starr Model wth Corrected Starr Data analyzes hourly wages based on total compensation with adjusted equity. Total compensation with adjusted equity reflects equity at time of issuance for DaVita, but removes equity pay altogether for SCA and USPI.

Highly Confidential – Outside Counsel/Experts Only

*2.2.3. Plaintiffs' Experts Fail to Properly Consider Qualitative Evidence That is Inconsistent with Defendants Having Rigid Pay Structures Or Job-Specific Pay Ranges and Grades for Class Positions Throughout the Class Period*

103. Besides Prof. Starr's quantitative analysis, Prof. Starr and Prof. Gerhart both present qualitative analyses of Plaintiff's claimed pay structures. However, these analyses are flawed because they ignore evidence that Defendants did not have job-specific pay ranges and grades for class positions (let alone rigid pay structures) throughout the Class Period, they ignore forms of pay that comprised a large share of compensation for many proposed class members, and because qualitative analyses alone cannot demonstrate that Defendants had rigid pay structures.

104. In their qualitative analyses, Plaintiffs' experts ignore qualitative record evidence that undercuts the existence of any job-specific pay ranges and grades that applied to class positions throughout the Class Period.[206] This evidence is not surprising, considering that the quantitative analyses I performed above in Section 2.2.2 shows that there were wide observed ranges of pay for individuals at the same level, significant overlap in observed pay ranges across levels, and that pay for proposed class members did not generally move together over time.

- **SCA did not use job-specific salary ranges or grades throughout the Class Period.** Emails exchanged between SCA employees in 2014 and 2016 indicate that there were salary ranges brought to SCA from HealthSouth (which SCA was spun-off from in

---

[206] In his deposition, SCA's Kevin Zaideman described the features of a structured compensation system with job-specific pay ranges and grades, and explained that such a system is different than an informal system in which Defendants reference existing employees' pay and external market data when setting pay. See Deposition of Kevin Zaideman (SCA), December 18, 2024 ("Zaideman (SCA) Deposition"), pp. 52–53 ("So the term 'range' has been used a lot at SCA. And prior to January of 2021, in absence of a bona fide job framework that had salary grades, job families, job functions, a new job code, and common job title structure, prior to that, we -- we didn't have a framework to operate off of. So we weren't using grades. We weren't using bands. We weren't using pay ranges associated with those grades or bands. What we were using was external market data and internal teammate pay data. So oftentimes I would be citing a range in supporting my clients, but I wouldn't be citing the salary grade range. I would be citing a range of data points. That range of data points would be compiled or would consist of information that we gathered from salary surveys and external benchmarks and/or specifically just like actual teammate pay. But it would be compiled in—in a statistical function in Excel where, let's say, I had a leader that asked for an analysis of internal pay for a specific job and there were ten teammates in that job. I would grab those ten data points and use a percentile function in Excel to display the 25th, 50th, and 75th percentile of what that data was."), p. 54 ("[Y]ou're basically taking an existing data set of actual teammate pay and converting it into a range of data points. So that's all it is, is effectively just data from a statistical analysis perspective. I would frequently have to coach leaders on, hey, when I'm using the term 'range' here, I'm not using it as actual salary grade pay range that is associated with pay grades, or that is a -- a true framework that the organization is operating off of for all roles in a job or all roles in general. Everything that I was doing was using a range of data points for a specific differentiated instance, case by case, ad hoc for whatever was the task or the pain point at hand based on the leader coming to me for -- for compensation consultation.").

2007), but these were last updated in 2010 or 2012.[207] Subsequent emails between SCA employees indicate that, by 2017, SCA had elected to remove these salary ranges from their internal compensation data systems because they were "outdated," not "actively managed" by SCA, didn't "carry a lot of weight," and "possibly aren't even providing real value to the users of the application."[208] Later, in 2018, SCA's Warren Cinnick wrote in an email that "we have no official published ranges and no unified job grades," and in 2020, an internal presentation confirmed that "SCA does not have a formal base salary/incentive structure, pay grades, or pay ranges."[209] Warren Cinnick confirmed in his deposition that, when he joined SCA in November 2017, "there was no discernable salary structure at SCA," and that there was no such structure until the beginning of 2021.[210] Kevin Zaideman similarly testified that,

---

[207] Email from Brooke Jackson (SCA) to Bridie Fanning (SCA), October 30, 2014, SCA000111304 ("I was able to find out some history on the comp structures. They were brought over from HealthSouth [...] I have [also] attached the pay zone history from Ceridian. This shows that the structure has been updated twice since the original file was uploaded – September 2008 and December 2010."); Email chain from Bridie Fanning (SCA) to Jennifer Sandoz (SCA) and Becky Johnson (SCA), "FW: Survey Data," February 2, 2016, SCA000100169–72 at SCA000100169 ("SCA has not conducted a compensation study for a long time (possibly 5-7+ years) [...] Currently, compensation is managed through pay bands that were implemented prior to the SCA spinoff from HealthSouth"); Email from Brooke Jackson (SCA) to Bridie Fanning (SCA), "Updated Salary Ranges," with attachment, November 20, 2014, SCA000078353 ("[W]e know that our ranges have not moved in over 4 years"); Email chain from Warren Cinnick (SCA) to Karri Hermanson (United Health Group), "SCA – Pay Equity for NIEs: Mercer Questions and Answers," with attachment, July 25, 2018, SCA001198974–77 at SCA001198974 ("Attached is a spreadsheet with a table showing 46 grades we inherited from previous HR leadership at SCA. [...] In the attached spreadsheet, each pay grade is associated with a minimum and maximum annual pay rate. All of these mins and maxes are obsolete and have not been updated since 2012 due to lack of oversight by prior HR leadership."); Reuters, "HealthSouth to Sell Surgery Unit for $945 Mln," August 9, 2007, available at https://www.reuters.com/article/business/healthsouth-to-sell-surgery-unit-for-945-mln-idUSN26342795/ , accessed on April 15, 2025.

[208] Email chain from Jennifer Simmons (SCA) to Becky Johnson (SCA) and Erin Soreano (SCA), "RE: Table or Range Matrix?," January 30, 2017, SCA000106045–47 at SCA000106046 ("I guess they are wanting to know also, if someone is a Director, what is the pay range? [...] So the current pay ranges in the system are a little out dated, which [is] why Becky and I decided to remove the data from CMS."); Email chain from Jennifer Sandoz (SCA) to Jennifer Sandoz (SCA), "FW: Update List for 1:1," February 20, 2017, SCA001186824–25 at SCA001186824 ("I've had lots of questions about what to pay people since the ranges/grades are out of date and hidden – I've been able to keep up for the most part, but the team will need to think about whether they complete this project (updating titles/grades/ranges) in 2016 or take another approach, and who will need to be trained and take over my access to the market data in the meantime."); Email chain from Suzanne Rogers (SCA) to Jennifer Simmons (SCA) et al., "RE: PAF/PRF," May 15, 2017, SCA001185620–32 at SCA001185620 ("I've treated those ranges as inaccurate due to the outdated state of our Grades/etc. Does anyone really use the Grades? My vote would be to remove until we can get our hands around a grading process. [...] I'm fine to remove them if that's what we want."), SCA001185622 ("I also don't think these ranges are actively managed so they could be out of date and possibly aren't providing real value to the users of the applications. [...] [W]e are not managing these nor have a robust grading system / salary structure so I don't feel these carry a lot of weight.").

[209] Email chain from Chip Zahn (SCA) to Tony Kilgore (SCA), "FW: Pay range visibility – system on which this appears," March 9, 2018, SCA000098450–52 at SCA000098451; "Compensation Framework Alignment and Validation," September 2020, SCA001669270 at p. 3.

[210] Cinnick (SCA) Deposition, pp. 8–9 ("Q. Okay. And how long did you work at SCA? A. From November 2017 until June of 2023"), pp. 153–154 ("Q. The salary structure that you were testifying about, when did that go into effect? A. [...] So a couple answers there I think are appropriate to share. When I joined, there was no discernable salary structure at SCA. It was something we built over time. We put that in place in the beginning of 2021, and did a lot of work on it in 2019 and 2020 to get to that point. So the first time it was fully utilized was then.").

between when he joined SCA in September 2017 and January 2021, there were no pay grades in place to help managers decide what to pay their employees. Instead, during that time period, he provided "ad hoc" compensation consulting services to help SCA's leaders determine pay for specific positions.[211] The lack of a consistent set of job-specific salary ranges or grades at SCA throughout the Class Period further aligns with deposition testimony from SCA's Leslie Wachsmann, who indicated that compensation at SCA was "very inconsistent and a little bit of the wild, wild west."[212]

- **USPI did not use job-specific salary ranges or grades throughout the Class Period.** An email exchange between USPI employees in 2013 noted that "there's a wide range of pay for each title," in part because "[w]e do not have salary ranges and levels."[213] Additional email exchanges between USPI employees in 2015 similarly noted that "[w]e do not have formal pay ranges established," and "we don't have specific pay scales for Administrator positions."[214] An internal spreadsheet from 2016 describing the current state of

---

[211] Zaideman (SCA) Deposition, p. 52 ("So the term 'range' has been used a lot at SCA. And prior to January of 2021, in absence of a bona fide job framework that had salary grades, job families, job functions, a new job code, and common job title structure, prior to that, we — we didn't have a framework to operate off of. So we weren't using grades. We weren't using bands. We weren't using pay ranges associated with those grades or bands."), pp. 54–56 ("Q. So as you sit here today, is your testimony that prior to January of 2021, SCA had absolutely no framework for compensation? A. Correct. Q. Were any systems in place prior to January of 2021 to help compensation managers decide what to pay their employees? [...] A. Two-part question. First part, no. That's effectively why I was there. That was my job. So there was no system in place. Everything came primarily to my email inbox ad hoc. I was -- would basically be providing compensation consultation services for leaders. So, oftentimes, it would look like they would email me, [h]ey, here's the situation. I want to promote somebody or I want to hire somebody. You know, what do you recommend? And because there was no framework, there were no grades in use, there was no rigid, you know, organized salary structure or salary ranges, I would effectively just have to qualify the job, oftentimes asking the leader, [d]o you have a job description? Can you provide me with details of the job? What is their scope? What is their span of control? What are the qualifications that are required of the role? Things like that.").

[212] Deposition of Leslie Wachsman (SCA), May 22, 2024, p. 119 ("Q. What levels existed [at] SCA prior to adopting UHG's level? A. The levels are more based on title, so all directors. And, again, it was — what I would say is prior to us establishing and going through kind of a comp restructuring and adopting UHG's framework, it was very inconsistent and a little bit of the wild, wild west."). See also Deposition of Jennifer Simmons-Duggan (SCA), p. 46 ("Q. Were employees paid according to pay bands? A. When I first got there, no. Q. Okay. A. Pay at SCA for a very long time was the Wild West, which is why we had to go to Mercer to start trying to not make it be the Wild West.").

[213] Email chain from Sandi Karrmann (USPI) to Shannon Mosley (USPI), "Fwd: USPI HRD — C. Hodges," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337 ("Compensation: We do not have salary ranges and levels [...] and titles aren't necessarily reflective of level of responsibility relative to others with the same title. Therefore, there's a wide range of pay for each title (which is the closest equivalent to levels).").

[214] Email chain from Peggy Wellman (USPI) to Mary Leachy (Saint Joseph) and Jeremy Zoch, "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 ("In regard to the request for Pay scales — We do not have formal pay ranges established, these are facility specific and are based upon market specific needs."); Email chain from Andy Johnston (USPI) to Vanessa Smith (USPI), "RE: Administrator Prorated Salary Increases — March 1, 2015 — JOHNSTON-SMITH (Due by 01/26/15)," January 21, 2015, USPI_CIV_000095479–80 at USPI_CIV_000095479 ("I've seen that approach work where there are specific pay scales. If you are at the top of the scale you get a bonus instead of an increase. But we don't have specific pay scales for Administrator positions.").

various business processes at USPI indicated that, at the facility level, there were "no ranges, structure or job descriptions" with respect to compensation and, at the corporate level, there were "no [salary] grades or ranges."[215] These documents align with testimony from USPI's Sandi Karrmann, who confirmed in her deposition that there were no "established salary ranges" for administrators and above when she worked at USPI between 2013 and 2020.[216]

- **DaVita did not use job-specific salary ranges or grades for class positions throughout the Class Period.** An internal presentation from 2018 discussing the results of a compensation risk assessment conducted by a third party firm noted that DaVita "has no stated target pay position," and as a result "[p]ay is not formulaic and is based on discretion."[217] A 2018 email exchange discussing the same compensation risk assessment further noted that DaVita "[doesn't] believe in 'salary bands' or 'pay grades'," and instead uses "[a] high degree of customization" in setting compensation, which may mean "unique structures for individual groups, or even individual people."[218] Consistent with "a high degree of customization" in how they set pay, DaVita's Michael Staffieri testified that, prior to a 2021 change in DaVita's compensation practices, there was "a lot of chaos in how compensation was done" and "there was no structure" in place for class positions.[219] DaVita's Colleen Arthur testified that, while DaVita had pay ranges for certain, non-class, clinical positions (e.g., RNs), they "did not have formal pay ranges for most of the time for any other positions" that she was aware of.[220] DaVita's Rob Chipman

---

[215] "Department Blueprint," February 9, 2016, USPI_CIV_000242488.

[216] Karrmann (USPI) Deposition, p. 32 ("When you joined USPI in 2013, what were your duties and responsibilities for the company? A. I was responsible for the human resources function[.]"), pp. 35–36 ("And why did you leave USPI in 2020? A. To accept an opportunity with Kimberly-Clark."), p. 39 ("For administrators and above, we did not have established salary ranges."). See also Deposition of Andrew Johnston (USPI), September 6, 2024 ("Johnston (USPI) Deposition"), p. 51 ("Q. You say that USPI doesn't have specific pay scales for administrators; is that correct at the time? A. Yes. That's correct.").

[217] "Compensation Risk Assessment – Part 2: Broad-Based Employee Programs," April 17, 2018, DVA_OMCEAL_001344570–82 at DVA_OMCEAL_001344573.

[218] Email from Colleen Arthur (DaVita) to Christine Moore (DaVita), "FW: DVA Compensation Structures," March 30, 2018, DVA_OMCEAL_001329256–61 at DVA_OMCEAL_001329257.

[219] Staffieri (DaVita) Deposition, p. 150 ("[B]efore 2021, there was no normal. [...] [T]here was a lot of chaos in how compensation was done at DaVita."), p. 157 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Before that time, there was no structure, so you're just trying to compare internally against other people in the role.").

[220] Arthur (DaVita) Deposition, pp. 78–79 ("We had pay ranges defined for our clinical field teammates or positions for PCT, R.N., social workers, dietician, and the administrative assistant in the clinic. We did not have formal pay ranges for most of the time for any other positions that I'm aware of."), p. 112 ("For the division vice president role, we didn't have a structured pay guidance or pay range, and decisions were made independently in

similarly testified that, when he joined DaVita, they "didn't have pay ranges or bands" in place.[221]

105. Plaintiffs' experts' qualitative evidence is also flawed because it ignores forms of pay that constituted a sizable share of compensation for most senior proposed class members, such as equity pay. For example, key documents that Prof. Gerhart and Prof. Starr rely upon in their reports as evidence that Defendants designed and implemented structured compensation systems focus on salaries and bonuses, but do not discuss how the claimed structured compensation systems governed equity pay.[222] This is notable because Prof. Starr includes all types of compensation (including equity) in his pay regression model and damages estimates, and yet Plaintiffs' experts have not explained

---

each business unit by the appropriate leader."), p. 112 ("For the division vice president role, we didn't have a structured pay guidance or pay range, and decisions were made independently in each business unit by the appropriate leader."), p. 119 ("Q. DaVita also tracked pay ranges for group vice presidents and general managers when deciding on pay to offer to general managers, correct? [...] A. While I was with the compensation team at DaVita, we did not have defined pay ranges for those positions."), p. 176-180 ("We didn't have pay bands for this [vice president] position.").

[221] Chipman (DaVita) Deposition, p. 61 ("When I first started, we didn't have pay ranges or bands."), pp. 30–31 (senior leaders had "carte blanche" to make decisions about pay).

[222] Prof. Gerhart claims that "Defendants [d]esigned [s]ystematized [c]ompensation [s]tructures." See Gerhart Report, p. 113, Section VII.B. He then presents evidence that "Defendants [i]mplemented the [f]oregoing [p]rinciples" with respect to systematized compensation structures. See Gerhart Report, ¶ 114. However, the documentary evidence he cites in that discussion focuses primarily on salaries and bonuses, and does not discuss how the claimed structured compensation systems govern equity pay. See, e.g., Email chain from Mike Staffieri (DaVita) to Tad Stahel (DaVita), "Re: Keith increase," December 17, 2014, DVA_OMCEAL_001339898–901; Email chain from Bridie Fanning (SCA) to Leslie Wachsman (SCA), "FW: Merit and Performance Review Process Updates," January 7, 2015, SCA000109831–37; "Untitled Spreadsheet," USPI, October 23, 2018, USPI_CIV_000214746, Tab "Compensation Ranges"; Email from Andy Johnston (USPI) to Bill Wilcox (USPI), "Vanessa," July 18, 2014, USPI_CIV_000027565 . Further, while Prof. Gerhart later claims that "SCA's [c]ompensation [s]tructure [a]pplied to [...] [a]ll [t]ypes of [p]ay," the only evidence he cites to support his claim is a diagram from a document describing SCA's "Total Compensation Philosophy," which merely acknowledges that equity pay is one component of total compensation, and focuses on executives (who are not members of the proposed class). See Gerhart Report, ¶ 119, Figure 8; "Surgical Care Affiliates Total Compensation Philosophy," SCA, Undated, SCA000079723–41 at SCA000079725, SCA000079728 ("Our 'pay for performance' philosophy is accomplished by having a majority of our senior leaders pay tied to company performance. We set base salaries (fixed pay) at levels that are competitive in our marketplace and provide annual cash and annual equity incentives (variable pay) that are competitive in our marketplace, are tied to performance outcomes, and that allow us to retain outstanding leaders in a competitive environment for *executive* talent." (emphasis added)). Similarly, Prof. Starr claims that Defendants "[u]sed [c]ompensation [s]tructures to [m]aintain [i]nternal and [e]xternal [e]quity." See Starr Report, ¶¶ 179–181. However, the documentary evidence he cites focuses on salaries and bonuses, and does not discuss how the claimed structured compensation systems govern equity pay. See, e.g., Email chain from Colleen Arthur (DaVita) to Kenny Gardner (DaVita), "Internal Promotions | Comp Request," May 23, 2018, DVA_OMCEAL_001057524–25; Email chain from Jennifer Sandoz (SCA) to Ajay Chokshi (SCA), "FW: Brian Tees comp / weekly update," with attachment, February 13, 2017, SCA000065974–84; Email chain from Alex Bateman (USPI) to Cindy English (USPI), "RE: Proposals for VP & Above March 1, 2015 Salary Increases - Johnston-Bateman (Due by Friday, February 6, 2015)," February 6, 2015, USPI_CIV_000039752–53.

why or how compensation other than salary would be linked across proposed class members.[223]

106. Finally, qualitative evidence alone is not sufficient to demonstrate Plaintiffs' claimed rigid pay structures. While it might demonstrate that Defendants at times considered internal equity and market forces, it is ultimately an empirical question whether in practice Defendants had rigid pay structures that would spread any harm from the alleged conduct classwide. In order to demonstrate that Defendants set pay according to rigid pay structures, Prof. Starr and Prof. Gerhart would need to perform a credible empirical analysis aimed at answering the relevant question (whether Defendants had pay structures that were sufficiently rigid that changes in pay for some proposed class members necessarily led to changes in pay for all other proposed class members), not a qualitative analysis. However, Prof. Gerhart agreed in his deposition that he did no quantitative analysis of pay structures, and as I previously showed in this section, Prof. Starr's empirical analyses are fatally flawed.[224]

---

[223] Starr Report, ¶ 112 ("Total compensation is defined using all available payment sources, including the employee's salary, bonuses, stocks, and all other pay.), ¶ 115 ("I use the resulting data set, at the individual-company-year level as my main dataset.").

[224] Gerhart Deposition, p. 288 ("Q. Because you didn't perform any quantitative work in this case, is it fair to say that your report contains your opinions on what could have happened and not on what did happen? [...] A. I think my report is framed as 'the likely impact.'").

## 3. MANY PROPOSED CLASS MEMBERS COULD NOT, OR WOULD NOT, BE HARMED BY THE ALLEGED CONDUCT, AND IT IS NOT POSSIBLE TO RELIABLY MEASURE HARM USING COMMON EVIDENCE

107. In Section 2, I discussed how Plaintiffs' conclusion that impact would be common to the class relies on unsupported and incorrect assumptions. Rather, I find that, for the varied labor markets in which proposed class members participated, extensive competition from non-Defendant firms for proposed class members' labor and lack of rigid pay structures together mean that proposed class members would not be commonly impacted by the alleged conduct. In this section, I turn to a discussion of groups of proposed class members who could not, or would not, be harmed by the alleged conduct, assuming it occurred. I discuss how individualized inquiry would be necessary to identify proposed class members in each of these groups of unharmed class members. I next summarize these ideas:

- First, related to my discussion in Section 2.1, proposed class members who participated in labor markets where Defendants did not jointly possess labor market power could not have been harmed by the alleged conduct (Section 3.1).

- Second, related to my discussion in Section 2.2, many proposed class members would not have been affected directly by the alleged conduct and thus could only have been harmed indirectly through Plaintiffs' claimed rigid pay structures. However, empirical and qualitative evidence is inconsistent with rigid pay structures through which changes in pay for one group of proposed class members would spread to all (or nearly all) other proposed class members. As a result, Plaintiffs and their experts have not demonstrated that individuals not directly affected by the alleged conduct would be harmed indirectly, and many (if not all) would not be (Section 3.2).

- Third, proposed class members who were newly hired during the Class Period from a non-Defendant firm (or after graduating from school or returning to work after time off) could not be harmed by the alleged conduct, at least initially, and possibly ever. Compensation for new hires is set competitively at the time of hire (since Defendants and non-Defendant firms alike could compete for such workers) and it would take time for new hires' pay to be impacted by the conduct. Plaintiffs' experts have provided no methodology for identifying when newly hired individuals would transition from no harm at hire to the claimed harms later on, if ever. Similarly, individuals who were

employed by Defendants at the start of the Class Period but who had short tenures could not be harmed, at least initially, and possibly ever. Like new hires, their pay would be competitive at the start of the Class Period (since it was set prior to the onset of any alleged conduct) and would take time to be affected, and Plaintiffs' experts have provided no methodology for identifying when harm would start to occur, if ever (Section 3.3).

- Fourth, any proposed class members whose compensation was skewed toward equity pay, and who held a large amount of equity from Defendant firms, could have been unharmed, or possibly even benefited from the alleged conduct (Section 3.4).

- Fifth, any proposed class members employed by USPI and DaVita who would not consider employment options at SCA could not be directly harmed by the alleged mobility restrictions because Plaintiffs and their experts have presented no evidence of mobility restrictions or information sharing between DaVita and USPI (Section 3.5).

- Sixth, proposed class members who would not engage with any solicitation directed toward them (for example because they would not consider changing employers) could not have been directly harmed by the alleged mobility restrictions (Section 3.6).

- Seventh, proposed class members whose inter-Defendant mobility was already restricted for reasons other than the alleged mobility restrictions, for example due to non-compete agreements or unvested equity fall into two categories: (1) those who could not have been directly harmed by the alleged mobility restrictions and (2) those who could have been directly harmed to a degree, but where the fact of that harm could only be determined through individualized inquiry (Section 3.7).[225]

108. In all of the cases discussed above, it is not possible using common evidence to identify which individuals could not, or would not, have been impacted by the alleged conduct. The category where quantification is most nearly possible is proposed class members newly hired from non-Defendants with short tenure, and proposed class members employed by Defendants at the onset of the Class Period with short tenure: 25% of proposed class members

---

[225] Individuals in the fifth, sixth, and seventh group could arguably still be impacted through Plaintiffs' alleged information sharing, but as I will discuss in Section 4, the information allegedly shared could have been used to compete, and would have been insufficient to coordinate on pay, even by Prof. Starr's own standards. As such, the individuals in the fifth, sixth, and seventh groups would be a subset of the second group I discussed above, those who could only be affected indirectly through Plaintiffs' unsupported rigid pay structure.

were newly hired during the Class Period and employed by Defendants for two years or less, and 3.8% of proposed class members were employed by one of the Defendants at the onset of the Class Period and left within 2 years.[226] Plaintiffs may claim that such individuals would over time become affected by the challenged conduct; however, it is not clear at what point in time these proposed class members' pay would begin to be suppressed below competitive levels under Plaintiffs' theory, and Plaintiffs' experts have provided no method to determine this. Moreover, although it is not possible to quantify precisely, the analyses I presented in Section 2.1 showing the abundance of non-Defendant firms competing for proposed class members' labor indicates that many or most (if not all) proposed class members could not be harmed by the alleged conduct due to Defendants lack of market power. Finally, in Section 3.8, I discuss several additional reasons why it is not possible to use evidence common to the proposed class to reliably quantify harm (if any).

### 3.1. Proposed Class Members Who Participate in Labor Markets Where Defendants Do Not Have Market Power Could Not Have Been Harmed by the Alleged Conduct

109. The alleged conduct could not have harmed proposed class members who participate in labor markets where Defendants do not have market power sufficient to suppress pay. In Section 2.1, I explained that Defendants do not have market power sufficient to suppress pay for many or most (if not all), proposed class members, and thus the alleged conduct could not have harmed many or most proposed class members for this reason. Proposed class members have many (and varied) employment options besides Defendants, including in the healthcare industry generally, and outside of the healthcare industry altogether. Employment options outside of the healthcare industry may be particularly likely for some proposed members of the class, such as those in certain specialty areas including Accounting, Tax, and Treasury jobs, but may also be likely for proposed class members generally.[227] By definition, all proposed class members are employed in a managerial capacity, and labor demand for supervision of other workers exists throughout the economy.[228]

110. Since proposed class members have many employment options outside of the Defendants, had compensation been suppressed below what non-Defendant competitors were offering, Defendants would have struggled to retain and hire

---

[226] See Workpaper 10.

[227] Exhibit 5.

[228] Footnote 50.

workers. Plaintiffs have not presented, nor have I seen, evidence indicating that Defendants struggled to retain and hire workers, either generally, or particularly, during the Class Period. Moreover, in Section 3.3, I present an empirical analysis of Defendants' hiring rates and employment counts over time which suggests that they did not.

111. Given the individualized nature of proposed class members' employment options, although it is theoretically possible that a proposed class member might exist for whom the only employment options are DaVita, SCA, or USPI, such a person could only be identified after conducting an individualized inquiry, and Plaintiffs' experts have not demonstrated that any such individual exists. Nor have Plaintiffs' experts demonstrated that any such individual was harmed or that the amount of any possible harm could be determined without an individualized inquiry. As I discussed in Section 2.1, each individual's relevant outside employment options, and thus relevant labor market, depend on individualized factors like skills, experience, location, and preferences among other considerations. The analysis I presented there shows extensive competition from non-Defendant employers for proposed class members' labor (e.g., see Exhibit 1 and Exhibit 2). Neither Prof. Starr nor Prof. Gerhart has put forward *any* analysis of market power in a claimed relevant antitrust market, and Prof. Starr seems unfamiliar with the idea of a relevant antitrust market.[229] While I can conceive of a person who would fail to consider any employment options outside of their employer due to various idiosyncratic reasons, it is not self-evident to me that there are any persons at Defendant "A," say, who would consider employment at Defendants "B" and "C" and not simultaneously be willing to consider employment at the many other possible employers I discussed in Section 2.1. To uncover whether any such person exists and who they might be—the only members of the proposed class for whom harm is possible—would require individualized inquiry. Available evidence on this question is limited to the analysis I have presented, and it points to the conclusion that most, if not all, proposed class members are unharmed.

---

[229] Starr Deposition, Volume I, p. 153 ("Q Are you familiar with the antitrust concept of a relevant market? A Vaguely."), pp. 154–155 ("Q And those -- those guidelines provide in particular tools for assessing the scope of what the guidelines call and what the case law calls a relevant market. Are you familiar with that? [...] A. I'm -- I'm somewhat familiar with that. Q You haven't attempted to define a relevant market in this case, have you? A Well, when it comes to thinking about market power, my -- my reading and my understanding of those -- those documents is that there are several ways to demonstrate market power, and in the merger context, it can be hard to demonstrate market power because the merger hasn't happened. And so there are several ways in that context to think about whether, you know, whether companies might have market power, and that would require defining a relevant market.").

112. A separate but important point is that **for proposed class members where Defendants did not have market power, neither the alleged mobility restrictions nor the alleged information sharing could suppress pay**. Additionally, a lack of market power corresponds to a lack of harm regardless of whether Plaintiffs allege individuals were harmed directly (due to not being solicited) or indirectly through a rigid pay structure. Therefore, **proposed class members where Defendants did not have market power could not be harmed by the alleged conduct directly, or indirectly through a rigid pay structure.**

### 3.2. Plaintiffs Have Not Demonstrated that Proposed Class Members Not Directly Impacted by the Alleged Conduct Would Be Harmed, And Many (If Not All) Would Not Be

113. Plaintiffs and their experts claim that individuals not directly affected by the alleged conduct would be harmed indirectly through a rigid pay structure that spreads harm classwide. However, as I discussed in Section 2.2, empirical and qualitative evidence does not support the existence of a rigid pay structure, but rather indicates that individualized factors were important in compensation setting. In particular, case evidence shows that proposed class members' pay (1) depends on individualized considerations, (2) varies widely between individuals even when they occupy the same seniority level at the same firm, and (3) does not move together over time. As a result, Plaintiffs and their experts have not demonstrated that proposed class members not directly affected by the alleged conduct would be harmed indirectly, and many (if not all) would not be.

114. Just above, I discussed how many or most (if not all) proposed class members, including those who were allegedly harmed only indirectly, could not be harmed because Defendants did not have market power. This is one reason for my conclusion that many (if not all) proposed class members not directly affected by the alleged conduct would not be harmed. However, even setting this aside and allowing for the possibility that Defendants had market power over proposed class members in some cases, my analysis of Defendants' pay data and proposed class members' pay changes over time suggests that many who were allegedly harmed only indirectly would not be harmed. Neither Plaintiffs nor their experts have offered any method based on common evidence that, even assuming the alleged conduct took place and harmed some proposed

class members directly, would allow them to identify which proposed class members (if any) were harmed indirectly.[230]

### 3.3. Pay for Proposed Class Members Newly Hired from Somewhere Other than Defendant Firms Could Not Have Been Harmed by Alleged Conduct, At Least Initially, and Possibly Ever

115. Competition from numerous non-Defendant firms for proposed class members' labor implies that pay for any proposed class members hired by Defendants during the Class Period from somewhere other than a Defendant firm would have to be competitive at the time of hire. This could include being hired from a non-Defendant firm, from outside the labor market, or after finishing a degree, for example an MBA. It is therefore not at all evident how these newly hired proposed class members could be harmed, or at what point that harm would start, if ever. Plaintiffs' experts have done nothing to address this gap in their logic.

116. Consider a proposed class member who is newly hired by a Defendant during the Class Period who was either previously not employed or previously employed by a non-Defendant firm. Compensation for such a person would be competitive, otherwise they would not have accepted the offer and would not have been a new hire. This gives two puzzles for Plaintiffs and their experts. First, how could such a person have been harmed? Second, since at the moment

---

[230] Moreover, they have not even offered a methodology that would allow them to identify which proposed class members were and were not directly affected. Speaking to this point, even Plaintiffs and their experts concede that there are many proposed class members who could only have been harmed indirectly through the pay structure. Third Amended Complaint, ¶ 74 ("Distortions to the labor market's competitive process, such as the distortions caused by Defendants' no-poach agreements, suppressed the pay of all employees who shared common pay structures, not just those who proactively sought to work for another outpatient medical care center. Moreover, because the pay rates for jobs within pay structures were tied together, the compensation of all employees was affected by Defendants' no-poach agreements."); Starr Report, ¶ 172 ("Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own."); Gerhart Report, ¶ 138 ("The most visible mechanism of suppression is in the case of individual employees who were denied the opportunity to be passive recipients of cold calling by other employers, and the higher pay and advancement opportunities those calls would have provided. However, the suppression effects of the No-Poach Agreements go well beyond that, because of the systematic way in which the pay of all employees is connected in companies through their widespread use of standardized principles and practices of employee compensation management."); Gerhart Deposition, pp. 38–39 ("Q. 'Defendants' -- it's the second sentence in eight: 'Defendants' no-poach agreements and CSI exchanges suppressed the wages of some class members directly.' A. Yes. Q. You agree with that? A. Yes. Q. Okay. All right. So the remainder of class members who you say were affected would have been affected indirectly; correct? [...] A. Yeah, it wouldn't -- it wouldn't seem as direct. It would be -- Given the nature of a system where -- where pay is -- of different people and titles is closely interrelated, that would be the so-called indirect effect or less direct effect."), p. 203 ("You would agree with me that the vast majority of the proposed class members are going to fall into that indirect bucket; correct? [...]  A. Well, that's an interesting question. I guess it would depend on how many people would have gotten cold-called and gotten outside offers. And so if it was a larger percentage of people, then the direct effects would be -- would get bigger; and then the indirect effects, I guess, would also be expected to be bigger because there'd be even more pressure for wages to rise. So, yeah, it's -- I — it's possible that -- that most people could have the so-called indirect effects, but it's not -- I don't know that it's necessarily true.").

of their hire they could not have been harmed, if the theory is that they were eventually harmed, when did that begin?

117. Prof. Starr's primary pay regression model assumes a common impact for all proposed class members and thus contains two immediate contradictions in this regard that parallel the puzzles posed above.[231] First, proposed class members hired during the Class Period could not have been harmed at the time of hire, but are assumed by Prof. Starr to have the same effects as all proposed class members. This is an immediate contradiction. Second, if harm across proposed class members is common, does that mean proposed class members newly hired during the Class Period are never harmed throughout their tenure at a Defendant firm? Or are they initially unharmed and they transition to being harmed at some point? And if the latter, how long does it take before they are harmed?[232]

118. Let me now reiterate why pay for new hires is competitive, at least initially. I first describe why it would be competitive even assuming both existence and effects of the alleged mobility restrictions. Then I do the same for the alleged information sharing.

119. First, I turn to alleged mobility restrictions and assume both existence and effects. The alleged mobility restrictions would not have restricted Defendants' ability to compete for workers not employed by Defendants. Defendants, as well as other labor market competitors, would have been free to compete for these proposed class members' labor at the time they were being recruited or considered for a position. Plaintiffs allege and Plaintiffs' experts assert no agreement between any Defendants not to compete with each other for workers not employed by Defendants. Moreover, as I discussed in Section 2.1, Defendants competed with many non-Defendant employers for proposed class members' labor. It is contrary to basic case facts to assert that there are no non-Defendant employment options for proposed class members. Thus, if pay for new hires were not set competitively, those proposed class members would

---

[231] Prof. Starr may argue that his pay regression model does not treat new hires as harmed at the time of hire because he only focuses his analysis on employees with full-year compensation. See Starr Deposition, Volume I, p. 258. However, his pay regression model does include new hires that I approximate could not have been harmed because they are within their first two years of employment with Defendants, and more importantly, Prof. Starr's damages calculations include the compensation for new hires for all years in which they were employed by Defendants, including the partial years he excludes from his pay regression analysis sample.

[232] Prof. Starr's common, implausibly large, claimed shortfall in compensation of -14.5% also poses a third puzzle. If, say, one-third of class members are unharmed following the logic above, that would imply that his estimate of -14.5% is a blend of 0%, or no effect, for the one-third that are newly hired and a yet-less-plausible -22% for those that are not newly hired. That is, 14.5% must be equal to 1/3 times zero, plus 2/3 times the claimed effect for those who are claimed to have been harmed: -22%=-14.5%/(2/3).

simply choose better options.[233] That pay for new hires would need to be set competitively is consistent with deposition testimony of USPI's Andrew Johnston, who noted that "[w]hen we hired people in from [...] outside [of USPI] we obviously had to make an offer that they would accept[.]"[234]

120. Prof. Gerhart acknowledges that pay for individuals newly hired by Defendants would have to be set competitively in both his expert report and his deposition testimony.[235] Prof. Starr when asked in his deposition whether pay for new hires is competitive at first seems to respond that there is no such thing as competitive compensation,[236] but ultimately agrees with the obvious—a worker would only "climb the job ladder" by moving to a Defendant (or indeed any firm) if it were their best option.[237]

---

[233] I note that the compensation that is paid for a position is determined by the options and decisions of the marginal worker (i.e., the last worker hired who has the highest reservation wage). This means that even if there were some proposed class members with no non-Defendant employment options who might accept below market pay, pay for new hires would still be set competitively, because such workers would not be the marginal worker relevant for determining compensation.

[234] Johnston (USPI) Deposition, pp. 40–41 ("Q. Well, would -- in offering a new hire a salary, would you consider how that would fit into the structure of your current employees? [...] A. When we hired people in from the outside we obviously had to make an offer that they would accept, so that was a part of the process thinking. And we would also make sure we understood where that offer fit relative to the internal ranges at the company."). See also Deposition of Peter Clemens (SCA), May 2, 2024 ("Clemens (SCA) Deposition"), p. 144 ("A: And why would it have been important for SCA to offer competitive wages? [...] A: If you're not competitive in area or the other, you're less attractive to a potential employee.").

[235] Gerhart Report, ¶ 56 ("Paying below market, on the other hand, precludes the company from competing adequately in the labor market to hire and retain sufficient employees, particularly high-quality employees."), ¶ 143 ("But when there are many of these new hire and retention perturbations across a firm, and when they continue year-after-year, the pressures to increase pay system-wide are continuous and substantial."); Gerhart Deposition, p. 56 ("Q. Dr. Gerhart, would you agree that, to the extent that defendants hired employees from non-defendant firms, that defendants would have paid those new hires competitively? [...] A. I -- I think that would probably have to be within sight of what the competitive rate would be. Q. Because, otherwise, those employees would go elsewhere; correct? [...] A. I mean, to the extent you pay below market, there's more of a chance somebody's going to go elsewhere. Q. So newly hired employees would have to be paid at a competitive rate? [...] A. I would expect they'd be, again, as I said, paid within sight, within the ballpark.").

[236] Starr Deposition, Volume I, pp. 253–254 ("Q. And those employees that were hired by the defendants from companies other than the defendants would at the time they were hired be -- have been paid a competitive wage or compensation; is that correct? [...] A. Well, again, so the way that economists think about labor markets is not that there is a single wage in the market. [...] [T]he broad view in the economics literature is that there's not one, one competitive wage [...]"). This testimony appears to conflate two ideas. The first concept is that of a competitive compensation package, which is a package that emerges from competition between competing employers. Prof. Starr agrees that that type of package is what would persuade new hires to join the firm. See Starr Deposition, Volume I, p. 254 ("[...] and for that given worker, they don't get an offer every day, but when they do get an offer, if it's an offer that's better for them, then they take it and they would climb the job ladder."). The second concept is that competitive compensation is "a single wage in the market." See Starr Deposition, Volume I, p. 253 ("A Well, again, so the way that economists think about labor markets is not that there is a single wage in the market. In fact, there's not even a single wage I'm sure at these companies.").

[237] Starr Deposition, Volume I, pp. 254–255 ("I imagine that the workers who chose to move, hopefully they got a bump with regards to some sort of amenity at the company, whether it's a pay bump or it is closer to their home or closer to their significant other or something else that would, that would make them better off."), p. 255 ("The way that economists generally think about this is that workers are hopefully better off on some dimension when they voluntarily take a job. Maybe it's compensation. Maybe it's some other benefits or amenities associated with that particular job.").

121. Second, I turn to the alleged information sharing and assume both existence and effects. Plaintiffs do not allege that non-Defendant firms were part of the alleged information sharing. As above, if Defendants attempted to set pay for new hires from non-Defendant firms below what other labor market competitors were offering, individuals who had the option of a job with a higher-paying, non-Defendant firm would choose the higher-paying job. Thus, as above, pay for new hires would have to be competitive.

122. Regardless of whether we are talking about the alleged mobility restrictions or the alleged information sharing, Plaintiffs' experts might try to argue that pay for proposed class members newly hired during the Class Period is not set competitively. I do not find such a claim credible. If that claim were made, it would imply that Defendants would have struggled to fill positions and maintain adequate staffing. Empirical evidence in this case points to the opposite conclusion. Exhibit 21 below shows that Defendants' employee counts grew substantially during the Class Period. (The bump in employee counts for DaVita between 2015 and 2019 is due to the entry and exit of HealthCare Partners ("HCP") employees into the structured data for DaVita.) Additionally, Exhibit 22 below shows that hiring rates for Defendant were similar during the Class Period, as compared to periods before or after the Class Period.

**EXHIBIT 21**
**_Defendants' Employee Counts Grew Over Time, and Throughout the Class Period_**



Source: Corrected Starr Data

Note: The exhibit shows the total number of employees for each Defendant in each year. The "bump" in 2016–2018 for DaVita's employment is explained by the entry of DaVita's HCP employees into the structured data in 2016 and their subsequent exit in 2018. See Workpaper 11. DaVita is excluded from this chart in 2005 as the employment count appears to be inaccurate in 2005. Specifically, although the employment count goes up markedly from 2005 to 2006, many of the individuals new to the data in 2006 do not have a "hire" action in 2006 suggesting they were hired prior to 2006 but just missing from the data. See Workpaper 12. USPI is excluded from this chart in 2022 as the Tenet data ends in 2021. The SCA data series begins in 2008 because SCA was founded in mid-2007.

**EXHIBIT 22**
**Defendants' Hiring Rates Were Stable Before, During, and After the Class Period**



Source: Corrected Starr Data

Note: The exhibit plots the hiring rate for each Defendant in each year. The hiring rate is calculated as the total number of new hires divided by the total number of employees in class positions at each Defendant in each year. Employees are considered to be a new hire at a Defendant in the first year they appear in the firm's data in a class position, and were not employed by the Defendant in the previous year. The exhibit omits the first year of data available for each Defendant. The "spike" in hiring rates in 2016 for DaVita is explained by the entry of DaVita's HCP employees into the structured data in 2016. See Workpaper 11. DaVita is excluded from this chart in 2006 as the hire rate is inaccurate due to data issues in 2005. Specifically, although the employment count goes up markedly from 2005 to 2006, many of the individuals new to the data in 2006 do not have a "hire" action in 2006, suggesting they were hired prior to 2006 but are missing from the data. See Workpaper 12. In 2005, DaVita acquired Gambro Healthcare. See DaVita, "DaVita Closes Gambro Healthcare Acquisition," Oct. 5, 2005, available at https://investors.davita.com/2005-10-05-DaVita-Closes-Gambro-Healthcare-Acquisition, accessed on April 15, 2025. The issues with employment counts in the 2005 and 2006 data may be an artifact of that transaction. USPI is excluded from this chart in 2022 as the Tenet data ends in 2021.

123. Using Defendants' data, I identify proposed class members who were hired by Defendants from somewhere other than another Defendant firm during the Class Period, and thus could not have been harmed by the alleged conduct at least initially, and possibly ever. This group represents 55% of proposed class members.[238] Both Named Plaintiffs were newly hired (or acquired) from non-Defendant firms: Scott Keech previously worked at Surgery Center Partners

---

[238] See Workpaper 10. The share of newly hired proposed class members is very similar for each Defendant. New hires include proposed class members that joined a Defendant in a class position during the Class Period and whose previous job was not a class position at another Defendant. In this analysis, I do not count as new hires proposed class members that joined SCA in 2008. They are excluded from this analysis because I cannot distinguish which SCA employees present in the structured data in 2008 were hired prior to the Class Period, or were hired in 2008, as SCA's structured data begins in 2008 but SCA was founded in mid-2007. I count as new hires proposed class members from HCP that first appeared in DaVita's structured data in 2016. This includes proposed class members that joined DaVita in 2012 as a result of DaVita's 2012 acquisition of HCP, and who would have had competitive pay upon joining DaVita because HCP was not part of the alleged mobility restrictions prior to their acquisition. It also includes HCP employees who were hired sometime between 2012 and 2016 and were still employed by DaVita in 2016.

before his employment at SCA in December 2011 (when Surgery Center Partners was acquired by SCA),[239] and Allen Spradling previously worked at TekSystems before being hired by SCA in the fall of 2008.[240]

124. Plaintiffs may claim that such individuals would over time become affected by the challenged conduct: either directly through the alleged mobility restrictions or the alleged information sharing, or indirectly through the alleged pay structures. However, it is not clear at what point in time proposed class members' pay would begin to be suppressed below competitive levels under Plaintiffs' theory. The average length of employment for proposed class members newly hired during the Class Period was short: 2.8 years.[241] This means that for many newly hired proposed class members, any impact from the alleged conduct had little time to accrue. Additionally, all three Defendants typically implemented pay changes annually,[242] as Prof. Starr and Prof. Gerhart agree.[243] That suggests newly hired individuals would generally not be harmed

---

[239] Keech (Named Plaintiff) Deposition, pp. 125–126 ("You say at the top that in February 2009 you went to work for Surgery Center Partners; correct? A. [...] Yes. Q. And you were in the role of regional director of clinical operations; correct? A. Correct.  Q. And you were in that role for the entire duration of your stay at Surgery Center Partners; correct? A. It's a little tricky. There was a takeover of Surgery Center Partners by SCA"); Email chain from Scott Keech (Named Plaintiff) to Shannon Kelly (Kaiser Permanente), "Re: Application," February 21, 2012, KEECH_000000339 ("[M]y current employers is SCA (they bought my company in mid December.").

[240] Spradling (Named Plaintiff) Deposition, DX006, pp. 49–50 (Q. "Understood. Understood. Okay. So you left TEKSystems in – oh, well, let's see. This says April 2009, but actually – but let – let's put a pin in the date. Correct? A. Correct. Q. Okay. Why did you leave? A. I was contacted by a mutual friend about an opportunity at SCA."), pp. 76–77 ("Q.  You started with SCA in September of 2008; is that Correct?  I'm assuming it would have been – A. Sorry.  Can I go back to my resume?  Q.  Yeah.  Sure.  A.  (Witness reviews document.)  Well, yeah, the date of the letter is September 9th, and that's the date I accepted, and I assume it says – does it have a start date in this letter?  I don't know if it does or not.  I don't think it does.  Q.  Fair to say that you started – that you accepted this job and started within a month or so after this letter; correct? A.  Correct.").

[241] Workpaper 13.

[242] Karrmann (USPI) Deposition, pp. 45–46 ("Q. And you say, it's that time of year again, so were pay increases done on an annual basis? A. Yes."); Deposition of Cindy English, Volume I (USPI), June 12, 2024, p. 28 ("Q. Again, sticking with that same period, 2007 to 2013 or so, were salary increases implemented on a regular basis? [...] A. Yes.  They were typically annually."),; Sandoz (SCA) Deposition, Volume I, pp. 40–41 ("Q.  And was there an annual process at SCA used to determine employee compensation for the following year? A.  That was the – that is the merit budget that was set, that was established, so that was part of the annual process, was to determine what percent of salaries, so 2 percent, 2 and a half percent, 3 percent, they were going to award and provide that budget then to the managers to award at their discretion to employees.  Q.  Was there a particular time of the year when this process began?  A.  It usually began in January, February, completed by March.  Q. Okay.  And by March, is that when employees would get the increase in compensation that was decided as part of that process? A.  Correct."); Priest (DaVita) Deposition, p. 133 ("Q.  All right.  And I think you mentioned that at DaVita, at least for your team, you were involved in deciding annual pay increases; correct?  A.  I was involved in the merit increase process.  Q.  Merit increase.  That was an annual process, right? A.  It was annual.  At one point it was based on the individual's anniversary date, and at some point we moved it to once a year so everybody's was being done simultaneously, or at least in the construct of the same period of time.").

[243] Starr Deposition, Volume I, p. 259 ("Q. And how long does it take for compensation to adjust? How frequently did the defendants adjust compensation? A. Well, the record evidence, at least on the CSI exchanges and the -- the discussions in the -- that I have on compensation structures suggest that broadly compensation is set once a year typically in the third quarter or something like that [...]."); Gerhart Report, ¶ 148 ("DaVita documents show that '[s]alaries and merit increases are reviewed annually at Director and below levels.' [...] Each year, USPI implemented salary increases based on its annual budget, and the Chief Financial Officer was involved in the budgeting process."), ¶ 127 ("Similarly, in 2015, SCA advised employees responsible for merit pay proposals that with respect to its annual merit planning process, 'If you have a teammate who was recently promoted and

for at least their first year. Economic theory and research also indicate that compensation is "sticky" or, put another way, that there is downward wage rigidity, which means that wages rarely fall, at least in nominal terms.[244] This further implies that any impact on the pay of proposed class members would not be immediate, and would most likely occur through reduced or withheld pay raises over several years, rather than through pay cuts. This explanation, however, is not at all plausible given facts in this case which show that newly hired proposed class members experienced substantial annual pay increases during Class Period years. I find that the median annual pay increase for new hires during Class Period years was 7.1%.[245]

125. In addition, proposed class members could only be harmed if they remained at Defendant firms, but new hires, who are less attached to their new employer initially, would be prone to consider alternative employment options if their pay was not competitive, which they could likely find relatively easily by leveraging connections in the labor market made in their recent job search.[246] Moreover, even if it were the case that the pay of newly hired individuals did

---

received a pay increase, you may decide to award that individual with a smaller or no additional award at this time."").

[244] Bruce Fallick, Daniel Villar, and William Wascher, "Downward Nominal Wage Rigidity in the United States in times of Economic Distress and Low Inflation," *Labour Economics*, 78, 2022, pp. 1–12 at p. 3 ("As is the case with many earlier studies, we find a significant amount of downward nominal wage rigidity in the United States at a 12-month horizon, both in terms of the proportion of wage changes that were actually constrained by downward nominal wage rigidity and in the proportion potentially subject to such rigidity should the notional wage change fall below zero.."); George A. Akerlof, William T. Dickens, George L. Perry, Robert J. Gordon and N. Gregory Mankiw, "The Macroeconomics of Low Inflation," *Brookings Papers on Economic Activity*, 1996, pp. 1–76 at p. 5 ("Our own reading of the evidence, and the fundamental assumption of the model that we develop below, is that nominal wages are downward rigid, except when firms are under extreme duress. [...] We present a range of evidence demonstrating that downward rigidity is an important feature of wage behavior [...]."). Firms may also "insure" workers by not adjusting wages downwards when faced with a negative shock. See, e.g., Luigi Guiso, Luigi Pistaferri and Fabiano Schivardi, "Insurance within the Firm," *Journal of Political Economy*, (2005), pp 1054–1087 at p. 1054 ("We allow for both temporary and permanent shocks to output and find that firms absorb temporary fluctuations fully but insure workers against permanent shocks only partially."). Other research, based on interviews of business people, labor leaders, business consultants, and counselors of unemployed people during a recession in the early 1990s found that "employers were reluctant to cut pay because they believed doing so would hurt employee morale, leading to lower productivity and current or future difficulties with hiring and retention." See Truman F. Bewley, "Why Not Cut Pay?" European Economic review, 42, 1998, pp. 459–490" at p. 459; Truman F. Bewley, "A Depressed Labor Market as Explained by Participant," American Economics Review, 85(2), 1995, pp. 250–254 "at p. 252 ("However, the main causes of downward wage rigidity have to do with employers' belief that other motivators are necessary, which are best thought of as having to do with generosity.").

[245] I first compute the year over year percent change in pay for new hires in each Class Period year. I then take the average of these pay changes over all Class Period years for each individual. Finally, I take the median of these individual level averages. See Workpaper 14.

[246] Henry S. Farber, "Mobility and Stability: The Dynamics of Job Change in Labor Markets," in *Handbook of Labor Economics*, Volume 3, ed. O. Ashenfelter and D. Card (Amsterdam, Netherlands: Elsevier Science B.V., 1999), pp. 2439–2483 at p. 2440 ("Three central facts describe inter-firm worker mobility in modern labor markets: (1) long-term employment relationships are common; (2) most new jobs end early; and (3) the probability of a job ending declines with tenure.").

begin to be affected after the first year, it would not turn on like a light switch and immediately equal Prof. Starr's estimated 14.5% effect.

126. Plaintiffs' experts have done nothing to demonstrate that they have a method for reliably determining when suppressed pay for newly hired proposed class members would start, nor the degree to which pay suppression for such individuals would vary over time. Thus, it is not possible to identify which individuals who were newly hired were and were not harmed, nor is it possible to reliably quantify harm for any who were using common evidence.

127. Although individualized inquiry would be necessary to quantify precisely the share of proposed class members who could not be harmed because they were newly hired during the Class Period, to roughly approximate a group of newly hired proposed class members who could not be harmed, I estimate the share of proposed class members newly hired during the Class Period who remained with the firm for two years or less. I find that 25% of proposed class members meet these criteria.[247] It is my view that this is likely an underestimate of the share of proposed class members who were not harmed because they were newly hired during the Class Period (and therefore had competitive pay at the time of hire).

128. As a final point, and relatedly, proposed class members who were employed by one of the Defendants at the onset of the Class Period and left shortly after the onset of the Class Period would not have been harmed by the alleged conduct. As with the new hires with short tenure, pay would be competitive initially for such individuals (since it was set before the onset of the conduct), and it is not clear at what time (if ever) pay suppression due to the alleged conduct would occur. As I discussed above, pay changes were typically implemented annually by all three Defendants, and downward nominal pay adjustments are rare. I roughly approximate the share of proposed class members who could not be harmed because they were already employed by one of the Defendants at the onset of the Class Period and left during the first two years of the Class Period. 3.8% of proposed class members meet these

---

[247] Workpaper 10 also presents the share of proposed class members who remained with the firm in a class position for 2 years or less separately by Defendant. New hires who remained with the firm in a class position for two years or less include proposed class members that (1) joined a Defendant in a class position during the Class Period, (2) whose previous job was not a class position at another Defendant, (3) who left the firm within two years, and (4) did not move to another Defendant. In this calculation, I do not count as new hires any proposed class members that are HCP employees and enter the DaVita's compensation data in 2016 because I cannot determine their tenure. I additionally include in this workpaper a calculation for the share of new hires (excluding HCP employees that entered DaVita's compensation data in 2016) who had tenure of 3 or less years 66%, 4 or less years 77%, 5 or less years 83%, and 6 or less years 88%.

criteria.[248] Additionally, another 13.1% of proposed class members were employed by one of the Defendants at the onset of the Class Period and remained for at least two years.[249] Pay for these individuals would also be competitive at the onset of the Class Period, and Plaintiffs and their experts have provided no methodology to determine when, if ever, they would start to incur harm.

### 3.4. Any Proposed Class Members Whose Alleged Pay Suppression Was Entirely Offset by Increases in Equity Would Not Have Been Harmed by the Alleged Conduct

129. Prof. Gerhart asserts in his report that the alleged conduct would have benefited Defendants' stockholders by reducing each firm's compensation-related costs, and in turn, boosting their profits and the firm's long-run stock performance.[250] However, he fails to consider that, as the evidence that I discuss in Section 2.2.1 shows, **equity pay is an important source of compensation for proposed class members.** This was especially the case at the highest levels such as SVP, and may be more important for some proposed class members than others. For DaVita, this is illustrated in Exhibit 11, which shows that the percent of annual total pay that is adjusted equity (valued at the time of issuance) ranges from 5% of annual total pay for Directors compared to 43% for SVPs. Although structured data on equity pay at the time of issuance is only available for DaVita, as I showed in Section 2.2.1, available qualitative and quantitative evidence demonstrates similar patterns with respect to the importance of equity in total compensation by seniority level at USPI and SCA. This means that, by Prof. Gerhart's own reasoning, individuals for whom a large share of their total compensation was equity pay, and who held a large amount of equity, could have been less harmed, unharmed, or possibly even benefited, from the alleged conduct. For these employees, even if their non-equity pay was suppressed as a result of the alleged conduct, that loss could have been (at least partially) offset as a result of

---

[248] Workpaper 10. In this analysis, I consider all SCA employees present in SCA's structured data in 2008 as employed by SCA at the onset of the Class Period because I cannot distinguish which SCA employees present in the structured data in 2008 were hired prior to the Class Period or were hired in 2008 as SCA's structured data begins 2008 and SCA was founded in mid-2007.

[249] Workpaper 10.

[250] Gerhart Report, ¶¶ 33, 36 ("In general, any reduction in costs (that does not reduce revenues) results in profit. Profits drive long-term stock performance. A company can distribute those profits to multiple places: (1) to shareholders in the form of dividends; (2) to shareholders in the form of increased equity/stock price appreciation; (3) reinvestment in the business; and/or (4) to executives. [...] I have reviewed the following evidence that, based on my experience and research in compensation and human resource management, is consistent with employers (here, Defendant firms) seeking to control labor costs, which could have financially benefited C-suite executives (and others) who were paid primarily in stock and were rewarded for their firms' performance.").

the gain in the value of their equity. Individualized inquiry would be necessary to identify which proposed class members belong to this group. I am not aware of any information common to the class that would allow for the identification of such individuals. Therefore, I cannot confirm based on evidence common to the class that they did exist, but neither can Plaintiffs and their experts demonstrate that they did not.

### 3.5. Proposed Class Members Employed by DaVita and USPI Who Would Not Consider Employment Options at SCA Could Not be Directly Harmed by the Alleged Mobility Restrictions

130. Plaintiffs' experts have provided no evidence that there was any agreement to restrict mobility between USPI and DaVita. As such, individuals employed by USPI and DaVita could only have been directly affected by the alleged mobility restrictions to the extent that they would have considered opportunities with SCA. Given this, any proposed class members employed by DaVita or USPI who would not have considered employment options at SCA (for example due to location considerations) could not have been directly harmed by the alleged mobility restrictions. Plaintiffs may claim such individuals could still be harmed by the alleged mobility restrictions indirectly through a rigid pay structure, but I have addressed this possibility in Section 3.2 where I concluded that Plaintiffs' experts have not demonstrated this would be the case, and many (if not all) would not be.

131. Additionally, individualized inquiry would be necessary to learn which proposed class members employed by DaVita and USPI would not have considered employment options at SCA. Therefore, I cannot confirm that such individuals did exist, but neither can Plaintiffs confirm that they did not.

### 3.6. Any Proposed Class Members Who Would Not Engage with Any Solicitation Outreach Could Not be Directly Harmed by the Alleged Mobility Restrictions

132. The alleged mobility restrictions would not directly affect any individuals who would not engage with any solicitation or outreach directed at them. This might occur, for example, because they have no interest in changing jobs or do not learn any useful information from the solicitation. Such individuals could not be directly impacted by the alleged mobility restrictions because they would not review any solicitation outreach, or answer the phone, let alone negotiate their wages at their current employer or move to a new employer as a result of the solicitation. Moreover, even many individuals who would engage by

answering the phone or reviewing a message sent to them may not get to the point of learning what the job is paying. Plaintiffs may claim such individuals could still be harmed by the alleged mobility restrictions indirectly through a rigid pay structure, but I have addressed this possibility in Section 3.2 where I concluded that Plaintiffs' experts have not demonstrated this would be the case, and many (if not all) would not be.

133. I am not aware of any information common to the class that would allow for the identification of individuals who would not engage with solicitation and outreach, nor attempt to negotiate higher wages or consider changing employers as a result of solicitation and outreach they received. Therefore, I cannot confirm based on evidence common to the class that they did exist, but neither can Plaintiffs and their experts demonstrate that they did not.

### 3.7. Proposed Class Members Whose Mobility Between Defendants Was Already Restricted Would Not Have Been Directly Harmed by the Alleged Mobility Restrictions in Some Cases, and in Other Cases Would Have Been Less Harmed

134. Proposed class members whose inter-Defendant mobility was already restricted regardless of the alleged mobility restrictions either could not have been directly harmed by the alleged mobility restrictions or would have been less directly harmed by the mobility restrictions than individuals who did not already have any inter-Defendant mobility restrictions. Plaintiffs may claim such individuals would still be harmed by the alleged mobility restrictions indirectly through a rigid pay structure, but I have addressed this possibility in Section 3.2 where I concluded that Plaintiffs' experts have not demonstrated this would be the case, and many (if not all) would not be.

135. There are at least three ways in which proposed class members' mobility between Defendants may have already been restricted for reasons other than the alleged conduct. First, many proposed class members agreed to non-compete agreements with their employers which likely prevented them from moving to another firm in the same industry or perhaps geography, including at least one other Defendant, for some period.[251] Second, hiring and recruitment limitations placed on external search firms used by Defendants would also have limited the inter-Defendant mobility of some proposed class members, potentially dulling or negating any impact of the alleged mobility restrictions.

---

[251] Because non-compete agreements would vary from individual to individual, it is hard to say definitively what mobility restrictions such employees would have agreed to. See below for available record evidence on the scope of non-compete agreements.

Finally, proposed class members faced with losing substantial equity pay that was not yet vested may also have self-restricted themselves from moving (to another Defendant firm or anywhere else) to avoid losing unvested equity. Similarly, proposed class members who expected to receive equity awards may have also self-restricted themselves from moving. Individualized inquiry would be necessary to identify proposed class members who could not have been directly harmed by the alleged mobility restrictions due to their mobility between Defendants already being restricted. I now discuss in more detail each of the ways in which proposed class members inter-Defendant mobility could have been limited regardless of the alleged conduct.

136. **Lawful non-compete agreements would have limited the mobility of proposed class members, dulling, or potentially negating, any impact of the alleged mobility restrictions**.[252] Non-compete agreements are agreements between an employee and an employer that restrict an individual from seeking employment with certain competing firms (for example those in a defined geographic scope or those explicitly listed or described) for some period of time.[253] The purpose of such agreements is to protect a firm's trade secrets, customer relationships, or other confidential information, as well as to encourage employees and employers to make relationship-specific investments.[254] Non-compete agreements are negotiated:

---

[252] I have no view as to the enforceability of the non-competes that were relevant for proposed class members. For remainder of report, when I discuss non-compete agreements, I mean lawful non-compete agreements.

[253] U.S. Government Accountability Office, "Noncompete Agreements: Use Is Widespread to Protect Business' Stated Interests, Restricts Job Mobility and May Affect Wages," May 11, 2023, available at https://www.gao.gov/products/gao-23-103785 at p. 3 ("In general, noncompete agreements (NCAs) are contracts between a worker and an employer in which the worker, upon departure from employment, agrees to not join a competing employer in a similar position or launch a competing business, generally for a specified period. NCAs are generally bound by (1) time—a period restricting certain types of related employment (e.g., 1 year); (2) geography—a defined territorial area in which the employee is restricted from working; and (3) scope— a prohibition limiting the nature of the work in which an employee can engage.").

[254] Absent a non-compete agreement, firms and workers may be less likely to make relationship-specific investments for fear of separation. See U.S Government Accountability Office, "Noncompete Agreements: Use Is Widespread to Protect Business' Stated Interests, Restricts Job Mobility and May Affect Wages, May 11, 2023, available at https://www.gao.gov/products/gao-23-103785 at p. 1 ("For example, the use of noncompete agreements may enhance economic efficiency by incentivizing firms to invest in worker training and other types of human capital."), p. 13 ("Firms can use NCAs to protect their business interests, such as keeping sensitive or confidential information from falling into the hands of an employer's competitors or ensuring an employer's workforce remains in place."). In the context of physicians, non-competes prevent physicians from taking patients with them to another practice in the same geographic market. See Kurt Lavetti, Carol Simon and William D. White, "The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians," *Journal of Human Resources*, 55 (3), 2020, pp. 1025–1067 at pp. 1027–1028 ("By preventing physicians from taking patients with them to another practice in the same geographic market, NCAs [non-compete agreements] have the effect of converting patient relationships, which would otherwise be general human capital that increases productivity at many firms, into firm-specific capital by making the patient relationships worthless to the physician outside of the practice that imposes the NCA. [...] Without extracting a payment for general human capital investments made by the firm, and without individual physicians making direct investments in recruiting patients, general human capital investments may be inefficiently low due to investment holdup problems. By converting general capital into firm-specific capital, NCAs offer firms a mechanism to overcome this investment holdup, leading firms to increase their investments in patient relationships.").

to the extent that employees did not view non-compete agreements as favorable when considering their employment contract, they could negotiate for additional compensation or employment terms.[255] Prof. Starr agrees that non-competes can have private and social benefits and that workers can negotiate on other employment terms when agreeing to a non-compete.[256]

137. Record evidence indicates that, during the Class Period, many proposed class members at USPI and SCA had non-compete language in their employment contracts that would have limited their mobility generally, and thus specifically between the two firms.[257] Indeed, record evidence includes many examples of proposed class members at all seniority levels that were

---

[255] Individuals who have non-competes can negotiate higher starting pay to compensate for any loss they perceive from the non-compete agreement (so long as they know about the non-compete). Indeed, a recent report from the Government Accountability Office found that executives that signed non-compete agreements received additional financial compensation upon signing non-compete agreements. See, U. S. Government Accountability Office, "Noncompete Agreements: Use is Widespread to Protect Business' Stated Interests, Restrict Job Mobility, and May Affect Wages," May 11, 2023, available at https://www.gao.gov/products/gao-23-103785 at p. 20 ("Similar to the employers that responded to our survey, stakeholders told us that executives or senior management more typically received additional financial compensation from employers for signing NCAs.").

[256] In his academic research, Prof. Starr notes that one positive benefit of noncompete agreements is that individuals who sign noncompetes can effectively negotiate over the terms of the contract so that "her expected future utility is no lower than it would be without the noncompete." See, Norman D. Bishara and Evan Starr, "The Incomplete Noncompete Picture," *Lewis & Clark Law Review*, 20(2), 2016, pp. 497–546 at p. 505 ("Despite the potential cost of noncompetes for individuals and regions, the use and enforcement of noncompetes may also provide both private and social benefits. For instance, proponents of private contracting argue that individuals who sign noncompetes will effectively negotiate over the terms of the contract, so that when an employee agrees to a noncompete, her expected future utility is no lower than it would be without the noncompete. Other socially positive spillovers of noncompetes include increases in innovation and employee training, which may be derived from the protection noncompetes offer for trade secrets and employer good will.").

[257] Record evidence suggests employees in many class positions at USPI would be covered by non-competes. See "Memo to Andrew Hayek (SCA) and Suzanne Watson (Chartwell Partners) from William H. Wilcox (USPI), May 2010, USPI_CIV_000714194–95 at USPI_CIV_000714194 ("It has come to my attention that Chartwell Partners is conducting an executive search in the ASC industry on behalf of SCA. I am writing to inform you of certain contractual provisions by which our senior operators are bound, USPI has non-compete agreements in place with each of our regional vice presidents, senior vice presidents and division senior vice presidents. In short, all of our operators above the administrator level (and most administrators) are bound by these agreements. In general, these agreements prohibit our senior operators from competing with USPI in the United States."). In accordance with SCA's Severance Plan, VPs, SVPs, and GVPs were required to execute a Limited Restrictive Covenant Agreements that would include post-employment non-compete provisions as a condition of employment and eligibility for the Severance Pay Plan. See "SCA Severance Pay Plan Effective December 18, 2008," SCA002220548–52 at SCA002220549 ("Commencement of Participation. An Employee shall become a Participant as of the date such Employee is hired as or promoted to one of the following positions: Senior Vice President ('SVP') and Vice President ('VP'); provided, however, that to be a Participant shall also have executed a Non-Disclosure, Non-Hire and Non-Solicitation Agreement with Company in the form presented to Employee by Company"); "Amendment to the SCA Severance Pay Plan Effective January 1, 2011," SCA002220553–54 at SCA002220553 ("An Employee shall become a Participant as of the date such Employee is hired as or promoted to one of the following positions: Senior Vice President ('SVP'), Group Vice President ('GVP') and Vice President ('VP'); provided, however, that to be a Participant such an Employee must also have executed a Limited Restrictive Covenant Agreement with Company in the form presented to Employee by Company."); "SCA Compensation Committee Meeting," February 8, 2011, SCA000640388–509 at SCA000640453 ("Mr. Sharff and Mr. Hayek then reviewed and discussed management's plan to ask Company vice-presidents and senior vice presidents to enter into restrictive covenant agreements including a post-employment non-compete provision. [...] After that discussion, and upon motion duly seconded, the Committee ratified and approved the following resolutions: BE IT RESOLVED, that the Amendment to the Severance Plan of the Company in the form attached hereto as Exhibit A is hereby authorized and approved, effective as of the date hereof[.]").

covered by non-compete clauses.[258]  If Plaintiffs and their experts are asserting that the alleged mobility restrictions directly harmed proposed class members at USPI or SCA who were subject to non-compete agreements, confirming such would require individualized inquiry into the terms of the non-compete agreement (including its duration and what employment opportunities it ruled out).

138. For example, it would be important to understand whether proposed class members employed by SCA who were subject to non-compete agreements preventing movement to USPI, but not to DaVita, would have considered opportunities at DaVita, which operated in a different industry from USPI and SCA, and therefore might not have been within the ambit of non-competes signed by USPI and SCA employees.[259] If a proposed class member employed by SCA who agreed to a non-compete restricting movement to USPI would not have considered opportunities at DaVita, then they could not have been directly impacted by the alleged mobility restrictions because the alleged mobility restrictions would not have prevented any movement that was not already prevented by the non-compete the employee agreed to. If they would have considered DaVita opportunities, then it is still theoretically possible the alleged mobility restrictions directly impacted them, but harm (if any) would be diminished by the existence of the non-compete, and common evidence would be insufficient to identify or quantify harm.[260]

---

[258] See, e.g., "Offer of Employment for a Regional Vice-President of Anesthesia Operations," January 25, 2013, USPI_CIV_000036736–37 at USPI_CIV_000036736 ("[W]hile you are employed by USPI and for one year following your last day of employment (the 'Non-Competition Period'), you will not, directly or indirectly, (i) compete with USPI or any of its subsidiaries in any business activities which USPI shall conduct or intend to conduct as of your last day of employment or (ii) undertake any planning for any business competitive with USPI[.]"); "Offer of Employment for a Director of Business Development," March 14, 2014, USPI_CIV_000446798–99 at USPI_CIV_000446798; "Offer of Employment for a Regional Director, Business Development for the San Antonio marketplace," September 8, 2014, USPI_CIV_000752863–64 at USPI_CIV_000752863; "Offer of Employment Letter for Director of Perioperative Clinical Services," November 13, 2013, SCA000549141–48 at SCA000549145 ("During Employee's employment with the Company and for a period of nine (9) months thereafter (the 'Non Compete Restricted Period'), the Employee shall not, directly or indirectly [...] provide or prepare to provide any services, similar or related to those Employee provided to the Company for any Person (including Employee) engaged in or planning to engage in the Business."); "Offer of Employment Letter for Senior Vice President," July 23, 2015, SCA000844623–24 at SCA000844623 ("As a condition of your employment and your eligibility for the Severance Pay Plan, you will be required to sign a Limited Restrictive Covenant Agreement on your first day of employment.").

[259] Although all three Defendants operate in the four digit "Outpatient Care Centers industry" (NAICS code 6214), USPI and SCA operate in the six digit "Freestanding Ambulatory Surgical and Emergency Centers" industry (NAICs code 621493), and DaVita operates in the six digit "Kidney Dialysis Centers" industry (NAICS code 621492). See my backup materials.

[260] To the extent there was variation over time in whether an individual had such a non-compete, or would consider employment at DaVita, that would also be relevant to quantifying harm accurately and would require individualized inquiry to determine.

139. For proposed class members employed by USPI who were subject to non-compete agreements preventing movement to SCA, but not to DaVita, the situation is less complicated. Such individuals could not be directly harmed by the alleged mobility restrictions regardless of whether they would consider employment opportunities at DaVita because Plaintiffs' experts have alleged no mobility restrictions between USPI and DaVita. Individualized inquiry would still be necessary in this case however to confirm that the individual at USPI had a non-compete that prevented movement to SCA throughout his/her employment with USPI during the Class Period.

140. Besides non-compete restrictions in many proposed class members' employment contracts, **contractual hiring and recruitment limitations agreed to by external search firms used by Defendants, and which are standard in the professional recruiting firm industry,[261] would also have limited the mobility of proposed class members, potentially dulling or negating any impact of the alleged mobility restrictions**. External search firms learn sensitive information when recruiting on a firm's behalf (e.g., via interviews or in-depth interactions with the firm's employees). That sensitive information may include information about company culture, compensation practices, performance and caliber of individual employees, the organizational chart, and company strategy.[262] It also

---

[261] Tanner (Catapult Staffing) Deposition, p. 57 ("Was it your understanding that these sort of contractual nonsolicits were common in the industry? A. Yes, I think from a client perspective, yes. In our contracts. Q. Would those sort of nonsolicit clauses also have been in your contracts while you were working at Catapult? A. Yes, I would imagine I think it's standard staffing agreement language with most of our clients."); Deposition of John Schultz (Russell Reynolds and Spencer Stuart), November 19, 2024 ("Schultz (Russell Reynolds and Spencer Stuart) Deposition"), pp. 117–119 (" ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Deposition of Michael Loiacano, June 28, 2024 ("Loiacano (Heidrick) Deposition"), pp. 46–47 (" ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ██████████████

[262] Fanning (SCA) Deposition, pp. 205–207 ("Q. You were asked earlier about the headhunters and some of them having their own companies that were off-limits or whatever the term was. Do you recall that? A. Correct. Q. Can you clarify for us so that the jury understands why they have that and how it's applied? A. Yes. Sure. So if you're a recruitment firm recruiting for very senior executives you learn a lot about that company. [...] I mean, you really get into what's going on behind the scenes to a certain extent of the performance and caliber of people and

includes forging relationships with key employees.[263] In order to prevent external search firms from using this information to subsequently recruit workers from that same firm, external search firms often agree to not recruit and hire *from* firms for which they recruit.[264] ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ [265]

141. To the extent that Defendants worked with the same external search firms during the Class Period, the hiring and recruiting of Defendants' employees

---

knowledge of people. You get to know the org chart. You get to know who works for who and who reports to who and what those teams are, what their jobs are, what the skills are required. So you get a lot of sensitive internal information that's very valuable in the marketplace, particularly when it comes to recruiting. [...] I'll share with you all this information so that you can go off and help me recruit the people I want you to go and find me more of, but I'm not going to allow you to come in and learn my organization and then use it to steal my talented executives. So if we're going to work together you can't recruit my people for other companies. [...] These recruiters are usually pretty smart about that because they don't like these agreements any more than I like them, right, because they get in the way. So there is usually an off-limits. It might be — it's usually timebound. There might be a division. There might be a level. Whatever. It depends how much they know about the organization, whether they're working in the organization, depends on the recruitment firm, how it works. But they will then basically say, look, we can't recruit from this company because we're already recruiting a lot of executives from them.").

[263] Schultz (Russell Reynolds and Spencer Stuart) Deposition, p. 118 ███████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████

[264] Metcalf (Russell Reynolds) Deposition, pp. 85–88 ("Q. Okay. Now, when Russell Reynolds enters into an agreement with a potential client, is there typically a provision that limits Russell Reynolds' ability to recruit from individuals ultimately placed at that client? A. It depends. [...] Q. Okay. And what does it depend upon? A. If there were a Master Services Agreement with a big scope of the relationship, there may be specific provisions around that, which would be the most typical situation. Q. And outside of a Master Services Agreement, would such limitations typically exist? [...] In other circumstances, it may be more the context of the situation. [...] Q. And how long would -- well, can you describe just generally what the policy would be [...] It would be typically if we're recruiting for an executive, we would not recruit out their team. It would be somewhat a conflict to the relationship. [...] Q. You're saying that if you were currently in the process of recruiting for an executive, that you wouldn't recruit one of their team members. Is that -- I just want to understand what your... A. So the policy would be typically that -- that we would not recruit the peers to the hiring manager or individuals that are directly involved in the search. So that could be interviewers. Q. Okay Now, what about after you've placed a candidate? Can Russell Reynolds go ahead and recruit that candidate typically within a — [...] -- six months later? A. Our -- we cannot recruit a placed candidate within six months. Q. Are those -- are those standard terms? A. Yes. Q. Okay. And are there any limitations on recruiting a placed candidate's direct reports typically? A. Yes. Q. Okay. And what are those limitations? A. Typically six months.").

[265] Loiacano (Heidrick) Deposition, pp. 45–47 ("█████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

Highly Confidential – Outside Counsel/Experts Only

may have been limited as a result of the limitations placed on third party recruiters. SCA and DaVita both worked with Heidrick & Struggles, Caldwell Partners, Russell Reynolds, and Spencer Stuart,[266] and Catapult Staffing may have worked with both USPI and SCA.[267] Record evidence includes examples of limitations placed on third party recruiters that would have limited mobility between Defendants:

- Bridie Fanning testified that, when she joined SCA in 2014, SCA had been using, "for quite a considerable length of time," only two external recruiting firms—Caldwell and CTPartners—both of which also worked for DaVita and had "off-limits," preventing them from recruiting DaVita employees for positions at SCA.[268]

- A 2014 engagement letter between SCA and external recruiting firm Caldwell Partners for the search of a Senior Director of Managed Care included a provision stipulating that Caldwell Partners would "not

---

[266] According to deposition testimony of Robert Chipman, DaVita worked with Heidrick & Struggles, Caldwell Partners, Korn Ferry, Russell Reynolds, and Spencer Stuart. See Chipman (DaVita) Deposition, pp. 98–99 ("Q. What recruiting agencies did DaVita use to fill those roles? [...] A. Yeah, over the course of the years that I was there, we used a variety of them, anywhere from 10 to 15 in any given time. Q. Was Heidrick & Struggles one? A. They were one, yes. Q. What about Caldwell Partners? A. Caldwell was one, yes. Q. Korn Ferry? A. Yes. Q. What about Russel Reynolds? A. Yes. Q. What about Spencer Stuart? A. Yes"). SCA also worked with some of the same recruiting firms. See "Heidrick and Struggles Confidential Progress Report –Senior Vice President, West," SCA, December 4, 2015, SCA000001836–47; "Caldwell Partners Report Confidential Candidate Report – Senior Director, Managed Care," SCA, June 2014, SCA000393815–25; "Assignment Status Report – Regional Vice President from Russell Reynolds to SCA," April 20, 2015, SCA0000002891–908; E-mail from Spencer Stuart to Bridie Fanning and Joe Clark at SCA, "*EXTERNAL* FW: Update: GVP, Development Discussion Materials," July 19, 2016, SCA000071259–65 at SCA000071260–65.

[267] See, e.g., "Catapult Staffing Service Order for an Administrator Position," February 13, 2018, USPI_CIV_000001791; See also Email from Megan Fox (Catapult Staffing) to Shannon Mosley (USPI) and Shannon McGarry (USPI), RE: [External] Catapult Weekly Recruiting Updates, February 16, 2018, USPI_CIV_000001734–35 at USPI_000001734 ("Below are weekly recruiting updates."). The deposition testimony of Jimmy Tanner, an external recruiter at Catapult Staffing, suggests that Catapult staffing worked with both SCA and USPI. See Tanner (Catapult Staffing) Deposition, p. 15 ("Q. Now, at Catapult did you do work for USPI – if I say USPI, do you know what that means? A. Yes, I do. And yes. Q. And did you do work for USPI during your time at Catapult? A. I did."); Shannon McGarry (USPI) Deposition, pp. 83–84 ("Q. And what outside recruiters were utilized? A. For me, I mainly used Catapult. That was my choice to utilize Catapult because they had a pulse of what we were looking for in regards to skill set. [...] Q. And how often would you communicate with the people at Catapult about a position that they were working to fill? A. Well, when there was a need to fill the position, I would actually reach out to Catapult and say, I need help with a CEO -- not a CEO role, but typically administrator. I need help with an administrator position.").

[268] Fanning (SCA) Deposition, pp. 30–32 ("Q. And while you were the chief talent officer at SCA, do you recall which search or recruiting firms you used in finding candidates? A. Yes. Q And what were those? A. When I started at SCA Michael Rucker was responsible for recruiting and the two firms predominantly that SCA were using were Caldwell and CTPartners, and they used them for quite a considerable length of time. And then as I started to get involved in recruitment we brought on different recruiters and we used Russell Reynolds, Heidrick & Struggles, Spencer Stuart, Parnassus Group, and to a lesser extent for executives Cielo Search. [...] Q. Okay. And would the search terms have their own target lists sometimes? A. Well, here was the thing. Usually a search firm gives you a target list, but as I just articulated, we were using several search firms. [...] What was different is that each of those search firms have their own off-limits with clients that they have. So, for example, Caldwell and CT both had DaVita as off-limits. They couldn't recruit from DaVita.").

solicit for hire or placement any employee of SCA,"[269] which would have restricted Caldwell Partners from recruiting SCA employees for positions at other firms they also recruited for, including DaVita.

- A 2011 engagement letter between Chartwell Partners and SCA for a search for a Vice President, as well as a 2013 agreement between USPI and Catapult Staffing included similar provisions.[270]

- A 2011 engagement letter between Caldwell Partners and DaVita for a search for a Vice President included a provision stipulating that Caldwell Partners would not solicit or hire "any of DaVita's employees to work [...] for any [...] entity."[271]

As a result, in some instances the limitations that external search firms working for Defendants placed on whom they could recruit from included co-Defendants.[272] Moreover, as Defendants' use of recruiting firms varied (e.g., over the Class Period or by job position),[273] individualized inquiry would be

---

[269] "Caldwell Partners Engagement Letter for SCA Senior Director of Managed Care Search," April 16, 2014, SCA000841643–47 at SCA000841645–46 ("For a period of one year from the date of this letter, TCP and its associates will not solicit for hire or placement any employee of SCA for search assignments conducted by TCP unless (a) you breach any terms of this agreement, including any terms relating to the timely payment of frees and expenses; (b) an authorized agent of Surgical Care Affiliates to an exception in writing or (c) a material change in control of Surgical Care Affiliates results in a detrimental change in our relationship with Surgical Care Affiliates. Additionally TCP agrees not to recruit the hired candidate(s) for other search assignments while the person's employment with Surgical Care Affiliates is maintained unless provisions (a) (b) or (c) above apply.").

[270] "Chartwell Partners Engagement Letter for SCA Vice President (or Senior Vice President) Search," March 15, 2011, DOJCIV-009-00000032–37 at DOJCIV-009-00000035 ("Chartwell Partners will not, while it is conducting this search and for a period of eighteen (18) months after the placement of the candidate or the termination of this agreement, whichever occurs first, recruit, contact employ, offer to recruit, or otherwise retain any employee of SCA."); "Master Services Agreement between Catapult Staffing and USPI," July 7, 2013, USPI_CIV_000432243–54 at USPI_CIV_000432248–49 ("During the term of this Agreement, Catapult agrees that it will not actively solicit any full time employee of Client's regarding outside employment opportunities, unless specifically directed or requested by a Human Resource Professional or Client.").

[271] "Caldwell Partners Engagement Letter for DaVita Vice President, Practice Affiliations," December 7, 2011, DVA_OMCEAL_000289410–15 at DVA_OMCEAL_000289413.

[272] See, e.g., Fanning (SCA) Deposition, pp. 207–208 ("So what I was referring to in both my testimony and what we talked about here is that Caldwell and CTPartners, the — were part of the recruiters, for example, when I joined SCA. Both had off-limits with DaVita because they were recruiting for Kent Thiry and DaVita. So they couldn't turn around and use that information to say, well, SCA, these are ten really great people at DaVita because they know that from a privileged position they have with Kent getting involved in their business."); Metcalf (Russell Reynolds) Deposition, pp. 87–88 ("A. So the policy would typically be that — that we would not recruit the peers to the hiring manager or individuals that are directly involved in the search. So that could be interviewers. Q. Okay. Now, what about after you've placed a candidate? Can Russell Reynolds go ahead and recruit that candidate typically within a [...] — six months later? [...] A. Our — we cannot recruit a placed candidate within six months. Q. Are those — are those standard terms? A. Yes. Q. Okay. And are there any limitations on recruiting a placed candidate's direct reports typically? A. Yes. Q. Okay. And what are those limitations? A. Typically six months. Q. Okay. And do you recall whether there were any limitations on Russell Reynolds' ability to recruit SCA employees other than those standard limitations? [...] A. Not other than the standard limitations.").

[273] At DaVita, recruiting for proposed class members was typically geographically decentralized, and the use of external search firm varied accordingly, as well as with the specific position that was being filled. See, Chipman (DaVita) Deposition, pp. 99–100 ("A. [...] I could describe the process in terms of how we would engage with [a recruiting agency.] Q. Yes. Please describe that. A. Okay. Let me start off with - - it varied. We had seven palmers, very decentralized organization, so it didn't happen the same way every time."), p. 98 ("Q. What positions did you

necessary to reliably quantify harm because it would be important to understand for which proposed class members the recruitment and hiring limitations imposed by external search firms would have restricted mobility between Defendants thus rendering the alleged mobility restrictions partially or entirely irrelevant.

142. **The mobility of proposed class members was also potentially limited because some proposed class members would have had substantial equity pay that had not yet vested**. As I explained in Section 2.2.1, proposed class members received equity compensation, and the share of an employees' compensation composed of equity typically increased with seniority. Proposed class members were often granted equity pay or other incentives such as signing bonuses that vest over time. For example, at DaVita, one employment agreement describes Restricted Stock Units ("RSUs") that vest over four years: ███████████████ The same letter describes stock options (the option to purchase shares in the future at a fixed price) that vest over ███████████████ [274] As another example, an employment agreement from USPI describes "non-qualified options to purchase ███ shares of common stock" that vest over a ███████ at a rate of ███████ [275] Similarly, a 2016 spreadsheet summarizing equity holdings for SCA

---

use those [external search] firms to fill? A. Again, because of the costs with an external agency, we would typically only use those for the higher roles, VP, SVP, and above. Q. What about director? A. Occasionally, if we were having a difficulty with either hiring from within or sourcing those ourselves, but that was rare."). At SCA, in some instances managers were allowed to decide whether to engage external recruiters. See Sandoz (SCA) Deposition, Volume I, p. 27 ("Q. And who was responsible for recruiting candidates at the director level? A. Well, it was — so Wanda McKenny led the overall recruiting function and worked with our — SCA had — Cielo was our recruiting partner, but it varied because some managers were allowed to recruit on their own or use one of our partners or agencies, but Wanda McKenny lead the recruiting for below vice president level."). At USPI, the use of external recruiters varied by position. See Deposition of Shannon McGarry (USPI), June 11, 2024, pp. 78–79 ("Q. Would you use outside recruiters for administrator positions? A. Yes. Q. How about CEOs? A. Yes. Q. And RVPs? A. Yes. Q. Were there any other positions that you would use, USPI would use outside recruiters to recruit? A. Those are the only three positions that I at the time was responsible for. So I can't say if other individuals utilized outside recruiters."); Deposition of Shannon Mosley (USPI), August 13, 2024 ("Mosley (USPI) Deposition"), p. 92 ("Q. And how would you go about actively recruiting for the position of administrator? A. Besides posting the job, you know, as I mentioned, I might reach out to an agency. It depended on the difficult -- the level of difficulty, the region, the area. And if it was a hard position to fill, say it had been open for three months, I would then reach out to an agency and ask for their help in finding a candidate. So mostly posting the job.").

[274] "DaVita Employment Agreement for ███████" DaVita, November 14, 2011, DVA_OMCEAL_001090817–29 at DVA_OMCEAL_001090818. See also "DaVita Employment Agreement for ███████" DaVita, Undated, DVA_OMCEAL_000296081–088 at DVA_OMCEAL_000296082.

[275] "USPI Employment Offer Letter for Regional Vice President, ███████" USPI, 2013, USPI_CIV_000301109–10 at USPI_CIV_000301109. See also "USPI Employment Offer Letter for Director of Acquisitions, ███████" September 3, 2013, USPI_CIV_000035655; "USPI Employment Offer Letter for Regional Vice President of the Phoenix region, ███████," USPI, May 9, 2014, USPI_CIV_000055047–48 at USPI_CIV_000055047; "USPI Employment Offer Letter for Regional Vice President of the Phoenix region,

employees shows that nearly all stock grants issued between 2013 and 2016 vested over ███████████████████████████████████████████████ ████████████████████████████████[276] Senior employees like those employed by Defendants would likely take into account their unvested equity with their current employer when considering alternative employment opportunities.[277]

143. As a result, employees with substantial unvested equity pay may not have had any desire to leave for a competitor – if they did leave, they would lose out on a significant portion of their equity compensation. An individual faced with losing substantial equity upon leaving would likely only choose to leave in the event that a competing employer was willing to compensate them for the equity pay that they would have to give up. Indeed, compensation such as equity or signing bonuses that vests over time is a common tool employers use to increase retention, as was recognized by Defendants themselves.[278] Academic literature shows that deferred vesting of stock and option grants leads to reduced employee mobility.[279] Understanding to what extent proposed class

Wade Burgess," August 25, 2014, USPI_CIV_000040029; "USPI Employment Offer Letter for Regional Vice President of Operations, December 5, 2008, USPI_CIV_000037954; "Stock Option Agreement," July 14, 2017, USPI_CIV_000022791–811 at USPI_CIV_000022794; "Minutes – USPI Holding Company, Inc. Option and Compensation Committee Meeting," October 19, 2017, USPI_CIV_000023128–133 at USPI_CIV_000023130; Email chain between Andy Johnston (USPI) and Andrea Fann (USPI), "Re: stock option agreement," March, 23, 2015, USPI_CIV_000039709–10 at USPI_CIV_000039709; "July 2016 USPI Equity Grants," USPI_CIV_000024141; "Re: Equity Plan and Deferred Comp Plan Amendments," USPI_CIV_000038254–55 at USPI_CIV_000038254 ("Equity Option Plan Summary: The plan was adopted as part of the UPSI/Tenet merge. The concept behind the plan is both an incentive to drive value and a retention tool for those ~135 participants. [...] If an employee were to depart today of their own will, they would have vested ████████████████ ██████ of the total options granted to date."). Some Defendants had deferred compensation plans, including USPI, a plan in which employees can "[d]efer receipt of taxable income to a future date," and employees may lose their unvested employer-matched contributions upon departure from the firm. See "United Surgical Partners International, Inc. Deferred Compensation Plan," USPI_CIV_000227267 at pp. 8, 12; "Minutes – USPI Holding Company, Inc. Compensation Committee Minutes," February 14, 2018, USPI_CIV_000620051–67 at USPI_CIV_000620063 ("Amend the USPI Deferred Compensation Plan to reflect employer contribution vesting to be ████████████████████████████████████."); Email chain between Daniel Cancelmi (Tenet) and Sandi Karrmann (USPI), "Re: USPI Deferred Compensation Plan," December 26, 2018, USPI_CIV_000212779–80 at USPI_CIV_000212779; "Tenet/USPI Deferred Compensation High Level Plan Comparison," April 1, 2016, USPI_CIV_000026240 ("███████████████████████████ ████████████████████████████████████████████████████████ ████████████").

[276] "Total Rewards Statement for 2016," March 8, 2016, BF000233732. See also "SCA Compensation Committee Meeting," SCA, March 4, 2015, SCA000545210–245 at SCA000545217. See also "Compensation Committee Meeting," SCA, March 6, 2013, SCA001279742–825 at SCA001279747 ("Historically, grants have been structured as: — ██████████████████████████████████████████████████████ ████████████████████████████████████.").

[277] To the extent that prospective employers would compensate a candidate for unvested equity they would lose if they were to change jobs, the above arguments would not apply in these specific instances.

[278] See, e.g., Email chain between Peter Clemens (SCA) and Michael Rucker (SCA), "RE: equity grant," July 16, 2014, SCA00004815–17 at SCA00004816 ("I believe these grants would be meaningful in our efforts to reward and retain these high performers over the mid- to long-run.").

[279] Academic research has found that following the issuance of broad-based employee stock options ("BBSO") employee turnover decreases but then increases again once the options vest. See, e.g., Serdar Aldatmaz, Paige

members had unvested equity pay (or were expecting to receive equity awards) such that they would not have engaged with solicitation outreach or proactively searched for employment elsewhere, and therefore could not have been directly harmed by the alleged mobility restrictions, would require individualized inquiry. Moreover, quantifying any harm would also require individualized inquiry in part to understand how proposed class members viewed their unvested equity pay, and in part because there could be variation over time for the same individual with respect to whether they had substantial unvested equity, and whether it prevented them from engaging with solicitation outreach or considering other employment opportunities.

144. I also note that individualized inquiry would be necessary to determine the extent to which the above mobility restrictions interacted with one another. For example, if a proposed class member from SCA had a non-compete agreement preventing his movement to USPI throughout the Class Period, and also had unvested equity awards such that he self-restricted from engaging with solicitation outreach, or otherwise searching for jobs, with DaVita during the Class Period, he could not be directly harmed by the alleged mobility restrictions. To the extent these things only occurred in some years during the Class Period, harm would be diminished and would not be able to be quantified using common evidence.

### 3.8. Common Evidence Cannot Be Used to Reliably Quantify the Extent of Harm for Proposed Class Members (If Any) Who Were Impacted by the Alleged Conduct For Several Other Reasons

145. There are several additional reasons that any potential harm due to the alleged conduct would be individualized and could not be quantified based on common evidence. For example:

---

Ouimet, and Edward D. Van Wesep, "The Option to Quit: The Effect of Employee Stock Options on Turnover," *Journal of Financial Economics*, 127(1), 2018, pp. 136–51 at p. 137 ("We exploit a large panel of establishment-level data to show that turnover is reduced following the granting of BBSOs and that the relation appears causal. We show that this reduction in turnover is largely temporary. After the options vest, turnover increases by an amount comparable in magnitude to the prior reduction. As such, BBSO grants appear to be delaying, as opposed to preventing, turnover. The increase in turnover once the options vest suggests that the mechanism through which BBSO grants reduce turnover is associated with anticipation of a deferred compensation award as opposed to a permanent increase in loyalty toward the firm following the granting of stock-based compensation."). See also Steven Balsam, Richard Gifford, and Sungsoo Kim, "The Effect of Stock Option Grants on Voluntary Turnover," *Review of Accounting and Finance*, 6(1), 2007, pp. 5–14 at p. 5 ("The objective of this research is to examine the effect of a broad-based option program on voluntary employee turnover. Design/methodology/approach – The paper examines the effect of a broad-based stock option program in a Fortune 100 company during the 1990s and uses logistical analysis. [...] The paper finds that voluntary turnover is lower during the periods in which the option cannot be exercised, i.e., the vesting period.").

- The alleged mobility restrictions may not have been enforced consistently. For example, record evidence includes instances in which the employees at external search firms recruiting on behalf of Defendants appeared unaware of the alleged mobility restrictions.[280] Bridie Fanning from SCA testified that external recruiters frequently ignored recruiting restrictions related to DaVita.[281] Michael Rucker testified that the scope of the agreement between SCA and DaVita "ebbed and flowed" over time depending on developments in the relationship between DaVita and SCA.[282] Andrew Hayek testified that the agreement initially applied only to Vice Presidents and more senior executives, and was later expanded to include corporate executives with the title of Director and more senior.[283]

- There could be proposed class members who did tell their boss of their intent to move and were thereafter considered for employment at other Defendants, and such individuals would be affected by the alleged conduct differently than those who did not or would not tell their boss of an intent to move.[284]

---

[280] For example, an employee from the executive search company Russell Reynolds recruiting on behalf of SCA indicated that they were aware of restrictions for recruiting from DaVita but not from USPI. See Email chain from Nate Haines (Russell Reynolds) to Bridie Fanning (SCA), "RE: DaVita and USPI," February 3, 2016, SCA000550887 ("Bridie Fanning: Nate / Clare, I just want to be sure you know that DaVita and USPI are off limits to SCA, regards, Bridie [...] Nate Haines: Thank you. I knew about Davita but not USPI. -Nate.").

[281] Fanning (SCA) Deposition, p. 231 ("Q. Sure. Understood. So you testified a couple times already that from time to time you would have to remind third-party recruiters about the hiring restrictions with DaVita? A There were many times, right, you can see in the emails. Q. I have. And is it fair to say they frequently ignored what you had told them about any restrictions with DaVita? A. Yeah."), p. 100 ("Well, obviously someone has been approached by a recruiter somewhere from one of the companies and it's been, hey, we shouldn't be proactively outreaching to them. I mean, as you can see, it's a very hard thing to control and I am obviously responding to that. Because I wouldn't have just, hey, I am just going to send a reminder to the recruiters just because I feel like it today. Something's happened for me to send that.").

[282] Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 6, 2022), Testimony of Michael Rucker (SCA), pp. 419–420 ("A. Yes. Q. Okay. You'll see that you told Bridie Fanning that you spoke to Andrew Hayek, 'and we landed on a more strict interpretation of the spirit of the understanding previously arrived at.' Do you see that language? A. Yes, I do. Q. This is in May of 2015; right? A. Yes. Q. Is it fair to say that up until this time and at various points during the existence of the gentlemen's agreement, that precise parameters and terms of it ebbed and flowed now and again? A. Yes. Q. And that ebb and flow happened depending on what was going on between SCA and DaVita at a given time? A. Yes. [...] Q. So you talked about the spirit of the understanding. Is it fair to say that the spirit of the understanding as you understood it was that, generally speaking, when it came to SCA and DaVita recruiting from each other, they would be sensitive about the way they did it? A. Yes."). See also email chain from Michael Rucker (SCA) to Bridie Fanning (SCA), "RE: dva candidate," May 21, 2015, SCA000861824 ("Spoke to AH. We landed on a more strict interpretation of the spirit of the understanding previously arrived at.").

[283] Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 6, 2022), Testimony of Andrew Hayek (SCA), p. 474 ("Q. And initially, what level of employees were off limits under your agreement? A. Vice presidents and above. Q. And did you interact with Mr. Thiry about this agreement over the course of the subsequent years? A. Yes, we did. Q. And did your understanding of the scope of the agreement get refined through those course of dealings with Mr. Thiry? A. Yes, it did. Q. So focusing on the level of employee, did that get refined? A. Yes. We ultimately expanded to include the director level, which is a role that became a bit more common in SCA, as we grew over the years.").

[284] It is unclear at what time candidates had to tell their bosses of their intentions. Prof. Starr cites to record evidence indicating that DaVita and SCA would not consider employees "until candidates' bosses were made

- There could be proposed class members who learned any information about compensation or opportunities that they would have learned through the solicitation or hiring process from other sources. For example, proposed class members could learn such information from online job postings or via informal discussions with other Defendant employees, both of which were not restricted by the alleged mobility restrictions.[285]

- There could be proposed class members for whom there were relevant employment opportunities with one Defendant but not the other two. For example, there could be proposed class members with strong location preferences working for one Defendant in an isolated location where no other Defendant firms have a presence who would not consider alternatives with the other two Defendant firms due to location. For example, among the Defendants, only DaVita had facilities in West Virginia.[286]

- There could be proposed class members whom Defendants would not have hired in the absence of the alleged mobility restrictions for reasons unrelated to the alleged mobility restrictions. For example, this might be the case because such individuals were viewed as unqualified. In Section 2.1.2, I explained that, according to record evidence, proposed class members who work for one Defendant may not be a good fit for another Defendant. As just one example, SCA's

---

aware that the employees wanted to pursue external job opportunities" (i.e., before a job offer). See Starr Report, ¶ 70, footnotes 107–108. Record evidence also includes examples in which candidates (from SCA) accepted the position (with USPI) before telling her boss. See, e.g., Email chain from Shannon Mosley (USPI) to Bill Wilcox (USPI) and Sandi Karrmann (USPI), "RE: Terri Seidel – STL RVP Offer," January 7, 2014, USPI_CIV_000021255–56 at USPI_CIV_000021255 ("Terri has accepted our verbal offer and is going to meet with Andrew today at 5pm").

[285] See, e.g., Spradling (Named Plaintiff) Deposition, p. 46 ("Q: And—and how are you primarily going about finding jobs? A: Although I don't recall that specific time in my life with great detail, the generic answer would be LinkedIn, job boards, headhunters, many—many local consulting firms."), p. 50 ("Q: Okay. Why did you leave [TEKSystems]? A: I was contacted by a mutual friend about an opportunity at SCA."), pp. 124–125 ("A: The—the IT skill set is very in demand and transferable, so in general IT resources are constantly reassessing their value to the market, so to speak, and as a result of that, opportunities present themselves. [...] Q: And is it the case that employees would look outside the company in order to get a sense of what their market rate was? A: Yes, my experience is that happens all the time. Q: And did you personally do that during the course of your time at SCA? A: I don't recall. Q: What about during the course of your career? A: Oh, without a doubt, yes. Q: And it's your – it's been your experience that that is very common, correct? A: Yeah, within the IT field, correct."), pp. 162–163 ("Q: So you were seeking $150,000 in compensation at Bank of America; correct? A: Correct. Q: What was your basis for seeking that? A: It was a promotional opportunity over what I was making at SCA. Q: And what was the basis for requesting that increase over what you were making at SCA? A: Well, I felt like I had a feeling for the market value of someone with my years of experience and education and certifications was worth.").

[286] Workpaper 15.

Bridie Fanning testified that "there wouldn't have been many people at USPI [that SCA] would have wanted to hire."[287]

146. In sum, the degree to which the alleged conduct would have harmed proposed class members would vary greatly across proposed class members, and many proposed class members including newly hired individuals with short tenures, and individuals over which Defendants did not have market power sufficient to suppress pay, could not have been harmed. It is not possible using evidence common to the proposed class to identify which individuals would not or could not have been impacted by the alleged conduct for the above reasons, nor is it possible to reliably quantify harm for proposed class members who were harmed by the alleged conduct (if any). Rather, individualized inquiry would be necessary given the wide array of complexities discussed throughout this section.

---

[287] Fanning (SCA) Deposition, pp. 114–115 ("Q. Did you dislike the fact that the agreement that SCA had with DaVita and USPI placed a total ban on recruiting? A. You know, I didn't really — I'm going to be frank. I didn't care that much about USPI. It wasn't a talent-rich organization. It wasn't like it was full of candidates I thought could be successful in SCA. Its culture was completely different, had a very different approach to recruiting. And, in fact, I think a lot of the people that the [sic] weren't successful at SCA went to USPI. So I know I found a person and offered them a job. We wanted to hire them. But there wouldn't have been many people at USPI we would have wanted to hire.").

**4. THE COMPENSATION INFORMATION ALLEGEDLY SHARED BETWEEN DEFENDANTS COULD HAVE HAD PROCOMPETITIVE EFFECTS, WAS NOT SUFFICIENT TO COORDINATE ON PAY, AND EVEN IF IT WERE, WOULD NOT HAVE HAD COMMON IMPACT**

147. Plaintiffs and their experts claim that, in addition to the alleged mobility restrictions, Defendants shared competitively sensitive information (referred to as "CSI Exchanges" by Prof. Starr and Prof. Gerhart) in order to further the goals of the conspiracy to suppress the compensation of their employees.[288] Plaintiffs' experts further claim that the alleged information sharing likely caused classwide impact.[289] I disagree. Before I lay out in greater detail the reasons behind that disagreement, let me first summarize four high level points.

148. First, **sharing compensation information is not equivalent to an agreement or conspiracy to suppress pay**. Plaintiffs and their experts have not presented evidence that Defendants agreed to use any information they shared to suppress pay, nor have they presented any evidence that Defendants lowered compensation (individual pay or the merit budget overall) in response to shared information. At most, the evidence Plaintiffs' experts rely on is, in the words of Prof. Starr, "qualitative evidence of exchanges of competitively-sensitive wage data," not evidence of "price-fixing."[290] This is important because the types of information discussed by Plaintiffs' experts can be used by firms to enhance, rather than suppress, competition. I discuss the potential for information sharing to have procompetitive effects, and Plaintiffs' experts' lack of evidence that compensation-related information was shared for anticompetitive purposes or was used to suppress pay, in more detail in Section 4.1.

149. Second, even assuming Defendants did share information in the ways alleged, contrary to the assumptions of both Prof. Starr and Prof. Gerhart, **the information allegedly shared would not be sufficient to suppress pay**. Prof. Starr claims that the information allegedly shared would "give

---

[288] Third Amended Complaint, ¶ 8 ("Defendants shared the competitively sensitive information to further the goals of the conspiracy to suppress the compensation of their employees."); Starr Report, ¶ 102 ("This evidence is consistent with exchanges of CSI in support of colluding to suppress Senior-Level Employees pay."); Gerhart Report, ¶ 157 ("Rather, such exchanges between competitors facilitate anticompetitive collusion to suppress employee pay.").

[289] Starr Report, ¶ 12; Gerhart Report, ¶ 82, p. 194.

[290] Starr Report, ¶ 96 ("...qualitative evidence of exchanges of competitively-sensitive wage data would include any evidence of communication or coordination among horizontal competitors involving employee compensation, particularly if it includes future plans for compensation. Evidence of firms agreeing to match or set compensation at certain levels would be evidence of price-fixing.").

Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees,"[291] however, the compensation-related information allegedly shared was generally aggregate in nature for each firm (i.e., for the entire firm or for broad groups of employees at the firm), and the cadence of the information sharing was irregular. I discuss this in more detail in Section 4.2.

150. Third, **Plaintiffs have not presented any credible evidence that the alleged information sharing suppressed pay for proposed class members**. First, as I will discuss in Section 5, Prof. Starr's pay regression model is severely flawed and does not measure changes in pay that occurred because of the alleged conduct. Once key flaws are corrected, Prof. Starr's pay regression model demonstrates no evidence that pay was suppressed for proposed class members. Second, Prof. Starr himself admits that his pay regression model cannot distinguish between effects of the alleged information sharing and effects of the alleged mobility restrictions.[292]

151. Finally, even for the sake of argument, assuming Defendants did share information with an understanding that it would be used to suppress pay, and that the compensation-related information sharing could somehow be used to coordinate on pay, **impact from the alleged information sharing would not have been common**. There are at least five reasons for this: (1) competition from non-Defendant employers would have prevented Defendants from suppressing pay for many or most (if not all) proposed class members; (2) the irregular nature of the alleged information sharing means that some proposed class members were employed by Defendants only in years in which no information was shared; (3) the alleged information sharing concerned salary pay but proposed class members earn substantial non-salary pay (e.g., bonuses and equity), and Defendants would have had an incentive to cheat on an agreement to coordinate on pay that was focused only on salary by adjusting other types of non-salary pay; and (4) the sharing of merit pay budgets at the firm level (or for broad groups of employees within the firm) would differentially impact high and low performers. In Section 4.3, I discuss in more detail the reasons impact would not be common to the proposed class.

---

[291] Starr Report, ¶ 93 ("In this case, the exchange of Senior-Level Employee compensation information would give Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees for their services.").

[292] Starr Report, ¶ 106 ("Given that Plaintiffs allege that both elements of the Challenged Conduct (i.e., the No-Poach Agreements and CSI Exchanges) occurred simultaneously, my analysis measures suppressed compensation from the whole of the Challenged Conduct rather than from each individual component.").

### 4.1. The Alleged Information Sharing between Defendants Cannot be Assumed to be Anticompetitive and Could Have Procompetitive Effects

152. Both Plaintiffs' experts assume that the alleged information sharing is anticompetitive. Prof. Gerhart concludes that "Defendants' years-long CSI [competitively sensitive information] Exchanges are inconsistent with unilateral conduct and would have harmed employees."[293] For his part, Prof. Starr states that the alleged information sharing is "consistent with anticompetitive conduct and inconsistent with unilateral conduct."[294] Neither expert has provided any evidence that Defendants shared information for the purpose of suppressing pay, or that the alleged information sharing had anticompetitive effects. From an economic perspective, it is not evident that the information sharing Defendants engaged in would be anticompetitive and lead to suppressed pay. Indeed, academic literature and economic theory suggest when firms gain more information about compensation in the industry, it can enhance competition and raise pay levels.

153. Prof. Starr's conclusion that the alleged information sharing was "consistent with anticompetitive conduct and inconsistent with unilateral conduct" is not supported by his own analysis and claims.[295] His analysis of the alleged information sharing leads him to conclude only that information sharing may facilitate coordination on pay because it is "often a key component of collusion."[296] This is a one-sided account; the full story is this: from an economic perspective, gaining information about what other firms in the industry are paying can just as readily lead to pay increases as pay decreases. Economists recognize that information sharing can support competition as there are "legitimate efficiency reasons for industry members to exchange information," including "monitor[ing] their own efficiency better" by comparing their costs to other firms.[297] Academic research has also found that

---

[293] Gerhart Report, ¶ 7.

[294] Starr Report, ¶ 12.

[295] Starr Report, ¶ 12.

[296] Starr Report, ¶ 93 ("The exchange of CSI is often a key component of collusion."), ¶ 55 ("Economists and antitrust authorities have long recognized that exchanges of CSI among horizontal competitors—or exchanges of information regarding price, quantity, capacity, costs, and specific customers, shared among participants that are actual or potential competitors—can and does help effectuate collusive outcomes."). See also Starr Report, ¶ 12 ("I conclude that the evidence regarding Defendants' CSI exchanges is consistent with anticompetitive conduct and inconsistent with unilateral conduct.").

[297] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, (Essex, England: Pearson Education Limited, 2015) ("Carlton and Perloff (2015)"), p. 405 ("Information exchanges between firms can facilitate cartels or promote efficiency.... There may also be legitimate efficiency reasons for industry members to exchange information. When a centralized market does not exist, disseminating price information can improve efficiency [...]. Moreover, firms can monitor their own efficiency better if they can compare their costs to those of other firms.").

information sharing can increase competition: as one example, economists developed a theoretical model to analyze the effects of a law that mandated meat packers publicly report transaction data (including average prices paid to feeders by meat packers) and found that increased information transparency increased competition between buyers and benefited feeders.[298]

154. Prof. Starr relies on academic literature and agency guidelines to argue that information sharing is anticompetitive, but these sources themselves indicate that information sharing may facilitate collusion or coordination on prices, not that information sharing necessarily implies collusion or coordination on prices.[299] Putting that aside, Prof. Starr himself seems to concede that information sharing *may* lead to wage suppression, not that it necessarily does. For example, when describing the effects of the alleged information sharing, Prof. Starr states that it "could" or "might have" allowed Defendants to suppress compensation, not that it did.[300] Similar to Prof. Starr,

---

[298] The authors analyze the effects of the 1999 Livestock Mandatory Price Reporting Act (MPRA) which required meat packers to publicly report transaction data that includes average prices paid to feeders by meat packers. See Christopher N. Boyer and B. Wade Brorsen, "Changes in Beef Packers' Market Power after the Livestock Mandatory Price Reporting Act: An Agent-Based Auction," *American Journal of Agricultural Economics*, 95(4), 2013, pp. 859–876 at p. 873 ("The agent-based common-value auction models show that reducing the noisy signal of the buyers and/or the seller can reduce market power by increasing competition between buyers. By strictly reducing the seller's noisy signal, the seller imposes a higher reserve price that more accurately reflects their salvage value, which results in the seller's expected revenue per item increasing. By strictly reducing the buyers' noisy signal, competition between the buyers increases, which increases the seller's expected revenue per item. Finally, reducing both the noisy signal of the buyers and the seller increases the seller's expected revenue per item due to increased competition between the buyers. This finding indicates that providing information to packers and/or feeders through the MPRA is beneficial to feeders. By giving packers more information, the feeder benefits primarily from an increase in competition between the packers; by giving the feeder more information, the feeder benefits primarily from setting a more accurate reserve price.").

[299] Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?," *Journal of Economic Literature*, 44 (1), 2006, pp. 43–95 ("Levenstein and Suslow (2006)") at p. 69 ("[i]ndustry associations often engage in the collection and dissemination of information, which may facilitate collusion"); U.S. Department of Justice and Federal Trade Commission, "Antitrust Guidelines for Collaborations Among Competitors," April 2000, available at https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf, accessed on April 8, 2025, p.15 ("[T]he sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables."); Michael Bloom, "Competition Matters: Information Exchange: Be Reasonable," *Federal Trade Commission*, December 11, 2014, available at https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable, accessed on April 3, 2025 ("[b]ut when competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws ... The bottom line is this: even competitors can exchange information when the purpose and likely effect of the exchange is to make the participants more effective competitors.").

[300] See, Starr Report, ¶ 58 ("This form of CSI sharing could also allow Defendants to set compensation below competitive levels."), ¶ 170 ("Second, the CSI exchanges allow for SCA and DaVita to match each other's compensation patterns should they want to, which might have allowed DaVita to reduce its compensation relative to what it would have done without the specific SCA benchmark data.").

Prof. Gerhart only opines that the alleged information sharing "likely" suppressed compensation.[301]

155. Additionally, contrary to what Prof. Starr claims, the alleged information sharing is not of the type that Prof. Starr describes as raising anticompetitive concerns.[302] He argues that for information sharing to support collusion, it need not be the case that "firms in a cartel explicitly choose a specific price or compensation level," but rather "that the cartel pursues a commonly understood goal (lowering input prices below competitive levels) and shares information to achieve that goal."[303] This itself is an oblique statement. However, taking it at face value, Prof. Starr has not provided any evidence that Defendants shared information in support of a "commonly understood goal" to suppress pay. For that matter, neither have Plaintiffs or Prof. Gerhart, a point that Prof. Gerhart concedes in his deposition.[304] All that said, however, Prof. Starr seems to understand that the information sharing of the type alleged here is not inherently anticompetitive. He notes that, "evidence of communication or coordination among horizontal competitors involving employee compensation," is qualitative evidence of information sharing whereas evidence of "price-fixing" would be "[e]vidence of firms agreeing to match or set compensation at

---

[301] Gerhart Deposition, p. 146 ("Q. [...] My understanding of the opinions that you are offering in this case, based on your previous testimony, was that information -- the alleged information sharing likely would lead -- likely would suppress compensation, not that it actually did. Am I understanding that correctly? A. Yes."); Gerhart Report, Section VIII.B, p. 194 ("Defendants' CSI Exchanges Would Likely Suppress Employee Compensation Across the Board."), ¶ 83 ("CSI Exchanges Reduce Class Pay. Based on my experience and research in compensation and human resource management, Defendants' CSI Exchanges were likely to lower Class pay...").

[302] Starr Report, ¶ 29 ("The exchanges of CSI are the exact kind of data exchanges that could lead to the suppression of employee compensation.").

[303] Starr Report, ¶ 93. See also Levenstein and Suslow (2006), p. 45 ("'Collusion in general implies [...] that the rival sellers in some manner arrive at an understanding as to what price to charge or what outputs to produce, or both.'").

[304] In his deposition, Prof. Gerhart stated that he does not have evidence that there is a "tacit understanding" that "pay[ing]" less was part of the information exchange. See, Gerhart Deposition, pp. 153–155 ("Q. Okay. Turning to your opinion that the alleged information exchanges likely suppressed compensation, let's focus on SCA and USPI. What information exchanges occurred that led you to offer that opinion? [...] A. Yeah, I'd have to go through the report to see what -- what pertained to that [...] if that information was available, that would certainly facilitate not having to worry about paying too much, paying too little. And, in fact, it could open up a path to pay less, especially if it includes -- and I don't have evidence of this, but this would be a possibility -- if it would include some sort of tacit understanding that's part of the exchange of information, that, you know, we will not -- it may lead to not raising pay as much as it would have been raised otherwise in the absence of this exchange of information and whatever other aspects there are to that -- that activity. Q. And just to be clear: You don't have evidence of such a tacit understanding; correct? [...] A. All I can add is, I mean, 'tacit,' by definition, means it's -- it's more difficult to observe than some things. So I don't -- I don't recall if there's any direct evidence on that in the -- in the report."). SCA's CEO Andrew Hayek also testified in his deposition that it was not the case that Defendants agreed to "fix [the] compensation of employees." See Deposition of Andrew Patrick Hayek (SCA), September 18, 2024 ("Hayek (SCA) Deposition"), p. 382 ("Q. Mr. Hayek, throughout your time at SCA did you ever agree with anyone at DaVita to fix compensation of employees? A. No. Q. Mr. Hayek, throughout your time at SCA, did you ever agree with anyone at USPI to fix compensation for employees? A. No. Q. Throughout your time at SCA, did you ever agree with anyone at any other company to fix compensation for employees? [...] A. No.").

certain levels."[305] Thus, according to Prof. Starr's own standard, the evidence Plaintiffs have presented is only evidence of information sharing, not evidence of Defendants agreeing to collude on compensation.

156. Above, I noted that from an economic perspective, information sharing can just as readily trigger competition and higher pay as it could support collusion. What does case evidence show about the likely effects of information sharing here? In this matter, case evidence I have reviewed is consistent with the idea that information sharing was used to compete. Defendants' employees testified that they would have used any merit pool information shared to help them compete more effectively. For example, SCA's Brian Mathis testified that SCA would rely on benchmarking information that they could gather to "make a decision about how to be competitive" which includes "offer[ing] an overall experience and compensation package that would attract and retain the talent that we needed."[306] Similarly, SCA's Michael Rucker testified that compensation information from competitors would allow SCA to offer a compensation package sufficient to "secure and retain the workforce" and to help SCA ensure that they were paying market rates.[307]

157. Prof. Starr and Prof. Gerhart have not established that the outcome of the alleged information sharing by Defendants would have been anticompetitive, as opposed to having no effect, or having procompetitive effects. To the extent Prof. Starr claims his pay regression estimates confirm that the information sharing was anticompetitive (which he appears to do),[308] he himself admits that

---

[305] Starr Report, ¶ 96 ("...qualitative evidence of exchanges of competitively-sensitive wage data would include any evidence of communication or coordination among horizontal competitors involving employee compensation, particularly if it includes future plans for compensation. Evidence of firms agreeing to match or set compensation at certain levels would be evidence of price-fixing.").

[306] Mathis (SCA) Deposition, pp. 51–52 ("Q. What -- what information would SCA rely on in deciding what to set the yearly wage increases at? A. I believe we would rely on benchmarking information that we could gather, and ultimately we had to make a decision about how to be competitive. Q. What do you mean 'how to be competitive'? A. We needed to compete for a workforce, which meant that we needed to offer an overall experience and compensation package that would attract and retain the talent that we needed.").

[307] Rucker (SCA) Deposition, pp. 295–296 ("Q. So you wanted to gather your competitors' future wage information in order to guide you in order to be able to stay competitive; is that right? A. The whole purpose of a healthy, robust merit process and any other time that we're spending on compensation matters, benefits, all the components of a total compensation package is to make sure that we can secure and retain the workforce that we need to deliver the services that are the economic engine of the business here. Q. And it also guided SCA in knowing that it didn't need to pay wages above what your competitors were projecting they were going to compensate their employees, correct? Q. We would not, as -- I mean, as a team, we wouldn't want to pay above market rates, and we wouldn't want to pay below market rates. Q. And exchanging this information with your competitors allowed you to do that, right? Q. That's right.").

[308] Starr Report, ¶ 102 ("If exchanging CSI among Defendants allowed them to agree on a (lower) pay increase for Senior-Level Employees, this would quantitatively manifest in lower pay in subsequent years. The wage suppression regression I perform next in Section VI demonstrates that Senior-Level Employee wages were suppressed during the Conduct Period. This evidence is consistent with exchanges of CSI in support of colluding to suppress Senior-Level Employees pay.").

his pay regression model is not able to distinguish between any effect of the alleged mobility restrictions and the information sharing, and as I will discuss in more detail in Section 5, his pay regression model is severely flawed, and once obvious flaws are corrected, it shows no evidence that proposed class members' pay was suppressed during the Class Period. Perhaps more to the point, relying on his flawed pay regression model, Prof. Starr inappropriately reaches conclusions that are the opposite of what basic market facts show.

158. Academic literature also demonstrates that employers having better information about what competitors are paying can benefit employees by raising compensation. For example, a recent academic paper analyzing the impact of salary benchmarking on employee pay uses economic theory to predict that "in equilibrium, salary benchmarking can intensify competition and raise salaries."[309] The intuition behind this (based on the model the authors present) is that without information about what other competitors are paying, the firm has to guess at where to set pay and risks setting pay too low. In this case, the worker may leave and the firm will incur costs to find a new employee and train them. The firm would have been better off to pay more and would do so had it had more information about the value of the worker to other firms. The same authors also analyzed national payroll data and found that the impact of benchmarking on pay varies across employees: it had a positive impact on the pay for some employees but no statistically significant impact on the pay for others.[310]

159. In another study, the authors found that a 2021 Colorado law requiring online job postings to include information about the expected salary of the position led to an increase in both posted and actual salaries, and in particular, found that the results are consistent with employers raising wages in response

---

[309] Cullen, Li, Perez-Truglia (2024), pp. 4–5 ("Motivated by the evidence, we propose a simple model with firms that are uncertain about the salary distribution. ... Suppose that one of the firms covertly gains access to a salary benchmark, learning the population distribution of wages, and hence learning the threshold wage needed to hire a worker"), pp. 6-7 ("However, a 2021 executive order mandates that agencies must also consider the procompetitive effects of benchmarks ... Our model provides a formal analysis of these procompetitive effects; it suggests that, in equilibrium, salary benchmarking can intensify competition and raise salaries."). The authors analyze national payroll data for 20 million workers and approximately 650,000 organizations to study firms that gain access to a tool that reveals aggregate data on market salaries for each job title to set pay ("salary benchmarking").

[310] Cullen, Li, Perez-Truglia (2024) at pp. 30–31 ("Given that the effects of benchmarking on salary dispersion are largely concentrated in low-skill positions, we can explore this same heterogeneity for salary levels. Figure 6 reproduces the results from Figure 5, but for the subsample of low-skill positions. The evidence points to a modest increase in average salary. ... By comparison, in high-skill positions, there is no evidence of significant effects on the salary level.").

to new information about their competitor's wages.[311] Empirical academic studies have also found that the impact of sharing of information about pay can be positive, negative, or zero depending on what the information suggests about the worker's current compensation in relation to the information.[312] In sum, the economics literature indicates that information sharing could increase, decrease or have no impact on compensation, and the effect could vary across members of the proposed class.

160. Besides not demonstrating that the alleged information sharing was anticompetitive or made for the purpose of coordinating on pay, Plaintiffs and their experts have also not demonstrated that the claimed information sharing was the unique way in which the Defendants could access the information that was allegedly shared, or if Defendants learned anything new from the limited compensation-related information that was shared. First, very similar information may have been available from other sources. For example, in one instance, the information SCA had on USPI's 2011 salary increase budget was

---

[311] David Arnold, Simon Quach and Bledi Taska, "The Impact of Pay Transparency in Job Postings on the Labor Market," 2024, at p. 18. The author use data from Lightcast to estimate the impact of the law on pay transparency in postings, job vacancy data to study the impacts on various aspects of the job posting, including expected salary, job requirements, and the volume of postings, and data actual on earnings from Glassdoor and the Quarterly Census of Employment and Wages (QCEW) to study the impact of the policy on realized wages. They find that posted salaries increased across all firms, including among firms that were already fully transparent before the policy. The authors find that the occupations that experienced a larger increase in transparency are also the occupations that experienced a larger increase in wages, which the authors argue is consistent with the policy having general equilibrium effects and that always-transparent firms are responding to broader increases in transparency at the market level.

[312] A recent academic article studies pay among academics in the U.S. and finds that pay transparency reduces gender-based pay inequality because (1) females are relatively more likely to be underpaid than their male peers and (2) pay transparency has the effect of granting pay increases to those who are underpaid. As a result, the authors find that the impact of pay transparency on female academics was statistically significantly larger than the effects on the pay of male employees. See Tomasz Obloj and Todd Zenger, "The Influence of Pay Transparency on (Gender) Inequity, Inequality and the Performance Basis of Pay," *Nature Human Behavior*, 6, 2022, pp. 646–655 at pp. 653, 648, Table 1. See also Michael Baker, Yosh Halberstam, Kory Kroft, Alexandre Mas and Derek Messacar, "Pay Transparency and the Gender Gap," *American Economic Journal: Applied Economics*, 15(2), 2023, pp. 157–183 at p. 159 ("We find that, on average, transparency laws significantly reduced the gender salary gap. Across our specifications for the reference group, we find that they led to a statistically significant 1.2–2 percentage point reduction in the gender gap."). In their analysis of payroll data for 20 million workers and approximately 650,000 organizations, Cullen, Li, Perez-Truglia (2024) found that in response to accessing salary benchmarking data, employers adjust pay depending on how an employee's pay compares to the information. See Cullen, Li, Perez-Truglia (2024) at p. 2 ("We find that after a firm is exposed to the benchmark information in a position, it sets salaries that are closer to the median salary benchmark. On the one hand, firms that would otherwise have paid more than the median benchmark reduce salaries toward the median (for the sake of brevity, we refer to this as 'compression from above'). On the other hand, firms that would otherwise have paid less than the median benchmark increase salaries toward the median (`compression from below')."). In another study of a 2010 California mandate that required municipal salaries to be posted online, the author found that disclosure led to an approximately 7 percent decreases in average compensation among top managers, and that the impacts varied across cities depending on the average level of compensation in the city prior to the reform, which the author argues is consistent with an "aversion to large salaries." See Alexandre Mas, "Does Transparency Lead to Pay Compression," *Journal of Policial Economy*, 125(5), 2017, pp. 1683–1721 at p. 1685 ("Wage cuts were substantially larger in cities where compensation was initially higher, particularly cities where the city managers were paid more than $200,000 annually prior to disclosure (the mean salary was $193,000 in 2009). There was no relative decline in the 50th, 75th, and 90th percentiles of the city wage distributions, on average, implying that reductions at the top of the wage distribution reflect pay compression.").

similar to salary increase information SCA had from Mercer, a third-party agency (provided in the same document).[313] In another instance, an internal presentation from 2012 compared DaVita's projected merit pay raises for 2013 against market salary data from various compensation survey providers, including World at Work, Mercer, EMPSight, and Hay Group, all of which predicted a merit pay increase in the range of 2–3%.[314] More generally, as I discussed in Section 2.1, Defendants often benchmarked pay against various other surveys.  Second, the information shared may have provided little incremental information. As an example, to the extent Defendants set their salary and merit increase budget based on inflation (as Mark Kopser testified was done at USPI),[315] or pay in the healthcare industry (as Prof. Gerhart notes that SCA and DaVita did),[316] the limited pay increase budget information shared would not have revealed much, if any, additional information. Indeed, an analysis of publicly available data shows that nominal year-on-year pay changes among medical and health services managers in the healthcare industry averaged 2.4% during the Class Period,[317] a number in the range of the 2-3% increases discussed in some of the merit pay increase budget documents Plaintiffs' experts point to as evidence of information sharing.[318] Additionally,

---

[313] Email chain from Sue Seme (SCA) to Cabin Team (SCA) and Brian Mathis (SCA), "RE: Updated: Cabin Team Materials," with attachment, January 14, 2011, OMC_BM_000000884–95 at OMC_BM_000000888 ("• Mercer's broader data (detail in separate file): — Actual 2010 increases = 2.0-2.4% — Expected 2011 increases = 2.7-3.0% — Basically no difference between mgmt and non-mgmt tiers [.] • Specific company reports (please keep confidential): — USPI = 2-3% (facility level; mgt. unclear but no raises last 2 yrs.").

[314] "Village Vitality Murphy Update," DaVita, September 2012, DVA_OMCEAL_001360570–622 at DVA_OMCEAL_001360573.

[315] Deposition of Mark Kopser, Volume I (USPI), December 12, 2024 ("Kopser (USPI) Deposition"), pp. 86–87 ("Q. And in general, what is a merit pool budget? A. In the context of budgeting, it was a -- an amount for what we expected inflation to be throughout the course of the year, which usually was using the current year forecast or forecast for inflation. And then when raises were actually given -- which would be in the spring, April time I think -- we would use the merit process of, you know, staff evaluations to give actual pay raises."), pp. 108–109 ("Q. Mr. Kopser, how was the merit pool percentage determined while you were at USPI? A. Typically the merit pool was budgeted to be approximately inflation.").

[316] Gerhart Report, ¶ 114 ("SCA regularly reviewed its salary structure to ensure that it was consistent with the healthcare industry and actively encouraged its managers to follow that structure in making compensation decisions. For instance, in 2015, SCA circulated a document regarding its annual merit planning process that explained […]"), ¶ 148 ("DaVita updated its salary structure by comparing its merit pool with other employers in the healthcare industry 'to make sure that they're staying competitive so that they can retain their employees and keep them productive.'").

[317] Workpaper 16.

[318] The merit pay increase budget documents Plaintiffs' experts point to as evidence of information sharing took the form of aggregate wage increase budgets for the entire firm, or for broad groups of employees within the firm and often fell into the range of 2-3%. See Email from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729 ("Are you all expecting typical ~2% wage increases for 2013? […] Yes 2-3%."); Email chain from Sue Seme (SCA) to Cabin Team (SCA) and Brian Mathis (SCA), "RE: Updated: Cabin Team Materials," with attachment, January 14, 2011, OMC_BM_000000884–95 at OMC_BM_000000888 ("[…] USPI = 2-3% (facility level; mgt. unclear but no raises last 2 yrs."); HAYEK-000012214–16 at Hayek-000012214 ("2009 Hayek Merit Pay Notes") ("Davita All non-field (corporate office, business office, execs) got zero increase […] Note: 2009 budget (created late last year) allowed for 2.2% wage increases on average, but field operators are coming in at 1.5%" […] USPI: Delaying salary increase in corporate office […] Field raises are driven by division leaders […] Bill expects another year of 3% raises on average with

during the Class Period, inflation averaged 1.8% but was in the 2–3% range during some of the years in which the merit pool information was allegedly shared (2009–2013).[319] Further, the 2–3% increase is also very similar to what was reported in a WorldatWork salary budget survey presented in Figure 15 of Prof. Gerhart's report, a tool that Prof. Gerhart claims Defendants likely used.[320] To the extent the information shared was essentially the same as what was already available elsewhere, it would not have had any impact on proposed class members' pay.

### 4.2. The Information Allegedly Shared by Defendants Would Not be Sufficient to Suppress Pay, Even by Plaintiffs' Experts' Own Standards

161. Having discussed how Plaintiffs' experts have presented no evidence to demonstrate that Defendants shared information with a goal of suppressing pay, and that from an economic perspective information sharing can have procompetitive effects, let me now turn to a consideration of the likely effects of the alleged information sharing at issue here. In this subsection, I show that the information allegedly shared would not have been sufficient to coordinate on pay for proposed class members.

162. Plaintiffs allege and Plaintiffs' experts assert that Defendants shared competitively sensitive information, including compensation-related information in the form of planned merit increase budgets, that allowed them to coordinate on pay and thereby suppress the pay of their employees.[321]

---

some markets higher (up to 10%) [...] 2% guidance in field [.] Non-VP follow 2% [.] VPs still frozen, now a year and 6 months, will probably keep for foresee.").

[319] Workpaper 17.

[320] Gerhart Report, Figure 15, ¶ 103 ("WorldatWork Is a Valuable Resource for Compensation Professionals. [...] Defendants' human resources professionals, similar to human resources professionals from other employers, likely used WorldatWork. The evidence I reviewed shows that DaVita and SCA relied upon WorldatWork as a resource.").

[321] Starr Report, ¶ 12 ("In Section V.C, I review qualitative evidence which shows Defendants shared CSI, including employee compensation-specific data. The SCA-DaVita CSI exchanges and SCA-USPI CSI exchanges indicate that (1) each Defendant in the pair considered the other Defendant a relevant labor market competitor and (2) allowed them to coordinate on pay levels or increases, potentially lowering Class pay."); Third Amended Complaint, ¶ 8 ("Defendants also employed collusive exchanges of competitively sensitive information to further their conspiracy to suppress competition between them for employees, and to thereby suppress the compensation of their employees. Beginning no later than 2009, Defendants exchanged planned wage and merit increases for use in their yearly budgeting processes. Defendants also exchanged other competitively sensitive information, including specific employee salaries, general and administrative expenses, forecasts, and forecasted sales volumes. Defendants shared the competitively sensitive information to further the goals of the conspiracy to suppress the compensation of their employees"); Gerhart Report, ¶ 23 ("Plaintiffs allege and the documents and testimony that I have reviewed about SCA and DaVita and SCA and USPI's exchange of Competitively Sensitive Information, including wage data, to further suppress the labor market pay rate, provide factual context on which I base my analysis as an expert in the field of Management and Human Resources. Over the years, DaVita, SCA, and USPI exchanged future merit increase data under the guise of lawful benchmarking. SCA and DaVita began exchanging data by at least 2009, and SCA and USPI began exchanging data in at least 2008. The exchanges were carried out by senior executives.").

However, the evidence of alleged information sharing that Plaintiffs' experts point to demonstrates that the information was either not compensation-related or not shared regularly, and that when compensation-related information was shared, it was sometimes backwards-looking and generally aggregate in nature for each firm (i.e., for the entire firm or for broad groups of employees at the firm), such that it could not be used to identify even the average total compensation, or average salary for individuals with a particular job title, let alone for an individual.

163. From an economic perspective, it is widely recognized that maintaining an agreement to coordinate on prices requires the ability to monitor prices and punish cartel members who deviate from the agreed-upon prices. This is because each cartel member has a strong economic incentive to cheat on the cartel; cheating increases their individual profits if undetected.[322] As a result, agreements to coordinate on prices in industries with complex pricing arrangements are understood to be difficult to sustain because they require detailed monitoring of many different prices to prevent cheating.[323] For these

---

[322] See Carlton and Perloff (2015), p. 160 ("Cartel agreements are easier to enforce if detecting violations is easy. Four factors aid in the detection of cheating: - There are few firms in the market -- Prices do not fluctuate independently -- Prices are widely known -- All cartel members sell identical products at the same point in the distribution chain."), p. 164 ("Unless a cartel can detect violations of its price-fixing agreement and prevent reoccurrences, member firms engage in secret price cutting (or output expansions) that destroys the cartel."), pp. 177–178 ("Cartels fail due to cheating by member firms or by competition from firms outside the cartel. Individual firms have an incentive to cheat on a cartel agreement because they can make higher profits by increasing output or undercutting the cartel's price. A cartel can maintain its agreement only if cheating can be detected and adequately punished.").

[323] Carlton and Perloff (2015), p. 160 ("Cartel agreements are easier to enforce if detecting violations is easy. Four factors aid in the detection of cheating: - There are few firms in the market -- Prices do not fluctuate independently -- Prices are widely known -- All cartel members sell identical products at the same point in the distribution chain."), p. 161 ("If a market has frequent shifts in demand, input costs, or other factors, prices in the market have to adjust often. In that case, cheating on a cartel arrangement may be difficult to detect because it cannot be distinguished easily from other factors that cause price fluctuations. Cheating is easier if prices are known."); Louis Kaplow and Carl Shapiro, "Antitrust," in *Handbook of Law and Economics*, Volume 2, p. 1103 ("Economists have long recognized that there exist certain prerequisites to successful collusion. [...] The key elements are (1) reaching consensus: some understanding must be reached among the otherwise-competing firms regarding what conduct is permitted under the terms of the collusive agreement, such as the prices that the firms will charge; (2) detection: some reliable means must exist by which departures from the agreement can be detected; and (3) punishment: some credible mechanism must be established by which such departures are punished if and when they are detected. Specifically, the prospect of detection and punishment must be sufficient to deter individual firms' proclivity to cheat on the agreement, typically by cutting prices in the short-term, hoping to reap greater profits through a higher market share, at the expense of the other firms, before they can respond. Related to the need to reach an agreement is the problem of (4) inclusion: a means of inducing participation by a sufficiently large number of incumbent suppliers so that competition from non-participants does not undermine the profitability of the collusive agreement. Lastly and relatedly, the incumbent firms must be protected by (5) entry barriers: there must not be so much competition from quickly arriving new entrants so as to undermine the effectiveness of collusion.") Economic theory suggests it is harder to sustain a conspiracy to fix pay when colluding firms have to coordinate on and monitor more than a single price. See Carlton and Perloff (2015), p. 159 ("Firms have more difficulty agreeing on relative prices when each firm's product has different qualities or properties. Each time a product is modified, a new relative price must be established. It is easier for a cartel to spot cheating when all it has to examine is a single price. It is relatively difficult to detect price cutting that is achieved by an increase in quality; a firm could increase its quality and hold its price constant if it wanted to increase sales without explicitly violating the pricing agreement.").

reasons, the information sharing necessary to support a successful conspiracy to coordinate on pay across all of the jobs and employees in the proposed class (and prevent unraveling due to cheating by conspiracy participants) would need to be very detailed. For example, it would likely need to include data on every component of pay (salary, bonus, equity, etc.) shared in regular intervals (say, monthly or yearly), and disaggregated by job title, and possibly by department, location and years of experience (to the extent pay varies by department, location or by years of experience within a particular job title).

164. My review of Prof. Starr's and Prof. Gerhart's reports, and the evidence cited within them, indicates that Plaintiffs' experts have presented no evidence that information sharing occurred between DaVita and USPI. Moreover, the types of information allegedly shared between SCA and DaVita, and separately between SCA and USPI, did not take the form that would be expected to support a successful conspiracy to fix pay (described above). Some of the evidence Plaintiffs point to is merely discussion of potential information sharing, rather than actual sharing. The evidence Plaintiffs' experts present concerning actual, as opposed to potential, information sharing falls into three categories: (1) information that was not compensation related at all, (2) information concerning overhead costs where compensation costs were an input but were inseparable from other costs, and (3) information related to compensation such as retrospective or prospective merit pay increase budgets.

165. Of these three types of information, the only type shared with any regularity between either pair of Defendants (based on the evidence presented by Plaintiffs' experts) was within the first category — information that was not compensation related at all. Specifically, Prof. Gerhart notes that case volume data were shared between SCA and USPI (but not between SCA and DaVita).[324] These data contained no information relevant to salaries, or any other form of compensation, either in aggregate, or at the individual level, and thus are clearly insufficient to support coordination on pay. Indeed, in his deposition testimony, Prof. Gerhart concedes that it is not obvious how the sharing of case volume information between USPI and SCA could be used to fix pay, noting that the sharing of case volume information "seems like it would be a less clear

---

[324] Gerhart Report, footnote 346 ("SCA VP of Strategy Brian Mathis also testified that SCA and USPI exchanged same-site case volume growth data twice a month at the beginning of his tenure at SCA, and later monthly."). For an example of the case volume data, see email chain from James Walker (USPI) to Brian Mathis (SCA) and Jason Cagle (USPI), "RE: Oct volume," with attachment, November 10, 2014, USPI_CIV_000021165; "October Cases — Final," USPI, November 10, 2014, USPI_CIV_000021166. Prof. Starr does not mention case volume exchanges in his report.

way to suppress wages [...] I don't see it as a clear path."[325] Prof. Starr similarly stated in his deposition that "compensation mostly likely was not included" in case volume information.[326] Prof. Gerhart also claims USPI and SCA shared information related to payor mix (i.e., share of case volume by payor type including commercial versus Medicare versus workers comp), but these data were also not related to compensation at all, and were not shared regularly.[327]

166. With respect to the second type of information (information concerning overhead costs where compensation costs were an input but were inseparable from other costs), Plaintiffs' experts point to instances in which USPI and SCA (but not SCA and DaVita) shared aggregate corporate overhead costs at the firm or department level.[328] The data were at a highly aggregated level (e.g., "very large grand total expense number[s]").[329] While these data would include as inputs labor costs, and thus senior-employee compensation as Prof. Starr claims,[330] the labor costs would be only one of several inputs, as the corporate

---

[325] Gerhart Deposition, pp. 160–161 ("Q. Would you agree with me that, if the only information that was exchanged was case volume information, that information could not be used to fix wages? [...] A. Yeah, at this moment, it seems like it would be a less clear way to suppress wages, yes, if only — yeah. [...] Q. How -- So, as you're sitting here, it is your testimony that case volume information, if exchanged, can be used to fix wages? [...] A. Again, I think I said I don't see it as a direct path at this moment, but I do think there's some -- I just think that the labor cost data and the revenue output data are often looked at together. And so I agree, I don't -- I don't -- I don't see it as a clear path, but I -- I do think it's relevant to know that it's not just wage data being examined; it's also other data. So, yeah.") In his report, Prof. Gerhart also seems to concede that case volume information was not compensation information. See Gerhart Report, footnote 346 ("In addition to the wage data exchanges discussed at length in this section, note that the SCA-USPI CSI Exchanges were not limited to compensation information. SCA VP of Strategy Brian Mathis also testified that SCA and USPI exchanged same-site case volume growth data twice a month at the beginning of his tenure at SCA, and later monthly.").

[326] Deposition of Evan P. Starr, Ph.D., Volume II, March 20, 2025 ("Starr Deposition, Volume II"), pp. 465–466.

[327] See, e.g., Email chain from Megan Farabaugh (USPI) to Jason Cagle (USPI) et al., "RE: SCA Payor Mix — Week 13," with attachment, April 5, 2013, USPI_CIV_000016019–20 at USPI_CIV_000016019 ("Please find our payor mix updated through Friday, March 29, 2013"); "Year over Year Weekly Case Counts Payor Mix Percentage," USPI, January 14, 2025, USPI_CIV_000016020; Gerhart Report, footnote 346; "Kopser (USPI) Deposition", p. 88 ("Q. Do you agree with the characterization that you regularly exchanged information with SCA? A. Excluding the case report, which was regular over a period of a few years, I don't believe any other information was regularly shared. Q. When you refer to case report, are you referring to that -- the pay or case mix? A.  No. The -- the monthly file that was our case finding. Q. Did you regularly exchange plans, merit pool budget information, with SCA or anyone else? A. No. Q. Did you regularly exchange any wage information with SCA or anyone else? A. No.").

[328] See, e.g., two separate documents cited by Prof. Gerhart which include expenses by department for USPI and SCA, one that contains 2010 and 2011 data and one that contains data in 2014 and 2015. See "Expense Comparison of USPI and SCA," USPI, January 11, 2015, USPI_CIV_000962509; "Overhead Comparison of USPI and SCA," USPI, December 16, 2013, USPI_CIV_000113335; Gerhart Report, footnote 375. See also Starr Report at ¶ 101 ("USPI and SCA also shared non-public corporate overhead cost on multiple occasions, which would include Senior-level Employee compensation.").

[329] Martin (USPI) Deposition, p. 63 ("Q. To your knowledge, what information did USPI receive from SCA over the years? [...] A. To my recollection, after all this time I think the -- what I recall is aggregated information, which is common in finance, I would share some very high level grand total information about volumes or revenues or something else, but nothing granular, you know, nothing about, you know, an individual employee's salaries or employees' salaries at all, other than as part of some very large grand total expense number for the company.").

[330] Starr Report, ¶ 101 ("USPI and SCA also shared non-public corporate overhead cost on multiple occasions, which would include Senior-Level Employee compensation.").

overhead expenses may have also included other expenses (e.g., rent and insurance).[331] While these data were sometimes department specific, they were not broken down into separate categories such as labor costs or rent costs within the department, nor did they contain compensation information for specific individuals nor even sufficient information to calculate the average salary for proposed class members within a given department.[332]

167. Prof. Gerhart states that the overhead expense data has "granularity" that is "significant," but does not state in what sense or what kind of information would not be "granular" or would have a granularity that would not be "significant."[333] In the interest of being concrete rather than vague, I provide an example of the overhead cost data shared in Exhibit 23. Such information could not facilitate coordination on pay between USPI and SCA. Furthermore, USPI's and SCA's ability to use this information to coordinate on pay was further hindered because according to Defendants' employees, these data were not easily comparable between USPI and SCA due to differences between USPI and SCA in the classification of departments and expenses.[334]

---

[331] Mathis (SCA) Deposition, p. 136 ("A. When you had the -- when you engaged in the benchmarking of corporate overhead with USPI it included all of the expenses that are included in SCA's corporate overhead, correct? A. I believe so. Q. And that would have included labor costs as well as other costs, correct? A. I believe so."); Kopser (USPI) Deposition, pp. 87–88 ("Q. And you testified that labor costs were included as a component of that benchmarking information; is that right? A. Yes. Q. Did that information shared with or received from SCA provide compensation information for specific individuals? A. No. Q. How was labor cost information reflected if it wasn't individual compensation? A. It would have been part of the overall number by department. So the finance, it would consist of salaries, expenses, and other items. Probably overall, 60 -- 60 to 80 percent of an office expense is payroll, but the other portion would be -- probably see rent, insurances, things like that. Q. Are you aware if there was any way to use that aggregated information that you just described to determine individual compensation? A. No.").

[332] Martin (USPI) Deposition, pp. 135–136 ("Q. Now first, what does Overhead Benchmarking mean to you? A. Well, it can mean a lot of things. But in general it just means trying to understand whether either the total amount for all overhead or total amount for key large components of it, compared favorably versus unfavorably with others in the industry. Q. And would compensation certainly be a key factor, payroll and compensation? A. It would be contained in the totals that a person would look at. In my experience, overhead benchmarking would not include breaking out compensation information from the other costs, nor would it include head count or things like that, in my personal experience. That's what it means to me.").

[333] Gerhart Report, ¶ 83 ("Moreover, the granularity of the overhead expense data exchanged was significant.").

[334] Kopser (USPI) Deposition, p. 34 ("And what makes the comparison difficult to do is each company names things different ways. [...] And the table shows that they're different departments at each company, so by looking at any individual one department is irrelevant. So we just aggregate it in total corporate expense and total field expense."); Email from Brian Mathis (SCA) to Jason Cagle (USPI), "Re: SCA Department Comparison.xlsx," with attachments, December 31, 2014, USPI_CIV_000021178 ("We made a few modifications, like putting your IT back together, to try and make it easier to compare the two companies."); Clemens (SCA) Deposition, pp. 137–138 ("Q. So is part of this -- is part of this process of seeing a competitor's G&A data to see if there are ways that SCA can reduce its costs? A. It's possible. But is there -- it's not enough information here to really be able to make that judgment unless something was really far out. You know, because there could just be classification differences between line items that could give you, you know, a false sense of what their actual expense is compared to yours. Does that make sense?").

**EXHIBIT 23**
*Example of Overhead Expense Data Shared Between USPI and SCA*

### Expense Comparison

Red = Added by USPI

| | USPI | | SCA | |
|---|---|---|---|---|
| | 2014 Forecast | 2015 Budget | 2014 Forecast | 2015 Budget |
| Legal | 1,055,204 | 891,457 | 1,731,913 | 2,222,350 |
| Compliance & Audit (External & Internal) | 2,114,979 | 2,200,170 | 1,343,832 | 1,701,961 |
| Accounting (Corporate) | 3,821,421 | 3,861,903 | 5,367,267 | 5,305,261 |
| Finance | 782,025 | 2,378,385 | 4,430,680 | 4,896,061 |
| Diligence | | | 412,055 | 519,205 |
| Sales & Market Development | 5,678,105 | 4,044,852 | 2,616,671 | 2,926,259 |
| HR | 2,477,704 | 2,429,242 | 2,681,796 | 3,139,651 |
| Client Services | | | 1,142,087 | 1,468,450 |
| Acquisition Integration | | | 1,029,412 | 1,503,506 |
| Development | 5,452,207 | 5,890,762 | 6,220,227 | 8,079,076 |
| External Deal Costs | 1,440,529 | 1,000,000 | 2,787,155 | 2,820,000 |
| Physician Leadership Team / Meeting | | | 182,525 | 190,000 |
| Executive | 4,112,446 | 5,571,173 | 3,385,977 | 3,619,718 |
| Strategy | 2,599,616 | 2,523,258 | 2,852,212 | 3,996,734 |
| IT | 8,182,426 | 9,338,024 | 7,291,564 | 7,770,192 |
| Corporate Legal Fees | 407,453 | 554,859 | 501,784 | 450,000 |
| Corporate Office Rent | 1,037,574 | 1,043,563 | 186,648 | 756,000 |
| GL/PL/WC (Corporate Allocation) | 238,413 | 141,554 | 350,988 | 412,067 |
| Group Medical Adjustments | 236,820 | 235,449 | 2,498,730 | 500,000 |
| General Overhead | 3,020,880 | 4,127,621 | 3,192,782 | 3,160,195 |
| Board Expenses | 394,149 | 439,516 | 281,370 | 435,000 |
| Electronic Health Records | 2,105,608 | 1,978,407 | | |
| **Total Corporate G&A** | **45,157,559** | **48,650,195** | **50,487,675** | **55,871,686** |
| | | | | |
| Clinical Services | 2,144,187 | 2,586,202 | 2,163,732 | 2,243,780 |
| Managed Care | 2,021,831 | 1,039,169 | 3,804,145 | 5,300,889 |
| Supply Chain Operations | 1,764,982 | 217,190 | 379,306 | 410,814 |
| Operations Overhead | 22,303,684 | 25,452,812 | 19,184,572 | 21,832,876 |
| GL/PL/WC (Direct Allocation) | (453,295) | - | | |
| Accounting (Facility) | 4,027,180 | 4,700,853 | 4,357,724 | 4,940,739 |
| Business Office / Revenue Cycle | 946,846 | 853,939 | 4,215,832 | 3,936,543 |
| **Total Direct G&A** | **32,755,415** | **34,850,165** | **34,105,312** | **38,665,641** |
| | | | | |
| **Total Overhead** | **77,912,974** | **83,500,360** | **84,592,987** | **94,537,327** |
| | | 5,587,386 | | 9,944,340 |
| | | 7% | | 12% |

Source: "Expense Comparison of USPI and SCA," USPI, January 11, 2015, USPI_CIV_000962509
Note: This exhibit provides an example of the corporate overhead information shared between USPI and SCA.

168. The evidence Plaintiffs' experts point to that does concern the sharing of compensation-related information, and thus falls within the third type,

primarily included the sharing of retrospective or prospective annual-level salary increase budgets (sometimes referred to as wage increase budgets or merit increase budgets) both between SCA and DaVita, and separately between USPI and SCA. Some of the evidence Plaintiffs' experts present, which I do not discuss in detail, does not pertain to actual information sharing, and merely references the *potential* sharing of merit pay budgets.[335] Even where the evidence does support information being shared, I have seen no explanation for how aggregate information of this type could be used to facilitate coordination on pay for proposed class members, and I find it implausible it could be used in such a manner. (I also discuss in more detail later in this section two instances Plaintiffs' experts point to concerning SCA and USPI (but not SCA and DaVita) sharing compensation information for individual employees. This evidence is extremely limited, and at least one of the two instances does not pertain to class positions.[336])

169. First, Plaintiffs' evidence does not support that these wage increase budgets were shared regularly throughout the Class Period. The contemporaneous business documents Plaintiffs' experts point to include only a few discrete instances in which a Defendant shared a merit pay increase budget, or had another Defendant's merit pay increase budget, all of which occurred prior to 2013. Even in these limited instances, much of the evidence Plaintiffs' experts provide only supports the notion that information was shared in one direction, some of which was retrospective or potentially available from other sources, i.e., DaVita or USPI sharing information with SCA but not SCA sharing

---

[335] See, e.g., a discussion of a potential exchange cited by both Prof. Starr and Prof. Gerhart. See email chain from Brian Mathis (SCA) to Jason Cagle (USPI), "RE: Wage Increase Budgets," August 20, 2014, USPI_CIV_000021155 ("[Brian Mathis (SCA):] Are you all willing to swap wage increase budgets as we have in the past? [Jason Cagle (USPI):] Sure. We're just heading into budgets. When were you hoping to see it? I may be a few weeks out."); Gerhart Report footnote 376; Starr Report footnote 366.

[336] The first instance does not pertain to a class position: SCA and USPI exchanged shared salary information for a "no. 2 Lawyer" which is not a class position because it would be in the excluded legal department. See email chain from Rich Sharff (SCA) to Jason Cagle (USPI), "RE: comp," May 30, 2012, USPI_CIV_000016522. The second instance may pertain to a class position for USPI but may pertain to a position in an excluded department for SCA. USPI provided the salary for an "internal audit manager" which may be similar to the USPI class position "Dir, Audit Svcs." SCA provided information for a "VP" and a "director who focuses solely on audit" in the combined compliance and audit departments which may be similar to the SCA class positions "Dir Internal Audit" or "VP Internal Audit" however, the compliance department is excluded from the class. See email chain from Mark Kopser (USPI) to Brian Mathis (SCA), "RE: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–79 at OMC_BM_000010778 ("[Mark Kopser (USPI):] We pay our internal audit manager 150K. Is that close to what you pay If you can share great in not OK. [Brian Mathis (SCA):] A few years ago we combined our compliance and our audit departments and now have a single VP ($175k + 40% potential bonus) that leads both. There is a director who focuses solely on audit which is probably the relevant position to compare to and she has a base of $103k with potential bonus of 25%."). The only other compensation-related information Plaintiffs' expert alleged was shared between USPI and SCA (but not between SCA and DaVita) included the sharing of SCA's firmwide PTO policy. See email chain from Cindy English (USPI) to Rich Sharff (SCA), "RE: Contacts as SCA Baylor and Tenet for PTO Policy and Accrual Inquiry?," August 25, 2014, USPI_CIV_000601224–29.

information with DaVita or USPI.[337] Evidence of such ad hoc information sharing in a few years during a Class Period spanning 12 years (2008–2019) does not strike me as "regular." The depositions Plaintiffs' experts point to on this topic also indicate that the information was not shared regularly throughout the Class Period (e.g., stating it was "not a regular practice," or that it only occurred in "some years" or "a year or two.").[338]

---

[337] Plaintiffs' experts only provide evidence of a few ad hoc instances in which Defendants shared information about merit pay increase budgets. First, a July 2009 document containing notes compiled by SCA's Andrew Hayek indicates that SCA had the 2009 merit pay increase budgets for DaVita and USPI. See 2009 Hayek Merit Pay Notes, HAYEK-000012214–16 at HAYEK-000012216. In his deposition, Andrew Hayek testified that he learned about the DaVita information from a conversation with Javier Rodriguez at DaVita and compiled it into this document. See Hayek (SCA) Deposition, pp. 367–369. I note that, at least as to DaVita, the information in Hayek's July 2009 document was backward-looking—it discussed merit increases that DaVita decided in January 2009 and implemented in March 2009. See email chain from Laura Mildenberger (DaVita) to Kent Thiry (DaVita) et al., "CALL MATERIALS," January 28, 2009, DVA OMCEAL 001181143–65 at DVA_OMCEAL_001181148 ("Effective (date email is sent), leaders will be required to manage their salary budgets in accordance with the following guidelines: …"); Email chain from Village Communications to Village Communications (DaVita et al., "Correction: Focal Merit Increase Process — Opening Mar. 9," March 6, 2009, DVA_OMCEAL_001096793–809 at DVA_OMCEAL_001096801 ("Each year during March we process merit increases for teammates that fall into one of the Focal Review categories — see chart below. This makes up 25% of the total teammate population. The Focal Review process is completed via the Compensation Planner tool, which will be open from Mar. 9 — Mar. 27."), DVA_OMCEAL_001096808 ("The merit process window is open from March 9 — March 27. All increase recommendations must be completed and approved by the SVP no later than March 27, 2009."). In addition, some of the DaVita information also appears to have been disclosed publicly in a proxy statement in advance of DaVita's June 15, 2009 annual meeting of stockholders before Hayek allegedly obtained it (assuming he obtained it sometime after the public disclosure, which occurred prior to June 15, 2009, and closer to July 2009, the date of the document with Hayek's compiled notes). See DaVita, "Notice of Annual Meeting of Stockholders," June 15, 2009, available at https://filecache.investorroom.com/mr5ir_davita/185/DaVita_Proxy09_Final_2.pdf at p. 21 ("[…] the Compensation Committee elected not to award merit increases to base salary in 2009 to our named executive officers and other members of management across the company and awarded reduced cash bonus awards to our chief executive officer and chief operating officer."). Second, Prof. Starr cites to an SCA document from 2011 that summarizes talking points for a meeting which had "Data on 2011 Salary Increase Budgets" for various firms including USPI. See email chain from Sue Seme (SCA) to Cabin Team (SCA) and Brian Mathis (SCA), "RE: Updated: Cabin Team Materials," with attachment, January 14, 2011, OMC_BM_000000884–95 at OMC_BM_000000888 ("Specific company reports (please keep confidential): — USPI = 2-3% (facility level; mgt. unclear but no raises last 2 yrs."). Third, in a 2012 email exchange, USPI provided SCA with its aggregate merit pay increase. See email chain from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729 ("[Brian Mathis (SCA):] Are you all expecting typical —2% wage increases for 2013? [Mark Kopser (USPI):] Yes 2-3%.").

[338] Hayek (SCA) Deposition, pp. 362–363 ("Q. And did you yourself ask CEOs or peers at other companies for their information regarding what they plan to do with respect to future wage increases? […] A. From time to time, I reached out to people in healthcare and outside of healthcare for their opinion or perspective on a variety of matters. Q. Did you ask Mr. Wilcox for that information? A. By 'that information,' average wage increase, kind of pooled average increase? Q. Yes. A. I believe I did on one or more occasions from time to time. Q. Did you ask for the same information from Mr. Thiry? […] Q. I don't recall if it was Mr. Thiry or Mr. Rodriguez, but on one or more occasions -- and again, I think it was maybe a couple, not a regular practice -- I did."); Mathis (SCA) Deposition, pp. 53–54 ("Q. In determining what the yearly wage increase budget would be for the following year did SCA exchange its wage increase budgets with any of SCA's competitors? […] A. Some of the time we would. […] Q. But did SCA exchange its yearly wage increase information with DaVita? […] A. I believe in some years we did."); Rucker Deposition, pp. 254–260 ("Q. Are you aware if anyone from SCA ever reached out to any USPI employees to obtain plans for future wage increases? A. I think there was a year or two where we did talk about in high-level, blunt terms what sort of a merit pool they were planning to fund for one or two years forward. Q. So you did, for those one or two years, exchange with USPI merit pool information; is that right? A. I think so, yeah. […] Q. And who do you recall you reached out to to exchange merit pool information with? A. I think I had a -- an informal conversation with -- it could have been Javier at -- Javier Rodriguez at DaVita. I can't recall other organizations, but I -- I may have reached out to one or two others in each of those one or two years that we did this. Q. And what were the years you believe that you reached out to your competitors to share merit pool

170. Second, besides being irregular, the merit or wage increase budgets allegedly shared took the form of *aggregate* wage increase budgets for the entire firm, or for broad groups of employees within the firm, that measured the "percentage that [the firm] would increase individuals' compensation in aggregate."[339] One example of the merit or wage increase budgets allegedly shared by USPI and SCA can be seen in Exhibit 24.[340] As the exhibit illustrates, these data did not contain information about individual compensation, but rather appear to be for employees of the firm generally. Information at this level of aggregation would not be sufficient to enable firms to coordinate on pay for specific jobs or proposed class members.[341] In some cases, the information was more disaggregated but in no case was the wage increase budget information

information? [...] A. I -- I don't -- I can't accurately answer your question. I think it may have been 2012, 2013. [...] Q. Okay. And when you obtained merit pool information, was it a mutual exchange with the other companies? A. Yes."), pp. 342–343 ("Q. You testified that -- and setting aside this time frame, you testified that you did recall one instance where discussions -- where you had a discussion with a competitor about a merit pool increase; is that correct? [...] A. Yes, that -- that company was DaVita, and we don't directly compete with them, but -- but yes, that was the conversation that I was referring to with Javier Rodriguez. [...] Q. Okay. But you're only -- you only recall that one instance? [...] Q. Is that correct? A. Yes."). See also Kopser (USPI) Deposition, p. 88 ("Q. Do you agree with the characterization that you regularly exchanged information with SCA? A. Excluding the case report, which was regular over a period of a few years, I don't believe any other information was regularly shared. Q. When you refer to case report, are you referring to that -- the pay or case mix? A. No. The -- the monthly file that was our case finding. Q. Did you regularly exchange plans, merit pool budget information, with SCA or anyone else? A. No. Q. Did you regularly exchange any wage information with SCA or anyone else? A. No.").

[339] The aggregate nature of these data was affirmed in deposition by Defendants' employees. See Mathis (SCA) Deposition, pp. 69–70 ("Q. In this e-mail you refer to the following year wage increases; do you see that? A. I do. Q. Would that have been a number in dollars or a percentage? How would that -- how would the following year wage increases be represented when you exchanged it with USPI? [...] A. I believe it would be a percentage increase. Q. A percentage of what? A. A percentage of the hourly or annual salary budget. So the total dollar increase. Let me restate that. Q. Sure. Yeah. A. I don't think that was clear. A percentage that we would increase individuals' compensation in aggregate. Q. And that was for compensation of base pay, correct? A. I believe so, yes."); Hayek Deposition, p. 367 ("Q. Okay. Could you just tell me generally what information this is and where you compiled it from, please? A. This is information about general average wage growth or wage increase, again, across pools -- broad pools of employees at six different companies. That's how I would describe it.").

[340] See, e.g., Email from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729 ("[Brian Mathis (SCA):] Are you all expecting typical ~2% wage increases for 2013? Mark Kopser (USPI): Yes 2-3%.").

[341] Deposition testimony of Defendants' employees affirms that aggregate merit pool budgets could not be used to coordinate on pay for specific job roles or proposed class members. Kopser (USPI) Deposition, pp. 86–87 ("Q. Does knowing another company's merit pool budget percentage tell you anything about the compensation paid to individual employees? A. No. Q. Does knowing another company's merit pool budget percentage tell you anything about a compensation increase that might be paid to an individual employee? A. No. Q. And why is it that knowing the merit pool budget percentage wouldn't tell you anything about individual compensation? A. Because if you don't have the starting point of what their salary was, or are they getting 2 percent or 3 percent or 1 percent, you have no idea what the ending salary point is."). See also, Clemens (SCA) Deposition, p. 189 ("Q. Okay. And so wouldn't sharing wage increase data with USPI impact its competition in the market for employees? A. It's -- I suppose it's possible. But consider the way you defined compensation earlier, there's a lot of components to it. There's a lot of other factors that somebody is going to look at. And we weren't recruiting the whole workforce. It was — if it happened, it was a person. And us knowing their overall merit increase or USPI knowing our overall merit increase has nothing to do with what that person potentially got from a merit increase standpoint, that component over compensation. So I really don't see that being reasonable for that to really impact the competitive nature of that employee by recruitment.").

disaggregated to the level of an individual or a specific job title or location.[342] Additionally, it is unclear how information for groups of employees that were largely not proposed class members (such as facility or field employees) would have affected proposed class members.[343] Moreover, it is unclear how budgets for large pools of employees that included both individuals within and outside of the proposed class, such as firm level budgets, would be distributed across employees and how they would affect proposed class members, if at all. [344]

---

[342] In the case of the 2009 Hayek Merit Pay Notes, one group for which a budget was shared appears to be at the job seniority level, but not the specific job title level. Specifically, the memo contained information for USPI "VPs" which may have pooled together VPs and SVPs since the other category listed was "non-VPs." However, no definitive forward-looking information was provided for VPs. See 2009 Hayek Merit Pay Notes, HAYEK-000012214–16 at Hayek-000012216 ("USPI: 2% guidance in field [.] Non-VP follow 2% [.] VPs still frozen, now a year and 6 months, will probably keep for foresee.").

[343] 2009 Hayek Merit Pay Notes, HAYEK-000012214–16 at Hayek-000012214–16 ("DaVita: All non-field (corporate office, business office, execs) got zero increase [...] Note: 2009 budget (created late last year) allowed for 2.2% wage increases on average, but field operators are coming in at 1.5% [...] USPI: Delaying salary increases in corporate office [...] Field raises are driven by division leaders [...] Bill expects another year of 3% raises on average with some markets higher (up to 10%) [...] 2% guidance in field [.] Non-VP follow 2% [.] VPs still frozen, now a year and 6 months, will probably keep for foresee[.]"); Email chain from Sue Seme (SCA) to Cabin Team (SCA) and Brian Mathis (SCA), "RE: Updated: Cabin Team Materials," with attachment, January 14, 2011, OMC_BM_000000884–95 at OMC_BM_000000888 ("• Mercer's broader data (detail in separate file): — Actual 2010 increases = 2.0-2.4% — Expected 2011 increases = 2.7-3.0% — Basically no difference between mgmt and non-mgmt tiers [.] • Specific company reports (please keep confidential): — USPI = 2-3% (facility level; mgt. unclear but no raises last 2 yrs.").

[344] It is worth noting that any impact on the compensation of individual employees could be borne entirely by *non-class* members, and it could still be the case that "all of the merit increases combined [...] add up to the average merit increase budget." See Gerhart Report, ¶ 153. Prof. Gerhart may claim that "the sizes of merit increases in percentage terms are usually uniform within a company across jobs and job levels," apparently implying that if the budgeted pay increase is 3% firmwide that every single person in the firm will see a 3% increase in their pay, however, as I explain in Section 4.3.3, actual pay increases for Defendants' employees could, and did, vary widely from the budgeted percentage based on employee performance and other factors. See Gerhart Report, ¶ 151.

Highly Confidential – Outside Counsel/Experts Only

*EXHIBIT 24*
*Example of Merit Pay Increase Budget Shared Between SCA and USPI*

**From:** "Kopser, Mark" <MKopser@uspi.com>
**Subject: RE: 2013 Labor**
**Date:** October 21, 2012 11:12:29 AM EDT
**To:** "Mathis, Brian" <Brian.Mathis@scasurgery.com>

Yes 2-3%

-----Original Message-----
From: Mathis, Brian [mailto:Brian.Mathis@scasurgery.com]
Sent: Friday, October 19, 2012 10:12 AM
To: Kopser, Mark
Subject: 2013 Labor

Mark,

Are you all expecting typical ~2% wage increases for 2013?

Source: Email from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729

171. Taking a step back, suppose for the sake of argument that there was a conspiracy. Irregular information sharing of highly aggregated information, between two of the three alleged conspirators, would not be sufficient to support it, and would be expected to result in little to no effect on pay — not a conspiracy that somehow managed to lead to a 14.5% decrease in pay. Importantly, the pay increase budgets shared discussed yearly pay increases typically on the order of 2% of compensation and thus,[345] even if used to attempt to coordinate on pay in a rough way, could not possibly lead to pay being suppressed by 14.5% throughout the Class Period. I therefore do not interpret the isolated episodes of information sharing alleged as having anything to do with collusion—certainly not collusion that could have an effect on compensation such as those claimed by Prof. Starr. A much more obvious interpretation of the information sharing alleged is that it would orient a firm as to where it was relative to its competitors, which can have procompetitive effects on pay.

---

[345] Email from Brian Mathis (SCA) to Lynn Howard (SCA) et al., "RE: Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729 ("[Brian Mathis (SCA):] Are you all expecting typical ~2% wage increases for 2013? [Mark Kopser (USPI):] Yes 2-3%.").

172. The pay increase budget pool information discussed by Plaintiffs' experts does not even meet Prof. Starr's own criteria stated in his report regarding the types of information that, when shared, can lead to anticompetitive outcomes because it did not involve the "direct sharing of prices (i.e., what a firm intends to pay or intends to sell at,"[346] or the "direct inter[firm] communications of current prices on specific transactions,"[347] and did not "give Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees for their services,"[348] as Prof. Starr claims, let alone enable Defendants to effectively suppress pay.[349]

173. Prof. Gerhart argues that even if the information shared was only sufficient to coordinate pay for some positions, that would be sufficient to "spread widely to other employees as well,"[350] presumably via Plaintiffs' alleged pay structure, although Prof. Gerhart does not articulate that clearly. But the evidence Prof. Starr and Prof. Gerhart have presented does not demonstrate that it would even be possible for Defendants to have coordinated on pay for even a single job throughout the Class Period.

---

[346] Starr Report, ¶ 56 ("The direct sharing of prices (i.e., what a firm intends to pay or intends to sell at), is the precursor to what economists and antitrust practitioners consider a traditional '"naked' price-fixing agreement.").

[347] Starr Report, ¶ 95 ("Further, the *direct and explicit* coordination among rivals to fix prices is anticompetitive and thus direct evidence of anticompetitive conduct. Episodes of direct inter-buyer information exchanges are even more likely to suppress employee compensation. Antitrust authorities appropriately consider 'direct inter[firm] communications of current prices on specific transactions to be nearly naked restraints' of trade. These 'hard-core cartel agreements' are accordingly per-se illegal under federal antitrust law."). In this context, the sharing of "current prices on specific transactions" would be analogous to the sharing of wages for specific employees. As I explained above, there are only a few instances in which SCA and USPI may have shared the compensation for individual employees, rather than data for aggregated departments, or other subsets of the firm, and only one instance *may* have pertained to a class position (internal audit manager or director of audit in the combined audit and compliance department) and I am aware of no instances in which SCA and DaVita exchange information pertaining to individual salaries. One instance of one pair of Defendants allegedly sharing a specific salary for a single position would not be sufficient to sustaining a conspiracy to fix pay.

[348] Starr Report, ¶ 93 ("In this case, the exchange of Senior-Level Employee compensation information would give Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees for their services.").

[349] This is consistent with academic literature that Prof. Starr cites, which notes that Antitrust enforcers object to agreements among rivals to exchange price information *if* doing so would facilitate the reaching of consensus on a collusive price, which in this case it would not. See Jonathan B. Baker, "The Case for Antitrust Enforcement," *Journal of Economic Perspectives*, 17(4), 2003, pp. 27–50 at p. 30 ("Antitrust enforcers also address the cartel threat indirectly. Antitrust law objects to agreements to engage in practices that likely facilitate collusion or appear to have led to higher prices, even without proof that the firms agreed on price. These may include, for example, agreements among rivals to exchange price and output information, if doing so would facilitate the reaching of consensus on a collusive price or help deter cheating by making price cutting transparent.").

[350] Gerhart Report, ¶ 149 ("As above, in this section I opine that pursuant to common evidence (and based on my experience and research in compensation and human resource management), coordination on compensation for a subset of job titles would likely cascade to the rest of the Class. Even if the Defendants did not coordinate on compensation for every single job title, if they successfully coordinated to suppress the compensation of some positions, that would be spread widely to other employees as well.").

174. Specifically, for SCA and DaVita, I have seen no instance in which compensation information for individual employees or job titles was shared. For SCA and USPI, I have seen two instances in which SCA and USPI shared compensation information for individual employees or job titles. Only one of these may pertain to a class position. The other concerned compensation for an individual not in the proposed class.[351] That is, the high water mark of information sharing Plaintiffs point to is one instance at one point in time of one pair of Defendants allegedly sharing a specific salary for a single position that may or may not be in the class. This would not be sufficient to allow coordination on pay generally and certainly would not support any inference of a 14.5% reduction in compensation. Prof. Starr states that the information sharing was sufficient for the Defendants to "arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees for their services."[352] This strains credulity, and I disagree.

175. Information on the overall pay increase budget percentage, which pertains only to salary compensation, would also not support effective coordination on pay because it only contains information on salaries, not bonuses, equity grants, or other types of pay received by proposed class members as part of their total compensation package. As I will explain in more detail in Section 4.3, a conspiracy to fix one piece of a price (in this case base salary) is unlikely to be successful as firms participating in the conspiracy will have an incentive to cheat by adjusting on other dimensions of price (in this case equity or bonus pay).[353]

---

[351] The first instance does not pertain to a class position: SCA and USPI shared salary information for a "No. 2 Lawyer" which is not a class position because it would be in the excluded legal department. See email chain from Rich Sharff (SCA) to Jason Cagle (USPI), "RE: comp," May 30, 2012, USPI_CIV_000016522. The second instance may pertain to a class position for USPI, but may pertain to a position in an excluded department for SCA: USPI provided the salary for an "internal audit manager" which may be similar to the USPI class position "Dir, Audit Svcs." SCA provided information for a "VP" and a "director who focuses solely on audit" in the "combined compliance and audit department" which may be similar to the SCA class positions "Dir Internal Audit" or "VP Internal Audit" however the compliance department is excluded from the class. See email chain from Mark Kopser (USPI) to Brian Mathis (SCA), "RE: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–79 at OMC_BM_000010778 ("[Mark Kopser (USPI):] We pay our internal audit manager 150K. Is that close to what you pay If you can share great in not OK. [Brian Mathis (SCA):] A few years ago we combined our compliance and our audit departments and now have a single VP ($175k + 40% potential bonus) that leads both. There is a director who focuses solely on audit which is probably the relevant position to compare to and she has a base of $103k with potential bonus of 25%.").

[352] Starr Report, ¶ 93 ("In this case, the exchange of Senior-Level Employee compensation information would give Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees for their services.").

[353] Even if it were the case that the merit pool information shared pertained to more than just salary compensation, it would still not contain information pertinent to *all* aspects of total compensation including bonuses and/or equity pay, and Defendants could still easily defect and adjust these dimensions of pay. While Prof. Gerhart seems to suggest in his deposition testimony that the merit pool information shared pertained to

176. Finally, as I mentioned above, and as I will discuss in detail in Section 5, Plaintiffs have not presented any credible evidence that the alleged information sharing suppressed pay for proposed class members. Prof. Starr's pay regression model is severely flawed and shows no evidence that pay was suppressed for proposed class members once obvious flaws are corrected. Moreover, by his own admission, it cannot distinguish between effects of the alleged information sharing and effects of the alleged mobility restrictions so could not possibly be used to demonstrate that the alleged information sharing specifically had an effect on pay.[354]

### 4.3. The Impact of the Alleged Information Sharing on Proposed Class Members' Pay Would Not be Common

177. Even assuming for the sake of argument that compensation-related information was shared between Defendant firms with an intent to use the information to coordinate on pay, and that Defendants somehow were able to use irregular, aggregated information to suppress pay for some proposed class members, the impact of the information sharing would not be common, and common evidence would not be sufficient to quantify harm for any proposed class members who were impacted. There are several reasons why: (1) the varied competition faced by Defendants for proposed class members' labor; (2) the irregular nature of the information sharing which occurred predominantly in the early part of the Class Period according to the evidence Plaintiffs' experts presented; (3) the varied impacts that the alleged information sharing concerning merit pay increase budgets would have on low and high performers; and (4) the fact that the alleged information sharing pertained only to salary information, not other aspects of total compensation like bonuses and equity, and that Defendants would have had an economic incentive to cheat on an agreement to coordinate on pay (assuming there was one) but that their ability to do so would have varied with proposed class members' compensation mix. In this section, I discuss each of these reasons in turn.

---

more than just salary compensation, he does not explain whether he considers the merit pool information shared to pertain to *all* aspects of compensation and indeed concedes that it would not inform equity compensation. See Gerhart Deposition, pp. 169–171.

[354] Starr Report, ¶ 106 ("Given that Plaintiffs allege that both elements of the Challenged Conduct (i.e., the No-Poach Agreements and CSI Exchanges) occurred simultaneously, my analysis measures suppressed compensation from the whole of the Challenged Conduct rather than from each individual component.").

*4.3.1. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Due to Their Varied Employment Opportunities, and the Varied Competition that is Implied for Their Labor*

178. First, the alleged information sharing would not have a common impact because, as I discussed in Section 2.1, proposed class members' labor market opportunities vary widely, and therefore, any impact of a conspiracy to suppress pay would also vary across proposed class members based on the extent of those other labor market opportunities. Neither Prof. Starr nor Prof. Gerhart conduct any analysis of labor market competition. [355] Neither expert considered whether Defendants would have faced varied competitive conditions for different types of proposed class members. Therefore, just as with the alleged mobility restrictions, neither expert can credibly conclude that the alleged information sharing suppressed pay.[356] My analysis in Section 2 demonstrates that, in fact, Defendants could not have had market power sufficient to suppress pay for many or most (if not all) proposed class members given extensive competition from non-Defendant employers for proposed class members' labor. Given this, individualized inquiry would be necessary to determine for which, if any, proposed class members Defendants did have market power sufficient to suppress pay.

*4.3.2. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Who Worked for Defendants at Different Times*

179. Second, the alleged information sharing would not have had a common impact because some proposed class members only worked for Defendants during time periods when there is no evidence of information being shared. As I discussed in Section 4.2, the evidence Plaintiffs' experts discuss pertaining to

---

[355] Starr Deposition, Volume I, pp. 155–156 ("Q. You haven't attempted to define a relevant market in this case, have you? A. [...] In this context I wasn't asked to study the relevant labor market and define the precise contours of the labor market. I wasn't asked to figure out exactly which companies every worker was going -- every worker was going to or coming from. [...] Q. Okay. It was a very long answer. My question was simple. You have not attempted to, nor have you defined a relevant market in this case; is that correct? [...] A I wasn't asked to define a relevant market, and I did not define a relevant market."); Gerhart Deposition, pp. 51–52 ("Q. [... D]o you have an understanding of the market that plaintiffs are alleging in this case? [...] A. think I would go back to what I said before, that you'd want to look at the degree to which companies people move between if there's a competitive, unrestricted market. Q. Did you look at those things related to the defendants in this case? [...] A. Yeah, I don't know that I had information; but, no, I didn't look at it in detail. [...] Q. Are you offering an opinion about the scope of the relevant labor market as it relates to the defendants in this case? A. My focus was on the movement between these three companies, I think, primarily, in this case. Q. Okay. But you're -- you are not asserting that these three companies, in and of themselves, are in a relevant labor market; correct? [...] A. I don't think I asserted that.").

[356] Prof. Starr asserts that Defendants have "market power over Class Members," a claim that is based on his alleged evidence of pay suppression, and Prof. Gerhart asserts that "Plaintiffs allege that Defendants unlawfully conspired to suppress competition in the market for Senior-Level Employees." See Starr Report, ¶ 196; Gerhart Report, ¶ 21.

compensation-related information does not support that information was shared regularly. Their evidence from contemporaneous business documents regarding merit pay increase budgets only includes a few instances, all prior to 2013.[357] Proposed class members who only worked for Defendants outside of these years, and in particular those who only worked for Defendants in the latter portion of the Class Period, could not have been affected by the alleged information sharing in those earlier years. Using Defendants' data, I estimate that 34.5% of proposed class members only worked for Defendant employers in 2014 or later, and thus could not have been harmed by any information sharing that occurred in 2013 and earlier.[358]

### 4.3.3. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Based on Performance

180. Third, the alleged information sharing would not have a common impact because much of the information that was allegedly shared between Defendants concerned merit pay increase budgets for the entire firm, or for broad groups of employees within the firm, where the amount of increase individuals received was conditioned on their performance. As I discussed in Section 2.2, Defendants use "pay for performance" strategies when setting many types of pay (and in particular, when determining merit pay increases) that aims to ensure that high performers are better compensated than low performers. Low performers whose performance is sufficiently poor that they receive no merit pay increase whatsoever could not have been affected by the alleged information sharing related to merit pay increases because they would have been ineligible to receive a merit pay increase of any amount regardless of whether the alleged information sharing took place. For example, at SCA, an internal business document from 2013 indicates that SCA employees that received a performance rating of "[d]oes not meet standards" would receive a 0% pay increase.[359] USPI's "2014/2015 Merit Guidelines" recommend a 0%

---

[357] As I explained in Section 4.2, Plaintiffs' experts only provide evidence of a few instances from contemporaneous business documents in which a Defendant shared a merit pay increase budget or had another Defendant's merit pay increase budget, which occurred in 2009, 2011, and 2012. Plaintiffs' experts also cite to deposition testimony from Michael Rucker (SCA) discussing DaVita and SCA sharing merit pay increase budgets on one occasion in 2012 or 2013, so to be conservative, I exclude proposed class members who worked for Defendants in 2013 from my calculation. See footnote 337 and 338.

[358] Workpaper 18.

[359] See email chain from Peter Clemens (SCA) to Chris Jennings (SCA) and Lynn Howard (SCA), "RE: Compensation Adjustments for Support Services Teammates,", February 21, 2013, SCA001125179–82 at SCA001125180 ("If teammate's pay is ... and the performance rating is ... Does not meet standards (0-4) ... compensation adjustment should be 0.0%."). In his deposition testimony, Allen Spradling affirmed that these guidelines specified the process by which to determine annual merit increases based on performance ratings. See Spradling (Named Plaintiff) Deposition, pp. 93–94 ("Q: And this chart is suggesting that depending on performance --or, actually, why don't you tell me what this chart is saying. A: Yeah. Exactly like you were saying,

merit increase for candidates that received a performance review of "Doesn't Meet/Perf. Plan."[360] Internal business documents at DaVita also indicate that not all employees receive merit pay increases due to factors including performance.[361] The deposition testimony of Defendants' employees and case evidence affirms that salary increases could and did vary widely from the budgeted percentage due to performance.[362]

### 4.3.4. Any Impact of the Alleged Information Sharing Would Vary Across Proposed Class Members Based on their Compensation Mix

181. Fourth, the alleged information sharing would not have a common impact because the compensation-related information allegedly shared pertained to

---

that these are guidelines for raters to try and follow based upon the rating they have given to direct reports. If they were middle-of-the-road performance --i.e., meets standards --1 to 2 percent. If less performance, less money. If more performance, more money.").

[360] "2014/2015 Merit Guidelines," USPI, USPI_CIV_000099574.

[361] Internal business documents from DaVita show that many employees do not receive salary increases, and suggests that even high performers may not receive a merit increase. See Email from David Maughan (DaVita) to Jeff Rieb (DaVita), "FW: Communication to RODs/DVPs," January 7, 2014, DVA_OMCEAL_001150350–51 at DVA_OMCEAL_001150350 ("**Note: that we are a pay for performance company and our top performers should be rewarded for their contributions.** This will require that our lower performers (PDR Ratings of 2 or 1) receive little or no increases." (emphasis in original)); Email chain from Jeremy Eaves (DaVita) to Philipp Stephanus (DaVita) et al., "ACTION REQUIRED--PLEASE CASCADE TO YOUR MANAGERS: COMPLETE FOCAL PDRs and MERIT INCREASE RECOMMENDATIONS," with attachment, March, 18, 2011, DVA_OMCEAL_001358600–02 at DVA_OMCEAL_001358600 ("**Please encourage merit increase differentiation**. Ratings of 1s and 2s should not likely be eligible for increases... Also remember that merit is not an entitlement—you don't have to award every year simply because someone is here." (emphasis in original)); Email from Cynthia Baxter (DaVita) to People Services Directors (DaVita), "Compensation philosophy" [with attached document "130301 Comp Philosophy.pdf"], March 2, 2013, DVA_OMCEAL_000906132–35 at DVA_OMCEAL_000906134 ("In any given year, ~35% of Vice Presidents receive merit increases. This means that even high performers may receive lower than expected merit increases or potentially no increase at all in a given year."); "Palmer Meeting," October 10, 2011, DVA_OMCEAL_001399746–74 at DVA_OMCEAL_001399774 ("PDR Score is no guarantee. With limited resources, we have to make difficult decisions on how best to use limited dollars. A team may be made up of solid performers; however, not everyone is guaranteed a merit increase. As leaders we have to differentiate based on factors such as outstanding performance, facility needs, team needs, retention needs and internal equity. [...] We recommend that you use your merit pool to reward your highest performers and/or rectify potential pay inequities within your team. This means that some teammates will receive a lower percentage or potentially no increase at all, nor an increase in every year.").

[362] See, e.g., Clemens (SCA) Deposition, p. 147 ("And there was then -- so that merit, if we came up with an X percentage overall merit increase, everybody would have to allocate that to their employees. High performers would get more than X percent, lower performers would get less. And it would average to hopefully that X percent, the guideline."); Mathis (SCA) Deposition, p. 247 ("Q. How in your experience are merit increases at SCA differentiated? A. They would be differentiated based on performance of the individual and the competitive nature of that role and the specifics of the market that that individual was in. Q. So in other words, in your experience did people -- did employees at SCA receive different merit increase amounts based on those various factors that you just described? A. Yes, they did. There were significant differences across the board, and I can say out of my own experience I wouldn't have kept working there if I'd gotten a 2 percent increase every year."); Kopser (USPI) Deposition, pp. 86–87 ("Q. And in general, what is a merit pool budget? A. In the context of budgeting, it was a -- an amount for what we expected inflation to be throughout the course of the year, which usually was using the current year forecast or forecast for inflation. And then when raises were actually given -- which would be in the spring, April time I think -- we would use the merit process of, you know, staff evaluations to give actual pay raises. Those pay raises would range a point or two higher than the budgeted number to a point or two lower with the discretion at the facility level, with the guideline that overall they came in at the budgeted number. [...] Q. And did employees at USPI receive different merit increase amounts? A. Yes. A. And what were those decisions based upon? A. Performance.").

Highly Confidential – Outside Counsel/Experts Only

salaries, not other important aspects of proposed class members' compensation such as equity grants and bonuses. From an economic perspective, any agreement to suppress one component of compensation would invite backsliding (i.e., cheating on the agreement) for other components of compensation. This would be expected to have larger effects for some proposed class members than others due to variation across proposed class members in the types of compensation (e.g., equity, bonuses, etc.) they would usually receive.[363]

182. The broader point that it is unsustainable to collude on one component of compensation is supported by the economic literature generally.[364] When firms cannot compete in one way, they adapt and find other ways to compete. For example, in regulated markets in which firms are price constrained, including commercial banking and air transportation, firms compete on factors other than price.[365] Similarly, academic literature has also shown that firms change their behavior strategically in the face of regulation or taxes.[366] The same phenomenon holds in labor markets. For instance, when wages were frozen during World War II, but health insurance coverage was not included, firms competed by offering private health insurance.[367] This is consistent with

---

[363] See Section 2.2.1.

[364] Economic theory suggests it is harder to sustain a conspiracy to fix pay when colluding firms have to coordinate on and monitor more than a single price. See Carlton and Perloff (2015) , p. 159 ("It is easier for a cartel to spot cheating when all it has to examine is a single price. It is relatively difficult to detect price cutting that is achieved by an increase in quality; a firm could increase its quality and hold its price constant if it wanted to increase sales without explicitly violating the pricing agreement.").

[365] See, e.g., George W. Douglas and James C. Miller III, "Quality Competition, Industry Equilibrium, and Efficiency in the Price-Constrained Airline Market," *The American Economic Review*, 64(4), (Sep. 1974), pp. 657–669 at p. 657 ("There are many examples of such regulated markets [...] which, although price constrained, reach an equilibrium through vigorous non price competition [...] Examples include commercial banking, stock brokerage, real estate brokerage, motor trucking, taxicab service, and, of particular interest here, air transportation.").

[366] See, e.g., Justin Marion and Erich Muehlegger, "Measuring Illegal Activity and the Effects of Regulatory Innovation: Tax Evasion and the Dyeing of Untaxed Diesel," *Journal of Political Economy,* 116(4), (Aug. 2008) pp. 633–666 at p. 633 ("This article examines tax evasion in the diesel fuel market. Diesel fuel used for on-road purposes is taxed, while other uses are untaxed, creating an incentive for firms and individuals to evade on-road diesel taxes by purchasing untaxed diesel fuel and then using it for on-road use.").

[367] The U.S. stands alone among wealthy nations in having private provision of health care by employers; avoidance of WWII price controls is generally thought to be the origin story of this unique institutional arrangement. See, e.g., David Blumenthal "Employer-Sponsored Health Insurance in the United States — Origins and Implications," The New England Journal of Medicine Health Policy Report, July 6, 2006, pp. 82–88 at p. 83 ("The resultant private insurance industry was therefore ready to sell insurance to employers when the opportunity to do so emerged during World War II. This opportunity arose because, to control inflation in the overheated wartime economy, the federal government in 1942 limited employers' freedom to raise wages and thus to compete on the basis of pay for scarce workers."); Paul Fronstin, "Testimony to the House Committee on Education and the Workforce on behalf of the Employee Benefit Research Institute," *Employee Benefit Research Institute*, September 10, 2024, p. 2, available at https://edworkforce.house.gov/uploadedfiles/9.10.24_help_hearing_on_erisa_anniversary_fronstin_testimon y.pdf, accessed on April 8, 2025 ("It was during World War II that employers began to offer more formal health coverage. Because the National War Labor Board (NWLB) froze wages, employers sought ways to get around the wage controls to attract scarce workers (Helms 2008).") See also Richard E. Schumann "Compensation from

---

employers adjusting other components of compensation (e.g., bonuses or equity pay) to attract or retain employees in the case that a conspiracy to fix pay only applies to a specific component of compensation such as salary. Such adjustments would be especially likely for firms where a high share of pay is skewed towards bonuses and equity, which as I explained in Section 2.2, was the case for the three Defendants.

183. Assuming then that Defendants would have cheated on any agreement they reached to fix salary pay because they could earn more profits by doing so, the effects of the alleged information sharing would vary across proposed class members and would require individualized inquiry to quantify. This is because the importance of non-salary pay components varied across proposed class members and the degree to which Defendants would have been able to offset any suppression in salary pay with an increase in non-salary pay therefore varied across proposed class members. To illustrate, consider an individual with a large share of equity pay, whose equity pay was adjusted by their employer to fully offset any salary suppression. At the same time, consider another individual not eligible for equity pay whose salary was suppressed as a result of the information sharing, but who did not receive an offsetting increase in equity pay since he was not eligible. In the first case, the individual would not be harmed by the alleged conduct, but in the second case, the individual would be, illustrating the complexity and need for individualized inquiry in order to determine which (if any) proposed class members would be harmed, and by how much.

---

World War II through the Great Society," *Bureau of Labor Statistics Compensation and Working Conditions Fall*, January 30, 2003, p. 1, available at https://www.bls.gov/opub/mlr/cwc/compensation-from-world-war-ii-through-the-great-society.pdf, accessed on April 8, 2025 ("As a result of wage restrictions, employers who needed to attract labor resorted to a growing range of fringe benefits, such as pensions, medical insurance, and paid holidays and vacations. These benefits were considered non-inflationary, as they were paid in cash and, thus, did not violate the wage ceiling. Additionally, payments for overtime afforded extra income to workers, without violating the limits on hourly wage payments.") See also Sherwin Rosen "Does the Composition of Pay Matter," in *Employee Benefits and Labor Markets in Canada and the United States*, (Kalamazoo, MI: W.E. Upjohn Institute, 2000), pp. 13–30 at p. 17 ("There is a natural tendency toward 'wage drift' in those circumstances [during periods of wage controls]: using wage and price controls to suppress inflation gives strong incentives for workers and employers to look for ways to increase worker incomes exempt from regulation. Provision of company-owned housing to employees often was used for this purpose in Europe and in the post World War II era.").

## 5. PROF. STARR HAS NOT DEVELOPED A RELIABLE METHODOLOGY TO ASSESS IMPACT AND DAMAGES STEMMING FROM THE CHALLENGED CONDUCT

184. Prof. Starr's pay regression model is not reliable for the purposes of establishing impact or damages because it does not measure changes in pay that were caused by the challenged conduct. In this section, I explain this point in some detail.

185. First, in Section 5.1, I explain that, even though a decline in mobility of proposed class members between Defendants is critical to Plaintiffs' theory of harm, and even though Plaintiffs and their experts claim mobility would be reduced by the alleged conduct, neither expert demonstrates that mobility was restricted during the Class Period. This fact alone is strong evidence that Prof. Starr's pay regression model does not measure how proposed class members' pay changed because of the alleged conduct. Second, in Section 5.2, I provide an overview of Prof. Starr's pay regression model (upon which he bases his claimed finding of common impact and his damages estimates) and discuss additional reasons that his model does not measure a change in pay caused by the challenged conduct. I show that Prof. Starr's pay regression model suffers from methodological flaws and, as a result, is incapable of reliably estimating the change in pay caused by the alleged conduct. When I correct these flaws and fix basic errors that Prof. Starr made when processing the data, I find no evidence of pay suppression or damages. I also find no evidence of pay suppression or damages when I make slight modifications to the class period start and end dates. Finally, in Section 5.3, I explain why the single effect Prof. Starr estimates in his pay regression model is not sufficiently linked to the varied conduct Plaintiffs allege.

### 5.1. Empirical Evidence Does Not Show a Reduction in Mobility Between Defendants During the Class Period

186. Plaintiffs and their experts, Prof. Starr and Prof. Gerhart, claim that a key mechanism by which the challenged conduct suppressed pay is that proposed class members were unable (or less able) to move between Defendants as a result of the alleged mobility restrictions.[368] Specifically, Prof. Gerhart claims

---

[368] Third Amended Complaint, ¶ 11 ("Defendants' conspiracy [...] denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment. In addition, Defendants' conspiracy eliminated the need for compensation increases to preempt competitive offers and retain employees."), ¶ 71 ("Defendants' conspiracy precluded information about pay and benefits from reaching employees at Defendants' companies. Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors.").

that the alleged mobility restrictions "restricted cold calling, which in turn limited job mobility,"[369] and harmed employees who would otherwise "benefit when they have uninhibited access to other jobs, i.e., job mobility."[370] However, Prof. Gerhart presents no empirical analysis of how mobility between Defendants during the Class Period compared to mobility between Defendants prior to or after the Class Period.[371] He merely cites academic literature and qualitative record evidence, and concludes that the alleged mobility restrictions "would likely have reduced employees' mobility and suppressed their compensation."[372] Similarly, Prof. Starr claims that no poach agreements as a general matter "lower workers' mobility and bargaining power, which translates into lower pay," and that the alleged mobility restrictions in particular "artificially suppressed employee mobility" and "in turn [...] suppressed employee compensation."[373] While Prof. Starr does present an empirical analysis that attempts to analyze mobility during the Class Period as compared to after the Class Period, his analysis does not exhibit the patterns that he claims it does, and has several fatal flaws that render it unreliable.

187. In this subsection, I discuss Prof. Starr's flawed mobility analysis. In Section 5.1.1, I show that, at face value, his own analysis does not support his conclusion that the alleged conduct reduced mobility. Proposed class members continued to move between "covered Defendants" (a term that Prof. Starr

---

[369] Gerhart Report, ¶ 59 ("I review evidence that, based on my experience and research in compensation and human resource management, shows that Defendants' No-Poach Agreements restricted cold calling, which in turn limited job mobility."). See also Gerhart Deposition, pp. 136–137 ("Q. How is it that you can reach the conclusion that there were fewer cold calls, without conducting an analysis to quantify that? [...] A. [...] [I]t's not clear why - if there are these restrictions, why they were put in place. And it seems like one explanation is that you thought it would reduce the number of cold calls and restrict mobility. And we did see examples of, for instance, movement between the companies, pretty important movements, before the agreement came in place. [...] And we saw testimony that -- that people said this these kind of agreements were not good for employees because it cut off their opportunities. So that's the rationale for arguing that there were fewer cold calls that would have come after the agreement was in place.").

[370] Gerhart Report, ¶ 7 ("Such collusion would be harmful to Defendants' employees because employees benefit when they have uninhibited access to other jobs, i.e., job mobility. Employees who receive outside employment offers benefit from job mobility by either voluntarily changing employers to obtain substantial compensation increases or by using the outside offers as leverage to negotiate higher compensation in return for remaining with their current employers. Employees not receiving offers who become aware of coworker offers then receive updated, more accurate information on their own outside pay opportunities, making job searches and job mobility more likely.").

[371] Gerhart Deposition, p. 113 (Q. You've not performed any analysis to measure the mobility of employees at SCA, DaVita, and USPI during the proposed class period; correct? [...] A. No quantitative analysis, no. Q. Okay. And no quantitative analysis comparing mobility levels during the class period to before or after the class period; correct? [...] A. I — Correct.").

[372] Gerhart Report, ¶¶ 64–65 ("Further, I show that restrictions on labor competition decrease employee mobility and thereby deprive employees of those opportunities. I also review common evidence that, based on my experience and research in compensation and human resource management, is consistent with employers who are not competing for labor but instead consistent with Defendant employers' top executives agreeing to implement restrictions on labor competition. [...] Finally, I explain that these restrictions would likely have reduced employees' mobility and suppressed their compensation.").

[373] Starr Report, ¶¶ 52, 73, 80.

adopts to describe moves between SCA-DaVita, and moves between SCA-USPI) throughout the Class Period, and they did so at equal or higher rates in nearly every year of the first part of the Class Period (2008–2013) as they did after the Class Period (2020–2021).[374] In my opinion, a far more significant takeaway from Prof. Starr's mobility analysis is that it shows that movement between covered Defendants accounted for less than 5%, and as little as 0.2%, of total departures per year before, during, and after the Class Period, a fact that is consistent with Defendants facing extensive competition from non-Defendant firms for proposed class members' services throughout the Class Period.

188. In Section 5.1.2, I turn to the flaws in Prof. Starr's mobility regression model, which he claims shows a statistically significant reduction in mobility between Defendants during the Class Period as compared to the years outside of the Class Period. I show that Prof. Starr's mobility regression model is fatally flawed and unreliable, as it omits most of the factors that drive mobility, includes an inappropriate time trend, and fails to account for the effects of the COVID-19 pandemic on labor markets, even though Prof. Starr acknowledges the effects of the pandemic and the lockdown period on compensation.

*5.1.1. Prof. Starr's Own Empirical Analysis Does Not Demonstrate that Mobility Was Lower During the Class Period*

189. Prof. Starr puts forward two opinions regarding mobility: that there is quantitative evidence of reduced mobility during the Class Period, and that this reduction in mobility led to a classwide reduction in pay. Yet Prof. Starr's own empirical analyses of mobility—in Figures 2 and 3 of his report—do not support his opinions.

190. First, Prof. Starr's empirical analysis shows that **proposed class members continued to move between Defendants throughout the Class Period**. This is apparent from the fact that, according to the left panel of Prof. Starr's Figure 2 (reproduced in Exhibit 25 below), the number of moves between covered Defendants is greater than zero during each year of the Class Period. Thus, while Prof. Starr and Prof. Gerhart present qualitative evidence which they claim shows that selected individuals did not move during the Class Period as a result of the alleged mobility restrictions, this evidence at best

---

[374] Starr Report, ¶ 83 ("As explained in Section V, SCA and DaVita entered into a No-Poach Agreement from 2008 to 2019, while SCA and USPI entered into a No-Poach Agreement from 2010 to 2019. I refer to these pairs of Defendants, 'SCA-DaVita' and 'SCA-USPI,' as 'Covered Defendants.'").

shows that mobility was restricted (or was believed to be restricted) in certain instances, rather than on a classwide basis.[375]

***EXHIBIT 25***
***Figure 2 in Prof. Starr's Report***



Source: Starr Report, Figure 2

Note: This exhibit contains a reproduction of Figure 2 in Prof. Starr's report. I obtain similar results if I re-estimate Figure 2 after correcting basic errors that Prof. Starr made when processing Defendants' structured data. See Workpaper 19.

191. Second, Prof. Starr's empirical analysis shows **no reduction in mobility for the first part of the Class Period.** The right panel of Prof. Starr's Figure 2 (reproduced in Exhibit 25 above) shows that, by Prof. Starr's own calculation, outside of 2009, moves between covered Defendants as a share of total departures were *higher* on a per-year basis during the first part of the Class Period (2008–2013) than for one or both years after the Class Period (2020–2021). It also shows that the number of moves between covered Defendants as a share of total departures *increased* at the start of the alleged SCA-USPI mobility restrictions in 2010. Prof. Starr himself acknowledges these patterns, noting that "mobility between covered Defendants may have been elevated in the early years of the Conduct Period."[376]

---

[375] Starr Report, ¶ 81 ("The qualitative evidence described above suggests that Defendants' conduct suppressed the flow of Senior-Level Employees between Defendant firms"), Section V.B; Gerhart Report, Section VI.B.

[376] Starr Report, ¶ 84.

192. Relatedly, Prof. Starr's Figure 3 purports to calculate the annual probability of mobility between covered Defendants relative to 2017, based on a regression analysis conducted by Prof. Starr. Prof. Starr's Figure 3 shows that, according to Prof. Starr's own calculation, the probability of a proposed class member moving between covered Defendants was *higher* for some or all years during 2008–2013, compared to one or both years during 2020–2021,[377] and that the probability of a proposed class member moving between covered Defendants *increased* at the start of the alleged SCA-USPI mobility restrictions in 2010.

193. To the extent that Prof. Starr is claiming that mobility was suppressed during the latter years (2014–2019) of the Class Period, any increase in mobility that he attributes to the end of Class Period (and the alleged conduct) is small. The left panel of Prof. Starr's Figure 2 (reproduced in Exhibit 25 above) shows that, on average, there were 3 moves per year between covered Defendants from 2014–2019, compared to 10.5 moves per year from 2020–2021 — a difference of only 7.5 moves per year across the two pairs of covered Defendants combined, which is only a tiny fraction of the 508 departures per year on average from Defendants from 2014–2019.[378] This difference reflects an increase in mobility during 2020–21, which is after the end of the Class Period, and during the period of the COVID-19 pandemic and lockdown. At the risk of stating the obvious, the pandemic and associated lockdown was one of the most serious labor supply and labor demand disruptions in many decades, with complex effects on the labor market.[379] Prof. Starr cannot be confident in interpreting this economically insignificant difference as being due to alleged mobility restrictions between some of the Defendants, when the transition out of the Class Period coincides with the pandemic and lockdown. Prof. Starr acknowledges that the pandemic period is not a reliable reference period when

---

[377] The probability of a proposed class member moving between SCA and DaVita was higher for every year during 2008–2013 compared to one or both years during 2020–2021 (as indicated by the fact that the coefficients for 2008–2013 reported in Prof. Starr's Figure 3 are larger than the coefficients for 2020 and/or 2021). The probability of a proposed class member moving between SCA and USPI was higher for two of the six years during 2008–2013 compared to one or both years during 2020–2021. See Starr Report, Figure 3.

[378] On a per-year basis, the number of additional moves between covered Defendants from 2020–2021, compared to from 2014–2019, ranges from 3 (10 moves in 2020 minus 7 moves in 2018) to 10 (11 moves in 2021 minus 1 move in 2014 or 2017). See Exhibit 25.

[379] U.S Bureau of Labor Statistics, "Empirical evidence for the Great Resignation," *Monthly Labor Review*, November 2022, available at https://www.bls.gov/opub/mlr/2022/article/empirical-evidence-for-the-great-resignation.htm, accessed on April 16, 2025 ("[C]ompared with the dot-com recession of 2001 and the 2007–09 Great Recession, the pandemic produced unique quits rates, and this finding holds across U.S. census regions. [...] The article empirically confirms the "Great Resignation" phenomenon, which is characterized by record job quitting during the pandemic[.]"); U.S. Bureau of Labor Statistics, "Labor Market Dynamics during the COVID-19 Pandemic," *Commissioner's Corner,* November 15, 2022, available at https://www.bls.gov/blog/2022/labor-market-dynamics-during-the-covid-19-pandemic.htm, accessed on April 16, 2025 ("The U.S. labor market experienced a period of unprecedented volatility during the COVID-19 pandemic."). See also Section 5.2.2.

he discusses his pay regression model, noting that "[t]he COVID-19 pandemic dramatically altered the supply and demand for labor broadly [...] it also had specific impacts in medical employment [...] if I did not control for the timing of COVID, the changes in the labor market created by the COVID pandemic might otherwise confound the Conduct estimate."[380] Prof. Gerhart similarly testified in his deposition that there were "some pretty wild swings" in the job turnover rate and the unemployment rate during the COVID-19 pandemic.[381] And yet Prof. Starr fails to address COVID at all in his mobility analysis despite his and Prof. Gerhart's recognition of its relevance.

194. Moreover, even if the "slowdown" in mobility in the latter part of the Class Period were attributable to the alleged conduct (which, as I explained above, Prof. Starr's analysis does not show), there would be no evidence of injury for the first part of the Class Period. In that case, many proposed class members would have been uninjured; in fact, 15.4% of proposed class members worked for Defendants during the Class Period but left before 2014.[382]

195. Besides not showing that mobility fell during the Class Period, **Prof. Starr's mobility patterns are also inconsistent with his pay suppression estimates**, suggesting that whatever his pay regression model is estimating, it is not the effect of the alleged conduct. If the alleged mobility restrictions suppressed pay by restricting mobility, then the timing of the mobility reduction should match the timing of the pay reduction. In fact, the patterns are reversed: Prof. Starr estimates a reduction in mobility in the latter part of the Class Period, while his pay regression model purports to show an immediate impact on pay at the start of the Class Period that declines over time.[383]

196. Finally, **Prof. Starr's own calculations also demonstrate that proposed class members had a wide range of outside employment options beyond Defendants**. The right panel in Prof. Starr's Figure 2 (reproduced in Exhibit 25 above) shows the number of moves between covered Defendants as a percent of total departures. Using Prof. Starr's own calculation in his Figure 2, Exhibit 26 then shows that, from 2008 to 2021, 96% to 99.8%

---

[380] Starr Report, ¶ 120.

[381] Gerhart Deposition, pp. 56–57 ("Q. Would you agree that the COVID-19 pandemic impacted labor markets? [...] A. Yes. Q. How so? A. Well, there were some pretty wild swings in the job opening rate, the unemployment rate.").

[382] Workpaper 18.

[383] Starr Report, Figure 7.

of departures on a per-year basis *were not* moves between covered Defendants. As Prof. Starr testified in his deposition, these departures include departures to a non-covered Defendant.[384] Prof. Starr's measure of the rate at which departing employees left for anywhere besides covered Defendants thus reinforces my estimates from Section 2.1 indicating that the vast majority of departures are for employers outside of the Defendants. Additionally, it is inconsistent with Prof. Starr's opinion that Defendants had market power over proposed class members that was sufficient to suppress pay to any extent, let alone by 14.5% (the conduct estimate reported in Prof. Starr's Figure 6) across the entire class.[385]

197. Additionally, there was also no marked change during versus outside of the Class Period in terms of whether departing employees were more or less likely to move between covered Defendants: the two years with the highest share of departures involving moves between covered Defendants, 2010 and 2012, are *within the Class Period.* Plaintiffs' allegations would suggest the opposite should be true – i.e., the years with the highest share of departures involving moves between covered Defendants should fall outside the Class Period.

198. Finally, Exhibit 27 shows that if I instead examine the number of total departures for proposed class members as a percentage of total employment, I observe a similar pattern - considerable turnover primarily to non-Defendant firms before, during, and after the Class Period, and that does not change markedly during the Class Period as compared to before or after. Like the results in Exhibit 26, these results are consistent with Defendants competing with many non-Defendant firms for proposed class members' labor, and inconsistent with Defendants having had market power sufficient to suppress pay for proposed class members.

---

[384] Starr Deposition, Volume I, pp. 136–137 ("Q. Okay. So the other 98 or 97 point something percent of the departures were moves to other employers; is that correct? [...] A. It's not clear where they went to or what they did. Q. So it's possible some retired or something like that? A. It's possible they were fired. It's possible they retired. It's possible they sat out of the labor market. It's possible they went and joined another company.").

[385] Starr Report, Figure 6, ¶ 136 ("Taken together, the quantitative analysis I performed in this section finds that the Challenged Conduct suppressed compensation by, on average 14.5 percent").

**EXHIBIT 26**

***Moves Between Covered Defendants Account for a Small Share of Total Departures for Proposed Class Members, and There is No Noticeable Change During versus Outside of the Class Period***



Source: Corrected Starr Data

Note: This exhibit shows the percent of total departures of proposed class members from Defendants that are versus are not moves between covered Defendants by year. This exhibit uses the same methodology as the right panel in Prof. Starr's Figure 2 to identify departures and moves between covered Defendants. Following Prof. Starr's methodology, departures are identified based on an employee's last year in the data at a particular Defendant, and moves between covered Defendants are identified based on whether an employee appears in the data at both DaVita and SCA, or at both USPI and SCA, within the same year or in successive years.

**EXHIBIT 27**
**There Was No Marked Decrease in Departures for Proposed Class Members as a Percentage of Total Employment During the Class Period**



Source: Corrected Starr Data
Note: This exhibit shows the total number of departures of proposed class members from Defendants that are versus are not moves between covered Defendants as a percent of total employment of proposed class members by year. This exhibit uses the same methodology as the right panel in Prof. Starr's Figure 2 to identify departures and moves between covered Defendants. Following Prof. Starr's methodology, departures are identified based on an employee's last year in the data in a class position, and moves between covered Defendants are identified based on individuals who appear in multiple firms' data in the same or adjacent calendar years in class positions. This exhibit uses the same methodology as Prof. Starr's Figure 3 to calculate total employment. Following Prof. Starr's methodology, total employment is calculated based on the total number of employees in class positions who appear in the data for at least part of the year. The increase in departures as a percent of total employment in 2018 reflects, at least in part, the departure of HealthCare Partners employees from DaVita's structured data upon sale of that division. See Workpaper 11. The increase in departures as a percent of total employment in 2021 reflects, at least in part, the fact that the Tenet payroll data only records pay through 2021, such that certain USPI employees stop appearing in USPI's structured data beginning in 2022.

### 5.1.2. Prof. Starr's Mobility Regression Analysis is Fundamentally Flawed and Unreliable

199. Prof. Starr also puts forward a mobility regression model that purports to estimate the average difference in mobility rates between the Class Period and a post-conduct period of 2020–2021. He estimates this mobility regression model for the covered Defendants combined, as well as separately for DaVita-SCA and SCA-USPI.[386] This model is fundamentally flawed and unreliable.

200. First, the mobility regression model does a poor job explaining the mobility patterns in the data: its R-squared is 0.001 or less in each of his analyses, meaning the model explains, at most, *one tenth of one percent* of the

---

[386] Starr Report, Figure 4.

variation in employees' decisions to move between covered Defendant firms or not.[387] This means that the overwhelming majority of the variation in mobility is either noise, or reflects omitted variables. By "noise," I mean random fluctuations in mobility that are not explained by his explanatory variables. By "omitted variables," I mean factors that might explain fluctuations in mobility that are not included in his mobility regression model.[388] In this instance, the leading example of omitted variables is the pandemic and the lockdown period, but there may be others as well. The simple R-squared statistic thus corroborates the visual impression of most of Prof. Starr's Figure 2, which shows year-to-year fluctuations in mobility.

201. Second, Prof. Starr misleadingly interprets the results of his mobility regression. He claims in his report, based on these results, that "the No-Poach Agreements are associated with a *statistically significant* decline (121 percent and 55 percent respectively) in movement between Covered Defendants" (emphasis added).[389] However, this statement is only true if Prof. Starr's results are evaluated using a 10% significance level, which is not the typical level used by statisticians.[390] In other words, simply evaluating Prof. Starr's own results using a more-typical 5% significance level results in a finding of no statistically significant change in mobility between DaVita and SCA, and no statistically significant change in mobility between SCA and USPI, during the Class Period. Unlike Prof. Starr, in my results below and throughout my report, I use a 5% significance level to evaluate statistical significance.

202. Finally, Prof. Starr's mobility regression model does nothing to account for the effects of the COVID-19 pandemic. Since Prof. Starr's data start in 2008 and end in 2021, his estimate is entirely determined by a comparison between Class Period years and 2020–2021 for SCA and DaVita (whose Class Period begins in

---

[387] Starr Report, Figure 4; Wooldridge (2009), p. 40 ("$R^2$ is the ratio of the explained variation compared to the total variation; thus, it is interpreted as the fraction of the sample variation in y that is explained by x.").

[388] A. Colin Cameron and Pravin K. Trivedi, *Microeconometrics: Methods and Applications*, (New York: Cambridge University Press, 2005), p. 7 ("[M]icrodata may be quite noisy. At the individual level many (idiosyncratic) factors may play a large role in determining responses. Often these cannot be observed, leading one to treat them under the heading of a random component, which can be a very large part of observed variation.").

[389] Starr Report, ¶ 89.

[390] Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80(4), 1980, pp. 702–736 at p. 717 ("Significance levels of five percent and one percent are generally used by statisticians in testing hypotheses. That is, given a significance level of five percent (or one percent for a stricter researcher) it is safe to assume that the true coefficient is not zero and that therefore the variable being tested has some effect on the dependent variable in question."). ABA Antitrust Section: American Bar Association, "Econometrics and Regression Analysis" in *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition (Chicago: ABA Publishing, 2017), p. 142 ("[S]tatistical hypotheses are carried out at conventional levels of 5 percent, occasionally at 1 percent or 10 percent.").

2008). This means his mobility regression model may confound the effects of the alleged conduct with the effects of the COVID-19 pandemic. Consistent with this, his results are sensitive to adding even basic controls for the effect of the COVID-19 pandemic on labor markets and employee mobility, as shown in Exhibit 28. Specifically, I assess how controlling for the healthcare job openings, quits, and layoffs and discharges rates from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey affects Prof. Starr's results. These rates reflect the extent to which labor markets have excess supply (*i.e.,* are slack) or have excess demand (*i.e.,* are tight), which in turn affects firms' expectations about likelihood of turnover and pay decisions. As I show in Section 5.2.2, these rates changed dramatically during the COVID-19 pandemic. I find that, after correcting for several basic errors that Prof. Starr made when processing the data which I discuss further in Section 5.2.3 and Appendix D (second row), when I add these controls to Prof. Starr's mobility regression model, there is no statistically significant difference in mobility during the Class Period, whether looking at the combined model or the USPI-SCA and DaVita-SCA specific models (third row).[391]

**EXHIBIT 28**
**Prof. Starr's Mobility Regression Model is Highly Sensitive to Alternative Time Trend Assumptions and Controlling for the COVID-19 Pandemic**

| Model Specification | Estimated Change in Mobility Rate During Conduct Period, Between: | | |
| --- | --- | --- | --- |
| | Either Pair of Covered Defendants | DaVita and SCA | USPI and SCA |
| [1] Starr's Model | -0.0023* | -0.0012 | -0.0017 |
| | (0.0008) | (0.0006) | (0.0010) |
| [2] Correct Data Processing Errors | -0.0024* | -0.0013* | -0.0017 |
| | (0.0008) | (0.0007) | (0.0010) |
| [3] JOLTS Healthcare Openings, Quits, and Layoffs and Disacharges Rates + Correct Data Processing Errors | -0.0017 | -0.0005 | 0.0015 |
| | (0.0013) | (0.0013) | (0.0024) |

Source: Starr Data; Corrected Starr Data; Bureau of Labor Statistics JOLTS Data

Note: This exhibit reports the conduct estimate for each of the indicated mobility regression models. The first model (row 1) includes a binary variable for the conduct period and a linear year trend, and is identical to the mobility regression that Prof. Starr estimates in Figure 4 of his report. The second model (row 2) corrects data processing errors in Prof. Starr's data. The third model (row 3) adds controls for healthcare job openings, quits, and layoffs and discharges rates from the Bureau of Labor Statistics Job Openings and Labor Turnover Survey ("JOLTS") Data. Standard errors in parentheses; * indicates statistical significance at at least the 5% level.

203. In the context of his pay regression model, Prof. Starr has acknowledged the importance of accounting for the effect of the pandemic, noting that "if I did

---

[391] As I explain further in Section 5.2.2, job openings, quits, and layoffs and discharges rates in the health care and social assistance industry fluctuated during the COVID-19 pandemic relative to their pre-pandemic levels.

not control for the timing of COVID, the changes in the labor market created by the COVID pandemic might otherwise confound the Conduct estimate."[392] His failure to control for these effects in his mobility regression by his own admission renders his mobility regression findings completely uninformative for the purposes of understanding whether the alleged conduct had any impact on mobility. The sensitivity of his mobility regression to including even basic controls for the labor market effects of the COVID-19 pandemic further demonstrates the unreliability of his results.

### 5.2. Prof. Starr Has Not Developed a Reliable Methodology to Estimate Whether, and by How Much, Proposed Class Members' Pay Changed Due to the Alleged Conduct

204. In Section 5.1, I showed that mobility of proposed class members did not fall during the Class Period. This shows that whatever Prof. Starr's pay regression model is measuring, it is not the effect of the alleged conduct on pay. However, there are several additional pieces of evidence that indicate Prof. Starr's pay regression model does not reliably measure the effect of the alleged conduct on proposed class members' pay.

205. In this subsection, I describe these additional pieces of evidence in greater detail. In Section 5.2.1, I show that the flawed regression Prof. Starr uses to claim 14.5% pay suppression fails a series of basic checks on the plausibility of his findings. Prof. Starr's pay regression model is a "before-and-after" model, the logic of which would be a comparison of pay during the Class Period to that outside the Class Period. Thus Prof. Starr is saying that pay during the Class Period is 14.5% lower than that outside the Class Period, adjusting for his proposed regression controls. Examining the actual data, as opposed to regression modeling, shows nothing surprising about pay during the Class Period. In particular, proposed class members' pay evolves smoothly through the onset of the Class Period (when, per Prof. Starr's logic, it should fall dramatically) and at the end of the Class Period (when, per Prof. Starr's logic, it should rise dramatically). The actual data do not follow the logic of Prof. Starr's claims. The evolution of total pay at the Defendants over time is, in a word, unremarkable: it tracks Prof. Starr's compensation benchmark. Moreover, proposed class members left Defendants at a similar rate before, during, and after the Class Period. If, as Prof. Starr claims, pay fell by 14.5% during the Class Period, employees would be expected to leave the employ of the

---

[392] Starr Report, ¶ 120.

Defendants for one of the many alternative employers I documented above in Section 2.1. In Section 5.2.2, I show that Prof. Starr's pay regression suffers from several methodological flaws, including misspecification and omitted variable bias. As a result, his pay regression does not reliably measure whether or by how much the alleged conduct impacted proposed class members' pay. In Section 5.2.3, I show that once I address certain obvious flaws in Prof. Starr's pay regression, I find there is no effect of the alleged conduct on pay. In Section 5.2.4, I show that Prof. Starr's pay regression results are also highly sensitive to changes in the start and end dates that are used to define the Class Period.[393] Finally, in Section 5.2.5, I explain that, as Prof. Starr himself admits in his report, only a subset of proposed class members contribute to the estimation of the conduct effect in his pay regression model. Prof. Starr provides no explanation for why the resulting conduct estimate can be extrapolated to reliably estimate damages for the remaining proposed class members.

*5.2.1. Prof. Starr's Findings are Factually Implausible and Inconsistent with the Reality of How Proposed Class Members' Pay and Turnover Rates Evolved Before, During, and After the Class Period*

206. Prof. Starr estimates a "before-and-after" pay regression model in his report. He explains that his pay regression model examines "how an individual's total compensation differs during the Conduct Period relative to before it started and after it ended," adjusting for his proposed regression controls.[394] He then uses the average reduction in pay for each Defendant estimated by his regression to calculate the damages that, according to him, are attributable to the alleged conduct.[395] However, as I explain in this section, Prof. Starr's claimed findings from his pay regression model — and in particular, his claimed findings that, due to the alleged conduct, pay was suppressed by 17.2% for DaVita, 12.0% for USPI, and 13.9% for SCA (and by 14.5% in

---

[393] Since Plaintiffs have changed the Class Period dates multiple times since filing their Consolidated Amended Class Action Complaint, this point may be particularly relevant.

[394] Starr Report, ¶ 117 ("The broad idea is to mimic the ideal comparison by examining how an individual's total compensation differs during the Conduct Period relative to before it started and after it ended, while adjusting for other relevant factors that might otherwise confound the relationship between the Conduct and total compensation."); Theon van Dijk and Frank Verboven, "Quantification of Damages," in *3 Issues in Competition Law and Policy*, (ABA Section of Antitrust Law, 2008), pp. 2331–2348 ("Van Dijk and Verboven (2008)") at p. 2335 ("In [the before-and-after method] the prices that prevailed before and after the collusive period are used to estimate the prices that would have emerged during the collusive period had the collusion not taken place. [...] The before-and-after approach is usually implemented within a multiple regression framework in which one estimates the price over the entire period (conspiracy and benchmark period) and includes an [indicator] (or 'dummy') variable that is equal to one during the conspiracy period and zero otherwise.").

[395] Starr Report, ¶ 192 ("I then take the wage suppression estimate from Figure 8, which shows that the Challenged Conduct suppressed wages by 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI [...] I then calculate what total compensation would have been but-for the Challenged Conduct [...] Damages are the difference between the but-for and real world compensation.").

aggregate across all three Defendants) do not align with the basic patterns of how compensation and turnover evolved for proposed class members before, during, and after the Class Period.[396] I also explain in this section that his claimed pay regression findings would imply the Defendants should have faced unusual retention problems during the Class Period, when the basic data on separations show nothing of the sort.

207. I next turn to my first basic check of the plausibility of Prof. Starr's claim that proposed class members' pay was suppressed during the Class Period. I compare proposed class members' pay to that of Prof. Starr's compensation benchmark group. The benchmark group Prof. Starr chose consists of medical and health services managers in the health care and social assistance industry who appear in the American Community Survey ("ACS") data.[397] My analysis shows that proposed class members' pay tracks that of the benchmark group before, during, and after the Class Period. This basic finding is inconsistent with Prof. Starr's pay suppression claims. It is simply not accurate that pay is relatively low during the Class Period.

208. Exhibit 29 shows average pay by year for proposed class members at each Defendant, as compared to the same benchmark group that Prof. Starr uses in his pay regression analysis. To ensure an "apples-to-apples" comparison, this analysis excludes any equity pay earned by proposed class members, since the ACS data does not reflect equity pay.[398] Exhibit 29 demonstrates three key

---

[396] Starr Report, ¶ 127 ("Figure 6 reports the results for the sample of Directors and above, building up to the main specification. [...] Finally, including individual-by-company fixed effects (as opposed to individual fixed effects) in Column (4) results in an aggregate wage suppression estimate of 14.5 percent."), ¶ 129 ("Figure 8 replicates the structure of Figure 6, but instead of imposing a common Conduct effect on each Defendant, it allows each Defendant to have its own Conduct effect. The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Directors and above was to reduce total compensation by 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI").

[397] Starr Report, ¶ 121 ("*Average annual earnings of managers in the healthcare field at the state-year level:* This controls for a baseline level of managerial earnings in the industries represented by the Defendant firms. If earnings in the labor market for managerial work in healthcare changed during vs. before/after the conduct, then Defendants might also have adjusted Class Member earnings even absent the Conduct."), Appendix E, ¶ 224 ("The American Community Survey is an annual survey produced by the Census Bureau. [...] With this dataset, I calculate annual earnings of health and medical managers in each state-year in the industries of the Defendants."); Centers for Disease Control, "About the Data: American Community Survey," May 15, 2024, available at https://www.cdc.gov/vision-health-data/data-sources/american-community-survey.html, accessed on February 23, 2025 ("ACS is an annual, nationally representative household survey that collects and produces information on demographic, social, economic, and housing characteristics of the U.S. population."). Prof. Starr explains in his report that he "[does] not expect" this benchmark group to be materially affected by the alleged conduct, since Defendants account for a small portion of managers in healthcare. See Starr Report, footnote 410 ("Because the Defendants comprise a small portion of total managers in healthcare, I do not expect the inclusion of this control to materially control for the effects of the Conduct itself. And even if it does, the empirical strategy captures deviations from this earnings of other managers, biasing the Conduct estimate towards zero.").

[398] ACS data are self-reported. Respondents are asked to report "Wages, salary, commissions, bonuses, or tips from all jobs. *Report amount before deductions for taxes, bonds, dues, or other items.*" See IPUMS USA, "INCWAGE: Wage and Salary Income," available at https://usa.ipums.org/usa-

patterns, none of which align with Prof. Starr's claim that pay was suppressed during the Class Period:

- **During the Class Period, average pay for proposed class members grew at a rate similar to Prof. Starr's compensation benchmark.** Exhibit 29 shows that average pay for proposed class members at DaVita (green line), SCA (orange line), and USPI (blue line) was higher than, but otherwise tracked, the compensation benchmark (pink line) during the Class Period.

- **Average pay for proposed class members did not sharply decrease at the beginning of the Class Period when the alleged conduct began.** Exhibit 29 shows that average pay evolved smoothly over time for DaVita (green line) and USPI (blue line) at the beginning of the Class Period (2008 for DaVita and 2010 for USPI), rather than sharply decreasing as Plaintiffs' theory of harm would predict, and as Prof. Starr's pay regression assumes. (Note that it is not possible to compare the change in pay for SCA at the start of the Class Period as compared to before the Class Period because the structured data begins in 2008, the first year of the Class Period, for SCA.[399])

- **Average pay for proposed class members did not sharply increase at the end of the Class Period when the alleged conduct ended.** Exhibit 29 shows that average pay evolved smoothly over time for SCA (orange line), and moved slightly upward for USPI (blue line) and DaVita (green line) at the end of the Class Period (2019), rather than sharply increasing as Plaintiffs' theory of harm would predict, and as Prof. Starr's pay regression assumes.

---

action/variables/INCWAGE#questionnaire_text_section, accessed on February 23, 2025. On its face, this question does not include equity awards.

[399] Section 1.2; Appendix D.

**EXHIBIT 29**

**Proposed Class Members' Compensation Evolved Similarly Over Time to Prof. Starr's Benchmark Group During the Class Period**



Source: Corrected Starr Data

Note: This exhibit shows average annualized total compensation without equity for proposed class members who were included in Prof. Starr's regression analysis (which only considered full-year employees) by year and Defendant (solid lines). This exhibit also shows average annualized compensation for medical and health services managers in the health care and social assistance industry from the American Community Survey ("ACS") by year (dashed line). The vertical lines indicate the start and end dates of the Class Period. The USPI data series ends in 2021 because the Tenet Payroll Data is only available through 2021. The SCA data series begins in 2008 because SCA was founded in mid-2007.

209. The patterns in Exhibit 29 also indicate that the percentage gap between proposed class members pay and the benchmark group's pay grew during the Class Period. This is the opposite of what Plaintiffs' claims would predict. To start, it is apparent from Exhibit 29 that pay for the benchmark group sits below pay for proposed class members at any of the Defendant firms throughout the period from 2005 to 2022. (In other words, the pink line sits below the orange, blue, and green lines during the entire period plotted.) This is likely because proposed class members are very senior managers and thus have higher pay than Prof. Starr's benchmark group. What is notable, however, is that this gap grew by 5.3 percentage points from the beginning of the Class

Period in 2008 to the end of the Class Period in 2019, the exact opposite of what would happen if pay for proposed class members were suppressed.[400]

210. Further, Exhibit 30, Exhibit 31, and Exhibit 32 show separately for DaVita, SCA, and USPI what happens if I accept the pay suppression effect estimated by Prof. Starr's pay regression model. His view that compensation was reduced by 14.5% during the Class Period implies that proposed class members' pay would have been unreasonably and implausibly high in a but-for world where their pay was not suppressed by 14.5% in aggregate. Exhibit 30, Exhibit 31, and Exhibit 32 build on Exhibit 29 and show how average pay for the benchmark group discussed above (pink dashed line) compares to Prof. Starr's estimate of what average pay would have been but-for the alleged conduct (yellow line) and what average pay actually was for DaVita (green line), SCA (orange line), and USPI (blue line) respectively. These exhibits demonstrate that according to Prof. Starr's model, average pay for proposed class members but-for the alleged conduct would have increased dramatically whether compared to actual average pay or average pay for the benchmark group. A gap in pay of this size would require substantial market power on the part of Defendants, which is not supported by my analysis of the Lightcast Data in Section 2. It would also imply significant retention problems at the Defendants during the Class Period, which as I show below is not borne out in the data.

---

[400] Workpaper 20.

*EXHIBIT 30*

***Prof. Starr's 14.5% Pay Suppression Estimate Implies That Pay for Proposed Class Employed by DaVita Would Have Increased Dramatically During the Class Period, Which is Unreasonable***



Source: Corrected Starr Data

Note: This exhibit shows actual average annualized total compensation without equity for proposed class members who were included in Prof. Starr's regression analysis by year, as well as but-for average annualized total compensation without equity which is calculated assuming that I accept Prof. Starr's opinion that but-for the alleged conduct, pay would have been 14.5% higher. This exhibit also shows average annualized compensation for medical and health services managers in the health care and social assistance industry from the American Community Survey ("ACS") by year (dashed line), weighted by state-year observations of proposed class members. The vertical lines indicate the start and end dates of the Class Period.

*EXHIBIT 31*
***Prof. Starr's 14.5% Pay Suppression Estimate Implies That Pay for Proposed Class Members Employed by SCA Would Have Increased Dramatically During the Class Period, Which is Unreasonable***



Source: Corrected Starr Data

Note: This exhibit shows actual average annualized total compensation without equity for proposed class members who were included in Prof. Starr's regression analysis by year, as well as but-for average annualized total compensation without equity which is calculated assuming that I accept Prof. Starr's opinion that but-for the alleged conduct, pay would have been 14.5% higher. This exhibit also shows average annualized compensation for medical and health services managers in the health care and social assistance industry from the American Community Survey ("ACS") by year (dashed line), weighted by state-year observations of proposed class members. The vertical lines indicate the start and end dates of the Class Period. The SCA data series begins in 2008 because SCA was founded in mid-2007.

Highly Confidential – Outside Counsel/Experts Only

*EXHIBIT 32*

***Prof. Starr's 14.5% Pay Suppression Estimate Implies That Pay for Proposed Class Employed by USPI Would Have Increased Dramatically During the Class Period, Which is Unreasonable***



Source: Corrected Starr Data

Note: This exhibit shows actual average annualized total compensation without equity for proposed class members who were included in Prof. Starr's regression analysis by year, as well as but-for average annualized total compensation without equity which is calculated assuming that I accept Prof. Starr's opinion that but-for the alleged conduct, pay would have been 14.5% higher. This exhibit also shows average annualized compensation for medical and health services managers in the health care and social assistance industry from the American Community Survey ("ACS") by year (dashed line), weighted by state-year observations of proposed class members. The vertical lines indicate the start and end dates of the Class Period. The USPI data series ends in 2021 because the Tenet Payroll Data is only available through 2021.

211. I turn now to my other basic check of the plausibility of Prof. Starr's claim that proposed class members' pay was suppressed during the Class Period. Exhibit 33 plots the departure rate for each Defendant over time. If Plaintiffs' claims were true, and in particular if Defendants suppressed pay by 14.5% as Prof. Starr alleges, then I would expect a large increase in departures during the Class Period, as proposed class members departed for non-Defendant firms, such as those I outlined above in Section 2. For example, a textbook that Prof. Starr relies upon in his own report estimates that a 1% decrease in wages should be expected to increase departures by between 0.5% and 0.9% - which would mean that, if pay is suppressed by 14.5% as Prof. Starr claims, then that should

be expected to increase departures by between 7% and 13% during the Class Period.[401] Exhibit 33 contradicts this expectation and shows that departures were similar across all three Defendants before, during, and after the Class Period (with the "spike" in 2018 explained by the departure of DaVita's HealthCare Partners employees from the structured data upon sale of that division).[402]

**EXHIBIT 33**
**Defendants' Departure Rates Were Generally Stable Over Time, Including During the Class Period**



Source: Corrected Starr Data

Note: This exhibit plots the departure rate for each Defendant by year. The departure rate is calculated as the total number of departures divided by the total number of proposed class members at each Defendant in each year. Employees are considered to have departed from a Defendant in the last year they appear in the Defendant's structured data in a class position. USPI employees who appear in the Tenet Payroll Data are excluded from the departure rate calculation in 2021 as there is no Tenet Payroll Data available in 2022. The SCA data series begins in 2008 because SCA was founded in mid-2007.

### 5.2.2. Prof. Starr's Pay Regression Model Suffers from Methodological Flaws and His Estimated Effect Cannot Be Interpreted as the Change in Proposed Class Members' Pay Caused by the Alleged Conduct

212. In the previous subsection, I performed two basic checks of the plausibility of Prof. Starr's finding that pay was suppressed during the Class Period. These

---

[401] Alan Manning, "The Elasticity of the Labor Supply Curve to an Individual Firm," in *Monopsony in Motion,* (Princeton University Press, 2003), pp. 102–103 ("[C]onsider the wage elasticity for all separations [...] They range from -0.5 for the NLSY to -0.9 for the PSID.").

[402] Workpaper 11.

checks show the implausibility of Prof. Starr's claims. How can Prof. Starr's pay regression lead him to conclusions so at odds with what basic case evidence shows? The answer is that Prof. Starr's pay regression model is flawed to the point of being unreliable and misleading. The pay regression model is misspecified and the pay suppression he estimates could be driven by factors that vary over time and are unrelated to the alleged conduct. As a result, and as I explain further below, the estimated effects from Prof. Starr's pay regression model cannot be interpreted as reliable measures of whether, or by how much, pay for proposed class members changed because of the alleged conduct.

*a) Prof. Starr's Pay Regression Model is Not Properly Specified, and Therefore Generates Unreliable Results*

213. As I discussed in Section 5.2.1, Prof. Starr estimates a "before-and-after" pay regression model that he ultimately uses to calculate damages. However, as I explain below, his pay regression model is susceptible to bias (and therefore unreliable) because it is not properly specified, meaning that the assumptions and modeling choices he makes are neither supported by evidence nor reasonable.

214. As an initial matter, there are at least two conditions that would need to be satisfied for Prof. Starr's pay regression to be properly specified, and therefore capable of reliably estimating the change in pay caused by the alleged conduct:[403]

- **It would have to be the case that Prof. Starr made reasonable and evidence-based choices when specifying the pay regression model**, such as by controlling for the factors that affect pay in a way that reflects economic reality, and by selecting an outcome variable that is appropriate to address the question at

---

[403] Prof. Starr agrees in his report that a "well-specified empirical model" is necessary to identify the change in pay caused by the alleged conduct (i.e., the causal effect of the alleged conduct). See Starr Report, ¶ 117 ("However, a well-specified empirical model, coupled with variation in the Challenged Conduct, can estimate the causal effect."). See also Wooldridge (2009), p. 300 ("In the special case that the omitted variable is a function of an explanatory variable in the model, the model suffers from functional form misspecification."), pp. 300–301 ("A multiple regression model suffers from functional form misspecification when it does not properly account for the relationship between the dependent and the observed explanatory variables. For example, if hourly wage is determined by $\log(wage) = \beta_0 + \beta_1\, educ + \beta_2\, exper + \beta_3\, exper^2 + u$, but we omit the squared experience term, $exper^2$, then we are committing a functional form misspecification. [...] Omitting functions of independent variables is not the only way that a model can suffer from misspecified functional form. For example, if [...] we use *wage* rather than $\log(wage)$ as the dependent variable, then we will not obtain unbiased or consistent estimators of the partial effects. [...] Misspecifying the functional form of a model can certainly have serious consequences.").

hand.[404] The *Reference Guide on Multiple Regression* explains this issue as follows: "Failure to develop the proper theory, failure to choose the appropriate variables, or failure to choose the correct form of the model can substantially bias the statistical results — that is, create a systematic tendency for an estimate to be too high or too low."[405] Prof. Starr's pay regression falls into exactly this category of a biased statistical result.

- **It would have to be the case that Prof. Starr's pay regression does not suffer from omitted variable bias, meaning that he controlled for all time-varying factors unrelated to the alleged conduct that affect pay when specifying the pay regression model**. If these factors are not properly controlled for, a "before-and-after" regression may suffer from a problem that economists refer to as "omitted variable bias."[406] Prof. Starr agrees that omitted variable bias is a concern for his pay regression model in his own report, explaining that omitted variables, unless properly controlled for, can "create[] bias in our estimate of the effect of the Challenged Conduct," such that "an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation."[407]

---

[404] Daniel L. Rubinfeld, "Reference Guide on Multiple Regression" in *Reference Guide on Scientific Evidence*, (Washington, D.C.: The National Academies Press, 2011), pp. 307–357 at pp. 312–313 ("Rubinfeld (2011)") ("The variable to be explained, the dependent variable, should be the appropriate variable for analyzing the question at issue. Suppose, for example, that pay discrimination among hourly workers is a concern. One choice for the dependent variable is the hourly wage rate of the employees; another choice is the annual salary. The distinction is important, because annual salary differences may in part result from differences in hours worked. If the number of hours worked is the product of worker preferences and not discrimination, the hourly wage is a good choice. If the number of hours worked is related to the alleged discrimination, annual salary is the more appropriate dependent variable to choose."), p. 316 ("Choosing the proper set of variables to be included in the multiple regression model does not complete the modeling exercise. The expert must also choose the proper form of the regression model.").

[405] Rubinfeld (2011), p. 312.

[406] Van Dijk and Verboven (2008), p. 2335 ("The before-and-after approach is usually implemented within a multiple regression framework in which one estimates the price over the entire period (conspiracy and benchmark period) and includes an indicator (or 'dummy') variable that is equal to one during the conspiracy period and zero otherwise. The estimated coefficient associated with this dummy variable then measures the amount of the price overcharge. For this interpretation to be valid, however, control variables that account for other factors that affect prices must be included, particularly if there is [a] chance that these factors are correlated with the conspiracy period. Failure to include such controls may result in an inference of significant damages when in fact prices simply reflect changes in competitive market conditions.").

[407] Starr Report, ¶ 110 ("Suppose, for example, that inflation rose after the Conduct Period, and that Class Members received cost of living adjustments to account for the increased inflation. Then, compensation during the Conduct Period may be lower than the total compensation after the Conduct Period, simply because of the differences in inflation, and not because the Challenged Conduct suppressed compensation. In statistical parlance, we would refer to inflation here as a confounder, which is a variable that, unless properly accounted for, creates bias in our estimate of the effect of the Challenged Conduct."), ¶ 132 ("While the model includes many control variables that reduce the likelihood of identifying a spurious relationship, it is not possible to include all such control variables. Thus, a remaining question is whether the estimates above are susceptible to 'omitted variable bias,' which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation.").

215. These conditions are unlikely to be satisfied in this setting, which means that Prof. Starr's unsupported assumptions and modeling choices are likely to drive his results.

216. A particularly important issue for Prof. Starr's pay regression model is the COVID-19 pandemic and associated lockdown. The time during and after the pandemic and associated lockdown was a period of nearly unprecedented labor market disruption. The time period that Prof. Starr analyzes in his pay regression analysis, 2005 to 2022, overlaps with the COVID-19 pandemic, which began in March 2020, and which the World Health Organization did not officially declare over (as a public health emergency) until May 2023.[408] As previously noted in Section 5.1, Prof. Starr acknowledges in his report that the COVID-19 pandemic "dramatically altered" the supply and demand for labor generally, and for healthcare labor specifically, and thus that it is important for him to account for it in his pay regression. Prof. Starr claims to do so by including a binary variable for the years 2020 and 2021 in his pay regression model.[409] However, as I demonstrate below, the assumptions he makes when modeling the impact that the COVID-19 pandemic had on proposed class members' pay — *i.e.,* that the labor market effects of the pandemic were the same in the years 2020 and 2021, and that these effects ended by 2022 — are unreasonable, given the economic reality of how the pandemic affected labor markets.[410]

217. In 2020, the labor market effects of the COVID-19 pandemic differed from those in later years. Exhibit 34 shows the layoffs and discharges rate in the health care and social assistance industry (which includes Defendants) between January 2015 and January 2025. The data underlying these exhibits come from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey

---

[408] Centers for Disease Control, "CDC Museum COVID-19 Timeline," July 8, 2024, available at https://www.cdc.gov/museum/timeline/covid19.html, accessed on February 23, 2025 ("March 11, 2020: After more than 118,000 cases in 114 countries and 4,291 deaths, the WHO declares COVID-19 a pandemic."); United Nations, "WHO Chief Declares End to COVID-19 as a Global Health Emergency," May 5, 2023, available at https://news.un.org/en/story/2023/05/1136367, accessed on February 23, 2025 ("The head of the UN World Health Organization (WHO) has declared 'with great hope' an end to COVID-19 as a public health emergency, stressing that it does not mean the disease is no longer a global threat.").

[409] Starr Report, ¶ 120 ("An indicator for the timing of the COVID-19 pandemic: This binary variable takes the value of one for the years 2020 and 2021, and zero otherwise. The COVID-19 pandemic dramatically altered the supply and demand for labor broadly, as businesses closed and workers were laid off in large numbers. It also had specific impacts in medical employment given the physician shortages nationwide and the challenges of working in a medical field during [a] global pandemic. If I did not control for the timing of COVID, the changes in the labor market created by the COVID pandemic might otherwise confound the Conduct estimate.").

[410] Starr Report, footnote 407 ("I do not include the year 2022 in the COVID indicator variable because, per a 2022 Johns Hopkins review: 'In 2022, COVID-19 illness was less severe and less deadly compared to 2020 and 2021, and no new variant has emerged with the capacity to fuel a major wave of cases.'").

("JOLTS"), which generates monthly estimates of job openings, voluntary quits, and involuntary layoffs and discharges in the U.S.[411] Exhibit 34 shows that, at the onset of the COVID-19 pandemic in March and April 2020, the rate of involuntary layoffs and discharges spiked to historically high levels, but returned to the pre-pandemic average level by May of the same year. As I will show further below, while layoffs and discharges returned to typical levels quickly, labor market disruption—in particular, long-term openings and compensation pressures due to unfilled positions—persisted for quite some time.

**EXHIBIT 34**
**Layoffs and Discharges Rate in the Health Care and Social Assistance Industry by Month, January 2015 to January 2025**



Source: Bureau of Labor Statistics JOLTS Data

Note: This exhibit shows the seasonally-adjusted layoffs and discharges rate in the health care and social assistance industry by month, as measured by the Bureau of Labor Statistics JOLTS Data. The layoffs and discharges rate is calculated by dividing the number of involuntary separations initiated by the employer by total employment. See Bureau of Labor Statistics, "Help & Tutorials: Job Openings and Labor Turnover Survey," January 21, 2022, available at https://www.bls.gov/help/one_screen/JT.htm#select-select-rate-and-or-level.

218. Another important difference between 2020 and subsequent years during the COVID-19 pandemic is that, unlike in subsequent years, the COVID-19 vaccine was not yet available for most of 2020, and only became available to

---

[411] U.S Bureau of Labor Statistics, "Job Openings and Labor Turnover Survey," available at https://www.bls.gov/jlt/, *JOLTS Home*, accessed on April 2, 2025 ("The Job Openings and Labor Turnover Survey (JOLTS) program of the Bureau of Labor Statistics (BLS) produces monthly and annual estimates of job openings, hires, and separations for the nation. The JOLTS program also produces monthly state estimates for all 50 states and the District of Columbia at the total nonfarm industry level.").

some workers beginning in December 2020 (with over 50% of adults receiving a first dose by May 2021).[412] The introduction of the COVID-19 vaccine, along with the spike in the layoffs and discharges rate in 2020 shown in Exhibit 34, helps explain the patterns I see in Exhibit 35. Exhibit 35 shows the number of people in the U.S. who were unable to work at some point during the previous four weeks because their employer closed or lost business due to the COVID-19 pandemic according to the Bureau of Labor Statistics' monthly Current Population Survey, which collects data on the U.S. labor force.[413] This number was as high as 49.8 million in May 2020 (which reflects data extending as far back as April 2020, due to the backward-looking nature of the survey), but decreased to 7.9 million by May 2021, and decreased further to 2.5 million by March 2022 (the last month for which data is available).[414]

[412] U.S. Food and Drug Administration, "FDA Approves First COVID-19 Vaccine," August 23, 2021, available at https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine, accessed on February 27, 2025 ("Since Dec. 11, 2020, the Pfizer-BioNTech COVID-19 Vaccine has been available under EUA in individuals 16 years of age and older, and the authorization was expanded to include those 12 through 15 years of age on May 10, 2021."); Centers for Disease Control, "COVID-19 Vaccination Coverage Among Adults — United States, December 14, 2020–May 22, 2021," June 25, 2021, available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7025e1.htm, accessed on February 27, 2025 ("By May 22, 2021, 57.0% of U.S. adults aged ≥18 years had received ≥1 vaccine dose. [...] High vaccination coverage among all age groups is important for decreasing COVID-19 cases, hospitalizations, and deaths...").

[413] U.S Bureau of Labor Statistics, "2.5 Million Unable to Work in March 2022 Because Employer Closed or Lost Business Due to COVID-19," *The Economics Daily*, April 6, 2022, available at https://www.bls.gov/opub/ted/2022/2-5-million-unable-to-work-in-march-2022-because-employer-closed-or-lost-business-due-to-covid-19.htm, accessed on April 2, 2025 ("These data are from the Current Population Survey and are not seasonally adjusted."); Bureau of Labor Statistics, "Labor Force Statistics from the Current Population Survey," available at https://www.bls.gov/cps/, accessed on April 6, 2025 ("The Current Population Survey (CPS) provides a wealth of information on the nation's labor force including data on the employed, unemployed, and those not in the labor force.").

[414] U.S Bureau of Labor Statistics, "2.5 Million Unable to Work in March 2022 Because Employer Closed or Lost Business Due to COVID-19," *The Economics Daily*, April 6, 2022, available at https://www.bls.gov/opub/ted/2022/2-5-million-unable-to-work-in-march-2022-because-employer-closed-or-lost-business-due-to-covid-19.htm, accessed on April 2, 2025.

**EXHIBIT 35**
**People Unable to Work At Some Point in the Last Four Weeks Because Their Employer Closed or Lost Business Due to COVID-19, May 2020 to March 2022**



Source: Bureau of Labor Statistics Current Population Survey

Note: This exhibit shows the number of individuals (in millions) who were unable to work at some point in the last four weeks because their employer closed or lost business due to COVID-19 by month, according to the Bureau of Labor Statistics Current Population Survey. See Bureau of Labor Statistics, "2.5 Million unable to work in March 2022 because employer closed or lost Business due to COVID-19," *The Economics Daily*, April 6, 2022, available at https://www.bls.gov/opub/ted/2022/2-5-million-unable-to-work-in-march-2022-because-employer-closed-or-lost-business-due-to-covid-19.htm.

219. The labor market effects of the COVID-19 pandemic extended through at least 2022, the last year in Prof. Starr's pay regression sample. Multiple pieces of evidence make this clear. Exhibit 36 shows the job openings rate for the health care and social assistance industry between January 2015 and January 2025, and Exhibit 37 shows the rate of voluntary quits for the health care and social assistance industry between January 2015 and January 2025. Like Exhibit 34, these exhibits reflect data from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey. These exhibits show that the job openings rate and the quits rate followed a similar pattern after the onset of the COVID-19 pandemic in March 2020: each data series steadily increased beginning in March 2020 and extending through late 2021 or early 2022, and

remained elevated through the end of 2022, and beyond, relative to pre-pandemic levels. Both series were still elevated relative to pre-pandemic norms through some or all of 2024. The patterns in these exhibits reflect the "Great Resignation" in 2021 and 2022, during which the number of workers quitting their jobs to seek new employment opportunities or leave the labor force altogether, and the number of unfilled job openings, reached historic highs.[415] These patterns also align with Prof. Gerhart's deposition testimony, where he indicated the job openings rate swung "wildly" during the COVID-19 pandemic and that the impacts of COVID-19 in labor markets continued into 2022 and beyond.[416]

220. Prof. Starr ignores this evidence, and instead treats pay in 2020 and 2021 as similarly affected by the COVID-19 pandemic, and treats pay in 2022 (the last year in his pay regression sample) as unaffected by the COVID-19 pandemic. In doing so, he misspecifies his pay regression model, which means that the labor market effects of the COVID-19 pandemic likely bias his results.

---

[415] Hubert Janicki, "From Great Resignation to Great Reshuffling: How the COVID-19 Pandemic Prompted More People to Change Jobs," *U.S Census Bureau*, May 13, 2024, available at https://www.census.gov/library/stories/2024/05/great-reshuffling.html, accessed on March 22, 2025 ("An unprecedented number of U.S. workers quit their jobs in 2021 and 2022, the first full two years of the COVID-19 pandemic — a phenomenon dubbed the Great Resignation."); U.S Bureau of Labor Statistics, "Empirical evidence for the Great Resignation," *Monthly Labor Review*, November 2022, available at https://www.bls.gov/opub/mlr/2022/article/empirical-evidence-for-the-great-resignation.htm, accessed on April 16, 2025 ("A major observation associated with the COVID-19 pandemic is the 'Great Resignation' phenomenon, which has received significant attention. This phenomenon [...] involves record rates of job quitting during the pandemic. As noted by one author, return-to-office mandates, attractive job offers from competing employers, and revelations about better work–life balance have motivated a 'record-breaking departure from jobs in a shockingly small window of time.'").

[416] Gerhart Deposition, pp. 56–57 ("Q. Would you agree that the COVID-19 pandemic impacted labor markets? [...] A. Yes. Q. How so? A. Well, there were some pretty wild swings in the job opening rate, the unemployment rate. So the unemployment rate was historically low before the pandemic, then of course it shot up. And then, actually, during the pandemic, there were some companies which were -- were doing quite well, you know, like Amazon. And so, in the labor market, there's always parts that do better and some that don't do as well; but, yes, the pandemic had an effect."), p. 58 ("Q. Would you agree that, to some extent, the impacts of COVID-19 in labor markets continued into 2022 and even after that? [...] A. Yes, I think there were some lasting impacts.").

*EXHIBIT 36*

**Job Openings Rate in the Health Care and Social Assistance Industry by Month, January 2015 to January 2025**



Source: Bureau of Labor Statistics JOLTS Data

Note: This exhibit shows the seasonally-adjusted job openings rate in the health care and social assistance industry by month, as measured by the Bureau of Labor Statistics JOLTS Data. The job openings rate is calculated by dividing the number of job openings by the sum of total employment and job openings. See Bureau of Labor Statistics, "Help & Tutorials: Job Openings and Labor Turnover Survey," January 21, 2022, available at https://www.bls.gov/help/one_screen/JT.htm#select-select-rate-and-or-level.

**EXHIBIT 37**
**Quits Rate in the Health Care and Social Assistance Industry by Month, January 2015 to January 2025**



Source: Bureau of Labor Statistics JOLTS Data

Note: This exhibit shows the seasonally-adjusted quits rate in the health care and social assistance industry by month, as measured by the Bureau of Labor Statistics JOLTS Data. The quits rate is computed by dividing the number of employees who left voluntarily (excluding retirements or transfers) divided by total employment. See Bureau of Labor Statistics, "Help & Tutorials: Job Openings and Labor Turnover Survey," January 21, 2022, available at https://www.bls.gov/help/one_screen/JT.htm#select-select-rate-and-or-level.

221. As a final note, Prof. Starr's failure to account for the fact that the COVID-19 pandemic extended into 2022 is particularly problematic given that, because his binary variable for COVID-19 absorbs any variation in pay from the years 2020 and 2021, his pay regression model identifies the effect of the alleged conduct on pay by comparing a relatively small number of years outside of the Class Period (2005–2009 and 2022 for USPI;[417] 2005–2007 and 2022 for DaVita; and only 2022 for SCA) to years during the Class Period (2010–2019 for USPI, and 2008–2019 for DaVita and SCA).[418] As a result, the year 2022 accounts for a sizable share of the employee-year observations outside of the

[417] In his pay regression, Prof. Starr analyzed data for USPI employees in 2022 who appeared in the USPI Payroll Data. However, he did not analyze data for USPI employees in 2022 who appeared in the Tenet Payroll Data, as that dataset only records pay information through the end of 2021. See Appendix D.

[418] Prof. Starr's conduct estimate is not identified using the years 2020 or 2021 because he separately controls for those years in his binary variable for COVID-19. Starr Deposition, Volume II, pp. 405–406 ("Q. Okay. So explain what taking a value of 1 for the years '20 and '21, zero otherwise, means. What does that do in the model? A. Whenever you include a control variable in the model, what the inclusion of a control variable is doing is it is purging that variable from both your treatment variable, the conduct variable, and it's purging the variation driven by that control variable from the dependent variable. And so it's a way of taking out the variation in the conduct variable that's driven by COVID and looking at what's just left over, and the same with the dependent variable. What's the variation in compensation that could be related to COVID, and let's purge that from the model, and let's look at what's left over.").

Class Period that are used to identify Prof. Starr's conduct estimate – 30% for USPI, 56% for DaVita, and 100% for SCA – and can therefore have a substantial impact on Prof. Starr's conduct estimate.[419]

222. In addition, Prof. Starr does not properly handle equity pay in the data. When constructing the outcome variable that he uses in his pay regression model, Prof. Starr measures equity pay not in the year that it is issued, but in the year that it vests, or is exercised or sold by, the employee.[420] That means that when Prof. Starr measures equity pay, he is measuring something other than the employer's choice of how to set equity pay. Rather, what he is measuring reflects factors unrelated to the alleged conduct such as vesting schedules, changes in the market value of equity, and employee choices as to when to sell stocks or exercise stock options. By doing so, he distorts the patterns in pay over time, which contributes to his pay regression model finding an effect from the alleged conduct when there is none.

223. Conceptually, when equity was issued is what matters for measuring how the alleged conduct affected Defendants' compensation decisions. Prof. Starr himself appears to agree (although he said otherwise in his deposition), as in his report he cites to, and discusses results from, a paper studying the High-Tech no poach matter, which includes discussion of how firms could stop issuing equity to employees during the conspiracy period if they no longer feel it is needed as a tool to retain employees.[421] To illustrate why it is problematic

---

[419] Workpaper 21.

[420] Starr Deposition, Volume II, p. 364 ("My understanding is, based on what I saw is that we have here realized earnings which come from actual compensation from stock equity grants paid to employees at the annual level, and so I -- when those were awarded, the individuals did not get any payouts. They got payouts only in expectation of staying, if they were to stay longer."); Starr Report, footnote 395 ("I understand that the stock amounts present in the pay data include only payments to employees, not unvested stock amounts. While DaVita supplied the unvested amounts, I only consider the realized payments, which are present in the pay data for each Defendant.").

[421] Starr Report, ¶ 49 ("Perhaps more germane to the present context is a study of the Silicon Valley no-poach case by Gibson (2024). Therein, Gibson examines the effects of the no poach agreements between Silicon Valley tech giants on salary and non-salary compensation. He finds that, as a lower bound, a single no-poach agreement for one year reduced salaries by 5.6 percent. He also finds that a no-poach agreement reduced the probability of a positive stock bonus by 8.3 percentage points and reduced stock bonuses on average by 79.6 percent. Gibson's explanation for the reduction in stock bonuses is that '[a] firm engaged in no-poaching agreements has less need to offer employees incentives to stay[.]' Put differently, stock compensation generally ties the worker to the firm by aligning company performance and individual payouts—but if there is less need to worry about worker retention then there is less need to provide stock compensation."); Starr Deposition, Volume II, p. 366 ("Q. But there would be an expected value of the stock at the time it is issued; is that correct? [...] A. I would say the expected value in each year before the vesting period ends is zero, and then after the vesting period ends, it's certain, whatever that – whatever the stock award says. And so it's really a matter of – of timing, and so up until the worker hits that vesting period, it's worth zero to them."), pp. 371–373 ("Q. If you did have data on the stock issuance dates and values and the like, would that have been the appropriate data to use to measure compensation? [...] A. I guess my – my initial reaction to your question is how would you incorporate stock compensation if you knew the exact time frame of when it was offered, when it vests, et cetera, and I guess I would come back to the idea that what really matters is what – is when dollars are exchanged, when

that Prof. Starr does not use equity at the time it was issued in his pay regression, consider that, by doing so, he inappropriately assigns equity pay that was issued during the Class Period to after the Class Period. For example, if an SCA or a USPI employee was issued equity pay during the Class Period, but that equity pay did not vest, or the employee did not choose to sell their stocks or exercise their stock options, until after the Class Period, then that would elevate Prof. Starr's pay measure in the post period relative to the Class Period, and bias his pay regression model in favor of finding a pay suppression effect.

224. A basic empirical test illustrates how Prof. Starr's improper handling of equity pay biases his results. For DaVita, the structured data include Prof. Starr's equity pay measure which does not reflect equity pay at the time of issuance, as well as a separate measure of equity pay at the time of issuance. I estimate Prof. Starr's pay regression using data for DaVita only, in two different ways: first, using his flawed measure of total compensation (which does not reflect equity pay at the time of issuance); and second, using a corrected measure of total compensation (which reflects equity pay at the time of issuance). I find that the conduct estimate from Prof. Starr's pay regression model using data only for DaVita decreases from -14% to -7.7% when I use equity at time of issuance in place of Prof. Starr's equity pay measure, in addition to correcting the basic errors Prof. Starr made when processing in the data (which I describe further in Section 5.2.3 and Appendix D). This result demonstrates that Prof. Starr's improper handling of equity pay biases his results, and correcting this error alone reduces the DaVita-only conduct estimate by more than 45%.[422]

225. Prof. Starr does not perform basic quantitative and qualitative analyses to rule out the possibility that his modeling choices and assumptions, including omitted variables, are driving his results. Take, for example, his market power analysis (or lack thereof). Prof. Starr does not perform any analysis of market power. He merely claims that his pay regression is, by itself, evidence that Defendants have market power.[423] However, a reference source on

---

compensation is actually exchanged. And so as a default I would start with understanding realized compensation. Q. Okay. So that's your testimony that as a – a default at least, it is appropriate and better to use realized values of equity compensation; is that correct? [...] A. Yes. My testimony is that it is a reasonable place to start when you're thinking about actual realized compensation for workers in a given year that you would study realized stock compensation as well.").

[422] Workpaper 22.

[423] Starr Report, ¶ 196 ("In the instant case, the evidence of wage suppression found in Section VI directly demonstrates that Defendants wield market power over Class Members. Put differently, Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members.").

econometrics published by the American Bar Association highlights the limitations of using a pay regression alone to analyze market power, in part due to concerns that pay regressions may generate unreliable results if not properly specified. This source explains that "[i]f prices increase during the affected period for reasons unrelated to market power, the 'Before-and-After' analysis can lead to the spurious conclusion that market power has increased."[424] Further, when I properly consider data and documents relevant to understanding whether Defendants have market power in the relevant labor markets where proposed class members participate (Section 2.1), find that in many or most (if not all) cases, Defendants would not have had market power sufficient to suppress compensation for proposed class members. Prof. Starr does not consider or engage with those data or documents, even though they reflect an on-the-ground reality that contradicts the extreme results of Prof. Starr's pay regression model. That contradiction, and Prof. Starr's failure to engage with it, suggest that a misspecified model built upon unreasonable modeling choices and faulty assumptions is driving Prof. Starr's pay regression results, and that it does not provide a reliable estimate of how much pay changed as a result of the alleged conduct.

226. Take, for another example, the results from Prof. Starr's pay regression when I allow the conduct estimate to vary across years (similar to Figure 7 in Prof. Starr's report). The results are shown in Exhibit 38. A key difference between Prof. Starr's Figure 7 and Exhibit 38 is that I measure the conduct estimate *relative to 2007* (the year before the Class Period began) in Exhibit 38, whereas Prof. Starr measured the conduct estimate *relative to 2017* in his Figure 7. As a result, using my approach, the results have a more straightforward interpretation than what Prof. Starr presented in his report: a positive conduct estimate for any year during the Class Period would indicate that pay was *higher* during that year compared to 2007 (the last year before the

---

[424] ABA Antitrust Section: American Bar Association, "Applying Econometrics to Address Class Certification," in *Econometrics: Legal, Practical and Technical Issues*, (Chicago: ABA Publishing, 2014), p. 350 ("Evidence contained in documents and statements by fact witnesses that relates to the determination of whether the defendants exercise market power can also be important in class certification disputes, since the ability to sustain prices above competitive levels is essential to the effectiveness of the conspiracy."); ABA Antitrust Section: American Bar Association, "Applying Econometrics to Assess Market Definition and Market Power," in Econometrics: Legal, Practical and Technical Issues, (Chicago: ABA Publishing, 2014), p. 254 ("The obvious limitation of the simple "Before-and-After" analysis is that it cannot control for other market factors that influence price. If prices increase during the affected period for reasons unrelated to market power, the "Before-and-After" analysis can lead to the spurious conclusion that market power has increased."), p. 256 ("There are two common concerns with the [difference-in-differences] model. First, if the model cannot reliably account for all important factors that influence price, then the estimated link between the price increase and market power is questionable. Second, the model assumes that the relationships between price and the relevant supply and demand factors are the same during the affected period and the unaffected period. If this assumption is untrue because the conduct at issue has impacted the relationships between price and key supply and demand factors, then the model's results can become unreliable.").

SCA and DaVita Class Period begins and three years prior to the USPI Class Period beginning), whereas a negative conduct estimate would indicate that pay was *lower* during that year compared to 2007. A second difference between Prof. Starr's Figure 7 and Exhibit 38 is that I also correct the basic errors that Prof. Starr made when processing the data.[425] Exhibit 38 shows that, according to Prof. Starr's pay regression, for every year during the Class Period besides 2008 and 2009, pay was *higher* (and increasingly so for later years) compared to 2007. This finding does not align with Plaintiffs' theory of harm (which would predict *lower* pay for each year during the Class Period compared to years before the Class Period began). It is also inconsistent with common impact throughout the Class Period since there is no evidence that pay was suppressed relative to 2007 for 10 of the 12 years during the Class Period. This again suggests that model misspecification and omitted variable bias underlies Prof. Starr's pay regression results.

---

[425] Appendix D.

**EXHIBIT 38**
**The By-Year Estimates from Prof. Starr's Pay Regression Do Not Align with Plaintiffs'**
**Allegations**



Source: Corrected Starr Data

Note: This exhibit shows the yearly conduct estimates from Prof. Starr's Figure 7, after correcting basic errors that Prof. Starr made when processing Defendants' structured data. The estimates are calculated relative to 2007, the year before the Class Period began. Error bars represent the 95% confidence interval.

### b) Prof. Starr's Alternative Difference-in-Difference Pay Regression Model, is Similarly Flawed and Unreliable

227. Prof. Starr agrees that model misspecification, and in particular omitted variable bias, is a concern for his "before-and-after" pay regression model.[426] He claims to address this concern when he estimates a "difference-in-differences" pay regression model that uses managers who work for Defendants as a control group. However, as I explain below, his "difference-in-differences" pay regression model is flawed and unreliable.

---

[426] Prof. Starr acknowledges that the estimates of his pay regression model may be susceptible to "omitted variable bias" and estimates a "difference-in-differences" pay regression model as a regression sensitivity to address this concern. See Starr Report, ¶ 132 ("Thus, a remaining question is whether the estimates above are susceptible to 'omitted variable bias,' which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation. To assess the potential for unobserved variables to be responsible for the observed relationships above, I deploy an approach designed to not only account for such omitted variables, but also to plausibly provide a lower-bound estimate of the effect of the Challenged Conduct on Class Compensation.").

228. The reliability of a difference-in-differences regression model hinges on choosing an appropriate control group — and the one Prof. Starr has selected, managers who work for Defendants, is not defensible. Prof. Starr's difference-in-differences pay regression model can only generate reliable results if, absent the alleged conduct, pay would have trended similarly over time for proposed class members and managers.[427] This assumption must hold in order for a difference-in-differences regression model to generate reliable results. Economists refer to this as the "parallel trends assumption."[428] However, as I show in Exhibit 39 below, the parallel trends assumption is not supported by the evidence. Exhibit 39 shows average pay for proposed class members, as compared to average pay for managers, from 2005 through 2022 (the years included in Prof. Starr's pay regression sample), using the exact measure of total compensation that Prof. Starr relies on for his pay regression analyses.[429] What is clear from the exhibit is that, even before the Class Period began, managers' pay did not follow the same trend over time as proposed class members' pay. While managers' pay remained relatively flat between 2005 and 2008, proposed class members' pay declined substantially from approximately $250K in 2005 to $150K in 2008. This pattern means that the parallel trends assumption is not appropriate in this setting, and that managers are not a defensible control group for proposed class members in the context of Prof. Starr's difference-in-differences regression.

---

[427] Starr Report, ¶ 133 ("However, if there are unobserved variables that are responsible for the Conduct effect, *but Manager compensation is similarly affected by such unobserved variables*, then by taking the difference between Class Member compensation and Manager compensation in a given company-year, we can difference out the effects of those unobserved variables." (emphasis added)); ABA Antitrust Section: American Bar Association, "Specifying and Estimating an Appropriate Econometric Model," in *Econometrics: Legal, Practical and Technical Issues*, Second Edition, (Chicago: ABA Publishing, 2014), pp. 65–88 at p. 73 ("The difference-in-differences model has limitations. The model essentially assumes that, but for the alleged activity, changes in prices between the relevant and benchmark markets over time would be identical. If the benchmark market is not appropriately chosen or if there are reasons other than the alleged activity as to why the relevant market would experience a unique change relative to the benchmark, the results would need careful interpretation.").

[428] The standard way to test this assumption is by using what is known as the "parallel pre-trends" test — i.e., evaluate whether, before the alleged conduct began, the difference in pay between managers and proposed class members was constant across years (meaning that the two time series tracked each other over time). See Jonathan Roth, Pedro H.C Sant'Anna, Alyssa Bilinski and John Poe, "What's Trending in Difference-in-Differences? A Synthesis of The Recent Econometrics Literature," Journal of Econometrics, 235, 2023, pp. 2218–2244 at p. 2219 ("However, even if one conditions on observable covariates, there are often concerns that the necessary parallel trends assumption may be violated due to time-varying unobserved confounding factors. It is therefore common practice to test for pre-treatment differences in trends ('pre-trends') as a test of the plausibility of the (conditional) parallel trends assumption."). I find that Prof. Starr's difference-in-differences pay regression fails this test, and therefore is unlikely to solve the problems with bias in his primary specification. See Workpaper 23.

[429] I explained above in this section that Prof. Starr's total compensation variable is flawed for the purposes of his pay regression analysis, as it measures equity at the time of vesting, sale, or exercise by the employee rather than at the time of issuance by Defendants. However, because Prof. Starr relies upon this total compensation variable when estimating his difference-in-differences pay regression, this is the appropriate variable to use for evaluating the validity of the parallel trends assumption.

229. These results are not surprising, considering that managers differ from proposed class members along a number of dimensions, including their seniority level, their job responsibilities, their skills and qualifications, and the types of compensation they earn.[430] Importantly, while equity pay accounts for a large share of total compensation for many proposed class members, it is less important for managers (e.g., at DaVita, 0.8% of total manager pay comes from equity pay, compared to 9.3% of total pay for proposed class members).[431] This means that time-varying factors that affect the value of equity pay in Prof. Starr's total compensation measure but that are unrelated to the alleged conduct will tend to disproportionately affect proposed class members compared to managers. For example, changes in stock prices for Defendants, or changes in employees' expectations about the stock market (and attendant changes in the timing of their decisions of when to sell their equity), disproportionately affect pay for proposed class members compared to managers.

---

[430] In fact, Prof. Gerhart refers to his own publication in the context of job analysis, which is used by human resources professionals to classify roles within a firm, pointing to the fact that jobs vary in these dimensions. See Gerhart Report, ¶ 108 ("Specifically, job analysis entails collecting information on job content (e.g., tasks, activities, work demands), characteristics of employees who hold these types of jobs (e.g., technical skills, manual dexterity, leadership), internal relationships (e.g., supervisors, peers), and external relationships (e.g., regulators, customers, suppliers).") Prof. Gerhart also highlights the special skills needed for executive level positions. See Gerhart Report, ¶ 62 ("Defendants' Senior-Level Positions Require Specialized Skills. Applied here, the common evidence in this case demonstrates that Defendant firms perceived that their senior-level positions required specialized, industry-specific skills and were difficult to fill [...] For example, former DaVita VP of Recruiting and Talent Management and People Services Group Director Chipman testified that 'any executive role or leadership role' is 'hard to fill,' 'just because the role is very specific and very dynamic.'").

[431] Workpaper 24. See also Fanning (SCA) Deposition, p. 169 ("Equity for more senior executives [at SCA] is a big part of their pay"); "SCA 2016 Total Compensation," SCA, March 2016, SCA001159728–48 at SCA001159734 ("As your leadership responsibilities grow, your portion of overall compensation 'at risk' generally grows").

**EXHIBIT 39**

*Managers' Pay Trended Differently Over Time Than Proposed Class Members' Pay According to Prof. Starr's Total Compensation Variable, Even Before the Class Period Began*



Source: Corrected Starr Data

Note: This exhibit plots Prof. Starr's annual total compensation data series (the same data series that he uses to estimate the difference-in-differences pay regressions in his report) for proposed class members and managers, after correcting basic data errors that Prof. Starr made when processing Defendants' structured data. SCA employees are not reflected in the data until 2008 because SCA was founded in mid-2007.

230. As a final consideration, even if one were to set aside the flaws in Prof. Starr's difference-in-differences analysis described above, the conduct estimates Prof. Starr obtains from his difference-in-differences pay regression model (-9.3% for DaVita, -7.5% for USPI, -7.7% for SCA, and -8.7% in aggregate across all three Defendants) are *much smaller in magnitude* than what he obtains from his "before-and-after" pay regression model (-17.2% for DaVita, -12.0% for USPI, -13.9% for SCA, and -14.5% in aggregate across all three Defendants).[432]

---

[432] Starr Report, ¶ 127 ("Figure 6 reports the results for the sample of Directors and above, building up to the main specification. [...] Finally, including individual-by-company fixed effects (as opposed to individual fixed effects) [...] results in an aggregate wage suppression estimate of 14.5 percent."), ¶ 129 ("Figure 8 replicates the structure of Figure 6, but instead of imposing a common Conduct effect on each Defendant, it allows each Defendant to have its own Conduct effect. The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Directors and above was to reduce total compensation by 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI"), ¶ 135 ("Figure 9 shows the results. [...] [N]ot only is Manager compensation negatively affected by the Conduct (by approximately -3.3 percent), but [...] Class Members are harmed above and beyond Managers by 9.0 percent. Breaking the results down by Defendant [...] reveals similar

*5.2.3. The Alleged Suppression of Pay Measured by Prof. Starr's Pay Regression Model Disappears Once Certain Obvious Flaws are Corrected*

231. Having shown that Prof. Starr's pay regression model suffers from methodological flaws, such that it does not measure changes in proposed class members' pay caused by the alleged conduct, I next show that, once certain obvious flaws in his pay regression model are corrected, his claim that the alleged conduct suppressed pay on average (and that Defendants had market power) no longer holds.

232. First, Prof. Starr committed several basic errors when preparing Defendants' data for analysis that inflate his estimate of the conduct effect. These errors include: inappropriately measuring hours worked for USPI employees in the before and after periods, but not the during period; using outdated and less-complete data to identify DaVita employees' job titles, departments, and locations; inappropriately omitting equity compensation for SCA entirely prior to 2021, but including it for 2021–2022, which distorts the "before versus after" comparison that he makes in his pay regression analysis; and inappropriately failing to exclude DaVita and USPI employees in certain departments.[433] I describe these errors in detail in Appendix D. **When I correct these data processing errors, while making no other changes to his data or analysis, I find that Prof. Starr's aggregate conduct estimate decreases in magnitude from -14.5% to -11.2%. This is shown in Model 2 of Exhibit 40.**[434]

233. Second, as I explained in Section 5.2.2, Prof. Starr does not properly define the outcome variable in his regression analysis. In particular, by measuring equity compensation at the time it vests, or is sold or exercised by, the employee, rather than at the time of issuance, he misspecifies the timing of when compensation is granted by each Defendant, which is relevant for understanding whether compensation offered by Defendants was higher or

---

patterns at play for each Defendant firm. For each company not only are Managers harmed by the Conduct, but Class Members are harmed above and beyond Managers, with the additional harm ranging from 6.8 percent to 9.6 percent.").

[433] Appendix D.

[434] I evaluate statistical significance at the conventional 5% significance level. See Franklin M. Fisher, "Multiple Regression in Legal Proceedings," Columbia Law Review, 80(4), 1980, pp. 702-736 at p. 717 ("Significance levels of five percent and one percent are generally used by statisticians in testing hypotheses. That is, given a significance level of five percent (or one percent for a stricter researcher) it is safe to assume that the true coefficient is not zero and that therefore the variable being tested has some effect on the dependent variable in question [...] The significance level tells us only the probability of obtaining the measured coefficient value if the true value is zero; it does not give the probability that the coefficient's true value is zero, nor does subtracting the significance level from one hundred percent give the probability that the hypothesis is not true.").

lower at various points in time, and, in particular, during versus outside of the Class Period.[435] I correct this issue by (1) for DaVita, replacing Prof. Starr's equity measure which does not record equity at the time of issuance with equity compensation recorded at the time of issuance; and (2) for SCA and USPI, removing equity compensation altogether, since equity compensation at the time of issuance is not available for either firm. (As the DaVita example I discussed above, where I run Prof. Starr's pay regression model for DaVita using equity at time of issuance and compare it to a DaVita-specific regression using Prof. Starr's equity pay measure, illustrates, including this inappropriate equity measure likely biases Prof. Starr's pay regression model in favor of finding a pay suppression effect).[436] **When I adjust Prof. Starr's outcome variable so that it does not improperly measure equity compensation in addition to the other data corrections described above, I find that Prof. Starr's aggregate conduct estimate falls further to -3.8%. This is shown in Model 3 of Exhibit 40.**

234. Third, as I explained in Section 5.2.2, Prof. Starr does not properly account for the effect of the COVID-19 pandemic in his regression analysis. In particular, by including a single binary variable for 2020 and 2021 in his pay regression model, he incorrectly assumes that the COVID-19 pandemic has the same effect on proposed class members' pay in 2020 and 2021, and he ignores that the labor market effects of the COVID-19 pandemic extended into 2022. To account for the labor market effects of the COVID-19 pandemic, I replace Prof. Starr's flawed binary variable with three control variables. These are: the job openings rate, the quits rate, and the layoffs and discharges rate for workers in the health care and social assistance industry. As I discussed in Section 5.1.2, these rates reflect the extent to which labor markets have excess supply (i.e., are

---

[435] I calculate the value of stock options at the time of issuance as 25% of the market value of the stock options at the time of issuance. This aligns with the methodology that DaVita used to calculate the value of stock options internally during the Class Period, which valued stock options by applying an adjustment factor of 20% or 25% to the market value of the stock options at the time of issuance. See Email from Louis Efron (DaVita) to Colleen Arthur (DaVita), "FW: fyi," with attachments, March 30, 2018, DVA_OMCEAL_000994610–16 at DVA_OMCEAL_000994613–14 ("SSARs are valued at 20% of stock price currently. In the past, they were valued at 25% of stock price."); Letter from Ken Thiry et al. (DaVita) to Scott Eposito (DaVita), March 2010, DVA_OMCEAL_000946317–20 at DVA_OMCEAL_000946318 ("This year you get to decide the number of shares you wish to receive in Restricted Stock Units (RSUs) at our standard 4:1 ratio (1 RSU counts as 4 SSARs").

[436] I also remove cash long term incentive plan ("LTIP") compensation for DaVita. Between 2013 and 2017, DaVita issued LTIP compensation as a mix of cash and equity that vested over time. While I observe equity compensation at time of issuance for DaVita in the structured data, I do not observe cash LTIP compensation at time of issuance. See Email from Louis Efron (DaVita) to Colleen Arthur (DaVita), "FW: fyi," with attachments, March 30, 2018, DVA_OMCEAL_000994610–16 at DVA_OMCEAL_000994613 ("Prior to 2012, we were 100% equity. From 2013-2017 we did a combination cash/equity. For 2018 and forseeable future, we are back to 100% equity"); "Summary: 2015 Long Term Incentive Program (LTIP) Awards," DaVita, 2015, DVA_OMCEAL_001062957–61 at DVA_OMCEAL_001062961 ("The 2015 cash LTIP vests 100% April 2018. [...] Your cash LTIP award will be taxed when you receive an award payout (if any) in 2018.").

slack) or excess demand (i.e., are tight), which affects firms' expectations about likelihood of turnover and pay decisions.[437] Further, as I discussed in Section 5.2.1, the job openings rate fluctuated between 2020, 2021, and 2022, as firms created new jobs, and job openings remained unfilled, at historical rates. Similarly, the layoffs and discharges rate and the quits rate fluctuated between 2020, 2021, and 2022, as firms initially laid off workers in March and April 2020, and workers subsequently departed from existing jobs during the "Great Resignation," at historical rates. **When I correct Prof. Starr's treatment of the COVID-19 pandemic in his pay regression model, in addition to the corrections described above, I find that Prof. Starr's aggregate conduct estimate flips in sign to positive 2.8%. That is, Prof. Starr's pay regression model incorporating these corrections shows no evidence of pay suppression. This is shown in Model 4 of Exhibit 40.**[438]

235. Additionally, if I were to alternatively estimate Model 4 of Exhibit 40, but include Prof. Starr's flawed measure of equity pay for USPI and SCA (instead of omitting equity pay for these two firms altogether), I similarly find that Prof. Starr's pay regression model shows no evidence of pay suppression (the conduct estimate is 2% and statistically insignificant).[439]

---

[437] Sebastian Heise, Jeremy Pearce, and Jacob Weber, "Wage Growth and Labor Market Tightness," *FRB of New York Staff Report No. 1128*, March 2025, available at https://ssrn.com/abstract=4980503, accessed on April 11, 2025, pp. 1–45 at p. 26 ("Amongst a broad range of measures of labor market tightness, quits and vacancies per effective searcher are independently the most strongly correlated with wage growth—both in the aggregate time series and in within-industry panel regressions.").

[438] The job openings rate, the quits rate, and the layoffs and discharges rate are jointly statistically significant in this pay regression model. See Workpaper 25. If I alternatively estimate this pay regression model by removing the individual fixed effects, and replacing the outcome variable and the control variables with the corresponding year-over-year differences, I similarly find that Prof. Starr's aggregate conduct estimate becomes positive and statistically insignificant. See Workpaper 26. Studies in the economics literature have concluded that earnings are best modelled in terms of first differences. See Costas Meghir and Luigi Pistaferri, "Earnings, Consumption, and Life Cycle Choices," *Handbook of Labor Economics,* 4b, p. 813 ("Following these two papers are two of the most important works in this literature, namely Macurdy (1982) and Abowd and Card (1989) [...] They both conclude that the best representation of earnings is a unit root in levels and MA(2) in first differences.").

[439] Workpaper 27.

**EXHIBIT 40**

**The Aggregate Conduct Effect Estimated by Prof. Starr's Pay Regression Shows No Evidence of Pay Suppression Once I Correct Certain Obvious Flaws in His Model**



Source: Starr Data; Corrected Starr Data

Note: This exhibit shows the conduct estimate for each of the indicated pay regression models. Each successive model is cumulative in terms of the corrections it incorporates. The Bureau of Labor Statistics Job Openings and Labor Turnover ("JOLTS") Data consist of the job openings, quits, and layoffs and discharges rates in the health care and social assistance industry. Error bars represent the 95% confidence interval.

236. The corrections for the obvious flaws in Prof. Starr's pay regression, shown in Model 4 of Exhibit 40, when applied to Prof. Starr's damages pay regression model (which allows the effect of the alleged conduct on pay to vary by Defendant), also lead to statistically insignificant conduct estimates for each Defendant. This is shown in Exhibit 41. In other words, neither the aggregate conduct estimate, nor the by-Defendant conduct estimates that Prof. Starr uses to calculate damages, show any evidence that the alleged conduct suppressed pay during the Class Period, once three obvious flaws in his pay regression model — the basic errors that he makes when processing the structured data, his use of a flawed and mistimed measure of equity pay, and his failure to properly account for the effect of the COVID-19 pandemic on labor markets — are corrected.

**EXHIBIT 41**
**The By-Defendant Conduct Effect Estimated by Prof. Starr's Pay Regression Shows No Evidence of Pay Suppression for Each of the Three Defendants Once I Correct Certain Obvious Flaws in His Model**



Source: Corrected Starr Data

Note: This exhibit shows the conduct estimate from Prof. Starr's pay regression by Defendant, after correcting the obvious flaws shown in Model 4 of Exhibit 40. Error bars represent the 95% confidence interval.

237. Prof. Starr also estimates a number of regression sensitivities in his report, where he purports to show that his pay regression results do not substantively change if he makes small changes to his model or to the underlying data. The results from these sensitivities are reflected in Figure 10 and Appendix D of Prof. Starr's report. I find that, similar to his aggregate and damages pay regression models, once I correct the obvious flaws in Prof. Starr's pay regression model that I described above, the regression sensitivities in Figure 10 and Appendix D of Prof. Starr's report no longer show any evidence that the alleged conduct reduced proposed class members' pay during the Class Period.[440]

---

[440] Workpaper 28. As I explained in Section 5.2.2, Prof. Starr's difference-in-differences pay regression is fundamentally flawed and does not produce reliable results due to its reliance on an inappropriate benchmark group.

238. Furthermore, Prof. Starr's alleged conduct effect also disappears if I make other corrections to his pay regression model besides those that I considered above. I describe these alternative corrections below:

- First, I remove the linear time trend from Prof. Starr's pay regression model. Prof. Starr includes an unsupported and econometrically incorrect linear time trend in his pay regression model. His inclusion of the linear time trend is unsupported because, although he claims he includes it to account "for the natural growth in annual compensation that would have happened over time even absent the Conduct" for individual workers, he already includes three other variables in his pay regression model that serve that purpose: wages for a benchmark group of health and medical manager, gross domestic product (GDP) per capita, and the consumer price index (CPI) in each year.[441] It is also econometrically incorrect because the linear time trend is forced to have the same effect throughout the Class Period and periods outside the Class Period, even though his "before-and-after" pay regression model design relies on variation over time to isolate the effect of the alleged conduct. In other words, although a foundational assumption of his pay regression model is that he can utilize differences over time to isolate the impact the alleged conduct had on pay, he is himself constraining factors in his model related to time to remain the same across the non-Class Period and Class Period years.[442]

---

[441] Starr Report, ¶ 119 ("[I]t is natural for individuals to have different earnings at different time periods. To address this, I include a linear time trend. This time trend accounts for the natural growth in annual compensation that would have happened over time even absent the Conduct."), ¶ 120 ("I next select other control variables to address geographic differences in pay, macro-economic factors, and healthcare-specific factors that might otherwise confound the Conduct estimate. [...] [R]egional inflation differences may confound the Conduct estimate if increases in the cost of living are passed on to workers in the form of higher nominal wages. Accordingly, I control for price levels at the most disaggregated level possible (the Census region-year level). [...] I control for the natural log of unemployment and the natural log of GDP per capita at the state-year level, which purges from the Conduct estimate any changes in compensation due to changes in the business cycle."), ¶ 121 ("The next set of controls ensures that trends specific to the healthcare industry do not confound the relationship between the Conduct and total compensation. [...] *Average annual earnings of managers in the healthcare field at the state-year level*: This controls for a baseline level of managerial earnings in the industries represented by the Defendant firms.").

[442] Douglas L. Miller, "An Introductory Guide to Event Study Models," Journal of Economic Perspectives, 37(2), 2023, pp. 203–230 at p. 220 ("These considerations lead to guidelines for researchers who are controlling for trends. First, don't let post-event parameter restrictions influence your estimated trends, unless you are highly confident that the treatment effects are not trending in that range. Otherwise, your control for trends may be picking up part of the trending treatment event. [...] Finally, if we are working with a timing-based data structure, controlling for trends has potential to create surprising and severe problems. Adding linear trend controls (and the required additional parameter restriction) can induce quadratic trends into our estimated event study coefficients. This arises from a subtle way in which the event dummies are collinear with the other variables in the model (as illustrated in online Appendix F.2). The key lesson is to be extra cautious about the combination of trend controls and a timing-based data structure.").

- Second, I replace the binary variable for the COVID-19 pandemic with three separate indicator variables for 2020, 2021, and 2022. As I explained above, Prof. Starr does not properly control for the effect of the COVID-19 pandemic in his pay regression model. By including a single binary variable for 2020 and 2021 in his pay regression model to account for the COVID-19 pandemic, he incorrectly assumes that the pandemic has the same effect on proposed class members' pay in 2020 and 2021, and he ignores that the labor market effects of the pandemic extended into 2022. I consider an alternative correction that replaces his single binary variable with three binary variables—one for 2020, another for 2021, and another for 2022 — which allows the effect of the COVID-19 pandemic on proposed class members' pay to differ across years beginning in 2020, and to extend into 2022 when the pandemic was still ongoing and still impacting the labor market.

- Third, I correct the standard errors in Prof. Starr's pay regression to properly account for the fact that the alleged conduct varies at the Defendant-year level. Prof. Starr does not properly calculate the standard errors in his pay regression model which are a measure of how precisely estimated his regression coefficients are, and are a key determinant of the statistical significance of the results.[443] To properly calculate the standard errors in a regression model, an adjustment (referred to by economists as "clustering" the standard errors) should be made to account for the level of assignment of the treatment under consideration. Prof. Starr appears to understand the primary thrust of these ideas, but misapplies them.[444] In the context of his "before-and-after" pay regression model, the main comparison is not across individuals, but across time. His proxy for the alleged conduct (the Class Period indicator is the "treatment" variable) varies

---

[443] ABA Antitrust Section: American Bar Association, "Appendix and Glossary," in *Econometrics: Legal, Practical and Technical Issues*, Second Edition, (Chicago: ABA Publishing, 2014), pp. 371–421 at p. 382 ("In regression analysis, the standard error of a regression coefficient measures the dispersion of the estimated coefficient around its (true) mean. The coefficient estimate will vary from sample to sample; the standard error of the coefficient indicates how much that estimate is likely to vary from sample to sample. Small standard errors imply that estimates are likely to be similar across samples, while large standard errors imply greater variation across samples and hence less reliable results.").

[444] Starr Report, ¶ 124, ("[I]t is also important to emphasize clustering in the standard errors, because it relates to the issue of statistical significance. Because individual earnings are likely to be serially correlated, I cluster the standard errors at the individual level. This allows the error term to be arbitrarily correlated within an individual over time, when estimating the standard error of the coefficient estimate (which is the key input to computing the p-value of that coefficient estimate).").

primarily over time (time is the "level of assignment").[445] However, Prof. Starr does not cluster on time and instead chooses to cluster his standard errors by individual. Practically, this means his standard errors are too small. This can falsely convey the impression that a regression coefficient is statistically significant when it is not. I correct Prof. Starr's standard errors by properly clustering at both the individual level, as well as at the Defendant and year level.

239. When I estimate Prof. Starr's pay regression model after incorporating each of these three corrections, along with correcting Prof. Starr's data processing errors but making no additional changes to the model, Prof. Starr's pay regression model shows **no** evidence of pay suppression (the conduct estimate is -5% and statistically insignificant). I continue to find no evidence of pay suppression if I additionally adjust Prof. Starr's outcome variable so that it does not improperly measure equity compensation by replacing Prof. Starr's measure of equity pay for DaVita with equity at time of issuance, and by removing equity pay altogether for USPI and SCA (the conduct estimate is -1.3% and statistically insignificant).[446]

240. Further, Prof. Starr's pay regression model does not account for numerous individualized factors I discussed earlier including what the skills and preferences, and in turn the relevant labor market, are for each employee; whether Defendants had market power sufficient to suppress pay for a given individual; the role that individualized negotiations, performance, or managerial discretion played in determining each employee's pay; and whether the mobility of some proposed class members was limited regardless of the alleged conduct (e.g., non-compete agreements or unvested equity). Because

---

[445] For additional details on Plaintiffs' allegations that the alleged conduct varied across Defendants and over time, see Section 5.3. See also Alberto Abadie, Susan Athey, Guido Imbens, and Jeffrey Wooldridge, "When Should You Adjust Standard Errors for Clustering?," *The Quarterly Journal of Economics*, 138(1) 2023, pp. 1–35 at p. 33 ("With clustered assignment, one should cluster the standard errors at the level of assignment Under partially clustered assignment, adding group-level fixed effects to this regression allows for group-specific linear trends in the underlying potential outcomes series but does not change the answer to the question whether one needs to adjust for clustering. [...] If sampling is not clustered, standard errors should be clustered at the treatment assignment level because the estimand of interest depends on potential outcomes and the sampling of potential outcomes is determined only by the assignment mechanism. When the fraction of sampled clusters is non-negligible and there is variation in average treatment effects across clusters, conventional clustered standard errors may be off").

[446] Workpaper 29. Further, if I implement all of the corrections that I have discussed in this section (correcting Prof. Starr's basic data processing errors; replacing Prof. Starr's measure of equity pay for DaVita with equity at time of issuance, and removing equity pay altogether for USPI and SCA; correcting Prof. Starr's treatment of the COVID-19 pandemic by controlling for the healthcare job openings, quits, and layoffs and discharges rates and by replacing his binary variable for COVID-19 with three separate binary variables for 2020, 2021, and 2022; removing the linear time trend; and correcting the standard errors to account for the fact that the alleged conduct varied at the Defendant-year level), Prof. Starr's pay regression model shows no effect of the alleged conduct on pay. See Workpaper 30.

these factors affect the potential impact of the alleged conduct, Prof. Starr's pay regression model cannot reliably measure whether there is harm or the quantum of damage.

241. Finally, as I demonstrated above, Prof. Starr's pay regression model shows no effect of the alleged conduct on pay after I correct obvious flaws, which corresponds to $0 in damages for the entire proposed class as a result of the alleged conduct.

*5.2.4. Prof. Starr's Pay Regression Model is Highly Sensitive to the Class Period Dates Selected by Plaintiffs, Which Have Changed Over Time*

242. Importantly, Prof. Starr's pay regression model also shows no effect on proposed class members' pay if I make slight modifications to the class period's start and end dates. I understand that Plaintiffs have changed their selected class period dates multiple times (and, indeed, Prof. Starr uses a different set of class period dates than what Plaintiffs alleged in their operative complaint, moving the end date of the class period from 2021 to 2019).

243. As background, Plaintiffs have considered a number of different class periods since the DaVita and SCA criminal indictments were issued, and since they filed their original complaint:

- Initially, the SCA indictment alleged a conduct period of May 1, 2010 to October 31, 2017 for the USPI-SCA agreement, and both the SCA and DaVita indictments alleged a conduct period of February 1, 2012 to July 31, 2017 for the DaVita-SCA agreement.[447]
- Next, in their Consolidated Amended Class Action Complaint and their Second Amended Complaint, Plaintiffs specified a class period of May 1, 2010 to January 5, 2021 for SCA and USPI, and February 1, 2012 to January 5, 2021 for DaVita.[448]

---

[447] Indictment of SCA, ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017"); Indictment, *United States of America vs. DaVita Inc. and Kent Thiry,* November 3, 2021, ¶ 9 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017").

[448] Consolidated Amended Class Complaint, ¶ 101 ("All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCA Holdings, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holding Company, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries"); Second Amended Complaint, ¶ 101 ("All natural persons who worked in skilled positions in the United States for one or more of the following: (a) from May 1, 2010 to January 5, 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010 to January 5, 2021, for United Surgical Partners Holdings,

- Subsequently, in their Third Amended Complaint, Plaintiffs specified a revised class period of May 2008 to January 2021 for SCA and DaVita, but continued to specify a class period of May 2010 to January 2021 for USPI.[449]

- Prof. Starr considers a class period of May 1, 2008 to December 31, 2019 for SCA and DaVita, and May 1, 2010 to December 31, 2019 for USPI.[450]

- Finally, I understand that there is evidence suggesting the possibility of other alternative class periods. Andrew Hayek, called as a government witness against DaVita and Kent Thiry, testified at trial that the SCA-DaVita agreement did not begin until January 2012.[451] Hayek also testified that the SCA-DaVita agreement ended when he left SCA at the end of 2017.[452] USPI documents also demonstrate that the agreement with SCA ended in October 2017.[453] Anthony Kilgore, who in January 2018 replaced Hayek as CEO of SCA, testified that he had no knowledge of any employee solicitation agreement with

---

Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; (c) from February 1, 2012 through January 5, 2021, for DaVita or one of its subsidiaries").

[449] Third Amended Complaint, ¶ 92 ("All natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 2010 to January 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries.").

[450] Section 1.2.

[451] Trial Tr., *United States v. DaVita*, No. 21-cr-00229-RBJ (D. Colo. Apr. 7, 2022), Testimony of Andrew Hayek (SCA), p. 535 ("Q. And it's in 2012, around February, that you described entering into this understanding or agreement with Mr. Thiry about how solicitations would be conducted; right? A. Yes. The agreement was approximately around January of 2012."); see also Hayek (SCA) Deposition, p. 165 ("Q. Now, when did you and -- when did you and Mr. Thiry agree not to solicit each other's executives? [...] A. [...] [I]n early 2012, we agreed not to solicit senior executives unless they were already looking at jobs [...] Q. And when was that first agreement or understanding reached? A. I believe approximately January 2012.").

[452] Hayek (SCA) Deposition, p. 190 ("A. I became the CEO of Optum Health earlier in 2017. Q. Yes. A. And then I wore a couple hats. I was both the CEO of Optum Health and retained the title and position of CEO of SCA through 2017, and then transitioned to Mr. Kilgore I believe in January of 2018. Q. Okay. So let's just take those points. So when you first got the position at Optum Health, was the agreement in place? A. Yes, I believe it continued into 2017. Q. And did it continue when Mr. Kilgore succeeded you? [...] A. When I moved out of my SCA role, it ceased to be something I thought was in effect or relevant.").

[453] Email from Shannon McGarry (USPI) to Shannon Mosley (USPI), "RE: SCA," October 24, 2017, USPI_CIV_000003394 ("You [Shannon McGarry] can now recruit Administrators from SCA – Surgical Care Affiliates."); Email from Shannon Mosley (USPI) to Megan Fox (Catapult Healthcare) et al., "SCA," October 23, 2017, USPI_CIV_000006432 ("Please disregard the non-poaching agreement between USPI and SCA. I give you permission to recruit out of SCA going forward."); Mosley (USPI) Deposition, pp. 126–127 ("So is this the first time you advised Catapult that they could now recruit from SCA? A. To the best of my recollection, yes. Q. And do you recall if you sent similar communications to other outside recruiting agencies about their ability to now recruit from SCA? A. I'm certain that I may have done that, let them know, just like I'm letting Catapult know."). See also Deposition of Bill Wilcox (USPI), September 24, 2024 ("Wilcox (USPI) Deposition"), p. 233 ("Once you received this communication from Ms. Karrmann and became aware of the DOJ guidance, did USPI stop any no-solicit agreements that it had previously had with other companies? A. It's my understanding we stopped all of them. Q. And so is it your testimony, sir, that the agreement with SCA was in place between 2010 and 2017? A. Correct.").

DaVita, USPI, or anyone else, and that while he was CEO, SCA had no agreements with anyone.[454]

- I do not express an opinion about which dates are the correct dates. I only note these alternatives to illustrate the point that there appears to be a legitimate question in this case about when the correct class period may be.

244. Exhibit 42 shows how the results from Prof. Starr's pay regression model change if, instead of using the dates specified in Prof. Starr's report to define the Class Period, I use the dates from the SCA and DaVita indictments, or the dates from Plaintiffs' prior complaints. For the purposes Exhibit 42, I correct the basic data processing errors that Prof. Starr made when constructing his data sample. I described these errors, and the corrections that I implement, in Section 5.2.3 and Appendix D. First, when I estimate Prof. Starr's pay regression model using the dates that were originally discussed in the SCA and DaVita indictments, but make no other changes to his pay regression model besides the data processing corrections, I obtain a positive conduct estimate (i.e., a finding that pay was inflated, not suppressed, during the Class Period) of 5.5% which is statistically significant (first bar). Second, when I estimate Prof. Starr's pay regression model using the class period from the Consolidated Amended Class Complaint and Plaintiffs' Second Amended Complaint, but make no other changes to his pay regression model besides the data processing corrections, I obtain a positive conduct estimate (i.e., a finding that pay was inflated, not suppressed, during the Class Period) of 4.2% which is statistically significant (second bar). Finally, when I estimate Prof. Starr's pay regression model using the class period from the Third Amended Complaint, but make no

---

[454] Kilgore (SCA) Deposition, pp. 56–60 ("Q. Did Mr. Hayek ever tell you that SCA and DaVita had reached an agreement not to hire each other's employees? A. No. Q. Did Andrew Hayek ever tell you that SCA and DaVita had reached any agreement with respect to the hiring or recruiting of each other's employees? A. No. Q. Did you ever know about any agreement between SCA and DaVita that would limit the hiring or recruiting of each other's employees? A. No. Q. Were you ever aware when you were at SCA of any agreement between SCA and DaVita that would limit the hiring or recruiting of each other's employees? A. No. [...] Did Andrew Hayek ever tell you whether he had one or more conversations with Bill Wilcox at USPI about recruiting each other's employees? A. No. Q. Did Andrew Hayek ever tell you that SCA and USPI had reached an agreement not to hire or recruit each other's employees? A. No. Q. Did Andrew Hayek ever tell you about any agreement between SCA and USPI that would limit hiring or recruiting from each other's employees? A. No. Q. Were you ever aware during your time at SCA, that SCA had reached an agreement with USPI not to recruit or hire each other's employees? A. No. Q. Were you ever aware that SCA and USPI had reached an agreement to limit hiring or recruiting in any way between SCA and USPI? [...] No. [...] Q. Were you ever aware during your time at SCA of any agreement between SCA and USPI that would limit the hiring or recruiting from each other's employees? [...] No."), pp. 67–68 ("When you transitioned to the CEO at SCA in around January of 2018, did Andrew Hayek tell you about any no-poach agreements that SCA had with any other companies? A. No. Q. When you transitioned to CEO, did Andrew Hayek tell you about any agreements that would limit the hiring or recruiting between SCA and any of its competitors? [...] No. Q. So when you were CEO at SCA from 2018 to 2019, your understanding was that SCA did not have any no-poach agreements with any of its competitors? A. We did not have any no-poach agreements with any competitors. Q. SCA did not have any no-poach agreements with any companies, or just its competitors? A. When I was CEO at SCA, we had no no-poach agreements with anyone.").

other changes to his pay regression model besides the data processing corrections, I obtain a statistically significant conduct estimate of -7.7% (third bar), which decreases further to -11.2% (fourth bar) if I instead estimate Prof. Starr's pay regression model using the class period from Prof. Starr's report. In other words, while the earliest set of available dates for the alleged conduct resulted in a positive conduct estimate (the opposite of what Plaintiffs' theory of harm predicts), each subsequent revision to the class period dates resulted in an increasingly negative conduct estimate.

*EXHIBIT 42*
**The Results from Prof. Starr's Pay Regression Are Highly Sensitive to the Class Period Dates and Moved from Positive and Significant to Negative and Significant Over Time**



Source: Corrected Starr Data

Note: This exhibit shows the conduct estimate from Prof. Starr's pay regression, under different class period dates. Error bars represent the 95% confidence interval.

245. The above results show that Prof. Starr's pay regression results are highly sensitive to the class period dates. Relatedly, Prof. Starr's own empirical analysis attempting to justify a class period end date of 2019 fails to do so. Prof. Starr estimates a year-by-year mobility regression model, which estimates whether inter-Defendant mobility changed between 2017 and each other year from 2008 to 2021, to "confirm that the Conduct Period end date of 2019 is appropriate."[455] But, Prof. Starr's year-by-year mobility regression model

---

[455] Starr Report, ¶ 86.

answers an irrelevant question: whether inter-Defendant mobility in 2017 (a single year of the Class Period) was statistically significantly different from what it was in 2020 (a single year of the post-conduct period). As Prof. Starr himself explains, "[i]f 2019 is the last year of the No-Poach Agreements, then in 2020 we should observe a statistically significant uptick in the movement of [proposed class members] between the Covered Defendants…" However, he does not test whether there is an uptick from *2019* to 2020, or even from 2018 to 2020. Instead, he chooses 2017, purportedly because this was the year "when Sandi Karrmann at USPI first circulated an antitrust memo internally regarding no poach agreements."[456] This is a non-sequitur: if Prof. Starr believes that the agreements were equally binding in 2018 and 2019 (and he has no assertion to the contrary), he has no reason to focus his statistical test on 2017. Moreover, it is unclear why the timing of an internal USPI memo has any bearing on the alleged agreement between DaVita and SCA.

246.  Indeed, Exhibit 43 shows that, when I estimate Prof. Starr's year-by-year mobility regression model using 2018 or 2019 as the reference years (instead of 2017), I find no statistically significant differences between inter-Defendant mobility in those years and inter-Defendant mobility in 2020. In other words, Prof. Starr's decision to use 2017 as a reference year is a clear case of cherry-picking, at odds with standard scientific practice.[457] Further, these results mean that, if I apply Prof. Starr's own reasoning, his empirical analysis shows that a class period end date of 2019 is inappropriate.

---

[456] Starr Report, ¶ 86.

[457] See, e.g., David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, (Washington, D.C.: The National Academies Press, 2011), pp. 213–302 at p. 233 ("Finally, there is the issue of which numbers to compare. Researchers sometimes choose among alternative comparisons. It may be worthwhile to ask why they chose the one they did. Would another comparison give a different view? A government agency, for example, may want to compare the amount of service now being given with that of earlier years—but what earlier year should be the baseline? If the first year of operation is used, a large percentage increase should be expected because of startup problems. If last year is used as the base, was it also part of the trend, or was it an unusually poor year? If the base year is not representative of other years, the percentage may not portray the trend fairly. No single question can be formulated to detect such distortions, but it may help to ask for the numbers from which the percentages were obtained; asking about the base can also be helpful.").

**EXHIBIT 43**
**Prof. Starr's Year-by-Year Mobility Regression Shows No Statistical Change in Inter-Defendant Mobility Between 2018 and 2020 or Between 2019 and 2020**

| | Estimated Percentage Point Change in Mobility Rate Between Base Year and 2020 | |
|---|---|---|
| Base Year | Davita/SCA | USPI/SCA |
| 2017 | 0.160% (0.001) | 0.381%* (0.002) |
| 2018 | 0.075% (0.001) | 0.103% (0.002) |
| 2019 | 0.106% (0.001) | 0.317% (0.002) |

Source: Corrected Starr Data
Note: This exhibit reports the estimated coefficient on the 2020 year indicator variable in Prof. Starr's year-by-year mobility regression model (Starr Report, Figure 3), where the model is estimated using the indicated base year. Prof. Starr uses 2017 as his base year. Robust standard errors in parentheses; * indicates statistical significance at at least the 5% level.

### 5.2.5. Prof. Starr's Pay Regression Model Extrapolates a Conduct Estimate Based on a Subset of Proposed Class Members

247. Finally, another limitation of Prof. Starr's pay regression model is that he only identifies the effect of the alleged conduct on pay using a subset of proposed class members, but he extrapolates the resulting conduct estimate to calculate damages for the entire proposed class. Prof. Starr admits that this is the case in his own report, noting that, because he includes individual-company fixed effects in his pay regression model, and "[b]ecause individual fixed effects rely on comparisons of the same individual during and absent the Conduct, in the main specification there may be Senior-Level Employees who are not contributing to the Conduct estimate."[458] Indeed, I find that 56% of proposed class members are not used to measure the conduct estimate in Prof. Starr's pay regression model, as they are not present in his regression sample both during and before or after the alleged conduct.[459] This 56% statistic includes all DaVita employees who worked under their HealthCare Partners division, as data for these employees is only available from 2016 to 2018 (when DaVita sold HealthCare Partners).[460] In other words, by Prof. Starr's own admission, more than half of proposed class members do not contribute to his estimate for the

---

[458] Starr Report, ¶ 130.
[459] Workpaper 31.
[460] Workpaper 11.

effect of the alleged conduct on pay, and Prof. Starr has offered no explanation for why his conduct estimate can be reliably extrapolated to quantify harm for these proposed class members.

248. Prof. Starr does perform a regression sensitivity in his report that excludes individual-company fixed effects from his pay regression model (and therefore uses a fuller set of proposed class members to identify the effect of the alleged conduct on pay). However, this is not his preferred model, and he does not use this model to calculate damages for the proposed class. Further, even if I were to accept this regression sensitivity (which I do not, since it suffers from the same obvious flaws that I discussed in Section 5.2.3), Prof. Starr's own results show that the conduct estimate is 53% smaller for DaVita, 14% smaller for SCA, and 13% smaller for USPI if he removes individual-company fixed effects from his pay regression model.[461]

### 5.3. Prof. Starr's Pay Regression Model is Not Properly Linked to the Alleged Conduct, as it Assumes a Single Effect Across Numerous Forms of Conduct That Varied in Nature and Timing

249. Finally, in addition to the methodological flaws discussed above, Prof. Starr's primary pay regression model (the model in which he estimates a pay suppression effect of -14.5%) suffers from another specification problem: it simply estimates a single effect across all forms of conduct and throughout the Class Period, despite the fact that Plaintiffs allege multiple forms of conduct that varied in nature (mobility restrictions versus information sharing), varied in terms of which Defendants and which proposed class members were involved, and varied in terms of when the conduct occurred. Once Prof. Starr's results are broken down to account for the variation in the nature and timing of the alleged conduct, the patterns generated by his pay regression are inconsistent with the patterns that would be expected based on Plaintiffs' allegations, illustrating the disconnect between his modeling of the alleged conduct and how Plaintiffs claim the alleged conduct actually worked.

250. There are several key dimensions along which Plaintiffs and their experts claim that the alleged conduct varied. I describe each of these key dimensions in the discussion that follows.

---

[461] Starr Report, Figure 35 ("DaVita Conduct: -0.0879*** [...] SCA Conduct: -0.149*** [...] USPI Conduct: -0.128***"); Starr Report, Figure 8 ("DaVita Conduct: [...] -0.188*** [...] SCA Conduct: -0.131*** [...] USPI Conduct: -0.147***").

- **Plaintiffs allege and Plaintiffs' experts claim that proposed class members at SCA were subject to two sets of bilateral conduct, whereas proposed class members at USPI and DaVita were subject to only one set of bilateral conduct.** Plaintiffs allege an overarching conspiracy in the Third Amended Complaint, and Prof. Starr's pay regression aligns with this interpretation.[462] However, elsewhere in their expert reports and in the Third Amended Complaint, they acknowledge that the alleged conduct at issue is at most bilateral alleged mobility restrictions and information sharing between two pairs of Defendants (USPI/SCA and DaVita/SCA), and nothing at all between one pair of Defendants (USPI/DaVita). Thus, according to Plaintiffs and their experts, proposed class members at SCA were affected by bilateral conduct between USPI/SCA *and* SCA/DaVita, whereas proposed class members at DaVita and USPI were subject to only one type of bilateral conduct between *either* SCA/DaVita *or* USPI/SCA.

- **Plaintiffs allege and Plaintiffs' experts claim that the alleged mobility restrictions and the alleged information sharing went into effect at different points in time.** Specifically, they claim that the alleged information sharing between SCA/DaVita and USPI/SCA began in 2009, after the alleged SCA/DaVita mobility restrictions began in 2008, but before the alleged SCA/USPI mobility restrictions began in 2010.[463] Thus, according to Plaintiffs' allegations, beginning in 2008, proposed class members at SCA and DaVita were newly subject to the alleged SCA/DaVita mobility restrictions; beginning in 2009, proposed class members at all three Defendants were newly (and for proposed class members at SCA and DaVita, additionally) subject to the alleged mobility restrictions between SCA/DaVita and USPI/SCA; and beginning in 2010, proposed class members at SCA and USPI were

---

[462] Third Amended Complaint, ¶ 105 ("Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in an overarching conspiracy, consisting of unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. 1."); Starr Report, ¶ 106 ("Given that Plaintiffs allege that both elements of the Challenged Conduct (i.e., the No-Poach Agreements and CSI Exchanges) occurred simultaneously, my analysis measures suppressed compensation from the whole of the Challenged Conduct rather than from each individual component.").

[463] Starr Report, ¶ 69 ("The No-Poach Agreement between DaVita and SCA began at least as early as May 2008"), 76 ("Former SCA CEO Hayek and former USPI CEO Bill Wilcox established the SCA-USPI No-Poach Agreement no later than May 2010"), 100–101 ("In or around 2009, SCA's then-CEO Hayek communicated directly with Javier Rodriguez, DaVita's then-SVP (and currently, its CEO) and obtained DaVita's planned wage increases budgeted for the upcoming year [...] Around 2009, Hayek obtained USPI's planned wage increases to be budgeted for the upcoming 2009 year"). While Prof. Gerhart agrees with Prof. Starr that the alleged information sharing between SCA and DaVita began "by at least 2009," he claims that the alleged information sharing between SCA and USPI began earlier, in "at least 2008." See Gerhart Report, ¶ 23.

newly (and additionally) subject to the alleged USPI/SCA mobility restrictions. Prof. Starr himself admits that his pay regression model is not able to distinguish between the effects of the alleged mobility restrictions and the alleged information sharing, instead claiming that "if the fact finder determines that only one element of the Challenged Conduct occurred, then the findings of wage suppression revealed by the analyses below must be wholly attributable to [...] that element of Challenged Conduct."[464]

- **Plaintiffs' experts assert that the alleged mobility restrictions began as non-solicitation agreements, but later became more restrictive when Defendants adopted a "tell your boss" requirement**.[465] Specifically, Plaintiffs' experts claim that the SCA/DaVita and USPI/SCA mobility restrictions began as no-solicitation agreements in 2008 and 2010, respectively (which prevented the Defendant firms participating in each bilateral agreement from "cold-calling" each other's Senior Employees), but later became more restrictive when Defendants adopted a "tell your boss" requirement (which required proposed class members to notify their boss before the recruiting and hiring process would be completed even in cases where candidates were not solicited but proactively applied).[466] Thus, according to Plaintiffs' experts' claims, beginning in 2008, proposed class members at SCA and DaVita were

---

[464] Starr Report, ¶ 106; Starr Deposition, Volume I, pp. 108–110 ("Q. [...] So are you – do you have an opinion that any one component of the different bilateral agreements that we've been talking about could have caused the entire impact or effect that you are assessing and offering opinions about with your wage suppression model? A. [...] [L]et me just make sure I understand your question. Your question is am I offering an opinion that any one of the subcomponents at issue here, which again are the CSI exchanges, the proactive prohibition on recruitment and the tell-your-boss provision -- is your question whether or not I am [...] making an opinion that any one of those subcomponents could be fully responsible for the wage suppression estimates that my models deliver? Q. That's correct. A. Is that what you're asking? Q. That is correct. A. Well, I don't have any opinions in this case on the effects of any particular subcomponents and whether they are capable of explaining the effect. [...] Q. So it's -- it's just taking them all together. Each may be contributing some portion of the impact that you're assessing with your wage suppression regressions; is that correct? [...] A. Again, I'm not able to and I wasn't asked to parse out the effects of each element of the alleged misconduct. Theoretically it seems like they would all push in the same direction, but I wasn't asked to and I did not undertake a quantitative analysis that would allow me to ascertain which component is responsible for which -- which magnitude of a wage suppression that the model estimates.").

[465] Plaintiffs refer to the "tell your boss" requirement in their operative complaint, noting that: "on or about October 16, 2015, [Mr. Hayek] emailed an SCA human resources executive: 'Putting two companies in italics ([USPI] and [DaVita]) - we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they told their boss already that they want to leave and are looking.'" Third Amended Complaint, ¶ 44.

[466] Gerhart Report, ¶ 22 ("SCA and DaVita expanded the terms to include a tell-your-boss requirement in 2011 and 2012 [...] After Hayek and former DaVita CEO Thiry agreed to implement the 'tell-your-boss' provision in the SCA-DaVita No-Poach Agreement, Hayek took that provision and 'applied it to the USPI relationship' 'for the sake of simplicity.'"); Starr Report, ¶ 70 ("Later, DaVita and SCA added an additional enforcement mechanism: the 'tell-your-boss' provision."), ¶ 77 ("Former SCA CEO Hayek testified at the DaVita criminal trial and at deposition that after he and Thiry agreed to implement the 'tell-your-boss' provision in the SCA-DaVita No-Poach Agreement, Hayek took that provision and 'applied it to the USPI relationship' 'for the sake of simplicity.'").

newly subject to a SCA/DaVita no-solicitation agreement; beginning in 2010, proposed class members at SCA and USPI were newly (and for proposed class members at SCA, additionally) subject to a USPI/SCA no-solicitation agreement; and later, proposed class members at all three Defendants, who were already subject to one or both of the two no-solicitation agreements, were newly (and additionally) subject to the "tell your boss" requirement.

251. Once Prof. Starr's pay regression model is adjusted to allow the effect of the alleged conduct to vary across years or across Defendants, the resulting patterns are inconsistent with Plaintiffs' allegations.[467] This is demonstrated in Exhibit 44 and Exhibit 45 below. Exhibit 44 shows Figure 7 from Prof. Starr's report, where Prof. Starr reports the estimated conduct effects from his pay regression model when he allows the effect of the alleged conduct to vary across years. When I compare Exhibit 44 to the description above of how the alleged conduct changed over time according to Plaintiffs and their experts, I find that the patterns in Figure 7 are not in alignment with what would be expected based on their claims. In particular, Prof. Starr's Figure 7 does not show the effect of the alleged conduct becoming *more negative* over time even though, as I explained above, Plaintiffs alleged and Plaintiffs' experts claim that the alleged conduct strengthened over time as the alleged mobility restrictions and information sharing took effect in a staggered fashion, and as the alleged mobility restrictions allegedly became more restrictive with the addition of the "tell your boss" requirement. To the contrary, Prof. Starr's Figure 7 shows the effect of the alleged conduct becoming less negative over time during the Class Period.

---

[467] I obtain similar results if I generate Exhibit 44 and Exhibit 45 after correcting the basic errors that Prof. Starr made when processing the data. See Workpaper 32; Workpaper 33; Appendix D.

Highly Confidential — Outside Counsel/Experts Only

*EXHIBIT 44*

***The Patterns in Figure 7 from Prof. Starr's Report Do Not Align with Plaintiffs' Allegations Regarding the Scope, Nature, and Timing of the Alleged Conduct***



Source: Starr Report, Figure 7

Note: This exhibit contains a reproduction of Figure 7 in Prof. Starr's report.

252. Exhibit 45 shows the estimated conduct effects from Prof. Starr's pay regression (taken directly from Figure 8 in his report) when Prof. Starr allows the effect of the alleged conduct to vary across Defendants. When I compare Exhibit 45 to my description above of how the alleged conduct differed across Defendants according to Plaintiffs and their experts, I find that the by-Defendant conduct estimates from Figure 8 in Prof. Starr's report are not in alignment with what I would expect based on Plaintiffs' allegations and Prof. Starr's claims. Prof. Starr's estimates do not show that the alleged conduct effect is larger for SCA than for DaVita or USPI even though, as I explained above, proposed class members at SCA were allegedly subject to two sets of bilateral conduct (USPI/SCA and DaVita/SCA), whereas proposed class members at USPI and DaVita were allegedly subject to only one.

**EXHIBIT 45**

***The By-Defendant Conduct Estimates from Figure 8 in Prof. Starr's Report Do Not Align with Plaintiffs' Allegations Regarding the Scope, Nature, and Timing of the Alleged Conduct***



Source: Starr Report, Figure 8

Note: This exhibit contains a reproduction of the by-Defendant estimates from Model (4) in Prof. Starr's Figure 8. Error bars represent the 95% confidence interval.

**6. PROF. STARR'S PAY REGRESSION MODEL DOES NOT DEMONSTRATE COMMON IMPACT DURING THE CLASS PERIOD, NOR DOES IT EVEN MEASURE THE EFFECT OF THE ALLEGED CONDUCT ON PAY USING ALL OR NEARLY ALL PROPOSED CLASS MEMBERS**

253. Prof. Starr purports to estimate the effect of the alleged conduct on average in his pay regression analysis, either for all three Defendants in aggregate (in his aggregate pay regression model) or separately by Defendant (in his damages pay regression model).[468] But, by focusing on averages, he conceals variation within the class, ignoring the diversity of jobs and skills among proposed class members. When I correct Prof. Starr's pay regression model for the obvious flaws that I discussed in Section 5.2.3 — i.e., correcting the basic errors he makes when processing the structured data; adjusting equity compensation so that it does not improperly measure the value of equity at the time that it vests, is exercised or sold; and reasonably controlling for the effect of the COVID-19 pandemic on labor markets using the healthcare job openings rate, quits rate, and layoffs and discharges rate — and estimate the model separately for key subgroups within the class, I find substantial variation in the alleged pay suppression across subgroups. These patterns are inconsistent with Plaintiffs' common impact allegations.

254. After I fix these obvious flaws, Prof. Starr's regression finds varying effects of the alleged conduct *across specialty areas* (Exhibit 46). The results indicate that all specialty areas are either not affected at all or are positively and statistically significantly affected (Business Development, Sales, Strategy, and Planning; Operations; and Physician Relations and Management).

---

[468] Starr Report, p. 115 ("Aggregate Suppression Model"), p. 117 ("Defendant-Specific Suppression Model"), Figure 6, Figure 8, ¶ 136 ("Taken together, the quantitative analysis I performed in this section finds that the Challenged Conduct suppressed compensation by, on average 14.5 percent, including from 12.0 percent to 17.2 percent at each Defendant.").

**EXHIBIT 46**

**Prof. Starr's Pay Regression Model, After Correcting Obvious Flaws, Finds That the Effect of the Alleged Conduct Varies Across Specialty Areas**

| Specialty | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|:---:|:---:|:---:|
| Accounting, Tax, and Treasury | ☐ | ☑ | ☐ |
| Business Development, Sales, Strategy, and Planning | ☑ | ☐ | ☐ |
| Business Office Administration and Management | ☐ | ☑ | ☐ |
| Clinical and Research | ☐ | ☑ | ☐ |
| Finance | ☐ | ☑ | ☐ |
| Information Technology | ☐ | ☑ | ☐ |
| Marketing and Communications | ☐ | ☑ | ☐ |
| Operations | ☑ | ☐ | ☐ |
| Other | ☐ | ☑ | ☐ |
| Pharmacy Management | ☐ | ☑ | ☐ |
| Physician Relations and Management | ☑ | ☐ | ☐ |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by specialty area. I correct the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Statistical significance is determined at the 5% level.

255. Similarly, Exhibit 47 shows the results when I fix the same obvious flaws and estimate Prof. Starr's pay regression model separately by Defendant and seniority level. The results indicate that the results vary *across Defendant-seniority level pairs*, and that all Defendant-seniority level pairs are either not affected (e.g., SCA and USPI Administrators) or positively and statistically significantly affected (e.g., DaVita and SCA Directors).

**EXHIBIT 47**

**Prof. Starr's Pay Regression Model, After Correcting For Obvious Flaws, Finds That the Effect of the Alleged Conduct Varies Across Defendants and Seniority Levels**

| Seniority Level | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|:---:|:---:|:---:|
| SCA: Administrator | ☐ | ☑ | ☐ |
| USPI: Administrator | ☐ | ☑ | ☐ |
| DaVita: Director | ☑ | ☐ | ☐ |
| SCA: Director | ☑ | ☐ | ☐ |
| USPI: Director | ☐ | ☑ | ☐ |
| DaVita: Senior Director | ☐ | ☑ | ☐ |
| SCA: Senior Director | ☑ | ☐ | ☐ |
| USPI: Senior Director | ☐ | ☑ | ☐ |
| DaVita: Vice President | ☐ | ☑ | ☐ |
| SCA: Vice President | ☑ | ☐ | ☐ |
| USPI: Vice President | ☐ | ☑ | ☐ |
| DaVita: Senior Vice President | ☐ | ☑ | ☐ |
| SCA: Senior Vice President | ☑ | ☐ | ☐ |
| USPI: Senior Vice President | ☐ | ☑ | ☐ |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by Defendant and seniority level. I correct the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Statistical significance is determined at the 5% level.

256. The idea that the effect of the alleged conduct may differ across job-related subgroups, such as those shown in Exhibit 46 and Exhibit 47, is consistent with the discussion in Section 2.1. There, I explained that there are substantial differences in proposed class members' outside employment options depending on their skills and preferences, and that for many or most (if not all) proposed class members, Defendants did not have market power sufficient to suppress proposed class members' pay. The results in Exhibit 46 and Exhibit 47, which indicate that all specialty area and Defendant-seniority level subgroups are either not affected at all or are positively and statistically significantly affected, align with that conclusion.

257. Further, after I fix the same obvious flaws, Prof. Starr's pay regression model also demonstrates varying effects *across states*, as shown in Exhibit 48 below. The results indicate that one state is positively affected (Texas), while all others are not affected at all (e.g., Oklahoma). Again, the idea that the effect of the alleged conduct may differ across geographic areas is not surprising, as it is aligns with my discussion in Section 2.1, where I explained that the relevant labor market can be narrower in geography for some jobs than it is for others, and that for many or most (if not all) proposed class members, Defendants did not have market power sufficient to suppress proposed class members' pay. The

results in Exhibit 48, which show that all states are either not affected or positively affected, are consistent with that conclusion.

**EXHIBIT 48**
***Prof. Starr's Pay Regression Model, After Correcting For Obvious Flaws, Finds That the Effect of the Alleged Conduct Varies Across States***

| State | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| AL | ☐ | ☑ | ☐ |
| AZ | ☐ | ☑ | ☐ |
| CA | ☐ | ☑ | ☐ |
| CO | ☐ | ☑ | ☐ |
| CT | ☐ | ☑ | ☐ |
| FL | ☐ | ☑ | ☐ |
| GA | ☐ | ☑ | ☐ |
| IA | ☐ | ☑ | ☐ |
| ID | ☐ | ☑ | ☐ |
| IL | ☐ | ☑ | ☐ |
| IN | ☐ | ☑ | ☐ |
| KY | ☐ | ☑ | ☐ |
| LA | ☐ | ☑ | ☐ |
| MA | ☐ | ☑ | ☐ |
| MD | ☐ | ☑ | ☐ |
| MI | ☐ | ☑ | ☐ |
| MN | ☐ | ☑ | ☐ |
| MO | ☐ | ☑ | ☐ |
| NC | ☐ | ☑ | ☐ |
| NE | ☐ | ☑ | ☐ |
| NJ | ☐ | ☑ | ☐ |
| NM | ☐ | ☑ | ☐ |
| NV | ☐ | ☑ | ☐ |
| NY | ☐ | ☑ | ☐ |
| OH | ☐ | ☑ | ☐ |
| OK | ☐ | ☑ | ☐ |
| OR | ☐ | ☑ | ☐ |
| PA | ☐ | ☑ | ☐ |
| SC | ☐ | ☑ | ☐ |
| TN | ☐ | ☑ | ☐ |
| TX | ☑ | ☐ | ☐ |
| VA | ☐ | ☑ | ☐ |
| WA | ☐ | ☑ | ☐ |
| WI | ☐ | ☑ | ☐ |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by state. I correct the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Statistical significance is determined at the 5% level. States with fewer than 50 observations do not appear in the exhibit (this removes 17 states from the analysis).

258. Finally, after I fix the same obvious flaws, Prof. Starr's pay regression model finds varying effects of the conduct *across years*. Notably, the results

indicate that the effect of the alleged conduct is statistically insignificant or statistically significant and positive during every year of the Class Period, the opposite of what Plaintiffs' theory of harm predicts.

**EXHIBIT 49**
**Prof. Starr's Pay Regression Model, After Correcting for Obvious Flaws, Finds Varying Patterns in Pay Across Class Period Years**

| Year | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|------|:---:|:---:|:---:|
| 2008 | ☐ | ☑ | ☐ |
| 2009 | ☐ | ☑ | ☐ |
| 2010 | ☐ | ☑ | ☐ |
| 2011 | ☐ | ☑ | ☐ |
| 2012 | ☐ | ☑ | ☐ |
| 2013 | ☐ | ☑ | ☐ |
| 2014 | ☑ | ☐ | ☐ |
| 2015 | ☑ | ☐ | ☐ |
| 2016 | ☑ | ☐ | ☐ |
| 2017 | ☑ | ☐ | ☐ |
| 2018 | ☑ | ☐ | ☐ |
| 2019 | ☑ | ☐ | ☐ |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by year. I correct the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Statistical significance is determined at the 5% level. Estimates reflect the effect of the indicated year on pay relative to 2007.

259. I also find substantial variation in the alleged pay suppression across subgroups when I only correct the basic errors Prof. Starr made when processing the structured data, but otherwise make no other changes to his pay regression. The results are shown in Appendix C.

260. For each of the exhibits, I perform a standard statistical test, which is known as a "Chow test," to assess whether, from a statistical perspective, it is appropriate to pool the data across the corresponding subgroups when estimating the alleged conduct effect.[469] I find that the Chow test supports using separate subgroup regressions to estimate the effect of the alleged conduct, and

---

[469] ABA Antitrust Section: American Bar Association, "Applying Econometrics to Address Class Certification," in *Econometrics: Legal, Practical and Technical Issues*, Second Edition, (Chicago: ABA Publishing, 2014), pp. 341–370 at p. 358 ("Standard statistical tests can be applied to test the stability of coefficients among subgroups of customers, products, time, geographies or other subsamples, and to determine whether it is appropriate to pool potential subgroups when estimating the average effect of the alleged conspiracy. For example, a Chow test can be implemented to determine whether the effect of an alleged conspiracy should be estimated separately for two or more potential subgroups of customers, products, or periods.").

does not support Prof. Starr's aggregate pay regression model which estimates a single conduct effect for all proposed class members.[470]

261. Moreover, Prof. Starr performs a number of empirical analyses, reflected in Figures 11, 12, and 16-18 of his report, which he claims "demonstrate that the generalized wage suppression [...] impacted all or nearly all Class Members."[471] However, these empirical analyses suffer from the same flaws as his main pay regression model. Consistent with the above results, I find that once I correct his additional analyses for the obvious flaws that I discussed in Section 5.2.3 – i.e., correcting the basic errors he makes when processing the structured data; adjusting equity so that it does not improperly measure the value of equity at the time that it vests, is exercised or sold; and reasonably controlling for the COVID-19 pandemic using the healthcare job openings rate, quits rate, and layoffs and discharges rate – none of his results hold or provide evidence that is consistent with common impact. These results are shown in Exhibit 50, Exhibit 51, and Appendix C.

262. As one example, Prof. Starr purports to show in Figure 16 of his report that "more than 92 percent of individuals are statistically significantly harmed at a confidence level of 91.4 percent" according to his pay regression analysis.[472] However, Exhibit 50 shows that, if I correct obvious flaws in Prof. Starr's pay regression model, this result no longer holds: according to the analysis, at a 95% confidence level, less than 5% of proposed class members were purportedly harmed. As a second example, Prof. Starr purports to show in Figure 18 of his report that "94.55 percent of individuals were harmed by the Conduct" according to his random coefficient regression analysis.[473] However, Exhibit 51 shows the results of Prof. Starr's random coefficient regression analysis after I correct obvious flaws with his pay regression model. Rather than showing evidence of common impact, the results instead indicate that less than 17% of proposed class members were purportedly harmed by the alleged conduct (far fewer than the 94.55% predicted in Prof. Starr's report). The corrected versions of Prof. Starr's other analyses, which also do not support a conclusion of common impact for all or nearly all proposed class members, can be seen in Appendix C.

---

[470] Workpaper 34.

[471] Starr Report, ¶ 137.

[472] Starr Report, ¶ 168.

[473] Starr Report, ¶ 148.

**EXHIBIT 50**
**Prof. Starr's Interval In-Sample Prediction Analysis, After Correcting for Obvious Flaws, Shows No Evidence of Common Impact**



Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's interval in-sample prediction analysis (Prof. Starr's Figure 16), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. The intersection of the dotted and solid lines in each panel represents the percentage of proposed class members potentially harmed at the 95% significance level.

**EXHIBIT 51**
**Prof. Starr's Random Coefficient Model Analysis, After Correcting for Obvious Flaws, Shows No Evidence of Common Impact**



Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's random coefficient model regression analysis (Prof. Starr's Figure 18), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. The blue curve shows the distribution of conduct estimates for proposed class members, jointly and then separately by Defendant. The red dashed line represents the average conduct estimate for each panel. The percentage of proposed class members potentially harmed by the conduct is reported under each panel.

## 7. PAY STRUCTURES CAPABLE OF GENERATING CLASSWIDE IMPACT, AS PLAINTIFFS' EXPERTS CONTEND, WOULD ALSO GENERATE UPWARD PRESSURE ON PAY FOR ALL OR NEARLY ALL PROPOSED CLASS MEMBERS

263. As I explained in Section 2.2, the claim that Defendants set pay according to rigid pay structures can be refuted by both record evidence and an analysis of Defendants' data. Despite this evidence, in this section, I explain that if one were to accept Plaintiffs' claim that Defendants had rigid pay structures sufficient to generate classwide harm, such pay structures would also generate *upward* pressure on compensation for all or nearly all proposed class members, a fact that Plaintiffs' experts fail to address or account for. This upward pressure could insulate against any downward pressure purportedly caused by the alleged conduct.

264. Under Plaintiffs' claimed rigid pay structures that Defendants purportedly used to set compensation for proposed class members, both decreases *and increases* in pay for one proposed class member should impact the pay for all other proposed class members. Plaintiffs claim that through Defendants' purported pay structures, any decreases in wages for workers directly affected by the alleged conduct would place downward pressure on the pay structures, leading to decreased wages for all other proposed class members. But that is only half the story, and they ignore the other half. Evidence suggests that if Defendants had the pay structures that Plaintiffs claim, there would have been upward pressure on the pay structure due to employees newly hired from somewhere other than a Defendant firm. This could include individuals hired from a non-Defendant firm or individuals first entering or re-entering the labor force (for example after a maternity leave or after completing a professional degree).

265. As I discussed in Section 2, Defendants were free to compete for new hires regardless of the alleged mobility restrictions, and also faced competition for these workers from other non-Defendant employers. Competition for these new hires would lead to competitive pay, which, under Plaintiffs' alleged pay structures, would put upward pressure on the wages of their equally qualified peers whose pay was allegedly suppressed. These wage adjustments would then put upward pressure throughout Defendant firms' entire pay structures as according to Plaintiffs "adjustment to the pay of some employees will lead to adjustments to the pay structure as a whole, affecting the pay of all

employees."[474] This upward pressure could potentially entirely offset, or at a minimum insulate against, any downward pressure on compensation stemming from the alleged mobility restrictions (as well as the alleged information sharing).

266. New hires from non-Defendant firms are just one group of individuals that would place upward pressure on pay through Defendants' purported pay structures. As I explained in Section 2.1, many or most (if not all) proposed class members had non-Defendant employment options, as well as employment options outside of the outpatient care center industry, and even healthcare-related industries. If Defendants were to lower compensation for these proposed class members, competition stemming from these individuals' outside employment options would apply upward pressure to the pay of Defendants' workers because they could use information on competing offers to negotiate higher pay at their existing jobs or else accept superior offers from non-Defendant competitors. As I showed in Section 2.2, there are many examples in the record where proposed class members engaged in exactly this type of pay negotiation with Defendants, leveraging competing offers they had received in order to obtain pay raises.

267. Plaintiffs and their experts have failed to present any evidence or analysis that the pay structures they claim existed would not be prone to upward pressure from groups of proposed class members for which Defendants compete, or to explain how they could account for these complexities in their quantification of harm based on common evidence. Instead, Prof. Starr's conclusions regarding common impact and the effect of the alleged conduct on proposed class members' pay ignore these issues entirely, leading to conclusions that, even under Plaintiffs' assumed pay structures, are inadequate and overstated. Given that more than half of proposed class members were newly hired during the Class Period, and that Defendants compete with many non-Defendant firms for proposed class members' labor, this upward pressure would be considerable, and could offset any downward pressure resulting from the alleged conduct either partially or completely.

---

[474] Third Amended Complaint, ¶ 74.

## 8. PLAINTIFFS' CRITERIA FOR THE PROPOSED CLASS ARE NOT OBJECTIVE

268. Plaintiffs claim that the proposed class consists of employees who worked for Defendants "in positions at the director-level and above."[475] By itself, this characterization is not sufficiently objective as to be implementable based on common evidence. In this section, I explain that there are at least three alternative criteria that could conceivably be used to identify director-level and above positions in an objective manner. For each of these alternative criteria, implementing them would require evidence that is not common to the proposed class. I then explain why the method Prof. Starr used to identify director-level and above positions (which differs from any of these three methods) is arbitrary and subjective.

269. One set of criteria for identifying director-level and above positions is based on an analysis of job responsibilities. Prof. Gerhart endorsed this approach during his deposition, testifying that job responsibilities (and not job titles alone) should be used to identify director-level and above positions, as "different companies may use the same title differently or use different titles for the same thing."[476] Under this approach, it would first be necessary to explain what job responsibilities constitute a "director" level job, and then any job considered to be more complex than a job handled by a director could be considered to be above the director level. However, analyzing job responsibilities for the 2,835 unique job titles at DaVita, 762 unique job titles at SCA, and 491 unique job titles at USPI during the Class Period to understand what constitutes a director and which jobs were above director level in terms of complexity and job responsibilities is a subjective and time-intensive process.[477] Indeed, in the textbook he authored, Prof. Gerhart describes the process of "job analysis," which he defines as "the systematic process of collecting information that identifies similarities and differences in the work" across jobs. He explains

---

[475] Third Amended Complaint, ¶ 92.

[476] Gerhart Deposition, pp. 44—45 ("Q. And what does it mean to be a 'director level and above' employee? [...] A. Yeah, one of the things in compensation is we try to teach not to focus too much on the title. It's important to focus on what's actually done. So it would -- the different – the different companies may use the same title differently or use different titles for the same thing. [...] Q. [...] The title doesn't necessarily dictate; it depends what the job responsibilities are. Is that what you're saying? [...] A. I think that's correct."). Consistent with Prof. Gerhart's testimony, even focusing on SCA employees only, job titles containing the word "director" cover a wide range of job responsibilities – e.g., a "Director, Accounting Operations" opening required "10+ years of experience in corporate or public accounting with SEC exposure"; a "Director, Revenue Management" role required "5+ years payor contracting/reimbursement experience in the ASC industry"; and a "Director of Development" role required only "two to three years' work experience," with healthcare industry knowledge "preferred" but not required. See "SCA Position Description, Director, Accounting Operations," SCA, September 25, 2017, SCA000608681—82 at SCA000608681; "SCA Position Description, Director, Revenue Management," SCA, Undated, SCA001153473—74 at SCA001153473—74; "SCA Position Description, Director of Development," SCA, April 1, 2015, SCA000568874—75 at SCA000568874—75.

[477] Workpaper 5.

that this process typically involves using document review, interviews, and work site visits to collect data on a wide range of job and employee characteristics, such as the tasks, activities, performance criteria, and working conditions associated with each job, as well as the technical knowledge and skills that the employees in each job possess.[478] In other words, the process of determining job responsibilities through job analysis requires a detailed review of information about jobs and employees that is not common to the proposed class, and one which Plaintiffs' experts did not undertake.

270. A second set of criteria for identifying director-level and above positions is based on internal company hierarchies, as delineated in documents or perhaps data fields, that explicitly state where jobs sit relative to directors in that hierarchy. For DaVita, the produced data include a field identifying a hierarchy of management "levels" to which each job belongs, one of which is labeled "Director."[479] However, for SCA and USPI, the produced data contain no such field, and as a result, there are many job titles for which it isn't clear what level the job title falls under, even within a given year during the Class Period, let alone across all years of the Class Period. As one example, internal organization charts produced by USPI for its IT Systems & Solutions roles indicate that a "Director Data Warehouse & Development," a "Director IT Business & Clinical Systems," a "Manager Application Support," and a "Manager Financial Systems" all reported directly to the same "SVP IT Systems & Solutions" in July 2016.[480] This is shown in Exhibit 52 below. Thus, it is not clear from internal organization charts alone (and without additional evidence that may or may not be common to the proposed class) whether the "Manager Application Support" and "Manager Financial Systems" positions are more, less, or equally senior to the "Director Data Warehouse & Development" and "Director IT Business & Clinical Systems" positions.

---

[478] Gerhart (2022), pp. 109–112.

[479] See, e.g., YTD-2016 TM Earnings by Management Level.xlsx, DVA_OMCEAL_000000041, Column F.

[480] 2016 USPI Internal Organization Chart, "Organization Chart," July 2016, USPI_CIV_000000190–227 at USPI_CIV_000000222.

**EXHIBIT 52**
*2016 Internal Organization Chart for IT Systems & Solutions Roles at USPI*



Source: USPI_CIV_000000190–227 at USPI_CIV_000000222
Note: This exhibit shows the internal organization chart for IT Systems & Solutions roles at USPI in 2016. See 2016 USPI Internal Organization Chart, "Organization Chart," July 2016, USPI_CIV_000000190–227 at USPI_CIV_000000222.

271. Further, as an additional source of complexity, even if one were able to identify director-level and above positions within a given Defendant, when comparing across all three Defendants, a given individual may be more junior to all directors within her own firm, but at the same level as or relatively more senior than a director at another co-Defendant. For example, the "Manager, Applications Support (IT)" position at DaVita was below the director level in 2016, according to the management level field in DaVita's produced data.[481] However, as discussed above, and as shown in Exhibit 52, the "Manager Application Support" position at USPI reported to the same "SVP IT Systems & Solutions" position (and thus was conceivably at the same level in USPI's internal company hierarchy as) as two different "Director" job titles. Resolving these ambiguities regarding the relative seniority of positions across different

---

[481] YTD-2016 TM Earnings by Management Level.xlsx, DVA_OMCEAL_000000041, Column F.

Defendants in an objective manner requires additional evidence (e.g., regarding job responsibilities) that is not common to the proposed class.

272. A third set of criteria for identifying director-level and above positions is based on measuring pay for a given job and comparing that to pay for directors. This approach requires a number of subjective choices about which "director" group to use for the comparison — e.g., would the reference point be the average pay across directors or instead the pay of the lowest-paid director, and should comparisons only be made within firms or across all Defendant firms? For example, in 2013, Administrators with the job title "Group Administrator" at SCA were on average paid less than Directors with job titles "Director of Ops" at SCA and less than Directors with job titles "Group Director" at DaVita, but more than Directors with job titles "Group Director" at SCA. [482] Thus, it is not clear based on pay alone whether Administrators with job titles "Group Administrator" at SCA should be treated as more, less, or equally senior to Director-level positions. Developing objective criteria for determining which jobs are senior to the director-level in this and similar situations requires additional evidence beyond pay (e.g., on job responsibilities or internal company hierarchies), may not be possible using common evidence produced in this matter, and certainly isn't something that Plaintiffs' experts have addressed or explained.

273. Prof. Starr does not use any of the approaches described above to identify director-level and above positions in his report. His approach involves (a) relying on the management level field in the produced data for DaVita, and (b) performing keyword searches for certain phrases, such as "director" or "vice president" or "administrator," in employees' job titles for USPI and SCA.[483] This approach, which relies on job titles for two of the three Defendants, is flawed because, as Prof. Gerhart testified in his deposition, "different companies may use the same title differently or use different titles for the same thing."[484] Further, it is unclear what objective criteria Prof. Starr applied to identify the relevant search terms that he used to identify proposed class members for USPI and SCA. For example, he includes "administrator" job titles at USPI and SCA as class-relevant jobs, but how did he decide that administrators at SCA and at USPI are director level and above employees?[485] The answer to this question is

---

[482] Workpaper 35.

[483] Starr Report, Backup Materials.

[484] Gerhart Deposition, p. 44.

[485] USPI explained in a letter to Plaintiffs dated December 12, 2024 that Administrators report to Division RVPs. However, as the example in Exhibit 52 shows, reporting relationships are not sufficient for assessing whether a

unclear, considering that, as noted above, individuals with "Administrator" job titles are often paid less than individuals with "Director" job titles.[486]

274. Finally, apart from the difficulties in identifying "director-level or above" positions, another complication when identifying proposed class members is how to identify the positions that Plaintiffs have carved out of the proposed class – i.e., "senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants."[487] As the examples below illustrate, ambiguities in how to identify these two groups of employees underscore the lack of objective criteria that can be used to identify proposed class members based on common evidence alone:

- **"Senior Corporate Officers":** For DaVita, Prof. Starr identifies "senior corporate officers" as those employees for whom the management level field in DaVita's produced data is equal to "Senior Officers." However, for SCA and USPI, Prof. Starr assumes that certain employees with terms such as "chief" or "president" in their job titles (other than "vice president") should be treated as a "senior corporate officer."[488] It is not obvious why "senior corporate officers" should not extend beyond the job titles he selects. For example, at USPI, internal organization charts from July 2016 indicate that, in addition to individuals with "chief" or "president" in their job titles, certain VPs (i.e., individuals in the "SVP, Strategy" and "SVP, Physician Strategy Group & Ortholink" roles) also reported directly to the CEO.[489] Likewise, while Prof. Starr excludes some titles with "chief" from the class, he continues to include others. For example, he does not exclude a "chief tech gastroenterology" at SCA from his proposed class, but he does not explain this decision that deviates from his proposed rule.

---

given job title is at or above the Director level. See Letter from Julia B. Bates (King & Spalding) to Sarah D. Zandi (Lieff Cabraser Heimann & Bernstein), "Re: In re Outpatient Medical Center Employee Antitrust Litig., N.D. Ill. 1:21-cv-000305," December 12, 2024.

[486] I understand that USPI has provided a list of job titles that they consider to be "subject to USPI's no-poach agreements." This list differs from the job titles that are included in Plaintiffs' proposed class according to Prof. Starr's analyses. See Appendix E; Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph Saveri (Joseph Saveri Law Firm Inc.) et al., "Re: In Re Outpatient Medical Center Antitrust Litigation, Case No 1:21-cv-00305," May 14, 2023.

[487] Third Amended Complaint, ¶ 92.

[488] Starr Report, Backup Materials.

[489] 2016 USPI Internal Organization Chart, "Organization Chart," July 2016, USPI_CIV_000000190–227 at USPI_CIV_000000191.

- **"Personnel in the Human Resources, Recruiting, and Legal Departments":** For all three Defendants, Prof. Starr assumes that anyone with the keywords "human resources," "legal," "recruit," "benefit," or other similar terms in their job titles or department names should be excluded from the class.[490] But it appears that Prof. Starr's keywords were too limited. For example, for DaVita, Prof. Starr does not exclude departments such as "People Insights and Analytics," "LAB-People Services," "TM [Teammate] Relations", "HRIS [Human Resources Information Systems]," "Talent Management," and "Compensation and Analytics" from the proposed class, even though he does exclude other, similar departments whose titles contain the terms he selected for his keyword searches (e.g., "human resources").[491]

_Justin McCrary_

_____

Justin McCrary

---

[490] Starr Report, Backup Materials.

[491] Starr Report, Backup Materials.

## APPENDIX A: CV and Prior Testimony For Justin McCrary, Ph.D.

# Justin McCrary

Columbia Law
521 Jerome Greene Hall
New York, NY 10027

Email: justin.mccrary@gmail.com
Homepage: https://www.law.columbia.edu/faculty/justin-mccrary

## Current Academic Appointments

Columbia University
2018– Paul J. Evanson Professor of Law
2018– Fellow, Program in the Law and Economics of Capital Markets

National Bureau of Economic Research
2012– Faculty Research Associate

## Past Academic Appointments

National Bureau of Economic Research
2008–19 Co-director, Crime Working Group
2006–12 Faculty Research Fellow

University of California, Berkeley
2014–17 Director, Social Sciences Data Laboratory (D-Lab)
2010–18 Professor of Law
2008–10 Assistant Professor of Law

Columbia University
Fall 2017 Samuel Rubin Visiting Professor of Law

University of Michigan
2003–07 Assistant Professor, Gerald R. Ford School of Public Policy, and
Assistant Professor, Department of Economics (courtesy)

## Government and Public Service

*Journal of Law and Economics*
2024– Member, Board of Editors

Rosalyn Yalow Charter School
2023– Member, Board of Directors
2024– Member, Finance Committee

California Law Revision Commission
2023–24 Consultant, Study of Antitrust Law

Committee on National Statistics
2022 Reviewer, National Academies of Sciences, Engineering, and Medicine

Securities and Exchange Commission
2022– Signatory, Intergovernmental Personnel Agreement

European Central Bank (Banco de España)
2013–14 Economist

Equal Employment Opportunity Commission
2000–16 Signatory, Intergovernmental Personnel Agreement

California Department of Justice
2011–12 Consultant

Federal Reserve Bank of New York
1996–98 Assistant Economist

## Education

Ph.D. Economics, University of California, Berkeley, 2003

A.B. Public Policy, Princeton University, 1996

## Languages

English (native); German (fluent); Spanish (elementary/intermediate)

## Hobbies

Chess, Squash, Classical guitar

## Testimony Experience

*State of California, ex rel.., Edelweiss Fund, LLC, v JP Morgan Chase Bank, et al.*
Superior Court of the State of California

VRDO case

Testimony regarding market definition, market power, and competitive effects

Retained through the joint defense group

Reply report filed on April 11, 2025

Affirmative report filed on March 14, 2025

*In re: Bank of America California Unemployment Benefits Litigation*
District Court of the Southern District of California

Case alleging slow payment of covid checks

Testimony regarding the unemployment insurance program literature and the time value of money

Retained through Bank of America

Report filed on April 4, 2025

*Leinani Deslandes and Stephanie Turner v McDonald's USA, LLC*
U.S. District Court for the Northern District of Illinois (Eastern Division)

Putative class action antitrust labor case

Testimony regarding franchising and vertical restraints, procompetitive benefits of vertical restraints, incentives, monopsony theory, general versus specific human capital, and salary structure models

Retained through McDonald's USA, LLC

Affirmative report on remand filed on March 28, 2025

Deposed on May 10, 2021 (via video)

Class certification report filed on April 15, 2021

*The Collection LLC v Porsche Cars North America*
Circuit Court of the 11th Judicial Circuit, Miami-Dade County

Antitrust case

Testimony regarding local market demand and a new proposed Porsche dealership

Retained through Porsche

Deposed on March 27, 2025

Report filed on February 3, 2025

*In re Cattle and Beef Antitrust Litigation*
U.S. District Court for the District of Minnesota

Antitrust case

Testimony regarding liability, class certification, regression methodology, and exchange and direct and indirect seller claimed damages

Retained through the joint defense group

Deposed on March 19 and 20, 2025

Class certification report filed on January 24, 2025

*Glencore Glencore Grain v Louis Dreyfus Company*
United State District Court of the Northern District of Illinois

Antitrust commodities market case

Testimony regarding market definition, market power, and competitive effects

Retained through Louis Dreyfus Company

Report filed on March 14, 2025

*MLRN LLC v U.S. Bank National Association*
Supreme Court of the State of New York

Mortgage-backed securities case (servicing)

Testimony regarding sampling and statistical methods

Retained through U.S. Bank

Deposed on March 14, 2025

Report filed on February 14, 2025

*Entri LLC v GoDaddy.com LLC*
U.S. District Court for the Eastern District of Virginia

Antitrust case

Testimony regarding market definition, market power, competitive effects, tying, procompetitive rationale of vertical integration, and damages

Retained through GoDaddy

Report filed on January 27, 2025

*Target v Visa; 7-Eleven v Visa*
U.S. District Court for the Southern District of New York

Antitrust case

Testimony regarding liability, two-sided markets, market power, and credit and debit card payment systems

Retained through Mastercard

Deposed on December 19, 2024

Report filed on October 1, 2024

*Rivera and Romero v Amazon Web Services*
District Court of the Western District of Washington

Putative class action alleging violations of the Illinois Biometric Information Privacy Act

Testimony regarding harm and damages

Retained through AWS

Report filed on December 13, 2024

*Noe Rosales, et al. v Valve Corporation*
American Arbitration Association
    Antitrust case
    Testimony regarding market definition, market power, and competitive effects in video game distribution
    Retained through Valve
    Testified at arbitration hearing on December 6 and 9, 2024

*Federal Trade Commission, et al. v The Kroger Company and Albertsons Companies, Inc.*
United States District Court for the District of Oregon
    §13(b) merger case
    Testimony regarding labor market definition (product and geographic), market power, merger effects, and bargaining theory
    Retained through Kroger
    Trial testimony on September 12, 2024
    Deposed on July 18, 2024
    Report filed on July 1, 2024

*Favell et al. v University of Southern California*
United States District Court of the Central District of California
    Putative class action alleging tuition overpayment
    Testimony regarding damages methodologies and conjoint analysis
    Retained through USC
    Deposed on September 2, 2024
    Report filed on August 22, 2024

*IKB International S.A. in Liquidation and IKB Deutsche Industriebank AG v U.S. Bank N.A.*
Supreme Court of the State of New York, County of New York
    Mortgage-backed securities case (servicing)
    Testimony regarding sampling and statistical methods
    Retained through U.S. Bank
    Deposed on July 23, 2024
    Report filed on June 28, 2024

*Attorney General for the Commonwealth of Massachusetts v Uber Technologies, Inc. and Lyft, Inc.*
Superior Court of the Commonwealth of Massachusetts for the County of Suffolk
    Alleged misclassification of employees as independent contractors
    Testimony regarding two-sided markets and platform companies
    Retained through Uber Technologies, Inc.
    Trial testimony on May 31, 2024
    Deposed on January 27, 2024 (via video)
    Report filed on October 13, 2023

*IKB International S.A. in Liquidation and IKB Deutsche Industriebank AG v Morgan Stanley, et al.*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case (servicing)

    Testimony regarding sampling and statistical methods

    Retained through Morgan Stanley

    Deposed on May 15, 2024

    Report filed on September 30, 2022

*State of New York ex rel., Edelweiss Fund, LLC v JP Morgan Chase & Co., et al.*
Supreme Court of State of New York, County of New York

    *Qui tam* action alleging collusion and/or coordination on the part of remarketing agents and thus municipal government overpayment for variable rate demand obligation (VRDO) interest rates

    Testimony regarding cartel theory, economic incentives, market power, barriers to entry, and random versus selected samples and bootstrap methodologies

    Retained through the joint defense group

    Deposed on May 2, 2024

    Report filed on March 15, 2024

*Mayor and City Council of Baltimore v Purdue Pharma L.P., et al.*
Circuit Court for Baltimore City

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, abatement plan, damages

    Retained through Janssen

    Deposed on April 26, 2024

    Report filed on February 23, 2024

*Chuba Hubbard et al. v NCAA et al.*
United States District Court for the Northern District of California

    Putative class action antitrust labor case

    Testimony regarding damages methodologies and causation

    Retained through NCAA

    Deposed on April 15, 2024

    Report filed on March 27, 2024

*Lisa Barkel-Williams, et al. v Auto Club Group and Auto Club Services*
United States District Court for the Eastern District of Michigan

    Unjust enrichment putative class action in the insurance industry

    Testimony regarding damages methodologies and causation

    Retained through Auto Club Group and Auto Club Services

    Report filed on March 22, 2024

*Palm Beach Tanning, Inc., et al., v Sunless, Inc.*
United States District Court for the Northern District of Ohio

    Intellectual property and antitrust dispute

    Testimony regarding antitrust economics and damages methodologies

    Retained through Sunless

    Deposed on February 21, 2024

    Report filed on January 16, 2024

*Richard Dennis, Michael Glass, and Port 22, LLC v The Andersons, Inc. and Cargill, Inc.*
United States District Court for the Northern District of Illinois, Eastern Division

  Putative class action antitrust finance case (wheat market)

  Testimony regarding antitrust economics and damages methodologies, causation, inferential statistics, and commodities markets (physical, futures, options)

  Retained through The Andersons and Cargill

  Deposed on January 26, 2024

  Report filed on December 20, 2023

*The Collection v Holman North Miami and Porsche Cars North America*
State of Florida, Division of Administrative Hearing

  Proposed new car dealership case

  Testimony regarding local market demand and a new proposed Porsche dealership

  Retained through Porsche Cars North America

  Deposed on January 17, 2024 (via video)

  Deposed on January 11, 2024

  Reply report filed on December 22, 2023

  Report filed on November 11, 2023

*Paul Orshan, et al. v Apple Inc.*
United States District Court for the Northern District of California

  Putative class action consumer products liability case

  Testimony regarding the law and economics of damages

  Retained through Apple, Inc.

  Deposed on January 9, 2024

  Deposed on June 8, 2022 (via video)

  Report filed on May 17, 2022

*Campbell v Uber Technologies, Inc. and Lyft, Inc.*
Superior Court of the Commonwealth of Massachusetts for the County of Suffolk

  Alleged misclassification of employees as independent contractors

  Testimony regarding two-sided markets and platform companies

  Retained through Uber Technologies, Inc.

  Report filed on October 13, 2023

*Erica Frasco v Flo Health, Inc., Google, LLC, Facebook, Inc., AppsFlyer, Inc., and Flurry, Inc.*
United States District Court for the Northern District of California

  Putative class action data breach and privacy case

  Testimony regarding liability and damages

  Retained through Flurry, Inc.

  Deposition on August 24, 2023 (via video)

  Report filed on June 27, 2023

*The DCH Health Care Authority v Purdue Pharma L.P.; Fort Payne Hospital Corporation v McKesson Corporation*
Circuit Court for Conecuh County, Alabama

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, regression methodology

    Retained through the Janssen Defendants

    Supplemental Disclosure filed on July 5, 2023

    Expert Disclosure filed on July 3, 2023

*PennyMac Loan Services, LLC v Black Knight Servicing Technologies, LLC; Black Knight, Inc.*
American Arbitration Association

    Intellectual property and antitrust dispute

    Testimony regarding damages

    Retained through Black Knight

    Testified at arbitration hearing on May 18, 2023

    Deposition on December 8, 2022

    Report filed on October 25, 2022

*State of Illinois ex rel., Edelweiss Fund, LLC v JP Morgan Chase & Co., et al.*
Circuit Court of Cook County, Illinois, County Department, Law Division

    *Qui tam* action alleging collusion and/or coordination on the part of remarketing agents and thus municipal government overpayment for variable rate demand obligation (VRDO) interest rates

    Testimony regarding cartel theory, economic incentives, market power, barriers to entry, and random versus selected samples and bootstrap methodologies

    Retained through the joint defense group

    Deposed on April 5, 2023

    Report filed on February 6, 2023

*National Fair Housing Alliance et al. v Deutsche Bank National Trust, as Trustee; Deutsche Bank Trust Company Americas, as Trustee; Ocwen Loan Servicing, LLC; and Altisource Solutions, Inc.*
United States District Court for the Northern District of Illinois, Eastern Division

    Housing maintenance discrimination

    Testimony regarding causation, economics of housing market

    Retained through Deutsche Bank, Ocwen, and Altisource

    Deposed on March 31, 2023 (via video)

    Declaration filed on February 28, 2023

    Report filed on February 21, 2023

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*
United States District Court for the Eastern District of New York

    Antitrust case

    Testimony regarding liability, two-sided markets, market power, and credit and debit card payment systems

    Retained through Mastercard

    Deposed on March 24, 2023

    Reply Report filed on January 13, 2023

    Report filed on September 30, 2022

*In re University of San Diego Tuition and Fees COVID-19 Refund Litigation*
United States District Court for the Southern District of California

> Putative class action alleging tuition overpayment
>
> Testimony regarding damages methodologies, conjoint analyses, and hedonic regression
>
> Retained through the University of San Diego
>
> Rebuttal report filed on February 20, 2023
>
> Affirmative report filed on February 6, 2023

*Palmer, Piroumian, Cox, and Franchitt v Cognizant Technology Solutions Corporation and Cognizant Technology Solutions U.S. Corporation*
United States District Court for the Central District of California

> Putative class action employment discrimination case
>
> Testimony regarding regression and statistical methodologies, the Yule-Simpson paradox and omitted variable bias, causation, personnel economics, self-selection, the economics of immigration, and damages methodologies
>
> Retained through Cognizant
>
> Deposed on January 23, 2023 (via video)
>
> Deposed on July 5, 2022 (via video)
>
> Report filed on June 10, 2022

*In re: Broiler Chicken Grower Antitrust Litigation Haff Poultry, Inc., et al. v Tyson Foods, Inc., et al.*
United States District Court for the Eastern District of Oklahoma

> Putative class action antitrust monopsony case
>
> Testimony regarding information sharing, no-poach allegations, causation, and damages estimation
>
> Retained through Pilgrim's and Sanderson
>
> Deposition on December 22, 2022
>
> Report filed on November 18, 2022

*Twitter v Musk*
Delaware Chancery Court

> Acquisition dispute
>
> Testimony regarding statistical sampling and extrapolation, inferential statistics, and data science
>
> Retained through Twitter
>
> Report filed on October 2, 2022

*Walter Peters v Apple Inc.*
Superior Court for the State of California, County of Los Angeles

> Putative class action consumer products liability case
>
> Testimony regarding event study methodology, extent of unharmed class members, and statistics
>
> Retained through Apple, Inc.
>
> Deposed on September 2, 2022 (via video)
>
> Report filed on July 26, 2022

*Appellant The Mount Sinai Hospital's OMHA Appeal (No. 3-7103567206)*
Centers for Medicare and Medicaid Services

    Centers for Medicare and Medicaid Services investigation

    Testimony regarding statistics and damages estimation

    Retained through Mt. Sinai

    Testified before administrative law judge on August 30, 2022 (via audio)

    Report filed on July 18, 2018


*National Fair Housing Alliance et al. v Bank of America, National Association; Bank of America Corp.; and Safeguard Properties Management*
United States District Court for the District of Maryland

    Housing maintenance discrimination

    Testimony regarding causation, economics of housing market

    Retained through Bank of America

    Supplemental declaration filed on August 31, 2022

    Deposed on February 28, 2022 (via video)

    Supplemental report filed on February 14, 2022

    Report filed on November 5, 2021


*In re Foreign Exchange Benchmark Rates Antitrust Litigation*
U.S. District Court for the Southern District of New York

    Putative class action antitrust case

    Testimony regarding liability, heterogeneity, trader communications, sampling, and regression

    Retained through Credit Suisse

    Declaration filed on August 26, 2022

    Deposed on July 30, 2020 (via video)

    Merits report filed on March 12, 2020

    Deposed on January 17, 2019

    Class certification report filed on October 25, 2018


*Raef Lawson v Grubhub Holdings Inc. and Grubhub Inc.*
United States District Court for the Northern District of California, San Francisco Division

    Alleged misclassification of employees as independent contractors

    Testimony regarding two-sided markets and platform companies

    Retained through Grubhub

    Report filed on June 15, 2022


*Jessica Robinson, Stacey Jennings, and Priscilla McGowan v Jackson Hewitt, Inc. and Tax Services of America, Inc.*
United States District Court for the District of New Jersey

    Putative class action antitrust labor case

    Testimony regarding the economics of franchising, general and specific human capital, and intrabrand restraints

    Retained through Jackson Hewitt

    Deposed on June 1, 2022

    Report filed on April 25, 2022

Highly Confidential - Outside Counsel/Experts Only

*City and County of San Francisco and the People of the State of California v Purdue Pharma L.P., et al.*
United States District Court for the Northern District of California

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, regression methodology

    Retained through Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., and Endo International plc

    Deposed on January 10, 2022 (via video)

    Report filed on December 2, 2021

*State of Florida v Purdue Pharma L.P. et al.*
Circuit Court of the Sixth Judicial Circuit in and for Pasco County, West Pasco Division, New Port Richey, Florida

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, regression methodology

    Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

    Deposed on December 13, 2021 (via video)

    Report filed on September 17, 2021

*Sarah J. Hunter and David N. Youtz v Booz Allen Hamilton Holding Corporation*
U.S. District Court for the Southern District of Ohio (Eastern Division)

    Putative class action antitrust labor case

    Testimony regarding heterogeneity of impact, incentives, contracting, damages models, and salary structure models

    Retained through Booz Allen, Mission Essential Personnel, and CACI International

    Live testimony in class certification hearing on October 22, 2021

    Deposed on August 6, 2021 (via video)

    Rebuttal merits report filed on July 15, 2021

    Affirmative merits report filed on June 3, 2021

    Deposed on April 12, 2021 (via video)

    Class certification report filed on March 12, 2021

*County of Bexar v Purdue Pharma L.P. et al.*
*(and In re Texas Opioid Litigation)*
District Court, 224th Judicial District, Dallas County, Texas
(and District Court, 152nd Judicial District, Harris County, Texas)

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, regression methodology

    Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

    Report filed on September 21, 2021

*County of Dallas v Purdue Pharma L.P. et al.*
*(and In re Texas Opioid Litigation)*
District Court, 116th Judicial District, Dallas County, Texas
(and District Court, 152nd Judicial District, Harris County, Texas)

   Prescription opioid medication litigation

   Testimony regarding causation, economics of crime, regression methodology

   Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

   Deposed on September 20, 2021 (via video)

   Report filed on July 30, 2021


*Iowa Public Employees' Retirement System, et al. v Bank of America Corporation, et al.*
U.S. District Court for the Southern District of New York

   Putative class action antitrust group boycott case

   Testimony regarding the stock lending market and heterogeneity of impact

   Retained through Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS

   Deposed on September 3, 2021 (via video)

   Reply report filed on November 22, 2021

   Class certification report filed on June 29, 2021


*The State of Alabama v Purdue Pharma L.P. et al.*
Circuit Court for Montgomery County, Alabama

   Prescription opioid medication litigation

   Testimony regarding causation, economics of crime, regression methodology

   Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

   Deposed on August 10, 2021 (via video)

   Report filed on July 29, 2021


*The People of the State of California v Purdue Pharma L.P. et al.*
Superior Court of the State of California, County of Orange

   Prescription opioid medication litigation

   Testimony regarding causation, economics of crime, regression methodology

   Retained through Endo Pharmaceuticals Inc. and Endo Health Solutions Inc.

   Trial testimony July 20-21, 2021 (via video)

   Deposed on February 8, 2021 (via video)

   Reply report filed on January 21, 2021

   Affirmative report filed on November 13, 2020


*Eric Stevens, et al. v Ford Motor Company*
U.S. District Court for the Southern District of Texas

   Putative class action consumer products liability case

   Testimony regarding the car market and damages methodologies

   Retained through Ford Motor Company

   Deposed on June 24, 2021

   Report filed on May 17, 2021

*Kaloma Cardwell v Davis Polk and Wardwell LLP, et al.*
U.S. District Court for the Southern District of New York

    Employment discrimination case

    Testimony regarding the labor market for high skilled workers and damages models

    Retained through Davis Polk and Wardwell

    Report filed on June 15, 2021

*Jamie Postpichal, Sarah Waters, and Ursula Freitas v Cricket Wireless, LLC*
U.S. District Court for the Northern District of California (San Francisco Division)

    Putative class action false advertising case

    Testimony regarding heterogeneity of impact, damages estimation, consumer preferences

    Retained through Cricket Wireless

    Deposed on April 16, 2021 (via video)

    Report filed on April 5, 2021

*Phoenix Light SF Limited, et al. and Commerzbank AG v HSBC Bank USA, N.A.*
U.S. District Court for the Southern District of New York

    Mortgage-backed securities case (servicing)

    Testimony regarding matching estimators, statistics, sampling, damages

    Retained through HSBC

    Report filed on September 14, 2020

*State of New Mexico v Honda Motor Company, et al.*
State of New Mexico, County of Santa Fe, First Judicial District Court

    Putative class action consumer products liability case

    Testimony regarding the car market and damages methodologies

    Retained through Ford Motor Company

    Report filed on September 8, 2020

*Donald Conrad et al. v Jimmy John's Franchise, LLC, et al.*
U.S. District Court for the Southern District of Illinois

    Putative class action antitrust labor case

    Testimony regarding liability, damages, heterogeneity, horizontal versus vertical relationships, franchise arrangements, internal labor markets, monopsony theory, and general versus specific human capital training

    Deposed on August 14, 2020 (via video)

    Retained through Jimmy John's Franchise, LLC and Jimmy John's Enterprises, LLC

    Report filed on July 1, 2020

*People of the State of California v Uber Technologies, Inc., Lyft, Inc., and Does 1-50*
Superior Court of the State of California, County of San Francisco

    Alleged misclassification of employees as independent contractors

    Testimony regarding two-sided markets and platform companies

    Retained through Uber Technologies, Inc.

    Report filed on July 24, 2020

*Alex Morgan, et al. v United States Soccer Federation, Inc.*
U.S. District Court for the Central District of California, Western Division

    Putative class action sex discrimination case

    Testimony regarding law and economics, labor economics, and damages methodologies

    Retained through United States Soccer Federation

    Deposed on April 9, 2020 (via video)

    Rebuttal report filed on March 6, 2020

    Affirmative report filed on February 4, 2020

*Barry Staubus, et al. v Purdue Pharma, L.P.*
Circuit Court for Sullivan County at Kingsport, Tennessee

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, regression methodology

    Retained through Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

    Deposed on April 7, 2020 (via video)

    Report filed on March 20, 2020

*John Capriole v Uber Technologies, Inc. and Dara Khosrowshahi*
U.S. District Court for the Northern District of California

    Putative class action regarding independent contractor versus employee

    Testimony regarding two-sided markets, economics of market-wide shocks, matching technologies, cost implications of reclassification, and capital-labor tradeoffs

    Retained through Uber Technologies, Inc.

    Report filed on April 6, 2020

*Spencer Verhines v Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

    Putative class action regarding independent contractor versus employee

    Testimony regarding two-sided markets, economics of market-wide shocks, matching technologies, cost implications of reclassification, and capital-labor tradeoffs

    Retained through Uber Technologies, Inc.

    Report filed on March 25, 2020

*Rescap Liquidating Trust v Primary Residential Mortgage, Inc.*
U.S. District Court for the District of Minnesota

    Mortgage-backed securities case (bankruptcy)

    Testimony regarding sampling, damages, and statistical concepts

    Retained through Primary Residential Mortgage, Inc.

    Bench trial testimony on March 12-13, 2020 (via video)

    Deposed on October 23, 2019

    Supplemental report filed on August 23, 2019

    Report filed on August 9, 2019

*County of Suffolk v Purdue Pharma LP, et al.; County of Nassau v Purdue Pharma LP, et al.; and The People of the State of New York v Purdue Pharma LP, et al.*
Supreme Court of the State of New York, County of Suffolk

    Prescription opioid medication litigation

    Testimony regarding causation, economics of crime, regression methodology

    Retained through Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

    Deposed on February 25, 2020

    Report filed on February 3, 2020


*Government of the United States Virgin Islands v Toyota Motor Corporation, et al.*
Superior Court of the Virgin Islands, Division of St. Thomas and St. John

    Putative class action consumer products liability case

    Testimony regarding the car market and damages methodologies

    Retained through Ford Motor Company

    Deposed on February 14, 2020

    Report filed on January 31, 2020


*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*
U.S. District Court for the Eastern District of New York

    Antitrust case

    Testimony regarding liability, two-sided markets, market power, and credit and debit card payment systems

    Retained through Mastercard, Bank of America, Barclays, Capital One, Citibank, Fifth Third, First National Bank of Omaha, HSBC, JPMorgan Chase, PNC, SunTrust, Texas Independent Bancshares, and Wells Fargo

    Deposed on January 14, 2020

    Report filed on June 10, 2019


*Olson, Perez, Postmates, and Uber v State of California*
U.S. District Court for the Central District of California

    U.S. constitutional objection to California adoption of Assembly Bill 5

    Testimony regarding two-sided markets and flexible work arrangements

    Retained through Postmates and Uber

    Declaration filed on January 8, 2020


*Phoenix Light SF Limited, et al. vs. Wells Fargo Bank*
U.S. District Court for the Southern District of New York

    Mortgage-backed securities case (servicing)

    Testimony regarding matching and other statistical methodologies

    Retained through Wells Fargo Bank

    Deposed on October 4, 2019

    Report filed on July 25, 2019

*Jacob Beaty and Jessica Beaty vs. Ford Motor Company*
U.S. District Court for the Western District of Washington

    Putative class action consumer products liability case

    Testimony regarding conjoint analysis and heterogeneity

    Retained through Ford Motor Company

    Deposed on June 25, 2019

    Class certification report filed on May 24, 2019


*Shamrell v Apple Inc.*
Superior Court of the State of California, County of San Diego

    Putative class action regarding products liability, Unfair Competition Law and Consumers Legal Remedies Act

    Testimony regarding heterogeneity across putative class members, failure rate methodologies, econometrics, and data science

    Retained through Apple, Inc.

    Deposed on June 6, 2019

    Supplemental class certification report filed on October 17, 2018

    Class certification report filed on March 29, 2017

    Report filed on February 1, 2017


*Cuyahoga County v Purdue Pharma LP, et al. and Summit County v Purdue Pharma LP, et al.*
U.S. District Court of the Northern District of Ohio

    Prescription opioid medication litigation

    Testimony regarding causation, drug use, economics of crime, regression methodology

    Retained through Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.

    Deposed on May 31, 2019

    Report filed on May 10, 2019


*Lerman v Apple Inc.*
U.S. District Court for the Eastern District of New York

    Putative class action consumer products liability case

    Testimony regarding heterogeneity across putative class members, the nature of products, and conjoint analysis

    Retained through Apple, Inc.

    Deposed on May 29, 2019

    Report filed on April 3, 2019


*Financial Guaranty Insurance Company v Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc.*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained through Morgan Stanley

    Deposed on May 15, 2019

    Report filed on October 19, 2018

*Rebuttal Testimony of Powerex Corp re: BPA Southern Intertie Hourly Rate*
U.S. Department of Energy, Bonneville Power Administration

    Administrative proceeding concerning the rates for transmission of electricity

    Testimony regarding regression methodology

    Retained through Powerex Corp.

    Testimony before the Hearing Officer on April 23, 2019

    Report filed on March 28, 2019


*Financial Guaranty Insurance Company v Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Holdings LLC, Morgan Stanley & Co. LLC, as successor to Morgan Stanley & Co. Inc., Morgan Stanley, and Saxon Mortgage Services, Inc.*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained through Morgan Stanley

    Deposed on January 8, 2019

    Report filed on August 7, 2018


*Trinidad Lopez v Liberty Mutual Insurance Company*
U.S. District Court for the Central District of California

    Wage and hour case after class certification

    Testimony regarding damages and statistics

    Retained through Liberty Mutual

    Report filed on December 21, 2018


*Samsung Electronics Co., Ltd., v Kuroda Electric Co., Ltd., Sakai Display Products Corporation and Sharp Corporation*
International Chamber of Commerce

    Contractual dispute regarding supply of television panels

    Testimony regarding economic theory, data science, statistics

    Retained through Samsung Electronics Co.

    Testified at arbitration hearing on December 20, 2018

    Report filed on September 28, 2018


*In re: Part 60 RMBS Put-Back Litigation*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained through Morgan Stanley Mortgage Capital Holdings LLC

    Deposed on November 27, 2018

    Report filed on June 22, 2018

*In Re: RFC and ResCap Liquidating Trust Litigation*
U.S. District Court for the District of Minnesota and
U.S. Bankruptcy Court for the Southern District of New York

   Mortgage-backed securities case (bankruptcy)

   Testimony regarding sampling, damages, and statistical concepts

   Retained through Advanced Financial Services, BMO Harris Bank, Cadence Bank, Colonial Savings, CTX Mortgage, Decision One, First Guaranty, Freedom Mortgage, Home Loan Center, HSBC Mortgage, Impac Funding, PNC, Provident, Standard Pacific, Synovus, and Universal American

   Testified at jury trial on November 1, 2018 (Minnesota; Home Loan Center)

   Final rebuttal report filed on June 14, 2018

   Deposed on April 24, 2018

   Rebuttal report to supplemental disclosure filed on February 26, 2018

   Report filed on October 27, 2017


*Residential Funding Company v Universal American Mortgage Co.*
U.S. District Court for the District of Minnesota

   Mortgage-backed securities case (bankruptcy)

   Testimony regarding sampling and statistical methods

   Retained through Universal American Mortgage Co.

   Report filed on August 30, 2018


*In re Gateway Plaza Residents Litigation*
Supreme Court of the State of New York, County of New York

   Putative class action regarding warranty of habitability

   Testimony regarding electricity usage, individual preferences and choices, and heterogeneity across putative class members; large scale data analysis

   Retained through Gateway Plaza

   Supplemental class certification and rebuttal report filed on August 8, 2018

   Class certification report filed on September 18, 2017


*United States of America v SavaSeniorCare*
U.S. District Court for the Middle District of Tennessee

   False Claims Act case

   Testimony regarding sampling and statistical methods

   Retained through SavaSeniorCare

   Report filed on August 6, 2018


*Latoya Brown et al. v Madison County, Mississippi*
U.S. District Court for the Southern District of Mississippi

   Putative class action alleging violations of § 1983 and the Fourth and Fourteenth Amendments

   Testimony regarding regression methodologies, measurement error, and data science

   Retained through Latoya Brown et al.

   Report filed on July 2, 2018

Highly Confidential - Outside Counsel/Experts Only

*Martin Dulberg et al. v Uber Technologies, Inc. and Rasier, LLC*
U.S. District Court for the Northern District of California

   Putative class action alleging breach of contract

   Testimony regarding heterogeneity in damages across putative class members

   Retained through Uber Technologies, Inc.

   Supplemental report filed on June 28, 2018

   Affirmative report filed on January 11, 2018


*Tri-City, LLC; Endor Car and Driver, LLC; Zehn-NY, LLC; Zwei-NY, LLC; Abatar, LLC; and Flatiron Transit, LLC v New York Taxi and Limousine Commission and Meera Joshi*
Supreme Court of the State of New York, County of New York

   Article 78 proceeding challenging an administrative ruling

   Testimony regarding mismatch between accessibility regulation and accessibility demand

   Retained through plaintiffs

   Supplemental report filed on May 18, 2018

   Affirmative report filed on April 13, 2018


*Federal Home Loan Bank of Boston, v Ally Financial, Inc., et al.*
Superior Court of the State of Massachusetts, Business Litigation Session, Suffolk County

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained through Morgan Stanley

   Report filed on May 17, 2018


*Cheryl Phipps and Shawn Gibbons v Wal-Mart Stores, Inc.*
U.S. District Court for the Middle District of Tennessee

   Putative class action alleging sex discrimination

   Testimony regarding the decentralized nature of Walmart's internal labor market and concomitant heterogeneity across proposed class members in pay and promotion outcomes

   Retained through Walmart

   Deposed on April 30, 2018

   Report filed on April 20, 2018


*People of the State of California v Morgan Stanley & Co.*
Superior Court of the State of California, County of San Francisco

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained through Morgan Stanley & Co.

   Deposed on February 9, 2018

   Report filed on January 25, 2018


*Tony Dickey and Paul Parmer et al. v Advanced Micro Devices, Inc.*
U.S. District Court for the Northern District of California

   Putative class action alleging false advertising

   Testimony regarding availability of information regarding and market for computer chips and heterogeneity across putative class members

   Retained through Advanced Micro Devices

   Report filed on January 26, 2018

*Federal Home Loan Bank of Chicago v Banc of America Funding Corporation, et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

>    Mortgage-backed securities case

>    Testimony regarding sampling, regression, and statistical methods

>    Retained through Morgan Stanley

>    Deposed on December 14, 2017

>    Report filed on August 21, 2017

*In re Lehman Brothers Holdings, Inc., et al., Debtors*
U.S. Bankruptcy Court for the Southern District of New York

>    Mortgage-backed securities case

>    Testimony regarding sampling, resampling methods for inference, and statistical methods

>    Retained through Lehman Brothers Holdings, Inc.

>    Deposed on October 9, 2017

>    Report filed on August 28, 2017

*Deutsche Bank National Trust Company v Morgan Stanley Mortgage Capital Holdings LLC*
U.S. District Court for the Southern District of New York

>    Mortgage-backed securities case

>    Testimony regarding sampling and statistical methods

>    Retained through Morgan Stanley Mortgage Capital Holdings LLC

>    Deposed on March 27, 2017

>    Report filed on December 16, 2016

*Rosen v Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

>    Putative class action regarding false advertising

>    Testimony regarding economics of safety

>    Retained through Uber Technologies, Inc.

>    Deposed on February 3, 2017

>    Report filed on January 13, 2017

>    Affirmative report filed on December 2, 2016

*Blackrock Allocation Target Shares: Series S Portfolio, et al. v Wells Fargo Bank, N.A.; Royal Park Investments SA/NV v Wells Fargo Bank, N.A., as Trustee; National Credit Union Administration Board, et al. v Wells Fargo Bank, N.A.; Phoenix Light SF Limited, et al. v Wells Fargo Bank, N.A.; and Commerzbank AG v Wells Fargo Bank, N.A.*
U.S. District Court for the Southern District of New York

>    Mortgage-backed securities case

>    Testimony regarding sampling and statistical methods

>    Retained through Wells Fargo Bank

>    Report filed on January 18, 2017

*LA Taxi Cooperative, Inc. et al. v Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

    False advertising case

    Testimony regarding economics of safety

    Retained through Uber Technologies, Inc.

    Report filed on January 13, 2017

    Affirmative report filed on November 18, 2016


*State of Illinois v Hitachi Ltd., et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

    Antitrust price-fixing case

    Testimony regarding liability and damages

    Retained through Hitachi Ltd.

    Report filed on November 11, 2016


*In re: City of San Bernardino, California, Debtor*
U.S. Bankruptcy Court, Central District of California, Riverside Division

    Municipal bankruptcy case

    Testimony regarding economics, econometrics, rare risks and the value of a statistical life

    Retained through the City of San Bernardino

    Report filed on October 3, 2016


*U.S. Bank National Association v Morgan Stanley Mortgage Capital Holdings LLC*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained through Morgan Stanley Mortgage Capital Holdings LLC

    Deposed on September 10, 2016

    Report filed on June 17, 2016


*National Credit Union Administration Board v RBS Securities, Inc.*
U.S. District Court for the Central District of California &
U.S. District Court for the District of Kansas

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained through RBS Securities

    Deposed on January 28, 2016

    Report filed on October 16, 2015


*Temple-Inland, Inc., v Thomas Cook, et al.*
U.S. District Court for the District of Delaware

    Escheat law case

    Testimony regarding sampling, statistical methods, and economic theory

    Retained through the State of Delaware

    Deposed on November 24, 2015

    Report filed on October 23, 2015

*National Consumer Protection Service v Farmacias Cruz Verde S.A. et al.*
Honorable Civil Court of Santiago (Chile)

  Putative class action antitrust case

  Testimony regarding damages methodologies

  Retained through Salcobrand

  Report filed on November 14, 2015

*Douglas O'Connor, et al. v Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

  Putative class action regarding independent contractor versus employee

  Testimony regarding heterogeneity in alleged damages across putative class members, potential for class conflict

  Retained through Uber Technologies, Inc.

  Report filed on October 27, 2015

  Report filed on July 7, 2015

*Students for Fair Admissions, Inc. v President and Fellows of Harvard College*
U.S. District Court for the District of Massachusetts

  Discovery dispute in affirmative action case

  Testimony regarding necessary inputs into statistical methodologies

  Retained through Harvard College

  Report filed on July 30, 2015

*Securities and Exchange Commission v James V Mazzo and David L. Parker*
U.S. District Court for the Central District of California

  Civil insider trading suit

  Testimony regarding probability theory and statistics

  Retained through James V. Mazzo and David L. Parker

  Deposed on May 13, 2015

  Report filed on March 13, 2015

*In re: City of Stockton, California, Debtor*
U.S. Bankruptcy Court, Eastern District of California

  Municipal bankruptcy suit

  Testimony regarding economic theory, labor economics, and econometrics

  Retained through the City of Stockton

  Deposed on March 13, 2013

  Report filed on February 15, 2013

*In the Matter of Act 111 Interest Arbitration Between Commonwealth of Pennsylvania and Pennsylvania State Troopers Association*

  Hearings on wage setting

  Testimony regarding rare risks and the value of a statistical life

  Retained through the Pennsylvania State Troopers Association

  Testified at arbitration hearing on December 4, 2012

  Report filed on December 4, 2012

## Scholarship on Competition

Accounting for the Employee-Employer Relationship in Antitrust Analysis (with Bryan Ricchetti)
*Antitrust Magazine Online*, June 2023

Measuring Benchmark Damages in Antitrust Litigation (with Daniel L. Rubinfeld)
*Journal of Econometric Methods*, Volume 3, January 2014

## Scholarship on Finance

A Fractional Solution to a Stock Market Mystery (with Robert P. Bartlett and Maureen O'Hara)
Working Paper, July 2022

Tiny Trades, Big Questions: Fractional Shares (with Robert P. Bartlett and Maureen O'Hara)
*Journal of Financial Economics*, Forthcoming

The Market Inside the Market: Odd-Lot Quotes (with Robert P. Bartlett and Maureen O'Hara)
*Review of Financial Studies*, Forthcoming

Subsidizing Liquidity with Wider Ticks: Evidence from the Tick Size Pilot Study Timestamps (with Robert P. Bartlett)
*Journal of Empirical Legal Studies*, Volume 17, Issue 2, June 2020

Dark Trading at the Midpoint: Pricing Rules, Order Flow, and Price Discovery (with Robert P. Bartlett)
*Journal of Law, Finance, and Accounting*, Volume 4, Issue 2, 2019

How Rigged Are Stock Markets?: Evidence from Microsecond Timestamps (with Robert P. Bartlett)
*Journal of Financial Markets*, Volume 45, September 2019

Shall We Haggle in Pennies at the Speed of Light or in Nickels in the Dark?: How Minimum Price Variation Regulates High Frequency Trading and Dark Liquidity (with Robert P. Bartlett)
Working Paper, 2015

## Scholarship on Sampling, Statistics, and Econometrics

What To Do If You Can't Use '1.96' Confidence Intervals for IV (with David S. Lee, Marcelo Moreira, Jack Porter, and Luther Yap)
Working paper, 2024

Robust Conditional Wald Inference for Over-Identified IV (with David S. Lee, Marcelo Moreira, Jack Porter, and Luther Yap)
Working paper, 2023

Valid *t*-Ratio Inference for IV (with David S. Lee, Marcelo Moreira, and Jack Porter)
*American Economic Review*, Volume 112, Number 10, October 2022

A Practical Proactive Proposal for Dealing with Attrition: Alternative Approaches and an Empirical Example (with John DiNardo, Jordan Matsudaira, and Lisa Sanbonmatsu)
*Journal of Labor Economics*, Volume 39, Number S2, April 2021

Conservative Tests Under Satisficing Models of Publication Bias (with Garret Christensen and Daniele Fanelli)
*PLOS One*, Volume 11, Number 2, February 22, 2016

New Evidence on the Finite Sample Properties of Propensity Score Matching and Reweighting Estimators (with Matias Busso and John DiNardo)
*Review of Economics and Statistics*, Volume 96, Number 5, December 2014

Incomes in South Africa Since the Fall of Apartheid (with Murray Leibbrandt and James Levinsohn)
*Journal of Globalization and Development*, Volume 1, Issue 1, January 2010

Manipulation of the Running Variable in the Regression Discontinuity Design: A Density Test
*Journal of Econometrics*, Volume 142, Issue 2, February 2008

## Scholarship on Risk and Crime

The Impact of the Coronavirus Lockdown on Domestic Violence (with Sarath Sanga)
*American Law and Economics Review*, Volume 23, Issue 1, Spring 2021

Why We Need Police (with Deepak Premkumar)
Chapter 3 in *The Cambridge Handbook of Policing in the United States*, Tamara Rice Lave and Eric Jr. Miller, eds., Cambridge University Press, June 2019

Are U.S. Cities Underpoliced? Theory and Evidence (with Aaron Chalfin)
*Review of Economics and Statistics*, Volume 100, Issue 1, March 2018, 167–186

Criminal Deterrence: A Review of the Literature (with Aaron Chalfin)
*Journal of Economic Literature*, Volume 55, Number 1, March 2017, 5–48 (lead article)

The Deterrence Effect of Prison: Dynamic Theory and Evidence (with David S. Lee)
*Advances in Econometrics*, Volume 38, 2017, editors Matias D. Cattaneo and Juan Carlos Escanciano
2018 Emerald Literati Award, Outstanding Author Contribution

Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process: An Empirical Inquiry (with Tamara Lave)
*Brooklyn Law Review*, Volume 78, Summer 2013, Number 4, 1391–1439

General Equilibrium Effects of Prison on Crime: Evidence From International Comparisons (with Sarath Sanga)
*Cato Papers on Public Policy*, Volume 2, 2012

*Controlling Crime: Strategies and Tradeoffs* (co-edited with Phil Cook and Jens Ludwig), Chicago: University of Chicago Press, 2011.

## Scholarship on Labor Economics

Unmarked? Criminal Record Clearing and Employment Outcomes (with Jeffrey Selbin (lead author) and Joshua Epstein)
*Journal of Criminal Law and Criminology*, Volume 108, Number 1, 2017 (lead article)

The Effect of Female Education on Fertility and Infant Health: Evidence from School Entry Laws Using Exact Date of Birth (with Heather Royer)
*American Economic Review*, Volume 101, Number 1, February 2011

Comment on "Free to Punish? The American Dream and the Harsh Treatment of Criminals", by Rafael di Tella and Juan Dubra
*Cato Papers on Public Policy*, Volume 1, 2011

Dynamic Perspectives on Crime
in *Handbook of the Economics of Crime*, Chapter 4, Edward Elgar, 2010

The Effect of Court-Ordered Hiring Quotas on the Composition and Quality of Police
*American Economic Review*, Volume 97, Number 1, March 2007

Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Comment
*American Economic Review*, Volume 92, Number 4, September 2002

## Scholarship on Intellectual Property

A Reconsideration of Copyright's Term (with Kristelia A. Garcia)
*Alabama Law Review*, Volume 71, Issue 2, 2019

Copyright and Economic Viability: Evidence from the Music Industry (with Kristelia A. Garcia and James Hicks)
*Journal of Empirical Legal Studies*, Volume 17, Issue 4, December 2020

## Scholarship on Monetary Policy

Following Germany's Lead: Using International Monetary Linkages to Estimate the Effect of Monetary Policy on the Economy (with Julian di Giovanni and Till von Wachter)
*Review of Economics and Statistics*, Volume 91, Number 2, May 2009

## Other Scholarship

The Ph.D. Rises in American Law Schools, 1960-2011: What Does It Mean for Legal Education? (with Joy Milligan and James Phillips)
*Journal of Legal Education*, Volume 65, Number 543, Spring 2016

## Referee

*Econometrica*

*American Economic Review*

*Quarterly Journal of Economics*

*Journal of Political Economy*

*Review of Economic Studies*

*Journal of Econometrics*

*Journal of Economic Literature*

*Review of Economics and Statistics*

*Journal of the American Statistical Association*

*American Economic Journal*

*Advances in Econometrics*

*American Law and Economics Review*

*International Law and Economics Review*

*Journal of Labor Economics*

*Journal of Econometric Methods*

*Industrial and Labor Relations Review*

*Journal of Law and Economics*

*Journal of Empirical Legal Studies*

*Journal of Urban Economics*

*Journal of Quantitative Criminology*

*American Political Science Review*

*American Sociological Review*

*Stanford Law Review*

*Yale Law Journal*

*Columbia Law Review*

APPENDIX A

## Other Activities

2023–    Member, Board of Directors, WayRay AG

2019–21  Member, Board of Directors, Plectica, LLC

2017–19  Member, Board of Directors, American Law and Economics Association

2007–19  Co-Director (with Phil Cook and Jens Ludwig), *Crime Working Group*, National Bureau of Economic Research

2009–14  Co-Director, *Law and Economics Program*, University of California, Berkeley

## Courses Taught

### *Columbia*

2023-24  L6293: Antitrust and Trade Regulation (Fall); L8856: Antitrust at Trial (Fall); L6916: Litigation, Economics, and Statistics (Spring); L6231: Corporations (Spring)

2022-23  L6293: Antitrust and Trade Regulation (Spring); L6916: Litigation, Economics, and Statistics (Spring)

2021-22  L6231: Corporations (Fall); L6916: Litigation, Economics, and Statistics (Fall); L6293: Antitrust and Trade Regulation (Spring)

2020-21  L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2019-20  L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall)

2018-19  L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2017-18  L6231: Corporations (Fall)

### *Berkeley*

2016-17  Law 244.4: Litigation and Statistics (Fall); Law 216: Law and Economics Workshop (Fall); Law 218.6: Law and Economics of Discrimination (Fall)

2015-16  Law 250: Business Associations (Fall); Law 244.4: Litigation and Statistics (Fall); Letters and Science 39D: Race, Policing, and Data Science (Fall)

2014-15  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer)

2013-14  Law 250S: Business Associations (Summer)

2012-13  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall)

2011-12  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall); Law 251.31: Introduction to Law, Economics, and Business (Spring); Legal Studies 145: Law and Economics I (undergraduate)

2010-11  Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 216: Law and Economics Workshop (Fall and Spring); Legal Studies 145: Law and Economics I (undergraduate); Law 209.6: Topic in Quantitative Methods (JSP); Econ 250C: Labor Economics (graduate, shared course with 209.6)

2009–10  Law 216: Law and Economics Workshop (Fall and Spring); Law 209.32: Quantitative Methods II (JSP)

2008–09  Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP); Law 209.32: Quantitative Methods II (JSP)

2007–08  Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP)

**Highly Confidential - Outside Counsel/Experts Only**

*Michigan*

Introduction to Quantitative Methods (policy), First Econometrics Field Course (economics), Advanced Economic Theory (policy)

## Grants and Fellowships

2007–2010 NIH, Constructive Proposals for Dealing With Attrition (with John DiNardo)

2009 Committee on Research, Junior Faculty Research Grant, UC Berkeley

2006–2009 NIH, The Effect of Female Education on Fertility and Infant Health (with Heather Royer, Grant # R03 HD051713)

2006–2011 NSF, New Instrumental Variables Estimates of the Effects of Schooling and Military Service: Empirical Strategies Using Non-Public-Use Data (with Josh Angrist and Stacey Chen)

2005 RWJ Foundation Health and Society Scholars Program, Small Grant Program

2004 Rackham Interdisciplinary Grant, University of Michigan

2004 CLOSUP Grant, University of Michigan

2004 National Poverty Center Grant, University of Michigan

2002–2003 Chancellor's Dissertation Year Fellowship, UC Berkeley

## Presentations

2023–2024 Columbia University, Department of Economics; Columbia University, School of Law

2022–2023 Northwestern University, School of Law

2018–2019 Columbia University, School of Law; Conference on Empirical Legal Studies, University of Michigan

2017–2018 Columbia University, School of Law; Georgetown University, School of Law

2016–2017 George Mason University, School of Law; University of Michigan, Economics Department (Summer, Fall); Equities Leaders Summit; University of Zürich, Department of Economics; ETH (Swiss Federal Institute of Technology) Zürich, Law and Economics; Northwestern University, School of Law; Duke University, School of Law; Duke University, Information Initiative

2015–2016 Goldman Sachs; University of California, Berkeley, School of Law; University of Virginia, School of Law; University of California, Irvine; Equal Employment Opportunity Commission; National Bureau of Economic Research, Summer Institute

2014–2015 Duke University; Federal Reserve Bank of New York; Equal Employment Opportunity Commission (EEO-DataNet); American Law and Economics Association (discussant); New York University (NYU / Penn Law and Finance Conference); National Bureau of Economic Research, Summer Institute (discussant)

2013–2014 University of Southern California, School of Law; London School of Economics; Bank of Spain; CEMFI; Carlos III; University of Zaragoza; University of Rotterdam; University of Maastricht; University of Götenborg

2012–2013 University of California, Los Angeles, School of Law

2011–2012 University of Oregon, Department of Economics; University of British Columbia, Department of Economics; Brown University, Department of Economics; University of Rochester, Department of Economics; Cato Institute; National Bureau of Economic Research, Summer Institute; Harvard Law School

2010–2011 Northwestern, School of Law; University of Wisconsin, Department of Economics; Brookings Institution; Cato Institute

2009–2010    University of Chicago, School of Law; Cornell University, School of Law and Department of Economics; University of Michigan, School of Law and Department of Economics; University of Virginia, School of Law, Olin Conference

2008–2009    University of California, Los Angeles, School of Law; University of Arizona, School of Law and Department of Economics; Stanford University, School of Law and Department of Economics; University of Miami, Department of Economics

2007–2008    Northwestern University, School of Law; University of Michigan, Department of Economics; National Bureau of Economic Research, Summer Institute; Florida State University

*Prior to 2007–2008, presentations are at departments of economics, unless otherwise noted*

2006–2007    University of Michigan, Program in Survey Methodology; Public Policy Institute of California; Brown University

2005–2006    University of Michigan; University of California, Irvine; University of California, Santa Barbara; University of California, Santa Cruz; California State University, Long Beach; University of Western Ontario; University of Toronto; University of Illinois, Chicago; University of Chicago, Graduate School of Business; APPAM; University of Florida; University of California, Berkeley, School of Law; Princeton University; RAND; Hebrew University (conference in honor of Reuben Gronau); Stanford University, University of Wisconsin, Madison; Northwestern University; Crime and Economics Summer Workshop, University of Maryland

2004–2005    Federal Reserve Bank of Chicago; University of Illinois, Urbana-Champaign; University of Michigan, William Davidson Institute; University of Maryland; Urban Institute; American Economics Association Meetings; City University of New York Health Economics Seminar; University of Wisconsin, Madison; Stanford University; University of California, Davis; University of California, Berkeley, Labor Lunch; NBER Summer Institute, Education/Labor Studies

2003–2004    University of Michigan; APPAM; NBER Labor Studies Meeting (Fall); Massachusetts Institute of Technology; Harvard University, Kennedy School; University of California, Los Angeles; University of California, San Diego; Columbia University; University of California, Berkeley; NBER Summer Institute, Monetary Policy; NBER Summer Institute, Labor Studies

2002–2003    University of California, San Diego; University of California, Los Angeles; RAND Institute; University of Chicago, Graduate School of Business; University of Chicago, Harris School of Public Policy; University of Michigan, Ford School of Public Policy; Columbia University; Dartmouth College; Federal Reserve Bank of New York; Boston University

Last updated: April 14, 2025

Highly Confidential - Outside Counsel/Experts Only

**APPENDIX B: Documents Relied Upon**

# Documents Relied Upon

### Academic Articles

- A. C. Harvey, "On Comparing Regression Models in Levels and First Differences," *International Economic Review*, 21(3), 1980, pp. 707–720

- Abigail Wozniak, "Are College Graduates More Responsive to Distance Labor Market Opportunities?" *Journal of Human Resources*, 45(4), 2010, pp. 944–970

- Alberto Abadie, Susan Athey, Guido Imbens, and Jeffrey Wooldridge, "When Should You Adjust Standard Errors for Clustering?" *The Quarterly Journal of Economics*, 138(1), 2023, pp. 1–35

- Alexandre Mas, "Does Transparency Lead to Pay Compression," *Journal of Political Economy*, 125(5), 2017, pp. 1683–1721

- Barry Gerhart, "Voluntary Turnover and Alternative Job Opportunities," *Journal of Applied Psychology*, 75(5), 1990, pp. 467–476

- Bruce Fallick, Daniel Villar, and William Wascher, "Downward Nominal Wage Rigidity in the United States in Times of Economic Distress and Low Inflation," *Labour Economics*, 78, 2022, pp. 1–12

- Charles F. Manski, "Identification of Endogenous Social Effects: The Reflection Problem," *The Review of Economic Studies,* 60(3), 1993, pp. 531–542

- Christine L. Exley, Muriel Niederle, and Lise Vesterlund, "Knowing When to Ask: The Cost of Leaning In," *Journal of Political Economy*, 128(3), 2020, pp. 816–854

- Christopher N. Boyer and B. Wade Brorsen, "Changes in Beef Packers' Market Power After the Livestock Mandatory Price Reporting Act: An Agent-Based Auction," *American Journal of Agricultural Economics*, 95(4), 2013, pp. 859–876

- David Arnold, Simon Quach and Bledi Taska, "The Impact of Pay Transparency in Job Postings on the Labor Market," 2024

- David Blumenthal "Employer-Sponsored Health Insurance in the United States — Origins and Implications," *The New England Journal of Medicine Health Policy*, 355(1), 2006, pp. 82–88

- David E. Wildasin, "Labor-Market Integration, Investment in Risky Human Capital, and Fiscal Competition," *American Economic Review*, 90(1), 2000, pp. 73–95

APPENDIX B

- David H. Autor, Frank Levy and Richard J. Murnane, "The Skill Content of Recent Technological Change: An Empirical Exploration," *The Quarterly Journal of Economics*, 118(4), 2003, pp. 1279–1333

- Douglas L. Miller, "An Introductory Guide to Event Study Models," *Journal of Economic Perspectives*, 37(2), 2023, pp. 203–230

- Edward Lazear, "Why Is There Mandatory Retirement?" *Journal of Political Economy*, 87(6), 1973, pp. 1261–1284

- Edward P. Lazear and Kathryn L. Shaw, "Personnel Economics: The Economist's View of Human Resources," *Journal of Economic Perspectives*, 21(4), 2007, pp. 91–114

- Edward P. Lazear and Sherwin Rosen, "Rank-Order Tournaments as Optimum Labor Contracts," *Journal of Political Economy*, 89(5), 1981, pp. 841–864

- Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80(4), 1980, pp. 702–736

- George A. Akerlof, William T. Dickens, George L. Perry, Robert J. Gordon and N. Gregory Mankiw, "The Macroeconomics of Low Inflation," *Brookings Papers on Economic Activity*, 1996, pp. 1–76

- George W. Douglas and James C. Miller III, "Quality Competition, Industry Equilibrium, and Efficiency in the Price-Constrained Airline Market," *American Economic Review*, 64(4), 1974, pp. 657–669

- George-Levi Gayle and Robert A. Miller, "Has Moral Hazard Become a More Important Factor in Managerial Compensation," *American Economic Review*, 99(5), 2009, pp. 1740–1769

- Jonathan B. Baker, "The Case for Antitrust Enforcement," *Journal of Economic Perspectives*, 17(4), 2003, pp. 27–50

- Jonathan Roth, Pedro H.C Sant'Anna, Alyssa Bilinski and John Poe, "What's Trending in Difference-in-Differences? A Synthesis of The Recent Econometrics Literature," *Journal of Econometrics,* 235, 2023, pp. 2218–2244

- Justin Marion and Erich Muehlegger, "Measuring Illegal Activity and the Effects of Regulatory Innovation: Tax Evasion and the Dyeing of Untaxed Diesel," *Journal of Political Economy*, 116(4), 2008, pp. 633–666

- Kurt Lavetti, Carol Simon and William D. White, "The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians," *Journal of Human Resources*, 55(3), 2020, pp. 1025–1067

- Luigi Guiso, Luigi Pistaferri and Fabiano Schivardi, "Insurance Within the Firm," *Journal of Political Economy*, (2005), pp 1054–1087

- Luis Garicano and Esteban Rossi-Hansberg, "Organization and Inequality in a Knowledge Economy," *The Quarterly Journal of Economics*, 121(4), 2006, pp. 1383–1435

- Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature*, 44 (1), 2006, pp. 43–95

- Matt Bloom and John G. Michel, "The Relationships Among Organizational Context, Pay Dispersion, and Managerial Turnover," *The Academy of Management Journal*, 45(1), 2002, pp. 33–42

- Michael Baker, Yosh Halberstam, Kory Kroft, Alexandre Mas and Derek Messacar, "Pay Transparency and the Gender Gap," *American Economic Journal: Applied Economics*, 15(2), 2023, pp. 157–183

- Norman D. Bishara and Evar Starr, "The Incomplete Noncompete Picture," *Lewis & Clark Law Review*, 20(2), 2016, pp. 497–546

- Serdar Aldatmaz, Paige Ouimet, and Edward D. Van Wesep, "The Option to Quit: The Effect of Employee Stock Options on Turnover," *Journal of Financial Economics*, 127(1), 2018, pp. 136–151

- Steven Balsam, Richard Gifford, and Sungsoo Kim, "The Effect of Stock Option Grants on Voluntary Turnover," *Review of Accounting and Finance*, 6(1), 2007, pp. 5–14

- Thomas Lemieux, "Increasing Residual Wage Inequality: Composition Effects, Noisy Data, or Rising Demand for Skill?" *American Economic Review*, 96(3), 2006, pp. 461–498

- Tomasz Obloj and Todd Zenger, "The Influence of Pay Transparency on (Gender) Inequity, Inequality and the Performance Basis of Pay," *Nature Human Behavior*, 6, 2022, pp. 646–655

- Truman F. Bewley, "A Depressed Labor Market as Explained by Participant," *American Economics Review*, 85(2), 1995, pp. 250–254

- Truman F. Bewley, "Why Not Cut Pay?" *European Economic review*, 42, 1998, pp. 459–490

- Zoe B. Cullen, Shengwu Li and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," *National Bureau of Economic Research*, 2024

**Bates Stamped Documents**

- BF000233732
- DOJCIV-009-00000032–37
- DVA_OMCEAL_000000041
- DVA_OMCEAL_000011812–22
- DVA_OMCEAL_000289410–15
- DVA_OMCEAL_000296081–088
- DVA_OMCEAL_000538771–803
- DVA_OMCEAL_000760685–699
- DVA_OMCEAL_000906132–35
- DVA_OMCEAL_000946317–20
- DVA_OMCEAL_000994610–16
- DVA_OMCEAL_001057524–25
- DVA_OMCEAL_001059650–52
- DVA_OMCEAL_001062957–61
- DVA_OMCEAL_001090817–29
- DVA_OMCEAL_001096793–809
- DVA_OMCEAL_001150350–51
- DVA_OMCEAL_001181143–65
- DVA_OMCEAL_001294747–50
- DVA_OMCEAL_001296546–49
- DVA_OMCEAL_001297898–900
- DVA_OMCEAL_001313820–23
- DVA_OMCEAL_001313824–27
- DVA_OMCEAL_001317525–27
- DVA_OMCEAL_001322030–34
- DVA_OMCEAL_001329256–61
- DVA_OMCEAL_001339898–901
- DVA_OMCEAL_001344570–82
- DVA_OMCEAL_001358600–02
- DVA_OMCEAL_001360570–622
- DVA_OMCEAL_001382483–86
- DVA_OMCEAL_001399746–74
- HAYEK-000012214–16
- KEECH_000000339
- OMC_BM_000000884–95
- OMC_BM_000010778–79
- OMC_BM_000014729
- SCA000000198–200
- SCA000001836–47
- SCA000002891–908
- SCA000003962
- SCA000003963–70
- SCA00004815–17
- SCA000065974–84
- SCA000071259–65
- SCA000075527–28
- SCA000078353
- SCA000079723–41
- SCA000091011
- SCA000098450–52
- SCA000100169–72
- SCA000100643–46

- SCA000106045–47
- SCA000109831–37
- SCA000111304
- SCA000128921
- SCA000163727
- SCA000227468–70
- SCA000393815–25
- SCA000523268–72
- SCA000532931–33
- SCA000545210–245
- SCA000549141–48
- SCA000550887
- SCA000568874–75
- SCA000608681–82
- SCA000640388–509
- SCA000641812
- SCA000838956
- SCA000841643–47
- SCA000844623–24
- SCA000861824
- SCA000900508–10
- SCA001117010–13
- SCA001125179–82
- SCA001129757–58
- SCA001153473–74
- SCA001159728–48
- SCA001185620–32
- SCA001186824–25

- SCA001198974–77
- SCA001200665–66
- SCA001279742–825
- SCA001280928–79
- SCA001284417–18
- SCA001437481–82
- SCA001478736
- SCA001613450
- SCA001669270
- SCA001669826
- SCA001773262
- SCA002220548–52
- SCA002220553–54
- SCA002270032–35
- SPRAD000014–15
- USPI_ CIV_000239009–12
- USPI_CIV_000000190–227
- USPI_CIV_000001734–35
- USPI_CIV_000001791
- USPI_CIV_000003394
- USPI_CIV_000006432
- USPI_CIV_000016019–20
- USPI_CIV_000016522
- USPI_CIV_000021155
- USPI_CIV_000021165
- USPI_CIV_000021166
- USPI_CIV_000021178
- USPI_CIV_000021255

Highly Confidential - Outside Counsel/Experts Only

APPENDIX B

- USPI_CIV_000021897–98
- USPI_CIV_000021899–904
- USPI_CIV_000021906
- USPI_CIV_000021907
- USPI_CIV_000022791–811
- USPI_CIV_000023128–133
- USPI_CIV_000023134–45
- USPI_CIV_000024141
- USPI_CIV_000024185
- USPI_CIV_000026215–216
- USPI_CIV_000026240
- USPI_CIV_000027565
- USPI_CIV_000030396–99
- USPI_CIV_000034853–54
- USPI_CIV_000035655
- USPI_CIV_000036006
- USPI_CIV_000036736–37
- USPI_CIV_000037627–29
- USPI_CIV_000037954
- USPI_CIV_000038254–55
- USPI_CIV_000039709–10
- USPI_CIV_000039752–53
- USPI_CIV_000039754
- USPI_CIV_000040029
- USPI_CIV_000040585–87
- USPI_CIV_000041645–56
- USPI_CIV_000044404–405
- USPI_CIV_000044881–83

- USPI_CIV_000045211–12
- USPI_CIV_000045232–33
- USPI_CIV_000055047–48
- USPI_CIV_000056611–43
- USPI_CIV_000064623–27
- USPI_CIV_000064628
- USPI_CIV_000068808–21
- USPI_CIV_000095479–80
- USPI_CIV_000099574
- USPI_CIV_000113335
- USPI_CIV_000121836–40
- USPI_CIV_000142589–90
- USPI_CIV_000147704–706
- USPI_CIV_000152743
- USPI_CIV_000192177–78
- USPI_CIV_000212779–80
- USPI_CIV_000214746
- USPI_CIV_000227267
- USPI_CIV_000231289
- USPI_CIV_000235807
- USPI_CIV_000242488
- USPI_CIV_000244825
- USPI_CIV_000272179–182
- USPI_CIV_000274099
- USPI_CIV_000295492
- USPI_CIV_000301109–10
- USPI_CIV_000314724
- USPI_CIV_000336479

Highly Confidential - Outside Counsel/Experts Only

- USPI_CIV_000336973–85
- USPI_CIV_000337004
- USPI_CIV_000338903–04
- USPI_CIV_000376500–06
- USPI_CIV_000401250–54
- USPI_CIV_000432243–54
- USPI_CIV_000441337–39
- USPI_CIV_000446798–99
- USPI_CIV_000452281–283
- USPI_CIV_000457557–60
- USPI_CIV_000467447–60
- USPI_CIV_000473082–83
- USPI_CIV_000499023–24
- USPI_CIV_000563699–700

- USPI_CIV_000601224–29
- USPI_CIV_000620051–67
- USPI_CIV_000650633–36
- USPI_CIV_000689431
- USPI_CIV_000701723
- USPI_CIV_000714194–95
- USPI_CIV_000752863–64
- USPI_CIV_000755571–72
- USPI_CIV_000764198–99
- USPI_CIV_000810697
- USPI_CIV_000890968–76
- USPI_CIV_000900796–801
- USPI_CIV_000962509

## Books

- A. Colin Cameron and Pravin K. Trivedi, *Microeconometrics: Methods and Applications*, (New York, NY: Cambridge University Press, 2005)

- ABA Antitrust Section: American Bar Association, *Econometrics: Legal, Practical and Technical Issues*, Second Edition (Chicago: ABA Publishing, 2014)

- ABA Antitrust Section: American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition (Chicago: ABA Publishing, 2017)

- Alan Manning, "The Elasticity of the Labor Supply Curve to an Individual Firm," in *Monopsony in Motion,* (Princeton University Press, 2003), pp. 80–114

- Barry Gerhart, Jerry Newman and George Milkovich, *Compensation ISE*, (McGraw-Hill Education, 2022)

- Daniel Rubinfeld, "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, (Washington, D.C.: The National Academies Press, 2011), pp. 305–357

APPENDIX B

- David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, (Washington, D.C.: The National Academies Press, 2011), pp. 213–302

- Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, (Essex, England: Pearson Education Limited, 2015)

- Edward P. Lazear and Paul Oyer, "Personnel Economics," in *The Handbook of Organizational Economics*, ed. Robert Gibbons and John Roberts (Princeton, N.J: Princeton University Press, 2013), pp. 479–519

- Erik Brynjolffson and Andrew McAfee, *The Second Machine Age*, (New York, NY: W. W. Norton & Company, 2014)

- Henry S. Farber, "Mobility and Stability: The Dynamics of Job Change in Labor Markets," in *Handbook of Labor Economics*, Volume 3, ed. O. Ashenfelter and D. Card (Amsterdam, Netherlands: Elsevier Science B.V., 1999), pp. 2439–2483

- Jeffrey M. Wooldridge, *Introductory Econometrics*, (Mason, OH: South-Western Cengage Learning, 2009)

- Louis Kaplow and Carl Shapiro, "Antitrust," in *Handbook of Law and Economics*, Volume 2, pp. 1077–1225

- Sherwin Rosen, "Does the Composition of Pay Matter," in *Employee Benefits and Labor Markets in Canada and the United States*, (Kalamazoo, MI: W.E. Upjohn Institute, 2000), pp. 13–30

- Theon van Dijk and Frank Verboven, "Quantification of Damages," in *3 Issues in Competition Law and Policy*, (ABA Section of Antitrust Law, 2008), pp. 2331–2348

**Data**

- Bureau of Labor Statistics Job Openings and Labor Turnover Survey Data

- DaVita Equity Grant Data
  - DVA_OMCEAL_001408533
  - DVA_OMCEAL_001408536
  - DVA_OMCEAL_001408539
  - DVA_OMCEAL_001408542–43
  - DVA_OMCEAL_001408547

- DaVita Payroll Data

- o DVA_OMCEAL_000000029–45
- o DVA_OMCEAL_000902589–91
- o DVA_OMCEAL_001182111
- o DVA_OMCEAL_001408544
- DaVita Teammate Data
  - o DVA_OMCEAL_001421632–35
- Hashed SSN Data
  - o "Highly Confidential - Outside Counsel Experts Only_SCA Hashed SSNs.xlsx"
  - o "SCA - Structured00000005.xlsx"
  - o "SCA - Structured00000013.xlsx"
  - o "SCA-Structured00000012_Highly Confidential–Outside Counsel Experts Only.xlsx"
  - o DVA_OMCEAL_000000047
  - o DVA_OMCEAL_001408550
  - o DVA_OMCEAL_001421640
  - o DVA_OMCEAL_001421733
- Lightcast Data
- NAICS Association Data
- Prof. Starr's Data
- SCA Payroll Data
  - o "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data.xlsx"
  - o "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions.xlsx"
  - o "CheckSumm_Highly Confidential-Outside Counsel, Experts Only"
  - o "CheckSummHE_ Highly Confidential-Outside Counsel, Experts Only.csv"
  - o "Eemploy_ Highly Confidential-Outside Counsel, Experts Only.csv"
  - o "Ejob_ Highly Confidential-Outside Counsel, Experts Only.csv"

- o "Highly Confidential - Outside Counsel Experts Only_Check History Hours and Earnings.xlsx"
  - o "Highly Confidential - Outside Counsel Experts Only_Teammate Roster Point In Time.xlsx"
  - o "Highly Confidential - Outside Counsel Experts Only_Termed in 2021.xlsx"
  - o "SCA-Structured00000007_Highly Confidential—Outside Counsel Experts Only.xlsx"
  - o "SCA-Structured00000009_Highly Confidential—Outside Counsel Experts Only.xlsx"
  - o "SCA-Structured00000010_Highly Confidential—Outside Counsel Experts Only.xlsx"
  - o "SCA-Structured00000011_Highly Confidential—Outside Counsel Experts Only.xlsx"
- Tenet Payroll Data
  - o USPI_CIV_000659234
  - o USPI_CIV_001168726
- USPI Payroll Data
  - o "2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions.xlsx"
  - o "2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes.xlsx"
  - o "4.19.24 Paygroup location.xlsx"
  - o "Exhibit A_Paygroup_Location.xlsx"
  - o "Exhibit B_ERNCD Values.xlsx"
  - o USPI_CIV_000021819
  - o USPI_CIV_00065922—33

## Depositions

- Deposition of Allen Spradling (Named Plaintiff), July 18, 2024
- Deposition of Andrew Johnston (USPI), September 6, 2024
- Deposition of Andrew Patrick Hayek (SCA), September 18, 2024

- Deposition of Anthony Kilgore (SCA), October 22, 2024
- Deposition of Anthony Martin (USPI), June 27, 2024
- Deposition of Barry Gerhart, Ph.D., March 5, 2025
- Deposition of Bill Wilcox (USPI), September 24, 2024
- Deposition of Brian Todd Mathis (SCA), September 20, 2024
- Deposition of Bridget A. Fanning. Ph.D. (SCA), July 17, 2024
- Deposition of Cindy English, Volume I (USPI), June 12, 2024
- Deposition of Clare Metcalf (Russell Reynolds), August 14, 2024
- Deposition of Colleen Arthur (DaVita), May 23, 2024
- Deposition of Evan P. Starr, Ph.D., Volume I, March 19, 2025
- Deposition of Evan P. Starr, Ph.D., Volume II, March 20, 2025
- Deposition of Javier Rodriguez (DaVita), August 12, 2024
- Deposition of Jennifer Sandoz, Volume I (SCA), September 26, 2024
- Deposition of Jennifer Simmons-Duggan (SCA), October 25, 2024
- Deposition of Jimmy Tanner (Catapult Staffing), July 31, 2024
- Deposition of John Schultz (Russell Reynolds and Spencer Stuart), November 19, 2024
- Deposition of Joseph T. Clark (SCA), September 11, 2024
- Deposition of Kent Thiry (DaVita), August 16, 2024
- Deposition of Kevin Zaideman (SCA), December 18, 2024
- Deposition of Kristen DesPalmes (DaVita), May 21, 2024
- Deposition of Leslie Wachsman (SCA), May 22, 2024
- Deposition of Mark Garvin (USPI), May 30, 2024
- Deposition of Mark Kopser, Volume I (USPI), December 12, 2024
- Deposition of Michael D. Staffieri (DaVita), April 5, 2024
- Deposition of Michael Loiacano (Heidrick), June 28, 2024
- Deposition of Michael Rucker (SCA), August 27, 2024
- Deposition of Peter Clemens (SCA), May 2, 2024
- Deposition of Robert Chipman (DaVita), August 7, 2024

- Deposition of Sandi Karrmann (USPI), August 14, 2024
- Deposition of Scott Keech (Named Plaintiff), August 22, 2024
- Deposition of Shannon McGarry (USPI), June 11, 2024
- Deposition of Shannon Mosley (USPI), August 13, 2024
- Deposition of Steven Priest (DaVita), November 5, 2024
- Deposition of Warren Joseph Cinnick (SCA), November 22, 2024

## Expert Reports and Backup Materials

- Amended Expert Witness Report of Dr. Barry S. Gerhart, February 11, 2025, and Backup Materials
- Amended Expert Witness Report of Dr. Evan P. Starr, January 21, 2025, and Backup Materials

## Industry Reports

- Paul Fronstin, "Testimony to the House Committee on Education and The Workforce on behalf of the Employee Benefit Research Institute," *Employee Benefit Research Institute*, September 10, 2024, available at https://edworkforce.house.gov/uploadedfiles/9.10.24_help_hearing_on_eris a_anniversary_fronstin_testimony.pdf
- Sebastian Heise, Jeremy Pearce, and Jacob Weber, "Wage Growth and Labor Market Tightness," *FRB of New York Staff Report No. 1128*, March 2025, available at https://ssrn.com/abstract=4980503, accessed on April 11, 2025, pp. 1–45
- U.S Government Accountability Office, "Noncompete Agreements: Use Is Widespread to Protect Business' Stated Interests, Restricts Job Mobility and May Affect Wages," May 11, 2023, available at https://www.gao.gov/products/gao-23-103785

## Legal Documents

- Consolidated Amended Class Action Complain, *In Re Outpatient Medical Center Employee Antitrust Litigation*, August 9, 2021
- Indictment, *United States of America v. DaVita Inc. and Kent Thiry*, November 3, 2021
- Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings*, LLC, January 5, 2021

- Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024

- Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, June 6, 2023

- Trial Tr., *United States v. DaVita,* No. 21-cr-00229-RBJ (D. Colo. Apr. 6, 2022)

- Trial Tr., United States v. DaVita, No. 21-cr-00229-RBJ (D. Colo. Apr. 7, 2022)

## Letters

- Letter from Julia B. Bates (King & Spalding) to Sarah D. Zandi (Lieff Cabraser Heimann & Bernstein), "Re: In re Outpatient Medical Center Employee Antitrust Litig., N.D. Ill. 1:21-cv-000305," December 12, 2024

- Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph Saveri (Joseph Saveri Law Firm Inc.) et al., "Re: In Re Outpatient Medical Center Antitrust Litigation, Case No 1:21-cv-00305," May 14, 2023

## Public Press and other Web Content

- "Total Renal Care Holdings, Inc. Announces Legal Name Change to DaVita Inc.," DaVita, October 9, 2000, available at https://investors.davita.com/2000-10-04-Total-Renal-Care-Holdings-Inc-Announces-Legal-Name-Change-to-DaVita-Inc, accessed on April 10, 2025

- Avaya, "What We Do: Avaya Empowers CX Innovation Without Disrupting Your Business," available at https://www.avaya.com/en/, accessed on April 2, 2025

- Bank of America, "Our Company," available at https://about.bankofamerica.com/en/our-company, accessed on April 2, 2025

- Centers for Disease Control, "About the Data: American Community Survey," May 15, 2024, available at https://www.cdc.gov/vision-health-data/data-sources/american-community-survey.html, accessed on February 23, 2025

- Centers for Disease Control, "CDC Museum COVID-19 Timeline," July 8, 2024, available at https://www.cdc.gov/museum/timeline/covid19.html, accessed on February 23, 2025

- Centers for Disease Control, "COVID-19 Vaccination Coverage Among Adults — United States, December 14, 2020–May 22, 2021," June 25, 2021, available

at https://www.cdc.gov/mmwr/volumes/70/wr/mm7025e1.htm, accessed on February 27, 2025

- CNBC, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," *CNBC,* January 8, 2007, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 10, 2025

- DaVita, "DaVita Closes Gambro Healthcare Acquisition," Oct. 5, 2005, available at https://investors.davita.com/2005-10-05-DaVita-Closes-Gambro-Healthcare-Acquisition, accessed on April 15, 2025

- DaVita, "Director, Corporate Strategy Job in 2000 16th Street, Denver, CO 80202 | Leadership & Supervisor Jobs at DaVita," February 13, 2025, available at https://careers.davita.com/job/R0378916/Director-Corporate-Strategy, accessed on April 8, 2025

- DaVita, "Notice of Annual Meeting of Stockholders," June 15, 2009, available at https://filecache.investorroom.com/mr5ir_davita/185/DaVita_Proxy09_Final_2.pdf, accessed on April 16, 2025

- DaVita, "Senior Director, Finance Job in 2000 16th Street, Denver, CO 80202 | Leadership & Supervisor Jobs at DaVita," March 26, 2025, available at https://careers.davita.com/job/R0397738/Senior-Director-Finance, accessed on April 8, 2025

- Department of Children & Family Services, "About Us: Franklin Foundation Hospital," available at https://www.dcfs.louisiana.gov/directory/office/9047, accessed on April 2, 2025

- Fidelity Investments, "How Equity Compensation and Stock Purchase Plans Are Taxed," available at https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/fidelity/equity-compensation-tax-treatment-guidelines.pdf, accessed on April 11, 2025

- GlobeNewsWire, "Surgical Care Affiliated Announces Closing of its Initial Public Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares," November 4, 2013, available at https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-to-Purchase-Additional-Shares.html, accessed on April 10, 2015

- GlobeNewsWire, "Surgical Care Affiliates (SCA), OptumCare to Combine," January 9, 2017, available at https://www.globenewswire.com/news-

release/2017/01/09/904294/28633/en/Surgical-Care-Affiliates-SCA-OptumCare-to-Combine.html, accessed on April 10, 2025

- Google Maps, "Montgomery, Alabama to Lexington, Kentucky," available at https://www.google.com/maps/dir/Montgomery+alabama/lexington+kentucky/, accessed on April 2, 2025

- Google Maps, "Santa Clara, California to San Francisco, California," available at https://www.google.com/maps/dir/santa+clara/san+francisco/, accessed on April 2, 2025

- HCA Midwest Health: Surgicenter of Johnson County, "About Surgicenter of Johnson County: Welcome to Surgency of Johnson County," available at https://surgicenterjc.com/, accessed on April 2, 2025

- Hubert Janicki, "From Great Resignation to Great Reshuffling: How the COVID-19 Pandemic Prompted More People to Change Jobs," *U.S. Census Bureau*, May 13, 2024, available at https://www.census.gov/library/stories/2024/05/great-reshuffling.html, accessed on March 22, 2025

- Intuit Quickbooks, "Payroll Records: What Are They and Why Do You Need Them?" January 22, 2020, available at https://quickbooks.intuit.com/r/payroll/payroll-records/, accessed on April 11, 2025

- IPUMS USA, "INCWAGE: Wage and Salary Income," available at https://usa.ipums.org/usa-action/variables/INCWAGE#questionnaire_text_section, accessed on February 23, 2025

- Kaiser Permanente, "What is Kaiser Permanente," available at https://healthy.kaiserpermanente.org/learn/what-is-kaiser-permanente, accessed on April 13, 2025

- Kathleen O'Toole, "Enrico Moretti: The Geography of Jobs," *Insights by Stanford Business,* June 10, 2013, available at https://www.gsb.stanford.edu/insights/enrico-moretti-geography-jobs, accessed on April 2, 2025

- Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 12, 2025

- LinkedIn, "Andrew Boyink," available at https://www.linkedin.com/in/andrewboyink/, accessed on April 10, 2025

- LinkedIn, "Naomi Kruger," available at https://www.linkedin.com/in/naomi-kruger-74986420/, accessed on February 26, 2025

- LinkedIn, "Stephanie A. Phillips," available at https://www.linkedin.com/in/stephanie-a-phillips-651913, accessed on February 26, 2025

- Mars Veterinary Health, "Who We Are," available at https://marsveterinary.com/who-we-are/, accessed on April 2, 2025

- McKinsey, "McKinsey & Company About us," available at https://www.mckinsey.com/about-us/overview, accessed on April 15, 2025

- Michael Bloom, "Competition Matters: Information Exchange: Be Reasonable," *Federal Trade Commission*, December 11, 2014, https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable, accessed on April 3, 2025

- NAICS Association, "NAICS Code Description 6214 — Outpatient Care Centers," available at https://www.naics.com/naics-code-description/?code=6214, accessed on April 3, 2025

- Navigant, "Guidehouse," available at https://www.navigant.com/, accessed on April 2, 2025

- Reuters, "HealthSouth to Sell Surgery Unit for $945 Mln," August 9, 2007, available at https://www.reuters.com/article/business/healthsouth-to-sell-surgery-unit-for-945-mln-idUSN26342795/, accessed on April 15, 2025

- Richard E. Schumann, "Compensation from World War II Through the Great Society," *U.S Bureau of Labor Statistics: Compensation and Working Conditions*, January 30, 2003, available at https://www.bls.gov/opub/mlr/cwc/compensation-from-world-war-ii-through-the-great-society.pdf, accessed on April 16, 2025

- SCA, "CEO - Gladiolus Surgery Center in Ft Myers, Florida | SCA Health," available at https://careers.sca.health/jobs/38935?lang=en-us, accessed on April 8, 2025

- SCA, "Director Operations in United States | SCA Health," available at https://careers.sca.health/jobs/39469?lang=en-us, accessed on April 8, 2025

- TekSystems, "IT and Business Services," available at https://www.teksystems.com/en/it-and-business-services, accessed on April 2, 2025

- Tenet Health, "Tenet Completes Purchase of USPI from WCAS," April 26, 2018, available at https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx, accessed on April 10, 2025

- Turbotax, "How to Report RSUs or Stock Grants on Your Tax Return," February 18, 2025, available at https://turbotax.intuit.com/tax-tips/investments-and-taxes/how-to-report-rsus-or-stock-grants-on-your-tax-return/L55yZieuO, accessed on April 11, 2025

- U.S Bureau of Labor Statistics, "2.5 Million Unable to Work in March 2022 Because Employer Closed or Lost Business Due to COVID-19," *The Economics Daily*, April 6, 2022, available at https://www.bls.gov/opub/ted/2022/2-5-million-unable-to-work-in-march-2022-because-employer-closed-or-lost-business-due-to-covid-19.htm, accessed on April 2, 2025

- U.S Bureau of Labor Statistics, "Empirical Evidence for the Great Resignation," *Monthly Labor Review,* November 2022, available at https://www.bls.gov/opub/mlr/2022/article/empirical-evidence-for-the-great-resignation.htm, accessed on April 16, 2025

- U.S Bureau of Labor Statistics, "Help & Tutorials: Job Openings and Labor Turnover Survey," January 21, 2022, available at https://www.bls.gov/help/one_screen/JT.htm#select-select-rate-and-or-level, accessed on April 16, 2025

- U.S Bureau of Labor Statistics, "Job Openings and Labor Turnover Survey, available at https://www.bls.gov/jlt/, *JOLTS Home*, accessed on April 2, 2025

- U.S Bureau of Labor Statistics, "Labor Force Statistics from the Current Population Survey," available at https://www.bls.gov/cps/, accessed on April 6, 2025

- U.S Census Bureau, "North American Industry Classification System: Introduction to NAICS," December 20, 2024, available at https://www.census.gov/naics/, accessed on April 2, 2025

- U.S. Bureau of Labor Statistics, "Labor Market Dynamics during the COVID-19 Pandemic," *Commisioner's Corner,* November 15, 2022, available at https://www.bls.gov/blog/2022/labor-market-dynamics-during-the-covid-19-pandemic.htm, accessed on April 16, 2025

- U.S. Department of Justice and Federal Trade Commission, "Antitrust Guidelines for Collaborations Among Competitors, April 2000, available at https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf, accessed on April 8, 2025

- U.S. Food and Drug Administration, "FDA Approves First COVID-19 Vaccine," August 23, 2021, available at https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine, accessed on February 27, 2025

- United Nations, "WHO Chief Declares End to COVID-19 as a Global Health Emergency," May 5, 2023, available at https://news.un.org/en/story/2023/05/1136367, accessed on February 23, 2025

- United Surgical Partners International, "USPI Regional Vice President, Operations II — New Jersey," 2025, available at https://careers.uspi.com/job/lakewood/uspi-regional-vice-president-operations-ii-new-jersey/26425/78736071152, accessed on April 6, 2025

- USPI, "Director of Business Office at USPI," available at https://careers.uspi.com/job/dakota-dunes/director-of-business-office/35934/78354660944, accessed on April 8, 2025

- USPI, "Surgery Center Administrator at USPI," available at https://careers.uspi.com/job/ventura/surgery-center-administrator/35934/77706296208, accessed on April 8, 2025

**SEC Filings**

- United Surgical Partners International, Inc., SEC Form Schedule 14A, 2007

- Total Renal Care Holdings, Inc., SEC Form 10-K for period ended December 31, 1998, filed on October 8, 1999

**Note: In addition to the documents on this list, I relied on all documents cited in my report to form my opinions.**

# APPENDIX C: Supplemental Exhibits

EXHIBIT 1
*Proposed Class Members' Employment Opportunities Extend Beyond Defendants, Beyond the Outpatient Care Centers Industry, and Beyond Healthcare-Related Industries*

| | Previous or Next Employer | Number of Moves | Share of Moves |
|---|---|---|---|
| 1 | Fresenius | 97 | 1.27% |
| 2 | HCA Healthcare | 81 | 1.06% |
| 3 | UnitedHealth Group | 48 | 0.63% |
| 4 | Kaiser Permanente | 44 | 0.58% |
| 5 | McKinsey | 41 | 0.54% |
| 6 | Encompass Health | 40 | 0.52% |
| 7 | Surgical Care Affiliates | 39 | 0.51% |
| 8 | United States Renal Care Incorporated | 39 | 0.51% |
| 9 | CVS Health | 35 | 0.46% |
| 10 | Optum | 35 | 0.46% |
| 11 | Bain & Company | 31 | 0.41% |
| 12 | Deloitte | 27 | 0.35% |
| 13 | United Surgical Partners International | 27 | 0.35% |
| 14 | Amazon | 25 | 0.33% |
| 15 | Baylor Scott & White Health | 25 | 0.33% |
| 16 | DaVita | 24 | 0.31% |
| 17 | Envision Physician Services | 23 | 0.30% |
| 18 | Target | 23 | 0.30% |
| 19 | Tenet Healthcare | 23 | 0.30% |
| 20 | Intermountain Health | 22 | 0.29% |
| 21 | McKesson | 21 | 0.27% |
| 22 | CommonSpirit Health | 20 | 0.26% |
| 23 | Aetna | 19 | 0.25% |
| 24 | Apria Healthcare | 19 | 0.25% |
| 25 | Humana | 19 | 0.25% |
| 26 | AMSURG | 18 | 0.24% |
| 27 | Cigna | 18 | 0.24% |
| 28 | Satellite Healthcare Wellbound | 17 | 0.22% |
| 29 | Sound Physicians | 17 | 0.22% |
| 30 | Abbott Laboratories | 16 | 0.21% |
| 31 | Elevance Health | 16 | 0.21% |
| 32 | Memorial Hermann | 16 | 0.21% |
| 33 | Molina Healthcare | 16 | 0.21% |
| 34 | Surgery Partners | 16 | 0.21% |
| 35 | University of California | 16 | 0.21% |
| | *4,515 more companies* | 6,626 | 86.7% |

Source: Lightcast Data

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer is the indicated firm. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendants' employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

Highly Confidential - Outside Counsel/Experts Only

APPENDIX C

---

*EXHIBIT 2*

*The Industries Proposed Class Members Come From and Go To Vary by Specialty Area, and Few Proposed Class Members Come From or Go To Defendants (NAICS Association Industry Codes)*



Source: Lightcast Data; NAICS Association

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer belongs to the indicated industry grouping. The results are shown separately by specialty area. "Outpatient Care Centers" is defined by NAICS codes beginning with 6214. "Healthcare Related (non-OCC)" includes NAICS codes related to healthcare that I identified based on a review of the industries for the top 50 most common previous and next employers for Defendants' employees in the Lightcast Data. "Other Industries" contains all remaining classified industries. "Unclassified Industry and Non-Defendant" includes firms that were not assigned NAICS codes by the NAICS Association. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendant employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

---

APPENDIX C

*EXHIBIT 3*

***The Industries that Proposed Class Members Come From and Go To Overall and By Defendant (Lightcast Industry Codes)***



Source: Lightcast Data

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer belongs to the indicated industry grouping. The results are shown separately by Defendant. "Outpatient Care Centers" is defined by NAICS codes beginning with 6214. "Healthcare Related (non-OCC)" includes NAICS codes related to healthcare that I identified based on a review of the industries for the top 50 most common previous and next employers for Defendants' employees in the Lightcast Data. "Other Industries" contains all remaining classified industries. "Unclassified Industry and Non-Defendant" includes firms that were not assigned NAICS codes in the Lightcast Data. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendant employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

APPENDIX C

**EXHIBIT 4**

***The Industries that Proposed Class Members Come From and Go To Overall and By Defendant (NAICS Association Industry Codes)***



Source: Lightcast Data; NAICS Association.

Note: The exhibit shows the percent of moves to and from a Defendant for which the previous or next employer belongs to the indicated industry grouping. The results are shown separately by Defendant. "Outpatient Care Centers" is defined by NAICS codes beginning with 6214. "Healthcare Related (non-OCC)" includes NAICS codes related to healthcare that I identified based on a review of the industries for the top 50 most common previous and next employers for Defendants' employees in the Lightcast Data. "Other Industries" contains all remaining classified industries. "Unclassified Industry and Non-Defendant" includes firms that were not assigned NAICS codes by the NAICS Association. The analysis includes all unique moves to or from a Defendant that took place during or before 2024, and that involve Defendant employees in class positions. I do not include moves between an acquired firm and an acquiring firm after the date of the acquisition (e.g., prior to Optum's acquisition of SCA in 2017, I include moves between SCA and Optum in the analysis, but after the acquisition, I do not include moves between SCA and Optum).

APPENDIX C

*EXHIBIT 5*

*There is Wide Variation in Compensation Within a Specific Seniority Level at DaVita, and Substantial Overlap in the Observed Compensation Ranges for Different Seniority Levels (Total Pay with Adjusted Equity)*



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay with adjusted equity for proposed class members of the indicated seniority level. Pay is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at DaVita between 2008-2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay with adjusted equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median.

*EXHIBIT 6*

*There is Wide Variation in Compensation Within a Specific Seniority Level at SCA, and Substantial Overlap in the Observed Compensation Ranges for Different Seniority Levels (Total Pay with Adjusted Equity)*



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay with adjusted equity for proposed class members of the indicated seniority level. Pay is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at SCA between 2008-2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay with adjusted equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median.

*EXHIBIT 7*
*There is Wide Variation in Compensation Within a Specific Seniority Level at USPI, and*
*Substantial Overlap in the Observed Compensation Ranges for Different Seniority Levels*
*(Total Pay with Adjusted Equity)*



Source: Corrected Starr Data

Note: This exhibit shows annualized total pay with adjusted equity for proposed class members of the indicated seniority level. Pay is adjusted for inflation and presented in 2019 dollars. The exhibit includes employee-year observations for proposed class members who were employed at USPI between 2010-2019, and were included in Prof. Starr's regression analysis (which only considered full-year employees). The range of plotted values represents the 5th to 95th percentile of annualized total pay with adjusted equity among employees in the seniority level, the blue circle represents the mean, and the orange triangle represents the median.

APPENDIX C

*EXHIBIT 8*
**Pay of Proposed Class Members at DaVita Does Not "Move Together" Over Time (Total Pay with Adjusted Equity)**



Source: Corrected Starr Data

Note: The exhibit shows the percent change in annualized total pay with adjusted equity relative to 2009 by year for the 27 proposed class members who were hired in 2009 at DaVita in a class position, appear in Prof. Starr's pay regression sample for the duration of their employment, and remained at a Defendant in a class position for at least four years. There are no Administrator and Hospital CEOs at DaVita that fit these requirements. Compensation includes adjusted equity (which reflects equity at time of issuance for DaVita), is adjusted for inflation and presented in 2019 dollars. The percent change in each year is calculated relative to the employee's compensation in 2009.



**EXHIBIT 9**
**Pay of Proposed Class Members at SCA Does Not "Move Together" Over Time (Total Pay without Equity)**



Source: Corrected Starr Data

Note: The exhibit shows the percent change in annualized total pay without equity relative to 2009 by year for the 10 proposed class members who were hired in 2009 at SCA in a class position, appear in Prof. Starr's pay regression sample for the duration of their employment, and remained at a Defendant in a class position for at least four years. There are no Senior Directors or SVPs at SCA that fit these requirements. Compensation is adjusted for inflation and presented in 2019 dollars. The percent change in each year is calculated relative to the employee's compensation in 2009.

**EXHIBIT 10**
**Pay of Proposed Class Members at USPI Does Not "Move Together" Over Time (Total Pay without Equity)**



Seniority Level    Administrator and Hospital CEO    Director    Vice President    —— Senior Vice President

Source: Corrected Starr Data

Note: The exhibit shows the percent change in annualized total pay without equity relative to 2009 by year for the 20 proposed class members who were hired in 2009 at USPI in a class position, appear in Prof. Starr's pay regression sample for the duration of their employment, and remained at a Defendant in a class position for at least four years. There are no Senior Directors at USPI that fit these requirements. Compensation is adjusted for inflation and presented in 2019 dollars. The percent change in each year is calculated relative to the employee's compensation in 2009. Data for USPI employees in the Tenet Payroll Data is unavailable in 2022, as the Tenet Payroll Data end in 2021.

Highly Confidential - Outside Counsel/Experts Only

*EXHIBIT 11*

**Pay for Administrators and Hospital CEOs at Defendants Does Not "Move Together" Over Time (Total Pay without Equity)**



Seniority Level    Administrator and Hospital CEO

Source: Corrected Starr Data

Note: The exhibit shows the percent change in annualized total pay without equity relative to 2009 by year for the 14 proposed class members who were hired in 2009 at the Administrator and Hospital CEO level, appear in Prof. Starr's pay regression sample for the duration of their employment, and remained at a Defendant in a class position for at least four years. Compensation is adjusted for inflation and presented in 2019 dollars. The percent change in each year is calculated relative to the employee's compensation in 2009. Data for USPI employees in the Tenet Payroll Data is unavailable in 2022, as the Tenet Payroll Data end in 2021.

*EXHIBIT 12*

*Pay for Senior Directors at Defendants Does Not "Move Together" Over Time (Total Pay without Equity)*



Seniority Level    Senior Director

Source: Corrected Starr Data

Note: The exhibit shows the percent change in annualized total pay without equity relative to 2009 by year for the 7 proposed class members who were hired in 2009 at the Senior Director level, appear in Prof. Starr's pay regression sample for the duration of their employment, and remained at a Defendant in a class position for at least four years. Compensation is adjusted for inflation and presented in 2019 dollars. The percent change in each year is calculated relative to the employee's compensation in 2009. Data for USPI employees in the Tenet Payroll Data is unavailable in 2022, as the Tenet Payroll Data end in 2021.

**EXHIBIT 13**
**Pay for Vice Presidents at Defendants Does Not "Move Together" Over Time (Total Pay without Equity)**



Source: Corrected Starr Data

Note: The exhibit shows the percent change in annualized total pay without equity relative to 2009 by year for the 9 proposed class members who were hired in 2009 at the Vice President level, appear in Prof. Starr's pay regression sample for the duration of their employment, and remained at a Defendant in a class position for at least four years. Compensation is adjusted for inflation and presented in 2019 dollars. The percent change in each year is calculated relative to the employee's compensation in 2009. Data for USPI employees in the Tenet Payroll Data is unavailable in 2022, as the Tenet Payroll Data end in 2021.

### EXHIBIT 14
### Pay for Senior Vice Presidents at Defendants Does Not "Move Together" Over Time (Total Pay without Equity)



Source: Corrected Starr Data

Note: The exhibit shows the percent change in annualized total pay without equity relative to 2009 by year for the 3 proposed class members who were hired in 2009 at the Senior Vice President level, appear in Prof. Starr's pay regression sample for the duration of their employment, and remained at a Defendant in a class position for at least four years. Compensation is adjusted for inflation and presented in 2019 dollars. The percent change in each year is calculated relative to the employee's compensation in 2009. Data for USPI employees in the Tenet Payroll Data is unavailable in 2022, as the Tenet Payroll Data end in 2021.

### EXHIBIT 15
### Prof. Starr's Pay Regression Model, Without Any Corrections, Finds That the Effect of the Alleged Conduct Varies Across Specialty Areas

| Specialty | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|:---:|:---:|:---:|
| Accounting, Tax, and Treasury | ☐ | ☐ | ☑ |
| Business Development, Sales, Strategy, and Planning | ☐ | ☐ | ☑ |
| Business Office Administration and Management | ☐ | ☐ | ☑ |
| Clinical and Research | ☐ | ☑ | ☐ |
| Finance | ☐ | ☑ | ☐ |
| Information Technology | ☐ | ☑ | ☐ |
| Marketing and Communications | ☐ | ☑ | ☐ |
| Operations | ☐ | ☐ | ☑ |
| Other | ☐ | ☐ | ☑ |
| Pharmacy Management | ☐ | ☑ | ☐ |
| Physician Relations and Management | ☐ | ☐ | ☑ |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by specialty area. Statistical significance is determined at the 5% level.

*EXHIBIT 16*
*Prof. Starr's Pay Regression Model, Without Any Corrections, Finds That the Effect of the Alleged Conduct Varies Across Defendants and Seniority Levels*

| Seniority Level | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| SCA: Administrator | ☐ | ☑ | ☐ |
| USPI: Administrator | ☐ | ☑ | ☐ |
| DaVita: Director | ☐ | ☐ | ☑ |
| SCA: Director | ☐ | ☐ | ☑ |
| USPI: Director | ☐ | ☑ | ☐ |
| DaVita: Senior Director | ☐ | ☐ | ☑ |
| SCA: Senior Director | ☐ | ☑ | ☐ |
| USPI: Senior Director | ☐ | ☑ | ☐ |
| DaVita: Vice President | ☐ | ☐ | ☑ |
| SCA: Vice President | ☐ | ☑ | ☐ |
| USPI: Vice President | ☐ | ☑ | ☐ |
| DaVita: Senior Vice President | ☐ | ☐ | ☑ |
| SCA: Senior Vice President | ☐ | ☐ | ☑ |
| USPI: Senior Vice President | ☑ | ☐ | ☐ |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by Defendant and seniority level. Statistical significance is determined at the 5% level.

**EXHIBIT 17**
*Prof. Starr's Pay Regression Model, Without Any Corrections, Finds That the Effect of the Alleged Conduct Varies Across States*

| State | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| AL | ☐ | ☐ | ☑ |
| AZ | ☐ | ☑ | ☐ |
| CA | ☐ | ☑ | ☐ |
| CO | ☐ | ☐ | ☑ |
| CT | ☐ | ☑ | ☐ |
| FL | ☐ | ☑ | ☐ |
| GA | ☐ | ☐ | ☑ |
| IA | ☐ | ☑ | ☐ |
| ID | ☐ | ☑ | ☐ |
| IL | ☐ | ☐ | ☑ |
| IN | ☐ | ☑ | ☐ |
| KY | ☐ | ☐ | ☑ |
| LA | ☐ | ☑ | ☐ |
| MA | ☐ | ☑ | ☐ |
| MD | ☐ | ☐ | ☑ |
| MI | ☐ | ☑ | ☐ |
| MN | ☐ | ☑ | ☐ |
| MO | ☐ | ☑ | ☐ |
| NC | ☐ | ☑ | ☐ |
| NE | ☐ | ☑ | ☐ |
| NJ | ☐ | ☐ | ☑ |
| NM | ☐ | ☑ | ☐ |
| NV | ☐ | ☑ | ☐ |
| NY | ☐ | ☐ | ☑ |
| OH | ☐ | ☑ | ☐ |
| OK | ☐ | ☐ | ☑ |
| OR | ☐ | ☑ | ☐ |
| PA | ☐ | ☐ | ☑ |
| SC | ☐ | ☑ | ☐ |
| TN | ☐ | ☐ | ☑ |
| TX | ☐ | ☐ | ☑ |
| VA | ☐ | ☑ | ☐ |
| WA | ☐ | ☐ | ☑ |
| WI | ☐ | ☑ | ☐ |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by state. Statistical significance is determined at the 5% level. States with fewer than 50 observations do not appear in the chart (this removes 17 states from the analysis).

*EXHIBIT 18*
*Prof. Starr's Pay Regression Model, Without Any Corrections, Finds That the Effect of the Alleged Conduct Varies Across Years*

| Year | Positive Estimate: Significant | No Significance | Negative Estimate: Significant |
|---|---|---|---|
| 2008 | ☐ | ☐ | ☑ |
| 2009 | ☐ | ☐ | ☑ |
| 2010 | ☐ | ☑ | ☐ |
| 2011 | ☐ | ☑ | ☐ |
| 2012 | ☑ | ☐ | ☐ |
| 2013 | ☑ | ☐ | ☐ |
| 2014 | ☑ | ☐ | ☐ |
| 2015 | ☑ | ☐ | ☐ |
| 2016 | ☑ | ☐ | ☐ |
| 2017 | ☑ | ☐ | ☐ |
| 2018 | ☑ | ☐ | ☐ |
| 2019 | ☑ | ☐ | ☐ |

Source: Corrected Starr Data

Note: This exhibit shows the conduct estimates from Prof. Starr's pay regression model, estimated separately by year. Statistical significance is determined at the 5% level. Estimates reflect the effect of the indicated year on pay relative to 2007.

*EXHIBIT 19*
*Prof. Starr's Quantile Regression Model, After Correcting for Obvious Flaws, Shows No Evidence of Common Impact*



Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's quantile regression analysis (Prof. Starr's Figure 11), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Prof. Starr's quantile regression analysis code is highly sensitive to changes in the model that it is being used to estimate and is subject to computational issues. I implemented the following changes in Prof. Starr's analysis code to remedy these computational issues: (1) demeaning and rescaling of all continuous control variables; (2) rescaling of the time trend; and (3) reducing the number of quantiles being estimated for the by-Defendant quantile regressions. These changes make estimating the quantile regressions computationally feasible, but do not substantively affect the results.

**EXHIBIT 20**
*Prof. Starr's Figure 12, After Correcting for Obvious Flaws, Shows No Evidence of Common Impact*

| | [1] Annual Wage Suppression % | [2] In any Year? | [3] Percentage Harmed: In each Year? | [4] Cumulatively? |
|---|---|---|---|---|
| Common Conduct Model | 2.8% | 68.2% | 37.2% | 16.5% |
| *Defendant-Specific Model* | | | | |
| DaVita | -2.2% | 96.9% | 59.2% | 83.3% |
| SCA | 3.0% | 62.7% | 31.4% | 11.6% |
| USPI | 7.7% | 48.0% | 20.8% | 8.2% |

Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's in sample prediction analysis (Prof. Starr's Figure 12), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Column 1 provides the conduct estimates in percentage terms from Exhibit 40 and Exhibit 41. The annual wage suppression percentages from the "Common Conduct Model" and the "Defendant-Specific Model" for DaVita are statistically insignificant at a 5% level, whereas the annual wage suppression percentages from the "Defendant-Specific Model" for SCA and USPI are statistically significant. Column 2 displays the percentage of class members harmed in at least one year. Column 3 displays the percentage of class members harmed in every year. Column 4 displays the percentage of class members that would have received more pay cumulatively throughout the period in the but-for world without the alleged conduct.

**EXHIBIT 21**
*Prof. Starr's Figure 17, After Correcting for Obvious Flaws, Shows No Evidence of Common Impact*

| | [1] Annual Wage Suppression % | [2] Confidence Level | [3] Percentage Harmed Cumulatively |
|---|---|---|---|
| Common Conduct Model | 2.8% | 90.4% | 5.6% |
| *Defendant-Specific Model* | | | |
| DaVita | -2.2% | 90.2% | 14.2% |
| SCA | 3.0% | 90.5% | 5.1% |
| USPI | 7.7% | 90.9% | 1.9% |

Source: Corrected Starr Data

Note: This exhibit displays the results of Prof. Starr's interval in-sample prediction analysis (Prof. Starr's Figure 17), after correcting the same obvious flaws in Prof. Starr's pay regression model that I corrected in Model 4 of Exhibit 40. Column 1 provides the conduct estimates in percentage terms from Exhibit 40 and Exhibit 41. The annual wage suppression percentages from the "Common Conduct Model" and the "Defendant-Specific Model" for DaVita are statistically insignificant at a 5% level, whereas the annual wage suppression percentages from the "Defendant-Specific Model" for SCA and USPI are statistically significant. Column 2 displays the confidence level at which the corresponding percentage of class members is harmed by the alleged conduct in Column 3. Column 3 displays the percentage of class members that would have received more pay cumulatively throughout the period in the but-for world without the alleged conduct. Prof. Starr's Figure 17 reports the "Confidence Level" associated with the minimum "Percentage Harmed Cumulatively" value that is greater than or equal to 90%. In my results, I report the "Percentage Cumulatively Harmed" associated with the minimum "Confidence Level" that is greater than or equal to 90%. I take this approach because, after correcting for obvious flaws in Prof. Starr's analysis, there is no "Confidence Level" associated with a "Percentage Harmed Cumulatively" value that is greater than or equal to 90%. Additionally, I use the 90% confidence level for this analysis because that aligns with Prof. Starr's approach from Figure 17 of his report. However, elsewhere in my report, I use a conventional 95% confidence level to evaluate statistical significance.

# APPENDIX D: Data Appendix

1. DaVita produced the following data in this matter:

- **DaVita Payroll Data**. The DaVita Payroll Data is an internal database that covers the years 2005 to 2022.[1] The DaVita Payroll Data record employee name and identifier, pay type (e.g., salary, bonus, equity pay), hours worked, earnings, job title, and seniority level (as assigned by DaVita) at the employee-pay type-year level.[2] In other words, these data report payroll information for DaVita employees, after aggregating to the annual level.

- **DaVita Teammate Data**. The DaVita Teammate Data is an internal database that covers the years 2005 to 2022.[3] The DaVita Teammate Data record employee identifier, action type, action date, job, department, location, and seniority level (as assigned by DaVita) at the employee-action level (where an action is any event that affects an employee, such as being hired, receiving a pay change, receiving a job title change, or being terminated).

- **DaVita Equity Grant Data**. The DaVita Equity Grant Data is an internal database that covers the years 2005 to 2022.[4] The DaVita Equity Grant Data record grant date, grant type (e.g., stock grant, stock option), vesting schedule, number of shares, and market value of shares for each stock option or stock grant that is issued.

2. SCA produced the following data in this matter:

- **SCA Payroll Data**. The SCA Payroll Data consists of two internal databases, one that covers the years 2008 to 2020 and a second that covers the years 2021 to 2022.[5] These data record employee name

[1] DVA_OMCEAL_000000029–45; DVA_OMCEAL_000902589–91; DVA_OMCEAL_001408544; DVA_OMCEAL_001182111.

[2] The job title and seniority level (as assigned by DaVita) fields are available in some, but not all, of the DaVita Payroll Data files.

[3] DVA_OMCEAL_001421635; DVA_OMCEAL_001421632–34.

[4] DVA_OMCEAL_001408533, DVA_OMCEAL_001408536, DVA_OMCEAL_001408539, DVA_OMCEAL_001408542, DVA_OMCEAL_001408543, DVA_OMCEAL_001408547.

[5] "Highly Confidential - Outside Counsel Experts Only_Check History Hours and Earnings.xlsx"; "Highly Confidential - Outside Counsel Experts Only_Termed in 2021.xlsx"; "Highly Confidential - Outside Counsel Experts Only_Teammate Roster Point In Time.xlsx"; "SCA-Structured00000007_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000009_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000010_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000011_Highly Confidential–Outside Counsel Experts Only.xlsx"; "CheckSumm_Highly Confidential-Outside Counsel, Experts Only"; "CheckSummHE_ Highly Confidential-Outside Counsel, Experts Only.csv"; "Eemploy_ Highly Confidential-Outside Counsel, Experts Only.csv"; "Ejob_ Highly Confidential-

and identifier, job title, department, location, paycheck date, pay type (e.g., salary, bonus, equity pay), hours worked, and earnings at the employee-paycheck-pay type level.

3. USPI produced the following data in this matter:

- **USPI Payroll Data.** The USPI Payroll Data is an internal database that covers the years 2005 to 2023.[6] The USPI Payroll Data record employee name and identifier, job title, department, location, paycheck date, pay type (e.g., salary, bonus, equity pay), hours worked, scheduled hours, and earnings at the employee-paycheck-pay type level.
- **Tenet Payroll Data**. Following Tenet's acquisition of USPI in 2018, USPI began tracking employee and compensation information for a subset of USPI employees in the Tenet Payroll Data instead of in the USPI Payroll Data.[7] The Tenet Payroll Data consists of two internal databases, the Tenet HRMS Data and the Tenet Genesys Data, that cover the years 2018 to 2021. The Tenet HRMS data record employee name and identifier, job title, department, location, and annual gross wages for 2018 to 2021 at the employee level. The Tenet Genesys data record employee name and identifier, job title, department, location, paycheck date, pay type (e.g., salary, bonus, equity pay), hours worked, and earnings at the employee-paycheck-pay type level.

4. Additionally, all three Defendants generated the following data specifically for use in this matter:

- **Hashed SSN Data**. The Hashed SSN Data is a dataset (or columns appended to existing datasets, in the case of USPI) that was produced specifically for this matter.[8] These data report numeric identifiers

---

Outside Counsel, Experts Only.csv"; "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data.xlsx"; "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions.xlsx".

[6] USPI_CIV_000021819; USPI_CIV_00065922–33; "2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions.xlsx"; "Exhibit A_Paygroup_Location.xlsx"; "Exhibit B_ERNCD Values.xlsx"; "4.19.24 Paygroup location.xlsx"; "2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes.xlsx".

[7] USPI_CIV_000659234; USPI_CIV_001168726.

[8] DaVita produced several datasets containing hashed SSNs for employees who appear in their structured data. See DVA_OMCEAL_000000047; DVA_OMCEAL_001408550; DVA_OMCEAL_001421733; DVA_OMCEAL_001421640. SCA similarly produced several datasets containing hashed SSNs for employees who appear in their structured data. See "Highly Confidential - Outside Counsel Experts Only_SCA Hashed SSNs.xlsx"; "SCA - Structured00000005.xlsx"; "SCA-Structured00000012_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA - Structured00000013.xlsx". USPI generated hashed SSNs and appended them to USPI_CIV_00065922–33 and USPI_CIV_000659234.

corresponding to individuals' SSNs that can be linked across all three Defendants, and therefore can be used to track employees who move from one Defendant to another, without disclosing the individuals' actual SSNs.

5. Prof. Starr constructed a dataset that combined several of the datasets described above with various publicly available datasets. However, he made several basic errors when constructing this dataset. I corrected these errors, and I rely on the corrected dataset throughout my report to assess the validity of Prof. Starr and Prof. Gerhart's conclusions:

- **Prof. Starr's Data**. Prof. Starr constructed a panel dataset at the employee-year-company level. This dataset combined certain variables from the DaVita Payroll Data, DaVita Teammate Data, SCA Payroll Data, USPI Payroll Data, Tenet Payroll Data, and Hashed SSN Data. This dataset also included selected variables from publicly available data sources, including average wage and income earnings for medical and health services managers in the health care and social assistance industry by state and year from the American Community Survey ("ACS") Data; per-capita healthcare services spending by state and year from Federal Reserve Economic Data ("FRED"); per-capita real GDP by state and year from FRED and the U.S. Bureau of Economic Analysis ("BEA"); consumer price index by Census Region, and unemployment rate by state and year, from the U.S. Bureau of Labor Statistics ("BLS"); and minimum wage by state and year from the U.S. Department of Labor. Prof. Starr relies on the seniority level (as assigned by DaVita) field in the DaVita Teammate Data and the DaVita Payroll Data to determine whether DaVita employees are in Director level or above jobs, but relies on a manual review of job titles in the SCA Payroll Data, the USPI Payroll Data, and the Tenet Payroll Data to determine the same for SCA and USPI employees. He further relies on a manual review of the job title fields and department fields in each of these datasets, as well as DaVita's seniority level field, to determine whether DaVita, SCA, and USPI employees belong to a group that is excluded from the proposed class (i.e., senior corporate officers or personnel in the human resources, recruiting, or legal departments).
- **Prof. Starr's Corrected Data**. Prof. Starr made four basic errors when processing the various datasets that he used to construct his

panel dataset, which I corrected. First, Prof. Starr did not properly account for the fact that hours worked are under-recorded in the USPI Payroll Data in 2005 and 2006, and he also incorrectly set hours worked equal to zero for all employees in the Tenet Payroll Data in 2018 to 2021.[9] I corrected these errors by replacing actual hours worked with scheduled hours worked for USPI in 2005 and 2006, and by correctly populating hours worked for employees in the Tenet Payroll Data. Second, Prof. Starr relied on incomplete and out-of-date data to identify employee and job characteristics for DaVita employees.[10] Prof. Starr relied on the following DaVita Teammate Data files for his analysis: DVA_OMCEAL_000902592. However, DaVita subsequently produced a similar, but more complete and up-to-date, DaVita Teammate Data file: DVA_OMCEAL_001421635. I corrected Prof. Starr's Data to rely on the more complete and up-to-date file. Third, Prof. Starr omitted equity compensation for SCA employees prior to 2021.[11] I corrected this error by including equity compensation for SCA in those years.[12] Fourth, Prof. Starr failed to exclude DaVita and USPI employees in certain departments due to basic errors in his analysis code, such as treating a department as excluded when it is listed in lowercase letters in the data, but not when it is listed in uppercase letters. For example, Prof. Starr's analysis code does not exclude the "Legal-Executive," "Compliance", "Compensation and Benefits", "Benefits Administration," "TM Relations and Compliance," or "Legal – Labor and Employment" departments at DaVita when they are capitalized, but does exclude them when they are in lowercase letters. Similarly, Prof. Starr's analysis code does not exclude the "Human Resources" and "Payroll and Benefits" departments at USPI, even though he does separately seek to exclude departments titled "Human Resource," "Payroll," and

[9] Median hours worked for USPI employees is substantially lower in 2005 and 2006 compared to any other year in 2005–2022 in Prof. Starr's Data, a fact that Prof. Starr did not account for at all when processing the data. See Workpaper 36. The proportion of USPI employees for whom hours worked equals zero is higher for each year in 2018–2021 compared to any other year in 2005–2022 in Prof. Starr's Data, due to Prof. Starr erroneously setting hours worked equal to zero for all employees in the Tenet Payroll Data. See Workpaper 37.

[10] Prof. Starr's failure to rely on the most up-to-date and complete DaVita Teammate Data results in numerous, incorrectly assigned values for the department and location fields, as well as less-complete data for 2022, in Prof. Starr's Data. See Workpaper 38; Workpaper 39.

[11] Prof. Starr's Data includes no equity pay for SCA in 2007–2020. See Workpaper 40.

[12] Additionally, Prof. Starr treats DaVita's Long Term Incentive Program (LTIP) cash awards as standard compensation. However, similar to equity awards, cash LTIP awards follow a multi-year vesting schedule and are only recorded in the data when an employee receives the associated compensation. As discussed in Section 5.2.2, it is inaccurate to record compensation at the time of vesting rather than the time of issuance; as such, I further correct Prof. Starr's measure of equity compensation to include cash LTIP awards.

"Benefits." I corrected these errors to exclude additional employees who Prof. Starr intended to exclude from his analysis.[13]

6. I also rely on proprietary data from Lightcast and publicly available data from other sources to perform certain analyses in my report:

- **Lightcast Data.** Lightcast is a proprietary data provider that has constructed a structured database of job histories based on resumes posted to online resume websites.[14] The Lightcast Data that I analyze in my report reflects job histories for individuals who worked for one of the three Defendants, or in the Outpatient Care Centers industry (NAICS code 6214) to which all three Defendants belong, in 2024 or earlier. The Lightcast Data record company name, occupation, industry, start date, and end date at the individual-job level.
- **NAICS Association Data.** NAICS Association provides data on industry codes from Dun & Bradstreet, a provider of business data and analytics. NAICS Association provides industry codes for a specified list of companies by matching the companies to entities in the Dun & Bradstreet database based on the company's name and other characteristics (e.g., location) where available.
- **Bureau of Labor Statistics Job Openings and Labor Turnover Survey ("JOLTS") Data.** The Bureau of Labor Statistics JOLTS Data report monthly estimates of job openings, voluntary quits, and involuntary layoffs and discharges based on a survey of establishments in the U.S.[15] These estimates are available by industry.

---

[13] Prof. Starr also made one additional error that affects a small number of observations in the data. He improperly included USPI's Bill Wilcox, USPI's Brett Brodnax, and SCA's Andrew Hayek in the proposed class during certain years when they served as CEO for USPI and SCA, respectively, but excluded them for other years. I corrected this error by excluding observations for the three individuals during all years when they served as CEO.

[14] Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 12, 2025 ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability.").

[15] U.S Bureau of Labor Statistics, "Job Openings and Labor Turnover Survey," available at https://www.bls.gov/jlt/, *JOLTS Home*, accessed on April 2, 2025 ("The Job Openings and Labor Turnover Survey (JOLTS) program of the Bureau of Labor Statistics (BLS) produces monthly and annual estimates of job openings, hires, and separations for the nation. The JOLTS program also produces monthly state estimates for all 50 states and the District of Columbia at the total nonfarm industry level.").

# Considers to Be Subject to the Alleged Mobility Restrictions

---

*EXHIBIT 1*
*Job Titles Included in Prof. Starr's Definition of the Class*

| Job Title |
| --- |
| 1. Admin Dir, Support Svcs |
| 2. Administrator |
| 3. Assistant Controller |
| 4. Associate Medical Director |
| 5. Asst Controller |
| 6. CEO |
| 7. Chief Executive Officer |
| 8. Clinical Director |
| 9. Controller |
| 10. Controller, USPI |
| 11. Dir, Audit Svcs |
| 12. Dir, Business Office |
| 13. Dir, Case Management |
| 14. Dir, Clin Quality Improv |
| 15. Dir, Clinical Ops |
| 16. Dir, Coding |
| 17. Dir, Corp Acct & A-D |
| 18. Dir, Corp Development |
| 19. Dir, Data & Analytics |
| 20. Dir, De Novo Development |
| 21. Dir, Enterpr Architect |
| 22. Dir, Fin Plan & Analysis |
| 23. Dir, Finance Corp |
| 24. Dir, Financial Rptg Sys |
| 25. Dir, Hosp Acct Shrd Srvc |
| 26. Dir, Hospital Him |
| 27. Dir, Information Tech |
| 28. Dir, Is Ops Delivery |
| 29. Dir, Lease Accting |
| 30. Dir, M&A Analytics |
| 31. Dir, Managed Care |
| 32. Dir, Material Management |
| 33. Dir, Medical Staff Svcs |
| 34. Dir, Mgd Care Economics |
| 35. Dir, Nursing |
| 36. Dir, Nursing Procedural |

| Job Title |
| --- |
| 37. Dir, Nursing Procedureal |
| 38. Dir, Operations Finance |
| 39. Dir, Pat Access Site I |
| 40. Dir, Pharmacy Services |
| 41. Dir, Pharmacy Svcs |
| 42. Dir, Plant Operations |
| 43. Dir, Procurement |
| 44. Dir, Program Management |
| 45. Dir, Radiology |
| 46. Dir, Reg Ops Finance |
| 47. Dir, Rehabilitative Svcs |
| 48. Dir, Respiratory Therapy |
| 49. Dir, Revenue Analysis |
| 50. Dir, Service Line |
| 51. Dir, Supply Chain |
| 52. Dir, USPI Bus Ofc Ops |
| 53. Dir, USPI Fac Acctg |
| 54. Director |
| 55. Director Applicaton Developmnt |
| 56. Director Managemt Support |
| 57. Director Network Engineer |
| 58. Director Of Finance |
| 59. Director Of Nursing |
| 60. Director Of Operations Imaging |
| 61. Division VP |
| 62. Exec VP |
| 63. Executive Director |
| 64. Group President |
| 65. Imaging Administrator |
| 66. Market President |
| 67. Market President I |
| 68. Partnership VP |
| 69. President - Imaging |
| 70. President Ambulatory Services |
| 71. President, Imaging |
| 72. Regional Administrator FT |
| 73. Regional Director |
| 74. Regional VP |
| 75. Regional VP - Imaging |
| 76. Regional VP - Operations |
| 77. Regional VP - Ops I |
| 78. Regional VP - Ops Ii |

Highly Confidential - Outside Counsel/Experts Only

APPENDIX E

| Job Title |
|---|
| 79. RVP Business Development |
| 80. Sales Executive |
| 81. Senior Director |
| 82. Senior VP |
| 83. Sr Dir, Accounting |
| 84. Sr Dir, Applied Clin Inf |
| 85. Sr Dir, Audit |
| 86. Sr Dir, Corp Devel-USPI |
| 87. Sr Dir, Data & Analytics |
| 88. Sr Dir, Is Operations |
| 89. Sr Dir, Is Ops Delivery |
| 90. Sr Dir, Managed Care |
| 91. Sr Dir, Patient Exp |
| 92. Sr Dir, Revenue Cycle |
| 93. Sr Dir, Service Line |
| 94. Sr Dir, Tax |
| 95. Sr Dir, USPI Bus Ofc Ops |
| 96. SVP |
| 97. SVP-Del |
| 98. Vice President |
| 99. VP |
| 100. VP - Controller |
| 101. VP Bus Dev - Cardiology Srvs |
| 102. VP Clinical Operations |
| 103. VP Financial |
| 104. VP, Cardiology Svcs |
| 105. VP, Chief Rev Cycle Ofcr |
| 106. VP, Clinical Operations |
| 107. VP, Corp Dev Terrhd USPI |
| 108. VP, Corp Developmnt-USPI |
| 109. VP, De Novo Development |
| 110. VP, M&A Analytics |
| 111. VP, Strat Netwk & Cntrtg |
| 112. VP, USPI Bus Ofc Ops |
| 113. VP, USPI Cno & Clin Ops |

Source: Starr Data

Note: This exhibit shows all USPI job titles included in the proposed class according to Prof. Starr.

*EXHIBIT 2*
*Job Titles Subject to USPI's Admitted Non-Solicitation Agreement with SCA*

| Job Title | Subject to Agreement? |
|---|---|
| 1. Administrator | Yes |
| 2. CFO - Imaging | Yes |
| 3. Chief Administrative Officer | Yes |
| 4. Chief Development Officer | Yes |
| 5. Chief Executive Officer | Yes (but excluding Bill Wilcox and Brett Brodnax) |
| 6. Chief Financial Officer | Yes |
| 7. Chief Financial Officer-Imaging | Yes |
| 8. Chief Med Information Officer | Yes |
| 9. Chief Nursing Officer | Yes (but only if corporate or hospital) |
| 10. Chief Operating Officer | Yes (but only if corporate or hospital) |
| 11. Chief Quality Officer FT | Yes (but only if corporate or hospital) |
| 12. Controller | Yes |
| 13. Division VP | Yes |
| 14. Executive Director | Yes |
| 15. Executive VP | Yes |
| 16. Group President | Yes |
| 17. Imaging Administrator | Yes |
| 18. Market President | Yes |
| 19. Partnership VP | Yes |
| 20. President | Yes (but excluding Bill Wilcox and Brett Brodnax) |
| 21. President - Ambulatory Services | Yes |
| 22. President - Imaging | Yes |
| 23. Regional Administrator FT | Yes |
| 24. Regional Director | Yes |
| 25. Regional VP | Yes |
| 26. Regional VP - Imaging | Yes |
| 27. RVP Business Development | Yes |
| 28. Sales Executive | Yes |
| 29. Senior VP | Yes |
| 30. VP | Yes |
| 31. VP - Controller | Yes |
| 32. VP Business Development - Cardiology Services | Yes |
| 33. VP Clinical Operations | Yes |

Source: Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.) et al., "In re Outpatient Medical Center Employee Antitrust Litigation, Case No. 1:21-cv-00305," May 14, 2023

# Exhibit 7

Lane Declaration


(Filed Under Seal)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In Re Outpatient Medical Center Employee Antitrust Litigation | Case No. 1:21-cv-00305 <br><br> **HIGHLY CONFIDENTIAL** <br><br> **OUTSIDE COUNSEL/EXPERTS ONLY** |

**EXPERT REPORT OF CELESTE SARAVIA, PH.D.**

April 16, 2025

*Highly Confidential - Outside Counsel/Experts Only*

**Table of Contents**

1. Qualifications, case background, and assignment ........................................................5

    1.1. Qualifications.................................................................................................................5

    1.2. Allegations in Plaintiffs' Third Amended Complaint ........................................6

        1.2.1. Alleged Three-Party Mobility Restrictions...........................................6

        1.2.2. Alleged Three-Party Information Sharing ..............................................6

        1.2.3. Alleged Two-Party Mobility Restrictions................................................7

        1.2.4. Alleged Two-Party Information Sharing ..................................................7

        1.2.5. Alleged Class.................................................................................................7

    1.3. Experts' Assessed Bilateral Conspiracies .............................................................8

    1.4. USPI's Admitted Conduct.........................................................................................9

    1.5. Assignment..................................................................................................................10

2. Summary of opinions ...................................................................................................11

3. Background on Defendants and the industries in which they operate .........................17

    3.1. Overview of outpatient care centers and ambulatory surgery centers ..................18

    3.2. Background on the Defendants................................................................................. 21

        3.2.1. USPI...............................................................................................................21

        3.2.2. SCA................................................................................................................23

        3.2.3. DaVita...........................................................................................................24

    3.3. Background on USPI Senior Employees .................................................................25

    3.4. Overview of compensation for USPI Senior Employees.......................................29

4. The economic evidence does not support a conclusion that USPI individually or in combination with SCA and DaVita has the market power to suppress wages................. 37

    4.1. Overview of Dr. Starr's and Dr. Gerhart's market power opinions.......................38

    4.2. Defendants' collective market power and ability to suppress Senior Employee compensation is constrained by competition from non-Defendants...........................40

        4.2.1. Senior Employee switching between Defendants is rare prior to and after the Alleged, Assessed, and Admitted Conduct periods............................................ 41

        4.2.2. USPI faces competition for its Senior Employees from firms beyond SCA and DaVita, and even beyond the ASC and OCC industries ...................................45

5. The Alleged, Assessed, and Admitted Mobility Restrictions could have directly impacted the employment options of, at most, a limited number of Senior Employees. 51

5.1. Overview of the potential impacts of a non-solicitation agreement ......................52

5.2. Economic evidence indicates that the Alleged, Assessed, and Admitted Mobility Restrictions would have impacted the employment options of a limited number of USPI Senior Employees........................................................................................53

5.2.1. Even outside the Alleged, Assessed, or Admitted Mobility Restrictions, few USPI Senior Employees accepted job offers from SCA or DaVita ...........................53

5.2.2. USPI Senior Employees' job opportunities beyond Defendants are extensive and varied.......................................................................................................57

5.3. Dr. Starr's analysis indicates that the Experts' Assessed SCA-USPI Mobility Restrictions could have directly impacted a limited number of Senior Employees ....58

5.3.1. Dr. Starr's analysis indicates that the Experts' Assessed SCA-USPI Mobility Restrictions had a minimal effect on mobility .........................................................59

5.4. Dr. Starr's analysis of switchers is flawed and overstates the direct impact of the Experts' Assessed SCA-USPI Mobility Restrictions ...................................................... 61

6. Plaintiffs' experts fail to present reliable economic evidence to support the conclusion that the Alleged or Assessed Information Sharing restricted labor market competition or suppressed compensation, and ignore evidence that is inconsistent with such a conclusion ...............................................................................................64

6.1. Overview of the economic theory of collusion and Plaintiffs' experts' analysis .... 67

6.1.1. Overview of economic conditions that are required for collusion to have an effect on market outcomes......................................................................................67

6.1.2. Neither Dr. Starr nor Dr. Gerhart conducts an analysis of whether the economic conditions for collusion to affect market outcomes hold ........................68

6.2. The economic evidence reviewed by Dr. Starr and Dr. Gerhart does not support a conclusion that the Experts' Assessed SCA-USPI Information Sharing or the Alleged SCA-USPI Information Sharing suppressed compensation or restricted labor market competition..............................................................................................70

6.2.1. Overview of Experts' Assessed SCA-USPI Information Sharing......................71

6.2.2. Plaintiffs' experts have not shown how the alleged information sharing they identify provides a mechanism to monitor and suppress compensation .................73

6.2.3. Plaintiffs', Dr. Starr's, and Dr. Gerhart's assertions that the Experts' Assessed SCA-USPI Information Sharing was sufficiently detailed to facilitate collusion ignore the complexity of Defendants' compensation packages.................78

7. Economic evidence does not support Plaintiffs' experts' claims that internal and external equity would have resulted in the Alleged, Assessed, or Admitted Mobility Restrictions suppressing the compensation of all or nearly all USPI Senior Employees 81

7.1. USPI's compensation trends are inconsistent with Plaintiffs' experts' claim that internal and external equity would result in all USPI Senior Employees' compensation being suppressed ...................................................................83

7.2. Dr. Gerhart offers flawed logic and analyses to support his assertion that concerns of internal and external equity would have resulted in the Experts' Assessed SCA-USPI Mobility Restrictions suppressing the compensation of USPI Senior Employees ...................................................................................89

7.2.1. Overview of Dr. Gerhart's claims related to internal and external equity.......89

7.2.2. Dr. Gerhart's review of USPI documents does not support his opinion that the Experts' Assessed SCA-USPI Mobility Restrictions would have a widespread impact on the compensation of USPI Senior Employees......................................... 91

7.2.3. Dr. Gerhart's claims about "external equity" contradict his claim that the Experts' Assessed SCA-USPI Mobility Restrictions would have affected all Senior Employees ...................................................................................98

7.3. Dr. Starr offers flawed analyses to support his assertion that the Experts' Assessed SCA-USPI Mobility Restrictions would have indirectly suppressed the compensation of USPI Senior Employees.................................................99

7.3.1. Overview of Dr. Starr's claims and analysis related to internal and external equity....................................................................................99

7.3.2. Dr. Starr's empirical analysis does not support the claim that internal equity would have resulted in all or nearly all USPI Senior Employees' wages being suppressed............................................................................... 103

8. Dr. Starr offers flawed empirical analyses to support his opinions on wage suppression and to calculate damages.............................................................113

8.1. Overview of regression models and identification of causal effects .....................115

8.2. Dr. Starr's before/during/after model ................................................117

8.2.1. Errors in Dr. Starr's data affect his results ...................................................118

8.2.2. Dr. Starr inappropriately pools data across Defendants ..............................118

8.2.3. Dr. Starr's results are driven by the end-date he selects for the Experts' Assessed SCA-USPI Conduct period .................................................................120

8.2.4. Dr. Starr's results are affected by his treatment of the COVID pandemic ... 124

8.2.5. Excluding post-admitted-conduct period data from Dr. Starr's regression ..127

8.3. Dr. Starr's difference-in-differences model .......................................................... 129

8.3.1. Manager compensation is not a suitable benchmark for Senior Employee compensation ...............................................................................................................131

8.3.2. Dr. Starr inappropriately pools data across Defendants ............................. 133

8.3.3. Dr. Starr's results are driven by his inclusion of COVID period data and his choice of the end-date for the Experts' Assessed SCA-USPI Conduct ................... 134

8.4. Dr. Starr's estimate of the effect of the Experts' Assessed USPI-SCA Conduct is implausibly high .............................................................................................. 135

8.4.1. Dr. Starr's estimate of the effect of the Experts' Assessed SCA-USPI Conduct is implausible compared to changes in compensation for switchers...................... 135

8.4.2. Even if Dr. Gerhart's and Dr. Starr's assertions about a purported compensation structure were accurate, evidence contradicts their claims of cascading effects...............................................................................................................137

# 1. Qualifications, case background, and assignment

*1.1. Qualifications*

1.  My name is Celeste C. Saravia. I am an economist with expertise in industrial organization, which is the study of markets and how firms compete. I received my Ph.D. in Economics from the University of California, Berkeley, in 2004. While studying at the University of California, Berkeley, I was a research assistant at the University of California Energy Institute. Since receiving my Ph.D., I have worked at Cornerstone Research as a consultant. In this role, I have used my expertise in industrial organization to study economic issues related to competition. In addition, I have held the position of lecturer at University of California, Berkeley, where I taught Industrial Organization and Public Policy and Natural Resource Economics. I have experience assessing competition issues across a wide range of industries, including energy, pharmaceuticals, medical devices, information technology, payment systems, aviation, telecommunications, and media distribution.

2.  I have published on competition issues in energy markets in one of the leading economics journals, the *American Economic Review*, and I have contributed to multiple books and treatises on competition issues for the American Bar Association. I contributed to the market definition chapter in the Seventh Edition of *Antitrust Law Developments* and to *The Indirect Purchaser Litigation Handbook* and *Antitrust Law and Economics of Product Distribution*. I have previously served as a Vice Chair of the Pricing Conduct and Distribution and Franchising Committees of the American Bar Association's Antitrust Section.

3.  I have testified on competition issues in depositions, trials, and in arbitration. I have been qualified by U.S. district courts to testify on competition issues on multiple occasions.[1] I have provided testimony in antitrust cases involving a wide range of allegations, including cases involving allegations of price fixing and other coordinated conduct, and a wide range of industries, including pharmaceutical products. A complete copy of my CV, including a list of prior testimony, is attached to this report as Appendix A.

4.  I have been retained to provide expert testimony on behalf of Defendants United Surgical Partners Holdings, Inc., United Surgical Partners International, Inc. (collectively "USPI") and Tenet Healthcare Corporation ("Tenet"). The other corporate Defendants in the case are Surgical Care

---

[1] I have testified at trial on competition issues in the following cases: *Tevra Brands, LLC v. Bayer Healthcare LLC, et al.*; *In re HIV Antitrust Litigation*; *Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars v. Ningbo Sunny Electronic Co. Ltd.*; and *J&M Distributing Inc. v. Hearth & Home Technologies Inc. and Magnotti and Sons, Inc. d/b/a The Fireplace and the Patio Place*.

Affiliates, LLC, and SCAI Holdings, LLC (collectively "SCA") and DaVita Inc. ("DaVita").[2] I refer to USPI, Tenet, SCA, and DaVita collectively as "Defendants."

## 1.2. Allegations in Plaintiffs' Third Amended Complaint

5. In their Third Amended Complaint ("Complaint"), dated November 14, 2024, Plaintiffs allege both three-party mobility restrictions and three-party information sharing, as well as two separate bilateral mobility restrictions and two separate sets of bilateral information sharing.

### 1.2.1. Alleged Three-Party Mobility Restrictions

6. With respect to the alleged three-party conspiracy, Plaintiffs contend: "[b]eginning no later than 2008 … Defendants … entered into agreements to avoid competing for employees, particularly those at the director level or above ('Senior Employees'), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers. These 'no-poach' agreements continued through 2021."[3] The Complaint also alleges that these agreements included a provision preventing the parties from considering unsolicited job applications from each other's employees unless the employee notified their current employer (i.e., the "Tell Your Boss" provision). I refer to these allegations as the "Alleged Three-Party Mobility Restrictions."[4]

### 1.2.2. Alleged Three-Party Information Sharing

7. Plaintiffs also allege "[f]rom May 2008 through January 2021, SCA, USPI, and DaVita conspired to reduce and limit compensation and mobility of their employees" and "[i]n furtherance of the conspiracy, Defendants … exchanged competitively sensitive information to fix and maintain the compensation of their employees."[5] Plaintiffs allege that Defendants' sharing of competitively sensitive information ("CSI") allowed them "to assure each other that they did not need to increase pay levels as much as

---

[2] The non-corporate defendants are Andrew Hayek (former CEO of SCA) and Kevin Thiry (former CEO of DaVita). See Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, November 14, 2024 ("Complaint"), ¶¶ 21, 32.

[3] Complaint, ¶ 7.

[4] Complaint, ¶ 46 ("Consistent with the conspiracy, Defendants told job candidates they needed to inform their current employer to be considered. For example, on or about April 26, 2016, SCA's human resources executive emailed a candidate from DaVita who was based in Dallas, Texas, that she could not recruit the candidate unless they 'have been given explicit permission by their employers that they can be considered for employment with us.'").

[5] Complaint, ¶ 38.

they otherwise would have."[6] I refer to the three-party information sharing alleged in the complaint as the "Alleged Three-Party Information Sharing."[7] and I refer to the three-party conspiracy alleged in the Complaint as the "Alleged Three-Party Conspiracy."

### 1.2.3. *Alleged Two-Party Mobility Restrictions*

8.  Plaintiffs also allege "SCA and DaVita Agree[d] Not to Poach Each Other's Employees" and this "conspiracy began at least as early as May 2008" (the "Alleged SCA-DaVita Mobility Restrictions").[8] And plaintiffs allege "SCA and USPI Agree[d] Not to Poach Each Other's Employees" and that this agreement began "[n]o later than May 2010" (the "Alleged SCA-USPI Mobility Restrictions").[9] In this report, I refer collectively to the Alleged Three-Party Mobility Restrictions and Alleged SCA-USPI Mobility Restrictions as the "Alleged USPI Mobility Restrictions."

### 1.2.4. *Alleged Two-Party Information Sharing*

9.  Plaintiffs' Complaint also alleges information sharing between SCA and DaVita, and information sharing between SCA and USPI. The alleged information sharing between SCA and USPI is referred to herein as the "Alleged SCA-USPI Information Sharing."[10] Plaintiffs contend the Alleged SCA-USPI Information Sharing "occurred from at least as early as 2009 and continued through at least 2017."[11] (In this report, I refer collectively to the Alleged Three-Party Information Sharing and Alleged SCA-USPI Information Sharing as the "Alleged USPI Information Sharing," and the Alleged USPI Mobility Restrictions and Alleged USPI Information Sharing are collectively referred to as the "Alleged USPI Conduct").

### 1.2.5. *Alleged Class*

10. Plaintiffs purport to represent a class defined as:

> [a]ll natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for [SCA]; (b) from May 2010 to January

---

[6] Complaint, ¶ 54.

[7] Complaint, ¶ 38.

[8] Complaint, ¶ 40.

[9] Complaint, ¶ 49.

[10] Complaint, ¶¶ 54–60.

[11] Complaint, ¶ 54.

2021, for [USPI]; or (c) from May 2008 to January 2021, for [DaVita].[12]

### 1.3. *Experts' Assessed Bilateral Conspiracies*

11.  Plaintiffs retained two economic experts, Dr. Evan P. Starr and Dr. Barry S. Gerhart, who each filed a report on January 15, 2025.[13] Plaintiffs' experts do not describe or analyze the Alleged Three-Party Mobility Restrictions or the Alleged Three-Party Information Sharing. Instead, Plaintiffs' experts describe and analyze two separate mobility restrictions and two separate bilateral pathways for information sharing.

12.  With respect to alleged mobility restrictions, Plaintiffs' experts describe and analyze two separate alleged non-solicitation agreements spanning different durations than those alleged in the Complaint—one between SCA and DaVita, claimed to be in effect from 2008 to 2019, and a separate agreement between SCA and USPI from 2010 to 2019 ("Experts' Assessed SCA-USPI Mobility Restrictions").[14] Plaintiffs' experts do not describe or analyze any alleged agreement between USPI and DaVita concerning mobility restrictions. For both sets of bilateral non-solicitation agreements, Plaintiffs' experts describe provisions preventing the parties from considering unsolicited job applications from each other's employees unless the employee notified their current employer (i.e., the Tell Your Boss provision).[15]

13.  With respect to alleged information sharing, Plaintiffs' experts describe and analyze two separate alleged bilateral pathways for information sharing, beginning as early as 2009 and continuing through 2019.[16] Plaintiffs' experts allege SCA and DaVita shared information ("Experts' Assessed SCA-DaVita Information Sharing"), and separately allege SCA and USPI

---

[12] Complaint, ¶ 92.

[13] On January 21, 2025, Dr. Starr served an amended version of his report. On February 11, 2025, Dr. Gerhart served an amended version of his report. Throughout my report I refer to these amended reports.

[14] See also Deposition of Evan P. Starr, March 19–20, 2025 ("Starr Deposition"), p. 37 ("Q[.] … you reference in paragraph 12(a)i two different bilateral agreements relating to solicitation of employees; correct? A[.] That's correct, yes; the bilateral meaning SCA and DaVita and separately SCA and USPI. Q[.] Okay. So two separate bilateral non-solicitation or solicitation agreements; correct? A[.] Yes[.]"). Dr. Starr testified that he has no opinion about the existence of an agreement between USPI and DaVita. See Starr Deposition, pp. 36–37 ("I wasn't asked to look into the -- any sort of agreement between DaVita and USPI."), 38 ("I have no opinion on the existence or nonexistence of an agreement between DaVita and USPI.").

[15] Expert Witness Report of Dr. Evan P. Starr, January 21, 2025 ("Starr Report"), ¶ 77.b ("The SCA-USPI No-Poach Agreement included the tell-your-boss provision. … As with the SCA-DaVita Agreement, SCA and USPI employees were required to inform their boss that they were looking at other opportunities before having an offer in hand."); Expert Witness Report of Dr. Barry Gerhart, February 11, 2025 ("Gerhart Report"), ¶ 22.b ("After Hayek and former DaVita CEO Thiry agreed to implement the 'tell-your-boss' provision in the SCA-DaVita No-Poach Agreement, Hayek took that provision and 'applied it to the USPI relationship'").

[16] Starr Report, ¶¶ 118.b.i ("The evidence presented above related to the SCA and DaVita CSI exchanges similarly ended in 2019, but started sometime in 2009."), 118.b.ii ("The evidence presented above related to the CSI exchanges between SCA and USPI similarly ended in 2019, but started sometime in 2009.").

shared information ("Experts' Assessed SCA-USPI Information Sharing") that could have been used to suppress compensation.[17] Plaintiffs' experts do not describe or analyze any alleged information sharing between USPI and DaVita.[18] Collectively, I refer to Experts' Assessed SCA-USPI Mobility Restrictions and Experts' Assessed SCA-USPI Information Sharing as "Experts' Assessed SCA-USPI Conduct."

### 1.4. USPI's Admitted Conduct

14. USPI admits that it had an agreement with SCA "to avoid actively soliciting each other's employees at the level of administrator or above, absent the knowledge of the employee's existing employer, that was effective from May 2010 until October 2017."[19] USPI admitted that the "agreement was oral[.]"[20] USPI admitted that it "told certain executives, human resources employees, and recruiters to avoid actively soliciting SCA employees at the administrator level and above[.]"[21] USPI admitted that "USPI's and SCA's then CEOs [Bill Wilcox and Andrew Hayek] monitored and enforced the USPI/SCA Agreement,"[22] that Mr. Hayek "communicated with USPI with respect to" the agreement,[23] and that "USPI senior executives executed and enforced" the agreement.[24] USPI also admitted that it "told candidates who were employed at the administrator level and above at SCA that they would need to inform SCA to be considered for a position at USPI" (i.e., the Tell Your Boss provision).[25] I refer to USPI's admitted mobility restrictions with SCA as "USPI's Admitted Mobility Restrictions with SCA".

---

[17] Starr Report, ¶ 19.b ("Plaintiffs also allege that SCA and DaVita, and SCA and USPI suppressed Class pay by regularly sharing competitively-sensitive information regarding employee compensation and other costs.").; Gerhart Report, ¶ 21 ("Plaintiffs allege that Defendants unlawfully conspired to suppress competition in the market for Senior-Level Employees in two ways: (1) SCA and DaVita and SCA and USPI agreed not to cold call, recruit, hire, or otherwise poach each other's Senior-Level Employees (the 'No-Poach Agreements'), and (2) SCA and DaVita and SCA and USPI engaged in anticompetitive CSI Exchanges.").

[18] See, e.g., Starr Deposition, pp. 36–37 ("I wasn't asked to look into the -- any sort of agreement between DaVita and USPI."), 38 ("I have no opinion on the existence or nonexistence of an agreement between DaVita and USPI.").

[19] Answer of Defendants United Surgical Partners Holdings, Inc., United Surgical Partners International, Inc., and Tenet Healthcare Corporation to Plaintiffs' Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, December 20, 2024 ("USPI and Tenet's Answer to the Third Amended Complaint"), ¶ 1. USPI also reported evidence of potential bilateral agreements with the following ASC companies: SurgCenter Development ("SCD"), Woodrum, and Tenet. See Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "*In re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305," June 1, 2023 at p. 4. Neither the Complaint nor Dr. Starr focus on these other agreements.

[20] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 88.

[21] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 50.

[22] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 7.

[23] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 21.

[24] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 38.

[25] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 46.

15. While USPI admits to sharing "business information" with SCA, USPI denies that the purpose of sharing this information was to suppress USPI's employees' pay.[26]

16. In this report, I refer collectively to the Alleged USPI Mobility Restrictions, Experts' Assessed SCA-USPI Mobility Restrictions, and USPI's Admitted Mobility Restrictions with SCA as the "Alleged, Assessed, or Admitted Mobility Restrictions." Similarly, I refer collectively to the Alleged USPI Information Sharing and the Experts' Assessed SCA-USPI Information Sharing as the "Alleged or Assessed Information Sharing." I also refer collectively to the Alleged USPI Conduct, the Experts' Assessed SCA-USPI Conduct, and USPI's Admitted Mobility Restrictions with SCA as the "Alleged, Assessed, or Admitted Conduct."

## 1.5. Assignment

17. I was asked by counsel representing USPI and Tenet to review and respond to the expert reports of Plaintiffs' experts, Dr. Starr and Dr. Gerhart, and to assess the economic analyses contained in those reports relating to various allegations about USPI's conduct. In particular, I have been asked to:

- Assess whether the available evidence and data support a conclusion that USPI, collectively with SCA, would have had market power sufficient to suppress the compensation of all or nearly all USPI Senior Employees by engaging in the Alleged, Assessed, or Admitted Conduct;

- Assess whether the economic evidence and analyses presented in Dr. Starr's and Dr. Gerhart's expert reports support Plaintiffs' allegations that the Alleged USPI Conduct suppressed the compensation of all or nearly all USPI Senior Employees;

- Assess whether the economic evidence and analyses presented in Dr. Starr's and Dr. Gerhart's expert reports support their conclusion that the Experts' Assessed SCA-USPI Conduct suppressed the compensation of all or nearly all USPI Senior Employees;

- Assess whether the economic analyses presented in Dr. Starr's and Dr. Gerhart's expert reports support a conclusion that USPI's Admitted

---

[26] USPI and Tenet's Answer to the Third Amended Complaint, p. 6 ("With respect to the third sentence of Paragraph 8, USPI and Tenet admit that there were occasions on which USPI shared business information with SCA. ... USPI and Tenet deny the fourth sentence of Paragraph 8." The fourth sentence of Paragraph 8 states "Defendants shared the competitive sensitive information to further the goals of the conspiracy to suppress the compensation of their employees."). See also USPI and Tenet's Answer to the Third Amended Complaint, p. 41 ("USPI and Tenet deny the allegations in Paragraph 82 as they relate to them[.]" Paragraph 82 states: "Defendants suppress their employees' pay through another method: exchanging competitively sensitive information including future planned company-wide pay increases. Like the no-poach agreements, these wage-fixing exchanges occurred between Defendants' most senior corporate Officers, the same individuals who set an approve company-wide pay levels. Defendants used the wage-fixing exchanges to assure each other that they did not need to increase pay levels as much as they otherwise would have, if there were competitive uncertainty about those highly confidential business plans.").

Mobility Restrictions with SCA suppressed the compensation of all or nearly all USPI Senior Employees;

- Assess whether Dr. Starr's empirical analysis reliably estimates the impact and damages, if any, from the Experts' Assessed SCA-USPI Conduct, and whether his analysis supports a conclusion of compensation suppression from the Alleged USPI Conduct or USPI's Admitted Mobility Restrictions with SCA.

18. Cornerstone Research is being compensated at my standard billing rate of $1,200 per hour for my work. I have been assisted in this matter by staff at Cornerstone Research, who worked under my direction. Neither my compensation in this matter nor the compensation that Cornerstone Research receives is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

19. In performing my analyses and forming my opinions, I have relied upon the materials cited in this report, including documents and data produced in this litigation as well as publicly available documents and data. A full list of the documents I relied upon in forming my opinions is in Appendix B.

20. I reserve the right to supplement or modify my opinions, if warranted, as additional information or documents are made available to me. In addition, I reserve the right to prepare additional supporting materials such as summaries, graphical exhibits, charts, demonstratives, animations, enlargements, or other enhancements, including for hearings and trial.

## 2. **Summary of opinions**

21. I have reviewed Plaintiffs' allegations from the Complaint, USPI's Answer to the Complaint, Dr. Starr's and Dr. Gerhart's expert reports as well as record documents and testimony. My overall opinions are as follows:

    1. The economic evidence does not support a conclusion that USPI in combination with SCA or in combination with SCA and DaVita had the requisite market power to suppress the compensation of all or nearly all USPI Senior Employees.
    2. An analysis of the Alleged, Assessed, and Admitted Mobility Restrictions demonstrates that each could have directly affected, at most, a small number of USPI Senior Employees.
    3. Plaintiffs' experts do not analyze any information sharing between DaVita and USPI, and their analysis of the Experts' Assessed SCA-USPI Information Sharing fails to identify reliable economic evidence to support their conclusion that such conduct restricted labor market competition or facilitated the suppression of compensation for all or nearly all USPI Senior Employees. Plaintiffs' experts also fail to identify

reliable economic evidence to support a conclusion that the Alleged SCA-USPI Information Sharing restricted labor market competition or facilitated the suppression of compensation for all or nearly all USPI Senior Employees.

4. Economic evidence does not support Plaintiffs' experts' claims that USPI maintains a compensation structure that would have resulted in the Alleged, Assessed, or Admitted Conduct suppressing the compensation of all or nearly all USPI Senior Employees.

5. Dr. Starr's empirical analysis of the effect or impact of the Experts' Assessed SCA-USPI Conduct on compensation is flawed. Moreover, his empirical analyses do not support the conclusion that the Alleged USPI Conduct, the Experts' Assessed USPI Conduct, or USPI's Admitted Mobility Restrictions with SCA suppressed compensation.

22. In **Section 4**, I review record evidence related to labor market mobility to determine if USPI, collectively with SCA and/or DaVita, possesses the labor market monopsony power required to suppress the compensation of Senior Employees. In the absence of market power, if USPI attempted to suppress compensation, it would lose Senior Employees to its other labor market competitors. **I find that the economic evidence does not support a conclusion that USPI collectively with SCA, or collectively with SCA and DaVita, has the requisite market power to suppress compensation of all or nearly all USPI Senior Employees**.

23. My conclusion is based on a review of Defendants' internal compensation records and third-party employee mobility data. I find that, during the years outside the Alleged, Assessed, or Admitted Conduct periods, SCA and DaVita account for less than 4 percent of USPI Senior Employee arrivals or departures, and that the vast majority of Senior Employees who left USPI or arrived at USPI transitioned to or from non-Defendant firms. Based on this analysis, I conclude that SCA alone, or SCA and DaVita collectively, account for a small share of the outside employment opportunities available to USPI Senior Employees. Even if USPI, SCA, and DaVita were to agree not to solicit each other's Senior Employees, the effect of such an agreement on compensation would be limited by the Senior Employees' many other employment options.

24. In **Section 5**, I analyze the potential direct impact of the Alleged, Assessed, and Admitted Mobility Restrictions between SCA and USPI or among Defendants. Plaintiffs allege that some USPI Senior Employees were directly harmed by the Alleged Three-Party Mobility Restrictions. Plaintiffs' experts claim some USPI employees were directly harmed by the Experts' Assessed SCA-USPI Mobility Restrictions. Plaintiffs and Plaintiffs' experts claim that these restrictions prevented SCA (and DaVita) from soliciting USPI Senior Employees who could have either accepted a new position with SCA (or DaVita) or used the solicitation as leverage to

increase their compensation at USPI. I review the frequency of USPI Senior Employee departures to SCA and DaVita outside the Alleged, Assessed, and Admitted Conduct period. I also review Dr. Starr's impact analysis of the Experts' Assessed SCA-USPI Mobility Restrictions. **I conclude that the Alleged, Assessed, and Admitted Mobility Restrictions could have directly affected, at most, a limited number of USPI Senior Employees**.

25. My conclusion is based on economic evidence showing that Senior Employee departures from USPI to SCA or DaVita were rare, even before and after the Alleged, Assessed, and Admitted Mobility Restrictions conduct periods. Outside of those periods, SCA and DaVita accounted for less than 2 percent of USPI Senior Employee departures, indicating that the Alleged, Assessed, and Admitted Mobility Restrictions could have directly affected, at most, a small number of Senior Employees.

26. I then review Dr. Starr's impact analysis of the Experts' Assessed SCA-USPI Mobility Restrictions. His results, unmodified, indicate that there would have been a total of approximately 11 additional departures from USPI to SCA during the Experts' Assessed SCA-USPI Mobility Restrictions conduct period but for the alleged mobility restrictions between the two firms. Even assuming that these departures would be incremental (i.e., that they do not include employees who switched to another employer instead of SCA), this would result in less than a 1 percent increase in employee mobility.[27]

27. In **Section 6**, I review the evidence that Dr. Starr and Dr. Gerhart highlight in support of their claim that the economic evidence is consistent with Defendants' sharing information that could be used to suppress compensation.[28] I find that neither Dr. Starr nor Dr. Gerhart provides any analysis of alleged information sharing between USPI and DaVita in support of the Alleged Three-Party Information Sharing. **I conclude that Plaintiffs' experts fail to present reliable economic evidence that the Experts' Assessed SCA-USPI Information Sharing restricted labor market competition, or suppressed compensation**.

28. Economic theory outlines a set of conditions needed for collusion (e.g., compensation suppression or price fixing) to arise and be profitable. Dr. Gerhart and Dr. Starr opine that the economic evidence is consistent with Defendants' sharing information to facilitate a conspiracy to suppress

---

[27] The total number of departures from USPI during the conduct period was 948. See Section 5 below for details of this calculation.

[28] Starr Report, ¶ 29 ("The exchanges of CSI are the exact kind of data exchanges that could lead to the suppression of employee compensation."); Gerhart Report, ¶ 7.f ("Based on my experience and research in compensation and human resource management, common evidence that Defendants' years-long CSI Exchanges are inconsistent with unilateral conduct and would have harmed employees. No company benefits by unilaterally sharing wage-related data with competing employers. Rather, mutual CSI Exchanges would have enabled Defendants to agree to keep Class pay low and limited the number of higher-paying jobs available to Class Members seeking better opportunities. As such, Defendants could have kept Class Members' pay low without fear of rising turnover rates.").

compensation.[29] Yet, neither Dr. Gerhart nor Dr. Starr assesses whether the necessary conditions for collusion hold. Moreover, the economic evidence indicates that certain conditions that are necessary for collusion do not hold.

29. Plaintiffs' experts provide characteristics of information sharing that they claim reduce competition and suppress compensation. They then review and identify communication documents that they claim demonstrate that "[t]he type of CSI shared could be used by Defendants to suppress employee wages."[30] Yet, neither expert explains how the different communications they have identified support their opinion or fit into an *economic* analysis of collusion. Applying Plaintiffs' experts' supposed criteria for assessing the likely impact of information sharing to the communications they identified calls into question their assertion that the information exchanged in each or any communication suppressed compensation. Moreover, Dr. Starr and Dr. Gerhart ignore qualitative and quantitative economic evidence that is inconsistent with the Alleged or Assessed Information Sharing suppressing compensation.

30. In **Section 7**, I review the evidence that Dr. Starr and Dr. Gerhart highlight to describe a compensation structure they claim USPI maintained. Both experts claim that the compensation structure was so rigid that if USPI were to increase the compensation of a limited number of employees in response to competition with SCA, USPI would have to increase compensation for all or nearly all USPI Senior Employees. Therefore, Plaintiffs' experts conclude that USPI maintains a compensation structure that would have resulted in the Alleged, Assessed, or Admitted Conduct suppressing the compensation of all or nearly all USPI Senior Employees. **I conclude that economic evidence does not support Plaintiffs' experts' claims that USPI maintains a compensation structure that would have resulted in the Alleged, Assessed, or Admitted Conduct suppressing the compensation of all or nearly all USPI Senior Employees**. I base my conclusion on the following analyses and opinions.

31. I review USPI's compensation records and find that compensation patterns are inconsistent with the type of compensation structure that Plaintiffs' experts claim would transmit harm across all or nearly all Senior Employees.

---

[29] Gerhart Report, ¶ 82.a ("[B]ased on my experience and research in compensation and human resource management, these [information] exchanges would have facilitated USPI's and SCA's ability to agree to set their pay rates lower than they otherwise would have."); Starr Report, ¶ 29 ("I find that both the qualitative and quantitative evidence is consistent with the alleged anticompetitive collusion and inconsistent with competition. ... The exchanges of CSI are the exact kind of data exchanges that could lead to the suppression of employee compensation.").

[30] Starr Report, ¶ 99. See also Gerhart Report, ¶ 82.

- The pay received by USPI Senior Employees within a given job category varies. For example, compensation for vice presidents ("VPs") at USPI ranged from less than $100,000 to over $400,000 per year in 2017.[31]
- The pay received by USPI Senior Employees at different job levels is not consistent with the rigid type of internal equity that would be required to transmit harm across all or nearly all Senior Employees. For example, in 2017, compensation for directors ranged from less than $100,000 to over $250,000, overlapping much of the range for VPs. As a result, many directors earned more than some VPs.[32]
- Compensation of USPI Senior Employees moves in different directions year-over-year. From any given year to the next, some employees' compensation grows, some declines, and some stays relatively constant.[33]
- Compensation for Senior Employees hired at the same time evolves differently across time.[34]

32. Dr. Gerhart relies on an internal USPI document describing existing pay within job titles to support his opinion that USPI maintains a compensation structure that would transmit direct harm across all or nearly all Senior Employees. The document Dr. Gerhart identifies does not support his conclusion. Rather, the pay ranges for a given job title that are reported in the document are consistent with the compensation patterns described above, which are inconsistent with a compensation structure that would transmit harm to all or nearly all Senior Employees. I find that the existence of these documents does not support Dr. Gerhart's conclusion that USPI implemented a structured compensation system that would transmit direct harm from a few Senior Employees to all or nearly all Senior Employees.

33. Dr. Starr offers a quantitative analysis to support his compensation structure opinions. Dr. Starr claims that USPI Senior Employee compensation is correlated across jobs and within jobs. I find that Dr. Starr's compensation dataset includes an error that inflates his measure of compensation, particularly in 2005 and 2006, causing him to overstate the correlation in compensation across jobs. Once the data are corrected, Dr. Starr's methodology finds that compensation is not correlated between jobs. Furthermore, I find that the results from his *within*-job correlation analysis are driven by differences in average pay *across* jobs and not from within-job correlation in pay. I modify his analysis to isolate the within-job correlation in compensation by applying Dr. Starr's methodology to a single job title at a time. I find that correlation within any given job Dr.

---

[31] See Exhibit 20.

[32] See Exhibit 20.

[33] See Exhibit 21.

[34] See Exhibit 19.

Starr analyzes is much smaller than his overall results, and negative in some instances.

34. Finally, in **Section 8**, I review Dr. Starr's analysis of wage suppression resulting from the Experts' Assessed SCA-USPI Conduct and damages calculations. Upon review of these regressions, I conclude that Dr. Starr offers flawed empirical analyses to support his opinions on wage suppression and to calculate damages. Dr. Starr estimates two types of compensation regressions. First, he estimates a before/during/after regression where he compares compensation during the Experts' Assessed SCA-USPI Conduct period to compensation outside of it, accounting for some individual and macroeconomic factors. Second, he estimates a difference-in-differences model where he compares the change in compensation for Senior Employees during the Experts' Assessed SCA-USPI Conduct period with the change in compensation for managers—a set of employees who are not part of the class. Based on the first regression model, he finds compensation for USPI Senior Employees was 12 percent lower during the Experts' Assessed SCA-USPI Conduct period than outside the conduct period and concludes that this difference was caused by the Experts' Assessed SCA-USPI Conduct.

35. I show that Dr. Starr's main specification, which provides the basis for his damages calculation, overstates the effect of the Experts' Assessed SCA-USPI Conduct for several reasons.

- First, Dr. Starr's regression data contain the same data processing error highlighted above that affects hours worked, as well as some other technical errors. Applying Dr. Starr's regression methodology to corrected data for Defendants results in an effect less than three-quarters the magnitude of Dr. Starr's main specification.

- Second, his main specification pools data across Defendants and imposes that the effects of the factors he accounts for are exactly the same across all Defendants. I perform a statistical test for whether the factors affect all Defendants the same and find they do not. I estimate Dr. Starr's regression on USPI's compensation data alone and find an estimated effect that is both smaller than his preferred estimate and similar to a sensitivity he estimates that allows the effects of some of his covariates to differ across Defendants.[35]

- Third, Dr. Starr cites documents that demonstrate USPI ceased enforcing its end of any mobility restrictions in late 2017, yet he includes 2018 and 2019 in the conduct period for the purposes of his impact regressions. Given the evidence Dr. Starr references, at most, only SCA was allegedly upholding the agreement in 2018 and 2019. If Dr. Starr's regression was identifying the effect of the Experts' Assessed

---

[35] This sensitivity is shown in Dr. Starr's Appendix Figure 29.

SCA-USPI Conduct, it should find an attenuated effect during these years. Yet, when I re-estimate Dr. Starr's regression allowing for different effects during the periods 2010–2017 and 2018–2019, his model finds a larger effect in 2018 and 2019. That is, according to Dr. Starr's analysis, USPI's compensation became *more* suppressed once it ceased enforcing its side of any mobility restrictions. This result indicates that Dr. Starr's regression model is not able to identify the effect of the Alleged, Assessed, or Admitted Conduct separately from other unrelated changes in compensation over time.

- Fourth, Dr. Starr recognizes that the COVID-19 pandemic, which began coincidentally with the end of the Experts' Assessed SCA-USPI Conduct period, impacted labor markets, and that therefore he needs to control for it in his regression. He does this in a very restrictive way, assuming that the pandemic had a constant impact on compensation for 2020 and 2021, and that its impact vanished in 2022. Research shows that the pandemic's impact on labor markets was varied and persistent. When I modify Dr. Starr's regression to allow for the effect of the pandemic to persist into 2022—possibly at a reduced level—his model finds that Experts' Assessed SCA-USPI Conduct had no significant effect.

- Last, given disagreement over when the conduct at issue ended and uncertainty about how to control for effects of the pandemic, I test whether Dr. Starr's results are being driven by his choices on both of these issues by estimating his model excluding data from 2018 thereafter. This methodology allows me to be agnostic about whether 2018–2019 are inside or outside the conduct period, and agnostic about whether the impact of the pandemic continued into 2022. When I estimate Dr. Starr's model this way, I find no statistically significant effect.

36. My finding that Dr. Starr overstated the impact of the Experts' Assessed SCA-USPI Conduct is consistent with my finding that Dr. Starr's estimate of harm is also higher than the actual compensation increases that former USPI employees earned when they switched to SCA before and after the Experts' Assessed SCA-USPI Conduct period.

## 3. Background on Defendants and the industries in which they operate

37. In this section, I provide an overview of facts that will serve as building blocks in my analysis of Plaintiffs' claims and in my analysis of Plaintiffs' experts' reports. I focus on the following topics.

38. First, I provide a brief overview of the **outpatient care center ("OCC")** industry—the industry in which Defendants' businesses operate.[36] In this overview, I provide information on the number and variety of employers **included in this industry and the industry's growth over the relevant time** period. Second, I provide a brief overview of **each Defendant's business and** the types of facilities each Defendant operates. Third, I provide an overview of the positions held by Senior Employees at USPI and the types of skills and backgrounds of the employees that fill those positions. This overview demonstrates that Senior Employees at USPI hold positions that require different skill sets and convey different responsibilities. Last, I provide an overview of the different types of compensation USPI offers, and the varied, complex processes used by USPI to set compensation levels for Senior Employees.

### 3.1. *Overview of outpatient care centers and ambulatory surgery centers*

39. Defendants' businesses all fall within the OCC industry. OCCs are facilities that exclusively provide outpatient health services that are administered without an overnight stay.[37]

40. OCCs generally specialize in terms of the types of care they provide, and include facilities as diverse as Family Planning Centers, which include birth control clinics and fertility clinics,[38] Outpatient Mental Health and

---

[36] My description of the OCC industry does not imply that I view the OCC industry as the relevant labor market for analyzing the issues in this case. To the contrary, labor markets are not the same as industries or even product markets. Moreover, as I describe in Section 4, USPI Senior Employees can and do move employers outside the OCC industry. See, e.g., Samuel Dodini, Michael Lovenheim, Kjell Salvanes, and Alexander Willen, "**Monopsony, Job Tasks and Labour Market Concentration,**" *The Economic Journal*, 134(661), 2024, pp. 1914–1949 at p. 1914 ("However, workers move across occupations and industries, and failing to account for these outside options can make labour demand appear more concentrated.").

[37] Definitive Healthcare, "Outpatient care: What is Outpatient Care?" available at https://www.definitivehc.com/resources/glossary/outpatient-care, accessed on February 25, 2025 ("Outpatient care refers to any healthcare consultation, procedure, treatment, or other service that is administered without an overnight stay at a hospital or medical facility.").

[38] Rachel K. Jones, Candace Gibson, and Jesse Philbin, "The Number of Brick-and-Mortar Abortion Clinics Drops, as US Abortion Rate Rises: New Data Underscore the Need for Policies that Support Providers," *Guttmacher*, June 2024, available at https://www.guttmacher.org/report/abortion-clinics-united-states-2020-2024, accessed on February 25, 2025 ("The nationwide 5% decline in brick-and-mortar abortion clinics took the number of such facilities from 807 in 2020 to 765 in March 2024 (Table 1)."); Blooming Eve, "Find a Fertility Clinic Near You," available at https://www.bloomingeve.com/, accessed on February 25, 2025 ("> 450 fertility centers in the US for you to choose from"); Blooming Eve, "All Fertility Clinics in the USA," available at https://www.bloomingeve.com/clinics, accessed on February 25, 2025 ("All fertility clinics in the USA").

Substance Abuse Centers,[39] and Kidney Dialysis Centers,[40] among others.[41] Ambulatory Surgical Centers ("ASCs") are specialized OCCs focused on providing same-day surgical care.[42] ASC facilities generally specialize in terms of the types of surgeries they provide.

41. OCCs have grown substantially within the U.S. healthcare sector as part of a shift to outpatient care. This shift has been enabled by medical innovations such as minimally invasive surgeries, by payors' preference for lower-cost care, and by the increasing adoption of outpatient care by health systems.[43] This growth is demonstrated by an 80 percent increase in OCC employment between 2009 and 2023 and a more than doubling of revenue over the same period.[44]

---

[39] These facilities can offer different treatment approaches to different groups of patients. See, e.g., Substance Abuse and Mental Health Services Administration, "2020 National Mental Health Services Survey," available at https://www.samhsa.gov/data/system/files/media-quick-stats/nmhss-us20.pdf ("Treatment approaches, by number and percent … Age groups served, by number and percent … Dedicated or exclusively designed programs or groups, by number and percent"). See also the SAMHSA National Directory of Mental Health Treatment Facilities, which tracks facilities by type and treatments, available at https://www.samhsa.gov/data/sites/default/files/reports/rpt34657/National_Directory_MH_facilities_2021.pdf, accessed on April 14, 2025. See also KFF, "Number of Mental Health Treatment Facilities, By Type of Care," 2022, available at https://www.kff.org/other/state-indicator/number-of-mental-health-treatment-facilities-by-type-of-care/, accessed on April 14, 2025.

[40] The National Forum of ESRD Networks, "National ESRD Census Data," September 30, 2024, available at https://esrdnetworks.org/resources-news/national-esrd-census-data/, accessed on February 25, 2025 ("The 18 ESRD Networks serve 7,563 dialysis centers and 224 transplant centers in the United States and its territories.").

[41] Office of Management and Budget, "North American Industry Classification System," 2022, available at https://www.census.gov/naics/reference_files_tools/2022_NAICS_Manual.pdf ("621410 Family Planning Centers … 621420 Outpatient Mental Health and Substance Abuse Centers … 621492 Kidney Dialysis Centers … 621493 Freestanding Ambulatory Surgical and Emergency Centers").

[42] Ambulatory Surgery Center Association, "What is an ASC?," available at https://www.ascassociation.org/asca/about-ascs/surgery-centers, accessed on February 25, 2025 ("Ambulatory surgery centers, or ASCs, are modern healthcare facilities focused on providing same-day surgical care, including diagnostic and preventive procedures."); CMS.gov, "State Operations Manual," July 21, 2023, available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/som107ap_l_ambulatory.pdf, 416.2 ("Ambulatory surgical center or ASC means any distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following an admission.").

[43] Deloitte, "Growth in Outpatient Care," available at https://www2.deloitte.com/content/dam/insights/us/articles/4170_Outpatient-growth-patterns/DI_Patterns-of-outpatient-growth.pdf, p. 2 ("Clinical innovation, patient preferences, and financial incentives are tilting the balance in favor of outpatient settings for hospital services. Aggregate hospital revenue from outpatient services grew from 30 percent in 1995 to 47 percent in 2016. Some of this change is driven by patient preference and clinical and technological advances such as minimally invasive surgical procedures and new anesthesia techniques that reduce complications and allow patients to return home sooner. Financial incentives have likely played a role as well. Health plans and government program payment policies support providing services in lower-cost care settings, including outpatient facilities. Health systems have also been acquiring or partnering with physicians and physician practices, further driving up the volume of services performed in outpatient settings."); Kimberly Steele, "Healthcare Industry Embraces Shift to Outpatient Care Sites," *JLL*, April 11, 2024, available at https://www.us.jll.com/en/newsroom/healthcare-industry-embraces-shift-to-outpatient-care-sites, accessed on February 25, 2025 ("Demographic trends, consumer preferences, technology and reimbursement changes are continuing to steer the shift toward outpatient care, in turn driving demand for medical outpatient buildings.").

[44] Federal Reserve Bank of St. Louis, "Employment for Health Care and Social Assistance: Outpatient Care Centers (NAICS 6214) in the United States," available at https://fred.stlouisfed.org/series/IPURN6214W200000000, accessed on April 14, 2025; Federal Reserve Bank of St. Louis, "Total Revenue for Outpatient Care Centers, All Establishments," available at https://fred.stlouisfed.org/series/REV6214ALLEST144QNSA#0, accessed on April 14, 2025.

42. Exhibit 1 shows the growth of employment in OCCs and ASCs between 2008 and 2022 based on data from the U.S. Bureau of Labor Statistics. Over this period, the number of people employed in OCCs has grown substantially, and ASCs have grown even faster. ASCs accounted for 14 percent of OCC employment in 2008, and their share grew to 17 percent in 2022.

**Exhibit 1**
**ASC and OCC employment, 2008–2022**



Source: U.S. Bureau of Labor Statistics

Note: OCCs are identified using the North American Industry Classification System ("NAICS") code 6214 ("Outpatient care centers") and ASCs are identified by NAICS 621493 ("Freestanding ambulatory surgical and emergency centers"). Employment counts are calculated as annual averages and do not include workers at government-owned facilities.

43. The OCC industry is comprised of many participants beyond Defendants, and combined, USPI, SCA, and DaVita account for a small share of facilities in the industry. Exhibit 2 shows the number of OCC facilities in the U.S. versus the number operated by Defendants over time. Defendants' share of U.S. facilities, and in particular the share of USPI and SCA combined, is small.

*Highly Confidential - Outside Counsel/Experts Only*

*Exhibit 2*
*Number of OCC facilities in the U.S., and number operated by USPI, SCA, and DaVita, 2008–2022*



**Number of Establishments**

Source: U.S. Bureau of Labor Statistics; Dr. Starr Compensation Regression Data

Note: OCCs are identified using the NAICS code 6214 ("Outpatient care centers"). U.S. overall counts of establishments come from the U.S. Bureau of Labor Statistics. These data are calculated as annual averages and do not include government-owned facilities. Defendants' yearly count of establishments represents the distinct number of employment locations by name for each Defendant in each year in Dr. Starr's regression data.

### 3.2. Background on the Defendants

44. The corporate Defendants in this matter are USPI, SCA, and DaVita. USPI and SCA both operate ASC facilities. DaVita primarily operates dialysis centers, which are part of a broader OCC industry. In the remainder of this section, I provide background on each of the Defendants.

### 3.2.1. USPI

45. Founded in 1998, USPI currently owns and operates 518 ASCs and 25 surgical hospitals across 37 states.[45] USPI partners with both local

---

[45] Tenet Healthcare Corporation, SEC Form 10-K for period ended December 31, 2024, filed on February 18, 2025 ("Tenet 2024 10-K"), p. 4 ("At December 31, 2024, USPI held indirect ownership interests in 518 ASCs and 25 surgical hospitals in 37 states."); United Surgical Partners International, "About Us: Who We Are," available at https://uspi.com/about-us/who-we-are/default.aspx, accessed on April 1, 2025 ("USPI was founded in 1998").

physicians and health systems in ownership of its surgical facilities,[46] and operates these facilities through management services contracts.[47] USPI facilities offer a range of procedures but focus on ophthalmology, gastroenterology, and orthopedics.[48]

46. USPI completed an initial public offering in 2001,[49] and was acquired by private equity firm Welsh Carson in 2007.[50] In 2015, USPI merged with Tenet in a deal that gave Tenet majority control of the company.[51] By 2018, Tenet had completed its buyout of Welsh Carson and had 95 percent control of USPI.[52] In December 2021, USPI acquired SCD, which operated 86 ASCs.[53]

---

[46] United Surgical Partners International, "About Us: Who We Are," available at https://uspi.com/about-us/who-we-are/default.aspx, accessed on April 1, 2025 ("We care for communities of all sizes through strategic joint venture partnerships with more than 50 health systems and thousands of physicians. ... We also have a proven track record of successful two-way partnerships between USPI and local physicians."); United Surgical Partners International, "Partners: For Physicians," available at https://uspi.com/partners/for-physicians/default.aspx, accessed on April 1, 2025 ("We have two models in which physician partners can participate: Two-way partnerships, wherein physicians have joint ownership in surgical facilities with USPI. Three-way partnerships, wherein physicians have joint ownership in surgical facilities together with USPI and another health system"). USPI owns approximately 30 percent of its ASCs outright. See Deposition of Sandi Karrmann (USPI), August 14, 2024 ("Karrmann Deposition"), PX 296 at DOJCIV-008-00000390 ("███████████████████████████████████ ███████████████").

[47] Tenet 2024 10-K, p. 54 ("USPI operates its surgical facilities in partnership with local physicians and, in many of these facilities, a health system partner. In most cases, we hold ownership interests in the facilities and operate them through separate legal entities. USPI operates facilities on a day-to-day basis through management services contracts. ... Our role as an owner and day-to-day manager provides us with significant influence over the operations of each facility.").

[48] Tenet, "Tenet and USPI to Acquire SurgCenter Development and Establish Long-Term Development Partnership," November 8, 2021, available at https://investor.tenethealth.com/press-releases/press-release-details/2021/Tenet-and-USPI-to-Acquire-SurgCenter-Development-and-Establish-Long-Term-Development-Partnership/default.aspx, accessed on April 1, 2025 ("The case mix of the centers has an attractive distribution among several service lines where USPI has demonstrated expertise, including approximately 80 percent in musculoskeletal care, such as total joint and spine procedures. This complements a robust service offering within USPI's broader platform in the areas of gastroenterology, ophthalmology, ENT, general surgery and other specialized procedures."); Francesca Mathewes, "USPI vs. AmSurg vs. SCA Health: 10 Key Comparisons to Know in 2024," *Becker's: ASC Review*, August 9, 2024, available at https://www.beckersasc.com/asc-news/uspi-vs-amsurg-vs-sca-health-10-key-comparisons-to-know-in-2024.html, accessed on April 1, 2025 ("USPI invests primarily in orthopedics and other specialties such as ophthalmology and gastroenterology."); Tenet 2024 10-K, p. 4 ("USPI's facilities offer a range of procedures and service lines, including, among other specialties: orthopedics, total joint replacement, and spinal and other musculoskeletal procedures; gastroenterology; pain management; otolaryngology (ear, nose and throat); ophthalmology; and urology.").

[49] Luisa Beltran, "IPO Market Starts Off Fresh," *CNN Money*, June 2, 2001, available at https://money.cnn.com/2001/06/02/deals/sat_ipos/, accessed on April 1, 2025.

[50] CNBC, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," August 5, 2010, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 1, 2025.

[51] Tenet Health, "Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx, accessed on April 1, 2025.

[52] WCAS, "Tenet Completes Purchase of USPI from WCAS," April 26, 2018, available at https://wcas.com/news/tenet-completes-purchase-of-uspi-from-wcas/, accessed on April 1, 2025.

[53] Tenet Health, "Tenet and USPI Complete Transaction to Acquire SCD," December 22, 2021, available at https://investor.tenethealth.com/press-releases/press-release-details/2021/Tenet-and-USPI-Complete-Transaction-to-Acquire-SCD/default.aspx, accessed on April 1, 2025.

*Highly Confidential - Outside Counsel/Experts Only*

47. USPI accounts for a small share of the ASC industry in the U.S. Exhibit 3 shows the number of ASC facilities in the U.S. for each year from 2008 to 2022, along with the number of facilities operated by USPI. In 2022, USPI operated 424 facilities out of 8,576 ASC facilities in the U.S. overall, or less than 5 percent of the U.S. total.[54]

***Exhibit 3***
***Number of ASC facilities in the U.S., and number operated by USPI and SCA, 2008–2022***



Source: U.S. Bureau of Labor Statistics; Dr. Starr Compensation Regression Data

Note: ASCs are identified using the NAICS code 621493 ("Freestanding ambulatory surgical and emergency centers"). U.S. overall counts of establishments come from the U.S. Bureau of Labor Statistics. These data are calculated as annual averages and do not include government-owned facilities. Defendants' yearly count of establishments represents the distinct number of employment locations by name for each Defendant in each year in Dr. Starr's regression data.

### *3.2.2. SCA*

48. SCA owns and operates more than 320 ASCs across 35 states.[55] SCA operates both single- and multi-specialty facilities covering many

---

[54] Workpaper 1.

[55] SCA Health, "Supporting Physician Specialists in Many Aspects of Patient Care," available at https://sca.health/about-us/, accessed on February 25, 2025 ("320+ surgical facilities … Industry-leading core ASC business delivers high-quality, lower cost care with exceptional patient and physician satisfaction scores."); SCA Health, "Patient Commitment: We Put Patients First," available at https://sca.health/patient-commitment/, accessed on April 1, 2025; Claire Wallace, "SCA Health Grows to 320+ Surgical Facilities," *Becker's: ASC Review*, August 31, 2022, available at https://www.beckersasc.com/asc-transactions-and-valuation-issues/sca-health-adds-almost-100-new-surgical-facilities-in-2022.html, accessed on April 1, 2025 ("SCA now has over 320 surgical facilities, up from 230 last year. In addition, while they used to serve 8,000 physicians across 35 states, they now serve 9,200.").

specialties, with an emphasis on orthopedics and spinal surgery.[56] About half of SCA's facilities are operated with local physician partners and half are operated with hospital system partners.[57]

49. SCA was acquired by Optum, a health services company that is owned by UnitedHealth Group, in 2017.[58]

50. SCA accounts for a small share of the ASC industry in the U.S. In 2022, SCA accounted for 201 out of 8,576 ASC facilities in the U.S., or roughly 2 percent of facilities.[59] The two Defendant ASC operators' networks combined account for a small share of facilities. Exhibit 3 above shows that in each year from 2008 to 2022, USPI and SCA together accounted for less than 10 percent of ASCs in the U.S.

### 3.2.3. DaVita

51. DaVita is in the broader OCC industry. It owns and operates 2,657 outpatient dialysis centers in 46 states and provides hospital inpatient dialysis services at over 750 hospitals,[60] and it also provides home-based dialysis services.[61] While DaVita owns many of its outpatient centers outright, a minority are owned and operated as joint ventures with partners ranging from physicians and health systems to management services organizations. DaVita usually holds a controlling interest in these centers.[62]

---

[56] Francesca Mathewes, "USPI vs. AmSurg vs. SCA Health: 10 Key Comparisons to Know in 2024," *Becker's: ASC Review*, August 9, 2024, available at https://www.beckersasc.com/asc-news/uspi-vs-amsurg-vs-sca-health-10-key-comparisons-to-know-in-2024.html, accessed on April 1, 2025 ("It focuses on orthopedics and spine."); SCA Health, "Build Your Career at SCA Health," available at https://careers.sca.health/, accessed on April 8, 2025 ("We provide a wide range of care to patients[.]").

[57] SCA Health, "Committed to Excellent Patient Care," available at https://sca.health/partnering-with-sca/physicians/#, accessed on April 1, 2025 ("Surgery center partnership"); SCA Health, "Partnering with Hospital Systems," available at https://sca.health/partnering-with-sca/hospital-systems/#, accessed on April 1, 2025 ("Professional ASC leadership, including managed care contracting, group purchasing, and management and operating systems ... ~50% of SCA Health facilities have a hospital system partner that allows for unique understanding of joint venture structures and local community relationships").

[58] UnitedHealth Group, "Surgical Care Affiliates (SCA), OptumCare to Combine," January 9, 2017, available at https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html, accessed on April 1, 2025.

[59] Workpaper 1.

[60] DaVita Inc., SEC Form 10-K for period ended December 31, 2024, filed on February 13, 2025 ("DaVita 2024 10-K"), p. 3 ("Our U.S. dialysis business is a leading provider of kidney dialysis services for patients suffering from ESKD. As of December 31, 2024, we provided dialysis, administrative and related laboratory services in the U.S. through a network of 2,657 outpatient dialysis centers in 46 states and the District of Columbia, serving a total of approximately 200,800 patients. We also have contracts to provide hospital inpatient dialysis services in approximately 760 hospitals throughout the U.S.").

[61] DaVita 2024 10-K, p. 5 ("Many of our outpatient dialysis centers offer certain support services for dialysis patients who prefer and are able to perform either HHD or peritoneal dialysis in their homes. Home-based hemodialysis support services consist of providing equipment and supplies, training, patient monitoring, on-call support services and follow-up assistance. Registered nurses train patients and their families or other caregivers to perform either HHD or peritoneal dialysis.").

[62] DaVita 2024 10-K, p. 8 ("We own and operate certain of our dialysis centers through entities that are structured as joint ventures. We generally hold controlling interests in these joint ventures, with nephrologists, hospitals, management services organizations, and/or other healthcare providers holding minority equity interests. ... For the

52. DaVita has been a standalone public company since 1995, when it operated as Total Renal Care.[63] It changed its name to DaVita in 2000.[64] In 2005, it acquired Gambro Healthcare for $3 billion in a deal that added 565 dialysis centers to its operations.[65]

### 3.3. Background on USPI Senior Employees

53. Plaintiffs claim that Defendants conspired to suppress competition for Senior Employees, which they define as employees "at the director level and above."[66] Senior Employees include employees in a variety of roles that require different skills and experience, from nursing certifications to business degrees, experience with health insurance billing or information technology, or experience in a surgical setting. As I explain below, any assessment of the effect of the Alleged, Assessed, or Admitted Conduct on USPI's Senior Employees requires an understanding of the employment options available to USPI Senior Employees. In this section, I describe examples of the jobs held by USPI Senior Employees.

54. Exhibit 4 below summarizes USPI job descriptions for nine common Senior Employee job titles in Dr. Starr's class data: clinical director / director of nursing, director of surgical services, director of clinical operations, director of finance, regional director, administrator, CEO, regional vice president ("RVP"), and market president. Each of these jobs requires a different combination of education and certifications, skills, and experience.[67]

---

year ended December 31, 2024, revenues from joint ventures in which we have a controlling interest represented approximately 30% of our U.S. dialysis revenues.").

[63] Total Renal Care Holdings Inc., SEC Form 10-Q for the quarterly period ended March 31, 1996, filed on March 15, 1996, p. 13 ("On November 3, 1995, the Company completed its initial public offering[.]").

[64] DaVita, "Total Renal Care Holdings, Inc. Announces Legal Name Change to DaVita Inc.," October 4, 2000, available at https://investors.davita.com/2000-10-04-Total-Renal-Care-Holdings-Inc-Announces-Legal-Name-Change-to-DaVita-Inc, accessed on April 1, 2025.

[65] DaVita, "DaVita to Acquire Gambro Healthcare, a Renal Dialysis Services Company," December 7, 2004, available at https://investors.davita.com/2004-12-07-DaVita-to-Acquire-Gambro-Healthcare-a-Renal-Dialysis-Services-Company, accessed on April 1, 2025.

[66] Complaint, ¶ 7 ("Beginning no later than 2008, however, Defendants or their predecessors in interest entered into agreements to avoid competing for employees, particularly those at the director level or above ('Senior Employees'), by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers.").

[67] USPI provided a letter to Plaintiffs containing the set of job titles that were subject to USPI's Admitted Mobility Restrictions with SCA. See Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C.), and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "*In re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305," May 14, 2023. Dr. Starr identified a set of job titles listed in USPI's compensation records that he considers part of the putative class. I present both lists of job titles in Appendix D. Exhibit 4 presents examples from the list of job titles Dr. Starr considers as part of the putative class and which may not be job titles that USPI admitted were subject to USPI's Admitted Mobility Restrictions with SCA.

*Exhibit 4*
*Education, skill, and experience requirements for a selection of USPI class jobs*

| Education and Certification | Skills and Specialties | Experience |
|---|---|---|
| **1. Clinical Director / Director of Nursing** | | |
| - Registered Nurse<br>- ACLS, BLS, PALS required or preferred | - Oversee clinical or nursing department operations<br>- Evaluate clinical or nursing staff performance<br>- Ensure regulatory compliance<br>- Manage and hire clinical or nursing staff | - Work as a Registered Nurse (sometimes in specific care settings like Outpatient Surgery, PACU, Preoperational, etc.)<br>- Previous management or supervisory work with teams of clinical staff or nurses |
| **2. Director of Surgical Services** | | |
| - Registered Nurse<br>- ACLS, BLS, PALS, CNOR required or preferred | - Oversee operating room and surgical department operations<br>- Ensure compliance with clinical policies and procedures<br>- Manage and hire clinical and nursing staff<br>- Train new clinical and nursing staff | - Work as Registered Nurse in surgical setting<br>- Previous management or supervisory work with teams of nurses |
| **3. Director of Clinical Operations** | | |
| - Registered Nurse<br>- Master's degree in relevant area preferred<br>- ACLS, BLS, PALS required or preferred | - Develop and implement updates to policies and procedures for service provision<br>- Implement strategies to improve patient outcomes<br>- Coordinate with senior facility management to meet facility goals through clinical operations | - Work as Registered Nurse in medical, surgical, or intensive care settings<br>- Previous clinical management or supervisory work |
| **4. Director of Finance** | | |
| - Bachelors required<br>- MBA, MPH, MHA, or Master's in Accounting preferred | - Financial reporting, management, and planning (oversee budgeting, ensure accuracy of financial statements, create financial reports, perform financial forecasting)<br>- Manage revenue cycle and facility finances<br>- Ensure compliance with financial regulations, internal and external accounting controls, and preparation for audits | - Work in hospital financial management role<br>- Experience developing financial staff<br>- Accounting or financial background preferred |
| **5. Regional Director** | | |
| - MBA or MHA preferred | - Oversee ASC and ASC Administrator operations within region<br>- Direct regional budgeting as well as financial reporting and analysis<br>- Recruit physicians and manage equity<br>- Recruit and train ASC Administrators | - Exposure to healthcare business development, operations, finance, and/or business consulting<br>- Experience in developing growth strategies |
| **6. Administrator** | | |
| - Master's or Nursing education preferred<br>- CASC, FACHE optional | - Oversee ASC operations<br>- Financial planning and management (oversee budgeting, manage revenue cycle, control expenses)<br>- Develop and implement quality improvement plan<br>- Recruit and retain physicians and ASC staff | - Work with high-level administrative or management (profit and loss) responsibility at ASC or hospital surgical center<br>- Knowledge of ASC accreditation process (AAAHC, Medicare, TJC)<br>- Previous health executive or nursing leadership |
| **7. CEO** | | |
| - Master's degree strongly preferred, particularly MBA or MHA<br>- FACHE optional | - Oversee Surgical Hospital operations<br>- Financial planning and management (oversee budgeting, direct investments)<br>- Develop and implement quality improvement plan<br>- Recruit and retain physicians and hospital staff<br>- Negotiate external contracts for services, pricing, and purchases | - Work in surgical divisions of hospitals or at surgical hospitals<br>- Experience in facility or healthcare management |
| **8. Regional Vice President** | | |
| - MBA or MHA preferred<br>- CASC, FACHE optional | - Oversee operations and performance for all facilities within region<br>- Manage physician partnerships and equity<br>- Provide strategic leadership to all facilities within region<br>- Financial planning and analysis (develop financial reports, analyze financial results) | - Work in Operating Room operations<br>- Exposure to healthcare business development, operations, finance, and/or business consulting<br>- Experience in developing growth strategies |
| **9. Market President** | | |
| - Education in health profession, business, or public administration | - Oversee operations and performance for all facilities within multi-state markets<br>- Direct senior executive teams in market<br>- Coordinate between facilities, healthcare partners, physicians, and employees<br>- Develop and implement market's strategic plan | - Work in healthcare management<br>- Prior experience mentoring and working with healthcare executives<br>- Knowledge and experience of financial reporting |

Source: Clinical Director / Director of Nursing (USPI_CIV_000258918; USPI_CIV_000255672; USPI_CIV_000035153; https://www.indeed.com/viewjob?jk=fe790283b33ab633&from=shareddesktop; https://www.indeed.com/viewjob?jk=58a75b27e4092221&from=shareddesktop; https://careers.uspi.com/job/monroe/clinical-director/35934/79380146160); Director of Surgical Services (USPI_CIV_000537576; https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-75Di200318061401/); Director of Clinical Operations (https://www.wayup.com/i-j-Director-of-Clinical-Operations-United-Surgical-Partners-International-Inc-USPI-482563639121828/; https://careers.uspi.com/job/dallas/uspi-director-clinical-operations-up-to-75-travel/26425/79499040448; https://careers.uspi.com/job/nashville/uspi-director-of-clinical-operations-hybrid-must-live-in-tn-up-to-75-travel/26425/78599147200); Director of Finance (USPI_CIV_000006204; USPI_CIV_000336360; USPI_CIV_000198551; USPI_CIV_000056074); Regional Director (USPI_CIV_000336074; USPI_CIV_000574241; https://www.indeed.com/viewjob?jk=bc655b0f0fe331fc&from=shareddesktop); Administrator (USPI_CIV_000776176; USPI_CIV_000484217; USPI_CIV_000557348; USPI_CIV_000031207; USPI_CIV_000188238; USPI_CIV_000301659; https://www.indeed.com/viewjob?jk=46a9059ad76901ba&from=shareddesktop; https://www.indeed.com/viewjob?jk=c078d8f7008bf116&from=shareddesktop); CEO (USPI_CIV_000241755; USPI_CIV_000250682; https://www.indeed.com/viewjob?jk=8c181807c183eabc&from=shareddesktop; https://www.indeed.com/viewjob?jk=1046d2fc27cbf644&from=shareddesktop); Regional Vice President (USPI_CIV_000188238; USPI_CIV_000239249; USPI_CIV_000261743; https://www.indeed.com/viewjob?jk=80dba394c619badf&from=shareddesktop); Market President (USPI_CIV_000889891; USPI_CIV_000713042; USPI_CIV_000035359; https://www.tealhq.com/job/uspi-market-president-i-midwest_d9052397-8ff0-420a-93ae-52f1189ff5d0)

Note: Table summarizes key required or preferred educational background and certifications, skills and specialties, and experiences for nine Senior Employee job titles. Job titles in this table reflect some of the largest titles by total compensation appearing in Dr. Starr's class data, except for director of surgical services and director of clinical operations, which are specialties within the "director" title in USPI data. This summary relies on job postings and/or resumes for each job title.

55. Some Senior Employee positions in the putative class as identified by Dr. Starr, such as clinical director, director of nursing, and director of surgical services, require certification as a Registered Nurse, but these jobs differ in the required skills or experience.[68] Of the positions for Registered Nurses, some require prior experience in a surgical setting, others require general experience in an intensive care setting, and others do not require nursing experience in a specific setting but instead require management or supervisory experience over medical workers.[69] Some of these jobs prefer both a background in nursing and a master's degree in a relevant area.[70]

---

[68] USPI Job Description, "Clinical Director/Director of Nursing at the Center for Ambulatory Surgical Treatment," Undated, USPI_CIV_000035153 at USPI_CIV_000035153 ("Current license as a Registered Nurse (for the state of CA)"); Indeed, "Crown Point Surgery Center: Clinical Director," available at https://www.indeed.com/viewjob?jk=fe790283b33ab633&from=shareddesktop, accessed on February 3, 2025 ("Current license as a CO Registered Nurse."); Indeed, "Baylor Scott & White Surgicare Centennial: Director of Nursing Outpatient Surgery," available at https://www.indeed.com/viewjob?jk=58a75b27e4092221&from=shareddesktop, accessed on February 3, 2025 ("RN License in the State"); WayUp, "USPI: FSH Director of Surgical Services," available at https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-751200318061401/, accessed on February 4, 2025 ("Current California Registered Nursing License.").

[69] WayUp, "USPI: FSH Director of Surgical Services," available at https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-751200318061401/, accessed on February 4, 2025 ("Five (5) years of experience in surgical nursing."); WayUp, "USPI: Director of Clinical Operations," available at https://www.wayup.com/i-j-Director-of-Clinical-Operations-United-Surgical-Partners-International-Inc-USPI-482563639121828/, accessed on February 4, 2025 ("Minimum of five (5) years' experience in Medical/Surgical or Intensive Care nursing."); Indeed, "Crown Point Surgery Center: Clinical Director," available at https://www.indeed.com/viewjob?jk=fe790283b33ab633&from=shareddesktop, accessed on February 3, 2025 ("At least two years supervisory experience in the outpatient surgery area."); WayUp, "USPI: FSH Director of Surgical Services," available at https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-751200318061401/, accessed on February 4, 2025 ("Two (2) years of nursing management experience preferred.").

[70] WayUp, "USPI: Director of Clinical Operations," available at https://www.wayup.com/i-j-Director-of-Clinical-Operations-United-Surgical-Partners-International-Inc-USPI-482563639121828/, accessed on February 4, 2025 ("Graduate of professional school of nursing, BSN required … Master's degree preferred, applicable to area of expertise … Current, active Texas RN License"); Indeed, "USPI: Surgery Center Administrator," available at

While the Senior Employee roles for Registered Nurses require different combinations of skills and experience, and therefore differ from each other, they are not unique to the OCC industry. As I show in detail below, USPI competes for workers in each of these roles with different types of employers, such as hospitals, urgent care centers, health insurance companies, and doctors' offices.

56. Other positions held by Senior Employees, such as director of finance,[71] regional director, or RVP, require a bachelor's degree or prefer candidates with MBAs or MHAs.[72] Some of these jobs call for specific experience in operating room operations.[73] Some do not require experience in any healthcare setting, but they do require different sets of skills such as project management, consulting, accounting, or financial experience.[74] As I show in detail below, USPI hires workers for these roles from and loses workers to businesses in industries as varied as residential building construction and management, scientific, and technical consulting services.

---

https://www.indeed.com/viewjob?jk=c078d8f7008bf116&from=shareddesktop, accessed on February 3, 2025 ("Nursing or Master's degree preferred.").

[71] There are distinct job titles requiring different educational backgrounds and skills even within directors of finance. In addition to the director of finance position discussed in this section, documents and Dr. Starr's class data identify a separate director of operations finance position, which requires a master's degree in a quantitative or technical field as well as knowledge and ability in business intelligence and financial analysis. See email chain from Shelly Campbell to Shannon Mosley, "FW: Director of Operations Finance," August 20, 2014, USPI_CIV_000457557–60 at USPI_CIV_000457557 ("Director Business Intelligence & Financial Analysis will create business intelligence solutions/reports and provide information and analytical consulting in support of financial, strategic and quality initiatives. ... Requires a Masters degree in Computer Science, Information Technology, Finance, Accounting or related field ... Minimum of 5 years related business intelligence experience including data design, data quality, and reporting/visualization[.]").

[72] USPI Job Description, "Director at TOPS Surgical Specialty Hospital," Undated, USPI_CIV_000056074–75 at USPI_CIV_000056075 ("Masters degree in Business Administration, Accounting or Health Care Administration preferred."); Indeed, "USPI: Regional Director," available at https://www.indeed.com/viewjob?jk=bc655b0f0fe331fc&from=shareddesktop, accessed on February 3, 2025 ("Master's degree in business administration or healthcare administration preferred."); Indeed, "USPI: Chief Executive Officer – Fresno Surgical Hospital," available at https://www.indeed.com/viewjob?jk=1046d2fc27cbf644&from=shareddesktop, accessed on April 8, 2025 ("A Master's degree is strongly preferred."); "Resume of Thanh T. Tran, FACHE," Undated, USPI_CIV_000241755–57; "Resume of Dan Smith, MBA," Undated, USPI_CIV_000250682–84; Indeed, "USPI: Regional Vice President, Operations I–Mid–Atlantic (MD/PA/NJ/DE)," available at https://www.indeed.com/viewjob?jk=80dba394c619badf&from=shareddesktop, accessed on February 3, 2025 ("Prefer Master's degree in Business Administration or Healthcare Administration; equivalent experience considered").

[73] Indeed, "USPI: Regional Vice President, Operations I–Mid–Atlantic (MD/PA/NJ/DE)," available at https://www.indeed.com/viewjob?jk=80dba394c619badf&from=shareddesktop, accessed on February 3, 2025 ("Must have OR Operations experience").

[74] USPI Job Description, "Director at TOPS Surgical Specialty Hospital," Undated, USPI_CIV_000056074–75 at USPI_CIV_000056075 ("Minimum 5 years in a hospital financial management capacity. Bachelors degree in Accounting required."); Indeed, "USPI: Regional Director," available at https://www.indeed.com/viewjob?jk=bc655b0f0fe331fc&from=shareddesktop, accessed on February 3, 2025 ("Minimum five years' experience with exposure to healthcare business development & operations, finance and business consulting required.").

*3.4. Overview of compensation for USPI Senior Employees*

57. To analyze whether compensation outcomes are consistent with the allegations that Defendants colluded to suppress Senior Employee compensation, it is important to understand the components of compensation that USPI offered. In this section, I review documentary evidence showing the complex ways that compensation for USPI employees was determined.

58. USPI provided a variety of forms of compensation to Senior Employees. Most Senior Employees received a base salary and an annual bonus.[75] Some higher-level employees were eligible for deferred compensation plans, and USPI matched some of the amounts eligible employees elected to defer. USPI also paid various forms of equity compensation. On a case-by-case basis, USPI also used other one-off compensation methods, such as retention bonuses and funds for education.[76]

59. **Salary:** Testimony indicates that salaries for existing USPI employees could be changed according to annual merit and market adjustments.[77] According to Sandi Karrmann, then Chief HR Officer at USPI, salary increases for merit came from the annual "merit budget," which was set by USPI executives in the previous year's budget.[78] Department heads and facility supervisors were charged with recommending salary increases for individual employees in their departments.[79] These recommendations were

---

[75] USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 2 ("Base salary and bonus").

[76] USPI_CIV_000338903–04 at USPI_CIV_000338903, ("What is her deal on tuition with her current employer? … Perhaps we should match the offer then? Reimburse her, but ask for a longer commitment? … Agree, I'll type that up and send.").

[77] "Federal Bureau of Investigation Interview of Mark Christopher Garvin," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000359 ("███████████████████████████████████████████ ████████████████████████████████████"); Deposition of Cindy English (USPI), Volume I, June 12, 2024 ("English Deposition"), p. 52 ("Q. So the salary increases in the prior years, were those merit increases, cost of living increases or something else? … A. They were referred to as 'merit.' Q. [] Were there separate cost of living increases, or were those salary increases the sole increase in salary for each employee? … A. The supervisor would have had the ability to potentially request a market increase in addition to, for example, the 2.5%. Q. [] And who would approve the market increase [] or reject the market increase? A. The people that would approve the overall increase. It didn't change.").

[78] Karrmann Deposition, p. 38 ("Q. And were the pay levels evaluated at least once a year company-wide to determine the raises for the next year? A. There was an overall merit budget established each year. Q. Can you describe the process for doing that? A. We would look at overall projected merit budgets, we would look at merit budgets that companies were projecting based on compensation surveys. And we would also evaluate our performance as a company and establish an appropriate merit budget balancing all the different factors."); English Deposition, pp. 27–28 ("Q. [] So my question is: Do you know who determined the recommended percentage that you received? … A. Not specifically. It would have been determined during the budgeting process.").

[79] English Deposition, p. 27 ("Q. [] And during the 2007-2012/2013 period, do you know who was involved in determining the salary increases for USPI's employees? A. Well, there was a budgeted percentage that was recommended. It was based on performance. And it was provided to the department heads, so I received one for accounts payable and payroll, and then the controller over the operational accounting side would have received, for her department, the same with the corporate accounting and so on."); Email from Cindy English to Jonathan Bond, "RE: Administrator Salary Considerations – BOND – Nov 2012," October 11, 2012, with attachment, USPI_CIV_000810697 at USPI_CIV_000810697 ("Please review and make any recommended changes to the

collected at corporate headquarters, reviewed, and approved in aggregate along with market adjustments by USPI executives.[80] For example, for the November 2009 salary increases, while "senior management" provided a spreadsheet showing a "proposed" salary increase of 2 percent across the board, "many returned the spreadsheets requesting varying increase percentages with explanations for the increase," and varying increases were approved.[81] For Senior Employees working at facilities with majority ownership by physician partners, the facility's governing board also needed to approve salary increases.[82] Merit increases for employees below the administrator level (e.g., directors who worked exclusively at one facility) were determined at the facility level and were based in part on input from physician owners.[83] Sandi Karrmann of USPI testified that USPI "didn't

---

amount of increase in column 'T' and return to me by next Wednesday 10/ 17."); Email chain from Alex Bateman to Cindy English, "RE: PLEASE RESPOND: Administrator Increase Questions Ellinger & Bray – JOHNSTON– BATEMAN," February 2, 2015, USPI_CIV_000650633–36 at USPI_CIV_000650635–636 ("Attached is the master worksheet for your March 1, 2015 Administrators' proposed 'pro-rated' salary adjustments. ... Please review and make any recommended changes to the amount of increase in column 'R' and return the approved copy to me by Monday, January 26th."); Email chain from Mark McCormick to Teresa Danna, "RE: Corporate Salary Increases - Nov 2014_Garvin_Danna (Due by Mon 10/20)," with attachment, October 20, 2014, USPI_CIV_000689431 ("I added proposed increases for SB, JK, and JS to the truncated file you sent me. Variance is based on performance."); Karrmann Deposition, pp. 43–44 ("RVPs would make recommendations for their administrators, review with their market presidents. They're also reviewing with their physician owners in the centers to get feedback and input.").

[80] "Federal Bureau of Investigation Interview of Mark Christopher Garvin," July 28, 2020, DOJCIV-008-00000353– 67 at DOJCIV-008-00000359 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); English Deposition, p. 40 ("Q. And is it your understanding that Mr. Wilcox and Mr. Kopser would then approve the salary increases? ... A. Yes. Q. [] And I think I may have forgotten to ask before. But for administrator increases, those would also be approved by Mr. Wilcox and Mr. Kopser and Niels? A. Yes."); Email from Cindy English to Jonathan Bond, "RE: Administrator Salary Considerations – BOND – Nov 2012," October 11, 2012, with attachment, USPI_CIV_000810697 at USPI_CIV_000810697 ("We will accumulate the proposed increases for discussion with Niels, Bill and Mark Kopser.").

[81] Email chain from Mark Kopser to Cindy English, "RE: Salary Adjustment Considerations - Wilcox (Nov 2010)," October 21, 2010, USPI_CIV_000147704–06 at USPI_CIV_000147704 ("It was my understanding that the 2% was the 'proposed' increase from senior management that was to be included in the spreadsheets distributed for consideration, revision and approval. This is consistent with what occurred in 2009 and the word 'proposed' was part of the 2010 communication that traveled with the spreadsheets. Looking at the final spreadsheet for the November 2009 increases, many returned the spreadsheets requesting varying increase percentages with explanations for the increase requested. John presented those for final approval and then submitted for processing, so there was not an across the board 2% increase for everyone last year.").

[82] Email chain from Teresa Danna to Cindy English, "RE: FW: Message from, KMBT_C454," with attachments, January 15, 2014, USPI_CIV_000499023–24 at USPI_CIV_000499023 ("Since the physicians own 85% of this center, Roseanne provided the Governing Board with the market data and asked that they consider a market increase. They approved an ███████████ with another review in 6 months for an ███████████."); Karrmann Deposition, p. 73 ("Q. And you mentioned that doctors played a role in setting that administrator pay. Do you remember that? A. Yes. Q. Let me back up and ask why would doctors be involved in setting the pay of administrators? A. Well, physicians, not all, but some of the physicians were owners in the center. Q. Were most of USPI's facilities owned by doctors and USPI jointly? A. Yes. Q. And did the doctors who were co-owners play an active role in setting administrators' salaries? A. The doctors had input, yes. Q. And did they sometimes have input that led to decreased salary pay for administrators? A. Yes.").

[83] Karrmann Deposition, p. 43 ("Q. [] And when you said the centers could determine their individual increases, within that budget; correct? They could have an overall 2 percent increase, which they could divvy up amongst their employees as they deemed fit; is that fair? ... [A.] Yes. However, at individual centers, physician owners also had input. And I can't speak to -- we didn't manage centrally, ultimately, the decisions that each center made about their employee increases.").

manage centrally, ultimately, the decisions that each center made about their employee increases."[84]

60. **Bonuses:** Annual bonuses at USPI were set on a similar timeline to merit salary increases.[85] The firm's bonus pool was set by USPI executives during the budgeting process and approved by USPI's compensation committee.[86] As part of the performance review process, supervisors would evaluate each individual employee's performance for the year and would allocate their portion of the firm's bonus pool to their employees.[87]

61. However, unlike salary increases, annual bonus amounts were "based on a mathematical calculation" that factored in the performance of the company or a specific facility, as well as the employee's performance toward certain goals.[88] Each job had a different bonus target. For example, the target in 2015 for administrators was 14 percent of their salary, while it was 30 percent for RVPs, 25 percent for home office vice presidents ("VPs") and senior vice presidents ("SVPs"), and 50 percent for market presidents.[89] The weighting and measure of USPI or facility performance also varied by job, with less-senior field operations employees evaluated on case growth in addition to earnings before interest, taxes, depreciation, and amortization ("EBITDA"),[90] while employees at the corporate office were evaluated on USPI's EBITDA.[91] Employees' individual goals were set by

---

[84] Karrmann Deposition, p. 43.

[85] "Federal Bureau of Investigation Interview of Mark Christopher Garvin," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000359 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇").

[86] USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041645; Email chain from Mark Garvin to John Wellik, "RE: Preliminary bonus calculations – Garvin," with attachment, USPI_CIV_000045232–33 at 232 ("The narrative below is what Bill used in getting the overall bonus pool approved by the Compensation Committee.").

[87] English Deposition, pp. 46–47 ("Q. What was the process of determining what the bonus would be for an administrator? ... Do you know who was involved? A. I believe that it would have been Kelly Barker, who was the controller over the surgery centers division, and that would have been operations personnel above the administrator level that was their supervisor. ... Q. So now moving over to the corporate employees. Did they receive any form of compensation other than salary? A. There would have been bonus plans for certain -- I believe it was director and -- actually, I'm not sure the level of person, but there were corporate bonuses. Q. And were you involved in determining bonuses? A. I would have been involved in determining bonuses for my staff. Q. And was that done on a -- would you do that on an annual basis? A. Yes.").

[88] "Federal Bureau of Investigation Interview of Mark Christopher Garvin," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000360 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇").

[89] USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 4. Target bonuses for different job titles could change over time. See USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041648; USPI, "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467450.

[90] USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 4; Email chain from Doug Esho to Andy Johnston and Mark Garvin, "RE: New Bonus Plans," February 22, 2017, USPI_CIV_000025214–17 at USPI_CIV_000025215 ("You will continue to be measured on your individual facility/region results, both in terms of EBITDA contribution/pre-tax income and case growth versus budget.").

[91] USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 4.

their supervisors,[92] and could be very detailed.[93] Progress toward these goals would be evaluated by the supervisors.[94]

62. Despite USPI's use of an annual bonus formula, USPI documents indicate that individual supervisors could override it and did so "from time to time."[95] USPI VP of Financial Operations Cindy English testified that supervisors could request a "discretionary amount" for employees who "did something that was over and above the normal cause -- the call of duty[.]"[96] There are several instances in the record of supervisors exercising this ability to adjust bonuses both upward and downward for Senior Employees.[97]

63. In addition to the annual bonus, USPI offered one-off bonuses to Senior Employees in certain situations. One example of a non-routine bonus was for retention. USPI records provide several examples of retention bonuses used for a variety of reasons: to incentivize junior employees to stay, to avoid losing Senior Employees, to keep facility employees through a sale, or to adjust employee compensation for changes in the labor market.[98]

---

[92] USPI presentation, "Year End Performance Review Process: Manager Training," December 2014, USPI_CIV_000056611–43 at 612, 615, 620; USPI, "USPI Performance Management Strategy," Undated, USPI_CIV_000037627–29 at USPI_CIV_000037627 ("The overall purpose of USPI's Performance Management Plan (PMP) is to align individual performance to the company's business objectives. ... This plan provides a supportive work environment to help our employees achieved [*sic*] their goals.").

[93] See, e.g., Brett Brodnax, "2009 Personal Objectives," January 2009, USPI_CIV_000034853–54.

[94] USPI presentation, "Year End Performance Review Process: Manager Training," December 2014, USPI_CIV_000056611–43 at USPI_CIV_000056622–623; USPI, "Compensation Committee Meeting," March 8, 2017, USPI_CIV_000023134–45 at USPI_CIV_000023140–141.

[95] "Federal Bureau of Investigation Interview of Mark Christopher Garvin," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000360 ("███████████████████████████████████████████ ███████████████████████████████████████").

[96] English Deposition, pp. 47–48 ("Q. And generally, if you could describe what your process was in determining the bonuses for your staff. A. I believe it was based on -- if an EBITDA target was met, different titles would get a different percentage of their salary. If they did something that was over and above the normal cause -- the call of duty, so to speak, we could request a discretionary amount. ... Q. [] And who would you make that request to? A. It would have gone up to my supervisor at that point in time.").

[97] Email chain from Mark Garvin to John Wellik, "RE: Preliminary bonus calculations – Garvin," with attachment, USPI_CIV_000045232–33 at USPI_CIV_000045232 ("I have updated the FMP items as well as made several discretionary adjustments, all of which offset to cause a net zero change in the overall bonus number. In short, I took away from Trenk and gave to Andrews & Burke. I also took away from Mitchell and gave to Snyders. My comments for each are in the appropriate field on the right hand side of the spreadsheet. Because I reduced some of the PMP's from 100%, the net result of all my changes is a lower total bonus amount for my Group."); Email chain from John Wellik to Andy Johnston, "RE: Preliminary bonus calculations - Johnston - 2/27," with attachment, March 6, 2013, USPI_CIV_000040585–87 at USPI_CIV_000040586 ("Dennis - ███████████████████████████ ██████████████████, but much of this is due to physician departures beyond his control. In looking at this overall bonus, ██████████████ to get him back to where he was in 2011. [okay]."), 585 ("Dennis picked up FL [FL centers are in Dennis' calculation for entire year, but were ██████████████████████, so helped him a little]").

[98] Email chain from Paul Slavin to Sandi Karrman, "RE: Patrick (updated)," March 13, 2018, USPI_CIV_000534606–09 at USPI_CIV_000534609 ("He came up in a conversation with Ron - Ron asked if it was worth a try to put an offer in front of him to try to save him."), 607 ("███████████████████████████ ████████████████████."); Email chain from Carolyn Campbell to Rachelle Pitts et al., "RE: Kevin Turner – Foundation Interim VP- IT," with attachments, March 23, 2017, USPI_CIV_000235807 at USPI_CIV_000235807 ("He has not returned his retention letter, but ██████████████████████████████ His offer letter is attached. ... Shelly: James just came to see me about Kevin Turner. They are extremely concerned about Kevin leaving and James would like to explore ways to make sure he stays as long as we need him. We are considering some type of ████████

64. **Equity Compensation:** USPI also offered equity compensation to some Senior Employees during the relevant period. USPI offered two plans over different time periods: the 2007 Equity Incentive Plan and the 2015 Stock Incentive Plan.[99] In both plans, equity compensation was governed by USPI's compensation committee, which determined employee eligibility, award terms, vesting schedules, and types and amounts of equity compensation for USPI employees.[100] The committee reviewed and approved equity grants proposed by USPI executives for Senior Employees.[101]

65. Equity compensation could come in a variety of forms. USPI offered different types of stock options, including non-qualified and incentive stock

---

██████████ if he sticks it out and I'm looking for some information about Kevin to pull that together:... Rachelle: Can you also send me his offer letter so I can see the ███████████████████████████?"); Email chain from Rachelle Pitts to Corey Ridgway and Melissa Nelson, "RE: Saginaw Staff Retention," with attachment, August 15, 2018, USPI_CIV_000563699–700 at USPI_CIV_000563699 ("I wanted to focus on the Clinical Director position only. My thought was to offer a bonus that would be paid at year end or completion of sale whichever is sooner. ... We are evaluating a potential sale of Saginaw and would like our Clinical Director to hang through end of year or sale."); Email chain from Paul Slavin to Mark Corcoran and Sandi Karrmann, "RE: Retention Review Recommendations," July 10, 2018, USPI_CIV_000064623–27 at 000064627 ("High Risk - review for possible market adjustment and retention bonus"), 625 ("We have a couple of choice we discuss, retention bonuses and moving people up in the ranges closer to the 75th percentile. ... My initial thought would be a retention around what their annual AIP would pay. So for Managers I would say $20K and for Directors around $30K. I would have it paid upfront for motivation purposes with a 12 month payback provision."), 623 ("Re: retention bonus, Sandi and I agreed not to do blanket retention but only target highest risk. I am recommending the following for her approval. █████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████."); Email from Mark Corcoran to Sandi Karrmann, "RE: Retention Plan for my team," July 3, 2018, USPI_CIV_000064628 at USPI_CIV_000064628 ("Retention bonus of $20k for managers and $30k for directors which approximates their annual AIP target – payable 50% now, 50% in 12 months with a payback requirement if they resign in less than 12 months (Janis excluded in light of her retirement in Sept)").

[99] USPI Group Holdings, Inc., "2007 Equity Incentive Plan," April 22, 2008, USPI_CIV_000336973–85; USPI, "Stock Option Agreement between USPI Holding Company, Inc. and Aric Burke," July 14, 2017, USPI_CIV_000022791–811 at USPI_CIV_000022805.

[100] USPI Group Holdings, Inc., "2007 Equity Incentive Plan," April 22, 2008, USPI_CIV_000336973–85 at USPI_CIV_000336973 ("The Administrator has discretionary authority, subject only to the express provisions of the Plan, to interpret the Plan; determine eligibility for and grant Awards; determine, modify or waive the terms and conditions of any Award; prescribe forms, rules and procedures; and otherwise do all things necessary to carry out the purposes of the Plan."); USPI, "Stock Option Agreement between USPI Holding Company, Inc. and Aric Burke," July 14, 2017, USPI_CIV_000022791–811 at USPI_CIV_000022805 ("This Plan shall be administered by a committee (the 'Committee') appointed by the Board of Directors of the Company (the 'Board'). ... The Committee shall have the sole authority, in its sole discretion, to adopt, amend, and rescind such rules and regulations as, in its opinion, may be advisable in the administration of this Plan, to construct and interpret this Plan, the rules and regulations, and the agreements and other instruments evidencing Awards sold or granted under this Plan, and to make all other determinations deemed necessary or advisable for the administration of this Plan.").

[101] USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041656; USPI, "Compensation Committee Meeting," May 3 and May 31, 2011, USPI_CIV_000890968–76 at USPI_CIV_000890973; Email chain from Andrea Fann to Andy Johnston, "RE: stock option agreement," March 23, 2015, USPI_CIV_000039709–10 at USPI_CIV_000039709 ("The grant date is February 1, 2008, per approval of the Compensation Committee of our Board of Directors"); USPI Office Memo from Bill Wilcox to Option and Compensation Committee, "Request for Approval," June 25, 2013, USPI_CIV_000121836–40 at USPI_CIV_000121836 ("We are requesting unanimous consent for the approval of annual base salary adjustments for senior officers and routine option grants."), 839; USPI Group Holdings, Inc., "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467458–460.

options.[102] USPI also granted stock directly through restricted stock awards.[103] The type of equity compensation granted to each employee could vary over time and was subject to approval from the compensation committee.[104]

66. Documents show that some USPI offers for Senior Employee positions included equity compensation.[105] For example, one proposal from Bill Wilcox, USPI's then CEO, to the compensation committee referred to proposed option grants for administrators, a regional director, and a VP as "routine."[106] Compensation committee meeting notes from 2013 show that over 50 USPI employees received more than 50,000 options each as part of a three-year plan, with over 2 million options granted to individuals with

---

[102] Email chain from Mark Garvin to Teresa Danna, "FW: Grant of Stock Options (P. Wrobleski) - Agreement Amended for Non-Compete," with attachments, July 24, 2013, USPI_CIV_000758762–65 at USPI_CIV_000758764 ("The agreements are structured as Non-Qualified Stock Options (NQ's), which give you the right to purchase stock of Holdings in the future through exercising the option. There is regular taxable income upon exercise of a NQ option."); Email chain from Andrea Fann to Andy Johnston, "RE: stock option agreement," March 23, 2015, USPI_CIV_000039709–10 at USPI_CIV_000039709 ("The agreements are structured as Incentive Stock Options (ISO's), which give you the right to purchase stock of Holdings in the future through exercising the option. There is no regular taxable income on vesting or exercise of an ISO, only upon sale of the resulting shares."); USPI, "Stock Option Agreement between USPI Holding Company, Inc. and Aric Burke," July 14, 2017, USPI_CIV_000022791–811 at USPI_CIV_000022805 ("This Plan provides for the grant or sale of options ('Options' or 'Awards') to purchase shares of the non-voting common stock of the Company, par value $0.01 per share ('Shares'), that do not qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986, as amended (the 'Code').").

[103] USPI Group Holdings, Inc., "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467458 ("RSA"); USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041650 ("The compensation committee has the authority to grant shares of restricted stock and options to purchase shares of certain classes of common and preferred equity securities of our Parent.").

[104] USPI Group Holdings, Inc., "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467458; USPI_CIV_000024141.xlsx.

[105] See, e.g., "Offer of Employment Letter to Steven Palmer for Director of Acquisitions," September 3, 2013, USPI_CIV_000035655 ("I would like to confirm USPI's desire for you to join our company as Director of Acquisitions ... Accordingly, below is an outline of our offer: ... ██████████████████ ████████████████████████████████████████████ ████████████████████████████████████"); "Offer of Employment Letter to Wade Burgess for Regional Vice President," USPI, August 25, 2014, USPI_CIV_000040029 ("[W]e are prepared to offer you the Regional Vice President (RVP) position ... Below is an outline of the benefits package: ... ████████████ ████████████████████████████████████████████ ███████████████████████████████"); "Offer of Employment Letter to Vaughn Ward for Regional Vice President," USPI, May 9, 2014, USPI_CIV_000055047–48 at USPI_CIV_000055047 ("I am pleased to confirm USPI's desire for you to join our company as Regional Vice President ... Accordingly, below is an outline of our offer terms: ... ████████████ ████████████████████████████████████████████ ███████████████████████████"); "Offer of Employment Letter to Leah A. Cerkvenik for Regional Vice President," USPI, Undated, USPI_CIV_000301109–10 at USPI_CIV_000301109 ("I am pleased to confirm USPI's desire for you to join our company as Regional Vice President ... Accordingly, below is an outline of our offer terms: ... ████████████████ ████████████████████████████████████████████ ████████████████████").

[106] USPI Office Memo from Bill Wilcox to Option and Compensation Committee, "Request for Approval," June 25, 2013, USPI_CIV_000121836–40 at USPI_CIV_000121836 ("The option grants are routine, with the exception of a replacement grant for True Results' president, and the issuance of initial grants to our new VP of Learning.").

fewer options.[107] A 2015 Tenet presentation about USPI's plan for non-qualified stock option grants noted that there were more than 140 participants at the VP level and above.[108]

67. **Deferred Compensation:** USPI offered a "select group of management and other highly compensated employees" from VPs and above the opportunity to defer their income and receive partial matches on deferrals from USPI.[109] The plan offered participants tax advantages and extra savings through the match while giving USPI a greater ability to retain participants through a five-year rolling vest period.[110] As of 2017, approximately 70 USPI employees participated in the deferred compensation plan.[111] The plan had been offered to Senior Employees as early as 2008.[112] Although this plan was utilized by a minority of Senior

---

[107] USPI, "Unanimous Written Consent of the Compensation Committee of the Board of Directors," February 21, 2013, USPI_CIV_000467447–60 at USPI_CIV_000467458–460.

[108] USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 5 ("Grants ... 40% July 1, 2015 20% July 1, 2016 / 2017 / 2018 ... Participants ... VPs and above (140)").

[109] USPI_CIV_000026240.xlsx, Tab "DC Tenet vs USPI Compare," ("Select Group of management and other highly compensated employees of the Company. (Currently VPs and above)"); USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 3; USPI presentation, "United Surgical Partners International, Inc. Deferred Compensation Plan," November 2011, USPI_CIV_000227267, p. 12 ("Company will match 50% on the first 10% of compensation deferred."); USPI_CIV_000026240.xlsx, Tab "DC Compare-Key Item Summary," ("USPI Match equal to 50% of deferrals, not to exceed 5% of your base salary and/or bonus for the year.").

[110] USPI presentation, "United Surgical Partners International, Inc. Deferred Compensation Plan," November 2011, USPI_CIV_000227267, p. 12 ("Vesting ... Participant deferrals – 100% ... Company contribution – rolling 5 year cliff"); USPI_CIV_000026240.xlsx, Tab "DC Compare-Key Item Summary," ("USPI's match and any related earnings, are 100% vested at the end of the fifth Plan Year following the Plan Year with respect to which the contributions were made."); USPI Office Memo from Sandi Karrmann to USPI Option & Comp Committee, "Equity Plan and Deferred Comp Plan Amendments," Undated, USPI_CIV_000038254–55 at USPI_CIV_000038255 ("Therefore, under the current plan design and [*sic*] employee terminated without cause loses the last five years of company match to their deferred compensation account."). After its merger with Tenet, USPI changed the vest to be based on years of service, reducing retention incentives for participants. See email chain from Daniel Cancelmi to Sandi Karrmann, "RE: USPI Deferred Compensation Plan Effective 12/31/18 - Change in Vesting from 5 Year Cliff to 5 Years of Service," December 26, 2018, USPI_CIV_000212779–80 at USPI_CIV_000212779 ("Back in February, the USPI Comp Committee approved (with Ron's prior approval) amending the vesting provision in the USPI Deferred Compensation plan (see item 6 in the attached). The USPI plan cliff-vests the employer contributions with each match (i.e. each match doesn't vest for 5 years and 364 days, regardless of your length of service) and we received approval to change to mirror the vesting in Tenet's plan (5-year cliff vesting based on years of service versus with each match)."); USPI Holding Company, Inc., "Compensation Committee Minutes," February 14, 2018, USPI_CIV_000620051–67 at USPI_CIV_000620063 ("Background ... USPI's employer contributions are cliff-vested over a 6-year period (5 years, 364 days) with each match. ... Proposal ... Amend the USPI Deferred Compensation Plan to reflect employer contribution vesting to be cliff-vested upon completion of 5 years of service with Tenet or a Tenet entity.").

[111] USPI Office Memo from Sandi Karrmann to USPI Option & Comp Committee, "RE: Equity Plan and Deferred Compensation Plan Amendments," September 7, 2017, USPI_CIV_000038258–59 at USPI_CIV_000038259 ("We have approximately 70 employees participating in the USPI Deferred Compensation Plan to which USPI provides a match of 50% of compensation deferred up to a maximum of 5% match.").

[112] USPI, "Job Offer as Regional Vice President of Operation," December 5, 2008, USPI_CIV_000037954 at USPI_CIV_000037954 ("Regional Vice President of Operations ... In addition to USPI's 401(k) plan, which includes a discretionary employer match of up to 50% of the first 6% of employee compensation contributed subject to annual IRS limits, you will be entitled to participate in USPI's Deferred Compensation Plan that allows for tax efficient deferral of additional compensation and provides for deferral of up to 75% of base salary and 100% of bonus with a discretionary employer match of up to 50% of the first 10% of compensation deferred.").

Employees, it offered an additional avenue for USPI to compensate its Senior Employees.

68.  Exhibit 5 summarizes the types of compensation Defendants pay their Senior Employees and the share of total compensation over the period 2008 to 2022 accounted for by each type. Salary comprises 58 to 73 percent of compensation across Defendants. Bonus pay accounts for 14 to 17 percent of total compensation. Equity pay accounts for up to 16 percent of Senior Employee compensation across Defendants. Paid time off ("PTO") and other types of compensation account for approximately 8 percent of Senior Employee pay at Defendants.

*Exhibit 5*
*Components of compensation for Senior Employees, 2008–2022*



Source: Dr. Starr Corrected Compensation Regression Data

Note: Total compensation is deflated according to each year's Consumer Price Index ("CPI"), standardized to 2019 U.S. dollars. The "Other" category includes compensation types labeled as additional, commission, debt forgiveness, education, holiday, jury, leave, on call, other, overtime, retro, settlement, severance, shift, shift differential, and sick.

69.  The above discussion details a complex, multifaceted, and discretionary compensation system that USPI used to attract, retain, and award Senior Employees, including salary increases, annual bonuses, retention bonuses, equity awards, and deferred compensation.

## 4. The economic evidence does not support a conclusion that USPI individually or in combination with SCA and DaVita has the market power to suppress wages

70. A buyer has market power if its decision on how much to buy affects the market price.[113] The extent to which a buyer or collection of buyers has market power, meaning the ability to suppress the market price, will depend upon whether sellers have the option of selling to other buyers that are willing to purchase at the competitive price. Similarly, an employer's ability to suppress wages is limited by workers' ability to find similarly attractive jobs at other employers. If employees have many other employment options, they will be free to move to these options in response to receiving sub-competitive wages from their employer. The outside options are one of the competitive checks that erodes an employer's market power and limits its ability to suppress wages.

71. For any alleged collusive conduct to have an anticompetitive effect, the alleged conspirators must collectively have market power. As Dr. Starr states in his report, "Defendants' Challenged Conduct could not have suppressed Class Member wages if Defendants lacked market power over them."[114] Further, as noted by Carlton and Perloff (2015), an economics textbook cited by Dr. Starr, "[i]f the cartel controls only a small share of the relevant market, which includes all close substitutes, firms not in the cartel undercut the cartel and prevent it from raising the market price[.]"[115] In the current context, if Senior Employees have many employment options beyond Defendants, then Defendants' ability to suppress Senior Employees' compensation will be constrained by competition from these alternative employment options. Thus, the question of whether Defendants collectively have market power is central to any analysis of the Alleged, Assessed, or Admitted Conduct.

---

[113] B. Douglas Bernheim and Michael D. Whinston, *Microeconomics* (New York, NY: McGraw-Hill Irwin, 2008), p. 648 ("Market power isn't limited to the sellers of a product; it also can be held by ... buyers. In some circumstances, however, there may be only a few buyers of a product. In an extreme case, called a monopsony market, there is just one buyer, called a monopsonist. In these circumstances, buyers may not need to take the price of a good as given. Rather, they can lower the price they pay, at least if they are willing to reduce the quantity that they purchase.").

[114] Starr Report, ¶ 12.ii.e. See also Starr Deposition, p. 158 ("Q[.] Okay. You would agree that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them; correct? A[.] If -- Yes. I would agree with my own statement here.").

[115] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition (Essex, England: Pearson Education Limited, 2015) ("Carlton and Perloff (2015)"), p. 155 ("Entry by nonmember firms or close substitutes produced in other industries prevents a cartel from raising price. If the cartel controls only a small share of the relevant market, which includes all close substitutes, firms not in the cartel undercut the cartel and prevent it from raising the market price; that is, the demand curve facing the cartel is relatively elastic. Even if all firms initially in a market form a cartel and raise the price, the higher price may induce enough new firms to enter that the cartel is unable to keep the price high in the long run."). Because the cartel alleged here is operated on the input market, rather than the standard case of a cartel over output, the effect of the cartel would be to decrease prices (i.e., compensation), but the restraint on the cartel's impact caused by other firms is the same.

72. Dr. Starr opines that Defendants have market power.[116] As I demonstrate in this section, the economic evidence does not support Dr. Starr's assertion of market power. Instead, there is clear evidence that USPI and SCA's (or all Defendants') collective labor market power is limited by the many employment options available to their employees beyond Defendants.

### 4.1. Overview of Dr. Starr's and Dr. Gerhart's market power opinions

73. Dr. Starr states that he was asked "to determine whether Defendants have market power over Class Members[.]"[117] He states that "[m]arket power can be directly established if there is evidence of the ability of firms to suppress wages below competitive levels."[118] He then argues that the "evidence of wage suppression" that he finds through his wage suppression regression analysis demonstrates that Defendants have market power.[119] That is, Dr. Starr's opinion that Defendants jointly have market power is based solely on his estimate of compensation suppression.[120] In Section 8, I demonstrate that Dr. Starr's compensation suppression analysis is fundamentally flawed, showing he has no reliable basis for his market power opinion.[121]

74. Dr. Starr argues that "USPI considered SCA a relevant labor market competitor[,]"[122] "DaVita sees SCA as a relevant labor market competitor[,]"[123] and "SCA considered both DaVita and USPI relevant labor market competitors."[124] However, Dr. Starr testified that he offered no opinion on "the contours of the [relevant] labor market[.]"[125] Dr. Starr does not assess the extent to which these Defendants recruited from each other outside or during the allegedly collusive period. Moreover, he does not assess the extent to which Defendants were each other's "most relevant"

---

[116] Starr Report, ¶ 12.ii.e ("Defendants Wield Market Power over Class Members."); Starr Deposition, pp. 159–160 ("Whether that is a reflection of an increase in market power because they are now shielded from competition as a result of the no-poach agreements or whether it's because ... the sharing of information has made alternative companies less attractive because people will earn similar amounts across companies, those two things have suppressed compensation. It's an interpretation issue of whether that is an increase in market power or whether it is a reflection of them exerting market power that they possibly have. I don't -- I don't distinguish between those interpretations in my report, and sitting here today, I don't think I have an opinion on exactly which is going on.").

[117] Starr Report, ¶ 11.e.

[118] Starr Report, ¶ 196.

[119] Starr Report, ¶ 196.

[120] Starr Deposition, p. 266 ("Q[.] Okay. So in terms of your opinions about the market power of the defendants over labor that are reflected in, I think, section 9 of your report, those are based on your wage suppression regressions; correct? A[.] Right.").

[121] Dr. Starr's analysis of the "qualitative evidence of an agreement" assumes that Defendants have market power, but he has failed to demonstrate that this is the case.

[122] Starr Report, ¶ 181.d.

[123] Starr Report, ¶ 179.k.

[124] Starr Report, ¶ 180.k.

[125] Starr Deposition, p. 43.

competitors for any Senior Employees.[126] He also does not assess the extent to which Defendants competed with non-Defendants for labor.[127] Instead, he bases his conclusion that USPI and SCA are competitors on purported evidence that SCA sought information from both USPI and DaVita.[128] Consequently, even if his statements were correct, they would not rule out the possibility that Defendants unilaterally and collectively lack market power over Senior Employees because they are constrained by non-Defendant employers.

75. Similarly, Dr. Gerhart fails to provide any quantitative evidence or analysis of market power. In fact, Dr. Gerhart testified that he did not perform any empirical or quantitative analysis to support his opinions in his report.[129]

76. While both Dr. Starr and Dr. Gerhart recognize that Defendants' relevant labor market competitors would include non-Defendant companies from which Defendants recruit employees or to which they lose employees, neither expert has done any analysis to identify these companies.[130] Critically, neither Dr. Starr nor Dr. Gerhart analyzes the extent to which Senior Employees have employment options beyond the Defendants.[131] Both experts also fail to analyze whether Defendants recruit employees from non-Defendant firms or to assess the extent to which Defendants' former employees elected to move to non-Defendant employers.[132] Neither

---

[126] Starr Deposition, p. 130 ("I wasn't asked to do any analysis on which employers are the most relevant. I was asked to study the extent to which the qualitative and quantitative evidence in this case is consistent with anticompetitive conduct[.]").

[127] Starr Deposition, p. 132 ("Q[.] There is data that would allow you to determine what job they took and which employer; correct? A[.] I wasn't asked [] to look into that. There may be data that you could use [] to assess that, but it wasn't one of my assignments."), 139 ("I wasn't asked to, to examine where every departing worker went to, and I did not do that."), 150 ("It wasn't asked of me to look at everywhere that DaVita, SCA and USPI are hiring for director and above, and it wasn't asked of me to look at where every director level and above employee or class member went to if they left.").

[128] Starr Report, ¶ 180.k ("Finally, the evidence presented in Section V.C.2 show that SCA actively sought out compensation information from both DaVita and USPI. This is explicit evidence that SCA considered both DaVita and USPI relevant labor market competitors.").

[129] Deposition of Barry Gerhart, March 5, 2025 ("Gerhart Deposition"), pp. 285–286 ("Q. [] And, again, I'd just want to confirm: You did not perform any empirical or quantitative analysis to support your opinions in this case; correct?... [A.] That is correct.").

[130] Starr Deposition, pp. 133 ("[I]f a senior level employee left for a fourth company outside of this, then whoever the - - let's say they left from SCA, and we'll call the other company ... company D, then SCA and company D, I would say, are labor market competitors for that worker."), 147 ("[A.] Yes. Let me put it in my own words, so to maybe by example. So if DaVita wants to hire a director from company E, ... and they do so, I would say that DaVita and company E are labor market competitors for that worker."), 139 ("Q[.] Okay. So you'd need data on where the departing employees went to, to determine who the relevant, competitors in the relevant labor market are; right? ... A[.] Yes, that's right."); Gerhart Deposition, p. 52 ("[Q. If] employees came from or moved to non-defendant companies, those companies would also be part of the relevant market, labor market; correct? ... [A.] I think any company that you lose employees to or you get employees from is -- that's part of the analysis.").

[131] Starr Deposition, p. 130 ("I wasn't asked to do any analysis on which employers are the most relevant."); Gerhart Deposition, pp. 285–286: ("[Q.] And, again, I'd just want to confirm: You did not perform any empirical or quantitative analysis to support your opinions in this case; correct?... [A.] That is correct.").

[132] Louis Kaplow and Carl Shapiro, "Antitrust," in *Handbook of Law and Economics*, Volume 2, ed. A. Mitchell Polinsky and Steven Shavell (Elsevier B.V., 2007), pp. 1090-1091 ("Kaplow and Shapiro (2007)"), p. 1090–1091 ("In antitrust analysis, both by agencies (notably, in examining prospective horizontal mergers) and by the courts, the

expert has conducted any of the types of analyses necessary to assess the competitive constraints that Defendants face.[133]

*4.2. Defendants' collective market power and ability to suppress Senior Employee compensation is constrained by competition from non-Defendants*

77. As I describe above, USPI and SCA's (or Defendants' collective) ability to suppress the compensation of their Senior Employees is limited by those employees' ability to find similarly attractive positions at employers beyond Defendants. If Senior Employees have many employment options beyond Defendants, they will be free to move to these options in response to suppressed compensation.[134] Likewise, employees of non-Defendant competitors hired by Defendants could demand competitive compensation.[135] Because of this, the share of Defendants' employee hires and departures that is accounted for by inter-Defendant moves outside the Alleged, Assessed, and Admitted Conduct periods provides an indication of Defendants' combined market power.

78. In this section, I use Defendants' compensation records to identify the frequency and share of Senior Employee transitions between USPI and SCA and between USPI and DaVita (Section 4.2.1.). Then I analyze data from Lightcast, a labor market analytics company, to identify the employers that Defendants compete with for Senior Employees (Section 4.2.2.). I find that USPI Senior Employees leave USPI for many different employment opportunities beyond Defendants and that USPI hires Senior Employees from many non-Defendant firms. These patterns indicate that USPI and SCA's (and Defendants' collective) ability to suppress compensation is constrained by competition from non-Defendants.

---

dominant method of gauging the extent of market power involves defining a so-called relevant market and examining the share of a firm or group of firms in that market. In defining product markets, the focus is on which products are sufficiently good demand substitutes for the product in question to be deemed in the same market.") While labor markets are markets for inputs rather than products, the principle of identifying a set of close substitutes is the same. Despite acknowledging that the "degree to which employees move to and from non-defendants as well" would be "of interest" when thinking about the labor market, Dr. Gerhart does not look at the degree to which individuals move between companies in this case. See Gerhart Deposition pp. 50–51. Dr. Starr likewise does not perform a "relevant market analysis" and was not asked to look into data that would show the movement of Senior Employees to non-Defendant firms. See Starr Deposition, pp. 131–132.

[133] Dr. Gerhart does not perform any of these analyses despite acknowledging that "any company that you lose employees to or you get employees from is ... part of the analysis" when defining a labor market. See Gerhart Deposition, p. 52. See also Starr Deposition, p. 131 ("I wasn't asked to do any analysis on which employers are the most relevant.").

[134] Dr. Gerhart testified that "to the extent you pay below market, there's more of a chance somebody's going to go elsewhere." Gerhart Deposition, p. 56.

[135] Dr. Gerhart agrees that when "defendants hired employees from non-defendant firms," those employees' compensation would be "within sight of what the competitive rate would be." Gerhart Deposition, p. 56.

*4.2.1. Senior Employee switching between Defendants is rare prior to and after the Alleged, Assessed, and Admitted Conduct periods*

79.  I begin my analysis of Defendants' market power by reviewing Senior Employee flows into and out of USPI. **Defendants'** compensation datasets include unique employee identification codes that persist when an employee moves from one Defendant to another. This allows employees to be tracked over time within a firm and across firms. Specifically, the identifiers allow one to identify new hires and departures and to track employees who switch jobs from one Defendant to another. I use the compensation data to examine aggregate turnover of Senior Employees at USPI and instances when a Senior Employee left USPI for another Defendant.[136]

80.  Exhibit 6 shows my analysis of Senior Employee turnover at USPI over time. The second column of Exhibit 6 shows total turnover of Senior Employees at USPI, defined as the sum of new hires and departures, for each year from 2006 through 2021. The third column shows the number of Senior Employee hires from and departures to SCA, and the fourth column shows the percentage of hires from and departures to SCA. The exercise is repeated with respect to DaVita in the fifth and sixth columns. For example, in 2013, 122 USPI Senior Employees either arrived or left. Among those Senior Employees, four of them either arrived from or left for SCA and none arrived from or left for DaVita.

---

[136] For the purpose of my analysis, I use a corrected version of Dr. Starr's data. I identify technical errors in Dr. Starr's work that relate to the way his code assigns jobs to Senior Employees and the way he determines each employee's hours worked. My analysis uses a version of Dr. Starr's data that has been corrected for these clear errors. An overview of Dr. Starr's data errors and the corrected data is provided in Appendix C. To identify Senior Employees who switch between USPI and other Defendants, I follow Dr. Starr's methodology, except that I remove a switcher who Dr. Starr double-counts. Except where otherwise stated, I use my corrected version of Dr. Starr's compensation data for analyses of switching behavior by Senior Employees among the Defendants.

*Exhibit 6*
*USPI's Senior Employee turnover accounted for by Defendants, 2006–2021*

| | | | Hires From and Departures To | | | |
| | | | SCA | | DaVita | |
| Year | | Total Turnover | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|
| 1. | 2006 | 76 | - | - | 1 | 1.3% |
| 2. | 2007 | 170 | - | - | 0 | 0.0% |
| 3. | 2008 | 109 | 2 | 1.8% | 0 | 0.0% |
| 4. | 2009 | 112 | 0 | 0.0% | 0 | 0.0% |
| 5. | 2010 | 105 | 6 | 5.7% | 0 | 0.0% |
| 6. | 2011 | 137 | 0 | 0.0% | 0 | 0.0% |
| 7. | 2012 | 135 | 5 | 3.7% | 1 | 0.7% |
| 8. | 2013 | 122 | 4 | 3.3% | 0 | 0.0% |
| 9. | 2014 | 117 | 1 | 0.9% | 1 | 0.9% |
| 10. | 2015 | 125 | 3 | 2.4% | 0 | 0.0% |
| 11. | 2016 | 225 | 1 | 0.4% | 0 | 0.0% |
| 12. | 2017 | 183 | 1 | 0.5% | 0 | 0.0% |
| 13. | 2018 | 219 | 5 | 2.3% | 0 | 0.0% |
| 14. | 2019 | 183 | 2 | 1.1% | 0 | 0.0% |
| 15. | 2020 | 299 | 6 | 2.0% | 0 | 0.0% |
| 16. | 2021 | 443 | 11 | 2.5% | 3 | 0.7% |
| 17. | **Outside of the Alleged Three-Party Mobility Restrictions: 2021** | **443** | **11** | **2.5%** | **3** | **0.7%** |
| 18. | **Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2008–2009 and 2020–2021** | **963** | **19** | **2.0%** | **-** | **-** |
| 19. | **Outside of USPI's Admitted Mobility Restrictions with SCA: 2008–2009 and 2018–2021** | **1,365** | **26** | **1.9%** | **-** | **-** |
| 20. | **During USPI's Admitted Mobility Restrictions with SCA: 2010–2017** | **1,149** | **21** | **1.8%** | **-** | **-** |

Source: Dr. Starr Corrected Compensation Data

Note: Senior Employee departures and arrivals are identified using the date of the employee's first and last paychecks. Inter-Defendant switches are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch.

81. For the purpose of analyzing market power, I focus my attention on years outside the Alleged, Assessed, and Admitted Mobility Restrictions, time frames in which there were no alleged or admitted restrictions on employees moving jobs from one Defendant to another. Analyzing employee switching outside each respective conduct period allows me to assess the importance of SCA and DaVita as employment options for USPI's Senior Employees absent any claim of collusion. The analysis below shows that SCA and DaVita account for a very small share of competition

for USPI Senior Employees outside the Alleged, Assessed, and Admitted Mobility Restrictions.[137]

82. **The Alleged Three-Party Mobility Restrictions from 2008 to January 2021**. With the data provided for this matter, I am able to identify Senior Employee job mobility among USPI, SCA, and DaVita only from 2008 through 2021, meaning I have just one year of mobility information (2021) outside the Alleged Three-Party Mobility Restrictions conduct period. In Exhibit 6 above, Row 17 shows the number of USPI Senior Employees that joined or departed USPI in 2021, and the number who joined or departed from SCA (Column 3) and DaVita (Column 5). In 2021, 443 employees joined or departed USPI; of these, 11 came from or departed to SCA, and three came from or departed to DaVita.[138] SCA and DaVita collectively represented less than 4 percent of total turnover.

83. **Experts' Assessed SCA-USPI Mobility Restrictions from 2010 to 2019**. The period prior to 2010 and after 2019 can be used to assess the extent to which USPI faced competition from SCA and other employers for Senior Employees outside the Experts' Assessed SCA-USPI Mobility Restrictions. In Exhibit 6, Row 18 shows that, in the four years outside the conduct period for which I have SCA compensation data, 963 Senior Employees either joined or departed from USPI. Of these, only 19 (2 percent) arrived from or left for SCA. That is, 98 percent of the employees who switched to or from USPI during this period did not come from SCA.[139]

84. **USPI's Admitted Mobility Restrictions with SCA from May 2010 to October 2017**. The period prior to 2010 and after 2017 can be used to assess the extent to which USPI faced competition from SCA and from other employers for Senior Employees outside USPI's Admitted Mobility Restrictions with SCA. In Exhibit 6, Row 19 shows that outside the Admitted Conduct period, a total of 1,365 Senior Employees joined or departed from USPI. Of these, 26 (1.9 percent) transferred to or from SCA;

---

[137] The compensation data do not identify where a Senior Employee who leaves the data departs to. As a result, some of the departures may represent terminations or retirements rather than a departure to a new employer. Similarly, some of the arrivals may not be hires from other firms (e.g., recent graduates). Given that the purported class consists of senior-level employees, it is unlikely that a large share of new hires came from outside the workforce (such as straight from college). However, even if a large proportion of turnover is movements into and out of the labor force, rather than switches to other non-Defendant employers, Defendants would still account for a very small share of job options—and competition—for USPI's employees. For example, if half of the 443 departures and arrivals in 2021 represented moves to or from outside the labor market, then about 222 (about half of the 443) hires and departures would have been voluntary switches to other employers, and just 11 of these were to or from SCA. See Starr Deposition, p. 137 ("It's possible they were fired. It's possible they retired. It's possible they sat out of the labor market. It's possible they went and joined another company.").

[138] Because the COVID pandemic affected labor market dynamics, I also review the same patterns restricting to years prior to the pandemic, when data are available. I do not have data on inter-Defendant switching outside both the Alleged Three-Party Mobility Restrictions and the years in which labor markets for healthcare workers may have been affected by the pandemic.

[139] Outside both the Experts' Assessed SCA-USPI Mobility Restrictions period and prior to the COVID pandemic, just two, or less than 1 percent (2/(109+112)) of the Senior Employees who either joined or departed from USPI arrived from or left to SCA.

over 98 percent of the employees that switched to or from USPI during this period switched to or from employers other than SCA.[140]

85.  Regardless of whether the Alleged, Assessed, or Admitted Mobility Restrictions period is considered, the parties to these agreements comprised a minimal share of the sources of new USPI Senior Employees and the destinations of departing ones. Most of USPI's labor market competition originates from firms other than SCA. As a result, any attempt by USPI and SCA to jointly suppress compensation (i.e., to jointly exercise market power) would be thwarted by employees moving to the employers from which or to which the vast majority of USPI's employees transitioned.

86.  Furthermore, during the Alleged, Assessed, and Admitted Mobility Restrictions, SCA continued to be a source and a destination for USPI Senior Employees. In Exhibit 6, Row 20 shows that during USPI's Admitted Mobility Restrictions with SCA, 1,149 employees joined or departed from USPI, and 21 of them (1.8 percent) came from or went to SCA.

87.  Exhibit 7 below illustrates the mobility displayed in Exhibit 6. Each pie chart represents Senior Employee switching during different time periods. Within each pie chart, the dark blue area represents USPI Senior Employee transitions to or from non-Defendants as a share of all USPI Senior Employee transitions. The orange and green wedges represent the share that arrived from or departed to SCA and DaVita, respectively.

88.  The first pie chart depicts mobility in 2021, outside the **Alleged Three-Party Mobility Restrictions time period**. This period falls outside the conduct period under any formulation of the conduct in this case, so under any formulation, mobility between USPI and other Defendants was unrestricted. Even so, SCA and DaVita accounted for a minimal share of the utilized employment options for USPI Senior Employees.

89.  The second pie chart depicts mobility outside **Experts' Assessed SCA-USPI Mobility Restrictions time period**, or the years 2008–2009 and 2020–2021. Before and after this alleged agreement, SCA accounted for a minimal share of the utilized employment options for USPI Senior Employees.

90.  The third pie chart depicts mobility outside **USPI's Admitted Mobility Restrictions with SCA time period**, or the years 2008–2009 and 2018–2021, where SCA accounted for a minimal share of the utilized employment options for USPI Senior Employees.

---

[140] Outside both the USPI's Admitted Mobility Restrictions with SCA time period and prior to the COVID pandemic, just nine, or less than 2 percent ((2+5+2)/(109+112+219+183)) of the Senior Employees who either joined or departed from USPI arrived from or left to SCA.

91.  As these charts show, in any formulation of the mobility restriction conduct period, both SCA and SCA collectively with DaVita comprised a small portion of the labor market competition faced by USPI. Other employers comprised a much greater share of employment options for USPI Senior Employees. This means that any attempt by Defendants, either USPI and SCA, or all three Defendants, to collectively suppress compensation would be thwarted by the Senior Employees credibly threatening to leave, or actually leaving, for opportunities at other firms.

**Exhibit 7**
**Share of USPI Senior Employee turnover accounted for by Defendant and by non-Defendant employers, outside the Alleged, Assessed, and Admitted Conduct periods**



Source: Dr. Starr Corrected Compensation Data

Note: Senior Employee departures and arrivals are identified using the date of the employee's first and last paychecks. Inter-Defendant switches are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch.

### 4.2.2. USPI faces competition for its Senior Employees from firms beyond SCA and DaVita, and even beyond the ASC and OCC industries

92.  In this section, I analyze a publicly available dataset on workers collected by Lightcast. Lightcast pulls information from online professional profiles to create a dataset tracking individuals' careers over time.[141] Lightcast data is commonly used by academic researchers to study labor market issues and underpins numerous peer-reviewed articles in leading economics

---

[141] Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 1, 2025 ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles").

journals.[142] I use a sample of Lightcast data covering resume information for any individual in its data who ever reported employment in the OCC industry—including, specifically, any who reported working for USPI, SCA, or DaVita. For each individual, the data include career information that would be reported on a resume: job titles, employers, and start and end dates of employment over time. These data allow me to track and analyze the career paths of a sample of USPI Senior Employees, including their previous and next jobs, employers, and industries. While the data are limited to people who post resume information online, unlike Defendants' payroll data, the Lightcast data allows me to see where Senior Employees arrive from or leave for, even when the source or destination firm is not a Defendant.

93. By analyzing employee transitions prior to the Alleged, Assessed, and Admitted Mobility Restrictions, I can observe the sources of competitive constraints that USPI faces absent any mobility restrictions. In his deposition, Dr. Starr endorsed this approach for identifying labor market competitors, testifying that "if a senior level employee left for a fourth company ... [that is,] [i]f they left SCA and they moved to company D, then SCA and company D ... are labor market competitors for that worker."[143]

94. My analysis of the employee transitions captured in the Lightcast data demonstrates that USPI competes for workers with hundreds of non-Defendant employers, including employers both within and outside the ASC or OCC industries.[144] Exhibit 8, below, provides a breakdown of the employers that USPI either lost Senior Employees to or hired Senior Employees from. The analysis is limited to include data from outside each of the Alleged, Assessed, and Admitted Mobility Restrictions time periods.

95. Each column of Exhibit 8 shows a breakdown of USPI's Senior Employee turnover outside a different formulation of the mobility restrictions.[145] Each row of the table describes a different category of employers and shows the share of USPI Senior Employee turnover accounted for by employers in

---

[142] Lightcast, "Academic Research Using Lightcast Data," available at https://lightcast.io/resources/new-academic-research, accessed on April 16, 2025 ("Researchers frequently analyze Lightcast data to inform their own insights across a wide range of disciplines. This comprehensive list includes reports authored by Lightcast (entirely or in part) as well as other releases where Lightcast data was employed from 2021-Present. ... Academic Research ... *Journal of Human Resources ... Labour Economics ... Journal of Labor Economics ... American Economic Review ... American Economic Journal: Macroeconomics*).

[143] Starr Deposition, p. 133.

[144] Outside the Alleged Three-Party Mobility Restrictions period, the Experts' Assessed SCA-USPI Mobility Restrictions period, and USPI's Admitted Mobility Restrictions with SCA, there were 304, 395, and 511 non-Defendant firms that hired employees from or lost employees to USPI, respectively. See Workpaper 2. This result is also consistent with USPI testimony describing a broad set of labor market competitors. See, e.g., Deposition of Mark Garvin (USPI), May 30, 2024 ("Garvin Deposition"), pp. 195–196 ("[USPI labor market competitors include] [a]ny and all health systems in the United States of America, any and all ambulatory surgery center companies in the United States of America, private equity firms employing physician practice management with various ancillary subs. And a host of multi-state, multi-site business operators, healthcare or not.").

[145] Because the COVID pandemic affected labor market dynamics, I also review the same patterns restricting to years prior to the pandemic. These patterns are consistent with Exhibit 8. See Workpaper 10.

that category. The categories of employers are mutually exclusive so that, within a column, the shares of turnover across categories sum to 100 percent.[146]

96. **Outside the Alleged Three-Party Mobility Restrictions period, employers in other industries accounted for the majority of Senior Employee turnover at USPI**. Under any formulation of the mobility restrictions, there were no restrictions on employee mobility between Defendants, prior to 2008 and after 2020. Column 2 of Exhibit 8 below shows that in this period, despite mobility within the ASC or OCC industries being unconstrained, other industries accounted for a large share of USPI's turnover. During this period, 18.9 percent of USPI's Senior Employees switched to and from General Medical and Surgical Hospitals, and 17.2 percent switched to and from Offices of Physicians—neither of which are OCCs.[147] Almost three-quarters of USPI turnover was accounted for by firms that are not even in the OCC industry.[148]

97. **Outside the Experts' Assessed SCA-USPI Mobility Restrictions period, employers in other industries accounted for the majority of Senior Employee turnover at USPI**. The Experts' Assessed SCA-USPI Mobility Restrictions began in 2010 and ended in 2019. Outside this period, 19.0 percent of USPI's turnover was accounted for by General Medical and Surgical Hospitals, and 15.6 percent was accounted for by Offices of Physicians. Neither of these are ASCs. Over three-quarters of USPI turnover was accounted for by firms that are not even in the ASC industry.[149]

98. **Outside USPI's Admitted Mobility Restrictions with SCA, employers in other industries accounted for the majority of Senior Employee turnover at USPI**. USPI's Admitted Mobility Restrictions with SCA began in 2010 and ended in 2017. Outside this period, 17.7 percent of USPI's turnover was accounted for by General Medical and Surgical Hospitals, and 15.7 percent was accounted for by Offices of Physicians. Neither of these are ASCs. Over three-quarters of USPI turnover was accounted for by firms that are not even in the ASC industry.[150]

---

[146] The employer categories listed in the table are based on the industry codes Lightcast assigned to the employers that people who worked for USPI reported switching from or to. Lightcast used the NAICS to categorize employers.

[147] Note that a portion of the employers that USPI employees switched from or to were not categorized into industries in the data, and therefore, these shares may understate the true amount of mobility accounted for by hospitals and physicians' offices.

[148] The sum of the shares in rows 1, 2, 3, and 4 of Column 2 (24.7, 12.1, 18.9, 17.2) is 72.9 percent.

[149] The sum of the shares in rows 1, 2, 3, 4, and 5 of Column 3 (25.5, 12.7, 19.0, 15.6, 3.7) is 76.5 percent.

[150] The sum of the shares in rows 1, 2, 3, 4, and 5 (26.5, 13.2, 17.7, 15.7, 3.2) is 76.4 percent.

*Exhibit 8*
*Share of USPI Senior Employee turnover outside the Alleged, Assessed, and Admitted Mobility Restrictions periods, by industry*

| | Share of Turnover | | |
|---|---|---|---|
| Industry of Previous or Next Employer | Outside of the Alleged Three-Party Mobility Restrictions: 2005 – 2007 and 2021 – 2024 | Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2005 – 2009 and 2020 – 2024 | Outside of USPI's Admitted Mobility Restrictions with SCA: 2005 – 2009 and 2018 – 2024 |
| 1. Classified Industries – excluding Healthcare Providers | 24.7% | 25.5% | 26.5% |
| 2. Healthcare Providers – excluding Hospitals, Offices of Physicians, and OCCs | 12.1% | 12.7% | 13.2% |
| 3. General Medical and Surgical Hospitals | 18.9% | 19.0% | 17.7% |
| 4. Offices of Physicians | 17.2% | 15.6% | 15.7% |
| 5. Outpatient Care Centers – excluding ASCs | 3.8% | 3.7% | 3.3% |
| 6. Ambulatory Surgical Centers | 4.5% | 4.8% | 4.4% |
| 7. Unclassified Industries | 18.7% | 18.6% | 19.2% |

Source: Lightcast; NAICS Association

Note: This table includes all reported previous and next employers for Senior Employees who started at and/or left USPI between January 1, 2005 and May 1, 2024, excluding the Alleged, Assessed, or Admitted Mobility Restrictions. For each employee, I identify previous and next employers for each class-relevant stint (i.e., each period of time in a class-relevant position at USPI). For a given stint, previous employer(s) are identified based on the most recent completed job before the start of the stint, as well as any ongoing job that began before the start of the stint. Next employer(s) are identified based on the first job starting after the end of the stint, as well as any other job that started during the stint. Ambulatory Surgical Centers are identified using the six-digit NAICS code 621493. Outpatient Care Centers are identified using four-digit NAICS code 6214. General Medical and Surgical Hospitals are identified using the four-digit NAICS code 6221. Offices of Physicians are identified using the four-digit NAICS code 6211. An analysis using Lightcast's own industry categories, rather than ones from NAICS Association, is provided in Workpaper 13.

99. Exhibit 9 below is similar to Exhibit 8 above but shows a breakdown of Senior Employee turnover for all three Defendants combined.[151] Columns 2, 3, and 4 show a breakdown of Defendants' combined turnover outside the Alleged, Assessed, and Admitted Conduct periods, respectively. Each row of the table describes a different category of employers and shows the share of Defendants' Senior Employee turnover that is accounted for by that category of employers. Column 2 shows that, outside the Alleged Three-Party Mobility Restrictions period, 75 percent of Defendants' turnover was accounted for by firms outside the OCC industry (Rows 1–4). Columns 3 and 4 show that the same is true of the period outside the Experts' Assessed SCA-USPI Mobility Restrictions and USPI's Admitted Mobility Restrictions with SCA.

---

[151] Because the COVID pandemic affected labor market dynamics, I also review the same patterns restricting to years prior to the pandemic. These patterns are consistent with Exhibit 9. See Workpaper 11.

*Exhibit 9*
**Share of Defendants' Senior Employee turnover outside the Alleged, Assessed, and Admitted Mobility Restrictions period, by industry**

| | Share of Turnover | | |
|---|---|---|---|
| Industry of Previous or Next Employer | Outside of the Alleged Three-Party Mobility Restrictions: 2005 – 2007 and 2021 – 2024 | Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2005 – 2009 and 2020 – 2024 | Outside of USPI's Admitted Mobility Restrictions with SCA: 2005 – 2009 and 2018 – 2024 |
| 1. Classified Industries – excluding Healthcare Providers | 39.7% | 40.9% | 42.6% |
| 2. Healthcare Providers – excluding Hospitals, Offices of Physicians, and OCCs | 12.8% | 12.1% | 12.2% |
| 3. General Medical and Surgical Hospitals | 10.9% | 10.4% | 10.1% |
| 4. Offices of Physicians | 11.6% | 11.0% | 10.8% |
| 5. Outpatient Care Centers – excluding ASCs | 4.3% | 4.7% | 4.2% |
| 6. Ambulatory Surgical Centers | 2.3% | 2.2% | 2.0% |
| 7. Unclassified Industries | 18.4% | 18.7% | 18.2% |

Source: Lightcast; NAICS Association

Note: This table includes all reported previous and next employers for Senior Employees who started at and/or left a Defendant firm between January 1, 2005 and May 1, 2024, excluding the Alleged, Assessed, and Admitted Conduct periods. For each employee, I identify previous and next employers for each class-relevant stint (i.e., each period of time in a class-relevant position at a Defendant). For a given stint, previous employer(s) are identified based on the most recent completed job before the start of the stint, as well as any ongoing job that began before the start of the stint. Next employer(s) are identified based on the first job starting after the end of the stint, as well as any other job that started during the stint. Ambulatory Surgical Centers are identified using the NAICS code 621493. Outpatient Care Centers are identified using NAICS code 6214. General Medical and Surgical Hospitals are identified using the four-digit NAICS code 6221. Offices of Physicians are identified using the four-digit NAICS code 6211. An analysis using Lightcast's own industry categories, rather than ones from NAICS Association, is provided in Workpaper 14.

100. Based on the information on employee transitions shown in Exhibit 9, a substantial share of USPI Senior Employees' job options is with employers outside the OCC industry. Furthermore, as I show in Section 3.2, Defendants account for only a small share of establishments, and a small share of employment, in the OCC industry overall. Even if Defendants comprised a majority of the OCC industry, which they do not (as shown in Exhibit 2), they would still face substantial competition for workers from employers outside the industry.

101. At a more granular level, looking at employee transitions by specific employer, the Lightcast data show that USPI Senior Employees switch to and from jobs with many different employers. Exhibit 10 below lists examples of employers that USPI hires Senior Employees from and loses them to—that is, employers it competes with for workers. These include hospitals such as CommonSpirit Health or Memorial Hermann and specialty healthcare providers such as Solis Mammography, but also firms and institutions beyond healthcare providers including McKinsey and Abbot Labs.

102. Dr. Starr testified that while Defendants' employees could find jobs in other industries, they could use their skills and knowledge "most productively" in

the healthcare industry.[152] Even if it were true that the healthcare industry contains the best employment options for all of **Defendants' Senior Employees**—including those in specialties like IT or finance—Exhibit 10 demonstrates that the employment opportunities in the healthcare industry extend far beyond Defendants and even beyond OCCs.[153]

---

*Exhibit 10*
*Companies that USPI hires Senior Employees from and loses them to*



Source: Lightcast
Note: In the graphic above, the companies named on the left are examples of the immediate previous employers of Senior Employees who joined USPI between January 1, 2005 and May 1, 2024. The companies named on the right are examples of the immediate next employers of Senior Employees who left USPI during the same period.

---

103. Case documents and deposition testimony further support the conclusion that Defendants competed with employers in industries beyond ASCs and OCCs for Senior Employees.[154] **Industry experience had "zero relevance" for**

---

[152] Starr Deposition, pp. 129–130 ("[T]o the extent these individuals could go and use their skills and knowledge most productively without a big drop-off in their productivity, it would be in the healthcare context in a similar job.").

[153] Dr. Gerhart agreed in his deposition that Defendants "compete in a broader industry" to an extent. See Gerhart Deposition, p. 73.

[154] For examples of USPI considering applications from non-Defendant competitors, see email chain from Shannon McGarry to Shannon Mosley, "RE: RVP Dallas candidates," March 21, 2018, USPI_CIV_000142589–90 ("Please see below for a list of candidates I am targeting for the RVP role in Dallas and their current titles [...] ████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████ ").

some candidate searches according to an external recruiter for SCA.[155] USPI's then Chief Operating Officer ("COO"), Mark Garvin, considered USPI's competitors to include "all health systems," "all ambulatory surgery center companies," "private equity firms employing physician practice management," and "a host of multi-state, multi-site business operators, healthcare or not."[156]

## 5. The Alleged, Assessed, and Admitted Mobility Restrictions could have directly impacted the employment options of, at most, a limited number of Senior Employees

104. Dr. Starr posits that the mechanism by which the Experts' Assessed SCA-USPI Mobility Restrictions could suppress workers' compensation is by suppressing their mobility, stating:

> Taken together, this body of research suggests that firms' suppression of worker mobility, whether via a no-poach agreement, noncompete agreement, or other mechanism that limits workers' outside options, leads to lower worker compensation.[157]

105. In this section, I explain that according to this mechanism the direct impact of the Alleged, Assessed, or Admitted Mobility Restrictions would therefore have been limited to the employees who lost a relevant outside option for employment.[158]

---

[155] Deposition of Clare Metcalf (Russell Reynolds), August 14, 2024, pp. 43–44 ("Q. Okay. And now, you referred to organizations to target. Can you elaborate on that? A. So we will often put together a target list of companies within the industry, without -- outside of the industry. Some searches, industry experience is very relevant and some searches it has zero relevance.").

[156] Garvin Deposition, pp. 195–196 ("Q. Now, with respect to competitors for employees, who would you consider to be competitors for the senior level type of employees who were involved in the SCA agreement to your understanding? A. Competitors to USPI for employees in general? Q. Correct. A. Any and all health systems in the United States of America, any and all ambulatory surgery center companies in the United States of America, private equity firms employing physician practice management with various ancillary subs. And a host of multi-state, multi-site business operators, healthcare or not.").

[157] Starr Report, ¶ 52. Dr. Starr testified that "[t]here are many mechanisms that could link the end of the conduct with the rise [] in compensation," including "the end of the wage exchanges which could have allowed the companies to reduce how much they're paying class members. It could arise from a sudden increase in solicitations relative to where they were before", but he has not quantitatively analyzed any mechanisms other than a reduction in mobility. See Starr Deposition, p. 204.

[158] This conforms with Dr. Gerhart's characterization of directly-impacted employees. See Gerhart Deposition, p. 199 ("Q. [] The direct effects are to those who you assert would not have received or did not receive cold calls, who would have received them absent the alleged conduct; correct?... [A.] I think it's basically correct, yes.").

*5.1. Overview of the potential impacts of a non-solicitation agreement*

106. For a non-solicitation agreement to preclude a specific employee from receiving a higher level of compensation, **either at the employee's current employer or at the co-party to the non-solicitation agreement, the following** conditions would have to hold:

1. Absent the non-solicitation agreement, the co-party to the non-solicitation agreement would have solicited the employee.
2. The solicited employee would have considered the solicitation.
3. The co-party would have given the employee an offer but for the non-solicitation agreement.
4. The offer would have conveyed a higher compensation than the employee's current compensation.
5. The employee would have either accepted the offer or used the offer to obtain better compensation at **the employee's** current employer.
6. The employee did not receive an offer from a third-party employer that conveyed an equal or higher increase in compensation than the co-party's offer.

107. For the Tell Your Boss provision of the Alleged, Assessed, and Admitted Mobility Restrictions to preclude a specific employee from receiving a **higher level of compensation, either at the employee's current employer or at** the co-party to the non-solicitation agreement, the following conditions would have to hold:

1. The employee applied to the co-party for a position.[159]
2. The co-party told the employee about the Tell Your Boss provision.
3. The employee either elected not to tell their boss and the co-party refused to consider the application, or the employee told their boss and their boss convinced the employee to stay.
4. If the recruiting process had continued, the employee would have received an offer from the co-party.
5. The offer would have conveyed a higher compensation than the employee's current compensation.
6. The employee would have either accepted the offer or used the offer to obtain better compensation at their current employer.
7. The employee did not receive an offer from a third-party employer that they could use to obtain the same increase in compensation than the co-party's offer.

---

[159] Dr. Starr testified that the "tell-your-boss provision is about curtailing competition when it is the employee who reached out first." Starr Deposition, p. 83.

*5.2. Economic evidence indicates that the Alleged, Assessed, and Admitted Mobility Restrictions would have impacted the employment options of a limited number of USPI Senior Employees*

108. According to Plaintiffs' theory of harm, employees can use a job offer from another company to increase their compensation (assuming the offer has better terms than their current position) by either accepting the offer or using the offer to negotiate better compensation at their current job.[160] Therefore, the way in which a non-solicitation agreement could directly harm an employee is by preventing a job offer they would have received but for the non-solicitation agreement.[161] The Tell Your Boss provision is similar in that, according to Plaintiffs' experts, the way in which it could directly harm an employee is by preventing a job offer they would have received but for the non-solicitation agreement.[162]

109. The number of USPI Senior Employees who might have been directly harmed by not receiving an offer from SCA or DaVita is determined in part by the share of all job opportunities for USPI Senior Employees that is represented by SCA or DaVita. In this section, I analyze evidence based on patterns of employee departures from USPI to assess the extent to which SCA and DaVita were significant employment options outside the periods covered by the Alleged, Assessed, and Admitted Mobility Restrictions. No matter the conduct period considered, the number of employees who accepted offers from SCA or DaVita outside any conduct period is small, limiting the number of USPI employees who could have been affected by the Alleged Three-Party Mobility Restrictions.

*5.2.1. Even outside the Alleged, Assessed, or Admitted Mobility Restrictions, few USPI Senior Employees accepted job offers from SCA or DaVita*

110. I start reviewing patterns of USPI Senior Employee departures by analyzing compensation data from USPI, SCA, and DaVita. As I describe above in Section 4.2, these data allow me to identify every Senior Employee departure from USPI and to determine whether the employee transferred to another Defendant. The degree to which USPI Senior Employees transferred to Defendants outside the Alleged, Assessed, or Admitted

---

[160] Complaint, ¶ 11 ("Defendants' conspiracy also denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment.").

[161] Complaint, ¶ 80 ("Defendants' no-poach agreements would have affected the proposed Class as a whole, and not just individual employees who would have otherwise received job offers from rival companies in the industry.").

[162] Gerhart Report, ¶ 77 ("[B]oth proactive and passive candidates at Defendant firms often did not receive job offers they could use as leverage or data points if they did not [*sic*] 'did not want to inform their boss that they were leaving and looking for a new job' (the 'tell-your-boss provision').").

Mobility Restrictions provides insight into the magnitude of the potential direct effects of the restrictions.[163]

111. Exhibit 11 summarizes data on departures from USPI, highlighting the number departing to other Defendants.[164] For example, in 2009, 50 USPI Senior Employees departed. Among those Senior Employees, zero left for SCA and zero left for DaVita.

---

[163] While employees who received offers and used them to negotiate higher compensation at their current jobs are not observed in these data, documentary evidence suggests that USPI's and SCA's offer acceptance rates were high, which suggests the number of such employees is likely small. SCA's business documents indicate that its offer acceptance rate was above 70 percent. An internal document from USPI indicates that its offer acceptance rate was 96 percent. See "Current HR Priorities," April 18, 2017, SCA000072712; SCA001471584.xlsx; USPI_CIV_000053367.xlsx.

[164] This table differs from Exhibit 6 in that it only looks at departures from USPI in each year.

*Exhibit 11*
*Total USPI Senior Employee departures and the number departing to SCA and DaVita, 2006–2021*

| Year | Total Departures | Departures To | | | |
| | | SCA | | DaVita | |
| | | Number | Percent | Number | Percent |
|---|---|---|---|---|---|
| 1. 2006 | 30 | - | - | 1 | 3.3% |
| 2. 2007 | 51 | - | - | 0 | 0.0% |
| 3. 2008 | 55 | 2 | 3.6% | 0 | 0.0% |
| 4. 2009 | 50 | 0 | 0.0% | 0 | 0.0% |
| 5. 2010 | 47 | 3 | 6.4% | 0 | 0.0% |
| 6. 2011 | 50 | 0 | 0.0% | 0 | 0.0% |
| 7. 2012 | 57 | 3 | 5.3% | 0 | 0.0% |
| 8. 2013 | 57 | 3 | 5.3% | 0 | 0.0% |
| 9. 2014 | 46 | 0 | 0.0% | 1 | 2.2% |
| 10. 2015 | 61 | 1 | 1.6% | 0 | 0.0% |
| 11. 2016 | 78 | 0 | 0.0% | 0 | 0.0% |
| 12. 2017 | 88 | 1 | 1.1% | 0 | 0.0% |
| 13. 2018 | 117 | 1 | 0.9% | 0 | 0.0% |
| 14. 2019 | 104 | 2 | 1.9% | 0 | 0.0% |
| 15. 2020 | 165 | 5 | 3.0% | 0 | 0.0% |
| 16. 2021 | 300 | 3 | 1.0% | 1 | 0.3% |
| 17. **Outside of the Alleged Three-Party Mobility Restrictions: 2021** | **300** | **3** | **1.0%** | **1** | **0.3%** |
| 18. **Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2008–2009 and 2020–2021** | **570** | **10** | **1.8%** | **-** | **-** |
| 19. **Outside of USPI's Admitted Mobility Restrictions with SCA: 2008–2009 and 2018–2021** | **791** | **13** | **1.6%** | **-** | **-** |
| 20. **During USPI's Admitted Mobility Restrictions with SCA: 2010–2017** | **484** | **11** | **2.3%** | **-** | **-** |

Source: Dr. Starr Corrected Compensation Data

Note: Senior Employee departures are identified using the date of the employee's last paycheck. Inter-Defendant switches are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch.

112. For the purpose of analyzing the potential direct effects of the Alleged, Assessed, or Admitted Mobility Restrictions, I follow the same strategy I use for assessing market power and focus my attention on years outside the Alleged, Assessed, or Admitted Conduct periods. Analyzing employee departures outside the Alleged, Assessed, or Admitted Conduct periods allows me to assess the importance of SCA and DaVita as employment options for USPI Senior Employees absent any claim of collusion and to assess the number of Senior Employees who may have been directly affected by the Alleged, Assessed, or Admitted Conduct.

113. **Alleged Three-Party Mobility Restrictions from 2008 through January 2021**. With the data provided for this matter, I can identify Senior Employee mobility between USPI and both DaVita and SCA from 2008 through 2021, leaving just 2021 outside the Alleged Three-Party Mobility Restrictions period.[165] Row 17 of Exhibit 11 shows that SCA and DaVita represented a small share of competition for USPI Senior Employees during 2021. Out of 300 Senior Employees departing USPI during this period, only three switched to SCA, and one switched to DaVita. This indicates that SCA or DaVita were the preferred job opportunities for 1.3 percent of departing USPI employees during 2021.

114. **Experts' Assessed SCA-USPI Mobility Restrictions from 2010 through 2019**. Row 18 of Exhibit 11 reports the number of USPI Senior Employees who departed USPI, and the number who left for a job at SCA in the periods prior to 2010 and after 2019, outside the Experts' Assessed SCA-USPI Conduct period. In the four years of these for which I have SCA compensation data, 570 Senior Employees left USPI. Of these employees, only 10—or less than 2 percent—took a job at SCA. Over 98 percent of Senior Employees' preferred labor market options were from firms other than SCA, even outside the Experts' Assessed SCA-USPI Mobility Restrictions, limiting the potential direct impact of the alleged agreement on USPI employees.[166]

115. **USPI's Admitted Mobility Restrictions with SCA from 2010 through 2017**. Row 19 of Exhibit 11 reports the number of Senior Employees who departed USPI, and the number who departed for a job at SCA, in the time period before and after USPI's Admitted Mobility Restrictions with SCA. During this period, a total of 791 Senior Employees departed USPI, but only 13—or less than 2 percent—took a job at SCA. Over 98 percent of USPI's Senior Employees' best outside job options came from firms other than SCA, even outside USPI's Admitted Mobility Restrictions with SCA, limiting the potential direct impact on USPI employees.[167]

116. The final row of Exhibit 11 shows the number of USPI Senior Employees who left their jobs, and the number of departing employees who took a job at SCA, between 2010 and 2017—*during* the Alleged, Assessed, or Admitted Conduct periods. This row demonstrates that the share of USPI's departing employees who left for a job at SCA during the Alleged, Assessed, or Admitted Conduct periods is similar to the share who left for a job at

---

[165] The only year outside the Alleged Three-Party Mobility Restrictions period for which I can observe inter-Defendant switching, 2021, is the year after the COVID-19 pandemic began in the U.S. During this period, labor markets for healthcare workers may still have been affected by the pandemic. However, even if 50 percent of USPI's Senior Employee departures represented departures from the labor force rather than switches, SCA would still account for a very small fraction (three of 150, or 2 percent) of the employers that USPI's switching employees switched to.

[166] Excluding the years that may have been affected by the COVID-19 pandemic, only two of 105 departing employees, or less than 2 percent, went to work for SCA.

[167] Excluding the years that may have been affected by the COVID-19 pandemic, only five of 326 departing USPI employees, or 1.5 percent, took a job at SCA.

SCA outside those periods. Out of 484 departing employees, 11 (2.3 percent) left for a job at SCA.

### 5.2.2. *USPI Senior Employees' job opportunities beyond Defendants are extensive and varied*

117. Above, I review departures from USPI and analyze how many of those employees transferred to other Defendants. In this section, I analyze where USPI Senior Employees departed to when it was not another Defendant. As I describe in Section 4.2.2 above, the Lightcast data allow me to identify where some of these Senior Employees depart for, even when they do not end up at another Defendant.

118. In Section 4.2.2, I use Lightcast data to identify the types of employers that USPI competes with for Senior employees by looking at the industries from which it hires workers and to which it loses them. In this section, I narrow my focus to the employers to which USPI Senior Employees depart. The results of this analysis are shown in Exhibit 12.[168] Even when there were no Alleged, Assessed, or Admitted Mobility Restrictions on **USPI's Senior Employees**, the majority of employees found their preferred outside option for employment with firms outside the ASC and OCC industries.

---

[168] Because the COVID-19 pandemic affected labor market dynamics, I also review the same patterns restricting to years prior to the pandemic. These patterns are consistent with Exhibit 12. See Workpaper 12.

***Exhibit 12***
***Share of USPI Senior Employee departures outside the Alleged, Assessed and Admitted Conduct periods, by industry***

| Industry of Next Employer | Share of Departures | | |
| --- | --- | --- | --- |
| | **Outside of the Alleged Three-Party Mobility Restrictions: 2005 – 2007 and 2021 – 2024** | **Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2005 – 2009 and 2020 – 2024** | **Outside of USPI's Admitted Mobility Restrictions with SCA: 2005 – 2009 and 2018 – 2024** |
| 1. Classified Industries – excluding Healthcare Providers | 21.2% | 22.6% | 24.3% |
| 2. Healthcare Providers – excluding Hospitals, Offices of Physicians, and OCCs | 12.4% | 11.1% | 12.3% |
| 3. General Medical and Surgical Hospitals | 18.2% | 17.1% | 15.4% |
| 4. Offices of Physicians | 22.4% | 19.4% | 17.9% |
| 5. Outpatient Care Centers – excluding ASCs | 3.5% | 4.4% | 3.4% |
| 6. Ambulatory Surgical Centers | 2.9% | 4.0% | 3.9% |
| 7. Unclassified Industries | 19.4% | 21.4% | 22.9% |

Source: Lightcast; NAICS Association

Note: This table includes all reported next employer for Senior Employees who left USPI between January 1, 2005 and May 1, 2024, excluding the Alleged, Assessed, or Admitted Conduct periods. For each employee, I identify next employers for each class-relevant stint (i.e., each period of time in a class-relevant position at USPI). Next employer(s) are identified based on the first job starting after the end of the stint, as well as any other job that started during the stint. Ambulatory Surgical Centers are identified using the six-digit NAICS code 621493. Outpatient Care Centers are identified using four-digit NAICS code 6214. General Medical and Surgical Hospitals are identified using the four-digit NAICS code 6221. Offices of Physicians are identified using the four-digit NAICS code 6211. An analysis using Lightcast's own industry categories, rather than ones from NAICS Association, is provided in Workpaper 15.

### 5.3. Dr. Starr's analysis indicates that the Experts' Assessed SCA-USPI Mobility Restrictions could have directly impacted a limited number of Senior Employees

119. As I explain above, the question of whether the Experts' Assessed SCA-USPI Mobility Restrictions affected the mobility of Senior Employees is a crucial one for Plaintiffs because a reduction in job offers received, and a reduction in mobility, is the mechanism their experts describe by which the mobility restrictions could have affected compensation.[169] The question of whether the Experts' Assessed SCA-USPI Mobility Restrictions impacted compensation hinges on whether it affected job offers and mobility.

120. Consistent with my analysis of patterns of employee switching in Section 4.2 above, Dr. Starr's own analysis of "whether the No-Poach Agreements suppressed the flow of Senior-Level employees during the Conduct Period"[170] suggests that very few employees could have been directly affected by the Experts' Assessed SCA-USPI Mobility Restrictions.

---

[169] Neither of Plaintiffs' experts provide any explanation of how the business information Defendants shared could have been used to suppress compensation. I discuss this issue in detail in Section 6 below.

[170] Starr Report, ¶ 82.

*5.3.1. Dr. Starr's analysis indicates that the Experts' Assessed SCA-USPI Mobility Restrictions had a minimal effect on mobility*

121. Dr. Starr conducts an analysis that he purports shows that the Experts' Assessed SCA-USPI Mobility Restrictions reduced the mobility of Senior Employees between the two companies. In his Figure 4, he estimates a reduction in the likelihood of Senior Employees switching between USPI and SCA due to Experts' Assessed SCA-USPI Mobility Restrictions. His results also indicate how many additional USPI and SCA employees would have switched jobs but for the Experts' Assessed SCA-USPI Mobility Restrictions according to his estimate. This analysis is crucial to Dr. Starr's damages estimate because it quantifies the magnitude of the conduit— mobility restrictions—for the compensation suppression he purports to find.

122. According to Dr. Starr's mobility regression, he estimates that the likelihood that any given employee leaves USPI for SCA or vice versa is 0.17 percent lower during the Experts' Assessed SCA-USPI Mobility Restrictions period than outside of it.[171] In Exhibit 13, I quantify the magnitude of that effect in terms of the number of employees who would have moved from USPI to SCA from 2010 through 2019 but for the Experts' Assessed SCA-USPI Mobility Restrictions. For example, in 2010, USPI employed 449 Senior Employees. According to Dr. Starr's analysis, SCA would have hired fewer than one additional Senior Employee from USPI.[172] During the Experts' Assessed SCA-USPI Mobility Restriction period, USPI employed a total of 1,580 Senior Employees, and 948 of them left USPI during this period. Some of these 948 left for SCA. Dr. Starr estimates that SCA would have hired approximately 11 more USPI employees over the ten-year period but for the Experts' Assessed SCA-USPI Mobility Restrictions. Furthermore, some of the 948 departures from USPI may have been among the 11 but-for departures to SCA that Dr. Starr estimates; that is, with the restrictions, they may have left for a non-Defendant firm instead, further reducing the impact of the restrictions on mobility.

---

[171] Starr Report, Figure 4, p. 85.

[172] 449 x 0.0017 = 0.76.

*Exhibit 13*
***Additional USPI Senior Employees that would have switched to SCA but for the Experts' Assessed SCA-USPI Mobility Restrictions according to Dr. Starr's mobility model***

| Year | Number of Senior Employees | Number of Senior Employee Departures | Additional But-For Senior Employee Departures to SCA According to Dr. Starr |
|---|---|---|---|
| 2010 | 449 | 70 | 0.8 |
| 2011 | 493 | 64 | 0.8 |
| 2012 | 538 | 75 | 0.9 |
| 2013 | 555 | 72 | 0.9 |
| 2014 | 587 | 74 | 1.0 |
| 2015 | 614 | 84 | 1.0 |
| 2016 | 729 | 94 | 1.2 |
| 2017 | 785 | 117 | 1.3 |
| 2018 | 838 | 139 | 1.4 |
| 2019 | 833 | 159 | 1.4 |
| **Total** | **1,580** | **948** | **10.9** |

Source: Dr. Starr Compensation Data

Note: This table shows the total number of USPI Senior Employees per year (in column 2), the total USPI Senior Employee departures (in column 3), and the additional number of USPI Senior Employees who would have switched to SCA but for the Experts' Assessed SCA-USPI Mobility Restrictions, according to Dr. Starr's mobility regression. Additional But-For Senior Employee Departures to SCA According to Dr. Starr are calculated by multipliying Dr. Starr's Figure 4 USPI-SCA regression coefficient (-0.00169) by the total number of USPI Senior Employees each year. The total Number of Senior Employees (in the Total row) denotes the number of unique Senior Employees working at USPI during the Experts' Assessed SCA-USPI Mobility Restrictions period.

123. I repeat the exercise in Exhibit 14 for SCA. Dr. Starr's mobility regression estimates that USPI would have hired approximately another eight of SCA's 1,322 Senior Employees during the Experts' Assessed SCA-USPI Mobility Restrictions.

124. Nearly 1,800 Senior Employees departed USPI and SCA during the period Dr. Starr analyzes. Dr. Starr's mobility regression estimates that there would have been fewer than 20 additional moves between the two Defendants during the Experts' Assessed SCA-USPI Mobility Restrictions conduct period from 2010 through 2019 but for the mobility restrictions.

*Exhibit 14*
**Additional SCA Senior Employees that would have switched to USPI but for the Experts' Assessed SCA-USPI Mobility Restrictions according to Dr. Starr's mobility model**

| Year | Number of Senior Employees | Number of Senior Employee Departures | Additional But-For Senior Employee Departures to USPI According to Dr. Starr |
|------|---------------------------|--------------------------------------|------------------------------------------------------------------------------|
| 2010 | 297 | 49 | 0.5 |
| 2011 | 336 | 51 | 0.6 |
| 2012 | 373 | 75 | 0.6 |
| 2013 | 388 | 58 | 0.7 |
| 2014 | 457 | 79 | 0.8 |
| 2015 | 502 | 85 | 0.8 |
| 2016 | 573 | 106 | 1.0 |
| 2017 | 569 | 117 | 1.0 |
| 2018 | 591 | 113 | 1.0 |
| 2019 | 615 | 97 | 1.0 |
| **Total** | **1,322** | **830** | **7.9** |

Source: Dr. Starr Compensation Data

Note: This table shows the total number of SCA Senior Employees per year (in column 2), the total SCA Senior Employee departures (in column 3), and the additional number of SCA Senior Employees who would have switched to USPI but for the Experts' Assessed SCA-USPI Mobility Restrictions, according to Dr. Starr's mobility regression. Additional But-For Senior Employee Departures to USPI According to Dr. Starr are calculated by multipliying Dr. Starr's Figure 4 USPI-SCA regression coefficient (-0.00169) by the total number of SCA Senior Employees each year. The total Number of Senior Employees (in the Total row) denotes the number of unique Senior Employees working at SCA during the Experts' Assessed SCA-USPI Mobility Restrictions period

### 5.4. Dr. Starr's analysis of switchers is flawed and overstates the direct impact of the Experts' Assessed SCA-USPI Mobility Restrictions

125. As I discuss above, Dr. Starr's methodology, as implemented, demonstrates that the direct impact of the Experts' Assessed SCA-USPI Mobility Restrictions would have been limited. In this section, I highlight a flaw in that methodology that causes him to overstate that limited impact.

126. Based on his mobility regression, Dr. Starr estimates that USPI and SCA Senior Employees were more likely to leave for a job at the other Defendant outside the Experts' Assessed SCA-USPI Mobility Restrictions period than during the period.[173] But his regression does not account for the fact that during some of these years, USPI and SCA Senior Employees were simply more likely to leave their jobs for any other employer. Nor does it recognize that USPI and SCA Senior Employees were far more likely to leave for a job with non-Defendant firms.

---

[173] Starr Report, Figure 4, p. 85. Note that, despite relying on this regression for his opinions regarding reductions in mobility, Dr. Starr testified that this regression "wasn't trying to estimate the causal effect [] of the conduct on mobility." Starr Deposition, p. 223.

127. As I show in Exhibit 11 above, the number of Senior Employees departing USPI changes from year to year, rising from 30 in 2006 to 300 in 2021. The departure rate rose as well, as I show in Exhibit 15 below. In the years when a higher share of USPI's Senior Employees departed, more switched to SCA, simply because they were more likely to switch to *any* other employer.

128. Dr. Starr recognizes that changes in the rate of employee turnover—and therefore changes to the rate of moves between Defendants—may be driven by "reasons other than the relaxation of the No-Poach Agreements."[174] For example, he notes that turnover at USPI increased in 2020 and 2021 when Tenet devalued its employee equity plan.[175] The increase in overall turnover at USPI would have affected the probability that Senior Employees switch to SCA for reasons unrelated to any mobility restrictions. But his regression does not control for changes in the overall turnover rate.

129. In this section, I modify Dr. Starr's Senior Employee mobility regression to control for changes in the overall rate of employee departures. I find that mobility between the firms as a share of total departures was no lower during the Experts' Assessed SCA-USPI Mobility Restrictions time period than outside of it.

130. In Exhibit 15, I review the share of USPI and SCA Senior Employees who departed between 2008 and 2021. The overall departure rate of USPI and SCA Senior Employees increased in 2020 and remained elevated in 2021. Dr. Starr concludes that the increased Senior Employee mobility between USPI and SCA in 2020 indicates mobility was suppressed prior to 2020. However, given the increase in *total* departures post-2019, it is not surprising to find an increase in mobility between USPI and SCA, simply because more Senior Employees were departing those firms.

---

[174] Starr Report, ¶ 85.

[175] Starr Report, ¶ 85 ("For example, I understand that in the 2019/2020 period a number of senior USPI employees left USPI in response to USPI's drastic re-valuation of its 2015 Employee Stock Equity Plan.").

***Exhibit 15***
***Share of USPI and SCA Senior Employees that depart increased in 2020***



Source: Dr. Starr Compensation Data
Note: Senior Employee departures are identified using Dr. Starr's mobility methodology applied to Dr. Starr's class.

131. Dr. Starr's mobility regression does not account for the increased likelihood of Senior Employee departures in 2020 and 2021. But the likelihood of any given USPI or SCA Senior Employee switching to a job with the other Defendant increases when their likelihood of leaving their current job rises.

132. Dr. Starr's mobility regression can be modified to account for the overall increase in departures from USPI and SCA in 2020. To do so, I estimate his regression, including a control for the departure rate of Senior Employees each year. I also make a correction to one of the 15,694 observations in Dr. Starr's regression data.[176] Exhibit 16 displays the results from these modifications to Dr. Starr's regression. Column 1 displays the results of Dr. Starr's mobility regression for USPI and SCA.[177] Column 2 shows the results of his regression correcting for the double-counted switcher. In

---

[176] Dr. Starr flags Heather Way (ID 181710) as a switcher between USPI and SCA in both 2020 and 2021. From a review of the relevant paycheck data, Ms. Way appears to have switched from SCA to USPI in January 2021.

[177] See Starr Report, Figure 4, Column 3, p. 85. Note that the effect of the conduct found in Dr. Starr's Figure 4, Column 3 (-0.00169), is not significant at a conventional level of statistical significance used by economists, the 5 percent level (i.e., the 95 percent confidence interval). See, e.g., American Bar Association, "Econometrics and Regression Analysis," in *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition (ABA Book Publishing, 2017), pp. 123–208 ("American Bar Association (2017)") at p. 142 ("Ideally the economist would choose the level of the [hypothesis] test to balance the costs of falsely rejecting a true hypothesis with the costs of failing to reject a false hypothesis. However, such an analysis is rarely carried out. Instead, statistical hypotheses are carried out at conventional levels of 5 percent, occasionally at 1 percent or 10 percent. These choices for the level of the test should be understood as conventions and not necessarily grounded in any careful balancing between the kinds of errors that can occur in practice.").

Column 3, I introduce a control variable for the rate of Senior Employee departures from USPI and SCA in each year. The estimated effect of the conduct is an increase in mobility during the Experts' SCA-USPI Assessed Conduct period, although this increase is not statistically distinguishable from no effect.[178]

*Exhibit 16*
***Senior Employees who depart USPI or SCA are not less likely to arrive at the other firm during the Experts' Assessed SCA-USPI Conduct period***

| | Figure 4: Model 3 | | |
| | (1) | (2) | (3) |
|---|---|---|---|
| | **Starr's Regression** | **Double-Switcher Correction** | **Double-Switcher Correction Control for Departures** |
| Conduct | -0.00169* | -0.00150 | 0.00196 |
| | (0.00100) | (0.000985) | (0.00151) |
| % Effect Relative to Sample Mean | -55.30% | -50.0% | +65.3% |
| | | | |
| Year | 8.30e-05 | 6.92e-05 | -0.000326 |
| | (0.000117) | (0.000116) | (0.000198) |
| % of USPI-SCA Employees Departing | | | 0.0588** |
| | | | (0.0236) |
| | | | |
| Sample | USPI & SCA | USPI & SCA | USPI & SCA |
| Sample Mean of DV | 0.003 | 0.003 | 0.003 |
| Observations | 15,694 | 15,694 | 15,694 |
| R-squared | 0.000 | 0.000 | 0.001 |

Source: Dr. Starr's Compensation Data

Note: Robust standard errors in parentheses. *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Percentage of Senior Employees Departing is calculated annually by dividing the number of USPI and SCA departures by the total number of USPI and SCA Senior Employees.

# 6. Plaintiffs' experts fail to present reliable economic evidence to support the conclusion that the Alleged or Assessed Information Sharing restricted labor market competition or suppressed compensation, and ignore evidence that is inconsistent with such a conclusion

133. Plaintiffs allege that, as part of Defendants' overarching conspiracy, Defendants "employed collusive exchanges of competitively sensitive information to further their conspiracy to suppress competition between them for employees, and to thereby suppress the compensation of their

---

[178] When I estimate Dr. Starr's mobility regression on data for the corrected class, Dr. Starr's estimated conduct effect shrinks and is not statistically significant at even a 90 percent confidence level. When the departure rate is added as a regressor, it shrinks further and remains insignificant. See Workpaper 8.

employees."[179] The Alleged Three-Party Information Sharing started "no later than 2009," and continued "through at least 2017."[180]

134. As discussed in Section 1.2, Dr. Starr and Dr. Gerhart do not address the Alleged Three-Party Information Sharing among Defendants. Neither Dr. Starr nor Dr. Gerhart presents any evidence of information sharing between DaVita and USPI, and therefore neither presents evidence supporting the Alleged Three-Party Information Sharing.[181] Rather, with respect to USPI, they analyze the Experts' Assessed SCA-USPI Information Sharing, which they claim allowed USPI to suppress compensation. Dr. Starr takes the position that "the CSI exchanges between SCA and USPI [] ended in 2019[.]"[182]

135. Both Dr. Gerhart and Dr. Starr opine that Defendants engaged in sharing of information that was inconsistent with their unilateral incentives and that could have the effect of suppressing compensation. Dr. Gerhart argues that "Plaintiffs have developed an extensive record of evidence common to the Class to demonstrate that these CSI Exchanges, which Defendants engaged in under the guise of lawful benchmarking, are inconsistent with unilateral conduct and would have harmed employee pay."[183] Dr. Gerhart concludes "Defendants' CSI Exchanges Likely Restricted Labor Market Competition."[184]

136. Dr. Starr argues that "[t]he exchange of CSI is often a key component of collusion."[185] He further argues that "[i]n this case, the exchange of Senior-Level Employee compensation information would give Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees for their services."[186] Finally, he claims that "the direct communications between horizontal competitors to agree to share CSI with each other is inherently inconsistent with unilateral conduct"[187] and that Defendants in this case

---

[179] Complaint, ¶ 8.

[180] Complaint, ¶¶ 8, 59.

[181] Starr Deposition, p. 44 ("I was not asked to look into any information exchanges between USPI and DaVita. I don't have any opinions on it."); Gerhart Deposition, p. 196 ("Q. You have not seen any evidence of sharing wage information between USPI and DaVita; correct? ... [A.] Again, I would refer back to whatever is in the report on that. ... If it's not in the report, then I didn't rely on it.").

[182] Starr Report, ¶ 118.b.ii.

[183] Gerhart Report, ¶ 82.

[184] Gerhart Report, Section VI.C. See also Gerhart Deposition, p. 34 ("Q. ... You are not opining that defendants' CSI exchanges in fact restricted labor market competition; you are opining that they likely restricted labor market competition. Correct? ... [A.] Well, I am concluding they likely restricted labor market competition.").

[185] Starr Report, ¶ 93.

[186] Starr Report, ¶ 93.

[187] Starr Report, ¶ 98.

shared information related to pay.[188] Dr. Starr concludes that "Defendants Exchanged CSI to Suppress Labor Market Competition."[189]

137. Thus, both experts opine that the information that SCA and USPI exchanged was consistent with or could have been used to support a conspiracy to suppress compensation.[190] Yet, as I demonstrate in this section, neither expert has conducted the type of analysis that is needed to conclude that SCA and USPI's information sharing was consistent with a conspiracy to suppress wages and inconsistent with benchmarking. Moreover, they ignore evidence that is inconsistent with such a conclusion.

138. In this section, I first provide an overview of the economic theory of collusion, including the conditions that are necessary for collusion to occur and have an effect on market prices. I demonstrate that neither Dr. Gerhart nor Dr. Starr assesses whether all the necessary conditions hold in the current matter in Section 6.1. In Section 6.2, I turn to the analysis of information sharing that Dr. Gerhart and Dr. Starr provide. I show that **neither Dr. Gerhart's nor Dr. Starr's analysis** supports their conclusion that the information shared is of the type that could be used to support collusion or that it could be used to restrict competition for labor or suppress compensation, and **that Plaintiffs' experts ignore economic** evidence that is inconsistent with the alleged compensation suppression agreement. Specifically, Plaintiffs' experts ignore evidence that USPI competed for new Senior Employees and that compensation trends across Defendants are **inconsistent with Plaintiffs' claims** that the Alleged, Assessed, or Admitted Conduct suppressed compensation for all or nearly all USPI Senior Employees.

---

[188] Starr Report, ¶ 99 ("The qualitative record evidence supports the allegation that Defendants SCA and DaVita shared CSI on employee pay data with one another, and SCA and USPI did the same.").

[189] Starr Report, Section V.C.

[190] Gerhart Report, ¶ 7.f ("Defendants' years-long CSI Exchanges are inconsistent with unilateral conduct and would have harmed employees. No company benefits by unilaterally sharing wage-related data with competing employers. Rather, mutual CSI Exchanges would have enabled Defendants to agree to keep Class pay low"); Starr Report, ¶ 29 ("I find that both the qualitative and quantitative evidence is consistent with the alleged anticompetitive collusion and inconsistent with competition. ... The exchanges of CSI are the exact kind of data exchanges that could lead to the suppression of employee compensation."); Starr Deposition, p. 109 ("I don't have any opinions in this case on the effects of any particular subcomponents and whether they are capable of explaining the effect. ...[I]f you share competitively sensitive information, that allows for competitors to know what you're charging [] and they could either explicitly or tacitly collude.").

*6.1. Overview of the economic theory of collusion **and Plaintiffs' experts'** analysis*

*6.1.1. Overview of economic conditions that are required for collusion to have an effect on market outcomes*

139. In antitrust economics, "collusion" generally refers to conduct that is coordinated between firms to derive supra-competitive profits.[191] The coordinated conduct could take the form of fixing prices, allocating the market, or some other form of agreed-upon conduct. When assessing whether the economic evidence is consistent with a claim of collusion, such as any alleged conspiracy to suppress compensation, an economist can assess whether the conditions that are needed for collusion to be profitable and to affect market outcomes are present and whether market outcomes are consistent with the allegations of collusion (e.g., are the observed changes in compensation consistent with the allegations of collusion).

140. Economic theory outlines a set of conditions needed for collusion (e.g., compensation suppression or price fixing) to arise and be profitable and affect market outcomes. These conditions are as follows. First, the members of the cartel need to collectively have meaningful market power for the collusion to be successful.[192] In the absence of meaningful market power, the members of the cartel will have limited ability to influence market outcomes.[193]

141. Second, participants in the cartel must behave in ways that are not in their unilateral incentives or individually rational. This means that they would not engage in the conduct but for the cartel.[194] For example, in a cartel to

---

[191] Louis Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, N.J.: Princeton University Press, 2010), p. 315 ("Collusion occurs when firms in an industry coordinate to maximize (or at least increase) joint industry profits as opposed to individual profits. In standard models of oligopolistic competition, firms maximize their own profits and ignore the consequence of their actions on competitor's profitability. As a result of this fundamental horizontal externality, whereby a firm takes actions (e.g., increases output or cuts prices) without any consideration of the negative impact on its competitors' profits, total industry profits are not maximized and firms will end up producing more and at lower prices than if they were active together in a concerted fashion. Thus economic theory argues that selfish actions by individual firms are (i) ultimately self-defeating and (ii) ultimately generate great benefits for consumers in the form of lower prices and higher output.").

[192] Jeffrey M. Perloff, "Cartels," *Journal of Industrial Organization Education,* 1(1), 2006, pp. 1–12 ("Perloff (2006)") at p. 3 ("Economists have identified many conditions for cartels to form, last, and be profitable. Here, we review some of the major ones. First, the cartel can significantly raise prices. Second, the cartel controls most of the market (makes most of the sales)."); Kaplow and Shapiro (2007), p. 1103 ("Economists have long recognized that there exist certain prerequisites to successful collusion. ... The key elements are ... inclusion: a means of inducing participation by a sufficiently large number of incumbent suppliers so that competition from non-participants does not undermine the profitability of the collusive agreement.").

[193] Kaplow and Shapiro (2007), p. 1115 ("If the firms have little collective market power, so they collectively face rather elastic demand for their products, their incentive to collude is correspondingly low.").

[194] Carlton and Perloff (2015), pp. 148–149 ("Why doesn't each competitive firm reduce its own output below the competitive level? At the competitive equilibrium each competitive firm sets its marginal revenue equal to it marginal cost and has no incentive to further lower its output. If it were to reduce its output by one unit, it would lose profits because the marginal revenue on the last unit produced (the price) would exceed its marginal cost. Thus, each competitive firm is maximizing its profits at the competitive output. ... If all firms cut back by, say, 10 percent, the market price definitely rises; however, if only one firm cuts back by 10 percent, the effect on price is so small that it is

suppress compensation, if only one firm suppressed the compensation of its employees below the competitive level, then that firm's employees would likely switch to other firms that were offering competitive compensation, implying that the first firm's decision to suppress compensation would not be profitable or individually rational.

142. Third, there must be a mechanism that can detect whether any member of the cartel has deviated from the agreed-upon conduct.[195] The ability to detect cheating is critical because each member of a cartel has an incentive to cheat or defect because doing so would increase its profits. In the absence of an ability to detect cheating, a collusive agreement is not sustainable.

143. Fourth, collusive agreements need a mechanism to punish any firm that deviates or cheats on the agreement.[196] The ability to punish is fundamental to the sustainability of a cartel because each individual participant in a cartel will always have an incentive to deviate.

### 6.1.2. *Neither Dr. Starr nor Dr. Gerhart conducts an analysis of whether the economic conditions for collusion to affect market outcomes hold*

144. Neither Dr. Starr nor Dr. Gerhart conducts an analysis of whether each of the conditions above holds. With respect to the first condition, as described in Section 4, Dr. Gerhart does not demonstrate that Defendants have market power to suppress compensation.[197] Dr. Starr claims that the results

---

hardly measurable. Each competitive firm decides that it doesn't pay to reduce its output significantly because its gain is less than its cost. If it reduces its output by one unit, its gain is the trivial amount by which price rises times the units it produces, whereas its loss is the price it would have received for this last unit. A competitive firm ignores the good it does other firms by reducing its output and increasing the market price; it places no value on the gains of other firms. This gain by others is an externality. Working cooperatively, the cartel members gain from the output reductions of each firm.").

[195] Perloff (2006), p. 3 ("Economists have identified many conditions for cartels to form, last, and be profitable. Here, we review some of the major ones. ... The cartel has mechanisms that allow it to detect and prevent cheating[.]"); Kaplow and Shapiro (2007), p. 1103 ("Economists have long recognized that there exist certain prerequisites to successful collusion. ... The key elements are ... (2) detection: some reliable means must exist by which departures from the agreement can be detected[.]").

[196] Kaplow and Shapiro (2007), p. 1103 ("Economists have long recognized that there exist certain prerequisites to successful collusion. ... The key elements are ... punishment: some credible mechanism must be established by which such departures are punished if and when they are detected. Specifically, the prospect of detection and punishment must be sufficient to deter individual firms' proclivity to cheat on the agreement, typically by cutting prices in the short-term, hoping to reap greater profits through a higher market share at the expense of the other firms, before they can respond."); George J. Stigler, "A Theory of Oligopoly," *The Journal of Political Economy*, 72(1), 1964, pp. 44–61 at p. 46 ("Enforcement consists basically of detecting significant deviations from the agreed-upon prices. Once detected, the deviations will tend to disappear because they are no longer secret and will be matched by fellow conspirators if they are not withdrawn."); W. Kip Viscusi, Joseph E. Harrington, Jr., and David E. M. Sappington, *Economics of Regulation and Antitrust*, Fifth Edition (Cambridge, MA: The MIT Press, 2018), p. 143 ("If we go back to the theory of collusion, what made it stable for firms to produce low quantities or charge high prices was that any cheating by a firm would be immediately punished. That threat of low future profits serves to discipline cartel members.").

[197] Dr. Gerhart restricts his analysis to "the movement between" Defendants and does not have an opinion on the scope of the relevant labor market in this case despite testifying that "any company that you lose employees to or you get employees from is ... part of the analysis." Gerhart Deposition, p. 52. He is not opining that the industry is limited

---

from his compensation regression establish that Defendants have market power by finding an impact of the Experts' Assessed SCA-USPI Conduct on compensation,[198] but as I demonstrate in Section 8, his regressions do not separately identify such an impact. Moreover, the economic evidence I present in Section 4 demonstrates that USPI does not have market power either individually or jointly with SCA and DaVita. USPI recruits from and loses Senior Employees to hundreds of other firms beyond the other Defendants. If USPI and SCA, or Defendants collectively, attempted to conspire to suppress compensation, their Senior Employees could leave for one of the other labor market competitors, which is inconsistent with market power.

145. With respect to the second condition, Dr. Starr and Dr. Gerhart simply assert that the exchange of information was necessarily against each Defendant's unilateral interest.[199] Yet, economic literature recognizes that firms can have an incentive to share information with competitors absent a conspiracy. This literature recognizes that sharing information with competitors is not inherently anticompetitive. Rather, a building block for economic models of competitive markets is that market participants know the prices of the good or service in question (e.g., wages in a labor market).[200] Information sharing that disseminates price information can improve market efficiency and competition, especially when a centralized market does not exist, as is often the case in labor markets.[201] Companies regularly consider information about their competitors' compensation for Senior Employees as part of benchmarking analyses.[202] Academic literature indicates that sharing aggregate compensation information can increase competition.[203] SCA and USPI employees testified in this matter that they

---

to the three corporate Defendants. See Gerhart Deposition, pp. 70–73. Dr. Starr testified that he "wasn't asked to study the relevant labor market and define the precise contours of the labor market." Starr Deposition, p. 155.

[198] Starr Report, ¶ 196 ("Market power can be directly established if there is evidence of the ability of firms to suppress wages below competitive levels. In the instant case, the evidence of wage suppression found in Section VI directly demonstrates that Defendants wield market power over Class Members.").

[199] Starr Report, ¶ 98 ("[T]he direct communications between horizontal competitors to agree to share CSI with each other is inherently inconsistent with unilateral conduct."); Gerhart Report, ¶ 82 ("[T]hese CSI Exchanges, which Defendants engaged in under the guise of lawful benchmarking, are inconsistent with unilateral conduct").

[200] Jeffrey M. Perloff, *Microeconomics*, 7th Edition (Boston, MA: Pearson Education Inc., 2015), p. 222 ("Perfectly competitive markets have five characteristics … 3. All market participants have full information about price").

[201] Carlton and Perloff (2015), p. 405 ("There may also be legitimate efficiency reasons for industry members to exchange information. When a centralized market does not exist, disseminating price information can improve efficiency. … Moreover, firms can monitor their own efficiency better if they can compare their costs to those of other firms.").

[202] Zoe B. Cullen, Shengwu Li, and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," NBER Working Paper 30570, August 2024 (Cullen, Li, and Perez-Truglia (2024)"), p. 9, ("[T]he use of salary benchmarking is widespread: of the 2,085 respondents who participate in setting salaries, 87.6% report using salary benchmarks.").

[203] Cullen, Li, and Perez-Truglia (2024), p. 40 ("[S]alary benchmarks can lead to higher pay, as resolving uncertainty prompts firms near the hiring margin to compete more fiercely with one another.").

used the information that was shared with them to help compete more effectively.[204]

146. With respect to the third condition, both experts suggest that the exchange of information could be used to coordinate and monitor the alleged conspiracy.[205] Yet, they fail to show that the exchanged information was sufficiently detailed and timely to provide a mechanism for coordination and monitoring. As described below, the examples of information sharing that Plaintiffs' experts identify are often aggregated to a level that would provide limited, if any, information about the compensation of any given Senior Employee or any given set of Senior Employees. Consequently, Plaintiffs' experts have failed to demonstrate how the Experts' Assessed SCA-USPI Information Sharing or the Experts' Assessed SCA-DaVita Information Sharing supported or were part of a conspiracy to suppress wages.

147. Finally, neither expert articulates any punishment mechanism, even as Dr. Starr acknowledges that "USPI appears to have ceased actively enforcing its end of the No-Poach Agreement in late 2017, [and] SCA appeared to continue enforcing the agreement through 2019."[206]

### 6.2. *The economic evidence reviewed by Dr. Starr and Dr. Gerhart does not support a conclusion that the Experts' Assessed SCA-USPI Information Sharing or the Alleged SCA-USPI Information Sharing suppressed compensation or restricted labor market competition*

148. Plaintiffs claim that USPI shared compensation information with SCA and DaVita in order to suppress compensation.[207] Plaintiffs further claim that

---

[204] Deposition of Brian Todd Mathis (SCA), September 20, 2024 ("Mathis Deposition"), pp. 51–52 ("[W]e would rely on benchmarking information that we could gather, and ultimately we had to make a decision about how to be competitive."). See also Deposition of Michael Rucker (SCA), August 27, 2024, pp. 261–263 (SCA used other companies' merit pool information, among other data points, to examine the market and "ensure we don't fall behind" and "that we're absolutely maintaining market-level total compensation packages so that we can effectively compete."). See also Deposition of Anthony Martin (USPI), June 27, 2024 ("Martin Deposition"), pp. 92–93 (benchmarking was important because "[i]t's also something board members tend to ask about, you know, how do you compare to your peers, how do I know you are doing a good job, how do I know we are earning a high enough margin. So, you know, there's reasons to benchmark in order to kind of determine whether a company is succeeding or not.").

[205] Gerhart Report, ¶ 149 ("I opine that pursuant to common evidence (and based on my experience and research in compensation and human resource management), coordination on compensation for a subset of job titles would likely cascade to the rest of the Class. Even if the Defendants did not coordinate on compensation for every single job title, if they successfully coordinated to suppress the compensation of some positions, that would be spread widely to other employees as well."); Starr Report, ¶ 12.a.ii ("The SCA-DaVita CSI exchanges and SCA-USPI CSI exchanges … allowed them to coordinate on pay levels or increases, potentially lowering Class pay.").

[206] Starr Report, ¶¶ 80.c.iv–v. Dr. Starr states that "USPI appears to have stopped enforcing the agreement … in or around October 2017" and that "USPI took no steps to inform SCA that the No-Poach Agreement was terminated." Dr. Starr also claims that "[i]t is possible that the No-Poach Agreement continued and that SCA still upheld its end of the bargain." If Dr. Starr's claim is correct, then USPI would have cheated on the agreement for up to two years without punishment from SCA.

[207] Complaint, ¶ 8 ("Defendants shared the competitively sensitive information to further the goals of the conspiracy to suppress the compensation of their employees.").

Defendants used the compensation information shared to implement and enforce their conspiracy to suppress compensation.[208] Neither Dr. Starr nor Dr. Gerhart provides any evidence of information sharing that were, or could have been, used to facilitate compensation suppression, as Plaintiffs' experts claim.

149. In this section, I review the Experts' Assessed SCA-USPI Information Sharing. Plaintiffs' experts highlight what they identify as examples of information sharing between SCA and USPI and claim that the information shared could be used to suppress employee compensation. However, they fail to explain how the specific instances of information sharing between USPI and SCA could have been used to suppress compensation. Moreover, Plaintiffs' experts do not provide any analysis to support Plaintiffs' allegation that the information sharing was conducted in support of the Alleged Three-Party Conspiracy and ignore evidence that the information sharing they identify would not be adequate for monitoring and enforcing an agreement to suppress compensation.

### 6.2.1. Overview of Experts' Assessed SCA-USPI Information Sharing

150. As described in the last section, neither of Plaintiffs' experts analyzes whether the conditions for a conspiracy hold in the Experts' Assessed SCA-USPI Information Sharing. Instead, both experts support their conclusions that the alleged exchange of information was inconsistent with unilateral conduct (and consistent with collusion) by separately reviewing the Experts' Assessed SCA-DaVita Information Sharing and the Experts' Assessed SCA-USPI Information Sharing.[209] Both experts identify the types of information they allege SCA and USPI (and SCA and DaVita) shared. Then they claim the information allegedly shared was inconsistent with unilateral conduct and consistent with the types of data that could be used to suppress compensation.[210]

151. Dr. Gerhart lists three reasons the identified information sharing was likely to lower Senior Employees' pay. First, he states that none of the data

---

[208] Complaint, ¶ 60 ("These exchanges of competitively sensitive information provided another means for and facilitated Defendants' implementation and enforcement of their conspiracy to suppress the compensation of their employees.").

[209] Starr Report, ¶ 101 ("The evidence shows that SCA and USPI routinely shared nonpublic Senior-Level Employee wage increase data with one another, in addition to other forms of CSI."); Gerhart Report, ¶ 82 ("I review common evidence that, based on my experience and research in compensation and human resource management, Defendants' Competitively Sensitive Information Exchanges would likely lead to Class-wide wage suppression.").

[210] Starr Report, ¶ 101; See also Gerhart Report, ¶ 82 ("I review common evidence that, based on my experience and research in compensation and human resource management, Defendants' Competitively Sensitive Information Exchanges would likely lead to Class-wide wage suppression."); Starr Report, ¶ 12.a.ii ("The SCA-DaVita CSI exchanges and SCA-USPI CSI exchanges ... allowed them to coordinate on pay levels or increases, potentially lowering Class pay.").

exchanged were published to the public or to the affected employees.[211] He then concludes "[t]his suggests that Defendants used the data for nefarious purposes (i.e., to fix wage rates)"[212] without directly connecting any instance of information sharing to a USPI decision to reduce (or not raise) compensation. Second, he states that the identity of the competitor producing the data was known to USPI.[213] Third, he cites the importance of what he describes as "the granularity of the overhead expense data."[214]

152. Dr. Starr outlines what he claims are economic criteria for assessing information sharing.[215] Specifically, he states that "qualitative evidence of exchanges of competitively-sensitive wage data would include any evidence of communication or coordination among horizontal competitors involving employee compensation, particularly if it includes future plans for compensation."[216] He states that the exchange of Senior Employee compensation information "would give Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay Senior-Level Employees for their services."[217] Dr. Starr also points out that the timing of the data is important to maintain a conspiracy.[218] According to Dr. Starr, data are more likely to be concerning when they are forward looking.[219]

153. Collectively Dr. Gerhart and Dr. Starr's framework for analyzing information sharing includes identifying instances when Defendants shared data that were (1) specific to Senior Employee compensation, (2) granular enough to describe what a Defendant was paying its Senior Employees, and (3) current or forward looking.[220] Dr. Gerhart and Dr. Starr claim to apply their framework to the Experts' Assessed SCA-USPI Information Sharing and conclude that the Experts' Assessed SCA-USPI Information Sharing is consistent with collusion. Yet, they fail to explain how the information that is included in the Experts' Assessed SCA-USPI Information Sharing is sufficiently granular and specific to Senior

---

[211] Gerhart Report, ¶ 83.a ("None of the extensive types of data exchanged were published to the public or to the affected employee victims of the suppressed compensation.").

[212] Gerhart Report, ¶ 83.a.

[213] Gerhart Report, ¶ 83.b ("The identity of the competitor producing the data was completely disclosed to the other competitor.").

[214] Gerhart Report, ¶ 83.c.

[215] See Starr Report, ¶¶ 93–96.

[216] Starr Report, ¶ 96.

[217] Starr Report, ¶ 93.

[218] Starr Report, ¶ 94 ("The timing of the information being exchanged is also relevant").

[219] Starr Report, ¶ 96 ("Therefore, qualitative evidence of exchanges of competitively-sensitive wage data would include any evidence of communication or coordination among horizontal competitors involving employee compensation, particularly if it includes future plans for compensation.").

[220] See Starr Report, ¶¶ 93 ("In this case, the exchange of Senior-Level Employee compensation information would give Defendants sufficient information to arrive at a general understanding between Defendants of what prices to pay[.]"), 96 ("[P]articularly if it includes future plans for compensation."); See also Gerhart Report, ¶ 83.c ("Moreover, the granularity of the overhead expense data exchanged was significant.").

Employee compensation in a forward-looking way that would support collusion or have an effect on market outcomes. That is, they have failed to describe how they have applied their own framework to the examples of the Experts' Assessed SCA-USPI Information Sharing they have identified. Moreover, many of the identified examples of the Experts' Assessed SCA-USPI Information Sharing do not involve forward-looking, granular data that are specific to Senior Employee compensation.

### 6.2.2. *Plaintiffs' experts have not shown how the alleged information sharing they identify provides a mechanism to monitor and suppress compensation*

154. Dr. Starr and Dr. Gerhart identify specific documents that they claim demonstrate that Defendants shared "[t]he type of CSI [... that] could be used by Defendants to suppress employee wages."[221] Both experts identify a number of communications that they claim support their opinion that Defendants shared the "type of CSI" that is consistent with conspiracy, but neither expert explains how the different communications they have identified support their opinion or fit into an *economic* analysis of collusion. The examples of information sharing they provide would be difficult, if not impossible, to leverage for a compensation suppression agreement for several reasons.

155. First, Dr. Starr and Dr. Gerhart identify 26 examples of what they purport are instances of compensation-related information sharing.[222] Appendix E summarizes all 26 examples. Nearly half of these examples do not contain data of any kind, as indicated in the rightmost column. Many examples of alleged information sharing are conversations about the possibility of exchanging or obtaining some type of information. For example, Dr. Gerhart cites to internal USPI emails where an employee states that they "hope we can show stats on Drs being employed and USPI overhead compared to other at upcoming Board meeting."[223] Dr. Starr cites to an internal USPI document that states "SCA: Find out what they are paying at the regional level and admin level."[224] Neither expert is able to analyze the information that was allegedly shared in examples such as these, because they have presented no evidence that information was actually shared.

156. Second, in instances when a document shows data were exchanged, neither expert attempts to analyze whether the data in the communication individually, or collectively with other communications that included data,

---

[221] Starr Report, ¶ 99. See also Gerhart Report, ¶ 82 ("Defendants' Competitively Sensitive Information Exchanges would likely lead to Class-wide wage suppression.").

[222] See Starr Report, ¶ 101. See also Gerhart Report, ¶¶ 23, 87.

[223] Gerhart Report, Footnote 43 ("USPI_CIV_00010451C8 [*sic*] (USPI requested SCA overhead to use in the USPI board meeting for the fourth time in 2011)."); Email chain from Jarod Moss to Bill Wilcox et al., "RE: Untitled," July 13, 2011, USPI_CIV_000104518.

[224] Starr Report, ¶ 101.p.

would be sufficient to coordinate on agreed-upon compensation levels or monitor any deviations from any agreed-to compensation levels. Contrary to Plaintiffs' experts' assertions, most of the communications that they identify only include aggregated information that was not specific to compensation, much less Senior Employee compensation.

157. For example, Dr. Gerhart and Dr. Starr identify instances in which SCA and USPI exchanged general and administrative ("G&A") expense data. Dr. Gerhart claims that these exchanges of information are significant for his analysis because of "the granularity of the overhead expenses exchanged."[225] In Exhibit 17 I display one of the G&A overhead files Dr. Gerhart highlights in his report. As the exhibit shows, the expense data are aggregated to the department level and do not isolate any compensation data. Even if the majority of costs in any line item was employee compensation, to calculate average compensation within a department, one would need to know how many people are employed in each department. Furthermore, the average compensation within a department, if it were identifiable from G&A data, would not isolate Senior Employees' compensation, or any individual's compensation.[226] Also, comparing aggregate spending by department across firms would be complicated by the fact that the companies defined their departments differently.[227] Neither expert explains how the G&A files alone would support a conspiracy to suppress compensation.[228]

---

[225] Gerhart Report, ¶ 83.c.

[226] Dr. Gerhart conceded during his deposition that average labor costs reflected in G&A data would not indicate anyone's actual salary because G&A was "a broader cost category." Gerhart Deposition, pp. 183, 186. Dr. Starr similarly testified there "are likely other costs" beyond labor included in the G&A data that were exchanged. See Starr Deposition, p. 469.

[227] Deposition of Mark Kopser (USPI), December 12, 2024 ("Kopser Deposition"), pp. 34–35 ("[W]hat makes the comparison difficult to do is each company names things different ways … looking at any individual one department is irrelevant. So we just aggregate it in total corporate expense and total field expense. … And we would look at it as a percent of EBITDA, which shows we were running 20 percent overheads and surgical repair affiliate was running at 35 percent."). See also email from Brian Mathis to Jason Cagle, "Re: SCA Department Comparison.xlsx," with attachments, December 31, 2014, USPI_CIV_000021178 ("Is the EHR spend corporate overhead to implement at surgical hospitals or ASCs or both? Does any of that get allocated to the facilities? Is your diligence function embedded in your development team? Is your integration function embedded in your operations team?"); Deposition of Peter Clemens (SCA), May 2, 2024, ("Clemens Deposition"), p. 137–138 ("Q. … [I]s part of this process of seeing a competitor's G&A data to see if there are ways that SCA can reduce its costs? … A. It's possible. But [] it's not enough information here to really be able to make that judgment unless something was really far out. You know, because there could just be classification differences between line items that could give you, you know, a false sense of what their actual expense is compared to yours. Does that make sense?").

[228] In deposition, both experts backed away from their assertions that the information sharing would have enabled Defendants to fix compensation levels. See, e.g., Gerhart Deposition, pp. 184–186 ("Q. [] Are you opining that this G&A information could have been used to fix compensation? … [A.] It seems like there's an exchange of all kinds of information. … And so I think, as I said before, this provides an opportunity to control labor costs or other costs and see what you need in terms of -- we don't have direct evidence of this, but if -- it opens the opportunity to coordinate on these kind of metrics. … Q. [] If the only information exchanged was this G&A information, you would agree with me that that could not have been used to set particular -- to agree to set particular salaries; correct? … [A.] Yeah, it wouldn't be as helpful as specific labor cost information if you're focused on setting wages and labor costs … Well, the general and administrative costs are broader than labor costs: So if you really needed an estimate of labor costs, you'd rather have labor costs rather than what the broader cost category is.") See also Starr Deposition, p. 469 ("Q[.] … [A]re there other components [of G&A] besides labor costs? … A[.] … I believe there are likely other costs here.").

*Exhibit 17*
*The G&A expenses did not contain granular compensation data for Senior Employees*

**Expense Comparison**

Red = Added by USPI

| | USPI | | SCA | |
|---|---|---|---|---|
| | **2014 Forecast** | **2015 Budget** | **2014 Forecast** | **2015 Budget** |
| Legal | 1,055,204 | 891,457 | 1,731,913 | 2,222,350 |
| Compliance & Audit (External & Internal) | 2,114,979 | 2,200,170 | 1,343,832 | 1,701,961 |
| Accounting (Corporate) | 3,821,421 | 3,861,903 | 5,367,267 | 5,305,261 |
| Finance | 782,025 | 2,378,385 | 4,430,680 | 4,896,061 |
| Diligence | | | 412,055 | 519,205 |
| Sales & Market Development | 5,678,105 | 4,044,852 | 2,616,671 | 2,926,259 |
| HR | 2,477,704 | 2,429,242 | 2,681,796 | 3,139,651 |
| Client Services | | | 1,142,087 | 1,468,450 |
| Acquisition Integration | | | 1,029,412 | 1,503,506 |
| Development | 5,452,207 | 5,890,762 | 6,220,227 | 8,079,076 |
| External Deal Costs | 1,440,529 | 1,000,000 | 2,787,155 | 2,820,000 |
| Physician Leadership Team / Meeting | | | 182,525 | 190,000 |
| Executive | 4,112,446 | 5,571,173 | 3,385,977 | 3,619,718 |
| Strategy | 2,599,616 | 2,523,258 | 2,852,212 | 3,996,734 |
| IT | 8,182,426 | 9,338,024 | 7,291,564 | 7,770,192 |
| Corporate Legal Fees | 407,453 | 554,859 | 501,784 | 450,000 |
| Corporate Office Rent | 1,037,574 | 1,043,563 | 186,648 | 756,000 |
| GL/PL/WC (Corporate Allocation) | 238,413 | 141,554 | 350,988 | 412,067 |
| Group Medical Adjustments | 236,820 | 235,449 | 2,498,730 | 500,000 |
| General Overhead | 3,020,880 | 4,127,621 | 3,192,782 | 3,160,195 |
| Board Expenses | 394,149 | 439,516 | 281,370 | 435,000 |
| Electronic Health Records | 2,105,608 | 1,978,407 | | |
| **Total Corporate G&A** | **45,157,559** | **48,650,195** | **50,487,675** | **55,871,686** |
| Clinical Services | 2,144,187 | 2,586,202 | 2,163,732 | 2,243,780 |
| Managed Care | 2,021,831 | 1,039,169 | 3,804,145 | 5,300,889 |
| Supply Chain Operations | 1,764,982 | 217,190 | 379,306 | 410,814 |
| Operations Overhead | 22,303,684 | 25,452,812 | 19,184,572 | 21,832,876 |
| GL/PL/WC (Direct Allocation) | (453,295) | - | | |
| Accounting (Facility) | 4,027,180 | 4,700,853 | 4,357,724 | 4,940,739 |
| Business Office / Revenue Cycle | 946,846 | 853,939 | 4,215,832 | 3,936,543 |
| **Total Direct G&A** | **32,755,415** | **34,850,165** | **34,105,312** | **38,665,641** |
| **Total Overhead** | **77,912,974** | **83,500,360** | **84,592,987** | **94,537,327** |
| | | 5,587,386 | | 9,944,340 |
| | | 7% | | 12% |

Source: USPI_CIV_00962509

Note: Dr. Gerhart describes the granularity of this and other documents as "significant." Gerhart Report, ¶ 83.c.

158. Third, some examples of the information sharing highlighted by Plaintiffs' experts are correspondences containing aggregate merit pool budgets. A company's planned merit pool budget is "the budget that [the companies] would set for pay increases in a given year[.]"[229] It is a company-wide "starting point," expressed as a percentage (e.g., 2 percent), that typically tracks inflation.[230] The merit pool budget was provided to department leaders to determine specific salary increases on a case-by-case basis.[231] Employees could receive smaller or larger salary increases based on the department leaders' discretion.[232]

159. For example, Dr. Starr cites an email chain between SCA and USPI where an SCA employee asks, "Are you all expecting typical ~2% wage increases for 2013?" and a USPI employee responds, "Yes 2-3%[.]"[233] This is the only document Dr. Starr cites in which USPI provided specific information about merit pool budgets to SCA.[234] Similar to the G&A documents above, this type of information is aggregated and does not identify pay changes for Senior Employees as a whole, let alone any individual Senior Employee.

160. Furthermore, merit pool budgets only reflect average increases in salary; they provide no information about the other types of compensation, which I describe in Section 3.4.[235] Neither expert explains how aggregate wage

---

[229] Mathis Deposition, p. 245.

[230] Mathis Deposition, p. 245. See also Kopser Deposition, pp. 51–53.

[231] Deposition of Andrew Johnston (USPI), September 6, 2024 ("Johnston Deposition"), p. 39 ("Q. So you were given a percentage increase as a target and then you tried to fit your salary increases within that percentage increase, correct? ... A. Sorry. That's correct."); Clemens Deposition, p. 147 ("[I]f we came up with an X percentage overall merit increase, everybody would have to allocate that to their employees. High performers would get more than X percent, lower performers would get less. And it would average to hopefully that X percent, the guideline.")

[232] Johnston Deposition, p. 44 ("Q. [] Well, if you had set a salary above the two percent, did you think it would go into effect without Bill's approval? ... A. No. I always felt like there were exceptions that could be made and those needed to be obviously requested and validated, justified. And they would be considered."); Clemens Deposition, p. 147 ("[I]f we came up with an X percentage overall merit increase, everybody would have to allocate that to their employees. High performers would get more than X percent, lower performers would get less. And it would average to hopefully that X percent, the guideline.").

[233] Starr Report, ¶ 101.i ("In October 2012, Mathis and Kosper [*sic*] again emailed to exchange wage information: Mathis contacted Kopser regarding '2013 Labor' and asked for USPI's planned wage increases for 2013. Kopser promptly provided the requested information to Mathis, who then relayed the information to the SCA personnel preparing the labor budget for the upcoming year."); Email chain from Brian Mathis to Lynn Howard, et al., "Fwd: 2013 Labor," October 21, 2012, OMC_BM_000014729.

[234] Dr. Starr does not cite any other communications in which USPI provided budgeted wage increases to SCA. See, e.g., Starr Report, ¶ 101.k (citing USPI_CIV_000016100, in which no information was exchanged). Other documents cited by Plaintiffs' experts show only requests for merit pool budget information, not actual information sharing. See, e.g., email chain from Brian Mathis to Jason Cagle, "Re: Wage Increase Budgets," August 20, 2014, USPI_CIV_000021155 ("Are you all willing to swap wage increase budgets as we have in the past?").

[235] Dr. Starr acknowledged this in his deposition. See Starr Deposition, p. 458 ("And again I -- I don't mean to push back but merit raises are just a small part of compensation, and compensation can include bonuses, can include stocks and other things. And so to the extent that the information shared between the companies was limited to only merit raises and did not describe bonuses, [] then I would agree with you. ... It's possible that bonus information was also shared separate from merit raise information.").

increase ranges could be used to effectuate a compensation suppression agreement among Senior Employees.[236]

161. Fourth, Dr. Gerhart points to only two shared documents that contain specific, granular compensation data for employees.[237] One of these documents contains information only pertaining to non-Senior Employees.[238] This document is an email exchange between USPI and SCA wherein USPI executives request compensation information for the "no. 2 lawyer [at SCA.]"[239] Personnel in the legal department are not Senior Employees, according to Plaintiffs.[240] The other document contains salary and bonus information for two Senior Employees, a VP and a director, as well as three non-Senior Employees who report to the director. Dr. Gerhart does not explain how this information sharing could have effectuated a conspiracy to suppress the compensation of all or nearly all Senior Employees.[241]

162. Fifth, the information was often backward looking rather than current or forward looking. For example, Dr. Starr highlights an email chain from 2017 between SCA and USPI sharing G&A data dating back to 2013.[242]

163. Sixth, Plaintiffs' experts rely on exchanges of information that are unrelated to compensation. For example, both Dr. Starr and Dr. Gerhart highlight an August 2014 email chain between SCA and USPI sharing details about their companies' PTO policies.[243] However, PTO policies do

---

[236] Even if the sharing of merit pool budgets could have allowed Defendants to suppress Senior Employee compensation, Plaintiffs' experts have not analyzed whether any changes resulted from information sharing. Dr. Gerhart acknowledged that he has not done "rigorous analysis of any sort" to analyze whether USPI's or SCA's planned merit budgets changed after instances of information sharing. See Gerhart Deposition, pp. 172–173.

[237] Email chain from Mark Kopser to Brian Mathis, "Re: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–9; Email chain from Rich Sharff to Jason Cagle, "RE: comp," May 30, 2012, USPI_CIV_000016522.

[238] Email chain from Mark Kopser to Brian Mathis, "Re: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–9.

[239] Email chain from Rich Sharff to Jason Cagle, "RE: comp," May 30, 2012, USPI_CIV_000016522; Gerhart Report, ¶ 82.b.i. Asked whether it was his opinion that "exchanging salary information for an audit manager and lawyer could lead to suppressed compensation across the class[,]" Dr. Gerhart replied, "I don't see these exchanges right now as having as big of an effect as some of the other exchanges." Gerhart Deposition, pp. 180–181.

[240] Complaint, ¶ 92 ("Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.").

[241] The salary and bonus information for one of the potential Senior Employees, VP of SCA's audit department is represented as current while the salary and bonus information for the other potential Senior Employees discussed in the email, a director, is described as being from "a few years ago." As I explain above, Dr. Gerhart has not shown how SCA and USPI could have used compensation information for as few employees to effectuate a conspiracy to suppress compensation. Furthermore, even if Defendants successfully conspired to suppress these few employees' wages, neither of Plaintiffs' experts shows that Defendants had a wage structure that would have spread the impact to all or nearly all Senior Employees.

[242] Starr Report, Footnote 373 ("See Ex. PX63 at SCA000609009 (a September 2017 email exchange between USPI and SCA wherein both provide their G&A as a percentage of revenue for 2013–2017).").

[243] Starr Report, ¶ 101.m ("Moreover, in a June and August 2014 email chain, former USPI VP of Financial Operations Cindy English and former SCA Executive VP and General Counsel Rich Sharff discussed detailed information regarding their respective companies' paid time off ('PTO') policies."); Gerhart Report, ¶ 116.c.iii ("Similarly, an email shows that, in 2014 at the direction of Karrmann, USPI's then-VP of Financial Operations Cindy English emailed SCA executive Rich Sharff to ask about SCA's policies regarding 'accruing PTO based on 'hours worked.''").

not reveal information about specific employees' compensation.[244] Dr. Gerhart also relies on exchanges of "case volume[]" information,[245] but Dr. Starr makes no mention of case volume exchanges in his report and agreed in his deposition that "compensation most likely was not included" in case volume information.[246] Dr. Gerhart also highlights exchanges of "payor mix comparisons[,]" but, again, these exchanges were not at all related to compensation.[247]

164. Seventh, some information shared between USPI and SCA was already available publicly. For example, Dr. Gerhart discusses exchanges of "same-site case volume growth data[.]"[248] However, USPI's then CFO Jason Cagle testified that aggregate volume information "was also publicly reported."[249] Payor mix comparisons were also publicly disclosed in USPI's annual financial filings.[250]

### 6.2.3. Plaintiffs', Dr. Starr's, and Dr. Gerhart's assertions that the Experts' Assessed SCA-USPI Information Sharing was sufficiently detailed to facilitate collusion ignore the complexity of Defendants' compensation packages

165. In addition to failing to identify how the Experts' Assessed SCA-USPI Information Sharing could have supported a collusive agreement to suppress compensation, Dr. Starr and Dr. Gerhart fail to analyze how Defendants' different compensation components would complicate any alleged conspiracy to suppress compensation. Economic research finds that markets where transactions are complex or customized are less susceptible to collusion,[251] and here, Defendants' compensation packages for Senior

---

[244] Starr Deposition, p. 475 ("I wouldn't expect that sharing PTO policies would generally reveal information about the precise compensation of any given worker on their own.").

[245] Gerhart Report, footnote 346. However, Dr. Gerhart acknowledges that case volume information is not "compensation information." Gerhart Report, footnote 346 ("In addition to the wage data exchanges discussed at length in this section, note that the SCA-USPI CSI Exchanges were not limited to compensation information. SCA VP of Strategy Brian Mathis also testified that SCA and USPI exchanged same-site case volume growth data twice a month at the beginning of his tenure at SCA, and later monthly."). See also Email chain from Jason Cagle to Brian Mathis, "RE: USPI February 2013 Final.xls," April 5, 2013, USPI_CIV_000016573–74 at USPI_CIV_000016573 ("Here is the file on case growth we share with SCA."); Email chain from James Walker to Brian Mathis and Jason Cagle, "RE: Oct volume," with attachment, November 10, 2014, USPI_CIV_000021165 ("Here are our October volumes.").

[246] Starr Deposition, p. 466.

[247] Gerhart Report, Footnote 346. See, e.g., Email chain from Megan Farabaugh to Jason Cagle et al., "RE: SCA Payor Mix – Week 13," April 5, 2013, USPI_CIV_000016019 ("Please find our payor mix updated through Friday, March 29, 2013."); USPI_CIV_000016020.xlsx ("Year over Year Weekly Case Counts Payor Mix Percentage").

[248] Gerhart Report, Footnote 346.

[249] Deposition of Jason Cagle (USPI), August 6, 2024, pp. 37 ("As I said, we did share volume information at an aggregate level that was also publicly reported. We would never share material nonpublic information with someone, nor would Mr. Kopser."), 53 ("I'm not aware that we would ever share material nonpublic information with anyone.").

[250] Gerhart Report, Footnote 346; Kopser Deposition, p. 81 ("[P]ayor mix data was public information in our 10K[.]").

[251] Louis Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, N.J.: Princeton University Press, 2010), p. 320 ("A market with complex transactions or with customized transactions will be less susceptible to firms being able to find a mutually acceptable understanding of what it means to tacitly

Employees are complex and non-systematic. In Exhibit 18, I show the various components of Senior Employee compensation, highlighting how they differ across Defendants. The two examples of information sharing highlighted by Dr. Starr and Dr. Gerhart that provide granular compensation information (for individuals who are, for the most part, not Senior Employees) disclose the position's salary and bonus structure, which are just two of several components.[252] Even if salary and bonus information were systematically shared, despite Plaintiffs' experts' failure to identify evidence that it was, given the complexity of compensation for Senior Employees, coordination on total compensation would have been difficult.

**Exhibit 18**
**Components of compensation for Senior Employees differed across Defendants, 2008–2022**



Source: Dr. Starr Corrected Compensation Regression Data

Note: Total compensation is deflated according to each year's CPI, standardized to 2019 U.S. dollars. The "Other" category includes compensation types labeled as additional, commission, debt forgiveness, education, holiday, jury, leave, on call, other, overtime, retro, settlement, severance, shift, shift differential, and sick.

166. Plaintiffs' experts' claims that aggregate spending data (like G&A data) could be used to maintain a conspiracy to suppress compensation are inconsistent with the evidence on the variability in compensation changes

---

collude. Similarly, a market with very diverse products such as different brands and different versions of a particular product will be more difficult to coordinate. Since complexity makes agreements about what it would mean to collude difficult to achieve, sometimes we see firms adopting practices that 'simplify their prices for consumers' or harmonize the conditions for a transaction.").

[252] Email chain from Mark Kopser to Brian Mathis, "Re: USPI April Final.xls," May 2, 2012, OMC_BM_000010778–9 at OMC_BM_000010778 ("We [USPI] pay our internal audit manager 150K[.] Is that close to what you pay[?] ... A few years ago we [SCA] combined our compliance and our audit departments and now have a single VP ($175k + 40% potential bonus) that leads both. There is a director who focuses solely on audit ... and she has a base of $103k with potential bonus of 25%."); Email chain from Rich Sharff to Jason Cagle, "RE: comp," May 30, 2012, USPI_CIV_000016522 ("[We, SCA, had] a number 2 [lawyer] until he left last fall. He was around $135K with a 40% bonus opportunity.").

of USPI employees over time. Exhibit 19 below displays the path of compensation for the 2010 cohort of new directors. In this exhibit, I peg each director's pay to its value in 2010 (0 percent), and display aggregate percentage changes over time, relative to each **director's** starting pay. The exhibit shows that there is variation in the year-over-year compensation changes of USPI Senior Employees. For example, between 2010 and 2011, pay for one newly hired director increased by almost 40 percent, but the others experienced anything from a pay increase of less than 20 percent to a decrease in pay of more than 10 percent. **The fact that Senior Employees'** compensation did not move together over time implies that aggregate information on compensation budgets or average cost of living increases would not be sufficient to monitor a conspiracy to suppress compensation **across employers. It raises the question of which employees'** compensation was to be suppressed, and by how much?

*Exhibit 19*
*USPI Senior Employee pay did not move together over time*



Source: Dr. Starr Corrected Compensation Regression Data

Note: This chart plots Senior Employees who were categorized as directors by Dr. Starr, hired or new to the director category in 2010, and worked a positive number of hours. Percent change is calculated relative to each employee's total annualized compensation in 2019 U.S. dollars in 2010. Blue lines represent employees who remained directors and were employed at USPI through 2017. Orange lines represent employees who switched job categories in some year before 2017. Green lines represent employees who left USPI in some year before 2017.

167. Dr. Starr and Dr. Gerhart highlight instances of alleged information sharing involving USPI that they claim could have been used by USPI to suppress compensation.[253] However, neither expert explains how the

---

[253] Starr Report, ¶¶ 99 ("The qualitative record evidence supports the allegation that Defendants SCA and DaVita shared CSI on employee pay data with one another, and SCA and USPI did the same. The type of CSI shared could be used by Defendants to suppress employee wages."), 102 ("The evidence is consistent with exchanges of CSI in support

specific alleged information shared could have been used to maintain a compensation suppression agreement. A review of the Experts' Assessed SCA-USPI Information Sharing reveals that much of the information sharing highlighted by Dr. Starr and Dr. Gerhart is not the forward looking, granular, compensation data specific to Senior Employees that Dr. Starr and Dr. Gerhart argue could be used to maintain a compensation suppression agreement between USPI and SCA. Neither expert explains how the Experts' Assessed SCA-USPI Information Sharing could have been used to suppress the compensation of Senior Employees, given the complex and non-systematic way that compensation is set and evolves. Furthermore, neither expert provides any evidence of information sharing between USPI and DaVita.

## 7. Economic evidence does not support Plaintiffs' experts' claims that internal and external equity would have resulted in the Alleged, Assessed, or Admitted Mobility Restrictions suppressing the compensation of all or nearly all USPI Senior Employees

168. Both Dr. Starr and Dr. Gerhart claim that the Experts' Assessed SCA-USPI Mobility Restrictions harmed all or nearly all USPI Senior Employees. They make this claim even though Dr. Starr's own analysis, reviewed in Section 5.3.1, finds the Experts' Assessed SCA-USPI Mobility Restrictions prevented approximately 11 USPI Senior Employees (less than one percent of USPI Senior Employees) from switching to SCA.[254] Dr. Starr and Dr. Gerhart claim that the direct harm suffered by less than one percent of the class, per Dr. Starr's analysis, would be transmitted to all or nearly all USPI Senior Employees through USPI's compensation structure.[255] In this section, I demonstrate that neither Dr. Starr nor Dr. Gerhart has a reliable basis for claiming that USPI's supposed compensation structure would

---

of colluding to suppress Senior-Level Employees' pay."); Gerhart Report, ¶ 82.a ("[T]hese exchanges would have facilitated USPI's and SCA's ability to agree to set their pay rates lower than they otherwise would have.").

[254] According to Dr. Starr, USPI employed 1,583 Senior Employees during the Experts' Assessed Mobility Restrictions (see Exhibit 13 above). Eleven of 1,583 Senior Employees represents 0.7 percent of all USPI Senior Employees employed during the Experts' Assessed Mobility Restrictions. "Current HR Priorities," April 18, 2017, SCA000072712 indicates that, as of April 18, 2017, SCA expected a "~70% offer acceptance rate[.]" Based on this offer acceptance rate, Dr. Starr's analysis, discussed in Footnote 163 of Section 5.3.1 above, implies that SCA would have extended approximately 16 offers to recruit 11 USPI Senior Employees during the assessed conduct period. Therefore, only 16 of 1,583 of USPI Senior Employees (1.01 percent) could have been directly impacted the assessed conduct period according to Dr. Starr's own analysis, even after accounting for solicitations. See Workpaper 16.

[255] Starr Report, Section VII.F ("Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own."); Gerhart Report, Section VIII.A ("the No-Poach Agreements would have suppressed pay across the board[.]").

transmit any direct harm suffered by a limited number of Senior Employees to all or nearly all USPI Senior Employees.[256]

169. Dr. Gerhart describes the direct mechanism for harm from a non-solicitation agreement and indirect pathways by which the harm can cascade to other employees through a compensation structure as follows:

- *Direct*: But for the alleged mobility restrictions, a Senior Employee (e.g., a director) would have received an unsolicited job offer that the employee could use to negotiate higher pay.[257]
- *Indirect effect on other Senior Employees with the same job*: After a director uses an unsolicited job offer to negotiate higher pay, the employer would then raise pay for all directors, because the other directors would "require higher pay to feel their pay is fair."[258]
- *Indirect effect on other Senior Employees in different jobs*: After a director uses an unsolicited job offer to negotiate higher pay, the employer would then raise pay for VPs, who would notice that the differential between director and VP pay fell, and feel their pay is unfair.[259]

170. As a result of these indirect effects, Plaintiffs' experts conclude that all or nearly all Senior Employees are harmed because those directly affected did not receive an increase in their compensation.

---

[256] Neither expert provides an estimate of the impact, if any, of the Experts' Assessed SCA-USPI Information Sharing on compensation nor do they even analyze whether the Experts' Assessed SCA-USPI Information Sharing had any effect on compensation. With respect to Dr. Gerhart, he affirms that "[i]t's true that [he] performed no quantitative analysis of the effects of the alleged information exchanges[.]" See Gerhart Deposition, p. 147. With respect to Dr. Starr, he claims that his wage suppression regression, which I address in Section 8, measures the effects of both the Experts' Assessed SCA-USPI Information Sharing and the Experts' Assessed SCA-USPI Mobility Restrictions. Yet, he acknowledges that he cannot identify whether any portion of his estimated compensation suppression results is derived specifically from the Experts' Assessed SCA-USPI Information Sharing. Rather, he simply asserts that "if the fact finder determines that only one element of the Challenged Conduct occurred, then the findings of wage suppression revealed by [his] analyses [] must be wholly attributable to the other element of the Challenged Conduct." See Starr Report, ¶ 106. As I describe in Section 8, Dr. Starr's wage suppression regressions are flawed and incapable of separating the effect, if any, of either the Experts' Assessed SCA-USPI Information Sharing or Experts' Assessed SCA-USPI Mobility Restrictions from other market factors. Nonetheless, to the extent that Dr. Starr or Dr. Gerhart claim that the Experts' Assessed SCA-USPI Information Sharing suppressed compensation for Senior Employees on average (e.g., to the extent Dr. Starr claims that his regression estimates the average impact of the Experts' Assessed SCA-USPI Information Sharing), my analysis in this section shows that compensation patterns are inconsistent with a compensation structure that would necessarily indicate all or nearly all Senior Employees suffered harm based on an estimate of average harm.

[257] Gerhart Report, ¶ 143.a ("In the absence of a No-Poach Agreement, a current employee (e.g., a Director) at a Defendant firm could have received an unsolicited job offer. … That Director could then either accept the outside offer or use the outside offer as leverage to negotiate a higher salary at the Defendant firm.").

[258] Gerhart Report, ¶ 143.b.

[259] Gerhart Report, ¶ 143.c ("Vice Presidents (one level above Directors) who did not receive cold calls notice that their pay is now unfair because the differential between their pay and the pay of Directors has now decreased. The pressure is now on to increase Vice Presidents' pay to the targeted differential to restore this important element of internal equity."). Also, according to Dr. Gerhart, other Senior Employees whose work overlaps with directors may also receive higher pay. See, e.g., Gerhart Report, ¶¶ 143.d–e ("Other job titles whose functions sometimes overlap with those of Director now notice that the gap between their pay and that of Directors in the same firm has grown, and they demand increases to restore pay fairness. … Director pay has moved substantially ahead of pay for other job titles whose work overlaps. Maintaining internal equity requires increasing pay for those job titles as well, and so forth.").

171. I begin in Section 7.1 by analyzing USPI's compensation patterns, showing that they are inconsistent with Dr. Gerhart's claim that there is a compensation structure that would transmit the direct harm suffered by a limited number of Senior Employees to all or nearly all USPI Senior Employees. Next, in Section 7.2, I review and respond to Dr. Gerhart's claims related to internal and external equity and his assertion that USPI's compensation system would lead to cascading effects across Senior Employees. Then in Section 7.3 I turn to Dr. Starr's qualitative and quantitative assessment of USPI's compensation. I show that neither Dr. Gerhart's nor Dr. Starr's analyses support their claim that USPI maintains a compensation structure that would have transmitted the effects of any alleged mobility restrictions across USPI Senior Employees. I further show that the empirical evidence is inconsistent with Dr. Gerhart's claim that there is a compensation structure that could transmit any direct harm suffered by a limited number of USPI Senior Employees to all or nearly all USPI Senior Employees.

*7.1. USPI's compensation trends are inconsistent with Plaintiffs' experts' claim that internal and external equity would result in all USPI Senior Employees' compensation being suppressed*

172. Plaintiffs' experts claim that Defendants implemented structured compensation systems that maintained internal equity. They claim this internal equity would result in the direct harm allegedly suffered by a limited number of USPI Senior Employees flowing through to all or nearly all USPI Senior Employees. Plaintiffs' experts' description of USPI's alleged compensation structure implies the following should be observed in USPI's compensation data:

1.  Pay within a job level should be similar and pay across job levels should be differentiated.[260]
2.  When one or some Senior Employees' compensation increases (or decreases), other Senior Employees' compensation should also reflect similar changes to maintain the compensation structure.[261]

---

[260] Gerhart Report, ¶ 94 ("Internal equity means paying employees within the same company similar to other employees within the same company doing similar work and making similar performance contributions. Internal equity depends on maintaining certain pay differentials based on job title, level, performance, etc.").

[261] Starr Report, ¶ 172 ("Compensation structures connect all employee pay within a firm, such that any suppression of wages for one group of employees would tend to suppress the pay of other employees."). See also Starr Deposition, pp. 453–454 ("Broadly, when we're talking about raises and if we see evidence that USPI or SCA is giving 2 percent raises or merit pool budget as you're saying, my understanding is there's some qualitative evidence that suggests that those raises would be broadly shared across the employees. I understand there's also some evidence, if I recall in this section, to suggest there could be slight deviations from that. I don't think I would have an opinion that every single worker would get exactly the same; but given the issues of internal equity that are present within the company, I would expect that there may be slight deviations but that broadly everybody would get paid similar compensation for similar work.").

3. Compensation paths should be similar across Senior Employees over the course of their career at USPI.[262]

173. In this section, I review USPI Senior Employee compensation data and show that compensation levels and trends are inconsistent with the structure that Plaintiffs' experts claim. I begin my empirical analysis of USPI's compensation patterns in Exhibit 20 where I plot the distributions of compensation for the three categories of Senior Employees at USPI as defined by Dr. Starr: directors, VPs, and SVPs.[263] Each color in the exhibit represents the distribution of compensation for Senior Employees in a different job category.[264] The horizontal axis represents levels of compensation. Each distribution spans the range of compensation paid to Senior Employees for a job category. The highest regions of each distribution indicate the most common levels of compensation for Senior Employees within a job category. For example, the distribution for directors, represented in blue, shows that directors' compensation levels span approximately $50,000 to $250,000 total compensation per year. Directors commonly earn around $100,000 per year, as indicated by the peak in the distribution around that level.

174. Two patterns are clear, each of which contradicts Plaintiffs' experts' assertions that USPI's alleged compensation structure would result in all or nearly Senior Employees being impacted. First, the wide range of compensation for each job category shown in the exhibit indicates a degree of variation in compensation within a job level that is inconsistent with Plaintiffs' experts claims. For example, some VPs (in yellow) earn about $50,000 per year while others earn over $500,000 per year. Second, overlapping compensation ranges across job categories indicates that USPI does not maintain compensation differentials across job levels, inconsistent with Plaintiffs' experts' claims. For example, some SVPs (in grey) earn less than $200,000, while many VPs (in yellow) and some directors (in blue) earn more than $200,000.

---

[262] Starr Report, ¶ 172 ("Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own.").

[263] Starr Report, ¶ 216 ("I then classified the job level using the job description USPI provided. Unlike DaVita, USPI did not provide its own level classification. To allow for comparison, I assigned a job level (based on the levels DaVita provided) using keywords from the USPI job description.").

[264] Exhibit 20 shows distributions of real annualized total compensation for 2017. Graphs showing the distributions for other years and other measures of pay are provided in a workpaper. See Workpaper 3.

*Exhibit 20*
*Pay within job categories varies and pay is not differentiated across job levels, 2017*



Source: Dr. Starr Corrected Compensation Regression Data
Note: The chart displays the distribution of 2017 annualized total compensation in 2019 U.S. dollars for USPI Senior Employees by job category. I exclude employees who recorded zero (or negative) hours worked in 2017.

175. Next, I review year-over-year compensation changes to analyze whether compensation increases (or decreases) are transmitted across other Senior Employees. **Plaintiffs'** experts claim that USPI maintains a salary structure that would imply compensation generally moves together, both within and across job types and levels.[265] To assess this claim, in Exhibit 21, I plot year-over-year compensation changes of all USPI Senior Employees from 2016 to 2017.[266] **USPI's data reflect a pattern that is inconsistent with Plaintiffs' experts' claims.** Each bar represents a single Senior Employee. From one year to the next, USPI Senior Employees experienced different changes to their compensation. At the left of the exhibit are Senior Employees whose compensation increased year-over-year. According to Dr. Starr and Dr. Gerhart, the compensation increases for these Senior Employees should have cascaded across other Senior Employees to maintain internal equity and the overall compensation structure. To the contrary, the right side of the exhibit shows that the compensation of many Senior Employees fell from 2016 to 2017. Senior Employees shown in the middle of the graph saw their pay remain relatively stable.

176. According to Dr. Starr, a set of employees were harmed because they were not solicited by SCA due to the alleged mobility restrictions. He claims that,

---

[265] Starr Report, ¶¶ 172 ("Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own."), 190 ("These findings are strongly consistent with the existence of a pay structure within jobs."), 186 ("These results are consistent with the qualitative evidence that there is a compensation structure within the firm that aligns wages across job levels.").

[266] Graphs showing compensation changes for USPI Senior Employees for other years are provided in Workpaper 4.

had these employees been solicited by SCA and leveraged a higher compensation package, the direct effect would have cascaded to all other employees, increasing their compensation by 12 percent. However, Exhibit 21 shows that many Senior Employees' compensation increased by more than 12 percent. Yet, those compensation increases did not cascade onto all or nearly all other Senior Employees, many of which saw little to no increase in compensation.

*Exhibit 21*
**Compensation of individual USPI Senior Employees changed differentially, 2016–2017**



Source: Dr. Starr Corrected Compensation Regression Data

*Highly Confidential - Outside Counsel/Experts Only*

Note: The first exhibit displays year-over-year changes to annualized total compensation in 2019 U.S. dollars from 2016 to 2017 for 205 directors. I exclude directors who recorded zero (or negative) hours worked in either year. I also exclude one employee whose compensation increased by more than 100 percent for readability. The second exhibit displays year-over-year changes to annualized total compensation in 2019 U.S. dollars from 2016 to 2017 for 246 VPs. I exclude VPs who recorded zero (or negative) hours worked in either year. I also exclude three employees whose compensation increased by more than 100 percent for readability. The third exhibit displays year-over-year changes to annualized total compensation in 2019 U.S. dollars from 2016 to 2017 for 47 SVPs. I exclude SVPs who recorded zero (or negative) hours worked in either year. I also exclude four employee whose compensation increased by more than 100 percent for readability.

177. Senior Employees also experienced different compensation paths over their career with USPI, contrary to Plaintiffs' experts' claim of a compensation structure. Exhibit 22 displays compensation paths for all USPI VPs hired at the beginning of the Experts' Assessed SCA-USPI Mobility Restrictions. Each line represents an individual VP who started working for USPI in 2010.[267] The compensation paths are measured as percentage changes from their 2010 compensation. As depicted in the exhibit, compensation for the 2010 cohort of USPI VPs took different paths, contrary to Plaintiffs' experts' description of a compensation structure at USPI. Over the first seven years of their career at USPI, cumulative salary growth ranged from approximately zero growth to 120 percent growth.

*Exhibit 22*
*USPI Senior Employees' compensation paths are not uniform, vice presidents 2010–2017*



Source: Dr. Starr Corrected Compensation Regression Data

Note: This chart plots Senior Employees who were categorized as VPs by Dr. Starr, hired or new to the VP category in 2010, and worked a positive number of hours. Percent change is calculated relative to each employee's total annualized compensation in 2010. Blue lines represent employees who remained VPs and were employed at USPI through 2017. Orange lines represent employees who switched job categories in some year before 2017. Green lines represent employees who left USPI in some year before 2017.

178. Each of the analyses I present in this section is inconsistent with Plaintiffs' experts' claims of a compensation structure among Senior Employees at

---

[267] A graph showing the path of compensation for the 2010 cohort of directors is provided in Section 6.2.3, Exhibit 19.

USPI. Compensation is differentiated within a job category and overlapping across job categories within a given year. Year-over-year changes in compensation differ by individual. Finally, compensation paths are differentiated over time.

*7.2. Dr. Gerhart offers flawed logic and analyses to support his assertion that concerns of internal and external equity would have resulted in the Experts' Assessed SCA-USPI Mobility Restrictions suppressing the compensation of USPI Senior Employees*

*7.2.1. Overview of Dr. Gerhart's claims related to internal and external equity*

179. Dr. Gerhart claims that USPI's compensation system is "highly structured and seeks to maintain internal equity."[268] Dr. Gerhart describes a two-step process by which he claims USPI designed such a system.

- Step 1 is assigning internal relative value to jobs, which according to Dr. Gerhart, can be expressed as a percentage differential between jobs.[269]
- Step 2 is job evaluation, which Dr. Gerhart describes as "the process of systematically determining the relative worth of jobs to create a job structure for the organization."[270] He describes firms setting the minimum and maximum pay for each salary grade at this step.[271]

180. To support his assertion that USPI designed a systematic compensation structure using these steps, Dr. Gerhart points to two internal USPI spreadsheets. The first spreadsheet, which Dr. Gerhart cites as evidence of both Step 1 and Step 2 described above, is a spreadsheet that contains a sheet titled "Job Description," which delineates job titles' function, family, summary, responsibilities, and qualifications.[272] The second spreadsheet, which Dr. Gerhart cites as evidence of Step 2, is a list of minimum, average, and maximum salaries for positions that included some Senior Employee roles (e.g., RVP, administrator, and market president).[273] Neither of the documents supports Dr. Gerhart's claim that USPI maintains a compensation structure that would result in all or nearly all Senior Employees being impacted by the alleged mobility restrictions. Both

---

[268] Gerhart Report, ¶ 98.

[269] Gerhart Report, ¶ 106 ("Step 1: Assign Internal Value to Jobs. … This relative value can be expressed as a percentage differential.").

[270] Gerhart Report, ¶ 111.

[271] Gerhart Report, ¶ 113.b ("In addition to deciding on salary midpoints, firms also need to set the minimum and maximum pay for each salary grade/range.").

[272] Gerhart Report, ¶ 110.c ("An internal USPI spreadsheet tracking compensation ranges for senior-level positions included a 'Job Description' sheet to delineate each title's function, job family, summary, responsibilities, and qualifications.").

[273] See Appendix D.

documents appear to reflect the existing range of pay for different positions at a certain point in time. Dr. Gerhart has not explained how these documents support his claim that USPI actively maintained and enforced pay range policies throughout the alleged class period that would result in a pay structure that would transmit the supposed direct harm suffered by a limited number of Senior Employees to all Senior Employees.

181. Dr. Gerhart also points to deposition testimony from USPI employees to support his claim that USPI maintains a compensation structure that would result in all USPI Senior Employees suffering harm. Dr. Gerhart highlights testimony from USPI's Chief Development Officer who testified that USPI considered the ranges of salaries that it was paying to current administrators when setting salaries for new administrators.[274] Dr. Gerhart provides examples of USPI VP of Talent Acquisition Shannon Mosely providing recruiters with a salary range for open positions and a recruiter who testified that USPI would typically provide a range it would be willing to pay to fill a position when asked.[275]

182. Collectively, these documents and testimony suggest USPI reviewed the range of salaries that it currently pays employees in a position when recruiting new employees into similar positions. The existence of these documents does not support Dr. Gerhart's conclusion that USPI "implemented structured compensation systems that maintained internal equity[.]"[276] Moreover, Dr. Gerhart does not provide any examples of USPI adjusting the pay of multiple employees in response to a small number of employees receiving pay increases or being hired at a higher compensation level. Instead, the documents Dr. Gerhart cites demonstrate that USPI tracked its employees' compensation levels, something that most companies likely do, and provided recruiters with salary ranges for a specific position, again something most companies likely do. Thus, either Dr. Gerhart is arguing that nearly all firms maintain a compensation structure such that if a limited number of employees receive a pay increase the employer would raise pay for all or nearly all employees, or his assertions about USPI's alleged compensation structure are non-falsifiable.[277]

---

[274] Gerhart Report, ¶ 114.c.iii ("For instance, USPI Chief Development Officer Andrew Johnston testified that to set salaries for administrators, USPI considered 'the range of salaries that we were paying to current administrators in the position.'").

[275] Gerhart Report, ¶ 114.c.v ("[F]ormer USPI VP of Talent Acquisition Mosley testified that when she hired external recruiters to fill administrator positions, she 'would have to provide a range in salary' for the recruiters to share with candidates. ... Similarly, former USPI recruiter McGarry testified that when recruiting candidates, during her 'initial conversation with the hiring manager about the position I do ask . . . is there a range that they would like to pay this person.'").

[276] Gerhart Report, Section VII.

[277] Falsifiability, or the notion that a scientific statement must be one that is falsifiable, is a central concept in the scientific method. In seminal writing on the philosophy of science, Karl Popper concludes, "In so far as a scientific statement speaks about reality, it must be falsifiable: and in so far as it is not falsifiable, it does not speak about reality." See Karl Popper, *The Logic of Scientific Discovery*, (New York, NY: Routledge Classics, 2005), p. 316.

*7.2.2. Dr. Gerhart's review of USPI documents does not support his opinion that the Experts' Assessed SCA-USPI Mobility Restrictions would have a widespread impact on the compensation of USPI Senior Employees*

183. As I describe at the start of this section, Dr. Gerhart claims that USPI maintains a compensation structure to maintain internal equity that would result in the direct impact supposedly suffered by a limited number of USPI Senior Employees flowing through to all or nearly all USPI Senior Employees.[278] Dr. Gerhart describes internal equity as "paying employees within the same company similarly to other employees within the same company doing similar work and making similar performance contributions. Internal equity depends on maintaining certain pay differentials based on job title, level, performance, etc."[279] In this section, I examine Dr. Gerhart's review of USPI's alleged pay structure. I show that it does not support his opinion that the alleged mobility restrictions would have widespread impact on the compensation of USPI Senior Employes.

184. Dr. Gerhart presents salary ranges of USPI Senior Employees as evidence that "USPI maintained job structures and pay ranges."[280] He claims that the maintained compensation structures link the compensation of all Senior Employees so that if a few are directly impacted, that impact will cascade across all Senior Employees. An examination of Dr. Gerhart's review of USPI's alleged pay structure reveals that it would not have likely spread any direct harm across other Senior Employees.

185. I reproduce Dr. Gerhart's Figure 7 in Exhibit 23. Dr. Gerhart's theory of indirect harm implies that if one or a few employees within a position would have received compensation increases, USPI would have increased compensation for the rest of the employees in that position to maintain the compensation structure. Exhibit 21 above, which shows the year-over-year change in compensation by title, demonstrates that this does not occur. Moreover, Dr. Gerhart's Figure 7 does not provide evidence that either the salary ranges are binding such that all employees' salaries must stay within the range, nor does it provide evidence that if USPI increased one employee's salary it would increase the salaries of all other employees with the same title. It is not clear from this figure, or anything Dr. Gerhart points to, that USPI would be unwilling to pay an employee outside the range on the document without adjusting the pay of others in the same

---

[278] Gerhart Report, ¶¶ 141 ("Accordingly, given Defendants' formalized pay structures and compensation design and their commitment to maintaining equity and pay fairness, the No-Poach Agreements would have negative, widespread, and systematic effects on Class Members' compensation."), 161 ("Because Defendant firms had systematized pay structures, impacts to these systems cycle on to other employees and their levels of compensation. Defendants' No-Poach Agreements and CSI Exchanges therefore limited and had negative consequences on employee compensation not only for the workers who were directly involved, but also for nearly all employees. Consequently, nearly all salaried employees, including Class Members, would have been paid more but for the challenged conduct.").

[279] Gerhart Report, ¶ 94.

[280] Gerhart Report, ¶ 114.c, Figure 7.

position. Indeed, documents in the record show that USPI has done exactly that for certain employees.[281] Furthermore, these ranges summarize salary, which as I note above in Section 3.4, is one of many components of compensation. Indeed, as shown in Exhibit 20 above, compensation ranges at USPI are even broader than the salary ranges depicted in Dr. Gerhart's Figure 7.

---

[281] See, e.g., Email chain from Alex Bateman to Andy Johnston, "RE: Admin merit increase," February 6, 2015, USPI_CIV_000336479 ("I'm reviewing these today and it jumped out that Cathy is paid like a market president -- ████████ than my other RVPs (while overseeing 2 ASCs)."); Email chain from Teresa Danna to Cindy English, "RE: FW: Message from, KMBT_C454," with attachments, January 15, 2014, USPI_CIV_000499023–24 at USPI_CIV_000499023 ("His November increase put him at ████ with is still well below our current range."); "Michael Bass Initial Offer," Undated, USPI_CIV_000036746–49 at USPI_CIV_000036748 ("To that end we have already gone above the normal RVP salary range for USPI and increased the amount of the relocation package. ... The AVERAGE RVP salary ranges from $150K–175K typically. We went ABOVE the average for him.").

***Exhibit 23***
***Example salary ranges at USPI, Gerhart Report, Figure 7***

| | A | B | C | D |
|---|---|---|---|---|
| 1 | | **USPI** | | |
| 2 | **Position** | **Minimum** | **Average** | **Maximum** |
| 3 | RVP | $140,000.00 | $198,691.90 | $ 300,000.00 |
| 4 | Market President | $245,000.00 | $300,451.11 | $ 346,006.00 |
| 5 | Administrator | $ 69,875.00 | $ 124,650.73 | $ 211,160.98 |
| 6 | CFO | $ 98,800.00 | $151,100.43 | $ 271,294.40 |
| 7 | CNO | $122,387.20 | $137,843.41 | $ 159,764.80 |
| 8 | CEO | $163,000.03 | $188,193.90 | $ 250,016.00 |
| 9 | COO | $ 111,758.40 | $ 132,904.51 | $ 154,999.94 |
| 10 | CSO | | | |
| 11 | CHRO | | | |
| 12 | CMO | $ 22,184.00 | $221,846.00 | $ 221,846.00 |
| 13 | AA | | | |
| 14 | Director of Nursing | $ 68,744.00 | $106,912.00 | $ 158,600.00 |
| 15 | Director of Operations | | | |
| 16 | Clinical Director | $ 61,443.20 | $ 98,979.25 | $ 144,185.60 |
| 17 | BOM | $ 39,728.00 | $ 68,985.92 | $ 144,200.00 |
| 18 | RN (Full Time) | $ 44,928.00 | $ 77,222.85 | $ 135,200.00 |
| 19 | RN (PRN) | $ 15,177.60 | $ 19,258.83 | $ 27,289.60 |
| 20 | RN (Part Time) | $ 17,810.00 | $ 56,184.16 | $ 77,851.28 |
| 21 | RN (Regular Part-Time | $ 39,800.00 | $ 60,138.00 | $ 80,475.20 |

Source: Gerhart Report, Figure 7

Note: Dr. Gerhart cites USPI_CIV_000214742, which is an email from Shannon Mosley in August 2018 requesting "min/mid/max information" for a number positions at USPI. He also cites USPI_CIV_000214746, which is an Excel file containing the above information.

186. Even if one were to accept that Figure 7 from Dr. Gerhart's report represents a rigid pay structure that would require adjusting if an employee's pay breached the minimum or maximum or otherwise shifted the distribution of pay, which it does not, the pay ranges do not demonstrate that direct harm would have spread indirectly to other Senior Employees. Two patterns in the exhibit are inconsistent with Dr. Gerhart's claim that USPI's alleged compensation structure would have spread any harm to Senior Employees who were not directly affected by the alleged mobility restrictions.

187. First, the range of pay within a position is wide, as reflected in Exhibits 20 and 23 and in USPI's messaging to external candidates.[282] Increasing the pay of a few employees in any position would not necessarily require adjusting the pay of all other Senior Employees. Dr. Starr estimates that pay for USPI Senior Employees was suppressed by approximately 12 percent.[283] Below I discuss flaws in Dr. Starr's analysis that cause him to overstate the impact. However, even if the impact were 12 percent, according to the pay ranges listed in Dr. Gerhart's Figure 7, the maximum pay for every position relevant for Senior Employees exceeds the average pay by more than 12 percent.[284] For example, the average salary for an administrator is listed as $124,650.73 while the maximum salary is $211,160.98. The maximum salary exceeds the average salary by nearly 70 percent. If an administrator with average compensation leveraged a solicitation from SCA (or DaVita) to negotiate a raise by 12 percent (i.e., the amount by which Dr. Starr estimated Senior Employees were harmed by the alleged mobility restrictions), the administrator's salary would increase from $124,650 to $139,608. The new salary would fall well within the prior pay range that had a maximum pay higher than $200,000. Dr. Gerhart does not describe how a change in one or even several Senior Employees' salaries that is small relative to the range of salaries would compel USPI to change the salary of all or nearly all other Senior Employees' salary.

188. Second, the pay ranges of adjacent positions overlap. For example, the maximum administrator salary exceeds the minimum, and even the average, RVP salary. In other words, there are RVPs who earn less than administrators. Dr. Gerhart does not explain how one or several administrators who receive a salary increase would compel USPI to increase the pay of RVPs when some administrators already earn more than some RVPs. Furthermore, Dr. Starr categorizes market president and administrator positions as VPs and categorizes RVPs as SVPs.[285] Yet, on average, market presidents earn more than RVPs, and administrators earn less than RVPs.

189. Dr. Gerhart also fails to consider internal USPI documents that are inconsistent with his claim that internal equity would result in the limited direct harm flowing through to all or nearly all USPI Senior Employees. For example, he fails to consider documents that indicate USPI sought to pay

---

[282] In response to an inquiry from an external candidate about how USPI's offer compared to others with the same title, Sandi Karrmann of USPI replied, "We do not have salary ranges and levels . . . And titles aren't necessarily reflective of level of responsibility relative to others with the same title. Therefore, there's a wide range of pay for each title[.]" See email chain from Sandi Karrmann to Shannon Mosley, "Fwd: USPI HRD – C. Hodges," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337.

[283] Starr Report, ¶ 129 ("The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Directors and above was to reduce total compensation by ... 12.0 percent at USPI[.]").

[284] Note that for the "CMO" position, the average wage is listed as being equivalent to the maximum wage. However, employees in this position are not a part of the alleged class. See Appendix D.

[285] See Appendix D.

"market-based" and "performance-driven" base salaries.[286] These documents, along with USPI's compensation data,[287] indicate that USPI did not adhere to ranges when setting salaries for Senior Employees.[288] Instead, documents indicate that decision-makers evaluated a variety of factors, including the performance of each employee, the performance of their facilities, and research on what other firms paid.[289] Documents further suggest that USPI considered internal equity only across employees in comparable roles with similar performance at facilities that were similar in terms of size and complexity.[290]

190. Dr. Gerhart also fails to address documents indicating that when setting compensation for new employees, USPI considered individual factors, such as competing offers and the employee's current salary and benefits.[291] For

---

[286] USPI Tenet Health presentation, "Tenet HR Committee: USPI Compensation Overview," November 4, 2015, USPI_CIV_000024185, p. 2; Email chain from Peggy Wellman to Mary Leahy et al., "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 ("We [USPI] do not have formal pay ranges established, these are facility specific and are based upon market needs.").

[287] I explain my analysis of USPI's compensation data for evidence that it adheres to salary ranges in Section 7.

[288] Karrmann Deposition, p. 39 ("For administrators and above, we did not have established salary ranges."). See also, Johnston Deposition, p. 51 ("Q. You say that USPI doesn't have specific pay scales for administrators; is that correct at the time. A. Yes. That's correct."); Email chain from Sandi Karrmann to Shannon Mosley, "Fwd: USPI HRD – C. Hodges," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337 ("We do not have salary ranges and levels… and titles aren't necessarily reflective of level of responsibility relative to others with the same title. Therefore, there's a wide range of pay for each title[.]"); Email chain from Peggy Wellman to Mary Leahy et al., "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 ("We do not have formal pay ranges established, these are facility specific and are based upon market specific needs."); Email chain from Monica Cintado to Brett Brodnax et al., "RE: Phone Interview with Jim Holmberg-VP Development candidate/Nashville (Resume Attached)," April 3, 2013, USPI_CIV_000047956–58 at USPI_CIV_000047957 ("[T]he offer he would receive reflects a competitive package that is equitable with like positions in USPI (given that we don't have salary ranges and levels, it's hard for an external candidate to know if their offer is competitive and fair).").

[289] Karrmann Deposition, p. 39 ("We evaluated performance of centers, performance of the individuals. And based on marketplace changes and cost of labor, we looked at those different factors and determined salary increases and compensation for administrators and above."); Karrmann Deposition, PX 296 at DOJCIV-008-00000389 ("███████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████ ").

[290] Karrmann Deposition, pp. 39–40 ("Q. [] Did you also consider internal equity in setting salaries for employees? A. Yes. Q. And what is your understanding of internal equity? A. Based on size and scope of the center for an administrator, the center they were in, the complexity of the center. All centers are different. Based on an administrator's performance, based on the length of time they've been in the role and based on that local market, because different markets pay differently across the country. Q. So in what sense would you consider -- take internal equity into account? A. For people with comparable size, scope, complexity of centers and similar performance results, and performance of their position. You would expect that people would move generally at the same rate, taking into account differences in market."), 41–42 ("Q. Now, when you were considering internal equity, that would be among different employees with the same title; correct? A. Yes. Q. And would it also be among employees at different locations? A. Yes. Q. And would you consider that between new hires and current employees? A. Yes. Q. And between newly promoted people and existing people with that title? A. Yes. Q. And also between people with different titles. For example, with the RVPs and market presidents, would you consider internal equity between -- to maintain different pay structures for RVPs and then market presidents? A. We wouldn't specifically compare an administrator to an RVP's pay. We would look at administrators within their job classification, or job title. And we would look at RVPs within RVPs. Q. And would you take care to make sure RVPs weren't being paid more than market presidents? A. We wouldn't specifically compare a market president to an RVP's pay, but we would look at RVPs against RVPs and market presidents against market presidents.").

[291] See email chain from Leah Cerkvenik to Shannon Mosley and Teresa Danna, "RE: Rochele Herzog offer information," December 26, 2013, USPI_CIV_000192177–78 at USPI_CIV_000192178 ("Per our conversation, we

example, during the alleged conduct period, USPI and SCA competed over an RVP candidate; the candidate chose USPI after it offered to pay her "like a market president -- ███████████ than [] other RVPs."[292] Dr. Gerhart has failed to offer any evidence that this instance resulted in all or nearly all RVPs receiving a pay increase, much less all or nearly all USPI Senior Employees.

191. Dr. Gerhart further fails to consider evidence that suggests pay was individualized. For example, USPI documents indicate that merit increase recommendations were based on each supervisor's view of their employees. USPI's then COO, Mark Garvin, testified that he based recommended salary increases "mostly on 'gut feel'" from "a holistic review" and not "any formula."[293] In some cases, supervisors recommended "outlier" merit increases based on employee performance, or competition for the employee from other firms.[294] Case documents indicate that supervisors could recommend more frequent or significant merit increases for strong



found out that Rochele is being offered - ███████████████████. What do you all think about offering her the same salary and sign on along w/with our annual bonus? Mark - were you wanting me to send the email to Niels or do you want to send it? Rochele has agreed to take our offer if we can match what the other company is offering"); United Surgical Partners International, "Confidential Assessment For Rochele Herzog: Administrator Candidate for United Surgical Partners," December 17, 2013, USPI_CIV_000376500–506 at USPI_CIV_000376500 ("Rochele Herzog Administrator Candidate for United Surgical Partners."); Email chain from Cindy English to Sherri Reinert and Paula Baldwin, " RE: FW: Lee Stubbs, Administrator candidate," July 20, 2016, USPI_CIV_000626729–30 at USPI_CIV_000626729 ("The details of our planned offer to Lee: ... ████████████████████████████████ ███████████████████████████████)"); Email chain from Shannon McGarry to Marc Steen and Shannon Mosley, "RE: USPI Employment Offer," February 14, 2018, USPI_CIV_000030396–399 at USPI_CIV_000030396–97 ("Here is what she's asking for now. ... ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████."); "Offer of Employment Letter to Julianne Christy for Administrator at Baylor Surgicare," USPI, February 8, 2018, USPI_CIV_000274099 at USPI_CIV_000274099 ("I would like to confirm USPI's desire for you to join our company as the Administrator at Baylor Surgicare at North Dallas."). See also email chain from Sandi Karrmann to Shannon Mosley, "Fwd: USPI HRD – C. Hodges," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337. In response to a candidate requesting additional PTO, Sandi Karrmann of USPI responded, "████████████████████████████████████. All I ask is that you don't talk about it with other[s], as others may not have gotten this much," and followed up with Shannon Mosely to revise the offer letter accordingly. See also USPI_CIV_000047956–58, an internal USPI email chain about how to tailor an offer for a VP candidate wherein, among other things, it's decided that USPI will commit to paying a full year's bonus despite the candidate joining mid-bonus cycle to "show an exception for him to make him feel we are stretching."

[292] Email chain from Alex Bateman to Andy Johnston, "RE: Admin merit increase," February 6, 2015, USPI_CIV_000336479.

[293] "Federal Bureau of Investigation of Mark Christopher Garvin," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000362–363 ("████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████").

[294] Email chain from Alex Bateman to Cindy English, "RE: PLEASE RESPOND: Administrator Increase Questions Ellinger & Bray – JOHNSTONBATEMAN," February 2, 2015, USPI_CIV_000650633–36 at USPI_CIV_000650634 ("Alex - I was helping go through some 'outliers' and there were no notes next to the increases for Ellinger and Bray so I thought I would check to see if you could provide an explanation for the ██████████████████████████ or if this was possibly an oversight. ... Jan was promoted from clinical director to Admin. Kenny was bumped up to match an outside offer - we had to keep him. ... Sorry - ████████████████████████████ ████████████████████████████).

performers.[295] In addition, case documents indicate that merit increases were sometimes driven by an individual employee's progress toward specific performance goals set by their supervisor.[296] Given this evidence of individualized pay, Dr. Gerhart fails to offer any explanation of why a limited number of individuals receiving a pay increase in response to an offer from a competitor would result in all or nearly all Senior Employees' salaries increasing. In fact, Dr. Gerhart testified to the contrary that many employees would not be affected by the sharing of merit pay increases, including new and under-performing employees who he claims would have been ineligible for merit-based raises.[297]

192. Dr. Gerhart also fails to explain how USPI's use of equity compensation, which could be individualized, is consistent with his claims of internal equity that would result in harm to all or nearly all Senior Employees. USPI documents indicate that, at times, USPI granted equity compensation in irregular amounts and intervals. For example, one employee was offered three times as many options as another even though both were newly promoted directors of corporate accounting.[298] Similarly, one Houston-area administrator was offered ▮▮▮▮▮ options while another Houston-area administrator was offered only ▮▮▮▮.[299] A USPI table listing equity grants in 2016 summarizes a wide range of grants within a job title—some SVPs were granted fewer than ▮▮▮▮ options and others granted over ▮▮▮▮. The table also indicates overlapping grants across job titles, for example, some VPs were granted over ▮▮▮▮▮▮▮.[300] In 2014, USPI made "one-time grants" for its "difference makers" in the form of options that vested over time as a "retention incentive."[301] Indeed, this was not the only time

---

[295] Email chain from Teresa Danna to Cindy English, "RE: FW: Message from, KMBT_C454," with attachments, January 15, 2014, USPI_CIV_000499023–24 at USPI_CIV_000499023 ("Alex Scott at Princeton joined the facility in November 2012 after completing the USPI Administrator training program ▮▮▮▮▮▮▮▮. After a 90 day probation period, his compensation ▮▮▮▮▮▮▮▮▮▮▮. His ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with is still well below our current range. He asked Roseanne to evaluate his salary from a market perspective. ... Roseanne and I fully support this increase (see her data points below). I wanted to make sure you approve before I sign off on the PAF and forward to Cindy English.").

[296] "Federal Bureau of Investigation of Mark Christopher Garvin," July 28, 2020, DOJCIV-008-00000353–67 at DOJCIV-008-00000359–360 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.").

[297] Gerhart Deposition, p. 168 ("Q. [] Well, but if they were either ineligible or had poor performance, like you said, those people wouldn't be subject to [merit pay increases]; correct? ... [A.] I would agree on, if someone's simply not eligible, then it also wouldn't matter.").

[298] USPI Office Memo from Bill Wilcox to Option and Compensation Committee, February 6, 2014, USPI_CIV_000041645–56 at USPI_CIV_000041656 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[299] USPI Office Memo from Bill Wilcox to Option and Compensation Committee, "RE: Request for Approval," June 25, 2013, USPI_CIV_000121836–40 at USPI_CIV_000121839 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[300] See USPI, "Resolutions of Compensation Committee of USPI Holding Company, Inc.," November 13, 2016, USPI_CIV_000068808–21 at USPI_CIV_000068818.

[301] USPI Office Memo from Bill Wilcox to Aric Burke, July 16, 2014, USPI_CIV_000044881–83 at USPI_CIV_000044881 ("This equity will vest over four years at 20%, 20%, 20% and 40%, respectively. The 'back-end' load of the vesting provisions is a retention incentive."), USPI_CIV_000044883 ("These are one-time grants for our 'difference makers.'").

USPI made one-off equity grants for the purposes of retaining or awarding select employees. In order to "save" an employee, USPI offered a package including a "███████████████████████████."[302] USPI also offered a VP equity in order to retain him due to his desire for equity compensation in particular.[303]

193. These examples demonstrate USPI's willingness to negotiate compensation for individual employees and to alter offered compensation on a "case-by-case" basis.[304]

### 7.2.3. *Dr. Gerhart's claims about "external equity" contradict his claim that the Experts' Assessed SCA-USPI Mobility Restrictions would have affected all Senior Employees*

194. In addition to the internal equity that Dr. Gerhart claims USPI achieves through maintaining a compensation structure within the firm, he also claims that USPI maintains "external equity." According to Dr. Gerhart, "[e]xternal equity means paying similar employees similarly to employees in other companies doing similar work and making similar performance contributions."[305] External equity implies that, when the external benchmark wage increased, USPI would increase wages in a similar way to maintain external equity. Dr. Gerhart states, "[i]n the absence of external equity, a company is at greater risk of employee turnover. However, if pay is suppressed in these other companies, achieving external equity will require lower labor costs than in a competitive market."[306]

---

[302] Email chain from Paul Slavin to Sandi Karrman, "RE: Patrick (updated)," March 13, 2018, USPI_CIV_000534606–09 at USPI_CIV_000534609 ("He came up in a conversation with Ron - Ron asked if it was worth a try to put an offer in front of him to try to save him."), USPI_CIV_000534607 ("In addition to above I recommend a onetime RSU grant valued at ███████.").

[303] Email chain from Bill Wilcox to Brett Brodnax, "Re: David Lewis Draft Offer Letter and Compensation Plan," November 15, 2014, USPI_CIV_000401250–54 at USPI_CIV_000401253 ("I am fine with this offer, except for one point - we are not in a position to grant any options right now, so I would delete this from the offer."), USPI_CIV_000401252 ("I'd recommend saying that he is option eligible then. ... I think it is a critical element to him in the position."), USPI_CIV_000401251 ("RVPs receive 30k, █████████████████████████. I'm just not sure we are ready to commit to a specific number of options right now given the impending changes. ... He knows others have gotten equity and he's been here a long time. I think we need to include some options in his offer. We don't want to lose David. For someone at his level and tenure, █████████████████████████ - I just hate committing before we know how we are going to approach newco equity, but agree we don't want to lose him.").

[304] Garvin Deposition, p. 90 ("Q. And so is it fair to say that if an employee was offered an opportunity outside of USPI for more money, at that point USPI would consider that and would match that increased compensation because they did not want to lose that employee?... [A.] That would all depend on the employee. And it was a case-by-case scenario and not a broad application."). See also email chain from Peter Blach to Sandi Karrmann and Shannon Mosley, "RE: Donita stock question," February 28, 2018, USPI_CIV_000272179–82 at USPI_CIV_000272181 ("[K]now that she'll likely negotiate. ... █████████████████████████████████?"); Email chain from Brett Brodnax to Sandi Karrman, "Re: Oaks Amanda Offer Letter 4 2016.docx," April 19, 2016, USPI_CIV_000900796–801 at USPI_CIV_000900801 ("I used the verbiage from Chris' letter for the stock. Alex did negotiate different terms [] and I think Amanda [a candidate for VP, Development] will do the same, but we can start here if you'd like."); Offer of Employment Letter to Amanda Oaks for Vice-President, Development, undated, USPI_CIV_000026215–16 ("I would like to confirm USPI's desire for you to join our company as Vice-President, Development[.]").

[305] Gerhart Report, ¶ 94.

[306] Gerhart Report, ¶ 94.

195. Dr. Gerhart's claims of external equity, along with observed labor mobility, are inconsistent with Plaintiffs' allegations that USPI was able to maintain sub-competitive compensation. If SCA and USPI (or all three Defendants) agreed to reduce compensation below competitive rates, as alleged by Plaintiffs, USPI's compensation would violate external equity. In Sections 4 and 5 above, I review labor mobility of Senior Employees at USPI and find that SCA (and DaVita) comprise a small fraction of Senior Employee moves to or from USPI. Specifically, both within and outside the Alleged, Assessed, and Admitted Mobility Conduct periods, almost all of USPI's employees were recruited from (and left to) non-Defendants. Thus, Dr. Gerhart's articulation of external equity would require USPI to compensate employees who did similar jobs to those available at the non-Defendant firms from which it recruited similarly to the compensation offered at the non-Defendant firms. Yet, these non-Defendant firms are not alleged to be party to any anticompetitive conduct, implying there is no reason to assume their employees' compensation is suppressed. Thus, maintaining external equity with these firms would imply USPI's compensation could not be sub-competitive.

196. USPI responding to external changes in compensation is precisely the competitive check I describe above in Sections 4 and 5. Suppressing compensation, which violates external equity, would cause USPI Senior Employees to leave USPI for any of the many outside options detailed above. Similarly, if USPI increases compensation because of external compensation increases from firms other than SCA (or DaVita), then its compensation is responding to competition *outside* the Alleged, Assessed, or Admitted Mobility Restrictions and is therefore competitive, not suppressed.

*7.3. Dr. Starr offers flawed analyses to support his assertion that the Experts' Assessed SCA-USPI Mobility Restrictions would have indirectly suppressed the compensation of USPI Senior Employees*

*7.3.1. Overview of Dr. Starr's claims and analysis related to internal and external equity*

197. Dr. Starr makes claims similar to Dr. Gerhart regarding internal and external equity. Specifically, Dr. Starr states "[c]ompensation structures connect all employee pay within a firm, such that any suppression of wages for one group of employees would tend to suppress the pay of other employees. ... Here, the existence of compensation structures within Defendant firms would mean that any wage suppressing effects of the Challenged Conduct would be broadly transmitted across the Class."[307]

---

[307] Starr Report, ¶ 172.

198. Dr. Starr begins by reviewing qualitative evidence. He asserts that this qualitative evidence demonstrates that Defendants used compensation structures to maintain internal and external equity. Yet, Dr. Starr fails to recognize that the qualitative evidence specific to USPI that he highlights is consistent with outside options for USPI Senior Employees acting as a competitive check on USPI's ability to suppress wages.[308]

199. First, Dr. Starr highlights testimony from USPI's then COO, Mark Garvin.[309] Mr. Garvin testified that USPI considered whether an employee had been solicited for an outside opportunity when deciding compensation and confirmed that USPI needed to "properly compensate employees at market rates to ensure competitor companies did not attempt to hire those employees away."[310] Offering additional compensation to employees who have been offered other positions and compensating other employees enough to retain them is entirely consistent with competitive compensation. This testimony does not describe any attempt by USPI to maintain an internal compensation structure. If anything, it points to the labor market competition USPI faces, which requires it to outbid competitors or face the loss of an employee. As described in Section 4, USPI faces significant labor market competition from non-Defendant employers.

200. Second, Dr. Starr points out that USPI used external sources, such as CareerBuilder, to gather reference points for fair-market salaries.[311] Referencing external sources to determine fair-market salaries is consistent with competitive compensation setting. If Defendants had sufficient market power and conspired to suppress compensation, they would not need to set their compensation based on fair-market salaries. To the contrary, USPI's

---

[308] Note that Dr. Starr ignores evidence contrary to his opinions that indicates USPI did not follow a strict compensation structure. See, e.g., Email chain from Peggy Wellman to Mary Leahy and Jeremy Zoch, "RE: FW: Human Resources Questions for St. Joseph's," with attachments, March 21, 2015, Email chain from Peggy Wellman to Mary Leahy et al., "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 ("In regard to the request for Pay scales - We do not have formal pay ranges established, these are facility specific and are based upon market specific needs."); Email chain from Julie Manning to Natalie Buncher and Shannon Mosley, "RE: Pay scale grid for surgery scheduler w/ other duties assigned," September 20, 2017, USPI_CIV_000033030–31 at USPI_CIV_000033031 ("USPI doesn't have a pay scale grid tool."); Email chain from Sandi Karrmann to Shannon Mosley, "Fwd: USPI HRD – C. Hodges," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337 ("We do not have salary ranges and levels . . . Therefore, there's a wide range of pay for each title (which is the closest equivalent to levels)."); Karrmann Deposition, p. 39 ("USPI did not have established salary ranges.").

[309] Starr Report, ¶ 181.a ("Deposition testimony and internal USPI documents demonstrate that USPI also focused on maintaining compensation equity. For example, COO Mark Garvin ... testified to how compensation equity principles informed its decision making.").

[310] Garvin Deposition, p. 93.

[311] Starr Report, ¶ 181.b ("To gather reference points for a fair-market salary to maintain external equity, USPI used external sources, such as CareerBuilder.").

reference to fair-market salaries is consistent with it setting competitive compensation to attract and retain Senior Employees.[312]

201. Dr. Starr claims that a firm taking external equity into account does not mean that compensation is entirely determined by a larger labor market or that it lacked monopsony power. He **provides an example that "a company** may seek to pay its employees at approximately the 75th percentile of some external pay benchmark. But if that company suppresses labor competition through, say, a non-solicitation agreement with an important labor competitor, the company may instead seek to pay its employees at the 50th percentile of some external pay benchmark. This illustrates both that all pay within a firm would move together, and that paying attention to external equity does not mean that wages were simply set by a larger labor **market."[313]** Yet, suppose the benchmark compensation range shifted upward. To maintain external equity, Defendants would have to match pay increases or face attrition of their employees, which is a competitive compensation setting process. That is, Dr. Starr has failed to explain how mobility restrictions between two firms could successfully reduce their employees' compensation in the face of labor market competition from other firms included in the benchmark.

202. Third, Dr. Starr references testimony from USPI's then VP of Financial Operations, Cindy English.[314] Ms. English described some of the processes by which USPI increases compensation on an annual basis. She testified that salary increases are recommended based on the budgeting process from the prior year and that proposed salary increases and bonuses would be approved by the CEO, CFO, and COO.[315] Ms. English described individual salary increases corresponding to merit (performance based) and non-merit (e.g., cost of living adjustments).[316] Dr. Starr provides examples of proposed and historical default pay increases in two years for

---

[312] See also email chain from Mark Garvin to Sandi Karrmann and Andy Johnston, "PayScale Information – RVP Nationwide," with attachments, February 8, 2017, USPI_CIV_000021897–98 at USPI_CIV_000021898 ("Shannon is also pulling our major market RVP salary data from CareerBuilder[.]"); "PayScale Market Report: Regional Vice President (RVP), Operations," February 3, 2017, USPI_CIV_000021899–904 at USPI_CIV_000021900 ("This PayScale compensation report represents a snapshot of market results for the position Regional Vice President (RVP), Operations and location United States."); Email chain from Shannon Mosley to Sandi Karrmann and Crystal Hodges, "RE: Salary Surveys," February 11, 2014, USPI_CIV_000057810–11 at USPI_CIV_000057810 ("[W]e do use a combination of Mercer and Salary.com for compensation analysis. For benefits, we use the Hewitt survey every other year.").

[313] Starr Report, ¶ 176.

[314] Starr Report, ¶ 181.c ("USPI VP of Financial Operations English testified that salary increases at USPI originated from a budget percentage that was recommended to department heads.").

[315] English Deposition, pp. 29 ("Q. So at that point, in late January, the recommended percentage had already been determined? A. It would have been determined in the prior year, when the budget for the next year was determined, yes.), 35 ("We will accumulate the proposed increases for discussion with Niels, Bill and Mark Kopser."), 48 ("Q. Do you know specifically who ultimately approved bonuses for your staff? A. It would have either -- it would have been the CFO at the time, so it could have been Mark Kopser or Jason Cagle, in addition to the CEO.").

[316] English Deposition, p. 52 ("Q. [] Were there separate cost of living increases, or were those salary increases the sole increase in salary for each employee? ... A. The supervisor would have had the ability to potentially request a market increase in addition to, for example, the 2.5% [merit increase].").

different job levels.[317] Each of these examples points to USPI making broad compensation decisions based on budgeting at the executive level. It does not describe a compensation structure wherein individual pay increases necessitate broader compensation increases to maintain the structure. In fact, to the extent firm-wide pay increases are constrained by a budget, increasing some employees' pay must result in lower pay increases for other employees in order to maintain the budget.

203. Finally, Dr. Starr points to examples of USPI reaching out to SCA for compensation information. He claims that the alleged information "exchanges may have helped USPI to coordinate its pay levels directly with SCA's, potentially reducing the amount of pay increases it would have otherwise given absent this information."[318] Dr. Starr does not provide any evidence or analysis showing that USPI lowered compensation, or reduced planned compensation increases, for USPI Senior Employees as a result of the information sharing.[319]

204. Furthermore, Dr. Starr ignores qualitative descriptions from USPI's course of business documents and testimony wherein USPI describes compensation that is not determined by pay scales or a pay grid, resulting in wide compensation ranges.[320]

---

[317] Starr Report, ¶ 181.c ("In 2015, the default increase for VP and above was 2.5 percent. In 2012, the proposed increase for everyone below the VP level was 2 percent.").

[317] See, e.g., Email chain from Greg Miller to Michael Stroup, "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Brodnax – Stroup (Due by Friday, February 6, 2015)," February 2, 2015, USPI_CIV_000964185–86 at USPI_CIV_000964185 (USPI human resources employee Greg Miller responding to a question from an SVP about how to distribute the budget for raises: "You are free to distribute your budget as you see fit. The challenge is that our budget is at 2.5% … so to maintain a 2.5% for folks that meet/meet [expectations] … means that you will not be able to reward the folks performing at higher levels. Again, it is up to you. For the first year, you might consider giving 2% to folks in the meet/meets and shooting for ~3% for higher performers."); Email chain from Teresa Danna to Andy Johnston, "RE: Administrator Salary Considerations – JOHNSTON – Danna – Nov 2012," October 19, 2012, USPI_CIV_000044404–05 at USPI_CIV_000044404 (USPI SVP revising pay increase recommendations and noting that he "put Kathy in for a 3% increase, and dropped Wade a little"); Email chain from Mark Garvin to Peggy Wellman and Cindy English, "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Garvin-Wellman (Due by Friday, February 6, 2015)," with attachment, February 9, 2015, USPI_CIV_000045211–12 at USPI_CIV_000045211 (USPI market president submitting pay increase recommendations and noting she tried "to balance rates" to meet the 2.5% budget).

[318] Starr Report, ¶ 181.d.

[319] Starr Deposition, p. 45 ("Q[.] You're not offering any opinion that the exchanges of information resulted in actual coordination of pay levels, are you? A[.] … I don't have an opinion on exactly how that information was then taken in and used in decision-making.").

[320] See, e.g., Email chain from Sandi Karrmann to Shannon Mosley, "Fwd: USPI HRD – C. Hodges," November 27, 2013, USPI_CIV_000441337–39 at USPI_CIV_000441337 ("We [USPI] do not have salary ranges and levels . . . Therefore, there's a wide range of pay for each title."); Email chain from Julie Manning to Natalie Buncher and Shannon Mosley, "RE: Pay scale grid for surgery scheduler w/ other duties assigned," September 20, 2017, USPI_CIV_000033030–31 at USPI_CIV_000033031 ("USPI doesn't have a pay scale grid tool."); Email chain from Peggy Wellman to Mary Leahy et al., "FW: Human Resources Questions for St. Joseph's," March 21, 2015, USPI_CIV_000755571–72 at USPI_CIV_000755571 ("In regard to the request for Pay scales - We do not have formal pay ranges established, these are facility specific and are based upon market specific needs."); Email chain from Andy Johnston to Vanessa Smith, "RE: Administrator Prorated Salary Increases – March 1, 2015 – JOHNSTON-SMITH (Due by 01/26/15)," January 21, 2015, USPI_CIV_000095479–80 at USPI_CIV_000095479 ("I've seen that approach work where there are specific pay scales. If you are at the top of the scale you get a bonus instead of an increase. But we don't have specific pay scales for Administrator positions."); Email chain from Monica Cintado to

*7.3.2. Dr. Starr's empirical analysis does not support the claim that internal equity would have resulted in all or nearly all USPI Senior Employees' wages being suppressed*

205. After reviewing documents and testimony that Dr. Starr claims demonstrate that USPI maintained a compensation structure, he analyzes historical USPI compensation data in an attempt to detect a compensation structure. In this section, I review Dr. Starr's analysis of USPI's compensation data and show that his analysis does not support Plaintiffs' Experts' claim that any direct harm of the Alleged, Assessed, or Admitted Mobility Restrictions would have been transmitted to all or nearly all USPI Senior Employees.

206. In Section 3.4 above, I review the components of Senior Employee compensation. Elements of compensation include salary, bonuses, equity, and deferred compensation. Each element of Senior Employee pay at USPI is determined through a different process.

207. According to Sandi Karrmann of USPI, USPI "did not have established salary ranges."[321] Shannon Mosley, then VP of Talent Acquisition at USPI, explained that USPI engaged in individualized analysis when attempting to fill open positions and determine the appropriate salary.[322] Ms. Karrmann further testified that, to determine salary increases, the general approach "was an overall merit budget for the organization" set by a group of executives each year.[323] The merit budget would give managers an "overall percentage increase within which to work."[324] Once the specific budgeted percentage was determined, it would be disseminated to managers to propose individual salary increases.[325] The process afforded managers "discretion to individualize increases within" the merit budget.[326]

---

Brett Brodnax et al., "RE: Phone Interview with Jim Holmberg-VP Development candidate/Nashville (Resume Attached)," April 3, 2013, USPI_CIV_000047956–58 at USPI_CIV_000047957 ("[T]he offer he would receive reflects a competitive package that is equitable with like positions in USPI (given that we don't have salary ranges and levels, it's hard for an external candidate to know if their offer is competitive and fair).").

[321] Karrmann Deposition, pp. 38–39.

[322] See, e.g., Deposition of Shannon Mosley (USPI), August 13, 2024, p. 94 ("What I'm trying to convey is there was a multi-pronged approach. It wasn't just one approach. There were different levers to pull to come to that decision other than just pulling a report.").

[323] Karrmann Deposition, p. 42.

[324] Karrmann Deposition, p. 44.

[325] Email chain from Alex Bateman to Cindy English, "RE: Proposals for VP & Above March 1, 2015 Salary Increases – Johnston-Bateman (Due by Friday, February 6, 2015)," with attachment, February 6, 2015, USPI_CIV_000039752–53 at USPI_CIV_000039752 ("The spreadsheet is defaulted to a proposed increase of 2.5% (prorated) for each person on your spreadsheet. Please revise the %'s in accordance with the performance leadership ratings you assigned to each person in steps 1 & 2 above. Merit increase guidelines are attached."); Email chain from Mark Kopser to Cindy English, "RE: Salary Adjustment Considerations - Wilcox (Nov 2010)," October 21, 2010, USPI_CIV_000147704–06 at USPI_CIV_000147704 ("Looking at the final spreadsheet for the November 2009 increases, many returned the spreadsheets requesting varying increase percentages with explanations for the increase requested. John presented those for final approval and then submitted for processing, so there was not an across the board 2% increase for everyone last year.").

[326] Karrmann Deposition, p. 46.

208. Anthony Martin, then Chief Accounting Officer at USPI, testified that bonuses at USPI were determined through a mix of company performance and individual employee performance, stating "some percentage of the bonus would be based solely on company earnings for the year and whether they met certain targets. And the other portion would be based on whether the individual employee met certain performance milestones that they agreed with their supervisor at the start of the year."[327] According to Cindy English of USPI, supervisors could also request an additional discretionary amount based on employee performance.[328]

209. Documents and testimony indicate that equity awards were determined on an individualized basis, depending on the individual's position, scope of responsibility, ability to affect profits, and performance. There were several equity plans during the conduct period, including the "2007 Equity Incentive Plan" and the "2015 Stock Incentive Plan."[329] The equity plans would have periodic valuations to update the share price[330] and typically distributed options over the course of a few years.[331]

210. The multiple components of pay, each determined in different ways, would make a systematized compensation structure difficult to maintain. Historically, USPI Senior Employees' compensation rates do not move together. Senior Employees hired in the same year for the same job start with different compensation levels and follow different compensation paths over time. As I show above in Section 7.1, Senior Employees in the same job category start at USPI at very different compensation levels (Exhibit 20), USPI Senior Employees experience different compensation changes year-over-year (Exhibit 21), and the paths of USPI Senior Employee pay diverge over time (Exhibit 19).

211. Dr. Starr conducts two separate empirical analyses that he claims demonstrate USPI did maintain a compensation structure despite the observed variance in compensation levels and paths.

212. **Across-job compensation analysis:** Dr. Starr compares average annual compensation across all VPs and SVPs at USPI to the annual average director compensation using a regression analysis. He estimates

---

[327] Martin Deposition, p. 56.

[328] English Deposition, pp. 47–48 ("Q. And generally, if you could describe what your process was in determining the bonuses for your staff. A. I believe it was based on -- if an EBITDA target was met, different titles would get a different percentage of their salary. If they did something that was over and above the normal cause -- the call of duty, so to speak, we could request a discretionary amount.").

[329] USPI Group Holdings, Inc., "2007 Equity Incentive Plan," July 15, 2014, USPI_CIV_000337006–011 at USPI_CIV_000337006; USPI, "Stock Option Agreement between USPI Holding Company, Inc. and Sandi Karrmann," November 18, 2016, USPI_CIV_000233594–614 at USPI_CIV_000233608.

[330] USPI, "Option and Compensation Committee Meeting," October 19, 2017, USPI_CIV_000023128–33 at USPI_CIV_000023130 ("Valuations occur twice per year, once at mid-year and once at year end").

[331] See, e.g., USPI, "Option and Compensation Committee Meeting," October 19, 2017, USPI_CIV_000023128–33 at USPI_CIV_000023130 ("Options vest as follows: - 2015 & 2016 grants: half four year cliff, half 25% per year. - 2017 & 2018 grants: half three year cliff, half 33% per year").

one version of the regression with no additional control variables and a second regression accounting for macroeconomic and healthcare factors.[332] Both regressions estimate a positive correlation between average director compensation and average VP and SVP compensation that is statistically significantly different from zero correlation. Dr. Starr concludes "[t]hese results are consistent with the qualitative evidence that there is a compensation structure within the firm that aligns wages across job levels."[333]

213. **Within-job compensation analysis:** Dr. Starr purports to estimate the correlation of compensation within jobs (e.g., director of finance, director of nursing, etc.). Specifically, he estimates a regression using Senior Employee compensation comparing individual compensation paths to the average compensation of a set of Senior Employees. For this regression, he randomly selects half of the Senior Employees within each job and calculates their average compensation for each year "holding out" the remaining Senior Employees from the average. Then he regresses compensation of the individual "hold out" Senior Employees against the average compensation of Senior Employees with the same job. The regression reports a coefficient that represents the average correlation between each of the hold out Senior Employees with the average compensation of Senior Employees with the same job title.[334] Dr. Starr reports that the regression coefficient indicates that individual compensation is statistically significantly predictive of the average director pay, which he describes as "strongly consistent with the existence of a pay structure within jobs."[335]

214. Dr. Starr's across-job and within-job compensation analyses suffer from several flaws, causing him to overstate the relationship of pay within and across job levels. First, Dr. Starr's results are driven, in part, by data errors in USPI's compensation data. Dr. Starr creates a measure of hourly pay for the purposes of his within- and across-job compensation correlation analyses.[336] To create the measure of hourly pay, Dr. Starr relies on a measure of hours worked in USPI's compensation records. However, the hours worked measure that Dr. Starr relies on to compute hourly pay is unreliable. In particular, it underreports hours worked in 2005 and 2006.[337]

---

[332] Starr Report, Figure 19, p. 160.

[333] Starr Report, ¶ 186.

[334] Starr Report, Figure 20.

[335] Starr Report, ¶ 190.

[336] See Starr Report, Figures 19 and 20.

[337] USPI's compensation records contain both a measure of "hours worked" and "standard hours." Dr. Starr relies on the hours worked measure to calculate hourly pay. The standard hours field records the number of hours an employee is expected to work in each week. Median hours worked for USPI employees is substantially lower in 2005 and 2006

215. This error causes his hourly pay measure to be artificially high especially from 2005 to 2006. To visualize the effect of correcting the hours measure, in Exhibit 24 I plot Dr. Starr's uncorrected measure of hourly pay and then also plot hourly pay correcting for the error in hours worked in 2005 and 2006.[338] The hashed lines represent the mean hourly rate as calculated by Dr. Starr, based on the underreported hours information. The solid line represents the same measure of average hourly pay after correcting the hours measure. The difference between the hashed and solid line indicates the degree to which Dr. Starr overstates hourly pay, primarily in 2005 and 2006.

**Exhibit 24**
**Correcting Dr. Starr's hourly pay measure**



Source: Dr. Starr Compensation Regression Data with Corrected Hours

Note: Dr. Starr Compensation Regression Data contain errors in assigning hours worked to employees. I have corrected these errors in this chart. Dashed lines represent Dr. Starr's measure of the mean hourly rate using his hours worked calculation, while solid lines represent the corrected version of this field.

216. The underreported hours inflate hourly pay for both directors and VPs/SVPs to a similar degree. Because Dr. Starr's mean hourly pay is inflated for both VPs and SVPs in the same years, Dr. Starr's regression overstates the correlation between the average pay measures. In Exhibit 25, I re-estimate Dr. Starr's across-job compensation regressions with the

---

compared to any other year in 2005–2022 in Dr. Starr's Data, a fact that Dr. Starr did not account for at all when processing the data. See Workpaper 5.

[338] To correct hours worked in 2005 and 2006, I rely on the "standard hours" field rather than the "total hours" field in the compensation data. Using the number of months of active employment, I measure corrected hours worked by scaling standard hours to the annual level.

corrected data and show that Dr. Starr overstates the correlation due to the hours error.

217. **The first pair of columns recreate Dr. Starr's Figure 19 USPI results.** Dr. Starr interprets his results as support for a compensation structure, stating that the variation in VP and SVP wages explains 87.9 percent of the variation in director wages at USPI. He concludes, **"knowing just the average wages of VPs and SVPs is in general highly informative of the average wages of Directors" based on the R**-squared measure reported in his regression.[339]

218. The second pair of columns displays the results of the same regression, correcting the hours worked measure. Once I fix the error in the hours measure in Column 3, the R-squared **of Dr. Starr's regression** drops from 87.9 percent to 30.8 percent, meaning that the variation in manager compensation explains only 30.8 percent of the variation in VP and SVP compensation. Furthermore, the coefficient on the mean hourly wage of VPs and SVPs falls from 0.882 to 0.366.[340]

219. Column 4 **estimates Dr. Starr's across-job regression correcting the hours** data and including the factors for which Dr. Starr controls. The coefficient on the mean hourly wage of VPs and SVPs falls further to 0.170, indicating that some of the correlation in compensation across jobs is explained by the other factors. The R-squared in this model increases to 0.840, but the incremental explanatory power of this model relative to Column 3 is due to the addition of the control factors, rather than from the compensation of VPs and SVPs. Most of the variation in manager pay in this model is explained by these additional control factors.

---

[339] Starr Report, ¶ 185. The R-squared measure of a regression indicates the portion of variation in the dependent variable (in this case, Mean Hourly Rate of Manager pay) that can be explained by the set of independent variables (in this case, Mean Hourly Rate of VPs & SVPs). See, e.g., Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, Fourth Edition (Mason, OH: South-Western Cengage Learning, 2009) ("Wooldridge (2009)"), p. 40, italics in original ("$R^2$ is the ratio of the explained variation compared to the total variation; thus, it is interpreted as the *fraction of the sample variation in y that is explained by x*.").

[340] The R-squared in the second regression, with additional controls, remains relatively high because the other variables explain a large portion of the variation in mean manager wages.

*Exhibit 25*
**Dr. Starr's across-job compensation correlation analysis, correcting employee hours**

| | Dr. Starr's Figure 19 | | Dr. Starr's Figure 19 Corrected Hours Adding Back in Zero Hour Employees | |
| --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) |
| Ln(Mean Hourly Rate of VPs & SVPs) | 0.822*** | 0.953*** | 0.366** | 0.170 |
| | (0.107) | (0.0959) | (0.126) | (0.124) |
| Covid | | 0.00167 | | 0.0135 |
| | | (0.167) | | (0.0994) |
| Ln(State GDP PC) | | -3.577 | | 1.071 |
| | | (3.237) | | (1.527) |
| Ln(State Unemployment Rate) | | -0.00366 | | -0.0148 |
| | | (0.336) | | (0.175) |
| Census Region Annual CPI | | 1.377* | | -0.391 |
| | | (0.744) | | (0.316) |
| Ln(Avg. State Mgr. Earnings) | | -0.994 | | 0.363 |
| | | (1.392) | | (0.740) |
| Ln(State Health Expend. PC) | | 0.320 | | 0.597 |
| | | (1.267) | | (0.409) |
| Observations | 18 | 18 | 18 | 18 |
| R-Squared | 0.879 | 0.939 | 0.308 | 0.840 |

Source: Dr. Starr Compensation Regression Data with Corrected Hours

Note: The first two columns show replications of Dr. Starr's Figure 19 results for USPI. The last two columns show Dr. Starr's Figure 19 results for USPI after correcting his error in assigning hours and including employees who he mistakenly treated as having zero hours worked in his regression analysis.

220. Second, both of Dr. Starr's analyses rely on comparing averages, either to another average or to individual compensation. In both instances, he is collapsing the variation in compensation that he claims is correlated. Exhibit 26 plots the average director compensation and the average VP/SVP compensation that Dr. Starr uses in his across-job compensation structure regression (bold lines) along with the component individual compensation that comprises the averages (thin lines). Dr. Starr estimates a regression of one average on the other, which abstracts from the underlying variation in compensation at the individual level. Dr. Starr similarly collapses the variation in his within-job analysis by comparing individual compensation to an average of other Senior Employees with the same job.

221. From his regression of average wages, Dr. Starr concludes that director pay is correlated with VPs and SVPs. He claims this as evidence of a compensation structure that would adjust to reflect wage changes from a single Senior Employee or small group of Senior Employees.[341] However, as

---

[341] Starr Report, ¶ 178 ("[E]conometric analyses of available wage data show strong support for compensation structures linking Class pay together.").

shown in Exhibit 26, the averages Dr. Starr uses as inputs to his regression do not contain the variation in compensation underlying those averages. In particular, compensation paths of individual Senior Employees (thin lines) cross because some are moving in different directions. These patterns are inconsistent with Dr. Starr's conclusion of a compensation structure that amplifies compensation increases across Senior Employees. By collapsing the compensation paths of individual Senior Employees to their average, Dr. Starr's regression is unable to account for the wide variation in Senior Employee compensation paths.

***Exhibit 26***
***Dr. Starr collapses variation in compensation***



Source: Dr. Starr Compensation Regression Data with Corrected Hours

Note: The mean hourly rate for directors and VPs/SVPs is shown by year in bold blue and black, while individual hourly rates are shown in grey and blue, respectively. Dr. Starr Compensation Regression Data contain errors in assigning hours worked to employees. The hourly rates shown use my corrected version of this field and include employees who he mistakenly treated as having zero hours worked in his regression build.

222. Third, correlation on its own is not sufficient to conclude that USPI had a compensation structure that would lead to direct impact on a limited number of Senior Employees flowing through to all or nearly all USPI Senior Employees. Two employees' compensation paths or two average compensation paths can be correlated if they tend to move in similar directions more often than not, but that does not mean that changing one would cause a change in the other. It also does not mean that the two series move together in a way consistent with a compensation structure that would result in direct impact to a limited number of USPI Senior Employees flowing through to all or nearly all USPI Senior Employees.

223. To demonstrate this issue, I estimate Dr. Starr's regression on hypothetical, randomly generated compensation paths that, by design, do not follow the patterns of a compensation structure as described by Dr. Starr.[342] I generate these data by initiating two separate wage series at an annual rate of $100,000 for hypothetical managers and $150,000 for hypothetical VPs and SVPs. Then, in each year, I randomly assign a change to each series, independent of one another, of between a 25 percent decrease and a 50 percent increase. The results of the randomly generated data are plotted in the top panel in Exhibit 27. The bottom panel of Exhibit 27 displays the random year-over-year changes used to generate the hypothetical compensation paths displayed in the top panel. The two compensation paths follow very different year-over-year growth patterns, in many years moving in the opposite direction.

*Exhibit 27*
*Hypothetical randomly generated compensation*



Source: Hypothetical Compensation Data

Note: Hypothetical data set 2005 annual compensation to $100,000 (directors) or $150,000 (VPs and SVPs). For subsequent years, compensation in each category is calculated by applying a separate, randomly generated change between -25 percent and +50 percent. Average annual hourly wage is calculated by dividing total annual compensation by 2,080 hours (assuming 40 hours worked per week, for 52 weeks).

---

[342] Starr Report, ¶ 182 ("The qualitative evidence above demonstrates there exist compensations structures at Defendant firms. I next find that the quantitative evidence is consistent with the existence of these compensation structures.").

224. Then I take the hypothetical compensation paths that are not dependent on or influenced by the other and **I estimate Dr. Starr's across-job regression.** Exhibit 28 displays the results. In the first column, I estimate a regression of the hypothetical manager compensation on hypothetical VP and SVP **compensation, analogous to Dr. Starr's across-job correlation regressions.**[343] Even though the data series are randomly generated and independent of one another, the R-squared of this regression is 0.788 and the correlation coefficient is 0.678 and statistically significant. Both of these estimates exceed the corresponding results from Dr. Starr's reported DaVita regression and Dr. Starr's USPI regression, after correcting the hours variable.[344] The second column estimates the same regression, controlling for a time trend. The results of this regression are very similar to the first.

225. This exercise demonstrates that a high R-squared or a coefficient significantly higher than zero resulting from a regression like Dr. Starr's across-job correlation regression is not sufficient to conclude that manager and VP and SVP pay are dependent on one another in a way that would translate alleged harm across job levels or across the firm.

*Exhibit 28*
***Dr. Starr's regression detects a compensation structure where there is no structure***

| | Dr. Starr's Figure 19 with Synthetic Wages | |
| --- | --- | --- |
| | (1) Baseline | (2) Add Time Trend |
| Ln(Mean Hourly Rate of VPs and SVPs) | 0.678*** | 0.649*** |
| | (0.102) | (0.210) |
| Year | | 0.00339 |
| | | (0.0176) |
| Constant | 1.360** | -5.316 |
| | (0.563) | (34.44) |
| Observations | 18 | 18 |
| R-squared | 0.788 | 0.788 |

Source: Hypothetical Compensation Data

Note: I apply Dr. Starr's Figure 19 regression without controls to the hypothetical wage data presented in Exhibit 27 above. In the second column, I include an annual time trend in the regression.

226. Fourth, his within-job compensation structure regression pools directors in different job titles when he attempts to measure the correlation of compensation within job titles. Dr. Starr describes the exercise as follows:[345]

---

[343] See Starr Report, Figure 19.

[344] See Exhibit 25.

[345] Starr Report, ¶ 188.

*Highly Confidential - Outside Counsel/Experts Only*

To implement this test, I use a randomized hold-out sample analysis. To illustrate the idea, consider the following example: Suppose that there are 100 Directors in a given company in a given year. I randomly split 50 into group A, and 50 into group B. I then examine whether the average wages of the 50 randomly selected Directors in group A are predictive of the individual wages of the other 50 Directors in group B. If so, then this is strong evidence in favor of a compensation structure.

227. However, his within-job regression contains 32 unique job titles, and he calculates the average compensation within each job title separately using half of the employees, randomly selected, in each job title. As a result, his regression identifies correlation based on across-job differences in pay rather than within-job correlation in pay over time. For example, directors of finance might have an average pay that is different from directors of nursing. As long as individual directors of nursing typically have compensation closer to the average compensation for directors of nursing than directors of finance, Dr. Starr's regression will report a high degree of correlation driven by this across-job variation in pay. This does not mean that compensation for individual directors of nursing is correlated with the average.

228. To illustrate the flaw, I re-estimate Dr. Starr's regression separately for 16 of the most common job titles. Exhibit 29 summarizes the results. Each row represents the results from a separate regression using employees from a single job title, listed in the first column.

229. The second column contains the coefficient estimate, representing the degree to which compensation of individual "hold out" Senior Employees is correlated with the average of the remaining Senior Employees of the same job title. Half of the job title regressions result in coefficient estimates that are not positive and significant, and four of the regressions result in *negative* point estimates, meaning individual compensation tends to move in the *opposite* direction from the average within the same job title.

230. The fourth column contains the R-squared measure of explanatory power. Dr. Starr finds that "the average wages of the random subset of workers with the same job title explain between 54.2 and 69.3 percent of the total variation in wages in the hold-out sample."[346] However, estimating the regression at the job title level, as in Exhibit 29, shows that, within a job title, a random subset of workers explains far less of the total variation in wages of the corresponding hold-out sample. For 10 of the 16 most common job titles, the average wages for the random subset of workers within a job title explains less than 10 percent of total variation in individual wages in the hold out sample.

---

[346] Starr Report, ¶ 190.

*Exhibit 29*
*Compensation is not correlated within job title according to Dr. Starr's regression methodology*

| | Job Title | Dr. Starr's Figure 20 | | | |
| --- | --- | --- | --- | --- | --- |
| | | Log Mean Hourly Rate | Standard Error | R-Squared | Observations |
| 1. | Administrator | 0.899*** | (0.0809) | 0.076 | 1,510 |
| 2. | Chief Executive Officer | -0.592*** | (0.178) | 0.176 | 54 |
| 3. | Clinical Director | 0.973*** | (0.0686) | 0.226 | 692 |
| 4. | Director | 0.459*** | (0.0888) | 0.031 | 851 |
| 5. | Director Of Finance | -0.203 | (0.314) | 0.040 | 12 |
| 6. | Director Of Nursing | -0.0862 | (0.316) | 0.001 | 139 |
| 7. | Imaging Administrator | -0.158 | (0.419) | 0.004 | 41 |
| 8. | Market President | 0.988*** | (0.0958) | 0.712 | 45 |
| 9. | Partnership Vp | 0.304 | (0.249) | 0.028 | 54 |
| 10. | Regional Administrator FT | -0.146 | (0.461) | 0.003 | 34 |
| 11. | Regional Director | 0.390*** | (0.131) | 0.130 | 61 |
| 12. | Regional VP | 0.669*** | (0.102) | 0.190 | 186 |
| 13. | Regional VP - Ops II | -3.610 | (4.791) | 0.036 | 17 |
| 14. | Senior Director | 0.133 | (0.627) | 0.001 | 35 |
| 15. | Senior VP | 0.492*** | (0.113) | 0.171 | 94 |
| 16. | VP | 0.620*** | (0.170) | 0.053 | 241 |

Source: Dr. Starr Compensation Regression Data

Note: This analysis runs Dr. Starr's Figure 20 regression separately for each job title. Following Dr. Starr's Figure 20 methodology, it holds roughly half of the USPI Senior Employees as a hold out sample. Job titles with 30 or more employees, before the hold out sample reduction, are included in this analysis. Standard errors are calculated using the ordinary least squares method. R-squared is labeled on top for each job title model.

231. Dr. Starr claims that USPI maintained a rigid pay structure that would transmit alleged harm to specific individuals indirectly to the remaining Senior Employees. However, as I have shown above, his analyses are flawed and overstate the relationship between pay across jobs and within jobs. Dr. Starr's within-job correlation methodology applied at the job level contradicts, rather than supports, his conclusion that compensation is correlated within a job title. These results undermine Dr. Starr's assertion that USPI maintains a compensation structure that would facilitate cascading harm from one or a few Senior Employees to all or nearly all Senior Employees.

## 8. Dr. Starr offers flawed empirical analyses to support his opinions on wage suppression and to calculate damages

232. Dr. Starr presents a set of empirical analyses of Senior Employee compensation that he claims provides estimates of the effect of the Experts'

Assessed SCA-USPI Conduct on Senior Employee compensation.[347] Dr. Starr's analysis does not separately identify effects, if any, of the Experts' Assessed SCA-USPI Mobility Restrictions from effects, if any, of the Experts' Assessed SCA-USPI Information Sharing.[348] He relies on these analyses as quantitative support for (1) his opinion that Defendants have substantial market power over Senior Employees,[349] (2) his opinion that the assessed conduct harmed all or nearly all Senior Employees,[350] and (3) his estimate of the amount by which the assessed conduct harmed all or nearly all Senior Employees.[351] In this section, I address the regression models on which Dr. Starr bases these conclusions. I begin by describing Dr. Starr's regression techniques and show that neither of his methods provides estimates of harm that identify the effect of the Experts' Assessed SCA-USPI Conduct. The estimates he presents are therefore not reliable for determining whether the Experts' Assessed SCA-USPI Conduct affected compensation, for measuring by how much, or for showing that Defendants had the requisite market power to suppress wages. Additionally, he does not analyze nor provide support for a conclusion of compensation suppression resulting from the Alleged USPI Conduct or USPI's Admitted Mobility Restrictions with SCA.[352]

233. In addition to the error that Dr. Starr makes in calculating hours worked, which I describe in Section 7, there are other errors in Dr. Starr's regression data construction. For example, while Dr. Starr testifies that "senior-senior level" executives are excluded from his definition of the class "because they were the ones who coordinated and [] enforced the no-poach agreements[,]"a number of "C-suite" executives, such as Bill Wilcox, USPI's

---

[347] As I describe in Section 2, Dr. Starr's description of the conduct alleged in this case differs from the description of the conduct alleged in the Complaint. In this section, I review Dr. Starr's analysis of the effect of the alleged conduct under his interpretation—that is, his analysis of the effect of Experts' Assessed SCA-USPI Conduct. For simplicity, throughout this section, I refer to the alleged conduct under Dr. Starr's interpretation as the "assessed conduct."

[348] Starr Report, ¶ 106 ("Given that Plaintiffs allege that both elements of the Challenged Conduct (i.e., the No-Poach Agreements and CSI Exchanges) occurred simultaneously, my analysis measures suppressed compensation from the whole of the Challenged Conduct rather than from each individual component.").

[349] Starr Report, ¶ 196 ("In the instant case, the evidence of wage suppression found in Section VI directly demonstrates that Defendants wield market power over Class Members.").

[350] Starr Report, ¶ 12.c ("In Section VII, I develop a series of econometric tests that I developed from the wage suppression model in Section VI, which shows that Defendants' Conduct, which occurred over a 'Conduct Period' defined as 2008 to 2019 for DaVita and SCA and 2010 to 2019 for USPI, harmed all or nearly all Class Members by suppressing their compensation.").

[351] Starr Report, ¶ 12.d ("In Section VIII, I compute aggregate damages to the Class as a whole using classwide methods and data. I employ the standard "but-for world" method of calculating damages to calculate that single damages to the Class sum to $869.5 million over the Conduct Period, which is composed of $631.7 in damages for Class Members at DaVita, $113.9 million in damages for Class Members at SCA, and $123.8 million in damages for Class Members at USPI. ").

[352] On May 14, 2023, USPI provided a list of the position titles that it admitted were "subject to agreements." The set of job titles that Dr. Starr considers Senior Employees and part of the putative class for the purpose of his analysis differs from the list of job titles USPI provided. See Appendix D; Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "In re Outpatient Medical Center Employee Antitrust Litigation, Case No. 1:21-cv-00305," May 14, 2023.

then-CEO, were included in his analysis and damages calculation.[353] I provide a more detailed description of the errors and the corrections that I implement in Appendix C. In the sections that follow, I use a version of Dr. Starr's data with my corrections.[354]

## 8.1. *Overview of regression models and identification of causal effects*

234. Dr. Starr uses two types of regression models to estimate the effect of the assessed conduct on Senior Employee compensation. The first is a before/during/after regression, which compares Senior Employees' compensation during the assessed conduct period to their compensation before and after it. The second is a difference-in-differences regression, which uses changes in manager compensation as a benchmark for how Senior Employee compensation would have changed during the assessed conduct period. Dr. Starr claims these regression models allow him to isolate or separately identify the effect of the assessed conduct from other factors that affect compensation.

235. A regression model can identify the effect of a treatment on an outcome when the treatment is as good as randomly assigned. For example, suppose I wanted to identify the effect of schooling (the treatment) on annual earnings (the outcome), a perennial question in applied economics. The effect I want to measure is how much a person's earnings would change, on average, if we could "either change their schooling in a perfectly controlled environment or change their schooling randomly."[355] The key assumption that allows a regression model to identify this effect is that other factors that affect earnings and may be correlated with education are "known and observed[.]"[356]

236. A before/after analysis (or variants of it) can identify the effect of a treatment on the outcome when everything that affects the outcome, other than the treatment, either remains unchanged or is accounted for with an adequate control variable. Continuing the education and earnings example, suppose a teacher earned more the year after obtaining a master's degree. A before/after analysis would quantify the increase in the teacher's earnings upon receiving the master's degree. So long as nothing else changed, one could attribute the earnings increase to the additional education. However, if the city passed a new budget at the same time, increasing the pay of all teachers, the before/after regression would need to account for the effect of the budget on the teacher's pay in order to

---

[353] Starr Deposition, pp. 119–120.

[354] I do not claim to have identified, let alone corrected, all of the errors in Dr. Starr's compensation data.

[355] Joshua Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics*, (Princeton, NJ: Princeton University Press, 2009) ("Angrist and Pischke (2009)"), p. 53.

[356] Angrist and Pischke (2009), p. 53.

separately identify the effect of the additional education on pay. Without controlling for the budget change, the regression would overstate the effect of the additional education on the teacher's pay by including the effect of the budget change. The overestimate of the effect of interest due to changes in unobserved factors is known as "omitted variables bias."[357]

237. When there are unobserved factors that affect the outcome variable, other regression techniques may be needed to account for them. One such technique is a difference-in-differences regression; difference-in-differences regressions identify the effect of a treatment by comparing changes in the treated group before and after treatment to changes in a "benchmark" group that is affected by the unobserved factors in the same way but was not "treated." In the schooling example above, the earnings of other teachers in the district who did not get master's degrees could be used as a benchmark; by accounting for changes to these teachers' pay, the regression would control for changes that may have been caused by unobserved factors common to all teachers, such as the increase in school funding. A difference-in-differences regression would quantify the incremental increase in pay for the teacher who earned the master's degree relative to the increase in pay of the other teachers. Provided other teachers' pay evolved in the same way the teacher of interest's pay would have evolved absent the additional schooling, this would yield an unbiased estimate of the effect of the master's degree on that employee's earnings.

238. One can attribute the difference-in-differences estimate to the effect of earning a master's degree provided that the change in pay for other teachers in the district represents the increase in pay that the teacher of interest would have received absent the master's degree. However, if the teacher of interest also started teaching summer courses for additional pay, the difference-in-differences regression would need to account for the increased hours worked in order to separately identify the effect of the degree on the teacher's earnings. Without controlling for hours worked, the difference-in-differences regression would overstate the effect of the degree on the teacher's annual earnings by including the effect of increased hours. In other words, the resulting estimate would still suffer from omitted variables bias.

239. This example helps show why, when one is trying to estimate the effect of a "treatment," it is necessary to start with an understanding of relevant economic factors and to tailor the model to account for them. Neither the before/after model nor the difference-in-differences model is inherently

---

[357] Wooldridge (2009), p. 842 ("Omitted Variable Bias: The bias that arises in the OLS estimators when a relevant variable is omitted from the regression."); See also Angrist and Pischke (2009), p. 59 ("The omitted variables bias (OVB) formula describes the relationship between regression estimates in models with different sets of control variables. This important formula is often motivated by the notion that a longer regression—one with controls, such as (3.2.9)—has a causal interpretation, while a shorter regression does not. The coefficients on the variables included in the shorter regression are therefore said to be biased.").

able to show causality or to separately identify the magnitude of a treatment's effect.

240. In the following sections, I describe Dr. Starr's regression models in detail and explain how he uses them to estimate the purported effect of the assessed conduct. I then describe the flaws in his models that make his estimates of the impact of the assessed conduct on USPI's Senior Employees unreliable.

## 8.2. Dr. Starr's before/during/after model

241. Dr. Starr's first regression model—exemplified in his Figure 6—is based on a comparison of Senior Employees' compensation during the assessed conduct period to their compensation before and after the period.[358] Dr. Starr estimates multiple specifications of this regression model; some account for factors such as hours worked, location, and macroeconomic factors that may affect Senior Employee pay.[359] Where Dr. Starr finds that compensation for USPI Senior Employees was lower during the assessed conduct period than before or after it, conditional on the factors in his regression, he attributes the decrease in compensation to the assessed conduct.

242. Dr. Starr estimates his before/during/after regression model on pooled data from all three Defendants. He estimates that Senior Employee compensation across all Defendants was, on average, 9.5 to 14.6 percent lower during the assessed conduct period than outside of it, depending on the factors he accounts for.[360] Dr. Starr then estimates an alternative specification—exemplified in his Figure 8—where he uses pooled data but allows for the impact of the assessed conduct to differ across the three Defendants. In this specification, he estimates that compensation for USPI's Senior Employees was 3.9 to 12.2 percent lower during the assessed conduct period than outside of it, depending on the factors he accounts for.[361] Out of this range of estimates, Dr. Starr uses 12 percent for his damage calculation.[362]

---

[358] For USPI, he analyzes a conduct period of 2010 through 2019; for SCA, he analyzes a conduct period of 2008 through 2019. See Starr Report, ¶ 12.c ("Defendants' Conduct, which occurred over a 'Conduct Period' defined as 2008 to 2019 for DaVita and SCA and 2010 to 2019 for USPI, harmed all or nearly all Class Members by suppressing their compensation.").

[359] Dr. Starr's control factors include average wages for workers in management positions in the healthcare industry in the employee's state, personal consumption expenditures for healthcare in the employee's state, state-level GDP per capita, the unemployment rate in the employee's state, the CPI for the employee's census region, and the year. Dr. Starr adds employee-level fixed effects and a single indicator variable for all years in the alleged conduct period.

[360] Starr Report, Figure 6, p. 116.

[361] Starr Report, Figure 8, p. 119.

[362] Starr Report, Figure 21, p. 164.

243. In the remainder of this section, I describe flaws in Dr. Starr's before/during/after regression model that render his results unreliable.

### 8.2.1. *Errors in Dr. Starr's data affect his results*

244. As a first step in assessing Dr. Starr's analysis, I check whether the data errors that I have identified and corrected affect his results. Exhibit 30 below shows that they do. The first column of Exhibit 30 shows the results Dr. Starr presents in Figure 6 of his report, based on his uncorrected data, and the second column shows the results that obtain when corrected data are used. Dr. Starr's estimate of the effect of the assessed conduct on Senior Employee pay at USPI falls from 14.5 percent to 11.2 percent when the corrections discussed above are made to his regression data.

### 8.2.2. *Dr. Starr inappropriately pools data across Defendants*

245. In estimating his regressions, Dr. Starr pools data from all three Defendants. Dr. Starr's regression accounts for changes in economic conditions through control variables that include the number of hours the Senior Employee worked in a year, state-level healthcare manager earnings, GDP, and CPI indicators as well as national macroeconomic controls including an indicator for the COVID-19 pandemic.[363] He also includes individual fixed effects.[364] In some regression specifications, Dr. Starr estimates a single average effect of the assessed conduct across all Defendants (e.g., Starr Report, Figure 6), and in other specifications he estimates conduct effects that vary by Defendant (e.g., Starr Report, Figure 8). However, in all the before/during/after regressions in the body of his report, he assumes that the changes in the control variables affect Senior Employees of all Defendants in the same way. Dr. Starr does not conduct statistical tests to determine if in fact changes in control variables affect Defendants' Senior Employees in the same way, although such tests exist. As I show below, this untested assumption affects Dr. Starr's conclusions and damage calculations.

246. Academic economics literature has developed standard statistical tests to assess the validity of an assumption such as Dr. Starr's that the control

---

[363] The variables Dr. Starr includes in his before/during/after regression to control for other factors that affect compensation and are not caused by the alleged conduct are a linear time trend, the annual Consumer Price Index (CPI) in the employee's Census Region, the unemployment rate and real Gross Domestic Product (GDP) per capita in the employee's state, average annual earnings of managers in the healthcare field in the employee's state, the Personal Consumption Expenditure on healthcare services per capita in the employee's state, an indicator for the employee's ZIP Code, the log of their total hours worked, the year, and a single indicator variable for the years 2020 and 2021, meant to account for the effect of the COVID pandemic on compensation in those two years. See Starr Report, pp. 106–109.

[364] Starr Report, ¶ 119.a ("I include individual fixed effects to mimic the ideal comparison. Inclusion of individual fixed effects means the regression model compares the same worker during and absent the Conduct Period.").

variables he selected affect all three Defendants' Senior Employees in the same way.[365] I implement one such test on Dr. Starr's regression, and the test rejects Dr. Starr's assumption that the control variables he selected affect all three Defendants' Senior Employees in the same way.[366] This result indicates that Dr. Starr's primary regression model that he uses to calculate alleged damages is mis-specified and, as I show below, yields misleading results.

247. In the appendix to his report, Dr. Starr estimates a version of his before/during/after regression where he estimates the effect of most control variables separately by Defendant.[367] This regression yields smaller estimates of the assessed conduct, ranging from 2.6 to 8.9 percent alleged wage suppression for USPI, compared to 3.9 to 12.2 percent from Dr. Starr's main specification.[368] Even in this specification, Dr. Starr assumes that the time trend and location affect Senior Employees in the same way across firms.

248. Exhibit 30 below shows the results of estimating Dr. Starr's before/during/after regression on data for USPI only, which allows the regression to estimate the effect of changes in the control variables on compensation specifically for USPI Senior Employees.[369] Dr. Starr's conduct effect estimate for USPI falls from 11.2 percent to 4.9 percent.[370] When I estimate Dr. Starr's regression on data for USPI alone, the effect is 5.4 percent, similar to this sensitivity. For the remainder of this section, I consider modifications of Dr. Starr's regression models starting from a baseline of his model estimated on data for USPI alone and implementing the corrections to his data.

---

[365] I use a statistical test applied to regression coefficients called the Chow test. The Chow test assesses whether the "same relationship holds for two different groups of economic units," in this case, whether Dr. Starr's controls affect USPI, SCA, and DaVita in the same way. See, e.g., Gregory C. Chow, "Tests of Equality Between Sets of Coefficients in Two Linear Regressions," *Econometrica*, 28(3), 1960, pp. 591–605 at p. 591 ("When a linear regression is used to represent an economic relationship, the question often arises as to whether the relationship remains stable in two periods of time, or whether the same relationship holds for two different groups of economic units. Is the consumption pattern of the American people today the same as it was before World War II? Do the firms in the steel industry and the firms in the chemical industry have similar dividend policies? Statistically these questions can be answered by testing whether two sets of observations can be regarded as belonging to the same regression model.").

[366] I performed a Chow test on Dr. Starr's before/during/after model that permits the conduct effects to vary across Defendants, testing the restriction that the effects of the other covariates (other than the conduct dummy) are equal across Defendants. The Chow test rejects this restriction above the 99% confidence level. See Workpaper 6.

[367] See Starr Report, Figure 29, p. 218.

[368] See Starr Report, Figures 8, 29, pp. 119, 218.

[369] A fully interacted regression model, which permits different regression coefficients on all regressors for each Defendant, yields mathematically identical results to what one would obtain estimating separate regressions for each Defendant. For simplicity, therefore, I estimate regressions on data for USPI alone. Note that Exhibit 30 does not report the coefficient estimates for all of Dr. Starr's controls; for a more complete set of parameter estimates from these regressions, Workpaper 18.

[370] See Starr Report, Figure 29, p. 218.

*Exhibit 30*
*Dr. Starr's before/during/after regression model estimated on data for USPI only*

| | (1) Figure 6: Model 4 Uncorrected Data All Defendants | (2) Figure 6: Model 4 Corrected Data All Defendants | (3) Figure 29: Model 3 Uncorrected Data All Defendants | (4) Figure 29: Model 3 Corrected Data All Defendants | (5) Figure 6: Model 4 Corrected Data USPI Only |
|---|---|---|---|---|---|
| Conduct | -0.157*** | -0.119*** | | | |
| | (0.0117) | (0.0109) | | | |
| % Wage Suppression | -14.5% | -11.2% | | | |
| | | | | | |
| USPI Conduct | | | -0.0936*** | -0.0506*** | -0.0550*** |
| | | | (0.0129) | (0.0110) | (0.0112) |
| % Wage Suppression | | | -8.9% | -4.9% | -5.4% |
| | | | | | |
| Year | 0.0522*** | 0.0559*** | 0.0571*** | 0.0539*** | 0.0562*** |
| | (0.00379) | (0.00373) | (0.00658) | (0.00632) | (0.00520) |
| Ln(Total Hours) | 0.570*** | | 0.848*** | | |
| | (0.0270) | | (0.0322) | | |
| Ln(Corrected Total Hours) | | 0.830*** | | 0.897*** | 0.768*** |
| | | (0.0258) | | (0.0416) | (0.0425) |
| Defendant-Specific Conduct Effects | No | No | Yes | Yes | Yes |
| Healthcare and Macro Controls | Yes | Yes | Yes | Yes | Yes |
| Individual-by-Company FE | Yes | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes | Yes |
| Observations | 27,010 | 25,959 | 27,010 | 25,959 | 7,289 |
| R-squared | 0.856 | 0.873 | 0.867 | 0.876 | 0.893 |

Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 6 and Figure 29 models are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's Figure 29 regression is a sensitivity of the regression in Figure 6 where he allows many of the estimated coefficients to vary by Defendant. Dr. Starr's regression data contain errors in assigning hours worked, job title, location, and department to employees. Column 1 uses uncorrected versions of these fields while columns 2, 3, and 4 use corrected versions.

### 8.2.3. Dr. Starr's results are driven by the end-date he selects for the Experts' Assessed SCA-USPI Conduct period

249. Dr. Starr's before/during/after regression compares compensation of Senior Employees during the assessed conduct period to their compensation outside the period. To make this comparison, Dr. Starr must first define the time period over which the conduct took place. He defines the conduct period based on instructions from counsel but opines that the evidence is "consistent with those dates."[371]

---

[371] Starr Deposition, pp. 69 ("[C]ounsel provided me with the start dates and the end dates for the class period, and I am assessing whether the qualitative evidence is consistent with that start date here."), 241–242 ("So to be clear, I don't have any conclusions on the end dates and the dates of the conduct. I don't have any opinions on that. Counsel provided me with -- with the dates, and so what I've done in this section -- in the prior section was look at the qualitative evidence to see if it's consistent with those dates. And in figure 3 I'm looking at year-by-year evidence to see if we find something that's consistent with an end date of 2019.").

250. The start of **Dr. Starr's** assessed conduct period, May 2010, coincides with the start of USPI's Admitted Mobility Restrictions with SCA,[372] as well as the start of the Alleged SCA-USPI Mobility Restrictions.[373]

251. By contrast, for the end of his assessed conduct period, he chooses a date (2019) that does not align with either the allegations (2021),[374] the admission (2017),[375] or the DOJ's indictment (again, 2017).[376] It also conflicts with documentary evidence, cited by Dr. Starr himself, that USPI abandoned the mobility restrictions with SCA in October 2017.[377] According to USPI's **contemporaneous** email communications, USPI was no longer upholding the agreement and was instead actively recruiting SCA employees for all positions starting in October 2017.[378]

252. While Dr. Starr cites record evidence to support his **statement** that "USPI appears to have stopped enforcing the agreement eight months later, in or around October 2017[,]"[379] he cites no record evidence to support his claim that SCA continued to uphold it.[380] Dr. Starr states, "[t]he record evidence

---

[372] Starr Report, ¶ 76.a ("Former SCA CEO Hayek and former USPI CEO Bill Wilcox established the SCA-USPI No-Poach Agreement no later than May 2010."); USPI and Tenet's Answer to the Third Amended Complaint, ¶ 7 ("USPI and Tenet admit that, from May 2010 until October 2017, USPI was a party to the USPI/SCA Agreement").

[373] Complaint, ¶ 49 ("No later than May 2010, Mr. Hayek established a no-poach agreement with his counterpart at USPI to eliminate competition between the companies for each other's employees, by not actively soliciting each other's employees."). Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, January 5, 2021 ("SCA Indictment"), ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017 ... SCA and [USPI] entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.").

[374] Complaint, ¶ 38 ("From May 2008 through January 2021, SCA, USPI, and DaVita conspired to reduce and limit compensation and mobility of their employees.").

[375] USPI and Tenet's Answer to the Third Amended Complaint, ¶ 7 ("USPI and Tenet admit that, from May 2010 until October 2017, USPI was a party to the USPI/SCA Agreement").

[376] SCA Indictment, ¶ 9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017 ... SCA and [USPI] entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.").

[377] See Starr Report, ¶¶ 80.c.ii–80.c.iii ("On October 22, 2017, Sandi Karrmann, then USPI's Chief Human Resource Officer, sent an email to [Bill] Wilcox and others reminding them the DOJ was cracking down on no-poach agreements and that USPI shouldn't enforce them anymore. ... The following day, USPI's then-VP of Talent Acquisition [Shannon] Mosley emailed an external recruiter to instruct, 'Please disregard the non-poaching agreement between USPI and SCA. I give you permission to recruit out of SCA going forward.' ... Further, in an October 2017 email chain, Mosley informed USPI's then-primary internal recruiter McGarry that McGarry was now allowed to recruit administrators from SCA, to which McGarry responded, 'Great. Yay!!'").

[378] See, e.g., email thread from Shannon McGarry to Shannon Mosley, "RE: SCA," October 24, 2017, USPI_CIV_000003394 ("October 23, 2017 ... You [Shannon McGarry, internal USPI recruiter] can now recruit Administrators from SCA – Surgical Care Affiliates."); Email from Shannon Mosley to Megan Fox and Miles Freeman, "SCA," October 23, 2017, USPI_CIV_000006432 ("Please disregard the non-poaching agreement between USPI and SCA. I give you [Megan Fox and Miles Freeman, external USPI recruiters] permission to recruit out of SCA going forward.").

[379] Starr Report, ¶ 80.c.ii.

[380] Dr. Starr claims that a regression of switching probabilities on year dummies provides evidence that the alleged conduct ended in 2019, but, for several reasons, it does not. First, if the Alleged Three-Party Mobility Restrictions had a meaningful effect on mobility between USPI and SCA, whether a year is within or outside of the conduct period should explain some of the differences in mobility over time. To the contrary, Dr. Starr's regression explains less than 1 percent of the variation in employee switching, as indicated by its R-squared; 99.8 percent of the variability in employee switching probabilities over time is unrelated to the year. Second, his results are inconsistent with his claim that the non-solicitation agreement restricted employee mobility because it finds an increase in the likelihood of

suggests that the SCA-USPI No-Poach Agreement fully ended in or around 2019,"[381] but he cites no evidence it was in force beyond October 2017. He claims that "SCA appeared to continue enforcing the agreement through 2019,"[382] and states "[i]t is *possible* that the No-Poach Agreement continued [beyond 2017] and that SCA still upheld its end of the bargain[,]"[383] but provides no documentary support for this inference. It is also possible that SCA, like USPI, ceased upholding the agreement in 2017. SCA's then CEO, Andrew Hayek, testified that when he left the CEO post in 2017,[384] he did not assume that "[]either of the two agreements [with DaVita and with USPI] ... were in place or effective or relevant."[385] Mr. Hayek's successor, Anthony Kilgore, testified that Hayek did not "ever tell [him] that SCA and USPI had reached an agreement not to hire or recruit each other's employees[.]"[386]

253. Even assuming that Dr. Starr was correct, and SCA continued to uphold the Experts' Assessed SCA-USPI Mobility Restrictions for two years while USPI actively recruited its Senior Employees, one would expect that the effect of the assessed conduct on pay would fall once USPI ceased participating. This hypothesis provides a test for whether Dr. Starr's regression model is identifying the effect of the assessed conduct on pay, or whether his conduct coefficient reflects other, unrelated changes over time that are not controlled for in the model.

254. I modified Dr. Starr's regression to allow for a decreased effect of the assessed conduct during the two years in which USPI was no longer participating. My regression simply adds to Dr. Starr's specification a single dummy variable for the 2018–2019 period. Because Dr. Starr's 2010–2019 dummy variable remains in the regression, the coefficient on the 2018–2019 dummy is interpreted as the differential effect of the conduct in 2018–2019 relative to its effect in 2010–2017. If Dr. Starr's regression were identifying the effect of the assessed conduct, then one would expect to see an attenuated effect after USPI resumed recruiting SCA employees. In the

---

switching when the agreement begins. According to Dr. Starr's Figure 3, the probability of Senior Employees switching between USPI and SCA was higher in nine of the 10 alleged conduct years than it was in 2009, before the alleged agreement began. Last, his regression does not find a significant difference between the mobility rate in 2019 and 2020— – the years before and after the end of his alleged conduct period.

[381] Starr Report, ¶ 80.c.

[382] Starr Report, ¶ 80.c.

[383] Starr Report, ¶ 80.v, italics added.

[384] Deposition of Andrew P. Hayek (SCA), September 18, 2024 ("Hayek Deposition") p. 35 ("[A]fter the acquisition, I took on a much broader role at Optum, as the CEO of Optum Health, and then continued to hold the SCA CEO title through the end of 2017.").

[385] Hayek Deposition, pp. 328–329 ("From my perspective, I considered it an agreement with DaVita, and I considered it an agreement with USPI, and I sought to follow it. And, you know, as I shared earlier, when I moved on from my role [] at SCA, I was no longer CEO, neither of the two agreements did I assume were in place or effective or relevant. And so, you know, I just - - the agreements each started and then, you know, they had - - as I shared with you earlier, the ended effectively when I was outside of my role.").

[386] Deposition of Anthony Kilgore (SCA), October 22, 2024 ("Kilgore Deposition") pp. 58–59.

regression, an attenuated effect would show up as a *positive* coefficient on the 2018–2019 differential effect dummy, indicating that compensation was less suppressed during this period.

255. The results of this modification are shown in Exhibit 31 below. Column 1 of this exhibit reports the results based on Dr. Starr's regression for USPI only. Column 2 reports the results based on Dr. Starr's regression for USPI with the 2018–2019 incremental effect dummy. As shown in the first column of Exhibit 31, once restricted to the corrected USPI data, Dr. Starr's model finds a 5.4 percent conduct effect for the entire period. When the model is updated to allow for a differential effect in 2018–2019, it estimates that there was a 5.2 percent conduct effect for the entire period, plus an additional 3.8 percent wage suppression effect during the 2018–2019 period, for a total conduct effect of 9.0 percent. Thus, Dr. Starr's model finds that the degree of wage suppression increased 73 percent (an additional 3.8 percent on a base of 5.2 percent) *after*—according to USPI's admissions, the DOJ complaint, and the documents Dr. Starr cited—USPI stopped enforcing the agreement. The fact that Dr. Starr's model finds a significantly larger effect during this period provokes skepticism that the conduct effect Dr. Starr estimates is separately identifying the effect of the assessed conduct (if any) from the effect of other time-varying factors that affect pay and are not included in the regression.

256. In Column 3 of Exhibit 31, I show the results of running Dr. Starr's regression assuming that the end of the conduct period is 2017, the end-date cited in USPI's Admitted Mobility Restrictions with SCA. Here, Dr. Starr's regression does not find a conduct effect that is statistically significantly different from zero. This result is not surprising given that Column 2 shows that Dr. Starr's regression finds that the degree of compensation suppression *increased* after 2018, which, as noted above, suggests that Dr. Starr's analysis is not isolating the effect of the assessed conduct. Nonetheless, it provides further evidence that his regression is not isolating the effect of the assessed conduct.

***Exhibit 31***
***Dr. Starr's before/during/after regression model allowing for a differential conduct effect in 2018–2019***

| | Figure 6: Model 4 | | |
| | (1) | (2) | (3) |
| | **Constant Conduct Effect 2010–2019** | **Differential Conduct Effect 2018–2019** | **Constant Conduct Effect 2010–2017** |
|---|---|---|---|
| Conduct 2010–2019 | -0.0550*** | -0.0531*** | |
| | (0.0112) | (0.0111) | |
| **% Wage Suppression** | **-5.4%** | **-5.2%** | |
| | | | |
| Conduct 2018–2019 | | -0.0392*** | |
| | | (0.0102) | |
| **% Wage Suppression** | | **-3.8%** | |
| | | | |
| Conduct 2010–2017 | | | 0.00692 |
| | | | (0.00746) |
| **% Wage Suppression** | | | **0.7%** |
| | | | |
| Year | 0.0562*** | 0.0608*** | 0.0474*** |
| | (0.00520) | (0.00543) | (0.00467) |
| Ln(Corrected Total Hours) | 0.768*** | 0.766*** | 0.768*** |
| | (0.0425) | (0.0425) | (0.0424) |
| | | | |
| Healthcare and Macro Controls | Yes | Yes | Yes |
| Individual-Company FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |
| Observations | 7,289 | 7,289 | 7,289 |
| R-squared | 0.893 | 0.893 | 0.892 |

Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** $p<0.01$, ** $p<0.05$, * $p<0.1$. Regression results using Dr. Starr's Figure 6 model 4 on USPI employees are shown. Dr. Starr's regression data contain errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

### 8.2.4. *Dr. Starr's results are affected by his treatment of the COVID pandemic*

257. The COVID pandemic also complicates Dr. Starr's before/during/after model because the start of the pandemic coincides with the end of his alleged conduct period. As I describe above, when there is an unmeasured factor affecting pay that covaries with the conduct period—as the pandemic does here—the regression will yield a biased estimate of the conduct period effect. Dr. Starr correctly notes that "[i]f [he] did not control for the timing of COVID, the changes in the labor market created by the COVID pandemic might otherwise confound the Conduct estimate."[387] Dr. Starr controls for the COVID pandemic in a very rigid way, allowing for it to have just a single, constant impact on compensation for 2020 and 2021.

258. In the U.S., the COVID pandemic began in early 2020,[388] and according to a growing body of research, its effects on the economy—and the labor

---

[387] Starr Report, ¶ 120.d.

[388] Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," July 8, 2024, available at https://www.cdc.gov/museum/timeline/covid19.html, accessed on April 3, 2025 ("January 20, 2020[:] CDC reports the first laboratory-confirmed case of the 2019 Novel Coronavirus in the U.S. from samples taken on January 18").

market in particular—were both varied and persistent. The pandemic affected employment and compensation, but the effects varied by region, industry, and job level.[389]

259. Economic impacts also varied over time. As the pandemic continued, some workers continued to lose income but some began receiving stimulus payments and Federal Pandemic Unemployment Benefits.[390] While it is true that the COVID mortality rate waned in 2022,[391] the economic effects of the pandemic on the labor market and the healthcare industry persisted. For example, the labor force participation rate fell by a record-breaking amount early in the pandemic, but rather than recovering quickly, it remained well below pre-pandemic levels into 2022.[392] The pandemic also gave rise to an increased rate of job quits in a phenomenon known as the "Great Resignation,"[393] and the quit rate notched its highest recorded level in March 2022,[394] after December 2021, when Dr. Starr stops controlling for any pandemic-related effects in his regression.[395]

---

[389] See, e.g., Sarah Albert, Andrew Foerster, and Pierre-Daniel G. Sarte, "Employment Effects of COVID-19 Across States, Sectors," *FRBSF Economic Letter*, November 22, 2021, available at https://www.frbsf.org/wp-content/uploads/el2021-32.pdf, accessed April 15, 2025 ("The COVID-19 pandemic led to dramatic declines in employment in both goods-producing and service-providing sectors, and the recovery in employment has continued but is still incomplete. Job dynamics in each sector have differed. Likewise, states have experienced widely dissimilar trajectories in both employment losses and in the recovery."); Sang Yoon Lee, Minsung Park, and Yongseok Shin, "Hit Harder, Recover Slower? Unequal Employment Effects of the COVID-19 Shock," *Federal Reserve Bank of St. Louis Review*, 103(4), 2021, pp. 367–383 at p. 367 ("The destructive economic impact of the COVID-19 pandemic was distributed unequally across the population."). See also Thomas J. Bollyky, et al., "Assessing COVID-19 Pandemic Policies and Behaviours and Their Economic and Educational Trade-Offs Across US States from Jan 1, 2020, to July 31, 2022: An Observational Analysis," *The Lancet*, 401, 2023, pp. 1341–1360 at p. 1352 ("As with cumulative infection and death rates, there was a great deal of variation across the USA regarding relative decline in state GDP [and the] state employment rate[.]"). Dr. Gerhart agreed that the COVID-19 pandemic impacted labor markets, stating that "in the labor market, there's always parts that do better and some that don't do as well; but, yes, the pandemic had an effect." Gerhart Deposition, pp. 56–57.

[390] Thesia I. Garner, Adam Safir, and Jake Schild, "Receipt and Use of Stimulus Payments in the Time of the Covid-19 Pandemic," *Beyond the Numbers: Prices & Spending*, 9(10), 2020 ("Of the 48 percent of respondents reporting a loss of income since March 13, [2022,] the majority (81 percent) reported using their stimulus payment mostly for expenses, as opposed to paying off debt or adding to savings, as might be expected. The resources they used to meet their spending needs were more diverse than those not reporting a loss of income.").

[391] See, e.g., Centers for Disease Control and Prevention, "COVID Data Tracker," available at https://covid.cdc.gov/COVID-DATA-TRACKER/#trends_weeklydeaths_testpositivity_00, accessed on April 1, 2025.

[392] Miguel Faria-e-Castro and Samuel Jordan-Wood, "Pandemic Labor Force Participation and Net Worth Fluctuations," *Federal Reserve Bank of St. Louis Review*, 106(1), 2024, pp. 40–58 at p. 40 ("The US labor force participation rate (LFPR) experienced a record drop during the early pandemic. While it has since recovered to 62.2 percent as of December 2022, it was still 1.41 percentage points below its pre-pandemic peak.").

[393] See, e.g., Vincent Amanor-Boadu, "Empirical Evidence for the 'Great Resignation'," *U.S. Bureau of Labor Statistics: Monthly Labor Review,* November 2022, available at https://doi.org/10.21916/mlr.2022.29, accessed on April 16, 2025.

[394] U.S. Bureau of Labor Statistics, "Job Openings and Labor Turnover – March 2022," May 3, 2022, available at https://www.bls.gov/news.release/archives/jolts_05032022.pdf, accessed on April 15, 2025, ("In March [2022], the number of quits edged up to a series high of 4.5 million"). See also the quits rate for total nonfarm payrolls, generally (Federal Reserve Bank of St. Louis, "Quits: Total Nonfarm," available at https://fred.stlouisfed.org/series/JTSQUR, accessed on April 15, 2025), and for the healthcare and social assistance industry, specifically (Federal Reserve Bank of St. Louis, "Quits: Health Care and Social Assistance," available at https://fred.stlouisfed.org/series/JTS6200QUL, accessed on April 15, 2025).

[395] Dr. Gerhart also testified that there were "lasting impacts" of the COVID pandemic on labor markets that continued into 2022. See Gerhart Deposition, p. 58 ("Q. [] Would you agree that, to some extent, the impacts of

260. Effects of the pandemic persisted in the ASC industry in particular. During the pandemic and for some time after, Americans deferred elective healthcare procedures, including many of the kind of surgeries performed at ASCs. This eventually caused a dramatic rise in demand for elective procedures.[396] Patients who had put off their healthcare needs during the pandemic caused a backlog of demand that extended into 2021 and 2022 and even beyond.[397]

261. Dr. Starr assumes that the pandemic had a constant effect on Senior Employee pay through 2020 and 2021 and that the effect went to zero in 2022. He justifies this choice by stating, "I do not include the year 2022 in the COVID indicator variable because, per a 2022 Johns Hopkins review: 'In 2022, COVID-19 illness was less severe and less deadly compared to 2020 and 2021, and no new variant has emerged with the capacity to fuel a major wave of cases.'"[398] However, Dr. Starr performed no analysis to determine, and has no opinion regarding, when labor markets recovered from the effects of the pandemic.[399]

262. A more flexible way to control for the effect of the pandemic on wages would be to allow its effect to persist, and perhaps differ, into 2022. To allow for the persistence of effects from the pandemic—but also for the possibility that effects had ended by 2022—I estimated Dr. Starr's model adding a separate COVID pandemic indicator for 2022. The results are shown in Exhibit 32. When Dr. Starr's assumption that the effect of the pandemic on compensation was zero in 2022 is relaxed, his estimate of the effect of the assessed conduct on pay falls to -1.1 percent, and becomes not statistically significantly different from zero. Unsurprisingly, the coefficient on the 2022 pandemic dummy is highly statistically significant. Dr. Starr would assume that this reflects changes due to the end of the conduct, but

---

COVID-19 in labor markets continued into 2022 and even after that? ... [A.] Yes, I think there were some lasting impacts.").

[396] For example, there was an estimated backlog of 1 million elective orthopedic surgeries in the U.S. by mid-2022. See Amit Jain, Punya Jain, and Shruti Aggarwal, "SARS-CoV-2 Impact on Elective Orthopaedic Surgery: Implications for Post-Pandemic Recovery," *The Journal of Bone and Joint Surgery*, 102(13), 2020, pp. e68(1)–e68(5). For another, there was an estimated backlog of 1.1 to 1.6 million elective cataract procedures in the U.S. by mid-2022. See Shruti Aggarwal, Punya Jain, and Amit Jain, "COVID-19 and Cataract Surgery Backlog in Medicare Beneficiaries," *Journal of Cataract & Refractive Surgery*, 46(11), 2020, pp. 1530–1533.

[397] Sriparna Roy and Bhanvi Satija, "US Hospitals See Post Pandemic Catch-up Behind Insurer Healthcare Costs," *Reuters*, February 13, 2024, available at https://www.reuters.com/world/us/us-hospitals-see-post-pandemic-catch-up-behind-insurer-healthcare-costs-2024-02-13/, accessed on April 9, 2025 ("Americans are catching up on healthcare missed during the COVID-19 pandemic, a trend driven by heart procedures and outpatient orthopedic surgeries that likely won't soon slow, according to interviews with three hospital officials in major U.S. cities, but other factors may also be at play. ... Officials from three hospitals - Providence health system headquartered in Renton, Washington, and Boston's Brigham and Women's Hospital and Tufts Medical Center - said the post pandemic 'catch-up' trend is occurring across age groups. ... Several also said the pandemic may have accelerated the shift to outpatient and offsite surgeries.").

[398] Starr Report, Footnote 407.

[399] Starr Deposition, pp. 396 ("I don't have an opinion on exactly the timing of when the labor market recovered from [] the pandemic."), 399 ("I have not done an analysis of exactly how the labor markets have -- the timing of which [] they were corrected. I've not done that.").

it may reflect persistent effects of and policy responses to the pandemic. His damages estimate relies on the assumption that the latter is zero.

**Exhibit 32**
**Dr. Starr's before/during/after regression model allowing the effect of the COVID-19 pandemic to continue into 2022 – Dr. Starr's Assessed Conduct period (2010–2019)**

| | **Figure 6: Model 4** | |
| --- | --- | --- |
| | **(1)** <br> **2020–2021 Covid Dummy** | **(2)** <br> **2020–2021 Covid Dummy And 2022 Covid Dummy** |
| Conduct | -0.0550*** <br> (0.0112) | -0.0111 <br> (0.0135) |
| **% Wage Suppression** | **-5.4%** | **-1.1%** |
| 2020–2021 Covid Dummy | -0.0222 <br> (0.0192) | 0.0736** <br> (0.0331) |
| 2022 Covid Dummy | | 0.177*** <br> (0.0456) |
| Year | 0.0562*** <br> (0.00520) | 0.0594*** <br> (0.00533) |
| Ln(Corrected Total Hours) | 0.768*** <br> (0.0425) | 0.766*** <br> (0.0425) |
| Healthcare and Macro Controls | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Observations | 7,289 | 7,289 |
| R-squared | 0.893 | 0.893 |

Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 6 model 4 on USPI employees are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's regression data contains errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

### 8.2.5. Excluding post-admitted-conduct period data from Dr. Starr's regression

263. As I explain above, whether 2018, 2019, or 2020 belong in the conduct period or outside of it is in dispute, and the answer matters. It is also clear that how one controls for the effects of the COVID pandemic on compensation matters. As I show in Exhibit 32, Dr. Starr's regression results vary between 1.1 percent (and not statistically significantly different from zero) and 5.4 percent depending on whether the effect of the pandemic is permitted to persist into 2022. This makes it difficult to use a comparison of the "during" period data and the "after" data to estimate the effect of the assessed conduct on Senior Employee pay.

264. By contrast, Plaintiffs' experts do not dispute that the start date of USPI's conduct is 2010. Therefore, it may be preferable to run Dr. Starr's regression on the "before" and "during" data only. As I explain above, comparing "before" and "during" data is a standard way to estimate the effect of a treatment on an outcome when "after" treatment period data are unavailable or are contaminated by other factors for which one cannot control. Moreover, if Dr. Starr's regression adequately controls for factors that affect USPI wages and that change over time (i.e., if his regression model is capable of identifying the effect of the assessed conduct), then a before/during regression using only the pre-period as a benchmark would yield an unbiased estimate of the true parameters of the model, and therefore of the effect of the assessed conduct.[400]

265. Exhibit 33 below shows the results of running Dr. Starr's before/during/after regression on data from the "before" and "during" periods only. This regression uses the change in compensation that occurred when the assessed conduct period began to estimate the assessed conduct effect.

266. Because data for 2018 through 2022 are excluded from this version of Dr. Starr's regression, this regression is agnostic about whether the conduct period ended in 2017, 2019, or 2021. Furthermore, because the 2020–2021 data are excluded, it is also agnostic about the correct way to control for the effects of the COVID pandemic. If Dr. Starr's regression were correctly specified (i.e., if his model controlled for all factors that changed over time and are unrelated to the Experts' Assessed SCA-USPI Conduct), this model would yield an unbiased estimate of the conduct effect even if Dr. Starr were correct about both the end-date and the control for the pandemic. I find the wage suppression effect estimated by this model is 1.5 percent and not statistically significantly different from zero.

---

[400] American Bar Association (2017), pp. 183–184 ("Sometimes data might exist on several unaffected periods. For example, data may exist not only for the before period, but also for an after period. With more than one unaffected period, the question arises as to whether one should combine the two unaffected periods and, if not, then which of the two unaffected periods should be compared to the affected period. In general, the before and after periods should be combined, if appropriate, since that will result in a larger sample and more precise estimates. However, it is appropriate to combine the periods only if the model is stable across them. Although there are many ways that one might assess whether the model prediction model is stable across the two time periods (e.g., testing all or some of the coefficients for equality), the most informative test is likely to test whether a prediction model estimated using only the before period would yield the same overcharge estimates as a prediction model estimated using only the after period. If such equivalence of the before and after models cannot clearly be established, attempting to combine the before and after period to predict the path of prices 'in the middle' (during the alleged anticompetitive act) is inadvisable, as prediction are likely to be unreliable."). See also Wooldridge (2009), pp. 99 ("In section 3.3. we derived the bias induced by leaving out a relevant variable when the true model contains two explanatory variables."), 100 ("The case where $\beta_2 \neq o$ is more difficult. Leaving $x_2$ out of the model results in a biased estimator of $\beta_1$. Traditionally, econometricians have suggested comparing the likely size of the bias due to omitting $x_2$ with the reduction in the variance—summarized in the size of $R_1^2$ —to decide whether $x_2$ should be included. However, when $\beta_2 \neq O$, there are two favorable reasons for including $x_2$ in the model. The most important of these is that any bias in $\tilde{\beta}_1$ does not shrink as the sample size grows; in fact, the bias does not necessarily follow any pattern. Therefore, we can usefully think of the bias as being roughly the same for any sample size. On the other hand, Var($\tilde{\beta}_1$) and Var($\hat{\beta}_1$) both shrink to zero as $n$ gets large, which means that the multicollinearity induced by adding $x_2$ becomes less important as the sample size grows. In large samples, we would prefer $\hat{\beta}_1$.").

*Exhibit 33*
*Dr. Starr's before/during/after regression model on "before" and "during" data only*

|  | (1)<br>Figure 6: Model 4<br>2005–2017 |
|---|---|
| Conduct | -0.0155 |
|  | (0.0152) |
| **% Wage Suppression** | **-1.5%** |
|  |  |
| Year | 0.0688*** |
|  | (0.0102) |
| Ln(Corrected Total Hours) | 0.580*** |
|  | (0.0683) |
|  |  |
| Healthcare and Macro Controls | Yes |
| Individual-Company FE | Yes |
| Location FE | Yes |
| Observations | 4,598 |
| R-squared | 0.891 |

Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 6 model 4 on USPI employees are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's regression data contains errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

## 8.3. Dr. Starr's difference-in-differences model

267. As I describe in the opening to this section, regressions do not inherently show causality or yield unbiased estimates of causal effects. For Dr. Starr's regression results to represent an unbiased estimate of the effect of the assessed conduct on compensation, his control variables must account for factors not caused by the assessed conduct that are correlated with the conduct period and affect Senior Employee compensation. If important factors are omitted, then Dr. Starr's estimate will reflect a combination of the effect of the assessed conduct and the effect of the omitted factors—in other words it will suffer from omitted variables bias. Dr. Starr describes his difference-in-differences regression model as a way to "assess" this bias.[401]

268. Because Dr. Starr's regression attempts to explain movements in compensation over an 18-year period—during which there were many changes in the economy overall and the healthcare industry in particular—

---

[401] Starr Report, ¶ 132 ("To assess the potential for unobserved variables to be responsible for the observed relationships above, I deploy [a difference-in-differences] approach designed to not only account for such omitted variables, but also to plausibly provide a lower-bound estimate of the effect of the Challenged Conduct on Class compensation.").

it is likely that there are many factors that affect compensation.[402] For example, **Dr. Starr's** regression period includes the "Great **Recession,**" the COVID pandemic, **the "Great Resignation,"** and changes to government policy regarding coverage for procedures performed at ASCs.[403] It also includes the dates USPI went private (2007)[404] and was purchased by Tenet (2015).[405]

269. To "assess the potential" that his results are biased by omitted factors,[406] Dr. Starr estimates a difference-in-differences style regression model, exemplified in his Figure 9. As explained in the opening to this section, difference-in-differences models provide a way to account for factors that affect pay but are not directly included in the model by comparing the changes in compensation for a "treated" population **with** changes for a benchmark—another group that was similarly affected by the omitted factors but were not "treated." As a benchmark for Senior Employees, Dr. Starr uses managers, who were not targets of the Alleged USPI Conduct,[407] and his difference-in-differences model estimates the amount by which compensation for Senior Employees diverged from that for managers during the assessed conduct period, conditional on his control variables.

270. The result from this regression is an estimate of the amount by which the **two groups' pay diverged, conditional on the controls.** This result can be taken as an unbiased estimate of the effect of the assessed conduct on Senior Employee pay provided certain conditions are met: (1) manager

---

[402] The USPI compensation data run from 2005 to 2022, while the SCA compensation data run from 2008 to 2022. Dr. Starr includes the entire 2005–2022, 18-year time period in most of his compensation regressions.

[403] Anna L. Goldman, Michael K. Paasche-Orlow, and Frederick Thurston Drake, "Affordable Care Act Medicaid Expansion and Access to Outpatient Surgical Care" *JAMA Surgery*, 155(11), 2020, pp. 1066–1067 ("Medicaid expansion through the Affordable Care Act (ACA) has provided insurance coverage to approximately 10 million low-income Americans since it was implemented in January 2014. To date, 36 states and the District of Columbia have opted to expand their Medicaid coverage. The ACA has been a boon for surgical care in Medicaid expansion states.").

[404] CNBC, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," August 5, 2010, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 1, 2025.

[405] Tenet Health, "Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx, accessed on April 1, 2025.

[406] Starr Report, ¶ 132 ("[A] remaining question is whether the estimates above are susceptible to 'omitted variable bias,' which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation. To assess the potential for unobserved variables to be responsible for the observed relationships above, I deploy an approach designed to not only account for such omitted variables, but also to plausibly provide a lower-bound estimate of the effect of the Challenged Conduct on Class compensation.").

[407] Of the managers identified by Dr. Starr, 92 percent were employed at specific ASCs or other facilities, and therefore, their pay was likely determined partly by the physician co-owners of the facilities. See Workpaper 17. See also, e.g., Karrmann Deposition, pp. 42–43 ("Q. Now, just give me a general description of how merit increases were instituted at USPI? A. To clarify, for any specific population or in general? Q. Well, were there different processes for different populations? A. We had one approach and we had different processes. One approach was there was an overall merit budget for the organization. But centers looked at their own pay and determined their own pay. ... Q. [] And when you said the centers could determine their individual increases, within that budget; correct? They could have an overall 2 percent increase, which they could divvy up amongst their employees as they deemed fit; is that fair? ... [A.] Yes. However, at individual centers, physician owners also had input. And I can't speak to -- we didn't manage centrally, ultimately, the decisions that each center made about their employee increases.").

compensation must have followed the same path as Senior Employee compensation over time, relative to observed and unobserved factors, but for the assessed conduct; and (2) manager compensation must not have been affected by the conduct.

271. Dr. Starr recognizes the second condition when he notes "[t]he downside to this approach is that Managers may also be directly or indirectly affected by the Conduct via intra-firm pay structures ... In that case, differencing between Class Members and Managers will provide *a lower bound* estimate of the effect of the Conduct on Senior-Level Employees."[408] Note that in this case, his gross conduct effect estimate would be an *upper bound* estimate. But Dr. Starr's regression only provides an unbiased estimate of the effect, or upper and lower bound estimates, if the *first* assumption also holds. Dr. Starr does not examine this assumption, and in the following section, I show that it likely does not hold.

### 8.3.1. *Manager compensation is not a suitable benchmark for Senior Employee compensation*

272. Dr. Starr's regression only provides an unbiased estimate of the effect, or upper and lower bound estimates, under the assumption that unobserved factors correlated with the assessed conduct affect manager and Senior Employee compensation in the same way. Dr. Starr assumes this holds, but he performs no analysis to support it. If Senior Employee compensation would have evolved differently over time than manager compensation even but for the assessed conduct, and the factors that cause this divergence are not accounted for in the regression, the differential conduct effect Dr. Starr estimates here will still be biased; it will still include the effect of unaccounted-for factors described above.

273. While the assumption that unobserved factors affect manager and Senior Employee compensation the same way is not testable, the assumption that manager compensation and Senior Employee compensation trended similarly over time outside the conduct period—that they were following "parallel trends"—is testable. When I test the assumption that the year effects are the same for managers and Senior Employees in the years before the conduct period, this assumption is rejected at the 95 percent confidence level.[409] This indicates that manager compensation is not a suitable benchmark for Senior Employee compensation. Specifically, Dr. Starr's identification assumption is that, despite the fact that manager

---

[408] Starr Report, ¶ 133. Note that if one assumes the conduct does not affect managers, then Dr. Starr's difference-in-differences regression may control for omitted variables bias. Under this assumption, his results would show that indeed the *conduct effect estimated by his before/during/after model is biased.* If instead, Dr. Starr assumes that managers may have been affected, and that the effect would have been to lower their pay, then even if assumption one holds, his difference-in-differences model provides a biased estimate of the conduct effect.

[409] See Workpaper 7.

compensation and Senior Employee compensation respond *differently* to observable factors, the compensation of these two groups responds identically to unobserved factors. He has no basis for the assumption that manager compensation and Senior Employee compensation would have responded the same way to the assessed conduct when the two types of compensation follow different paths over time even outside the conduct period. Without this assumption, any divergence in manager and Senior Employee compensation cannot be attributed to the assessed conduct.

274. That compensation for managers and for Senior Employees follows different paths over time is also suggested by a simple graph of average compensation for the two types of employees over time, as shown in Exhibit 34 below. This is another indication that manager compensation is not a suitable benchmark for Senior Employee compensation but for the assessed conduct.

**Exhibit 34**
**Total compensation for managers and Senior Employees at USPI**



Source: Dr. Starr Compensation Regression Data

Note: The averages of total compensation are shown for managers and for directors and above in Dr. Starr's Figure 9 regression sample.

275. Dr. Starr estimates two types of difference-in-differences models. In the first, he allows for both manager and Senior Employee compensation to shift—by different amounts—during the conduct period he assesses. In the second model, he includes individual year dummies that are the same for managers and Senior Employees, and therefore this model cannot estimate a differential shift in manager compensation as the first model purports to do. For both models, identification of the conduct effect depends on his

assumption that manager compensation is a good benchmark for Senior Employee compensation, and, as I explain above, it is not.

276. Even if manager compensation were a good benchmark for Senior Employee compensation, Dr. Starr's difference-in-differences analysis would still suffer from some of the same flaws as his before/during/after analysis. I show how each of the relevant problems affects his analysis in the sections below.

### 8.3.2. *Dr. Starr inappropriately pools data across Defendants*

277. As with his before/during/after regressions, Dr. Starr pools data from the three Defendants to estimate his difference-in-differences regressions, and, as I show in section 8.2, the restriction that his covariates affect compensation in the same way for each Defendant is rejected by the data. When Dr. Starr's difference-in-differences models are estimated on data for USPI only, his conduct effect estimates change. The results are shown in Exhibit 35. For the difference-in-differences model without year fixed effects, his estimated conduct effect goes from -3.5 percent to -0.2 percent. For the model with year fixed effects, his estimated conduct effect goes from -3.2 percent to -0.1 percent. In both cases, Dr. Starr's model estimates a much smaller conduct effect when it is estimated for USPI alone, and in both cases, the conduct effect is not statistically significantly different from zero.

**Exhibit 35**
**Dr. Starr's difference-in-differences regression model using only USPI data**

| | (1)<br>Figure 9: Model 3<br>No Year Dummies<br>All Defendants | (2)<br>Figure 9: Model 3<br>No Year Dummies<br>USPI Only | (3)<br>Figure 9: Model 4<br>With Year Dummies<br>All Defendants | (4)<br>Figure 9: Model 4<br>With Year Dummies<br>USPI Only |
|---|---|---|---|---|
| Conduct USPI (Managers) | 0.00289 | -0.0412*** | | |
| | (0.00718) | (0.00811) | | |
| Conduct USPI*1(Directors & Above) | -0.0360*** | -0.00197 | -0.0319*** | -0.000871 |
| | (0.00939) | (0.00962) | (0.00929) | (0.00960) |
| **USPI Lower Bound Suppression %** | **-3.5%** | **-0.2%** | **-3.1%** | **-0.1%** |
| | | | | |
| Conduct SCA (Managers) | -0.0487*** | | | |
| | (0.0107) | | | |
| Conduct SCA*1(Directors & Above) | -0.0654*** | | -0.0815*** | |
| | (0.0122) | | (0.0126) | |
| **SCA Lower Bound Suppression %** | **-6.3%** | | **-7.8%** | |
| | | | | |
| Conduct Davita (Managers) | -0.0321*** | | | |
| | (0.00476) | | | |
| Conduct Davita*1(Directors & Above) | -0.0936*** | | -0.0943*** | |
| | (0.00993) | | (0.00971) | |
| **Davita Lower Bound Suppression %** | **-8.9%** | | **-9.0%** | |
| | | | | |
| 1(Directors & Above) | 0.226*** | 0.119*** | 0.227*** | 0.118*** |
| | (0.00839) | (0.0148) | (0.00832) | (0.0148) |
| Year | 0.0363*** | 0.0428*** | | |
| | (0.00163) | (0.00341) | | |
| Ln(Corrected Total Hours) | 0.881*** | 0.824*** | 0.882*** | 0.826*** |
| | (0.0115) | (0.0290) | (0.0114) | (0.0285) |
| | | | | |
| Healthcare and Macro Controls | Yes | Yes | Yes | Yes |
| Individual-Company FE | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes |
| Company-Year FE | No | No | Yes | Yes |
| Observations | 80,192 | 14,141 | 80,192 | 14,141 |
| R-squared | 0.921 | 0.935 | 0.923 | 0.937 |

Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 9 models 3 and 4 are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's regression data contain errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

### 8.3.3. Dr. Starr's results are driven by his inclusion of COVID period data and his choice of the end-date for the Experts' Assessed SCA-USPI Conduct

278. The results from Dr. Starr's difference-in-differences regression models are affected by the same problems with the post-assessed-conduct period data I described above for his before/during/after regression. Differencing manager and Senior Employee pay will not remove any bias caused by the COVID pandemic if the pandemic affected manager and Senior Employee compensation differently, and it will not correct for a misspecification of the conduct period. When I re-estimate Dr. Starr's difference-in-differences models dropping the data from 2018 through 2022, as shown in Exhibit 36 below, the estimated wage suppression effect goes from -0.2 percent to +1.3 percent and not significantly different from zero in the model without year dummies, and from -0.1 percent to +1.5 percent and not significantly different from zero in the model with year dummies.

*Exhibit 36*
*Dr. Starr's difference-in-differences regression model on "before" and "during" data only*

| | (1) Figure 9: Model 3 No Year Dummies 2005–2017 | (2) Figure 9: Model 4 With Year Dummies 2005–2017 |
|---|---|---|
| Conduct USPI (Managers) | -0.0426*** | |
| | (0.0128) | |
| Conduct USPI*1(Directors & Above) | 0.0125 | 0.0147 |
| | (0.0153) | (0.0153) |
| **Lower Bound Suppression %** | **1.3%** | **1.5%** |
| | | |
| 1(Directors & Above) | 0.114*** | 0.113*** |
| | (0.0233) | (0.0234) |
| Year | 0.0564*** | |
| | (0.00712) | |
| Ln(Corrected Total Hours) | 0.631*** | 0.636*** |
| | (0.0518) | (0.0511) |
| Healthcare and Macro Controls | Yes | Yes |
| Individual-Company FE | Yes | Yes |
| Location FE | Yes | Yes |
| Company-Year FE | No | Yes |
| Observations | 8,553 | 8,553 |
| R-squared | 0.928 | 0.93 |

Source: Dr. Starr Corrected Compensation Regression Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Regression results using Dr. Starr's Figure 9 models 3 and 4 are shown. The dependent variable in all models is the log of total annual compensation. Dr. Starr's regression data contain errors in assigning hours worked, job title, location, and department to employees. All columns use corrected versions of these fields.

### 8.4. Dr. Starr's estimate of the effect of the Experts' Assessed SCA-USPI Conduct is implausibly high

279. Based on his regressions, Dr. Starr estimates that the assessed conduct reduced compensation for all USPI Senior Employees by 12 percent. In this section, I place that estimate in context by comparing it to how compensation changed for Senior Employees who moved between Defendants when their mobility was not constrained, and look for evidence of the cascading effects described by Dr. Gerhart. Based on the compensation changes of Senior Employees who switch Defendants, Dr. Starr's estimated effect of restraining these types of moves is implausibly high.

### 8.4.1. Dr. Starr's estimate of the effect of the Experts' Assessed SCA-USPI Conduct is implausible compared to changes in compensation for switchers

280. According to Dr. Starr, some USPI and SCA Senior Employees would have received job offers from the other party but for the Experts' Assessed SCA-USPI Mobility Restrictions. Those employees could have accepted the offer or leveraged their offer in an attempt to obtain higher compensation from

their current employer.[410] For employees who would have leveraged their offer for higher compensation, Dr. Starr claims that their employer would have been compelled to increase the compensation of other Senior Employees to maintain internal equity.[411] The compensation increase obtained by Senior Employees who switched between USPI and SCA, when mobility between the two firms was not constrained, provides an indication of the offers that Senior Employees could have leveraged for compensation increases, which Dr. Starr alleges is a source of direct harm.[412]

281. Using USPI's and SCA's compensation data, I analyze the compensation of the 16 Senior Employees who Dr. Starr identified as having switched employment between SCA and USPI outside the Experts' Assessed SCA-USPI Conduct period. Dr. Starr identified an additional three Senior Employees who switched from SCA to USPI in 2018 and 2019—when USPI admits and Dr. Starr acknowledges that USPI ceased participating in mobility restrictions with SCA.[413] For each of these 19 Senior Employees, I calculate compensation for the final year (or annualized compensation for partial years) at their original firm and annualized compensation at their destination firm for the year following their switch. Exhibit 37 below shows the percentage change in annualized compensation for each of the 19 switchers. As this exhibit shows, switching employees did not uniformly earn higher compensation at the destination firm. The average increase in compensation for switchers was *minus* 1.4 percent.[414] Dr. Starr purports to find that the assessed conduct lowered compensation across all Senior Employees by 12 percent.[415] Compared to the actual compensation increase of essentially zero, Dr. Starr's 12 percent estimate of the impact from the Expert's Assessed SCA-USPI Mobility Restrictions is implausibly large.

---

[410] Starr Report, ¶ 53.a ("In a dynamic labor market search model, no-poach agreements suppress pay broadly by reducing the rate at which job offers are made. Notably, the rate of job offers can still affect pay even if those job offers are turned down. This is because those job offers can be used as leverage for bargaining for a raise at the current employer.").

[411] Starr Report, ¶ 178 ("[T]here is substantial documentary evidence indicating that the compensation paid to Class Members followed a compensation structure driven, in part, by considerations of both internal and external equity. In addition, econometric analyses of available wage data show strong support for compensation structures linking Class pay together.").

[412] Starr Report, ¶ 53.a ("Notably, the rate of job offers can still affect pay even if those job offers are turned down. This is because those job offers can be used as leverage for bargaining for a raise at the current employer.").

[413] In order to accurately compare compensation for switchers, I identify the year of the switcher's last paycheck at their initial employer. If the switcher received their last paycheck prior to Dr. Starr's identified switch year, I use the earlier year as the switch year. I also drop switchers with insufficient compensation information in the year following the switch.

[414] Excluding the SCA employees who switched to USPI in 2018 or 2019, the average change in compensation was an increase of 3.4 percent; excluding employees who switched during the COVID pandemic (2020–2022), the average change in compensation was a decrease of 16.1 percent. Excluding both of the above, the average change in compensation was a decrease of 5.9 percent. See Workpaper 9.

[415] Starr Report, ¶ 129 ("The resulting estimates suggest that the aggregate wage suppressing effect of the Conduct for Directors and above was to reduce total compensation by … 12.0 percent at USPI").

*Highly Confidential - Outside Counsel/Experts Only*

*Exhibit 37*

***Percentage change in annualized compensation for Senior Employees who switched between USPI and SCA outside the Experts' Assessed SCA-USPI Mobility Restrictions or from SCA to USPI in 2018 or 2019***



**Percent change in compensation**

Source: Dr. Starr Corrected Compensation Regression Data

Note: Switches between USPI and SCA are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. I include all switches, regardless of direction, that occur in 2008–2009 or 2020–2021, as well as switches from SCA to USPI in 2018 or 2019. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch. Percent change is calculated using the employee's annualized compensation in the switch year at the firm they depart and their annualized compensation in the following year at the firm they join. Total annualized compensation adjusted for work hours is deflated according to the CPI, standardized to 2019 U.S. dollars.

282. Even the individual switches between USPI and SCA that did result in a compensation increase may overstate any alleged direct effect. A non-solicitation agreement between SCA and USPI would not have prevented their Senior Employees from receiving offers from other employers. Even if a Senior Employee's best outside offer would have been from a Defendant, the conduct would not have prevented the employee from receiving second best offers from other non-Defendants and using those offers to obtain a raise.

*8.4.2. Even if Dr. Gerhart's and Dr. Starr's assertions about a purported compensation structure were accurate, evidence contradicts their claims of cascading effects*

283. As I explain in Section 7.1 above, Dr. Gerhart's report provides the following example to describe the indirect pathway by which direct harm to Senior Employees who would have received offers but for the assessed conduct cascades to other employees: After a director uses an unsolicited job offer to negotiate higher pay, the employer would then raise pay for all

directors, because the other directors would "require higher pay to feel their pay is fair[.]"[416]

284. In this section, I analyze the distribution of compensation for the peers of the Senior Employees who switched outside of the Experts' Assessed SCA-USPI Mobility Restrictions period, as Dr. Gerhart's example describes. Then, I look for evidence on the scale of the "cascading effects" that Dr. Gerhart and Dr. Starr describe.

285. I first consider the Senior Employees that switched from SCA to USPI among the employees I analyze in Section 8.4.1 who switched between Defendants outside the conduct period. For each instance of a Senior Employee switching from SCA to USPI, I analyze the distribution of compensation for other Senior Employees at USPI with the same job title assigned to the switcher at USPI. Based on Dr. Gerhart's and Dr. Starr's theory of indirect harm, new hires' compensation levels would be high relative to incumbent USPI employees with the same job title, which they assert, would compel USPI to increase compensation of other Senior Employees in similar positions, and more broadly "[g]iven the emphasis we have seen that firms, including the Defendant firms, put on internal equity[.]"[417] This increase in compensation of Senior Employees in with the same job title as the switcher would appear as a shift in the distribution.

286. Exhibit 38 below shows the results of this analysis. For each switcher, I identify the incumbent USPI employees whose job title matches the switcher's new title. I then plot total compensation for these employees in the year of the switch (left-side distribution of each pair) and the year after (right-side distribution of each pair). The switcher's annualized compensation at their new job in the year after the switch is shown in black.

287. Contrary to Dr. Gerhart's and Dr. Starr's assertion, the switcher's compensation falls well within the range of compensation for incumbent employees in the year of the switch (left-side distribution of each pair). Because the switcher's compensation falls within the compensation range of incumbent employees, even if USPI did maintain a compensation structure, no shift in the structure—and no cascading effects—would be necessary. Indeed, comparing the distribution of compensation in the year of the switch with that in the following year, I see no systematic increase in the distribution of compensation that Plaintiffs' experts describe as the source of indirect harm.

---

[416] Gerhart Report, ¶ 143.b.

[417] Gerhart Report, ¶ 143.b; Starr Report, ¶ 178 ("[T]here is substantial documentary evidence indicating that the compensation paid to Class Members followed a compensation structure driven, in part, by considerations of both internal and external equity. In addition, econometric analyses of available wage data show strong support for compensation structures linking Class pay together.").

***Exhibit 38***
***Distribution of compensation at USPI before and after the arrival of a new hire from SCA***



Source: Dr. Starr Corrected Compensation Data

Note: Switches between USPI and SCA are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch. From left to right, in chronological order by year of switch, the IDs of the switchers represented are 76372, 114940, 209855, 179442, 181710, 240458, and 313516. The observations in each distribution pairing are determined by the switcher's job title in the year after they join USPI. For each pairing, the left-most distribution shows compensation in the switch year and the right-most distribution shows compensation in the following year. Total annualized compensation adjusted for work hours deflated according to each year's CPI, standardized to 2019 U.S. dollars.

288. Next, I consider the Senior Employees that switched from USPI to SCA among the employees I analyze in Section 8.4.1 who switched between Defendants outside of the conduct period. I analyze the distribution of compensation for their former peers at USPI during and after the year that they depart. Based on Dr. Gerhart's and Dr. Starr's descriptions of indirect effects, "other Directors at the Defendant firm who were not cold called will immediately increase their own pay expectations and require higher pay to feel their pay is fair[.]"[418]

289. Exhibit 39 below shows the results of this analysis. For each switcher, I identify all of switcher's former peers at USPI, and plot their compensation in the year that the switcher switched (left-side cloud of each pair) and the year after (right-side cloud of each pair). The switcher's annualized compensation at the new job (with SCA) is shown in black. The former USPI Senior Employee's new compensation at SCA tends to fall in the middle of the distribution of former peers. Even if USPI did maintain a compensation structure, no shift in the structure—and no cascading effects—would be necessary. Indeed, USPI did not systematically increase

---

[418] Gerhart Report, ¶ 143.b.

compensation for the remaining incumbents after these Senior Employees accepted an offer from SCA.

**Exhibit 39**
***Distribution of compensation at USPI before and after the departure of a switcher to SCA***



Source: Dr. Starr Corrected Compensation Data

Note: Switches between USPI and SCA are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch. From left to right, in chronological order by year of switch, the IDs of the switchers represented are 145093, 107425, 53775, 86475, 169104, 255844, 319661, 137423, 244709. The observations in each distribution pairing are determined by the switcher's job title in the year after they join SCA. For each pairing, the left-most distribution shows compensation in the switch year and the right-most distribution shows compensation in the following year. Total annualized compensation adjusted for work hours deflated according to each year's CPI, standardized to 2019 U.S. dollars. I drop observations from two administrators with total annualized compensation greater than $400,000 in 2008–2010.

290. Dr. Starr estimates that suppressing mobility between USPI and SCA suppressed compensation of not only the USPI employees who would have switched, but all or nearly all Senior employees at USPI. My analysis indicates that Dr. Starr's estimate of suppressed compensation that purportedly cascaded across all or nearly all Senior Employees is implausibly large. Using historical switches of Senior Employees between USPI and SCA, the results of my analysis of compensation at USPI is inconsistent with Plaintiffs' experts' theory of harm. When Senior Employees switch, they tend to earn compensation within the range earned by other employees with the same title at USPI and at SCA. Even if USPI maintained a compensation structure, historical switches indicate that USPI would not need to adjust the structure to accommodate switches to and from SCA.

291. Based on changes in compensation for Senior Employees who switched jobs between USPI and SCA outside the assessed conduct period—an average of minus 1.4 percent—Dr. Starr's conduct effect estimate of 12 percent is implausibly large even as an estimate of an impact of the conduct

on directly-affected employees (if any). Furthermore, my review of the compensation patterns of the peers of USPI and SCA Senior Employees who received job offers from the other party outside of the conduct period is inconsistent with any substantial cascading effects of the conduct on other employees.

_____

Celeste Saravia, Ph.D.

April 16, 2025

**APPENDIX A**

# CELESTE SARAVIA, PH.D.
## Vice President

**Cornerstone Research**
Two Embarcadero Center, 20th Floor • San Francisco, CA 94111
415.229.8116 • fax 415.229.8199
csaravia@cornerstone.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1998–2004 | **University of California, Berkeley** | Berkeley, California |
| | *Ph.D. in Economics, 2004* | |
| 1994–1998 | **Northwestern University** | Evanston, Illinois |
| | *B.A. in Mathematics, 1998* | |

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 2004-Present | **Cornerstone Research** | San Francisco, California |

*Vice President and Co-Head of Antitrust Practice*

- Extensive experience across class certification, liability, and damages both as lead consulting expert and as the testifying expert, with a particular focus on civil litigation antitrust matters.
- Experience across multiple industries, including semiconductors, telecommunications, retail, franchising and distribution, consumer high-tech products, financial services, payment services, life sciences, health insurance, healthcare, and energy.

| | | |
|---|---|---|
| 2023-2025 | **University of California, Berkeley** | Berkeley, California |

*Lecturer*

- Instructor for undergraduate Industrial Organization and Natural Resource Economics.

| | | |
|---|---|---|
| 2000–2004 | **University of California Energy Institute** | Berkeley, California |

*Research Assistant*

- Developed and implemented models for econometric analysis of the efficiency of the California electricity market. Maintained and updated large electricity databases.

| | | |
|---|---|---|
| 2002 | **Analysis Group** | San Francisco, California |

*Summer Associate*

- Developed analytical models for an economic consulting project.

| | | |
|---|---|---|
| 1999–2000 | **University of California, Berkeley** | Berkeley, California |

*Teaching Assistant*

- Instructed sections for Graduate Micro Economics and Introduction to Economics

## OTHER PROFESSIONAL ACTIVITIES

2017–2023    *Vice Chair, ABA Pricing Conduct Committee, Section of Antitrust Law*
2014–2017    *Vice Chair, ABA Franchising and Distribution Committee, Section of Antitrust Law*

**APPENDIX A**

## HONORS AND AWARDS

- Selected by 2016, 2017, 2019, 2020 and 2023 Who's Who Legal: Consulting Experts as a leading economic consulting and competition economist.

- Received a Best Antitrust Business Article award in the concerted practices category in 2016 for the publication, "Analyzing Incentives and Liability in 'Hub-and-Spoke' Conspiracies," with C. Falls, published by the American Bar Association Section of Antitrust Law, *Distribution and Franchising Committee Newsletter*.

## REPRESENTATIVE CONSULTING EXPERIENCE

### Representative antitrust and competition civil litigation consulting experience

- *State of Colorado et al. v Google LLC* Analyzed claims that Google's search results page has the effect of throttling web traffic to specialized vertical search providers (e.g., Yelp, Expedia, Hotels.com, AirBnB, Angie's List).

- *Alleged collusion in a financial services product.* Assessed liability issues in matters alleging a horizontal conspiracy among market makers in a financial asset.

- *FTC v. Qualcomm* and other matters involving Qualcomm. Analyzed claims that Qualcomm's business practices relating to its licensing of patents and its selling of cellular modem chips were anticompetitive.

- *Garber, et al. v. Office of the Commissioner of Baseball, et al.; Laumann, et al. v. National Hockey League, et al.* Analyzed liability and class certification issues in multiple cases challenging exclusive broadcast territories.

- *Universal Surveillance Corporation v. Checkpoint Systems, Inc.* Analyzed damages issues in a case involving allegations of anticompetitive bundling.

- *Cathode Ray Tube (CRT) Antitrust Litigation* Analyzed liability and damages issues in multiple cases involving allegations of a horizontal conspiracy.

- *Alleged Collusion in the Processing of a Renewable Natural Resource* Assessed liability, damages, and class certification issues in direct class actions in matters alleging horizontal conspiracy to suppress production of a renewable natural resource.

- *Alleged Monopoly and Foreclosure in Home Recreation Industry* Assessed claims of attempted monopoly and foreclosure by large distributor of home recreation products against class of retailers. Developed statistical model of damages to measure alleged impact of challenged conduct and class certification.

- *Alleged No-Poach matters* Analyzed class certification in alleged no-poach agreements. Analyzed complex datasets that track individual employees' compensation, performance, promotion, hiring, firing, and mobility across firms.

- *Competitive effects of franchising agreements* Analyzed the pro-competitive benefits of franchising agreements in a lawsuit challenging specific clauses of franchise agreements as anticompetitive.

- *In re Flash Memory Antitrust Litigation.* Assessed class certification issues in direct and indirect class actions.

- *American Express Travel Related Services Company Inc. v. Visa USA Inc. et al.* Analyzed competitive effects of Visa U.S.A. and MasterCard's rule, barring member banks from issuing Amex or Discover cards.

- *Rambus v. Micron et al.* Analyzed liability issues in case alleging that large semiconductor firms implemented a group boycott that was alleged to have the effect of artificially restricting industry support for a new product.

- *Thales Avionics Inc. v. Matsushita Avionics Systems Corporation.* Analyzed claims that Panasonic Avionics Corporation, formerly Matsushita Avionics Systems Corporation, had engaged in predatory pricing with respect to in-flight entertainment systems.

- *Alleged Predatory Pricing in Generic Pharmaceutical* Analyzed claims that a manufacturer of a generic drug engaged in predatory pricing.

- *Alleged Anticompetitive Reverse Payment* Assessed class certification issues in a direct and indirect class action involving allegations of an anticompetitive reverse payment.

- Arbitration examining the competitive effects of the terms imposed on signatories to the 1998 Master Settlement Agreement on subsequent market structure in the cigarette industry. Supported Peter Reiss and Timothy Bresnahan on behalf of Philip Morris.

**Representative merger consulting experience**

- *China International Marine Containers/Maersk Container Industry* Retained by the DOJ to investigate competitive effects. Merger abandoned.

- *U.S. v. Sabre/Farelogix*, 2019–2020. Supported Aviv Nevo in expert reports as expert witness for the DOJ.

- *FTC v. Sysco/US Foods Merger* Analyzed potential economic impacts of a proposed merger.

- *Applied Materials Inc./Tokyo Electron Ltd.* Supported DOJ in evaluating the proposed merger. Merger was abandoned.

- *Thoratec/Heartware* Supported the FTC in evaluating the proposed merger. Merger abandoned after FTC authorized a preliminary injunction.

- Assessed the competitive effects of a proposed merger of two electricity firms.

## EXPERT TESTIMONY

- *National ATM Council, Inc., et al. v. Visa Inc., et al.* United States District Court, District of Columbia. Filed expert report (2024)

- *Dow Chemical Canada ULC and Dow Europe GmbH v. Nova Chemicals Corp.* Court of King's Bench of Alberta, Calgary. Filed expert report, gave deposition testimony, and testified at trial (2024)

- *In re: Amitiza Antitrust Litigation.* United States District Court, District of Massachusetts. Filed expert reports and gave deposition testimony (2024)

- *Tevra Brands, LLC v. Bayer Healthcare LLC, et al.* United States District Court, Northern District of California San Jose Division. Filed expert report, gave deposition testimony (2023), and testified at jury trial (2024)

- *The State Of Connecticut, et al. v. Sandoz, INC., et al.* United States District Court, District of Connecticut. Filed expert report and gave deposition testimony (2024)

- *In re: Qualcomm Incorporated Securities Litigation.* United States District Court, Southern District of California. Filed expert report (2023) and gave deposition testimony (2024)

- *In re: Broiler Chicken Grower Antitrust Litigation Haff Poultry, Inc., al, v. Tyson Foods, Inc., et al.* United States District Court Eastern District of Oklahoma. Filed expert report (2022) and gave deposition testimony (2023)

- *In re HIV Antitrust Litigation.* United States District Court, Northern District of California San Francisco Division. Filed expert report, gave deposition testimony (2022), and testified at jury trial (2023)

- *O.E.M. Glass Network, Inc. et al v. Mygrant Glass Company, Inc. et al.* United States District Court for the Eastern District of New York. Filed expert report (2021) and gave deposition testimony (2022)

- *B & R Supermarket, Inc., et al. v. Visa, Inc., et al.* U.S. District Court, Eastern District of New York. Filed expert report and gave deposition testimony (2021)

- *eBay v. Amazon et al.* American Arbitration Association. Filed expert report (2020), gave deposition testimony (2020), and arbitration testimony (2020)

- *All-Tag Corp. v. Checkpoint Systems, Inc.* U.S. District Court, Southern District of Florida. Filed expert report (2019) and gave deposition testimony (2019)

- *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation.* U.S. District Court, Eastern District of New York. Filed expert reports (2019) and gave deposition testimony (2019)

- *Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars v. Ningbo Sunny Electronic Co. Ltd.* U.S. District Court, Northern District of California. Filed expert report (2019), gave deposition testimony (2019), and testified at jury trial (2019)

- *Fresenius Kabi v Par Sterile Products, LLC and Par Pharmaceuticals Companies, Inc.* U.S. District Court, District of New Jersey. Filed expert report (2019) and gave deposition testimony (2019)

- *Inline Packaging, LLC v. Graphic Packaging International, Inc.* U.S. District Court, District of Minnesota. Filed expert report (2017) and gave deposition testimony (2018)

- *In RE: Dental Supplies Antitrust Litigation,* U.S. District Court, Eastern District of New York. Filed expert report (2017) and gave deposition testimony (2018)

- *The Rack LLC, v. Westfield LLC, Westfield Promenade LLC.* Superior Court, State of California for the County of Los Angeles. Gave deposition testimony (2017)

- *J&M Distributing Inc. v. Hearth & Home Technologies Inc. and Magnotti and Sons, Inc. d/b/a The Fireplace and the Patio Place.* U.S. District Court, District of Minnesota. Filed expert report (2014) and testified at jury trial (2015)

- *The Morning Star Packing Company, et al. v. SK Foods, L.P., et al.* U.S. District Court, Eastern District of California. Filed expert report (2015) and gave deposition testimony (2015)

**PUBLICATIONS**

**APPENDIX A**

- "Most-Favored Entry Clauses in Drug-Patent Litigation Settlements: A Reply to Drake and McGuire (2022)" with A. Elzinga and P. Kovacheva, *The Antitrust Source*, December 2023

- "Comments on the Potential Implications of the Draft FTC-DOJ Merger Guideline 4 for the U.S. Pharmaceutical Industry," with Sarah Abraham, John Asker, Avigail Kifer, Margaret Kyle, and Ariel Pakes, September 18, 2023, available at https://www.regulations.gov/comment/FTC-2023-0043-1505

- "Necessity as the Mother of Invention? Streamlining the Evaluation of Competitor Collaborations" with I. Simmons, G. Bashour, and A. Klein, *Antitrust Magazine*, Vol.34, No 3, Summer 2020

- **"**Bright Line**"** Apple v. Pepper Invites Further Economic Analysis**,** with T. Kumler, *Competition Policy International*, July 2019

- "Tying Law and Policy," (contributor) Antitrust Law and Economics of Product Distribution Second Edition, 2016

- "Class Certification under Rule 23," (contributor) *ABA Indirect Purchaser Litigation Handbook,* 2016.

- "Analyzing Incentives and Liability in 'Hub-and-Spoke' Conspiracies," with C. Falls, *Distribution: The Newsletter of the Distribution and Franchising Committee,* Vol 19, No. 1, April 2015

- "Relevant Markets," (contributor) *ABA Antitrust Law Developments (Seventh),* Vol. 1, Chapter 6, March 2012

- "Horizontal Merger Guidelines and Market Definition in Monopolization Cases," with E. Bruegmann and N. Soboleva, *Global Competition Review: The Antitrust Review of the Americas*, 2011

- "Standards for Assessing Bundled Discounts," with V. Howell, *Global Competition Review: The Antitrust Review of the Americas* (special issue), 2009

- "Vertical Arrangements, Market Structure, and Competition: An Analysis of Restructured U.S. Electricity Markets," with J. Bushnell and E. Mansur, *American Economic Review,* Volume 98, Issue 1, March 2008, pages 237-266

## PRESENTATIONS

- Panel presentation, "Hatching a Procompetitive Settlement" American Bar Association, Webinar, September 2024

- Panel presentation, "Can Bots collude? Cartels in the age of artificial intelligence" Global Competition Review Live: Cartels, Washington, D.C., May 2024

- Panel presentation, "Big Data and Evolving Views of Market Definition and Power" Antitrust in the Financial Sector Summit, New York, NY, September 2023

- Panel presentation, "Transatlantic Antitrust Class Actions" Fordham University, 49th Annual Antitrust Conference, New York, NY, September 2022

- Panel presentation, "Certifiable? Navigating Class Actions Today" American Bar Association 70th Antitrust Law Spring Meeting, April 2022

- Panel presentation, "12th Summit on Biosimilars & Innovator Biologics" American Conference Institute, June 2021

- Panel presentation, "Big Tech Trial Juror Study" American Bar Association Antitrust Law Section, May 2021

**APPENDIX A**

- Panel presentation, "Fundamentals—Economics" American Bar Association 69th Antitrust Law Virtual Spring Meeting, March 2021

- Panel presentation "Women in Lead Roles: First Chairs and Expert Witnesses" American Bar Association Antitrust Law Section, February 2021

- Panel presentation, "Tech Enforcement and Digital Competition Challenges" Antitrust TX, October 2020

- Panel presentation, "Economic Analysis in Antitrust, Consumer and Securities Class Actions" The Chicago Bar Association Webinar, May 2020

- Moderated Panel presentation, "Antitrust Counseling on Competitor Collaborations and Price Gouging during COVID-19" American Bar Association Section of Antitrust Law teleconference, April 2020

- Panel presentation, "FTC vs. Qualcomm and Other Recent Antitrust Developments in High Tech and Life Sciences" 20th Annual Berkeley-Stanford Advanced Patent Law Institute: Silicon Valley, East Palo Alto, CA, December 2019

- Panel presentation, "Legal Standards for Class Certification and Regression Analysis" The Economics of Class Certification, San Francisco, CA November 2019

- Panel presentation, "A Deep Dive into Spokeo: Including a Discussion of the Use of Experts and Statistical Sampling at Class Certification in light of Spokeo and Tyson," Bridgeport Continuing Education 2017 Class Action Litigation Conference, San Francisco CA, September 2017

- Panel presentation, "Proof Agreements, Incentives and Liabilities in Hub-and-Spoke Antitrust Conspiracies: A 2017 Update," The Knowledge Group Teleconference, May 2017

- Panel presentation, "Clarifying Liability in Hub-and-Spoke Conspiracies," 64th American Bar Association Section of Antitrust Law Spring Meeting, Washington D.C., April 2016

- Panel presentation, "Trial Practice Fundamentals: Working with Your Expert," American Bar Association Webinar, May 2015

- Panel presentation, "Downloading the Future: Media Mergers and Content Distribution," 63rd American Bar Association Section of Antitrust Law Spring Meeting, April 2015

- Panel presentation, "Analyzing Conspiracies with Both Vertical & Horizontal Elements," American Bar Association Teleconference, January 2015

- Expert in mock trial focusing on pay-for-delay to teach State and Federal court judges, "Antitrust Law & Economics Institute for Judges," American Bar Association/George Mason University School of Law Judicial Education Program, October 2014

**APPENDIX B**

# Documents Relied Upon

**Academic Articles**

- Amit Jain, Punya Jain, and Shruti Aggarwal, "SARS-CoV-2 Impact on Elective Orthopaedic Surgery: Implications for Post-Pandemic Recovery," *The Journal of Bone and Joint Surgery*, 102(13), 2020, pp. e68(1)–e68(5)

- Anna L. Goldman, Michael K. Paasche-Orlow, and Frederick Thurston Drake, "Affordable Care Act Medicaid Expansion and Access to Outpatient Surgical Care" *JAMA Surgery*, 155(11), 2020, pp. 1066–1067

- George J. Stigler, "A Theory of Oligopoly," *The Journal of Political Economy*, 72(1), 1964, pp. 44–61

- Gregory C. Chow, "Tests of Equality Between Sets of Coefficients in Two Linear Regressions," *Econometrica*, 28(3), 1960, pp. 591–605

- Jeffrey M. Perloff, "Cartels," *Journal of Industrial Organization Education*, 1(1), 2006, pp. 1–12

- Miguel Faria-e-Castro and Samuel Jordan-Wood, "Pandemic Labor Force Participation and Net Worth Fluctuations," *Federal Reserve Bank of St. Louis Review*, 106(1), 2024, pp. 40–58

- Samuel Dodini, Michael Lovenheim, Kjell Salvanes, and Alexander Willen, "Monopsony, Job Tasks, and Labor Market Concentration," *The Economic Journal*, 134(661), 2024, pp. 1914–1949

- Sang Yoon Lee, Minsung Park, and Yongseok Shin, "Hit Harder, Recover Slower? Unequal Employment Effects of the COVID-19 Shock," *Federal Reserve Bank of St. Louis Review*, 103(4), 2021, pp. 367–383

- Shruti Aggarwal, Punya Jain, and Amit Jain, "COVID-19 and Cataract Surgery Backlog in Medicare Beneficiaries," *Journal of Cataract & Refractive Surgery*, 46(11), 2020, pp. 1530–1533

- Thesia I. Garner, Adam Safir, and Jake Schild, "Receipt and Use of Stimulus Payments in the Time of the Covid-19 Pandemic," *Beyond the Numbers: Prices & Spending*, 9(10), 2020

- Thomas J. Bollyky, et al., "Assessing COVID-19 Pandemic Policies and Behaviours and Their Economic and Educational Trade-Offs Across US States from Jan 1, 2020, to July 31, 2022: An Observational Analysis," *The Lancet*, 401, 2023, pp. 1341–1360

**APPENDIX B**

- Zoe B. Cullen, Shengwu Li, and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," *NBER Working Paper Series* 30570, October 2022, Revised August 2024, pp. 1–53

## Bates Stamped Documents

- DOJCIV-008-00000353–67
- DOJCIV-008-00000387–96
- DOJCIV-008-00000390
- Hayek-000012214–16
- OMC_BM_000000884–95
- OMC_BM_000006875
- OMC_BM_000007716
- OMC_BM_000010778–9
- OMC_BM_000013354–56
- OMC_BM_000014729
- SCA000072712
- SCA000609009–11
- SCA000862885
- SCA001075713–5
- SCA001471584.xlsx
- SCA002277742–44
- SCA002364259–63
- SCA002364264–65
- USPI_CIV_000003394
- USPI_CIV_000006432
- USPI_CIV_000016019
- USPI_CIV_000016020.xlsx
- USPI_CIV_000016089–92
- USPI_CIV_000016100
- USPI_CIV_000016522

- USPI_CIV_000016573–74
- USPI_CIV_000021155
- USPI_CIV_000021165
- USPI_CIV_000021178
- USPI_CIV_000021897–98
- USPI_CIV_000021899–904
- USPI_CIV_000022791–811
- USPI_CIV_000023128–33
- USPI_CIV_000023134–45
- USPI_CIV_000024141.xlsx
- USPI_CIV_000024185
- USPI_CIV_000025214–17
- USPI_CIV_000026215–16
- USPI_CIV_000026240.xlsx
- USPI_CIV_000030396–99
- USPI_CIV_000033030–31
- USPI_CIV_000034853–54
- USPI_CIV_000035153
- USPI_CIV_000035655
- USPI_CIV_000035855
- USPI_CIV_000036746–49
- USPI_CIV_000037627–29
- USPI_CIV_000037954
- USPI_CIV_000038254–55
- USPI_CIV_000038258–59

**APPENDIX B**

- USPI_CIV_000039709–10
- USPI_CIV_000039752–53
- USPI_CIV_000040029
- USPI_CIV_000040585–87
- USPI_CIV_000041645–56
- USPI_CIV_000044404–05
- USPI_CIV_000044881–83
- USPI_CIV_000045211–12
- USPI_CIV_000045232–33
- USPI_CIV_000046079
- USPI_CIV_000047956–58
- USPI_CIV_000053367.xlsx
- USPI_CIV_000055047–48
- USPI_CIV_000056074–75
- USPI_CIV_000056611–43
- USPI_CIV_000057810–11
- USPI_CIV_000064623–27
- USPI_CIV_000064628
- USPI_CIV_000068808–21
- USPI_CIV_000095479–80
- USPI_CIV_000110943
- USPI_CIV_000111376–82
- USPI_CIV_000113333
- USPI_CIV_000113335
- USPI_CIV_000122239
- USPI_CIV_000122240
- USPI_CIV_000146394
- USPI_CIV_000212779–80

- USPI_CIV_000233594–614
- USPI_CIV_000337006–011
- USPI_CIV_000584419–21
- USPI_CIV_000601224–29
- USPI_CIV_000620051–67
- USPI_CIV_000626729–30
- USPI_CIV_000686081–92
- USPI_CIV_000962508
- USPI_CIV_000962509
- USPI_CIV_000104518
- USPI_CIV_000105175–77
- USPI_CIV_000121836–40
- USPI_CIV_000142589–90
- USPI_CIV_000147704–06
- USPI_CIV_000192177–78
- USPI_CIV_000214742–45
- USPI_CIV_000214746.xlsx
- USPI_CIV_000227267
- USPI_CIV_000235807
- USPI_CIV_000241755–57
- USPI_CIV_000250682–84
- USPI_CIV_000272179–82
- USPI_CIV_000274099
- USPI_CIV_000301109–10
- USPI_CIV_000336479
- USPI_CIV_000336973–85
- USPI_CIV_000338903
- USPI_CIV_000376500–06

**APPENDIX B**

- USPI_CIV_000401250–54
- USPI_CIV_000441337–39
- USPI_CIV_000457557–60
- USPI_CIV_000467447–60
- USPI_CIV_000499023–24
- USPI_CIV_000534606–09
- USPI_CIV_000563699–700
- USPI_CIV_000650633–36

- USPI_CIV_000689431
- USPI_CIV_000755571–72
- USPI_CIV_000758762–65
- USPI_CIV_000810697
- USPI_CIV_000890968–76
- USPI_CIV_000900796–801
- USPI_CIV_000964185–86
- USPI_CIV_00890968–76

**Books**

- American Bar Association, "Econometrics and Regression Analysis," in *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition (ABA Book Publishing, 2017), pp. 123–208

- Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition (Essex, England: Pearson Education Limited, 2015)

- B. Douglas Bernheim and Michael D. Whinston, *Microeconomics* (New York, NY: McGraw-Hill Irwin, 2008)

- Jeffrey M. Perloff, *Microeconomics*, 7th Edition (Boston, MA: Pearson Education Inc., 2015)

- Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, Fourth Edition (Mason, OH: South-Western Cengage Learning, 2009)

- Joshua Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics*, (Princeton, NJ: Princeton University Press, 2009)

- Karl Popper, *The Logic of Scientific Discovery*, (New York, NY: Routledge Classics, 2005)

- Louis Kaplow and Carl Shapiro, "Antitrust," in *Handbook of Law and Economics*, Volume 2, ed. A. Mitchell Polinsky and Steven Shavell (Elsevier B.V., 2007), pp. 1073–1225

- Louis Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, N.J.: Princeton University Press, 2010)

- W. Kip Viscusi, Joseph E. Harrington, Jr. and David E. M. Sappington, *Economics of Regulation and Antitrust*, Fifth Edition (Cambridge, MA: The MIT Press, 2018)

**APPENDIX B**

**Data**

- "4.19.24 Paygroup location.xlsx"

- "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data.xlsx"

- "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs' Structured Data Questions.xlsx"

- "2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions.xlsx"

- "2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes.xlsx."

- "CheckSumm_Highly Confidential-Outside Counsel, Experts Only"

- "CheckSummHE_ Highly Confidential-Outside Counsel, Experts Only.csv"

- "Eemploy_ Highly Confidential-Outside Counsel, Experts Only.csv"

- "Ejob_ Highly Confidential-Outside Counsel, Experts Only.csv"

- "Exhibit A_Paygroup_Location.xlsx"

- "Exhibit B_ERNCD Values.xlsx"

- "Highly Confidential - Outside Counsel Experts Only_Check History Hours and Earnings.xlsx"

- "Highly Confidential - Outside Counsel Experts Only_SCA Hashed SSNs.xlsx"

- "Highly Confidential - Outside Counsel Experts Only_Teammate Roster Point in Time.xlsx"

- "Highly Confidential - Outside Counsel Experts Only_Termed in 2021.xlsx"

- "SCA - Structured00000005.xlsx"

- "SCA - Structured00000013.xlsx"

- "SCA-Structured00000007_Highly Confidential–Outside Counsel Experts Only.xlsx"

- "SCA-Structured00000009_Highly Confidential–Outside Counsel Experts Only.xlsx"

- "SCA-Structured00000010_Highly Confidential–Outside Counsel Experts Only.xlsx"

- "SCA-Structured00000011_Highly Confidential–Outside Counsel Experts Only.xlsx"

**APPENDIX B**

- "SCA-Structured00000012_Highly Confidential–Outside Counsel Experts Only.xlsx"
- DVA_OMCEAL_000000029–45
- DVA_OMCEAL_000000047
- DVA_OMCEAL_000902589–91
- DVA_OMCEAL_001182111
- DVA_OMCEAL_001408533
- DVA_OMCEAL_001408536
- DVA_OMCEAL_001408539
- DVA_OMCEAL_001408542
- DVA_OMCEAL_001408543
- DVA_OMCEAL_001408544
- DVA_OMCEAL_001408547
- DVA_OMCEAL_001408550
- DVA_OMCEAL_001421632–34
- DVA_OMCEAL_001421635
- DVA_OMCEAL_001421640
- DVA_OMCEAL_001421733
- USPI_CIV_000021819
- USPI_CIV_00065922–34
- USPI_CIV_000659234
- USPI_CIV_001168726

**Depositions**

- Deposition of Peter Clemens (SCA), May 2, 2024
- Deposition of Mark Garvin (USPI), May 30, 2024
- Deposition of Cindy English (USPI), Volume I, June 12, 2024
- Deposition of Anthony Martin (USPI), June 27, 2024
- Deposition of Jason Cagle (USPI), August 6, 2024

- Deposition of Shannon Mosley (USPI), August 13, 2024

- Deposition of Clare Metcalf (Russell Reynolds), August 14, 2024

- Deposition of Sandi Karrmann (USPI), August 14, 2024

- Deposition of Michael Rucker (SCA), August 27, 2024

- Deposition of Andrew Johnston (USPI), September 6, 2024

- Deposition of Andrew P. Hayek (SCA), September 18, 2024

- Deposition of Brian Todd Mathis (SCA), September 20, 2024

- Deposition of Anthony Kilgore (SCA), October 22, 2024

- Deposition of Mark Kopser (USPI), Volume I, December 12, 2024

- Deposition of Barry Gerhart, March 5, 2025

- Deposition of Evan P. Starr, March 19, 2025

- Deposition of Evan P. Starr, Volume 2, March 20, 2025

## Expert Reports

- Amended Expert Witness Report of Dr. Barry Gerhart, February 11, 2025

- Amended Expert Witness Report of Dr. Evan P. Starr, January 21, 2025

## Legal Documents

- Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, January 5, 2021

- Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024

- Answer of Defendants United Surgical Partners Holdings, Inc., United Surgical Partners International, Inc., and Tenet Healthcare Corporation to Plaintiffs' Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, December 20, 2024

## Letters

- Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser

**APPENDIX B**

Heimann & Bernstein, LLP), "*In re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305," May 14, 2023

- Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts (Roberts Law Firm), Linda P. Nussbaum (Nussbaum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "*In re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305," June 1, 2023

## Press Releases

- Tenet Health, "Tenet and USPI Complete Transaction to Acquire SCD," December 22, 2021, available at https://investor.tenethealth.com/press-releases/press-release-details/2021/Tenet-and-USPI-Complete-Transaction-to-Acquire-SCD/default.aspx, accessed on April 1, 2025

- Tenet Health, "Tenet and USPI to Acquire SurgCenter Development and Establish Long-Term Development Partnership," November 8, 2021, available at https://investor.tenethealth.com/press-releases/press-release-details/2021/Tenet-and-USPI-to-Acquire-SurgCenter-Development-and-Establish-Long-Term-Development-Partnership/default.aspx, accessed on April 1, 2025

- Tenet Health, "Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx, accessed on April 1, 2025

- United Health Group, "Surgical Care Affiliates (SCA), OptumCare to Combine," January 9, 2017, available at https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html, accessed on April 1, 2025

## SEC Filings

- Total Renal Care Holdings, Inc., SEC Form 10-Q for the quarterly period ended March 31, 1996, filed on March 15, 1996

- DaVita Inc., SEC Form 10-K for period ended December 31, 2024, filed on February 13, 2025

- Tenet Healthcare Corporation, SEC Form 10-K for period ended December 31, 2024, filed on February 18, 2025

**APPENDIX B**

## Websites

- Ambulatory Surgery Center Association, "What is an ASC," available at https://www.ascassociation.org/asca/about-ascs/surgery-centers, accessed on February 25, 2025

- Blooming Eve, "All Fertility Clinics in the USA," available at https://www.bloomingeve.com/clinics, accessed on February 25, 2025

- Blooming Eve, "Find a Fertility Clinic Near You," available at https://www.bloomingeve.com, accessed on February 25, 2025

- Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," July 8, 2024, available at https://www.cdc.gov/museum/timeline/covid19.html, accessed on April 3, 2025

- Centers for Disease Control and Prevention, "COVID Data Tracker," available at https://covid.cdc.gov/COVID-DATA-TRACKER/#trends_weeklydeaths_testpositivity_00, accessed on April 1, 2025

- Claire Wallace, "SCA Health Grows to 320+ Surgical Facilities," *Becker's: ASC Review*, August 31, 2022, available at https://www.beckersasc.com/asc-transactions-and-valuation-issues/sca-health-adds-almost-100-new-surgical-facilities-in-2022.html, accessed on April 1, 2025

- CMS.gov, "State Operations Manual," July 21, 2023, available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/som107ap_l_ambulatory.pdf

- CNBC, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," August 5, 2010, available at https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html, accessed on April 1, 2025

- DaVita, "DaVita to Acquire Gambro Healthcare, a Renal Dialysis Services Company," December 7, 2004, available at https://investors.davita.com/2004-12-07-DaVita-to-Acquire-Gambro-Healthcare-a-Renal-Dialysis-Services-Company, accessed on April 1, 2025

- DaVita, "Total Renal Care Holdings, Inc. Announces Legal Name Change to DaVita Inc.," October 4, 2000, available at https://investors.davita.com/2000-10-04-Total-Renal-Care-Holdings-Inc-Announces-Legal-Name-Change-to-DaVita-Inc, accessed on April 1, 2025

**APPENDIX B**

- Definitive Healthcare, "Outpatient care: What is Outpatient Care?" available at https://www.definitivehc.com/resources/glossary/outpatient-care, accessed on February 25, 2025

- Deloitte, "Growth in Outpatient Care," available at https://www2.deloitte.com/content/dam/insights/us/articles/4170_Outpatient-growth-patterns/DI_Patterns-of-outpatient-growth.pdf

- Federal Reserve Bank of St. Louis, "Employment for Health Care and Social Assistance: Outpatient Care Centers (NAICS 6214) in the United States," available at https://fred.stlouisfed.org/series/IPURN6214W200000000, accessed on April 14, 2025

- Federal Reserve Bank of St. Louis, "Quits: Health Care and Social Assistance," available at https://fred.stlouisfed.org/series/JTS6200QUL, accessed on April 15, 2025

- Federal Reserve Bank of St. Louis, "Quits: Total Nonfarm," available at https://fred.stlouisfed.org/series/JTSQUR, accessed on April 15, 2025

- Federal Reserve Bank of St. Louis, "Total Revenue for Outpatient Care Centers, All Establishments," available at https://fred.stlouisfed.org/series/REV6214ALLEST144QNSA#0, accessed on April 14, 2025

- Francesca Mathewes, "USPI vs. AmSurg vs. SCA Health: 10 Key Comparisons to Know in 2024," *Becker's: ASC Review*, August 9, 2024, available at https://www.beckersasc.com/asc-news/uspi-vs-amsurg-vs-sca-health-10-key-comparisons-to-know-in-2024.html, accessed on April 1, 2025

- Indeed, "Crown Point Surgery Center: Clinical Director," available at https://www.indeed.com/viewjob?jk=fe790283b33ab633&from=shareddesktop, accessed on February 3, 2025

- Indeed, "USPI: Chief Executive Officer – Fresno Surgical Hospital," available at https://www.indeed.com/viewjob?jk=1046d2fc27cbf644&from=shareddesktop, accessed on April 8, 2025

- Indeed, "Baylor Scott & White Surgicare Centennial: Director of Nursing Outpatient Surgery," available at https://www.indeed.com/viewjob?jk=58a75b27e4092221&from=shareddesktop, accessed on February 3, 2025

- Indeed, "USPI: Regional Director," available at https://www.indeed.com/viewjob?jk=bc655b0f0fe331fc&from=shareddesktop, accessed on February 3, 2025

**APPENDIX B**

- Indeed, "Surgery Center Administrator - Merrillville, IN," available at https://www.indeed.com/viewjob?jk=46a9059ad76901ba&from=shareddesktop, accessed on February 3, 2025

- Indeed, "USPI Chief Executive Officer - Baylor Scott & White Las Colinas - Irving, TX 75064," available at https://www.indeed.com/viewjob?jk=8c181807c183eabc&from=shareddesktop, accessed on February 3, 2025

- Indeed, "USPI: Regional Vice President, Operations I–Mid–Atlantic (MD/PA/NJ/DE)," available at https://www.indeed.com/viewjob?jk=80dba394c619badf&from=shareddesktop, accessed on February 3, 2025

- Indeed, "USPI: Surgery Center Administrator," available at https://www.indeed.com/viewjob?jk=c078d8f7008bf116&from=shareddesktop, accessed on February 3, 2025

- KFF, "Number of Mental Health Treatment Facilities, By Type of Care," 2022, available at https://www.kff.org/other/state-indicator/number-of-mental-health-treatment-facilities-by-type-of-care, accessed on April 14, 2025

- Kimberly Steele, "Healthcare Industry Embraces Shift to Outpatient Care Sites," *JLL*, April 11, 2024, available at https://www.us.jll.com/en/newsroom/healthcare-industry-embraces-shift-to-outpatient-care-sites, accessed on February 25, 2025

- Lightcast, "Academic Research Using Lightcast Data," available at https://lightcast.io/resources/new-academic-research, accessed on April 16, 2025

- Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 1, 2025

- Luisa Beltran, "IPO Market Starts Off Fresh," *CNN Money*, June 2, 2001, available at https://money.cnn.com/2001/06/02/deals/sat_ipos, accessed on April 1, 2025

- Office of Management and Budget, "North American Industry Classification System," 2022, available at https://www.census.gov/naics/reference_files_tools/2022_NAICS_Manual.pdf

- Rachel K. Jones, Candace Gibson and Jesse Philbin, "The Number of Brick-and-Mortar Abortion Clinics Drops, as US Abortion Rate Rises: new Data Underscore the Need for Policies that Support Providers," *Guttmacher*, June 2024, available at https://www.guttmacher.org/report/abortion-clinics-united-states-2020-2024, accessed on February 25, 2025

**APPENDIX B**

- Sarah Albert, Andrew Foerster, and Pierre-Daniel G. Sarte, "Employment Effects of COVID-19 Across States, Sectors," *FRBSF Economic Letter*, November 22, 2021, available at https://www.frbsf.org/wp-content/uploads/el2021-32.pdf, accessed April 15, 2025

- SCA Health, "Build Your Career at SCA Health," available at https://careers.sca.health, accessed on April 8, 2025

- SCA Health, "Committed to Excellent Patient Care," available at https://sca.health/partnering-with-sca/physicians, accessed on April 1, 2025

- SCA Health, "Partnering with Hospital Systems," available at https://sca.health/partnering-with-sca/hospital-systems, accessed on April 1, 2025

- SCA Health, "Patient Commitment: We Put Patients First," https://sca.health/patient-commitment, accessed on April 1, 2025

- SCA Health, "Supporting Physician Specialists in Many Aspects of Patient Care," available at https://sca.health/about-us, accessed on February 25, 2025

- Sriparna Roy and Bhanvi Satija, "US Hospitals See Post Pandemic Catch-up Behind Insurer Healthcare Costs," *Reuters*, February 13, 2024, available at https://www.reuters.com/world/us/us-hospitals-see-post-pandemic-catch-up-behind-insurer-healthcare-costs-2024-02-13, accessed on April 9, 2025

- Substance Abuse and Mental Health Services Administration, "2020 National Mental Health Services Survey," available at https://www.samhsa.gov/data/system/files/media-quick-stats/nmhss-us20.pdf

- Substance Abuse and Mental Health Services Administration, "National Directory of Mental Health Treatment Facilities," April 2021, available at https://www.samhsa.gov/data/sites/default/files/reports/rpt34657/National_Directory_MH_facilities_2021.pdf

- Teal Labs, Inc., "USPI Market President I Midwest @ United Surgical Partners International," available at https://www.tealhq.com/job/uspimarket-president-i-midwest_d9052397-8ff0-420a-93ae-52f1189ff5d0, accessed on April 1, 2025

- The National Forum of ESRD Networks, "National ESRD Census Data," September 30, 2024, available at https://esrdnetworks.org/resources-news/national-esrd-census-data, accessed on February 25, 2025

- U.S. Bureau of Labor Statistics, "CES Overview," February 7, 2025, available at https://www.bls.gov/web/empsit/cesprog.htm, accessed on April 15, 2025

**APPENDIX B**

- U.S. Bureau of Labor Statistics, "Job Openings and Labor Turnover – March 2022," May 3, 2022, available at https://www.bls.gov/news.release/archives/jolts_05032022.pdf, accessed on April 16, 2025

- U.S. Bureau of Labor Statistics, "QCEW Overview," March 14, 2025, available at https://www.bls.gov/cew/overview.htm, accessed on April 16, 2025

- United Surgical Partners International, "About Us: Who We Are," available at https://uspi.com/about-us/who-we-are/default.aspx, accessed on April 1, 2025

- United Surgical Partners International, "Clinical Director at USPI," available at https://careers.uspi.com/job/monroe/clinical-director/35934/79380146160, accessed on March 31, 2025

- United Surgical Partners International, "Partners: For Physicians," available at https://uspi.com/partners/for-physicians/default.aspx, accessed on April 1, 2025

- United Surgical Partners International, "USPI Director, Clinical Operations (up to 75% travel) at USPI," available at https://careers.uspi.com/job/dallas/uspi-director-clinical-operations-up-to-75-travel/26425/79499040448, accessed on March 31, 2025

- United Surgical Partners International, "USPI Director of Clinical Operations (Hybrid, must live in TN) - up to 75% travel at USPI," available at https://careers.uspi.com/job/nashville/uspi-director-of-clinical-operations-hybrid-must-live-in-tn-up-to-75-travel/26425/78599147200, accessed on March 31, 2025

- Vincent Amanor-Boadu, "Empirical Evidence for the 'Great Resignation'," *U.S. Bureau of Labor Statistics: Monthly Labor Review*, November 2022, available at https://doi.org/10.21916/mlr.2022.29, accessed on April 16, 2025

- WayUp, "USPI: FSH Director of Surgical Services," available at https://www.wayup.com/i-j-United-Surgical-Partners-International-Inc-USPI-751200318061401, accessed on February 4, 2025

- WayUp, "USPI: Director of Clinical Operations," available at https://www.wayup.com/i-j-Director-of-Clinical-Operations-United-Surgical-Partners-International-Inc-USPI-482563639121828, accessed on February 4, 2025

- WCAS, "Tenet Completes Purchase of USPI from WCAS," April 26, 2018, available at https://wcas.com/news/tenet-completes-purchase-of-uspi-from-wcas, accessed on April 1, 2025

**APPENDIX B**

**Note: In addition to the documents on this list, I relied on all documents cited in my report to form my opinions.**

APPENDIX C

## *Data Appendix*

1. USPI produced the following data in this matter:

- **USPI Payroll Data.** The USPI Payroll Data is an internal database that covers the years 2005 to 2023.[1] The USPI Payroll Data record employee name and identifier, job title, department, location, paycheck date, pay type (*e.g.,* salary, bonus, equity pay), hours worked, scheduled hours, and earnings at the employee-paycheck-pay type level.

- **Tenet Payroll Data.** Following Tenet's acquisition of USPI in 2018, USPI began tracking employee and compensation information for a subset of USPI employees in the Tenet Payroll Data instead of in the USPI Payroll Data.[2] The Tenet Payroll Data consists of two internal databases, the Tenet HRMS Data and the Tenet Genesys Data, that cover the years 2018 to 2021. The Tenet HRMS data record employee name and identifier, job title, department, location, and annual gross wages for 2018 to 2021 at the employee level. The Tenet Genesys data record employee name and identifier, job title, department, location, paycheck date, pay type (e.g., salary, bonus, equity pay), hours worked, and earnings at the employee-paycheck-pay type level.

2. SCA produced the following data in this matter:

- **SCA Payroll Data.** The SCA Payroll Data consists of two internal databases, one that covers the years 2008 to 2020 and a second that covers the years 2021 to 2022.[3] These data record employee name and identifier, job title, department, location, paycheck date, pay type

---

[1] USPI_CIV_000021819; USPI_CIV_00065922–33; "2023-5-15 Ltr K. Limarzi to Pls RE ACPERA Administrator or Above Positions.xlsx"; "Exhibit A_Paygroup_Location.xlsx"; "Exhibit B_ERNCD Values.xlsx"; "4.19.24 Paygroup location.xlsx"; "2024-11-25 Ltr J Bates Attachment - USPI Double Counting Paycodes.xlsx".

[2] USPI_CIV_000659234; USPI_CIV_001168726.

[3] "Highly Confidential - Outside Counsel Experts Only_Check History Hours and Earnings.xlsx"; "Highly Confidential - Outside Counsel Experts Only_Termed in 2021.xlsx"; "Highly Confidential - Outside Counsel Experts Only_Teammate Roster Point In Time.xlsx"; "SCA-Structured00000007_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000009_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000010_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA-Structured00000011_Highly Confidential–Outside Counsel Experts Only.xlsx"; "CheckSumm_Highly Confidential-Outside Counsel, Experts Only"; "CheckSummHE_ Highly Confidential-Outside Counsel, Experts Only.csv"; "Eemploy_ Highly Confidential-Outside Counsel, Experts Only.csv"; "Ejob_ Highly Confidential-Outside Counsel, Experts Only.csv"; "2022-3-29 Ltr C Ventura to L. Chan RE SCA Sample Structured Data.xlsx"; "2023-10-27 Letter from T. Rothman to S. Zandi re Plaintiffs'Plaintiffs' Structured Data Questions.xlsx".

(*e.g.,* salary, bonus, equity pay), hours worked, and earnings at the employee-paycheck-pay type level.

3. DaVita produced the following data in this matter:

- **DaVita Payroll Data.** The DaVita Payroll Data is an internal database that covers the years 2005 to 2022.[4]  The DaVita Payroll Data record employee name and identifier, pay type (e.g., salary, bonus, equity pay), hours worked, earnings, job title, and seniority level (as assigned by DaVita) at the employee-pay type-year level.[5]  In other words, these data report payroll information for DaVita employees, after aggregating to the annual level.
- **DaVita Teammate Data.** The DaVita Teammate Data is an internal database that covers the years 2005 to 2022.[6] The DaVita Teammate Data record employee identifier, action type, action date, job, department, location, and seniority level (as assigned by DaVita) at the employee-action level (where an action is any event that affects an employee, such as being hired, receiving a pay change, receiving a job title change, or being terminated).
- **DaVita Equity Grant Data.** The DaVita Equity Grant Data is an internal database that covers the years 2005 to 2022.[7] The DaVita Equity Grant Data record grant date, grant type (*e.g.,* stock grant, stock option), vesting schedule, number of shares, and market value of shares for each stock option or stock grant that is issued.

4. Additionally, all three Defendants generated the following data specifically for use in this matter:

- **Hashed SSN Data.** The Hashed SSN Data is a dataset (or columns appended to existing datasets, in the case of USPI) that was produced specifically for this matter.[8] These data report numeric identifiers

---

[4] DVA_OMCEAL_000000029–45; DVA_OMCEAL_000902589–91; DVA_OMCEAL_001408544; DVA_OMCEAL_001182111.

[5] The job title and seniority level (as assigned by DaVita) fields are available in some, but not all, of the DaVita Payroll Data files.

[6] DVA_OMCEAL_001421635; DVA_OMCEAL_001421632–34.

[7] DVA_OMCEAL_001408533; DVA_OMCEAL_001408536; DVA_OMCEAL_001408539; DVA_OMCEAL_001408542; DVA_OMCEAL_001408543; DVA_OMCEAL_001408547.

[8] DaVita produced several datasets containing hashed SSNs for employees who appear in their structured data. See DVA_OMCEAL_000000047; DVA_OMCEAL_001408550; DVA_OMCEAL_001421733; DVA_OMCEAL_001421640. SCA similarly produced several datasets containing hashed SSNs for employees who appear in their structured data. See "Highly Confidential - Outside Counsel Experts Only_SCA Hashed

corresponding to individuals' SSNs that can be linked across all three Defendants, and therefore can be used to track employees who move from one Defendant to another, without disclosing the individuals' actual SSNs.

5. Dr. Starr constructed a dataset that combined several of the datasets described above with various publicly available datasets. However, he made several basic errors when constructing this dataset. I corrected these errors, and I rely on the corrected dataset throughout my report to assess the validity of Dr. Starr and Dr. Gerhart's conclusions:

- **Dr. Starr's Data.** Dr. Starr constructed a panel dataset at the employee-year-company level. This dataset combined certain variables from the DaVita Payroll Data, DaVita Teammate Data, SCA Payroll Data, USPI Payroll Data, Tenet Payroll Data, and Hashed SSN Data. This dataset also included selected variables from publicly available data sources, including average wage and income earnings for medical and health services managers in the health care and social assistance industry by state and year from the American Community Survey ("ACS") Data; per-capita healthcare services spending by state and year from Federal Reserve Economic Data ("FRED"); per-capita real GDP by state and year from FRED and the U.S. Bureau of Economic Analysis ("BEA"); consumer price index by Census Region, and unemployment rate by state and year, from the U.S. Bureau of Labor Statistics ("BLS"); and minimum wage by state and year from the U.S. Department of Labor. Dr. Starr relies on the seniority level (as assigned by DaVita) field in the DaVita Teammate Data and the DaVita Payroll Data to determine whether DaVita employees are Senior Employees, but relies on a manual review of job titles in the SCA Payroll Data, the USPI Payroll Data, and the Tenet Payroll Data to determine the same for SCA and USPI employees. He further relies on a manual review of the job title fields and department fields in each of these datasets, as well as DaVita's seniority level field, to determine whether DaVita, SCA, and USPI employees belong to a group that is excluded from the proposed class (*i.e.,* senior corporate officers or personnel in the human resources, recruiting, or legal departments).

---

SSNs.xlsx"; "SCA - Structured00000005.xlsx"; "SCA-Structured00000012_Highly Confidential–Outside Counsel Experts Only.xlsx"; "SCA - Structured00000013.xlsx". USPI generated hashed SSNs and appended them to USPI_CIV_00065922–33 and USPI_CIV_000659234.

- **Dr. Starr's Corrected Data.** Dr. Starr made four basic errors when processing the various datasets that he used to construct his panel dataset, which I corrected. First, Dr. Starr did not properly account for the fact that hours worked are under-recorded in the USPI Payroll Data in 2005 and 2006, and he also incorrectly set hours worked equal to zero for all employees in the Tenet Payroll Data in 2018 to 2021.[9] I corrected these errors by replacing actual hours worked with scheduled hours worked for USPI in 2005 and 2006, and by correctly populating hours worked for employees in the Tenet Payroll Data. Second, Dr. Starr relied on incomplete and out-of-date data to identify employee and job characteristics for DaVita employees.[10] Dr. Starr relied on the following DaVita Teammate Data files for his analysis: DVA_OMCEAL_000902592. However, DaVita subsequently produced a similar, but more complete and up-to-date, DaVita Teammate Data file: DVA_OMCEAL_001421635. I corrected Dr. Starr's Data to rely on the more complete and up-to-date file. Third, Dr. Starr omitted equity compensation for SCA employees prior to 2021.[11] I corrected this error by including equity compensation for SCA in those years. Fourth, Dr. Starr failed to exclude DaVita and USPI employees in certain departments due to basic errors in his analysis code, such as treating a department as excluded when it is listed in lowercase letters in the data, but not when it is listed in uppercase letters. For example, Dr. Starr's analysis code does not exclude the "Legal-Executive," "Compliance", "Compensation and Benefits", "Benefits Administration," "TM Relations and Compliance," or "Legal – Labor and Employment" departments at DaVita when they are capitalized, but does exclude them when they are in lowercase letters. Similarly, Dr. Starr's analysis code does not exclude the "Human Resources" and "Payroll and Benefits" departments at USPI, even though he does separately seek to exclude departments titled "Human Resource," "Payroll," and

---

[9] Median hours worked for USPI employees is substantially lower in 2005 and 2006 compared to any other year in 2005–2022 in Dr. Starr's Data, a fact that Dr. Starr did not account for at all when processing the data. See Workpaper 5. The proportion of USPI employees for whom hours worked equals zero is higher for each year in 2018–2021 compared to any other year in 2005–2022 in Dr. Starr's Data, due to Dr. Starr erroneously setting hours worked equal to zero for all employees in the Tenet Payroll Data. See Workpaper 19.

[10] Dr. Starr's failure to rely on the most up-to-date and complete DaVita Teammate Data results in numerous, incorrectly assigned values for the department and location fields, as well as less-complete data for 2022, in Dr. Starr's Data. See Workpaper 20; Workpaper 21.

[11] Dr. Starr's Data includes no equity pay for SCA in 2007–2020. See Workpaper 22.

"Benefits." I corrected these errors to exclude additional employees who Dr. Starr intended to exclude from his analysis.[12]

6. I also rely on proprietary data from Lightcast and publicly available data from other sources to perform certain analyses in my report:

- **Lightcast Data.** Lightcast is a proprietary data provider that has constructed a structured database of job histories based on resumes posted to online resume websites.[13] The Lightcast Data that I analyze in my report reflects job histories for individuals who worked for one of the three Defendants, or in the Outpatient Care Centers industry (NAICS code 6214) to which all three Defendants belong, in 2024 or earlier. The Lightcast Data record company name, occupation, industry, start date, and end date at the individual-job level.

- **NAICS Association Data.** NAICS Association provides data on industry codes from Dun & Bradstreet, a provider of business data and analytics. NAICS Association provides industry codes for a specified list of companies by matching the companies to entities in the Dun & Bradstreet database based on the company's name and other characteristics (e.g., location) where available.

- **Bureau of Labor Statistics Data.** The Bureau's Quarterly Census of Employment and Wages program collects and publishes national counts of annual average private-sector establishments by NAICS industry.[14] The Bureau also provides national estimates of annual average private-sector employment by NAICS industry from the Current Employment Statistics program.[15]

---

[12] Dr. Starr also made one additional error that affects a small number of observations in the data. He improperly included USPI's Bill Wilcox, USPI's Brett Brodnax, and SCA's Andrew Hayek in the proposed class during certain years when they served as CEO for USPI and SCA, respectively, but excluded them for other years. I corrected this error by excluding observations for both during all years when they served as CEO.

[13] Lightcast, "Lightcast Data," available at https://lightcast.io/products/data/overview, accessed on April 12, 2025 ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability.").

[14] U.S. Bureau of Labor Statistics, "QCEW Overview," available at https://www.bls.gov/cew/overview.htm, accessed on April 16, 2025 ("QCEW produces a comprehensive tabulation of data on the number of establishments, monthly employment and quarterly wages for workers covered by State unemployment insurance (UI) laws and Federal workers covered by the Unemployment Compensation for Federal Employees (UCFE) program. ... At the national level, the QCEW program publishes establishment, employment and wage data for nearly every NAICS industry.").

[15] U.S. Bureau of Labor Statistics, "CES Overview," available at https://www.bls.gov/web/empsit/cesprog.htm, accessed on April 16, 2025 ("The Current Employment Statistics (CES) program is a monthly survey conducted by the Bureau of Labor Statistics. The survey provides employment, hours, and earnings estimates based on payroll records of business establishments. ... CES data are classified according to the 2022 North American Industry Classification System (NAICS).").

# Job Titles Included in
# Dr. Starr's Definition of the Class

| Job Title |
|---|
| 1. Admin Dir, Support Svcs |
| 2. Administrator |
| 3. Assistant Controller |
| 4. Associate Medical Director |
| 5. Asst Controller |
| 6. CEO |
| 7. Chief Executive Officer |
| 8. Clinical Director |
| 9. Controller |
| 10. Controller, USPI |
| 11. Dir, Audit Svcs |
| 12. Dir, Business Office |
| 13. Dir, Case Management |
| 14. Dir, Clin Quality Improv |
| 15. Dir, Clinical Ops |
| 16. Dir, Coding |
| 17. Dir, Corp Acct & A-D |
| 18. Dir, Corp Development |
| 19. Dir, Data & Analytics |
| 20. Dir, De Novo Development |
| 21. Dir, Enterpr Architect |
| 22. Dir, Fin Plan & Analysis |
| 23. Dir, Finance Corp |
| 24. Dir, Financial Rptg Sys |
| 25. Dir, Hosp Acct Shrd Srvc |
| 26. Dir, Hospital Him |
| 27. Dir, Information Tech |
| 28. Dir, Is Ops Delivery |
| 29. Dir, Laboratory |
| 30. Dir, Lease Accting |
| 31. Dir, M&A Analytics |
| 32. Dir, Managed Care |
| 33. Dir, Material Management |
| 34. Dir, Medical Staff Svcs |
| 35. Dir, Mgd Care Economics |
| 36. Dir, Nursing |
| 37. Dir, Nursing Procedural |

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX D**

| Job Title |
|---|
| 38. Dir, Nursing Procedureal |
| 39. Dir, Operations Finance |
| 40. Dir, Pat Access Site I |
| 41. Dir, Pharmacy Services |
| 42. Dir, Pharmacy Svcs |
| 43. Dir, Plant Operations |
| 44. Dir, Procurement |
| 45. Dir, Program Management |
| 46. Dir, Radiology |
| 47. Dir, Reg Ops Finance |
| 48. Dir, Rehabilitative Svcs |
| 49. Dir, Respiratory Therapy |
| 50. Dir, Revenue Analysis |
| 51. Dir, Service Line |
| 52. Dir, Supply Chain |
| 53. Dir, USPI Bus Ofc Ops |
| 54. Dir, USPI Fac Acctg |
| 55. Director |
| 56. Director Applicaton Developmnt |
| 57. Director Managemt Support |
| 58. Director Network Engineer |
| 59. Director Of Finance |
| 60. Director Of Nursing |
| 61. Director Of Operations Imaging |
| 62. Division VP |
| 63. Exec VP |
| 64. Executive Director |
| 65. Group President |
| 66. Imaging Administrator |
| 67. Market President |
| 68. Market President I |
| 69. Partnership VP |
| 70. President - Imaging |
| 71. President Ambulatory Services |
| 72. President, Imaging |
| 73. Regional Administrator FT |
| 74. Regional Director |
| 75. Regional VP |
| 76. Regional VP - Imaging |
| 77. Regional VP - Operations |
| 78. Regional VP - Ops I |

| Job Title |
| --- |
| 79. Regional VP - Ops Ii |
| 80. RVP Business Development |
| 81. Sales Executive |
| 82. Senior Director |
| 83. Senior VP |
| 84. Sr Dir, Accounting |
| 85. Sr Dir, Applied Clin Inf |
| 86. Sr Dir, Audit |
| 87. Sr Dir, Corp Devel-USPI |
| 88. Sr Dir, Data & Analytics |
| 89. Sr Dir, Is Operations |
| 90. Sr Dir, Is Ops Delivery |
| 91. Sr Dir, Managed Care |
| 92. Sr Dir, Patient Exp |
| 93. Sr Dir, Revenue Cycle |
| 94. Sr Dir, Service Line |
| 95. Sr Dir, Tax |
| 96. Sr Dir, USPI Bus Ofc Ops |
| 97. SVP |
| 98. SVP-Del |
| 99. Vice President |
| 100. VP |
| 101. VP - Controller |
| 102. VP Bus Dev - Cardiology Srvs |
| 103. VP Clinical Operations |
| 104. VP Financial |
| 105. VP, Cardiology Svcs |
| 106. VP, Chief Rev Cycle Ofcr |
| 107. VP, Clinical Operations |
| 108. VP, Corp Dev Terrhd USPI |
| 109. VP, Corp Developmnt-USPI |
| 110. VP, De Novo Development |
| 111. VP, M&A Analytics |
| 112. VP, Strat Netwk & Cntrtg |
| 113. VP, USPI Bus Ofc Ops |
| 114. VP, USPI Cno & Clin Ops |

Source: Dr. Starr Compensation Build

Note: List includes all USPI job titles included in Dr. Starr's director and above class.

**APPENDIX D**

# Job Titles Subject to
# USPI's Admitted Non-Solicitation Agreement with SCA

| Job Title | Subject to Agreement? |
|---|---|
| 1. Administrator | Yes |
| 2. CFO - Imaging | Yes |
| 3. Chief Administrative Officer | Yes |
| 4. Chief Development Officer | Yes |
| 5. Chief Executive Officer | Yes (but excluding Bill Wilcox and Brett Brodnax) |
| 6. Chief Financial Officer | Yes |
| 7. Chief Financial Officer-Imaging | Yes |
| 8. Chief Med Information Officer | Yes |
| 9. Chief Nursing Officer | Yes (but only if corporate or hospital) |
| 10. Chief Operating Officer | Yes (but only if corporate or hospital) |
| 11. Chief Quality Officer FT | Yes (but only if corporate or hospital) |
| 12. Controller | Yes |
| 13. Division VP | Yes |
| 14. Executive Director | Yes |
| 15. Executive VP | Yes |
| 16. Group President | Yes |
| 17. Imaging Administrator | Yes |
| 18. Market President | Yes |
| 19. Partnership VP | Yes |
| 20. President | Yes (but excluding Bill Wilcox and Brett Brodnax) |
| 21. President - Ambulatory Services | Yes |
| 22. President - Imaging | Yes |
| 23. Regional Administrator FT | Yes |
| 24. Regional Director | Yes |
| 25. Regional VP | Yes |
| 26. Regional VP - Imaging | Yes |
| 27. RVP Business Development | Yes |
| 28. Sales Executive | Yes |
| 29. Senior VP | Yes |
| 30. VP | Yes |
| 31. VP - Controller | Yes |
| 32. VP Business Development - Cardiology Services | Yes |
| 33. VP Clinical Operations | Yes |

Source: Letter from Kristen C. Limarzi (Gibson Dunn) to Joseph R. Saveri (Joseph Saveri Law Firm Inc.), Michael L. Roberts ( Roberts Law Firm), Linda P. Nussbaum (Naussbum Law Group, P.C) and Dean M. Harvey (Lieff Cabraser Heimann & Bernstein, LLP), "In re Outpatient Medical Center Employee Antitrust Litigation, Case No. 1:21-cv-00305," May 14, 2023

**APPENDIX E**

# Experts' Assessed Information Sharing between SCA and USPI

## USPI & SCA (2009–2018)

| Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|
| 1. 12/20/2009 | Email from SCA to USPI discussing interest in a "corporate overhead benchmarking exercise":<br>- "The idea of the exercise is to benchmark the levels of corporate resources allocated to the various activities from a purely corporate perspective. For example, how many and what level of people do we each have dedicated to Development and what additional costs do our Development teams incur. Not what are the salaries of the individuals but one level of detail up from that. We ran this by our General Counsel as well as outside counsel to ensure the planned exercise is completely appropriate."<br>- A suggested template is attached, but not cited. | Gerhart | No |
| 2. 12/22/2009 | Internal SCA email: "Talked to Mark Kopser at USPI and he is going to fill out the template over the next couple of days. Seemed to know a lot of it off the top of his head and apparently had been trying to get AmSurg to do this for a few years." | Gerhart | No |
| 3. 2/12/2010 | Internal USPI emails with "GA cost comparison SCA versus USPI":<br>- Compares total cost and "cost per center" across 3 departments<br>- Most recent response: "Impressive. Can we get anything at facility level, ie staffing?" | Starr | Yes |
| 4. 6/16/2010 | SCA document with information on USPI compensation strategy:<br>- "USPI: Delaying salary increases in corporate office, made corporate bonuses discretionary ... Bill [Wilcox] expects another year of **3% raises on average** with some markets higher (up to 10%) where competition is pushing wages faster ... USPI does not have a central HR department and does not have wage scales - all driven locally"<br>- "USPI: **2% guidance in field** ... VPs still frozen, now a year and 6 months, will probably keep for foresee" | Both | Yes |
| 5. 1/14/2011 | SCA document with competitor "salary increase budgets":<br>- "USPI = **2-3% (facility level; mgt. unclear but no raises last 2 yrs)**" | Starr | Yes |

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX E**

| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 6. | 7/13/2011 | Internal USPI emails about competitor benchmarking (no specific competitor mentioned):<br>- "I hope we can show stats on Drs being employed and USPI overhead compared to others at upcoming Board meeting."<br>- "Fourth request on competitor info! Let's also get info on employment both in general and by specialty (a la McKinsey study)."<br>- "Thanks, with respect to employment, I'll gather info and circulate." | Gerhart | No |
| 7. | 5/2/2012 | USPI: "**We pay our internal audit manager 150K … Is that close to what you pay[?]**"<br>SCA: "A few years ago we combined our compliance and our audit departments and now have a single VP **($175k + 40% potential bonus)** that leads both. There is a director who focuses solely on audit which is probably the relevant position to compare to and she has a **base of $103k with potential bonus of 25%**." | Both | Yes |
| 8. | 5/30/2012 | USPI: "Do you have a no. 2 lawyer, or a handful of equals? If you have a no. 2, mind telling me roughly what their comp is like?"<br>SCA: "Had a number 2 until he left last fall. He was around **$135K with a 40% bonus opportunity** … Haven't refilled the position yet, and if I do I will probably shift to the handful of equals (have them on the low side, in my opinion -- **$120K base plus 10% bonus potential** for 10-year lawyers)." | Gerhart | Yes |
| 9. | 9/9/2012 | Internal SCA emails:<br>- "We're collecting market information on what our competitors and other organizations are planning for merit adjustments."<br>- "If Andrew [Hayek] does not want to email Bill Wilcox (CEO) at USPI then I can email Mark Kopser (CFO)." | Starr | No |
| 10. | 10/21/2012 | SCA: "Are you all expecting typical **~2% wage increases for 2013**?"<br>USPI: "Yes **2-3%**" | Starr | Yes |

**APPENDIX E**

| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 11. | 7/31/2013 | USPI shares 2013 G&A info and discusses possibility of sharing revenue data:<br>- USPI: "I know that a few years back we exchanged data on corporate G&A with each other. I was wondering if you would be interested in repeating that exercise."<br>- SCA: "Sure, I would like to do this again. Just send what we exchanged the last time we did this."<br>- USPI: "I've also asked ... to do a form for us to compare net revenue per case. To the extent you're also interested in swapping information on that, [we] will send that along."<br>- SCA: "Let me think through the NPR swap question."<br>- USPI: "OK. Just so you know, I'm talking about one aggregate number for all of ASCs combined (i.e., all ASC net revenue, divided by total ASC cases). From an antitrust perspective, you wouldn't be exchanging anything that would give either of us knowledge of specific reimbursement contracts."<br>- SCA: "I will have a conversation or two around here and let you know. My first inclination is to hold off on sharing this info, at least with Tenet."<br>- SCA: "We still don't file publicly. Just post on intralinks so our banks and bond holders can pull down the filings. Let me discuss internally and I will get back to you." | Both | Yes |
| 12. | 8/9/2013 | SCA: "One of the things we have shared in the past is plans for the following year wage increases. Have you all started [to] set a number yet that you're planning to budget?"<br>USPI: "Not yet ... We'll remember to share with you when we do." | Both | No |
| 13. | 12/16/2013 | USPI emails with former USPI CFO:<br>- USPI: "Do you have the last G&A comparison you did with SCA? No one here does."<br>- Former CFO: "Here is the last -- out of date"<br>- Attached spreadsheet (also cited) compares USPI and SCA G&A expenses as of June 2011. | Gerhart | Yes |
| 14. | 8/20/2014 | SCA: "Are you all willing to swap wage increase budgets as we have in the past?"<br>USPI: "Sure. We're just heading into budgets ... I may be a few weeks out." | Both | No |

**APPENDIX E**

| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 15. | 8/25/2014 | Email exchange between USPI and SCA, including table with SCA's PTO and accrual policies:<br>- USPI and SCA set up a phone call to discuss PTO policy.<br>- USPI: "I did neglect to ask a question. At what number of hours does SCA consider an employee to be classified as full time for accrual purposes? We consider an employee full time if they average 30+ hours a week."<br>- SCA: "24"<br>- USPI: "When you respond with 'when' employees can use holiday hours, could you also let me know if it is accrued on a per pay period basis or is their holiday bank loaded up front?  Is it a 'use it or lose it' calendar year holiday policy?"<br>- SCA: "Loaded up front and yes."<br>- USPI later clarified whether the same PTO policy also also covered hourly employees, and SCA confirmed that it did. | Both | Yes |
| 16. | 12/19/2014 | Email chain in which SCA shares overhead benchmarking template; USPI discusses internally:<br>- SCA: "Here is a draft template as a starting point. Let me know if you would suggest any changes or want to review what the departments are before we both fill it in. At one point in the past I think we had done both number of FTEs and dollars. Do you want to take that approach again?"<br>- USPI (Internally): "I want to compare G&A with SCA. See their starting point for categories. Any changes you would suggest?"<br>- USPI (Internally): "Here's the team's first stab at this …  I added a couple of lines and notes for just a little further clarification as to what we were putting where (hid column G that has some of our notes as to how we pulled the various numbers)."<br>- Attached spreadsheet (shared internally at USPI; cited by Gerhart) includes USPI's expenses (forecasted and budgeted) by department. | Both | Yes |
| 17. | 2015 | Internal USPI document on west coast recruiting:<br>- "SCA - Find out what they are paying at the regional level and admin level" | Starr | No |
| 18. | 1/11/2015 | Internal USPI emails discussing "highlights" from an "SCA Overhead Comparison":<br>- "Our ~$84M total compares to their $95. We're either more disciplined, or under spending in some areas, or both … They overspend us in legal by a lot … They've invested a lot in finance … They spend $8M on development vs our ~ $6M … They don't have any ERH spend and spend less on IT than we do."<br>- Response from USPI CEO: "Please keep this just amongst the three of us."<br>- Attached speadsheet, "14 12 31 Overhead Comparison SCA USPI.xlsx," is not cited. | Both | Yes |

**APPENDIX E**

| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 19. | 2/18/2015 | Internal USPI email:<br>- "I've got a request ... to partner with SCA's HR department to see if they would be open to sharing salary information with us on their RVPs and Administrators in the San Francisco/Bay Area." | Starr | No |
| 20. | 3/3/2015 | Email from SCA to USPI asking to discuss forecasting methodology:<br>- SCA: "I'm wondering if you, or someone else at USPI, would be willing to share your forecasting methodology ... We are wondering if we would be just as accurate, or maybe more accurate, if we backed off from a center level approach and moved to a regional or group approach. Would you be open to having a discussion on this?"<br>- USPI: "Happy to."<br>- A meeting is scheduled for 3/6/2015. | Starr | No |
| 21. | 4/1/2015 | Internal SCA emails discussing sharing information with USPI:<br>- "My inclination is to continue to share data with USPI in many of the same ways we have since 2008 as it has proven to provide helpful insight and I don't believe impacts competition. This morning I am planning to send our volume file per our monthly procedure. While we may want to be a notch more guarded now with Tenet in the mix I think I can manage that with Jason Cagle as the one-off ideas outside of volume arise"<br>- "I agree - I don't think sharing this data gives them any kind of competitive advantage."<br>- "I am supportive of us continuing to apply what we can learn from them to advance our agenda and do not personally see any additional downside given the [T]enet relationship." | Gerhart | No |
| 22. | 5/28/2015 | Internal USPI email circulating documents comparing USPI and SCA's 2014-2015 expenses and growth statistics. Includes a list of SCA's health system partners and a document listing "SCA thoughts". | Starr | Yes |

**APPENDIX E**

| | Date | Description | Identified By | Includes Quantitative Evidence? |
|---|---|---|---|---|
| 23. | 6/3/2015 | Emails between USPI and McKinsey consultant discussing G&A expenses; attached spreadsheet (cited) includes forecasted and budgeted expenses by department for USPI and SCA. | Gerhart | Yes |
| 24. | 9/19/2017 | Internal USPI emails discussing slides related to a cost reduction analysis:<br>- "Slide 2 - A short overview and context illustrating our current G&A as well as G&A as a % of revenue over the past five years, I still need to include a comparable piece to other organizations (i.e. SCA and HCA)"<br>- "I've reached out to SCA (the only good comp) for the G&A comparison. I think they'll cooperate, but no guarantees. They've been a little different post-Optum." | Both | No |
| 25. | 9/21/2017 | An email exchange sharing G&A (total and without equity compensation) as a percentage of revenue for 2013–2017:<br>- USPI: "Would you be willing to share the following info with us? You may recall we've done this before. What you see below is our actual as a percentage of systemwide revenue."<br>- SCA: "As requested, see below information for SCA." | Starr | Yes |
| 26. | 5/12/2018 | Internal SCA/Optum emails discussing past G&A benchmarking with USPI:<br>- SCA: "We're trying to understand our OH relative to competitors and are looking for new ways to track competitor info down ... we wondered if you're able to make any connections or have access to this type of information."<br>- Optum: "Only data point we had in the past was USPI who we benchmarked with every ~2 years for the last decade... Let me know if you need any help with the CFO."<br>- Included slide lists SCA's "Financial Highlights" | Both | Yes |

Source: Gerhart Report; Starr Report; Produced Documents

Note: Documents covered, ordered by row number, include: 1. (OMC_BM_000006875); 2. (Mathis Deposition, Ex. PX497 [OMC_BM_000007716]); 3. (Wilcox Deposition, Ex. PX516 [USPI_CIV_000105175–7]); 4. (Hayek Deposition, Ex. PX490 [Hayek-000012214–6]); 5. (Wilcox Deposition, Ex. PX522 [OMC_BM_000000884–95]); 6. (USPI_CIV_000104518); 7. (Wilcox Deposition, Ex. PX523 [OMC_BM_000010778–9]); 8. (Cagle Deposition, Ex. PX234 [USPI_CIV_000016522]); 9. (Mathis Deposition, Ex. PX491 [OMC_BM_000013354–6]); 10. (Hayek Deposition, Ex. PX489 [OMC_BM_000014729]); 11. (Clemens Deposition, Ex. PX33 [SCA002364259–63], Wachsman Deposition, Ex. PX59 [SCA002364264–5], and Martin Deposition, Ex. PX135 [USPI_CIV_000016089–92]); 12. (Clemens Deposition, Ex. PX37 [USPI_CIV_000016100]); 13. (USPI_CIV_000113333 and USPI_CIV_000113335); 14. (Cagle Deposition, Ex. PX232 [USPI_CIV_000021155]); 15. (Martin Deposition, Ex. PX140 [USPI_CIV_000146394], English Deposition, Ex. PX120 [USPI_CIV_000584419–21], and English Deposition, Ex. PX119 [USPI_CIV_000601224–9]); 16. (Martin Deposition, Ex. PX138 [USPI_CIV_000122239] and Martin Deposition, Ex. PX 138A [USPI_CIV_000122240]); 17. (Mosley Deposition, Ex. PX283 [USPI_CIV_000035855–6]); 18. (Cagle Deposition, Ex. PX235 [USPI_CIV_000110943]); 19. (Cagle Deposition, Ex. PX239 [USPI_CIV_000046079]); 20. (Wachsman Deposition, Ex. PX60 [SCA001075713–5]); 21. (SCA000862885); 22. (Wilcox Deposition, Ex. PX520 [USPI_CIV_000111376–82]); 23. (USPI_CIV_000962508 and USPI_CIV_000962509); 24. (Cagle Deposition, Ex. PX240 [USPI_CIV_000686081–92]); 25. (SCA000609009–11); 26. (Mathis Deposition, Ex. PX501 [SCA002277742–4]). Date shown is the latest date given on the document or across the set of documents, if applicable.

*Highly Confidential - Outside Counsel/Experts Only*

**APPENDIX F**

## *Correction of Dr. Starr's processing of USPI departures*

1. Throughout my report, I present several analyses that rely on a version of Dr. Starr's compensation dataset in which I corrected several data processing errors.[1] Since filing my report, I have identified an additional error in Dr. Starr's processing of the compensation data that causes him to overcount departures from USPI. In this Appendix, I describe the error and my correction to it. I then reproduce the analyses from my report that use Dr. Starr's process for identifying departures as an input. After correcting Dr. Starr's compensation data for this additional error, the analyses presented in this appendix provide qualitatively similar results to those presented in the report I submitted on April 16, 2025, and all my opinions contained in my report are unaffected.

2. The additional data processing error in Dr. Starr's compensation dataset stems from his processing of USPI's Tenet Payroll Data. The Tenet Payroll Data, which contain compensation information for a subset of USPI Senior Employees, are only available through 2021, while the rest of USPI's compensation data are available into 2022. Dr. Starr identifies employees that depart USPI as those who appear as Senior Employees in the compensation data one year and not the following year. Because the Tenet Payroll Data end in 2021 and are not available in 2022, this method leads Dr. Starr to flag every USPI employee in the Tenet Payroll Data in 2021 as a departing employee. Dr. Starr's methodology cannot distinguish between employees in the Tenet Payroll Data who departed versus those that remained at USPI.

3. Some of the analyses in Sections 4 and 5 of my report rely on the departure information in Dr. Starr's compensation dataset, which is affected by Dr. Starr incorrectly flagging all employees in the 2021 Tenet Payroll Data as departures.[2] Dr. Starr's data processing error artificially increases the departure rate in 2021. To correct this error, I omit the final year of Tenet Payroll Data from the departure rate calculation, which is consistent with how Dr. Starr treats the final year of the remaining USPI compensation data.[3] Below I present updated versions of the analyses in my report that rely on departures, after correcting for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data.

---

[1] See the Data Appendix (Appendix C).

[2] Exhibits 6, 7, 11, 15, and 16 of my report require the identification of departing employees, and therefore are affected by Dr. Starr's mistake.

[3] I retain all eleven inter-Defendant switchers identified by Dr. Starr in my analysis. Note that, because I cannot observe whether other USPI employees in the Tenet Payroll Data left for non-Defendant employees, to the extent any did depart USPI, I am overstating the share of inter-Defendant switching in 2021.

**APPENDIX F**

4.  Appendix F Exhibit 6 below is a sensitivity of Exhibit 6 in my report that corrects for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. See paragraphs 80 through 86 of my report for a description of this analysis. The description and qualitative conclusions presented in the body of my report also apply to this sensitivity.

*Appendix F Exhibit 6*
*USPI's Senior Employee turnover accounted for by Defendants, 2006–2021 – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data*

| | | | Hires From and Departures To | | | |
| | | | SCA | | DaVita | |
| Year | | Total Turnover | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|
| 1. | 2006 | 76 | - | - | 1 | 1.3% |
| 2. | 2007 | 170 | - | - | 0 | 0.0% |
| 3. | 2008 | 109 | 2 | 1.8% | 0 | 0.0% |
| 4. | 2009 | 112 | 0 | 0.0% | 0 | 0.0% |
| 5. | 2010 | 105 | 6 | 5.7% | 0 | 0.0% |
| 6. | 2011 | 137 | 0 | 0.0% | 0 | 0.0% |
| 7. | 2012 | 135 | 5 | 3.7% | 1 | 0.7% |
| 8. | 2013 | 122 | 4 | 3.3% | 0 | 0.0% |
| 9. | 2014 | 117 | 1 | 0.9% | 1 | 0.9% |
| 10. | 2015 | 125 | 3 | 2.4% | 0 | 0.0% |
| 11. | 2016 | 225 | 1 | 0.4% | 0 | 0.0% |
| 12. | 2017 | 183 | 1 | 0.5% | 0 | 0.0% |
| 13. | 2018 | 219 | 5 | 2.3% | 0 | 0.0% |
| 14. | 2019 | 183 | 2 | 1.1% | 0 | 0.0% |
| 15. | 2020 | 299 | 6 | 2.0% | 0 | 0.0% |
| 16. | 2021 | 239 | 11 | 4.6% | 3 | 1.3% |
| 17. | **Outside of the Alleged Three-Party Mobility Restrictions: 2021** | **239** | **11** | **4.6%** | **3** | **1.3%** |
| 18. | **Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2008–2009 and 2020–2021** | **759** | **19** | **2.5%** | **-** | **-** |
| 19. | **Outside of USPI's Admitted Mobility Restrictions with SCA: 2008–2009 and 2018–2021** | **1,161** | **26** | **2.2%** | **-** | **-** |
| 20. | **During USPI's Admitted Mobility Restrictions with SCA: 2010–2017** | **1,149** | **21** | **1.8%** | **-** | **-** |

Source: Dr. Starr Corrected Compensation Data

Note: Senior Employee departures and arrivals are identified using the date of the employee's first and last paychecks. Inter-Defendant switches are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch. I drop observations from the 2021 Tenet Payroll Data except for the Senior Employees Dr. Starr flags as switching from SCA to USPI.

**APPENDIX F**

5.  Appendix F Exhibit 7 below is a sensitivity of Exhibit 7 in my report that corrects for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. See paragraphs 87 through 91 of my report for a description of this analysis. The description and qualitative conclusions presented in the body of my report also apply to this sensitivity.

*Appendix F Exhibit 7*
*Share of USPI Senior Employee turnover accounted for by Defendant and by non-Defendant employers, outside the Alleged, Assessed, and Admitted Conduct periods – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data*



Source: Dr. Starr Corrected Compensation Data

Note: Senior Employee departures and arrivals are identified using the date of the employee's first and last paychecks. Inter-Defendant switches are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch. I drop observations from the 2021 Tenet Payroll Data except for the Senior Employees Dr. Starr flags as switching from SCA to USPI.

**APPENDIX F**

6.   Appendix F Exhibit 11 below is a sensitivity of Exhibit 11 in my report that corrects for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. See paragraphs 110 through 116 of my report for a description of this analysis. The description and qualitative conclusions presented in the body of my report also apply to this sensitivity.

*Appendix F Exhibit 11*
*Total USPI Senior Employee departures and the number departing to SCA and DaVita, 2006–2021 – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data*

| Year | Total Departures | Departures To | | | |
| | | SCA | | DaVita | |
| | | Number | Percent | Number | Percent |
|---|---|---|---|---|---|
| 1. 2006 | 30 | - | - | 1 | 3.3% |
| 2. 2007 | 51 | - | - | 0 | 0.0% |
| 3. 2008 | 55 | 2 | 3.6% | 0 | 0.0% |
| 4. 2009 | 50 | 0 | 0.0% | 0 | 0.0% |
| 5. 2010 | 47 | 3 | 6.4% | 0 | 0.0% |
| 6. 2011 | 50 | 0 | 0.0% | 0 | 0.0% |
| 7. 2012 | 57 | 3 | 5.3% | 0 | 0.0% |
| 8. 2013 | 57 | 3 | 5.3% | 0 | 0.0% |
| 9. 2014 | 46 | 0 | 0.0% | 1 | 2.2% |
| 10. 2015 | 61 | 1 | 1.6% | 0 | 0.0% |
| 11. 2016 | 78 | 0 | 0.0% | 0 | 0.0% |
| 12. 2017 | 88 | 1 | 1.1% | 0 | 0.0% |
| 13. 2018 | 117 | 1 | 0.9% | 0 | 0.0% |
| 14. 2019 | 104 | 2 | 1.9% | 0 | 0.0% |
| 15. 2020 | 165 | 5 | 3.0% | 0 | 0.0% |
| 16. 2021 | 96 | 3 | 3.1% | 1 | 1.0% |
| 17. **Outside of the Alleged Three-Party Mobility Restrictions: 2021** | **96** | **3** | **3.1%** | **1** | **1.0%** |
| 18. **Outside of the Experts' Assessed SCA-USPI Mobility Restrictions: 2008−2009 and 2020−2021** | **366** | **10** | **2.7%** | **-** | **-** |
| 19. **Outside of USPI's Admitted Mobility Restrictions with SCA: 2008−2009 and 2018−2021** | **587** | **13** | **2.2%** | **-** | **-** |
| 20. **During USPI's Admitted Mobility Restrictions with SCA: 2010−2017** | **484** | **11** | **2.3%** | **-** | **-** |

Source: Dr. Starr Corrected Compensation Data

Note: Senior Employee departures are identified using the date of the employee's last paycheck. Inter-Defendant switches are identified by applying Dr. Starr's methodology to the corrected data, but removing the first instance of the switcher who is counted twice. Because Dr. Starr's methodology does not identify the direction of inter-Defendant job switches, I determine a direction based on the switcher's first or last paychecks, or by identifying their employer in the years before and/or after the switch. I drop observations from the 2021 Tenet Payroll Data except for the Senior Employees Dr. Starr flags as switching from SCA to USPI.

*Highly Confidential - Outside Counsel/Experts Only*

7.   Appendix F Exhibit 15 below is a sensitivity of Exhibit 15 in my report that corrects for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. See paragraphs 127 and 130 of my report for a description of this analysis. The description and qualitative conclusions presented in the body of my report also apply to this sensitivity.

*Appendix F Exhibit 15*
*Share of USPI and SCA Senior Employees that depart increased in 2020 – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data*



Source: Dr. Starr Compensation Data

Note: Senior Employee departures are identified using Dr. Starr's mobility methodology applied to Dr. Starr's class. I drop observations from the 2021 Tenet Payroll Data.

**APPENDIX F**

8.  Columns 1, 2, and 3 of Appendix F Exhibit 16 below show a sensitivity of the regressions in Exhibit 16 of my report on data that are corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data. As a robustness check, I also estimate the regression in Column 3, where I control for the rate of USPI departures, excluding data from 2021 altogether. Column 4 below shows the results from this regression. Columns 3 and 4 below show that the conclusions from my analysis remain unchanged after either of these corrections: Dr. Starr's mobility regression finds no impact of the conduct on employee mobility once changes in the overall departure rate at USPI are taken into account.

*Appendix F Exhibit 16*
*Senior Employees who depart USPI or SCA are not less likely to arrive at the other firm during the Experts' Assessed SCA-USPI Conduct period – corrected for Dr. Starr's mistreatment of USPI departures in the Tenet Payroll Data*

| | Figure 4: Model 3 | | | |
| --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) |
| | Starr's Regression Correcting Departures | Double-Switcher Correction Correcting Departures | Double-Switcher Correction Control for Departures Correcting Departures | Double-Switcher Correction Control for Departures Drop 2021 |
| Conduct | -0.00188* | -0.00168 | 0.00143 | 0.00330* |
| | (0.00104) | (0.00102) | (0.00165) | (0.00175) |
| % Effect Relative to Sample Mean | -60.7% | -55.3% | +47.3% | +128.7% |
| | | | | |
| Year | 0.000101 | 8.65e-05 | -0.000324 | -0.000513** |
| | (0.000120) | (0.000119) | (0.000251) | (0.000261) |
| % of USPI-SCA Employees Departing | | | 0.108** | 0.116** |
| | | | (0.0457) | (0.0459) |
| | | | | |
| Sample | USPI & SCA | USPI & SCA | USPI & SCA | USPI & SCA |
| Sample Mean of DV | 0.003 | 0.003 | 0.003 | 0.003 |
| Observations | 15,492 | 15,492 | 15,492 | 14,052 |
| R-squared | 0.000 | 0.000 | 0.001 | 0.001 |

Source: Dr. Starr's Compensation Data

Note: Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1. Percentage of Senior Employees Departing is calculated annually by dividing the number of USPI and SCA departures by the total number of USPI and SCA Senior Employees. These regressions are all estimated on data that exclude all 2021 Tenet Payroll Data observations except for the ones Dr. Starr flags as switchers from SCA. Column 1 shows Dr. Starr's regression; Column 2 shows Dr. Starr's regression on data that additionally exclude the double-counted switcher; Column 3 adds a control for the corrected average departure rate at USPI and SCA; Column 4 is the same regression as Column 3 but excludes data for 2021 altogether.

# Exhibit 8

Lane Declaration


(Filed Under Seal)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | MASTER DOCKET NO. 1:21-CV-00305 |

EXPERT REPORT OF DR. JOHN H. JOHNSON, IV

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ..................................................................................................1

II.  QUALIFICATIONS........................................................................................................8

III. SUMMARY OF ALLEGATIONS, PROPOSED CLASS, AND ASSIGNMENT ....................................9
     A. Summary of Plaintiffs' Allegations..................................................................... 9
     B. Proposed Class Definition ................................................................................. 10
     C. Assignment ....................................................................................................... 10

IV.  BACKGROUND ON THE DEFENDANTS AND THE PROPOSED CLASS ......................................11
     A. Defendants......................................................................................................... 11
     B. Proposed Class Members ................................................................................. 13

V.   DR. STARR AND DR. GERHART IGNORE COMPETITION FOR EMPLOYEES WITHIN THE
     PROPOSED CLASS FROM ALL NON-DEFENDANT EMPLOYERS...........................................16
     A. Economic Evidence of All Departures of Relevant Employees from the Defendants
        Illustrates the Competitive Constraints Faced by Defendants....................................... 19
     B. Plaintiffs' Experts Fail to Assess Evidence on Hiring Practices by the Defendants that
        Contradict Their Conclusions that Defendants Had the Ability to Suppress Mobility and
        Compensation for All Proposed Class Members .......................................................... 27
     C. Dr. Starr's Analysis of "Limited Mobility" is Flawed and Fails to Consider Evidence on
        Overall Turnover Rates that Contradict His Opinions ................................................. 33
     D. Defendants' Share of Total Employment is Small Even Within the Industries Dr. Gerhart
        Identifies as Potentially Relevant .......................................................................... 37

VI.  DR. STARR'S AND DR. GERHART'S THEORY OF ANTITRUST IMPACT FROM THE
     ALLEGED MOBILITY RESTRICTIONS IS UNSUPPORTED BY ECONOMIC ANALYSIS .............40
     A. Summary of Plaintiffs' Experts' Theory of Harm Due to the Alleged Mobility
        Restrictions....................................................................................................... 40
     B. Plaintiffs' Experts' Narrative of the Alleged Mobility Restrictions Ignores Contrary
        Evidence and is Not Supported by Empirical Analysis................................................. 42
     C. Plaintiffs' Theory of a "Wage Structure" and Purported "Cascading" Effects of the
        Alleged Conduct is Not Supported by the Available Data or Dr. Starr's Analysis.................... 49
        1. Summary of Plaintiffs' Experts' Theory of "Cascading" Effects Due to the
           Defendants' Purported Use of "Wage Structures"............................................. 49
        2. Compensation Data for Relevant Employees Contradicts Dr. Gerhart's and Dr. Starr's
           Conclusion of "Cascading Effects"............................................................... 51
        3. Dr. Starr's "Quantitative Evidence of a Compensation Structure" is Flawed and Does
           not Support his Conclusion that the Purported "Wage Suppression" would "Transmit"
           Across Proposed Class Members ................................................................... 59
     D. Dr. Starr and Dr. Gerhart Ignore Other Factors that Would Limit the Impact (If Any) of
        the Alleged Conduct............................................................................................. 66

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

1. Plaintiffs' Experts Acknowledge that the Defendants Benchmarked Compensation to Non-Defendant Firms But Do Not Account for How This May Limit the Impact of the Alleged Conduct on Compensation Received by Relevant Employees ................................. 66

2. Plaintiffs' Experts' Own Description of the Purported "Wage Structures" at Defendant Firms Suggest these Practices Would Limit the Impact of the Alleged Conduct on Compensation .................................................................................................. 69

3. Defendants Utilized Long-Term Incentives to Retain High Performing Employees, Which Would Limit the Impact of the Alleged Mobility Restrictions .................................. 69

VII.  DR. STARR'S AND DR. GERHART'S OPINIONS ON THE ALLEGED INFORMATION SHARING DO NOT ADDRESS PLAINTIFFS' WAGE FIXING ALLEGATION AND ARE NOT SUPPORTED BY ECONOMIC ANALYSIS OR THE EVIDENCE THEY PRESENT ......................... 71

A. Summary of the Alleged Information Sharing Evidence Presented by Plaintiffs' Experts ......... 71

B. Dr. Starr and Dr. Gerhart Fail to Assess Whether the Alleged Information Sharing or the Economic Conditions in the Markets at Issue Could Facilitate a Successful "Wage Fixing" Conspiracy ................................................................................................ 75

1. Dr. Starr and Dr. Gerhart Do Not Assess How the Co-Defendants Could Successfully Coordinate to Form a Wage Fixing Cartel ............................................................ 75

2. Dr. Starr and Dr. Gerhart Do Not Address How the Defendants Would Limit Competition for Employment of Proposed Class Members from Other Employers ............ 79

3. Dr. Starr and Dr. Gerhart Do Not Assess How the Alleged Information Sharing Would Prevent Cheating on the Alleged Wage Fixing Conspiracy ..................................... 81

C. Dr. Starr and Dr. Gerhart Do Not Offer a Reliable Link Between the Alleged Information Sharing and Antitrust Impact ............................................................................... 81

1. Plaintiffs' Experts' Speculative Link Between the Alleged Sharing of Merit Budget Information and Purported "Wage Suppression" Is Not Supported by Any Economic Analysis ................................................................................................. 82

2. Plaintiffs' Experts Offer No Reliable Link Between the Alleged Information Sharing for a Limited Number of Individual Jobs and "Suppressed Compensation" Across Proposed Class Members .............................................................................. 88

3. Plaintiffs' Experts Offer No Mechanism Through Which Sharing General Business Information Would Lead to "Suppressed Compensation" Across Proposed Class Members ................................................................................................. 89

VIII.  DR. STARR'S "WAGE SUPPRESSION" REGRESSION MODEL IS UNRELIABLE AND CANNOT SHOW ANTITRUST IMPACT OR BE USED TO CALCULATE DAMAGES FROM THE ALLEGED CONDUCT ......................................................................................... 91

A. Summary of Dr. Starr's "Wage Suppression" Regression Model .............................. 93

B. Dr. Starr's Incorrect Treatment of Defendants' Data Impacts the Results of his "Wage Suppression" Regression Model ............................................................... 96

C. Indicators of the Unreliability of Dr. Starr's "Wage Suppression" Regression Model .............. 99

1. The Results of Dr. Starr's Regression Model Are Inconsistent with His Own Analysis of the Alleged Conduct and the Academic Literature He Cites ............................. 99

2. The Results of Dr. Starr's "Wage Suppression" Regression Are Sensitive to the Specification and Included Sample .................................................................. 103

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

3. Dr. Starr's "Wage Suppression" Regression is Based on the Flawed Assumption that Relevant Factors Would Affect Compensation in the Same Way in His Benchmark and Proposed Conduct Periods ............................................................................................ 106

D. Dr. Starr's "Wage Suppression" Regression Produces Biased Results as His Model Does Not Account for the Factors that Determine the Levels of Variable Pay Received by Relevant Employees ............................................................................................... 109

1. Relevant Employees Received Multiple Types of Compensation, All of Which Dr. Starr Includes in His "Wage Suppression" Regression Model ............................................ 111

2. Empirical Testing Shows that Dr. Starr's "Wage Suppression" Regression Cannot Establish Impact for Base Salary ............................................................................... 115

3. The Failure to Include Firm Specific Performance Controls in Dr. Starr's "Wage Suppression" Regression Renders His Analysis Unreliable ................................................. 117

4. Dr. Starr's "Wage Suppression" Regression Model Cannot Account for the Variation in Timing for Long-Term Incentive Payments ................................................... 120

IX. DR. STARR'S DAMAGES CALCULATION IS UNRELIABLE AND IS BASED ENTIRELY ON HIS UNRELIABLE "WAGE SUPPRESSION" REGRESSION MODEL ...................................... 127

A. Dr. Starr's Damages Calculation Depends on the Defined Class Period ................................ 128

B. Dr. Starr's Damages Calculation Depends on His Identification of Relevant Employees ........ 132

X. DR. STARR'S CONCLUSION THAT "DEFENDANTS WIELD MARKET POWER" IGNORES WELL-ESTABLISHED METHODS USED BY ECONOMISTS TO ASSESS MARKET POWER AND IS REFUTED BY AVAILABLE EVIDENCE .................................................................... 133

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

## I.    EXECUTIVE SUMMARY

1.      I have been asked by counsel for Defendants DaVita Inc. ("DaVita"), Surgical Care Affiliates, LLC and SCAI Holdings, LLC (collectively "SCA"), Andrew Hayek, and Kent Thiry to provide an assessment of the merits and damages issues addressed in the expert reports of Dr. Evan Starr and Dr. Barry Gerhart in the *In Re Outpatient Medical Center Employee Antitrust Litigation*.[1]  Plaintiffs allege that the Defendants DaVita, SCA, and United Surgical Partners International ("USPI") (i) "entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees," and (ii) "exchanged competitively sensitive information to fix and maintain the compensation of their employees."[2]  Plaintiffs' experts describe and analyze separate bilateral agreements, between DaVita and SCA and between SCA and USPI.

2.      Plaintiffs' experts' assessments of antitrust injury and damages ignore a foundational feature of the labor markets at issue here—the Defendants are only three of hundreds of employers who compete for the labor of the more than 6,300 proposed class members, who held a variety of different jobs at the Defendants, requiring a variety of different skills and qualifications.  Dr. Starr and Dr. Gerhart myopically focus their analyses entirely on competition for the proposed class members between either DaVita and SCA or between SCA and USPI.  The economic evidence, including the documents and data Plaintiffs' experts reference in their reports, refute this simplistic conception of labor market competition limited to only the Defendants.

- Over 95 percent of employees who left a Defendant moved to options outside of the other "Covered Defendants" both during and outside of the proposed class period.

- During the proposed class period, over 3,000 relevant employees were hired by one of the Defendants from sources outside of the other "Covered Defendants" (98 percent of all hires during the relevant period), including from numerous competing employers.

- Individual job history data from Lightcast (which collects individuals' online resumé profiles from career websites) shows that proposed class members moved to numerous

---

[1] Expert Witness Report of Dr. Evan P. Starr, January 15, 2025, Notice of Errata Regarding the Expert Report of Dr. Evan P. Starr, January 21, 2025, and Starr Deposition Exhibit DX83 (Errata dated March 19, 2025) ("Starr Report"); Expert Witness Report of Dr. Barry Gerhart, January 15, 2025, and Notice of Errata Regarding the Expert Report of Dr. Barry Gerhart, February 11, 2025 ("Gerhart Report").

[2] Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024 ("Complaint"), ¶38.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

firms outside of the Defendants, including other firms in the outpatient care industry, the broader healthcare industry, and outside of the healthcare industry altogether.

- The Defendants' share of total employment in the industries Plaintiffs' experts describe as potentially relevant is small—Defendants account for less than 1 percent of employment in the Healthcare sector and only approximately 17 percent even when looking at the smaller Other Outpatient Care Centers industry, both of which would not account for competition between the Defendants and firms beyond the healthcare sector.

3.     Based on his analyses limited only to the Defendants, Dr. Starr concludes that "the quantitative evidence" of mobility rates between (i) DaVita and SCA or (ii) SCA and USPI are "strongly consistent with a No-Poach Agreement to prevent Class Members from moving" between Defendants subject to one of the agreements.[3]  However, these mobility analyses simply show that very few employees moved between DaVita and SCA or between SCA and USPI either outside of the proposed class period or during the alleged conduct.  Applying his own simple comparison of averages separately for the two pairs of Defendants involved in the alleged bilateral mobility restrictions, I find (i) *no* additional hires per year absent the alleged conduct between DaVita and SCA and (ii) two additional hires per year absent the alleged conduct between SCA and USPI (out of the hundreds of employees the Defendants hire into relevant positions each year).  Further, these analyses are plagued by several conceptual issues:

- Dr. Starr presents no analysis controlling for any other factor that could affect mobility rates between the proposed class period and the benchmark period (other than a simple time-trend that he has not provided an economic rationale to include).

- He relies on an unconventional (and more relaxed) standard of statistical significance to overcome the problem that his analyses find changes in mobility rates that are no different than random chance occurrence.

- By focusing his analysis on only movements between the "Covered Defendants," Dr. Starr ignores the vast majority of mobility events for relevant employees.

Simply applying Dr. Starr's own mobility analysis to overall turnover rates (departures to any destination, including Defendants and non-Defendants) shows *no* consistent pattern of suppressed mobility across the Defendants.  Indeed, the results for DaVita show a statistically significant *increase* in mobility during the alleged conduct relative to the benchmark period.

---

[3] Starr Report, ¶90.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

4.      Both Dr. Starr and Dr. Gerhart rely on anecdotal evidence of the alleged mobility restrictions between DaVita and SCA and separately between SCA and USPI.  But, in their subjective assessments of documents they simply ignore evidence counter to their stylized narrative of the non-solicitation and "tell your boss" provisions of the alleged bilateral mobility restrictions.  Both experts ignore:

- Changes in which Defendants' employees were covered by the alleged agreements over time, instead assuming that all members of the class (both Directors and VPs/SVPs) were the focus of the alleged conduct for the full proposed class period.

- Evidence that contradicts the assumed start and end dates of the alleged mobility restrictions.

5.      Dr. Starr's own empirical analysis of the purported start and end dates of the conspiracy illustrates the fundamental flaws in his and Dr. Gerhart's subjective interpretation of the documentary evidence.  His results are based on a small number of employee moves in any given year, rendering them highly sensitive to:

- The inclusion of one individual who was mistakenly double counted in his data set;

- The arbitrary selection of 2017 as a "base year," for his analysis; and

- His reliance on an unconventional (and more relaxed) standard of statistical significance.

I demonstrate that the results of this simple regression are not consistent with the start and end dates Dr. Starr assumes.  Further, his results cannot support his conclusion as they are driven by his selection of a base year—with the resulting start and end dates of the alleged conspiracy depending upon which year he arbitrarily chooses to treat as the base year in the regression.

6.      Plaintiffs' experts theorize that employees not "directly" affected by the alleged mobility restrictions—those who would not have received additional cold calls or external offers in the but-for world—are still "indirectly" affected through "cascading effects."  However, their theory of "wage structures" is not supported by the available evidence or Dr. Starr's analysis.  For example, internal documents cited by Dr. Starr and Dr. Gerhart describe the "high degree of customization" used by DaVita in determining compensation.[4]  Similarly, an internal SCA presentation notes that, as of September 2020, SCA did not "have a formal base salary/incentive structure, pay grades, or pay

---

[4] DVA_OMCEAL_001329256–9261, at 9257.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

ranges."[5]  Further, the empirical evidence based on actual compensation paid by the Defendants is also not consistent with Plaintiffs' experts' theory of a rigid "wage structure":

- Data on actual compensation paid to Directors shows wide variation in pay both within a single Defendant and across Defendants.  For example, using Dr. Starr's calculated "hourly rate," in 2017, DaVita Directors were paid between ███████████████ per hour while SCA Directors were paid between ███████████████████.[6]

- Actual compensation paid to Vice Presidents also show wide variation in pay both within a single Defendant and across Defendants.  For example, in 2017, DaVita "Vice Presidents" were paid between ████████████████████ while SCA "Vice Presidents" were paid between ████████████████████

- Actual compensation information also is inconsistent with Plaintiffs' experts' contention of a rigid "wage structure" between jobs and the use of "fixed percentage pay differentials" by the Defendants.  Available data shows that the differentials between Director and VP/SVP compensation are not "fixed"—ranging between 137 percent and over 400 percent at DaVita and between 31 percent and 82 percent at SCA during the proposed class period.

- Dr. Starr's only quantitative support for this purported "wage structure" are correlations of average compensation series.  Showing that compensation is "correlated" does not inform the question of whether all, some, or none of the relevant employees were paid less *due to* the alleged conduct.  Further, Dr. Starr's analysis (i) does not find a consistent pattern across Defendants when applied to the more relevant measure, changes in compensation over time, and (ii) finds the same result of a supposed "wage structure" when applied to compensation that moves randomly for different employees.  Each of these results demonstrates the unreliability of Dr. Starr's analysis.

- Dr. Starr and Dr. Gerhart also fail to assess other factors that would undermine any alleged antitrust conspiracy and/or limit the impact of the alleged conspiracy, including the

---

[5] SCA001669270, at slide 3.

[6] Dr. Starr calculates the "hourly rate" as total compensation divided by the number of hours worked in a year to compare employees that may have worked different number of hours within the same year.  Proposed class members are senior level employees that received substantial total compensation.  Based on Dr. Starr's own analysis, proposed class members received annual compensation of over $200,000, on average, and up to over $14 million (Starr Report, Figure 5).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Defendants' benchmarking practices, consistent hiring of employees from non-Defendants during the proposed class period, and the use of long-term incentives to retain employees.

7. Dr. Starr and Dr. Gerhart also offer unsupported opinions about the use of alleged information sharing to facilitate a wage fixing conspiracy. Despite citing economic literature that explains the obstacles to a successful cartel are "coordination, cheating, and entry,"[7] Dr. Starr provides no assessment of the feasibility of the alleged wage fixing conspiracy given the conditions in this industry. He provides no explanation for how any alleged wage fixing cartel could:

- Set compensation for 6,300 proposed class members with different educational backgrounds, working in different functional areas, with different skillsets and employment backgrounds, employed in different geographic areas, across a 12-year period in the face of competition from hundreds of firms outside the Defendants.

- Be monitored or enforced in light of the large percentage of compensation that is paid in the form of bonuses and long-term incentives. Plaintiffs' experts provide no explanation for how the information sharing they cite could be used to "fix" variable compensation levels.

- Restrict demand for the employees at issue both in the face of substantial growth in employment at the Defendants as well as the significant number of non-Defendants who were hiring employees.

- Utilize the limited instances of information sharing cited by Plaintiffs' experts (merit budget increases in a small number of years early in the proposed class period, information on three individual jobs, and general business information) to "fix" the compensation of relevant employees, let alone the thousands of proposed class members.

8. The empirical evidence is inconsistent with a wage fixing conspiracy using the information allegedly shared. Plaintiffs' experts present no analysis to show that any of the alleged information sharing resulted in changes in pay for any individual employee of a Defendant or the aggregate merit budgets used by the Defendants—a conclusion that is not supported by the available evidence. An analysis of the distribution of actual merit increases at each Defendant shows wide variation in merit increases (i) across Defendants, (ii) for different employees at the same Defendant, and (iii) over time. When applied only to base salary, which is the portion of compensation that would be impacted directly

---

[7] Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature*, Vol. 44, No. 1, 2006 ("Levenstein and Suslow (2006)"), pp. 42–95, p. 45.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

by merit budgets, Dr. Starr's own regression model shows no statistically significant suppression in compensation in the aggregate or across two of the three Defendants.

9.      Dr. Starr puts forward a regression model, which he asserts can "empirically test" if the alleged conduct "economically and statistically significantly suppressed Class Member wages."[8]  Dr. Starr claims that this model accounts for all relevant factors aside from the alleged conduct that determine compensation for all 6,300 proposed class members, and that by "controlling for other relevant economic factors," his model can identify the effect of the alleged conduct by comparing total compensation before and after the proposed class period to total compensation during the proposed class period.[9]  Dr. Starr's regression model, from which he estimates a 14.5 percent "wage suppression" in aggregate due to the challenged conduct for the three corporate Defendants, is plagued by several errors which render it unreliable:

- Dr. Starr makes several errors in his underlying data construction.  He overstates the total compensation per hour of USPI employees, omits relevant data for certain employees, and includes non-relevant employees in human resources, recruiting, and legal departments that should be excluded from the class under his own methodology to identify proposed class members.  Simply correcting these data errors reduces Dr. Starr's damages estimate by over $170 million dollars, or nearly 20 percent.

- The results of Dr. Starr's own "robustness checks" and my additional testing show the sensitivity of his model to different regression model specifications.

- Statistical testing disproves the fundamental assumption of Dr. Starr's model that with the exception of the alleged conduct, economic factors affected compensation in the same way in both the benchmark and proposed class periods.

- After correcting Dr. Starr's data errors, his own model no longer finds statistically significant aggregate "wage suppression" (or Defendant-specific "wage suppression" for two of the three Defendants) for base salary.

- Dr. Starr's regression attempts to model all forms of compensation (base salary, bonus, and long-term incentives) in a single model without accounting for changes in firm performance that impact variable compensation levels.  As my testing shows, Dr. Starr's "wage suppression" model fails to find statistically significant "wage suppression" when firm-

---

[8] Starr Report, ¶103.

[9] Starr Report, ¶105.

specific performance measures for certain types of variable compensation are included in his model.

- Moreover, by including equity payments (rather than grants) in his regression, Dr. Starr (i) incorrectly attributes stock payments granted prior to the alleged conduct to his damages, and (ii) incorrectly ignores that the vast majority (more than 99 percent for DaVita) of proposed class members' stock payments after the conduct period were granted during the conduct period.

10. The unreliable nature of Dr. Starr's regression is also highlighted by the unrealistic magnitudes of his estimated "wage suppression" relative to his own analysis of mobility rates. Dr. Starr cites an academic paper by Caldwell and Danieli, which finds that a 10 percent increase in outside employment options increases earnings by only 1.7 percent. In this case, Dr. Starr's regression model would suggest proposed class members were underpaid by an average of 14.5 percent in *every* year of the proposed class period. Based on the academic literature he cites a "wage suppression" effect of this magnitude would imply that the available outside employment options decreased by *approximately 60 percent*. However, Dr. Starr's own mobility analysis suggests, at most, a change in mobility rates of only 2 percent due to the alleged conduct.

11. Dr. Starr's calculation of damages is based entirely on his flawed "wage suppression" regression model, which, as discussed above, cannot be used to reliably estimate "wage suppression" or calculate damages for the proposed class. Further, the results of Dr. Starr's "wage suppression" regression (and damages analysis) vary significantly depending on the definition of the proposed class period. When I apply his model to different alleged conduct periods, I find his model generates vastly different damages estimates—including *no damages*. When applied to the alleged conduct dates Dr. Starr assumes—which are contradicted by available evidence—his analysis finds the largest damages estimate across all of the previously alleged conduct periods. Dr. Starr's damages calculation is also elevated by his inclusion of senior executives at the Defendants, which he testified are excluded from the proposed class.

12. Finally, Dr. Starr offers an unsupported opinion on the existence of market power by the Defendants. He reaches this conclusion based entirely on the results of his unreliable compensation regression model. Dr. Starr conducts no analysis of any relevant antitrust labor market and ignores the well-established methods that antitrust economists regularly use to assess market power and market definition. He performs no assessment of any qualitative evidence, conducts no "Hypothetical Monopsonist Test," does not analyze employment options outside the Defendants, does not consider the

7

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

possibility that any subset of employees within the class could be in different relevant labor markets, and fails to assess any geographic constraints that would limit or expand competition for some proposed class members.

## II.  QUALIFICATIONS

13.  My name is John H. Johnson, IV.  I am the CEO of Edgeworth Economics, L.L.C. ("Edgeworth").  Edgeworth is a consulting firm that provides clients with objective expert economic and financial analysis for complex litigation and public policy debates.  Edgeworth's experts work in a wide range of areas, including labor and employment, antitrust, data management, class certification, and intellectual property.  I am also an Adjunct Professor at the Georgetown University McCourt School of Public Policy and am a member of the Board of Directors of the National Archives Foundation.

14.  I am an economist specializing in economic and statistical analysis of antitrust and labor and employment issues.  I received my B.A. *magna cum laude* with highest distinction in Economics from the University of Rochester and my Ph.D. in Economics from the Massachusetts Institute of Technology ("MIT").  My areas of specialization at MIT were econometrics—the application of statistics to economics—and labor economics.  During my career as a professional economist, I have provided economic analysis in a wide range of litigation matters involving antitrust, labor and employment, consumer protection, damages, and statistics.  Prior to my employment as an economic consultant, I was an Assistant Professor of Economics and Labor and Industrial Relations at the University of Illinois at Urbana-Champaign.  In my various teaching roles, I have taught courses in labor economics and statistics, among other topics.  I continue to teach as an Adjunct Professor at Georgetown University's McCourt School of Public Policy, including a course on *Antitrust and Public Policy.*

15.  I have testified at trial, at evidentiary hearings, and by deposition, and provided consulting on a wide range of antitrust matters related to class certification, liability, and damages as well as in antitrust cases involving claims both of coordinated behavior and monopolization.  I have written numerous papers and given many talks on topics related to class certification, scientific standards in litigation, appropriate use of econometrics in litigation, and antitrust damages and was previously an Editor of the *Antitrust Law Journal*.  I have been accepted as an expert in Economics, Econometrics, and Statistics in Federal District Courts.  My curriculum vitae, which includes a list of my previous antitrust (and other) expert testimony in the last four years and publications, is attached as **Appendix A** to this report.[10]

---

[10] Edgeworth is compensated for my work and the work of my team relating to this litigation based on hourly rates.  My rate is $1,525 per hour.  Payment for Edgeworth's services is not contingent upon my opinions or the outcome of this litigation.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

### III.   SUMMARY OF ALLEGATIONS, PROPOSED CLASS, AND ASSIGNMENT

#### A.   Summary of Plaintiffs' Allegations

16.    Plaintiffs allege that "SCA, USPI, and DaVita conspired to reduce and limit compensation and mobility of their employees."[11]  Plaintiffs allege that the Defendants "entered into no-poach agreements to eliminate competition between and among themselves for employees, focusing primarily upon but not limited to Senior Employees."[12]  Plaintiffs' experts describe two bilateral agreements, (i) between DaVita and SCA and separately (ii) between SCA and USPI,[13] which I refer to as the alleged mobility restrictions throughout my report.  Specifically, Plaintiffs allege that:

- Beginning in May 2008, DaVita and SCA agreed not to solicit each other's employees.[14] Plaintiffs further allege that Kent Thiry of DaVita and Andrew Hayek of SCA "further honed" the agreement "to preclude DaVita and SCA from soliciting or recruiting each other's employees at the director-level and above, unless the employees were already seeking outside employment and had informed their supervisors they wanted to leave."[15]

- "No later than May 2010, Mr. Hayek [of SCA] established a no-poach agreement with his counterpart at USPI to eliminate competition between the companies for each other's employees, by not actively soliciting each other's employees."[16]

17.    Plaintiffs further allege that the Defendants "exchanged competitively sensitive information" (what Plaintiffs' experts refer to as "CSI") to "fix and maintain the compensation of their employees."[17] Specifically, Plaintiffs allege that beginning "no later than 2009, Defendants exchanged planned wage and merit increases for use in their yearly budgeting processes" as well as "other competitively sensitive information, including specific employee salaries, general and administrative expenses, forecasts, and forecasted sales volumes."[18]  Both of Plaintiffs' experts describe alleged information sharing between (i)

---

[11] Complaint, ¶38.

[12] Complaint, ¶38.  "Senior Employees" are defined by Plaintiffs as employees at the Director level or above (Complaint, ¶7)

[13] Plaintiffs' experts do not assess any alleged mobility restrictions between DaVita and USPI.  See Deposition of Evan P. Starr, Ph.D., March 19, 2025 & March 20, 2025 ("Starr Deposition") 38:3–8; Deposition of Barry Gerhart, Ph.D., March 5, 2025 ("Gerhart Deposition") 196:5–198:12

[14] Complaint, ¶40.

[15] Complaint, ¶¶41–42.

[16] Complaint, ¶49.

[17] Complaint, ¶38.

[18] Complaint, ¶8.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

DaVita and SCA and separately (ii) between SCA and USPI,[19] which I refer to as the alleged information sharing throughout my report.

### B.  Proposed Class Definition

18.     As Plaintiffs' experts describe, the proposed class includes "employees who worked in positions at the director-level and above […] in the United States for one or more of the following: (a) from May 1, 2008, to December 31, 2019, Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 1, 2010, to December 31, 2019, United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 1, 2008, through December 31, 2019, DaVita Inc. or one of its subsidiaries."[20]  I understand that the period in which the conduct at issue has been alleged to have occurred has changed over time.[21]  Throughout my report, I refer to the conduct period assessed by Plaintiffs' experts as the proposed class period.

### C.  Assignment

19.     I have been asked by counsel for DaVita, SCA, Andrew Hayek, and Kent Thiry to provide an assessment of the expert reports submitted by Dr. Evan Starr and Dr. Barry Gerhart in this case. Specifically, I have been asked to assess the methods presented by Dr. Starr and Dr. Gerhart with respect to their opinions on antitrust liability, antitrust impact, and the calculation of class-wide damages.[22]  In the course of preparing this report, I conducted an economic analysis of the industry at issue.  As part of my analysis, I reviewed deposition testimony, documents in the litigation record, as well as publicly available information.  I also conducted various analyses of data produced in this litigation—including data regarding relevant employees' base and variable compensation.  Additionally, I reviewed the expert reports of Dr. Starr and Dr. Gerhart, as well as the materials supporting their reports, and their deposition testimony.  I have been assisted in this matter by staff of Edgeworth, who

---

[19] See Section VII.A.  Neither of Plaintiffs' experts discuss alleged information sharing between DaVita and USPI (Starr Deposition 38:3–8; Gerhart Deposition 196:5–198:12).

[20] Starr Report, ¶9; Gerhart Report, ¶5.

Excluded from the class are "senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants" (Complaint, ¶92).

[21] For example, in their Third Amended Complaint, Plaintiffs allege that the "'no-poach' agreements continued through 2021" (Complaint, ¶7).

[22] My analyses and opinions may also be relevant for an assessment of Dr. Starr's and Dr. Gerhart's class certification opinions.  As I describe below, Plaintiffs' experts have not offered a reliable methodology to show liability, class-wide impact, or class-wide damages.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

worked under my direction.  A list of materials which I relied upon to develop my opinions is attached in **Appendix B** to this report.[23]

## IV.  BACKGROUND ON THE DEFENDANTS AND THE PROPOSED CLASS

### A.  Defendants

20.     DaVita currently specializes in kidney dialysis care and is headquartered in Denver, Colorado.[24] As of 2022, DaVita "provided dialysis and administrative services in the U.S. through a network of 2,724 outpatient dialysis centers."[25]  In 2012, DaVita acquired HealthCare Partners, renamed to DaVita Medical Group ("DMG") in 2016, which operated medical groups and affiliated physician networks.[26] DaVita sold DMG in 2019.[27]  Kent Thiry is the former Chairman and CEO of DaVita, a title he held between 1999 and 2019.[28]

21.     SCA is an Ambulatory Surgery Centers ("ASCs") management company headquartered in Birmingham, Alabama that currently operates outpatient surgical facilities in multiple states.[29]  SCA facilities offer surgical services across spinal, total joint replacement, gynecology, cardiovascular, orthopedic, and other specialties.[30]  The company was created in 2007 and was privately held until its

---

[23] I understand that I was provided access to the entire record as of the time of this report's writing.  If additional information is provided to me in this litigation, I will analyze it and consider it as part of my opinions and supplement this report as appropriate.

[24] DaVita Inc. 10-K, 2022 Annual Report, p. 2.  DaVita relocated its headquarters from El Segundo, CA in 2010 (DaVita, "DaVita Announces New Corporate Headquarters in Denver, Colorado," May 27, 2009, https://investors.davita.com/2009-05-27-DaVita-Announces-New-Corporate-Headquarters-in-Denver-Colorado. See also, Starr Report, ¶24(b) ("Davita focuses on kidney care").

[25] DaVita Inc. 10-K, 2022 Annual Report, p. 4.

[26] DaVita Inc. 10-K, 2012 Annual Report, p. 2; DaVita Inc. 10-K, 2016 Annual Report, p. 2.

[27] UnitedHealth Group, "Optum completes acquisition of DaVita Medical Group from DaVita," June 19, 2019, https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html.

[28] Deposition of Kent Thiry, August 16, 2024 ("Thiry Deposition") 9:23–24; DaVita, "DaVita Announces CEO Succession," April 29, 2019, https://investors.davita.com/ 2019-04-29-DaVita-Announces-CEO-Succession.

[29] SCA Health, "About Us," https://sca.health/about-us/; SCA Health, "Contact Us," https://sca.health/about-us/contact/.  SCA was headquartered in Deerfield, IL from at least 2013 to 2017, but most of SCA's relevant employees were located in Alabama during those years.

[30] SCA Health, "Build Your Career at SCA Health," https://careers.sca.health/.

11

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

initial public offering in 2013.[31]  In 2017, SCA was acquired by Optum, a subsidiary of UnitedHealth.[32] Andrew Hayek was the Chairman and CEO of SCA from 2008 until 2017 when he became the CEO of OptumHealth, a title he held until 2019.[33]

22.      USPI currently operates ASCs and surgical hospitals in multiple states and is headquartered in Dallas, Texas.[34]  USPI's service lines include orthopedics, spine, pain management, gastrointestinal, ophthalmology, urology, and other specialized outpatient services.[35]  USPI was a publicly traded company until 2007, when private equity firm Welsh, Carson, Anderson, and Stowe acquired USPI.[36] USPI was later acquired by Tenet Healthcare Corporation.[37]

23.      The Defendants DaVita, SCA, and USPI are three of many companies that provide different types of outpatient care services within the healthcare industry in the United States.[38]  Outpatient care refers to any healthcare consultation, procedure, treatment, or other service that is administered without an overnight stay at a hospital or medical facility.[39]  Outpatient care centers can include dialysis centers that provide kidney care, ASCs where surgical procedures are performed, along with other types of

---

[31] SCA001258153–8251, at 8167–8168; Global News Wire, "Surgical Care Affiliates Announces Closing of Its Initial Public Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares," November 4, 2013, https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-to-Purchase-Additional-Shares.html.

[32] Reuters, "UnitedHealth to buy Surgical Care Affiliates in $2.3 billion deal," January 9, 2017, https://www.reuters.com/article/world/americas/unitedhealth-to-buy-surgical-care-affiliates-in-23-billion-deal-idUSKBN14T15C/.

[33] Hayek Deposition, 11:2–12:20.  Prior to working at SCA, Mr. Hayek served as President of VillageHealth at DaVita from 2007 to 2008 (Deposition of Andrew Patrick Hayek, September 18, 2024 ("Hayek Deposition") 38:11–20).

[34] USPI, Homepage, https://uspi.com/home/default.aspx; USPI, "Contact Us," https://uspi.com/contact-us/default.aspx.

[35] USPI, "Who We Are," https://uspi.com/about-us/who-we-are/.

[36] United Surgical Partners International, Inc. 10-K, 2009 Annual Report, p. 4; Reuters, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," January 8, 2007, https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html.

[37] Tenet Healthcare Corporation gained majority ownership of USPI in 2015 and completed its acquisition in 2018 (see Tenet Health, "Tenet Healthcare Corporation Completes United Surgical Partners International and Aspen Healthcare Transactions," June 16, 2015, retrieved from https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm; Tenet Health, "Tenet Completes Purchase of USPI from WCAS," April 16, 2018, https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx).

[38] See, e.g., NAICS Association, "NAICS Code Description," https://www.naics.com/naics-code-description/?code=6214 (listing more than 70,000 "US Business Entities" operating Outpatient Care Centers).

[39] See, e.g., Definitive Healthcare, "Outpatient Care," https://www.definitivehc.com/resources/glossary/outpatient-care.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

medical facilities.[40]  Total employment of nursing, administrative, managerial, executive, and other personnel in the outpatient care industry has grown over the relevant period.  Per the Bureau of Labor Statistics ("BLS"), around 600,000 individuals were employed in the Outpatient Care Center industry in 2008, growing to slightly over 1 million in 2019 (and around 1.1 million in 2022).[41]  Similarly, employment within the broader Healthcare and Social Assistance sector grew substantially from around 16 million in 2008 to 20.4 million in 2019 (and around 20.6 million in 2022).[42]

### B.  Proposed Class Members

24.     Dr. Starr opines that the proposed class includes 6,308 putative members "holding director-level or above positions."[43]  These "director-level or above" positions include multiple job levels (e.g., Directors, Vice Presidents, Senior Vice Presidents) as well as a variety of job functions, across different departments.  Dr. Starr's data shows that proposed class members are heterogeneous, holding hundreds of different jobs (such as Director, Real Estate and Vice President of Finance).  For example,[44]

- The approximately 3,400 proposed class members at DaVita worked in approximately 400 different job titles, including employees that worked, for example as Regional Operations Directors of groups of kidney dialysis centers, in the Finance department, and in the IT Management department.

- The approximately 1,400 proposed class members at SCA worked in approximately 150 different job titles, including employees that worked in the, for example, Finance, Development, and Managed Care departments.

---

[40] Definitive Healthcare, "Outpatient clinics are in!," https://www.definitivehc.com/blog/outpatient-clinics-are-in.

[41] U.S. Bureau of Labor Statistics, "Employment for Health Care and Social Assistance: Outpatient Care Centers (NAICS 6214) in the United States [IPURN6214W200000000]," retrieved from FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/IPURN6214W200000000.

[42] U.S. Bureau of Labor Statistics, "All Employees, Health Care and Social Assistance [CEU656200000]," retrieved from FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/CEU6562000001.

[43] Starr Report, ¶22.  See **Appendix C-1** for a summary of proposed class members by year.

[44] Note that the job title tracked in the Defendants' data is frequently populated with generic titles such as "Director" or "Vice President."  The counts of unique job titles would not account for the differences in job responsibilities and qualifications for a "Director" in the finance department and another "Director" in the IT department, for example.

During the proposed class period, relevant employees worked in 480 departments at DaVita, 85 departments at SCA, and 116 departments at USPI.  DaVita also provided information on the "Job Family" to categorize its jobs.  Relevant employees at DaVita held jobs in 187 Job Families, including Clinical Management, Business Development, and Corporate Strategy.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- The approximately 1,500 proposed class members at USPI worked in approximately 40 different job titles, including employees that worked in the, for example, Radiology, Physician Incentives, and Resource Management departments.

25.     These different jobs held by the proposed class members had a wide variety of different responsibilities and required different skills or previous experiences.  I show examples of job descriptions for Director level jobs, as identified by Dr. Starr in **Exhibit 1**.  As this exhibit shows, Director level jobs have a variety of different responsibilities and require different qualifications.  For example,

- The "Director, Real Estate" position at DaVita is responsible for managing "external real estate and development partnerships" and requires a bachelor's degree as well as a "minimum of ten plus years of corporate development experience."

- The "Director, IT Governance and Administration" position at SCA is responsible for managing "the IT budget and monthly financial forecasting" and requires 15 years or more of technology leadership experience, with a preference for "Project Manager Certification."

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 1**
**EXAMPLES OF JOB DESCRIPTIONS FOR RELEVANT POSITIONS**
**DIRECTOR LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Construction Management at DaVita | **Director, Real Estate**<br><br>• Manages external real estate and development partnerships including surveyors, geotechnical and civil engineers, coordinating legal entitlement process, managing architects and drawing production, and ensuring that all areas of the center development process undergo appropriate review<br>• Works closely with real estate and legal to accomplish the goals and objectives and strategic plans<br>• Analyzes and makes business recommendations on construction trends and portfolio conditions<br>• Ensures that appropriate steps are taken to anticipate and correct any unsatisfactory operating results and vendor relationships | Minimum Qualifications<br>• A Bachelor's Degree is required; Master's Degree (MBA) preferred<br>• A minimum of ten plus years of corporate development experience required<br>• Business management including financial, operational, compliance and organizational responsibilities<br>• Wide ranging multi-state design and construction experience and market knowledge required<br>• Strategic ability to think through and partner with operations to deliver capital optimized real estate solutions |
| IT at SCA | **Director, IT Governance and Administration**<br><br>• Establish Governance processes within the PMO ensuring compliance with ITIL standards.<br>• Optimize costs of services through a blend of internal and external service models.<br>• Risk monitoring of the companies project portfolio.<br>• Responsible for the IT budget and monthly financial forecasting.<br>• Manage IT's P&L monthly and report to the CIO variances from the budget.<br>• Manage major program initiatives related to program budget and actuals. | Total education, vocational training and experience<br>• 15+ years of technology leadership experience.<br>• Ability to design, formalize, implement, and educate teammates on IT Governance and other project management processes.<br>• Experience in all aspect of talent management (recruiting, interviewing, hiring, evaluating, discipline, etc.).<br>• Strong understanding of ITIL standards and industry best practices.<br>• Prior experience reporting to executive management required.<br>• Bachelor's degree in computer related field preferred.<br>• Project Manager Certification preferred. |

Note: See **Appendix C-2** for additional examples.

Sources: DVA_OMCEAL_001302342–2343; SCA000073150–3151.

26.     Similarly, the responsibilities differ between Vice President positions, examples of which I show in **Exhibit 2**. While the "Vice President of Finance and Reimbursement" position at DaVita directs accounting operations, payroll, and financial reporting, the "Vice President of Development" position, "leads the development function in the assigned geography to contribute to the growth objectives in the 5 year plan for the group." These jobs also require different qualifications, with the VP in the finance department requiring a finance or business-related degree and six years of experience in business and/or accounts receivable management, while the "Vice President of Development" requires experience in leading direct and indirect teams of at least 5 people across multiple internal and external stakeholders.

15

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 2**
**EXAMPLES OF JOB DESCRIPTIONS FOR RELEVANT POSITIONS**
**VICE PRESIDENT LEVEL**

| Department and Defendant | Job Responsibilities | Job Qualifications |
|---|---|---|
| [a] | [b] | [c] |
| Finance at DaVita | *Vice President of Finance and Reimbursement*<br><br>[D]irects all aspects of accounting operations, overseeing all transactions related to general ledger, receivables, payables, payroll and financial reporting. This position provides advice and leadership on financial and reimbursement processes to support the mission and objectives of Lifeline and network of clients. Provide consultative support and coordinate activities to support Lifeline clients regarding all aspects of health care financial and revenue cycle management. | Education and Experience<br>Bachelor's degree in Finance or Business Administration or related area<br><br>Specialized Experience, Education, Training, or Qualifications<br>• Master's Degree in Business Administration (MBA) preferred<br>• Minimum of six (6) years experience in business management and/or accounts receivable management<br>• Expert-level computer skills and proficiency in MS Excel; intermediate proficiency in PowerPoint, MS Word and Outlook<br>• Three (3) years Healthcare experience strongly preferred |
| Development at SCA | *Vice President of Development*<br><br>Lead the development function in the assigned geography to contribute to the growth objectives in the 5 year plan for the group. Maintain strong analytical focus in deal sourcing, evaluation and closing. Provide strategic updates to senior leadership team in development and operations in the Group. Collaborate with peers across SCA in all functions to achieve overall SCA goals and development goals in the region. Recruit and retain top talent in the organization to support aggressive growth in the region. | Ideal Experience<br>6+ years in consultative sales or business development<br>Experience in strategy development, selling, and closing complex transactions within dynamic organizations.<br>Experience leading direct and indirect teams of 5+ people across multiple internal and external stakeholders.<br>Experience with analytics and assessment of business models and investments<br>C-suite engagement<br><br>Education<br>A bachelor's degree is required and advanced degree is desirable. |

Note: See **Appendix C-3** for additional examples.

Sources: DVA_OMCEAL_001318066–8068; SCA000058911–8916.

As I describe in more detail below, the competition for an individual employee's labor will depend on their own background, location, and which job opportunities that employee is qualified for (and would be interested in). Dr. Gerhart described this dynamic when he testified that, "each person almost has their own individual market for opportunities."[45] Available information shows that Defendants compete with hundreds of non-Defendant firms across a variety of industries for the labor of relevant employees.

## V. DR. STARR AND DR. GERHART IGNORE COMPETITION FOR EMPLOYEES WITHIN THE PROPOSED CLASS FROM ALL NON-DEFENDANT EMPLOYERS

27. Economists characterize competitive conditions for labor services based on the supply side (workers) and the demand side (employers). To understand how the two sides interact with each other

---

[45] Gerhart Deposition, 119:14–120:6.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

and determine the degree of competition for labor, economists focus on supply-side substitution, i.e., employees' ability and willingness to substitute away from their current employer (such as a Defendant) to another employer (such as a different Defendant or a non-Defendant).[46] Competition within labor markets functions differently than competition in product markets as labor markets are "matching markets" where the employer and the job applicant must "match" in their preferences.[47] In a product market, the customer decides to purchase a product from a specific vendor and pays a specific price for the product. In labor markets, depending on the jobs at issue, both employees and employers may have a range of choices for potential matches across firms, industries, and geographic locations.[48] Once a match is found, the employer and employee then potentially negotiate the terms of compensation, including base salary, variable compensation, long-term equity and cash incentives, as well as benefits.

28.     In assessing antitrust liability, impact, and damages, Dr. Starr and Dr. Gerhart myopically ignore competition for the 6,300 proposed class members from any employers outside of DaVita, SCA, and USPI. Dr. Starr and Dr. Gerhart do not properly account for (or in many cases, consider at all):

- Available data on employee departures, which shows that during and outside the proposed class period more than 95 percent of employees who left one of the Defendants moved to options outside of the other Defendants as well as data on employee hiring, which shows that during the proposed class period over 3,000 relevant employees joined a Defendant from numerous competing non-Defendants. The existence of outside employment options for proposed class members demonstrates that any conclusions based solely on inter-Defendant mobility are incomplete, failing to capture competition from competitors outside the alleged conspiracy.

---

[46] See American Bar Association, Section of Antitrust Law, *Market Power Handbook: Competition Law and Economic Foundations*, 2nd ed., ABA Book Publishing, 2012, pp. 52–54. See also, U.S. Department of Justice and the Federal Trade Commission, "2023 Merger Guidelines," December 18, 2023 ("2023 Merger Guidelines"), §4.3(B).

[47] As I explain in Section X, the concept of a "relevant labor market" has a specific meaning in antitrust economics. It represents the boundaries of effective competition within which a set of firms actively compete for the services of workers. See U.S. Department of Justice, "Public Workshop on Competition in Labor Markets," September 23, 2019, comments by Dr. Patrick Greenlee and Dr. Kevin Murphy. See also, U.S. Department of Treasury, *The State of Labor Market Competition*, March 7, 2022, https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf.

[48] As the Department of Justice ("DOJ") and Federal Trade Commission ("FTC") Merger Guidelines explain, "[d]epending on the occupation, alternative job opportunities might include the same occupation with alternative employers, or alternative occupation" (2023 Merger Guidelines, §4.3.D.8).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Available documents and data show class members moving to numerous firms other than the Defendants. These include firms in the ASC and Outpatient Care Center industries, the broader healthcare industry, and outside of the healthcare industry altogether.

- Statistical evidence on overall turnover rates for relevant employee departures directly rebuts Dr. Starr's conclusion that Defendants restricted employee mobility during the proposed class period.

- When focusing on the healthcare sector (which Dr. Gerhart appears to identify as a potentially relevant industry), Defendants' share of total employment in the healthcare industry is less than 1 percent. Even when looking at the smaller Other Outpatient Care Center industry Dr. Gerhart points to, Defendants' share of total employment is still only approximately 17 percent. These shares of total employment also do not account for the fact that the Defendants compete for labor with firms beyond the healthcare sector, which would further constrain their ability to suppress compensation.

The fact that the Defendants' share of employment in the industries that Plaintiffs' own experts identify is small indicates that the labor market competition from non-Defendants would be meaningful. Economic theory and the antitrust literature predict that the continued competition with a large number of firms (to which proposed class members continued to move) would restrict Defendants' ability to suppress wages below competitive levels, contradicting Dr. Starr's assertion that the Defendants suppressed compensation for all relevant employees by 14.5 percent on aggregate over the span of an almost twelve-year proposed class period.[49] As Dr. Starr states, "Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members."[50]

---

[49] For example, a textbook cited by Dr. Starr describes that monopsony power depends on the number of buyers ("When the number of buyers is very large, no single buyer can have much influence over price"), the labor supply elasticity (i.e., a measure of workers' willingness to supply labor in the face of a wage reduction), and the interaction among buyers (Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 8th ed., Pearson, 2013 ("Pindyck and Rubinfeld"), pp. 386–387).

Dr. Starr does not account for these factors because he does not study the nature of competition for relevant employees from firms outside of the three Defendants.

[50] Starr Report, ¶196.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

### A. Economic Evidence of All Departures of Relevant Employees from the Defendants Illustrates the Competitive Constraints Faced by Defendants

29.     Dr. Starr focuses his quantitative analysis of mobility entirely on moves between "Covered Defendants" (i.e., SCA and DaVita and separately between SCA and USPI).[51]  That is, out of the hundreds of relevant employees moving from and to the Defendants each year, Dr. Starr only studies a small number of moves between "Covered Defendants" to support his claim that "Defendants' Conduct artificially suppressed the bilateral mobility of Senior-Level Employees between SCA and DaVita, and SCA and USPI."[52]  Dr. Starr summarizes the moves between "Covered Defendants" in his Figure 2.[53] As Dr. Starr's analysis shows, few employees moved between "Covered Defendants" both outside and during the proposed class period.  Moreover, some employees moved between  "Covered Defendants" both outside of and during the proposed class period, despite the alleged mobility restrictions.

30.     Despite testifying that he was assessing the two separate bilateral agreements, Dr. Starr presents all employee moves between "Covered Defendants" together in his Figure 2.[54]  Based on his Figure 2, which I replicate in the first panel of **Exhibit 3** below, Dr. Starr calculates the average number of "departures between Covered Defendants" for 2010–2019 and compares this to the average for 2020–2021, claiming to find "markedly" different rates between periods.[55]  This "markedly" different rate of hiring between the Defendants outside of the alleged conduct is a difference of 6.2 employees, on average, per year.[56]  That is, Dr. Starr purports to find that the Defendants, in aggregate, "suppressed wages" for all proposed class members by up to 14.5 percent by foreclosing 6.2 additional moves

---

[51] Dr. Starr presents three analyses of "mobility events" between Defendants subject to one of the agreements: (i) a simple chart of "mobility events," (Figure 2) (ii) a regression analysis that Dr. Starr purports to use to "confirm that the Conduct Period end date of 2019 is appropriate" for both agreements (Figure 3), and (iii) a separate regression analysis "to test that the cumulative effect of the No-Poach Agreements was to suppress movement." (Figure 4) (Starr Report, ¶¶81–90).  I address his regression analyses in his Figure 3 and 4 in Sections VI.B and V.C, respectively.

[52] Starr Report, ¶12(b).

[53] See Starr Report, Figure 2, which counts 71 mobility events between "Covered Defendants."  Dr. Starr double counts the move of the employee Heather Way, counting her move from SCA to USPI in both 2020 and 2021. Ms. Way's termination date at SCA was January 22, 2021, and she was hired at USPI on January 25, 2021. After correcting this double counting, Dr. Starr's Figure 2 contains 70 total mobility events.

[54] Starr Deposition 102:6–103:4.

[55] Starr Report, ¶84.

For the purposes of his analysis, Dr. Starr does not account for *when* in the year an employee moved between Defendants.  For example, Dr. Starr includes the move of employee Tanya Hague from SCA to USPI in 2010 as "during" the alleged conduct for the purposes of his comparison.  However, Ms. Hague ended her employment at SCA on January 31, 2010 and was hired by USPI on February 1, 2010—*before* the start of the alleged conduct between these Defendants in May 2010.

[56] Starr Report, ¶84.

19

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

between the two pairs of "Covered Defendants" each year out of the approximately 300 employees, on average, that departed one of the Defendants each year during the proposed class period—almost 50 times more than the difference in moves Dr. Starr purports to find. Further, as this exhibit shows, there is variation in the number of moves year-to-year, including outside of the proposed class period. For example, in 2020 there were 3 moves between DaVita and SCA compared to 0 moves in 2021. Dr. Starr does not assess *why* there would be more moves in some years and not others separate and apart from the alleged mobility restrictions (e.g., changes in available job opportunities over time).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

EXHIBIT 3
DR. STARR'S FIGURE 2
NUMBER OF DEPARTURES THAT ARE MOVES BETWEEN COVERED DEFENDANTS
2008 – 2021



Notes: All three charts above exclude the double counted move of Heather Way in 2020, included in Dr. Starr's Figure 2. Dr. Starr's benchmark periods are highlighted in grey on each chart.

Source: Starr turnover.

21

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

31.     Dr. Starr's choice to present together all moves between either pair of "Covered Defendants" obscures the different patterns of employee movements between the different "Covered Defendant" pairs.  In **Exhibit 3**, I also show the same data graphed separately for employees that moved between (i) DaVita and SCA (in the middle panel) and (ii) between SCA and USPI (in the last panel).  When split apart to show the employees impacted by the specific alleged bilateral mobility restrictions, Dr. Starr's own analysis no longer shows any change in the rates of moves between DaVita and SCA during and after the end of the alleged conduct.  Dr. Starr's simplistic approach of comparing averages for numbers of the employees moving between "Covered Defendants" finds that, for DaVita and SCA, on average, more employees moved between these Defendants *during* the alleged conduct than outside of it (an average of 1.67 moves per year during the proposed class period compared to 1.5 after).  That is, one of Dr. Starr's own quantitative analyses in fact contradicts his own conclusion that "Defendants' Conduct artificially suppressed the bilateral mobility of Senior-Level Employees between SCA and DaVita."[57]

32.     For employees moving between SCA and USPI, Dr. Starr's simplistic comparison of averages would suggest that, on average, 2 fewer employees moved during the alleged conduct than in his benchmark periods before and after it (an average of 2.8 moves per year during the proposed class period compared to 4.75 outside the proposed class period).  That is, even for employee moves between SCA and USPI, which drive the "markedly" different rate of movement Dr. Starr purports to find, his own analysis would suggest that only 2 additional employees would have moved each year absent the alleged conduct.[58]

33.     Departures to destinations other than a "Covered Defendant," including to employment opportunities at non-Defendant competitors, exceed 95 percent of total departures in each year of Dr. Starr's analysis—including the years during the alleged mobility restrictions and those outside of it.[59]  In **Exhibit 4**, I compare the departures to "Covered Defendants" in Dr. Starr's analysis to all other departures.[60]  The vast majority of all departures by proposed class members (highlighted in light blue in

---

[57] Starr Report, ¶12(b).

[58] Starr Report, ¶84.

[59] At his deposition, Dr. Starr argued that it is unclear if employees departing from the Defendants moved to other employers as departing employees could have been unemployed or left the labor market entirely (Starr Deposition, 136:19–137:10).  According to BLS data on labor force flows, during the proposed class period, on average, only 4.1 percent of all employees in the U.S. became unemployed or exited the labor market each month.  (U.S. Bureau of Labor Statistics, "Employment Level (LNU02000000), Labor Force Flows Employed to Unemployed (LNU07400000), and Labor Force Flows Employed to Not in Labor Force (LNU07800000)," retrieved from https://fred.stlouisfed.org/graph/?id=LNU02000000,LNU07400000,LNU07800000,#).

[60] I identify "departures" in this analysis based on the termination dates tracked in the Defendants' structured data.  In his Figure 2 analysis, Dr. Starr considers a relevant employee to have departed a Defendant in a given year if

(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

the pie charts) was not to one of the other "Covered Defendants," both during and outside of the proposed class period.  For example,

- The top panel of this exhibit shows moves between DaVita and SCA, which account for less than one percent (0.7 percent) of all departures during the proposed class period and even less after the proposed class period.  As discussed above, Dr. Starr's own comparison would suggest no additional moves between DaVita and SCA during the proposed class period absent the alleged mobility restrictions.

- The bottom panel of this exhibit shows moves between SCA and USPI, which account for approximately 2 percent of all employee departures during the proposed class period compared to approximately 1 percent prior to the proposed class period and 3 percent after.  Dr. Starr's analysis would suggest 2 additional moves each year, on average, between SCA and USPI during the proposed class period absent the alleged mobility restrictions (1.5 percent of all class period departures in the but-for world).

Even though movements to other employment opportunities far exceeded movements to "Covered Defendants" during and outside the proposed class period, Dr. Starr and Dr. Gerhart offer no analysis of competition from non-Defendants to support their conclusion of restricted employee mobility. Plaintiffs' experts thus do not assess the competitive constraints non-Defendants placed on Defendants' ability to allegedly suppress compensation below competitive levels.

---

they do not appear in a relevant position in the next year's data.  This leads to two issues.  First, Dr. Starr's analysis in Figure 2 considers employees as leaving the company if they move from a position he classifies as class-relevant in one year to a position he classifies as non-relevant in the next year.  Second, Dr. Starr's classification of departures (i.e., employees who are in this year's, but not in next year's data) considers nearly 40 percent of all relevant USPI relevant employees in 2021 as departures.  The lack of 2022 payroll data for many of these employees was related to a migration in payroll systems and not due to departures, as Dr. Starr assumes (see 2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter).

I see the same results when I apply Dr. Starr's methodology for identifying departures—the overwhelming majority of relevant employee departed to destinations other than the "Covered Defendants" before, during and after the proposed class period.  See **Appendix D-1** for the same set of pie charts comparing moves between "Covered Defendants" to all other departures, using Dr. Starr's methodology (corrected for the two issues mentioned above).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 4**
**MOVES BETWEEN "COVERED DEFENDANTS"**
**COMPARED TO ALL DEPARTURES**

**DAVITA AND SCA**



**SCA AND USPI**



Notes: For the purposes of this exhibit, I adopt Dr. Starr's convention in his mobility analyses and consider all of 2008 as part of the proposed class period he studies for DaVita and SCA as well as all of 2010 for the proposed class period he studies for SCA and USPI. Departures are identified by termination records. This chart does not include DMG employees that left in 2019 when DaVita sold DMG or USPI employees with a termination date on December 31, 2019 that transfer to the Tenet payroll.

Source: Starr turnover (Corrected Data).

34.     The Named Plaintiffs and employee-specific examples cited by Dr. Starr and Dr. Gerhart further highlight the broad employment opportunities proposed class members availed themselves of when they departed from the Defendants.

24

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- After leaving SCA, Named Plaintiff Allen Spradling returned to the financial services industry (where he worked prior to SCA) as a project manager for Bank of America's IT group, testifying that the skills he gained at SCA and prior employers made him qualified for a job at Bank of America.[61]

- While employed at SCP (which was acquired by SCA), Named Plaintiff Scott Keech actively searched for new employment opportunities.[62] Mr. Keech sought the help and advice of former colleagues in his search, requesting they submit his resumé or inquire on various positions including "Senior Program Officer at Innovations for the Underserved" at the California Healthcare Foundation and multiple positions at Kaiser Permanente.[63] Ultimately, Mr. Keech left SCA to work as an "Area Continuum Administrator" at Kaiser Permanente.[64]

- Former DaVita Vice President of Marketing Communications Bill Myers, who was discussed in both Plaintiffs' expert reports, "began interviewing for a position" and left DaVita to work for telecommunications company Liberty Global.[65]

35. To examine the broader set of companies that relevant employees moved to after working at one of the Defendants, I use individual job history data from Lightcast, which collects individuals' online resumé profiles from career websites.[66] The dataset I analyzed contains employees' job titles and

---

[61] Deposition of Allen Spradling, July 18, 2024 ("Spradling Deposition") 135:1–2; 161:12–19. See also, Spradling Deposition, 124:10–14 ("…the IT skill set is very in demand and transferrable.").

[62] Deposition of Scott Keech, August 22, 2024 ("Keech Deposition") 172:15–173:12; 191:7–192:10; Keech Deposition, Exhibit 0056 (KEECH_000000806–0808) (email chain).

[63] Keech Deposition, Exhibit 0048 (KEECH_000001104–1106) (email regarding job interest); Keech Deposition, Exhibit 0050 (KEECH_000000332–0333) (email chain citing CNO job interest); Keech Deposition, Exhibit 0041B (KEECH_000000317–0324) (email expressing interest in Kaiser Permanente administrator positions).

[64] Keech Deposition, 195:10-17; Keech Deposition, Exhibit 0072 (LinkedIn Profile).

[65] Gerhart Report, ¶81(v); Starr Report, footnote 174; LinkedIn, "Bill Myers," https://www.linkedin.com/in/bill-myers-6b88a12/.

[66] See Lightcast, "Overview," https://lightcast.io/products/data/overview ("When someone posts their resume on the internet or builds an online profile with their career information, they create a record of how workers describe their own experience. We aggregate anonymous data from millions of online professional profiles, adding another layer of insight into workforce skills, career paths, and talent availability.") Dr. Starr points to academic literature that relies on data tracked by Lightcast (see, for example, Francine Lafontaine, and Saattvic, Margaret Slade, "No–Poaching Clauses in Franchise Contracts, Anticompetitive or Efficiency Enhancing?" cited in Starr Report, ¶48).

The Lightcast data I use for my analysis includes anyone who reported employment at companies in the Outpatient Care Industry (i.e., all companies Lightcast matched to the NAICS 6214 Industry Classification), which includes individuals that reported working for DaVita, SCA, or USPI.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

company names with the corresponding employment start and end dates. I matched the job titles in the Lightcast data to the set of relevant job titles included in Dr. Starr's analysis and examined the set of different companies relevant employees worked at after being employed at one of the Defendants. The Lightcast data thus allows me to observe where at least a subset of the companies' employees worked for immediately after departing from relevant positions at the Defendants.[67] The Defendants acknowledged the wide range of firms they compete with for labor. As Bridie Fanning (SCA) testified, "[t]here were hundreds of places that people [from SCA] could go and work."[68]

36.     The Lightcast data shows that all three Defendants compete with a broad set of different employers (inside and outside of the healthcare industry) for the labor of relevant employees. For example,

- For DaVita, the Lightcast data records departures to approximately 1,000 different companies,[69] including to dialysis competitor Fresenius, other healthcare companies such as Kaiser Permanente, and companies with large footprints outside of healthcare such as retailers Amazon and Walmart.

- For SCA, the Lightcast data records departures to over 250 different companies, including outpatient care companies such as Covenant Physician Partners, other healthcare companies such as Sutter Health, and companies primarily operating outside of healthcare such as BMO (a commercial bank) and Dell Technologies (a computer manufacturer).

---

[67] Because the Lightcast data is limited to employees with online resumes, the set of companies observed in the Lightcast data is likely a subset of all the companies' relevant employees worked for after their employment in relevant positions at Defendants.

[68] Deposition of Bridget A. Fanning, Ph.D., July 17, 2024 ("Fanning Deposition",) 303:20–304:13. See also, Deposition of Mark Garvin, May 30, 2024 ("Garvin Deposition",) 195:14–196:2 ("Q. Now, with respect to competitors for employees, who would you consider to be competitors for the senior level type of employees who were involved in the SCA agreement to your understanding? A. Competitors to USPI for employees in general? Q. Correct. A. Any and all health systems in the United States of America, any and all ambulatory surgery center companies in the United States of America, private equity firms employing physician practice management with various ancillary subs. And a host of multi-state, multisite business operators, healthcare or not."). See also Deposition of Dennis Kogod, September 6, 2024 ("Kogod Deposition",) 179:9–20 ("Q. And the places – DaVita executives do leave DaVita to go to other companies, right? A. Yes. Q. And the pool of other companies to which DaVita executives go is also very large, correct? […] A. Yes").

[69] I identify unique companies as tracked by the field *company_name*, which captures the standardized company name associated with a job (see Lightcast, "US PROFILES (PSEUDONYMIZED) JOBS," https://docs.lightcast.dev/data-shares/us-profiles-pseudonymized-jobs.)

I limit my analysis of the Lightcast data to begin in 2005 for DaVita and USPI, and in 2007 for SCA. I do not include moves between relevant employees and firms that acquired one of the Defendants as external moves, specifically moves from SCA to Optum and UnitedHealth Group starting in 2017 and moves from USPI to Tenet starting in 2015 (see footnotes 32 and 37, *supra*).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- For USPI, the Lightcast data records departures to over 200 different companies, including outpatient care companies such as US Renal Care, other healthcare companies such as HCA Healthcare, and companies primarily operating outside of healthcare such as McKinsey (a management consulting company).

That is, the available Lightcast data shows hundreds of outside competitors hiring proposed class members, which would limit Defendants' ability to restrict mobility and lower proposed class members' compensation below competitive levels.

### B. Plaintiffs' Experts Fail to Assess Evidence on Hiring Practices by the Defendants that Contradict Their Conclusions that Defendants Had the Ability to Suppress Mobility and Compensation for All Proposed Class Members

37.    Dr. Gerhart testified that it would be of interest to "look at the degree to which […] people move between" firms and that such an assessment of competition for labor would include not just the Defendants but non-Defendant firms as well.[70]  Similarly, Dr. Starr testified that assessing where departing employees moved to and where Defendants hired from would be relevant to determine "labor market competitors."[71]  However, Dr. Starr only studies "departures that are moves between Covered Defendants" and does not assess the *hiring* practices at the Defendants.[72]  Hiring by the Defendants from non-Defendant companies is another indication of the wide range of competitive labor market options for the proposed class members, as well as competitive constraints on the Defendants.[73]

38.    In **Exhibit 5**, I summarize the number of all external hires from non-Defendant firms into relevant positions (in the light blue areas) before, during, and after the proposed class period compared to the employee moves between "Covered Defendants" identified by Dr. Starr (in the grey areas).[74]  As

---

[70] Gerhart Deposition, 51:5–15, 52:8–21.

[71] Starr Deposition p. 147:4–15 ("[T]o the extent that there were hires from other employers, those other employers would also be relevant competitors in the relevant labor market for those employees.  Do you agree with that?  A. Yes.  Let me put it in my own words, so to maybe by example.  So if DaVita wants to hire a director from company E, then I would say – and they do so, I would say that DaVita and company E are labor market competitors for that worker.").  See also, Starr Deposition, 139:6–11 ("Q Okay.  So you'd need data on where the departing employees when to, to determine who the relevant, competitors in the relevant labor market are; right? […] A: Yes, that's right"); Starr Deposition, pp. 132:21–133:13 ("Q. You would agree with me, would you not, that if a senior level employee departed, say, DaVita for another employer, then that employer is clearly a relevant employment alternative for that employee; correct? […] A.  Yes.")."

[72] Starr Report, ¶84.

[73] See Starr Report, Section V.B. and Gerhart Report, Section VI.B.

[74] I identify the timing of hirings based on the hire dates.  I see the same results when I identify hires as those employees who are in this year's but not in last year's payroll data (analogue to Dr. Starr's methodology of identifying departures)—the overwhelming majority of external hires into relevant senior roles at Defendants

(continued on next page . . .)

27

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

this exhibit shows, the Defendants did not hire a large number of employees from "Covered Defendants" even outside the alleged conduct periods. In addition, there were thousands of external hires from outside of the Defendants into relevant positions during the proposed class period— approximately 98 percent of hiring during the relevant period was from outside the "Covered Defendants."[75]  For example,

- DaVita did not hire a single relevant employee from SCA after the proposed class period (in 2020 and 2021) while hiring 246 employees from other sources including competing firms into relevant employee positions. Similarly, USPI did not hire a single relevant employee from SCA in 2008 and 2009 before the proposed class period for USPI while hiring 105 employees from other sources into relevant positions.

- As the blue section of the pie charts below shows, each of the Defendants hired hundreds of relevant employees from sources other than the "Covered Defendants" during the proposed class period—with both USPI and SCA hiring more than 500 employees each and DaVita hiring more than 2,000 employees from outside sources.

---

were from other sources and not from "Covered Defendants" before, during and after the proposed class period. See **Appendix D-2**.

[75] As I show in **Exhibit 18** below, each of the Defendants' employment *increased* during the relevant period (between 60 and 190 percent for relevant job levels). Given the thousands of employees hired by the Defendants during this period, it is not possible that Defendants could have only hired employees from other "Covered Defendants. For example, DaVita hired over 2,000 relevant employees during the proposed class period. During this same period, SCA (the other member of the alleged bilateral mobility restriction with DaVita) had only 1,390 employees in relevant positions (see Starr Report, Figure 21).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 5**
**EXTERNAL HIRES INTO RELEVANT EMPLOYEE POSITIONS**
**BY DEFENDANT AND TIME PERIOD**



Notes: Hires are identified based on hiring date. The grey-shaded areas contain the 70 mobility events (i.e., moves between "Covered Defendants") from Dr. Starr's Figure 2.

Source: Starr turnover (Corrected Data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

39.     The hiring experiences of the Named Plaintiffs themselves highlight the opportunities for proposed class members to "match with" and potentially be hired from different employers.

- Prior to joining SCA, Mr. Spradling worked in the financial services, technology services, and law enforcement industries in various IT and project management roles and considered multiple industries when looking for jobs.[76] Mr. Spradling had no healthcare experience before he went to SCA and the job he applied to at SCA was not a job for which healthcare experience or skills were necessary.[77] Mr. Spradling considered employment opportunities across multiple industries because IT "[p]roject management arguably is project management regardless of the industry."[78]

- Prior to joining SCP (acquired by SCA), Mr. Keech worked at hospitals (Santa Clara Medical Center and Good Samaritan Hospital) and Kaiser Permanente. [79] Mr. Keech testified that the leadership skills he obtained throughout his career are transferable across healthcare and other industries, and testified that he did not have any particular destination in mind as he identified potential positions "[t]hrough jobs websites, recruiters, and […] networking" once he was looking to leave Kaiser Permanente in May of 2007.[80]

Moreover, the two Named Plaintiffs highlight the different outside opportunities available to the relevant employees who held a variety of positions at the Defendants.  Mr. Spradling, an IT Director at SCA, was hired by SCA from Teksystems (a business and technology services company) and was hired by Bank of America (a financial institution) after working at SCA.[81]  In contrast, Mr. Keech, a Regional Director of Clinical Operations at SCA, worked at California Pacific Medical Center as an administrator of an ASC prior to joining SCA and worked at Kaiser Permanente (an integrated healthcare delivery

---

[76] Spradling Deposition, Exhibit DX005 (Sprad000014–0015).

[77] Spradling Deposition, 44:12–45:22, 65:16–65:21.

[78] Spradling Deposition, 44:12–45:22.

[79] Keech Deposition, Exhibit 42B (KEECH_000001419–1422).

[80] Keech Deposition, 106:13–16, 116:22–117:3, 168:14–168:20.

[81] Spradling Deposition, Exhibit DX005 (Sprad000014–0015); TEKsystems, "Who We Are", https://www.teksystems.com/en/who-we-are; Bank of America, "Our Company," https://about.bankofamerica.com/en/our-company.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

system company) after his time at SCA.[82]  Plaintiffs' experts have not assessed how the outside opportunities would vary across these two employees or the thousands of proposed class members.

40.      As the experience of the Named Plaintiffs exemplifies, Defendants recruited from a large and diverse set of companies, both within and outside of the healthcare industry.  Recruiting presentations list a large number of target companies within various industries.[83]  For example, an attachment to an email from SCA's Chief Talent Officer Bridie Fanning from October 2015 contains a "search list" of "Companies for SCA to Recruit from."[84]  The list contains hundreds of companies from different industries, including:[85]

- A broad set of companies within the healthcare sector, including industries such as "Surgical Service Companies," "Large Non-for-Profit Health Systems," "Large Physician Groups," and healthcare-adjacent segments such as the "Health Insurance" and "Healthcare Technology" industries.

- Investment Banks such as BMO Harris, Deutsche Bank, and JP Morgan Chase.[86]

Other documents also show that SCA recruited Vice Presidents from a range of companies, targeting employees in healthcare-related companies as well as companies with large footprints outside of healthcare.  For example, the recruitment firm Russel Reynolds listed approximately 50 companies, including the large pharmaceutical company Johnson and Johnson and "[l]arge CA-Based Companies" such as Amgen (a biotech company) and McKesson Corporation for their search for a Regional Vice President position in California.[87]

---

[82] Keech Deposition, Exhibit DX0041 (KEECH_000000320–0322); Presidio Surgery Center, "About Us," https://presidiosurgery.com/about-us/; Keech Deposition, 111:16–113:16, Exhibit 0072 (Mr. Keech's LinkedIn Profile).

[83] Conversely, because such target companies employ talent with potentially matching skillsets to a Defendants' job position, these companies may also constitute potential destinations for Defendants' current employees. Thus, these target companies are in potential continuous competition with Defendants for the labor of proposed class members.

[84] SCA000287698.

[85] SCA000287699.

[86] See also, SCA000663768, a 2015 email from Andrew Hayek to Bridie Fanning.  (Andrew Hayek suggests to "add not-for-profit investment bankers to the list" for recruitment.  Mr. Hayek states that "[m]any large investment banks have teams focused on health systems.")

[87] SCA000002890–2932, at 2932.  Another Russel Reynolds target list from 2017 includes healthcare companies as well as advisory and consulting companies such as PwC, Accenture, McKinsey & Co., and Oliver Wyman (SCA000065727).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

41.     DaVita documents also discuss competition for employees with the broader healthcare industry (and not just the outpatient care or dialysis care industries) and companies outside of healthcare.

- For example, a 2013 presentation on "Consulting Alumni at DaVita" denotes that hires from management consulting companies such as Bain, McKinsey and BCG worked in Director and VP roles at DaVita.[88]

- A 2014 search by recruiting firm The Caldwell Partners International for a Group Vice President position lists candidates from healthcare companies (e.g., OptumHealth) as well as companies with large footprints outside of healthcare (e.g., OfficeMax, Burger King, and H&R Block).[89]

42.     As these examples demonstrate, (i) Defendants competed for hires with a large set of different firms, and (ii) the available outside opportunities for proposed class members extended beyond the Defendants.  I also use the Lightcast data to examine the set of companies and industries from which Defendants hired relevant employees.  The Lightcast data similarly shows the Defendants hiring employees from a variety of different companies into relevant positions.[90]

- For DaVita, the Lightcast data records relevant hires from over 900 different companies, including from dialysis competitor Fresenius, other healthcare companies such as Kaiser Permanente, and companies with large footprints outside of healthcare such as Amazon, Deloitte (an advisory and consulting firm) or Target (a department store).

- For SCA, the Lightcast data records relevant hires from over 350 different companies, including outpatient care company Select Medical, other healthcare companies such as Banner Health, and companies primarily operating outside of healthcare such as Goldman Sachs (an investment bank and broker) and FedEx (a courier).

- For USPI, the Lightcast data records relevant hires from over 250 different companies, including outpatient care companies such as US Renal Care, other healthcare companies such as HCA Healthcare, and companies primarily operating outside of healthcare such as Deloitte (an advisory and consulting firm) and Johnson & Johnson (a pharmaceutical company).

---

[88] DVA_OMCEAL_000906018.

[89] DVA_OMCEAL_000010422.

[90] I limit this analysis to individuals hired directly into relevant roles (i.e., Director level or above).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

43.     Competition with hundreds of companies is inconsistent with Plaintiffs' experts' opinions on the impact of the alleged bilateral conduct between the Defendants.  As the Lightcast data shows, proposed class members chose to join Defendants from a large number of non-Defendant firms.  While Plaintiffs' experts do not assess any competition with non-Defendants for new hires, Dr. Gerhart testified that the compensation Defendants provided to these new hires "would probably have to be within sight of what the competitive rate would be," otherwise they would have joined a competing firm or remained at their current employer rather than agreeing to work for a Defendant.[91]  Plaintiffs' experts have not assessed how the Defendants would be able to suppress compensation for these employees given the competition Defendants faced from the variety of non-Defendant firms they hired relevant employees from.  Moreover, Plaintiffs' experts claim that the Defendants had "wage structures" such that the purported "wage suppression" would impact all employees—if such "wage structures" were rigid (as Plaintiffs' experts claim), compensation across employees would equally have to *increase* in response to newly hired employees paid competitive rates.

### C.  Dr. Starr's Analysis of "Limited Mobility" is Flawed and Fails to Consider Evidence on Overall Turnover Rates that Contradict His Opinions

44.     Dr. Starr concludes that "the quantitative evidence" of mobility rates he presents "is strongly consistent with a No-Poach Agreement to prevent Class Members from moving between Covered Defendants."[92]  To support this conclusion, Dr. Starr points to a regression analysis he purports to use "to test that the cumulative effect of the No-Poach Agreements was to suppress movement" in his Figure 4.[93]  However, the only factor Dr. Starr accounts for in his mobility analysis is a time trend.  That is, Dr. Starr assumes that no other factors (e.g., greater overall mobility rates as part of the "great resignation" after the COVID-19 pandemic) would impact the rate in which employees' mobility between "Covered Defendants" changed across his period of analysis.[94]  As with his other "quantitative" analyses I describe above, this regression analysis simply shows that very few employees moved

---

[91] Gerhart Deposition, 56:1–15.

[92] Starr Report, ¶90.

[93] Starr Report, ¶87, Figure 4.  I note that while both Dr. Starr and Dr. Gerhart point to the importance of solicitations or "cold calls," nether attempt to quantify the additional number of solicitations or "cold calls" that would have occurred in the absence of the non-solicitation agreements (Gerhart Deposition, 117:24–118:3; Starr Deposition, 177:6–178:3).  Instead, Dr. Starr focuses his analysis on "movement" between Defendants (Starr Deposition, 176:8–177:5).  That is, Plaintiffs' experts have not shown that the alleged conduct in fact had any significant impact on the number of solicitations or "cold calls" to class members.

[94] As Dr. Starr testified, the great resignation "referred to sort of an increased propensity for workers to leave their employer for other companies" (Starr Deposition, 399:22–401:1).  See also, U.S. Bureau of Labor Statistics, "The 'Great Resignation' in perspective," July 2022, https://www.bls.gov/opub/mlr/2022/article/the-great-resignation-in-perspective.htm.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

between DaVita and SCA or between SCA and USPI both outside of the proposed class period and during the alleged conduct. In fact, the results he presents for the individual agreements are not statistically significant at conventional levels.[95]

45.      By focusing his analysis on only movements between the "Covered Defendants," Dr. Starr ignores the majority of mobility events for relevant employees. In fact, Plaintiffs' experts' conclusions that employee mobility was restricted by the bilateral agreements is inconsistent with Defendants' overall turnover rates. In **Exhibit 6** below, I display the annual turnover rates at the Defendants, calculated as the percentage of all relevant employees who leave one of the Defendants for any destination in a given year.[96] As this exhibit shows, there is no consistent pattern indicating a systematic reduction in mobility during the alleged proposed class periods. Turnover rates vary from year to year at each Defendant, generally remaining between approximately 10 and 20 percent for SCA (in orange) and DaVita (in green).[97]

---

[95] Starr Report, Figure 4 columns [2] and [3].

Throughout his report, Dr. Starr refers to results as "statistically significant" using the more relaxed standard of a 10 percent level of statistical significance. However, the conventional level to determine statistical significance is 5 percent. See, e.g., American Bar Association, Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, 3rd ed., ABA Book Publishing, 2017 ("ABA Proving Antitrust Damages",) p. 142 ("[S]tatistical hypotheses are carried out at conventional levels of 5 percent"); Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 320 ("In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at .05 or 5%.").

[96] To analyze overall turnover rates, I use the actual termination records provided in the Defendants' structured data. Termination records for all employees are available through at least December 2022. I consider a relevant employee to be terminated in a given year if I observe a corresponding termination record for this employee in the same year.

I do not include USPI employees which transitioned to Tenet Payroll data as terminated. These employees have a termination record on December 31, 2019, but appear with regular hours in the Tenet payroll data during 2020 (see *2023.09.26 - K. Limarzi Ltr. re Structured Data Productions*, point 8).

[97] I note that the increase in turnover rates for USPI (in the purple line) after the proposed class period coincides with changes in the equity valuation for USPI's 2015 Employee Stock Equity Plan, which Dr. Starr acknowledged led to departures of senior USPI employees (see Starr Report, ¶85). **Appendix D-3** shows similar patterns in overall turnover rates using Dr. Starr's methodology (i.e., considering employees as terminated in this year if they do not appear in next year's payroll data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 6**
**OVERALL TURNOVER RATE FOR RELEVANT EMPLOYEES**
**BY DEFENDANT**
**2006 – 2022**



Notes: Turnover rates are calculated as the percentage of relevant employees at each Defendant who were terminated each year. This chart does not show DMG employees that left in 2019 when DaVita sold DMG or USPI employees with a termination date of December 31, 2019 that transfer to the Tenet payroll.

Turnover rates for DaVita and USPI are not shown for 2005 where very few terminations are identified (28 for DaVita and 5 for USPI). Vertical lines indicate the start and end of the proposed class periods.

Source: Starr turnover (Corrected Data).

46.     Dr. Starr does not assess the overall turnover rates at the Defendants. However, one can apply Dr. Starr's own regression model, which he states can be used to test if "the cumulative effect of the No-Poach Agreements was to suppress movement" to overall turnover rates.[98] I present the results of this test in **Exhibit 7** below, using Dr. Starr's regression to assess if the overall turnover rates (i.e., whether

---

[98] Starr Report, ¶87. He reports the results of this test in his Figure 4.

35

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

employees stayed at the respective Defendant or left the company to any destination) were "suppressed" during the proposed class period.[99]

- There was a statistically significant *increase* in turnover at DaVita during the proposed class period and

- No statistically significant change in turnover at SCA during the same period.

The lack of a statistically significant decline in turnover at SCA and DaVita during the proposed class period is inconsistent with Dr. Starr's finding "that the cumulative effect of the No-Poach Agreements was to suppress movement."[100]

---

[99] I note that the "Conduct" estimates of overall turnover rates in this analysis are not consistent across Defendants. This is not indicative of (i) systematically *lower* turnover rates due to the alleged mobility restrictions in the proposed class period or (ii) systematically *higher* turnover rates during the proposed class period that one might expect if compensation for relevant employees was suppressed by 14.5 percent in aggregate.

See **Appendix D** for additional versions of this analysis, (i) using Dr. Starr's methodology to identify departures in any given year as those employees who are not in next year's payroll data (see **Appendix D-4**), and (ii) including Dr. Starr's "macroeconomic and healthcare" controls (see **Appendix D-5**). I find that there is no statistically significant change in overall turnover at SCA and DaVita and similarly find that overall turnover rates of relevant senior employees did not systematically change during the proposed class period.

[100] Starr Report, ¶87.

I note that the increase in turnover rates for USPI after the proposed class period coincides with changes in the equity valuation for USPI's 2015 Employee Stock Equity Plan, which Dr. Starr acknowledged led to departures of senior USPI employees (see Starr Report, ¶85).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

EXHIBIT 7
DR. STARR'S FIGURE 4 PROBABILITY OF MOBILITY
APPLIED TO OVERALL TURNOVER

| Statistic | Overall Turnover (Departures to any Destination) | | |
|---|---|---|---|
| | DaVita | SCA | USPI |
| [a] | [b] | [c] | [d] |
| Conduct | 0.0187* | 0.0043 | -0.0363* |
| | (0.0056) | (0.0129) | (0.0065) |
| Time-trend | 0.0022* | 0.0003 | 0.0061* |
| | (0.0005) | (0.0014) | (0.0006) |
| Observations | 20,430 | 7,605 | 10,896 |
| Departures | 2,889 | 1,088 | 1,334 |
| R-squared | 0.0010 | 0.0000 | 0.0116 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

### D. Defendants' Share of Total Employment is Small Even Within the Industries Dr. Gerhart Identifies as Potentially Relevant

47.    At various points, Dr. Gerhart (and Dr. Starr in his discussion of the Defendants' businesses) contends that Defendants have "large," "leading," or "dominant" footprints.[101]  However, neither of Plaintiffs' experts define the relevant labor market(s) for proposed class members in order to assess these claims.  Plaintiffs' experts also do not assess the Defendants' share of employment within the industries that they suggest are relevant.  For example, Dr. Gerhart argues that "the great majority of employee movement is within the same industry," pointing to (i) the relevant "sector" for employees (identified by the 2-digit industry code assigned to firms by the U.S. Census Bureau) as well as (ii) more

---

[101] Gerhart Report, ¶11 ("DaVita is currently one of the leading players in the outpatient medical center industry"); ¶13 ("SCA is a large firm in the ambulatory surgical center ('ASC') industry"); ¶15 ("USPI is another dominant firm in the ASC industry"); ¶87(a) (citing testimony from Mark Garvin, USPI's former COO that "USPI and SCA were two of the largest players in the ASC […] industry and there was an expectation that a certain number of employees would flow between the two organizations").

Starr Report, ¶25 (SCA is "another dominant firm in the healthcare space"); Starr Report, ¶26 (USPI "comprise the largest ambulatory surgery company in the country").

As a general matter, the magnitude of a firm's share in the (output) services market need not imply the same magnitude of a firm's share in the labor (input) market (see, for example, U.S. Department of Justice, "Public Workshop on Competition in Labor Markets," September 23, 2019, comments by Dr. Patrick Greenlee and Dr. Kevin Murphy, p. 19).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

granular industries (specifically, he points to industries identified by 5-digit industry codes).[102]  The Defendants are within the Healthcare and Social Assistance sector, which includes outpatient care centers as well as hospitals, offices of physicians, and skilled nursing facilities.[103]

48.      I analyzed publicly available data from the BLS on both the Healthcare sector (the 2-digit NAICS 62 sector) and the more granular Other Outpatient Care Centers industry (the 5-digit NAICS 62149 industry), which Plaintiffs' experts suggest may be relevant.[104]  The BLS data shows that Defendants' shares of total employment in the Healthcare sector and in the Other Outpatient Care Centers industry are not "dominant."  In **Exhibit 8** below, I compare the Defendants' total U.S. employment to industry-wide employment for 2016.[105]

- As shown in the left panel below, Defendants employed less than 1 percent of the total U.S. workforce in the Healthcare sector in 2016.  That is, as Dr. Starr describes in his report, the Defendants comprise a "small portion" of total managerial employment in the Healthcare sector.[106]

- The right panel shows this same comparison in the Other Outpatient Care Centers industry, where the Defendants made up only 16.8 percent of total employment in 2016.

---

[102] Gerhart Report, ¶61(f).  The North American Industry Classification System ("NAICS") classifies business into a hierarchical structure of 2-digit to 6-digit codes, with additional digits conveying increasing levels of specificity (U.S. Census Bureau, "Economic Census: NAICS Codes & Understanding Industry Classification Systems," February 12, 2024, https://www.census.gov/programs-surveys/economic-census/year/2022/guidance/understanding-naics.html).

Similarly, Dr. Starr testified that relevant employees had "jobs that are in the healthcare sector," and the "most relevant market" for the employees at issue "would be at similarly situated companies in the healthcare industry" (Starr Deposition, 128:8–23).

[103] The Healthcare sector is associated with the 2-digit NAICS 62.  See, U.S. Bureau of Labor Statistics, "Industries at a Glance: Health Care and Social Assistance: NAICS 62," https://www.bls.gov/iag/tgs/iag62.htm.

[104] Gerhart Report, ¶61(f).

The 5-digit NAICS 62149 code classifiers outpatient care centers "except family planning centers and outpatient mental health and substance abuse."  Per the NAICS classification, Defendants do not operate in the same 6-digit code.  NAICS classifies DaVita into Sector 621492 "Kidney Dialysis Centers" while USPI and SCA are classified into Sector 621493 "Freestanding Ambulatory Surgical and Emergency Centers" (see NAICS Association, "NAICS Code Description," https://www.naics.com/naics-code-description/?code=6214).

[105] I use 2016 here because Defendants' combined share of total employment in the Other Outpatient Care Centers industry was highest in 2016.

[106] Starr Report, footnote 410 ("Defendants comprise a small portion of total managers in healthcare").

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY



**EXHIBIT 8**
**DEFENDANTS' SHARE OF TOTAL U.S. EMPLOYMENT**
**2016**

Note: **Appendix E-1** shows the counts of employees at the Defendants relative to the Healthcare sector (NAICS 62) and Other Outpatient Care Centers industry (NAICS 62149) for each year.

Sources: Starr turnover (Corrected Data); BLS OEWS Data on industry employment.

I find similar results when I look at the number of facilities operated by the Defendants compared to the overall number of facilities within the same sector and industry. For example, combined, the Defendants operated approximately 0.5 percent of the facilities in the Healthcare sector and approximately 17 percent of the facilities in Other Outpatient Care Centers industry in 2016 (their highest share during the relevant period).[107]

49.     As with my analysis in the previous sections, both of these shares are indicative of the numerous opportunities for relevant employees outside of the Defendants. These outside opportunities would constrain the impact, if any, of the alleged conduct on compensation for relevant employees as the Defendants compete for their labor with hundreds of other firms—inside the Outpatient Care Center industry, Healthcare sector, and beyond. Plaintiffs' experts do not account for any of these outside opportunities in their assessment of the alleged conduct—even for companies within the sectors and industries they point to as potentially relevant. In fact, the Defendants account for a small share of employment within these industries. Neither of the Plaintiffs' experts have assessed how the

---

[107] See **Appendix E-2** for a summary of these shares by year.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Defendants could suppress compensation by 14.5 percent, on aggregate, for relevant employees given the competition they face from outside employers.

## VI. DR. STARR'S AND DR. GERHART'S THEORY OF ANTITRUST IMPACT FROM THE ALLEGED MOBILITY RESTRICTIONS IS UNSUPPORTED BY ECONOMIC ANALYSIS

### A. Summary of Plaintiffs' Experts' Theory of Harm Due to the Alleged Mobility Restrictions

50.     Plaintiffs' experts reference two agreements, which they refer to as "no-poach" agreements, between (i) DaVita and SCA and (ii) between SCA and USPI.  According to Plaintiffs' experts, SCA and DaVita, and separately SCA and USPI, agreed "not to pursue recruiting, soliciting, hiring, and/or cold calling […] each other's Senior-Level Employees unless those Senior-Level Employees informed their current employers that they intended to seek employment elsewhere," which Plaintiffs' experts refer to as a "tell your boss" provision.[108]  An economic assessment of the impact to the proposed class must account for the scope of these agreements (e.g., the employees impacted, the time periods covered).  However, Plaintiffs' experts ignore evidence contrary to their conclusion that these agreements would suppress compensation for all relevant employees for the full proposed class period.

51.     As Plaintiffs' experts describe, only some employees—those who would have received cold calls absent the alleged conduct—would be "directly" affected by the alleged mobility restrictions.[109]  Plaintiffs' experts' theory of harm implies that these employees would "benefit when they have uninhibited access to other jobs, i.e., job mobility" and can either (i) "voluntarily chang[e] employers to obtain substantial compensation increases" or (ii) leverage outside offers to "negotiate higher compensation" with their current employer.[110]  To properly study the direct effects of the alleged mobility restrictions, one has to consider not only an alleged offer not received, but also whether that offer would have made any difference given the other job opportunities available to that employee.[111]

---

[108] Starr Report, ¶19(a).  See also, Starr Report, ¶12; Starr Report ¶70(b); Gerhart Report, ¶21.

[109] Gerhart Report, ¶8; Gerhart Deposition, 199:18–25; Starr Report, ¶39.

[110] Gerhart Report, ¶7(b).  See also, Starr Report, ¶52 ("These mechanisms," such as no-poach agreements, "lower workers' mobility and bargaining power, which translates to lower pay.")

[111] Plaintiffs' experts also suggest that cold calls (absent an outside job offer) provide employees information on the "market value" of their labor (Starr Report, ¶73(c), footnote 173).  Similarly, Plaintiffs' experts have done no analysis to show that relevant employees had access to meaningfully different market information due to the alleged conduct.

Plaintiffs' experts do not assess what "market" information was available to employees apart from cold calls.  For example, named Plaintiff Allen Spradling testified that IT professionals "are constantly reassessing their value in the market." Spradling Deposition, 124:10–125:24 ("A: The—the IT skill set is very in demand and transferable, so in general IT resources are constantly reassessing their value to the market, so to speak, and as a

(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

That is, it is necessary to study whether, but for the alleged conduct, an employee would receive an additional job opportunity that was "accessible to" that employee and "higher-paying" than any other job offer they received in the actual world.[112]

52.      Neither Dr. Starr nor Dr. Gerhart attempt to quantify the number of cold calls or external job offers that would have existed in the but-for world, let alone for any of the individual 6,300 proposed class members.[113]  As Dr. Gerhart testified, "each person almost has their own individual market for opportunities."[114]  Given this, to assess if an employee was harmed "directly" by the alleged mobility restrictions, Plaintiffs' experts would have to model the additional job opportunities that would have been available to that employee absent the alleged mobility restrictions and determine if these were "higher-paying external job opportunities" than the opportunities available to that employee in the actual world—which are not limited to the Defendants themselves, but all other non-Defendant employers.  However, neither of Plaintiffs' experts conduct any analysis of non-Defendant employment opportunities.

53.      In addition, Plaintiffs' experts theorize that employees not "directly" affected by the alleged mobility restrictions—those who would not have received additional external offers or cold calls in the but-for world—are still "indirectly" affected.[115]  To support their claims, Plaintiffs' experts point to the use of purported "wage structures" at the Defendant firms.  Specifically, Dr. Starr argues that "the existence of compensation structures within Defendant firms would mean that any wage suppressing

---

result of that, opportunities present themselves. […] Q: And is it the case that employees would look outside the company in order to get a sense of what their market rate was? A: Yes, my experience is that happens all the time. Q: And did you personally do that during the course of your time at SCA? A: I don't recall.  Q: What about during the course of your career?  A: Oh, without a doubt, yes.  Q: And it's your – it's been your experience that that is very common, correct?  A: Yeah, within the IT field, correct.").  Mr. Spradling received job alerts via email from sites such as Indeed and Neuvoo with information on available job opportunities, including posted salary information for some jobs (see, e.g., Sprad005529; Sprad002185).  Dr. Gerhart opines that he "reviewed evidence in this litigation showing that employees at Defendant firms were also concerned about external equity," citing information on relevant employees being aware of the "market level" for their individual position (Gerhart Report, ¶115(b)–(e)).

[112] As Dr. Gerhart describes, "[e]mployees accrue" the benefits of job mobility "only where higher-paying external job opportunities actually exist and are accessible to employees (Gerhart Report, ¶7(b)).  That is, to be harmed by the alleged mobility restrictions, an employee would have had to receive "higher-paying external job opportunities" absent the alleged conduct that they did not have in the actual world.  In order for this outside opportunity to be available to the employee, it would have to be one that the employee was qualified for and desired to switch to (or could credibly use to negotiate a higher salary from their current employer).

[113] For example, Dr. Gerhart testified that he had "not quantified" how many fewer cold calls there would be to relevant employees absent the alleged conduct, nor has he shown that there were fewer job offers due to the alleged conduct (Gerhart Deposition, 135:23–136:10, 143:16–18).

[114] Gerhart Deposition, 119:14–24.

[115] Gerhart Deposition, 202:13–202:21; Starr Report, ¶39.  See also, Starr Deposition, 433:22–434:3.

41

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

effects of the Challenged Conduct would be broadly transmitted across the Class."[116]  Similarly, Dr. Gerhart concludes, without conducting any analysis, that "agreements not to poach employees likely lead to cascading effects class-wide" due to "Defendants' formalized pay structures and compensation design and their commitment to maintaining equity and pay fairness."[117]

54.     Ultimately, the question of impact to the proposed class is an empirical question.  While Plaintiffs' experts argue that the alleged mobility restrictions would impact all employees, both those "directly" impacted by the conduct and purportedly "indirectly" impacted, they offer no analysis able to assess the but-for external job opportunities for employees "directly" targeted to determine if they were in fact impacted by the alleged conduct.  Dr. Gerhart testified that he performed no empirical analysis.[118]  Further, as I describe below, available compensation information—and Dr. Starr's own analysis—does not support the Plaintiffs' experts' conclusion that employees would be "indirectly" affected by the alleged conduct due to "cascading effects."

### B.  Plaintiffs' Experts' Narrative of the Alleged Mobility Restrictions Ignores Contrary Evidence and is Not Supported by Empirical Analysis

55.     An understanding of the nature of the conduct at issue is important to develop both sound economic theories and empirical testing to assess antitrust liability, impact, and damages.  Both Dr. Starr and Dr. Gerhart present anecdotal documentary evidence of the alleged mobility restrictions.[119]

---

[116] Starr Report, ¶172.  Similarly, Dr. Starr claims that "where there is a single market-clearing wage, a no-poach agreement would tend to have widespread compensation suppression effects across *all* employees, and not just the compensation for employees who would have been poached in a but-for world" (Starr Report, ¶53).  Dr. Starr has offered no evidence that there was a "single market-clearing wage." In fact, relevant employees worked in a variety of jobs (see Section IV.B) and were paid a variety of salaries (see Section VI.C.2).

[117] Gerhart Report, Section VIII.A, ¶141.  Dr. Gerhart also argues that employees "not receiving offers who become aware of coworker offers then receive updated, more accurate information on their own outside pay opportunities, making job searches and job mobility more likely" (Gerhart Report, ¶7(b)).  Like Plaintiffs' experts' theory of "direct" effects, the impact of this additional potential information would depend on the available opportunities for an individual employee.

[118] Gerhart Deposition, 282:23–288:23.

[119] See, e.g., Starr Report, Sections V.B.2, V.B.3, and V.C.2 and Gerhart Report, Section VI.B and VI.C.

Dr. Gerhart presents no analysis of the impact of these agreements, testifying that his opinion is limited to "what the likely consequences would be of such an agreement" (Gerhart Deposition, 103:24–104:19).

Dr. Starr concludes not only that the documents he presents are "consistent with anticompetitive collusion and inconsistent with unilateral conduct" but also that these documents can be used to *show* antitrust impact (Starr Report, ¶11).  For example, Dr. Starr claims based on his review of documents that (i) the alleged "no-poach restrictions harmed [proposed class members] by limiting their mobility and suppressing their compensation" and (ii) the "tell-your-boss provision" of the alleged mobility restrictions "created a chilling effect" (Starr Report, ¶¶71, 73, 78, 80).

(continued on next page . . .)

42

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

But, in their subjective assessments of documents—and Dr. Starr's "wage suppression" regression—they simply ignore evidence counter to their stylized narrative of the non-solicitation and "tell your boss" provisions of the alleged mobility restrictions. Dr. Starr and Dr. Gerhart conclude that the alleged mobility restrictions would suppress compensation for all proposed class members at (i) DaVita and SCA between May 2008 and December 2019 and (ii) USPI between May 2010 and December 2019 but fail to address how changes in the agreements over time, including changes to agreement provisions and jobs covered, would affect the proposed class. For example,

- Andrew Hayek (SCA) testified that the alleged mobility restrictions between DaVita and SCA initially applied only to Vice Presidents and above, and they were later expanded to include Directors too.[120]

- As Dr. Starr notes, after DaVita and SCA first agreed to the alleged mobility restrictions, "DaVita and SCA added an additional enforcement mechanism: the 'tell your boss' provision."[121]

56.     Both experts also ignore evidence contradicting Plaintiffs' assertions regarding the start dates of the agreements. For example, Andrew Hayek (SCA) testified that the agreement between DaVita and SCA did not begin until 2012.[122] Further, Dr. Starr and Dr. Gerhart fail to assess whether their conclusions change based on direct evidence they present on the end dates for the alleged mobility restrictions. As Dr. Starr states, "USPI appears to have ceased actively enforcing its end of the No-Poach Agreement in late 2017."[123] In addition, both experts ignore other evidence contradicting Plaintiffs' assertions about the end dates of the agreements. For example, Andrew Hayek (SCA) and

---

Economists have no specialized expertise to determine intent. As Nobel Laureate George Stigler stated, even in the face of a written anticompetitive agreement and meetings between competitors: "A reasonable man, and often even an economist, would say that the documents seemed to present a conclusive proof of collusive behavior. The economist, however, would have no professional basis for reaching such a conclusion: he has no special skill in reading documents and relating them to actual behavior" (George J. Stigler, "What Does an Economist Know?" *Journal of Legal Education*, Vol. 33, No. 2, 1983, p. 311).

While Dr. Starr claims that "economists frequently bring their expertise to bear in analyzing documentary evidence of communications among cartel members," the only authority he cites is a paper which discusses economic case studies, not the review of documents (Starr Report, ¶28, footnote 46). This paper does not present a scientific approach to use economics to assess evidence of communications, nor does it support the idea that his subjective review is scientific, replicable, has a known error rate, or can be falsified.

[120] Hayek Deposition, 203:20–204:9.

[121] Starr Report, ¶70(b).

[122] Hayek Deposition, 165:21–166:24.

[123] Dr. Starr cites an October 23, 2017 email from Shannon Mosley (Vice President of Talent Acquisition at USPI) instructing external recruiters that they can recruit from SCA going forward (Starr Report, ¶80(c), footnote 311, citing USPI_CIV_000006432 (Exhibit PX282)).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Anthoy Kilgore (SCA) testified that the alleged mobility restrictions between SCA and DaVita as well as between SCA and USPI "ended effectively when [Hayek] was outside of [his] role" as CEO of SCA at the end of 2017.[124]

57.     Unlike an empirical economic analysis, the conclusions drawn from a narrative based on a review of documents are (i) not objectively falsifiable, (ii) have no known error rate, and (iii) are subject to bias if they fail to assess other contradictory and competing documents.  Dr. Starr's and Dr. Gerhart's presentations of documentary evidence highlight the limitation of simply reviewing documents to assess the impact of the alleged conduct.  Both of Plaintiffs' experts exclude contradictory and competing documents from their discussion of the alleged mobility restrictions.

58.     In fact, the empirical analysis Dr. Starr presents fails to support his subjective conclusions based on his documentary narrative.[125]  Dr. Starr purports to "confirm that the Conduct Period end date of 2019 is appropriate" for the alleged mobility restrictions "using a regression approach," which he presents in his Figure 3.[126]  Specifically, Dr. Starr "test[s] how the probability of a move between each pair of Covered Defendants varies from 2008 to 2021, relative to 2017."[127]  That is, Dr. Starr tests if the probability of a move between "Covered Defendants" in a given year was different than the probability of a move in 2017.  Because there are so few employee moves between "Covered Defendants" during his period of analysis, Dr. Starr relies on limited variation in his outcome variable.  For example, the "uptick" in 2020 Dr. Starr purportedly finds is an increase of only five employee moves (out of the over 1,500 employees in the proposed class at SCA and USPI).[128]  Given this limited variation, Dr. Starr's analysis is sensitive to the specification he selects, finding results that contradict his conclusions when tested using "base years" other than 2017.

---

[124] Hayek Deposition, 328:17–330:8.  See also, Hayek Deposition, 189:23–190:22.  Mr. Hayek's successor as CEO at SCA, Anthony Kilgore, testified that there were no "no-poach agreements" when he was CEO of SCA (Deposition of Anthony Kilgore, October 22, 2024 ("Kilgore Deposition",) 67:11–68:13 ("Q: So when you were CEO at SCA from 2018 to 2019, your understanding was that SCA did not have any no-poach agreements with any of its competitors? A: We did not have any no-poach agreements with any competitors.  Q: SCA did not have any no-poach agreements with any companies, or just its competitors?  A: When I was CEO at SCA, we had no no-poach agreements with anyone")).

[125] Dr. Gerhart presents no empirical analysis at all, testifying over 20 times that he did not attempt to "quantify" the effect of the alleged conduct.  See, e.g., Gerhart Deposition, 107:21–108:4, 139:16–21, 143:16–21, and 249:10–14.

[126] Starr Report, ¶86.  See also, Starr Deposition, 333:7–334:9.

[127] Starr Report, ¶86.

[128] See **Exhibit 3** (which shows one employee moving between SCA and USPI in 2017 and six employees moving between SCA and USPI in 2020).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

59. The sensitivity of Dr. Starr's analysis can be seen first by simply applying his own test after correcting his double counting of one employee who moved between SCA and USPI and correctly accounting for statistical significance.[129] As I discuss above, Dr. Starr refers to results as "statistically significant" at the 10 percent level. However, the conventional level to determine if results are statistical significance is 5 percent.[130] While Dr. Starr argues that if "2019 is the last year of the No-Poach Agreements, then in 2020 we should observe a statistically significant uptick in the movement of Senior Employees between the Covered Defendants," this is not the pattern I find.[131] Instead, I find no statistically significant change in the probability of mobility for either Defendant pair in 2020 when using the conventional threshold for statistical significance of 5 percent. This result undermines his conclusion that his mobility regression is consistent with a conspiracy ending in 2019.[132]

60. Further, the results of Dr. Starr's analysis are sensitive to his selection of 2017 as the "base year"—i.e., the year in which "probability of mobility" for other years are compared to. For example, based on Dr. Starr's analysis no employees moved between DaVita and SCA in 2014, 2017, and 2021. Dr. Starr's choice of 2017 as a base year means that every other year for DaVita and SCA is compared against a year with a 0 percent probability of a move between these two Defendants. By selecting a year with no moves between DaVita and SCA as his reference year, Dr. Starr increases the likelihood of finding a statistically significant increase in mobility (as the probability of a move in that year would be compared to the 0 percent probability in 2017). In selecting 2017 as the "base year" for his analysis, Dr. Starr points out that this was when "USPI appears to have stopped enforcing the agreement" between itself and SCA.[133] Dr. Starr does not discuss why this "base year" would be relevant for an assessment of the agreement between DaVita and SCA nor why he selects this year if his contention is that the alleged mobility restrictions between SCA and USPI continued (at least on SCA's side) through 2019.[134]

61. To show this, I take his own analysis using different "base years," applying the same double counting correction I reference above. **Exhibit 9** shows the result of this test for the employee moves

---

[129] As I describe above, Dr. Starr double counts a move of one employee across 2020 and 2021, which I remove from my analysis in this section (see footnote 53, *supra*).

[130] See footnote 95, *supra*.

[131] Starr Report, ¶86.

[132] Dr. Starr's analysis only finds a statistically significant change in the probability of moves (relative to 2017) between DaVita and SCA in 2011, during the conduct period (see **Exhibit 9**). For SCA and USPI, Dr. Starr's analysis finds a statistically significant increase in the probability of mobility (relative to 2017) in 2010, the start of the alleged conduct for SCA and USPI, and in 2021, a year after the proposed class period (see **Exhibit 10**).

[133] Starr Report, ¶¶80(c), 86.

[134] Starr Report, ¶80(c).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

between DaVita and SCA and **Exhibit 10** shows the result of this test for the employee moves between SCA and USPI. In both exhibits, each column shows the results of Dr. Starr's analysis applied to a different base year. For example, the first column in **Exhibit 9** shows the probability of mobility between DaVita and SCA (i.e., how likely is it for an employee to move between these Defendants) relative to 2008. When applied to this base year, Dr. Starr's analysis shows no statistically significant change in mobility across years. That is, Dr. Starr's analysis would suggest that the probability of an employee move between DaVita and SCA is not statistically different in any year compared to 2008. Dr. Starr's test finds the same results when applied to different base years with the same number of moves. For example, Dr. Starr's analysis finds the same results in base years 2014, 2017, and 2021— this is because there are no moves between DaVita and SCA in these years. That is, the results of Dr. Starr's analysis are entirely dependent on the base year he selects—finding different patterns when applied to different base years.

62.     As these results show, for DaVita and SCA, Dr. Starr's analysis does not find "a statistically significant uptick in the movement" in 2020 for relevant employes with any base year.[135]  For SCA and USPI, Dr. Starr's analysis only finds this pattern if his analysis is applied to the "base years" 2009 or 2011—when there are no moves between SCA and USPI.[136]  That is, Dr. Starr only finds the relationship he expects when he compares the probability of moving to a year with a 0 percent probability of movement between these Defendants. In short, the results of Dr. Starr's analysis are tied to the base year he selects and do not support his conclusion that he can "confirm" the end date of the alleged mobility restrictions.

---

[135] Even using Dr. Starr's less rigorous 10 percent level of statistical significance, his analysis only finds an "uptick in the movement" in 2020 for DaVita and SCA employes for base years 2014, 2017, and 2021.

[136] Similarly, using Dr. Starr's less rigorous 10 percent level of statistical significance, his analysis only finds an "uptick in the movement" in 2020 for SCA and USPI employes for base years 2009, 2011, 2016, and 2017.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

## EXHIBIT 9
### STARR FIGURE 3
### ANNUAL PROBABILITY OF MOBILITY BETWEEN DAVITA AND SCA
### RELATIVE TO DIFFERENT BASE YEARS

| Statistic | Base Year 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [j] | [k] | [l] | [m] | [n] | [o] |
| Year=2008 | Base Year | 0.0011 | 0.0013 | -0.0001 | 0.0010 | 0.0026 | 0.0032 | 0.0026 | 0.0028 | 0.0032 | 0.0024 | 0.0027 | 0.0017 | 0.0032 |
| Year=2009 | -0.0011 | Base Year | 0.0002 | -0.0012 | -0.0001 | 0.0015 | 0.0021 | 0.0015 | 0.0017 | 0.0021 | 0.0013 | 0.0016 | 0.0006 | 0.0021 |
| Year=2010 | -0.0013 | -0.0002 | Base Year | -0.0014 | -0.0003 | 0.0013 | 0.0019 | 0.0013 | 0.0015 | 0.0019 | 0.0011 | 0.0014 | 0.0004 | 0.0019 |
| Year=2011 | 0.0001 | 0.0012 | 0.0014 | Base Year | 0.0011 | 0.0027 | 0.0033* | 0.0027 | 0.0029 | 0.0033* | 0.0025 | 0.0028 | 0.0018 | 0.0033* |
| Year=2012 | -0.0010 | 0.0001 | 0.0003 | -0.0011 | Base Year | 0.0015 | 0.0022 | 0.0016 | 0.0018 | 0.0022 | 0.0014 | 0.0017 | 0.0007 | 0.0022 |
| Year=2013 | -0.0026 | -0.0015 | -0.0013 | -0.0027 | -0.0015 | Base Year | 0.0007 | 0.0001 | 0.0002 | 0.0007 | -0.0001 | 0.0002 | -0.0008 | 0.0007 |
| Year=2014 | -0.0032 | -0.0021 | -0.0019 | -0.0033* | -0.0022 | -0.0007 | Base Year | -0.0006 | -0.0004 | -0.0000 | -0.0008 | -0.0005 | -0.0015 | -0.0000 |
| Year=2015 | -0.0026 | -0.0015 | -0.0013 | -0.0027 | -0.0016 | -0.0001 | 0.0006 | Base Year | 0.0002 | 0.0006 | -0.0002 | 0.0001 | -0.0009 | 0.0006 |
| Year=2016 | -0.0028 | -0.0017 | -0.0015 | -0.0029 | -0.0018 | -0.0002 | 0.0004 | -0.0002 | Base Year | 0.0004 | -0.0004 | -0.0001 | -0.0011 | 0.0004 |
| Year=2017 | -0.0032 | -0.0021 | -0.0019 | -0.0033* | -0.0022 | -0.0007 | -0.0000 | -0.0006 | -0.0004 | Base Year | -0.0008 | -0.0005 | -0.0015 | -0.0000 |
| Year=2018 | -0.0024 | -0.0013 | -0.0011 | -0.0025 | -0.0014 | 0.0001 | 0.0008 | 0.0002 | 0.0004 | 0.0008 | Base Year | 0.0003 | -0.0007 | 0.0008 |
| Year=2019 | -0.0027 | -0.0016 | -0.0014 | -0.0028 | -0.0017 | -0.0002 | 0.0005 | -0.0001 | 0.0001 | 0.0005 | -0.0003 | Base Year | -0.0010 | 0.0005 |
| Year=2020 | -0.0017 | -0.0006 | -0.0004 | -0.0018 | -0.0007 | 0.0008 | 0.0015 | 0.0009 | 0.0011 | 0.0015 | 0.0007 | 0.0010 | Base Year | 0.0015 |
| Year=2021 | -0.0032 | -0.0021 | -0.0019 | -0.0033* | -0.0022 | -0.0007 | -0.0000 | -0.0006 | -0.0004 | -0.0000 | -0.0008 | -0.0005 | -0.0015 | Base Year |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Positive and statistically significant results are shown in blue.

Source: Starr turnover.

47

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 10**
**STARR FIGURE 3**
**ANNUAL PROBABILITY OF MOBILITY BETWEEN SCA AND USPI**
**RELATIVE TO DIFFERENT BASE YEARS**

| Statistic | Base Year | | | | | | | | | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [j] | [k] | [l] | [m] | [n] | [o] |
| Year=2008 | Base Year | 0.0028 | -0.0053 | 0.0028 | -0.0027 | -0.0014 | 0.0019 | 0.0001 | 0.0021 | 0.0021 | -0.0007 | 0.0015 | -0.0011 | -0.0039 |
| Year=2009 | -0.0028 | Base Year | -0.0081* | 0.0000 | -0.0055* | -0.0043* | -0.0010 | -0.0027 | -0.0008 | -0.0007 | -0.0035* | -0.0014 | -0.0039* | -0.0067* |
| Year=2010 | 0.0053 | 0.0081* | Base Year | 0.0081* | 0.0026 | 0.0038 | 0.0071* | 0.0054 | 0.0073* | 0.0073* | 0.0046 | 0.0067 | 0.0042 | 0.0014 |
| Year=2011 | -0.0028 | 0.0000 | -0.0081* | Base Year | -0.0055* | -0.0043* | -0.0010 | -0.0027 | -0.0008 | -0.0007 | -0.0035* | -0.0014 | -0.0039* | -0.0067* |
| Year=2012 | 0.0027 | 0.0055* | -0.0026 | 0.0055* | Base Year | 0.0013 | 0.0046 | 0.0028 | 0.0048 | 0.0048 | 0.0020 | 0.0041 | 0.0016 | -0.0012 |
| Year=2013 | 0.0014 | 0.0043* | -0.0038 | 0.0043* | -0.0013 | Base Year | 0.0033 | 0.0016 | 0.0035 | 0.0035 | 0.0008 | 0.0029 | 0.0004 | -0.0024 |
| Year=2014 | -0.0019 | 0.0010 | -0.0071* | 0.0010 | -0.0046 | -0.0033 | Base Year | -0.0017 | 0.0002 | 0.0002 | -0.0025 | -0.0004 | -0.0029 | -0.0057* |
| Year=2015 | -0.0001 | 0.0027 | -0.0054 | 0.0027 | -0.0028 | -0.0016 | 0.0017 | Base Year | 0.0019 | 0.0020 | -0.0008 | 0.0013 | -0.0012 | -0.0040 |
| Year=2016 | -0.0021 | 0.0008 | -0.0073* | 0.0008 | -0.0048 | -0.0035 | -0.0002 | -0.0019 | Base Year | 0.0000 | -0.0027 | -0.0006 | -0.0031 | -0.0059* |
| Year=2017 | -0.0021 | 0.0007 | -0.0073* | 0.0007 | -0.0048 | -0.0035 | -0.0002 | -0.0020 | -0.0000 | Base Year | -0.0028 | -0.0006 | -0.0032 | -0.0060* |
| Year=2018 | 0.0007 | 0.0035* | -0.0046 | 0.0035* | -0.0020 | -0.0008 | 0.0025 | 0.0008 | 0.0027 | 0.0028 | Base Year | 0.0021 | -0.0004 | -0.0032 |
| Year=2019 | -0.0015 | 0.0014 | -0.0067 | 0.0014 | -0.0041 | -0.0029 | 0.0004 | -0.0013 | 0.0006 | 0.0006 | -0.0021 | Base Year | -0.0025 | -0.0053* |
| Year=2020 | 0.0011 | 0.0039* | -0.0042 | 0.0039* | -0.0016 | -0.0004 | 0.0029 | 0.0012 | 0.0031 | 0.0032 | 0.0004 | 0.0025 | Base Year | -0.0028 |
| Year=2021 | 0.0039 | 0.0067* | -0.0014 | 0.0067* | 0.0012 | 0.0024 | 0.0057* | 0.0040 | 0.0059* | 0.0060* | 0.0032 | 0.0053* | 0.0028 | Base Year |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Positive and statistically significant results are shown in blue. I remove the employee Dr. Starr "double counts" as a move in both 2020 and 2021 (see footnote 53, *supra*).

Source: Starr turnover.

48

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

63.     Both of Plaintiffs' experts fail to consider information contrary to their own narrative description of the alleged mobility restrictions.  They also do not assess how the changes in the agreements would impact the proposed class.  Further, the analysis that Dr. Starr puts forward to purportedly measure the effect of the alleged conduct on mobility rates is based on a small number of moves between the "Covered Defendants," and does not support his conclusion that the alleged mobility restrictions ended in 2019 for both pairs of Defendants.

### C.  Plaintiffs' Theory of a "Wage Structure" and Purported "Cascading" Effects of the Alleged Conduct is Not Supported by the Available Data or Dr. Starr's Analysis

#### 1.  Summary of Plaintiffs' Experts' Theory of "Cascading" Effects Due to the Defendants' Purported Use of "Wage Structures"

64.     Dr. Starr and Dr. Gerhart both point to two elements of the purported "wage structures" at Defendant firms—internal equity and external equity.  Dr. Starr defines internal equity as "the idea that individuals doing comparable work within a firm should receive similar compensation."[137]  Dr. Starr argues that the "relevant implication is that if employee compensation is driven, in part, by considerations of internal equity, the firm's ability to suppress compensation of a group of employees would also be indirectly felt even by those employees who were not the target of wage suppression."[138]  Both Dr. Starr's and Dr. Gerhart's conclusion that "internal equity" would lead to "cascading effects" are predicated on the flawed assumptions that a change in one employee's compensation due to an outside job offer—or even a "cold-call"—would lead to rapid adjustments of a similar magnitude for *all* employees' compensation.[139]  The actual compensation information for relevant employees contradicts Plaintiffs' experts' conclusion that a compensation increase for one employee immediately results in compensation increases for other employees.

65.     Secondly, Plaintiffs' experts point to external equity, which Dr. Starr describes as employers seeking "to achieve pay similarities between laborers doing similar jobs at different firms."[140]  As Dr.

---

[137] Starr Report, ¶173.  See also, Gerhart Report, ¶94.

[138] Starr Report, ¶174.

[139] For example, Dr. Starr's "wage suppression" regression and correlation analyses both assume that the impact of the alleged conduct would be instantaneous (i.e., Dr. Starr (i) calculates the same "wage suppression" for every year in the proposed class period, beginning with the first year of the alleged conduct and (ii) calculates contemporaneous correlations across job levels and within job titles) (see Starr Report, Figures 6, 8, and 19).

Similarly, Dr. Gerhart argues that a Director receiving a higher paying job offer would result in "other Directors at the Defendant firm who were not cold called will *immediately* increase their own pay expectations and require higher pay to feel their pay is fair" (Gerhart Report, ¶143, emphasis added).

[140] Starr Report, ¶175.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Gerhart describes, in "the absence of external equity, a company is at greater risk of employee turnover."[141] That is, if a firm does not set competitive compensation, they are likely to lose employees to other firms that do. Dr. Gerhart argues that "if pay is suppressed in these other companies, achieving external equity will require lower labor costs than in a competitive market."[142] This conclusion—that the alleged conduct would impact all employees despite "external equity" constraints—is predicated on the flawed premise that the Defendants are the only firms proposed class members could move to.[143] Plaintiffs' experts present no assessment of the hundreds of other firms competing for labor from relevant employees which may constrain the ability of the Defendants to "suppress wages." Neither Dr. Starr nor Dr. Gerhart have presented any analysis to suggest that compensation was "suppressed in these other companies" where relevant employees could move.

66.     Dr. Gerhart presents what he describes as an "example of the no-poach agreements' cascading effects." In his example,[144]

- A Director does not receive "an unsolicited job offer having higher pay […] than their current job" due to the alleged conduct.

- Due to this offer the Director would have received absent the alleged conduct, "other Directors at the Defendant firm who were not cold called will *immediately* increase their own pay expectations and require higher pay to feel their pay is fair."

- Next, Vice Presidents "who did not receive cold calls notice that their pay is now unfair because the differential between their pay and the pay of Directors has now decreased," which leads to "pressure" to "increase Vice Presidents' pay to the targeted differential."

- Further, "[o]ther job titles whose functions sometimes overlap with those of Director now notice that the gap between their pay and that of Directors in the same firm has grown, and they demand increases to restore pay fairness."

- Finally, when "the firm performs its annual system-wide compensation review, it now discovers that Director pay has moved substantially ahead of pay for other job titles whose

---

[141] Gerhart Report, ¶94.

[142] Gerhart Report, ¶94.

[143] As I discuss in Section VI.D, Defendants also benchmarked their pay to a variety of compensation surveys, which include information from non-Defendant firms.

[144] Gerhart Report, ¶143, emphasis added.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

work overlaps," and "[m]aintaining internal equity requires increasing pay for those job titles as well."

67.    Dr. Gerhart assumes that an additional job offer for a Director would move compensation for all Directors, irrespective of the type of work they were doing.  For example, by Dr. Gerhart's theory, if Named Plaintiff Allen Spradling, who worked as a Director of IT in Birmingham, AL,[145] received another job offer, all other Directors—not just those in SCA's IT department but also those in the Finance, Marketing, Development, and other departments—would *immediately* demand higher compensation (including base salary as well as bonus and equity), irrespective of their job responsibilities, performance, outside job opportunities, or location.  Dr. Gerhart further assumes that this additional job offer for a Director would move compensation for all Vice Presidents and all "[o]ther job titles whose functions sometimes overlap with those of Director."  That is, Dr. Gerhart's theory would suggest *all* employees would demand higher compensation due to a single additional job offer— contrary to his own argument that "the pressures to raise pay diminish as one gets further removed from the new-hire Director, and the adjustments take time to play out."[146]  Dr. Starr similarly posits that "[c]ompensation structures connect all employee pay within a firm, such that any suppression of wages for one group of employees would tend to suppress the pay of other employees."[147]

### 2.    Compensation Data for Relevant Employees Contradicts Dr. Gerhart's and Dr. Starr's Conclusion of "Cascading Effects"

68.    To support their conclusion that "formalized pay structures" would "lead to cascading effects class-wide,"[148] Plaintiffs' experts review documents they claim describe Defendants' compensation policies.  However, several documents Dr. Starr and Dr. Gerhart cite in support of their conclusion of rigid "wage structures" do not support their conclusions.  For example, Dr. Starr cites a March 2018 internal DaVita document, which describes the "high degree of customization" used by DaVita in determining compensation, such as "unique structures for individual groups, or even individual people" and that DaVita did not "believe in 'salary bands' or 'pay grades.'"[149]  Similarly, an internal SCA

---

[145] Spradling Deposition, 201:1–24; Spradling Deposition, Exhibit DX005 (Sprad000014–0015).

[146] Gerhart Report, ¶143.

Dr. Gerhart testified that the pay adjustments "would take some amount of time […] It's not likely to be instantaneous.  I mean, it could be in some cases, but not -- unlikely in all cases (Gerhart Deposition, 223:11–17).

[147] Starr Report, ¶172.

[148] Gerhart Report, Section VIII.A, ¶141.

[149] DVA_OMCEAL_001329256–9261, at 9257.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

presentation notes that, as of September 2020, SCA did not "have a formal base salary/incentive structure, pay grades, or pay ranges.[150]  Ultimately, Dr. Starr and Dr. Gerhart's conclusions regarding the purported "cascading effects" on compensation for relevant employees is an empirical issue.

69.      In fact, data reflecting the actual compensation received by relevant employees does not follow Plaintiffs' experts' description of the purported "cascading effects" of the alleged conduct.  Dr. Gerhart testified that "internal equity is the key to causing cascading effects," and that "internal equity is reflected in the focus on paying people systematically […] based on their role and their performance" as well as a firms' "accepted or desired differentials" between different job levels.[151]  However, Dr. Gerhart does not conduct any empirical analysis to assess how (if at all) these two considerations of "internal equity" impacted compensation for relevant employees.  While Dr. Starr presents two correlation analyses to purportedly "demonstrate that groups of employee wages are tied together," as I describe below, his analyses do not support Plaintiffs' experts' theory of "cascading effects."[152]

---

[150] SCA001669270, at slide 3. ███████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████

See also, SCA000098450–8452, at 8450–8451 (In a 2018 internal email exchange, SCA HR professionals note that "at SCA, we have no official published ranges and no unified job grades," and that the available "pay ranges in the PAF system are significantly dated and should not be used as reference"); Deposition of Leslie Wachsman, May 22, 2024 ("Wachsman Deposition",) 118:8–119:14 ( "Q. What -- how do you -- what do you call the levels?  Does each level have a name? ███████████████████████████████████████
███████████████████████████████████████████████████  A. The levels are more based on title, so all directors.  And, again, it was -
- what I would say is ████████████████████████████████████████████████
██████████████████ it was very inconsistent and a little bit of the wild, wild west.  So that's, again, one of the things as CFO I wanted to put more structure in place."); Deposition of Kevin Zaideman, December 18, 2024 ("Zaideman Deposition",) 54:22–56:5 ("Q: So as you sit here today, is your testimony that prior to January of 2021, SCA had absolutely no framework for compensation?  A: Correct.  Q: Were any systems in place at SCA prior to January 20 of '21 to help managers decide what to pay their employees?  A: Two-part question.  First, No.  That's effectively why I was there.  That was my job.  So there was no system in place.  Everything came primarily to my email inbox ad hoc"); Zaideman Deposition, 52:14–53:18 ("So the term 'range' has been used a lot at SCA.  And prior to January of 2021, in absence of a bona fide job framework […] We weren't using pay ranges associated with those grades or bands.  What we were using was external market data and internal teammate pay data. […] But it would be compiled in—in a statistical function in Excel where, let's say, I had a leader that asked for an analysis of internal pay for a specific job and there were ten teammates in that job.  I would grab those ten data points and use a percentile function in Excel to display the 25th, 50th, and 75th percentile of what that data was.")

[151] Gerhart Deposition, 250:17–24.

[152] Starr Report, ¶178.

### a. Compensation Data Contradicts Plaintiffs' Experts' Conclusion of Consistent Compensation Changes Within Job Levels

70.     The first step of Plaintiffs' experts' "cascading effects" theory is that the Defendants would adjust compensation for employees in jobs "similar" to the employee that received an additional job offer.  For example, Dr. Starr argues that "[c]ompensation structures connect all employee pay within a firm" as pay for employees is "in part, set with reference to the pay of those employees whose jobs are most similar to their own."[153]  As Dr. Gerhart asserts in his example mentioned above, due to the additional offer a Director receives absent the alleged conduct, "other Directors at the Defendant firm who were not cold called will *immediately* increase their own pay expectations and require higher pay to feel their pay is fair."[154]  That is, Plaintiffs' experts' theory of "cascading effects" assumes that the compensation for all Directors (or all Vice Presidents) are connected, such that a change on one Director's (or Vice President's) compensation will immediately cause consistent changes in the compensation of all Directors (or all Vice Presidents).

71.     However, the Defendants' compensation data shows that employees within each of these job levels (as identified by Dr. Starr) have wide variation in compensation both within a single Defendant and across Defendants.  **Exhibit 11** shows Dr. Starr's calculated hourly rate (i.e., total compensation divided by the number of hours worked by the employee in that year) for jobs he identifies as being in the Director level in 2017.[155]  Dr. Starr calculates the hourly rate to compare employees that may have worked different number of hours within the same year.[156]  In this exhibit, each dot represents the hourly rate for an individual employee at one of the Defendants.  The vertical black bars show the median hourly rate for that Defendant.  As this exhibit shows, each Defendants paid a variety of compensation for "similar" employees.  For example, in 2017, DaVita Directors were paid between ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ while SCA Directors were paid between ▮▮▮▮▮▮▮▮▮▮▮▮▮.[157]  This exhibit also shows that the compensation for these different job levels was not consistent Defendant by Defendant.  For example, the median hourly rate across all "Directors" at USPI was ▮▮▮▮▮▮ (as

---

[153] Starr Report, ¶172.

[154] Gerhart Report, ¶143, emphasis added.

[155] I select 2017 as an illustration in this exhibit, but I see similar variation across all years.  See **Appendix F** for the distribution in hourly rates by Defendant and job level in each year from 2005 to 2022.

[156] Proposed class member are senior level employees that received substantial total compensation.  Based on Dr. Starr's own analysis, proposed class members received annual compensation of over $200,000, on average, and up to over $14 million (Starr Report, Figure 5).

[157] In this section, I report the ranges between the 1st percentile and 99th percentile of compensation.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

indicated by the vertical black bar on the USPI distribution in purple) compared to █████████ for SCA (shown in orange) and ███████████ for DaVita (shown in green).

**EXHIBIT 11**
**HOURLY RATE FOR DIRECTORS**
**BY DEFENDANT**



Notes: The vertical black bar on each distribution indicates the median hourly rate. Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours. Employees with compensation below the 1st percentile or above the 99th percentile for each Defendant are not shown in this exhibit.

Source: Starr turnover (Corrected Data).

72.     I find an even wider variation in compensation for employees that Dr. Starr has identified as being within the Vice President level. In **Exhibit 12,** I present a similar analysis of the distribution in compensation for these employees as I present above for the Director level. In 2017, DaVita Vice Presidents were paid between ████████ and █████████ while SCA Vice Presidents were paid between █████████████████ .

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 12**
**HOURLY RATE FOR VICE PRESIDENTS**
**BY DEFENDANT**
**2017**



Notes: The vertical black bar on each distribution indicates the median hourly rate. Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours. Employees with compensation below the 1st percentile are not shown in this exhibit. Sixteen employees with hourly rates above $500 per hour are not shown.

Source: Starr turnover (Corrected Data).

73.     The first step in Dr. Gerhart's theory is that a single employee receiving one job offer or cold call in the but-for world would result in an adjustment of expectations across all employees in that same job level—irrespective of what job those employees held or where their compensation fell within the wide distribution of compensation for employees within their job level. The range of compensation for Directors and Vice Presidents—hundreds of dollars per hour—illustrates how unrealistic the predicate of his "cascading effects" theory is. For example, Dr. Gerhart's theory implies that an employee making near the top of the range (e.g., a DaVita Vice President earning ▮▮▮▮▮▮▮) would immediately change their expectations in response to an offer a different employee receives near the bottom of the range (e.g., a DaVita Vice President earning ▮▮▮▮▮▮). Moreover, given this wide range, there is no reason to assume that the Defendants would have adjusted their purported "wage

55

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

structure" due to an increase in compensation for one (or several) employees as their compensation would likely remain within this wide range.

### b. Compensation Data Contradicts Plaintiffs' Experts' Conclusion of Consistent "Pay Differentials" Between Job Levels

74.     The second step of Plaintiffs' experts' "cascading effects" theory is that the Defendants maintained rigid "differentials" between different jobs such that compensation changes within one group of employees would lead to compensation changes for other groups.  For example, Dr. Gerhart argues that the "widespread, systematic impact on other employees happens as a function of Defendants' commitment to maintain desired and accepted pay differentials based on jobs, grades/ranges […] and employee performance."[158]  While Dr. Gerhart claims that Defendants "used fixed percentage pay differentials between jobs at different levels of a grade/range system" based on general compensation practices he cites, he does no empirical analysis to determine if this is true for the compensation of relevant employees.[159]  As I describe below, relevant employees received a large portion of their total compensation in the form of variable compensation (i.e., bonus and equity compensation).  Dr. Gerhart's general discussion of "pay differentials" is focused on salary ranges, and he does not assess if his assumed "pay differentials" would apply to total compensation.

75.     In fact, the data underlying Dr. Starr's correlation analysis across job levels contradicts the theory of fixed "pay differentials."[160]  **Exhibit 13** and **Exhibit 14** show the average hourly rate for Directors and VPs/SVPs at DaVita and SCA, respectively.[161]  In these exhibits,

- The dark blue portion of each bar shows the average hourly rate (as calculated by Dr. Starr as total compensation divided by the number of hours worked by the employee in that year) for Directors.

- The light blue portion of each bar shows the difference in average rates between Directors and VPs/SVPs, such that the total height of each bar shows the average rate of VPs/SVPs in that year.

- For each year, I label the percentage difference between the hourly rate for Directors and VPs/SVPs.  For example, in 2008 Directors at DaVita had an average hourly rate of █████

---

[158] Gerhart Report, ¶142.

[159] Gerhart Report, ¶113(a).

[160] Starr Report, Figure 19.

[161] See **Appendix G-1** for a similar chart for USPI.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

██████ compared to ████████, on average, for Vice Presidents and Senior Vice Presidents—or 141 percent higher.

As these exhibits show, the differentials between different job levels are not "fixed"—ranging between 137 percent and over 400 percent at DaVita and between 31 percent and 82 percent at SCA during the proposed class period.

**EXHIBIT 13**
**DIFFERENCE BETWEEN AVERAGE HOURLY RATE**
**DIRECTORS AND VPS/SVPS**
**DAVITA**
**2005 – 2022**



Note: Vertical lines indicate the start and end of the proposed class period.

Source: Starr turnover (Corrected Data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 14**
**DIFFERENCE BETWEEN AVERAGE HOURLY RATE**
**DIRECTORS AND VPS/SVPS**
**SCA**
**2005 – 2022**



Note: Vertical lines indicate the start and end of the proposed class period.

Source: Starr turnover (Corrected Data).

76.     This wide range of differentials contradicts Dr. Gerhart's assumption of how effects would "cascade" across job levels.  To the extent Defendants adjusted compensation for one job level and not others (through, for example, offering different bonus amounts), there is no reason to assume, as Plaintiffs' experts have, that changes in compensation for one group of employees would necessarily lead to changes in compensation for other groups of employees.  Dr. Gerhart assumes that if the pay for a Director is increased, (i) Vice Presidents will "notice that their pay is now unfair because the differential between their pay and the pay of Directors has now decreased and (ii) this will lead to "pressure" to "increase Vice Presidents' pay to the targeted differential."[162]  However, as **Exhibit 11** and **Exhibit 12** above show, there is substantial overlap in the distribution of compensation between

---

[162] Gerhart Report, ¶143

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Directors and Vice Presidents.  For example, in 2017, DaVita Directors were paid between ███████████ and ███████████ and Vice Presidents were paid between ███████████████████████.  Given this overlap, there is no reason to assume that Vice Presidents will "notice that their pay is now unfair." Moreover, Dr. Gerhart's "cascading effects" theory hinges on the maintenance of a fixed ratio (e.g., Vice Presidents always make 10 percent more than Directors).  But, as the empirical analysis demonstrates, there is no fixed differential and the underlying mechanism that Dr. Gerhart alleges creates the "cascading effects" does not exist for the positions at issue.

### 3. Dr. Starr's "Quantitative Evidence of a Compensation Structure" is Flawed and Does not Support his Conclusion that the Purported "Wage Suppression" would "Transmit" Across Proposed Class Members

77.     While Dr. Gerhart presents no analysis to support his theory of "cascading effects," Dr. Starr presents two correlation analyses that he states are "consistent with the existence" of "compensation structures" at the Defendant firms.[163]  First, Dr. Starr purports to "study whether earnings are positively correlated across job levels, conditional on a variety of macroeconomic and healthcare specific controls."[164]  Second, Dr. Starr purports to "study whether wages are positively correlated within specific job titles."[165]  Dr. Starr argues that because these two correlation analyses purport to show that compensation is correlated (i) "across job levels" and (ii) "within specific job titles," this is "strong support for compensation structures linking Class pay together."[166]

78.     However, Dr. Starr's analysis cannot determine *why* the average compensation series he studies move together, i.e., whether a change in compensation for one job is the reason for any part of any movement in compensation for other jobs.  In fact, compensation across jobs (particularly when

---

[163] Starr Report, ¶182.  I note that neither of these analyses address the issue of external equity as each looks at wages only within a single Defendant.

[164] Starr Report, ¶182.

[165] Starr Report, ¶182.

[166] Starr Report, ¶178.  In addition to his discussion of "compensation structures" and correlation analysis, Dr. Starr presents what he describes as "independent and complimentary methods" to demonstrate that "the generalized wage suppression" he purports to find with his "wage suppression" regression model "would harm all or nearly all Class Members" (Starr Report, ¶138).  Each of these proposed "methods" is based on his flawed "wage suppression" regression model and suffers from the same flaws described in Section VIII.

Further, the results of Dr. Starr's own "complimentary methods" do not support his conclusion on their face. For example, Dr. Starr presents what he refers to as "Interval In-Sample Predictions" in his Figure 16 and reports that "more than 91.5 percent of Senior-Level Employees are statistically significantly harmed" (Starr Report, ¶168).  However, when I apply this same analysis to Dr. Starr's corrected data (see Section VIII.B) and apply the conventional level of 5 percent to determine statistical significance, but make no other corrections, I find that Dr. Starr's "Interval In-Sample Predictions" suggest only approximately half of relevant employees might have been impacted by the alleged conduct.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

averaged together) can be correlated whether all, some, or none of compensation moves in relationship to a purported "wage structure." Thus, the correlation that Dr. Starr finds for average time series is unsurprising; all it indicates is that compensation generally moved together between 2005 and 2022 after accounting for the limited set of macroeconomic and healthcare factors that Dr. Starr includes in some of his analyses.[167]

79.       I construct a simple illustration limited to base salary to show why the finding of two series to be highly correlated has no probative value for the assessment of impact to any individual proposed class members, much less to the proposed class as a whole. The construction of my illustration is as follows:

- There are two employees within the same firm who start in the same job in 2015, one of which has a starting salary of $85,000 (Employee 1) and the other of which has a starting salary of $80,000 (Employee 2).

- Both of these employees receive an average merit increase of 2 percent each year.

- In 2019, Employee 1 receives an outside job offer, which she leverages to negotiate a 15 percent increase in her base salary that year.

80.       According to Dr. Starr's theory, the existence of "compensation structures" within the Defendant firms would cause Employee 2 to similarly receive a similar 15 percent increase in his base salary. However, whether or not Employee 2 receives this increase in his base salary, the pay for Employee 1 and Employee 2 will be correlated. **Exhibit 15** graphically represents this illustration, with the blue line showing the base salary of Employee 1 and the orange line showing the base salary of Employee 2. In the first panel, I show the effect that would be seen if Dr. Starr's assumed "wage structure" existed, where Employee 2 receives a similar pay increase as Employee 1. In the second panel, I show the same two employees, but now Employee 2 only receives an average merit increase of 2 percent each year.

---

[167] Starr Report, ¶184. The analyses Dr. Starr puts forward cover 2005 through 2022 for DaVita and USPI and 2008 through 2022 for SCA. In some of his analyses, Dr. Starr includes the same "macroeconomic and healthcare factors" that he includes in his "wage suppression" regression.

These factors do not account for any firm-specific factors (such as financial or stock market performance) that would drive compensation of employees in the same direction. For example, in 2007, when USPI went private, total compensation for many employees increased due to stock buyouts. Similarly, as I explain below, many DaVita employees missed out on long-term incentive payments in 2019 due to the firm's performance.

Dr. Starr's analysis would attribute these events to a spurious correlation between average compensation of Directors and VPs/SVPs because he does not account for any firm-specific factors which impacted compensation of many employees in a given year.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 15**
**ILLUSTRATION OF HIGHLY CORRELATED BASE SALARY SERIES**

| WITH "CASCADING EFFECTS" | WITHOUT "CASCADING EFFECTS" |



81.     The correlation between the base salary for these two employees in the second panel is *0.96*. That is, even absent a comparable pay increase for Employee 2 (after the job offer received by Employee 1), these two series are highly correlated. By Dr. Starr's logic, both of these panels would indicate the existence of a "compensation structure." However, only the first panel is consistent with impact to employees not directly impacted by the alleged mobility restrictions. Given that Dr. Starr's "wage structure" analyses cannot show *why* pay is correlated across jobs, they are not probative of the question at issue—whether or if a change in an individual's compensation due to an additional job offer (or cold call) causes all other compensation to increase.[168]

82.     In discussing his correlation analysis across job levels, Dr. Starr argues that the relevant question is "if wages for one job level are higher, then are they also higher in another job level?"[169] As an initial point, Dr. Starr's analysis across job levels tests if *average* compensation for all Directors is correlated with *average* compensation for all Vice Presidents and Senior Vice Presidents. As I show above, compensation levels varied significantly even for employees within the same job level. Rather

---

[168] For some of his correlation analyses, Dr. Starr includes additional variables that he claims control "for macroeconomic and healthcare factors that might otherwise cause [wages] to move together" (Starr Report, ¶184). However, if Dr. Starr is not controlling for all factors that might result in wages "moving together," his analysis will still find a correlation absent his contention of a "wage structure." As I discuss in detail in Section VIII.D, Dr. Starr's additional controls do not include any control for firm performance, which would impact employees' compensation over time.

[169] Starr Report, ¶182.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

than testing if two aggregate series generally move together, the more relevant question is: are the *changes* in compensation for one employee related to the *changes* in compensation for other employees? As the hypothetical example above shows, two series can be correlated even if the *change* in pay is not similar. Moreover, by Dr. Gerhart's contention, Defendants' focus on "internal equity" including "accepted or desired differentials" between different job levels is "key" to the effects "cascading" across proposed class members.[170] This "fixed" differential would imply that the changes in compensation move in tandem across levels (i.e., finding a correlation close to 1).

83.     To test this more relevant question (i.e., whether the changes in compensation for one employee are related to the changes in compensation for other employees), I apply Dr. Starr's correlation analysis to the changes in average compensation for each job level (i.e., the difference between the average compensation in that job level in the current year and the prior year, also referred to as a "first difference"). That is, I test whether Dr. Starr's analysis finds a statistically significant relationship—and the size of this relationship (which would need to be close to 1 to support Plaintiffs' experts' arguments of "cascading effects") —between the year-over-year changes in average pay for Directors and the year-over-year changes in average pay for VPs/SVPs. **Exhibit 16** shows the results of this test, applying the same data corrections described in Section VIII.B.

---

[170] Gerhart Deposition, 250:17–24.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 16**
**DR. STARR'S FIGURE 19: RELATIONSHIP BETWEEN DIRECTOR AND VP/SVP WAGES**
**ON CORRECTED DATA**
**APPLIED TO YEAR-OVER-YEAR CHANGES**

| | Dependent Variable: First Difference of Ln(Mean Hourly Rate for Directors) | | | | | |
|---|---|---|---|---|---|---|
| | DaVita | | SCA | | USPI | |
| *First Difference of* Ln(Mean Hourly Rate of VPs & SVPs) | 0.2550* 0.0471 | 0.2540* 0.0603 | 0.1973 0.1385 | 0.0387 0.1784 | 0.1323* 0.0395 | 0.0740 0.0843 |
| *First Difference of* Ln(Avg. State Mgr. Earnings) | | 0.4369 0.3962 | | -0.0091 0.2525 | | 0.5953 0.6439 |
| *First Difference of* Ln(State Health Expend. PC) | | -0.8956 0.6182 | | -0.6363 0.3165 | | 0.0226 0.6202 |
| *First Difference of* Covid | | -0.0209 0.1169 | | -0.1112* 0.0430 | | 0.1333 0.1028 |
| *First Difference of* Ln(State GDP PC) | | 0.8356 1.6459 | | 0.3975 1.0358 | | -1.8287 1.7080 |
| *First Difference of* Ln(State Unemployment Rate) | | 0.0541 0.2157 | | 0.0224 0.0883 | | -0.2328 0.1976 |
| *First Difference of* Census Region Annual CPI | | 0.4872 0.2604 | | -0.4134* 0.1245 | | -0.2373 0.2964 |
| Constant | -0.0004 0.0196 | -0.0173 0.0456 | 0.0294 0.0140 | 0.0789* 0.0253 | 0.0142 0.0147 | 0.0288 0.0359 |
| Observations | 17 | 17 | 14 | 14 | 17 | 17 |
| R-squared | 0.5059 | 0.6043 | 0.2074 | 0.6631 | 0.2797 | 0.4120 |

Notes: * indicates results that are statistically significant at the conventional 5 percent level. Results of Dr. Starr's variable of interest that are not statistically significant are shown in yellow. Dr. Starr notes that "the constant term is suppressed" for his analysis; however, the analysis does include a constant term, although it is not shown in his Figure 19.

See **Appendix H-1** for this same test on Dr. Starr's Figure 37, which studies the opposite relationship (i.e., how pay for directors relates to pay for VPs/SVPs).

Source: Starr turnover (Corrected Data).

84.     As this exhibit shows, when applied to the *changes* in compensation, Dr. Starr's correlation analysis across job levels does not find a statistically significant relationship between job levels at SCA or USPI, after accounting for the other factors that Dr. Starr argues would result in compensation moving together.[171]  That is, his own analysis does not show that "there are equity forces at work across job levels" within two of the three Defendants.[172]  Further, while Dr. Starr's analysis finds a relationship

---

[171] Starr Report, ¶184.

[172] Starr Report, ¶182.

63

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

for DaVita which is statistically significantly different from zero, the estimated coefficient is 0.25, significantly below 1—contrary to Plaintiffs' experts' conception of a "wage structure."

85.     Dr. Starr also purports to assess "whether the wages of workers with the same job title move together" by testing whether the average compensation of a subset of employees within a job title is correlated with individual employees' compensation in that same job title.[173]  Specifically, Dr. Starr calculates whether the average hourly rate of a random 50 percent sample within a given job title-year combination is correlated with the individual hourly rates for the remaining 50 percent of employees in that same job title and year (in his "hold-out sample").[174]  Dr. Starr argues that the findings of his purported test "are strongly consistent with the existence of a pay structure within jobs" as the hourly rates of individuals in the hold-out sample "moved almost one for one" with the average rate of "others" in the same job title (who are not part of the hold-out sample).[175]

86.     However, Dr. Starr's test has no bearing on whether there is a "wage structure" such that the alleged conduct would have "cascading effects."  That is, Dr. Starr's analysis cannot answer the question at issue: would a positive wage shock to an employee that received an additional job offer in the but-for world "cascade" to others in the same job who did not?  Instead, Dr. Starr's analysis merely confirms that relevant employees worked in numerous different jobs at the Defendants, with different average wage levels (and considerable variation in pay around these averages).

87.     In fact, Dr. Starr's test would find the same relationship—that the average hourly rate for employees in one job title is correlated with the hourly rate of individuals within that same job title— even if the compensation levels for workers with the same job title do *not* move together.  To illustrate this, I perform a "placebo test," which I present in **Exhibit 17** below.  For this test, I replicate Dr. Starr's "hold-out sample test" with only one modification: I replace the actual wages for any worker who remained in the same job with a completely *independent* and *random* wage change between –5 and +10 percent.  This "placebo test" thus ensures by definition that wages of workers with the same job title do *not* move together.  For every Defendant, Dr. Starr's method would still find a statistically significant

---

[173] Starr Report, ¶187.

[174] Starr Report, ¶¶187–188.  ("To implement this test, I use a randomized hold-out sample analysis.  To illustrate the idea, consider the following example: Suppose that there are 100 Directors in a given company in a given year.  I randomly split 50 into group A, and 50 into group B.  I then examine whether the average wages of the 50 randomly selected Directors in group A are predictive of the individual wages of the other 50 Directors in group B.  If so, then this is strong evidence in favor of a compensation structure.")

[175] Starr Report, ¶190.  Starr Deposition, 424:22–430:1.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"almost one for one" relationship with the individual compensation of those in the hold-out set—even if compensation moved randomly and independently from each other.[176]

EXHIBIT 17
DR. STARR'S FIGURE 20: WITHIN-JOB HOURLY RATE CORRELATION
ON CORRECTED DATA
PLACEBO TEST WITH RANDOM COMPENSATION CHANGES

| | Dependent Variable: Ln(Hourly Rate) | | | | | |
|---|---|---|---|---|---|---|
| | DaVita | | SCA | | USPI | |
| Ln(Average Placebo Hourly Rate of Others in Same Job-Year) | 0.8661* (0.0279) | 0.8609* (0.0223) | 0.9340* (0.0205) | 0.9516* (0.0397) | 0.8991* (0.0315) | 0.8872* (0.0351) |
| Ln(Avg. State Mgr. Earnings) | | 0.1746* (0.0619) | | 0.0922 (0.0522) | | 0.1027 (0.0802) |
| Ln(State Health Expend. PC) | | 0.0795 (0.0542) | | 0.0007 (0.0548) | | -0.2464* (0.1099) |
| Covid | | -0.0210 (0.0179) | | -0.0466* (0.0139) | | -0.0258 (0.0250) |
| Ln(State GPD PC) | | 0.0424 (0.0722) | | -0.0010 (0.1362) | | 0.4420* (0.0873) |
| Ln(State Unemployment Rate) | | 0.0222 (0.0246) | | 0.0517* (0.0195) | | 0.0961* (0.0205) |
| Census Region Annual CPI | | 0.0865* (0.0430) | | 0.0987 (0.0572) | | 0.2038* (0.0878) |
| Constant | | -2.8112* (0.6464) | | -1.1807 (1.5724) | | -4.0856* (0.4027) |
| Observations | 6,377 | 6,377 | 2,591 | 2,591 | 4,145 | 4,145 |
| R-squared | 0.5543 | 0.5646 | 0.6591 | 0.6633 | 0.5500 | 0.5653 |

Notes: * indicates results that are statistically significant at the conventional 5 percent level. While Dr. Starr notes that "the constant term is suppressed" for his analysis, the analysis does include a constant term, which is not reported.

This analysis uses the same employees and starting compensation as Dr. Starr's Figure 20, but randomly replace the actual compensation for any worker who remained in the same job title with an independent and random compensation change drawn from a [–5, +10 percent] uniform distribution.

Source: Starr turnover (Corrected Data).

88.     The reflexive property generating the "almost one for one" co-movement between individual wages and the (approximated) average wages among their peer group is well understood in the

---

[176] In my backup materials, I show the results of 1,000 repetitions of this placebo test—each time with different "hold-out samples" and different random and independent wage changes for employees remaining in the same job. A meaningful statistical test should falsely reject that "wages of workers in the same job title do not move together" only around 5 percent of the time. Dr. Starr's test, however, rejects this true null hypothesis 100 percent of the time.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

econometrics and statistics literature on "peer effects."[177]  As labor economist and Nobel Prize laureate Joshua Angrist describes in a textbook on this topic, "any shock common to the group […] creates spurious peer effects."[178]  In Dr. Starr's application, any shocks *common* to a job title-year group (such as the firm's or the group's performance, group-specific merit budgeting decisions and/or job-specific benchmarking adjustments) will create the spurious illusion of "cascading" peer effects extending to employees in the same job.  To address the relevant question at issue—whether an *uncommon* positive wage shock for a few employees would "cascade" to all others in the same job—Dr. Starr's test would need to properly account for the effects of all *common* shocks.  Dr. Starr has not done that.

### D.  Dr. Starr and Dr. Gerhart Ignore Other Factors that Would Limit the Impact (If Any) of the Alleged Conduct

#### 1.  Plaintiffs' Experts Acknowledge that the Defendants Benchmarked Compensation to Non-Defendant Firms But Do Not Account for How This May Limit the Impact of the Alleged Conduct on Compensation Received by Relevant Employees

89.     Dr. Gerhart argues that companies benchmark their compensation to external sources in order to "match a company's internal compensation structure […] with the value (as indicated by pay level) assigned by the external market."[179]  Dr. Starr similarly argues that the Defendants sought to maintain "external equity."[180]  While Dr. Starr argues the "relevant implication" of external equity in the context of "wage suppression" (i.e., "if Firm A is able to suppress the wages of its own employees, Firm B (which nominally competes with Firm A over labor) can pay its own employes less"), the same forces

---

[177] If one regressed the individual hourly rates on an average estimated over the *same* set of individuals (and not over a 50 percent sample of "others"), the regression would mechanically guarantee a *perfect* "one for one" relationship.  This is known as the "reflection problem."  See Charles F. Manski, "Economic Analysis of Social Interactions," *Journal of Economic Perspectives*, Vol. 14, No.3, 2000, p. 128 (describing that average "behavior in the group is itself determined by the behavior of group members.  Hence, data on outcomes do not reveal whether group behavior actually affects individual behavior, or group behavior is simply the aggregation of individual behaviors.  This *reflection problem* is similar to the problem of interpreting the (almost) simultaneous movements of a person and his reflection in a mirror.  Does the mirror image cause the person's movements or reflect them?")

Dr. Starr's estimate of the average hourly rate within a job is estimated over a 50 percent sample and thus not perfectly identical to the exact group average.  However, as long as the 50 percent sample is large enough, it will provide a good approximation of the exact group average (by the law of large numbers – the same law that guarantees that if one throws a coin often enough, one will eventually get 50 percent heads and 50 percent tails.)  Therefore, Dr. Starr's estimator also moves closer to the mechanical "reflexive one-for-one" relationship simply because of sample size (and not because "wages of workers with the same job title move together").

[178] Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion*, 1st ed., Princeton University Press, 2009, p. 146; Joshua D. Angrist, "The Perils of Peer Effects," *Labour Economics*, Vol. 30, 2014, p. 101.

[179] Gerhart Report, ¶115(f).  See also, Starr Report, ¶¶175–176.

[180] Starr Report, ¶¶179–181.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

would apply to wage increases as well.[181]  In the face of competition from a wide range of companies, the "relevant implication" for Defendants would be the opposite of Dr. Starr's contention.  That is, if Firm A competes with Firm 1 through Firm 100 for employees, it would not be able to "suppress wages" unless many of its 100 competitors did the same (or risk losing employees to their labor market competitors).  Similarly, if Defendants benchmark compensation against the external market, which includes a variety of non-Defendant firms, this may undermine or limit the impact of the alleged conduct on compensation for relevant employees.

90.     Plaintiffs' experts reference "abundant evidence" that DaVita, SCA, and USPI benchmarked their pay to external market data.[182]  As shown by the evidence cited by Dr. Starr and Dr. Gerhart, the Defendants used a variety of different surveys to benchmark compensation for relevant jobs.  For example,

- Several employees involved in compensation setting at DaVita testified that DaVita benchmarked internal pay to external market data.[183]  For example, former Senior Director of Compensation and Analytics Colleen Arthur testified that DaVita relied on external data from Kenexa and Payfactors, a service called Qualigence that provided compensation data pertaining to specific external positions and geographies, and salary surveys including Mercer and Towers Watson.[184]

- Available evidence also shows that SCA benchmarked its pay to external market data. Former SCA Talent Officer Bridie Fanning testified that SCA relied on multiple surveys to benchmark its pay structures and set compensation, including Hewett, Mercer, and Willis Towers, and Watson.[185]  Dr. Gerhart cites similar statements from other SCA executives

---

[181] Starr Report, ¶175.

[182] Gerhart Report, ¶116(a).  See also, Gerhart Report, ¶116(b)–(c), Starr Report, ¶¶179–181.

[183] Gerhart Report, ¶116(a), citing Rodriguez Deposition, 113:17–23; Chipman Deposition, 79:13–23; Arthur Deposition, 108:3–109:9.

DaVita benchmarked compensation against a variety of different types of companies in several industries.  For example, in 2015 DaVita benchmarked compensation using a Towers Watson survey that included information from hundreds of companies in industries such as "Aerospace," "Consumer Products," and "Telecommunications" (DVA_OMCEAL_001386589–6626, at 6589).

[184] Deposition of Colleen Arthur, May 23, 2024 ("Arthur Deposition",) 107:24–110:1; DVA_OMCEAL_001332708–2711 (Exhibit PX73), at 2708–2710; DVA_OMCEAL_001344567–4582 (Exhibit PX268), at 4573.  See also, Gerhart Report, ¶116(a); Starr Report, ¶179(d), (j).  Towers Watson and Willis Group merged in 2016 to become Willis Towers Watson (WTW, "Our History," https://www.wtwco.com/en-us/about-us/our-history)

[185] Fanning Deposition, 175:11-16.  See also, Gerhart Report, ¶116(b); Starr Report, ¶180(c), (i).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

involved in compensation decision making, including former COO Michael Rucker who testified that SCA "would hold up every data point that we could possibly get our hands on to say what is this information telling us the market's doing, how do we ensure that we don't fall behind and that we don't overdo it."[186]

- Similarly, USPI regularly relied on external benchmarking to set employees' pay. For example, former USPI internal recruiter Shannon McGarry testified that she ran compensation reports ten to twelve times a month to benchmark pay to the external market.[187] Like DaVita and SCA, USPI also relied on a variety of third-party services including Ambulatory Surgery Center Association and Mercer to benchmark pay.[188]

91. Despite acknowledging the importance of "external equity," benchmarking, and salary surveys for setting compensation, neither Dr. Starr nor Dr. Gerhart consider how benchmarking would undermine the broader compensation effects of any alleged conduct.[189] Given that the Defendants regularly benchmarked compensation to external labor market data, including a wide range of non-Defendant firms, such benchmarking could have applied upward pressure on any purported "wage structure" within each of the Defendant firms, potentially reducing the impact of the alleged conduct. Ultimately, the relevant question is if Defendants were able to suppress compensation without losing employees to their competitors. Dr. Starr and Dr. Gerhart have not explained how Defendants could suppress compensation below competitive levels when relevant employees could move to hundreds of

---

[186] Gerhart Report, ¶116(b); Deposition of Michael Rucker, August 27, 2024 ("Rucker Deposition"), 262:15–20. The 2017 compensation analysis Dr. Gerhart cites reveals that SCA did in fact rely on data from third-party compensation aggregators Mercer and Towers to create salary budget recommendations for Development positions (Gerhart Report, ¶116(b); SCA001046573–6574 (Exhibit PX528), at 6573).

[187] Deposition of Shannon McGarry, June 11, 2024 ("McGarry Deposition",) 108:14–19, 110:3–12. See Gerhart Report, ¶116(c).

[188] Gerhart Report, ¶116(c). See also, Starr Report, ¶181(b).

[189] Gerhart Report, ¶115(f); Starr Report, ¶175.

While Dr. Gerhart claims that "if pay levels in the market for any of these benchmark jobs have been artificially depressed, then pay [for] these jobs in a company will also be lower," he has performed no analysis of the benchmark levels for any relevant job nor has he described how the Defendants could "artificially depress" benchmark data across the variety of surveys utilized and across the companies included within these surveys (Gerhart Report, ¶115(f)). As I discuss above, the evidence that Dr. Gerhart cites indicates that that Defendants benchmarked to a broad set of labor market competitors—not just one another.

Similarly, Dr. Starr argues that "a company may seek to pay its employees at approximately the 75th percentile of some external pay benchmark" but switch to benchmarking to "approximately the 50th percentile of some external pay benchmark" if "that company is suppressing labor competition" (Starr Report, ¶176). Dr. Starr fails to provide any evidence that the Defendants in this case changed their external benchmarking practices over time due to the alleged conduct.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

other firms that competed with the Defendants for their labor and that the Defendants benchmark themselves against.

### 2. Plaintiffs' Experts' Own Description of the Purported "Wage Structures" at Defendant Firms Suggest these Practices Would Limit the Impact of the Alleged Conduct on Compensation

92. Taking Dr. Starr's and Dr. Gerhart's description of the Defendants' purported "wage structures" at face value, the continued addition of new employees would put *upward* pressure on compensation. According to Plaintiffs' experts, Defendants' purported "wage structures" imply that any "wage suppression" would impact all employees. If that were the case, compensation across employees would also have to *increase* in response to newly hired employees paid competitive rates (i.e., joining the Defendants at higher compensation levels compared to current employees' compensation that was allegedly "suppressed"). Neither Dr. Starr nor Dr. Gerhart has described how an additional six employees failing to move between the Defendants each year would suppress compensation for all proposed class members while the Defendants hiring hundreds of employees each year would not have the opposite effect on compensation due to these same forces.

93. Dr. Gerhart acknowledged that "when there are many […] new hire and retention perturbations across a firm, and when they continue year-after-year, the pressure to increase pay system-wide are continuous and substantial."[190] As I show above, the Defendants regularly hired from non-Defendant firms. If compensation was not suppressed at these non-Defendant firms, based on Plaintiffs' experts' own theory, these newly hired employees would have to be paid a competitive rate, creating "pressure to increase" pay. Dr. Gerhart acknowledged that compensation for these new hires "would probably have to be within sight of what the competitive rate would be," otherwise they would have joined a competing firm.[191] If these new employees were paid "within sight of what the competitive rate would be" as the Plaintiffs' experts theorize, then current employees would be as well by Plaintiffs' experts' own "cascading effects" theory.

### 3. Defendants Utilized Long-Term Incentives to Retain High Performing Employees, Which Would Limit the Impact of the Alleged Mobility Restrictions

94. An academic article referenced by Dr. Starr discusses how long-term incentive programs— where employees must remain at the firm to receive the compensation they were granted in previous

---

[190] Gerhart Report, ¶143.

[191] Gerhart Deposition, 56:1–21.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

years—are commonly used as retention tools by firms.[192]  One reason why employees would be incentivized to remain at their current employers is to receive any unvested compensation they have been granted but not yet received.  The Defendants themselves describe their long-term incentive programs as an effort "to reward and retain […] high performers over the mid- to long-run."[193]

95.     Dr. Starr and Dr. Gerhart do not address how unvested compensation would potentially limit the mobility of the proposed class (separate and apart from the alleged conduct) given that these are senior level employees who received a large part of their compensation in long-term incentives.[194]  For example, DaVita equity grants generally had vesting periods of ████████████,[195] and the value of these grants could be substantial relative to other types of compensation employees received:

- Proposed class member ███████████████████ was hired by DaVita as a "Division/Region VP" in 2010.  He was granted ███████████████ in 2010, followed by an additional grant for ████████████ in March of 2011 and an additional grant for ██████████████ in March of 2013.[196]

- DaVita's stock price roughly doubled from about $30 in 2010 to about $60 in 2013.  The value of ████████████████ unvested options appreciated to around ██████████ by the end of 2013, exceeding his total realized cash compensation of less than ████████ in the same year.

96.     Similarly, SCA equity grants generally vested over a ██████████ period.[197]  SCA tracked the value of unvested equity in compensation statements provided to employees.  For example, the "Total Compensation Statement" for proposed class member █████████████, a Vice President of Development at SCA, shows that as of December 31, 2014, he had █████████ in unvested Restricted Stock Units ("RSUs") and stock options, multiple times the value of his base salary (██████████) at the time.[198]  Dr. Starr and Dr. Gerhart do not consider that employees like ██████████████████ and ██.

---

[192] Matthew Gibson, "Employer Market Power in Silicon Valley," *W. E. Upjohn Institute Working Papers*, 2024.

[193] SCA000048815-8817, at 8816 (Exhibit PX465).

[194] See **Exhibit 26** and **Exhibit 27**.

[195] DVA_OMCEAL_001332734–2774, at 2760; DVA_OMCEAL_000711693–1695.

[196] I calculate the unvested value of options based on the "Black-Scholes-Merton" valuation model DaVita uses in its SEC 10-K financial filings (see, e.g., DaVita Inc. 10-K, 2010 Annual Report, p. 106).  See also, Gerhart Deposition, 78:18–24 ("one of the common methods [to value option grants] is the Black-Scholes method").

[197] See, e.g., SCA002246316; See also, SCA000465129 and SCA001159728–9748 at 9741.

[198] BF000222637.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

██████ would be incentivized not to depart from DaVita or SCA while their granted equity compensation is not yet vested.

97.     In addition, Plaintiffs' experts do not discuss how potential increases in stock prices—which Dr. Gerhart claims incentivized the alleged collusion—would improve the position of the proposed class members, a large portion of whose compensation was comprised of equity.[199]  By their own contention, the value of these forms of compensation would be *higher* for proposed class members due to the alleged conduct.  The opposite would also hold.  The value of equity as well as long-term cash incentives and bonuses were contingent on Defendants' financial performance.[200]  Plaintiffs' experts do not address that in their purported but-for world, (i) financial performance may have fallen in the face of a 14.5 percent (or more) increase in  compensation for relevant employees (as suggested by Dr. Starr's flawed regression model), such that (ii) recipients of long-term equity or cash incentives (or bonuses) would have received less in the but-for world.[201]  Ultimately, Dr. Starr and Dr. Gerhart fail to assess other factors that would undermine any alleged antitrust conspiracy and/or limit the impact of the alleged conspiracy.

## VII.   DR. STARR'S AND DR. GERHART'S OPINIONS ON THE ALLEGED INFORMATION SHARING DO NOT ADDRESS PLAINTIFFS' WAGE FIXING ALLEGATION AND ARE NOT SUPPORTED BY ECONOMIC ANALYSIS OR THE EVIDENCE THEY PRESENT

### A.   Summary of the Alleged Information Sharing Evidence Presented by Plaintiffs' Experts

98.     In addition to the alleged mobility restrictions, Plaintiffs allege that the Defendants "fix[ed] wages directly by regularly exchanging competitively sensitive wage and other business information among each other."[202]  Dr. Starr testified that he was not offering an "opinion on whether the Defendants coordinated pay levels."[203]  However, Dr. Starr claims that the alleged information sharing included what Defendants "would pay their employes" and speculates that it "would have allowed them

---

[199] Gerhart Report, ¶7(a).  See DVA_OMCEAL_000926457–6460 (describing that 2016 and 2017 payouts of DaVita's 2013 long-term cash incentive program depend on financial performance over the 2013–2015 period).

[200] See ¶155, *infra* for a discussion of Defendants' variable pay programs.  See also, for example, SCA001497129–7179, at 7150–7154 (a presentation from 2010 for the "Compensation Committee Meeting" which shows that incentive payouts for employees in "Home Office VP", "SVP", "RVP" and "Dir Ops" roles depend on "Corporate", "Group" and/or "Region"-specific financial metrics).

[201] I note that Dr. Starr's regression model omits any financial performance measures, and thus also cannot account for any feedback effects between compensation and financial performance.

[202] Complaint, ¶54.

[203] Starr Deposition, 47:1–7.

71

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

to fix Senior-level Employee pay."[204]  Similarly, Dr. Gerhart testified that he was offering the opinion that the alleged information sharing was "likely" to have impacted compensation, but not offering the opinion that it actually did.[205]  In support of their conclusion, Plaintiffs' experts reference specific examples of alleged bilateral information sharing between (i) DaVita and SCA or (ii) SCA and USPI.[206]  These examples are limited to:

- DaVita or SCA sharing (or discussing sharing) information about merit increase budgets in only certain years between 2009 and 2012 or 2013[207] and SCA or USPI sharing (or discussing sharing) similar information in certain years between 2009 and 2014.[208]  These merit increase budgets included the average percentage increase in base salary across all employees (or a range of possible average percent increases).[209]  For example, Plaintiffs' experts point to an October 2012 email exchange where Brian Mathis (SCA) asked if Mark

---

[204] Starr Report, ¶58.  See also, Starr Report, ¶179(k) (The "CSI exchanges allow for SCA and DaVita to match each other's compensation patterns should they want to, which might have allowed DaVita to reduce its compensation relative to what it would have done without the specific SCA benchmark data"); ¶180(k) (The "CSI exchanges may have helped SCA to coordinate its pay levels directly with DaVita and USPI, potentially reducing the rate of e.g., wage increases it would have given absent this information"); ¶181(d) (The "CSI exchanges may have helped USPI to coordinate its pay levels directly with SCA's, potentially reducing the amount of pay increases it would have otherwise given absent this information").

[205] Gerhart Deposition, 146:11–147:18.

[206] Gerhart Report, ¶¶82–83; Starr Report, ¶¶100–101.

[207] See, e.g., HAYEK-000012214–2216 (Exhibit PX490) and Rucker Deposition, 256:13–257:3, 294:5–17, 342:17–343:11, 353:5–355:14 (Michael Rucker (SCA) testified that he had "an informal conversation with" Javier Rodriguez (DaVita) about each company's merit pool potentially in "2012, 2013").

I note that this first document (HAYEK-000012214–2216 (Exhibit PX490)) appears to include information on DaVita merit increases that had already been decided (e.g., "All non-field (corporate office, business office, execs) got zero increase" and that there "[h]as been 'zero complaints' about these raises").  In addition, Mr. Hayek testified that this file was a document he "created and, in some cases, copied and pasted information" around July 2009 (Hayek Deposition, 366:20–368:14).  DaVita's public Proxy Statement in June 2009 includes similar information as this document, including that the DaVita "Compensation Committee elected not to award merit increases to base salary in 2009 to our named executive officers and other members of management across the company" (DaVita, "Notice of Annual Meeting of Stockholders," June 3, 2009, https://filecache.investorroom.com/mr5ir_davita/185/ DaVita_Proxy09_Final_2.pdf., p. 21).

[208] See, e.g., HAYEK-000012214–2216 (Exhibit PX490); OMC_BM_000014729 (Exhibit PX525); USPI_CIV_000021155 (Exhibit PX232).

[209] Brian Mathis (SCA) testified that the merit budget was represented as a "percentage that we would increase individuals' compensation in aggregate" and was applied to base salary (Mathis Deposition, 69:18–70:11).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Kopser (USPI) was "expecting typical ~2% wage increases for 2013," to which Mr. Kopser responded that USPI was expecting a "2–3%" average wage increase.[210]

- SCA and USPI sharing compensation information for an "internal audit" position in 2012[211] and a discussion about sharing compensation information for "RVPs [Regional Vice Presidents] and Administrators in the San Francisco/Bay Area" in 2015, for which Plaintiffs' experts point to no information actually being shared.[212]

- SCA and USPI sharing general business information during the relevant period such as case volume data and aggregate overhead cost information. For example, in July 2013, Jason Cagle (USPI) sent Peter Clemens (SCA) selected corporate general and administrative cost data and asked him to reciprocate.[213] This information included a single, aggregate amount of general and administrative costs for each department included.

99. Although the evidence they present about merit budget information and compensation information for a few individual jobs is limited to discrete conversations in specific years in the early portion of the proposed class period, Dr. Starr and Dr. Gerhart assume, without support, that this alleged information sharing continued for the full relevant period.[214] For example, Dr. Starr concludes that "SCA's and DaVita's senior executives repeated [the exchange of merit budget information] regularly" based on testimony from Andrew Hayek (SCA), who stated that this information was shared "on one or more occasions."[215] However, Dr. Starr omitted the next sentence of Mr. Hayek's testimony where he stated that this information was shared "maybe a couple" of times and was "not a regular practice."[216]

---

[210] OMC_BM_000014729 (Exhibit PX525). Mr. Mathis testified that he could not remember which years he shared this type of budget information with USPI (Deposition of Brian Todd Mathis, September 20, 2024 ("Mathis Deposition",) 53:14–54:3, 55:7–56:20).

In addition to merit budgets, Plaintiffs' experts also point to SCA providing USPI with information on its "PTO policy" in 2014 (USPI_CIV_000601224–1229 (Exhibit PX119)).

[211] OMC_BM_000010778–0779 (Exhibit PX523).

[212] USPI_CIV_000046079 (Exhibit PX239).

Dr. Gerhart also points to a May 2012 email in which Rick Sharff, General Counsel at SCA, provided compensation information to Jason Cagle (USPI) for Mr. Sharff's "no. 2 lawyer" (USPI_CIV_000016522 (Exhibit PX234)). My understanding is that employees within the legal departments at the Defendants are outside of the proposed class (Complaint, ¶92).

[213] SCA002364259–4261 (Exhibit PX033).

[214] Similarly, the alleged merit budget information sharing referenced within the complaint focus on specific periods in 2009 and 2011–2014 (Complaint, ¶¶54–60).

[215] Starr Report, ¶100; Hayek Deposition, 362:8–363:7.

[216] Hayek Deposition, 362:8–363:7.

(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Dr. Starr simply assumes the absence of an agreement "to stop exchanging wage data" is proof that the alleged information sharing continued.[217] As I discuss above, the conclusions drawn from simply reviewing documents—and not conducting any empirical analysis—are not consistent with sound scientific practice or economic analysis.

100.    Neither Dr. Starr nor Dr. Gerhart present any empirical analysis to assess the effect specifically of the alleged information sharing. Dr. Starr points to the results of his "wage suppression" regression—which estimates an *average* effect across the entire time period and cannot parse out the effects (if any) on compensation of the alleged information sharing from the other challenged conduct.[218] That is, he provides no empirical analysis to test whether the specific alleged information sharing example he cites had an effect on compensation for any proposed class member or if sharing this information at specific points in time had different impacts on compensation during the proposed class period. Further, Dr. Gerhart testified that he conducted no empirical analysis and simply offered an opinion on the "likely" effects of the alleged information sharing on the proposed class.[219] While Plaintiffs allege that the Defendants "fix[ed] wages directly" through the alleged information sharing,[220] neither Dr. Starr nor Dr. Gerhart assess or even explain how the information allegedly shared—inconsistently across the 12-year proposed class period—could form the basis of an understanding as to what compensation to pay or the amount of hiring to suppress.

---

Dr. Starr also cites testimony from Brian Mathis (SCA), who testified that he believed SCA and DaVita shared "yearly wage increase" information "in some years," but noted that he personally did not share information with DaVita and did not know who did (Mathis Deposition, 54:16–24).

[217] Starr Report, ¶¶100–101. In his discussion of the end of the alleged DaVita and SCA information sharing as well as the alleged SCA and USPI information sharing, Dr. Starr cites to testimony from Leslie Wachsman (SCA) (Starr Report, ¶¶100–101 and footnotes 353, 387). However, her testimony specifically references the exchange of case volume data between SCA and USPI, not "wage data" or exchanges of information with DaVita (Wachsman Deposition, at 177:22–178:19, 232:19–233:1).

See also, Starr Deposition, 94:10–23, 96:13–97:7, 462:1–465:10, 501:12–503:16.

[218] Dr. Starr points to the results of his flawed "wage suppression" regression as "quantitative evidence" that is "consistent with exchanges of CSI in support of colluding to suppress Senior-Level Employees pay" (Starr Report, ¶102). However, as Dr. Starr himself acknowledges, his regression analysis cannot measure the "suppressed compensation" specifically due to the alleged information sharing (Starr Report, ¶106).

[219] Gerhart Deposition, 34:6–22, 285:24–286:4.

[220] Complaint, ¶54.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

### B. Dr. Starr and Dr. Gerhart Fail to Assess Whether the Alleged Information Sharing or the Economic Conditions in the Markets at Issue Could Facilitate a Successful "Wage Fixing" Conspiracy

101.     Dr. Starr asserts that "the exchange of CSI is often a key component of collusion," citing a paper by Dr. Margaret Levenstein and Dr. Valerie Suslow from the *Journal of Economic Literature*.[221] In this article, Dr. Levenstein and Dr. Suslow describe three key problems economists recognize as an obstacle to any successful cartel: coordination, entry (i.e., competition from firms outside of the cartel), and cheating.[222]  Dr. Roger Blair and Dr. Jeffrey Harrison provide a similar framework for assessing monopsony cartel behavior, which is alleged in this case.[223]  They describe the "three major tasks that must be performed if a buyer cartel is to be successful" as agreement, implementation, and monitoring.[224]  They also highlight two significant obstacles to maintaining a cartel—restricting entry and limiting cheating.  Neither Dr. Starr nor Dr. Gerhart provides any analysis to assess whether the economic conditions to facilitate a successful wage fixing cartel exist in this case, nor how the information sharing they cite would overcome these obstacles.

### 1. Dr. Starr and Dr. Gerhart Do Not Assess How the Co-Defendants Could Successfully Coordinate to Form a Wage Fixing Cartel

102.     A successful wage fixing cartel requires "some mutually satisfactory agreement on a host of issues" with respect to base salary, other forms of compensation, demand for labor, and other terms and conditions  of employment.[225]  Dr. Starr and Dr. Gerhart are silent about how the Defendants' alleged information sharing could result in coordination of base salary (and other forms of compensation) paid to thousands of proposed class members, or how the Defendants would suppress their demand for labor collectively to reduce compensation.  To successfully form a wage fixing cartel, the Defendants would

---

[221] Starr Report, ¶93, citing Levenstein and Suslow (2006).

[222] Levenstein and Suslow (2006), pp. 45–46.

[223] Roger D. Blair and Jeffrey L. Harrison, *Monopsony in Law and Economics*, 1st ed., Cambridge University Press, 2010 ("Blair and Harrison (2010)").

As Dr. Starr describes, "a firm with monopsony power (i.e., buying power) sets the prices at which they will purchase inputs (such as labor) below what would be realized in a competitive market, increasing the monopsonist's own profits at the expense of the employee" (Starr Report, ¶32).

[224] Blair and Harrison (2010), p. 50–51.

[225] Blair and Harrison (2010), p. 50–51.  Dr. Levenstein and Dr. Suslow describe the analog to monopsony in a traditional price fixing conspiracy where firms must determine "what prices to charge" and "what level of output to produce" (Levenstein and Suslow (2006), p. 45).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

need a mechanism to coordinate and agree on the compensation paid to and the demand for over 6,300 proposed class members:[226]

- With a wide range of educational backgrounds and specific credentials;

- Working in different departments, including Operations, Business Development, Corporate Strategy, Payor Contracting, Communications, Government Affairs, Clinical Services, IT, and Finance;

- Employed in different geographic locations;

- Across an approximately 12-year time period, and

- Who could be hired away by hundreds of competing non-Defendant employers.

103.    Economists recognize that certain conditions facilitate collusion amongst buyers, including when a product is "homogeneous" with a "single price to fix."[227]  On the other hand, "product heterogeneity requires a complex price schedule that maintains equilibrium price differentials" which "undermines the stability of the cartel."[228]  Dr. Levenstein and Dr. Suslow explain that, "[f]irms must be able to coordinate on an equilibrium—in a situation in which there are often multiple equilibria—which increases prices [suppresses wages] and allocates reduced output [employment] among member firms."[229]  The types of employees at issue in this case—highly skilled workers employed across a range of jobs, in different functions, geographic locations, and with different levels of education and skills are clearly heterogeneous, and there is no single prevailing wage for all proposed class members.[230]  Dr. Starr and Dr. Gerhart offer no explanation for how the alleged wage fixing cartel could effectively set compensation for this diverse set of employees.

104.    The ability of Defendants to form an agreement to "fix" compensation is further complicated as base salary is not the only element of compensation.  Many of the proposed class members—Directors, Vice Presidents, and Senior Vice Presidents—receive bonus and equity compensation.  For example, during the proposed class period, variable compensation (e.g., bonus and equity payments) accounts for:

---

[226] See Sections IV and X for additional detail on the variety of proposed class members backgrounds, jobs, and geographic locations.

[227] Blair and Harrison (2010), p. 50.

[228] Blair and Harrison (2010), p. 50.

[229] Levenstein and Suslow (2006), p. 45.

[230] See **Exhibit 11** and **Exhibit 12**, *supra*.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Between 17 and 52 percent of total compensation for relevant DaVita employees,

- Between 4 and 29 percent of total compensation for SCA employees, and

- Between 12 and 36 percent of total compensation for relevant USPI employees.

105.    Any agreement between the Defendants to fix compensation would necessarily have to limit not only base salary levels, but these other bonus and equity components.  Otherwise, the agreement would not be sustainable.  If any given employee's compensation could be simply adjusted with respect to variable compensation, each co-conspirator would have the incentive to undermine an agreement with additional variable compensation.[231]  Neither Dr. Starr nor Dr. Gerhart provide any explanation of (or analysis of) how the examples of alleged information sharing they cite could be used to fix variable compensation levels.  Plaintiffs' experts do not address how Defendants would be able to allegedly coordinate variable compensation in the face of the different compensation plans utilized by the Defendants.[232]

106.    Another obstacle to the formation of the alleged wage fixing agreement is the length of time over which the conspiracy is alleged to have been maintained.  Plaintiffs' experts assess a period that spans May 2008 through December 2019—an almost 12-year period.  Dr. Levenstein and Dr. Suslow explain that in "a dynamic economy, the solution to all these problems"—coordination, entry, and cheating—"will change over time, so successful cartels must develop an organizational structure that allows them to solve these problems continuously."[233]  However, Plaintiffs' experts point to a few discrete events of alleged merit budget information sharing, limited to the early portion of the period they studied.  Neither offer a mechanism by which the Defendants could coordinate compensation in the years where no compensation information was allegedly shared.  In addition, during the course of the proposed class period, there were several changes at the organizations, specifically with respect to equity compensation, which would only further complicate any effort to fix compensation.  For

---

[231] See, e.g., Levenstein and Suslow (2006), p. 45–46 ("A cartel must somehow escape from the Prisoners' Dilemma: by raising price above marginal cost, the cartel creates an incentive for each producer to cheat.  Each firm would like to lower its price, increase its output and market share, and thereby increase its profits").  Similarly, employers would have the incentive to *increase* compensation to attract additional employees away from other members of the cartel.  See also, Pindyck and Rubinfeld, p. 478 ("Unlike our prisoners in the prisoners' dilemma, cartel members can talk to each other to formalize an agreement.  This does not mean, however, that agreeing is easy […] Furthermore, each member of the cartel will be tempted to "cheat" by lowering its price slightly to capture a larger market share than it was allotted").

[232] As I describe in Section VIII, the Defendants had a variety of bonus and long-term incentive plans.  Plaintiffs' experts offer no assessment of *how* Defendants would be able to "coordinate" compensation levels across these different programs, which were tied to that Defendants' own performance.

[233] Levenstein and Suslow (2006), p. 45.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

example, after SCA went public in 2013, it introduced a new long-term incentive plan.[234]  In addition, USPI was acquired by Tenet in 2015.[235]  As I describe above, Dr. Gerhart conducted no empirical analysis to assess the impact of the alleged information sharing, and Dr. Starr's "wage suppression" regression does not attempt to account for these differences in corporate structures—or variable compensation plans—over time.

107.     Further, to facilitate a successful monopsony cartel, firms must implement "a restriction" on their purchases (i.e., the amount of labor to employ) and "the group must decide on how much each participant will curtail its purchases."[236]  Dr. Starr and Dr. Gerhart provide no assessment of whether, or to what extent, the Defendants restricted demand for proposed class member labor as a means to facilitate a wage fixing conspiracy.  In fact, during the relevant period, all three companies expanded employment within the jobs allegedly targeted by the wage fixing conspiracy—the opposite of what one would expect if they were "suppressing" wages.  **Exhibit 18** shows the change in the number of employees overall, and in relevant class positions, over the proposed class period.  As this exhibit shows, the number of Directors (as identified by Dr. Starr) more than *doubled* at each of the Defendants between 2008 and 2019.  Neither Dr. Starr nor Dr. Gerhart explain how an effective cartel could fix compensation in the face of such employment growth, nor do they present any analysis of the but-for employment growth that was allegedly suppressed to maintain the conspiracy.

---

[234] Surgical Care Affiliates, Inc. 10-K, 2014 Annual Report, p. 81; Global News Wire, "Surgical Care Affiliates Announces Closing of Its Initial Public Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares," November 4, 2013, https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-to-Purchase-Additional-Shares.html; SCA000552095–2113.

[235] Tenet Health, "Tenet Healthcare Corporation Completes United Surgical Partners International and Aspen Healthcare Transactions," June 16, 2015, retrieved from https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm.

As Dr. Starr describes, around this acquisition, "key employees of USPI were offered participation in the 2015 Employee Stock Equity Plan," that Tenet revalued in 2018, "resulting in a significant drop in the value of the stock options" (Starr Report, ¶85).

[236] Blair and Harrison (2010), p. 51.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 18**
**GROWTH IN DEFENDANT EMPLOYMENT**
**2008 COMPARED TO 2019**

| Defendant | Count of Employees | | Percentage Change |
|---|---|---|---|
| | 2008 | 2019 | |
| [a] | [b] | [c] | [d] |
| **DaVita** | | | |
| Directors | 508 | 1,092 | 115% |
| VPs & SVPs | 114 | 222 | 95% |
| All Employees | 38,672 | 69,484 | 80% |
| **SCA** | | | |
| Directors | 118 | 342 | 190% |
| VPs & SVPs | 171 | 273 | 60% |
| All Employees | 6,607 | 10,887 | 65% |
| **USPI** | | | |
| Directors | 183 | 382 | 109% |
| VPs & SVPs | 232 | 425 | 83% |
| All Employees | 8,893 | 18,661 | 110% |

Notes: Counts of Directors and VPs/SVPs are based on Dr. Starr's assignment of job levels at each of the Defendants and follow Dr. Starr's method for identifying proposed class members.

Source: Starr turnover.

108.    Moreover, any successful conspiracy to fix compensation and reduce employment is also necessarily more complex because changes in a key input—employee labor—will have consequences for the output market(s)—the goods or services that are being produced by the Defendants.  Yet both of Plaintiffs' experts simply assume that any reduction in compensation (resulting from a coordinated reduction in demand for skilled labor at issue) would have no corresponding effects on the Defendants' ability to offer the services they provide or the profits they earn as a result.

### 2. Dr. Starr and Dr. Gerhart Do Not Address How the Defendants Would Limit Competition for Employment of Proposed Class Members from Other Employers

109.    By ignoring competition for employees outside of the Defendants, Dr. Starr and Dr. Gerhart overlook that a successful wage fixing agreement requires a mechanism to prevent other employers (what Dr. Levenstein and Dr. Suslow describe as "outsiders") from bidding up the compensation of Defendants' employees.[237]  As I describe above, the Defendants do not control a large share of the employment opportunities for the 6,300 proposed class members.  A wage fixing conspiracy cannot artificially depress compensation if other competitors outside the cartel would simply offer higher

---

[237] Levenstein and Suslow (2006), p. 45.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

compensation. The economic analysis suggests significant competition for proposed class members from non-Defendant employers:

- Defendants account for a small portion of total employment within the industries Dr. Gerhart's points to as potentially relevant—accounting for less than 1 percent of the employment within the Healthcare sector and approximately 17 percent of the employment within the outpatient care industry (see Section V.D);

- Defendants benchmark compensation against a range of other employers across different industries, including outside the healthcare industry, as potential competitors for labor (see Section VI.D.1);

- Relevant employees are located across numerous geographical areas, each of which has different economic conditions. The set of competitors with whom the Defendants compete for labor potentially varies across geographic locations at least for some employees (see Section X); and

- Annual turnover at DaVita, SCA, and USPI was between 12 and 14 percent, on average, depending on the Defendant. Both during and outside the proposed class period, a large majority (over 95 percent) of senior employees who left a Defendant did not go to a Defendant covered by the alleged mobility restrictions (see Section V.A).

110.     Defendants' data shows that the Defendants regularly hired employees from non-Defendant firms. Dr. Starr and Dr. Gerhart do not address how the Defendants were able to compete with non-Defendants for labor while simultaneously supporting a wage fixing conspiracy. For example, Dr. Gerhart acknowledged that employees hired from non-Defendant firms "would probably have to be [paid] within sight of what the competitive rate would be."[238] Given the need to pay newly hired employees "within sight" of a competitive rate, Plaintiffs' experts do not explain how the Defendants were able to suppress compensation by up to 17.2 percent.[239]

---

[238] Gerhart Deposition, 56:1–21.

[239] Given that Dr. Starr does not separately estimate the purported "wage suppression" due to the alleged information sharing from that of the alleged mobility restrictions (Starr Report, ¶106), it is not clear what portion of this estimated "wage suppression" is due to the alleged information sharing.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

### 3. Dr. Starr and Dr. Gerhart Do Not Assess How the Alleged Information Sharing Would Prevent Cheating on the Alleged Wage Fixing Conspiracy

111.    Neither Dr. Starr nor Dr. Gerhart provide any explanation for how the Defendants could limit deviations from the alleged cartel (i.e., cheating), particularly in light of the types of information allegedly shared.  As Dr. Levenstein and Dr. Suslow describe, a "cartel must develop an incentive compatible structure—a combination of monitoring, rewards, and punishments—to prevent cheating by members."[240]  Plaintiffs' experts do not describe any mechanism by which the Defendants monitored, rewarded, or punished each other in support of a wage fixing conspiracy.  As I describe below, aside from limited examples of information for specific jobs, Plaintiffs' experts do not point to any alleged information sharing of compensation levels for relevant jobs—let alone all relevant jobs over a 12-year period.  For example, with respect to the merit budgets, Dr. Gerhart testified that "knowing the percent increase would not by itself tell you what [another Defendant's] average pay level is."[241]  Without information on a co-Defendants' actual compensation levels, it is unclear how a Defendant would be able to monitor the behavior of co-Defendants to ensure compliance with a wage fixing conspiracy (or punish them for any deviation).  Moreover, Plaintiffs' experts do not point to any evidence of Defendants confirming that another Defendant set compensation at an agreed upon level—or punishing them for cheating.

### C. Dr. Starr and Dr. Gerhart Do Not Offer a Reliable Link Between the Alleged Information Sharing and Antitrust Impact

112.    In their assessment of the alleged information sharing, Plaintiffs' experts point to three general categories of information that was allegedly shared, which they characterize as containing "pay data."[242] Dr. Starr claims that "the exchange of Senior-Level Employee compensation information would give Defendants sufficient information to arrive at a general understanding between Defendants of what price to pay Senior-Level Employees for their services"[243] without describing how the information shared was sufficient to the determine the "price" to pay any proposed class member, let alone the over 6,300 proposed class members.  Similarly, Dr. Gerhart claims that "based on [his] experience and research in compensation and human resource management, Defendants' CSI Exchanges were likely to lower Class

---

[240] Levenstein and Suslow (2006), p. 45.

[241] Gerhart Deposition, 163:7–17.

[242] Starr Report, ¶99; Gerhart Report, ¶82.

[243] Starr Report, ¶93.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

pay,"[244] without describing *how* the specific information shared could be used to "lower Class pay," and without conducting any analysis to show that any alleged information sharing *did impact* any proposed class members' compensation. As I discuss below, for each type of alleged information sharing, Plaintiffs' experts do not offer a reliable link between the actual information shared and purported "lower Class pay."

### 1. Plaintiffs' Experts' Speculative Link Between the Alleged Sharing of Merit Budget Information and Purported "Wage Suppression" Is Not Supported by Any Economic Analysis

113.    Absent any analysis, Dr. Starr speculates that "[i]f exchanging CSI among Defendants allowed them to agree on a (lower) pay increase for Senior-Level Employees, this would quantitatively manifest in lower pay in subsequent years."[245] However, simply speculating about what would happen *if* the alleged information sharing "allowed" Defendants "to agree on a (lower) pay increase" on base salaries is not sufficient to show impact to the proposed class. Plaintiffs' experts have not provided any analysis of actual compensation increases nor attempted to estimate compensation increases "but-for" the alleged information sharing. Put simply, Plaintiffs' experts have done no analysis to show that the alleged information sharing impacted the compensation provided by any of the Defendants to proposed class members.[246] Further, neither of Plaintiffs' experts discuss how alleged bilateral sharing of merit budget information between SCA and DaVita and separately between SCA and USPI would "allow" the Defendants to collectively "agree" to a specific compensation increase.

114.    While Dr. Gerhart makes several general statements about how firms "typically" treat merit budgets,[247] neither he nor Dr. Starr assess how the Defendants set their merit budgets during the relevant

---

[244] Gerhart Report, ¶83. He draws this conclusion based his assessment that (i) the information shared was not public, which "suggests that Defendants used the data for nefarious purposes (i.e., to fix wage rates)," (ii) the information shared was not anonymized, and (iii) "the granularity of the overhead expense data exchanged was significant."

[245] Starr Report, ¶102. Similarly, absent any analysis, Dr. Gerhart argues that "coordination on compensation for a subset of job titles would likely cascade to the rest of the Class" and that "a reduction in the merit increase budget would likely directly reduce the compensation of all of Defendants' employees" (Gerhart Report, ¶149).

[246] Starr Report, ¶102, 106, footnote 388; Starr Deposition, 424:3–9 ("What I have to say in this case is that I know that the evidence from the CSI exchanges suggests that they shared information on what they were going to pay their workers in the next year. I don't have direct evidence on how those pieces of information were incorporated into compensation"); Gerhart Deposition, 147:10–24, 172:20–173:6, 176:4–12.

[247] For example, Gerhart Report ¶151, emphasis added ("all employees in companies are *typically* covered by the same salary merit increase budget and that the sizes of merit increases in percentage terms are usually uniform within a company across jobs and job levels [...] WorldatWork and other surveys that that collect data on planned and/or actual merit budgets (that have already been implemented) *typically* do not find any meaningful differences in the size of merit percent awarded to employees in different levels or types of jobs").

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

period.  For example, Dr. Starr cites a March 2018 internal DaVita document, which indicates that at the "Director and below level[s]", employees "typically [receive] annual 'merit' increases" for salary, while at the "VP and above level[s], typically there is more irregular salary increases […] in connection with significant increases in responsibility."[248]  Neither Dr. Starr nor Dr. Gerhart address how sharing or discussions of sharing merit budgets between DaVita and SCA in only certain years between 2009 and 2012 or 2013 would impact Vice Presidents and Senior Vice Presidents if pay increases for these employees were determined using different processes.[249]

115.     Defendants' own data can be used to test if Defendants set similar merit increases across relevant employees (and each other) in the same year.  For example, in **Exhibit 19** and **Exhibit 20**, I show the distribution of the year-over-year change in base salary for employees that remain in the same job title across both years (e.g., the percent change in base salary for employees in the job "Director, Real Estate" that were also in the job "Director, Real Estate" in the previous year).  In these exhibits, I present the results for 2009, the first year of the alleged information sharing according to Dr. Starr, and 2013, one of the last years for which Plaintiffs' experts present evidence of sharing or discussions of sharing merit budget information.[250]  I see similar variation across all years.[251]

---

[248] Starr Report ¶179, citing to DVA_OMCEAL_001329256–9261, at 9257.

[249] In addition, employees with low performance ratings were typically not eligible for merit increases (see DVA_OMCEAL_001358600–8602 ("Ratings of 1s and 2s should not likely be eligible for increases"); DVA_OMCEAL_001150350–0351 ("Note: that we are a pay for performance company and our top performers should be rewarded for their contributions.  This will require that our lower performers (PDR Ratings of 2 or 1) receive little or no increases.  Any recommended increases for a 2 must be justified in the comments section in the CPS"); SCA000132458 ("Merit increases should be differentiated per performance rating […] Merit awards should not be given to: […] Employees rated Needs Improvement or on an elevated or final CAP".)

[250] See ¶98, *supra*.

[251] See **Appendix I-1** for my analysis of base salary changes across all years.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 19**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2009**

| Job Level and Defendant | No Salary Change | Percent Change in Base Salary | | | | | | |
| | | Less than 1.0% | Between 1.0 and 1.9% | Between 2.0 and 2.9% | Between 3.0 and 4.9% | Between 5.0 and 7.9% | Between 8.0 and 11.9% | 12% or Greater |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| **Directors** | | | | | | | | |
| DaVita | 5% | 29% | 25% | 8% | 11% | 9% | 7% | 5% |
| SCA | 0% | 15% | 2% | 37% | 35% | 5% | 0% | 3% |
| USPI | 0% | 11% | 20% | 18% | 20% | 13% | 3% | 2% |
| **VPs & SVPs** | | | | | | | | |
| DaVita | 25% | 6% | 9% | 7% | 10% | 7% | 10% | 24% |
| SCA | 1% | 4% | 6% | 31% | 43% | 9% | 5% | 1% |
| USPI | 3% | 24% | 33% | 12% | 5% | 6% | 1% | 1% |

Note: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. Negative pay changes are not shown in this exhibit. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

116.     As this exhibit shows, the Defendants did not apply uniform merit increases across all of their employees. Moreover, the Defendants do not have similar distributions of merit increases, even for employees within the same job level. For example,

- Each of the Defendants distributed pay increases differently across employees in different job levels (as identified by Dr. Starr), which is inconsistent with Plaintiffs' experts' claim that a single, overall merit budget could be used to "coordinate" base salary.

- Over half of DaVita Directors received an increase of less than 2 percent in 2009, while over 70 percent of SCA Directors received an increase of between 2 and 5 percent.

- One quarter of DaVita Vice President and Senior Vice Presidents received no base salary increase at all, while the majority of SCA Vice Presidents received increases over 2 percent.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 20**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2013**

| Job Level and Defendant | No Salary Change | Less than 1.0% | Between 1.0 and 1.9% | Between 2.0 and 2.9% | Between 3.0 and 4.9% | Between 5.0 and 7.9% | Between 8.0 and 11.9% | 12% or Greater |
|---|---|---|---|---|---|---|---|---|
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| **Directors** | | | | | | | | |
| DaVita | 5% | 8% | 26% | 20% | 14% | 11% | 8% | 8% |
| SCA | 1% | 0% | 15% | 37% | 27% | 10% | 5% | 4% |
| USPI | 2% | 4% | 18% | 45% | 13% | 11% | 2% | 2% |
| **VPs & SVPs** | | | | | | | | |
| DaVita | 15% | 4% | 25% | 8% | 9% | 10% | 13% | 14% |
| SCA | 3% | 7% | 16% | 30% | 19% | 16% | 3% | 5% |
| USPI | 2% | 1% | 21% | 45% | 9% | 10% | 5% | 4% |

Note: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. Negative pay changes are not shown in this exhibit. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

117. I see similar results in 2013, where the Defendants did not apply uniform merit increases across all of their employees nor did the Defendants have similar distributions of merit increases, even within the same job level. For example,

- Almost 40 percent of SCA's Directors received an increase between 2 and 3 percent in 2013, while approximately 40 percent of DaVita Directors received an increase of less than 2 percent.

- DaVita Vice President and Senior Vice Presidents received a wide range of base salary increases (including 15 percent that received no increase), while the majority of SCA Vice President and Senior Vice Presidents received increases of between 2 and 5 percent.

- Moreover, the pattern of merit increases in 2013 is not consistent with those in 2009 (as shown in **Exhibit 19**).

118. Plaintiffs' experts have not conducted any analysis to show that Defendants adjusted their planned merit increase budgets after the alleged information sharing, nor have they provided any assessment of how (if at all) the merit budgets Defendants ultimately used differed from what they would have been absent the alleged information sharing. Both Dr. Starr and Dr. Gerhart acknowledge that the Defendants use compensation surveys to benchmark their compensation (including merit

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

increases) against a variety of different firms.[252]  As Brian Mathis testified, SCA "would generally try to gather a lot of data points to reflect the broad market for labor" when setting merit budgets.[253]  In addition, Defendants also discussed using publicly available information to set merit budgets.[254]  Plaintiffs' experts have not shown (or tried to show) that the merit budgets Defendants ultimately used were lower due to the alleged information sharing, given Defendants reliance on these multiple sources of information.

119.    Further, Dr. Starr's own analysis does not support his conclusion that the alleged sharing of merit budget information in certain years suppressed compensation.  In **Exhibit 21**, I show the results of Dr. Starr's own "wage suppression" regression on base salary (i.e., the portion of compensation that changes based on merit budgets), applying the corrections to his data that I describe in detail in Section VIII.B but making no other changes.  In this exhibit, the first column shows the aggregate results of Dr. Starr's "wage suppression" regression (as he reports in his Figure 6) applied to base salary.  As this exhibit shows, Dr. Starr's own model finds no statistically significant aggregate effect when it is applied to base salary.  In addition, Dr. Starr's own model finds no statistically significant Defendant-specific effect for DaVita or USPI as shown in the second column below and a Defendant-specific effect of only 4.4 percent for SCA.  In fact, Dr. Starr's model finds that DaVita employees were paid *higher* base salary during the alleged conduct after accounting for the other factors Dr. Starr includes in his model.  That is, Dr. Starr's own "wage suppression" regression fails to find that base salaries were suppressed overall or for two of the three Defendants.

---

[252] Dr. Gerhart acknowledges that the Defendants (and other companies) benchmark against third party companies "to avoid the serious pitfalls of paying too much or too little relative to their competitors" (Gerhart Report, ¶56).

Dr. Starr speculates, absent any analysis, that "the CSI exchange" between SCA and DaVita "may have helped actually set Defendant-specific external benchmarks" (Starr Report, ¶179).  Dr. Starr does not assess how (if at all) these purported benchmarks were used by the Defendants.  Nor does he assess if these purported benchmarks were lower or higher (or similar) to other external benchmarks used by the Defendants.

[253] Mathis Deposition, 75:10–76:6.

[254] For example, as Dr. Gerhart discusses, executives at DaVita and SCA testified that they considered inflation when setting merit budgets (Gerhart Report, ¶140(a), citing Thiry Deposition, 114:17–23 and Clemens Deposition, 150:11–18).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 21**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**
**BASE SALARY**

| Statistic | Aggregate Model | Defendant-Specific Model |
|---|---|---|
| [a] | [b] | [c] |
| Pooled Conduct | 0.0024 | |
| **% Wage Suppression** | -- | |
| | (0.0067) | |
| DaVita Conduct | | 0.0258* |
| **% Wage Suppression** | | -- |
| | | (0.0080) |
| SCA Conduct | | -0.0448* |
| **% Wage Suppression** | | **-4.4%** |
| | | (0.0106) |
| USPI Conduct | | -0.0125 |
| **% Wage Suppression** | | -- |
| | | (0.0085) |
| Observations | 26,828 | 26,828 |
| Included Employees | 5,097 | 5,097 |
| R-squared | 0.9129 | 0.9133 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Negative and statistically significant results are shown in gray. Not statistically significant or positive and statistically significant results are shown in yellow.

This test includes compensation Dr. Starr identifies as "regular pay" and "other compensation" (see Starr Report, Figure 26), excluding DaVita long-term cash incentive payments. See Section VIII.D.2 for a more detailed discussion of this test).

Source: Starr turnover (Corrected Data).

120. Neither Dr. Starr nor Dr. Gerhart provide more than speculation to link the alleged sharing of merit budget information in specific years to "suppressed compensation." Compensation for proposed class members includes not just base salary but bonus and equity payments, which were substantial.[255] Plaintiffs' experts fail to explain how information on the aggregate merit budget for base salary would impact the levels of variable compensation—compensation included within Dr. Starr's "wage suppression" regression—or how this information sharing would "allow" Defendants to "agree" to

---

[255] See Section VIII.D.1.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

lower variable compensation levels.[256]  Further, Plaintiffs' experts also do not discuss how Defendants would have been able to monitor what merit budget their co-Defendants ultimately used.  Dr. Starr claims that the alleged information sharing would allow Defendants "to set compensation below competitive levels with the knowledge that their rivals would do the same" without describing *how* the Defendants would have this knowledge (or providing any evidence of a mechanism to monitor the alleged conspiracy).[257]  As I show above, Dr. Starr's own "wage suppression" analysis does not find any negative and significant effect on base salary from the alleged conduct for two of the three Defendants.

### 2. Plaintiffs' Experts Offer No Reliable Link Between the Alleged Information Sharing for a Limited Number of Individual Jobs and "Suppressed Compensation" Across Proposed Class Members

121.    In their discussions of the alleged information sharing, Plaintiffs' experts have not shown evidence that the Defendants shared compensation information systematically for relevant jobs.  Instead, Dr. Starr and Dr. Gerhart only point to information sharing between SCA and USPI for an "internal audit" position in 2012[258] and discussions between SCA and USPI of potentially sharing information on "RVPs [Regional Vice Presidents] and Administrators in the San Francisco/Bay Area" in 2015.[259]  Neither of Plaintiffs' experts explain how these specific examples they cite for individual jobs, at specific points in time, in certain geographic areas would facilitate a conspiracy to "lower Class pay" for more than 6,300 employees over the proposed almost 12-year conduct period.[260]

122.    For example, Dr. Starr points to a February 2015 internal USPI email in which Shannon Mosley requests that Bill Wilcox ask SCA "if they would be open to sharing salary information with us on their RVPs [Regional Vice Presidents] and Administrators in the San Francisco/Bay Area."[261]  After reviewing additional related internal email communications, Mr. Wilcox testified that he "would

---

[256] Dr. Gerhart acknowledged that if the information exchange is "restricted to the merit increase pool, then I don't know that it speaks directly to bonus" and that "I'm not seeing a direct connection at the moment" between average merit pool information and equity compensation (Gerhart Deposition, 170:1–17).

[257] Starr Report, ¶58.

[258] OMC_BM_000010778–0779 (Exhibit PX523).

[259] USPI_CIV_000046079 (Exhibit PX239).

Dr. Gerhart also points to a May 2012 email in which Rick Sharff, General Counsel at SCA, provided compensation information to Jason Cagle (USPI) for Mr. Sharff's "no. 2 lawyer" (USPI_CIV_000016522 (Exhibit PX234)).  My understanding is that employees within the legal departments at the Defendants are outside of the proposed class (Complaint, ¶92).

[260] Dr. Gerhart testified that "I don't see these exchanges right now as having as big of an effect as some of the other exchanges" (Gerhart Deposition, 180:19–181:2).

[261] USPI_CIV_000046079 (Exhibit PX239).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

conclude that no information was shared" as USPI "determined that [it was] not going to […] create that position."[262]  That is, neither of Plaintiffs' experts point to any compensation information actually being shared between SCA and USPI for these jobs.  In addition, for the "internal audit" position discussed in 2012, Mark Kopser (USPI) mentions a single employee that holds the position "internal audit manager" at USPI, and Brian Mathis (SCA) mentions a single employee that holds a potentially comparable position within SCA.[263]  Plaintiffs' experts do not offer a reliable link between the sharing of (or discussion of sharing) compensation information between SCA and USPI for a few specific jobs at specific points in time and "suppressed wages" for all proposed class members over an almost-12-year conduct period.

123.    Neither Dr. Starr nor Dr. Gerhart point to any alleged information sharing related to individual jobs between DaVita and SCA.[264]  Nor do Plaintiffs' experts discuss how SCA and USPI potentially sharing compensation information for these selected jobs would affect compensation for DaVita employees.  Even for SCA and USPI employees, Plaintiffs' experts offer only a speculative mechanism through which information for a small number of individual jobs at specific points in time—starting in 2012—would lead to suppressed compensation across all relevant employees for the full proposed class period.  For example, while Dr. Gerhart speculates that "even if the Defendants did not coordinate on compensation for *every* single job title, if they successfully coordinated to suppress the compensation of some positions, that would be spread widely to other employees as well,"[265] he does not actually assess if this happened.[266]  As I discuss in Section V.C, Dr. Gerhart's theory of "cascading effects" is not supported by the available evidence.

### 3. Plaintiffs' Experts Offer No Mechanism Through Which Sharing General Business Information Would Lead to "Suppressed Compensation" Across Proposed Class Members

124.    In support of their conclusions that the alleged information sharing "suppressed compensation," Plaintiffs' experts cite examples of general business information shared between SCA and USPI such as case volume data and aggregate overhead cost information.  Neither expert provides a reliable link between this information and the alleged "wage suppression."  For example, to support his claim that

---

[262] Deposition of Bill Wilcox, September 24, 2024 ("Wilcox Deposition",) 237:19–239:18.

[263] OMC_BM_000010778–0779 (Exhibit PX523).

[264] See, Starr Report, ¶101 and Gerhart Report, ¶82.

[265] Gerhart Report, ¶149.

[266] When asked if he conducted any empirical analysis to determine if there were "cascading effects" (i.e., changes in compensation for some employees would flow through to compensation to all employees) at the Defendants, Dr. Gerhart testified that he "did not quantify it" (Gerhart Deposition, 205:12–18).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"these exchanges would have facilitated USPI's and SCA's ability to agree to set their pay rates lower than they otherwise would have," Dr. Gerhart points to testimony from Brett Brodnax that "USPI shared 'growth stats.'"[267]  Specifically, Mr. Brodnax testified that SCA and USPI shared "growth statistics," which he described as "basically year-over-year volume stats."[268]  Dr. Gerhart does not describe how case volume information would allow SCA or USPI to "set their pay rates" nor how this information would allow either to set pay "lower than they otherwise would have."[269]

125.    Similarly, Plaintiffs' experts point to sharing of aggregate overhead costs (also referred to as general and administrative costs) between SCA and USPI without describing *how* SCA or USPI would use this aggregate information to determine what the other was paying their employees overall or for any individual job.  For example, Dr. Starr points to a 2017 example of SCA and USPI sharing general and administrative costs as a percent of revenue for the current and prior years.[270]  Based on this document, USPI's general and administrative costs for 2017 were 3.6 percent of their revenue.[271]  Dr. Starr offers no mechanism through which SCA could use this overall ratio to determine the pay for any job (or group of jobs) at USPI in order to "fix" compensation.

126.    The overhead cost information shared between SCA and USPI cited by Plaintiffs' experts are limited to aggregate expense information, which was not tracked any more granularly than at the department level.  For example, Plaintiffs' experts point to an "Expense Comparison" compiled around the end of 2014 by SCA and USPI, which compares the different firms' general and administrative costs broken out by department.[272]  This includes a single, aggregate cost number for each department such as "Legal," "Compliance & Audit (External & Internal)," and "Accounting (Corporate)."  Dr. Starr argues that this "non-public corporate overhead cost data […] would include Senior-Level Employee

---

[267] Gerhart Report, ¶82 citing Brodnax Deposition, 42:3–18.

[268] Deposition of Brett Brodnax, September 12, 2024 ("Brodnax Deposition",) 42:3–18, 183:1–10.

[269] Dr. Gerhart testified that exchanging case volume data "seems like it would be a less clear way to suppress wages" (Gerhart Deposition, 160:15–23).

[270] SCA000609009–9011 (Exhibit PX063).

[271] Starr Report, ¶101, citing SCA000609009–9011 (Exhibit PX063), at 9011.

[272] USPI_CIV_000111376–1382 (Exhibit PX520), at 1381–1382.

Dr. Gerhart cites to an email exchange between Brian Mathis (SCA) and Jason Cagle (USPI) discussing a potential template for the information exchange and points out that Mr. Mathis states that "in the past I think we had done both number of [full-time equivalents] and dollars" (Gerhart Report, ¶82(d), citing USPI_CIV_000122239 (Exhibit PX138).  However, Dr. Gerhart does not reference the template attached to the email chain, which only shows dollar amounts and does not include the number of employees (see USPI_CIV_000122240).

compensation."[273]  While total overhead costs may include compensation for relevant jobs, these costs are aggregated across both wage information and *all* other general and administrative costs.[274]  Dr. Starr does not describe how SCA or USPI would determine the pay for any individual job or group of jobs in the, for example, "Accounting" department (or any other department) based on these aggregate costs.

127.    As with the sharing of (or discussions of sharing) compensation information for select individual jobs, neither Dr. Starr nor Dr. Gerhart points to any sharing of general business information between DaVita and SCA.[275]  Plaintiffs' experts do not discuss how SCA and USPI sharing the aggregate business information cited would affect compensation for DaVita employees.  Plaintiffs' experts' conclusion that the general business information shared could be used by SCA and USPI to "fix" compensation for relevant employees is not supported simply because this information was aggregate not just across different jobs but also across compensation as well as other costs.  With each type of information shared, neither Dr. Starr nor Dr. Gerhart offer a reliable link between the alleged information sharing and suppressed compensation or antitrust impact to the proposed class—nor do they offer a mechanism by which the Defendants would be able to monitor or enforce any wage fixing conspiracy.

## VIII.    DR. STARR'S "WAGE SUPPRESSION" REGRESSION MODEL IS UNRELIABLE AND CANNOT SHOW ANTITRUST IMPACT OR BE USED TO CALCULATE DAMAGES FROM THE ALLEGED CONDUCT

128.    Dr. Starr puts forward a regression model, which he claims can "empirically test" if the alleged conduct "economically and statistically significantly suppressed Class Member wages."[276]  Dr. Starr claims that this model accounts for all relevant factors aside from the alleged conduct that determine

---

[273] Starr Report, ¶101.  Similarly, Dr. Gerhart argues that "the sharing of this data and subsequent discussion of expenses is consistent with a discussion about expenses that include labor costs" (Gerhart Report, ¶82(d)).

In his discussion of the alleged information sharing, Dr. Starr points out that "it was beneficial for SCA to manage overhead cost growth," and that "SCA tries to manage labor costs as a percent of revenue" (Starr Report, ¶101).  Dr. Gerhart acknowledged that this would be true for all firms, testifying that "all organizations care about controlling all kinds of costs; but if labor is your primary cost, then will likely care more" (Gerhart Deposition, 66:1–16).

[274] Deposition of Mark Kopser Vol. I, December 12, 2024 ("Kopser Deposition",) 87:21–88:6 ("Q: Did that information shared with or received from SCA provide compensation information for specific individuals?  A: No.  Q: How was labor cost information reflected if it wasn't individual compensation?  A: It would have been part of the overall number by department.  So the finance, it would consist of salaries, expenses, and other items.  Probably overall, 60—60 to 80 percent of an office expense is payroll but the other portion would be—probably see rent, insurances, things like that.")

[275] See, Gerhart Report, ¶¶82–83; Starr Report, ¶100.

[276] Starr Report, ¶103.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

compensation for all 6,300 proposed class members, and that by "controlling for other relevant economic factors," his model can identify the effect of the alleged conduct by comparing total compensation before and after the proposed class period to total compensation during the proposed class period.[277] Dr. Starr's regression model attributes any change in total compensation in the proposed class period that is "unexplained" by the specific economic factors included in the models to the alleged conspiracy, i.e., the estimated "wage suppression" reflects the portions of total compensation unexplained by the other factors in his model.

129.     As Dr. Starr himself states, a "multivariate regression model is a tool."[278] Simply "running a regression" and generating results does not mean that a proposed model is reliable or that the results yield a relevant answer to any particular question.  Whether or not a particular regression model is relevant for studying a particular question, and whether the answer it provides is reliable, is a matter of how the model is constructed and implemented.  As one economic treatise notes, "a set of regression estimates are only as good as the underlying assumptions used to build and estimate the model."[279] Dr. Starr similarly states that "regression models can produce unbiased estimates of the causal effect" of the alleged conduct "*[w]hen properly constructed*."[280] It is the role of an economist to conduct empirical testing to ascertain if the model is, in fact, properly constructed and can isolate the effects of the alleged conduct from all other factors that impact compensation.[281]

130.     When assessing the results of a regression model, it is important to keep in mind two elements of regression analysis.  First, the selection of economic factors is critical to a model's ability to distinguish between lawful and unlawful drivers of compensation.  A regression model does not "know" whether all relevant lawful factors have been accounted for—it is simply comparing average total compensation in the benchmark periods to average total compensation in the proposed class period, accounting for whichever factors the economist has chosen to include.  If the economist has omitted relevant factors that affect compensation over time—e.g., firm performance that determines the level of variable compensation employees receive—the model will not be able to separately identify the effect of

---

[277] Starr Report, ¶117.

[278] Starr Report, ¶109.

[279] Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010 ("Davis and Garces"), p. 79.

[280] Starr Report, ¶109, emphasis added.

[281] See, e.g., ABA Proving Antitrust Damages, p. 163, emphasis in original ("[F]rom an economic and statistical point of view, it is important to test whether a regression model is misspecified in order to avoid drawing incorrect or unreliable conclusions").

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

the alleged conduct.[282]  That is, although the model can mechanically find differences in average compensation between the periods of analysis—controlling for the included factors—it does not "know" whether the reasons for those differences are due to the alleged conduct or these omitted factors.

131.     Second, a regression like the model offered by Dr. Starr is "probabilistic"—meaning that it calculates the likelihood of the effect they find occurring due to random chance (as opposed to the effect being attributable to the underlying variable of interest).[283]  A standard practice in economic research is that if the identified result would occur by chance only 5 percent (or less) of the time, that result is deemed to be "statistically significant."[284]  It is important that a regression model is defined to properly calculate this likelihood of chance occurrence because "[a] finding that the estimated impact is not statistically different than zero would be consistent with a lack of causation and zero damages."[285]  As I discuss below, Dr. Starr's "wage suppression" regression model cannot reliably distinguish the effect of the alleged conduct from all other economic factors.  As it cannot isolate the effect of the alleged conduct, Dr. Starr's analysis cannot show antitrust impact and cannot be used to calculate damages caused by the alleged conduct.

### A.  Summary of Dr. Starr's "Wage Suppression" Regression Model

132.     Dr. Starr presents a regression model purportedly to "evaluate whether there exists a causal relationship between the Challenged Conduct and Class Members' compensation."[286]  Specifically, Dr. Starr purports to estimate the effect of the alleged conduct on what he describes as employees' "total compensation," which includes base salary, bonuses, and long-term incentive pay such as equity

---

[282] See, e.g., Daniel L. Rubinfeld, "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy*, ABA Section of Antitrust Law, 2008, p. 738.  ("[F]ailure to include an important major explanatory variable that accounts for factors that differ between the period of alleged wrongdoing and other time periods can cause the measured effect of the dummy variable of interest to be biased, which in turn could lead to an invalid conclusion on liability.  In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis.")

[283] See, e.g., American Bar Association, Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, 2nd ed., ABA Book Publishing, 2014 ("ABA Econometrics (2014)"), p. 6, emphasis added.  ("Statistical hypothesis testing involves stating a 'null hypothesis' and then asking whether a statistical result is consistent with what would be expected if the null hypothesis were true.  If the statistical result is sufficiently inconsistent with the null hypothesis […], the null hypothesis is said to be 'rejected' and the statistical result is said to be 'statistically significant.'  If the statistical result is not sufficiently inconsistent with the null hypothesis, the null hypothesis is 'not rejected' and the statistical result is said to be 'not statistically significant.' […] Consider an econometric study of the overcharge imposed by an alleged cartel.  In such a study, a *natural null hypothesis to test is that the overcharge was zero*.  Such a null hypothesis accords with the Plaintiffs having the burden of proof with regard to damages.")

[284] See footnote 130, *supra*.

[285] ABA Econometrics (2014), p. 309.

[286] Starr Report, ¶104.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

payments.[287] Dr. Starr purports to "isolate" the effect of the alleged conduct on total compensation for relevant employees "by accounting or 'controlling' for other relevant factors that might also cause changes in compensation."[288] These "other relevant factors" included in Dr. Starr's analysis are:[289]

- Indicator variables, each of which is intended to capture any difference unexplained by the other factors in the model between average total compensation between the "benchmark" periods and the alleged "conspiracy" period, which differ for each Defendant:

  - The indicator for DaVita employees compares average total compensation from 2005–2007 and 2020–2022 to average total compensation between 2008 and 2019 (i.e., the alleged conduct period for "DaVita and SCA Challenged Conduct").

  - The indicator for SCA employees compares average total compensation from 2020–2022 to average total compensation between 2008 and 2019.[290]

  - The indicator for USPI employees compares average total compensation from 2005–2009 and 2020–2022 to average total compensation between 2010 and 2019 (i.e., the alleged conduct period for "USPI and SCA Challenged Conduct").

- "Baseline" control variables that include (i) individual "fixed effects" to account for "any characteristics that are inherent to an individual (e.g., a superior negotiation ability)" that do not change over time and (ii) a linear time trend purportedly to account "for the natural growth in annual compensation that would have happened over time even absent the Conduct."

- "Other" control variables "to address geographic differences in pay" and "macro-economic factors," specifically (i) ZIP Code "fixed effects," (ii) the Consumer Price Index ("CPI") by Census region, (iii) unemployment rate by state, (iv) real GDP per capita by state, and (v)

---

[287] Starr Report, ¶112. For long-term incentive pay, Dr. Starr relies on *payments* data rather than grant data. That is, Dr. Starr includes long-term incentive pay in his analysis in the year in which it is paid out (and the value at which it is paid out) rather than when the compensation decision was actually made and the compensation was granted by the Defendants (see Starr Report, footnote 395).

[288] Starr Report, ¶105.

[289] Starr Report, ¶118–122.

[290] The SCA data begins in 2008. Because of this, Dr. Starr's analysis does not include a pre-period benchmark for SCA and only compares the compensation of SCA employees during the proposed class period to the period after.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

> an indicator for the COVID-19 pandemic, which "takes the value of one for the years 2020 and 2021, and zero otherwise."[291]

- "Healthcare-Specific" control variables, including "average annual earnings of managers in the healthcare field" by state and "healthcare services personal consumption expenditure per capita" by state.

- Total hours for each employee to account for part-time employees who "may appear to have low *annual* earnings simply because they are working fewer hours."

133.    Using this model, Dr. Starr estimates that the alleged conduct—the alleged mobility restrictions and the alleged information sharing together—"suppressed wages by 14.5 percent overall."[292]  Dr. Starr also uses this model to estimate the effect of the alleged conduct separately at each Defendant, purporting to find compensation was suppressed "by 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI," which Dr. Starr describes as "a similar degree at each Defendant firm."[293]  Dr. Starr also presents what he describes as "a series of robustness checks and alternative models to test the validity" of his results.[294]

134.    The construction of Dr. Starr's regression makes specific assumptions.  First, as Dr. Starr acknowledges, his "wage suppression" regression model only purports to measure "suppressed compensation from the whole of the Challenged Conduct rather than from each individual component part" over the full 12-year conduct period he studies.[295]  Dr. Starr argues that this single model can reliably measure "suppressed wages" irrespective of what the actual challenged conduct is, stating that "if one of the elements of the Challenged Conduct is deemed not to have suppressed wages (because it did not happen), then the finding of suppressed wages" he presents "must be due the other element of the Challenged Conduct."[296]  That is, Dr. Starr asserts that his model can correctly estimate the effect of

---

[291] As Dr. Starr describes, the "COVID-19 pandemic dramatically altered the supply and demand for labor broadly" and "had specific impacts in medical employment" (Starr Report, ¶120).

[292] Starr Report, ¶107.

[293] Starr Report, ¶¶105, 107.  Dr. Starr estimates Defendant-specific effects of the conduct with a single model. That is, in his "preferred" specification, Dr. Starr assumes that the effect of each control variable is identical across Defendants.  As Dr. Starr describes, "Defendants may respond differentially to control variables (e.g., Defendants might give different cost of living adjustments for the same level of inflation)," which he purports to test in his Figure 29 (Starr Report, ¶130).

[294] Starr Report, ¶105.

[295] Starr Report, ¶106.

[296] Starr Report, footnote 388.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

the alleged conduct if it includes the alleged mobility restrictions (which changed over time[297]), the alleged information sharing (which were not consistent across time or Defendants[298]), or some combination of both. However, this conclusion is entirely based on his own say so.

135. Second, Dr. Starr's model assumes that all relevant factors that impact total compensation for all 6,300 proposed class members are accounted for. The relevant question for whether Dr. Starr's model is reliable—and not mis-specified—is whether it has captured the complexity of how total compensation (as defined by Dr. Starr) is determined in a way that would allow the model to isolate the effect on compensation due to the alleged conduct. Dr. Starr's choice to model total compensation for all three Defendants in a single regression means that this model also assumes that those included factors have the *same* impact on compensation within his benchmark periods and the conduct periods for all three Defendants. If this assumption does not hold, Dr. Starr's model cannot reliably capture the relevant factors that impact total compensation in a way that would allow it to isolate the effect of the alleged conduct.

### B. Dr. Starr's Incorrect Treatment of Defendants' Data Impacts the Results of his "Wage Suppression" Regression Model

136. Dr. Starr commits several errors in his treatment of Defendants' data, which impact the results of his "wage suppression" regression and calculation of damages. First, Dr. Starr overestimates the total compensation per hour for USPI employees in the early portion of his relevant period as he makes no adjustment for relevant employee-years that have missing hours information, predominantly in 2005 and 2006.[299] This data error results in an overstatement of the per-hour earnings in Dr. Starr's benchmark period, which biases Dr. Starr's regression towards finding a larger "wage suppression" during the proposed class period. To correct Dr. Starr's data error, I identify employee pay records for full time

---

[297] See Section VI.B. As Dr. Starr testified, his "wage suppression" model cannot be used to measure the effects of the different components of the alleged mobility restrictions, specifically the non-solicitation agreements and the "tell your boss" provision (Starr Deposition, 103:23–105:5).

[298] See Section VII.C.

[299] For example, in Dr. Starr's data, USPI employee ████████ had regular earnings of ██████ in 2005 with *zero* regular hours worked and 128 hours of PTO, holiday, and sick leave.

See *2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter* ("Questions 3 and 4 ask why certain employees have high regular pay associated with zero hours worked. It is our understanding that the hours worked field is frequently blank or equal to zero for "exempt" (i.e., salaried) employees because USPI does not typically track their actual hours worked. The employees identified in Questions 3 and 4 are listed as "exempt" in the structured data.")

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

employees where the pay type is coded as "regular" with positive total earnings and zero hours worked and adjust the hours worked to be equal to 40 hours per week.[300]

137.     Second, Dr. Starr omits relevant data for certain employees, which I integrate into his data.  For USPI employees in 2018–2021, Dr. Starr does not include available data on total hours worked and excludes these employee-years from his regression analysis.[301]  In addition, while Dr. Starr includes equity payments made to SCA employees in 2021 and 2022, he omits equity payments between 2013 and 2020 from his analysis.[302]  Finally, Dr. Starr does not utilize all available DaVita Teammate data, which includes relevant information on employee jobs, for example.[303]

138.     Third, Dr. Starr makes an error in applying his own methodology for identifying non-relevant "members of the human resources, recruiting, [and] legal departments" in the Defendants' data, which entails running keyword searches.[304]  Specifically, Dr. Starr includes employees such as those in the "LEGAL - Commercial Litigation" in his regression analysis.  Dr. Starr does not consider that department names and job titles could have different capitalizations of keyword terms he searches for.[305]

---

[300] USPI employees can be paid biweekly (26 paychecks per year) or semimonthly (24 paychecks per year).  I adjust the regular hours per paycheck to be 80 hours for employees paid biweekly and 86.67 hours for employees paid semimonthly.  I exclude part-time employees-years with missing regular hours.  As I describe below, I find similar results when I exclude all records with missing regular hours rather than make this adjustment for full-time employees.

[301] Pay information for USPI employees in Tenet files from 2018 to 2021 was produced in two files, one annual and one at the paycheck level (*USPI_CIV_000659234.xlsx* (annual file), *USPI_CIV_001168726.xlsx* (paycheck-level)).  Dr. Starr relies only on the annual file, which does not include total hours, instead of also using the paycheck-level data, which does include information on hours worked.

These records are also missing ZIP Code information (another control in Dr. Starr's "wage suppression" regression).  I categorize records with missing ZIP Code information into a "Missing" category.

[302] Starr Deposition, 380:13–383:2.

[303] Dr. Starr also relies on incomplete Teammate data for DaVita.  I modify Dr. Starr's data to use the updated Teammate data (*DVA_OMCEAL_001421635*) that accounts for time-variant employee information.  I also use an additional job code dictionary produced by DaVita (*DVA_OMCEAL_001421634*).

[304] Starr Report, footnote 2; Complaint, ¶92.

[305] For example, Dr. Starr searches DaVita department names and job titles for the term "legal," which does not identify departments such as "LEGAL - Commercial Litigation" and "Legal – Privacy" departments, both of which he includes in his analysis.  Because Dr. Starr only searches for a limited number of terms, he includes additional job titles that appear to be related to Legal or HR functions such as "dir hr" for SCA and "Director, Corporate Counsel" for DaVita (see Dr. Starr's turnover).

I also exclude Andrew Hayek, whom Dr. Starr includes as a Vice President in his analysis between 2015 and 2017 when Mr. Hayek was the CEO of SCA (or CEO of SCA and OptumHealth).  Dr. Starr testified that Mr. Hayek should have been excluded as a "senior officer" when he worked at SCA (Starr Deposition, 383:10–385:16).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

When I adjust Dr. Starr's analysis to take this into account, I exclude approximately 1,600 employee-years from his analysis.

139.     After correcting Dr. Starr's data errors, I re-run his "wage suppression" regression, which he reports in Figures 6 and 8 of his report with no additional changes.  In **Exhibit 22**, I show the results of this analysis.  As the exhibit shows, Dr. Starr's aggregate "wage suppression" estimate drops from 14.5 percent to 11.3 percent.  Similarly, all of Dr. Starr's Defendant-specific results also decline when I fix his data errors.  After making these data corrections—and with no other changes to his model—Dr. Starr's damages estimate declines over $170 million (a decline of approximately 20 percent).  I apply these same corrections to all of my testing of Dr. Starr's regression model.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 22**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**

| Statistic | Dr. Starr's Aggregate Model | | Dr. Starr's Defendant-Specific Model | |
|---|---|---|---|---|
| | Figure 6 | Corrected | Figure 8 | Corrected |
| [a] | [b] | [c] | [d] | [e] |
| Pooled Conduct | -0.1565* | -0.1198* | | |
| **% Wage Suppression** | **-14.5%** | **-11.3%** | | |
| | (0.0117) | (0.0102) | | |
| DaVita Conduct | | | -0.1882* | -0.1742* |
| **% Wage Suppression** | | | **-17.2%** | **-16.0%** |
| | | | (0.0145) | (0.0140) |
| SCA Conduct | | | -0.1491* | -0.1095* |
| **% Wage Suppression** | | | **-13.9%** | **-10.4%** |
| | | | (0.0177) | (0.0170) |
| USPI Conduct | | | -0.1276* | -0.0748* |
| **% Wage Suppression** | | | **-12.0%** | **-7.2%** |
| | | | (0.0142) | (0.0112) |
| Observations | 27,010 | 26,863 | 27,010 | 26,863 |
| Included Employees | 5,173 | 5,103 | 5,173 | 5,103 |
| R-squared | 0.8563 | 0.8757 | 0.8565 | 0.8763 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. See **Appendix J-1** for the results of Dr. Starr's analysis where I exclude USPI records with missing regular hours.

Source: Starr Report, Figure 6 column [4] and Figure 8 column [4]; Starr turnover (Corrected Data).

### C. Indicators of the Unreliability of Dr. Starr's "Wage Suppression" Regression Model

#### 1. The Results of Dr. Starr's Regression Model Are Inconsistent with His Own Analysis of the Alleged Conduct and the Academic Literature He Cites

140.    The unreliable nature of Dr. Starr's results can be shown by simply comparing the magnitudes of his estimated "wage suppression" relative to his own analysis and the academic literature he cites. For example, Dr. Starr purports to find that the compensation of DaVita employees was suppressed by 17.2 percent due to (i) the alleged mobility restrictions and (ii) the alleged information sharing between DaVita and SCA.[306]  However,

---

[306] Starr Report, Figure 8.  As Dr. Starr acknowledges, his "wage suppression" regression model only purports to measure "suppressed compensation from the whole of the Challenged Conduct rather than from each individual component part" (Starr Report, ¶106).

99

- Dr. Starr's own mobility analysis shows no decrease in mobility for DaVita employees during the period of the alleged mobility restrictions;[307] and

- Dr. Starr's evidence of alleged information sharing between DaVita and SCA, as discussed above, is limited to the discrete conversations about merit budgets in certain years between 2009 and 2012 or 2013.[308]

That is, Dr. Starr' purports to find that total compensation for all 3,400 DaVita employees in the proposed class was lower by 17.2 percent, on average, over the 12-year proposed class period due to alleged sharing of merit budget information in a few years.[309] Dr. Starr has provided no analysis to assess if any of the Defendants ever adjusted their merit budgets in response to the alleged information sharing. Even if DaVita had adjusted its merit budgets down from, for example, 3 percent to 2 percent in two years—an adjustment that Dr. Starr has not shown occurred—this change would result in *base salary* being lower by about 2 percent (a difference that could be offset by changes in variable compensation).

141. As the DaVita results highlight, Dr. Starr's "wage suppression" regression finds significantly larger "wage suppression" than his own analysis of the alleged conduct would suggest. While Dr. Starr claims that there is "broad support throughout the economic literature" for the "idea that firms can suppress pay by limiting employee outside options," the inconsistency of Dr. Starr's estimate with the literature he cites further indicates the unreliability of his regression model.[310] For example, the Caldwell and Danieli paper which Dr. Starr describes as having "develop[ed] a method for estimating individual-level outside options and stud[ied] how it relates to earnings" finds that a 10 percent increase in outside options increases earnings by only 1.7 percent.[311]

142. As shown in **Exhibit 23,** this estimate from the literature implies that, due to the alleged mobility restrictions, the available outside employment options would be expected to decrease by

---

[307] See Section V.A. Dr. Starr testified that "compensation is […] not only related to mobility, it's also related to job offers that you get, information that you learn from those job offers which can be shared across the company" (Starr Deposition, 203:10–204:1). However, Dr. Starr presents no quantitative analysis of "job offers," if these were suppressed during the proposed class periods, or if the addition (if any) job offers available in the but-for world would have actually led to higher compensation.

[308] See Section VII.C.

[309] Starr Report, Figure 21.

[310] Starr Report, ¶50.

[311] Starr Report, ¶50, citing Sydnee Caldwell and Oren Danieli, "Outside Options in the Labor Market," *The Review of Economic Studies*, Vol. 91, Issue 6, 2024, pp. 3286–3315 ("Caldwell and Danieli (2024)"), pp. 3308–3309.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

*approximately 60 percent* to reach the magnitude of Dr. Starr's estimated 14.5 percent "wage suppression" across Defendants. Put in context, this decrease is significantly larger than Dr. Starr's own finding that the alleged conduct changed employee mobility rates by, at most, only 2 percent (6.2 additional moves between the "Covered Defendants" each year out of the approximately 300 employees, on average, that departed one of the Defendants each year during the proposed class period).[312] In addition, even if the alleged conduct totally prevented mobility between the Defendants, it would nonetheless be implausible to assume that proposed class members' outside employment options decreased by 60 percent given the hundreds of other non-Defendant employment options available to proposed class members—with proposed class members moving to non-Defendant firms 95 percent of the time even outside the proposed class period.

---

[312] Per Caldwell and Danieli's estimate of the relationship of outside options and pay, a 2 percent reduction in outside options would be associated with less than a 0.4 percent reduction in pay, far below the 14.5 percent "wage suppression" Dr. Starr purports to find in his regression analysis.

This 2 percent reduction in "movements" is reflective of the reduction in "outside options" in the broader sense, unless recruiting efforts between "Covered Defendants" (e.g., cold calls) in the but-for world would have been *less* effective in eliciting movements. Neither Dr. Starr nor Dr. Gerhart quantify the amount of cold calls lost due to the alleged conduct. As a percentage of all cold calls, the purported reduction in cold calls during the proposed class period would be equivalent to the percent reduction in movements (or lower), unless the "Covered Defendants" in the proposed but-for world class period would have required more cold calls than outside the proposed class period to convince employees to move between them.

**EXHIBIT 23**
**IMPLIED REDUCTION IN OUTSIDE OPTIONS**
**BASED ON DR. STARR'S AGGREGATE "WAGE SUPPRESSION"**
**AND ELASTICITY ESTIMATED BY CALDWELL AND DANIELI**



Notes: The orange line shows the "constant elasticity" Dr. Starr cites from Caldwell and Danieli. That is, from any given starting point, if outside options increase by 10 percent (e.g., from 100 to 110 percent), then compensation increases by 1.7 percent (e.g., from 100 to 101.7 percent).

Sources: Starr Report; Figure 6; Caldwell and Danieli (2024), pp. 3308–3309.

143. While Dr. Starr's mobility analysis studies only observed moves between the Defendants, the outside options, or an employee's "Option Set," as described by the literature Dr. Starr cites, represents the employee's probability of working in jobs with certain characteristics and the distribution of such jobs in the economy.[313] These outside options could include similar occupations that exist within the same industry, but could also, for example, include similar jobs in different industries based on an individual's skills, education, and commuting preferences, and vary by regional availability of jobs.[314] Dr. Starr claims that these economic studies provide broad support for his findings of mobility and wage

---

[313] *Id,* at pp. 3294–3298.

[314] *Id,* at 3286, 3293, Figure 3.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

suppression even though he has not attempted to study changes in "outside options" available to proposed class members—instead focusing only on the limited set of potential outside employment options that were available to an employee at one of the other "Covered Defendants."

144.    As I show above, in 2016, Defendants' employees represented less than 1 percent of all employment in the Healthcare sector.  Even if this industry reflected the available "outside options" for relevant employees, as Dr. Gerhart argues, the change in outside options due to the alleged conduct would be significantly lower than the change implied by Dr. Starr's estimated "wage suppression"—not even accounting for the available options outside of the Healthcare sector.[315]  For example, absent the alleged conduct, assuming the potentially available "outside options" for employees at DaVita would change from (i) excluding all other relevant job positions at SCA to, (ii) including these job positions, (i.e., each employee at DaVita could perfectly substitute for every position at SCA), their outside options would increase only marginally relative to existing Healthcare sector employment options.[316] That is, while Plaintiffs allege that during the conduct period relevant DaVita employees could not move to SCA, they potentially could have moved to over 650,000 Manager positions in the Healthcare sector.  If *all* SCA positions hypothetically became available to those DaVita employees, the total "outside options" available to DaVita employees would increase by only 0.13 percent in the Healthcare sector—or even less if outside employment options beyond the Healthcare sector were included as well.

### 2.    The Results of Dr. Starr's "Wage Suppression" Regression Are Sensitive to the Specification and Included Sample

145.    In addition to the results of his "preferred model," Dr. Starr presents what he refers to as "robustness checks," in which he "consider[s] several other specifications and sample restrictions to

---

[315] Relevant employees may also seek employment outside of the healthcare industry.  For example, named Plaintiff Allen Spradling moved to the financial services industry, working for Bank of America after working at SCA (Spradling Deposition, 134:15–17).

[316] In 2016, DaVita had over 6,000 employees in "Manager or above" positions (as defined by Dr. Starr), while SCA had approximately 860 such employees, which represents 1.06 percent of the 664,900 employees in Manager positions in the Healthcare sector in 2016.  I note this comparison makes the following assumptions:

(i) taking Plaintiffs' allegations at face value, there is a national class of employees who are willing to broadly substitute across firms and geographic regions (i.e., willing to accept employment at another firm in another location).

(ii) that external jobs across the industry are comparable to ones in which the employees held at Defendants. For example, Dr. Starr testified that proposed class members would have skills that would translate to jobs within the "healthcare industry" (Starr Deposition, 128:8–130:4).

(iii) that all employees at DaVita are perfectly substitutable for all jobs at SCA.  However, SCA may not in reality be willing to hire some (or all) of DaVita's employees due to other reasons, such as skills, performance, experience, or other factors affecting the "match" of the employment contract.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"ensure the results" in his Figure 6 and Figure 8 "are robust to deviations from the baseline setup."[317] Rather than show the robustness of his analysis, the results of Dr. Starr's "robustness checks" show significant variation in the estimated effect of the alleged conduct, highlighting the instability of Dr. Starr's model. For example, after applying the data corrections I describe above, Dr. Starr's "robustness checks" find that for his models of total compensation:[318]

- The DaVita specific "wage suppression" was not statistically different from 0 (in his Figure 35 specification, excluding individual-company fixed effects) or as high as 22.8 percent (in his Figure 34 specification, harmonizing time periods across Defendants); and

- The SCA specific "wage suppression" was not statistically different from 0 (in his Figure 35 specification, excluding individual-company fixed effects) or as high as 22.1 percent (in his Figure 29 specification, including control variables interacted by Defendant).

Dr. Starr argues that the results he presents are "all broadly similar in that the relationship between the Conduct and compensation is negative, statistically significant, and similarly sized."[319] After correcting Dr. Starr's data treatment, his model in fact does not find a statistically significant relationship in each of his robustness checks nor are the estimates "similarly sized," contradicting his claim that his results are "robust."[320] These different estimates of "wage suppression" have a significant impact on Dr. Starr's calculation of damages, estimating:

- Between *no damages* and $955 million in damages for DaVita; and

- Between *no damages* and $214 million in damages for SCA.

146. Further, the results of Dr. Starr's model are sensitive to the inclusion of the specific "baseline" controls he selects for his model (and does not test as part of his "robustness checks"). Specifically, Dr. Starr includes a linear time trend to purportedly account "for the natural growth in annual compensation that would have happened over time even absent the Conduct."[321] Dr. Starr does not address what "natural growth" in compensation this linear time trend accounts for that are not accounted for by his other controls. Dr. Starr offers no additional explanation for including his linear time-trend beyond the

---

[317] Starr Report, ¶130.

[318] See my workpapers for the results of all Dr. Starr's "robustness checks" applying the data corrections I describe above.

[319] Starr Report, ¶131.

[320] Starr Report, ¶131.

[321] Starr Report, ¶119(b).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"natural growth in annual compensation," despite already including CPI as a control, which he purports accounts for increases over time (i.e., employees may receive "cost of living adjustments to account for the increased inflation.")[322]

147.　　In **Exhibit 24** I present the results of Dr. Starr's "wage suppression" regression making two changes: (i) correcting the data errors I describe above and (ii) removing the time-trend Dr. Starr includes in his model.  When I make these two adjustments, Dr. Starr's aggregate estimate of "wage suppression" declines to 4.6 percent, and his Defendant-specific estimates are no longer statistically significant for SCA or USPI.  These results—as well as his own "robustness checks"—show the sensitivity of Dr. Starr's regression model to the inclusion of specific control variables.[323]  While Dr. Starr argues that the results he presents "are not an artifact of the specific model [he] construct[s]," the testing he himself presents contradicts this claim and shows the sensitivity of his results to the specification he selects.[324]  Additional adjustments to his model to exclude a single control variable (that he has not provided an economic rationale to include) further show the sensitivity and unreliable nature of his results.

---

[322] Starr Report, ¶110.

[323] As the American Bar Association ("ABA") Proving Antitrust Damages treatise states, "[R]esults should be tested to make sure they are robust to reasonable changes in the set of control variables—including reasonable alternative variables used to capture similar economic concepts, such as alternative cost or demand controls. Models that yield results that are highly sensitive to particular choices of explanatory variables have a high likelihood of being affected by specification error and thus should generally not be relied upon (ABA Proving Antitrust Damages, p. 164).

[324] Starr Report, ¶131.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 24**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**
**EXCLUDING HIS LINEAR TIME-TREND**

| Statistic | Dr. Starr's Aggregate Model | | Dr. Starr's Defendant-Specific Model | |
|---|---|---|---|---|
| | Figure 6 Corrected | Excluding Time Trend | Figure 8 Corrected | Excluding Time Trend |
| [a] | [b] | [c] | [d] | [e] |
| Pooled Conduct | -0.1198* | -0.0476* | | |
| **% Wage Suppression** | **-11.3%** | **-4.6%** | | |
| | (0.0102) | (0.0104) | | |
| DaVita Conduct | | | -0.1742* | -0.1092* |
| **% Wage Suppression** | | | **-16.0%** | **-10.3%** |
| | | | (0.0140) | (0.0144) |
| SCA Conduct | | | -0.1095* | -0.0190 |
| **% Wage Suppression** | | | **-10.4%** | **--** |
| | | | (0.0170) | (0.0172) |
| USPI Conduct | | | -0.0748* | -0.0022 |
| **% Wage Suppression** | | | **-7.2%** | **--** |
| | | | (0.0112) | (0.0111) |
| Observations | 26,863 | 26,863 | 26,863 | 26,863 |
| Included Employees | 5,103 | 5,103 | 5,103 | 5,103 |
| R-squared | 0.8757 | 0.8721 | 0.8763 | 0.8729 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

### 3. Dr. Starr's "Wage Suppression" Regression is Based on the Flawed Assumption that Relevant Factors Would Affect Compensation in the Same Way in His Benchmark and Proposed Conduct Periods

148. As I describe above, regression models like Dr. Starr's are predicated on two key assumptions. One is that they have appropriately captured the factors affecting compensation for relevant employees and can thus distinguish the effects of the alleged conduct from the effects of these factors. The second fundamental assumption in Dr. Starr's model is that the benchmark periods he selects can be used to model compensation "but for" the alleged conduct. Specifically, Dr. Starr's model assumes that, with the exception of the alleged conduct, economic conditions—measured by the controls he includes in his model—affected compensation in the same way in both the benchmark and proposed conduct periods. For example, the model assumes that the unemployment rate and inflation affected relevant employees'

106

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

total compensation (including variable pay like equity payments) in the same way in the benchmark periods as in the alleged conduct period. If this assumption does not hold then a comparison between these periods cannot isolate the effect of the alleged conduct since the difference would not reflect solely the effect of the alleged conduct but also other differences between the periods.

149.    Dr. Starr has two benchmark periods, 2005–2007 for DaVita and USPI (but not SCA) and 2020–2022 for all three Defendants. This later benchmark period includes the COVID-19 pandemic, which, as Dr. Starr describes, "dramatically altered the supply and demand for labor broadly" and "had specific impacts in medical employment."[325] Dr. Starr purports to account for this "dramatic" change by including a dummy variable for 2020 and 2021.[326] However, the sensitivity of his analysis to the use of this benchmark period can be seen from the results of Dr. Starr's own "robustness checks." Dr. Starr presents the results of his model "harmonizing" the time periods across Defendants, i.e., excluding his early benchmark period in his Figure 34. Relying on only the later benchmark period increases his estimate of "wage suppression" substantially for DaVita and SCA.[327] That is, Dr. Starr's results are sensitive to the specific benchmark period he relies on—increasing significantly for two out of the three Defendants when relying entirely on his later benchmark period.

150.    The assumption of comparability between the benchmark and proposed class periods is testable with standard econometric tools. I conduct this test by undoing the assumption of Dr. Starr's model and allowing within his model for the possibility that total compensation was *not* affected identically by economic factors in the benchmark and conduct periods. If Dr. Starr's assumption holds, the test will identify no difference between the separately estimated economic relationships. If it does not hold, the test will reject this assumption.[328] The results of these tests are summarized in **Exhibit 25** below.

---

[325] Starr Report, ¶120.

[326] Due to Dr. Starr's inclusion of this dummy variable for 2020 and 2021, Dr. Starr's later benchmark period is effectively limited to 2022 only.

Dr. Starr also includes a "robustness check" where he purports to exclude these years from his analysis. I note that Dr. Starr describes his Figure 31 as "[dropping] COVID years," but he in fact excludes 2019 and 2020 from the analysis presented in his report.

[327] Specifically, after correcting Dr. Starr's data treatment, the wage suppression estimates from his preferred model (Starr Report, Figure 8) change from 16.0 to 22.8 percent for DaVita, from 10.4 to 13.9 percent for SCA, and from 7.2 to 5.7 percent for USPI after excluding the early benchmark period (see Starr Report, Figure 34).

[328] I conduct Chow tests to determine whether the coefficients of the control variables differ across periods.

See ABA Proving Antitrust Damages, pp. 164–166. ("Another potential misspecification is caused by imposing incorrect restrictions on the coefficients of the regression model—that is, by forcing the coefficients to take incorrect values. Forcing incorrect values on some coefficients can bias other coefficients. […] The existence of bias resulting from the imposition of incorrect restrictions can be econometrically tested using standard procedures often used by economists. […] A standard method for detecting changes in model parameters is the

(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 25**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**
**DIFFERENCES IN THE ESTIMATED EFFECTS OF DR. STARR'S CONTROLS**
**ACROSS BENCHMARK AND ALLEGED CONDUCT PERIODS**

| Statistic | Statistically Significant Differences Between Combined Benchmark and Class Period |
|---|---|
| [a] | [b] |
| Time-trend | -- |
| Log of Avg. State Mgr. Earnings | -- |
| Log of State Health Expend. PC | Yes |
| Log of State GDP per Capita | Yes |
| Log of State Unemployment Rate | Yes |
| Census Region Annual CPI | Yes |
| Log of Total Hours | Yes |

Notes: Statistical significance is estimated at conventional levels of 5 percent. A joint F-test rejects that the controls are jointly equal across the two benchmark periods and the conduct period in his model. I cannot test differences in Dr. Starr's COVID-19 control separately as it only exists in his benchmark periods.

Source: Starr turnover (Corrected Data).

As this exhibit shows, the estimated coefficients for healthcare services personal consumption expenditure per capita, GDP per capita, unemployment rate, CPI, and total hours are statistically significantly different between Dr. Starr's combined benchmark periods and the proposed class period.

151.     As this analysis shows, the factors Dr. Starr includes in his model do not have the same relationships with compensation in the benchmark and alleged misconduct periods, undermining the fundamental assumption on which his model is based—i.e., that the three periods are the same, other than the existence of the alleged conduct in the middle period. These results provide further evidence

Chow test. The Chow test is more accurately described as a testing principle than a single test, and it describes methods to test if all the coefficients in the model have changed between two periods (or subgroups of the observations), or if some specific subset of parameters has changed, or if some particularly important combination of parameters (or function of the parameters) has changed.")

See also, Jeffrey Wooldridge, *Introductory Econometrics*, 5th ed., Cengage Learning, 2013, p. 453 ("The Chow test – which is simply an F test – can be used to determine whether a multiple regression function differs across two groups"); Damodar N. Gujarati, *Basic Econometrics*, 2nd ed., McGraw-Hill, 1988, p. 443 ("One of the popular methods of testing for differences between two (or more) regressions is the Chow test"); ABA Econometrics (2014), p. 358 ("Standard statistical tests can be applied to test the stability of coefficients among subgroups of customers, products, time, geographies, or other subsamples, and to determine whether it is appropriate to pool potential subgroups when estimating the average effect of the alleged conspiracy. For example, a Chow test can be implemented to determine whether the effect of an alleged conspiracy should be estimated separately for two or more potential subgroups of customers, products or periods").

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

that Dr. Starr's "wage suppression" model has not reliably captured the relevant non-conspiratorial economic factors that affected total compensation for relevant employees.

### D. Dr. Starr's "Wage Suppression" Regression Produces Biased Results as His Model Does Not Account for the Factors that Determine the Levels of Variable Pay Received by Relevant Employees

152. As Dr. Starr describes, "a multivariate regression model can be used to isolate the effect of the Challenged Conduct by accounting or 'controlling' for other relevant factors that might also cause changes in compensation."[329] If, however, Dr. Starr does not correctly account for "other relevant factors that might also cause changes in compensation" in his model, it will not be able to reliably estimate the effect of the alleged conduct. Dr. Starr himself points to this issue, stating that estimates can be "susceptible to 'omitted variable bias,' which occurs when an unobserved confounding variable is responsible for the observed relationship between the Conduct and compensation."[330] That is, if a relevant factor is excluded from Dr. Starr's "wage suppression" model, any difference in total compensation during the conduct period due to this omitted factor would be attributed to his average "wage suppression" effect.

153. Dr. Starr's "wage suppression" model includes a limited set of controls, which Dr. Starr argues can account for all relevant factors that impact total compensation for all proposed class members. However, Dr. Starr's own Figure 5 shows the wide range in total compensation received by employees included within his "wage suppression" regression. As his table shows, Dr. Starr includes employees that have total annual compensation of less than $3,000 as well as employees making more than $14.8 million. That is, Dr. Starr purports to account for all relevant factors that impact compensation for both a USPI Clinical Director in Arizona (paid ███████ in 2008) and a DaVita Senior Vice President in Colorado (paid █████████ in 2021, █████████ of which was payment of equity granted in previous years) in a single model. This second employee was a Senior Vice President at DaVita between 2012 and 2022 and received compensation (as calculated by Dr. Starr) of between █████████ and ██████ ██████ per year during this period. This wide variation in compensation year-over-year for a single employee in the same job is due to the large portion of his compensation that was variable (e.g., bonus

---

[329] Starr Report, ¶105.

[330] Starr Report, ¶132.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

and long-term incentives), which was determined, in part, by the performance of his employer DaVita—a factor that Dr. Starr omits from his analysis.[331]

154.    In his discussion of his regression analysis, Dr. Starr acknowledges that one might "conceive that *company performance* should be controlled for, because workers may receive bonuses tied to company performance."[332] Dr. Starr argues that this is a "bad" control because "controlling for company performance" would "close off" a "causal pathway" between the alleged conduct and total compensation "if the Conduct affects company performance."[333] Dr. Starr understates the problem that occurs when a relevant variable is excluded from a "wage suppression" model such as the one he proposes. When a regression omits a critical factor, such as firm financial performance, it suffers from what is known as "omitted variable bias."[334] As an ABA antitrust treatise explains, omitted variable bias is a form of model mis-specification and can lead to "misinterpretation of estimated results" and results that are "biased and unreliable."[335] Omitted factors are particularly problematic in a model like Dr. Starr's, because the underlying assumption of the model is that it has accounted for all relevant factors other than the alleged conspiracy.[336] In other words, if the analyst fails to include all relevant economic factors in his model, what he calls "wage suppression" is likely to be conflated with other legal, contemporaneous economic factors that determine compensation.[337] Simply speculating that a given variable is a "bad" control is not a justification for its exclusion. Dr. Starr provides nothing more than speculation to support his claim that the alleged conduct would affect firm performance, stating

---

[331] For example, a 2017 SCA "Compensation Committee Meeting" presentation notes that "[i]ncentive-based compensation is tied to performance in an objective and predictable manner," and that "a significant portion of each leader's cash compensation is 'at risk' and payable only upon the achievement of defined Company objectives" (SCA001543663, at slide 7). Similarly, DaVita's "[l]ong-term incentives […] are provided only to high performers and [are] viewed as a long-term, appreciating asset" which usually are provided "in the form of equity." DaVita also awarded bonuses "based on [DaVita], team, and individual performance…[looking] at historical multi-year track record as well as future potential." See DVA_OMCEAL_000906132–6135.

[332] Starr Report, ¶123(f), emphasis in original.

[333] Starr Report, ¶123(c), (f).

[334] More specifically, omitted variable bias occurs when a model does not control for variables that are expected to (a) influence the dependent variable in the regression (in this case, compensation) and (b) also be correlated with the explanatory variable(s) of interest (in this case, Dr. Starr's "Conduct" period indicator).

[335] ABA Proving Antitrust Damages, pp. 148, 164.

[336] Starr Report, ¶117

[337] The ABA antitrust treatise also explains that "omitted variable bias can be tested by identifying and including in the regression model additional explanatory variables […]. If these additional explanatory variables turn out to be statistically significant, and the coefficient estimates on the previously included explanatory variables change substantially when the additional variables are added, then the regression model that omitted the additional explanatory variables likely is misspecified and its results are biased and unreliable" (ABA Proving Antitrust Damages, p. 164).

110

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

only that total compensation may be "an input to company performance (depending on the measure used)."[338]  While Dr. Starr presents a series of sensitivity analyses that he describes as "robustness checks," which include adding additional control variables, some of which he describes as "bad controls," he does not perform a similar test to include any measure of firm performance—even measures of firm performance that do not include compensation for relevant employees.[339]

### 1. Relevant Employees Received Multiple Types of Compensation, All of Which Dr. Starr Includes in His "Wage Suppression" Regression Model

155.    Relevant employees received multiple types of compensation, including multiple types of variable compensation (i.e., bonus and equity payments).  For example,

- DaVita offered employees bonuses and long-term incentives, which included both equity-based compensation as well as cash long-term incentives ("Cash LTI") for a subset of the period.[340]  DaVita's equity compensation provided a "link to long-term shareholder value" while its Cash LTI provided a link "to Dialysis performance," and are paid out "only if certain performance goals are achieved."[341]  In addition to long-term incentives, employees received annual bonuses based on a bonus pool that would depend on the performance of "the relevant business" and their own "relative performance."[342]

---

[338] Starr Report, footnote 415.

[339] Starr Report, ¶130.  Dr. Starr purports to "assess the potential for unobserved variables to be responsible for the observed relationships" by comparing the compensation over time of relevant Director and VP level employees to that of managers (below Director level).  The key assumption of this type of analysis is that "[m]anager compensation is similarly affected" by the "unobserved variables that are responsible for the Conduct effect" (Starr Report, ¶133).  Dr. Starr has not described why he assumes firm performance (which impacts variable compensation paid to proposed class members at higher rates than managers) or any other factor would impact both managers and relevant employees "similarly."

Due to its construction, Dr. Starr's model will attribute any changes in total compensation between the benchmark and conduct period that is not accounted for by his limited controls to the estimated "wage suppression."  To the extent that the change in total compensation comes from variable compensation, which proposed class members receive more of than managers, Dr. Starr's analysis comparing compensation between these two groups would still attribute this difference to his estimated "wage suppression."  See, e.g., SCA000073564–3571, at 3567.

[340] Between 2012 and 2018, DaVita offered the mixture of long-term cash and equity incentives, opting for "100% equity" at other times during the conduct period (DVA_OMCEAL_001329256–9261, at 9258; DVA_OMCEAL_000294731–4747, at 4738).

[341] DVA_OMCEAL_000926457–6467 at 6460; DVA_OMCEAL_000297363–7368 at 7364.

[342] DVA_OMCEAL_001329256–9261, at 9257–9258.

111

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- SCA offered employees a mixture of short-term annual cash awards and long-term equity compensation during the proposed class period.[343]  Higher level employees were given a greater portion of their compensation in the form of "annual incentive and/or equity" payments.[344]  Equity grants were "tied to the creation of shareholder value" with awards subject to "assessment of teammate performance and market compensation."[345]

156.    To show how these different types of compensation vary over time, I show Dr. Starr's calculation of total compensation for proposed class members at DaVita and SCA, broken out by pay type in **Exhibit 26** and **Exhibit 27**.  These charts show the average amount of each type of compensation that employees of each Defendant received in each year.  During the proposed class period, variable compensation (e.g., bonus, cash long-term incentives, and equity payments) accounts for between 17 and 52 percent of total compensation for relevant DaVita employees, depending on the year, and between 4 and 29 percent of total compensation for SCA employees over this same period.[346]

---

[343] SCA001159728–9748 at 9733.

[344] SCA001159728–9748 at 9734.

[345] SCA001159728–9748 at 9731, 9740.

[346] See **Appendix K-1** for a similar analysis for USPI.  Variable compensation accounts for between 12 and 36 percent of annual total compensation for relevant USPI employees during the proposed class period.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 26**
**AVERAGE ANNUAL TOTAL COMPENSATION**
**BY COMPENSATION TYPE**
**DAVITA**
**2005 – 2022**



Notes: The total compensation in this analysis is the compensation that Dr. Starr describes as "Class Compensation" in his Figure 23. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr.

Dr. Starr speculates that the "drop" in total compensation he identifies in his Figure 23 in 2019 is due to the sale of DaVita Medical Group (Starr Report, Figure 23 notes). However, as this analysis shows, there is also a decline in compensation *per employee* due to changes in variable compensation levels.

Source: Starr turnover (Corrected data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 27**
**AVERAGE ANNUAL TOTAL COMPENSATION**
**BY COMPENSATION TYPE**
**SCA**
**2005 – 2022**



Notes: The total compensation in this analysis is the compensation that Dr. Starr describes as "Class Compensation" in his Figure 24. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr.

Source: Starr turnover (Corrected data).

157.    These exhibits further show that not only the amount of variable compensation, but also the type of variable compensation employees received changed over time. For example,

- DaVita U.S. employees received Cash LTI grants in 2012 through 2017, which were then paid out in 2015 through 2020 as I show in **Exhibit 26**.[347] This exhibit also shows that DaVita employees received almost no Cash LTI payments in 2019 as DaVita did not hit the relevant financial performance targets for employees to receive those payments.[348]

---

[347] DVA_OMCEAL_000972302; DVA_OMCEAL_001329256–9261, at 9258.

[348] DVA_OMCEAL_001402387–2433, at 2398–2399; DVA_OMCEAL_001329256–9261, at 9258.

114

- SCA introduced a new long-term incentive plan in 2013 when the company went public.[349] The long-term incentive compensation offered to SCA employees include both stock options as well as RSUs, both of which were described as being "[d]irectly linked to [SCA's] performance."[350]

As these exhibits indicate, the level of variable compensation that employees received would depend not only on the compensation practices of a given Defendant but also on the performance of the firm itself in that year, which Dr. Starr does not account for in his regression analysis.

### 2. Empirical Testing Shows that Dr. Starr's "Wage Suppression" Regression Cannot Establish Impact for Base Salary

158.     As I describe above, Dr. Starr's model does not find statistically significant "wage suppression" on base salary after correcting his data errors. Dr. Starr acknowledges that testing his model on "different measures of compensation" is an important test to assess the "robustness" of his model. In his Figure 26, Dr. Starr presents the results of this test to "show that the results are robust to using different measures of compensation."[351] First, Dr. Starr purports to test the effect of the alleged conduct on "regular plus other pay."[352] Without discussion, Dr. Starr includes DaVita's Cash LTI payments in his measure of "regular pay." These Cash LTI payments are long-term incentives that were offered by DaVita for a limited period not a form of base salary.

159.     In **Exhibit 28** I present the results of Dr. Starr's Figure 26 analysis making two changes but otherwise making no corrections to Dr. Starr's model: (i) adjusting Dr. Starr's incorrect data treatment as I describe above (in Section VIII.B) and (ii) excluding DaVita Cash LTI payments from his measure of "regular pay." As this exhibit shows, Dr. Starr's own regression does not find "suppression" of base salary overall. Further, Dr. Starr's regression—making no other corrections—does not find "suppression" for base salary for DaVita and USPI individually and finds that the effect for SCA would be only 4.4 percent (down from the 10.4 percent Dr. Starr reports in his Figure 26). In fact, Dr. Starr's model would suggest that the alleged conduct *increased* base salary for DaVita employees.[353] As I

---

[349] See, e.g., SCA 2013 10-K, p. 102.

[350] SCA000465129, at slide 11. In addition, after SCA was acquired by Optum, a subsidiary of UnitedHealth, its equity grants were made under the UnitedHeath Group program (SCA001037832–7833).

[351] Starr Report, ¶130(a).

[352] Starr Report, ¶130(a).

[353] Although Dr. Starr estimates separate effects for each of the Defendants, he runs a single pooled model, which assumes that his included control variables have the same effect on compensation across Defendants. That is, a change in DaVita specific data (i.e., the exclusion of their Cash LTI from Dr. Starr' analysis) would impact results for the other Defendants as well.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

describe in the previous sections, Dr. Starr's "wage suppression" regression is unreliable. That is, the purported finding of "suppression" on base salary for SCA in this test is not consistent with Dr. Starr's own "robustness check" that finds no statistically significant "wage suppression" on total compensation in his Figure 35 specification, excluding individual-company fixed effects.[354]

EXHIBIT 28
DR. STARR'S "WAGE SUPPRESSION" REGRESSION
BASE SALARY
CORRECTED DATA

| Statistic | Dr. Starr's Aggregate Model | | Dr. Starr's Defendant-Specific Model | |
| | Figure 26 [1] Corrected | Excluding DaVita Cash LTI | Figure 26 [2] Corrected | Excluding DaVita Cash LTI |
| [a] | [b] | [c] | [d] | [e] |
| Pooled Conduct | -0.0326* | 0.0024 | | |
| **% Wage Suppression** | **-3.2%** | **--** | | |
| | (0.0075) | (0.0067) | | |
| DaVita Conduct | | | -0.0206* | 0.0258* |
| **% Wage Suppression** | | | **-2.0%** | **--** |
| | | | (0.0095) | (0.0080) |
| SCA Conduct | | | -0.0580* | -0.0448* |
| **% Wage Suppression** | | | **-5.6%** | **-4.4%** |
| | | | (0.0117) | (0.0106) |
| USPI Conduct | | | -0.0401* | -0.0125 |
| **% Wage Suppression** | | | **-3.9%** | **--** |
| | | | (0.0092) | (0.0085) |
| Observations | 26,828 | 26,828 | 26,828 | 26,828 |
| Included Employees | 5,097 | 5,097 | 5,097 | 5,097 |
| R-squared | 0.8903 | 0.9129 | 0.8903 | 0.9133 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

This test includes compensation Dr. Starr identifies as "regular pay" and "other compensation" (see Starr Report, Figure 26), excluding DaVita long-term cash incentive payments.

Source: Starr turnover (Corrected Data).

---

[354] See Section VIII.C.2, *supra*.

116

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

160.    As the results of my test shows, Dr. Starr's analysis is not "robust to using different measures of compensation" as he claims.[355]  In fact, Dr. Starr's analysis does not show any effect of the alleged conduct across Defendants on base salary.  That is, the "wage suppression" Dr. Starr purports to find is driven by employees' variable compensation.  As I describe below, Dr. Starr's model does not account for firm performance, a key factor in determining the levels of variable compensation for relevant employees.  After correcting for this error, Dr. Starr's "wage suppression" model fails to find statistically significant "wage suppression" when firm-specific performance measures for certain types of variable compensation are included in his model.

### 3.    The Failure to Include Firm Specific Performance Controls in Dr. Starr's "Wage Suppression" Regression Renders His Analysis Unreliable

161.    Dr. Starr's model cannot account for differences in the value of variable compensation such as long-term incentive payments included within his measure of total compensation as his model does not attempt to control for changes in firm specific performance over time.  That is, Dr. Starr's model does not know if a change in variable compensation between his conduct and benchmark periods is due to changing firm performance over time or due to the alleged conduct.  By not accounting for firm performance, Dr. Starr's model assumes any difference in compensation payments between these periods is due to the alleged conduct and attributes it to his estimate of "wage suppression."

162.    To illustrate the issue of Dr. Starr's omission of firm performance controls I assess the value of Cash LTI payments for DaVita.  Between 2012 and 2017 DaVita provided employees working within its dialysis business Cash LTI grants as well as equity grants.[356]  These Cash LTI grants vested over a three-year period and would be paid out "only if certain performance goals are achieved."[357]  As I show in **Exhibit 26** above, DaVita dialysis employees received significantly lower Cash LTI payment in 2019 (the last year of the proposed class period).[358]  While Dr. Starr would attribute any portion of this lower

---

[355] Starr Report, ¶130.

[356] DVA_OMCEAL_000944057–4061, at 4060.  DaVita made limited cash and equity LTI grants to employees at DMG during the conduct period, which were tied to DMG specific performance metrics (DVA_OMCEAL_001329256–9261, at 9259; DVA_OMCEAL_000939090–9103, at 9090).  DMG employees only appear in the data during the conduct period and do not contribute to the "wage suppression" estimate in Dr. Starr's "preferred" model (Starr Report, ¶130, "Because individual fixed effects rely on comparisons of the same individual during and absent the Conduct, in the main specification there may be Senior-Level Employees who are not contributing to the Conduct estimate").

[357] DVA_OMCEAL_000297363–7368 at 7364.

[358] On average, DaVita employees received Cash LTI payments of $237 in 2019 compared to over $46,000 in 2020.  From 2015 to 2018, the relevant period determining Cash LTI payouts for 2019, DaVita's U.S. Dialysis and Lab Adjusted Operating Income declined from $1.76 billion to $1.68 billion.  In 2019, Adjusted Operating

(continued on next page . . .)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

payment amount not explained by his limited controls to the alleged conduct, in fact these payments were significantly lower due to DaVita not hitting specific performance goals for its dialysis business.

163.    Specifically, DaVita set targets for its Cash LTI payments based on the "compound annual growth rate […] in Dialysis & Lab Operating Income (OI)" over the previous three years.[359]  Between 2015 and 2018—the relevant period to determine the value of Cash LTI payments in 2019—DaVita's U.S. Dialysis Adjusted Operating Income declined, missing the targeted "performance goals" such that employees did not receive the Cash LTI they had been granted previously.[360]  In **Exhibit 29,** I show how Dr. Starr's results are affected by the omission of the relevant firm performance measures that determined the value of these Cash LTI payments for DaVita employees.  For this test, I apply Dr. Starr's model to total compensation less stock payments (i.e., base salary, bonus payments, and Cash LTI payments) for DaVita specifically.  The first column in the exhibit shows the results of Dr. Starr's model making no other changes.  In the second column I include two additional controls: (i) an indicator for DaVita U.S. Dialysis employees in 2015–2020 (i.e., the employees who were potentially eligible for Cash LTI payments) and, for these employees and years, (ii) the three-year growth rate of DaVita's U.S. Dialysis Adjusted Operating Income.  As the results of this exhibit show, when I include these additional controls to account for how Cash LTI payments changed over time, Dr. Starr's model no longer finds a statistically significant "wage suppression" for DaVita employees.

---

Income increased again to $1.93 billion, leading to larger payouts in 2020 (DaVita Inc. 10-K, 2017 Annual Report, p. 79; DaVita Inc. 10-K, 2018 Annual Report, p. 79; DaVita Inc. 10-K, 2019 Annual Report, p. 57).

[359] DVA_OMCEAL_000926457–6467 at 6460; DVA_OMCEAL_000683921–3930 at 3930.

[360] See, for example, ████████████████████████████████████ (DVA_OMCEAL_000929239–9248, at 9239, 9248).  DaVita's 2018 U.S. Dialysis operating income was $1.68 Billion (DaVita Inc. 10-K, 2018 Annual Report, p. 79).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 29**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION LIMITED TO DAVITA**
**ON CORRECTED DATA**
**TOTAL COMPENSATION LESS STOCK PAYMENTS**
**INCLUDING DAVITA SPECIFIC FIRM PERFORMANCE CONTROLS**

| Statistic | Dr. Starr's Model | Including Adjusted OI 2015-2020 | Including Adjusted OI Before G&A 2015-2020 |
|---|---|---|---|
| [a] | [b] | [c] | [d] |
| DaVita Conduct | -0.0437* | -0.0116 | -0.0180 |
|   % Wage Suppression | **-4.3%** | -- | -- |
|  | (0.0122) | (0.0127) | (0.0126) |
| 2015-2020 U.S. Dialysis Employees Indicator |  | 0.0496* | 0.0520* |
|  |  | (0.0124) | (0.0137) |
| 3-Year Growth Rate of Dialysis Adjusted OI |  | 0.0115* |  |
|   For 2015-2020 U.S. Dialysis Employees |  | (0.0012) |  |
| 3-Year Growth Rate of Dialysis Adjusted OI Before G&A Expenses |  |  | 0.0114* |
|   For 2015-2020 U.S. Dialysis Employees |  |  | (0.0015) |
| Observations | 13,451 | 13,451 | 13,451 |
| Included Employees | 2,598 | 2,598 | 2,598 |
| R-squared | 0.8649 | 0.8698 | 0.8690 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

164.     Dr. Starr argues that "controlling for company performance" would be a "bad control" as total compensation may be "an input to company performance (depending on the measure used)."[361] Although Dr. Starr has done no analysis to show that the alleged conduct in fact impacted any measure of firm performance, to address this concern I include an additional test in **Exhibit 29** above. In the last column of this exhibit, I adjust the control for DaVita's U.S. Dialysis Adjusted Operating Income to now exclude general and administrative expenses, which include the labor costs of relevant employees.[362] That is, by making this adjustment, I ensure that the changes in operating income I measure are not due to changes in the cost of labor for the relevant employees. With this adjustment, I

---

[361] Starr Report, ¶123(f), footnote 415.

[362] See DaVita Inc. 10-K, 2018 Annual Report, p. 81.

119

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

continue to find that Dr. Starr's model no longer finds a statistically significant "wage suppression" for DaVita employees.

165.     While this test illustrates the impact of omitted firm performance controls for a specific type of variable compensation offered by one of the Defendants, this issue permeates Dr. Starr's analysis across all three Defendants.  All three Defendants offered variable compensation to relevant employees, which were, at least in part, determined by that firm's own performance.  Dr. Starr makes no attempt to model changes in compensation due to any of these firm specific factors—which would vary by Defendant, the different types of variable compensation, and time as the example of DaVita's cash LTI program I describe above shows.  This omission impacts all of the models Dr. Starr has put forward including variable compensation.

### 4. Dr. Starr's "Wage Suppression" Regression Model Cannot Account for the Variation in Timing for Long-Term Incentive Payments

166.     Dr. Starr's inclusion of long-term incentive *payments* (rather than grants) introduces a timing issue into his regression analysis, which Dr. Starr does not account for.  Dr. Starr's "stock compensation" measure is associated with the wrong year because he only looks at the payments, which can occur years after when Defendants made and implemented their compensation decisions for proposed class members.  This timing issue biases Dr. Starr's total compensation regression results, which include these equity payments.  In all of his models including "stock compensation," Dr. Starr does not account for this timing issue nor do his models account for changes in the value of these grants over time due to factors outside of Defendants' compensation setting process, for example, changes in stock prices over multiple years which can impact both the value of the payment itself and the employee's behavior (e.g., if they decide to "exercise" vested stock options on a certain date because of gains in the underlying stock price).[363]

167.     Because Dr. Starr analyzes only long-term incentive payments, the "stock compensation" Dr. Starr includes in his regression is measured in the year an employee received vested RSUs or unilaterally chose to exercise their vested stock options.[364]  This employee decision happens after the

---

[363] Dr. Starr testified that the expected value of equity grants was "entirely zero before the vesting period," assuming that employees (and firms) place *no value* on unvested equity (Starr Deposition, 368:7–369:8).

Dr. Starr's assertion contradicts how the Defendants calculated expected values for stock grants and options prior to vesting.  For example, DaVita's 2013 10-K accounted for "$134.7 million in total estimated but unrecognized long-term incentive compensation for LTIP awards outstanding, including $89.4 million for nonvested stock-based awards under [their] equity compensation and stock purchase plans" (DaVita Inc. 10-K, 2013 Annual Report, p. 98).

[364] Stock options include non-qualified stock options ("NQs") and Stock Appreciation Rights ("SARs").

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

company's decision to grant stock compensation, often by several years. For the question at issue— whether or not Defendants suppressed compensation for proposed class members—one would need to compare the pay decisions Defendants actually made to those they would have made but-for the alleged conduct *during* the proposed class period. However, Dr. Starr's model of total compensation including these long-term incentives conflates this comparison by (i) attributing lower "stock compensation" in the early proposed class period to the conduct, when that compensation was granted *before* the proposed class period, and (ii) misattributing higher "stock compensation" after the proposed class period to after the end of the conduct, when that compensation was granted *during* the proposed class period.

168. For Dr. Starr's "stock compensation" measure, there is a difference of multiple months (and usually a difference of multiple years) between the following events:

- First, the time at which equity was *granted* to an employee (i.e., stock grants). That is, the time at which the company made a compensation decision. This reflects the company's choice regarding the given employee's equity compensation.

- Second, the time at which an employee either received vested RSUs or *chose* to exercise their right to vested options (i.e., stock earnings).[365] This is the measure included in Dr. Starr's regression analysis. The value and timing of these earnings would depend not only on the initial grant decision made by the firm but the associated vesting schedule, changes in the underlying stock price, and the individual employee's choice.

Dr. Starr does not account for any of these other factors, including stock price changes over time, which can explain some of the fluctuations in his total compensation measure over time, or an employee's decision (not) to exercise their vested options in a given year.

169. In **Exhibit 30** below, I show an example of proposed DaVita class member ███████████ who received a stock option grant before the proposed class period. ███████████ was granted stock options by DaVita in August 2006. At the time of the grant, DaVita's stock price (the blue line) was trading at $24.51. Each stock option had a corresponding strike price of ██████ (the orange line). Once the options vested, and ███████████ decided to exercise his rights to the options, he would receive the difference between the current DaVita stock price and this strike price.[366] In August of 2009, during the proposed class period, ███████████ decided to exercise his rights to ██████ options. Because DaVita's stock price only increased by $1.10 during the financial crisis, ███████████ only received ██████ (or



---

[365] In most instances, if an employee leaves the company before equity vests, he or she will forfeit the right to the underlying stock. For this reason, stock grants are a "retention" tool (see Starr Report, ¶49).

[366] ███████████ would receive no payout if the stock price declined.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

███ for each of the ███ options he exercised). Dr. Starr considers this as part of ███ *proposed class period* stock earnings. Dr. Starr ignores that DaVita made the compensation decision in 2006, two years *before* the alleged conduct period. In addition, his model lacks any explanatory factors which could account for the (modest) stock price change between 2006 and 2009—a period which was affected by the financial crisis—or ███' decision to exercise the options in 2009.

**EXHIBIT 30**
**EXAMPLE OF THE EXERCISE OF STOCK OPTIONS**
**BY DAVITA PROPOSED CLASS MEMBER ███**
**JANUARY 1, 2006 – DECEMBER 31, 2009**



Notes: Grant ID DVA11390.

Source: DaVita Grant Recap Data (DVA_OMCEAL_001408533, DVA_OMCEAL_001408536, DVA_OMCEAL_001408539, DVA_OMCEAL_001408542, DVA_OMCEAL_001408543, DVA_OMCEAL_001408547); Investing.com, "DaVita Healthcare Partners Inc.," https://www.investing.com/equities/davita-inc.

170.     In **Exhibit 31** I show an example of proposed class member ███, who was granted ███ stock options by DaVita in May of 2018, during the proposed class period. At the time of the grant, DaVita's stock price (the blue line) was trading at $66.29. In May of 2022, two and a half years after the end of the proposed class period, ███ decided to exercise ███ options. Because

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

DaVita's stock price increased by about 50 percent, ███████████ received ████████ per option (and ███████████ total) in May of 2022.[367]  Dr. Starr considers the ████████ for Mr. Gregory in 2022 as *post-period* stock earnings, ignoring that ██████████████ benefited from a compensation decision made by DaVita in 2018, *during* the proposed class period.  In addition, Dr. Starr's model lacks any explanatory factors which could account for the (sizeable) stock price increase between 2018 and 2022 or ██ ██████████ decision to exercise 2,816 stock options in May of 2022.

---

[367] ████████ [Stock Earnings] = ██████ [Options Exercised] x ████████ [Stock Price Appreciation].

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 31**
**EXAMPLE OF THE EXERCISE OF STOCK OPTIONS**
**BY PROPOSED CLASS MEMBER** ▮▮▮▮▮▮▮
**JANUARY 1, 2018 – DECEMBER 31, 2022**



Notes: Grant ID DVA16431. ▮▮▮▮▮▮ previously exercised ▮▮▮▮ of his options in May of 2021 (when DaVita's stock price was trading even higher at $125.41).

Source: DaVita Grant Recap Data (DVA_OMCEAL_001408533, DVA_OMCEAL_001408536, DVA_OMCEAL_001408539, DVA_OMCEAL_001408542, DVA_OMCEAL_001408543, DVA_OMCEAL_001408547); Investing.com, "DaVita Healthcare Partners Inc.," https://www.investing.com/equities/davita-inc.

171.    Dr. Starr's regression on total compensation also misattributes stock compensation for proposed class members that worked at SCA granted *during* the proposed class period to earnings *after* the proposed class period.  For example, ▮▮▮▮▮▮, a Vice President of Operations at SCA, received a grant for ▮▮▮ RSUs in March 2017.[368]  The RSUs were scheduled to vest in ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.  After SCA was acquired by Optum (a subsidiary of UnitedHealth)

---

[368] SCA002246316 (Grant ID OP917047).

124

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

in 2017, ▮▮▮▮▮▮▮ RSUs were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[369]  In March of 2021, ▮▮▮ ▮▮▮▮▮▮ received a payment of ▮▮▮▮▮▮ for his RSUs granted in 2017, which Dr. Starr's regression analysis erroneously attributes to compensation after the proposed class period.[370]

172.    The timing issue I illustrate above, where Dr. Starr misattributes stock earnings to the post-period for compensation decision *during* the proposed class period, is pervasive.  Dr. Starr identifies ▮▮▮▮▮▮▮▮▮▮▮ of DaVita stock earnings *after* the proposed class period ▮▮▮▮▮▮▮▮▮▮▮▮ in 2020, ▮▮▮▮▮ ▮▮▮▮▮ in 2021, and ▮▮▮▮▮▮▮▮▮ in 2022).  However, all but ▮▮▮▮▮▮▮▮▮ (over ▮▮▮▮▮▮▮▮▮) of stock earnings Dr. Starr attributes to the *post-period* were originally granted during the proposed class period.  That is, Dr. Starr attributes to the *post-period* financial gains for proposed class members based on compensation decisions (i.e., stock grants) DaVita made *during* the proposed class period.

173.    Dr. Starr's erroneous use of stock earnings measured at the time of payment biases his regression towards finding larger wage suppression effects because the returns on DaVita's stock price were smaller during the proposed class period.  Because Dr. Starr does not attempt to control for these differences in firm performance over time, his estimate of the effect of the conduct captures not only the purported difference between the actual and but-for compensation of employees, but also the comparatively lower returns on DaVita's stock price during the proposed class period.  This issue is demonstrated in **Exhibit 32** which shows the average stock earnings of relevant DaVita employees (in the light blue bars) and the average Cash LTI earnings (in the darker blue bars).  The percentage return on DaVita's stock price over a three-year period is shown in the red line.[371]  For example, this line shows that as of Q1 of 2022, DaVita's stock had increased 103 percent over Q1 of 2019.[372]



---

[369] SCA000108278–8279, at 8278.  ("Effective March 27, 2017, outstanding Surgical Care Affiliates ('SCA') equity incentive awards will become equity incentive awards that upon vesting or exercise, as applicable, will be settled in common stock of UnitedHealth Group.  The conversion formula specified in the merger agreement resulted in a conversion ratio of ▮▮▮▮▮, which will be applied to all outstanding equity awards.")

[370] Starr turnover.  The payment associated with Mr. Brown's grant is identified by the "Document No." RSU7047."  From March 2017 to March 2021, UnitedHealth's stock price appreciated from $168 to $357 (stock prices from Investing.com, ticker symbol "UNH").

[371] DaVita ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (DVA_OMCEAL_001332734–2774, at 2760).  The average time between grant and exercise for stock payments to DaVita class members is ▮▮▮▮▮▮.

[372] I show the three-year return on DaVita's stock price in **Exhibit 32** because the average time between grants and payments for proposed DaVita class members' equity was 3.3 years.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 32**
**RELEVANT DAVITA EMPLOYEES**
**ANNUAL AVERAGE STOCK AND LONG-TERM CASH INCENTIVE PAYMENTS**
**COMPARED TO DAVITA STOCK PRICE RETURNS**
**2005 – 2022**



Notes: The "Return on DVA Stock over 3 Years" measures the percentage return between the average DaVita Stock Price in Q1 of this year and the average in Q1 three years ago. Vertical lines indicate the start and end of the proposed class period.

Sources: Starr turnover (Corrected Data); Investing.com, "DaVita Healthcare Partners Inc.," https://www.investing.com/equities/davita-inc.

174.     As this exhibit shows, stock and long-term cash incentive earnings are correlated with the stock price return over multiple years:[373]

- The three-year stock price returns before the proposed class period from 2005–2007 were high (between 89 and 282 percent) and correspondingly, the average stock earnings for relevant DaVita employees were also high (see the blue bars), in part because employees have an incentive to exercise their stock options when stock prices have increased in value.

---

[373] Note that the blue bars (stock and Cash LTI payments) as well as the red line (the return on DVA Stock over three years) in **Exhibit 32** follow a similar pattern.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- The three-year stock price returns in the early part of the proposed class period, which coincides with the financial crisis were lower, and thus, "stock earnings" of proposed class members—many of whom received stock grants *before* the proposed class period—were lower than the proceeding period.

- Both the returns on DaVita's stock price and the stock earnings (as well as the long-term cash incentive earnings) were lower towards the end of the proposed class period.

175.    DaVita's stock price returns increased again after the proposed class period, corresponding with higher stock earnings of proposed class members in and after 2020, as they profited from the stock grants DaVita distributed during the proposed class period.  That is, Dr. Starr both misattributes (i) the lower earnings of proposed class members in the proposed class period due to lower stock price returns to the effect of the alleged conduct, and (ii) the higher earnings of proposed class members in the post-period to the end of the alleged conspiracy period, even though proposed class members in this period gained from stock grants received *during* the proposed class period.

176.    As the testing in this section shows, Dr. Starr's "wage suppression" model (i) fails to find "wage suppression" on base salary, (ii) fails to find "wage suppression" on certain types of variable compensation when firm specific performance measures are included in his model, and (iii) uses long-term incentive payment data that creates a timing issue within his model, which renders any estimate of purported "wage suppression" on long-term incentive compensation unreliable.  Put simply, Dr. Starr's "wage suppression" model cannot reliably model relevant employees' total compensation and cannot be used show antitrust impact or be used to calculate damages from the alleged conduct.

## IX.    DR. STARR'S DAMAGES CALCULATION IS UNRELIABLE AND IS BASED ENTIRELY ON HIS UNRELIABLE "WAGE SUPPRESSION" REGRESSION MODEL

177.    Dr. Starr's calculation of damages is entirely based on his flawed "wage suppression" regression model, which, as I describe above, cannot be used to reliably calculate damages for the proposed class.  For example, after making only the data corrections I describe above in Section VIII.B, Dr. Starr's damages estimate declines by approximately 20 percent.  Further, Dr. Starr's "wage suppression" regression suffers from several fundamental flaws:

- The results of Dr. Starr's own "robustness checks" and my additional testing show the sensitivity of his model to different regression model specifications.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Statistical testing disproves the fundamental assumption of Dr. Starr's model that with the exception of the alleged conduct, economic factors affected compensation in the same way in both the benchmark and proposed class periods.

- After correcting Dr. Starr's data errors, his own model no longer finds statistically significant "wage suppression" for all Defendants for base salary.

- Dr. Starr's regression model does not account for changes in firm performance that impacts variable compensation levels. As my testing shows, Dr. Starr's "wage suppression" model fails to find "wage suppression" when firm specific performance measures are included in his model.

- Moreover, by including equity payments (rather than grants) in his regression, Dr. Starr (i) incorrectly attributes stock payments granted prior to the alleged conduct to his damages, and (ii) incorrectly ignores proposed class members' stock payments after the conduct period that were granted during the conduct period.

Taken together, Dr. Starr's "wage suppression" regression cannot reliably estimate the effect of the alleged conduct (either in total or separately for the alleged mobility restrictions or the alleged information sharing) and therefore cannot be used to estimate damages to the proposed class caused by the alleged conduct. Below, I discuss other reasons why Dr. Starr's damages calculations are unreliable.

### A. Dr. Starr's Damages Calculation Depends on the Defined Class Period

178. The period in which the conduct at issue has been alleged has changed over time. While Dr. Starr and Dr. Gerhart assess the period from May 1, 2008 to December 31, 2019 for DaVita and SCA employees and the period from May 1, 2010 to December 31, 2019 for USPI employees,[374] previously the conduct was alleged to have taken place over different periods:

- In the Third Amended Complaint (the operative complaint), Plaintiffs alleged a proposed class period of May 2008 to January 2021 for DaVita and SCA and May 2010 to January 2021 for USPI.[375]

---

[374] Starr Report, ¶9; Gerhart Report, ¶5.

[375] Complaint, ¶92.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Previously, in the Second Amended Complaint, Plaintiffs alleged a proposed class period of May 1, 2010 to January 5, 2021 for SCA and USPI and May 1, 2010 to January 5, 2021 for DaVita.[376]

- The now-dismissed indictments against SCA and DaVita alleged a conduct period of May 2010 to October 2017 for SCA and USPI and February 2012 to July 2017 for DaVita.[377]

179.     Dr. Starr offered the opinion that the qualitative evidence he reviewed was "consistent" with the timing of the alleged conduct he assessed within his report."[378]  However, as I describe above in Sections VI.B and VII.A, Plaintiffs' experts ignore evidence counter to their assumed start and end date of the alleged conduct.  For example,

- Andrew Hayek (SCA) testified that the alleged mobility restrictions between DaVita and SCA did not begin until 2012.[379]

- As Dr. Starr states, "USPI appears to have ceased actively enforcing its end of the No-Poach Agreement in late 2017."[380]

- Andrew Hayek (SCA) and Anthony Kilgore (SCA) testified that the alleged mobility restrictions between SCA and DaVita as well as between SCA and USPI ended in 2017.[381]

---

[376] Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, June 6, 2023, ¶101.  Plaintiffs allege the same proposed class period in their Consolidated Amended Class Complaint (see Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, August 9, 2021, ¶101).

[377] Indictment, *United States v. Surgical Care Affiliates, LLC* (N.D. Tex.), January 5, 2021, ¶9 ("Beginning at least as early as May 2010 and continuing until at least as late as October 2017" SCA and USPI "entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees"), ¶17 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017" SCA and DaVita "entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees"); Indictment, *United States v. DaVita Inc., et al.* (D. Colo.), July 14, 2021, ¶9 ("Beginning at least as early as February 2012 and continuing until at least as late as July 2017" DaVita and Kent Thiry "entered into and engaged in a conspiracy with SCA to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.").  See also, Complaint, ¶¶2–6.

[378] For example, Starr Deposition, 59:2–60:8, 69:17–70:1 (on the start and end of the alleged mobility restrictions involving DaVita and SCA); 68:19–69:9, 73:1–15 (on the start and end of the alleged mobility restrictions involving SCA and USPI).

[379] Hayek Deposition, 165:21–166:24.

[380] Starr Report, ¶80, footnote 311.

[381] Hayek Deposition, 189:23–190:22, 328:17–330:8; Kilgore Deposition, 67:11–68:13.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Plaintiffs' experts point to merit budget information being shared or discussed: (i) in only certain years between 2009 and either 2012 or 2013 for DaVita and SCA and (ii) in only certain years between 2009 and 2014 for SCA and USPI.

Dr. Starr further testified that the "quantitative evidence" he presents in his Figure 3 is "consistent with an end date of 2019."[382]  However, as I describe above, the results of Dr. Starr's mobility analysis are tied to the base year he selects and do not support his conclusion that the "quantitative evidence" is "consistent" with the alleged mobility restrictions ending in December 2019.

180.     When I test the results of Dr. Starr's "wage suppression" model applied to the different periods in which the conduct at issue has been alleged, I find substantially different results.  That is, the volume of damages Dr. Starr calculates depends on the proposed class period he assesses, which is not "consistent" with the available evidence.  I summarize the results of this test in **Exhibit 33**.  In the first column, I show the results of Dr. Starr's analysis on corrected data.  In the subsequent columns, I show the results of Dr. Starr's analysis applied to the alleged conduct period according to the (i) Third Amended Complaint, (ii) Second Amended Complaint, and (iii) DOJ indictments.[383]

---

[382] Starr Deposition, 241:13–242:6.  See also, Starr Report, ¶118.

[383] The following dates are used to define the "Conduct" indicator:
- Column [b] 2008-2019 (DaVita), 2008-2019 (SCA), 2010-2019 (USPI).
- Column [c] 2008-2020 (DaVita), 2008-2020 (SCA), 2010-2020 (USPI).
- Column [d] 2012-2020 (DaVita), 2010-2020 (SCA), 2010-2020 (USPI).
- Column [e] 2012-2017 (DaVita), 2010-2017 (SCA), 2010-2017 (USPI).

130

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT 33**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION AND DAMAGES CALCULATION**
**ON CORRECTED DATA**
**APPLIED TO DIFFERENT CLASS PERIODS**

| Statistic | Dr. Starr's Period of Analysis | Third Amended Complaint | Second Amended Complaint | DOJ Indictments |
|---|---|---|---|---|
| [a] | [b] | [c] | [d] | [e] |
| Pooled Conduct | -0.1198* | -0.0805* | 0.0370* | 0.0508* |
| % Wage Suppression | -11.3% | -7.7% | -- | -- |
| | (0.0102) | (0.0092) | (0.0093) | (0.0059) |
| | | | | |
| DaVita Conduct | -0.1742* | -0.1080* | 0.0490* | 0.0992* |
| % Wage Suppression | -16.0% | -10.2% | -- | -- |
| | (0.0140) | (0.0116) | (0.0119) | (0.0096) |
| SCA Conduct | -0.1095* | -0.0869* | 0.0137 | -0.0218* |
| % Wage Suppression | -10.4% | -8.3% | -- | -2.2% |
| | (0.0170) | (0.0164) | (0.0119) | (0.0103) |
| USPI Conduct | -0.0748* | -0.0476* | 0.0220 | 0.0105 |
| % Wage Suppression | -7.2% | -4.6% | -- | -- |
| | (0.0112) | (0.0116) | (0.0116) | (0.0081) |
| | | | | |
| Observations | 26,863 | 26,863 | 26,863 | 26,863 |
| Included Employees | 5,103 | 5,103 | 5,103 | 5,103 |
| R-squared | 0.8763 | 0.8753 | 0.8747 | 0.8763 |
| **Total Damages (Millions)** | **$697.6** | **$493.9** | **$0.0** | **$10.5** |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

I follow Dr. Starr's method for calculating damages in partial years by prorating the total compensation for relevant employees in that year based on the number of months included in the alleged conduct period.

Source: Starr turnover (Corrected Data).

181. As this exhibit shows, when I apply Dr. Starr's own "wage suppression" model to the different periods the conduct has been alleged to span, I find a wide range of estimated damages—from $0 if the dates in the Second Amended Complaint are used to almost $700 million for the dates Dr. Starr uses for his analysis. I note that Dr. Starr's analysis applied to the time period outlined in the Third Amended Complaint estimates damages approximately 30 percent lower than for the period he studies, even though the period alleged by Plaintiffs in the operative Complaint is *longer* than the period Dr. Starr studies. That is, the results of Dr. Starr's "wage suppression" regression (and damages analysis) vary significantly depending on the definition of the proposed class period. When applied to the dates Dr.

131

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Starr studies—which are contradicted by evidence Dr. Starr ignored—his analysis finds the largest damages across all of these potential proposed class periods definitions.[384]

### B. Dr. Starr's Damages Calculation Depends on His Identification of Relevant Employees

182.     Dr. Starr testified that senior officers, which he defined as "C-suite" employees, were excluded from the proposed class as "they would have been in the know about these agreements and part of the enforcement mechanisms."[385]  However, Dr. Starr includes a number of these "C-suite" employees in his analysis (and damages calculation).  For example, Dr. Starr includes the CEOs of two of the Defendants in his damages calculation (Andrew Hayek and Anthony Kilgore of SCA, William Wilcox and Brett Brodnax of USPI) *when they held* the title CEO—calculating a total of ▮▮▮▮▮ in damages for these individuals.  That is, despite testifying that "CEOs are the most obvious" to exclude from the proposed class "because they were the ones who coordinated and, and enforced the no-poach agreements,"[386] Dr. Starr includes these employees in his calculation of damages to the proposed class.

183.     Further, both of Plaintiffs' experts cite examples of other senior employees (not within the "C-suite") discussing the alleged conduct.  That is, Plaintiffs' experts' documentary narrative would suggest that certain proposed class members were aware of the agreements and also perpetuated the alleged conduct.  For example, Dr. Starr calculates: [387]

- ▮▮▮▮▮▮ for Javier Rodriguez between 2008 to 2011, when he was a Senior Vice President at DaVita.[388]

[384] Further, for the purposes of his "wage suppression" regression, Dr. Starr assumes an instantaneous effect of the alleged conduct even though  the mechanisms by which the alleged conduct would impact compensation would take time.  For example, as Dr. Starr testified, the alleged mobility restrictions did not limit mobility in the early part of the proposed class period (Starr Deposition, 202:3–14).  In addition, the alleged information sharing of merit budgets would impact compensation *after* a merit cycle, which the Defendants planned for in the prior year (Starr Deposition, 96:7–12).

[385] Starr Deposition, 118:12–18, 119:16–120:4.

[386] Starr Deposition, 119:16–120:4.

[387] Damages are calculated using Dr. Starr's turnover for his Figure 8.

[388] According to Dr. Starr, Mr. Rodriguez was involved in monitoring and enforcing the alleged agreements (Starr Report, ¶72(a), footnote 139, citing DVA_OMCEAL_000658781 (Exhibit PX333)).  According to Dr. Starr, Mr. Rodriguez and Mr. Hayek also communicated about the alleged information sharing (Starr Report, ¶100(a), (b), (f), citing Hayek Deposition at 369:11–24, Rucker Deposition at 234:20–25, 255:10–256:21).

- ████████████████████ for Brian Mathis between 2009 to 2016, when he was a Vice President of Strategy, Group Vice President, and Senior Vice President at SCA.[389]

- ████████████████████ for Robert Finnegan between 2016 and 2018, when he was a Senior Vice President of Development at USPI.[390]

Dr. Starr and Dr. Gerhart do not address why employees would take part in a conspiracy to suppress their own compensation. It is illogical that individuals would have acted to suppress their own pay, yet that is exactly what Dr. Starr assumes. Dr. Starr does not provide a methodology for identifying employees that "would have been in the know about" the alleged conduct "and part of the enforcement mechanisms" nor does he exclude these employees from his calculation of damages.

## X.    DR. STARR'S CONCLUSION THAT "DEFENDANTS WIELD MARKET POWER" IGNORES WELL-ESTABLISHED METHODS USED BY ECONOMISTS TO ASSESS MARKET POWER AND IS REFUTED BY AVAILABLE EVIDENCE

184.    Dr. Starr concludes that the "evidence of wage suppression" he purports to find with his regression model standing alone "demonstrates that Defendants wield market power over Class Members."[391] Monopsony power (i.e., market power for buyers) in labor markets is defined as a firm's ability to pay compensation below the level "that would prevail in a competitive market" for a sustained period of time.[392] As Dr. Starr argues, "Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members."[393] As a threshold matter, given that the only evidence Dr. Starr uses to support his conclusion that "Defendants wield market power" is his wage suppression regression, all of the flaws that render his "wage suppression" model unreliable undermine its use as "direct proof of Defendants' market power."[394]

185.    Dr. Starr fails to consider any of the other types of analytical methods or approaches economists use to support a conclusion of monopsony power in labor markets. First, Dr. Starr does not assess the

---

[389] Dr. Starr cites Mr. Mathis' testimony with respect to the alleged information sharing between DaVita and SCA (Starr Report, ¶100(d), citing Mathis Deposition at 53:14–56:20). Dr. Starr also cites emails between Mr. Mathis and Mark Kopser (USPI), which Dr. Starr claims included exchanges of wage information (Starr Report, ¶101(h), (i), citing OMC_BM_000010778 (Exhibit PX523) and OMC_BM_000014759 (Exhibit PX489)).

[390] According to Dr. Starr, ████████████████████████████████████████ ████████████████████ (Starr Report, ¶77(e), citing DOJCIV-007-00000118).

[391] Starr Report, ¶196.

[392] Pindyck and Rubinfeld, p. 382.

[393] Starr Report, ¶196.

[394] Starr Report, ¶196. While he discussed other types of evidence in his deposition, Dr. Starr testified that his "wage suppression" regression was his "primary evidence" of market power (Starr Deposition, 266:5–267:19).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

competition Defendants face for the labor of relevant employees. A relevant antitrust labor market represents the area of effective competition within which a set of firms actively compete for the services of workers. As the DOJ and FTC Merger Guidelines state:[395]

> "When defining a market for labor the Agencies will consider the job opportunities available to workers who supply a relevant type of labor service, where worker choice among jobs or between geographic areas is the analog of consumer choices among products and regions when defining a product market."

Dr. Starr presents no such assessment of the "job opportunities available to workers" either in terms of the types of jobs available to that worker at rival employers or their geographic location. An economist can apply a series of (qualitative and/or quantitative) tools to analyze worker substitution possibilities that may constrain the ability of firms to suppress wages.[396] Other than simply pointing to the results of his flawed regression analysis, Dr. Starr fails to apply any of the other analytical tools and methods used by economists to determine the scope of competition for employees.

186. Dr. Starr further does not address that these other types of evidence contradict his conclusion with respect to Defendants' "market power." For example, Dr. Starr ignores the "practical indicia" of the scope of labor market competition for relevant employees.[397] Dr. Starr fails to provide a meaningful economic explanation for how the Defendants could exert market power to suppress wages by 14.5 percent, in aggregate, given that:

- Both of Plaintiffs' experts agree that the other firms that relevant employees move to or come from would be "labor market competitors" for the Defendants.[398] As I describe in detail in Section V, the Defendants' data, data tracked by Lightcast, and available evidence such as Defendants' recruiting lists indicate competition with numerous non-Defendant firms—none of which Dr. Starr assesses.

---

[395] 2023 Merger Guidelines, §4.3.

[396] 2023 Merger Guidelines, §4.3. For example, Dr. Starr does not define a relevant labor market nor does he use any of the tools economists would use to do so such as the "Hypothetical Monopsonist Test," which is a framework used to analyze whether a single hypothetical employer (monopsonist) could profitably reduce compensation below competitive levels by a small but significant and non-transitory amount (typically 5–10 percent) without losing too many workers (2023 Merger Guidelines, §4.3(A)).

[397] As the Merger Guidelines describe, a "relevant market can be identified from evidence on observed market characteristics ('practical indicia'), such as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors" (2023 Merger Guidelines, §4.3).

[398] Starr Deposition, 147:4–15 ("Let me put it in my own words, so to maybe by example. So if DaVita wants to hire a director from company E, then I would say – and they do so, I would say that DaVita and company E are labor market competitors for that worker"). See also, Gerhart Deposition, 51:5–15, 52:8–21.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

- Plaintiffs' experts do not assess indirect evidence, such as labor market shares and barriers to entry (for potentially competing employers), to determine whether market power is likely.[399] Dr. Starr provides no explanation for how the Defendants could exert market power given their relatively small share of employment in just the Other Outpatient Care Centers industry (approximately 17 percent) and the Healthcare sector (less than 1 percent)—which would not account for competing employers outside of the healthcare sector.[400]

187.    Further, competition for relevant employees may vary by geographic area depending on the job and preferences of individual employees.[401]  As the Merger Guidelines state, "[g]eographic market definition may involve considering workers' willingness or ability to commute."[402]  Dr. Starr simply assumes all employees would be within the same national geographic market without addressing the substantial geographic dispersion of Defendants' operations.[403]  As Dr. Starr acknowledges, the Defendants' "regional business offices and corporate headquarters" are located in different states, which may impact compensation levels across relevant employees.[404]  However, Dr. Starr does not assess how labor market competition might vary for these employees across geographies.[405]  For example, in 2017,

---

[399] See Pindyck and Rubinfeld, p. 387 ("When the number of buyers is very large, no single buyer can have much influence over price").

See also, Jonathan Baker, *Market Definition: An Analytical Overview,* Antitrust Law Journal, Vol. 74, No. 1, 2007, p. 130. (Information on market participants "is commonly used, among other things, to compute statistics about the size distribution of firms, usually in the form of market shares, from which inferences about market power and likely anticompetitive effect may be made"); Davis and Garces, pp. 191–2 ("However, market shares can be a misleading proxy for what we are actually trying to measure: substitution patterns between goods").

[400] As I noted above, these calculations are based on Dr. Gerhart's selected industry codes.  I do not agree that either of these industries represents the relevant antitrust labor market.

[401] For example, the named Plaintiffs testified that they were unwilling to relocate at certain points in time due to geographic preference ▮▮▮▮▮▮▮▮▮▮.  See, e.g., Spradling Deposition, 196:4–14 ("[My wife] wouldn't consider going south.  Q. And why was that?  A. Just comfort desire with climate, that kind of thing"); Keech Deposition, 186:22–187:3 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[402] 2023 Merger Guidelines, §4.3.

[403] In **Appendix L-1**, I summarize relevant employees' geographic locations across time.

[404] Starr Report, ¶16, Section IV.C.2 ("DaVita is based in Denver, Colorado. […]  SCA's main offices are in Birmingham, Alabama and Deerfield, Illinois. […] USPI's main office is in Dallas, Texas."), ¶120(a) ("the Defendant firms do seem to take into account geography when determining compensation").

[405] In addition, Dr. Starr does not test whether his assumed "wage structure" mechanism implies that any wage suppression in one region (due to the alleged lack of offers from another "Covered Defendant") would lead to "indirect" impact (through compensation adjustments "cascading" across employees) across regions.

135

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

over 60 percent of proposed USPI class members were located in Texas (in/or around USPI's Dallas headquarters), while less than 10 percent of proposed SCA class members worked in Texas at the same time.[406]  As Brian Mathis (SCA) testified, for "the most part USPI was hiring corporate roles in Dallas," while SCA was "hiring corporate roles in Birmingham.  Therefore [he] would not have seen us as competing for those types of roles."[407]  Dr. Starr does not test if his conclusion would hold to the extent Defendants recruit for specific roles within a given geographic region (or employees prefer to remain within that geographic region).

188.     In summary, Dr. Starr's conclusion of monopsony power does not hold.  Contrary to available evidence, Plaintiffs' experts do not assess the outside options available to relevant employees nor do they assess how competition for relevant employees varied by geography.  Dr. Starr's conclusion that "Defendants wield market power over class members" is refuted by the quantitative evidence on mobility and outside competition for proposed class members' labor (see Section V), entirely based on a flawed wage suppression model (see Section VIII), and unsupported by antitrust methods economists use to assess labor markets and monopsony power.

---

[406] Constraints due to moving costs and individual-specific geographical preferences may also apply to geographic distances between Defendants' operations *within* states, particularly large ones such as Texas or California.

[407] Mathis Deposition, 122:13–17.  The departure rates in Section V above are consistent with Mr. Mathis' observations and demonstrate that movements between SCA and USPI amounted to only a small fraction of hirings and departures at either Defendant.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

Dated this April 16, 2025 in Washington, DC.

_____
Dr. John H. Johnson, IV

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

## Appendix A.   DR. JOHNSON CV

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**



1111 19th Street NW
Washington, DC 20036
+1 202 559 4388
jjohnson@edgewortheconomics.com

April 2025

# John H. Johnson IV

### EDUCATION

Massachusetts Institute of Technology
PhD, Economics, 1999

University of Rochester
BA, *magna cum laude* with Highest Distinction in Economics, 1995
Phi Beta Kappa

### CURRENT EMPLOYMENT

Edgeworth Economics, Washington, DC
Chief Executive Officer, Partner, September 2009-present

McCourt School of Public Policy, Georgetown University, Washington, DC
Adjunct Professor, Fall 2022

### EMPLOYMENT HISTORY

Edgeworth Economics, Washington, DC
President, September 2009-December 2018

Georgetown University, Washington, DC
Affiliated Professor, Georgetown Public Policy Institute, 2008-2011

Criterion Economics, LLC, Washington, DC
President, March 2009-September 2009

NERA Economic Consulting, Washington, DC
Vice President, 2005-2009
Senior Consultant, 2003-2005
Consultant, 2001-2003

University of Illinois at Urbana-Champaign, Champaign, IL
Assistant Professor of Economics and of Labor & Industrial Relations, 1999-2001

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

## APPOINTMENTS

District of Columbia Board on Professional Responsibility
Hearing Committee Member, April 2023-present

National Archives Foundation
Board of Directors, March 2018-present

Appleseed Pro Bono Network
Board of Directors, June 2011-December 2018
Chair, Board of Directors, March 2016-March 2018
Chair-Elect, February 2015-February 2016
Chair of Nominating Committee, February 2013-January 2015

Antitrust Law Journal
Associate Editor, June 2011-May 2013
Assistant Editor, June 2010-May 2011

Hawaii Appleseed Center for Law and Economic Justice
Board of Directors, February 2013-January 2016

American Bar Association Antitrust Agriculture and Food Committee
Vice Chairman, June 2013-July 2014

## TEACHING EXPERIENCE

Georgetown University/McCourt School of Public Policy Courses
   o   Antitrust and Public Policy
   o   Masters in Public Policy: Thesis Research Seminar
   o   The Law and Economics of Labor Discrimination Public Policy

University of Illinois at Urbana-Champaign Courses
   o   Labor Problems
   o   Women in the Labor Market
   o   Graduate Labor Economics

LinkedIn Learning
   o   Data Analytics for Business Professionals

## AWARDS AND HONORS

Good Apple Award, Appleseed Foundation, September 2021
Finalist, Entrepreneur of the Year, Mid-Atlantic Region, Ernst & Young, 2017
Pro Bono Innovator Award, Appleseed Pro Bono Network, 2012
Pro Bono Practice Award Recipient, Akin Gump Strauss Hauer and Feld, 2012
Finalist, Competition Economist of the Year, Global Competition Review, 2012
**"Top Young Competition Economist," Global Competition Review, 2012**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

MEMBERSHIPS

Society of Human Resources Management
American Association for Public Opinion Research
American Economic Association
American Statistical Association
American Bar Association
- o Labor and Employment Section
- o Antitrust Section
Canadian Bar Association
International Association of Privacy Professionals
National Association of Forensic Economists
Society of Labor Economists

TESTIMONY AND EXPERT REPORTS
PRIOR FOUR YEARS

*Pamela Wimbish and Patricia Onken v. IBM, Inc.,* United States District Court, Southern District of New York.
Case No. 23 CV 08327
Expert Report, March 14, 2025.

*Giang Bui vs. Cargill Incorporated, Cargill Meat Solutions Corporation, Cargill Limited, JBS USA Food Company, Swift Beef Company, JBS Packerland Inc., JBS Canada ULC, Tyson Foods, Inc., Tyson Fresh Meats, Inc., and National Beef Packing Company, LLC*. Supreme Court of British Columbia.
File No. S221365
Affidavit, March 13, 2024.
Deposition, October 11, 2024.

*Xockets Inc. v. Nvidia Corporation, Microsoft Corporation, and RPX Corporation,* United States District Court for the Western District of Texas, Waco Division.
Case No. 6:24-CV-00453-LS
Declaration, October 9, 2024.

*In the Matter of the Arbitration Between National Football League Players Association v. National Football League*
Expert Report, January 19, 2024.
Deposition, March 8, 2024.
Expert Report, April 19, 2024.
Declaration, June 14, 2024.
Deposition, July 19, 2024.
Trial Testimony, August 6, 2024.

*In re: Generic Pharmaceuticals Pricing Antitrust Litigation,* United States District Court for the Eastern District of Pennsylvania
Case No. 2:16-MD-02724
In re: Clomipramine Cases, DPP Case: 16-CM-27241
Clomipramine Expert Report, February 2, 2024.
Deposition, April 24, 2024.
Reply Report, June 17, 2024.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

*In re: Generic Pharmaceuticals Pricing Antitrust Litigation,* United States District Court for the Eastern District of Pennsylvania
  Case No. 2:16-MD-02724
  In re: Clobetasol Cases, DPP Case: 16-CB-27241
  Clobetasol Expert Report, February 2, 2024.
  Deposition, April 24, 2024.
  Reply Report, June 17, 2024.
.
*In re: EpiPen Direct Purchaser Litigation*, United States District Court District of Minnesota
  Case No. 20-CV-00827-ECT-JFD
  Expert Report, June 1, 2023.
  Reply Report, July 5, 2023.
  Deposition, October 25, 2023.
  Expert Report, April 12, 2024.

*Jennifer Nosalek, Randy Hirschorn and Tracey Hirschorn, individually and on behalf of all others similarly situated, v. MLS Property Information Network, Inc., Anywhere Real Estate Inc. (f/k/a Realogy Holdings Corp.), Century 21 Real estate LLC, Coldwell Banker Real Estate LLC, Sotheby's International Realty Affiliates LLC, Better Homes and Gardens Real Estate LLC, Era Franchise Systems LLC, HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, RE/MAX LLC, Polzler & Schneider Holdings Corporation, Integra Enterprises Corporation, RE/MAX of New England Inc., RE/MAX Integrated Regions, LLC, and Keller Williams Realty, INC.,* United States District Court for The District of Massachusetts.
  Case No. 1:20-cv-12244-PBS
  Declaration with M. Kheyfets, March 26, 2024.

*The Icon at Panorama, LLC v. Southwest Regional Council of Carpenters, et al.,* United States District Court Central District of California,
  Case No. 2:19-cv-00181
  Expert Report, February 13, 2024.
  Deposition, March 18, 2024.

*State of Washington v. Tyson Foods, Inc. et al.,* State of Washington King County Superior Court.
  Case No. 21-2-14174-5 SEA.
  Expert Report, February 1, 2024.
  Deposition, March 14, 2024.

*Tarah Kye Borozny, et al. vs. RTX Corporation, Pratt & Whitney Division, et al.,* United States District Court, District of Connecticut
  Case No. 3:21-cv-1657 (SVN)
  Expert Report, January 29, 2024.
  Deposition, February 29, 2024.

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

*In re: Broiler Chicken Antitrust Litigation,* United States District Court for the Northern District of Illinois, Eastern Division
> Case No. 1:16-cv-08637
> Expert Report, January 22, 2021.
> Deposition, March 23-24, 2021.
> Supplemental Expert Report, May 20, 2021.
> Expert Report, February 21, 2022.
> Evidentiary Hearing, May 11, 2022.
> Deposition, June 30 – July 1, 2022.
> Supplemental Expert Report, August 11, 2023.
> Supplemental Expert Report, October 2, 2023.
> Supplemental Expert Report, February 2, 2024.
> Supplemental Expert Report, June 7, 2024.

*In re: Rail Freight Surcharge Antitrust Litigation (No. II),* United States District Court for the District of Columbia.
> MDL Docket No. 2925, Misc. No. 20-8 (BAH)
> *Environmental Protection & Improvement Company LLC v. Union Pacific Railroad Company, et al.,*
> Case No. 1:22-cv-02587.
> Expert Report, December 13, 2023.

*In re: Rail Freight Surcharge Antitrust Litigation (No. II),* United States District Court for the District of Columbia.
> MDL Docket No. 2925, Misc. No. 20-8 (BAH).
> Expert Report, *August 15, 2023.*
> Deposition, November 8, 2023.

*In re: Surescripts Antitrust Litigation,* United States District Court for the Northern District of Illinois
> Case No. 1:19-cv-06627
> Expert Report, September 14, 2023.
> Deposition, October 12, 2023.

*Laronda Rasmussen, et al. vs. The Walt Disney Company,* Superior Court of the State of California, County of Los Angeles
> Case No. 19STCV10974
> Expert Report, September 8, 2023.
> Deposition, October 2, 2023.

*In re: Watkins Incorporated v. McCormick & Company, Incorporated.,* United States District Court of Minnesota.
> Case No. 15-cv-2688 (DSD/BRT).
> Expert Report, January 7, 2021.
> Deposition, February 3, 2021.
> Trial Testimony, August 28, 2023.

*In re: Folgers Coffee Marketing Litigation,* United States District Court for the Western District of Missouri, Central Division
> Case No: 21-2984-MD-C-BP
> Expert Report, December 9, 2022.
> Deposition, January 31, 2023.
> Declaration, July 17, 2023.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

*Nicholas Marcus Thompson, Jennifer Phillips, Michelle Herbert, Kathy Samuel, Wagna Celidon, Duane Guy Guerra, Stuart Philp, Shalane Rooney, Daniel Malcolm, Alain Babineau, Bernadeth Betchi, Carol Sip, Monica Agard and Marcia Banfield Smith vs. His Majesty The King.* Canada Federal Court.
>    File No. T-1458-20
>    Affidavit, September 30, 2022.
>    Affidavit, February 28,2023.
>    Deposition, July 14, 2023.

*In re: Caustic Soda Antitrust Litigation, United States District Court for the Western District Of New York*
>    Case No: 1:19-cv-00385-EAW-MJR
>    Expert Report, June 27, 2022.
>    Deposition, July 29, 2022.
>    Sur-reply Expert Report, December 27, 2022.
>    Deposition, January 23, 2023.
>    Evidentiary Hearing, June 5-6, 2023.
>    Declaration, October 17, 2024.

*In re: Distribution of Cable Royalty Funds, Before the Copyright Royalty Judges, Washington, DC*
>    Consolidated Docket Number 16-CRB-0009 CD (2014-17)
>    Expert Report, July 1, 2022.
>    Rebuttal Testimony, November 2, 2022.
>    Hearing Testimony, March 21-23, 2023.

*In re: Caustic Soda Antitrust Litigation, Relates to Indirect Purchaser Action, United States District Court for the Western District Of New York*
>    Case No: 1:10-cv-00385-EAW-MJR
>    Expert Report, November 28, 2022.
>    Deposition, January 11, 2023.

*Nicholas Marcus Thompson, Jennifer Phillips, Michelle Herbert, Kathy Samuel, Wagna Celidon, Duane Guy Guerra, Stuart Philp, Shalane Rooney, Daniel Malcolm, Alain Babineau, Bernadeth Betchi, Carol Sip, Monica Agard and Marcia Banfield Smith vs. Her Majesty The Queen.* Canada Federal Court.
>    File No. T-1458-20
>    Affidavit, September 7, 2022.

*Steves and Sons, Inc., v. JELD-WEN, Inc.,* United States District Court for the Eastern District of Virginia, Richmond Division
>    Case No. 3:16-cv-00545-REP
>    Declaration, March 21, 2022.
>    Declaration, June 9, 2022.
>    Declaration, July 8, 2022.

*International Construction Products LLC, v. Caterpillar Inc., Komatsu America Corp., Associated Auction Services, LLC d/b/a Cat Auction Services,* United States District Court for the District of Delaware.
>    Case No.: 15-108-RGA.
>    Expert Report, November 15, 2021.
>    Deposition, December 8, 2021.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

*In re: Rail Freight Surcharge Antitrust Litigation (MDL-I),* United States District Court for the District of Columbia.
> Case No. 1:07-mc-00489.
> Expert Report, January 22, 2013.
> Deposition, May 31, 2013.
> Supplemental Expert Report, April 15, 2021.
> Deposition, November 16, 2021.

*Pamela La Fosse, et al. v. Sanderson Farms,* United States District Court for the Northern District of California
> Case No. 19-cv-06570-RS (N.D. Cal. Jul. 2, 2020)
> Expert Report, September 17, 2021.
> Deposition, October 15, 2021.

*In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices, And Antitrust Litigation,* United States District Court for the District of Kansas.
> Civil Action No. 2:17-md-02785-DDC-TJJ (MDL. No.: 2785)
> Expert Report, March 18, 2019.
> Deposition, April 10, 2019.
> Declaration, May 21, 2019.
> Declaration, May 21, 2019.
> Hearing Testimony, June 11, 2019.
> Damages Report, December 23, 2019.
> Deposition, January 28, 2020.
> Declaration, July 14, 2020.
> Declaration, September 2, 2021.


PUBLICATIONS
PRIOR TEN YEARS


BOOKS


Everydata: The Misinformation Hidden in the Little Data You Consume Every Day
> Bibliomotion, Inc., with Mike Gluck, New York, NY, 2016.


ARTICLES


"The Evolution of DOJ's Views on No-Poach Litigation."
> *Antitrust Magazine,* Vol.36, No. 3. with James Mutchnik and Charles Fields, Summer 2022.

"Are Pandemic Sellers Actually Violating Price-Gouging Laws?"
> *Law 360* with G. Korenko and M. Milner, April 3, 2020.

"Turning Daubert on Its Head: Efforts to Ban Hypothesis Testing in Antitrust Class Actions"
> *Antitrust Magazine,* Vol. 30, No. 2, with Laila Haider and Gregory Leonard, Spring 2016.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

KEYNOTE AND BOOK PRESENTATIONS

Everydata: The Misinformation Hidden in the Little Data in your Everyday Life

- o University of South Carolina, February 2018
- o Consumer Electronics Show, January 2017
- o Chief Legal Counsel Association, October 2016
- o TEDx Buffalo, October 2016
- o Busboys and Poets, July 2016
- o Huntington Book Review, July 2016
- o O2 Labs, June 2016
- o Latham & Watkins, June 2016
- o Piper Marbury Institute, June 2016
- o Vinson & Elkins, June 2016
- o Government Acquire Conference, June 2016
- o TJ-STAR Research Symposium, Thomas Jefferson High School, June 2016
- o 1919 Investment Club, May 2016
- o Sagamore Institute, May 2016
- o Ball State Town and Gown Speaker Series, May 2016
- o Ice Miller, May 2016
- o Inside Self Storage World Exposition, April 2016
- o Securities and Exchange Commission University, April 2016
- o Arkansas Literary Festival, April 2016
- o Central High School, Little Rock, Arkansas, April 2016
- o University of Illinois College of Business, April 2016
- o University of Michigan School of Law, March 2016

ACADEMIC AND CONSULTING PRESENTATIONS
PRIOR TEN YEARS

"Keeping Secrets Amidst Increased Employee Mobility"
    American Bar Association Spring Meetings, April 2025

"Algorithmic Pricing in Antitrust"
    Venable, March 2025.
    Axinn, April 2025.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

"Antitrust Class Actions 101"
Jenner Block, October 2024
Freshfields, December 2024

"Economics of MLS: Assessing Value and Competition" (with M. Kheyfets).
CMLS 2023 Conference, Championing MLS, New Orleans, LA. October 5, 2023

"Value of MLS"
cMLS Legal Summit, July 2023.

"Economic Outlook Roundtable"
cMLS Bring it to the Table Conference, April 2023.

"Does Economics Matter in Criminal Antitrust Cases?
ABA Antitrust Spring Meetings, March 2023.

"Moving Economic Thinking: Minority Rights and Competition"
Kirkland Antitrust & Competition Institute, March 2023.

"Introduction to Economic Consulting"
MIT Labor Economics Lunch, April 2022.

"Recent Trends and Strategies in HR Analytics."
Law Firm HR Roundtable. October 2021.

"Economics of Class Certification"
Weil, July 2021, with Michael Kheyfets and David Colino

"HR Analytics in Uncertain Times: Using Data to Guide Your Path Forward"
Human Capital Institute. Webcast Series. June 2020 with Chuck Fields

"Apples and Economics: Is Illinois Brick Obsolete?"
American Bar Association, April 2020

"HR Data Analytics: Introductory Course"
Latham and Watkins, November 2019, with Chuck Fields

"Reverse Payment Settlements: Explaining 'Large and Unexplained.'"
American Bar Association, April 2018.

"Data Analytics for Business Professionals"
LinkedIn Learning, January 2018.

"Economic Analysis of Antitrust Class Actions"
McMillan, with Matt Milner and Sophie Meadows, June 2017.

"Working with Experts in Litigation"
Kirkland & Ellis, September 2016.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Appendix B.    MATERIALS RELIED UPON

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

## MATERIALS RELIED UPON

\* I incorporate by reference all materials in the turnover productions from Dr. Starr and Dr. Gerhart.

### Court Filings

Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, August 9, 2021.

Indictment, *United States v. DaVita Inc., et al.* (D. Colo.), July 14, 2021.

Indictment, *United States v. Surgical Care Affiliates, LLC* (N.D. Tex.), January 5, 2021.

Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, June 6, 2023.

Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, October 27, 2024.

### Expert Reports

Expert Witness Report of Dr. Barry Gerhart, January 15, 2025.

Expert Witness Report of Dr. Evan P. Starr, January 15, 2025.

Notice of Errata Regarding the Expert Report of Dr. Barry Gerhart, February 11, 2025.

Notice of Errata Regarding the Expert Report of Dr. Evan P. Starr, January 21, 2025.

Starr Deposition Exhibit DX83 (Errata dated March 19, 2025).

### Data

*Bates Numbered Files:*

| | |
|---|---|
| BF000222637 | DVA_OMCEAL_001408547 |
| DVA_OMCEAL_001408533 | DVA_OMCEAL_001408829 |
| DVA_OMCEAL_001408536 | DVA_OMCEAL_001421631 |
| DVA_OMCEAL_001408539 | DVA_OMCEAL_001421634 |
| DVA_OMCEAL_001408542 | DVA_OMCEAL_001421635 |
| DVA_OMCEAL_001408543 | SCA002246316 |

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

SCA-Structured0000001                          USPI_CIV_000659234

SCA-Structured00000010                         USPI_CIV_001168726

USPI_CIV_000122240

*Data Letters:*

2023.09.26 - K. Limarzi Ltr. re Structured Data Productions.

2023-10-05 - Letter from M. Lane to S. Zandi.

2024.08.29 USPI Resp Plaintiffs 7.19.2024 Letter.

2024.11.18 USPI Production - Vol. 27.

*Lightcast:*

| | |
|---|---|
| 2024-10-23T162506_0_0_0.csv | 2024-10-23T162506_2_0_0.csv |
| 2024-10-23T162506_0_1_0.csv | 2024-10-23T162506_2_1_0.csv |
| 2024-10-23T162506_0_2_0.csv | 2024-10-23T162506_2_2_0.csv |
| 2024-10-23T162506_0_3_0.csv | 2024-10-23T162506_2_3_0.csv |
| 2024-10-23T162506_0_4_0.csv | 2024-10-23T162506_2_4_0.csv |
| 2024-10-23T162506_0_5_0.csv | 2024-10-23T162506_2_5_0.csv |
| 2024-10-23T162506_0_6_0.csv | 2024-10-23T162506_2_6_0.csv |
| 2024-10-23T162506_0_7_0.csv | 2024-10-23T162506_2_7_0.csv |
| 2024-10-23T162506_1_0_0.csv | 2024-10-23T162506_3_0_0.csv |
| 2024-10-23T162506_1_1_0.csv | 2024-10-23T162506_3_1_0.csv |
| 2024-10-23T162506_1_2_0.csv | 2024-10-23T162506_3_2_0.csv |
| 2024-10-23T162506_1_3_0.csv | 2024-10-23T162506_3_3_0.csv |
| 2024-10-23T162506_1_4_0.csv | 2024-10-23T162506_3_4_0.csv |
| 2024-10-23T162506_1_5_0.csv | 2024-10-23T162506_3_5_0.csv |
| 2024-10-23T162506_1_6_0.csv | 2024-10-23T162506_3_6_0.csv |
| 2024-10-23T162506_1_7_0.csv | 2024-10-23T162506_3_7_0.csv |

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

*SCA:*

Structured00000002 (*Teammate Roster Point In Time.xlsx, Termed in 2021.xlsx*)

*U.S. Bureau of Labor Statistics:*

| | |
|---|---|
| natsector_M2008_dl.xls | natsector_M2018_dl.xlsx |
| natsector_M2009_dl.xls | natsector_M2019_dl.xlsx |
| natsector_M2010_dl.xls | natsector_M2020_dl.xlsx |
| natsector_M2011_dl.xls | natsector_M2021_dl.xlsx |
| natsector_M2012_dl.xls | natsector_M2022_dl.xlsx |
| natsector_M2013_dl.xls | natsector_M2023_dl.xlsx |
| natsector_M2014_dl.xlsx | natsector_may2004_dl.xls |
| natsector_M2015_dl.xlsx | natsector_may2005_dl.xls |
| natsector_M2016_dl.xlsx | natsector_may2006_dl.xls |
| natsector_M2017_dl.xlsx | natsector_may2007_dl.xls |

*Other:*

Investing.com, "DaVita HealthCare Partners Inc (DVA)," https://www.investing.com/equities/davita-inc.

U.S. Bureau of Labor Statistics, "Series ID: CEU6562149001," https://data.bls.gov/dataViewer/view/timeseries/CEU6562149001.

U.S. Bureau of Labor Statistics, "Occupational Employment and Wage Statistics," https://www.bls.gov/oes/tables.htm.

U.S. Census Bureau Country Business Patterns Data, https://www.census.gov/programs-surveys/cbp/data/datasets.html?text-list-cc4db501b6%3Atab=all#text-list-cc4db501b6.

## **Testimony Transcripts**

Deposition of Allen Spradling, July 18, 2024.

Deposition of Andrew Patrick Hayek, September 18, 2024.

Deposition of Anthony Kilgore, October 22, 2024.

Deposition of Barry Gerhart, Ph.D., March 5, 2025.

Deposition of Bill Wilcox, September 24, 2024.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Deposition of Brett Brodnax, September 12, 2024.

Deposition of Brian Todd Mathis, September 20, 2024.

Deposition of Bridget A. Fanning, Ph.D., July 17, 2024.

Deposition of Colleen Arthur, May 23, 2024.

Deposition of Dennis Kogod, September 6, 2024.

Deposition of Evan P. Starr, Ph.D., March 19, 2025 & March 20, 2025.

Deposition of Kent Thiry, August 16, 2024.

Deposition of Kevin Zaideman, December 18, 2024.

Deposition of Leslie Wachsman, May 22, 2024.

Deposition of Mark Garvin, May 30, 2024.

Deposition of Mark Kopser Vol. I, December 12, 2024.

Deposition of Michael Rucker, August 27, 2024.

Deposition of Robert Chipman, August 7, 2024.

Deposition of Scott Keech, August 22, 2024.

Deposition of Shannon McGarry, June 11, 2024.


**Bates Numbered Documents**

| | |
|---|---|
| DVA_OMCEAL_000010422–0428 | DVA_OMCEAL_000939090–9103 |
| DVA_OMCEAL_000294731–4747 | DVA_OMCEAL_000944057–4061 |
| DVA_OMCEAL_000297363–7368 | DVA_OMCEAL_000972302 |
| DVA_OMCEAL_000683921–3930 | DVA_OMCEAL_001150350–0351 |
| DVA_OMCEAL_000711693–1695 | DVA_OMCEAL_001300788–0792 |
| DVA_OMCEAL_000906018–6026 | DVA_OMCEAL_001302342–2343 |
| DVA_OMCEAL_000906132–6135 | DVA_OMCEAL_001302757–2758 |
| DVA_OMCEAL_000926457–6467 | DVA_OMCEAL_001311454–1456 |
| DVA_OMCEAL_000929239–9248 | DVA_OMCEAL_001311499–1500 |

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

| | |
|---|---|
| DVA_OMCEAL_001313626–3618 | SCA000073564–3572 |
| DVA_OMCEAL_001318066–8068 | SCA000098450–8452 |
| DVA_OMCEAL_001313954–3958 | SCA000108278–8279 |
| DVA_OMCEAL_001329256–9261 | SCA000132458 |
| DVA_OMCEAL_001332708–2711 | SCA000287698 |
| DVA_OMCEAL_001332734–2774 | SCA000287699 |
| DVA_OMCEAL_001344567–4582 | SCA000465129 |
| DVA_OMCEAL_001358600–8602 | SCA000552095–2113 |
| DVA_OMCEAL_001386589–6626 | SCA000555897–5900 |
| DVA_OMCEAL_001402387–2433 | SCA000568874–8875 |
| HAYEK-000012214–2216 | SCA000609009–9011 |
| KEECH_000000317–0324 | SCA000663768–3770 |
| KEECH_000000806–0808 | SCA000989200–9202 |
| KEECH_000000320–0322 | SCA001037832–7833 |
| KEECH_000000332–0333 | SCA001046573–6574 |
| KEECH_000001104–1106 | SCA001102036–2037 |
| KEECH_000001419–1422 | SCA001159728–9748 |
| OMC_BM_000000884–0895 | SCA001258153–8251 |
| OMC_BM_000010778–0779 | SCA001497129–7179 |
| OMC_BM_000014729 | SCA001543663 |
| SCA000002890–2932 | SCA001669270 |
| SCA000015897–5901 | SCA001893511–3515 |
| SCA000048815–8817 | SCA002364259–4261 |
| SCA000058911–8916 | Sprad000014–0015 |
| SCA000065727 | Sprad002185 |
| SCA000073150–3151 | Sprad005529 |

5

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

USPI_CIV_000016522

USPI_CIV_000021155

USPI_CIV_000046079

USPI_CIV_000111376–1382

USPI_CIV_000169100–9102

USPI_CIV_000190519–0524

USPI_CIV_000198546–8549

USPI_CIV_000210543–0545

USPI_CIV_000601224–1229

USPI_CIV_000974608–4610

USPI_CIV_000974615–4617

**Articles, Books, and Additional Sources**

American Bar Association, Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, 2nd ed., ABA Book Publishing, 2014.

American Bar Association, Section of Antitrust Law, *Market Power Handbook: Competition Law and Economic Foundations*, 2nd ed., ABA Book Publishing, 2012.

American Bar Association, Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, 3rd ed., ABA Book Publishing, 2017.

Charles F. Manski, "Economic Analysis of Social Interactions," *Journal of Economic Perspectives*, Vol. 14, No.3, 2000.

Damodar N. Gujarati, *Basic Econometrics*, 2nd ed., McGraw-Hill, 1988.

Daniel L. Rubinfeld, "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy*, ABA Section of Antitrust Law, 2008.

Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011.

Davita, "Proxy Statement,' June 03, 2009, https://filecache.investorroom.com/mr5ir_davita/185/DaVita_Proxy09_Final_2.pdf.

DaVita Inc. 10-K, 2005 Annual Report.

DaVita Inc. 10-K, 2006 Annual Report.

DaVita Inc. 10-K, 2007 Annual Report.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

DaVita Inc. 10-K, 2008 Annual Report.

DaVita Inc. 10-K, 2009 Annual Report.

DaVita Inc. 10-K, 2010 Annual Report.

DaVita Inc. 10-K, 2011 Annual Report.

DaVita Inc. 10-K, 2012 Annual Report.

DaVita Inc. 10-K, 2013 Annual Report.

DaVita Inc. 10-K, 2014 Annual Report.

DaVita Inc. 10-K, 2015 Annual Report.

DaVita Inc. 10-K, 2016 Annual Report.

DaVita Inc. 10-K, 2017 Annual Report.

DaVita Inc. 10-K, 2018 Annual Report.

DaVita Inc. 10-K, 2019 Annual Report.

DaVita Inc. 10-K, 2020 Annual Report.

DaVita Inc. 10-K, 2021 Annual Report.

DaVita Inc. 10-K, 2022 Annual Report.

George J. Stigler, "What Does an Economist Know?" *Journal of Legal Education*, Vol. 33, No. 2, 1983.

Jeffrey Wooldridge, *Introductory Econometrics*, 5th ed., Cengage Learning, 2013.

Jonathan Baker, "Market Definition: An Analytical Overview," *Antitrust Law Journal*, Vol. 74, No. 1, 2007.

Joshua D. Angrist, "The Perils of Peer Effects," *Labour Economics*, Vol. 30, 2014.

Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion*, 1st ed., Princeton University Press, 2009.

Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature*, Vol. 44, No. 1, 2006.

Matthew Gibson, "Employer Market Power in Silicon Valley," *W. E. Upjohn Institute Working Papers*, 2024.

Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010.

Robert S. Pindyck and Daniel Rubinfeld, *Microeconomics*, 8th ed., Pearson, 2013.

Roger D. Blair and Jeffrey L. Harrison, *Monopsony in Law and Economics*, 1st ed., Cambridge University Press, 2010.

Surgical Care Affiliates, Inc. 10-K, 2013 Annual Report.

Surgical Care Affiliates, Inc. 10-K, 2014 Annual Report.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Sydnee Caldwell and Oren Danieli, "Outside Options in the Labor Market," *The Review of Economic Studies*, Vol. 91, Issue 6, 2024.

United Surgical Partners International. Inc. 10-K, 2009 Annual Report.

U.S. Department of Justice, "Public Workshop on Competition in Labor Markets," September 23, 2019, comments by Dr. Patrick Greenlee and Dr. Kevin Murphy.

U.S. Department of Justice and the Federal Trade Commission, "2023 Merger Guidelines," December 18, 2023.

U.S. Department of Treasury, *The State of Labor Market Competition*, March 7, 2022, https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf.


**Websites**

Bank of America, "Our Company," https://about.bankofamerica.com/en/our-company.

DaVita, "DaVita Announces New Corporate Headquarters in Denver, Colorado," May 27, 2009, https://investors.davita.com/2009-05-27-DaVita-Announces-New-Corporate-Headquarters-in-Denver-Colorado.

DaVita, "DaVita Announces CEO Succession," April 29, 2019, https://investors.davita.com/ 2019-04-29-DaVita-Announces-CEO-Succession.

Definitive Healthcare, "Outpatient Care," https://www.definitivehc.com/resources/glossary/outpatient-care.

Definitive Healthcare, "Outpatient clinics are in!", https://www.definitivehc.com/blog/outpatient-clinics-are-in.

Global News Wire, "Surgical Care Affiliates Announces Closing of Its Initial Public Offering of Common Stock and Exercise in Full of Option to Purchase Additional Shares," November 4, 2013, https://www.globenewswire.com/news-release/2013/11/04/586515/28633/en/Surgical-Care-Affiliates-Announces-Closing-of-Its-Initial-Public-Offering-of-Common-Stock-and-Exercise-in-Full-of-Option-to-Purchase-Additional-Shares.html.

Lightcast, "Overview," https://lightcast.io/products/data/overview.

Lightcast, "US PROFILES (PSEUDONYMIZED) JOBS," https://docs.lightcast.dev/data-shares/us-profiles-pseudonymized-jobs.

LinkedIn, "Bill Myers," https://www.linkedin.com/in/bill-myers-6b88a12/.

NAICS Association, "NAICS Code Description," https://www.naics.com/naics-code-description/?code=6214.

Presidio Surgery Center, "About Us," https://presidiosurgery.com/about-us/.

Reuters, "United Surgical to Be Acquired for $1.4 Billion in Private Equity Deal," January 8, 2007, https://www.cnbc.com/2007/01/08/united-surgical-to-be-acquired-for-14-billion-in-private-equity-deal.html.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

Reuters, "UnitedHealth to buy Surgical Care Affiliates in $2.3 billion deal," January 9, 2017, https://www.reuters.com/article/world/americas/unitedhealth-to-buy-surgical-care-affiliates-in-23-billion-deal-idUSKBN14T15C/.

SCA Health, "About Us," https://sca.health/about-us/.

SCA Health, "Build Your Career at SCA Health," https://careers.sca.health/.

SCA Health, "Contact Us," https://sca.health/about-us/contact/.

TEKsystems, "Who We Are", https://www.teksystems.com/en/who-we-are.

Tenet Health, "Tenet Completes Purchase of USPI from WCAS," April 16, 2018, https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx.

Tenet Health, "Tenet Healthcare Corporation Completes United Surgical Partners International and Aspen Healthcare Transactions," June 16, 2015, retrieved from https://www.sec.gov/Archives/edgar/data/70318/000119312515224695/d943349dex991.htm.

U.S. Bureau of Labor Statistics, "All Employees, Health Care and Social Assistance [CEU656200000]," retrieved from FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/CEU6562000001.

U.S. Bureau of Labor Statistics, "Employment for Health Care and Social Assistance: Outpatient Care Centers (NAICS 6214) in the United States [IPURN6214W200000000]," retrieved from FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/IPURN6214W200000000.

U.S. Bureau of Labor Statistics, "Employment Level (LNU02000000), Labor Force Flows Employed to Unemployed (LNU07400000), and Labor Force Flows Employed to Not in Labor Force (LNU07800000)," retrieved from https://fred.stlouisfed.org/graph/?id=LNU02000000,LNU07400000,LNU07800000,#).

U.S. Bureau of Labor Statistics, "Industries at a Glance: Health Care and Social Assistance: NAICS 62," https://www.bls.gov/iag/tgs/iag62.htm.

U.S. Bureau of Labor Statistics, "The 'Great Resignation' in perspective," July 2022, https://www.bls.gov/opub/mlr/2022/article/the-great-resignation-in-perspective.htm.

U.S. Census Bureau, "Economic Census: NAICS Codes & Understanding Industry Classification Systems," February 12, 2024, https://www.census.gov/programs-surveys/economic-census/year/2022/guidance/understanding-naics.html.

UnitedHealth Group, "Optum completes acquisition of DaVita Medical Group from DaVita," June 19, 2019, https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html.

USPI, "Contact Us," https://uspi.com/contact-us/default.aspx.

USPI, Homepage, https://uspi.com/home/default.aspx.

USPI, "Who We Are," https://uspi.com/about-us/who-we-are/.

WTW, "Our History," https://www.wtwco.com/en-us/about-us/our-history.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix C.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-1**
**COUNT OF CLASS MEMBERS**
**BY DEFENDANT**

| Year | DaVita | SCA | USPI |
|------|--------|-----|------|
| [a] | [b] | [c] | [d] |
| 2008 | 590 | 266 | |
| 2009 | 671 | 274 | |
| 2010 | 744 | 297 | 433 |
| 2011 | 838 | 336 | 489 |
| 2012 | 995 | 373 | 529 |
| 2013 | 1,069 | 388 | 543 |
| 2014 | 1,101 | 457 | 580 |
| 2015 | 1,147 | 498 | 607 |
| 2016 | 1,691 | 571 | 720 |
| 2017 | 1,871 | 568 | 777 |
| 2018 | 1,796 | 591 | 809 |
| 2019 | 1,314 | 615 | 807 |

Notes: Counts of class members based on Dr. Starr's assignment of job levels at each of the Defendants. Excludes employees that departed DaVita and SCA prior to May 2008 and May 2010 for USPI.

Source: Starr turnover.

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-2**
**EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS**
**DIRECTOR LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| IT at DaVita | ***Developer, Data Integration (IT)***<br><br>• Collaborate with business users and other IT teams to design, develop and deploy the best solutions to ensure high level of customer service.<br>• Follow project and technology goals in line with departmental objectives. Responsible for successful project delivery and customer satisfaction.<br>• Partner with departmental management to develop strategic/tactical solutions to support business strategies.<br>• Develop and establish departmental technical standards and procedures.<br>• Work with the project management team to plan and coordinate project development activities across various teams.<br>• Ensures projects are delivered on time, on budget, and with high quality. | <u>Minimum Qualifications</u><br>Bachelors Degree in Computer Science, Engineering or Business Administration required<br>• 3-5 years of software development experience<br>• Experience with the development of application integration (EAI, B2B) solutions<br>• Proficiencies in web services, J2EE, and application server technology.<br>• Workday Integration development experience (Workday Studio, EIB, XSLT, web services) is highly desired.<br>• Skilled in database design and development, Oracle, preferred. |
| Quality Management Department at SCA | ***Group Director of Clinical Services***<br><br>• Maintain Knowledge of: Clinical best practices<br>• Provide collaboration and mentorship to centers in SVP region per identified needs regarding clinical and quality programs, accreditation standards, regulatory requirements and safety initiatives<br>• Provide consultative services to centers in region for accreditation and regulatory survey preparation and activities<br>• Monitor, analyze and communicate to centers regarding activities, trends, results and recommendations related to quality, accreditation, and regulatory activities and findings | <u>Education, vocational training, and experience</u><br>Licensed Registered Nurse with training and experience in working in the ambulatory surgery center (ASC) industry and with ASC operations. |
| Finance at USPI | ***Director of Finance***<br><br>• Member of the Senior Leadership Team along with the Chief Executive Officer and Chief Nursing Officer.<br>• Responsible for the leadership and management for the following departments: Health Information Management, Accounts Payable and the Business Office. Oversees the accounts receivable, accounting and collections functions.<br>• Recommends appropriate strategies and actions in response to economic trends and regulatory changes.<br>• Actively works with USPI to review and negotiate sources of financing for capital equipment and expansion projects.<br>• Coordinates and controls the facility's cash and investment management activities. | <u>Candidate Requirements</u><br>• Minimum 5 years in a hospital financial management capacity.<br>• Bachelors degree in Accounting required.<br>• Masters degree in Business Administration, Accounting or Health Care Administration preferred.<br>• Minimum 5 years demonstrated experience in managing and developing their staff.<br>• Experience managing multiple financial departments/functions<br>• Must be able to demonstrate strong analytical and computer skills |

Sources: DVA_OMCEAL_001313954–3958, SCA001893511–3515; USPI_CIV_000198546–8549.

2

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

EXHIBIT C-2 (CONTINUED)
EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS
DIRECTOR LEVEL

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Operations Group at DaVita | **Home Group Director**<br><br>• Collaboratively develop palmer level strategic growth plan with Division Home Directors, and DVPs; and communicate it effectively to key stakeholders<br>• Actively develop home leadership bench strength and create robust succession planning<br>• Accountable for budget formulation and 3 year forecasting<br>• Review data summaries for internal audit purposes. Uphold compliance expectations for all DaVita policies, audits, corrective actions, training and programs in accordance with State and Federal regulations for patient care services (including but not limited to HIPAA, CMS, OSHA or other governing agencies). | Education and Experience<br>10+ years of experience<br>Bachelor's Degree<br><br>Specialized Experience, Education, Training, or Qualifications<br>Master's degree (Preferred)<br>Minimum of A.D.N degree from accredited school of nursing (Preferred)<br>Minimum of two (2) years' clinical nephrology experience (direct patient care) (Preferred)<br>Operations experience (program management, multi-facility management) |
| Development at SCA | **Director of Development**<br><br>• Pursue and assess acquisition, merger, and joint venture opportunities.<br>• In conjunction with the responsible operations executive assess the prospects for an acquisition or contribution to the overall objective of the company and the specific market.<br>• Assist the responsible Operations group in structuring the proposed transaction and managing the legal, compliance and executive approvals required.<br>• Developing the business plan, executive summary and pro forma financial statements required to obtain the above approvals. | Qualifications<br>• Bachelor's Degree in Accounting, Economics or Finance, MBA or CPA preferred.<br>• Two to three years' work experience required.<br>• Healthcare industry knowledge is preferred.<br>• Extremely strong financial, analytical and written skills are required. |
| IT at USPI | **Director, Data Warehouse - Information Technology**<br><br>The scope of this role will include working directly with the operating and HQ teams to define the business requirements, and then design the associated databases and interfaces in support of the BI applications utilizing one of the BI tools described. [...] Coordinate and direct the activities of all assigned data warehouse, integration, and master data management areas and ensure that that policies, procedures and standards are followed with emphasis on support for data integration/integrity and data/event mapping practices. | Background\Experience<br>• The successful candidate will be experienced in leading the design and implementation of databases and associated tools in support of BI applications utilizing one of the major BI applications. Healthcare experience is a plus, but not mandatory.<br>• The successful candidate will be highly analytical, and have a proven track record of taking disparate information, and creating meaning through the design databases to support reporting, desktop information design, and mobile information design.<br>• This individual will have a strong working knowledge of database design, interfaces, and ETL tools.<br>• Experience in financial roles is a plus, but not a requirement. |

Sources: DVA_OMCEAL_001300788–0792, SCA000568874–8875, USPI_CIV_000190519–0524.

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-2 (CONTINUED)**
**EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS**
**DIRECTOR LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Commercial Integrated Care Analytics at DaVita | **Director, Actuary (DaVita IKC)**<br><br>• Lead new contract actuarial underwriting process, from data transformation to final recommendations to business leaders<br>• Manage teammate productivity and performance within new business lane of the DaVita actuarial team<br>• Support enterprise risk management process and capability development | Specialized Experience, Education, Training, or Qualifications<br>Bachelor's degree in relevant field<br>At least 8 years of relevant actuarial experience<br>Extensive actuarial modeling experience in Microsoft Excel<br>Strong track record of managing actuarial analysts<br>Proven experience in actuarial project management<br><br>Certificates, Licenses, and Registrations<br>Associate of the Society of Actuaries (ASA)<br>Fellow of the Society of Actuaries (FSA) (Preferred) |
| Finance and Accounting (SOX) at SCA | **Director, System Strategy and Support**<br><br>• Evaluate all existing RCO systems and identify gaps vs best in class<br>• Own partnerships with all RCO system vendors and ensure optimal support and adoption<br>• Own all system conversion projects (including new site conversions, internal system conversions (like Emdeon to Zirmed)<br>• Build out the future state system strategy to support a $4B revenue cycle with consolidation of IV, Billing, Collecting, Cash Posting and Self Pay functions in 2-3 CBOs | Education, Experience, and Licensure<br>• Upholds and practices the principlesand policies of the SCA Compliance program<br>• 4-year college degree required with Masters in Business or Healthcare Finance preferred<br>• 6+ years of revenue cycle / patient accounting experience<br>• Computer experience: Excel, Word, Medical Billing Software and Applications.<br>• Excellent verbal and written communication skills and efficient time user. |
| Business Development at USPI | **Market Director of Business Development**<br><br>• Responsible for strategically planning and implementing visits to a small number of key Physicians, Physician office staffs throughout their assigned market [...]<br>• Market Director of Business Development will be expected to develop meaningful relationships with Contacts and the local Tenet executive team to assist in the sales process.<br>• Provide intelligence to appropriate facility departments and Tenet entities as to process improvements in quality, service or efficiency requested or suggested by Contacts.<br>• Thoroughly research Contacts to understand where and why they refer patients to our facilities or other facilities. Works with key department members to implement operational fixes that may be needed to better serve patients. | Education, Experience, and Other Requirements<br>Minimum Education<br>Bachelors degree in Marketing/Sales or a related field or the equivalent combination of education, training and/or experience<br><br>Minimum Experience<br>At least 5 years of experience in a related field such as physician relations, network development, medically-related sales, or a similar role in a hospital or other healthcare setting, preferably from Tenet or a company with a robust ethics and compliance program. |

Sources: DVA_OMCEAL_001311499–1500, SCA000989200–9202, USPI_CIV_000974608–4610.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT C-3**
**EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS**
**VICE PRESIDENT/SENIOR VICE PRESIDENT LEVEL**

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Operations at DaVita | **VP, National IKC Operations & Transformation Support**<br><br>• Lead National, Non-Clinical Support Functions including but not limited to IKCA, VHES and CSS teams.<br>• Lead Integration-Specific Projects including but not limited to [...] oversee the ops implementation playbook coordination across VBEs, CKCC, Commercial, SNP programs<br>• Provide Integration Oversight & PMO to key areas including but not limited to [...] surface key risks, recommendations & decisions via the established PMO structure<br>• Support for IKC COO & SVP IKC Operations in ways such as [...] coordinate with Claire on establishing effective management process / alignment with goals & metrics | Education and Experience<br>10+ years of experience<br>Master's degree |
| Diligence and Integration at SCA | **Vice President, Diligence and Integration**<br><br>• Hire, train, and retain A-level talent<br>• Lead the Diligence and Integration teams and Support Services departments in achieving ambitious goals<br>• Continuously facilitate connections with Support Services leaders to discuss their service offerings, including benefits, alternatives and impact of selecting alternatives<br>• Identify non-SCA supported services requested by facilities and proactively determine SCA supported alternatives while administering the SCA Operating Model Review Committee (ORC) approval process<br>• Optimize de novo and construction projects | Education, training and experience:<br>• Advanced or Bachelor's degree in Healthcare Management, Finance, Operations, Management or related field required<br>• 10+ years leading high functioning senior project management teams<br>• 5+ years project management experience in diligence, integration, and de novo construction<br>• Strong understanding of the Ambulatory Surgery Center (ASC), Specialty Practice, and healthcare industry preferred |
| Business Development at USPI | **Group VP of Business Development**<br><br>• Responsible for developing a list of Contacts who align with Tenet's mission and values and who appear to have a high-quality clinical practice or services that would support the development or enhancement of facility service lines.<br>• Responsible for monitoring, on a quarterly basis, the activities of the Group Business Development Associates as documented in the PRM system to oversee performance and to identify non-compliance with company policy and reporting such non-compliance to the Tenet Ethics and Compliance Department.<br>• Creates a targeted growth plan which includes a detailed list of Contacts to be contacted to achieve growth plan. | Education, Experience, and Other Requirements<br>Minimum Education<br>Bachelors degree in Marketing/Sales or a related field or the equivalent combination of education, training and/or experience<br><br>Preferred Education<br>Master's degree in Business or Healthcare<br><br>Minimum Experience<br>At least 7 years of experience in a related field such as physician relations, network development, medically-related sales, or a similar role in a hospital or other healthcare setting, preferably from Tenet or a company with a robust ethics and compliance program. |

Sources: DVA_OMCEAL_001311454–1456, SCA001102036–2037, USPI_CIV_000974615–4617.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

EXHIBIT C-3 (CONTINUED)
EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS
VICE PRESIDENT/SENIOR VICE PRESIDENT LEVEL

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Physician Experience at DaVita | **VP of Physician Strategy, Experience and Engagement**<br><br>• Physician strategy - Pursuing, assimilating and communicating strategy associated with attending, medical director and joint venture partners and their associated practices. This position will be responsible for assessing challenges, identifying needs, prioritizing investments within direct control, and influence investment outside of direct control.<br>• Proactive physician engagement - Identifying strategies to increase physician's fulfillment, autonomy, trust in DaVita, leadership capabilities in order to improve achievement in clinical outcomes. Create products and programs, create and adapt processes, and implement change management to improve the experience of the physician. | <u>Education and Experience</u><br>6 to 8 years of experience<br>Bachelor's Degree<br><br><u>Specialized Experience, Education, Training, or Qualifications</u><br>Experienced in health care strategic consulting (Preferred)<br>Experienced in physician engagement strategy including physician job fulfillment, physician compensation, physician network management and physician productivity<br>Ability to engage directly with senior level executives (e.g., CEO, President, etc.)<br>Master's Degree (Preferred) |
| Operations at SCA | **VP, Managed Care**<br><br>• Set Company Managed Care Strategy, Annual Plan, Revenue Targets, and Budget<br>• Lead and manage RDMCs, Ensure Managed Care regional goals and objectives are being met<br>• Manage Payor Relationships and Contracting Activity to achieve Company Net Revenue Increase Goal; Negotiate contracts for assigned geographic territory<br>• Coordinate with Surgical Care Affiliates Operations and Development to meet Company's fiscal goals (EBITDA, margin rate, test results for remediation of material weakness, and same store growth)<br>• Coordinate with Sales & Marketing to maximize patient volume | <u>Total education, vocational training and experience:</u><br>• Bachelors Degree required; Masters Degree preferred.<br>• Excellent knowledge of the healthcare industry; minimum of 10 years experience in the healthcare industry with emphasis on contract negotiations.<br>• Experience negotiating payor contracts; knowledge of payor contracting from both payor and provider perspective<br>• Experience analyzing contracts and modeling reimbursement methodologies and rates<br>• An understanding and commitment to the mission, vision and values of Surgical Care Affiliates. |
| Sales at USPI | **Group VP of Sales**<br><br>• Responsible for developing a list of Contacts who align with Tenet's mission and values and who appear to have a high-quality clinical practice or services that would support the development or enhancement of facility service lines. Strategically implement strategies with Group Sales Representatives to develop relationships with these Contacts with the goal of earning increased selection by Contacts of our facilities for inpatient and outpatient services.<br>• Group VP of Sales will be expected to develop meaningful relationships with Contacts and the local Tenet executive team to assist in the sales process. | <u>Education, Experience, and Other Requirements</u><br><u>Minimum Education</u><br>Bachelors degree in Marketing/Sales or a related field or the equivalent combination of education, training and/or experience<br><br><u>Preferred Education</u><br>Master's degree in Business or Healthcare<br><br><u>Minimum Experience</u><br>At least 7 years of experience in a related field such as physician relations, network development, medically-related sales, or a similar role in a hospital or other healthcare setting, preferably from Tenet or a company with a robust ethics and compliance program. |

Sources: DVA_OMCEAL_001313626–3618, SCA000555897–5900, USPI_CIV_000169100–9102.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

EXHIBIT C-3 (CONTINUED)
EXAMPLES OF JOB DESCRIPTIONS AT THE DEFENDANTS
VICE PRESIDENT/SENIOR VICE PRESIDENT LEVEL

| Department and Defendant [a] | Job Responsibilities [b] | Job Qualifications [c] |
|---|---|---|
| Kidney Care Management Team at DaVita | **Senior Vice President - Group**<br><br>• Works closely with Chief Operating Officer to develop national Kidney Care strategy<br>• Manages financial and revenue growth, operations and labor management, contract management, and clinical outcomes within the divisions for the Group(s)<br>• Maintains awareness and knowledge of competition; proactively assess related SWOT (division strengths, weaknesses, opportunities, and threats); analyze and implement effective responses<br>• Ensures effective implementation of all corporate programs including but not limited to annual bonus process, Triple Crown awards and goals, and CQI (continuous quality improvement) initiatives | <u>Minimum Qualifications</u><br>• Bachelor's degree required; Master's degree preferred; MBA strongly preferred<br>• Minimum of 15 years' progressive management experience required<br>• Healthcare provider operating experience strongly preferred; dialysis or similar provider services experience preferred<br>• Demonstrated track record of successful fiscal and operating management; demonstrated financial expertise |
| Executive Team at SCA | **Senior Vice President**<br><br>• P&L Management; continue to cultivate and grow current operations in the market focusing on both top-line and bottom-line growth<br>• Consultative, solutions-oriented "architect" who can identify needs, and coordinate partners, assets, expertise and focus to establish and evolve critical relationship with strategic partners (health systems, payers, ACOs, IPAs, etc)<br>• New business development. Identify and assess strategic expansion opportunities<br>• Innovate around new products and services: identify areas of unmet needs and drive from concept to actual delivery of new solutions and value-add service | <u>The Person</u><br>Experience: 10 to 15 years in regional management capacity leading multi-site and multi-state operations, preferably in a multiple service line healthcare environment; experience in doing deals with health systems, with significant C-suite interaction.<br><br>Leadership: Must have current P&L responsibility; must be credible with experience in managing multiple, cross functional teams or projects, influencing senior-level management and key external stakeholders [...]<br>Technical Stewardship: Advanced business knowledge, analytics and assessment capabilities; must be able to "see the field" of the evolving and ever-changing healthcare landscape [...] |
| Operations at USPI | **Regional Vice President**<br><br>• Strategic Planning for each Facility (20% of Time)<br>• Case Growth (20%)<br>• Engage with Health Systems, IPAs, etc. to earn appropriate cases at facilities in the region<br>• Leadership Development with Administrators/CEOs (20%)<br>• Communication with physician and health system partners training<br>• Partnership Management (20%)<br>• Full Deployment of USPI's EDGE and Leadership Initiatives (20%) | <u>Qualifications</u><br>• Prefer Master's degree in business administration or healthcare administration. Equivalent experience considered.<br>• Minimum five years experience with exposure to healthcare business development & operations, finance and business consulting<br>• Ability to work well with "C" level healthcare partners, physicians, employees, patients and fellow workers<br>• Excel & PowerPoint analytical and presentation skill a must |

Sources: DVA_OMCEAL_001302757–2758, SCA000015897–5901, USPI_CIV_000210543–0545.

7

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix D.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT D-1**
**MOVES BETWEEN "COVERED DEFENDANTS"**
**COMPARED TO ALL DEPARTURES**
**USING DR. STARR'S METHODOLOGY**
**DAVITA AND SCA**



Notes: For the purposes of this exhibit, I adopt Dr. Starr's convention in his mobility analyses and consider all of 2008 as part of the proposed class period for DaVita and SCA as well as all of 2010 for the proposed class period for SCA and USPI.

A departure is identified if the given employee is in this year's, but not in next year's payroll data. This chart does not include DMG employees that left in 2019 when DaVita sold DMG as well as USPI/Tenet records in 2021 due to data truncation (see footnote 60).

Source: Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

### EXHIBIT D-2
### EXTERNAL HIRES INTO RELEVANT EMPLOYEE POSITIONS
### BY DEFENDANT AND TIME PERIOD
### USING DR. STARR'S METHODOLOGY



Notes: Identifies hires using first appearance in the data or employment gaps of one year or more. Grey-shaded areas indicate the 70 moves between "Covered Defendants" from Dr. Starr's Figure 2.

Source: Starr turnover (Corrected Data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT D-3**
**OVERALL TURNOVER RATE FOR RELEVANT EMPLOYEES**
**BY DEFENDANT**
**USING DR. STARR'S METHODOLOGY**
**2006 – 2022**



Notes: Turnover rates are calculated as the percentage of relevant employees at each Defendant who were terminated each year (i.e., under Dr. Starr's methodology the percentage of relevant employees in this year's, but not in next year's payroll data). This chart does not include DMG employees that left in 2019 when DaVita sold DMG as well as USPI/Tenet records in 2021 due to data truncation (see footnote 60).

Turnover rates for DaVita and USPI are not shown for 2005 where very few terminations are identified (27 for DaVita and 1 for USPI). Vertical lines indicate the start and end of the proposed class periods.

Source: Starr turnover (Corrected Data).

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT D-4**
**DR. STARR'S FIGURE 4 PROBABILITY OF MOBILITY**
**APPLIED TO OVERALL TURNOVER**
**USING DR. STARR'S METHODOLOGY**

| Statistic | Overall Turnover (Departures to any Destination) | | |
|---|---|---|---|
| | DaVita | SCA | USPI |
| [a] | [b] | [c] | [d] |
| Conduct | 0.0010 | 0.0016 | -0.0317* |
| | (0.0059) | (0.0137) | (0.0073) |
| Time-trend | 0.0018* | 0.0004 | 0.0046* |
| | (0.0006) | (0.0014) | (0.0007) |
| Observations | 18,084 | 6,700 | 9,773 |
| Departures | 2,286 | 966 | 1,167 |
| R-squared | 0.0005 | 0.0000 | 0.0054 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

4

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT D-5**
**DR. STARR'S FIGURE 4 PROBABILITY OF MOBILITY**
**APPLIED TO OVERALL TURNOVER RATES**
**INCLUDING DR. STARR'S MACROECONOMIC AND HEALTHCARE CONTROLS**

| Statistic | DaVita | SCA | USPI |
|---|---|---|---|
| [a] | [b] | [c] | [d] |
| Conduct | 0.0131 | -0.0091 | -0.0344* |
| | (0.0083) | (0.0222) | (0.0112) |
| Time-trend | 0.0060* | 0.0072* | 0.0029 |
| | (0.002) | (0.0032) | (0.0027) |
| Log of Avg. State Mgr. Earnings | 0.0177 | 0.0220 | 0.0218 |
| | (0.0279) | (0.0479) | (0.0456) |
| Log of State Health Expend. PC | -0.0569 | -0.0589 | -0.0176 |
| | (0.0314) | (0.0595) | (0.0408) |
| Covid | -0.0019 | -0.0349 | -0.0143 |
| | (0.0131) | (0.0202) | (0.0203) |
| Log of State GDP per Capita | 0.0690* | 0.1597* | -0.0607 |
| | (0.0267) | (0.0414) | (0.0407) |
| Log of State Unemployment Rate | -0.0298* | 0.0445* | 0.0173 |
| | (0.0092) | (0.0174) | (0.0161) |
| Census Region Annual CPI | -0.0843* | -0.0733 | 0.1082* |
| | (0.0266) | (0.0558) | (0.0441) |
| | | | |
| Observations | 20,430 | 7,605 | 10,896 |
| Departures | 2,889 | 1,088 | 1,334 |
| R-squared | 0.0027 | 0.0064 | 0.0132 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variables of interest that are negative and statistically significant are shown in grey. Not statistically significant or positive and statistically significant results are shown in yellow.

Source: Starr turnover (Corrected Data).

5

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix E.**

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

**EXHIBIT E-1**
**DEFENDANTS' SHARE OF TOTAL U.S. EMPLOYMENT**
**2008 – 2022**

| Year | Defendants | | | | Total Employment | | Percent of Total Employment Held by Defendants | |
| | DaVita | SCA | USPI | Total | Healthcare and Social Assistance (NAICS 62) | Other Outpatient Care Centers (NAICS 62149) | Healthcare and Social Assistance (NAICS 62) | Other Outpatient Care Centers (NAICS 62149) |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
|---|---|---|---|---|---|---|---|---|
| 2008 | 39,154 | 6,824 | 9,100 | 55,078 | 16,499,250 | 442,400 | 0.33% | 12.45% |
| 2009 | 39,562 | 6,417 | 9,015 | 54,994 | 16,867,510 | 456,583 | 0.33% | 12.04% |
| 2010 | 43,041 | 6,520 | 10,121 | 59,682 | 17,159,240 | 473,217 | 0.35% | 12.61% |
| 2011 | 45,383 | 6,685 | 10,809 | 62,877 | 17,428,210 | 486,208 | 0.36% | 12.93% |
| 2012 | 51,789 | 6,759 | 11,358 | 69,906 | 17,720,090 | 507,792 | 0.39% | 13.77% |
| 2013 | 55,893 | 7,009 | 13,321 | 76,223 | 18,059,100 | 533,675 | 0.42% | 14.28% |
| 2014 | 58,845 | 7,860 | 13,715 | 80,420 | 18,341,690 | 559,933 | 0.44% | 14.36% |
| 2015 | 61,871 | 8,629 | 14,818 | 85,318 | 18,738,850 | 592,158 | 0.46% | 14.41% |
| 2016 | 77,922 | 9,739 | 18,072 | 105,733 | 19,257,910 | 629,192 | 0.55% | 16.80% |
| 2017 | 84,024 | 9,879 | 17,130 | 111,033 | 20,208,050 | 662,550 | 0.55% | 16.76% |
| 2018 | 85,585 | 10,738 | 18,335 | 114,658 | 20,621,190 | 688,325 | 0.56% | 16.66% |
| 2019 | 70,378 | 11,145 | 19,389 | 100,912 | 21,025,440 | 713,133 | 0.48% | 14.15% |
| 2020 | 70,200 | 11,816 | 21,355 | 103,371 | 20,569,100 | 712,958 | 0.50% | 14.50% |
| 2021 | 73,076 | 13,382 | 22,635 | 109,093 | 20,833,710 | 735,158 | 0.52% | 14.84% |
| 2022 | 76,597 | 14,141 | 23,579 | 114,317 | 21,300,140 | 754,817 | 0.54% | 15.14% |

Source: Starr turnover (Corrected Data); BLS OEWS Data on industry employment.

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT E-2**
**DEFENDANTS' SHARE OF TOTAL U.S. FACILITIES**
**2008 – 2022**

| Year | Defendants | | | | Total Facilities | | Percent of Total Facilities Operated by Defendants | |
|------|--------|-----|------|-------|----------------------------------------------|----------------------------------------------|----------------------------------------------|----------------------------------------------|
| | DaVita | SCA | USPI | Total | Healthcare and Social Assistance (NAICS 62) | Other Outpatient Care Centers (NAICS 62149) | Healthcare and Social Assistance (NAICS 62) | Other Outpatient Care Centers (NAICS 62149) |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2008 | 2,443 | 140 | 167 | 2,750 | 791,007 | 19,704 | 0.35% | 13.96% |
| 2009 | 2,640 | 128 | 175 | 2,943 | 799,271 | 20,445 | 0.37% | 14.39% |
| 2010 | 2,665 | 128 | 185 | 2,978 | 812,860 | 21,124 | 0.37% | 14.10% |
| 2011 | 2,816 | 130 | 210 | 3,156 | 818,726 | 21,678 | 0.39% | 14.56% |
| 2012 | 3,053 | 130 | 212 | 3,395 | 833,883 | 23,364 | 0.41% | 14.53% |
| 2013 | 3,487 | 134 | 228 | 3,849 | 843,603 | 23,960 | 0.46% | 16.06% |
| 2014 | 3,743 | 155 | 235 | 4,133 | 855,252 | 24,697 | 0.48% | 16.73% |
| 2015 | 3,991 | 159 | 244 | 4,394 | 876,072 | 26,618 | 0.50% | 16.51% |
| 2016 | 4,165 | 168 | 303 | 4,636 | 890,519 | 27,304 | 0.52% | 16.98% |
| 2017 | 4,410 | 170 | 307 | 4,887 | 897,635 | 31,950 | 0.54% | 15.30% |
| 2018 | 4,548 | 185 | 318 | 5,051 | 907,426 | 31,466 | 0.56% | 16.05% |
| 2019 | 4,606 | 188 | 327 | 5,121 | 918,433 | 32,036 | 0.56% | 15.99% |
| 2020 | 4,302 | 198 | 349 | 4,849 | 928,174 | 32,191 | 0.52% | 15.06% |
| 2021 | 4,321 | 229 | 391 | 4,941 | 947,570 | 37,625 | 0.52% | 13.13% |
| 2022 | 4,426 | 240 | 424 | 5,090 | 976,418 | 41,228 | 0.52% | 12.35% |

Note: Facilities at the Defendants are identified by facility ID.

Source: Starr turnover (Corrected Data); U.S. Census Bureau Country Business Patterns Data.

2

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix F.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-1**
**HOURLY RATE FOR DIRECTORS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles 1st | 25th | Median | 75th | 99th |
|------|---------|-----------|------|-----|------|--------|------|------|
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2005 | DaVita | 183 | | | | | | |
| | SCA | -- | | | | | | |
| | USPI | 93 | | | | | | |
| 2006 | DaVita | 336 | | | | | | |
| | SCA | -- | | | | | | |
| | USPI | 103 | | | | | | |
| 2007 | DaVita | 334 | | | | | | |
| | SCA | -- | | | | | | |
| | USPI | 121 | | | | | | |
| 2008 | DaVita | 380 | | | | | | |
| | SCA | 87 | | | | | | |
| | USPI | 142 | | | | | | |
| 2009 | DaVita | 405 | | | | | | |
| | SCA | 103 | | | | | | |
| | USPI | 144 | | | | | | |
| 2010 | DaVita | 418 | | | | | | |
| | SCA | 110 | | | | | | |
| | USPI | 151 | | | | | | |
| 2011 | DaVita | 454 | | | | | | |
| | SCA | 125 | | | | | | |
| | USPI | 152 | | | | | | |
| 2012 | DaVita | 550 | | | | | | |
| | SCA | 144 | | | | | | |
| | USPI | 184 | | | | | | |
| 2013 | DaVita | 635 | | | | | | |
| | SCA | 150 | | | | | | |
| | USPI | 185 | | | | | | |
| 2014 | DaVita | 661 | | | | | | |
| | SCA | 192 | | | | | | |
| | USPI | 197 | | | | | | |
| 2015 | DaVita | 661 | | | | | | |
| | SCA | 202 | | | | | | |
| | USPI | 222 | | | | | | |
| 2016 | DaVita | 946 | | | | | | |
| | SCA | 248 | | | | | | |
| | USPI | 252 | | | | | | |
| 2017 | DaVita | 1,079 | | | | | | |
| | SCA | 254 | | | | | | |
| | USPI | 267 | | | | | | |
| 2018 | DaVita | 1,067 | | | | | | |
| | SCA | 247 | | | | | | |
| | USPI | 308 | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-1 (CONTINUED)**
**HOURLY RATE FOR DIRECTORS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | 1st | 25th | Median | 75th | 99th |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2019 | DaVita | 746 | | | | | | |
| | SCA | 266 | | | | | | |
| | USPI | 309 | | | | | | |
| 2020 | DaVita | 795 | | | | | | |
| | SCA | 294 | | | | | | |
| | USPI | 325 | | | | | | |
| 2021 | DaVita | 789 | | | | | | |
| | SCA | 336 | | | | | | |
| | USPI | 305 | | | | | | |
| 2022 | DaVita | 857 | | | | | | |
| | SCA | 383 | | | | | | |
| | USPI | 275 | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

2

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-2**
**HOURLY RATE FOR VICE PRESIDENTS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
|------|---------|-----------|------|-----|------|--------|------|------|
| | | | | 1st | 25th | Median | 75th | 99th |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2005 | DaVita | 31 | | | | | | |
| | SCA | -- | | | | | | |
| | USPI | 74 | | | | | | |
| 2006 | DaVita | 45 | | | | | | |
| | SCA | -- | | | | | | |
| | USPI | 95 | | | | | | |
| 2007 | DaVita | 55 | | | | | | |
| | SCA | -- | | | | | | |
| | USPI | 142 | | | | | | |
| 2008 | DaVita | 77 | | | | | | |
| | SCA | 116 | | | | | | |
| | USPI | 152 | | | | | | |
| 2009 | DaVita | 88 | | | | | | |
| | SCA | 123 | | | | | | |
| | USPI | 168 | | | | | | |
| 2010 | DaVita | 99 | | | | | | |
| | SCA | 124 | | | | | | |
| | USPI | 174 | | | | | | |
| 2011 | DaVita | 119 | | | | | | |
| | SCA | 126 | | | | | | |
| | USPI | 213 | | | | | | |
| 2012 | DaVita | 146 | | | | | | |
| | SCA | 118 | | | | | | |
| | USPI | 216 | | | | | | |
| 2013 | DaVita | 146 | | | | | | |
| | SCA | 132 | | | | | | |
| | USPI | 220 | | | | | | |
| 2014 | DaVita | 159 | | | | | | |
| | SCA | 157 | | | | | | |
| | USPI | 239 | | | | | | |
| 2015 | DaVita | 180 | | | | | | |
| | SCA | 161 | | | | | | |
| | USPI | 234 | | | | | | |
| 2016 | DaVita | 248 | | | | | | |
| | SCA | 180 | | | | | | |
| | USPI | 294 | | | | | | |
| 2017 | DaVita | 252 | | | | | | |
| | SCA | 174 | | | | | | |
| | USPI | 294 | | | | | | |
| 2018 | DaVita | 241 | | | | | | |
| | SCA | 193 | | | | | | |
| | USPI | 308 | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-2 (CONTINUED)**
**HOURLY RATE FOR VICE PRESIDENTS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
| | | | | 1st | 25th | Median | 75th | 99th |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2019 | DaVita | 165 | | | | | | |
| | SCA | 205 | | | | | | |
| | USPI | 303 | | | | | | |
| 2020 | DaVita | 183 | | | | | | |
| | SCA | 199 | | | | | | |
| | USPI | 316 | | | | | | |
| 2021 | DaVita | 196 | | | | | | |
| | SCA | 233 | | | | | | |
| | USPI | 310 | | | | | | |
| 2022 | DaVita | 210 | | | | | | |
| | SCA | 246 | | | | | | |
| | USPI | 297 | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

4

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-3**
**HOURLY RATE FOR SENIOR VICE PRESIDENTS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | 1st | 25th | Median | 75th | 99th |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2005 | DaVita | 3 | | | | | | |
| | SCA | -- | | | | | | |
| | USPI | 13 | | | | | | |
| 2006 | DaVita | 10 | | | | | | |
| | SCA | -- | | | | | | |
| | USPI | 19 | | | | | | |
| 2007 | DaVita | 9 | | | | | | |
| | SCA | -- | | | | | | |
| | USPI | 28 | | | | | | |
| 2008 | DaVita | 9 | | | | | | |
| | SCA | 6 | | | | | | |
| | USPI | 27 | | | | | | |
| 2009 | DaVita | 9 | | | | | | |
| | SCA | 2 | | | | | | |
| | USPI | 26 | | | | | | |
| 2010 | DaVita | 14 | | | | | | |
| | SCA | 3 | | | | | | |
| | USPI | 31 | | | | | | |
| 2011 | DaVita | 12 | | | | | | |
| | SCA | 5 | | | | | | |
| | USPI | 34 | | | | | | |
| 2012 | DaVita | 10 | | | | | | |
| | SCA | 7 | | | | | | |
| | USPI | 36 | | | | | | |
| 2013 | DaVita | 8 | | | | | | |
| | SCA | 8 | | | | | | |
| | USPI | 41 | | | | | | |
| 2014 | DaVita | 9 | | | | | | |
| | SCA | 9 | | | | | | |
| | USPI | 43 | | | | | | |
| 2015 | DaVita | 10 | | | | | | |
| | SCA | 11 | | | | | | |
| | USPI | 51 | | | | | | |
| 2016 | DaVita | 8 | | | | | | |
| | SCA | 12 | | | | | | |
| | USPI | 58 | | | | | | |
| 2017 | DaVita | 7 | | | | | | |
| | SCA | 8 | | | | | | |
| | USPI | 64 | | | | | | |
| 2018 | DaVita | 7 | | | | | | |
| | SCA | 12 | | | | | | |
| | USPI | 58 | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

5

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT F-3 (CONTINUED)**
**HOURLY RATE FOR SENIOR VICE PRESIDENTS**
**BY DEFENDANT**
**2005 – 2022**

| Year | Company | Employees | Mean | Percentiles | | | | |
| | | | | 1st | 25th | Median | 75th | 99th |
|------|---------|-----------|------|-----|------|--------|------|------|
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] |
| 2019 | DaVita | 5 | | | | | | |
| | SCA | 12 | | | | | | |
| | USPI | 49 | | | | | | |
| 2020 | DaVita | 4 | | | | | | |
| | SCA | 15 | | | | | | |
| | USPI | 44 | | | | | | |
| 2021 | DaVita | 3 | | | | | | |
| | SCA | 17 | | | | | | |
| | USPI | 35 | | | | | | |
| 2022 | DaVita | 3 | | | | | | |
| | SCA | 31 | | | | | | |
| | USPI | 3 | | | | | | |

Notes: Excludes outliers and partial-year records as identified by Dr. Starr as well as USPI records with missing regular hours.

Source: Starr turnover (Corrected Data).

6

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix G.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT G-1**
**DIFFERENCE BETWEEN AVERAGE HOURLY RATE**
**DIRECTORS AND VPS/SVPS**
**USPI**
**2005 – 2022**



Note: Vertical lines indicate the start and end of the proposed class period.

Source: Starr turnover (Corrected Data).

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix H.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT H-1**
**DR. STARR'S FIGURE 37: REVERSE RELATIONSHIP BETWEEN DIRECTOR AND VP/SVP WAGES**
**ON CORRECTED DATA**
**APPLIED TO YEAR-OVER-YEAR CHANGES**

| | Dependent Variable: First Difference of Ln(Mean Hourly Rate of VPs & SVPs) | | | | | |
|---|---|---|---|---|---|---|
| | DaVita | | SCA | | USPI | |
| First Difference of Ln(Mean Hourly Rate of Directors) | 1.9840* | 1.9514* | 1.0516 | 0.3686 | 2.1142* | 0.9315 |
| | 0.5702 | 0.8307 | 0.4912 | 1.5986 | 0.8899 | 0.9581 |
| First Difference of Ln(Avg. State Mgr. Earnings) | | -0.9416 | | 0.5105 | | 1.8854 |
| | | 1.2088 | | 0.4865 | | 1.4456 |
| First Difference of Ln(State Health Expend. PC) | | 1.5063 | | -0.4434 | | -1.2271 |
| | | 3.4814 | | 0.8260 | | 1.7037 |
| First Difference of Covid | | 0.4232 | | -0.0619 | | 0.2645 |
| | | 0.5346 | | 0.2010 | | 0.3706 |
| First Difference of Ln(State GDP PC) | | -5.4803 | | -2.1722 | | 1.8093 |
| | | 7.4219 | | 3.5107 | | 8.8673 |
| First Difference of Ln(State Unemployment Rate) | | -0.4932 | | -0.1302 | | -0.2374 |
| | | 0.8861 | | 0.2707 | | 0.9598 |
| First Difference of Census Region Annual CPI | | -0.5047 | | -0.0797 | | -1.9834 |
| | | 1.7809 | | 0.6889 | | 1.5055 |
| Constant | -0.0087 | 0.0481 | 0.0095 | 0.0551 | -0.0428 | 0.0677 |
| | 0.0542 | 0.1660 | 0.0213 | 0.1214 | 0.0620 | 0.1722 |
| Observations | 17 | 17 | 14 | 14 | 17 | 17 |
| R-squared | 0.5059 | 0.6092 | 0.2074 | 0.3981 | 0.2797 | 0.5366 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Results of Dr. Starr's variable of interest that are not statistically significant are shown in yellow. Dr. Starr notes that "the constant term is suppressed" for his analysis; however, the analysis does include a constant term, although it is not shown in his Figure 37.

Source: Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix I.**

**HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY**

**EXHIBIT I-1**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2009 – 2022**

| Job Level and Defendant | No Salary Change | Percent Change in Base Salary | | | | | | | Other Salary Changes |
| | | Less than 1.0% | Between 1.0 and 1.9% | Between 2.0 and 2.9% | Between 3.0 and 4.9% | Between 5.0 and 7.9% | Between 8.0 and 11.9% | 12% or Greater | |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [k] |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |

Notes: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT I-1 (CONTINUED)**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2009 – 2022**

| Job Level and Defendant | No Salary Change | Percent Change in Base Salary | | | | | | | Other Salary Changes |
| | | Less than 1.0% | Between 1.0 and 1.9% | Between 2.0 and 2.9% | Between 3.0 and 4.9% | Between 5.0 and 7.9% | Between 8.0 and 11.9% | 12% or Greater | |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [k] |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |

Notes: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. I note that the majority of job titles for DaVita employees change between 2013 and 2014 (DaVita changed its payroll system between 2013 and 2014, see 2.b in *2023-10-05 - Letter from M. Lane to S. Zandi*). These employees are not included in this analysis. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

2

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT I-1 (CONTINUED)**
**DISTRIBUTION OF CHANGES IN BASE SALARY**
**BY DEFENDANT AND JOB LEVEL**
**2009 – 2022**

| Job Level and Defendant | No Salary Change | Percent Change in Base Salary | | | | | | | Other Salary Changes |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Less than 1.0% | Between 1.0 and 1.9% | Between 2.0 and 2.9% | Between 3.0 and 4.9% | Between 5.0 and 7.9% | Between 8.0 and 11.9% | 12% or Greater | |
| [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [k] |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **Directors** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |
| **VPs & SVPs** | | | | | | | | | |
| DaVita | | | | | | | | | |
| SCA | | | | | | | | | |
| USPI | | | | | | | | | |

Notes: Employees that are not within the same job title for the full current and full previous year are excluded from this analysis. Base salary includes regular, PTO, sick, and holiday pay, as categorized by Dr. Starr, on an annualized basis.

Source: Starr turnover (Corrected Data).

3

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix J.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT J-1**
**DR. STARR'S "WAGE SUPPRESSION" REGRESSION**
**ON CORRECTED DATA**
**EXCLUDING USPI RECORDS WITH MISSING REGULAR HOURS**

| Statistic | Dr. Starr's Aggregate Model | | Dr. Starr's Defendant-Specific Model | |
| --- | --- | --- | --- | --- |
| | Figure 6 | Corrected Excl. USPI Records Missing Regular Hours | Figure 8 | Corrected Excl. USPI Records Missing Regular Hours |
| [a] | [b] | [c] | [d] | [e] |
| Pooled Conduct | -0.1565* | -0.1192* | | |
| **% Wage Suppression** | **-14.5%** | **-11.2%** | | |
| | (0.0117) | (0.0102) | | |
| DaVita Conduct | | | -0.1882* | -0.1730* |
| **% Wage Suppression** | | | **-17.2%** | **-15.9%** |
| | | | (0.0145) | (0.0140) |
| SCA Conduct | | | -0.1491* | -0.1080* |
| **% Wage Suppression** | | | **-13.9%** | **-10.2%** |
| | | | (0.0177) | (0.0171) |
| USPI Conduct | | | -0.1276* | -0.0716* |
| **% Wage Suppression** | | | **-12.0%** | **-6.9%** |
| | | | (0.0142) | (0.0111) |
| Observations | 27,010 | 26,537 | 27,010 | 26,537 |
| Included Employees | 5,173 | 5,066 | 5,173 | 5,066 |
| R-squared | 0.856 | 0.876 | 0.857 | 0.877 |

Notes: Statistical significance at a conventional 5 percent level is denoted by a *. Negative and statistically significant results are shown in grey. USPI records with missing regular hours are excluded.

Sources: Starr Report, Figure 6 column [4] and Figure 8 column [4]; Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix K.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**EXHIBIT K-1**
**AVERAGE ANNUAL TOTAL COMPENSATION**
**BY COMPENSATION TYPE**
**USPI**
**2005 – 2022**



Notes: The total compensation in this analysis is the compensation that Dr. Starr describes as "Class Compensation" in his Figure 25. The annual Tenet data (*USPI_CIV_000659234.xlsx*), which includes additional off-cycle bonuses, does not differentiate between variable compensation types. Following Dr. Starr's classification, these are included within "All Other Compensation" (see *2024.11.18 USPI Production - Vol. 27.pdf*).

Sources: Starr turnover (Corrected Data).

1

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

**Appendix L.**

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

EXHIBIT L-1
GEOGRAPHIC DISPERSION OF RELEVANT EMPLOYEES
TOP 5 STATES

| State and Defendant [a] | 2008 [b] | 2009 [c] | 2010 [d] | 2011 [e] | 2012 [f] | 2013 [g] | 2014 [h] | 2015 [i] | 2016 [j] | 2017 [k] | 2018 [l] | 2019 [m] | 2020 [n] | 2021 [o] | 2022 [p] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Colorado (DaVita HQ)** | | | | | | | | | | | | | | | |
| DaVita | 4% | 6% | 7% | 11% | 16% | 19% | 21% | 23% | 21% | 23% | 25% | 28% | 29% | 32% | 33% |
| SCA | 2% | 2% | 2% | 1% | 1% | 2% | 2% | 2% | 1% | 2% | 2% | 2% | 4% | 3% | 2% |
| USPI | 0% | 1% | 2% | 1% | 2% | 2% | 2% | 2% | 1% | 1% | 2% | 2% | 3% | 2% | 2% |
| **Alabama (SCA HQ)** | | | | | | | | | | | | | | | |
| DaVita | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 0% | 0% | 1% | 0% | 1% | 1% | 1% | 1% |
| SCA | 27% | 28% | 29% | 34% | 42% | 45% | 44% | 46% | 45% | 46% | 46% | 45% | 45% | 47% | 50% |
| USPI | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 1% | 1% | 0% |
| **Texas (USPI HQ)** | | | | | | | | | | | | | | | |
| DaVita | 5% | 5% | 5% | 5% | 5% | 5% | 6% | 7% | 6% | 6% | 4% | 5% | 5% | 4% | 4% |
| SCA | 6% | 6% | 6% | 6% | 4% | 4% | 6% | 7% | 8% | 8% | 9% | 10% | 9% | 8% | 7% |
| USPI | 66% | 67% | 66% | 66% | 65% | 64% | 67% | 66% | 66% | 64% | 63% | 61% | 42% | 37% | 35% |
| **California (DaVita former HQ)** | | | | | | | | | | | | | | | |
| DaVita | 22% | 20% | 21% | 18% | 18% | 18% | 17% | 15% | 25% | 22% | 21% | 11% | 11% | 10% | 10% |
| SCA | 17% | 17% | 17% | 19% | 16% | 16% | 15% | 13% | 13% | 11% | 10% | 11% | 9% | 10% | 8% |
| USPI | 4% | 3% | 3% | 3% | 3% | 4% | 4% | 4% | 5% | 5% | 5% | 6% | 8% | 8% | 7% |
| **Florida** | | | | | | | | | | | | | | | |
| DaVita | 7% | 7% | 6% | 6% | 7% | 7% | 7% | 7% | 8% | 7% | 7% | 6% | 6% | 5% | 5% |
| SCA | 6% | 6% | 7% | 6% | 5% | 4% | 5% | 4% | 4% | 5% | 5% | 5% | 6% | 5% | 5% |
| USPI | 2% | 2% | 2% | 1% | 1% | 1% | 1% | 1% | 3% | 3% | 3% | 5% | 8% | 9% | 13% |
| **All Other States** | | | | | | | | | | | | | | | |
| DaVita | 61% | 62% | 61% | 59% | 54% | 50% | 48% | 47% | 40% | 42% | 42% | 49% | 48% | 48% | 47% |
| SCA | 41% | 40% | 39% | 34% | 32% | 29% | 27% | 28% | 28% | 28% | 28% | 28% | 27% | 27% | 28% |
| USPI | 28% | 27% | 28% | 28% | 28% | 29% | 27% | 28% | 25% | 27% | 27% | 27% | 38% | 43% | 43% |

Source: Starr turnover (Corrected Data).

1

# Exhibit 9

# Lane Declaration

# (Filed Under Seal)

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE: OUTPATIENT MEDICAL CENTER
EMPLOYEE ANTITRUST LITIGATION

MASTER DOCKET NO. 1:21-CV-00305

ERRATA TO

EXPERT REPORT OF DR. JOHN H. JOHNSON, IV

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL / EXPERTS ONLY

1. **Footnote 7:** Change "pp. 42–95, p. 45" to "pp. 43–95, at p. 45".

2. **Footnote 44**: Change "187 Job Families" to "185 Job Families". "Clinical Management" to "Clinic Management".

3. **Label on the right panel of Exhibit 8:** Change "Outpatinet" to "Outpatient".

4. **Paragraph 56:** Change "Anthoy Kilgore" to "Anthony Kilgore".

5. **Paragraph 59:** Change "are statistical significance" to "are statistically significant".

6. **Paragraph 71:** Change "each Defendants" to "each Defendant".

7. **Exhibit 12 Note**: Change "Sixteen employees" to "Eighteen employees".

8. **Exhibit 17:** Add coefficients and standard errors for the "Constant" term:

    First DaVita Column: Coefficient is 0.5525* and standard error is (0.1330).

    First SCA Column: Coefficient is 0.2498* and standard error is (0.0848).

    First USPI Column: Coefficient is 0.3703* and standard error is (0.1294).

9. **Paragraph 95:** Change "around ███████" to "around ██████".

10. **Paragraph 104 and Footnote 346:** Change "Between 12 and 36 percent" to "Between 13 and 36 percent". Insert "relevant" before "SCA employees".

11. **Footnote 232:** Change "that Defendants'" to "Defendants'".

12. **Footnote 244:** Change "based his assessment" to "based on his assessment".

13. **Paragraph 117:** Change "SCA Vice President" to "SCA Vice Presidents".

14. **Exhibit 21 Note:** Remove ")" from "discussion of this test)".

15. **Footnote 300:** Change "employees-years" to "employee-years".

16. **Paragraph 140:** Remove apostrophe from "Dr. Starr' purports".

17. 

19. **Footnote 323:** Add an end-quote after "relied upon".

20. **Paragraph 172:** Change "for compensation decision" to "for compensation decisions" and change "████████████" to ████████████

21. **Paragraph 176:** Add "to" before "show antitrust impact".

22. **Paragraph 178**: Change "May 1, 2010 to January 5, 2021 for DaVita" to "February 1, 2012 to January 5, 2021 for DaVita".

23. **Appendix B:** Add the following files to the "Data, Bates Numbered Files" sub-section: DVA_OMCEAL_001408531–8532, 8534–8535, 8537–8538, 8540–8541, 8544–8546, 8548–8549.

24. **Exhibit D-3:** In the subtitle, change "2006 – 2022" to "2006 – 2021".

_____
Dr. John H. Johnson, IV
May 2, 2025

# Exhibit 10

Lane Declaration

(Filed Under Seal)

Highly Confidential
Outside Counsel/Experts Only

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| |
|---|
| *IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION* |

Case No. 1:21-cv-00305-SRH-YBK

# CORRECTED EXPERT REPORT OF LAUREN J. STIROH, PH.D.

## June 26, 2025

Highly Confidential
Outside Counsel/Experts Only

# Contents

**I.    Introduction** ................................................................................ **1**

A. Qualifications .......................................................................................1

B. Assignment ..........................................................................................1

C. Materials Relied Upon .......................................................................2

D. Nature of the Case ..............................................................................2

   1.  Overview of Defendants ..............................................................2

   2.  Summary of Plaintiffs' Allegations ............................................4

   3.  Summary of Plaintiffs' Experts' Opinions ................................5

E. Summary of Opinions .........................................................................6

**II.   Impact Is Economically Implausible Given the Competitive
Realities Faced by DaVita and SCA** ...................................... **11**

A. Market Power Is Necessary for Firmwide Suppression of Compensation ..................11

B. Plaintiffs and Their Experts Do Not Assess or Acknowledge the Extent of
Competition for Senior-Level Employees ..................................................13

C. DaVita Competes for Employees with Many Employers Across Many Industries.....14

   1.  DaVita Competed with a Broad Set of Employers in Multiple Industries ...........15

   2.  DaVita and SCA Represented a Small Share of One Another's Hires.................23

   3.  DaVita and SCA Represent a Small Share of Employment in the Industries
that Competed for DaVita Senior-Level Employees ...........................24

**III.  Economic Evidence Is Consistent with Competitive Behavior and
Outcomes** ............................................................................. **26**

A. DaVita's Significant Employment Growth Is Consistent with Competitive
Outcomes ....................................................................................................26

B. DaVita's Compensation Grew at a Competitive Rate ................................29

**IV.   Economic Evidence Is Inconsistent with Plaintiffs' Mechanisms of
Harm** ...................................................................................... **33**

A. There Was No Reduction in Employee Mobility ........................................34

   1.  Dr. Starr's Analysis of Employee Mobility is Flawed and Estimates a
Reduction in Employee Mobility Between DaVita and SCA When There
Was None...................................................................................................35

   2.  Dr. Starr Fails to Establish a Meaningful Increase in Employee Mobility after
2019 ..........................................................................................................41

B. It Is Implausible That There Would Have Been Any Meaningful Reduction in
Information Available To Senior-Level Employees.................................43

Highly Confidential
Outside Counsel/Experts Only

**V.    Dr. Starr's Compensation Regressions Estimate Firmwide Conduct Effects Where There Are None............................................. 48**

A. Dr. Starr's Model Yields No Firmwide Conduct Effect for Potentially Relevant Alternative Conduct Periods.......................................................................49

B. Dr. Starr Uses a Flawed Measure of Equity Compensation and Made Errors in Constructing His Data...................................................................................56

C. Dr. Starr's Regressions Are Not Robust to Alternative Specifications .......................58

D. Dr. Starr's Robustness Checks Are Not Informative...................................................63

**VI.   Plaintiffs Fail to Establish the Alleged Information Exchanges Supported Wage-Fixing and Fail to Consider that Information Exchanges Can Be Procompetitive ....................................................... 64**

A. Plaintiffs Fail to Establish that the Alleged Information Exchanges Could Have Supported Wage-Fixing................................................................................64

B. Economic Research Demonstrates that Firms Have Unilateral Incentives to Exchange Compensation-Related Information and Benchmark Compensation ........66

Highly Confidential
Outside Counsel/Experts Only

## I.   Introduction

### A. Qualifications

1.  My name is Lauren J. Stiroh.  I am an economist and a Senior Managing Director at NERA.  NERA was founded in 1961 and provides research and analysis in the field of applied microeconomics, including the economics of competition, regulation, and finance.  A substantial portion of my work, as well as NERA's consulting work, includes class certification, liability matters, and the determination of economic damages.

2.  I have provided economic consulting services and testimony in a substantial number of antitrust cases and in connection with liability, damages, and class certification issues.  I have testified at trial and in deposition regarding a variety of business practices.  These include, for example, abuse of monopsony power, labor disputes, commercial disputes, business interference, breach of contract, allegations of monopolization, price predation, tie-ins, price discrimination, abuse of market power, and patent infringement.  I have experience with antitrust damages and class certification issues in a range of industries including labor, health insurance, medical devices, pharmaceuticals, biotechnology, real estate, café franchises, futures trading exchange services, advertising and promotion, sports, industrial chemicals, automotive services, consumer products, agricultural products, and semiconductors.

3.  I received my Ph.D. in economics from Harvard University in 1996.  Prior to that, I completed my B.A. in economics from the University of Western Ontario in 1990, and my M.A. from the University of British Columbia in 1991.  My curriculum vitae, which includes a list of my prior expert testimony, is appended to this report as **Exhibit 1**.  NERA is being compensated for my time at a rate of $1,250 per hour.  Neither NERA's compensation, nor my compensation, depends on the outcome of this litigation.

### B. Assignment

4.  I have been asked by counsel for DaVita Inc. ("DaVita") and Kent Thiry to evaluate Plaintiffs' claims that alleged agreements between DaVita and Surgical Care Affiliates, LLC and SCAI Holdings, LLC (collectively "SCA") restricting the movement of employees between them and the alleged exchange of "competitively sensitive information" ("CSI ") between DaVita and SCA, as set out in the Complaint, resulted in substantial reductions in compensation for all of DaVita's Senior-Level employees from 2008 through 2019.[1]  Specifically, I have been asked to evaluate and comment on the disclosed opinions, methodologies, analyses, and conclusions of the experts retained by

---

[1]    Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, November 14, 2024 ("Complaint").  I use the term "Senior-Level employees" to mean the same group of people to whom Dr. Starr refers as "Class Members."

1

Highly Confidential
Outside Counsel/Experts Only

and testifying for Plaintiffs, Dr. Barry S. Gerhart and Dr. Evan P. Starr, dated January 15, 2025,[2] that pertain to DaVita.

## C. Materials Relied Upon

5.  In preparing this report, I, and economists working under my direction, have reviewed Plaintiffs' experts' reports, documents and data referenced therein, the Complaint, documents, deposition transcripts, testimony provided in connection with this case and in *United States of America v. DaVita Inc., Kent Thiry*, proprietary data, and publicly available information. The opinions expressed in this report are based on my review of this information, my training and experience as an economist, and the application of economic analysis to the information that I have reviewed. A list of the sources of information and materials I relied upon in forming my opinions is presented in **Exhibit 2**.

6.  I may use the materials that I have identified, as well as other information that has been or may be produced during the course of this case, to support my testimony at any relevant hearing or trial. In addition, I may use demonstrative materials (*e.g.*, tables and charts) based on this information and my analyses to support that testimony.

## D. Nature of the Case

### 1. Overview of Defendants

7.  The Corporate Defendants include DaVita, SCA, and USPI. For the remainder of this report, I use the term "Defendants" to refer to the Corporate Defendants.

8.  Headquartered in Denver, Colorado, DaVita is a provider of kidney care services, operating 2,675 outpatient dialysis centers across 46 states.[3] DaVita cares for more than 200,000 dialysis patients in the United States and employs approximately 55,000 individuals in the United States.[4] DaVita expanded its global workforce from 32,500 employees in 2008 to approximately 70,000 by 2023, representing employment growth of approximately 115 percent.[5] Kent Thiry served as DaVita's CEO from 1999 until May 31, 2019, when he was succeeded by Javier Rodriguez.[6]

---

[2] Expert Witness Report of Dr. Barry S. Gerhart, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, January 15, 2025 as amended ("Gerhart Report"); Expert Witness Report of Dr. Evan P. Starr, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, January 15, 2025 as amended ("Starr Report").

[3] DaVita also operates outpatient dialysis centers in the District of Columbia. DaVita is sometimes referred to as "The Village" or "DVA." DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, pp. 2-3.

[4] "About," *DaVita Website*, available at https://www.davita.com/about.

[5] DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, p. 22; DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2008, p. 18.

[6] "DaVita Announces CEO Succession," *DaVita Investors Website*, April 29, 2019, available at https://investors.davita.com/2019-04-29-DaVita-Announces-CEO-Succession.

Highly Confidential
Outside Counsel/Experts Only

9.  In October 2005, DaVita acquired Gambro Healthcare U.S., adding approximately 520 dialysis centers to its portfolio.[7] In November 2012, DaVita acquired HealthCare Partners ("HCP"), "one of the nation's largest operators of medical groups and physician networks."[8] HCP, later known as DaVita Medical Group, was subsequently acquired by Optum in June 2019.[9]

10. SCA is an ambulatory surgery center management company, operating around 320 surgical facilities in 35 states and employing around 11,000 individuals.[10] Andrew Hayek served as SCA's CEO from 2008 through 2017.[11] In January 2017, Optum acquired SCA, and Mr. Hayek became CEO of OptumHealth in April.[12]

11. United Surgical Partners International, Inc. and United States Surgical Partners Holdings, Inc. ("USPI") is an "ambulatory surgery platform" founded in 1998.[13] Headquartered in Dallas, Texas, USPI operates approximately 535 surgical facilities across over 37 states.[14] USPI employs roughly 20,000 individuals.[15] In March 2015, Tenet Healthcare Corporation ("Tenet") purchased 50.1 percent of USPI, and Tenet increased its ownership stake to 95 percent in April 2018.[16]

---

[7] "DaVita Closes Gambro Healthcare Acquisition," *DaVita Investors Website*, October 5, 2005, available at https://investors.davita.com/2005-10-05-DaVita-Closes-Gambro-Healthcare-Acquisition.

[8] "DaVita and HealthCare Partners Finalize Merger," *Davita Investors Website*, November 1, 2012, available at https://investors.davita.com/2012-11-1-DaVita-and-HealthCare-Partners-Finalize-Merger.

[9] "History & Culture," *DaVita Website*, available at https://www.davita.com/about/history-and-culture; "Optum completes acquisition of DaVita Medical Group from DaVita," *United Health Group Website*, June 19, 2019, available at https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html.

[10] "About Us," *SCA Health Website*, available at https://sca.health/about-us/; "SCA Health grows to 320+ surgical facilities (Becker's)," *Harlee Medical Website*, available at https://www.harleemedical.com/sca-health-grows-to-320-surgical-facilities-beckers/; Complaint, ¶ 2.

[11] Before joining SCA, Mr. Hayek was President of DaVita's VillageHealth division. Complaint, ¶ 21.

[12] SCA has been a wholly-owned subsidiary of UnitedHealth Group since 2017. "Surgical Care Affiliates (SCA), OptumCare to Combine," *UnitedHealth Group Website*, January 9, 2017, available at https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html; Susan Morse, "UnitedHealth Group shuffles executive management, names new Optum leaders," *Healthcare Finance News Website*, April 24, 2017, available at https://www.healthcarefinancenews.com/news/unitedhealth-group-shuffles-executive-management-names-new-optum-leaders.

[13] "Who We Are," *USPI Website*, available at https://uspi.com/about-us/who-we-are/default.aspx; Complaint, ¶ 5.

[14] "Who We Are," *USPI Website*, available at https://uspi.com/about-us/who-we-are/default.aspx; "Contact Us," *USPI Website*, available at https://uspi.com/contact-us/default.aspx; "Home," *USPI Website*, available at https://uspi.com/home/default.aspx.

[15] "Home," *USPI Website*, available at https://uspi.com/home/default.aspx.

[16] "Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," *Tenet Health Investor Website*, March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx; "Tenet Completes Purchase of USPI from WCAS," *Tenet Health Investor Website*, April 26, 2018, available at https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx.

Highly Confidential
Outside Counsel/Experts Only

## 2. Summary of Plaintiffs' Allegations

12.     Plaintiffs allege that DaVita, SCA, and USPI "conspired to restrain competition and reduce compensation for their employees."[17]  Plaintiffs allege that Defendants "agreed with one another not to solicit or hire the other company's employees without the consent of their current employer."[18]  They argue that Defendants "entered into agreements to avoid competing for employees, particularly those at the director level or above …, by refraining from soliciting or hiring each other's employees absent the knowledge and consent of their existing employers."[19]

13.     Plaintiffs claim that DaVita and SCA agreed not to solicit one another's Senior-Level employees beginning in May 2008, when Mr. Hayek "left DaVita to become SCA's CEO," that the agreement was expanded at some later date to include a requirement that SCA and DaVita would not solicit and recruit one another's Senior-Level employees unless the employee first told "their boss" that they were considering other employment options, and that the agreement continued through 2021.[20]  Plaintiffs also claim that in May 2010, "Mr. Hayek established a no-poach agreement with his counterpart at USPI to eliminate competition between the companies for each other's employees, by not actively soliciting each other's employees."[21]  Although Plaintiffs allege that DaVita, SCA and USPI "entered into and engaged in an overarching conspiracy," Plaintiffs' Complaint does not allege any specific agreement or connection alleged between DaVita and USPI; and Plaintiffs' experts do not purport to analyze any agreement or connection between DaVita and USPI.[22]

14.     In addition to these alleged agreements, Plaintiffs allege that DaVita and SCA and SCA and USPI "fix[ed] wages directly by regularly exchanging competitively sensitive wage and other business information among each other."[23]  Plaintiffs claim that this information included "confidential plans for future company-wide pay increases."[24]  According to Plaintiffs, these information exchanges occurred "from at least as early as 2009 and continued through at least 2017."[25]

---

[17]    Complaint, ¶ 1.

[18]    Complaint, ¶ 2.

[19]    Complaint, ¶ 7.  Plaintiffs refer to the alleged agreement to refrain from soliciting or hiring each other's Senior Level employees without the knowledge or consent of the employee's existing employer as a "no-poach" agreement.

[20]    Complaint, ¶¶ 7, 40, 42.  The Department of Justice's indictment of DaVita and Kent Thiry specified that the mobility restriction began "at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates being unknown to the Grand Jury[.] …"  Indictment, *United States of America v. DaVita Inc., Kent Thiry*, Case No. 21-cr-00229-RBJ, United States District Court, District of Colorado, November 3, 2021 ("DaVita-Thiry Indictment"), p. 2.

[21]    Complaint, ¶ 49.

[22]    Complaint, ¶¶ 105.

[23]    Complaint, ¶ 54.  The Complaint further alleges, "Defendants also exchanged other competitively sensitive information, including specific employee salaries, general and administrative expenses, forecasts, and forecasted sales volumes."  Support for these allegations appears to be limited to communications between SCA and USPI.  Complaint, ¶¶ 8, 59.

[24]    Complaint, ¶ 54.

[25]    Complaint, ¶ 54.

4

Highly Confidential
Outside Counsel/Experts Only

15. Plaintiffs argue that the alleged conduct impacted compensation by "reduc[ing] competition for Defendants' employees and suppress[ing] the compensation of Defendants' employees below competitive levels."[26] Further, they claim that the alleged conduct "denied their employees access to job opportunities, restricted their mobility, and deprived them of significant information that they would have used to negotiate for better compensation and terms of employment."[27] Plaintiffs claim that Defendants "maintained internal compensation systems and developed compensation structures" such that "the compensation of all [Senior-Level] employees was affected by Defendants' no-poach agreements."[28]

16. I understand that, according to the Complaint, the putative Class in this matter includes "[a]ll natural persons who worked in positions at the director-level and above in the United States" at Defendant firms.[29] The Complaint alleges a Class Period from "May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries."[30] Plaintiffs' experts address a different time period. Dr. Starr states, "[t]he qualitative and quantitative evidence … suggests that the no-poach agreement between SCA and DaVita began in May 1, 2008 and ended in 2019;" and in his quantitative analysis, he analyzes a conduct period beginning January 2008 and ending December 2019.[31] Dr. Gerhart addresses the same alleged conduct period as Dr. Starr.[32] In the remainder of this report, I use the term "alleged conduct period" to refer to the period from January 2008 through December 2019.

### 3. Summary of Plaintiffs' Experts' Opinions

17. Dr. Gerhart states that he was retained by Plaintiffs to assess whether "evidence common to the Class regarding turnover rates and labor costs is consistent with incentives to collude," whether such collusion is harmful, whether such collusion is consistent with unilateral conduct, and whether "Defendants used structured administrative pay systems" such that the alleged conduct "would likely have cascading effects and suppress the pay of Defendants' employees."[33] Dr. Gerhart opines that the alleged conduct restricted cold-

---

[26] Complaint, ¶ 10.

[27] Complaint, ¶ 11.

[28] Complaint, ¶ 74.

[29] Complaint, ¶ 92. The full class definition includes, "[a]ll natural persons who worked in positions at the director-level and above in the United States for one or more of the following: (a) from May 2008 to January 2021 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers; (b) from May 2010 to January 2021, for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or (c) from May 2008 through January 2021, for DaVita Inc. or one of its subsidiaries. Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants." I refer to these members of the proposed Class as "Senior-Level employees."

[30] Complaint, ¶ 92.

[31] Starr Report, ¶ 118. Dr. Starr accounts for the starting date of May 1, 2008 when prorating his damages calculation for 2008. *See* Starr Report, footnote 497.

[32] Gerhart Report, ¶ 5.

[33] Gerhart Report, ¶ 6. In addition, Dr. Gerhart was retained by Plaintiffs to "[a]ssess what theory and research in the related fields of compensation design, employee turnover, and human resource management show about the effect of No-Poach Agreements and CSI Exchanges on employees' current and future wages."

5

Highly Confidential
Outside Counsel/Experts Only

calling and created a "chilling effect," suppressing compensation because "employees benefit when they have uninhibited access to other jobs."[34] In addition, Dr. Gerhart opines that "pay at Defendant firms moved in systematic and structured ways, such that wage suppression as to a subset of employees would have impacted other employees' pay."[35] Dr. Gerhart does not provide any quantitative analysis of compensation data at DaVita or any other Defendant to support his opinions.

18.     Dr. Starr opines that "the evidence regarding Defendants' No-Poach Agreements is consistent with anticompetitive conduct and inconsistent with unilateral conduct."[36] He provides quantitative analysis of "employee mobility" and "wage suppression." From his employee mobility analysis, Dr. Starr opines that there was a "0.226 *percentage point* reduction in the probability of movement between Covered Defendants" and a 0.117 percentage point reduction in the probability of movement between DaVita and SCA during the alleged conduct period.[37] From his compensation regression analysis, Dr. Starr opines that the conduct "lowered compensation at Defendants by 14.5 percent annually."[38] He asserts that this purported impact "suppressed wages … by 17.2 percent at DaVita, 13.9 percent at SCA, and 12.0 percent at USPI" in each year from 2008 to 2019 for DaVita and SCA and from 2010 to 2019 for USPI.[39] Thus, according to Dr. Starr's analysis, but-for the alleged conduct, approximately two more employees per year would have moved between DaVita and SCA, and this small change in employee movement would purportedly have resulted in 17.2 percent higher compensation for all 3,439 Senior-Level employees employed at Davita during the alleged conduct period.[40]

## E. Summary of Opinions

19.     DaVita hired Senior-Level employees from hundreds of different companies in addition to SCA; and its Senior-Level employees that left DaVita were hired by hundreds of different employers in addition to SCA. DaVita competed for Senior-Level employee talent with all of those other employers—and thousands of other potential employers—

---

34      Gerhart Report, ¶¶ 7, 59.

35      Gerhart Report, ¶ 7.

36      Starr Report, ¶ 12.

37      Starr Report, ¶ 88, Figure 4 (emphasis in original). By percentage point reduction, Dr. Starr refers to a difference between two percentages. That is, the actual probability of mobility between DaVita and SCA during the conduct period was 0.102 percent but Dr. Starr's estimates imply that it would have been 0.219 percent but for the alleged conduct, a difference of 0.117 percentage points.

38      Starr Report, ¶ 198, Figure 6.

39      Starr Report, ¶ 107, Figure 8.

40      There are 3,439 DaVita class members according to Dr. Starr. Starr Report, ¶ 192, Figure 21. In terms of employee movements, Dr. Starr's 0.117 percentage point reduction translates to an average reduction of 1.9 employee movements between SCA and DaVita per year during the alleged conduct period. This figure is obtained by multiplying the estimated 0.117 percentage point reduction in the probability of employee mobility with 1,627, which is the average number of Senior-Level employees employed at DaVita or SCA each year during the alleged conduct period, according to Dr. Starr's turnover: $((0.117 \div 100) \times 1,627 = 1.9)$. Dr. Starr's results translate to a decrease in approximately 1.4 movements from DaVita to SCA and 0.5 movements from SCA to DaVita each year (according to Dr. Starr's turnover, there were on average 1,189 Senior-Level employees at DaVita and 439 Senior-Level employees at SCA during the alleged conduct period). Note also that, even outside of the alleged conduct period only 0 to 4 employees moved between DaVita and SCA in any given year according to the data relied on by Dr. Starr. *See* **Figure 12**, column (d)

Highly Confidential
Outside Counsel/Experts Only

during the alleged conduct period; and DaVita's compensation for Senior-Level employees was necessarily influenced by competition from that broad pool of actual and potential alternative employers. It is economically implausible that the compensation of all or nearly all of DaVita's Senior-Level employees was materially suppressed due to agreements between DaVita and SCA given the many other competitive alternatives available to DaVita's Senior Level employees. Dr. Starr's claim that the compensation of all of DaVita's Senior-Level employees was suppressed by 17.2 percent from May 2008 through the end of 2019 does not make economic sense given the broad set of competing alternative employers available to DaVita's Senior-Level employees. DaVita would not have been able to continue hiring Senior Level employees throughout the alleged conduct period if its compensation was 17.2 percent below competitive levels, nor would it have been able to retain its Senior-Level employees if it paid 17.2 percent less than "market" compensation given the many different alternatives available to DaVita's Senior-Level employees. In fact, comparison to industry benchmarks shows that during the alleged conduct period DaVita's compensation for Senior-Level employees kept pace with industry benchmarks. Dr. Starr's quantitative analyses of employee mobility and compensation suffer from critical flaws, which cause his models to estimate large degrees of purported compensation suppression (which Dr. Starr refers to as "conduct effects" (a term I adopt)) where there are none.

20. Based on my analysis to date, I have reached the following opinions:

a. *It is economically implausible that compensation for all of DaVita's Senior-Level employees was meaningfully impacted by agreements with SCA given the many different competitive alternatives available to DaVita's Senior-Level employees in addition to SCA and DaVita's history of successfully competing for and attracting Senior-Level employees.*

   i. Plaintiffs did not make any attempt to evaluate the extent of competition for Senior-Level employees or otherwise assess the competitive realities faced by DaVita and SCA to hire and retain Senior-Level employees. Nor did they meaningfully assess whether DaVita and SCA had market power over the compensation of their Senior-Level employees or whether the alleged agreements between DaVita and SCA meaningfully increased any such purported market power. Because market power is a prerequisite for the compensation of DaVita's Senior-Level employees to be impacted, this is a fatal omission on the part of Plaintiffs and their experts.

   ii. Dr. Starr's compensation regressions are not a substitute for a proper assessment of market power. His compensation regression model is flawed and his purported results are unreliable and overturned once certain of his errors are corrected.

   iii. Resume data from Lightcast show that DaVita participated in broad labor markets for its Senior-Level employees, competing with at least 1,000 employers spanning more than 100 industries. DaVita successfully attracted talent in these markets and grew substantially in terms of overall employment during the alleged conduct period. Between 2008 and 2019,

7

Highly Confidential
Outside Counsel/Experts Only

DaVita hired 1,295 Senior-Level employees. This amount of total Senior-Level hiring is over 90 percent of the total number of Senior-Level employees ever employed at SCA during the alleged conduct period. These market outcomes would not be feasible if DaVita did not offer competitive compensation during the alleged conduct period.

iv. DaVita and SCA represented a small share of employment opportunities in the set of industries from which DaVita most commonly recruited Senior-Level employees and to which it most commonly lost Senior-Level employees, as well as in the two industries that Plaintiffs reference in their Complaint (and Plaintiffs' experts reference in their reports): the healthcare industry and the outpatient medical center industry.

v. SCA was not a frequent source of Senior-Level talent for DaVita or a frequent destination for Senior-Level talent leaving DaVita during or after the alleged conduct period, and thus the alleged constraints did not meaningfully restrict labor market options of DaVita employees. After the alleged conduct period, none of DaVita's 350 post-conduct Senior-Level hires were from SCA, and departures to SCA represented less than one percent of DaVita's Senior-Level departures during this period.

vi. It is implausible that a mobility restriction and/or information exchange between employers with very little hiring overlap in various industries where Defendants successfully competed with hundreds of other employers and grew rapidly would lead to any impact on compensation, much less the 17.2 percent impact Dr. Starr estimates for DaVita Senior-Level employees, even if Defendants entered into and upheld the alleged agreements exactly as characterized by Plaintiffs. And it is economically implausible that an agreement restricting the mobility of Senior-Level employees between DaVita and SCA would immediately reduce the compensation of all DaVita's Senior-Level employees in any magnitude similar to that asserted by Dr. Starr.

b. *The economic evidence is consistent with competitive behavior and outcomes.*

i. Plaintiffs have not shown that DaVita and SCA decreased employment in order to suppress wages. To the contrary, employment increased at DaVita during the alleged conduct period. Plaintiffs do not offer any explanation for how DaVita could have attracted so many new employees from a wide variety of sources if it did not offer competitive compensation.

ii. My analysis shows that compensation for DaVita's Senior-Level employees kept pace with compensation in relevant benchmarks during the alleged conduct period. This result is robust to alternative benchmarks representing compensation in the healthcare industry and in a broader set of industries, as well as Dr. Starr's own measure of healthcare manager compensation.

8

Highly Confidential
Outside Counsel/Experts Only

c. *The economic evidence is inconsistent with Plaintiffs' mechanisms of harm. There was no reduction in employee mobility, and, even if a reduction of mobility of the magnitude measured by Dr. Starr had occurred, Plaintiffs have not established, nor is it plausible, that there was a meaningful reduction in employee access to information.*

    i. Dr. Starr's analysis of employee mobility is unreliable and correcting certain flaws in his analysis shows that there was no decrease in employee mobility between DaVita and SCA during the alleged conduct period.

        1. According to Dr. Starr's own data, the average yearly fraction of DaVita and SCA Senior-Level employees who departed for DaVita or SCA was higher during the alleged conduct period than it was in the non-conduct period. Consistent with this fact, correcting certain flaws in Dr. Starr's empirical approach overturns his finding that the alleged conduct reduced mobility between DaVita and SCA.

        2. Dr. Starr's analysis that purports to show that the alleged conduct ended in 2019 is flawed and, if anything, shows that there was no unusual increase in Senior-Level employee mobility between DaVita and SCA after 2019.

    ii. An economically meaningful reduction in information about competitive alternative compensation is implausible, because DaVita recruited hundreds of employees from a wide variety of sources other than SCA, its Senior-Level employees left for hundreds of other employers other than SCA during the alleged conduct period, and Dr. Starr's analysis, though flawed and overstated, implies that only approximately two additional employees would have moved between DaVita and SCA each year during the conduct period absent the conduct at issue.

        1. DaVita employees had access to information through many sources, most importantly through the substantial recruiting of DaVita Senior-Level employees by employers outside of the alleged conspiracy between the Defendant firms.

        2. DaVita employees also had access to public sources of information, like Glassdoor and PayScale, and could obtain information by engaging in job search activities.

d. *Dr. Starr's compensation regression finds impact where there is none.*

    i. Dr. Starr's model yields no firmwide conduct effect for potentially relevant alternative conduct periods. For example, if the finder of fact were to determine that 2012 to 2017, the conduct period from the criminal indictment and the period during which Mr. Hayek, CEO of SCA testified that a mobility restriction between DaVita and SCA was in place, is the appropriate conduct period for examining impact, Dr. Starr's model would

9

Highly Confidential
Outside Counsel/Experts Only

suggest that, if anything, compensation for DaVita Senior-Level employees was higher during this period than in the before and after periods. In addition, had he elected to use a conduct period starting in 2009, which is the first year that the alleged agreements could even plausibly have any effect on compensation, he would have estimated a conduct effect that is not statistically significantly different from zero.

ii. Dr. Starr makes errors in preparing his data and uses an inappropriate measure of equity compensation for DaVita that reflects stock market performance and employee decisions regarding the timing of stock option exercises rather than DaVita's compensation decisions. Just correcting these errors substantially reduces the conduct effect Dr. Starr's model estimates for DaVita.

iii. Dr. Starr's model does not adequately control for differences in market conditions that changed across the conduct and non-conduct periods, including major labor market shocks, and this failure affects his conclusions that there was any firmwide impact of the conduct at issue. Adding improved controls for labor supply and demand conditions overturns Dr. Starr's conduct effect for DaVita.

e. *The nature and frequency of the alleged information exchanges between DaVita and SCA would not economically allow DaVita and SCA to use such exchanges to "fix" compensation for DaVita's Senior-Level employees, and Dr. Starr is not correct that employers have no unilateral, non-conspiratorial incentive to engage in such exchanges.*

i. Plaintiffs have not established that the alleged information exchanges between DaVita and SCA supported any fixing of wages or compensation of Senior-Level employees.

1. The one document Plaintiffs point to as indicating that DaVita shared compensation information with SCA pertained to backward-looking, aggregate, company-level information, some of which was publicly available and related to DaVita's prior year's merit budget.

2. Even if DaVita and SCA had regularly shared annual merit increase rates (and I am not aware of any information in the record showing that they did), Plaintiffs and their experts do not explain how exchanging information about company-level merit increases could be used to set or fix compensation across hundreds of job titles in different states for employees in the broad labor markets in which DaVita and SCA competed with hundreds of other employers for talent.

ii. Contrary to Plaintiffs' experts' claims, employers have non-conspiratorial incentives to exchange general information of the type that is alleged to

10

Highly Confidential
Outside Counsel/Experts Only

have been shared between DaVita and SCA. Compensation benchmarking has procompetitive benefits and can lead to increased compensation.

21. These opinions are based on my review and analysis of information made available to me to date and are expressed from the perspective of an economist addressing questions of antitrust economics. I reserve the right to update my opinions should additional information become available to me.

## II. Impact Is Economically Implausible Given the Competitive Realities Faced by DaVita and SCA

22. As a matter of economics, an agreement between DaVita and SCA that restricted the mobility of Senior-Level employees between them and/or an exchange of compensation information between DaVita and SCA could meaningfully impact DaVita's Senior-Level employees' compensation *only* if DaVita and SCA collectively had market power over the compensation of those employees and if the alleged agreements meaningfully allowed them to exercise market power that they could not exercise individually. However, Plaintiffs and their experts made no attempt to assess market power or otherwise consider the extent of competition for Senior-Level employees and the competitive realities faced by DaVita and SCA with regard to DaVita's Senior-Level employees. In this section, I show that DaVita and SCA competed for employees with many employers in many industries. I also show that SCA represented a small share of DaVita's hires and departures even outside of the alleged conduct period, indicating that SCA was not DaVita's primary labor market competitor, as Plaintiffs claim.[41] In addition, I show that DaVita and SCA together represented a small share of employment in the healthcare industry and in the outpatient medical centers industry, two industries that Plaintiffs and their experts reference, during the alleged conduct period.

23. These facts make it implausible that the alleged conduct would lead to firmwide impact on compensation, much less the 17.2 percent impact Dr. Starr estimates for DaVita employees. This is the case even if Defendants carried out the alleged agreement and information exchanges as alleged by Plaintiffs.

### A. Market Power Is Necessary for Firmwide Suppression of Compensation

24. In product markets, market power is defined as "the ability of a firm or a group of firms within a relevant market profitably to raise prices above the competitive level for a sustained period of time."[42] In labor markets, market power is analogously the "firm's power to reduce the compensation it pays to its workers, paying less than an equivalent job would, in a hypothetical perfectly competitive market."[43] Dr. Starr agrees that market power is "the ability of a firm to restrict output, raise prices, suppress wages, reduce

---

[41] Complaint, ¶ 62.

[42] ABA Section of Antitrust Law, *Econometrics: Legal, Practical and Technical Issues*, 2nd Edition (American Bar Association, 2014) ("ABA Handbook on Econometrics (2014)"), p. 14.

[43] US Department of the Treasury, "The State of Labor Market Competition," March 7, 2022, p. 3.

Highly Confidential
Outside Counsel/Experts Only

quality or consumer choice, or inhibit innovation relative to the levels that would have prevailed under competition."[44]

25.     Thus, employers must have market power over the compensation of Senior-Level employees in order to suppress compensation below competitive levels.[45] Without market power, suppression is not profitable because employers offering compensation below competitive levels not only lose employees to firms offering competitive compensation but are also unable to attract new hires to replace lost workers and support growth.[46] In other words, competition from employers in the labor market constrains Defendants' ability to suppress compensation. Dr. Starr agrees that market power is a prerequisite for suppression of compensation. He states that "Defendants would not have been able to suppress Class Member wages if the Challenged Conduct did not generate market power over Class Members."[47]

26.     In the Complaint, Plaintiffs allege that "[m]arket 'frictions' result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) there are a limited number of essentially identical positions from which workers can choose. Such market frictions adversely impact competition in labor markets, and generally provide market power to employers."[48] However, Plaintiffs' experts have not shown any of these alleged frictions to be meaningful or demonstrated that the alleged conduct led to an increase in market power on the part of DaVita and SCA through market frictions or any other means. Indeed, as discussed further below, DaVita was able to attract and hire 1,295 Senior-Level employees during the alleged conduct period from hundreds of employers notwithstanding such alleged market frictions.[49] These market facts demonstrate that "market frictions" are either not present or not sufficient to prevent employees moving between jobs, including to DaVita and are therefore not sufficient to bestow market

---

[44]  Starr Report, ¶ 194.

[45]  For a discussion of market power in product markets *see*, *e.g.*, Frank H. Easterbrook, "Limits of Antitrust," *Texas Law Review* 63:1 (August 1984), p. 20 ("Firms that lack power cannot injure competition no matter how hard they try."); Mark R. Patterson, "The Market Power Requirement in Antitrust Rule of Reason Cases: A Rhetorical History," *San Diego Law Review* 37:1 (2000), p. 2 ("Without market power, a seller cannot impose anticompetitive terms and therefore need not be kept in check by antitrust laws.")

[46]  US Department of the Treasury, "The State of Labor Market Competition," March 7, 2022, p. 3 ("Monopsony's counterpart is perfect competition, an economic model in which both workers and firms take wages as given—meaning they cannot raise or lower the prevailing wage. Under perfect competition, the residual labor supply curve (or firm-specific labor supply curve) is flat, meaning each firm can hire whatever amount of labor it wants but only at the market wage.")

[47]  Starr Report, ¶ 196. *See also* Deposition of Evan Starr, Ph.D., Vol I, March 19, 2025 ("Starr Deposition, Vol. I"), 268:22-269:10 ("Q. Would you agree that defendants would not have been able to suppress class member wages if the challenged conduct did not generate market power over class members? … A. I think we've talked about this previously. … My opinion is that the, the defendants had market power. Otherwise the alleged misconduct would not have suppressed wages.")

[48]  Complaint, ¶ 61.

[49]  Between 2008 and 2019, DaVita recruited 1,295 Senior-Level employees from hundreds of employers for an average of 108 employees per year. An employee is considered a Senior-Level new hire if they appear with positive regular hours worked as a Senior-Level employee in DaVita's structured data in a particular year but do not appear at all in the immediately prior year. Employees that worked at DaVita as a part of the HCP acquisition are not included in these counts. *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

12

Highly Confidential
Outside Counsel/Experts Only

power to DaVita, when DaVita's growth depends on it being able to attract hundreds of new Senior-Level employees every year.

### B. Plaintiffs and Their Experts Do Not Assess or Acknowledge the Extent of Competition for Senior-Level Employees

27.     Even though competition from employers outside of the alleged agreement limits firms' ability to suppress compensation, neither Plaintiffs nor their experts make any attempt to evaluate labor market competition or assess Defendants' market share in any relevant labor markets.[50] This subsection summarizes Plaintiffs' and their experts' limited statements and economic evidence regarding relevant labor markets and Defendants' market power.[51]

28.     Plaintiffs' Complaint is unclear as to what labor market Plaintiffs assert to be at issue, if any. The Complaint alleges that "SCA, USPI, and DaVita were the nation's largest operators of outpatient medical care centers as well as one another's top rivals for labor."[52] Elsewhere in the Complaint, however, Plaintiffs also reference the broader healthcare industry in addition to outpatient medical care centers: "[i]n a properly functioning and lawfully competitive labor market, outpatient medical care and healthcare industry employers would compete with one another to attract and retain employees for their needs."[53]

29.     Plaintiffs' experts also do not seek to define the scope of any labor market in which DaVita competed for any Senior-Level employees. Dr. Starr testified that he does not "have any opinions on exactly the contours of the labor market in this case."[54] Dr. Starr admitted that the relevant labor markets would include the many other employers that DaVita employees went to and from, but he did not do any analysis of who these relevant employers were.[55] Dr. Gerhart also did not define a relevant labor market and similarly

---

[50]    The American Bar Association notes that calculating market shares is the first step in identifying market power, stating "[t]he simplest and most common measure of market power is market share." Neither Plaintiffs nor their experts address the geographic market. For purposes of this report, I evaluate market power assuming the relevant geographic market is at least national. ABA Handbook on Econometrics (2014), pp. 241-242. *See also* U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023, p. 49 ("As discussed above, the Agencies may use evidence about market shares and market concentration as part of their analysis. These structural measures can provide insight into the market power of firms as well as into the extent to which they compete.")

[51]    I understand that when Plaintiffs have alleged a *per se* violation, as I understand is the case here, the court may not require an analysis of relevant markets for purposes of determining liability. However, as an economic matter, it is inappropriate to evaluate impact from a purported competitive restraint without considering whether the model yields economically rational results. To make that determination, an economist needs to consider whether the firms that are alleged to have engaged in conduct that affected market outcomes have sufficient market power to accomplish the price changes predicted by their models.

[52]    Complaint, ¶ 62.

[53]    Complaint, ¶¶ 68-69. The Complaint also states, "companies like Defendants would solicit and hire employees from other companies in the same industry because those employees have training and experience that are lacking in hires from other industries."

[54]    Starr Deposition, Vol. I, 43:11-19.

[55]    Starr Deposition, Vol. I, 132:21-133:13, 147:4-15.

Highly Confidential
Outside Counsel/Experts Only

admitted that "any company that you lose employees to or you get employees from" would be relevant in a market definition analysis.[56]

30. Plaintiffs and their experts also fail to establish that Defendants possessed market power over the compensation of Senior-Level employees during the alleged conduct period, or that the alleged agreements meaningfully allowed them to exercise market power over Senior-Level employees that they could not exercise individually. Employment shares are one indicator of the competitive circumstances faced by DaVita and SCA for Senior-Level employees. Plaintiffs do not discuss or provide employment shares, yet they claim that Defendants "are among the largest employers in the outpatient medical care center industry."[57] Dr. Gerhart makes no explicit reference to market power in his report and does not provide any economic evidence regarding Defendants' market power or otherwise assess the competitive circumstances faced by Defendants. The only economic evidence Dr. Starr purports to provide regarding market power is his compensation regression analysis, which he claims "directly demonstrates that Defendants wield market power over Class Members."[58] However, Dr. Starr's compensation regression analysis is critically flawed, as I describe in **Section V**. Thus, Plaintiffs' only economic evidence regarding market power is unreliable, and, as I explain below, they have failed to recognize that DaVita and SCA faced substantial competition for Senior-Level employees that would constrain any purported firmwide impact of any agreement between only those two firms concerning the mobility of Senior-Level employees between them or the information exchange alleged to be competitively sensitive.

## C. DaVita Competes for Employees with Many Employers Across Many Industries

31. Using proprietary resume data from Lightcast, I have assessed the number and identity of employers with which DaVita competes for Senior-Level employees.[59] My analysis shows that DaVita hired Senior-Level employees from, and lost Senior-Level employees to, hundreds of employers in many industries, demonstrating that DaVita competes for Senior-Level employees with many different employers in addition to SCA. My analysis shows that this was true before, during and after the alleged conduct period. Using Dr. Starr's data, I show that SCA represented only a small fraction of the labor pool from which DaVita recruits. Using publicly available data, I calculate DaVita and SCA's employment share in the industries of the employers with which DaVita commonly

---

[56] In his deposition, Dr. Gerhart agreed that he did not offer an opinion regarding the scope of the relevant labor market, stating "[m]y focus was on the movement between these three companies, I think, primarily, in this case." Deposition of Barry Gerhart, Ph.D., March 5, 2025 ("Gerhart Deposition"), 52:3-21.

[57] Complaint, ¶ 63.

[58] Starr Report, ¶ 196.

[59] Lightcast is a labor market analytics company that collects and disseminates labor market data. The resume data I use from Lightcast, which Lightcast refers to as the "profile database," is "built from individual profiles of over 120 million workers in the United States." These data are "gathered from publicly available information on the web, third-party resume databases and job boards, the recruiting industry, opt-in data from employers and applicant tracking systems, sales and marketing CRM databases, and various consumer/identity databases." "Lightcast Data: Basic Overview," *Lightcast Website*, available at https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview; "Profiles Methodology," *Lightcast Website*, archived February 27, 2025, at the Wayback Machine, available at https://web.archive.org/web/20250227153835/https://kb.lightcast.io/en/articles/6957504-profiles-methodology.

Highly Confidential
Outside Counsel/Experts Only

competes, as well as in two industries referenced in Plaintiffs' Complaint: the healthcare industry and the outpatient medical center industry. I show that DaVita and SCA had a small share of employment in all of these industries.

### 1. DaVita Competed with a Broad Set of Employers in Multiple Industries

32. I evaluate DaVita's share of employment in the industries in which it competes using data from Lightcast. These data include resume profile information for individuals who listed a Senior-Level position at DaVita in their profile.[60] These data permit me to observe the job histories of DaVita Senior-Level employees, including their employer immediately before and after their employment at DaVita. In addition, Lightcast has categorized each employer in the dataset according to their North American Industry Classification System ("NAICS") six-digit industry code.[61]

33. **Figure 1** summarizes the top 15 immediate prior employers in the profiles of DaVita Senior-Level employees in the Lightcast data from 2008 to 2019. The figure shows that DaVita recruited Senior-Level employees from over 900 different organizations in more than 100 industries. The top prior employer was Fresenius, a leading provider of dialysis services with around 3,700 locations that is outside of the alleged conspiracy.[62] While it is the most frequently noted prior employer, Fresenius was the prior employer for only 2.5 percent of DaVita Senior-Level employees in the Lightcast data. The employers accounting for the next two largest fractions of DaVita's Senior-Level employees were McKinsey and Bain & Company, both global management consulting companies, indicating that DaVita draws from a broad and fragmented, rather than narrow and concentrated, labor market. McKinsey was the prior employer for 1.7 percent of DaVita's Senior-Level employees, while Bain & Company was the prior employer for 1.4 percent of DaVita's Senior-Level employees in the Lightcast data. **Figure 1** also shows that DaVita's Senior-Level employees came from a wide range of different industries outside of outpatient medical centers or the healthcare industry. The top 15 employers belonged to industries including Management, Scientific, and Technical Consulting Services, Insurance Carriers, and Department Stores.

---

[60] The Lightcast data used in these analyses include observations for individuals who indicated: (i) ever having worked in a job classified by Lightcast in the 4-digit NAICS code 6214, which represents outpatient medical centers; (ii) ever having worked at DaVita, SCA, or USPI; or (iii) ever having worked at a set of specific Defendant facilities provided to Lightcast. Criterion (iii) was included to account for the fact that some individuals could have listed a specific facility where they worked instead of the company name, *e.g.*, "Burbank Dialysis" instead of "DaVita."

[61] According to the U.S. Census Bureau, the NAICS was developed "as the standard for use by Federal statistical agencies in classifying business establishments for the collection, tabulation, presentation, and analysis of statistical data describing the U.S. economy." In particular, "NAICS is a 2- through 6-digit hierarchical classification system, offering five levels of detail. Each digit in the code is part of a series of progressively narrower categories, and the more digits in the code signify greater classification detail. The first two digits designate the economic sector, the third digit designates the subsector, the fourth digit designates the industry group, the fifth digit designates the NAICS industry, and the sixth digit designates the national industry." "North American Industry Classification System – Frequently Asked Questions (FAQs)," *U.S. Census Bureau Website*, available at https://www.census.gov/naics/.

[62] "Facts & Figures," *Fresenius Medical Care Website*, available at https://freseniusmedicalcare.com/en/investors/equity-story/facts-and-figures/.

Highly Confidential
Outside Counsel/Experts Only

**Figure 1: Immediate Prior Employers of DaVita Senior-Level Employees by Frequency, 2008-2019[63]**

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | ---(Count)--- | -(Percent)- |
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 35 | 2.5 % |
| McKinsey | Management, Scientific, and Technical Consulting Services | 24 | 1.7 |
| Bain & Company | Management, Scientific, and Technical Consulting Services | 20 | 1.4 |
| UnitedHealth Group | Insurance Carriers | 19 | 1.3 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 16 | 1.1 |
| Target | Department Stores | 15 | 1.1 |
| Deloitte | Management, Scientific, and Technical Consulting Services | 15 | 1.1 |
| McKesson | Drugs and Druggists' Sundries Merchant Wholesalers | 13 | 0.9 |
| Intermountain Health | General Medical and Surgical Hospitals | 9 | 0.6 |
| Accenture | Computer Systems Design and Related Services | 9 | 0.6 |
| United States Army | National Security and International Affairs | 8 | 0.6 |
| Optum | Insurance Carriers | 8 | 0.6 |
| Amgen | Pharmaceutical and Medicine Manufacturing | 8 | 0.6 |
| Abbott Laboratories | Medical Equipment and Supplies Manufacturing | 8 | 0.6 |
| HCA Healthcare | General Medical and Surgical Hospitals | 7 | 0.5 |
| Other Companies (935) | Other Industries (133) | 1,208 | 85.0 |
| | **Total** | **1,422** | **100 %** |

34. **Figure 2** summarizes the most common prior industries for DaVita's Senior-Level employees as reflected in the Lightcast data. Outpatient Care Centers represent a small fraction of prior employers, with only 6.5 percent of DaVita Senior-Level employees listing prior employers in this industry. The healthcare industry, including "General Medical and Surgical Hospitals," "Offices of Physicians," "Outpatient Care Centers," and "Other Ambulatory Health Care Services" was the prior employer for 27.8 percent of DaVita's Senior-Level employees.[64] Non-healthcare employers accounted for a substantial 72.2 percent of prior employers for DaVita's Senior-Level employees.

---

[63] In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: "director," "vp," or "vice president." I exclude employees with titles related to HR, recruiting, or legal functions and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data. Companies are identified using the variable "company_name," if available, or "company_raw" otherwise. While it is possible that some SCA employees appear as Optum employees or United Health Group ("UHG") employees in the Lightcast data after SCA was acquired in 2017, it is apparent from the structured data that less than 0.5 percent of DaVita hires from 2008 to 2019 were from SCA. Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

[64] The listed industries are denoted by NAICS 4-digit codes 6221, 6211, 6214, and 6219, respectively. All NAICS 4-digit industries that begin with "62" other than industries that begin with "624," which represents the "Social Assistance" industry, are included in this percentage.

Highly Confidential
Outside Counsel/Experts Only

**Figure 2: Industries of Immediate Prior Employers of DaVita Senior-Level Employees by Frequency, 2008-2019[65]**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | ---(Count)--- | -(Percent)- |
| (a) | (b) | (c) | (d) |
| 5416 | Management, Scientific, and Technical Consulting Services | 106 | 9.8 % |
| 6221 | General Medical and Surgical Hospitals | 95 | 8.8 |
| 6214 | Outpatient Care Centers | 70 | 6.5 |
| 6211 | Offices of Physicians | 63 | 5.8 |
| 5241 | Insurance Carriers | 51 | 4.7 |
| 3254 | Pharmaceutical and Medicine Manufacturing | 43 | 4.0 |
| 6113 | Colleges, Universities, and Professional Schools | 38 | 3.5 |
| 5415 | Computer Systems Design and Related Services | 27 | 2.5 |
| 6219 | Other Ambulatory Health Care Services | 24 | 2.2 |
| 4242 | Drugs and Druggists' Sundries Merchant Wholesalers | 22 | 2.0 |
| 5221 | Depository Credit Intermediation | 19 | 1.8 |
| 3391 | Medical Equipment and Supplies Manufacturing | 19 | 1.8 |
| 5242 | Agencies, Brokerages, and Other Insurance Related Activities | 18 | 1.7 |
| 4522 | Department Stores | 17 | 1.6 |
| 5412 | Accounting, Tax Preparation, Bookkeeping, and Payroll Services | 15 | 1.4 |
| | Other Industries (129) | 458 | 42.2 |
| | **Total** | **1,085** | **100 %** |
| | **Healthcare Industries (12)** | **302** | **27.8** |
| | **Non-Healthcare Industries (132)** | **783** | **72.2** |

35.    **Figure 3** summarizes the top 15 immediate subsequent employers in the profiles of DaVita Senior-Level employees from 2008 to 2019. The figure shows that DaVita Senior-Level employees departed for 973 companies across 123 industries during the alleged conduct period. The most common subsequent employer was again Fresenius. Only two percent of DaVita Senior-Level employees left DaVita for Fresenius, and the next largest subsequent employers were United States Renal Care Incorporated and Optum. SCA appears fifth on this list, but SCA was the subsequent employer for less than one percent of the departing DaVita Senior-Level employees according to Dr. Starr's data.[66] And, as discussed in **Section IV.A**, below, there was no reduction in employee mobility between DaVita and SCA in the alleged conduct period.

---

[65]    "Healthcare Industries" are identified as 4-digit NAICS industries that begin with "62," other than NAICS industries that begin with "624," which represent the "Social Assistance" industry. "Non-Healthcare Industries" include all 4-digit NAICS industries that do not begin with "62," in addition to those that begin with "624." Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

[66]    *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

Highly Confidential
Outside Counsel/Experts Only

### Figure 3: Immediate Next Employer of DaVita Senior-Level Employees by Frequency, 2008-2019[67]

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees ---(Count)--- | -(Percent)- |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 26 | 2.0 % |
| United States Renal Care Incorporated | Outpatient Care Centers | 19 | 1.4 |
| Optum | Insurance Carriers | 14 | 1.1 |
| Sound Physicians | Offices of Physicians | 13 | 1.0 |
| Surgical Care Affiliates | Outpatient Care Centers | 12 | 0.9 |
| UnitedHealth Group | Insurance Carriers | 11 | 0.8 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 9 | 0.7 |
| HCA Healthcare | General Medical and Surgical Hospitals | 9 | 0.7 |
| National Veterinary Associates | Other Professional, Scientific, and Technical Services | 8 | 0.6 |
| Envision Physician Services | Offices of Physicians | 8 | 0.6 |
| Scan | Insurance Carriers | 7 | 0.5 |
| American Dental Partners | Offices of Dentists | 7 | 0.5 |
| Satellite Healthcare Wellbound | Outpatient Care Centers | 6 | 0.5 |
| Radiology Partners | Other Ambulatory Health Care Services | 6 | 0.5 |
| Northstar Anesthesia, P.A. | Offices of Other Health Practitioners | 6 | 0.5 |
| Other Companies (958) | Other Industries (115) | 1,166 | 87.9 |
| | Total | 1,327 | 100 % |

36.     **Figure 4** summarizes the most common industries in which DaVita's Senior-Level employees worked after departing DaVita, according to the Lightcast data.  It shows that DaVita Senior-Level employees departed for companies in a range of industries, with more than half departing to employers in non-healthcare industries: 41.6 percent of DaVita Senior-Level employees departed for employers in the healthcare industry and 58.4 percent of DaVita's Senior-Level employees departed for employers in non-healthcare industries.

---

[67]  In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: "director," "vp," or "vice president."  I exclude employees with titles related to HR, recruiting, or legal functions and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.  Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.  I identify next employers for Senior-Level employees with an end date at DaVita between 2008 and 2019.  Employees who worked within the Healthcare Partners or DaVita Medical Group branch of DaVita and thereafter moved to Optum in 2019 are excluded as these may represent departures related to the divestiture of DaVita Medical Group.  Companies "Sound Physicians" and "Caremore Health" were not assigned a NAICS industry in the Lightcast data.  Their NAICS industries were manually determined based on data from Factiva.  Note that Optum is a subsidiary of UnitedHealth Group (UHG), so while it is possible that some SCA employees appear as Optum employees or UHG employees in the Lightcast data after SCA was acquired in 2017, I know from the structured data that only one percent of DaVita departures from 2008 to 2019 went to SCA.  **Exhibit 3** displays the immediate next employer of DaVita Senior-Level employees by frequency from 2008 to 2016.  Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967; "Sound Inpatient Physicians, Inc.," *Dow Jones Factiva*, accessed April 16, 2025; "Caremore Health Medical Partners Pc.," *Dow Jones Factiva*, accessed April 16, 2025.

Highly Confidential
Outside Counsel/Experts Only

**Figure 4: Industries of Immediate Next Employers of DaVita Senior-Level Employees by Frequency, 2008-2019[68]**

| 4-Digit NAICS | Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | ---(Count)--- | --(Percent)-- |
| (a) | (b) | (c) | (d) |
| 6214 | Outpatient Care Centers | 93 | 10.3 % |
| 6211 | Offices of Physicians | 78 | 8.7 |
| 6221 | General Medical and Surgical Hospitals | 75 | 8.3 |
| 5241 | Insurance Carriers | 58 | 6.5 |
| 5416 | Management, Scientific, and Technical Consulting Services | 33 | 3.7 |
| 6219 | Other Ambulatory Health Care Services | 28 | 3.1 |
| 6213 | Offices of Other Health Practitioners | 26 | 2.9 |
| 5419 | Other Professional, Scientific, and Technical Services | 25 | 2.8 |
| 5415 | Computer Systems Design and Related Services | 24 | 2.7 |
| 6113 | Colleges, Universities, and Professional Schools | 19 | 2.1 |
| 6216 | Home Health Care Services | 19 | 2.1 |
| 5242 | Agencies, Brokerages, and Other Insurance Related Activities | 18 | 2.0 |
| 6212 | Offices of Dentists | 17 | 1.9 |
| 6215 | Medical and Diagnostic Laboratories | 16 | 1.8 |
| 5412 | Accounting, Tax Preparation, Bookkeeping, and Payroll Services | 14 | 1.6 |
| | Other Industries (108) | 356 | 39.6 |
| | **Total** | **899** | **100 %** |
| | **Healthcare Industries (13)** | **374** | **41.6** |
| | **Non-Healthcare Industries (110)** | **525** | **58.4** |

37.     The results are similar if I instead look at the immediate prior and next employers before the alleged conduct period from 2005 to 2007 or after the alleged conduct period from 2020 to 2022, as shown in **Exhibits 4** to **7**. While the set of employers and industries changes slightly over time, the conclusion that DaVita competes for employees with a broad set of employers in multiple industries, including outside of outpatient medical centers and even the healthcare industry, is true irrespective of the period under analysis.

38.     Lightcast data also show that the considerable competition DaVita faced for employees differed across departments and job titles, which reflects the heterogeneous positions within the proposed class. For example, **Figure 5** shows the top five subsequent and prior industries for DaVita Senior-Level employees in finance jobs. **Figure 6** shows the top five subsequent and prior industries for DaVita Senior-Level employees in information technology ("IT") jobs. The top prior industry for finance employees was Management, Scientific, and Technical Consulting Services, the top next industry was Offices of Physicians, and the healthcare industry accounted for only 22 percent of

---

[68]    Employees who worked within the Healthcare Partners or DaVita Medical Group branch of DaVita and thereafter moved to Optum in 2019 are excluded as these may represent departures related to the divestiture of DaVita Medical Group. Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

19

Highly Confidential
Outside Counsel/Experts Only

subsequent employers, suggesting that the skills of DaVita employees in finance jobs are marketable beyond the outpatient medical centers industry or the broader healthcare industry. For IT employees the top five next industries include four non-healthcare industries, and the top next industry for IT employees was Management, Scientific, and Technical Consulting Services. These results show that DaVita competed with many employers across many industries for IT and Finance employees. They also show that the industries DaVita competed with differed across jobs, a fact that is inconsistent with firmwide impact.

**Figure 5: Top Five Industries of Immediate Prior and Next Employers of DaVita Senior-Level Employees in Finance Jobs, 2008-2019[69]**

**Top 5 Previous Industries for Finance Employees**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | (Count) | ·(Percent)· |
| (a) | (b) | (c) | (d) |
| 5416 | Management, Scientific, and Technical Consulting Services | 7 | 9.7 % |
| 5241 | Insurance Carriers | 7 | 9.7 |
| 6211 | Offices of Physicians | 5 | 6.9 |
| 5221 | Depository Credit Intermediation | 5 | 6.9 |
| 3391 | Medical Equipment and Supplies Manufacturing | 3 | 4.2 |
| | Other Industries (35) | 45 | 62.5 |
| | **Total** | **72** | **100 %** |
| | **Healthcare Industries (5)** | **12** | **16.7** |
| | **Non-Healthcare Industries (35)** | **60** | **83.3** |

**Top 5 Next Industries for Finance Employees**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | (Count) | ·(Percent)· |
| (a) | (b) | (c) | (d) |
| 6211 | Offices of Physicians | 4 | 8.0 % |
| 5412 | Accounting, Tax Preparation, Bookkeeping, and Payroll Services | 3 | 6.0 |
| 5241 | Insurance Carriers | 3 | 6.0 |
| 4885 | Freight Transportation Arrangement | 2 | 4.0 |
| 5416 | Management, Scientific, and Technical Consulting Services | 2 | 4.0 |
| | Other Industries (28) | 36 | 72.0 |
| | **Total** | **50** | **100 %** |
| | **Healthcare Industries (6)** | **11** | **22.0** |
| | **Non-Healthcare Industries (27)** | **39** | **78.0** |

---

[69] Senior-Level employees are identified as holding finance jobs if they have titles that contain a set of finance-related keywords. Employees who worked within the Healthcare Partners or DaVita Medical Group branch of DaVita and thereafter moved to Optum in 2019 are excluded from next industry counts as these may represent departures related to the

Highly Confidential
Outside Counsel/Experts Only

**Figure 6: Top Five Industries of Immediate Prior and Next Employers of DaVita Senior-Level Employees in Information Technology Jobs, 2008-2019[70]**

**Top 5 Previous Industries for IT Employees**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees (Count) | Senior-Level Employees -(Percent)- |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| 6221 | General Medical and Surgical Hospitals | 6 | 9.5 % |
| 5241 | Insurance Carriers | 4 | 6.3 |
| 5415 | Computer Systems Design and Related Services | 4 | 6.3 |
| 5242 | Agencies, Brokerages, and Other Insurance Related Activities | 3 | 4.8 |
| 3391 | Medical Equipment and Supplies Manufacturing | 3 | 4.8 |
| | Other Industries (31) | 43 | 68.3 |
| | **Total** | **63** | **100 %** |
| | **Healthcare Industries (6)** | **14** | **22.2** |
| | **Non-Healthcare Industries (30)** | **49** | **77.8** |

**Top 5 Next Industries for IT Employees**

| 4-Digit NAICS | 4-Digit NAICS Industry Name | Senior-Level Employees (Count) | Senior-Level Employees -(Percent)- |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| 5416 | Management, Scientific, and Technical Consulting Services | 4 | 7.7 % |
| 5415 | Computer Systems Design and Related Services | 4 | 7.7 |
| 6221 | General Medical and Surgical Hospitals | 4 | 7.7 |
| 5419 | Other Professional, Scientific, and Technical Services | 3 | 5.8 |
| 5112 | Software Publishers | 3 | 5.8 |
| | Other Industries (28) | 34 | 65.4 |
| | **Total** | **52** | **100 %** |
| | **Healthcare Industries (7)** | **13** | **25.0** |
| | **Non-Healthcare Industries (26)** | **39** | **75.0** |

39. Consistent with the Lightcast data, documents and testimony in the record also show that DaVita and SCA recruited from and lost Senior-Level employees to a broad set of employers across numerous industries. For example, SCA's former Chief of Talent, Dr. Bridget Fanning, testified that "[t]here were hundreds of places that people could go and work. It wasn't that they could only ever go and work for USPI or they could only ever

---

divestiture of DaVita Medical Group. Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

[70] Senior-Level employees are identified as holding information technology jobs if they have titles that contain a set of IT-related keywords. Employees who worked within the Healthcare Partners or DaVita Medical Group branch of DaVita and thereafter moved to Optum in 2019 are excluded from next industry counts as these may represent departures related to the divestiture of DaVita Medical Group. Lightcast Profile Data; 4-Digit Industry Names are from: "North American Industry Classification System," *US Census Bureau Website,* available at https://www.census.gov/naics/?48967.

Highly Confidential
Outside Counsel/Experts Only

go and work for DaVita."[71]  She also testified that she created a "consolidated list" of firms for SCA to recruit from, and that "there [were] about 4- or 500 companies on that list."[72]  DaVita COO Mike Staffieri testified that there was "a long list" of roles for which DaVita did not value healthcare experience.[73]  Dennis Kogod, DaVita's former Chief Operating Officer agreed that "the pool of people from which DaVita recruits executives" and "the pool of other companies to which DaVita executives go" are "very large."[74] Executive recruiter ███████, who worked with DaVita to recruit Senior-Level employees, estimated that ███████████████████████████████████████ ██████████████████████████ [75]  In 2013, DaVita engaged a recruiter to search for DVP and VP Acute roles and considered candidates from a diverse set of employers, including GE Healthcare and ConvaTec (a medical products company).[76]  Similarly, in 2013 DaVita also considered candidates from a diverse range of industries and employers including Advance Auto Parts, Emdeon, Dunkin Brands, Blue Nile, Saks Fifth Avenue, and others for a Group VP, Endeavor position.[77]  Documents also show that senior DaVita employees went on to become executives at many other organizations, including American Dental Partners, Air Methods, and DAVIDsTEA.[78]

40.    I reviewed DaVita's job descriptions for Senior-Level employee roles and found that they also reflect the broad scope of industries from which DaVita sought to recruit employees. For example, a December 2009 posting for "Director – Revenue Management" listed multiple required qualifications and stated "experience in Healthcare, Consulting, Information Technology, or Insurance industries preferred."[79]  Another job description from August 2016 for "VP, Clinical Operations ECR" did not state a requirement or preference for healthcare experience but did state a preference for, for example, a "[d]emonstrated track record of successful fiscal and operating management" and "[s]even to ten years' proven experience successfully managing large scale, multi-site,

---

[71]    Deposition of Bridget Fanning, former Chief Talent Officer, SCA, July 17, 2024 ("Fanning Deposition"), 303:11-304:13.

[72]    Fanning Deposition, 31:17-32:5, 32:20-33:1.

[73]    Deposition of Michael Staffieri, Chief Operating Officer, DaVita, April 5, 2024 ("Staffieri Deposition"), 118:14-120:8.

[74]    Deposition of Dennis Kogod, former Chief Operating Officer, DaVita, September 6, 2024 ("Kogod Deposition"), 179:9-20 ("Q. … So the pool of people from which DaVita recruits executives is very large, right? A. Yes. … Q. And the places – DaVita executives do leave DaVita to go to other companies, right? A. Yes.  Q. And the pool of other companies to which DaVita executives go is also very large, correct? … A. Yes.")

[75]    Deposition of ███████ Executive Recruiter, Spencer Stuart, November 19, 2024, 114:14-115:9.

[76]    Email from Samantha Carey (CTPartners) to Dennis Kogod (DaVita), Subject: Update on Ops Searches, February 19, 2013, DVA_OMCEAL_000124754-755.

[77]    Email from Rob Chipman (DaVita) to Brian Schaffer (DaVita), Subject: FW: DaVita GVP Status Report, October 23, 2013, DVA_OMCEAL_000011812-822 at 815-817, 820.  As another example, in 2014, DaVita considered candidates from Sears, Kindred Healthcare, Scripps Health, Dignity Health, and Smile Brands in a search for a Group VP, Dreamteam.  Email from Darin DeWitt (Caldwell Partners) to Robert Chipman (DaVita), Subject: Need some data for Monday…, October 10, 2014, DVA_OMCEAL_000017255-278 at 257, 263, 271-273.

[78]    Email from Erica Rockenback (DaVita) to Stephanee Roessing (DaVita), et al., Subject: FW: DaVita Alumni in C-suite, November 19, 2017, DVA_OMCEAL_000041688-689.

[79]    Position Description: Director – Revenue Management, December 2009, DVA_OMCEAL_001294850-853 at 852-853.  See also Job Description – Sr Director, Project Management, August 2016, DVA_OMCEAL_001296753-754.

Highly Confidential
Outside Counsel/Experts Only

multi-functional operations."[80]  These job descriptions corroborate that healthcare industry experience was not always required or even preferred and that many Senior-Level roles at DaVita required skills that were not industry-specific.  In summary, Lightcast data as well as documents and testimony in the record indicate that DaVita competes with many employers and that the labor markets in which it competes are not restricted to outpatient medical centers or even the healthcare industry.

### 2.  DaVita and SCA Represented a Small Share of One Another's Hires

41.  Plaintiffs allege that Defendants were "one another's top rivals for labor."[81]  This allegation is not supported by any analysis of labor market data in Plaintiffs' experts' reports.  In fact, Plaintiffs' assertion is refuted by the economic evidence, which shows that SCA and DaVita are not important sources of Senior-Level talent for one another.  After the alleged conduct period from 2020 to 2022, Dr. Starr's data show that none of DaVita's 350 Senior-Level employee hires came from SCA.[82]  During the same period, departures from DaVita to SCA represented less than one percent of DaVita's 318 Senior-Level departures.[83]  Plaintiffs' experts offer no economic theory to explain how DaVita was able to compete successfully for the employees it recruited during the alleged conduct period who came from firms other than SCA, if it was offering compensation that was 17.2 percent below the competitive level.[84]  Indeed, such an outcome is economically implausible.

42.  DaVita grew substantially during the alleged conduct period, hiring 1,295 Senior-Level employees during this period, which is more than 90 percent of the total number of Senior-Level employees ever employed at SCA during the period.[85]  DaVita would not

---

[80]  "ECR" stands for "Early Clinical Research."  Job Description – VP, Clinical Operations ECR, August 2016, DVA_OMCEAL_001297448-450 at 450.

[81]  Complaint, ¶ 62.

[82]  I focus on the period from 2020 to 2022, because it is not alleged to be affected by any conduct and because SCA data is not available for most of the period from 2005 to 2007.  For this calculation, the data are restricted to only those employee-years with positive total hours worked.  A new Senior-Level employee hire at a Defendant company in a particular year is defined as someone who appears in its data as a Senior-Level employee in a particular year but not in its data for any position in the immediately prior year.  The numerator is calculated as the number of those Senior-Level new hires with any prior experience at the other Defendant.  *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[83]  Dr. Starr's methodology to flag movements between DaVita and SCA is used to identify the number of people that moved between SCA and DaVita in a particular year.  I determine whether each movement flagged by Dr. Starr was from DaVita to SCA or from SCA to DaVita based on observing whether the employee appeared first in DaVita data and then SCA data or vice-versa.  *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[84]  From 2008 to 2019, less than 0.5 percent of DaVita's 1,295 hires were from SCA.  During the same period SCA was the destination for one percent of DaVita's 1,408 departures.  *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[85]  1,414 unique Senior-Level employees worked at SCA at some point during the alleged conduct period.  *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

Highly Confidential
Outside Counsel/Experts Only

have been able to support this growth if it had been suppressing compensation below competitive levels.

### 3. DaVita and SCA Represent a Small Share of Employment in the Industries that Competed for DaVita Senior-Level Employees

43.    In this section, I evaluate DaVita and SCA's share of employment 1) among the top five NAICS 4-digit industries from which DaVita hired employees or to which it lost employees, 2) within the healthcare industry, and 3) among outpatient medical centers.[86] My analysis of shares among these employers should not be interpreted as an affirmative opinion that I am endorsing any of these possibilities as the relevant antitrust market for this matter. Rather, I am demonstrating that however one might try to define appropriate relevant labor markets, so long as they include the companies with which DaVita actually competes for Senior-Level employees, DaVita and SCA's combined share of employment is too small to support an inference of market power. In fact, each of the share calculations below excludes many employers with which DaVita competed for Senior-Level labor.

44.    **Figure 7** displays DaVita's share of employment of managers and above in the top five NAICS 4-digit industries described above, in the healthcare industry, and in the outpatient medical center industry.[87] The figure shows that DaVita and SCA never represented more than 1.3 percent of managerial employment in the top five industries in which they competed for employees. In the healthcare industry (NAICS code 62), DaVita and SCA never represented more than 1.5 percent of managerial employment. And, even looking within the more narrow 4-digit NAICS outpatient medical centers industry (NAICS code 6214), DaVita and SCA together represented at most 16.0 percent of managerial employment in the outpatient medical care industry during the alleged conduct period. These employment shares suggest that DaVita and SCA competed with many alternative employers for talent. Even in the narrowest industry mentioned in the Complaint, DaVita and SCA's combined share was only 11.7 percent in 2009 when the first exchange of information allegedly occurred and was only 13.3 percent in 2012 when the indictment alleged the mobility restriction between DaVita and SCA began.[88] There is no economic basis to infer that SCA and DaVita would be able to gain monopsony power, suppress competition for workers, limit employee mobility, dampen "labor supply elasticities," suppress employee compensation, or "effectuate collusive outcomes" with employment shares of this level.[89] It is clear from this economic evidence that DaVita and SCA represented a small share of employment among the many alternative

---

[86]    To evaluate employment in the "healthcare industry," I focus on NAICS industry sector 62, which is the "Healthcare and Social Services" sector, and I exclude NAICS 624, which is the "Social Assistance" industry.

[87]    Publicly-available data do not allow a precise comparison of wage levels in the categories that Plaintiffs have included in the purported class. For purposes of this analysis, I include "Managers" and above, rather than "Directors" and above.

[88]    Deposition of Evan Starr, Ph.D., Vol. II, March 20, 2025 ("Starr Deposition, Vol. II"), 333:3-335:10 ("A. … The CSI exchanges, based on my review of the evidence, began sometime in 2009, though what was exchanged was compensation, future compensation information that would have been incorporated into the next year's compensation decisions, based on my understanding.") *See also* Starr Report, ¶ 100. The indictment alleged a conduct period from February 1, 2012 to July 31, 2017 for DaVita. DaVita-Thiry Indictment, ¶ 9.

[89]    *See* Starr Report, ¶¶ 29, 43-44, 55.

Highly Confidential
Outside Counsel/Experts Only

employers that the data show were competing or DaVita Senior-Level employees, and are thus unlikely to have been able profitably to suppress wages to all Senior-Level employees while continuing to attract new employees and grow their labor bases.[90]

**Figure 7: DaVita and SCA's Share of Employment for Different Industry Segments Competing for DaVita Senior-Level Employees[91]**

| Year | DaVita and SCA Managers and Up -------(Count)------- | Top 5 Previous and Next NAICS 4-digit Industries ------(Count)----- | ··(Percent)- | Healthcare Companies -------(Count)------ | ··(Percent)- | Outpatient Medical Centers -----(Count)---- | ··(Percent)·· |
|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) 100*(b)/(c) | (e) | (f) 100*(b)/(e) | (g) | (h) 100*(b)/(g) |
| 2008 | 2,948 | 406,440 | 0.7 % | 399,830 | 0.7 % | 24,260 | 12.2 % |
| 2009 | 3,016 | 426,120 | 0.7 | 419,780 | 0.7 | 25,750 | 11.7 |
| 2010 | 3,270 | 440,950 | 0.7 | 435,920 | 0.8 | 28,470 | 11.5 |
| 2011 | 3,637 | 458,390 | 0.8 | 443,990 | 0.8 | 30,230 | 12.0 |
| 2012 | 4,257 | 470,130 | 0.9 | 453,400 | 0.9 | 31,980 | 13.3 |
| 2013 | 4,600 | 482,420 | 1.0 | 462,120 | 1.0 | 33,760 | 13.6 |
| 2014 | 5,020 | 499,810 | 1.0 | 467,920 | 1.1 | 35,350 | 14.2 |
| 2015 | 5,187 | 508,590 | 1.0 | 470,190 | 1.1 | 37,340 | 13.9 |
| 2016 | 6,670 | 539,790 | 1.2 | 481,420 | 1.4 | 42,820 | 15.6 |
| 2017 | 7,288 | 552,500 | 1.3 | 493,150 | 1.5 | 45,540 | 16.0 |
| 2018 | 7,395 | 583,190 | 1.3 | 519,740 | 1.4 | 48,840 | 15.1 |
| 2019 | 6,530 | 615,300 | 1.1 | 545,120 | 1.2 | 51,190 | 12.8 |
| 2020 | 6,632 | 628,020 | 1.1 | 548,360 | 1.2 | 51,630 | 12.8 |
| 2021 | 7,168 | 695,640 | 1.0 | 599,270 | 1.2 | 56,500 | 12.7 |
| 2022 | 7,654 | 766,500 | 1.0 | 645,440 | 1.2 | 61,740 | 12.4 |
| **Total** | **81,272** | **8,073,790** | **1.0 %** | **7,385,650** | **1.1 %** | **605,400** | **13.4 %** |

45. Dr. Starr infers market power among Defendants solely because he estimates that compensation was suppressed for the three Defendants during the conduct period.[92] His inference of market power is wholly inconsistent with the market outcomes and economic data described in this section. It is, however, consistent with his estimates being the

---

[90]  *See* **Figure 8**. SCA also grew over this period, from 288 employees in 2008 to 614 employees by 2019. *See* **Exhibit 8**.

[91]  This table presents employment shares of DaVita and SCA managers and above in three industry groups: (i) Outpatient Medical Centers, identified as NAICS Code "6214", (ii) Healthcare Companies, identified at the 2-digit NAICS code level as "62" excluding non-healthcare companies which are identified as "624" at the 3-digit NAICS code level, and (iii) the top five NAICS 4-digit industries DaVita senior employees come from and leave to (*see* **Figure 2** and **Figure 4**). For all three industry groups, only counts for employees at the most detailed level of Management Occupations are included (identified as those occupations for which the Occupation Code starts with "11" and OCC Group is either "detailed" or missing) with the exception of those occupations that pertain to executive, HR, legal, and recruiting job titles (such as "Chief Executives", "Human Resources Managers", "Compensation and Benefits Mangers", and "Top Executives"). Managers and up are identified when variable "final_level_year" is equal to "Manager," "Director," "Vice President," or "Senior Vice President." Only observations with positive hours worked are included. "Occupational Employment and Wage Statistics," *US Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/tables.htm; Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[92]  Starr Report, ¶ 196 ("In the instant case, the evidence of wage suppression found in Section VI directly demonstrates that Defendants wield market power over Class Members.")

Highly Confidential
Outside Counsel/Experts Only

result of econometric flaws rather than any purported anticompetitive conduct, which I show to be the case in **Section V**.

## III. Economic Evidence Is Consistent with Competitive Behavior and Outcomes

46. As noted above, during the alleged conduct period, DaVita hired Senior-Level employees from more than 1,000 companies that are not alleged to be part of the purported conspiracy. The fact that DaVita was able to attract over one thousand new Senior-Level employees and accomplished substantial growth through hiring during the alleged conduct period is economic evidence that DaVita's compensation offers were competitive. It is implausible as an economic matter that DaVita would be able to accomplish that growth if it offered compensation that was substantially below competitive levels. In fact, DaVita's compensation grew in line with comparable industry benchmarks during the alleged conduct period. This economic evidence is consistent with DaVita offering competitive compensation and inconsistent with Dr. Starr's claim that compensation for Senior-Level employees at DaVita was as much as 17.2 percent below competitive levels.

### A. DaVita's Significant Employment Growth Is Consistent with Competitive Outcomes

47. Dr. Starr opines that the agreements gave Defendants "monopsony" power over their Senior-Level employees.[93] According to monopsony models, suppressing compensation requires a reduction in employment.[94] There is no economic evidence of reduced employment of Senior-Level employees by DaVita during the conduct period, which is inconsistent with Dr. Starr's assertion that Defendants' alleged conduct meaningfully suppressed employee mobility or compensation. If the alleged conduct suppressed employee compensation, then Defendant firms would be unable to compete for new employees. Further, employees would depart for roles at non-Defendant firms offering competitive compensation. Plaintiffs and their experts fail to demonstrate that employment levels decreased at DaVita compared to what they otherwise would have been, nor do they address the implications of the fact that DaVita grew substantially during the purported conduct period.

48. **Figure 8** shows the growth in DaVita's Senior-Level employees during the alleged conduct period.[95] In 2008, at the beginning of the alleged conduct period, DaVita

---

[93] Starr Report, ¶ 34.

[94] Joan Robinson, who is credited with the first monopsony model, noted with respect to monopsony models, "[i]n every case the amount of employment under monopoly will be less than under competition." Joan Robinson, *The Economics of Imperfect Competition* (2nd Edition) (London: Macmillan, 1976), p. 269. *See also* Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics* (7th Edition) (Upper Saddle River, NJ: Pearson, 2009), pp. 376. *See also* Eric Posner, "You Deserve a Bigger Paycheck. Here's How You Might Get It.," *New York Times Website*, September 23, 2021, available at https://www.nytimes.com/2021/09/23/opinion/antitrust-workers-employers.html ("Companies that use their market power to suppress wages do something similar: They hire fewer workers, and this leads to unemployment and low growth as well.")

[95] This chart excludes Senior-Level employees that joined DaVita as part of the HCP acquisition in 2012. While the acquisition occurred in 2012, the added employees do not appear in DaVita's produced payroll data until 2016.

Highly Confidential
Outside Counsel/Experts Only

employed 587 Senior-Level employees. By 2019, DaVita employed 1,173 Senior-Level employees, an almost 100 percent increase. During the alleged conduct period, DaVita hired a total of 1,295 Senior-Level employees in addition to the employees that joined DaVita when it acquired HCP in 2012.[96] **Exhibit 8** shows that SCA also experienced considerable growth during the alleged conduct period, with the number of Senior-Level employees growing from 288 in 2008 to 614 in 2019, a 113 percent increase. In the same period, SCA hired a total of 1,127 Senior-Level employees.[97]

---

Consideration of these employees does not change my opinions, but I have excluded them from **Figure 8** to focus on the hiring that DaVita achieved outside of acquisitions. "DaVita and HealthCare Partners Finalize Merger," *Davita Investors Website*, November 1, 2012, available at https://investors.davita.com/2012-11-1-DaVita-and-HealthCare-Partners-Finalize-Merger.

[96] For this calculation, the data are restricted to only those employee-years with positive regular hours worked. A new Senior-Level employee at a DaVita in a particular year is defined as someone who appears in its data as a Senior-Level employee in a particular year but not in its data for any position in the immediately prior year. Employees that worked at DaVita as part of the HCP acquisition are not included in these counts. *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[97] For this calculation, the data are restricted to only those employee-years with positive regular hours worked. A new Senior-Level employee at a SCA in a particular year is defined as someone who appears in its data as a Senior-Level employee in a particular year but not in its data for any position in the immediately prior year.

27

Highly Confidential
Outside Counsel/Experts Only

**Figure 8: Number of DaVita Senior-Level Employees[98]**



49.  DaVita's Senior-Level employment grew at a compound annual growth rate of 6.5 percent from 2008 to 2019.[99]  This is not consistent with DaVita underpaying Senior-Level employees on a broad scale.  The mere fact that DaVita was able to attract additional employees is economic evidence that the compensation offer was competitive.  Dr. Gerhart agreed that growth would require competitive compensation, when he testified that new hire compensation "would probably have to be within sight of what the competitive rate would be."[100]

---

[98]  Only observations with positive hours worked are included.  Bars in gray indicate years outside the alleged conduct period.  Although DaVita acquired HCP in 2012, HCP employees do not appear in DaVita's data until 2016, when they appear all at once.  Therefore, employees that joined DaVita as a part of the HCP acquisition are not included.  Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[99]  *See* **Figure 8**.

[100]  Gerhart Deposition, 56:1-9.

Highly Confidential
Outside Counsel/Experts Only

## B. DaVita's Compensation Grew at a Competitive Rate

50.   Not only was DaVita's compensation consistent with competitive offerings during the alleged conduct period (as demonstrated by DaVita's ability to attract hundreds of Senior-Level employees), but the growth rate of Senior-Level compensation was similar to or higher than that of comparable benchmarks during the alleged conduct period, indicating that DaVita did not underpay Senior-Level employees once it attracted them to the firm.

51.   **Figure 9** displays the average salary for DaVita Senior-Level employees from 2005 to 2022 compared with two benchmarks over the same period.  The "OEWS 3-Digit Industry Benchmark" is the average salary of management employees in the ambulatory health care services industry excluding executives, compensation and benefits managers, and HR managers, as calculated from the United States Bureau of Labor Statistics' Occupational Employment and Wages Series.[101]  The "Top 5 NAICS Benchmark" is the average annual salary of management employees in the top five industries from which DaVita hired employees or to which it lost employees during the alleged conduct period, according to my analysis of the Lightcast data.[102]

52.   **Figure 9** shows that DaVita Senior-Level salaries generally kept pace with these industry benchmarks.  Average salaries of Senior-Level employees grew similarly to average salaries in the OEWS 3-digit industry benchmark and the top 5 NAICS industry benchmarks during the conduct period.

---

[101]   *See* "Occupational Employment and Wage Statistics," *US Bureau of Labor Statistics Website*, available at https://www.bls.gov/oes/ ("The Occupational Employment and Wage Statistics (OEWS) program produces employment and wage estimates annually for approximately 830 occupations.  These estimates are available for the nation as a whole, for individual states, and for metropolitan and nonmetropolitan areas; national occupational estimates for specific industries are also available.")  *See* also "Occupational Employment and Wage Statistics Frequently Asked Questions," *U.S. Bureau of Labor Statistics OEWS FAQs Website*, available at https://www.bls.gov/oes/oes_ques.htm.  The OEWS wage data include "straight-time, gross pay, exclusive of premium pay."  The components include base rates, commissions, cost-of-living allowances, deadheading pay, guaranteed pay, hazard pay, incentive pay, longevity pay, over-the-road pay (mileage), piece rates, portal-to-portal rates, production bonuses, and tips.  The OEWS wage data does not include attendance bonuses, back pay, clothing allowances, discount, draw, holiday bonus, holiday premium pay, jury duty pay, meal and lodging payments, merchandise discounts, non-production bonuses, on-call pay, overtime pay, prerequisites, profit-sharing payments, relocation allowances, severance pay, shift differentials, stock bonuses, tool/equipment allowances, tuition repayment, uniform allowance, weekend premium pay, and year-end bonuses.

[102]   The top five industries are listed in **Figure 2** and **Figure 4** and discussed in **Section II.C.1**.

29

Highly Confidential
Outside Counsel/Experts Only

**Figure 9: Average DaVita Senior-Level Salary Relative to Benchmarks**[103]



53.     **Figure 10** displays the average salary for DaVita Senior-Level employees with the same two benchmarks, with the salaries indexed to 2007 levels. The indexing means that the plotted points are interpreted as percentages of the 2007 level of each series and allow one to more easily compare growth paths. The figure confirms that DaVita's salaries grew similarly to the benchmarks during the alleged conduct period, with slightly higher growth during the early years and lower growth during some years in the middle and end of the period.

---

[103]   Included are Senior-Level DaVita employees, excluding observations identified as partial-year observations or outliers. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")); "Occupational Employment and Wage Statistics," *US Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/tables.htm; Lightcast Profile Data.

Highly Confidential
Outside Counsel/Experts Only

**Figure 10: Growth in Average DaVita Senior-Level Salary Relative to Benchmarks, Indexed to 2007[104]**



54.     **Figures 9** and **10** above compare DaVita's salaries for Senior-Level employees with benchmark salaries. **Figure 11**, below, compares the growth rate of total compensation excluding equity at DaVita with two benchmarks.[105]  Total compensation including equity is not available in any publicly available and nationally representative data, but total compensation excluding equity is available in the Census Bureau's Quarterly Workforce Indicators (QWI) and in the American Community Survey (ACS).  The "QWI Industry Benchmark" is the mean compensation excluding equity of workers with at least a bachelor's degree.  It is based on QWI data for the 3-digit ambulatory health care services industry.[106]  The benchmark labeled "Dr. Starr Healthcare Manager Earnings"

---

[104]   DaVita salaries and wage benchmarks are indexed to 2007.  Included are Senior-Level DaVita employees, excluding observations identified as partial-year observations or outliers.  Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")); "Occupational Employment and Wage Statistics," *US Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/tables.htm; Lightcast Profile Data.

[105]   Dr. Starr filters DaVita compensation into 20 different pay types, such as regular pay, bonus pay, stock pay, commission pay, and paid time off.  The measure of compensation in **Figure 11** is the sum of all pay types minus stock pay.  Starr turnover materials ("05_2_Build All Pay Dataset.do").

[106]   "Quarterly Workforce Indicators (QWI)," *U.S. Census Bureau QWI Website*, available at https://ledextract.ces.census.gov/qwi/all ("The Quarterly Workforce Indicators (QWI) are a set of economic indicators including employment, job creation, earnings, and other measures of employment flows.  The QWI are reported based on detailed firm characteristics (geography, industry, age, size) and worker demographics information (sex, age, education, race, ethnicity) and are available tabulated to national, state, metropolitan/micropolitan areas, county, and Workforce Investment Board (WIB) areas.").  John M. Abowd, *et al*., "The LEHD Infrastructure Files and the Creation of the Quarterly Workforce Indicators," *U.S. Census Bureau, Longitudinal Employer-Household Dynamics Program* (2005), available at

Highly Confidential
Outside Counsel/Experts Only

reflects cash compensation and is Dr. Starr's own data series of the mean state-level compensation of healthcare managers in Defendants' industries in the ACS.[107] The figure shows that the total compensation excluding equity of DaVita's Senior-Level employees generally grew faster than comparable compensation measures in the early years of the alleged conduct period and grew more slowly in the later years, with total growth over the entire alleged conduct being roughly similar across all three series.[108]

---

https://lehd.ces.census.gov/doc/technical_paper/tp-2006-01.pdf, Appendix A, p. 81 ("The QWI system measures the average earnings of full-quarter employees by summing the earnings on the UI [Unemployment Insurance] wage records of all individuals at a given employer who have full-quarter status in a given quarter then dividing by the number of full-quarter employees."); "Wage Records Program [Technical Notes]," *U.S. Bureau of Labor Statistics Website*, available at https://www.bls.gov/wrp/technical-notes.htm ("All wage records contain an employee's total wages for the quarter … total wages are defined as all compensation received by an employee, including salaries, hourly pay, piecework pay, bonuses, commissions, vacation and sick leave pay, severance pay, the cash value of meals and lodging, and tips and other gratuities. Generally, total wages exclude employer contributions for old-age, survivors, and disability insurance; health insurance; UI; workers' compensation; and private pension and welfare funds. However, employee contributions for the same purposes are included, as is money withheld for income taxes, union dues, and so forth, even though they are deducted from the workers' gross pay. However, definitions of total wages can vary slightly by state. For example, in some states, employer contributions to certain deferred compensation plans, such as 401(k) plans, are included in total wages.")

[107] Dr. Starr uses this as a control variable in his compensation regression analysis and describes the data in Appendix E of his report. Starr Report, ¶ 121, Appendix E, pp. 236-237. Dr. Starr uses the variable 'incwage' from the ACS to construct his healthcare manager earnings benchmark, which includes "wages, salaries, commissions, cash bonuses, tips, and other money income received from an employer. Payments-in-kind or reimbursements for business expenses are not included." *See* "INCWAGE," *IPUMS USA Website*, available at https://usa.ipums.org/usa-action/variables/INCWAGE/#description_section.

[108] Total growth over the alleged conduct period compares compensation in 2019 to compensation in 2007 for all series. The fact that the data points on the charts are so close to one another in these years indicates that they all experienced similar average growth over the period. Comparing 2020 compensation to 2007 compensation shows that DaVita Senior-Level employees experienced faster average growth over the 2008 to 2020 period than was experienced in the two benchmark series.

32

Highly Confidential
Outside Counsel/Experts Only

**Figure 11: Growth in Average DaVita Senior-Level Total Compensation Excluding Equity Relative to Benchmarks, Indexed to 2007** [109]



55. These figures and analysis discussed above demonstrate that DaVita's compensation practices were in line with competitive benchmarks and do not support Plaintiffs' contention that compensation at DaVita was anticompetitively suppressed for more than a decade as a result of an agreement that affected a very small part of the labor pool in which DaVita competes for Senior-Level employees.

## IV.   Economic Evidence Is Inconsistent with Plaintiffs' Mechanisms of Harm

56. Plaintiffs claim that the alleged agreements between DaVita and SCA suppressed compensation by purportedly restricting employee mobility between SCA and DaVita.[110] They claim that a reduction in employee movements between DaVita and SCA directly impacted employees who would have moved but for the alleged conduct by denying them "faster wage growth."[111]  They also claim that the reduction in employee mobility could impact even employees who would not have moved regardless of the alleged conduct,

---

[109] DaVita compensation and benchmarks are indexed to 2007.  Both benchmarks are at the state level and aggregated to the national level, weighted by the share of DaVita Senior-Level employees employed in each state in a given year.  Included are Senior-Level DaVita employees, excluding observations identified as partial-year observations or outliers.  Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")); "Quarterly Workforce Indicators (QWI)," *US Census Bureau QWI Website*, available at https://ledextract.ces.census.gov/qwi/all.

[110] Complaint, ¶ 11.

[111] Complaint, ¶ 71.

Highly Confidential
Outside Counsel/Experts Only

because "the threat of losing employees to competitors encourages employers to preemptively increase and maintain appropriately high compensation."[112] Plaintiffs also claim that the alleged agreements reduced employees' information regarding compensation and that "employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors."[113]

57. In this section, I show that the economic evidence is inconsistent with the mechanisms of harm put forth by Plaintiffs and their experts. I show that Dr. Starr's analysis of employee mobility is critically flawed and that there was, in fact, no reduction in employee mobility between DaVita and SCA during the alleged conduct period. I also explain that it is implausible that there was any reduction in information available to employees, given that there was no decrease in employee mobility and given the many alternative sources of timely and specific information that were available to DaVita employees during the alleged conduct period. It is therefore economically implausible that the alleged mechanisms of harm served to suppress compensation.

Without a reduction in employee mobility or a meaningful reduction in access to information and wage discovery, there is no basis to assume that any reduction in compensation levels occurred as a result of the alleged agreements. The conclusions in this section are consistent with the observation above that DaVita's compensation kept pace with industry benchmarks during the alleged conduct period.

## A. There Was No Reduction in Employee Mobility

58. Plaintiffs and their experts claim that the alleged agreements between DaVita and SCA suppressed compensation by reducing employee mobility. Dr. Starr writes, "if Defendants here agreed to lessen competition for Senior-Level Employees by ceasing solicitations or cold calling for recruitment purposes between them, the predicted result is lower compensation for Senior-Level Employees and less mobility between Defendants."[114] Dr. Gerhart writes that employees "undoubtedly benefit from voluntary (employer) job changes."[115] He argues that employee mobility benefits employees who stay, claiming that "concerns about turnover" may lead employers to "take proactive measures to increase compensation of incumbent employees."[116]

59. In this section, I evaluate Dr. Starr's analyses of employee mobility. I show that there are critical flaws in Dr. Starr's quantitative analysis purporting to show that fewer employees moved between DaVita and SCA during the alleged conduct period than would have occurred but for the alleged agreements. Dr. Starr's analysis has no statistical validity and what he reports as meaningful results are neither meaningful nor robust.

---

[112] Complaint, ¶ 72.

[113] Complaint, ¶ 71.

[114] Starr Report, ¶ 37.

[115] Gerhart Report, ¶ 43.

[116] Gerhart Report, ¶ 72.

Highly Confidential
Outside Counsel/Experts Only

**1. Dr. Starr's Analysis of Employee Mobility is Flawed and Estimates a Reduction in Employee Mobility Between DaVita and SCA When There Was None**

60. In his report, Dr. Starr purports to assess "whether the quantitative evidence shows suppression of Senior-Level Employee movement between Defendant Firms."[117] However, Dr. Starr's "quantitative evidence" is critically flawed. His analysis is incapable of demonstrating any meaningful decrease in employee mobility between DaVita and SCA during the alleged conduct period.

61. In his Figure 2, Dr. Starr displays calculations of the total number of employee movements between "Covered Defendants" between 2008 and 2021, expressed in counts and as a share of total employee departures. He opines that the "patterns suggest that … mobility between covered Defendants may have been elevated in the early years of the Conduct Period," but "the bilateral flow of Senior-Level Employees slowed markedly in the middle and end of the Conduct Period, and then rose markedly following the end of the Conduct Period."[118]

62. In **Figure 12** below, I have summarized employee movements between DaVita and SCA using the data from Dr. Starr's Figure 2 and dropping data reflecting movements between SCA and USPI.[119] In **Figure 12**, I have also included mobility in 2022, which Dr. Starr does not include in his Figure 2.[120] Column (d) displays the number of movements between DaVita and SCA from 2008 to 2022. Employee movements are identified by Dr. Starr as employees who left either DaVita or SCA and subsequently became employed at the other company. The movement counts displayed in column (d) are informative. First, only a handful of employees (zero to four) moved between DaVita and SCA in any year, including outside of the alleged conspiracy period. Second, the

---

117 Starr Report, ¶ 81.

118 Starr Report, ¶ 84.

119 *See* **Exhibits 9** and **10** for charts of these data similar to the left and right panels Dr. Starr's Figure 2, but showing only movements between SCA and DaVita.

120 While Dr. Starr claimed in his report and deposition that his methodology for identifying employee movements did not permit him to identify mobility during 2022 due to missing data for DaVita and SCA in 2023, he in fact relies on available data in 2021 and 2022 to identify employee mobility between Defendants in 2022 and indeed flagged these moves in his turnover programs. Starr Deposition, Vol. I, 218:24-219:4. Dr. Starr also purportedly justifies the exclusion of 2022 from his mobility analysis in his footnote 325 ("However, because I would need to observe where Class Members worked in *2023* to see if they left for a Covered Defendant in 2022, I cannot assign mobility events to workers in 2022.") I find this explanation inconsistent with Dr. Starr's workpaper code ("11_1_Mobility_Final.do"). In Dr. Starr's mobility analysis, he flags two sets of "departures": i) departures between two covered Defendants, and ii) total departures from a Defendant company. I refer to the former as "employee movements" and the latter as "departure events." According to Dr. Starr's methodology, employee movements are backward-looking: in any given year t (including 2022), employee movements between two covered defendants are flagged when an employee i) appeared in both Defendants' data in year t, or ii) appeared in one Defendant's data in year t and the other's data in year t-1. *See* Starr turnover materials ("11_1_Mobility_Final.do", lines 34-42). Because of these backward-looking conditions, employee movements in 2022 would require only data from 2022 and 2021, which are available across all three Defendants, and not from 2023. Thus, it is possible to flag employee movements in 2022 using Dr. Starr's methodology (and Dr. Starr indeed flagged employee movements in 2022). However, according to Dr. Starr's methodology, departure events are forward looking: in any given year t, departure events are flagged when an employee appears in a Defendant firm's data in year t, but not in year t+1. Thus, absent the 2023 data, it is not possible to flag a departure event in 2022 (and Dr. Starr indeed did not flag departure events in 2022).

Highly Confidential
Outside Counsel/Experts Only

movement counts show that the year with the highest mobility between DaVita and SCA was 2011 (a year that is within Plaintiffs' alleged conspiracy period) when four employees moved between DaVita and SCA. They also show that the only two consecutive years with zero employee movements between DaVita and SCA were in 2021 and 2022 (two years that are outside Plaintiffs' alleged conspiracy period). On average, more employees moved between DaVita and SCA during the alleged conduct period than after the conduct period.[121]

**Figure 12: Employee Movements Between DaVita and SCA Based on Dr. Starr's Data[122]**

| Year | Senior-Level Employees | Total Departures | DaVita-SCA Departures | DaVita-SCA Departures, Percentage of Employees | DaVita-SCA Departures, Percentage of Departures |
|------|------|------|------|------|------|
| | ----------------------(Count)---------------------- | | | -------------------------(Percent)------------------------- | |
| (a) | (b) | (c) | (d) | (e) $100*(d)/(b)$ | (f) $100*(d)/(c)$ |
| 2008 | 931 | 174 | 3 | 0.32 % | 1.72 % |
| 2009 | 944 | 109 | 2 | 0.21 | 1.83 |
| 2010 | 1,040 | 126 | 2 | 0.19 | 1.59 |
| 2011 | 1,197 | 180 | 4 | 0.33 | 2.22 |
| 2012 | 1,366 | 177 | 3 | 0.22 | 1.69 |
| 2013 | 1,499 | 222 | 1 | 0.07 | 0.45 |
| 2014 | 1,593 | 243 | 0 | 0.00 | 0.00 |
| 2015 | 1,683 | 229 | 1 | 0.06 | 0.44 |
| 2016 | 2,314 | 339 | 1 | 0.04 | 0.29 |
| 2017 | 2,496 | 417 | 0 | 0.00 | 0.00 |
| 2018 | 2,477 | 837 | 2 | 0.08 | 0.24 |
| 2019 | 1,978 | 314 | 1 | 0.05 | 0.32 |
| 2020 | 2,008 | 304 | 3 | 0.15 | 0.99 |
| 2021 | 2,209 | 386 | 0 | 0.00 | 0.00 |
| 2022 | 2,290 | N/A | 0 | 0.00 | N/A |
| **2008-2019 Total** | **19,518** | **3,367** | **20** | **0.10 %** | **0.59 %** |
| **2020-2021 Total** | **4,217** | **690** | **3** | **0.07** | **0.43** |
| **2020-2022 Total** | **6,507** | **N/A** | **3** | **0.05** | **N/A** |

63.     Column (e) of **Figure 12** expresses employee movements between DaVita and SCA as a share of total employees in each year. Column (f) expresses employee movements as a share of total departures in each year. While only a small share of employee departures were accounted for by movements between DaVita and SCA in any year, **Figure 12** shows that a larger fraction of employee departures between DaVita and SCA occurred during the alleged conduct period than after (0.59 percent during 2008-2019, compared with 0.43 percent between 2020 and 2021). Thus, Dr. Starr's own employee mobility

---

[121]    From 2008 to 2019, 1.7 employees moved between DaVita and SCA on average (20 ÷ 12 = 1.7). From 2020 to 2021, the average number of movements between the two companies was 1.5 (3 ÷ 2 = 1.5), and from 2020 to 2022, the average was 1 (3 ÷ 3 = 1).

[122]    "Senior-Level Employees" are counts of Senior-Level employees at both DaVita and SCA in a given year. The counts in this table include HCP employees, which means that the count of total departures in 2018 include employees who left DaVita in conjunction with DaVita's divestiture of HCP. All of Dr. Starr's mobility analyses, as well as my mobility analyses, use the same sample of Senior-Level employees, including HCP. Starr turnover materials ("DaVita USPI SCA Complete Data with Outliers.dta").

Highly Confidential
Outside Counsel/Experts Only

data show more movement between DaVita and SCA during the alleged conduct period than after the alleged conduct period when measured either as total departures, average departures per year, as a share of employment, or as a share of overall departures.

64. Dr. Starr seeks to establish that mobility was suppressed during the conduct period by applying a regression analysis that purports to control for other underlying economic factors. However, Dr. Starr's mobility regression provides no statistically meaningful evidence that mobility between DaVita and SCA was suppressed during the alleged conduct period. Using data from 2008 to 2021, Dr. Starr regresses an indicator of movement between DaVita and SCA on only a conduct period indicator for 2008 to 2019 and a linear time trend.[123] That is, the single control in Dr. Starr's regression analysis is a time trend, and he does not include controls for any economic factors that may theoretically explain mobility patterns. Dr. Starr concludes from his analysis that there was "a statistically significant decline" in movement between DaVita and SCA because the coefficient on his conduct indicator was negative and statistically significant at the ten percent level.[124] The decline in movement estimated by Dr. Starr is small in magnitude and devoid of any economic meaning. Even taken at face value, Dr. Starr purports to estimate that employee mobility between DaVita and SCA declined by approximately a tenth of one percentage point, or 1.9 movements per year.[125] However, Dr. Starr's mobility regression analysis is deeply flawed.

65. As an initial matter, Dr. Starr reports an R-squared for his regression of only 0.001. The R-squared for a regression is a measure that reports how much of the underlying variation in the data is being explained by the variables included in the regression.[126] An R-squared of 0.001 means that Dr. Starr's model is explaining almost none of the year-to-year variation in mobility, and that there are therefore factors outside of his model that explain 99.9 percent of the employee movements that Dr. Starr has not accounted for. [127] With almost none of the variability in employee mobility explained by the model, there is no basis for Dr. Starr to conclude that the changes in employee mobility his model shows are the result of the alleged conduct.[128]

---

[123] Starr Report, ¶ 89, Figure 4, Column 2. Dr. Starr's indicator of mobility is equal to one for employee-year observations representing movements between DaVita and SCA and zero for all other employee-year observations. There are 23,735 employee-year observations in the data period, 23 of which are set equal to one and the remainder are set equal to zero.

[124] Starr Report, ¶ 89.

[125] More precisely, the conduct effect is -0.00117. Starr Report, Figure 4.

[126] R-squared is a statistical measure of the proportion of the variance in the dependent variable that is explained by all of the independent variables in the model. James H. Stock and Mark W. Watson, *Introduction to Econometrics* (4th Edition) (New York, NY: Pearson, 2019), p. 111; Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* (7th Edition) (Boston, MA: Cengage, 2020), p. 35; ABA Handbook on Econometrics (2014), p. 100.

[127] James H. Stock and Mark W. Watson, *Introduction to Econometrics* (4th Edition) (New York, NY: Pearson, 2019), pp. 111, 113-114; Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* (7th Edition) (Boston, MA: Cengage, 2020), p. 35 ("A value of $R^2$ that is nearly equal to zero indicates a poor fit of the OLS line: very little of the variation in $y_i$ is captured by the variation in the $\hat{y}_i$ (which all lie on the OLS regression line.")

[128] Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: The National Academies Press, 2011), p. 314 ("Failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect

Highly Confidential
Outside Counsel/Experts Only

66. Moreover, the result that Dr. Starr purports to obtain is a product of flaws in his regression specification rather than an economically or statistically meaningful reduction in mobility. Dr. Starr's sole control variable in his regression is a linear time trend in his regression and his negative conduct effect is influenced by the inclusion of this variable. A time trend is sometimes included in time series regressions to capture the effects of things that are changing over time that cannot easily be controlled for directly, such as technological progress or improvements in efficiency. Dr. Starr does not offer any reason to think that there would be a trend over time to employee mobility, and there is no economic basis to anticipate that there would be one.[129] Without a sound economic justification for what variable is omitted, and why it is appropriate to capture the effect of the omitted variable with a time trend, Dr. Starr has no basis to opine that his results are economically meaningful instead of the result of poor specification.

67. In addition, Dr. Starr's employee mobility analysis failed to control for the underlying labor supply and demand conditions that affect employee mobility, including the COVID-19 pandemic and its impact on labor markets, and other macroeconomic variables that he included in his analysis of compensation but not mobility.[130] That is, Dr. Starr did not include controls for GDP per capita or the unemployment rate, which have been shown to be related to turnover and which he included in his compensation regressions.[131] Addressing these flaws overturns Dr. Starr's purported finding of a suppression in labor mobility between DaVita and SCA during the conduct period.

68. **Figure 13** shows the sensitivity of Dr. Starr's regression model of employee mobility to his unjustified inclusion of a time trend and his omission of standard labor supply and demand conditions:

- Column (b) reproduces Dr. Starr's original result from his Figure 4, Column 2. It is notable that even in Dr. Starr's original result, the conduct coefficient is statistically significant at the ten percent level but not at the five percent level,

---

that actually is caused by the excluded variable. In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis.")

[129] Starr Report, ¶¶ 87-88; Starr Deposition, Vol. I, 224:6-230:24. Dr. Starr testified as to the reasons why he has used a linear trend rather than individual year indicator variables, stating, "Typically in the analysis that I've been running I would, I would include a year trend if including year fixed effects would mean that I cannot estimate my coefficient of interest because it's perfectly co-linear." Later in his deposition, he stated "So given that there is a clear trend in the data, I wanted to capture that. I estimated it year by year in figure 3. In figure 4 I estimate it this way." However, (as I show in **Section IV.A.2**) Dr. Starr's year-by-year estimates displayed in his Figure 3 do not show a "clear trend" in the data. Moreover, Dr. Starr did not seek to understand what was driving the purported trend, or whether the "trend" is in fact economic evidence directly contradicting the purported restriction in mobility.

[130] Lucy Bayly, "Unemployment rate soars to 14.7 percent, highest level since the Great Depression," *NBC News Website*, May 8, 2020, available at https://www.nbcnews.com/business/economy/u-s-economy-shed-record-20-5-million-jobs-last-n1202696.

[131] The macroeconomic controls I include are Dr. Starr's ln(GDP Per Capita) and ln(Unemployment Rate) measures from his compensation regressions. Economic literature shows that turnover rates are related to macroeconomic conditions. *See, e.g.*, Michael J. Pries and Richard Rogerson, "Declining Worker Turnover: The Role of Short Duration Employment Spells," *National Bureau of Economic Research* Working Paper 26019 (June 2019); Steven J. Davis, *et al.*, "The Establishment-Level Behavior of Vacancies and Hiring," *National Bureau of Economic Research* Working Paper 16265 (August 2010); Henry R. Hyatt and James R. Spletzer, "The Recent Decline in Employment Dynamics," *IZA Journal of Labor Economics* 2:5 (September 2013).

Highly Confidential
Outside Counsel/Experts Only

which is generally considered the conventional cut-off for statistical significance.[132]

- Column (c) shows that the conduct effect is not statistically significant (at either the five or ten percent level) when I do not include a linear time trend in Dr. Starr's regression model.[133] This shows that the conduct effect Dr. Starr estimates arises due to his unjustified and unwarranted inclusion of a linear trend.

- In column (d) I add macroeconomic controls without a time trend and show that results are similar to column (c). That is, there is no longer any finding of a conduct effect in this specification.

- In column (e) I include Dr. Starr's time trend, but now also include macroeconomic controls. Column (e) shows that, even with Dr. Starr's linear time trend, adding controls for GDP and the unemployment rate results in a conduct effect that is not statistically significantly different from zero.

---

[132] Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: The National Academies Press, 2011), p. 320 ("In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%."); ABA Proving Antitrust Damages (2017), p. 142 ("[S]tatistical hypotheses are carried out at conventional levels of 5 percent.")

[133] The coefficient on the conduct indicator in the regression with no time trend and no controls returns the difference in the average mobility rate in the alleged conduct period minus the average mobility rate in the after-period. The 0.00031 conduct effect I estimate confirms the results in **Figure 12**. The average fraction of employees who moved between DaVita and SCA from 2008 to 2019 was 0.00102, and the average fraction of employees who moved between DaVita and SCA from 2020 to 2021 was 0.00071. 0.00031 is the difference between these two fractions.

39

Highly Confidential
Outside Counsel/Experts Only

**Figure 13: Sensitivity Results of Dr. Starr's Employee Mobility Regressions[134]**

| Variable | Original Model | No Time Trend | Add Controls No Time Trend | Add Controls |
|---|---|---|---|---|
| | **Dependent Variable: Indicator for Movements Between SCA/DaVita** | | | |
| **(a)** | **(b)** | **(c)** | **(d)** | **(e)** |
| Conduct | -0.00117 * | 0.00031 | 0.00021 | -0.00117 |
| | (0.000618) | (0.000470) | (0.000486) | (0.000926) |
| **% Effect Relative to Sample Mean** | **-121.1%** | **32.3%** | **22.0%** | **-120.3%** |
| Year | -0.000250 *** | | | -0.000214 |
| | (0.000090) | | | (0.000141) |
| Ln(GDP Per Capita) | | | -0.003083 ** | -0.002608 ** |
| | | | (0.001310) | (0.001237) |
| Ln(Unemployment Rate) | | | 0.001194 ** | -0.000055 |
| | | | (0.000537) | (0.000962) |
| **Sample Time Range** | **2008-2021** | **2008-2021** | **2008-2021** | **2008-2021** |
| **Sample Mean of DV** | **0.000969** | **0.000969** | **0.000969** | **0.000969** |
| **Observations** | **23,735** | **23,735** | **23,735** | **23,735** |
| **R-squared** | **0.001** | **0.000** | **0.001** | **0.001** |

69.    My analysis shows that Dr. Starr's purported economic evidence of reduced employee mobility is unreliable. Even if any meaning could be attached to a purported finding in a regression that fails to explain 99.9 percent of the variable being studied, my analysis shows that Dr. Starr's supposed finding of a reduction in mobility is overturned when his model is adjusted to include even the most basic of standard economic controls. Dr. Starr writes that "[q]uantitative evidence of a no-poach agreement would be an attendant decrease in employee mobility between firms with an active no-poach agreement."[135] However, as demonstrated, Dr. Starr's purported quantitative evidence of an "attendant decrease in employee mobility" between DaVita and SCA is unreliable and such an effect is non-existent once certain flaws in his analysis are corrected.[136] Both common sense appraisal of mobility numbers and appropriate statistical methods reveal no decrease in employee mobility between DaVita and SCA during the alleged conduct period. This means that reduction in employee mobility cannot have been a mechanism for meaningful compensation suppression. Plaintiffs' experts' claims that the alleged conduct deprived individual employees of the wage growth associated with changing employers are thus unsupported. In addition, Plaintiffs' experts' claims regarding broad

---

[134]    Significance values are as follows: *** p < 0.01, ** p < 0.05, * p < 0.1. Robust standard errors are in parentheses. Starr turnover materials ("DaVita USPI SCA Complete Data with Outliers.dta").

[135]    Starr Report, ¶ 66.

[136]    Starr Report, ¶ 66.

Highly Confidential
Outside Counsel/Experts Only

impact resulting from alleged measures to prevent attrition are unsupported, since there is no econometric evidence that mobility would have been higher in the but-for world.

### 2. Dr. Starr Fails to Establish a Meaningful Increase in Employee Mobility after 2019

70. Dr. Starr provides one additional regression analysis of employee mobility. In his Figure 3, he presents the results of a regression analysis to confirm "that the Conduct Period end date of 2019 is appropriate for both the SCA-DaVita No-Poach Agreement and the USPI-SCA No-Poach Agreement."[137] As I show below, Dr. Starr's conclusions from his Figure 3 are unsound, and his analysis is flawed and misleading.

71. Dr. Starr's Figure 3 displays the coefficients on individual year indicators from a regression of a measure of employee mobility between DaVita and SCA (and SCA and USPI) for each year between 2008 and 2021. Dr. Starr writes that "[i]f 2019 is the last year of the No-Poach Agreements, then in 2020 we should observe a statistically significant uptick in the movement of Senior Employees between the Covered Defendants," and he concludes from his Figure 3 that, "[r]elative to 2017, in 2020 there is a statistically significant increase in mobility."[138] Dr. Starr concludes that his analysis provides quantitative support for using 2019 as an appropriate end date for the conduct period in his compensation suppression analysis, instead of an end date of 2020 that would be more consistent with the January 2021 end date alleged in the Complaint.[139]

72. In fact, Dr. Starr's regression analysis provides no robust support for choosing 2019 as the end year for his conduct period. Dr. Starr's regression analysis produces a positive coefficient that is statistically significant at the ten percent level (*i.e.*, his apparent chosen significance level) for four of the fourteen years in his regression.[140] This fact shows that mobility varied year-over-year during the period of Dr. Starr's analysis, and that the mobility rate in 2020 was not unusual even compared with years during the alleged conduct period. In fact, if the criteria for assessing years in which the alleged agreements did not affect mobility is a statistically significant increase in mobility relative to a year when there were zero movements between SCA and DaVita, then Dr. Starr could equally have concluded that there was no impact of the agreements on mobility in 2008, 2011, or 2012. Each of these years has coefficients with larger magnitudes than the 2020 coefficient that Dr. Starr uses as meaningful economic evidence of the end of the alleged conspiracy period. In addition, the results in Dr. Starr's Figure 3 show that mobility between DaVita and SCA was not elevated in 2021 relative to 2017. A more reasonable interpretation of Dr. Starr's results is that the increase in mobility in 2020 relative to 2017 was not unusual and was consistent with year-to-year variability in mobility rates.

---

137 Starr Report, ¶ 86.

138 Starr Report, ¶ 86. Here again, Dr. Starr assesses statistical significance at the 10 percent level instead of at the 5 percent level. His analysis finds no statistically significant increase in mobility in 2020 relative to 2017 when measured at a 5 percent significance threshold.

139 Starr Report, ¶ 86.

140 Dr. Starr finds positive coefficients that are statistically significant at his selected 10 percent significance threshold in 2008, 2011, and 2012 as well as in 2020. Starr Report, Figure 3.

Highly Confidential
Outside Counsel/Experts Only

73.     Dr. Starr's analysis is also misleading because his purported finding of a significant increase in mobility in 2020 is predicated on the base year he selected. When including fixed effects (like Dr. Starr's year indicators) in a regression, the econometrician has to leave out one of the fixed effects, with the result that the coefficients on the other fixed effects are interpreted relative to the category that was left out. Dr. Starr elected to make 2017 the base year in his analysis so the coefficients on his individual year indicator variables are interpreted relative to 2017, one of two years with zero employee movements between DaVita and SCA during the period alleged in the Complaint as the conduct period.[141] As a matter of econometrics, Dr. Starr could have chosen any base year. If he instead used as the base year any of the 10 years during the alleged conduct period when employee mobility was higher than zero, he would not have found a statistically significant positive coefficient for 2020, eliminating his supposed quantitative support for his decision to analyze a conduct period that ends in 2019.[142] Given that there are an average of 1.7 employee movements per year between DaVita and SCA from 2008 to 2019, Dr Starr's choice of a base year with zero movements does not reflect the overall rate of employee mobility during the alleged conduct period.[143]

74.     Column (c) of **Figure 14**, below, displays the coefficients on the 2020 year indicator that result from running Dr. Starr's conduct end-date regression with alternative base years. The figure shows that Dr. Starr would have found a negative coefficient for 2020 had he used 2008, 2009, 2010, 2011, or 2012 as the base year in his regression. 2014 and 2017 are the only two years in the conduct period that, if chosen as a base year, produce a positive and statistically significant coefficient indicating increased mobility in 2020, and these are significant only if Dr. Starr's ten percent significance threshold is applied. These are also the only two years in the conduct period with no movement between DaVita and SCA, a phenomenon that also occurred in 2021 and 2022, both outside of the alleged conduct period.

---

[141]   The data also show that there were zero employee movements between DaVita and SCA in 2021 and 2022. *See* **Figure 12**.

[142]   *See* **Figure 14**.

[143]   *See* footnote 121.

Highly Confidential
Outside Counsel/Experts Only

**Figure 14: Annual Number of Movements and Probability of Mobility Between DaVita and SCA in 2020 Relative to Alternative Base Years[144]**

| Base Year | Number of Movements | Conduct Coefficient For 2020 |
|---|---|---|
| | ----(Count)---- | --------(Estimates)-------- |
| (a) | (b) | (c) |
| 2008 | 3 | -0.0017 |
| 2009 | 2 | -0.0006 |
| 2010 | 2 | -0.0004 |
| 2011 | 4 | -0.0018 |
| 2012 | 3 | -0.0007 |
| 2013 | 1 | 0.0008 |
| 2014 | 0 | 0.0015 * |
| 2015 | 1 | 0.0009 |
| 2016 | 1 | 0.0011 |
| 2017 | 0 | 0.0015 * |
| 2018 | 2 | 0.0007 |
| 2019 | 1 | 0.0010 |

75. As demonstrated, Dr. Starr's own employee mobility data show that employees were more likely to move between DaVita and SCA during the alleged conduct period than after the alleged conduct period. There is no statistically meaningful reduction in mobility during the conduct period, and to the contrary, average mobility was higher during the conduct period than after the conduct period. Dr. Starr's analysis does not show that there was any meaningful increase in employee mobility in 2020, and thus there is no statistical support for Dr. Starr's opinion that the purported agreement had an impact that ended in 2019, as opposed to some earlier year. As I show below in **Section V.A**, Dr. Starr's opinion about the date on which impact from the agreement ended materially affects his purported finding of compensation suppression.

### B. It Is Implausible That There Would Have Been Any Meaningful Reduction in Information Available To Senior-Level Employees

76. Plaintiffs claim that the alleged agreement "deprived [employees] of significant information that they would have used to negotiate for better compensation and terms of employment."[145] Dr. Starr states that the alleged agreements affected mobility and

---

[144] Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. Starr turnover materials ("DaVita USPI SCA Complete Data with Outliers.dta"). For completeness, **Exhibit 11** displays the coefficients that result from running Dr. Starr's conduct end-date regression for all possible alternative base years. The results confirm that the sign and significance of the coefficients on the year indicators are sensitive to the chosen base year.

[145] Complaint, ¶ 11.

Highly Confidential
Outside Counsel/Experts Only

bargaining leverage "indirectly by reducing the information about outside options available to employees."[146]  Dr. Gerhart claims that the alleged agreements suppressed bargaining power "because they cut off key avenues by which employees could obtain better information on alternative employment opportunities, including those with higher wages."[147]  Ultimately, Dr. Gerhart claims that this mechanism of harm indirectly transmitted impact to "all or nearly all salaried employees of Defendant firms."[148]

77.    In this section, I explain that it is implausible that there was any meaningful reduction in information available to Senior-Level employees during the alleged conduct period, given that there was no decrease in mobility between DaVita and SCA during the alleged conduct period and given the many alternative sources of timely and specific information that were available to DaVita employees during the alleged conduct period.[149]  I also explain that, had there been a mechanism for information regarding job opportunities to spread rapidly through the DaVita organization, as Plaintiffs allege, recruiting activities by employers outside of the alleged agreement, which vastly outnumbered the recruiting activities from SCA, could have ensured that all DaVita Senior Level employees were compensated at competitive levels, regardless of any agreements between DaVita and SCA.[150]

78.    As a preliminary matter, since I have shown that there was no reduction in employee mobility between DaVita and SCA during the alleged conduct period, there can be no reduction in information flowing from mobility, for example, through employees observing the job moves and compensation outcomes of colleagues.  Moreover, even if there had been a reduction of mobility between DaVita and SCA, it is unlikely that the alleged conduct would have meaningfully impacted employee information flow.  That is because DaVita employees had access to other timely and specific information regarding compensation and job opportunities during the alleged conduct period and there is no reason to believe that the information flow from SCA that was purportedly suppressed was any different from the information that flowed from the multiple other sources unaffected by the alleged agreement.  In other words, if DaVita's compensation for its Senior-Level employees was below market levels, those employees would have found out about that suppression from outreach by, or information provided by, the hundreds of other alternative employers who competed for DaVita Senior-Level employees.[151]

---

[146]    Starr Report, ¶ 39.

[147]    Gerhart Report, ¶ 67.

[148]    Gerhart Report, ¶ 157.

[149]    Plaintiffs also fail to establish that information from cold calls and other recruiting efforts would in fact, have been transmitted throughout DaVita.  Plaintiffs' experts offer no method of measuring the supposed reduction in cold-calling, and do not quantify its impact.

[150]    I note again that Dr. Starr's analysis without correction implies that approximately two more employees would have moved between DaVita and SCA each year but for the alleged conduct.  *See* footnote 40.  This stands in contrast to the more than 100 employees that joined or left DaVita each year over the alleged conduct period, bearing whatever market information was available to them from their recruiting experience.

[151]    *See* **Figure 1** and **Figure 3**.

Highly Confidential
Outside Counsel/Experts Only

79.  One such source of information to DaVita employees was information from the departure of employees to employers other than SCA. To the extent that employee departures are informative to incumbent employees, this would have been an important source of information, because many DaVita employees departed to many employers over the alleged conduct period.[152] Specifically, 1,402 DaVita Senior-Level employees departed for 1,020 different employers during the alleged conduct period, and SCA was the destination for less than 1 percent of those departures.[153] Information about compensation or other conditions of employment from other competitive alternatives would have been timely and specific, as it related to the real-time employment prospects of DaVita employees. Plaintiffs' experts themselves point to documents and testimony indicating that offers from outside of the alleged conspiracy were important sources of information for DaVita employees. For example, Dr. Gerhart notes that ███████████

████████████████████████████████████████

[154]

80.  DaVita employees also had access to public sources of information on compensation and employment opportunities through companies like Glassdoor and Indeed. Glassdoor is an online forum and job board where visitors can post compensation and other information pertaining to their own jobs and search and view information posted by others.[155] Indeed is an online job board that aggregates job listings and allows visitors to explore compensation through its "Find salaries" tool.[156] To demonstrate the type of information available to DaVita employes on these sites, **Figure 15** displays the results of two searches for Director jobs at SCA Health (the company's name after it became a division of Optum) on Glassdoor. The left panel displays the first page of results that Glassdoor returns from a search of job openings for "SCA Health Director." This search returned results for 23 Director jobs, all of which included estimated salary ranges provided by the employer. The right panel displays the results of searching user submitted salaries on Glassdoor using the same search term.[157] It shows that users submitted 736 SCA salaries, including 15 for Directors.[158] Similarly, **Figure 16** shows some of the first results that Indeed returns for a search of job postings for "Director" jobs at SCA. This search returned results for 25 Director jobs, all of which included salary ranges.

---

[152]  *See* **Section II.C**.

[153]  *See* **Figure 3**.

[154]  Gerhart Report, ¶ 58.

[155]  "About Us," *Glassdoor Website*, available at https://www.glassdoor.com/about.

[156]  "About Indeed," *Indeed Website*, available at https://www.indeed.com/about; "Salaries," *Indeed Website*, available at https://www.indeed.com/career/salaries?from=gnav-homepage.

[157]  Glassdoor users input their actual income and have the option of having it displayed on Glassdoor as a range. "Adding a Salary," *Glassdoor Website*, October 24, 2024, available at https://help.glassdoor.com/s/article/Adding-a-salary?language=en_US.

[158]  The pay for SCA Director jobs reported by Glassdoor users ranged from $164,000 to $244,000, and the total salary range for SCA Director employer job postings was $137,000 to $200,000.

45

Highly Confidential
Outside Counsel/Experts Only

## Figure 15: SCA Director Search Results from Glassdoor[159]

<strong>Job Openings Search</strong>     <strong>Compensation Information Search</strong>



---

[159] "SCA Health Director Jobs," *Glassdoor Website*, March 21, 2025, available at https://www.glassdoor.com/Jobs/SCA-Health-Director-Jobs-EI_IE221678.0,10_KO11,19.htm; "SCA Health Director Salaries," *Glassdoor Website*, available at https://www.glassdoor.com/Salary/SCA-Health-Director-Salaries-E221678_D_KO11,19.htm.

Highly Confidential
Outside Counsel/Experts Only

**Figure 16: SCA Director Job Openings Search Results from Indeed[160]**



81.    While these searches were conducted at the time of the writing of this report, it is indicative of the type of information that was available over large parts of the alleged conduct period.  Salary information has been available on Glassdoor since at least June 2008. [161]  Job listings have been available since 2004 on Indeed and since at least June

---

[160]    "SCA Health director Jobs," *Indeed Website*, March 28, 2025, available at https://www.indeed.com/cmp/Sca-Health-1/jobs?q=director&l=#cmp-skip-header-desktop.

[161]    Company reviews and salary information have been available on Glassdoor since at least June 2008.  Job listings have been available on Glassdoor since at least June 2010.  "About Us," *Glassdoor Website*, available at https://www.glassdoor.com/about/; Erick Schonfeld, "At Glassdoor, Find Out How Much People Really Make at Google,

Highly Confidential
Outside Counsel/Experts Only

2010 on Glassdoor.[162]  In addition, documents in the record show that one of the class representatives received job alerts for various DaVita jobs from another internet resource, LinkedIn.[163]  All told, considerable information about job openings and salaries became increasingly available from public sources during the alleged conduct period.  Job postings and salary surveys were a potentially important source of information for job searchers as well as for employees who were not looking to change jobs.

82.     Finally, to support Dr. Gerhart's conclusion that a reduction of information would have led all or nearly all putative Class Members to be impacted by the alleged conduct, it would have to be the case that compensation information transmitted to one employee through an active solicitation would be transmitted throughout the organization. However, if there were a mechanism that led compensation information to spread through the DaVita organization, then recruiting activities by the many employers outside of the alleged agreement would also impact compensation throughout the organization.  In this scenario, cold calls or hiring activity by outside employers would cause information regarding competitive compensation to be broadly transmitted through the organization.

## V.     Dr. Starr's Compensation Regressions Estimate Firmwide Conduct Effects Where There Are None

83.     Dr. Starr's estimates of the effect of the alleged conduct on the compensation of DaVita employees vary greatly across his regression models, from a purported compensation suppression of 4.8 percent in his Figure 26 to 24.8 percent in his Figure 34.[164]  As I describe below, Dr. Starr made errors in constructing his data, and his empirical methodology is critically flawed.  The wide variation in his estimates reflects these flaws, and the general unreliability of his results.[165]  The flaws in Dr. Starr's data and models

---

Microsoft, Yahoo, and Everywhere Else.," *TechCrunch Website*, June 10, 2008, available at https://techcrunch.com/2008/06/10/at-glassdoor-find-out-how-much-people-really-make-at-google-microsoft-yahoo-and-everywhere-else/; JP Mangalindan, "How Glassdoor became the No. 2 jobs site in the US," *Yahoo Finance Website*, February 26, 2018, available at https://finance.yahoo.com/news/glassdoor-became-no-2-jobs-site-us-222246364.html.

[162]  Indeed began offering job postings in 2004 and added a feature allowing job seekers to search for jobs by salary in 2008. "About Indeed," *Indeed Website*, available at https://www.indeed.com/about; "Salaries," *Indeed Website*, available at https://www.indeed.com/career/salaries?from=gnav-homepage; "Indeed Celebrates 20 Years of Helping People Get Jobs," *Business Wire Website*, November 19, 2024, available at https://www.businesswire.com/news/home/20241116622469/en/Indeed-Celebrates-20-Years-of-Helping-People-Get-Jobs; "Indeed.com Launches Job Search by Salary," *Indeed Website*, April 15, 2008, available at https://www.indeed.com/press/releases/indeed-launches-job-search-by-salary.

[163]  Scott Keech is a Named Plaintiff in this matter who "was employed by Defendant SCA from approximately 2011 to March 2012 as a Regional Director of Operations and Clinical Services in the San Francisco, California area."  Complaint, ¶ 17. *See, e.g.*, Your job alert for United States, February 22, 2022, KEECH_000002092-093; Your job alert for United States, January 19, 2022, KEECH_000002656-057; Your saved job at On Time Talen Solutions is still available, January 15, 2022, KEECH_000002714-015; Your job alert for Manhattan, New York, United States, January 19, 2022, KEECH_000002658-059; Your job alert for Manhattan, New York, United States, March 1, 2022, KEECH_000003499-500; Your saved job at Premise Health is still available, December 31, 2021, KEECH_000002910-911; Your saved job at DaVita Kidney Care is still available, December 28, 2021, KEECH_000002954-955.  While these documents are dated after the alleged conduct period, they are indicative of the sources of information that were available during the alleged conduct period.

[164]  Starr Report, Appendix D.

[165]  A model's reliability "depends on both the quality of data available and how well the models control for relevant supply and demand factors."  ABA Handbook on Econometrics (2014), pp. 262-263.

Highly Confidential
Outside Counsel/Experts Only

lead Dr. Starr's models not only to estimate widely varying conduct effects but to estimate statistically significant conduct effects where there are none.

84.    Dr. Starr's preferred estimate of compensation suppression implies that a decrease in employee mobility between DaVita and SCA of approximately two employees per year resulted in an immediate 17.2 percent suppression of compensation for all DaVita Senior-Level employees in the class.  The implausibility of Dr. Starr's results reinforce that his regression analysis of compensation is critically flawed.

85.    In this section, I describe the flaws in Dr. Starr's models and show how they lead to bias in his estimated conduct effects.  Correcting these flaws overturns Dr. Starr's purported results and finding of compensation suppression for all DaVita Senior-Level employees. Dr. Starr relies on his compensation regressions as the sole economic evidence regarding the impact of the alleged conduct as well as regarding Defendants' market power over the compensation of Senior-Level employees.[166]  The economic evidence in this section which overturns Dr. Starr's compensation regression models, therefore overturns Dr. Starr's conclusions regarding both market power and impact.

## A. Dr. Starr's Model Yields No Firmwide Conduct Effect for Potentially Relevant Alternative Conduct Periods

86.    Dr. Starr elected to use a conduct period for DaVita beginning in 2008 and ending in 2019 for reasons that are unsupported by his statistical analysis.[167]  In this section, I show that Dr. Starr's conduct effect is highly sensitive to changes in the start and end dates he uses for the alleged conduct period, such that if the finder of fact were to determine a different conduct period than that evaluated by Dr. Starr, his model would offer no support for a finding of impact, injury or market power for DaVita's Senior-Level employees.

87.    This sensitivity of Dr. Starr's purported finding of compensation suppression to changes in the start and end dates is notable because the Department of Justice and Plaintiffs have alleged several different conduct and class periods over time:

- **DOJ Indictments:**  In the DOJ's indictments of DaVita and SCA, the DOJ alleged that the DaVita-SCA agreement began "at least as early as" February 1, 2012, and lasted "at least" until July 31, 2017.[168]

- **Consolidated Amended Class Action Complaint & Second Consolidated Amended Class Action Complaint:** In Plaintiffs' Consolidated Amended Class Action Complaint and their Second Consolidated Amended Class Action

---

[166]    Starr Report, ¶ 196.

[167]    I understand that Plaintiffs' Complaint alleges a class period for DaVita starting in May 2008 and going through January 2021.  Complaint, ¶ 92.  *See* **Section IV.A** for a discussion of Dr. Starr's quantitative analysis purportedly confirming that the alleged conduct ended in 2019.

[168]    DaVita-Thiry Indictment, ¶ 9; Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, Case No. 3:21-cr-00011-L, United States District Court for the Northern District of Texas, Dallas Division, January 5, 2021, ¶ 17.

Highly Confidential
Outside Counsel/Experts Only

Complaint, Plaintiffs alleged class periods of February 1, 2012 to January 5, 2021, for DaVita, and May 1, 2010, to January 5, 2021, for SCA.[169]

- **Third Consolidated Amended Class Action Complaint:** In Plaintiffs' Third Consolidated Amended Class Action Complaint, Plaintiffs shifted again, alleging a class period of May 2008 to January 2021 for both DaVita and SCA.[170]

- **Testimony Suggesting Other Conduct Periods:** Andrew Hayek testified that the DaVita-SCA agreement did not begin until January 2012.[171] Mr. Hayek also testified that the DaVita-SCA agreement ended when Hayek left SCA at the start of 2018.[172] Hayek's replacement as SCA CEO, Anthony Kilgore, testified that he was not aware of any agreement with DaVita and that SCA had no such agreements while he was CEO.[173]

- **Dr. Starr's Report:** Dr. Starr's report does not use any of the periods referenced in the Complaints, the DOJ indictments or mentioned in Mr. Hayek's testimony. Instead, it considers a conduct period of January 1, 2008, to December 31, 2019, for DaVita and SCA.[174] Dr. Starr did not investigate whether his model showed any evidence of compensation suppression in any of the periods alleged in the Complaints or the DOJ indictment or the period when Mr. Hayek testified that a mobility restriction was in place.

88. I do not offer an opinion about which conduct or class period is correct. I note these inconsistent allegations and conflicting testimony because, as explained below, the results of Dr. Starr's regression are highly sensitive to, and in fact depend critically on, the dates used for the alleged conduct period.

89. Dr. Starr's compensation regression utilizes data on the annual compensation of DaVita employees from 2005 to 2022. His dependent variables are the natural log of various compensation measures, such as total compensation, total compensation excluding equity, regular pay plus "other pay," and the hourly wage.[175] Dr. Starr regresses his dependent variables on conduct indicators (either pooled for all three corporate

---

[169] Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, August 9, 2021, ¶ 101; Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, June 6, 2023, ¶ 101.

[170] Complaint, ¶ 92.

[171] Transcript of Proceedings before the Honorable R. Brooke Jackson, Day 4, *United States of America v. DaVita Inc., Kent Thiry*, Case No. 21-cr-00229-RBJ, United States District Court for the District of Colorado, April 7, 2022, 535:7-11. *See also* Deposition of Andrew Hayek, former Chief Executive Officer, SCA, September 18, 2024 ("Hayek Deposition"), 165:21-23.

[172] Hayek Deposition, 189:22-190:9.

[173] Deposition of Anthony Kilgore, former CEO, SCA, October 22, 2024, 56:19-58:17, 67:11-68:13.

[174] Starr Report, ¶ 118. Dr. Starr accounts for the starting date of May 1, 2008 when prorating his damages calculation for 2008. *See* Starr Report, footnote 497.

[175] Starr Report, ¶¶ 118; 130.

Highly Confidential
Outside Counsel/Experts Only

Defendants, or for DaVita, SCA and USPI separately), and various controls. His controls include a linear time trend, a COVID indicator (equal to one for 2020 and 2021 and zero for all other years), and state- or region-level controls for "geographic differences in pay, macro-economic factors, and healthcare-specific factors," including the average wages of managers in the healthcare industry, health expenditures per capita, GDP per capita, the unemployment rate, and Consumer Price Index.[176] In some specifications, Dr. Starr also controls for the natural log of total hours worked and the work location.[177] In many of his models, he includes either individual or individual-company fixed-effects.[178]

90. Dr. Starr concludes based on his analysis that "the aggregate wage suppressing effect of the Conduct for Directors and above was to reduce total compensation by 17.2 percent at DaVita."[179] I have tested the sensitivity of this purported conduct effect to alternative conduct periods. I have determined that Dr. Starr's result is highly sensitive to even small changes in the start and end dates of the alleged conduct period, and that Dr. Starr's estimated impact is overturned when examining many different potential conduct periods.

91. Plaintiffs allege a class period beginning in May 2008, when Mr. Hayek left DaVita to become the CEO of SCA and ending in January 2021, when the DOJ announced its indictment of SCA.[180] In his regression analysis, Dr. Starr chose to begin the conduct period in January 2008 and end the conduct period in 2019. As I show in **Section IV.A**, Dr. Starr's flawed statistical analysis does not support an end date in 2019. In addition, it is implausible that the alleged conduct would have impacted DaVita compensation starting in January 2008 at all for several reasons. First, DaVita reviews salaries once a year during its annual merit process, with changes to compensation being implemented between April and May of each year.[181] Thus, merit increases would not have been affected by the alleged conduct—assuming it began in May 2008—until April or May 2009, if at all.[182] Second, Plaintiffs' alleged mechanisms by which impact from the conduct would purportedly flow to all Senior-Level employees at DaVita would have taken time to impact compensation, if they did so at all. Dr. Gerhart acknowledges that

---

[176] Starr Report, ¶¶ 119-121.

[177] *See*, *e.g.*, Starr Report, Figure 6, Figure 8, ¶ 122.

[178] *See*, *e.g.*, Starr Report, Figure 6, Figure 8, Figure 9, Figure 10.

[179] Starr Report, ¶ 129 and Figure 8, column (4).

[180] Complaint, ¶¶ 21, 92.

[181] Email from Laura Mildenberger (DaVita) to Kent Thiry (DaVita), *et al.*, Subject: CALL MATERIALS, January 28, 2009, DVA_OMCEAL_001181143-165 at 145; Village Communications (DaVita) to Village Communications (DaVita), *et al.*, March 17, 2011, DVA_OMCEAL_001096182-198 at 192; Email from Lana Natali (DaVita) to Guy Seay (DaVita), *et al.*, January 15, 2014, DVA_OMCEAL_001153790-813 at 796; Email from Colleen Arthur (DaVita) to Danielle Reveal (DaVita), *et al.*, January 18, 2016, DVA_OMCEAL_001061165-190 at 169

[182] Arthur Deposition, 133:9-12 ("Q. And in fall of the prior year is when there's a recommendation made about what the merit pool should be, correct? A. That is correct."); Email from Laura Mildenberger (DaVita) to Kent Thiry (DaVita), *et al.*, Subject: CALL MATERIALS, January 28, 2009, DVA_OMCEAL_001181143-165 at 145; Village Communications (DaVita) to Village Communications (DaVita), *et al.*, March 17, 2011, DVA_OMCEAL_001096182-198 at 192; Email from Lana Natali (DaVita) to Guy Seay (DaVita), *et al.*, January 15, 2014, DVA_OMCEAL_001153790-813 at 796; Email from Colleen Arthur (DaVita) to Danielle Reveal (DaVita), *et al.*, January 18, 2016, DVA_OMCEAL_001061165-190 at 169.

Highly Confidential
Outside Counsel/Experts Only

adjustments to compensation "take time to play out."[183]  It also would have taken time for the alleged agreement between Mr. Thiry and Mr. Hayek to be implemented throughout DaVita and SCA.  Dr. Starr himself stated that "in the early stages of the instantiation of these no-poach agreements, these are large companies and recruitment is being done by internal workers who may or may not be aware the moment that Mr. Hayek or Mr. Wilcox or Mr. Thiry decided to implement these agreements."[184]  Third, assuming, as Plaintiffs' experts do, that the mechanism for compensation suppression was suppression of Senior-Level employee mobility, then the fact that Dr. Starr finds that employee mobility was "elevated in the early years of the Conduct Period" suggests that compensation would not have been suppressed during those years.[185]  For these reasons, the "Conduct Period" in Dr. Starr's compensation suppression regression is not tied to the period or periods in which the challenged conduct would, as an economic matter, even be able to affect compensation.  Adjusting the Conduct Period to make it more aligned with the allegations in the Complaint demonstrates the flaws in Dr. Starr's analysis.

92.    **Figure 17** displays the results of Dr. Starr's compensation regression model for DaVita with alternative conduct periods.  Column (b) displays Dr. Starr's model with his original conduct period from 2008 to 2019 and columns (c) through (f) show his results for alternative conduct periods beginning in 2009 or 2010 and ending in 2019 or 2020. Applying Starr's model as is but adjusting the conduct period to be 2009 to 2019 (starting in the earliest time, given the timing of DaVita compensation decisions and implementation of those decisions, that compensation could even possibly be suppressed across all Senior-Level DaVita employees) yields an insignificant effect, meaning that the conduct effect is statistically indistinguishable from zero (*i.e.*, no conduct effect for DaVita Senior-Level employees).  Further adjusting the conduct period to end in 2020 to align with the Third Amended Complaint (which alleges that the class period ended in January 2021) also yields a conduct coefficient that is substantially smaller than Dr. Starr's conduct effect and only significant at the 10 percent level.  I find no conduct effect if the beginning of the conduct period is delayed until 2010 (the first full year when affected merit increases could be in place) and runs through either 2019 or 2020.

---

[183]    Gerhart Report, ¶ 143.

[184]    Starr Deposition, Vol. II, 336:6-337:12.

[185]    Starr Report, ¶ 84.

Highly Confidential
Outside Counsel/Experts Only

### Figure 17: Dr. Starr's Compensation Regression for Alternative Conduct Start and End Dates[186]

| | Dependent Variable: Ln(Total Annual Compensation) | | | | |
|---|---|---|---|---|---|
| Variable | 2008-2019 | 2009-2019 | 2009-2020 | 2010-2019 | 2010-2020 |
| | -----------------------------------------------------------(Estimates)----------------------------------------------------------- | | | | |
| (a) | (b) | (c) | (d) | (e) | (f) |
| DaVita Conduct | -0.151 *** | -0.035 | -0.038 * | 0.077 *** | 0.066 *** |
| | (0.019) | (0.026) | (0.021) | (0.017) | (0.016) |
| % Effect | -14.0% | -3.4% | -3.8% | 8.0% | 6.8% |
| Year | 0.057 *** | 0.049 *** | 0.056 *** | 0.029 *** | 0.021 ** |
| | (0.007) | (0.007) | (0.011) | (0.007) | (0.010) |
| Ln(Avg. State Mgr. Earnings) | 0.020 | 0.022 | 0.010 | 0.033 | 0.052 * |
| | (0.027) | (0.028) | (0.029) | (0.028) | (0.029) |
| Ln(State Health Expend. PC) | 0.201 | -0.181 | -0.322 ** | -0.420 *** | -0.139 |
| | (0.176) | (0.191) | (0.159) | (0.158) | (0.170) |
| Covid | -0.046 * | 0.068 ** | 0.069 ** | 0.202 *** | 0.178 *** |
| | (0.026) | (0.033) | (0.033) | (0.026) | (0.028) |
| Ln(State GDP PC) | -0.409 * | -0.535 ** | -0.505 ** | -0.758 *** | -0.774 *** |
| | (0.215) | (0.220) | (0.223) | (0.230) | (0.231) |
| Ln(State Unemployment Rate) | 0.033 | -0.029 | -0.017 | -0.103 *** | -0.110 *** |
| | (0.026) | (0.030) | (0.034) | (0.026) | (0.029) |
| Census Region Annual CPI | 0.064 | 0.466 *** | 0.437 *** | 0.963 *** | 0.933 *** |
| | (0.099) | (0.132) | (0.128) | (0.101) | (0.107) |
| Ln(Total Hours) | 0.848 *** | 0.850 *** | 0.851 *** | 0.854 *** | 0.852 *** |
| | (0.032) | (0.032) | (0.032) | (0.032) | (0.032) |
| Observations | 14,236 | 14,236 | 14,236 | 14,236 | 14,236 |
| Adjusted R-squared | 0.79 | 0.79 | 0.79 | 0.79 | 0.79 |
| Employee FE | Yes | Yes | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes | Yes | Yes |

93. Dr. Starr's model also fails to establish compensation suppression for other conduct periods that the finder of fact may find relevant. As noted above, I understand that Mr. Hayek testified that the mobility restriction began no earlier than January 1, 2012 and ended in 2017 when he stepped down as CEO of SCA.[187] Accordingly, **Figure 18** displays the results of Dr. Starr's model adjusting the conduct period to start in 2012 and end in 2017. The figure shows that Dr. Starr's model would yield a positive and statistically significant effect if the finder of fact were to determine that 2012 to 2017 is the appropriate conduct period for examining impact. In other words, analysis using this period would suggest that, if anything, compensation for DaVita Senior-Level employees was higher during this period than in the before and after period, after controlling for relevant economic conditions, rather than being suppressed as Dr. Starr claims. Similar positive conduct effects are found if the conduct period were to be 2013 to 2017, allowing the conduct period to start with the first full year of wage data after the mobility

---

[186] Significance values are as follows: *** p < 0.01, ** p < 0.05, * p < 0.1. Standard errors, clustered by employee, are in parentheses. Column (b) displays the results of Dr. Starr's Figure 6, column (3) restricted to DaVita employees only. Columns (c) through (f) display these same results with different alleged conduct periods. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta).

[187] Hayek Deposition, 35:14-23, 165:21-23; 190:10-22.

Highly Confidential
Outside Counsel/Experts Only

restriction was purportedly in effect. It also yields a positive and statistically significant effect if the court were to determine that 2010 to 2017 is the appropriate conduct period encompassing both an information exchange period and the dates of the mobility restriction according to DaVita.[188]

### Figure 18: Dr. Starr's Compensation Regression for Alternative Conduct Periods[189]

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| **Variable** | **2012-2017** | **2013-2017** | **2010-2017** |
| | ------------------------------(Estimates)------------------------------ | | |
| **(a)** | **(b)** | **(c)** | **(d)** |
| DaVita Conduct | 0.119 *** | 0.082 *** | 0.124 *** |
| | (0.009) | (0.008) | (0.010) |
| **% Effect** | **12.7%** | **8.5%** | **13.3%** |
| Year | 0.022 *** | 0.027 *** | 0.028 *** |
| | (0.006) | (0.007) | (0.006) |
| Ln(Avg. State Mgr. Earnings) | 0.072 ** | 0.056 ** | 0.117 *** |
| | (0.028) | (0.028) | (0.029) |
| Ln(State Health Expend. PC) | -0.135 | -0.143 | -0.400 *** |
| | (0.156) | (0.156) | (0.155) |
| Covid | 0.174 *** | 0.148 *** | 0.201 *** |
| | (0.020) | (0.021) | (0.019) |
| Ln(State GDP PC) | -0.415 * | -0.527 ** | -0.421 * |
| | (0.219) | (0.220) | (0.219) |
| Ln(State Unemployment Rate) | -0.068 *** | -0.051 ** | -0.138 *** |
| | (0.025) | (0.025) | (0.024) |
| Census Region Annual CPI | 0.859 *** | 0.807 *** | 0.877 *** |
| | (0.065) | (0.065) | (0.063) |
| Ln(Total Hours) | 0.839 *** | 0.842 *** | 0.843 *** |
| | (0.032) | (0.032) | (0.032) |
| **Observations** | **14,236** | **14,236** | **14,236** |
| **Adjusted R-squared** | **0.79** | **0.79** | **0.79** |
| Employee FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |

94.    Documents in the record suggest other relevant periods for investigation. For example, Dr. Starr's model does not allow him to separately measure the impact of the alleged

---

[188]  I understand that the exchange of information was alleged to have begun in 2009, and that Dr. Starr stated that 2010 is the earliest year that the alleged information exchange could have had an effect. *See* Starr Report, ¶ 118.

[189]  Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. Standard errors, clustered by employee, are in parentheses. Columns (b), (c), and (d) display the results of Dr. Starr's Figure 6, column (3) model restricted to DaVita employees only for different alleged conduct periods. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta).

Highly Confidential
Outside Counsel/Experts Only

exchange of information and the alleged agreement.[190]  However, if the finder of fact is interested in examining the alleged period of the information exchanges using Dr. Starr's model, I understand that the earliest documentary support about information exchanges is from 2009, and that Dr. Starr stated that 2010 is the earliest year that the alleged information exchange could have had an effect.[191]  Had Dr. Starr started his conduct period in 2010 or 2011, he would only have found impact if he assumed 2011 as the end of the conduct period.

95.     For completeness, I have examined the results that Dr. Starr's model would yield for every possible start date between 2008 and 2016 and for every possible end date between 2009 and 2021.  **Figure 19** includes the results of this analysis. The columns indicate the start year used for the alleged conduct period, and the rows indicate the end year used for the alleged conduct period.  The cells display the coefficient on the conduct indicator for a regression with the indicated start and end conduct years.  Figures in red are those where the model yields a negative conduct coefficient (indicating compensation suppression) and figures in green are those where the model yields a positive conduct coefficient, indicating that compensation was elevated.[192]  The figure shows that there is considerable variability in the conduct effects Dr. Starr's model estimates for alternative conduct periods, and many conduct periods do not yield a negative and statistically significant conduct effect.

---

[190]   Starr Deposition, Vol. I, 84:18-85:24, 88:16-89:8.

[191]   Starr Deposition, Vol. II, 333:3-335:10 ("A. … The CSI exchanges, based on my review of the evidence, began sometime in 2009, though what was exchanged was compensation, future compensation information that would have been incorporated into the next year's compensation decisions, based on my understanding.")  *See also* Starr Report, ¶ 118.

[192]   Deeper shading (*i.e.*, darker red or darker green) is used to reflect numbers of bigger magnitudes.  The larger the positive coefficient, the darker the green shading, and the larger (in absolute value) the negative coefficient, the darker the red shading.  A figure highlighted in dark green indicates that the model finds elevated compensation in the studied period relative to other years.  Generally speaking, Dr. Starr's model finds larger compensation effects when he includes 2008 in the alleged conduct period than he would if he used any other year as the starting period for the start of the alleged conduct period.  As noted, it is implausible that the conduct could have had an effect on compensation for all Senior-Level employees starting as early as 2008.

Highly Confidential
Outside Counsel/Experts Only

**Figure 19: DaVita Compensation Regression Results: Dr. Starr's Conduct Effect by Start and End Year of Alleged Conduct[193]**

|  | DaVita Alleged Conduct Period Start Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DaVita Alleged Conduct Period End Year | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
| **2009** | -0.155 *** | -0.116 *** | | | | | | | |
| **2010** | -0.129 *** | -0.077 *** | 0.003 | | | | | | |
| **2011** | -0.188 *** | -0.138 *** | -0.060 *** | -0.084 *** | | | | | |
| **2012** | -0.102 *** | -0.024 * | 0.042 *** | 0.039 *** | 0.125 *** | | | | |
| **2013** | -0.118 *** | -0.036 ** | 0.031 *** | 0.024 ** | 0.069 *** | -0.011 | | | |
| **2014** | -0.067 *** | 0.010 | 0.054 *** | 0.043 *** | 0.075 *** | 0.019 ** | 0.039 *** | | |
| **2015** | 0.016 | 0.076 *** | 0.092 *** | 0.074 *** | 0.096 *** | 0.053 *** | 0.069 *** | 0.077 *** | |
| **2016** | 0.048 *** | 0.102 *** | 0.107 *** | 0.086 *** | 0.105 *** | 0.065 *** | 0.075 *** | 0.072 *** | 0.040 *** |
| **2017** | 0.071 *** | 0.122 *** | 0.124 *** | 0.103 *** | 0.119 *** | 0.082 *** | 0.094 *** | 0.088 *** | 0.053 *** |
| **2018** | 0.110 *** | 0.183 *** | 0.175 *** | 0.141 *** | 0.164 *** | 0.120 *** | 0.136 *** | 0.128 *** | 0.073 *** |
| **2019** | **-0.151 ***** | -0.035 | 0.077 *** | 0.050 *** | 0.108 *** | 0.009 | 0.025 | -0.041 * | -0.112 *** |
| **2020** | -0.117 *** | -0.038 * | 0.066 *** | 0.043 *** | 0.094 *** | 0.003 | 0.012 | -0.025 * | -0.074 *** |
| **2021** | -0.151 *** | -0.035 | 0.077 *** | 0.050 *** | 0.108 *** | 0.009 | 0.025 | -0.041 * | -0.112 *** |
| **2022** | -0.153 *** | 0.137 *** | 0.191 *** | 0.129 *** | 0.201 *** | 0.071 *** | 0.093 *** | 0.029 * | -0.077 *** |

96. These results show that Dr. Starr's conduct effect is highly sensitive to the start and end dates he uses for the alleged conduct period.[194] If the Court or the finder of fact were to determine a different conduct period than that evaluated by Dr. Starr, Dr. Starr's model would offer no support for a robust and reliable finding of impact, injury or market power for many conduct periods that the Court may find applicable.

## B. Dr. Starr Uses a Flawed Measure of Equity Compensation and Made Errors in Constructing His Data

97. Dr. Starr made several errors in constructing his data. He failed to use updated employee data produced by DaVita on October 11, 2024. As a result, his data included inaccurate job title, manager level, and department information for 549 Senior-Level employee-year

---

[193] Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. The above analysis tests Dr. Starr's regression model from Figure 6, column (3) of his expert report by changing the years of alleged conduct for DaVita. The numbers displayed are the coefficients of overall conduct for DaVita only. SCA and USPI are excluded from this analysis. Bolded and outlined is the coefficient of conduct when conduct starts in 2008 and ends in 2019 for DaVita, which is the conduct period used in Dr. Starr's report. Color scale indicates coefficients greater than zero in green and less than zero in red. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta).

[194] **Exhibit 12** displays the results of a similar analysis varying start and end dates for conduct including both DaVita and SCA in the regression since the alleged conduct period pertains to both Defendants. The exhibit shows that 2008 to 2019 produces the single largest (in magnitude) negative coefficient of all possible combinations.

observations.[195] Dr. Starr's data construction also failed to exclude 1,493 employee-year observations corresponding to the legal and HR departments at DaVita that I understand are not part of the purported Class.[196] In addition to these errors, Dr. Starr used a conceptually flawed measure of equity compensation to construct the total compensation measure he used in his compensation regressions. Specifically, Dr. Starr included the value of stock options in an employee's total compensation in the year the employee decided to exercise the options rather than in the year DaVita elected to grant the stock option to them.[197] That is, Dr. Starr valued stock options based on the exercise price at the exercise date rather than using the expected value of the equity grant at the time it was granted. As a result of these decisions, Dr. Starr's equity compensation measure does not reflect DaVita's compensation decisions, which are the focus of this matter. Instead, his equity compensation measure reflects factors outside of DaVita's control, including stock market returns and the investment decisions of individual employees.

98. There are well-established methods, based on principles of economics and finance, for valuing equity compensation at the time of the grant.[198] DaVita reports the value of its total equity grants in its 10-K filing each year.[199] I have constructed a value of equity compensation at the grant date using the "weighted-average fair value" of grants from DaVita's 10-K in the year of the grant.[200] I have also corrected Dr. Starr's total compensation measure by removing any component of pay associated with stock options exercises from his measure and adding the corrected value of equity grants to his measure in the year they were granted.

99. **Figure 20** displays the results of Dr. Starr's regression specification from column (3) of his Figure 6, with Dr. Starr's original data and with Dr. Starr's data corrected for errors, including the errors in identifying class members and in his measure of the value of equity compensation. Both models are exactly as specified by Dr. Starr but limited to DaVita employees only. The figure shows that Dr. Starr's data errors are consequential

---

[195] After including the 2022-2023 DaVita Teammate Data, I find changes to job titles for 210 Senior-Level employees in 2022, changes to manager levels for 100 Senior-Level employees, and changes to departments for 463 Senior-Level employees, among employees originally identified as Senior-Level employees in Dr. Starr's data or newly identified as Senior-Level employees after my corrections. Overall, inclusion of the 2022-2023 DaVita Teammate Data identified new job titles, manager levels, and/or department information for 549 unique Senior-Level employees in 2022. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[196] Dr. Starr excludes departments in a case-sensitive manner, which fails to properly exclude 1,493 Senior-Level employee-year observations that work in HR and legal departments based on their department classification or job title.

[197] *See* Starr turnover materials; DaVita Stock Option Exercise Data; DaVita Stock Options Grants Data.

[198] *See, e.g.*, Fischer Black and Myron Scholes, "The Pricing of Options and Corporate Liabilities," *The Journal of Political Economy* 81:3 (May-June 1973), pp. 637-654.

[199] The value of stock appreciation rights and stock units granted are available for each year, *e.g.*, DaVita stock appreciation rights granted in 2016 were valued at $13.74 per share, and stock units were valued at $70.99 per share in the year which they were granted. DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2016, p. F-36.

[200] According to an annual filing from DaVita, "the Company has estimated the grant-date fair value of stock-settled stock appreciation rights using the Black-Scholes-Merton valuation model and stock-settled stock unit awards at intrinsic value on the date of the grant." This annual filing also describes the assumptions regarding the term of the awards, the expected volatility, the expected dividend yield, and the risk-free interest rate. DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2016, pp. F-36-F-37.

Highly Confidential
Outside Counsel/Experts Only

for his results. Column (b) displays the results of running Dr. Starr's model on Dr. Starr's original data for DaVita only. The conduct effect for Dr. Starr's model when applied only to DaVita's data is 14.0 percent.[201] Column (c) displays the results of running Dr. Starr's model on Dr. Starr's data corrected for errors. The conduct effect based on the corrected data is substantially smaller at 9.2 percent.

**Figure 20: Dr. Starr's Compensation Regression for DaVita Corrected for Data Errors[202]**

| Variable | Dependent Variable: Ln(Total Annual Compensation) | |
| | Dr. Starr's Original Data | Corrected Data |
| --- | --- | --- |
| | ----------------------------(Estimates)---------------------------- | |
| (a) | (b) | (c) |
| DaVita Conduct | -0.151 *** | -0.096 *** |
| | (0.019) | (0.016) |
| **% Effect** | **-14.0%** | **-9.2%** |
| Year | 0.057 *** | 0.049 *** |
| | (0.007) | (0.006) |
| Ln(Avg. State Mgr. Earnings) | 0.020 | -0.011 |
| | (0.027) | (0.026) |
| Ln(State Health Expend. PC) | 0.201 | -0.002 |
| | (0.176) | (0.170) |
| Covid | -0.046 * | 0.001 |
| | (0.026) | (0.022) |
| Ln(State GDP PC) | -0.409 * | 0.100 |
| | (0.215) | (0.190) |
| Ln(State Unemployment Rate) | 0.033 | -0.034 |
| | (0.026) | (0.024) |
| Census Region Annual CPI | 0.064 | 0.063 |
| | (0.099) | (0.088) |
| Ln(Total Hours) | 0.848 *** | 0.759 *** |
| | (0.032) | (0.035) |
| **Observations** | **14,236** | **13,138** |
| **Adjusted R-squared** | **0.79** | **0.83** |
| Employee FE | Yes | Yes |
| Location FE | Yes | Yes |

## C. Dr. Starr's Regressions Are Not Robust to Alternative Specifications

100. I have shown that Dr. Starr's conduct effects are sensitive to the start- and end-dates he elects to use as the conduct period in his regressions as well as to the data errors in his

---

[201] This is the same result that Dr. Starr obtains for DaVita when he runs his fully interactive model in his Figure 29, column (3).

[202] Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. Standard errors, clustered by employee, are in parentheses. Column (b) uses Dr. Starr's data to recreate Figure 6 column (3) from Dr. Starr's expert report, excluding SCA

Highly Confidential
Outside Counsel/Experts Only

underlying analysis. In this subsection, I show that Dr. Starr's model does not adequately control for underlying labor supply and demand factors that changed across the conduct and non-conduct periods, including major labor market shocks. Adding improved controls for labor supply and demand conditions overturns Dr. Starr's purported conduct effect, revealing no firmwide compensation impact for Senior-Level employees during the conduct period assessed by Dr. Starr.

101. Dr. Starr's "before-during-after" regressions compare compensation during the alleged conduct period with compensation in a before-period from 2005 to 2007 and in an after-period from 2020 to 2022. If Dr. Starr's regression specification adequately controls for underlying labor supply and demand conditions that changed across the period, dropping the after-period to run a "before-during" regression should lead to the same conclusion as dropping the before-period to run a "during-after" comparison.[203] In this subsection, I conduct this experiment and show that Dr. Starr's "before-during" regression produces substantially different results from his "during-after" regression.

102. **Figure 21** displays the results of Dr. Starr's regression specification run as two separate "before-during" and "during-after" regressions. The results show that Dr. Starr's results are highly sensitive to the time frame of the analysis. While the "before-during" regression returns a statistically insignificant conduct effect near zero, the during-after regression produces a statistically significant negative conduct effect with a large magnitude. This is particularly notable because Dr. Gerhart suggests that the alleged conduct would have lasting effects, and any lasting effects would lead to smaller conduct effects estimated in the during-after regressions.[204] It is also notable in light of the fact that the "after" period is affected by the largest shock to the labor market since the Great Depression, as I explain below. This suggests that, even if otherwise valid, Dr. Starr's regression does not adequately control for underlying labor supply and demand conditions that are changing between the before- during- and after-periods.

---

and USPI observations. Column (c) is the same as column (b) but corrects Dr. Starr's data as described above. Starr Report, Figure 6; Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")); DaVita Annual Reports 2005-2022.

[203] Discussing before-during-after models, one ABA textbook states "it is appropriate to combine the [before and after] periods only if the model is stable across them. Although there are many ways that one might assess whether the model [] is stable across the two time periods … the most informative test is likely to test whether a prediction model estimated using only the before period would yield the same overcharge estimates as a prediction model estimated using only the after period. If such equivalence of the before and after models cannot clearly be established, attempting to combine the before and after period ... is inadvisable, as predictions are likely to be unreliable." ABA Proving Antitrust Damages (2017), pp. 183-184.

[204] Gerhart Report, ¶ 7 ("[s]uch wage suppression resulting from Defendants' anticompetitive No-Poach Agreements and CSI Exchanges would likely persist into the future, as relative compensation and compensation levels often do not change much in the short term.")

59

Highly Confidential
Outside Counsel/Experts Only

**Figure 21: Dr. Starr's Compensation Regression for DaVita Based on Before-During and During-After Analyses[205]**

| | Dependent Variable: Ln(Total Annual Compensation) | |
| --- | --- | --- |
| **Variable** | **Model with Controls Before-During** | **Model with Controls During-After** |
| | ------------------------------(Estimates)------------------------------ | |
| **(a)** | **(b)** | **(c)** |
| DaVita Conduct | -0.006 | -0.170 *** |
| | (0.022) | (0.041) |
| **% Effect** | **-0.6%** | **-15.6%** |
| Year | 0.020 ** | 0.054 *** |
| | (0.010) | (0.006) |
| Ln(Avg. State Mgr. Earnings) | -0.001 | -0.008 |
| | (0.030) | (0.026) |
| Ln(State Health Expend. PC) | 0.687 *** | -0.091 |
| | (0.226) | (0.164) |
| Ln(State GDP PC) | 0.237 | 0.074 |
| | (0.265) | (0.217) |
| Ln(State Unemployment Rate) | -0.128 *** | -0.076 *** |
| | (0.030) | (0.023) |
| Census Region Annual CPI | -0.024 | -0.085 |
| | (0.157) | (0.149) |
| Ln(Total Hours) | 0.748 *** | 0.741 *** |
| | (0.041) | (0.037) |
| Covid | | -0.027 |
| | | (0.033) |
| **Observations** | **10,205** | **12,288** |
| **Adjusted R-squared** | **0.83** | **0.83** |
| Employee FE | Yes | Yes |
| Location FE | Yes | Yes |

103. One of the factors potentially confounding the results is the COVID-19 pandemic and its impact on labor markets. The COVID-19 pandemic was the largest labor market shock

---

[205] Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. Standard errors, clustered by employee, are in parentheses. Columns (b) and (c) use the specification reported in Dr. Starr's Figure 6 column (3). Column (b) limits to observations between 2005 and 2019, and column (c) limits to observations between 2008 and 2022. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta"))

since the Great Depression.[206]  During 2020, the pandemic caused a large decrease in labor force participation and an increase in unemployment rates.[207]  Economists have found, and government statistics reflect, that excess slack in labor markets was largely gone by the end of 2020.[208]  However, the COVID-19 pandemic continued to affect labor markets through at least 2022.  While labor demand recovered in 2021, labor supply was slower to recover, leading labor markets to be historically tight in 2021 and 2022.[209]  By July 2021, the unfilled job opening rate, a key indicator of labor market tightness, was at its highest level since the inception of the data series twenty years prior, and this rate continued to increase during 2022.[210]  In April 2021, a record four million people quit their jobs, part of what became known as "The Big Quit" or "The Great Resignation."[211]  Importantly, economists have also concluded that the labor market situation during 2021 and 2022 was even tighter than the unemployment rate suggested, suggesting that Dr.

---

[206] Lucy Bayly, "Unemployment rate soars to 14.7 percent, highest level since the Great Depression," *NBC News Website*, May 8, 2020, available at https://www.nbcnews.com/business/economy/u-s-economy-shed-record-20-5-million-jobs-last-n1202696.

[207] U.S. private sector employment fell by 21 percent from February to April 2020, and the US unemployment rate spiked to 14.7 percent in April 2020.  Alexander Bartik, *et al.*, "Measuring the Labor Market at the Onset of the COVID-19 Crisis," *National Bureau of Economic Research* Working Paper 27613 (July 2020), p. 1; Tomaz Cajner, *et al.*, "The U.S. Labor Market during the Beginning of the Pandemic Recession," *National Bureau of Economic Research* Working Paper 27159 (May 2020), p. 1; Sumedha Gupta, *et al.*, "Effects of social distancing policy on labor market outcomes," *Contemporary Economic Policy* 41:1 (September 2022), p. 169.

[208] Robert E. Hall and Marianna Kudlyak, "The unemployed with jobs and without jobs," *Labour Economics* 79 (August 2022), p. 2  ("[J]ob-finding rate for the jobless unemployed fell in April 2020 but bounced back later.  In November 2020, the job-finding rate among the jobless unemployed was at the level similar to the average rates in 2015 and 2016, when total unemployment was 5.3% and 4.9%, respectively.")

[209] Labor supply was abnormally low during 2021 due to a decrease in labor force participation rates relative to the historical trend.  Labor demand was unexpectedly high due to the quick economic recovery and government programs like the CARES Act, which increased consumer demand for goods and services.  Robert E. Hall and Marianna Kudlyak, "The unemployed with jobs and without jobs," *Labour Economics* 79 (August 2022), pp. 2, 4-6.  In addition to labor force participation, the desired number of working hours decreased during this period as well.  *See* R. Jason Faberman, *et al.*, "Has the Willingness to Work Fallen during the Covid Pandemic?," *Labour Economics* 79 (September 2022), p. 9.  "Labor Force Participation Rate [CIVPART]," Federal Reserve Economic Data, *Federal Reserve Bank of St. Louis Website*, April 4, 2025, available at https://fred.stlouisfed.org/series/CIVPART.  In April 2021, a record four million people quit their jobs, part of what became known as "The Big Quit" or "The Great Resignation."  Lisa Curtis, "Why The Big Quit Is Happening And Why Every Boss Should Embrace It," *Forbes Website*, June 30, 2021, available at https://www.forbes.com/sites/lisacurtis/2021/06/30/why-the-big-quit-is-happening-and-why-every-boss-should-embrace-it/.  Robin Brooks and Ben Harris, "The US recovery from COVID-19 in international comparison," *The Brookings Institution Website*, October 17, 2024, available at https://www.brookings.edu/articles/the-us-recovery-from-covid-19-in-international-comparison/; Scott Fulford, "The post-pandemic economy," *Princeton University Press Website*, May 22, 2024, available at https://press.princeton.edu/ideas/the-post-pandemic-economy; Alyssa Flowers and Andrew Van Dam, "The most unusual job market in modern American history, explained," *The Washington Post Website*, December 29, 2021, available at https://www.washingtonpost.com/business/2021/12/29/job-market-2021/.

[210] Louise Sheiner, *et al.*, "The US labor market post-COVID: What's changed, and what hasn't? *The Brookings Institution Website*, March 22, 2024, available at https://www.brookings.edu/articles/the-us-labor-market-post-covid-whats-changed-and-what-hasnt/; "Job Openings and Labor Turnover - July 2021,"*U.S. Bureau of Labor Statistics Website,* September 8, 2021, available at https://www.bls.gov/news.release/archives/jolts_09082021.pdf; "Job Openings and Labor Turnover Survey : History," *U.S. Bureau of Labor Statistics Website*, March 29, 2024, available at https://www.bls.gov/opub/hom/jlt/history.htm.

[211] Lisa Curtis, "Why The Big Quit Is Happening And Why Every Boss Should Embrace It," *Forbes Website*, June 30, 2021, available at https://www.forbes.com/sites/lisacurtis/2021/06/30/why-the-big-quit-is-happening-and-why-every-boss-should-embrace-it/.

Highly Confidential
Outside Counsel/Experts Only

Starr's unemployment rate control is an inadequate control for labor market conditions during this period.[212]

104. Dr. Starr includes a COVID-19 control equal to one in 2020 and 2021 in his regression model and zero in every other year.[213] This control does not have a statistically significant coefficient when included in the model, likely because it reflects the average effect of the slack 2020 labor market and the tight 2021 labor market. Accordingly, it does not adequately control for the labor market situation in either year. It also does not control for the unusual labor market situation during 2022. Dr. Starr also controls for the state unemployment rate. However, economists have found that, during the period following COVID the unemployment rate failed to capture the labor market situation to the extent it had previously.[214] Economists have suggested that additional controls are necessary for this period.[215]

105. **Figure 22** displays the results of Dr. Starr's compensation regression for DaVita with alternative and economically meaningful controls. Column (b) again displays Dr. Starr's original model using Dr. Starr's data corrected for errors. In column (c) I correct Dr. Starr's COVID-19 control. When I replace Dr. Starr's COVID-19 control with an indicator for 2020 only, the conduct effect decreases from 9.2 percent to 6.3 percent. In column (d), I add a control for the state-level rate of unfilled job openings from the U.S. Bureau of Labor Statistics Job Openings and Labor Force Turnover Survey ("JOLTS"). The unfilled job openings rate has a statistically significant positive coefficient when included in the model, reflecting that difficulty filling positions puts upward pressure on

---

[212] During 2022, vacancy rates and quit rates corresponded to a degree of labor market tightness previously associated with sub-2 percent unemployment rates. Alex Domash, Lawrence H. Summers, "How Tight Are U.S. Labor Markets," *National Bureau of Economic Research* Working Paper 29739 (February 2022), pp. 1-2. Louise Sheiner, *et al.*, "The US labor market post-COVID: What's changed, and what hasn't? *The Brookings Institution Website*, March 22, 2024, available at https://www.brookings.edu/articles/the-us-labor-market-post-covid-whats-changed-and-what-hasnt/.

[213] Starr Report, ¶ 120.

[214] Alex Domash, Lawrence H. Summers, "How Tight Are U.S. Labor Markets," *National Bureau of Economic Research* Working Paper 29739 (February 2022), p. 2 ("Historically, measures of slack on the supply-side, like the unemployment rate and the prime-age (25-54) nonemployment rate, have moved in tandem with measures of slack on the demand-side, such as the job vacancy rate and the quits rate, meaning that different indicators gave broadly corroborative signals of labor market tightness. Since the beginning of the Covid-19 pandemic, however, the supply-side indicators and the demand-side indicators have diverged significantly. While the unemployment rate and prime-age nonemployment rate remain elevated at late-2017 levels and imply modest degrees of slack, the job vacancy rate and quits rate have surged to series highs and imply a very tight labor market."). *See also* Louise Sheiner, *et al.*, "The U.S. Labor Market Post-Covid: What's Changed, and What Hasn't?," *The Brookings Institution Website*, March 22, 2024, available at https://www.brookings.edu/wp-content/uploads/2024/03/U.S.-Labor-Market-post-COVID.pdf, p. 2 ("Before 2019, the unemployment rate was widely regarded to be an adequate measure of labor market slack, largely because it closely tracked other measures of slack like the ratio of vacancies to unemployed workers (V/U) and quit rates, measures that that Bureau of Labor Statistics reports in its monthly Job Openings and Labor Turnover Survey. Many economists are no longer confident about the adequacy of the unemployment rate as the only important measure. Although unemployment in 2023 was at about the same level as it was in 2019, other measures of slack suggested that the labor market was much tighter.")

[215] During 2022, vacancy rates and quit rates corresponded to a degree of labor market tightness previously associated with sub-2 percent unemployment rates. Alex Domash, Lawrence H. Summers, "How Tight Are U.S. Labor Markets," *National Bureau of Economic Research* Working Paper 29739 (February 2022), pp. 1-2. Louise Sheiner, *et al.*, "The U.S. Labor Market Post-Covid: What's Changed, and What Hasn't?," *The Brookings Institution Website*, March 22, 2024, available at https://www.brookings.edu/wp-content/uploads/2024/03/U.S.-Labor-Market-post-COVID.pdf, p. 2.

Highly Confidential
Outside Counsel/Experts Only

compensation. With the addition of this variable the conduct effect becomes positive and insignificant, overturning Dr. Starr's conduct effect.

### Figure 22: Dr. Starr's Compensation Regression for DaVita with Labor Market Controls[216]

| | Dependent Variable: Ln(Total Annual Compensation) | | |
|---|---|---|---|
| Variable | Baseline Model | 2020 Covid Dummy | 2020 Covid Dummy Unfilled Job Opening |
| | --------------------------------------(Estimates)-------------------------------------- | | |
| (a) | (b) | (c) | (d) |
| DaVita Conduct | -0.096 *** | -0.065 *** | 0.022 |
| | (0.016) | (0.013) | (0.017) |
| % Effect | -9.2% | -6.3% | 2.2% |
| Year | 0.049 *** | 0.022 *** | 0.012 * |
| | (0.006) | (0.008) | (0.008) |
| Ln(Avg. State Mgr. Earnings) | -0.011 | 0.035 | 0.000 |
| | (0.026) | (0.026) | (0.027) |
| Ln(State Health Expend. PC) | -0.002 | 0.505 ** | 0.460 ** |
| | (0.170) | (0.208) | (0.208) |
| Ln(State GDP PC) | 0.100 | -0.013 | 0.077 |
| | (0.190) | (0.165) | (0.162) |
| Ln(State Unemployment Rate) | -0.034 | -0.085 *** | -0.035 ** |
| | (0.024) | (0.016) | (0.016) |
| Census Region Annual CPI | 0.063 | 0.220 *** | 0.174 *** |
| | (0.088) | (0.054) | (0.054) |
| Ln(Total Hours) | 0.759 *** | 0.757 *** | 0.759 *** |
| | (0.035) | (0.035) | (0.035) |
| Covid (2020 and 2021) | 0.001 | | |
| | (0.022) | | |
| Covid (2020 Only) | | 0.163 *** | 0.263 *** |
| | | (0.018) | (0.022) |
| Avg. Annual Unfilled Job Openings | | | 0.063 *** |
| | | | (0.009) |
| **Observations** | **13,138** | **13,138** | **13,138** |
| **Adjusted R-Squared** | **0.83** | **0.83** | **0.83** |
| Employee FE | Yes | Yes | Yes |
| Location FE | Yes | Yes | Yes |

## D. Dr. Starr's Robustness Checks Are Not Informative

106. In his Appendix D, Dr. Starr provides the results of a number of compensation regressions that he refers to as robustness checks.[217] He opines, "[t]hese robustness

---

[216] Significance values are as follows: *** p < 0.01, ** p < 0.05, * p < 0.1. Standard errors, clustered by employee, are in parentheses. Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta"))

[217] Starr Report, ¶ 130.

Highly Confidential
Outside Counsel/Experts Only

checks demonstrate that the wage suppressing effects found by the model are not an artifact of the specific model I construct and provide additional confidence that the econometric modeling is detecting a true suppression of employee wages."[218]  However, Dr. Starr's robustness tests suffer from the same flaws as his other compensation regressions.  They rely on flawed data, they assume a conduct period from 2008 to 2019, and they fail to adequately control for underlying supply and demand conditions.  Accordingly, they do not provide any "additional confidence" regarding Dr. Starr's analysis or conclusions.

## VI.  Plaintiffs Fail to Establish the Alleged Information Exchanges Supported Wage-Fixing and Fail to Consider that Information Exchanges Can Be Procompetitive

107.  Even if DaVita and SCA had regularly shared annual merit increase rates, which Plaintiffs do not establish, Plaintiffs and their experts do not explain how exchanging information about company-level merit increases could be used to fix wages across hundreds of job titles in different states for employees in the broad labor markets in which DaVita and SCA competed with hundreds of other employers for talent.  Plaintiffs' experts rely on their (false) claim that there is no unilateral reason to exchange compensation information to suggest that the alleged information exchanges were anticompetitive.[219]  This claim is in conflict with economic literature that establishes unilateral incentives to engage in information exchange and compensation benchmarking.

### A. Plaintiffs Fail to Establish that the Alleged Information Exchanges Could Have Supported Wage-Fixing

108.  Plaintiffs have alleged that the alleged exchanges of purportedly competitively sensitive information between DaVita and SCA supported "wage-fixing."[220]  However, the documents and information that Dr. Starr cites show that the information DaVita shared with SCA in 2009 was not competitively sensitive.  And I am not aware of any documents or testimony showing that DaVita and SCA reached an agreement to suppress, set, or fix wages.

109.  Plaintiffs allege that, "in or about 2009, Andrew Hayek communicated directly with Javier Rodriguez, a senior executive at DaVita … and obtained DaVita's planned wage increases budgeted for the upcoming year."[221]  Plaintiffs mischaracterize this information exchange as pertaining to future wage increases when it was in fact historical information, much of which was already publicly available.  According to Mr. Hayek's 2009 notes, "[a]ll non-field (corporate office, business office, execs) got zero

---

[218]  Starr Report, ¶ 131.

[219]  Starr Report, ¶¶ 93-98; Gerhart Report, ¶ 157.

[220]  Complaint, ¶ 54.

[221]  Complaint, ¶ 55.

Highly Confidential
Outside Counsel/Experts Only

increase."[222]  This information was largely publicly available.  In advance of DaVita's June 2009 shareholders meeting, DaVita released a public proxy statement stating, "the Compensation Committee elected not to award merit increases to base salary in 2009 to our named executive officers and other members of management across the company."[223]

110.  Plaintiffs allege a second instance of information sharing between DaVita and SCA around 2011 to 2012.  Plaintiffs claim that "SCA contacted numerous labor competitors, including USPI and DaVita, to exchange planned merit adjustments for the upcoming years."[224]  Dr. Starr cites an internal SCA email from September 2012 as support for this claim.[225]  The document states, "[w]e're collecting market information on what our competitors and other organizations are planning for merit adjustments."[226]  Although that email listed DaVita as a competitor firm, Plaintiffs provide no indication that DaVita received or responded to any such request.  SCA's former Chief Development Officer, Brian Mathis, testified that he did not know if anyone reached out to DaVita in response to this email.[227]

111.  Dr. Starr further cites testimony from Mr. Hayek, writing that Mr. Hayek "testified that he reached out to DaVita executives, including former CEO Thiry, for 'average wage increase' information on 'one or more occasions.'"[228]  However, there is no indication in Mr. Hayek's deposition that DaVita complied with this request, and Mr. Hayek indicated that the request itself was not a regular practice.[229]  Dr. Starr also writes that Mr. Mathis, "who joined SCA in February 2009, testified that SCA exchanged yearly wage increase budgets with DaVita, but did not recall the years or exact number of times."[230]  However, when asked if he recalled any of the competitors that SCA exchanged information with, Mr. Mathis testified "I wouldn't have put [DaVita] in that category."[231]  Finally, Dr. Starr cites testimony by Michael Rucker, former Chief Operating Officer at SCA, that, on one occasion in 2012 or 2013, he shared information with DaVita about merit increases.[232]

---

[222]  Andrew Hayek Notes, July 6, 2009, HAYEK-000012214-216 at 214.  This is the only document of which I am aware that suggests that DaVita and SCA exchanged information about compensation.

[223]  DaVita, "Notice of Annual Meeting of Stockholders," June 15, 2009, p. 21.

[224]  Complaint, ¶ 56.

[225]  Starr Report, ¶ 101.

[226]  Email from Brian Mathis (SCA) to Lynn Howard (SCA), Subject: Re: Merit Information, September 9, 2012, OMC_BM_000013354-356 at 355.

[227]  Deposition of Brian Todd Mathis, former Chief Development Officer, SCA, September 20, 2024 ("Mathis Deposition"), 83:21-23.

[228]  Starr Report, ¶ 100.

[229]  Hayek Deposition, 362:25-363:7.

[230]  Starr Report, ¶ 100.

[231]  Mathis Deposition, 54:1-15.

[232]  Starr Report, ¶ 100.

Highly Confidential
Outside Counsel/Experts Only

Mr. Rucker could not remember exactly when he had that conversation and did not offer details about exactly what information was allegedly shared.[233]

112. Even if DaVita and SCA exchanged planned merit increases, I am not aware of any documents or testimony suggesting that DaVita and SCA reached any agreement to fix wages, or altered their compensation plans to the detriment of Senior-Level employees as a result of having received information from each other about merit increases. In his report, Dr. Starr writes that "[e]vidence of firms agreeing to match or set compensation at certain levels would be evidence of price-fixing."[234] However, neither Dr. Starr nor Dr. Gerhart cite any "evidence" of such an agreement. Plaintiffs and their experts do not explain how exchanging information about company-level merit increases could be used to fix wages across hundreds of job titles in different states for employees in broad labor markets in which DaVita and SCA did not have market power. Moreover, they have not explained how "price-fixing" would be possible given that merit budgets pertain only to base pay.[235] Bonus and equity compensation was an important part of Senior-Level employees' compensation packages.[236] In fact, Dr. Gerhart suggests that granular data (in contrast to information about firmwide increases) is preferable for supporting such an agreement.[237] Moreover, according to economic theory, collusive agreements cannot be sustained without monitoring and enforcement mechanisms, but Plaintiffs and their experts do not describe any monitoring or enforcement mechanisms that DaVita and SCA could have used or establish that DaVita and SCA employed any such mechanisms.[238]

## B. Economic Research Demonstrates that Firms Have Unilateral Incentives to Exchange Compensation-Related Information and Benchmark Compensation

113. Dr. Starr writes that he is "not aware of an example of how a firm can directly share CSI with a horizontal competitor that is in the company's unilateral self-interest."[239] Similarly, Dr. Gerhart writes "[n]o company benefits by unilaterally sharing wage-related data with competing employers."[240] Further, Dr. Gerhart opines that "Defendants' years-long CSI Exchanges are inconsistent with unilateral conduct and would have harmed

---

[233] Deposition of Michael Rucker, former Chief Operating Officer, SCA, August 27, 2024 ("Rucker Deposition"), 256:13-257:3, 270:8-272:6, 275:13-277:2, 289:25-290:13, 294:5-19, 339:1-340:17, 341:21-342:3, 343:12-345:25, 346:1-18, 383:10-16.

[234] Starr Report, ¶ 96.

[235] Rucker Deposition, 255:17-256:12.

[236] In 2017, the average compensation of Senior-Level employees at DaVita was 59.82 percent salary, 15.00 percent bonus, 5.76 percent equity, and 19.42 percent other. Salary, bonus, and equity amounts are based on the variables "amount_regular," "amount_bonus," and "amount_stocks" in Dr. Starr's dataset, with stock compensation corrected for Dr. Starr's errors as described above. Other compensation represents "total_amount" net of the three aforementioned variables. *See* Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

[237] Gerhart Report, ¶ 83.

[238] Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature* 44 (March 2006), p. 45.

[239] Starr Report, ¶ 98.

[240] Gerhart Report, ¶ 7.

Highly Confidential
Outside Counsel/Experts Only

employees."[241]  However, economic literature and theory recognize that information sharing and benchmarking across firms can have procompetitive benefits and can be in a firm's unilateral self-interest.

114.    Economic theory teaches that it is economically rational and in each producer's unilateral best interest to observe, study, and respond to business and pricing decisions made by competitors.[242]  Economic literature suggests that increased transparency among producers can lead to more competitive outcomes.[243]  In fact, perfect information, for both consumers and producers, is an underlying assumption of a perfectly competitive market.[244]

115.    Information sharing can help companies make informed production and pricing decisions, particularly in industry settings with uncertainty.  Under certain market conditions, an individual firm has non-collusive incentives to share information with rivals.[245]  These incentives arise because information exchange allows individual firms to share the benefit of private, idiosyncratic information to gain an understanding of market shocks that they are relatively less informed about.  This exchange can lead to higher expected consumer surplus since information exchange enables market prices to better reflect market information.[246]

116.    Empirical economic research confirms that information sharing serves non-collusive purposes and often results in consumer welfare gains.  For example, in a study of the airline industry, Armantier and Richard (2003) show that information sharing leads to a higher likelihood of active markets, an increased number of flights, and increased expected consumer welfare in a majority (61 percent) of markets, and minor decreases in

---

[241]    Gerhart Report, ¶ 7.

[242]    David Besanko and Ronald R. Braeutigam, Microeconomics (4th Edition) (Hoboken, NJ: John Wiley & Sons, Inc., 2011), pp. 533-536 (where each firm's output is a "best" or profit-maximizing response to the other firm's output), pp. 541-542 (where each firm chooses a profit-maximizing price, given the price set by the other firm).

[243]    William Novshek and Lynda Thoman, "Information disaggregation and incentives for non-collusive information sharing," *Economic Letters* 61:3 (1998) ("Novshek and Thoman (1998)"), pp. 327-328 ("Information sharing among firms in an industry may lead to better decision making, and thus provide positive benefits to both firms and society. … We show that in a specific robust example of such a model, firms have a non-collusive incentive to share disaggregated information. Furthermore, sharing disaggregated information increases consumers' surplus and the total surplus."); Xavier Vives, "Private information, strategic behavior, and efficiency in Cournot markets," *RAND Journal of Economics* 33:3 (2002) ("Vives (2002)"), p. 373 ("[I]nformation sharing on costs (or demand) is good for welfare with Cournot competition independent of whether uncertainty is of the private or common-value variety.")

[244]    Libby Rittenberg and Timothy Tregarthen, Principles of Microeconomics (1st Edition) (Boston, MA: FlatWorld Knowledge, 2009), pp. 465, 468-469 ("Perfect competition is a model of the market … it assumes that buyers and sellers have complete information about market conditions. … We assume that all sellers have complete information about prices, technology, and all other knowledge relevant to the operation of the market. … We assume also that buyers know the prices offered by every seller.")  *See also* Patrick M. Emerson, *Intermediate Microeconomics* (1st Edition) (Corvallis, OR: Oregon State University, 2019), p. 296 (describing that in perfect competition there is an "implicit assumption" that "buyers and sellers have full information, meaning that they know the prices charged by every firm.")

[245]    Novshek and Thoman (1998), pp. 327-328.  The authors highlight asymmetric demand shocks as an example of a market condition wherein firms have non-collusive incentives to share information.

[246]    Novshek and Thoman (1998), pp. 331-332.

Highly Confidential
Outside Counsel/Experts Only

aggregated expected welfare (3.6 percent). [247] In a study of the automotive industry, Doyle and Snyder (1999) find that automakers' information exchange is consistent with firms using information to mitigate demand uncertainty.[248]

117. There is also economic literature particular to labor markets regarding the benefits of salary benchmarking. First, surveys have shown that the use of benchmarking services is common in many industries, with the majority of employers reporting that they engage in salary benchmarking.[249] A recent empirical paper evaluating the impact of using salary benchmark information on compensation found that benchmarking reduced variation in compensation across employees and did not decrease average compensation. Moreover, for some employees, benchmarking increased average compensation and employee retention.[250] This research shows that, even if there were an exchange of information as Plaintiffs allege, it would not be expected to lead to a decrease in average compensation across employees. The regression analyses I presented above that fixed certain flaws in Dr. Starr's analysis confirm that no such decrease in average compensation across employees occurred at DaVita.[251]

Signed this 26th of June, 2025:

_____

Lauren J. Stiroh

---

[247] Olivier Armantier and Oliver Richard, "Exchanges of Cost Information in the Airline Industry," *RAND Journal of Economics* 34:3 (2003), pp. 471-473.

[248] Maura P. Doyle and Christopher M. Snyder, "Information Sharing and Competition in the Motor Vehicle Industry," *Journal of Political Economy* 107:6 (1999), pp. 1329, 1338-1339.

[249] According to one study, 87.6 percent of HR managers report using salary benchmarks for setting pay. *See* Zoe B. Cullen, *et al.*, "What's My Employee Worth? The Effects of Salary Benchmarking," *National Bureau of Economic Research* Working Paper 30570 (October 2022), p. 9.

[250] *See* Zoe B. Cullen, *et al.*, "What's My Employee Worth? The Effects of Salary Benchmarking," *National Bureau of Economic Research* Working Paper 30570 (October 2022), pp. 28-31.

[251] *See* **Section V**.



**NERA**

**Exhibit 1**



# Lauren Stiroh
## Senior Managing Director

NERA
360 Hamilton Avenue
10th Floor
White Plains, New York 10601
914 448 4143
lauren.stiroh@nera.com

## Overview

Dr. Stiroh specializes in the economics of antitrust, intellectual property, and commercial damages. She has conducted research, prepared expert reports, and testified in court on a variety of issues arising from antitrust allegations such as monopolization, exclusionary conduct, tying, vertical restrictions, price fixing, predatory pricing, price discrimination, and abuse of standard setting. Dr. Stiroh has analyzed the competitive effects of mergers, acquisitions, and joint ventures. She has also written expert reports and consulted on matters related to assessing impact and damages in class action litigation. She has performed or critiqued damage calculations in more than a dozen industrial settings.

Dr. Stiroh has also written and testified on the subject of intellectual property value and valuation. She has assessed and critiqued damages from patent, copyright, and trademark infringement in industries including semiconductors, biotechnology, pharmaceuticals, medical devices, and consumer products. Dr. Stiroh is co-editor and contributing author of *Economic Approaches to Intellectual Property Policy, Litigation and Management*, published in 2005.

Dr. Stiroh holds a Ph.D. in Economics from Harvard University, an M.A. in Economics from the University of British Columbia, and a B.A. in Economics from the University of Western Ontario.

## Education

**Harvard University**                                              1996
Ph.D., Economics

**University British Columbia**                                    1991
M.A., Economics

**University Western Ontario**                                     1990
B.A., Economics

## Honors and Professional Activities

Member, American Bar Association.

Member, American Economic Association.

YWCA-NYC Academy of Women Leaders, Class of 2010.

Derek Bok Teaching Award, 1996.

Harvard University Scholarship 1991-1994.

**Exhibit 1**

Social Sciences and Humanities Research Council of Canada Fellowship 1991-1994.

University Graduate Fellowship (University of British Columbia) 1990-1991.

Huron College Corporation Scholarship (University of Western Ontario) 1987-1989.

## Professional Experience

**NERA Economic Consulting**                                    1996-present

2021- Senior Managing Director/Managing Director

2016-2021 Chair, Global Antitrust and Competition Practice

2005-2016 Managing Director/Senior Vice President

2002-2005 Vice President

1999-2002 Senior Consultant

1996-1999 Senior Analyst

**Universidad del Desarrollo Social**                            1994

*Consultant.* Prepared two studies for the National Planning Department concerning the effect of the trade liberalization in Colombia on the distribution of income.

**Harvard University**                                           1994-1996

*Research Assistant.* Research Assistant for Professor Dale Jorgenson. Estimated human capital and national income accounts.

**Harvard University**                                           1993-1996

*Teaching Fellow in Economics.* Taught principles of economics, the introductory and core course in economics at Harvard College.

## Expert Testimony and Reports (2021-2025)

### In Re: Cattle and Beef Antitrust Litigation

- Deposition testimony, on behalf of Defendants, Cargill Meat Solutions Corporation et al., in connection with *Olean Wholesale Grocery Cooperative, Inc., et al. v. Cargill Meat Solutions Corporation et al.* March 19, 2025.

- Expert Report, on behalf of Defendants, Cargill Meat Solutions Corporation et al., in connection with *Olean Wholesale Grocery Cooperative, Inc., et al. v. Cargill Meat Solutions Corporation et al.* January 24, 2025.

### Henry, et al., v. Brown University, et al.

- Deposition testimony, on behalf of Defendants, Brown University, et al., in connection with *Henry, et al., v. Brown University, et al.* November 12, 2024.

- Expert Report, on behalf of Defendants, Brown University, et al., in connection with *Henry, et al., v. Brown University, et al.* August 7, 2024.

**Exhibit 1**

### *In Re: Turkey Antitrust Litigation*

- Testimony on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., October 10, 2024.

- Declaration on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., January 26, 2024.

- Deposition testimony, on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., August 15, 2023.

- Rebuttal Declaration and Expert Report, on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., May 31, 2023.

- Declaration and Expert Report, on behalf of Defendants, Butterball, LLC, et al., in connection with Olean Wholesale Grocery Cooperative, Inc., and John Gross and Company, Inc. v. Agri Stats, Inc., et al., and Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli, and Gnemi, LLC d/b/a Logan Farms v. Agri Stats, Inc., et al., February 14, 2023.

### *In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*

- Testimony, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, September 10, 2024.

- Deposition testimony, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, August 9, 2023.

- Expert Report, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, June 28, 2023.

- Deposition testimony, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, March 25, 2022.

- Expert Report, on behalf of Defendants, In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, January 12, 2022.

### *The State of Connecticut, et al. v. Sandoz, Inc., et al.*

- Deposition testimony, on behalf of Defendant, Mylan Pharmaceuticals, Inc., in connection with *The State of Connecticut, et al., v. Sandoz, Inc., et al.* June 26, 2024.

- Expert Report, on behalf of Defendant, Mylan Pharmaceuticals, Inc., in connection with *The State of Connecticut, et al., v. Sandoz, Inc., et al.* April 26, 2024.

**Exhibit 1**

### *In Re: Pork Antitrust Litigation*

- Surrebuttal Expert report, on behalf of Defendants, Clemens Food Group, LLC, et al., in connection with *In Re: Pork Antitrust Litigation*, June 7, 2024.

- Deposition testimony, on behalf of Defendants, Clemens Food Group, LLC, et al., in connection with *In Re: Pork Antitrust Litigation*, March 8, 2024.

- Expert Report, on behalf of Defendants, Clemens Food Group, LLC, et al., in connection with *In Re: Pork Antitrust Litigation*, December 11, 2023.

### *State of Washington v. Tyson Foods, et al.*

- Declaration, on behalf of Defendant, Wayne Farms, LLC, in connection with *State of Washington v. Tyson Foods, et al.*, May 8, 2024.

- Deposition testimony, on behalf of Defendant, Wayne Farms, LLC, in connection with *State of Washington v. Tyson Foods, et al.*, March 13, 2024.

- Expert Report, on behalf of Defendant, Wayne Farms, LLC, in connection with *State of Washington v. Tyson Foods, et al.*, February 1, 2024.

### *Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.*

- Deposition testimony, on behalf of Defendant, Amgen, Inc., in connection with *Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.* May 7, 2024.

- Expert Report, on behalf of Defendant, Amgen, Inc., in connection with *Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.* March 29, 2024.

### *Cabot Microelectronics Corporation v. DuPont de Nemours, Inc., et al.*

- Expert Report, on behalf of Cabot Microelectronics Corporation, in connection with *Cabot Microelectronics Corporation v. DuPont de Nemours, Inc., et al.* April 19, 2024.

- Deposition testimony, on behalf of Cabot Microelectronics Corporation, in connection with *Cabot Microelectronics Corporation v. DuPont de Nemours, Inc., et al.* June 5, 2024.

### *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*

- Declaration, on behalf of Defendants, NHK Spring Co., Ltd., and TDK Corporation in connection with *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*, January 30, 2024.

- Testimony, on behalf of Defendants, NHK Spring Co., Ltd., and TDK Corporation in connection with *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*, December 12, 2023.

- Deposition testimony, on behalf of Defendants, NHK Spring Co., Ltd., and TDK Corporation in connection with *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*, February 15-16, 2023.

- Expert Report, on behalf of Defendants, NHK Spring Co., Ltd., and TDK Corporation in connection with In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation, December 22, 2022.

**Exhibit 1**

### *Apple, Inc. v. Masimo Corporation and Sound United, LLC*

- Deposition testimony, on behalf of Apple, Inc., in connection with *Apple, Inc. v. Masimo Corporation and Sound United, LLC*, January 25, 2024.

- Expert Reply Report, on behalf of Apple, Inc., in connection with *Apple, Inc. v. Masimo Corporation and Sound United, LLC*, January 5, 2024.

- Expert Rebuttal Report, on behalf of Apple, Inc., in connection with *Apple, Inc. v. Masimo Corporation and Sound United, LLC*, December 15, 2023.

- Expert Report, on behalf of Apple, Inc., in connection with *Apple, Inc. v. Masimo Corporation and Sound United, LLC*, November 22, 2023.

### *Tremor Video, Inc. v. Alphonso, Inc., n/k/a LG Ads, LG Electronics, Inc., LG Electronics U.S.A., Inc.*

- Affidavit, on behalf of Defendants, Alphonso, Inc., and LG Electronics, Inc., in connection with *Tremor Video, Inc. v. Alphonso, Inc., n/k/a LG Ads, LG Electronics, Inc., LG Electronics U.S.A., Inc.*, September 26, 2023.

- Expert Rebuttal Report, on behalf of Defendants, Alphonso, Inc., and LG Electronics, Inc., in connection with *Tremor Video, Inc. v. Alphonso, Inc., n/k/a LG Ads, LG Electronics, Inc., LG Electronics U.S.A., Inc.*, February 24, 2023.

- Expert Report, on behalf of Defendants, Alphonso, Inc., and LG Electronics, Inc.; in connection with *Tremor Video, Inc. v. Alphonso, Inc. n/k/a LG Ads, LG Electronics, Inc., LC Electronics U.S.A., Inc.*, February 3, 2023.

### *Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc.*

- Deposition testimony, on behalf of Defendants, The National Association of Realtors, et al., in connection with Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc., July 18, 2023.

- Expert Report, on behalf of Defendants, The National Association of Realtors, et al., in connection with Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc., June 1, 2023.

- Expert Report, on behalf of Defendants, The National Association of Realtors, et al., in connection with Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc., May 31, 2022.

**Exhibit 1**

### *In Re: Broiler Chicken Antitrust Litigation*

- Deposition testimony, on behalf of Defendant, Wayne Farms, LLC in connection with *In Re: Broiler Chicken Antitrust Litigation,* June 28, 2023.

- Declaration and Expert Report, on behalf of Defendant, Wayne Farms, LLC in connection with *In Re: Broiler Chicken Antitrust Litigation,* February 21, 2022.

### *AliveCor, Inc., v. Apple, Inc.*

- Deposition testimony, on behalf of Defendant, Apple, Inc., in connection with *AliveCor, Inc., v. Apple, Inc.,* June 14, 2023.

- Expert Rebuttal Report, on behalf of Defendant, Apple, Inc., in connection with *AliveCor, Inc., v. Apple, Inc.,* May 22, 2023.

- Deposition testimony, on behalf of Defendant, Apple, Inc., in connection with *AliveCor, Inc., v. Apple, Inc.,* May 18, 2023.

- Expert Report, on behalf of Defendant, Apple, Inc., in connection with *AliveCor, Inc., v. Apple, Inc.,* March 23, 2023.

### *Simon and Simon, PC d/b/a City Smiles; and VIP Dental Spas, et al., v. Align Technology, Inc., and Misty Snow, et al., v. Align Technology, Inc.*

- Deposition testimony, on behalf of Defendants, Align Technology, Inc., in connection with Simon and Simon, PC d/b/a City Smiles; and VIP Dental Spas, et al., v. Align Technology, Inc., and Misty Snow, et al., v. Align Technology, Inc., June 7, 2023.

- Expert Report, on behalf of Defendants, Align Technology, Inc., in connection with Simon and Simon, PC d/b/a City Smiles; and VIP Dental Spas, et al., v. Align Technology, Inc., and Misty Snow, et al., v. Align Technology, Inc., May 5, 2023.

### *David Toms, et al., v. State Farm Life Insurance Company*

- Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *David Toms, et al., v. State Farm Life Insurance Company,* August 23, 2022.

- Second Declaration and Expert Report on behalf of Defendant, State Farm Life Insurance Company in connection with *David Toms, et al., v. State Farm Life Insurance Company,* August 1, 2022.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *David Toms, et al., v. State Farm Life Insurance Company,* April 15, 2022.

### *Earl L. McClure, et al., v. State Farm Life Insurance Company*

- Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* June 23, 2022.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* April 8, 2022.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* December 9, 2021.

**Exhibit 1**

***Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc.***

- Testimony, on behalf of Defendants, The National Association of Realtors, et al., in the United States District Court for the Western District of Missouri, Western Division in connection with *Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc.*, April 18, 2022.

- Expert Report and Declaration, on behalf of Defendants, The National Association of Realtors, et al., in connection with Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc., November 12, 2021, and January 28, 2022.

- Deposition testimony, on behalf of Defendants, The National Association of Realtors, et al., in connection with Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC Re/Max, LLC, and Keller Williams Realty, Inc., January 17, 2022.

***Chandra B. Singh, et al., v. State Farm Life Insurance Company***

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Chandra B. Singh, et al., v. State Farm Life Insurance Company,* March 11, 2022.

***Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company***

- Declaration, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* February 25, 2022.

- Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* December 22, 2021.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* December 3, 2021.

***William T. Whitman, et al., v. State Farm Life Insurance Company***

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *William T. Whitman, et al., v. State Farm Life Insurance Company,* March 29, 2021, and February 15, 2022.

***John E. Jaunich, et al., v. State Farm Life Insurance Company***

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *John E. Jaunich, et al., v. State Farm Life Insurance Company,* December 13, 2021.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *John E. Jaunich, et al., v. State Farm Life Insurance Company,* August 5, 2021.

**Exhibit 1**

### Elizabeth A. Bally, et al., v. State Farm Life Insurance Company

- Supplemental Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* September 23, 2021.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* December 21, 2020.

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* February 3, 2020.

### Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC

- Deposition testimony, on behalf of Defendants, SAP SE, SAP America, Inc., and SAP Labs, LLC in connection with *Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC,* August 9, 2021.

- Expert Report, on behalf of Defendants, SAP SE, SAP America, Inc., and SAP Labs, LLC in connection with Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC, June 2, 2021.

### Anna Gonzalez and Ronald K Page, et al., v. State Farm Life Insurance Company

- Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Anna Gonzalez and Ronald K. Page, et al., v. State Farm Life Insurance Company,* August 9, 2021.

### In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation

- Deposition testimony, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* March 25, 2021.

- Expert Reply Report, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* February 1, 2021.

- Expert Report, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* August 28, 2020.

### Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.

- Deposition testimony, on behalf of Defendant, QVC, Inc., in connection with *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.,* March 2, 2021.

- Expert Report, on behalf of Defendant, QVC, Inc., in connection with *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.,* January 25, 2021.

**Exhibit 1**

## Publications (2015-2025)

"Checking in on PeaceHealth: Providing Some Clearer Guidance to Bundling Sellers," co-authored with David Reichenberg, Cozen O'Connor, *The Antitrust Source,* American Bar Association, Volume 19, Issue 2, October 2019.

"Sports, Student-Athletes, and Antitrust," *Ass'n: The Newsletter of the Trade, Sports, & Professional Associations Committee*, American Bar Association, Section of Antitrust Law, Summer 2018.

"Demonstrating Faulty Predictions in Class Certification Analysis," co-authored with Christine Siegwarth Meyer and Claire (Chunying) Xie, NERA Economic Consulting, American Bar Association, Section of Antitrust Law, *Antitrust Magazine*, Vol. 30, No. 2, Spring 2016.

## Presentations and Speeches

Panelist, "Antitrust and Labor Markets" presented by the *George Mason Law Review, 26th Annual Antitrust Symposium,* February 24, 2023.

Presenter, "Investigating Trends in the Foal Crop," on behalf of the Jockey Club, 70th Round Table Conference on Matters Pertaining to Racing, August 14, 2022.

Panelist, "Proving Market Power in Unilateral Conduct Cases," presented by the *ABA Section of Antitrust Law, Unilateral Conduct Committee*, June 30, 2020.

Panelist, "A View of Class Actions from Both Sides of the Atlantic," presented by *Monckton Chambers and NERA Economic Consulting Summer Webinar Series: Competition Law in the UK and EU*, June 25, 2020.

Panelist, "Honest Broker or Advocate: Effective Expert Testimony," presented by the *Antitrust Magazine and Economics Committee, Our Curious Amalgam Podcast Release,* April 29, 2020.

Panelist, "Algorithms, Textual Analysis, and Collusion," presented at New York University, School of Law, New York, New York, January 31, 2020.

Panelist, "Wage the Battle to Win the War: Expert Challenges at Class Certification," presented at McDermott, Will & Emery, Chicago, Illinois, September 24, 2019.

Panelist, "College Sports – Beyond Pay," presented by *The Trade, Sports, and Professional Associations Committee of the American Bar Association's Section of Antitrust Law,* American Bar Association Spring Meeting, Washington, DC, April 11, 2018.

Panelist, "The Nexus between Competition and Innovation," presented by *GCR Live: Women in Antitrust*, Washington, DC, November 9, 2017.

Panelist, "2015 Canadian Bar Association Roundtable: IP and Competition Law," presented by *The Economics and Law Committee of the CBA National Competition Law Section, Borden Ladner Gervais, LLP*, Toronto, ON, June 22, 2015.

April 2025

**Exhibit 2**                                                            Highly Confidential
                                                        Outside Counsel/Experts Only

### Materials Relied Upon by Lauren J. Stiroh, Ph.D.

**Court Filings**

Third Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, November 14, 2024

Second Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, June 6, 2023

Consolidated Amended Class Action Complaint, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305, United States District Court for the Northern District of Illinois, Eastern Division, August 9, 2021

Indictment, *United States of America v. DaVita Inc., Kent Thiry*, Case No. 21-cr-00229-RBJ, United States District Court, District of Colorado, November 3, 2021

Indictment, *United States of America v. Surgical Care Affiliates, LLC and SCAI Holdings, LLC*, Case No. 3:21-cr-00011-L, United States District Court for the Northern District of Texas, Dallas Division, January 5, 2021

**Expert Reports and Accompanying Backup**

Expert Witness Report of Dr. Barry S. Gerhart, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, January 15, 2025

Expert Witness Report of Dr. Evan P. Starr, *In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division, January 15, 2025

**Depositions and Accompanying Exhibits**

*In Re Outpatient Medical Center Employee Antitrust Litigation*, Case No. 1:21-cv-00305-SRH-YBK, United States District Court for the Northern District of Illinois, Eastern Division:

Deposition of Colleen Arthur, former Senior Director of Recruiting Operations, Strategy, and Employment Branding, DaVita, May 23, 2024

Deposition of Bridget Fanning, former Chief Talent Officer, SCA, July 17, 2024

Deposition of Barry Gerhart, Ph.D., March 5, 2025

Deposition of Andrew Hayek, former Chief Executive Officer, SCA, September 18, 2024

**Exhibit 2**

Highly Confidential
Outside Counsel/Experts Only

Deposition of Anthony Kilgore, former CEO, SCA, October 22, 2024

Deposition of Dennis Kogod, former Chief Operating Officer, DaVita, September 6, 2024

Deposition of Brian Todd Mathis, former Chief Development Officer, SCA, September 20, 2024

Deposition of Michael Rucker, former Chief Operating Officer, SCA, August 27, 2024

Deposition of John Schultz, Executive Recruiter, Spencer Stuart, November 19, 2024

Deposition of Michael Staffieri, Chief Operating Officer, DaVita, April 5, 2024

Deposition of Evan Starr, Ph.D., March 19–20, 2025

**Trial Transcript**

Transcript of Proceedings before the Honorable R. Brooke Jackson, Day 4, *United States of America v. DaVita Inc., Kent Thiry*, Case No. 21-cr-00229-RBJ, United States District Court for the District of Colorado, April 7, 2022

**Data**

Lightcast Profile Data

Starr turnover materials

**Bates Stamped Data**

2022-2023 DaVita Teammate Data

DVA_OMCEAL_001408829

DaVita Stock Options Exercise Data

DVA_OMCEAL_001408532

DVA_OMCEAL_001408535

DVA_OMCEAL_001408538

DVA_OMCEAL_001408540

DVA_OMCEAL_001408545

DVA_OMCEAL_001408549

DaVita Stock Options Grants Data

DVA_OMCEAL_001408533

DVA_OMCEAL_001408536

**Exhibit 2**

Highly Confidential
Outside Counsel/Experts Only

DVA_OMCEAL_001408539

DVA_OMCEAL_001408542

DVA_OMCEAL_001408543

DVA_OMCEAL_001408547

**Bates Stamped Documents**

DVA_OMCEAL_000011812-822

DVA_OMCEAL_000017255-278

DVA_OMCEAL_000041688-689

DVA_OMCEAL_000124754-755

DVA_OMCEAL_001061165-190

DVA_OMCEAL_001096182-198

DVA_OMCEAL_001153790-813

DVA_OMCEAL_001181143-165

DVA_OMCEAL_001294850-853

DVA_OMCEAL_001296753-754

DVA_OMCEAL_001297448-450

HAYEK-000012214-216

KEECH_000002092-093

KEECH_000002656-057

KEECH_000002658-059

KEECH_000002714-015

KEECH_000002910-911

KEECH_000002954-955

KEECH_000003499-500

OMC_BM_000013354-356

**SEC Filings and Other Investor Information**

DaVita Annual Reports 2005–2022

**Exhibit 2**                                                                      Highly Confidential
Outside Counsel/Experts Only

DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2023

DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2016

DaVita Inc., Form 10-K for the Fiscal Year Ended December 31, 2008

DaVita, "Notice of Annual Meeting of Stockholders," June 15, 2009


**Academic Literature**

ABA Section of Antitrust Law, *Econometrics: Legal, Practical and Technical Issues*, 2nd Edition (American Bar Association, 2014)

ABA Section of Antitrust Law, *Proving Antitrust Damages*, 3rd Edition (American Bar Association, 2017)

Abowd, John M., Bryce E. Stephens, Lars Vilhuber, Fredrik Andersson, Kevin L. McKinney, Marc Roemer, and Simon Woodcock, "The LEHD Infrastructure Files and the Creation of the Quarterly Workforce Indicators," U.S. Census Bureau, Longitudinal Employer-Household Dynamics Program Technical Paper No. TP-2006-01 (2005), available at https://lehd.ces.census.gov/doc/technical_paper/tp-2006-01.pdf

Armantier, Olivier and Oliver Richard, "Exchanges of Cost Information in the Airline Industry," *RAND Journal of Economics* 34:3 (2003)

Bartik, Alexander, Marianne Bertrand, Feng Lin, Jesse Rothstein, and Matt Unrath, "Measuring the Labor Market at the Onset of the COVID-19 Crisis," *National Bureau of Economic Research* Working Paper 27613 (July 2020)

Besanko, David and Braeutigam, R. Ronald, *Microeconomics*, 4th Edition (Hoboken, NJ: John Wiley & Sons, Inc., 2011)

Black, Fischer and Myron Scholes, "The Pricing of Options and Corporate Liabilities," *The Journal of Political Economy* 81:3 (May-June 1973)

Cajner, Tomaz, Leland D. Crane, Ryan A. Decker, John Grigsby, Adrian Hamins-Puertolas, Erik Hurst, Christopher Kurz, and Ahu Yildirmaz, "The U.S. Labor Market during the Beginning of the Pandemic Recession," *National Bureau of Economic Research* Working Paper 27159 (May 2020)

Cullen, Zoe B., Shengwu Li, and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," *National Bureau of Economic Research* Working Paper 30570 (October 2022)

Davis, Steven J., R. Jason Faberman, and John C. Haltiwanger, "The Establishment-Level Behavior of Vacancies and Hiring," *National Bureau of Economic Research* Working Paper 16265 (August 2010)

Domash, Alex and Lawrence H. Summers, "How Tight Are U.S. Labor Markets?" *National Bureau of Economic Research* Working Paper 29739 (February 2022)

**Exhibit 2**

Highly Confidential
Outside Counsel/Experts Only

Doyle, Maura P. and Christopher M. Snyder, "Information Sharing and Competition in the Motor Vehicle Industry," *Journal of Political Economy* 107:6 (1999)

Easterbrook, Frank H., "Limits of Antitrust," *Texas Law Review* 63:1 (August 1984)

Emerson, Patrick M., *Intermediate Microeconomics*, 1st Edition (Corvallis, OR: Oregon State University, 2019)

Faberman, R. Jason, Andreas I. Mueller, and Ayşegül Şahin, "Has the Willingness to Work Fallen during the Covid Pandemic?" *Labour Economics* 79 (September 2022)

Gupta, Sumedha, Laura Montenovo, Thuy Nguyen, Felipe Lozano-Rojas, Ian Schmutte, Kosali Simon, Bruce A. Weinberg, and Coady Wing, "Effects of social distancing policy on labor market outcomes," *Contemporary Economic Policy* 41:1 (September 2022)

Hall, Robert E. and Marianna Kudlyak, "The unemployed with jobs and without jobs," *Labour Economics* 79 (August 2022)

Hyatt, Henry R. and James R. Spletzer, "The Recent Decline in Employment Dynamics" *IZA Journal of Labor Economics* 2:5 (September 2013)

Levenstein, Margaret C. and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature* 44 (March 2006)

Novshek, William and Lynda Thoman, "Information disaggregation and incentives for non-collusive information sharing," *Economics Letters* 61:3 (1998)

Patterson, Mark R., "The Market Power Requirement in Antitrust Rule of Reason Cases: A Rhetorical History," *San Diego Law Review* 37:1 (2000)

Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics*, 7th Edition (Upper Saddle River, N.J.: Pearson, 2009)

Posner, Eric, "You Deserve a Bigger Paycheck. Here's How You Might Get It.," *New York Times Website*, September 23, 2021, available at https://www.nytimes.com/2021/09/23/opinion/antitrust-workers-employers.html, accessed April 16, 2025

Pries, Michael J. and Richard Rogerson, "Declining Worker Turnover: The Role of Short Duration Employment Spells," *National Bureau of Economic Research* Working Paper 26019 (June 2019)

Rittenberg, Libby and Timothy Tregarthen, *Principles of Microeconomics*, 1st Edition (Boston, MA: FlatWorld Knowledge, 2009)

Robinson, Joan, *The Economics of Imperfect Competition*, 2nd Edition (London: Macmillan, 1976)

Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, 3rd Edition (Washington, DC: The National Academies Press, 2011)

Stock, James H. and Mark W. Watson, *Introduction to Econometrics*, 4th Edition (New York: Pearson, 2019)

**Exhibit 2**

Highly Confidential
Outside Counsel/Experts Only

Vives, Xavier, "Private information, strategic behavior, and efficiency in Cournot markets," *RAND Journal of Economics* 33:3 (2002)

Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, 7th Edition (Boston, MA: Cengage, 2020)

## Publicly Available Information

"About," *DaVita Website*, available at https://www.davita.com/about, accessed March 28, 2025

"About Indeed," *Indeed Website*, available at https://www.indeed.com/about, accessed March 28, 2025

"About Us," *Glassdoor Website*, available at https://www.glassdoor.com/about/, accessed March 28, 2025

"About Us," *SCA Health Website*, available at https://sca.health/about-us/, accessed March 28, 2025

"Adding a Salary," *Glassdoor Website*, October 24, 2024, available at https://help.glassdoor.com/s/article/Adding-a-salary?language=en_US, accessed April 14, 2025

Bayly, Lucy, "Unemployment rate soars to 14.7 percent, highest level since the Great Depression," *NBC News Website*, May 8, 2020, available at https://www.nbcnews.com/business/economy/u-s-economy-shed-record-20-5-million-jobs-last-n1202696, accessed April 9, 2025

Brooks, Robin and Ben Harris, "The US recovery from COVID-19 in international comparison," *The Brookings Institution Website*, October 17, 2024, available at https://www.brookings.edu/articles/the-us-recovery-from-covid-19-in-international-comparison/, accessed April 14, 2025

"Caremore Health Medical Partners Pc.," *Dow Jones Factiva*, available at https://global.factiva.com/cof/default.aspx?NAPC=K, accessed April 16, 2025

"Contact Us," *USPI Website*, available at https://uspi.com/contact-us/default.aspx, accessed March 28, 2025

Curtis, Lisa, "Why the Big Quit Is Happening and Why Every Boss Should Embrace It," *Forbes Website*, June 30, 2021, available at https://www.forbes.com/sites/lisacurtis/2021/06/30/why-the-big-quit-is-happening-and-why-every-boss-should-embrace-it/, accessed April 14, 2025

"DaVita and HealthCare Partners Finalize Merger," *Davita Investors Website*, November 1, 2012, available at https://investors.davita.com/2012-11-1-DaVita-and-HealthCare-Partners-Finalize-Merger, accessed March 28, 2025

"DaVita Announces CEO Succession," *DaVita Investors Website*, April 29, 2019, available at https://investors.davita.com/2019-04-29-DaVita-Announces-CEO-Succession, accessed April 1, 2025

"DaVita Closes Gambro Healthcare Acquisition," *DaVita Investors Website*, October 5, 2005, available at https://investors.davita.com/2005-10-05-DaVita-Closes-Gambro-Healthcare-Acquisition, accessed March 28, 2025

**Exhibit 2**                                                              Highly Confidential
                                                                    Outside Counsel/Experts Only

Dow Jones, Company Snapshots, *Factiva Website*, available at
  https://global.factiva.com/cof/default.aspx?NAPC=K

"Facts & Figures," *Fresenius Medical Care Website*, available at
  https://freseniusmedicalcare.com/en/investors/equity-story/facts-and-figures/, accessed March 28,
  2025

Flowers, Alyssa and Andrew Van Dam, "The most unusual job market in modern American history,
  explained," *The Washington Post Website*, December 29, 2021, available at
  https://www.washingtonpost.com/business/2021/12/29/job-market-2021/, accessed April 10, 2025

Fulford, Scott, "The post-pandemic economy," *Princeton University Press Website*, May 22, 2024,
  available at https://press.princeton.edu/ideas/the-post-pandemic-economy, accessed April 16, 2025

"History & Culture," *DaVita Website*, available at https://www.davita.com/about/history-and-culture,
  accessed March 28, 2025

"Home," *USPI Website*, available at https://uspi.com/home/default.aspx, accessed March 28, 2025

"INCWAGE," *IPUMS USA Website*, available at https://usa.ipums.org/usa-
  action/variables/INCWAGE/#description_section, accessed April 16, 2025

"Indeed Celebrates 20 Years of Helping People Get Jobs," *Business Wire Website*, November 19,
  2024, available at https://www.businesswire.com/news/home/20241116622469/en/Indeed-
  Celebrates-20-Years-of-Helping-People-Get-Jobs, accessed March 31, 2025

"Indeed.com Launches Job Search by Salary," *Indeed Website*, April 15, 2008, available at
  https://www.indeed.com/press/releases/indeed-launches-job-search-by-salary, accessed March 31,
  2025

"Job Openings and Labor Turnover - July 2021," *U.S. Bureau of Labor Statistics*, September 8, 2021,
  available at https://www.bls.gov/news.release/archives/jolts_09082021.pdf, accessed March 31, 2025

"Job Openings and Labor Turnover Survey : History," *U.S. Bureau of Labor Statistics*, March 29,
  2024, available at https://www.bls.gov/opub/hom/jlt/history.htm, accessed April 16, 2025

"Labor Force Participation Rate [CIVPART]," Federal Reserve Economic Data, *Federal Reserve Bank
  of St. Louis Website*, April 4, 2025, available at https://fred.stlouisfed.org/series/CIVPART, accessed
  April 16, 2025

"Lightcast Data: Basic Overview," *Lightcast Website*, available at
  https://kb.lightcast.io/en/articles/6957498-lightcast-data-basic-overview, accessed March 28, 2025

Mangalindan, JP, "How Glassdoor became the No. 2 jobs site in the US," *Yahoo Finance Website*,
  February 26, 2018, available at https://finance.yahoo.com/news/glassdoor-became-no-2-jobs-site-us-
  222246364.html, accessed March 31, 2025

Morse, Susan, "UnitedHealth Group shuffles executive management, names new Optum leaders,"
  *Healthcare Finance News Website*, April 24, 2017, available at
  https://www.healthcarefinancenews.com/news/unitedhealth-group-shuffles-executive-management-
  names-new-optum-leaders, accessed April 2, 2025

**Exhibit 2**                                                                                          Highly Confidential
Outside Counsel/Experts Only

"North American Industry Classification System," *US Census Bureau Website*, available at https://www.census.gov/naics/?48967, accessed April 16, 2025

"North American Industry Classification System – Frequently Asked Questions (FAQs)," *U.S. Census Bureau Website*, available at https://www.census.gov/naics/, accessed March 29, 2025

"Optum completes acquisition of DaVita Medical Group from DaVita," *United Health Group Website*, June 19, 2019, available at https://www.unitedhealthgroup.com/newsroom/2019/2019-06-19-optum-davita-medical-acquisition.html, accessed March 28, 2025

"Profiles Methodology," *Lightcast Website*, archived February 27, 2025, at the Wayback Machine, available at https://web.archive.org/web/20250227153835/https://kb.lightcast.io/en/articles/6957504-profiles-methodology, accessed April 8, 2025

"Salaries," *Indeed Website*, available at https://www.indeed.com/career/salaries?from=gnav-homepage, accessed March 26, 2025

"SCA Health Director Jobs," *Glassdoor Website*, March 21, 2025, available at https://www.glassdoor.com/Jobs/SCA-Health-Director-Jobs-EI_IE221678.0,10_KO11,19.htm, accessed April 10, 2025

"SCA Health Director Salaries," *Glassdoor Website*, available at https://www.glassdoor.com/Salary/SCA-Health-Director-Salaries-E221678_D_KO11,19.htm, accessed April 10, 2025

"SCA Health grows to 320+ surgical facilities (Becker's)," *Harlee Medical Website*, available at https://www.harleemedical.com/sca-health-grows-to-320-surgical-facilities-beckers/, accessed March 28, 2025

Schonfeld, Erick, "At Glassdoor, Find Out How Much People Really Make at Google, Microsoft, Yahoo, and Everywhere Else," *TechCrunch Website*, June 10, 2008, available at https://techcrunch.com/2008/06/10/at-glassdoor-find-out-how-much-people-really-make-at-google-microsoft-yahoo-and-everywhere-else/, accessed March 31, 2025

Sheiner, Louise, David Wessel, and Elijah Asdourian, "The U.S. Labor Market Post-Covid: What's Changed, and What Hasn't?," *The Brookings Institution Website*, March 2024, available at https://www.brookings.edu/articles/the-us-labor-market-post-covid-whats-changed-and-what-hasnt, accessed March 31, 2025

"Sound Inpatient Physicians, Inc.," *Dow Jones Factiva*, available at https://global.factiva.com/cof/default.aspx?NAPC=K, accessed April 16, 2025

"Surgical Care Affiliates (SCA), OptumCare to Combine," *UnitedHealth Group Website*, January 9, 2017, available at https://www.unitedhealthgroup.com/newsroom/2017/0109scaoptumcare.html, accessed March 28, 2025

"Tenet Completes Purchase of USPI from WCAS," *Tenet Health Investor Website*, April 26, 2018, available at https://investor.tenethealth.com/press-releases/press-release-details/2018/Tenet-Completes-Purchase-of-USPI-from-WCAS/default.aspx, accessed March 28, 2025

**Exhibit 2**                                                                        Highly Confidential
                                                                        Outside Counsel/Experts Only

"Tenet, United Surgical Partners International and Welsh Carson to Create the Nation's Largest Ambulatory Surgery Platform," *Tenet Health Investor Website*, March 23, 2015, available at https://investor.tenethealth.com/press-releases/press-release-details/2015/Tenet-United-Surgical-Partners-International-and-Welsh-Carson-to-Create-the-Nations-Largest-Ambulatory-Surgery-Platform/default.aspx, accessed April 2, 2025

U.S. Bureau of Labor Statistics, "Occupational Employment and Wage Statistics," *U.S. Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/tables.htm, accessed April 1, 2025

U.S. Bureau of Labor Statistics, "Occupational Employment and Wage Statistics Frequently Asked Questions," *U.S. Bureau of Labor Statistics OEWS Website*, available at https://www.bls.gov/oes/oes_ques.htm, accessed April 16, 2025

U.S. Census Bureau, "Quarterly Workforce Indicators (QWI)," *U.S. Census Bureau QWI Website*, available at https://ledextract.ces.census.gov/qwi/all, accessed April 1, 2025

U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023, available at www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf

U.S. Department of the Treasury, "The State of Labor Market Competition," March 7, 2022, available at https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf, accessed March 28, 2025

"Wage Records Program [Technical Notes]," *U.S. Bureau of Labor Statistics Website*, available at https://www.bls.gov/wrp/technical-notes.htm, accessed April 16, 2025

"Who We Are," *USPI Website*, available at https://uspi.com/about-us/who-we-are/default.aspx, accessed March 28, 2025

Highly Confidential
Outside Counsel/Experts Only

## Corrected Exhibit 3: Immediate Next Employers of DaVita Senior-Level Employees by Frequency

### 2008-2016

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | ·(Count)· | ·(Percent)· |
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 26 | 3.2 % |
| United States Renal Care Incorporated | Outpatient Care Centers | 17 | 2.1 |
| Surgical Care Affiliates | Outpatient Care Centers | 11 | 1.3 |
| Sound Physicians | Offices of Physicians | 9 | 1.1 |
| HCA Healthcare | General Medical and Surgical Hospitals | 7 | 0.9 |
| UnitedHealth Group | Insurance Carriers | 6 | 0.7 |
| Northstar Anesthesia, P.A. | Offices of Other Health Practitioners | 6 | 0.7 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 6 | 0.7 |
| Humana | Insurance Carriers | 6 | 0.7 |
| ScionHealth | General Medical and Surgical Hospitals | 5 | 0.6 |
| Molina Healthcare | Agencies, Brokerages, and Other Insurance Related Activities | 5 | 0.6 |
| Envision Physician Services | Offices of Physicians | 5 | 0.6 |
| Aetna | Insurance Carriers | 5 | 0.6 |
| Radiology Partners | Medical and Diagnostic Laboratories | 4 | 0.5 |
| Integramed Fertility | n/a | 4 | 0.5 |
| Other Companies (608) | Other Industries (95) | 695 | 85.1 |
| | Total | 817 | 100 % |

Notes: In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify next employers for Senior-Level employees with an end date at DaVita between 2008 and 2016.

The NAICS code for Sound Physicians was identified using Factiva.

Sources: Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website* , available at https://www.census.gov/naics/?48967.

"Sound Inpatient Physicians Inc.," *Dow Jones Factiva* , Accessed April 16, 2025.

Highly Confidential
Outside Counsel/Experts Only

## Corrected Exhibit 4: Immediate Prior Employers of DaVita Senior-Level Employees by Frequency

### 2005-2007

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees -(Count) | -(Percent) |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Gambro Healthcare USA | Outpatient Care Centers | 17 | 7.5 % |
| Gambro | Other Miscellaneous Manufacturing | 7 | 3.1 |
| Accenture | Computer Systems Design and Related Services | 4 | 1.8 |
| UnitedHealth Group | Insurance Carriers | 3 | 1.3 |
| United States Navy | National Security and International Affairs | 3 | 1.3 |
| United States Congress | Executive, Legislative, and Other General Government Support | 3 | 1.3 |
| Renal Care Group | Outpatient Care Centers | 3 | 1.3 |
| Nabi Biopharmaceuticals | Pharmaceutical and Medicine Manufacturing | 3 | 1.3 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 3 | 1.3 |
| HCA Healthcare | General Medical and Surgical Hospitals | 3 | 1.3 |
| Fresenius | Outpatient Care Centers | 3 | 1.3 |
| United States Air Force | National Security and International Affairs | 2 | 0.9 |
| Unisource Worldwide | Paper and Paper Product Merchant Wholesalers | 2 | 0.9 |
| US Oncology Network | Outpatient Care Centers | 2 | 0.9 |
| Target | Department Stores | 2 | 0.9 |
| Other Companies (157) | Other Industries (47) | 168 | 73.7 |
| | **Total** | **228** | **100 %** |

Notes: In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify prior employers for Senior-Level employees with a start date at DaVita between 2005 and 2007.

Sources: Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website* , available at https://www.census.gov/naics/?48967.

Highly Confidential
Outside Counsel/Experts Only

**Corrected Exhibit 5: Immediate Next Employers of DaVita Senior-Level Employees
by Frequency**

**2005-2007**

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees (Count) | Senior-Level Employees (Percent) |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 6 | 5.4 % |
| Liberty Dialysis | Outpatient Care Centers | 4 | 3.6 |
| Apria Healthcare | Commercial and Industrial Machinery and Equipment Rental and Leasing | 3 | 2.7 |
| The Little Clinic | Offices of Other Health Practitioners | 2 | 1.8 |
| Tenet Healthcare | General Medical and Surgical Hospitals | 2 | 1.8 |
| Sinai Health System | General Medical and Surgical Hospitals | 2 | 1.8 |
| Pennsylvania State University | Colleges, Universities, and Professional Schools | 2 | 1.8 |
| Ochsner Health | Offices of Physicians | 2 | 1.8 |
| Oakwood Agency | Elementary and Secondary Schools | 2 | 1.8 |
| Nationwide Laboratory Services | Architectural, Engineering, and Related Services | 2 | 1.8 |
| Millennium Pharmacy Systems | Agencies, Brokerages, and Other Insurance Related Activities | 2 | 1.8 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 2 | 1.8 |
| Hamilton Healthcare | General Medical and Surgical Hospitals | 2 | 1.8 |
| Gwa Group Limited | Clay Product and Refractory Manufacturing | 2 | 1.8 |
| Cms Health Systems, Inc. | Home Health Care Services | 2 | 1.8 |
| Other Companies (74) | Other Industries (19) | 75 | 67.0 |
| **Total** | | **112** | **100 %** |

Notes: In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify next employers for Senior-Level employees with an end date at DaVita between 2005 and 2007.

NAICS codes from companies that were not assigned one by Lightcast are identified using Factiva.

Sources: Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website* , available at https://www.census.gov/naics/?48967.

"Hamilton Health Care System Inc," *Dow Jones Factiva* , Accessed April 16, 2025.

"GWA Group Ltd.," *Dow Jones Factiva,* Accessed April 16, 2025.

"Cms Health Care Inc," *Dow Jones Factiva,* Accessed April 16, 2025.

Highly Confidential
Outside Counsel/Experts Only

**Corrected Exhibit 6: Immediate Prior Employers of DaVita Senior-Level Employees
by Frequency**

**2020-2022**

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees (Count) | Senior-Level Employees (Percent) |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Fresenius | Outpatient Care Centers | 7 | 1.9 % |
| Amazon | Electronic Shopping and Mail-Order Houses | 7 | 1.9 |
| Target | Department Stores | 5 | 1.4 |
| HCA Healthcare | General Medical and Surgical Hospitals | 5 | 1.4 |
| Nephrology Practice Solutions | Outpatient Care Centers | 4 | 1.1 |
| McKinsey | Management, Scientific, and Technical Consulting Services | 4 | 1.1 |
| Deloitte | Management, Scientific, and Technical Consulting Services | 4 | 1.1 |
| CVS Health | Health and Personal Care Stores | 4 | 1.1 |
| Bain & Company | Management, Scientific, and Technical Consulting Services | 4 | 1.1 |
| Mercy Health | Offices of Physicians | 3 | 0.8 |
| Kaiser Permanente | Other Ambulatory Health Care Services | 3 | 0.8 |
| Dish | Cable and Other Subscription Programming | 3 | 0.8 |
| Cigna | Agencies, Brokerages, and Other Insurance Related Activities | 3 | 0.8 |
| University of Tennessee | Colleges, Universities, and Professional Schools | 2 | 0.5 |
| Surgical Care Affiliates | Outpatient Care Centers | 2 | 0.5 |
| Other Companies (281) | Other Industries (66) | 309 | 83.7 |
| **Total** | | **369** | **100 %** |

Notes: In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify prior employers for Senior-Level employees with a start date at DaVita between 2020 and 2022.

Nephrology Practice Solutions is an independent subsidiary of DaVita Inc. and was thus assigned the same NAICS code as DaVita, i.e., 6214.

SCA is tied for 15th place with 29 companies that were prior employers for 2 Senior-Level DaVita hires during the period. This exhibit has been manually re-sorted so that SCA is shown in the table.

Sources: Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website*, available at https://www.census.gov/naics/?48967.

"Nephrology Practice Solutions Names New Chief Medical Officer," DaVita Investors Website, May 28, 2020, available at https://investors.davita.com/2020-05-28-Nephrology-Practice-Solutions-Names-New-Chief-Medical-Officer.

Highly Confidential
Outside Counsel/Experts Only

## Corrected Exhibit 7: Immediate Next Employers of DaVita Senior-Level Employees by Frequency

### 2020-2022

| Company Name | 4-Digit NAICS Industry Name | Senior-Level Employees | |
|---|---|---|---|
| | | (Count) | (Percent) |
| (a) | (b) | (c) | (d) |
| Optum | Insurance Carriers | 25 | 6.0 % |
| CVS Health | Health and Personal Care Stores | 8 | 1.9 |
| WelbeHealth | Home Health Care Services | 6 | 1.4 |
| Amazon | Electronic Shopping and Mail-Order Houses | 5 | 1.2 |
| Radiology Partners | Medical and Diagnostic Laboratories | 4 | 1.0 |
| ChenMed | Offices of Physicians | 4 | 1.0 |
| Us Anesthesia Partners | Office Administrative Services | 3 | 0.7 |
| UnitedHealth Group | Insurance Carriers | 3 | 0.7 |
| United States Renal Care Incorporated | Outpatient Care Centers | 3 | 0.7 |
| Satellite Healthcare Wellbound | Outpatient Care Centers | 3 | 0.7 |
| Salesforce | Software Publishers | 3 | 0.7 |
| National Veterinary Associates | Other Professional, Scientific, and Technical Services | 3 | 0.7 |
| LifeStance Health | Offices of Physicians | 3 | 0.7 |
| Cityblock Health | Offices of Physicians | 3 | 0.7 |
| Virta Health | Home Health Care Services | 2 | 0.5 |
| Other Companies (303) | Other Industries (59) | 336 | 81.2 |
| | **Total** | **414** | **100 %** |

Notes: In the Lightcast data, I identify Senior-Level employees by searching the "title_name" variable for the keywords: director, vp, or vice president.

I exclude employees with titles related to HR, recruiting, or legal functions, and employees with the title "Medical Director," as this title appears overrepresented in the Lightcast data compared to DaVita's structured data.

Companies are identified using the variable "company_name," if available, or "company_raw" otherwise.

I identify next employers for Senior-Level employees with an end date at DaVita between 2020 and 2022.

NAICS codes from companies that were not assigned one by Lightcast are identified using Factiva.

Sources: Lightcast Profile Data.

4-Digit Industry Names are from "North American Industry Classification System," *US Census Bureau Website*, available at https://www.census.gov/naics/?48967.

"Welbe Health Llc," *Dow Jones Factiva*, Accessed April 16, 2025.

"Satellite Healthcare Inc.," *Dow Jones Factiva*, Accessed April 16, 2025.

Highly Confidential
Outside Counsel/Experts Only



**Exhibit 8: Number of SCA Senior Level Employees**

Notes: Only observations with positive hours worked are included. Data for SCA are only available starting from 2008. Bars in gray indicate years outside the alleged conduct period.

Source: Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta, with NERA corrections as described in **Section V.B** ("DaVita USPI SCA Complete Data with Outliers Adj DaVita Equity Comp.dta")).

Highly Confidential
Outside Counsel/Experts Only



**Exhibit 9: Counts of Departures between DaVita and SCA**

Note:     Grey line indicates the end of the alleged conduct period.

Source:     Starr turnover materials ("DaVita USPI SCA Complete Data with Outliers.dta")

Highly Confidential
Outside Counsel/Experts Only



**Exhibit 10: Departures between DaVita and SCA, Percentages of Total Departures**

Note: Grey line indicates the end of the alleged conduct period.

Source: Starr turnover materials ("DaVita USPI SCA Complete Data with Outliers.dta")

Highly Confidential
Outside Counsel/Experts Only

## Exhibit 11: Coefficients from Dr. Starr's Figure 3 Regression
## With Alternative Base Years

**Dependent Variable: Indicator for Movements Between SCA/DaVita**

| | Base Year | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Coefficient Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| | | | | | | | (Estimates) | | | | | | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) | (n) |
| 2008 | Base Year | 0.0011 | 0.0013 | -0.0001 | 0.0010 | 0.0026 | 0.0032 * | 0.0026 | 0.0028 | 0.0032 * | 0.0024 | 0.0027 | 0.0017 |
| 2009 | -0.0011 | Base Year | 0.0002 | -0.0012 | -0.0001 | 0.0015 | 0.0021 | 0.0015 | 0.0017 | 0.0021 | 0.0013 | 0.0016 | 0.0006 |
| 2010 | -0.0013 | -0.0002 | Base Year | -0.0014 | -0.0003 | 0.0013 | 0.0019 | 0.0013 | 0.0015 | 0.0019 | 0.0011 | 0.0014 | 0.0004 |
| 2011 | 0.0001 | 0.0012 | 0.0014 | Base Year | 0.0011 | 0.0027 | 0.0033 ** | 0.0027 | 0.0029 * | 0.0033 ** | 0.0025 | 0.0028 | 0.0018 |
| 2012 | -0.0010 | 0.0001 | 0.0003 | -0.0011 | Base Year | 0.0015 | 0.0022 * | 0.0016 | 0.0018 | 0.0022 * | 0.0014 | 0.0017 | 0.0007 |
| 2013 | -0.0026 | -0.0015 | -0.0013 | -0.0027 | -0.0015 | Base Year | 0.0007 | 0.0001 | 0.0002 | 0.0007 | -0.0001 | 0.0002 | -0.0008 |
| 2014 | -0.0032 * | -0.0021 | -0.0019 | -0.0033 ** | -0.0022 * | -0.0007 | Base Year | -0.0006 | -0.0004 | 0.0000 | -0.0008 | -0.0005 | -0.0015 * |
| 2015 | -0.0026 | -0.0015 | -0.0013 | -0.0027 | -0.0016 | -0.0001 | 0.0006 | Base Year | 0.0002 | 0.0006 | -0.0002 | 0.0001 | -0.0009 |
| 2016 | -0.0028 | -0.0017 | -0.0015 | -0.0029 * | -0.0018 | -0.0002 | 0.0004 | -0.0002 | Base Year | 0.0004 | -0.0004 | -0.0001 | -0.0011 |
| 2017 | -0.0032 * | -0.0021 | -0.0019 | -0.0033 ** | -0.0022 * | -0.0007 | 0.0000 | -0.0006 | -0.0004 | Base Year | -0.0008 | -0.0005 | -0.0015 * |
| 2018 | -0.0024 | -0.0013 | -0.0011 | -0.0025 | -0.0014 | 0.0001 | 0.0008 | 0.0002 | 0.0004 | 0.0008 | Base Year | 0.0003 | -0.0007 |
| 2019 | -0.0027 | -0.0016 | -0.0014 | -0.0028 | -0.0017 | -0.0002 | 0.0005 | -0.0001 | 0.0001 | 0.0005 | -0.0003 | Base Year | -0.0010 |
| **2020** | **-0.0017** | **-0.0006** | **-0.0004** | **-0.0018** | **-0.0007** | **0.0008** | **0.0015 *** | **0.0009** | **0.0011** | **0.0015 *** | **0.0007** | **0.0010** | Base Year |
| 2021 | -0.0032 * | -0.0021 | -0.0019 | -0.0033 ** | -0.0022 * | -0.0007 | 0.0000 | -0.0006 | -0.0004 | 0.0000 | -0.0008 | -0.0005 | -0.0015 * |

Notes:  Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$.

Green cells indicate a positive coefficient estimate, and red cells indicate a negative coefficient estimate.

Source:  Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta).

Highly Confidential
Outside Counsel/Experts Only

**Exhibit 12: DaVita and SCA Compensation Regression Results**
**Dr. Starr's Conduct Effect by Start and End Year of Alleged Conduct**

DaVita and SCA Alleged Conduct Period Start Year

| End Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | -0.111 *** | -0.075 *** | | | | | | | |
| 2010 | -0.080 *** | -0.036 *** | 0.022 ** | | | | | | |
| 2011 | -0.126 *** | -0.083 *** | -0.032 *** | -0.064 *** | | | | | |
| 2012 | -0.056 *** | 0.000 | 0.038 *** | 0.026 *** | 0.092 *** | | | | |
| 2013 | -0.076 *** | -0.019 * | 0.021 ** | 0.009 | 0.043 *** | -0.019 ** | | | |
| 2014 | -0.057 *** | -0.003 | 0.027 *** | 0.016 * | 0.041 *** | -0.002 | 0.014 * | | |
| 2015 | 0.001 | 0.041 *** | 0.053 *** | 0.038 *** | 0.057 *** | 0.024 *** | 0.039 *** | 0.051 *** | |
| 2016 | 0.034 *** | 0.071 *** | 0.072 *** | 0.053 *** | 0.068 *** | 0.039 *** | 0.049 *** | 0.055 *** | 0.037 *** |
| 2017 | 0.047 *** | 0.082 *** | 0.081 *** | 0.062 *** | 0.075 *** | 0.048 *** | 0.059 *** | 0.061 *** | 0.039 *** |
| 2018 | 0.078 *** | 0.123 *** | 0.114 *** | 0.087 *** | 0.104 *** | 0.072 *** | 0.087 *** | 0.089 *** | 0.055 *** |
| 2019 | **-0.127 ***** | -0.036 * | 0.039 *** | 0.015 | 0.057 *** | -0.016 | 0.004 | -0.021 | -0.073 *** |
| 2020 | -0.092 *** | -0.030 * | 0.040 *** | 0.016 | 0.055 *** | -0.013 | 0.003 | -0.010 | -0.045 *** |
| 2021 | -0.127 *** | -0.036 * | 0.039 *** | 0.015 | 0.057 *** | -0.016 | 0.004 | -0.021 | -0.073 *** |
| 2022 | -0.123 *** | 0.091 *** | 0.122 *** | 0.068 *** | 0.125 *** | 0.028 ** | 0.056 *** | 0.036 *** | -0.038 *** |

*DaVita and SCA Alleged Conduct Period End Year (row axis)*

Notes:   Significance values are as follows: *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$.

The above analysis tests Dr. Starr's regression model from Figure 6, column (4) of his expert report by changing the years of alleged conduct for DaVita and SCA.

USPI is excluded from this analysis.

Bolded and outlined is the coefficient of conduct when conduct starts in 2008 and ends in 2019 for DaVita, which is the conduct period used in Dr. Starr's report.

Color scale indicates coefficients greater than zero in green and less than zero in red.

Source:   Starr turnover materials (DaVita USPI SCA Complete Data with Outliers.dta).

# Exhibit 11

Lane Declaration

(Filed Under Seal)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL

CENTER EMPLOYEE ANTITRUST

LITIGATION            | Docket No. 1:21-cv-00305

_____|

CONFIDENTIAL - UNDER PROTECTIVE ORDER

VIDEO DEPOSITION OF BARRY GERHART, Ph.D.

WEDNESDAY, MARCH 5, 2025

SAN FRANCISCO, CALIFORNIA

Reported by:   Marilynn Hoover, RPR

California CSR No. 8841

Barry Gerhart, Ph. D. Confidential
March 05, 2025

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the video deposition of BARRY GERHART, Ph.D., was taken before Marilynn Hoover, California CSR No. 8841; on Wednesday, March 5, 2025, at 9:09 a.m.; located at 275 Battery Street, 29th Floor, in San Francisco, California.

ON BEHALF OF PLAINTIFFS:

    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

    BY MS. LIN Y. CHAN, ESQ.

        MR. DEAN M. HARVEY, ESQ.

        MS. SARAH D. ZANDI, ESQ.

    275 Battery Street, 29th Floor

    San Francisco, California 94111-3339

    Telephone:  415-956-1000

    E-mail:  LChan@lchb.com

             DHarvey@lchb.com

             SZandi@lchb.com


NUSSBAUM LAW GROUP

    BY MS. SUSAN R. SCHWAIGER, ESQ.

    1133 Avenue of the Americas, 31st Floor

    New York, New York 10036

    Telephone:  917-224-7088

    E-mail:  SSchwaiger@nussbaumpc.com

ON BEHALF OF UNITED SURGICAL PARTNERS HOLDINGS

INC., UNITED SURGICAL PARTNERS INTERNATIONAL INC.,

AND TENET HEALTHCARE CORPORATION:

    KING & SPALDING, LLP

    BY MS. JULIA BARRETT BATES, ESQ.

    500 West 2nd Street, Suite 1800

    Austin, Texas 78701

    Telephone:  512-457-2053

    E-mail:  JBates@kslaw.com


    KING & SPALDING, LLP

    BY MS. DIANA LIU, ESQ.

    50 California Street, Suite 3300

    San Francisco, California 94111

    Telephone:  415-318-1203

    E-mail:  DLiu@kslaw.com


    KING & SPALDING, LLP

    BY MR. CONNOR BREWER, ESQ.

    1401 Lawrence Street, Suite 1900

    Denver, Colorado 80202

    Telephone:  713-751-3254

    E-mail:  CBrewer@kslaw.com

Barry Gerhart, Ph. D. Confidential
March 05, 2025

KING & SPALDING, LLP

BY MS. JULIANNE LEE DURAN, ESQ.

1700 Pennsylvania Avenue N.W., Suite 900

Washington, D.C. 20006

Telephone:  202-626-9625

E-mail:  JDuran@kslaw.com


KING & SPALDING, LLP

BY MS. VERONICA MOYE, ESQ.

2601 Olive Street, Suite 2300

Dallas, Texas 75201

Telephone:  214-764-4418

E-mail:  VMoye@kslaw.com


ON BEHALF OF DEFENDANT DAVITA INC.:

MORGAN LEWIS & BOCKIUS, LLP

BY MR. KENNETH M. KLIEBARD, ESQ.

   MR. JASON L. CHRESTIONSON, ESQ.

110 North Wacker Drive

Chicago, Illinois 60606

Telephone:  312-324-1774

E-mail:  Kenneth.Kliebard@morganlewis.com

         Jason.Chrestionson@morganlewis.com

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MORGAN LEWIS & BOCKIUS, LLP

BY MS. MOLLY MORIARTY LANE, ESQ.

One Market Street, Spear Street Tower

San Francisco, California 94105-1596

Telephone:  415-442-1000

E-mail:  Molly.Lane@morganlewis.com


MORGAN LEWIS & BOCKIUS, LLP

BY MR. NATHAN T. SHAPIRO, ESQ.

101 Park Avenue

New York, New York 10178

Telephone:  212-309-6796

E-mail:  Nathan.Shapiro@morganlewis.com


ON BEHALF OF DEFENDANTS SURGICAL CARE

AFFILIATES LLC AND SCAI HOLDINGS LLC:

McGUIRE WOODS, LLP

BY MS. SARAH ZIELINSKI, ESQ.

    MS. AMY B. MANNING, ESQ.

77 West Wacker Drive, Suite 4100

Chicago, Illinois 60601-7567

Telephone:  312-849-8288; 312-750-8904

E-mail:  SZielinski@mcguirewoods.com

        AManning@mcguirewoods.com

Barry Gerhart, Ph. D. Confidential
March 05, 2025

McGUIRE WOODS, LLP

BY MR. ANDREW E. TALBOT, ESQ.

800 East Canal Street

Richmond, Virginia 23219

Telephone:  804-775-1622

E-mail:  ATalbot@mcguirewoods.com


ON BEHALF OF ANDREW HAYEK:

WILSON SONSINI GOODRICH & ROSATI, P.C.

BY MS. JORDANNE M. STEINER, ESQ.

1700 K Street N.W., Fifth Floor

Washington, D.C. 20006

Telephone:  212-497-7761

Email:  Jordanne.Miller@wsgr.com


ON BEHALF OF KENT THIRY:

McDERMOTT WILL & EMERY, LLP

BY MS. KATHARINE O'CONNOR, ESQ.

444 West Lake Street

Chicago, Illinois 60606

Telephone:  312-984-3627

E-mail:  KOConnor@mwe.com

Barry Gerhart, Ph. D. Confidential
March 05, 2025

ALSO PRESENT:  Daniel Stroud, videographer

Michael Cheung, exhibit technician

Sara Champion, Cornerstone Research

Melissa Lou, DaVita in-house counsel

Peter Shakow, Optum in-house counsel

Wendy Petropoulos, Cornerstone Research

Joseph Ammer, Edgeworth Economics

Barry Gerhart, Ph. D. Confidential
March 05, 2025

EXAMINATION INDEX

                                              PAGE

Examination by Ms. Zielinski                   12

Examination by Ms. Bates                      257

Examination by Mr. Kliebard                   273

                      *   *   *


                   EXHIBIT INDEX

EXHIBIT NO.     DESCRIPTION                    PAGE

Exhibit DX78    Expert witness report of

                Dr. Barry Gerhart              18

Exhibit DX79    Notice of errata regarding the

                expert report of Dr. Barry Gerhart   19

Exhibit DX80    Expert witness report of

                Dr. Barry Gerhart              19

Exhibit DX81    Expert witness report of

                Dr. Barry Gerhart              21

WEDNESDAY, MARCH 5, 2025; SAN FRANCISCO, CALIFORNIA

THE VIDEOGRAPHER:  Good morning, ladies and gentlemen.

We're on video record.  The time is 9:09 a.m.  Today's date is March 5th, 2025.

This marks the beginning of video 1, volume 1, in the deposition of Barry Gerhart, Ph.D., in the case In Re Outpatient Medical Center Employee Antitrust Litigation, appearing before the United States District Court, Northern District of Illinois, Eastern Division; case number 1:21-cv-00305.

We're located today at 275 Battery Street, San Francisco, California.

Would all counsel in the room please identify themselves for the record.

MS. ZIELINSKI:  Sarah Zielinski from McGuire Woods, for SCA.

MR. TALBOT:  Andrew Talbot from McGuire Woods, on behalf of SCA.

MS. CHAMPION:  Sarah Champion, an economist with Cornerstone Research, on behalf of defendants.

MS. MANNING:  Amy Manning, McGuire Woods, on behalf of SCA.

MR. KLIEBARD:  Good morning, counsel and Professor Gerhart.  I am Ken Kliebard.  I am with

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Morgan Lewis, representing DaVita.

MS. BATES:  Julia Bates with King & Spalding, representing USPI and Tenet.

MS. LIU:  Diana Liu from King & Spalding, representing USPI and Tenet.

MR. BREWER:  Connor Brewer from King & Spalding, representing USPI and Tenet.

MS. LOU:  Melissa Lou, in-house counsel with DaVita.

MS. LANE:  Molly Lane with Morgan Lewis, on behalf of DaVita Inc.

MR. HARVEY:  Dean Harvey of Lieff Cabraser, for the plaintiffs.

MS. ZANDI:  Sarah Zandi of Lieff Cabraser, for the plaintiffs.

MS. CHAN:  Lin Chan, Lieff Cabraser, for the plaintiffs.

THE VIDEOGRAPHER:  Would those on Zoom please identify themselves for the record.

MS. DURAN:  Julianne Duran, King & Spalding, for USPI and Tenet.

MS. MOYE:  Veronica Moyé, King & Spalding, for USPI and Tenet.

MR. SHAPIRO:  Nathan Shapiro, Morgan Lewis & Bockius, on behalf of DaVita Inc.

MR. CHRESTIONSON:  Jason Chrestionson, Morgan Lewis & Bockius, on behalf of DaVita Inc.

MS. STEINER:  Jordanne Steiner, Wilson Sonsini Goodrich & Rosati, on behalf of Andrew Hayek.

MR. AMMER:  Joseph Ammer with Edgeworth Economics.

MS. SCHWAIGER:  Susan Schwaiger from Nussbaum Law Group, for the plaintiffs.

MR. SHAKOW:  Peter Shakow, in-house counsel at Optum SCA.

MS. PETROPOULOS:  Wendy Petropoulos with Cornerstone Research.

THE VIDEOGRAPHER:  Okay.  You may swear in the witness.

THE STENOGRAPHIC REPORTER:  Good morning.

My name is Marilynn Hoover.  I am a California certified shorthand reporter and my license number is 8841.

Thank you.

--o0o--

BARRY GERHART, Ph.D., called as a witness, being duly sworn on oath, was examined and did testify as follows:

--o0o--

EXAMINATION

BY MS. ZIELINSKI:

Q.   Good morning, Dr. Gerhart.

A.   Good morning.

Q.   We met off the record.  I'm Sarah Zielinski for the SCA defendants.

Could you please state your full name for the record.

A.   Barry Gerhart.

Q.   And this is the first time you've had your deposition taken; is that right?

A.   Correct.

Q.   Have you ever before provided testimony under oath?

A.   No.

Q.   But you understand that your testimony today is under oath; correct?

A.   Yes.

Q.   And you understand that you must answer my questions truthfully and honestly?

A.   Yes.

Q.   And is there any reason that you could not give your complete and honest testimony today?

A.   Not that I can think of.

Q.   Okay.  Great.  So, before we get started,

Barry Gerhart, Ph. D. Confidential
March 05, 2025

let's cover a few ground rules that you may have also covered with your counsel.

As I'm sure you're aware, I'll be asking questions, and your role is to answer those questions.

Do you understand that?

A.   I understand.

Q.   And as the court reporter asked, we're -- we'll do our best not to talk over each other; so please let me finish my question before you start your answer.

Does that sound good?

A.   Yes.

Q.   Okay.  And, also, to get a clear record, you'll need to answer questions verbally instead of shaking your head.

Does that sound okay?

A.   Yes.

Q.   Okay.  Thanks.  If you need to take a break at any time, let me know.  One thing I ask is, if there's a question pending, we just wrap up that question and get an answer to it before we take a break.

Does that work?

A.   Yes.

Q.   Okay.  And if you do not understand any of

Barry Gerhart, Ph. D. Confidential
March 05, 2025

the questions I ask, just ask me to rephrase them.  If you respond, we'll assume that you understood the question.

Does that work?

A.    Yes.

Q.    Okay.  You were retained as an expert witness by plaintiffs' counsel in this matter; correct?

A.    Correct.

Q.    Is this the first time you've ever been hired as an expert witness in a litigation matter?

A.    I think it's the second time.

Q.    Okay.  What was the prior matter?

A.    In the animation -- animators case.

Q.    Okay.  Did you submit a report in that case?

A.    Yes.

Q.    And what -- sort of as a general matter, what sort of things were you opining about in that case?

MS. CHAN:  Objection.  Vague.

You may answer.

THE WITNESS:  My recollection is it was about the effects of a no-poach agreement.

Q.    BY MS. ZIELINSKI:  Okay.  Turning to this matter:  How much time have you spent thus far working

Barry Gerhart, Ph. D. Confidential
March 05, 2025

on this matter?

A.   How many hours?

Q.   Yes.

A.   At least 50.  A little over 50.

Q.   Okay.  Is anyone supporting you in the work you're doing on this case?

MS. CHAN:  I'm going to object and instruct you not to answer to the extent that your answer would reveal attorney expert communications or work product; but, outside of that, you can answer.

THE WITNESS:  The only people I've communicated with are part of the firm, the law firm.

Q.   BY MS. ZIELINSKI:  Okay.  So no other -- no other team members supporting you, other than the legal team?

A.   No.

Q.   Okay.  Are you familiar with Dr. Evan Starr?

A.   I know of Evan Starr, yes.

Q.   All right.  How is it that you're familiar with him?

A.   I assigned some of his research on a syllabus I use for a doctoral level course on human resources.

Q.   Okay.  Have you ever communicated with Dr. Starr related to this case?

not relied upon.

Q.   BY MS. ZIELINSKI:  Are you taking your counsel's instruction?

A.   Yes.

Q.   All right.  Let's turn to page 1 of your report where it talks about your qualifications.

Do you see that?

A.   Yes, I do.

Q.   You say at the bottom of page 1 that your work focuses on compensation design, employee mobility, turnover, and human resources management; right?

A.   Yes.

Q.   In the course of your work, have you ever studied those issues for healthcare companies?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  So I've done work using data sets that cover the whole economy, that would not exclude healthcare, and, I think, as we'll probably get into later, those organizations like World at Work which -- which provide a certification called the certified compensation professional.  And people from all industries go to take courses at World at Work. So I think, for what -- I'll just -- I'll stop there for now.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  So you've generally encountered data related to healthcare companies.

Have you actually studied those issues for healthcare companies?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.  Asked and answered.

THE WITNESS:  As I said, I've studied companies economy-wide, and that would have included healthcare companies.

Q.   BY MS. ZIELINSKI:  Do you consider yourself to be an economist?

A.   No.

MS. CHAN:  Objection.  Vague and ambiguous.

Sorry.  You may answer.

THE WITNESS:  No.

Q.   BY MS. ZIELINSKI:  Okay.  Your expertise does not include antitrust economics; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  I'd say that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  All right.  Let's flip to page 7 of your report -- or, I'm sorry, page 4 of your report, paragraph 7.  And I'm referring to paragraphs 7 and 8, which is on pages 4 through 8.

Paragraphs 7 and 8 list the opinions that

Barry Gerhart, Ph. D. Confidential
March 05, 2025

you've reached in this matter, correct, to date?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: Those are my conclusions.

Q. BY MS. ZIELINSKI: Looking at paragraph 7, right after the word "conclusions," it says that your conclusions are based on your experience and research in compensation in human resources management; correct?

A. Yes, that's what it says.

Q. You're not offering any opinions based on any other expertise beyond what's listed there; correct?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: I'm not sure what -- what -- Do you have something specific in mind?

Q. BY MS. ZIELINSKI: Based on economics or antitrust experience. You're not basing your opinions on expertise in either of those areas; correct?

MS. CHAN: Objection. Vague and ambiguous.

You may answer.

THE WITNESS: Yeah, so I would not refer to myself as an economist. Part of compensation is being pretty -- it involves a lot of labor economics, and I -- I have some knowledge of labor economics.

Q. BY MS. ZIELINSKI: Do you have any degrees

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Do you see that?

A.   I know it's there, but where exactly are we looking?

Q.   7(A).

A.   Yeah.

Q.   After the italicized "incentives to collude."

A.   Yeah.

Q.   It's that first sentence.

A.   I see it.

Q.   You're offering -- So you're offering the opinion that defendants -- Well, strike that.

You're not offering an opinion on whether defendants actually did collude; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah, I didn't see that as part of my charge, but I can speak to what incentives there would be to collude.

Q.   BY MS. ZIELINSKI:  Okay.  So it's your opinion that defendants were incentivized to collude, but not that they actually -- but you've not actually opined that they actually did collude; correct?

A.   I have not opined -- There's --

MS. CHAN:  Objection.  Vague and ambiguous.

You can answer.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS:  Yeah, there's -- there's evidence in the report that would be relevant to that.

Q.   BY MS. ZIELINSKI:  So where you're talking about -- where your report talks about collusion, you're talking about evidence that you reviewed as opposed to an opinion you're offering regarding the conduct; is that correct?

A.   Yeah.

MS. CHAN:  Objection.

THE WITNESS:  Yes.

MS. CHAN:  Vague and ambiguous.

THE WITNESS:  My focus is on what the consequences would be of collusion.

Q.   BY MS. ZIELINSKI:  And not whether they -- not whether they did it or not; correct?

A.   That's not my --

MS. CHAN:  Objection.  Vague and ambiguous.

You can answer.

THE WITNESS:  That's not my focus.

Q.   BY MS. ZIELINSKI:  And, similarly, you -- you're not offering an opinion about whether the defendants entered into an agreement to fix wages; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS: Yeah, again, I would say my focus is on the consequences of such actions.

Q. BY MS. ZIELINSKI: Okay. So you're not offering an opinion on that; correct?

MS. CHAN: Objection. Vague and ambiguous.

You may answer.

THE WITNESS: I'm -- I'm not.

Q. BY MS. ZIELINSKI: Okay. Let's flip to the table of contents of your report.

Starting with Roman numeral 5, these -- these are the headings -- I guess a preliminary question: These are the headings of the -- that are used throughout your report; correct?

A. Yes.

Q. So all of these correspond to opinions or conclusions that you've reached in your report; correct?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: I would say yes.

Q. BY MS. ZIELINSKI: Okay. Looking at Roman numeral 6, it says: "Defendants' collusion would likely have suppressed employees' compensation."

Do you see that?

A. Yes.

Q. Are you offering an opinion that defendants'

Barry Gerhart, Ph. D. Confidential
March 05, 2025

alleged conduct actually suppressed employees' compensation or is just -- or likely would?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  Likely.

Q.   BY MS. ZIELINSKI:  And so you're not -- And is that true -- Let me go to a couple other opinions.

That's also true for heading 6(C), defendants' CSI exchanges likely restricted labor market compensation; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Sorry.  What -- What is your question there?

Q.   BY MS. ZIELINSKI:  Do you see that?

A.   I see it, yes.

Q.   You are opining -- You are not opining that defendants' CSI exchanges in fact restricted labor market competition; you are opining that they likely restricted labor market competition.  Correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Well, I am concluding they likely restricted labor market competition.

Q.   BY MS. ZIELINSKI:  And, similarly, for the heading for section 7 -- or, I'm sorry, not seven -- eight, it says:  "A structured compensation system

Barry Gerhart, Ph. D. Confidential
March 05, 2025

You agree with that; correct?

MS. CHAN:  Objection.  Vague and ambiguous.  Compound.  Misstates the report.

You may answer.

THE WITNESS:  Yeah, actually, I'd have to think about that some more, I think.

I think I would go with, at a minimum, nearly all.  I think the effect would be pretty pervasive.

Q.   BY MS. ZIELINSKI:  So you disagree with what you wrote here in your report?

A.   No, I don't disagree.

MS. CHAN:  Objection.  Misstates his testimony.  Argumentative.  Compound.  Vague and ambiguous.

Q.   BY MS. ZIELINSKI:  Okay.  So you do agree with what you wrote in your report?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  That -- Are we talking about nearly all employees?

Q.   BY MS. ZIELINSKI:  No.  I'm talking about the "some."  I'll get to the "nearly all."

A.   Oh, okay.  So where are we?

Q.   "Defendants" -- It's the second sentence in eight:  "Defendants' no-poach agreements and CSI

Barry Gerhart, Ph. D. Confidential
March 05, 2025

exchanges suppressed the wages of some class members directly."

A.    Yes.

Q.    You agree with that?

A.    Yes.

Q.    Okay.  All right.  So the remainder of class members who you say were affected would have been affected indirectly; correct?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  Yeah, it wouldn't -- it wouldn't seem as direct.  It would be -- Given the nature of a system where -- where pay is -- of different people and titles is closely interrelated, that would be the so-called indirect effect or less direct effect.

Q.    BY MS. ZIELINSKI:  Okay.  Now let's look to the next part, where it says that the compensation of nearly all employees of the proposed class would be affected.

Do you see that?

A.    Um-hum.  Yes.

Q.    So you can see that not all class members were affected, when you say "nearly all"; correct?

MS. CHAN:  Objection.  Mischaracterizes the

Barry Gerhart, Ph. D. Confidential
March 05, 2025

report.  Vague and ambiguous.  Compound.

THE WITNESS:  Yeah, I -- I think the effect would be pervasive.  "Nearly all" is what the report says, which is maybe as good as any way to describe it.  If anything, I would -- You know, there's a -- there's -- For instance, there's an overall merit increase budget that the companies use; and if that is suppressed and that's what's applied as the overall budget in each company, that's going to have a very pervasive effect, just as an example.

Q.   BY MS. ZIELINSKI:  Yep.

"Nearly all" isn't "all."  You agree with that; correct?

A.   Well --

MS. CHAN:  Objection.  Vague and ambiguous. Misstates his testimony.

THE WITNESS:  I agree "nearly all" is not "all."

MS. ZIELINSKI:  Okay.

THE WITNESS:  I am not sure if "nearly all" is the best term, but that's what's in the report and that's what I'm happy with for now.

Q.   BY MS. ZIELINSKI: Okay.  All right.  Let's go to paragraph 5 of your report, which is on page 3.

You provide here your understanding of the

Barry Gerhart, Ph. D. Confidential
March 05, 2025

companies' interests to restrict the labor market by using no-poach and by sharing competitively sensitive information.

So I think there's a logic here to why that would -- an explanation for why they would engage in those behaviors.

Q.   BY MS. ZIELINSKI:  So is the answer to my question no?

MS. CHAN:  Objection.  Misstates prior testimony.  Asked and answered.

THE WITNESS:  Yeah, that's the best answer I think I can give.

Q.   BY MS. ZIELINSKI:  Okay.  I asked -- This started by me asking what experience you have in determining whether businesses are incentivized to collude.

I heard you explain your theory, but I didn't hear the answer to your question on what experience you have in that area.

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah, I took my task as to why would -- what would explain companies engaging in these behaviors.

Q.   BY MS. ZIELINSKI:  Okay.  So you don't have prior experience on that?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN:  Objection.  Argumentative. Misstates prior testimony.  Vague and ambiguous.

THE WITNESS:  Yeah, I don't have -- I don't have anything further to add.

Q.   BY MS. ZIELINSKI:  Okay.  Let's look at 7(A).  And you say that one of the reasons that you believe defendants were incentivized to collude is because defendants cared about keeping turnover lower; correct?

A.   Yes, because turnover is costly.

Q.   Don't all organizations care about keeping turnover low?

MS. CHAN:  Objection.  Calls for speculation.  Vague and ambiguous.

THE WITNESS:  I think, in general, organizations prefer lower turnover to higher turnover.

Q.   BY MS. ZIELINSKI:  So you'd agree, then, that all organizations care about keeping turnover low?

MS. CHAN:  Objection.  Misstates prior testimony.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  I would say, in general, that's true.

Q.   BY MS. ZIELINSKI:  Would you agree that keeping turnover low is even more important for senior-level positions?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  Yes, I would say, generally, that would be true.

Q.   BY MS. ZIELINSKI:  How do you determine whether an -- Would you agree that -- I'm sorry. Strike that.

Would you agree that not all businesses that care about keeping turnover low are engaged in collusion?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yes, I would.

Q.   BY MS. ZIELINSKI:  So what's the test for determining whether an organization cares enough about keeping turnover low such that it gives them an incentive to collude?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  Yeah, I -- I don't have a precise answer for a standard; but, again, my focus was on explaining why a company would consider engaging in these kind of behaviors.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  And did you conduct any quantitative analysis of the defendants' actual turnover rates?

A.   I didn't --

MS. CHAN:  Objection.  Vague and ambiguous.

You can answer.

THE WITNESS:  No.

Q.   BY MS. ZIELINSKI:  And you didn't analyze how those rates -- turnover rates compared to other employers; correct?

A.   That's --

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  That's correct.

Q.   BY MS. ZIELINSKI:  Okay.  Going back to 7(A) again, you say that the other reason that you conclude that defendants were incentivized to collude is because they cared about reducing their significant labor costs; correct?

A.   Yes.

Q.   Labor costs generally comprise a substantial portion of a firm's total operating costs; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  It varies by industry, depending, for instance, on how capital-intensive versus labor-intensive the work is.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  But would you agree that labor costs generally comprise a substantial portion of a firm -- of a firm's total operating costs?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  I think, generally, that's true; but there is -- there are significant differences between industries.

Q.   BY MS. ZIELINSKI:  Would you agree that all organizations care about managing labor costs?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  Yeah, I think all organizations care about controlling all kinds of costs; but if labor is your primary cost, then will likely care more.

Q.   BY MS. ZIELINSKI:  Well, what -- And you would agree that not all businesses that care about managing labor costs are engaged in collusion; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  To my knowledge, that's correct.

Q.   BY MS. ZIELINSKI:  So what's the test for determining whether an organization cares enough about

Barry Gerhart, Ph. D. Confidential
March 05, 2025

reducing labor costs such that it gives them an incentive to collude?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: I think the more costly the turnover is, the more likely it would be that they would engage in things like no-poach agreements and ensuring of competitively sensitive information.

Q. BY MS. ZIELINSKI: You would agree that not all companies with high turnover costs are engaged in collusion; correct?

MS. CHAN: Objection. Vague and ambiguous. Calls for speculation.

THE WITNESS: I -- Yeah, I would agree with that.

Q. BY MS. ZIELINSKI: Did you do any quantitative analysis of defendants' actual labor costs?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: I did see some labor cost numbers; and I know that, in some of the testimony, pretty well-placed people, like the chief operating officer, I think, said that labor was their biggest cost.

Q. BY MS. ZIELINSKI: Did you analyze how defendants' labor costs compared to other employers?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  No, not specifically in this report.

Q.   BY MS. ZIELINSKI:  So you've not conducted any analysis to differentiate defendants from other companies who care about lower -- lowering turnover and managing labor costs; correct?

MS. CHAN:  Objection.  Misstates prior testimony and his report.  Vague and ambiguous. Compound.

THE WITNESS:  I don't think it's addressed explicitly in the report.

Q.   BY MS. ZIELINSKI:  Then how can you conclude that defendants here are any more likely to collude than any other company?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  Yeah, I think probably the -- it's based on my own knowledge of what labor costs are.  And, as I mentioned before, they do vary across industry, depending on how labor capital-intensive and -- This is more of a -- This has many labor-intensive aspects; and so, in this particular -- in these particular companies, labor cost is the single largest operating cost.  That's not true of all companies.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  But you agree that not all companies that have labor costs as their single largest operating cost are engaged in collusion; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  It is --

MS. CHAN:  Calls for speculation.

THE WITNESS:  It is not a deterministic relationship.  In other words, it doesn't always happen when labor costs are high.  I would agree with that.  It's just more likely.

Q.   BY MS. ZIELINSKI:  But you haven't done an analysis to conclude that defendants here are any more likely to collude than other companies where labor costs -- than other companies that have significant labor costs; correct?

MS. CHAN:  Objection.  Misstates prior testimony and the report.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  Yeah, I don't -- there's no explicit analysis; again, it would just -- it would be based on knowledge of what labor costs are in different companies and also the testimony about the -- how important labor costs were to them and how disruptive turnover was to them and that they were

Barry Gerhart, Ph. D. Confidential
March 05, 2025

very focused on it, and that would -- that would be

the background.

Q.   BY MS. ZIELINSKI:  Moving back to

paragraph 7:  You have -- Under A, you have a little I

and you say that "these incentives are particularly

strong, whereas here the industry is small and

tight-knit."

Do you see that?

A.   Um-hum.  Yes.

Q.   What is -- Sorry.  What industry are you

referring to there?

A.   I think the focus here is on the three firms

that we're talking about; and they have pretty close

connections, is what that paragraph is trying to get

at.

Q.   Okay.  So you are opining that the industry

is limited to these three defendants?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  No.  There's other evidence in

the report about going beyond the three defendants,

and I think one person testified the industry was

incestuous.  I don't -- I can't tell you exactly how

that defendant was defining "industry."  Talked about

regularly seeing each other at conferences.  And then,

of course, in the three firms, we know, for instance,

Barry Gerhart, Ph. D. Confidential
March 05, 2025

that there was movement from DaVita to SCA.

And so I think the focus is on those kind of tight-knit connections.  Those are the ones most explicitly laid out in the report, and there's other connections as well.

Q.   When you use the term "industry," are you using a different concept than labor market?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah, it's -- it's -- it's a bit vague there, but I think the focus was on -- I think it's on employee movement primarily and just the way that their interpersonal connections might have provided an opportunity -- maybe "incentive" isn't the best word; maybe it's an opportunity -- along with an incentive to take action to restrict movement.

Q.   BY MS. ZIELINSKI:  I'm not sure I understood the answer.

So are you saying that industry, the word "industry," does mean the same thing as labor market?

MS. CHAN:  Objection.  Misstates the testimony.  Vague and ambiguous.

THE WITNESS:  I think, generally, industry would probably correspond a little more closely to the product market, but --

MS. ZIELINSKI:  Okay.

THE WITNESS: -- in this case, would also include, to use a general term, healthcare companies. So that's the product market but also talking about the labor market activity, the movement between -- of people between these companies.

Q. BY MS. ZIELINSKI: So the -- So the industry -- You mentioned the industry being healthcare companies; correct?

MS. CHAN: Objection. Vague and ambiguous. Misstates testimony.

THE WITNESS: Yeah, that's at a very general level. I mean, obviously, within an industry, there's -- there's certain parts where -- where companies compete more closely in the product market but also in the labor market.

Q. BY MS. ZIELINSKI: When you were characterizing the industry as "small and close-knit," were you characterizing the relationship between the three defendants or relationships within a broader industry?

A. I think probably some of both, but a lot of the focus here is on the three defendants.

Q. And is the broader industry healthcare companies?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS:  I mean, that would be broad enough to include all three.

Q.   BY MS. ZIELINSKI:  And what's the basis for asserting that an industry comprised of healthcare companies is small or close-knit?

MS. CHAN:  Objection.  Vague and ambiguous. Misstates prior testimony.

THE WITNESS:  Yeah, I think the focus here is on -- as you said, I think, on the three defendants.

Q.   BY MS. ZIELINSKI:  Okay.  So you're not opining about the industry as a whole; you're just focused on the three defendants when you describe this?

A.   Well, I mean, some of both, I think.  As I noted, some people in their testimony did opine on a broader industry, but most of the focus of the report is on the three defendants.

Q.   And you agree that the three defendants compete in a broader industry; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  I'm sure that's true to an extent; and I was focused on the competition between them, to a large extent.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  All right.  Let's --
still focusing on seven -- back up to 7(A).

          After you talk about defendants caring about
keeping turnover low and caring about reducing their
labor costs, you say:  "This was a means to increase
defendant firms' profits and stock value and which
likely inured to the benefit of defendant C suite
executives who are paid in stock."

          Do you see that?

     A.   I do.

     Q.   Under -- So under your theory, employees of
defendants who receive stock compensation would have
benefited from the alleged conduct; correct?

          MS. CHAN:  Objection.  Vague and ambiguous.
Compound.  Misstates the report.

          THE WITNESS:  The logic -- which I don't
think is unique -- again, is you want to increase
revenues and reduce costs.  Labor cost is a big part
of cost here.  So if you reduce labor cost, it leads
to hire profits over time.  That correlates with stock
values, shareholder return.  Executives, especially as
you go up to higher levels, are paid increasingly
based on profits and stock returns.

     Q.   BY MS. ZIELINSKI:  So you agree that
defendants -- employees of defendants who receive

Barry Gerhart, Ph. D. Confidential
March 05, 2025

that people benefited, again, because they -- they may have done significantly better in the absence of the no-poach and the sharing of competitively sensitive information.  And they may have done better if they would have gotten an outside offer, which they could have either leveraged or taken, which could have had higher compensation.

So I -- I don't really -- I don't agree that -- it's not clear to me that people benefited.

Q.   BY MS. ZIELINSKI:  Well, it says right here that -- that the keeping turnover lower --

(Reporter request.)

Q.   BY MS. ZIELINSKI:  It says here that keeping turnover lower and reducing their significant labor costs, you know, then it goes on to say, inured to the benefit of defendant C-suite executives; correct?

MS. CHAN:  Objection.  Argumentative. Compound.

THE WITNESS:  They -- They do better if they can control labor costs, yes.

Q.   BY MS. ZIELINSKI:  Okay.  So you agree that people who were paid in stock did benefit from the alleged conduct?

A.   It depends --

MS. CHAN:  Objection.  Argumentative.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS: Yeah.

MS. CHAN: Asked and answered. Vague and ambiguous. Compound.

THE WITNESS: I would -- I would say they could have benefited more.

MS. ZIELINSKI: Okay.

THE WITNESS: And they lost some -- they could have lost some benefit because of the restriction on the labor market.

Q. BY MS. ZIELINSKI: The measure of an employee's compensation at a given point in time includes salary, bonus, grants of equity; correct?

A. For higher-level --

MS. CHAN: Objection. Calls for speculation. Compound.

THE WITNESS: For higher-level employees, um-hum.

Q. BY MS. ZIELINSKI: How -- How are grants of equity valued for the purposes of determining someone's compensation?

MS. CHAN: Objection. Vague and ambiguous. Compound.

THE WITNESS: One of the common methods is the Black-Scholes method.

Q. BY MS. ZIELINSKI: I guess what I mean is:

Barry Gerhart, Ph. D. Confidential
March 05, 2025

When --

A.    For options.  Sorry.  Did you ask me about grants?

Q.    Yes.

A.    Oh, grants?  Okay.  Go ahead.

Q.    Yeah.  So how are grants of equity valued as a measure of compensation?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  I mean, I think the greater challenge is valuing options.

MS. ZIELINSKI:  Okay.

THE WITNESS:  I'm not sure what you're getting at with grants.

Q.    BY MS. ZIELINSKI:  Yeah.  So what's the appropriate point in time to value that equity grant? Is it -- Is it -- So is it the full grant of the equity?  Is it after the equity is vested?  Is it after the person sells their shares?  What -- Which piece of that is considered compensation?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.  Calls for speculation.

THE WITNESS:  Well, clearly, it matters when it vests, and there may be certain requirements that have to be met for it to vest, where you actually have

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN: You said -- Oh, I see.

Q. BY MS. ZIELINSKI: Our favorite page of the report, no.

The last sentence of B, which is what we -- we looked at 7(B) before -- the last sentence of that paragraph says: "Employees accrue these benefits, however, only where higher-paying external job opportunities actually exist and are accessible to employees."

Do you see that?

A. Yes.

Q. And then look at paragraph 7(H)(iii) which is on page 7.

Okay. At the very bottom of that page 7 and going to the top of the next, it says: "However, in the absence of outside offers of higher pay, because of collusion that interferes with typical labor market competition, these upward pay adjustments would not take place."

Do you see that? It's --

A. Sorry. Where?

Q. It's at the -- It's at the very bottom of seven, like the very last line, and it starts with "however." Page 7.

A. Yeah. Which line is it?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.    The very last one.

A.    Oh, okay.  So it's the beginning of the sentence.  Sorry.  Got it.

Q.    That's okay.

A.    Okay.  "However, in the absence."  Yeah.

Q.    "However, in the absence of outside offers of higher pay, because of collusion that interferes with labor market competition, these upward pay adjustments would not take place."

A.    I see it.

Q.    Is it your understanding that the alleged conduct by defendants eliminated higher-paying job opportunities available to class members?

        MS. CHAN:  Objection.  Vague and ambiguous.  Compound.

        THE WITNESS:  Higher-paying job opportunities where?

Q.    BY MS. ZIELINSKI:  At non-defendant firms, as a general matter.

A.    At non --

        MS. CHAN:  Vague and ambiguous.  Calls for speculation.

        THE WITNESS:  So is your question:  Would it have been possible for employees to move to non-defendant firms?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. ZIELINSKI:  Yes.

THE WITNESS:  Yes, it would be possible.

Q.   BY MS. ZIELINSKI:  And to receive higher-paying jobs at non-defendant firms as well?

A.   Yes.

MS. CHAN:  Objection.  Calls for speculation.

THE WITNESS:  Yes.

Q.   BY MS. ZIELINSKI:  Okay.  So the conduct did not eliminate higher-paying job opportunities available to class members; correct?

MS. CHAN:  Objection.  Misstates prior testimony.  Vague and ambiguous.  Compound.  Calls for speculation.

THE WITNESS:  Yeah.  The issue, again, is that there would be fewer such job opportunities because of the restrictions put in place.

Q.   BY MS. ZIELINSKI:  And, again, you haven't quantified what -- how many fewer you believe there to be; correct?

MS. CHAN:  Sorry.  Let me just -- Okay.

THE WITNESS:  No, I haven't quantified it.

Q.   BY MS. ZIELINSKI:  And you don't even know if it in fact is the case that there were fewer opportunities; correct?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN:  Objection.  Misstates prior testimony.  Compound.  Vague and ambiguous.

THE WITNESS:  I don't have -- I didn't quantify it as a -- As I said, again, if you restrict the amount of proactive recruiting that can be done; we know proactive recruiting -- again, the Federal Reserve study concludes that over 75 percent of job switchers are proactively recruited.  And, again, as I said earlier, it's not necessarily that you have a lot of good outside offers rolling in; so even missing out on one outside offer that would have been a great offer is a negative outcome for the employees that miss out on those.  And then, as the report says, that negative effect can cascade, will typically cascade, through -- through a system.

Q.   BY MS. ZIELINSKI:  But, again, you haven't shown that there were in fact fewer offers; correct?

A.   I did not.

MS. CHAN:  Objection.  Vague and ambiguous.  Misstates prior testimony.

THE WITNESS:  I did not quantify it.

MS. ZIELINSKI:  Can we take a break?

THE VIDEOGRAPHER:  We're off the record.  The time is 1:32 p.m.

(Recess.)

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE VIDEOGRAPHER:  We're back on the record. The time is 1:58 p.m.

This marks the beginning of video 4, volume 1, in the continuing deposition of Barry Gerhart, Ph.D.

Q.   BY MS. ZIELINSKI:  Dr. Gerhart, just to make sure I understand some of the opinions we talked about earlier:  You are not offering an opinion that the defendants actually did agree to fix wages; correct?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for a legal conclusion.  Calls for speculation.

THE WITNESS:  My main focus would be on the likely consequences of sharing competitively sensitive information.

Q.   BY MS. ZIELINSKI:  So that's a no; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I think it would be:  No, I'm not trying to make a legal determination.

Q.   BY MS. ZIELINSKI:  Well -- Well, and you're also just not offering an expert opinion?

A.   I'm not offering -- yeah.

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah.

Q.   BY MS. ZIELINSKI:  Yes, you're not offering -- Just to make sure the record's clear --

Barry Gerhart, Ph. D. Confidential
March 05, 2025

pay-related information was not what I would expect to see.

Q.   BY MS. ZIELINSKI:  And you just described recommended ways in which companies obtain information.

Where do those recommendations come from?

A.   Certainly part of it is just observing the kinds of surveys companies typically rely on, which would fit what I just described as the more typical approach.

Q.   So it's your -- So based on your -- Strike that.

Going back to the question I asked before: My understanding of the opinions that you are offering in this case, based on your previous testimony, was that information -- the alleged information sharing likely would lead -- likely would suppress compensation, not that it actually did.

Am I understanding that correctly?

A.   Yes.

MS. ZIELINSKI:  Okay.

(Reporter request.)

Q.   BY MS. ZIELINSKI:  Because you're not offering an opinion on whether the alleged information sharing actually lowered class pay, you're also not

Barry Gerhart, Ph. D. Confidential
March 05, 2025

offering an opinion on whether the information sharing

actually had anti-competitive impact; correct?

MS. CHAN:  Objection.  Misstates prior

testimony.  Vague and ambiguous.

THE WITNESS:  My opinion would be --

MS. CHAN:  Compound.  Sorry.

THE WITNESS:  Yeah.  My opinion would be

that I do not see how it would help foster competition

in the labor market.

Q.    BY MS. ZIELINSKI:  Okay.  But you're not

offering an opinion that the information sharing

actually had an anti-competitive impact; correct?

MS. CHAN:  Objection.  Misstates prior

testimony.  Asked and answered.  Vague and ambiguous.

Compound.

THE WITNESS:  I -- I think, as you said

before, I would say it had a likely impact, but I

don't have it quantified.

Q.    BY MS. ZIELINSKI:  Okay.  And just to --

just to clarify that last piece that you said:  It's

true that you performed no quantitative analysis of

the effects or likely effects of the alleged

information exchanges; correct?

A.    Correct.

Q.    Okay.  Let's go to page 194 of your report.

It's paragraph 149.

All right.  And that -- Are you there?

A.    Yes, I am.

Q.    On page 194?

A.    Yes.

Q.    Okay.  Paragraph 149 says:  "As above in this section, I opine that, pursuant to common evidence" -- and I'm going to skip down after the parentheses -- "that coordination on compensation for a subset of job titles would likely cascade to the rest of the class even if defendants did not coordinate on compensation for every single job title. If they successfully coordinated to suppress the compensation of some positions, that would spread widely to other employees as well."

Do you see that?

A.    I see it.

Q.    Are you offering an opinion on which subset of jobs defendants coordinated compensation for?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  No, not a subset of the class.

Q.    BY MS. ZIELINSKI:  Okay.  So you don't have -- you do not have an opinion on which subset of jobs that you're referring to, that's being referred to in

THE WITNESS:  Yeah, that's -- I'd actually have to think through that.

So if there was one year where wages were suppressed, then, as I said, I think those effects could be lasting.

And then I'd have to think through, well, would -- if the -- if the same amount of suppression took place the following year, would it be additive or not?  And I would just have to have more time to think through that.

Q.   BY MS. ZIELINSKI:  Would your opinion change if the last information exchange between SCA and DaVita was in 2013?

MS. CHAN:  Objection.  Incomplete hypothetical.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  Yeah, I would go back to:  One year could have a lasting effect on suppressing wages.  And, I mean, on the face of it, it seems logical that, if it was done in more years, it would have a bigger effect; but I'd kind of have to, as I've said, think about are those effects additive each year or is there some other relationship between the years?  So that's about -- that's what I can offer at this point.

Q.   BY MS. ZIELINSKI:  So the number of times

Barry Gerhart, Ph. D. Confidential
March 05, 2025

that information -- merit pool information was exchanged between a company would be relevant to the degree of -- the likely degree of compensation suppression; is that right?

MS. CHAN: Objection. Vague and ambiguous. Incomplete hypothetical. Calls for speculation.

THE WITNESS: Possibly. Again, I'd have -- I'd have to think through it; but, yeah, possibly.

Q. BY MS. ZIELINSKI: And if there were fewer exchanges of information, you'd expect to see less of an impact; is that right?

MS. CHAN: Objection. Incomplete hypothetical. Calls for speculation. Vague and ambiguous.

THE WITNESS: Yeah, again, I'd have to think through it; but possibly.

Q. BY MS. ZIELINSKI: Did you -- Let me say it this way: It's correct that you've not formed an opinion as to whether DaVita and SCA ever actually agreed to the same merit percentage in any given year; correct?

A. Agreed. I don't recall there being direct evidence of agreement and coordination; just the opportunity.

Q. Did you ever look at whether DaVita or SCA's

planned merit increase changed following any exchanges of merit pool information?

A. I don't believe there is -- there's anything in the report that speaks directly to that.

Q. You have not seen any evidence of sharing wage information between USPI and DaVita; correct?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: Again, I would refer back to whatever is in the report on that.

Q. BY MS. ZIELINSKI: Okay. And if there's not -- If you haven't written any examples or identified any examples of sharing wage information between USPI and DaVita in your report, then we can conclude you did not see such evidence; correct?

MS. CHAN: Objection. Vague and ambiguous.

And I'm going to instruct the witness not to answer to the extent that this question is asking for attorney/expert privileged protected communications and work product; but if you can answer outside of that, go ahead.

THE WITNESS: Yeah. What I -- What I can say is: If it's not in the report, then I didn't rely on it. I wouldn't -- There's always the possibility of realizing that there's something out there relevant that was not included.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  Okay.  Would it impact your opinions if at trial it were proven that USPI and DaVita did not exchange compensation-related information?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for a legal conclusion.  Calls for speculation.

THE WITNESS:  So, again, my -- my charge is to gauge what the likely consequences are of exchange of information.  I don't think it's my main charge is to establish whether there was exchange that wouldn't be acceptable from a legal standpoint; so, again, I'm focusing on the consequences where there were exchanges.

Q.   BY MS. ZIELINSKI:  But would -- But if it were proven that USPI and DaVita did not exchange compensation-related information, would that change your opinion about the consequences?  Would it change your opinions about the likelihood of suppressing compensation?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for a legal conclusion.  Incomplete hypothetical.

THE WITNESS:  Yeah, I -- Well, I would be interested to see such evidence, but I'd have to see what it was exactly to know.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

not fair.

And, as I think we saw, there's quite a bit of testimony that the companies placed a high value on making sure -- whatever term they used, it was basically internal equity -- they talked about pay being appropriate, pay being fair, pay being equitable. So that's -- I would start with that element, the internal equity within a similar role.

And then you mentioned -- I'm sorry. I think you mentioned different pay levels and -- You didn't mention different pay levels? I thought you did.

Q. BY MS. ZIELINSKI: Oh, I see job levels.

A. Okay. So different job levels, which would be different pay levels.

And one place to start would be if you look at -- World at Work does a couple pay surveys regularly about how people -- how companies design their pay systems, and one of the parameters they -- they survey is midpoint progression, which is the percentage difference between, say, a pay grade midpoint and the pay grade midpoint at the next level, the pay grade midpoint below that, and they -- they -- they have targets that they -- that they try to adhere to on what the differentials in pay are between pay

levels.

So, to the extent they're doing that, if at one pay level somebody uses an outside offer to leverage higher pay and that affects the pay of other people in that role and pay level, then to maintain the differential between that level and the next level, the next level would have to go up. And if you're -- if you're -- if somebody's reporting to you and their pay is getting closer to yours, you may not believe that is fair.

So that would be another aspect of internal equity, and I'll just -- I'll pause there for now.

Q. BY MS. ZIELINSKI: And this -- this cascading effect that you just described, those are the class members who you say were indirectly affected by the alleged conduct; is that correct?

MS. CHAN: Objection. Compound. Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS: I think that's the word I used, and, again, with caveats that "indirect" doesn't mean less important.

Q. BY MS. ZIELINSKI: Sure. And you agree -- you would agree with me that the vast majority of the proposed class members are going to fall into that indirect bucket as opposed to the direct bucket?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN: Objection. Vague and ambiguous. Compound.

Q. BY MS. ZIELINSKI: I'll rephrase my question.

You would agree with me that the vast majority of the proposed class members are going to fall into that indirect bucket; correct?

MS. CHAN: Objection. Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS: Well, that's an interesting question. I guess it would depend on how many people would have gotten cold-called and gotten outside offers. And so if it was a larger percentage of people, then the direct effects would be -- would get bigger; and then the indirect effects, I guess, would also be expected to be bigger because there'd be even more pressure for wages to rise.

So, yeah, it's -- I -- it's possible that -- that most people could have the so-called indirect effects, but it's not -- I don't know that it's necessarily true.

Q. BY MS. ZIELINSKI: Okay. You haven't conducted an analysis to determine that one way or the other; correct?

MS. CHAN: Objection. Vague and ambiguous.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS:  Yeah, I have not quantified that.

Q.   BY MS. ZIELINSKI:  Let's turn to page 182.

And you conclude here that defendants' employees would experience cascading effects.

Do you see that?

A.   Where on 182?  Oh, down at the bottom?

Q.   Oh, I'm sorry.  Yep.

A.   Yep.

Q.   Okay.  And in the paragraphs that follow, you describe your methodology for arriving at this conclusion; correct?

MS. CHAN:  So I'm going to just object that there are many pages of paragraphs that follow; so this is compound, and perhaps the witness should have the opportunity to review those paragraphs.

Q.   BY MS. ZIELINSKI:  Well, actually, let me just refer you to the rest of 148.

You say, after the heading, that "defendants' documents indicate that top-down salary structures would cause across-the-board cascading effects."

Correct?

A.   That's what -- That's the way I read it, yes.

Q.   Okay.  And, in order to determine -- to reach your opinion that there would be cascading effects, you base that opinion on defendants' documents; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  The opinion is based on how compensation systems work in the vast majority of companies.  And then I think we have testimony consistent with that, especially around things like -- or, for example, around things like internal equity being a focus in these companies.

Q.   BY MS. ZIELINSKI:  You didn't conduct any empirical analysis of defendants' employees' pay to determine whether there were such cascading effects; correct?

MS. CHAN:  Vague and ambiguous.

THE WITNESS:  I think that's correct, I did not quantify it.

Q.   BY MS. ZIELINSKI:  You're -- You're aware that data reflecting defendants' employees' pay was produced in this case; correct?

MS. CHAN:  Hold on.  I'm going to instruct the witness not to answer to the extent that this question is asking about attorney/expert communications or work product upon which the expert

Barry Gerhart, Ph. D. Confidential
March 05, 2025

did not rely.

Apart from that, you can answer.

THE WITNESS:  Yeah, I didn't rely on those data.

Q.   BY MS. ZIELINSKI:  If that data was produced in this case, you could have performed an analysis to confirm whether these cascading effects that you talk about in fact existed within defendants' pay structures; correct?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  Are you asking me if I would be -- I'm not sure what you mean.  Like if I --

Q.   BY MS. ZIELINSKI:  The point -- Sorry.

A.   Go ahead.  Yeah.

Q.   The point is that I'm asking whether, based on data, the opinions -- the opinions you formed about the cascading effects within defendants' pay systems could have been confirmed?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  Those -- I mean, if the right data were available, that could be relevant, yes.

Q.   BY MS. ZIELINSKI:  Okay.  It can be verified whether or not defendants indeed had pay structures

Barry Gerhart, Ph. D. Confidential
March 05, 2025

that led to cascading effects, if you had their pay data; correct?

MS. CHAN: Objection. Misstates prior testimony. Compound. Vague and ambiguous.

THE WITNESS: So I guess I would go back to that if you don't -- if you're not able to observe what the pay structures were without the alleged agreement and sharing of information, you have some challenges in doing a study, but the quantitative data should provide some information.

Q. BY MS. ZIELINSKI: Well, isn't this opinion that you're offering irrespective of the alleged conduct?

MS. CHAN: Objection. Misstates prior testimony.

Q. BY MS. ZIELINSKI: In other words --

(Cross talk.)

MS. ZIELINSKI: I'm sorry.

THE WITNESS: Oh, I see.

Q. BY MS. ZIELINSKI: In other words, your opinion here is with respect to the rigidity of the pay structure?

You're not opining that the pay structure has changed --

A. Yeah.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   -- as a result of the conduct; correct?

MS. CHAN:  Objection.  Misstates prior testimony.  Vague and ambiguous.  Compound.

THE WITNESS:  I think if it's -- I wouldn't call it rigid; but if there's a systematic pay structure, then I would expect cascading effects.

Q.   BY MS. ZIELINSKI:  And whether or not a compensation structure causes cascading effects can be verified by analyzing actual pay data; correct?

MS. CHAN:  Objection.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  It would -- It seems like it could be relevant.

Q.   BY MS. ZIELINSKI:  But -- But you didn't conduct that analysis; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I did not.

Q.   BY MS. ZIELINSKI:  So just so I understand what you would expect to see if a -- with a -- in a compensation structure that has cascading effects, I want to understand what you'd expect to see in -- Sorry.  Scratch that.  So let me say it a different way.

Is it your opinion that, because of defendants' compensation systems, you'd expect to see

that changes for pay in one seniority level of employees in the job hierarchy would cause changes in pay for other employees at a different seniority level in the job hierarchy?

A.    That's --

MS. CHAN:  Objection.  Vague and ambiguous. You may answer.

THE WITNESS:  That's one effect in a systematic pay system.

Q.    BY MS. ZIELINSKI:  Okay.  Is it your opinion that, because of defendants' compensation systems, you'd expect to see that a change in pay for employees in one job category would also likely cause changes in pay for employees in another job category?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I'd have to know more about the categories; but it's -- yes, that is also -- that's another effect.

Q.    BY MS. ZIELINSKI:  Okay.  How much overlap must there be between the jobs of the first employee whose pay was impacted and the job titles of other employees in order to also see an impact?

MS. CHAN:  Objection.  Compound.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  So in the case of -- So

possible that class members who negotiated their pay were able to negotiate a salary that would have offset or been uneffected by the alleged suppression of compensation; correct?

MS. CHAN:  Objection.  Misstates prior testimony.  Asked and answered.  Vague and ambiguous.  Compound.

THE WITNESS:  I believe the effect would be negative for the class of not -- of not having full opportunity to get outside offers from everywhere.

Q.   BY MS. ZIELINSKI:  But you would agree with me that it's possible that there were some class members who were not harmed; correct?

MS. CHAN:  Objection.  Asked and answered.  Misstates prior testimony.  Vague and ambiguous.  Compound.  And calls for a legal conclusion.

THE WITNESS:  Again, I'm -- I'm focused on the class, and I just don't see any advantage.  And I see a disadvantage to all members of the class if they're restricted from getting offers that they would have otherwise received.

MS. ZIELINSKI:  Okay.

MS. CHAN:  Oh, sorry.  Sorry.  Before you ask the question, I just wanted to note that we've been going for over an hour; so, whenever you're

Barry Gerhart, Ph. D. Confidential
March 05, 2025

ready, it would be great to take a break.

MS. ZIELINSKI: Okay. I want to get through just one more topic before we take a break.

Q. BY MS. ZIELINSKI: All right. Let's turn to page 103.

So I want to talk about the features that are necessary to have a structured compensation system that would likely cause class-wide impact.

So, I guess, before we refer to the language in your report: What -- What are those features?

A. I would say that you make pay decisions in a systematic way, and a big part of that is internal equity, which, again, is one -- one component of it is that people in a similar role, similar performance, would get paid similarly.

And I think we talked about the other parts of a systematic compensation system. I mean, the key is that people's pay, even not in that same role that I was talking about, same role, same performance, pay of employees is linked in other ways such that, in a system, when one part of the system changes, it cascades to have other effects in the system.

And there's other things that I have in the report about the merit increase budget and how that typically applies the same to different employees,

Barry Gerhart, Ph. D. Confidential
March 05, 2025

different levels, different roles, and so forth, so...

And managing, auditing, looking to make sure there's

as few exceptions as possible to internal equity,

again, which is -- seems to be embraced as an

important goal in these companies, like in most

companies.

    Q.  BY MS. ZIELINSKI:  Okay.  And let's look at

paragraph 93 and the second sentence.

        It says:  "I also review evidence showing

that this included assigning internal value to jobs,

creating salary grades and ranges, benchmarking

internal structures to external data, implementing pay

policies, and regular updating the compensation

structure, among other practices."

        Do you see that?

    A.  I see it.

        MS. CHAN:  And, for clarity, that's the

third sentence.

        MS. ZIELINSKI:  Thank you.

    Q.  BY MS. ZIELINSKI:  Are these features that

you claim are necessary to make a compensation system

structured?

        MS. CHAN:  Objection.  Compound.  Misstates

the testimony.

        You can answer.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS: I think what I would say is these are sufficient but not necessary.

Q. BY MS. ZIELINSKI: Are any of these features necessary?

A. I think assigning an internal value to jobs is necessary.

Q. Okay.

A. Part of it comes down to how formalized it is, but it doesn't need to be formalized. So if you are -- You can have a formalized -- formalized grades and ranges, but the same purpose is served by if you're -- if, when you decide what to pay an individual, you ask for data on what the pay of other people is and that, and you ask for the 25th percentile and the 75th percentile of pay in that role. And so it could be served in a variety of ways, but it gets you to the same place.

The benchmarking, I think, has -- has to be done in some way. It's sort of hard to function without knowing how your pay and labor costs compare to the companies that -- that you choose to compare yourself to.

And regularly updating the compensation structure, that involves -- that could involve a number of things. One is the merit increase budget,

which leads to changes in the level of the compensation structure.

So that's -- those are my thoughts on that, on 93.

Q. BY MS. ZIELINSKI: Okay. So what -- when we talk about creating a job structure, would you agree with me that, in order to have a compensation structure, there needs to be more than just grouping into job families with job descriptions; correct?

MS. CHAN: Objection. Compound. Vague and ambiguous. Incomplete hypothetical.

THE WITNESS: Well, you need to -- as one step, you need to group together work that's -- that requires -- that's a similar role and have a general -- a general decision about what you're going to pay that role, and then you differentiate within that based on performance contributions.

Q. BY MS. ZIELINSKI: And the jobs also need to be ordered in terms of worth with salary ranges; correct?

MS. CHAN: Objection. Compound. Vague and ambiguous. Incomplete hypothetical.

THE WITNESS: Well, they need to be ordered in some way. They can be ordered in different ways. So, I mean, a CEO gets paid more than the COO, who

Barry Gerhart, Ph. D. Confidential
March 05, 2025

STATE OF CALIFORNIA     )
                        )  SS.
COUNTY OF SAN FRANCISCO )

    I, MARILYNN HOOVER, CSR No. 8841 for the State of California, do hereby certify:

    That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

    That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced by me to typewritten form; and that the same is a true, correct, and complete transcript of the said proceedings.

    Before completion of the deposition, review of the transcript [ ] was [X] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed shall be appended hereto.

    I further certify that I am not interested in the outcome of the action.

    Witness my hand this 8th day of March 2025.


_____

                    Marilynn Hoover, RPR

                    California CSR No. 8841

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Docket No. 1:21-cv-00305 |


HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

VIDEO-RECORDED REBUTTAL DEPOSITION OF

BARRY GERHART, Ph.D., VOLUME II

THURSDAY, JULY 10, 2025

SAN FRANCISCO, CALIFORNIA


Reported by:   Marilynn Hoover, RPR

California CSR No. 8841

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

BE IT REMEMBERED THAT, pursuant to the Federal

Rules of Civil Procedure, the video deposition of

BARRY GERHART, Ph.D., was taken before Marilynn

Hoover, California CSR No. 8841; on Thursday, July 10,

2025, at 9:04 a.m.; located at 275 Battery Street,

29th Floor, in San Francisco, California.

                    APPEARANCES

ON BEHALF OF PLAINTIFFS:

    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

    BY MS. SARAH D. ZANDI, ESQ.

    275 Battery Street, 29th Floor

    San Francisco, California 94111-3339

    Telephone:  415-956-1000

    E-mail:  SZandi@lchb.com


    JOSEPH SAVERI LAW FIRM, LLP

    BY MR. JOSEPH RICHARD SAVERI, ESQ.

        MR. DAVID SEIDEL, ESQ.

    601 California Street, Suite 1505

    San Francisco, California 94108

    Telephone:  415-500-6800

    E-mail:  JSaveri@saverilawfirm.com

             DSeidel@saverilawfirm.com

ON BEHALF OF UNITED SURGICAL PARTNERS HOLDINGS

INC., UNITED SURGICAL PARTNERS INTERNATIONAL INC.,

AND TENET HEALTHCARE CORPORATION:

KING & SPALDING, LLP

BY MR. CONNOR BREWER, ESQ.

1401 Lawrence Street, Suite 1900

Denver, Colorado 80202

Telephone:  713-751-3254

E-mail:  CBrewer@kslaw.com


KING & SPALDING, LLP

BY MS. DIANA LIU, ESQ.

MR. MATTHEW H. DAWSON, ESQ.

50 California Street, Suite 3300

San Francisco, California 94111

Telephone:  415-318-1203

E-mail:  DLiu@kslaw.com

MDawson@kslaw.com


KING & SPALDING, LLP

BY MS. VERONICA MOYE, ESQ.

2601 Olive Street, Suite 2300

Dallas, Texas 75201

Telephone:  214-764-4418

E-mail:  VMoye@kslaw.com

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

ON BEHALF OF DEFENDANT DAVITA INC.:

    MORGAN LEWIS & BOCKIUS, LLP

    BY MR. KENNETH M. KLIEBARD, ESQ.

        MR. JASON L. CHRESTIONSON, ESQ.

    110 North Wacker Drive

    Chicago, Illinois 60606

    Telephone:  312-324-1774

    E-mail:  Kenneth.Kliebard@morganlewis.com

            Jason.Chrestionson@morganlewis.com


    MORGAN LEWIS & BOCKIUS, LLP

    BY MS. MOLLY MORIARTY LANE, ESQ.

    One Market Street, Spear Street Tower

    San Francisco, California 94105-1596

    Telephone:  415-442-1000

    E-mail:  Molly.Lane@morganlewis.com


    MORGAN LEWIS & BOCKIUS, LLP

    BY MR. NATHAN T. SHAPIRO, ESQ.

    101 Park Avenue

    New York, New York 10178

    Telephone:  212-309-6796

    E-mail:  Nathan.Shapiro@morganlewis.com

MORGAN LEWIS & BOCKIUS, LLP

BY MR. J. CLAYTON EVERETT JR., ESQ.

1111 Pennsylvania Avenue N.W.

Washington, D.C. 20004

Telephone: 202-739-5860

E-mail: Clay.Everett@morganlewis.com


ON BEHALF OF DEFENDANTS SURGICAL CARE

AFFILIATES LLC AND SCAI HOLDINGS LLC:

McGUIRE WOODS, LLP

BY MS. SARAH ZIELINSKI, ESQ.

MS. AMY B. MANNING, ESQ.

77 West Wacker Drive, Suite 4100

Chicago, Illinois 60601-7567

Telephone: 312-849-8288; 312-750-8904

E-mail: SZielinski@mcguirewoods.com

AManning@mcguirewoods.com


McGUIRE WOODS, LLP

BY MR. JOSHUA D. WADE, ESQ.

800 East Canal Street

Richmond, Virginia 23219

Telephone: 804-775-1622

E-mail: JWade@mcguirewoods.com

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

ON BEHALF OF ANDREW HAYEK:

    WILSON SONSINI GOODRICH & ROSATI, P.C.

    BY MS. JORDANNE M. STEINER, ESQ.

    1700 K Street N.W., Fifth Floor

    Washington, D.C. 20006

    Telephone:  212-497-7761

    Email:  JSteiner@wsgr.com


ON BEHALF OF KENT THIRY:

    McDERMOTT WILL & EMERY, LLP

    BY MS. CHELSEA MOUNAYER, ESQ.

    444 West Lake Street

    Chicago, Illinois 60606

    Telephone:  312-984-2165

    E-mail:  KMounayer@mwe.com


ALSO PRESENT:  Daniel Stroud, videographer

                Zach Czerenda, concierge

                Michele Carter,  Cornerstone Research

                Wendy Petropoulos, Cornerstone Research

                Sebastian Macek, Cornerstone Research

                Melissa Lou, DaVita in-house counsel

                Andrew Mohraz, DaVita in-house counsel

                Peter Shakow, Optum in-house counsel

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

EXAMINATION INDEX

                                                          PAGE

Examination by Ms. Zielinski                              316

Examination by Mr. Kliebard                               524

Examination by Mr. Seidel                                 534

* * *

EXHIBIT INDEX

EXHIBIT NO.    DESCRIPTION                               PAGE

Exhibit DX84   Rebuttal expert witness report

               of Dr. Barry Gerhart                       318

Exhibit DX85   Updated rebuttal expert witness

               report of Dr. Barry Gerhart                322

Exhibit DX86   The State of the Labor Market

               Competition                                346

Exhibit DX87   Article:  Inter-industry labor flows  397

Exhibit DX88   Expert report of Justin McCrary,

               Ph.D. (highly confidential, outside

               counsel/experts only)                      404

Exhibit DX89   Determinants of gender differences

               in change in pay among job-switching

               executives                                 443

EXHIBITS PREVIOUSLY MARKED

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit PX36 | E-mail string (confidential); Bates numbers SCA000540405 to 000540411 | 530 |
| Exhibit DX81 | Expert witness report of Dr. Barry Gerhart | 442 |

THURSDAY, JULY 10, 2025; SAN FRANCISCO, CALIFORNIA

THE VIDEOGRAPHER: Good morning, ladies and gentlemen. We're on video record.

The time is 9:04 a.m. Today's date is July 10th, 2025.

This marks the beginning of video 1, volume 2, in the continuing deposition of Barry Gerhart, Ph.D., in the case In Re Outpatient Medical Center, et al., appearing before the United States District Court for the Northern District of Illinois, Eastern Division; case number 1:21-cv-00305.

We're located in person today at 275 Battery Street, San Francisco, California.

Would all counsel in the room please identify themselves for the record.

MR. SEIDEL: Good morning. David Seidel with the Joseph Saveri Law Firm, on behalf of the plaintiffs.

MS. ZANDI: Sarah Zandi, Lieff Cabraser Heimann & Bernstein, on behalf of plaintiffs.

MR. SAVERI: Joseph Saveri on behalf of the plaintiffs.

MS. ZIELINSKI: Sarah Zielinski, McGuire Woods, on behalf of the SCA defendants.

MR. WADE: Joshua Wade, also of McGuire

Woods, for the SCA defendants.

MS. CARTER:  Michele Carter, Cornerstone Research, on behalf of defendants.

MR. DAWSON:  Matthew Dawson, King & Spalding, on behalf of USPI.

MS. LIU:  Diana Liu, also King & Spalding, on behalf of the defendants.

MR. KLIEBARD:  Good morning.  Ken Kliebard, Morgan Lewis, on behalf of DaVita.

MS. LANE:  Molly Lane, appearing on behalf of DaVita, from Morgan Lewis.

MS. LOU:  Melissa Lou, in-house counsel for DaVita.

THE VIDEOGRAPHER:  And would those joining by Zoom please identify themselves for the record.

MS. MOYE:  Good morning.  Veronica Moye, King & Spalding, for USPI.

MS. MANNING:  Good morning.  Amy Manning, McGuire Woods, for SCA.

MS. MOUNAYER:  Good morning.  Chelsea Mounayer, McDermott Will & Emery, for defendant Thiry.

MS. STEINER:  Good morning.  Jordanne Steiner, Wilson Sonsini Goodrich & Rosati, for defendant Andrew Hayek.

MR. SHAPIRO:  Good morning.  Nathan Shapiro,

Morgan Lewis, on behalf of DaVita.

MR. CHRESTIONSON:  Good morning.  Jason Chrestionson, Morgan Lewis, also on behalf of DaVita.

MR. MOHRAZ:  Andrew Mohraz with DaVita.

MR. BREWER:  Connor Brewer, King & Spalding, USPI.

MS. PETROPOULOS:  Wendy Petropoulos, Cornerstone Research.

THE VIDEOGRAPHER:  Go for it.

MR. SAVERI:  Is that everybody?

THE STENOGRAPHIC REPORTER:  Yes, to my knowledge, that's everyone.

MR. SAVERI:  Thank you.

THE VIDEOGRAPHER:  You may swear in the witness.

THE STENOGRAPHIC REPORTER:  Good morning.

My name is Marilynn Hoover.  I am a California certified shorthand reporter and my license number is 8841.  Thank you.

--o0o--

BARRY GERHART, Ph.D., called as a witness, being duly sworn on oath by the stenographic reporter, was examined and did testify as follows:

--o0o--

you what's been marked Exhibit 84.

And is that a true and correct copy of the report that you submitted on May 30th, 2025?

And if you need to look at the...

A.   So this is --

THE CONCIERGE:  Which tab is this?

MR. WADE:  This is tab 2.

THE WITNESS:  This is the second rebuttal submission, the third.

Q.   BY MS. ZIELINSKI:  Actually, this would -- this should be the first rebuttal submission from May 30th, 2025.  And if you want to look at the date --

A.   Oh, okay.

Q.   -- of this, you can refer to page 179?

A.   I believe it is as you described it.

Q.   Okay.  And did you personally draft that report?

A.   It's my report.  Everything in the report is there at my direction.

Q.   Okay.  And did you personally draft it, or did you have assistance drafting it?

A.   I think just what I said:  Everything in here has been at my direction.  It's my report.  I stand by it.

Q.   How much time did you spend working on your report?

A.   I haven't separated my time out by different tasks.  I just try to keep a running total.

Q.   Okay.  What's your running total thus far for this matter?

A.   I don't know what it is exactly.  I know for sure it's well over a hundred hours, but I'm not sure beyond that.

Q.   Okay.  So, since the last time you were deposed -- or during your last deposition, you've said that you had spent 50 hours working on this matter, as of that point in time.

A.   Yeah.

Q.   Do you recall that?

A.   That sounds about right.

Q.   Okay.  And as of right now, you've spent at least an additional 50 hours working on this matter; is that correct?

A.   Yes.

Q.   Okay.  Can you -- And are you -- are you able to be any more specific than an additional 50 hours?

A.   No.  Like I said, I just try to of course track my time.

Q.    Okay.

A.    Yeah.

Q.    Did anyone assist you in drafting that report, defendants' Exhibit 84?

A.    It's my report and everything in here is at my direction.

Q.    Did you have a team of people reporting to you, to assist you with your report?

A.    A team of people reporting to me?  No.

Q.    Okay.  Other than attorneys involved in this case, you didn't have any assistance with the report; correct?

A.    I didn't work with anybody but counsel.

Q.    Okay.  Got it.

A.    Well, there was some data that I looked at; but I asked counsel how I could get the data, and they connected me to -- I think it's Econ One.  That's all I can think of.

Q.    Okay.  And who -- what is Econ One?

A.    I don't honestly know.  I just -- I -- I guess they do some work to provide data.  They're good with spreadsheets.  So I needed a spreadsheet with some data, to do some simple arithmetic.

Q.    And what data -- what data was compiled by Econ One?

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.   So I don't -- There's -- There's a figure with plotting; I think it's mean salary over time, by company and by director.  And so they gave me the mean salaries.

Q.   Okay.

A.   They also gave me -- I was trying to look at one of the charts from one of the defense experts and probably, I think, Saravia.  And I couldn't quite tell what the numbers were from the chart.  So they also got the numbers underlying her chart, that they provided to me.

Q.   And was Econ One retained by you or by your counsel?

MR. SEIDEL:  I'm going to caution the witness:  You can answer the question to the extent you can without divulging any communications with us or with -- or with them.

THE WITNESS:  I didn't know about them.  I just asked how I could get the data I just described, and they connected me to Econ One.

MS. ZIELINSKI:  Okay.  All right.  Can I have defendants' Exhibit 85.

(Exhibit DX85 marked.)

Q.   BY MS. ZIELINSKI:  All right.  I am handing you what has been marked defendants' Exhibit 85, and

my question is:  Is that a true and correct copy of the rebuttal report that you submitted on June 30th, 2025?

THE CONCIERGE:  Is that tab 3.

MR. WADE:  Yes, this is tab 3.

THE WITNESS:  Yes, it looks like it is.

Q.  BY MS. ZIELINSKI:  Okay.  And did you personally draft -- did you personally draft this report?

A.  It's my report.  Everything in it is at my direction.

Q.  How much time did you personally spend working on this report?

A.  I don't know.

Q.  Okay.  Fair to say that the time that you spent working on this report is part of the additional 50 hours that you testified to before?

A.  Well, actually, I don't think I said 50 hours.  I just said my total time so far is over a hundred.

I'm sorry.  What was the question again?

Q.  The -- Right.  And, but you also testified that, as of the last deposition, you had spent 50 hours.

A.  Um-hum.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

Q.   Correct?

MR. SEIDEL:  Objection.  Mischaracterizes.

THE WITNESS:  Yes.  Last time, I think that's right.  I think that I estimated I'd spent at least 50, and now I'm pretty sure I've spent at least -- I've spent at least a hundred.  I don't know beyond that.

Q.   BY MS. ZIELINSKI:  Okay.  And the time that you spent working on defendants' Exhibit 85, your June 30th, 2025, rebuttal report, is included in that estimate of over a hundred hours; correct?

A.   Yes.

Q.   Same questions as before:  Did anyone -- Setting aside counsel, did anyone assist you in drafting this report?

A.   No.

Q.   Okay.  And did you -- You reviewed and approved this report before it was submitted?

A.   It's my report.

Q.   That's a yes?

A.   Yes.

Q.   Okay.  And are the three reports submitted a complete statement of your opinions in this case?

A.   Yes.  That's my intent, yes.

Q.   Okay.  As you sit here right now, there

isn't any opinion that you intend to offer that's not included in one of these reports; correct?

A.   I believe that's correct; but, as I read and think about things, I obviously come up with different ways of looking at something, so -- but my intent was to be as complete in the report as possible.

Q.   Okay.  And, as you sit here today, there are no changes that you'd like to make to any of your reports or appendices; correct?

A.   Nothing substantive.  I may have come across a few small word errors or something like that --

Q.   Okay.

A.   -- but I don't think -- nothing substantive, that I could think of.

Q.   Okay.  Any specific changes that come to mind?

A.   Not right now, no.

Q.   Okay.  Let's turn to paragraph 1 of the June 30th rebuttal report, defendants' Exhibit 60 -- I'm sorry -- 85.

A.   Paragraph 1.

Q.   Yes.  In that first paragraph, it's the last sentence -- or, I'm sorry, it's the second to last sentence -- you say -- you characterized the June 30th report as an update to your prior rebuttal

report.

Do you see that?

A.    Yes, I see it.

Q.    What do you mean by "an update"?

A.    I think just adding responses to the other two defense experts.

Q.    Okay.  Neither of the two reports we just entered into evidence have an updated résumé for you.

Is it fair to say that your résumé remains the same as what you submitted in your January 2025 report?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I don't -- I don't think there have been any substantive changes.

Q.    BY MS. ZIELINSKI:  Okay.  If there's no --
If there's no updated résumé in your May 30th and June 30th reports, then we should take it that your January 2025 résumé that you submitted is your most up-to-date résumé; correct?

A.    Yeah, I think so.  I might have another publication or two.  Maybe one.  Can't really think of much else that would have changed.

MS. ZIELINSKI:  Okay.

MR. KLIEBARD:  Sorry.  I'm getting a couple of e-mails from people on Zoom that they can't hear

you.  I don't know if you can slide your -- maybe your microphone up.

THE WITNESS:  Yep.

THE VIDEOGRAPHER:  That's not -- They're not connected.

MR. KLIEBARD:  Oh, it's a different microphone?

THE VIDEOGRAPHER:  Yes.  It's probably the system here.

MS. ZANDI:  Maybe if you'd just speak up a little bit.

THE WITNESS:  Yep.

MS. ZIELINSKI:  Okay.

THE WITNESS:  Please feel free to remind me.

MR. KLIEBARD:  Thank you.

Q.    BY MS. ZIELINSKI:  Have you had your deposition taken -- Other than the last deposition, have you had your deposition taken any other times?

A.    No.

Q.    Okay.  And the last time -- in your last deposition, you stated that you provided an expert report in the animators case.

Besides that case and this case, have you been hired as an expert witness in any other matters?

A.    Those are the only reports that I've ever

provided.

Q.   Okay.  Are there other matters where you've been retained but not provided reports?

A.   Yes, but it never got much past a preliminary stage.  Yeah.

Q.   And was that -- were those retentions since the last deposition or prior to that?

A.   Prior.

Q.   Okay.  During your last deposition, we discussed the expertise you were relying on to form your opinions in this case.

Do you recall that?

A.   No.

MR. SEIDEL:  Hold on a second.  Hold on a second.

THE WITNESS:  Uh-huh.  Yeah.

MR. SEIDEL:  Objection to form.  Go ahead.

THE WITNESS:  I'm not sure what you mean.

MS. ZIELINSKI:  Okay.

THE WITNESS:  And I don't recall the conversation exactly.

MS. ZIELINSKI:  Sure.

THE WITNESS:  Yeah.

Q.   BY MS. ZIELINSKI:  In your initial report in this case, you indicated that the expertise you were

relying on to form your opinions in this case was your

expertise in compensation and human resources

management.

          Do you recall that?

     A.    That sounds right.

     Q.    Okay.

     A.    Yeah.

     Q.    And the question is:  You're not relying on

any additional expertise, beyond compensation in human

resources management, to form the opinions in either

of those rebuttal reports; correct?

          MR. SEIDEL:  Objection to form.

          THE WITNESS:  That's how I would describe my

main areas of expertise.

     Q.    BY MS. ZIELINSKI:  Okay.  There's no other

expertise, that we didn't talk about in your prior

deposition, that you're relying on for the opinions in

these supplemental reports; correct?

     A.    Yeah, I think that's probably correct.  It's

just a little hard for me to answer -- because I have

some knowledge of some other areas; but, again, my

primary expertise would be in the areas you described.

     Q.    Okay.  And what I'm asking about is the

expertise that you are relying on to form your

opinions in this case.

And the question is whether you are relying on any expertise beyond the expertise in compensation and human resources management that we discussed at your last deposition.

MR. SEIDEL:  Objection to form.

THE WITNESS:  Again, I would -- I would say those are my primary areas of expertise.

Q.  BY MS. ZIELINSKI:  Okay.  And you're not intending to offer any legal opinions in any of your reports; correct?

A.  That's correct.

Q.  Okay.  When you were deposed on March 5th, you indicated that you had reviewed the report that Dr. Starr submitted in January of this year; is that correct?

A.  That's correct.

Q.  Okay.  Did you rely on any of Dr. Starr's opinions from his January report when forming the opinions in either of your rebuttal reports?

A.  I don't remember explicitly using anything from his report.  I know we -- there's -- I talked about a figure from his report where he looks at -- I think it's moves during different points in time between defendants, and that's mostly because the defendant experts brought that up a lot.  So that, I

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

guess, we relied on.

Is that a sufficient answer?  I mean, that's an example of something that was relied on, I guess.

Q.   Can you think of anything else from Dr. Starr's report that you relied on?

A.   Not -- Not at the moment, I can't.

Q.   Have you reviewed -- Or are you aware that Dr. Starr also submitted rebuttal reports in this case?

A.   I think I'm aware.  If I'm not aware, I would assume he would need to, yeah.

Q.   Okay.  Have you reviewed either of his rebuttal reports?

A.   I have not.

Q.   Did any of Dr. Starr's opinions in his January report cause you to change any of your opinions?

A.   As far as I can remember, no.

Q.   Did reviewing his reports cause you to add to any of your opinions?

MR. SEIDEL:  Objection to form, and mischaracterizes.

THE WITNESS:  As far as I -- I mean, I don't think so; but, anytime I read something, it's possible I find something interesting and go -- like if there

report; correct?

MR. SEIDEL:  Hold on a second.

THE WITNESS:  Yeah.  Yeah.  Yeah.

MR. SEIDEL:  Objection to the form.

THE WITNESS:  Yeah, I believe that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  Meaning that statements made throughout your report, supporting these opinions, are still -- are not intended to augment the opinions beyond what likely happened; correct?

A.   I think that's correct.

Q.   Previously, you testified that you were not offering an opinion on whether defendants actually did collude.

Do you remember that?

MR. SEIDEL:  Objection to form.

THE WITNESS:  That sounds right.

Q.   BY MS. ZIELINSKI:  Okay.  And, likewise, you still are not offering an opinion that defendants actually did collude; correct?

A.   I think that's right.  Obviously, there's evidence in the report that would be relevant; but, yeah, I'm not -- that's not my -- I don't think it's my assignment to offer an opinion on that.  I think my

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

assignment is to say what the likely consequences would be.

Q.   Okay.  And so if -- throughout your report, if you're referencing the defendants' agreements, it's your intention to describe your view of evidence as opposed to offering an opinion that defendants in fact entered into an agreement; is that correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  That sounds correct.

Q.   BY MS. ZIELINSKI:  Okay.  And you also testified in your prior deposition that you were not offering an opinion that defendants entered into an agreement, or agreements, to fix wages.

Do you recall that?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I -- I think that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  And that's also true with your supplemental reports:  You are also not offering an opinion that the defendants agreed to fix wages; correct?

A.   I think that's correct.

Q.   Okay.  So, again, in your report, if you are referring to defendants having an alleged wage-fixing agreement, you are describing your view of evidence as opposed to offering an opinion that the defendants

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

entered into a wage-fixing agreement; correct?

A.    Correct.

MR. SEIDEL:  Object to --

THE WITNESS:  Oh.

MR. SEIDEL:  Objection to form.

No worries.  Go ahead.

THE WITNESS:  Correct.

Q.    BY MS. ZIELINSKI:  You are not offering an opinion that defendants engaged in an overarching conspiracy among all three defendants; correct?

A.    I'm offering no opinion on that.

Q.    Okay.  And you're also not offering any opinion that evidence is consistent with defendants engaging in an overarching conspiracy; correct?

A.    I think that's correct.

Q.    Okay.  You understand that plaintiffs here have alleged that there was an overarching conspiracy among all three defendants?

MR. SEIDEL:  Objection to form.

THE WITNESS:  Yes.

Q.    BY MS. ZIELINSKI:  Okay.  But it's your understanding that whether defendants' conduct constitutes an overarching conspiracy is a question for the jury to answer at trial; right?

MR. SEIDEL:  Objection.  Calls for a legal

conclusion.

THE WITNESS: Well, as far as I understand, yes.

Q. BY MS. ZIELINSKI: Okay. And since it's a question for the jury to answer at trial, it's not your role as an expert witness to answer that question on their behalf; correct?

MR. SEIDEL: Objection to form. Calls for a legal conclusion.

THE WITNESS: I -- I think that's correct.

Q. BY MS. ZIELINSKI: Okay. Let's turn to page 92 of that report.

And here, heading 6 above paragraph 234, you offer the opinion that defendants have market power; correct?

A. Yes.

Q. And you did not offer that opinion in your initial report; correct?

A. I think that's probably correct.

Q. So that's a new opinion that you're offering in rebuttal; correct?

MR. SEIDEL: Objection to form.

THE WITNESS: It's -- It's a new term, yes; and, beyond that, I'm not sure how I would describe it. But, yeah, I don't think we -- I don't think the

term "market power" was in the first one.

Q.   BY MS. ZIELINSKI:  Do you agree that defendants could not have suppressed the compensation of proposed class members without market power?

A.   I'd have to think about that, but -- I think market power is pretty fundamental, but I'd have to think through that.

Q.   Okay.  So you don't have an opinion one way or the other as to whether defendants could have suppressed compensation of proposed class members without market power?

A.   So market power, one aspect of it is employees don't respond to changes in wages, for example, with turnover, as strongly.  So I think, probably, yes -- Oh, sorry.  I actually forgot your question.

But given if employees don't respond to changes in wages as strongly as might have been expected in the past, then that would generally give employers more leeway in where they set their wage.

Q.   Okay.  Let me ask my question again.

Do you agree that defendants could not have suppressed the compensation of proposed class members without market power?

A.   I think that's probably correct.

Q. Okay. What analysis did you conduct that measures the market power of defendants?

A. I'm not -- Do you mean -- Well, what -- what do you mean by "analysis"?

Q. Well, let me -- I guess we'll start with an empirical analysis.

You didn't conduct any empirical analysis showing that defendants had market power; correct?

A. No. I don't think I did anything that would speak to that quantitatively, yes.

Q. Okay. You did not, for example, conduct a hypothetical monopsonist test?

A. No, I don't believe I did.

Q. Okay. You did not define a relevant labor market or markets?

A. No, I did not.

Q. Okay. And you didn't calculate defendants' market shares; correct?

A. Which market share do you refer to?

Q. In the market where you claim they have market power.

MR. SEIDEL: Objection to form.

THE WITNESS: Yeah, I guess I'll say I didn't. There's probably some things I did that are relevant, but I think -- I didn't calculate some

measure of market power explicitly.  I think that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  All right.

So, aside from empirical testing to establish market power, did you conduct any other analysis to measure the defendants' market power?

A.   I don't think directly, no.

Q.   Okay.  You claim that you did not need to define a relevant market to demonstrate market power; correct?

A.   I don't know if I explicitly said that or not, but I -- so I'm not actually sure.

Q.   Okay.  But, regardless, you've not specified what market the -- the market in which the defendants -- the market or markets in which the defendants supposedly had market power; correct?

A.   I don't think there's any explicit definition.  Correct.

Q.   Okay.  And you've not analyzed whether defendants had market power in each of the labor markets in which proposed class members participated; correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I think that's correct.  Yeah.

Q.   BY MS. ZIELINSKI:  Do you have an

understanding of the purpose of defining a relevant market in antitrust cases?

A.    I do not have much knowledge at all of antitrust.

Q.    Okay.  Do you understand that a relevant market is defined by identifying alternatives?

A.    Again, I don't have any expertise in antitrust.

Q.    Okay.  If you don't have expertise in antitrust, how is it that you are able to offer the opinion that defendants have market power from an antitrust perspective?

MR. SEIDEL:  Objection to form.

Objection to the extent it calls for a legal conclusion.

THE WITNESS:  Yeah.  So when I use the term "market power," it's more on the labor side; and that relates to work I've done, over many years, on human resources and compensation, and studying how much variation there is in wages across employers and that sort of thing.

So when I said before that I didn't use the term "market power" before, I feel like I've studied related issues over time but I just -- that wasn't a term that I -- that I used.  There wasn't much reason

for me to use it; but it is helpful to me, now that I'm using it, to have an understanding of how wages vary across employers.

Q.   BY MS. ZIELINSKI:  So, throughout your report, when you use the term "market power," you are not using that term in the sense of antitrust economics but in the sense of labor markets; correct?

MR. SEIDEL:  Object -- I'm sorry.

Objection to form.  Vague.

And object to the extent it calls for a legal conclusion.

THE WITNESS:  Yes.  And I believe I defined it in the report, that -- basically, in the context of employment, defining "market power" as -- I think manning does this -- in terms of the elasticity; so, in other words, how much does something like turnover respond to an increase or decrease in wages.  And, again, if the elasticity isn't as strong as under a standard neoclassical model, then kind of standard labor economics textbooks define that as market power.

Q.   BY MS. ZIELINSKI:  So setting aside antitrust economics, when you assess labor markets, one of the things that is considered is alternative employment opportunities; correct?

MR. SEIDEL:  Objection to form.

on the five-digit, was -- made sense for some purposes.

Q.    Would you still -- So hold on.

So even if it were determined that defendants had less than 1 percent share of employment in the relevant market, would you still offer the opinion that they have market power?

MR. SEIDEL:  Objection to form.

Objection to the extent it calls for a legal conclusion.  Vague.

THE WITNESS:  So, again, the definition of "market power" I'm using is kind of, I think, standard in the labor econ literature; and that is, changes in wages don't lead to as much of a response in employee turnover; and, given that, that gives you some latitude on how high or low to set your wage as an employer.

Q.    BY MS. ZIELINSKI:  So I don't know if you are agreeing, that if you're answering -- whether you're answering yes or no to my question, so I want to pose it again.

Even if it were determined that defendants had less than 1 percent share of employment in the relevant market, would you still offer the opinion that they have market power?

MR. SEIDEL: Objection. Asked and answered.

THE WITNESS: Yeah. So, yes.

MS. ZIELINSKI: This is a good time to take a break.

MR. SEIDEL: Sounds great.

MS. ZIELINSKI: Okay. We'll go off the record.

THE VIDEOGRAPHER: We're off the record. The time is 10:14 a.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:32 a.m.

This marks the beginning of video 2, volume 2, in the continuing deposition of Barry Gerhart, Ph.D.

Q. BY MS. ZIELINSKI: Dr. Gerhart, I'm going to start by asking you a question to clarify some testimony you gave previously.

So, before the break, earlier today, I asked you: "Aside from empirical testing to establish market power, did you conduct any other analysis to measure the defendants' market power?"

And you answered: "I don't think, directly, no."

Do you recall that?

A.   Yes.

Q.   Okay.  And my question is:  Was there any analysis, whether direct or indirect, done to measure the defendants' market power?

A.   Yeah, I guess the answer is probably no.  I was just, I guess, not wanting -- I was just trying to think through what I did and how direct or indirect, if either.

So I think the answer is that a lot of my market power discussion is based on the current literature in mostly labor economics about what market power is and how much there is in the -- in the U.S.

Q.   Okay.  So, setting aside that literature, you did not conduct any analysis to measure the defendants' market power; correct?

A.   I think that's -- that's correct. Obviously, some of the -- Not some.  The allegations about, for instance, no-poach would be relevant to market power, just like noncompetes would be, but...

Q.   But you did not conduct any analysis to measure the defendants' market power; correct?

A.   No, I don't think so.  Yeah, I think that's right.

Q.   Okay.  All right.  Let's look at paragraph 235 of your report, which is at page 94.

And in that paragraph, you include a quote from David Card, that "many or even most firms have some wage-setting power."

Do you see that?

A.    I see it.

Q.    And is it your understanding that Professor Card is saying that almost every employer has some degree of wage-setting power over their employees?

A.    That's the way I read it.

Q.    And that's because of labor market frictions; is that correct?

A.    Yeah, labor market friction is a major factor in market power.

Q.    And labor market frictions are things like imperfect information and job search costs, things like that; correct?

A.    And two-way matching, which one of the defense experts, one or more, spent some time on. But, yeah, I think that's very relevant.

Q.    Okay.  And those frictions exist in almost every labor market; is that right?

A.    That sounds right.  Yeah, I think that's probably right.

Q.    Okay.  Well, is it right or...

A.    I -- I --

Q.    BY MS. ZIELINSKI:  Okay.  Well, let's focus on the "well paid" portion.

A.    Okay.

Q.    You can't assume that non-defendant employment options are less well paid than opportunities with the defendants; correct?

A.    Well, it would depend on a number of things. If in fact defendants were able to suppress wages, then, you know, that's one issue.  But I guess, absent that, would the pay be higher at other defendant companies than what they could get elsewhere?  I think it would be higher if they're a better match and are more productive at the other defendant companies, again, within that five-digit industry.

And, again, presumably, the people -- the reason people are more likely to move within their five-digit industry is they get better jobs for them. And at least some of that would logically be that the pay is better in those jobs; that's why they move to them.

So, yeah, I mean, "match" -- match is about moving to where you're most productive; and where you're more productive, on average, your pay will be higher than if you took a job where you're -- where you're less productive.  So I think it probably does

make sense that moves within that five-digit industry, in general -- not always; in general -- would be associated with higher pay.

Q.   You didn't do any analysis to show that opportunities at defendants would have been higher-paying for class members than opportunities at non-defendant firms; correct?

A.   No, I don't think I did.

Q.   Okay.  And you didn't do any analysis to show that opportunities at defendants would have been more attractive for all class members than opportunities at non-defendant firms; correct?

A.   Did you say "all"?

Q.   Yes.

A.   No, I did not.

Q.   Does it change your answer if I didn't say "all"?

A.   Well --

MR. SEIDEL:  Object -- Hold on.

THE WITNESS:  Oh, sorry.

MR. SEIDEL:  That's okay.  No worries.

Objection to form.

Go ahead.

THE WITNESS:  Yeah, it's just -- I mean, it would -- I'd have to think about it a bit more, yeah.

Q.   BY MS. ZIELINSKI:  Okay.  And you didn't do any analysis to show that opportunities at defendants would have been more attractive for class members than opportunities at non-defendant firms; correct?

A.   I didn't do a quant -- No, I didn't quantify that.

Q.   Okay.  All right.  Let's turn to a page -- oh, wait; let's see -- paragraph 222 on page 114.

Wait.  No.  I think it's 276.  I think it's 276, sorry, page 114.

MR. SEIDEL:  Paragraph 276?

MS. ZIELINSKI:  Yeah.

THE WITNESS:  Okay.  Well, 276 starts on 113?

MS. ZIELINSKI:  Yep.

THE WITNESS:  Okay.

MS. ZIELINSKI:  And then we'll look to --

THE WITNESS:  Yeah.

MS. ZIELINSKI:  -- the top of 114.

THE WITNESS:  Yes.

Q.   BY MS. ZIELINSKI:  Okay.  All right.

At the top line there, the first full sentence, you say:  "We have seen that employer changes within five-digit industries are much, much more likely than moves outside of a five-digit

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

exchanges, there wasn't any end date that we gave, so...

For the no-poach, yeah, 2019 was the end of the class period.

Q.   BY MS. ZIELINSKI:  Okay.  But what -- what I'm getting at here is that the fact that departures were stable during the class period can't tell you that defendants' alleged conduct was suppressing turnover; correct?

A.   Well, I think, if turnover was going up generally, that the -- the JOLTS is not a perfect comparison, but it's the best comparison we could get, and I think one or -- I think at least one of the experts used JOLTS, but perhaps my memory is not correct.  If turnover was going up more broadly and it didn't go up at the defendants, then that would suggest market power; that there's some -- some reason that it's not going up.  So I -- that's how I would read it.

Q.   Okay.  But, again, you did not conduct an analysis of the defendants' turnover as compared to during the conduct versus before and after the conduct; correct?

A.   I think that's right.

Q.   Okay.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.    Yeah.

Q.    Let's go to paragraph 48, which is on page 20.

Okay.  I'm looking about three lines down in paragraph 48.  It says:  "Based on my review of the evidence."

Do you see that?

A.    I see it.

Q.    Okay.  It says:  "Based on my review of the evidence which Dr. Johnson neglects to assess, the agreements terms were not narrowly invoked; and, in the early years, the evidence indicates that SCA and DaVita did not limit their restrictions to employees at the VP level and above."

Do you see that?

A.    I see it.

Q.    So here you are indicating -- you are saying that the evidence in this case indicates that SCA and DaVita did not limit the restrictions to employees at the VP and level above for a period time at the beginning of the class period; correct?

A.    That looks to be correct.

Q.    You also say at the beginning of paragraph 48 that "Hayek testified that the agreement initially applied to VPs and above, and later expanded

to include directors"; correct?

A.   Yes.

Q.   So you agree that Hayek's testimony does not say that the SCA-DaVita agreement always applied to directors; correct?

A.   I -- Yes, correct.

Q.   Why did you discount that testimony?

A.   There was other evidence, which there was -- where people were talking about the agreement, and there was nothing ruling out directors.  That's one aspect of it.  And I -- I mean, I don't know what other reasons -- what -- what might have caused Hayek to recall that, but it seemed like there was other evidence that it wasn't limited to VP and above.

Q.   Did you not find Hayek's testimony to be credible?

A.   I don't have enough experience with testimony to know what's credible; but there was other evidence that seemed to be consistent with not limiting the level to VP and above.

Q.   So, on balance, you looked at the evidence that you cited in these paragraphs, and you determined which evidence was more persuasive; correct?

A.   I suppose.  I mean, it's probably something for the jury to decide, I guess, is my understanding.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

(Sotto voce remarks.)

Q.   BY MS. ZIELINSKI:  All right.  You also --
So you said that -- When you said it was something for
the jury to decide, what were you referring to?

A.   The scope of the agreement.

Q.   Okay.  So when you are describing evidence
in your report, you are not offering any opinions
about what that evidence means?

A.   Oh, I think the intent is to offer evidence
and just try to take away from it the best
interpretation.  And, in this case, I think it's
offering evidence that it wasn't necessarily limited
to vice presidents and above.

Q.   Isn't it the jury's role to look at the
evidence and take away the best interpretation?

MR. SEIDEL:  Objection.  Calls for a legal
conclusion.

THE WITNESS:  That's -- That's my
understanding, yeah.

Q.   BY MS. ZIELINSKI:  Okay.  You say in
paragraph 47 that "SCA and DaVita did not perfectly
execute their no-poach agreement."

Do you see that?

A.   I see it.

Q.   Okay.  What do you mean, "did not perfectly

execute"?

A. That would mean that some employees moved between them, despite the no-poach agreement.

Q. So, at times, the agreement was enforced differently; correct?

A. That's -- That's the way it would seem. I don't think any -- there was a lot of agreement -- well, just even public policies that are not enforced with a hundred percent success, so...

Q. Sometimes -- At some points in time, the agreement was enforced more strictly; and other times, it was enforced less strictly. Correct?

A. I don't know if it's at certain times and other times. I mean, all I think we can say is that some hires occurred despite them seeming to be inconsistent with the no-poach.

Q. Okay. Would you agree that the impact of the agreements would change, depending on how strictly the agreements were enforced at the time?

A. I think, anytime something is executed better, it has more of an impact.

(Sotto voce remarks.)

Q. BY MS. ZIELINSKI: Let's go to paragraph 52, page 22.

A. Yes.

Q.    Okay.  Are you offering an opinion on when the alleged no-poach agreement started and ended?

A.    I'm offering evidence that -- The no-poach or...

Q.    The no-poach, yes.

A.    I'm providing evidence that seems relevant.

Q.    Okay.  So you're not offering an opinion about the alleged -- the start date or the end date of the alleged no-poach agreement; correct?

A.    I'm offering evidence that I -- that I think is relevant to when it started.

Q.    Okay.  So this paragraph 51, 52, 53, is just a description of evidence as opposed to offering your opinions about certain end date; correct?

A.    Well, it's certainly offering evidence.  And I think, if called on to say when the best guess is as to the start date, then you can see what -- what we -- what -- what the opinion is.

Q.    So you are offering an opinion about the start date?  I'm just -- I'm not trying to be tricky.

A.    Yeah.

Q.    I'm just trying to understand what the scope of your opinions is.

A.    So I suggest a start date based on what I looked at, but I'm not -- I'm not trying to take the

place of the jury.

Q.   But you did consider evidence that the beginning of the start date for the SCA-DaVita -- alleged SCA-DaVita no-poach agreement was in 2012; correct?

A.   I considered that the defendant expert suggested 2012.

Q.   And you also looked at other evidence that you believe suggests that the agreement is consistent with the agreement starting in 2008; correct?

A.   That's -- Yeah, I think that's correct.

Q.   And why did you, after looking at the evidence -- the evidence -- those two pieces of evidence, what did you do?

A.   I guess probably just found the -- some of the quotes, I think, from e-mail correspondence between Thiry and Hayek to be compelling as to the date.  Some of it was around Hayek hiring Rucker and the correspondence they had, and Thiry was obviously unhappy about that and didn't want more of it to happen.  So I think just looking at that, that seemed persuasive to me.

Q.   So you made a determination about which evidence was more compelling and persuasive; correct?

A.   I found that very, very relevant, I guess,

is what I would say, yes.

Q.   And then same with paragraph 53:  Do you see that, about the end date?

A.   Yes, I do.

Q.   In the end of paragraph 3, you say that your opinion that "the evidence is consistent to show that the SCA-DaVita no-poach agreement continued through 2019"; correct?

A.   Yes.

Q.   And at the beginning of paragraph 53, you reference testimony by Hayek and Kilgore; correct?

A.   Yes.

Q.   Are you aware that Hayek testified that the agreement ended in 2017?

A.   I think I do recall that, yes.

Q.   And that Kilgore testified that SCA did not have a no-poach agreement when he became the CEO in 2018?

A.   I -- I -- That sounds right.

Q.   So that evidence is not consistent with the 2019 end date; correct?

A.   Doesn't seem to be consistent with that, no.

Q.   Okay.  So in putting forth your opinion that the evidence is consistent with a 2019 end date, you weighed various pieces of evidence to determine what

was more persuasive; correct?

A.    That sounds right.

Q.    Let's go to paragraph 54.  In the last sentence, you say that "the evidence is consistent to show that the SCA-USPI no-poach agreement continued through 2019"; correct?

MR. SEIDEL:  Sorry.  Where are you reading from?

MS. ZIELINSKI:  Paragraph 54.

MR. SEIDEL:  What -- Where in 54?

MS. ZIELINSKI:  The end.

MR. SEIDEL:  The last sentence?

MS. ZIELINSKI:  Yep.

MR. SEIDEL:  Thanks.

THE WITNESS:  Okay.  I see it.

Q.    BY MS. ZIELINSKI:  And at the bottom of page 24, in that same paragraph, you reference testimony by Hayek; correct?

A.    Um-hum.  Yes.

Q.    And you're aware that Hayek testified that the SCA-USPI no-poach agreement ended in 2017; correct?

A.    Yes.

Q.    And, again, like we said a moment ago, Kilgore testified that SCA did not have a no-poach

agreement when he became CEO in 2018; correct?

A.    Yes.

Q.    And you recognize that this evidence does not say that the SCA-USPI agreement continued through 2019; correct?

A.    I -- That's -- Yeah, I believe that's how the experts interpreted it, yes.

Q.    So that evidence is not consistent with the 2019 end date; correct?

A.    I think that's correct.

Q.    So in order to determine -- to offer your opinion that the evidence is consistent to show that the SCA-USPI no-poach agreement continued through 2019, you looked at various pieces of evidence and determined what you found to be most persuasive; correct?

A.    That sounds correct.

Q.    What expertise do you have to interpret evidence and weigh inconsistencies regarding the timing and scope of a conspiracy?

A.    I don't have any special expertise.

Q.    Okay.  Have you investigated conspiracies in your work as a compensation academic?

A.    I'm sorry.  I have to think just for a second.

Nothing obvious jumps out to me, but I'm just -- No, I don't recall anything right now.

MS. ZIELINSKI:  Okay.

(Exhibit DX81 previously marked.)

Q.  BY MS. ZIELINSKI:  All right.  Dr. Gerhart, I am handing you what's been previously marked as defendants' Exhibit 81.

This is the report that you issued in January 2025, as corrected --

A.  The original.

Q.  -- by errata in February.

A.  The original report?

Q.  Correct.

A.  Okay.

MS. ZIELINSKI:  Correct.

MS. ZANDI:  This is January.  One second.

(Pause.)

MS. ZIELINSKI:  All right.

(Sotto voce remarks.)

THE CONCIERGE:  Is there a corresponding tab with this one?

MR. WADE:  Yes.  I'm sorry.

THE CONCIERGE:  Is this tab 1?

MR. WADE:  Yes, thank you.

THE CONCIERGE:  All right.  Thank you.

is not fair, then employers are concerned that will

cause problems with having their employees engaged to

do the kind of things they need to do to execute the

strategy.

Q. Is there a quantitative test I can run to

determine whether compensation is structured?

A. I mean, I think there's probably some data

that would be relevant to that. I mean, some of my

past research has looked at the relationship between

pay, individual pay, and performance; so that would be

-- that would be one way to look at it.

Q. Your opinion in this case is that

defendants' conduct as a result of their compensation

structure likely caused cascading effects across the

pay of class members; correct?

A. That's correct.

Q. Is there a test I can run, a quantitative

test, to determine whether those -- there is -- there

are in fact cascading effects across a compensation

structure?

A. I'd have to think about that. It's -- I

mean, I think where I'm -- my frame of reference is

that there's just decades of research and practice

where the focus is on equity and how important it is

in managing employees. So if somebody who's in the

same job and has similar performance to me is getting paid more than me, that -- that often results in outcomes that employers wish to avoid.

So if you look at World at Work, which is the leading compensation professional association, you know, they -- they put a heavy focus on internal equity and external equity as part of how you use a structured compensation system.  My textbook of course does the same thing.

Q.   So the test that you are advancing for whether a company has a compensation structure that causes cascading effects is purely qualitative; correct?

A.   I think we have research on how -- how employees compare their pay to others; that they do it very regularly, that it effects their behavior.  But in terms of the specific situation of the defendants, I do not quantify that effect.

Q.   So the test that you advocated a moment ago for determining when a company's compensation structure is sufficient to cause cascading effects is essentially just a list of characteristics that you would look for in a compensation structure; correct?

A.   I think that's about right, yes.

Q.   Okay.  Will you -- Would you agree with me

that some employers' compensation systems are more structured than others?

A. I'm sure there's some variance, yes.

Q. Okay.

A. Yeah.

Q. So the degree of structure in a compensation system is not binary; it exists on a spectrum. Correct?

A. I think so -- although I think it's probably a bit hard to compete successfully, over time, if you don't make people's pay decisions in a systematic manner. People do kind of care about their pay, so that's why it gets so much attention.

Q. Do you -- Do you think it is -- In your view, do you believe that nearly all companies have compensation structures that would lead to cascading effects in pay?

A. I think private-sector companies, except maybe for ones that are very small, tend to have structured compensation systems.

Q. Okay. So not public-sector companies?

A. They have -- They have -- They have their own structure, but that's not really -- that's not quite the same as in the private sector. It'd be structured -- For instance, individual differences in

pay would sometimes be more a function of something like seniority rather than individual performance.

Q.   Okay.  So you think all companies, except for ones -- all private-sector companies, except for ones that are very small, would have structured compensation systems that would cause cascading effects; correct?

MR. SEIDEL:  Objection to form.  Misstates testimony.

THE WITNESS:  All or, I would say, virtually all.

Q.   BY MS. ZIELINSKI:  Okay.  And, in fact, you say in your report that it would be unfathomable for a company the size of SCA not to have a compensation structure capable of causing cascading effects; correct?

A.   Did I use the word "unfathomable"?

Q.   Yeah.  Let's go to page 179, paragraph 436.

A.   436?  Oh, I did use the word.  Oh, okay.

Well, I mean, it is -- I would be very surprised to have a company like SCA without significant structure in how they decide people's compensation.

Q.   And if we look at pages 150 -- starting at 159 to 163, are these the -- is it your opinion, for a

pay structure -- a pay system to produce cascading effects, it must have all the characteristics described in paragraphs 386 to 398 of this report?

A.    So, in my compensation book, I talk about how different firms might have different degrees of formalization.  And so some of this, like job analysis, there's a -- when you talk about job analysis, you can talk about using a particular job analysis method, and that quantifies things and is very data heavy.

But you can also accomplish -- I mean, the reason you're doing that to some extent in compensation is you need to match your jobs to survey jobs.  So whether you use the formal job analysis or not, you do need to analyze the content of the job and figure out how well it matches the survey job.  And the consulting companies can help do that; sometimes they have tools to do that.

So it doesn't have to be done in exactly this way for it to be systematic, but this would be kind of the most detailed description of how to do it.  And a lot of firms that have structured compensation systems.  If you go look, for instance, at World at Work surveys, they don't probably spend a lot of time in any given year doing job analysis, or

certainly not a formal job analysis; but it's very

critical to do something equivalent to that, that

gives you the same output.

Q.   You said a moment ago that the degree of

structure in a system, in a compensation system,

exists on a spectrum.

So how would you distinguish between a

company that has a compensation system that produces

cascading effects and one that does not produce

cascading effects?

A.   So I think structured compensation --

structured or system -- systematic/systematized

compensation means you have principles and you apply

them consistently, and that's how you achieve fairness

and equity.  And the degree of formalization can vary;

but, for instance, if people regularly ask, "Well,

what are the other people in that job getting paid,

and what's their performance, and what are they

getting paid now?" that's a structured compensation

system.

Q.   So a company could have a structured

compensation system on paper but not consistently

execute on the principles behind that system, and it

wouldn't have produced cascading effects; correct?

MR. SEIDEL:  Objection to form, and vague.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

THE WITNESS:  It's on paper, but they don't use it.

Q.    BY MS. ZIELINSKI:  You testified a moment ago that, in order to determine the difference between a compensation system that produces cascading effects and one that does not, the key is whether the company consistently enforces the principles behind the system; correct?

A.    Yes.

Q.    Okay.  And so my question is, then:  It's possible that there is a company that has some of these characteristics that you describe in paragraphs 386 through 398 but does not consistently follow through on those principles, such that it does not cause cascading effects; correct?

A.    Almost anything is at least somewhat possible, but if you -- Again, people care, obviously, deeply about their pay and whether it's fair and how it compares to others; and so that puts a pretty serious limit on how far you can stray from deciding people's compensation in a systematic and structured manner.

Q.    And, again, it's your view that virtually every company has a compensation system that causes cascading effects; correct?

Do you see that?

A.    Yes.

Q.    So you're not offering -- I just want to make sure I understand:  It's fair to say that you're not offering an opinion that defendants had rigid wage structures?

A.    I'm not -- I don't remember using the word "rigid."

Q.    Okay.  That -- That is not your opinion, that defendants have a rigid pay structure; correct?

A.    No.  No, it's not.

Q.    Okay.

A.    They have a structured pay system.

Q.    Okay.  Let's go to paragraph 491 on 201.

All right.  In this paragraph, you criticize defendants' experts as characterizing your opinion as requiring that a change in pay for one employee would lead to changes for all, or nearly all, of their employees' compensation; right?

A.    That looks to be correct.

Q.    Okay.  So you are not offering an opinion, then, that defendants' pay systems are so structured that a change in one employee's compensation due to an outside job offer would lead to rapid adjustments of a similar magnitude for all, or nearly all, employees'

compensation; correct?

A.   I think that's correct.

Q.   Okay.  So if I'm understanding your opinion correctly, then, it's not that one employee is enough to lead to these cascading effects that you are describing; there must be compensation -- suppression of compensation for some subset of employees before these cascading effects occur.  Correct?

A.   The cascading effects would logically be larger, the more employees who are getting, for instance, unsolicited outside offers.

Q.   And I want to focus specifically on cascading effects for all, or nearly all, class members.

A.   Yes.

Q.   So, in order to cause cascading effects in the pay of all, or nearly all, class members, how big of a subset of employees whose wages are directly suppressed -- how many employees does that need to be in order to impact all, or nearly all, class members' compensation?

A.   It's -- I'm not sure it's possible to come up with a precise number.

I'd just go back to the other outpatient care industry, which, I think, again, it was

Dr. Johnson said one in six jobs in that industry at the defendants.

So if from time to time -- Well, I don't know if it would be one in six. I mean, one in six would certainly be a lot of outside offers. It wouldn't have to be that high. Again, I can't give you a number. In a big organization, one person getting an outside offer would not have an effect; but, in a big organization, there would be a lot more than one person getting cold calls and outside offers when that -- such calls are not restricted.

Q. Okay. And I take it, when you say one is not enough, you'd also agree that two or three or four or five is also not enough; correct?

A. I don't know where you would draw the line; but, the more coming in, the more effect it would have, yes.

Q. Right. Yeah. Yeah, I understand you to be saying that it's difficult to draw the line; but, again, we're -- we're talking about this subset that you're talking about. We're talking about, you know, more than just, you know, a dozen or so employees. Correct?

MR. SEIDEL: Objection to form.

THE WITNESS: I don't know. I don't know

where to draw the line; but I would expect that, in ordinary circumstances, it would be -- there would be more than a dozen getting such outside offers, so... But I don't have it at my fingertips what the number would be right now.

But we -- you know, I'll go back to the Federal Reserve study that I cite regularly, which finds that over three quarters of people who have changed jobs did so without actively searching for a job.  So that -- they -- they were -- they were passive candidates.  And then more than that would have gotten outside offers, because not everybody takes an outside offer.

Q.   BY MS. ZIELINSKI:  If 25 percent of class members were directly affected by the defendants' conduct and their wages were suppressed, would it be your opinion that that is sufficient to cause cascading effects across the class?

A.   Again, I don't know where to draw the number.  One in four employees getting outside offers seems like a goodly number that would have a substantial effect.

Q.   Okay.  But any lower than that, you cannot determine where to draw the line of how many employees would need to be directly affected in order to cause

cascading effects; correct?

A.   At this moment, I don't -- I wouldn't be able to draw the line.

Q.   Let's go to paragraph 495 of your report, which is on page 203.

Let's see.  Okay.  It's about halfway through the paragraph.  It says -- It's referring to Dr. McCrary.  It says:  "In his Exhibits 13 and 14."

Do you see where I'm at?

A.   I see it.

Q.   Okay.  "In his" -- It says:  "In his Exhibits 13 and 14, Dr. McCrary shows that different employees have different pay growth over time.  That is exactly what is expected under a structured compensation, given its emphasis on pay for performance and the fact that employees do not have equal performance and their performance can vary over time."

Do you see that?

A.   I see it.

Q.   You're not offering any analysis disagreeing with Dr. McCrary's opinion that different employees have different pay growth over time; correct?

A.   I agree that different employees have different pay growth over time.

A.   Generally speaking, there's -- there would have to be other factors; but I'm -- I'm having a little trouble thinking of what those factors would be.  Again, the ones that come to mind are the factors we want to avoid coming into play.

In a traditional labor union setting, there would be some differences in employee pay growth over time; but it would be based on seniority, primarily.

Q.   Let's go to the next page, 204, and figure 3, which is --

A.   Yes.

Q.   -- in paragraph 496.

A.   Yes.

Q.   Okay.  You present here a hypothetical scenario to illustrate your theory of cascading effects.

A.   Yes.

Q.   Correct?

A.   Yes.

Q.   Okay.  So, in your hypothetical, director A and director B have different salaries but their ratios of salary and performance are equal.

A.   Yes.

Q.   And then you say that director A receives an unsolicited outside offer and negotiates an increase

based on that outside offer; correct?

A.    Yes.

Q.    Okay.  So, as the first step -- we're going to go through the steps here.

So, as the first step in your cascading effects hypothetical, you say that director B is likely to be very dissatisfied due to a perception of a lack of internal equity and with the realization that external equity is lower than realized; correct?

A.    That sounds right.

Q.    Okay.  And you say that, based on that dissatisfaction, director B can take -- take several steps in response; correct?

A.    Yes.  Yes.

Q.    So, for your theory of cascading effects to work, director B must know of director A's existing salary relative to their own salary; correct?

A.    Yes.  I mean, this is a very small example; so, in real life, there'd be other people besides director A --

Q.    Sure.

A.    -- getting an outside offer.

So employers do try to prevent employees from discussing their wages, but that's -- that's a policy where enforcement isn't all that successful a

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

lot of the time.

So, yes, it would -- the cascading effect is more likely to the extent that there's knowledge of the difference in pay, yes.

Q.   What does the evidence that you've reviewed in this case indicate that defendants here were successful in -- or whether the employees of defendants had knowledge of their co-workers wages?

A.   No.

MR. SEIDEL:  Hold on a second.

THE WITNESS:  Oh, I'm sorry.  I'm sorry.

MR. SEIDEL:  No problem.

Objection to form.  Unclear.

THE WITNESS:  I don't recall seeing evidence on how much employees talked to each other in these companies about pay.

Q.   BY MS. ZIELINSKI:  Okay.  But, again, going back to your hypothetical:  For this theory of cascading effects to work, director B does have to know director A's salary relative to their own; correct?

A.   Yes, I think that's probably true.

Q.   Okay.  And director B must also know the value of director A's external job offer and then the renegotiated salary; correct?

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.    Yes.

Q.    Okay.  And --

A.    And if I may...

Q.    Um-hum.

A.    I think, in the case of an external offer, if you know that there's an offer, you can make a pretty good guess, if the person stays, that their -- their pay increased.  So I do think people do talk, but there's other ways to infer that; and if it's a good outside offer, people don't usually keep it much of a secret.  So there's various mechanisms by which people can compare themselves.

Q.    And, but did you see evidence of those discussions happening among class members in this case?

A.    I didn't.  But there's so much evidence from so many sources, that that's kind of human nature.  But, no, I don't -- I don't have any evidence specific to these companies, at least that I can think of right now.

Q.    And, in your hypothetical, would director B know this information about director A's external job offer instantaneously?

A.    They could know very quickly.

Q.    You would agree that if, hypothetically,

director B does not know how much he's paid relative to director A, then there wouldn't be any effect on -- this cascading effect wouldn't work; correct?

A.    Yeah, it seems like it would be less strong. But, again, you can make a comparison and make an inference even if you don't know the exact dollar number.  But employees often do find out the dollar number.

Q.    And what evidence are you basing that on, that employees often do find out the dollar number?

A.    Well, I think one piece of evidence is employers trying very hard to keep employees from -- from talking.  So that seems like that wouldn't be a focus if it didn't happen that employees shared information.

Q.    Do you believe that, in the U.S. private sector, there is little perceived pay transparency in terms of the ability to discuss pay with co-workers?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I do, especially at the time of class period.

MS. ZIELINSKI:  Okay.

THE WITNESS:  Let me be clear:  So there's employer policies aimed at preventing pay transparency in general, but that doesn't necessarily work very

well.

Q.   BY MS. ZIELINSKI:  But, again, you saw no evidence of that in this case; correct?

A.   I don't have any evidence, that I can think of, on these particular defendants and their employees.

Q.   Okay.  Going back to your hypothetical:  For this theory of cascading effects to work, director B also must know director A's performance relative to his or her own; correct?

A.   Yes.

Q.   Okay.  And how would director B gather that information?

A.   I think people often have an idea of who's doing well and how they compare to other people in their jobs.

Q.   And does this assume that director A and director B work closely together such that they would be aware of each other's performance?

A.   That would, I think, facilitate it; but it depends on what you mean by "work closely."  I mean, there's different ways to work closely:  You can be in proximity; you could be working on projects or initiatives together.  And, again, there's -- there's different avenues to get information in an

organization.

Q.   Well, you certainly wouldn't expect that every director in a company would have visibility into every other director's performance; correct?

A.   Not every other director.

Q.   Okay.  So they would have to work in some sort of close enough proximity to have that understanding; correct?

A.   They'd have to have some opportunity to get that understanding, yes.

Q.   And how closely would two directors have to work together in order to gain that sort of understanding?

A.   Hmm.  I think that's probably hard to come up with a simple rule; but, again, I would just go back to it.  I think it's fairly common for people to have an understanding of who's doing well and who's contributing the most.

Q.   You would also agree with me that you would not expect every director in a company to have visibility into what every other -- into what other directors were paid; correct?

A.   That, I think, would be unusual.  I think there's some companies which post their salaries, but I wouldn't say that's typical.

Q.   Okay.  So when this director A received this outside job offer, you would not expect that every other director in the company would have visibility into director A's salary or new salary as a result of the job offer; correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I would say not usually, but companies have -- it's hard to grasp all -- all the ways people interact and communicate and exchange information, so...  But, yeah, there's certain things that would make it more likely, I agree.

Q.   BY MS. ZIELINSKI:  Okay.  And, but not every -- not every director would have visibility into that information; correct?

A.   I would say not typically.

Q.   Correct.  Okay.

All right.  So then step 2 of your hypothetical, you say that now VP A -- we're in paragraph 500 now, if you'd like to look at it.

A.   Oh.

Q.   You say that "now VP A has a smaller pay differential compared to director A, and VP A expects there to be an appropriate payoff to being a vice president rather than a director"; correct?

A.   Correct.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

Q. And so you then suggest that, under this cascading effects hypothetical, that VP A's salary will be increased; correct?

A. There'd be pressure to increase it, yes.

Q. Okay. So, for your theory to work, must the VP know director A's existing salary relative to their own?

A. That would certainly facilitate it, and I think that would be pretty common.

Q. Why do you say that?

A. If it's somebody reporting to you.

Q. Okay. So in this -- in this hypothetical you gave, we're talking about a direct report; correct?

A. I think that's what I had in mind.

Q. Okay.

A. Yeah. I don't know that it would be limited; because, if you're at a higher level, you may also know what other directors are paid; but, certainly, you would usually know if somebody's reporting to you what their pay is.

MR. SEIDEL: Sarah, we've been going over an hour. Can you let us know when is a good stopping point. I'm not asking for a break now.

MS. ZIELINSKI: Yeah.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

an offer is -- that an opportunity is attractive does not -- according to your theory of how impact spreads across the class in this case, does not provide enough information; correct?

MR. SEIDEL:  Objection to the form.

THE WITNESS:  Sorry.  Knowing the offer is attractive...

Q.  BY MS. ZIELINSKI:  As we said before, what the individual needs to know in order to cause class-wide impact is the amount of the offer; correct?

MR. SEIDEL:  Objection to the form.

THE WITNESS:  I mean, that would maximize the impact, I think; but, again, if a really good company with a -- especially a position which is a move up, but it doesn't have to be a move up, is contacting you, you may not even need a salary offer to negotiate with your current employer.

Q.  BY MS. ZIELINSKI:  Do you say anything like that in any of your reports in this case?

A.  I'm not sure I do.  But just sitting here, thinking about how things work, that's -- that is something that came to mind.

Q.  And is that an opinion you're offering in this case?

A.  That you don't necessarily need a specific

salary offer to negotiate with your current employer?

Yes.

Q.    What's the basis for that?

A.    Well, the only thing I can say for sure at the moment would be personal experience for -- over the years, seeing people do that.

Q.    Have you seen any evidence in this case that class members used the mere existence of a cold call from another company to negotiate higher compensation?

MR. SEIDEL:  Objection.  Misstates prior testimony.

THE WITNESS:  I'm not thinking of a specific example right now.

Q.    BY MS. ZIELINSKI:  You've not conducted an analysis in this case of how many fewer job offers class members received as a result of the alleged conduct; correct?

A.    That's correct.

Q.    And you've also not conducted an analysis of how many fewer job cold calls class members received because of the alleged conduct; correct?

A.    That's correct.

Q.    Let's go to paragraph 405 of your report on page 166.

In paragraph 405 you quote from your

textbook the following sentence:  "Pay levels at firms" -- let's see -- "with structured compensation systems are not completely static.  They also can adjust over time to changing market conditions and/or business strategies."

Do you see that?

A.   I see it.

Q.   Would you agree that the evidence in this case shows that there was variation over time in the defendants' pay structures?

A.   The main thing I could think of -- I'm not sure I'll get the numbers right -- I think it was -- ah, shoot -- during one of -- around one of the acquisitions, the number of senior VPs dropped pretty dramatically -- I'm forgetting now whether it was USPI or SCA -- and their pay dropped, but...  So that -- that would be an example of a major change in business strategy.

So that that's not a big surprise.  That's the most -- That's the one that comes to mind most immediately.

Q.   When you reviewed evidence in this case about the characteristics of defendants' pay structures, did you see evidence that those structures varied over time?

formalization, which I don't see as being a good example of what change in market conditions or business strategies would cause.

Q.   In that sentence in paragraph 405, when you say "this variation over time," are you referring to SCA's pay structure?

A.   Sorry.  I lost -- Where is the "variation over time"?

Q.   It's in the third line.

(Sotto voce reading.)

THE WITNESS:  Oh, okay.  "This variation over time supports my" -- I'm being a little vague there about what my opinion is.  I -- I think -- I -- I mean, I think my opinion, the opinion I meant to express there, was that they used structured compensation, and that -- but it became more formalized, maybe became more formalized over time. Again, I thought it was pretty formalized at one point.

Q.   BY MS. ZIELINSKI:  And my question is just simply whether, in that sentence, when you say "this variation over time" --

A.   Yeah.

Q.   -- if you're referring to SCA's pay structure.

A.    Oh, I'm sorry.  Yes, I must be.

Q.    Okay.

A.    Yeah.

Q.    Okay.  We're going to pull out your May 30th report, which should be in that stack as defendants' Exhibit 84.  It should be marked.

A.    Okay.  I have it.

Q.    Okay.  Let's go to page --

THE CONCIERGE:  Is this an existing tab?

MS. ZIELINSKI:  Yes.  This is Exhibit 84.

THE CONCIERGE:  The one from earlier?

MS. ZIELINSKI:  Yes.

MR. WADE:  This was tab 2 from earlier?

THE CONCIERGE:  Okay.  Okay.  Thank you.

Q.    BY MS. ZIELINSKI:  We're going to page 133, paragraph 370.

A.    Okay.  Which?  Oh, this is the first installment, I'll say, of the rebuttal?

Q.    Correct.

A.    Oh, okay.

Q.    Yeah.

A.    Okay.  I thought it was the original.

Q.    No, no.  Yeah, first installment.

A.    Okay.

Q.    Page 133, paragraph 370.

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

A.   Yes.

Q.   Okay.  You say:  "I am not persuaded that SCA's former director of compensation and senior compensation Zaideman was being truthful when he testified that SCA had absolutely no framework for compensation before 2021 and that there was no system in place to help managers decide what to pay their employees."

Do you see that?

A.   I see it.

Q.   Is it fair to say that you've reviewed certain evidence and, based on that evidence that you reviewed, you made the determination that Mr. Zaideman did not tell the truth when he said SCA did not have a compensation framework in place before 2021?

A.   I think, probably, if I rewrote it, I would say -- I might say I'm not accurate; but it didn't seem -- So this is what I was talking about before:  I looked, for instance -- I think it was a memo from 2005, sent to people to help them in setting pay for people who report to them, which included information on range penetration.

So you can't have -- you can't have range penetration without having a range with a midpoint. So this is why I just found -- I just found this hard

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

to square with that memo.  And then later, I think he says -- I don't know, maybe it's in here.  Well, maybe it's not in here.  But I remember reading him saying, I think, that they had pay ranges but they hadn't been kept up to date.

Well, that's -- that's a little different. I mean, if you -- if you do something and you just don't manage it well, that's -- that's not -- you don't have it.  So I just -- That's the background for why I put it this way, I guess.

Q.   So this is another instance where you weighed evidence and selected the evidence that you believed to be more credible; correct?

A.   I just thought the evidence was -- was very relevant.  Again, I don't know how you can have range penetration without a range, and I think that was 2015.  So I just -- it didn't make sense to me.

Q.   Sorry.  I was referring to Zaideman's testimony that SCA had absolutely no framework for compensation.

A.   No, that's what I'm referring to, too --

Q.   Okay.

A.   -- that there had to be salary ranges in place, which is a pretty key part of structured compensation.

STATE OF CALIFORNIA        )
                           )  SS.
COUNTY OF SAN FRANCISCO )

     I, MARILYNN HOOVER, CSR No. 8841 for the State of

California, do hereby certify:

     That prior to being examined, the witness named

in the foregoing deposition was duly sworn to testify

the truth, the whole truth, and nothing but the truth;

     That said deposition was taken down by me in

shorthand at the time and place therein named, and

thereafter reduced by me to typewritten form; and that

the same is a true, correct, and complete transcript

of the said proceedings.

     Before completion of the deposition, review of

the transcript [ ] was [X] was not requested.  If

requested, any changes made by the deponent (and

provided to the reporter) during the period allowed

shall be appended hereto.

     I further certify that I am not interested in the

outcome of the action.

     Witness my hand this 14th day of July 2025.


                    _____

                         Marilynn Hoover, RPR

                         California CSR No. 8841

| Page | Line | Correction | Reason for Change |
|------|------|------------|-------------------|
|  |  | See attached chart for corrections |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Witness Signature                                          Date

*Barry Gerhart*

SARA J BROWN
NOTARY PUBLIC
STATE OF WISCONSIN

Subscribed and sworn to before me this
___ day of _____ 20__
Notary Public, Dane Co., State of Wis.
My commission expires ___8/17/2027___

I, _Barry Gerhart_, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page(s), and that I am signing this before a Notary Public.

_Barry Gerhart_

STATE OF ___WI___

COUNTY OF ___Dane___

Before me, _Sara J Brown_, on this day personally appeared _Barry Gerhart_, known to me, or proved to me under oath or through _WI DL_, _____ (description of identity card or other document), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the ___3___ day of _April_, 20_25_.

SARA J BROWN
NOTARY PUBLIC
STATE OF WISCONSIN

_____
NOTARY PUBLIC IN AND FOR THE
STATE OF ___WI___

My Commission Expires: ___8/17/2027___

**Errata for Expert Deposition of Dr. Barry Gerhart**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
March 5, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 1 | 37 | 19–21 | "Yeah, I think the term 'directly' there is meant 'the most easily seen,' maybe." | "Yeah, I think the term 'directly' there is meant to mean 'the most easily seen,' maybe." | Clarification |
| 2 | 51 | 12–15 | "I think I would go back to what I said before, that you'd want to look at the degree to which which companies people move between if there's a competitive, unrestricted market." | "I think I would go back to what I said before, that you'd want to look at the degree to which companies people move between if there's a competitive, unrestricted market." | Delete repeated word for clarification |
| 3 | 74 | 19–20 | "So if you reduce labor cost, it leads to hire profits over time." | "So if you reduce labor costs, it leads to higher profits over time." | Typographic error |
| 4 | 78 | 16–17 | "For higher-level employees, um-hum." | "For higher-level employees, yes." | Clarification |
| 5 | 114–15 | 114:23–115:2 | "No quantitative analysis bringing to bear knowledge of how these processes work and what the consequences of restricting mobility are and how—how mobility can lead to higher pay for employees or opportunities for mobility." | "No quantitative analysis.  My focus was on bringing to bear knowledge of how these processes work and what the consequences of restricting mobility are and how—how mobility can lead to higher pay for employees or opportunities for mobility." | Typographic error; clarification |
| 6 | 118 | 10–11 | "Yeah.  As I said, even missing one cold call could be very consequential." | "As I said, even missing one cold call could be very consequential." | Clarification |
| 7 | 129 | 4 | "Um-hum." | "Yes." | Clarification |
| 8 | 130 | 10 | "Um-hum." | "Yes." | Clarification |
| 9 | 131 | 20–22 | "And then my recollection is, I think it was Rucker left, Hayek then recruited Rucker; so that one's probably not too relevant." | "And then my recollection is, I think it was Hayek left, Hayek then recruited Rucker; so that one's probably not too relevant." | To conform the record to the facts; clarification |

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 10 | 137 | 1–3 | "For instance, the CEO and COO of SCA moving from DaVita." | "For instance, the future CEO and COO of SCA moving from DaVita." | To conform the record to the facts; clarification |
| 11 | 138 | 2–3 | "So your—So if I'm understanding . . ." | "So you're—So if I'm understanding . . ." | Typographic error |
| 12 | 164 | 17–20 | "And I think it's typically—once the percentage is set, then how it's allocated internally would typically be based on internal equity kinds of principles and internal equity principles." | "And I think it's typically—once the percentage is set, then how it's allocated internally would typically be based on internal equity kinds of principles and clearly stated internal equity." | Clarification |
| 13 | 190 | 10–13 | "And I think I also mentioned that your merit increase budget could also be influenced by your growth and how much hiring you have to do, because labor is a drive demand . . ." | "And I think I also mentioned that your merit increase budget could also be influenced by your growth and how much hiring you have to do, because labor is a derived demand . . ." | Typographic error |
| 14 | 197 | 9–11 | "I don't think it's my main charge is to establish whether there was exchange that wouldn't be acceptable from a legal standpoint . . ." | "I don't think my main charge is to establish whether there was exchange that wouldn't be acceptable from a legal standpoint . . ." | Clarification |
| 15 | 210 | 7–10 | "And then I think we talked about adjacent job levels would be affected if pay is going up in the job level below or above, and then it could relate to job levels not immediately adjacent." | "And then I think we talked about how adjacent job levels would be affected if pay is going up in the job level below or above, and then it could relate to job levels not immediately adjacent." | Clarification |
| 16 | 215 | 11–14 | "Well, I would think, the more outside offers there are, the more pressure it would put on the system and that there would be system-like cascading effects." | "Well, I would think, the more outside offers there are, the more pressure it would put on the system and that there would be system-wide cascading effects." | Typographic error |
| 17 | 224 | 19–22 | "'Restraints that can strain the employee labor market | "'Restraints that constrain the employee | Typographic error; to |

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | and suppress compensation, such as no-poach agreements and CSI exchanges, enable firms to benchmark to lower rates so that upward pay adjustments do not occur.'" | labor market and suppress compensation, such as no-poach agreements and CSI exchanges, enable firms to benchmark to lower rates so that upward pay adjustments do not occur.'" | conform the record to the facts |
| 18 | 228–29 | 228:25–29:4 | "But it's certainly possible that class members who negotiated their pay were able to negotiate a salary that would have offset or been uneffected by the alleged suppression of compensation; correct?" | "But it's certainly possible that class members who negotiated their pay were able to negotiate a salary that would have offset or been unaffected by the alleged suppression of compensation; correct?" | Typographic error |
| 19 | 272 | 22–23 | "Well, that was my intention, yes." | "It was my intention to include everything I relied on for my opinions about USPI's compensation practices in the report." | Clarification |
| 20 | 283 | 15–16 | "Empirical Research Issues and Comparative HRM" | "Empirical Research Issues in Comparative HRM" | Typographic error; to conform the record to the facts |
| 21 | 289 | 7–8 | "I was looking at things common to the class employees across the companies." | "I was looking at things common to the class member employees across the companies." | Clarification |
| 22 | 290 | 13–17 | "I think it was Staffieri who said something to the effect of, when he's setting pay, he needs to know what other people are paid, because he doesn't want any individual employee's pay to get out of the whack with the pay of other people . . ." | "I think it was Staffieri who said something to the effect of, when he's setting pay, he needs to know what other people are paid, because he doesn't want any individual employee's pay to get out of whack with the pay of other people . . ." | Typographic error |
| 23 | 293 | 9–11 | " . . . then you can assume that there would be more offers and that less offers | " . . . then you can assume that there would be more offers | Typographic error |

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | for employees of those two companies to move to the other company?" | and not less offers for employees of those two companies to move to the other company?" | |
| 24 | 294 | 10–13 | "I see it as if there's specially good offers coming in and they're coming from the defendant companies, then that would be pretty critical to know." | "I see it as if there's especially good offers coming in and they're coming from the defendant companies, then that would be pretty critical to know." | Typographic error |

4

Page    Line    Correction                                                          Reason for Change

                 See attached chart for corrections

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

------  ------   ----------------------------------------------    ----------------------------------------

_Barry Gerhart_
--------------------------------------------------------------    __08/21/2025____
Witness Signature                                                    Date

I, _____Barry Gerhart_____, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page(s), and that I am signing this before a Notary Public.

_____Barry Gerhart_____

STATE OF _____WI_____

COUNTY OF_____Dane_____

Before me, _____August 21, 2025_____, on this day personally appeared_____Barry Gerhart_____, known to me, or proved to me under oath or through_____Driver Lic._____ (description of identity card or other document), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _____21_____ day of _____August_____, 20_25.

_____
NOTARY PUBLIC IN AND FOR THE
STATE OF_____Wisconsin._____

My Commission Expires: _____11/6/2027._____

**Errata for Expert Deposition of Dr. Barry Gerhart, Vol. II**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
July 10, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 1. | 319 | 1 | "Exhibit 84." | "defendants' Exhibit 84." | Clarification |
| 2. | 323 | 25 | "Um-hum." | "Yes." | Clarification |
| 3. | 327 | 22 | "the animators case." | "the Animators case." | Typographic error |
| 4. | 329 | 9–10 | "beyond compensation in human resources management" | "beyond compensation and human resources management" | Typographic error |
| 5. | 338 | 19 | "I think that's probably correct." | "My initial report does show that defendant firms had market power during the Conduct Period, given the presence of various labor market frictions, and given my determination that the no-poach conduct and CSI Exchanges would likely have suppressed pay Class-wide" | Clarification; to conform the record to the facts |
| 6. | 340 | 9–10 | "I don't think I did anything that would speak to that quantitatively, yes." | "I don't think I did anything that would speak to that quantitatively." | Clarification |
| 7. | 342 | 3–4 | "I do not have much knowledge at all of antitrust." | "I do not have much knowledge at all of antitrust law." | Clarification |
| 8. | 343 | 15 | "manning" | "Manning" | Typographic error |
| 9. | 353 | 22 | "the other outpatient care centers industry." | "the Other Outpatient Care Centers industry." | To conform the record to the facts |
| 10. | 357 | 3–4 | "the other outpatient care centers industry;" | "the Other Outpatient Care Centers industry;" | To conform the record to the facts |
| 11. | 358 | 5–6 | "the other outpatient care centers" | "the Other Outpatient Care Centers industry" | To conform the record to the facts |

1

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 12. | 358 | 11 | "the other outpatient care center industry," | "the Other Outpatient Care Centers industry," | To conform the record to the facts |
| 13. | 358 | 17–18 | "there's evidence in the report" | "there's evidence in the rebuttal report" | Clarification |
| 14. | 359 | 4 | "of the report" | "of the rebuttal report" | Clarification |
| 15. | 359 | 25 | "the other outpatient care industry" | "the Other Outpatient Care Centers industry" | To conform the record to the facts |
| 16. | 361 | 1 | "the five-digit" | "the five-digit industry code" | Clarification; to conform the record to the facts |
| 17. | 363 | 5 | "Yeah, I guess the answer is probably no." | "I did not perform any quantitative analysis to measure the defendants' market power." | Clarification; to conform the record to the facts |
| 18. | 363 | 16 | "I think that's—that's correct." | "That is partially correct." | Clarification; to conform the record to the facts |
| 19. | 363 | 22–23 | "No, I don't think so. Yeah, I think that's right." | "I did not perform any quantitative analysis to measure the defendants' market power. I did assess defendants' experts' testimony and determine that based on my review of the evidence and my knowledge of the compensation-related literature and basic labor economics, their testimony did not convince me that the evidence is inconsistent to show that defendants had the market power necessary to harm all or nearly all class | Clarification; to conform the record to the facts |

2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | members' compensation." | |
| 20. | 365 | 16–17 | "the three defendants" | "the three defendant firms" | Clarification; to conform the record to the facts |
| 21. | 366 | 12 | "there's less information" | "there's less of an information deficit" | Clarification |
| 22. | 367 | 16 | "the three defendants," | "the three defendant firms," | Clarification; to conform the record to the facts |
| 23. | 369 | 23 | "in antitrust" | "in antitrust law" | Clarification |
| 24. | 371 | 4–5 | "like a no-poach" | "like a no-poach agreement" | Clarification |
| 25. | 371 | 5–8 | "And I guess part of that is trying to think about what would have happened without such a no-poach versus what happened with such an alleged no-poach." | "And I guess part of that is trying to think about what would have happened without such a no-poach agreement versus what happened with such an alleged no-poach agreement." | Clarification |
| 26. | 374 | 2 | "a successful no-poach" | "a successful no-poach agreement" | Clarification |
| 27. | 375 | 17 | "like no-poach." | "like a no-poach agreement" | Clarification |
| 28. | 377 | 20–22 | "What the report says is that the defendants seem like they would be very good matches that defendant employees" | "The report and rebuttal show that defendants seem like they would be very good matches for other defendants' employees" | Clarification; to conform the record to the facts |
| 29. | 381 | 4–5 | "Yeah, I don't think I would necessarily say that." | "No, that is not my opinion." | Clarification |
| 30. | 383 | 11 | "Yes." | "It's possible." | Clarification |
| 31. | 388 | 9–10 | "Sure, some things will vary by individuals, yes. A lot of things vary by individuals." | "Sure, some preferences will vary by individuals." | Clarification; to conform the record to the facts |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 32. | 389 | 12–13 | "same five-digit industry" | "same five-digit industry code" | Clarification; to conform the record to the facts |
| 33. | 389 | 25 | "Yeah, it's hard to know." | "I would need more information." | Clarification |
| 34. | 390 | 22 | "same five-digit industry" | "same five-digit industry code" | Clarification; to conform the record to the facts |
| 35. | 391 | 7 | "within their five-digit" | "within their five-digit industry" | Clarification; to conform the record to the facts |
| 36. | 391 | 11 | "within their five-digit" | "within their five-digit industry" | Clarification; to conform the record to the facts |
| 37. | 394 | 5–6 | "I didn't do a quant—No, I didn't quantify that. | "No, I didn't quantify that, but I did perform a qualitative analysis of the evidence, which was consistent to show that defendants' employees would have valued opportunities at other defendant firms." | Clarification; to conform the record to the facts |
| 38. | 397 | 3–4 | "Let's mark this as defendants 87." | "Let's mark this as defendants' Exhibit 87." | Typographic error |
| 39. | 398 | 21 | "other outpatient care centers industry;" | "Other Outpatient Care Centers industry;" | To conform the record to the facts |
| 40. | 400 | 9–10 | "But I think the other thing on the post-conduct is," | "But I think the other thing on the post-conduct period is," | Clarification |
| 41. | 400 | 16 | "the pre-conduct and conduct and post-conduct" | "the pre-conduct and conduct and post-conduct periods" | Clarification |
| 42. | 403 | 18–19 | "'healthcare-related non-OCC industries'" | "'Healthcare Related (non-OCC) industries'" | To conform the record to the facts |

4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 43. | 403 | 20 | "'outpatient care centers.'" | "'Outpatient Care Centers.'" | To conform the record to the facts |
| 44. | 403 | 25 | "'healthcare and social assistance.'" | "'Healthcare and Social Assistance.'" | To conform the record to the facts |
| 45. | 405 | 4–7 | "So he—I think 'healthcare-related' must be code 62, and 'outpatient care centers' looks like it's 6214.  So it's not 'other outpatient care centers'; it's broader." | "So he—I think 'Healthcare Related' must be code 62, and 'Outpatient Care Centers' looks like it's 6214.  So it's not 'Other Outpatient Care Centers'; it's broader." | To conform the record to the facts |
| 46. | 405 | 15–16 | "within the two-digit healthcare industry" | "within the two-digit Healthcare and Social Assistance industry" | To conform the record to the facts |
| 47. | 406 | 12–14 | "Four-digit would be outpatient care centers. And then within outpatient care centers, there's a lot of different types." | "Four-digit would be Outpatient Care Centers.  And then within Outpatient Care Centers, there's a lot of different types." | To conform the record to the facts |
| 48. | 406 | 20–21 | "for outpatient care centers?" | "for Outpatient Care Centers?" | To conform the record to the facts |
| 49. | 407 | 1 | "'other outpatient care center'" | "'Other Outpatient Care Center'" | To conform the record to the facts |
| 50. | 407 | 2 | "outpatient care center" | "'Outpatient Care Center'" | To conform the record to the facts |
| 51. | 407 | 24 | "within the five-digit outpatient care center industry" | "within the five-digit Other Outpatient Care Centers industry" | To conform the record to the facts |
| 52. | 411 | 20–21 | "Yeah, I'd have to—I think that's what I—I think what I meant to say is if" | "My opinion is that if" | Clarification |
| 53. | 413 | 6 | " the 'other outpatient care centers'" | " the 'Other Outpatient Care Centers'" | To conform the record to the facts |
| 54. | 419 | 9 | "the pre-conduct;" | "the pre-conduct period;" | Clarification |

5

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 55. | 421 | 19 | "the pre-conduct and the conduct period" | "the pre-conduct period and the conduct period" | Clarification |
| 56. | 425 | 20–21 | "lower-level employees And senior-level employees" | "lower-level employees and senior-level employees" | Typographic error |
| 57. | 438–439 | 438:25–439:1 | "I found that very, very relevant, I guess, is what I would say, yes." | "I found that very, very relevant, I guess, is what I would say, yes. I provided a factual background of Plaintiffs' conspiracy claim in support of my analysis, and determined that the evidence was consistent to show certain start and end dates." | Clarification; to conform the record to the facts |
| 58. | 439 | 22 | "Doesn't seem to be consistent with that, no." | "Doesn't seem to be consistent with that, no, but the weight of the evidence I reviewed was consistent to show a 2019 end date." | Clarification; to conform the record to the facts |
| 59. | 441 | 10 | "I think that's correct." | "I think that's correct with respect to this specific piece of evidence, but taken together the bulk of the evidence was consistent with a 2019 end date." | Clarification; to conform the record to the facts |
| 60. | 450 | 19–21 | "Well, I think the no-poach would give them a less incentive to not adhere to the wage-fixing." | "Well, I think the no-poach agreements would give them less incentive to not adhere to the wage-fixing agreements." | Clarification; typographic error |
| 61. | 452 | 9 | "increase composition" | "increase compensation" | Typographic error; clarification |
| 62. | 454 | 17–19 | "No, and I'm not—I'm not intending to offer a | "No, and I'm not intending to offer a | Clarification; to conform |

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
|   |         |         | legal opinion. It's more of a lay-person impression." | legal opinion. I submitted this evidence in my rebuttal report to respond to defendants' experts' argument that I provided insufficient evidence regarding the CSI Exchanges in my opening report. Accordingly, as I explain in my rebuttal report, defendants' experts' argument does not give me cause to change my assessment in my opening report." | the record to the facts |
| 63. | 454 | 22–23 | "That—That part is—I think that's right, yeah." | "I am not offering an expert opinion about typical actions of colluding parties to conceal their conduct. I submitted this evidence as support for my finding in my rebuttal report that defendants' experts had not persuaded me that my expert opinions in my opening report regarding the CSI exchange were unsupported." | Clarification; to conform the record to the facts |
| 64. | 466 | 16 | "that it effects their behavior" | "that it affects their behavior" | Typographic error |
| 65. | 467 | 12–13 | "People do kind of care about their pay, so that's why it gets so much attention." | "People do care about their pay, so that's why it gets so much attention." | Clarification |
| 66. | 475 | 3–4 | "I think this is from World at Work—World at Work survey" | "I think this is from World at Work—a World at Work survey" | Clarification |

7

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 67. | 476 | 11 | "No.  No, it's not." | "My opinion is that Defendant firms had systematic pay structures." | Clarification |
| 68. | 484 | 8 | "co-workers wages?" | "co-workers' wages?" | Typographic error |
| 69. | 486–487 | 486:23–481:1 | "Let me be clear:  So there's employer policies aimed at preventing pay transparency in general, but that doesn't necessarily work very well." | "Let me be clear:  So there's employer policies aimed at preventing pay transparency in general, but that doesn't necessarily work very well to prevent employees from discussing their pay with each other." | Clarification |
| 70. | 491 | 23 | "directors salaries" | "directors' salaries" | Typographic error |
| 71. | 498 | 16–18 | "this analysis does not tell us whether base pay for individual class members move together over time; correct?" | "this analysis does not tell us whether base pay for individual class members moves together over time; correct?" | Typographic error |
| 72. | 498 | 22 | "So that's why I'm not using individual." | "So that's why I'm not using individual pay." | Clarification; to conform the record to the facts |
| 73. | 505 | 5–6 | "Hmm.  Yeah, again, I look at evidence that I think is relevant." | "Again, I look at evidence that I think is relevant, rather than at hypotheticals." | Clarification |
| 74. | 506 | 14 | "That sounds right." | "My opinion about likely impact to class members in this case partially depends upon information about job opportunities being conveyed to the recipient of a cold call. Information received by recipients of cold calls is not the | Clarification; to conform the record to the facts |

8

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | only pathway of impact." | |
| 75. | 509 | 4–6 | "Well, the only thing I can say for sure at the moment would be personal experience for— over the years, seeing people do that." | "The basis for my opinion that you don't necessarily need a specific salary offer to negotiate with your current employer is based on my expertise in compensation and human resource management.  It is also based on evidence in my reports showing that defendants responded to even the threat of outside offers to retain employees." | Clarification; to conform the record to the facts |
| 76. | 512 | 11–12 | "'They can also adjust over time to changing.'" | "'They can also adjust over time to changing market conditions and/or business strategies.'" | To conform the record to the facts |
| 77. | 513 | 2–3 | "example of what change in market conditions or business strategies would cause." | "example of what changes in market conditions or business strategies would cause." | Typographic error |
| 78. | 514 | 10 | "Yes.  This is Exhibit 84." | "Yes.  This is defendants' Exhibit 84." | To conform the record to the facts |
| 79. | 515 | 16–18 | "I think, probably, if I rewrote it, I would say—I might say I'm not accurate; but it didn't seem—" | "My opinion is that based on my experience in compensation and human resource management and my review of the evidence, I do not think that Zaideman's testimony that SCA entirely lacked a compensation | Clarification; to conform the record to the facts |

9

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | framework before 2021 was accurate." | |
| 80. | 528 | 6–7 | "I'm not sure there's a way to do it very precisely." | "My rebuttal report describes why I would have expected much higher mobility of the Class Members between Defendants, absent the restrictions." | Clarification |
| 81. | 528 | 24 | "Yes." | "I prepared a rebuttal report that was served May 30 and then I updated that rebuttal report for June 30." | Clarification; to conform the record to the facts |

10

# Exhibit 12

Lane Declaration


(Filed Under Seal)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - x

IN RE:  OUTPATIENT MEDICAL :

CENTER EMPLOYEE ANTITRUST  : Master Docket No.

LITIGATION                 : 1:21-cv-00305-SRH-YBK

- - - - - - - - - - - - - x


HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER


Videotaped Deposition of

EVAN P. STARR, Ph.D.


Baltimore, Maryland

Wednesday, March 19, 2025

9:24 a.m.


Job No. 577303

Pages:  1 - 271

Reported by:  Janet A. Hamilton, RDR

Videotaped Deposition of EVAN P. STARR, Ph.D., held at the office of:

Kramon & Graham, P.A.

750 East Pratt Street

Suite 1100

Baltimore, Maryland  21202-3201

410.752.6030

Pursuant to Notice, before Janet A. Hamilton, Registered Diplomate Reporter and Notary Public in and for the State of Maryland.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025          3

                    A P P E A R A N C E S

       ON BEHALF OF THE PLAINTIFFS:

              DEAN M. HARVEY, ESQUIRE

              SARAH D. ZANDI, ESQUIRE

              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

              275 Battery Street, 29th Floor

              San Francisco, California  94111-3339

              415.956.1000

       -And-   EMILY HARWELL, ESQUIRE (via Zoom)

              250 Hudson Street, 8th Floor

              New York, New York  10013

              212.355.9500


       ON BEHALF OF DEFENDANT DaVITA, INC.:

              MORGAN LEWIS & BOCKIUS LLP

              J. CLAYTON EVERETT, JR., ESQUIRE

              1111 Pennsylvania Avenue, NW

              Washington, DC  20004-2541

              202.739.3000

       -And-   NATHAN T. SHAPIRO, ESQUIRE

              101 Park Avenue

              New York, New York  10178-0060

              212.309.6000

A P P E A R A N C E S   C O N T I N U E D


-And-    KENNETH M. KLIEBARD, ESQUIRE

         110 North Wacker Drive

         Chicago, Illinois  60606

         312.324.1000


-And-    MOLLY MORIARTY LANE, ESQUIRE (via Zoom)

         One Market, Spear Street Tower

         28th Floor

         San Francisco, California  94105-1596

         415.442.1333


-And-    JOHN C. DODDS, ESQUIRE

         2222 Market Street

         Philadelphia, Pennsylvania  19103-3007

         215.963.5000

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025                                    5

    A P P E A R A N C E S   C O N T I N U E D


    ON BEHALF OF DEFENDANTS UNITED SURGICAL PARTNERS

    HOLDINGS, INC., UNITED SURGICAL PARTNERS

    INTERNATIONAL, INC., and TENET HEALTHCARE

    CORPORATION:

        KING & SPALDING LLP

        EMILY NEWTON, ESQUIRE (pro hac vice)

        LAUREN SMITH, ESQUIRE

        JACOB (JAY) PAOLILLO, ESQUIRE (via Zoom)

        1180 Peachtree Street, NE

        Suite 1600

        Atlanta, Georgia  30309

        404.572.2745


-And-   VERONICA MOYÉ, ESQUIRE (pro hac vice)

        1185 Avenue of the Americas

        34th Floor

        New York, New York  10036

        212.556.2100

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025      6

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANTS SURGICAL CARE

AFFILIATES, LLC and SCAI HOLDINGS LLC:

      McGUIREWOODS LLP

      SARAH A. ZIELINSKI, ESQUIRE

      AMY B. MANNING, ESQUIRE

      77 West Wacker Drive

      Suite 4100

      Chicago, Illinois  60601-1818

      312.849.8100

-And-   JOSHUA D. WADE, ESQUIRE

      Gateway Plaza

      800 East Canal Street

      Richmond, Virginia  23219-3916

      804.775.1000

ON BEHALF OF DEFENDANT ANDREW HAYEK:

      WILSON SONSINI GOODRICH & ROSATI, P.C.

      JORDANNE M. STEINER, ESQUIRE (pro hac vice)

      1700 K Street, NW, Fifth Floor

      Washington, DC  20006

      202.920.8703

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                7

A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF DEFENDANT KENT THIRY:

     McDERMOTT WILL & EMERY LLP

     DANIEL R. CAMPBELL, ESQUIRE (via Zoom)

     KATHARINE M. O'CONNOR, ESQUIRE (via Zoom)

     444 West Lake Street

     Suite 400

     Chicago, Illinois  60605

     312.372.2000


ALSO PRESENT:

     ANDREW MOHRAZ, ESQ., Associate General

        Counsel, DaVita, Inc.

     ADAM NUDELMAN, Videographer

     SOPHIE MEADOWS, Edgeworth Economics

     ERIN JOHNSON, Ph.D., NERA

     WENDY L. PETROPOULOS, Ph.D.

        Cornerstone Research

     MICHELE CARTER, Cornerstone Research

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    8

                     C O N T E N T S

EXAMINATION OF EVAN P. STARR, Ph.D.            PAGE

    By Mr. Everett                             12


                     E X H I B I T S

            (Attached to the transcript)

STARR DEPOSITION

Exhibit DX 82    Expert Report of

                 Dr. Evan P. Starr

Exhibit DX 83    List of corrections to

                 Report of Dr. Evan P. Starr

THE VIDEOGRAPHER: This is media unit number 1 in the videotaped deposition of Evan Starr in the matter of In Re: Outpatient Medical Center Employee Antitrust Litigation in the US District Court for the District, Northern District of Illinois, Eastern Division, Case Number 1:21-cv-00305. Today's date is March 19, 2025. Time on the record is 9:24 a.m. Videographer today is Adam Nudelman representing US Legal.

Would all attorneys present please identify themselves, state whom they represent, beginning with the party noticing the proceeding.

MR. EVERETT: Good morning. This is Clay Everett from Morgan Lewis & Bockius on behalf of DaVita.

MR. SHAPIRO: Nathan Shapiro, Morgan Lewis & Bockius on behalf of DaVita.

MR. KLIEBARD: Good morning. Ken Kliebard from Morgan Lewis & Bockius --

THE REPORTER: I can't hear you, sir.

MR. KLIEBARD: Oh, sorry. Ken Kliebard, K-L-I-E-B-A-R-D, also with Morgan Lewis & Bockius, on behalf of DaVita.

MS. CARTER: Michele Carter, Cornerstone

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    10

Research for defendants.

MS. MOYE:  Veronica Moyé, that's M-O-Y-É, King & Spalding, for USPI and Tenet.

MS. NEWTON:  Emily Newton also from King & Spalding for the Tenet and USPI defendants.

MS. MANNING:  Amy Manning of McGuireWoods for SCA.

MS. ZIELINSKI:  Sarah Zielinski of McGuireWoods for SCA.

MS. ZANDI:  Sarah Zandi, Lieff Cabraser Heimann & Bernstein for plaintiffs.

MR. HARVEY:  Dean Harvey of Lieff Cabraser for the plaintiffs.

MR. WADE:  Joshua Wade of McGuireWoods for SCA.

MR. DODDS:  Jack Dodds from Morgan Lewis for DaVita.

MR. MOHRAZ:  Andrew Mohraz, M-O-H-R-A-Z, in-house counsel for DaVita.

MS. STEINER:  Jordanne Steiner from Wilson Sonsini Goodrich & Rosati on behalf of defendant Andrew Hayek.

MS. SMITH:  Lauren Smith with King & Spalding on behalf of USPI.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

11

MR. HARVEY:  Could those attending remotely also state their appearance, please.

If we can hear them.

THE VIDEOGRAPHER:  Has anyone checked to see if --

MS. ZANDI:  I think we might have muted them.  The screen is showing -- I'll let you look.

THE VIDEOGRAPHER:  Repeat it.  Would the Zoom participants repeat the intros.

MR. HARVEY:  Zoom folks?  Yeah.

MR. CAMPBELL:  Sure.  You've got Dan Campbell from McDermott Will & Emery on behalf of defendant Kent Thiry.

MS. O'CONNOR:  Kate O'Connor from McDermott Will & Emery on behalf of Kent Thiry.

MS. LANE:  Molly Lane from Morgan Lewis & Bockius on behalf of DaVita.

MS. JOHNSON:  Erin Johnson from NERA -- that's N-E-R-A -- on behalf of DaVita.

MS. PETROPOULOS:  Wendy Petropoulos, Cornerstone.

MS. MEADOWS:  Sophie Meadows from Edgeworth Economics.

MR. PAOLILLO:  Jay --

09:26:19
09:26:20
09:26:25
09:26:31
09:26:36
09:26:39
09:27:10
09:27:14
09:27:23
09:27:25
09:27:26
09:27:31
09:27:32
09:27:34
09:27:37
09:27:38
09:27:44
09:27:46
09:27:50
09:27:52
09:27:54
09:27:57
09:28:02

THE REPORTER:  I'm sorry.  Say that again, please.

MR. PAOLILLO:  Jay, J-A-Y, Paolillo, P-A-O-L-I-L-L-O, from King & Spalding for USPI and Tenet.

MS. HARWELL:  Emily Harwell from Lieff Cabraser for the plaintiffs.

MR. HARVEY:  Anyone else?  Okay.

THE VIDEOGRAPHER:  Court reporter today, Jan Hamilton, also with US Legal, will now administer the oath.  You can proceed.

PROCEEDINGS

-----

EVAN P. STARR, Ph.D.,
a witness herein, being duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT DAVITA, INC.
BY MR. EVERETT:

Q  Good morning, Dr. Starr.  So I'm Clay Everett, as I've just announced, representing DaVita.

We haven't met before, have we?

A  Not to my knowledge.

Q  You've had your deposition taken in the

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                                14

Q   All right.  Dr. Starr, you understand that you're testifying as an expert witness in this case?                                                    09:29:57 / 09:30:00 / 09:30:04

A   I understand that, yes.                              09:30:05

Q   And that you are offering opinion testimony in this case?                                  09:30:06 / 09:30:08

A   Yes.                                                 09:30:10

Q   Okay.  And do you understand what opinion testimony is?                                       09:30:11 / 09:30:15

A   To the extent --                                    09:30:18

MR. HARVEY:  Objection.  Calls for legal conclusion.                                          09:30:19 / 09:30:21

A   To the extent that's a -- that's a legal term, I'm not sure exactly what the legal term is.    09:30:22 / 09:30:25

Q   You are -- but you are offering opinions within the scope of your expertise; is that correct?                                              09:30:31 / 09:30:34 / 09:30:37

A   That's right.  I was asked by counsel to develop opinions on several matters in this case, and that's -- that's what I've done in my report.    09:30:37 / 09:30:42 / 09:30:44

Q   How many hours have you spent working on this matter?                                         09:30:47 / 09:30:51

A   I can't recall the exact number, but several hundred.                                        09:30:53 / 09:30:56

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

15

Q   When did you start work?                          09:30:58

A   I was retained, I believe, in the middle           09:31:01
of 2023.                                               09:31:05

Q   And -- and you started work shortly               09:31:09
thereafter?                                            09:31:12

A   That's right.                                      09:31:12

Q   And you said you've spent several hundred         09:31:15
hours.  Can you give me any more specificity on        09:31:17
that?  More than 200 hours?                            09:31:22

A   Probably more than 200 hours.                      09:31:25

Q   More than 300?                                     09:31:27

A   I'm not sure.                                      09:31:30

Q   Who's retained you in this case?                   09:31:33

A   To the best of my knowledge, counsel has          09:31:38
retained me.                                           09:31:41

Q   Of the 2 to 300 hours that you've spent on        09:31:43
this matter, what portion of that were spent           09:31:47
preparing the report that you've -- that you've        09:31:51
offered into evidence in this case?                    09:31:55

A   The vast majority of the hours that I've          09:31:58
spent working have been towards this report.           09:32:01

Q   Have you provided expert testimony in the         09:32:08
past?                                                  09:32:12

    MR. HARVEY:  Objection.  Vague.                    09:32:14

A  I have provided expert testimony in a few cases prior to this.

Q  How many cases?

A  I believe it's four or five.  I'd have to go look exactly what I -- what I wrote in my report.

Q  Those are disclosed in your report?

A  They are, yes.

Q  So we'll go through those.  Have you ever in another case besides this case provided expert testimony on damages issues?

A  There's one case that is related that I provided testimony related to damages although it has a very different flavor.

Q  In what way were the -- was the flavor different?

A  In this prior case it was a -- the case was about physicians moving from one hospital to another, and I was asked to examine the patients that would lose access to their physicians as a result of noncompete agreements being enforced. And so the damages there were to the patients who would lose their physicians, and so it was not a compensation case.

Q  Are any of the other cases in which you've provided expert testimony in the past antitrust cases?

A  To the extent that you can classify issues related to noncompete agreements antitrust, then yes.  I'm not sure if that is a legal -- the implicated competition issues related to noncompetes.  So I don't know if those are employment or antitrust based on how you would classify them, but given that antitrust authorities are interested in those issues, my sense is that somebody could plausibly classify them as an antitrust issue.

Q  So you provided expert testimony in other cases relating to the effect of noncompetes; is that correct?

A  That's right.

Q  What are noncompetes?

A  Noncompetes are clauses in employment contracts that prohibit a departing worker from joining or starting a competing company typically within a specified time limit after they leave and sometimes within a geographic radius as well.

Q  So they're -- they're agreements between

conclusion.

A   My understanding, based on reading that report and the conversations with the attorneys, is that the judge did not want to go down that line of inquiry and, and so threw out that, the, the line of inquiry that my report was relevant to, and therefore excluded my report.

My understanding is that had nothing to do with the quality of the report or any of the methods or analysis that I did.

Q   Have you ever had a judge disagree with your expert opinions in an opinion from the judge?

A   Not to my knowledge.

Q   Has your testimony in other cases always been on behalf of a plaintiff in the case?

A   In my mind I don't think about the plaintiff/defendant distinction.  I, I am -- I think I was retained and provided a report in the case where I was on the side of the defendants.

Q   In which case was that?

A   This was a case -- I'd have to look at the exact name of the case, but it was a Han Nara case that's referenced in my report.

Q   And what was at issue in that case?

09:35:51
09:35:53
09:35:55
09:35:56
09:36:01
09:36:07
09:36:09
09:36:11
09:36:12
09:36:15
09:36:18
09:36:22
09:36:28
09:36:29
09:36:32
09:36:38
09:36:40
09:36:46
09:36:49
09:36:51
09:36:54
09:36:57
09:37:02
09:37:04

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025

20

A   At issue in that -- well, so I was asked in that case to, to provide a rebuttal report from a statistics expert; and so I was retained as a statistics expert to discuss sampling procedures that were done in that case.

Q   Your -- well, let's finish this out.

So you've been deposed before; correct?

A   Correct.

Q   How many times?

A   I believe it's a handful of times.  I think five, maybe more, maybe less.  I can't remember exactly, but.

Q   In each of the cases that are disclosed in your expert report where you provided expert testimony in the past, were you deposed in each of those cases?

A   I was deposed in all of them except for one; and in that one I testified live in a, in the arbitral hearing.

Q   Okay.  And so that anticipates to some extent my, my next question.  So it sounds like you've testified at least once in an arbitral hearing; is that correct?

A   That's right.

09:37:07
09:37:10
09:37:15
09:37:19
09:37:22
09:37:28
09:37:32
09:37:36
09:37:36
09:37:39
09:37:44
09:37:48
09:37:49
09:37:52
09:37:55
09:37:57
09:37:59
09:38:02
09:38:08
09:38:09
09:38:11
09:38:14
09:38:18
09:38:18

Q   Have you ever otherwise testified live in court?

A   I presume testimony in front of the US Senate and the US House would not count as testifying live in court.  This is different testimony.  Yes.  So I think if you're asking have I testified live in court, aside from that one arbitration case, then I think the answer is no.

Q   You served an expert report in this matter on January 15th, 2025; is that correct?

A   I believe that was right.

Q   And then you made some corrections to that expert report; is that correct?

A   That's correct.

Q   And served a revised report that incorporated those corrections; correct?

A   That's right.

Q   What were the circumstances that led you to preparing the corrected report?

MR. HARVEY:  Let me just caution the witness not to reveal the content of any communications you had with plaintiffs' counsel or with other consulting or testifying experts.

A   Can you repeat the question?

Q   What were the circumstances that led you to serve the corrected expert report?

A   As I was rereading the report after we submitted it, I noticed several formatting problems that were unexpected and, and changed, and I wanted to correct those; and so that's -- and then in rereading the report there were several small substantive changes that, that I thought, as someone who cares about the quality of their work, I wanted to make sure that those small substantive changes were -- nonsubstantive changes were corrected.

Q   Are you working with any consulting firm, economic consulting firm or other consulting firm, in relation to the work that you performed in this case?

A   I had a team that was operating under my direction, but I'm not employed by a consulting firm.

Q   What's the name of the firm?

A   Econ One.

Q   And who on that team worked with you?

A   Augustus Urschel and Madeleine Bowe.

Q   So let's -- let's mark now your corrected

09:39:33
09:39:36
09:39:40
09:39:44
09:39:47
09:39:54
09:39:58
09:40:01
09:40:06
09:40:09
09:40:12
09:40:16
09:40:20
09:40:25
09:40:28
09:40:32
09:40:34
09:40:39
09:40:44
09:40:47
09:40:50
09:40:52
09:40:58
09:41:07

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025          76

evidence that you believed was inconsistent with any of those opinions; correct?

A   I would.  I would.  As I state here on page 77 in my review of the qualitative evidence, there is some suggestive evidence that USPI became aware of the concerns related to the no-poach agreement in 2017, and so I looked into that.  And the record evidence didn't show they took any steps to notify SCA that they were done with the agreement, and so arguably this is evidence that might be inconsistent with the 2019 end date.  And so I -- I investigated that discrepancy.

Q   Okay.  And -- and so when there was evidence that was inconsistent with any of the opinions based on the qualitative evidence that are described in section V.B of the report, you considered that inconsistent evidence and then offer an opinion about whether the inconsistent evidence is more -- more convincing or credible than the consistent evidence?

MR. HARVEY:  Objection to form.

A   I'm sorry.  Maybe you can restate the question.  I was getting confused with all the what is consistent and inconsistent.

Q  So you offer various opinions in section V.B of your report concerning whether the evidence that you reviewed and that you rely upon is consistent with the existence of various agreements, the timing of those agreements and the scope of those agreements; correct?

A  I would say in section 5 we -- there's even more detail than you described regarding the enforcement of those agreements, how they were communicated, the various examples of how they were used in practice, et cetera.  So there's much more than you just described in this section.

Q  And you didn't limit your review to evidence that was consistent with those conclusions; correct?

MR. HARVEY:  Objection.  Asked and answered.

A  I did not.

Q  You -- you considered inconsistent evidence as well; correct?

MR. HARVEY:  Objection.  Asked and answered.

A  I did.

Q  And with regard to evidence that was

inconsistent, you determined in your opinion that

the, that evidence should not be, shouldn't change

your opinion that the evidence is consistent with

the existence of those agreements; is that

correct?

MR. HARVEY: Objection to form.

A Let me try to answer your question. In

this case there is a lot of qualitative evidence,

and I reviewed the qualitative evidence to assess

whether the alleged conduct was consistent with

anticompetitive collusion.

And so in furtherance of that, I studied

the qualitative evidence that was consistent and

inconsistent; and at the end of the day, there was

an ultimate question of was the -- is the -- is

the qualitative evidence consistent with

anticompetitive conduct, weighing all of that

evidence together.

And my answer is that the evidence, the

qualitative evidence is consistent with

anticompetitive conduct.

Q Got it. So in this section of your

report, after weighing that consistent and

inconsistent evidence, you offer your opinion on

that, that ultimate question; correct?

MR. HARVEY: Objection to form.

A I offer that opinion, I offer the opinion that the qualitative evidence is inconsistent with competitive conduct and consistent with anticompetitive collusion in this section; but it also comprises -- I was also asked to look at the quantitative evidence as well.

This section, section V.B, is describing the qualitative evidence as it relates to the no-poach agreements.

Q And we'll get to your quantitative analysis as well; but again, just focusing on this section V.B which relates to the qualitative evidence concerning what you're describing as bilateral no-poach agreements, you weighed the consistent and inconsistent evidence and then rendered your opinion about whether the, the -- on the ultimate question about whether the evidence is, in fact, more consistent with the parameters of those agreements; correct?

MR. HARVEY: Objection. Vague. Objection to form.

A I think -- I think I've answered your

question already. I can try to summarize what, again, I think is an answer, which is that I reviewed the qualitative evidence as it relates to the bilateral no-poach agreements between SCA and DaVita and SCA and USPI; and I was asked to form an opinion about whether that evidence is consistent with anticompetitive conduct.

And in reviewing that evidence, I did not ignore inconsistent evidence, and I considered both evidence that would be inconsistent and consistent, and then in rendering my opinion I ultimately came to the conclusion that the qualitative evidence was consistent with anticompetitive conduct.

Q Okay. After weighing the consistent and inconsistent evidence?

I'm sorry. You have to answer audibly.

A Oh yes.

Q Thanks. Okay.

So let's focus again back on the SCA and DaVita, what you're calling no-poach agreements.

Do you offer opinions about whether the qualitative evidence shows that there were changes or modifications to that agreement or those

81

agreements over time?

A  The one potential change that comes to mind is that I believe at the outset of the SCA-DaVita no-poach agreement, initially there was simply a prohibition on proactive solicitation; and at some point shortly thereafter, there was an addition of the tell-your-boss provision.

Q  Okay.  And is the tell-your-boss provision in your mind a material modification of the underlying agreement?

MR. HARVEY:  Objection.  Vague.

A  The -- the question you asked is, is it a material modification.  What do you mean by "material"?

Q  Economically material.

A  That sounds like an empirical question at the end of the day.  Are you asking me if I have an opinion on the effect of the tell-your-boss provision on its own?

Q  Well, let me -- let me just take what you first said.  So you believe that that's an empirical question; is that correct?

A  I was just trying to interpret the question that you were asking me.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025          129

What do you mean by that?          13:15:05

A  I mean, the places where their skill set          13:15:07
and their experience would most easily transfer.          13:15:10

Q  So it would include all the employers for          13:15:15
particular employees where their skill sets would          13:15:20
most easily transfer; is that right?          13:15:24

A  Yeah, let me clarify.  And when I say          13:15:26
easily, I mean that their -- their productivity          13:15:30
would not fall off because they have to learn, for          13:15:35
example, how a new industry operates, right, that          13:15:38
their knowledge of how to do their job is largely          13:15:41
similar at the other location.          13:15:46

Q  And those -- depending on those skills,          13:15:51
there might be different relevant labor markets          13:15:54
for different individuals; correct?          13:15:58

MR. HARVEY:  Objection to form.          13:16:01

A  When you say different labor markets, like          13:16:04
what do you mean?          13:16:07

Q  I mean just what you were talking about          13:16:08
before when you -- when you describe what a          13:16:10
relevant labor market is.          13:16:13

A  Right.  So I think what I'm trying to say          13:16:15
is that we are in the healthcare context, and to          13:16:17
the extent these individuals could go and use          13:16:21

their skills and knowledge most productively without a big drop-off in their productivity, it would be in the healthcare context in a similar job.

Q And the -- the potential employers for someone in an IT department might be different than those with finance skills, for instance; is that correct?

A I think I would just reiterate my answer that if I am an individual who has expertise in IT, in the healthcare industry, in the ASE industry in particular, that the most relevant labor market competitors are those who are working in that same context.

Q And you haven't done any analysis to determine who the most relevant employers are for different class members, have you?

MR. HARVEY: Objection to form.

A I wasn't asked to do any analysis on which employers are the most relevant. I was asked to study the extent to which the qualitative and quantitative evidence in this case is consistent with anticompetitive conduct and to quantify the harms done to the workers as a result of that

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

131

conduct using common methods and evidence.

Q  Yeah.  So you haven't done a relevant market analysis; correct?

A  I wasn't asked --

MR. HARVEY:  Objection to form.

A  Let me repeat what I just said.  I wasn't asked to do a relevant market analysis, however you're referring to that, and I did not do one.

Q  A clear indication of who -- which employers might be able to employ individuals with readily transferrable skills is the employer from which an employee was hired.

Is that fair?

MR. HARVEY:  Objection to form.

A  I'm sorry.  I found the question confusing.  Could you restate it?

Q  Sure.  So there are lots of people that during the conduct period at issue in this case moved from other employers to, for instance, DaVita or SCA or USPI; correct?

MR. HARVEY:  Objection to form.

A  Among -- among the class members, during the window of data that we have, which again is approximately 2008, which is the start of the SCA

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

132

data up until 2022, we do see senior-level employees moving between SCA and USPI and SCA and DaVita.

Q   And from other employers as well; correct?

A   In the data that's provided, we only have payroll records -- sorry.  We have a lot of data from only these three companies.  So if I see an individual in the data, let's say, at SCA and they move to DaVita within the time period for which I have data, I can observe that move.  If they moved to another company outside of the three companies for which I have access to the data, I don't know what kind of job they took.

Q   There is data that would allow you to determine what job they took and which employer; correct?

MR. HARVEY:  Objection to form.

A   I wasn't asked to -- to look into that. There may be data that you could use to -- to assess that, but it wasn't one of my assignments.

Q   But you'd agree with me that if -- and you focused on departure so let's focus on departures first.

You would agree with me, would you not,

included in the -- in the class definition; is that right?

MR. HARVEY:  Objection to form.

A  We don't know exactly where these individuals are going or if they're going anywhere.  They could again be sitting out or unemployed, so I don't have a, a number of the other, the number of other companies that they went to in 2008, for example.

Q  Right.  And I'll get back to that question; but my question is a little bit different, which is that the -- there may be different sets of competitors in the labor markets for different employees that are included within the class definition; is that right?

MR. HARVEY:  Objection to form.

A  I think I gave the answer that I gave because we don't know where they went.  So a competitor in this case is a company, and it's possible that this year the company hired in IT and next year the company is going to hire in finance.

And so it could very well be that we have the same company hiring for both of those types of

jobs. Could be in this year, could be in another year; and what we would need, I think, to answer your question is the different employers that these individuals went to, if they went anywhere after they left.

Q Okay. So you'd need data on where the departing employees went to, to determine who the relevant, competitors in the relevant labor market are; right?

MR. HARVEY: Objection to form.

A Yes, that's right.

Q Okay. And you haven't examined or tried to determine whether such data's available?

MR. HARVEY: Objection to form.

A I wasn't asked to, to examine where every departing worker went to, and I did not do that.

Q Your previous answers were suggesting you thought that or would expect that the moves were generally with other healthcare companies; is that right?

MR. HARVEY: Objection to form.

A I believe my testimony was that to the extent this individual's primary experience and expertise is in IT and healthcare or in finance

and healthcare, that they would be most well situated to be equally productive in similarly situated companies in the healthcare space.

Q  And do you know how many similarly situated companies in healthcare space there are?

A  Sitting here today I don't, I don't know.

Q  Order of magnitude?

A  I don't know.

Q  Certainly thousands; right?

MR. HARVEY:  Objection to form.

A  I don't know.

Q  No idea?

A  I don't know.

Q  Okay.  You at some point in your report refer to the defendants as among the largest in the outpatient medical care industry.

Does that sound familiar?

A  I'd have to go back and double check my language; but that is my -- that's consistent with my recollection.

Q  And how many entities are there in outpatient medical care industry?

MR. HARVEY:  Objection.  Vague.

A  What do you mean by "entities"?

A  I'm -- I'm somewhat familiar with that.

Q  You haven't attempted to define a relevant market in this case, have you?

A  Well, when it comes to thinking about market power, my -- my reading and my understanding of those -- those documents is that there are several ways to demonstrate market power, and in the merger context, it can be hard to demonstrate market power because the merger hasn't happened.  And so there are several ways in that context to think about whether, you know, whether companies might have market power, and that would require defining a relevant market.

In this context I wasn't asked to study the relevant labor market and define the precise contours of the labor market.  I wasn't asked to figure out exactly which companies every worker was going -- every worker was going to or coming from.  I was asked to assess the harm done to the workers as a result of the alleged conduct, whether that conduct -- the evidence, qualitative and quantitative, was consistent with anticompetitive harm.

My understanding of this literature and

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025

156

these documents is that you can establish market power through a market definition exercise, or you can establish it directly. And as I talk about later in my report, the evidence that I uncover from the wage suppression models constitute direct evidence of market power.

Q Okay. It was a very long answer. My question was simple. You have not attempted to, nor have you defined a relevant market in this case; is that correct?

MR. HARVEY: Objection. Argumentative. Asked and answered.

A I wasn't asked to define a relevant market, and I did not define a relevant market.

Did you want to go back to the --

Q I'll get back to that in a minute. So my next question for you, sir, is whether you agree that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them.

Would you agree with that?

MR. HARVEY: Object to form.

A Sorry. A lot of --

MR. HARVEY: Objection to form.

A   There were a lot of negatives in there. Could you restate the question?

Q   Yep.  Would you agree that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them?

MR. HARVEY:  Objection to form.

A   I think -- I think the -- the question that you're asking is let's imagine a world in which the defendants had no market power.  They had no power to set wages.

In that world is it possible that the conduct could have suppressed wages?  Is that your question?

Q   If you want to look, I'm actually reading from your report.

A   Okay.

Q   So my question is whether you agree with what you wrote, which is that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them?

MR. HARVEY:  Counsel, could you please identify where you're reading?

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025

181

more disaggregated compensation data. So to harmonize it, we aggregated it all to the individual employee company level.

So I would -- I would now have a dataset where I observe individual A at DaVita in 2010. The defendants didn't give, harmonize time frames of the data. SCA only gave data that started in 2008. USPI and DaVita had data that started a little bit earlier, and so we call this an unbalanced panel in econometrics.

And so what the model does is it has to define for each company when does the conduct period start and stop, and so that's defined -- the conduct overall is defined. So this is at, remember, the individual company level, and the conduct varies at the -- sorry -- the individual company year level, and the conduct varies at the company year level, based on the record evidence that I analyzed previously.

And so the conduct variable is set to 2008 to 2019 for DaVita and SCA, and it's set to 2010 to 2019 for USPI based on the record evidence that's described previously.

And so for workers that are employed at

182

this time period -- they may have been employed for a year or two; they don't necessarily have to be employed over the whole time frame -- that this is the aggregate effect on their compensation during the conduct period was about negative 14.5 percent across each of the three defendants.

Q  So just at the last part I just want to make sure I understand.  So the 14.5 percent, is that at 14.5 percent suppression on an individual per year or over the entire time the individual's included in that class?

A  Thank you for that clarification.

This is per year, and this is for the typical class member regardless of which company you are at, because later we're going to disaggregate between companies.

Q  Okay.  But at least in terms of this model, this is across all three companies; correct?

A  That's right.

Q  Okay.  And I -- it was in your description -- thank you very much for that, by the way -- in your description of how you put together the model, but the data was harmonized at

the individual company year level; correct?

A  That's right.

Q  And so, and that's based in part on the fact that DaVita's compensation data was at the annual level of aggregation?

A  That's right.

Q  Okay.  And then the other variables that you included in your model as control variables, did you also harmonize those to the annual level?

A  Yes.  As, as described in the control variables, I think I have approximately ten, ten control variables; and so it depends on which control variable that you're talking about, for example.

Some of them have natural variation across time.  So, for example, the state unemployment rate can vary from year to year, and so that is a state year variable.

State GDP per capita, that also can vary across time and state as well.  State healthcare expenditures per capita, again, that changes year to year.  Averager -- average manager earnings in that state in the industries by the defendants, that also changes year to year.

Q   And -- and the evidence that you rely on for that opinion are your regressions; is that correct?

A   I believe the -- if I could just turn to the right page.  So I've been asked to determine whether defendants have market power over class members, and based on my wage suppression estimates, I suggest that companies did suppress or they -- all or nearly all class members experienced wage suppression as a result of the alleged misconduct and -- and if we had a perfectly competitive market, then it would -- I do not expect that we would have -- that the conduct would have had these effects.

Q   And -- and so that's what you're comparing it against is a perfectly competitive market?

A   But we have to think about the term market power and what's it mean here, and the typical benchmark in economics classes is to think about it in a perfectly competitive market.  And it's long been alleged that labor markets are perfectly competitive.  That claim, I think, has been debunked several times.

    I do think that here if -- if the

16:58:57
16:59:00
16:59:08
16:59:08
16:59:14
16:59:35
16:59:38
16:59:44
16:59:49
16:59:53
16:59:57
17:00:01
17:00:08
17:00:10
17:00:13
17:00:15
17:00:20
17:00:22
17:00:24
17:00:27
17:00:31
17:00:34
17:00:36
17:00:38

companies didn't have some power, market power over setting wages, then they would not have been able to suppress class member compensation as a result of the conduct.

Q   Okay.  So in terms of your opinions about the market power of the defendants over labor that are reflected in, I think, section 9 of your report, those are based on your wage suppression regressions; correct?

A   Right.  I was asked to assess market power and the existence of market power, and as I talk about in section 9, there's generally two ways to assess market power.  One is using an indirect test, which is, again, more common, as we discussed, when you cannot test directly whether there is evidence of market power.  And so what I did is a direct test of market power by examining whether or not the alleged conduct suppressed compensation for all or nearly all members, and that constitutes direct evidence of market power.

Q   And -- and that evidence, again, just to be clear is your wage suppression regressions?

A   Certainly the wage suppression regressions, and I'd have to think about the

extent to which it's consistent with the other analyses. The mobility analysis also seems relevant for the market power though I think the primary evidence is the -- the compensation analyses.

Q Okay. So at least the primary evidence is the compensation analysis; is that correct?

A And I'm saying analyses here just because there's many.

Q And the analyses that you're referring to are the regressions about wage suppression in various forms; correct?

A They are, and I would also include in there potentially the wage structure regressions as well.

Q Okay. And is that reflected in section 9 of your report?

A The -- the compensation structure regressions are in part 7(F).

Q But is your reliance on the compensation structure regressions a support for your opinions regarding market power reflected in your report in the section that addresses market power?

A Well, I think to the extent that we

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Janet A. Hamilton, Registered Diplomate Reporter and Notary Public before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that review was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of March, 2025.

Registered Diplomate Reporter

My commission expires

March 31, 2028

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - x

IN RE:  OUTPATIENT MEDICAL :

CENTER EMPLOYEE ANTITRUST  : Master Docket No.

LITIGATION                 : 1:21-cv-00305-SRH-YBK

- - - - - - - - - - - - - x


HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER


Videotaped Deposition of

EVAN P. STARR, Ph.D.

VOLUME 2

Baltimore, Maryland

Thursday, March 20, 2025

9:18 a.m.


Job No. 577304

Pages:  272 - 522

Reported by:  Janet A. Hamilton, RDR

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025                    273

           Videotaped Deposition of EVAN P. STARR,

Ph.D., held at the office of:




           Kramon & Graham, P.A.

           750 East Pratt Street

           Suite 1100

           Baltimore, Maryland  21202-3201

           410.752.6030









           Pursuant to Notice, before Janet A.

Hamilton, Registered Diplomate Reporter and Notary

Public in and for the State of Maryland.

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025                    274

A P P E A R A N C E S

   ON BEHALF OF THE PLAINTIFFS:

         DEAN M. HARVEY, ESQUIRE

         SARAH D. ZANDI, ESQUIRE

         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

         275 Battery Street, 29th Floor

         San Francisco, California  94111-3339

         415.956.1000


   ON BEHALF OF DEFENDANT DaVITA, INC.:

         MORGAN LEWIS & BOCKIUS LLP

         J. CLAYTON EVERETT, JR., ESQUIRE

         1111 Pennsylvania Avenue, NW

         Washington, DC  20004-2541

         202.739.3000

-And-   NATHAN T. SHAPIRO, ESQUIRE

         101 Park Avenue

         New York, New York  10178-0060

         212.309.6000

(Appearances continued on next page)

A P P E A R A N C E S   C O N T I N U E D


-And-   KENNETH M. KLIEBARD, ESQUIRE

        110 North Wacker Drive

        Chicago, Illinois  60606

        312.324.1000


-And-   MOLLY MORIARTY LANE, ESQUIRE (via Zoom)

        One Market, Spear Street Tower

        28th Floor

        San Francisco, California  94105-1596

        415.442.1333


-And-   JOHN C. DODDS, ESQUIRE

        2222 Market Street

        Philadelphia, Pennsylvania  19103-3007

        215.963.5000

(Appearances continued on next page)

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025                                276

```
         A P P E A R A N C E S   C O N T I N U E D


     ON BEHALF OF DEFENDANTS UNITED SURGICAL PARTNERS

     HOLDINGS, INC., UNITED SURGICAL PARTNERS

     INTERNATIONAL, INC., and TENET HEALTHCARE

     CORPORATION:

          KING & SPALDING LLP

          EMILY NEWTON, ESQUIRE (pro hac vice)

          LAUREN SMITH, ESQUIRE

          1180 Peachtree Street, NE

          Suite 1600

          Atlanta, Georgia  30309

          404.572.2745


  -And-   VERONICA MOYÉ, ESQUIRE (pro hac vice)

          1185 Avenue of the Americas

          34th Floor

          New York, New York  10036

          212.556.2100


  (Appearances continued on next page)
```

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025                277

A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF DEFENDANTS SURGICAL CARE

AFFILIATES, LLC and SCAI HOLDINGS LLC:

        McGUIREWOODS LLP

        SARAH A. ZIELINSKI, ESQUIRE

        AMY B. MANNING, ESQUIRE

        77 West Wacker Drive

        Suite 4100

        Chicago, Illinois  60601-1818

        312.849.8100

-And-   JOSHUA D. WADE, ESQUIRE

        Gateway Plaza

        800 East Canal Street

        Richmond, Virginia  23219-3916

        804.775.1000


ON BEHALF OF DEFENDANT ANDREW HAYEK:

        WILSON SONSINI GOODRICH & ROSATI, P.C.

        JORDANNE M. STEINER, ESQUIRE (pro hac vice)

        1700 K Street, NW, Fifth Floor

        Washington, DC  20006

        202.920.8703

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025            278

A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF DEFENDANT KENT THIRY:

McDERMOTT WILL & EMERY LLP

DANIEL R. CAMPBELL, ESQUIRE (via Zoom)

KATHARINE M. O'CONNOR, ESQUIRE (via Zoom)

444 West Lake Street

Suite 400

Chicago, Illinois  60605

312.372.2000


ALSO PRESENT:

ANDREW MOHRAZ, ESQ., Associate General

Counsel, DaVita, Inc.

ADAM VAUGHN, Videographer

WENDY L. PETROPOULOS, Ph.D.

Cornerstone Research

MICHELE CARTER, Cornerstone Research

C O N T E N T S

EXAMINATION OF EVAN P. STARR, Ph.D.                    PAGE

By Mr. Everett                                        282

By Ms. Newton                                         445

By Ms. Zielinski                                      476

E X H I B I T S

(None marked)

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025

280

THE VIDEOGRAPHER: We are on the record at 9:18 a.m. Audio and video recording will continue to take place. All parties agree to go off record. Please note the microphones are sensitive and may pick up whispering and private conversations.

This is the recorded proceeding of Dr. Evan P. Starr taken by counsel in the matter of Outpatient Medical Center Employee Antitrust Litigation. This proceeding is taking place at Kramon & Graham, P.A., 750 East Pratt Street, Suite 1100, Baltimore, Maryland 21202. My name is Adam Vaughn, and I am the videographer on behalf of US Legal Support located at 11625 North Chase Drive, Suite 900, Houston, Texas, 77060.

I am not related to any party in this action nor am I financially interested in the outcome. The court reporter is Jan Hamilton on behalf of US Legal Support. Counsel will state their appearances for the record, after which the court reporter will enter the statement for the proceeding into the record and swear in the witness.

MR. EVERETT: This is Clay Everett from

Morgan Lewis for DaVita.

MR. SHAPIRO:  Nathan Shapiro, Morgan Lewis, for DaVita.

MR. KLIEBARD:  Good morning.  Ken Kliebard of Morgan Lewis, also on behalf of DaVita.

MS. CARTER:  Michele Carter, Cornerstone Research, for defendants.

MS. MOYÉ:  Veronica Moyé, King & Spalding, USPI and Tenet.

MS. NEWTON:  Emily Newton, King & Spalding, also for Tenet and USPI.

MS. MANNING:  Amy Manning, McGuireWoods, SCA.

MS. ZIELINSKI:  Sarah Zielinski, McGuireWoods, SCA.

MS. ZANDI:  Sarah Zandi, Lieff Cabraser Heimann & Bernstein for plaintiffs.

MR. HARVEY:  Dean Harvey, Lieff Cabraser for plaintiffs.

MR. WADE:  Joshua Wade, McGuireWoods for SCA.

MR. DODDS:  Jack Dodds, Morgan Lewis for DaVita.

MR. MOHRAZ:  Andrew Mohraz for DaVita.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025                        282

MS. STEINER:  Jordanne Steiner, Wilson Sonsini Goodrich & Rosati for Andrew Hayek. 09:20:24 / 09:20:25

MS. SMITH:  Lauren Smith, King & Spalding, for USPI and Tenet. 09:20:28 / 09:20:30

MR. HARVEY:  And the Zoom?

P R O C E E D I N G S

-----

EVAN P. STARR, Ph.D.,

a witness herein, being duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT DAVITA

MR. EVERETT:

Q  All right.  Good morning, Dr. Starr. 09:20:54

A  Good morning. 09:20:55

Q  Just I wanted to follow up real briefly on one thing from yesterday.  Yesterday you testified that in one of your academic papers you utilized a regression that incorporated a linear time trend. 09:20:56 / 09:20:59 / 09:21:01 / 09:21:06

Do you recall that? 09:21:09

A  Yes. 09:21:10

Q  Which -- which paper is that? 09:21:10

A  If I could look in my CV, I can give you the title. 09:21:13 / 09:21:17

Q  And while you're looking for it, just to 09:21:24

uncertain is how long they are staying, and so if we want to talk about expected values, an individual might have a subjective probability that they will make it to a year, whatever the vesting period is, and they might have their own subjective value of what that equity grant is worth at a particular point in time; but in terms of what's in their bank account, what actually transfers on the day that stock award is made, my understanding is that it is a, it is a promise to pay at some future date based on certain conditions. There's no dollars exchanged on that day.

Q Right. And I understand that the -- in terms of the realized value for unvested stock options, that would be zero; is that right?

A As long as the unvested stock options -- and I don't want to complicate the hypothetical, but some bonuses -- sometimes stock options might come with a cash bonus, so to the extent we're only talking about stock options with a vesting period of a given time, my understanding is that when the stock option award is made, that it would come in general with no -- no actual dollars being

transferred, just a promise to pay at a future point in time based on the conditions laid out in the award.

Q  But there would be an expected value of the stock at the time it is issued; is that correct?

MR. HARVEY:  Objection.  Asked and answered.

A  I would say the expected value in each year before the vesting period ends is zero, and then after the vesting period ends, it's certain, whatever that -- whatever the stock award says. And so it's really a matter of -- of timing, and so up until the worker hits that vesting period, it's worth zero to them.  And then any subjective beliefs they have about their future probabilities of mobility, which may or may not be right, they might form an expectation of how much that particular stock award might be worth, but it's not worth anything in realized earnings until that future date in time.

Q  And -- and do you -- do you know how as an accounting matter unvested stock options are valued?

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025

367

MR. HARVEY: Objection to form.

A I'm not an accountant, and I -- I -- I can't -- sitting here today, I can't say I know how defendants valued stock options in this case. We use the value of realized earnings that they provided to us.

Q And do you know if as -- in terms of reporting and accounting for, say -- say, financial reporting, whether stock options need to be valued at the time of issuance?

MR. HARVEY: Objection to form.

A My understanding is that an award of a given number of stock options has a value and is tied to the resale of those stocks at any given time. If you have ten shares of a stock and you'd like to sell them, then you sell them at the -- at the going rate, and that rate could change over time.

Exactly how accountants pick that rate, if it's the rate at a -- the start or the expected rate at the time of vesting or something different, I'm not exactly sure how they do that, and I don't know how they did it in this case. We used the realized earnings that defendants shared

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025                    368

with us.

Q  But your testimony is that as an economic matter the expected value of stock options is zero until they are vested; is that right?

MR. HARVEY:  Objection.  Misstates prior testimony.

A  The expectation that individuals have is entirely conditional on how long they expect to stay.  So the expected value -- so if you -- if I look at a stock, an award that vests in -- I'll give myself more time -- two years, what is my expected award if I stay one year?  Zero.

What is my expected award if I stay 1.5 years?  Zero.

What is my expected award if I stay 1.8 years?  Zero.

What is my expected award if I stay 1.9 years?  Zero.

What is my expected award if I stay 1.99 years?  Zero.

What is my expected award as soon as I cross that threshold?  It's whatever the value of the award is as laid out in the particulars of that contract.

And so my testimony is that there might be a forward-looking expectation which relates to the individuals' subjective probability of how long they are going to stay, but the expected value of that award depends on -- it's zero -- it's entirely zero before the vesting period, and then it's exactly what's awarded in it at the time they cross that threshold.

Q   And from the perspective of the employer who is paying compensation, you would take into account their expectations about the likelihood of vesting?

MR. HARVEY:  Objection to form.

A   As a practical matter, when companies are issuing stock compensation, my understanding is that part of the goal of stock compensation is that when the company does well, the worker does well, and when you have a vesting period of a certain number of years, it acts potentially as an incentive mechanism to keep the worker around such that they have a particular incentive to stay, a higher incentive to stay to reach a given period of time.

And I just want to cite from Gibson here

because I thought he put this very nicely for why he looked at stock compensation differently than salary compensation, and Gibson writes here in his -- in his article that his explanation for the reduction in stock bonuses arising from the no-poach agreement is that "a firm engaged in no-poaching agreements has less need to offer employees incentives to stay."

And so that's -- that's his justification for why he includes equity compensation. So I can imagine that when companies are choosing to use equity compensation, they're -- they're doing it in part to try to help keep workers to stick around, and so they have a subjective belief not only about how long those workers might stay without the equity compensation but maybe that their belief updates if they were to provide equity compensation.

Q But -- but in the case of individuals who received equity compensation before the conduct period, that would not have been affected by the conduct; correct?

MR. HARVEY: Objection. Asked and answered.

employee compensation?  Would that in your opinion transmit across all class members?

MR. HARVEY:  Objection to form.

A  What do you mean by a narrow shock?

Q  I guess the opposite of what you mean by a broad shock.

MR. HARVEY:  Objection to form.

A  So I think that the -- at issue in this case are -- is the alleged misconduct which is agreements not to poach each others' workers, which consists of a direct prohibition on solicitation and the tell-your-boss provision and separately the CS -- the CSI exchanges.  And so I'm not sure it's worth talking about narrow shocks to an individual worker or not when the -- the conduct at issue in this case is clearly not narrow.

The evidence is -- let me be clear.  The evidence is consistent with the agreements at issue in this case not being narrow.  The -- it's possible at the same time -- and let me play with your hypothetical for just a moment -- that if the right worker is seen as a -- as a benchmark in a certain job and that worker is able to leave, for

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025

438

example, that that puts -- that gives information and competitive pressure for other workers.

I'll just give you one example that comes to mind off the top of my head. The example of Skip Thurman is an interesting one at DaVita, and Skip Thurman saw one of his co-workers, Bill Myers, leave, and he got a raise of ███████████ ███████████. And that helped Skip Thurman realize that he was being largely undercompensated relative to -- to what he could earn elsewhere. He described the no-poach agreements as, I believe, an invisible fence. He likened it to being in a kennel, and he realized that not only was he underpaid but others were also underpaid. And so based on his testimony, it seems to me possible that even just a handful of departures or a handful of effects that resulted from the no-poach agreement could -- could create broad effects that would affect other workers.

Q   Is that something you've tested?

A   What I've looked at in this case, as we've talked about several times, and forgive me if I sound like a broken record here, is whether the evidence in this case is consistent with

anticompetitive conduct, whether I can quantify the harms from the conduct, whether all or nearly all class members are harmed using common methods and evidence, and -- and that -- that's what I've done.

And so I haven't tested whether a single job mobility event or a single event of any kind, aside from what I was asked to do, I haven't looked at those individual events and tried to assess what impacts they have.

Q Is -- if there was a positive shock to compensation, would that also tend to filter through and impact every employee among the senior employees of defendants?

A So I'll just return, I think, to the example that we started with here, which is probably the easiest to understand, which is that if -- you imagine a world in which the defendants are sharing their raise information. And, again, just to give a purely hypothetical, suppose that SCA is thinking about raises of 4 percent and then they learn that DaVita and USPI are giving 2 percent raises. If they then give everyone a raise of 2 percent instead of 4 percent, that's

14:08:45
14:08:50
14:08:54
14:08:58
14:09:01
14:09:01
14:09:06
14:09:11
14:09:14
14:09:18
14:09:21
14:09:29
14:09:35
14:09:40
14:09:42
14:09:44
14:09:46
14:09:50
14:09:51
14:09:55
14:09:58
14:10:02
14:10:07
14:10:11

broadly felt. If instead they were to go from 2 percent to 4 percent, again, that would be broadly felt.

Q So you gave the example before of Skip Thurman. Have you looked to see whether others who worked in a similar role as Mr. Thurman or Mr. Myers who Mr. Thurman was referring to got raises when -- when the information that you were talking about became available?

A Yeah. I'd love to talk about the common impact section in my report where we use a variety of methods to estimate whether all or nearly all members of the class were harmed, and so that would include Skip Thurman and -- and the others, subject to the caveat that they were in the director and above jobs.

Q But -- but I think the example that you gave was that Mr. Thurman became aware of some other employee getting an offer with -- for substantially more compensation than he or -- or perhaps others in a similar role were being paid.

Did that positive shock result in an increase in pay for Mr. Thurman or others?

A So my understanding of part of the Skip

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Janet A. Hamilton, Registered Diplomate Reporter and Notary Public before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that review was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of March, 2025.

*Janet A. Hamilton*

Registered Diplomate Reporter

My commission expires

February 4, 2028

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

------------------------------ Master Docket No.

IN RE OUTPATIENT MEDICAL CENTER   1:21-cv-00305-SRH-YBK

EMPLOYEE ANTITRUST LITIGATION,

--------------------------------

Baltimore, Maryland

Tuesday, July 15, 2025

*** HIGHLY CONFIDENTIAL ***

Deposition of EVAN P. STARR, Ph.D., VOL. III, a witness herein, called for examination by counsel for the Defendant DaVita, in the above-entitled matter, pursuant to notice, the witness being duly sworn by Barbara J. Moore, a Notary Public in and for the State of Maryland, taken at the offices of KRAMON & GRAHAM, P.A., 750 E. Pratt Street, Baltimore, Maryland, at, and the proceedings being taken down by Stenotype by BARBARA MOORE, CRR, RMR, and transcribed under her direction.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

APPEARANCES:


On Behalf of the Plaintiff:

DEAN M. HARVEY, ESQ. (pro hac vice)
LIN Y. CHAN, ESQ. (pro hac vice)
YAMAN SALAHI, ESQ. (pro hac vice)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
dharvey@lchb.com


On Behalf of the Defendant DaVita, Inc.:
J. CLAYTON EVERETT, ESQ.
NATHAN T. SHAPIRO, ESQ.
KENNETH M. KLIEBARD, ESQ.
MORGAN LEWIS, LLP
1111 Pennsylvania Avenue, NW
Washington, D.C.   20004


SARA CHAMPION, ESQ.
CORNERSTONE RESEARCH
2001 K St NW, Suite 800
Washington, DC 20006


On Behalf of SCA Defendants:

SARAH A. ZIELINSKI, ESQ.
ANDREW E. TALBOT, ESQ.
AMY B. MANNING, ESQ. (Via Zoom)
PETER SHAKOW, ESQ. (Via Zoom)
McGUIRE WOODS, LLP
77 W Wacker Drive, # 4100
Chicago, IL 60601

Evan P. Starr Volume III Highly Confidential
July 15, 2025

APPEARANCES (Continued):

        On Behalf of Defendants Tenet and USPI:

           EMILY SHOEMAKER NEWTON, ESQ.

           LAUREN SMITH, ESQ.

           VERONICA MOYÉ, ESQ.

           KING & SPALDING, LLP

           1180 Peachtree Street, NE

           Suite 1600

           Atlanta, GA 30309

Videographer: Adam Nudelman

TABLE OF CONTENTS

WITNESS                                                    PAGE

EVAN P. STARR, Ph.D.

BY ATTORNEY EVERETT                                        528

BY ATTORNEY ZIELINSKI                                      788


                           EXHIBITS

EXHIBIT        DESCRIPTION                                 PAGE

EX DX 90    Updated expert witness report        563

EX DX 91    Errata                               563

EX DX 92    May 30 rebuttal report               564

EX DX 93    LinkedIn download                    566

EX DX 94    Lafontaine paper                     613

EX DX 95    Collaci paper                        633

EX DX 96    Gibson paper                         640

P R O C E E D I N G S

THE VIDEOGRAPHER:  This is media Unit No. 1 in the videotaped deposition of Dr. Evan Starr in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation, Case No. 1:21-cv-00305.

Today's date is July 15, 2025. Time on the record 9:16 a.m.  This video deposition is taking place in Baltimore, Maryland.

Would all attorneys present please identify themselves, state whom they represent, beginning with the party that noticed this proceeding.

ATTORNEY EVERETT:  Good morning, Clay Everett for Morgan Lewis for DaVita.

(Attorneys stated their appearances for the record.)

ATTORNEY EVERETT:  I assume that the Zoom notices could be noted in the report; is that correct?

THE VIDEOGRAPHER: Adam Nudelman, also with U.S. Legal. We'll now administer the oath and we can proceed.

********************

EVAN P. STARR,

having been called as a witness on behalf of the Plaintiff and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY

ATTORNEY EVERETT:

BY ATTORNEY EVERETT:

Q. Good morning, Dr. Starr.

A. Good morning.

Q. You wouldn't disagree, would you, that the employers that hired Defendants' senior-level employees are competitors for those employees?

ATTORNEY HARVEY: Objection to form.

THE WITNESS: Can you state the question again.

they've traditionally been separate.

Q.    Have you ever taught industrial organization?

A.    I have.  I've taught managerial economics, and I've taught intramicro and intermediate micro, and I taught antitrust courses in graduate school as well.

Q.    So I guess turning back to these naturally occurring sources of monopsony power, those exist in labor markets regardless of any, say, no-poach agreement; right?

A.    There are naturally existing frictions that exist independent of firm conduct and independent of firm behavior.

Q.    And for the three defendants here, do you have the opinion that each of them had some monopsony power by virtue of these types of naturally occurring frictions?

A.    So when I think about whether the companies and the defendants in this case have market power, I think we can look to the economic literature, which has some estimates of the typical

Evan P. Starr Volume III Highly Confidential
July 15, 2025

firm market power in the healthcare industry.

And when you look across industries, healthcare has the most market power relative to just -- to -- sorry. Healthcare has the second most market power, according to some estimates.

And so as a default, I would expect that they have market power and a significant degree of market power. I'm not relying on that for my opinion that the defendants had market power. I'm primarily relying on my wage regression that the documents -- that defendants had market power. But I think it would be expected that they would, given the prior literature.

Q. Okay. And they would have had any of that naturally occurring monopsony power bothboth before, during and after the conduct at issue?

A. There would be some naturally occurring market power. I imagine that they would have had that both before and during and after the conduct, and their behavior may have also either extended their market power or it may have -- they

may have actualized their market power in ways that they weren't during the after period or before period.

Q.    And have you done any analysis to determine whether the naturally occurring monopsony power that defendants may have had that arose from things such as frictions varied over time?

A.    Your question is have I studied whether the other sources of market power have varied over time in addition to -- so we should talk about, I guess -- I'm not sure where you're going.  I haven't done a separate analysis that identifies market power arising from naturally occurring frictions versus firm conduct.

The empirical model that I estimate is designed to take into account a variety of other issues and identify the effect of the conduct itself.

So I'm confident in that, but I haven't done a separate analysis that would say search all matching frictions that were naturally occurring would have been higher here or there.

And so the goal is purely on causal identification. Whatever the relevant contours of the labor market are for a given individual is immaterial once you've estimated the appropriate causal effect.

Just to give an example of how that works in this case, if you recall, my empirical model compares the same workers to themselves. And so presumably that same worker is in a similar labor market or has similar preferences and skills as they did at different points in time.

And so when you have that sort of comparison that's driving your estimate, the labor market for that individual is already held sort of constant, and in that sense it's not necessary to think about all the potential moves and where everybody goes to.

BY ATTORNEY EVERETT:

Q. Again, just to be clear, you have not attempted to define even the rough contours of any labor market in this case; correct?

ATTORNEY HARVEY: Objection to form.

THE WITNESS: As I just testified, my task was not to identify the rough contours of the labor market. It was to identify the harm done to the employees as a result of the challenged conduct, among other assignments.

And so that was what I did, and what I did is consistent with the literature. If you study the no-poach agreements that have been studied in the literature, for example, and the High Tech case and in the franchise cases, none of those studies do an analysis that examines the rough contours of the labor market, as you put it. That's because you don't need to do that when the goal

is to estimate the harm of the conduct.

So my analysis is consistent with the literature, and it's consistent with the other research that I've done on identifying the harms from mobility restrictions.

BY ATTORNEY EVERETT:

Q.    And the literature that you're referring to on no-poach agreements is four papers. Is that right?

A.    Well, so I would include, you know, if you want to think about the literature mobility restrictions more broadly, there are limited instances of no-poach agreements in the literature. There's a handful of papers, but the literature on non-compete agreements is much larger.

And so I think in totality I don't think many of them take the perspective that Defendants' experts do hear that you have to study and count the exact number of employers that people go to.

Q.    So I guess putting aside the non-compete literature, which I acknowledge you've

record.)

THE VIDEOGRAPHER: We're back on the record at 16:27.

EXAMINATION BY

ATTORNEY ZIELINSKI:

Q. Dr. Starr, nice to see you again. I'm Sarah Zielinski, an attorney for SCA.

First let's go to your report, Defendant's Exhibit 90, and I'm on page 62. And this is Paragraph 68D.

A. Okay.

Q. And that paragraph says, "The testimony of SCA's director of IT security and corporate designee Brian Rasko shows that SCA had flimsy corporate retention policies."

Do you see that?

A. Yes.

Q. Are you offering an opinion in this case that SCA had flimsy corporate retention policies?

A. I'm using the word "flimsy" here because there's a lot of discretion given to

Evan P. Starr Volume III Highly Confidential
July 15, 2025

employees about what is considered ephemeral or

general correspondence and that the record evidence

suggests that there was no training on what those

would be.  And so it suggests that the record

evidence may be left up to the whims of

individuals.

Q.    So is that an opinion that you're

offering in this case?

A.    I'm just trying to describe the

evidence which I then describe in this subparagraph

about the lack of training and about the policies

of SCA as I've described.  And so flimsy seems like

an adequate adjective to describe that information.

Q.    Okay.  And what I'm trying to

understand is whether this paragraph is just a

descriptive, you know, something that you're doing

to characterize evidence that you saw or whether

that's an opinion that you are offering in this

case.

ATTORNEY HARVEY:  Objection to

form.

THE WITNESS:  Let me back up.  So

we're talking about this section which is in response to Defendant's experts here claiming that the record evidence is insufficient to support wage fixing or support wage fixing or support wage suppression as it relates to only the CSI exchanges.

So I'm responding to that by saying A, I think that the evidence that we do have is already sufficient to suppress compensation just from the CSI exchanges.

And then here what I'm talking about, in this section I'm talking about the evidence that we may not have because we don't observe it. So there's lots of pieces of that evidence. Some of it is coming from the fact that emails were supplied by individuals and not the companies themselves because of subpoenas.

Some of it is coming from the fact

harmed by the challenged conduct.

BY ATTORNEY ZIELINSKI:

Q.     Did you do a comparison of facility CEOs or administrators to their job responsibilities to the job responsibilities of director, director and above at SCA?

A.     Well, it says here that the CEOs are the leader of the surgical hospitals, and so they are the ones who are in charge of the hospital, so their responsibilities would include overall running of the hospital.

And so that was a very large responsibility.  And so we assume that they were in the director and above category.

ATTORNEY ZIELINSKI:  Nothing further from SCA.

ATTORNEY HARVEY:  I think I don't have anything, but why don't we take a second just to double-check.

THE VIDEOGRAPHER:  Off the record at 16:53.

(Recess taken from 4:53 p.m.

to 4:55 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 16:55.

ATTORNEY ZIELINSKI:  While we were on a break, Plaintiff's counsel indicated that a question that he had previously instructed the witness not to answer that we can now reask and have the witness answer.

BY ATTORNEY ZIELINSKI:

Q.    So the question was -- so the answer to my question is that you don't have any expertise in analyzing retention policies; correct?

A.    So I think that the -- your question is do I have expertise in analyzing corporate retention policies.  My expertise is in economics, labor economics and understanding competitive conduct and how that affects workers.  So the issue here that we're talking about is one of evidence that I would normally be looking for in a case like this where the goal is to understand what communications took place that would be consistent

with anti-competitive conduct and inconsistent with unilateral conduct.

And so I'd be looking for communications that would indicate individuals sharing specific instances of price information, asking for prices, future price changes. I would be interested in what they're doing beyond normal benchmarking.

And so that's an expertise that economists bring to these cases is reconciling the qualitative evidence with theory about what cartel behavior would look like. And so the issue of retention policies comes into play because that determines the scope of the record evidence that we can see.

And so the extent to which SCA has retention policies which facilitates emails and communications not being shared is relevant to that discussion because it limits therefore what we can see.

And so the fact that some practices were made to keep information unknown is also relevant because economists understand that cartel behavior is likely to be secretive, and so even the types of

STATE OF MARYLAND:                                    SS

I, Barbara Moore, a Registered Court Reporter of the State of Maryland, do hereby certify that these proceedings took place before me at the time and place herein set out, and the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor an employee of counsel nor related to any of the parties, nor in any way interested in the outcome of this action.

_____

BARBARA MOORE, CRR, RMR

_____

My Commission Expires:

February 8, 2026



Dean M. Harvey, Esquire
Lieff Cabraser Heimann & Bernstein, LLP. (San Francisco)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339

Re: Deposition of **Evan P. Starr, Ph.D.**
   Date: 3/19/2025
   Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:

Dear Sir/Madam,

Attached please find the above-referenced deposition transcript. If applicable, signature is required within 30 days from the date of receipt of this letter.

In accordance with the disposition of signature at the deposition or the pertinent jurisdictional rules, the deponent should follow these instructions to complete the Errata Sheet:

(1) Read the transcript and indicate any corrections or changes in ink on the enclosed Errata Sheet. Please include page and line numbers. If more space is needed for corrections, please use a blank sheet of paper. If no corrections or changes are necessary, please indicate "no corrections" or "no changes" on the Errata Sheet.

(2) Sign and date the Errata Sheet and Acknowledgement of Deponent/Affiant pages.

(3) Please return the executed Errata Sheet and Acknowledgement pages to the address indicated below, submit via fax (888-503-3767) or email (transcripts@planetdepos.com).

A copy of this letter and the returned signature pages, if any, will be distributed to counsel.

Sincerely,

Production Department
Planet Depos, LLC
451 Hungerford Drive
Suite 400
Rockville, Maryland 20850

No. 577303

No. 577303

Re:   Deposition of **Evan P. Starr, Ph.D.**
       Date: 3/19/2025
       Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
       Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
|  |  | See attached chart for corrections. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

April 19, 2025
_____           _____
       (Date)                                (Signature)

No. 577303

Re: Deposition of **Evan P. Starr, Ph.D.**
   Date: 3/19/2025
   Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
   Return to: transcripts@planetdepos.com

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

April 19, 2025
_____          _____
        (Date)                                                    (Signature)

No. 577303

Re:     Deposition of **Evan P. Starr, Ph.D.**
        Date: 3/19/2025
        Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
        Return to: transcripts@planetdepos.com

```
                        ACKNOWLEDGMENT OF DEPONENT


             I, Evan P. Starr, Ph.D., do hereby

        acknowledge that I have read and examined the

        foregoing testimony, and the same is a true, correct

        and complete transcription of the testimony given by

        me and any corrections appear on the attached Errata

        sheet signed by me.


          April 19, 2025          _____

              (Date)                    (Signature)
```

**Errata for Volume 1 of the Expert Deposition of Evan P. Starr, Ph.D.**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
March 19, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 1 | 22 | 8 | "several small substantive changes" | "several small nonsubstantive changes" | Clarification |
| 2 | 23 | 7 | "Defendants' Exhibit 2" | "Defendants' Exhibit 82" | Clarification; to conform the transcript to the record |
| 3 | 40 | 5 | "You're not offering opinion about what the" | "You're not offering any opinion about what the" | Clarification |
| 4 | 41 | 9 | "romanette 2 in 12(a)" | "romanette ii in 12(a)" | Typographic error |
| 5 | 44 | 9–10 | "DaVita USPI exchange" | "DaVita-USPI exchange" | Typographic error |
| 6 | 46 | 24 | "Mm-hmm." | "Yes." | Clarification |
| 7 | 55 | 12 | "section V.B, 5.B, I review the evidence." | "section V.B, I review the evidence." | Clarification; to conform the testimony to the record |
| 8 | 57 | 5 | "subsection 5(b)ii of your report;" | "subsection V(B)ii of your report;" | Clarification; to conform the transcript to the record |
| 9 | 57 | 19 | "section 5(b)ii of your report;" | "section V(B)ii of your report;" | Clarification; to conform the transcript to the record |
| 10 | 58 | 19 | "the DaVita-SCA agreements beginnings" | "the DaVita-SCA agreement's beginnings" | Typographic error |
| 11 | 61 | 1–2 | "consistent with an anticompetitive conduct." | "consistent with anticompetitive conduct." | Clarification |
| 12 | 61 | 6-8 | "The evidence that I reviewed in part A is that suggests, yes, that there is a proactive recruitment restriction." | "The evidence that I reviewed in part A suggests, yes, that there is a proactive recruitment restriction." | Clarification |
| 13 | 62 | 15 | "section paragraph 70, sections (A)1, 2 and 3." | "paragraph 70, sections (A)i, ii and iii." | Clarification; to conform the testimony to the record |
| 14 | 63 | 14 | "no-poach agreements" | "no-poach agreement" | Clarification; to conform the |

1

3217488.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | | testimony to the record |
| 15 | 63 | 16 | "SCA and DaVita agreements," | "SCA and DaVita's agreement," | Clarification; to conform the transcript to the record |
| 16 | 66 | 14 | "agreements" | "agreement" | Clarification; to conform the testimony to the record |
| 17 | 69 | 1 | "SCA DaVita agreement" | "SCA-DaVita agreement" | Typographic error |
| 18 | 74 | 14 | "SCA and USPI agreements" | "SCA and USPI agreement" | Clarification; to conform the transcript to the record |
| 19 | 74 | 20 | "page 78.6." | "page 78, point vi." | Typographic error; to conform the testimony to the record |
| 20 | 77 | 7 | "section 5" | "section V" | Typographic error; to conform the testimony to the record |
| 21 | 80 | 18 | "Oh yes." | "Oh. Yes." | Typographic error; clarification |
| 22 | 80 | 21 | "no-poach agreements" | "no-poach agreement" | Clarification; to conform the testimony to the record |
| 23 | 81 | 13 | "material modification." | "material modification?" | Typographic error |
| 24 | 85 | 22–23 | "the effects of all the subcomponents of the alleged misconduct" | "the effects of each subcomponent of the alleged misconduct" | Clarification; to conform the testimony to the record |
| 25 | 86 | 21 | "start middle of 2008" | "starts middle of 2008" | Typographic error |
| 26 | 90 | 13–14 | "sharing at CSI; correct?" | "sharing of CSI; correct?" | Typographic error; to conform the transcript to the record |
| 27 | 93 | 1 | "(Witness nodded.)" | "Yes." | Clarification |
| 28 | 96 | 9–11 | "and so this suggests that around 2009 the Hayek | "and so this suggests that around 2009 Hayek | Clarification |

2

3217488.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | obtained planned wage increase from USPI," | obtained planned wage increase from USPI," | |
| 29 | 111 | 8–9 | "So that the class in this case" | "So the class in this case" | Clarification; potentially a typographic error |
| 30 | 114 | 5–6 | "and the senior—senior-senior executives" | "and the senior corporate officers" | Clarification; to conform the testimony to the record |
| 31 | 116 | 21 | "section 5" | "section V" | Typographic error |
| 32 | 120 | 15–17 | "And so how did you identify who were in the legal recruiting and HR departments?" | "And so how did you identify who were in the legal, recruiting, and HR departments?" | Typographic error; to conform the transcript to the record |
| 33 | 120 | 21–23 | "And at least it was your intent in the, in the data build to exclude everyone in the legal recruiting and HR departments;" | "And at least it was your intent in the data build to exclude everyone in the legal, recruiting, and HR departments;" | Typographic error; to conform the transcript to the record |
| 34 | 121 | 10–12 | "but so was the intention to exclude anyone from the legal recruiting and HR departments" | "but so was the intention to exclude anyone from the legal, recruiting, and HR departments" | Typographic error; to conform the transcript to the record |
| 35 | 121 | 21–22 | "And that would include anyone in the legal recruiting and HR departments?" | "And that would include anyone in the legal, recruiting, and HR departments?" | Typographic error; to conform the transcript to the record |
| 36 | 122 | 5–6 | "and that was to exclude everyone from the legal recruiting and HR departments;" | "and that was to exclude everyone from the legal, recruiting, and HR departments;" | Typographic error; to conform the transcript to the record |
| 37 | 122 | 12–13 | "Excluding those in legal recruiting and HR." | "Excluding those in legal, recruiting, and HR." | Typographic error; to conform the transcript to the record |
| 38 | 122 | 14–15 | "And if someone in the legal recruiting or HR departments was actually included" | "And if someone in the legal, recruiting, or HR departments was actually included" | Typographic error; to conform the transcript to the record |

3

3217488.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 39 | 130 | 11 | "in the healthcare industry, in the ASE" | "in the healthcare industry, in the ASC" | Typographic error |
| 40 | 154 | 3–7 | "The Horizontal Merger Guidelines are what the DOJ and FTC released as it relates to their thinking on competition is used related to horizontal competitors engaging in M&A and anticompetitive conduct." | "The Horizontal Merger Guidelines are what the DOJ and FTC released as it relates to their thinking on competition with respect to horizontal competitors engaging in M&A and anticompetitive conduct." | Clarification |
| 41 | 158 | 1 | "paragraph 12(E)" | "paragraph 12(e)" | Typographic error; to conform the transcript to the record |
| 42 | 171 | 6 | "Burdette and Mortenson" | "Burdett and Mortensen" | Typographic error |
| 43 | 177 | 18-19 | "just don't go after these workers that appears in the report as well." | "'just don't go after these workers' that appears in the report as well." | Clarification |
| 44 | 180 | 5-6 | "the conduct, reduced compensation and aggregate by 14.5" | "the conduct reduced compensation in aggregate by 14.5" | Clarification |
| 45 | 187 | 21 | "what would conduct have been" | "what would compensation have been" | Clarification |
| 46 | 193 | 7 | "To look at each year's again, we'd have to" | "To look at each year, again, we'd have to" | Clarification |
| 47 | 212 | 20 | "he has estimates that executives were harmed" | "he estimates that executives were harmed" | Clarification |
| 48 | 214 | 19 | "section 5" | "section V" | Typographic error; to conform the testimony to the record |
| 49 | 251 | 24 | "specific significant estimate" | "statistically significant estimate" | Typographic error |
| 50 | 267 | 16 | "section 9" | "section IX" | Typographic error; to conform the transcript to the record |
| 51 | 267 | 19 | "part 7(F)" | "part VII(F)" | Typographic error; to |

4

5

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
|   |         |         |               |           | conform the testimony to the record |

3217488.4



Dean M. Harvey, Esquire
Lieff Cabraser Heimann & Bernstein, LLP. (San Francisco)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339

Re: Deposition of **Evan P. Starr, Ph.D., Volume 2**
    Date: 3/20/2025
    Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:

Dear Sir/Madam,

Attached please find the above-referenced deposition transcript. If applicable, signature is required within 30 days from the date of receipt of this letter.

In accordance with the disposition of signature at the deposition or the pertinent jurisdictional rules, the deponent should follow these instructions to complete the Errata Sheet:

(1) Read the transcript and indicate any corrections or changes in ink on the enclosed Errata Sheet. Please include page and line numbers. If more space is needed for corrections, please use a blank sheet of paper. If no corrections or changes are necessary, please indicate "no corrections" or "no changes" on the Errata Sheet.

(2) Sign and date the Errata Sheet and Acknowledgement of Deponent/Affiant pages.

(3) Please return the executed Errata Sheet and Acknowledgement pages to the address indicated below, submit via fax (888-503-3767) or email (transcripts@planetdepos.com).

A copy of this letter and the returned signature pages, if any, will be distributed to counsel.

Sincerely,

Production Department
Planet Depos, LLC
451 Hungerford Drive
Suite 400
Rockville, Maryland 20850

No. 577304

No. 577304

Re:  Deposition of **Evan P. Starr, Ph.D., Volume 2**
     Date: 3/20/2025
     Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
     Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
|      |      | See attached chart for corrections. |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |

April 19, 2025

_____            _____
       (Date)                                    (Signature)

No. 577304

Re:    Deposition of **Evan P. Starr, Ph.D., Volume 2**
        Date: 3/20/2025
        Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
        Return to: transcripts@planetdepos.com

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

April 19, 2025

_____        _____
     (Date)                      (Signature)

No. 577304

Re:    Deposition of **Evan P. Starr, Ph.D., Volume 2**
         Date: 3/20/2025
         Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
         Return to: transcripts@planetdepos.com

```
                ACKNOWLEDGMENT OF DEPONENT


        I, Evan P. Starr, Ph.D., Volume 2, do hereby

   acknowledge that I have read and examined the

   foregoing testimony, and the same is a true, correct

   and complete transcription of the testimony given by

   me and any corrections appear on the attached Errata

   sheet signed by me.


      April 19, 2025      _____

          (Date)                    (Signature)
```

**Errata for Expert Deposition of Evan P. Starr, Ph.D., Volume 2**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
March 20, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 1 | 285 | 2–3 | "'Low Wage Workers and the Enforceability of Noncompete Agreements,'" | "'Low-Wage Workers and the Enforceability of Non-Compete Agreements,'" | Typographic error; to conform the testimony to the record |
| 2 | 289 | 8–10 | "'Locked in Noncompete Enforceability in the Careers of High Tech Workers'" | "'Locked In? Noncompete Enforceability and the Careers of High Tech Workers'" | Typographic error; to conform the testimony to the record |
| 3 | 289 | 13–15 | "'Do Firms Value Court Enforceability of Noncompete Agreements: A Revealed Preference Approach,'" | "'Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach,'" | Typographic error; to conform the testimony to the record |
| 4 | 298 | 16–18 | "'Employment Restrictions on Resource Transferability and a Value Appropriation From Employees';" | "'Employment Restrictions on Resource Transferability and Value Appropriation From Employees';" | Typographic error; to conform the testimony to the record |
| 5 | 315 | 23-24 | "They're all specifically significant" | "They're all statistically significant" | Typographic error |
| 6 | 317 | 21-23 | "done in section IV because it does get to the time trend issue here. So in section IV I recognize that," | "done in section VI because it does get to the time trend issue here. So in section VI, I recognize that," | Typographic error |
| 7 | 319 | 1 | "We're going to connect directors" | "We're going to compare directors" | Typographic error |
| 8 | 336 | 9–10 | "for leave USPI or SCA" | "for 'Leave for USPI or SCA'" | Clarification; to conform the transcript to the record |
| 9 | 349 | 13 | "but invested at some later point" | "but it vested at some later point" | Typographic error; clarification |
| 10 | 378 | 10 | "we use what the companies' provided with us." | "we use what the companies provided us with." | Clarification |
| 11 | 387 | 7 | "Mm-hmm." | "Yes." | Clarification |
| 12 | 392 | 24 | "paragraph 120(D)." | "paragraph 120(d)." | Typographic error; to |

1

3218799.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | | conform the testimony to the record |
| 13 | 393 | 11 | "paragraph D" | "paragraph (d)" | Typographic error; to conform the testimony to the record |
| 14 | 397 | 1 | "emergency declaration from the US wasn't until May" | "emergency declaration from the US declaring the pandemic over wasn't until May" | Clarification; to conform the testimony to the record |
| 15 | 405 | 2 | "all class members was harmed." | "all class members were harmed." | Typographic error |
| 16 | 406 | 8–9 | "Frischwaugh-Lovell theorem" | "Frisch-Waugh-Lovell theorem" | Typographic error |
| 17 | 406 | 11 | "The Frischwaugh-Lovell theorem." | "The Frisch-Waugh-Lovell theorem." | Typographic error |
| 18 | 408 | 3 | "effect between directors above and managers" | "effect between directors and above and managers" | Clarification |
| 19 | 414 | 22 | "paragraph 12(C)" | "paragraph 12(c)" | Typographic error; to conform the transcript to the record |
| 20 | 414 | 24 | "12(C) you said?" | "12(c) you said?" | Typographic error; to conform the testimony to the record |
| 21 | 415 | 6 | "12(C)," | "12(c)," | Typographic error; to conform the transcript to the record |
| 22 | 415 | 16 | "paragraph 12(C)" | "paragraph 12(c)" | Typographic error; to conform the transcript to the record |
| 23 | 416 | 9 | "section 12(C)" | "section 12(c)" | Typographic error; to conform the testimony to the record |
| 24 | 417 | 8 | "the harm to all or nearly all members" | "the harm to all or nearly all class members" | Clarification |

2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 25 | 417 | 23 | "all or nearly all members were harmed" | "all or nearly all class members were harmed" | Clarification |
| 26 | 418 | 2 | "why all or nearly all members" | "why all or nearly all class members" | Clarification |
| 27 | 418 | 22–23 | "section VII.F.ii" | "section VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 28 | 419 | 15 | "subsection VII.F.i." | "subsection VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 29 | 421 | 2 | "subsection VII.F.i." | "subsection VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 30 | 421 | 7–8 | "section VII—7.1" | "section VII.F.1" | Clarification; to conform the testimony to the record |
| 31 | 421 | 15 | "section VII.F.i" | "section VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 32 | 421 | 17 | "section VII.F.i" | "section VII.F.1" | Typographic error; clarification; to conform the testimony to the record |
| 33 | 424 | 13-14 | "the compensation structures being the same across dependents is not necessary" | "the compensation structures being the same across defendants is not necessary" | Clarification |
| 34 | 442 | 11 | "all or nearly all members were" | "all or nearly all class members were" | Clarification |
| 35 | 443-444 | 22-1 | "the qualitative evidence shows that for the compensation generally at these companies is set with" | "the qualitative evidence shows that the compensation generally at these companies is set with reference to a" | Clarification |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
|   |         |         | reference to a compensation structure." | compensation structure." |   |
| 36 | 448 | 1–2 | "paragraph 101(A)." | "paragraph 101(a)." | Typographic error; to conform the transcript to the record |
| 37 | 448 | 7 | "101(B)" | "101(b)" | Typographic error; to conform the transcript to the record |
| 38 | 448 | 10 | "101(F)" | "101(f)" | Typographic error; to conform the transcript to the record |
| 39 | 448 | 13 | "101(G)" | "101(g)" | Typographic error; to conform the transcript to the record |
| 40 | 448 | 16 | "101(I)" | "101(i)" | Typographic error; to conform the transcript to the record |
| 41 | 448 | 19 | "101(K)" | "101(k)" | Typographic error; to conform the transcript to the record |
| 42 | 448 | 22 | "101(K)" | "101(k)" | Typographic error; to conform the transcript to the record |
| 43 | 459 | 12 | "paragraph 101(G)." | "paragraph 101(g)." | Typographic error; to conform the transcript to the record |
| 44 | 459 | 16 | "paragraph 101(G)" | "paragraph 101(g)" | Typographic error; to conform the transcript to the record |
| 45 | 460 | 12–13 | "I wrote 'in'" | "I wrote, 'In'" | Typographic error; to |

4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | | conform the testimony to the record |
| 46 | 460 | 20 | "paragraph 101(K)" | "paragraph 101(k)" | Typographic error; to conform the transcript to the record |
| 47 | 461 | 9 | "paragraph K" | "paragraph k" | Typographic error; to conform the testimony to the record |
| 48 | 466 | 14 | "paragraph 101(C)" | "paragraph 101(c)" | Typographic error; to conform the transcript to the record |
| 49 | 466 | 21 | "101(J)" | "101(j)" | Typographic error; to conform the transcript to the record |
| 50 | 467 | 4 | "paragraph 101(N)," | "paragraph 101(n)," | Typographic error; to conform the transcript to the record |
| 51 | 467 | 7 | "paragraph 101(O)." | "paragraph 101(o)." | Typographic error; to conform the transcript to the record |
| 52 | 467 | 18 | "101(L)." | "101(l)." | Typographic error; to conform the transcript to the record |
| 53 | 468 | 7–8 | "In paragraph 101(C), you can flip to paragraph C," | "In paragraph 101(c), you can flip to paragraph c," | Typographic error; to conform the transcript to the record |
| 54 | 473 | 17 | "101(M)." | "101(m)." | Typographic error; to conform the transcript to the record |

5

3218799.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 55 | 477 | 21–22 | "paragraph E," | "paragraph e," | Typographic error; to conform the testimony to the record |
| 56 | 477 | 23 | "paragraph E" | "paragraph e" | Typographic error; to conform the testimony to the record |
| 57 | 478 | 1 | "on an all-for-one plan such that everyone at the" | "on an 'all-for-one' plan, such that everyone at the" | Typographic error; to conform the testimony to the record |
| 58 | 478 | 3 | "department and company performance" | "'department and company performance'" | Typographic error; to conform the testimony to the record |
| 59 | 478 | 11 | "paragraph E" | "paragraph e" | Typographic error; to conform the testimony to the record |
| 60 | 499 | 20 | "top down policy" | "top-down policy" | Typographic error |
| 61 | 511 | 3 | "VP of human resources" | "VP of Human Resources" | Typographic error; to conform the testimony to the record |
| 62 | 511 | 5–6 | "chief talent officer" | "Chief Talent Officer" | Typographic error; to conform the testimony to the record |
| 63 | 511 | 7–8 | "SVP of chief human resources and support" | "SVP, Chief Human Resources and Support Services Officer" | Typographic error; clarification; to conform the testimony to the record |
| 64 | 521 | 1 | "broadly across the workers at d companies." | "broadly across the workers at different companies." | Typographic error |

6

Case: 1:21-cv-00305 Document #: 742-12 Filed: 04/10/26 Page 2156 of 2286 PageID #:37988

Evan P. Starr Volume III Highly Confidential
July 15, 2025

ACKNOWLEDGMENT OF DEPONENT

I, EVAN P. STARR, Ph.D., do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

September 3, 2025            _____

        DATE                     EVAN P. STARR, Ph.D.

Subscribed and sworn to

before me on this_____ day

of _____, _____.


_____

        Notary Public

Evan P. Starr Volume III Highly Confidential
July 15, 2025

*** ERRATA SHEET ***

NAME OF CASE: IN RE OUTPATIENT
DATE OF DEPOSITION: July 15, 2025
NAME OF WITNESS: EVAN P. STARR, Ph.D.

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| | | | | Please see attached chart |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

_____

Subscribed and sworn before me
this____day of_____,20__.
_____      _____
(Notary Public)          My Commission Expires:

**Errata for Volume III of the Expert Deposition of Evan P. Starr, Ph.D.**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
July 15, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 1. | 526 | 14 | "Collaci paper" | "Callaci paper" | Typographic error |
| 2. | 528 | 6–7 | "the Plaintiff" | "the Plaintiffs" | Clarification; to conform the record to the facts |
| 3. | 529 | 20 | "or DaVita hired from another company," | "or DaVita hired them from another company," | Clarification |
| 4. | 530 | 6–7 | "reveal preference" | "revealed preference" | Typographic error |
| 5. | 530 | 15 | "typically confused" | "typically introduced in" | Typographic error |
| 6. | 530 | 16 | "workers" | "consumers" | Clarification |
| 7. | 530 | 17–18 | "they reveal those preferences based on what you choose" | "they reveal their preferences based on what they choose" | Typographic error |
| 8. | 531 | 10–11 | "Their choices can be used to ranks." | "Their choices can be used as ranks." | Typographic error |
| 9. | 531 | 22 | "approving every single" | "recruiting every single" | Typographic error |
| 10. | 532 | 4-5 | "But certainly many workers are making advanced options. They're also all" | "But certainly many workers are, if they have options," | Typographic error |
| 11. | 533 | 3 | "then a weighted labor" | "then creates a weighted labor" | Typographic error |
| 12. | 533 | 13-14 | "I can't think of a recent paper" | "I can think of a recent paper" | Typographic error |
| 13. | 533 | 15–16 | "I have to be specific about exactly what paperwork we're talking about." | "I have to be specific about exactly what paper we're talking about." | Typographic error |
| 14. | 533 | 16-17 | "about. I've done this" | "about. In the work I've done that is" | Typographic error |
| 15. | 533 | 20–21 | "really trying just to identify at the causal effect of a non-compete clause" | "really trying just to identify the causal effect of a non-compete clause" | Typographic error |
| 16. | 534 | 21 | "those positions." | "those decisions." | Typographic error |
| 17. | 535 | 2 | "two workers" | "two companies" | Clarification |
| 18. | 535 | 4–5 | "and then one of the companies that announces this policy." | "and then one of the companies announces this policy." | Typographic error |

1

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 19. | 535 | 6–8 | "And so—and so the question is who do you identify which company's workers are indifferent between." | "And so the question is how do you identify which companies workers are indifferent between." | Typographic error; clarification |
| 20. | 535 | 11 | "job search section" | "job search session" | Typographic error |
| 21. | 537 | 9 | "simultaneous job succession" | "simultaneous job search session" | Typographic error |
| 22. | 537 | 13 | "clicked on in examining" | "clicked on and is examining" | Clarification |
| 23. | 538 | 9–11 | "Indeed will tell you, you know, how many percentage will land jobs from searching Indeed" | "Indeed will tell you, you know, what percentage will land jobs from searching on Indeed" | Clarification |
| 24. | 538 | 19 | "what was the pitch" | "but that was the pitch" | Typographic error |
| 25. | 539 | 6–7 | "on potential employers job postings?" | "on potential employers' job postings?" | Typographic error |
| 26. | 541 | 2 | "the data" | "the Indeed data" | Typographic error |
| 27. | 541 | 19 | "cooperative" | "coauthorship" | Typographic error |
| 28. | 541 | 22 | "from Indeed and their chief" | "from Indeed, including their chief" | Typographic error; clarification |
| 29. | 542 | 7–9 | "they were the ones who initially did the initial jobs because it was their internal data." | "they were the ones who initially did the initial draws because it was their internal data." | Typographic error; clarification |
| 30. | 542–543 | 542:21–543:5 | "And so what we're doing is we're taking two companies that work as kind of indifferent between, and then the ideal experiment is to say okay, one of these companies announces this policy, what happens on worker interest on Indeed, as a result, or what happens to workers on Glassdoor?" | "And so what we're doing is we're taking two companies that workers are kind of indifferent between, and then the ideal experiment is to say okay, one of these companies announces this policy, what happens to worker interest on Indeed, as a result, or what happens to worker reviews on Glassdoor?" | Typographic error; clarification |
| 31. | 543 | 9 | "this click." | "this click one." | Typographic error |
| 32. | 544 | 1 | "self-report" | "have to report" | Typographic error |
| 33. | 544 | 10 | "That I'm running." | "Surveys that I'm running." | Clarification |

2

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 34. | 545 | 13–14 | "I've used survey data collected by myself by governments." | "I've used survey data collected by myself and by governments." | Clarification |
| 35. | 546 | 5 | "and phase a" | "and it's a" | Typographic error |
| 36. | 546 | 11–13 | "so we thought we kind of use this to study whether firms valued the ability enforce noncompetes." | "so we thought we could use this to study whether firms valued the ability to enforce noncompetes." | Clarification |
| 37. | 546 | 14 | "So they did those papers very simple." | "So the idea of the paper is very simple." | Typographic error; clarification |
| 38. | 546 | 20 | "As far as if they have to leave there" | "And so the idea of the paper is that firms don't have to leave their pay there" | Typographic error |
| 39. | 547 | 4–5 | "So we would see small mass at 100,000 in 2020 and after than before." | "So we would see excess mass at 100,000 or just above in 2020 and after relative to before 2020." | Typographic error; clarification |
| 40. | 547 | 18 | "it would have made that decide harder to pass" | "it would have made that design harder to pass" | Typographic error |
| 41. | 549 | 18 | "what we –" | "what we purchased from them –" | Typographic error; clarification |
| 42. | 552 | 1–2 | "So based on my understanding of defendant expert reports," | "So based on my understanding of defendants' experts' reports," | Typographic error; to conform the record to the facts |
| 43. | 553 | 4 | "And so I think that's fundamental." | "And so I think that's a fundamental problem." | Clarification |
| 44. | 554 | 4–5 | "And so this happening in that data set." | "And so this is happening in that data set." | Typographic error |
| 45. | 554 | 12–13 | "Defendants' experts didn't study how represented it was" | "Defendants' experts didn't study how representative it was" | Typographic error |
| 46. | 555 | 15–16 | "I want to make sure I didn't hear you." | I want to make sure I didn't mishear you." | Typographic error |
| 47. | 556 | 2–3 | "and I think this is right that we eventually figured out that to get the hash SSNs correct, yes." | "and I think this is right that we eventually figured out that to get the hashed SSNs correct across Defendants, yes." | Typographic error; clarification |
| 48. | 556–557 | 556:22–557:1 | "I think the earliest one was 1979 was in the data." | "I think the earliest one was 1979 in the data." | Clarification |
| 49. | 558 | 7–8 | "If I put on LinkedIn, I don't know if they scraped in LinkedIn." | "If I put the profile on LinkedIn, I don't know if they scraped LinkedIn." | Typographic error; clarification |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 50. | 558 | 10-11 | "I have no way to figure out what websites –" | "I have no way to figure out which websites they are pulling from – " | Typographic error |
| 51. | 560 | 4-7 | "So if you have a DaVita SCA or USPI employee you don't have the information online, I don't know how Lightcast would have got it." | "So if you have a DaVita, SCA, or USPI employee where you don't have their resume online, I don't know how Lightcast would have gotten it." | Typographic error; clarification |
| 52. | 561 | 8–9 | "I should say my reaction I was just responding to Defendants," | "I should say my first reaction is that I was just responding to Defendants' experts" | Clarification |
| 53. | 562 | 8–9 | "Alan Spradling" | "Allen Spradling" | Typographic error; to conform the record to the facts |
| 54. | 562 | 13 | "Alan Spradling" | "Allen Spradling" | Typographic error; to conform the record to the facts |
| 55. | 562 | 20 | "eight employees in the Lightcast data" | "employees in the Lightcast data" | Typographic error; clarification |
| 56. | 563 | 15–16 | "the errata that was served yesterday this report" | "the errata that was served yesterday to this report" | Typographic error; clarification |
| 57. | 565 | 17 | "Paragronrx" | "ParagonRX" | Typographic error; to conform the record to the facts |
| 58. | 565 | 19–20 | "Corizon Health in the state of Tennessee?" | "Corizon Health, and the state of Tennessee?" | Typographic error; to conform the record to the facts |
| 59. | 571 | 12 | "I couldn't tell you if I" | "I could tell you if I" | Clarification |
| 60. | 572 | 3-5 | "I think my critique was that there are employees that were written down that were clearly defendants." | "I think my critique was that there are employers that were written down that were clearly defendants." | Typographic error; clarification; to conform the record to the facts |

4

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 61. | 572 | 5-8 | "It was either written in the USSCA or the USPI or DaVita something or other that was measured as something other than DaVita or USPI or some other defendants." | "It was either written SCA, USPI or DaVita or something or other that was measured as something other than DaVita or USPI or SCA by Defendants' Experts." | Typographic error; clarification |
| 62. | 572 | 10–11 | "you can determine how many in which the employees moved between Defendants" | "you can determine how many and which of the employees moved between Defendants" | Typographic error; clarification |
| 63. | 573 | 1 | "Yes, I would say it's small." | "Yes, I would say it's small--" | Clarification |
| 64. | 573 | 16-19 | "I don't know whether the Lightcast data represents what fraction of that 90 percent the Lightcast data could even possibly represent" | "I don't know whether the Lightcast data is representative, what fraction of that 95 percent the Lightcast data could even possibly represent," | Clarification |
| 65. | 575 | 8–9 | "recognizing that Kaiser Permanente are the same company," | "recognizing that Kaiser and Kaiser Permanente are the same company," | Typographic error; to conform the record to the facts |
| 66. | 577 | 19 | "keeping track of them" | "keeping track of that" | Typographic error |
| 67. | 580 | 1 | "Paragronrx" | "ParagonRx" | Typographic error; to conform the record to the facts |
| 68. | 582 | 2 | "It was a busy month." | "Yes. It was a busy month." | Clarification |
| 69. | 582 | 7–10 | "In total, you know, 300 sounds high for this 92, and I'd have to go back and look at my records. It could have been, I don't know, another hundred, something like that. It was a lot of work." | "In total, you know, 300 sounds high for DX-92, and I'd have to go back and look at my records. It could have been, I don't know, another hundred for DX-90, something like that. It was a lot of work." | Typographic error; clarification; to conform the record to the facts |
| 70. | 582 | 13-14 | "I work with the same assistants that I worked on in the initial report." | "I worked with the same assistants that I worked with on the initial report." | Typographic error |
| 71. | 582 | 16 | "Augustus Herschel and Madeline Bow." | "Augustus Urschel and Madeleine Bowe." | Typographic error |

5

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 72. | 585 | 19–21 | "I'm just referencing the academic literature on firm specific ^^monopsony power." | "I'm just referencing the academic literature on firm-specific monopsony power." | Typographic error |
| 73. | 586 | 5–6 | "There is many sources of monopsony power." | "There are many sources of monopsony power." | Typographic error |
| 74. | 586 | 19 | "acquired in the labor market" | "squared in the labor market" | Typographic error |
| 75. | 586 | 19–21 | "So there's many soures of monopsony power. There's manpower induced by the companies themselves." | "So there are many sources of monopsony power, some natural, some induced by the companies themselves." | Typographic error; clarification |
| 76. | 587 | 8-9 | "one of the kind of matching friction to the others as" | "one of the kind of natural frictions, I am sure there are others as" | Typographic error; clarification |
| 77. | 588 | 14 | "there's a one mining company" | "there's one mining company and they employee everybody" | Typographic error; clarification |
| 78. | 588 | 17 | "Monopsony is" | "Monopsony power is" | Typographic error |
| 79. | 589 | 3–4 | "but in nearly all context I imagine that's true." | "but in nearly all contexts I imagine that's true." | Typographic error; clarification |
| 80. | 589 | 5–6 | "So in nearly all context for labor markets," | "So in nearly all contexts for labor markets," | Typographic error; clarification |
| 81. | 589 | 14–15 | "They find that in the gig worker marketplace, workers have monopsony power." | "They find that in the gig worker marketplace, companies have monopsony power." | Clarification |
| 82. | 589 | 22 | "The modern economics, the elaborate" | "The modern economics, the labor" | Typographic error |
| 83. | 591 | 5 | "intramicro" | "intro to micro" | Typographic error; clarification |
| 84. | 592 | 16 | "bothboth" | "both" | Typographic error; clarification |
| 85. | 593 | 20-21 | "search all matching frictions" | "search and matching frictions" | Typographic error; clarification |
| 86. | 595 | 6–7 | "I said 'extended,' I believe where I used the word 'actualized,'" | "I said 'extended,' and I believe I also used the word 'actualized,'" | Typographic error; clarification |

6

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 87. | 596 | 10 | "listing letter" | "existing literature" | Typographic error; clarification |
| 88. | 599 | 14–17 | "you go on to say that the way that monopsony power is often measured in the economic literature by the elasticity of labor supplied to the firm; correct?" | "you go on to say that the way that monopsony power is often measured in the economic literature is by the elasticity of labor supplied to the firm; correct?" | Clarification; to conform the record to the facts |
| 89. | 601 | 5 | "maximize" | "actualize" | Typographic error |
| 90. | 601 | 11-12 | "I have many analysis here" | "I have many analyses here" | Typographic error |
| 91. | 602 | 15–16 | "I took the industry organization class in graduate school." | "I took the industrial organization class in graduate school." | Typographic error; clarification |
| 92. | 604 | 12 | "high-tech no-poach case" | "High-Tech No-Poach case" | Typographic error; to conform the record to the facts |
| 93. | 606 | 14 | "can contribute. There's" | "can contribute if there's" | Typographic error |
| 94. | 607 | 14 | "case when I signed," | "case, one of my assignments," | Typographic error |
| 95. | 609 | 17–18 | "the High Tech case" | "the High-Tech case" | Typographic error; to conform the record to the facts |
| 96. | 610 | 18-19 | "the perspective that Defendants' experts do hear that you have to" | "the perspective that Defendants' experts do here that you have to" | Typographic error |
| 97. | 611-612 | 611:22-612:1 | "That's four papers." | "It's a handful of papers and if" | Typographic error |
| 98. | 612 | 13 | "Collaci" | "Callaci" | Typographic error; to conform the record to the facts |
| 99. | 613 | 4 | "Collaci," | "Callaci," | Typographic error; to conform the record to the facts |

7

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 100. | 615 | 6–10 | "I imagine that in this case we have, you know, equity is like DaVita especially, I don't imagine that the fast food workers are getting equity compensation." | "I imagine that in this case we have, you know, equity is used at DaVita especially. I don't imagine that the fast food workers are getting equity compensation." | Typographic error; clarification |
| 101. | 616 | 13–15 | "Some of them I believe Lafontaine will look at managers differently from other workers in this context," | "Some of them, I believe--Lafontaine will look at different types of workers. For example, they look at managers differently from other workers in this context," | Clarification |
| 102. | 616 | 21 | "buy us their estimates" | "bias their estimates" | Typographic error |
| 103. | 620 | 3–6 | "I do not think this is a cross-sectional. This has longitudinal elements as well. It's not a purely cross-sectional empirical design." | "I do not think this is a cross-sectional design. This has longitudinal elements as well. It's not a purely cross-sectional empirical design." | Clarification |
| 104. | 620 | 21-22 | "I think Lafontaine caused a long difference in differences" | "I think Lafontaine called this a long difference in differences" | Typographic error |
| 105. | 621 | 13–14 | "they could have been salaries." | "they could have been paid salaries." | Clarification |
| 106. | 621 | 14–16 | "been salaries. You know, they talk to us in the abstract and tell me later about that, you know," | "been salaried. You know, they talk at least here in the abstract, and study later that, you know," | Typographic error |
| 107. | 624 | 8 | "more apples to apples." | "more apples to apples comparison." | Typographic error |
| 108. | 624 | 17 | "I believe –" | "I believe you said –" | Typographic error |
| 109. | 626 | 9 | "Collaci" | "Callaci" | Typographic error; to conform the record to the facts |
| 110. | 628 | 12 | "9.4 percent" | "9.4 percentage points" | Clarification |

8

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 111. | 629 | 2–6 | "Based on my understanding of the way that Defendants processed the data and what they provided to us that the stock data was provided to us based on the value on which the employee received it." | "Based on my understanding of the way that Defendants processed the data and what they provided to us that the stock data was provided to us based on the value at which the employee received it." | Clarification |
| 112. | 629 | 16 | "figure our" | "figure out" | Typographic error |
| 113. | 630 | 4–5 | "15.8 divided by 17.2 is less than .5" | "7.8 divided by 17.2 is less than .5" | Typographic error |
| 114. | 632 | 2 | "is that data is using from" | "is that data is coming from" | Typographic error |
| 115. | 635 | 8–10 | "Gibson is focused on the high tech no-poach case, which are relatively high-earning workers," | "Gibson is focused on the High-Tech No-Poach case, which involved relatively high-earning workers," | Typographic error; clarification; to conform the record to the facts |
| 116. | 635 | 13 | "low-income workers like in the Gibson case" | "more low-income workers than in the Gibson case" | Typographic error |
| 117. | 639 | 13–14 | "who were not paid to equity" | "who were not paid with equity" | Typographic error |
| 118. | 640 | 21 | "high tech workers" | "high-tech workers" | Typographic error |
| 119. | 641 | 5 | "Ebay," | "eBay," | Typographic error; to conform the record to the facts |
| 120. | 641 | 18–19 | "I'll tell you I know Google and all these companies, obviously it has lots of places," | "I'll tell you, I mean I know Google and all these companies have offices in lots of places," | Typographic error |
| 121. | 641 | 22 | "bay area" | "Bay Area" | Typographic error |
| 122. | 642 | 6 | "Bay area" | "Bay Area" | Typographic error |
| 123. | 644 | 7 | "San Francisco Bay area" | "San Francisco Bay Area" | Typographic error |

9

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 124. | 644 | 13 | "San Francisco Bay area" | "San Francisco Bay Area" | Typographic error |
| 125. | 647 | 3–6 | "So in figure 41 of my updated report on page 243, I look at the effect of the conduct according to the state in which the—is reported in the data." | "So in figure 41 of my updated report on page 243, I look at the effect of the conduct according to the state in which the individual is reported to work in the data." | Clarification |
| 126. | 648 | 18 | "high tech industry" | "high-tech industry" | Typographic error; to conform the record to the facts |
| 127. | 649 | 6 | "San Francisco Bay area" | "San Francisco Bay Area" | Typographic error |
| 128. | 650 | 14 | "in the high tech no-poach case," | "in the High-Tech No-Poach case," | Typographic error; to conform the record to the facts |
| 129. | 652 | 2–3 | "depending on whether the workers is in the Bay area versus elsewhere." | "depending on whether the workers are in the Bay Area versus elsewhere." | Typographic error; clarification |
| 130. | 653 | 9–13 | "And I think that it's important to emphasize that the labor market here is generally natural." | "And I think it's important to emphasize that the labor market here is generally national." | Typographic error |
| 131. | 653 | 18 | "differ. For" | "differ for" | Typographic error |
| 132. | 654 | 6 | "direct solicitations," | "direct solicitations and include the tell your boss provision," | Typographic error |
| 133. | 654 | 9 | "information, specific jobs," | "information, including for specific jobs," | Typographic error |
| 134. | 654 | 12 | "against geographic areas on" | "across geographic units depending on" | Typographic error |
| 135. | 655 | 8 | "references" | "preferences" | Typographic error |
| 136. | 655 | 21 | "broadly a national" | "broadly consider a national" | Clarification |
| 137. | 659 | 17–18 | "It's not like these are one-off." | "It's not like these are one-offs." | Clarification |

10

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 138. | 661 | 2 | "Dr. McCray's" | "Dr. McCrary's" | Typographic error |
| 139. | 662 | 4 | "Dr. McCray" | "Dr. McCrary" | Typographic error |
| 140. | 662 | 8 | "SCA DaVita" | "SCA, DaVita, and USPI" | Typographic error; clarification |
| 141. | 662 | 9 | "lost three people." | "lost three people, one each to SCA, DaVita, and USPI." | Clarification |
| 142. | 663 | 3–7 | "And if you did this for SCA and DaVita and USPI, they would have two defendants employers so you would divide their numbers by two and you would get back to a number of two, and you would find that these are the same on a per defendant basis." | "And if you did this for SCA and DaVita and USPI, they would have two defendants' employers they could hire from so you would divide their numbers by two and you would get back to a number of two, and you would find that these are the same on a per defendant basis." | Clarification |
| 143. | 666 | 9–10 | "we only have really conduct period data for SCA." | "we only really have conduct period data for SCA." | Clarification |
| 144. | 666 | 22 | "Dr. McCray's" | "Dr. McCrary's" | Typographic error |
| 145. | 671 | 3 | "top five competitor" | "top five competitors" | Typographic error |
| 146. | 671 | 13 | "same number" | "same rank" | Clarification |
| 147. | 677 | 7-11 | "if USPI is not losing a lot of workers in those years and not doing a lot of hiring, then it would be surprising that that rank would not be high." | "if USPI is not losing a lot of workers in those years and not doing a lot of hiring, then it would not be surprising that that rank would not be high." | Clarification |
| 148. | 679 | 7-10 | "lots of companies that didn't hire or have workers leave two defendants in a given year." | "lots of companies that didn't hire or have workers leave to defendants in a given year." | Typographic error |

11

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 149. | 679 | 21–22 | "They should be included in the zero if we were going this thing correctly." | "They should be included in the zero if we were doing this thing correctly." | Typographic error |
| 150. | 682 | 14–18 | "I believe in this section what I'm responding is to Defendants' experts across their reports, want to try to say that the mobility patterns alone are responsible for the wage suppression efforts that I get." | "I believe in this section I'm responding to Defendants' experts' arguments across their reports that the mobility patterns alone are responsible for the wage suppression effects that I get." | Typographic error; clarification |
| 151. | 683 | 4 | "move, in fact" | "move. In fact" | Clarification |
| 152. | 683 | 17 | "company effects" | "company fixed effects" | Typographic error |
| 153. | 684 | 11 | "Defendants' experts claims that" | "Defendants' experts' claims that" | Typographic error |
| 154. | 684 | 22 | "in this case" | "in this case the conduct" | Typographic error |
| 155. | 686 | 10 | "question of whom reached out to whom" | "question of who reached out to whom" | Clarification |
| 156. | 687 | 13 | "analysis" | "empirical analysis" | Clarification |
| 157. | 687 | 17 | "cause of the conduct" | "causal effect of the conduct" | Typographic error |
| 158. | 688 | 14 | "I believe it's on page 16, 17, and 18." | "I believe it's on pages 16, 17, and 18." | Clarification |
| 159. | 688 | 16 | "Stiroh saying" | "Dr. Stiroh saying" | Typographic error |
| 160. | 689 | 1-2 | "Honig Bastrom, co-authored" | "Honey Batra and co-authors" | Typographic error |
| 161. | 689 | 14-15 | "offers from Defendants and non-defendants" | "offers from non-defendants" | Clarification |

12

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 162. | 690–691 | 690:20–691:4 | "You're asking me have I examined what's available from—and job offers from non-defendant employers in this case? And how that might relate to what job offers would have came from Defendants, is that what you're saying?" | "You're asking me have I examined what's available from job offers from non-defendant employers in this case? And how that might relate to what job offers would have contained from Defendants, is that what you're saying?" | Typographic error; clarification |
| 163. | 693 | 18–19 | "They are switching costs to jobs, yes." | "There are switching costs to jobs, yes." | Typographic error |
| 164. | 695 | 15 | "labor is an experience" | "labor is an experience good" | Typographic error |
| 165. | 697 | 5 | "But I think" | "But the modal situation I think" | Typographic error |
| 166. | 700 | 2 | "different style" | "differenced out" | Typographic error |
| 167. | 701 | 1 | "different in" | "differenced out in" | Typographic error |
| 168. | 701 | 3–5 | "So I also want to know what percent of Defendants' employees are remote work at any given point in time." | "So I also want to know what percentage of Defendants' employees are working remotely at any given point in time." | Clarification |
| 169. | 701 | 19–21 | "And then to examine the robustness to looking at different cuts of that data to ensure sure that we get similar results either way." | "And then to examine the robustness, looking at different cuts of that data to ensure that we get similar results either way." | Clarification |
| 170. | 702 | 15 | "versus after" | "versus absent" | Typographic error |
| 171. | 703 | 18 | "empirical regression" | "empirical question is" | Typographic error |
| 172. | 704 | 7 | "differences," | "difference is" | Typographic error |
| 173. | 704 | 17 | "defendants' experts claims" | "defendants' experts' claims" | Typographic error |

13

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 174. | 707 | 10 | "bothboth" | "both" | Typographic error |
| 175. | 712 | 3–8 | "The issue is that you have—you have pay on both sides, so you have—you have some being granted before during the pay factor and the same during versus after. The question is what do you get, the regression is looking at all of that variation." | "The issue is that you have—you have pay on both sides, so you have—you have some stock equity being granted before that pays out during and the same during versus after. The question is what do you get—the regression is looking at all of that variation." | Clarification |
| 176. | 714 | 15 | "together of what" | "pulling out or what" | Typographic error; clarification |
| 177. | 715 | 8 | "biometrics" | "econometrics" | Typographic error |
| 178. | 715 | 11 | "utilize" | "residualize out" | Typographic error |
| 179. | 717 | 6 | "some of them don't do it all together." | "some of them don't do it altogether." | Typographic error |
| 180. | 717 | 16 | "Dr. Seravia," | "Dr. Saravia," | Typographic error |
| 181. | 718 | 7–8 | "Dr. McCrary and Dr. Stiroh's attempt to do it," | "Dr. McCrary's and Dr. Stiroh's attempts to do it," | Clarification |
| 182. | 718 | 9 | "Johnson's attempt to do it" | "Johnson's doesn't even attempt to do it" | Typographic error |
| 183. | 719 | 5 | "2007" | "2011" | Typographic error |
| 184. | 719 | 15–16 | "he actually never received at no point in time." | "he actually never received at any point in time." | Clarification |
| 185. | 720 | 6 | "offering" | "altering" | Typographic error |
| 186. | 721 | 20–21 | "that this are the appropriate models to run" | "that these are the appropriate models to run" | Typographic error |

14

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 187. | 723 | 7 | "stock price" | "strike price" | Typographic error |
| 188. | 723 | 20 | "see here" | "see the disconnect here" | Typographic error |
| 189. | 726 | 6-7 | "establish what Defendants have been paid but for the conduct." | "establish what Defendants' employees would have been paid but for the conduct." | Clarification |
| 190. | 726 | 10 | "reports" | "results" | Typographic error |
| 191. | 727 | 16 | "time" | "harm" | Typographic error |
| 192. | 727 | 17 | "tax policy" | "tax policy is" | Typographic error |
| 193. | 728 | 6 | "if the conduct still is suppressed" | "if the compensation is suppressed by then conduct" | Clarification |
| 194. | 729 | 1–2 | "the no-poach agreement" | "the no-poach agreements" | Clarification |
| 195. | 729 | 6–8 | "The no-poach agreement is my understanding that was between DaVita and SCA and then SCA and USPI." | "My understanding is that the no-poach agreements were between DaVita and SCA and then SCA and USPI." | Clarification |
| 196. | 729 | 9 | "recruiting and hiring" | "recruiting and hiring from other companies" | Typographic error |
| 197. | 729 | 18 | "I'm not sure" | "I'm not sure to the extent" | Typographic error |
| 198. | 730 | 8 | "Give me a second." | "Let me give an example." | Typographic error |
| 199. | 732 | 15–16 | "with reference to" | "relative to" | Typographic error |
| 200. | 736 | 15 | "a new analysis" | "a new hire analysis" | Clarification |
| 201. | 738 | 3-5 | "more broadly restrictions can affect even studying" | "mobility restrictions can affect even starting" | Typographic error |

15

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 202. | 738 | 12–13 | "post-Bell and" | "post-Bellum" | Typographic error; clarification |
| 203. | 739 | 21 | "suppressed" | "increased" | Clarification |
| 204. | 740 | 2–3 | "he doesn't review best literature." | "he doesn't review this literature." | Clarification |
| 205. | 740 | 17–20 | "If you review the compensations that are made in this case and you consider now pay is set at these companies" | "If you review the compensation decisions that are made in this case and you consider how pay is set at these companies" | Typographic error; clarification |
| 206. | 741 | 10–12 | "Look, the academic literature this is inconsistent with Dr. McCrary," | "Look, the academic literature is inconsistent with Dr. McCrary," | Clarification |
| 207. | 742 | 9–10 | "I did a separate analysis how long in the first year in the data" | "I did a separate analysis looking only at the first year in the data" | Typographic error; clarification |
| 208. | 744 | 9 | "incumbent higher pay" | "incumbent pay" | Clarification |
| 209. | 744 | 16 | "Column 1 and 2" | "Columns 1 and 2" | Clarification |
| 210. | 745 | 6 | "may have" | "only has" | Typographic error |
| 211. | 745 | 17 | "partial data" | "partial data in 2007" | Typographic error |
| 212. | 746 | 13–14 | "the first year, was 2025" | "the first year, was 2005" | Typographic error |
| 213. | 746 | 17–19 | "in the 2025 data that is a senior-level employee in your analysis, the year 2025 is the first year" | "in the 2005 data that is a senior-level employee in your analysis, the year 2005 is the first year" | Typographic error |
| 214. | 747 | 14 | "efficient" | "coefficient" | Clarification |
| 215. | 748 | 15 | "10" | "tenure" | Typographic error |
| 216. | 748 | 20 | "effect for tenure" | "effect of conduct for tenure" | Typographic error |

16

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 217. | 751 | 9–10 | "they were a manager maybe before years and now they just got promoted." | "they were a manager maybe for years and now they just got promoted." | Typographic error |
| 218. | 751 | 11 | "first in the" | "first full year in the" | Typographic error |
| 219. | 755 | 12 | "Mortinson" | "Mortensen" | Typographic error |
| 220. | 755 | 13 | "economical" | "canonical" | Typographic error |
| 221. | 757 | 14–15 | "So in a pure monopsony, you converge two." | "So in a pure monopsony, you converge to -- " | Typographic error |
| 222. | 757 | 22 | "ladder" | "labor" | Typographic error |
| 223. | 758 | 14 | "hiring an elastic" | "highly inelastic" | Typographic error |
| 224. | 758 | 15 | "So it's a type" | "So to tie it back" | Typographic error |
| 225. | 765 | 8 | "overtime" | "over time" | Typographic error |
| 226. | 773 | 10 | "discussing pulling" | "discussing gathering merit pool" | Typographic error |
| 227. | 773 | 18 | "Peter Clemons" | "Peter Clemens" | Typographic error |
| 228. | 774 | 10 | "emergency" | "internal" | Typographic error |
| 229. | 778 | 7 | "Ken Thiry" | "Kent Thiry" | Typographic error |
| 230. | 778 | 18–19 | "And Bridie Fanning in his deposition" | "And Bridie Fanning in her deposition" | Typographic error |
| 231. | 780 | 20 | "Ken Thiri well. Ken Thiri has" | "Kent Thiry well. Kent Thiry has" | Typographic error |
| 232. | 786 | 11 | "quantitative" | "qualitative" | Typographic error |

17

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 233. | 788 | 8–9 | "Defendant's Exhibit 90," | "Defendants' Exhibit 90," | Typographic error |
| 234. | 788 | 14 | "Brian Rasko" | "Brian Rasco" | Typographic error |
| 235. | 790 | 2 | "Defendant's experts" | "Defendants' experts" | Typographic error |
| 236. | 792 | 14 | "bilateral" | "unilateral" | Typographic error |
| 237. | 792 | 16 | "And then analyze the qualitative evidence" | "And then analyze the quantitative evidence" | Typographic error |
| 238. | 792 | 19 | "bilateral" | "unilateral" | Typographic error |
| 239. | 793 | 8 | "consistent" | "inconsistent" | Typographic error |
| 240. | 794 | 7–8 | "which is to assess access that the qualitative evidence is" | "which is to assess that the qualitative evidence is" | Typographic error |
| 241. | 794 | 12–13 | "My opinion is in that qualitative evidence is consistent with" | "My opinion is that qualitative evidence is consistent with" | Typographic error |
| 242. | 796 | 2 | "consistent" | "inconsistent" | Typographic error |
| 243. | 796 | 16–17 | "The evidence that I saw in the initial report of all this CSI exchanges" | "The evidence that I saw in the initial report of all these CSI exchanges" | Typographic error |
| 244. | 797 | 6 | "things about" | "thinking about" | Typographic error |
| 245. | 797 | 10–11 | "what we don't observe as relevant because" | "what we don't observe is relevant because" | Typographic error |
| 246. | 802 | 2 | "Brian Rasko." | "Brian Rasco." | Typographic error |
| 247. | 802 | 19 | "Brian Rasko;" | "Brian Rasco;" | Typographic error |
| 248. | 804 | 15 | "relevant amount of documents" | "relevant documents" | Typographic error |

18

19

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 249. | 806 | 19 | "in the" | "and the" | Typographic error |
| 250. | 809 | 2 | "difference" | "differencing" | Typographic error |
| 251. | 811 | 18–19 | "and saw how many CEOs and how many CEOs there were at SCA." | "and saw how many CEOs there were at SCA." | Typographic error |
| 252. | 816 | 18 | "Brian Rasko," | "Brian Rasco," | Typographic error |

19

# **Exhibit 13**

# Lane Declaration

# (Filed Under Seal)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--o0o--

)
IN RE OUTPATIENT MEDICAL CENTER  ) No. 1:21-cv-00305
EMPLOYEE ANTITRUST LITIGATION    )
_____)

CONFIDENTIAL

_____

VIDEO DEPOSITION OF

SHANNON MOSLEY

August 13, 2024

_____

DEPOSITION OF SHANNON MOSLEY, produced as a witness, duly sworn by me via videoconference at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on August 13, 2024, from 9:18 A.M. to 3:05 P.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand via videoconference.

APPEARANCES


NUSSBAUM LAW GROUP, PC, 1133 Avenue of the Americas, 31st Floor, New York, NY 10036, represented by JONATHAN J. ROSS, Attorney at Law, appeared via videoconference as counsel on behalf of the Plaintiffs.

Email: jross@nussbaumpc.com



KING & SPALDING, 500 West 2nd Street, Suite 1800, Austin, TX 78701, represented by VERONICA MOYE & JULIA C. BARRETT, Attorneys at Law, appeared via videoconference as counsel on behalf of USPI and Tenet.

Email: vmoye@kslaw.com



MORGAN, LEWIS & BOCKIUS LLP, 110 North Wacker Drive, Chicago, IL 60606-1511, represented by STACI M. HOLTHUS, Attorney at Law, appeared via videoconference as counsel on behalf of DaVita.

Email: staci.holthus@morganlewis.com

Shannon Mosley   Confidential
August 13, 2024

WILSON SONSINI GOODRICH & ROSATI, One Market Plaza, Spear Tower, San Francisco, CA 94105, represented by KAREN J. SHARP, Attorney at Law, appeared via videoconference as counsel on behalf of Andrew Hayek.

Email: karen.sharp@wsgr.com

McGUIRE WOODS, 77 West Wacker Drive, Suite 4100, Chicago, IL 60601-1818, represented by ANDREW E. TALBOT and AMY B. MANNING, Attorneys at Law, appeared via videoconference as counsel on behalf of Surgical Care Affiliates.

Email: atalbot@mcguirewoods.com

McDERMOTT WILL & EMERY, 444 West Lake Street, Chicago, IL 60606-0029, represented by GLENNA SIEGEL, Attorney at Law, appeared via videoconference as counsel on behalf of Kent Thiry.

Email: gsiegel@mwe.com

ALSO PRESENT:

Maggie Kane, Videographer

INDEX

|                                              | PAGE |
|----------------------------------------------|------|
| Examination by MR. ROSS                      | 6    |
| Examination by MS. MOYE                      | 141  |
| Further Examination by MR. ROSS              | 145  |
| Further Examination by MS. MOYE              | 155  |
| Further Examination by MR. ROSS              | 156  |

EXHIBITS                                                PAGE

| Exhibit PX279 | Subpoena                              | 9   |
| Exhibit PX280 | ███████████                           | 33  |
| Exhibit PX281 | ██████████                            | 45  |
| Exhibit PX282 | Email to Megan Fox, 10/23/17, re SCA  | 126 |
| Exhibit PX283 | Wellman Market Recruiting Forecast Q1 2015 | 132 |
| Exhibit PX284 | Email to Shannon Mosley, 10/11/13, re clinical directors / Redding? | 149 |

EXHIBITS (PREVIOUSLY MARKED)    PAGE

| Exhibit PX91  | 22  |
| Exhibit PX220 | 111 |
| Exhibit PX99  | 115 |
| Exhibit PX239 | 130 |

Shannon Mosley   Confidential
August 13, 2024

THE VIDEOGRAPHER:  Good morning.  We're on the record at 14:18 UTC, on Tuesday, August 13, 2024.

Audio and video recording will continue to take place until all parties agree to go off the record.  Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of witness Shannon Mosley, in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation.  This proceeding is being held at the remote videoconference.

My name is Maggie Kane.  I'm the videographer on behalf of U.S. Legal Support, located at 16825 North Chase Drive, Suite 900, Houston, Texas 77060.  I'm not related to any party in this action, nor am I financially interested in the outcome.

The court reporter is Brandon Combs, on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which the court reporter will swear in the witness.

MR. ROSS:  This is Jonathan Ross from

Nussbaum Law Group for the plaintiffs.

MS. MOYE:  Veronica Moye for the witness and for USPI/Tenet, King & Spalding.

MS. BARRETT:  Julia Barrett, also with King & Spalding, on behalf of USPI/Tenet and the witness.

MS. HOLTHUS:  Staci Holthus of Morgan, Lewis & Bockius on behalf of DaVita, Inc.

MR. TALBOT:  Andrew Talbot and Amy Manning from McGuire Woods on behalf of the SCA defendants.

MS. SIEGEL:  Glenna Siegel from McDermott, Will & Emery on behalf of Kent Thiry.

MS. SHARP:  Karen Sharp with Wilson Sonsini Goodrich & Rosati on behalf of Andrew Hayek.

SHANNON MOSLEY,

 having been first duly sworn, testified as follows:

EXAMINATION

Q.   (BY MR. ROSS)  Good morning, Ms. Mosley. Thank you for coming in today.  To start, if you could just state your full name and home address for the record.

A.   Yes.  My name is Shannon January Mosley, and my home address is ████████████████████ ██████████████ .

Q.   And are you represented by counsel here

Shannon Mosley   Confidential
August 13, 2024

THE WITNESS:  Yeah, when Greg told me, from what I can recall, there wasn't mention of that particular document at that time.

Q.   (BY MR. ROSS)  And is it fair to say that a number of months had gone by between the time that Ms. Karrmann gave you that article and you were told that you could now solicit from SCA?

MS. MOYE:  Objection to the form.

THE WITNESS:  And again, the time frame is fuzzy.  And to be clear, the document was placed on my desk, but, you know, I didn't see Sandi set it on my desk, it was just sitting there and I read it.

So, and I don't remember the time frame to be honest.  I do not remember the time frame in between.

Q.   (BY MR. ROSS)  Do you recall discussing that document with Ms. Karrmann around the time that it was placed on your desk?

A.   I'm really trying to remember whether or not I talked to Sandi.  I did talk with counsel.  I can't remember if I spoke with Sandi about it.

Q.   And I don't want to know anything about your discussions with counsel.  And you don't recall discussing it with Sandi.  Do you recall discussing it with anyone else who was not an attorney?

Shannon Mosley   Confidential
August 13, 2024

MS. MOYE:  And the "it" is the document itself?  Is that what you're asking about?

MR. ROSS:  Yes, the article that was placed on her desk by Sandi concerning the illegality of no poach agreements.

MS. MOYE:  Object to the form.

THE WITNESS:  So, Greg reported to Sandi, so Greg knew about the document, I knew about the document.  Outside of that, I don't recall who else it was circulated to.  Again, when it came up, came back up, it was through legal counsel.

Q.   (BY MR. ROSS)  Okay.  But my question was, did you discuss that document, the article, after it was placed on your desk, did you discuss that article with anyone other than an attorney?

A.   I do not recall.

Q.   It's possible that you did?

MS. MOYE:  Object to the form.  Don't speculate.

THE WITNESS:  Don't recall.

MR. ROSS:  Okay.  So let's pull up Tab 12, which will be marked as PX282; is that correct?

THE VIDEOGRAPHER:  Yes, that's correct. I'm pulling that up.

(Whereupon, Exhibit PX282 was marked for identification.)

MS. MOYE:  What exhibit number again?

MR. ROSS:  PX282.  That is Tab 12.

Q.  (BY MR. ROSS)  Do you have that document in front of you, Ms. Mosley?

A.  Yes.

Q.  And do you recognize this document as an email that was sent during the normal course of your business at USPI?

A.  Yes.

Q.  And this is an email dated October 23, 2017, from you to Megan Fox and Miles Freeman, who I believe are both at Catapult.

And you tell them, please disregard the nonpoaching agreement between USPI and SCA.  I give you permission to recruit out of SCA going forward.

So is this the first time that you advised Catapult that they could now recruit from SCA?

A.  To the best of my recollection, yes.

Q.  And do you recall if you sent similar communications to other outside recruiting agencies about their ability to now recruit from SCA?

A.  I'm certain that I may have done that, let them know, just like I'm letting Catapult know.  I

don't specifically remember when, but yes, I would have informed the agencies because they are recruiting for USPI.

Q.   And from the time that Ms. Karrmann placed the article on your desk concerning the illegality of no poach agreements, through October 23, 2017, you continued to apply the SCA/USPI no poach agreement; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  So the way that I'll answer that is I was waiting on directive from my supervisor, you know, regarding what to do in response to that memo.  Paper.

Q.   (BY MR. ROSS)  So while you were waiting to be told what to do, you did not advise Catapult or any other recruiting agency that they could now solicit from SCA?

A.   To the best of my recollection, I don't believe I did.

Q.   And you did not inform Ms. McGarry that she could now recruit from SCA?

A.   I don't believe I did, to the best of my recollection.

Q.   And do you recall ever telling any other recruiting agencies that they could now recruit from

Shannon Mosley   Confidential
August 13, 2024

AMSURG?

A.   No, I don't recall that.

Q.   Or from SCD?

A.   Don't recall.

Q.   Or from Woodrum?

A.   Same answer, I do not recall.

Q.   Or from ASCOA?

A.   I do not recall.

Q.   Or from Foundation?

A.   I don't recall.

Q.   Ms. Mosley, do you recall ever obtaining wage information concerning SCA's employees?

MS. MOYE:  Object to the form.

THE WITNESS:  I need more context.

Q.   (BY MR. ROSS)  Context is, do you recall ever seeking wage information of SCA employees?

MS. MOYE:  Object to the form.

THE WITNESS:  Me personally, did Shannon solicit information, the answer is Shannon did not do that.

Q.   (BY MR. ROSS)  Are you aware of anybody at USPI doing that?

MS. MOYE:  Object to the form.

THE WITNESS:  At USPI.  I'm pausing because I'm trying to...

Shannon Mosley   Confidential
August 13, 2024

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: August 26, 2024

_____

BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

*** ERRATA SHEET ***

NAME OF CASE: OUTPATIENT MEDICAL
DATE OF DEPOSITION:  8-13-24
NAME OF WITNESS:  SHANNON MOSLEY

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| 74 | 18 | "leader" | "leader's" | transcription error |
| 76 | 20 | "witness" | "witness's" | transcription error |
| 92 | 10 | "site" | "job" | transcription error |

Subscribed and sworn before me

this____day of_____,20__.

_____

_____ Shannon Mosley

(Notary Public)        My Commission Expires:

# **Exhibit 14**

# Lane Declaration

# (Filed Under Seal)

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL        )
CENTER EMPLOYEE ANTITRUST       )
LITIGATION,                     )
                                ) Master Docket No.
                                ) 1:21-cv-00305
                                )
THIS DOCUMENT RELATES TO:        )
ALL ACTIONS                      )


* * *HIGHLY CONFIDENTIAL* * *

VIDEOTAPED DEPOSITION OF ANDREW PATRICK HAYEK

Chicago, Illinois

September 18, 2024


Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR, CSR

JOB NO. 6616478-001

September 18, 2024

9:00 A.M.

HIGHLY CONFIDENTIAL VIDEOTAPED deposition of ANDREW PATRICK HAYEK, held at K&L Gates, 70 West Madison Street, Chicago, Illinois, before Kathy S. Klepfer, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter, and Certified Shorthand Reporter of the State of Illinois.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

A P P E A R A N C E S:

JOSEPH SAVERI LAW FIRM

Attorneys for Plaintiffs

601 California Street

Suite 1505

San Francisco, California  94108

BY:  JOSEPH SAVERI, ESQ.

CADIO ZIRPOLI, ESQ.

WILLIAM CASTILLO GUARDADO, ESQ. (Remotely)

- and -

NUSSBAUM LAW GROUP

1133 Avenue of the Americas

31st Floor

New York, New York  10036

BY:  SUSAN SCHWAIGER, ESQ. (Remotely)


MORGAN LEWIS & BOCKIUS, LLP

Attorneys for DaVita

2222 Market Street

Philadelphia, Pennsylvania  19103

BY:  KENNETH KLIEBARD, ESQ.

MOLLY LANE, ESQ. (Remotely)

STACI HOLTHUS, ESQ. (Remotely)

APPEARANCES (Cont'd.)


WILSON SONSINI GOODRICH & ROSATI

Attorneys for Andrew Hayek

      1700 K Street, NW

      Fifth Floor

      Washington, D.C.  20006

BY:   JEFFREY BANK, ESQ.

      JORDANNE STEINER, ESQ.

      KAREN SHARP, ESQ.

      - and -

K&L GATES

      70 West Madison Street

      Suite 3300

      Chicago, Illinois  60602-4207

BY:  BRIAN J. SMITH, ESQ.

      - and -

PROSKAUER

      1001 Pennsylvania Avenue, N.W.

      Suite 600 South

      Washington, D.C.  20004

BY:  MARK ROSMAN, ESQ.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

A P P E A R A N C E S (Cont'd.)

McGUIREWOODS

Attorneys for Surgical Care Affiliates

        77 West Wacker Drive, Suite 4100

        Chicago, Illinois  60601

BY:   AMY B. MANNING, ESQ.

        ANGELO RUSSO, ESQ.

McDERMOTT WILL & EMERY

Attorneys for Kent Thiry

        444 West Lake Street

        Suite 4000

        Chicago, Illinois  60606

BY:  DANIEL R. CAMPBELL, ESQ.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

A P P E A R A N C E S (Cont'd.)


KING & SPALDING

Attorneys for USPI and Tenet Healthcare

        1180 Peachtree Street, NE

        Suite 1600

        Atlanta, Georgia  30309

BY:   VERONICA MOYE, ESQ.

        JULIA C. BARRETT, ESQ. (Remotely)






ALSO PRESENT:

        PETER PREZZANO, Videographer

        DAN ACOSTA, CONCIERGE (Remote)

Andrew Patrick Hayek  Highly Confidential
September 18, 2024

INDEX

EXAMINATION OF A. HAYEK:                                    PAGE

By Mr. Saveri                                                10

By Mr. Bank                                                 382


EXHIBITS:                                                   PAGE

Exhibit PX 483, Reporter's Transcript, Trial to      58
Jury - Day Four in USA v. DaVita Inc. and Kent
Thiry

Exhibit PX 484, E-mail chain Bates-stamped          152
DVA_OMCEAL_000429386 through 390

Exhibit PX 485, E-mail chain Bates-stamped          154
DOJ-PROD001A-000000011

Exhibit PX 486, E-mail chain Bates-stamped          240
USPI_CIV_000014009

Exhibit PX 487, E-mail Bates-stamped                246
USPI_CIV_000014006

Exhibit PX 488, E-mail Bates-stamped SCA001107824 349

Exhibit PX 489, E-mail chain Bates-stamped          352
OMC_BM_000014729

Exhibit PX 490, E-mail Bates-stamped                366
HAYEK-000012214 through 216, with attachment

EXHIBITS PREVIOUSLY MARKED:                                 PAGE

Exhibit PX 158                                              57

Exhibit PX 316                                              95

Exhibit PX 30                                             285

Exhibit PX 171                                            313

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

INDEX (Cont'd.)

EXHIBITS PREVIOUSLY MARKED:                      PAGE

Exhibit PX 336                                    320

Exhibit PX 159                                    331

Exhibit PX 37                                     363

Exhibit PX 232                                    364

Exhibit PX 160                                    373


DIRECTIONS NOT TO ANSWER:

Page 96:15

VIDEOGRAPHER:  We are now on the record.  The time is 9:11 a.m., according to the video monitor, on September 18, 2024.  This is the video-recorded proceeding of Andrew Hayek, taken in the matter of In re Outpatient Medical Center Employee Antitrust Litigation filed in the United States District Court for the Northern District of Illinois.

This proceeding is being held at 70 West Madison Street in Chicago, Illinois.  My name is Peter Prezzano, the videographer on behalf of U.S. Legal Support located in Houston, Texas.  The court reporter is Kathy Klepfer, also on behalf of U.S. Legal Support.

The court reporter has noted counsels' appearances for the record.  Will the court reporter please administer the oath, and you may proceed.

* * *

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

ANDREW PATRICK HAYEK,  called as a

witness, having been duly sworn,

was examined and testified as

follows:

EXAMINATION BY

MR. SAVERI:

Q.    Good morning, Mr. Hayek.

A.    Good morning.

Q.    I introduced myself to you before we started, but, once again, my name is Joseph Saveri, and I'm one of the lawyers for plaintiffs in this matter.

Could you please state your name, full name, and spell it for the record, please.

A.    Andrew, A-N-D-R-E-W, Patrick, P-A-T-R-I-C-K, Hayek, H-A-Y-E-K.

Q.    Mr. Hayek, are you presently employed?

A.    Yes.

Q.    And where are you employed?

A.    Triple Aim Partners.

Q.    And what is your title at Triple Aim Partners?

A.    I'm the chief executive officer.

Q.    And how long have you been the CEO at Triple Aim Partners?

employees?

"A   Yes, we did."

Was that a -- was that testimony correct?

A.   Yes.  And as I referenced, when we recruited a DaVita executive, Mr. Thiry or someone else might reach out, as I shared with you, and -- and there'd be some similar attributes to the Mr. Rucker situation, but it varied person by person.

Q.   Well --

A.   And then, as -- as I also shared, in early 2012, a discussion around soliciting senior executives.

Q.   Do you recall testifying, a little bit farther down on page 473, lines 14 to 16:

"Q   And what did you discuss, if anything, with regard to solicitation and recruiting?"

Do you see where I'm reading -- reading from?

MR. BANK:  Objection.

THE WITNESS:  Yes, I do.

BY MR. SAVERI:

Q.   "Q   And what did you discuss, if

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

anything, with regard to solicitation and recruitment?

"A    We agreed not to solicit each other's senior executives."

Mr. Hayek, that testimony that you gave under oath was truthful when you gave it, correct?

A.    Yes.  And as I shared here, there's a further aspect to it.

Q.    Now, when did you and -- when did you and Mr. Thiry agree not to solicit each other's executives?

MR. BANK:  Objection.

THE WITNESS:  To clarify, in early 2012, we agreed not to solicit senior executives unless they were already looking at jobs, and then there were -- there was a further clarification, which we can talk about.

BY MR. SAVERI:

Q.    And when was that first agreement or understanding reached?

A.    I believe approximately January 2012.

Q.    Could you turn to the Exhibit 483, sir.  It's the -- it's the second -- it's the

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

second trial testimony.

A.    Yes.

Q.    Would you turn to page 535.

      Tell me when you're there.

A.    I'm on 535.

Q.    7 -- line 7:

      "Q    And it's in 2012, around February, that you described entering into this agreement or understanding with Mr. Thiry about how solicitations would be conducted, right?

      "A    Yes.  The agreement was approximately around January of 2012."

      Was that testimony accurate and truthful?

      MR. CAMPBELL:  Object to the form.

      THE WITNESS:  Yes.

BY MR. SAVERI:

Q.    So, to the best of your recollection, the agreement began in approximately January of 2012?  I want to be as clear as I can be.

A.    That's the question?

Q.    Is that your understanding?

      Yes.  Is that your understanding?

A.    Yes.

Q.    Great.  Now, at the time, that is, in

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

MR. BANK:  Objection.

MR. KLIEBARD:  Objection.

Mischaracterizes.

THE WITNESS:  Are you asking about, would there be more than one purposes, or are you asking about effects?

BY MR. SAVERI:

Q.   I'm just trying to understand your answer.

I think you said or testified that the reducing -- the reduction of movement was one purpose, and then you added the phrase "among others," and I'm trying to understand what you meant by "among others."

A.   Understood.

You had asked about intent or purposes.

Q.   Yeah.

A.   And the purposes began with a business relationship.  And for DaVita, that was a very specific set of business opportunities and relationships different from USPI and Mr. Thiry.

Second, we talked about some threats and the avoidance of risk.  And then, third, the reducing the likelihood or probability of losing

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

a senior executive.

So there are multiple purposes.

Q.    And when you say "reducing risk," was the reduction in the risk of those retaliatory or other actions that Mr. Thiry and Mr. Mello had -- had mentioned to you in some of the conversations that you had had or in e-mail communications that you had had previously?

MR. BANK:  Objection.

THE WITNESS:  Is your question, was one of the purposes to avoid the risks of some of what Kent had described?  So suing me or -- or reputational harm to SCA?

BY MR. SAVERI:

Q.    All -- all that -- all those things, yes, sir.

MR. CAMPBELL:  Object to the form.

THE WITNESS:  So can you just re-clarify the question just so I understand?

BY MR. SAVERI:

Q.    Well, let's move on.

Let me ask you a question, sir.  Was this agreement that we've been discussing between SCA and DaVita still in place when you

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

left in 2017 to become the CEO of Optum Health?

A.   I became the CEO of Optum Health earlier in 2017.

Q.   Yes.

A.   And then I wore a couple hats.  I was both the CEO of Optum Health and retained the title and position of CEO of SCA through 2017, and then transitioned to Mr. Kilgore I believe in January of 2018.

Q.   Okay.  So let's just take those points.

So when you first got the position at Optum Health, was the agreement in place?

A.   Yes, I believe it continued into 2017.

Q.   And did it continue when Mr. Kilgore succeeded you?

MR. BANK:  Objection.

THE WITNESS:  When I moved out of my SCA role, it ceased to be something I thought was in effect or relevant.  I had moved on, and -- and there were other transitions.

BY MR. SAVERI:

Q.   Okay.  Before you left and transitioned, did you ever tell Mr. Thiry or did

you notify him, you know, in writing or in a communication, the agreement's over?

A.   As I shared, when I transitioned out of my role, it ceased to be something I thought was relevant or in place, and I did not have a specific communication terminating the agreement.

Q.   Did Mr. Kilgore, to the best of your knowledge, ever communicate to Mr. Thiry or anybody at DaVita that the agreement that we've been discussing was no longer in effect?

MR. CAMPBELL:  Objection.  Foundation.

THE WITNESS:  Can you reask that question?  It was -- I just want to make sure I'm tracking.

MR. SAVERI:  Read it back.

(Record read.)

THE WITNESS:  I don't have specific knowledge or recollection of Mr. Kilgore -- I'm not aware of Mr. Kilgore communicating something specific.

BY MR. SAVERI:

Q.   And was the agreement then in place from the time you formed it in 2012 through the time that you left SCA?

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

MR. BANK:  Objection.

BY MR. SAVERI:

Q.   To the best of your knowledge?

MR. BANK:  Objection.

MR. KLIEBARD:  Objection.  Vague.

THE WITNESS:  To the best of my knowledge, from the time we formed it through continuing into 2017, the agreement was in place.

MR. SAVERI:  Okay.  Thank you.

This is a good time to break.

MR. BANK:  Great.

VIDEOGRAPHER:  This ends media unit 3. Now going off the record at 12:48 p.m.

(Luncheon recess.)

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

AFTERNOON SESSION

VIDEOGRAPHER:  This begins media unit 4.  Now going back on the record at 1:34 p.m.

ANDREW PATRICK HAYEK, resumed and

testified further as follows:

EXAMINATION BY (Cont'd.)

MR. SAVERI:

Q.    Good afternoon, Mr. Hayek.

A.    Good afternoon.

Q.    Before lunch, we were talking about some of the aspects of the agreements between -- or the understandings between SCA and DaVita.

First, let me ask you, when -- while you were the CEO of SCA, approximately how many employees worked at SCA?

A.    It depends on the timing or the stage.

Q.    Okay.  Could I give me a little bit more color, more detail to that?

A.    At the beginning, when I joined SCA in the early years, perhaps 6- or 7,000 teammates total.

Q.    When you -- when you say "teammates," what do you mean?

A.    Employees.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

BY MR. SAVERI:

Q.   Go ahead.

A.   I'd say, first and foremost, I haven't seen the notes that you're referring to.  I don't know who took them or their understanding of these two agreements or, you know, the situation, and I don't know -- I don't know much at all.

I can tell you what I recall, and what I recall is what I told you earlier:  That I referred to them as non-solicitation agreements. And again, they applied to senior executives, unless that senior executive was already considering outside roles and had shared such with their supervisor.  So consistent with what I've been telling you today.

Q.   And again, the fact that they weren't reduced to writing as a -- like a formal agreement, from your perspective, didn't detract from whether they would be enforceable or followed by any of the companies involved?

MR. BANK:  Objection.

THE WITNESS:  From my perspective, I considered it an agreement with DaVita, and I considered it an agreement with USPI, and

I sought to follow it.

And, you know, as I shared earlier, when I moved on from my role at -- at SCA, I was no longer CEO, neither of the two agreements did I assume were in place or effective or relevant.  And so, you know, I just -- the agreements each started and then, you know, they had -- as I shared with you earlier, they ended effectively when I was outside of my role.

BY MR. SAVERI:

Q.   Well --

A.   When I left my role.

Q.   When you left your role, you -- you had nothing more to do with the agreements, is that fair?

A.    From my perspective, I moved on from my role, and they were no longer relevant, you know, effective, in place.  I moved on.  Things changed at DaVita.  Things changed at USPI.

So, from my perspective, I had moved on, and they weren't relevant after I left my role.

Q.   Okay.  But, for example, you don't -- do you know as you sit here today whether your

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

successors, right, whether your successor in the CEO position followed the agreements or not?

A.    As I shared with you earlier, I don't recall any specific conversation with Mr. Kilgore about either agreement, and in my mind, they ceased to be relevant or, you know, in place or -- or, you know, in effect once I had left my role.

Q.    Now, putting aside your experience at SCA, have you ever worked with a company that had similar agreements with any of their competitors?

MR. BANK:  Objection.

THE WITNESS:  Is your question whether I'm aware of or have been a part of a company that had an agreement similar to the agreement I had with DaVita or the agreement I had with USPI?

BY MR. SAVERI:

Q.    Yeah.

A.    No.

Q.    How about currently, do you have any -- a similar agreement with any company?

MR. BANK:  Objection.

THE WITNESS:  No.

Andrew Patrick Hayek  Highly Confidential
September 18, 2024

BY MR. SAVERI:

Q.    Okay, Mr. Hayek.

MR. ZIRPOLI:  This is Tab 14.

CONCIERGE:  Thank you, counsel.

BY MR. SAVERI:

Q.    Now, I have handed you a document which has been previously marked as Exhibit 159 that has the Bates numbers DOJ-PROD001B-00152893.  It's the one in the upper right-hand corner.  And it goes on through the last page that ends in, looks like, 908.

Do you have that in front of you, sir?

A.    Yes, I have the starting number, and then there is an attachment to it.

Q.    So let me ask you, first:  Did -- while Bridie Fanning was the CTO at SCA, did she create a list of companies that recruiters could or could not reach out to for candidates?

MR. BANK:  Objection.

THE WITNESS:  What I recall is she created -- well, I would say compiled a list --

BY MR. SAVERI:

Q.    Fair enough.

A.    -- of types of companies or example

Andrew Patrick Hayek  Highly Confidential
September 18, 2024

referred to the agreement with your

subordinates, your reports, created confusion

about what the -- what the terms of the

agreement were?

          MR. BANK:  Objection.  Calls for

     speculation.

          THE WITNESS:  I don't know.

BY MR. SAVERI:

     Q.    So you don't know whether or not,

because of -- of your inconsistency in the way

you referred to it, to the agreement with your

subordinates, they had questions about what the

agreement was or its terms?

          MR. BANK:  Objection.  Same objection.

          THE WITNESS:  Again, I don't know, and

     I generally expect if there's a question or

     confusion, you know, senior executives would

     reach out for clarification.  That would

     happen on a range of topics if there was

     confusion.

BY MR. SAVERI:

     Q.    Okay.  Mr. Hayek, then you -- you

indicate that, "if we want to revisit our

relationship with USPI, that's something we can

do."

Do you see that?

A.    Yes.

Q.    And this is dated in 2015.

Subsequent to this e-mail, did you revisit, ever, the relationship with USPI or Mr. Wilcox?

A.    I don't recall doing so.  And as I shared earlier, you know, when I left my role at SCA, it was no longer in place or effective or relevant or something I considered in effect.

Q.    But you also then gave the instructions to Mr. Rucker and Ms. -- Dr. Fanning, in particular, until that time, "we should not be making outbound calls to them," correct?

MR. BANK:  Objection.

THE WITNESS:  That is what I write in this e-mail.

BY MR. SAVERI:

Q.    Okay.  And then Dr. Fanning writes back to you on December 12, 2015, "Andrew, I'm sorry about this.  I've recommunicated this to our firms."

Do you see that?

A.    I do.

Q.    And so Dr. Fanning, in doing that, is -- well, one, reiterating that she understands the agreement; is that correct?

A.    I'm not sure if she's doing that, but she's acknowledging my e-mail and saying she is going to communicate to her firms, or our firms.

Q.    Well, she says in fact that she's done it already, right?  "I have recommunicated this to our firms -- to our firms."

That indicates that she's already done that, correct?

A.    You're correct.  That's how I read it as well.

Q.    Okay.

MR. SAVERI:  Let's go off the record.

Well, I don't have any more questions at this time, so I'm going to pass the witness.

MR. BANK:  Let's go off the record.

VIDEOGRAPHER:  Now going off the record at 5:52 p.m.

(Recess.)

VIDEOGRAPHER:  Now going back on the record at 6:06 p.m.

EXAMINATION BY

CERTIFICATE

I, Kathy S. Klepfer, a Registered

Merit Reporter and Certified Shorthand

Reporter within and for the State of

Illinois, do hereby certify:

That ANDREW PATRICK HAYEK, the witness

whose deposition is herein before set forth,

was duly sworn by me and that such

deposition is a true record of the testimony

given by such witness.

I further certify that I am not

related to any of the parties to this action

by blood or marriage and that I am in no way

interested in the outcome of this matter.

In witness whereof, I have hereunto

set my hand this 19th day of September 2024.

_____
KATHY S. KLEPFER, RPR, RMR, CRR, CLR

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

NAME OF CASE:  In re Outpatient

DATE OF DEPOSITION:  September 18, 2024

NAME OF WITNESS:  Andrew Patrick Hayek

Reason Codes:

    1.  To clarify the record.
    2.  To conform to the facts.
    3.  To correct transcription errors.

Page _____ Line _____ Reason _____  See attached chart for corrections
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

_____
ANDREW PATRICK HAYEK

Errata for Deposition of Andrew Patrick Hayek
*In re Outpatient Medical Center Antitrust Litigation*
September 18, 2024

| Transcript Page | Description of Correction | Reason for Correction |
|---|---|---|
| Page 4, line 10 | Add address for Wilson Sonsini Goodrich & Rosati's San Francisco office (One Market Plaza, Spear Tower, Suite 3300, San Francisco, CA 94105)  and move the entry of appearance for Karen Sharp, Esq. from under the DC office address to under the San Francisco office address | Transcription error |
| Page 12, lines 6-7 | Change "I retained the Optum CEO role" to "I retained the SCA CEO role" | To clarify the record |
| Page 12, line 21 | Change "although did not use it" to "although I did not use it" | Transcription error |
| Page 13, line 17 | Change "have you report" to "have you, report" | Transcription error |
| Page 14, lines 20-21 | Change "This is 20 years ago" to "That was 20 years ago" | Transcription error |
| Page 28, line 10 | Change "I want to make sure if that's correct" to "I want to make sure that it's correct" | Transcription error |
| Page 28, lines 19-20 | Change "I don't recall the dates and the month. I recall April 2022" to "I don't recall the dates. And the month – I recall April 2022" | Transcription error |
| Page 29, line 12 | Change "and the totality, yes" to "so the totality, yes" | To clarify the record |
| Page 34, line 23 | Change "was – well, yes" to "was with cash" | Transcription error |
| Page 35, line 1 | Change "$58" to "$57" | To conform the record to the facts |
| Page 37, line 14 | Change "2010 or '11" to "approximately 2014 or 2015" | To conform the record to the facts |
| Page 39, line 14 | Change "to mine" to "to me" | Transcription error |
| Page 42, lines 15-16 | Change "I did work at KKR. That was 2001 to 2003" to "I did work at KKR, but that was 2001 to 2003" | To clarify the record |
| Page 49, line 8 | Change "meaning through this interaction" to "meaning throughout this interaction" | Transcription error |
| Page 49, line 24 through page 50, line 2 | Change "I think the first interaction would have been in a meeting context with DOJ and FBI, someone was present, but that's my best recollection" to "I think the first interaction would have been in a meeting context with DOJ, and someone from the FBI was present, but that's my best recollection" | To clarify the record |
| Page 53, lines 13-14 | Change "as what I'm doing here today" to "as is what I'm doing here today" | Transcription error |
| Page 53, line 20 | Change "Of a similar answer" to "I'd give a similar answer" | Transcription error |

-1-

| Page 55, line 25 | Change "I recall the 'Jackson' and a jury" to "I recall the name 'Jackson' and a jury" | Transcription error |
|---|---|---|
| Page 79, line 10 | Change "Regarding my leaving SCA, right?" to "Regarding my leaving DaVita, right?" | To clarify the record |
| Page 80, lines 1-2 | Change "actually came before I shared that I was leaving SCA." to "actually came before I shared that I was leaving DaVita." | To clarify the record |
| Page 82, lines 2-6 | Change "My interpretation was the promotion. And there are other parts to it. It was compensation and role and, you know, several things. My interpretation is that was an effort to – to convince me to stay." to "My interpretation was the promotion – and there are other parts to it – it was compensation and role and, you know, several things – my interpretation is that it was an effort to convince me to stay." | Transcription error |
| Page 85, lines 19-21 | Change "It's hard to know I would have had a different set of opportunities" to "It's hard to know. I would have had a different set of opportunities." | Transcription error |
| Page 89, lines 3-4 | Change "I remember there being a bit of a time" to "I remember there being a bit of time" | Transcription error |
| Page 95, line 22 | Change "For the deposition" to "For the exhibit tech" | Transcription error |
| Page 125, lines 4-6 | Change "With respect to going to SCA, I had thought it was private, and learned that it was behind my back" to "With respect to going to SCA, I had thought it was private, and learned that it wasn't behind by back" | To clarify the record |
| Page 127, lines 19-21 | Change "There can be circumstances that when the solicitation in a number of – of situations, yes" to "There can be circumstances with non-solicitations in a number of situations, yes" | Transcription error and to clarify the record |
| Page 136, line 13 | Change "asking to withdraw the offer because that" to "asking to withdraw the offer and that" | To clarify the record |
| Page 176, lines 9-10 | Change "I heard that too" to "I heard ten too" | Transcription error |
| Page 185, line 10 | Change "One of the effects is to" to "One of the purposes is to" | To clarify the record |
| Page 185, lines 16-17 | Change "It – one of the effects was to" to "It – one of the purposes was to" | To clarify the record |
| Page 188, line 22 | Change "different from USPI and Mr. Thiry" to "different from USPI and Mr. Wilcox" | To clarify the record |
| Page 229, lines 2-3 | Change "between ourselves and USPI" to "between SCA and USPI" | To clarify the record |
| Page 235, lines 21-22 | Change "one at a time. The purpose, as I shared" to "one at a time. [line break] A. The purpose, as I shared" | Transcription error |
| Page 236, lines 12-15 | Change "So that was the – I can – that was the business context. And then, secondly, you know, the agreement reduced the likelihood of losing senior executives." to "So that was the business context. And then, second, you know, | To clarify the record |

| | the agreement was intended to reduce the likelihood of losing senior executives." | |
| --- | --- | --- |
| Page 239, line 22 | Change "considering outside students" to "considering outside opportunities" | Transcription error |
| Page 253, line 5 | Change "I know that" to "I knew that" | Transcription error |
| Page 255, lines 23-24 | Change "I believe how I use the word 'we do.'" To "I know how I use the words 'we do.'" | To clarify the record |
| Page 258, line 4 | Change "Mr. Thiry and USPI" to "Mr. Thiry and DaVita" | To clarify the record |
| Page 284, line 5 | Change "not soliciting them at DaVita" to "not soliciting them from DaVita" | To clarify the record |
| Page 294, line 25 | Change "promoted into chief operating" to "promoted to chief operating" | Transcription error |
| Page 297, lines 14-15 | Change "everyone knew at director above" to "everyone knew at director and above" | Transcription error |
| Page 311, line 11 | Change "I never recall her" to "I do not recall her" | To clarify the record |
| Page 329, line 1 | Change "I sought to follow it" to "I sought to follow them" | To clarify the record |
| Page 347, line 24 through page 348, line 4 | Change "To clarify – and I think you're saying the same thing – a very minor subset of all the information that you have and information that you use, including with outside parties in the ordinary course of information, is not public" to "To clarify – and I think we're saying the same thing – a very minor subset of all the information that you have and information that you use, including with outside parties in the ordinary course of business, is not public" | To clarify the record |

# Exhibit 15

Lane Declaration


(Filed Under Seal)

Bill Wilcox  Confidential
September 24, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| IN RE OUTPATIENT MEDICAL | ) | MASTER DOCKET NUMBER |
|---|---|---|
| CENTER EMPLOYEE ANTITRUST | ) | 1:21-CV-00305 |
| LITIGATION | ) | |
| | ) | CONSOLIDATED AMENDED |
| | ) | CLASS ACTION COMPLAINT |
| | ) | |
| | ) | JURY TRIAL DEMANDED |

-----------------------------------------------

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF

BILL WILCOX

September 24, 2024

-----------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF BILL WILCOX, produced as a witness at the instance of the Plaintiffs, was taken in the above-styled and numbered cause on September 24, 2024, from 9:59 a.m. to 5:47 p.m., before Jamie K. Israelow, Certified Shorthand Reporter in and for the State of Texas, Registered Merit Reporter and Certified Realtime Reporter, reported by machine shorthand, at the offices of Jones Day, 2727 North Harwood Street, Suite 600, in the City of Dallas, County of Dallas and State of Texas, and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any notary public.

                         A P P E A R A N C E S

FOR THE CLASS PLAINTIFFS:

        Linda P. Nussbaum, Esq.
        Jonathan J. Ross, Esq.
        NUSSBAUM LAW GROUP, PC
        1133 Avenue of the Americas, 31st FL
        New York, New York  10036
        D: 917.438.9189
        D: 917.438.9102
        lnussbaum@nussbaumpc.com
        jross@nussbaumpc.com


FOR THE DEFENDANT UNITED SURGICAL PARTNERS
INTERNATIONAL, INC.:

        Veronica Moyé, Esq.
        Connor Brewer, Esq.
        KING & SPALDING
        2601 Olive Street, Suite 2300
        Dallas, Texas 75201
        D: 713.751.3254
        vmoye@kslaw.com
        cbrewer@kslaw.com


FOR THE SCA DEFENDANTS:

        Angelo M. Russo, Esq.
        Amy B. Manning, Esq. (By Zoom)
        McGUIREWOODS, LLP
        77 West Wacker Drive, Suite 4100
        Chicago, Illinois  60601
        312.849.8100
        arusso@mcguirewoods.com
        amanning@mcguirewoods.com
        -- and --
        Andrew E. Talbot, Esq. (By Zoom)
        MCGUIREWOODS LLP
        Gateway Plaza, 800 East Canal Street
        Richmond, Virginia  23219-3916
        D: 804.775.1622
        atalbot@mcguirewoods.com

Bill Wilcox  Confidential
September 24, 2024

FOR THE DEFENDANT ANDREW HAYEK:

    Karen Sharp, Esq.
    WILSON SONSINI GOODRICH & ROSATI, P.C.
    One Market Plaza, Spear Tower
    Suite 3300
    San Francisco, California  94105-1126
    D: 415.947.2052
    ksharp@wsgr.com


FOR THE DEFENDANT KENT THIRY:

    Katharine O'Connor, Esq.
    McDERMOTT WILL & EMERY, LLP
    444 West Lake Street
    Chicago, Illinois  60606-0029
    D: 312.984.3627
    koconnor@mwe.com

FOR THE DEFENDANT DAVITA, INC.:

    Staci Holthus, Esq. (By Zoom)
    MORGAN, LEWIS & BOKIUS LLP
    110 North Wacker Drive, Suite 2800
    Chicago, Illinois  60606-1511
    D: 312.324.1763
    staci.holthus@morganlewis.com

ALSO PRESENT:

    Erica Taylor, Videographer
    Chris Azoff, USLS Tech  (By Zoom)

INDEX

                                          PAGE
Appearances                               2-3

BILL WILCOX

     EXAMINATION BY MS. NUSSBAUM               9
     EXAMINATION BY MS. MOYE                 229

  Corrections and Signature                 242
  Reporter's Certificate                    244

                PLAINTIFFS' EXHIBITS
NO.              DESCRIPTION               PAGE

PX503        Subpoena to Testify at a         55
             Deposition in a Civil Action
PX506        Letter dated October 2, 2018, to  88
             William Wilcox from Megan Lewis


                CONFIDENTIAL
             PLAINTIFFS' EXHIBITS
NO.              DESCRIPTION               PAGE

PX504        Email dated 2/10/2018, to        79
             205.306.2662 from William H.
             Wilcox
PX505        Email dated 2/13/2018, to Daphne  83
             Walker from Bill Wilcox
PX507        Federal Bureau of Investigation,  90
             Interview dated 11/30/2018
PX508        Notes from second interview      128
PX509        Email chain, top email dated     119
             10/22/2017, to Jeffrey Andrews
             from Bill Wilcox
PX510        Email chain, top email dated     148
             4/7/2010, to Brett Brodnax from
             Bill Wilcox
PX511        Letter dated May 2010, to Andrew  151
             Hayek and others from William H.
             Wilcox
PX512        Email chain, top email dated     157
             5/31/2012, to Andrew Hayek from
             Bill Wilcox
PX513        Email chain, top email dated     161
             11/1/2013, to Andy Johnston from
             Shannon Mosley

CONFIDENTIAL
PLAINTIFFS' EXHIBITS (CONTINUED)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| PX514 | Email chain, top email dated 12/20/2013, to Bill Wilcox from Chris Hartshorn | 168 |
| PX515 | Email dated 1/8/2014, to Jonathan Bond and Chris Hartshorn from Bill Wilcox | 171 |
| PX516 | Email chain, top email dated 2/12/2010, to Mark Kopser and others from Niels Vernegaard | 175 |
| PX517 | Email chain, top email dated 5/13/2010, to Bill Wilcox and others from Andrew Hayek | 187 |
| PX518 | Email chain, top email dated 7/13/2011, to Bill Wilcox and others from Jarod Moss | 189 |
| PX519 | Email chain, top email dated 9/6/2014, to Bill Wilcox and others from Jason Cagle | 191 |
| PX520 | Email dated 5/28/2015, to Marian Lowe and others from Bill Wilcox | 197 |
| PX522 | Email dated 1/14/2011, to Cabin Team and Brian Mathis from Sue Seme | 202 |
| PX523 | Email chain, top email dated 5/2/2012, to Brian Mathis from Mark Kopser | 204 |
| PX524 | Email chain, top email dated 9/9/2012, to Lynn Howard from Brian Mathis | 208 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PLAINTIFFS' EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| PX521 | Email dated 8/1/2017, to Bill Wilcox from Jason Cagle | 200 |
| PX525 | Email chain, top email dated10/21/2012, to Lynn Howard and others from Brian Mathis | 213 |

Bill Wilcox   Confidential
September 24, 2024

DEFENDANT'S EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| DX77 | March 2015 Email chain between Bill Wilcox and Ms. Wellman and others | 238 |

CONFIDENTIAL
PREVIOUSLY MARKED EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| PX37 | Email chain, top email dated 8/9/2013, to Brian Mathis and others from Jason Cagle | 216 |
| PX226 | Email chain, top email dated 9/3/2013, to Jason Cagle from Katrina Gross | 219 |
| PX227 | Email chain, top email dated 5/14/2010, to Brett Brodnax from Bill Wilcox | 155 |
| PX232 | Email chain, top email dated 8/20/2014, to Jason Cagle from Brian Mathis | 223 |
| PX239 | Email chain, top email dated 2/18/2015, to Bill Wilcox from Shannon Mosley | 225 |
| PX298 | Email chain, top email dated 10/22/2017, to Bill Wilcox from Sandi Karrmann | 115 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PREVIOUSLY MARKED EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| PX91 | Letter to Scott Hammond, Esq. And Veronica Lewis, Esq. From Richard A. Powers | 67 |
| PX235 | Email dated 1/11/2015, to Jason Cagle from Bill Wilcox | 194 |

REPORTER'S NOTE:  Please be advised that an UNCERTIFIED ROUGH DRAFT version of this transcript exists.  If you are in possession of said rough draft, please replace it immediately with this CERTIFIED FINAL TRANSCRIPT.

Bill Wilcox   Confidential
September 24, 2024

P R O C E E D I N G S

(On the record at 9:59 a.m.)

(Exhibits PX503 to PX508 were marked.)

THE VIDEOGRAPHER:  Good morning.  We are now on the record at 9:59 a.m. on September 24th, 2024. This is the video-recorded proceeding of witness, Bill Wilcox, taken by counsel for plaintiff, in the matter regarding Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois, Eastern Division.  This proceeding is being held at Jones Day located in Dallas, Texas.

My name is Erica Taylor.  I'm the videographer on behalf of U.S. Legal Support.  The court reporter is Jamie Israelow on behalf of U.S. Legal Support.

Will counsel please state their appearances for the record.

MS. NUSSBAUM:  Good morning. Linda Nussbaum for the class plaintiffs.

MR. ROSS:  And Jonathan Ross for the class plaintiffs as well.

MS. MOYÉ:  Veronica Moyé, King & Spalding, for USPI.

MR. BREWER:  Connor Brewer, King &

Bill Wilcox  Confidential
September 24, 2024

Spalding, for USPI.

MS. O'CONNOR:  Katharine O'Connor, McDermott Will & Emery, on behalf of Kent Thiry.

MR. RUSSO:  Angelo Russo, McGuireWoods, on behalf of the SCA defendants.

MS. SHARP:  Karen Sharp, Wilson Sonsini, on behalf Mr. Hayek.

MS. HOLTHUS:  Staci Holthus, Morgan, Lewis & Bockius, on behalf of Defendant DaVita, Inc.

MR. TALBOT:  Andrew Talbot, McGuireWoods, on behalf of the SCA defendants.

MS. MANNING:  Amy Manning from McGuireWoods on behalf of the SCA defendants.

THE VIDEOGRAPHER:  The court reporter will now swear in the witness.

BILL WILCOX,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. NUSSBAUM:

Q.   Good morning, Mr. Wilcox.  Can you state your full legal name for the record, please.

A.   William Holder Wilcox.

Q.   What is your date of birth?

A.   ███████████████ .

Q.   And your home address?

Bill Wilcox  Confidential
September 24, 2024

A.   I assumed, yes.

Q.   And so you were at that time doing the best you could to be accurate as to what had occurred approximately nine to 10 years before; is that right?

MS. MOYÉ:  Objection to the form.

A.   Yeah.  If you rephrased it and said:  In the past, I would say yes.  The nine to 10 -- 10 years may not be important, but it's -- that's just a recollection.

Q.   (By Ms. Nussbaum)  Now, Mr. Wilcox, at the very bottom paragraph on -- on Page 5, it says:  ████

████████████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████

███████████████████████████

████████████████████████

█████████████████

Is that correct?

A.   Yes, other than it was a not-to-actively-solicit agreement.

Q.   Now, do you recall an agreement that USPI had with Tenet with respect to the solicitation of accountants?

MS. MOYÉ:  Object to the form.

Bill Wilcox  Confidential
September 24, 2024

A.   Yes.

Q.   (By Ms. Nussbaum)  And what was that agreement?

A.   I don't remember specifically.  I was not personally involved.

Q.   Okay.  Did USPI reach an agreement with Tenet that they would not actively recruit each other's accountants and that Tenet would not actively recruit accountants from USPI?

MS. MOYÉ:  Objection to the form.

A.   I believe so.

Q.   (By Ms. Nussbaum)  Okay.  Let's turn to Page 9 of 13.  Okay.  Let's -- and let's look at the page before the last few sentences, 8 of 13, ███████

███████████████████████████████████████████████

██████████████████████████████████████████████.  Do you see that?

MS. MOYÉ:  Are you referring to the last paragraph on Page 8?

MS. NUSSBAUM:  Yes.

Q.   (By Ms. Nussbaum)  It says:  ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



Is that accurate?

MS. MOYÉ:  Object to the form.

A.   Which part?

Q.   (By Ms. Nussbaum)

A.   Oh, the whole paragraph?

Q.   Yeah, whole paragraph.

A.   Yes.

Q.   So that's accurate; is that correct?

A.   That paragraph is accurate --

Q.   Yeah.

A.   -- yes.

Q.   Let's turn now to the next page, 9 of 13, and that says:

████████████████████████

A.   I believe so.

Q.   Okay.  And so when we were discussing that earlier, you said that you were not clear on the time frame.  Does the information in Exhibit 507, in which ██

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

refresh your recollection that by the time you learned of the Burke-Ward subpoenas, you were aware of the DOJ guidance on no-poach agreement?

MS. MOYÉ:  Object to the form.

A.   Yes, aware and that we had enacted protocols to address any concerns.

Q.   (By Ms. Nussbaum)  So when you and your colleagues were making the telephone calls to all of the proposed recipients of the Burke-Ward subpoenas, which included your competitors such as SCA and recruiters, you were aware at that time that the agreement, the no-solicit agreement between yourself and SCA, was an agreement that likely violated the DOJ no-poach guidance that Ms. Karrmann had sent you; is that right?

MS. MOYÉ:  Objection to the form.

A.   Well, we had terminated and put in the

you were asked about earlier today.  This one is PX298.
And unfortunately, I do not have another copy of that
one.  Maybe if you can give me your stack, I can help
you find the right documents.  We may need the court
reporter's stack as well.

A.   Got it.

Q.   Got it.  Thank you.

So this PX298 was marked at the deposition
of Sandi Karrmann, and this is an October 22nd, 2017
email exchange.  Do you see that?

A.   Yes.

Q.   And the top email exchange on this exhibit,
PX298, Sandi Karrmann writes to you and others:  FYI, we
really can't push these kinds of gentleman's agreements.
The DOJ has cracked down on these as a violation of
antitrust laws.

Do you see that, sir?

A.   Yes.

Q.   Was this the first time that you became aware
of any DOJ guidance on the subject of the type of
gentleman's agreements?

A.   Yes.

Q.   And in this email, Ms. Karrmann says:  The DOJ
has cracked down on these as a violation of antitrust
laws.

Is that correct, sir?

A.   Yes.

Q.   Did Ms. Karrmann say in this email that this was an illegal agreement?

A.   No.

Q.   Once you received this communication from Ms. Karrmann and became aware of the DOJ guidance, did USPI stop any no-solicit agreements that it had previously had with other companies?

A.   It's my understanding we stopped all of them.

Q.   And so is it your testimony, sir, that the agreement with SCA was in place between 2010 and 2017?

A.   Correct.

Q.   Now, the agreement with SCA, is that the only agreement you have personal knowledge of?

A.   "Personal knowledge," meaning?

Q.   You actually -- let me back up and rephrase it.

Did you have discussions with anyone outside of USPI about any agreement not to solicit other than SCA?

A.   No.

Q.   Did you ever have any discussions with Tenet about any no-solicit agreement?

A.   No.

Q.   Did you ever have any discussion with SCD about

any no-solicit agreement?

A.   No.

Q.   Did you ever have any discussion with Woodrum, the Zasa brothers' company --

A.   No.

Q.   -- about any agreement not to solicit?

A.   No.

Q.   Is it correct, sir, that your knowledge regarding any such agreements is as a result of communications you received from other USPI employees?

A.   And possibly counsel.

Q.   Okay.  Thank you.

Now I'm going to refer you back to the DOJ's interview notes.

THE WITNESS:  You need that back?

(Reporter nods.)

Q.   (By Ms. Moyé)  This is Exhibit 507.  These are the notes from your October 2, 2018 interview.  The court reporter has just given you a copy.  If you could, turn to Page 6 of 13.

A.   Okay.

Q.   In the first full paragraph on that page, I'm going to read it to you:

Bill Wilcox   Confidential
September 24, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL    )  MASTER DOCKET NUMBER
CENTER EMPLOYEE ANTITRUST   )  1:21-CV-00305
LITIGATION                  )
                            )  CONSOLIDATED AMENDED
                            )  CLASS ACTION COMPLAINT
                            )
                            )  JURY TRIAL DEMANDED


REPORTER'S CERTIFICATION OF THE REMOTE ORAL AND

VIDEOTAPED AND VIDEOCONFERENCED

DEPOSITION OF BILL WILCOX

September 24, 2024


I, Jamie K. Israelow, a Certified Shorthand Reporter duly commissioned and qualified in and for the State of Texas, Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that there came before me on the 24th day of September, 2024, located at Jones Day, located at 2727 North Harwood Street, Suite 600, in the city of Dallas, County of Dallas, State of Texas, the following named person, to-wit:  BILL WILCOX, who was duly sworn to testify the truth, the whole truth, and nothing but the truth of knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon examined upon oath and his examination reduced to typewriting under my supervision;

that Volume 1 of the deposition is a true record of the testimony given by the witness, and signature of the witness is to be before any notary public and returned within 30 days from date of receipt of transcript.

I further certify that pursuant to FRCP Rule 30(e) that the signature of the deponent:

___ was requested by the deponent or a party before the completion of the deposition and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor:

_X_ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

That the amount of time used by each party at the deposition is as follows:

Linda P. Nussbaum, Esq. - 6:47

Jonathan J. Ross, Esq. - 0:00

Veronica Moyé, Esq. - 0:16

Bill Wilcox  Confidential
September 24, 2024

Connor Brewer, Esq. - 0:00

Angelo M. Russo, Esq. - 0:00

Amy B. Manning, Esq. - 0:00

Andrew E. Talbot, Esq. - 0:00

Karen J. Sharp, Esq. - 0:00

Katharine O'Connor, Esq. - 0:00

Staci Holthus, Esq. - 0:00


That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Linda P. Nussbaum, Esq. and Jonathan J. Ross, Esq., Attorney for Class Plaintiffs.

Veronica Moyé, Esq. and Connor Brewer, Esq., Attorney for DEFENDANT UNITED SURGICAL PARTNERS INTERNATIONAL, INC..

Angelo M. Russo, Esq. and Amy B. Manning, Esq. and Andrew E. Talbot, Esq., Attorney for the SCA DEFENDANTS.

Karen J. Sharp, Esq., Attorney for Defendant ANDREW HAYEK.

Katharine O'Connor, Esq., Attorney for Defendant KENT THIRY.

Staci Holthus, Esq., Attorney for Defendant DAVITA, INC.

Bill Wilcox   Confidential
September 24, 2024

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of October, 2023.

_Jamie K. Israelow_
_____
Jamie K. Israelow, CSR, RMR, CRR
Texas CSR 3801
Expiration Date:  4/30/2025
US LEGAL SUPPORT, INC.
Firm Registration No. 122
16825 Northchase Drive, Suite 900
Houston, Texas  77060
713.653.7100

Charge for transcript and exhibits $ _____

To be paid by Class Plaintiffs / Linda P. Nussbaum, Esq.

SERVICE NO. 6616480-001

Docusign Envelope ID: 61F3C909-8C49-474B-9ABA-B08E3AC56EA8

CHANGES AND SIGNATURE

WITNESS NAME:  BILL WILCOX

DATE OF DEPOSITION:  September 24, 2024

          Please indicate changes on this sheet of paper, giving the change, page number, line number and reason for the change.  Please sign each page of changes.

PAGE/LINE          CORRECTION          REASON FOR CHANGE

30:16 - change "partcipating" to "participation"

30:21 - change "tax taxes" to "taxes"

35:18 - change "came" to "coming"

240:2 - add "of" between "one Plaintiffs'"

[each change above reflects transcription errors]

_____

_____

_____

_____

_____

_____

_____

_____

DocuSigned by:

_WHW_____

5811D18E47AE48B...

Subscribed and sworn before me

this 7th day of November, 2024.

_____        _____

# **Exhibit 16**

# Lane Declaration

# (Filed Under Seal)

Anthony Kilgore  Confidential
October 22, 2024

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--o0o--

```
                                  )
IN RE OUTPATIENT MEDICAL CENTER   ) No. 1:21-cv-00305
EMPLOYEE ANTITRUST LITIGATION     )
_____)
```

_____

CONFIDENTIAL

VIDEO DEPOSITION OF

ANTHONY KILGORE

October 22, 2024

_____

DEPOSITION OF ANTHONY KILGORE, produced as a witness, duly sworn by me at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on October 22, 2024, from 10:15 A.M. to 3:40 P.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand at:

2601 Olive Street, Suite 2100, Dallas, Texas

Anthony Kilgore   Confidential
October 22, 2024

APPEARANCES


JOSEPH SAVERI LAW FIRM, INC., 601 California Street, Suite 1000, San Francisco, CA 94108, represented by DAVID SEIDEL and WILLIAM CASTILLO GUARDADO, Attorneys at Law, appeared as counsel on behalf of the Plaintiffs.

Email: dseidel@saverilawfirm.com


KING & SPALDING, 500 West 2nd Street, Suite 1800, Austin, TX 78701, represented by JULIA BARRETT BATES, Attorney at Law, appeared via videoconference as counsel on behalf of USPI and the Witness.

Email: jbates@kslaw.com


MORGAN, LEWIS & BOCKIUS LLP, One Market, Spear Street Tower, San Francisco, CA 94105, represented by MOLLY MORIARTY LANE, Attorney at Law, appeared via videoconference as counsel on behalf of DaVita.

Email:  molly.lane@morganlewis.com

WILSON SONSINI GOODRICH & ROSATI,

1700 K Street NW, 5th Floor, Washington, DC 20006-3814,

represented by JORDANNE M. STEINER, Attorney at Law,

appeared via videoconference as counsel on behalf of

Andrew Hayek.

Email: jordanne.miller@wsgr.com

McGUIRE WOODS, 77 West Wacker Drive,

Suite 4100, Chicago, IL 60601-1818, represented by

ANGELO M. RUSSO and ANDREW E. TALBOT, Attorneys at Law,

appeared via videoconference as counsel on behalf of

Surgical Care Affiliates.

Email: arusso@mcguirewoods.com

McDERMOTT WILL & EMERY, 444 West Lake Street,

Chicago, IL 60606-0029, represented by

DANIEL R. CAMPBELL, Attorney at Law, appeared via

videoconference as counsel on behalf of Kent Thiry.

Email: dcampbell@mwe.com

ALSO PRESENT:

Erica Taylor, Videographer

Dan Acosta, Technician

Lauren Gallagher

Anthony Kilgore  Confidential
October 22, 2024

INDEX

                                                        PAGE

    Examination by MR. SEIDEL                              6

    Examination by MR. RUSSO                             173


EXHIBITS                                                PAGE


Exhibit PX537    CV                                        9


Exhibit PX538    Email to Tony Kilgore,                   44
                 3/22/16, re Tim Bogardus
                 pulling out


Exhibit PX539    Email to Tony Kilgore,                   50
                 10/24/17, re Riley Orr -
                 USPI candidate


Exhibit PX540    Standards of Legal and                   91
                 Regulatory Conduct


Exhibit PX541    Email to Chip Zahn, 1/27/18,            137
                 re annual merit


Exhibit PX542    Email to Tony Kilgore,                  163
                 2/13/18, re introduction

Anthony Kilgore  Confidential
October 22, 2024

THE VIDEOGRAPHER:  Good morning.  We're now on the record at 10:15 A.M., on October 22, 2024.

This is the video-recorded proceeding of witness Anthony Kilgore, taken by counsel for Plaintiff, in the matter regarding Outpatient Medical Center Employee Antitrust Litigation.

Filed in the United States District Court for the Northern District of Illinois, Eastern Division.

This proceeding is being held at McGuireWoods, located in Dallas, Texas.

My name is Erica Taylor, on behalf of U.S. Legal Support.  The court reporter is Brandon Combs, on behalf of U.S. Legal Support.

Would counsel please state their appearances for the record.

MR. SEIDEL:  Good morning.  David Seidel with the plaintiffs, from the Joseph Saveri Law Firm.

MR. CASTILLO GUARDADO:  Good morning.  William Castillo Guardado with the Joseph Saveri Law Firm, representing the plaintiffs.

MR. RUSSO:  Good morning.  Angelo Russo, McGuireWoods, on behalf of the SCA defendants and

the witness.

MR. TALBOT:  Andrew Talbot from McGuireWoods, on behalf of the SCA defendants and the witness.

MR. CAMPBELL:  Good morning.  Dan Campbell from McDermott, Will & Emery, on behalf of Defendant Kent Thiry.

MS. STEINER:  Good morning.  This is Jordanne Steiner from Wilson Sonsini Goodrich & Rosati, on behalf of Defendant Andrew Hayek.  I have with me my colleague Lauren Gallagher.

Ms. Gallagher should be noted as present for the deposition but should not be noted as appearing on behalf of Mr. Hayek.

MS. LANE:  Good morning.  Molly Lane from Morgan, Lewis & Bockius, appearing on behalf of DaVita.

MS. BATES:  Good morning.  Julia Bates with King & Spalding, appearing on behalf of USPI and Tenet.

ANTHONY KILGORE,
having been first duly sworn, testified as follows:

EXAMINATION

Q.   (BY MR. SEIDEL)  Good morning, Mr. Kilgore.  Can you please state your full name

And that's how I found out, was receiving a phone call. I was not in Deerfield but got the call that there were -- I believe they were FBI agents there.

Q. (BY MR. SEIDEL) Do you know what they were doing at the Deerfield office?

MR. RUSSO: Object to form.

THE WITNESS: They wanted to see Andrew. So my CFO was there on site, and called me, said, we've got agents -- I'm speculating agents. The government is here in the lobby, what do you want me to do?

And I said, well, get them out of the lobby and in a conference room and call counsel, Rich Sharff at the time.

Q. (BY MR. SEIDEL) What title did you have at SCA when that occurred?

A. I was CEO.

Q. Were you ever interviewed by the government in relation to that criminal case?

A. I was not.

Q. Are you aware that other people were interviewed by the government as part of that criminal case?

A. I would assume people were interviewed, but I have no idea.

Q.   And has anybody informed you of what they told the government during those interviews?

A.   No.

Q.   And what is your understanding of what the criminal case was about?

A.   So my understanding, cursory as it is, was that there seemed to be an accusation of not pursuing or hiring from certain companies, USPI being one of them, and potentially others.

Q.   Is that the extent of your understanding of what the criminal case was about?

A.   That's it.

Q.   And do you have any different understanding of what this case is about?

A.   I don't have a full, you know, kind of a full view here.

Q.   Nothing else to add about the civil case?

A.   That's correct.

Q.   When you were at SCA, did Andrew Hayek ever tell you whether he had one or more conversations with Kent Thiry, the CEO of DaVita, about recruiting?

A.   Not that I remember.

Q.   Did Mr. Hayek ever tell you that SCA and DaVita had reached an agreement not to hire each

other's employees?

A.   No.

Q.   Did Andrew Hayek ever tell you that SCA and DaVita had reached any agreement with respect to the hiring or recruiting of each other's employees?

A.   No.

Q.   Did you ever know about any agreement between SCA and DaVita that would limit the hiring or recruiting of each other's employees?

A.   No.

Q.   Were you ever aware when you were at SCA of any agreement between SCA and DaVita that would limit the hiring or recruiting of each other's employees?

A.   No.

Q.   Did you know that SCA told third-party recruiters not to recruit from DaVita?

MR. RUSSO:  Object to form.

THE WITNESS:  That's a very general, broad statement.  I could imagine there are situations where, for a given role, somebody said that's not what we want.  But so I don't -- I'll answer I don't know.

Q.   (BY MR. SEIDEL)  Do you have any precise memory of any instances when SCA told any

Anthony Kilgore   Confidential
October 22, 2024

third-party recruiters blanketly not to recruit from DaVita?

A.   No, I never did that.  I found DaVita employees to be often smart, well-trained, cultural fits.  Over time we did start to see that only some of the DaVita folks that came over were able to adapt to the different business model.

Because it's not a single speciality, there's some complexity that gets introduced, so we had a mixed bag of results with folks that came over.

Q.   Do you have any knowledge that Bridie Fanning instructed outside recruiters not to recruit from DaVita?

A.   I don't know.

Q.   You don't have any knowledge?

A.   I don't have any knowledge of that.

Q.   And I'm going to ask you the same set of questions with respect to USPI.

Did Andrew Hayek ever tell you whether he had one or more conversations with Bill Wilcox at USPI about recruiting each other's employees?

A.   No.

Q.   Did Andrew Hayek ever tell you that SCA and USPI had reached an agreement not to hire or

Anthony Kilgore    Confidential
October 22, 2024

recruit each other's employees?

A.    No.

Q.    Did Andrew Hayek ever tell you about any agreement between SCA and USPI that would limit hiring or recruiting from each other's employees?

A.    No.

Q.    Were you ever aware during your time at SCA, that SCA had reached an agreement with USPI not to recruit or hire each other's employees?

A.    No.

Q.    Were you ever aware that SCA and USPI had reached an agreement to limit hiring or recruiting in any way between SCA and USPI?

MR. RUSSO:    Object to form.

THE WITNESS:    No.

Q.    (BY MR. SEIDEL)   Were you ever aware that SCA told its recruiters not to hire or recruit from USPI?

A.    No.

Q.    Were you ever aware that Bridie Fanning told recruiters not to recruit from USPI?

A.    No.

Q.    Were you ever aware during your time at SCA of any agreement between SCA and USPI that would limit the hiring or recruiting from each other's

Anthony Kilgore   Confidential
October 22, 2024

is.

There's both -- I'm assuming from the question there's both an offensive and a defensive position, and so I don't want to give up my ability to bring in somebody.

Q.   (BY MR. SEIDEL)  You did say that previously.  I appreciate that.  I missed that.

Can you explain a little bit more why you wouldn't want to limit the pool of talent that you could recruit from?

A.   Well, if you're doing anything that's worth doing, talent is important, best talent usually wins at the end, given a long enough time horizon.

Q.   And how does having -- and how does not wanting to, you know, limit the pool of talent help with that?

A.   Well, if best talent resides in a pool that's off limits to you, then it is inherently off limits.  That's a problem.

MR. SEIDEL:  I think now is a good time to take a break.  Mr. Russo, you had requested a break?

MR. RUSSO:  If it's a good time for you, sure.

MR. SEIDEL:  Would you like to take a

break now or do you want to keep going?

THE WITNESS:  We can -- why don't we take a short break if this is a natural break point.

MR. SEIDEL:  Sounds good.  Sounds good, let's do that.  Why don't we take a 10-minute break.

THE VIDEOGRAPHER:  We're now off the record at 11:37 A.M.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record at 11:50 A.M.

Q.   (BY MR. SEIDEL)  When you transitioned to the CEO at SCA in around January of 2018, did Andrew Hayek tell you about any no-poach agreements that SCA had with any other companies?

A.   No.

Q.   When you transitioned to CEO, did Andrew Hayek tell you about any agreements that would limit the hiring or recruiting between SCA and any of its competitors?

MR. RUSSO:  Object to form.

THE WITNESS:  No.

Q.   (BY MR. SEIDEL)  So when you were CEO at SCA from 2018 to 2019, your understanding was that SCA did not have any no-poach agreements with any of its competitors?

Anthony Kilgore   Confidential
October 22, 2024

A.   We did not have any no-poach agreements with any competitors.

Q.   SCA did not have any no-poach agreements with any companies, or just its competitors?

A.   When I was CEO at SCA, we had no no-poach agreements with anyone.

Q.   When you were CEO at SCA, did SCA have any agreements with any companies that would limit the hiring or recruiting of employees?

MR. RUSSO:  Object to form.  Sorry, were you done, David?  Yeah, object to form.

MR. CAMPBELL:  Asked and answered.

THE WITNESS:  Same answer, no.

Q.   (BY MR. SEIDEL)  When you were CEO at SCA, did you believe there was any need for any no-poach agreements?

A.   Didn't even occur to me, so -- didn't occur to me.

Q.   Did SCA have any joint ventures with any of its competitors?

MR. RUSSO:  Object to form.

THE WITNESS:  We had many joint ventures. The entire business model was built on joint ventures.  Can you be more specific on what you're looking for?

Anthony Kilgore   Confidential
October 22, 2024

Q.   (BY MR. SEIDEL) Absolutely.  When you were referring to the many joint ventures that occurred in your business model, those were the joint ventures in which SCA owned the ambulatory surgery centers with doctors and other partners; correct?

A.   That is correct.

Q.   Other than that, did SCA have any joint ventures with any of its competitors, like USPI?

MR. RUSSO:  Object to form.

THE WITNESS:  There were -- competitors is a loose term.  Our primary business model was to have joint ventures with surgeons at its core.  That was -- just about every center that I'm aware of had surgeon investors.

We also had partners that were health systems.  We had partners, joint venture partners that were health plans that had bought in at certain places.

We also had a smaller number, but certainly existed, where physician groups that were primary care and/or speciality care were invested.  Some of those had a parent relationship with other organizations, HealthCare Partners to DaVita, for instance.

Anthony Kilgore  Confidential
October 22, 2024

                    CERTIFICATE OF REPORTER

                    I, BRANDON D. COMBS, a Certified Shorthand

Reporter, hereby certify that the witness in the

foregoing deposition was by me duly sworn to tell

the truth, the whole truth, and nothing but the

truth in the within-entitled cause;

                    That said deposition was taken in

shorthand by me, a disinterested person, at the time

and place therein stated, and that the testimony of

the said witness was thereafter reduced to

typewriting, by computer, under my direction and

supervision;

                    That before completion of the deposition,

review of the transcript was not requested.  If

requested, any changes made by the deponent (and

provided to the reporter) during the period allowed

are appended hereto.

                    I further certify that I am not of counsel

or attorney for either or any of the parties to the

said deposition, nor in any way interested in the

event of this cause, and that I am not related to

any of the parties thereto.

                    DATED: October 31, 2024

_____
BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

<u>**Anthony Kilgore October 22, 2024 Deposition**</u>
<u>**Errata Sheet**</u>

I, Anthony Kilgore, having read the foregoing deposition, Pages 1 through 179, taken October 22, 2024, do hereby certify said testimony is a true and accurate transcript, with the following changes:

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 3 | 11-12 | Change "appeared via videoconference as counsel on behalf of Surgical Care Affiliates" to "appeared as counsel on behalf of Anthony Kilgore, Surgical Care Affiliates, LLC, and SCAI Holdings, LLC" | Correct typographical error |
| 3 | 17-18 | Change "appeared via videoconference as counsel" to "appeared as counsel" | Correct typographical error |
| 10 | 10 | Change "So it's one" to "So that's one" | Correct typographical error |
| 10 | 16 | Change "same role, titles" to "same role, but the titles" | Correct typographical error |
| 12 | 1 | Change "I did" to "I do" | Clarify intended meaning |
| 15 | 24 | Change "There was" to "There were" | Clarify intended meaning |
| 17 | 11 | Change "held full P&O" to "I held full P&L" | Correct typographical error |
| 17 | 12-16 | Change "section of the company, section of the country geographically established. With a rollup of surgery center and surgical hospital assets that made up that portfolio." to "section of the country, geographically established, with a rollup of surgery center and surgical hospital assets that made up that portfolio." | Clarify intended meaning |
| 17 | 16 | Change "Responsible" to "I was responsible" | Clarify intended meaning |
| 18 | 13 | Change "Alaska, Montana." to "Alaska, and Montana." | Clarify intended meaning |
| 20 | 1 | Change "So varied" to "So that varied" | Correct typographical error |
| 21 | 1-2 | Change "Cabin Team, my team was Epic. Cabin Team was Andrew's direct reports, so think about it as" to "My team was Epic, and Cabin Team was Andrew's direct reports. So I think about it as" | Clarify intended meaning |

1

Docusign Envelope ID: 7DA90F51-0B82-42BB-8208-5568A4955ED8

| Page | Line(s) | Correction | Reason |
|------|---------|-----------|--------|
| 21 | 10 | Change "included Cabin" to "included the Cabin" | Clarify intended meaning |
| 21 | 14 | Change "technically Cabin" to "technically the Cabin" | Clarify intended meaning |
| 22 | 7-8 | Change "Also would have Brian Mathis, would often attend, as our strategy leader." to "Also, Brian Mathis would often attend, as our strategy leader." | Clarify intended meaning |
| 23 | 18-19 | Change "the final candidate that anybody -- anyone that my RVPs were going to hire" to "the final candidate that my RVPs were going to hire" | Clarify intended meaning |
| 24 | 4 | Change "best possible talent" to "the best possible talent" | Correct typographical error |
| 24-25 | 25-1 | Change "socialize a peer-level interview." to "socialize with a peer-level interviewee." | Clarify intended meaning |
| 26 | 7 | Change "workshops" to "workshopped" | Correct typographical error |
| 27 | 8 | Change "kind of determined" to "which kind of determined" | Clarify intended meaning |
| 27 | 18-20 | Change "Typical process is either have an external recruiter that you like and have a relationship with. Often best practice is" to "The typical process is to have an external recruiter that you like and have a relationship with, but often the best practice is" | Clarify intended meaning |
| 28 | 1-2 | Change "Get comfortable with selecting an external recruiter, at which point next step" to "You get comfortable with selecting an external recruiter, at which point the next step" | Correct typographical error |
| 28 | 4 | Change "what our hopes and dreams to" to "what our hopes and dreams are to" | Clarify intended meaning |
| 30 | 14 | Change "CLO" to "Cielo" | Correct typographical error |
| 30 | 16 | Change "pure play executive recruiter" to "pure executive recruiter" | Correct typographical error |
| 31 | 8 | Change "CLO" to "Cielo" | Correct typographical error |
| 32 | 9 | Change "Still" to "I still" | Correct typographical error |

2

| Page | Line(s) | Correction | Reason |
|------|---------|-----------|--------|
| 32 | 13 | Change "agreed" to "I agreed" | Correct typographical error |
| 32 | 14 | Change "First" to "I first" | Correct typographical error |
| 35 | 8-9 | Change "At SCA we did not have a -- what is a senior person" to "At SCA we did not have a strict definition of what is a senior person" | Clarify intended meaning |
| 37 | 24 | Change "I had strong input into the budget." to "I had input into the budget." | Correct typographical error |
| 38 | 16 | Change "needed to do things" to "I needed to do things" | Correct typographical error |
| 40 | 18 | Change "But wanted" to "But I wanted" | Correct typographical error |
| 49 | 1 | Change "SPI" to "USPI" | Correct typographical error |
| 62 | 10 | Change "not a" to "I'm not a" | Correct typographical error |
| 62 | 25 | Change "Have had success" to "I have had success" | Correct typographical error |
| 64 | 19 | Change "I'm sure others that" to "I'm sure there are others that" | Clarify intended meaning |
| 70 | 1-2 | Change "DaVita is not a competitor in the term, the way I understand you to be using it." to "DaVita is not a competitor in the way I understand you to be using the term." | Clarify intended meaning |
| 73 | 13 | Change "Dragolovic had" to "Dragolovic who had" | |
| 74 | 18-19 | Change "They were probably surgeon owners as well." to "There were probably surgeon owners as well." | Correct typographical error |
| 79 | 9 | Change "remember happening" to "remember it happening" | Correct typographical error |
| 89 | 2 | Change "it's not competitive" to "it's not competitively sensitive" | Clarify intended meaning |
| 89 | 25 | Change "termed" to "terminated" | Clarify intended meaning |

3

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 100 | 5-6 | Change "we're not actually talking about what an employee is going to be increased." to "we're not actually talking about what increase an employee is going to receive." | Clarify intended meaning |
| 111 | 11 | Delete "Yes." | Clarify intended meaning |
| 114 | 10 | Change "I don't remember a specific to merit pool." to "I don't remember an exchange specific to merit pool." | Clarify intended meaning |
| 116 | 12 | Change "So varied" to "So, it varied" | Clarify intended meaning |
| 117 | 24 | Change "through Cabin" to "through the Cabin" | Clarify intended meaning |
| 119 | 18 | Change "bonus pool" to "merit pool" | Correct typographical error |
| 124 | 12-13 | Change "promotionary tract" to "promotion track" | Correct typographical error |
| 127 | 10 | Change "So started to" to "So we started to" | Correct typographical error |
| 130 | 12 | Change "So that's where really have" to "So that's where we really have" | Correct typographical error |
| 134 | 11-12 | Change "We had the kind of Frankenstein morphs and structures to fit within their guidelines" to "We had to kind of Frankenstein morph our structures to fit within their guidelines" | Correct typographical error |
| 138 | 19 | Change "She officed out of our office" "She worked out of our office" | Correct typographical error |
| 143 | 16 | Change "a bit more stickler on" to "a bit more of a stickler on" | Correct typographical error |
| 146 | 7 | Change "don't have the full context" to "I don't have the full context" | Correct typographical error |
| 150 | 21 | Change "would be the" to "he would be the" | Correct typographical error |
| 152 | 22-23 | Change "it's being participating" to "it's participating" | Clarify intended meaning |
| 156 | 21-22 | Change "You want to be thoughtful about -- you don't want to" to "You want to be thoughtful.  You don't want to" | Correct typographical error |

Docusign Envelope ID: 7DA90F51-0B82-42BB-8208-5568A4955ED8

| Page | Line(s) | Correction | Reason |
|------|---------|------------|--------|
| 159 | 13 | Change "And so looked forward to setting something up." to "And said look forward to setting something up." | Correct typographical error |

**Signed by:**

*Tony Kilgore*

9642C162D9774FE...

Anthony Kilgore

5

# Exhibit 18

Lane Declaration


(Filed Under Seal)

**From:** Mosley, Shannon
**To:** McGarry, Shannon
**Sent:** 10/23/2017 6:33:48 PM
**Subject:** SCA

Shannon,
You can now recruit Administrators from SCA – Surgical Care Affiliates. This should help open up a larger pool.
Thanks,

Shannon Mosley |Vice President, Talent Acquisition
**United Surgical Partners International** | www.uspi.com
ph: 972-763-3820    fax: 972-692-8099



CONFIDENTIAL

USPI_CIV_000002591

# **Exhibit 19**

# Lane Declaration

# (Filed Under Seal)

**From:**   Mosley, Shannon
**To:**   Megan Fox (megan.fox@catapulthealthcare.com); Miles Freeman
**Sent:**   10/23/2017 6:32:56 PM
**Subject:**   SCA

Megan/Miles:
Please disregard the non-poaching agreement between USPI and SCA.   I give you permission to recruit out of SCA going forward.
Thanks,

Shannon Mosley |Vice President, Talent Acquisition
**United Surgical Partners International |** www.uspi.com
ph: 972-763-3820      fax: 972-692-8099



CONFIDENTIAL

USPI_CIV_000006432

# **Exhibit 20**

# Lane Declaration

# (Filed Under Seal)

| | |
|---|---|
| **From:** | Wilcox, Bill </O=UNITED SURGICAL PARTNERS/OU=UNITEDSURGICAL/CN=RECIPIENTS /CN=BWILCOX> |
| **To:** | Brodnax, Brett |
| **CC:** | Wilcox, Bill; Karrmann, Sandi |
| **Sent:** | 11/15/2014 9:41:31 AM |
| **Subject:** | Re: David Lewis Draft Offer Letter and Compensation Plan |

I had forgotten he did development work. I retract my comments. Thanks !

Sent from my iPhone

On Nov 15, 2014, at 8:52 AM, "Brodnax, Brett" <BBrodnax@uspi.com> wrote:

Thanks. It makes sense. He's done development related work before and is good at it. I've seen him in action. I want to make sure I understand what you believe his weaknesses are so we can address them?(Other than your point about being able to keep happy which is very true)

As to your point about a mentor, In the new org he'd end up working for Rob Finnegan which would be good. Also, he's right there with Andy who is good also.

BB

---

**From:** Wilcox, Bill
**To:** Brodnax, Brett
**Cc:** Karrmann, Sandi; Wilcox, Bill
**Sent:** Fri Nov 14 17:00:03 2014
**Subject:** Re: David Lewis Draft Offer Letter and Compensation Plan

I think he should get ███████ equivalent to others in similar position but on ████████ until we know he has skills for this position. We need to tell him we do not know which entity but should have a good idea around year end and will make them available as soon as possible. ███████████████████████ either way.
He is going to need a strong mentor in development if he is going to succeed. May also need some courses or other training. I'm glad he is getting a shot. He is hard to keep happy though. Push back if this does not make sense to you.

Sent from my iPhone

On Nov 14, 2014, at 5:51 PM, "Brodnax, Brett" <BBrodnax@uspi.com> wrote:

Bill, we're trying to put together an offer to keep David Lewis. He would replace Deann. We're all afraid we'll lose him if we don't offer him something different from what he's doing now and he's interested in joining development. With the uncertainty of if and when a new entity will be put together what would you suggest we do? He wasn't given ██████ as a sales person. Thanks

---

**From:** Karrmann, Sandi
**To:** Brodnax, Brett
**Sent:** Fri Nov 14 16:44:09 2014
**Subject:** Re: David Lewis Draft Offer Letter and Compensation Plan

I don't think Bill supports issuing options now - we decided to hold off on other grants we would normally have done with promotions until the new entity is established. We did not do others who have been promoted to VP or SVP jobs, or even the new RVP in Atlanta.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

USPI_CIV_000401250

Sandi

On Nov 14, 2014, at 2:25 PM, Brodnax, Brett <BBrodnax@uspi.com> wrote:

Thanks. I'd like to wait too but it could be months or never. sorry, who may want to wait until the new entity is established?

---

**From:** Karrmann, Sandi
**Sent:** Friday, November 14, 2014 2:19 PM
**To:** Brodnax, Brett
**Subject:** Re: David Lewis Draft Offer Letter and Compensation Plan

I could support ███ - I just hate committing before we know how we are going to approach newco equity, but agree we don't want to lose him. He may have to wait awhile though, until the new entity is established.

Sandi

On Nov 14, 2014, at 2:08 PM, Brodnax, Brett <BBrodnax@uspi.com> wrote:

He knows others have gotten equity and he's been here a long time. I think we need to include some options in his offer. We don't want to lose David. For someone at his level and tenure, ███ seems ███ Thoughts?

---

**From:** Karrmann, Sandi
**Sent:** Friday, November 14, 2014 2:04 PM
**To:** Brodnax, Brett
**Cc:** Spencer, Phil; Steen, Marc; Johnston, Andy
**Subject:** Re: David Lewis Draft Offer Letter and Compensation Plan

RVPs receive ████████████████████████ I'm just not sure we are ready to commit to a specific number of options right now given the impending changes. We need to rethink LTI in the future and I don't feel comfortable that we know enough to commit to an amount yet.

Sandi

On Nov 14, 2014, at 1:34 PM, Brodnax, Brett <BBrodnax@uspi.com> wrote:

Phil, I want to make sure I understand what you're saying. Is the comp schedule that Marc sent to us correct?

Marc, replace the bullet related to options with the standard one we use and plug in ████████ Shannon would have the language. Sandi, does that amount feel about right to you?

---

I'm fine with the base and development bonus.

Thanks
BB

**From:** Spencer, Phil
**Sent:** Friday, November 14, 2014 12:14 PM
**To:** Steen, Marc
**Cc:** Karrmann, Sandi; Brodnax, Brett; Johnston, Andy
**Subject:** Re: David Lewis Draft Offer Letter and Compensation Plan

One additional quick perspective here - he's earning ████████████ The ████████████ above that is if he hits on all 4 pain deals (████████████ max. I'd say it isn't likely...and that we keep in mind that ████████████ if he remains an employee period...

You could reduce exposure by splitting up the pain ████████████████████████████
████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY USPI_CIV_000401251

Otherwise- the plan is simply keeping him whole basically with his current comp.

Phil


On Nov 14, 2014, at 11:54 AM, Steen, Marc <msteen@uspi.com> wrote:

Brett and Andy,

Here is the letter and comp plan for David. I'm not sure how to phrase the stock option eligible bullet so please weigh in on the right way to phrase this. If I could get input today I can send this to David to review by the end of the day so he has the weekend and Monday and Tuesday to think about it, ask questions and give us an answer on Wednesday when Phil and Andy meet with him in person.

The two major questions that came up as part of the discussion are:



Existing Market Coverage
- Austin
- San Antonio
- Corpus Christi
- Arkansas

New Markets
- Iowa
- Other TBD

Other Responsibilities
- Pain Acquisitions
- Participate in team VMP objectives for existing markets including relocations, mergers and other tuck-ins.

---

**From:** Spencer, Phil
**Sent:** Friday, November 14, 2014 6:55 AM
**To:** Karrmann, Sandi
**Cc:** Steen, Marc
**Subject:** Re: David Lewis Draft Offer Letter and Compensation Plan

I'd recommend saying that he is option eligible then... I think it is a critical element to him in the position.

Phil

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

USPI_CIV_000401252

On Nov 13, 2014, at 11:39 PM, Karrmann, Sandi <skarrmann@uspi.com> wrote:

I am fine with this offer, except for one point - we are not in a position to grant any options right now, so I would delete this from the offer. We could consider this in the future, but not something we can promise right now.

Sandi

On Nov 13, 2014, at 3:24 PM, Spencer, Phil <phspencer@uspi.com> wrote:

Marc-

I agree with what is shown.  I'm happy to provide further detail on the variable comp (or total comp) as it pertains to him for anyone with further questions.

Phil

**From:** Steen, Marc
**Sent:** Thursday, November 13, 2014 11:12 AM
**To:** Karrmann, Sandi; Spencer, Phil
**Subject:** David Lewis Draft Offer Letter and Compensation Plan

Thanks.  I know it's a super busy week for you guys. Here is a draft offer letter as well and the first pass at regional coverage and other responsibilities.  I used Sudeep's so I don't know if ████████████████ If we grant him that ███████████████████████████████ (see comment below).

Copying Phil for concurrent review.

Existing Market Coverage
Austin
San Antonio
Corpus Christi
Arkansas

New Markets
Iowa
Other TBD

Other Responsibilities
Pain Acquisitions
Participate in team VMP objectives for existing markets including relocations, mergers and other tuck-ins.

**From:** Karrmann, Sandi
**Sent:** Wednesday, November 12, 2014 5:21 PM
**To:** Steen, Marc
**Subject:** RE: Sudeep's letter

Yes, it's been crazy.  I've printed out the emails/information – let me take a look at it tonight and see if I can swing by at some point tomorrow.  I have a meeting immediately following the board meeting, then am running to catch a flight.

**From:** Steen, Marc
**Sent:** Wednesday, November 12, 2014 12:05 PM
**To:** Karrmann, Sandi
**Subject:** RE: Sudeep's letter

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Thanks. Do you have time to review this with me tomorrow or Friday? I know it's board week so you are super swamped. I've got the responsibility and territory figured out. Just want to get the comp piece nailed down tomorrow and present to Brett. With the goal of giving David an offer letter on Friday.

**From:** Karrmann, Sandi
**Sent:** Tuesday, November 11, 2014 5:52 PM
**To:** Steen, Marc
**Subject:** Fwd: Sudeep's letter

Sorry - crazy day. Here you go.

Sandi

Begin forwarded message:

**From:** "Mosley, Shannon" <smosley@uspi.com>
**Date:** November 11, 2014 at 9:31:04 AM CST
**To:** "Karrmann, Sandi" <skarrmann@uspi.com>
**Subject: Sudeep's letter**


<David Lewis Comp Plan Development.xlsx>
<David Lewis VP Development Offer Letter DRAFT.docx>

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 21

Lane Declaration


(Filed Under Seal)

Message

| | |
|---|---|
| **From:** | Clemens, Peter [/O=SURGICALCARE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CLEMENP] |
| **Sent:** | 7/16/2014 10:18:55 AM |
| **To:** | Rucker, Michael [michael.rucker@scasurgery.com] |
| **Subject:** | RE: equity grant |

I just reviewed the model with Cindy. It is not completely up to date as I hoped. She's working on updating now and will then have the base case. Then, she will at a hypothetical case with the 5 additional grants you suggested. There are tabs that generate what you're after once its all input.

She's working to get something by the time of the call. Then we can look at the values that everyone holds.

**From:** Rucker, Michael
**Sent:** Wednesday, July 16, 2014 6:05 AM
**To:** Clemens, Peter
**Subject:** FW: equity grant

Pete,
Would you be able to develop a simple summary table of the equity currently held by GVPs and SVPs, as well as the additional equity I previously proposed for a small group?

It would be good to have in advance of this afternoon's call re: same.
Best,
Michael

...will share note below which I received yesterday from Sam with team as an anecdote/single but timely data point re: market concerning our leading TGS SVP candidate.

*"Michael,*
*I spoke with Thom and he is very positive. Unfortunately, we have to reschedule his VC with Jason, but are on top of that. He is very interested in SCA, and feels that it is a great opportunity and fit.*

*Four areas to consider:*
1. *Timing- Accelecare has been approached by a PE firm who has just bought their main competitor. They are planning on putting numbers to an offer next week. If that goes forward, Tom is likely looking at a 60 day window for deal to close (is that likely?). If it does not go forward, Tom needs to determine the time horizon for potential exit. If more than a few months, he will pull the plug.*
2. *Role- I vaguely mentioned the hospital role to plant the seed and indicated that, if the time horizon extends out, we may have to fill SVP CA with another candidate*
3. *Location- he ideally wants to stay in Seattle and is open to commuting to Pasadena a few days a week along with travel to centers*
4. *Compensation- he is currently at* ▮▮▮▮ *+ approx.* ▮▮▮▮ *(annually). The vast majority of his comp is in equity. On the first transaction, he brought in just over* ▮▮▮. *He maintains the same level of ownership/equity in this deal. If the new PE firm does the deal in the next month or two, his equity value is approximately* ▮▮. *If they hit proforma (3 years) is would be more like* ▮▮▮▮.

*Comp: I asked Thom about expectations and he said he is open to a variety of structures, but "ideally, over 3, 4 or 5 years, it would be in the same overall aggregate" of what he has at Accelecare. I would anticipate that we would bring him up on base a good chunk, and then a good chunk of equity. Thoughts? Can we get close?*

Confidential

## CTPartners
DESIGNED TO DELIVER

Samantha Carey
Partner, Healthcare Services & Private Equity
1166 Avenue of the Americas, #3
New York, NY 10036
D +1 212.588.3575
M +1 917.612.4093
www.ctnet.com
Bio: http://www.ctnet.com/scarey.aspx

---

**From:** Clark, Joe
**Sent:** Tuesday, June 24, 2014 4:03 PM
**To:** Rucker, Michael; Hayek, Andrew; Sharff, Rich; Clemens, Peter
**Subject:** Re: equity grant

I am supportive of these additional grants.
The only edit I have is that we might want to think about bumping Mathis ██████████████████ given that what he is leading on the payer front has the chance of being transformational


**Joe Clark**

Executive Vice President

Surgical Care Affiliates | www.scasurgery.com

205.545.2760 (o) | 205.913.9051 (c) | joe.clark@scasurgery.com

---

**From:** <Rucker>, Michael Rucker <Michael.Rucker@scasurgery.com>
**Date:** Friday, June 6, 2014 at 4:07 PM
**To:** Andrew Hayek <Andrew.Hayek@scasurgery.com>, "Sharff, Rich" <Rich.Sharff@scasurgery.com>, Pete Clemens <Peter.Clemens@scasurgery.com>, Joe Clark <joe.clark@scasurgery.com>
**Cc:** Michael Rucker <Michael.Rucker@scasurgery.com>
**Subject:** equity grant

Gents,
To follow up on our discussion earlier this week re: equity grants, I would like to recommend we make the following incremental equity grants at the same time as the upcoming neo equity grant.

- Christian Ellison - ██ worth of value in combined ██████ option grant
- Cory Roberts - ██ worth of value in combined ██████ option grant
- Ajay Chokshi - ██ worth of value in combined ██████ option grant
- Winborne Macphail - ██ worth of value in combined ██████ option grant
- Brian Mathis - ██ worth of value in combined ██████ option grant

I would ask that you reflect on this recommendation in the context of the data included in the attached file. I believe these grants would be meaningful in our efforts to reward and retain these high performers over the mid- to long-run.
Best,
Michael

Confidential

SCA000048816

**Michael A. Rucker**
EVP & Chief Operating Officer
Surgical Care Affiliates | www.scasurgery.com
520 Lake Cook Road, Suite 250 | Deerfield, IL 60015
847.236.0927 (O) | 202.669.6822 (M)
Michael.Rucker@scasurgery.com

Confidential                                                                                                    SCA000048817

# Exhibit 22

Lane Declaration

(Filed Under Seal)

Message

---

**From**: Buono, Tim [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=90BBDFE737464C2BB3168EE6E3E518D6-BUONO TIM ()

**Sent**: 8/15/2018 7:58:55 AM

**To**: Cinnick, Warren [warren.cinnick@scasurgery.com]

**CC**: Dunn, Julie [julie.dunn@scasurgery.com]

**Subject**: RE: Could chat now - 847-494-6678 - RE: Development Position - CONFIDENTIAL - Adam Brazitis, Candidate

Perfect — will call you in 2 minutes

**Timothy M. Buono**
Senior Vice President, Development
100 First Stamford Place, Suite 327 | Stamford, CT 06902
Surgical Care Affiliates| www.scasurgery.com
203-487-8144 (o) | 203-505-3097 (m)
Tim.Buono@scasurgery.com

---

**From:** Cinnick, Warren
**Sent:** Wednesday, August 15, 2018 8:58 AM
**To:** Buono, Tim <Tim.Buono@scasurgery.com>
**Subject:** Could chat now - 847-494-6678 - RE: Development Position - CONFIDENTIAL - Adam Brazitis, Candidate
**Importance:** High

Good morning Tim … could talk now if you are open … call the cell when you are free … **847-494-6678**

**Warren J. Cinnick**
*Vice President — Human Resources*
872.267.3813 (O) | 847.494.6678 (C) | warren.cinnick@scasurgery.com

Surgical Care Affiliates | www.scasurgery.com
Clinical Quality · Integrity · Service Excellence · Teamwork · Accountability · Continuous Improvement

---

**From:** Buono, Tim
**Sent:** Wednesday, August 15, 2018 6:18 AM
**To:** Cinnick, Warren <Warren.Cinnick@scasurgery.com>
**Cc:** Pribyl, Barbie <Barbie.Pribyl@scasurgery.com>; Dunn, Julie <Julie.Dunn@scasurgery.com>
**Subject:** Re: Development Position - CONFIDENTIAL - Adam Brazitis, Candidate

Any chance we could speak today?  I am relatively open.

Sent from my iPhone

On Aug 15, 2018, at 1:47 AM, Cinnick, Warren <Warren.Cinnick@scasurgery.com> wrote:

> Tim … am ready with some guidance to dialogue about Adam B … can you make time on Friday this
> week for a call?
>
> W
>
>
> **Warren J. Cinnick**
> *Vice President — Human Resources*

---

CONFIDENTIAL SCA000525299

872.267.3813 (O) | 847.494.6678 (C) | warren.cinnick@scasurgery.com

Surgical Care Affiliates | www.scasurgery.com
Clinical Quality · Integrity · Service Excellence · Teamwork · Accountability · Continuous Improvement

**From:** Zaideman, Kevin
**Sent:** Monday, August 13, 2018 5:04 PM
**To:** Cinnick, Warren <Warren.Cinnick@scasurgery.com>
**Subject:** RE: Development Position - CONFIDENTIAL - Adam Brazitis, Candidate

Warren,

See the attached deck with 2 slides:

#1 – Comp Analysis and Recommendation for Sr. Director Development role applied to this specific candidate
#2 – Comp Analysis and Recommendation for VP Development role applied to this specific candidate

Perhaps there is an opportunity to proceed in a similar fashion, where Adam would be a high potential Senior Director Development on the VP Development "bench" with a short runway into the VP role (12-24 months out).

Please review and let me know your thoughts.  I can also schedule time with Tim to discuss if necessary.  Please advise.  Thanks!

-KZ

**From:** Buono, Tim
**Sent:** Monday, August 13, 2018 9:49 AM
**To:** Cinnick, Warren <Warren.Cinnick@scasurgery.com>
**Cc:** Langston, Mark <Mark.Langston@scasurgery.com>; Zaideman, Kevin <Kevin.Zaideman@scasurgery.com>
**Subject:** RE: Development Position - CONFIDENTIAL - Adam Brazitis, Candidate

Warren – Just wanted to follow up on Adam.  Please let me know your thoughts, or if we need to have a call.  Thanks, Tim

**Timothy M. Buono**
Senior Vice President, Development
100 First Stamford Place, Suite 327 | Stamford, CT 06902
Surgical Care Affiliates | www.scasurgery.com
203-487-8144 (o) | 203-505-3097 (m)
Tim.Buono@scasurgery.com

**From:** Cinnick, Warren
**Sent:** Wednesday, August 08, 2018 12:27 PM
**To:** Buono, Tim <Tim.Buono@scasurgery.com>
**Cc:** Langston, Mark <Mark.Langston@scasurgery.com>; Zaideman, Kevin <Kevin.Zaideman@scasurgery.com>
**Subject:** FW: Development Position - CONFIDENTIAL - Adam Brazitis, Candidate

CONFIDENTIAL

SCA000525300

Tim … will make time for you and I, or you and I and Mark L, as you see fit …

Can you send me the CV, please, for Adam Brazitis?

I will get Kevin Zaideman (Sr. Mgr., Compensation) started on pulling the marketplace data (internal and external) for a VP-Development and a Senior Director-Development located in the NYC area (and nationally). This way, we can understand that guidance as we think this through. Also, Kevin will provide a sense of "internal equity" in the information he gathers for us.

Keep the candidate "warm", and let him know we are considering some options. Share no $, equity, or title info with him until we have a plan, please.

W


**Warren J. Cinnick**
*Vice President — Human Resources*
872.267.3813 (O) | 847.494.6678 (C) | warren.cinnick@scasurgery.com

Surgical Care Affiliates | www.scasurgery.com
Clinical Quality · Integrity · Service Excellence · Teamwork · Accountability · Continuous Improvement

**From:** Zulla, Caitlin
**Sent:** Wednesday, August 8, 2018 11:00 AM
**To:** Buono, Tim <Tim.Buono@scasurgery.com>; Kilgore, Tony <Tony.Kilgore@scasurgery.com>; Strauss, Jason <Jason.Strauss@scasurgery.com>; Langston, Mark <Mark.Langston@scasurgery.com>
**Subject:** RE: Development Position - CONFIDENTIAL

Thanks all – agreed that connecting with Warren to discuss is the right next step. Please let me know if I can help at all…

Caitlin

**Caitlin Zulla**
Chief Financial Officer & Chief Administrative Officer
Surgical Care Affiliates (SCA)
510 Lake Cook Road, Suite 400 | Deerfield, IL 60015
201.679.0914(c) | Caitlin.Zulla@scasurgery.com


**From:** Buono, Tim
**Sent:** Wednesday, August 8, 2018 11:00 AM
**To:** Kilgore, Tony <Tony.Kilgore@scasurgery.com>; Strauss, Jason <Jason.Strauss@scasurgery.com>; Zulla, Caitlin <Caitlin.Zulla@scasurgery.com>; Langston, Mark <Mark.Langston@scasurgery.com>
**Subject:** RE: Development Position - CONFIDENTIAL

Happy to do so.

Mark – let me know if you want to be included in the discussion.

Thanks, Tim

**Timothy M. Buono**
Senior Vice President, Development

CONFIDENTIAL

SCA000525301

100 First Stamford Place, Suite 327 | Stamford, CT 06902
Surgical Care Affiliates | www.scasurgery.com
203-487-8144 (o) | 203-505-3097 (m)
Tim.Buono@scasurgery.com

**From:** Kilgore, Tony
**Sent:** Wednesday, August 08, 2018 11:58 AM
**To:** Buono, Tim <Tim.Buono@scasurgery.com>; Strauss, Jason <Jason.Strauss@scasurgery.com>; Zulla, Caitlin <Caitlin.Zulla@scasurgery.com>; Langston, Mark <Mark.Langston@scasurgery.com>
**Subject:** RE: Development Position - CONFIDENTIAL

Tim,

Thanks for laying this out so thoughtfully. I have some thoughts but before answering, would you have a conversation with Warren and update the team on his perspective as well?

Thanks
TK

**Tony Kilgore**
Chief Executive Officer
Surgical Care Affiliates | www.scasurgery.com
847.772.6227 | tony.kilgore@scasurgery.com

**From:** Buono, Tim
**Sent:** Wednesday, August 08, 2018 10:45 AM
**To:** Kilgore, Tony <Tony.Kilgore@scasurgery.com>; Strauss, Jason <Jason.Strauss@scasurgery.com>; Zulla, Caitlin <Caitlin.Zulla@scasurgery.com>; Langston, Mark <Mark.Langston@scasurgery.com>
**Subject:** Development Position - CONFIDENTIAL

Tony/Jason/Caitlin/Mark:

I am in the process of trying to finalize the hiring of a Senior Director, Development who will support my enhanced mandate (multi-sites, specialty practices, banker/brokers, etc.). We have identified a solid candidate (Adam Brazitis – CV attached). I have spent a great deal of time with him, he has been vetted by Jason, Mark, Neil and Walker, and comes highly recommended by Erika (who worked with him at Morgan Stanley). In addition, Adam is located in CT and the proximity will make things very productive from my (selfish) perspective.

Adam is very interested in the position, but the challenge with landing him is his current compensation with Aetna's corporate development/strategy team. He is a Managing Director with a base of ███, bonus of ███ and ███ of annual equity grants. We have offered him ███████ bonus (consistent with Sr. Director), and ███ equity in March (again, consistent with Sr. Director). We have also included (i) a ███ signing bonus and (ii) ████████ to soften the blow of the cut in base. However, he is also walking from ███ in equity value which vests in December, 2018, and is looking for something additional to account for that loss.

We could bring him in as a VP now, which would solve the issue easily, but strongly believe it (a) could cause some negative ripples through the existing team, and (b) creates a better incentive for him to earn his next step quickly. Given our belief in his abilities, and the substantial amount of potential growth in what will be his areas of focus, we see him becoming a VP by the end of 2019, and have given him that objective.

SCA000525302

Given the lack of flexibility on the equity front, I believe the options are as follows:

1. Tell him this is the best we can do – which has a meaningful chance of failing, or creating a less than optimal starting point.
2. Increase the starting bonus to ███.
3. Agree to guarantee his 2018 bonus at ██████████ – a guarantee of ██████ vs. a discretionary ██████.
4. Raise his base beyond ██████ – not sure this is the right move, as it would make him more of an outlier within SCA Sr Directors, and lessen the "bump" assuming he gets to VP.

I have spoken with Mark at length, and my recommendation would be to either increase the signing bonus (#2) or guarantee his 2018 bonus (#3) – whichever is easier from an internal perspective.

I am beginning to get my arms around the multi-sites, specialty practices and brokers, leading some non-ASC deals, and am get spread too thin very quickly. The success of this effort will depend upon my ability to be in the market/field, which requires the support of someone who will be able to operate and support at Adam's level – to keep processes moving and to begin taking responsibility for deals (hopefully relatively quickly). In terms of growing this team, my thought is to add an Associate in 2019, but anything further would be tied to specific, incremental targets.

Please let me know your thoughts, or whether we ought to discuss live.

Thank you,

Tim

**Timothy M. Buono**
Senior Vice President, Development
100 First Stamford Place, Suite 327 | Stamford, CT 06902
Surgical Care Affiliates | www.scasurgery.com
203-487-8144 (o) | 203-505-3097 (m)
Tim.Buono@scasurgery.com

CONFIDENTIAL

SCA000525303